**Exhibit E**

1090
STEVE W. BERMAN
Associate Counsel
Washington Bar #12536
SEAN R. MATT
Associate Counsel
Washington Bar #21972
HAGENS BERMAN LLP
1301 Fifth Ave, Ste. 2900
Seattle, WA. 98101
(206) 623-7292
BRIAN SANDOVAL
Nevada Attorney General
L. TIMOTHY TERRY
Chief Deputy Attorney General
Nevada Bar #2341
198 N. Carson Street
Carson City, NV 897031
(775) 684-1185

**IN THE SECOND JUDICIAL DISTRICT COURT**

**IN AND FOR THE COUNTY OF WASHOE, STATE OF NEVADA**

| | |
|---|---|
| STATE OF NEVADA, | ) |
| Plaintiff, | ) |
| vs. | )  Case No. CV 02-00260 |
| | ) |
| ABBOTT LABORATORIES, INC.;  BAXTER | )  Dept. No. 8 |
| INTERNATIONAL INC.; BAXTER HEALTH- | ) |
| CARE CORPORATION; BRISTOL-MYERS | ) |
| SQUIBB COMPANY; ONCOLOGY | ) |
| THERAPEUTICS NETWORK CORP.; | ) |
| APOTHECON, INC.; DEY, INC.; GLAXO- | ) |
| SMITHKLINE P.L.C.; SMITHKLINE BEECHAM | ) |
| CORPORATION; GLAXO WELLCOME, INC.; | ) |
| PHARMACIA CORPORATION; PHARMACIA | ) |
| & UPJOHN, INC.; and TAP PHARMACEUTICAL | ) |
| PRODUCTS, INC., and DOES 1 through 100 | ) |
| | ) |
| Defendants. | ) |

**FIRST AMENDED COMPLAINT**

*Attorney General's Office*
*Medicaid Fraud Control Unit*
*198 N. Carson Street*
*Carson City, NV 89701*

-1-

# TABLE OF CONTENTS

**PAGE**

I.     INTRODUCTION ...........................................................................................1

    A.    Defendants' Unlawful Scheme ...........................................................1

    B.    The Damages Caused By Defendants' Illegal Conduct..........................3

        1.    Damages to the State of Nevada .............................................3

        2.    Damages to Patients ..............................................................3

    C.    The Objectives of This Action ............................................................4

II.    PARTIES .....................................................................................................4

    A.    Plaintiff ...........................................................................................4

    B.    Defendants .......................................................................................5

        1.    Abbott ..................................................................................5

        2.    Baxter ..................................................................................5

        3.    The BMS Group (Bristol-Myers, Oncology Therapeutics Network, Apothecon)................................................................6

        4.    Dey......................................................................................7

        5.    The GSK Group (GlaxoSmithKline, SmithKline Beecham, Glaxo Wellcome)..................................................................7

        6.    The Pharmacia Group (Pharmacia and Pharmacia & Upjohn)....................8

        7.    TAP .....................................................................................9

III.   VENUE AND JURISDICTION ....................................................................9

IV.   DEFINITIONS............................................................................................10

V.    PRESCRIPTION DRUG SPENDING IN THE UNITED STATES HAS INCREASED DRAMATICALLY, DISPROPORTIONATELY IMPACTING THE POOR AND ELDERLY ...........................................12

    A.    Increases in Prescription Drug Costs Generally ..................................12

    B.    Impacts on Medicaid Programs .........................................................12

    C.    Impacts on the Medicare Program and the Elderly................................13

VI.   THE PRESCRIPTION DRUG MARKET.....................................................14

- i -

A.      Drug Classifications (Brand Name and Generic) ................................... 14

B.      The Distribution Channel ................................................................... 15

     1.      Wholesalers ................................................................................. 15

     2.      Retail pharmacies ....................................................................... 15

     3.      Physicians and others ................................................................. 17

VII.    GOVERNMENT REIMBURSEMENT SYSTEMS FOR
PRESCRIPTION DRUGS ........................................................................ 17

A.      The Medicare Insurance Program .................................................... 17

B.      The Medicaid Insurance Program .................................................... 19

     1.      Eligibility ................................................................................... 20

     2.      Medicaid prescription drug coverage and payment policies ..................... 21

VIII.   AWP PLAYS A CENTRAL ROLE IN ALL PRESCRIPTION
DRUG REIMBURSEMENT SYSTEMS, AND THE TRUTHFUL
REPORTING OF AWPS IS ESSENTIAL TO THE INTEGRITY
OF THE MARKETPLACE ........................................................................ 21

IX.     THE AWP INFLATION SCHEME ............................................................. 25

A.      General Outline Of The Scheme For Brand Name Drugs ..................... 26

     1.      Artificially Inflating AWPs ......................................................... 26

     2.      Improper Use of Free Samples ................................................... 27

     3.      Other Hidden and Improper Inducements and Price Reductions ............... 27

B.      General Outline of the AWP Inflation Scheme for Generic Drugs ....... 28

C.      How The AWP Inflation Scheme Impacts Many Private
Reimbursement Systems Through PBMs ......................................... 34

D.      Congressional And Other Federal Investigations and Actions ............. 36

E.      Examples Of Specific AWP Inflation By Each Defendant ................... 38

     1.      Abbott ....................................................................................... 38

         a.      Abbott's understanding of AWP and intentional
manipulation thereof ........................................................ 40

         b.      Abbott has been the target of multiple government
investigations .................................................................. 57

     2.      Baxter ....................................................................................... 59

- ii -

a.    Baxter's understanding of AWP and intentional
      manipulation thereof ..................................................................61

b.    Baxter provided other improper incentives.................................68

c.    Baxter has been the target of multiple government
      investigations ..................................................................................69

3.  The BMS Group (Bristol-Myers, OTN and Apothecon) ............................70

a.    The BMS Group's understanding of AWP and
      intentional manipulation thereof .......................................................72

b.    The BMS Group provided other improper incentives ...................75

c.    The BMS Group has been the target of multiple
      government investigations .................................................................75

4.  Dey...............................................................................................................77

a.    Dey's understanding of AWP and intentional
      manipulation thereof .........................................................................79

b.    Dey provided other improper incentives..........................................83

c.    Dey has been the target of multiple government
      investigations ....................................................................................84

d.    Dey has concealed its AWP manipulation.......................................86

5.  The GSK Group (GlaxoSmithKline, SmithKline Beecham,
    Glaxo Wellcome)..........................................................................................86

a.    GSK's understanding of AWP and intentional
      manipulation thereof .........................................................................89

      (1)    Glaxo's Zofran® ...................................................................90

      (2)    SKB's Kytril ........................................................................95

      (3)    General Counsel Correspondence Between
             Glaxo and SKB ....................................................................96

      (4)    Additional AWP manipulation ...........................................98

b.    GSK provided other improper incentives .......................................99

c.    The GSK Group has been the target of multiple
      government investigations ...............................................................100

6.  The Pharmacia Group (Pharmacia and P&U)............................................101

a.    Pharmacia's understanding of AWP and intentional
      manipulation thereof .......................................................................102

- iii -

| | | b. | The Pharmacia Group provided other improper incentives.........117 |
| | | c. | The Pharmacia Group has been the target of multiple government investigations ...........................................................118 |
| | 7. | TAP | ...................................................................................120 |
| | | a. | TAP's understanding of AWP and intentional manipulation thereof ...................................................120 |
| | | b. | TAP provided other improper incentives....................................121 |
| | | c. | TAP has been the target of multiple government investigations ...............................................................122 |
| | | d. | TAP concealed its AWP manipulation .........................................124 |

X.     DEFENDANTS' CONCEALMENT OF THE TRUTH AND TOLLING OF STATUTES OF LIMITATION.................................................................125

XI.     DIRECT DAMAGE SUSTAINED BY THE STATE OF NEVADA, PATIENTS AND THIRD-PARTY PAYORS.................................................127

XII.    CLAIMS FOR RELIEF .........................................................................129

       COUNT I
       DECEPTIVE TRADE PRACTICES (VIOLATIONS OF
       NRS 598.0903, *ET SEQ.*)
       CLAIM FOR DAMAGES CAUSED TO NEVADA RESIDENTS .........................129

       COUNT II
       DECEPTIVE TRADE PRACTICES DIRECTED AT ELDERLY
       NEVADA RESIDENTS (VIOLATIONS OF NRS 598.0973)
       CLAIM FOR CIVIL PENALTIES AND INJUNCTIVE RELIEF ..........................131

       COUNT III
       DECEPTIVE TRADE PRACTICES (VIOLATIONS OF
       NRS 598.0973, *ET SEQ.*)
       CLAIM FOR CIVIL PENALTIES, INJUNCTIVE RELIEF, AND
       RESTITUTION FOR THE STATE OF NEVADA....................................................133

       COUNT IV
       RACKETEERING (VIOLATIONS OF NRS 207.400, *ET. SEQ.*)
       CLAIM FOR TREBLE DAMAGES TO STATE OF NEVADA
       AND CIVIL FORFEITURE.................................................................................136

       COUNT V
       MEDICAID FRAUD (VIOLATIONS OF NRS 422.540, *ET. SEQ.*)
       CLAIM FOR COST RECOVERY AND CIVIL PENALTIES ................................149

       COUNT VI
       FALSE CLAIMS (VIOLATIONS OF NRS 357, *ET. SEQ.*)
       CLAIM FOR COST RECOVERY AND CIVIL PENALTIES ................................151

COUNT VII
    PUNITIVE DAMAGES CLAIM BROUGHT ON BEHALF OF
    THE STATE OF NEVADA ........................................................................... 153

XIII.  DEMAND FOR JURY TRIAL ....................................................................... 153

1534.13 0051 BSC.DOC

## I.   INTRODUCTION

1.      The State of Nevada, through Attorney General Brian Sandoval, brings this action for monetary damages, civil penalties, declaratory and injunctive relief, restitution, disgorgement of profits and punitive damages on behalf of the State of Nevada, and restitution on behalf of persons residing in Nevada who have paid inflated charges for medications as a direct result of the defendants' implementation of the Average Wholesale Price Inflation Scheme detailed below.

2.      Each of the defendants is or has been engaged in the business of manufacturing, marketing and selling prescription pharmaceuticals throughout the United States, including Nevada.  The principal payors for such prescription pharmaceuticals are federal and/or state governments (under, respectively, the Medicare and Medicaid Programs), private insurers and self-insured employers (Third-Party Payors), and private individuals (Patients).  Patients include those without prescription drug insurance coverage (including elderly patients who make payments for drugs that are not covered under the Medicare program) and those who make co-payments under a Third-Party Payor plan or under Medicare Part B.

### A.   Defendants' Unlawful Scheme

3.      Private and public drug reimbursement systems, including private insurance companies, Medicare, and Medicaid, reimburse physicians and pharmacies for hundreds of prescription drugs based upon the Average Wholesale Price ("AWP"), as published and reported by third-party publications such as *First DataBank*, *Red Book*, *Blue Book*, or *Medispan* (the "Publishers").

4.      AWPs are not independently determined by the Publishers.  Rather, as part of the AWP Inflation Scheme described in this Amended Complaint, pharmaceutical companies "self-report" the AWP to Publishers, who then publish the purported AWP exactly as provided to them by the pharmaceutical manufacturers.

- 1 -

5.      As extensive government investigations have recently revealed, numerous pharmaceutical manufacturers (including each of the defendants named herein) have engaged in a scheme (the "AWP Inflation Scheme") involving the fraudulent reporting of fictitious AWPs for certain prescription pharmaceuticals. More specifically, defendants have reported fictitious and fraudulent AWPs that, in many instances, greatly exceeded the average of the wholesale prices based upon a good faith and reasonable estimate utilizing the pricing and transaction information available to defendants in conducting their ordinary business affairs. Thus, the defendant's AWPs for these drugs bear little or no relationship to any purchase price at which a provider or pharmacy is able to procure these drugs.

6.      Because prescription drugs are priced based on the published AWPs within the various reimbursement systems, defendants inflate AWP reimbursement rates to enable providers and others to make secret profits through overcharges to patients, their insurers and other end payors, including Medicaid. This, in turn, motivates the providers to sell and administer the drugs with the most inflated AWPs, resulting in increased market share and profit for the defendants and inflated payments for drugs by health plans (Medicare, Medicaid, and other Third-Party Payors including insurers) and individual Patients (through co-pays or direct payments).

7.      In some cases, as an integral part of the scheme, utilize chargebacks, credits, rebates, hidden price discounts and/or other unlawful financial inducements, including free samples, that are not included in the AWPs reported by defendants, which consequently further reduce the provider's cost while increase the provider's spread and their incentive to prescribe a particular defendant's product.

8.      Thus, in a perversion of the type of competitive behavior expected in a market not subject to illegal manipulation, defendants often promote their drugs not based on lower prices, but by the use of reimbursement rates based on a fictitious and inflated AWP that allows

- 2 -

purchasers and intermediaries to make inflated profits – and defendants to increase their market share – at the expense of those who ultimately pay for the drugs at issue.

**B.     The Damages Caused By Defendants' Illegal Conduct**

9.     The intended and foreseeable consequences of defendants' unlawful conduct are several and far reaching, including but not limited to increased drug costs to the State of Nevada and its agencies, and increased drug costs to Patients who are Nevada residents.

**1.     Damages to the State of Nevada**

10.     One of the foreseeable and intended consequences of defendants' conduct has been to unjustly enrich the defendants at the expense of Nevada's health care system, the state health care authority, and ultimately, all Nevada residents and taxpayers.

11.     In particular, the AWP Inflation Scheme has cost the State of Nevada millions of dollars in excess Medicaid payments made for medications as a direct result of defendants' unlawful actions.

12.     In addition, the AWP Inflation Scheme has cost the State of Nevada millions of dollars in excess drug costs for the public employees for whom it provides health care.

13.     Finally, numerous state agencies purchase medications at illegally inflated prices based on the AWP Inflation Scheme.

14.     The State seeks to recover these costs as actual damages and/or restitution in this case.

**2.     Damages to Patients**

15.     As further intended and foreseeable effects of the defendants' AWP Inflation Scheme, many Patients residing in Nevada also suffered losses.

16.     The general public, who must make co-payments for drugs based upon these inflated AWP prices, suffered immense damages. A major group of consumers adversely impacted by this practice are the elderly, who make co-payments as part of Medicare. Other harmed consumers include those Nevada citizens who make drug co-payments under third-party

- 3 -

health insurance contracts.  And other harmed consumers are all payors, including insurance companies, unions and others who purchase drugs based upon AWP.

17.      Through its *parens patriae* and statutory powers, the State of Nevada also seeks restitution of these losses in this case.

**C.     The Objectives of This Action**

18.      In this action, the Attorney General seeks to secure for the people of the State of Nevada a fair and open market, free from unfair or deceptive acts or practices, and to enable Patients in this State to better shoulder the financial burden of necessary medications.

19.      In addition, the Attorney General brings this action to return to the State and its resident Patients the increased medication costs caused by defendants' wrongful conduct and to disgorge defendants' excessive profits from the AWP Inflation Scheme accomplished through violations of state law.

## II.     PARTIES

**A.     Plaintiff**

20.      This action is brought for and on behalf of the State of Nevada and damaged persons and entities within the State of Nevada, by Brian Sandoval, Attorney General of the State of Nevada, pursuant to, *inter alia*, the provisions of the Nevada Deceptive Trade Practice Act, NRS 598.0903 *et seq.*, Nevada's Civil RICO statute, NRS 207.470 *et seq.*, Nevada's Medicaid Fraud Statutes, NRS 422.540-.580, the Nevada False Claims Act NRS 357.010 *et seq.*, and the common law and statutory authority of the Attorney General to represent the State of Nevada and its residents.

- 4 -

**B.    Defendants**

21.    The acts charged in this Amended Complaint as having been done by the Defendants were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of the defendants' business or affairs.

22.    At all times relevant hereto, each of the defendants transacted business in the State of Nevada, including but not limited to, selling and distributing products in the State.

23.    The true names and capacities, whether individual, corporate, associate, or otherwise, of defendants named herein as Does 1 – 100 are unknown to plaintiff, who therefore sues such defendants by such fictitious names. Each of the defendants designated herein as a Doe Defendant is legally responsible in some manner for the unlawful acts referred to herein. Plaintiff will seek leave of Court to amend this Complaint to reflect the true names and capacities of the defendants designated herein as Does when such identities become known. Collectively, these companies are referred to as "defendants."

**1.    Abbott**

24.    Defendant Abbott Laboratories, Inc. ("Abbott") is an Illinois corporation with its principal place of business at 100 Abbott Park Road, Abbott Park, Illinois. Abbott is a diversified health care company that discovers, develops, manufactures, and markets health care products and pharmaceuticals. Abbott's principal businesses are global pharmaceuticals, nutritionals, and medical products. Abbott reported revenues for the year 2000 of approximately $13.7 billion and net earnings of $2.8 billion.

25.    Abbott manufactures several drugs reimbursed by the Nevada Medicaid Program and which are purchased by citizens of the State of Nevada.

**2.    Baxter**

26.    Defendant Baxter International Inc. ("Baxter") is a Delaware corporation with its principal place of business at One Baxter Parkway, Deerfield, Illinois.

- 5 -

27.     Defendant Baxter Healthcare Corporation is the principal domestic operating subsidiary of Baxter International.

28.     Baxter International and Baxter Healthcare Corporation are collectively referred to as "Baxter." Baxter, with year 2000 sales of $6.9 billion, is a global medical products company that, *inter alia*, develops, manufactures, markets and/or distributes drugs to treat cancer, trauma, hemophilia, immune deficiencies, infectious diseases, kidney disease and other disorders.

29.     Baxter manufactures several drugs reimbursed by the Nevada Medicaid Program and which are purchased by citizens of the State of Nevada.

### 3.     The BMS Group (Bristol-Myers, Oncology Therapeutics Network, Apothecon)

30.     Defendant Bristol-Myers Squibb Co. ("Bristol-Myers") is a Delaware corporation with its principal place of business located at 345 Park Avenue, New York, New York. Bristol-Myers is a multi-national health care company specializing in the manufacturing, marketing and sale of pharmaceuticals and medical devices. For the year 2000, Bristol-Myers reported revenues of approximately $20 billion and net earnings of $4.7 billion.

31.     Defendant Oncology Therapeutics Network Corp. ("OTN") is a Delaware corporation with its principal place of business located at 395 Oyster Point Boulevard, Suite 405, South San Francisco, California. OTN has been a wholly-owned subsidiary of Bristol-Myers since its acquisition in 1996. Prior to 1996, OTN was an independent company. In 2001, OTN reported revenues of over $1.4 billion.

32.     OTN is a healthcare services and distribution firm that directly sells Bristol-Myers' infusion oncology drugs and related products to approximately 2,300 office-based oncology practices in the United States. At the time of its acquisition by Bristol-Myers, OTN was the leading distributor of chemotherapeutic drugs and related products for the treatment of cancer. Bristol-Myers paid OTN a commission for marketing and selling its drugs. Both prior to

- 6 -

and after Bristol-Myers acquired OTN, Bristol-Myers marketed and sold its drugs directly to medical providers across the country, and thus Bristol-Myers and OTN employed and maintained extensive marketing and sales departments.

33.     Defendant Apothecon, Inc. ("Apothecon") is a Delaware corporation with its principal place of business located in Princeton, New Jersey.  It is a subsidiary of Bristol-Myers specializing in small to mid-size niche brand and generic products.

34.     Bristol-Myers, OTN and Apothecon are collectively referred to herein as the "BMS Group."

35.     The BMS Group manufactures several drugs reimbursed by the Nevada Medicaid Program and which are purchased by citizens of the State of Nevada.

**4.     Dey**

36.     Defendant Dey, Inc. ("Dey") is a Delaware corporation with its principal place of business at 2751 Napa Valley Corporate Drive, Napa, California.  Dey is a unit of Merck KGaA, a German pharmaceutical conglomerate.

37.     Dey is a specialty pharmaceutical company that primarily develops, manufactures and markets generic drugs used in the treatment of selected respiratory diseases and allergies. Dey, one of the largest U.S. manufacturers of such pharmaceuticals, had net sales of $266 million in 1998.

38.     Dey manufactures several drugs reimbursed by the Nevada Medicaid Program and which are purchased by citizens of the State of Nevada.

**5.     The GSK Group (GlaxoSmithKline, SmithKline Beecham, Glaxo Wellcome)**

39.     Defendant GlaxoSmithKline, P.L.C. ("GlaxoSmithKline") is a public limited company incorporated under the laws of England and Wales, with its corporate headquarters located at 980 Great West Road, Brentford, Middlesex, United Kingdom TW8 9GS. GlaxoSmithKline was created through the December 27, 2000, merger of GlaxoWellcome,

- 7 -

P.L.C. and SmithKline Beecham, P.L.C.  GlaxoSmithKline's operational headquarters are located at One Franklin Plaza, 16th and Race Streets, Philadelphia, Pennsylvania.

40.    Defendant SmithKline Beecham Corporation ("SKB"), a wholly-owned U.S. subsidiary of the former SmithKline Beecham P.L.C., is a Pennsylvania corporation with its principal place of business at One Franklin Plaza, 16th and Race Streets, Philadelphia, Pennsylvania.

41.    Defendant GlaxoWellcome, Inc. ("Glaxo"), a wholly-owned subsidiary of GlaxoSmithKline, is a North Carolina corporation with its principal place of business at 5 Moore Drive, P.O. Box 13398, Research Triangle Park, North Carolina.  Cerenex Pharmaceuticals ("Cerenex"), a division of Glaxo prior to the merger, was responsible for Glaxo's central nervous system drugs, including Zofran.

42.    Defendants GlaxoSmithKline, SKB and Glaxo are referred to collectively as the "GSK Group."

43.    The GSK Group is a diversified pharmaceutical company which controls an estimated seven percent of the world's pharmaceutical market.  In 2001, the GSK Group reported pharmaceutical sales of $24.8 billion.

44.    The GSK Group manufactures several drugs reimbursed by the Nevada Medicaid Program and which are purchased by citizens of the State of Nevada.

**6.    The Pharmacia Group (Pharmacia and Pharmacia & Upjohn)**

45.    Defendant Pharmacia Corporation ("Pharmacia") is a Delaware corporation with its principal place of business located at 100 Route 206, North Peapack, New Jersey.  Pharmacia was created through the merger of Defendant Pharmacia and Upjohn, Inc. and Monsanto Company on March 31, 2000.

46.    Defendant Pharmacia & Upjohn, Inc. ("P&U") is a subsidiary of Pharmacia Corp. In 1995, P&U was formed through the merger of Pharmacia AB and The Upjohn Company.  In 1998, Pharmacia & Upjohn relocated its global headquarters from the United Kingdom to New

- 8 -

Jersey. In September 1999, the company established its global headquarters on a 70-acre campus in Peapack, New Jersey.

47.     Pharmacia is a highly diversified health care company with reported sales of $18.1 billion for the fiscal year ended December 31, 2000, and $12.0 and $10.8 billion, respectively, in prescription pharmaceuticals sales for years 2001and 2000. Prescription pharmaceuticals sales account for over 85 percent of Pharmacia's overall pharmaceutical sales. According to its Annual Report, Pharmacia's oncology drugs alone generated more than $1 billion in sales in 2001.

48.     The Pharmacia Group manufactures several drugs reimbursed by the Nevada Medicaid Program and which are purchased by citizens of the State of Nevada.

7.     **TAP**

49.     Defendant TAP Pharmaceutical Products, Inc. ("TAP") is a corporation that arose in 1977 from a partnership between Takeda Chemical Industries, Ltd. and Defendant Abbott, under which each company owns 50 percent of TAP's stock. Abbott and Takeda jointly control TAP's operations and rotate control of TAP's presidency.

50.     Prior to April 2000, TAP was known as TAP Holdings, Inc. TAP, together with its subsidiary, TAP Pharmaceuticals, Inc., develops and markets pharmaceutical products for the United States and Canada. TAP's headquarters is located in Waukegan, Illinois.

51.     TAP manufactures several drugs reimbursed by the Nevada Medicaid Program and which are purchased by citizens of the State of Nevada.

## III.     VENUE AND JURISDICTION

52.     Each defendant conducts extensive business in the State of Nevada, including the sale of the pharmaceuticals that are the subject of the schemes alleged herein. This Court has personal jurisdiction over each defendant, and venue is properly laid in this County.

- 9 -

## IV.   DEFINITIONS

53.     Like many industries, the pharmaceutical industry has its own specialized vocabulary. For the Court's convenience, the following terms are used in this Amended Complaint and are defined as follows:

(a)     "Brand name drug" is, generally, a drug product that is covered by a patent and thus manufactured and sold exclusively by one firm (unless it is "cross-licensed" so that other firms can sell it). After the patent expires, multiple firms can produce the drug product, but the brand name remains with the original manufacturer's product.

(b)     "Generic drug" is a drug product that is no longer covered by patent protection and thus may be produced and/or distributed by many firms.

(c)     "Average wholesale price" or "AWP" is generally defined as a national average of list prices charged by wholesalers to pharmacies and, with few exceptions, constitutes the manufacturer's suggested list price for a wholesaler to charge a pharmacy for a drug.

(d)     "Direct price" or "DP" is the price charged by a drug manufacturer, before discounts, for drugs sold directly to non-wholesale accounts such as retailers.

(e)     "Wholesale acquisition cost" or "WAC" is the price that a drug manufacturer charges to the wholesaler, before discounts."

(f)     "Actual acquisition cost" or "AAC" is the net cost at which the pharmacy acquires a drug.

(g)     "Maximum allowable cost" or "MAC" is generally referred to as the upper limit of ingredient cost for which a third-party payor will reimburse a pharmacy for dispensing certain multiple source drugs.

(h)     "Federal Upper Limit" or "FUL" is the amount established by CMS as a target amount of payment for a drug in a State Medicaid Program.

(i)     "Generic Pharmaceutical Manufacturer" is a firm that produces and markets generic prescription and/or nonprescription drug products. Some generic firms both manufacture

- 10 -

and distribute drug products while others only repackage or distribute products manufactured for them by contract manufacturing firms (sometimes even a major pharmaceutical firm). Although all drug products must have FDA approval for sale, independent clinical trials are not required for generic drugs; the innovator's evidence of safety and effectiveness are accepted. Generic firms must show that their products are bio-equivalent, often through laboratory studies and assurances. Since generic firms often produce identical drugs, they generally compete on price to establish or gain market share.

(j)    "Pharmacy Benefit Manager" or "PBM" is an organization that provides administrative services in processing and analyzing prescription claims for pharmacy benefit and coverage programs. Their services can include contracting with a network of pharmacies; establishing payment levels for provider pharmacies; negotiating rebate arrangements; developing and managing formularies, preferred drug lists, and prior authorization programs; maintaining patient compliance programs; and operating disease management programs. Many PBMs also operate mail order pharmacies or have arrangements to include prescription availability through mail order pharmacies.

(k)    "CMS" means the Center for Medicare and Medicaid Services.

(l)    "HCFA" means the Health Care Financing Administration.

(m)    "DHHS" means the United States Department of Health and Human Services.

(n)    "DOJ" means the United States Department of Justice.

(o)    "Third-Party Payment" means payment or reimbursement amounts established by third-party drug programs for prescriptions and services dispensed to beneficiaries. Payment formulas typically specify an amount for the prescription ingredients to which is added a dispensing fee (e.g., EAC or MAC plus a dispensing fee) for calculating the total prescription "price" or payment from the third-party program.

- 11 -

## V.   PRESCRIPTION DRUG SPENDING IN THE UNITED STATES HAS INCREASED DRAMATICALLY, DISPROPORTIONATELY IMPACTING THE POOR AND ELDERLY

54.    Prescription drug costs have dramatically escalated over the last decade, with important impacts on government health programs (including Medicare and Medicaid), employers and patients (and particularly elderly patients).

### A.    Increases in Prescription Drug Costs Generally

55.    In 1998, spending on prescription drugs totaled $91 billion in the United States and is projected to reach approximately $243 billion in 2008. THE KAISER FAMILY FOUNDATION, PRESCRIPTION DRUG TRENDS: A CHARTBOOK at 20 (July 2000) (hereinafter "CHARTBOOK"). In 1999, spending for prescription drugs was $99.6 billion. THE KAISER FAMILY FOUNDATION, PRESCRIPTION DRUG TRENDS: A CHARTBOOK UPDATE at 5 (November 2001) (hereinafter "CHARTBOOK UPDATE")

56.    The growth in prescription drug costs has been staggering. For each year from 1990 to 1998 (excluding 1993 and 1994), prescription drugs costs grew more than 10% annually. CHARTBOOK at 20, 22. Projected prescription drug spending of $116.9 billion in 2000 is nearly double the amount spent in 1995. CHARTBOOK UPDATE at 5.

57.    In the last decade, annual growth in prescription drug costs has significantly outpaced spending for other health care categories, including physician services and hospital care. For example, in 1998 prescription drug expenditures increased 15% compared to 5% for physician services and 3% for hospital care. CHARTBOOK at 20. Since 1995, the annual percent increases in spending for prescription drugs have been more than double those for hospital care and physician services. CHARTBOOK UPDATE at 5.

### B.    Impacts on Medicaid Programs

58.    Similarly, spending for prescription drugs by the Medicaid Program has been growing faster than Medicaid spending for other services. For example, from 1990 to 1998,

- 12 -

Medicaid spending on prescription drugs increased an average of 14.8% each year, compared to 11.1% for other acute care and 9.1% for long-term care. CHARTBOOK UPDATE at 6.

59.     More than 75% of Medicaid prescription drug expenditures were spent for the blind, disabled and the aged. CHARTBOOK UPDATE at 6.

60.     Medicaid provided drug coverage for 10% of the Medicare population in the Fall of 1999, as 53% of Medicare beneficiaries with incomes below the federal poverty level are on Medicaid. THE KAISER FAMILY FOUNDATION, MEDICARE AND PRESCRIPTION DRUGS FACT SHEET at 1 (April 2003).

**C.     Impacts on the Medicare Program and the Elderly**

61.     Overall prescription drug spending in the Medicare Program – even *without* considering proposals to expand Medicare drug coverage – is projected to rise from $71 billion in 2001 to $228 billion in 2011. CHARTBOOK UPDATE at 6.

62.     The increases in prescription drug costs have impacted seniors (defined as age 65 or older) disproportionately because older Americans spend more on prescriptions, both in dollar terms and as a proportion of total household budgets. In 1999, seniors spent nearly twice as much for prescription drugs as did non-seniors. CHARTBOOK UPDATE at 7. In 1998, the proportion of annual total household expenses that consumers aged 65 or older spent out-of-pocket on drugs was over twice as large as that for the next youngest age group (55 to 64 years old) and almost three times as large as the average for all consumers. CHARTBOOK at 24.

63.     Seniors spend more out-of-pocket on prescription drugs than the non-elderly because seniors have more acute and chronic health conditions and use more prescription drugs to treat them. Seniors are also less likely to have insurance coverage for prescription drugs. CHARTBOOK at 24.

64.     While Medicare beneficiaries constitute just 13 percent of the U.S. population, they account for approximately 36 percent of total outpatient prescription drug expenditures. Most of those covered by Medicare have only moderate incomes: 45 percent have incomes

- 13 -

below 200 percent of the poverty level, which equates to approximately $15,000 for an individual and $20,000 for a couple.

65.     As this Amended Complaint demonstrates, the frauds contested here have contributed to the surge in spending on prescription drugs.

## VI.    THE PRESCRIPTION DRUG MARKET

66.     In order to better understand the frauds and schemes contested in this lawsuit, it is necessary to briefly review the structure of the prescription drug industry, including the distribution channel and prescription drug pricing conventions and terminology.  Like many industries, the pharmaceutical industry has its own specialized vocabulary.

### A.    Drug Classifications (Brand Name and Generic)

67.     Prescription drug manufacturers generally fall into one of two categories: (i) major pharmaceutical companies that emphasize research and development and the sale of brand name drugs (although these companies may also sell generic drugs), and (ii) generic manufacturers.

68.     A "brand name" drug is a patented drug that is manufactured and sold exclusively by one firm (or other companies via a license received from the patent-holder).  After the patent expires for a brand name drug, multiple companies can produce the drug, even though the brand name is still used to refer to the original manufacturer's product.

69.     Conversely, a "generic" drug is a drug that is no longer covered by patent protection and can consequently be produced and distributed by any company that wishes to do so.  Generics are sometimes referred to as multi-source drugs.

70.     Thus, a brand name drug may or may not have a generic equivalent, depending upon whether the patent has expired and whether a generic manufacturer has produced a generic version.  For example, TAP and Abbott's Prevacid, a popular anti-ulcerant (proton pump inhibitor), is under patent and has no generic equivalent.  Tagamet (histamine-2 receptor

- 14 -

antagonist) is another drug used to treat ulcers but is no longer protected by patent. It has a generic equivalent named Cimetidine.

**B.    The Distribution Channel**

    **1.    Wholesalers**

71.    The drug manufacturers distribute their prescription drugs predominantly through wholesalers, although the manufacturers also distribute prescription drugs to some large retailers, hospitals, providers and managed care organizations.

72.    As of 1998, roughly 80% of prescription drugs were sold to wholesalers who act as "middlemen" in the distribution chain. CHARTBOOK at 20. The drug wholesaler industry is very concentrated, with three wholesalers commanding roughly 90% of the market. They are: AmeriSource-Bergen, McKesson and Cardinal Health.

73.    The price that a drug manufacturer charges to the wholesaler, before discounts, is known in the industry as the *wholesale acquisition cost* or "WAC."

74.    Wholesalers typically price prescription drugs using one of two approaches (both of which could yield a similar price): (i) "Cost Plus," which is the WAC plus a markup percent; and (ii) "List Less" which is the *"average wholesale price"* ("AWP") less a discount percent. AWP is intended to be a national average of list prices charged by wholesalers to pharmacies and, with few exceptions, constitutes the manufacturer's suggested list price for a wholesaler to charge a pharmacy for a drug. As discussed in more detail below, AWP forms the reimbursement foundation in private insurance systems as well as in government reimbursement systems such as Medicare and Medicaid, including the Nevada Medicaid Program.

    **2.    Retail pharmacies**

75.    Although most retailers obtain their prescription drugs from wholesalers, in 1998 drug manufacturers sold 12.4% of their prescription drugs directly to retailers, including independent pharmacies, chain drugstores and chain warehouse operations. CHARTBOOK at 65, 73.

- 15 -

76.     The price charged by a drug manufacturer, before discounts, for drugs sold directly to non-wholesale accounts such as retailers is called the *direct price* ("DP").

77.     The cost to a pharmacy of a prescription drug is typically referred to as *actual acquisition cost* ("AAC"). If the pharmacy purchases directly from a manufacturer, the AAC will equal the DP.

78.     In selling to the uninsured and to indemnity-insured consumers (where the consumers pay for the drug and then submit a reimbursement request to their insurer), pharmacies typically pay a price based directly or indirectly on the AWP.

79.     In selling to other categories of insured consumers (typically the consumer who makes a specified copay in dollar terms (*e.g.*, $10 per prescription) or a coinsurance amount (*e.g.*, 20% of the prescription price)), the pharmacy charges the consumer based on the insurer's payment formula plus what the insurer allows for a professional dispensing fee. The insurer's payment formula is typically based on AWP less a certain discount for brand name drugs, and a maximum allowable cost ("MAC") plus a dispensing fee for generics.

80.     Many health plans, HMOs and employers contract with Pharmacy Benefit Managers ("PBMs") to process pharmaceutical claims and manage drug utilization and "formularies," which are listings of drugs that may be dispensed under a particular plan. The PBMs never actually take possession of prescription drugs (except for drugs that they sell through their in-house mail order operations), but manage delivery of the drug "benefit" through relationships with drug manufacturers and retail pharmacies. For brand name drugs, PBMs often reimburse retail pharmacies at a rate equal to 12 to 13 percent off AWP plus a dispensing fee. For generic drugs, PBMs typically reimburse retail pharmacies at MAC based on the PBM's own estimate of what pharmacies pay on average for the generic drug, plus a dispensing fee.

- 16 -

3.    **Physicians and others**

81.    In 1998, drug manufacturers sold the remaining 6.6% of their prescription drugs directly to hospitals (2.6%), physicians and others (4%), including home health care companies. CHARTBOOK at 65, 73.

82.    Like the price directly charged by the drug maufacturer to chain pharmacies, the price charged by a drug manufacturer, before discounts, for drugs sold directly to hospitals, private practice physicians and public health clinics is the DP.

83.    Physicians and hospitals are most frequently reimbursed based on AWP for the drugs that they provide to privately-insured patients, as well as those patients participating in government-sponsored prescription drug programs.

## VII.    GOVERNMENT REIMBURSEMENT SYSTEMS FOR PRESCRIPTION DRUGS

### A.    The Medicare Insurance Program

84.    In 1965, Congress established the Medicare Program – known officially as "Health Insurance for the Aged and Disabled" – by adding Title XVIII to the Social Security Act.

85.    The United States Department of Health & Human Services ("DHHS") is responsible for the funding, administration and supervision of the Medicare Program.  The Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"), is a division of DHHS and is directly responsible for the administration of the Medicare Program.

86.    The Medicare Program generally does not cover the cost of prescription drugs that a Medicare beneficiary self-administers (*e.g.*, by swallowing the drug in liquid or pill form). However, Medicare "Part B" does cover some drugs, including injectables administered directly by a doctor, certain oral anti-cancer drugs, and drugs furnished under a durable medical

- 17 -

equipment benefit. All United States citizens and permanent residents aged 65 or older are eligible for Part B coverage.

87.     More specifically, Part B covers drugs and biologicals that are not usually self-administered by the patient and are furnished as an incident to a physician's professional services, antigens prepared by a physician for a particular patient, blood clotting factors for hemophilia patients, immunosuppressant therapy drugs furnished to an individual who receives an organ transplant, erythropoietin ("EPO") self-administered by dialysis patients, oral anti-cancer drugs, oral anti-emetic drugs in conjunction with chemotherapy treatments. CCH, 2003 MEDICARE EXPLAINED, ¶ 350 at 92-93 (hereinafter "MEDICARE EXPLAINED"). Approximately 450 drugs are covered by Medicare Part B.

88.     In determining the amount it will pay, Medicare calculates the "allowed" amount for the drug. During the period 1992 through 1997, Medicare's reimbursement for covered drugs was set at the lesser of (i) the estimated acquisition cost, or (ii) national average wholesale price. For generic drugs, payment was based on the lower of the estimated acquisition cost or the wholesale price that was defined as the median price for all sources of the generic form of the drug. This payment methodology was set forth in 42 C.F.R. § 405.517, a regulation first published in the Federal Register on November 25, 1991 and which became effective on or about January 1, 1992.

89.     The estimated acquisition cost for a drug could be determined by the Medicare Program "based on surveys of the actual invoice prices paid for the drug" taking into consideration the estimated acquisition cost, including "factors such as inventory, waste and spoilage." However, historically it has been the AWP published in the *Red Book* or other compendia that has been used as a ceiling for Medicare reimbursement.

90.     On January 1, 1998, 42 C.F.R. § 405.517 was amended to provide that the allowed amount would be based upon the lower of the billed charge on the Medicare claim form or 95 percent of AWP.

- 18 -

91.     The Medicare Program has publicly announced that it would use the AWP
published in pharmaceutical industry magazines as the basis for reimbursement.  Specifically,
Program Memorandum AB-99-63 (dated September 1999 but re-issuing PM AB-98-76 dated in
December 1998), a publicly available Medicare Program bulletin, confirmed that reimbursement
for certain Medicare Part B drugs and biologicals "are paid based on the lower of the billed
charge or 95 percent of the AWP as reflected in sources such as the *Red Book*, *Blue Book*, or
Medi-Span."

