**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**


CITIZENS FOR CONSUME, et al     . CIVIL ACTION NO.01-12257-PBS
  Plaintiffs     .
            .
    V.      . BOSTON, MASSACHUSETTS
            .
ABBOTT LABORATORIES, et al     . SEPTEMBER 14, 2009
    Defendants    .
. . . . . . . . . . . . . . . .

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:


   James J. Fauci, Esquire
   George B. Henderson, Esquire
   United States Attorney's Office
   Suite 9200
   1 Courthouse Way
   Boston, MA 02210
   617-748-3298
   jeff.fauci@usdoj.gov

   Sarah L. Reid, Esquire
   Kelley, Drye & Warren LLP
   101 Park Avenue
   New York, NY 10178
   212-808-7800
   sreid@kelleydrye.com

   Michelle Townes, Esquire
   Georgia Department of Law
   40 Capitol Square, S.W.
   Atlanta, GA 30334-1300
   404-656-3446
   mtownes@law.ga.gov

Peter A. Mullin, Esquire
Office of the Attorney General (MA)
One Ashburton Place
Boston, MA 02108
617-727-2200 x. 2622
peter.mullin@state.ma.us

Eric Gortner, Esquire
Kirkland & Ellis LLP
200 East Randolph Drive
Suite 7400
Chicago, IL 60601
312-861-2285
egortner@kirkland.com

James J. Breen, Esquire
The Breen Law Firm, P.A.
3562 Old Milton Parkway
Alpharetta, GA 30005
770-740-0008
jbreen@breenlaw.com

Joanne M. Cicala, Esquire
Kirby McInerney LLP
830 Third Ave.
10th Floor
New York, NY 10022
212-371-6600
jcicala@kmllp.com

Nicholas N. Paul, Esquire
California Department of Justice
Bureau of Medi-Cal Fraud
1455 Frazee Road
Suite 315
San Diego, CA 92108-4304
619-688-6099
nicholas.paul@doj.ca.gov

Douglas Farquhar, Esquire
Hyman, Phelps & McNamara, P.C.
Suite 1200
700 13th Street, N.W.
Washington, DC 20005
(202) 737-5600
dbf@hpm.com

John P. Bueker, Esquire
Ropes & Gray LLP
1 International Place
Boston, MA 02210
617-951-7000
john.bueker@ropesgray.com

Court Reporter:

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**



2

1

## <u>I N D E X</u>

2   Proceedings                                                     3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                **P R O C E E D I N G S**

2      CASE CALLED INTO SESSION

3          THE COURT:  Good morning.

4          COUNSEL:  Good morning, Your Honor.

5          THE CLERK:  The Honorable Marianne B. Bowler

6  presiding.  You may be seated.  Today's date is September 14,

7  2009.  We're on the record in the matter of Citizens for

8  Consume, et al, v. Abbott Laboratories, et al, Civil Action

9  No., the main one is 01-12257.  Counsel please identify

10  themselves for the record.

11          MR. HENDERSON:  George Henderson, Assistant U.S.

12  Attorney for the United States.

13          MR. FAUCI:  Jeff Fauci with the United States

14  Attorney's Office for the United States.

15          MR. GORTNER:  Eric Gortner from Kirkland & Ellis for

16  Roxane and Boehringer Ingelheim defendants.

17          MS. REID:  Sarah Reid from Kelley, Drye & Warren for

18  the Dey defendants.

19          THE COURT:  All right.

20          MR. PAUL:  Nicholas Paul from the California

21  Department of Justice for California.

22          THE COURT:  Thank you.

23          MR. FARQUHAR:  Doug Farquhar, I'm representing today

24  Purepac in the Iowa case.

25          MR. BUEKER:  Good morning, Your Honor, John Bueker

4

1   from Ropes & Gray on behalf of Schering-Plough and Warrick

2   Pharmaceuticals Corporation appearing and on behalf of the New

3   York Counties defendants.

4          MR. MULLIN:  Good morning, Your Honor, Peter Mullin

5   from the Massachusetts Attorney General's office with Matt

6   Yager from the AG's office on behalf of the Delaware Medicaid

7   Agency.

8          THE COURT:  All right, thank you.  And you have an

9   appearance in, Mr. Mullin?

10          MR. MULLIN:  I do in the MDL but not on behalf of the

11   Commonwealth, the state of Delaware.

12          THE COURT:  All right, maybe you'll put one in.

13          MR. MULLEN:  All right.

14          THE COURT:  All right.

15          MR. HENDERSON:  And we're not here at the table for

16   any particular reason other than we just happened to sit here,

17   Your Honor.  So whatever order you wish to take the motions is

18   fine.

19          THE COURT:  Well, the government always likes to be

20   up front, you know.

21          MS. TOWNES:  Good morning, Your Honor, Michelle

22   Townes.  I'm representing the state of Georgia Medicaid Agency.

23   I'm with the Georgia Attorney General's office.

24          THE COURT:  Thank you.

25          MR. BREEN:  And finally, Your Honor, Jim Breen, I

5

1    represent the relator Ven-A-Care of the Florida Keys.

2            THE COURT:  Thank you very much.

3            Well, the way I plan to proceed is to take them as I

4    usually do in chronological order they way they were filed.  I

5    do have this other matter which is the motion for clarification

6    of the order dated October 29, 2008 and that is for the record

7    Docket Entry 5672 filed by Mr. Breen.

8            MR. FAUCI:  That was filed by the United States, Your

9    Honor.

10           THE COURT:  Sorry, yeah.

11           MR. FAUCI:  I can handle that if you'd like.

12           THE COURT:  All right.  Well, there is no opposition

13   so is it a problem?

14           MR. GORTNER:  Your Honor, it is.  We - Roxane

15   defendants, I believe your court has - there's no shortage of

16   paper that's filed in this court so we figured it was a simply

17   enough issue that we could discuss it orally at least but we

18   still may have an opposition to the motion.

19           THE COURT:  And it is for the record, your

20   opposition--

21           MR. GORTNER:  Yes.

22           THE COURT:  Do you know the Docket Entry No.?

23           MR. GORTNER:  It's not on the record, Your Honor.

24           THE COURT:  Well, you mean you didn't file any

25   opposition?

6

1        MR. GORTNER:  We did not file an opposition on the

2  record, Your Honor.

3        THE COURT:  Well, then what makes you think you have

4  the right to oppose it at this point?

5        MR. GORTNER:  Well, Your Honor, again our

6  understanding was that we would be able to discuss it at the

7  oral argument that would be set for the motion.

8        THE COURT:  Well, I'll hear you briefly but usually,

9  you know, when nobody files an opposition, that phrase there

10 being no opposition, things are usually permitted.

11       MR. GORTNER:  Well, Your Honor, the simple issue on

12 this motion, it – I believe it's a motion for reconsideration.

13       THE COURT:  No, it's not for reconsideration.  It's

14 for clarification.

15       MR. GORTNER:  What I mean by that, Your Honor, is in

16 effect it is a motion for reconsideration.  We briefed, in the

17 motion to compel we fully briefed this issue about the request

18 for lobbying being overbroad.  And in particular in the

19 briefing that we submitted to Your Honor and we've argued this

20 in court before Your Honor, the issue of the over breadth, and

21 specifically the notion that they were seeking documents not

22 just from Roxane Laboratories which is the company that has the

23 drugs at issue here, but in fact also from Boehringer Ingelheim

24 Corporation which does not manufacture drugs and BIPI

25 Boehringer Ingelheim Pharmaceuticals which manufactures only

7

1   brand drugs that are not at issue in the litigation.  We

2   specifically raised that in our briefs.  In Your Honor's

3   specific order Your Honor stated the request is overbroad,

4   however and therefore limited to defendant Roxane specifically.

5   So from our standpoint this is not a clarification, this is

6   asking you to reconsider the issue that we raised before Your

7   Honor of this being overbroad.

8          THE COURT:  Well, I mean I thought the issue here was

9   plaintiffs request No. 41 for BIPI.

10         MR. GORTNER:  And the request for that was for the

11  lobbying documents, which was briefed as part of the motion to

12  compel before Your Honor.  And during that briefing and the

13  oral argument that we had we specifically raised this issue of

14  over breadth which I believe is reflected in this order that

15  because of the Noerr-Pennington Doctrine the narrowness of the

16  request for lobbying documents they were not entitled to get

17  documents from all potential defendants.  That they should be

18  limited to just defendant Roxane because that's the company

19  that has the subject drugs at issue here.

20         So at a minimum the order I think is clear.  In

21  addition we have a--

22         THE COURT:  Why is that not good enough?

23         MR. FAUCI:  If I may, Your Honor, the United States

24  regularly, and perhaps it was a sloppy practice, we regularly

25  refer to all of the defendants including the Boehringer

1   Ingelheim defendants, as Roxane collectively in our papers and

2   that's what we're receiving clarification on.  And as to the

3   merits, we don't believe that Roxane has a lobbying arm.

4   Roxane is a sister corporation to BIPI, Boehringer Ingelheim

5   Pharmaceuticals Incorporated, and the evidence that we've

6   received to date in discovery suggests that BIPI performed many

7   corporate functions on behalf of the Boehringer Ingelheim group

8   including Roxane.  One such function was a government relations

9   department that we believe if any lobbying was performed on

10  behalf of Roxane it probably came out of the shop and those

11  were BIPI employees.  We've produced an email.  It's in a

12  different motion.  It's, cause we also have the lobbying at

13  issue in our motion to compel testimony.  Exhibit C to that

14  motion is an email from a Joe Ferrara who work – it's Exhibit C

15  to Docket No. 5899, and it's an email from a Joe Ferrara who is

16  a BIPI employee in this government relations group and he's

17  talking to Roxane employees about congressional hearings on the

18  use and abuse of AWP and talking about potential responses to

19  those hearings.  We think that, those types of emails if they

20  exist probably lie within the possession of BIPI and so we

21  think that the Court's order producing lobbying documents

22  should include BIPI as well.

23          MR. GORTNER:  Your Honor, again looking at that

24  particular document, I think that that takes quite a bit of the

25  issue out of context.  We have right now presently almost

9

1  completely briefed a motion for summary judgment documenting

2  why we believe that BIC and BIPI are not proper defendants in

3  this case.  They did not manufacture or sell the subject drugs.

4  It's before Judge Saris and the briefing is almost completed

5  before we have to go back now and--

6          THE COURT:  Do you have a date for a hearing yet?

7          MR. GORTNER:  We don't have a date for a hearing yet,

8  Your Honor.  At a minimum perhaps one solution is to at least

9  deny this without prejudice to see whether they're even--

10         THE COURT:  That's my inclination is to--

11         MR. GORTNER:  --proper defendants.

12         THE COURT:  --deny it without prejudice at this time.

13         All right, so moving on, then the next is 5678,

14  United States motion for a protective order.

15         MR. HENDERSON:  Yes.  Your Honor, George Henderson,

16  will argue on behalf of the United States.  And I want to put

17  this all in context, Your Honor.  As Your Honor probably is

18  aware fact discovery has ended.  It ended in December and we

19  are in the midst of summary judgment briefing.  Defendants have

20  filed, there are cross motions on both sides.  Defendants have

21  filed motions for spoliation and sanctions as well.

22         There were approximately 150 days of depositions take

23  of federal and state government employees.  Approximately 60

24  days of depositions from federal personnel and about 80 days of

25  depositions from state Medicaid people.  The Medicaid program

10

1    has been the subject of intense discovery and a huge amount of

2    discovery.  States have produced to the defendants about $1.4

3    million pages of documents from their state Medicaid programs.

