# EXHIBIT B

**GEORGIA DEPARTMENT OF COMMUNITY HEALTH**

*Rhonda M. Medows, MD, Commissioner*     *Sonny Perdue, Governor*

2 Peachtree Street, NW
Atlanta, GA 30303-3159
www.dch.georgia.gov

March 31, 2008

The Honorable Thurbert Baker
Attorney General of Georgia
132 Judicial Building
Atlanta, GA 30334

RE:   Possible Georgia Participation in Pharmaceutical Litigation
      Regarding Average Wholesale Price

Dear Attorney General Baker:

As you know, the Department of Community Health (DCH) and your office have considered over the past few years the possibility of Georgia becoming a participant in litigation against the pharmaceutical industry regarding the issue of the Average Wholesale Price (AWP) of pharmaceutical products. The basic contention is that the pharmaceutical manufacturers have arbitrarily inflated the AWP for drug products. This AWP is used as a benchmark for reimbursements paid to pharmacists by the state Medicaid agency for prescription drugs furnished to Medicaid members. The effect of this alleged overstatement of AWP is that DCH is paying more for reimbursements of pharmaceutical services than it would were the AWP a more accurate reflection of the actual costs and prices of drugs.

Recently, attorneys for an Alabama law firm, Beasley, Allen, Crow, Methvin, Portis & Miles, P.C., and J. Benjamin Finley of Finley & Buckley, P.C. of Atlanta, visited the Department to talk about Georgia filing suit on this issue against the pharmaceutical industry. The attorneys indicated they have a meeting scheduled with you for late April to discuss the same topic. DCH agreed to share with these attorneys some pharmacy claims data that could be used to determine potentially how much DCH may have overpaid in pharmaceutical reimbursements as a result of an inflated AWP.

Please find enclosed a summary of points on this issue from Jerry Dubberly, DCH Director of Pharmacy Services. Of course, DCH would be the plaintiff in any lawsuit. DCH recognizes that the decision to proceed with litigation is a joint decision requiring careful consideration of all sides of the issue. Mr. Dubberly's comments are an attempt to highlight the most pertinent issues from the DCH perspective. DCH also recognizes any decision on outside attorneys to pursue the litigation on behalf of DCH and Georgia rests with your office.

We would be happy to discuss this matter further with you, or anyone you designate, either before or after your April meeting with the outside attorneys. Thank you for your consideration and service to the State.

Sincerely,

Rhonda M. Medows, M.D.

Enclosures
cc:  Clyde L. Reese, III, General Counsel
     Jerry Dubberly, Pharmacy Director

## AWP Litigation Points

**The case for litigation:**
- The expected definition of Average Wholesale Price (AWP) is the average surveyed price charged by wholesalers to pharmacies for a drug/product.
- AWP has been reported to be an inflated price and not truly reflective of the average price wholesalers charge pharmacies for drugs/products.
- AWP is used in the reimbursement methodology to establish Georgia Medicaid payment to pharmacy providers.
- As a result of inflated AWPs over the commonly expected definition, Medicaid has paid pharmacies more than the pharmacies' acquisition cost. The CFR calls for Medicaid to reimburse pharmacies at estimated acquisition cost plus a reasonable dispensing fee (42 CFR 447.331).
- Through verdict and settlement, other states have been successful in making a case that Medicaid agencies have been harmed due to the inflated AWPs.

**Points for Consideration:**
- The contention is that the manufacturers did not accurately report AWP. However, AWP and its calculation methodology are not defined in statute or regulation.
- Manufacturers provide an average wholesale price -much like a list price. However, the amount wholesalers charge pharmacies may be different from this suggested AWP.
- Compendia such as Red Book, MediSpan, and FirstData Bank have historically surveyed wholesalers and publish AWP reference files. Payers use these reference files as the AWP of record- not the list price published by the manufacturer.
- These compendia have been sued recently regarding their lack of diligence in surveying wholesalers and publishing an "accurate AWP."
- Given the name "Average Wholesale Price," there is an expectation that the price is in fact an average of the prices at which wholesalers sold the drugs to the pharmacies. However, payers understand that AWP is an inflated price and have tried to account for that inflation through reimbursing at a discount off of AWP, using a maximum allowable cost schedule, enforcing Most Favored Nation reimbursement rates, soliciting supplemental rebates from manufacturers, and offering lower dispensing fees.
- OIG and DoJ have published reports for many years acknowledging and even attempting to quantify the inflation of AWP over actual acquisition costs. DCH has been unsuccessful legislatively in moving pharmacy reimbursement rates to align more closely with actual acquisition costs.
- The actual overpayment for drugs is made not to the pharmaceutical manufacturer but to the retail pharmacy. Payers do not pay the manufacturer for the product. They pay the pharmacy. Arguably, the beneficiary of inflated AWP is the pharmacy – not the manufacturer. The exception to this may be if a drug is

generic, then the generic manufacturers would benefit from increased marketshare (i.e. pharmacies buying one generic manufacturer's drug versus a competitors' generic drug), but the actual overpayment again goes to the pharmacy.
- Litigation with verdicts/settlements of this magnitude may result in higher drug prices and/or lower rebates from the pharmaceutical manufacturers.
- If litigation is pursued, should SHBP, BOR and the state workers' compensation program be included as they all use AWP in their pharmacy reimbursement methodology?
- If counsel is retained on a contingency basis, the financial arrangement should be structured such that all awards are returned to the State. The State should then be invoiced any attorney/contingency fees to ensure that we receive 50/50 matching funds from CMS.