# EXHIBIT C

# Unknown

**From:** Jerry Dubberly
**Sent:** Monday, July 28, 2008 9:48 AM
**To:** 'jbelinfante@gov.state.ga.us'
**Subject:** FW: AWP Litigation Info
**Attachments:** drug spend hx1991-2006.xls; The case for litigation2008.doc; AWP Lawsuit Spreadsheet Notes.doc

---

**From:** Jerry Dubberly
**Sent:** Monday, July 28, 2008 9:38 AM
**To:** 'jbelinsante@gov.state.ga.us'
**Cc:** Carrie Downing; Clyde Reese
**Subject:** AWP Litigation Info

Josh,

Attached are files related to the AWP litigation that we spoke of this morning. The calculations were a result of information provided to DCH by outside legal counsel. We took their formula and calculated from there. We also looked at the generic payments using the same study they referenced. I provided this information to DCH legal counsel at the time in preparation for discussions with the AG's office. If you have any questions about the attachments, please let me know.

Thanks,
Jerry

10/1/2009

# AWP Litigation Points

**The case for litigation:**
- The expected definition of Average Wholesale Price (AWP) is the average surveyed price charged by wholesalers to pharmacies for a drug/product.
- AWP has been reported to be an inflated price and not truly reflective of the average price wholesalers charge pharmacies for drugs/products.
- AWP is used in the reimbursement methodology to establish Georgia Medicaid payment to pharmacy providers.
- As a result of inflated AWPs over the commonly expected definition, Medicaid has paid pharmacies more than the pharmacies' acquisition cost. The CFR calls for Medicaid to reimburse pharmacies at estimated acquisition cost plus a reasonable dispensing fee (42 CFR 447.331).
- Through verdict and settlement, other states have been successful in making a case that Medicaid agencies have been harmed due to the inflated AWPs.

**Points for Consideration:**
- The contention is that the manufacturers did not accurately report AWP. However, AWP and its calculation methodology are not defined in statute or regulation.
- Manufacturers provide an average wholesale price -much like a list price. However, the amount wholesalers charge pharmacies may be different from this suggested AWP.
- Compendia such as Red Book, MediSpan, and FirstData Bank have historically surveyed wholesalers and publish AWP reference files. Payers use these reference files as the AWP of record- not the list price published by the manufacturer.
- These compendia have been sued recently regarding their lack of diligence in surveying wholesalers and publishing an "accurate AWP."
- Given the name "Average Wholesale Price," there is an expectation that the price is in fact an average of the prices at which wholesalers sold the drugs to the pharmacies. However, payers understand that AWP is an inflated price and have tried to account for that inflation through reimbursing at a discount off of AWP, using a maximum allowable cost schedule, enforcing Most Favored Nation reimbursement rates, soliciting supplemental rebates from manufacturers, and offering lower dispensing fees.
- OIG and DoJ have published reports for many years acknowledging and even attempting to quantify the inflation of AWP over actual acquisition costs. DCH has been unsuccessful legislatively in moving pharmacy reimbursement rates to align more closely with actual acquisition costs.
- The actual overpayment for drugs is made not to the pharmaceutical manufacturer but to the retail pharmacy. Payers do not pay the manufacturer for the product. They pay the pharmacy. Arguably, the beneficiary of inflated AWP is the pharmacy – not the manufacturer. The exception to this may be if a drug is

generic, then the generic manufacturers would benefit from increased marketshare (i.e. pharmacies buying one generic manufacturer's drug versus a competitors' generic drug), but the actual overpayment again goes to the pharmacy.
- Litigation with verdicts/settlements of this magnitude may result in higher drug prices and/or lower rebates from the pharmaceutical manufacturers.
- If litigation is pursued, should SHBP, BOR and the state workers' compensation program be included as they all use AWP in their pharmacy reimbursement methodology?
- If counsel is retained on a contingency basis, the financial arrangement should be structured such that all awards are returned to the State. The State should then be invoiced any attorney/contingency fees to ensure that we receive 50/50 matching funds from CMS.

