# EXHIBIT A

Page 1

```
            UNITED STATES DISTRICT COURT
             DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE
LITIGATION                      MDL No. 1456
_____
THIS DOCUMENT RELATES TO:       Master File No.
                                  01-CV-12257-PBS
_____ Subcategory No.
                                  06-CV-11337-PBS
United States of America, ex rel.
Ven-A-Care of the Florida Keys, Judge Patti B. Saris
Inc., v. Abbott Laboratories,
Inc.                            Magistrate Judge
                                 Marianne B. Bowler
CIVIL ACTIN NO. 06-11337-PBS

                    CONFIDENTIAL
   VIDEOTAPED DEPOSITION OF ELVIN M. MONTANEZ, PHARM.D.
     Taken on Behalf of the United States of America
                      VOLUME I

           DATE TAKEN:    APRIL 29, 2009
           TIME:          9:05 a.m. - 5:01 p.m.
           PLACE:         Sheraton Orlando North
                          600 North Lake Destiny Drive
                          Maitland, FL 32751


           Stenographically Reported by:
               Delina M. Valentik,
          Registered Professional Reporter
            Florida Professional Reporter
```

Page 174

1  Q. Prior to the break we were talking
2  about the time that you spent doing analyses as
3  part of developing your opinions in this case.
4  A. Uh-huh.
5  Q. And you said you spent 15 hours on
6  what we've termed as a labor analysis.
7  A. Uh-huh.
8  Q. Is that fair?
9  A. Uh-huh.
10     MR. TORBORG: Object to form.
11 BY MS. ST. PETER-GRIFFITH:
12  Q. And on hour on supplies -- on a supply
13 analysis?
14  A. Uh-huh.
15  Q. What did you do in those 15 hours to
16 do your analysis, to perform your analysis for
17 the labor analysis?
18  A. Well, the labor analysis that was
19 probably something that, you know, that takes
20 place -- again, if you asked me to tell you how
21 home infusion service is provided, I can do that
22 in very short order. I can write down for you,

Page 175

1  you know, what we do because we do it every day.
2  So my analysis of 15 hours that was actually
3  conducted beyond -- previous to what was required
4  in this report. You know, part of it you see in
5  that infusion partners diagram. That was part of
6  my 15 hours as far as the study. So you can look
7  at that analysis there and you can see I had to,
8  one, participate either sitting with a pharmacist
9  or participating as a pharmacist in the activity
10 in this case I did both. I observed pharmacists
11 that were working for me at the time. And I also
12 participated as a pharmacist at the time
13 servicing patients, documenting my time, knowing,
14 you know, just from looking at the clock knowing
15 how long it takes for me to do the particular
16 services that were documented. Also checking the
17 product compounding. You know, the people who
18 are in the sterile product compounding area of
19 the home infusion rooms also called SPCs, looking
20 at how long it takes for them to make seven bags
21 of TPN or, you know, three bags of vancomycin and
22 also doing it myself.

Page 176

1  As part of being a pharmacist you have
2  to take responsibility for servicing your
3  patients after hours which means that you're on
4  your own and your normal responsibilities as a
5  pharmacist during a regular work day would be to
6  service the clinical aspects, you know, study the
7  patients. But after hours you yourself may be
8  the one that was actually doing the mixing, who's
9  actually doing the delivery, who's actually doing
10 the checking, you're working on your own and in
11 many home infusion companies that's the case,
12 after hours is a skeleton crew.
13     So the experience that I have in those
14 15 hours is both through observation and through
15 self, you know, participating in myself.
16  Q. So are you testifying that you spent
17 15 hours working in the pharmacy or observing
18 other pharmacists?
19     MR. TORBORG: Objection form, misstates
20 testimony.
21     THE WITNESS: I'm testifying that, yes,
22 I observed pharmacists. I mean, I am the

Page 177

1  operations manager in these pharmacies that, you
2  know, I work for. So observation is -- is, you
3  know, common to what I have to do on a daily
4  basis. But I observe them. And I also
5  participated in what they did.
6     I also observed the -- you know, the
7  nurse that was doing the intake coordination.
8  BY MS. ST. PETER-GRIFFITH:
9  Q. Okay. How much time and when did you
10 spend observing pharmacists in formulating your
11 labor analysis?
12     MR. TORBORG: Object.
13     THE WITNESS: Again, I think I've
14 answered that as far as the 15 hours. But I can
15 tell you that over the 14 years I've done it on
16 many occasions.
17 BY MS. ST. PETER-GRIFFITH:
18  Q. I'm -- I don't think you have answered
19 the question with regard to the 15 -- well, let's
20 start this. When did you expend those 15 hours
21 conducting this analysis?
22  A. Over the process of 15 years I would

