# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

```
-------------------------X
IN RE PHARMACEUTICAL          )
INDUSTRY AVERAGE WHOLESALE    )
PRICE LITIGATION,             ) MDL No. 1456
_____     ) Civil Action No
THIS DOCUMENT RELATES TO:     ) 01-12257-PBS
_____     ) Judge Patti B.
United States of America,     ) Saris
ex rel. Ven-A-Care of the     ) Mag. Judge
Florida Keys, Inc., v.        ) Marianne Bowler
Abbott Laboratories Inc.      )
Civil Action No.              )
06-11337-PBS                  )
-------------------------X
```

Videotaped Deposition of CYNTHIA B.
SENSIBAUGH, a witness herein, at the offices of
Jones Day, 51 Louisiana Avenue, N.W., Washington,
D.C. commencing at 9:11 a.m. on Friday, March 7,

```
                                          Page 74
 1       MR. GOBENA:  Or, Tina, you will have it
 2  in front of you there.
 3       MS. TABACCHI:  I have it.
 4       MR. GOBENA:  And we'll give it to the
 5  witness.
 6       (Exhibit Sensibaugh 006 was marked
 7  for identification.)
 8       BY MR. GOBENA:
 9    Q.  This is a document that we went over
10  during your 30(b)(1) deposition, Ms. Sensibaugh.
11  It's a February 10 interoffice correspondence from
12  you to Don Buell, B-u-e-l-l, Michael Heggie, Chris
13  Lockett and Rich Masterson.  And it's regarding
14  the President's budget proposal on Medicare
15  reimbursement of outpatient drugs.
16       And you wrote, "As you know, the
17  President included a provision in his fiscal year
18  1998 budget proposal that would base the Medicare
19  reimbursement for outpatient drugs on acquisition
20  cost rather than AWP," which is something you just
21  testified to having knowledge about.
22       Abbott opposed the President's 1998
```

```
                                          Page 75
 1  budget proposal shifting Medicare drug
 2  reimbursement from AWP to acquisition cost; isn't
 3  that correct?
 4       MS. TABACCHI:  Object to the form.
 5       THE WITNESS:  Abbott didn't take a
 6  position on the acquisition cost shift.
 7       BY MR. GOBENA:
 8    Q.  I want to read some testimony to you
 9  from Mr. Landsidle -- from his deposition, and you
10  reviewed his transcript; isn't that correct?
11    A.  That is correct.
12    Q.  I asked him a question -- this is on
13  page 200 of the transcript, and I said -- I asked
14  him, "And at least as of June 1997, Abbott opposed
15  the President's budget proposal that would have
16  switched the reimbursement of drugs from AWP to
17  acquisition costs; isn't that correct?"
18       Ms. Tabacchi objected to the form.
19       Mr. Landsidle testified, "Looking at
20  this memo, I would have to say that that was the
21  position."
22       MS. TABACCHI:  Object.
```

```
                                          Page 76
 1       BY MR. GOBENA:
 2    Q.  Mr. Landsidle testified that Abbott's
 3  position was that it was opposed to a shift from
 4  an AWP-based system to an acquisition cost system.
 5  Are you saying that Mr. Landsidle was incorrect
 6  when he stated that in his testimony?
 7       MS. TABACCHI:  Object to the form.
 8       THE WITNESS:  Yes, I'm not aware of any
 9  public position Abbott took on that.
10       BY MR. GOBENA:
11    Q.  But was Mr. Landsidle incorrect that
12  there was at least an internal position that
13  Abbott was opposed to a shift from an AWP-based
14  reimbursement system under Medicare Part B to an
15  acquisition cost-based system?
16       MS. TABACCHI:  Object to the form.
17  Beyond the scope.
18       THE WITNESS:  I'm not prepared to
19  testify on -- correct or incorrect on that.
20       BY MR. GOBENA:
21    Q.  In the next sentence of your memo you
22  say, "An industry meeting to discuss strategy with
```

```
                                          Page 77
 1  regard to this issue has been tentatively
 2  scheduled for Thursday, February 20."
 3       I believe you testified last time that
 4  you can't recall whether that meeting actually
 5  happened.  Is my recollection correct?
 6       MS. TABACCHI:  Object to the form.
 7       THE WITNESS:  That is correct that I do
 8  not know that that meeting actually occurred.
 9       BY MR. GOBENA:
10    Q.  Well, this memo suggests that you were
11  authorized to have meetings with other members of
12  the pharmaceutical industry about this proposed
13  change from an AWP-based system to an acquisition
14  cost-based system in 1997; isn't that correct?
15       MS. TABACCHI:  Object to the form.
16  Beyond the scope.
17       THE WITNESS:  Well, when I look at this
18  memo, it seems to be reporting that a meeting will
19  occur, but it doesn't say anything about
20  attendance or who -- whether someone will attend.
21       BY MR. GOBENA:
22    Q.  You go on to say, "We would like to get
```

