# EXHIBIT 1

```
                                                                  Page 1
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MASSACHUSETTS
 2
 3
      In Re:                             )
 4    PHARMACEUTICAL INDUSTRY             ) CA No. 01-12257-PBS
      AVERAGE WHOLESALE PRICE             ) MDL No. 1456
 5    LITIGATION                          ) Pages 1 - 53
 6
 7
 8                           MOTION HEARING
 9             BEFORE THE HONORABLE PATTI B. SARIS
                    UNITED STATES DISTRICT JUDGE
10
11
12
13
                                 United States District Court
14                               1 Courthouse Way, Courtroom 19
                                 Boston, Massachusetts
15                               July 26, 2007, 2:05 p.m.
16
17
18
19
20
21
22
                              LEE A. MARZILLI
23                         OFFICIAL COURT REPORTER
                          United States District Court
24                        1 Courthouse Way, Room 3205
                              Boston, MA  02210
25                              (617)345-6787
```

```
 1   A P P E A R A N C E S:
 2   For the Plaintiffs:
 3        JOANNE M. CICALA, ESQ., JAMES P. CARROLL, ESQ.,
     AARON D. HOVAN, ESQ., and J. BRADLEY VATRT, ESQ.,
 4   Kirby, McInerney & Squire, LLP, 830 Third Avenue, New York,
     New York, 10022, appearing for the City of New York and all
 5   New York counties except Nassau.
 6        ROSS B. BROOKS, ESQ., Milberg Weiss & Bershad, LLP,
     One Pennsylvania Plaza, New York, New York, 10119,
 7   appearing for Nassau County.
 8        THERESA A. VITELLO, ESQ., Levy, Phillips & Konigsberg,
     LLP, 800 Third Avenue, New York, New York, 10022, appearing
 9   for Orange County.
10   For the Defendants:
11        LYNDON M. TRETTER, ESQ. and HOA T. T. HOANG, ESQ.,
     Hogan & Hartson, 875 Third Avenue, New York, New York, 10022,
12   appearing for Bristol-Myers Squibb and as liaison counsel for
     the defendants.
13
          JOHN T. MONTGOMERY, ESQ. and JOHN P. BUEKER, ESQ.,
14   Ropes & Gray, LLP, One International Place, Boston,
     Massachusetts, 02110, appearing for Schering and Warrick.
15
          MARK H. LYNCH, ESQ., Covington & Burling, LLP,
16   1201 Pennsylvania Avenue, N.W., Washington, D.C., 20004-2401,
     appearing for GlaxoSmithKline.
17
18
19
20
21
22
23
24
25
```

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  In Re:  Pharmaceutical Industry Average
 3   Wholesale Price Litigation, Civil Action No. 01-12257, will
 4   now be heard before this Court.  Will counsel please identify
 5   themselves for the record.
 6              MS. CICALA:  Good afternoon, your Honor.  Joanne
 7   Cicala from Kirby, McInerney & Squire on behalf of the City
 8   of New York and all New York counties in the first amended
 9   consolidated complaint except for Nassau.
10              MR. HOVAN:  Aaron Hovan, also with Kirby, McInerney
11   & Squire.
12              MR. CARROLL:  James Carroll from Kirby, McInerney &
13   Squire.
14              MR. BROOKS:  Good morning, your Honor.  Ross Brook,
15   Milberg Weiss, on behalf of Nassau County.
16              MR. VATRT:  Brad Vatrt, also with Kirby, McInerney
17   & Squire.
18              MR. VITELLO:  Good afternoon, your Honor.  Theresa
19   Vitello with with Levy Phillips on behalf of Orange County.
20              MR. TRETTER:  Lyndon Tretter, Hogan & Hartson, on
21   behalf of BMS and as liaison counsel for the defense.
22              MR. BUEKER:  Good afternoon, your Honor.  John
23   Bueker from Ropes & Gray on behalf of Schering and Warrick.
24              MR. MONTGOMERY:  John Montgomery for Schering and
25   Warrick as well.
```

Page 4

1            MR. DAVIS:  William Davis from Mintz Levin on
2    behalf of Eli Lilly, your Honor.
3            MR. LYNCH:  Mark Lynch for GlaxoSmithKline.
4            THE COURT:  All right, many familiar faces.  Is
5    there anyone up here who wants to introduce themselves?
6    Okay.
7            So we're in the next round, and maybe as a few
8    preliminary matters, I know you've seen the memo from the
9    United States on how FUL works, and I'm assuming that
10   everyone in this room agrees that that's basically how it
11   works.  Is that right?
12           MS. CICALA:  We do, your Honor.
13           MR. BUEKER:  I don't think we have any
14   disagreement.  I think that --
15           THE COURT:  It was a point of enormous confusion to
16   me before, and I think that that was an extremely helpful
17   description that both sides seemed to agree to.
18           MS. CICALA:  We do agree.
19           THE COURT:  So that helps me understand the FUL
20   claim, which was the primary reason why I permitted some sort
21   of an amendment, is because we didn't really know what it
22   was.  So to backtrack, it's the big issue outstanding in my
23   mind.  Let me just say this.  It strikes me that if a FUL
24   claim is to survive, it must be based on published price.  Is
25   that right?

