# EXHIBIT A

### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

CITIZENS FOR CONSUME, et al  . CIVIL ACTION NO. 01-12257-PBS
  Plaintiffs             .
                     .
      V.             . BOSTON, MASSACHUSETTS
                     . DECEMBER 4, 2008
ABBOTT LABORATORIES, et al   .
  Defendants            .
. . . . . . . . . . . . . . . .

### TRANSCRIPT OF MOTION HEARING
#### BEFORE THE HONORABLE MARIANNE B. BOWLER
#### UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the United States:
Justin Draycott, Esquire, Anne St. Peter Griffith, Esquire, United States Attorney's Office, 99 N.E. 4th Street, Miami, FL 33132, 305-961-9000, justin.draycott@usdoj.gov.

George B. Henderson, Esquire, United States Attorney's Office, 1 Courthouse Way, Suite 9200, Boston, MA 02210, 617-748-3272, george.henderson2@usdoj.gov.

Gejaa T. Gobena, Esquire, United States Department of Justice, 601 D Street NW, Patrick Henry Building, Room 9028, Washington, DC 20004, 202-307-1088, gejaa.gobena@usdoj.gov.

For Abbott Labs.:
Jason Winchester, Esquire, Jones Day, 77 West Wacker Drive, Chicago, IL 60601-1692, 312-782-3939.

Sarah Reid, Esquire, Kelley Drye & Warren LLP, 101 Park Avenue, New York, NY 10178.

James R. Daly, Esquire, Jones, Day, Reavis & Pogue, 77 West Wacker Drive, Chicago, IL 60601-1692, 312-782-3939.

Court Reporter:
Proceedings recorded by electronic sound recording, transcript produced by transcription service.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

1                          <u>I N D E X</u>

2    Proceedings                                          3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    **P R O C E E D I N G S**

2        COURT CALLED INTO SESSION

3            THE CLERK:  The Honorable Marianne B. Bowler

4    presiding.  Today is December 4, 2008.  The case of the Abbot

5    Wholesale Price multi-district litigation, Civil Action No. 01-

6    12257, et al will now be heard.  Would counsel please identify

7    themselves for the record.

8            MR. DRAYCOTT:  Justin Draycott, United States

9    Department of Justice, for the United States.

10            THE COURT:  Thank you.

11            MR. HENDERSON:  George Henderson, assistant U.S.

12    Attorney for the United States.

13            THE COURT:  Thank you very much.

14            MR. DALEY:  Good morning, Your Honor, Jim Daley on

15    behalf of Abbott Laboratories.

16            MR. WINCHESTER:  Good morning, Judge, Jason

17    Winchester also for Abbott.

18            THE COURT:  Thank you very much.  Well, we're here

19    for a long morning.  We have a series of motions to be heard

20    and I'm a little late, but it was my understanding that there

21    was some negotiations going on.

22            Well, we'll take the motions in the order in which

23    they were filed.  So the first motion will be Docket Entry No.

24    5174, Abbott's motion to compel sufficient responses.

25            All right, Mr. Daley?

4

1          MR. DALEY:  Judge, if I may.  On our list we had

2    5112 as an earlier filed motion which is--

3          THE COURT:  Okay.

4          MR. DALEY:  --Abbott's motion to compel certain

5    testimony.

6          THE COURT:  Oh, I'm sorry.  Mr. Duffy, didn't list

7    them in numerical order.

8          THE CLERK:  I did not.

9          THE COURT:  Yeah, 5112 is - oh, I see.  Okay.

10         MR. DALEY:  Shall we do that one first, Judge?

11         THE COURT:  We shall.

12         MR. DALEY:  Okay.

13         THE COURT:  Let me just, I have them all right here.

14         MR. DALEY:  Your Honor, this is Abbott's motion to

15   compel testimony that relates to depositions that have been

16   taken where the government has instructed the witnesses not to

17   answer on the grounds of the deliberative process privilege.

18   And what we've done is there are many, many objections on that

19   ground.  We are not moving on them all.  Exhibit 1 to our

20   opening brief is the list of testimony and the instructions not

21   to answer that we are asking to be compelled.

22         One of the things we did earlier in the week, Judge,

23   was our view is that the lay of the land on the deliberative

24   process privilege has changed in light of Judge Saris' recent

25   ruling both in terms of releasing documents and some of her

1   comments.  We filed with the Court a copy of the transcript

2   and a copy of the Judge's recent order.  I have extra copies if

3   you need that.  But essentially Judge Saris has made--

4            THE COURT:  Maybe you can provide the law clerk with-

5            MR. DALEY:  Certainly.

6            THE COURT:  --a copy.  It will be of assistance.

7            MR. DALEY:  What happened, Judge, was that there were

8   certain, as I think the Court may be aware at least around the

9   edges, the documents were submitted to Judge Saris for in-

10  camera review.  She went through them; found that the lions

11  share of the documents submitted weren't even qualified for the

12  privilege.  They were not pre-decisional.  They were

13  communications with third parties.  They did not contain

14  information that ought to have been kept from us to begin with

15  and she released about two-thirds of those documents or three

16  quarters of them to us.  And then we had a hearing and the

17  Judge has made it very clear that at least for discovery

18  purposes matters concerning what the government knew and

19  understood and believed at the various times in this litigation

20  is material that the defendants are entitled to to make up

21  their defenses.  And so while this motion that we're talking

22  about today was filed before that, I think in the spring or in

23  the summer, subsequent events I think impact the rules of the

24  game.  And so what we are taking the position on--

25            THE COURT:  And have you discussed this with the

6

1    government since her ruling?

2            MR. DALEY:  Yes, Judge.  I've asked them--

3            THE COURT:  Have you tried to narrow this at all?

4            MR. DALEY:  I've asked them if they're willing to

5    move on any of this and they've told me that, at least on this

6    motion, they are unwilling.  And so we have, you know, our

7    defenses for Abbott and the other defendants involved in this

8    matter are basically get to what did the government know and

9    understand?  Did they have a policy relating to cross

10   subsidization?  Were they aware of that?  Did they allow it?

11   What did they know?  What did they consider?  What did they

12   look at?  What did they reject?  Did they look at ASP and say,

13   well, you know, we could do that but, you know, it'll mess up

14   the providers, it'll affect beneficiary access.  All that sort

15   of stuff is on the table for us to learn in discovery and what

16   we have is situations where for the witnesses that we've

17   included in Exhibit 1 the government has simply come in and

18   when we've asked them what they were doing, did they have

19   meetings, was this issue discussed; we are getting instructions

20   not to answer.  And so we're being foreclosed from the very

21   material that is essential to our defenses.  And what we've

22   done is we've put some examples in our opening brief, they're

23   also repeated in Exhibit 1, but one of, you know, an example

24   that I think tells the tale on this motion is we have Mr. Vito

25   who is the regional inspector for OIG and he was the author of

7

1  many of the reports that are from the defendant's perspective

2  critical to the case; reports of OIG going out, doing surveys,

3  talking about how big the spread is, 66%, et cetera, et cetera,

4  and people ought to be decreasing the amount reimbursement.

5       He testifies in his deposition that there are these

6  entrance and exit meetings between OIG and CMS.  When CMS goes

7  out to do an investigation they come in, they sit down with CMS

8  and they say here's what we're going to do and they talk about

9  the game plan.  And when it's done before they make the report

10  public they have an exit interview where they sit down, talk

11  about their findings and recommendations.  Now the government

12  has denied in their papers and in open court that they ever

13  paid any attention to what we call cross subsidization,

14  overpaying for the drugs because the dispensing and other

15  service fees were inadequate and letting the providers make up

16  the inadequate fees with overpayments on the drugs.

17       Mr. Vito testifies in his deposition that that very

18  subject was discussed on more than one occasion in these exit

19  and entrance interviews and meetings that he had personally

20  with CMS.  So we get the yes answer, the yes we discussed that

21  and then we ask him, okay, please tell us what was discussed.

22  Instruction, not to answer, deliberative process privilege,

23  period.  Now that is critical to our case.  It's the thing that

24  they deny.  They deny that they considered that, that they used

25  it in their analysis, that they dealt with it in any way, shape

1   or form.  We've got a witness who says it was discussed.  We

2   ask him about it.  It's a very strong point for us and so – we

3   have other examples.  I could go through them.  Same

4   preliminary read is in the brief.  These are the examples from

5   the brief, Judge.

6           In the brief he talked about cross subsidization.  He

7   talked about CMS having discussions where they recognize that

8   the spreads on generics were much larger than the spreads on

9   branded drugs, which is an important feature in our defense

10  because all of our drugs are generics, and so while the

11  government had certain expectations with respect to what the

12  spread was on branded drugs, the expectation in our view was

13  much larger and, you know, 66, 80% when you come to the generic

14  field.  He testified that, yes, yes, that's something we

15  discussed.  We ask him, okay, tell us what you discussed.

16  Instruction, not to answer.

17          So we're being foreclosed on this and what's

18  happening is that in the briefs the government comes forward.

19  They don't make the case that Judge Saris has made very clear

20  that they have to make.  They have to do two things.  One, they

21  have to show that this material was covered in the first

22  instance by the deliberative process privilege.  They have to

23  make a showing that it's pre-decisional, that it relates to a

24  particular decision that – and once they do that, which they

25  haven't done for any of these first of all in their briefs.

9

1   They don't even attempt to make that showing.  And then the

2   second step of the analysis and the one that Judge Saris

3   performed when she did the in-camera review was, okay, if it

4   does apply then we have to do the balancing test.  And the

5   question is is the government's interest in keeping this

6   confidential outweighed by the defendant's need for this

7   information to prosecute their defenses?  They don't even take

8   a crack at that in their briefs.

9        So in our view the government has not met its burden

10  to come forward and show that this material is, first of all,

11  qualifies for the DPP.  And secondly, that they can win the

12  balancing test, and for that reason we ask that we simply be

13  allowed to go forward and deal with the witnesses that are in

14  Exhibit 1.  I can tell you it is fairly limited testimony.

15  Again, we haven't asked for everything.  It is nine witnesses.

16  In the materials that I gave to your law clerks, Your Honor,

17  since this was briefed there's been a variety of depositions.

18  We've come up with only one more witness that we want to add to

19  it and that's in the supplementary materials.  So it's

20  essentially 10 witnesses, a fairly limited set of questions and

21  because the government has not met their burden it's our

22  position that we should just be allowed to take those

23  forthwith.

24        THE COURT:  Why shouldn't I grant your brother's

25  motion?

10

1          MR. DRAYCOTT:  First of all, the motion has already

2    been denied and the, your decision on that motion was upheld by

3    Judge Saris on precisely the witnesses, precisely the

4    deposition transcripts that are before you now.  Mr. Reed, Mr.

5    Vito, they were a subject of a motion that was Judge Saris'

6    November 9th ruling explicitly denied their objections to Your

7    Honor's rulings about the instructions given by the United

8    States to Mr. Vito and Mr. Reed at deposition.  These are

9    precisely on point.  Abbott just with respect to that issue

10   filed three briefs.  Two of them covered other privilege issue

11   but also specifically asked that Your Honor could overrule the

12   objections stated in the instructions given to Mr. Vito and Mr.

13   Reed and other witnesses.  They then filed a brief which was

14   wholly directed at the deposition of Larry Reed.  They then

15   filed supplemental briefs with Judge Saris and she said among

16   the rulings all the objections and all their arguments with

17   respect to the instructions given to government witnesses were

18   denied.  That's exactly on point.  And so what they, the first

19   thing that respectfully that Abbott should have done is explain

20   that they were seeking reconsideration of issues that have

21   absolutely been decided here and that request should have gone

22   to Judge Saris.

23          THE COURT:  What's your response to that, Mr. Daley?

24          MR. DALEY:  Judge, I don't think that Judge Saris

25   dealt with these precise issues.  And this motion that we're

11

1  talking about today was filed in the spring.  So, I don't

2  think Mr. Draycott is correct in terms of what Judge Saris

3  ruled upon.  I don't think she touched these particular issues.

4  And this has been pending since then and as I said the playing

5  field has changed with respect to what is in play on the

6  deliberative process privilege.

7         MR. DRAYCOTT:  In my response to this motion, I laid

8  out the entire 11 briefs that have been filed at that time on

9  the deliberative process privilege.  Docket No. 4474 they take

10 issue with instructions.  There is a brief filed on October 1st

11 under seal which was submitted a final brief to Judge Saris

12 regarding its objections to the order of the magistrate judge.

13 Your supplemental brief took issue with the government's

14 instructions to Larry Reed and it was directly in front of

15 Judge Saris and she gave them no relief on it.  And she said,

16 and I quote the ordered concluded with this statement, "That

17 the objections to the magistrate's order are otherwise denied."

18 She gave them a little bit of – she modified Your Honor doing a

19 little bit with respect to the categories of material, but

20 other than that they were completely denied with respect to the

21 objections that had been stated at deposition.

22        And again, it's a bit tedious to go through this now

23 but in our brief we laid out per docket entry every brief they

24 filed with respect to deliberative process privilege including

25 those which were specifically directed at instructions given,

12

1   the instructions that were given at deposition and which those

2   earlier briefs actually gave you the same transcript references

3   that are contained in this motion, the same testimony given by

4   Mr. Vito and the same testimony by Mr. Reed.  Now granted

5   they've added some witnesses at the end that are going to be

6   easier to dispose of because they're outside of timeframe.  So

7   the first thing I would say is that to the extent that they

8   want to renew the Court's inquiry on this issue it really ought

9   to be in the form of a motion for Judge Saris to reconsider an

10  order which explicitly overruled their objections or denied

11  their objections to the order of the November 7th that Your

12  Honor issued.

13        The next thing I have to say is that with respect to

14  deliberative process privilege there has been some, and this is

15  just by way of background, there have been hearings before

16  Judge Saris and an order issued by Judge Saris, on July 24th was

17  a hearing, November 13th and there's an order of November 5th.

18  However, the critical thing to understand is that Judge Saris

19  hasn't somehow thrown out the privilege or that she found that

20  we had asserted it where it was improper.  In some certain

21  situations she found that we have properly asserted the

22  privileges and then she undertook the balancing test and

23  allowed disclosure.  However, she has done that in an extremely

24  narrow category.  And this is a relatively recent development

25  and may require a further briefing of Your Honor, but the only

1  place where she is even requiring us to sub - first of all,

2  there's whole categories of material that she's excluded.  And

3  there's some important categories because they bear directly on

4  documents that have been submitted to you which are no longer

5  required to be reviewed in-camera.  For example, draft OIG

6  reports.  In the in-camera submissions we've made to you the

7  bulk of that material, in fact I think all of the material

8  except maybe two documents, are draft of OIG reports.

9        Judge Saris has explicitly said we don't have to

10  submit that for in-camera review.  She said that on November,

11  excuse me, on July 24th.  She absolutely explicitly confirmed

12  that we don't have to do that on July, sorry, November 13th.

13  And I can direct you to the point in the transcript, page 20

14  and page 21 of the November 13th transcript, and I took up the

15  issue of what we could exclude.  And I said--

16        THE COURT:  Page, again?

17        MR. DRAYCOTT:  20 and 21.  Well, first of all, back

18  on November, I'm sorry, on July 24th she said that we don't have

19  to submit OIG drafts.  She just outright excluded it as

20  something that we would have to submit.  She said on page 25,

21  and I quote, these are her words exactly, "Skip the OIG

22  reports."  She's talking about what we don't have to submit to

23  her for in-camera review.  "I'm not going to require every

24  draft of every OIG report.  That's ridiculous."  And I'm

25  quoting Judge Saris. " That's classic big firm litigation."

14

1    The on page 26, "I'm not going to require some Judge to look

2    at every draft of every OIG report."  That's what she said on

3    July 24th.

4              THE COURT:  Some Judge.

5              MR. DRAYCOTT:  I then came in on the 20th and I said

6    just for clarification, for example, one clarification I can

7    offer you that relieved us of a lot of the burden, this is me

8    talking, you've heard mention of the 42 documents that were

9    submitted to Judge Bowler but far and away the bulk of those

10   documents require, the bulk of those prior drafts – sorry.

11   You've heard mention of the 42 documents that we submitted to

12   Judge Bowler.  But far and away the bulk of those is prior

13   drafts of final OIG reports.  And then what Judge Saris said

14   unequivocally was – with the Court's indulgence--

15        PAUSE

16             MR. DRAYCOTT:  Sorry.  Page 39 and 40, I confirmed

17   the greatest bulk of boxes reveals certain drafts, the drafts

18   of the OIG reports and Your Honor excluded that the last time

19   we were here and it's still excluded.  I think that makes it

20   easier for me.  I think it also makes it easier for Judge

21   Bowler with respect to documents, and she said, the drafts, and

22   she agreed that these are absolutely excluded.  That takes away

23   the bulk of the documents that are before you for in-camera

24   review.  And there are two drafts that fall outside of that

25   description and it's absolute unequivocal that Judge Saris just

1    removed those.  And I would just point Your Honor to the

2    transcript of November, I'm sorry, July 24th and November 13th.

3    And the documents that Mr. Daley is now alluding to or the

4    testimony that he's alluding to are entrance and exit--

5            THE COURT:  Do you have the pages in the July 24th

6    transcript?

7            MR. DRAYCOTT:  July 24th transcript is, the

8    statement--

9        PAUSE

10           MR. DRAYCOTT:  Skip the OIG report is on page 25.

11   And then the discussion, I'm not going to require every draft

12   of every OIG report, the discussion of the OIG reports

13   continues onto page 26.  The two places on – and then, Your

14   Honor, I can file a supplemental brief pointing you to every

15   point of the transcript where the OIG drafts were covered if

16   that would be more convenient for Your Honor, or I could give

17   you the citations now.

18           THE COURT:  Yes, give them to me now.

19           MR. DRAYCOTT:  Page 21 I talk about, specifically

20   about the material to be submitted to Your Honor.  And then I

21   resume the, the discussion of this resumes on page 39.  I,

22   again, make specific reference – yeah, November 13th, sorry.

23   And then I confirm that, what the Judge had said on July 24th

24   that our understanding was correct and she confirms that on

25   page 40.  And that she generally said that with respect to

16

1  draft documents if we've submitted the final she didn't

2  require production of preliminary drafts.  This is significant

3  with respect to the testimony that Mr. Daley just alluded to

4  because the entrance and exit or certainly the exit conferences

5  that are held are in the context of the draft reports for the

6  reports that are then prepared.

7          There's two elements to a report when it issues.

8  There's the OIG findings, recommendations, and then there is a

9  published - and then there is a final written response by the

10 agency to those recommendations that's then an appendix to the

11 report.  So the result of that conferral, OIG's final

12 recommendations and the agency's response to them are in a

13 written final format that have all been publicly released and

14 have been available and they're just out there.  And that's

15 generally a category of material where Judge Saris hasn't

16 required previous drafts.

17          What's more, in addition to the final drafts or

18 sorry, the final versions of both the report and the agency

19 response we have produced hundreds and thousands of pages of

20 work papers relating to the reports.  Primarily the thing that

21 we have withheld from those work paper set is an extremely

22 narrow class of material which is the entrance and exit

23 conference notes which is just the conversations, the back and

24 forth between agency personnel about the format of that report,

25 what it's going to look like, properly deliberative process

17

1    privilege.

2              And what's more, the last point I'd make with respect

3    to this category of material relates to the process that we

4    began after November 13th.  Abbott had asked for an appointment

5    of a special master which didn't occur that day but they

6    appended to that motion a schedule of privilege log entries

7    that they wanted in-camera review for.  We then, there was a

8    fairly long colloquy on this issue.  What the government agreed

9    to do and then Judge Saris ultimately said that she would

10   undertake personal review of all the material covered by those

11   entries for which the government would continue to assert

12   privilege.  She then simply put it to me that she hated doing

13   in-camera review.  She wanted me to go back--

14             THE COURT:  There are two things judges hate to hear;

15   in-camera and pro se.

