# EXHIBIT I

```
                                                              1

               IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS


  IN RE:                         )
                                 )  CA No. 07-10248-PBS
  PHARMACEUTICAL INDUSTRY AVERAGE)  CA No. 06-11337-PBS
  WHOLESALE PRICE LITIGATION     )  CA No. 05-11084-PBS
                                 )  Pages 1-47




                     STATUS CONFERENCE

          BEFORE THE HONORABLE PATTI B. SARIS
              UNITED STATES DISTRICT JUDGE




                          United States District Court
                          1 Courthouse Way, Courtroom 19
                          Boston, Massachusetts
                          November 13, 2008, 3:45 p.m.









                    LEE A. MARZILLI
                 OFFICIAL COURT REPORTER
              United States District Court
              1 Courthouse Way, Room 3205
                   Boston, MA  02210
                     (617)345-6787
```

**Page 2**

APPEARANCES:

FOR THE PLAINTIFFS:

   GEJAA T. GOBENA, ESQ. and JUSTIN DRAYCOTT, ESQ.,
United States Department of Justice, Civil Division,
P.O. Box 261, Ben Franklin Station, Washington, D.C., 20044,
for the United States of America.
   GEORGE B. HENDERSON, ESQ. and BARBARA HEALY SMITH,
ESQ., United States Attorney's Office, United States
Courthouse, 1 Courthouse Way, Suite 9200, Boston,
Massachusetts, 02210, for the United States of America.

   JAMES JOSEPH BREEN, ESQ., The Breen Law Firm,
5755 North Point Parkway, Suite 39, Alpharetta, Georgia,
30022, for the Relator, Ven-A-Care of the Florida Keys, Inc.

FOR THE DEFENDANTS:
   NEIL MERKL, ESQ., Kelley Drye & Warren, LLP,
101 Park Avenue, New York, New York, 10178k,
for Dey, Inc.
   JOHN W. REALE, ESQ., Kirkland & Ellis, LLP,
200 East Randolph Drive, Chicago, Illinois, 60601,
for Boehringer Ingelheim Corporation, et al.
   JAMES R. DALY, ESQ., Jones Day,
77 West Wacker, Chicago, Illinois, 60601-1692,
for Abbott Laboratories.

**Page 3**

                    P R O C E E D I N G S
         THE CLERK:  In re:  Pharmaceutical Industry
Average Wholesale Price Litigation, Civil Action
Nos. 07-10248, 06-11337, and 05-11084, will now be heard
before this Court.  Will counsel please identify themselves
for the record.
         MR. HENDERSON:  George Henderson for the United
States, your Honor.
         MS. SMITH:  Barbara Healy Smith, also for the
United States.
         MR. GOBENA:  Gejaa Gobena on behalf of the United
States.
         MR. BREEN:  Jim Breen on behalf of the relator,
Ven-A-Care of the Florida Keys.
         MR. MERKL:  Neil Merkl on behalf of defendant Dey.
         MR. REALE:  John Reale on behalf of the Boehringer
defendants.
         MR. DALY:  Good afternoon, Judge.  Jim Daly on
behalf of Abbott Labs.
         THE COURT:  Great.  Today is a status conference,
and I at least received a few things from the defendants.
I'm not sure, did I receive anything from you?
         MR. HENDERSON:  No, your Honor.
         THE COURT:  All right, I always want to check
because it's such a messy docket, no fault of our Clerk's

**Page 4**

office, but it all gets intermingled with other cases.  I
want to make sure I didn't miss anything.
         And, by the way, did you all notice we have now
deconstructed our docket, so hopefully we can follow the
case more easily with respect to the subcategories.  If
anyone has confusion about that, please ask Mr. Alba because
it should be a lot easier now to follow what's happening in
these cases as opposed to the New York cases and the
California cases and the like, so we're going to do that.
         Now, this is, as far as I'm concerned, unless you
think otherwise, only the Ven-A-Care cases.  Is that right?
         MR. HENDERSON:  Correct, your Honor.
         THE COURT:  Because I received some notice coming
in from New York telling me that they don't plan on
attending, and inasmuch as I'd love to see them, I wasn't
planning on them attending.  Is there anyone here from
another case that didn't understand that?
         Okay, just on the Ven-A-Care cases, what is it
that I need to resolve?
         MR. HENDERSON:  Your Honor, as I understand it,
the defendants are essentially seeking an extension of the
discovery schedule and at least for seven states which are
in litigation in which they have just issued notices for the
last -- I'm sorry, five states, I think, which are in
litigation.  Is it five or seven?  Seven, seven states.

**Page 5**

         THE COURT:  Right now the discovery cutoff is
December 15.  Is that correct?
         MR. HENDERSON:  That's correct.  The defendants
have announced that -- they've requested us to agree to an
extension of the discovery schedule for at least these seven
states that are in litigation elsewhere, and they would like
to be able to essentially have our discovery take place
according to the litigation schedules of those seven other
jurisdictions, which --
         THE COURT:  Short of that, though, do you have the
other depositions scheduled?
         MR. MERKL:  Yes, your Honor.
         THE COURT:  I'm not inclined to wait.  I'm very
eager.  This was an agreed-upon schedule.  I, of course,
would extend a schedule if somebody got sick or, you know,
something happens to you personally, but I don't want to
wait for the schedules in the other states.
         MR. MERKL:  Your Honor, we've basically completed
twenty-two states, okay?  That leaves twenty-nine that we
need to do.  Twenty-one of those states we have issued, in
accordance with the procedure we discussed with your Honor,
the 30(b)(6) and in some cases the 30(b)(1) and the document
subpoenas.  We have dates for those or most of those before
the 15th.
         THE COURT:  Okay.

6

1  MR. MERKL: What we'd like is, could we extend
2  that time 60 days?
3      What Mr. Henderson was referring to was a separate
4  proposal I made, which is, there are seven states where the
5  discovery in those states -- those are litigating states --
6  is actively going on or about to start. We felt that rather
7  than dropping our own 30(b)(6) notice and our own document
8  demand in the middle of those proceedings, that could we
9  work with them and cross-notice --
10     THE COURT: You know what, let me just say,
11 normally I would say "Yes, sure," but I'm not willing to
12 wait the time that it would take. It puts us too far behind
13 the eight ball.
14     MR. MERKL: Well, the understanding would be, your
15 Honor, on those seven states is that what we were proposing
16 there was that would not affect things like experts and
17 summary judgment. It would just --
18     THE COURT: Well, how could it not? I mean, take
19 Massachusetts, which is the one that I've now got my sleeves
20 rolled up on. It's a mess understanding what happened to
21 that Medicaid program. It changed from year to year; there
22 were different policies at different points. You've got to
23 do discovery state by state, as far as I can tell. And it
24 matters. It matters to, you know, issues like causation.
25 If in fact you're going to litigate all these states and