92.     Pursuant to PM AB-99-63, the AWP for a single-source drug or biological equals
the AWP of the single product.  For a multi-source drug or biological, the AWP is equal to the
lesser of the median AWP of all of the generic forms of the drug or biological or the lowest
brand name product AWP.

93.     There are no regulations describing how AWPs are to be calculated, nor any
regulatory process for approving them.  Pharmaceutical companies do not report AWPs directly
to the federal government, but – as discussed in greater detail below – instead send their pricing
information to independent publishing companies that compile the data and publish the AWPs in
trade publications, which are then used by the government, as well as private health plans.

94.     Medicare Part B reimburses medical providers 80% of the allowable amount for a
drug.  The remaining 20% is paid by the Medicare Part B beneficiary, and is called the "co-
payment" amount.  All medical providers are required by law to bill the 20% co-payment and
make attempts beyond merely billing to collect that amount.  In addition, beneficiaries under
Part B are required to pay an annual deductible amount before Part B benefits are payable.

95.     Some Medicare beneficiaries are able to purchase private Medigap insurance,
which covers, among other things, all or part of the 20% co-payment for covered drugs.

**B.      The Medicaid Insurance Program**

96.     Nationwide in 1998, Medicaid covered 40.4 million people at some time during
the year at a cost of $176.9 billion.  BRIAN K. BRUEN, MEDICAID AND PRESCRIPTION DRUGS: AN

- 19 -

OVERVIEW at 1 (October 2000) (prepared for the Kaiser Commission on Medicaid and the Uninsured) (hereinafter "MEDICAID AND PRESCRIPTION DRUGS"). In 1995, Medicaid covered about 55% of the nonelderly poor. *Id.* at 1.

### 1.   Eligibility

97.   Most people eligible for Medicaid fall into one of the following categories: (i) low-income families with children who meet the eligibility requirements for the Aid to Families with Dependent Children ("AFDC") program; (ii) aged, blind and disabled people who receive Supplemental Security Income ("SSI"), with some exceptions; (iii) low-income pregnant women and children who do not qualify under the AFDC rules because their income is too high or they fail to meet categorical restrictions, but whose incomes do not exceed established limits; (iv) the "medically needy," who are people with higher income or greater resources than the financial standards allow, but who meet certain categorical standards by, for example, incur medical expenses that reduce their excess income or resources to required levels; and (v) people requiring institutional long-term care. *Id.* at 1-2.

98.   Although coverage for outpatient prescription drugs is an optional benefit within Medicaid, all Medicaid Programs, including Nevada's, offer prescription drug coverage. *Id.* at 2.

99.   Nationwide, Medicaid spent $14.5 billion for prescription drugs. THE KAISER COMMISSION ON MEDICAID AND THE UNINSURED, MEDICAID FACTS: MEDICAID AND PRESCRIPTION DRUGS at 1 (October 2000). In 2000, the Nevada Medicaid Program spent $50,370,705 for prescription drugs, representing 8.4% of the program's total net expenditures.

100.   Medicare beneficiaries who have low incomes and limited resources may also be covered by Medicaid as "dual eligibles." For dual eligibles who are eligible for full Medicaid coverage, Medicaid supplements Medicare by providing services and supplies not covered by Medicare, most notably prescription drugs and long-term care services. Medicaid pays monthly Medicare premiums, deductibles and coinsurance for those with incomes below the FPL who do not qualify for full Medicaid benefits, while other Medicare beneficiaries with incomes up to 175

- 20 -

percent of the FPL receive assistance with all or part of their monthly Medicare Part B premiums.

### 2.   Medicaid prescription drug coverage and payment policies

101.   The Nevada Medicaid Program covers prescription drugs, which are defined by federal regulation as simple or compound substances or mixtures of substances prescribed for the cure, mitigation, or prevention of disease or for health maintenance that are prescribed by a physician or other licensed practitioner of the healing arts within the scope of this professional practice on a written prescription that is maintained in the pharmacist's or practitioner's records. 42 C.F.R. § 440.120.

102.   Nevada provides prescription drug coverage to categorically needy (AFDC-related, aged, blind, disabled) eligible individuals.

103.   Medicaid payments for outpatient prescription drugs include two components: acquisition costs and dispensing fees.  The Nevada Medicaid program presently reimburses for outpatient drugs on the basis AWP less 15% plus a $4.76 dispensing fee.  NEVADA MEDICAID SERVICES MANUAL § 1204.2.  For generic drugs for which Federal Upper Limits ("FUL") have been set by HCFA, the reimbursement amount is the FUL plus a $4.76 dispensing fee.  *Id.*  The Nevada Medicaid Program uses the AWP as reported by *First DataBank*.

### VIII.  AWP PLAYS A CENTRAL ROLE IN ALL PRESCRIPTION DRUG REIMBURSEMENT SYSTEMS, AND THE TRUTHFUL REPORTING OF AWPS IS ESSENTIAL TO THE INTEGRITY OF THE MARKETPLACE

104.   As demonstrated above, AWPs play a very important role in the various prescription drug pricing and reimbursement systems that operate in the United States.

105.   There are approximately 65,000 different drug products in the United States, including different dosages of the same drug.  Prescription drugs are dispensed to Patients by or through different types of medical providers, including but not limited to:  (a) physicians who administer the drug in an office, (b) hospitals, (c) retail pharmacies, (d) home infusion

- 21 -

pharmacies, and (e) other medical providers. Reimbursements and end-payor payments for those drugs are almost always based on AWP.

106.     Providers and pharmacies regularly submit claims for reimbursement, seeking reimbursement for the drugs from Medicare, Medicaid, insurers and Patients. Defendants were and are well aware that various participants in these systems rely on AWPs to reimburse providers and pharmacies for prescription drugs: private insurance companies (such as Blue Cross and Blue Shield Plans); health maintenance organizations and other managed care organizations; self-insured employers and other health plans such as union health and welfare plans; PBMs who administer the pharmacy benefit for private plans; Medicare; and Medicaid, including the Nevada Medicaid Program. In short, use of the published AWPs to establish reimbursement rates for drugs *is an industry-wide practice* and exists with respect to all classes of drugs, brand name and generic.

107.     There are several pharmaceutical industry compendia that periodically publish, in printed and electronic media, the AWPs for the tens of thousands of drugs on the market, including the *Drug Topics Red Book* (the "*Red Book*"), *American Druggist First DataBank Annual Directory of Pharmaceuticals, Essential Directory of Pharmaceuticals* (the "*Blue Book*") and Medi-Span's *Master Drug Database* (collectively referred to herein as the "Publishers"). These Publishers publish AWPs for the various dosage forms for drugs.

108.     In periodically announcing the AWP for each drug, and during the time period relevant to this Amended Complaint, the Publishers published the prices that are supplied to them by the defendants for their respective drugs. For instance, the forward to the 1999 edition of the *Red Book* states that "all pricing information is supplied and verified by the products' manufacturers, and it should be noted that no independent review of those prices for accuracy is conducted." In addition, a June 1996 Dow Jones news article reported that Phil Southerd, an associate product manager of the *Red Book*, stated that it only publishes prices that are faxed

- 22 -

directly from the manufacturer. Thus, the defendants control the prices listed as the AWPs for each drug listed by the Publisher. As one defendant, Dey, has admitted in court papers:

> Virtually every drug manufacturer who participates in these reimbursement programs, and against whom Dey competes also communicates their suggested AWP prices to the reporting services. To the best of Dey's knowledge, with few, if any exceptions, First DataBank and Medi-Span have selected and reported the AWP pricing exactly as suggested by these competing manufacturers.

(Dey, L.P. v. First Databank and Wolters Kluwer Health, Inc. d/b/a Medi-Span, Complaint (the "Dey Complaint"), ¶ 37.) *See also* ¶ 47 of Dey Complaint (recounting testimony of First DataBank representative who admits that First DataBank had always accepted the AWPs suggested by the manufacturers).

109.    A system that bases its reimbursement rates for drugs on the published AWP is thus dependent on the honesty of the drug manufacturers. Defendants knew they could directly control and fabricate the AWP for their drugs at any time by forwarding to the Publishers a phony AWP. Defendants also knew that actual transaction price data – the amounts charged to providers and others for their drugs – was not publicly available, and they kept this information (on which AWPs should have been calculated) highly confidential and secret.

110.    The importance of accurately reported AWPs was recently reconfirmed by the HHS Office of the Inspector General ("OIG") in an April 2003 report titled COMPLIANCE PROGRAM GUIDANCE FOR PHARMACEUTICAL MANUFACTURERS ("OIG COMPLIANCE PROGRAM"). The OIG report found that the "government sets reimbursement with the expectation that the data provided are complete and accurate" and made clear that the AWP must be a meaningful figure that is not artificially inflated:

> Many federal and state health care programs establish or ultimately determine reimbursement rates for pharmaceuticals, either prospectively or retrospectively, using price and sales data directly or indirectly furnished by pharmaceutical manufacturers. The government sets reimbursement with the expectation that the data provided are complete and accurate. The knowing submission of false, fraudulent, or misleading information is actionable. A

- 23 -

pharmaceutical manufacturer may be liable under the False Claims Act . . . if government reimbursement (including, but not limited to, reimbursement by Medicare and Medicaid) for the manufacturer's product depends, in whole or in part, on information generated or reported by the manufacturer, directly or indirectly, and the manufacturer has knowingly . . . failed to generate or report such information completely and accurately. Manufacturers may also be liable for civil money penalties under various laws, rules and regulations. Moreover, in some circumstances, inaccurate or incomplete reporting may be probative of liability under the federal anti-kickback statute.

Where appropriate, manufacturers' reported prices should accurately take into account price reductions, cash discounts, free goods contingent on a purchase agreement, rebates, up-front payments, coupons, goods in kind, free or reduced-price services, grants, or other price concessions or similar benefits offered to some or all purchasers. Any discount, price concession, or similar benefit offered on purchases of multiple products should be fairly apportioned among the products (and could potentially raise anti-kickback issues). Underlying assumptions used in connection with reported prices should be reasoned, consistent, and appropriately documented, and pharmaceutical manufacturers should retain all relevant records reflecting reported prices and efforts to comply with federal health care program requirements. [OIG COMPLIANCE PROGRAM at 11-12.]

111.    And, the OIG rejected the notion that purposeful AWP manipulation to create

"spreads" was a lawful practice:

The "spread" is the difference between the amount a customer pays for a product and the amount the customer receives upon resale of the product to the patient or other payer. In many situations under the federal programs, pharmaceutical manufacturers control not only the amount at which they sell a product to their customers, but also the amount those customers who purchase the product for their own accounts and thereafter bill the federal health care programs will be reimbursed. To the extent that a manufacturer controls the "spread," it controls its customer's profit.

Average Wholesale Price (AWP) is the benchmark often used to set reimbursement for prescription drugs under the Medicare Part B program. For covered drugs and biologicals, Medicare Part B generally reimburses at "95 percent of average wholesale price." 42 U.S.C. 1395u(o). Similarly many state Medicaid programs and other payers base reimbursement for drugs and biologicals on AWP. Generally, AWP or pricing information used by commercial price reporting services to determine AWP is reported by pharmaceutical manufacturers.

- 24 -

> If a pharmaceutical manufacturer purposefully manipulates the
> AWP to increase its customers' profits by increasing the amount
> the federal health care programs reimburse its customers, the anti-
> kickback statute is implicated. Unlike *bona fide* discounts, which
> transfer remuneration from a seller to a buyer, manipulation of the
> AWP transfers remuneration to a seller's immediate customer from
> a subsequent purchaser (the federal or state government). Under
> the anti-kickback statute, offering remuneration to a purchaser or
> referral source is improper if one purpose is to induce the purchase
> or referral of program business. In other words, it is illegal for a
> manufacturer knowingly to establish or inappropriately maintain a
> particular AWP if one purpose is to manipulate the "spread" to
> induce customers to purchase its product.
>
> In the light of this risk, we recommend that manufacturers review
> their AWP reporting practices and methodology to confirm that
> marketing considerations do not influence the process.
> Furthermore, manufacturers should review their marketing
> practices. *The conjunction of manipulation of the AWP to
> induce customers to purchase a product with active marketing of
> the spread is strong evidence of the unlawful intent necessary to
> trigger the anti-kickback statute.* Active marketing of the spread
> includes, for example, sales representatives promoting the spread
> as a reason to purchase the product or guaranteeing a certain profit
> or spread in exchange for the purchase of a product. [OIG
> COMPLIANCE PROGRAM at 26-27.] [Emphasis added.]

112.   As detailed below, defendants have taken advantage of this system in a fraudulent

and otherwise unlawful manner to manipulate the AWPs for their drugs at the expense of

numerous prescription drug payors including the Nevada Medicaid Program.

## IX.   THE AWP INFLATION SCHEME

113.   The AWPs for the drugs at issue here bore little relationship to the drugs' pricing

in the marketplace. Defendants simply fabricated and overstated their AWPs in furtherance of a

scheme to generate profit spreads to providers, PBMs and others and to increase defendants'

profits at the expense of Patients and programs such as the Nevada Medicaid Program.

114.   Defendants' pattern of fraudulent conduct in artificially inflating the AWPs for

their drugs (sometimes referred to herein as the "AWP Inflation Scheme") directly caused the

State of Nevada to substantially overpay for those drugs. Furthermore, the AWP Inflation

- 25 -

Scheme caused Nevada citizens and Third-Party Payors to pay inflated co-pays or prices for prescription drug purchases.

**A.    General Outline Of The Scheme For Brand Name Drugs**

115.    Each defendant perpetrated the alleged fraudulent AWP Inflation Scheme by using some and/or all of the following practices:

**1.    Artificially Inflating AWPs**

116.    Each defendant provided AWPs for each of its drugs, both brand name and generic, to *First DataBank*, the *Red Book*, the *Blue Book*, Medi-Span and other pharmaceutical compendia.

117.    Defendants deliberately and intentionally reported inflated AWPs that greatly exceeded the average of the wholesale prices based upon a good faith and reasonable estimate utilizing the pricing and transaction information available to defendants in conducting their ordinary business affairs.  Thus, the defendant's AWPs for these drugs bear little or no relationship to any purchase price at which a provider or pharmacy is able to procure these drugs. Defendants created the AWP Inflation Scheme solely to cause the State of Nevada and others to overpay for the drugs.

118.    Defendants created and perpetuated this scheme so that the medical providers and pharmacies who purchased these drugs at a low cost would bill Patients and their insurers at the inflated AWPs and earn a substantial profit from the "spread" between the real cost and the various AWP-related reimbursement rates established by Medicare, Medicaid and thousands of private health insurance plans.

119.    Defendants knew and understood that Medicare, the Nevada Medicaid Program and private payors used the *First DataBank* and other publications to determine the AWPs of the drugs.  Because defendants controlled the AWPs published in *First DataBank* and other compendia, defendants knew and understood that they could manipulate the providers' profits. The purpose of artificially inflating the providers' profits was to create an illegal kickback to the

- 26 -

providers and other reimbursement players, funded by overpayments by various reimbursing entities, including the Nevada Medicaid Program, and Patients.

120.    As part of their scheme, defendants specifically instructed and expected the providers to charge the inflated AWPs for drugs to Medicare, Medicaid, and Patients making co-payments.

### 2.    Improper Use of Free Samples

121.    Defendants, through their sales personnel and marketing representatives, also provided free samples of their drugs to physicians as a means of lowering the price. The free samples were used to offset the total cost associated with the purchases of the drugs, thereby increasing the "spread." Moreover, defendants specifically told physicians to bill the Nevada Medicaid Program and others for the free samples, which defendants knew was unlawful.

122.    Every free sample of a drug for which a provider bills a patient or insurer effectively reduces that provider's overall cost for that drug. However, reimbursing entities, such as the Nevada Medicaid Program, paid the full cost of the drug; the free sample is not used by the drug company in calculating the AWP, which in turn inflates the AWP.

123.    Although defendants provided free samples and marketed them as a way to lower the providers' actual cost of the drugs, they did not include the value of the free samples in calculating the AWPs for those drugs. Thus, defendants effectively and improperly passed on the cost of the free samples directly to the State of Nevada, other reimbursing entities and Patients making co-pays.

### 3.    Other Hidden and Improper Inducements and Price Reductions

124.    Defendants have also provided and/or arranged for many other non-public financial inducements to stimulate sales of their drugs at the expense of the Nevada Medicaid Program and others. Such inducements included volume discounts, credits, rebates, off-invoice pricing, free goods, credit memos, consulting fees, debt forgiveness and educational and promotional grants. All of these incentives were designed to lower the providers' net cost of

- 27 -

purchasing defendants' drugs, yet – again – the value of these services was kept "off the book," so as to not be reflected in the AWP, which in turn inflates the AWP.

**B.      General Outline of the AWP Inflation Scheme for Generic Drugs**

125.     Defendants' AWP Inflation Scheme is most exacerbated for generic drugs or for brand name drugs for which there are biological or therapeutic equivalents.

126.     As with brand name drugs, reimbursement for multi-source, or generic drugs, is also related to a published AWP for each generic drug manufactured and/or distributed by a generic drug company.

127.     In the Medicare payor arena, multi-source drugs or biologicals are reimbursed on the basis of AWP.  For multi-source drugs or biologicals reimbursed under Medicare Part B, the AWP is equal to the lessor of the median AWP of all of the generic forms of the drug or biological, or the lowest AWP of the brand name product.  42 C.F.R. § 405.517.

128.     Under the Nevada Medicaid Program, reimbursement for multiple source drugs for which there are at least three suppliers is equal to (i) a $4.76 dispensing fee, plus (ii) an amount equal to 150 percent of the lowest AWP published by First DataBank, Medi-Span or the *Red Book* (an amount called the "Federal Upper Limit" or "FUL").  42 C.F.R. § 447.332(b).  This calculation is made and published periodically by CMS.

129.     Because reimbursement under Medicare and Medicaid is pegged to the AWP, generic drug makers act in unison by elevating the AWP for all generic drugs, thereby inflating the amount of the reimbursement that occurs through Medicaid and Medicare Part B, including the Medicare co-payment through Part B.

130.     The raising of an individual defendant's reported AWP for a multi-source drug thus raises the AWP at which the generic drug is reimbursed.  In the case of Medicare, raising an individual AWP contributes to a higher median AWP.  Under Medicaid, raising an individual AWP increases the FUL if the AWP being raised is the lowest AWP published (unless there are

- 28 -

only two suppliers of the generic drug, in which case raising the AWP increases the reimbursement amount correspondingly).

131.   Moreover, while any one generic manufacturer can only affect the median generic reimbursement AWP for a product (in the case of Medicare) or the FUL (in the case of Medicaid), defendants can and do create a spread between the median AWP and the actual prices paid by reporting AWPs that are far in excess of the actual wholesale prices *while simultaneously maintaining or lowering actual wholesale prices*.

132.   As stated by one industry consultant:

> . . . Th[e] situation is more pronounced with generic drugs. Many generic companies have taken advantage of this use of AWP by substantially inflating their published AWPs. . . . [T]he system allows a retailer to acquire a drug at a low cost $2.50 per 100 tablets, for example) while relying on a published AWP ($20.00 or more) for its own pricing. It is not uncommon that the $25.00 retail price for a generic drug renders a gross profit well above $20.00 for the retailer. It is also common for the AWP of a generic product to remain stable while the actual selling price declines. . . . It is obvious that AWP is not an accurate measure of the prices manufacturers charge. It must also be noted that not all generic products will be priced similarly. Some, in fact, use the more traditional method of a 20% markup to reach an AWP. This can be a handicap for generic companies choosing this method because retailers often use the AWP as the starting point for many pricing decisions and an artificially high AWP provides the retailer with greater profits.

133.   Indeed, in 1998 the OIG found a direct link between raising a generic AWP and causing inflated reimbursements within Medicare Part B and Medicaid:

> There is evidence that high-priced generic drugs have a significant financial impact on Medicare and Medicaid reimbursement. We found that inclusion of higher-priced generic drugs in Medicare payment calculations can raise allowances above the price of brand-name drugs.

DHHS OIG, THE IMPACT OF HIGH-PRICED GENERIC DRUGS ON MEDICARE AND MEDICAID at 9 (July 1998) (hereinafter "IMPACT OF HIGH-PRICED GENERIC DRUGS ON MEDICARE").

134.   The OIG study specifically found that higher-priced generic drugs increased Medicare reimbursements because the higher-priced generic drugs were included in the median

- 29 -

calculation. *Id.* at ii. Historically, "[w]hen the median generic policy was implemented, generic prices were normally less than those of the brand-name product." *Id.* "However," the OIG observed, "what may have originally been a cost-saving mechanism has, for certain categories of drugs, become a losing proposition." *Id.*

135.    In a 2001 investigation, GAO found that:

> Two drugs, albuterol sulfate and ipratropium bromide, used with DME for respiratory conditions, account for most of the pharmacy-supplied drugs paid for by Medicare. In 2001, they were available to pharmacy suppliers at prices that averaged, respectively, 85 percent and 78 percent less than AWP. Other high-volume DME-administered drugs had prices averaging 69 percent and 72 percent less than AWP. These findings are consistent with prior studies of similar drugs [albuterol].

*Medicare Part B Drug Program Payments Should Reflect Market Prices.* GAO-01-1142T. (Sep. 21, 2001).

136.    In a recent report to Congress, the Medicare Payment Advisory Commission, an independent federal body established by the BBA of 197, reported on variations in Medicare purchasing. One of the issues examined was "[i]ncentives for increasing AWPs:"

> *In percentage terms, the biggest difference between the listed AWP for drugs and actual prices paid by physicians and suppliers tends to occur with generic drugs or brand name drugs for which there are alternatives available in the same therapeutic class. For these drugs, manufacturers compete to increase their market share.* This competition can take two forms. A manufacturer may raise the AWP for its product without changing the price charged to purchasers. ... [or] leave the AWPs at existing levels, and offer larger discounts directly to physicians who choose their drugs over products offered by competitors.

MEDICARE PAYMENT ADVISORY COMMISSION, REPORT TO CONGRESS: VARIATION AND INNOVATION IN MEDICARE at 156 (Jun. 12, 2003).

137.    Furthermore, each Medicare carrier has the discretion to determine which NDCs should be used to calculate the payment rate for each HCPCS code, and this can lead to variations in payment amount among carriers for the same coded drug.

- 30 -

138.   In the private payor arena, generic drug reimbursement is determined either in the same manner for brand name drugs (*i.e.*, a certain percentage "discount" off of the AWP), or is based on an amount specified as the maximum allowable cost or "MAC." MAC prices or reimbursements rates for generically equivalent drugs for which there are three or more suppliers are based upon the FULs issued periodically by CMS.

139.   PBMs often utilize this government-issued MAC reimbursement publication as a basis for their proprietary MAC list and supplement the list with other generic products or modify it for a variety of purposes. Sometimes, to stabilize the cost variance of different generic products of the same compound, PBMs calculate a maximum allowable cost based on the list average wholesale prices of competing generic drug manufacturers (indeed, this is termed in the industry as the "average average wholesale price" or "AAWP"). The resulting proprietary MAC generic drug reimbursement lists are typically based on the AAWP and, in turn, the AWP.

140.   Accordingly, in the private payor arena generic drug reimbursement is closely tied to the published AWP for a generic drug. Generic drug makers are able to push market share for their generic drugs by intentionally increasing the published AWP for a generic drug with the intention to create a profit margin for others in the distribution chain, be they pharmacists or physicians. That profit margin is taken advantage of either directly (through reimbursement based upon the AWP for some plans and in some channels) or indirectly on the AWP based upon the establishment of a MAC tied to the AWP.

141.   Documents produced by defendant generic manufacturers show that they are aware of the AWPs reported by their competitors and of the actual sales prices of their generic competitors, and that they manipulate their own AWPs in order to gain or maintain a competitive advantage in the market for their generic products. Each defendant generic maker or distributor competes by inflating its AWP and thereby inflating the median AWP. The natural and expected result of this "leap frogging" of increasing AWPs is that multi-source drugs have some of the

- 31 -

highest spreads of any drugs, sometimes resulting in an AWP over 50,000% over actual costs.  A few examples are set forth below:

| Defendant | Multisource Drug | Red Book AWP | DOJ Determined Actual AWP | Percentage Spread |
|---|---|---|---|---|
| Abbott | Sodium Chloride | $670.89 | $3.22 | 20,735% |
| Baxter | Dextrose | $928.51 | $2.25 | 41,167% |
| Baxter | Sodium Chloride | $928.51 | $1.71 | 54,199% |
| Boehringer Group | Leucovorin Calcium | $184.40 | $2.76 | 6,581% |
| B. Braun | Sodium Chloride | $11.33 | $1.49 | 660% |
| BMS Group | Etoposide (Vepesid) | $136.49 | $34.30 | 298% |
| Dey | Albuterol Sulfate | $30.25 | $9.17 | 230% |
| Immunex | Leucovorin Calcium | $137.94 | $14.58 | 846% |
| Pharmacia | Etoposide | $157.65 | $9.47 | 1,565% |
| Sicor Group | Tobramycin Sulfate | $342.19 | $6.98 | 4,802% |
| Watson | Vancomycin HCL | $70.00 | $3.84 | 1,567% |

142.   The importance of AWPs to generic drugs was recently revealed in a lawsuit filed by Dey against two of the Publishers.  Dey is a generic manufacturer, and generic manufacturers largely compete on price because they market products that contain the same active ingredients and are predominantly therapeutically interchangeable.  (¶ 9 of Dey Complaint.)  A large segment of the generic marketplace for respiratory drugs is comprised of a relatively small number of entities controlling purchase decisions.  (¶ 12 of Dey Complaint.)

143.   Dey recognizes that the vast majority of prescription drug transactions – as much as 85% – are covered, in whole or in part, by third-party payor reimbursement arrangements such as managed care plans and Medicaid.  (¶ 13 of Dey Complaint.)  Both Medicaid and the private insurance systems rely on reimbursement formulas that utilize the AWP.  (¶¶ 14-16 of Dey Complaint.)

144.   Dey has an agreement with First DataBank and Medi-Span to provide the reporting services with AWP pricing information.  Pursuant to this agreement (and in order to

- 32 -

make Dey's products eligible for reimbursement through Medicaid Programs), Dey has reported

WACs and AWPs. (¶¶ 26-32 of Dey Complaint.)

> In each case, until the events that have resulted in the present
> crisis, First DataBank has (except for some inadvertent errors)
> selected for listing in its published reports the AWP as suggested
> by Dey. For over ten years, until April 2003, no prices other than
> those submitted by Dey have been listed by First DataBank as
> AWP for Dey products in its databases [even though Dey also
> reported declining WACs for the products]."

(¶ 32 of Dey Complaint; *see also* ¶ 36 of Dey Complaint for similar allegation against Medi-

Span.) This has also been the course of dealings between the Publishers and Dey's competitors:

> Virtually every drug manufacturer who participates in these
> reimbursement programs, and against whom Dey competes also
> communicates their suggested AWP prices to the reporting
> services. To the best of Dey's knowledge, with few, if any
> exceptions, First DataBank and Medi-Span have selected and
> reported the AWP pricing exactly as suggested by these competing
> manufacturers.

(¶ 37 of Dey Complaint.) *See also* ¶ 47 of Dey Complaint (recounting testimony of First

DataBank representative who admits that First DataBank had always accepted the AWPs

suggested by the manufacturers).

    145.    As Dey alleges, providers who dispense generic drugs "are cognizant of, and are

highly attentive to, AWPs as reported by the recognized industry compendia published by First

DataBank and Medi-Span because of the direct relationship between the level of reimbursement

anticipated for the drugs selected and the reported AWPs of those drugs." (¶ 38 of Dey

Complaint.) Indeed, Dey admits that it has relied on the Publishers' practice of treating all

manufacturers equally by simply reporting whatever AWP a manufacturer submitted.

Consequently, Dey alleges that First DataBank and Medi-Span have frustrated Dey's "reasonable

expectations" by, for the first time, *independently reporting* an AWP different than that

submitted by Dey. (¶ 39 of Dey Complaint.) These allegations become even more emphatic in a

section of the Dey Complaint titled "The Immediate Consequences of the Arbitrary Changes:"

-33-

Since reimbursement to Dey's customers is, in Medicaid program in many states and in and [sic] insurance programs, most frequently based on the AWP as reported by the reporting services, this arbitrary and capricious reduction by First DataBank and Medi-Span in AWP would result in a drastic reduction in the reimbursement to drug providers who choose to dispense Dey's product.  Since there has not been a comparable reduction in the AWP for Dey's competitors, there would be no comparable reduction in the reimbursement the purchasers of competitive products receive.

Because reimbursement for Dey products would be significantly reduced, but reimbursement for those competing products would remain as they have been, Dey is prevented, by First DataBank's and Medi-Span's arbitrary and capricious acts, from effectively competing in the marketplace.

In fact, within one day of learning that First DataBank and Medi-Span had arbitrarily changed Dey's AWP, Dey has already been contacted by at least nine of its customers complaining about the drastic changes and indicating that, because of those changes, the customers would not be able to purchase Dey products since they could not earn a reasonable profit from the sale of such products.

Further, at least one customer has already indicated that he had canceled all of his purchases presently on order from Dey and was, instead, buying those products from Dey's direct competitors.

….. These providers will cease to purchase and dispense Dey's drugs if the reimbursement for those drugs is a fraction of those obtained from competing companies.  Because purchasing decisions are highly concentrated in this industry among wholesalers and group purchasing organizations, this scenario is playing out across the country and threatens to eliminate sales of Dey's products that are covered by Medicaid and insurance reimbursement programs.

(¶¶ 50-54 of Dey Complaint.)

## C.   How The AWP Inflation Scheme Impacts Many Private Reimbursement Systems Through PBMs

146.    As previously noted, health plans typically contract with PBMs so that a health plan's participants can obtain brand name drugs from pharmacies or, via mail order, directly from the PBMs.  In these contracts, the brand name drugs are priced at the AWP less a certain percentage "discount."

- 34 -

147.    PBMs are fiscal intermediaries that specialize in the administration and management of prescription benefit programs. PBM clients include HMOs, employers, preferred provider organizations and other health insurers. Collectively, four PBMs comprise the significant market share of the PBM market. They are: AdvancePCS; Caremark; Express Scripts; and Medco Health. These four companies handle the drug benefits of 210 million people in the United States, or 70 percent of the nation's population.

148.    For brand name drugs, PBMs use the inflated AWP set by drug manufacturers as the basis for reimbursements made (i) by health plans to the PBMs for their members' drug purchases, and (ii) from the PBMs to the pharmacies for the purchases made by health plans' members.

149.    The PBMs typically contract with retail pharmacies to reimburse an amount equal to each drug's AWP, less a specified discount, plus a dispensing fee. Because the PBMs consider the contracting relationship with retail pharmacies to be confidential, health plans are never informed of the reimbursement amount to pharmacies. However, the PBM frequently pockets a "spread" or differential between charges paid to pharmacies and collected from clients.

150.    For example, the PBM may charge the plan AWP minus 13 percent, but pay the retail pharmacy AWP minus 15 percent, generating an undisclosed 2 percent spread for the PBM.

151.    Under this typical arrangement, if the AWP is $100, the client pays $87 ($100 less 13%). The PBM pays the pharmacy $85 ($100 less 15%) and therefore pockets the $2 spread. Assuming, for the sake of this example, that the true, uninflated AWP is $50, the PBM would pocket a spread of only $1 (the difference between the $43.50 received from the plan and the $42.50 paid to the pharmacy).

152.    As the example presented demonstrates, PBMs are motivated to, and do, place on their formulary those drugs with inflated AWPs: the greater the AWP inflation, the greater the profit to the PBM based on the 2 percent spread.

- 35 -

153.    A similar situation occurs for generic drug pricing based on MAC lists, as the PBM uses one MAC list to charge clients and another MAC list to reimburse pharmacies.

154.    Further, PBMs also have mail order services in which case they act as the pharmacy. In this situation, the PBM keeps the spread between the AWP and the list price as there is no intermediary, like a pharmacy, dispensing the drug. The PBMs keep this spread knowing that the AWPs are inflated and not the true AWP.

155.    Defendants knew and understood that the PBMs used the *Red Book* and other publications to determine the AWPs of the drugs. Because the drug manufacturers controlled the AWPs published in the *Red Book* and other compendia, the drug manufacturers knew and understood that they could help manipulate the PBMs' profits. The purpose of artificially inflating the PBMs' profits was to create an illegal kickback to the PBMs, funded by health plan and subscriber overpayments.

156.    The PBMs deliberately utilize the inflated AWP to overcharge health plans for generic drugs purchased by their participants and beneficiaries at retail pharmacies. An example of this practice was recently reported in the WALL STREET JOURNAL on March 31, 2003. According to the JOURNAL article, the AWP for fluoxetine (generic Prozac) is $2.66 a pill. Express Scripts collects from the plan 60 percent of the AWP, or $1.06 a pill.. Express Scripts pays the pharmacy 25 cents a pill and keeps the rest as profit. . And at the same time it was making this profit, Express Scripts was notifying its clients it was saving them money by having switched to fluoxetine, instead of Prozac.

D.    **Congressional And Other Federal Investigations and Actions**

157.    The United States Department of Justice ("DOJ"), the United States General Accounting Office ("GAO"), the Office of the Inspector General at the United States Department of HHS ("OIG"), and certain Congressional subcommittees have been investigating defendants and other pharmaceutical manufacturers for questionable practices regarding the industry's calculation of AWPs and for offering illegal incentives to providers.

- 36 -

158.    In a letter dated September 28, 2000, sent from the House of Representatives Committee on Ways and Means, Subcommittee on Health, to the President of the trade organization known as the Pharmaceutical Research and Manufacturers of America (most defendants are members of this association), Congressman Stark identified the improper scheme of manipulating AWPs and noted:

> This corruptive scheme is perverting financial integrity of the Medicare program and harming beneficiaries who are required to pay 20% of Medicare's current limited drug benefit.

159.    In his September 28 letter, Congressman Stark made the following five "shocking conclusions":

> First – Certain drug manufacturers have abused their position of privilege in the United States by reporting falsely inflated drug prices in order to create a de facto improper kickback for their customers.
>
> Second – Certain drug manufacturers have routinely acted with impunity in arranging improper financial inducements for their physicians and other healthcare provider customers.
>
> Third – Certain drug manufacturers engage in the fraudulent price manipulation for the express purpose of causing federally funded health care programs to expend scarce tax dollars in order to arrange de facto kickbacks for the drug manufacturers' customers at a cost of billions of dollars.
>
> Fourth – Certain drug manufacturers arrange kickbacks to improperly influence physicians' medical decisions and judgments notwithstanding the severely destructive effect upon the physician/patient relationship and the exercise of independent medical judgment.
>
> Fifth – Certain drug manufacturers engage in illegal price manipulation in order to increase utilization of their drugs beyond that which is necessary and appropriate based on the exercise of independent medical judgment not affected by improper financial incentives.

160.    The DOJ and Congressional investigations are ongoing.

- 37 -

**E.    Examples Of Specific AWP Inflation By Each Defendant**

161.    Due to each defendant's acts of concealment, the following examples of specific unlawful conduct are merely illustrative and are not intended to constitute an exhaustive account of all of the unlawful activity engaged in by each defendant.  Additional detail is peculiarly within each defendant's control thereby warranting further discovery into each drug identified in this Amended Complaint as well as other drugs for which any defendant has published an AWP.

162.    Defendants are each charged with inflating the AWP for the drugs identified below *and* for those identified in Appendix A.

**1.    Abbott**

163.    Abbott engages in an organization-wide and deliberate scheme to inflate AWPs. Abbott has stated fraudulent AWPs for all or almost all of its drugs, including those set forth below.

| A-Methapred | methylprednisolone sodium succinate | Anti-Inflammatory Agent Used to provide relief for inflamed areas of the body.  Also used for control of allergic processes |
| Aminosyn | amino acid | Nitrogen Product Used as a nutritional supplement |
| Biaxin | clarithromycin | Macrolide (Anti-Infective Agent) Used to treat mild to moderate infections |
| Calcijex | calcitrol | Hormone Used in the treatment of hypocalcemia |
| Depakote | divalproex sodium | Anticonvulsant Used in the treatment of complex partial seizures |
| Ery-tab | erythromycin, enteric-coated | Antibiotic Agent (Anti-Infective Agent) Used in the treatment of various infections |
| Erythromycin | erythromycin base | Antiacne Agent; Anti-Infective Agent Used in the treatment of various infections |
| Liposyn II | fat emulsion | Caloric Agent; Nutritional Supplement Used as a nutritional supplement |

- 38 -

| Prevacid | lansoprazole | Proton Pump Inhibitor (Gastrointestinal Agent) Used in the treatment of duodenal ulcer and erosive esophagitis |
|---|---|---|
| | acetylcysteine | Mucolytic (Respiratory Agent: Diagnostic Aid) Used for certain lung conditions when increased amounts of mucus make breathing difficult |
| | acyclovir sodium | Anti-Infective Agent Used in the treatment of herpes infections |
| | amikacin sulfate | Antibiotic Agent (Anti-Infective Agent) Used to treat respiratory tract, urinary tract, bone, skin and soft tissue infections |
| | cimetidine hydrochloride | Gastrointestinal Agent Used in the treatment of duodenal ulcer and prevention of ulcer recurrence |
| | clindamycin phosphate | Anti-Infective Agent Used in the treatment of vaginal infections |
| | dextrose | Caloric Agent Used to increase intake of calories and fluids |
| | dextrose sodium chloride | Caloric Agent; Electrolyte Replenisher Used to increase intake of calories and fluids |
| | diazepam | Central Nervous System Agent Used to treat status eplipeticus and anxiety disorders. Also used as an amnesic prior to surgical procedures |
| | fentanyl citrate | Central Nervous System Agent Used for anesthetic purposes |
| | furosemide | Diuretic Used in the treatment of edema associated with cirrhosis and kidney disease. Also used to manage hypertension |
| | gentamicin sulfate | Anti-Infective Agent Used as a general antibiotic to treat serious gastrointestinal, respiratory, bone, skin and soft tissue infections |
| | heparin sodium or heparin lock flush | Blood Modifier Used to prevent and treat thrombosis and pulmonary embolism. Also used as an anticoagulant in blood transfusions and dialysis procedures |
| | leucovorin calcium | Antianemic Agent (Blood Modifier) Used in the treatment of anemia |

- 39 -

| | | |
|---|---|---|
| | lorazepam | Central Nervous System Agent<br>Used in the treatment of anxiety disorders |
| | sodium chloride | Flush; Abortifacient<br>Used to remove medicine and blockage from intravenous (IV) catheter. Also used to induce abortion |
| | tobramycin sulfate | Antibiotic Agent (Anti-Infective Agent)<br>Used to treat severe infection |
| | vancomycin hydrochloride | Antibiotic Agent (Anti-Infective Agent)<br>Used as a general antibiotic |

164.    The specific drugs manufactured and/or distributed by Abbott for which relief is currently sought in this case are set forth below or in Appendix A.

165.    Abbott controlled and set the AWPs for all of its drugs, including those appearing in Appendix A, through direct communications with industry compendia.

166.    Abbott's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs has resulted in excessive overpayments by the State of Nevada and Nevada citizens.

   a.    **Abbott's understanding of AWP and intentional manipulation thereof**

167.    Several documents illustrate Abbott's pattern of inflating AWPs. For example, Abbott anticipated that the spread between AWP and cost would be eliminated by legislative changes in 1997. Accordingly, Abbott looked for ways to maximize the profit spread immediately. In one internal memorandum about a third party's pricing product, Abbott states:

> One of GeriMed's goals of obtaining maximum profitability for its members presents an opportunity for our injectables. They think there is about an 18 month window of opportunity to promote our injectables as more profitable for their members to use because of the bigger spread between AWP and cost. Legislative changes in reimbursement are expected to do away with this spread advantage by mid 1997.