4    The United States has produced several hundred thousand pages.

5    There have been 30(b)(6) depositions taken of state Medicaid

6    officials and federal Medicaid officials.

7              Larry Reid, the CMS official who has headed the

8    oversight of state Medicaid programs and CMS the federal agency

9    was deposed for six days.  His colleague and associate, Deirdre

10   Dozor (ph), who is also the head of the, director of the

11   pharmacy division and CMS's Medicaid Bureau was deposed for two

12   days.  Dennis Smith who is the head of the Medicaid program at

13   CMS was also deposed.  And Donald Thompson was also deposed on

14   30(b)(6) issues about the agency's understanding of AWP and so

15   forth.

16             There has been extensive testimony and documentation

17   about CMS review of state plan amendments and how they do it.

18   I will agree that from the CMS perspective the testimony has

19   come from CMS headquarters people because over the past, since

20   I think 19, since 2002 CMS headquarters has had responsibility

21   for approving and disapproving state plan amendments.  They've

22   always had a responsibility for disapproving state plan

23   amendments and then they took over the responsibility for

24   approvals as well.

25             The testimony basically indicates that every state

11

1    plan amendment that comes in is looked on on a case-by-case

2    basis.  And the regulations are very simple.  They say that

3    the, and I'll quote from 42 CFR 430.14 which is has always been

4    in place.  It says, "CMS regional staff reviews state plans and

5    plan amendments, discusses any issues with the Medicaid agency

6    and consults with central office staff on questions regarding

7    the application of federal policy."  And that's the law on the

8    criteria and procedures and policies that the regions have

9    always used in reviewing state plan amendments.

10          The specific details of what they did with a

11   particular plan amendment have been the subject of a lot of

12   discovery especially on the state, of state Medicaid officials

13   of which I said there were about 80 days of deposition.  But

14   also during the deposition of Larry Reid, Deirdre Dozor, Dennis

15   Smith, there were lots of questions about why did CMS approve

16   this plan amendment?  Why did CMS disapprove that plan

17   amendment?  So I suggest, Your Honor, now to reopen discovery

18   and we're looking, I don't know how many months of more

19   discovery of regional people on really it's the same old stuff.

20   I just, I can't see it.  There has been so much discovery, so

21   many days of depositions.  We've been all over the country and

22   I respectfully request that the Court allow the protective

23   order.

24          Similarly, with regard to issues relating to

25   preservation and document retention, there was testimony by CMS

12

1   employees in response to 30(b)(6) depositions, 30(b)(6)

2   notices.  We had Joseph Bryant who testified about CMS

3   collection and production of documents responsive to Abbott's

4   request for productions, which were incorporated by reference

5   by Roxane, and that included instructions given to the CMS

6   regions and attached to our motion is a list of all the contact

7   people.  There was testimony about the contacts with those

8   people and the instructions given to the regional offices.

9          To be sure those people in each of the 10 regional

10  offices who actually collected and implemented those

11  instructions, that testimony has not been taken.  But we, the

12  government has produced hundreds of thousands of pages of

13  materials from the state agencies and honestly, Your Honor,

14  given the huge volume of information, I just don't see that

15  there's any shortage of information.  There isn't anything that

16  the defendants lack.  They've got the record of government, in

17  their view government knowledge of the AWP problem.  There is

18  lots of government knowledge of the AWP problem.  It's been a

19  problem for many years and they're not lacking in evidence of

20  what the government has known and when.

21          THE COURT:  All right, why shouldn't I grant this

22  motion?

23          MR. GORTNER:  Well, Your Honor, with respect to the

24  first topic area which is essentially the regional office's

25  review of the state plans submitted by the individual Medicaid

13

1   agencies, as an initial matter there's no dispute that before

2   2002 the regional offices of the CMS had exclusive authority to

3   review and approve state plans.  They were the gateway for

4   approving a plan and allowing the disbursement of the federal

5   monies, all the Medicaid programs which are the very monies

6   that the federal government is suing Roxane over, the

7   defendants upon.

8          There's also no dispute that not a signal regional

9   office representative or person has ever been deposed on this

10  case.  Roxane has not come forward with these motions.  We've

11  always tried to limit ourselves to non-duplicative discovery

12  requests and what we did last fall is when we looked at the

13  testimony that occurred, the individuals that Mr. Henderson

14  refers to, Larry Reid, Dennis Smith, Deirdre Dozor, could only

15  testify about the review process from 2002 onward.  In fact on

16  page nine and 10 of our brief, we exerted specific testimony

17  from Larry Reid, their 30(b)(6) representative, who said time

18  and time again I can't tell you what happened before 2002.  In

19  fact before 2002 the processes were inconsistent and that's why

20  we brought it over to the central office in 2002.  That

21  testimony puts the regional office issues front and center and

22  that's specifically why we requested it under Rule 30(b)(6).

23  There's no question that this is relevant evidence and that

24  they should have to present a 30(b)(6) deponent on these

25  issues.  They just simply refused to present anyone on any

14

1   topic and there's been no testimony at all about the processes

2   that occurred even though they're seeking damages for these

3   monies in our case from 1996--

4           THE COURT:  Well, can we come to a compromise?  Can

5   we narrow it?

6           MR. GORTNER:  I certainly – the way this process

7   worked is once I sent my letter, again which was a few topics,

8   not one of these 14 pages of topics, I had a meet and confer

9   where I explained to one of the government's counsel what we

10  really want is to understand.  We have had a part, what we

11  think is a partial production from the regional offices.  We

12  want to understand how this process occurred, why certain plans

13  were approved or disapproved, and so I attempted to narrow it

14  down to specific policies or procedures, how they were

15  implemented.  The response I got back from the government was

16  under no circumstances we'd present anyone under any narrow

17  version of topics.  So the meet and confer went nowhere because

18  there was nothing I could narrow it down to.

19          So on that issue, Your Honor, I think we're

20  absolutely entitled to discovery.  This, the regional offices

21  are aware the actual approval or acquiescence and the

22  understandings of AWP are crucial from the 1996 to 2002 period.

23          THE COURT:  Has there been paper discovery on this?

24          MR. GORTNER:  There has been paper discovery but that

25  relates to my second topic under Rule 30(b)(6).  The discovery

15

1  that's come from the regional offices we think is wrongfully

2  inadequate.  As Your Honor may know there's a pending

3  spoliation motion from Abbott Laboratories and Dey and Roxane

4  on the broader central office CMS production but when you look

5  at these regional office productions we have virtually no

6  emails, very few electronic documents.  The plans and the

7  documentation supporting the plans are few and far between.

8            So, again, one of the reasons we asked for a 30(b)(6)

9  topic is that when we looked at the regional office production

10  to see if that would be a sufficient proxy for testimony

11  because everyone's busy in these cases and doesn't want to be

12  taking unnecessary discovery, when we looked at the documents

13  our review was, this seems very incomplete and in light of the

14  fact that litigation holds didn't go out in these cases we

15  believe until 2003 or 2004, we think a lot of those documents

16  were never preserved or at least have never been produced which

17  again raises the importance of being able to at least get

18  deposition testimony on these topics.

19            THE COURT:  Well, have you asked for those documents?

20            MR. GORTNER:  We have, we have asked for those

21  documents.

22            THE COURT:  And the response is?

23            MR. GORTNER:  The response that we have received is

24  that this is a, this is the production, this is the collection

25  process and this is production that we received.  So my

1   understanding, I cannot and obviously will not seek to speak

2   for the government, my understanding is that what we have

3   received is represented to be the universe of documents that

4   they have with respect to state plan reviews.  But we, and I

5   mean this with respect, Your Honor, but there have been times

6   both in the federal have limit discovery and other

7   circumstances where what the procedures are written as being in

8   the regulation or the statute or the manual often diverge from

9   what happens in practice and we have seen that time and time

10  again in this litigation.  How people actually implement rules

11  is often more important and different from what the rule

12  actually says.  So, again, you can only get that type of

13  information and that ability to defend yourself in these cases

14  by having deposition testimony.

15          MR. HENDERSON:  May I reply very briefly, Your Honor?

16          THE COURT:  Yes, you may.

17          MR. HENDERSON:  Your Honor, keep in mind there have

18  been 80 days of depositions of state Medicaid officials.

19  They've all been, they've all testified about their

20  communications with CMS and so forth and Mr. Gortner's

21  suggestion that he needs testimony about CMS's failure to

22  follow rules relating to state plan amendments, I just quoted

23  you what the rule says.  How can anybody violate that rule,

24  Your Honor?  It's so vague and the testimony from headquarters,

25  and they have done disapprovals all along.  Throughout the time

17

1   period they've done disapprovals.  They say it's a case-by-

2   case basis.

3        So in order to give this kind of testimony, Your

4   Honor, where they're going to be hundreds upon hundreds of

5   state plan amendments all over the country, all of the regions,

6   all of the states; they have failed to identify any particular

7   state plan amendments to say why did you approve this.

8        THE COURT:  Exactly.  I mean if you were able to

9   identify and say to me this is a real problem, you know I might

10  say well you could have this one, but short of that I'm

11  inclined to agree with the government.  I mean the argument you

12  used in your prior motion is, you know, we've done an awful lot

13  of discovery here and it seems like we've done enough.

14       MR. GORTNER:  Well, Your Honor, one suggestion I

15  might offer is we certainly, we didn't know we would ever have

16  that opportunity.  This is the first time I've heard from

17  anyone from the government saying present us a subset of state

18  plans or a subset of regional offices for discovery and we'll

19  work with you to narrow it.  If that's the offer that's being

20  made, we certainly would consider that and would attempt, we

21  believe we're entitled to broader discovery but if the Court's

22  inclination is that we're only entitled to a subset we

23  certainly can and will identify that.  That offer has never

24  been made to us.  It's been a flat out refusal--

25       THE COURT:  Well, is that a compromise, a narrow

18

1    subset?

2           MR. HENDERSON:  I would not offer that, Your Honor.

3    I'll tell you why.  Because what Roxane wants and want the

4    defendants want is they want to show a CMS official, and

5    they've done this numerous times, they've done this to state

6    officials and to federal officials, they want to show here's a

7    state plan amendment that says we want to change from AWP minus

8    10% to AWP minus 12%, okay, a small reduction in the amount of

9    payments for drugs.  And then they say well here's a study that

10   was done in the state that shows that for generics acquisition

11   costs is AWP minus 40%.  Why is it that you approve this state

12   plan amendment when you knew about this?  And we've had those

13   questions and answers over and over and over again.  They want

14   more I guess but the plan amendments are what they are.  the

15   approvals are what they are.  The studies showing these big

16   spreads are what they are.  And they just, this is just beating

17   a dead horse over and over again.  So I'm just not willing to

18   agree to it.

19          THE COURT:  Yeah, I have to agree with the

20   government.  So I will allow the protective order.