| Fiscal Year | Total Cost | Ingredient Cost | Brand Ingredient Cost | Generic Ingredient Cost | GAO Reference Overpayment | DCH Effective Discount Brand | DCH Effective Discount Generic | Potential Overpayment % Brand | Potential Overpayment % Generic | Potential Brand Overpayment | Potential Generic Overpayment | Net Potential Overpayment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1991 | $ 151,351,239 | $ 144,086,380 | $ 115,269,104 | $ 28,817,276 | 21.84% | 10.0% | 60.0% | 11.8% | -38.16% | $ 13,647,862 | $ (10,996,672.49) | $ 2,651,189 |
| 1992 | $ 187,499,760 | $ 178,499,772 | $ 142,799,817 | $ 35,699,954 | 21.84% | 10.0% | 60.0% | 11.8% | -38.16% | $ 16,907,498 | $ (13,623,102.56) | $ 3,284,396 |
| 1993 | $ 212,493,741 | $ 202,294,041 | $ 161,835,233 | $ 40,458,808 | 21.84% | 10.0% | 60.0% | 11.8% | -38.16% | $ 19,161,292 | $ (15,439,081.24) | $ 3,722,210 |
| 1994 | $ 252,957,819 | $ 240,815,844 | $ 192,652,675 | $ 48,163,169 | 21.84% | 10.0% | 60.0% | 11.8% | -38.16% | $ 22,810,077 | $ (18,379,065.19) | $ 4,431,012 |
| 1995 | $ 281,038,288 | $ 267,548,450 | $ 214,038,760 | $ 53,509,690 | 21.84% | 10.0% | 60.0% | 11.8% | -38.16% | $ 25,342,189 | $ (20,419,297.72) | $ 4,922,891 |
| 1996 | $ 310,490,124 | $ 295,586,598 | $ 236,469,278 | $ 59,117,320 | 21.84% | 10.0% | 60.0% | 11.8% | -38.16% | $ 27,997,963 | $ (22,559,169.16) | $ 5,438,793 |
| 1997 | $ 335,796,620 | $ 319,678,382 | $ 255,742,706 | $ 63,935,676 | 21.84% | 10.0% | 60.0% | 11.8% | -38.16% | $ 30,279,936 | $ (24,397,854.13) | $ 5,882,082 |
| 1998 | $ 362,183,494 | $ 344,798,686 | $ 275,838,949 | $ 68,959,737 | 21.84% | 10.0% | 60.0% | 11.8% | -38.16% | $ 32,659,332 | $ (26,315,035.74) | $ 6,344,296 |
| 1999 | $ 430,092,663 | $ 409,448,215 | $ 327,558,572 | $ 81,889,643 | 21.84% | 10.0% | 60.0% | 11.8% | -38.16% | $ 38,782,935 | $ (31,249,087.78) | $ 7,533,847 |
| 2000 | $ 549,521,669 | $ 523,144,629 | $ 418,515,703 | $ 104,628,926 | 21.84% | 10.0% | 60.0% | 11.8% | -38.16% | $ 49,552,259 | $ (39,926,398.08) | $ 9,625,861 |
| 2001 | $ 671,809,089 | $ 639,562,252 | $ 511,649,802 | $ 127,912,450 | 21.84% | 15.5% | 60.0% | 6.3% | -38.16% | $ 32,438,597 | $ (48,811,391.09) | $ (16,372,794) |
| 2002 | $ 794,096,508 | $ 755,979,876 | $ 604,783,900 | $ 151,195,975 | 21.84% | 15.5% | 60.0% | 6.3% | -38.16% | $ 38,343,299 | $ (57,696,384.11) | $ (19,353,085) |
| 2003 | $ 941,478,255 | $ 896,287,298 | $ 717,029,839 | $ 179,257,460 | 21.84% | 15.5% | 60.0% | 6.3% | -38.16% | $ 45,459,692 | $ (68,404,646.61) | $ (22,944,955) |
| 2004 | $ 1,125,947,053 | $ 1,071,901,594 | $ 857,521,276 | $ 214,380,319 | 21.84% | 15.5% | 60.0% | 6.3% | -38.16% | $ 54,366,849 | $ (81,807,529.69) | $ (27,440,681) |
| 2005 | $ 1,208,997,119 | $ 1,150,965,257 | $ 920,772,206 | $ 230,193,051 | 21.84% | 15.5% | 60.0% | 6.3% | -38.16% | $ 58,376,958 | $ (87,841,668.44) | $ (29,464,711) |
| 2006 | $ 1,041,465,659 | $ 991,475,307 | $ 793,180,246 | $ 198,295,061 | 21.84% | 15.5% | 60.0% | 6.3% | -38.16% | $ 50,287,628 | $ (75,669,395.46) | $ (25,381,768) |
| | | | | | | | | | | $ 556,414,365 | $ (643,535,779.48) | |
| | | | | | | | | | | Total Net Potential Overpayment | | $ (87,121,414) |

# AWP Lawsuit Spreadsheet Notes:

- Finley and Buckley (FB) claim the State has overpaid for prescription drugs since a GAO study showed the average acquisition cost of drugs was 21.84% off the Average Wholesale Price (AWP).

- DCH currently reimburses drugs at the lessor of the following: AWP-11%; the provider's usual and customary; the Most Favored Nation Rate (~ AWP-16%); State Maximum allowable charge (AWP-66%); or Federal Maximum allowable charge.

- If DCH providers were acquiring drugs at AWP-21.84%, then Medicaid should have been reimbursing providers at that rate (acquisition) plus a reasonable dispensing fee. The spreadsheet provided looks at the following:

    - Potential overpayments for branded drugs was calculated using the following methodology: $(AWP-21.84\%) - (AWP- Discount_{year\ x})$.

        - Overpayment for years 1991-2006 based on the FB methodology shows a potential overpayment of $556,414,365.

    - If FB's premise is that AWP is inflated by 21.84%, then a look at the generic drug payments is also warranted.

    - Potential payment discrepancies for generic drugs were calculated using the following methodology: $(AWP-21.8\%) - (AWP-60\%)$. AWP-60% represents the impact of our state maximum allowable cost program. We are currently at AWP-66%, but I backed it down for previous years where the discount may not have been as aggressive.

        - Payment discrepancies for the generic drugs from 1991-2006 showed a potential underpayment to providers of $643,535,779.

    - The net impact if all the above assumptions are accepted, it would show a net potential underpayment to providers of $87,121,414.

Comments:
- It is not DCH's position that we have paid providers less than acquisition cost.
- The AWP calculation methodology has not been set forth in any statute or government guidance. Therefore, a claim that an undefined calculation methodology is unfair or misreported is not one that DCH can support.
- DCH has made reasonable attempts through the pricing methodology and rebate program to mitigate some portion of the inflated AWP pricing practices of pharmaceutical manufacturers.
- The methodology utilized to estimate potential overpayments by the State is not Georgia-specific. Application of a global GAO study figure without an in-depth

analysis of reported AWP compared to pharmacy actual acquisition costs would have to prove out the proposed methodology. This has not been performed.
- Should the methodology proposed be applied to the generic utilization for Georgia Medicaid, there is a question of potential underpayment to providers for generic drugs. While the DCH Medicaid MAC payment for generics is aggressive, it does not pay providers below acquisition cost for drugs.