45 (Pages 174 to 177)

Page 194

1  was how he -- how was he an expert in home
2  infusion or something like that.  And he started
3  with his first experience.  And looks like you're
4  moving on.  Do you want him to go through all of
5  his experience now or do you want to do it sort
6  of in piecemeal?
7       THE WITNESS:  I mean, I think we should
8  since the question was asked because I don't
9  think I've answered it thoroughly, but that's how
10 I started.
11      MS. ST. PETER-GRIFFITH:  I was planning
12 on having him go through each and every --
13      MR. TORBORG:  Okay.  If you're going to
14 do it by steps, that's fine.
15      MS. ST. PETER-GRIFFITH:  Yeah.  I was
16 planning on doing it by steps, sort of.
17      THE WITNESS:  Okay.
18 BY MS. ST. PETER-GRIFFITH:
19      Q.  But I want you to tell me why it is --
20      A.  Uh-huh.
21      Q.  -- Dr. Montanez, that you are holding
22 yourself as an expert in home infusion.

Page 195

1       A.  Okay.  I believe from that point until
2  1998 I worked as a home infusion pharmacist and
3  many of my colleagues told me that I was
4  innovative and I did things that other
5  pharmacists either weren't capable of doing or
6  weren't willing to do.  And that is I went, you
7  know, into patients homes.  I experienced health
8  care firsthand.  It wasn't just, you know, behind
9  the counter or in a laboratory creating drugs.  I
10 went to patients homes with those drugs.  I
11 delivered.  I saw every aspect.  And that enabled
12 me to really discuss in a meaningful way what
13 needed to be done with a patient when discussing
14 it with their primary caregiver.  That set me
15 apart as an expert in pharmacy, as a pharmacist.
16      Q.  Okay.
17      A.  I think physicians were recognizing
18 that.  And we saw the referral activity increase
19 as a result.  We actually heard in many areas
20 physicians specifically requesting that home
21 infusion be provided by a specific entity, the
22 entity that I worked for, as a result of their

Page 196

1  comfort level with what was happening in the
2  home.  That process continued when I was promoted
3  to the corporate office to be the director of
4  clinical operations in which I revamped all the
5  policies and procedures for at the time it was
6  six home infusion operations.
7       Q.  I don't want to interrupt you as
8  you're discussing this.
9       A.  Uh-huh.
10      Q.  But can I just ask you for the names
11 of the entities and the years as you go through
12 your experience.
13      A.  Okay.  Well, I was promoted in 1998 to
14 ProHealth Medical which is their corporate
15 office.  Florida Hospital Home Infusion was the
16 name of the pharmacy, home infusion pharmacy
17 where I started in home infusion.
18      Good Samaritan Medical Center was where
19 I was the director of pharmacy prior to that and
20 I was the director for four years.
21      My CV kind of chronologically goes
22 through all of that, so if you want to use that

Page 197

1  as a reference, it's there, I believe.
2       Q.  We can -- we can use it or whatever is
3  easiest for you --
4       A.  Okay.
5       Q.  -- to discuss the answer to the
6  question --
7       A.  Uh-huh.
8       Q.  -- about the bases for your expertise.
9  I believe the CV, if you want to refer to it, is
10 the exhibit that we looked -- it was the last
11 page Exhibit 4.
12      A.  Okay.  I don't think I need it.
13      Q.  Okay.  Well --
14      A.  Because I'm pretty familiar with the
15 CV.
16      Q.  Okay.
17      A.  But I was promoted at the time to
18 ProHealth Medical where I became the director of
19 operations and -- clinical operations and from
20 there the director of operations which involved
21 all clinical and nonclinical activities and I've
22 been the vice president of operations for

Page 198

 1  ProHealth Medical since I want to say 2004 or
 2  2003.
 3      Q.  Is that a position you currently hold?
 4      A.  That is the position I currently hold.
 5      Q.  Do you have any --
 6          MR. TORBORG:  Excuse me.  I just want
 7  to make sure, do you have anything else you want
 8  to say about why you believe you're an expert in
 9  the area of home infusion?
10          THE WITNESS:  Again, because I do it
11  every day.  I've been doing it every day for the
12  past 14 years.  I've been taking care of patients
13  for the past 14 years.  I've been contracting
14  with third party payors for the past 14 years.
15  When I was even a pharmacist I was involved in
16  the contracting even though it wasn't my direct
17  responsibility I was asked, what are we looking
18  at as far as, you know, this proposal, you know.
19  Back in the days when capitation was common, I
20  was asked to evaluate what -- what capitation
21  risks are we looking at here and look at the
22  conditions, again, I've been doing it every day,