20 (Pages 74 to 77)

Page 82

1  documents say, yes.
2        BY MR. GOBENA:
3     Q.  And Ms. Tobiason, in her memorandum,
4  raised reservations about Medicare reimbursing for
5  drugs at AWP minus 15 percent; isn't that correct?
6        MS. TABACCHI:  Object to the form.
7  Beyond the scope of the notice.
8        THE WITNESS:  I would say her memo does
9  go through issues that she raised -- a summary as
10 well as issues that she raised with the rule, yes.
11       BY MR. GOBENA:
12    Q.  And Mr. Robertson, in his June 14, '91,
13 memo, which you have there as one of the exhibits,
14 stated that, you know, shifting to an AWP minus
15 15 percent reimbursement structure in the rules
16 was not good for -- had significant implications
17 for Abbott's business; isn't that correct?
18       MS. TABACCHI:  Object to the form.
19 Beyond the scope of the notice.
20       THE WITNESS:  Yes, he does say that in
21 his memo.
22       BY MR. GOBENA:

Page 83

1     Q.  And Ms. Hanrahan, in discussing
2  meetings with outside groups about proposed
3  changes to Medicare's drug -- the way that
4  Medicare reimburses for drugs in her June 1994
5  memo about the Booth proposed survey, says that
6  Abbott -- or not Abbott -- at least she and
7  someone else, because she says "our" -- were
8  concerned about Mr. Booth's proposed survey to
9  determine acquisition costs for certain drugs
10 reimbursed by Medicare Part B; isn't that correct?
11       MS. TABACCHI:  Object to the form.
12 Beyond the scope of the notice.
13       THE WITNESS:  Yes, she does say that in
14 her memo.
15       BY MR. GOBENA:
16    Q.  And is it fair to say, Ms. Sensibaugh,
17 that every time there was a proposed change to the
18 way that Medicare reimbursed for drugs, whether
19 it's the '91 proposed reg or this proposed survey
20 by Mr. Booth or the proposed shift to an
21 acquisition cost-based reimbursement system,
22 Abbott opposed those changes?

Page 84

1        MS. TABACCHI:  Object to the form.
2  Beyond the scope.
3        THE WITNESS:  Well, you lumped them all
4  together, but, you know, as we discussed, Abbott
5  had not taken a position on those particular
6  issues.
7        MR. GOBENA:  I will try and cut through
8  some exhibits here to go faster.  Let's have this
9  exhibit marked as Sensibaugh 30(b)(6) Exhibit 7.
10       (Exhibit Sensibaugh 007 was marked
11 for identification.)
12       BY MR. GOBENA:
13    Q.  What I am going to do is I am not going
14 to focus on the whole document.  I am just going
15 to focus on the second page, item Roman numeral V,
16 Medicare reform.  And while you're looking at
17 that, I will just identify it for the record.
18 This is a June 5, '97, memorandum from David
19 Landsidle to Jose DeLasa and several -- carbon
20 copies to several individuals.  And this is a
21 document I believe we reviewed at your 30(b)(1)
22 deposition.