```
 1            MS. CICALA:  Yes, absolutely, your Honor, the FUL
 2   is based on the lowest published price.
 3            THE COURT:  And if you looked at their little
 4   example, and I think the defendant actually laid it out in
 5   the brief, you know, Example 1, Example 2, Example 3 -- that
 6   was extremely helpful to me in understanding it -- I don't
 7   know if it was to you -- but it can't just be any published
 8   price.  It would have to have made a difference.
 9            MS. CICALA:  I completely agree.  It was actually
10   set out in our brief, your Honor.
11            THE COURT:  So it was yours?
12            MS. CICALA:  Yes.
13            THE COURT:  So don't you have to allege that for
14   each drug, that whatever the published price is was, A,
15   false, and, B, would have made a difference?
16            MS. CICALA:  Yes, your Honor, that's absolutely
17   what we have to allege and what we believe we have alleged in
18   our first amended complaint.
19            THE COURT:  So it's not relying on transactional
20   price?
21            MS. CICALA:  Well, it is relying on transactional
22   prices to the extent that what our argument is is that the
23   published prices must be tethered to what the actual provider
24   acquisition costs were, and we believe that that's consistent
25   with what HCFA and the OIG and the DOJ say.
```

 1              THE COURT:  But suppose --
 2              MS. CICALA:  So, for example, the defendants --
 3              THE COURT:  But have you actually done the checkup
 4   to say -- let's say that the AWP was or the WAC you would say
 5   was fictitious, under whatever measure it is.
 6              MS. CICALA:  Right, under whatever measure you use.
 7              THE COURT:  Did you then go back and look at the
 8   FUL for whatever time period we're talking about, a quarter
 9   or a year?
10              MS. CICALA:  Absolutely.
11              THE COURT:  And say whether or not that would have
12   taken it down?
13              MS. CICALA:  Yes, that's exactly what we did.  What
14   we did, first, we calculated what we believed the true
15   published price should have been based on the actual prices
16   to the providers, and then we applied to that number -- let's
17   call it an ASP, a true ASP -- we applied to that number
18   150 percent.  If we come up with a figure that is below the
19   FUL, then, we argue, had defendants reported their true ASP,
20   the FUL would have been lower.  And that's precisely what
21   we've --
22              THE COURT:  Now, in doing the ASP, I -- and maybe
23   I'm jumping too far ahead here --
24              MS. CICALA:  No, that's fine.
25              THE COURT:  -- I completely agree with the

Page 7

1  defendants that the pennies don't count.  There are too
2  many -- it creates a distortion.  And maybe to some extent
3  I'm importing knowledge that I've gained through my big
4  trial, but that's also one of the reasons of having an MDL
5  judge.
6           MS. CICALA:  Sure.
7           THE COURT:  They're sometimes used for samples,
8  sometimes for charity, it could have been for other reasons,
9  but no one's selling stuff at a fraction of a penny.  I think
10 that creates a distortion.  So if at some point you get
11 expert testimony that there is some other thing that I don't
12 understand, maybe; but I'm not going to let thousands of
13 drugs be a matter of discovery.  It's just too big an
14 expansion, based on what I understand.  So take those out.
15          MS. CICALA:  May I comment on that?
16          THE COURT:  And you've now recalculated based on
17 some sort of weighted average.
18          MS. CICALA:  Sure.
19          THE COURT:  So what does that do to the complaint?
20          MS. CICALA:  I can answer that precisely.  There
21 are 344 penny drugs at issue based on the AACs that we put in
22 Exhibit B to the complaint.  If we recalculate those based on
23 a weighted average, all but 26 would still be in the case.
24          THE COURT:  All right, so those 26 should come out
25 until you provide some sort of a good-faith basis, through

Page 8