16             MR. DRAYCOTT:  And I'll add my own name to that list

17   of people who hate that word now.  And so we went back and we

18   have been reviewing all that material and she said whittle this

19   down to the stuff that you really care about.  And so we have

20   since the 13th been in a rolling production of material from

21   this schedule that Abbott created of the privilege log entries.

22             THE COURT:  And how much more do you have to produce?

23             MR. DRAYCOTT:  And we've – we've taken off certainly

24   over 112 entries we released documents from.  I think there's

25   slightly under 200 entries, 184.  We released stuff from over

18

1   110.  We're going to do another production from that.  There

2   is however one core category of material for which we are going

3   to continue to assert privilege before Judge Saris and it is

4   the notes of the entrance and exit conferences.  We're going to

5   argue to Judge Saris that those are similar to the drafts of

6   OIG reports, that they are part of that process.  But this

7   issue of whether or not the OIG entrance and exit conference

8   notes that we produced is going to be squarely in front of her

9   within the week because I think, I suspect that when I finish

10  conferral with the agency and gone fully through this that the

11  category that will probably be left will be entrance and exit

12  conference notes and that the agency will continue to assert

13  privilege there.

14          So on a number of fronts I think that this, Abbott's

15  motion on this point is inappropriate.  One, because exactly

16  the testimony of Mr. Vito and Mr. Reed that's presently covered

17  by this motion, the same exact transcript designation were

18  covered by prior motions and that relief was not granted.  So

19  that I think takes care of it.  The major defect with this

20  motion it should have been just Judge Saris, you know, you now

21  need to reconsider the decision in which you declined to

22  overrule the objection stated by government counsel at

23  deposition, and we have been stating these objections since,

24  you know, day one.  And Your Honor's seen the briefing that

25  started back in February of `07 on these issues.  So this isn't

1  something that's developed lately.

2        But the other important background piece of

3  information that I have is that with respect to the category of

4  material that Judge Saris is considering and weigh the

5  privilege it isn't any deliberative material.  She's been very

6  specific.  And this is described in specific places in these

7  transcripts and I can walk you through it there.

8        THE COURT:  Okay.  A couple of minutes because we

9  have a long agenda this morning.

10       MR. DRAYCOTT:  But this is going to inform actually

11  Your Honor's consideration of a lot of issues today which is

12  the material that we were required to submit for in-camera

13  review or the material for which she's indicated she may look

14  at the balance and consider disclosure is going to be documents

15  which reflect the existence of mega spreads, you know, Judge

16  Saris' term for – now previously, I should back up a little.

17  Previously the categories of material that she requires

18  submitting for in-camera review were the spreads for Abbott's

19  drugs, or drugs in the complaint is actually I think how she

20  narrowed it, or the marketing of the spread and you may recall

21  there was some litigation over whether it was use of spread or

22  marketing of the spread.  And so we had through several orders

23  by Judge Saris, and these were orders on Abbott's objections to

24  your orders which defined it as, defined the relative class of

25  drugs as being Abbott's drugs in the complaint.

20

1          Judge Saris in July expanded that arguably slightly

2   she said.  But in some ways she narrowed it, in some ways she

3   expanded it.  The focus – she was concerned that the government

4   was, might be asserting as damages payment for drugs that

5   included what she calls the 30% yardstick or speed limit.  We

6   explained to the judge that wasn't the case.  So after we

7   explained that she said, okay, what they get is documents which

8   relate to mega spreads and instead of going just Abbott's drugs

9   she included infusions and inhalants.  Inhalants she included

10  because those are drugs that are at issue in the Day & Roxane

11  cases, not at issue in Abbott.  These are drugs that are

12  delivered through a nebulizer and they are generally albuterol,

13  ipratropium bromide.  So it's mega spread for infusions,

14  inhalants and the antibiotic Vancomycin which is in the Abbott

15  complaint.  And she also said cross subsidization.  And so she

16  said with respect to those issues that's where she'll look at a

17  document in-camera and determine whether or not even if they're

18  privileges that they'll be, whether or not the defendant's need

19  for the document outweighs the government's interest in

20  preserving it.

21          So it's not that she's thrown open the doors to any

22  and all deliberative process.  And if Your Honor, this is

23  unfortunately the tedious part, but if you go through and which

24  I have done every single transcript designation in Abbott's

25  motion to compel the testimony of government witnesses, none of

1   them are specific to that issue.  Mr. Daley alluded to the

2   issue of the government's knowledge of a difference between the

3   acquisition cost and AWP for generics.  He argued that he

4   should be entitled to that information.  He argued that point

5   to Judge Saris on, I think it was on July 24th and she

6   absolutely wouldn't give it to him.  She said she wasn't going

7   to view it with respect to generics.  And again, I can point

8   you to precisely the point where she denied him that relief

9   with respect to generic and it's just absolutely unequivocal.

10          On page, this is the July 24th hearing.  We were

11  talking about specifically the issue I've just alluded to which

12  is what's the category of material.  Is it infusions and

13  inhalants or is it broader than that.  Mr. Daley said, and I

14  quote at the bottom of page – she said, so say it.  "I don't

15  want any more briefing.  Say the words."  And this is to

16  establish the categories of material at the bottom of page 23

17  and Mr. Daley said, infusions, solutions, injectables.  My

18  response was those were enormously broad because injectables

19  would cover too much.  Then Mr. Daley said, and generics.  The

20  Court, "No, not generics.  Now you're going beyond."  And then

21  further on in the middle of page 24, "Generics, this is where

22  you got me worried.  I'm not doing it with generics."  The

23  Court said, "I'm just not doing it with generics."  She

24  excluded from the scope if there are just documents that talk

25  generally about generics without beyond specific to inhalants

22

1   or infusion drugs she's not requiring in-camera review of

2   documents and she's just not going to that level of generality.

3   And it's absolutely unequiovocable on page 24 of the July 24th

4   hearing.

5        She didn't throw open the doors to any and all

6   deliberative process.  It's narrow.  And again, if you were to

7   go and I can, I don't think we have the time for it but we

8   could do it, every single transcript designation that they've

9   got is much, much broader.  It's just general methodology, why

10  did you, you know, what was considered.  None of it is specific

11  to the categories of information that the judge has said is at

12  issue here.  So even if this were an open issue, and I don't

13  believe it is by virtue of the Court's prior rulings that are

14  exactly on point, there's no indication that the judge would

15  view this issue any differently if she was asked to reconsider

16  it.

17       THE COURT:  All right.  Mr. Daley, very briefly.  I

18  mean, it sounds--

19       MR. DALEY:  Very briefly, Judge.

20       THE COURT:  Listening to both arguments it sounds

21  like we're talking about apples and oranges so--

22       MR. DALEY:  Well I think we are talking about apples

23  and oranges because my brother is talking about what the

24  government was obligated to go and search for documents.  And

25  they're saying, oh, Judge, if we have to search everything that

23

1  mentions a document in 20 years of documents that's going to

2  be overwhelming.  I'm not asking for documents.  That's —

3  whatever Judge Saris has decided on that front, she has

4  decided.  I'm not asking for documents.  I'm not asking for

5  draft OIG reports.  That is a stretch.

6          What Judge Saris said is, and I'm quoting from page

7  24, she says, "Here's the problem, I remember being a lawyer.

8  We all remember.  I'm sure you do this for attorney-client

9  privilege.  You look at whether there's a plausible basis and

10  you assert it.  Usually the first stab through most attorneys

11  over assert," as we believe the government may be doing here

12  and, "on the theory that, well, we'll chisel back.  My problem

13  is I have to decide, A, if the privilege applies and then, B,

14  do a weighing.  Okay.  So I've got part B and I couldn't

15  entrust that to the government.  In other words, the government

16  can't be the filter for what's relevant and what's covered as a

17  matter of law to just do that weighing.  That's something I

18  think I have to do.  And so since government knowledge is both

19  relevant to the various issues we've talked about, scienter,

20  reliance.  There's a common law fraud claim.  It's relevant to

21  the government knowledge defense.  They may go down in flames

22  on it, but I can't say they can't have the discovery."  That's

23  on page 23 and 24.

24          Now, I'm not asking for OIG reports and that's

25  another burdensome argument.  In other words, if you've got the

24

1  final report do you really need every draft?  And Judge Saris

2  is saying quite--

3          THE COURT:  You're asking for the witnesses.

4          MR. DALEY:  I'm asking for the witnesses to answer a

5  simple question.  That's a completely different issue and it's

6  very narrow.  There's nothing burdensome about it at all.

7  Judge Saris hasn't ruled anything with respect to this.  And

8  when we talk about the documents that Judge Saris is dealing

9  with, we gave her a list of 200 documents from a privilege log

10  that has 1,500 documents on it.  We said, Judge, we're going to

11  limit it to this.  Since that hearing on November 24 the

12  government has produced to us like 115 of those.  So in other

13  words they're not even sticking with what they put on their

14  privilege log.  We've already gotten over half of them from

15  them because they were over designated to begin with.  But

16  we're not asking for the documents.  Judge Saris is either

17  going to do that herself or we talked in the hearing on the 24th

18  that the defendants are in favor of appointing the, a special

19  master and taking this off of both Your Honor's plate and Judge

20  Saris' plate and she seemed to be interested in that, but she's

21  going to take a look at whatever is remaining from that 200 and

22  make a decision about whether she's going to look at it or send

23  it to a special master.  That's apples.

24          The oranges are we've got very limited testimony

25  about stuff.  I mean my brother will stand up.  He will, he

25

1   will deny that the government considered cross subsidization,

2   but I've got a witness who took the stand and said I talked

3   about that with CMS.  And we ask him, what did they say?  They

4   say, no.  That's the kind of focused, narrow, inquiry that we

5   believe we are fully entitled to get and there's nothing in

6   Judge Saris' order that prevents that.  The fact that she said

7   you don't have to give us all the draft OIG reports that's a

8   document issue.  That's a burdensome of documents issue not a

9   focused deposition question.

10          THE COURT:  All right.  I'm going to take it under

11   advisement.  Maybe I'll take a break and make some rulings and

12   then come back or else give you something quick electronically.

13   But let's move on.

14          MR. DALEY:  Thank you.

15          THE COURT:  The next is 5128 by my count which is the

16   government's motion to quash.

17          MR. DALEY:  This is our motion, right Justin?

18          MR. DRAYCOTT:  Pardon me?

19          MR. DALEY:  This is ours right?  We moved--

20          MR. DRAYCOTT:  Yeah, I think so.

21          MR. DALEY:  --or you moved for protection.  Okay.

22          Judge, this is a related motion in the sense that we

23   have Mr. Bernie and I believe, Mr. Chang or Ms. Chang and these

24   are folks who work in the Office of Legislative Affairs within

25   CMS.  We noticed them up for their deposition and rather than

26

1    get a deposition where we get to ask a question and maybe they

2    assert the DPP in which case it would be part of the prior

3    motion, they refused to put these people up.  They just said no

4    how, no way, we're not even putting them up because we think

5    everything that they have to say is going to be covered by the

6    DPP.

7              We say well, I don't even know what that means

8    because the only way you can judge a privilege is to put the

9    person up and have them talk about it.  And as I've stated one

10   of the reasons that Judge Saris has released so many documents

11   and why the government has released them to us is that a lot of

12   what they've kept out isn't even privileged and so to sort of

13   just bring the curtain down on these two people we think is,

14   you know, it's sort of one step beyond the motion that we just

15   argued.  And I'll tell you that I deposed Tom Scully who was

16   the former chief administrator of CMS in the late 1990s and

17   early 2000s and he said of Mr. Bernie, and I quote from, it's

18   in our brief but he says that, Mr. Bernie, "was always the key

19   guy driving CMS internally" and that, "most incredibly complex

20   policies came from Bernie over the years, probably half of your

21   litigation," talking to me about the case.  So here's a guy

22   that we say, okay, we'd really like to depose this guy since

23   he's the key driver of CMS over this time period.  They won't

24   even put him up.

25              THE COURT:  Briefly.

1          MR. DRAYCOTT:  By way of background, it is important

2    to consider just the number of witnesses and this is not a

3    place, this is not a case in which the government has tried to

4    shut down, for example, testimony of ex-witnesses.  We've

5    produced former administrators, multiple former administrators.

6    We have gone to the upper reaches all across, I mean to put it

7    on the corporate structure we've put in CEOs, executive senior

8    vice presidents, head of divisions, people who would be the

9    functional equivalent of in other words the head of divisions

10   or the functional equivalent of the highest level of corporate

11   witnesses.  We have generally not sought to protect them and

12   they've been deposed for in many cases days and days and days.

13   In some cases, Larry Reed for example, for six days., Robert

14   Vito for four days.  There were very few people who testified

15   for less than multiple days.  We have sought protection for two

16   individuals and the most effective way to argue this to Your

17   Honor is just to refer you to the declaration--

18          THE COURT:  Well you're saying you won't produce them

19   period?

20          MR. DRAYCOTT:  Your Honor that is because there is

21   nothing that Mr. Bernie does except engage in this--

22          THE COURT:  Well--

23          MR. DRAYCOTT:  It's the Office of Legislation.  He

24   doesn't go out and compile information.  Again, the declaration

25   is what I would base this on is that he does virtually nothing

28

1  else but develop policy.  That's his role.  He's within the

2  Office of Legislation.  He has no role in the administration of

3  this benefit.  He is a--

4        THE COURT:  No, I'll permit the depositions to go

5  forward.  They can assert what they want, and you can instruct

6  them but I will permit--

7        MR. DRAYCOTT:  Your Honor, could we get then a

8  limiting order with respect that, again, consistent with the

9  principles that have been articulated by Judge Saris in the

10  context of deliberative process litigation that the questioning

11  should be limited to those, to the scope that she has confined

12  us to with respect to documents.

13        THE COURT:  No.

14        MR. DRAYCOTT:  That is--

15        THE COURT:  I'll leave it up to Mr. Daley to make,

16  formulate the questions that he wants and then you can give the

17  instructions that you want, but I'm not going to inhibit it at

18  this stage.

19        So 528 is denied.

20        MR. DRAYCOTT:  Just one--

21        THE COURT:  5-1-2-8.

22        MR. DRAYCOTT:  One follow-up on that issue, Your

23  Honor, discovery in this case was - well fact discovery is

24  closed with respect to Abbott and then further discovery of

25  state Medicaid officials is allowed to go through December 15th.

29

1    I think there's probably no way that we're going to get –

2    given all the depositions that are now ongoing of state

3    Medicaid officials, it's going to be I think impossible to get

4    those scheduled and done by December 15th and so I would just if

5    Your Honor could on the record indicate that the depositions

6    that were the subject of this motion can occur after December

7    15th.

8             THE COURT:  Any objection to that, Mr. Daley?

9             MR. DALEY:  No.  I recognize that it is the holidays,

10   Judge, and--

11            THE COURT:  All right.

12            MR. DALEY:  --we'll work together and we'll do it

13   quickly though.

14            THE COURT:  All right.

15            Next is 5156 which is the United States' motion for a

16   protective order regarding 30(b)(6) notices.

17            MR. DRAYCOTT:  A colleague of mine is going to be

18   arguing that, Your Honor, thankfully.

19            MS. STRONG:  Your Honor, Elizabeth Strong for the

20   United States.

21            THE COURT:  Thank you.

22       PAUSE

23            THE COURT:  All right, time is precious.  Get to it.

24            MR. DALEY:  Judge, if I may?  One of the things that

25   we did on – we have worked out quite a bit on this in sense of

30

1  I've gone through these things, gone through the various

2  requests and limited them substantially and I've provided this

3  to counsel already, but this is a compilation of Exhibits A, B,

4  C were the letters between counsel where we listed the topics--

5           THE COURT:  Uh-huh.

6           MR. DALEY:  --and I've gone through and you can see

7  I've crossed out everything that we are no longer seeking with

8  respect to this, and so it limits it to about nine topics that

9  we need to deal with.

10          MS. STRONG:  And, Judge, that's one of two

11  developments since we originally filed this motion.  The other

12  is that we did produce CMS designees on the topics as we

13  drafted them, included them in the motion and in the draft

14  order, Your Honor, the topic designations were described in the

15  motion.  So they've taken testimony from two CMS designees, Don

16  Thompson and Larry Reed, on those topics.

17          But if we could I guess focus on those I think it

18  might be 11 topics that remain, just focus our attention on

19  those, Judge, beginning with the first topic, topic one of the

20  November 20th letter.  It's important, Judge, I think here to

21  focus on exactly what topic one seeks here.  They want a

22  30(b)(6) CMS designee into the truth and voracity of the DOJ

23  lawyer that drafted the amicus brief or at least this portion

24  of the amicus brief and the first amended complaint.  This is,

25  in effect it's a rehash, Judge, of something you've already

31

1  ruled on.  In your May 22nd order you said that they could not

2  conduct deposition into that process because it's an attack on

3  the attorney-client privilege and for the same reason it would

4  be inappropriate here in a 30(b)(6) context.

5          THE COURT:  What makes it any different now, Mr.

6  Daley?

7          MR. DALEY:  Judge, we're specifically not asking for

8  a lawyer.  I mean, if you read the statement they say in their

9  brief no governmental payer knew of or sanctioned Abbott's

10 conduct as set forth in this complaint.  That's a factual

11 statement made in a brief.  We're simply asking for a fact

12 witness, a 30(b)(6) witness at this point, to tell us what the

13 factual basis for that.  If they don't have a witness who can

14 say that, we'll take that answer as well.  But we just, it's

15 very, very narrow, very, very focused.

16         THE COURT:  Do you have a fact witness you can

17 produce?

18         MS. STRONG:  Judge, they've asked about the facts

19 under that issue of many 30(b)(1) witnesses.  The facts

20 underlying that statement they've already inquired.  What this

21 topic describes is a 30(b)(6) about the drafting of the

22 documents.

23         THE COURT:  Well, are you telling me you don't have a

24 non-lawyer witness who could testify to that?

25         MS. STRONG:  A non-lawyer witness but still about

32

1  attorney-client privileged information.  It doesn't have to be

2  just a lawyer testifying to violate the privilege.  If the

3  client, and it would be CMS that is doing the testifying at a

4  30(b)(6) deposition, they would be disclosing the attorney-

5  client privileged information, the communication between that

6  client and the attorney that drafted those passages.  It still

7  seeks attorney-client privileged information, work product.

8  It's entirely privileged, Judge.

9          THE COURT:  I'm inclined to agree on this one Mr.

10 Daley with the government.

11         MR. DALEY:  Well, Judge, our position is that this

12 was the amicus brief that they filed that Judge Saris relied

13 on.  They were asked to give the secretary's position and

14 understanding and they write, no governmental payer knew of or

15 sanctioned Abbott's conduct, i.e. it's deliberate manipulation

16 of published prices, et cetera, et cetera.  We assume that

17 there's a factual basis for that.  I mean, that's what they're

18 suing us for.  So we're clearly not asking for a privileged

19 communication.  In fact I assume that before you.  I mean we

20 would never do that.  I mean that would be a fool's errand.

21 We're simply asking for the factual basis for that statement.

22         MS. STRONG:  Judge, they have a factual basis for it.

23 They - not just the documents and interrogatories and 30(b)(1)

24 testimony but this seeks 30(b)(6) testimony about veracity and

25 good faith basis representations made in this matter by the

33

1   Department of Justice.

2         And to address something Mr. Daley said earlier, he

3   said he was narrow and focused but it's not, Judge.  It's

4   including but not limited to these two paragraphs that remain,

5   paragraphs B and F.  So it would be the veracity and good faith

6   basis of every representation of factual allegation made by the

7   Department of Justice in this litigation.  That's hardly

8   narrow.

9         MR. DALEY:  I think when you read the, you know,

10  topic one and then we've limited it to sub-topic B so far,

11  Judge, so I don't think we're asking for everything plus B.

12  We're asking for B.

13        THE COURT:  No, I'm going to stand by my ruling on

14  this one.