7

1  you're going to defend all these states, each state has its
2  own story, doesn't it, for Medicaid? Are you finding that?
3      MR. MERKL: Yes, your Honor, and I guess the
4  reason we were proposing carving those out, realizing that
5  you prefer not to do that now, was just to hope to take
6  advantage of that massive ongoing discovery that other
7  parties are already doing so that we could focus this. If
8  that's not workable, I guess we'd still like an extra
9  60 days to try and get it all done.
10     THE COURT: Well, let me just ask you this. Let
11 me just back up. Understanding that every single state
12 might have a different story, by December 15, how many
13 states will we be done with without those that are heavily
14 litigating?
15     MR. HENDERSON: Your Honor, if I might say so, we
16 don't need to do discovery in all of the states in order to
17 establish what their Medicaid reimbursement formulas have
18 been over time. Those changes are established as a matter
19 of law in state plan amendments. Ninety-nine percent of the
20 discovery of states that has been going on has been
21 "the government knowledge" defense, and the reason --
22     THE COURT: All right, that may be true too. My
23 point is, what if we did this? I'm not inclined to extend
24 the schedule. This case is taking too long. It's going
25 forever. But what if -- what is it, seven states that are

8

1  being heavily litigated? Is that it?
2      MR. MERKL: Well, there's seven that are being
3  heavily litigated, twenty-one that are less so. But we have
4  actually everything noticed, and it's going to be this mad
5  dash --
6      THE COURT: Excuse me. What are the ones that are
7  currently under litigation in these other states?
8      MR. MERKL: The seven states that I was referring
9  to are Idaho, Mississippi, New York, Utah, South Carolina,
10 Pennsylvania, Iowa.
11     MR. HENDERSON: And Kansas has just filed suit.
12     MR. MERKL: Well, Kansas we would propose to do
13 with the standard 30(b)(6) approach by December 15 because
14 it has to start --
15     THE COURT: So with the exception of these, can't
16 we -- listen, I view this as potentially overwhelming to do
17 the summary judgment in all the states anyway. What if we
18 were just to let these go their normal -- let them pick up
19 discovery in these other cases but keep to December 15 for
20 every other state?
21     MR. MERKL: Yes.
22     THE COURT: And not put off, not put off anything
23 by 60 days, not put off -- do summary judgment on the
24 other --
25     MR. MERKL: Forty-one.

9

1  THE COURT: -- forty-three or whatever -- I don't
2  know how many states we're talking about -- states. In
3  other words, keep completely on the schedule. You finish --
4  I'm not going to extend the December 15. This is just
5  getting too far beyond, and everyone agreed to the schedule,
6  but we basically carve off these states because we're going
7  to have plenty on our plate.
8      MR. HENDERSON: Your Honor, I don't think -- I
9  mean, as far as we're concerned, those seven states, they've
10 just been noticed too late. And I will report to the Court
11 that we've been in touch with counsel for those litigating
12 states, except for South Carolina which we haven't really
13 conferred with. All of them oppose this --
14     THE COURT: Are you moving for summary judgment,
15 or are you? Everybody is, right?
16     MR. MERKL: Everybody is, your Honor.
17     MR. HENDERSON: Yeah, I'm not sure we're going to
18 be moving for summary judgment on all issues for all states.
19     THE COURT: I don't know. I think what's going to
20 happen is going to be overwhelming to me. And short of the
21 First Circuit just dramatically changing the territory, I
22 think it is going to crush my session -- I'm just putting it
23 out there, all right? -- to try and figure out, you know,
24 forty-three, forty-one states. I think I'll have plenty to
25 do. So I think what makes sense is, why don't we -- I'm not

10

1  going to extend the schedule.  We are going to keep to this
2  schedule.  If these states can do -- rather than kill you
3  over Thanksgiving and Christmas to try and put all these in,
4  it is cost-effective to piggyback on what's happening with
5  these other states, and in the meantime, put all the other
6  states on the schedule we agreed to.
7       MR. HENDERSON:  The difficulty with that, your
8  Honor, is then we don't know what the schedules of those
9  other states are, and we're essentially putting off
10 discovery indefinitely.
11      THE COURT:  Well, that's why I'm for sure not
12 putting off the whole of Florida.  If at some point when
13 we're much closer, if it looks like they are lost in
14 Never-Never-Land, then tell me that that's impossible.  But
15 I just don't see how -- I've watched Mylan I'm working
16 through, okay, and it is unbelievably fact-intensive and
17 difficult to go through what the Medicaid policies are.  It
18 is not just a question of law.  It's who knew what, how did
19 it happen, when did the policies change?  It's hard, it's
20 really hard, and we're working through that right now.  So
21 if there are other states that look like that, that's going
22 to be -- it's going to be state by state:  What did they
23 know, when did they know it, what was the statutory scheme?
24 And so I think I'll have plenty to do and so will you.  I
25 don't think you'll be wanting for things to do.

11

1       MR. HENDERSON:  I might want a vacation, your
2  Honor, at the end of it all.
3       THE COURT:  You get Thanksgiving and Christmas.
4  And so I'm not putting this off.  We are kick-starting this.
5  We need this to happen.  And so I don't think it's so
6  terrible if we do forty-one or forty-three states rather
7  than fifty; and the truth is, if I start ruling your way on
8  a bunch of these, it may refine our knowledge with respect
9  to the others and then vice versa as well.
10      MR. MERKL:  I understand you to mean rule in my
11 way?
12      THE COURT:  Yes, either way.  I mean, it will
13 start focusing people on the summary judgment.  So as I'm
14 hearing it, everything was going to be done except for these
15 states, right?
16      MR. MERKL:  Yes.  Well, everything is noticed, but
17 the problem --
18      THE COURT:  Then you're going to have to live with
19 it.  You agreed to that schedule; live with it.
20      MR. MERKL:  Can I just point out one thing that's
21 happening with the states?
22      THE COURT:  Yes.
23      MR. MERKL:  The starting point, of course, is the
24 documents.  What we're finding with the states is, it's not
25 as though they got the memo five years ago that these were

12

1  starting and they stored all their documents and kept all
2  their documents.  It's not.  Some of them are starting from
3  the get-go, and it's a struggle getting them to turn the
4  stuff around quickly.
5       THE COURT:  That's your fault for waiting so long.
6  Basically we all agreed with the schedule.  I think it
7  was -- I went back to look.  It says joint, joint.
8       MR. MERKL:  Yes, your Honor, yes.
9       THE COURT:  All right, so understand, I'm not here
10 to make people spend a fortune.  If someone else is going to
11 do Utah, all power to them.  I mean, we'll see about that
12 later.  But I think we can move this case, we can start
13 working it through and just getting it going on the other
14 states.  You agreed; you're stuck with it.  If you don't get
15 your documents, as far as I'm concerned, I'm sorry, but you
16 took too long to start it going.  So, you know, it's got to
17 be reasonable.  They'll do what they reasonably can do, and
18 that's what we'll do.
19      Now, that having been said, now I -- I think
20 that's it for that issue, right?
21      MR. MERKL:  Well, Medicaid, yes, your Honor, on
22 the discovery.  There's some other pending discovery
23 motions.
24      THE COURT:  Yes, I think there are.  Now, I called
25 Judge Bowler this morning, and I'm trying to figure out what

13

1  the status was, and do you have a bunch of -- do you have
2  any -- various motions for protective order have been filed,
3  is that it?  Have they been opposed?  What's the status of
4  all that?
5       MR. HENDERSON:  I can't -- there are a bunch of --
6  the defendants have a bunch of motions, pending motions that
7  have been fully briefed to compel.  We, I think, just filed
8  a motion for protective order.  In the Roxane case, we only
9  just on Monday got delivered two hard drives and four CDs of
10 materials that have been requested way back in 2007, and we
11 just got them now.  So there are going to be issues like
12 this that probably have to be dealt with on a case-by-case
13 basis on separate motions.  The defendants have some motions
14 to compel.  We may have some.
15      THE COURT:  Does that affect these joint
16 scheduling orders?  Were these produced too late?  Or is
17 this just a question of -- does it affect depositions or
18 anything that you just got these documents?
19      MR. HENDERSON:  It may.  We have to look at them
20 and see whether -- right now in the Roxane case, for
21 example, that's the main one, from our perspective, where
22 we're just in the process of noticing five depositions of
23 current or former employees.
24      THE COURT:  Why did it take so long to get to
25 them?