(ABT AWP/MDL 015839) (Highly Confidential).

168.    In a second memorandum about this same product, Abbott states:

- 40 -

> The purpose of these programs was to "enhance revenue and decrease cost." *** These suggestions are made to save money through lower contract pricing or increase revenue through better spread between AWP and contract price.... The [distributor's] program identifies the lowest cost product and *the best spread for the particular state.*

(ABT AWP/MDL 010407-09) (Highly Confidential) (emphasis added).

169.   Abbott tried to maximize the spread because it understood that its customers routinely engaged in "spread shopping" – comparing Abbott's AWPs with those of its competitors in order to determine the greatest spread (and therefore sell or administer the drug with the greatest spread).  An example is a document produced by Abbott, prepared by a customer in late 1993, comparing Abbott's proposed contract price and its published AWPs with that of Baxter's competing generic drugs.  (ABT AWP/MDL 028546) (Highly Confidential).

170.   In response to government subpoenas, Abbott produced numerous price lists setting forth spreads between AWPs and prices offered to wholesalers, providers and other intermediaries.  A review of those price lists reveals that Abbott has consistently offered hundreds of its drugs and other solutions to its customers at prices significantly below the published AWP and that the spread was of great importance to its customers.  To repeat every one of those drugs and the spread offered to each specific customer here is not practical.  However, set forth below in Tables 1 and 2 are a number of those drugs (not already referenced above) with spreads in excess of 100% from two specific Abbott customers.

- 41 -





173.    In addition, Abbott has inflated the AWPs for the following drugs, whose 1999 AWP as reported in the *Red Book* is set forth below, as is the spread between AWP and wholesale cost. The size of these spreads is an indicator that the reported AWPs are grossly inflated and have no bearing to the actual average of wholesale prices.

| Drug Name | NDC | Quantity | 1999 AWP Red Book | W-Sale Spread | % |
|---|---|---|---|---|---|
| (AMINO ACIDS) Aminosyn (10%) | 00074-2991-03 | 500 ml 12s | 1,216.95 | 1,107.51 | 1012.0% |
| (AMINO ACIDS) Aminosyn (10%) | 00074-2991-03 | 500 ml 12s | 1,216.95 | 1,079.43 | 784.9% |
| (AMINO ACIDS) Aminosyn (10%) | 00074-2991-05 | 1000 ml 6s | 1,158.38 | 1,048.82 | 957.3% |
| (AMINO ACIDS) Aminosyn (10%) | 00074-2991-05 | 1000 ml 6s | 1,158.38 | 1,008.86 | 674.7% |
| (AMINO ACIDS) Aminosyn (8.5%) | 00074-5855-03 | 500 ml 12s | 1,065.90 | 968.34 | 992.6% |
| (AMINO ACIDS) Aminosyn (8.5%) | 00074-5855-03 | 1000 ml 6s | 1,066.33 | 946.63 | 790.8% |
| (AMINO ACIDS) Aminosyn (PH6, 10%) | 00074-4360-05 | 1000 ml 6s | 1,098.03 | 978.87 | 821.5% |
| (AMINO ACIDS) Aminosyn II (INJ, IJ, 10%) | 00074-1090-03 | 500 ml 12s | 1,216.95 | 1,107.51 | 1012.0% |
| (AMINO ACIDS) Aminosyn II (INJ, IJ, 10%) | 00074-1090-03 | 500 ml 12s | 1,216.95 | 1,079.43 | 784.9% |
| (AMINO ACIDS) Aminosyn II (INJ, IJ, 10%) | 00074-1090-05 | 1000 ml 6s | 1,158.38 | 1,048.82 | 957.3% |
| (AMINO ACIDS) Aminosyn II (INJ, IJ, 10%) | 00074-1090-05 | 1000 ml 6s | 1,158.38 | 1,021.76 | 747.9% |
| (AMINO ACIDS) Aminosyn II (INJ, IJ, 10%, BULK) | 00074-7121-07 | 2000 ml 6s | 2,432.69 | 2,265.71 | 1356.9% |
| (AMINO ACIDS) Aminosyn II (INJ, IJ, 15%, BULK) | 00074-7122-07 | 2000 ml 6s | 3,649.07 | 3,226.67 | 763.9% |

- 43 -

| Drug Name | NDC | Quantity | 1999 AWP *Red Book* | W-Sale Spread | % |
|---|---|---|---|---|---|
| (AMINO ACIDS) Aminosyn II (INJ, IJ, 15%, BULK) | 00074-7122-07 | 2000 ml 6s | 3,649.07 | 3,215.39 | 741.4% |
| (AMINO ACIDS) Aminosyn II (INJ, IJ, 8.5%) | 00074-1088-03 | 500 ml 12s | 1,065.90 | 983.34 | 1191.1% |
| (AMINO ACIDS) Aminosyn II (INJ, IJ, 8.5%) | 00074-1088-03 | 500 ml 12s | 1,065.90 | 965.34 | 960.0% |
| (AMINO ACIDS) Aminosyn II (INJ, IJ, 8.5%) | 00074-1088-05 | 1000 ml 12s | 1,066.33 | 976.51 | 1087.2% |
| (AMINO ACIDS) Aminosyn II (INJ, IJ, 8.5%) | 00074-1088-05 | 1000 ml 12s | 1,066.33 | 965.83 | 961.0% |
| (AMINO ACIDS) Aminosyn II W/ELECTROLYTES (INJ, IJ) | 00074-1089-03 | 500 ml 12s | 1,055.78 | 932.66 | 757.5% |
| (AMINO ACIDS) Aminosyn W/ELECTROLYTES (INJ, IJ) | 00074-5852-03 | 500 ml 12s | 1,058.92 | 895.60 | 548.4% |
| (AMINO ACIDS) Aminosyn W/ELECTROLYTES (INJ, IJ) | 00074-5856-03 | 500 ml 12s | 1,119.34 | 999.94 | 837.5% |
| (AMINO ACIDS) Aminosyn W/ELECTROLYTES (INJ, IJ) | 00074-5856-03 | 5u0 ml 12s | 1,119.34 | 991.66 | 776.7% |
| (AMINO ACIDS) Aminosyn W/ELECTROLYTES (INJ, IJ) | 0C074-5856-05 | 1000 ml 6s | 1,119.20 | 995.42 | 804.2% |
| (FAT EMULSION) Liposyn II (W/ADMIN SET, 10%) | 00074-9786-03 | 500 ml | 48.40 | 29.10 | 150.8% |
| (FAT EMULSION) Liposyn II (W/ADMIN SET, 10%) | 00074-9786-03 | 500 ml | 48.40 | 35.42 | 272.9% |
| (FAT EMULSION) Liposyn II (W/ADMIN SET, 10%) | 00074-9789-03 | 500 ml | 111.89 | 87.66 | 361.8% |

- 44 -

| Drug Name | NDC | Quantity | 1999 AWP *Red Book* | W-Sale Spread | % |
|---|---|---|---|---|---|
| (FAT EMULSION) Liposyn II (W/ADMIN SET, 10%) | 00074-9789-03 | 500 ml | 111.89 | 91.11 | 438.5% |
| (FAT EMULSION) Liposyn III (20%) | 00074-9790-03 | 500 ml | 73.85 | 53.99 | 271.9% |
| (FAT EMULSION) Liposyn III (VIAL, 20%) | 00074-9791-03 | 500 ml | 107.58 | 83.35 | 344.0% |
| (METHOTREXATE SODIUM SUCCINATE) A-Methapred (PDI, IJ {ADD-VANTAGE}) | 00074-5601-44 | 500 mg ea | 34.66 | 25.26 | 268.7% |
| (METHOTREXATE SODIUM SUCCINATE) A-Methapred (PDI, IJ {UNIVIAL}) | 00074-5631-08 | 1 gm ea | 34.66 | 17.91 | 106.9% |
| (METHOTREXATE SODIUM SUCCINATE) A-Methapred (PDI, IJ {UNIVIAL}) | 00074-5684-01 | 40 mg ea | 3.40 | 1.10 | 47.8% |
| (METHOTREXATE SODIUM SUCCINATE) A-Methapred (PDI, IJ {UNIVIAL}) | 00074-5685-02 | 125 mg ea | 9.01 | 5.66 | 169.0% |
| Acetylcysteine (SOL, IH, 10%) | 00074-3307-03 | 30ml 3s | 34.16 | 12.26 | 56.0% |
| Acetylcysteine (SOL, IH, 20%, 4ml) | 00074-3308-03 | 30ml 3s | 32.99 | 14.24 | 75.9% |
| Acyclovir Sodium (VIAL, FLIPTOP) | 00074-4427-01 | 500 mg, 10s | 997.50 | 691.40 | 225.9% |
| Acyclovir Sodium (VIAL, FLIPTOP) | 00074-4427-01 | 500 mg, 10s | 1,995.00 | 1,603.00 | 408.9% |
| Amikacin Sulfate (Vial, Fliptop) | 00074-1955-01 | 50mg/ml, 2ml 10s | 948.46 | 823.46 | 658.8% |
| Amikacin Sulfate (Vial, Fliptop) | 00074-1956-01 | 250mg/ml, 2ml 10s | 1,154.73 | 1,004.73 | 669.8% |
| Amikacin Sulfate (Vial, Fliptop) | 00074-1957-01 | 250mg/ml, 4ml 10s | 2,350.71 | 2,030.71 | 634.6% |
| Cimetidine Hydochloride (ADD-VANTAGE, 150 mg/ml) | 00074-7446-02 | 2 ml 25s | 204.25 | 169.25 | 483.6% |

- 45 -

| Drug Name | NDC | Quantity | 1999 AWP *Red Book* | W-Sale Spread | % |
|---|---|---|---|---|---|
| Cimetidine Hydochloride (INJ, IJ {VAIL, FLIPTOP}), 150 mg/ml, 2 mg/ml) | 00074-7444-01 | 2 ml 10s | 86.69 | 73.19 | 542.1% |
| Cimetidine Hydochloride (INJ, IJ {VAIL, FLIPTOP}), 150 mg/ml, 2 mg/ml) | 00074-7444-01 | 2 ml 10s | 86.69 | 76.69 | 766.9% |
| Cimetidine Hydochloride (INJ, IJ {VAIL, FLIPTOP}), 150 mg/ml, 2 mg/ml) | 00074-7444-01 | 2 ml 10s | 86.69 | 72.19 | 497.9% |
| Cimetidine Hydochloride (INJ, IJ {VAIL, FLIPTOP}), 150 mg/ml, 2 mg/ml) | 00074-7444-01 | 2 ml 10s | 86.69 | 76.09 | 717.8% |
| Cimetidine Hydochloride (VIAL-FLIPTOP, 150 mg/ml) | 00074-7445-01 | 8 ml 10s | 210.31 | 177.81 | 547.1% |
| Cimetidine Hydochloride (VIAL-FLIPTOP, 150 mg/ml) | 00074-7445-01 | 8 ml 10s | 210.31 | 182.31 | 651.1% |
| Cimetidine Hydochloride (VIAL-FLIPTOP, 150 mg/ml) | 00074-7445-01 | 8 ml 10s | 210.31 | 178.81 | 567.7% |
| Cimetidine Hydochloride (VIAL-FLIPTOP, 300 mg/50ml) | 00074-7447-16 | 50 ml 48(s?) | 1,254.00 | 1,134.00 | 945.0% |
| Clindamycin Phosphate (Vial, Fliptop, 150mg/ml) | 00074-4050-01 | 2 ml 25s | 324.19 | 248.84 | 330.2% |
| Clindamycin Phosphate (Vial, Fliptop, 150mg/ml) | 00074-4051-01 | 4 ml 25s | 593.75 | 419.75 | 241.2% |
| Dextrose (INJ, IJ, {50/150 ML PART FILL}) | 00074-1523-01 | 5%, 50 ml | 19.05 | 15.24 | 400.0% |
| Dextrose (INJ, IJ, {50/150 ML PART FILL}) | 00074-1523-01 | 5%, 50 ml | 19.05 | 15.05 | 376.3% |

- 46 -

| Drug Name | NDC | Quantity | 1999 AWP *Red Book* | W-Sale Spread | % |
|---|---|---|---|---|---|
| Dextrose (INJ, IJ, {ADD-VANTAGE, LIFECARE}) | 00074-7100-13 | 5%, 50 ml | 13.31 | 10.03 | 305.8% |
| Dextrose (INJ, IJ, {ADD-VANTAGE, LIFECARE}) | 00074-7100-13 | 5%, 50 ml | 13.31 | 10.15 | 321.2% |
| Dextrose (INJ, IJ, {ADD-VANTAGE, LIFECARE}) | 00074-7100-23 | 5%, 100 ml | 13.31 | 10.03 | 305.8% |
| Dextrose (INJ, IJ, {ADD-VANTAGE, LIFECARE}) | 00074-7100-23 | 5%, 100 ml | 13.31 | 10.15 | 321.2% |
| Dextrose (INJ, IJ, {ADD-VANTAGE}) | 00074-7100-02 | 5%, 250 ml | 16.14 | 11.90 | 280.7% |
| Dextrose (INJ, IJ, {ADD-VANTAGE}) | 00074-7100-02 | 5%, 250 ml | 16.14 | 12.14 | 303.5% |
| Dextrose (INJ, IJ, {LIFECARE/PLASTIC}) | 00074-1522-03 | 5%, 500 ml | 11.89 | 7.89 | 197.3% |
| Dextrose (INJ, IJ, {LIFECARE/PLASTIC}) | 00074-1522-03 | 5%, 500 ml | 11.89 | 8.29 | 230.3% |
| Dextrose (INJ, IJ, {LIFECARE/PLASTIC}) | 00074-7922-02 | 5%, 250 ml | 11.25 | 10.01 | 807.3% |
| Dextrose (INJ, IJ, {LIFECARE/PLASTIC}) | 00074-7922-02 | 5%, 250 ml | 11.25 | 9.60 | 581.8% |
| Dextrose (INJ, IJ, {LIFECARE/PLASTIC}) | 00074-7922-02 | 5%, 250 ml | 11.25 | 9.65 | 603.1% |
| Dextrose (INJ, IJ, {LIFECARE/PLASTIC}) | 00074-7922-02 | 5%, 250 ml | 11.25 | 9.45 | 525.0% |
| Dextrose (INJ, IJ, {LIFECARE/PLASTIC}) | 00074-7922-02 | 5%, 250 ml | 11.25 | 9.83 | 692.3% |
| Dextrose (INJ, IJ, {LIFECARE/PLASTIC}) | 00074-7922-03 | 5%, 500 ml | 11.25 | 9.75 | 650.0% |
| Dextrose (INJ, IJ, {LIFECARE/PLASTIC}) | 00074-7922-03 | 5%, 500 ml | 11.25 | 9.70 | 625.8% |
| Dextrose (INJ, IJ, {LIFECARE/PLASTIC}) | 00074-7922-03 | 5%, 500 ml | 11.25 | 9.50 | 542.9% |

- 47 -

| Drug Name | NDC | Quantity | 1999 AWP Red Book | W-Sale Spread | % |
|---|---|---|---|---|---|
| Dextrose (INJ, IJ, {LIFECARE/PLAS TIC}) | 00074-7922-03 | 5%, 500 ml | 11.25 | 9.45 | 525.0% |
| Dextrose (INJ, IJ, {LIFECARE/PLAS TIC}) | 00074-7922-03 | 5%, 500 ml | 11.25 | 9.79 | 670.5% |
| Dextrose (INJ, IJ, {LIFECARE/PLAS TIC}) | 00074-7922-09 | 5%, 1000 ml | 13.15 | 11.74 | 832.6% |
| Dextrose (INJ, IJ, {LIFECARE/PLAS TIC}) | 00074-7922-09 | 5%, 1000 ml | 13.15 | 10.05 | 324.2% |
| Dextrose (INJ, IJ, {LIFECARE/PLAS TIC}) | 00074-7922-09 | 5%, 1000 ml | 13.15 | 10.55 | 405.8% |
| Dextrose (INJ, IJ, {LIFECARE/PLAS TIC}) | 00074-7922-09 | 5%, 1000 ml | 13.15 | 11.04 | 523.2% |
| Dextrose (INJ, IJ, {LIFECARE/PLAS TIC}) | 00074-7922-09 | 5%, 1000 ml | 13.15 | 10.69 | 434.6% |
| Dextrose (INJ, IJ, {LIFECARE/PLAS TIC}) 1000 ML CONTAINER | 00074-1518-05 | 1000 ml | 34.20 | 19.66 | 135.2% |
| Dextrose (INJ, IJ, {LIFECARE/PLAS TIC}) 1000 ML CONTAINER | 00074-1519-05 | 70%, 1000 ml | 42.37 | 24.38 | 135.5% |
| Dextrose (INJ, IJ, {LIFECARE/PLAS TIC}) 1000 ML CONTAINER | 00074-1519-05 | 70%, 1000 ml | 42.37 | 32.95 | 349.8% |
| Dextrose (INJ, IJ, {LIFECARE/PLAS TIC}) 1000 ML CONTAINER | 00074-1536-03 | 500 ml | 23.97 | 14.78 | 160.8% |
| Dextrose (INJ, IJ, {LIFECARE/PLAS TIC}) 1000 ML CONTAINER | 00074-5645-25 | 50%, 500 ml | 35.45 | 31.76 | 860.7% |
| Dextrose (INJ, IJ, {LIFECARE/PLAS TIC}) 1000 ML CONTAINER | 00074-5647-25 | 70%, 500 ml | 44.09 | 39.83 | 935.0% |
| Dextrose (INJ, IJ, {LIFECARE/PLAS TIC}) 1000 ML CONTAINER | 00074-7918-19 | 70%, 500 ml | 53.32 | 46.57 | 689.9% |

- 48 -

| Drug Name | NDC | Quantity | 1999 AWP _Red Book_ | W-Sale Spread | % |
|---|---|---|---|---|---|
| Dextrose (INJ, IJ, {LIFECARE/PLASTIC}) 1000 ML CONTAINER | 00074-7918-19 | 70%, 500 ml | 53.32 | 42.45 | 390.5% |
| Dextrose (INJ, IJ, {LIFECARE/PLASTIC}) 1000 ML CONTAINER | 00074-7936-19 | 50%, 500 ml | 42.86 | 37.43 | 689.3% |
| Dextrose (INJ, IJ, {LIFECARE/PLASTIC}) 1000 ML CONTAINER | 00074-7936-19 | 50%, 500 ml | 42.86 | 34.12 | 390.4% |
| Dextrose (INJ, IJ, {LIFECARE/PLASTIC}) 2000 ML CONTAINER | 00074-7936-17 | 50%, 1000 ml | 80.56 | 71.94 | 834.6% |
| Dextrose (INJ, IJ, {LIFECARE/PLASTIC}) 2000 ML CONTAINER | 00074-7936-17 | 50%, 1000 ml | 80.56 | 66.71 | 481.7% |
| Dextrose (INJ, IJ, {LIFECARE/PLASTIC}, BULK PACKAGE) | 00074-7120-07 | 70%, 2000 ml | 75.82 | 64.99 | 600.1% |
| Dextrose (INJ, IJ, {LIFECARE/PLASTIC}, BULK PACKAGE) | 00074-7120-07 | 70%, 2000 ml | 75.82 | 59.46 | 363.4% |
| Dextrose (INJ, IJ, {LIFECARE}) | 00074-1522-02 | 5%, 250 ml | 11.88 | 8.25 | 227.3% |
| Dextrose (INJ, IJ, {LIFECARE}) | 00074-7922-61 | 5%, 150 ml | 11.24 | 10.14 | 921.8% |
| Dextrose (INJ, IJ, {LIFECARE}) | 00074-7922-61 | 5%, 150 ml | 11.24 | 9.84 | 702.9% |
| Dextrose (INJ, IJ, {LIFECARE}) | 00074-7922-61 | 5%, 150 ml | 11.24 | 9.64 | 602.5% |
| Dextrose (INJ, IJ, {LIFECARE}) | 00074-7922-61 | 5%, 150 ml | 11.24 | 9.44 | 524.4% |
| Dextrose (INJ, IJ, {LIFECARE}) | 00074-7922-61 | 5%, 150 ml | 11.24 | 9.85 | 708.6% |
| Dextrose (INJ, IJ, {LIFECARE}) | 00074-7923-36 | 5%, 50 ml | 11.86 | 10.62 | 856.5% |
| Dextrose (INJ, IJ, {LIFECARE}) | 00074-7923-36 | 5%, 50 ml | 11.86 | 10.56 | 812.3% |
| Dextrose (INJ, IJ, {LIFECARE}) | 00074-7923-36 | 5%, 50 ml | 11.86 | 10.31 | 665.2% |
| Dextrose (INJ, IJ, {LIFECARE}) | 00074-7923-36 | 5%, 50 ml | 11.86 | 9.93 | 514.5% |

- 49 -

| Drug Name | NDC | Quantity | 1999 AWP *Red Book* | W-Sale Spread | % |
|---|---|---|---|---|---|
| Dextrose (INJ, IJ, {LIFECARE}) | 00074-7923-37 | 5%, 100 ml | 11.86 | 10.62 | 856.5% |
| Dextrose (INJ, IJ, {LIFECARE}) | 00074-7923-37 | 5%, 100 ml | 11.86 | 10.56 | 812.3% |
| Dextrose (INJ, IJ, {LIFECARE}) | 00074-7923-37 | 5%, 100 ml | 11.86 | 10.31 | 665.2% |
| Dextrose (INJ, IJ, {LIFECARE}) | 00074-7923-37 | 5%, 100 ml | 11.86 | 9.93 | 514.5% |
| Dextrose W/Sodium Chloride | 00074-7926-02 | 5%-0.45%, 250 ml | 12.07 | 10.14 | 525.4% |
| Dextrose W/Sodium Chloride | 00074-7926-02 | 5%-0.45%, 250 ml | 12.07 | 10.07 | 503.5% |
| Dextrose W/Sodium Chloride | 00074-7926-02 | 5%-0.45%, 250 ml | 12.07 | 10.59 | 715.5% |
| Dextrose W/Sodium Chloride | 00074-7926-03 | 5%-0.45%, 500 ml | 12.07 | 10.14 | 525.4% |
| Dextrose W/Sodium Chloride | 00074-7926-03 | 5%-0.45%, 500 ml | 12.07 | 9.97 | 474.8% |
| Dextrose W/Sodium Chloride | 00074-7926-03 | 5%-0.45%, 500 ml | 12.07 | 10.10 | 512.7% |
| Dextrose W/Sodium Chloride | 00074-7926-03 | 5%-0.45%, 500 ml | 12.07 | 10.07 | 503.5% |
| Dextrose W/Sodium Chloride | 00074-7926-03 | 5%-0.45%, 500 ml | 12.07 | 10.29 | 578.1% |
| Dextrose W/Sodium Chloride | 00074-7926-09 | 5%-0.45%, 1000 ml | 14.36 | 12.11 | 538.2% |
| Dextrose W/Sodium Chloride | 00074-7926-09 | 5%-0.45%, 1000 ml | 14.36 | 11.16 | 348.8% |
| Dextrose W/Sodium Chloride | 00074-7926-09 | 5%-0.45%, 1000 ml | 14.36 | 11.42 | 388.4% |
| Dextrose W/Sodium Chloride | 00074-7926-09 | 5%-0.45%, 1000 ml | 14.36 | 12.11 | 538.2% |
| Dextrose W/Sodium Chloride | 00074-7926-09 | 5%-0.45%, 1000 ml | 14.36 | 11.69 | 437.8% |
| Dextrose W/Sodium Chloride | 00074-7941-02 | 5%-0.9%, 250 ml | 12.07 | 10.14 | 525.4% |
| Dextrose W/Sodium Chloride | 00074-7941-03 | 5%-0.9%, 500 ml | 12.07 | 10.14 | 525.4% |
| Dextrose W/Sodium Chloride | 00074-7941-03 | 5%-0.9%, 500 ml | 12.07 | 9.97 | 474.8% |
| Dextrose W/Sodium Chloride | 00074-7941-03 | 5%-0.9%, 500 ml | 12.07 | 10.46 | 649.7% |
| Dextrose W/Sodium Chloride | 00074-7941-03 | 5%-0.9%, 500 ml | 12.07 | 10.07 | 503.5% |
| Dextrose W/Sodium Chloride | 00074-7941-03 | 5%-0.9%, 500 ml | 12.07 | 10.48 | 659.1% |
| Dextrose W/Sodium Chloride | 00074-7941-09 | 5%-0.9%, 500 ml | 14.35 | 12.99 | 955.1% |

- 50 -

| Drug Name | NDC | Quantity | 1999 AWP Red Book | W-Sale Spread | % |
|---|---|---|---|---|---|
| Dextrose W/Sodium Chloride | 00074-7941-09 | 5%-0.9%, 500 ml | 14.35 | 11.30 | 370.5% |
| Dextrose W/Sodium Chloride | 00074-7941-09 | 5%-0.9%, 500 ml | 14.35 | 12.47 | 663.3% |
| Dextrose W/Sodium Chloride | 00074-7941-09 | 5%-0.9%, 500 ml | 14.35 | 12.10 | 537.8% |
| Dextrose W/Sodium Chloride | 00074-7941-09 | 5%-0.9%, 500 ml | 14.35 | 11.70 | 441.5% |
| Diazepam (INJ, IJ {AMP}) | 00074-3210-32 | 5 mg/ml, 2 ml, ea C-IV | 1.91 | 0.42 | 28.2% |
| Diazepam (INJ, IJ {AMP}) | 00074-3210-32 | 5 mg/ml, 2 ml, ea C-IV | 1.91 | 0.42 | 28.2% |
| Diazepam (INJ, IJ {CARPUJECT LUER LOCK}) | 00074-1273-32 | 5 mg/ml, 2 ml, ea C-IV | 2.72 | 0.69 | 34.0% |
| Diazepam (INJ, IJ {CARPUJECT, 22GX1-1/4"}) | 00074-1273-02 | 5 mg/ml, 2 ml, ea C-IV | 2.50 | 0.63 | 33.7% |
| Diazepam (INJ, IJ {CARPUJECT, 22GX1-1/4"}) | 00074-1273-02 | 5 mg/ml, 2 ml, ea C-IV | 2.50 | 0.13 | 5.5% |
| Diazepam (INJ, IJ {VIAL, FLIPTOP}) | 00074-3213-01 | 5 mg/ml, 10 ml, ea C-IV | 3.80 | 0.25 | 7.0% |
| Diazepam (INJ, IJ {VIAL, FLIPTOP}) | 00074-3213-01 | 5 mg/ml, 10 ml, ea C-IV | 3.80 | 2.36 | 163.9% |
| Furosemide (INJ, IJ {VIAL, P.F.,FLIPTOP}) | 00074-6102-02 | 10 mg/ml, 2 ml 25s | 70.95 | 58.31 | 461.3% |
| Furosemide (INJ, IJ {VIAL, P.F.,FLIPTOP}) | 00074-6102-02 | 10 mg/ml, 2 ml 25s | 70.95 | 55.45 | 357.7% |
| Furosemide (INJ, IJ {VIAL, P.F.,FLIPTOP}) | 00074-6102-02 | 10 mg/ml, 2 ml 25s | 70.95 | 55.95 | 373.0% |
| Furosemide (INJ, IJ {VIAL, P.F.,FLIPTOP}) | 00074-6102-04 | 10 mg/ml, 4 ml 25s | 122.02 | 104.87 | 611.5% |
| Furosemide (INJ, IJ {VIAL, P.F.,FLIPTOP}) | 00074-6102-04 | 10 mg/ml, 4 ml 25s | 122.02 | 97.75 | 402.8% |
| Furosemide (INJ, IJ {VIAL, P.F.,FLIPTOP}) | 00074-6102-04 | 10 mg/ml, 4 ml 25s | 122.02 | 99.52 | 442.3% |
| Furosemide (INJ, IJ {VIAL, P.F.,FLIPTOP}) | 00074-6102-04 | 10 mg/ml, 4 ml 25s | 122.02 | 100.77 | 474.2% |
| Furosemide (INJ, IJ {VIAL, P.F.,FLIPTOP}) | 00074-6102-04 | 10 mg/ml, 4 ml 25s | 122.02 | 105.77 | 650.9% |

- 51 -

| Drug Name | NDC | Quantity | 1999 AWP *Red Book* | W-Sale Spread | % |
|---|---|---|---|---|---|
| Gentamicin Sulfate (Vial, Fliptop) | 00074-1207-03 | 40 mg/ml, 2 ml | 2.46 | 2.00 | 434.8% |
| Gentamicin Sulfate (Vial, Fliptop) | 00074-1207-03 | 40 mg/ml, 2 ml | 2.46 | 1.84 | 296.8% |
| Gentamicin Sulfate (Vial, Fliptop) | 00074-1207-03 | 40 mg/ml, 2 ml | 2.46 | 2.06 | 515.0% |
| Gentamicin Sulfate (Vial, Fliptop) | 00074-1207-03 | 40 mg/ml, 2 ml | 2.46 | 1.90 | 339.3% |
| Heparin Lock Flush (INJ, IJ {VIAL, FLIPTOP}) | 00074-1151-70 | 10 u/ml, 10 ml 25 s | 38.30 | 22.35 | 140.1% |
| Heparin Lock Flush (INJ, IJ {VIAL, FLIPTOP}) | 00074-1151-70 | 10 u/ml, 10 ml 25 s | 38.30 | 27.05 | 240.4% |
| Heparin Lock Flush (INJ, IJ {VIAL, FLIPTOP}) | 00074-1152-70 | 100 u/ml, 10 ml 25 s | 43.64 | 29.64 | 211.7% |
| Heparin Lock Flush (INJ, IJ {VIAL, FLIPTOP}) | 00074-1152-70 | 100 u/ml, 10 ml 25 s | 43.64 | 29.69 | 212.8% |
| Heparin Lock Flush (INJ, IJ {VIAL, FLIPTOP}) | 00074-1152-70 | 100 u/ml, 10 ml 25 s | 43.64 | 31.64 | 263.7% |
| Heparin Lock Flush (INJ, IJ {VIAL, FLIPTOP}) | 00074-1152-70 | 100 u/ml, 10 ml 25 s | 43.64 | 29.89 | 217.4% |
| Heparin Lock Flush (INJ, IJ {VIAL, FLIPTOP}) | 00074-1152-78 | 100 u/ml, 30 ml 25 s | 100.94 | 82.44 | 445.6% |
| Heparin Lock Flush (INJ, IJ {VIAL, FLIPTOP}) | 00074-1152-78 | 100 u/ml, 30 ml 25 s | 100.94 | 79.99 | 381.8% |
| Heparin Lock Flush (INJ, IJ {VIAL, FLIPTOP}) | 00074-1152-78 | 100 u/ml, 30 ml 25 s | 100.94 | 77.19 | 325.0% |
| Leucovorin Calcium (INJ, IJ {VIAL, FLIPTOP 30 ML}) | 00074-4541-04 | 10 mg/ml, 25 ml | 24.94 | 15.04 | 151.9% |
| Leucovorin Calcium (INJ, IJ {VIAL, FLIPTOP 30 ML}) | 00074-4541-04 | 10 mg/ml, 25 ml | 24.94 | 14.94 | 149.4% |
| Leucovorin Calcium (INJ, IJ {VIAL, FLIPTOP 30 ML}) | 00074-4541-04 | 10 mg/ml, 25 ml | 24.94 | 17.44 | 232.5% |
| Leucovorin Calcium (INJ, IJ {VIAL, FLIPTOP 30 ML}) | 00074-4541-04 | 10 mg/ml, 25 ml | 24.94 | 17.69 | 244.0% |

- 52 -

| Drug Name | NDC | Quantity | 1999 AWP Red Book | W-Sale Spread | % |
|---|---|---|---|---|---|
| Leucovorin Calcium (INJ, IJ {VIAL, FLIPTOP}) | 00074-4541-02 | 10 mg/ml, 10 ml | 9.98 | 6.03 | 152.7% |
| Leucovorin Calcium (INJ, IJ {VIAL, FLIPTOP}) | 00074-4541-02 | 10 mg/ml, 10 ml | 9.98 | 5.98 | 149.5% |
| Leucovorin Calcium (INJ, IJ {VIAL, FLIPTOP}) | 00074-4541-02 | 10 mg/ml, 10 ml | 9.98 | 6.38 | 177.2% |
| Sodium Chloride (ADD-VANT, LIFECARE P.F.) | 00074-7101-13 | 0.9%, 50 ml | 13.31 | 10.15 | 321.2% |
| Sodium Chloride (ADD-VANT, LIFECARE P.F.) | 00074-7101-13 | 0.9%, 50 ml | 13.31 | 10.03 | 305.8% |
| Sodium Chloride (ADD-VANT, LIFECARE P.F.) | 00074-7101-23 | 0.9%, 100 ml | 13.31 | 10.15 | 321.2% |
| Sodium Chloride (ADD-VANT, LIFECARE P.F.) | 00074-7101-23 | 0.9%, 100 ml | 13.31 | 10.03 | 305.8% |
| Sodium Chloride (ADD-VANT, LIFECARE) | 00074-7101-02 | 0.9%, 250 ml | 16.14 | 12.14 | 303.5% |
| Sodium Chloride (ADD-VANT, LIFECARE) | 00074-7101-02 | 0.9%, 250 ml | 16.14 | 11.77 | 269.3% |
| Sodium Chloride (ADD-VANT, LIFECARE) | 00074-7984-36 | 0.9%, 50 ml | 11.86 | 9.93 | 514.5% |
| Sodium Chloride (ADD-VANT, LIFECARE) | 00074-7984-36 | 0.9%, 50 ml | 11.86 | 10.62 | 856.5% |
| Sodium Chloride (ADD-VANT, LIFECARE) | 00074-7984-36 | 0.9%, 50 ml | 11.86 | 10.31 | 665.2% |
| Sodium Chloride (ADD-VANT, LIFECARE) | 00074-7984-36 | 0.9%, 50 ml | 11.86 | 10.56 | 812.3% |
| Sodium Chloride (ADD-VANT, LIFECARE) | 00074-7984-37 | 0.9%, 100 ml | 11.86 | 9.93 | 514.5% |
| Sodium Chloride (ADD-VANT, LIFECARE) | 00074-7984-37 | 0.9%, 100 ml | 11.86 | 10.62 | 856.5% |
| Sodium Chloride (ADD-VANT, LIFECARE) | 00074-7984-37 | 0.9%, 100 ml | 11.86 | 10.31 | 665.2% |

1534.13 0051 BSC.DOC

| Drug Name | NDC | Quantity | 1999 AWP *Red Book* | W-Sale Spread | % |
|---|---|---|---|---|---|
| Sodium Chloride (ADD-VANT, LIFECARE) | 00074-7984-37 | 0.9%, 100 ml | 11.86 | 10.56 | 812.3% |
| Sodium Chloride (LIFECARE, PLASTIC CONT) | 00074-7983-03 | 0.9%, 500 ml | 11.05 | 9.30 | 531.4% |
| Sodium Chloride (LIFECARE, PLASTIC CONT) | 00074-7983-03 | 0.9%, 500 ml | 11.05 | 9.50 | 612.9% |
| Sodium Chloride (LIFECARE, PLASTIC CONT) | 00074-7983-03 | 0.9%, 500 ml | 11.05 | 10.03 | 983.3% |
| Sodium Chloride (LIFECARE, PLASTIC CONT) | 00074-7983-03 | 0.9%, 500 ml | 11.05 | 9.33 | 542.4% |
| Sodium Chloride (LIFECARE, PLASTIC CONT) | 00074-7983-09 | 0.9%, 1000 ml | 12.00 | 9.40 | 361.5% |
| Sodium Chloride (LIFECARE, PLASTIC CONT) | 00074-7983-09 | 0.9%, 1000 ml | 12.00 | 9.37 | 356.3% |
| Sodium Chloride (LIFECARE, PLASTIC CONT) | 00074-7983-09 | 0.9%, 1000 ml | 12.00 | 10.98 | 1076.5% |
| Sodium Chloride (LIFECARE, PLASTIC CONT) | 00074-7983-09 | 0.9%, 1000 ml | 12.00 | 9.58 | 395.9% |
| Sodium Chloride (LIFECARE, PLASTIC) | 00074-1583-02 | 0.9%, 250 ml | 11.75 | 8.35 | 245.6% |
| Sodium Chloride (LIFECARE, PLASTIC) | 00074-1583-02 | 0.9%, 250 ml | 11.75 | 10.15 | 634.4% |
| Sodium Chloride (LIFECARE, PLASTIC) | 00074-1583-02 | 0.9%, 250 ml | 11.75 | 10.42 | 783.5% |
| Sodium Chloride (LIFECARE, PLASTIC) | 00074-1583-02 | 0.9%, 250 ml | 11.75 | 10.31 | 716.0% |
| Sodium Chloride (LIFECARE, PLASTIC) | 00074-7983-02 | 0.9%, 250 ml | 11.05 | 9.40 | 569.7% |
| Sodium Chloride (LIFECARE, PLASTIC) | 00074-7983-02 | 0.9%, 250 ml | 11.05 | 9.59 | 656.8% |
| Sodium Chloride (LIFECARE, PLASTIC) | 00074-7983-02 | 0.9%, 250 ml | 11.05 | 9.93 | 886.6% |

- 54 -

| Drug Name | NDC | Quantity | 1999 AWP *Red Book* | W-Sale Spread | % |
|---|---|---|---|---|---|
| Sodium Chloride (LIFECARE, PLASTIC) | 00074-7983-61 | 0.9%, 150 ml | 11.05 | 9.65 | 689.3% |
| Sodium Chloride (LIFECARE, PLASTIC) | 00074-7983-61 | 0.9%, 150 ml | 11.05 | 9.69 | 712.5% |
| Sodium Chloride (LIFECARE, PLASTIC) | 00074-7983-61 | 0.9%, 150 ml | 11.05 | 9.45 | 590.6% |
| Tobramycin Sulfate (INJ, IJ {Vial Fliptop}) | 00074-3577-01 | 10 mg/ml, 2 ml | 5.73 | 2.79 | 94.9% |
| Tobramycin Sulfate (SRN) | 00074-3583-01 | 40 mg/ml, 2 ml | 12.35 | 6.51 | 111.5% |
| Tobramycin Sulfate (Vial Fliptop) | 00074-3578-01 | 40 mg/ml, 2 ml | 11.37 | 6.38 | 127.9% |
| Tobramycin Sulfate (Vial, Bulk) | 00074-3590-02 | 40 mg/ml, 50 ml | 284.51 | 180.87 | 174.5% |
| Vancomycin Hydrochloride (PDI, IJ {ADD-VANTAGE}) | 00074-6534-01 | 500 mg 10s ea | 13.10 | 9.50 | 263.9% |
| Vancomycin Hydrochloride (PDI, IJ {ADD-VANTAGE}) | 00074-6534-01 | 500 mg 10s ea | 13.10 | 7.30 | 125.9% |
| Vancomycin Hydrochloride (PDI, IJ {ADD-VANTAGE}) | 00074-6534-01 | 500 mg 10s ea | 13.10 | 7.23 | 123.2% |
| Vancomycin Hydrochloride (PDI, IJ {BULK VIAL}) | 00074-6509-01 | 5 gm ea | 163.72 | 127.72 | 354.8% |
| Vancomycin Hydrochloride (PDI, IJ {BULK VIAL}) | 00074-6509-01 | 5 gm ea | 163.72 | 119.86 | 273.3% |
| Vancomycin Hydrochloride (PDI, IJ {VIAL, FLIPTOP}) | 00074-4332-01 | 500 mg 10s ea | 36.40 | 32.65 | 870.7% |
| Vancomycin Hydrochloride (PDI, IJ {VIAL, FLIPTOP}) | 00074-4332-01 | 500 mg 10s ea | 36.40 | 33.15 | 1020.0% |
| Vancomycin Hydrochloride (PDI, IJ {VIAL, FLIPTOP}) | 00074-4332-01 | 500 mg 10s ea | 36.40 | 29.30 | 412.7% |

| Drug Name | NDC | Quantity | 1999 AWP *Red Book* | W-Sale Spread | % |
|---|---|---|---|---|---|
| Vancomycin Hydrochloride (PDI, IJ {VIAL, FLIPTOP}) | 00074-4332-01 | 500 mg 10s ea | 36.40 | 29.50 | 427.5% |
| Vancomycin Hydrochloride (PDI, IJ {VIAL, FLIPTOP}) | 00074-4332-01 | 500 mg 10s ea | 36.40 | 32.48 | 828.6% |
| Vancomycin Hydrochloride (PDI, IJ {VIAL, FLIPTOP}) | 00074-6533-01 | 1 gm 10s ea | 72.78 | 65.18 | 857.6% |
| Vancomycin Hydrochloride (PDI, IJ {VIAL, FLIPTOP}) | 00074-6533-01 | 1 gm 10s ea | 72.78 | 61.56 | 548.7% |
| Vancomycin Hydrochloride (PDI, IJ {VIAL, FLIPTOP}) | 00074-6535-01 | 1 gm 10s ea | 26.18 | 18.78 | 253.8% |
| Vancomycin Hydrochloride (PDI, IJ {VIAL, FLIPTOP}) | 00074-6535-01 | 1 g.a 10s ea | 26.18 | 13.28 | 102.9% |
| Vancomycin Hydrochloride (PDI, IJ {VIAL, FLIPTOP}) | 00074-6535-01 | 1 gm 10s ea | 26.18 | 12.00 | 84.6% |
| Lorazepam (INJ, IJ {HYPAK SYRINGE}) | 00074-6776-01 | 2 mg/ml, 1 ml, C-IV | 12.87 | 9.27 | 257.5% |
| Lorazepam (INJ, IJ {VIAL, FLIPTOP}) | 00074-1539-10 | 4 mg/ml, 10 ml, C-IV | 89.87 | 59.87 | 199.6% |
| Lorazepam (INJ, IJ {VIAL, FLIPTOP}) | 00074-6778-01 | 2 mg/ml, 1 ml, C-IV | 11.45 | 8.45 | 281.7% |
| Lorazepam (INJ, IJ {VIAL, FLIPTOP}) | 00074-6778-01 | 2 mg/ml, 1 ml, C-IV | 11.45 | 8.50 | 288.1% |
| Lorazepam (INJ, IJ {VIAL, FLIPTOP}) | 00074-6779-01 | 4 mg/ml, 1 ml, C-IV | 12.87 | 9.07 | 238.7% |
| Lorazepam (INJ, IJ {VIAL, FLIPTOP}) | 00074-6780-01 | 2 mg/ml, 10 ml, C-IV | 85.78 | 59.23 | 223.1% |
| Lorazepam (INJ, IJ {VIAL, FLIPTOP}) | 00074-6780-01 | 2 mg/ml, 10 ml, C-IV | 85.78 | 58.58 | 215.4% |
| Lorazepam (INJ, IJ {VIAL, FLIPTOP}) | 00074-6780-01 | 2 mg/ml, 10 ml, C-IV | 85.78 | 66.28 | 339.9% |
| Lorazepam (INJ, IJ {VIAL, FLIPTOP}) | 00074-6781-01 | 4 mg/ml, 10 ml, C-IV | 114.38 | 84.38 | 281.3% |

| Drug Name | NDC | Quantity | 1999 AWP *Red Book* | W-Sale Spread | % |
|---|---|---|---|---|---|
| Lorazepam (INJ, IJ {VIAL, FLIPTOP}) | 00074-6781-01 | 4 mg/ml, 10 ml, C-IV | 114.38 | 86.88 | 315.9% |
| Lorazepam (INJ, IJ {VIAL}) | 00074-1539-01 | 4 mg/ml, 1 ml, C-IV | 10.18 | 6.38 | 167.9% |
| Lorazepam (INJ, IJ {VIAL}) | 00074-1985-01 | 2 mg/ml, 1 ml, C-IV | 9.82 | 6.82 | 227.3% |
| Lorazepam (INJ, IJ {VIAL}) | 00074-1985-10 | 2 mg/ml, 10 ml, C-IV | 86.81 | 60.98 | 236.1% |

### b.  Abbott has been the target of multiple government investigations

174.    In connection with its scheme to inflate AWPs, Abbott has been investigated by the United States Department of Justice, Commonwealth of Massachusetts, the Office of Inspector General of the Department of Health and Human Services, the Attorney General for the State of Texas, the Attorney General for the State of California, and the State of California Department of Justice Bureau of Medi-Cal Fraud and Elder Abuse.