21          MR. GORTNER:  Your Honor, with--

22          THE COURT:  So--

23          MR. GORTNER:  --respect to the document, the second

24   topic though, the document collection and production efforts of

25   the regional office, is your ruling also to that or are we able

19

1   to get testimony on that issue?  Again, as we mentioned in the

2   brief--

3           THE COURT:  No, I think really there's, this has just

4   go on and on and on and on and I'm satisfied.  So Docket Entry

5   No. 5678 is allowed.

6           All right, moving on to 5697, motion to compel.

7           MR. GORTNER:  Your Honor, we filed a motion last week

8   which the Court entered to substitute this motion--

9           THE COURT:  Right.

10          MR. GORTNER:  --for Docket 6328.  We're happy to

11  argue that docket number now if you'd like--

12          THE COURT:  All right.

13          MR. GORTNEER:  --or keep it in order.

14          THE COURT:  Can you pull up 6328 for me.

15      PAUSE

16          MR. GORTNER:  And, Your Honor, I'd like to mention

17  for the record that Day Laboratories also joined this motion

18  with Docket No. 6384.

19          Your Honor, this is a motion to compel limited

20  testimony from two declarants.  What, to take a step back

21  briefly, what occurred in this case is toward the end of

22  discovery about a month, right at the end of discovery the

23  government moved and was granted leave to add some particular

24  NDC's for a product called Nova Plus Ipratropium Bromide, a

25  private label version of our generic drug Ipratropium Bromide.

20

1    At the time there was some motion practice and some

2    discussion.  At the time the government had represented that

3    there was no need to conduct further discovery of the Medicare

4    carriers that paid for these drugs and there had been extensive

5    fact discovery.  And so I believe we all understood that we

6    were going to stand on that testimony and the factual record

7    that we had developed of the Medicare carriers who had been

8    deposed in some instances many months before these Nova Plus

9    NDC's were added to the case.  What then occurred in late

10   February we received an expert report where their expert had

11   conducted a particular analysis that looked at the Nova Plus

12   drugs, and based upon certain carriers classifying these drugs

13   as brand versus generics which we contend is an absolute

14   misclassification, they have purported damage figures of over a

15   billion, with a B, a billion dollars based on this

16   classification of these drugs as brands versus generics.

17        At summary judgment we moved to dismiss these claims

18   or, excuse me, for summary judgment on these claims because of

19   this clear misclassification of these drugs.  In response to

20   that the government attached two declarations from two of the

21   Medicare carrier individuals who had previously been deposed

22   but had not testified on Nova Plus issues.  They were not at

23   issue in the litigation at that time.  And these new

24   declarations now claimed that they had properly classified them

25   as a brand.  They had followed a HCFA or a regulatory type

21

1   definition and that they had relied only upon red book CD's,

2   these red book electronic CD's, which we just received last

3   week for the first time.

4           Now, in light of the astronomic potential damages the

5   government's alleging on this case and this brand new testimony

6   which is directly contrary to the existing testimony we had in

7   the record, which was that one of the Medicare carriers have

8   been classifying these drugs based upon capitalization

9   conventions, we've asked for limited relief to be able to go

10  depose these particular declarants and at least clarify the

11  basis and be able to cross examine them on the materials that

12  we just received last week.

13          MR. FAUCI:  First, Your Honor, the--

14          THE COURT:  If you'll identify yourself--

15          MR. FAUCI:  Sure.

16          THE COURT:  --each time because it is being recorded

17  and it's easier for the record.

18          MR. FAUCI:  Jeff Fauci on behalf of the government.

19  A couple points, Your Honor.  Just quickly with regard to the

20  red book CD's that were just produced last week, we did produce

21  those.  We believe it was the first set.  Roxane filed a

22  motion for spoliation which is not at issue here and alleged

23  that those CD's had been spoliated.  We don't think that those

24  CD's had ever been properly requested in discovery.  We saw an

25  allegation that they'd been spoliated and we produced them.  We

22

1   don't think they had ever previously been produced before.

2        THE COURT:  And what about these two deponents?

3        MR. FAUCI:  These two deponents, Your Honor, what the

4   issue really seems to me to be that Roxane's complaint is that

5   they were not aware that these two, that the United States was

6   going to be seeking damages based on the classification of Nova

7   Plus as a brand by three of the four D marks.  If that's the

8   case that they didn't have that impression during the discovery

9   period, that's not the United States' fault.  The D mark

10  pricing arrays were produced to Roxane in January and March of

11  2008.  Those arrays plainly showed that three of the four D

12  marks took this Nova Plus took this Ipratropium Bromide and

13  treated it as a brand.  Roxane was on notice at least in

14  September of 2008 that we were going to amend our complaint.

15  We sent a draft version of the amended complaint at that time

16  to include the Nova Plus NDCs.  Taking those two facts together

17  it's not a great leap to think that the United States was going

18  to calculate damages based on the way the D marks classified

19  the drugs.

20       There was three months left in fact discovery.  The

21  United States did represent when it moved to amend that we did

22  not think that any discovery was necessary, but quite frankly

23  the defendants take a lot of discovery that we don't think is

24  necessary.  If they had wanted to re-depose Ms. Helton (ph) and

25  Ms. Stone, they saw that--

23

1          THE COURT:  Well, this argument works both ways so--

2          MR. FAUCI:  Understood.  And I guess the basic point

3    would be that they've identified two bases in their motion for

4    relief here, Rule 56(f) and Rule 26(a)(1).  Those are the only

5    two rules that I've seen in their motion.  Rule 56(f) is

6    plainly inapplicable here.  They're, by Mr. Gortner's own

7    admission, they're seeking this testimony in support of their

8    own motion for summary judgment.  Rule 56(f) only contemplates

9    seeking discovery to oppose a motion for summary judgment.  And

10   Rule 26(a)(1), they say that we didn't sufficiently identify

11   the topics on which Ms. Helton and Ms. Stone would be offering

12   testimony.  That's frankly untrue.  The disclosures identified

13   Ms. Helton and Stone and they said that they would be

14   testifying about Medicare allowed reimbursement amounts.

15   That's exactly what the disclosure said.  Their affidavits fall

16   squarely within that, and Roxane has offered no authority for

17   the proposition that a Rule 26(a)(1) disclosure needs to be so

18   precise as to include a statement that they're going to be

19   testifying about how one particular drug--

20          THE COURT:  And where are these two individuals

21   located now?

22          MR. HENDERSON:  One's in North Carolina.  The other

23   one is in Indianapolis.

24          THE COURT:  All right, any brief response?

25          MR. GORTNER:  Just briefly, Your Honor.  The issue

24

1   here is that we had existing testimony in the record at the

2   time that they added the NDCs as to what was the Medicare

3   carrier process by which they were classifying or

4   misclassifying in our view these drugs.  They have now added in

5   July 24th declarations that are completely different than the

6   existing testimony that existed in the record, and we issued

7   new materials that we didn't have at the time of the discovery

8   closure.

9          THE COURT:  How much time do you need with each of

10   these individuals?

11          MR. GORTNER:  I think we could, deposition time we

12   could probably do each deposition in less than four and a half

13   hours per individual, perhaps even less than that.  Hopefully

14   the government will agree, but we generally have tried to make

15   our depositions to the point and targeted.

16          THE COURT:  All right, I'll permit the depositions of

17   these two individuals.

18          MR. FAUCI:  The United States – if I may, Your Honor?

19   The United States would request that the Roxane motion address

20   both the Nova Plus issue and a Zenith Goldline issue.  We would

21   request that the question be limited to Nova Plus.  They have

22   offered absolutely no reason why they could not have – that

23   there's nothing that happened after discovery period about

24   Zenith Goldline that changed the game.  They knew everything

25   that they knew about Zenith Goldline during the discovery

1    period.  They've offered no reason why--

2              THE COURT:  What's new.

3              MR. GORTNER:  Your Honor, again--

4              THE COURT:  What's new?

5              MR. GORTNER:  The new is that they now have

6    additional new testimony in the declarations that there were

7    certain categories of drugs, preservative free drugs that they

8    purposely were not supposed to include in their pricing arrays.

9    Again, that's new information and it would take very little

10   time for this discovery.  In terms of burden, there is no

11   burden here really for this particular line of questioning,

12   Your Honor.  Again, these declarations are bringing in new

13   facts not just for the defendants and the government but also

14   for the Court to have a complete factual record.

15             THE COURT:  Okay, I will permit both depositions to

16   go forward limited to four hours to be completed within 30

17   days.

18             MS. REID:  Your Honor, may I--

19             MR. FAUCI:  Limited to those two--

20             MS. REID:  --be heard?

21             MR. FAUCI:  --topics, Your Honor?

22             THE COURT:  Limited to?

23             MR. FAUCI:  To the two topics requested.

24             THE COURT:  Absolutely.

25             MS. REID:  Your Honor, Sarah Reid on behalf of Dey.

26

1    Our joiner on this motion was simply to be allowed to attend

2    and cross-examine.  The reason being that the Nova Plus issue

3    has been used as a damage scenario in the Dey action and

4    therefore Dey had, was not on notice until the expert report

5    was received that Nova Plus was an issue.  We have no intention

6    of adding any length to the deposition.  We simply want to be

7    present and be entitled to ask follow-up questions as needed.

8             THE COURT:  Well, work out your time so that it's a

9    total of four hours.

10            MS. REID:  Absolutely, Your Honor.  Thank you.

11            THE COURT:  So to that extent your portion in 6384 is

12   allowed.

13            MS. REID:  Thank you, Your Honor.

14            THE COURT:  All right, moving on to--

15            MR. HENDERSON:  I'm sorry, Your Honor, just one small

16   detail.  Sometimes we have arguments about this.  The four

17   hours, is that clock time or transcript time?  It can make a

18   big difference with breaks and so forth.

19            MR. GORTNER:  It should be deposition time, Your

20   Honor, because we don't know how long the breaks tend to go and

21   again four hours is a reasonable time.

22            THE COURT:  Yeah, I mean deposition time.  I mean the

23   breaks shouldn't count.

24            All right, moving on to 5725.  Defendants?

25            MS. REID:  Your Honor, Sarah Reid again from Kelley

27

1   Drye and Ms. Townes is here from Georgia.  I think you can sit

2   here if you want to be officially at the plaintiffs' table.

3       PAUSE

4           THE COURT:  All right, I'll hear you.

5           MS. REID:  Okay.  Thank you, Your Honor.

6           Your Honor, this is a motion brought by Dey to compel

7   the production of documents which have been withheld and

8   returned to the Georgia Department of Community Health.  This

9   raises an issue of whether the privilege has been waived as to

10  these documents.  Briefly, Your Honor, a subpoena was served by

11  Dey in connection with the deposition of the Georgia director

12  of pharmacy.  That subpoena was served with document requests

13  in July of last year.  August 20th of last year, the director of

14  pharmacy produced a production of several boxes and an

15  electronic CD with a cover memo which is attached to our moving

16  declaration called the Douberly (ph) memo dated August 20th

17  listing what documents had been produced including explicitly

18  noting at one place documents reflecting material from

19  attorneys concerning the pricing litigation.

20          On September 5th after Kelley Drye had an opportunity

21  to review some of the documents, we noted that a few of the

22  documents said attorney-client privileged.  On September 5th we

23  alerted the attorneys for the state of Georgia and we enclosed

24  with them a copy of the protective order in this case which

25  governs with how to deal with the production of privileged

28

1    documents at paragraph 27.

2            I will not go through in detail the ins and outs.

3    Basically, we gave the Georgia attorneys an opportunity to re-

4    review to the extent they had not reviewed these documents and

5    on September 23rd we were told that we could produce the, make

6    the production with the exception of those few documents that

7    we had identified, sent back to them with the attorney-client

8    privilege written on it.  We could go ahead and produce the

9    rest of the production.  We did that and sent that to our

10   counsel co-defendant in essence, Abbott Roxane, the Department

11   of Justice.  And it was at that point that everything kind of

12   fell apart.