Page 199

 1  buying, selling the services, developing policy
 2  and procedure for those services, modifying the
 3  policies and procedures for those services,
 4  adapting everything that has been brought to our
 5  industry's attention either through
 6  accreditation, through government, through, you
 7  know, third party payor requirements, you know,
 8  even the scientific, you know, body of health
 9  care when new conditions or new disease states
10  are identified as being a viable option for
11  treatment in the alternate site which is another
12  term for home infusion, an alternate site other
13  than hospital, I've been involved in it.
14          I've, you know, if your -- I think if
15  you're in a specific profession for as long --
16  you know, if it's your chosen profession, not
17  only are you going to be involved in it every
18  day, but you're also going to continuously be
19  reading, you know, you're going to be reading
20  things that may be pertinent to your industry
21  either through internet bulletins or e-mails or
22  through journals, through your membership in your

Page 200

 1  organization.
 2  BY MS. ST. PETER-GRIFFITH:
 3      Q.  Okay.  Any other reason why you're a
 4  home infusion expert?
 5      A.  I'm sure I could go on, but I think,
 6  you know, this deposition should, you know,
 7  probably have what I'm trying to say is I'm an
 8  expert because I've been involved in every aspect
 9  of home infusion you can think of.  Every aspect
10  you can think of.  I've been involved in it.  If
11  it was in home care or home infusion, I was aware
12  of it and I was -- I was involved in it.
13      Q.  You use the term continuously reading,
14  what information do you continuously read?
15      A.  Whatever comes across, you know, my
16  desk.  I have, you know, as a member of the
17  National Home Infusion Association, you know,
18  you're preview to their website, so, you know,
19  you can always go into their website and read new
20  articles.  They have list serves that you can
21  participate in.  These list serves are, you know,
22  very active.  You know, you throw out questions.

Page 201

 1  You communicate electronically as a community
 2  resources and it's actually quite, you know,
 3  quite efficient.
 4          There's journals.  There's American
 5  Society of Health System Pharmacists.  You know,
 6  they have a journal called the American Journal
 7  of Hospital Pharmacy.  You know, probably other
 8  journals out there that I'm not citing, but if it
 9  catches your eye, you pick it up and you read it.
10      Q.  Anything else that you can recall
11  reading?
12      A.  No.  I've read more than I can recall.
13      Q.  Okay.  You indicated earlier that
14  ProHealth -- is ProHealth the parent company for
15  six home infusion operations.
16      A.  They're a parent company now for five.
17  At one point it was six.  We had a joint venture
18  with Orlando Regional Home Infusion which is no
19  longer in operation.  I believe that was
20  purchased by Orlando Regional Hospital some time
21  in 1990, I would like to say eight.  And I'd like
22  -- I believe the purchase was because we ran such

|                                                         |                                                         |
| ------------------------------------------------------- | ------------------------------------------------------- |
| Page 202                                                | Page 204                                                |

 1  a good -- such a good program that the hospital
 2  said we want to take this over, we like it so
 3  much.
 4        Q.  What are the other entities?
 5        A.  The other entities are Florida
 6  Hospital Home Infusion, Broward Infusion Group,
 7  H. Lee -- I mean, not H. Lee -- Access Infusion
 8  Partners.  Health First Infusion.  And BioPlus
 9  Specialty Pharmacy Services.
10        Q.  Is -- what is ProHealth?
11        A.  ProHealth is a -- like a parent
12  company that's like -- acts as a management
13  company.  ProHealth is where we develop policy
14  and procedure.  We handle all of the HR and
15  benefits, accounting, both receivables and
16  payables for all of those entities.  What we did
17  was we created a business model that allowed us
18  to develop infusion companies without investing
19  in all that resource each time we develop an
20  infusion center, so you can call it a management
21  company.
22        Q.  Okay.  Is it also a distribution -- a

 1  experience as an expert in this case.
 2        A.  Okay.
 3        Q.  So what are your job responsibilities,
 4  let's start with for ProHealth.
 5        A.  Okay.  Again, policy and procedure
 6  really involves process, structure and function
 7  of your business.  I'm involved in everything
 8  there from A to Z.  So that makes me very familiar
 9  with the processes and procedures that are
10  conducted at every one of the facilities.
11           The contracting side I'm directly
12  responsible for participating and assisting in
13  contract negotiations with third party payors.
14  Sometimes, you know, adjudicating and resolving,
15  you know, problem claims.  You know, looking at,
16  you know, various issues that may have a claim
17  held up that has an operational or clinical
18  question, I'll help in -- in that regard.
19           Purchasing, we decide purchasing policy
20  based on cost effectiveness, cost efficiency,
21  performance of a product or supply.
22           The technology, the IT department

|                                                         |                                                         |
| ------------------------------------------------------- | ------------------------------------------------------- |
| Page 203                                                | Page 205                                                |