Page 85

1        We were discussing earlier whether or
2  not Abbott had sort of an external official
3  position on the President's proposal to shift from
4  an average wholesale price position to an
5  acquisition cost-based position.  Do you recall
6  that?
7     A.  Yes, I do.
8     Q.  And you said that it was your
9  understanding that Abbott did not have an external
10 view on the issue, and you were not prepared to
11 testify as to whether the company had an internal
12 view on this shift in acquisition cost system;
13 isn't that correct?
14    A.  That is correct.
15    Q.  It -- there is an indication here in
16 this memo from Mr. Landsidle that he was meeting
17 with members of Congress about the proposed change
18 from an average wholesale price to an acquisition
19 cost-based Medicare drug reimbursement system.  Do
20 you see that there?
21    A.  I do see that bullet there.
22    Q.  And you reviewed Mr. Landsidle's

22 (Pages 82 to 85)

Page 138

1  memorandum itself which starts at ABT-DOJ 296491,
2  if you go to the -- if you review the memorandum,
3  it indicates that the pricing information in
4  attachment 1 is DOJ pricing information that
5  the -- CMS is asking the carriers to consider;
6  isn't that correct?
7          MS. TABACCHI:  Object to the form.
8  Beyond the scope.
9          THE WITNESS:  Yes, that's what it's
10 asking in the memo.
11         BY MR. GOBENA:
12    Q.   So basically this memo asking the
13 carriers to consider these DOJ prices was asking
14 carriers to make reimbursement decisions that
15 could affect Abbott drugs; isn't that correct?
16         MS. TABACCHI:  The same objections.
17         THE WITNESS:  Yes, to the extent they
18 would have impact on Medicare reimbursement for
19 these drugs, yes.
20         BY MR. GOBENA:
21    Q.   In addition to reviewing the program
22 memorandum -- the September 8, 2000, program

Page 139

1  memorandum, did you review any other documents in
2  connection with the activities reflected in that
3  2000 program memorandum?
4          MS. TABACCHI:  Object to the form.
5  Asked and answered.
6          THE WITNESS:  I just reviewed parts of
7  Mrs. Haas' testimony.  I think she talked about
8  this.
9          BY MR. GOBENA:
10    Q.   Do you know whether or not the
11 September 8, 2000, program memorandum was
12 withdrawn at any point by CMS?
13         MS. TABACCHI:  Object to the form.
14 Beyond the scope.
15         THE WITNESS:  As I remember, it was
16 withdrawn in, I think, November of that year.
17         MR. GOBENA:  We will have this marked
18 as Sensibaugh 30(b)(6) 14.
19         (Exhibit Sensibaugh 014 was marked
20 for identification.)
21         BY MR. GOBENA:
22    Q.   And this is a November 17 program

Page 140

1  memorandum which supersedes the September 8, 2000,
2  program memorandum, and I will read parts of it
3  into the record here.  It says, "This is to notify
4  you that you should not use the DOJ data attached
5  to program memorandum AB-00-86 in your next update
6  of Medicare payment allowances for drugs and
7  biologicals.  Instead, until further notice, you
8  should delay the use of this new source of average
9  wholesale price, and use the AWP data from your
10 usual source."
11         It goes to say, "While we continue to
12 believe that the AWPs reported in the usual
13 commercially available sources are inaccurate and
14 inflated above the true wholesale prices charged
15 in the marketplace, congressional action may
16 preclude the use of this alternative source.  To
17 avoid the disruption that would result from a
18 decrease in payment allowances followed by an
19 immediate increase due to final congressional
20 action, we are deferring the use of DOJ AWP data
21 until further notice."
22         Do you know whether or not Abbott had a

Page 141

1  position on whether the agency should or should
2  not have been using the DOJ data that was provided
3  in the September 8, 2000, program memorandum?
4          MS. TABACCHI:  Object to the form.
5  Beyond the scope.
6          THE WITNESS:  Yes, Abbott did not have
7  a position on the program memorandum.
8          MR. GOBENA:  I am going to have this
9  marked as Sensibaugh Exhibit 15.
10         (Exhibit Sensibaugh 015 was marked
11 for identification.)
12         BY MR. GOBENA:
13    Q.   While you're reviewing the document, I
14 will just identify it for the record.  This is an
15 e-mail from Rosemary Haas to Dale Johnson dated
16 November 22, 2000.
17         Once you have had a chance to review
18 it, Ms. Sensibaugh, let me know.
19    A.   Okay.  I've reviewed it.
20    Q.   Ms. Haas writes to Mr. Johnson, "Allow
21 me to clarify in response to your question, Dale.
22 The HCFA program memorandum is good news" -- and

36 (Pages 138 to 141)