```
 1   discovery or whatever --
 2              MS. CICALA:  That's fine.
 3              THE COURT:  -- that this isn't a sample, because
 4   samples are handed out, and it isn't a charity, and it isn't
 5   just an accounting placeholder.  Typically these drugs are
 6   sold -- well, I want a typical price.
 7              MS. CICALA:  Sure.
 8              THE COURT:  Not something that's likely to be
 9   something else, all right.  So that's point one.  So you
10   would say all the 26, if I use the 20 to 25 percent markup
11   range.
12              MS. CICALA:  Exactly right, yes.  And then, I mean,
13   I entirely respect where your Honor is coming from on the
14   pennies.  We put them in based on our understanding of the
15   wholesale data and given how many of them are pursuant to
16   contract and given the classes of trade we used.
17              And, also, we had run weighted averages before we
18   filed the first amended consolidated complaint, and as we saw
19   that in large part due to binary exercises they are out, we
20   felt comfortable with the methodology.  But, in any event,
21   your Honor, I guess the bottom line is, of the 344 penny
22   prices in the complaint, all but 26 would stay in based on a
23   weighted average.
24              THE COURT:  So the next issue is, the defendants
25   allege -- and it's a little hard for us, we didn't sit and
```

```
 1   trade because there's really not much of a retail class of
 2   trade there.
 3              THE COURT:  I understand that, but for at least the
 4   physician-administered drugs, which is why it's useful to
 5   have the list, it should roughly reflect where Medicare is
 6   going because they're the, you know, the big elephant in the
 7   room.  With respect to self-administered drugs, how is
 8   Medicare deciding what to do under the new Part D?
 9              MR. TRETTER:  Oh, under Part D as in "dog"?
10              THE COURT:  Are they doing anything like this?
11   This is why we need discovery.  I can't address that here.
12   And so you take a typical price in good faith, and that's
13   going to be enough, and it's going to be 30 percent, and
14   everything else is stayed.  And once I get further into this
15   case and I decide whether it's 30 or 24 or 25 percent, and
16   once I decide what classes of trade make sense according to
17   expert opinion, then I'll be able to start pruning down.
18              MR. TRETTER:  All right.  What I'm hearing, though,
19   your Honor, is, we're not engaging in nearly as much pruning
20   as the defendants hoped, because I think you'll get rid of
21   some NDCs here.  But, you know, remember, we had 133 in the
22   MDL, and you have 11,000 here.
23              THE COURT:  I understand that.  I'm on the same
24   page with you, but -- so I'm limiting you to 30 percent, and
25   it's a good-faith, whether it's median or average or typical
```

Page 23

1   through some publication, excluding pennies or low fliers --
2   median maybe makes sense -- but whatever you want to use
3   that's in good faith --
4            MS. CICALA:  Yes, the weighted average, I mean, the
5   weighted average is in good faith.
6            THE COURT:  Well, get rid of the pennies, though.
7            MS. CICALA:  Yes, but I gave you the statistics on
8   what happens to the pennies with the weighted average.
9   There's very little impact on the NDC.
10           THE COURT:  What if I added 30 percent?
11           MS. CICALA:  It sounds like Mr. Tretter is
12  representing something like 1,400 NDCs would fall out.
13           MR. TRETTER:  Well, that's just on the pills, and
14  then a few more would end up out in the PADs.  But once you
15  take out the pennies, probably it would be a little bit more.
16  But that was with the pennies.
17           THE COURT:  All right, what you're just going to
18  do, we're not going to have a new complaint here.  We're just
19  going to have a new exhibit.
20           MS. CICALA:  Okay.
21           THE COURT:  And you don't have to answer it.  It's
22  going to be called a "substitute exhibit" because I can't
23  keep going through these rounds of motions to dismiss.
24           MS. CICALA:  Your Honor, I would like to include
25  the below 30s in the exhibit so the Court has a complete list

```
 1                C E R T I F I C A T E
 2
 3
     UNITED STATES DISTRICT COURT )
 4   DISTRICT OF MASSACHUSETTS    ) ss.
     CITY OF BOSTON               )
 5
 6
 7
 8            I, Lee A. Marzilli, Official Federal Court
 9   Reporter, do hereby certify that the foregoing transcript,
10   Pages 1 through 53 inclusive, was recorded by me
11   stenographically at the time and place aforesaid in Civil
12   Action No. 01-12257-PBS, MDL No. 1456, In re:  Pharmaceutical
13   Industry Average Wholesale Price Litigation, and thereafter
14   by me reduced to typewriting and is a true and accurate
15   record of the proceedings.
16            In witness whereof I have hereunto set my hand this
17   31st day of July, 2007.
18
19
20
21               /s/ Lee A. Marzilli
                 _____
22               LEE A. MARZILLI, CRR
                 OFFICIAL FEDERAL COURT REPORTER
23
24
25
```

PRINTED DUPLICATE
The Original certified E-Transcript file was electronically signed using RealLegal technology.

Electronically signed by Lee Marzilli (501-148-248-2705)                    a857858e-3535-44c5-992e-2b164c2ab34e