15        MS. STRONG:  Turning, Judge, to topic two of the

16  November 21, 2007 letter, and I'm not entirely clear why,

17  Judge, this is still on Abbott's list because we produced Don

18  Thompson as a CMS designee on slightly modified but as I

19  understand their interest still getting to their interest in

20  the definition of AWP, this theory that AWP didn't really mean

21  the plain language meaning.  And Abbott deposed Don Thompson in

22  March.  The deposition was left open and they never asked for

23  that second day before the close of fact discovery.  So it's my

24  understanding that they got what they wanted, the vast majority

25  of what they wanted in topic two so it's our position that they

34

1   – that's what we gave them, Judge, included in the topics.

2          THE COURT:  What else is there?

3          MR. DALEY:  Judge, we're in topic two from the

4   November 21 letter.  Our problem with Don Thompson is we did

5   ask Don Thompson about this and he told us that if you want to

6   know how the secretary understood and interpreted this you have

7   to go read the Federal Register.  That's not an answer for us.

8   Remember, Judge Saris asked them to file an amicus brief that

9   tells us what the secretary's position is and secretary's

10  understanding.  They didn't tell Judge Saris to go read the

11  Federal Register.  So we want a witness to testify to this.

12  And we do have one more day remaining with him but we've

13  already covered this material with him and they have refused to

14  put up a witness – this gets into the, an important distinction

15  between applied and interpreted.  The question asks for how did

16  CMS over the years interpret and apply the term AWP.  They say,

17  oh, we'll give you somebody that'll tell you how it was applied

18  because that's easy.  They applied it 95% of AWP according to

19  the statute and the looked in the compendia.  What the case is

20  about is what did you understand?  This is whole government

21  knowledge.  This is what, how did you interpret it?  What did

22  you do?  We understand you used 95% of AWP to reimburse under

23  Medicare but what did you understand AWP to mean?  We don't

24  have a person to say that and for all of these, for – they talk

25  about we've had fact witnesses, 30(b)(1) witnesses.  For each

35

1    one of those by the way I'll tell you, they make a speech and

2    say these witnesses are speaking only for themselves.  They're

3    not speaking for the federal government.  So that's why we've

4    gone with this 30(b)(6) route so that we can get the

5    government's position on this.

6          MS. STRONG:  Judge, if I may respond?  CMS's position

7    is what is in the public record.  It seems like a lot of these

8    topics were drafted as if CMS was not a government agency that

9    was subject to the APA.  CMS acts in its formal notice and

10   common rule making process.  That process is that the documents

11   are public.  It includes within those, comments from the public

12   and all the rationale that CMS has is in those documents.  So

13   when Abbott seeks a 30(b)(6) deposition about CMS's position on

14   the rationale and for the regulations, that is the CMS answer.

15   Mr. Thompson's response is the CMS, the 30(b)(6) response to

16   those questions.

17         With respect to--

18         THE COURT:  It may fly now but I don't think it'll

19   fly very well at trial.

20         MS. STRONG:  With respect, Judge, to the difference

21   between applied and interpret, it's seems to be a distinction

22   without a difference.  The way CMS applied the term AWP

23   reflected its understanding of the term AWP.

24         MS. DALEY:  I think the government's position here

25   flies in the face of, you know, what I just read from Judge

36

1    Saris a couple weeks ago.  We're entitled to know what they

2    knew and understood and that's all we're asking.  And for them

3    to say go look it up in the Federal Register is a non-answer of

4    epic proportion.

5            THE COURT:  I think Abbott's entitled to that to

6    prepare a defense.

7        PAUSE

8            THE COURT:  So ruling in Abbott's favor on that.

9            Next?

10           MS. STRONG:  Next, Judge, topic three, the manner in

11   which CMS, its agents, employee and the carriers interpreted or

12   implemented the term since the passage of the MMA in 2003, our

13   position, Judge, is that it's irrelevant but it's also been

14   covered actually Don Thompson.  It was brought up in the Don

15   Thompson deposition back in March.  But CMS's position is

16   what's in its public documents.  To the extent that individual

17   employees or agents of CMS had interpretations that would be

18   irrelevant under *Lockman*.  But the period at issue here is 1991

19   through 2001 and so after 2003, really it's 2004 and the period

20   thereafter is irrelevant.

21           THE COURT:  What's the relevance of 2003?

22           MR. DALEY:  Judge, are we talking about subsection B?

23   I think that we're talking about the Balance Budget Act of

24   1997.  And we've always treated A, B together on this, Judge.

25   This is, our position is the same in terms of government

37

1  knowledge.

2          MS. STRONG:  I'm sorry, I thought we had move on to

3  topic three.

4          MR. DALEY:  Okay.  Well, we had – all right, so the

5  Court's ruling is, prior ruling is with respect to all of topic

6  two.  Okay.  I'm sorry, I misunderstood.

7          MS. STRONG:  Actually, Judge--

8          MR. DALEY:  Judge, do the--

9          MS. STRONG:  --I'm sorry--

10          MR. DALEY:  I--

11          MS. STRONG:  --I think Mr. Daley might be correct.

12          MR. DALEY:  Well let's address this one because--

13          MS. STRONG:  Okay, and then boot back.

14          MR. DALEY:  --the relevance of 2003 is this, Judge.

15  Under the Medicaid Modernization Act, I know you've been with

16  us long enough to know that that came into play in 2003, `04,

17  `05.  What they did is they moved Medicare to ASP plus 6%,

18  okay.  And so that's what most drugs are now reimbursed on

19  under the Medicare program.  Interestingly, our drugs are not.

20  Our four infusion drugs like water, salt water and dextrose

21  they still use AWP minus a percentage.  And so here you have

22  it's the same question, you've got ASP right in the statute.

23  They're calling for actual sales price, average sales price in

24  the marketplace and yet they still are using AWP for our drugs

25  knowing that AWP far exceeds the price that you can actually

1  acquire it at.  So this goes to that what is AWP mean now?  I

2  mean you cannot say that AWP means the actual acquisition price

3  in the marketplace when you've got a statute that's directing

4  that all other drugs be reimbursed on actual average sales

5  price and still using AWP.  So this goes to the position that

6  the government is taking with respect to what is the meaning of

7  this term.  It can't mean ASP because ASP is already there in

8  Medicaid Modernization Act.  So it simply goes to that question

9  where they have called out our drugs and said while the rest of

10  the world we're going to reduce everything and do ASP, we're

11  still going to reimburse infusion drugs or certain infusion

12  drugs at AWP minus, and we're exploring that.  There's a whole

13  body of evidence that we've yet to develop with respect to that

14  because we haven't been able to get a full explanation of why

15  our drugs have been culled from the herd and still be

16  reimbursed at the very high AWP levels on purpose.

17       MS. STRONG:  The answer, Judge, is in the public

18  record.  The public record reflects as CMS has to do, it has to

19  be in the formal notice and rule making documentation.  You

20  know it's related to my prior argument, Judge, that this is a

21  request for a 30(b)(6) deposition which is a CMS designee on

22  what CMS's position was on this question and those are

23  reflected in the public documents.

24       THE COURT:  I'll let the deposition go forward.

25       MS. STRONG:  Should we turn back?  I think I may have

39

1    skipped over, Judge, with respect to topic two and your ruling

2    with respect to the term AWP, and I guess, with respect to your

3    ruling, Judge, there are I guess sort of two different versions

4    of topics A and B.  There's the version on which the

5    depositions did go forward and these included in, the language

6    that is included in our motion.  And then there's the language

7    used in this draft that Mr. Daley just gave you that is

8    slightly different but is your, does your ruling apply to

9    Abbott's language or is it in effect a granting of the

10   government's motion to allow it to go forward on 2(a) and 2(b)

11   as included, the definition included in the motion?

12              I'm not sure if I made that clear.

13              MR. DALEY:  I'm not sure if I understand it.

14              THE COURT:  You know I'm not sure if I--

15              MR. DALEY:  I think we're moving on A and B and

16   they're very much the same.  I think you've already ruled, on

17   2(a) and (b) I think the Court's already ruled.

18              MS. STRONG:  And has the Court ruled on 2(a) and 2(b)

19   as drafted in the motion, the government's motion or as drafted

20   in Abbott's version?

21              THE COURT:  As drafted in the government's motion.

22              MS. STRONG:  With respect to D, Your Honor, this is a

23   request for a 30(b)(6) deposition on basically challenging an

24   interrogatory or excuse me, response to an interrogatory.  And

25   - I'm sorry, if I could just have one moment.  The quoted

40

1   language the response to that interrogatory was actually

2   amended and is no longer effective.  It's therefore irrelevant,

3   Judge.

4           THE COURT:  What's your position?

5           MR. DALEY:  Judge, our position – the reason we want

6   to explore this is that they filed an affidavit that said that

7   the general concept that AWP refers to the price at which a

8   pharmaceutical firm or a wholesaler sells drugs to its customer

9   is commonly understood in the industry.  So they took the

10  position in this written interrogatory response that that was

11  the common understanding.  Then we asked them to verify it and

12  they took this sentence out, and so we find that very curious

13  that they come in, they file a formal document making a

14  representation in an interrogatory and then take it out.  So we

15  simply want to ask is that because that's not a true statement

16  or is it because for some other reason?  So we're entitled to

17  explore this.  It's simply--

18          THE COURT:  Yes, you are entitled to explore it.

19          MS. STRONG:  Judge, if I might respond?  What he's

20  getting to is privileged information.  Why, I'm not sure--

21          THE COURT:  Well, he's entitled to explore it.  You

22  can raise your objection when you go forward but--

23          MR. DALEY:  Judge, one point for verification on your

24  immediate and prior ruling.  What I have in front of you is

25  what we are asking for, in other words through the parties

41

1   discussions it's 2(a) and (b) in the document in front of you

2   that we want to depose on, not what the government says in its

3   brief because this is the result of the negotiations so--

4           THE COURT:  All right.

5           MR. DALEY:  We want it to be that--

6           THE COURT:  So--

7           MS. STRONG:  Just to clarify, Judge, when he says

8   it's the result of negotiation the government hasn't agreed to

9   2(a) and 2(b) how he's drafted them.  The government would

10  still for the language of 2(a) and 2(b) as drafted in the

11  motion.

12          THE COURT:  Well, did you have some discussion

13  about--

14          MR. DALEY:  Yeah, I mean this is - that letter is

15  attached as Exhibit A to their brief, Judge.  I mean it's what

16  we told them we would want under this topic and that they've

17  refused to give us.

18          MS. STRONG:  I did--

19          MR. DALEY:  Now they're trying to - I'll tell you

20  what they're doing, Judge.  What they're going to say, in our

21  brief we said AWP as, you know, Judge Saris defined it and

22  they're going to have some definition of it that is going to

23  make it difficult to get it--

24          THE COURT:  Okay, A and B as it appears.

25          MR. DALEY:  Thank you, Judge.

42

1          MS. STRONG:  Pardon me.  I just want to make sure

2    that I haven't left the Court with a misimpression that when he

3    says that he took this document that was attached to our motion

4    and just--

5          THE COURT:  I've made a ruling.

6          MS. STRONG:  Okay.  I just--

7          THE COURT:  I've made a ruling.

8          MS. STRONG:  --want to make clear that the--

9          THE COURT:  Let's move on.

10         MS. STRONG:  Okay, Judge.

11         With respect to the topics, Abbott's topics that

12   address, the headline was continued use of AWP, Judge, it's

13   seven through 10.  Judge, these topics for one thing they're

14   somewhat misleading because to the extent that government

15   knowledge is relevant in this matter it's where - if the

16   government had full knowledge and approval it's relevant to

17   defendant's scienter and it's knowledge specifically to

18   infusion drugs, cross subsidization, Abbott drugs or

19   Vancomycin, this is a point Judge Saris made I believe it was

20   November 5th, that is the context in which government knowledge

21   is relevant.  The topics that are described here are not

22   relevant, Judge.  They are not likely to lead to the discovery

23   of admissible evidence in that they are--

24         THE COURT:  Well, that may be your opinion but that's

25   a question to be decided down the road I think.

43

1          MS. STRONG:  And it really goes to, Judge, a

2    statement defendants made in their response brief in one of

3    their bullets that their view is that CMS may make deliberate

4    policy decision to pay inflated prices but again, it's drafted

5    as I mentioned earlier with a view that CMS is not governed by

6    the APA.  Any CMS deliberate policy decisions are in public

7    documents.  They are public matters.  The 36(b)(6) deposition

8    will point to CMS public documents reflecting the notice in

9    rule making process that was the CMS decision making process.

10   They have the documents.  They have 30(b)(1) deposition

11   testimony exploring the subject.  It's really not relevant.

12   It also, Judge, goes to sort of questions of law.  And so we

13   just think that they're improper as 30(b)(6) topics.

14          MR. DALEY:  Judge, we're just trying to prove our

15   case and I think the passage I read from Judge Saris, you know,

16   maybe we'll go down in flames on some of our arguments, maybe

17   the government will.

18          THE COURT:  Yeah, government's motion on this denied.

19          MS. STRONG:  With respect to the Medicaid, Judge,

20   topics 16 through 18, Judge, I guess the points are similar to

21   those previously made.  In fact, some of them are duplicative

22   of not only 30(b)(1) testimony but 30(b)(6) I believe was

23   touched upon by Larry Reed, the questions about the federal

24   upper limit or FUL.  And--

25          THE COURT:  Same ruling.

44

1           MS. STRONG:  Same ruling.  And with respect to the

2   final topic, Judge, topic 22, this, Judge, is entirely

3   duplicative of 30(b)(6) testimony that they already have.  They

4   deposed Vicky Roby as a 30(b)(6) witness on document

5   preservation and production on March 20th.  Marianne Bowman,

6   30(b)(6) designee on this topic June 5th.  Joseph Brennan,

7   30(b)(6) deposition on this topic November 15th.  Glenda Bailey,

8   30(b)(6) deponent on this topic.  That's in addition to three

9   30(b)(1) deponents that were depositions conducted solely on

10  the issue of document preservation or production.

11          Judge, there's a First Circuit case called *Ameristar*

12  that speaks the question of multiple 30(b)(6) depositions.

13          THE COURT:  What else is to be gained here, Mr.

14  Daley?

15          MR. DALEY:  Judge, this is a, of all of them this may

16  be the narrowest.  This relates to a letter – when the

17  government was investigating this case during the 10 years that

18  they had it under seal, they contacted the defendants to let

19  them know that they were investigating.  The defendants did a,

20  negotiated with them, gave them a paper explaining their

21  position.  Along with that, on March 17, 2000 the defendants

22  sent the federal government a letter saying please don't

23  destroy documents.  We know you've been working on this case

24  for five years now, we may end up in litigation.  You ought to

25  do something about preserving documents.  And this – all we're

45

1  asking for here is what, if anything, did the federal

2  government, CMS, the Department of Justice, do in response to

3  that letter?  And we've offered to let them give us a written

4  response.  We're not trying to waste anybody's time.  They can

5  give us a written response.  They can just tell us.  Maybe it

6  was nothing and if it's nothing, tell us.  It goes to a

7  spoliation motion, it goes to a variety of things because there

8  are problems with the documents but very, very narrow.  What

9  did you do in response to that letter, if anything?

10           MS. STRONG:  I understand from Mr. Daley what it is

11  but what I don't see, Judge, is why these depositions hadn't

12  sufficiently covered that question.  That letter is dated March

13  17, 2000.

14           THE COURT:  Were there specific questions about this

15  letter in previous depositions?

16           MR. DALEY:  No, Judge.  This is the 30(b)(6) topic.

17  They objected to it.

18           THE COURT:  All right, I'll allow it.  I'll allow it.

19           MR. DALEY:  Thank you.

20           THE COURT:  All right.  All right, does that take

21  care of that?

22           MS. STRONG:  I think that's it for the motion, Judge.

23           THE COURT:  All right.

24           MS. STRONG:  Thank you.

25           THE COURT:  Move on to 5173.

46

1          MR. WINCHESTER:  Judge, this is Abbott's motion to

2     compel a few discrete categories of documents.  Thankfully, I

3     can tell the Court that Mr. Draycott and I have talked

4     beforehand and I think for a couple of them we can at least

5     short circuit some argument today.  Starting with these we've

6     listed the six categories right on the first page of our brief,

7     Judge.  The first is a decision memorandum signed by the former

8     CMS head, Tom Skully on October 22, 2002.  This particular

9     memorandum talks about the policies CMS is adopting and should

10    adopt for how it's going to review state Medicaid plans, you

11    know, in other words when are they going to disapprove of state

12    Medicaid plans for how they want to pay for drugs. And very

13    clear this document shows CMS' knowledge that the states which

14    are reimbursing at let's say AWP minus 10% or 15% were

15    reimbursing for far more than what everybody understood the

16    actual acquisition cost was.  The document references an OIG

17    study that says for generic drugs, like those in this case, you

18    can buy those at an average of 66% below AWP.  So it goes to

19    the government knowledge things we've been talking about today.

20         The government produced to us, you can see it's

21    Exhibit 4 of our papers the draft of this very decision in its

22    entirety.  We've questioned numerous witnesses about it.  When

23    we said give us the final, the one signed by Mr. Scully

24    however, they gave it to us and redacted almost all of it out.

25    You can see that.  I think it's Exhibit 3.  And we said, what

47

1  gives?  They're trying to claim now a deliberative process

2  privilege over that.  You know, from our standpoint as Mr.

3  Daley's talked to the Court about we think the deliberative

4  process privilege game has changed here.  We certainly think

5  that this would be relevant.  We should be able to get at it.

6  It is furthermore a final decision.  It's not even

7  deliberative.  It's a final decision signed by the CMS

8  administrator.  But more to the point, Judge, this cat is long

9  out of the bag.  They gave us the draft.  We've got the whole

10  thing.  We've questioned witnesses about it.  They've sat

11  there.  We've questioned numerous people about this document.

12  They want to now claim that that version was inadvertently

13  produced but that can't just hold.  They haven't tried to get

14  it back.  They've said it would be inconvenient to do so given

15  just how many people they distributed this thing to but that's

16  not a defense.  They've allowed questioning about it.  The

17  draft is out there.  And certainly under any kind of balancing

18  there is no reason why we ought not have the full copy of the

19  final memorandum.

20        THE COURT:  Why not?

21        MR. DRAYCOTT:  Well, Your Honor, because, well, first

22  of all, there is a previous draft that was produced in the MDL

23  in response to subpoenas that were issued back in the `03, `04

24  timeframe.  And so there was a very large production back then.

25  It was before the government was a party here and it was

48

1    disseminated too throughout the MDL at that time.  That

2    document, the draft version, was used at a deposition and the

3    witness who it was shown to, a very senior CMS official

4    entirely of his own initiative immediately recognized the

5    privilege made for the document and then we, and another DOJ

6    attorney at that point recalled the document.  We then, and

7    there was a, you know--

8           THE COURT:  Cat is out of the bag.

9           MR. DRAYCOTT:  And but – and so the, it ultimately

10   perhaps considerations we just couldn't get that cat back in

11   the bag because it had been out there long enough.  However, we

12   would submit that with respect to deliberative process

13   privilege the same way for principles that apply other places

14   don't apply with respect to deliberative process privilege

15   because it's an executive branch privilege that the agency

16   exercises discretion in asserting the way the principles

17   certainly don't apply especially in a situation where the

18   government isn't trying to somehow make affirmative use of

19   certain information and then withholding other parts of it.

20   So there's nothing unfair in terms of what we're trying to do

21   here.  We're not trying to use information over here and then

22   withhold information over here.  This is the agency has an

23   important institutionally interest in preserving the integrity

24   of its deliberative function.  The document has different

25   parts.  There are parts – for the sake of convenience the

49

1    recommendations are laid out and then there is a part that

2    allows the administrator to simply sign off on the

3    recommendation and put the decision into effect.  So there's

4    different parts of the document.  We've released the part of

5    the document that reflects the decision of the administrator.