14

1      MR. HENDERSON:  To the documents?
2      THE COURT:  Yes.
3      MR. REALE:  Your Honor, I'm not familiar with the
4  intricacies of this.  I don't know that he's necessarily
5  giving you the full story.
6      THE COURT:  This is a joint scheduling order,
7  joint, agreed upon, so how are they --
8      MR. REALE:  Your Honor, we were just compelled to
9  produce some documents, and I know that --
10     THE COURT:  Well, all right, that's different, but
11 did you do a basic document production long before now?
12     MR. REALE:  Yes, your Honor.
13     MR. HENDERSON:  They provided to us, your Honor,
14 what they had produced in other litigation without
15 undertaking any independent search for the documents that we
16 requested, and it took a long time until we -- it took a
17 while.  We finally moved to compel.  We haven't even gotten
18 the information, for example, the e-mails that Judge --
19     THE COURT:  When is the Roxane deposition
20 scheduled for?
21     MR. HENDERSON:  Between now and December 15.
22 We're still working with counsel to set these dates.
23     THE COURT:  But what's pending in front of
24 Judge Bowler?  Is there anything pending?
25     MR. HENDERSON:  Right now there's just one

15

1  deposition in the Dey case that we want to take a deposition
2  of a former employee who happens to be in prison, so we have
3  to go -- we are required under the rule -- long story, your
4  Honor, nothing to do with their Dey employment.  It's post-
5  employment conduct.  But, in any event, the rules require
6  that we file a motion to take a deposition.
7      THE COURT:  So I suggest you try and schedule a
8  hearing before Judge Bowler, like, soon.  I was trying to
9  look on the docket.  I saw some of your motions, your
10 motions, like, on deliberative process privilege?  I think
11 you're being -- it took me -- I know we're going to get
12 there -- it took me forever.  I feel sorry for whoever you
13 entrusted this task with, but it took me forever to go
14 through the twelve documents because it's not all or
15 nothing, you know.  I mean, when you go through them, some
16 of it's protected, some of it's not, some of it I'd have to
17 balance.  It takes forever, and I can guarantee you I am not
18 going to sit -- or I just talked to Judge Bowler.  She said
19 it would be impossible for her to go through.  I think you
20 were overprotective of the deliberative -- I mean, I
21 understand the institutional pressures that make you do
22 that.  It was overprotective.  And most of these were old
23 documents.  It was just unnecessary.
24     MR. HENDERSON:  Your Honor, we followed your
25 instructions to the T in that regard.

16

1      THE COURT:  But some of them weren't even
2  protected.  They were cover memos.  Some of them were
3  factual recitations or they were post-policy.  I mean, it
4  wasn't even protected.  Some of it was core, as you would
5  say, but some of it wasn't even subject to it, and I don't
6  know what to do with that.  You know, there were cover
7  memos.  I didn't understand why they were being -- there
8  were ones that were from outside the agency, I forget, some
9  carrier.  They weren't even protected.
10     So I don't know what to do.  I think a master
11 makes sense.  I can't possibly do it myself, I can't.  It
12 took me personally -- I didn't send it to a magistrate
13 judge.  I didn't give it to a law clerk.  I sat and read
14 them and balanced, and I can't possibly do it for the volume
15 of documents we're talking about.
16     MR. HENDERSON:  What I recommend, your Honor,
17 since we haven't filed an opposition to the motion, that we
18 be permitted to file an opposition to that particular
19 motion.  And I think it's probably inevitable that some of
20 these motions, whether it's the defense motions or a motion
21 that we make, may require in individual circumstances for
22 some particular depositions that we're going to go beyond
23 the December 15 deadline, just because it takes that time
24 for a motion to be heard and decided.
25     THE COURT:  I'm not extending the deadline short

17

1  of family illness or personal illness.  I mean, something
2  that's human, of course I'm going to do that.
3      MR. HENDERSON:  Well, we're not suggesting that.
4  We're just saying that in order to resolve a motion -- I
5  don't think all of these motions are going to be decided in
6  time to get these depositions done by the 15th.
7      THE COURT:  Well, it might be that Judge Bowler
8  decides it after, but I think I would go in there with all
9  the information and try and schedule them.  I mean, I don't
10 know why this is all coming up at the last minute, but I
11 know just as a practical matter that's what happens in
12 litigation, but I am not generally reopening it.
13     And so the big issue really is for me, on the
14 deliberative process privilege, many of these were old
15 documents.  Many of them were uncontroversial.  I just
16 couldn't even understand why it was worth the dime not to
17 disclose them, even if there was argument for it.  There
18 were a couple where it was really heartland, you know, "This
19 is what I think, and this is what you think."  You know,
20 what you think about is deliberative of what a jury might
21 do, but most of it wasn't.  You've seen it now.
22     MR. REALE:  No, your Honor, we haven't.
23     THE COURT:  Why?
24     MR. REALE:  They haven't produced it to us yet.
25     MR. DALY:  Mr. Draycott tells me that we'll have

18

1  them tomorrow, but we don't have them yet, Judge.
2          THE COURT: So any carrier documents shouldn't be.
3  Any cover memos shouldn't be. Any factual recitations
4  shouldn't be. Any drafts can be withheld, and anything
5  that's what you referred to in the memo occasionally as
6  "core" deliberative, like core, the back-and-forth before a
7  policy, arguably. But the older it is, the less important
8  this thing is. And anything post-2003 you don't need to put
9  in unless it's referencing backwards; you know, "As we knew
10 back then, we knew that these inhalers were --" But that
11 doesn't need to come in. A, it's probably not relevant,
12 and, B, it's -- so the weighing would be different. But I
13 don't -- how many of these documents did you say were now
14 subject to this privilege?
15         MR. DALY: Judge, there's the eight that you
16 ordered produced. There's forty-two that have been
17 previously submitted to Judge Bowler that she has yet to
18 rule on. I think she may have been waiting on your Honor's
19 ruling. But there were two in camera submissions to her,
20 one December, '07, one in June of this year, forty-two
21 there. And then, as I put in our motion, Judge, based on
22 your ruling, it appears that a variety of documents that
23 should have been submitted were not. And there's no way in
24 the world I'd want your Honor -- I would suggest your Honor
25 do this. That's why I think we should appoint a special