175.    These investigations confirm that Abbott has engaged in a deliberate scheme to inflate the published AWPs for many of its drugs.  According to Representative Pete Stark, the ranking member of the Congressional Ways and Means Committee:

> The price manipulation scheme is executed through Abbott's inflated representations of average wholesale price ("AWP") and direct price ("DP") which are utilized by the Medicare and Medicaid programs in establishing drug reimbursements to providers.  The difference between the inflated representations of AWP and DP versus the true price providers are paying, is regularly referred to . . . as "the spread."  The evidence . . . clearly shows that Abbott has intentionally reported inflated prices and has engaged in other improper business practices in order to cause its customers to receive windfall profits from Medicare and Medicaid when submitting claims for certain drugs.  The evidence further reveals that Abbott manipulated prices for the express purpose of expanding sales and increasing market share of certain drugs.  This was achieved by arranging financial benefits or inducements that influenced the decisions of health care providers submitting Medicare and Medicaid claims.

*See* October 31, 2000 letter from U.S. Representative Pete Stark to Miles White, Chief Executive Officer of Abbott.  (P007647-78.)

- 57 -

176.   The government investigation into Abbott's AWP for vancomycin identified:

> prices that are routinely made available to many providers, but are
> far below Medicare reimbursement rates. They include 1999
> prices for vancomycin, the Abbott Labs-manufactured antibiotic,
> which a health care provider could buy for $76.00 but for which
> the AWP upon which Medicare's reimbursement was based on
> was $261.84.

*See* September 25, 2000 letter from U.S. Rep. Tom Bliley to the Honorable Nancy-Ann Min

DeParle, Administrator of the Health Care Financing Administration. (P007015-490.)

177.   For other doses of vancomycin, Abbott reported an AWP of $68.77 as of April

2000. The DOJ requested that *First DataBank* adjust it to $8.14.

178.   At least one Publisher, Medi-Span, challenged the manner in which Abbott set its

AWPs for vancomycin. The following statement appeared in a February 9, 1996 faxed letter to

Abbott from a representative of Medi-Span:

> It appears that the only difference between these two products
> listed is the vial it comes in. If it is, please let us know why the
> $400 plus difference in AWPs?... [T]his customer claims he can
> get Vancomycin for $6 or $7 per vial DP as opposed to the $52.94
> and $19.50 the Abbott Vancomycin cost.

(ABT AWP/MDL 001215.)

179.   In a report published by the DHHS (the "DHHS Report"; PM Rev. AB-00-86,

"An Additional Source of Average Wholesale Price Data In Pricing Drugs and Biologicals

Covered by the Medicare Program," Sept. 8, 2000), the DOJ documented at least 81 instances

where the published AWPs for various dosages of 16 drugs manufactured by Abbott were

substantially higher than the actual prices listed by wholesalers. The chart below sets forth the

16 drugs identified by the DOJ and the spread associated with one particular dosage of each

drug. These figures compare the DOJ's determination of an accurate AWP for that particular

dosage, based upon wholesalers' price lists, with the AWP reported by Abbott in the 2001 *Red*

*Book.*

- 58 -

| Drug | Abbott's 2001 Red Book AWP | DOJ Determined Actual AWP | Difference | Percentage Spread |
|---|---|---|---|---|
| Acetylcysteine | $35.87 | $21.90 | $13.97 | 64% |
| Acyclovir | $1047.38 | $349.05 | $698.33 | 200% |
| Amikacin Sulfate | $995.84 | $125.00 | $870.84 | 697% |
| Calcitriol (Calcijex) | $1,390.66 | $1079.00 | $311.66 | 29% |
| Cimetidine Hydrochloride | $214.34 | $35.00 | $179.34 | 512% |
| Clindamycin Phosphate | $340.52 | $75.35 | $265.17 | 352% |
| Dextrose | $239.97 | $3.91 | $236.06 | 6,037% |
| Dextrose Sodium Chloride | $304.38 | $1.93 | $302.45 | 15,671% |
| Diazepam | $28.50 | $2.03 | $26.47 | 1,304% |
| Furosemide | $74.52 | $14.38 | $60.14 | 418% |
| Gentamicin Sulfate | $64.42 | $.51 | $63.91 | 12,531% |
| Heparin Lock Flush | $38.30 | $13.60 | $24.70 | 182% |
| Metholprednisolone Sodium Succinate | $34.08 | $2.30 | $31.78 | 1,382% |
| Sodium Chloride | $670.89 | $3.22 | $667.67 | 20,735% |
| Tobramycin Sulfate | $150.52 | $2.94 | $147.58 | 5,020% |
| Vancomycin Hydrochloride | $382.14 | $4.98 | $377.16 | 7,574% |

(P006299-316.)

180.    One published report states: "Amikacin, used to treat an infection that HIV+ people get and manufactured by Abbott, had an AWP of $54.56. DOJ said the actual price was $6.75." *See States Mull Suit Against Drug Companies*, www.stateline.org (April 2, 2001) (P011268-70).

## 2.    Baxter

181.    Baxter engages in an organization-wide and deliberate scheme to inflate AWPs. Baxter has stated fraudulent AWPs for all or almost all of its drugs, including those set forth below.

| | | |
|---|---|---|
| Aggrastat | tirofiban hydrochloride | Glycoprotein Receptor Inhibitor (Blood Modifier) Used in the treatment of acute coronary symptoms |
| Ativan | lorazepam | Antianxiety Agent (Psychotherapeutic Agent); Anticonvulsant Used to relieve anxiety and treat insomnia |

- 59 -

| Bebulin VH | factor ix (systemic) | Antihemorrhagic Agent<br>Used to treat hemophilia B |
|---|---|---|
| Brevibloc | esmolol hcl | Autonomic Nervous System Agent<br>Used in the treatment of tachyarrhythmias in critical situations |
| Buminate | albumin (human) | Plasma Fraction (Blood Modifier)<br>Used in the treatment of hypovolemia and hypoalbuminemia |
| Claforan | cephalosporin (systemic) | Antibacterial Agent (Anti-Infective Agent)<br>Used in the treatment of infections caused by bacteria |
| Gammagard S/D | immune globulin solution | Antibacterial Agent (Anti-Infective Agent)<br>Used to prevent or treat some illnesses. |
| Gentran | dextran | Blood Derivative; Blood Modifier<br>Used in the emergency treatment of shock |
| Holoxan/Ifex | ifosfamide | Antineoplastic<br>Used in the treatment of various forms of cancer |
| Iveegam EN | immune globulin iv | Antibacterial Agent (Anti-Infective Agent)<br>Used as replacement therapy in patients with primary immunodeficiency syndromes |
| Osmitrol | mannitol | Osmotic Diuretic<br>Used to promote diureses during treatment of acute kidney failure. Also used to reduce intraocular and intracranial pressure |
| Recombinate | factor viii | Antihemophilic Factor<br>Used to induce blood clotting |
| Travasol | amino acid | Dietary Supplement<br>Used for nutritional support in cancer patients |
| Vancocin HCl | vancomycin hydrochloride | Antibacterial Agent (Anti-Infective Agent)<br>Used in the treatment of infections caused by bacteria |
| | cisplatin | Antineoplastic<br>Used to treat cancer of the bladder, ovaries, and testicles |
| | dextrose | Caloric Agent; Electrolyte Replenisher<br>Used to increase intake of calories and fluids |
| | doxorubicin hcl | Antineoplastic<br>Used in the treatment of various forms of cancer |
| | gentamicin | Antibacterial Agent (Anti-Infective Agent)<br>Used to treat serious bacterial infections |

- 60 -

| | | |
|---|---|---|
| | heparin | Anticoagulant (Cardiovascular Agent) Used to decrease the clotting ability of the blood |
| | sodium chloride | Flush; Abortifacient Used to remove medicine and blockage from intravenous (IV) catheter. Also used to induce abortion |

182.     The specific drugs manufactured and/or distributed by Baxter for which relief is currently sought in this case are set forth below or in Appendix A.

183.     Baxter controlled and set the AWPs for all of its drugs, including those appearing in Appendix A, through direct communications with industry compendia.  For example, a September 7, 1995 inter-office memorandum provides:

> I have been in contact with both *Red Book* and Medispan earlier this year about our AWPs. I told them that we will not be raising our AWPs for FVIII in 1995, and will only increase IGIV in the event of a label change.  There are a few general rules about AWP adjustments.
>
> • A manufacturer may raise AWPs at any time in the year.  There is a monthly publication called the *Red Book* Update that lists all changes to the April publication (the big red book).
>
> • If a manufacturer does decide to increase AWPs: - payors want a justification for the increase.  This is why we typically don't increase the AWP unless we have a label change, product enhancement . . . .

(BAX MDL 0004754) (Highly Confidential).

184.     Baxter's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs has resulted in excessive overpayments by the State of Nevada and Nevada citizens.

### a.     Baxter's understanding of AWP and intentional manipulation thereof

185.     Despite its manipulation, Baxter understood what AWP should mean: "The average price that a pharmacy (or provider) pays for the product from their drug wholesaler or

- 61 -

distributor." (BAX MDL 0011378) (Highly Confidential).  Contrary to its own definition of

AWP, Baxter nonetheless set AWPs for its drugs far in excess of what providers paid for those

drugs.

     186.    In at least one internal document, Baxter recognized that deliberate manipulation

of the spread was being wrongly used to gain competitive advantage by manufacturers:

> ***The deliberate manipulation of AWP or WAC prices is a problem
> that we need to address.  The spread between acquisition cost and
> AWP/WAC is direct profit for customers, and is being used to
> increase product positioning in the market by certain
> manufacturers.***

(BAX MDL 0012778) (Highly Confidential) (emphasis added).

     187.    Despite this recognition, Baxter nonetheless continued to manipulate its AWPs in

order to maintain the competitiveness of its own products based upon the spread.  In a January 6,

1992 inter-office memorandum, Baxter informs its employees how to respond to inquiries

concerning AWP increases for Baxter products:

> If you receive inquiries from customers or payors questioning our
> rationale on this recent increase in Published AWP for Baxter
> products please communicate the following message and no more.
>
> If any further information is needed please send the inquiry to me
> directly.
>
> A recent review of industry published direct prices and AWPs
> revealed that Baxter's published AWPs are significantly lower than
> competitive AWPs.  We have therefore adjusted our AWPs to meet
> competitive levels.
>
> Most of Baxter General Healthcare Division's products are sold to
> distributors at negotiated contract prices that are different from
> AWPs.  We do not have knowledge of or input to the actual prices
> charged to the provider by our distributors. The contracted prices
> to our distributors will not be directly affected by this change in
> AWPs.

(BAX MDL 0004210) (Highly Confidential).

     188.    In addition, Baxter's marketing and sales documents, which were prepared and

disseminated to its employees and agents via the U.S. mail and interstate wire facilities,

compared the costs of their respective drugs to those of their respective competitors and were intended to induce physicians to use Baxter drugs and shift market share in its favor. Other documents created and disseminated by Baxter compared the AWP and the actual "cost" of their respective drugs, so that medical providers could easily see the different "return-to-practice" amounts available for different levels of purchase.

189.    Baxter admittedly manipulated the AWP for Gammagard S/D. In 1996, Baxter distributed a memo providing "[t]he deliberate manipulation of AWP or WAC prices is a problem that we need to address. The spread between acquisition cost and AWP/WAC is a direct profit for customers, and is being used to increase product positioning in the market by certain manufacturers." Immediately below this text is a handwritten note reading "[w]ill raise AWP for GG/SD by 15%." (BAX MDL 0012778) (Highly Confidential).

190.    According to Baxter's own documents, the published AWPs for Gammagard S/D were higher than the actual prices provided to wholesalers. In a customer announcement dated September 24, 1996, Baxter increased the AWP for one particular dosage of Gammagard S/D from $640.71 to $737.00, and the WAC from $365.00 to $420.00. The difference between the new AWP and the new WAC ($317.00) constituted a 43% spread. (BAX MDL 005366) (Highly Confidential).

191.    A Baxter document made public as a result of the congressional investigation entitled, "Confidential – Baxter Internal Use Only," acknowledged that: "Increasing AWPs was a large part of our negotiations with the large homecare companies." Baxter further admitted in internal documents that homecare companies that reimburse based on AWP make a significantly higher margin. Thus, Baxter's own documents demonstrate its active participation in the scheme to artificially inflate AWPs.

192.    In response to government subpoenas, Baxter produced numerous price lists setting forth spreads between AWPs and prices apparently offered to wholesalers, providers and other intermediaries. A review of those price lists reveals that Baxter has consistently offered

- 63 -

hundreds of its drugs and other solutions to its customers at prices significantly below the published AWP and that the spread was of great importance to its customers. To repeat every one of those drugs and the spread offered to each specific customer here is not practical. However, set forth below in Tables 1 and 2 are a number of those drugs (not already referenced above) with spreads between the AWPs and direct prices. Table 1 is an analysis of certain dosages of Baxter drugs from a document entitled "Baxter Healthcare Corporation Intravenous and Irrigation Solution Products Report" (BAX MDL 0003428-46) (Highly Confidential)).

**Table 1**

| Drug | AWP | DP | Difference | % Spread |
|------|-----|-----|-----------|---------|
| Ringers | 10.84 | 6.34 | 4.50 | 71% |
| Lactated Ringers | 12.36 | 7.43 | 4.93 | 66% |
| Plasma-lyte 148 | 15.67 | 10.85 | 4.82 | 44% |
| 5% Travert and electrolyte no. 2 | 16.39 | 11.30 | 5.09 | 45% |
| 6% Gentran75 | 73.46 | 33.19 | 40.27 | 121% |
| Sterile Water | 9.97 | 6.15 | 3.82 | 62% |
| Sodium Lactate | 17.98 | 11.11 | 6.87 | 62% |
| Osmitrol | 70.28 | 35.12 | 35.16 | 100% |
| Gentamycin | 10.78 | 7.25 | 3.53 | 49% |
| Metronidazole injection | 15.34 | 7.85 | 7.49 | 95% |
| Rocephin | 40.18 | 32.67 | 7.51 | 23% |
| Nitroglycerin | 17.37 | 9.82 | 7.55 | 77% |
| Potassium Chloride Injection | 14.63 | 10.16 | 4.47 | 44% |
| Dopamine | 19.30 | 13.40 | 5.90 | 44% |
| Lidocaine | 22.74 | 13.48 | 9.26 | 67% |
| Heparin | 9.94 | 6.49 | 3.45 | 53% |
| Theophylline | 11.45 | 7.81 | 3.64 | 47% |
| Glycine for Irrigation | 32.87 | 19.70 | 13.17 | 67% |
| Tis-U-Sol | 22.73 | 11.36 | 11.37 | 100% |
| Acetic Acid | 20.70 | 10.91 | 9.79 | 90% |
| Irrigating Solution G | 16.67 | 11.04 | 5.63 | 51% |
| Balanced Salt Solution | 28.76 | 15.00 | 13.76 | 92% |
| Sodium Bicarbonate | 39.23 | 16.36 | 22.87 | 140% |

193.     Table 2 is an analysis of certain dosages of Baxter drugs from a document entitled "IV Nutrition Products" (BAX MDL 0003421-26) (Highly Confidential).

**Table 2**

| Drug | AWP | DP | Difference | % Spread |
|------|-----|-----|-----------|---------|
| Novamine Injection | 95.14 | 51.48 | 43.66 | 85% |

- 64 -

| | | | |
|---|---|---|---|
| Travasol | 83.44 | 40.21 | 43.23 | 108% |
| RenAmin Injection | 75.00 | 48.00 | 27.00 | 56% |
| Aminess Essential Amino Acid | 107.35 | 66.00 | 41.35 | 63% |
| BranchAmin Injection | 93.60 | 60.00 | 33.60 | 56% |

194.   The following are additional examples of Baxter drugs with inflated AWPs and the spread between the published AWP and wholesale cost is identified below. The size of these spreads is an indicator that the reported AWPs are grossly inflated and have no bearing to the actual average of wholesale prices.

| Drug Name | NDC | Quantity | 1999 AWP Red Book | W-Sale Spread | % |
|---|---|---|---|---|---|
| (AMINO ACIDS) Travasol (Amino Acids/Dextrose/Elect, KIT, IJ) | 00338-0783-98 | 3s | 232.99 | 161.59 | 226.3% |
| (AMINO ACIDS) Travasol (Amino Acids/Elect, INJ, IJ) | 00338-0457-03 | 500 ml 12s | 581.49 | 457.53 | 369.1% |
| (AMINO ACIDS) Travasol (Amino Acids/Elect, INJ, IJ) | 00338-0459-04 | 1000 ml 6s | 928.63 | 826.93 | 813.1% |
| (AMINO ACIDS) Travasol 10%, (INJ, IJ, 10%) | 00338-0625-03 | 500 ml 12s | 877.10 | 781.94 | 821.7% |
| (AMINO ACIDS) Travasol 10%, (INJ, IJ, 10%) | 00338-0625-06 | 2000 ml 6s | 1,278.78 | 859.68 | 205.1% |
| (AMINO ACIDS) Travasol 10%, (INJ, IJ, 10%) | 00338-0629-03 | 500 ml 12s | 1,001.23 | 753.67 | 304.4% |
| Dextrose (BULK PACKAGE) | 00338-0031-06 | 50%, 2000 ml | 55.16 | 33.56 | 155.4% |
| Dextrose (BULK PACKAGE) | 00338-0719-06 | 70%, 2000 ml | 62.38 | 49.07 | 368.7% |
| Dextrose (GLASS FULL FILL) | 00338-0348-04 | 70%, 1000 ml | 16.50 | 10.30 | 166.1% |
| Dextrose (GLASS UNDERFILL) | 00338-0032-13 | 70%, 500 ml | 36.25 | 28.09 | 344.2% |
| Dextrose (MINI-BAG PLUS) | 00338-0551-11 | 5%, 50 ml | 14.50 | 11.33 | 357.4% |
| Dextrose (MULTI PACK, MINI-BAG) | 00338-0017-31 | 5%, 50 ml | 9.68 | 7.88 | 437.8% |
| Dextrose (QUAD PACK, MINI-BAG) | 00338-0017-10 | 5%, 25 ml | 11.31 | 9.51 | 528.3% |
| Dextrose (QUAD PACK, MINI-BAG) | 00338-0017-11 | 5%, 50 ml | 9.68 | 7.88 | 437.8% |

- 65 -

| Drug Name | NDC | Quantity | 1999 AWP Red Book | W-Sale Spread | % |
|---|---|---|---|---|---|
| Dextrose (QUAD PACK, MINI-BAG) | 00338-0017-11 | 5%, 50 ml | 9.68 | 8.39 | 650.4% |
| Dextrose (QUAD PACK, MINI-BAG) | 00338-0017-18 | 5%, 100 ml | 9.68 | 7.88 | 437.8% |
| Dextrose (QUAD PACK, MINI-BAG) | 00338-0017-18 | 5%, 100 ml | 9.68 | 8.39 | 650.4% |
| Dextrose (SINGLE PACK, MINI-BAG) | 00338-0016-02 | 5%, 250 ml | 9.25 | 5.86 | 172.9% |
| Dextrose (SINGLE PACK, MINI-BAG) | 00338-0017-01 | 5%, 150 ml | 9.25 | 7.92 | 595.5% |
| Dextrose (SINGLE PACK, MINI-BAG) | 00338-0017-01 | 5%, 150 ml | 9.25 | 7.58 | 453.9% |
| Dextrose (SINGLE PACK, MINI-BAG) | 00338-0017-02 | 5%, 250 ml | 9.25 | 7.92 | 595.5% |
| Dextrose (SINGLE PACK, MINI-BAG) | 00338-0017-02 | 5%, 250 ml | 9.25 | 7.58 | 453.9% |
| Dextrose (SINGLE PACK, MINI-BAG) | 00338-0017-03 | 5%, 500 ml | 9.25 | 7.99 | 634.1% |
| Dextrose (SINGLE PACK, MINI-BAG) | 00338-0017-03 | 5%, 500 ml | 9.25 | 7.58 | 453.9% |
| Dextrose (SINGLE PACK, MINI-BAG) | 00338-0017-04 | 5%, 1000 ml | 10.81 | 8.56 | 380.4% |
| Dextrose (SINGLE PACK, MINI-BAG) | 00338-0017-04 | 5%, 1000 ml | 10.81 | 8.85 | 451.5% |
| Dextrose (SINGLE PACK, MINI-BAG) | 00338-0017-41 | 5%, 50 ml | 9.68 | 6.48 | 202.5% |
| Dextrose (SINGLE PACK, MINI-BAG) | 00338-0017-41 | 5%, 50 ml | 9.68 | 8.39 | 650.4% |
| Dextrose (SINGLE PACK, MINI-BAG) | 00338-0017-48 | 5%, 100 ml | 9.68 | 8.39 | 650.4% |
| Dextrose (SINGLE PACK, MINI-BAG) | 00338-0017-48 | 5%, 100 ml | 9.68 | 7.88 | 437.8% |
| Dextrose (SINGLE PACK, MINI-BAG) | 00338-0023-02 | 10%, 250 ml | 10.63 | 8.94 | 529.0% |
| Dextrose (SINGLE PACK, MULTI-BAG) | 00338-0017-38 | 5%, 100 ml | 9.68 | 7.88 | 437.8% |
| Dextrose (SINGLE PACK, MULTI-BAG) | 00338-0017-38 | 5%, 100 ml | 9.68 | 8.39 | 650.4% |
| Dextrose W/Sodium Chloride | 00338-0085-02 | 5%-0.45%, 250 ml | 9.94 | 7.01 | 239.2% |
| Dextrose W/Sodium Chloride | 00338-0085-02 | 5%-0.45%, 250 ml | 9.94 | 7.94 | 397.0% |
| Dextrose W/Sodium Chloride | 00338-0085-03 | 5%-0.45%, 500 ml | 9.93 | 8.13 | 451.7% |

- 66 -

| Drug Name | NDC | Quantity | 1999 AWP Red Book | W-Sale Spread | % |
|---|---|---|---|---|---|
| Dextrose W/Sodium Chloride | 00338-0085-03 | 5%-0.45%, 500 ml | 9.93 | 7.93 | 396.5% |
| Dextrose W/Sodium Chloride | 00338-0085-04 | 5%-0.45%, 1000 ml | 11.80 | 9.55 | 424.4% |
| Dextrose W/Sodium Chloride | 00338-0089-02 | 5%-0.9%, 250 ml | 9.94 | 7.01 | 239.2% |
| Dextrose W/Sodium Chloride | 00338-0089-03 | 5%-0.9%, 500 ml | 9.94 | 7.94 | 397.0% |
| Dextrose W/Sodium Chloride | 00338-0089-04 | 5%-0.9%, 1000 ml | 11.81 | 9.56 | 424.9% |
| Sodium Chloride (MINI-BAG PLUS) | 00338-0553-11 | 0.9%, 50 ml | 14.50 | 11.18 | 336.7% |
| Sodium Chloride (MINI-BAG PLUS) | 00338-0553-18 | 0.9%, 100 ml | 14.50 | 11.33 | 357.4% |
| Sodium Chloride (MULTI PACK, MINI-BAG) | 00338-0049-31 | 0.9%, 50 ml | 9.61 | 7.81 | 433.9% |
| Sodium Chloride (MULTI PACK, MINI-BAG) | 00338-0049-31 | 0.9%, 50 ml | 9.61 | 8.32 | 645.0% |
| Sodium Chloride (MULTI PACK, MINI-BAG) | 00338-0049-38 | 0.9%, 100 ml | 9.67 | 7.87 | 437.2% |
| Sodium Chloride (MULTI PACK, MINI-BAG) | 00338-0049-38 | 0.9%, 100 ml | 9.67 | 8.38 | 649.6% |
| Sodium Chloride (QUAD PACK, MINI-BAG) | 00338-0049-18 | 0.9%, 100 ml | 9.67 | 7.87 | 437.2% |
| Sodium Chloride (QUAD PACK, MINI-PACK) | 00338-0049-11 | 0.9%, 50 ml | 9.67 | 7.87 | 437.2% |
| Sodium Chloride (SINGLE PACK, MINI-BAG) | 00338-0049-01 | 0.9%, 150 ml | 9.10 | 7.42 | 441.7% |
| Sodium Chloride (SINGLE PACK, MINI-BAG) | 00338-0049-01 | 0.9%, 150 ml | 9.10 | 7.77 | 584.2% |
| Sodium Chloride (SINGLE PACK, MINI-BAG) | 00338-0049-02 | 0.9%, 250 ml | 9.10 | 7.45 | 451.5% |
| Sodium Chloride (SINGLE PACK, MINI-BAG) | 00338-0049-02 | 0.9%, 250 ml | 9.10 | 7.77 | 584.2% |
| Sodium Chloride (SINGLE PACK, MINI-BAG) | 00338-0049-03 | 0.9%, 500 ml | 9.10 | 7.44 | 448.2% |

- 67 -

| Drug Name | NDC | Quantity | 1999 AWP Red Book | W-Sale Spread | % |
|---|---|---|---|---|---|
| Sodium Chloride (SINGLE PACK, MINI-BAG) | 00338-0049-03 | 0.9%, 500 ml | 9.10 | 7.60 | 506.7% |
| Sodium Chloride (SINGLE PACK, MINI-BAG) | 00338-0049-04 | 0.9%, 1000 ml | 9.86 | 8.06 | 447.8% |
| Sodium Chloride (SINGLE PACK, MINI-BAG) | 00338-0049-04 | 0.9%, 1000 ml | 9.86 | 7.61 | 338.2% |
| Sodium Chloride (SINGLE PACK, MINI-BAG) | 00338-0049-41 | 0.9%, 50 ml | 9.67 | 7.96 | 465.5% |
| Sodium Chloride (SINGLE PACK, MINI-BAG) | 00338-0049-48 | 0.9%, 100 ml | 9.67 | 7.87 | 437.2% |
| Sodium Chloride (SINGLE PACK, MINI-BAG) | 00338-0049-48 | 0.9%, 100 ml | 9.67 | 8.38 | 649.6% |

### b.     Baxter provided other improper incentives

13.     Baxter also provided physicians with free goods with the understanding that physicians would bill for those goods, in violation of federal law.  Billing for free goods was a way for physicians to obtain greater profit at the expense of government payors and Patients. Baxter's fraudulent use of free goods aimed at increasing market share is evidenced by an internal memorandum from a Baxter contract administrator to certain field sales managers encouraging the distribution by U.S. mail or otherwise of free product to achieve overall price reduction:

> BAXTER:  "The attached notice from Quantum Headquarters was sent on April 10th to all their centers regarding the reduction on Recombinate pricing.  Please note that they want to continue to be invoiced at the $.81 price.  They have requested that we send them free product every quarter calculated by looking at the number of units purchased in that quarter and the $.13 reduction in price . . . free product given to achieve overall price reduction."

Letter from Stark, Committee on Ways and Means to Holman, Pres. Pharmaceutical Research and Manufacturers of America, Sept. 28, 2002 (P0075410-44).

- 68 -

195. Another example of Baxter's abuse of AWPs is the provision of free goods. For example, one Baxter document evidences a purchase order to PBM Caremark, in which Baxter provided free goods with a value of $136,684. These free goods were not reported in Baxter's AWP. On information and belief, based upon the foregoing examples, as well as an investigation into industry sales practices, the provision of free goods is not typically an isolated instance at a drug company, but instead is part of a regional or nationwide marketing strategy that is approved at levels higher than individual salespersons. Thus, it is reasonable to infer that other instances of such conduct exists and will be revealed upon discovery.

c. **Baxter has been the target of multiple government investigations**

196. Baxter has been investigated by the United States Department of Justice, Department of Health and Human Services Office of Inspector General, the Attorney General for the State of California, the Attorney General for the State of Texas, the Attorney General for the State of Illinois, and the Committee on Commerce of the House of Representatives.

197. These investigations confirm that Baxter has engaged in a deliberate scheme to inflate AWPs for many or most of its drugs. In a report published by the DHHS (AB-00-86), the DOJ documented at least 41 instances where the published AWPs for various dosages of drugs manufactured by Baxter were substantially higher than the actual prices listed by wholesalers. The chart below sets forth the four drugs identified by the DOJ and the spread associated with one particular dosage of each drug. These figures compare the DOJ's determination of an accurate AWP for that particular dosage, based upon wholesalers' price lists, with the AWP reported by Baxter in the 2001 *Red Book*.

| Drug in Lowest Dosage Form | Baxter's 2001 *Red Book* AWP | DOJ Determined Actual AWP | Difference | Percentage Spread |
|---|---|---|---|---|
| Dextrose | $928.51 | $2.25 | $926.26 | 41,167% |
| Dextrose Sodium Chloride | $357.69 | $2.93 | $354.76 | 12,108% |
| Sodium Chloride | $928.51 | $1.71 | $926.80 | 54,199% |
| Factor VIII | $1.28 | $.92 | $.36 | 39% |

(P006299-006316).

- 69 -

3.     **The BMS Group (Bristol-Myers, OTN and Apothecon)**

198.    The BMS Group engages in an organization-wide and deliberate scheme to inflate AWPs. The BMS Group has stated fraudulent AWPs for all or almost all of its drugs, including those set forth below.

| | | |
|---|---|---|
| Avapro | irbesartan | Antihypertensive Agent<br>Used to treat hypertension |
| Blenoxane | bleomycin sulfate | Antineoplastic<br>Used in the treatment of various forms of cancer |
| Buspar | buspirone hcl | Antianxiety Agent (Psychotherapeutic Agent)<br>Used to treat certain anxiety disorders or to relieve the symptoms of anxiety |
| Carboplatin | paraplatin | Antineoplastic<br>Used to treat cancer of the ovaries |
| Cefzil | cefprozil | Antibacterial Agent (Anti-Infective Agent)<br>Used in the treatment of infections caused by bacteria |
| Coumadin | warfarin sodium | Anticoagulant (Blood Modifier)<br>Used to promote clotting |
| Cytoxan | cyclophosphamide | Antineoplastic<br>Used in the treatment of various forms of cancer |
| Etopophos | etoposide phosphate | Antineoplastic<br>Used to treat cancer of the testicles and certain types of lung cancer |
| Glucophage | meformin hcl | Antihyperglycemic Agent<br>Used to treat a type 2 diabetes mellitus. |
| Monopril | fosinopril sodium | Antihypertensive Agent; Vasodilator (Cardiovascular Agent)<br>Used to treat hypertension |
| Monopril HCT | fosinopril sodium & hydrochloro-thiazide | ACE Inhibitor (Cardiovascular Agent)<br>Used in the treatment of hypertension and congestive heart failure |
| Plavix | clopidogrel bisulfate | Antithrombotic Agent<br>Used to lessen the chance of heart attack or stroke |
| Rubex | doxorubicin hcl | Antineoplastic<br>Used in the treatment of various forms of cancer |
| Serzone | nefazodone hcl | Antidepressant (Psychotherapeutic Agent)<br>Used to treat mental depression |
| Taxol | paclitaxel | Antineoplastic<br>Used in the treatment of various forms of cancer |

- 70 -

| Tequin | gatifloxacin | Antibacterial Agent (Anti-Infective Agent) Used to treat bacterial infections |
| Vepesid | etoposide | Antineoplastic Used to treat cancer of the testicles and certain types of lung cancer |
| Videx EC | didanosine | Antiviral Agent (Anti-Infective Agent) Used in the treatment of HIV infection |
| | amikacin sulfate | Antibiotic Agent (Anti-Infective Agent) Used to treat respiratory tract, urinary tract, bone, skin and soft tissue infections |
| | amphotercin b | Antifungal Agent (Anti-Infective Agent) Used to help the body overcome serious fungus infections |

199.    The specific drugs manufactured and/or distributed by The BMS Group for which relief is currently sought in this case are set forth below or in Appendix A.

200.    The BMS Group controlled and set the AWPs for all of its drugs, including those appearing in Appendix A, through direct communications with industry compendia.  For example, in one BMS document, Denise Kaszuba, a senior BMS Group pricing analyst, instructed the *Red Book* that:

> Effective immediately, Bristol-Myers Oncology Division products factor used in determining the AWP should be changed from 20.5% to 25%.  This change should not effect [*sic*] any other business unit of Bristol-Myers Squibb Company.

Other internal documents clearly indicate that BMS had direct control over the spread between its states wholesale price and the published AWP.  A BMS office dispatch dated September 9, 1992 notes the need for a mark up of the AWP over the state wholesale price.  "After reviewing the results of the wholesaler survey performed by Bristol Oncology . . we have determined that for those items with a labeler 0003, we will use a 1.25 mark-up and for those items with the labeler 00015, we will use a 1.20 mark-up.  We noticed too, that FDB and Redbook use a 1.20 for everything."  (BMSAWP/0011246).

- 71 -

201.    The BMS Group's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs has resulted in excessive overpayments by the State of Nevada and Nevada citizens.

###### a.    The BMS Group's understanding of AWP and intentional manipulation thereof

202.    BMS was well aware that providers and other purchasers of its drugs were using the spread to determine whether to purchase its drugs. Indeed, BMS was aware of and tracked the prices and AWPs of its competitors in order to remain competitive. In an internal BMS memorandum, BMS identifies its competitors who sell etoposide (Gensia, Pharmacia, Abbott, Chiron, Ben Venue, Immunex and Astra) and their corresponding list price and AWPs. (BMS3CA/000128).

203.    BMS created AWP competitor analyses that tracked the AWPs of its competitors' relevant drugs, and used that data internally to propose suggested AWPs for BMS drugs. One such competitor analysis set forth the competitor AWPs for Atenolol with chlorthalidone and provided an "Apothecon suggested AWP" for each dosage. (BMS3CA/000648)

204.    BMS clearly believed that the maintenance of a spread on its drugs was important in gaining and maintaining market share. In an internal BMS document, concerning its drug Vepacid (etoposide), BMS noted:

> The Etopophos product file is significantly superior to that of etoposide injection . . . . Currently, physician practice can take advantage of the growing disparity between Vepesid's list price (and, subsequently, the Average Wholesale Price) and the actual acquisition cost when obtaining reimbursement for etoposide purchases. If the acquisition price of Etopophos is close to the list price, the physician's financial incentive for selecting the brand is largely diminished.

205.    BMS internal documents reveal that in 1995, BMS set the *Red Book* AWP for Blenoxane at $276.29. At the same time, BMS was selling Blenoxane to oncologists practicing in St. Petersburg, Florida for only $224.22. In 1996, BMS increased its reported AWP for Blenoxane to $291.49, while continuing to sell the drug to oncologist for $224.27. In 1997,

- 72 -

BMS falsely reported that it had increased the AWP of Blenoxane to $304.60, when in reality, BMS had lowered the price to oncologists to $155.00. In 1998, BMS again reported a false AWP for Blenoxane of $304.60 while further reducing the actual price to oncologists to $140.00.