13           At that point on September 26th the Department of

14   Georgia demanded the entire production be returned to it as

15   potentially privileged because they claimed that there were now

16   other documents that were privileged.  They hadn't realized,

17   apparently had not reviewed.  Ultimately there was back and

18   forth but on October, in mid-October we returned the electronic

19   CD which had several hundred email on it, segregated the entire

20   hard copy production and basically did that in reliance on the

21   fact that the Department would give us a privilege log as

22   required under Rule 45.  And that, there's an email exchange

23   which is Exhibit J, October 16th where my sister counsel

24   confirms that I will prepare a privilege log almost a year ago.

25   We have not gotten any privilege log since then.

29

1        Under the law in this Circuit and citing

2   particularly to *In re:  Grand jury Subpoena,* a 2001 which I'm

3   sure Your Honor is familiar with.

4        THE COURT:  By heart.

5        MS. REID:  It is crystal clear that the operative

6   language in Federal Rule Civil Procedure 45(d)(2) is mandatory

7   and that a party that fails to submit a privilege log is deemed

8   to have waived the underlying privilege claim.  We are now over

9   a year later.  We have no privilege log and we respectfully

10  submit that the privilege has been waived and that the

11  documents at this point should be able to be used and be

12  produced.

13        THE COURT:  For one it's a pretty strong argument.

14  What do you have to say?  Where's the privilege log and why

15  haven't we seen it?

16        MS. TOWNES:  Right.  I did not ultimately produce the

17  privilege log and that was for the reasons that I put in my

18  response to their motion to compel.  Research suggests that it

19  was to be decided on a case by case basis and that the Court

20  would order, could order a privilege log to be produced.  And

21  that case, both cases are listed in my response as I said,

22  that's *United States v. Construction Products Research* and

23  there's also *In re: Imperial Corporation of America* v.

24  *Shielings.*

25        At no point did Georgia state that the entire

30

1    production was privileged.  In fact what I informed Dey's

2    attorney is that there were so many privileged documents that

3    Georgia would produce an entirely new production and we would

4    pay for the return of the production that was originally

5    produced.  The assertions that there was no legal counsel that

6    reviewed these document is simply false.  The pharmacy

7    director, Mr. Douberly, was acting in conjunction with the in-

8    house legal department at the Department of Community Health.

9    What I informed Dey's attorneys is that my office had not

10   reviewed the documents.  An attorney had reviewed the documents

11   but ultimately the pharmacy director was responsible for

12   gathering the documents and sending the documents to Dey, but

13   he did so in consultation with his in-house attorney.

14            THE COURT:  Well, now what exactly does that mean?

15            MS. TOWNES:  I'm sorry, what does?

16            THE COURT:  What exactly does that mean, in

17   consultation with – I mean did the--

18            MS. TOWNES:  Right.

19            THE COURT:  --attorney look at every document?

20   That's the bottom line.

21            MS. TOWNES:  The pharmacy director was directed to

22   gather all of the documents and review them with in-house

23   counsel.

24            THE COURT:  So in other words counsel did look at

25   every--

31

1          MS. TOWNES:  Counsel, yes, counsel was supposed to

2    have looked at the documents--

3          THE COURT:  Not supposed to.

4          MS. TOWNES:  --and I was informed that counsel--

5          THE COURT:  Not sup--

6          MS. TOWNES:  --did review the documents.  But Mr.

7    Douberly is the one that ultimately sent out the documents, and

8    he did produce privileged documents after the permission was

9    given to go ahead and produce the documents.  I believe it was

10   within a couple of days.  That's when I finally had the chance

11   to get documents from the Department and I noticed there were

12   several documents, numerous documents.  Some were entitled

13   attorney-client privilege.  There were memorandums, as an

14   example memorandums from counsel seeking to represent the state

15   of Georgia in AWP litigation.  There were, and as a matter of

16   fact Dey's attorneys compiled some of the documents into an

17   electronic folder and labeled it privileged themselves, so I

18   think it's disingenuous to say that Georgia has to prove that

19   there's privileged documents when they labeled the documents

20   privileged themselves.  The privilege was obvious that these

21   documents consisted of attorney-client privilege, work product

22   privilege.  Dey knew that.

23         THE COURT:  Well, which privilege?  I mean with no

24   privilege log how do we really know?

25         MR. BREEN:  Your Honor, may I make a suggestion?  Jim

32

1   Breen, I represent Ven-A-Care.  As Your Honor's aware my

2   primary office is in Atlanta.  Georgia's a witness in this

3   case.  Obviously they're not a party.  I believe though that

4   perhaps my office could offer to assist the Attorney General,

5   I'd held this out just today, and get this privilege log done.

6   Get it done so it complies with our rules here.  Discovery is

7   already over in this matter--

8            THE COURT:  Well it's pretty late.

9            MR. BREEN:  --and that way perhaps--

10           THE COURT:  It's, I mean a year.

11           MR. BREEN:  That way, Your Honor, we could present it

12   in a very brief period of time and perhaps then appropriate

13   rulings could be made.  Everybody could see what we're talking

14   about and that might assist the Court and this witness, non-

15   party witness in getting this resolved.  I'd be happy to make

16   my facilities and office available to do that.

17           MS. TOWNES:  I have a partial privilege log here,

18   Your Honor, that has not been sent over to Dey but as an

19   example.

20           THE COURT:  Yeah, too little too late is my instinct

21   but I'll hear from counsel for Dey.

22           MS. TOWNES:  Okay.

23           MS. REID:  Thank you, Your Honor.  I think that the

24   law is clear.  It is indeed too little too late.  The number of

25   documents that were withheld as "privileged" was, out of the

33

1   emails of several hundred we got three emails back.  There

2   are, some of those emails that clearly weren't privileged,

3   though they probably were not helpful.  There is no attorney-

4   client privilege when you're making a pitch to a potential

5   agency that then does not join in the AWP litigation.  There is

6   no privilege even in the state of Georgia, and the Attorney

7   general opinions in Georgia make it clear, between agency and

8   in-house counsel.

9        So to suggest that Your Honor or somebody in this

10  court is going to have to go through several hundred documents

11  on a privilege log in order to determine a privilege when under

12  the First Circuit law, clearly they have not met their burden

13  of proving the privilege which was their burden.  They didn't

14  do it within the time period of the protective order entered in

15  this case.  I mean, I would just respectfully submit that the

16  privilege has been waived and the documents should be produced.

17       THE COURT:  Well that's my instinct.  I'm going to

18  take it under advisement.  I'll give you a brief ruling margin

19  order on it.  But that is my instinct.  I want to have another

20  look at it just to be sure.

21       MS. TOWNES:  Your Honor, if I may, my research

22  indicated that there is privilege between Georgia and outside

23  attorneys that are seeking to represent Georgia in AWP

24  litigation whether they've actually been retained at that time

25  or not.

34

1          THE COURT:  So noted.

2          MR. BREEN:  And, Your Honor, would you at least

3    consider my offer and as long as the Attorney General of

4    Georgia is comfortable with that to post haste complete a

5    privilege log so that appropriate rulings can be made in an

6    expedited manner.

7          THE COURT:  I'll consider it.

8          MR. BREEN:  Thank you, Judge.

9          THE COURT:  All right, so that's under advisement.

10   The next is 5728, again defendant's Dey.

11         MS. REID:  Yes.  Yes, Your Honor.  I'm going to just

12   take one second and I'll move on.

13      PAUSE

14         MS. REID:  Your Honor, this is a motion brought by

15   Dey to compel the production of documents from Mr. Luis Cobo

16   and/or from Ven-A-Care.  The origins of this motion derive from

17   Mr. Cobo's deposition.  As Your Honor is probably aware Mr.

18   Cobo is a principal in Ven-A-Care and a fact witness in this

19   case.  He has been deposed as a fact witness, is a principal of

20   the relator and indeed has received a fair amount of money as a

21   result of settlements in these cases to date.

22         Mr. Cobo owns or owned a community retail pharmacy

23   next door to Ven-A-Care which was called Cobo Pharmacy.  And he

24   was the pharmacist in charge of both pharmacies during the

25   relevant period.  And according to the claims data that was

35

1    produced by Florida, Cobo Pharmacy submitted claims to Florida

2    Medicaid for at least one of Dey's NDCs which is the subject

3    drug in this case.  It is not clear and in fact it seems

4    unlikely that Ven-A-Care itself ever did submit claims for

5    Dey's drugs.

6           After Mr. Cobo at his deposition identified what he

7    characterized as a box of documents relating to Cobo Pharmacy

8    and relating to his filling of claims at the pharmacy, the

9    spread, his knowledge of the spread, Dey market, marketing the

10   spread and finally to an audit that he self initiated along

11   with another of the relators in about 2000 to determine whether

12   he had overpaid or been overpaid by Medicaid, an audit which he

13   then led him to reimburse the state for $40,000 for his self

14   determined alleged overpayment.  After that testimony we

15   promptly asked for those documents.  There was some back and

16   forth, and it turned out that there were actually more

17   documents than Mr. Cobo had testified to.  We then sent a

18   letter categorizing the particular items that we wanted from

19   Mr. Cobo and/or from Ven-A-Care.  We didn't care from whom we

20   got it.

21          Out of those 13 items two we've been advised they do

22   not have documents for.  Those are number eight and number 11.

23   So obviously we're not moving on those.  But if we can put them

24   into kind of three broad categories, 12 and 13 which is and I'm

25   referring to what is Exhibit M to our moving affidavit,

36

1  September 8, 2008 letter, are the documents that concern the

2  payment by Cobo to Florida Medicaid for purported overpayments,

3  that's the $40,000, and all documents regarding that audit.

4  Clearly that's relevant.

5          There is testimony from Mr. Cobo which we cite in

6  our memo stating that he felt that if he was going to be an

7  active participant in this lawsuit, he certainly had an

8  obligation to try to rectify anything that I had seen that

9  would have been problematic for the program on a much larger

10  scale.  Additionally, another principal of Ven-A-Care

11  acknowledged the relevancy of the audit to the litigation by

12  saying that he was actually mad when he learned with Mr. Cobo

13  what was going on at Cobo Pharmacy in terms of how these claims

14  were being submitted.

15          So we would respectfully submit that as to the audit

16  there really is no question as to the relevance and those

17  documents should be turned over.

18          THE COURT:  Okay, let's do it category by category.

19  So let's--

20          MS. REID:  So that's 12 and 13, that category.

21          THE COURT:  So let's hear the response on 12 and 13.

22          MR. BREEN:  Number one, Cobo Pharmacy is not a party

23  to this case.  The relator is Ven-A-Care, has been since 1995.

24  And part of the problem here is this audit, this self audit

25  that Mr. Cobo did on his pharmacy was no secret.  I believe he

37

1   testified to that in prior cases.  And the subpoena that was

2   served on Cobo and Cobo's Pharmacy was not served until after

3   he testified in this case towards the end of the discovery

4   phase.  And he testified to the best of his ability about these

5   matters during his deposition.  And so we did object to any

6   further information on the self audit.  We believe it's overly

7   burdensome and its relevance is difficult to even determine.

8   This is a case now brought by the government against Dey

9   Laboratories for reporting inflated prices and Mr. Cobo didn't

10  hold back in testifying to this thing.  This thing's been

11  around for quite a bit of time.  So we did object.