 1  distributor pharmacist --
 2        A.  No.
 3        Q.  -- pharmacy?
 4        A.  They don't -- ProHealth does not
 5  purchase anything or sell anything.
 6        Q.  Are you at all involved with any
 7  entity other than ProHealth and these five
 8  interrelated infusion pharmacies?
 9        A.  I am.  I'm involved with the National
10  Home Infusion Association.
11        Q.  Okay.
12        A.  American Society of Health System
13  Pharmacists, Florida Society of Health System
14  Pharmacy and the -- I've been on the board for
15  the Community Health Accreditation Program for --
16  on my third term and each term is three years.
17        Q.  Okay.  What I'd like to go over now,
18  sir, is what specific experience that you have
19  with these entities, with ProHealth and these --
20  these interrelated pharmacies --
21        A.  Uh-huh.
22        Q.  -- that you contend inform your

 1  reports directly to me and so we're constantly
 2  looking at health care technologies, what works,
 3  what doesn't work.  You know, what theoretically
 4  saves you money.  What actually saves you money.
 5           The billing department, in that case
 6  we're always looking at performance where are we
 7  performing well, where aren't we.  When it comes
 8  to billing I think it really has more to do with
 9  the fact that there really is no standardized
10  billing format for home infusion, so a lot of it
11  is still paper, HCFA-1500s.  Some of it is being
12  done electronically now.  But it's very laborious
13  and so you have to get involved in how efficient
14  that process works.
15        Q.  Anything else for ProHealth?
16        A.  Well, I'm on the executive team.  You
17  know, the executive team is always looking -- I
18  think the executive team looks at current and
19  forward thinking projects.  We tend to be a
20  little bit bigger on the scope there as to what
21  emerging opportunities are there in home infusion
22  that we could, you know, participate in.

Page 234

1  for my company to be exposed to right now.
2     Q.  Well, your report discusses the
3  complaint products, does it not?
4     A.  It does.
5     Q.  Okay.  All I'm trying to find out
6  about is and what we can do is why don't we start
7  going back to '95.
8     A.  Uh-huh.
9     Q.  Or for any point in time from the '91
10 -- well, your experience with the complaint
11 products --
12    A.  Uh-huh.
13    Q.  -- only dates back to --
14    A.  '95.
15    Q.  -- '95.  Okay.
16    A.  My experience with the complaint
17 products go back beyond that, but as it pertains
18 to the hospital.
19    Q.  Okay.
20    A.  Okay.
21    Q.  So not the home infusion market?
22    A.  No.

Page 235

1     Q.  Is it fair to say that your home
2  infusion experience begins in '95?
3     A.  Yes.
4     Q.  From '95 through 2001 what was
5  ProHealth or any of the interrelated pharmacies
6  paying Abbott for vancomycin?
7         MR. TORBORG:  Object to form.
8         THE WITNESS:  Again, it would be, you
9  know, it would be a range of, you know, the cost.
10 I'd have to go back and -- and see.  We'd have to
11 look at it and see.  I can only tell you it would
12 be -- you know, it's not all that different.
13        MR. TORBORG:  Which vancomycin?
14        THE WITNESS:  You know, there's the --
15        MS. ST. PETER-GRIFFITH:  Any of them.
16        THE WITNESS:  The 500 milligram.  The
17 one gram.  I'd have to go back and see.
18 BY MS. ST. PETER-GRIFFITH:
19    Q.  Do you remember what you were billing
20 Florida Medicaid for vancomycin?
21    A.  I remember that it was being billed at
22 AWP and the formula integer I think they were

Page 236

1  using AWP minus.
2     Q.  AWP minus a percentage?
3     A.  Yeah.
4     Q.  Okay.  So did you ever notify in
5  between -- for the '91 -- I'm sorry.  For the '95
6  through 2001 time frame did you ever notify
7  Florida Medicaid as to what your estimated
8  acquisition cost was for any of the vancomycin
9  products that you were billing to Florida
10 Medicaid?
11        MR. TORBORG:  Object to form.
12        THE WITNESS:  You know, if I notified
13 'em it was because they asked for it.  I never
14 volunteered the information.
15 BY MS. ST. PETER-GRIFFITH:
16    Q.  Why not?
17    A.  Because I thought that was public.
18 I'm inquiring -- as far as AWP, that's public
19 record.  As far as the acquisition cost, you
20 know, if we had to report it, I would have.  And
21 I'm sure I did, if I had to.
22    Q.  Did you -- did you recover a spread in