6           Now, I should say one more thing about this document.

7    This, at the present we are trying to re-review documents

8    withheld based on deliberative process privilege in the context

9    of the instructions and statements made by Judge Saris back on

10   November 13th.  I think it's, my judgment is that it's, the bulk

11   of this document the agency will probably continue to stand on

12   its assertion of privilege.  This would be a document though

13   I'd have to go back and probably revisit the redactions and see

14   if there were some parts of it that might be unredacted.  I

15   don't want to given anybody here false hope that we're going to

16   produce the entire document, but there may be some parts of it

17   that we would allow out because the redactions were made, you

18   know, months and months before the hearings that--

19          THE COURT:  All right, do that and then we'll go from

20   there.

21          MR. WINCHESTER:  The second issue, Your Honor, has to

22   do with claim forms.  We talked about this with Your Honor back

23   in July of 2007 effectively just saying this is a False Claims

24   Act case, give us the claims that you say are false.  At the

25   time the government said we're rolling out a bunch of

1   information to them, data on false claims and everything else.

2   We'll let them see what they see.  And Your Honor, you know,

3   quite rightly said let's see what happens then come back if you

4   don't like it.  We got the data.  I want to be fair to them.

5   They've certainly given us the data, the dollars and cents that

6   they claim were paid out for all of our products.  What we're

7   looking for now is not every claim, just some, a representative

8   sample of the actual claim forms that they say were false in

9   this case.  And part of what they come back and say in their

10  response is, we're in the electronic age now Abbott, wake-up.

11  This is all electronic and the data are the claims.

12  Respectfully, let's, first of all, we have a number of

13  witnesses who've testified that during this time period there

14  were paper claim forms.  These HCFA 1500 forms that the Court's

15  heard a lot about, we ought to get some of those.  Pick some.

16  You know, all we're asking for is let's say program by program

17  one a year for each of the drugs, for each of the NDCs at

18  issue, each of the J codes at issue on the sides.  Give us a

19  sample so that we can take a look and say, here's a claim form

20  the government alleges is false.  Let's go talk to who

21  submitted it.  Maybe they can give us information about what

22  their practice is, whether they think it's false, and following

23  those things up.  Even in the electronic age, and I'm not sure

24  that either Mr. Draycott or I know the exact answer to this,

25  but it's my understanding that even when we're talking about

51

1   electronic submissions as they do today, the data is not all

2   there is.  There is an electronic claim form that would contain

3   some information.  Maybe that's something we need to figure out

4   after this but at least it's our understanding that that's

5   there.  If it is there then we want a representative sample.

6   If they want to come back and tell the Court as to the

7   electronic there's nothing more, we have nothing more to give,

8   that's fine.  And as to the paper we used to have them but we

9   just don't have them anymore then fine, tell us that.  But if

10  you've got it we want it on a limited basis, on a sample basis.

11          THE COURT:  I think on a sample basis is perfectly

12  fair.

13          MR. DRAYCOTT:  Well, Your Honor, just to make it

14  clear, there's nothing that we have that we are somehow

15  withholding and refusing to give.  And, Your Honor, frankly I

16  had presumed that this part of this request was failed by now.

17  What the government had produced is not only all the claims

18  data that we've been talking about, we've given – the only edit

19  that we've run on any data would have been to just make sure

20  that we're giving Abbott claims data and that we're not giving

21  Abbott Day claims data or Roxane claims data.

22          THE COURT:  Well, I've made a ruling.  To be produced

23  on a sample basis.

24          MR. DRAYCOTT:  Your Honor, I'm frankly at a loss as

25  how to respectfully, how to comply with it given that what

52

1    we've done is produce it.  We've also produced the expert

2    report regarding our damage analysis.  The gentleman's been

3    deposed already.  There's going to be continued expert

4    discovery on the subject of damages and there is simply, we do

5    not currently have in our possession something that is a sample

6    of claims data.  We would have to then--

7            THE COURT:  Sit down Mr. Win - no, I don't mean now.

8    I mean sit down and work it out what it is you would like on a

9    sample basis.

10           MR. WINCHESTER:  Okay.

11           THE COURT:  All right.

12           MR. WINCHESTER:  Sure.

13           THE COURT:  After this hearing.

14           MR. WINCHESTER:  We can do that, Judge.

15           The third item we talked about was a provider look up

16   table.  The government has given us that so we can take that

17   off of the Court's docket.  The next issue has to do with work

18   papers for a couple of OIG reports.  They've produced to us

19   work papers for a number of OIG reports throughout this period

20   up to 2006, and we have questions about two specific OIG

21   reports.  The first is in April of, or sorry, January of 2007.

22   And this is regarding the states use of new drug pricing data

23   in the Medicaid program.  Specifically, OIG commissioned a

24   study to take a look at now that all these states are getting

25   AMP, A-M-P, the actual manufacturers' price, the average

1   manufacturers' price, are you using it?  And they came to find

2   out that a number of them were not.  And so this is pretty

3   similar to a study that they have given us from back in 2001

4   when the DOJ true AWP as the Court has heard about were out

5   there, they did a study to say, okay states, are you going to

6   use these?  And as we found out through the work papers a lot

7   of states said no because they had concerns over what we talk

8   about as cross subsidization.  They didn't want to put their

9   providers out of business.  So we want to see with respect to

10  this report, OIG's taken a look, you got AMP now, are you using

11  it and if not, why not?  And so they have this information.

12  It's not burdensome for them to give it to us.

13              The second issue is a report from January 2008,

14  very similar.  It's taken a look at now that we have Medicare

15  Part D, cause we have prescription drug coverage, what is the

16  relationship between what we're paying and what the providers

17  are buying the drugs for.  And this thing is fantastic.  It

18  says the pharmacies are buying generic drugs, like the ones in

19  this case, on average at close to 75% off of AWP.  And rather

20  than saying that's fraud, which is the position the government

21  advances here against Abbott, CMS' conclusion in this report is

22  to say we are pleased, that's a quote, pleased to see that the

23  AWP driven payments under Part D provide margins to community

24  pharmacies with respect to their acquisition costs.  And it in

25  fact talks about the fact that where you've got spreads for

54

1   generics which are nine times higher than what you see for

2   brands, that's good for us systematically cause we want to

3   encourage providers to use generics.  It goes directly to

4   everything we've been talking to the Court about today, their

5   knowledge of spreads, their use of and being pleased by

6   spreads.  Issues that we think certainly go to government

7   knowledge and to negate that claim that you hear over and over

8   from them, had we only known what the real prices were we never

9   would have paid based on AWP.

10          MR. DRAYCOTT:  Your Honor, with respect to OIG work

11  papers we have produced not just some work papers.  We have

12  produced hundreds of thousands of pages.  Although Abbott has

13  been rigorous in asserting a time based objection and not going

14  outside of the claims period in this case, we've actually

15  produced material from `01, `02, `03, `04, `05.  At some point

16  we just have to say enough is enough.  This is an `07 report

17  which, again, the first report pursuant to the Deficit

18  Reduction Act of 2005 CMS initially got authority to provide

19  AMP data to the states and they started to analyze something

20  that was permitted or they were able to--

21          THE COURT:  Okay, denied as to this one.

22          MR. DRAYCOTT:  And then the other one, I think

23  actually Mr. Henderson may have some comments there, but again

24  it's a 2008 report.  At some point we have to put a reasonable

25  cap--

55

1          THE COURT:  Denied.  Next?

2          MR. WINCHESTER:  The next one I think, Judge, for

3   document preservation memoranda we may be able to work through.

4   All we've asked the government to do is to tell us for all your

5   document preservation and collection memoranda have you either

6   given to us or logged them on a privilege log?  And I talked to

7   Mr. Draycott about this this morning.  I think they are

8   amendable to doing that, to telling us either they've done it

9   or they will do it and that's fine--

10          THE COURT:  Reasonable.

11          MR. WINCHESTER:  --if we can get that representation.

12          MR. DRAYCOTT:  I think it's already done.  It would

13   have been done by a different attorney other than myself, Your

14   Honor, but it certainly with respect to if we haven't given it

15   to them, if it's not already been logged, and I think it has,

16   then we'll--

17          THE COURT:  All right.

18          MR. DRAYCOTT:  --we'll log it.

19          THE COURT:  So that's resolved.

20          MR. WINCHESTER:  The final thing, Judge, just

21   concerns deposition transcripts that they have from other AWP

22   cases, and I'm a little embarrassed that we're even here

23   talking to you about this.  The government came to us some time

24   ago and said, look, we want all the deposition transcripts that

25   you, Abbott, have in your possession from AWP cases where we

56

1  weren't there cause we don't want to go around trying to

2  figure out where they happened and tracking them down.  And I

3  said, well, we might have protective order concerns, but I'll

4  make a chart for you of all the transcripts we got and you'll

5  then now for all the ones where it was just Abbott asserting

6  confidentiality under protective orders, I'll give you those.

7  And for all the rest where it was some party not Abbott making

8  confidentiality designation, you'll at least know who they are

9  and you can go approach them and see if you can work that out

10 and get the transcript.  We've asked for the same thing from

11 the government.  That's all we've asked.  They say, forget it,

12 we're not doing it.

13        MR. DRAYCOTT:  Your Honor, this is one where we –

14 there has to be clarification and it's important clarification.

15 With respect to the government's interest and what it asked

16 Abbott for that related to primarily discovery that was on

17 depositions given by third parties such as wholesalers, state

18 Medicaid officials and we absolutely agree that with respect to

19 discovery in this case that there should be a full sharing of

20 deposition material that the parties have so that we don't

21 burden third parties such as state Medicaid agencies,

22 wholesalers, anybody that is outside of this litigation and

23 we're certainly willing to do that.  My understanding is that

24 there is a distinct category of documents which are problematic

25 here and that what Mr., what my colleague is asking for--

57

1          MR. WINCHESTER:  Winchester.

2          MR. DRAYCOTT:  I did actually know that -- is

3    depositions of other drug company defendants and that presents

4    a significant issue for a number of reasons.  First of all, as

5    a question of general relevance is how is the conduct cited in

6    Abbott or Roxane or sorry, Day or Roxane relevant to the case

7    against Abbott?  There are protective order issues that because

8    as Your Honor's probably aware the confidentiality and

9    proprietary information assertions have been consistent in this

10   case such that there is a phalanx of just confidentiality

11   concerns.  This is also Abbott wants material from other

12   defendants.  They've, you know, they certainly, they share a

13   database in terms of what the government is producing.  They

14   ought to just be able to work that out between themselves.  I

15   mean, the important consideration is I'm an attorney with the

16   civil frauds office, if I have depositions in my possession

17   there's a reason for that and it's a reason I really can't go

18   into, you know, because of seal considerations.  And so with

19   respect to the request for this information we're already given

20   them and providing and in fact suggested that we share

21   depositions of third parties.  We cannot and will not give them

22   a list of other testimony we're acquiring relating to just

23   other drug companies.  We think it's irrelevant.  They can go

24   get it themselves.  There's this vehicle at the MDL if they

25   want to why don't – the question I put to Mr. Winchester is

58

1  does he want me giving Abbott the depositions of Abbott

2  employees to some other drug company.  Can I give Abbott

3  depositions to Day or Roxane?

4         THE COURT:  Well that's--

5         MR. DRAYCOTT:  Well but it's related I think because

6  if he can expect that if he's going to object to that on

7  Abbott's, that you're going to get the same type of objection

8  from any other drug company that I might be dealing with.

9         MR. WINCHESTER:  He's three, four steps down the

10  road, Judge.  What we're asking for is the chart, the same one

11  that I made for them when they made this exam same demand on me

12  and called up and said, you know, Winchester we want this, we

13  want all these documents.  At least give us the first step.

14  We're not saying we're ever going to get all these transcripts

15  but give us the first step knowing what's there.  So that to

16  meet his claim that, you know, if some other drug manufacturers

17  got a transcript in their hands they either serve it as

18  confidential, I can go to them and say--

19         THE COURT:  Well can you give it to him not including

20  anything sealed?

21         MR. DRAYCOTT:  The sealed still wouldn't take care of

22  the concern about just investigations but the point is when we

23  asked for this information it wasn't to get information about

24  other drug companies from Mr. Winchester.  It was to ease the

25  burden on third parties; people that aren't part of the MDL

1  aren't drug company defendants.  So to suggest that we've been

2  demanding that Abbott produce, you know, material that they

3  might have gotten from another drug company it just isn't the

4  case.  And--

5        THE COURT:  Well, I don't see what the problem is as

6  to things that are not sealed.

7        MR. DRAYCOTT:  Well - because the important

8  governmental concern here is it tells him frankly where

9  attorneys are looking and that is privilege work product.  It

10 is, there is the governmental investigation privileges issues

11 and it's wholly irrelevant to the case against Abbott.  If we

12 were to try to get, and I can't conceive of the circumstances,

13 but if we were to ever try to use that in this case, and I

14 don't see how we would, then we would have to disclose it just

15 in order to use it.  so with that protection that if we were to

16 ever use it we would have to disclose it during discovery

17 there's no harm to Abbott here.  All they're getting to is

18 access of what deposition transcripts an attorney in the

19 Department of Justice may want to acquire and that carries with

20 it just a lot of concerns and concerns that, and privileges and

21 governmental concerns that just aren't present with respect to

22 what Abbott has.  But we're not, again, what we think we should

23 share is third party discovery so to alleviate the burden on

24 wholesalers, Medicaid agencies and the like.  But there's

25 really no use here for the deposition testimony of other

60

1  defendants, especially when in the proprietary concerns that

2  are consistently expressed and thought--

3          THE COURT:  Well, I just, I mean if the depositions

4  have taken place and they're not sealed--

5          MR. DRAYCOTT:  Then they can go get, then Mr.--

6          THE COURT:  --I don't see what the big deal is.

7          MR. DRAYCOTT:  Then Abbott can go get those from the

8  party but they may not be sealed but--

9          THE COURT:  Well, how do they know about them?

10          MR. DRAYCOTT:  Because they're in the M – if they're

11  in the MDL they are a party to this MDL, they can ask the other

12  defendants and there are generally notices going on.  The

13  problem is that there are generally--

14          THE COURT:  Well, they don't have a vehicle to ask

15  the other defendants and get it instantly the way they do in a

16  request in a pending case.

17          MR. DRAYCOTT:  I think this--

18          THE COURY:  I will order it produced but not as to

19  anything sealed.

20          MR. DRAYCOTT:  The list, Your Honor, or the

21  deposition transcripts?

22          THE COURT:  Well let's start with a list.

23          MR. DRAYCOTT:  I think that is the last item.

24          MR. WINCHESTER:  That's it, Judge.

25          THE COURT:  All right, time for the morning break.

61

1    We'll take a 10 or 15 minute break.

2                              RECESS

3           THE CLERK:  Resuming on the record, Your Honor, AWP

4    MDL litigation, Civil Action No. 01-12257 and others.

5           THE COURT:  All right, going back for a moment to

6    Docket Entry 5112, as to Reed and Vito, I'm inclined to agree

7    with the government.  That said, I direct you to further

8    consult and discuss each objected to question with respect to

9    each deposition in the context of Judge Saris' recent

10   deliberative process rulings and any related rulings on appeal

11   of my rulings.  One option would be to provide written answers

12   to the objected to questions.  In the event that you can't

13   agree you can renew the motion at which point I will consult

14   with either Judge Saris or her clerk and decide whether or not

15   she wants me to deal with it or she will deal with it.  I don't

16   want to end up with inconsistent rulings here.  I think this is

17   maybe a safer course.

18           Okay?  All right, so we start with 5174.

19           MR. WINCHESTER:  That's ours, Your Honor.

20           THE COURT:  Right.

21      *    MR. WINCHESTER:  This has to do with a set of

22   requests for admission that we served on the government and

23   neither Ms. St. Peter-Griffith nor I has any interest I think

24   in walking the Court through 175 RFAs today, which I'm sure

25   will make you somewhat happy but my hope is that if you go

62

1    through some--

2         THE COURT:  The only thing that will make me happy

3    right now is finding my Blackberry.

4         MR. WINCHESTER:  There have been a lot of articles in

5    Chicago recently about our President-elect Obama being stripped

6    of his Blackberry now having a lot of issues--

7         THE COURT:  One feels terribly insecure without it.

8         MR. WINCHESTER:  What I hope to do with respect to

9    these, Your Honor, is to break them down into some categories

10   on which we have principal areas of dispute.  And then maybe

11   with some guidance form the Court we can make some further

12   progress.

13        The first category as we've set forth in our brief,

14   Your Honor, and that I'll start with is the first 69 of these

15   RFAs where literally what we did is to take direct quotes from

16   government officials and congressional testimony and reports,

17   various things of that nature, documents we have, put these

18   direct quotes in an RFA, attach the underlying document where

19   the quotes appear and say, admit that this is a true and

20   correct document, that the statements were made at or near the

21   time and with information provided by a person with knowledge

22   and that it was kept in the regular course of business; your

23   basic stuff that RFAs are for getting the grounds of

24   admissibility in.  And what we get back from the government is

25   a, literally ton of objections, no straight answers for these

63

1  which are just admit the person said it, it's quoted in a

2  document type of thing which we thought were easy lay up

3  questions.

4        Just as a couple of examples, Your Honor, if you look

5  at Exhibit B to our motion, it's actually the government's

6  responses to RFAs.  So if you look at No. 24 we have a quote.

7  It says, "In 1990 the secretary of HHS, the head person,

8  testified before Congress that many studies," this is a quote,

9  "and most information available on this subject show that the

10 list prices for drug products commonly known as the average

11 wholesale process, AWP, rarely, if ever, reflect the prices

12 that pharmacies actually pay.  Since 1976 our policy has been

13 that AWP is not an acceptable measure of EAC, estimated

14 acquisition cost."  It goes directly to what we've been saying

15 about the government knowing that these two did not equate and

16 that AWP, which was the benchmark for their payment, was not in

17 fact an average of a cost anybody paid.  That testimony is

18 there.  All we say is admit it, admit that that statement was

19 made by a person with knowledge and we get a page of objections

20 and an answer that ultimately says subject to all of our

21 objections we admit with qualification because the document

22 speaks for itself and it's not really an admission against us

23 anyway.

24        So, you know, when we're suppose to have an answer

25 that says admit or deny we get the document speaks for itself.

64

1   And we've given you a lot of case law in our brief that says

2   the documents don't speak for themselves.  That is an improper

3   objection to make in an RFA.  We understand the government is

4   going to take the position ultimately that nobody has said

5   anything that can bind the agency.  That's fine.  They can make

6   that later when we're trying to offer these into evidence but

7   for purposes of now all we're saying is these are factual

8   statements, they are subject to being admitted or denied.

9   Obviously, all your objections to admissibility you can reserve

10  until later but we're entitled to a clean record on these

11  things so that we can try and introduce them.  They're evidence

12  in the case.  We need this to be able to do it.

13          Similarly again, if you look at No. 37, same thing,

14  we've got a direct quote from 95 from the chief of the Medicare

15  technical issue section talking about the fact that AWP is

16  different than estimated acquisition cost.  And we get again,

17  the document speaks for itself and it's out of context by the

18  way.  Again, Your Honor, admit it or deny it.  You're going to

19  have your chance to challenge why it's out of context, why it's

20  not, an admission whatever that may be down the road but let's

21  at least clean this record up for these that are direct quotes

22  and say we admit it, we deny it.

23          THE COURT:  Well--

24          MR. WINCHESTER:  I don't know if you want to do these

25  categorically.

65

1          THE COURT:  Yeah, it's easier to go one at a time.

2          MS. ST.PETER-GRIFFITH:  Your Honor, before we get to

3  the, before we even get to--

4          THE COURT:  Well, why don't you identify yourself for

5  the record?

6          MS. ST. PETER-GRIFFITH:  Oh, I'm sorry, Your Honor.

7  Ann St. Peter Griffith, from the United States Attorney's

8  Office in the Southern District of Florida, on behalf of the

9  United States.

10          Your Honor, before we start going category by

11  category the United States has raised in its opposition the

12  issue of do we even need to do this right now.  Rule 36

13  provides that this matter and objections can be deferred until

14  a later point in time at, closer to trial after dispositive

15  motions and motions in limine have been heard which will enable

16  us to avoid having to go through these sort of one by one

17  which, Your Honor, is--

18          THE COURT:  Well it's an `01 case, I hope we're

19  pretty close to trial.