19

1  master and get it over with.
2          THE COURT: Why don't you talk about who might be
3  a special master. And let me just say this: I know this
4  poor guy asked for additional time who was doing it
5  initially. It must have taken him longer than -- what was
6  his name again? I am so sorry because it's really brutal.
7  And maybe you didn't want to do it page by page and
8  paragraph by paragraph. I sort of did. And so in the ones
9  where I'm saying, like, there's no way the cover memo was,
10 well, something maybe internal to it was, and you just
11 basically across the board claimed the privilege.
12         MR. DRAYCOTT: We took, your Honor, no
13 exaggeration here, hundreds and hundreds of attorney and
14 paralegal time in trying to respond to directions that your
15 Honor gave us on the 24th, and the thing that I would
16 actually implore you to do is to let us file a response to
17 the motion that has been filed with your Honor and --
18         THE COURT: To this master thing.
19         MR. DRAYCOTT: To the request. We just got it
20 yesterday. We --
21         THE COURT: Well, let me just say this: We need
22 to move this forward. I, quite candidly, don't think
23 anything is proving up at all that the government both knew
24 and approved of what I have been calling the "mega spreads."
25 They do support the 20 to 25 to 30 percent understanding,

20

1  but I can't prevent them from seeing what's there in order
2  to mount the defense. And if I ever reject it, it goes up
3  on appeal. So that's the issue. You want me to prejudge
4  the defense, and I'm not willing to do that. I don't
5  disagree with you that a lot of it doesn't support their
6  theory, but they can't know that.
7          MR. DRAYCOTT: Your Honor, there were a lot of
8  issues raised and a lot said in the motion that was just
9  filed, and I think that this is an area where a couple of
10 things: We would be well advised to listen and to reflect
11 on everything that your Honor said today, and I think that
12 we listened very carefully to what your Honor said on
13 July 24, and we devoted an enormous amount of resources in
14 trying to comply with that. So I would again implore you
15 for an opportunity to respond. And we will also, while
16 we're responding to the motion that was filed yesterday, we
17 will consider all the points that your Honor has made.
18         Your Honor has also, I think, said some things
19 that were both helpful and, you know, caused more work for
20 us. We'll consider all of that. We'll look anew at the
21 privilege assertions that we've made, and we'll be doing
22 that while we're also at the same time responding to the
23 motion, but if we can both try to respond to your Honor's
24 comments in a constructive way but at the same time also
25 address the request for a special master that has been made.

21

1  And, for example, one clarification I can offer you that
2  relieved us of a lot of burden, you've heard mention of the
3  forty-two documents that were submitted to Judge Bowler, but
4  far and away, the bulk of those is prior drafts of final OIG
5  reports. Now, when your Honor ruled on the 24th, she said
6  you can just exclude those. If that principle were applied,
7  for example, to the documents that are before Judge Bowler,
8  it virtually -- I haven't looked at those in preparation for
9  today, but my recollection is that that would remove a huge
10 number of percentage of the documents that were submitted to
11 Judge Bowler for in camera review.
12         THE COURT: Well, why haven't you at least turned
13 over to them --
14         MR. DRAYCOTT: Oh, your Honor, that was -- as soon
15 as we got your order, we forwarded it on to the Office of
16 General Counsel for the CMS division. It was just a matter
17 of advising the client agency. What I'm hoping your Honor
18 recognized from the declarations that had been filed by the
19 agency in support of this privilege assertion, it was a
20 matter of enormous importance.
21         THE COURT: But they didn't even go through them
22 document by document of the twelve. I mean, it was sort of
23 this -- it was an across-the-board thing.
24         MR. DRAYCOTT: But, your Honor, again, just to
25 answer your question, as soon as we got your order, we

22

1  conferred with the client agency.  We wanted to make sure
2  that there was nothing further they wanted to require us --
3  there was nothing more that they would ask of us by way of
4  reconsideration.  I confirmed as late as this morning that
5  that's not going to occur, and I advised Mr. Daly that we
6  would turn over the documents.  But I think that was a
7  minimal delay, and it was for that purpose.
8         THE COURT:  What I'm going to ask you to do, and I
9  mean this:  Turn over everything that's relevant except
10 where it's core deliberative process and you care -- and you
11 care, that's the big thing, and you care -- because
12 otherwise the burden is overwhelming.  If we're left with
13 forty documents, now that I've set up the basic standards, I
14 can go "thumbs up, thumbs down," and you don't have to do a
15 master.  But if we're at -- how many documents did you say
16 we're at, 2,000 or something like that? -- I'm going to make
17 the government pay for the master because I can't do 2,000
18 documents.  And, you know, you spent hours on this.
19        MR. DRAYCOTT:  I assure you I did.
20        THE COURT:  But, for example, there was a cover
21 memo or there was the memo from a carrier.  That's not even
22 a prayer for those being --
23        MR. DRAYCOTT:  Well, your Honor, with respect the
24 cover memo, in my defense, it really didn't present as part
25 of the same document, and the cover memo was just a couple

23

1  of sentences, so that's how that got added.  But --
2         THE COURT:  But even in a lot of the memos, about
3  90 percent of them were just factual recitations.  They
4  weren't deliberative.  So, in fairness, it took me paragraph
5  by paragraph.  I don't understand the lingo.  I didn't
6  understand the abbreviations.  I can't guarantee I got it
7  right.  I can't.  I mean, I just don't understand some of
8  it, so --
9         MR. DRAYCOTT:  Well, your Honor, I guess if I can
10 respectfully get some clarification from your Honor then
11 with respect to the current state.  I take it that we are at
12 the same time permitted to respond to the motion that was
13 filed.  In the interim, we have direction from your Honor
14 with respect to some broad categories that we can both, you
15 know, take in and take out.  We'll try to respond to that,
16 but at this point we can, I think -- I'm hoping that I
17 understand your Honor correctly that we can respond on both
18 fronts, that we can both go back and revisit our privilege
19 assertions, try to refine them, and look at them with the
20 guidance that we've received from your Honor today in mind,
21 but that we still may respond to the motion for a special
22 master?
23        THE COURT:  Here's the problem.  I remember being
24 a lawyer.  We all remember.  I'm sure you do this for
25 attorney-client privilege.  You look at whether there's a

24

1  plausible basis, and you assert it.  Usually the first stab
2  through most attorneys overassert, and on the theory that,
3  well, we'll chisel back.  My problem is that I have to
4  decide, A, if the privilege applies, and then, B, do a
5  weighing, okay.  So I've got Part B, and I couldn't entrust
6  that to the government as a matter of law to just do the
7  weighing.  That's something I think I have to do.  And so
8  since government knowledge is both relevant to the various
9  issues we've talked about -- scienter, reliance, there's a
10 common law fraud claim, it's relevant to the government
11 knowledge defense -- they may go down in flames on it, but I
12 can't say they can't have the discovery.
13        MR. DRAYCOTT:  No, no, and I've heard your Honor
14 today, and I heard your Honor back on the 24th, but I'm just
15 trying to make -- I'm trying to be clear in my own mind what
16 I need to do after today, and I take it that I still owe
17 your Honor a brief.
18        THE COURT:  Do you have little stickies on the
19 ones you really care about of the 2,000?  How many documents
20 did you say are subject to the deliberative privilege right
21 now?
22        MR. DRAYCOTT:  Your Honor, we did throughout the
23 process of logging these documents also review them, and we
24 did attorney review on them, so I'm hard-pressed right now
25 to answer your question off the cuff.  But we can certainly