206.    An internal BMS Group document shows that the AWP set by the BMS Group for its drugs bears no relation to an *actual* wholesale price, and is greater than the highest price actually paid by providers. More specifically, in a discussion about lowering Vepesid's AWP in order to create sales for Etopophos, the BMS Group stated that the "AWP for Vepesid would be reduced from its current level to the highest bid price currently in the marketplace."

207.    BMS Group documents also reveal that physicians were making medical decisions based on how much profit they could make from the AWP manipulated spread. In considering provider choice between BMS drugs Etopophos® and Vepesid® (Etoposide), the BMS Group noted that:

> The Etopophos product file is significantly superior to that of etoposide injection . . . . Currently, physician practice can take advantage of the growing disparity between Vepesid's list price (and, subsequently, the Average Wholesale Price) and the actual acquisition cost when obtaining reimbursement for etoposide purchases. If the acquisition price of Etopophos is close to the list price, the physician's financial incentive for selecting the brand is largely diminished.

208.    While the BMS Group and other defendants have placed the blame for setting published AWPs on the publications in which the AWPs are contained, another BMS Group document demonstrates that publications reporting AWPs had no discretion to set AWPs, and instead published verbatim the prices reported by the BMS Group and other Defendants. In the document, Denise Kaszuba, a senior BMS Group pricing analyst, instructed the *Red Book* that:

> Effective immediately, Bristol-Myers Oncology Division products factor used in determining the AWP should be changed from 20.5% to 25%. This change should not effect [*sic*] any other business unit of Bristol-Myers Squibb Company.

- 73 -

209. The chart below further evidences BMS Group drugs for which inflated AWPs were published. The size of these spreads is an indicator that the reported AWPs are grossly inflated and have no bearing to the actual average of wholesale prices.

| Drug Name | NDC | Quantity | 1999 AWP Red Book | W-Sale Spread | % |
|---|---|---|---|---|---|
| (CYCLOPHOSPHAMID E) Cytoxan Lyophilized (PDJ, LJ, {VIAL}) | 00015-0539-41 | 100 mg ea | 6.45 | 2.78 | 75.7% |
| (CYCLOPHOSPHAMID E) Cytoxan Lyophilized (PDJ, LJ, {VIAL}) | 00015-0539-41 | 100 mg ea | 6.45 | 2.53 | 64.5% |
| (CYCLOPHOSPHAMID E) Cytoxan Lyophilized (PDJ, LJ, {VIAL}) | 00015-0539-41 | 100 mg ea | 6.45 | 1.49 | 30.0% |
| (CYCLOPHOSPHAMID E) Cytoxan Lyophilized (PDJ, LJ, {VIAL}) | 00015-0546-41 | 200 mg ea | 12.25 | 6.42 | 110.1% |
| (CYCLOPHOSPHAMID E) Cytoxan Lyophilized (PDJ, LJ, {VIAL}) | 00015-0546-41 | 200 mg ea | 12.25 | 2.83 | 30.0% |
| (CYCLOPHOSPHAMID E) Cytoxan Lyophilized (PDJ, LJ, {VIAL}) | 00015-0547-41 | 400 mg ea | 25.71 | 18.21 | 242.8% |
| (CYCLOPHOSPHAMID E) Cytoxan Lyophilized (PDJ, LJ, {VIAL}) | 00015-0547-41 | 400 mg ea | 25.71 | 5.93 | 30.0% |
| (CYCLOPHOSPHAMID E) Cytoxan Lyophilized (PDJ, LJ, {VIAL}) | 00015-0548-41 | 1 gm ea | 51.43 | 36.43 | 242.9% |
| (CYCLOPHOSPHAMID E) Cytoxan Lyophilized (PDJ, LJ, {VIAL}) | 00015-0549-41 | 2 gm ea | 102.89 | 73.72 | 252.7% |
| (ETOPSIDE) Vepesid (INJ, LJ {M.D.V.}) | 00015-3084-20 | 20 mg/ml, 7.5 ml | 204.74 | 153.29 | 297.9% |
| (ETOPSIDE) Vepesid (INJ, LJ {M.D.V.}) | 00015-3095-20 | 20 mg/ml, 5 ml | 136.49 | 102.19 | 297.9% |

210. Additional evidence of the phony nature of this defendant's AWPs arises from its manipulation of its reported AWPs in late 2000 and 2001, when it increased its reported AWPs for certain of the drugs identified in Appendix A across the board without any change in product or service offered. If these AWPs were real, price increases would not be uniform and would bear a relationship to some product change. At the same time of these price increases, cost to

- 74 -

providers did not increase, further evidencing the phony nature of the AWPs. The specific drugs subject to this manipulation were BuSpar, Cefzil, Coumadin, Glucophage, Glucophage XR, Glucovance, Metaglip, Monopril, Monopril HCT, Pravachol, Serzone, Sinemet, Sinemet CR, and Tequin.

### b.    The BMS Group provided other improper incentives

211.    As part of its scheme the BMS Group also used free drugs and other goods to encourage participation by physicians. Thus, for example, the BMS Group provided free Etopophos® to two Miami oncologists in exchange for their agreement to purchase other BMS Group cancer drugs. Similarly, other documents show that the BMS Group provided free Cytogards in order to create a lower-than-invoice cost to physicians that purchased other cancer drugs through OTN. (A Cytogard is a device that prevents spillage of intravenous administered treatments such as BMS's cancer drug Etopophos®.)

### c.    The BMS Group has been the target of multiple government investigations

212.    In connection with its scheme to inflate AWPs, BMS has been investigated by the United States Department of Justice, the Commonwealth of Massachusetts, the Office of Inspector General of the U.S. Department of Health and Human Services, the Attorney General for the State of Texas, the State of California Office of the Attorney General, the State of California Department of Justice, Bureau of Medi-Cal Fraud and Elder Abuse, and the U.S. House of Representatives, Committee on Commerce. Defendant Apothecon has been investigated in connection with its scheme to inflate AWPs by at least the Office of Medicare Fraud and Elder Abuse, Office of Attorney General, State of Texas.

213.    These investigations confirm that BMS engaged in an ongoing deliberate scheme to inflate AWPs. For example, by letter dated February 27, 2001 to BMS, Rep. Stark outlined numerous examples of illegal practices by BMS. Referring to a letter from Denis Kaszuba, a

- 75 -

senior pricing analyst at BMS to Medispan, dated August 10, 1992 (BMSAWP/0011247), Rep.

Stark noted:

> Bristol has control over the AWPs, DPs, and WACs published for
> its drugs and directs national publishers to change their prices.
> Bristol directed a national publisher of drug prices to increase all
> of Bristol's AWPs for oncology drugs by multiplying Bristol's
> supplied direct prices by a 25% factor rather than the previous
> 20.5% factor . . . . The increase in the AWP created a spread that,
> in itself, provided a financial kickback to oncologists for
> prescribing Bristol's cancer drugs.

214.    In the same letter, Rep. Stark noted:

> The evidence clearly shows that Bristol has intentionally reported
> inflated prices and has engaged in other improper business
> practices in order to cause its customers to receive windfall profits
> from Medicare and Medicaid when submitting claims for certain
> drugs. The evidence further reveals that Bristol manipulated prices
> for the express purpose of expanding sales and increasing market
> share of certain drugs where the arranging of a financial benefit or
> inducement would influence the decisions of healthcare providers
> submitting the Medicare and Medicaid claims.

215.    The February 27, 2001 letter from Rep. Stark to BMS noted that as to BMS ". . .

the manipulated discrepancies between [BMS's] inflated AWPs and DPs versus their true costs

are staggering. For example, in the 2000 edition of the *Red Book*, Bristol reported an AWP of

$1296.64 for . . . Vepesid (Etoposide) for injection . . . while Bristol was actually offering to sell

the exact same drug to [a large national group purchasing organization] for $70.00." The

difference noted by Rep. Stark represents a % 1,752 spread related to Vepecid.

216.    In a report published by the DHHS, the DOJ documented numerous instances

where the published AWPs for various dosages of five (5) drugs manufactured by the BMS

Group were substantially higher than the actual prices listed by wholesalers. The chart below

sets forth the BMS Group drugs identified by the DOJ and the spread associated with one

particular dosage of each drug. These figures compare the DOJ's determination of an accurate

AWP for that particular dosage, based upon wholesalers' price lists, with the AWP reported by

the BMS Group in the 2001 *Red Book*.

| Drug | Manufacturer | BMS's 2001 *Red Book* AWP | DOJ Determined Actual AWP | Difference | Percentage Spread |
|------|--------------|---------------------------|----------------------------|------------|-------------------|
| Amikacin Sulfate | Apothecon | $32.89 | $17.31 | $15.58 | 90% |
| Amphotercin B | Apothecon | $17.84 | $6.20 | $11.64 | 188% |
| Bleomycin Sulfate | BMS | $609.20 | $509.29 | $99.91 | 20% |
| Cyclophospamide | BMS | $102.89 | $45.83 | $57.06 | 125% |
| Etoposide (Vepesid) | BMS | $136.49 | $34.30 | $102.19 | 298% |

217.   In a report published by DHHS, the DOJ documented at least 12 instances where the published AWPs for drugs manufactured by the BMS Group were substantially higher than the actual prices listed by wholesalers.

218.   In 1997, an OIG Report identified three other Medicare Part B drugs with inflated AWPs – which the 1997 *Red Book* indicates were manufactured only by the BMS Group at that time: Paraplatin® (carboplatin), Rubet® (doxorubicin hydrochloride), and Taxol® (paclitaxel). Sales of these inflated drugs were substantial. For example, Paclitaxel generated $941 million in revenue for the BMS Group in 1997, and Carboplatin generated $702 million in revenue in 2001.

219.   The government's investigation uncovered other drugs for which the BMS Group was stating a fraudulent AWP. Specifically:

   a.   In the 2000 edition of the *Red Book*, BMS reported an AWP of $1296.64 for Vepesid (Etoposide) for injection while BMS was actually offering to sell the exact same drug to a large customer for only $70.00.

   b.   From 1995 through 1998 the *Red Book* listed AWP for BMS' Blenoxane 15u increased from $276.29 to $304.60, while the actual cost to physicians declined from $224.22 to $140.00, resulting in a spread of $164.60 in 1998.

   **4.   Dey**

220.   Dey engages in an organization-wide and deliberate scheme to inflate AWPs. Dey has stated fraudulent AWPs for all or almost all of its drugs, including those set forth below.

| | | |
|---|---|---|
| | acetylcysteine | Mucolytic (Respiratory Agent: Diagnostic Aid) Used for certain lung conditions when increased amounts of mucus make breathing difficult |

- 77 -

| | albuterol or albuterol sulfate | Bronchodilator (Respiratory Agent)<br>Used for relief of bronchospasm in asthma sufferers |
| --- | --- | --- |
| | cromolyn sodium | Antiallergic and Mast Cell Stabilizer<br>Used to help prevent or treat the symptoms of seasonal or chronic allergic rhinitis |
| | ipratropium bromide | Bronchodilator (Respiratory Agent)<br>Used for relief of bronchospasm in asthma sufferers |
| | metaproterenol sulfate | Bronchodilator (Respiratory Agent)<br>Used for relief of bronchospasm in asthma sufferers |

221.    The specific drugs manufactured and/or distributed by Dey for which relief is
currently sought in this case are set forth below or in Appendix A.

222.    Dey controlled and set the AWPs for all of its drugs, including those appearing in
Appendix A, through direct communications with industry compendia. For example, Dey's own
documents indicate that it initially set both the AWP and WAC for its products and also regularly
approved subsequent AWPs and WACs published by industry compendia. In a January 13, 1996
letter from Dey to First DataBank, Dey announced the availability of a new ipratropium bromide
inhalation solution. The letter includes the following instructions to First DataBank:

"Effective immediately, please update your database to reflect the
introduction of this new DEY product as follows:

| NDC/ Order Number | Description | Vial Size | Strength | Units per Ctn | Ctns per Case | AWP | WAC |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 49502-685-03 | Ipatropium Bromide Inhalation Solution 2.0% | 2.5ml | 0.5mg/2.5ml | 25 | 12 | $44.10 | $25.50 |
| 49502-685-60 | Ipatropium Bromide Inhalation Solution 2.0% | 2.5ml | 0.5mg/2.5ml | 60 | 12 | $105.60 | $60.90 |

(DL-CA00120) (Confidential). In a 1998 worksheet produced by *Red Book* to Dey in order to
verify its listings of Dey products, an employee of Dey went through each of the Dey products

- 78 -

listed in the *Red Book* and approved each of the AWPs and WACs for each of its products.

Handwritten comments on the document include the notation "9/11/98 – checked AWP & WAC

pricing (backup attached)" (DL-CA 00080) (Confidential).

223.    As noted above, in its suit against First DataBank and Medi-Span, Dey admitted

to controlling the published AWPs.  To reiterate, Dey has an agreement with First DataBank and

Medi-Span to provide the reporting services with AWP pricing information.  Pursuant to this

agreement (and in order to make Dey's products eligible for reimbursement through Medicaid

Programs), Dey has reported WACs and AWPs.  (¶¶ 26-32 of Dey Complaint.)

> In each case, until the events that have resulted in the present
> crisis, First DataBank has (except for some inadvertent errors)
> selected for listing in its published reports the AWP as suggested
> by Dey.  For over ten years, until April 2003, no prices other than
> those submitted by Dey have been listed by First DataBank as
> AWP for Dey products in its databases [even though Dey also
> reported declining WACs for the products]."

(¶ 32 of Dey Complaint; *see also* ¶ 36 of Dey Complaint for similar allegation against Medi-

Span.).

224.    Dey's scheme to inflate its reported AWPs and market the resulting spread to

increase the market share of its drugs has resulted in excessive overpayments by the State of

Nevada and Nevada citizens.

### a.    Dey's understanding of AWP and intentional manipulation thereof

225.    Dey was aware that its customers were "spread shopping" and competed by

increasing the spread to its customers.

226.    In an internal memorandum regarding Albuterol Pricing Strategies, one of three

primary pricing objectives was "TO PROVIDE INCENTIVE TO RETAIL/CHAIN

PROVIDERS TO USE DEY'S ALBUTEROL UD BY INCREASING THE SPREAD ON

MEDICARE/MEDICAID REIMBURSEMENTS." (DL-TX-0090852) (confidential).  Thus, in

the pharmacy and chain distribution network, Dey "WILL INCREASE SPREAD FOR RETAIL

AND PROVIDE DEY WITH HIGHEST PROFIT." (DL-TX-0090854) (confidential).

- 79 -

227. In an internal worksheet filled out by Dey in preparation for a bid of potential sales to one of its customers, Dey listed the current contract price of various products as well as a recommended new contract price. In the notes next to these figures the worksheet states, "This account needs AWP-40% or better to see profit due to the employer groups they serve. Have not made the switch to our product line due to the spread . . ." (DL-TX-0014029)

228. Competition between generic products produced by Dey was fierce and the spread was a major factor in this competition. In another similar bid price worksheet for a different customer, the corresponding notes state "cromolyn pricing is at AWP-40% and 35% respectively – bear in mind that we are competing with the branded spread and the generic perception of [sic] everything should be AWP-60%" (DL-TX-0014439)

229. This competition came at the expense of those, including the Nevada Medicaid Program, whose payments were based on AWP. For instance, Albuterol sulfate, a multisource drug and one of Dey's top selling products, was a focus of the federal government's investigation into AWP inflation. OIG found that "Medicare's reimbursement amount for albuterol was nearly six times higher than the median catalog price" and that "Medicare and its beneficiaries would save between $226 million and $245 million a year if albuterol were reimbursed at prices available to suppliers." *See* "Excessive Medicare Reimbursement for Albuterol," OEI-03-01-00410, March 2002.

230. The OIG determined that the Medicare-allowed amount for albuterol sulfate in 1996 was $0.42. However the actual wholesale price was $0.15, and the highest available wholesale price was $0.21.

231. GAO also found that albuterol sulfate was one of a small number of products that accounted for a large portion of Medicare spending and volume. More specifically, albuterol sulfate ranked first in volume of units covered by Medicare, accounting for 65.8% of total units reimbursed. Furthermore, albuterol sulfate accounted for 6.3% of total Medicare spending, ranking fifth out of more than 400 covered drugs. *See* GAO Report to Congressional

- 80 -

Committees, MEDICARE: Payments for Covered Outpatient Drugs Exceed Providers' Cost, Tables 1 and 2, pp. 7-8.

232. According to Dey's own documents, the published AWPs for many of its own products were higher than the actual prices charged wholesalers and other intermediaries. Table 1 below is excerpted from a pricing proposal by Dey to McKesson Drug Company, one of the country's largest wholesalers, dated December 20, 1995.

**Table 1**

| Generic Name | Strength | Size | AWP | WAC | Suggested Sell Price | % Discount from WAC | % Spread |
|---|---|---|---|---|---|---|---|
| Acetylcysteine Solution | 10% | 4 mL | $67.80 | $25.80 | $18.00 | -40.0% | 277% |
| Acetylcysteine Solution | 10% | 10 mL | $40.26 | $15.27 | $13.50 | -30.0% | 198% |
| Acetylcysteine Solution | 10% | 30 mL | $110.48 | $41.97 | $33.50 | -35.0% | 230% |
| Acetylcysteine Solution | 20% | 4 mL | $81.36 | $31.08 | $21.50 | -40.0% | 278% |
| Acetylcysteine Solution | 20% | 10 mL | $48.66 | $18.57 | $16.20 | -30.0% | 200% |
| Acetylcysteine Solution | 20% | 30 mL | $133.43 | $50.64 | $39.90 | -35.0% | 234% |
| Acetylcysteine Solution | 20% | 100 mL | $92.21 | $75.90 | $59.90 | -40.0% | 54% |
| Albuterol Sulfate Inhalation Soln. | 0.083% | 3 mL | $30.25 | $14.50 | $12.00 | -29.3% | 152% |
| Albuterol Sulfate Inhalation Soln. | 0.083% | 3 mL | $36.30 | $17.40 | $14.40 | -29.3% | 152% |
| Albuterol Sulfate Inhalation Soln. | 0.083% | 3 mL | $72.60 | $34.50 | $28.80 | -28.7% | 152% |
| Cromolyn Sodium Inhalation, USP | 20 mg/2ml | 2 mL | $42.00 | $34.20 | $29.00 | -25.0% | 45% |
| Cromolyn Sodium Inhalation, USP | 20 mg/2ml | 2 mL | $84.00 | $66.00 | $58.00 | -22.3% | 45% |
| Metaproterenol Sulfate Inhalation Soln. | 0.4% | 2.5 mL | $30.75 | $11.00 | $10.00 | -21.5% | 207% |
| Metaproterenol Sulfate Inhalation Soln. | 0.6% | 2.5 mL | $30.75 | $11.00 | $10.00 | -21.5% | 207% |
| Sodium Chloride Solution | 0.9% | 3 mL | $24.20 | $13.00 | $10.94 | -32.7% | 121% |
| Sodium Chloride Solution | 0.9% | 5mL | $24.20 | $13.00 | $10.94 | -32.7% | 121% |

(DL-TX 0011179)

233. And between 1992 and 1998, Dey kept its AWP for Albuterol Sulfate 0.083% NDC #4950-20687, at $32.30, while its wholesale price decreased each year:

| PERCENTAGE OF "SPREAD" BETWEEN DEY LAB'S REPORTED AWP AND THE ACTUAL WHOLESALE PRICE FOR ALBUTEROL SULFATE 0.083% NDC# 4950-20687-03, 3ml/25's | | | |
|---|---|---|---|
| Year | *Red Book*/First DataBank AWP | McKesson Wholesale Price | Percent "Spread" |

- 81 -

| 1992 | $32.30 | $25.45 | 21.3% |
|------|--------|--------|-------|
| 1993 | $30.25 | $25.39 | 16.1% |
| 1994 | $30.25 | $23.69 | 21.7% |
| 1995 | $30.25 | $15.26 | 49.6% |
| 1996 | $30.25 | $15.26 | 49.6% |
| 1997 | $30.25 | $11.84 | 60.9% |
| 1998 | $30.25 | $10.00 | 67.0% |

234.    If the AWP stayed the same, but the price decreased as set forth below, the

reported AWP cannot be an "average" wholesale price.

235.    Additional manipulation of Dey AWPs occurred as set forth below. The size of

these spreads is an indicator that the reported AWPs are grossly inflated and have no bearing to

the actual average of wholesale prices.

| Drug Name | NDC | Quantity | 1999 AWP Red Book | W-Sale Spread | % |
|-----------|-----|----------|-------------------|---------------|---|
| Acetylcysteine (SOL, IH, 10%) | 49502-0181-10 | 10 ml 3s | 40.26 | 24.99 | 163.7% |
| Acetylcysteine (SOL, IH, 10%) | 49502-0181-30 | 30ml 3s | 110.48 | 68.51 | 163.2% |
| Acetylcysteine (SOL, IH, 10%) | 49502-0184-04 | 4 ml 12 s | 67.80 | 42.00 | 162.8% |
| Acetylcysteine (SOL, IH, 20%) | 49502-0182-00 | 100ml ea | 92.21 | 16.31 | 21.5% |
| Acetylcysteine (SOL, IH, 20%) | 49502-0182-04 | 4 ml 12 s | 81.36 | 50.28 | 161.8% |
| Acetylcysteine (SOL, IH, 20%) | 49502-0182-10 | 10 ml 3s | 48.66 | 30.09 | 162.0% |
| Acetylcysteine (SOL, IH, 20%) | 49502-0182-30 | 30ml 3s | 133.43 | 82.79 | 163.5% |
| Albuterol Sulfate (SOL, IH, 0.083%) | 49502-0196-20 | 0.5%, 20ml | 14.99 | 8.49 | 130.6% |
| Albuterol Sulfate (SOL, IH, 0.083%) | 49502-0196-20 | 0.5%, 20ml | 14.99 | 9.67 | 181.8% |
| Albuterol Sulfate (SOL, IH, 0.083%) | 49502-0697-03 | 3 ml 25s UD | 30.25 | 20.75 | 218.4% |
| Albuterol Sulfate (SOL, IH, 0.083%) | 49502-0697-03 | 3 ml 25s UD | 30.25 | 21.41 | 242.2% |
| Albuterol Sulfate (SOL, IH, 0.083%) | 49502-0697-33 | 3 ml 30s UD | 36.30 | 24.90 | 218.4% |
| Albuterol Sulfate (SOL, IH, 0.083%) | 49502-0697-33 | 3 ml 30s UD | 36.30 | 25.69 | 242.1% |
| Albuterol Sulfate (SOL, IH, 0.083%) | 49502-0697-60 | 3 ml 60s UD | 72.60 | 49.80 | 218.4% |

- 82 -

| Drug Name | NDC | Quantity | 1999 AWP Red Book | W-Sale Spread | % |
|---|---|---|---|---|---|
| Albuterol Sulfate (SOL, IH, 0.083%) | 49502-0697-60 | 3 ml 60s UD | 72.60 | 51.38 | 242.1% |
| Cromolyn Sodium (SOL, IH, 10 mg/ml) | 49502-0689-02 | 2 ml 60s UD | 42.00 | 18.25 | 76.8% |
| Cromolyn Sodium (SOL, IH, 10 mg/ml) | 49502-0689-02 | 2 ml 60s UD | 42.00 | 19.74 | 88.7% |
| Cromolyn Sodium (SOL, IH, 10 mg/ml) | 49502-0689-12 | 2 ml 120s UD | 84.00 | 37.10 | 79.1% |
| Cromolyn Sodium (SOL, IH, 10 mg/ml) | 49502-0689-12 | 2 ml 120s UD | 84.00 | 39.48 | 88.7% |
| Metaproterenol Sulfate (SOL, IH {SULFATE FREE}) | 49502-0676-03 | 0.6%, 2,500 ml 25s UD | 30.75 | 19.75 | 179.5% |
| Metaproterenol Sulfate (SOL, IH {SULFATE FREE}) | 49502-0676-03 | 0.6%, 2,500 ml 25s UD | 30.75 | 19.17 | 165.5% |
| Metaproterenol Sulfate (SOL, IH {SULFATE FREE}) | 49502-0678-03 | 0.4%, 2,500 ml 25s UD | 30.75 | 19.75 | 179.5% |
| Metaproterenol Sulfate (SOL, IH {SULFATE FREE}) | 49502-0678-03 | 0.4%, 2,500 ml 25s UD | 30.75 | 19.17 | 165.5% |

### b.  Dey provided other improper incentives

236.   In addition to marketing the spread, Dey has utilized other impermissible inducements to stimulate sales of its drugs without accounting for them in its WAC or AWP. These inducements were designed to result in a lower net cost to the provider while concealing the actual wholesale price beneath a high invoice price. By utilizing "off-invoice" inducements, Dey provided purchasers with substantial discounts meant to gain their patronage while maintaining the fiction of a higher wholesale price.

237.   For example, in an announcement of a special incentive program to its customers to induce the purchase of its Ipratropium Bromide Inhalation solution, Dey sent its customers an offer sheet entitled "Profitability Enhancement For You" in which it stated "For every dollar of Dey Cromolyn Sodium unit-dose purchased, Dey will *provide free goods of either:* Coromolyn Sodium Inhalation Solution 0.02%, 2.5ml, at 1.0 times the rebate amount -OR- Ipatropium

- 83 -

Bromide Inhalation Solution 0.02%, 2.5ml, when it launches, at a value of 1.5 times the rebate amount for Cromolyn." (DL-TX-0004775) (emphasis added).

      c.    **Dey has been the target of multiple government investigations**

238.    In connection with its scheme to inflate AWPs, Dey has been investigated by the United States Department of Justice, United States Department of Health and Human Services, Office of Inspector General, the United States District Attorney for the District of Massachusetts, the Attorney General of the State of California, the Attorney General for the State of Texas, the Attorney General of the State of Connecticut, and the District Attorney for the County of Suffolk, New York State.

239.    These investigations confirm that Dey has engaged in a deliberate scheme to inflate the published AWPs for many of its drugs. For instance, Dey's spread for albuterol sulfate, a drug that constituted 37% of Dey's income in 1998, drastically increased between 1992 and 1998. In 1992, Dey's *Red Book* AWP for albuterol sulfate (.083% concentration, 3 ml) was $32.30. McKesson's wholesale price for the drug was $25.45 (a spread of $ 6.85 or 27%). By 1998, Dey's *Red Book* AWP for the same concentration/dose of albuterol sulfate had barely slipped to $30.25, while McKesson's wholesale price had plummeted to $10.00 (a spread of $20.25 or 202%). See September 25, 2000 letter from U.S. Rep. Bliley to Nancy-Ann Min DeParle.

240.    The federal government is not the only entity to uncover Dey's scheme to inflate AWPs. The Attorneys General of Texas and West Virginia recently discovered that due to over inflated AWPs, both state's Medicaid Programs have been defrauded by Dey for millions of dollars. Texas alleged that, between 1995 and 1999, it paid $13.7 million for Dey's albuterol sulfate and ipratropium bromide, when it should have paid only $8.7 million – an overcharge of $5 million. West Virginia alleges that Dey and others manipulated the AWP to significantly overcharge state agencies and residents for several drugs, including albuterol, from at least 1995 through 2000.

- 84 -

241.   In June 2003, and shortly before trial, Dey settled the State of Texas action by paying $18,500,000 – an amount constituting double damages and reimbursement for all costs and attorneys' fees.

242.   In its own suit against Dey and other pharmaceutical manufacturers for AWP manipulation, the Attorney General for the State of Connecticut documented significant spreads between Dey's published AWPs and actual wholesale prices for many of its drugs. Incorporated below are examples cited by the Connecticut Attorney General. The size of these spreads is an indicator that the reported AWPs are grossly inflated and have no bearing to the actual average of wholesale prices.

| Drug | NDC # | Year | AWP | ACTUAL PRICE | SPREAD | % OVERCHARGE |
|------|-------|------|-----|--------------|--------|--------------|
| ALBUTEROL | 49502-0303-17 | 1996 | $21.70 | $3.25 | $18.45 | 488% |
| IPATROPIUM BORMIDE | 49502-0685-03 | 2001 | $44.10 | $8.35 | $35.58 | 355% |
| IPATROPIUM BROMIDE | 49502-0685-03 | 2000 | $44.10 | $11.45 | $32.65 | 239% |
| IPATROPIUM BROMIDE | 49502-0685-03 | 1999 | $44.10 | $11.45 | $30.11 | 177% |

243.   In a report published by the DHHS, the DOJ documented at least 15 instances where the published AWPs for various dosages of 4 drugs manufactured by Dey were substantially higher than the actual prices listed by wholesalers. The chart below sets forth the drugs identified by the DOJ and the spread associated with one particular dosage of each of the 4 drugs. These figures compare the DOJ's determination of an accurate AWP for that particular dosage, based upon wholesalers' price lists, with the AWP reported by Dey in the 2001 *Red Book*.

| Drug in Lowest Dosage Form | 2001 *Red Book* AWP | DOJ Determined AWP | Difference | Percentage Spread |
|----------------------------|---------------------|---------------------|------------|-------------------|
| Acetylcysteine | $59.88 | $25.80 | $34.08 | 132% |
| Albuterol Sulfate | $30.25 | $9.17 | $21.08 | 230% |
| Cromolyn Sodium | $42.00 | $23.01 | $18.99 | 82% |
| Metaproterenol Sulfate | $30.75 | $11.29 | $19.46 | 172% |

- 85 -

### d.    Dey has concealed its AWP manipulation

15.    In an effort to conceal the existence of a spread from end payors, Dey concealed

the true wholesale prices of its drugs.  For instance, in a handwritten memorandum to Dey's

pricing committee a potential pricing structure with a customer was discussed:

> "I met with IPC to discuss our contract offer (illegible). . . Tom
> Konnelly (IPC) said he wanted to keep net pricing hidden from 3rd
> parties by increasing in the purchase price on our offer by 25%.
> IPC then requires a 25% rebate back to IPC. . . I have remarked the
> pricing.  If this offer is accepted, the higher price will go into
> McKesson as a chargeback contract.  Dey will then rebate IPC
> 25% on contract purchases on a quarterly basis. . ."

(DL-TX-0024844)

### 5.    The GSK Group (GlaxoSmithKline, SmithKline Beecham, Glaxo Wellcome)

244.    The GSK Group engages in an organization-wide and deliberate scheme to inflate

AWPs.  The GSK Group has stated fraudulent AWPs for all or almost all of its drugs, including

those set forth below.

| | | |
|---|---|---|
| Advair Diskus | salmeterol-fluticasone | Bronchodilator (Respiratory Agent)<br>Used for treatment of asthma |
| Agenerase | amprenavir | Antiviral Agent<br>Used in treatment of HIV infection |
| Alkeran | melphalan | Antineoplastic<br>Used to treat ovarian cancer and a certain type of<br>cancer in the bone marrow |
| Amerge | naratriptan succinate | Antimigraine Agent<br>Used for treatment of migraine attacks |
| Beconase AQ | beclomethasone dipropionate<br>monohydrate | Anti-Inflammatory Agent<br>Used to treat discomfort of hay fever, other<br>allergies, and other nasal problems |
| Ceftin | cefuroxime axetil | Antibacterial Agent<br>Used to treat infections caused by bacteria |
| Combivir | lamivudine-zidovudine | Antiviral Agent<br>Used in treatment of HIV infection |
| Daraprim | pyrimethamine | Antiprotozoal<br>Used for treatment of malaria and other protazoal<br>infections |

| Epivir | lamivudine | Antiviral Agent<br>Used in treatment of HIV infection |
|--------|------------|------------------------------------------------|
| Flonase | fluticasone propionate (nasal) | Anti-Inflammatory Agent<br>Used for treatment of allergic and nonallergic rhinitis |
| Flovent | fluticasone propionate (inh) | Antiasthmatic (Anti-Inflammatory Agent)<br>Used for treatment of asthma |
| Imitrex | sumatriptan or sumatriptan succinate | Antimigraine Agent<br>Used for treatment of migraine attacks or cluster headaches |
| Kytril | granisetron hcl | Antiemetic (Gastrointestinal Agent)<br>Used to prevent the nausea and vomiting that may occur after chemotherapy |
| Lamictal | lamotrigine | Anticonvulsant<br>Used to help control some types of seizures in the treatment of epilepsy |
| Lanoxin | digoxin | Antiarrhythmic Agent (Cardiovascular Agent)<br>Used to improve the strength and efficiency of the heart, or to control the rate and rhythm of the heartbeat. |
| Leukeran | chlorambucil | Alkylating Agent (Antineoplastic)<br>Used to treat cancer of the blood and lymph system |
| Mepron | atovaquone | Antiprotozoal<br>Used to treat and to prevent pneumonia |
| Myleran | busulfan | Antineoplastic<br>Used to treat some kinds of cancer of the blood. |
| Navelbine | vinorelbine tartrate | Antineoplastic<br>Used for treatment of lung cancer |
| Paxil | paroxetine hcl | Antianxiety agent; Antidepressant (Psychotherapeutic Agent)<br>Used in the treatment of various psychotherapeutic disorders |
| Purinethol | mercaptopurine | Antimetabolite (Antineoplastic)<br>Used to treat some kinds of cancer. |
| Relenza | zanamivir | Antiviral Agent<br>Used in the treatment of the infection caused by the flu virus (influenza A and influenza B). |
| Retrovir | zidovudine | Antiviral Agent<br>Used for treatment of HIV infection |
| Serevent | salmeterol xinofoate | Bronchodilator (Respiratory Agent)<br>Used to treat or prevent symptoms of asthma, chronic bronchitis, emphysema, and other lung diseases |

- 87 -

| Trizivir | abacavir sulfate-lamivudine-zidovudine | **Antiviral Agent**<br>Used for treatment of HIV-1 infection |
|---|---|---|
| Valtrex | valacyclovir hcl | **Antiviral Agent**<br>Used for treatment of shingles and genital herpes |
| Ventolin HFA | albuterol sulfate | **Bronchodilator (Respiratory Agent)**<br>Used for treatment or prevention of bronchospasm |
| Wellbutrin | bupropion hcl | **Antidepressant (Psychotherapeutic Agent)**<br>Used for treatment of depression |
| Zantac | rantidine hydrochloride | **Gastrointestinal Agent**<br>Used in the treatment of active duodenal ulcer |
| Ziagen | abacavir sulfate | **Anti Infective Agent**<br>Used in the treatment of HIV infection |
| Zofran | ondansetron hcl | **Antiemetic (Gastrointestinal Agent)**<br>Used to treat or prevent the nausea and vomiting that may occur after chemotherapy |
| Zofran ODT | ondansetron | **Antiemetic (Gastrointestinal Agent)**<br>Used to treat or prevent the nausea and vomiting that may occur after chemotherapy |
| Zovirax | acyclovir | **Antiviral Agent**<br>Used for treatment of shingles, genital herpes and herpes simplex |
| Zyban | buproprion hcl | **Antidepressant (Psychotherapeutic Agent)**<br>Used to relieve mental depression. Also used to aid in cessation of smoking |
|  | thioguanine | **Antineoplastic**<br>Used to treat some kinds of cancer |

245.    The specific drugs manufactured and/or distributed by The GSK Group for which relief is currently sought in this case are set forth below or in Appendix A.

246.    The GSK Group controlled and set the AWPs for all of its drugs, including those appearing in Appendix A, through direct communications with industry compendia.  For example, in 1991 a Glaxo document entitled "Zofran Third Party Payment Plan," among the many recommendations concerning the pricing of its then new drug Zofran was the recommendation that "In establishing direct-to-wholesaler and *Red Book* wholesale prices for Zofran, Glaxo should take into consideration physicians' expected profit margins."  (GSK-MDL-ZN02-03428) (Highly Confidential).  Expanding further on the recommendation above,

elsewhere in the same document it is stated: "Because insurers often reimburse physician-infused drugs up to the average wholesale price (AWP), the doctor's profits are determined by the differential between the AWP and the price they pay to the wholesaler or pharmacy supplier. The company should ensure that doctors will make acceptable return on Zofran® by managing markups through the distribution chain." (GSK-MDL-ZN02-034366) (Highly Confidential).

247.     The GSK Group's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs has resulted in excessive overpayments by the State of Nevada and Nevada citizens.

     **a.     GSK's understanding of AWP and intentional manipulation thereof**

248.     In a GSK document entitled "Zofran Tablets & Zofran Injection: Sales Training Guide Reimbursement Module" (GSK-MDL-ZN02-035925) (Highly Confidential), GSK defines AWP as follows:

> Average Wholesale Price (AWP): The composite wholesale prices charged on a specific commodity that is assigned by the drug manufacturer and is listed in either the Red Book or Blue Book and used by third-party payers as a basis for reimbursement.

(GSK-MDL-ZN02-035985) (Highly Confidential). Thus, by its own definition, GSK recognizes that: (i) AWP should be an average of actual wholesale prices; (ii) the drug manufacturers control the published AWP; and (iii) the published AWPs directly affect the payments made by the State.

249.     GSK acknowledged that the AWP, as published in industry compendia, was used as the basis for most payments by third party payors. GSK's own documents state, "Most, but not all, plans determine a payment for new drugs, based on the drug's cost as listed in the *Red Book* and pay all providers that amount less any patient co-payments." (GSK-MDL-ZN02-035965) (Highly Confidential). Elsewhere in the same document GSK acknowledges: "Payment amounts for most payers is usually based on the AWP as listed in *Red Book*, however,

- 89 -

co-payments, especially for Zofran Tablets will be required." (GSK-MDL-ZN02-035973) (Highly Confidential).

250.    The purpose of The GSK Group's AWP manipulation was to increase the spread in order to maximize the profit to providers and other intermediaries at the expense of the State, Patients and other payors.  That scheme has resulted in a system where drugs are administered based upon a profit incentive to physicians and other intermediaries and which results in an incentive to prescribe more expensive, rather than cheaper drugs.  In talking points prepared in advance of negotiations with clinics, Glaxo instructed its sales people to remind customers that "Cheaper is not necessarily a prudent medical or business decision" and that "Cheaper ≠ Good medicine or Good Business!" (GSK-MDL-ZN02-077818-19) (Highly Confidential).

251.    The GSK Group tried to maximize spread because it understood that its customers routinely engaged in "spread shopping" – comparing its AWPs with those of its competitors in order to determine the greatest spread (and therefore sell or administer the drug with the greatest spread).

252.    Perhaps the most flagrant example of the GSK Group's fraudulent manipulation of AWPs is found in the documents relating to Glaxo's Zofran® and SKB's Kytril®.  These two drugs both minimize the nausea associated with chemotherapy, and, prior to the merger of Glaxo and SKB, competed head-to-head in the same market.  As detailed below, much of that competition concerned which product could generate *the greater spread*, or profit, for physicians; not over which product was better for patients.

### (1)    Glaxo's Zofran®

253.    A Glaxo marketing document, sent to its sales and marketing personnel via U.S. Mail and interstate wire facilities, advises that they should emphasize to medical providers both the benefits of Zofran® and the financial benefits of the spread.  Specifically:

> By using a 32 mg bag, the physician provides the most effective
> dose to the patient and increases his or her profit by $_____ in

- 90 -

> reimbursement as well as paying no upcharges for the bag or
> admixing

254.    A follow-up internal Glaxo memo, dated October 27, 1994, entitled "Zofran Pricing Recommendation," states: "Physician reimbursement for the administration of intravenous oncology drugs is based on the spread between acquisition cost and the AWP." The memo later notes that "Kytril carries a 20% spread between List Price and AWP compared to Zofran which carries a 16 2/3% spread providing SKB with a significant advantage in the clinic setting with respect to reimbursement." (P007015-P007490, at P007487-P007490).