12          THE COURT:  What are we talking about in terms of a

13  universe of documents?

14          MR. BREEN:  Well, on--

15          THE COURT:  I mean it sounds to me like it's pretty

16  narrow.

17          MR. BREEN:  On the audit it's pretty narrow, but the

18  real problem is when we drew it out a little bit more it's

19  going to have to be more carefully looked at in terms of

20  privilege and what have you so we objected to it.  We thought

21  that the relevance was tenuous.  It came in late in the game.

22  He's already testified about it.  And it's really, if it was

23  only the audit documents we probably wouldn't be here today but

24  there's a lot of other things that they've asked for in

25  addition to that.

38

1          THE COURT:  I'll allow it as to the audit documents

2  at this time and not the remaining documents.  If after you see

3  the audit documents you absolutely feel you must have other

4  things I'll hear you.

5          MR. BREEN:  Very well, Your Honor.

6          THE COURT:  Okay.

7          MS. REID:  Thank you, Your Honor.

8          THE COURT:  All right.  All right, moving on then to

9  5776.

10         MS. REID:  Thank you, Your Honor.

11         THE COURT:  You're welcome.

12     PAUSE

13         THE COURT:  A familiar face.  No, you're the familiar

14  face, Mr. Mullin.

15     PAUSE

16         MS. REID:  Your Honor, this one will take a little

17  bit of explanation because I just want to bring Your Honor up

18  to date as to what has occurred with Judge Saris and with the

19  claims data issue.  As Your Honor is aware, Judge Saris in

20  November of last year made it clear that the issue of whether

21  or not the government's failure to produce claims data at a

22  state level would ultimately have consequences in terms of

23  their ability to prove damages, was an issue for her to

24  determine at a later date.  And indeed as we speak that is one

25  of the main issues that the defendants have moved for summary

39

1    judgment on and it's in the process of being briefed.

2          At that same time though Judge Saris said if you want

3    to subpoena the state claim data go ahead and do it.  So Dey

4    did.  We served 38 subpoenas a month before the end of

5    discovery.  We got some more state claim data as a result and

6    by the end of fact discovery we filed two motions.  One motion

7    which went to Judge Saris was a motion to extend the time for

8    discovery so that states could have an opportunity to respond

9    since many of them did not feel they could do it in a month.

10          The other motion we filed which is the motion before

11   Your Honor today was as to four states, Delaware, Oklahoma,

12   South Dakota and North Carolina who simply said forget it, we

13   are not going to do this for various reasons.  So we filed the

14   motion to compel as to you, before Your Honor and then we filed

15   the motion to extend the time for people to, states to produce

16   additional states claim data.

17          On June 10th Judge Saris ruled on her motion and it

18   was a memo endorsement order and basically, I'm looking for the

19   exact language, what she said was she declined to extend the

20   discovery deadline but any state claim data that had been

21   produced up to that point could be used and the expert reports

22   could be supplemented.  So in essence anything by June 10th we

23   could use, anything after that we could not.  At the

24   government's request we advised all the other remaining states

25   that they didn't have to produce anything more pursuant to the

40

1    subpoenas in view of her ruling.

2         That then left us with this one particular motion,

3    the motion to compel where the four states had simply said that

4    they could not, would not comply.  As to one of those states,

5    Delaware, which Mr. Mullin is here for, they moved to quash in

6    Delaware where we opposed it and their motion was granted in

7    December, and he has the order.  We can bring that order before

8    you.  That is the status of Delaware.  The other three are

9    before Your Honor, and I think at this point we can argue the

10   issue of burden which is really the issue raised by the other

11   three, but the threshold issue for Your Honor is what to do in

12   face of Judge Saris' June 10th ruling that states claim data

13   produced before June 10th can be used and thereafter she did,

14   you know, not.

15        And I, my, you know, my argument on it is from my

16   point of view and as I'm arguing before Judge Saris right now

17   as far as we are concerned the federal share for Delaware and

18   the other three remaining states, South Dakota, Oklahoma and

19   North Carolina should be excluded and no damages awarded

20   because of the state's failure to produce that claims data.

21   Whether at this point it makes sense to force them--

22        THE COURT:  Yeah, it's problematic.  I mean the

23   motion, it's an old motion and it didn't get heard probably

24   when it should have been heard and--

25        MS. REID:  There have been many motions in this case,

41

1  Your Honor.  There can be no criticism of anyone with regard

2  to any of the hearings.  So I don't--

3          THE COURT:  I'll hear the opposition.

4          MR. HENDERSON:  Very briefly on behalf of the United

5  States George Henderson speaking.  We did file an opposition.

6  The states also filed an opposition.  The United States'

7  opposition is basically that it is too late and what do we do

8  with this data?  As we indicated in our opposition to the

9  motion to extend the deadline, all this new claims data comes

10 in and then our experts have to redo their reports and that was

11 the basis of our argument to Judge Saris.  And if the Court

12 may, I'll offer the Court a copy of Judge Saris' ruling so you

13 can--

14         THE COURT:  This is the June, the--

15         MR. HENDERSON:  Yes.

16     PAUSE

17         MR. HENDERSON:  And I think the language she says to

18 the extent that new claims data have been produced in response

19 to the subpoena expert reports can be supplemented.  I believe

20 she's referring to data that has already been produced at the

21 time of this order because that was right in the middle of when

22 our experts were finalizing their expert reports and our

23 argument was, Judge, we don't have time and resources to deal

24 with more of this claims data every time a state submits data.

25 It's another hard drive of claims data that has to be analyzed.

42

1          So our point is now all the expert reports have been

2    done and to go back and redo them again with more state claims

3    data is, I just don't think is within the contemplation of

4    Judge Saris' ruling.

5          THE COURT:  Well, it's too - okay, I'll hear you, Mr.

6    Mullin.

7          MR. MULLIN:  Thank you, Your Honor.  Peter Mullin on

8    behalf of the Delaware Medicaid Agency.  Essentially Delaware's

9    position, Your Honor, is that two federal Judges have ruled

10   against Delaware having to produce these documents.  The

11   subpoena at issue was issued by the U.S. District Court for

12   Delaware.  The Delaware Medicaid Agency promptly moved before

13   that Court to quash the subpoena.  The subpoena asked for--

14         THE COURT:  On what grounds?

15         MR. MULLIN:  On the ground that there had not been

16   sufficient notice in issuing the subpoena and the return date

17   and on the second ground that the subpoena was burdensome.  The

18   subpoena asked for 11 years worth of claims data from 1991 to

19   December 2001, and it's claims data that no longer exists on

20   the active server.  It's only on back-up tapes.  They no longer

21   have either the hardware nor the software to produce the data

22   and they would have to engage their claims processor, EDS, and

23   there's been an estimate that it would be somewhere between

24   $500,000 a million dollars to do that.

25         The motion to quash was opposed by Dey--

43

1          THE COURT:  An estimate by?

2          MR. MULLIN:  It was an estimate by the, an official

3    of the Delaware Medicaid Agency.  I have a copy of an affidavit

4    that was submitted in that case, and I'd be glad to hand that

5    up, Your Honor.  This is a declaration of Frances O'Connor.

6      PAUSE

7          THE COURT:  You willing to pay the cost?

8          MS. REID:  Your Honor, we actually have paid the

9    reasonable cost for many of the states.  In this case of

10   Delaware, if they could use as Mr. O'Connor said another states

11   Medicaid hardware and software in order to retrieve it the cost

12   would be substantially less.  You know, we have not obviously

13   given them a blank check, but we have worked out this with

14   other states in terms of, you know, making it as, not as

15   burdensome as possible because we understand that, you know, it

16   is an issue.

17         MR. MULLIN:  If I might, Your Honor, it seems to me

18   that this issue whether it's burdensome or not burdensome was

19   litigated before the Court in Delaware.  Dey appeared, filed an

20   opposition, argued the issue there and it was resolved there on

21   February 24th of `09, and the motion to quash was granted.

22   Subsequently Judge Saris ruled--

23         THE COURT:  Is it clear from the ruling that it was

24   granted on that basis and not just on the basis of timing and

25   notice?

44

1    MR. MULLIN:  It is and I'll hand up a copy of the

2  ruling, Your Honor.

3     PAUSE

4     THE COURT:  Well, it is clear.  It says subpoena

5  imposes too onerous a burden in terms of, on plaintiff in terms

6  of time and expense.  That's pretty clear.

7     MR. MULLIN:  And it seems to me that Judge Saris'

8  ruling in this case saying that anything that's already been

9  produced as to June 10th can be used, but denying extending or

10  keeping the period for discovery open is also a ruling

11  essentially adverse to compelling Delaware to produce this.

12  Therefore, we'd ask that the Court deny the motion to compel.

13  If the Court was inclined to grant the motion to compel, we'd

14  ask that you order Dey to pay whatever the cost of the Delaware

15  agency is to produce these claims data.

16     THE COURT:  Well, I think it's moot as to Delaware.

17  I think it's been decided.  I mean, I see an order by a

18  district judge.  I, as far as I'm concerned it's moot as to

19  Delaware.  As to the other three states, I'll take it under

20  advisement.  And, again, I'll give you quick rulings not at

21  great length but electronic rulings really quickly.

22     MS. REID:  I would very much appreciate it.  Thank

23  you, Your Honor.

24     THE COURT:  All right.

25     MR. MULLIN:  Thank you.

45

1          THE COURT:  So we move on to 5898.

2          MR. FAUCI:  Jeff Fauci on behalf of the United

3     States, Your Honor.  This is the United States motion to compel

4     testimony.  There were three points at issue originally and we

5     notified the Court prior to this that we're only moving on two

6     of those now.  Those two points are a refusal to provide

7     30(b)(6) testimony from Boehringer Ingelheim, from the

8     Boehringer Ingelheim defendants, and a dispute regarding the

9     United States' right to take a substitute deposition in lieu of

10    one cancelled on the eve of the deposition at the close of

11    discovery.

12         The first and more important issue is the 30(b)(6)

13    testimony.  The defendants have just refused to provide

14    testimony from BIC or BIPI, Boehringer Ingelheim Corporation or

15    Boehringer Pharmaceuticals Incorporated, on topics relating to

16    the scienter or to their asserted belief that the United States

17    approved of their conduct.  Roxane produce a corporate designee

18    of these topics but defendants refused to do so for BIC and

19    BIPI.  The defendants have taken the view from what I

20    understand that they're only providing corporate testimony for

21    BIC and BIPI on issues relating to the corporate veil.  This

22    ignores that the United States is seeking damages against BIC

23    and BIPI based on their own involvement in Roxane's conduct.

24         The defendants' claim that the United States' theory

25    that BIC and BIPI were directly liable for the underlying

46

1   conduct is somehow not articulated in the United States'

2   complaint.  This just is not the case.  The complaint is

3   replete with allegations about the defendants' oral conduct and

4   includes an allegation that, "BIC, BIPI and Roxane acted in

5   concert together to foster, facilitate and promote the unlawful

6   conduct alleged."  The parties are right now in the midst, as

7   Mr. Gortner alluded to earlier, in extensive summary judgment

8   briefings about BIC and BIPI's involvement in the conduct

9   alleged.