Page 237

1  between the -- for the '95 through 2001 time
2  period, did you recover a spread for your
3  vancomycin Medicaid billings between what you
4  paid for it and what you recouped from Florida
5  Medicaid?
6     A.  I did.
7         MR. TORBORG:  Object to form.
8  BY MS. ST. PETER-GRIFFITH:
9     Q.  Do you remember what the general range
10 of that spread was?
11    A.  I don't recall off the top of my head.
12    Q.  Was that spread important to the
13 operation of ProHealth or any of the interrelated
14 pharmacies?
15    A.  It was important to covering the cost
16 of the interrelated pharmacy.
17    Q.  And what cost did it cover?
18    A.  It covered the cost of the services.
19 I believe I go into that in pretty good detail in
20 my expert report.
21    Q.  So your expert report then it's your
22 contention explains how ProHealth and its

Page 238

1  interrelated pharmacies used the vancomycin
2  spread. Correct?
3      MR. TORBORG: Object to form.
4      THE WITNESS: No, we didn't use the
5  vancomycin spread. It was there. You know, we
6  just -- I think if you're suggesting that we
7  purchased vancomycin to take advantage of the
8  spread, no, that wasn't the case. Vancomycin was
9  an order that comes on a prescription and let me
10 tell you in '95 through 2001 there were very few
11 manufacturers of that particular product and even
12 fewer manufacturers that were able to produce it
13 on a readily available basis so that you could
14 acquire it and provide it.
15 BY MS. ST. PETER-GRIFFITH:
16     Q. In billing Florida Medicaid why didn't
17 you use the estimated acquisition cost?
18     MR. TORBORG: Object to form.
19     THE WITNESS: The estimated acquisition
20 cost is something if I was required to provide
21 it, I provided it. Was I required to provide it?
22 BY MS. ST. PETER-GRIFFITH:

Page 239

1      Q. Well, you testified earlier that you
2  billed AW -- AWP minus.
3      A. Uh-huh.
4      Q. You never told Florida Medicaid what
5  you were actually paying for the product?
6      A. If they required that I report it, I'm
7  sure I did. I mean, I was compliant with
8  Medicaid.
9      Q. Okay. What did you utilize the
10 vancomycin spread to pay for? You said services,
11 anything else?
12     A. And supplies.
13     Q. And this is for the entire '95 through
14 2001 time period?
15     A. Certainly.
16     Q. What service and supplies did you
17 utilize the vancomycin spread to pay for?
18     A. The services include everything that's
19 included in providing vancomycin care. All the
20 clinicians, technicians, drivers, nurses involved
21 in any particular case of vancomycin. There is
22 the overhead or the indirect costs that that was

Page 240

1  utilized to pay for. The indirect cost I think go
2  into -- we can -- you know, it's -- it's very
3  exhaustive, but the ABT report, I think, does a
4  very good job of detailing that.
5      Q. This is the ABT report that you
6  referenced before?
7      A. The ABT report that is referenced in
8  2006.
9      Q. The one that you didn't utilize the
10 paper for your -- purposes of your report, just
11 your recollection?
12     A. Correct.
13     Q. Did that ABT report have anything to
14 do with Florida Medicaid?
15     A. No. It had everything to do with the
16 per diem costs, the service costs, the direct and
17 indirect costs of providing drugs such as
18 vancomycin.
19     Q. In what state did the ABT report
20 pertain?
21     A. I believe --
22     MR. TORBORG: Object to form.

Page 241

1      THE WITNESS: Yeah, I believe they
2  didn't make state conclusions. I think they made
3  general conclusions.
4      MS. ST. PETER-GRIFFITH: Okay.
5      THE WITNESS: By taking samples from
6  different states.
7  BY MS. ST. PETER-GRIFFITH:
8      Q. Any other services that you utilized
9  the vancomycin spread to pay for?
10     A. Vancomycin cost of providing the
11 service.
12     Q. Do you know whether the federal law
13 authorized the use of Medicaid funds to pay for
14 these services?
15     MR. TORBORG: Object to form.
16     THE WITNESS: I'm sure you're going to
17 tell me. I can go back and look at my reports,
18 but you're saying the federal law, off the top of
19 my head right now, no.
20 BY MS. ST. PETER-GRIFFITH:
21     Q. What about supplies, what supplies did
22 you utilize -- what supplies did ProHealth for