20          MS. ST.PETER-GRIFFITH:  Yes, Your Honor, but there

21  are a number of matters that might be resolved on dispositive

22  motions that could substantially, substantially narrow the RFAs

23  that we're dealing with today, most notably the government

24  knowledge issue.  In addition to relevance considerations there

25  are many, many documents and many RFAs in the RFAs that were

66

1   served that are completely outside of the time period of this

2   case.  So we would just raise that before we go through it

3   category by category, Your Honor, that Your Honor consider take

4   up the issue of whether it makes sense to defer these until a

5   later point in time that is closer to trial because frankly

6   many of them might be resolved just through the course of

7   motions in limine and dispositive motions.

8           THE COURT:  Well, it's a little too late with motions

9   in Limine, I mean this is discovery.

10          MS. ST. PETER-GRIFFITH:  Well, Your Honor, I think

11  motions in limine in terms of ultimately what Mr. Winchester

12  was referring to was making a record to go into evidence at

13  trial.  You know, we haven't heard from the defendant as to

14  which of these RFAs are going to be necessary for them for

15  purposes of summary judgment, if any.  Many, many deal with the

16  public record.  They can use the public record.  We're just

17  going to go through, this could be a very time consuming

18  process, Your Honor, because each of these RFAs are separate

19  and Your Honor needs to make a finding as to the objections or

20  the, in instances where we've admitted the problems associated

21  with each RFA.

22          THE COURT:  Any possibility of withdrawing this

23  without prejudice to be renewed at a later date?

24          MR. WINCHESTER:  Judge, we thought about it and, you

25  know, we recognize this is a burden on the Court and we're not

67

1   interested in increasing your workload or the government's but

2   in fairness we served these a year ago.  This is a case they've

3   been investigating since 1995 and, you know, when counsel says

4   let's put it off till trial cause maybe I'm going to beat

5   Abbott on summary judgment, well, in fairness--

6            THE COURT:  Yeah.

7            MR. WINCHESTER:  --a lot of these RFAs are admit you

8   knew AWP was higher--

9            THE COURT:  Yeah.

10           MR. WINCHESTRER:  --than acquisition cost.  That's

11  going to bear on summary judgment for us.

12           THE COURT:  Well, I have to agree with that.

13           MS. ST. PETER-GRIFFITH:  Judge, can we just sort of

14  try and further narrow the scope though?  Can we just focus on

15  - one of our objections and it's a significant one because of

16  the number of RFAs that it deals with, there are a whole host

17  of RFAs that are outside the `91 through 2001 period of the

18  case, some going back to the early `70s.

19           THE COURT:  Okay.  Can we limit the time period?

20           MR. WINCHESTER:  Well, Your Honor, I think the--

21           THE COURT:  At least initially.

22           MR. WINCHESTER:  Respectfully, I'd say, no, we can't.

23  Here's why, our--

24           THE COURT:  You can't but I can.

25           MR. WINCHESTER:  Well and you may.  Your were just

68

1   asking me, Your Honor.  We'll do what you'd like but here's

2   why I would say we shouldn't, how about that.  Our position all

3   along has been you've charged us with a set of conduct, you say

4   we did bad things between 1991 and 2001.  Okay, that's fine.

5   The Court's talked about you get discovery through 2003 on what

6   you allege to be the bad things Abbott did.  Our point in

7   response and Judge Saris has said unequivocally, you are

8   entitled to run this to ground.  I don't know if I'm ever going

9   to, you know, find your way on this but run it to ground is,

10  you government, have known about this not just over the time

11  period you're charging us with but back into the `60s, the

12  `70s, the `80s.

13         We have direct quotes from government officials in

14  charge of these programs that say out loud we know average

15  wholesale price is not a price people are paying and yet this

16  is what we're using to reimburse.  So just trying to conscribe

17  their knowledge to this 10 year period is not going to give

18  anybody, including the Court at summary judgment, the full

19  nature of the government's knowledge of this which Judge Saris

20  has said we are entitled to discovery and to run to ground and

21  to make our best pitch to her about why this should defeat

22  their claims.

23         MS. ST. PETER-GRIFFITH:  Your Honor, the burden

24  associated with going back in time for what we're talking about

25  and one of the reasons why we have objected so vigorously to

69

1    keeping to the timeframe that frankly applies to my brother

2    who are defending Abbott in this case they're very vigorous in

3    their assertion that this is a `91 through 2001 time period.

4    Verifying what needs to be verified for this RFAs, going all

5    the way back to the time period that they have is a significant

6    burden, Your Honor, and we think it maybe one of marginal

7    utility, but many, you know, a number of our objections go to

8    that issue so it is--

9            THE COURT:  All right, it's allowed for the limited

10   time period `91 to 2001.

11           MS. ST. PETER-GRIFFITH:  Your Honor, with regard to

12   the RFAs under category 1 there is one other topic, Your Honor,

13   a general topic that I think we need to address before we get

14   into the individual categories and that's the definition of AWP

15   which is another significant objection which affects all but 50

16   of the RFAs that are at issue here.  Defendants would have us

17   use a definition that is not the definition that Judge Saris

18   has articulated.  And our position is that that really puts us

19   in an untenable position because we're admitting to an RFA

20   using the definition that's not ultimately going to be used at

21   trial or for purposes of this case perhaps.

22           THE COURT:  What's your response?

23           MR. WINCHESTER:  Sure, Judge.  They want to say well

24   you're using your own definition of AWP, we don't have to

25   answer to that.  Our whole point here is and we are entitled to

70

1   get discovery from them that AWP being a price people actually

2   pay is not what they thought it was.  That they thought AWP was

3   what was in the compendia.  So when we present all these RFAs

4   to them and say, admit you knew that AWP published in the

5   compendia was not an average price anybody was paying they can

6   admit that or deny it.  They don't get to change it around and

7   suggest well, Judge Saris said very early in this case AWP

8   ought to be read strictly as an actual average price.  We're

9   entitled to the discovery to show that in fact that isn't how

10  the government understood it and the Court has said that.  So

11  when we give them the RFAs they can admit it or deny it.  I

12  mean it's easy for them to do.

13          THE COURT:  I agree.  I agree.  All right, next?

14          MS. ST. PETER-GRIFFITH:  Your Honor, if we could go

15  through the first categories to address what Mr. Winchester had

16  said, you know, we've asserted our objections--

17          THE COURT:  I just have to tell you that my secretary

18  just found my phone.

19          MS. ST.PETER-GRIFFITH:  Oh, terrific, Your Honor.

20          THE COURT:  In Neiman Marcus.

21          MS. ST.PETER-GRIFFITH:  Oh my.  You know we have

22  answered to the extent that with regard to one through 69 which

23  address the time period that we're talking about, `91 through

24  2001, Your Honor, we've admitted whether or not the quote is

25  contained in the language.  We've told them flat out these are

1  RFAs that go to the question of authenticity.  We told them we

2  can work out authenticity.  We're not going to object to

3  authenticity.  So it's difficult, we preserved our objections

4  with regard to the documents but it's difficult to understand

5  where the problem is.

6         THE COURT:  Well, are you willing to enter into a

7  formal stipulation on the record that you're not going to

8  challenge the authenticity?

9         MS. ST. PETER-GRIFFITH:  Your Honor, I would have to

10  confer with my colleagues before I can say that.

11         THE COURT:  Well before you make assertions like

12  that.

13     PAUSE

14         MS. ST. PETER-GRIFFITH:  Yes, Your Honor, we can.

15         THE COURT:  All right.

16         MS. ST. PETER-GRIFFITH:  So, you know, it's difficult

17  to understand where the objection is because we've admitted in

18  some instances the language is misquoted.  In some instances

19  it's spliced from different pages and put together and our

20  response reflects that.  But to the extent that we can admit

21  that the language is contained in the document we admit that

22  the language is contained in the document.  So it's difficult

23  to understand sort of what the concern is on the part of Abbott

24  with regard to the sufficiency of our response.

25         MR. WINCHESTER:  And to simply – if you look at the

72

1    cases that we've cited, Judge, the Courts say you get a

2    request to admit, you admit it, you deny it.  You don't say

3    admitted with the qualification the document speaks for itself

4    and is out of context.  Those are not proper admissions.  All

5    we're looking to do is have them clean it up and take out what

6    we would submit are the objections that are just not proper.

7    We're not saying that they're waiving their ability to contest

8    admissibility at least later but let's have you say at least

9    for a quote out of the document that we attached to an RFA for

10   goodness sakes we admit it was said, we admit it was said by

11   somebody with knowledge.

12            MS. ST. PETER-GRIFFITH:  But, Your Honor, the problem

13   with that is if the document doesn't get admitted into evidence

14   the RFA can still be used.  An RFA is admitted for all purposes

15   in a case.  So what we have--

16            MR. WINCHESTER:  So they can admit it--

17            MS. ST. PETER-GRIFFITH:  So what we have is a problem

18   where it's the cart before the horse.  We have documents that

19   they're quoting from that may never be admitted into evidence

20   but the quote may be.  And that's a very difficult, you know,

21   judgment to make at this juncture, Your Honor.

22            MR. WINCHESTER:  They can always admit them, Judge.

23   I mean if their point is you need more context, okay, fine.

24   Give us the admission that it says what we say it says cause

25   it's in there.  It's a quote.  And then you can later say; well

73

1   now you need to see the rest.  Okay, fine, introduce it

2   yourself.

3              THE COURT:  Allowed.

4              MR. WINCHESTER:  Next category, Judge, and these are

5   very similar.  We're on now items 144 to 173 and I'll give the

6   Court a couple of examples, but these are literally admit you

7   said what you said.  So we've got documents, for instance let's

8   say No. 149, in or about 1984 HHS was convinced as the factual

9   matter that there was a significant discrepancy between AWP and

10  actual sales price.  We've got documents that back that up, but

11  that's the factual proposition, admit it or deny it.  And we

12  get, objections, we stand on our objections, no answer.

13             MS. ST. PETER-GRIFFITH:  Your Honor, with regard to,

14  I'm sorry, Mr. Winchester--

15             THE COURT:  That was 149.

16             MS. ST. PETER-GRIFFITH:  149, 149 is outside the time

17  period.  That's in 1984.  So, and I would tell you that we

18  stood on our objections with regard to those that were outside

19  the time period.  I think if we move to I believe 166 within

20  this same category of documents, Your Honor, which, or 167 I

21  believe is the first one within the time period.  With regard

22  to those we admitted with qualification or denied.  The problem

23  is, is that Mr. Winchester has cited that these are quotes that

24  come from documents.  We requested the documents that they come

25  from.  If you just read the RFA it's not, the items are not in

74

1   quotes and there's no attribution to a particular document.

2        So our position is we admit that it's in the public

3   record but for the most part, Your Honor, there are some, you

4   know, we have to go one by one but for the most part we've

5   admitted that they may be in the public record but we defer to

6   the public record because we cannot admit to a paraphrasing of

7   a document that's not attributed anywhere.  And, you know, so –

8   but we can admit to what's in the public record.

9        MR. WINCHESTER:  Judge, for these – these are factual

10  propositions.  We're stating facts.  There is, we believe,

11  ample evidence to support these facts but these are conclusions

12  drawn from what we believe the evidence is.  So when we put it

13  before them and we say, let's take 172, on June 13, 2000 the

14  HCFA administrators believed that on several occasions the

15  administration had unsuccessfully sought from congress the

16  tools necessary to ensure the system was paying actual price

17  rather than a contract price and that's a fact.  Tell us, we

18  admit it, we deny it.  And they give answers like, subject to

19  all of our numerous objections we admit that those statements

20  may exist in the record.  Well, that's not an admission or a

21  denial.  We're saying this is the conclusion we draw from the

22  evidence that's out there.  It is a fact.  You can say yes or

23  no, admit it, deny it, that this is what was the state of

24  knowledge of the organization that administered the programs at

25  issue in the case.  They can do that.

1          MS. ST. PETER-GRIFFITH:  Your Honor, I think when we

2    began this discussion concerning this particular category of

3    documents that Mr. Winchester attributed them as coming from

4    documents them as being quoted form documents and we have no

5    attribution, you know, that's why this particular - and, Your

6    Honor, for these we do have responses.  So the question is the

7    sufficiency of the responses.  At a minimum we need attribution

8    as to where this is coming from because, you know, we can make

9    a statement or they can pull a statement, paraphrase it from

10   the public record but outside of the context not understanding

11   where the context is that they're pulling that from it's very

12   difficult for us to, you know, say yes definitively X,Y, and Z.

13          MR. WINCHESTER:  Judge, the first 69 were the ones

14   that were the direct quotes.  These are just facts.  This is

15   what RFAs are so we say factually here is a fact, admit it or

16   deny it.

17          THE COURT:  Allowed.  Next?

18          MR. WINCHESTER:  Next issue, Your Honor, has to do

19   with a series of RFAs that we have that basically go to were

20   there laws in place that governed the conduct you're

21   complaining about here.  So for instance if you look at our

22   request 105 we say during the relevant claim period time at

23   issue no federal statute or regulation required Abbott or any

24   other manufacturers to report prices to the publishers that

25   incorporated all distinct available to certain wholesalers,

76

1    distributors or purchasers of drugs.  Admit there was no law

2    that required us to do that.  And we get objections, they stand

3    on their objections.  That's legal conclusions.  Respectfully

4    we've got cases that say was there a law, is it in effect.

5    Tell us, was there a law there or not?  They object and give us

6    no answer.  And for all of these that fall in this category,

7    and there are a number set forth in our brief, they're all

8    basically like this.  Admit that there was no rule.  And if

9    they want to come forward and deny that, then fine.  at least

10   we'll be able to pursue from them which rule do you say applied

11   here.  Which rule do you say actually told us that we would

12   have to report to those publishing compendia prices that

13   include discounts?  So they can tell us whether they believe

14   some rule required it or didn't.

15        MS. ST. PETER-GRIFFITH:  Your Honor, if I could just

16   get a clarification so that we understand from the record which

17   RFAs we're talking about in this category.  I have 72 through

18   85 and 87 through 109.

19        MR. WINCHESTER:  I have 72 to 85, 87 and 88, 96

20   through 100, 105 to 109 and 142 to 143.

21        MS. ST. PETER-GRIFFITH:  Okay.  I just wanted to

22   understand the universe, Your Honor, of what we're talking

23   about here.

24        Your Honor, RFAs are about admitting facts.  They're

25   not about drawing legal conclusions and, you know, it's our –

77

1  whether or not a statute exists saying does 42 CFR, you know,

2  Section 1937 exist that's a fact that can be denied or

3  admitted.  Asking about whether or not X, Y and Z legally is

4  the case is a legal proposition and RFAs are not, that's not

5  the purpose and intent of an RFA is to draw--

6          THE COURT:  Well--

7          MS. ST.PETER-GRIFFITH:  --a legal conclusion.

8          THE COURT:  Denied to the extent that it requires a

9  legal conclusion.  Anything that requires a legal conclusion,

10  no, but allowed for the balance.

11          MR. WINCHESTER:  And, Judge, I just point out Rule 26

12  but its text says you can use RFAs for the application of law

13  to fact.  And we have plenty of cases in there that say the

14  existence of a statute – was there a statute that governs the

15  conduct you're alleging--

16          THE COURT:  I've made a ruling.

17          MR. WINCHESTER:  Okay.  The next set, Your Honor, are

18  a few requests that concern the government's position about the

19  application of law to fact, exactly what Rule 26 talks about.

20  And these are, for instance let's look at one.

21      PAUSE

22          MR. WINCHESTER:  If you look in 89 or 90, we're just

23  trying to get them to say what is your position here about

24  what's right and what's wrong.  So in No. 89 we say it is the

25  plaintiff's position that a provider who submitted a claim for

78

1   payment to Medicare Part B or Medicaid for a drug knowing that

2   it would be paid at an amount that exceeded acquisition has

3   submitted a false claim under the False Claim Act.  Could not

4   be more material to the claims they're raising against us.

5           No. 90 is just the flip side.  It says, it's your

6   position that such a provider did not submit a false claim.

7   It's one way or the other.  And they can tell us and what we

8   get are objections and not answers.  These are application of

9   law to fact.  Admit that under this circumstance, which they

10  are alleging in this case is false claim if anything, but we're

11  entitled to know and these are the types of things where

12  they're standing on objections and they will not tell us.

13          MS. ST. PETER-GRIFFITH:  Your Honor, each of these

14  RFAs start with the, it is the plaintiff's position.  The

15  United States position in this case is not a fact, that they're

16  asking us to admit that this is, this is what you're arguing

17  and that's not a proper purpose for an RFA.  It's perhaps

18  appropriate for in the context of a contention interrogatory

19  which is what we point out to them but simply say and each of

20  them start exactly this way, it is the plaintiff's position

21  that.  And we're at a loss frankly, Your Honor, to understand

22  what the purpose of these RFAs is other than to perhaps lock us

23  into a particular legal position which frankly might change

24  over the course of discovery.

25          The United States' position and legal argument can

79

1    evolve over the course of a case so simply to say it is the

2    United States position that and to have that as an admitted

3    fact, Your Honor, is we don't see the utility in that and it's

4    not a proper purpose for an RFA.

5         MR. WINCHESTER:  Judge, the rule itself says you can

6    ask RFAs that apply law to fact.  In terms of evolution we've

7    got 13 years of evolution here.  I mean frogs could walk on

8    land in less time than they've had to evolve their theories.

9    They know what their theories are and so when we say it's your

10   position that it's this or that, yes or no, they can admit it

11   and the rule allows it.

12        THE COURT:  I'm going to allow it.

13        MR. WINCHESTER:  Last issue, Judge, are a series of

14   requests that go directly to government knowledge in the sense

15   that we say, look, one of the many ways, many, many ways in

16   which you knew that the published average wholesale price you

17   were using to reimburse wasn't what people really bought the

18   drugs for is you, government, bought the drugs at prices

19   substantially below AWP.  So we give them requests that say for

20   instance No. 115, admit you purchased Vancomycin from Abbott at

21   X price.  And what we get in response is, well we deny that

22   Medicare and Medicaid purchased it at that price.  Well, that's

23   not an answer.  We asked a question that said did you, the

24   government, purchase at that price.  They don't answer the

25   question.  And so we have a number of these like this that are

1    pure facts.  It's in their capability to answer the question.

2    No dispute that these are factual matters and they won't answer

3    them.

4              MS. ST. PETER-GRIFFITH:  Your Honor, if I could just

5    ask for clarification from Mr. Winchester so that we got a

6    clear record as to which--

7              MR. WINCHESTER:  Certainly.

8              MS. ST. PETER-GRIFFITH:  --RFAs we're talking about.

9              MR. WINCHESTER:  I certainly can.  I'm talking about

10   Nos. 112, 114 through 123, 125 to 128, and I believe also 142

11   and 43 is what I have.

12             MS. ST. PETER-GRIFFITH:  Okay, Your Honor, with

13   regard to 112, we've already indicated that we would answer

14   that.  With regard to those dealing with government purchases

15   our position is, Your Honor, that purchases under the federal

16   supply schedule, purchases by the VA is first of all incredibly

17   burdensome to place upon us to have to seek out that

18   information and it's wholly immaterial.  This case is not about

19   the government purchasing drug products.  It's about the

20   reimbursement programs of Medicare and Medicaid.  We have

21   answered these RFAs to that extent.  I'm not sure that each of

22   the RFAs that Mr. Winchester listed deals directly with the

23   government purchasing and frankly, Your Honor, I think we

24   probably – if I could just check.

25             MR. WINCHESTER:  No, that's fair.  They don't all,

81

1   Judge.  There are certain of them like 127 if you look at it,

2   it says admit that during the relevant claim period in

3   connection with Medicaid--

4           THE COURT:  Okay, can we narrow it to the ones you're

5   actually seeking.