25

1  go back, take another cut through these documents and, you
2  know, try to refine the -- and talk about -- we're going to
3  need to talk about the issue with the client.
4         THE COURT:  But I set a December 15 deadline, and
5  they're taking depositions, so -- and then do I want to
6  reopen them again?  And so --
7         MR. DRAYCOTT:  But, your Honor, I don't know that
8  appointment of a special master and giving it to a special
9  master would be --
10        THE COURT:  Who's going to do this?  Who's going
11 to do it?
12        MR. DRAYCOTT:  A great amount of that is going to
13 fall to me, your Honor, and --
14        THE COURT:  No, but I've got to no matter what.
15 You told me how many you thought there were.
16        MR. DALY:  Well, from their privilege log alone,
17 Judge, we had 200, but there is, like, boxes of documents
18 that they never even logged.  These documents from the
19 Legislative office, three of which you've ordered produced
20 to us, they've never even logged them.  So the log is one
21 thing.  We gave you a list of 200 we think ought to be
22 looked at.  Perhaps counsel can look at those, decide which
23 one he wants to give us.  Whatever is left we would put to a
24 special master.  But there's a bunch of stuff, Judge, that
25 they never logged.  They took the Office of Legislation and

26

1  in a broad sweep just said, "That's" all DPP. That's all
2  deliberative process privilege." We don't even know what
3  the particulars are, so --
4          MR. DRAYCOTT: You Honor, can I get a
5  clarification? I mean, again, in terms of the questions
6  you've asked of me, I'm assuming that we're working within
7  the parameters that your Honor set on July 24. There what
8  you indicated for us to submit for in camera review are
9  documents which showed the existence of the mega spreads for
10 both infusions and inhalants.
11         THE COURT: The kind of drugs that they
12 manufacture, isn't that what they are?
13         MR. MERKL: Yes, your Honor.
14         MR. DALY: Vancomycin.
15         MR. DRAYCOTT: The infusions, inhalants,
16 vancomycin, and then your Honor also addressed the
17 cross-subsidization issue, and then we were also talking
18 about anything that related particularly to Abbott, Dey, or
19 Roxane. So it's that, if I'm understanding --
20         THE COURT: That sounds fair, yes.
21         MR. DRAYCOTT: Now, we've essentially complied
22 with the order and your Honor has done that work and has
23 issued the order on what documents we have to turn over. I
24 think what Mr. Daly is now alluding to is documents that
25 were withheld that may relate to policy-making generally but

27

1  don't specifically reference a mega spread or an infusion
2  drug or a -- and if we're talking about that, then there's
3  very little more to do because the work has been done. So
4  if we're staying within the parameters that your Honor set
5  on July 24, then there's very little work to do, if any.
6          THE COURT: Don't forget, don't forget, this is
7  what I think -- I agree totally with the way you just
8  described it, but they've got to be privileged to begin
9  with. They've got to be deliberative or attorney-client,
10 whatever, so they've got to be privileged to begin with. So
11 it's not enough -- in other words, they may be relevant,
12 broadly speaking, but not privileged. So on the privilege,
13 when I did the weighing, anything that shows knowledge of
14 that almost automatically I'm going to weigh in their favor.
15         MR. DRAYCOTT: But, your Honor, what I'm saying
16 is, what we've done is, we've complied with the direction
17 that you gave us on the 24th.
18         THE COURT: Some of the stuff just wasn't
19 privileged. It didn't even get to Point A.
20         MR. DRAYCOTT: Right, at which point -- and you've
21 ordered it turned over, and it will be in their hands
22 tomorrow.
23         THE COURT: But the issue is, I haven't looked at
24 the other 200.
25         MR. DRAYCOTT: But if what you're asking for is

28

1  the documents which show knowledge of the --
2          THE COURT: Excuse me, you're not hearing me.
3  First, you have to figure out, are they privileged? Does it
4  even apply? Otherwise, shovel it over. Is it deliberative?
5  Was it predecisional and deliberative? If it's not
6  predecisional and deliberative, regardless of this other
7  subcategory, it's got to be turned over, and it's got to be
8  done page by page and paragraph by paragraph. If in fact it
9  is predecisional and deliberative, that's when I've got to
10 come into it: Well, what about the weighing? As a general
11 category, I'm going to weigh it in their favor if it
12 involves vancomycin, infusions and inhalants. If it doesn't
13 involve those, I'm likely to weigh it your way.
14         MR. DRAYCOTT: But what I'm saying, your Honor, is
15 we've done that work and you've done that work now.
16         THE COURT: Well, but for twelve, twelve sets of
17 documents.
18         MR. DRAYCOTT: Well, with respect to the category
19 that you directed us to submit in camera on the 24th; that
20 is, the documents that show knowledge of the mega spreads
21 for infusions, inhalants, vancomycin, and for the documents
22 that mention --
23         THE COURT: Why didn't you disclose it to them
24 then?
25         MR. DRAYCOTT: Well, your Honor, again, this goes

29

1  back to, we conferred with the client agency, and they're
2  going to be turned over tomorrow.
3          THE COURT: No, but why did I have to go through
4  the exercise of the in camera review?
5          MR. DRAYCOTT: But, your Honor, my --
6          THE COURT: You know what, are there 200 of them?
7  Is that it?
8          MR. DALY: 200 on the privilege log, Judge, yes.
9          MR. DRAYCOTT: I'm not sure to which that --
10         THE COURT: Why don't you give them to him?
11         MR. DRAYCOTT: Which, the --
12         THE COURT: The 200 --
13         MR. DRAYCOTT: I'm not sure which --
14         THE COURT: -- that you've asserted deliberative
15 process privilege.
16         MR. DRAYCOTT: I'm not sure to what group of
17 documents Mr. Daly is making reference, which is why I'm
18 having trouble, your Honor.
19         MR. DALY: Your Honor, it's the motion that we
20 filed. It's Schedule 1 to the motion. We selected 200 by
21 number from your privilege log and said, "Judge, based on
22 these titles, these ought to be looked at." We didn't even
23 ask to do the whole privilege log, Judge.
24         THE COURT: Well, what if I looked at -- maybe
25 take every fifth one, and if I think there's a problem, I'll

30

1  send it to a master?
2        MR. DALY:  We've got this other problem, Judge,
3  that with respect to these documents that were not reviewed
4  in response to your July 24 order, in their brief, Judge,
5  they say that they looked at the log, the log was the
6  parameter of what they looked at to determine what you
7  wanted from your July 24 order.  According to their own
8  briefing, the rule-making files were not reviewed, the
9  legislative files were not reviewed, and I cannot let --
10       MR. DRAYCOTT:  But that's what took the greatest
11 bulk of the time was reviewing the rule-making support
12 files.  We were told they want them in detail to this in the
13 document that was submitted --
14       THE COURT:  And it may well be that earlier drafts
15 of rules and all that aren't going to qualify.  I don't want
16 to spend -- I'm going to take a look at -- you show him the
17 200 documents.  You give it to me, and if I think it's a
18 mess, I'm going to appoint a special master.  Who do we
19 want?  We're getting to December 15.  I can't wait.  It's
20 Thanksgiving.  You all have families.  I can't have you
21 working over Thanksgiving.  I'm not bucking the December 15
22 date.  We're moving.
23       MR. DALY:  Judge, we'll take anybody that your
24 Honor has a confidence and faith in that you've worked with
25 before.  We're happy with whatever your Honor chooses.