255.    In response to the larger spread being offered on Kytril, this same internal document discusses several options to increase Zofran's spread "to balance the reimbursement spread which currently exists between Zofran and the market in which it competes. . . ." The pricing options considered for increasing the "spread" for Zofran® included:

Recommendation #1

| | | |
|---|---|---|
| • | 4.5% price increase | $178.97 to $187.02 |
| • | Increase AWP | 16 2/3% to 20%<br>$214.76 to $233.78 (8.5%) |
| • | 3%Wholesaler<br>Rebate<br>(11/14/94 - 1/31/95) | $187.02 to $172.92 (chargeback)<br>$179.92 to $167.31 (rebate) |

256.    In an effort to hide the fact that Glaxo was increasing the spread for Zofran®, Glaxo elected to not only increase its AWP and provide rebates, but to also include a small actual price increase. In describing the reason for an increase in the actual selling price, an internal Glaxo document states:

> The recommended multi-tiered modification to current promotion, should also provide an immediate resultant impact to weekly unit sales without being easily intelligible by SKB as to the means by which this was achieved. Thus, providing additional time before a competitive response would be delivered.

257.    Glaxo internal documents, however, recognized that as a result of its increasing the spread for Zofran®, SKB would have two options:

- 91 -

> Option 1:  Decrease the purchase price of Kytril.
>
> Option 2:  Take a price increase to raise the AWP while maintaining purchase price to generate a higher spread than $52.00.

(P007015-P007490, at P007489-P007490).

258.    In order to increase the spread for Zofran®, Glaxo increased the AWP for a 20 ml injection of Zofran® to $233.02 in January of 1995. This was discussed in an October 27, 1994 memo entitled "Zofran Pricing Recommendation" and further discussed at a Glaxo pricing committee meeting on November 4, 1994. (P007015-P007490, at P007487-P007490).

259.    In February 1995, the *Florida Infusion Chemo Net* reported that Glaxo was increasing the published AWP for Zofran®, but was specifically offering incentives to lower the actual price offered to medical providers, thereby allowing medical providers to seek reimbursement at inflated prices. Specifically:

> Effective January 3, 1995. Glaxo has increased the acquisition costs of Zofran injection. The new AWP is set at $233.02. However, the company has provided incentives to the market place which will ensure that Zofran price to physicians and clinics will be lower than the contractual price available prior to the increase.

Letter from Bliley, Chairman Commerce Committee to Nancy Min DeParle, Sept. 25, 2000 (P007015-P007490, at P007046).

260.    Glaxo was fully aware that the larger spread for its product would be a big selling point. A flier in GSK's possession but produced by wholesaler NSS advertises to physicians that:

Your Zofran™ Deal Just Got Better!!!

(Effective 4:00pm January 9, 1995)

*New AWP $233.02

New Price from NSS

** $161.00 * *

(GSK-MDL-ZN02-034942) (Highly Confidential).

- 92 -

261.    In March 1996, Glaxo again increased the AWP for Zofran® by 4.8%.  In

response, SKB immediately increased the AWP for Kytril by 4.8%.  An internal SKB memo,

dated March 21, 1996, entitled "Kytril Price Increase," states:

> I recommend a 4.8% price increase effective March 25, 1996 for
> all Kytril presentations.  This is in response to a Glaxo Wellcome
> price increase of 4.8% for Zofran effective March 8, 1996.

(P007015-P007490, at P007078).

262.    In a Glaxo internal memo dated October 25, 1994, entitled "Issue considerations

on Zofran pricing strategies," Nancy Pekarek (a communications manager for Glaxo who later

became Vice-President of U.S. Corporate Media Relations) recognized the implications of

increasing the AWP to create a better spread:

> If Glaxo chooses to increase the NWP and AWP for Zofran in
> order to increase the amount of Medicaid reimbursement for
> clinical oncology practices, we must prepare for the potential of a
> negative reaction from a number of quarters.  Some likely
> responses:
>
>   (1)    Press: Glaxo's health care reform messages stressed
> the importance of allowing the marketplace to moderate prices.
> On the surface, it seems that in response to the entrance of a
> competitor in the market, Glaxo has actually raised its price on
> Zofran-perhaps twice in one year.  How do we explain that price
> increase on a drug that is already been cited in the press as one of,
> if not the most expensive drug on the hospital formulary?
>
>   *If we choose to explain the price increase by explaining the*
> *pricing strategy, which we have not done before, then we risk*
> *further charges that we are cost shifting to government in an*
> *attempt to retain market share.*
>
>   (2)    Congress: Congress has paid a good deal of
> attention to pharmaceutical industry pricing practices and is likely
> to continue doing so in the next session.  How do we explain to
> Congress an 8% increase in the NWP between January and
> November of 1994, if this policy is implemented this year? How
> do we explain a single 9% increase in the AWP?  *What arguments*
> *can we make to explain to congressional watchdogs that we are*
> *cost-shifting at the expense of the government?*  How will this
> new pricing structure compare with costs in other countries?
>
>   (3)    *Private insurers, out-of-pocket payers: These*
> *groups, and perhaps others, are likely to incur greater costs as a*

- 93 -

> *result of this pricing strategy. How will they be affected? What response do we have for them?*

(GSK-MDL-Z01-05675) (Highly Confidential) (emphasis added).

263.    Glaxo also knew that Zofran® products were being marketed based on the spread between the actual cost and the published AWP. For example, when Glaxo introduced the Zofran® premixed IV bag, it used marketing materials which stated:

> Convenient
> Costs Less Than Vial
> Higher AWP
> Better Reimbursement

(P007015-007490, at P007243).

264.    Other internal Glaxo documents directly compared the "Profit Per Dose" and "Profit as %" and "Profit Per Vial" of Zofran® to Kytril®. These comparisons also identified that in order to increase the spread for Zofran®, Glaxo included "early pay disc" and "rebates" and "incentive."

265.    In marketing the new Zofran® premixed IV bag, Glaxo produced and used a document entitled "Profit Maximization – It's In the Bag." This document compared Kytril® to Zofran® based upon its total return of investment (ROI). Specifically, Glaxo's marketing materials including the following chart:

|  | Cost | AWP | Potential Reimbursement/ Patient | Reimbursement/ Year | ROI |
|---|---|---|---|---|---|
| Zofran 32mg bag | $110.41 | $195.00 | 84.59 | $13,957,350 | 76.6% |
| Kytril 1 mg vial | $102.73 | $175.00 | 72.27 | $11,924,000 | 70.3% |

(P007114) (Highly Confidential).

266.    Another Glaxo document entitled "Profit Maximization – Continued" reflects how much "Total Revenue Potential" there was for using Zofran® because of the large spread between the cost and reimbursement for various Zofran® products. (P007115) (Highly Confidential).

- 94 -

267.    An internal SKB document further acknowledges Glaxo's attempts to use and market the spread and its effects on payors:

> As of late, Glaxo promotional efforts have focused almost entirely on the financial benefits of "up-dosing" rather than efficacy of Zofran. *Though physicians have certainly benefited financially from such tactics, it is costing 3rd party payers and patients more for medication.*

(P007115-P007490, at P007138-P007139) (Highly Confidential) (emphasis added).

268.    In a September 27, 2000 article in *USA Today,* Glaxo spokesman Rick Sluder (who received a copy of the October 24, 1994 memo described herein) discussed the issue of the spread and blamed a system that set up a reimbursement method that relies on average wholesale prices which are not actually "representative of actual prices." Mr. Sluder, admitting that Glaxo changed its wholesale prices to keep up with competitors who changed wholesale prices, stated "We didn't want to put ourselves at a price disadvantage." Mr. Sluder also admitted that the marketing of Glaxo drugs is based, in part, on the spread. In fact, he noted that Glaxo's sales staff is briefed on the price advantages to doctors who bill and get reimbursed based upon the AWP. (E-mail from Clapton to Vaughan dated Sept. 27, 2000 citing "How Drug Makers Influence Medicare Reimbursements to Doctors; WALL STREET JOURNAL (P007501-P007506).

### (2)    SKB's Kytril

269.    According to its internal documents (and prior to selling Kytril®'s global rights to the Roche Group in December 2000), SKB also knew that by creating the spread for Kytril®, it could directly affect the amount of revenue medical providers receive and thereby affect overall demand for Kytril®. Specifically, an August 6, 1996 internal SKB memo stated:

> In the clinic setting however, since Medicare reimbursement is based on AWP, product selection is largely based upon the spread between acquisition cost and AWP.
>
> *            *            *
>
> From this analysis, there seems to be no other reason, other than profitability, to explain uptake differentials between the hospital

- 95 -

> and clinic settings, therefore explaining why physicians are willing
> to use more expensive drug regimens.

(P007015-P007490, at P007249-P007250).

270.    Internal SKB documents reveal how it marketed the spread.  One internal document entitled "Price Comparison of Kytril and Zofran for Reimbursement" discussed how much additional revenue and "spread per patient" a medical provider would make by using Kytril® due to its larger spread.  It stated:

> Kytril reimbursement for 5 patients treated $540.00 - Kytril 6
> treated patients $423.12
>
> Difference = $117.00 every 6 patients.
>
> Use 5ht3 5 times a day = $2,340.00 month.  $28,080.00 year more!

(P007015-P007490, at P007117).

271.    Other internal SKB documents entitled "Cost v. Profit" and "Kytril Profit Model" compare Kytril® and Zofran® to demonstrate how much additional profit/revenue the medical provider will receive by using Kytril®.

### (3)    General Counsel Correspondence Between Glaxo and SKB

272.    Most revealing is an exchange of correspondence between counsel for Glaxo and SKB over Zofran® and Kytril® in which each accuse the other of fraud.

273.    On February 6, 1995, Timothy D. Proctor, Senior Vice President, General Counsel and Secretary for Glaxo, sent a letter to J. Charles Wakerly, Senior Vice President, Director and General Counsel of SKB informing him of "several issues pertaining to the advertising and marketing of Kytril":

> Glaxo's sales representatives have encountered a substantial
> amount of what appear to be "homemade" Kytril vs. Zofran cost
> comparisons.  It is our understanding that many of these pieces
> have been generated through a company-provided lap top
> computer program.
>
> . . . .

- 96 -

> In addition, a significant number of these pieces (see Exhibits F-J) contain direct statements or make references as to how institutions can increase their "profits" from Medicare through the use of Kytril. Some even go so far as to recommend that the medical professional use one vial of Kytril for two patients (see Exhibit F) but charge Medicaid for three vials. This raises significant fraud and abuse issues which I am sure you will want to investigate."

(P007015-P007490, at P007123-P007126).

274.    On February 22, 1995, Ursualy B. Bartels, Vice President and Associate General Counsel for SKB, wrote in response that SKB was investigating Glaxo's claims and asked whether Glaxo had specific information regarding the improper marketing of Kytril.  Mr. Bartels also accused Glaxo of using false and misleading marketing materials regarding Zofran that rely on the medical providers' ability to garner more profit.  Specifically, he stated:

> Regarding similar concerns, we would like to draw your attention to reports we are receiving from our field force regarding reimbursement issues.  In an apparent effort to increase reimbursement to physicians and clinics, effective 1/10/95, Glaxo increased AWP for Zofran by 8.5%, while simultaneously fully discounting this increase to physicians.  The latter was accomplished by a 14% rebate available to wholesalers on all non-hospital Zofran sales on the multi-dose vial. ***The net effect of these adjustments is to increase the amount of reimbursement available to physicians from Medicare and other third party payors whose reimbursement is based on AWP.***  Since the net price paid to Glaxo for the non-hospital sales of the Zofran multi-dose vial is actually lower, it does not appear that the increase in AWP was designed to increase revenue per unit to Glaxo. ***Absent any other tenable explanation, this adjustment appears to reflect an intent to induce physicians to purchase Zofran based on the opportunity to receive increased reimbursement from Medicare and other third party payors.  In fact, we have had numerous verbal reports from the field concerning Glaxo representatives who are now selling Zofran based on the opportunity for physicians to receive a higher reimbursement from Medicare and other third-party payors while the cost to the physician of Zofran has not changed.***

(P007015-007490, at P007478-P007481) (emphasis added).

275.    On April 25, 1995, Adrianna L. Carter, Glaxo Assistant General Counsel, responded to SKB's February 22, 1995 letter.  Ms. Carter provided, pursuant to SKB's request, numerous additional examples of false and misleading marketing materials concerning "cost

- 97 -

comparisons distributed to health care professionals by SmithKline representatives." Ms. Carter

also denied SKB's allegations regarding "fraud and abuse" over the price increase of Zofran.

However, Ms. Carter did admit that the AWP price increase for Zofran® does not affect the

actual cost to medical providers and that Glaxo's sales representatives were using the "spread" to

gain market share. Specifically, Ms. Carter stated:

> It is true that, despite a price increase, some physicians and other
> healthcare professionals will not see the higher price as the result
> of rebates or other incentives.
>
>       \*      \*      \*
>
> It is also true that our sales representatives have been explaining
> the relationship between the price and Medicare reimbursement for
> Zofran to physicians.
>
>       \*      \*      \*
>
> Finally, Ms. Carter stated that despite SKB's assertions that any
> alleged improper marketing of Kytril would end, "Unfortunately,
> despite your efforts, these activities are still ongoing."

(P007015-007490, at P007127-P007131).

276.    The fact that Glaxo and SKB each accused the other of similar conduct, but

neither took any action to bring it to the attention of the public or the appropriate authorities, is

evidence that each of them were engaged in an ongoing scheme to defraud.

### (4)    Additional AWP manipulation

277.    Additional evidence of the phony nature of this defendant's AWPs arises from its

manipulation of its reported AWPs in late 2000 and 2001, when it increased its reported AWPs

across the board without any change in product or service offered. If these AWPs were real,

price increases would not be uniform and would bear a relationship to some product change. At

the same time of these price increases, cost to providers did not increase, further evidencing the

phony nature of the AWPs. The specific drugs subject to this manipulation were Agenerase,

Albenza, Alkeran Tablets, Amerge, Amoxil, Augmentin, Avandamet, Avandia, Avodart,

Bactroban Cream, Beconase, Ceftin Tablets and Powder for Oral Suspension, Combivir,

- 98 -

Compazine, Coreg, Daraprim Tablets, Dyazide, Epivir, Epivir-HBV, Eskalith CR, Flonase, Flovent, Imitrex, Lamictal, Lanoxicaps, Lanoxin, Leukeran Tablets, Malarone, Mepron, Myleran, Parnate, Paxil, Purinethol, Relafen, Relenza, Requip, Retrovir, Serevent, Stelazine, Tagamet, Tabloid brand Thioguanine, Thorazine, Trizivir, Urispas, Valtrex, Ventolin, Wellbutrin, Zantac, Ziagen, Zofian, Zovirax and Zyban.

### b. GSK provided other improper incentives

278. In addition to marketing the spread on its products, the GSK Group has also used other methods to induce physicians and other intermediaries to use its drugs such as rebates and free samples in order to increase the spread between acquisition costs and reimbursement.

279. In an e-mail by GSK account representative Paul J. Ostruszka explaining how he was able to increase the market share of Zofran over Anzimet, among the suggested techniques he recommends to his fellow GSK account reps is "Ask your customers how much JUST 1 FREE Zofran Tablet Sample is WORTH" (emphasis in original). This e-mail was later forwarded to the entire Zofran team. (GSK-MDL-ZN02-077634).

280. An advertisement in the *Florida Infusion Chemo net* reveals that SKB created the spread not only by artificially inflating the AWP for Kytril®, but also by providing discounts and rebates. Specifically, the advertisement states:

> We have been notified that, effective April 1, 1995, SmithKline's
> long running promotional rebate for Kytril purchases will come to
> a very successful conclusion.

(P007015-007490, at P007187).

281. SKB also knew that medical providers were billing for a 1 mg single dose vial per patient, but actually were using less than the full single dose per patient. Depending on the weight of a patient, medical providers were able to use less of the drug, *i.e.*, the lighter the patient, the less Kytril® was needed. SKB subsequently introduced a Kytril® 4 mg Multi-Dose vial that allowed medical providers to bill 6 treatments for the cost of 4. For example, an SKB

- 99 -

marketing document entitled "Kytril Vial Usage" states, "You can use only three vials of Kytril for four patients." (P007015-007490, at P007068 and P007455).

282.    SKB also used other financial incentives to decrease medical providers' costs and thereby increase profits. For example, SKB promised to contribute to research and education programs through the OnCare Foundation if OnCare agreed to use Kytril instead of a competing drug. (P007015-007490, at P007061).

283.    On information and belief, based upon the foregoing examples, as well as an investigation into industry sales practices, the provision of free goods and educational programs is not typically an isolated instance at a drug company, but instead is part of a regional or nationwide marketing strategy that is approved at levels higher than individual salespersons. Thus, it is reasonable to infer that other instances of such conduct exist and will be revealed upon discovery.

### c.    The GSK Group has been the target of multiple government investigations

284.    In connection with its scheme to inflate AWPs, the GSK Group has been investigated by the United States Department of Justice, the Office of Inspector General of the Department of Health and Human Services, the Attorney General for the State of Texas, and the Attorney General for the State of California.

285.    These investigations confirm that the GSK Group has engaged in a deliberate scheme to inflate the published AWPs for its drugs.

286.    In a report published by the DHHS (the "DHHS Report"), the DOJ documented that the published AWPs for various dosages of Zofran and Kytril manufactured by The GSK Group were substantially higher than the actual prices listed by wholesalers. The chart below sets forth the AWPs identified by the DOJ and the spread associated with one particular dosage of each drug. These figures compare the DOJ's determination of an accurate AWP for that

- 100 -

particular dosage, based upon wholesalers' price lists, with the AWP reported by The GSK Group in the 2001 *Red Book*.

| Drug | GSK 2001 Red Book AWP | DOJ Determined Actual AWP | Difference | Percentage Spread |
|---|---|---|---|---|
| Ondanestron (Zofran) | $128.24 | $22.61 | $101.63 | 450% |
| Granisetron (Kytril) | $195.20 | $139.04 | 56.16 | 40% |

(P006299-P006316).

## 6. The Pharmacia Group (Pharmacia and P&U)

287. The Pharmacia Group engages in an organization-wide and deliberate scheme to inflate AWPs. The Pharmacia Group has stated fraudulent AWPs for all or almost all of its drugs, including those set forth below.

| | | |
|---|---|---|
| Adriamycin | doxorubicin hydrochloride | Antineoplastic<br>Used in the treatment of various forms of cancer |
| Adrucil | fluorouracil | Antimetabolite; Antineoplastic<br>Used in the treatment of various forms of cancer |
| Amphocin | amphotericin b | Antifungal (Anti-Infective Agent)<br>Used in the treatment of serious fungal infections |
| Celebrex | celecoxib | Analgesic; Antirheumatic Agent<br>Used to relieve some symptoms caused by arthritis |
| Cleocin-T | clindamycin phosphate (topical) | Antibacterial Agent (Anti-Infective Agent)<br>Used to treat bacterial infections |
| Cytosar-U | cytarabine | Antineoplastic<br>Used in the treatment of cancer of the blood |
| Depo-Testosterone | testosterone cypionate | Androgen (Hormone)<br>Used to replace hormones or stimulate growth |
| Neosar | cyclophospamide | Alkylating Agent (Antineoplastic)<br>Used in the treatment of various forms of cancer as well as some kidney disease |
| Solu-Cortef | hydrocortisone sodium succinate | Anti-Inflammatory Agent; Skin and Mucous Membrane Agent<br>Used to provide relief for inflamed areas of the body. Also used as replacement therapy in adrenocortical insufficiency |
| Solu-Medrol | methylprednisolone sodium succinate | Anti-Inflammatory Agent<br>Used to provide relief for inflamed areas of the body. Also used as replacement therapy in adrenocortical insufficiency |

- 101 -

Case 1:01-cv-12257-PBS Document 6542-6 Filed 09/30/09 Page 109 of 179

| | | |
|---|---|---|
| Toposar | etoposide | Antineoplastic<br>Used in the treatment of testicular and lung cancer |
| Vincasar | vincristine sulfate | Antineoplastic<br>Used in the treatment of various forms of leukemia and cancer |
| | bleomycin sulfate | Antineoplastic; Antibiotic Agent (Anti-Infective Agent)<br>Used in the treatment of various forms of cancer |

288.  The specific drugs manufactured and/or distributed by Pharmacia for which relief is currently sought in this case are set forth below or in Appendix A.

289.  Pharmacia controlled and set the AWPs for all of its drugs, including those appearing in Appendix A, through direct communications with industry compendia. For example, in its presentation entitled "Strategic Presentation on Average Wholesale Price (AWP)," P&U included a flow chart that shows P&U communicates its AWPs to First DataBank, Medi-Span and *Red Book*. This same flow chart then shows that third party payors rely on these industry compendia for prices. (PH025792) (Highly Confidential).

290.  Pharmacia's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs has resulted in excessive overpayments by the State of Nevada and Nevada citizens.

### a. Pharmacia's understanding of AWP and intentional manipulation thereof

291.  Pharmacia understands that third party reimbursement is based on its published AWPs. According to a "Strategic Presentation on Average Wholesale Price (AWP)" prepared by P&U, the "Definition of AWP" is:

> An artificial pricing index that is used as a common basis for third-party reimbursement to pharmacists and physicians.
>
> -The difference between the published AWP (less a percentage) and the direct price is the profit margin that drives these classes of trade.

- 102 -

1534.13 0051 BSC.DOC

(PH 025785) (Highly Confidential).  During this same presentation, Pharmacia provided an

"AWP History":

- ◆   Historically, Wholesalers viewed AWP as an actual average selling price to their customers.

- ◆   Competition of 1980's led to AWP representing a "Suggested List Price"

- ◆   P&U AWP = 125% of Direct Price (DP)

- ◆   Exceptions being VANTIN, CVC, GENOTROPIN, and RESCRIPTOR = 120% of DP

(PH025791) (Highly Confidential).  Further, the presentation recognized that "'95 Medicare

(Part B) outpatient drug bill (I.V./inhalants/oncolitics/nutritionals) of $1.8 billion based primarily

on AWP."  (PH025793) (Highly Confidential).

292.    The Pharmacia Group has engaged in an ongoing deliberate scheme to inflate

AWPs.  According to one member of the Congressional Ways and Means Committee:

> The evidence . . . indicates that [Pharmacia & Upjohn] have knowingly and deliberately inflated their representations of the average wholesale price ("AWP"), wholesale acquisition cost ("WAC") and direct price ("DP") which are utilized by the Medicare and Medicaid programs in establishing drug reimbursements to providers.
>
>                                   *  *  *
>
> [T]hese practices must stop and ... these companies must return the money to the public that is owed because of their abusive practices.

*See* Extension of Remarks of U.S. Representative Pete Stark in the House of Representatives,

October 3, 2000 (P007545-P007547).

293.    In a letter dated October 3, 2000 to Pharmacia (with accompanying exhibits),

Representative Stark addressed the Pharmacia Group's illegal practices:

> The manipulated disparities between your company's reported AWPs and DPs are staggering.  For example, in 1997, Pharmacia & Upjohn reported an AWP of $946.94 for 200 mg. of Adriamycin PFS while offering to sell it to American Oncology Resources (AOR) for $168.00 and to Comprehensive Cancer Center for

- 103 -

$152.00 (Composite Exhibit "1"). Your company then aggressively marketed its cancer drugs to health care providers by touting financial inducements and other types of incentives. Pharmacia & Upjohn created and marketed the financial inducements for the express purpose of influencing the professional judgment of doctors and other health care providers in order to increase the company's market share.

\* \* \*

Pharmacia & Upjohn's own internal documents . . . reveal that the company abused its position as a drug innovator in an initial *Phase III* FDA clinical trial for a cancer drug used to treat lymphoma (Composite Exhibit "2") (emphasis in original).

". . . Clinical Research Trials

> Initial Phase III Protocol trial for "Oral Idamycin" in lymphomas. This trial will offer AOR $1.1M [million] in additional revenues. Two hundred twenty-five (225) patients at $5,000 per patient . . . (emphasis added by Rep. Stark)

> The above . . . items are contingent on the signing of the AOR Disease Management Partner Program. AOR's exclusive compliance to the purchase of the products listed in the contract product attachment is also necessary for the above items to be in effect."

The linking of doctor participation in FDA clinical drug trials to their purchase and administration of profit-generating oncology drugs is entirely inconsistent with the objective scientific testing that is essential to the integrity of the trial.

\* \* \*

It is clear that Pharmacia & Upjohn targeted health care providers, who might be potential purchasers, by creating and then touting the windfall profits arising from the price manipulation. For example, Pharmacia & Upjohn routinely reported inflated average wholesale prices for its cancer drug Bleomycin, 15u, as well as direct prices. The actual prices paid by industry insiders was in many years less than half of what Pharmacia & Upjohn represented. Pharmacia & Upjohn reported that the average wholesale price for Bleomycin, 15u, rose from $292.43 to $309.98, while the price charged to industry insiders fell by $43.15 (Composite Exhibit "4").

\* \* \*

Pharmacia & Upjohn reported price increases in October 1997 with full knowledge that the true prices of the drugs were falling.

- 104 -

For example, Composite Exhibit "7" reveals that Pharmacia & Upjohn voluntarily lowered its price of Adriamycin PFS 200 mg to $152.00 while reporting an AWP of $946.94:

> "Dear Willie,
>
> > A (VPR) Voluntary Price Reduction will become effective May 9, 1997. The wholesalers have been notified, however it may take two weeks to complete the transition . . ."

Additionally, internal Pharmacia & Upjohn documents secured through the Congressional investigations show that Pharmacia & Upjohn also utilized a large array of other inducements to stimulate product sales. These inducements, including "educational grants" and free goods, were designed to result in a lower net cost to the purchaser while concealing the actual price beneath a high invoice price. Through these means, drug purchasers were provided substantial discounts that induced their patronage while maintaining the fiction of a higher invoice price – the price that corresponded to reported AWPs and inflated reimbursements from the government. Composite Exhibit "8" highlights these inducements:

AOR/PHARMACIA & UPJOHN PARTNERSHIP PROPOSAL: Medical Education Grants. A $55,000 grant has been committed for 1997 for the AOR Partnership for excellence package including Education/Disease Management, Research Task Force, AOR Annual Yearbook. A $40,000 grant to sponsor the AOR monthly teleconference. This sponsorship was committed and complete in February 1997 . . .

PHARMACIA & UPJOHN, INC. INTEROFFICE MEMO: If needed, you have a "free goods" program to support your efforts against other forms of generic doxorubicin . . .

Use your "free goods" wisely to compete against other generic forms of Adriamycin, not to shift the customer to direct shipments. The higher we can keep the price of Adriamycin, the easier it is for you to meet your sales goals for Adriamycin (emphasis added by Rep. Stark).

(P007613-P007632).

294.    Pharmacia's marketing pitches, as quoted by U.S. Rep. Pete Stark in a

September 28, 2000 letter to Alan F. Holmer, President of the Pharmaceutical Research and

Manufacturers of America, promoted a physician's ability to profit at the expense of Medicare

and its beneficiaries:

- 105 -

> PHARMACIA: Some of the drugs on the multi-source list offer you savings of over 75% below list price of the drug. For a drug like Adriamycin, the reduced pricing offers AOR a reimbursement of over $8,000,000 profit when reimbursed at AWP. The spread from acquisition cost to reimbursement on the multi-source products offered on the contract give AOR a wide margin for profit.

(P007548-P007588).

295.    In 1997, Pharmacia sent to a clinic a proposal listing the AWP and the contract price at which several drugs would be sold to the provider. The differences are staggering and just a few are noted below:

|  |  |  |
|---|---|---|
| Adriamycin (10 mg) | 46.00 | 7.50 |
| Adriamycin (50 mg) | 230.00 | 37.50 |
| Neosar (2 g) | 86.00 | 18.00 |
| Toposar (1 g) | 1,330.75 | 120.00 |
| Vincasar (2 mg) | 741.50 | 7.50 |

(P007615).

296.    According to Pharmacia's own documents, the published AWPs for its drugs were higher than the actual prices provided to wholesalers. In response to government subpoenas, the Pharmacia Group produced numerous price lists setting forth spreads between AWPs and prices apparently offered to wholesalers, providers and other intermediaries. A review of those price lists reveals that Pharmacia has consistently offered hundreds of its drugs and other solutions to its customers at prices significantly below the published AWP and that the spread was of great importance to its customers. To repeat every one of those drugs and the spread offered to each specific customer here is not practical. However, set forth below in Table 1 are a number of those drugs with spreads between the AWPs and direct prices. Table 1 is an analysis of certain dosages of P&U drugs from a document entitled "Oncology Express CONTRACT PRICING" (PH011977) (Highly Confidential).

- 106 -

**Table 1**

| PRODUCT | LIST | AWP | CONTRACT PRICE | DIFFERENCE (between AWP and contract price) | PERCENTAGE SPREAD |
|---------|------|-----|----------------|---------------------------------------------|-------------------|
| Adriamycin | 883.80 | 1104.13 | 119.00 | 985.13 | 828% |
| Adrucil | 12.83 | 16.04 | 4.56 | 11.48 | 252% |
| Amphocin | 29.01 | 36.26 | 13.00 | 23.26 | 179% |
| Neosar | 80.22 | 100.28 | 16.15 | 84.13 | 521% |
| Toposar | 614.81 | 768.51 | 33.84 | 734.67 | 2,171% |

297.    Additional drugs for which Pharmacia reported false AWPs are identified as

follows. The size of these spreads is an indicator that the reported AWPs are inflated and do not

reflect a true AWP and bear no relationship to a real AWP.

| Drug Name | NDC | Quantity | 1999 AWP Red Book | W-Sale Spread | % |
|-----------|-----|----------|-------------------|---------------|---|
| (AMPHOTERCIN B) Amphocin (PDI, IJ) (CLINDAMYCIN PHOSPHATE) | 00013-1405-44 | 50 mg ea | 36.26 | 20.26 | 126.6% |
| Cleocyn (ADD-VANTAGE, 150 mg/ml) (CLINDAMYCIN PHOSPHATE) | 00009-0728-09 | 60 ml 5s | 905.88 | 646.68 | 249.5% |
| Cleocyn (ADD-VANTAGE, 150 mg/ml) (CLINDAMYCIN PHOSPHATE) | 00009-0902-18 | 6 ml 25S | 462.19 | 300.19 | 185.3% |
| Cleocyn (ADD-VANTAGE, 150 mg/ml) (CLINDAMYCIN PHOSPHATE) | 00009-3124-03 | 4 ml 25s | 367.50 | 241.50 | 191.7% |
| Cleocyn (ADD-VANTAGE, 150 mg/ml) (CLINDAMYCIN PHOSPHATE) | 00009-3447-03 | 6 ml 25s | 485.31 | 323.31 | 199.6% |
| Cleocyn (INJ, IJ, 150 mg/ml) (CLINDAMYCIN PHOSPHATE) | 00009-0775-26 | 4 ml 25s | 346.56 · | 220.56 | 175.0% |
| Cleocyn (INJ, IJ, 150 mg/ml) (CYCLOPHOSPHAM IDE) Neosar (PDI, IJ | 00009-0870-26 | 2 ml 25s | 189.83 | 128.63 | 210.2% |
| {S.D.V.}) | 00013-5606-93 | 100 mg ea | 6.29 | 2.86 | 83.4% |

- 107 -

| Drug Name | NDC | Quantity | 1999 AWP *Red Book* | W-Sale Spread | % |
|---|---|---|---|---|---|
| (CYCLOPHOSPHAM IDE) Neosar (PDI, IJ {S.D.V.}) | 00013-5606-93 | 100 mg ea | 6.29 | 1.29 | 25.8% |
| (CYCLOPHOSPHAM IDE) Neosar (PDI, IJ {S.D.V.}) | 00013-5606-93 | 100 mg ea | 6.29 | 2.54 | 67.7% |
| (CYCLOPHOSPHAM IDE) Neosar (PDI, IJ {S.D.V.}) | 00013-5606-93 | 100 mg ea | 6.29 | 2.79 | 79.7% |
| (CYCLOPHOSPHAM IDE) Neosar (PDI, IJ {S.D.V.}) | 00013-5616-93 | 200 mg ea | 11.94 | 7.52 | 170.1% |
| (CYCLOPHOSPHAM IDE) Neosar (PDI, IJ {S.D.V.}) | 00013-5616-93 | 200 mg ea | 11.94 | 7.29 | 156.8% |
| (CYCLOPHOSPHAM IDE) Neosar (PDI, IJ {S.D.V.}) | 00013-5616-93 | 200 mg ea | 11.94 | 7.52 | 170.1% |
| (CYCLOPHOSPHAM IDE) Neosar (PDI, IJ {S.D.V.}) | 00013-5616-93 | 200 mg ea | 11.94 | 5.19 | 76.9% |
| (CYCLOPHOSPHAM IDE) Neosar (PDI, IJ {S.D.V.}) | 00013-5626-93 | 500 mg ea | 25.06 | 18.82 | 301.6% |
| (CYCLOPHOSPHAM IDE) Neosar (PDI, IJ {S.D.V.}) | 00013-5626-93 | 500 mg ea | 25.06 | 18.41 | 276.8% |
| (CYCLOPHOSPHAM IDE) Neosar (PDI, IJ {S.D.V.}) | 00013-5626-93 | 500 mg ea | 25.06 | 18.82 | 301.6% |
| (CYCLOPHOSPHAM IDE) Neosar (PDI, IJ {S.D.V.}) | 00013-5626-93 | 500 mg ea | 25.06 | 14.86 | 145.7% |
| (CYCLOPHOSPHAM IDE) Neosar (PDI, IJ {S.D.V.}) | 00013-5636-70 | 1 gm ea | 50.15 | 40.65 | 427.9% |
| (CYCLOPHOSPHAM IDE) Neosar (PDI, IJ {S.D.V.}) | 00013-5636-70 | 1 gm ea | 50.15 | 40.50 | 419.7% |
| (CYCLOPHOSPHAM IDE) Neosar (PDI, IJ {S.D.V.}) | 00013-5636-70 | 1 gm ea | 50.15 | 33.85 | 207.7% |
| (CYCLOPHOSPHAM IDE) Neosar (PDI, IJ {S.D.V.}) | 00013-5636-70 | 1 gm ea | 50.15 | 40.65 | 427.9% |
| (CYCLOPHOSPHAM IDE) Neosar (PDI, IJ {S.D.V.}) | 00013-5646-70 | 2 gm ea | 100.28 | 81.95 | 447.1% |

| Drug Name | NDC | Quantity | 1999 AWP Red Book | W-Sale Spread | % |
|---|---|---|---|---|---|
| (CYCLOPHOSPHAM IDE) Neosar (PDI, IJ {S.D.V.}) | 00013-5646-70 | 2 gm ea | 100.28 | 81.33 | 429.2% |
| (CYCLOPHOSPHAM IDE) Neosar (PDI, IJ {S.D.V.}) | 00013-5646-70 | 2 gm ea | 100.28 | 69.48 | 225.6% |
| (CYCLOPHOSPHAM IDE) Neosar (PDI, IJ {S.D.V.}) | 00013-5646-70 | 2 gm ea | 100.28 | 81.95 | 447.1% |
| (CYTARABINE) Cytosar-U (30 ML VIAL) | 00009-3295-01 | 1 gm ea | 61.43 | 44.43 | 261.4% |
| (CYTARABINE) Cytosar-U (30 ML VIAL) | 00009-3295-01 | 1 gm ea | 61.43 | 42.93 | 232.1% |
| (CYTARABINE) Cytosar-U (30 ML VIAL) | 00009-3295-01 | 1 gm ea | 61.43 | 35.18 | 134.0% |
| (CYTARABINE) Cytosar-U (30 ML VIAL) | 00009-3295-01 | 1 gm ea | 61.43 | 14.63 | 31.3% |
| (CYTARABINE) Cytosar-U (30 ML VIAL) | 00009-3296-01 | 2 gm ea | 120.25 | 86.25 | 253.7% |
| (CYTARABINE) Cytosar-U (30 ML VIAL) | 00009-3296-01 | 2 gm ea | 120.25 | 83.25 | 225.0% |
| (CYTARABINE) Cytosar-U (30 ML VIAL) | 00009-3296-01 | 2 gm ea | 120.25 | 67.75 | 129.0% |
| (CYTARABINE) Cytosar-U (30 ML VIAL) | 00009-3296-01 | 2 gm ea | 120.25 | 28.63 | 31.2% |
| (CYTARABINE) Cytosar-U (PDI, IJ {M.D.V.}) | 00009-0373-01 | 100 mg ea | 8.14 | 5.14 | 171.3% |
| (CYTARABINE) Cytosar-U (PDI, IJ {M.D.V.}) | 00009-0373-01 | 100 mg ea | 8.14 | 4.99 | 158.4% |
| (CYTARABINE) Cytosar-U (PDI, IJ {M.D.V.}) | 00009-0373-01 | 100 mg ea | 8.14 | 1.94 | 31.3% |
| (CYTARABINE) Cytosar-U (PDI, IJ {M.D.V.}) | 00009-0473-01 | 500 mg ea | 32.33 | 23.83 | 280.4% |
| (CYTARABINE) Cytosar-U (PDI, IJ {M.D.V.}) | 00009-0473-01 | 500 mg ea | 32.33 | 23.08 | 249.5% |

- 109 -

| Drug Name | NDC | Quantity | 1999 AWP Red Book | W-Sale Spread | % |
|---|---|---|---|---|---|
| (CYTARABINE) Cytosar-U (PDI, IJ {M.D.V.}) | 00009-0473-01 | 500 mg ea | 32.33 | 17.33 | 115.5% |
| (DOXORUBICIN HYDROCHLORIDE) Adriamycin (PFS INJ, IJ {M.D.V., P.F.}) | 00013-1166-83 | 2 mg/ml, 100 ml | 1,104.13 | 956.13 | 646.0% |
| (DOXORUBICIN HYDROCHLORIDE) Adriamycin (PFS INJ, IJ {M.D.V., P.F.}) | 00013-1166-83 | 2 mg/ml, 100 ml | 1,104.13 | 960.18 | 667.0% |
| (DOXORUBICIN HYDROCHLORIDE) Adriamycin (PFS INJ, IJ {M.D.V., P.F.}) | 00013-1166-83 | 2 mg/ml, 100 ml | 1,104.13 | 940.63 | 575.3% |
| (DOXORUBICIN HYDROCHLORIDE) Adriamycin (PFS INJ, IJ {VIAL, P.F.}) | 00013-1136-91 | 2 mg/ml, 5 ml | 56.34 | 48.94 | 661.4% |
| (DOXORUBICIN HYDROCHLORIDE) Adriamycin (PFS INJ, IJ {VIAL, P.F.}) | 00013-1136-91 | 2 mg/ml, 5 ml | 56.34 | 47.39 | 529.5% |
| (DOXORUBICIN HYDROCHLORIDE) Adriamycin (PFS INJ, IJ {VIAL, P.F.}) | 00013-1136-91 | 2 mg/ml, 5 ml | 56.34 | 46.14 | 452.4% |
| (DOXORUBICIN HYDROCHLORIDE) Adriamycin (PFS INJ, IJ {VIAL, P.F.}) | 00013-1146-91 | 2 mg/ml, 10 ml | 112.66 | 97.86 | 661.2% |
| (DOXORUBICIN HYDROCHLORIDE) Adriamycin (PFS INJ, IJ {VIAL, P.F.}) | 00013-1146-91 | 2 mg/ml, 10 ml | 112.66 | 95.71 | 564.7% |
| (DOXORUBICIN HYDROCHLORIDE) Adriamycin (PFS INJ, IJ {VIAL, P.F.}) | 00013-1146-91 | 2 mg/ml, 10 ml | 112.66 | 92.26 | 452.3% |
| (DOXORUBICIN HYDROCHLORIDE) Adriamycin (PFS INJ, IJ {VIAL, P.F.}) | 00013-1156-79 | 2 mg/ml, 25 ml | 281.68 | 244.68 | 661.3% |
| (DOXORUBICIN HYDROCHLORIDE) Adriamycin (PFS INJ, IJ {VIAL, P.F.}) | 00013-1156-79 | 2 mg/ml, 25 ml | 281.68 | 246.18 | 693.5% |