10          We're here today on the discovery motion that was

11   filed within; the request was filed within the discovery time

12   period.  At the discovery stage the United States is only

13   required to show that the discovery it seeks is likely to lead

14   to the discovery of admissible evidence.  As detailed in our

15   memorandum we've shown that we have evidence that BIC and BIPI

16   were involved in the claims setting process.  They shared a

17   pricing approval and procedure, pricing policy and procedure

18   for certain drugs.  Multiple BIPI employees were emailed launch

19   plans and proposed pricing and endorsed them.  We're having a

20   fight as to whether those people are engaging in, whether they

21   were acting as BIPI agents or Roxane agents, but they were BIPI

22   employees and we think that the evidence before the Court is

23   more than sufficient to show that we have an issue as to

24   whether or not BIC and BIPI were involved in misconduct.  And

25   that being the case, they have to provide corporate testimony

47

1   as to the issues that we've requested it on which are issues

2   relating to their scienter and to whether or not they approved

3   of the conduct.

4         They've provided us testimony for Roxane and they

5   can't – we don't think they should be able to refuse to provide

6   it for BIC and BIPI just because they don't want the

7   allegations to proceed against BIC and BIPI.  They do.  We have

8   evidence.  We think we should be entitled to the discovery.

9         THE COURT:  All right, why shouldn't I allow this?

10        MR. GORTNER:  Your Honor, for similar reasons to what

11  we discussed earlier.  We do have this issue about whether BIC

12  and BIPI are proper defendants here.  We certainly don't see

13  any allegations in the complaint aside from corporate alter ego

14  piercing the veil allegations which we were happy to provide

15  and have provided extensive 30(b)(6).  But the topics they're

16  looking for for BIC and BIPI are incredibly broad.  It's their

17  understanding of all the laws and practices of Medicare and

18  Medicaid, about AWP's and WAC industry reporting practices,

19  government knowledge, OIG compliance, lobbying.

20        There's not a single drug in this case from

21  Boehringer Ingelheim Pharmaceuticals and Boehringer Ingelheim

22  Corporation doesn't even manufacturer drugs.  It's a parent

23  holding company.  So at a minimum as we did with the lobbying

24  issues, before imposing this onerous and 30(b)(6) preparation

25  discovery, it's a very time consuming, difficult process.  At a

48

1   minimum we should await Judge Saris' rulings on whether these

2   defendants should even be in the case.  We contend they should

3   not be in the case.  And there's been no shortage of discovery

4   in these cases.

5           With respect to the second topic, the issue of a

6   substitute witness, again these cases have been discovered to

7   death.  We gave the government every single deposition of every

8   Roxane employee in every AWP case over the years.  I think

9   there have been 50 different depositions of Roxane or

10  affiliated employees.  They deposed two sales managers that

11  were essentially identical positions doing identical roles for

12  the same time period as this individual we've termed witness A

13  who unfortunately we found out at the 11th hour appears to have

14  a very serious illness.  And what we suggested was we would

15  certainly, and we still suggest this, we will do a telephonic

16  deposition if there's something the government can point to

17  that this witness uniquely has that they weren't able to get

18  from a duplicative, cumulative deposition testimony of all

19  kinds of other Roxane sales managers.  They still in their

20  papers have not identified any prejudice or any unique

21  testimony they need from this individual.  What we think is

22  occurring here is there's an individual that they didn't notice

23  during the year and a half discovery time period and after the

24  close of discovery they thought boy this person might be a good

25  person to depose, let's substitute him in.  That's unfair.

49

1    It's unduly burdensome.  It's duplicative in light of the

2    copious amounts of discovery of Roxane employees in this case,

3    Your Honor.

4             THE COURT:  Why shouldn't I make the same ruling,

5    denying it without prejudice upon determination by Judge Saris

6    on the motions for--

7             MR. FAUCI:  What I would offer, Your Honor--

8             THE COURT:  Will you let me finish?

9             MR. FAUCI:  Yes, Your Honor.  Sorry.

10            THE COURT:  Until there's a ruling on the motion for

11   summary judgment.

12            MR. FAUCI:  I don't think we're opposed to that.  I

13   don't think we'd be using this testimony to oppose the motion

14   for summary judgment.  That's already been briefed.  We would,

15   obviously we would like that if the Court allows, if the Court

16   decides that BIC and BIPI have come forward with sufficient

17   evidence, The United States has come forward with sufficient

18   evidence that BIC and BIPI are still in the case; that we

19   should be ordered this deposition to occur quickly.

20            THE COURT:  All right.  Denied without prejudice, to

21   be renewed after a ruling on the motions for summary judgment.

22            MR. FAUCI:  May I ask, on the other issue of the

23   additional deposition, Your Honor, may I be briefly heard on

24   that?

25            THE COURT:  You may.

50

1              MR. FAUCI:  Mr. Gortner's recitation of what

2   happened I largely agree with.  We requested dates for several

3   depositions for several witnesses.  We requested those for this

4   witness on October 8th.  The deposition was scheduled in

5   November.  It was set for December 12th.  On December 9th, three

6   days before the deposition was to occur and six days before

7   discovery cutoff in this case, we were told that this witness

8   had a very serious medical illness.  I believe Mr. Gortner

9   referred to co-counsel on our case that it be cruel to depose

10  this witness.  And we promptly agreed that we, given that we

11  had no interest in deposing this witness, and we don't see the

12  benefit of going forward with a telephonic witness, of a

13  witness who's in this person's condition.  If that's the case--

14              THE COURT:  This person is still critically ill?

15              MR. FAUCI:  We've been asked not to comment for HIPPA

16  reasons on what her illness is.  I'll defer to Mr. Gortner.

17              MR. GORTNER:  Your Honor, I actually don't know the

18  answer to that.  These motions were pending at the beginning

19  of, the end of last year and I have no additional information.

20  If I may, our understanding is that the illness was terminal,

21  but we don't know the details of it and we wanted to be careful

22  in our briefing--

23              THE COURT:  Yeah, yeah.

24              MR. GORTNER:  --on it.

25              THE COURT:  Certainly.

51

1          MR. FAUCI:  Had we known that this witness had some

2    sort of illness and was not going to be in a position to

3    testify, we would have requested a different witness.  We just

4    found out about this, although the deposition had been

5    scheduled at that point for 60 days, had been requested for 60

6    days, wit had been scheduled for 30, we found out about it

7    three days before the deposition at a point when we were all

8    flying all over the country trying to finish up discovery, and

9    we just didn't have time to get out a notice at that point.

10   And we assumed that we would be able to work this out with

11   Roxane.  Obviously, we haven't.  But to suggest that we're

12   cherry picking a new witness at this hour is I think

13   disingenuous.  We had set this deposition.  We could have

14   noticed other depositions during the discovery period but we

15   didn't.  We've requested Mr. Ducek (ph).  If we really wanted

16   him, we could have noticed him.  We didn't.  We were all set to

17   go with Witness A and then we found out that she was this sick

18   and we decided not to go forward with it.

19          MR. GORTNER:  And I'll just move for the record if we

20   can extract that.  I believe Mr. Fauci inadvertently mentioned

21   Witness A's last name.  I just – we'll work it out with the

22   transcript to try to redact that.

23          THE COURT:  It should be.

24          MR. FAUCI:  No, I mentioned the name of the witness

25   we're trying to depose.  We did Mr. Ducek who I don't think

52

1   there's any privacy on.

2           MR. BREEN:  Your Honor, if I could make a comment

3   very briefly because I was in the middle of this deposition

4   also.  And my brother Mr. Gortner said that if he feels to the

5   effect that we're trying to cherry pick a witness, nothing

6   could be further from the truth.  I was the one that was

7   supposed to take this deposition along with counsel for the

8   government, and when I heard the facts and circumstances I

9   became very concerned that we not take this deposition, and I'm

10  not going to go into the details.  And it was some

11  consternation among the plaintiffs' team about not taking this

12  very important deposition of a sales manager that we needed to

13  take.  But to the extent that anybody was advocating not taking

14  it was me because of what I heard about the – for obvious

15  reasons.  And we need another sales manager, it's that simple,

16  and we have not been provided one yet and with all due respect,

17  Your Honor, we're entitled to it.  And we backed down on this

18  witness as we should have done as counsel and human beings, but

19  we should not be precluded from taking that deposition.

20          MR. GORTNER:  And, Your Honor, briefly, first of all,

21  there's nothing in the case management order or anything that

22  requires them to take two or three or four sales managers.  The

23  issue here is if under circumstances that none of us are under

24  no control, there is no requirement that or anything magical

25  about the three sales managers that they're referred to, and I

53

1    still have not seen in the papers or in any of the argument

2    today any showing of prejudice or the need for additional

3    testimony that this particular witness, because that's the real

4    issue here, Your Honor, is in the absence of them being able to

5    depose this witness for circumstances out of our control what

6    is the prejudice?  What have they lost from this witness's

7    potential testimony that they have not been able to obtain from

8    the numerous other sales managers deposed in this case.  I

9    still have not heard anything or any showing of prejudice.

10            THE COURT:  I'll allow a substitution, one day, to be

11   done within 30 days.

12            MR. BREEN:  Yes, Your Honor.  Thank you.

13            THE COURT:  All right, that takes us to 5976,

14   California.

15            MR. PAUL:  Good morning, Your Honor, Nicholas Paul

16   for California.

17            THE COURT:  Thank you.

18            MR. PAUL:  Sorry, first time before you.  First of

19   all, Your Honor, we filed a motion for leave to file a reply

20   brief.  Could we deem that motion granted?

21            THE COURT:  Deem allowed.

22            MR. PAUL:  Thank you, Your Honor.  Essentially there

23   are 21 topics at issue here, Your Honor, but if I could just

24   provide a brief overview.

25            THE COURT:  We have your reply actually.

54

1        MR. PAUL:  Thank you, Your Honor.  At this point

2   California has produced eight different 30(b)(6) witnesses for

3   nine 30(b)(6) depositions across 38 hours of 30(b)(6)

4   testimony.  The defendants listed originally 68 topics which

5   included 47 subtopics within those 68.  And we've produced

6   witnesses on 47 of the 68 topics.  We've also produced 15 other

7   program witnesses across 110 hours of fact depositions,

8   including the director of Medicaid program and the secretary of

9   the California Department of Health and Human Services, the

10  cabinet secretary.

11        In terms of context briefly, there are three

12  defendants remaining in the California case which is AWP case

13  analogous to the U.S. case that I know you're very familiar

14  with and those defendants are Dey Sandoz Inc. and Myler (ph),

15  and the discovery closed June 30th.  We're in expert depositions

16  now and summary judgment motions are due October 31st.  The,

17  I've got a copy of Exhibit B to our motion which lists the

18  specific topics at issue which I'm glad to hand up if that

19  would--

20        THE COURT:  No, it's not necessary.

21        MR. PAUL:  Right.

22        THE COURT:  We'll just go through them one by one.

23        MR. PAUL:  All right, Your Honor.  I think the – our

24  position has never been that we resist discovery wholesale as

25  to these topics.  The specific issue is whether these topics

55

1   are appropriate for 30(b)(6) testimony.  I think it's--

2          THE COURT:  Well, since you haven't been here before

3   let me tell you how I go through these.  I'll hear you, I'll

4   hear the opposition, I'll make a ruling from the bench--

5          MR. PAUL:  I understand, Your Honor.

6          THE COURT:  --in most everything.

7          MR. PAUL:  Thank you.  I thought it might be

8   convenient for the parties if we went, divided the 21 topics

9   into three categories and I suggest starting with Nos. 58 and

10  59 as the first category.  And topic No. 58 seeks testimony

11  regarding all communications with the relator, Ven-A-Care, with

12  its counsel and the principals in Ven-A-Care and No. 59 seeks

13  testimony regarding all of Ven-A-Care's presentations to any

14  state or federal agency at any time.