6           MR. WINCHESTER:  What's that?

7           THE COURT:  Can we narrow it then to the ones you're

8   actually seeking.

9           MR. WINCHESTER:  These are among the ones we're

10  actually seeking.  Counsel pointed out that not every one of

11  these deals directly with government purchases--

12          THE COURT:  Right.

13          MR. WINCHESTER:  --and that is true.  There are a

14  couple of these that are not directly on admit you bought the

15  drug at X price.  And so I just wanted to make that clear.

16  There are some like you see in 127 that just says basically

17  admit that during the relevant claim period we gave you AMP

18  data, average manufacture price, and we get, and this is a good

19  one, we get admitted with the qualification that you only gave

20  us AMP in order to do the Medicaid rebates and everything else.

21  Again, that's one that we think is a lot more verbiage than

22  just what we're entitled to which is admit it.

23          MS. ST.PETER-GRIFFITH:  Your Honor, our problem is

24  this.  These are the types of questions that we're going to

25  have to go through category by category because we have

82

1  responded and the issue I believe is the sufficiency of the

2  qualification that we've provided and with each of these being

3  - we can't just sort of wholesale category say the response

4  isn't sufficient because there's a qualification to the answer.

5  We have provided an answer and the sufficiency I think we're

6  going to have to through one by one because we are committed to

7  qualify our answer to the extent that it is appropriate.

8         THE COURT:  All right, I'm going to deny this one

9  without prejudice and come back to it if you feel you really

10  need it.

11        MR. WINCHESTER:  Thank you, Judge.  I think that's it

12  on this one.

13        THE COURT:  All right.  Then we move to 5179.

14        MR. GOBENA:  Yes, Your Honor.  Good afternoon, Gejaa

15  Gobena here on behalf of the United States.  And I have some

16  good news to report which is that counsel and I have made

17  substantial progress in narrowing the issues that are, we need

18  to present to Your Honor.

19        THE COURT:  All right.

20        MR. GOBENA:  And I don't know if you want me to go

21  through the issues that we resolved, but I think--

22        THE COURT:  No.

23        MR. GOBENA:  --but I think we agree--

24        THE COURT:  Done.

25        MR. GOBENA:  Okay.  We've agreed to memorialize it in

83

1   correspondence and we should be able to take care of that

2   after the hearing.  There are really only three areas of

3   dispute here.

4           THE COURT:  I just want to get the motion in front of

5   me.

6           MR. GOBENA:  Sure.  And--

7           THE COURT:  I'm sorry, Mr. Gobena.

8           MR. GOBENA:  No problem.  It's 5179.

9           THE COURT:  Yep.

10          MR. GOBENA:  It's a motion to compel documents and

11  deposition testimony.  And then the other motion is a motion

12  for the Court to order compliance with previous Court orders.

13  And actually both of them are interrelated.  Actually 5609

14  which comes later on in your sheet is interrelated with 5179.

15          THE COURT:  Well should we hear them together then?

16          MR. GOBENA:  Yeah, we can hear them together.  And

17  basically the cross over with those two motions deals with a

18  certain category of documents.  We are seeking to take

19  deposition testimony from Abbott's sales force and these are

20  the people who are out there actually marketing and selling the

21  drugs at issue in this case.  And there are two categories of

22  documents that we were seeking in particular.  One were

23  personnel files that had sort of evaluations, sales goals, to

24  help us understand how these sales force people were

25  incentivized to sell the drugs.  And then a separate category

84

1   were working files and these are the files that reflect their

2   day-to-day interactions with customers of Abbott.  And I

3   mentioned earlier we made a substantial amount of progress in

4   resolving some of the disputes about that.  And again, this

5   touches both 5179 and 5609.

6           Here's where we have some dispute.  There are certain

7   former Abbott HVD employees whom we subpoenaed.  And Abbott

8   actually agreed to represent those former employees I believe

9   because they're now working for a spin-off company called

10  Hospira that's also represented by Jones Day and they

11  represented them.  And the subpoena called for documents.  And

12  the witnesses provided documents and then counsel reviewed

13  documents and provided whatever they thought was responsive.

14  The issue that we have is that at least in one deposition in

15  particular a witness indicated that they provided a box plus an

16  eight inch additional stack of documents that covered personnel

17  files and their working policy, two different categories of

18  documents.

19          What was produced ultimately on that sales force

20  employees behalf was just 38 pages of personnel files.  Now we

21  tried to go to counsel and figure out what exactly the criteria

22  they're using that would sift out thousands of pages of

23  responsive materials that seem to be relevant on their face,

24  working files is what the witness called it, they're unwilling

25  to provide the criteria.  So our position is, why don't they

85

1   just produce all the documents to us, we can make a relevance

2   determination.  These witnesses obviously thought they were

3   relevant otherwise they wouldn't have gathered them in the

4   first place.  And that for the former people represented, you

5   know, by evidence that they be able to track down if they could

6   just provide the documents rather than filter because we don't

7   know what's being filtered out.  So that's the first issue.

8          THE COURT:  All right.

9          MR. WINCHESTER:  Judge, with respect, do we get to

10  get behind all of their determinations of what should be

11  produced as responsive to all of our requests in this case?

12  That's just not how it works.  They served subpoenas.  We

13  represented the people and we told all these people, look, give

14  us everything you got, bring it all in.  We'll take the task of

15  determining what's responsive and that's what we did.  So to

16  have them come in now and suggest, well, we need to get behind

17  everything Jones Day did is a little offensive.  It's not

18  normal ground rules.

19          They're certainly not offering to give us all the

20  documents let's say from OIG that they chose not to produce

21  cause they determined them to be not responsive and that's all

22  we did.  People gave us documents that they collected and when

23  counsel says these people must have thought they were relevant,

24  in fairness there's no basis for him to say that.  We asked

25  people give us everything you have and we will go forward and

86

1   make the determination of relevancy.  So when they now say,

2   well we want everything that you guys decided was not

3   responsive there's no ground for that and it certainly not any

4   rule that's going to apply both in the case or any other case.

5   So we just think there's no basis for it.

6          MR. GOBENA:  May I just briefly respond to that, Your

7   Honor?

8          THE COURT:  Sure.

9          MR. GOBENA:  The witness, for example the one witness

10  I'm talking about said that of the thousands of pages of

11  documents they produced of which only 38 were produced they

12  included his working files.  Those are inherently relevant to

13  this case.  It's back and forth with the customer--

14         THE COURT:  Now which witness is that?

15         MR. GOBENA:  This is a guy named Frank Janardi (ph).

16  And that's just one witness.  But we don't know if this is an

17  isolated incident or symptomatic of a larger problem in which

18  very restrictive search criteria or sorry, filtering criteria

19  were used, and we're not questioning the integrity of counsel.

20  I, frankly we just would like, A, to know what the criteria

21  was.  And we've actually had conversations with Abbott when

22  they asked what criteria does the government use in searching

23  for documents and collecting them.  I don't see why at least

24  the transparency can't be offered.  And secondly, for that

25  particular witness, why not just produce those documents?  It

87

1   seems like there's a lot more work involved in filtering--

2          THE COURT:  Well are you willing to produce it for

3   one witness, for this one witness as a sample?

4          MR. WINCHESTER:  The materials that we combed

5   through?  Your Honor, I guess I'd have to go and ask the client

6   about that.  He raises this; let me say I didn't go through

7   those documents personally.  I don't really know what was in

8   there.  You're talking about people in 2008 who are being

9   deposed so when they bring a bunch of things in you got five

10  years at least worth of things outside of the period.  So--

11         MR. GOBENA:  Well, this witness was specifically

12  identified in the motion papers, Your Honor, so there's been –

13  it's a witness that we've actually specifically--

14         THE COURT:  Yeah, I realize that.

15         MR. WINCHESTER:  So it's in there, Judge.  But the

16  idea that you can equate when a witness says I brought in a box

17  of stuff with it must all be relevant, it doesn't hold.

18         THE COURT:  No, I agree with that.

19         MR. GOBENA:  I mean, but certainly they're talking

20  about working files, the files that they used to interact with

21  their customers.  How's that not relevant?  I mean, I'm not

22  understanding what the filter is that was being applied to sort

23  out working files and that's the concern.  I think we're not

24  questioning again that, you know, the integrity of counsel.

25  All we're saying is, okay, when a witness says they provided

88

1   thousands of pages of working files and ultimately those

2   weren't produced, well those are inherently relevant.  We'd

3   expect those to be produced.  And, I mean I think Your Honor

4   has come up with a reasonable solution which is okay, provide

5   those working files that were withheld from Mr. Janardi and

6   then we can revisit the issue later on if they'd like.

7           THE COURT:  All right, I'll permit it to that scale.

8           MR. GOBENA:  Thank you, Your Honor.  The second issue

9   relates to a category of depositions that still, we're still

10  talking about these sales force personnel.  Your Honor, I think

11  you need to understand some important background context.

12  Something like two-thirds of Abbott's document production in

13  this case came after the close of fact discovery.  We're

14  talking about 2.2 million pages of documents after fact

15  discovery was closed, after we're supposed to have done our

16  depositions in this case.

17          Within those documents one of the categories of

18  documents that they produced or included some documents relates

19  to these sales force working files.  And so what we asked for

20  in our motion is the opportunity to on a limited basis re-open

21  or commence a few depositions and I have a proposal for a

22  number that, you know, to keep things within control,

23  depositions based on the late production.  In addition to the

24  late, sort of the post fact cutoff production, there's also

25  another area of dispute that I think we worked out but is

89

1  relevant to this which is Abbott had several--

2          THE COURT:  What are you looking for specifically?

3          MR. GOBENA:  Basically, the ability to reopen or open

4  five depositions based on late production of documents.

5          THE COURT:  It's late in the game.  I'm really not

6  happy about more discovery at this point.

7          MR. GOBENA:  I understand, Your Honor, but it's not a

8  function of our, it's not something that we, a problem that we

9  created.  There's two reasons.  One is the late production and

10 we've had a dispute over whether or not Abbott was going to go

11 to its former employees and collect working files from them.

12 They said they're not obligated to.  We recently reached, made

13 an agreement where we said, okay, can you give us the contact

14 information and then we'll go find these people and ask for the

15 files and provide you whatever they provide us so that both

16 sides have the same information.

17         What if it turns out in those files there's some

18 highly relevant information that, you know, because of this

19 dispute that only got resolved now we have access to and like

20 to question the witness about?  You know, there are a lot of,

21 there's 153 sales force people.  We're only asking for five.

22 It's a very narrow limited request and it may very well be that

23 we don't need to take those depositions but we'd like to have

24 that limited option to do that.

25         MR. WINCHESTER:  That's a lot of what ifs in there,

1  Judge.  First of all, we did not produce documents out of

2  time.  the Court extended the discovery period and our

3  documents were produced.  They can't come here today and tell

4  you who they want to depose.  They just want some blanket

5  authority to go and maybe re-depose people they've already had

6  or get some new people that they, but they can't tell you who

7  they are now.  So I think at best this is not right.

8         THE COURT:  No, I think unless you can be more

9  specific at this time it's too vague.  Denied.

10        MR. GOBENA:  All right.  Your Honor, the final issue

11  relates to the deposition of two former Abbott executives,

12  Dwayne Burnham and Thomas Hodson.  Dwayne Burnham was the

13  former CEO of Abbott and Thomas Hodson was the former chief

14  operating officer.  The reason why we want these depositions is

15  that these people have personal unique knowledge about the

16  issues in the case.

17        Let's start first with Mr. Burnham.  Mr. Burnham was

18  the CEO.  We have documents in evidence that we submitted in

19  previous briefings that establish that he was directly involved

20  in the formulation, approval and advocacy of Abbott's position

21  on AWP and government reimbursement policy.  He actually went

22  and interacted with Congress people about reimbursement issues.

23  He was consulted by his subordinates about what Abbott's

24  position was ultimately going to be on AWP and government

25  reimbursement.  And why that's important is that there's some

91

1  legislative developments during his tenure where Congress is

2  looking into ways to reform AWP based reimbursement.

3           THE COURT:  But you're just figuring that out now?

4           MR. GOBENA:  Sorry?

5           THE COURT:  You're just figuring this out now?

6           MR. GOBENA:  I'm sorry, figuring out what, Your

7  Honor?  I'm confused.

8           THE COURT:  Well, I mean why wasn't this person

9  deposed earlier?

10          MR. GOBENA:  We tried to depose them and, Your Honor,

11 they asked for a motion for a protective order and you granted

12 it on a limited basis.  You said, they said there are going to

13 be 30(b)(6) depositions that would cover their knowledge,

14 activities, what they engaged in.  We took those depositions.

15 I can read you from the transcripts, none of the witnesses were

16 prepared at all to testify about these people.  These witnesses

17 knowledge none of them were willing to testify, able to testify

18 about their activities.  They were unwilling to provide

19 anything or unable to probably is more accurate to put it.  The

20 only way to find out about their personal knowledge and

21 activities, and they are directly involved with the issues in

22 this case, is a deposition.  The 30(b)(6) that Your Honor

23 offered as an alternative didn't work.

24          In addition, we actually did object to your Honor's

25 original order and Judge Saris--

92

1            THE COURT:  When was the 30(b)(6)?

2            MR. GOBENA:  Sorry?

3            THE COURT:  When was the 30(b)(6)?

4            MR. GOBENA:  The 30(b)(6)s happened earlier this

5    year.

6            THE COURT:  When?

7            MR. GOBENA:  I believe in March.

8            THE COURT:  And when was this motion filed?

9            MR. GOBENA:  This motion was filed March 31st, soon

10   after the depositions took place.

11           THE COURT:  Okay, soon after.  All right.

12           MR. WINCHESTER:  Judge, if I may.  If this sounds

13   familiar it's because you've already ruled on it.

14           THE COURT:  Yeah, yeah.

15           MR. WINCHESTER:  There's nothing, there's nothing new

16   that has happened that requires any kind of different result.

17   First of all, this Court ruled that these depositions would not

18   go forward.  They were permitted to go ahead and take the

19   30(b)(6) depositions.  At the hearing on 1/31, January 31

20   counsel for the United States, Mr. Breen said, Judge, I

21   understand you denied the ruling, our ability to get these

22   people now.  Can we modify the 30(b)(6) request to ask these

23   30(b)(6) witnesses what was in these individuals' mind?  The

24   Court said, no.  Why?  Because we're already past the end of

25   discovery and you told them you have to work with what you've

93

1  got.  So this notion that these witnesses didn't know what Mr.

2  Hodson or Mr. Berman were thinking, you had already ruled on

3  that.  That's already been affirmed.  There's absolutely

4  nothing here.

5       When we talk about what these witnesses knew or

6  didn't know on the 30(b)(6) side with respect to lobbying which

7  Mr. Gabini was talking about, they had four fact witnesses, two

8  30(b)(6) witnesses, six witnesses all tolled, about 10 days of

9  testimony.  When you look at their brief as to what they say

10 they thought they might need, it's all about the question of

11 they asked the witness, do you know what Mr. Berman thought

12 about that?  The witness said, no.  Well, there's a reason for

13 that.  You told them that they didn't have to be prepared on

14 that.

15      So there's absolutely nothing new with respect to

16 either one of these witnesses.  With respect to Hodson, Mr.

17 Hodson, the only thing they cite as a reason they'd like to

18 talk to him in their brief is he was a witness in another case

19 who testified about the corporate relationship between Abbott

20 and TAP and we've been around this block before too.  As this

21 Court has held on a number of occasions the, TAP case has

22 nothing to do with this case that's here.  So they still have

23 to make their showing.  You've already ruled on it.  Judge

24 Saris has already affirmed you.  The one thing she disagreed

25 she let them take Mr. Gonzalez' deposition, the president of

94

1    the HPD, the hospital products division.  That's already gone

2    forward.  And they've had 10 days of 30(b)(6) deposition on the

3    subject and there's nothing in their brief other than what,

4    exactly what you told them would not be the proper subject of a

5    30(b)(6) deposition.

6              MR. GOBENA:  Your Honor, if I may address my

7    brother's comments real quickly.  First of all, these witnesses

8    have demonstrated document involvement in the issues in the

9    case.  The 30(b)(6)s were meant as a way to provide insight

10   into that, into whatever their role was in the case.  None of

11   the witnesses could testify about that.  I can read you from

12   various witnesses, 30(b)(6) witnesses.  Mike Sellers who was

13   offered on a variety of topics was asked the question, in

14   preparing for today's deposition, the 30(b)(6), did you do any

15   inquiry to find out what involvement was of Tom Hodson in any

16   of the topics that are at issue in today's deposition?

17   Objection to form.  Answer, no.  What about Dwayne Berman?

18   Answer, no.  These witnesses did not even remotely try and

19   prepare themselves to address the factual information that

20   might be directly in possession of these two former executives

21   who have documented knowledge of the issues of this case.  And

22   what's more, Mr. Berman's all over memos that

23   deal with AWP and government reimbursement issues.  He

24   obviously was involved in the company's formulation of that

25   policy.  That directly goes to scienter in this case.

95

1          With respect to Mr. Hodson he testified as a

2     30(b)(6) answering questions about AWP, government

3     reimbursement.  In addition the senior vice president for the

4     division whose comments at issue in this case, a guy named Don

5     Robertson testified that Mr. Hodson was responsible for

6     approving sales and marketing plans for his division.  So he's

7     directly involved in the decision making process that is

8     implicated in this case.  Your Honor offered an out for the

9     defendants to provide 30(b)(6) testimony.  They didn't prepare

10    their witnesses to address any of the specific factual

11    knowledge that these witnesses have.

12          In addition, Judge Saris indicated that in upholding

13    Your Honor's ruling that she thought that perhaps these

14    depositions could go forward or should go forward I should say,

15    indicate--

16          THE COURT:  Compromise, five written deposition

17    questions.

18          MR. WINCHESTER:  Thank you, Your Honor.

19          MR. GOBENA:  Your Honor, if I can - I know Your Honor

20    ruled, but if I could briefly ask for a moment of your

21    indulgence.  We did a written deposition before and it, you

22    know, and we fought about the result mostly because it was -

23    and it's not any, I'm not casting any aspersion on counsel but

24    this was, basically it was treated as an interrogatory.  You

25    know we're willing to go to where these witnesses are.  if you

96

1   want to put severe limits on the questioning, we can do an

2   hour or two with these witnesses on specific documents, but I

3   think it's important to have the live, in-person testimony

4   because high level people in this case have been questioned

5   even on the government's side.

6          THE COURT:  Five written deposition questions.

7          MR. WINCHESTER:  Thank you, Judge.

8          THE COURT:  All right, that takes us to Document--

9          MR. WINCHESTER:  The home stretch.

10         THE COURT:  Yeah.  We're not finished.  All right.

11         MR. WINCHESTER:  No, the next one, Judge, I think

12  you're at the last one here.

13         THE COURT:  Right.

14         MR. WINCHESTER:  Which I think is--

15         THE COURT:  I'm jumping ahead.

16         MR. WINCHESTER:  --5276.

17         THE COURT:  Right, 5276 it is.

18         MR. WINCHESTER:  Judge, this is our motion.  It is

19  very discreet.  There are two pieces of paper that we

20  inadvertently produced which are privileged documents, memos

21  directly from Abbott's in-house counsel to persons who asked

22  for that counsels advice, two documents out of about three

23  million pages here.  The protective order in this case

24  specifically contemplates and both parties carefully wrote this

25  in to say if you inadvertently produce privilege documents,

97

1  that's not going to affect the waiver.  It says right there,

2  not going to affect a waiver.  Here's what you have to do, make

3  a formal written request to get the documents back within 21

4  days of when you learn about them and if they were

5  inadvertently produced you get them back.  And that is exactly

6  the situation here.  These documents slipped through and were

7  made in a production that we made in about November of 2007

8  having to do with the former Abbott Home Infusion Services

9  Group.  They're two copies basically of the same document

10  really.  And we learned about this inadvertent production in

11  March of this year when the government, and it was actually

12  counsel Ms. St. Peter-Griffith here, tried to mark the

13  documents as exhibits to use with our 30(b)(6) witness on

14  compliance.  And she tried to put them in, and the defense

15  counsel at the deposition immediately snapped those documents

16  back and the government to its credit tore the documents up

17  right sitting there, did not use them.  Within 21 days, in fact

18  19 days later we submitted a written request to say give us

19  those documents back.  Put them in a sealed envelope if we're

20  going to fight about it, and that's where we are.  So there's

21  no question that we have complied exactly with what the

22  protective order says and there's no waiver.