31

1        MR. DRAYCOTT:  Your Honor, I need to confer with
2  Mr. Henderson and Ms. Smith.
3        THE COURT:  I'm thinking some retired Superior
4  Court judge.
5        MR. HENDERSON:  Judge, I don't think that it's
6  going to affect the discovery, the deposition schedule.
7  These depositions -- there are no depositions that are
8  pending.
9        THE COURT:  I'm just simply saying, I need to get
10 some closure on this.  I need to move on.  I understand how
11 the government works very well, and deliberative process
12 privilege is a very difficult privilege because it
13 requires -- you're going to weigh it differently than I am.
14 So I went through just as a sample.  I deliberately didn't
15 refer it to a magistrate judge because they care so much,
16 they've been sort of over the top on this, so I thought,
17 "All right, I'll look."  And sometimes I agreed, sometimes I
18 disagreed, sometimes I partially agreed and partially
19 disagreed.  Everyone's going to call this differently.  I'm
20 not saying this is bad faith.  I am simply saying I have not
21 got the resources to go through a gazillion documents and
22 write up a memo like I did on this on every single one.  I
23 can't.  So we can either go to a master, or I can spot-check
24 a few of them, and if I think that there's a problem, then
25 I'll appoint a master.

32

1        MR. HENDERSON:  Well, it depends whether you're
2  going to narrow the categories to the ones, the categories,
3  the ones that were addressed at the last hearing and which
4  Mr. Draycott just described, or now you're expanding them to
5  the entire universe.
6        THE COURT:  I just want you to turn them over
7  because I don't want to do this.  Okay, that's what I really
8  want.  But you're not willing to do that, okay?  Because I
9  hate doing it.  More than life itself, I hate going through
10 these documents.  I hate it.  So if I've got to, I will.  So
11 the reality is, the basic thing I want to say is, if you
12 don't care, turn them over.  It's only where you really
13 care --
14       MR. DRAYCOTT:  Your Honor, the one thing that I
15 would ask you to understand -- and, believe me, your Honor,
16 as much time as you spent, I guarantee you I was hour for
17 hour doing it with you.  But we do have a client agency
18 whose interests we are representing here, and so while
19 you're saying, you know, "Do you care?" there's two levels
20 of which you're speaking to me:  one, as an attorney for the
21 Department of Justice, and then -- but also I have CMS as a
22 client, and it is CMS that has asserted that privilege.
23       THE COURT:  Well, then let their attorneys do it.
24       MR. DRAYCOTT:  And we're certainly going to bring
25 them in, and we will consult with them.  But I will get back

33

1  to the issue that Mr. Henderson just raised, which is, in
2  order for me to go forward, I need to be very clear if we're
3  on the same criteria that your Honor established back on the
4  24th, which is the mega spreads for the infusions,
5  inhalants, the vancomycin, the cross-subsidization.  If
6  that's what you're asking us to corral, we did a tremendous
7  amount of work in advance of the submission that we filed to
8  you and which you've now ruled upon, and what's left to do
9  is not going to be burdensome, if at all, because that's the
10 criteria we're looking for, those documents within that
11 criteria that we're going to be looking at.
12       THE COURT:  Those criteria were the ones where I
13 said I thought the deliberative process privilege would be
14 outweighed by the defendants' needs, but you have to make
15 the threshold decision first about whether they're
16 deliberative and predecisional.  In other words, there might
17 be tons of other documents that you need to produce that
18 don't fall in that category but aren't protected by the
19 deliberative process privilege.
20       MR. DRAYCOTT:  One moment, your Honor.  If I
21 can --
22       THE COURT:  Do you understand what I'm saying?
23       MR. HENDERSON:  Now I get it, now I get it.  Okay.
24       MR. REALE:  Your Honor, I'd like to raise one
25 additional issue, if I may, and that is that they are

34

 1  seeking recovery on behalf of their expenditures to the
 2  Medicaid programs to all fifty states.  And here we are in
 3  November, and we've asked for it, and they've agreed to
 4  produce claims data from all fifty states; but for Roxane,
 5  we still haven't received complete claims data from nineteen
 6  states, and we still haven't received MAC data from
 7  thirty-eight states.
 8          THE COURT:  When is that going to be produced?
 9          MR. MERK:  Dey as well, your Honor.
10          THE COURT:  When is all that going to be produced?
11          MR. HENDERSON:  We've produced what we've got.
12  There are going to be a lot of states where -- there are two
13  categories -- let me -- I have to back up so you'll
14  understand.
15          THE COURT:  I don't know why this is all happening
16  a month before the deadline after four years on both sides,
17  why Roxane did a dump and why you haven't done a dump yet.
18          MR. HENDERSON:  Well, we can't produce what we
19  don't have, your Honor.
20          THE COURT:  Excuse me.  You should have produced
21  it.  It shouldn't have happened last week, okay?  I know
22  we've been dithering with Roxane for a while now.  It should
23  have been produced.  But now let's go to your issue.
24          MR. HENDERSON:  On the claims data, your Honor, we
25  can't produce what we don't have.  There are many states

35

 1  where we do not have claims data that we've obtained from
 2  the states.  What we have is a different level.  There is a
 3  top level that CMS does obtain on a routine basis that is on
 4  a Web site.  It's always been available to the defendants.
 5  They've got it.  They've had it for a long time.
 6          There is another level of claims data that we have
 7  obtained from the states.  We've produced that.  They've had
 8  it for a long time, with the exception that in the last
 9  month or so there may be one or two states where we just
10  recently got something.  We have to process it.  We'll
11  produce it as soon as we can.  Then there are a whole mess
12  of other states where we don't have any data other than that
13  top level that they've already got.  That's what Mr. Reale
14  is talking about is this data that we haven't collected, and
15  we're going to have to make our case without it, your Honor,
16  but we don't have it.  The states haven't produced it.
17          THE COURT:  If they don't have it, they don't have
18  it, which means they may lose on those claims because I
19  can't create something out of nothing.
20          MR. REALE:  Your Honor, they have to drop those
21  claims if they don't have it.
22          THE COURT:  You know what, I'm not doing that
23  right here.
24          MR. REALE:  I understand that, but --
25          THE COURT:  This is about discovery.  If they