- 110 -

| Drug Name | NDC | Quantity | 1999 AWP Red Book | W-Sale Spread | % |
|---|---|---|---|---|---|
| (DOXORUBICIN HYDROCHLORIDE) Adriamycin (PFS INJ, IJ {VIAL, P.F.}) | 00013-1156-79 | 2 mg/ml, 25 ml | 281.68 | 240.78 | 588.7% |
| (DOXORUBICIN HYDROCHLORIDE) Adriamycin (PFS INJ, IJ {VIAL, P.F.}) | 00013-1176-87 | 2 mg/ml, 37.5 ml | 422.51 | 365.81 | 645.2% |
| (DOXORUBICIN HYDROCHLORIDE) Adriamycin (PFS INJ, IJ {VIAL, P.F.}) | 00013-1176-87 | 2 mg/ml, 37.5 ml | 422.51 | 360.01 | 576.0% |
| (DOXORUBICIN HYDROCHLORIDE) Adriamycin (PFS INJ, IJ {VIAL, P.F.}) | 00013-1176-87 | 2 mg/ml, 37.5 ml | 422.51 | 361.16 | 588.7% |
| (DOXORUBICIN HYDROCHLORIDE) Adriamycin (PFS INJ, IJ {VIAL, P.F.}) | 00013-1176-87 | 2 mg/ml, 37.5 ml | 422.51 | 364.70 | 630.9% |
| (DOXORUBICIN HYDROCHLORIDE) Adriamycin (RDF PDI, IJ {M.D.V.}) | 00013-1116-83 | 150 mg ea | 788.44 | 680.44 | 630.0% |
| (DOXORUBICIN HYDROCHLORIDE) Adriamycin (RDF PDI, IJ {M.D.V.}) | 00013-1116-83 | 150 mg ea | 788.44 | 666.44 | 546.3% |
| (DOXORUBICIN HYDROCHLORIDE) Adriamycin (RDF PDI, IJ {M.D.V.}) | 00013-1116-83 | 150 mg ea | 788.44 | 671.44 | 573.9% |
| (DOXORUBICIN HYDROCHLORIDE) Adriamycin (RDF PDI, IJ) | 00013-1086-91 | 10 mg ea | 53.64 | 46.48 | 649.2% |
| (DOXORUBICIN HYDROCHLORIDE) Adriamycin (RDF PDI, IJ) | 00013-1086-91 | 10 mg ea | 53.64 | 44.69 | 499.3% |
| (DOXORUBICIN HYDROCHLORIDE) Adriamycin (RDF PDI, IJ) | 00013-1086-91 | 10 mg ea | 53.64 | 43.94 | 453.0% |
| (DOXORUBICIN HYDROCHLORIDE) Adriamycin (RDF PDI, IJ) | 00013-1086-91 | 10 mg ea | 53.64 | 46.48 | 649.2% |

| Drug Name | NDC | Quantity | 1999 AWP *Red Book* | W-Sale Spread | % |
|---|---|---|---|---|---|
| (DOXORUBICIN HYDROCHLORIDE) Adriamycin (RDF PDI, IJ) | 00013-1106-79 | 50 mg ea | 268.18 | 232.39 | 649.3% |
| (DOXORUBICIN HYDROCHLORIDE) Adriamycin (RDF PDI, IJ) | 00013-1106-79 | 50 mg ea | 268.18 | 230.18 | 605.7% |
| (DOXORUBICIN HYDROCHLORIDE) Adriamycin (RDF PDI, IJ) | 00013-1106-79 | 50 mg ea | 268.18 | 229.18 | 587.6% |
| (ETOPSIDE) TOPOSAR (INJ, IJ {M.D.V.}) | 00013-7336-91 | 20 mg/ml, 5 ml | 157.65 | 148.65 | 1651.7% |
| (ETOPSIDE) TOPOSAR (INJ, IJ {M.D.V.}) | 00013-7336-91 | 20 mg/ml, 5 ml | 157.65 | 147.25 | 1415.9% |
| (ETOPSIDE) TOPOSAR (INJ, IJ {M.D.V.}) | 00013-7336-94 | 20 mg/ml, 10 ml | 315.29 | 297.29 | 1651.6% |
| (ETOPSIDE) TOPOSAR (INJ, IJ {M.D.V.}) | 00013-7336-94 | 20 mg/ml, 10 ml | 315.29 | 294.29 | 1401.4% |
| (ETOPSIDE) TOPOSAR (INJ, IJ {M.D.V.}) | 00013-7356-88 | 20 mg/ml, 25 ml | 768.51 | 724.51 | 1646.6% |
| (FLUOROURACIL) Adrucil (INJ, IJ {VIAL}) | 00013-1036-91 | 50 mg/ml, 10 ml | 3.20 | 1.78 | 125.4% |
| (FLUOROURACIL) Adrucil (INJ, IJ {VIAL}) | 00013-1036-91 | 50 mg/ml, 10 ml | 3.20 | 1.65 | 106.5% |
| (FLUOROURACIL) Adrucil (INJ, IJ {VIAL}) | 00013-1036-91 | 50 mg/ml, 10 ml | 3.20 | 1.70 | 113.3% |
| (FLUOROURACIL) Adrucil (INJ, IJ {VIAL}) | 00013-1046-94 | 50 mg/ml, 50 ml | 16.04 | 9.29 | 137.6% |
| (FLUOROURACIL) Adrucil (INJ, IJ {VIAL}) | 00013-1046-94 | 50 mg/ml, 50 ml | 16.04 | 8.09 | 101.8% |
| (FLUOROURACIL) Adrucil (INJ, IJ {VIAL}) | 00013-1056-94 | 50 mg/ml, 100 ml | 32.06 | 19.06 | 146.6% |
| (FLUOROURACIL) Adrucil (INJ, IJ {VIAL}) | 00013-1056-94 | 50 mg/ml, 100 ml | 32.06 | 13.16 | 69.6% |

- 112 -

| Drug Name | NDC | Quantity | 1999 AWP Red Book | W-Sale Spread | % |
|---|---|---|---|---|---|
| (FLUOROURACIL) | | | | | |
| Adrucil (INJ, IJ {VIAL}) (FLUOROURACIL) | 00013-1056-94 | 50 mg/ml, 100 ml | 32.06 | 17.81 | 125.0% |
| Adrucil (INJ, IJ {VIAL}) (HYDROCORTISON E SODIUM SUCCINATE) Solu- | 00013-1056-94 | 50 mg/ml, 100 ml | 32.06 | 20.46 | 176.4% |
| Cortef (ACT-O-VIAL) (HYDROCORTISON E SODIUM SUCCINATE) Solu- | 00009-0900-13 | 100 mg ea | 3.34 | 2.24 | 203.6% |
| Cortef (ACT-O-VIAL) (HYDROCORTISON E SODIUM SUCCINATE) Solu- | 00009-0900-13 | 100 mg ea | 3.34 | 2.03 | 155.0% |
| Cortef (ACT-O-VIAL) (HYDROCORTISON E SODIUM SUCCINATE) Solu- | 00009-0900-13 | 100 mg ea | 3.34 | 1.59 | 90.9% |
| Cortef (ACT-O-VIAL) (HYDROCORTISON E SODIUM SUCCINATE) Solu- | 00009-0900-13 | 100 mg ea | 3.34 | 1.96 | 142.0% |
| Cortef (ACT-O-VIAL) (HYDROCORTISON E SODIUM SUCCINATE) Solu- | 00009-0900-13 | 100 mg ea | 3.34 | 1.80 | 116.9% |
| Cortef (ACT-O-VIAL) (HYDROCORTISON E SODIUM SUCCINATE) Solu- | 00009-0909-08 | 250 mg ea | 7.56 | 4.91 | 185.3% |
| Cortef (ACT-O-VIAL) (HYDROCORTISON E SODIUM SUCCINATE) Solu- | 00009-0909-08 | 250 mg ea | 7.56 | 4.31 | 132.6% |
| Cortef (ACT-O-VIAL) (HYDROCORTISON E SODIUM SUCCINATE) Solu- | 00009-0909-08 | 250 mg ea | 7.56 | 5.36 | 243.6% |
| Cortef (ACT-O-VIAL) (HYDROCORTISON E SODIUM SUCCINATE) Solu- | 00009-0909-08 | 250 mg ea | 7.56 | 5.07 | 203.6% |
| Cortef (ACT-O-VIAL) | 00009-0912-05 | 500 mg ea | 14.71 | 9.16 | 165.0% |

- 113 -

| Drug Name | NDC | Quantity | 1999 AWP Red Book | W-Sale Spread | % |
|---|---|---|---|---|---|
| (HYDROCORTISONE SODIUM SUCCINATE) Solu-Cortef (ACT-O-VIAL) | 00009-0912-05 | 500 mg ea | 14.71 | 9.27 | 170.4% |
| (HYDROCORTISONE SODIUM SUCCINATE) Solu-Cortef (ACT-O-VIAL) | 00009-0912-05 | 500 mg ea | 14.71 | 9.20 | 167.0% |
| (HYDROCORTISONE SODIUM SUCCINATE) Solu-Cortef (ACT-O-VIAL) | 00009-0912-05 | 500 mg ea | 14.71 | 8.31 | 129.8% |
| (HYDROCORTISONE SODIUM SUCCINATE) Solu-Cortef (ACT-O-VIAL) | 00009-0912-05 | 500 mg ea | 14.71 | 8.16 | 124.6% |
| (HYDROCORTISONE SODIUM SUCCINATE) Solu-Cortef (ACT-O-VIAL) | 00009-0920-03 | 1000 mg ea | 29.29 | 16.64 | 131.5% |
| (HYDROCORTISONE SODIUM SUCCINATE) Solu-Cortef (ACT-O-VIAL) | 00009-0920-03 | 1000 mg ea | 29.29 | 18.80 | 179.2% |
| (METHOTREXATE SODIUM SUCCINATE) Solu-Medrol (ACT-O-VIAL) | 00009-0190-09 | 125 mg ea | 5.64 | 3.41 | 152.9% |
| (METHOTREXATE SODIUM SUCCINATE) Solu-Medrol (ACT-O-VIAL) | 00009-0190-09 | 125 mg ea | 5.64 | 2.83 | 100.7% |
| (METHOTREXATE SODIUM SUCCINATE) Solu-Medrol (ACT-O-VIAL) | 00009-0765-02 | 500 mg ea | 18.95 | 13.44 | 243.9% |
| (METHOTREXATE SODIUM SUCCINATE) Solu-Medrol (ACT-O-VIAL) | 00009-3389-01 | 1 gm ea | 34.13 | 23.66 | 226.0% |
| (METHOTREXATE SODIUM SUCCINATE) Solu-Medrol (ACT-O- | 00009-3389-01 | 1 gm ea | 34.13 | 23.11 | 209.7% |

- 114 -

| Drug Name<br>VIAL) | NDC | Quantity | 1999 AWP<br>*Red Book* | W-Sale<br>Spread | % |
|---|---|---|---|---|---|
| (METHOTREXATE<br>SODIUM<br>SUCCINATE) Solu-<br>Medrol (ACT-O-<br>VIAL) | 00009-3389-01 | 1 gm ea | 34.13 | 24.28 | 246.5% |
| (METHOTREXATE<br>SODIUM<br>SUCCINATE) Solu-<br>Medrol (ACT-O-<br>VIAL) | 00009-3389-01 | 1 gm ea | 34.13 | 19.92 | 140.2% |
| (METHOTREXATE<br>SODIUM<br>SUCCINATE) Solu-<br>Medrol (PDI, IJ<br>{ACT-O-VIAL}) | 00009-0113-12 | 40 mg ea | 2.13 | 0.53 | 33.1% |
| (METHOTREXATE<br>SODIUM<br>SUCCINATE) Solu-<br>Medrol (PDI, IJ<br>{ACT-O-VIAL}) | 00009-0113-12 | 40 mg ea | 2.13 | 0.96 | 82.1% |
| (METHOTREXATE<br>SODIUM<br>SUCCINATE) Solu-<br>Medrol (VIAL) | 00009-0758-01 | 500 mg ea | 21.26 | 15.75 | 285.8% |
| (METHOTREXATE<br>SODIUM<br>SUCCINATE) Solu-<br>Medrol (VIAL) | 00009-0758-01 | 500 mg ea | 21.26 | 15.01 | 240.2% |
| (METHOTREXATE<br>SODIUM<br>SUCCINATE) Solu-<br>Medrol (VIAL) | 00009-0758-01 | 500 mg ea | 21.26 | 13.92 | 189.6% |
| (METHOTREXATE<br>SODIUM<br>SUCCINATE) Solu-<br>Medrol<br>(W/DILUENT) | 00009-0796-01 | 2 gm ea | 57.98 | 43.67 | 305.2% |
| (METHOTREXATE<br>SODIUM<br>SUCCINATE) Solu-<br>Medrol<br>(W/DILUENT) | 00009-0796-01 | 2 gm ea | 57.98 | 43.48 | 299.9% |
| (METHOTREXATE<br>SODIUM<br>SUCCINATE) Solu- | 00009-0887-01 | 500 mg ea | 0.00 | -6.17 | -100.0% |

| Drug Name<br>Medrol<br>(W/DILUENT) | NDC | Quantity | 1999 AWP<br>*Red Book* | W-Sale<br>Spread | % |
|---|---|---|---|---|---|
| (TESTOSTERONE CYPIONATE) Depo-Testosterone (200 mg/ml) | 00009-0417-01 | 1 ml, C-III | 14.73 | 3.51 | 31.3% |
| (TESTOSTERONE CYPIONATE) Depo-Testosterone (200 mg/ml) | 00009-0417-01 | 1 ml, C-III | 14.73 | 2.38 | 19.3% |
| (TESTOSTERONE CYPIONATE) Depo-Testosterone (200 mg/ml) | 00009-0417-02 | 10 ml, C-III | 80.53 | 49.82 | 162.2% |
| (TESTOSTERONE CYPIONATE) Depo-Testosterone (200 mg/ml) | 00009-0417-02 | 10 ml, C-III | 80.53 | 61.68 | 327.2% |
| (VINCRISTINE SULFATE) Vincasar (INJ, IJ {VIAL}) | 00013-7456-86 | 1 mg/ml, 1 ml | 43.23 | 38.73 | 860.7% |
| (VINCRISTINE SULFATE) Vincasar (INJ, IJ {VIAL}) | 00013-7456-86 | 1 mg/ml, 1 ml | 43.23 | 37.38 | 639.0% |
| (VINCRISTINE SULFATE) Vincasar (INJ, IJ {VIAL}) | 00013-7456-86 | 1 mg/ml, 1 ml | 43.23 | 39.18 | 967.4% |
| (VINCRISTINE SULFATE) Vincasar (INJ, IJ {VIAL}) | 00013-7456-86 | 1 mg/ml, 1 ml | 43.23 | 37.23 | 620.5% |
| (VINCRISTINE SULFATE) Vincasar (INJ, IJ {VIAL}) | 00013-7466-86 | 1 mg/ml, 2 ml | 86.46 | 79.46 | 1135.1% |
| (VINCRISTINE SULFATE) Vincasar (INJ, IJ {VIAL}) | 00013-7466-86 | 1 mg/ml, 2 ml | 86.46 | 76.01 | 727.4% |
| (VINCRISTINE SULFATE) Vincasar (INJ, IJ {VIAL}) | 00013-7466-86 | 1 mg/ml, 2 ml | 86.46 | 77.76 | 893.8% |
| (VINCRISTINE SULFATE) Vincasar (INJ, IJ {VIAL}) | 00013-7466-86 | 1 mg/ml, 2 ml | 86.46 | 79.21 | 1092.6% |
| Bleomycin Sulfate (PDI, IJ {VIAL}) | 00013-1616-78 | 15 u ea | 309.98 | 150.98 | 95.0% |
| Bleomycin Sulfate (PDI, IJ {VIAL}) | 00013-1616-78 | 15 u ea | 309.98 | 151.98 | 96.2% |

- 116 -

| Drug Name | NDC | Quantity | 1999 AWP Red Book | W-Sale Spread | % |
|-----------|-----|----------|-------------------|---------------|---|
| Bleomycin Sulfate (PDI, IJ {VIAL}) | 00013-1616-78 | 15 u ea | 309.98 | 150.98 | 95.0% |
| Bleomycin Sulfate (PDI, IJ {VIAL}) | 00013-1636-86 | 30 u ea | 619.91 | 301.91 | 94.9% |
| Bleomycin Sulfate (PDI, IJ {VIAL}) | 00013-1636-86 | 30 u ea | 619.91 | 289.91 | 87.9% |
| Bleomycin Sulfate (PDI, IJ {VIAL}) | 00013-1636-86 | 30 u ea | 619.91 | 301.91 | 94.9% |

### b.   The Pharmacia Group provided other improper incentives

298.   In addition to marketing the spread, The Pharmacia Group has utilized other impermissible inducements to stimulate sales of its drugs.  These inducements were designed to result in a lower net cost to the provider while concealing the actual wholesale price beneath a high invoice price.  By utilizing "off-invoice" inducements, The Pharmacia Group provided purchasers with substantial discounts meant to gain their patronage while maintaining the fiction of a higher wholesale price.

299.   The government investigators also uncovered an October 3, 1996 internal memorandum wherein Pharmacia told three oncology sales representatives:

> Our competitive intelligence tells us that our pricing on Adriamycin, although higher than generics, is in the "ball park" for you to attain the customers Adriamycin business.  If needed, you have a "free goods" program to support your efforts against other forms of generic doxorubicin.

> . . . .

> You should not have to use "free goods" to steer customer [sic] away from NSS or OTN.  OTN and NSS Adriamycin pricing is competitive.  Use your "free goods" wisely to compete against other generic forms of Adriamycin, not to shift the customer to direct shipments.  The higher we can keep the price of Adriamycin, the easier it is for you to meet your sales goals for Adriamycin.

(PH 024315).

300.   On information and belief, based upon the foregoing examples, as well as an investigation into industry sales practices, the provision of free goods is not typically an isolated

- 117 -

instance at a drug company, but instead is part of a regional or nationwide marketing strategy that is approved at levels higher than individual salespersons. Thus, it is reasonable to infer that other instances of such conduct exists and will be revealed upon discovery.

### c.   The Pharmacia Group has been the target of multiple government investigations

301.    In connection with its scheme to inflate AWPs, The Pharmacia Group has been investigated by the Department of Justice, the Texas Attorney General, the California Attorney General, the Massachusetts Attorney General, the Attorney General of the State of Connecticut, the Attorney General of the State of New York, and the Department of Health and Human Services Office of Inspector General.

302.    In a report published by the DHHS, the DOJ documented at least 43 instances where the published AWPs for various dosages of drugs manufactured by The Pharmacia Group were substantially higher than the actual prices listed by wholesalers. The chart below sets forth the drugs identified by the DOJ and the spread associated with one particular dosage of each drug. These figures compare the DOJ's determination of an accurate AWP for that particular dosage, based upon wholesalers' price lists, with the AWP reported by The Pharmacia Group in the 2001 *Red Book*.

| Drug | The Pharmacia Group's 2001 *Red Book* AWP | DOJ Determined Actual AWP | Difference | Spread |
|---|---|---|---|---|
| Amphotercin B | $36.26 | $16.00 | $20.26 | 127% |
| Bleomycin Sulfate | $309.98[1] | $158.67 | $151.31 | 96% |
| Clindamycin Phosphate | $93.60 | $61.20 | $32.40 | 53% |
| Cyclophosphamide | $6.29 | $3.92 | $2.37 | 60% |
| Cytarabine | $8.98 | $4.06 | $4.92 | 122% |
| Doxorubicin HCL | $1104.13 | $150.86 | $953.27 | 632% |
| Etoposide | $157.65 | $9.47 | $148.18 | 1,565% |
| Fluorouracil | $3.20 | $1.47 | $1.73 | 118% |

[1] Calculation based on the AWP listed in the 2000 *Red Book*.

- 118 -

| | | | | |
|---|---|---|---|---|
| Hydrocortisone Sodium Succinate | $2.00 | $1.55 | $.45 | 29% |
| Metholprednisolone Sodium Succinate | $2.05 | $1.45 | $.60 | 41% |
| Testosterone Cypionate | $17.01 | $11.79 | $5.22 | 44% |
| Vincristine Sulfate | $43.23 | $5.10 | $38.13 | 748% |

303.    In OIG report OEI-03-00-00310, the government noted that 20 mg of irinotecan, which according to the *Red Book* is manufactured only by The Pharmacia Group, had a Medicare Median of $117.81 and a Catalog Median of $98.63, resulting in a spread of 19.45%. (P006398-P006424).

304.    The GAO issued a report entitled "Payments for Covered Outpatient Drugs Exceed Providers' Cost" (GAO-01-1118) wherein it found that irinotecan had an Average AWP of $141.32, the Average Widely Available Discount from AWP to physicians for irinotecan was 22.9%, and the drug constituted 2.0% of the total amount of Medicare spending in 1999. (P005546-P005578).

305.    As of April 2000, another Pharmacia Group drug, Toposar® (etoposide), had an AWP of $28.38. The DOJ found that retailers were buying it for $1.70. (P006299-006316).

306.    Similarly, by letter dated September 25, 2000 to the HCFA Administrator, the Chairman of the Commerce Committee revealed that:

> [I]n 1998, Pharmacia-Upjohn's Bleomycin had an AWP of $309.98, but health care providers could purchase it for $154.85. In 1997, Pharmacia-Upjohn's Vincasar could be purchased for $7.50, while the AWP was a staggering $741.50.

*See* letter dated May 25, 2000 from U.S. Rep. Thomas J. Bliley to Nancy-Ann Min DeParle, HCFA Administrator. (P007015-P007490).

307.    Exhibit 1 to U.S. Rep. Pete Stark's September 28, 2000 letter to Alan F. Holmer, President of the Pharmaceutical Research and Manufacturers of America, reveals that while the AWP for 1 mg of Vincasar® (vincritine sulfate) was $370.75 in 1997, one physician group's

- 119 -

(American Oncology Resources) price in 1997 was only $4.15. (P007515). Similarly, while the AWP for 2 mg of Vincasar® was $741.50, AOR's actual pre-April 1997 price was $7.75 (in fact, The Pharmacia Group had offered to reduce it to $7.50). *Id.* As of April 2000, Adriamycin had a reported AWP of $241.36, while the real wholesale price was $33.43.

7. **TAP**

308. TAP engages in an organization-wide and deliberate scheme to inflate AWPs. TAP has stated fraudulent AWPs for all or almost all of its drugs, including those set forth below.

| | | |
|---|---|---|
| Prevacid | lansoprazole | Proton Pump Inhibitor (Gastrointestinal Agent) Used in the short-term treatment of duodenal ulcer, erosive esophagitis and gastroesophageal reflux disease |

309. The specific drugs manufactured and/or distributed by TAP for which relief is currently sought in this case are set forth below or in Appendix A.

310. TAP controlled and set the AWPs for all of its drugs, including those appearing in Appendix A, through direct communications with industry compendia.

311. TAP's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs has resulted in excessive overpayments by the State of Nevada and Nevada citizens.

a. **TAP's understanding of AWP and intentional manipulation thereof**

312. According to Criminal Information filed against several doctors and the Indictment filed against six former TAP employees and a urologist, TAP referred its practice of inflating the AWP for Lupron and the corresponding inducement to the physicians as its "Return to Practice" program.

- 120 -

313. At various times, TAP employees would conduct a "Business Review Meeting" with individual doctors or their staff to explain in detail how a doctor could make money by buying Lupron® and exploiting the spread.

314. TAP created sophisticated computer programs, including spreadsheets for use with physicians, to further explain how "Return to Practice" worked and how much money a physician could make from the spread. These computer programs were loaded onto laptop computers used by sales representatives and taken directly into physician's offices.

315. TAP knew and understood that, because Medicare and other insurers relied upon the Publishers to establish AWPs, and because TAP could precisely control the published AWP, TAP could increase whenever they so desired the profit obtained by physicians.

### b. TAP provided other improper incentives

316. In addition to marketing the spread, TAP has utilized other impermissible inducements to stimulate sales of its drugs. These inducements were designed to result in a lower net cost to the provider while concealing the actual wholesale price beneath a high invoice price.

317. On information and belief, based upon the foregoing examples, as well as an investigation into industry sales practices, the provision of free goods is not typically an isolated instance at a drug company, but instead is part of a regional or nationwide marketing strategy that is approved at levels higher than individual salespersons. Thus, it is reasonable to infer that other instances of such conduct exists and will be revealed upon discovery.

318. For example, TAP has pled guilty to illegally conspiring with medical providers to provide free samples which would then be billed to Medicare. In an October 3, 2001, press release that referenced the guilty plea, TAP's president, Thomas Watkins, stated:

> We admit that TAP provided free samples of Lupron to a number
> of physicians, primarily in the early to mid-1990s, with the
> knowledge that those physicians would seek and receive
> reimbursement. The billing for free samples is wrong, and it
> should never have happened.

- 121 -

319.    TAP has also provided and/or arranged for many other non-public financial inducements to stimulate the sales of its drugs.  Such inducements included volume discounts, rebates, off-invoice pricing, free goods, credit memos, consulting fees, debt forgiveness and grants.  All of these incentives are designed to lower the cost of the drug to the medical provider while concealing the actual cost.

320.    For example, the Indictment alleges three specific instances when TAP employees offered an HMO, a urology practice and a hospital unrestricted "educational grants" of more than $75,000 to continue their use of Lupron.  It offered Tufts HMO $65,000 in grants.

321.    Another way that TAP funneled illicit payments to physicians was through the "TAP into the Future" program, which consisted of providing physicians with all-expense paid weekends at luxurious resorts.  These junkets were disguised as educational or consulting programs, with all of the doctors in attendance designated as "consultants" even though the doctors who attended did not do anything that could reasonably be deemed consulting services.

322.    As set forth above, TAP's scheme to inflate its reported AWPs and market the resulting spread to increase the market share of its drugs and its use of other "off invoice" rebates and financial inducements to its customers has resulted in excessive overpayments by the State, Patients and other payors.

          **c.      TAP has been the target of multiple government investigations**

323.    In connection with its scheme to inflate AWPs, TAP has been investigated by the Department of Justice.

324.    On October 13, 2001, the United States Attorney in Boston, Massachusetts announced that TAP had agreed to pay $875 million to resolve criminal charges and civil liabilities in connection with its fraudulent pricing and marketing practices for the drug named Lupron®.  As part of the agreement:

        a        TAP agreed to plead guilty to a conspiracy to violate the Prescription Drug Marketing Act, 21 U.S.C. §§ 331(t) and 333(b), and to pay a $290 million criminal fine,

- 122 -

the largest criminal fine ever in a health care fraud prosecution. The plea agreement between the United States and TAP specifically stated that TAP's criminal conduct caused the Government losses of $145,000,000;

     b.     TAP agreed to pay the United States Government $559,483,560 for filing false and fraudulent claims with the Medicare and Medicaid programs as a result of TAP's fraudulent drug pricing schemes and sales and marketing misconduct;

     c.     TAP agreed to pay the fifty states and the District of Columbia $25,516,440 for filing false and fraudulent claims with the States, as a result of TAP's drug pricing and marketing misconduct, and for TAP's failure to provide state Medicaid programs TAP's best price for Lupron®, as required by law;

     d.     TAP agreed to comply with the terms of a sweeping Corporate Integrity Agreement that, among other things, significantly changes the manner in which TAP supervises its marketing and sales staff and ensures that TAP will report to the Medicare and Medicaid programs the true average sale price for drugs reimbursed by those programs;

     e.     Abbott and Takeda agreed to cooperate fully with the ongoing government investigation of TAP and its former officers and employees in exchange for the United States declining prosecution of Abbott and Takeda for conduct relating to Lupron®; and

     f.     An Indictment was unsealed in the District of Massachusetts against six current or former TAP employees (including an account executive, three District Managers, a National Accounts Manager and the former Vice President of Sales), and a urologist, alleging that they conspired to (i) bill Medicare for free samples of Lupron® and (ii) market Lupron® using the "spread" and the "return to practice" program.

The TAP defendants have been sued in a class action in connection with their fraudulent pricing and marketing practices for Lupron®.

1534.13 0051 BSC.DOC

325.    At a hearing in the criminal matter, which has an extensive record, United States

District Court Judge William G. Young found:

> This has been a gross abuse of the Medicare/Medicaid repayment
> system, knowing, intelligent. You have demonstrated, and it's all
> been confirmed in open court, and I don't want anyone forgetting
> about the fact that this company, not under its present
> management, knowingly abused the public trust in a most, and I
> use my words carefully, despicable way.

*United States v. TAP Pharm. Prods., Inc.*, No. CR-01-10354-WGY (D. Mass. Dec. 6, 2001).

### d.    TAP concealed its AWP manipulation

326.    TAP deliberately acted to conceal its fraudulent reporting and marketing of the

AWP spread.

327.    For example, TAP instructed physicians not to report the true price they paid for

Lupron. According to the Indictment, a TAP Senior Marketing executive, Alan MacKenzie,

advised TAP's sales force to:

> tell physicians that if doctors disclosed their invoice costs to the
> Medicare Program, that Program would take steps to reduce the
> maximum payment allowed for Lupron and thus reduce the
> physician's profit for Return to Practice.

328.    MacKenzie also told the sales force to caution doctors not to discuss their price

discounts with other physicians and instructed TAP employees to tell urologists that:

> by discussing your costs of Lupron with other physicians, you run
> the risk of that information getting back to HCFA. If HCFA then
> realizes that AWP is not a true reflection of the price, the AWP
> could be affected, thus lowering the amounts you may charge.

329.    A presentation to TAP's sales representatives included the same statements listed

above, as well as directions for the leader of the presentation, which stated:

> The main point to make to physicians is that confidentiality clause
> is a protection for them. If word is leaked back to HCF/Medicare
> that the cost of Lupron is going down, they very well may take
> steps in reducing allowable. This tactic should help prevent
> physicians talking amongst themselves.

- 124 -

## X.   DEFENDANTS' CONCEALMENT OF THE TRUTH AND TOLLING OF STATUTES OF LIMITATION

330.   The allegations in this Amended Complaint establish that each defendant has engaged in the AWP Inflation Scheme. Nevada's allegations are based on information and belief and are made after a reasonable if not exhaustive investigation into the facts and the law. As this Amended Complaint demonstrates, the allegations are supported by investigations conducted by the Department of Justice, the DHHS Office of the Inspector General, and Congress and, in many instances, defendants' own documents produced in those investigations. This Amended Complaint provides numerous examples involving specific drugs, and these examples lay a complete foundation for the rest of the allegations contained herein. Moreover, the generalized allegations (which provide a general outline of the scheme to defraud engaged in by each defendant), coupled with specific factual examples regarding specific drugs, support a strong inference that each defendant engaged in fraud and deceptive activity with respect to other drugs.

331.   Notwithstanding the impressive volume of specificity that embodies this Amended Complaint, Nevada alleges that much information remains peculiarly within each defendant's knowledge or control, as explained further below. Indeed, when an alleged scheme of fraud is complex and far-reaching (as alleged here), pleading every instance of fraud would be extremely ungainly, if not impossible.

332.   Each defendant concealed its fraudulent conduct from the State of Nevada and others by controlling the process by which the AWPs for drugs were set. Defendants prevented the State of Nevada and others from knowing what the actual pricing structures for these drugs were, and failed to inform them of the usage of free samples and the provision of other financial incentives to providers and other intermediaries to lower their respective costs for the drugs. In short, the actual wholesale transaction prices of these particular drugs and the variety of hidden incentives that Defendants employ to reduce the listed prices of drugs are peculiarly within the

- 125 -

Defendants' control. Moreover, defendants' fraudulent conduct was of such a nature as to be self-concealing.

333.    Each defendant closely guarded its pricing structures and marketing plans from public disclosure. For example, a recent CMS Health Care Industry Market Update (dated January 10, 2003) stated that drug "price discounts are closely guarded as competitive information." *See* p. 39.

334.    Each defendant also concealed its fraudulent conduct by instructing providers and others not to report the prices they paid for drugs.

335.    Each defendant also worked with and motivated provider and intermediary trade associations to halt any investigations or change in the AWP system.

336.    Each defendant knew that the actual transaction price data – the amounts charged to providers and others for their drugs – was not publicly available, and they kept this information (on which AWPs should have been calculated) highly confidential and secret.

337.    Each defendant's efforts to conceal its pricing structures for drugs is evidence that it knew that its conduct was fraudulent.

338.    Thus, each defendant concealed that (i) its AWPs were highly-inflated (and were inflated to cause the Nevada Medicaid Program and other reimbursement programs and Patients making co-pays to overpay for drugs); (ii) it was manipulating the AWPs of the drugs; and (iii) its inflated AWPs greatly exceeded the average of the wholesale prices based upon a good faith and reasonable estimate utilizing the pricing and transaction information available to the defendant in conducting its ordinary business affairs.

339.    Nevada was diligent in pursuing an investigation of the claims asserted in this Amended Complaint. Through no fault of its own, Nevada did not receive inquiry notice nor learn of the factual basis for its claims in this Amended Complaint and the injuries suffered therefrom until recently. Nor did any Nevada residents on whose behalf claims are pursued in *parens patraie*.

- 126 -

340.   Any applicable statutes of limitations have been tolled by defendants' knowing and active concealment and denial of the facts alleged herein.  Nevada has been kept in ignorance of vital information essential to knowledge of and the pursuit of these claims, without any fault or lack of diligence on its part.  The State could not reasonably have discovered the fraudulent nature of the published AWPs.

341.   Defendants were and continue to be under a continuing duty to disclose to Nevada the fact that the published AWPs bore and continue to bear no relationship to the prices or pricing structures for drugs.  Because of their knowing, affirmative, and/or active concealment of the fraudulent nature of the published AWPs, defendants are estopped from relying on any statutes of limitations.

## XI.   DIRECT DAMAGE SUSTAINED BY THE STATE OF NEVADA, PATIENTS AND THIRD-PARTY PAYORS

342.   Patients are directly damaged by defendants' AWP Inflation Scheme because Patients frequently are required to make a co-payment for a pharmaceutical, or because Patients occasionally make payment in full.  As explained in greater detail above, the amount of the co-payment is often a direct function of the overall reimbursement paid on behalf of the patient by Medicare or Third-Party Payors.

343.   For example, as alleged herein, Medicare recipients must pay 20% of the total amount that is reimbursed by Medicare to the pharmaceutical manufacturer.  Thus, if Medicare reimburses $100 for a covered drug based upon the reported AWP, the Medicare beneficiary is responsible for 20% (or $20) in this situation.

344.   An example of the dramatic impact of AWP inflation on Patients is provided by reviewing the typical drug treatment regimen for a stage II breast cancer Medicare patient with a body surface are of approximately two meters.

- 127 -

345.    The treatment consists of four chemotherapy infusion treatments given at three-week intervals.  Dosages have been totaled to reflect the quantities administered over the 12 week chemotherapy period:

| Drug Name | Mfr. | Dosage/ treatment x 4 treatment cycles | Estimated cost of treatment x 4 treatment cycles | AWP cost of treatment x 4 treatment cycles | Spread % | Spread in $ | Patient co-pay based on wholesale prices | Patient co-pay based on AWP prices | Add'l co-pay created by inflated AWP |
|---|---|---|---|---|---|---|---|---|---|
| Adriamycin | BMS | 480mg | $1,062.6 | $2,649.91 | 59.9% | $1,587.31 | 212.52 | 529.82 | $317.3 |
| Cytoxan | | 4,800mg | $237.02 | $237.02 | 0% | $0 | 47.04 | 47.04 | $0 |
| Decadron (IV) | | 40mg | $830.88 | $1097.10 | 14.8% | $266.22 | 166.18 | 219.42 | $53.24 |
| Anzemet (IV) | Aventis | 400mg | $591.08 | $666.00 | 11.25% | $74.92 | 118.22 | 133.2 | $14.98 |
| TOTAL | | | $2,721.54 | $4,650.03 | | $1,928.45 | $543.96 | 929.48 | $385.52 |

346.    Thus, over one-third of the Medicare co-payment results from AWP inflation.

347.    Many Medicare beneficiaries obtain supplemental insurance known as "Medigap" or "Medicare Plus" to cover the costs of pharmaceuticals as well as other costs not paid by Medicare.  Such supplemental insurers are also Third-Party Payors who are damaged by the AWP Inflation Scheme.

348.    The AWP Inflation Scheme also affected the State of Nevada because, in each instance of a drug payment made under Medicaid, the State paid an inflated amount.

349.    Similarly, numerous State agencies have overpaid for medications based upon the fraudulently reported AWPs.

350.    In addition, Third-Party Payors also typically make reimbursement to health care providers for pharmaceuticals based upon the AWP.  They have made inflated reimbursement payments based on defendants AWP Inflation Scheme.

- 128 -

## XII.   CLAIMS FOR RELIEF

### COUNT I

### DECEPTIVE TRADE PRACTICES
### (VIOLATIONS OF NRS 598.0903, *ET SEQ.*)

### CLAIM FOR DAMAGES CAUSED TO NEVADA RESIDENTS

351.   The State of Nevada repeats and realleges the preceding paragraphs of this Amended Complaint as if fully set forth herein.

352.   This Claim is brought for restitution of the losses incurred by Nevada residents as a result of the AWP Inflation Scheme.

353.   Defendants' conduct as alleged in this Amended Complaint constitutes deceptive acts or practices in violation of NRS 598.0915(13), 598.0915(15), and 598.0923(3) in that:

> (a)   Defendants have failed to disclose material facts in connection with the sale of goods in that they have not disclosed that their AWPs greatly exceeded the average of the wholesale prices based upon a good faith and reasonable estimate utilizing the pricing and transaction information available to defendants in conducting their ordinary business affairs, but were instead inflated in order to drive up the prices paid by Patients and Third-Party Payors within the State of Nevada;

> (b)   Defendants have made false or misleading statements of facts concerning the price of goods in that they have made deceptive statements about the true AWP paid for their medications in order to drive up the prices paid by Patients within the State of Nevada;

> (c)   Defendants have knowingly made false representations in a transaction by representing that the AWP is an accurate reflection of the average wholesale price paid for their drugs; and

> (d)   Defendants have violated state and federal statutes and regulations relating to the sale or lease of goods including, without limitation, the Nevada RICO statute (NRS 207.470 *et seq.*), the federal regulations governing the determination of Medicare payments for drugs (42 C.F.R. § 405.517), the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343 and the Racketeer Influenced and Corrupt Organizations Act (RICO), particularly 18 U.S.C. § 1962(c) & (d).

- 129 -

354. Defendants acted willfully and knowingly in committing the actions set forth above.

355. The wrongful conduct alleged in this Amended Complaint occurs and continues to occur in the ordinary course of defendants' business or occupation and has caused great harm to the State of Nevada and its residents, who were foreseeable and direct victims of defendants' wrongful conduct.