15         Now, we've attempted to work with the defendants and

16  suggested that we re-word 58 and 59 so that the topic was

17  directed at the agencies knowledge of those two topics since

18  presumably that would go to California's knowledge of the

19  information put forward by Ven-A-Care.  But they made it clear

20  I think that they want to depose a California Department of

21  Justice attorney, person on these topics.  And that's something

22  that we have not been willing to agree to at this point.  A

23  deposition of California DOJ people would very quickly as to

24  No. 58 get into the obviously privileged communications between

25  myself and Mr. Green and any other analogous communications

56

1   with counsel for the relator.

2            As for 59 we've already produced to the defendants as

3   a compromise effort here all of the documents accompanying any

4   Ven-A-Care presentation to California at any time.  That

5   includes a 1998 presentation and a 2000 presentation which I

6   believe is also provided widely to other states under the aegis

7   of NAMTCU, National Association of Medical Thought Control

8   Units.  And we've also produced all documents regarding any

9   communication between us and Ven-A-Care other than those to

10  which we claim a privilege.  We've long since provided the

11  defendants at the close of discovery, fact discovery, a

12  privilege log as to any exceptions.  So those three areas we

13  think are maybe possibly appropriate for interrogatory type

14  responses but just not appropriate to sit a DOJ person down for

15  30(b)(6) testimony.

16           THE COURT:  All right.  I'll hear the opposition.

17           MS. REID:  Thank you, Your Honor.  I think as an

18  overarching comment we are at the end of fact discovery.  We're

19  in the middle of expert reports.  With all of these topics we

20  have done our best to get fact discovery where we can and, you

21  know, to a great extent I don't think that there's a point to

22  having Rule 30(b)(6) depositions when we're about to start

23  summary judgment.

24           With regard to these particular 58 and 59, you know,

25  California has produced what it has produced.  It's given us

57

1   the fact testimony it's going to give us, and I think our only

2   concern at this point is as long as no DOJ attorney is taking

3   the witness stand and giving testimony later or putting in an

4   affidavit on these topics, then we are content to let it go at

5   this point if that's California's point.

6           THE COURT:  That sounds reasonable.

7           MR. PAUL:  Your Honor, I'll only agree to that

8   request on the defendants' part as to topics 58 and 59.

9           THE COURT:  Okay.

10          MR. PAUL:  The remaining, the next category of topics

11  are those numbered 64, 65 and 66, and they are a little similar

12  I think to what we just described.  They asked the dates, facts

13  and circumstances regarding how California first learned of the

14  fraud which is from Ven-A-Care and the false claims that we now

15  allege in the complaint, how and when we learned of facts

16  underlying all of our allegations in the specific paragraphs of

17  the complaint and then testimony regarding each instance in

18  which we sought a seal extension in terms of investigating the

19  case.  And I would just point out to the Court that I believe

20  essentially the exact same set of facts was addressed last

21  December in a U.S. case on seal extensions and the Court deemed

22  that that was not appropriate for 30(b)(6) testimony as I cite

23  in the reply brief.

24          MS. REID:  Your Honor, taking the last point first,

25  my brother counsel is indeed correct, you did deny that motion.

58

1  We have made it again, again for the same reasons that in

2  order for us to adduce evidence of the prejudice on our due

3  process claims, spoliation and possible latches, we need to be

4  able to inquire beyond simply the seal, the reasons for the

5  continued seals and the extensions.  And I know Your Honor has

6  ruled before but I do want to make the record on that point

7  that we do maintain.

8          THE COURT:  It will remain consistent.

9          MS. REID:  Yes.  On the other point, on the

10  extensions of time to intervene, I believe we have received

11  them through January of 2003.  The case itself was not unsealed

12  as to Dey until 2005.  To the extent there are any such further

13  papers that were filed in regard to keeping it sealed, we would

14  ask that those be produced.  There may not have been and if

15  that's so I would accept the representation from counsel.

16          THE COURT:  Counsel?

17          MR. PAUL:  I understand my sister's request and the

18  reason why she refers to 2003.  I believe all such documents

19  have been turned over, but I will represent to the Court that

20  the first thing that I'll do is verify that.  I think it has to

21  do with the fact that Judge Saris had our remand motion under

22  consideration for a period of time.

23          THE COURT:  Right.

24          MR. PAUL:  Not much happened after 2003, but I will

25  undertake that and get back to you within the week.

59

1           MS. REID:  Thank you.

2           THE COURT:  All right.

3           MS. REID:  The other point I would make on 64 and 65

4  which deal with the date, facts and circumstances describing

5  when and how California learned of the fraud and false claims

6  alleged in the complaint, and how they learned of the facts

7  underlying the allegations in certain paragraphs of the

8  complaint, I would suggest that one compromise to this is that

9  they simply designate testimony that has been given as

10 responsive to those issues.  I think there is testimony that's

11 been given from a 30(b)(1) witness, particularly I think by

12 Mr., I will pronounce his name incorrectly, Douberly.  But if

13 California would undertake to do that within--

14         THE COURT:  Within 30 days.

15         MS. REID:  --30 days.  Frankly, on this and for the

16 vast majority of the other outstanding items that would be

17 acceptable to us.

18         MR. PAUL:  And just to clarify I think it was 64 and

19 65 that you mentioned.

20         MS. REID:  64 and 65, I just wanted to give you a

21 heads up that that's going to be my suggestion on some of the

22 other ones too.

23         MR. PAUL:  I'm willing to go through the prior

24 transcripts, Your Honor--

25         THE COURT:  All right.

60

1          MR. PAUL:  --of the fact testimony or prior 30(b)(6)

2     depositions and designate--

3          THE COURT:  All right, sounds reasonable.

4        PAUSE

5          MR. PAUL:  The last category, Your Honor, is the most

6     extensive but they're all the same types of issues and that's

7     topics 1 through 14 and 16 and 63.  These essentially are

8     topics which require an attorney to sit down and explain the

9     allegations against the remaining defendants as set forth in

10    the various numbered paragraphs of California's complaint.  And

11    I think these topics collectively embrace about 50 to 60

12    numbered paragraphs, specific allegations.  And as worded, they

13    require an attorney to sit down and master the morass of data

14    that's been produced in this case regarding each defendant and

15    be in a position to sit down and set it forth for purposes of a

16    30(b)(6) deposition.  And if any is missing, then I suppose

17    there's an argument down the road that you're not allowed to

18    move on matters that were not regurgitated in the 30(b)(6), and

19    there have been tens of millions of pages of electronic data,

20    pricing data as well as documentary information, emails and

21    letters, et cetera, that I think we'd really represent an

22    insurmountable task for a DOJ attorney to master that, and it's

23    a little analogous to asking the defendants to sit for a

24    30(b)(6) deposition on their 60 to 70 affirmative defenses.

25          THE COURT:  Well, what can kind of agreement can we

61

1   come to here?  Is there any reasonable resolution?

2        MR. PAUL:  Well, one compromise is that numbers 16

3   and 63 deal specifically with damages and the defendants are

4   about to take our damages expert's deposition over two or three

5   days within the next two weeks.  That guy is at a far better

6   position to describe the prices that California maintains

7   defendants should have reported and the result of damages than

8   any DOJ attorney.

9        MS. REID:  Excuse me, was it 16?

10        THE COURT:  Through 63.

11        MS. REID:  And 63.  I fact I was going to suggest

12   that 63 particularly is susceptible to expert discovery now

13   that we have their expert report.  And certainly 16 we would be

14   willing to, you know, approach in the same fashion with the

15   expert in terms of answering that question.

16        At that point that just leaves you with 1 to 14.  and

17   again, my suggestion there would be that to the extent

18   California believes there is 30(b)(1) testimony that is

19   responsive, they can so designate and we can leave it at that.

20        THE COURT:  I think the way probably to deal with

21   this motion for the record is withdraw without prejudice to be

22   renewed to those limited areas that there may be further

23   issues.  I think that's probably the efficient way of doing.  I

24   think we've come to some pretty reasonable resolutions here.

25        MR. PAUL:  certainly, Your Honor, and that's fine by

62

1    California if the agreement is that, and I do agree to counsel

2    my sister's suggestion that we simply designate fact testimony

3    to address o1 through 14.

4              THE COURT:  All right.  All right, that takes care of

5    the docket for today.  I have one comment and I probably should

6    have made it at the outset when I had everyone here, but you

7    can pass this on to your colleagues, those who were here and

8    those who are here at other hearings.  We had several requests

9    at the last moment on Thursday and Friday to participate in

10   this telephonically.  And I gave it serious thought but it

11   really is very difficult when you do not have a stenographer

12   and you have multiple people speaking and it's being recorded.

13   And our experience in the past has been there tends to be

14   confusion when the person goes to transcribe the transcript

15   with so many people in the room, and that is the reason that I

16   have opted not to do it.  I realize that many of the states

17   have serious financial issues and travel is the problem, but I

18   will not entertain it the future.  I do it occasionally in this

19   court, status conferences in civil cases that are very brief

20   and I have two parties and so it's very clear.  But for that

21   reason I explain to you this is the reason that requests to

22   participate telephonically were denied.

23             All right, we stand in recess.

24             THE COURT:  Thank you, Your Honor.

25             MR. FARQUHAR:  I'm sorry, Your Honor, if I might,

63

1   Doug Farquhar representing Purepac.  We thought that there

2   were a couple of motions that were going to be argued today on

3   the cross notice of Lynne Donovan in the Iowa case and in the

4   New York case.

5           THE COURT:  You're correct.

6           MR. BUEKER:  Specifically, Your Honor, Docket 6263

7   and 6264.  The 6262 is in the New York Counties case.  For the

8   record this is John Bueker speaking.  And in the Iowa case the

9   Docket No. is 6264.

10          THE COURT:  I think you're correct so we'll hear you.

11  It's just not the way the--

12          MR. BUEKER:  What's that?

13          THE COURT:  It's just not the way the list was

14  prepared for me but I remember a discussion about it so.

15          MR. BUEKER:  Your Honor, I will note that we're both

16  on the same side.  Mr. Farquhar is here on Iowa and I'm here on

17  New York, so plaintiff was the one that requested these be put

18  on.  I don't know where plaintiffs' counsel might be.

19          THE COURT:  And that would be?

20          MR. BUEKER:  Ms. Cicala, the Kirby McInerney firm.

21          THE COURT:  Yeah, yeah.

22          MR. FARQUHAR:  But, Your Honor, I think this--

23          THE COURT:  Did you have any conversation with her?

24          MR. FARQUHAR:  About this hearing?

25          THE COURT:  Yeah.

64

1          MR. FARQUHAR:  No.

2          MR. BUEKER:  No, I mean I received the same letter I

3    think the Court received saying that she was requesting a

4    ruling today.  I just suspected she would be here to argue the

5    issue.  For me it's an up or a down issue.

6          THE COURT:  Do you have a number where we can reach

7    her?

8          MR. BUEKER:  Her New York number is on the pleading

9    but I may be able to — she's in Texas.

10        PAUSE

11         MR. BUEKER:  We can certainly try their main number

12   in New York and offer to transfer to Texas.