23          The three issues the Court has to consider here was

24  this production of these two documents out of three million

25  inadvertent versus being purposeful or somehow grossly

1   negligent.  Second, are the documents privileged?  And third,

2   did we comply with the protective order?  I think as I've just

3   said taken them adversely we certainly have complied with the

4   protective order.  To the question of privilege, Your Honor I

5   believe has these documents as part of the government's

6   in-camera submission.  We don't need to talk about the

7   substance of them in open court here, but you can pretty

8   clearly see there is a request for legal advice going from two

9   business people to the Office of General Counsel and you get a

10  responsive memo back that says here is my legal advice on your

11  questions.  I don't think there can be a dispute that this is

12  not privileged communication or that that is a privileged

13  communication.

14          So the real issue is was this an inadvertent

15  production, and the cases that we've provided the Court make

16  very clear this issue of inadvertent production is the vain of

17  these huge cases where you're talking about thousands, millions

18  of pages to be produced and the Court's make clear where you've

19  got reasonable steps in place to make sure this doesn't happen.

20  When it does it's inadvertent.  And we've given the Court the

21  only record that there is on this through the declarations that

22  tell you the way we do this is a two-tiered process.  The first

23  tier are people who are basically conducting the clerical or

24  mechanical task, you don't do privilege determinations.  What

25  you do is mark every last document that has a lawyer on it,

99

1   communication to or from a lawyer.  Don't try to decide for

2   yourself is it privileged, just mark it.  And all of those go

3   to a second tier of more senior counsel who review those and

4   make the actual determination on privilege.  We either produce

5   them or we log them on our privilege log.

6           In this case what happened was for these two copies

7   of this same document for reasons unbeknownst to me, those

8   documents accidentally were not marked by the first tier

9   reviewers so they never got to the second tier reviewers.  And

10  that as all the cases we've presented make clear is an

11  inadvertent production.  We clearly did not produce these

12  documents purposefully.  And this is the subject of all the

13  waiver cases that the government tries to put forward which

14  says well you can't offer the document in support of some

15  theory of your and then hide the rest.  Well we didn't do that.

16          We're not offering these documents in support of any

17  theory we have.  These were documents that slipped through in

18  response to a number of the government's inquiries.  There was

19  no purpose to this nor in light of the cases that we've shown

20  can there be any suggestion of a gross negligence here in light

21  of our procedures.  So we complied with the protective order.

22  We've got privileged documents.  They were inadvertently

23  produced and we'd like them back.

24          MS. ST. PETER-GRIFFITH:  Your Honor, what my brother

25  counsel for Abbott I think omitted from the discussion is that

100

1    there was a waiver and there has been a waiver on this

2    subject matter.  That deposition that was at issue was their

3    lawyer, Abbott's in-house lawyer who they put up as the

4    30(b)(6) representative on compliance issues.  Surrounding his

5    deposition Abbott produced more than 30 documents that were

6    generated by counsel and were using it affirmatively in this

7    case to show their compliance measures.

8           This particular document, we don't have to get into

9    the subject, Your Honor, but it's our position that this

10   particular document goes to that subject matter and it is

11   impermissible for Abbott to pick and choose which documents

12   they're going to waive attorney-client privilege on and produce

13   30 of them and say, look how good we were as corporate

14   citizens, and then withhold those that may not be as favorable

15   to them.  That is a waiver.  It's – waiver on the subject

16   matter.  It is impermissible.  They put their lawyer up, Your

17   Honor, as the 30(b)(6) rep to talk about compliance.

18          Numerous witnesses have said they relied upon

19   in-house counsel to determine whether their practices of

20   whether they were in compliance.  The general counsel for this

21   case wore a separate hat of being the compliance officer.  And

22   with regard to the issue of are these documents privileged,

23   Your Honor, that is a burden that Abbott has and frankly it's

24   difficult to understand.  These particular documents weren't in

25   the, didn't come from the General Counsel's Office.  They came

101

1   from contract files and they appeared to be advice consistent

2   with the role of a compliance officer as opposed to a general

3   counsel.

4        Additionally, with regard to the issue of

5   inadvertence, Your Honor, we understand there's been a mass of

6   production here, but one of the reviews these particular

7   documents twice missed attorney review – they all, attorney

8   reviewed for privilege.  They also missed a review for

9   confidentiality designations which the protective order in this

10  case is very, very clear.  These documents were stamped

11  confidential and it's our position that it rises to the level

12  of gross negligence if there's a, if a document is reviewed for

13  confidentiality as carefully as it should be and it, you know,

14  the privilege character isn't identified.  But the real big

15  issue here, Your Honor, is the issue concerning the waiver of

16  the subject matter with regard to compliance matters and the

17  production of documents.

18       THE COURT:  All right, it's after one.  I'll think

19  about this over the lunch period, and I'll see you at two

20  o'clock and then according to my schedule we have 5356, 5692

21  and the one that was added this morning, Mr. Duffy, is?

22       THE CLERK:  5356, 5692 was the one added this

23  morning.  And 5609 might still be up there as well.

24       UNIDENTIFIED:  Actually that'll be resolved.

25       THE COURT:  No, we dealt with 5609.

102

1          THE CLERK:  Resolved.

2          THE COURT:  All right, so two o'clock.  I do have a

3   criminal matter at 2:30 so we'll do our best.

4                          RECESS

5   //

6   //

7   //

8   //

9   //

10  //

11  //

12  //

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

103

1          **A F T E R N O O N   P R O C E E D I N G S**

2          THE CLERK:  Okay.

3          MR. WINCHESTER:  Before you rule on this privilege

4    document motion could I address a couple of things that counsel

5    brought up in her argument?

6          THE COURT:  If I'm ruling in your favor does it

7    matter?

8          MR. WINCHESTER:  Not at all.

9          THE COURT:  All right.  Allowed.  I had made that

10   determination before I came out.

11         MR. WINCHESTER:  Excellent.  Thank you, Judge.

12         MS. ST. PETER-GRIFFITH:  Thank you, Your Honor.

13         THE COURT:  Okay, that leaves us now with as I see it

14   5276 next or did, is that the one I that I just--

15         MR. WINCHESTER:  Well that's the one you just did,

16   Your Honor.  That was the privileged document.

17         THE COURT:  Okay.  So then - Mr. Duffy, next time you

18   have to put these in numerical order.

19         THE CLERK:  I will, Your Honor.  The last to the next

20   one is 5642.

21         THE COURT:  Right.

22         MR. HENDERSON:  I have 5357.  That's actually a

23   memorandum.

24         THE COURT:  No, 5356.

25         MR. HENDERSON:  Yes.  That would be the motion.

104

1          THE COURT:  Yeah, that's the next one.

2          MR. HENDERSON:  Shall I proceed, Your Honor?

3          THE COURT:  You may.

4          MR. HENDERSON:  Okay.  This is the government's

5   motion for a protective order in the Day case with respect to

6   some 30(b)(6) topics.  And I would suggest to Your Honor that

7   we do have to keep in mind the veritable orgy of discovery

8   that's been going on on the part of the defense side.  They've

9   taken about 50 days of depositions of government employees, 21

10  of Office of Inspector General employees questioning

11  extensively about these various OIG reports.  And there was a

12  list of 76 reports that were produced early on in the case

13  along with work papers for a great many of them.  And so what

14  I'm suggesting, Your Honor, is we have to apply some rule of

15  reasonableness.

16          The first two topics that are the subject of our

17  motion, I'm going to group them according to categories, are

18  topics 29 and 51 which relate to some, to OIG reports.  Topic

19  29 deals with a 2001 Office of Inspector General report

20  relating to AID drugs, drugs for treating AIDS and specifically

21  that topic requests, focuses on a chart.  And this chart, Your

22  Honor, is a very simple explanation of drug pricing.  And you

23  look at it and why on Earth Day wants to ask about this chart

24  is beyond me.  If you look at the chart all it has is the most

25  basic information that starts with for example manufacturers'

1   established wholesale prices and average wholesale prices and

2   wholesale acquisition costs.  Well, there's no dispute about

3   that, Your Honor, at least not with respect to Day.  Day has

4   admitted in its testimony and answers to interrogatories that

5   it submits its wholesale AWPs and WAC prices to the compendia

6   with the expectation that these compendia will publish them and

7   in fact they do publish them.  And in the one instance where

8   one of these publishers didn't, Day promptly sued the company

9   and forced them to publish exactly what Day was reporting.

10          So what they're going to ask the OIG about the fact

11  that on this chart it says that manufacturers set these prices

12  is beyond me and particularly when they're, what they're asking

13  about is the drafting and preparation of this chart and its

14  circulation.  This was public, you know, this was out there on

15  the web so it was circulated to the entire world.  And so I

16  suggest we're just off the deep end here when we're asking

17  about something like this chart which just talks about – the

18  next piece on the chart is states that wholesalers are the

19  middlemen who buy drugs from manufacturers and sell to

20  retailers.  Now why do we need to have testimony from an OIG

21  person who apparently drafted this thing about what he did to

22  prepare this and drafts of it.  I just think, Your Honor, there

23  has to be a limit.  The – so that's really the gist on that

24  particular topic.  They should be focusing on, and there has

25  been lots of focus on the drugs that are at issue in these

1   cases and many, many OIG reports and studies focusing on the

2   differences between actual acquisition costs and published

3   prices.

4         THE COURT:  All right.  Why shouldn't I allow this

5   portion of the motion?

6         MS. REID:  Good afternoon, Your Honor.  My name is

7   Sarah Reid.  I'm with Kelly Dwyer and representing Day.  I

8   think it's the first time I've had the honor of being in your

9   courtroom.

10        THE COURT: We welcome you.

11        MS. REID:  The, just as the outset, there's been a

12   lot of discovery.  There has not necessarily been huge amounts

13   of discovery by Day.  They have of course have participated in

14   the Abbott discovery but I don't think Day has in any way

15   abused or been overbroad in its discovery.  It's tried to be

16   focused.  And the reason that this particular report is of such

17   interest and the reason that we designated it as a topic is

18   because it is a study by the Chicago office of the OIG which

19   demonstrates exactly the understanding of how the priced points

20   worked in the market for all drugs.  And the report itself

21   specifically refers to the DOJ and WP project.  It refers to

22   the drugs that were under the DOJ AWP noting that they weren't

23   any of the AIDS drugs.  And the chart in question, I don't know

24   if Your Honor had an opportunity to look at, is so interesting

25   because it says exactly what the defendants have said, it

107

1  compares the, you know, what the list wholesale acquisition

2  cost is but notes the actual selling price is the AMP.  Then at

3  that wholesalers it says the list price is the average

4  wholesale price but the actual selling price is actual

5  acquisition cost.

6         So from our point of view we don't see a lengthy

7  deposition but we would like to understand what they looked at,

8  the sources, facts that they looked at that led them to put

9  together this chart, this report which so directly demonstrates

10  an understanding of how the market which is in complete

11  contract to what they've alleged against us.

12         THE COURT:  I'll allow a three hour deposition.

13         MS. REID:  Thank you, Your Honor.

14         MR. HENDERSON:  With respect to topic No. 51, Your

15  Honor, I think you've already resolved this.  This relates to a

16  Office of Inspector General report dated January of 2008 and

17  this was the subject of a request by Abbott for work papers on

18  that.  Day wants to take the deposition, a 30(b)(6) deposition

19  on this and I suggest the same principles apply and the Court

20  should deny or should allow our motion for protective order on

21  that.

22         THE COURT:  Same ruling.

23         MR. HENDERSON:  Very well.  The next two topics are

24  topics No. 32 and 33 and these request 30(b)(6) testimony on

25  the extensions of time that the government requested and

108

1   obtained in the Qui Tam cases while they were under seal.

2   The motions and the supporting memoranda and the Courts

3   allowances of the motions have been unsealed and the defendants

4   have them.  They apparently are not happy with those

5   explanations and would like to understand perhaps my subjective

6   reasons if they differed from what was stated.  I'm sure they

7   would like to probe my views on whether I knew something

8   different or whether I thought something different than what I

9   wrote.  But I suggest, Your Honor, this is off limits.

10          THE COURT:  No, if you want to have a conversation,

11  if you want to have a conversation you can step out of the

12  courtroom.

13      PAUSE

14          MR. HENDERSON:  May I proceed, Your Honor?

15          THE COURT:  You may.

16          MR. HENDERSON:  I suggest that this type of 30(b)(6)

17  deposition is--

18          THE COURT:  The government's motion to this aspect of

19  the - the government's request is allowed to this portion.

20          MS. REID:  Your Honor, I understand that you've

21  ruled.  I just want to note on the record that it is, the

22  requests were made in any effort to look at and construct the

23  record to demonstrate the prejudice as a result of the nine

24  year delay in this matter.

25          THE COURT:  My ruling stands.

109

1          MS. REID:  Thank you.

2          THE COURT:  You're welcome.

3          MR. HENDERSON:  The next two topics, topics 40 and

4  42, request 30(b)(6) deposition testimony about how and when

5  the government learned about the fraud that's alleged in the

6  complaint.  And Judge Saris has rejected a statute of

7  limitations argument.  So this type of testimony is not

8  relevant to a statute of limitations defense because Judge

9  Saris has said that basically on the statute Day's arguments

10  can't prevail.

11          What Day argues I think is that they have a due

12  process argument about the, what they say is a long delay

13  between the originally filing on the Qui Tam complaint against

14  Day which was added in 1997 and the date when the government

15  intervened in 2005.  And I suggest that this due process rubric

16  is simply an excuse for a fishing expedition into the

17  government's internal investigation.  The factual information

18  about what the government learned is, well from Day's

19  perspective they say all these OIG reports are what the

20  government learned about the, what's alleged in the complaint.

21          In addition there is the issue about the specifics

22  that relate to Day, the evidence that Day was intentionally

23  reporting false pricing information with the intended purpose

24  of increasing reimbursements under the Medicare and Medicaid

25  program.  Day knows full well that the evidence that we have on

1   that came from Day.  They know they produced their internal

2   documents and when.  And the evidence came from testimony that

3   was developed in the Qui Tam litigation brought in the state of

4   Texas and those depositions.  They know full well exactly when

5   the government learned of their own conduct because that was

6   disclosed in their production of documents, in the testimony

7   that their current and former employees gave in the Texas case

8   and then finally when they produced their transaction data to

9   us, actually we got it slightly in advance from Texas in about

10   2003.  That's when we could look at their own prices and

11   determine that their average actual selling prices were no

12   relation whatsoever to the AWPs that they were reporting.  So

13   they know full well about what the government learned about

14   their specific conduct and when.  And they have this other

15   layer up here of all these OIG reports.

16           So what I'm suggesting, Your Honor, is that this,

17   these 30(b)(6) topics about how and when the government learned

18   about the fraud, in this situation where there's no statute of

19   limitations issue it's going too far.  We're just--

20           THE COURT:  Okay, let me hear from Day on this one.

21           MS. REID:  Thank you, Your Honor.  Let me just

22   clarify, the thing that Day does not know and the reason that

23   this is such an issue for us is we are still unclear as to when

24   it is CMS first knew allegedly of the actual prices that were

25   paid by Day.  There is OIG reports in 1995 invoices with Day

111

1  invoice prices and that is two years before we were added to

2  the relators Qui Tam complaint, a year before the complaint

3  itself is filed.  What we want with this 30(b)(6) testimony, or

4  we will take it in a written answer, is somebody to commit as

5  to when it is, the government's position is that they first

6  learned of this supposed fraud.  And there has been everything

7  kind of around it but we still don't have an answer to that

8  and, you know, we have of course examined Ven-A-Care on that as

9  to what they gave the government.  But I think that the other

10 half of this is what the government, in that critical time

11 period what their position is on what they knew.

12         THE COURT:  All right.  I'll permit you to have it to

13 the extent of five written deposition questions and in the

14 event you're not satisfied with the responses to those

15 questions you may renew your request.

16         MS. REID:  Thank you, Your Honor.

17         MR. HENDERSON:  Let's see, a few more topics.  Topic

18 60 asks for 30(b)(6) testimony on whether the United States

19 contends that the usual and customary price submitted by any

20 provider to Medicare or Medicaid for any Day subject drug is

21 false or fraudulent.  Now the usual and customary, I'll give

22 you a little background, under the reimbursement methodology

23 that most states employ, they will reimburse based on the lower

24 of several different components.

25         One is the estimated acquisition cost which is

112

1   normally AWP or AWP minus 5% or 10%, whatever the state sells

2   or another component may be a so-called federal upper limit

3   which is a cap, and another component is this usual and

4   customary charge that the pharmacist will submit on the claim

5   form.  And the state methodologies typically provide to pay at

6   the lower of any of these three different components.

7          Now, we're alleging that the estimated acquisition

8   component which includes AWP minus 5% or whatever the state

9   does, that's where the fraud is because the defendants submit

10  they reported phony AWP prices or in some cases WAC prices.

11  We're not making, our complaint makes no allegation about usual

12  and customary charges.  And I don't know why Day is asking

13  this, I suspect it's because they think that if they lock us

14  into a position one way or the other, yes or no, either way,

15  they have some theory, some clever theory for saying, ah-ha,

16  gotcha, the government can't prove its case.

17         But I suggest, Your Honor, where it's not an element

18  of our case, this usual and customary chart is not an element,

19  we don't allege fraud.  If it happened, it was by some other

20  party.  If some pharmacist out there submitted a phony usual

21  and customary price, that's the pharmacist's issue, not ours.

22  We haven't developed proof in the case of this.  We don't

23  anticipate developing proof.  It's conceivable if Day comes up

24  with some theory that is a bit of a surprise we may have to

25  respond to it.  So I don't want to take any position on this.

113

1   I don't know what they've got up their sleeve, but I can say

2   it's not an element of our case.  We don't anticipate any proof

3   and we don't have any position on this.

4          THE COURT:  All right.  Why do you need it?

5          MS. REID:  The reason is, Your Honor, and Mr.

6   Henderson's heard this argument before, the government is well

7   aware, the usual and customary charge is ordinarily defined by

8   various states as to what goes into it.  It has to be certified

9   as true and accurate by the pharmacist.  And then if it comes

10  in at say $20 and the reimbursement formulas give you something

11  less than that under an AWP methodology, then you pay the

12  lesser amount.  The point is the usual and customary charges

13  are certified as on this accurate subject to the penalties of

14  perjury et cetera, et cetera, and our issue for the government

15  is, is their position that the usual and customary charges are

16  false and fraudulent or that they aren't.

17         Now, if they want to give us the answer to that as a

18  contention interrogatory, I will take that, I mean as a written

19  response.  But I think that we're entitled to know their

20  position on that.  This is not a surprise.  They have known

21  that this is an issue.

22         THE COURT:  All right.  How many – can one contention

23  interrogatory do it?

24         MS. REID:  Yeah, I think so.

25         THE COURT:  All right.  Allowed to that extent.  All

114

1  right, thank you.

2       MR. HENDERSON:  Fine.  Finally, two more that are

3  related.  These are the 30(b)(6) topics 61 and 62.  Let me just

4  make a note of Your Honor's ruling on the topic, was it a

5  contention interrogatory?