36

 1  don't produce it, they've got a problem, but I have no
 2  idea -- I see he's going like this and like this.  I don't
 3  know whether it's dispositive or not.  I don't know.  I
 4  don't understand it, so I'll get to that at summary
 5  judgment.
 6          So this is what we're going to end up doing on
 7  this, okay, this is what we're doing:  The discovery
 8  deadline is still December 15.  I agree with you that it
 9  is -- we will have enough on our plate so that if in fact
10  you can piggyback on these other states, I don't see the
11  need for both sides to be spending this kind of money on
12  them.  At some point, if they're too slow, I will leave it
13  up to the parties to let me know that it's too slow, and I
14  will have to let you do these seven other states.  You know,
15  I'm not going to wait.
16          MR. MERKL:  I understand.
17          THE COURT:  But I think we have enough to do.  We
18  will go with the other states.  The December 15 deadline for
19  the other states is on.  We're going to stick with the
20  expert discovery schedule, et cetera.
21          With respect to the deliberative process
22  privilege, you're going to give me the 200 documents he's
23  talking about, and then I'm going to take a look, and then
24  I'm going to appoint a master if I think that it's just
25  going to be too time-consuming.  My guess is from my review

37

 1  of the twelve sets of documents you gave me, it took -- I
 2  would not be able to do 200, and I called Judge Bowler, and
 3  she doesn't have the time either.  You need to go down to
 4  Judge Bowler and see her and get a ruling because I am not
 5  reopening the December 15 deadline.  Now, if she makes
 6  certain rulings that need by force to come in afterwards,
 7  that's a different story, but I'm not generally extending
 8  that deadline.
 9          MR. DRAYCOTT:  Two points of clarification, and
10  thank you, your Honor, and I do have, I think, a clearer
11  understanding.  But, one, with respect to the 200 documents,
12  I take it that you would have us go back, rereview those.
13  You don't want the 200 right away, but just turn over to you
14  any which we propose to continue to withhold from
15  defendants.  Is that right?
16          THE COURT:  When can you do that?  How about --
17  today is Thursday -- how about next week?  Is next week
18  Thanksgiving?
19          MR. MERKL:  The week after, your Honor.
20          MR. DRAYCOTT:  Your Honor, knowing how long and
21  how much work went into the last submission to you, I would
22  like to take some more time.  I will try to do it with all
23  deliberative speed.
24          THE COURT:  It might be quicker to have me do it,
25  like, "yes, no, yes, no."

38

1  MR. DRAYCOTT: But I would like to -- we will,
2  your Honor, try to glean this down to the ones that, again,
3  which you -- you asked me if there were ones that have a tab
4  on it of being of special importance, and I've indicated
5  that that hasn't been done yet, but it's the first thing I'm
6  going to do. I only got Mr. Daly's -- sorry -- the Abbott,
7  the joint submission yesterday. I really barely had time to
8  look at it before today. We'll go back to the 200
9  documents. We'll look very closely at them, and then we
10 will submit to you any which we're not going to turn over.
11 And we'll go back to the agency and ask them whether or not
12 they're willing to --
13     THE COURT: I know, but how long is this going to
14 take? We have December 15, and I can't --
15     MR. DRAYCOTT: Your Honor, I'm going to start the
16 process tomorrow.
17     THE COURT: Because it took you three months last
18 time.
19     MR. DRAYCOTT: I will endeavor --
20     THE COURT: And I'm not for a minute saying you
21 didn't work hard. If anything, I pity you right now
22 because, I mean, it's like going back and re-eating food you
23 didn't like the first time around.
24     MR. DRAYCOTT: The pity doesn't seem to be getting
25 me too far today, but I will endeavor to do this by a week

39

1  from tomorrow.
2     THE COURT: Fair enough, fair enough. And then
3  I'll just do a quick "yes, no, yes, no." I can't begin to
4  do it paragraph by paragraph the way I did the last time,
5  but the reality is that it was -- I think what you did is,
6  you saw a document; if there was something there that was
7  deliberative, you withheld it. I think that the law doesn't
8  let you do it so broadly.
9     MR. DRAYCOTT: No, but the thing that we didn't do
10 generally, your Honor, is we didn't go through redactions.
11 Of course, we were never asked to do that, but we can also
12 consider redactions at this point, which is --
13     THE COURT: It will take you forever.
14     MR. DRAYCOTT: Well, again, we'll try to get this
15 done.
16     THE COURT: Most of these documents were from the
17 late 1990s. They're ten years old, right?
18     MR. DRAYCOTT: Your Honor, believe me, I've heard
19 everything that your Honor said today, the concerns that
20 you've raised and the places where you think we're on firmer
21 ground and less firm ground. Just to clarify, though, I
22 take it the one thing -- the greatest bulk of the documents
23 for which we have asserted privilege are drafts of OIG
24 reports, and your Honor excluded that from the last time we
25 were here. If that's still excluded, I think that makes it

40

1  easier for me. I think it also makes it easier for
2  Judge Bowler with respect to the documents that are now --
3     THE COURT: The drafts, as long as the final is
4  produced.
5     MR. DRAYCOTT: Absolutely.
6     THE COURT: Yes, sure. And there was one other
7  memo you gave me you said was just a draft, so it was hard
8  for me to understand because you didn't give me a
9  declaration that went document by document. At least I
10 didn't find it.
11     MR. DRAYCOTT: No, no, we were relying on prior
12 declarations.
13     THE COURT: But they were broad-sweeping, the end
14 of the Republic if these are produced.
15     MR. DRAYCOTT: Your Honor, thank you. I think
16 I've got the clarification I need, and we will endeavor --
17     THE COURT: Next week. And you saw what I
18 excluded, I mean, the real back-and-forth: "I recommend
19 that you do this policy thing for this reason," and the guy
20 says "No." I mean, that's like core stuff, but 99 percent
21 of it wasn't that.
22     MR. DRAYCOTT: Your Honor, I gave your order a
23 very careful reading and will continue to do so. Thank you.
24     MR. HENDERSON: Just a couple of fine points, your
25 Honor.

41

1     THE COURT: I'm sure they're fine.
2     MR. HENDERSON: Well, yes. On the seven states
3  that are going to go after December 15, am I correct in
4  understanding it will be one 30(b)(6) and one 30(b)(1)
5  deposition per state?
6     MR. MERKL: Your Honor, what we propose to do is,
7  we'll just cross-notice whatever they do. If they do three
8  or four depositions in the state, we'll do three or four.
9  The whole idea is to avoid having to go out and making them
10 do this extra process.
11     MR. HENDERSON: Some of these states have had
12 dozens of depositions that just --
13     THE COURT: I can't answer that in advance. I
14 mean, my theory was on this that it would have some limits
15 on it per state, but if somebody is already taking a
16 deposition --
17     MR. MERKL: Exactly, your Honor, these are
18 happening anyway.
19     THE COURT: What?
20     MR. MERKL: These are all depositions that would
21 be happening anyway.
22     THE COURT: Yes, I know, but at some point it's a
23 burden on the -- the litigating burden. It's whatever it
24 was for these other states: one 30(b)(6), one 30(b)(1), you
25 can cross-notice. Do you want to attend the rest and I

42

1  would use the information? Sure. But I can't make the
2  government attend all of these if there are eight per state.
3  You can still use the materials, but you just won't --
4       MR. MERKL: Be able to ask questions, but we can
5  use the material.
6       THE COURT: Yes, but you can use the material.
7       MR. MERKL: Or we can ask questions of one and
8  notice a 30(b)(6) of --
9       THE COURT: Yes.
10      MR. MERKL: Okay.
11      THE COURT: But they can use the material. If
12  it's out there under oath, it can be used.
13      MR. HENDERSON: On summary judgment, I think
14  anybody can use anything that's under oath basically.
15      One other fine point, your Honor. The last time
16  around, I think it was in the Abbott case, there were a
17  couple of situations -- and I think I speak on behalf of all
18  the parties here -- where a witness got sick or something
19  and the deposition had to be postponed.
20      THE COURT: Sure.
21      MR. HENDERSON: And the question is, can we, if we
22  all agree that a deposition has to be scheduled for that
23  type of reason, can we do it ourselves without seeking leave
24  of Court?
25      THE COURT: Of course, of course.