356. Defendants' violations of the Deceptive Trade Practices Act were committed with the intent to mislead and defraud.

357. Defendants' wrongful, deceptive and illegal conduct has resulted in excessive and illegal profits to defendants and excessive payments made by Patients who are Nevada residents. Defendants' AWP Inflation Scheme had the foreseeable and intended consequence of causing Nevada residents to overpay for defendants' drugs.

WHEREFORE, the State of Nevada prays as follows:

A. That the Court adjudge and decree that defendants have engaged in the conduct alleged herein.

B. That the Court adjudge that the conduct is unlawful and in violation of NRS 598.0915(13), 598.0915(15) and 598.0923(3).

C. That the Court enjoin and restrain defendants and their officers, agents, servants, and employees, and those in active concert or participation with them, from continuing to engage in such conduct or other conduct having similar purpose or effect.

D. That the Court enjoin defendants and order that any and all future disseminations of AWP accurately reflect the average of wholesale prices based upon a good faith and reasonable estimate utilizing the pricing and transaction information available to the defendant in conducting their ordinary business affairs.

E. That, pursuant to NRS 598.0993, the Court make such orders or judgments as may be necessary to restore to Patients who reside in the State of Nevada all moneys which

- 130 -

defendants acquired from them by means of any of the deceptive trade practices complained of herein.

F. That the State of Nevada recover from defendants the costs of this action, including reasonable attorneys' fees.

G. That the Court Order such other and further relief as it may deem just, necessary and appropriate.

**COUNT II**

**DECEPTIVE TRADE PRACTICES DIRECTED AT ELDERLY NEVADA RESIDENTS**
**(VIOLATIONS OF NRS 598.0973)**

**CLAIM FOR CIVIL PENALTIES AND INJUNCTIVE RELIEF**

358. The State of Nevada repeats and realleges the preceding paragraphs of this Amended Complaint as if fully set forth herein.

359. This Claim is brought for civil penalties and injunctive relief to prevent the harm caused to elderly Patients in Nevada by the AWP Inflation Scheme.

360. Defendants' conduct as alleged in this Amended Complaint constitutes deceptive acts or practices in violation of NRS 598.0915(13), 598.0915(15), 598.0923(2), and 598.0923(3) in that:

(a) Defendants have failed to disclose material facts in connection with the sale of goods in that they have not disclosed that their AWPs greatly exceeded the average of the wholesale prices based upon a good faith and reasonable estimate utilizing the pricing and transaction information available to defendants in conducting their ordinary business affairs, but were instead inflated in order to drive up the prices paid by Patients and Third-Party Payors within the State of Nevada;

(b) Defendants have made false or misleading statements of facts concerning the price of goods in that they have made deceptive statements about the true AWP paid for their medications in order to drive up the prices paid by elderly Patients within the State of Nevada;

(c) Defendants have knowingly made false representations in a transaction by representing that the AWP is an

- 131 -

accurate reflection of the average wholesale price paid for their drugs; and

(d) Defendants have violated state and federal statutes and regulations relating to the sale or lease of goods including, without limitation, the Nevada RICO statute (NRS 207.470 *et seq.*), the federal regulations governing the determination of Medicare payments for drugs (42 C.F.R. § 405.517), the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343 and the Racketeer Influenced and Corrupt Organizations Act (RICO), particularly 18 U.S.C. § 1962(c) & (d).

361. Defendants' conduct was in disregard of the rights of elderly persons, many of whom are forced to make expensive co-payments based on defendants' falsified AWP. Defendants knew that their AWP Inflation Scheme would adversely affect elderly persons, and such persons are more vulnerable to defendants' scheme given their age and/or conditions and their need for defendants' drugs. Further, defendants' conduct caused elderly persons to suffer substantial economic damage.

362. The wrongful conduct alleged in this Amended Complaint occurs and continues to occur in the ordinary course of defendants' business or occupation and has caused great harm to the State of Nevada and its residents.

363. Defendants' violations of the Deceptive Trade Practices Act were committed with the intent to mislead and defraud.

364. Defendants' wrongful, deceptive and illegal conduct has resulted in excessive and illegal profits to defendants and excessive payments made by elderly Patients in Nevada. Defendants' AWP Inflation Scheme had the foreseeable and intended consequence of causing Nevada residents to overpay for defendants' drugs.

WHEREFORE, the State of Nevada prays as follows:

A. That the Court adjudge and decree that defendants have engaged in the conduct alleged herein.

B. That the Court adjudge that the conduct is unlawful and in violation of NRS 598.0915(13), 598.0915(15), 598.0923(2), 598.0923(3) and 598.0973.

- 132 -

C.     That the Court enjoin and restrain defendants and their officers, agents, servants, and employees, and those in active concert or participation with them, from continuing or engaging in such conduct or other conduct having similar purpose or effect.

D.     That the Court enjoin defendants and order that any and all future disseminations of AWP accurately reflect the average of wholesale prices based upon a good faith and reasonable estimate utilizing the pricing and transaction information available to the defendant in conducting their ordinary business affairs.

E.     That, pursuant to NRS 598.0973(1), the Court assess civil penalties of $10,000 from each defendant for each violation directed toward an elderly person as complained of herein.

F.     That the State of Nevada recover from defendants the costs of this action, including reasonable attorneys' fees.

G.     That the Court order such other and further relief as it may deem just, necessary and appropriate.

## COUNT III

### DECEPTIVE TRADE PRACTICES
### (VIOLATIONS OF NRS 598.0903, *ET SEQ.*)

### CLAIM FOR CIVIL PENALTIES, INJUNCTIVE RELIEF, AND RESTITUTION FOR THE STATE OF NEVADA

365.     The State of Nevada repeats and realleges the preceding paragraphs of this Amended Complaint as if fully set forth herein.

366.     This Claim is brought for restitution of the losses suffered by the State of Nevada as a result of the AWP Inflation Scheme to recover civil penalties for defendants' violations of Nevada law, and to impose injunctive relief ending the unlawful schemes.

367.     Defendants' conduct as alleged in this Amended Complaint constitutes deceptive acts or practices in violation of NRS 598.0915(13), 598.0915(15), 598.0923(2), and 598.0923(3) in that:

- 133 -

(a)     Defendants have failed to disclose material facts in connection with the sale of goods in that they have not disclosed that their AWPs greatly exceeded the average of the wholesale prices based upon a good faith and reasonable estimate utilizing the pricing and transaction information available to the defendant in conducting its ordinary business affairs, but were instead inflated in order to drive up the prices paid for medications by the State of Nevada;

(b)     Defendants have made false or misleading statements of facts concerning the price of goods in that they have made deceptive statements about the true AWP paid for their medications in order to drive up the prices paid by the State of Nevada;

(c)     Defendants have knowingly made false representations in a transaction by representing that the AWP is an accurate reflection of the average wholesale price paid for their drugs; and

(d)     Defendants have violated state and federal statutes and regulations relating to the sale or lease of goods including, without limitation, the Nevada RICO statute (NRS 207.470 *et seq.*), the federal regulations governing the determination of Medicare payments for drugs (42 C.F.R. § 405.517), the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343 and the Racketeer Influenced and Corrupt Organizations Act (RICO), particularly 18 U.S.C. § 1962(c) & (d).

368.    Defendants acted willfully and knowingly in committing the actions set forth above.

369.    The wrongful conduct alleged in this Amended Complaint occurs and continues to occur in the ordinary course of defendants' business or occupation and has caused great harm to the State of Nevada and its residents.

370.    Defendants' violations of the Deceptive Trade Practices Act were committed with the intent to mislead and defraud.

371.    Defendants' wrongful, deceptive and illegal conduct has resulted in excessive and illegal profits to defendants and excessive payments by the State of Nevada and its residents. Defendants' AWP Inflation Scheme had the foreseeable and intended consequence of causing Nevada to over-reimburse for defendants' drugs.

- 134 -

WHEREFORE, the State of Nevada prays as follows:

A.      That the Court adjudge and decree that defendants have engaged in the conduct alleged herein.

B.      That the Court adjudge that the conduct is unlawful and in violation of NRS 598.0915(13), 598.0915(15) and 598.0923(3).

C.      That the Court enjoin and restrain defendants and their officers, agents, servants, and employees, and those in active concert or participation with them, from continuing to engage in such conduct or other conduct having similar purpose or effect.

D.      That the Court enjoin defendants and order that any and all future disseminations of AWP accurately reflect the average of wholesale prices based upon a good faith and reasonable estimate utilizing the pricing and transaction information available to defendants in conducting their ordinary business affairs.

E.      That, pursuant to NRS 598.0999, the Court assess civil penalties of $2,500 from each defendant for each willful violation of NRS 598.0903 to 598.0997 complained of herein.

F.      That, pursuant to NRS 598.0993, the Court make such additional orders or judgments as may be necessary to restore to the State all moneys which defendants acquired from it by means of any of the deceptive trade practices complained of herein.

G.      That, pursuant to NRS 598.0993, the Court order defendants to pay restitution that restores the State to the financial position that it would be in, absent the defendants' conduct.

H.      That the State of Nevada recover from defendants the costs of this action, including reasonable attorneys' fees.

I.      That the Court order such other and further relief as it may deem just, necessary and appropriate.

- 135 -

## COUNT IV

### RACKETEERING
### (VIOLATIONS OF NRS 207.400, *ET SEQ.*)

### CLAIM FOR TREBLE DAMAGES TO STATE OF
### NEVADA AND CIVIL FORFEITURE

372.   The State of Nevada incorporates by reference all preceding paragraphs as if fully set forth herein.

373.   This Claim is brought for treble damages to the State of Nevada and civil forfeiture of the profits wrongfully obtained by defendants as a result of their racketeering activities as detailed herein.

374.   At all relevant times, defendants each conducted the affairs of an association-in-fact enterprise within the meaning of NRS 207.380.

375.   Subsequent to July 1, 1983, and within five-year periods, each defendant engaged in far more than two crimes related to racketeering that have the same or similar pattern, intents, results, accomplices, victims or methods of commission, and are otherwise related by distinguishing characteristics and are not isolated instances.

**The Manufacturer-Publisher Enterprises**

376.   The following are publishers of pharmaceutical industry compendia that periodically publish the AWPs, both in printed and electronic media, for various dosages of drugs:  (a) **Thomson Medical Economics** ("Thomson Medical") is a division of Thomson Corporation, a Delaware corporation with its principal place of business located at One Station Place, Stamford, Connecticut, and it is the publisher of the *Drug Topics Red Book* (the "*Red Book*"); (b) **First DataBank, Inc.**, ("First DataBank") a Missouri corporation, with its principal place of business at 1111 Bayhill Drive, San Bruno, California, and it is the publisher of drug pricing information including, but not limited to, *American Druggist First Databank Annual Directory of Pharmaceuticals* and *Essential Directory of Pharmaceuticals*, commonly referred to as the *Blue Book*; (c) and **Facts & Comparisons, Inc.**, ("Facts & Comparisons") a division of

Lippincott Williams & Wilkins, Inc., a Pennsylvania corporation which acquired all drug information reference products formerly published by Medi-Span, Inc. and which currently makes available drug pricing information, including, but not limited to, the Medi-Span *Master Drug Data Base*. These entities are sometimes collectively referred to herein as "the Publishers."

377.    For purposes of this claim, certain RICO "enterprises" are associations-in-fact consisting of (a) one of the Publishers that reported AWPs for drugs, and (b) a defendant, including its directors, employees and agents. These associations-in-fact are sometimes collectively referred to herein as the "Manufacturer-Publisher Enterprises." Each of the Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating pharmaceutical price information, which all too often includes disseminating false and misleading AWPs, (b) selling, purchasing, and administering drugs, and (c) deriving profits from these activities. Each of the enterprises had a common purpose of perpetuating use of AWPs as a benchmark for reimbursement in the pharmaceutical industry, generally, and specifically for the drugs of that defendant. Defendants have this as a purpose because without the AWP scheme, they would not be able to push the spread. The Publishers agree to this scheme, because if they did not, the manufacturers could easily revert to the other methods of publishing prices, or the publishers would have to independently investigate the AWP at significant expense. The Publishers also have an economic incentive to merely report the AWPs provided to them by the manufacturers, because to do otherwise would require the Publishers to spend money to extensively survey actual sales prices in the market. By simply republishing what is submitted to them by the drug manufacturers, the Publishers save on expenses and consequently reap greater profits. Thus, each of the Manufacturer-Publisher Enterprises has a common purpose of perpetuating the use of AWPs as a benchmark for reimbursement in the pharmaceutical industry.

- 137 -

378.    Each of the Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between the defendant and the specific Publishers that are its associates. As to each of the Manufacturer-Publisher Enterprises, there is a common communication network by which the defendant and the specific Publisher share information on a regular basis. Typically, this communication occurs by use of the wires and mails in which a manufacturer will instruct a publisher to list a certain AWP. As to each of the Manufacturer-Publisher Enterprises, the defendant and the specific Publisher functioned as a continuing unit. At all relevant times, each of the Manufacturer-Publisher Enterprises was operated by the specific defendant for criminal purposes, namely, carrying out the AWP Inflation Scheme.

379.    At all relevant times, each one of the Publishers was aware of the defendants' AWP Inflation Scheme, was a knowing and willing participant in that scheme, and reaped profits from that scheme. Each of the Publishers is aware that the published AWPs are inflated. This awareness comes from the following sources: First, at some point prior to 1992 the Publishers in many instances obtained AWPs themselves by survey. From their surveys of those in the distribution chain, they were and are aware that the reported AWPs were not accurate. Second, as various congressional bodies and government agencies reported on AWP inflation, the Publishers did not change or challenge the self-reported AWPs, but continued blindly accepting the requested AWPs. Third, when the State of Texas began prosecuting Dey for its AWP practices, and when other states began focusing on Dey, the Publishers stopped accepting Dey's reported AWPs and published a different, far lower AWP. They withdrew from the Dey enterprise due to fear that they would be sued if they continued to publish Dey's false AWPs. This prompted a lawsuit by Dey alleging that the Publishers were treating Dey differently than they were treating all other manufacturers. In other words, Dey was complaining of the others being allowed to continue the scheme while it could not.

- 138 -

380.    The foregoing evidences the Publishers' willing participation in the enterprise; their common purpose in the AWP Inflation Scheme; and their agreement to a structure wherein the manufacturers made decisions as to what AWPs would be reported.  This structure was the basis on which each of the enterprises was structured and its affairs conducted.  The only exception occurred when the Publishers, fearing litigation, refused to accept Dey's instructions. The Publishers were willing participants in the scheme because, if the truth were revealed, the entire AWP reporting system would collapse.

381.    For purposes of this count, the Manufacturer-Publisher Enterprises are identified as follows:

(a)    *The Abbott Manufacturer-Publisher Enterprises:*  The Abbott Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Abbott, and Abbott, including its directors, employees and agents:  (1) the Abbott-Thomson Medical Enterprise; (2) the Abbott-First DataBank Enterprise; and (3) the Abbott-Facts & Comparisons Enterprise.  Each of the Abbott Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering drugs, and (c) deriving profits from these activities.  Each of the Abbott Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Abbott and Thomson Medical, Abbott and First DataBank, and Abbott and Facts & Comparisons.  As to each of these Abbott Manufacturer-Publisher Enterprises, there is a common communication network by which Abbott and Thomson Medical, Abbott and First DataBank, and Abbott and Facts & Comparisons share information on a regular basis.  As to each of these Abbott-Manufacturer-Publisher Enterprises, Abbott and

- 139 -

Thomson Medical, Abbott and First DataBank, and Abbott and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Abbott Manufacturer-Publisher Enterprises was operated and conducted by Abbott for criminal purposes, namely, carrying out the AWP Inflation Scheme.

      (b)    *The Baxter Manufacturer-Publisher Enterprises:*  The Baxter Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Baxter, and Baxter, including its directors, employees and agents: (1) the Baxter-Thomson Medical Enterprise; (2) the Baxter-First DataBank Enterprise; and (3) the Baxter-Facts & Comparisons Enterprise.  Each of the Baxter Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering drugs, and (c) deriving profits from these activities.  Each of the Baxter Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Baxter and Thomson Medical, Baxter and First DataBank, and Baxter and Facts & Comparisons.  As to each of these Baxter Manufacturer-Publisher Enterprises, there is a common communication network by which Baxter and Thomson Medical, Baxter and First DataBank, and Baxter and Facts & Comparisons share information on a regular basis.  As to each of these Baxter-Manufacturer-Publisher Enterprises, Baxter and Thomson Medical, Baxter and First DataBank, and Baxter and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Baxter Manufacturer-Publisher Enterprises was operated and conducted by Baxter for criminal purposes, namely, carrying out the AWP Inflation Scheme.

- 140 -

(c)    *The BMS Group Manufacturer-Publisher Enterprises:*  The BMS Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by BMS Group, and BMS Group, including its directors, employees and agents:  (1) the BMS Group-Thomson Medical Enterprise; (2) the BMS Group-First DataBank Enterprise; and (3) the BMS Group-Facts & Comparisons Enterprise.  Each of the BMS Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering drugs, and (c) deriving profits from these activities.  Each of the BMS Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between BMS Group and Thomson Medical, BMS Group and First DataBank, and BMS Group and Facts & Comparisons.  As to each of these BMS Group Manufacturer-Publisher Enterprises, there is a common communication network by which BMS Group and Thomson Medical, BMS Group and First DataBank, and BMS Group and Facts & Comparisons share information on a regular basis.  As to each of these BMS Group Manufacturer-Publisher Enterprises, BMS Group and Thomson Medical, BMS Group and First DataBank, and BMS Group and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the BMS Group Manufacturer-Publisher Enterprises was operated and conducted by BMS Group for criminal purposes, namely, carrying out the AWP Inflation Scheme.

(d)    *The Dey Manufacturer-Publisher Enterprises:*  The Dey Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Dey, and Dey, including its directors, employees and agents:  (1) the Dey-Thomson Medical Enterprise;

- 141 -

(2) the Dey-First DataBank Enterprise; and (3) the Dey-Facts & Comparisons Enterprise. Each of the Dey Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering drugs, and (c) deriving profits from these activities. Each of the Dey Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Dey and Thomson Medical, Dey and First DataBank, and Dey and Facts & Comparisons. As to each of these Dey Manufacturer-Publisher Enterprises, there is a common communication network by which Dey and Thomson Medical, Dey and First DataBank, and Dey and Facts & Comparisons share information on a regular basis. As to each of these Dey Manufacturer-Publisher Enterprises, Dey and Thomson Medical, Dey and First DataBank, and Dey and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Dey Manufacturer-Publisher Enterprises was operated and conducted by Dey for criminal purposes, namely, carrying out the AWP Inflation Scheme.

(e)    *The GSK Group Manufacturer-Publisher Enterprises:*  The GSK Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by GSK Group, and GSK Group, including its directors, employees and agents: (1) the GSK Group-Thomson Medical Enterprise; (2) the GSK Group-First DataBank Enterprise; and (3) the GSK Group-Facts & Comparisons Enterprise. Each of the GSK Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and

- 142 -

misleading AWPs, (b) selling, purchasing, and administering drugs, and (c) deriving profits from these activities. Each of the GSK Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between GSK Group and Thomson Medical, GSK Group and First DataBank, and GSK Group and Facts & Comparisons. As to each of these GSK Group Manufacturer-Publisher Enterprises, there is a common communication network by which GSK Group and Thomson Medical, GSK Group and First DataBank, and GSK Group and Facts & Comparisons share information on a regular basis. As to each of these GSK Group Manufacturer-Publisher Enterprises, GSK Group and Thomson Medical, GSK Group and First DataBank, and GSK Group and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the GSK Group Manufacturer-Publisher Enterprises was operated and conducted by GSK for criminal purposes, namely, carrying out the AWP Inflation Scheme.

(f)     *The Pharmacia Group Manufacturer-Publisher Enterprise:* The Pharmacia Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Pharmacia Group, and Pharmacia Group, including its directors, employees and agents: (1) the Pharmacia Group-Thomson Medical Enterprise; (2) the Pharmacia Group-First DataBank Enterprise; and (3) the Pharmacia Group-Facts & Comparisons Enterprise. Each of the Pharmacia Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering drugs, and (c) deriving profits from these activities. Each of the Pharmacia Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of

- 143 -

activities between Pharmacia Group and Thomson Medical, Pharmacia Group and First DataBank, and Pharmacia Group and Facts & Comparisons. As to each of these Pharmacia Group Manufacturer-Publisher Enterprises, there is a common communication network by which Pharmacia Group and Thomson Medical, Pharmacia Group and First DataBank, and Pharmacia Group and Facts & Comparisons share information on a regular basis. As to each of these Pharmacia Group Manufacturer-Publisher Enterprises, Pharmacia Group and Thomson Medical, Pharmacia Group and First DataBank, and Pharmacia Group and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Pharmacia Group Manufacturer-Publisher Enterprises was operated and conducted by the Pharmacia Group for criminal purposes, namely, carrying out the AWP Inflation Scheme.

(g)     *The TAP Manufacturer-Publisher Enterprises:*  The TAP Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by TAP, and TAP, including its directors, employees and agents: (1) the TAP-Thomson Medical Enterprise; (2) the TAP-First DataBank Enterprise; and (3) the TAP-Facts & Comparisons Enterprise. Each of the TAP Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, (b) selling, purchasing, and administering drugs, and (c) deriving profits from these activities. Each of the TAP Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between TAP and Thomson Medical, TAP and First DataBank, and TAP and Facts & Comparisons. As to each of these TAP Manufacturer-Publisher Enterprises, there is a common communication network by which TAP and Thomson Medical, TAP and First DataBank,

- 144 -

and TAP and Facts & Comparisons share information on a regular basis. As to each of these TAP Manufacturer-Publisher Enterprises, TAP and Thomson Medical, TAP and First DataBank, and TAP and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the TAP Manufacturer-Publisher Enterprises was operated and conducted by TAP for criminal purposes, namely, carrying out the AWP Inflation Scheme.

**Conduct of the RICO Enterprises' Affairs**

382.    Defendants have exerted control over their Manufacturer-Publisher Enterprises and, in violation of NRS 207.400, defendants have conducted or participated in the conduct of the affairs of those RICO enterprises, directly or indirectly, in the following ways:

(a)    Each of the defendants has directly controlled the reimbursement rates for its drugs;

(b)    Each of the defendants has directly controlled the AWPs that are reported by the Publishers;

(c)    Each of the defendants has directly controlled the creation and distribution of marketing, sales, and other materials used to inform health care providers nationwide of the profit potential of its drugs;

(d)    Each of the defendants has controlled and participated in the affairs of its Manufacturer-Publisher Enterprises by using a fraudulent scheme to manufacture, market and sell its drugs on the basis of AWPs that each of the defendants provides to the Publishers;

(e)    Each of the defendants intended that each of the Publishers would (and did) distribute their publications containing false AWPs through the U.S. mails and by interstate wire facilities; and

(f)    Each of the Publishers has allowed these defendants to exert control over their organizations knowing that the AWPs were inflated and were not real numbers.

- 145 -

Each Publisher did so because the reporting of AWPs was, and is, a major part of its business.

383. Each of the Manufacturer-Publisher Enterprises had a hierarchical decision-making structure headed by the respective defendant. The defendant issued instructions on how its AWPs were to be reported and each Publisher accepted those instructions despite knowing of their falsity.

384. Each of the defendants has conducted the affairs of each of the Manufacturer-Publisher Enterprises with which they associated by reporting fraudulently inflated AWPs for drugs that were then published by the Publishers and disseminated nationwide.

**Defendants' Racketeering**

385. Defendants have conducted and participated in the affairs of the AWP Enterprise through racketeering activity that includes acts indictable under NRS 205.380. In particular, by (i) reporting artificially high AWPs, and (ii) representing that their sales price was related to the AWP, defendants obtained money from the State of Nevada, and Patients and Third-Party Payors residing therein under false pretenses.

386. In conducting the AWP Inflation Scheme as detailed above and throughout this Amended Complaint, each defendant had the intent to defraud the State of Nevada, and Patients and Third-Party Payors residing therein.

387. Defendants' racketeering involved hundreds, if not thousands, of separate instances of obtaining money under false pretenses pursuant to NRS 205.380, and insurance fraud in violation of NRS 686A.291 and 686A.2815. Each of these instances constitutes a "crime related to racketeering" within the meaning of NRS 207.360.26. Collectively, these violations constitute "racketeering activity" within the meaning of NRS 207.390 in which the defendants intended to defraud Plaintiff and other intended victims of the scheme.

388. Defendants' fraudulent and unlawful scheme consisted first of deliberately overstating the AWPs for the drugs, creating a "spread" based on the inflated figure to induce

- 146 -

medical providers to prescribe the drugs to their patients, thereby causing Medicare and the Nevada Medicaid Program to reimburse an artificially-inflated rate of reimbursement for the drugs. Defendants' fraudulent and unlawful marketing scheme also consisted of providing free samples of the drugs to medical providers, instructing these professionals to bill the Medicare and Medicaid Programs for these free samples, and providing other unlawful financial incentives, including kickbacks, to induce use of the drugs.

389. Finally, in order to obtain higher payments from residents in Nevada, defendants fraudulently misrepresented that the AWPs accurately reflected the average wholesale prices paid by hospitals and physicians for their drugs, thereby committing insurance fraud within the meaning of NRS 686A.2815(2)-(4), (6) and (8).

390. These schemes were calculated and intentionally crafted so as to ensure that the Medicare and Medicaid Programs would be over-billed for the drugs, as well as Patients residing in Nevada. In designing and implementing these fraudulent schemes, defendants were at all times cognizant of the facts that (a) the entire Medicare Program and all patients for whom the drugs are prescribed, and (b) the State of Nevada in its Medicaid payments for prescription drugs, as well as payments made by other state agencies, all rely upon the honesty of defendants in setting the AWP as reported in the *First DataBank* and similar publications.

391. By intentionally and artificially inflating AWPs and by providing medical providers with unlawful financial inducements to use the drugs, and by subsequently failing to disclose such practices to the Patients and others from whom reimbursement was sought, defendants engaged in a repeated, fraudulent, and unlawful course of conduct constituting racketeering.

392. These racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive plaintiff and other victims of the scheme. Each separate instance of racketeering activity perpetrated by defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same

- 147 -

results affecting the same victims, including the State of Nevada, and Patients residing therein. Defendants have engaged in this racketeering activity for the purpose of conducting the ongoing business affairs of the enterprises.

393.   Defendants' violations have directly and proximately caused the State of Nevada and Patients and Third-Party Payors residing therein to be injured in their property insofar as they have paid millions of dollars in inflated reimbursements or other payments for the drugs.

394.   The State of Nevada and Patients residing therein have relied to their detriment on billing statements that were based on information reported directly or indirectly by defendants. As a result of defendants' fraudulent acts, the billing statements so distributed have resulted in inflated payments for the State and its resident Patients.  Defendants' AWP Inflation Scheme had the foreseeable and intended consequence of causing Nevada to over-reimburse for defendants' drugs.

WHEREFORE, the State of Nevada prays as follows:

A.   That the Court adjudge and decree that defendants have engaged in the conduct alleged herein.

B.   That the Court adjudge that the conduct is unlawful and in violation of NRS 207.400, and NRS 207.360.26.

C.   That the Court enjoin and restrain defendants and their officers, agents, servants, and employees, and those in active concert or participation with them, from continuing to engage in such conduct or other conduct having similar purpose or effect.

D.   That the Court enjoin defendants and order that any and all future disseminations of AWP accurately reflect the average of wholesale based upon a good faith and reasonable estimate utilizing the pricing and transaction information available to defendants in conducting their ordinary business affairs.

1534.13 0051 BSC.DOC

E.     That, pursuant to NRS 207.460, the Court order that defendants forfeit all property, including money, derived from or gained through defendants' conduct in violation of NRS 207.400.

F.     That, pursuant to NRS 207.470, the Court find that defendants are jointly and severally liable to the State of Nevada for three times the damages it has sustained as a result of the defendants' violations of NRS 207.400.1.

G.     That, pursuant to NRS 207.480, the Court order defendants to pay restitution that restores the State and its residents to the financial position that they would be in, absent the defendants' conduct.

H.     That, pursuant to NRS 207.480, the State of Nevada recover from defendants the costs of this action, including reasonable attorneys' fees.

I.     That the Court order such other and further relief as the Court deems just, necessary and appropriate.

### COUNT V

### MEDICAID FRAUD
### (VIOLATIONS OF NRS 422.540, *ET SEQ.*)

### CLAIM FOR COST RECOVERY AND CIVIL PENALTIES

395.     The State of Nevada realleges and incorporates the previous paragraphs of this Amended Complaint as though fully set forth herein.

396.     This Claim is brought for treble damages and civil penalties pursuant to NRS 422.580.

397.     Each of the defendant pharmaceutical companies is a manufacturer of drugs included in the Nevada Medicaid drug formulary.

398.     Each of the defendants violated NRS 422.540(1)(c) in that, acting with intent to defraud, they made or caused to be made false statements by reporting inflated AWPs that greatly exceeded the average of wholesale prices, based upon a good faith and reasonable

- 149 -

estimate utilizing the pricing and transaction information available to the defendants in conducting their ordinary business affairs.  In making these false representations, each defendant knew that others, including providers, hospitals, pharmacies and other providers, would use the inflated AWPs to obtain reimbursement from the Nevada Medicaid Program.

399.   As a result of defendants' violations of NRS 422.540(1)(c), the Nevada Medicaid Program made substantially higher reimbursements for defendants' products than it otherwise would have.  Defendants' AWP Inflation Scheme had the foreseeable and intended consequence of causing Nevada to over-reimburse for defendants' drugs.

WHEREFORE, the State of Nevada prays as follow:

A.   That the Court adjudge and decree that the defendants have engaged in the conduct alleged herein;

B.   That the Court adjudge that the conduct is unlawful and in violation of NRS 422.540(1)(c);

C.   That, pursuant to NRS 422.580, the Court find each defendant liable for:

    (a)   An amount equal to three times the amount unlawfully obtained;

    (b)   Not less than $5,000 for each false claim, statement or representation;

    (c)   An amount equal to three times the total of the reasonable expenses incurred by the State in enforcing NRS 422.580; and

    (d)   Payment of interest on the amount of the excess payment at the rate fixed pursuant to NRS 99.040 for the period from the date upon which payment was made to the date upon which repayment is made pursuant to the plan.

D.   That the Court order such other and further relief as it may deem just, necessary and appropriate.

**COUNT VI**

**FALSE CLAIMS**
**(VIOLATIONS OF NRS 357, *ET SEQ.*)**

**CLAIM FOR COST RECOVERY AND CIVIL PENALTIES**

400.    The State of Nevada realleges and incorporates the previous paragraphs of this Amended Complaint as though fully set forth herein.

401.    This Claim is brought for treble damages and civil penalties pursuant to NRS 357.040.

402.    Each of the defendant pharmaceutical companies is a manufacturer of drugs included in the Nevada Medicaid drug formulary.

403.    Acting with intent to defraud, in reckless disregard of the truth or falsity, in deliberate ignorance of whether the information is true or false, or with knowledge of the information, each defendant caused false claims to be made to the State by reporting inflated AWPs that greatly exceeded the average of wholesale prices, based upon a good faith and reasonable estimate utilizing the pricing and transaction information available to the defendants in conducting their ordinary business affairs.  In making these false representations, each defendant knew that others, including providers, hospitals, pharmacies and other providers, would use the inflated AWPs to obtain reimbursement from the Nevada Medicaid Program.  Therefore, each of the defendants has violated NRS 357.040(1)(a), (b) and (g) by, respectively, (a) knowingly presenting or causing to be presented a false claim for payment or approval; (b) knowingly making or using, or causing to be made or used, a false record or statement to obtain payment or approval of a false claim; and (c) knowingly making or using, or causing to be made or used, a false record or statement to conceal avoid or decrease an obligation to pay or transmit money to the state.

404.    Defendants knew, or by virtue of their position, authority or responsibility should have known, of the falsity of their representations.

- 151 -

405.    Defendants had the authority or responsibility to make such claims, statements and representations, exercised that authority and, as a direct or indirect result, the false statement was made, resulting in a claim for an item when defendants knew or had reason to know that they and others were not entitled under applicable statutes, regulations, rules, or policies to Medicaid payment or for the amount of payment requested or claimed.

406.    As a result of defendants' violations of NRS 357.040(1)(a), (b) and (g), the Nevada Medicaid Program made substantially higher reimbursements for defendants' products than it otherwise would have. Defendants' AWP Inflation Scheme had the foreseeable and intended consequence of causing Nevada to over-reimburse for defendants' drugs.

WHEREFORE, the State of Nevada prays as follow:

A.    That the Court adjudge and decree that the defendants have engaged in the conduct alleged herein;

B.    That the Court adjudge that the conduct is unlawful and in violation of NRS 357.040(1)(a), (b) and (g);

C.    That, pursuant to NRS 357.040(1), the Court find each defendant liable for:

(a)    An amount equal to three times the amount unlawfully obtained;

(b)    Not less than $10,000 for each false claim;

(c)    An amount equal to the reasonable expenses incurred by the State in enforcing NRS 357.040; and

(d)    Payment of interest on the amount of the excess payment at the rate fixed pursuant to NRS 99.040 for the period from the date upon which payment was made to the date upon which repayment is made pursuant to the plan.

D.    That the Court order such other and further relief as it may deem just, necessary and appropriate.

- 152 -

## COUNT VII

### PUNITIVE DAMAGES CLAIM BROUGHT
### ON BEHALF OF THE STATE OF NEVADA

407.    The State of Nevada realleges and incorporates the previous paragraphs of this

Amended Complaint as though fully set forth herein.

408.    The defendants' conduct as described in this Amended Complaint was oppressive,

fraudulent, and malicious, and the State is therefore entitled to an award of punitive damages

against the defendants.

WHEREFORE, the State of Nevada prays as follows:

A.    That the Court adjudge and decree that defendants have engaged in the conduct

alleged herein.

B.    That the Court order defendants to pay punitive damages to the State of Nevada in

an amount to be determined after trial.

C.    That the Court order such other and further relief as the Court deems just,

necessary and appropriate.

## XIII.   DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

By _____                    DATED:        October 31, 2003.
Steve W. Berman
Sean R. Matt
HAGENS BERMAN LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Brian Sandoval
Attorney General of the State of Nevada
L. Timothy Terry
Assistant Attorney General
100 N. Carson Street
Carson City, Nevada 89701-4714

COUNSEL FOR PLAINTIFF
STATE OF NEVADA

- 153 -

| CARD SEQ | Manufacturer | Product Name | Generic Name | NDC | AMP Dec-97 | AMP Dec-98 | AMP Dec-98 | AMP Dec-98 | AMP Dec-98 | AMP Dec-98 |
|---|---|---|---|---|---|---|---|---|---|---|

## IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

## IN AND FOR WASHOE COUNTY

STATE OF NEVADA,                              )
                                              )
                              Plaintiff,      )       CASE NO. CV 02-00260
                                              )
        v.                                    )       DEPT. NO. 8
                                              )
ABBOTT LABORATORIES, INC.; BAXTER             )
INTERNATIONAL INC.; BAXTER                    )
HEALTHCARE CORPORATION; BRISTOL-              )
MYERS SQUIBB COMPANY; ONCOLOGY                )
THERAPEUTICS NETWORK CORP.;                   )
APOTHECON, INC.; DEY, INC.;                   )
GLAXOSMITHKLINE P.L.C.; SMITHKLINE            )
BEECHAM CORPORATION; GLAXO                    )
WELLCOME, INC.; PHARMACIA                     )
CORPORATION; PHARMACIA & UPJOHN,              )
INC.; and TAP PHARMACEUTICAL                  )
PRODUCTS, INC., and DOES 1 through 100,       )
                                              )
                              Defendants.     )
_____ )

### CERTIFICATE OF SERVICE

I, Carrie L. Scheafer, declare under penalty of perjury that the following facts are true and correct:

I am a citizen of the United States, over the age of 18 years, and not a party to or interested in the within-entitled cause. I am an employee of Hagens Berman, and my business address is 1301 Fifth Avenue, Suite 2900, Seattle, WA 98101.

On November 3, 2003, I caused an original and one copy of the following documents to be filed with the Clerk of the Court:

FIRST AMENDED COMPLAINT [REDACTED]

- 1 -

1534.13 0054 BSC.DOC

CERTIFICATE OF SERVICE

In addition I served the following documents on the parties listed below in the manner

indicated:

## VIA U.S. MAIL

**Counsel for Defendants Abbott Laboratories and**
**Tap Pharmaceutical Products**
R. Christopher Cook
**Jones, Day, Reavis & Pogue**
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113

Philip W. Bartlett
**Burton Bartlett & Glogovac**
50 W. Liberty St., Ste. 650
Reno, NV 89501

Daniel E. Reidy
**Jones Day Reaves & Pogue**
77 West Wacker, Ste. 3500
Chicago, IL 60601-1692

**Counsel for Defendants Baxter Pharmaceutical Products, Inc.**
Matthew A. Rossi
**Akin, Gump, Strauss, Hauer,& Feld, L.L.P.**
Robert S. Strauss Bldg.
1333 New Hampshire Avenue, NW
Washington, D.C. 20036

Richard L. Elmore
**Hale Lane Peek Dennison Howard & Anderson**
100 West Liberty Street, 10th Floor
Reno, NV 89509

Lisa C. Phelan
**Akin Gump Strauss Hauer & Feld LLP**
2029 Century Park East, Ste. 2400
Los Angeles, CA 90067

Thomas B. Hamilton
**Akin Gump Strauss Hauer & Feld LLP**
1700 Pacific Ave., Ste 4100
Dallas, TX 75201

- 2 -

**Counsel for Defendants Bristol-Meyers Squibb Co.**
Lyndon M. Tretter
**Hogan & Hartson**
875 Third Avenue
New, NY 10017

Pat Lundvall
**McDonald Carano Wilson McCune**
  **Bergen Frankovich & Hicks**
241 Ridge St., 4th Floor
Reno, NV 89505-1670

**Counsel for Defendant Dey Inc.**
Stephen Hudspeth
**Coudert Brothers, LLP**
1114 Avenue of the Americas
New York, NY 10036

J. Thomas Susich
**Crowell, Susich, Owen & Tackles, Ltd.**
510 W. Fourth Street
Carson City, NV 89703

**Counsel for Defendants SmithKline Beecham Corp., GlaxoSmithKline and GlaxoWelcome**
Allen J. Wilt
**Lionel Sawyer & Collins**
50 West Liberty Street
Suite 1100
Reno, NV 89501

Ethan M. Posner
**Covington & Burling**
1201 Pennsylvania Ave. NW
Washington, DC 20004-2401

Matthew L. Larrabee
**Heller Ehrman White & McAuliffe, LLP**
333 Bush Street
San Francisco, CA 94104

Robert B. Hubbell
**Heller Ehrman White McAuliffe**
601 South Figueroa St.
40th Floor
Los Angeles, CA 90017

- 3 -

**Counsel for Defendants Pharmacia Corp.; Pharmacia & Upjohn Co.**
Thomas F. Kummer
Gavin C. Jangard
**Kummer Kaempfer Bonner & Renshaw**
3800 Howard Hughes Parkway
Seventh Floor
Las Vegas, NV  89109

Scott A. Stempel
**Morgan Lewis & Bockius, LLP**
1111 Pennsylvania Ave. NW
Washington, DC  20004

Executed on November 3, 2003, in Seattle, Washington.

Carrie L. Scheafer

- 4 -

1534.13 0054 BSC DOC