13         THE COURT:  See if we can track her down.

14        PAUSE

15         THE COURT:  We can ask if she's willing to have them

16   on the papers.

17        PAUSE

18         THE CLERK:  She said she was told that her motions

19   weren't being heard today.

20         THE COURT:  Is she willing to have them taken on the

21   papers?

22        PAUSE

23         THE COURT:  And who told her question her.

24        PAUSE

25         THE CLERK:  Mrs. Feeney, and she said only if you're

65

1  ruling her way, she would have it taken on the papers.

2      THE COURT:  That's an inappropriate response.

3      MR. FARQUHAR:  I couldn't hear it, Your Honor.

4      THE COURT:  Her response was only if I'm ruling her

5  way does she want it taken on the papers.  Well, do you want to

6  come up with a calendar and pick a date.

7      MR. FARQUHAR:  Who was it who told her that the

8  hearing had been canceled?  I'm up from D.C. for this and it's

9  a substantial amount of time.  I mean, obviously I'll do what

10 Your Honor wants, but I'd like to at least seek costs for, you

11 know, the--

12     THE COURT:  No, my clerk is out on for – what do you

13 call it when your wife has a baby.  Paternity leave I guess.

14     MR. FARQUHAR:  Paternity leave I guess.

15     THE COURT:  And my secretary, because we had the list

16 printed out apparently thought it was not on.

17     MR. FARQUHAR:  Oh, I see.

18     MR. BUEKER:  Okay.

19     THE COURT:  So it's the Court's problem.

20     MR. FARQUHAR:  All right.

21     THE COURT:  Ask her if she wants to argue it now over

22 the phone?

23     MR. FARQUHAR:  That'd be great.

24     PAUSE

25     THE CLERK:  (Inaudible - #12:40:02).

66

1          THE COURT:  Tell her I'm taking it on the papers.

2  That's the way that'll be done.  We'll do it on the papers.

3          MR. FARQUHAR:  All right, Your Honor--

4          THE COURT:  That way you won't have another trip and

5  it's as if you've argued.

6          MR. FARQUHAR:  Well – I guess I'd just like to if I

7  could just say a couple things very briefly.

8          THE COURT:  All right, let's get her on the speaker.

9     PAUSE

10          THE COURT:  It's discretionary whether I give you a

11  hearing you realize.

12          MR. FARQUHAR:  I understand that, Your Honor.

13          THE COURT:  Plug it into the other phone.

14          MR. FARQUHAR:  Thank you, Your Honor.  I appreciate

15  it.

16     PAUSE

17          MS. CICALA:  Hello, Joanne Cicala.

18          THE CLERK:  Attorney Cicala, you're on the record in

19  the matter of Citizens for Consume, et al. v. Abbott

20  Laboratories.

21          MS. CICALA:  Very good.

22          THE COURT:  All right, apparently there was some

23  confusion and I suggested that we either take it on the papers

24  and not make counsel come back for another hearing.  Counsel

25  has asked to make a few brief remarks so we've patched you in

67

1  and you may reply as well.

2          MS. CICALA:  Thank you very, very much, Magistrate

3  Judge Bowler.

4          THE COURT:  You're welcome.

5          MR. FARQUHAR:  Thank you, Your Honor.  And, Ms.

6  Cicala, this is Doug Farquhar.  I'm appearing today on behalf

7  of Purepac.

8          MS. CICALA:  Hi Doug.

9          MR. FARQUHAR:  Hi.  The issue is the cross notice of

10 the deposition of Lynne Donovan who was an employee of Hawaii

11 Medicaid.  We crossed noticed this deposition into the Iowa

12 case and into the New York Counties case, and the plaintiff in

13 both instances moved to quash the cross notices.  There's

14 really only two issues here.  The first is relevance and the

15 second is logistics and timing, if you will.  On relevance, I

16 think the papers are all quite clear and well established

17 relevance.  I won't burden the Court with an oral argument on

18 those points.

19          On timing there was one additional development that I

20 thought should be brought to the Court's attention which I wish

21 to mention now and that's why I've requested the opportunity to

22 make some comments.  The papers were all filed before the

23 deposition took place.  The deposition in fact did take place

24 on July 20th.  It was one of three days in which Ms. Donovan,

25 her testimony was taken for the Hawaii matter.  We only cross

68

1   noticed the second day where there was discussion of meetings

2   and documents that were attended by Medicaid administrators

3   from around the country.

4           At the deposition on July 20th, Michael Winget-

5   Hernandez who represents the state of Hawaii appeared and

6   represented Ms. Donovan.  When he entered his appearance he

7   also entered an appearance on behalf of Iowa and the New York

8   Counties.  In other words, it's the same, same law firm

9   representing the plaintiffs in all these cases.  Now, just so

10  that it's clear, I'm not misleading the Court, about a hundred

11  pages later in the deposition transcript he did note that they

12  had objected to the cross notices, but he did in fact enter his

13  appearance at the deposition on behalf of these two.  And I

14  think in light of the logistics that are set forth in the

15  papers, and again I won't repeat it here, but there was ample

16  opportunity for an attorney on behalf of Iowa and New York to

17  appear and in fact an attorney did appear and that's the only

18  point I wish to make.

19          MR. BUEKER:  I have nothing further to add to that,

20  Your Honor, John Bueker on behalf of New York, if only to say

21  that the original deposition of Ms. Donovan was rescheduled at

22  the request of Mr. Winget-Hernandez who ultimately defended the

23  deposition.  So as far as timing I think it's a mere

24  technicality that really shouldn't come in to play and the

25  relevance is adequately set forth in the papers.

69

1          THE COURT:  And your motion is 6264?

2          MR. BUEKER:  The New York motion is 6262, Your Honor,

3    and the Iowa motion is 6264.  Thank you, Your Honor.

4          THE COURT:  All right, do you want to be heard?

5          MS. CICALA:  Yes, please, Your Honor.  First on

6    September 9th we were informed Brian Feeney that these motions

7    would not be heard today.  We had an associate prepare to

8    attend this hearing today to argue our position on the motion

9    to quash.  And the only reason we are not in court right is

10   that Ms. Feeney expressly told us these motions would not be

11   heard.  So I want the Court to--

12         THE COURT:  No, that's clear.  My secretary was in

13   error.  That's--

14         MS. CICALA:  And I appreciate that very much but I

15   want you to know, Your Honor, that I'm very sorry that we're

16   not there.  These motions are very important to both the

17   states, to the state of Iowa and to the New York Counties and

18   our non-appearance is merely a reflection of this error.

19         At oral argument we were prepared to discuss with

20   Your Honor, my associate Jocelyn Norman who is not on the phone

21   with me right now, the testimony of Ms. Donovan which confirms

22   the propriety of our motion to quash.  Ms. Donovan has never

23   worked has never worked for either New York or Iowa Medicaid

24   and throughout her testimony it is entirely clear she had

25   nothing relevant to say with regard to either the New York or

70

1    Iowa Medicaid programs.

2          Mr. Winget-Hernandez is, was present for the

3    deposition as counsel for the state of Hawaii.  My firm does

4    not represent the state of Hawaii.  I asked Mr. Winget-

5    Hernandez in his capacity as our, as of counsel to our firm to

6    make clear on the record that we had the motions to quash

7    pending.  Those motions were pending at the time of the

8    deposition as Mr. Farquhar represented, and as Mr. Farquhar

9    also represented, Mr. Winget-Hernandez made clear on the record

10   the pendency of those motions and that we objected to the

11   introduction of his deposition testimony in our cases.

12         I would ask the Court if it is inclined to deny our

13   motion to stay its hand so that we may supplement that which we

14   have already filed and provide to you some more information

15   with regard to the utter irrelevancy of Ms. Donovan's testimony

16   to either the Iowa or the New York cases.  Defendants have and

17   will continue to have until the close of discovery ample

18   opportunity to take whatever discovery they need regarding Iowa

19   and New York Medicaid directly from the Iowa and New York

20   Medicaid programs and it is not for a representative of the

21   state of Hawaii to provide this Court with the information as

22   to the knowledge or expectation or anything frankly of the New

23   York or Iowa program.

24         So just in conclusion I would once again apologize

25   for our failure to appear.

71

1          THE COURT:  That's not an issue.  I mean that's not-
2  -
3          MS. CICALA:  I do thank you for your understanding
4  there, Your Honor.  And if Your Honor is inclined to deny the
5  motion, I would ask that you give us one week to supply you
6  with a very brief discussion of the testimony provided to
7  basically put some flesh on the bones that I've just laid forth
8  as to the utter irrelevancy of Ms. Donovan's testimony to
9  either the New York or the Iowa cases.
10          THE COURT:  Brief response?
11          MR. FARQUHAR:  Thank you, Your Honor.  The relevancy
12  is really a matter for determination at an admissibility phase—
13          THE COURT:  Right.
14          MR. FARQUHAR:  --as opposed to a cross notice phase.
15  I would just note that in terms of the cross notice the reason
16  that it was cross noticed was that Ms. Donovan did attend
17  meetings and did receive emails that were, the meetings were
18  attended by Iowa and New York officials, Medicaid officials and
19  the emails included Iowa and New York Medicaid officials.
20  That's why her testimony was cross noticed into this case.  It
21  could be at the end of the day that the better testimony does
22  come from the Iowa and New York people but we're--
23          THE COURT:  That's down the road.
24          MR. FARQUHAR:  That's down the road, exactly, Your
25  Honor.

72

1          MS. CICALA:  My understanding is that Ms. Donovan

2    was asked nothing with, regarding the Iowa or New York programs

3    and it seems absurd to suggest that every attendee of a meeting

4    is somehow relevant to the knowledge of Iowa or New York

5    Medicaid.  It seems like a far flung fishing expedition that is

6    utterly divorced from what's really at issue in either the New

7    York or Iowa cases which would be an examination of the New

8    York and Iowa witnesses on these subjects as opposed to a

9    representative from Hawaii who can have first, no firsthand

10   knowledge with--

11         THE COURT:  Well, again that's getting into

12   admissibility issues.  But I'll take it under advisement and

13   give you a brief ruling.

14         MR. FARQUHAR:  Thank you, Your Honor.

15         MR. BUEKER:  Thank you, Your Honor.

16         THE COURT:  All right.

17         MS. CICALA:  Thank you, Your Honor.

18         THE COURT:  You're welcome.

19         All right then we stand in recess.

20         MR. FARQUHAR:  Thank you.

21         MR. BUEKER:  Thank you, Your Honor.

22         MR. FARQUHAR:  And not that I don't like coming to

23   Boston.

24         THE COURT:  No, but we made it worthwhile for you.

25         MR. FARQUHAR:  That's right.  That's right and I

73

1    appreciate it.

2         THE COURT:  And it's a nice day, a lot better than it

3    was on Saturday.

4         MR. FARQUHAR:  Well that's right.

5         MR. BUEKER:  Absolutely, Your Honor.

6         MR. FARQUHAR:  We came up early and spent some time

7    on Cape Cod on Saturday and Saturday was not a great day to be

8    on Cape Cod.  Thank you, again.

9         THE COURT:  You're welcome.

10        MS. CICALA:  Thank you, Your Honor.

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

74

1                           CERTIFICATION

2        I, Maryann V. Young, court approved transcriber, certify

3   that the foregoing is a correct transcript from the official

4   digital sound recording of the proceedings in the

5   above-entitled matter.

6

7   /s/ Maryann V. Young                October 1, 2009

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25