6       THE COURT:  Uh-huh, one.

7       MR. HENDERSON:  Topics 61 and 62 ask for 30(b)(6)

8  deposition testimony on the compliance guidelines issued by

9  Office of Inspector General in 2003.  These were guidelines

10 that OIG issued providing guidelines for pharmaceutical

11 manufacturers to use and consider in having an effective

12 compliance program to not run afoul of the law.  And these

13 guidelines also talked about the obligation to submit truthful

14 pricing information relied upon by state Medicaid and federal

15 Medicare programs.  And the defendant Day specifically focuses

16 at least on one of its topics on, "the definition of AWP as

17 used in the OIG compliance guidelines," which is a, it's a

18 false characterization because the guidelines have no

19 definition of AWP.  They don't define the term.  They make

20 observations about it as have been made for many years.  Lots

21 of observations about AWP, at least when it's published,

22 doesn't represent, it doesn't reflect actual acquisition cost

23 so I say because of the conduct of the defendants, Your Honor.

24 But in any event there's no definition of AWP in those

25 guidelines.  And the guidelines were as you can well imagine

115

1    because they talk about compliance with the law, they were

2    written by counsel for Office of the Inspector General.  And so

3    the defendants clearly want to probe the legal thinking and

4    presumably challenge some of the conclusions in those

5    guidelines and have a debate with counsel for Office of

6    Inspector General about what does AWP mean, what did you mean

7    subjectively when you wrote this?  What did you intend when you

8    wrote that?

9            And I suggest, Your Honor, that in the context of a

10   Federal Register notice that sets forth guidelines for

11   companies to follow, it's really just inappropriate to start

12   that type of probing the mentality of counsel who prepared that

13   sort of really a legal document to guide companies in complying

14   with the law.  Boy, if every agency counsel who wrote something

15   like that had to be subject to a deposition, we wouldn't be

16   issuing complaint.

17           THE COURT:  It would keep the U.S. Attorney's Office

18   in business.

19           MR. HENDERSON:  Yes, we'd be business defending a lot

20   of depositions.

21           THE COURT:  On behalf of Day?

22           MS. REID:  This seems to me to be similar to what

23   Your Honor's ruled, similar with the Abbott 30(b)(6) issues on

24   the definitions of AWP.  This is part and parcel on that whole

25   line of inquiry of how things evolved over time.  And it seems,

116

1  you know, I don't want to debate law, but I want to

2  understand, you know, the context of this whole section on

3  average wholesale price, what you're supposed to do and, you

4  know, whether it was used.  So that was the reason for it, and

5  I think that we're entitled to, you know, reasonable amount of

6  time to question on that perhaps as part of the Abbott

7  30(b)(6).

8         THE COURT:  What's reasonable?  What's reasonable?

9         MR. HENDERSON:  Oh, what's reasonable--

10         THE COURT:  I mean, you're--

11         MS. REID:  On this?

12         THE COURT:  No, I'm asking Day.  She just asked, said

13  a reasonable time so I'm asking her what's reasonable.

14         MS. REID:  On this?  I would think we could do this

15  in a couple of hours.  I'm not looking for a full day on the

16  OIG--

17         THE COURT:  Limited to two hours.

18         MR. HENDERSON:  That's it on that particular motion.

19         MS. REID:  I'm afraid there are more.

20         MR. HENDERSON:  Oh, are there?  I'm sorry, I--

21         THE COURT:  Are you waiving them?

22         MR. HENDERSON:  I took, no, I took the red eye back

23  from California last night and I haven't slept a wink since the

24  day before yesterday.  So I may have missed them.  Perhaps--

25         MS. REID:  Yeah, if you'd like I can go through them.

117

1          MR. HENDERSON:  All right.  Since I've blown it in

2     that respect, I'll allow counsel for Day to start the argument

3     first on the remaining topics.

4          MS. REID:  Okay.  Basically, Your Honor, these are

5     topics 34, 35, 36, 37, 38 and 41.  And I'll give you an

6     example, they basically are asking for the false statements and

7     fraudulent statements made by Day that led to the claims in the

8     complaint.  Instances of Day actively promoting the spread, the

9     basis for the allegation that Day knew that it's false price

10    reporting would cause customers to submit claims for

11    fraudulently inflated reimbursement and generally the factual

12    basis for the allegation of fraud against Day.

13         The objection by the government is that it was too

14    broad, this is mini-trial.  I think that we are entitled to

15    have a 30(b)(6) witness answer this.  We have asked for it in

16    interrogatories and have not gotten real answers.  So at this

17    point I just need to be able to question and, you know, get the

18    government's position on these points.

19         MR. HENDERSON:  Your Honor, normally this type I

20    think of questioning would be okay.  If the government had gone

21    out and gathered independent factual information and documents

22    from third parties, it would be okay to find out what evidence

23    the government has gathered.  In this case all of the evidence

24    about Day's conduct has come from Day.  It has come from

25    depositions.  It has come from documents generated by Day.  So

118

1   what we would have to do is we'd have to go through the

2   several million pages of documents that Day has produced and

3   pick out the ones that we intend to use as trial exhibits.  And

4   we'd have to say, okay, here are the ones that we're going to

5   rely on and then we'd have this dispute about just how do you

6   interpret this and the other thing?

7          THE COURT:  Well eventually you'll have to do that.

8          MR. HENDERSON:  That's right, we'll eventually have

9   to do that.  And likewise we'll have to identify which of the

10   employees we're going to call to testify, but I think at this

11   stage of the game we don't have to do that.  This is not trial

12   ready yet.  We don't have to identify each page of each

13   deposition that we interpret as saying you're marketing the

14   spread here.  We don't have to pull out each and every document

15   and say here's the line where we think this shows that you're

16   marketing the spread.  I don't think we have to do that.  If we

17   had independent evidence, fine, but we don't.  It all comes

18   from Day documents and Day testimony.

19          MS. REID:  Your Honor--

20          THE COURT:  All right.

21          MS. REID:  I don't - they must have had something

22   when they filed suit in the Ven-A-Care.  I mean there had to

23   have been some reason.  They didn't, you can't just bring a

24   complaint and then say after the fact when I finally got your

25   documents I knew there as a fraud.

119

1          MR. HENDERSON:  We had, certainly we had Day

2   produced to us during the investigation a million or so pages

3   of documents and we had testimony from the Texas litigation,

4   all of Day employees.  So, yes, we had information before we--

5          THE COURT:  I'm going to allow the government's

6   motion on this category.

7          MR. HENDERSON: Thank you.

8          MS. REID:  I have one question on that and I just

9   raise it because it's an issue that we're in a real bind.

10  We're at the end of discovery.  You know, if we're not doing

11  this we've asked the interrogatory responses.  The answers, the

12  interrogatory responses ate very sparse.  They say, well, we

13  may supplement it, discovery is ongoing.  I would like to have

14  a date of when supplements to interrogatories have to be done

15  so we can have some finality on this, Your Honor, for summary

16  judgment are filed.  I'm prepared to--

17         THE COURT:  Well, do you have a summary judgment

18  date?

19         MS. REID:  Yes.  It's the end of, I think beginning

20  of June we have to file our initial briefs.

21         MR. HENDERSON:  I guess the problem I have, Your

22  Honor, is that's not before the Court.  They haven't moved to

23  compel on any interrogatories.  I've haven't looked at them.

24  We haven't discussed them.

25         THE COURT:  All right, premature at this time.

120

1          MS. REID:  Your Honor, do you want me to move to

2  compel or do we, I mean, I haven't--

3          THE COURT:  Sit down and see what you can do.  Have a

4  meet and confer and if you have to move to compel, you have to

5  move to compel.

6          MS. REID:  I don't want to.

7          THE COURT:  All right.

8          MS. REID:  Thank you.

9          THE COURT:  All right, anything else?

10          MR. HENDERSON:  We have another motion.  This is--

11          THE COURT:  Okay, well that's - in this present

12  motion?

13          MR. HENDERSON:  I think we've covered everything.

14          THE COURT:  All right.  There are two remaining

15  motions, 5642 and 5692.  You have two choices.  We can recess

16  now.  I have to deal with this criminal matter cause I may have

17  to take testimony.  And I'll hear you when I'm finished,

18  probably a half hour, 40 minutes or I can take them on the

19  papers and give you an electronic ruling in the next day.  If

20  you want oral argument, I'm happy to hear it but I'm going to

21  deal with the criminal case.

22          MR. HENDERSON:  I'd be happy to submit them on the

23  papers.  The only thing about one of them is this motion to

24  take the deposition of a prisoner.

25          THE COURT:  Yeah.

121

1          MR. HENDERSON:  I submitted an order which had a

2   date in it.  I've now talked about doing this on the 15th which

3   is the only day available.  It's the last day of discovery, but

4   I haven't, since my travels I've just gotten back from

5   California, I haven't been able to talk to prison authorities

6   to double check that they can do it on that short notice.  So

7   my only hesitation is if Your Honor decides to allow that

8   motion the form of the order and whether we can do it by the

9   15th and if not I would ask for leave to take it--

10          MS. REID:  Your Honor, I'm happy to stay and argue

11   this and--

12          THE COURT:  All right, so we'll take the break and we

13   can deal with the criminal matter.

14          MS. REID:  Thank you, Your Honor.

15          THE COURT:  All right.

16      RECESS

17          THE CLERK:  Okay, resuming on the record AWP MDL

18   litigation 01-12257 and others.

19          THE COURT:  All right, resuming on the record.

20   Mr. Henderson?

21          MR. HENDERSON:  Thank you, Your Honor, George

22   Henderson for the United States.  With the Court's permission

23   and at the request of Mr. Daley who has a schedule issue with a

24   flight back, I'd ask that we address No. 5692--

25          THE COURT:  When I was in the justice department they

122

1    tortured, the taught people torture the other side flight

2    schedule.

3           MR. DALEY:  Your Honor, this one was added just this

4    morning so we, Mr. Winchester and I would be done but for them

5    adding this and we're fine to have it--

6           THE COURT:  Sure.

7           MR. DALEY:  --addressed today but if the Court can

8    indulge us that'd be great.

9           THE COURT:  Sure.

10          MR. DALEY:  Thank you.

11          THE COURT:  No problem.

12          MR. HENDERSON:  And I do recognize it was added late

13   and the government did not give advance warning to defense

14   counsel so if they have any objections I can understand but

15   I'll proceed, Your Honor, in any event.

16          In the motion that is Document No. 5692 the

17   government has requested--

18       PAUSE

19          MR. HENDERSON:  The United States has requested a

20   protective order with regard to a deposition of Robert Reed.

21   Robert Reed was the former pharmacy program administrator for

22   the state of Ohio Medicaid program.  The United States has

23   informed before, I'm trying to recall what the date of its

24   letter was, but we informed the defendants in a letter dated

25   November 12 that the United States would not be pursuing claims

123

1   for the federal share of the Medicaid expenditures for drugs

2   reimbursed through the Ohio program.  So Ohio is out of our

3   picture.  And we have a discovery deadline of the 12th.  This

4   really from our perspective is irrelevant and we think the

5   parties should be focusing on relevant discovery in the

6   remaining time left and not trying to take a deposition of a

7   former Medicaid administrator for a state that's not an issue.

8   That's the short and simple of our argument, Your Honor.

9            THE COURT:  All right.

10           MS. REID:  Your Honor, I will speak first and let Mr.

11  Daley comment because it is Day that filed the opposition.  I

12  am not the person that was in charge of this whole issue, but

13  based on what I know from my partner who was it was always

14  expected that Mr. Reed would testify.  He was to be the

15  30(b)(6) witness for Ohio.  He is very knowledgeable.  He is a

16  person who was on the pharmacy technical advisory group of the

17  National Association of State Medicaid Directors.  The PTAG

18  group is a group that interacts directly with CMS on the

19  Medicaid side.  He is very knowledgeable about state plans,

20  about pricing and--

21           THE COURT:  Do you intend to call him as a witness?

22           MS. REID:  Your Honor, this is not – given everything

23  that's going on, taking this man's deposition which he is

24  prepared to give, we're talking about one day, it's scheduled,

25  and we've got it preserved because who knows given the passage

124

1  of time where we'll be.  The government has the resources.

2  They're, you know, pushing for their depositions when they want

3  them.  This is an important deposition.  This man is very

4  knowledgeable.  It's really quite amazing that they basically

5  yanked their Ohio Medicaid damage claim rather than let him

6  testify.  So I think at this point, you know, there's really no

7  grounds other than the fact as I hear Mr. Henderson enunciate

8  it a possible burden.  There's no question it's relevant.  I

9  think it should just be allowed to proceed.

10        THE COURT:  Mr. Daley?

11        MR. DALEY:  Judge, I agree with everything counsel

12  for Day stated.  I just want to explain why I'm standing up.

13  The motion that they filed only seeks to quash Day's notice but

14  we also subpoenaed them.  I didn't think the Court would be

15  very happy with me if I just laid in the weeds today and said,

16  well, whatever you ruled for them doesn't matter to me cause

17  we've subpoenaed it too so it seems to me we have an--

18        THE COURT:  Are you going to do it at the same time?

19        MR. DALEY:  Yes, absolutely.  And all we have is we

20  have a letter from assistant United States attorney saying

21  we're going to drop our claims.  I'm not even sure what that is

22  for Ohio but as counsel was indicating this is a witness who--

23        THE COURT:  The claims have not actually been

24  dropped?

25        MR. DALEY:  No, there's just a letter which I'm not

125

1   even sure what that is so--

2            THE COURT:  Motion for protective order is denied.

3            MR. DALEY:  Thank you, Judge.

4            THE COURT:  That leaves us with one which is 5642.

5            MR. HENDERSON:  Yes, Your Honor.  And despite my

6   sister's comment about all the discovery that the United States

7   wants we've cross noticed one deposition of Day.  We've taken

8   two depositions of former Day salesmen and we have one more

9   scheduled.  So we've cross noticed one 30(b)(6), three

10  30(b)(1)s.  Now we'd like to take one more of a former Day

11  sales employee.  And as the documents indicate attached they

12  certainly strongly suggest that he was marketing the spread on

13  Day products.  Day says this is duplicative, the documents

14  speak for themselves.  I suggest not, Your Honor.  Documents of

15  this sort never completely speak for themselves and it is the

16  memory of the witness that's important.

17           We deposed one other sales representative.  He was,

18  he met with counsel for eight hours the day before and on the

19  day of the testimony remembered nothing about what he had done.

20  We deposed another sales rep. subsequently.  He did have some

21  rather significant memory of his marketing activities and gave

22  some important testimony on that.  So I don't think it's a

23  forgone conclusion what any particular witness may or may not

24  remember or know.  And certainly Judge Saris has indicated that

25  marketing the spread is conduct that is highly relevant to this

126

1   case.  So I would suggest that this is really a no brainer,

2   Your Honor.  We should be entitled to take this dep--

3          THE COURT:  And he's in custody?

4          MR. HENDERSON:  He's in custody and he was, I think

5   he pled guilty to sexual assault but the fact that a man's been

6   committed, been found guilty of a crime is not a basis for

7   saying he's incompetent to testify as I noted in my paper, Your

8   Honor.

9          THE COURT:  How different from your brothers on the

10  criminal side of the U.S. Attorney's Office.

11         MR. HENDERSON:  I think I'm being quite consistent,

12  Your Honor.  The *Connolly* case is a good example where the

13  government relied on the testimony of criminals who had pled

14  guilty to dozens upon dozens of murders and they were allowed

15  to testify.

16         MS. REID:  Your Honor--

17         THE COURT:  On behalf of Day.

18         MS. REID:  On behalf of Day.

19         THE COURT:  Why shouldn't I grant this motion?

20         MS. REID:  Okay.  There are two concerns, Your Honor.

21  First, as Mr. Henderson has alluded to, you know, there's the

22  issue of is it duplicative and what, you know, whether we're

23  going to elicit on a weighing test significant testimony.

24  There were 20 sales representative in this time period.

25  They've talked to two so far.  They've contacted many.  There

127

1   are three more that are going to be taken I think in the

2   California MDL which will in essence translate back into here.

3   And so the question is is Mr. Ricks incarcerated in Colorado

4   state prison, of sufficient importance that, you know, we

5   should order his deposition and--

6          THE COURT:  How much time do you need with him, Mr.

7   Henderson?

8          MR. HENDERSON:  One day.

9          MS. REID:  The other issue that I have and I think

10  it's a more serious issue than perhaps my brother counsel has

11  indicated that Mr. Ricks last worked for Day in 1996.  He was

12  probably among his first jobs.  He left.  There's been no

13  contact with him since then by the company.  We had a heck of a

14  time finding him you can imagine when we found him what we

15  thought, but when you look at what he did and what was said at

16  his sentencing in 2005 in Denver, he basically impersonated

17  various professionals in order to lure women and sexually

18  assault them.  When he was let out on bond he then impersonated

19  a police officer, picked up prostitutes and sexually assaulted

20  them.  At his sentencing he asked for probation so that he

21  could work with young adolescents.  In summary--

22         THE COURT:  Trust me, I've heard it all.

23         MS. REID:  Yeah, you probably - the DA prosecuting

24  said the guy is a real con artist.  That wasn't the DA, that

25  was a police officer.  But the DA said he is a good liar, a

128

1    chronic liar who will say anything to get what he wants.  And

2    that is part of my concern.

3            THE COURT:  Well I'll let you have the deposition,

4    Mr. Henderson, but I don't think, I think you'll have

5    credibility issues with this witness but I'll let you have it.

6            MS. REID:  Can we get the prison records for both

7    sides in advance just so that we have some basis to know if

8    there are medical issues because there's some hint of that in

9    the reporting too that he needs to be in treatment.

10           MR. HENDERSON:  I think there's no hint of that at

11   all, Your Honor, and to try to enlist the local prison

12   authorities in document production--

13           THE COURT:  Privacy issues--

14           MR. HENDERSON:  Yeah.

15           THE COURT:  --and everything else there.  Only,

16   whatever records Mr. Henderson has in his possession should be

17   shared with Day, records regarding the defendant's

18   medical/penal status in the institution.

19           MS. REID:  The other thing I would ask, Your Honor,

20   given the, you know, difficulty of getting a date if we could

21   have permission as we did for the government's witnesses, if we

22   could possibly do this after the holidays.  We'll do it

23   promptly.

24           THE COURT:  Yeah.  Try to get it done by January 16th.

25           MR. HENDERSON:  Yeah, with the Court's permission I'm

129

1    not sure I can get it done by the 15th, but I would like to

2    get in done in December.

3            THE COURT:  Well get it done in January and you need

4    an order from me--

5            MR. HENDERSON:  Yes.

6            THE COURT:  --which I think is attached.

7            MR. HENDERSON:  Correct.  Except it has a date of

8    November 20 so can I submit a new one with a--

9            THE COURT:  Submit a new one.

10           MR. HENDERSON:  --proposed date.

11           THE COURT:  I'll allow it tomorrow.

12           MR. HENDERSON:  Just to be clear I think the, as I

13   interpreted the Court you want me to wait until January.  We

14   have a lot going on in January.  I'd like to get this done.

15           THE COURT:  Well, if you can do it--

16           MR. HENDERSON:  If I can get it done in December.

17           THE COURT:  --but get it done by the end of January.

18   If you can do it next week, fine.

19           MS. REID:  As long as--

20           MR. HENDERSON:  Okay.

21           MS. REID:  But we just need to coordinate the date.

22           THE COURT:  You need to coordinate the date.

23           MR. HENDERSON:  We'll coordinate and agree.

24           THE COURT:  And any records you have about him,

25   medical records, probation records, criminal history records

130

1    are to be shared.

2              MR. HENDERSON:  Yeah.  We have none.

3              MS. REID:  Thank you, Your Honor.

4              MR. HENDERSON:  Thank you, Your Honor.  I think

5    that's everything.

6              THE COURT:  Okay.  We stand in recess.

7    //

8    //

9    //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

131

1                    CERTIFICATION

2        I, Maryann V. Young, court approved transcriber, certify

3    that the foregoing is a correct transcript from the official

4    digital sound recording of the proceedings in the

5    above-entitled matter.

6

7    /s/ Maryann V. Young                December 17, 2008

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25