43

1       MR. HENDERSON: Thank you, because last time it
2  took many months.
3       THE COURT: If you all agree, I mostly agree. My
4  biggest issue is that this case is getting very old, and
5  short of the First Circuit just ending the entire case,
6  we're all going to grow old together unless we get this
7  moving, right? I mean, this case, I'm still getting new
8  cases in it.
9       MR. MERKL: Kansas.
10      THE COURT: It's been seven years since I started,
11  so we need to get some momentum on the case. Even if I just
12  had five sample cases that could be briefed all the way
13  through to give people a sense of how I might come down on
14  these things. Maybe I could even divvy it up, and then you
15  could go on appeal or something, just something, and then
16  maybe have some serious -- have you started talking
17  settlement?
18      MR. HENDERSON: Yes, your Honor. In fact,
19  Mr. Merkl --
20      THE COURT: We need to go off the record for this.
21      MR. MERKL: We can do that in a second. Can I
22  just ask for clarification on the claims data? I
23  understand, obviously, if the government doesn't have it, we
24  won't get it; and the consequences of not having it, we'll
25  litigate that later.

44

1       THE COURT: Right.
2       MR. MERKL: What I don't understand is, is the
3  government saying, for the seventeen states that we don't
4  have the claims data for yet, we don't have it because it
5  doesn't exist at the state level? Or is it some problem
6  where they're having trouble getting it from the states
7  where the onus is kind of now on me to go to these states
8  and get it?
9       THE COURT: Which is it, that it doesn't exist or
10 the states won't give it to you?
11      MR. HENDERSON: I think probably every state has
12 claims data. They process claims. We have not had, quite
13 frankly, the resources to go out and -- it's very
14 time-consuming to collect this data, so we have not done it
15 for all fifty states, and some states simply haven't
16 produced it to us. So we just don't have it all, and we're
17 unlikely to get much more. It's possible we could get
18 another state or two before December 15, but --
19      THE COURT: Do they understand they won't get
20 their half if they don't do it?
21      MR. HENDERSON: Your Honor, we're going to rely on
22 the data, more summary data that is reported to CMS that's
23 on the Web site. That's what's been done in the Abbott
24 case, for example.
25      THE COURT: And that may be enough or not. I just

45

1  don't understand it well enough.
2       MR. HENDERSON: And the defendants will move to
3  exclude our damages estimates to the extent that they rely
4  on that high-level data, and the Court will have to decide,
5  but we can't produce what we don't have.
6       THE COURT: All right, that's where it is. I
7  can't refine it any more.
8       MR. MERKL: No, I understand, your Honor. I guess
9  what I'm saying is, if it really exists, CMS can direct the
10 states to give it to us. I understand the states may not
11 want to do it, but they're claiming these states. The data
12 we're talking about, your Honor, is the type of thing you're
13 looking at in Massachusetts --
14      THE COURT: I tell you what, if you want to
15 subpoena it, subpoena it. They're stuck with whatever they
16 produce.
17      MR. HENDERSON: One final thing, your Honor. I
18 think we should have a scheduling conference scheduled at
19 some point, certainly both to talk about what the status is
20 of these other seven states later on down the road, and also
21 I think, too, when we get closer to summary judgment, to
22 talk about how we're going to approach summary judgment. We
23 don't have a game plan right now. We've had a little bit of
24 discussion amongst us, but I think it's going to -- some
25 months from now --

46

1  THE COURT: What are you thinking of?
2  MR. HENDERSON: January-February time period.
3  THE COURT: I'm thinking you're going to have to
4  brief it state by state, right?
5  MR. MERKL: That's our view.
6  MR. DALY: Not necessarily, Judge.
7  MR. HENDERSON: I don't think we're going to have
8  fifty summary judgment motions.
9  THE COURT: I don't know enough. If Mylan is any
10 indication, it's so sui generis.
11 MR. HENDERSON: Well, there are going to be
12 state-by-state issues, but, in any event, it just seems to
13 me we may need a scheduling conference or a status
14 conference. If your Honor doesn't want to do it, that's
15 fine. It just seems to me --
16 THE COURT: Let me put it this way: I had this
17 and I thought this was very helpful today, and I thank you
18 all for coming. I'm just simply saying, I don't know when
19 to schedule it for. I don't have theoretical opposition,
20 but I don't want to create problems. The way we have this
21 now, you're going to be done with --
22 MR. HENDERSON: How about after the close of
23 expert discovery?
24 THE COURT: Which is when?
25 MR. HENDERSON: I've forgotten. Does anybody

47

1  know? The beginning of March maybe?
2  MR. MERKL: March --
3  THE COURT: Close of expert discovery, May 22?
4  MR. MERKL: Yes, May 22, your Honor. Close of
5  expert for the Abbott, Dey, and Roxane cases, May 22, 2009.
6  THE COURT: Robert, why don't we give them a date
7  in May, and it's without prejudice to anyone asking to come
8  in sooner, if that's necessary, because this was useful
9  today. When should we do this in May?
10 THE CLERK: May 28 at 2:00 p.m.
11 MR. MERKL: Is that Memorial Day?
12 THE CLERK: The Thursday of Memorial Day week.
13 THE COURT: Now let's go off the record.
14 (Discussion off the record.)
15 (Adjourned, 4:45 p.m.)

48

1  C E R T I F I C A T E
2
3
   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5
6
7      I, Lee A. Marzilli, Official Federal Court
8  Reporter, do hereby certify that the foregoing transcript,
9  Pages 1 through 47 inclusive, was recorded by me
10 stenographically at the time and place aforesaid in Civil
11 Action Nos. 07-12048, 06-11337, and 05-11084, In Re:
12 Pharmaceutical Industry Average Wholesale Price Litigation,
13 and thereafter by me reduced to typewriting and is a true
14 and accurate record of the proceedings.
15     In witness whereof I have hereunto set my hand
16 this 19th day of November, 2008.
17
18
19
20
21     /s/ Lee A. Marzilli
       _____
22     LEE A. MARZILLI, CRR
       OFFICIAL FEDERAL COURT REPORTER
23
24
25