# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ———————————————————— ) | **MDL No. 1456** |
| **IN RE PHARMACEUTICAL INDUSTRY** ) | **Master File No. 01-12257-PBS** |
| **AVERAGE WHOLESALE PRICE LITIGATION** ) | **Subcategory Case No. 06-11337** |
| ———————————————————— ) | |
| ) | **Judge Patti B. Saris** |
| **THIS DOCUMENT RELATES TO:** ) | |
| *State of California, ex rel. Ven-A-Care v.* ) | **Magistrate Judge** |
| *Abbott Laboratories, Inc., et al.* ) | **Marianne B. Bowler** |
| Case No:  1:03-cv-11226-PBS ) | |
| ———————————————————— ) | |

## STATE OF CALIFORNIA'S SUR-REPLY BRIEF IN FURTHER OPPOSITION TO DEFENDANTS' MOTION FOR AN ORDER GRANTING LEAVE TO TAKE DEPOSITION OUT OF TIME

Defendants' Reply (Def. Rep., Dkt 6582, 489) to California's Opposition (CA Opp., Dkt 6482, 437) includes several arguments urging the Court to grant their motion to depose Thomas Ahrens, including, for the first time, the argument that California engaged in spoliation. California responds as follows:

    1)      Defendants provide no basis to support their spoliation claim; and

    2)      Defendants' remaining arguments also have no merit.

## 1.      Defendants provide no basis to support their spoliation claim.

Defendants claim that California's failure "to produce any documents pertaining to [Ahrens] indicates that his electronic documents were destroyed when he left DHS. Thus, the only way Defendants can learn of the relevant information he may possess is through his deposition." Def. Rep. at 5. Defendants are wrong in several respects.

First, if the basis on which Defendants argue in the preceding quoted assertion were itself sufficient reason to grant a deposition out of time, i.e. that the absence of discovery documents pertaining to a person with allegedly relevant knowledge in turn justifies an out of time deposition of that person, California would be moving for leave to take out of time depositions of

numerous employees of the defendant pharmaceutical manufacturers.  Even if the late-breaking spoliation allegation were true, and it is not, the absence of document discovery pertaining to an individual does not constitute a valid basis on which to allege spoliation and is not, without more, a reason to justify ordering a deposition after discovery has closed.

Second, the quoted assertion is factually wrong. Between August 1, 2007 and February 13, 2009, California produced more than 80 paper documents containing references pertaining to Mr. Ahrens. In addition, again contrary to Defendants' assertions, California produced a number of electronic materials referencing Mr. Ahrens, including: (a) 46 documents, on October 24, 2008; 42 documents, on November 14, 2008; 2 documents, on November 25, 2008; 142 documents, on February 27, 2009; and 4 documents, on March 16, 2009.

Third, Defendants offer no proof of spoliation, and overlook the fact that California has produced thousands of documents concerning Medi-Cal's operations predating 1994 (the earliest actionable period alleged in California's complaint), with some documents going as far back as 1982 – fully *16 years* before Ven-A-Care filed its original complaint. For instance, California has produced, (a) materials relating to its State Plan Amendments dating back to 1982; (b) responsive DHCS document retention schedules dating back to 1983; (c) responsive Legislative Materials, Legislative Bill Analyses and Enrolled Bill Reports dating back to 1985; (d) responsive DHCS Organizational Charts dating back to 1985; (e) Provider Manual updates, and the Provider Manual, dating back to 1991; and (f) responsive DHCS/Medi-Cal Fiscal Intermediary Operational Instruction Letters dating back to 1994.

2.     **Defendants' remaining arguments have no merit.**

Defendants argue their delay in seeking Mr. Ahrens' deposition was the result of "careful deliberation" required by California's allegedly late document productions. Def. Rep. at 2-4. This argument is substantively deficient for a number of reasons.

First, Defendants maintain California's completion of electronic discovery by March 16 was "tardy" and apparently constituted some sort of bad faith, forcing Defendants to have make "educated guesses" about who to depose. Def. Rep. at 2.  This assertion is difficult to comprehend when Defendants themselves knew at least by January 2009 that Mr. Ahrens had participated in the 2000 Drug Task Force, which constituted a specifically described basis on which to list him as a possible deponent. *See* CA Opp., Ex. 7, second entry.

Second, Defendants claim that until they deposed Vic Walker and Katherine Ahrens in May 2009, "both of whom were particularly knowledgeable," they did not understand that they had to put Tom Ahrens on their "short list" in preparation for additional "careful deliberation." Def. Opp. at 2-3. Defendants never raised this argument in any substantive manner in their Motion, and in particular never mentioned either deposition as a basis on which to justify the relief they seek. One explanation for this omission in their moving argument could be the fact that Vic Walker's deposition contains no mention, anywhere, of Thomas Ahrens. See Ex. 1, Deposition of Vic Walker dated May 21, 2009. Katherine Ahrens' deposition contains precisely one instance of the name "Tom Ahrens," as follows: "Q. Okay. Did you marry Tom Ahrens? A. Yes." Ex. 2, Deposition of Katherine Ahrens dated May 20, 2009 at 11:9-10.

Finally, Defendants' Opposition manifests a certain confusion which undercuts their argument.  Defendants appear concerned, simultaneously, that Ahrens should be produced for a late deposition both because California produced too little information (i.e., their spoliation assertion) and too much information (i.e., the assertion that California "buried" his name in its initial disclosures served in August 2007, and again in written interrogatory responses served in

December 2007, because that made their task of identifying his purported salience as a witness more difficult. Def. Opp. at 3-4.). Defendants also appear uncertain of the gravamen of the sin they impute to California regarding its allegedly "late" March 16 production. At one point they claim that "Defendants' delay in seeking Mr. Ahrens' deposition was the result of careful deliberation by Defendants that was required by California's tardy production of its electronic production. " Def. Opp. at 1-2. Elsewhere, they protest that "Defendants never contended that they needed Mr. Ahrens' deposition because of some late-produced piece of discovery or new development." Def. Opp. at 5.  Neither assertion explains why Mr. Ahrens' deposition is so critical to Defendants' defense, or why Defendants waited so long to seek Mr. Ahrens' deposition (i.e., until June 9, 2009, leaving three weekdays before discovery cut-off) that compliance with this Court's discovery deadline was not feasible.

## CONCLUSION

For the reasons set forth above, Plaintiff the State of California respectfully requests this Court to (a) order the instant Sur-Reply be filed, or in the alternative that Defendants' spoliation arguments be deemed ignored, and (b) enter an order denying Defendants' Motion for an Order Granting Leave to Take Deposition Out of Time.

Dated:  October 16, 2009

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General for the State of California

By:   __/s/ Nicholas N. Paul_____
          NICHOLAS N. PAUL
          CA State Bar No. 190605
          Supervising Deputy Attorney General
          Bureau of Medi-Cal Fraud and Elder Abuse
          Office of the Attorney General
          1455 Frazee Road, Suite 315
          San Diego, CA  92108
          Telephone:  (619) 688-6099
          Fax:  (619) 688-4200

**Attorneys for Plaintiff,**
**STATE OF CALIFORNIA**

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing was delivered to all counsel of

record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by

sending on October 16, 2009, a copy to Lexis-Nexis for posting and notification to all parties.

<u>__/s/ Nicholas N. Paul_____</u>
NICHOLAS N. PAUL

# EXHIBIT 1

Walker, Vic                                         May 21, 2009
                         Sacramento, CA

                   UNITED STATES DISTRICT COURT

                    DISTRICT OF MASSACHUSETTS

        ----------------------------X

        IN RE PHARMACEUTICAL INDUSTRY )

        AVERAGE WHOLESALE PRICE        )

        LITIGATION                     )

        ----------------------------X MDL No. 1456

        THIS DOCUMENT RELATES TO:     ) Civil Action:

        State of California, ex rel.  ) 01-12257-PBS

        Ven-A-Care v. Abbott           )

        Laboratories, Inc., et al.,    )

        ----------------------------X


                    THURSDAY, MAY 21, 2009


                 VIDEOTAPED DEPOSITION OF

                       VIC WALKER


                  SACRAMENTO, CALIFORNIA


        Reported By:  CAROL NYGARD DROBNY, CSR No. 4018

                  Registered Merit Reporter

Walker, Vic                                    May 21, 2009

                        Sacramento, CA

---

Page 2

1        A P P E A R A N C E S :
2
3    For the STATE OF CALIFORNIA:
4
5        BUREAU OF MEDI-CAL FRAUD & ELDER ABUSE
6        BY:  JOHN FISHER
7        Attorney General
8        Civil Prosecutions Unit
9        110 West A Street, #1100
10       San Diego, California  92186
11       john.fisher@doj.ca.gov
12
13         -AND-
14
15       BUREAU OF MEDI-CAL FRAUD & ELDER ABUSE
16       BY:  SUZANNE GRAYDON
17       Investigative Auditor II
18       110 West A Street #100
19       San Diego, California  92186
20       suzanne.graydon@doj.ca.gove
21
22

---

Page 3

1        A P P E A R A N C E S :  (CONTINUED)
2
3    For the STATE OF CALIFORNIA:
4
5        STATE OF CALIFORNIA
6        OFFICE OF THE ATTORNEY GENERAL
7        CALIFORNIA DEPARTMENT OF JUSTICE
8        BY:  RAYMOND J. LIDDY
9          Deputy Attorney General
10       1455 Frazee Road, Suite 315
11       San Diego, California  92108
12       raymond.liddy@doj.ca.gov
13
14            and
15
16       DEPARTMENT OF HEALTH SERVICES
17       BY:  JANET M. ALEXANDER
18          Staff Counsel
19       Office of Legal Services MS0010
20       1501 Capitol Avenue, Suite 71.5001
21       Sacramento, California  95899
22       jalexander@dhs.ca.gov

---

Page 4

1        A P P E A R A N C E S :  (CONTINUED)
2
3    For the Defendant SANDOZ, INC.:
4
5        WHITE & CASE
6        BY: LARA A. BERWANGER, ESQ.
7        1155 Avenue of the Americas
8        New York, New York  10036
9        lberwanger@whitecase.com
10
11   For DEY & MYLAN:
12
13       KELLEY DRYE & WARREN, LLP
14       BY: MICHAEL MALONEY, ESQ.
15         BRENDAN CYR, ESQ.
16       101 Park Avenue
17       New York, New York  10178
18       mmaloney@kelleydrye.com
19       bcyr@kelleydrye.com
20
21
22   (CONTINUED)

---

Page 5

1        A P P E A R A N C E S :  (CONTINUED)
2
3    For VENACARE FLORIDA KEYS: (Afternoon Session Only)
4
5        KRAUSE, KALFAYAN, BENINK & SLAVENS
6        BY:  DAVID B. ZLOTNICK, ESQ.
7        625 Broadway, Suite 635
8        San Diego, CA  92101
9        dzlotnick@kkbs-law.com
10
11
12   Videographer:  BENJAMIN LEWIS
13
14
15
16
17
18
19
20
21
22

---

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                          May 21, 2009
                         Sacramento, CA

---

Page 6

1              I N D E X
2
3    WITNESS:  VIC WALKER              PAGE
4       Examination by Mr. Maloney................ 010
5       Examination by Ms. Berwanger.............. 212
6
7            E X H I B I T S
8    EXHIBIT        DESCRIPTION        PAGE
9    Exhibit Walker 001 - HHC016-0100 - 0111........ 047
10   Exhibit Walker 002 - CAAG/DHS0086981........... 073
11   Exhibit Walker 003 - CAAG/DHS0086984........... 080
12   Exhibit Walker 004 - CAAG/DHS0072968 - 2971.... 094
13   Exhibit Walker 005 - CAAG/DHS-E0047695 - 7696.. 099
14   Exhibit Walker 006 - CAAG/DHS0087014 - 7016.... 102
15   Exhibit Walker 007 - CAAG/DHS0076362........... 106
16   Exhibit Walker 008 - CAAG/DHS0086972 - 6973.... 110
17   Exhibit Walker 009 - CAAG/DHS-E0015226 - 5166.. 124
18   Exhibit Walker 010 - CAAG/DHS-E0041441 - 1475.. 128
19   Exhibit Walker 011 - CAAG/DHS-E0018080 - 8083.. 135
20   Exhibit Walker 012, CAAG/DHS0072855 - 2856..... 137
21   Exhibit Walker 013 - CAAG/DHS0068472 - 8570.... 143
22   Exhibit Walker 014 - CAAG/DHS0068571 - 8646.... 149

---

Page 7

1       E X H I B I T S  (CONTINUED)
2    EXHIBIT        DESCRIPTION        PAGE
3    Exhibit Walker 015 - CAAG/DHS0086481 - 6491.... 156
4    Exhibit Walker 016 - CAAG/DHS-E0044649 - 4651.. 162
5    Exhibit Walker 017 - CAAG/DHS-E0018998......... 183
6    Exhibit Walker 018 - CAAG/DHS-E0041068 - 1094.. 187
7    Exhibit Walker 019 - SANDOZ CALI3000314 - 0368. 216
8    Exhibit Walker 020 - CAAG/DHS-SAN000063 - 0078. 219
9    Exhibit Walker 021 - CAAG/DHS-SAN000296 - 0329. 222
10
11
12
13
14
15
16
17
18
19
20
21
22

---

Page 8

1              P R O C E E D I N G S
2
3         BE IT REMEMBERED,
4    that on Thursday, May 21, 2009, commencing at the
5    hour of 9:06 a.m.  thereof, at the offices of
6    Department of Justice, 1300 I Street, Sacramento,
7    California, before me, Carol Nygard Drobny, a
8    Certified Shorthand Reporter of the State of
9    California, there personally appeared
10
11              VIC WALKER,
12   called as a witness by the Defendant, who, being
13   by me first duly sworn, was thereupon examined and
14   interrogated as hereinafter set forth.
15
16         VIDEOGRAPHER:  Good morning.
17         We're on the video record, ladies and
18   gentlemen, at 9:06.
19         I'm Benjamin Lewis from Henderson Legal
20   Services in Washington, D.C.
21         The phone number there is 202-220-4158.
22         This is a matter pending before the U.S.

---

Page 9

1    District Court, District of Massachusetts, in the
2    case captioned, Pharmaceutical Industry Average
3    Wholesale Price Litigation, Case Number 01-122 57
4    PBS.
5         This is the beginning of tape one of the
6    video deposition of Vic Walker on May 21st, 2009.
7         We are located at 1300 I Street,
8    Sacramento, California 94244.
9         Counsel, would you please identify
10   yourselves beginning with the questioning
11   attorney.
12         MR. MALONEY:  Michael Maloney with Kelly
13   Drye & Warren on behalf of Dey, Inc., Dey, L.P.,
14   Mylan, Inc., and Mylan Pharmaceuticals.
15         MR. CYR:  Brendan Cyr from Kelly Drye &
16   Warren on behalf of Dey, Inc., Dey, L.P., Mylan,
17   Inc., and Mylan Pharmaceuticals.
18         MS. BERWANGER:  Lara Berwanger from
19   White & Case on behalf of Sandoz, Inc.
20         MR. FISHER:  John Fisher for the State
21   of California.
22         THE WITNESS:  Vic Walker for California

---

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                        May 21, 2009
                        Sacramento, CA

Page 10

1    Department of Health Care Services.
2          MR. LIDDY:  Raymond Liddy with the
3    Department of Justice, State of California.
4          MS. ALEXANDER:  Janet Alexander, the
5    Department of Health Care Services.
6          Suzanne Graydon, California DOJ.
7          VIDEOGRAPHER:  Thank you.
8          Will the Reporter please swear in the
9    witness.
10         (Thereupon the oath was
11   administered to the witness by the Court
12   Reporter.)
13
14         EXAMINATION
15   BY MR. MALONEY:
16      Q.  Good morning, Mr. Walker.
17         Can you please state and spell your name
18   for the record.
19      A.  I typically go by Vic, V-i-c, Walker, W-
20   a-l-k-e-r.
21         My full name is Victor McCoy Walker, Jr.
22      Q.  Thank you.

Page 11

1          What is your current home address?
2       A.  811 Shasta Circle, El Dorado Hills,
3    California 95762.
4       Q.  And your current business address?
5       A.  1501 Capitol Avenue, Sacramento,
6    California 95814.
7       Q.  Thank you.
8          Mr. Walker, have you ever been deposed
9    before?
10      A.  Not on a face-to-face like this.
11         In the past I have done a written
12   deposition once.
13      Q.  Do you know if that was the only
14   occasion that you did a written deposition?
15      A.  You know, there may have been a second
16   one, but I -- I clearly remember one -- more
17   clearly.
18      Q.  Do you remember generally what that
19   deposition was about?
20      A.  The makers of Zantac were suing us over
21   having taken them off the Medi-Cal formulary.
22   They didn't like that.

Page 12

1       Q.  Did that matter have anything to do with
2    prescription drug pricing?
3       A.  Yes, certainly.
4       Q.  And did that relate only to the
5    prescription drug pricing as it relates to Zantac
6    being on the California formulary?
7       A.  Primarily.
8          It was -- let's see.
9          How much can I say, given that this was
10   all done as part of a negotiation?
11         MR. FISHER:  Well, it's probably --
12   speak in generalities if it's confidential, if
13   it's protected under some sort of settlement
14   agreement.  But you can answer the question in
15   that light.
16   BY MR. MALONEY:
17      Q.  Well, just one more question on that
18   matter.
19         Do you know the result of that case?
20      A.  We won.  Zantac did not go back on the
21   formulary.
22      Q.  Okay.

Page 13

1       A.  Actually, the list of contract drugs at
2    that point.
3       Q.  Okay.  Have you ever given other sworn
4    testimony before a Court or a Legislature?
5       A.  Not before Legislature.
6          Before a Court I -- I have.  I was
7    witness to a traffic accident once.
8       Q.  Is that the only occasion you remember
9    giving testimony before a Court?
10      A.  Yes.
11      Q.  Have you ever prepared testimony for
12   someone else to give before a Court or
13   Legislature?
14      A.  I have prepared -- helped prepare
15   documents to be presented to the Legislature.
16      Q.  Do you have a general sense on how many
17   occasions you have done something like that?
18      A.  One that clearly comes to mind.  I'm
19   trying to remember what was it about.
20         It had nothing to do with drug pricing.
21      Q.  Okay.  Mr. Walker, do you understand
22   that you're under oath in the same manner that --

4 (Pages 10 to 13)

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                          May 21, 2009
                          Sacramento, CA

Page 14

1   as if you were a witness at trial?
2       A.  Uh-huh.
3       Q.  Okay.  Now, before we get started I'm
4   going to go over a few basic instructions.
5           I'm going to ask you questions.  And I
6   would ask that you respond verbally rather than a
7   nod of the head or anything like that so the Court
8   Reporter can record your testimony.
9           And I'd also ask that you please wait to
10  finish -- for me to ask a question before you
11  provide an answer, again, so the Court Reporter
12  can record your testimony.
13          If I ask a question that you do not
14  understand, please feel free to ask me to rephrase
15  the question or to ask it again.
16          If you need a break at any time, just
17  let me know.
18          The one thing I would ask is that if we
19  -- if you do ask for a break, please answer any
20  question pending before we go on a break.
21          From time-to-time another attorney may
22  object to a question I ask.

Page 15

1           Unless your attorney instructs you not
2   to answer, please answer the question regardless
3   of the objection.
4           Do you understand these -- these rules?
5       A.  Yes.
6           MR. MALONEY:  Thank you.
7           Just for the record, I'd like to clear
8   up an issue regarding the notice of this
9   deposition.
10          This deposition was originally noticed
11  at a 30(b)(6) deposition, but, in fact, it is a
12  30(b)(1_ deposition
13          THE WITNESS:  What does that mean?
14          MR. FISHER:  That means as we -- you're
15  not here as a spokesperson for DHCS on certain
16  topics or issues that the Defendants identified.
17          You're here as a fact witness as just
18  Vic Walker, just what you did, what as you saw,
19  just as a fact witness as opposed to as an expert
20  witness for DHCS.
21          THE WITNESS:  Okay.  Let me correct
22  something that I said earlier.

Page 16

1           I have served as a witness a couple of
2   other times in some personnel issues back in the
3   1980s when I was working for the State Hospital.
4   BY MR. MALONEY:
5       Q.  Is it fair to say that none of those
6   matters involved pharmaceutical pricing?
7       A.  No.  It is fair to say that.
8       Q.  Thanks.
9           Mr. Walker, are you currently on any
10  medications that would affect your ability to give
11  full, accurate and truthful testimony today?
12      A.  I don't think so.
13      Q.  Are you on any medications at all?
14      A.  Yes, I take several.
15      Q.  If you're comfortable, would you mind
16  listing those medications?
17      A.  I take things for asthma, for sinuses,
18  for blood pressure.
19      Q.  Okay.  Do you know of any other reason
20  why you might not be able to give full, accurate,
21  and truthful testimony today?
22      A.  No.

Page 17

1       Q.  Mr. Walker, what did you do to prepare
2   for this deposition?
3       A.  Not very much of anything.
4           I had a conversation with the -- the
5   attorneys yesterday.
6       Q.  Was that conversation in person or over
7   the phone?
8       A.  In person.
9           That is with the State attorneys.
10      Q.  And do --
11      A.  Not with your side.
12      Q.  Okay.  Do you recall who was present at
13  that meeting?
14      A.  Janet and John and -- who was the other
15  fellow?
16          MR. FISHER:  For the record, it was
17  David Zlotnick, who is the counsel for the
18  relators.  It's Z-l-o-t-n-i-c-k.
19          THE WITNESS:  The day before that, I
20  think it was, I had a conversation -- actually a
21  few days before I had a conversation with Barbara
22  Dayvault as well.

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                    May 21, 2009
                    Sacramento, CA

Page 18

1  BY MR. MALONEY:
2     Q.  Okay.  We'll start with the -- the
3  conversation with Barbara.
4        Was she the only person you had a
5  conversation with on that day in preparation for
6  the deposition?
7     A.  Yes.
8     Q.  Is she an attorney?
9     A.  I -- that's my understanding, yes.
10    Q.  And do you know who she represents?
11    A.  She represents the State.  She works
12  with Janet.
13    Q.  Did you review any documents during that
14  meeting?
15    A.  No.
16    Q.  Do you know -- recall how long that
17  meeting lasted?
18    A.  Oh, it was about 20 minutes.  It was a
19  hallway meeting really.  I just ran in to her, and
20  I asked her what to expect.
21    Q.  So it was an impromptu meeting, it
22  wasn't planned?

Page 19

1     A.  Yeah.
2     Q.  And the meeting yesterday, did you
3  review any documents during that meeting?
4     A.  A document was brought out, but I wasn't
5  shown it.
6     Q.  You saw no part of the document
7  whatsoever?
8     A.  No.  It was sitting upside down, so I --
9  it was difficult to see.
10    Q.  Okay.  Do you recall who brought that
11  document out during the meeting?
12    A.  I think it was you, John.  I think it
13  was John.
14       MR. FISHER:  Unfortunately, I can't
15  testify.
16       So --
17       THE WITNESS:  Okay.
18       MR. FISHER:  It's got to be your --
19       THE WITNESS:  I think it was John.
20  BY MR. MALONEY:
21    Q.  And during that meeting you saw no other
22  documents?

Page 20

1     A.  I don't think I did, no.  I did not.
2     Q.  And how long did that meeting last?
3     A.  About an hour.
4     Q.  Other than lawyers did you speak with
5  anyone else about this deposition?
6     A.  I mentioned to some people that I was
7  going to be involved in a deposition.
8     Q.  Did you discuss the topics of the
9  deposition or this lawsuit with anyone?
10    A.  No.
11    Q.  Okay.  Did you bring any documents with
12  you today for the deposition?
13    A.  Not for the deposition.
14       This is just a -- note of what the
15  address is here.
16    Q.  Okay.  Mr. Walker, are you a Registered
17  Pharmacist?
18    A.  Yes.
19    Q.  When did you first become a Registered
20  Pharmacist?
21    A.  In California -- it was in 1980.  I'm
22  not sure what the month was.

Page 21

1     Q.  Are you registered in any other states?
2     A.  Until recently I was registered in
3  Oregon, but I let my license lapse -- or retired
4  it, would be more -- a more correct statement.
5     Q.  Can you briefly describe your education
6  beginning with after high school?
7     A.  I went to Santa Ana College, got an AA
8  in prepharmacy, which is -- and then went on to
9  Oregon State University in Corvallis, Oregon, and
10  got a Bachelor's Degree in pharmacy, BS.
11    Q.  Did you focus in any particular subject
12  during your education?
13    A.  There was no minor, if you will.
14       I was interested in computer
15  applications.
16    Q.  As it relates to pharmacy?
17    A.  Yes.  We were looking at --
18  pharmacokinetics kinds of software.
19    Q.  Since getting your BS from Oregon State
20  have you taken any other courses or training
21  relating to pharmacy?
22    A.  I've taken a number of continuing

6 (Pages 18 to 21)

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                          May 21, 2009
                        Sacramento, CA

---

Page 22

1    education courses.  I have not pursued a --
2    further degree in pharmacy though.
3        Q.  Okay.  Did any of those CLEs focus on
4    any particular area?
5        A.  Lots of different areas.  Pharmacy is a
6    very broad area of study.  Probably focused more
7    on psychiatry.
8        Q.  Do you subscribe to any pharmacy
9    publications?
10       A.  Yes.
11       Q.  Do you -- what publications do you --
12   sorry -- do you subscribe to?
13       A.  "American Journal of Hospital Pharmacy."
14          I think I get the California --
15   actually, it's not my subscription, but the
16   "California Pharmaceutical Journal," I think is
17   the name of it, and "Hospital Pharmacy."
18          There's a few other things that -- and I
19   don't pay money for them, but they send them to me
20   anyway.
21       Q.  Okay.  Regularly read those
22   publications?

---

Page 23

1        A.  Not real regularly, to be honest.
2        Q.  Okay.  And what sort of time frame do
3    you read them?
4        A.  On occasion if I'm going to go to lunch
5    and I go without a companion, I'll grab one of
6    those as I'm going out the door so -- really a few
7    times a year probably.
8        Q.  Okay.  Are you a member of any
9    professional society or organization?
10       A.  Yes.  I'm a member of the American
11   Cancer Society of Health System Pharmacists, ASHP,
12   the California Society of Health System
13   Pharmacists, CSHP, and CPNP, College of
14   Psychiatric and Neuro -- Neurological Pharmacists,
15   I think it is.
16       Q.  CPNP was that?
17       A.  CPNP.
18          I'm not sure if it would fit in to extra
19   training or not, but I'm board certified in
20   psychiatric pharmacy.
21       Q.  Okay.  Have you ever written an article
22   for a publication?

---

Page 24

1        A.  Yes.
2        Q.  On how many occasions?
3        A.  A few.  I'm not sure how many.  Several
4    times.
5        Q.  Would you say that you've written these
6    articles recently, in the past -- over your
7    career?
8        A.  I wrote an article quite recently for
9    "Hospital Pharmacy."  It's an editorial on ethics
10   and pharmacy.
11       Q.  Did that -- you said that was for the
12   hospital pharmacy.
13       A.  "Hospital Pharmacy."
14          It's one of the journals I get.
15       Q.  And did the journal relate to ethics in
16   respect to hospital pharmacy or pharmacy in
17   general?
18       A.  Pharmacy in general.
19       Q.  Okay.  I would like to switch areas.
20          Where did you first work after you
21   received your degree, your BS from Oregon State?
22       A.  I started at Payless Drugs in Medford,

---

Page 25

1    Oregon, and I worked as an intern until about
2    November of 1980.
3          At that point I got my Oregon license,
4    and I continued working as a pharmacist until July
5    of 1981.
6        Q.  What were your responsibilities during
7    your time at Payless?
8        A.  Fill prescriptions, stock shelves,
9    counsel with patients, typical pharmacist things.
10       Q.  Did you ever submit Medicaid claims when
11   you worked at Payless?
12       A.  Sure.
13       Q.  What kind of information did you provide
14   on those claims?
15       A.  It was all done electronically.  We
16   didn't fill out paper forms.
17       Q.  Uh-huh.
18       A.  So it was essentially the kinds of
19   things that you have to put in to the computer to
20   fill a prescription, patient's name, what is the
21   drug, number of tablets, the -- days supply.
22          Now, we're talking back then.  I don't

---

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                    May 21, 2009
                    Sacramento, CA

Page 26

1  remember whether we did days supply or not, who
2  was the doctor, things like that.
3      Q.  Did you have to submit price information
4  for those claims?
5      A.  I had to submit how much we were
6  charging.
7      Q.  How much the pharmacy was charging for
8  the -- the drugs dispensed to the Medicaid
9  beneficiary?
10     A.  Uh-huh.
11     Q.  Was that charge typically called a
12 "usual and customary charge"?
13     A.  I'm not sure that I called it that.
14        It was the charge -- to be very honest
15 with you, I didn't pay a lot of attention to what
16 the charge was that the computer set.
17        They had a -- a pricing formula that
18 priced things, and it sent the -- the claim
19 electronically or -- actually, I don't know if it
20 was -- it was electronically between me and
21 wherever the central computer was.
22     Q.  Okay.  Did you ever purchase drugs for

Page 27

1  Payless when you worked there?
2      A.  I ordered drugs, sure.
3      Q.  Did you ever discuss the prices of the
4  drugs you ordered for Payless?
5      A.  I don't remember doing so, but I'm --
6  you know, very possibly did.
7      Q.  Okay.  Did you -- were you aware of the
8  prices that Payless paid for the drugs it ordered?
9      A.  I don't know how much Payless paid for
10 those.
11        I do know what the -- you know, I saw
12 the list price on the microfiche, or Red Book, or
13 whatever document I was looking at.
14     Q.  And was that list price an AWP, an
15 Average Wholesale Price?
16     A.  I think so.  I don't remember.
17        Probably was.
18        This is going back quite a ways.
19     Q.  Yes.
20        How about after Payless?
21        What was your next job after Payless?
22     A.  After Payless I took a job as a

Page 28

1  pharmacist at Patton State Hospital in San
2  Bernardino, California.
3      Q.  And what were your responsibilities as a
4  pharmacist at the -- the hospital?
5      A.  Patton is a psychiatric hospital
6  primarily for criminal offenders, and my job was
7  not much in the way of ordering drugs or things
8  like that.
9         I did drug regimen reviews, where I
10 would review the drugs that a patient is taking,
11 and if I saw a problem, I'd make a comment to the
12 doctor.
13        I taught classes on use of those drugs
14 in -- in patients to -- medical students,
15 actually, to -- I taught some classes on what the
16 various mental illnesses were and how the drugs
17 affected patients to various groups of people.
18        I set up a satellite pharmacy in one of
19 the outlying buildings, and we ran that.
20        I reviewed orders that the doctors
21 wrote, make sure that they made sense.
22     Q.  Okay.  How long were you at Patton State

Page 29

1  Hospital?
2      A.  I was there for four years.
3      Q.  So you left Patton somewhere around
4  1985; is that correct?
5      A.  Uh-huh.
6      Q.  And where did you go next?
7      A.  I took a promotion to pharmaceutical --
8  excuse me -- Pharmacist 2 at California
9  Institution for Men Chino.  That was an 80-bed
10 hospital and a 5 to 6,000-bed prison.
11     Q.  You said that was the California
12 Institute for Men?
13     A.  Institution for Men.
14     Q.  Okay.  And were your responsibilities at
15 the California Institution for Men any different
16 than at Patton State Hospital?
17     A.  Yeah.
18        I was in charge of the pharmacy, so
19 there were a lot of administrative kinds of things
20 to do.
21     Q.  Did you order pharmaceuticals during
22 your time at the California Institution for Men?

Henderson Legal Services, Inc.
202-220-4158            www.hendersonlegalservices.com

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                            May 21, 2009
                          Sacramento, CA

Page 30

1    A.  Yes.
2    Q.  Were you aware of the prices for the
3  drugs you ordered in that role?
4    A.  The microfiche had prices, and I also
5  had a -- a book of the contract prices that the --
6  Department of General Services got for us.
7    Q.  And were the prices on the microfiche
8  the list -- similar to the list prices that you
9  mentioned earlier?
10   A.  Yes.
11   Q.  And the contract price, how did they
12 compare to the prices on the microfiche, the list
13 prices?
14   A.  Typically were lower.
15   Q.  Is it fair to say that the -- the Office
16 of General Services negotiated lower prices
17 through contracts?
18       MR. FISHER:  Objection as to form.
19       THE WITNESS:  The word "negotiated" is
20 likely not a correct word.
21       They had a contract process where they
22 received bids.

Page 31

1  BY MR. MALONEY:
2    Q.  So through the bidding process the
3  Office of General Service contracted for lower
4  prices than list prices?
5        MR. FISHER:  Objection as to form.
6        THE WITNESS:  They oftentimes were
7  lower.
8  BY MR. MALONEY:
9    Q.  Now, the list prices that were on the
10 microfiche at the California Institution for Men,
11 were those AWPs?
12   A.  Again, I think they were AWPs.
13   Q.  Do you know if -- are you familiar with
14 Wholesale Acquisition Cost?
15   A.  I am now.  I was not then.
16   Q.  Okay.  Okay.
17       And how long were you at the California
18 Institution for Men?
19   A.  I was there for three years.
20   Q.  Okay.  So, if my math is correct, that's
21 about 1988?
22   A.  Uh-huh.

Page 32

1    Q.  And where did you next work?
2    A.  I took a job here.
3    Q.  And by "here" you mean the Department of
4  --
5    A.  Of Health Services.
6    Q.  Okay.  What was your title when you
7  started with the Department of Health Services?
8    A.  Pharmaceutical Consultant 2.
9    Q.  And generally what were your
10 responsibilities as a Pharmaceutical Consultant 2?
11   A.  When I first got there, my job was to
12 review drugs and do the necessary regulatory
13 paperwork to add drugs to the Medi-Cal formulary.
14   Q.  And by "Medi-Cal," you're referring to
15 California's Medicaid program?
16   A.  Yes.
17   Q.  Did you have any other responsibilities
18 when you first started?
19   A.  Learn the program.
20   Q.  And how did you go about to learn the
21 program?
22   A.  I read the provider manual -- at least

Page 33

1  parts of it.  It was thinner then than it is now.
2        And -- and then my boss, who was Len
3  Terra, would give me assignments of one kind or
4  another.
5        The job was just -- was not just adding
6  drugs.  It included legislative issues, doing bill
7  analyses, dealing with patients and providers that
8  were unhappy or needed help.
9    Q.  Did you read any materials other than
10 the provider manual?
11   A.  Well, yes.  I mean --
12   Q.  Over time?
13   A.  I read the newspaper.  I read -- lots of
14 things.
15   Q.  Well, in reference to learning the
16 program when you first started and shortly after
17 you first started, did you read materials in
18 addition to the -- the provider manual?
19   A.  I looked through the regulations, Title
20 22.
21   Q.  What were the -- what types of
22 legislative issues did you work on?

                Henderson Legal Services, Inc.
202-220-4158                        www.hendersonlegalservices.com

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                           May 21, 2009
                          Sacramento, CA

Page 34

1     A.  I can't remember very clearly.
2         Just bills or proposals for bills.
3         There was one the -- there were some
4  proposals to create an open formulary for Medi-
5  Cal, and I worked on that.  That one comes to
6  mind.
7     Q.  And, when you worked on a legislative
8  issues, can you provide additional detail as to
9  what you did on those types of projects?
10    A.  I typically wrote the bill analysis.
11    Q.  And what is a "bill analysis"?
12    A.  It is a document that -- you know, is
13  the basis for the official policy from the
14  Governor on a bill, we're going to oppose it,
15  we're going to not oppose it, oppose if amended,
16  oppose -- excuse me -- oppose unless amended, and
17  -- with some backing as to why we would take that
18  position.
19    Q.  So in addition to stating a policy
20  position regarding a bill, the bill analysis would
21  provide some sort of reasoning or support for that
22  position?

Page 35

1     A.  Typically.  Typically.
2     Q.  And eventually this bill analysis
3  reaches the Governor?
4     A.  After going through half a dozen steps
5  of people approving it and their supervisors
6  approving it, and it goes to agency, and it's
7  approved, then eventually it would become the
8  official position of the -- and I don't know if
9  the -- Governor sees it at that point or not, but
10  it becomes the official position of the Department
11  and of the State -- or the Governor.
12        I can't say that I'm the world's
13  greatest expert on the workings of the Legislature
14  and all these things.
15    Q.  Okay.  In terms of -- what happens after
16  the Governor or the Department takes an official
17  position regarding a bill?
18        Is that transmitted or communicated to
19  the Legislature somehow?
20    A.  That's my understanding, that it is.
21    Q.  Do you have an understanding as to
22  whether the Legislature considers the Department's

Page 36

1  or the Governor's official position regarding
2  Medicaid legislative issues?
3     A.  You'd have to ask the Legislature on
4  that.
5         We -- you know, I -- I know that various
6  people appear before the Legislature and testify,
7  and we -- whether they listen or not is another
8  question
9     Q.  And did -- by "those people" -- by
10  "various people," do you mean that some DHS
11  personnel testify or have testified before the
12  Legislature regarding Medicaid legislative issues?
13    A.  It's my understanding that's the case.
14    Q.  Excuse me.
15        Did your responsibilities as a
16  Pharmaceutical Consultant 2 change over time?
17    A.  Yes.  Yes.
18    Q.  How did they change?
19    A.  I've always had a -- affinity for data
20  and computers.  They like me and I like them.
21        And so -- I started working a lot more
22  with the design of the Medi-Cal claims processing

Page 37

1  system, setting up things so that it would -- be
2  able to create certain rules to pay for or not pay
3  for drugs that -- depending upon situations with a
4  patient, you know.
5         The patient --
6         We created a rule to control utilization
7  of H2 blockers like Tagamet and things like that.
8     Q.  Did Medi-Cal process its own claims?
9     A.  No.  It's -- they're processed by a
10  fiscal intermediary.  Currently it's EDS.
11    Q.  When -- when you first started at DHS,
12  was EDS the fiscal intermediary?
13    A.  Yes.
14    Q.  Was there a point in time when EDS was
15  not the fiscal intermediary?
16    A.  Yes.
17    Q.  Do you generally recall that time frame?
18    A.  I got here in November of '88, and EDS
19  had recently taken over the contract from Computer
20  Sciences Corporation.
21    Q.  Okay.
22    A.  So it was like in '87 they took it over,

                                    10 (Pages 34 to 37)

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                          May 21, 2009
Sacramento, CA

Page 38

1  I think.
2      Q.   What other responsibilities did you take
3  on as a Pharmaceutical Consultant 2 at DHS?
4      A.   Well, I was assigned to work on the RFP,
5  which was for proposal for the news claims
6  processing system in 1992.
7          I was -- the pharmacist that was
8  primarily involved in designing the system.
9          Once the RFP was awarded I -- I reviewed
10 the proposals, gave my input on that.
11         Once the RFP was -- excuse me --
12 awarded, then I was involved in the design of the
13 system, and was for several years -- still
14 involved to some degree.
15     Q.   Okay.  Were there any other
16 responsibilities that you took on that did not
17 relate to claims processing?
18     A.   That I was -- that I was doing -- that I
19 was not doing before?
20         I don't think so.
21         I mean, the -- the process for reviewing
22 drug petitions has changed somewhat.  We went to

Page 39

1  the negotiation model, but other than -- than
2  that, my job stayed pretty similar.
3      Q.   Okay.  Did you ever change positions
4  within the Department of Health and Services?
5      A.   In 2004 or '5, I think, I became a
6  Pharmaceutical Consultant 2 Supervisor and running
7  -- was running a small analysis unit that does
8  data mining, looking at the claims database for
9  patterns.
10     Q.   And after you became a Pharmaceutical
11 Consultant 2 Supervisor did you take on any other
12 titles or positions at DHS?
13     A.   No.
14     Q.   Are you still with DHS?
15     A.   DHCS now.
16     Q.   DHCS now.
17         And do you still hold the same title?
18     A.   Yes.
19     Q.   When you first started at DHS, do you
20 recall who your supervisor was?
21     A.   Len Terra.
22     Q.   Do you recall what his title was?

Page 40

1      A.   When I first started there, he was the
2  Pharmaceutical Consultant 2.
3      Q.   Okay.
4      A.   He was kind of the lead pharmacist, but
5  was the same title that I had.
6      Q.   Okay.  And eventually he moved on to
7  other position?
8      A.   Yeah.  They created a position for him.
9      Q.   Okay.
10     A.   Or better -- better organizational
11 structure.
12     Q.   Okay.  And after Len Terra who was your
13 next supervisor?
14     A.   After my -- Len Terra was Kevin Gorospe.
15     Q.   Do you recall his title?
16     A.   Pharmaceutical Program Consultant.
17         That was Len Terra -- Len's title also.
18     Q.   And I take it Mr. Gorospe has -- has
19 taken other positions as well since that time?
20     A.   No.  He's --
21     Q.   He has the same title?
22     A.   That's his job, yeah.

Page 41

1      Q.   Okay.  And did you have a different
2  supervisor after Ken Gorospe?
3      A.   No.
4          Kevin is my supervisor now.
5      Q.   Okay.
6      A.   Don't have a lot of turnover in this
7  operation.
8      Q.   Just in general over your career as a
9  Pharmaceutical Consultant 2 and Pharmaceutical
10 Consultant 2 Supervisor were you responsible for
11 keeping abreast of developments in Medicaid as
12 they relate to your role at DHS?
13     A.   Sure.
14         I mean, one needs to keep up with --
15 with their job.
16     Q.   In general how did you go about doing
17 that?
18     A.   Various things that -- we can read, news
19 -- news articles, listen to NPR.  That's actually
20 one of the best sources -- listening to some of
21 those sources, news sources, reading journals,
22 reading various articles on the Internet, or other

11 (Pages 38 to 41)

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                        May 21, 2009
                          Sacramento, CA

Page 42

1  sources when the Internet became available.
2      Q.  Did you ever read any government
3  reports?
4      A.  I'm sure I did.  Don't recall any
5  specific ones.
6      Q.  In terms of the Medicaid program in
7  general, Medicaid is a joint federal/state
8  program; correct?
9      A.  That's my understanding.
10     Q.  And under this joint federal state
11 program the Federal Government sets broad policy
12 directives that Medi-Cal's required to -- to meet
13 in order to participate in the program?
14     A.  That's my understanding.
15     Q.  And as a joint program both the Federal
16 and State Governments contribute to the monies
17 used to support the program; correct?
18     A.  That's my understanding.
19     Q.  Do you know generally how much the
20 Federal Government contributes and how much
21 California contributes?
22     A.  Well, under the stimulus rules that

Page 43

1  recently have been set, I think the ratio is
2  supposed to change, but previous, and I don't know
3  what that new share would be, but in the past in
4  general it was a 50/50 split except for family
5  planning products, and that's a 90/10 split.
6      Q.  Okay.  But in general in the past before
7  recent events the share relating to prescription
8  drugs was approximately 50/50?
9      A.  Yes.
10     Q.  Do you know the name of the federal
11 agency that operates the Medicaid program on the
12 federal level?
13     A.  In the past it was HCFA, Health Care
14 Financing Administration.  Now it's CMS, Centers
15 for Medi-Cal/Medicaid Services, I think.
16     Q.  Okay.  And under the joint program
17 California has flexibility to attach its program
18 to local needs subject to federal approval;
19 correct?
20     A.  That's my understanding.
21     Q.  And in one -- one area that California
22 can adjust to meet its local deals is the

Page 44

1  reimbursement methodology for prescription drugs
2  within federal guidelines; correct?
3      A.  With approval, yes.
4      Q.  So any prescription drug reimbursement
5  methodology put forth by California Medicaid must
6  be approved by CMS before it can be implemented?
7      A.  I believe so.
8      Q.  Okay.  Are you aware of any regulation
9  that controls what kind of price California can
10 use as a basis for its reimbursement for
11 prescription drugs?
12     A.  "Regulation" is a special meaning as
13 opposed to a law.
14     Are you talking about general -- a law
15 or a regulation?
16     Are you talking about regulation only?
17     Q.  Well, we'll start with a law first.
18     Are you aware of any federal law that
19 governs what type of price California can use as a
20 basis for reimbursement for prescription drugs?
21     A.  I am not aware of -- of a federal law
22 that would require us to use -- I assume you're

Page 45

1  talking about AWP as a basis for price versus
2  something else?
3      Q.  Yes.
4      A.  I think -- federal law requires that we
5  reimburse at the EAC, I think, the Estimated
6  Acquisition Costs, but I don't recall that they
7  specify what that is.
8      I'm ding this from memory.  I haven't
9  looked at the law in a while.
10     Q.  Okay.  Are you aware of any federal
11 regulation that would govern what type of price
12 California could use in determining estimated
13 acquisition costs?
14     A.  Regulation, no.
15     Q.  Okay.  Are you aware of any federal
16 requirement that requires California Medicaid to
17 make sure that beneficiaries have access to
18 prescription drug benefits under the California
19 Medicaid program?
20     A.  Restate that question, please.
21     Q.  Are you aware of a federal statute that
22 requires California Medicaid to -- to make sure

                                    12  (Pages 42 to 45)

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                      May 21, 2009
Sacramento, CA

Page 46

1  that its program provides sufficient access to
2  beneficiaries who want prescription drug benefits?
3      A.  I am not aware of one.
4      Q.  Okay.  Are you -- have you ever heard of
5  the term "access to care" as -- as it relates to
6  Medicaid?
7      A.  I think I have heard it -- that term.
8      Q.  What is your understanding of "access to
9  care"?
10     A.  Like I say, I think I've heard the term.
11     I don't know how -- if it's -- if that's
12  a term that's used in the law, I don't know how it
13  is defined.
14     So -- I'm not sure I can help you very
15  much on that one.
16     Q.  Well --
17     A.  You know, in general, patients should
18  have access to care.
19     Q.  And is it your understanding that in
20  general "access to care" means the ability to get
21  care?
22     A.  I would think so -- but again, I --

Page 47

1  that's -- I'm trying to think where I've heard it.
2      I read the newspaper and -- various
3  sources like that, and, you know, I've heard the
4  term at one time or another.
5      MR. MALONEY:  Okay.  I'd like to mark
6  this as Exhibit Walker 1.
7      (Exhibit Walker 001 was marked for
8  Identification.)
9  BY MR. MALONEY:
10     Q.  Mr. Walker, I've handed you what has
11  been marked as Exhibit Walker 1.  Please take a
12  minute to take a look at this document.
13     A.  It may take me more than a minute.  I
14  haven't seen this before.
15     Interesting.  I've never seen that.
16     Q.  So you don't recognize this document?
17     A.  No.  Maybe I should get a copy.
18     Q.  Is this the type of document that you
19  would review if you had received it when you
20  worked at Medi-Cal?
21     A.  Had I received this document -- I might
22  certainly have reviewed it -- particularly if my

Page 48

1  boss told me to.
2      Q.  Okay.  Have your supervisors at Medi-Cal
3  instructed you to review various reports during
4  your career at Medi-Cal?
5      A.  It's not so often that I would be
6  explicitly instructed to read something, you know.
7      But -- you know, I'm expected to keep up
8  on things.
9      Q.  And as -- as you're required to keep up
10  on things, does that include reviewing reports to
11  the extent they relate to your responsibilities?
12     A.  If they come across my desk, yeah.
13     This one never did.
14     Q.  Okay.
15     A.  I must say, it's interesting.
16     Q.  All right.  Can you please turn to page
17  2.
18     A.  Numbered 2 here?
19     Q.  Yes.
20     A.  Okay.
21     Q.  I'd like to direct your attention to the
22  first sentence in the first full paragraph.

Page 49

1      That sentence states "As this review
2  will demonstrate, pharmacies generally purchase
3  drugs at prices that are discounted significantly
4  off of AWP."
5      Did I read that correctly?
6      A.  I think so.
7      Q.  And is that generally consistent with
8  your understanding of AWP when you started at
9  Medi-Cal?
10     A.  Yes.
11     Q.  And in the next paragraph the third
12  sentence begins with "These purchases."
13     A.  Okay.
14     Q.  That sentence states "These purchases
15  indicated an average of 15.93 percent below AWP."
16     Did I read that correctly?
17     A.  Yes.
18     Q.  And by "these purchases" the author is
19  referring to the purchases made during an OIG
20  audit; is that correct?
21     A.  I believe so.
22     Q.  Do you know what the "OIG" is?

13 (Pages 46 to 49)

Walker, Vic                                            May 21, 2009
                        Sacramento, CA

---

Page 50

1    A.  Office of the Inspector General.
2    Q.  Is that an office with -- HCFA, what is
3  now known as CMS?
4    A.  It's a federal office.  I'm not sure if
5  they were with HCFA or if they stood independent.
6        I'm not sure what their relationship
7  was.
8    Q.  But, in any, case it's a federal office?
9    A.  Yeah.
10   Q.  Okay.  And this sentence here that --
11  that I just read, "These purchases indicated an
12  average of 15.93 percent below AWP," is that
13  finding generally consistent with your
14  understanding of the purchasing of pharmaceuticals
15  when you started at Medi-Cal?
16   A.  I can honestly say I don't know.
17       This is from 1985, from what I read.
18   Q.  Uh-huh.
19   A.  And I don't know that we were -- that
20  things were at AWP-15.93 back then.
21   Q.  Okay.
22   A.  I truly don't know.

---

Page 51

1    Q.  Okay.  But, in any event, it was your
2  understanding when you started at Medi-Cal that
3  pharmacies generally purchased drugs at prices
4  that were discounted significantly from AWP?
5        MR. FISHER:  Objection as to form.
6        THE WITNESS:  I don't -- I don't know if
7  the word "significantly" would be in there, but I
8  knew that pharmacies sometimes purchase drugs at
9  less than AWP.
10       That would be accurate.
11       MR. MALONEY:  Okay.  You can set that
12  aside.
13       THE WITNESS:  Is this a good time to
14  take a break?
15       MR. MALONEY:  Yes.  Yes.
16       VIDEOGRAPHER:  We're now going off the
17  video record at approximately 10:11.
18         (Thereupon a recess was taken at
19  10:11 a.m.  and the deposition resumed at 10:24
20  a.m.)
21       VIDEOGRAPHER:  We're now back on the
22  video record at approximately 10:24.

---

Page 52

1  BY MR. MALONEY:
2    Q.  Mr. Walker, I'm going to show you what
3  was previously marked as Gorospe Exhibit 26.
4    A.  Okay.
5    Q.  Sorry.
6        Please take a minute to look at this and
7  let me know when you're ready.
8    A.  Okay.
9        I've looked through it.
10   Q.  Do you recognize this document?
11   A.  No.
12   Q.  Do you recognize any part of it?
13   A.  I recognize the arguments that are made
14  in it, but I don't remember -- I didn't write
15  this, and I don't remember that I ever saw it.
16   Q.  Okay.  This document is entitled "Medi-
17  Cal Pays Too Much For Prescription Drugs;" right?
18   A.  Yes.
19   Q.  And it appears to have a statement below
20  the title referring to a State Controller's
21  Office.
22       It appears to be an audit of Medi-Cal

---

Page 53

1  reimbursement?
2    A.  I -- I can't say as to whether or not an
3  audit was the source of this or not.
4    Q.  But, in any event, it appears to be a
5  statement from a State Controller's Office?
6    A.  (Nodding head)
7    Q.  It regards Medi-Cal prescription drug
8  reimbursement?
9    A.  Yes.
10   Q.  And below this statement there's a
11  section entitled "Comments"?
12   A.  Uh-huh.
13   Q.  And does it appear to you that these
14  comments were written by DHS in response to the
15  State Controller's Office statement?
16       MR. FISHER:  Objection as to form.
17       THE WITNESS:  I've been reading this and
18  trying to figure out who wrote what to who and who
19  actually did the writing.
20       I'm not sure.
21  BY MR. MALONEY:
22   Q.  Okay.  And attached -- actually, can you

---

                                    14 (Pages 50 to 53)

Page 54

1  -- please turn to the second page of this exhibit.
2       The last paragraph, that paragraph
3  states "As for the method for accomplishing these
4  reductions in pharmacy reimbursement, the
5  Department has chosen the legislative budget
6  process rather than the regulatory process because
7  of the higher visibility of the budget process
8  considering the impact upon pharmacy providers and
9  beneficiaries, including beneficiary advocacy
10 groups."
11      Did I read that correctly?
12    A.  I think so.
13    Q.  And this paragraph seems to indicate
14 that that comment was written by the Department,
15 even though we don't know which Department;
16 correct?
17      MR. FISHER:  Objection as to form.
18      THE WITNESS:  I don't know.  I -- when I
19 read the word "Department" I would guess that that
20 is Department of Health Services.
21 BY MR. MALONEY:
22    Q.  And is that because the Department of

Page 55

1  Health Services is responsible for setting or
2  proposing changes to pharmacy reimbursement for
3  Medi-Cal as indicated in this paragraph?
4     A.  The paragraph doesn't indicate that the
5  Department has those responsibilities, but --
6       Restate your question, please.
7     Q.  Is it fair to say that this statement
8  was written by or on behalf of the Department of
9  Health Services because that Department is
10 responsible for changes to pharmacy reimbursement
11 in the Medi-Cal program such as the changes
12 referred to in this paragraph?
13      MR. FISHER:  Objection as to form.
14      THE WITNESS:  I'm trying to answer you
15 correctly and concisely.
16      I'm not sure how to answer your
17 question.
18      At the risk of belaboring this, ask me
19 one more time, please.
20      You're going to get tired.
21      MR. MALONEY:  Actually, I'll withdraw
22 the question and we'll -- we'll move on.

Page 56

1       Could you please turn back to the first
2  page.
3       THE WITNESS:  Sure.
4  BY MR. MALONEY:
5     Q.  In the statement at the top of the page
6  -- the State Controller's Office states that it
7  believes "The Medi-Cal drug reimbursement rate is
8  too high for both the drug ingredient cost portion
9  and the dispensing fee portion of the overall fee
10 payment to pharmacies;" is that correct?
11    A.  You read it correctly.
12    Q.  Do you recall -- learning of this belief
13 by the State Controller's Office during your time
14 at Medi-Cal?
15    A.  I'm trying to remember about this
16 particular instance --
17      Well, I -- yeah, I remember this.
18    Q.  Do you recall generally when you learned
19 of this?
20    A.  Well, this document appears to have been
21 in the neighborhood of 1996.
22      This is a 3-12-96 draft on page 22.

Page 57

1       So I would guess that this is in the
2  neighborhood of 1996.
3     Q.  Okay.  And -- the second sentence of
4  this statement states "Relative to the drug
5  ingredient cost segment the SCO recommends that
6  Medi-Cal change from an Average Wholesale Price,
7  AWP less 5 percent reimbursement to an AWP less 10
8  percent reimbursement."
9       Is that correct?
10    A.  Yes, you read it right.
11    Q.  Do you recall learning of such a
12 proposal from the SCO some time in the
13 neighborhood of 1996?
14    A.  I didn't remember that it was from the
15 SCO, but, you know, we -- we worked on AWP-5
16 changes and AWP-10.
17    Q.  Okay.  And do you recall working on
18 those proposed changes somewhere in the timeframe
19 around 1996?
20    A.  I would be hard pressed to say that I
21 remember the exact time frame.
22      At the same time that this was happening

15 (Pages 54 to 57)

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                             May 21, 2009
Sacramento, CA

Page 58

1   I was involved in a lot of the claims processing
2   design.
3         I was not involved in the -- for the
4   most part I was not involved in -- you know, any
5   of the budget discussions as to should we go to 50
6   versus 10 versus 7 or whatever.
7         I do remember that when we decided to do
8   that I was given the assignment of making sure the
9   computer did it correctly.
10    Q.  Okay.  But you have no reason to believe
11  that this proposal by the SCO to change to AWP-10
12  percent did not take place somewhere in the time
13  frame of 1996?
14        MR. FISHER:  Objection as to form.
15        THE WITNESS:  I think your statement is
16  correct.  I have no reason to believe that it
17  would not be correct.
18  BY MR. MALONEY:
19    Q.  And in the "Comments" section on this
20  first page -- in the second paragraph this
21  paragraph states "We concur with the SCO's
22  recommendation for reducing drug ingredient cost

Page 59

1   reimbursement to pharmacies.  The Governor's
2   proposed budget includes a proposal to AWP less 5
3   percent and Direct Price reimbursement elements
4   with AWP less 10 percent or Wholesale Acquisition
5   Cost, WAC, plus 7 percent, whichever is lower, on
6   a drug-by-drug basis."
7         Did I read that correctly?
8    A.  Yes.
9    Q.  Do you recall a proposal to change
10  reimbursement to AWP less 10 percent or WAC plus 7
11  percent, whichever is lower?
12    A.  I vaguely remember some things about
13  that, yeah.
14        I can't say that it's as fresh in my
15  mind as what happened yesterday.
16    Q.  Okay.  Do you have any reason to believe
17  that this proposal did not take place around the
18  time frame of 1996?
19    A.  Well, the proposal to go to WAC plus
20  didn't take place, so your statement would not be
21  correct.
22    Q.  Well, I'll rephrase.

Page 60

1         Do you have any reason to believe that
2   the proposal to go to WAC plus 7 percent was not
3   made some time in the time frame of 1996?
4    A.  I would not disbelieve that.  I'm not
5   sure about the exact time frame.
6         I'm guessing that this is about that
7   time.
8    Q.  Okay.  And back to the second page for
9   one moment.
10        The last paragraph that I read earlier,
11  this paragraph refers to the legislative budget
12  process as it relates to changes in pharmacy
13  reimbursement; correct?
14    A.  Uh-huh.
15    Q.  And this is similar to the testimony you
16  gave earlier about bill analyses, is that correct,
17  this process?
18    A.  Well, they're similar in that they both
19  have to do with the Legislature, but it's really
20  two different processes.
21    Q.  Okay.  If Medi-Cal wanted to use the
22  legislative budget process to change its pharmacy

Page 61

1   reimbursements, would it make a proposal to the
2   Legislature?
3    A.  I'm not the expert on that.
4         You really ought to ask Kevin or
5   somebody else.
6    Q.  Do you recall working on any such
7   proposal?
8    A.  No.
9    Q.  Okay.
10        Okay.  You can set that aside.
11        Mr. Walker, I'm going to show you what
12  has previously been marked as Miller Exhibit 16.
13        Oh.  Sorry.
14        Please take a minute to look at this
15  document, although I can tell you that my
16  questions will relate only to the cover page on
17  the inside of the first page and to page 4.
18    A.  This section, this letter from Kathleen
19  Connell?
20    Q.  Yes.
21    A.  And then page 4, you say?
22    Q.  Yes.

16 (Pages 58 to 61)

Henderson Legal Services, Inc.

202-220-4158                      www.hendersonlegalservices.com

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                    May 21, 2009
                        Sacramento, CA

Page 62

1    A.  I want to at least look through the rest
2  of it.
3         Okay
4    Q.  Okay.  Do you recognize this document?
5    A.  Only -- I recognize the last page,
6  Wholesaler Acquisition Cost pricing, WAC, but the
7  rest of it I don't know that I ever saw.
8    Q.  And actually that page was not supposed
9  to be stapled to this exhibit.
10   A.  Oh.  Oh.
11        Well, I do recognize what I was given --
12 this last page.
13   Q.  I apologize for that.
14        That appears to be a copy error.
15        With respect to the letter on the inside
16 of the cover page of this document, this letter
17 appears to be dated December 12th, 1996 from
18 Kathleen Connell, the Controller -- who is the
19 Controller of the State of California addressed to
20 Ms. Kimberly Belshe, Director of DHS.
21   A.  Uh-huh.
22   Q.  Is that correct?

Page 63

1    A.  Yes.
2    Q.  And the first sentence of this letter
3  states "I am pleased to provide you with the
4  following Medi-Cal checkup which assesses progress
5  by the Department of Health Services, DHS, in
6  addressing the findings of the March 1996 audit of
7  the Medi-Cal program conducted by my office."
8        Does that refresh -- refresh your
9  recollection of a 1996 audit of the Medi-Cal
10 program?
11   A.  I don't remember anything being called a
12 "checkup."
13        We get audited on a periodic basis.
14        I don't remember this one particularly.
15   Q.  Okay.  But you remember similar audits?
16   A.  I remember that we have been audited at
17 one time or another by the SCO.
18   Q.  Okay.  And Kathleen Connell, as
19 Controller of the State of California, is the head
20 of the SCO; is that correct?
21   A.  That's my understanding -- or State
22 Controller's Office.

Page 64

1         She's the Controller of the State of
2  California.  It kind of fits.
3    Q.  Okay.  Okay.
4         And, if you could, please turn to page
5  4.
6    A.  Okay.
7    Q.  Actually, I realize I should correct my
8  earlier statement.
9         My questions may go on to page 5.
10   A.  Okay.
11   Q.  Towards the bottom of page 4 there's a
12 section entitled "Medicaid Savings That Continue
13 to Require Legislative Action;" correct?
14   A.  Yes.
15   Q.  And the first sentence in this section
16 states "As SCO noted in the March audit, Medi-Cal
17 reimbursement rate for pharmaceuticals is too high
18 compared to other states and other major high-
19 volume purchasers of prescription drugs;" correct?
20   A.  That's what it says.
21   Q.  And the -- second paragraph states "DHS
22 attempted to rectify this problem, but its

Page 65

1  legislative effort has not been -- not yet been
2  successful.  A recommendation was included in the
3  Governor's budget proposal for fiscal year 1997
4  that would have lowered the rate and saved Medi-
5  Cal 127 million annually, however, this proposal
6  was not adopted by the State Legislature.  As a
7  result, the Medi-Cal program continues to pay much
8  more for prescription drugs than is paid by other
9  major purchasers of drugs."  Did I read that
10 correctly?
11   A.  Yes.
12   Q.  Does that refresh your recollection
13 regarding the AWP-10 percent or WAC plus 7 percent
14 proposal that was discussed with the previous
15 exhibit?
16   A.  I remember at the time that we put forth
17 some proposals.
18        I don't remember if this is that
19 particular one, because it seems to me that I
20 recall that we lost in the Legislature at least
21 once, so this may very well have been that, that
22 time.

17 (Pages 62 to 65)

Henderson Legal Services, Inc.
202-220-4158            www.hendersonlegalservices.com

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                         May 21, 2009
                         Sacramento, CA

Page 66

1    Q.  The -- the instance that you recall
2  where DHS lost in the Legislature, is that what
3  you're referring to?
4    A.  Yeah.  Yeah.
5    Q.  Okay.
6    A.  A proposal was made to go to a different
7  price, and we ended up not changing it.
8    Q.  Okay.
9    A.  I think.
10   Q.  Okay.  If we could please turn back to
11 the prior exhibit.
12   A.  To --
13   Q.  The exhibit was previously marked
14 Gorospe 26.
15   A.  Oh, okay.
16   Q.  This is the exhibit that discusses a
17 proposal to change reimbursement to AWP less 10
18 percent or WAC plus 7 percent, whichever is lower;
19 correct?
20   A.  I believe so, yeah.
21   Q.  Now, is it fair to say that as of the
22 time of this proposal DHS was aware that WAC was a

Page 67

1  price that was available to be used as a basis for
2  reimbursement for prescription drugs?
3        MR. FISHER:  Objection as to form.
4        THE WITNESS:  DHS is a very large
5  organization with thousands of people.
6        I was aware of it.
7  BY MR. MALONEY:
8    Q.  Okay.  If -- is it fair to say that if
9  DHS made a proposal to change reimbursement to use
10 WAC as a basis for reimbursement, that it was
11 prepared to go through with that reimbursement
12 basis if the Legislature accepted such a change?
13       MR. FISHER:  Objection as to form.
14       THE WITNESS:  That's asking me to
15 predict what the upper management of DHS would
16 decide to do, and I really can't do that.
17 BY MR. MALONEY:
18   Q.  Okay.  Do you know if any other staff at
19 DHS around the time frame of 1996 were aware that
20 WAC was a price that was available to be used as a
21 basis for reimbursement for prescription drugs?
22       MR. FISHER:  Objection as to form.

Page 68

1        THE WITNESS:  I know that I built some
2  spread sheets that incorporated WAC in as an
3  option, and those spread sheets were given to Len
4  Terra and --
5        So I know that he at least probably was
6  aware of that.
7  BY MR. MALONEY:
8    Q.  Do you recall approximate when you
9  created those spread sheets?
10   A.  No.
11   Q.  Okay.
12   A.  You know, if we were working on this, it
13 would be somewhere in the neighborhood of this
14 time.
15   Q.  Okay.  If we could go back to page 4 of
16 Exhibit Miller 16, the checkup exhibit.
17   A.  Okay.
18   Q.  The continuation of this section on page
19 4 on to page 5, the next paragraph, the one that -
20 - the first paragraph on page 5, it states "DHS
21 intends to consider incorporating changes in drug
22 payments in the 1997-98 budget proposal.  The SCO

Page 69

1  urges that both DHS and the Governor's Office
2  provide strong support to the passage of this
3  proposal."
4        Did I read that correctly?
5    A.  Yes.
6    Q.  Do you recall what proposal, if any, DHS
7  incorporated in the 1997/'98 budget proposal?
8    A.  No.
9    Q.  Okay.  And back to page 4, the second
10 paragraph.
11       Does this paragraph -- refers to
12 "legislative effort by DHS."
13       Do you recall testifying earlier about
14 bill analyses and how based on a bill analysis DHS
15 and possibly the Governor would take a position
16 regarding a particular bill pending before the
17 Legislature regarding pharmacy reimbursement?
18   A.  Uh-huh.
19   Q.  And did you testify earlier -- I believe
20 you testified earlier, please correct me if I'm
21 wrong, that once the Governor or the Department
22 takes a position on a particular bill it's

                                    18 (Pages 66 to 69)

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                           May 21, 2009
                          Sacramento, CA

Page 70

1  communicated to the Legislature?
2      A.  It is my understanding that that is the
3  case.
4      Q.  Okay.  And in terms of the -- of a
5  legislative effort such as the one referred to in
6  this paragraph, would the Governor or DHS also
7  communicate to the Legislature its position
8  regarding a particular proposal relating to
9  pharmaceutical reimbursement in the Medi-Cal
10 program?
11         MR. FISHER:  Objection as to form.
12      Sorry.
13         THE WITNESS:  I don't know what -- what
14 gets told to the Legislature by our -- Office of
15 Legislative Services, I think it is.
16 BY MR. MALONEY:
17      Q.  Do you know that something is
18 communicated to the Legislature regarding things
19 such as pharmacy -- pharmaceutical reimbursement
20 when these issues arise?
21         MR. FISHER:  Objection as to form.
22         THE WITNESS:  Do I know it?

Page 71

1      I have reason to believe it, let's put
2  it that way.
3      I've never attended those meetings where
4  something like that -- I never sat in on any of
5  the discussions, so -- I don't know what is said
6  in there.
7      Q.  Okay.  I'll clarify my question.
8      I'm not asking what is said to the
9  Legislature.  I'm asking if the Department's
10 position in whatever form is communicated to the
11 Legislature regarding legislative efforts to
12 change pharmaceutical reimbursement when they
13 arise.
14      A.  It is my understanding that that would
15 be the case, but, again, hands-on, I have had
16 little or nothing to do with that.
17      Q.  Okay.  And are you aware or do you have
18 an understanding that other stakeholders on Medi-
19 Cal also communicate their position to the
20 Legislature regarding changes in pharmaceutical
21 disbursement in the medical forum?
22         MR. FISHER:  Objection to form.

Page 72

1         THE WITNESS:  It's my understanding that
2  other stakeholders talk to the Legislature, yes.
3  BY MR. MALONEY:
4      Q.  Do you have an understanding of who
5  those other stakeholders are -- generally?
6      A.  Particularly if we're talking about
7  pharmaceutical pricing, the pharmacists' advocacy
8  groups would be interested, and also the
9  manufacturers.
10      Q.  Okay.
11      A.  Possibly others.
12      Q.  And the pharmacy advocacy groups, do you
13 know any pharmacy advocacy groups in the State of
14 California?
15      A.  Well, CPhA is the biggest.
16         MR. MALONEY:  Okay.  Okay.  I'm done
17 with this document.
18      You can set that aside.  Thanks.
19         THE WITNESS:  Okay.
20         CPhA is California Pharmacists
21 Association.
22         MR. MALONEY:  Do you mind taking a short

Page 73

1  break while I collect a few exhibits?
2         MR. FISHER:  That's fine.
3         VIDEOGRAPHER:  This concludes tape one
4  of today's video deposition of Vic Walker.
5      We're now going off video record at
6  approximately eleven o'clock.
7         (Thereupon a recess was taken at
8  11:00 a.m. and the deposition resumed at 11:06
9  a.m.)
10         VIDEOGRAPHER:  This is the beginning of
11 disk two in today's videotaped deposition of Vic
12 Walker.
13      We are now back on the video record at
14 approximately 11:06.
15         MR. MALONEY:  I'd like to have this
16 marked as Exhibit Walker 2.
17         (Exhibit Walker 002 was marked for
18 Identification.)
19         THE WITNESS:  I think that's the one
20 that's the tearing of this.
21      Yeah.  That's the same as this one that
22 was given by mistake.

19 (Pages 70 to 73)

Henderson Legal Services, Inc.
202-220-4158                         www.hendersonlegalservices.com

Walker, Vic                                      May 21, 2009
                    Sacramento, CA

Page 74

1       MR. MALONEY:  Right.
2  BY MR. MALONEY:
3       Q.  If you could take a minute to look at
4  what has been marked as Exhibit Walker 2 and let
5  me know when you're ready.
6       A.  Okay.
7       Q.  Do you recognize this document?
8       A.  I do -- at least vaguely.
9           I recognize my handwriting here.
10      Q.  Okay.  So this handwritten statement
11  towards the bottom of the page is yours?
12      A.  Yes.
13      Q.  And that states "30-day Notice to
14  Providers;" is that correct?
15      A.  30-day Plus Notice to Providers.
16      Q.  Oh, okay.
17          This document is entitled "Wholesaler
18  Acquisition Price, Pricing WAC.  What is Needed to
19  Make it Happen;" correct
20      A.  Uh-huh.
21      Q.  Do you recall generally when this
22  document was created?

Page 75

1       A.  No, I -- I do not.
2       Q.  Do you recall whether you reviewed this
3  document any time during your tenure at DHS?
4       A.  I wrote it.
5       Q.  You wrote it.  Okay.
6           As --
7       A.  This was -- this was a note to myself to
8  help me organize what the task would be to make
9  WAC happen.
10      Q.  Okay.  And when we say "make WAC
11  happen," we're talking in terms of the AWP-X
12  percent or WAC plus some percent?
13      A.  Probably would be set up that way.
14      Q.  Okay.
15      A.  And it would be possible to go to a
16  strictly WAC only, too, but, you know, we would
17  look at a number of different options probably.
18      Q.  Okay.  And that structure of WAC based
19  reimbursement is similar to what we saw in the
20  prior exhibit relating to the -- comments to the
21  SCO statement; correct?
22      A.  Uh-huh.

Page 76

1       Q.  Do you have any reason to believe that
2  the -- consideration of WAC pricing as set forth
3  in this document did not take place around the
4  time of 1996?
5       A.  Do I have a reason to believe that it
6  was not in that time period?
7       Q.  (Nodding head)
8       A.  No.
9       Q.  Okay.
10      A.  No, it likely was.
11      Q.  And this document in the first section,
12  the first paragraph, first section is entitled
13  "Resources Needed," and it states "File of
14  Wholesaler Acquisition Costs from First DataBank,"
15  and then in parentheses it says "Already requested
16  from George Pennebaker.  I don't have a target
17  date of when we'll get it, but will call George
18  and ask him to put it high on priority list."
19          Is that correct?
20      A.  Yes.
21      Q.  So at the time this document was written
22  that account had access to or could have had

Page 77

1  access to WAC pricing from First DataBank;
2  correct?
3           Do you know if Medi-Cal ever received
4  the list of WAC prices from First DataBank?
5       MR. FISHER:  Objection to form.
6       THE WITNESS:  I don't know if we
7  received this particular one, but we did receive
8  WAC prices at one time or another.
9           We're currently getting them.
10  BY MR. MALONEY:
11      Q.  Do you have a general idea of when Medi-
12  Cal first received WAC prices?
13      A.  It was the -- I don't -- it -- I don't
14  know when we first received them.
15      Q.  Okay.  When is your first recollection
16  of receiving WAC prices?
17      A.  I remember working with George
18  Pennebaker, who was the pharmacist at EDS that
19  kind of interfaced with us, and requesting back
20  prices from First DataBank, but I don't recall if
21  this was the first one or if there was anything
22  before that.

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                          May 21, 2009
                        Sacramento, CA

Page 78

1    Q.  Okay.  And the next section in this
2  document is entitled "Major Steps;" correct?
3    A.  Uh-huh.
4    Q.  And to paraphrase these major steps, the
5  first step is to get the WAC file and run the
6  numbers; correct?
7    A.  Uh-huh.
8    Q.  And the next step is to write the
9  proposed language for what we want to do; correct?
10   A.  Uh-huh.
11   Q.  And "we" means DHS; correct?
12   A.  Well, let me characterize what it is we
13  wanted to do.
14       It may have been -- I don't remember
15  exactly what it was that I was writing in terms of
16  language, but it might have been -- easily been
17  the instructions to EDS to make the changes.
18   Q.  And the next step is to get the legal
19  basis to switch from AWP-to WAC plus?
20   A.  Uh-huh.
21   Q.  And it mentions either law change or
22  regulation change?

Page 79

1    A.  Yes, it was in regulation at the time,
2  and it was not written in law.
3    Q.  Okay.  And do you know why it was
4  written in regulation rather than law?
5    A.  No.
6    Q.  And the last major step is to write OIL
7  and get SDN to make the change; correct?
8    A.  Yeah.  And "OIL" is an Operating
9  Instruction Setter to EDS to implement something,
10  and "SDN" is a Systems Development Notice, which
11  is instructions that we give to EDS to make some
12  change in the system.
13   Q.  So those are the sort of procedural
14  means that DHS uses to make changes?
15   A.  Yeah.
16   Q.  I'd like you to set this exhibit aside
17  for a moment.
18       I'd like --
19   A.  Getting towards lunchtime.
20       MR. MALONEY:  Oh.  I'm sorry.
21       What time is it?
22       MS. BERWANGER:  Not time to have lunch.

Page 80

1  Sorry.
2       MR. MALONEY:  I'd like to have this
3  document marked as Exhibit Walker 3.
4       (Exhibit Walker 003 was marked for
5  Identification.)
6  BY MR. MALONEY:
7    Q.  Mr. Walker, please take a moment to
8  review this document and let me know when you're
9  ready.
10   A.  Okay.
11   Q.  Do you recognize this document?
12   A.  Generally, yes.
13       I recognize some of the arguments in
14  here.
15   Q.  Do you recall reviewing this document at
16  any time during your tenure at Medi-Cal?
17   A.  I don't remember the specific day that I
18  sat down at my desk and looked at it.
19       I may have written portions of it.  I'm
20  sure I didn't write the fiscal impact portion, but
21  -- some of the other parts I might have written.
22   Q.  Okay.  Do you recognize any of the

Page 81

1  handwritten notes on this document?
2    A.  That looks like my handwriting.
3    Q.  And you're referring to the note
4  on the top righthand corner?
5    A.  Yeah.
6    Q.  And --
7    A.  If you can't read that, one of the
8  reasons I'm a very good pharmacist is because I
9  can write just like doctors.
10       I'm do my best to try to read it.
11       It says "created 12-12-96 by --" and I
12  don't know what that says.
13   Q.  Okay.
14   A.  Yeah, something.
15   Q.  And this document relates to the
16  restructuring of drug ingredient cost
17  reimbursement; correct?
18   A.  Yes.
19   Q.  And it provides a description of Medi-
20  Cal's current at the time reimbursement formula;
21  correct?
22   A.  Uh-huh.

21 (Pages 78 to 81)

Walker, Vic                                           May 21, 2009
                        Sacramento, CA

Page 82

1    Q.   And that formula is based on AWP less 5
2   percent direct price for a selected list of
3   manufacturers, State Maximum Allowable Ingredient
4   Cost or the Federal Upper Limit; correct?
5    A.   Uh-huh, yes.
6    Q.   And the proposed restructuring of drug
7   ingredient cost reimbursement would replace AWP
8   less 5 percent and direct price with AWP less 10
9   percent or Wholesale Acquisition Cost or 7
10  percent, whichever is lower on a drug-by-drug
11  basis; correct?
12   A.   That's what this says.
13   Q.   And in the "Proposal" section, the last
14  sentence of the first paragraph states "This would
15  more closely approximate actual acquisition costs
16  of drugs by pharmacies;" correct?
17   A.   That's what it says.
18   Q.   And that refers to the proposed
19  reimbursement change; correct?
20   A.   I believe so.
21   Q.   The next sentence under the "Proposal"
22  section states "Most Medicaid states use the AWP

Page 83

1   less X percent method exclusively with an average
2   WAC plus 9.2 percent.  Three states use a
3   combination of AWP less X percent or WAC plus X
4   percent, whichever is less."
5        Did I read that correctly?
6    A.   Yes, although, if I were to rewrite
7   this, I would say "AWP less X percent or Y plus Y
8   percent."
9        The two numbers might be different.
10   Q.   Okay.  Is it fair to say that at this
11  time the author of this document was aware that
12  other State Medicaid programs used WAC as one
13  basis for reimbursement for prescription drugs?
14       MR. FISHER:  Objection as to form.
15       THE WITNESS:  Well, assuming that I was
16  the author, I was aware that there were other
17  states that did that.
18  BY MR. MALONEY:
19   Q.   And would it be fair to say that any
20  other person at DHS who read this document would
21  also be aware that other states used WAC as a
22  basis for reimbursement for prescription drugs?

Page 84

1        MR. FISHER:  Objection as to form.
2        THE WITNESS:  If they agreed with me.
3   BY MR. MALONEY:
4    Q.   Okay.  And below this paragraph it
5   states "Implementation Date, November 1, 1997;"
6   correct?
7    A.   That was a target date.
8    Q.   Okay.  So this proposal would have been
9   considered before November 1, 1997; correct?
10   A.   I believe so.
11   Q.   Okay.
12   A.   It -- this is created 12-12-96, and we
13  would have been scrambling to get that in place.
14   Q.   Okay.  And the next section is entitled
15  "Action Required," and it states "Requires change
16  to or override of 22 CCR 51513, which specifies
17  the ingredient cost reimbursement formula;"
18  correct?
19   A.   Uh-huh.
20   Q.   And that regulation cited in this
21  paragraph is a California regulation; correct?
22   A.   Yeah.  Yeah, Title 22.

Page 85

1    Q.   And would this change require
2   legislative approval?
3        MR. FISHER:  Objection as to form.
4        THE WITNESS:  It would -- well, I'm not
5   the attorney.
6        I don't work in the Office of
7   Administrative Law or in the Legislature, but we
8   would have either had to change the regulation or
9   get a law that would override that change.
10       But we could have changed -- at least
11  they ethically could have changed it in
12  regulation.
13  BY MR. MALONEY:
14   Q.   And the next section appears to be a
15  section that lists the pros and cons of the
16  proposal; correct?
17   A.   Uh-huh.
18   Q.   And it lists two pros of the proposal.
19       The first one is to -- reduces drug
20  expenditures by reducing ingredient cost
21  reimbursement to make it more consistent with the
22  actual acquisition of drugs and other third party

                              22  (Pages 82 to 85)

Walker, Vic                                          May 21, 2009
                        Sacramento, CA

Page 86

1   payers; correct?
2       A.  Uh-huh.
3       Q.  And the second pro is would result in
4   General Fund savings; correct?
5       A.  (Nodding head)
6       Q.  And there are three cons listed here.
7       The first is "Will be opposed by
8   pharmacy providers just as they opposed a previous
9   legislative proposal on this issue;" correct?
10      A.  Yes.  And there were a lot of things
11  going on, and it's difficult for me to pinpoint
12  which one we're talking about.
13      Q.  Okay.  Did -- is it your understanding
14  that many of the proposals were around this
15  timeframe related to the AWP less X percent or WAC
16  plus Y percent proposal or similar proposals?
17      A.  I don't remember at what point we
18  brought WAC plus in to the -- the picture.
19      So -- you know, I want to answer your
20  question correctly and not mislead you.
21      So I'm not sure how to answer your
22  question.

Page 87

1       Q.  Okay.  Is it fair to say that WAC was
2   brought in to the picture at least by December
3   12th, 1996?
4       A.  Sure looks like it.
5       Q.  Okay.  Is it also fair to say that
6   pharmacy providers opposed the legislative
7   proposals related to the use of WAC as a basis for
8   reimbursement?
9       MR. FISHER:  Objection as to form.
10      THE WITNESS:  I'm not sure --
11      Well, I wasn't involved in the meetings.
12  I'm not sure that WAC was put forth previously to
13  this.
14  BY MR. MALONEY:
15      Q.  Okay.
16      A.  You know, when -- when you say "WAC," I
17  want to be precise, and I'm not sure that WAC was
18  introduced previous to this.
19      Q.  Okay.
20      A.  It wasn't entirely -- it took some work
21  to get ahold of those numbers.
22      Q.  Okay.  But Medi-Cal did eventually get

Page 88

1   ahold of WAC prices?
2       A.  Yes.
3       I should say that the field that's on
4   the First DataBank file that we used is called
5   WHN, net wholesale, and that's the value that we
6   used.
7       I don't think there's a field on the --
8   First DataBank NDDF national drug data file that's
9   in -- that's titled "WAC."
10      Q.  So First DataBank provided you with what
11  it called "WHN prices"?
12      A.  Yeah.  Yeah.
13      Q.  And that's a title that First DataBank
14  gave those prices?
15      A.  Yes, which means "net wholesale."
16      Q.  And your understanding of WAC as
17  it's used in industry is based on your experience
18  as a pharmacist?
19      You -- didn't gain an understanding of
20  the term "WAC" from First DataBank; correct?
21      A.  Well, actually -- I don't know that I
22  heard First Data -- I don't remember hearing "WAC"

Page 89

1   when I was out actively practicing pharmacy.
2       I don't -- you know, which continued
3   until 1988.
4       Had some side jobs on Saturdays and
5   such, but, you know, I recall that I first heard
6   the term "WAC" when I was working here.
7       Q.  Okay.
8       A.  So when you say in my practice as a
9   pharmacist, I need to distinguish that.
10      Q.  Okay.  The second con listed here is
11  "Will undermine working relationship between the
12  Department of Health Services and the California
13  Pharmacist Association in efforts to develop a
14  regulatory solution that reduces ingredient costs
15  while recognizing other inequities in the
16  reimbursement policies"?
17      A.  Uh-huh.
18      Q.  Did I read that correctly?
19      A.  Yes.
20      Q.  At this time did DHS have a good working
21  relationship with the California Pharmacists
22  Association?

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                                    May 21, 2009
Sacramento, CA

Page 90

1       MR. FISHER: Objection as to form.
2       THE WITNESS: From what I could see we
3  tried to maintain a good relationship with -- with
4  CPhA.
5       It's a lot easier than having an
6  adversarial relationship, so, you know, both have
7  the same goal of trying to make sick people well.
8  BY MR. MALONEY:
9       Q.   And with respect to these first two cons
10 listed here, was it your understanding at the
11 time, if such a proposal went before the
12 Legislature, the CPhA would be one group that
13 would oppose such a legislative proposal?
14      MR. FISHER: Objection as a form.
15      THE WITNESS: Likely.
16      I think I probably wrote these things.
17 These were my opinions.
18      But -- you know, it seems to me likely
19 that they would oppose, you know, if we're trying
20 to reduce their reimbursement, they probably won't
21 like it.
22 BY MR. MALONEY:

Page 91

1       Q.   Okay.  And the third con listed here is
2  "Some pharmacy providers will stop providing
3  services to Medi-Cal beneficiaries because of the
4  reduced payment."
5       Did I read that correctly?
6       A.   Yes.
7       Q.   And is this a con because it would
8  reduce medical beneficiaries' access to a
9  prescription drug benefit?
10      A.   It would make it harder for
11 beneficiaries to get -- some beneficiaries to get
12 the benefits, so, yeah.
13      Q.   Okay.  And do you have an idea as to
14 what type of beneficiaries would have a more
15 difficult time to get the benefit as it relates to
16 this con listed here in this document?
17      A.   What do you mean by "what type"?
18      Q.   I believe you testified, please correct
19 me if I'm wrong, that you said some beneficiaries
20 would have greater difficulty in getting the drug
21 benefit.
22      Do you know which type of beneficiaries

Page 92

1  would have greater difficulty?
2       A.   The beneficiaries that trade with the
3  pharmacies that refuse to accept Medi-Cal.
4       Q.   Okay.
5       A.   That's why I say "some."
6       Q.   Okay.
7       A.   They would have to go to a different
8  pharmacy.
9       Q.   Do you know if this proposed
10 restructuring of drug ingredient cost
11 reimbursement was ever put before the Legislature?
12      A.   I don't know.  I don't know.
13      Q.   Okay.
14      A.   Just don't know.
15      Q.   Is it fair to say that it was considered
16 by DHS though?
17      MR. FISHER: Objection as to form.
18      THE WITNESS: My office certainly
19 considered it.
20 BY MR. MALONEY:
21      Q.   Okay.  Do you recall who your supervisor
22 was around the time that this document was

Page 93

1  written?
2       A.   It would have been Len Terra.
3       Q.   And do you know or recall that -- if he
4  was involved in the consideration of this
5  proposal?
6       A.   Yes.
7       Q.   Do you recall if -- or know if Len --
8  submitted this proposal to his superior at the
9  time?
10      MR. FISHER: Objection as to form.
11      THE WITNESS: At that time.
12      I'm not -- I think it was probably Mike
13 Neff, was the supervisor, and I believed that he
14 would have.
15      However, I -- I don't remember --
16      Well, I was sure I was in meetings that
17 -- that met with him and with Len's supervisor.
18      I don't remember the time frame when
19 Mike was there.
20      MR. MALONEY: Okay.
21      THE WITNESS: But whoever it was, he
22 would have met with them.

Henderson Legal Services, Inc.
202-220-4158                          www.hendersonlegalservices.com

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                              May 21, 2009
Sacramento, CA

Page 94

1        MR. MALONEY:  Okay.  We can set this
2   document aside for now.
3        I'd like to have this document marked as
4   Exhibit Walker 4.
5        (Exhibit Walker 004 was marked for
6   Identification.)
7   BY MR. MALONEY:
8    Q.  Mr. Walker, please take a minute to look
9   at this document, although I can tell you that --
10  my questions relate only to the first page
11  generally and the second page.
12   A.  Okay.
13       Okay.  I've read the first two pages.
14   Q.  Okay.
15   A.  As long as we stick to those, we'll be
16  all right.
17   Q.  If I move to another page, I'll give you
18  additional time.
19   A.  Thank you.
20   Q.  Do you recognize this document?
21   A.  I do not.
22   Q.  This document is entitled

Page 95

1   "Implementation Status of State Controller's March
2   1996 Audit Recommendations;" correct?
3    A.  Uh-huh.
4    Q.  And this seems to refer to the SCO audit
5   that we discussed with respect to previous
6   exhibits?
7    A.  It seems like that's probably the case.
8    Q.  Please turn to page 2.
9        I'd like to direct your attention to the
10  section entitled "Audit Issue 2 - Reduction of
11  Prescription Drugs Costs."
12   A.  Uh-huh.
13   Q.  And underneath this title there's a
14  section entitled "State Controller's
15  Recommendation," which states "The Department
16  should amend its regulations to reduce its maximum
17  reimbursement rate for prescription drugs;"
18  correct?
19   A.  Uh-huh.
20   Q.  And the next section is entitled
21  "Update" and it states, "Following the
22  Department's unsuccessful legislative effort in

Page 96

1   this area in 1996, the Department, in accord with
2   your recommendation, sponsored a proposal in the
3   Governor's 1997-98 budget to lower drug cost
4   reimbursement to make it more consistent with
5   actual drug purchasing practices of pharmacies --
6   purchasing practice of pharmacies."
7        Sorry.
8        Is that correct?
9    A.  That's what it reads.
10   Q.  Do you recall if the proposal sponsored
11  in the Governor's 1997/'98 budget was the AWP
12  minus X percent or WAC plus Y percent change to
13  reimbursement that we discussed with the previous
14  three exhibits?
15   A.  I don't remember specifically, but given
16  the other documents that I've seen, it's likely
17  that it was that particular proposal.
18   Q.  Is it fair to say that whether or not
19  the AWP plus X or WAC plus Y percent proposal was,
20  in fact, the one in the '97/'98 budget proposal
21  that DHS sponsored a proposal that was more
22  consistent with actual drug purchasing practice of

Page 97

1   pharmacies?
2        MR. FISHER:  Object as to form.
3        THE WITNESS:  Well, this document says
4   that that was the case, and I -- I don't
5   disbelieve it.
6   BY MR. MALONEY:
7    Q.  Okay.  Do you have any recollection of
8   the proposal that was in that budget?
9    A.  I believe it's what we were talking
10  about here.
11   Q.  Okay.  And the next sentence in this
12  paragraph states the proposal was not adopted by
13  the Legislature?
14   A.  Uh-huh.
15   Q.  Do you recall the Legislature rejecting
16  the proposal sponsored by DHS relating to a
17  reduction in prescription drug costs in the
18  '97/'98 budget?
19   A.  I recall that we were not successful in
20  some of the proposals that we tracked.
21   Q.  And it was the Legislature's decision to
22  not adopt these proposals that caused the

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                          May 21, 2009
                        Sacramento, CA

---

**Page 98**

1  Department to not be successful; correct?
2       MR. FISHER:  Objection as to form.
3       THE WITNESS:  Yeah.  I object to form.
4  I don't understand your question.
5  BY MR. MALONEY:
6    Q.  I'll rephrase.
7       It was the Legislature's decision to not
8  adopt the proposal relating to reimbursement
9  costs?
10   A.  That is my understanding.
11   Q.  Okay.  And the next two sentences state
12  "The Department has no reason to believe that the
13  Legislature would be any more receptive to this
14  proposal now than it has been during the past two
15  years.  Accordingly, the Department considers this
16  item closed."
17      Do you recall if proposals to reduce
18  prescription drug reimbursement rates were made in
19  both the 1997 and '98 budget and the previous
20  budget?
21   A.  I think it likely.
22      I remember trying to do it more than

---

**Page 99**

1  once, and -- and being a bit unsuccessful.
2    Q.  Okay.  Do you recall the Legislature
3  being unreceptive to proposals to reduce
4  prescription drug reimbursement rates around the
5  time frame of 1996 to '97?
6       MR. FISHER:  Objection as to form.
7       THE WITNESS:  I don't -- I don't recall,
8  but -- what the time frame was.
9       I know that in those years, middle years
10  kind of, that we put forth proposals to -- make a
11  change from AWP minus to something else and were
12  unsuccessful.
13      BY MR. MALONEY:  Okay.  We can set that
14  document aside for now.
15      THE WITNESS:  Okay.
16      MR. MALONEY:  I' like to have this
17  document marked as Exhibit Walker 5.
18      (Exhibit Walker 005 was marked for
19  Identification.)
20      THE WITNESS:  Thank you.
21      MR. MALONEY:  I'm short one.
22  BY MR. MALONEY:

---

**Page 100**

1    Q.  Mr. Walker, please take a minute to
2  review this document and let me know when you're
3  ready.
4    A.  Okay.
5    Q.  Do you recognize this document?
6    A.  I didn't write this document, but I
7  recognize the -- the topic, and I think I probably
8  wrote ports -- portions of it, that is to say, I
9  gave information to Michael Alexander, and Mike
10  wrote it.
11      He did the final that went forward.
12   Q.  Is that consistent with the notation on
13  the second page that states "Program Analyst
14  contacted Vic Walker"?
15   A.  Uh-huh.  Uh-huh.
16   Q.  And this document, it's entitled "Fiscal
17  Analysis of Proposed Drug Rebate and Pricing
18  Calculation Changes, parentheses, Direct Pricing
19  to AWP-5 Percent, closed paren;" correct?
20   A.  Yes.
21   Q.  And generally this document evaluates a
22  proposal to -- to eliminate direct price as a

---

**Page 101**

1  basis for reimbursement; correct?
2    A.  Yes.
3    Q.  And in place of direct price it would
4  apply the AWP-5 percent formula to the drugs that
5  were formerly reimbursed based on direct price?
6       Was it proposing 5 percent or was that
7  left up in the air?
8    A.  Yeah, it did.
9       The summary does sound like it's saying
10  -- going to AWP-5.
11   Q.  And -- if we look at the calculations on
12  the second page, is it fair to say that it changed
13  to eliminate direct pricing for the drugs that are
14  reimbursed based on that basis and reimbursing for
15  those drugs on AWP-5 percent would increase
16  reimbursement?
17      MR. FISHER:  Objection as to form.
18      THE WITNESS:  If we were to change from
19  direct pricing to AWP-5 pricing, would it change
20  the amount paid out to pharmacies?
21      Yes.
22  BY MR. MALONEY:

---

Henderson Legal Services, Inc.

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                    May 21, 2009
Sacramento, CA

Page 102

1    Q.  And is it also part of this proposal to
2  -- negotiate more aggressively to obtain enhanced
3  rebates to make up that cost difference?
4    A.  It looks like it, yeah.
5    Q.  Do you know if this proposal was ever
6  put before the Legislature?
7       MR. FISHER:  Objection as to form.
8       THE WITNESS:  I don't know.
9       MR. MALONEY:  Okay.  We can set that
10  aside for now.
11      I'd like to mark this as Exhibit Walker
12  6.
13         (Exhibit Walker 006 was marked for
14  Identification.)
15      MR. MALONEY:  Sorry.
16      THE WITNESS:  This looks like more of
17  the same.
18  BY MR. MALONEY:
19    Q.  Please take a minute to look at this
20  document and let me know when you're ready.
21    A.  Okay.  I don't know who wrote "Victor
22  Walker R.Ph." on this.  It's not my handwriting.

Page 103

1       And I don't recall seeing this
2  particular document, though I remember the issue.
3    Q.  Okay.  And this document relates to the
4  proposal we discussed in the previous exhibit;
5  correct?
6    A.  It appears so.
7    Q.  And that's the elimination of direct
8  price as a basis for reimbursement?
9    A.  (Nodding head)
10    Q.  And on the second and third pages of
11  this document it would appear to be -- statutory
12  or regulatory language?
13    A.  Statutory.
14    Q.  And on the second page -- the second
15  page is entitled "Trailer Bill Language, Estimated
16  Acquisition Cost Equalization, Medi-Cal Drug
17  Rebate Program;" correct?
18    A.  Uh-huh.
19    Q.  And do you know what a "trailer bill"
20  is?
21    A.  In general.
22    Q.  What is your understanding of -- of what

Page 104

1  a "trailer bill" is?
2    A.  During the budget negotiations to try to
3  get the budget passed every year they have a
4  number of bills called "trailer bills," or at
5  least they have at least one trailer bill.  They
6  may have more than one.
7       I'm not an expert on this area, but I've
8  overheard and been involved in discussions where
9  they would put forth various changes to law to
10  implement various financial issues such as this.
11    Q.  Okay.  And the trailer bill language on
12  the second page of this document is consistent
13  with the proposal to eliminate direct price as a
14  basis for reimbursement; correct?
15    A.  It -- it appears to do that.
16       You know, it consists of what the
17  proposal -- I'm not sure what that means, but, you
18  know, it -- it appears to do exactly that.
19    Q.  And is it fair to say that this trailer
20  bill language was drafted by DHS?
21       MR. FISHER:  Objection as to form.
22       THE WITNESS:  It probably was.

Page 105

1  BY MR. MALONEY:
2    Q.  On --
3    A.  But I don't know who did it.
4    Q.  If we could turn to the third page.
5    A.  Okay.
6    Q.  Do you know what "budget control
7  language" is?
8    A.  "Budget control language"?
9       You know, I honestly don't know exactly
10  what that -- I was wondering what the difference
11  was between this and this.
12       I don't know what "budget control
13  language" is here.
14       MR. MALONEY:  Okay.  I think we can set
15  this aside.
16       The next two exhibits might put us past
17  12:00.
18       Do we want to continue or stop?
19       MR. FISHER:  How are you doing food-
20  wise?
21       Do you want to get a bite to eat now or
22  in a while?

27 (Pages 102 to 105)

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                    May 21, 2009
                   Sacramento, CA

Page 106

1        THE WITNESS:  Now is a good time.
2        MR. FISHER:  Okay.
3        THE WITNESS:  We could keep going if you
4    want to miss the rush.
5        MR. FISHER:  Are you doing well food-
6    wise?
7        Can you hang in there?
8        THE WITNESS:  Yeah.  You got to be tough
9    to work for Medi-Cal.
10       MR. FISHER:  Okay.  You want to keep
11   pushing forward?
12       MR. MALONEY:  All right.  Sure.
13       THE WITNESS:  Maybe we'll get through
14   all of them.
15       MR. MALONEY:  I'd like to mark this as
16   Exhibit Walker 7.
17          (Exhibit Walker 007 was marked for
18   Identification.)
19   BY MR. MALONEY:
20       Q.  Mr. Walker, please take a minute to look
21   at this document and let me know when you're
22   ready.

Page 107

1        A.  Okay.
2        Q.  Do you recognize this document?
3        A.  I do not.
4        I -- I see that my name is on it, but I
5    don't remember seeing it.
6        I could very well have.
7        Q.  This is an E-mail dated 24th 1999 from
8    Marianne Lewis to what appears to be several DHS
9    staff members; right?
10       A.  Yes.
11       Q.  It also appears to be addressed to
12   someone at the E-mail address j-a-r-a-m-e-y
13   @msn.com.
14       Do you know who that might be?
15       A.  That I don't recognize.  Jaramey -- no,
16   I don't recognize that.
17       Q.  Okay.  And the subject of this E-mail is
18   "White papers Re proposals to reduce drug costs;"
19   correct?
20       A.  Uh-huh.
21       Q.  And in the E-mail Ms. Lewis states
22   "Attached are the proposals to reduce drug costs

Page 108

1    as requested.  They have all been reviewed by
2    Dave, and he has asked me to forward them to you."
3        Do you know who Dave is?
4        A.  It's probably referring to Dave
5    Mitchell.
6        He was the Branch Chief of the Medi-Cal
7    Benefits Branch at the time, and we were -- our --
8    our unit sat within his branch.
9        Q.  Okay.  And this E-mail was also sent to
10   Kevin Gorospe; correct?
11       A.  Yes, he was cc'ed.
12       Q.  And was he your supervisor at the time?
13       A.  You know, I honestly don't know.
14       I was thinking that Len Terra was, but
15   he would surely have been on this -- this listing
16   unless -- unless Kevin had taken over, so perhaps
17   he had.
18       Q.  Okay.
19       A.  I know you interviewed Kevin.
20       Refresh my memory as to when Kevin took
21   over, and then --
22       Q.  Well, I don't think we need to go in to

Page 109

1    that specifically.
2        A.  Okay.  Well, I -- I'm guessing that
3    Kevin was my supervisor at that point.
4        Q.  Okay.  And the E-mail lists 13 proposals
5    to reduce drug costs and appears to attach
6    documents relating to those proposals; correct?
7        A.  Uh-huh.
8        Q.  And one of the proposals, number 9, is
9    "Change basis for reimbursement of drugs;"
10   correct?
11       A.  That's what it reads.
12       Q.  And if we look at the bottom of the
13   page, there are icons which appear to represent
14   attachments to the E-mail?
15       A.  Uh-huh.
16       Q.  And one of these icons is entitled "AWP
17   minus - WAC Plus;" correct?
18       A.  Yes, uh-huh.
19       Q.  Do you recall reviewing a document
20   entitled "AWP minus - WAC Plus"?
21       A.  No.
22       Q.  Around 1999?

                        28 (Pages 106 to 109)

Walker, Vic                                      May 21, 2009
Sacramento, CA

Page 110

1     A.  No.
2         MR. MALONEY:  Okay.  We can set that
3  aside for now.
4         I'd like to mark this as Exhibit Walker
5  8.
6         (Exhibit Walker 008 was marked for
7  Identification.)
8         THE WITNESS:  Thank you.
9  BY MR. MALONEY:
10    Q.   Please take a minute to look at this
11 document and let me know when you're ready.
12    A.   Okay.
13    Q.   Do you recognize this document?
14    A.   More or less.
15        It's -- my style of writing certainly.
16 It says that I prepared it.
17    Q.   Do you have any reason to believe you
18 did not prepare it?
19    A.   No.
20    Q.   This document is entitled "Department of
21 Health Services Proposals to Reduce Medi-Cal
22 Expenditures for Pharmaceutical Products, Change

Page 111

1  Basis for Reimbursement of Drugs;" correct?
2     A.   Uh-huh.
3     Q.   And in general it discusses a proposal
4  to implement the AWP minus X or WAC plus Y
5  reimbursement change that we have discussed
6  earlier; correct?
7     A.   Yes.
8     Q.   Based on your review of this document
9  and your review of the prior exhibit, Exhibit
10 Walker 7, do you think this document was the E-
11 mail -- the attachment entitled "AWP-WAC Plus"
12 document attached to Marianne Lewis' November
13 24th, 1999 E-mail?
14        MR. FISHER:  Objection as to form.
15        THE WITNESS:  I can't say if this is
16 that exact.  It certainly could have been.
17        If you have this -- you know, and if you
18 tell me that this -- that this thing was printed
19 from this document, then I would say perhaps, but
20 I'm just guessing.
21 BY MR. MALONEY:
22    Q.   Okay.  But, in any event, Exhibit 8, the

Page 112

1  evaluation of the proposal to change the basis for
2  reimbursement of drugs, is dated November 24th,
3  '99 which is one day before the E-mail that is
4  Exhibit Walker 7; correct?
5     A.   Yes.  This is dated the 23rd.
6     Q.   Okay.
7     A.   Yeah.  So -- this could easily be that.
8     Q.   Okay.  Now, with respect to Exhibit
9  Walker 8, the evaluation of the proposal, the
10 document proposes to decrease the amount Medi-Cal
11 is willing to pay for drugs to something that is
12 more -- that more closely approximates the
13 pharmacists' actual acquisition costs; correct?
14    A.   (Nodding head)
15    Q.   And it describes the reimbursement that
16 was currently used by Medi-Cal for pharmacy
17 providers?
18    A.   Well, that was used back then.
19    Q.   Right.
20        And the reimbursement used by Medi-Cal
21 at the time this proposal was evaluated was AWP-5
22 percent direct price for about 11 major

Page 113

1  manufacturers, State Maximum Allowable Ingredient
2  Cost, and the Federal Upper Limit; correct
3     A.   Uh-huh.
4     Q.   And if we look at the -- I guess the
5  second paragraph under the "Description" section
6  it describes the proposed change to an AWP-X or
7  WAC plus Y percent, whichever is lower proposal;
8  correct?
9     A.   Yes.
10    Q.   And the last sentence in that paragraph
11 states "This would be --"
12        I'm sorry.
13        It states "This would more closely
14 approximate actual acquisition costs of drugs by
15 pharmacies;" correct?
16    A.   That's what it says.
17    Q.   And is it your understanding that this
18 sentence is -- means that the proposed change
19 would more closely approximate actual acquisition
20 costs as opposed to the -- then existing
21 reimbursement formula?
22        MR. FISHER:  Objection as to form.

29 (Pages 110 to 113)

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                        May 21, 2009
                        Sacramento, CA

| Page 114 | Page 116 |
|---|---|

**Page 114**

1       THE WITNESS:  It was my -- or my
2  understanding at the time certainly that -- that
3  it would be closer to their actual acquisition
4  cost than the formula that we were using at the
5  time.
6  BY MR. MALONEY:
7       Q.   And the next paragraph states -- the
8  first two sentences state "According to federal
9  requirements, pharmacy reimbursement for the drug
10 cost component is supposed to be based on Medi-
11 Cal's best estimate of what pharmacies actually
12 pay for the drugs.  Our current reimbursement
13 formula no longer reflects purchasing practices of
14 pharmacies.  AWP-5 percent represents too high
15 payment, whereas Direct Price represents too low
16 payment, since pharmacies usually no longer buy
17 drugs direct from manufacturers.  The net effect
18 is too high payment."
19      Did I read that correctly?
20      A.   Yes.
21      Q.   Was that your understanding at the time?
22      A.   Yes.

**Page 115**

1       Q.   There's a chart towards the bottom of
2  this page that lists several states and what
3  appears to be their -- Medicaid reimbursement
4  formulas; is that correct?
5       A.   Yes.
6       Q.   And each of the states listed here use
7  WAC as a basis for reimbursement; correct?
8       A.   As part of their reimbursement.
9            Colorado and Texas apparently were also
10 using AWP on occasion.
11           If you look at the prices that came from
12 First DataBank, sometimes the wholesale -- net
13 wholesale field for a given NDC was not populated,
14 so in that case you would have to go get a price
15 from someplace else.
16      Q.   And is that why this proposal also
17 included AWP as a basis for reimbursement?
18      A.   As I recall.
19      Q.   And the proposal choose whichever
20 price is lower; correct?
21      A.   That's what we were -- what was being
22 proposed then.

**Page 116**

1       Q.   If we could turn to the second page.
2            The first paragraph states, "The Federal
3  Office of Inspector General conducted an audit to
4  determine actual acquisition costs of drugs by
5  pharmacies.  The report indicated that Medi-Cal
6  reimbursement far exceeded actual purchasing costs
7  of pharmacies.  The overall estimate of the extent
8  that AWP exceeded pharmacy invoice prices was 17.5
9  percent for brand named drugs and 41.4 percent for
10 generic drugs."
11      Did I read that correctly?
12      A.   Yes.
13      Q.   Was that your understanding at the time?
14      A.   Yes.  I don't remember which OIG report
15 -- I couldn't put my hands on it now, but -- if I
16 wrote it, then I -- I believe that that was
17 correct.
18      Q.   And you reviewed an OIG report in
19 preparing this document?
20      A.   I'm not sure that I did that versus just
21 asking -- you know, my supervisor, you know, and -
22 - and he said, "Oh, I -- you know, remember that

**Page 117**

1  it was this number or that number."
2            I -- I don't remember if I actually saw
3  the OIG report or not.
4       Q.   But someone at DHS reviewed the OIG
5  report that --
6       A.   Probably.
7       Q.   Okay.  In any event, you believed the
8  information was useful enough to use in this
9  document; correct?
10      A.   Yeah.
11      Q.   And the next paragraph states "In other
12 third party payor programs, parentheses, i.e.,
13 private sector, reimbursement for drug cost is
14 lower than Medi-Cal.  Payment in such programs is
15 usually in the range of AWP-17 percent to minus 10
16 percent."
17      Did I read that correctly?
18      A.   Yes.
19      Q.   And was that -- is that consistent with
20 your understanding at the time?
21      A.   Yes.
22      Q.   And the next section states "Legislation

                  Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                      May 21, 2009
                        Sacramento, CA

Page 118

1  Required.  This change can be implemented through
2  regulation, but the Department does not believe it
3  can sustain the legal challenges to the
4  regulations that will be brought to bear by its
5  opponents.  The most certain way to implement a
6  new reimbursement schedule is through
7  legislation."
8       Did I read that correctly?
9    A.  Yes.
10    Q.  Do you recall who the opponents would be
11 to such a change?
12    A.  I would assume that it would be --
13 people that are likely to be financially or
14 otherwise harmed by that, you know, CPhA, the
15 pharmacists -- manufacturers possibly.
16    Q.  Do you have personal knowledge of any
17 instance where a manufacturer opposed a change to
18 California reimbursement?
19    A.  I can't -- I can't recall that there was
20 anything.  I mentioned manufacturers because
21 they're certainly players in this.
22    Q.  Do you have any personal knowledge of an

Page 119

1  instance where the provider associations opposed a
2  change to reimbursement?
3    A.  I was told that -- I wasn't in those
4  meetings, but I know that --
5       Well, I take that back.
6       I've read various E-mails, and
7  newsletters, and things from CPhA where they were
8  quite upset that they were changing prices, so,
9  yes, they opposed.
10    Q.  Okay. The next section states
11 "Legislative History.  This identical proposal has
12 been made almost every year since the early 1990s,
13 but has been fought to a standstill in every
14 instance by the effective lobbying efforts of the
15 pharmacy provider organizations and beneficiary
16 advocacy organizations."
17       Did I read that correctly?
18    A.  Yes.
19    Q.  And was that your understanding of --
20 the legislative history of this proposed change to
21 reimbursement when this document was prepared?
22    A.  Yes.

Page 120

1       I didn't mention beneficiary advocacy
2  organizations previously, but they would be
3  stakeholders, too.
4    Q.  And does this sentence refer to the
5  legislative process that we discussed earlier
6  where the stakeholders would communicate their
7  positions to the Legislature and the Legislature
8  would make a decision?
9    A.  Well, this is talking about the -- the
10 previous thing was talking about changing through
11 regulation versus changing through legislation.
12       If we had attempted to change it through
13 regulation, then the organizations would have come
14 to us rather than going to the Legislature to
15 voice their objections because of the way the
16 regulatory process works.
17    Q.  Right.  Okay.
18       In the event that the -- proposed change
19 went through the legislative process, however,
20 these organizations would make their positions
21 known to the Legislature?
22    A.  I would think so.

Page 121

1    Q.  And you recall reading articles and
2  reviewing other sources indicating that the
3  pharmacy provider organizations, in fact, did
4  oppose changes to reimbursement that were before
5  the Legislature; correct?
6    A.  As I recall, yes.
7    Q.  And at the bottom there's a section
8  entitled "Recommendation," and the recommendation
9  is to propose the change; correct?
10    A.  Yes.
11    Q.  And the next sentence states "Medi-Cal
12 reimbursement for drugs has become so high in
13 comparison to other third party payors changes
14 truly need to be made"?
15    A.  True.
16    Q.  And that's consistent with your
17 understanding at the time?
18    A.  Yes.
19    Q.  Do you know if the proposal was, in
20 fact, made?
21    A.  I do not.
22       MR. MALONEY:  Okay.  Why don't we break

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                    May 21, 2009
                        Sacramento, CA

Page 122

1  for lunch.
2        MR. FISHER:  Okay.
3        THE WITNESS:  Sounds good to me.
4        VIDEOGRAPHER:  We are now going off the
5  video record at approximately 12:15.
6            (Thereupon a recess was taken at
7  12:15 p.m. and the deposition resumed at 1:14
8  p.m.)
9            (David Zlotnick entered the
10 proceedings and Janet Alexander began attending
11 via conference call.)
12       VIDEOGRAPHER:  Back on the video record
13 at approximately 1:14.
14 BY MR. MALONEY:
15    Q.  Mr. Walker, do you recall participating
16 in a drug task force?
17    A.  Yes.
18    Q.  Do you recall the time -- around what
19 time frame?
20    A.  It was about 1999, fairly early in the
21 Davis administration, as I recall.
22    Q.  And generally what was the purpose of

Page 123

1  the drug task force?
2    A.  To look at the rapidly rising cost of
3  drugs and see what could be done about it.
4    Q.  And do you recall the other members of
5  the drug task force?
6    A.  Some of them.
7    Q.  Was that a large number of people who
8  participated in the drug task force?
9    A.  Yeah.
10       They rented a room in the Host Hotel
11 down in the basement at the airport and had a big
12 table, and it was filled all the way around.
13    Q.  Were there people from the pharmacy
14 associations on the drug task force?
15    A.  CPhA?
16       Yes, I think so.
17       Certainly CPhA members.
18    Q.  And were there people from the
19 beneficiary advocacy organizations on the task
20 force as well?
21    A.  I recall some.
22    Q.  Do you recall any of the options

Page 124

1  considered by the drug task force to reduce
2  reimbursement?
3    A.  Yes.
4    Q.  Generally which ones do you recall?
5    A.  I remember that the State Controller, I
6  think, was proposing AWP-15.
7       There were -- Dr. Stahl proposed doing
8  some things with atypical antipsychotics, and, you
9  know, I haven't refreshed my memory with looking
10 at that giant report that we put together, but
11 those are two that stand out, and that's -- AWP-15
12 might be of interest to you.
13       MR. MALONEY:  All right.  Why don't we
14 mark this document as -- actually --
15       THE REPORTER:  9.
16       MR. MALONEY:  Exhibit 9.
17            (Exhibit Walker 009 was marked for
18 Identification.)
19       THE WITNESS:  Thank you.
20 BY MR. MALONEY:
21    Q.  Please take a minute to look at this
22 document and let me know when you're finished.

Page 125

1    A.  All right.
2    Q.  Do you recognize this document?
3    A.  Yes.
4    Q.  This is a March 17th, 2000 E-mail from
5  Kevin Gorospe to many recipients; correct?
6    A.  Yes.
7    Q.  And you are one of the recipients listed
8  on this E-mail; correct?
9    A.  Yes.
10    Q.  Do you recall reviewing this E-mail on
11 or around March 17th, 2000?
12    A.  I recall working on or being involved
13 with this document.
14       I don't recall whether or not I looked
15 at that particular E-mail.
16    Q.  Okay.  And the document that you're
17 referring to is the Medi-Cal FFS Drug Task Force
18 Matrix; correct?
19    A.  Yes.
20    Q.  And this document lists many drug cost
21 control options and contains a space for a pro/con
22 analysis of each option; correct?

                        32 (Pages 122 to 125)

Walker, Vic                                        May 21, 2009
                          Sacramento, CA

Page 126

1     A.  (Nodding head)
2     Q.  Is it fair to say that these were the
3  options considered by the drug task force to
4  reduce pharmaceutical reimbursement costs?
5     A.  Yes.
6     Q.  If I could direct your attention to the
7  page marked page 4 of 16.
8         If you look at drug cost control option
9  number 7, this option is changing ingredient cost
10  reimbursement of drugs; correct?
11     A.  Uh-huh.
12     Q.  And this is essentially the AWP-X or WAC
13  plus Y percent change that we've seen in previous
14  proposals as far back as 1996; correct?
15     A.  Yes.
16     Q.  So this drug cost control option was one
17  of the options considered by the drug task force
18  in 2000; correct?
19     A.  Yes.
20     Q.  And if we could turn to page 12 of 16.
21     A.  Okay.
22     Q.  And drug cost control option number 24

Page 127

1  is described as AB 1915, AWP-15 percent?
2     A.  Uh-huh.
3     Q.  And --
4     A.  That was the State Controller's one that
5  I referred to earlier.
6     Q.  Okay.  So this is a drug cost control
7  option proposed by the State Controller's Office?
8     A.  (Nodding head)
9     Q.  And does AB 1915 refer to an Assembly
10  Bill Number 1915?
11     A.  I think so.
12     Q.  So the State Controller's Office
13  proposed this drug cost control option in the form
14  of an Assembly Bill before the Legislature?
15     A.  I would assume so.  I don't remember
16  whether or not I looked at the bill or not.
17     Q.  Okay.  And in general the proposal was
18  to change reimbursement to AWP-15 percent?
19     A.  That's what the State Controller was
20  proposing.
21     Q.  Okay.  If you look at drug cost control
22  option number 24 again, above the title it lists

Page 128

1  Walter Barnes, State Controller's office?
2     A.  Uh-huh.
3     Q.  Do you know who Walter Barnes is?
4     A.  No.
5         I remember that there was a
6  representative from the State Controller's Office.
7  I'm presuming that's probably him.
8         MR. MALONEY:
9     Q.  Okay.  We can set this aside now.
10        Walker 10?
11        I'd like to mark this as Exhibit Walker
12  10.
13        (Exhibit Walker 010 was marked for
14  Identification.)
15        MR. MALONEY:  Whoops.
16        THE WITNESS:  Are you going to focus on
17  any particular area?
18        MR. MALONEY:  Yes, I'm going to focus on
19  page 23 and page 24.
20        THE WITNESS:  Save us some time.
21        Okay, if we stick to 23 and 24, please.
22  BY MR. MALONEY:

Page 129

1     Q.  Do you recognize this document?
2     A.  Yes.
3     Q.  This is another version of the cost
4  control options matrix; correct?
5     A.  Yeah, I think this is a further refined.
6     Q.  And this document lists the various cost
7  control options considered by the drug task force
8  and also the pros and cons relating to each
9  option?
10     A.  Uh-huh.
11     Q.  And on page 24 the option to change
12  ingredient cost reimbursement of drugs is -- is
13  listed; correct?
14     A.  Yes, the State Controller's AWP-15.
15     Q.  I'm sorry.
16        I'm referring to page 23.
17     A.  Oh.  Go back to 23.
18        What was your question?
19     Q.  This page sets forth the option to
20  change ingredient cost reimbursement to the AWP or
21  WAC --
22     A.  Yes.

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                              May 21, 2009
                          Sacramento, CA

Page 130

1    Q.  -- structure; correct?
2    A.  Yes.
3    Q.  And it also lists the pros and cons of
4  such a proposal?
5    A.  Yes.
6    Q.  And some of the pros relating to this
7  reimbursement change would be -- it would save
8  money from the General Fund; correct?
9    A.  Yeah.
10   Q.  And AWP-10 percent would be more
11  comparable to other programs' reimbursement rates?
12   A.  Yes.
13   Q.  And that refers to other Medicaid
14  programs; correct?
15   A.  I believe so.  I believe so.
16       I -- those numbers were somewhat more
17  easy for me to get.
18   Q.  And it also states that -- this proposal
19  would give the State flexibility in obtaining the
20  best price; correct?
21   A.  Which line is that?
22       Yes.  Yes, that's correct.

Page 131

1    Q.  And for the cons the first two cons
2  listed here are "May put many pharmacies out of
3  business, particularly those in high Medi-Cal
4  population areas;" correct?
5    A.  Uh-huh.
6    Q.  "And may damage the pharmacy safety net
7  for the most vulnerable population of Medi-Cal
8  drug service users."
9    A.  Yes.
10   Q.  And do those cons relate to access to
11  care and the impact of access to care that this
12  change would have?
13   A.  Well, if -- if pharmacies go out of
14  business that are serving Medi-Cal patients, and
15  if they don't have alternatives close by or easily
16  accessible to go to, you could run in to an access
17  problem, yes.
18   Q.  And that was one of the issues
19  considered with respect to this proposed change?
20   A.  Sure.
21   Q.  I'd like to turn to page 24.
22       This page lists the various pros and

Page 132

1  cons for the State Controller's proposed cost
2  control option; correct?
3    A.  Yes.
4    Q.  Excuse me.
5        In the pros listed are that "The
6  proposal would save the General Fund money, it's
7  an understandable price structure, and pricing
8  would be more in line with managed care plans, but
9  dispensing fee is not addressed."
10   A.  Yes.
11   Q.  And -- the first con listed is "A
12  blanket solution that may not be realistic.
13  Managed care organizations have already squeezed
14  much of the margin for community pharmacies out of
15  reimbursement.  While Medi-Cal reimbursement is
16  higher than that of commercial plans, the extra
17  margin may be the only thing keeping some
18  providers afloat."
19   A.  True.
20   Q.  Does that also relate to potential
21  access to care problem?
22   A.  Indirectly only.

Page 133

1    Q.  And by "indirectly" do you mean that if
2  a community pharmacy cannot make a profit it may
3  go out of business and, therefore, Medi-Cal
4  beneficiaries would not be able to get drugs from
5  that pharmacy?
6    A.  Yes.  Yes.
7    Q.  And in the next con, the second con, it
8  states "reimbursement discounts need to be
9  selectively determined based on the product type,
10  source, et cetera.  Any change in product
11  reimbursement needs to be offset with some change
12  providing reimbursement for professional services
13  that include interventions."
14       Did I read that correctly?
15   A.  Yes.
16   Q.  And does that refer to the concept that
17  if you reduce reimbursement you need to increase
18  the dispensing fee?
19   A.  Yes.
20       Well, reimbursement is the total of the
21  dispensing fee plus the ingredient cost.
22       So --

                                    34 (Pages 130 to 133)

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                    May 21, 2009
                    Sacramento, CA

Page 134

1    Q.  So --
2    A.  -- if you decrease the ingredient cost,
3  you would need to have some kind of offset -- in
4  some cases.
5    Q.  In dispensing?
6    A.  Yeah.
7    Q.  Okay.  And that was a consideration that
8  was important to evaluating this proposal;
9  correct?
10   A.  Sure.
11   Q.  And the third con states "May result in
12  a significant decrease in the number of Medi-Cal
13  pharmacy providers."
14      This also relates to a potential access
15  to care problem; correct?
16   A.  Yes.
17   Q.  Do you know if this cost control options
18  matrix was submitted to the Governor?
19   A.  I was told that it was -- or some
20  version of it.
21      I'm not sure this is the final version,
22  but they put together a report and sent it on to

Page 135

1  the Governor.
2    Q.  Do you know -- what decision the
3  Governor made regarding the options considered?
4    A.  I'm not aware of one.
5    MR. FISHER:  Objection to form.
6    THE WITNESS:  I'm not aware that he made
7  a decision.
8    MR. MALONEY:  Okay.  You can set this
9  aside.
10      I believe we're at Walker 11.
11      (Exhibit Walker 011 was marked for
12  Identification.)
13  BY MR. MALONEY:
14   Q.  Please take a look at this document and
15  let me know when you're ready.
16   A.  Okay.
17   Q.  Do you recognize this document?
18   A.  I don't recall seeing this particular
19  version of it, but I do remember seeing a -- an
20  attendee list on a spread sheet.
21   Q.  And this appears to be the drug task
22  force member list; correct?

Page 136

1    A.  It does.
2    Q.  And on the third page your name appears
3  associated with the California Department of
4  Health Services; correct?
5    A.  That's right.
6    Q.  Does this appear to be an accurate
7  representation of the member list of the drug task
8  force?
9    A.  Yes.
10      Nothing jumps out at me that is
11  incorrect.
12      MR. MALONEY:  Okay.  We can set that
13  aside.
14      Why don't we go off the record for a
15  minute while I organize some exhibits.
16      VIDEOGRAPHER:  We are now going off the
17  video record at approximately 1:38.
18      (Thereupon a recess was taken at
19  1:38 p.m. and the deposition resumed at 1:45
20  p.m.)
21      VIDEOGRAPHER:  Back on the video record
22  at approximately 1:45.

Page 137

1    MR. MALONEY:  I'd like to mark this as
2  Exhibit Walker 12.
3      (Exhibit Walker 012 was marked for
4  Identification.)
5  BY MR. MALONEY:
6    Q.  Mr. Walker, please take a look at this
7  document and let me know when you're ready.
8    A.  I'll be darn.  I did do that one.
9      Okay.
10   Q.  Do you recognize this document?
11   A.  No and yes.  I didn't remember that I
12  had done this, but it refreshes my memory.
13   Q.  Is this a document you created?
14   A.  I believe so, yes.
15   Q.  This is a Secondary Division Bill
16  Analysis; correct?
17   A.  Yes.
18   Q.  And this provides summary position, and
19  supporting arguments, background findings, and
20  other information relating to Bill AB 1915;
21  correct?
22   A.  Yes.

35 (Pages 134 to 137)

Henderson Legal Services, Inc.
202-220-4158              www.hendersonlegalservices.com

Page 138

1   Q.  Is this an example of the type of bill
2   analyses that you perform as part of your
3   responsibilities?
4   A.  Performs in the present tense.  I
5   haven't done one of these in a long time but back
6   then, yes.
7   Q.  And is this an example of the type of
8   bill analyses that you did when you began working
9   at DHS?
10  A.  Yeah.  Yeah.
11       I -- I don't recall that I did one on
12  this particular subject back then, but it's
13  typical of the style that these are written in.
14  Q.  And I believe you testified earlier that
15  when a bill analysis is complete it's eventually
16  used as a basis for the Department or the Governor
17  to take a position on a particular bill; correct?
18  A.  Yes, after it's gone through all the
19  approvals.
20  Q.  Do you know if this bill analysis was
21  approved?
22       MR. FISHER:  Objection as to form.

Page 139

1       THE WITNESS:  I don't know.
2   BY MR. MALONEY:
3   Q.  With respect to this particular bill
4   analysis, the summary states "The section of the
5   bill that the Pharmaceutical Unit is analyzing
6   reduces Medi-Cal's estimated acquisition cost for
7   fee-for-service pharmacy drug reimbursement for
8   most drugs from AWP-5 percent to AWP-15 percent;"
9   correct?
10  A.  Yes.
11  Q.  And do you know what the "Pharmaceutical
12  Unit" is?
13  A.  That was the organization that I worked
14  in, supervised by Len Terra and then by Kevin
15  Gorospe.  They've since changed the structure.
16  Q.  Okay.  And the position and supporting
17  arguments stated in this bill analysis with
18  respect to AB 1915 is to oppose unless amended;
19  correct?
20  A.  Yes.
21  Q.  So if this bill analysis was adopted by
22  DHS, DHS's position would be to oppose unless

Page 140

1   amended AB 1915?
2   A.  That's right.
3   Q.  And one of the supporting arguments for
4   this position as stated here is that "This bill's
5   provisions regarding pharmacy reimbursement are in
6   conflict with federal Medicaid law governing the
7   establishment of reimbursement rates for pharmacy
8   providers and may result in an inadequate network
9   of Medi-Cal pharmacy providers, particularly in
10  rural areas."
11       And is it your understanding that this
12  supporting argument means that if the bill is
13  adopted, there could be access to care problems in
14  violation of federal Medicaid law?
15       MR. FISHER:  Objection as to form.
16       THE WITNESS:  There could be a --
17  problem with access to care.  Whether it -- that
18  objects -- or breaks the federal law would have to
19  be somebody else's decision.
20  BY MR. MALONEY:
21  Q.  Was it your understanding at the time
22  this document was created that access to care was

Page 141

1   a requirement set forth in federal Medicaid law?
2       MR. FISHER:  Objection as to form.
3       THE WITNESS:  I believe that there is a
4   requirement for that.  I believe I knew it back
5   then.
6   BY MR. MALONEY:
7   Q.  Okay.  Under the "Specific Findings"
8   section -- does this section represent the
9   findings made by DHS while formulating its
10  position on this bill?
11       MR. ZLOTNICK:  Object to the form.
12       THE WITNESS:  It represents the findings
13  that I made.
14       You know, sometimes these things are
15  changed after I -- it leaves my hands, and -- but
16  this was my findings at the time.
17  BY MR. MALONEY:
18  Q.  So if this was in an -- an officially
19  adopted bill analysis by DHS, would those findings
20  then be DHS's findings?
21       MR. FISHER:  Objection as to form.
22       THE WITNESS:  I -- I would think so,

36 (Pages 138 to 141)

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                    May 21, 2009
Sacramento, CA

Page 142

1  but, again, I'm not the -- I'm not the person that
2  handles those things when it gets to that level,
3  so I don't know if they would modify it or not.
4  BY MR. MALONEY:
5      Q.  I'd like to turn to the second page and
6  to the paragraph that begins with "When the
7  proposed AWP --"
8      A.  Okay.
9      Q.  -- and the second sentence in that
10 paragraph states "If California reduces its
11 pharmacy reimbursement this drastically, Medi-Cal
12 may suffer a serious patient access problem as
13 providers disenroll from Medi-Cal rather than
14 accept the reduced payment."
15         Was that your understanding of the
16 potential effect of this bill at the time this
17 document was created?
18     A.  That was my opinion.
19     Q.  Okay.  We can set that aside for now.
20         All right.  Do you know the -- outcome
21 of the drug task force that you participated in?
22     A.  I'm not aware that there was an outcome.

Page 143

1  You'd have to define what the "outcome" meant.
2      Q.  Was there any change to reimbursement
3  implemented based on the work of the drug task
4  force?
5      A.  No.
6      Q.  Was --
7      A.  Not that I recall.
8         MR. MALONEY:  Okay.  All right.  I think
9  we're up to Exhibit 313.
10        I'd like to mark as Exhibit 13 this
11 document.
12        (Exhibit Walker 013 was marked for
13 Identification.)
14        THE WITNESS:  Thank you.
15        You going to focus on any particular
16 part?
17        MR. MALONEY:  Yes.  I'm going to focus
18 on pages 5 and 6.
19        THE WITNESS:  All right.
20 BY MR. MALONEY:
21     Q.  Do you recognize this document?
22     A.  Yes.

Page 144

1      Q.  This is a report entitled "Study of
2  Medi-Cal Pharmacy Reimbursement" dated June 2002;
3  correct?
4      A.  Yes.
5      Q.  Did you review this document when --
6  when it was issued?
7      A.  I eventually saw it.  I'm not sure at
8  what point that I saw it, and -- I didn't -- I
9  read through it, yes.
10     Q.  Okay.  And this was --
11     A.  And there's some points I missed, but,
12 yeah, I read it.
13     Q.  This study was performed at the request
14 of DHS; correct?
15     A.  Yes.
16     Q.  Can you please turn to page 5.
17        This page is entitled "Conclusions and
18 Recommendations; correct?
19     A.  Yes.
20     Q.  And under the section entitled
21 "Ingredient Reimbursement Recommendations" the
22 first sentence states "There was sufficient

Page 145

1  evidence in the study of pharmacy acquisition cost
2  to suggest that the Department's current
3  ingredient cost allowance of the Average Wholesale
4  Price, AWP, minus 5 percent provides for
5  ingredient reimbursement in excess of a pharmacy's
6  actual acquisition cost."
7      A.  Yes.
8      Q.  Did I read that correctly?
9      A.  Yes.  Yes.
10     Q.  Is that consistent with your
11 understanding at the time?
12     A.  Yes.
13     Q.  And is that consistent with your
14 understanding throughout your career at DHS?
15     A.  Well, keep in mind when I first arrived
16 here that we were paying at AWP, not at AWP-5, and
17 after we implemented AWP-5 there is a period of
18 time that I might have said that the -- AWP-5 is a
19 good -- loss estimate.
20        So when you say throughout my career --
21 I couldn't say yes to that.
22     Q.  Okay.  During the time that Medicaid

37 (Pages 142 to 145)

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                                May 21, 2009
                          Sacramento, CA

| Page 146 | Page 148 |
|---|---|
| 1 reimbursed based on AWP did you have an<br>2 understanding that reimbursement was in excess of<br>3 pharmacies' actual acquisition costs?<br>4    A.  I had a general understanding of that.<br>5 We hadn't gone out and done a survey or something<br>6 like that.<br>7       MR. MALONEY:  Okay.<br>8       VIDEOGRAPHER:  We've got about four<br>9 minutes left.<br>10       MR. MALONEY:  I'll finish this exhibit.<br>11 BY MR. MALONEY:<br>12    Q.  And was there a time after California<br>13 implemented the AWP-5 percent reimbursement that<br>14 you reached an understanding that reimbursement<br>15 based on AWP-5 percent was in excess of<br>16 pharmacies' actual acquisition cost?<br>17    A.  I -- at some point I arrived at that<br>18 conclusion. I don't know when.<br>19    Q.  It was before this report was issued<br>20 though; correct?<br>21    A.  Yes.<br>22    Q.  Was it well before this report was | 1 support a differential reimbursement rate for<br>2 generic drugs such as one between AWP-20 percent<br>3 and AWP-25 percent."<br>4       Did I read that correctly?<br>5    A.  Yes.<br>6    Q.  When you reviewed this report, did you<br>7 agree with this recommendation?<br>8    A.  In terms of those exact numbers, I don't<br>9 know that I had an opinion.  I hadn't done the<br>10 study.<br>11       But I agreed with the general findings,<br>12 that AWP was -- not a good estimate of EAC at that<br>13 point.<br>14       MR. MALONEY:  Okay.  We can set that<br>15 aside.<br>16       We'll switch tape now.<br>17       VIDEOGRAPHER:  This concludes disk two<br>18 of today's videotape deposition of Vic Walker.<br>19       We're now off the record at<br>20 approximately 2:08.<br>21       (Thereupon a recess was taken at<br>22 2:08 p.m.  and the deposition resumed at 2:13 |

| Page 147 | Page 149 |
|---|---|
| 1 issued?<br>2    A.  Well, we have evidence in 1996 I was<br>3 thinking that way.<br>4    Q.  Okay.  The second paragraph under the<br>5 "Ingredient Reimbursement Recommendation" section<br>6 states in the first sentence "In light of these<br>7 findings, we recommend that the Department should<br>8 consider increasing the discount from the Average<br>9 Wholesale Price for both single source and<br>10 multiple source drugs."<br>11       And by "single source drugs" the report<br>12 is generally referring to brand drugs; correct?<br>13    A.  In general.<br>14    Q.  And "multiple source drugs" generally<br>15 refers to generic drugs; correct?<br>16    A.  In general.<br>17    Q.  And the next sentence states, "The<br>18 acquisition cost study indicates that the<br>19 Department could justify setting ingredient<br>20 reimbursement for brand name drugs at a level<br>21 between at AWP-12 percent and AWP-15 percent," and<br>22 it goes on to state that "The study would also | 1 p.m.)<br>2       VIDEOGRAPHER:  This is the beginning of<br>3 tape three in today's video deposition of Vic<br>4 Walker.<br>5       We're now back on the video record at<br>6 approximately 2:13.<br>7       MR. MALONEY:  I'd like to mark this<br>8 document as Exhibit Walker 14.<br>9       (Exhibit Walker 014 was marked for<br>10 Identification.)<br>11       THE WITNESS:  Thank you.<br>12       Is this any different from the first<br>13 one?<br>14       MR. MALONEY:  This document is entitled<br>15 "Survey of Acquisition Costs --"<br>16       THE WITNESS:  Oh.<br>17       MR. MALONEY:  "-- of Pharmaceuticals."<br>18 BY MR. MALONEY:<br>19       If you'll take a moment to look at the<br>20 document, I'm going to focus on page 4.<br>21    A.  I didn't recall that there were two<br>22 different documents. |

Henderson Legal Services, Inc.

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                      May 21, 2009
                     Sacramento, CA

Page 150

1    Q.  Okay.  Do you recognize this document?
2    A.  I vaguely recall that there were two
3  separate documents, though I didn't remember that
4  'til I saw this.
5        I -- am somewhat familiar with it --
6  certainly familiar with the fact that a study was
7  done by Myers and Stauffer.
8    Q.  Do you recall reviewing this document at
9  or around the time it was issued?
10   A.  I don't -- I probably did.
11       I think -- yes.  I remember getting two
12  .pdf documents and at least glancing through them.
13   Q.  Okay.  And similar to the previous
14  exhibit, this is a -- report prepared by Myers and
15  Stauffer for the Department of Health Services;
16  correct?
17   A.  Uh-huh.
18   Q.  And this document is entitled "A Survey
19  of Acquisition Costs of Pharmaceuticals in the
20  State of California"?
21   A.  Yes.
22   Q.  And this survey was performed in

Page 151

1  relation to Myers and Stauffer's recommendations
2  in the prior exhibit regarding reducing
3  reimbursement?
4    A.  It was done in -- keeping with the
5  instructions from the Legislature.  The -- SB 393
6  said among other things that the DHS shall conduct
7  a study of adequacy of Medi-Cal pharmacy
8  reimbursement rates including the cost of
9  providing prescription drugs and services.
10       I would say that's why we did it.
11   Q.  Okay.  And, if we look at page 4 of this
12  document, it lists some of the significant
13  findings of the study; correct?
14   A.  I believe so.
15   Q.  And it -- it appears that one of the
16  significant findings of the study was that the
17  acquisition cost of multisource drugs exhibited
18  much greater variation but averaged 56.6 percent
19  of the AWP?
20   A.  Where are you at?
21   Q.  The last finding.
22   A.  Oh, okay.

Page 152

1    Q.  They averaged 56.6 percent of AWP for
2  drugs without FUL prices, and -- roughly --
3  apparently 12.7 percent of AWP for multisource
4  drugs with FUL prices; is that correct?
5    A.  That's what it says.
6    Q.  Is that generally consistent with your
7  understanding of the acquisition costs of
8  multisource drugs around this time frame?
9    A.  I remember that they were considerably
10  less than AWP-5 or even AWP-17 where we are now,
11  but I don't remember the exact numbers.
12   Q.  Okay.  And where this finding says "56.6
13  percent of AWP," if we were to convey that in
14  terms of AWP-5 percentage, would it be roughly
15  equivalent to AWP -- 43.4 approximately percent?
16   A.  Something like that, if that's one
17  hundred minus 56.6.
18   Q.  Okay.  Do you have Exhibit Walker 8 in
19  front of you?
20       It's the document entitled "Department
21  of Health Services Proposals to Reduce Medi-Cal
22  Expenditures for Pharmaceutical Products" prepared

Page 153

1  by Vic Walker on November 23rd, '99.
2    A.  Here it is.  Yes.
3    Q.  If you turn to the back of that
4  document, the first paragraph references an OIG
5  report that estimated that AWP exceeded pharmacy
6  invoice prices at -- by 41.4 percent for generic
7  drugs; is that correct?
8    A.  That's what it says.
9    Q.  Now, that -- finding is generally
10  consistent with the finding in this 2002 Myers and
11  Stauffer report; correct?
12       MR. FISHER:  Objection as to form.
13       THE WITNESS:  It would appear to be.  It
14  would appear to me the numbers are fairly close.
15  BY MR. MALONEY:
16   Q.  Okay.  Now, I think we discussed earlier
17  that the proposal in Exhibit Walker 8 in '99 was
18  rejected by the Legislature; right?
19   A.  I believe so.
20   Q.  Do you know if the recommendations by
21  Myers and Stauffer to reduce reimbursement was
22  accepted in some form by the Legislature?

39 (Pages 150 to 153)

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                          May 21, 2009
                        Sacramento, CA

Page 154

1         MR. FISHER:  Objection as to form.
2         THE WITNESS:  I -- I don't know if the
3    Legislature accepted it in some form.
4         You're probably going toward did we make
5    a change based on this.  Yes.
6    BY MR. MALONEY:
7      Q.  Okay.  And was that change to change
8    reimbursement to AWP-10 percent?
9      A.  That was the first change that we made.
10     Q.  Was that in the year 2002?
11     A.  Thereabouts.
12     Q.  And was that change related to the
13   findings in these Myers and Stauffer reports?
14     A.  The Myers and Stauffer report provided
15   us some useful information in coming to a final
16   number.
17     Q.  Do you think this finding in -- Walker
18   Exhibit 14 that acquisition costs for multiple
19   source drugs averaged 56.6 percent of AWP was some
20   of the information that helped lead to the change
21   in reimbursement?
22        MR. FISHER:  Objection as to form.

Page 155

1         THE WITNESS:  The information in this
2    report was useful in making that change -- making
3    the final recommendation, I'm sure.
4         MR. MALONEY:  Okay.
5         THE WITNESS:  Although the final
6    recommendation that went to the Legislature, I
7    didn't hands-on do.
8      Q.  Okay.  We can set that aside.
9         I believe you -- mentioned that the
10   current reimbursement is at AWP-17 percent?
11     A.  Yes.
12     Q.  And when was that change made?
13     A.  You know, I am -- I don't remember.
14        2007, I think.
15        I think it was about 2007.
16        I'm sure you got some documents in there
17   to give us some numbers.
18        See, you've got to understand that, if I
19   were sitting at my desk doing this, I would be
20   looking up numbers and documents to get that
21   information.
22        MR. MALONEY:  Why don't we just mark

Page 156

1    this exhibit.
2         15?
3         THE REPORTER:  (Nodding head)
4         MR. MALONEY:  Mark that as Walker
5    Exhibit 15.
6         (Exhibit Walker 015 was marked for
7    Identification.)
8         THE WITNESS:  Thank you.
9         Oh, I remember that.
10        Any particular parts you're going to
11   look at?
12        MR. MALONEY:  Just the first page.
13        THE WITNESS:  Okay.
14        Okay.
15   BY MR. MALONEY:
16     Q.  Okay.  Do you recognize this document?
17     A.  Yes.  I've seen it before certainly.
18     Q.  And this document is entitled "Medi-Cal
19   Drug Rebate/Dispute Resolution, Frequently Asked
20   Questions;" correct?
21     A.  Uh-huh.
22     Q.  And the first question is "What is

Page 157

1    California's reimbursement rate?"  correct?
2      A.  Yes.
3      Q.  And this sets out the reimbursement
4    rates from about 1989 to -- to the rate that
5    became effective on September 1, 2004; correct?
6      A.  Yes.
7      Q.  And this shows that -- on or after
8    December 1st, 2002 Medi-Cal used AWP-10 percent as
9    a basis for reimbursements?
10     A.  Yes.
11     Q.  And effective September 1st, 2004 Medi-
12   Cal used AWP-17 percent --
13     A.  Yes.
14     Q.  -- as a basis for reimbursement.
15        And it also lists selling price as a
16   basis for reimbursement?
17     A.  Yes.
18     Q.  And it says that --
19     A.  And -- notice that it says "will be."
20     Q.  Right.
21        It says "Selling price will be based on
22   average sales price"?

                              40  (Pages 154 to 157)

                 Henderson Legal Services, Inc.
202-220-4158                      www.hendersonlegalservices.com

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                          May 21, 2009
Sacramento, CA

Page 158

1    A.  Yes.
2    Q.  Do you know if Medi-Cal currently use
3   Average Sales Price as a basis for reimbursement?
4    A.  No.
5    Q.  No, you don't know, or, no, Medi-Cal
6   does not?
7    A.  Medi-Cal does not use it.
8       MR. MALONEY:  Okay.  Why don't we take
9   another short break while I organize additional
10  exhibits.
11      VIDEOGRAPHER:  We are going off video
12  record at approximately 2:23.
13         (Thereupon a recess was taken at
14  2:23 p.m.  and the deposition resumed at 2:37
15  p.m.)
16      VIDEOGRAPHER:  We're back on the video
17  record at approximately 2:37.
18  BY MR. MALONEY:
19    Q.  Mr. Walker, you mentioned that Medi-Cal
20  did -- does not use average sales price as a basis
21  for reimbursement?
22    A.  That's true.

Page 159

1    Q.  Is it using any other price other than
2   average sales price as a basis for reimbursement?
3    A.  We're using -- as it says here, AWP-17,
4   MAIC, FUL, or the provider charge.
5       We pay the lower of those.
6    Q.  Okay.  And the --
7    A.  Or, to be correct, we add on dispensing
8   fee and pay at the lower of those.
9       I have to include the dispensing fee
10  because, you know, if the list price is $10, and
11  the FUL price is $5, and the pharmacy charges us
12  $2, we'll happily pay them $2.
13    Q.  Okay.  And the reimbursement change that
14  became effective September 1st, 2004 contemplated
15  using average sales price; correct?
16    A.  Yes.
17    Q.  But it turned out that the program
18  decided not to use average sales price?
19    A.  I'm not sure what the history was on
20  that.
21       I wasn't the primary person working on
22  it.

Page 160

1       I want to say that it wasn't available
2   to us.  I think it's not available to us.
3    Q.  Did the Department look at another price
4   to replace average sales price?
5    A.  We looked at a -- a new and improved way
6   of doing MAICs, which didn't happen.
7       We've talked about doing AMPs at one
8   point, but we don't have the authority to do that
9   at this point.
10    Q.  Okay.  What is "AMP"?
11    A.  Average Manufacturer Price.
12    Q.  And what does AMP represent?
13    A.  It is -- I believe, the average of --
14  average price that a pharmacist -- excuse me -- a
15  manufacturer would sell the product out the door
16  to a wholesaler.
17    Q.  And does that include discounts?
18    A.  It includes some discounts.
19    Q.  Okay.  And does --
20    A.  I believe.
21    Q.  Does DHS use AMP for supplemental
22  rebates?

Page 161

1    A.  Yes.  And for -- yes.
2    Q.  And how long has DHS been using AMP for
3   rebates?
4    A.  We've had AMPs from the manufacturers
5   for several years now, but I don't know -- I don't
6   remember the date that we started getting them.
7    Q.  When you joined Medi-Cal, was it using
8   AMP?
9    A.  No.  AMP didn't exist then.
10    Q.  Okay.  Do you know when it came in to
11  existence?
12    A.  It came in as an artifact of OBRA '90,
13  so it had been about October 1990 that the law
14  said that this shall be an AMP.
15    Q.  Okay.  You said the program considered
16  using AMP as a basis for reimbursement; correct?
17    A.  We've talked about it.
18    Q.  Would AMP --
19    A.  I couldn't say that the program
20  considered it, but we've talked about it in our
21  office.
22    Q.  Okay.  Would you consider AMP to be a

41 (Pages 158 to 161)

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                        May 21, 2009
                        Sacramento, CA

Page 162

1  better estimate of acquisition cost?
2      A.  Better than what?
3      Q.  AWP?
4      A.  Probably.
5          MR. MALONEY:  Okay.  All right.
6      I'd like to mark this as exhibit -- 16?
7          THE REPORTER:  (Nodding head)
8          (Exhibit Walker 016 was marked for
9  Identification.)
10 BY MR. MALONEY:
11     Q.  Please take a minute to review this
12 exhibit and let me know when you're ready.
13     A.  It's been a while.
14         Okay.
15     Q.  This document is -- appears to be an E-
16 mail chain ending in September 4, 2001 in which
17 you participated; correct?
18     A.  Yes.
19     Q.  And it appears that the messages on this
20 chain were sent to various people -- people from
21 various state Medicaid agencies; correct?
22     A.  In general, yes.  This is an ADURS E-

Page 163

1  mail chain.
2      Q.  And what is "ADURS"?
3      A.  American Drug Utilization Society.
4          Excuse me.
5          Drug Utilization Review Society.
6      Q.  Were you a member of ADURS?
7      A.  Yes.
8      Q.  This -- the subject of this E-mail chain
9  is "Re:  Prescription Drug Savings - Acquisition
10 Costs."
11         It appears that the discussion relates
12 to -- started from the -- based on the executive
13 summary of an OIG report dated August 10th, 2001;
14 correct?
15     A.  So it would appear.
16     Q.  And did you -- often participate in E-
17 mail discussions similar to this?
18     A.  From time-to-time.
19     Q.  When did you sign up for -- to receive
20 E-mails similar to this from the ADURS
21 organization?
22     A.  I became the DUR pharmacist in about

Page 164

1  2000, and so -- and I attended the first ADURS
2  meeting that I attended shortly thereafter, you
3  know, like in February, I think, and I signed up
4  about -- about then.
5          So it would have been about February
6  2000.
7      Q.  And generally this E-mail discussion
8  relates to the use of actual acquisition cost for
9  reimbursement in Medicaid; --
10     A.  Yes.
11     Q.  -- correct?
12         And on September 4th, you wrote a
13 message to the list serve relating to that issue;
14 right?
15     A.  I'm not sure it was September 4th.
16         Ron Graham's reply is on September 4th.
17 I am -- oh.  I take that back.
18         Yes, I did.
19     Q.  Okay.  And --
20     A.  I was getting confused by the times, but
21 I forgot that he's located two hours east of here.
22 So --

Page 165

1      Q.  He works for Oklahoma; right?
2      A.  Yeah.  Yeah.
3          So he's -- so that would have been --
4  different time for me, and that's why I'm getting
5  confused.
6      Q.  Okay.  And in your E-mail you state "I
7  think paying at actual acquisition cost, ACC,
8  would be a very good thing.  There are two serious
9  problems with paying at AAC though."
10         And in the first problem you generally
11 note that it's difficult to get AAC for use in
12 reimbursement; correct?
13     A.  Yes.
14     Q.  And in the second problem you note that
15 California hasn't updated its dispensing fee since
16 the late eighties; is that accurate?
17     A.  Pretty sure.
18         Might have been the mid-eighties, but at
19 the time that was my best guess.
20     Q.  Okay.  And you note that pharmacists'
21 costs have risen quite a bit during this time --
22 during that time?

                        42 (Pages 162 to 165)

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                                May 21, 2009
Sacramento, CA

---

Page 166

1     A.  Yes.
2     Q.  And you ask the question, "How is it
3  that the pharmacists can mostly stay in business
4  with no adjustment for inflation?"
5         And your -- response to that question is
6  that pharmacists have -- been able to stay in
7  business because of the spread between AWP-X
8  percent and AAC; is that accurate?
9     A.  That's an accurate characterization --
10  characterization of what this says.
11     Q.  And was that your understanding at the
12  time you wrote this message?
13     A.  Yes.
14     Q.  And in the last sentence of this second
15  problem you discuss here, you state "If we change
16  from the current reimbursement mechanism to one
17  that's AAC-based, we're going to have to do some
18  serious revamping of our dispensing fees or we'll
19  have problems with patient access."
20         Did I read that correctly?
21     A.  Well, if you're reading the last
22  sentence, it says "one man's opinion."

---

Page 167

1     Q.  Well, the second to last sentence, I
2  guess.
3     A.  Yes, that is -- that's correct, second
4  to the last sentence.
5     Q.  And that was your understanding at the
6  time you wrote this message; correct?
7     A.  Yes, that was my belief.
8     Q.  Okay.  And your -- beliefs here were
9  based on your experience working in the California
10  Medicaid program; correct?
11     A.  Yes.
12     Q.  And they were also based on your
13  experience as a Registered Pharmacist?
14     A.  Yes.  Yes.
15         Although for the past -- let's see.
16         I was -- you know, I'd been there for
17  over 10 years, so at that time I had -- I had been
18  inside Medi-Cal for a long time at that point.
19         MR. MALONEY:  Okay.  I think we can set
20  that aside.
21         I'm going to mark -- well, I'm going to
22  show you what's been previously marked as Gorospe

---

Page 168

1  Exhibit 18.
2         THE WITNESS:  Okay.
3         MR. FISHER:  Thank you.
4  BY MR. MALONEY:
5     Q.  Just take a minute to look at this
6  document.  I'm going to focus on -- pages 4 and 5
7  -- actually 4, 5 and 6.
8     A.  Okay.
9     Q.  Do you recognize this document?
10     A.  I do not.  I don't recall seeing it.
11     Q.  This is an Office of Inspector General
12  report dated May 1996 entitled "Review of Pharmacy
13  Acquisition Costs for Drugs Reimbursed Under the
14  Medicaid Drug Prescription Program of the
15  California Department of Health Services;"
16  correct?
17     A.  Yes.
18     Q.  Is this the type of document that you
19  would have reviewed in your position as a pharma -
20  - Pharmaceutical Consultant 2 at
21  Medicaid if it had come across your desk?
22     A.  If it had come across my desk, I

---

Page 169

1  typically would have looked at it, and it may
2  have.
3     Q.  Okay.
4     A.  I just don't remember it.
5     Q.  Okay.  In any event, this OIG relates
6  specifically to the California Medicaid program;
7  correct?
8     A.  That's my understanding -- although when
9  I read the summary real quick it did talk about
10  other -- they pulled samples from other states as
11  well, but this particular report's just about
12  California, I believe, --
13     Q.  Okay.
14     A.  -- based on the title.
15     Q.  If we turn to page 1 -- I'll give you
16  additional time to review that page.
17         I should say I'm mostly interested in
18  the first sentence.
19     A.  Oh.  Then go ahead.
20     Q.  The first sentence here states "At the
21  request of HCFA, OIL, Office of Audit Services,
22  OAS, conducted a review of pharmacy acquisition

---

43 (Pages 166 to 169)

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                        May 21, 2009
Sacramento, CA

Page 170

1    costs for drugs reimbursed under the Medicaid
2    prescription drug program of the California
3    Department of Health Services, state agency."
4         Did I read that correctly?
5         A.  I think so.
6         Q.  So it appears that this report relates
7    specifically to the California Department of
8    Health Services?
9         A.  Yes.  Yes.
10        Q.  Okay.  And, if we could turn to page 4,
11   please.
12        Page 4 contains the beginning of section
13   -- a section entitled "Findings and
14   Recommendations;" correct?
15        A.  Yes.
16        Q.  And this section starts out with
17   findings and recommendations relating to brand
18   name drugs and generic drugs on page 5 as well;
19   correct?
20        A.  Yes.
21        Q.  And with respect to brand name drugs,
22   the OIG states "We estimate that AWP exceeded

Page 171

1    invoice prices for brand name drugs by 17.5
2    percent."
3         Did I read that correctly?
4         A.  Yes.
5         Q.  And was that consistent with your
6    understanding of AWP with respect to brand name
7    drugs in 1996?
8         A.  I don't recall the number back then.
9         Q.  Okay.
10        A.  I knew it was -- you know, AW -- the
11   true price the pharmacy paid was something less
12   than AWP, but what the number was I truly don't
13   remember at this point.
14        Q.  Okay.  And with respect to generic
15   drugs, beginning on page 5, the OIG states "We
16   estimate that AWP exceeded invoice prices for
17   generic drugs by 41.4 percent."
18        Did I read that correctly?
19        A.  Yes.
20        Q.  And, again, was that generally
21   consistent with your understanding of AWP in 1996?
22        A.  I -- I can't swear to 41.4 percent, but

Page 172

1    I did know that AWP was not a hundred percent
2    accurate estimating -- estimate for EAC, and it
3    tended to be more incorrect for generic drugs --
4         Q.  Okay.
5         A.  -- than for single source.
6         Q.  If I could refer you back to Exhibit
7    Walker 8 again.
8         A.  Okay.
9         Q.  It's this document.
10        A.  I'm going to have to file these in
11   order.  Yes.
12        Q.  I believe that's it.
13        A.  Okay.
14        Q.  Once again, if you could look at the
15   second page of this exhibit, the first paragraph.
16        This paragraph states that the -- that
17   "An OIG report found that the overall estimate
18   that -- to the extent that AWP exceeded pharmacy
19   invoice prices was 17.5 percent for brand named
20   drugs, 41.4 percent for generic drugs; right?
21        A.  That's what it reads.
22        Q.  Do you think that Gorospe Exhibit 18

Page 173

1    could have been the source for these numbers in
2    Walker Exhibit 8?
3         MR. FISHER:  Object as to form.
4         THE WITNESS:  There's certainly a good
5    chance that they came from there.
6    BY MR. MALONEY:
7         Q.  Okay.  And exhibit -- well, you prepared
8    Exhibit Walker 8; correct?
9         A.  I believe so, yes.
10        Q.  Is it fair to say that when you prepared
11   this you were aware that AWP exceeded pharmacy
12   invoice prices by 17.5 percent for brand name
13   drugs and by 41.4 percent for generic drugs?
14        A.  At the time that I wrote this I got
15   those numbers.
16        I don't remember -- I truly don't
17   remember seeing this document, so I can't
18   guarantee that that number came from my reading it
19   here or from somebody else telling me.
20        Q.  Okay.  In any event, you felt confident
21   in the -- confident in those numbers to put them
22   in this document; correct?

44 (Pages 170 to 173)

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                          May 21, 2009
                        Sacramento, CA

Page 174

1      A.   Yes.  I was quoting from a particular --
2   this OIG report.
3      Q.   Okay.
4      A.   So -- you know, I had to depend on them
5   to get it right.
6      Q.   Okay.  But you generally trusted OIG as
7   a source of information relating to prescription
8   drug reimbursement and actual acquisition costs?
9           MR. FISHER:  Objection as to form.
10          THE WITNESS:  I never looked at their --
11   their -- how they did their studies or whatever.
12   I didn't have a reason to disbelieve them, let's
13   put it that way.
14   BY MR. MALONEY:
15      Q.   Okay.  We can set -- set aside these
16   exhibits.
17          I'm going to show you what's been
18   previously marked as Gorospe Exhibit 19.
19          Please take a minute to review this
20   document.
21          I will plan to question -- ask questions
22   only relating to the summary.

Page 175

1      A.   Okay.  Okay.
2      Q.   Do you recognize this report?
3      A.   I do not.
4      Q.   This is another Office of General
5   Inspector report; correct?
6      A.   It appears to be.  Inspector General.
7      Q.   And it's entitled "Medicaid Pharmacy -
8   Actual Acquisition Cost of Prescription Drug
9   Products for Brand Name Drugs" dated April 1997;
10   correct?
11      A.   Yes.
12      Q.   And this is the type of report that you
13   would have reviewed at Medi-Cal if it had come
14   across your desk?
15      A.   (Nodding head)
16      Q.   In fact, you did review other reports
17   relating from the OIG -- on certain occasions
18   during your time at --
19      A.   I'm sure that at some time in my 20
20   years here I've looked at OIG reports.
21      Q.   Okay.
22      A.   I don't recall any specific ones.

Page 176

1      Q.   Okay.  If we look at the summary, is it
2   fair to say that this report -- was the result of
3   a survey of the actual acquisition cost of brand
4   name drugs throughout the country?
5      A.   Well, they said that they didn't -- they
6   excluded a few states, and -- and then they took a
7   random sample of 11 of the other states, so I
8   couldn't say it's across the country.
9      Q.   Okay.  Was California one of the states
10   in which --
11      A.   Yes.
12      Q.   -- the study was performed?
13      A.   Yes.
14      Q.   Okay.  And, if we look at the second
15   sentence in the second to last paragraph --
16      A.   On this page?
17      Q.   Yes.  Under the "Summary."
18          The OIG states "We estimated that actual
19   acquisition cost was a national average of 18.3
20   percent below AWP."
21      A.   Oh, I see.
22      Q.   Did I read that correctly?

Page 177

1      A.   Yes.
2      Q.   And that's generally in line with the
3   findings in the California specific report;
4   correct?
5      A.   In the ballpark, and it says 17.5 in the
6   other one, so it's pretty close.
7      Q.   Okay.  All right.  We can set that
8   aside.
9          I'll show you what's been previously
10   marked as Gorospe Exhibit 20.
11          Once again, if you could just take a
12   look at this document, let me know when you're
13   ready.
14          I'll focus my questions on the summary
15   again.
16      A.   I see.
17          Okay.
18      Q.   Okay.  Do you recognize this document?
19      A.   I do not.
20      Q.   This is another OIG report.
21          It's dated August 1997, and it's
22   entitled "Medicaid Pharmacy - Actual Acquisition

45 (Pages 174 to 177)

Walker, Vic                                    May 21, 2009

Sacramento, CA

Page 178

1  Cost of Generic Prescription Drug Products;"
2  correct?
3      A.  Yes.
4      Q.  And, when I look at this summary, it
5  appears that this report is related to the survey
6  that was the basis of the brand report that we
7  just looked at; correct?
8      A.  Yes.
9      Q.  And, once again, California was one of
10 the states that was involved in this survey;
11 correct?
12     A.  Yes.
13     Q.  And if we look at the third paragraph,
14 the OIG states "We estimated that, on average,
15 actual acquisition cost of generic drugs was 42.5
16 percent below AWP."
17     Did I read that correctly?
18     A.  Yes.
19     Q.  And that's generally in the ballpark of
20 the California specific report that we looked at
21 earlier; correct?
22     A.  Yes.  It was 44.3 or something like

Page 179

1  that.
2      Just to be sure on that.  41.1 -- 41.4.
3  Q.  Okay.
4  A.  Yeah.  So it's in the ballpark.
5  Q.  Okay.  That's generally in the ballpark
6  of the -- difference between AWP and actual
7  acquisition cost that was included in Walker
8  Exhibit 8; correct?
9      A.  I believe so.
10     Q.  Okay.  Let's set that aside.
11     I'll show you what's been previously
12 marked as Gorospe Exhibit 27.
13     Sorry.
14     Once again, please take a quick look at
15 that document.  I'll focus my questions on the
16 Executive Summary, which was the third -- page of
17 the exhibit.
18     A.  Okay.
19     Q.  Do you recognize the OIG report?
20     A.  I do not -- do not recognize it.
21     Q.  Okay.  This is --
22     Okay.  This is a report entitled

Page 180

1  "Medicaid Pharmacy - Actual Acquisition Cost of
2  Brand Name Prescription Drug Products" dated
3  August 2001; correct?
4      A.  Yes.
5      Q.  And this report describes another survey
6  of actual acquisition costs?
7      A.  Yes -- different from the 1997 one, I
8  think.
9      Q.  Right.
10     And it made findings as to the actual
11 acquisition cost of brand name drugs under the
12 executive summary; correct?
13     A.  Yes.
14     Q.  And in the last paragraph the OIG states
15 "We estimated that the actual acquisition cost for
16 brand name drugs was a national average of 21.84
17 percent below AWP."
18     Did I read that correctly?
19     A.  Yes.
20     Q.  And generally is that in the ballpark of
21 the findings of the prior reports?
22     A.  No.  That's a bit higher.

Page 181

1      Q.  Okay.  And the OIG notes in the next
2  sentence that -- the difference between its
3  current findings in this report and the findings
4  in its 1994 pricing survey; correct?
5      A.  Yeah, it does.
6      Q.  Okay.  You can set that aside.
7      Only a few more of these.
8      A.  Okay.
9      Q.  I'll show you what's been marked as
10 Gorospe Exhibit 28.
11     Once again, please take a look at the
12 document and let me know when you're ready.
13     I'll focus my questions on the Executive
14 Summary.
15     A.  Okay.
16     Q.  Do you recognize this document?
17     A.  I do not.
18     Q.  This is another OIG report similar to
19 the one we just looked at except focused on the
20 actual acquisition cost of generic drugs; correct?
21     A.  Yes.
22     Q.  And it's dated March 2002?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                    May 21, 2009
                      Sacramento, CA

Page 182

1    A.  Yes.
2    Q.  And in the Executive Summary in the
3 second to last paragraph the OIG states "We
4 estimated that the actual generic drugs
5 acquisition cost was a national average of 65.93
6 percent below AWP;" correct?
7    A.  That's what it says.
8    Q.  Is this consistent with your
9 understanding of actual acquisition costs of
10 generic drugs in the time frame of 2002?
11   A.  I didn't know what the number was -- or
12 I don't recall what the number was.
13   Q.  But you were generally aware that --
14   A.  I knew that generic drugs -- AWP was not
15 a good measure of the actual acquisition cost of
16 drugs, and it was particularly more wrong for
17 generic drugs, but what the number was I truly
18 don't remember.
19       MR. MALONEY:  Okay.  You can set that
20 aside.
21       Okay.  I'd like to mark this as Walker
22 Exhibit 17.

Page 183

1       (Exhibit Walker 017 was marked for
2 Identification.)
3       THE WITNESS:  Thank you.
4 BY MR. MALONEY:
5    Q.  Please take a minute to look at this
6 document and let me know when you're ready.
7    A.  Okay.
8    Q.  Do you recognize this E-mail?
9    A.  I don't remember seeing it.
10   Q.  Your --
11   A.  I see that I'm -- I see that I'm a
12 recipient.
13       I may very well have received it, but I
14 -- I don't recall seeing it.
15   Q.  Okay.  The subject of this E-mail is
16 "Medicaid Pharmacy - Additional Analyses of the
17 Actual Acquisition Cost of Prescription Drug
18 Products," and it lists -- what appears to be a
19 report number; correct?
20   A.  Yes.
21   Q.  And the body of the E-mail is -- it
22 contains a link to an OIG report and a brief

Page 184

1 summary of the report; correct?
2    A.  Yes, and overview.
3    Q.  When OIG reports were circulated in your
4 department, were they commonly circulated by E-
5 mail?
6    A.  If -- if a report came out in more
7 recent years -- and mind you, when they first got
8 here the E-mail was not nearly as common -- but
9 usually if -- if a report were to be circulated
10 nowadays, I'd just get an E-mail about it.
11   Q.  Okay.  And how were they circulated
12 before E-mail?
13   A.  Paper.  Paper -- if they -- if they were
14 circulated.
15   Q.  Okay.  And I'll show you what's been
16 previously marked as Gorospe Exhibit 22.
17       Just take a quick minute to look at this
18 document.
19       Once again, I'll focus on the Executive
20 Summary.
21   A.  This says September, but it doesn't give
22 a year.

Page 185

1       Do we happen to have a clue as to what
2 year it was?
3    Q.  I believe Appendix 12.
4    A.  Okay.  So around about 2002.
5       What area do you want to focus on?
6    Q.  The Executive Summary.
7    A.  Okay.
8    Q.  Do you recognize this report?
9    A.  I do not.
10   Q.  Okay.  This appears to be the report
11 that was linked to an E-mail that we looked at in
12 Walker Exhibit 17; correct?
13   A.  Likely so.
14       Actually, yes, because the numbers
15 match.
16   Q.  Okay.  And this report appears to
17 provide additional analyses of the survey results
18 of the two previous reports we looked at relating
19 to brand and generic drugs; correct?
20   A.  That's what it appears to do.
21   Q.  And on page -- the second page of the
22 Executive Summary the OIG lists its findings of

47 (Pages 182 to 185)

Walker, Vic                                          May 21, 2009
                        Sacramento, CA

Page 186

1  its -- or the results of its additional analyses;
2  correct?
3      A.  Yes.
4      Q.  And the OIG found that for single source
5  -- single source innovator drugs the actual
6  acquisition cost was approximately 17.2 percent
7  below AWP; correct?
8      A.  Yes.
9      Q.  And for multiple source drugs without
10  FULs the OIG found that the actual acquisition
11  cost was approximately 44.2 percent below AWP;
12  correct?
13      A.  Yes.
14      Q.  And for multiple source drugs with FULs
15  the OIG found that pharmacies purchased drugs at
16  approximately 72.1 percent below AWP; correct?
17      A.  Yes.
18      Q.  And the -- if we look at the E-mail in
19  Walker Exhibit 17, the same findings are listed in
20  the summary of this report in the E-mail; correct?
21      A.  17.2, 27.2, 44.2, 72.1.
22          That appears to be.

Page 187

1      Q.  Okay.  And these findings were
2  circulated to the DHS personnel listed on the "to"
3  field of this E-mail; correct?
4      A.  Yes.
5      Q.  Okay.
6      A.  Excuse me.  I'm yawning on the camera.
7          That's not courteous.
8          Sorry, viewers.
9          MR. MALONEY:  Okay.  I'll mark this as
10  Exhibit Walker 18.
11          (Exhibit Walker 018 was marked for
12  Identification.)
13          THE WITNESS:  Thank you.
14  BY MR. MALONEY:
15      Q.  Take a minute to look at this document
16  and let me know when you're ready.
17      A.  Are you going to focus on any particular
18  part?
19          Should have numbered the slides.
20      Q.  I'm going to look at the -- probably
21  focus mostly on the slide that has a Bates number
22  in the lower righthand corner ending in 081.

Page 188

1      A.  Okay.
2      Q.  Do you recognize this presentation?
3      A.  Yes.
4      Q.  And you created this presentation;
5  correct?
6      A.  Yes.
7      Q.  And do you recall approximately when you
8  created this presentation?
9      A.  I didn't put a date on this; did I?
10          Sometime this decade.  A few years ago.
11      Q.  Okay.
12      A.  But I honestly don't remember when it
13  was.
14      Q.  Do you think it was more than four years
15  ago?
16      A.  I was invited to speak at a -- somewhere
17  in the neighborhood of four years -- four or more
18  probably.
19      Q.  Okay.
20      A.  If I look at the -- the date on the file
21  that this came from, I could tell you a little
22  more definitively.

Page 189

1      Q.  Okay.  All right.  We'll turn to the
2  slide ending -- well, that's -- has a Bates number
3  ending in 081.
4      A.  Okay.
5      Q.  This slide is entitled "Accuracy of
6  payment;" correct?
7      A.  Yes.
8      Q.  And it lists AWP, AWP-10 percent, new
9  maximum allowable ingredient costs, and wholesale
10  selling price?
11      A.  This must have been before -- this must
12  have been longer than -- than just four years ago,
13  because this was done during a time when we were
14  paying at AWP-10, and we stopped doing that in
15  2004.
16      Q.  Okay.
17      A.  So this must be before that.
18      Q.  And California switched to AWP-10 in
19  2002; correct?
20      A.  Yeah.
21          So it would have been somewhere in that
22  range, 2002/2003 probably.

48 (Pages 186 to 189)

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                    May 21, 2009
                    Sacramento, CA

Page 190

1    Q.  Okay.  And under "AWP" it states "Ain't'
2  What's Paid"?
3    A.  That's right.
4    Q.  And was that your understanding of AWP
5  at the time your created this presentation?
6    A.  I've heard it called that by various
7  people, and it's -- some people would argue it's a
8  good -- it's a good description.
9    Q.  Okay.  And when did you first hear AWP
10 described as "Ain't What's Paid"?
11   A.  Sometime in the late eighties or early
12 nineties probably -- although when I first heard
13 it it was not in reference to a drug.  It was in
14 reference to diapers.
15   Q.  Okay.  When did you first hear "Ain't
16 What's Paid" with respect to pharmaceutical
17 pricing?
18   A.  In that ballpark, probably in the early
19 nineties.
20   Q.  Okay.  And who did you give this
21 presentation to?
22   A.  As I recall, this was to a -- I think it

Page 191

1  was a -- a group purchasing organization, PCN,
2  from Pharmaceutical Network, and I was invited to
3  speak at this presentation.
4    Q.  Okay.
5    A.  I should have remembered to put dates on
6  things.  I usually do.
7       MR. MALONEY:  Okay.  I think we can set
8  that aside for now.
9       THE WITNESS:  Okay.
10 BY MR. MALONEY:
11   Q.  Were you -- were you ever instructed to
12 preserve documents in connection with this case?
13   A.  Yes.
14   Q.  Do you recall when you were first
15 instructed to preserve documents?
16   A.  I don't remember the exact date or time,
17 but if you look at how big my computer files are,
18 I should tell you, I don't throw things away very
19 much.
20   Q.  Okay.  Do you recall generally whether
21 you were first instructed more than five years ago
22 or less than five years ago?

Page 192

1    A.  Oh, I'm sure it was more.
2    Q.  Do you recall whether you were first
3  instructed more than eight years ago?
4    A.  I want to -- I recall some issue about
5  this when we moved from 7th and P Street to our
6  current quarters, and we had to box up all our
7  files, and I vaguely recall that we -- it might
8  not have been in connection with this lawsuit but
9  a different one that said we had to be sure not to
10 throw important documents.
11   Q.  Okay.
12   A.  And then I had a conversation after we
13 moved here with Jane Lamborn, I think, and it was
14 -- I don't remember the dates, but it would have
15 been on or after 2003, because we moved over here
16 then.
17   Q.  And you believe that the -- issue
18 regarding preservation of documents before that
19 discussion was not related to this case?
20   A.  I don't think that it -- this particular
21 set of companies was suing us about that
22 particular issue, so it -- might have been

Page 193

1  something else.
2    Q.  Okay.
3    A.  It's a vague recollection.
4    Q.  And you mentioned a name.
5       Was that Jane Lamborn?
6    A.  Yes.  She's one of the attorneys who was
7  originally on this case.
8    Q.  Okay.  And you -- I believe you
9  testified it was on or around 2003 -- in or around
10 2003?
11   A.  Well, no, that we moved to our current
12 building.
13   Q.  Okay.
14   A.  So it would have had to have been after
15 that.
16   Q.  After that?
17   A.  Yeah.
18   Q.  Okay.
19   A.  Because I remember meeting in one of the
20 rooms there.  So --
21   Q.  Okay.  What did you do to --
22       Well, were you asked to gather

49 (Pages 190 to 193)

Walker, Vic                                    May 21, 2009
                     Sacramento, CA

Page 194

1  documents?
2     A.  Yes.
3     Q.  And what did you do to gather documents?
4     A.  I don't keep very many documents on
5  paper, but I went through the files that I had and
6  tried to pull out the documents that fit the
7  criteria.
8     Q.  And -- when you no longer need a paper
9  document, what do you do with it?
10    A.  Typically put it in the recycle, or
11  shred it if it's confidential.
12        If it's something I'm supposed to
13  preserve, then I tuck it away.
14    Q.  Okay.  And I believe you testified that
15  you don't keep many paper documents.
16        Was that --
17    A.  No, I don't keep a lot.  I -- most of
18  the -- you know, all these gobs of E-mails and
19  things that you've seen probably came off of the
20  computer files that I have of them, you know.
21        But those -- serve very nicely.
22    Q.  Okay.  And what about older documents

Page 195

1  that came in to existence before E-mail?
2     A.  I actually managed to preserve those,
3  too.
4        Many of them came in under the old Profs
5  E-mail system, and you got copies of those.
6     Q.  Okay.
7     A.  You know, I preserved those in files.
8     Q.  Did you --
9     A.  Keep in mind that a lot of what I was
10  doing during this period of time had nothing to do
11  with pricing things or whatever.
12        I was designing claims processing
13  systems over at EDS, and on occasion I would be
14  called in to do something because I'm good with
15  spread sheets.
16    Q.  Okay.  Were you instructed to tell
17  others to collect and preserve documents in
18  relation to this litigation?
19    A.  I don't remember that I was told to tell
20  others.
21        I was told to do that, and others -- you
22  know, as -- I was in the room when others were

Page 196

1  told or got an E-mail, and I was not the only
2  person.
3        So others were told, but I was not told
4  to --
5     Q.  Okay.
6     A.  -- tell other people.
7     Q.  And the conversation you had with Jane
8  Lamborn after 2003, do you recall if she -- if
9  other DHS personnel were present at that
10  conversation and also were instructed to preserve
11  documents?
12    A.  This is -- probably comes under
13  attorney/client privilege; doesn't it?
14        MR. FISHER:  Not if -- just the identity
15  of who else was there.
16        THE WITNESS:  As I recall, it was just
17  me and one other attorney.
18        MR. FISHER:  But thank you.
19        THE WITNESS:  Jane is an attorney.
20  BY MR. MALONEY:
21    Q.  After this conversation with Jane did
22  you speak with anyone in the IT Department about

Page 197

1  collecting your electronic files?
2     A.  I talked to people that I believe
3  they're under contract with the Department, and
4  you guys are -- somebody, IT kinds of people, to
5  collect those -- those documents, and help them to
6  know which file extensions to be looking at and
7  where I kept my files and things like that.
8     Q.  Did you talk to anybody from the IT
9  Department or these IT contractors that you
10  mentioned about collecting the electronic
11  documents held by other DHS staff members?
12    A.  Yes.  I talked about -- just -- just
13  which -- as I recall, the only conversation I
14  recall was a conversation on which file extensions
15  to be looking at.
16        You want to look at doc files, .xrs
17  files for Excel files, and Dbase Files, and things
18  like that to -- to assist them.
19    Q.  Do you recall the general time frame of
20  this conversation with the IT people?
21    A.  I want to say in the last year or so --
22  maybe last two years.

                              50 (Pages 194 to 197)

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                    May 21, 2009
                        Sacramento, CA

Page 198

1        It wasn't this year.  It was -- a year
2   or so ago.
3        Q.  Okay.  And that was the first
4   conversation you had with the IT people about the
5   collection and preservation of documents?
6        A.  Well, I remember that there was some con
7   -- we've had labels stuck on our computers for
8   quite some time now that say, you know, "Judicial
9   hold.  Do not delete any documents," something
10  like that.
11       So those -- we've had those computers
12  since 2005, so -- and the stickers were stuck on
13  some time after that, maybe a year or so
14  afterwards.
15       Q.  Okay.  After your conversation with Jane
16  Lamborn just after 2003, where did you search to
17  collect your own documents?
18       A.  The places where I keep documents.
19       I have some file drawers and things like
20  that.
21       Q.  Okay.  And you also searched your
22  computer files at the time or was -- did you

Page 199

1   search your computer files later?
2        A.  Yeah, I did.
3        I looked for a few key phrases like
4   "spread" and things like that, but -- for the most
5   part we just gave you everything wholesale, I
6   think.
7        Q.  Okay.  And when was the next
8   conversation you had with anyone about the
9   collection and preservation of documents after the
10  conversation with Jane Lamborn?
11       A.  Gee, I don't know.
12       We've had -- it will be brought up in a
13  meeting or something.  They'll say, "By the way,
14  be sure that you preserve documents" or something
15  like that.
16       Q.  Okay.
17       A.  I don't recall any specific
18  conversations on the subject.  I was told to do
19  it, so I did it.
20       Q.  Okay.  And you said, I believe, that you
21  recalled another meeting or conversation in 2005
22  relating to the preservation of documents; is that

Page 200

1   accurate?
2        A.  2005?
3        Where are we going?
4        Q.  Correct me if I'm wrong, but I believe
5   you testified there was some sort of a meeting in
6   2005, and then afterwards stickers were applied to
7   computers?
8        A.  No, no, not that there was a meeting.
9        We bought those new computers in 2005.
10       Q.  Okay.
11       A.  And we still have them, and the stickers
12  got applied, I want to say, several years after
13  that -- a couple years at least.
14       Q.  Okay.  So after the Jane Lamborn
15  conversation you don't remember a specific
16  conversation or a meeting relating to the
17  preservation and collection of documents relating
18  to this case?
19       A.  I really don't.
20       Q.  Did Jane Lamborn ever follow up with you
21  about the collection or preservation of documents?
22       A.  She or the -- you know, at some point

Page 201

1   she stopped being the -- the attorney that was
2   involved with this and more of it went to Janet
3   Alexander, and Janet has talked to me at one time
4   or another, but I don't really recall any specific
5   meetings where we sat down and said "The subject
6   of this meeting is preservation of documents."
7        Q.  Okay.
8        A.  Yeah.
9        Q.  Do you recall -- sorry.
10       A.  That's -- that's --
11       Q.  Okay.  Do you recall receiving any E-
12  mails or memos relating to the collection and
13  preservation of documents?
14       A.  I think I probably did.
15       I think I've seen some -- something
16  saying be sure to do that.
17       We did have some meetings with --
18  Katharine Arons, who headed up an effort to go
19  through and redact a bunch of documents.
20       I don't know if that would fit in to
21  what you're asking.
22       Q.  Okay.  Was that in relation to this

                              51 (Pages 198 to 201)

Henderson Legal Services, Inc.
202-220-4158              www.hendersonlegalservices.com

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                           May 21, 2009
Sacramento, CA

Page 202

1  case?
2      A.  I believe so.
3      Q.  Okay.  And I'm sorry.  I don't know if I
4  got your answer.
5          Did you recall receiving memos or E-
6  mails regarding the collection and preservation of
7  documents?
8      A.  We've got them from time-to-time, I
9  think.
10     Q.  And do you recall receiving any before
11 the conversation with Jane Lamborn?
12     A.  I do not.
13     Q.  What's the earliest memo or E-mail
14 regarding collection and preservation of documents
15 that you remember receiving?
16     A.  I don't remember receiving any
17 particular specific one, and certainly not any
18 dates.
19     Q.  Okay.  Okay.
20     A.  It wasn't a grand moment in my life.
21     Q.  Okay.  When you began collecting
22 documents after your conversation with Jane

Page 203

1  Lamborn, who did you give the documents to?
2      A.  On those rare occasions when something
3  came across that -- that -- like a piece of mail
4  or something like that or a -- I would typically
5  give them to Janet Alexander.
6      Q.  Okay.  Did Jane Lamborn or Janet
7  Alexander ever ask you questions about the
8  documents you gave to them?
9      A.  I don't remember that they did.
10     Q.  Before your meeting with Jane Lamborn
11 did you continue to dispose of hard copy documents
12 that you had no need of?
13     A.  Yes.
14     Q.  And before the conversation with Jane
15 Lamborn --
16     A.  Let's put it this way:  Before I was
17 told to preserve documents I didn't preserve
18 documents.
19     Q.  And that would apply to electronic
20 documents as well?
21     A.  I tend to be a pack rat, so electronic
22 documents are pretty much there.

Page 204

1      Q.  Okay.
2      A.  I preserved and kept things that I
3  thought would be of interest or that I might want
4  to look at someday, and so, you know, I have lots
5  of space on the hard drive, so I saved them.
6      Q.  Okay.  But to the extent you thought an
7  electronic document would not be of interest or
8  you may not need in the future, did you dispose of
9  those type of documents before your conversation
10 with Jane Lamborn in 2003?
11     A.  Yeah.
12     Q.  Okay.
13     A.  But, like I said, they're usually
14 somebody says "Let's go get pizza at noon," you
15 know, and I write back and I say, "Okay.  I'll be
16 there."
17         Those ones go in the trash.
18     Q.  Okay.  All right.  I'm going to follow
19 up with some of the testimony you gave earlier
20 this morning.
21     A.  Can we take a break?
22         MR. MALONEY:  Sure.  Yes.  Of course.

Page 205

1          VIDEOGRAPHER:  We're now going off the
2  video record at approximately 3:51.
3          (Thereupon a recess was taken at
4  3:51 p.m.  and the deposition resumed at 4:01
5  p.m.)
6          VIDEOGRAPHER:  We're back on the video
7  record at approximately 4:01.
8  BY MR. MALONEY:
9      Q.  Mr. Walker, do you recall testifying
10 earlier this morning about contracts the Office of
11 General Services made with -- or made for the
12 purchase of drugs?
13     A.  Yes.
14     Q.  And I believe that was -- you learned of
15 those contracts during your time with the -- was
16 it the California Institution for Men?
17     A.  That was where I worked with them the
18 most.
19     Q.  Okay.
20     A.  But I -- to be accurate, I -- I knew
21 about them when I was at -- Patton --
22         Oh.  Yes.  Let's put the microphone on.

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                    May 21, 2009
                        Sacramento, CA

Page 206

1      I knew about them when I was at Patton
2 Hospital.
3      Q.  Okay.  Do you know if OGS entered in to
4 those contracts with wholesalers?
5      A.  They did.
6      They -- they created a primed vendor
7 contract first as an experiment, and then moved
8 forward, and during the experimental time my
9 institution was one of the sites to do it, both
10 Patton and CIM.
11     Q.  Okay.  And are you aware of any OES
12 contracts for the purchase of drugs with
13 manufacturers?
14     MR. FISHER:  Just to make the record --
15 I think it's DGS.
16     MR. MALONEY:  Oh, DGS.  I apologize.
17     THE WITNESS:  Yes.  They -- they do
18 contracts with manufacturers on a bid basis.
19 BY MR. MALONEY:
20     Q.  Okay.  And do you have a general
21 understanding of the proportion of contracts that
22 were with wholesalers as proposed to portion of

Page 207

1 contracts that were with manufacturers?
2      A.  I think we had a single contract with
3 McKesson at the time.
4      I'm unaware of any other contracts with
5 wholesalers.
6      Q.  Okay.  Do you know if the contract with
7 McKesson covered the majority of drugs purchased
8 by -- or I guess by DGS or the agencies you worked
9 for?
10     A.  Well, it covered the -- the bulk of the
11 drugs that we needed to buy at the institutions I
12 was at.
13     Q.  Okay.  Okay.
14     A.  And I was more aware of those at -- at
15 CIM.
16     Q.  Okay.
17     A.  Just to clarify, there was another
18 pharmacist that handled that at Patton.
19     Q.  Okay.  Are you aware of any instance
20 where MediCal directly purchased drugs?
21     A.  No.
22     Q.  Okay.  And do you also recall testifying

Page 208

1 earlier today about a spread sheet you built
2 incorporating WAC prices that you eventually gave
3 to Len Terra?
4      A.  A number of spread sheets.
5      Q.  Okay.  And do you recall the -- when --
6 approximately when you first created a spread
7 sheet incorporating WAC prices?
8      A.  Probably around the time that that
9 document that -- that I wrote, that gave out the
10 plan of how we were going to proceed and saying
11 that I would get the -- the prices from First
12 DataBank through George Pennebaker.
13     Q.  Okay.
14     A.  Because I had to get the -- we had to
15 order those special, and that was either the
16 second time we had done it or the first time.
17     Q.  Okay.  That -- I don't have the exhibit
18 here, but do you recall that that document was --
19 excuse me -- created in 1996?
20     A.  I think I remember seeing in there that
21 it was '96, but we should look up to be sure of
22 the date.

Page 209

1      Q.  Okay.
2      A.  I think it was 12-12-96 or something;
3 wasn't it?
4      Q.  Actually, it's two exhibits, Exhibit
5 Walker 2 and Walker 3.
6      A.  I don't have these in order.
7      Oh, here we go.
8      Doesn't have a date.  I'm not sure of
9 what time we -- I did that.
10     Q.  Okay.
11     A.  Honestly, it might have been before '96.
12     Q.  Okay.  If you look at Exhibit 3 --
13     A.  What does it look like?
14     Okay.  I have too many pieces of paper
15 here, and I just imagine what you guys have to go
16 through.
17     MR. FISHER:  You want me just to hand it
18 to him?
19     MR. MALONEY:  Sure.
20     MR. FISHER:  This is what it looks like.
21     THE WITNESS:  I'll just look at yours.
22 BY MR. MALONEY:

53 (Pages 206 to 209)

Walker, Vic                                          May 21, 2009
                        Sacramento, CA

Page 210

1    Q.  This document describes a restructuring
2  of drug ingredient cost reimbursement that
3  incorporates WAC pricing; right?
4    A.  Uh-huh.
5    Q.  And in the upper righthand corner it has
6  a handwritten note?
7    A.  "12-12-96."
8    Q.  And this is your handwriting; correct?
9    A.  Yes.  It actually says created 12-12-96
10  by me now that I look at it.
11    Q.  Okay.  So it's accurate to say that you
12  were considering WAC prices --
13    A.  As early as that.
14    Q.  -- as early as that?  Okay.
15      And does that refresh your recollection
16  as to whether you or DHS requested WAC prices in
17  1996?
18    A.  Yes.
19      I -- I think that we did in 1996 or
20  perhaps early '97, but -- I'm just not saying that
21  that was the first time.
22    Q.  Okay.  Okay.  When you collected

Page 211

1  documents for this case, did you collect the
2  spread sheets that you created incorporating WAC
3  prices?
4    A.  You have all the electronic ones.
5    Q.  Okay.  Do you recall if you collected
6  the spread sheet that you created relating to WAC
7  prices around the timeframe of '96 or '97?
8    A.  I would imagine that it's in there.
9    Q.  Okay.
10    A.  I don't recall specifically seeing the
11  file.
12    Q.  Okay.
13    A.  You know, I've got -- I think I've got
14  over a million files.
15    Q.  Okay.  But in your search for documents
16  would this document -- this spread sheet and
17  documents like it have been covered by your
18  search?
19    A.  I think so.
20      Keep in mind that when it came to
21  electronic documents I didn't search real hard.  I
22  gave you everything.

Page 212

1    Q.  Okay.
2    A.  I remember --
3      Well, yeah.
4      Go ahead.
5      MR. MALONEY:  Okay.  I think I'm done.
6    I'll pass the witness for now and I'll
7  reserve a little time if I have any follow-up
8  questions.
9
10      EXAMINATION
11  MS. BERWANGER:
12    Q.  Again, for the record my name is Lara
13  Berwanger.  I represent the Defendant Sandoz, Inc.
14      Mr. Walker, are you familiar with my
15  client, Sandoz, Inc.?
16    A.  As Sandoz, yes.
17    Q.  But you are familiar with the name?
18    A.  Although I was thinking that they had
19  been bought out by Novartis some years back.
20    Q.  Sandoz is part of the Novartis family,
21  without getting too in detail about the corporate
22  structure.

Page 213

1      Are you also familiar with the name
2  Geneva Pharmaceuticals, Inc.?
3    A.  Yes.
4    Q.  Do you understand that Geneva
5  Pharmaceuticals, Inc., and Sandoz, Inc., are the
6  same company, there was just a name change at some
7  point from Geneva Pharmaceuticals, Inc., to
8  Sandoz, Inc.?
9    A.  I'm not sure that I knew that, but I
10  know that a number of name brand companies buy or
11  develop generic houses to market their products as
12  well -- additional revenue stream.
13    Q.  Actually, the Sandoz, Inc., that I
14  represent is the generic manufacturer.
15      There was a company known as Sandoz in
16  the 1990s which did manufacture brand products,
17  but that is not my client.
18    A.  Okay.  That's good to know.
19    Q.  Are you familiar --
20    A.  Be honest with you, I didn't know Sandoz
21  still existed.
22    Q.  Okay.

                 Henderson Legal Services, Inc.
202-220-4158                        www.hendersonlegalservices.com

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                    May 21, 2009
                      Sacramento, CA

| Page 214 |
| --- |

1    A.  I'm glad the name is still there though.
2    Q.  So my client, Sandoz, for the record is
3  the new name of the generic pharmaceutical company
4  Geneva Pharmaceuticals, Inc.
5    A.  I didn't know that.
6       And Geneva Pharmaceuticals is Geneva
7  Generics?
8    Q.  Yes, it was once upon a time known as
9  Geneva Generics.
10       Very good.
11    A.  Okay.
12    Q.  While I'm going through some questions
13  with you I might from time-to-time refer to
14  "Sandoz, Inc.," I may refer to "Geneva
15  Pharmaceuticals, Inc."
16       Can we agree I'm speaking about the same
17  company?
18    A.  If I get confused, I'll tell you.
19    Q.  Please do.
20       Have you ever spoken with anyone from
21  Geneva?
22    A.  I've spoken to Sandoz pre-Novartis times

| Page 215 |
| --- |

1  many times, but I don't recall speaking to anybody
2  from Geneva.
3    Q.  So it's fair --
4    A.  More often than not we negotiated
5  contracts with the name brand pharmaceutical
6  manufacturers for single source drugs, and it was
7  unusual for Geneva or some -- you know, a generic
8  house to come in and talk to us.
9    Q.  Okay.  So it's fair to say that, sitting
10  here today, you can't recall any discussions with
11  anyone from Geneva where the topic of AWP was
12  discussed?
13    A.  (Nodding head)
14    Q.  It's fair to say that you can't recall
15  any conversations with anyone from Geneva where
16  WAC was discussed?
17    A.  No.  I can't recall any conversations,
18  period.
19    Q.  Is it fair to say then you can't recall
20  any conversations where someone from Geneva made a
21  statement about AWP or WAC that you found to be
22  false or misleading?

| Page 216 |
| --- |

1    A.  That would be true -- never having had a
2  conversation with anybody -- that I can recall.
3       You're liable to pull out a piece of
4  paper that has something, but I don't remember it
5  at this point.
6       MR. FISHER:  Little voices stay in your
7  head.
8       MS. BERWANGER:  Can you please mark this
9  as Exhibit 19.
10       (Exhibit Walker 019 was marked for
11  Identification.)
12  BY MS. BERWANGER:
13    Q.  Mr. Walker, the Court Reporter has put
14  in front of you a document marked Exhibit 19 to
15  your deposition.
16       The document comes from the files of my
17  client and bears the Bates stamp SANDOZ CALI
18  3000314 through 3000368.
19    A.  Okay.
20    Q.  I will give you a minute to just quickly
21  flip through the document.
22       There isn't very much to read, but you

| Page 217 |
| --- |

1  can just take a moment to familiarize yourself
2  with it.
3    A.  Go back to -- this is going back a ways.
4    Q.  Yes, it is.
5    A.  Okay.
6    Q.  If you'll turn to the first page, you
7  see there's a cover letter dated August 4th, 1992
8  from Ron Hartmann to the Department of Health
9  Services, specifically to Mr. Neff; correct?
10    A.  Uh-huh.
11    Q.  And the letter purports to include a
12  rebate check from Geneva Pharmaceuticals for the
13  drugs reimbursed from January 1st, 1992 through
14  March 31st, 1992; is that correct?
15    A.  Uh-huh.
16    Q.  Mr. Hartmann also says that he's
17  including a print-out identifying the A-M-P or the
18  AMP and calculating a rebate for each product; is
19  that correct?
20    A.  That's what it says here.
21    Q.  Would you turn to page Bates stamped
22  3000343.

                              55 (Pages 214 to 217)

Henderson Legal Services, Inc.
202-220-4158              www.hendersonlegalservices.com

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                          May 21, 2009
                          Sacramento, CA

Page 218

1     A.  Okay.
2     Q.  See there's a schedule there at the top
3  which is titled "Medicaid First Quarter 1992;"
4  correct?
5     A.  Yes.
6     Q.  And there are several columns below the
7  title.
8         From the left the columns read "Item,
9  Abbreviation Information Number, Product," look
10 like the abbreviation for "Average Manufacturing
11 Cost," abbreviation for "Quantity, Total Cost, and
12 10 Percent Rebate;" correct?
13    A.  That's what the headings say.
14    Q.  And there's several products listed
15 under the "Product" column; correct?
16    A.  Yes.
17    Q.  And for many of these products there's a
18 rebate for the product listed under the 10 percent
19 rebate column; correct?
20    A.  Yes.
21    Q.  Would you agree with me that it's likely
22 that the Average Manufacturer Cost column is what

Page 219

1  Mr. Hartmann was referring to when he said that he
2  was transmitting AMPS under the rebate?
3     A.  The NDC is on page 27.  Let's see if I
4  can find page 27.
5         I could tell you.  I think it's on 26.
6     Q.  Page 27 actually, I believe.
7     Those NDCs were only the NDCs that were
8  invalid or disputed.
9     A.  I don't know if these are the AMPs or
10 not.
11        They may be.  Certainly could be.
12    Q.  I can represent to you that these
13 actually are the AMPs for the product.
14    A.  All right.
15    MS. BERWANGER:  You can put this
16 document aside.
17        Okay.  Please mark this Exhibit 20.
18        (Exhibit Walker 020 was marked for
19 Identification.)
20    THE WITNESS:  Thank you.
21 BY ATTORNEY THREE:
22    Q.  Actually, going back to Exhibit 19 for a

Page 220

1  moment --
2         I apologize.
3     A.  That's the one we just looked at?
4     Q.  The one we just looked at.
5     A.  Okay.
6     Q.  Sitting here today, do you have any
7  reason to believe that this letter and the
8  attachments were not actually received by Mr.
9  Neff?
10        MR. FISHER:  Objection as to form.
11        THE WITNESS:  I don't know whether he
12 received them or not.
13        Based upon what -- I don't have reason
14 to believe they weren't received or -- or not,
15 frankly.
16        I don't know.
17 BY MS. BERWANGER:
18    Q.  Okay.  You can go to Exhibit 20 now.
19        Exhibit 20 for the record is a document
20 produced to us by the State of California Bates
21 stamped CAAG/DHS-SAN000063 through 00078.
22        VIDEOGRAPHER:  Counsel, we're down to

Page 221

1  about 10 minutes.
2         MS. BERWANGER:  Okay.  Thank you.
3         VIDEOGRAPHER:  Okay.
4  BY MS. BERWANGER:
5     Q.  Have you ever seen this document before?
6     A.  I don't remember seeing it.
7     Q.  Have you ever seen a document like it?
8     A.  I've seen checks from manufacturers.
9         I have seen letters from manufacturers
10 to -- people.
11        I don't know that I've seen them to the
12 accounting office or not.
13        I'm not sure that I have seen this kind
14 of document before today that lists the average
15 manufacturer costs and the 10 percent supplemental
16 rebate so nicely written out.
17    Q.  Would you turn to the third page of the
18 document.
19    A.  This one here?
20    Q.  Actually, the one right before it.
21    A.  The letter?
22    Q.  Yes, the letter.

                              56 (Pages 218 to 221)

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                    May 21, 2009
                      Sacramento, CA

Page 222

1        This is another letter from Ron
2    Hartmann, this time to the Accounting Section, the
3    State of California Department of Health Services
4    dated May 10th, 1995 which again states that its
5    transmitting a print-out identifying AMPs and
6    calculated rebates for products for October 1st,
7    1994 through December 31st, 1994; correct?
8        A.   Uh-huh.
9        Q.   And then you go ahead to the -- two
10   pages, the page Bates stamp CAAG-DHS-SAN 000067,
11   there's a schedule similar to the one we looked at
12   before with the calculation for the 10 percent
13   supplemental rebate, and the Average Manufacturing
14   Price for several products; correct?
15       A.   Yes.
16       MS. BERWANGER:  You can put that
17   document aside.
18       Please mark this Exhibit 21.
19       (Exhibit Walker 021 was marked for
20   Identification.)
21       THE WITNESS:  Thank you.
22   BY MS. BERWANGER:

Page 223

1        Q.   The Court Reporter has placed in front
2    of you Exhibit -- Exhibit 21 to your deposition,
3    Bates stamped CAAG/DHS-SAN000296 through 329, and
4    this document was also produced to us from the
5    State of California.
6        You can take your time looking at the
7    document.
8        I'll represent to you I'm going to be
9    only covering the letter found on the fourth page
10   of the document and the page Bates stamped 303.
11       A.   Okay.
12       Q.   Would you turn to the fourth page of the
13   document.
14       A.   The letter?
15       Q.   The letter.
16       This is another letter from Ron Hartman
17   to the State of California dated May 21st, 1996?
18       A.   Uh-huh.
19       Q.   Which includes a print-out identifying
20   which -- I'm sorry -- which says that he's
21   transmitting a print-out identifying the AMP and
22   the calculated rebate for each product for the

Page 224

1    period October 1st, 1995 through December 31st,
2    1995; correct?
3        A.   That's correct.
4        Q.   And if you turn to the page Bates
5    stamped 303, this is another schedule which
6    contains the Average Manufacturing Price for
7    several Sandoz products; correct?
8        A.   So it appears.  This is -- the NDC
9    numbers are all six-digit numbers, and NDCs
10   typically are 11 digits, so am I to assume that
11   00781 is prepended to each of these NDCs?
12       Q.   I believe that's correct.
13       That's impressive that you know the
14   labeler code for Geneva.
15       A.   I read it here on the previous document,
16   but it sticks in my --
17       Q.   Okay.
18       A.   But it looked familiar.
19       VIDEOGRAPHER:  Five minutes.
20       THE WITNESS:  Mainly from working in
21   pharmacies in the past.
22   BY MS. BERWANGER:

Page 225

1        Q.   Sure.
2        Mr. Walker, is it fair to say based on
3    these documents that from the time period 1992
4    through 1996 California received AMPS for several
5    products directly from Geneva?
6        A.   Well, it would appear that you were
7    sending something called -- average manufacturer
8    cost to our accounting department.
9        Q.   Or to Michael Neff; correct?
10       A.   In the early days, yes.
11       Q.   And Ron Hartmann represented to the
12   State in the cover letter that he was transmitting
13   AMPs; correct?
14       A.   On at least one of those.
15       Q.   I believe in all three.
16       A.   Was it on all three?
17       Where did they go?
18       I'll take your word for it --
19       Q.   Okay.
20       A.   -- if it's on there.
21       Q.   I believe it's on there.
22       A.   Because I know I can trust you.

57 (Pages 222 to 225)

96262d25-15c9-4434-a533-2a915453a2a3

Walker, Vic                                          May 21, 2009
                        Sacramento, CA

Page 226

1    Q.  Of course.
2    A.  Yeah, it says it on that one.
3    Q.  The Department could have compared the
4  AMPs for -- from Sandoz to the AWPs for Sandoz
5  products found in First DataBank; correct?
6       MR. FISHER:  Objection to form.
7       THE WITNESS:  Had I known that we were
8  getting those, and honest to goodness I don't
9  remember ever seeing that document, it would have
10  been possible for us to do that.
11  BY MS. BERWANGER:
12    Q.  Would that have been something that you
13  would have liked to have done?
14       MR. FISHER:  Objection as to form.
15       THE WITNESS:  It -- it potentially would
16  have been useful.
17  BY MS. BERWANGER:
18    Q.  Because AMPs are a better estimate of
19  actual acquisition costs than AWP; correct?
20       MR. FISHER:  Objection as to form.
21       THE WITNESS:  In my experience they
22  certainly can be.

Page 227

1       MS. BERWANGER:  No further questions at
2  this time.
3       Subject to any questions from other
4  counsel or any further document production from
5  the State I can pass the witness.
6       VIDEOGRAPHER:  We've got about a minute
7  left on these, so if there's any more questions I
8  need to change the tape.
9       MR. MALONEY:  Why don't we stop for now
10  and we'll discuss, see if there's any need.
11       VIDEOGRAPHER:  Now going off the video
12  record at approximately 4:31.
13       (Thereupon a recess was taken at
14  4:31 p.m.  and the deposition resumed at 4:36
15  p.m.)
16       VIDEOGRAPHER:  We're back on the video
17  record at approximately 4:36.
18       MR. MALONEY:  For the record, this is
19  Michael Maloney on behalf of the Dey and Mylan
20  Defendants.
21       We're finished with the deposition
22  subject to production of further documents from

Page 228

1  California.
2       Thank you.
3       THE WITNESS:  Thank you.
4       VIDEOGRAPHER:  This concludes today's
5  video deposition of Vic Walker.
6       We are now back off the video record at
7  approximately 4:36.
8       (Thereupon the deposition was
9  adjourned at. 4:36 p.m.)
10
11
12
13
14
15       --oOo--
16    Signed under penalty of perjury:
17
18  _____
19       VIC WALKER
20  _____
21       Date
22

Page 229

1       --oOo--
2
3       I, CAROL NYGARD DROBNY, a Certified Shorthand
4  Reporter of the State of California, duly authorized to
5  administer oaths, do hereby certify:
6       That I am a disinterested person herein; that
7  the Witness, VIC WALKER, named in the foregoing
8  deposition was by me duly sworn to testify the truth,
9  the whole truth, and nothing but the truth; that the
10  deposition was reported in shorthand by me, CAROL NYGARD
11  DROBNY, a Certified Shorthand Reporter of the State of
12  California, and thereafter transcribed into typewriting.
13       That before completion of the deposition,
14  review of the transcript [ ] was [X] was not requested.
15  If requested, any changes made by the deponent (and
16  provided to the Reporter) during the period allowed are
17  appended hereto.
18       Dated:  May 22, 2009
19
20  _____
21       CAROL NYGARD DROBNY CSR #4018
22

58 (Pages 226 to 229)

# EXHIBIT 2

Ahrens, Katherine                                    May 20, 2009
                     Sacramento, CA

Page 1

            UNITED STATES DISTRICT COURT

         FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------X
In re:  PHARMACEUTICAL          )  MDL No. 1456

INDUSTRY AVERAGE WHOLESALE      )

PRICE LITIGATION                )  Master File No.

-----------------------------)  01-12257-PBS

THIS DOCUMENT RELATES TO:       )  Subcategory Case

State of California ex rel.     )  No. 06-11337

Ven-A-Care of the Florida       )  Hon.

Keys, Inc. v. Abbott Labs,      )  Patti B. Saris

Inc, et al.,                    )

Civil Action No.                )

03-11226-PBS                    )

-----------------------------X



            VIDEOTAPED DEPOSITION OF

               KATHERINE AHRENS

            Wednesday, May 20, 2009

            Sacramento, California


REPORTED BY:  JOHN P. SQUIRES, CCRR, CSR No. 2001

Ahrens, Katherine                                              May 20, 2009
                          Sacramento, CA

---

Page 2

1   APPEARANCES OF COUNSEL:
2
3   For Dey, Inc., Dey, L.P., Mylan, Inc., and Mylan
4   Pharmaceuticals, Inc.:
5       KELLEY DRYE & WARREN, LLP
6       BRENDAN CYR, ESQ.
7       101 Park Avenue
8       New York, New York  10178
9       212.808.7800
10      bcyr@kelleydrye.com
11
12
13  For the California Department of Health Care
14  Services:
15      OFFICE OF THE ATTORNEY GENERAL
16      STATE OF CALIFORNIA
17      RANDAL L. GLASER, DEPUTY ATTORNEY GENERAL
18      110 West A Street, Suite 1100
19      San Diego, California  92101
20      619.688.6411
21      Randal.glaser@doj.ca.gov
22

---

Page 4

1   APPEARANCES OF COUNSEL:  (CONTINUED)
2
3   For Sandoz, Inc.
4       WHITE & CASE
5       LARA A. BERWANGER, ESQ.
6       1155 Avenue of the Americas
7       New York, New York  10036-2787
8       212.819.2549
9       lberwanger@whitecase.com
10
11
12  For Ven-A-Care of the Florida Keys:
13      KRAUSE, KALFAYAN, BENINK & SLAVENS, LLP
14      DAVID B. ZLOTNICK, ESQ.
15      625 Broadway, Suite 635
16      San Diego, California  92101
17      619.232.0331
18      dzlotnick@kkbs-law.com
19
20  ALSO PRESENT:
21      Suzanne Graydon, Investigative Auditor II
22      Benjamin Lewis, Videographer

---

Page 3

1   APPEARANCES OF COUNSEL:  (CONTINUED)
2
3   For the California Department of Health Care
4   Services:
5       OFFICE OF THE ATTORNEY GENERAL
6       STATE OF CALIFORNIA
7       RAYMOND J. LIDDY, Deputy Attorney General
8       1455 Frazee Road, Suite 315
9       San Diego, California  92108
10      619.688.6482
11      raymond.liddy@doj.ca.gov
12
13          -and-
14
15      OFFICES OF LEGAL SERVICES
16      DEPARTMENT OF HEALTH CARE SERVICES
17      BARBARA B. DAYVAULT, SENIOR COUNSEL
18      1501 Capitol Avenue
19      Sacramento, California  95814
20      916.440.7854
21      bdayvaul@dhs.ca.gov
22

---

Page 5

1               I N D E X
2
3   WITNESS: KATHERINE AHRENS            PAGE
4       Examination By Mr. Cyr.................... 010
5       Examination By Ms. Berwanger.............. 190
6
7
8              E X H I B I T S
9   NUMBER          DESCRIPTION          PAGE
10  Exhibit Ahrens 001 - Medi-Cal Contracting
11          Section Pharmacy Pricing
12          Calculation Examples...... 094
13  Exhibit Ahrens 002 - Undated letter, Lewis to
14          Salyer.................... 121
15  Exhibit Ahrens 003 - Medi-Cal Drug Rebate
16          Agreement................. 121
17  Exhibit Ahrens 004 - 10-14-03 e-mail from Berk
18          to Ahrens, attachments.... 137
19  Exhibit Ahrens 005 - 9-6-02 letter from Hillbom
20          to Johnston............... 143
21  Exhibit Ahrens 006 - E-mail string and
22          attachments............... 147

---

                                    2 (Pages 2 to 5)

Ahrens, Katherine                                        May 20, 2009
                        Sacramento, CA

Page 6

1          E X H I B I T S  (CONTINUED)
2    NUMBER          DESCRIPTION          PAGE
3    Exhibit Ahrens 007 - 5-3-04 e-mail from Walker
4          to Agnew, et al.,
5          attachments............... 152
6    Exhibit Ahrens 008 - State of California's
7          Objections And Responses
8          to Defendant Abbott's
9          First Set of
10         Interrogatories........... 167
11   Exhibit Ahrens 009 - E-mail string............. 195
12   Exhibit Ahrens 010 - Database of contracts..... 198
13   Exhibit Ahrens 011 - 8-4-92 letter from
14         Hartmann to Neff.......... 202
15   Exhibit Ahrens 012 - Remittance Advice,
16         attachments............... 204
17   Exhibit Ahrens 013 - Check, attachments........ 205
18
19
20
21
22

Page 8

1    name is Brendan Cyr.  I'm with the law firm of
2    Kelly Drye & Warren in New York and I represent
3    Dey, Inc., Dey, L.P., Mylan, Inc., and Mylan
4    Pharmaceuticals.
5          MS. BERWANGER:  Lara Berwanger, from
6    White & Case, representing Sandoz, Inc.
7          MR. GLASER:  My name is Randy Glaser.
8    I'm with the California of Department of Justice.
9    I'm here on behalf of the Department of Health
10   Services and I'll be defending Ms. Ahrens today.
11         MR. LIDDY:  Raymond Liddy, also with the
12   DOJ.
13         MS. DAYVAULT:  Barbara Dayvault, with
14   the Department of Health Care Services.
15         MS. GRAYDON:  Suzanne Graydon, with
16   California DOJ.
17         MR. ZLOTNICK:  David Zlotnick,
18   representing Ven-A-Care of the Florida Keys.
19         THE VIDEOGRAPHER:  Thank you.
20         Will the reporter please swear in the
21   witness.
22

Page 7

1          P R O C E E D I N G S
2
3          THE VIDEOGRAPHER:  Good morning.  We're
4    on the video record, ladies and gentlemen, at
5    9:05.
6          I'm Benjamin Lewis, with Henderson Legal
7    Services in Washington D.C.  The phone number
8    there is 202 220-4158.
9          This is a matter pending before the U.S.
10   District Court, District of Massachusetts, in the
11   case captioned Pharmaceutical Industry Average
12   Wholesale Price Litigation, Case Number 01-12257-
13   PBS.
14         This is the beginning of tape 1 of
15   today's video deposition of Katherine Ahrens on
16   May 20, 2009.
17         We are located at 1300 I Street,
18   Sacramento, California 94244.
19         Counsel, would you please identify
20   yourselves, beginning with the questioning
21   attorney.
22         MR. CYR:  Good morning, Ms. Ahrens.  My

Page 9

1          On Wednesday, May 20, 2009, at the hour
2    of 9:05 of said day, at the Office of the Attorney
3    General, State of California Department of
4    Justice, 1300 I Street, Sacramento, California,
5    before me, JOHN P. SQUIRES, a Certified Shorthand
6    Reporter, personally appeared KATHERINE AHRENS,
7    who was examined as a deponent in said cause.
8
9          THE VIDEOGRAPHER:  You may proceed.
10         MR. CYR:  Before we get started with the
11   deposition, I'd just like to clarify something for
12   the record.
13         We had served a notice, yesterday I
14   believe, for Ms. Ahrens' deposition and the
15   deposition notice itself erroneously noted that
16   you were being noticed as a 30(b)(6) witness and
17   it was actually our intention to notice you -- or
18   notice Ms. Ahrens as a 30(b)(1) witness in her
19   individual capacity.  It's our understanding --
20   and I think Mr. Glaser and I had a discussion off
21   the record before -- that Ms. Ahrens will be
22   appearing in her individual capacity as a 30(b)(1)

                    Henderson Legal Services, Inc.
202-220-4158                        www.hendersonlegalservices.com

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                    May 20, 2009
Sacramento, CA

Page 10

1  witness.
2        Mr. Glaser, can you confirm that?
3        MR. GLASER:  Yeah, that's correct.
4        MR. CYR:  Okay.
5
6        KATHERINE AHRENS,
7  the deponent herein, having been first duly sworn,
8  was examined and testified as follows:
9
10       EXAMINATION
11    Q.  Good morning, Ms. Ahrens.
12        Could you state and spell your name for
13  the record, please.
14    A.  Katherine, K-a-t-h-e-r-i-n-e, last name
15  Ahrens, A-h-r-e-n-s.
16    Q.  Ms. Ahrens, did you used to be known by
17  another name, another last name?
18    A.  Yes.
19    Q.  What was that last name, please?
20    A.  One would have been Salz, S-a-l-z, as in
21  zebra.
22    Q.  Okay.

Page 11

1    A.  And my maiden name was Cabacungan, C-a-
2  b-a-c-u-n-g-a-n.
3    Q.  Okay.  And when did your name change
4  from Cabacungan to Ahrens?
5    A.  June 29, 2002.
6    Q.  Okay.  And did it change because you
7  were married?
8    A.  Yes.
9    Q.  Okay.  Did you marry Tom Ahrens?
10    A.  Yes.
11    Q.  Okay.  Have you ever been deposed
12  before?
13    A.  Yes.
14    Q.  How many times?
15    A.  Once.
16    Q.  What was the -- what type of matter were
17  you deposed in?
18    A.  Well, it was a lawsuit.
19    Q.  Okay.
20    A.  A beneficiary suing the State, suing
21  Medi-Cal.
22    Q.  Okay.  When were you deposed?

Page 12

1    A.  I don't recall the year.  It was a few
2  years ago.
3    Q.  Okay.  More than five years ago?
4    A.  I'm not sure.
5    Q.  Okay.  What was the nature of the
6  lawsuit? Strike that.
7        What were the nature of the claims in
8  the lawsuit?
9    A.  The beneficiary was challenging our
10  authority to establish -- or to make a drug, a
11  certain drug prior authorized, to require prior
12  authorization for a certain drug, and also
13  challenging the process by which we established
14  criteria and the validity of the criteria for that
15  particular drug.
16    Q.  Okay.  And what was the drug at issue?
17    A.  Serostim.
18    Q.  Serostim?
19        And what is that drug for?
20    A.  It's a human growth hormone that is
21  approved by the Food and Drug Administration for
22  the treatment of kakexia associated with AIDS or

Page 13

1  AIDS wasting -- not AIDS wasting.  For AIDS or
2  HIV-associated illness.
3    Q.  Okay.  What was the result of that
4  lawsuit?
5    A.  The beneficiary lost the lawsuit.
6    Q.  So the drug remained as a prior
7  authorization status?
8    A.  Um-hmm.
9    Q.  What do you mean when you say "prior
10  authorization"?
11    A.  That means that the provider must seek
12  approval from Medi-Cal for payment -- for Medi-Cal
13  to pay for a product or service.
14    Q.  Okay.
15    A.  It's not just drugs that are prior auth.
16  Some services are as well.  Other services are as
17  well.
18    Q.  Well, and if a service wasn't -- prior
19  authorization wasn't required for a service, am I
20  correct in assuming that the provider would just
21  be able to -- let's say it's a drug.  Would the
22  provider just be able to dispense the drug and

4 (Pages 10 to 13)

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                        May 20, 2009
                        Sacramento, CA

Page 14

1  then submit a claim for reimbursement?
2     A.  Correct.
3     Q.  Okay.  And what did you say the name of
4  that drug again was?  I'm sorry.
5     A.  The brand name was Serostim.
6     Q.  Serostim.
7        And it was a brand-name drug?
8     A.  Correct.
9     Q.  Okay.  Have you ever been deposed in any
10 other lawsuits?
11    A.  No.
12    Q.  Okay.  Have you ever given any other
13 type of sworn testimony?
14    A.  Unless it's sworn testimony when you go
15 through a divorce, no, not that I can recall.
16    Q.  Okay.  Were you deposed when you were
17 divorced?
18    A.  No.
19    Q.  Okay.  I'm assuming that any -- did you
20 perhaps sign an affidavit during your divorce
21 proceedings?
22    A.  I don't recall --

Page 15

1     Q.  Okay.
2     A.  -- the process.
3     Q.  And this may seem like a silly question,
4  but I assume nothing at your divorce proceedings
5  had anything to do with Medicaid reimbursement for
6  prescription drugs.
7     A.  No.
8     Q.  Okay.
9        MR. GLASER:  That's good.
10       MR. CYR:  Q.  Have you ever given sworn
11 testimony before a legislative body perhaps?
12    A.  No.
13    Q.  Okay.  Have you ever prepared testimony
14 for someone else to give?
15    A.  No.
16    Q.  Okay.  I'm just going to go over some of
17 the basics of the deposition procedure now.
18 You're probably familiar with them, but just to
19 make sure you're up to speed.
20       You understand that you're under oath
21 today and it's -- you're giving testimony, it's
22 the same as if you were a witness at a trial?

Page 16

1     A.  Yes.
2     Q.  Okay.  And you understand that the
3  videotape of this deposition may be used at trial
4  at a later date?
5     A.  Yes.
6     Q.  Okay.  Now, I'm going to be asking you a
7  series of questions and I would ask that you
8  answer the questions verbally, as opposed to, you
9  know, shaking your head or nodding your head.  The
10 court reporter needs to take down your response
11 and he can't type down a shake of the head or nod
12 of the head.
13       I'd ask that you please wait for me to
14 finish asking my question before you begin your
15 answering your question, and I'll try to do the
16 same for you, I'll wait until you finish asking
17 the question before I ask my next question.  It's
18 kind of difficult, once again, for the court
19 reporter to take down the testimony if we're both
20 talking at the same time.
21       If you don't understand a question that
22 I've asked, please ask me to clarify and I'll do

Page 17

1  my best to do so.
2        If you don't ask to clarify, I'm going
3  to assume that you understand the question.
4        If you need a break at any time, just
5  let me know and we'll try to accommodate you.
6  There's one thing I ask, though, that if there is
7  a question pending on the record, that you answer
8  the question before we take a break.
9        From time to time Mr. Glaser or one of
10 the other attorneys here may interpose an
11 objection to one of my questions, and I'd ask that
12 unless you're instructed not to answer the
13 question that I've asked you, you are required to
14 provide an answer to the question.  Do you
15 understand that?
16    A.  Yes.
17    Q.  Okay.  And just as a courtesy for your
18 counsel, you might want to pause a minute -- or
19 just for a few moments after I ask my question in
20 case  Mr. Glaser does intend to pose an objection.
21 Okay?
22    A.  Okay.

5 (Pages 14 to 17)

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                    May 20, 2009
                          Sacramento, CA

Page 18

1      Q.   Do you understand all those instructions
2   and points I've covered?
3      A.   Yes.
4      Q.   Okay.  Are you currently on any
5   medications?
6      A.   Yes.
7      Q.   Which ones?
8      A.   I'm on Cymbalta.
9      Q.   Okay.
10     A.   And Restasis.  I use over-the-counter
11   Naprosyn.  Those are the routine medications.
12        And as needed I use Provigil, hundred
13   milligrams, and Norco, 5 -- well, it's a 10-
14   milligram tablet that I cut in half when I need it
15   for pain.
16     Q.   Okay.
17     A.   And then various vitamins and
18   supplements.
19     Q.   Not counting the vitamins and
20   supplements, ou mentioned about five medications?
21   Is that --
22     A.   I didn't count them.

Page 19

1      Q.   Okay.
2      A.   Oh, one other, Imitrex nasal spray --
3      Q.   Okay.
4      A.   -- as needed.
5        And I forgot one other one.  Zoltadem at
6   bedtime.
7      Q.   Do any of these medications affect your
8   memory?
9      A.   Not that I'm aware of.
10     Q.   Okay.  Will any of these medications
11   affect your ability to give accurate and truthful
12   testimony today?
13     A.   No.
14     Q.   Okay.  Do you have any medical
15   conditions that might impact your memory?
16     A.   Not that I'm aware of.
17     Q.   Okay.  Do you know of any reason -- any
18   other reason why you might not be able to give
19   full and complete and accurate testimony today?
20     A.   No.
21     Q.   Okay.  Did you do anything to prepare
22   for the deposition today?

Page 20

1      A.   Do you mean like study?  What do you
2   mean by did I do anything to prepare for the
3   deposition?  I got a good night's rest, I mean --
4      Q.   That's good.  I wish I could say the
5   same.
6        Well, did you meet with anyone?
7      A.   The attorneys, before the deposition.
8      Q.   And who specifically did you meet with?
9      A.   Randy.
10     Q.   Mr. Glaser?
11     A.   And Barbara and Ray.
12     Q.   I'm sorry.  Barbara?
13        MS. DAYVAULT:  Dayvault.
14        MR. GLASER:  And Mr. Ray Liddy.
15        MR. CYR:  Q.  And you met with Mr. Liddy
16   as well?
17     A.   Yes, as a group, not individually.
18     Q.   Right.
19        When did this meeting take place?
20     A.   Yesterday.
21     Q.   About how long was the meeting?
22     A.   About an hour and a half.

Page 21

1      Q.   Hour and a half?
2        And you met with Randy, Barbara and Ray
3   in person?
4      A.   Um-hmm.
5      Q.   Was there anyone on the telephone?
6      A.   No.
7      Q.   Okay.  Did you review any documents at
8   the meeting?
9      A.   No.
10     Q.   Okay.  Other than the meeting yesterday,
11   did you talk to anyone else about this deposition?
12     A.   That I would be at the deposition, yes.
13     Q.   Okay.  You told people you work with --
14     A.   My supervisor --
15     Q.   Okay.
16     A.   -- my husband.
17     Q.   Okay.  Did you talk with anyone about
18   the substance of the deposition?
19     A.   My boss, my supervisor I mean --
20     Q.   Who is your supervisor?
21     A.   Kevin Gorospe.
22     Q.   Okay.  And when did you speak to Mr.

6 (Pages 18 to 21)

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                        May 20, 2009
                    Sacramento, CA

Page 22

1   Gorospe about the deposition?
2       A.   Yesterday, in the context that I would
3   be here, but --
4       Q.   Okay.  But did you talk about what you
5   were -- the testimony that you -- the substance of
6   the testimony you were going to give today?
7       A.   No.
8       Q.   No.
9       A.   And then I would have talked to my
10  husband about the fact that I was going to be here
11  today.
12      Q.   Okay.  Did you review any of the other
13  depositions, any transcripts of the other
14  depositions that have been taken in this action?
15      A.   No.
16      Q.   Okay.  You mentioned Kevin Gorospe is
17  your supervisor.  Have you talked to him about
18  this case at all?
19      A.   Not recently, but, yes, since the case
20  began.  Yes.
21      Q.   Okay.  And what about the case did you
22  discuss with Mr. Gorospe?

Page 23

1       A.   Basically, the nature of the case, that
2   it was a lawsuit that involved manufacturers.
3       Q.   Okay.
4       A.   Nothing beyond what would have been
5   typical of an interaction with any other work-
6   related subject.
7       Q.   Okay.  Maybe Mr. Gorospe just mentioned
8   there was this lawsuit and it was against drug
9   manufacturers?  Is that it?
10      A.   I was involved with portions of the
11  lawsuit in the beginning, for example with
12  document collection and some of the rogs
13  responding to those.
14      Q.   Okay.
15      A.   And the redactions.  So to the extent
16  that I needed clarification on how to respond
17  appropriately to any of those activities, then I
18  would have had conversations with Kevin --
19      Q.   Okay.
20      A.   -- accordingly.
21      Q.   Okay.  You had mentioned that you had
22  worked on preparing responses to interrogatories?

Page 24

1       A.   Um-hmm.
2       Q.   Do you know approximately when you
3   worked on preparing those responses?
4       A.   I don't recall the exact time or the
5   date, month, but it seems to me that this process
6   started sometime in 2007.
7       Q.   Okay.  Maybe, if I could help you out,
8   maybe around December, November of 2007?
9       A.   I don't know.
10      Q.   Okay.
11      A.   It could be.  I don't know.
12      Q.   Can't say for certain?
13      A.   No.
14      Q.   Okay.  Apart from Mr. Gorospe, have you
15  had discussions with anyone else about this
16  lawsuit?
17      A.   Janet Alexander.
18      Q.   Okay.  She is counsel for the Department
19  of Health Services?
20      A.   Correct.
21      Q.   It's the Department of Health Care
22  Services; right?

Page 25

1       A.   Correct.
2       Q.   Today.
3            But it used to be known as the
4   Department of Health Services; right?
5       A.   Correct.
6       Q.   If I use those two terms interchangeably
7   today, can we understand that I'm referring to the
8   Department of Health Care Services, which used to
9   be known as the Department of Health Services?
10      A.   Yes.
11      Q.   Okay.  You spoke with Ms. Alexander?
12      A.   Um-hmm.
13      Q.   When did that conversation take place?
14      A.   It would not have been a single
15  conversation, but multiple conversations, again
16  associated with --
17          MR. GLASER:  I'm going to object and I'm
18  going to advise the deponent not to discuss any
19  conversations that you had.
20          You can answer questions about when.
21          THE WITNESS:  Okay.
22          MR. GLASER:  But I would ask you not to

7 (Pages 22 to 25)

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                      May 20, 2009
                          Sacramento, CA

Page 26

1   respond to any questions that ask you to describe
2   the contents of conversations.
3        Ms. Alexander is an attorney with the --
4        MR. CYR:  Right, right, right.
5        Q.  Would you have spoken to Ms. Alexander
6   about this lawsuit more than once?
7        A.  Yes.
8        Q.  Do you remember -- can you say
9   approximately how many times you've spoken with
10  her?
11       A.  No.  I don't recall.
12       Q.  More than 10 times?
13       A.  Can't recall.
14       Q.  Okay.  Have you spoken to anyone else
15  about this lawsuit?
16       A.  Randy Glaser, John Fisher.
17       Q.  And you mentioned Mr. Glaser.  You've
18  spoken to him outside -- at another time besides
19  the meeting you had with him yesterday?
20       A.  Correct.
21       Q.  Okay.  How many times have you spoken
22  with Mr. Glaser about the lawsuit?

Page 27

1        A.  I don't recall.
2        Q.  Okay.  And do you remember how many
3   times you've spoken with Mr. Fisher about the
4   lawsuit?
5        A.  No.
6        Q.  Okay.  I'd like to change gears now.
7            Could you describe your educational
8   background since high school.
9        A.  Junior college with a major in -- I
10  think it was Life Sciences.  But the focus was to
11  transfer to a four-year college.
12           And then --
13       Q.  Can I just interrupt you there?  What
14  was the name of the junior college?
15       A.  San Joaquin Delta College.
16       Q.  Okay.  And then from there?
17       A.  University of Pacific, College of the
18  Pacific.
19           And that was to finish up some pre-
20  pharmacy requirements to be accepted into the
21  Doctor of Pharmacy program.
22           Then the School of Pharmacy at the

Page 28

1   University of the Pacific for my Doctor of
2   Pharmacy.
3        Q.  So you received a Doctor of Pharmacy
4   from the university?
5        A.  School of Pharmacy.
6        Q.  School of Pharmacy.
7            And did you receive a bachelor's degree
8   from the University of the Pacific?
9        A.  No.
10       Q.  Just the doctorate?
11       A.  Um-hmm.
12       Q.  Do you have a bachelor's degree?
13       A.  No.
14       Q.  Okay.  Did you receive any degree from
15  the junior college?
16       A.  Associate -- the A.A. degree.
17       Q.  Since you received your doctorate in
18  pharmacy, have you taken any courses or any
19  additional training?
20       A.  For licensure, continuing licensure we
21  are required -- the State Board of Pharmacy
22  requires that we complete 30 -- a minimum of 30

Page 29

1   continuing education hours between licensing
2   periods, so every two years.  So in order to meet
3   those requirements, I've participated in
4   continuing education courses.
5        Q.  Okay.  Let me back up.
6            When did you receive your Doctorate of
7   Pharmacy?
8        A.  1982.
9        Q.  1982?
10           And I take it because you're required to
11  take the continuing education classes you're a
12  registered pharmacist?
13       A.  Correct.
14       Q.  Okay.  And when did you become a
15  registered pharmacist?
16       A.  1982.
17       Q.  Okay.  And so you've been doing those
18  continuing education classes every year since
19  then?
20       A.  Um-hmm.
21       Q.  On a two-year cycle?
22       A.  Yes.

                     Henderson Legal Services, Inc.
202-220-4158                        www.hendersonlegalservices.com

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                    May 20, 2009
                        Sacramento, CA

Page 30

1    Q.   Okay.  Have you taken any other classes
2  since graduating, apart from the continuing
3  education classes?
4    A.   Are you referring to classes associated
5  with a college or are you referring to classes in
6  general? I don't know what you mean by "classes."
7    Q.   Let's start with classes associated with
8  the college.
9    A.   I've gone back and taken fitness
10 classes.
11   Q.   Okay.  Well, anything -- let me make it
12 a little simpler.  Anything related to pharmacy?
13   A.   No.
14   Q.   No.  Okay.
15       Any classes -- vocational-type classes
16 related to your job at DHS or DHCS?
17   A.   At a college?
18   Q.   At a college.
19   A.   No.
20   Q.   I assume you've probably had some on-
21 the-job training.
22   A.   Correct.

Page 31

1    Q.   Okay.  What was the nature of that
2  training?
3    A.   Every year or so we have a class that's
4  on legislative training, how to do a bill
5  analysis.
6    Q.   Okay.
7    A.   Classes on management, classes on how to
8  work with various computer programs, how to work
9  with -- classes on how to work with programs that
10 have been specifically designed for use by the
11 Department.
12   Q.   Okay.  Are there any programs -- the
13 last category of classes that you mentioned,
14 dealing with computer programs specifically
15 designed for the Department, are there any
16 computer programs that you use that were designed
17 specifically for the Department on a regular
18 basis?
19   A.   Not knowing what you mean by "regular,"
20 there are programs that have been designed for the
21 Department that I access periodically.
22   Q.   Okay.

Page 32

1    A.   As often as I need to.
2    Q.   Okay.  What are some of those programs?
3    A.   One of the programs is called LiveLink.
4    Q.   Okay.  And what is LiveLink?
5    A.   I don't know the full extent of
6  LiveLink's capabilities.
7    Q.   Okay.
8    A.   But for what I use it for is to access
9  historical documents.  It's electronic storage of
10 documents, specifically provider bulletins or
11 Operating Instruction Letters or OILs.
12   Q.   And the provider bulletins and the OILs,
13 those are documents that are prepared by DHS; is
14 that correct?
15   A.   The OIL would be prepared by the
16 Department or DHS, DHCS.
17       And I'll use "Department" to mean
18 Department of Health Care Services or Department
19 of Health Services.
20   Q.   Absolutely.  That's fine.
21   A.   That's typically how I refer to the
22 organization that I work for.

Page 33

1    Q.   Okay.
2    A.   The bulletin articles are prepared by
3  the fiscal intermediary and sent to the Department
4  for review and final approval before distribution
5  to the provider community.
6    Q.   Okay.  You mentioned a term in there,
7  "the fiscal intermediary."
8    A.   Um-hmm.
9    Q.   What is the fiscal intermediary?
10   A.   The function of the fiscal intermediary
11 --
12   Q.   Oh, the function -- yes, the function of
13 the fiscal intermediary.  I'm sorry.
14   A.   -- is to process our claims that are
15 submitted to the Department by providers and to
16 prepare provider bulletins that are sent to the
17 provider community, of course upon our
18 instruction, that notify providers of changes but
19 at the same time notify the fiscal intermediary of
20 updates or changes that need to be made to the
21 system, the claims processing system --
22   Q.   Okay.

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                     May 20, 2009
                        Sacramento, CA

Page 34

1     A.   -- in order to facilitate billing needs.
2     Q.   Okay.
3     A.   Beyond that, I don't know what their
4  function is.
5     Q.   Okay.  And currently who is the
6  Department's -- or the fiscal intermediary works
7  primarily for the Medi-Cal program; is that
8  correct?
9     A.   I don't know if that is correct.  I know
10  that they do work for us, but I don't know if they
11  work for other departments that have claims to
12  process.
13     Q.   Okay.  Who is the fiscal intermediary
14  currently?
15     A.   EDS.
16     Q.   EDS?  Is that Electronic Data Systems?
17     A.   Yes.
18     Q.   Okay.  Since you've been at the
19  Department, has it always been Electronic Data
20  Systems?
21     A.   As far as I know, yes.
22     Q.   Okay.  You mentioned LiveLink and you

Page 35

1  use that to access historical documents and you
2  mentioned the provider bulletins and the OILs.
3        Are there any other types of documents
4  you look at on LiveLink?
5     A.   No.
6     Q.   Okay.  You don't access any documents
7  that might have been prepared by a manufacturer
8  and sent to the program?
9     A.   I don't know that they're stored there.
10  No.
11     Q.   Okay.  Would they be stored -- would
12  documents like that be stored somewhere else?
13     A.   I don't know.
14     Q.   Okay.  Are there other computer programs
15  that you use?
16     A.   Computer programs that have been --
17     Q.   Set up specifically for DHS.
18     A.   On occasion I will access our RAIS
19  system.
20     Q.   Okay.  And what is the RAIS system?
21     A.   It's --
22     Q.   Strike that.  Let me ask a better

Page 36

1  question.
2        Why do you access -- what reasons do you
3  have to access the RAIS system?
4     A.   Rarely now do I access it.  But when I
5  do access it, it's to look up pricing information.
6     Q.   Is that pricing information for drugs?
7     A.   Correct.
8     Q.   Okay.  And what type of pricing
9  informationdo you look at on the RAIS system?
10     A.   It's been such a long time since I've
11  hadneed to look at that system --
12     Q.   Okay.
13     A.   -- because that's not part of what my
14  primary job is today.
15     Q.   Okay.
16     A.   So when I looked at RAIS more routinely,
17  I would look for rebate information.
18     Q.   What type of rebate information
19  specifically?
20     A.   Supplemental rebate and CMS or HCFA
21  Rebate.
22     Q.   Any other computer programs designed

Page 37

1  specifically for DHS that you use during the
2  course of your work?
3     A.   No.
4     Q.   Okay.  Do you subscribe to any
5  publications? Well, strike that.
6        Do you subscribe to any trade
7  publications?
8     A.   There are some online publications that
9  are free that I subscribe to.  But no hard copy.
10     Q.   No hard copy?
11        What are the online publications?
12     A.   You know, I don't know the names of
13  them.  I just know that -- I think there's like
14  California Health Line or -- it's just a
15  newsletter that pops up daily.
16     Q.   Do you receive that via e-mail?
17     A.   Yes.
18     Q.   Okay.  And what kind of information is
19  in that?
20     A.   It's anything that has to do with things
21  going on in the State of California.  So, for
22  example, there would be information there on

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                         May 20, 2009
                        Sacramento, CA

Page 38

1  proposed cuts to the Medi-Cal program or some
2  national trends or things that are going on with
3  healthcare, healthcare reform, those kinds of
4  informational types of articles.
5     Q.   Okay.  Any other online publications?
6     A.   Kaiser Foundation --
7     Q.   Okay.
8     A.   -- puts out a publication that I'll look
9  at.
10    Q.   What kind of information is in the
11 Kaiser Foundation?
12    A.   There's somewhat the same information,
13 but at times there are more reports because Kaiser
14 Foundation itself does reports or studies on
15 different issues, so there will be that kind of
16 information in the Kaiser reports.
17         Kaiser does one also that's HIV
18 specific, HIV-AIDS, things that are going on in
19 the United States and worldwide as related to HIV.
20    Q.   Okay.  Any other publications?
21    A.   There's a publication called -- I think
22 it's called Pharmasource, and it might have

Page 39

1  articles that are related to practice trends, like
2  in different pharmacy practice settings or new
3  drugs or new indications for existing drugs, just
4  anything that's related to the activity of
5  dispensing a drug in various settings or drug-
6  related issues, if there's a -- one of the things
7  that just popped into my head was like when there
8  was an issue with deaths associated with the wrong
9  drug concentration being in an IV.
10    Q.   Okay.
11    A.   Those kinds of things.
12    Q.   So is it a publication targeted at the
13 pharmacy industry?
14    A.   Targeted at pharmacists.
15    Q.   Pharmacists.  Okay.
16         You had mentioned before that you're a
17 registered pharmacist.  Do you have any other
18 professional licenses?
19    A.   No.
20    Q.   Okay.  Are you a member of any
21 professional associations or organizations?
22    A.   No.  I think my membership to the

Page 40

1  American Pharmacy Association -- or American
2  Pharmacists Association has expired.
3     Q.   Okay.  But you were a member at one
4  point of the American Pharmacists Association?
5     A.   Yes.
6     Q.   Okay.  When were you a member of the
7  American Pharmacists Association?
8     A.   Last year.
9     Q.   Okay.  Just last year or...
10    A.   I don't know the renewal period.
11    Q.   Oh, okay.
12    A.   But when the renewal notice came, I
13 didn't renew.
14    Q.   Okay.  When did you join the American
15 Pharmacists Association?
16    A.   It probably would have been in 2008.
17    Q.   Okay.  So only for about a year; right?
18    A.   Yes.
19         The membership comes with attendance at
20 their annual meeting --
21    Q.   Oh, okay.
22    A.   -- which is a national meeting during

Page 41

1  which we're able to get continuing education
2  hours.
3     Q.   And that's why you became a member?
4     A.   Correct.
5     Q.   Okay.  Have you ever been a member of
6  the California Pharmacists Association?
7     A.   Yes.
8     Q.   When were you a member of that?
9     A.   I don't know.  I may have been a member
10 as a student and then intermittently since 1982,
11 but I don't believe anytime recently.
12    Q.   Okay.  Anytime recently within the past
13 five years?
14    A.   Correct.
15    Q.   Within the past 10 years?
16    A.   I don't know.
17    Q.   Okay.  Any other professional
18 associations?
19    A.   At one point in time I was a member of
20 the California Hospital Society of -- CSH --
21 California Society of Hospital Pharmacists.  That
22 was the name of it then.  And I think it's been

Henderson Legal Services, Inc.
202-220-4158                          www.hendersonlegalservices.com

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                    May 20, 2009
Sacramento, CA

Page 42

1  renamed to California Society of Health Systems
2  Pharmacists.
3      Q.  And you say you were a member of that at
4  one point in time?
5      A.  Um-hmm.  Yes.
6      Q.  But no longer?
7      A.  Correct.
8      Q.  Okay.  Do you remember approximately
9  when you were a remember?
10     A.  Probably in the 1980s.
11     Q.  But not in the 1990s?
12     A.  Probably not.
13     Q.  Okay.  Have you ever written an article
14  for publication?
15     A.  Publication where?
16     Q.  In a trade journal or a newsletter.
17     A.  I wrote an article one time for a
18  publication in the California Pharmacists
19  Association's journal, CPHA.
20     Q.  And what was that article about?
21     A.  It had to do with Pharmacist
22  Intervention programs.  It would have been around

Page 43

1  the time that the Department was collaborating
2  with CPHA to do a study to determine the cost-
3  effectiveness of paying pharmacists for specific
4  intervention activities and assessing the impact
5  on quality of life and overall healthcare costs
6  for patients with specific diagnoses.
7      Q.  What do you mean by "intervention
8  activities"?
9      A.  Today the buzzword -- or the term that's
10  used is MTM, or Medication Therapy Management.
11        Back then the term was Cognitive
12  Services, also Pharmaceutical Intervention.  The
13  term that we -- the Department or our pharmacy
14  unit decided to use was Pharmacist Intervention.
15     Q.  Okay.
16     A.  And the intervention was related to
17  aspects of care that had nothing to do with
18  dispensing the product, so it would have centered
19  on patient education around their medication as
20  well as their disease so that the patient or
21  beneficiary could be empowered to better manage
22  their disease and have improved outcomes.

Page 44

1      Q.  Okay.  So the pharmacist essentially
2  being more than just a pharmacist, maybe giving --
3  or not more than just a pharmacist, but more than
4  just dispensing drugs; giving the patient some
5  medical advice and guidance?
6      A.  Not medical advice, because as a
7  pharmacist your license doesn't give you that --
8  it's not a license that gives you that authority
9  to give medical advice.
10        You can give medical information --
11     Q.  Okay.
12     A.  -- you can provide patient education,
13  you can provide them drug information and refer
14  them back to their physician or advise them to
15  seek additional evaluation from other members of
16  their healthcare team --
17     Q.  Okay.
18     A.  -- as appropriate.
19     Q.  Okay.  Have you written any other
20  articles for publication?
21     A.  No.
22     Q.  And you're presently employed by the

Page 45

1  Department; is that correct?
2      A.  Correct.
3      Q.  Okay.  Where did you work prior to
4  working for the Department?
5      A.  I worked for the Department of
6  Developmental Services at the Stockton
7  Developmental Center.
8      Q.  And what time period did you work there?
9      A.  I worked for Developmental Services from
10  1985 until I believe it was 1991.
11     Q.  And what was the title of the position
12  you held there?
13     A.  Pharmacist I.
14     Q.  And what were your responsibilities
15  there?
16     A.  I was part of an interdisciplinary team,
17  and the facility was a long-term care facility
18  that housed clients with developmental
19  disabilities and many of whom also had mental
20  illness, so dually diagnosed.  I had a patient
21  load, I had a skilled nursing unit, and then
22  another unit that was more behavior, and I would

12 (Pages 42 to 45)

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                    May 20, 2009
                      Sacramento, CA

Page 46

1  review their charts --
2      Q.  I'm sorry.  You would review the
3  clients' charts?
4      A.  Correct.
5      Q.  Okay.
6      A.  And I would identify problems that might
7  be drug related and, when necessary, send notes to
8  whoever their physician was with recommendations
9  for change or if they needed lab work.
10        Also worked with the staff who were
11  administering the medications.  We would have to
12  monitor them for appropriate administration of
13  medications and documentation.
14     Q.  Okay.
15     A.  And then the dispensing function.
16        I was a member of the Therapeutic Review
17  Committee.
18        I would prepare drug histories and just
19  participate in annual and semiannual meetings for
20  the beneficiaries assigned to me or clients
21  assigned to me as the team made up their plan.
22     Q.  Okay.  You said you were involved in

Page 47

1  dispensing drugs at the Department of
2  Developmental Services.  Is it the Department of
3  Developmental Services?
4      A.  Correct.
5      Q.  Okay.  Did you know at the time how the
6  Department acquired the drugs that you dispensed?
7      A.  Yes, because we would have to order
8  them.
9      Q.  Okay.
10     A.  The pharmacy.
11     Q.  Okay.  Were you involved in ordering
12  drugs?
13     A.  From time to time.
14     Q.  How would that process work?
15     A.  I would make a list of what we were
16  running out of in the pharmacy, and if we had to
17  short-order, we would short-order from the
18  wholesaler.
19        If it were something that our central
20  packer -- we had I think it was Fairview
21  Developmental Center that had like a central
22  prepacking operation where they would take bulk

Page 48

1  product and then unit-dose it for use within the
2  Developmental Services system for all the
3  developmental centers.
4         And I think there may have been drugs
5  that we would secure from time to time that were
6  on the Department of General Services contract.
7      Q.  You had mentioned -- first you had
8  mentioned that sometimes you would order drugs
9  directly from a wholesaler?
10     A.  Correct.
11     Q.  Do you remember which wholesaler?
12     A.  I think the wholesaler that we used was
13  Valley Wholesale.
14     Q.  Valley Wholesale?
15     A.  In Stockton.
16     Q.  You had also said that most of the drugs
17  -- I think I had this -- correct me if I'm wrong -
18  - most of the drugs were -- you acquired from --
19  was it Central Fairfield?
20     A.  It was Fairview Developmental Center.
21     Q.  Okay.  Fairview Developmental Center?
22     A.  I think it was Fairview.  It may have

Page 49

1  been Lanterman.  It's wherever Rick Shasha worked.
2  That's what I recall.  He was the pharmacist that
3  was kind of managing -- he may have worked for
4  Lanterman.  It's one of the two.
5      Q.  Okay.  And you said that they did --
6  they would package unit dose?
7      A.  Some.
8      Q.  Okay.  Is that primarily what you had
9  ordered from them, things that had been repackaged
10  into a unit-dose form?
11     A.  I believe so.
12     Q.  Okay.
13     A.  And then we did our own prepacking too
14  as well.  So I don't -- I think the technicians --
15  we had pharmacy technicians that worked in the
16  pharmacy, and what we as a pharmacist would do
17  would be to write down -- you always have a book
18  of what you need, and then decisions.  We might
19  decide do we have time to wait for it to come from
20  Lanterman or do we get it off the DGS contract or
21  is it something that we need tomorrow, in which
22  case we might order it from the wholesaler.  But

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                      May 20, 2009
                        Sacramento, CA

Page 50

1  usually the drugs that we ordered from the
2  wholesaler were the minority.
3      Q.   Okay.  Fairview Development Center -- or
4  Lanterman's -- one of those two.  I guess you
5  don't remember which one it was exactly.
6      A.   I just remember it's Rick Shasha.
7      Q.   Rick Shasha?  Okay.
8          Where Rick worked, was that a private
9  business or was that something that was run by
10 California?
11     A.   It was part of the Department of
12 Developmental Services.
13     Q.   Okay.
14     A.   It was a facility not -- well, it was a
15 facility much like the Stockton Developmental
16 Center, except the Stockton Developmental
17 Center had more dually diagnosed individuals than
18 say like Fairview or Lanterman would have had.
19     Q.   Okay.  Do you know how Fairview or
20 Lanterman, how they acquired the drugs that they
21 would pass on to you?
22     A.   No.

Page 51

1      Q.   Okay.  When you would order drugs from a
2  wholesaler, did you ever look at the prices for
3  the drugs that you were ordering?
4      A.   No.
5      Q.   No.
6          Do you know who was responsible for
7  that?
8      A.   No.
9      Q.   Okay.  You also mentioned that you would
10 order drugs off a Department of General Services
11 contract?
12     A.   Yes.
13     Q.   How would that process work?
14     A.   I don't know.
15     Q.   Well, how would you order drugs?
16     A.   I would put it on the list of here's
17 what we need, and the technician or somebody else
18 would actually go through the process of placing
19 that order.
20     Q.   Okay.
21     A.   I might look to see what is on the DGS
22 contract, do we get this from DGS, who is our

Page 52

1  source --
2      Q.   Okay.
3      A.   And then write the drug down on the
4  appropriate log for someone else to place the
5  order.
6      Q.   So whether a drug came from the DGS
7  contract or from Fairview or Lanterman, that was
8  based on the type of drug, essentially; right?
9  Certain drugs you got from the DGS contract and
10 certain drugs -- other drugs you got from
11 Lanterman; is that correct?
12     A.   I'm not sure what the basis of how the
13 decision -- you know, if it was -- I don't recall.
14 I would only be guessing.
15     Q.   Okay.
16     A.   And I don't want to guess.
17     Q.   Okay.  And I don't want you to guess.
18         You had mentioned that you started
19 working for the Department of Developmental
20 Services in 1985.
21     A.   Um-hmm.
22     Q.   Is that correct?

Page 53

1      A.   Yes, thereabouts.
2      Q.   What did you do before then?
3      A.   I worked for Doctors Medical Center in
4  Modesto.
5          MR. GLASER:  Brandon, when you get an
6  opportunity, when you finish up this line of
7  questioning, think we might take a break?  As soon
8  as you're ready.  I don't want to interrupt your
9  questioning, but it's been about an hour or so.
10         MR. CYR:  Okay.
11     Q.   What were your -- was it Doctors Medical
12 Center in Modesto?
13     A.   Correct.
14     Q.   What were your responsibilities there?
15     A.   It was an acute care center, so it would
16 have been again reviewing physicians' orders as
17 they came down, entering the information -- the
18 patient-specific information or the order into our
19 system, and then at a designated time work on
20 filling the unit dose cassettes for administration
21 -- or delivery and administration by the nursing
22 staff.

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                          May 20, 2009
                          Sacramento, CA

Page 54

1    Q.  Okay.
2    A.  For each patient.  So we would have to
3  review the orders.  If the card exchange hadn't
4  occurred, we would have to add medications to the
5  individual's cassette or remove medications,
6  however the order had changed.
7       And then also part of the job was to
8  prepare IVs.
9    Q.  Okay.  Would it be accurate to describe
10  it as kind of like an in-house pharmacy?
11    A.  Yes.
12    Q.  Okay.  And did you have a job from the
13  time that you graduated from the School of
14  Pharmacy?
15    A.  I had one other job prior and it was
16  working -- but it was only for a few months -- it
17  was working for an HMO-type pharmacy.  So in that
18  respect, it was closed to the general public, only
19  open to members of that health maintenance
20  organization.  And I don't recall the name of the
21  organization.  It was during the time when HMOs
22  were relatively new, the concept was new.

Page 55

1    Q.  Okay.  And at either of those jobs, the
2  Doctors Medical Center or the HMO where you worked
3  before then, were you involved in ordering drugs
4  from a wholesaler or manufacturer?
5    A.  Again the same process as at the
6  Developmental Center.  When we appeared short --
7  and I'm speaking of the acute care hospital now.
8    Q.  Okay.
9    A.  When inventory was low on a particular
10  product, we had a designated area that we would
11  write items in and then the technician would take
12  care of ordering it --
13    Q.  Okay.
14    A.  -- the next day.
15       In the HMO setting, it was pretty much
16  the same thing.
17    Q.  Okay.  And you weren't -- you didn't
18  look at prices or price lists or --
19    A.  No.
20    Q.  Okay.  And you weren't involved in
21  paying for those drugs when you ordered them?
22    A.  No.

Page 56

1    Q.  Okay.  At the Doctors Medical Center,
2  did you ever submit claims for reimbursement from
3  a third-party payer?
4    A.  No.
5    Q.  Okay.  And at the HMO pharmacy?
6    A.  The HMO is the third party, so we just
7  collected the copay.
8    Q.  Okay.  And you said you left the
9  Department of Developmental Services around 1991;
10  is that correct?
11    A.  Correct.
12    Q.  And where did you go from there?
13    A.  I went from there to the Department of
14  Health Services, to their field office.
15       MR. CYR:  I think this might be a good
16  place to take a break.
17       THE VIDEOGRAPHER:  We are now going off
18  the video record approximately 10:15.
19       We're back on the video record at
20  approximately 10:29.
21       MR. CYR:  Q.  Ms. Ahrens, before the
22  break we were talking about you had started, I

Page 57

1  think, working at the Department of Health
2  Services in 1991; is that correct?
3    A.  I believe so.
4    Q.  And you mentioned you were in a field
5  office?
6    A.  Correct.
7    Q.  What was the field office?
8    A.  The Stockton Drug Unit.
9    Q.  Stockton Drug Unit.
10       And what was your title?
11    A.  Pharmaceutical Consultant I.
12    Q.  And what were your responsibilities?
13    A.  Adjudication of treatment authorization
14  requests for drugs.
15    Q.  And what did adjudication of treatment
16  authorization requests entail?
17    A.  Looking at the drug that was being
18  requested and the diagnosis or its intended use,
19  the medical justification for that drug.
20    Q.  And, I'm sorry, this is in the context
21  of the Medi-Cal program?
22    A.  Correct.

                              15 (Pages 54 to 57)

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                    May 20, 2009
                        Sacramento, CA

Page 58

1    Q.   And just so the record is clear, the
2    Medi-Cal program is California's Medicaid program?
3    A.   Correct.
4    Q.   And when would it be necessary to go
5    through the -- to adjudicate a treatment
6    authorization?
7    A.   Whenever a pharmacy provider sent in a
8    request for payment of a drug on behalf of a
9    beneficiary.
10   Q.   Okay.  So is it like processing a claim?
11   A.   No.
12   Q.   No?
13        Does this process happen whenever a
14   pharmacist submits a claim for reimbursement?
15   A.   No.
16   Q.   No?
17        What triggers the adjudication process?
18   A.   Whenever the provider submits a TAR, or
19   a Treatment Authorization Request.
20   Q.   When is it necessary for a Medi-Cal
21   provider to submit a TAR?
22   A.   It is necessary whenever -- as far as

Page 59

1    drugs go, whenever the drug is available only
2    through prior authorization.
3    Q.   Okay.  And so if prior authorization
4    wasn't required for a drug, this process wouldn't
5    happen?
6    A.   Correct.
7    Q.   Okay.  Why is it necessary for -- strike
8    that.
9        How is it determined whether the prior
10   authorization is necessary for a drug?
11   A.   Medi-Cal has a list of drugs that are
12   available without prior approval.  So anything not
13   on that list would be subject to prior approval.
14   Q.   Okay.  And how does a drug get on that
15   list for which a prior authorization is not
16   necessary?
17   A.   Now?
18   Q.   Actually, at the time you were working
19   at the Stockton Drug Unit.
20   A.   At the time that I was working at the
21   Drug Unit, I had no knowledge of how the drugs got
22   on the list.

Page 60

1    Q.   Okay.  But you have some knowledge of
2    that today; right?
3    A.   Correct.
4    Q.   Okay.  We'll get to that in a little
5    bit.
6        What would the adjudication process --
7    well, actually, strike that.
8        It seems like there are two terms you
9    kind of use interchangeably, a "Treatment
10   Authorization Request" and "prior authorization."
11   Is that accurate or...
12   A.   The Treatment Authorization -- when I
13   say Treatment Authorization Request, it's in
14   reference to the form --
15   Q.   Okay.
16   A.   -- that providers would submit to Medi-
17   Cal.
18   Q.   Okay.  And the process is called prior
19   authorization?
20   A.   I don't know if I would say process is
21   called prior authorization.
22   Q.   Okay.

Page 61

1    A.   I don't -- it's not the process.
2    Q.   Could you talk a little bit about the --
3    or strike that.
4        Could you describe the adjudication
5    process once a Treatment Authorization Request is
6    submitted.
7    A.   I can describe the process once it hits
8    a pharmacist's desk or once it would hit my desk,
9    but not what happened before or after it left my
10   desk.
11   Q.   Okay.  Let's start once it hits -- when
12   you say the pharmacist's desk, you mean a
13   pharmacist at the Department?
14   A.   A pharmacist at the Drug Unit.
15   Q.   Okay.  Describe for me what happens once
16   it hits the pharmacist's desk at the Drug Unit.
17   A.   Then, when I worked at the Drug Unit?
18   Q.   Um-hmm.
19   A.   The TAR would key in a number that was
20   assigned to the TAR --
21   Q.   Okay.
22   A.   I think it was a document control

16  (Pages 58 to 61)

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                    May 20, 2009
                        Sacramento, CA

Page 62

1   number.  And then that would pull up the patient's
2   history, their TAR history, and other information
3   about the beneficiary or patient --
4        Q.   Okay.
5        A.   -- that I or that a consultant would use
6   to assist in determining the outcome of the TAR,
7   of the adjudication.
8             And so the information in the history
9   would be reviewed as well as information that the
10  provider would submit on the TAR.
11       Q.   What type of information would the
12  provider submit with the TAR?
13       A.   It has to be medical justification that
14  substantiates the need for that particular item or
15  drug that's being requested.
16       Q.   By "medical justification," do you mean
17  some sort of evidence that the drug was medically
18  necessary for the beneficiary?
19       A.   Yes.
20       Q.   Okay.  Would it be sometimes like a
21  statement from a doctor or something like that?
22       A.   On occasion a doctor would submit the

Page 63

1   TAR, but typically the TARs came from the pharmacy
2   provider --
3        Q.   Okay.
4        A.   -- and so...
5        Q.   So the pharmacy provider would be
6   submitting the justification -- I guess providing
7   the reasons why the drug was medically necessary?
8        A.   Um-hmm.
9        Q.   Okay.  Any other information you looked
10  at when you were considering a TAR?
11       A.   We would look at other drugs that were
12  available on the Medi-Cal list that might be used
13  to treat the same condition.
14       Q.   Okay.
15       A.   And look in the history to see if there
16  was evidence of that drug having been tried or
17  ruled out, as well as whether or not the provider
18  submitted information that stated such.
19       Q.   Okay.  Any other information that you
20  would consider?
21       A.   We would always have to look at the
22  indication for -- you know, what the published

Page 64

1   indication was for the drug for both labeled and
2   unlabeled drug use.
3        Q.   Okay.  How would you decide whether or
4   not to grant a TAR?
5        A.   Well, the decision would be based on
6   whether or not enough medical justification was
7   submitted with the TAR to substantiate the need.
8        Q.   Okay.  Just to clarify that point,
9   medical justification, I'm assuming that includes
10  a statement from the pharmacist that the drug was
11  medically necessary and, based on some of the
12  other things you've told us, maybe looking at the
13  patient's history to see whether other drugs that
14  -- other drugs where no prior authorization was
15  required had been tried and didn't work out or
16  weren't available for that treatment.  Is that
17  correct?
18       A.   Partially correct.
19       Q.   Okay.
20       A.   A statement that a drug is medically
21  necessary from a provider is not medical
22  justification, that's an opinion.

Page 65

1        Q.   Okay.
2        A.   So the medical justification had to be
3   objectively presented --
4        Q.   Okay.
5        A.   -- and decisions are made on a case-by-
6   case basis.
7             So to the extent that we were able to
8   acquire the information from history or from --
9   and/or from information provided on the TAR or
10  with the TAR, then we could make a decision from
11  there to approve --
12       Q.   Okay.
13       A.   -- or deny.
14       Q.   Okay.  Did you ever look at the price of
15  the drug when reviewing TAR applications?  Or
16  strike that.
17             Was that ever -- was the price of a drug
18  a factor that you ever considered --
19       A.   No.
20       Q.   -- when looking at TAR applications?
21             Did you look at the price of a drug when
22  considering TAR applications?

                                 17 (Pages 62 to 65)

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                    May 20, 2009
                        Sacramento, CA

Page 66

1      A.  No.
2      Q.  Did you have any other responsibilities
3  at the Stockton Drug Unit?
4      A.  Sometimes I would review appeals, either
5  provider appeals or beneficiary appeals.
6      Q.  And what would a provider or beneficiary
7  be appealing?
8      A.  Usually it was whenever we denied a
9  request.
10      Q.  Okay.  Anything else?
11      A.  No.
12      Q.  Okay.  And how long did you hold that
13  position?
14      A.  Oh, roughly three and a half years.
15      Q.  Okay.  And during that time who was your
16  -- between 1991 -- or I guess -- so that would be
17  until about -- would that be the middle of 1994?
18      A.  Approximately.
19      Q.  Okay.  And during that time period when
20  you were at the Stockton Drug Unit who was your
21  supervisor?
22      A.  Carlo Michelotti and Joyce Rutan.

Page 67

1      Q.  Could you spell the -- Joyce's last
2  name?
3      A.  R-u-t-a-n.
4      Q.  R-u-t-a-n, Rutan?
5      A.  Um-hmm.
6      Q.  Okay.
7      A.  Yes.
8      Q.  Was it Mr. Michelotti and then Ms.
9  Rutan?
10      I'm sorry.  Let me ask a better
11  question.
12      Was Mr. Michelotti your supervisor first
13  and then later in time Joyce Rutan was your
14  supervisor?
15      A.  Correct.
16      Q.  Do you know approximately the time
17  periods?
18      A.  No.
19      Q.  And then you left that position you said
20  around the middle of 1994; is that correct?
21      A.  Correct.
22      Q.  Okay.  And where did you go to next?

Page 68

1      A.  I was promoted to Pharmaceutical
2  Consultant II here in Sacramento.
3      Q.  And what were your responsibilities in
4  that position?
5      A.  From the beginning or now or --
6      Q.  Let's start from the beginning, if you
7  can recall.
8      A.  In the beginning it was to review
9  manufacturer petitions for addition of their drug
10  on the Medi-Cal List of Contract Drugs.
11      I also wrote OILs in response to
12  additions of manufacturers to the authorized
13  manufacturer list.  And that was primarily --
14  those were the main functions --
15      Q.  Okay.
16      A.  -- early on.
17      Q.  And for about how long were those your
18  main functions, if you remember?
19      A.  I wrote OILs for about 10 years and I
20  reviewed petitions for probably around 10 years.
21      Q.  Okay.  So you held those kind of
22  responsibilities -- those two responsibilities

Page 69

1  until about 2004?
2      A.  Approximately.  Maybe 2003.  That's
3  approximate.
4      Q.  Okay.  But it was about 10 years; right?
5      A.  Roughly.
6      Q.  Okay.  During that time period who were
7  your supervisors?
8      A.  Immediate supervisor?
9      Q.  Yes.  Let's start with the immediate
10  supervisor.
11      A.  Len Terra.  I think it's Leonard,
12  actually.  L-e-n.  Last name T-e-r-r-a.  And Kevin
13  Gorospe.
14      Q.  Len Terra, was he a doctor or is he a
15  doctor?
16      A.  Do you mean a medical doctor?
17      Q.  Well, would you refer to him as Dr.
18  Terra or Mr. Terra?
19      A.  I refer to him as Len.
20      Q.  Okay.  And you refer to Kevin Gorospe as
21  Kevin?
22      A.  Correct.

Henderson Legal Services, Inc.
202-220-4158                        www.hendersonlegalservices.com

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                      May 20, 2009
                        Sacramento, CA

Page 70

1     Q.  Okay.  Then I assume -- am I correct
2  that Len Terra was your supervisor first and then
3  Kevin Gorospe?
4     A.  Correct.
5     Q.  Okay.  Did you have any people that
6  reported to you during that time period?
7     A.  No.
8     Q.  I want to ask some questions about some
9  of your responsibilities then.  You had mentioned
10  a phrase, "OILs."
11     A.  Excuse me.
12        Yes.
13     Q.  What is an OIL or OILs?
14     A.  It's an Operating Instruction Letter.
15     Q.  Okay.  What was the purpose of an OIL?
16  What is the purpose of an OIL?
17     A.  It's to provide instruction to the
18  fiscal intermediary so that changes can be made to
19  the system regarding the status of a manufacturer
20  or a drug on the list, the Medi-Cal List of
21  Contract Drugs.
22        And then also for the fiscal

Page 71

1  intermediaries to publish a provider notice of the
2  changes whenever those changes would impact the
3  provider.
4     Q.  Okay.  And then you said I think the
5  fiscal intermediary at this time was EDS.  Right?
6     A.  Correct.
7     Q.  Okay.  You mentioned the Medi-Cal List
8  of Contract Drugs.
9     A.  Correct.
10     Q.  What is that?
11     A.  It's the list of drugs that prescribers
12  can use -- or a list of drugs that prescribers can
13  prescribe to beneficiaries without prior
14  authorization, for the most part.  So any drug not
15  on the list would be subject to prior approval.
16     Q.  Okay.  And you would need to fill out a
17  TAR?
18     A.  Correct.
19     Q.  Okay.  You used a phrase there -- I
20  think you used a phrase.  I might be wrong.  You
21  said prescribers can prescribe drugs on the Medi-
22  Cal list?

Page 72

1     A.  Correct.  Well, it's the list that's
2  available that tells them what they can prescribe
3  without having to submit a TAR or provide
4  information for a TAR.
5     Q.  Okay.  And by "prescribers" you mean
6  doctors; right?
7     A.  Whoever has the authority to prescribe
8  under California law.
9     Q.  Okay.  Okay.  I think this kind of
10  dovetails into the first responsibility you
11  described.  But how would a drug make its way onto
12  the Medi-Cal List of Contract Drugs?
13     A.  Some drugs were grandfathered in when
14  the list was created.
15        Some drugs are automatically added to
16  the list pursuant to statute.
17        And drugs that are not -- that were not
18  either grandfathered in or added pursuant to
19  statute were petitioned for addition by the
20  manufacturer.
21        And on occasion we would initiate our
22  own petition.

Page 73

1     Q.  Just to kind of unpack some of the
2  things you said there, when was the list created?
3     A.  I believe the term "Medi-Cal List of
4  Contract Drugs" was born out of statute that was
5  passed in -- I'm thinking it was around '91, but
6  I'm not sure about that.  But prior to that it
7  would have been called the Formulary.
8     Q.  You mentioned that there were some drugs
9  that were grandfathered onto the list when the
10  list was created.  What do you mean by that?
11     A.  When the name of the list of drugs that
12  prescribers could prescribe from without prior
13  approval changed from the Formulary to the List of
14  Contract Drugs, the process of how that list was
15  created, whether it was called the Formulary or
16  versus the Medi-Cal List of Contract Drugs,
17  changed.
18     Q.  Okay.
19     A.  So -- what was the first part of that
20  question again?
21        MR. CYR:  Actually, could I have the
22  court reporter read the question back, please.

                              19 (Pages 70 to 73)

Ahrens, Katherine                                      May 20, 2009
                        Sacramento, CA

Page 74

1          (The reporter read the record as
2    follows:
3          "You mentioned that there were some
4    drugs
5          that were grandfathered onto the list
6    when
7          the list was created.  What do you mean
8    by
9          that?")
10         THE WITNESS:  Okay.  So the new law
11   changed the process from being a regulatory
12   process to a contracting process and gave
13   instructions specifically as to how the list --
14   the new process, the drugs that would be included
15   on the Medi-Cal List of Contract Drugs would
16   either be retained on or as it transitioned from
17   the Formulary status to the Contract Drug List
18   status.  So some of those drugs that were on the
19   Formulary that gained access through the
20   regulatory process were placed onto the list until
21   decisions could be made about the status.  And
22   it's in statute.  It's in existing statute.  So

Page 75

1    that whole process is outlined there.
2          MR. CYR:  Q.  Okay.  Do you have an
3    understanding of that process?
4          A.  I have an understanding of how -- yes, I
5    do.
6          Q.  Okay.  What is that understanding?
7          A.  For the transition time?
8          Q.  Um-hmm.
9          A.  Manufacturers of single-source drugs had
10   a certain amount of time to enter into agreement
11   with the State, with the Department for
12   supplemental rebates.  And then also, too, for any
13   new drug that was -- that came to market, the
14   manufacturers were to petition the State for
15   addition -- for evaluation of their drug for
16   addition to the list.
17         Q.  Okay.
18         A.  So if a determination was made that we
19   shouldn't have a certain drug on the list that was
20   on the list, then we would have to go through a
21   process to delete the drug or -- to delete the
22   drug from the list.

Page 76

1          Q.  Okay.  You mentioned -- well, first you
2    mentioned a phrase in there, "single-source drug."
3    Could you explain what you mean by that.
4          A.  That means it's only made by one
5    manufacturer.
6          Q.  Okay.  Is that the same thing as a
7    brand-name drug?
8          A.  For the most part.
9          Q.  Okay.
10         A.  But not always.
11         Q.  Okay.  What would be the circumstances
12   when a single-source drug wouldn't be the same as
13   a brand-name drug?
14         A.  It no longer is single source once it
15   loses its patent and other manufacturers can
16   manufacture the drug, but it would still retain
17   its brand name, even though the drug would be --
18   or the chemical entity would be available through
19   multiple manufacturers, through multiple sources.
20         Q.  Okay.  You had mentioned that there were
21   some drugs that were added to the list through
22   statute?

Page 77

1          A.  Correct.
2          Q.  Is that correct?
3              Was that a certain category of drugs?
4          A.  Correct.
5          Q.  What was the criteria in the statute?
6          A.  There is a portion of the statute that
7    says that drugs are -- drugs that are approved by
8    the FDA for the treatment of cancer will be added
9    to the list.
10             And there's another piece of statute
11   that says that drugs that are approved by the FDA
12   for AIDS or AIDS-related -- or for the treatment
13   of AIDS or AIDS-related conditions will be added
14   to the list.
15         Q.  Okay.  Any other categories of drugs?
16         A.  No.
17         Q.  Okay.  And I think you said that drugs
18   that either weren't grandfathered onto the list or
19   weren't in those categories that were statutorily
20   required to be added to the list, drug
21   manufacturers would petition to have their drugs
22   added to the list?

                                    20 (Pages 74 to 77)

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                    May 20, 2009

Sacramento, CA

Page 78

1     A.  Correct.
2     Q.  And how did that process work?
3     A.  The manufacturer would have to send a
4  letter requesting evaluation of their drug for
5  addition to the list, and that would be the
6  petition.
7     Q.  Okay.  And what were the criteria that
8  you used to determine whether to add a
9  manufacturer's drug to the list?
10    A.  The criteria are in statute.
11    Q.  Okay.
12    A.  And they are the misuse potential,
13 safety, efficacy, essential need, and cost.
14    Q.  Just going through some of those
15 criteria, by "misuse potential," what do you mean
16 by that?
17    A.  Each criterion is further defined in
18 regs, Title 22, so misuse potential or any of the
19 criteria were evaluated according to how each
20 criterion is defined in regulation.
21    Q.  Okay.  But what's your understanding of
22 the phrase "misuse potential"?

Page 79

1     A.  Misuse potential would be potential for
2  diversion or use of a more costly product in lieu
3  of a less costly product that would have the same
4  therapeutic efficacy --
5     Q.  Okay.
6     A.  -- or that could be used for the same
7  condition.
8     Q.  Okay.
9     A.  Or use of the drug when not
10 therapeutically appropriate.
11    Q.  Okay.  By "safety," I assume you mean
12 whether or not the drug posed a health risk to the
13 patient or...
14    A.  Again it's according to how it's defined
15 in Title 22 --
16    Q.  Okay.
17    A.  -- because it's as compared to other
18 drugs that could be used for treatment of the same
19 condition.
20    Q.  Okay.  If we could turn to the last
21 factor you mentioned, the cost, what information
22 would you look at -- strike that.

Page 80

1         You had mentioned before that it was
2  your job to review these petitions that
3  manufacturers had submitted; is that correct?
4     A.  Correct.
5     Q.  And you would apply these five criteria?
6     A.  Correct.
7     Q.  Okay.  What information did you look at
8  when you were considering the cost criteria?
9     A.  I would look at information provided by
10 the drug manufacturer and I would look at the --
11 because the criterion requires that we compare it
12 to the cost of other drugs that are used for
13 treatment of the same condition or that are in the
14 same therapeutic category, I would look at -- I
15 would look at the cost of those drugs as well.
16        I might look at whether or not the drug
17 would replace existing therapy or be in addition
18 to existing treatments, and also consider offsets
19 that might be gained through the use of the drug.
20    Q.  What do you mean by "offsets"?
21    A.  If the drug could be used on an
22 outpatient basis, for example, to avert an

Page 81

1  inpatient stay.
2         If the drug could be used in lieu of a
3  more costly therapy, like an IV therapy versus
4  oral therapy.
5         If the drug could avert or decrease
6  hospital stay or emergency room -- decrease
7  emergency room visits.
8     Q.  Okay.
9     A.  Office visits.
10        THE VIDEOGRAPHER:  Counsel, we have
11 about six minutes or so.
12        MR. CYR:  Okay.
13    Q.  In other words, whether the drug would
14 replace a more costly treatment alternative; is
15 that correct?
16    A.  Partially.
17    Q.  Okay.  How is it inaccurate?
18    A.  It's inaccurate in that it isn't just a
19 comparison of whether or not it would replace a
20 more costly therapeutic alternative, but also a
21 less costly.  It wasn't only comparing it to more
22 costly, but also to less costly.

21 (Pages 78 to 81)

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                    May 20, 2009
                    Sacramento, CA

Page 82

1    Q.  Okay.  I understand.
2        You had mentioned that there was certain
3    information that you would consider when
4    considering the cost criteria as provided by the
5    drug manufacturer?
6    A.  Correct.
7    Q.  What information would the drug
8    manufacturer provide?
9    A.  Oftentimes we would get petitions for
10   drugs that were newly marketed, newly released
11   into the marketplace, so we would have to get AWP,
12   Average Wholesale Price, from the manufacturer, we
13   would have to get the AMP from the manufacturer,
14   at times we would have to get their HCFA Rebate,
15   and then also whatever their business proposal was
16   for supplemental rebate.
17       MR. CYR:  I think we need to change the
18   tape now, so this would be a good place to take a
19   break.
20       THE VIDEOGRAPHER:  This concludes tape 1
21   of today's deposition.
22       We are now going off record at

Page 83

1    approximately 11:15.
2        This is the beginning of tape 2 in
3    today's video deposition of Katherine Ahrens.
4        We're back on the video record
5    approximately 11:25.
6        MR. CYR:  Q.  Ms. Ahrens, before the
7    break we were talking about some of the
8    information that a manufacturer -- some of the
9    cost information that a manufacturer would provide
10   to you with a petition and one of the terms you
11   used was AWP?
12   A.  Correct.
13   Q.  What's your understanding of that term?
14       MR. GLASER:  Object as to form.
15       MR. CYR:  Q.  You can go ahead and
16   answer the question.
17   A.  It means Average Wholesale Price.
18   Q.  Okay.  And why would a manufacturer
19   provide that information to you on the -- on its
20   petition?
21   A.  The Average Wholesale Price -- I need to
22   back up a little bit, too.

Page 84

1    Q.  Sure.
2    A.  When I first started, we also used
3    Direct Price.  So they would -- some manufacturers
4    were Direct Price, some were Average Wholesale
5    Price.  But in either case the information came
6    from the manufacturer.  That type of pricing
7    information would come from the manufacturer.
8        And the reason that we needed it was
9    since one of the drug evaluation criteria is cost,
10   we would need the information to determine what
11   the drug ingredient cost would be for -- to the
12   Department.
13   Q.  Okay.  You used the phrase "drug
14   ingredient cost."  Is that a term that's used in
15   the reimbursement process?  You know what, strike
16   that.
17       When you talk about the cost to the
18   Department, is the cost to the Department what the
19   Department pays the pharmacist who dispenses the
20   drug to a Medicaid beneficiary?
21   A.  That's one aspect of cost.
22   Q.  Okay.  And how is the AWP or the Direct

Page 85

1    Price relevant -- strike that.
2        Is AWP relevant to that aspect of the
3    cost?
4    A.  Yes.
5    Q.  Okay.  How is it relevant?
6    A.  AWP is specified as one of the factors
7    used in the calculation of how much a pharmacist
8    would be reimbursed for dispensing a drug.
9    Q.  Okay.  Would AWP be used -- would AWP be
10   used as a basis to calculate the payment to the
11   pharmacist?
12   A.  It's one of -- it depends upon the drug.
13   Q.  Okay.
14   A.  It's one of the calculations.
15   Q.  Okay.  And what were the other -- let's
16   consider a generic drug.  What would be the other
17   possible payment calculations for a generic drug?
18   A.  If the generic drug had a federal upper
19   limit, that would be part of the calculation.
20       Or if we had an MAIC -- if Medi-Cal had
21   applied its own MAIC, that would be included in
22   the determination.  So it's the lowest of AWP

22 (Pages 82 to 85)

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                    May 20, 2009
Sacramento, CA

Page 86

1  minus whatever or the FAC or the MAIC or the
2  provider's usual and customary --
3      Q.  Okay.
4      A.  -- cost of dispensing fee.
5      Q.  So it would be the lowest of those four
6  possible prices?
7      A.  Um-hmm.
8      Q.  And that would be the amount -- now,
9  would it be that -- during the time period between
10  1994 and 2004, would it be -- was it just a flat
11  AWP as one of the payment bases or was AWP perhaps
12  discounted?
13         MR. GLASER:  Object as to form.
14         THE WITNESS:  Discounted by whom?
15         MR. CYR:  Q.  Let me ask a better
16  question.
17         If AWP was the payment basis for a drug,
18  would the AWP -- would the pharmacist be paid the
19  AWP or would the pharmacist be paid AWP less a
20  certain percentage?
21         MR. GLASER:  Object as to form.
22         THE WITNESS:  AWP wasn't the basis for

Page 87

1  the reimbursement.
2         It's the basis for a calculation --
3         MR. CYR:  Q.  Okay.
4      A.  -- that would lead to the reimbursement.
5      Q.  Okay.
6      A.  But it wasn't the reimbursement.
7      Q.  Okay.  And what was the calculation for
8  the reimbursement?
9      A.  Again, the lowest of the AWP minus --
10  depending upon the time period -- either five
11  percent, 10 percent or 17 percent.
12      Q.  Okay.
13      A.  Or the FAC or the MAIC plus a dispensing
14  fee.
15      Q.  Okay.  Okay.  You had mentioned that the
16  reimbursement payment to the pharmacist was one of
17  the factors you looked at when considering the
18  cost -- or one of the factors -- one of the
19  elements that made up the cost to the program.
20         What are the other elements that make up
21  the -- that make up the cost?  I'm sorry.  Go
22  ahead.

Page 88

1      A.  Again, how cost was evaluated was
2  defined in regs, and so all those elements in that
3  definition were included in the evaluation.  So
4  offsets, the cost of the drug itself, any
5  supplemental rebates that the manufacturer might
6  propose --
7      Q.  Okay.
8      A.  -- and the rebate that was due pursuant
9  to the federal rebate agreement.
10      Q.  Okay.  You had mentioned another piece
11  of data that the manufacturer would provide to you
12  with a petition, AMP.
13      A.  The manufacturer would not provide the
14  AMP all the time.  During the course of the
15  negotiations or evaluation of the drug, the AMP
16  may have been provided, depending upon the
17  proposal submitted by the manufacturer.
18      Q.  Okay.  You mentioned a phrase in there,
19  "supplemental rebate."  What do you mean by that?
20      A.  Supplemental rebate is an amount that
21  the manufacturer agrees to provide the State
22  pursuant to agreement that is beyond what the

Page 89

1  manufacturer otherwise provides through the
2  federal rebate agreement.
3      Q.  Okay.  And when a manufacturer would
4  petition the -- petition the Department for
5  inclusion on the Medi-Cal Drug List, would the
6  manufacturer submit a supplemental rebate
7  proposal?
8      A.  Not with a petition.
9      Q.  Not with a petition?
10      A.  Not typically.
11      Q.  Would the manufacturer subsequently
12  submit a supplemental rebate proposal?
13      A.  Sometimes.
14      Q.  Okay.
15      A.  Sometimes it was zero.
16      Q.  But that was usually something -- was
17  that usually something that was initiated by the
18  manufacturer in the negotiation process?
19      A.  That's the purpose of the petition is to
20  petition for inclusion of their drug on the Medi-
21  Cal List of Contract Drugs.  It's a contract.
22  Part of the evaluation -- the evaluation process

23 (Pages 86 to 89)

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                    May 20, 2009
                    Sacramento, CA

Page 90

1  includes cost, and more often than not
2  manufacturers would also include in their business
3  proposal a proposal for supplemental rebate.
4      Q.  Okay.  You had mentioned also a HCFA
5  Rebate.  What do you mean by that?
6      A.  That would be the rebate amount that the
7  manufacturer would pay pursuant to their federal
8  rebate agreement.
9      Q.  Okay.  Can a manufacturer's drug be
10 reimbursed under the Medicaid program without a
11 HCFA agreement?
12     A.  Yes.
13     Q.  What are the circumstances in which that
14 can happen?
15     A.  Upon approval of a TAR.
16     Q.  But it would be necessary to submit a
17 TAR if a manufacturer did not have a HCFA Rebate?
18     A.  Correct.
19     Q.  How does the HCFA Rebate work?  Strike
20 that.  Let me ask a better question.
21         How is the amount of the rebate that's
22 covered under the HCFA Rebate agreement, how is

Page 91

1  that calculated?
2      A.  For single-source drugs, it's based on
3  best price or at least 15 percent of the
4  manufacturer's AMP plus any CPI penalties that may
5  be applied to the drug.
6      Q.  Okay.
7      A.  For multi-source drugs, it's 11 percent
8  of AMP.
9      Q.  Are those two figures sometimes referred
10 to as the URA, or Unit Rebate Amount?
11     A.  Which, the --
12     Q.  Well, I guess let's simplify it.
13         For multi-source drugs, 11 percent of
14 AMP, is that sometimes referred to as the Unit
15 Rebate Amount?
16     A.  Yes.
17     Q.  Okay.  And for a multi-source drug, is
18 the rebate that a manufacturer will pay to, say,
19 the Medi-Cal program, is that calculated by
20 multiplying the URA times the number of units that
21 Medi-Cal reimbursed for for a given quarter?
22         MR. GLASER:  Object as to form.

Page 92

1         MR. CYR:  Q.  You can answer the
2  question if you can.
3      A.  Yes.
4      Q.  Okay.  So the amount of the rebate that
5  Medi-Cal receives pursuant to the HCFA agreement
6  is one of the factors that's considered when
7  you're looking at the cost criteria on a
8  manufacturer's petition; is that correct?
9      A.  The number is considered.
10         The amount --
11     Q.  Well, I guess you don't know the amount
12 when you're determining the petition; right?
13         But the URA is considered; is that
14 correct?
15     A.  It's part of what we would look at.
16     Q.  Okay.
17     A.  And looking at the drug ingredient cost.
18     Q.  Okay.  So you would look at...
19         So you would look at essentially -- when
20 you're determining the cost of the drug to the
21 program, you would look at three numbers, the drug
22 ingredient cost, the HCFA Rebate amount, and any

Page 93

1  supplemental rebate amount that the manufacturer
2  was willing to provide; is that correct?
3      A.  Partially correct.
4      Q.  Okay.
5      A.  The cost analysis would -- and I think I
6  stated it previously.  We look at the potential
7  impact of addition to -- addition of that drug on
8  the list, would the drug be in addition to or in
9  lieu of another drug and less costly or what would
10 the utilization -- potential utilization of the
11 drug be compared to other drugs that might be used
12 to treat the same condition or that were in the
13 same category --
14     Q.  Okay.
15     A.  -- as that particular drug.
16     Q.  Okay.  Could you describe how the
17 supplemental rebate amounts are typically
18 calculated?
19         MR. GLASER:  Object as to form.
20         THE WITNESS:  It would depend upon the
21 business proposal that the manufacturer would
22 submit.

                              24 (Pages 90 to 93)

Henderson Legal Services, Inc.
202-220-4158              www.hendersonlegalservices.com

Ahrens, Katherine                                May 20, 2009
                    Sacramento, CA

Page 94

1        MR. CYR:  Q.  Okay.  Are there types of
2  supplemental rebate contracts that you would see
3  typically?
4        MR. GLASER:  Object as to form.
5        THE WITNESS:  We have different types of
6  contracts.
7        MR. CYR:  Q.  Okay.
8     A.  But it was still up to the manufacturer
9  to determine their own business proposal.
10       MR. CYR:  Let me introduce a document
11  that I think might help with this question.
12       Hold on one second.
13       I apologize for the delay.
14       Would you mark that as Ahrens 1.
15       (Exhibit Ahrens 001 marked)
16       MR. CYR:  Q.  Ms. Ahrens, could you take
17  a minute to review this document.
18       And just for the record, this is a
19  document that was produced by the State of
20  California, Bates-stamped CAAG/DHS0068437, and it
21  was previously marked in the deposition of Craig
22  Miller on September 24th, 2008.

Page 95

1        You've had a chance to review the
2  document?
3     A.  Um-hmm.  Yes.
4     Q.  Okay.  Do you recognize this document?
5     A.  I recognize the format of this document.
6     Q.  Okay.
7     A.  But not this --
8     Q.  Not this particular document?
9     A.  Correct.
10    Q.  Looking at this document, at the top --
11  there's a heading at the top, it says "Medi-Cal
12  Contracting Section Pharmacy Pricing Calculation
13  Examples."  And then below that heading it reads
14  "Here is the rule Medi-Cal uses to calculate its
15  net cost per unit.  Medi-Cal's net cost per unit
16  is calculated as the lower of AWP minus 5 percent
17  or Direct Price or Federal Upper Limit Price (FUL)
18  or State Upper Level Price (MAIC) minus all
19  manufacturer rebates.  In some cases, differences
20  in the pharmacist's fee must also be included (for
21  example, when a new product can replace two older
22  prescriptions, Medi-Cal will take into account the

Page 96

1  decrease in dispensing fees)."
2        Did I read that correctly?
3     A.  Yes.
4     Q.  Okay.  And then it lists or gives three
5  different -- three different examples.  One is an
6  example for Gorillacillin, 500-milligram capsule,
7  and that's described as a single-source drug
8  manufactured by a non-direct company; is that
9  correct?
10    A.  That's what's printed here, yes.
11    Q.  Okay.  And the second example is for a
12  Direct Price drug called Godzillacillin, 500-
13  milligram capsule, which is a single-source drug
14  manufactured by a Direct Price company.  Is that
15  what's listed there?
16    A.  Correct.
17    Q.  And then the third example is for a
18  generic drug and there's no clever name for it and
19  it's a drug manufactured a non-Direct Price
20  company but has no federal or state upper price
21  limits; is that correct?
22    A.  Correct.

Page 97

1     Q.  And you've had a chance to review the
2  document.
3        The three columns lay out a sort of cost
4  analysis.  Does that reflect the type of analysis
5  that you would do when you would consider drug
6  manufacturers' petitions, at least the cost
7  element of drug manufacturers' petitions?
8     A.  No.
9     Q.  In what way are these different from the
10  type of analysis you would do?
11    A.  This layout here is just looking at one
12  drug.
13       The analysis in order to assess cost to
14  Medi-Cal would also include offsets or consider
15  whether or not the drug was in addition to or in
16  lieu of other drugs and it would be a comparison
17  of the overall impact -- or analysis of the
18  overall impact adding that drug to the Medi-Cal
19  List of Contract Drugs would have on the Medi-Cal
20  drug program and potentially the Medi-Cal program
21  as a whole.
22    Q.  Okay.  But was this -- does this reflect

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                    May 20, 2009
Sacramento, CA

Page 98

1  a portion of the analysis that you would do?
2      A.  Yes.
3      Q.  What portion of the analysis does it
4  reflect?
5      A.  Calculation of drug ingredient cost.
6      Q.  Okay.  And let's look at the third
7  column, Example 3.  Go down the column.  There's
8  the "Price Per Capsule" and that reads "AWP," and
9  then you go across to the right and it reads
10  "$3.00."  Did I read that correctly?
11      A.  Yes.
12      Q.  And then "AWP minus 5%" and there is a
13  parenthetical that reads "calculated as AWP times
14  .95," and then you go across and that reads
15  "$2.85"?
16      A.  Correct.
17      Q.  And in this hypothetical that AWP minus
18  5 percent, that would be the amount that's paid to
19  the provider; is that correct?
20      A.  The AWP minus 5 percent?
21      Q.  Um-hmm.
22      A.  No, that is not correct.

Page 99

1      Q.  What's incorrect about that?
2      A.  It does not include the dispensing fee.
3  The provider is reimbursed the ingredient cost
4  plus a dispensing fee.
5      Q.  I guess, just for the sake of clarity,
6  if the provider submitted a usual and customary
7  charge that was lower than $2.85 plus the
8  dispensing fee, the provider would be paid that
9  amount; is that correct?
10      A.  Correct.
11      Q.  Okay.  But taking away the dispensing
12  fee and assuming that the usual and customary
13  charge was not lower than the AWP minus 5 percent
14  plus a dispensing fee, the $2.85 would be the
15  amount that was paid to the provider for this
16  drug; is that correct?
17      A.  Not taking into account the dispensing
18  fee, correct.
19      Q.  Okay.
20      A.  And assuming no FUL or MAIC.
21      Q.  And it looks like they make that
22  assumption here in this example; is that correct?

Page 100

1      A.  Correct.
2      Q.  Okay.  We go farther on down and it says
3  Medi-Cal's lowest price is $2.85; is that correct?
4      A.  Correct.
5      Q.  Do you have an understanding of what's
6  meant by that?
7      A.  Medi-Cal's lowest price?
8      Q.  Um-hmm.
9      A.  Yes.
10      Q.  And what is that understanding?
11      A.  The lowest of the FUL, the MAIC and the
12  scenario Direct Price or AWP minus 5 percent.
13      Q.  Okay.  And in this little example, if,
14  say, there was a FUL for this drug and it was,
15  say, $2.50, that would be Medi-Cal's lowest price
16  in this case; right?
17      A.  Correct.
18      Q.  Okay.  And then below that there's the
19  Average Manufacturer's Price as reported to HCFA?
20      A.  Yes.
21      Q.  And that's 50 cents?
22      A.  That's what's written there.

Page 101

1      Q.  That's what's written there, right.
2  Okay.
3          And then below that reads "Medi-Cal's
4  AMP calculation."  And then it reads "In this
5  example, Medi-Cal agrees to add a drug to the list
6  if the manufacturer will give us a 40% rebate over
7  HCFA." Did I read that correctly?
8      A.  You did.
9      Q.  Okay.  What's your understanding of what
10  is being said there?
11      A.  My understanding of what's being said
12  here is that if a generic company petitioned and
13  agreed to provide a supplemental rebate that is in
14  excess of what is provided -- or a rebate that's
15  in excess of what's provided to the federal rebate
16  agreement, then we would agree to add that drug to
17  the list.  And "List" here is capitalized in
18  reference to the Medi-Cal List of Contract Drugs.
19      Q.  Okay.
20      A.  So that's in this make believe scenario.
21      Q.  Okay.  Did you do analyses like this
22  when you were reviewing petitions?

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                    May 20, 2009
                        Sacramento, CA

Page 102

1        MR. GLASER:  Object as to form.
2        THE WITNESS:  The analyses -- the fiscal
3    analyses would be in this format in that, as it
4    states in the header area here, that we calculate
5    the lower of AWP minus 5 direct FUL or MAIC minus
6    all manufacturer rebates.
7        Q.  Right.
8        A.  So to the extent that there were rebates
9    or rebate information available to us, then yes,
10   that calculation would be included in the
11   analysis.
12       Q.  Okay.  Let's go through this analysis a
13   little more.
14           Below that portion that we just looked
15   at there's -- it reads "HCFA Rebate" and then in
16   parenthetical is a "straight 11%" and then there's
17   an "11%" over on the right side.
18       A.  Um-hmm.
19       Q.  And then it reads "California
20   supplemental rebate %."
21       A.  Um-hmm.
22       Q.  And then there's a "40%" over on the

Page 103

1    right side.
2        A.  Um-hmm.
3        Q.  And I think that references the 40
4    percent in that sentence above.  Is that correct?
5        A.  Correct.
6        Q.  Okay.  And then the total rebate amount
7    is 51 percent?
8        A.  Correct.
9        Q.  Okay.  And then below that there's a
10   line, and then below that it reads "AMP," and the
11   AMP amount is 50 cents?
12       A.  Correct.
13       Q.  And then the HCFA Rebate amount is AMP
14   times 11 percent, which works out to be -- they
15   list here as -- there as six cents.
16       A.  Yes.
17       Q.  And then the California supplemental
18   rebate amount would be AMP times 40 percent; is
19   that correct?
20       A.  Correct.
21       Q.  And that works out to be 20 cents.
22           So the total rebate amount per unit for

Page 104

1    this drug is 26 cents; is that correct?
2        A.  Correct.
3        Q.  Okay.
4        A.  No.  Is it 26?  I can't read it.  Yes.
5        Q.  Okay.  It's very hard to read.  I'm
6    sorry.  The print is so small.
7            And then there's a sentence that reads
8    "Therefore, Medi-Cal's cost is calculated as:
9    Medi-Cal's lowest price," which is AWP minus 5
10   percent in this case, and that's given as $2.85,
11   minus the total rebates, which would be minus 26
12   cents in this case, to give Medi-Cal's net cost,
13   which would be $2.59.  Did I read that correctly?
14       A.  Correct.
15       Q.  Okay.  So the net cost in this case is
16   the amount you would pay the provider for
17   reimbursement less the HCFA Rebate -- the amount
18   that you would receive for the HCFA Rebate less
19   the amount -- the amount of any supplemental
20   rebate over and above the HCFA Rebate that the
21   manufacturer would be willing to give you; is that
22   correct?

Page 105

1        A.  No.  It's not -- the pharmacy -- that's
2    not the amount that we reimburse the pharmacy.
3        Q.  That's because -- reading the -- are you
4    looking at the AWP minus 5 percent, the third line
5    from the bottom?
6        A.  Okay.  Yeah.
7        Q.  Okay.  And that's not the total amount
8    you reimburse the pharmacy; correct?  Because it
9    doesn't include the dispensing fee?
10       A.  Right.
11       Q.  Okay.  But for the ingredient cost
12   portion of the reimbursement -- do you understand
13   what I mean by that?
14       A.  Yes.
15       Q.  Okay.  That would be -- that figure
16   would represent the reimbursement -- or the
17   ingredient cost portion of the reimbursement; is
18   that correct?
19       A.  Correct.
20       Q.  Okay.
21       A.  I understood you to say, though, that
22   the amount minus the rebate represented the

Henderson Legal Services, Inc.
202-220-4158                           www.hendersonlegalservices.com

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                    May 20, 2009
                        Sacramento, CA

---

Page 106

1   pharmacy reimbursement for ingredient.
2       Q.  No, no, no.  I'm sorry if I misspoke.
3           The ingredient cost portion minus the
4   rebate represents the Medi-Cal program's net cost
5   for the drug; is that correct?
6       A.  Correct.
7       Q.  Okay.  And so when the manufacturer --
8   so the supplemental rebate would essentially be --
9   strike that.
10          In this example, the supplemental rebate
11  is calculated as a percentage of AMP; is that
12  correct?
13      A.  In Example 3, yes.
14      Q.  Okay.  Is that always the way
15  supplemental rebate agreements are calculated?
16      A.  As a percent of AMP?
17      Q.  Um-hmm.
18      A.  No.
19      Q.  What other ways are supplemental rebate
20  amounts calculated?
21      A.  Again depending upon the business
22  proposal.

---

Page 107

1           Sometimes manufacturers will offer a
2   supplemental rebate that is in addition to, so a
3   HCFA or CMS plus a supplemental rebate.
4           Sometimes they'll offer --
5       Q.  Let me just stop you right there.
6           Is the analysis that's done in Example
7   3, is that a HCFA plus analysis?
8       A.  Correct.
9       Q.  Okay.  Please go ahead.
10      A.  Another type would be a total rebate --
11      Q.  Okay.
12      A.  -- in which case, for example, if we
13  were to use this example, the offer might be for a
14  total rebate of 40 percent, which means that as
15  the HCFA or CMS Rebate increases, then the
16  supplemental rebate decreases.
17      Q.  Okay.
18      A.  Sometimes there's an offer for a CMS
19  plus with a cap.  So they might offer, using again
20  this example, CMS -- or HCFA plus 40 percent with
21  a cap of 55, 55 percent, a total rebate of 55
22  percent.  So that would mean that if -- and this

---

Page 108

1   wouldn't happen with generics, but it would happen
2   with single-source drugs.
3       Q.  Okay.
4       A.  If the CMS or HCFA Rebate were to
5   change, to increase because of best price and/or
6   CPI penalties, then at the point which the CMS
7   plus the supplemental exceeded 55 percent, the
8   supplemental would be decreased such that the
9   total rebate would be equal to 55 percent, just
10  using that as an example.
11      Q.  Let me stop you right there.  I want to
12  clarify something.
13          55 percent of AMP in this case?
14      A.  Rebates when they're percentage based
15  are always a percent of AMP.
16      Q.  Okay.
17      A.  Which also changes quarterly.
18      Q.  Right.
19      A.  The other type of rebate -- or proposals
20  that we would receive would be for net cost.  So
21  that means that the manufacturer would say
22  regardless of what happens to the AWP or the CMS

---

Page 109

1   HCFA Rebate, we will give or agree to give a
2   supplemental rebate such that the net cost as
3   calculated here would always equal -- would always
4   net a certain amount.  So if it were a dollar --
5   if the net costs were always going to be a dollar
6   and AWP started out at $2 and the CMS Rebate was
7   50 cents, then they would initially start with a
8   50-cent rebate.  If the AWP went up, AWP minus, if
9   it had gone up and the CMS Rebate stayed the same,
10  then our supplemental rebate would increase to get
11  to that net cost amount that was agreed upon.
12      Q.  Okay.
13      A.  So there are variations --
14      Q.  Okay.
15      A.  -- to --
16      Q.  To the different types of supplemental
17  rebates?  To the --
18      A.  To the different types of contracts for
19  supplemental rebates.
20      Q.  Okay.  Okay.  And at least, just to --
21  just to clear up one point, at least sometimes the
22  supplemental rebate amount will be based on AMP;

---

                        28 (Pages 106 to 109)

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                    May 20, 2009

Sacramento, CA

Page 110

1  is that correct?
2      A.  Sometimes a supplemental rebate is based
3  on a percent of AMP.
4      Q.  A percentage of AMP.  Okay.
5          You had said that the manufacturer will
6  sometimes provide you with AMP as part of the
7  petition process.  And would the manufacturer
8  provide you with AMP because the AMP would be
9  relevant to the supplemental rebate --
10     A.  Correct.
11     Q.  -- amount negotiation?
12     A.  Correct.
13     Q.  Okay.  Does the Department collect AMPs
14 from manufacturers on a regular basis?
15     A.  No.
16     Q.  How does the Department -- I guess once
17 the supplemental rebate -- once a supplemental
18 rebate agreement where the amount of the rebate as
19 a percentage and AMP has been negotiated, how does
20 the Department go about calculating the rebate
21 amount?
22     A.  The rebate amount would be based on --

Page 111

1  again, assuming we're talking about a contract
2  that was negotiated that was a percent of AMP, the
3  Department depends upon the manufacturer to submit
4  their AMP information for that particular drug in
5  a timely manner so that rebate can then be
6  calculated.
7      Q.  Okay.  So the manufacturer submits its
8  AMP to the Department --
9      A.  The manufacturer calculates and submits
10 AMP.
11     Q.  Okay.  How often does a manufacturer
12 submit AMP?  Strike that.
13         How often does the Department require a
14 manufacturer to submit AMP?
15         MR. GLASER:  Object to the form.
16         THE WITNESS:  To the extent that the
17 Department has a rebate agreement with that
18 manufacturer that is AMP based, we require that
19 AMP be sent to us on a quarterly basis during the
20 terms of the contract, the duration of the
21 contract.
22         MR. CYR:  Q.  Okay.  Does a manufacturer

Page 112

1  need to pay a supplemental rebate to the Medi-Cal
2  program in order to be on the Contract Drug List?
3      A.  No.
4      Q.  What would be the circumstances under
5  which a drug would be included on the program --
6  on the Medi-Cal Contract Drug List?
7          And this is setting aside the -- setting
8  aside the -- I think you had mentioned cancer
9  drugs and AIDS drugs and certain drugs that had
10 been grandfathered onto the list.
11         What would be the circumstances under
12 which a drug would be included on the list without
13 the manufacturer being obligated to pay a
14 supplemental rebate to the program?
15     A.  If a drug was added to the list pursuant
16 to a rebate agreement, pursuant to having met the
17 criteria for addition to the list, and that drug
18 became multi-source sometime after inclusion on
19 the list, then once the drug becomes available
20 through multiple manufacturers, so long as a
21 manufacturer has a CMS -- or rebate agreement in
22 place, we cover that manufacturer's drug without

Page 113

1  prior authorization.  So there would be no need
2  for a supplemental rebate if -- if you made a drug
3  and you were single source and you're on the list
4  and you have a supplemental rebate agreement with
5  the State of California, then after a period of
6  time your drug loses its exclusivity in that other
7  manufacturers cannot -- now produce -- if they've
8  gotten approval from the FDA to market and produce
9  the generic equivalent of your drug, then if I
10 came along and then manufactured that -- your same
11 chemical entity and I signed a rebate agreement
12 with the feds, my drug could -- pharmacy providers
13 could receive payment for my drug product without
14 me having to enter into an agreement with
15 supplemental rebate, versus if Randy were to
16 manufacture the same drug but not have entered
17 into a supplemental rebate, even though he's
18 producing the same product, we would not pay for
19 his drug, unless it were approved, prior approved
20 through the -- or unless it was approved through
21 the TAR process.
22     Q.  Okay.

29 (Pages 110 to 113)

Ahrens, Katherine                                    May 20, 2009
                        Sacramento, CA

Page 114

1    A.  So in that case there's no supplemental
2  rebate from the manufacturer and their drug is
3  covered and essentially on the list.
4        MR. GLASER:  For the record, I don't
5  produce drugs.
6        THE WITNESS:  Nor do I.
7        MR. CYR:  Nor do I.
8    Q.  Let me see if I can state that another
9  way.  And you can correct me if my understanding
10  is wrong.
11        If a drug is a single-source drug and
12  there's -- and it's contracted onto the Medi-Cal
13  contract list and it subsequently becomes a multi-
14  source drug, it loses its exclusivity and another
15  generic -- a generic manufacturer comes in and
16  starts producing that same drug, the generic
17  manufacturer -- the generic version of the drug
18  can be added to the Medi-Cal Contract Drug List
19  without a supplemental rebate paid to the program;
20  is that correct?
21    A.  If you were to look at the Medi-Cal List
22  of Contract Drugs, drugs are listed according to

Page 115

1  their generic name, they are not listed by brand
2  name.
3    Q.  Okay.
4    A.  And so once a chemical entity is on the
5  list, so long as the manufacturer, again, has
6  signed a federal rebate agreement, then we'll pay
7  for -- we don't have to physically add that drug
8  to the list.  The manufacturer has to be on the
9  list of approved manufacturers.  There is a
10  separate list in the provider manual of authorized
11  manufacturer/labeler codes --
12    Q.  Okay.
13    A.  -- and that's what drives whether or not
14  we pay for that product.
15    Q.  Okay.  But does the generic manufacturer
16  have to pay a supplemental rebate to Medi-Cal to
17  be on the Contract Drug List?
18    A.  No.
19    Q.  Okay.  Does the manufacturer have to pay
20  a supplemental rebate to the Medi-Cal program to
21  be on the preferred manufacturer list?
22    A.  No.

Page 116

1    Q.  Okay.
2    A.  It's not a preferred manufacturer list.
3  There's no such list.
4    Q.  Okay.  What was the list that you -- I'm
5  sorry.
6    A.  The list is a list of manufacturers by
7  label or code who have signed an agreement with
8  the feds for rebate.  They've signed a rebate
9  agreement with the feds, so they agree to pay the
10  HCFA Rebate or the CMS Rebate, whichever term you
11  want to use.  They're interchangeable.
12        MR. CYR:  How much time do we have left
13  on the tape?
14        THE VIDEOGRAPHER:  One hour, three
15  minutes.
16        MR. CYR:  Okay.
17    Q.  I'd like to jump back to your employment
18  history with the Department.
19        You said your primary responsibilities
20  were handling manufacturer petitions -- or
21  processing and reviewing manufacturer petitions
22  and handling or drafting the OILs that were sent

Page 117

1  to the fiscal intermediary concerning drugs that
2  were added to the Contract Drug List.
3    A.  And also manufacturers who were added to
4  the authorized manufacturer list.
5    Q.  Okay.  And you held that position until
6  about 2004; is that correct?
7    A.  No, that's not correct.  I've had the
8  same position.  My duties have changed.
9    Q.  Okay.
10    A.  The position is the same.
11    Q.  Okay.  But your duties changed around
12  2003, 2004; is that correct?
13    A.  My duties changed over time --
14    Q.  Okay.
15    A.  -- from the time I began working for the
16  Pharmacy Contracting Section until now.  So there
17  isn't a finite date of when I transitioned from
18  one set of duties to another.  They shift.
19    Q.  Okay.  I understand.
20        What new responsibilities -- or what
21  responsibilities have you gotten -- strike that.
22        What other responsibilities have you

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                          May 20, 2009
                        Sacramento, CA

Page 118

1  been given since you joined the Department, apart
2  from those two that we discussed?
3      A.  Sometimes duties would include analysis
4  of legislation.  And those are as assigned.
5          Sometimes, again as assigned, it's
6  responding to letters from beneficiaries or the
7  legislature on behalf of a beneficiary or
8  providers when they have concerns about the drug
9  program or issues that they need clarification on.
10         Sometimes the duties include working
11  towards implementation of programs or processes
12  that are legislatively or statutory mandated once
13  the legislation has passed.
14         Sometimes it's providing clarification
15  to field office staff or other departmental staff
16  on policy-related -- pharmacy policy-related
17  issues.
18         Sometimes it's analysis of whether or
19  not the Department -- or the Pharmacy Division can
20  implement new programs to improve quality of care.
21         So where I reside now is within the
22  policy branch.

Page 119

1      Q.  Okay.
2      A.  And so it's policy-related issues.
3      Q.  Okay.  And I take it you don't review
4  manufacturer petitions for inclusion on the
5  Contract Drug List anymore?
6      A.  No.
7      Q.  Okay.  Do you know approximately when
8  that responsibility was kind of phased out of your
9  duties?
10     A.  Probably around 2003.  Whenever we moved
11  from -- whenever we moved to the east end, which
12  2003, 2002 -- 2003, I think right around there --
13     Q.  Okay.
14     A.  -- I was starting to transition out of
15  that and focus more on policy.
16     Q.  And is your supervisor still Kevin
17  Gorospe?
18     A.  Yes.
19     Q.  Okay.  And so it's just been Len Terra
20  and then Kevin Gorospe?
21     A.  Yes.
22     Q.  Okay.  Do you have anyone that reports

Page 120

1  to you?
2      A.  No.
3          MR. CYR:  No.
4          I think this is probably a good time to
5  break for lunch.
6          THE VIDEOGRAPHER:  We're now going off
7  the video record approximately 12:28.

Page 121

1          A F T E R N O O N   S E S S I O N
2
3          (Exhibit Ahrens 002 and Exhibit
4  Ahrens 003 marked)
5          THE VIDEOGRAPHER:  We're back on the
6  video record at approximately 1:40.
7          MR. CYR:  Q.  Welcome back, Ms. Ahrens.
8          As I mentioned at the beginning of the
9  deposition, one of the defendants that I represent
10  -- or two of the defendants that I represent in
11  this action are drug manufacturers named Dey,
12  Inc., and Dey, L.P.  Are you familiar with either
13  of those companies?
14     A.  Familiar in that I know they exist.
15     Q.  Okay.  Have you ever had any
16  communications with anyone from Dey?
17     A.  None that I recall.
18     Q.  There are two entities, Dey, L.P.
19  and Dey, Inc., but I'll refer to them
20  interchangeably as "Dey."  Will you understand
21  what I'm talking about?
22     A.  Yes.

                                    31 (Pages 118 to 121)

Ahrens, Katherine                                      May 20, 2009
Sacramento, CA

Page 122

1    Q.  Okay.  Do you know, did Dey have any
2  drugs on the Medi-Cal List of Contract Drugs while
3  you were in the position of reviewing
4  manufacturers' petitions?
5    A.  I wouldn't know.
6    Q.  Okay.  Do you recall ever reviewing a
7  petition that was submitted by Dey?
8    A.  No.
9    Q.  Okay.  I'll represent to you that my
10 client specializes in the manufacture of
11 inhalation drugs, including albuterol sulfate and
12 ipatroprium bromide.
13      Were the manufacturers' petitions you
14 reviewed, were they limited to a certain category
15 or class of drugs?
16   A.  No.
17   Q.  Okay.  So you wouldn't have not reviewed
18 a Dey manufacturer petition just because it was --
19 just because Dey made inhalation drugs?
20   A.  Correct.
21   Q.  Okay.  Would you take a look at what's
22 been marked as Exhibit 2.  You've had a chance to

Page 123

1  review that?
2    A.  Correct.
3    Q.  Okay.  Do you recognize this document?
4    A.  No.
5    Q.  Okay.  Have you seen documents like this
6  before?
7    A.  Yes.
8    Q.  Okay.  Have you written documents like
9  this before?
10   A.  Yes.
11   Q.  Okay.  What information is being
12 conveyed in this document?
13      MR. GLASER:  Object as to form.
14      MR. CYR:  Q.  Based on your review of
15 the document.
16   A.  As you read the letter, the letter says
17 that the letter is to inform you -- meaning Joan
18 Salyer of Dey, L.P. -- of the Department's
19 decision to add unit-dose albuterol sulfate
20 inhalation solution 0.083 percent to the list.
21 The letter says that it was evaluated on the
22 statutorily required criteria and that Dey

Page 124

1  satisfactorily addressed the criteria so that the
2  Department has determined that their product, the
3  unit-dose albuterol sulfate inhalation solution
4  0.083 percent, would be an appropriate addition to
5  the list.  It says that the Department is in the
6  process of securing the contract from Dey, L.P.,
7  and that the Department would notify provider of
8  the addition of their product -- that would be to
9  the list -- and that the manufacturer should not
10 actively promote their drug as an addition to the
11 list prior to publication or notification of the
12 private providers by the Medi-Cal bulletin.
13   Q.  Okay.  Some of the names of the people
14 on the document.  Do you recognize the name
15 Marianne Lewis?
16   A.  Yes.
17   Q.  And who is that?
18   A.  She was Chief of the Medi-Cal
19 Contracting Section.
20   Q.  Okay.
21   A.  At the time.
22   Q.  I think you said you were -- that was

Page 125

1  the section you were in.
2    A.  Correct.
3    Q.  Well, there's no date on this document.
4  Strike that.
5      Len Terra is bcc'd on this document, and
6  I think you said that he was your supervisor.
7    A.  Correct.
8    Q.  Who is Dr. Mike Namba?
9    A.  At that time, if Len Terra is here as a
10 supervisor, then Mike Namba would have been one of
11 the Pharmaceutical Consultant II Specialists on
12 staff.
13   Q.  Okay.  And were Mr. Namba's duties
14 similar to yours?
15   A.  Yes.
16   Q.  And so he reviewed petitions submitted
17 by manufacturers for inclusion on the Medi-Cal
18 Drug Contract List?
19   A.  Correct.
20   Q.  I think you stated that, as the letter
21 reads, the Medi-Cal contracting unit had reviewed
22 Dey's submission for inclusion on the Contract

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                          May 20, 2009
                         Sacramento, CA

Page 126

1  Drug List and had approved the submission and were
2  going to add Dey's albuterol sulfate onto the
3  list.  Is that correct?
4     A.  It actually says that the Department has
5  conducted a review, not that the unit has
6  conducted the review.
7     Q.  Okay.
8     A.  And it says it's the Department's
9  decision.
10    Q.  Okay.  Not just the unit's decision, but
11 the Department's decision?
12    A.  Right.
13    Q.  Okay.  And it notes that the review
14 consisted of a therapeutic and economic analysis.
15 Is that a reference to the criteria we were
16 discussing before?
17    A.  I don't know.
18       The criteria is -- it says that the drug
19 was evaluated on the statutorily required five
20 criteria.
21    Q.  Okay.  And that's a reference to the
22 criteria that we were discussing before; is that

Page 127

1  correct?
2     A.  Correct.
3     Q.  Okay.  And that would include the cost
4  criteria; is that correct?
5     A.  Correct.
6     Q.  Okay.  If you would take a look at
7  what's been marked as Ahrens Exhibit 3.
8        You've had a chance to review this
9  before we went on the record; is that correct?
10       If you want to take some more time to
11 review it now, please do.
12    A.  I wanted to check one thing.
13    Q.  Okay.  Do you recognize this document?
14    A.  No.
15    Q.  Have you seen documents like this in
16 your time at the Department?
17    A.  Not that I recall.
18    Q.  As part of the petition process that we
19 discussed before the lunch break, when a
20 manufacturer would agree to provide the Department
21 with a supplemental rebate, would they enter into
22 an agreement with the Department -- a contract

Page 128

1  with the Department to provide that agreement --
2  to provide the rebate?
3     A.  When they agreed to provide a rebate,
4  they would enter into a contract for the rebate,
5  yes.
6     Q.  Okay.  Did you ever review those rebates
7  -- or did you ever review those contracts?
8     A.  Yes.
9     Q.  Okay.  Is this contract a supplemental
10 rebate agreement contract?
11    A.  No.
12    Q.  Could you take a look at -- on the
13 second page, Article III, the first paragraph
14 under "ARTICLE III - CONTRACTOR'S
15 RESPONSIBILITIES."
16    A.  Um-hmm.
17    Q.  And that paragraph reads "Contractor
18 will provide the Department a Rebate for the
19 Covered Product(s), which includes the HCFA Basic
20 Rebate and HCFA CPI Rebate, as appropriate.  The
21 HCFA Rebates represent the discount obtained by
22 multiplying the units of the Covered Product(s)

Page 129

1  reimbursed by the Department in the preceding
2  quarter by the per Unit Rebate Amount provided to
3  the Department by HCFA.  HCFA will calculate the
4  rebate amount in accordance with Contractor's HCFA
5  Agreement.  Contractor's obligation for Rebates
6  will continue for the duration of the Contractor's
7  HCFA Agreement."  Did I read that correctly?
8     A.  Yes.
9     Q.  Okay.  And let's go back and look at the
10 first page and the first paragraph on that page
11 under the caption that reads "MEDI-CAL DRUG REBATE
12 AGREEMENT."  The first sentence of that paragraph
13 defines Dey, L.P., Pharmaceuticals Corporation as
14 Contractor; is that correct?
15    A.  Correct.
16    Q.  Okay.  So if you flip back to the second
17 page and that paragraph we were looking at before,
18 essentially this paragraph is saying that Dey,
19 L.P. will pay rebates to Medi-Cal pursuant to
20 Dey, L.P.'s rebate agreement; is that correct?
21    A.  It says that the contractor will provide
22 the Department a rebate for the covered products,

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                    May 20, 2009

Sacramento, CA

Page 130

1  which includes the HCFA Basic Rebate plus the HCFA
2  CPI Rebate as appropriate.
3      Q.  Okay.  And if you look at the first
4  page, there's a definition of the HCFA Basic
5  Rebate there at paragraph 2.4 on the bottom of the
6  page.
7      A.  Correct.  Um-hmm.
8      Q.  And that's the -- that's defined as the
9  quarterly payment by the contractor pursuant to
10  the contractor's HCFA agreement made in accordance
11  with Section 1927(c)(1) or Section 1927(c)(3) of
12  the Social Security Act?  Did I read that
13  correctly?
14      A.  Yes.
15      Q.  And you understand that paragraph to be
16  referring to the HCFA Rebate payments that we were
17  discussing before lunch?
18      A.  It refers to a portion of the HCFA
19  Rebate payments.
20      Q.  Okay.
21      A.  But --
22      Q.  Is there another portion of the HCFA

Page 131

1  Rebate payments?
2      A.  The HCFA Rebate is the best price plus
3  any CPI penalties.  So it's the sum of those two.
4  It isn't just the basic rebate plus -- it isn't
5  just the basic rebate.  If there is a CPI penalty,
6  that becomes part of the rebate.
7      Q.  Okay.  Is that for -- the basic rebate
8  which would be the best price plus the CPI amount,
9  is that just for single-source drugs?
10      A.  The basic rebate is the basic rebate.
11  The CPI Rebate is separate.  The HCFA Rebate is
12  the sum of the two.
13      Q.  Okay.
14      A.  And I don't know the CMS Rebate
15  agreement for multi-source drugs to know whether
16  or not they're subject to a CPI penalty.
17      I know that single-source drugs are
18  subject to CPI penalty.
19      Q.  Okay.  But going back to paragraph 3.1,
20  the only -- the only rebate amounts that the
21  contractor is agreeing to pay in paragraph 3.1 are
22  the HCFA Basic Rebate amount and the HCFA CPI

Page 132

1  Rebate amount; is that correct?
2      A.  When you look at this contract and you
3  go back to Article II, 2.7 defines rebate.  So
4  there's a definition for HCFA CPI Rebate, HCFA
5  Basic Rebate and a definition for rebate.  So in
6  the first part of 3.1 it says that the contractor
7  will provide the Department a rebate.
8      And looking at 2.7, it says rebate means
9  with respect to the covered products the quarterly
10  payment paid by -- payment by contractor pursuant
11  to Article III, Section 3.1 of this agreement and
12  it also means equalization payment as used in the
13  Welfare and Institutions Code Section 14105.31(c).
14      Q.  Okay.  Looking at that paragraph, what
15  is meant by the equalization payment as used in
16  Welfare and Institutions Code Section 14105.31(c)?
17      A.  Without having 14105.31(c) in front of
18  me, I cannot tell you that.
19      Q.  Okay.
20      A.  I don't know.
21      Q.  Going back to paragraph 3.1, is there
22  any other rebate amount other than the HCFA Basic

Page 133

1  Rebate or the HCFA CPI Rebate that's referenced in
2  that paragraph?
3      A.  Not according to anything contained
4  within this contract.
5      Q.  Okay.  You've had a chance to review
6  this contract.  Is there anything else in this
7  contract that you would see that would obligate
8  the -- obligate Dey to pay an amount other than
9  the HCFA Basic Rebate and the HCFA CPI Rebate --
10      A.  No.
11      Q.  -- to Medi-Cal?
12      Do you know why Medi-Cal would enter
13  into an agreement with Dey that didn't obligate
14  Dey to pay anything other than the -- strike that.
15      Do you know why Medi-Cal would enter
16  into a drug rebate agreement with Dey that didn't
17  obligate Dey to pay anything other than the HCFA
18  Basic Rebate and the HCFA CPI Rebate?
19      A.  Why Medi-Cal would do that?
20      Q.  Um-hmm.
21      A.  Because upon evaluation or review of the
22  drug for addition to the Medi-Cal List of Contract

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                May 20, 2009

Sacramento, CA

Page 134

1  Drugs, the drug met the information provided in
2  addition to the evaluation conducted by the
3  pharmacists doing the review, the determination
4  was made that all five drug evaluation criteria
5  were met.
6      Q.  Okay.
7      A.  So that this is a HCFA-only rebate
8  agreement.  Doesn't -- it's not -- it's not
9  inappropriate.
10     Q.  Okay.  Let me ask you a question that
11  might clarify it.
12         For Dey's albuterol sulfate to be
13  included on the Medi-Cal drug rebate agreement,
14  Dey would have to have a rebate agreement with
15  Medi-Cal, even though Dey was not agreeing to pay
16  Medi-Cal a supplemental rebate agreement; is that
17  correct?
18     A.  No, that is not correct.
19     Q.  Okay.  Why is that not correct?
20     A.  It's the Medi-Cal List of Contract
21  Drugs, what it says is that we'll have a contract
22  -- this is a contract, and the contract says that

Page 135

1  so long as -- it says that we will add the
2  contractor's covered product to the Medi-Cal List
3  of Contract Drugs.  Whether or not we have a
4  supplemental -- the important thing is whether or
5  not the criterion are met.  And, as I stated
6  previously, sometimes the petitions to add a drug
7  to the list could be initiated by the Department.
8      Q.  Okay.
9      A.  Sometimes -- most often they were
10  initiated by the manufacturer.
11         However, after the creation of the Medi-
12  Cal List of Contract Drugs and pursuant to the
13  requirements in the W&I Code, drugs cannot be
14  added to the list unless a contract is secured
15  with the manufacturer, with a manufacturer for
16  that product.
17     Q.  Okay.
18     A.  So the criteria are met, however that
19  determination was made through the analysis, a
20  contract was generated, an OIL would have been
21  generated, a bulletin would have gone out, and
22  providers then would have been able to receive

Page 136

1  payment for this product.
2      Q.  Okay.  So the criteria could be met for
3  inclusion on the Medi-Cal drug contract list
4  though the manufacturer was not agreeing to pay
5  Medi-Cal a supplemental rebate?
6      A.  The rebate alone doesn't determine
7  whether or not a drug gets added to, retained on,
8  or deleted from the list.
9      Q.  Okay.
10     A.  It's whether or not criteria are met.
11         And because they fail one criteria
12  doesn't necessarily mean that they will or will
13  not be added to the list if the other criteria --
14  you know, they could be successful, for example --
15  I'll give you an example.  They could be
16  successful in meeting a cost criterion and
17  efficacy and maybe even safety but fail criteria
18  for misuse potential or essential need -- and/or
19  essential need, which might result in the decision
20  to not add the drug to the list, to have it remain
21  on prior authorization status.
22     Q.  Okay.  So, now would it be required that

Page 137

1  the drug meet all the criteria?
2      A.  Yes.
3      Q.  Okay.  But provided that the drug met
4  all the criteria, you would issue a contract and
5  the drug would be -- or you would enter into
6  agreement and the drug would be added to the list?
7      A.  Yes.
8      Q.  Okay.  You can put this document aside
9  now.
10         Mark this as Ahrens 4.
11         (Exhibit Ahrens 004 marked)
12         MR. CYR:  Q.  Ms. Ahrens, if you want to
13  just take a minute to review this document.
14         While you do that, I'll describe it for
15  the record.  This is a document that was produced
16  to us by the State of California, it bears the
17  Bates stamp CAAG/DHS-E0050204, 50205 and 50206.
18         Have you had an opportunity to review
19  the document?
20     A.  Um-hmm.
21     Q.  Do you recognize this document?
22     A.  No.  But it's addressed to me, so must

35 (Pages 134 to 137)

Ahrens, Katherine                                May 20, 2009
                        Sacramento, CA

Page 138

1    be mine.
2        Q.  Okay.  Who is Stephen Berk?
3        A.  He was a pharmacist that was on staff
4    with our program at one point in time.
5        Q.  Okay.  And if you look at the document,
6    it reads -- or the first page of the e-mail, which
7    is an e-mail, reads "Katherine, Mike sent me a
8    note indicating you are going to handle
9    albuterol."
10       First of all, do you know, is "Mike"
11   there, is that a reference to Mike Namba?
12       A.  Probably.  Could be.
13       Q.  Okay.  But you can't say for certain?
14       A.  No.
15       Q.  Okay.
16       A.  We -- no, I can't.
17       Q.  It says Mike sent a note to me
18   indicating that you are going to handle albuterol.
19   Did I read that correctly?
20       A.  Yes.
21       Q.  What did you understand him to mean by
22   saying you were going to handle albuterol?

Page 139

1        A.  This would be an assumption on my part,
2    but since Steve is sending me this e-mail, it says
3    here "Here is the spreadsheet I had for the
4    albuterols, let me know if you have any
5    questions."  So for whatever reason, Steve was
6    having to pass along his assignment on albuterol
7    to another pharmacist.  And what stage he was at
8    in the evaluation, I don't know, I don't recall.
9    So apparently what he was doing was passing it on
10   to me.  He's saying that Mike sent him a note
11   saying that I was going to handle albuterol.
12       Q.  Okay.  Could you take a look at the
13   second and third pages of the document.
14       A.  Um-hmm.
15       Q.  Do you recognize these pages?
16       A.  I don't recognize the pages.
17       Q.  Okay.  Have you seen documents like this
18   before?
19       A.  Yes.
20       Q.  Okay.  And what would you use a document
21   like this for?
22       A.  It would be used in -- as part of the

Page 140

1    drug evaluation analysis in applying the five
2    criteria to the assessment, to the evaluation.
3        Q.  Okay.  And which of the five criteria
4    would this be used for?
5        A.  Cost.
6        Q.  Okay.  And how would you use this to
7    assess the cost criteria?
8        A.  Because I have no recollection of this
9    particular assignment, I don't know what -- I
10   don't know what the assignment was at the time, I
11   don't know if it were a product that the
12   Department initiated a request or initiated the
13   petition to start the process of evaluating the
14   drug if we had identified an essential need for a
15   unit-dose product on the list --
16       Q.  Okay.
17       A.  -- and then subsequently sought a
18   manufacturer to enter into an agreement so that we
19   would have met all the conditions for adding a
20   drug to the list or if it were a petition that was
21   initiated by Dey.
22       So when I'm looking at the spreadsheet

Page 141

1    just as it is, because of how the criteria are
2    defined, I would -- I'm wondering where the other
3    comparators are.  So I don't know if this -- I
4    didn't create this spreadsheet so -- or I don't
5    recall having created this spreadsheet, so I can't
6    answer your question I don't think.
7        Q.  Would you use spreadsheets like this to
8    do -- to assess the cost criteria when examining
9    manufacturers' petitions?  Not this specific
10   spreadsheet.
11       A.  Right.
12       Q.  I know you don't recall using this
13   particular spreadsheet.
14       A.  Right, right.
15       Q.  But would you use spreadsheets that had
16   a similar layout this?
17       A.  Similar, yes.
18       Q.  And -- similar.  Would they be different
19   from this spreadsheet, this particular spreadsheet
20   in any certain way?
21       A.  The headers on this spreadsheet, if I
22   were doing a drug evaluating -- doing a fiscal on

                                    36 (Pages 138 to 141)

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                    May 20, 2009
Sacramento, CA

Page 142

1  our drug according to the criteria, the headers
2  wouldn't necessarily be exactly like this.
3      Q.   Okay.  But would they be -- the basic
4  layout of the document would be similar; is that
5  correct?
6      A.   It would be similar.
7      Q.   Okay.  Could you explain how you would
8  use this document to do the -- to assess the cost
9  criteria?
10     A.   I wouldn't use it by itself.
11     Q.   What else would you use with it?
12     A.   Again, because the regs define cost as a
13 comparison of other products or -- this is just --
14 it looks -- I can't tell if it's -- this looks
15 like it's for an inhalation device, which is --
16 it's not the same as the inhalation solution that
17 was referred to in the prior documents.  This is
18 for an inhaler.
19     Q.   Okay.  Let me just interrupt you there
20 and clear up the record.  I'm not suggesting that
21 this was the same -- we're talking about the same
22 product that we were talking about when we looked

Page 143

1  at the previous exhibits.
2      A.   And -- it does have the HFA.  I don't
3  even know what we're evaluating here.  I don't
4  know what drug we're looking at.  I don't know the
5  purpose of this spreadsheet.  So I mean there's
6  not enough information here for me to -- I don't
7  know what the assessment is here.
8      Q.   Okay.  Well, let's put that document
9  aside.
10         Would you mark this as Ahrens 5.
11         (Exhibit Ahrens 005 marked)
12         MR. CYR:  Q.  Ms. Ahrens, why don't you
13 take a moment to review this document and I'll
14 introduce it for the record.
15         This is a document that was produced to
16 us by the State of California, Bates-stamped
17 CAAG/DHS-E0049939, 49940.
18     A.   Okay.
19     Q.   Do you recognize this document?
20     A.   Yes.
21     Q.   What is this document?
22     A.   This is a document that lets a

Page 144

1  manufacturer know that we have initiated a review
2  of their product in response to their petition and
3  that as part of the process that we would be
4  sending a letter to the Medi-Cal Contract Drug
5  Advisory Committee for their evaluation and
6  recommendation.
7      Q.   And what's the specific drug that's
8  being referenced in this letter?
9      A.   DuoNeb.
10     Q.   Okay.  And the letter is directed to
11 Russell Johnston at Dey, L.P.; is that correct?
12     A.   Correct.
13     Q.   Okay.  If you turn to the second page,
14 the second paragraph in the letter reads "Send any
15 correspondence to the pharmaceutical consultant
16 assigned to coordinate the review of this drug at
17 the following address" and then it gives your
18 name; is that correct?
19     A.   That's correct.
20     Q.   All right.  And then an address which I
21 assume was your office at the time.
22     A.   Correct.

Page 145

1      Q.   Okay.  Do you recall being involved in
2  the review of this drug?
3      A.   Yes.
4      Q.   Okay.  Just looking at the letter, do
5  you recall having any communications with Russell
6  Johnston?
7      A.   No.
8      Q.   Okay.  Do you recall having
9  communication with anyone at Dey in regard to this
10 review?
11     A.   Yes.  But I couldn't tell you any name
12 or anything other than --
13     Q.   Okay.
14     A.   -- other than that there was contact.
15     Q.   Okay.  And the name below the signature
16 line is "Douglas Hillblom"?
17     A.   Correct.
18     Q.   Who is Douglas Hillblom?
19     A.   Chief of the Medi-Cal Contracting
20 Section.
21     Q.   He was Chief of the Contracting Section
22 at the time this letter was written?

37 (Pages 142 to 145)

Ahrens, Katherine                                    May 20, 2009
                        Sacramento, CA

Page 146

1      A.  Correct.
2      Q.  Which is September 6, 2002?
3      A.  Apparently.
4      Q.  Why don't you put that to the side for
5  now.
6          And just to be clear, I think you had
7  said this before, but I just wanted to make sure,
8  that this was in response to a petition that was
9  submitted by a manufacturer; is that correct?
10     A.  Correct.
11     Q.  So this wasn't one of those instances
12  where Medi-Cal decided to initiate a review?
13     A.  Correct.
14     Q.  Or to solicit a petition from the
15  manufacturer; correct?
16     A.  Not to solicit a petition.  We don't
17  solicit petitions.
18     Q.  Okay.
19     A.  That's not a correct statement.
20     Q.  Well, what would --
21     A.  It would have been to secure a contract
22  for addition of the drug to the list.

Page 147

1      Q.  Okay.  But Medi-Cal would have initiated
2  the process?
3      A.  The review.
4      Q.  The review.
5      A.  Yes.
6          MR. CYR:  Okay.  Would you mark this as
7  Ahrens Exhibit 6.
8          (Exhibit Ahrens 006 marked)
9          MR. CYR:  Q.  Would you take a moment to
10  review this document, and while you're looking at
11  it I'll introduce it for the record.
12         This is a document that was produced to
13  us by the State of California, Bates-stamped
14  CAAG/DHS0068016 to 68019.
15     A.  Okay.
16     Q.  You've had a chance to review this
17  document?
18     A.  Yes.
19     Q.  Do you recognize this document?
20     A.  No.
21     Q.  Looking at the first page of the
22  document, it appears to be an e-mail that was sent

Page 148

1  by you to Diane Furukawa?
2      A.  Correct.
3      Q.  Who is Diane Furukawa?
4      A.  Currently -- well, she's a pharmacist.
5  Currently she's Chief of the Medi-Cal Drug
6  Contracting Branch.
7      Q.  Okay.  What was her position at the time
8  this e-mail was sent?
9      A.  I don't know.
10     Q.  In March of 2004.
11     A.  I don't know.
12     Q.  Okay.  Do you know why you would be
13  sending her this e-mail?
14     A.  I don't recall.
15     Q.  Okay.  And the bottom portion of the e-
16  mail is an e-mail from someone named John
17  Valencia?
18     A.  Correct.
19     Q.  To you; is that correct?
20     A.  Correct.
21     Q.  Okay.  Do you know who John Valencia is?
22     A.  Yes.

Page 149

1      Q.  Who is John Valencia?
2      A.  He's an attorney with Wilke Fleury.
3      Q.  And Mr. Valencia is conveying some
4  information to you; is that correct?
5      A.  Correct.
6      Q.  What is he conveying?
7      A.  He's conveying -- well, he's providing
8  Dey's offer on three products, the DuoNeb, AccuNeb
9  .63 milligram and AccuNeb 1.25 milligram, and
10  attaching a file with numbers that the
11  manufacturer would have provided.
12     Q.  Okay.  And looking at the first page of
13  the e-mail again, Mr. Valencia uses the term
14  "Fixed Net Program Cost"?
15     A.  Correct.
16     Q.  Do you know what that's in reference to?
17     A.  The offer would be in reference to net
18  cost for these three products.
19     Q.  Okay.
20     A.  So when we discussed earlier the types
21  of supplemental rebate we would negotiate -- or
22  the offers that we would receive, this is one of

                              38 (Pages 146 to 149)

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                    May 20, 2009
                        Sacramento, CA

Page 150

1  those types.
2      Q.  Okay.  And just so I understand,
3  essentially Mr. Valencia on behalf of Dey is
4  offering a rebate -- to pay a rebate -- or I guess
5  Dey is offering -- strike that.
6          Day is offering to pay a rebate in the
7  amount such that Medi-Cal's net cost for, for
8  example, DuoNeb would be $1.03?
9      A.  That's what it says on the front of the
10  e-mail, so, yes, that appears to be their offer on
11  March 4th, 2004.
12     Q.  Okay.  In looking at the -- looking at
13  the second page, there's a line that begins
14  "Actual AMP 2003"?
15     A.  Correct.
16     Q.  And then it gives a row of amounts under
17  columns that look like they're headed "Q1", "Q2,"
18  "Q3" and "Q4"; is that correct?
19     A.  Correct.
20     Q.  Is it your understanding that that's the
21  AMP for DuoNeb?
22     A.  It would be my understanding that this

Page 151

1  is the AMP that Dey is reporting for DuoNeb to us
2  --
3      Q.  Okay.
4      A.  -- to Medi-Cal at that point in time.
5      Q.  Okay.  Why would Dey be providing the
6  AMPs to you in association with this offer?
7      A.  I don't know if it was contained in the
8  initial letter that went out to Dey that says we
9  were initiating the review where there's a
10  paragraph in there that says that they want to
11  meet with us, be prepared with your therapeutic
12  presentation or clinical presentation along with
13  any business proposal that they might want to
14  present and it's necessary to or appropriate or
15  whatever the verbiage was there to include AMP.
16     Q.  Can we go back and look at Exhibit 5 for
17  a minute.  If we turn to the second page of
18  Exhibit 5 and we read that first paragraph.
19     A.  Correct.
20     Q.  It reads "Also, include the drug's FDA
21  classification (Chemical Type and Treatment
22  Potential), the Average Manufacturer's Price (AMP)

Page 152

1  for each National Drug Code (NDC) number for this
2  product and the calendar quarter the AMP is from."
3  Did I read that correctly?
4      A.  Correct.
5      Q.  So in other words, the Medi-Cal program
6  was asking Dey for its AMPs?
7      A.  Correct.
8      Q.  Okay.
9      A.  For this review.
10     Q.  For this review.
11         Would that be typical, that you would
12  ask a manufacturer for their AMPs for a review?
13     A.  Yes.
14         MR. CYR:  Why don't we take a break and
15  change tape now.
16         THE VIDEOGRAPHER:  This concludes tape 2
17  in today's deposition.  We are now going off
18  record at approximately 2:33.
19         (Exhibit Ahrens 007 marked)
20         THE VIDEOGRAPHER:  This is the beginning
21  of tape 3 in today's video deposition of Katherine
22  Ahrens.  We are now back on the video record at

Page 153

1  approximately 2:57.
2          MR. CYR:  Q.  Ms. Ahrens, welcome back.
3  I'm going to change gears now.  The
4  court reporter has handed you what's been marked
5  as Ahrens Exhibit 7.  Have you had a chance to
6  review that document?
7      A.  No.
8      Q.  Okay.  Why don't you take the time to
9  just give it a look-over.
10         And while you're doing that, just for
11  the record, this is a document Bates-stamped
12  CAAG/DHS-E0017242 to 17261.  It was produced to us
13  in this action by the State of California.
14         You can spend as much time with the
15  document as you need, Ms. Ahrens, but I'm going to
16  be asking you about page 4, page 5, page 11, and
17  the last page of the document, page 19, and the
18  first page of the document as well.
19         Have you had a chance to review?
20     A.  Yes.
21     Q.  Okay.  Looking at the first page of this
22  document, do you recognize this document?  I'm

39 (Pages 150 to 153)

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                    May 20, 2009
                    Sacramento, CA

Page 154

1   sorry.  The first page of the exhibit, this page.
2       A.   No, I don't recall it.
3       Q.   Okay.  But looking at the -- looking at
4   the -- this appears to be an e-mail with an
5   attachment; is that correct?
6       A.   Correct.
7       Q.   And looking at the attachment to the e-
8   mail, do you recognize this document?
9       A.   No.
10      Q.   Okay.  Let's go back to the first page.
11  This appears to be an e-mail from Vic Walker to a
12  number of people and, based on the acronyms after
13  their names, they all appear to be employees of
14  the Department; is that correct?
15      A.   Correct.
16      Q.   Okay.  Who is Vic Walker?
17      A.   He's a pharmacist in our program.
18      Q.   Okay.  And if you go down and look at
19  the body of the e-mail, the e-mail reads -- the
20  message reads "Richard Cudlip sent me the attached
21  document.  I think that you may find it useful,
22  especially for training or answering questions.

Page 155

1   Thanks Richard! Vic."
2           Do you know who Richard Cudlip is?
3       A.   Richard Cudlip was a pharmacist on
4   contract through EDS who worked briefly with our -
5   - with the Pharmacy Benefits Group.
6       Q.   Mr. Walker says that he thinks you may
7   find this document useful, especially for training
8   or answering questions.
9           Do you recall using this document for
10  training purposes?
11      A.   No.
12      Q.   Okay.  Do you recall using documents
13  like this for training purposes?
14      A.   No.
15      Q.   Okay.  Let's turn to page 4 of this
16  document, which is Bates-stamped CAAG/DHS-
17  E0017246.  The top of the page reads "Average
18  Manufacturer's Price" and then it gives a
19  definition, and the definition reads AMP is the
20  price paid to -- rather, quote -- strike that.
21  Let me start that again.
22          "AMP is 'The average price paid to a

Page 156

1   manufacturer by retail pharmacies or by
2   wholesalers for drugs distributed to the retail
3   pharmacies.'  AMP is based on sales to the retail
4   sector, which generally pays higher prices than
5   other purchasing sectors."
6           Did I read those two sentences
7   correctly?
8       A.   Yes.
9       Q.   Is that consistent with your
10  understanding of what AMP is?
11      A.   Not really.
12      Q.   How is your understanding of AMP
13  different?
14      A.   My understanding of AMP is that it is a
15  calculation performed by the manufacturer and what
16  gets included in that calculation or what entities
17  have done business with that are included in the
18  calculation may or may not vary between
19  manufacturers and is something that they have the
20  ability to adjust should they determine that the
21  entities that they include or exclude in their
22  calculation needs to be modified.

Page 157

1           So there's no -- the way this reads,
2   it's as if it were a standard calculation used by
3   all manufacturers consistently, but we know from
4   experience that the calculations are not
5   consistent because the methodology is not defined
6   or clearly stated in federal regs or statute.
7       Q.   Okay.  Looking a little farther down the
8   page -- actually, strike that.
9           Let's move on to page 5.
10          Page 5 at the top of the page reads
11  "Average Wholesale Price (AWP)" and then it gives
12  a definition of Average Wholesale Price and that
13  definition is "AWP is the price assigned to a drug
14  and is listed in the Red Book, First DataBank or
15  Medispan.  AWP operates as a suggested list price
16  and is typically not what is paid as buyers may
17  negotiate lower prices through the inclusion of
18  discounts, rebates or free goods."
19          Is that consistent with your
20  understanding of the term "AWP," that definition
21  that I just read?
22      A.   It is consistent in that I understand it

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                    May 20, 2009

Sacramento, CA

Page 158

1  to be the price assigned to a drug as listed in
2  the different compendia, Red Book, First DataBank
3  or Medispan, and that the number still is based on
4  what the manufacturer reports.
5     Q.  But it's not consistent with your
6  understanding that AWP operates as a suggested
7  list price?
8     A.  No.
9     Q.  Do you think AWP operates as something
10  other than a suggested list price?
11    A.  My -- or my working assumption whenever
12  I would look at AWP or the number that we got from
13  AWP minus whatever percentage was in place at the
14  time, since AWP was the base, my assumption was
15  that that number was an accurate representation of
16  the Average Wholesale Price according to
17  information that the manufacturer would have
18  provided to the compendia, who then published the
19  AWP.  But it still marries back to what
20  information -- because only the manufacturer knows
21  what they sell product for, no one has access to
22  contracts that they may have negotiated, we

Page 159

1  wouldn't know.  It's dependent on us believing or
2  trusting that the manufacturer has reported
3  correctly.
4        So to say that it operates as a
5  suggested list price, that statement to me is the
6  opinion of the Academy of Managed Care Pharmacy.
7     Q.  Okay.  Setting aside your working
8  assumption of AWP as it's used in California's
9  reimbursement methodology, do you understand that
10  the AWPs that are listed in Red Book, First
11  DataBank and Medispan reflect -- strike that.
12       Setting aside your working assumption of
13  AWP as it's used in the Medi-Cal reimbursement
14  formula, do you understand today that AWP as
15  listed in Red Book, First DataBank or MediSpan
16  does not represent -- or I should say the AWPs
17  that are listed in Red Book and First DataBank and
18  MediSpan do not represent actual averages of
19  prices paid for pharmaceuticals?
20    MR. GLASER:  Object as to form.
21    THE WITNESS:  Again, because the
22  calculation is dependent upon the information that

Page 160

1  the manufacturer provides to the repositories, I
2  cannot say a hundred percent across the board that
3  that would be the case for every single
4  manufacturer, so I can't say that I understand
5  that it's not an accurate -- across the board
6  nationwide, outside of how it's applied in Medi-
7  Cal, I can't agree with that.
8    MR. CYR:  Q.  Okay.  Going down a little
9  farther on the page, under the -- it says in bold
10  "How Calculated" and then it reads "According to
11  the Red Book, AWP pricing information is 'based on
12  data obtained from manufacturers, distributors and
13  other suppliers.'  There are no requirements or
14  conventions that AWP reflect the price of any
15  actual sale of drugs by a manufacturer, nor is it
16  defined in law or regulations."
17       Is that statement consistent with your
18  understanding of how manufacturers derive -- or
19  how -- strike that -- how Red Book and other
20  pricing publications derive the AWPs that they
21  publish?
22    A.  I don't know how each entity -- I'm

Page 161

1  aware of how First DataBank has performed that
2  calculation to arrive at AWP, but I'm not aware of
3  how the other -- MediSpan or Red Book arrives at
4  their calculations -- or determinations of AWP.
5     Q.  The second sentence in that paragraph,
6  "There are no requirements or conventions that AWP
7  reflect the price of any actual sale of drugs by a
8  manufacturer, nor is it defined in law or
9  regulations," is that accurate with your
10  understanding of AWP -- or consistent with your
11  understanding of AWP?
12    A.  No.  I think that it again is the
13  opinion of Academy of Managed Care Pharmacy.
14       My understanding of it is that it's a
15  number born out of what manufacturers report.  You
16  know, so if -- if they're not reporting
17  accurately, how would we know that?
18    Q.  The last clause in that second sentence,
19  "nor is it defined in law or regulations," is that
20  consistent with your understanding?
21    A.  I'm not aware of all the law, so no.
22    Q.  Do you know of any law or regulation

41 (Pages 158 to 161)

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                          May 20, 2009
                        Sacramento, CA

Page 162

1  that defines AWP?
2     A.  I think that our law, when it speaks to
3  reimbursement -- or maybe it's in regs -- speaks
4  to the AWP as reported in whatever the compendia
5  is, it ties it in that way, but not in terms of
6  how the manufacturer or how any given entity is to
7  report to arrive at AWP.
8     Q.  Okay.  Let's go on to page -- actually,
9  I know I didn't tell you that we were going to
10 look at this page, but could we look at page 10.
11    A.  Sure.
12    Q.  Why don't you just take a moment to look
13 it over.
14    A.  Okay.
15    Q.  Page 10, at the top of the page it reads
16 "Retail or Usual and Customary (U&C) Price" and
17 then it gives a definition, and the definition
18 reads "U&C is defined as the pharmacy's selling
19 price to individual consumers.  The price includes
20 the cost of the drug and the pharmacy's mark-up.
21 The mark-up includes allowances for business
22 operating costs, e.g., rent, utilities, employee

Page 163

1  wages/benefits, etc., and dispensing services."
2       Did I read that correctly?
3     A.  Yes.
4     Q.  Okay.  Is that consistent with your
5  understanding of the term "usual and customary
6  charge"?
7     A.  The portion that is consistent with my
8  understanding of usual and customary is the
9  portion that states that it is defined as the
10 pharmacy's selling price to individual consumers.
11      The portion that states that the price
12 includes the cost of the drug plus pharmacy mark-
13 up and the mark-up would include allowances for
14 all those other portions is not -- I don't -- I
15 wouldn't know -- or don't -- I'm not familiar with
16 what an individual pharmacy, if it's an
17 independent or a retail pharmacy, how they would
18 arrive at their usual and customary.
19    Q.  Okay.  And that's because the pharmacy
20 is the one that sets that; right?
21    A.  Correct.
22    Q.  Okay.  And in fact it says under the

Page 164

1  bold "How Calculated" U&C is set by each
2  individual pharmacy; correct?
3     A.  Correct.
4     Q.  And that's consistent with your
5  understanding of how that's set; correct?
6     A.  Correct.
7     Q.  Let's look at page 11.  The bold heading
8  at the top of this page reads "Wholesale
9  Acquisition Cost," or WAC, and it gives a
10 definition, and the definition reads "WAC is the
11 cost at which wholesalers purchase drug products
12 from the manufacturer."  This price is defined as
13 the list price" -- I'm sorry.  "This price is
14 defined as the 'list price established by
15 manufacturers for sales to wholesalers.'  The drug
16 manufacturers provide this information.  WAC, like
17 the Average Wholesale Price (AWP - defined on page
18 5), is a suggested price, and is typically not
19 what is paid."
20      First of all, are you familiar with the
21 term "Wholesale Acquisition Cost"?
22    A.  Yes.

Page 165

1     Q.  Okay.  Is this definition given here
2  consistent with your understanding of that term?
3     A.  Yes, up to the first and second
4  sentences or third, drug manufacturers provide
5  information.
6     Q.  Okay.
7     A.  To say that -- I can't say that I agree
8  or would know that it is typically what is not
9  paid.
10    Q.  Okay.
11    A.  Because I don't know what their
12 contracts were.
13    Q.  Okay.  And then going down a little
14 farther on the page, under the "How Calculated"
15 segment, it reads "WAC is a proprietary price set
16 by the pharmaceutical manufacturers.  Each
17 manufacturer assigns its own price using its own
18 formula.  First DataBank and MediSpan report WAC
19 prices in their drug information databases, and
20 they are also listed in the Red Book."  Did I read
21 that paragraph correctly?
22    A.  Yes.

Henderson Legal Services, Inc.
202-220-4158                        www.hendersonlegalservices.com

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                    May 20, 2009
                        Sacramento, CA

| Page 166 | Page 168 |

Page 166

1    Q.  Is that consistent with your
2  understanding of how WAC is calculated?
3    A.  It is my understanding that it is a
4  price that is established by the manufacturer,
5  yes.
6    Q.  And is it also your understanding that
7  it's available in First DataBank and MediSpan?
8    A.  Because our reimbursement methodologies
9  to pharmacies is not based on WAC, it's not a
10 number that I ever looked at, so I can't say that
11 I was aware of it being in First DataBank.  I know
12 that I've seen WAC in Red Book, but again that's
13 not a data source that we use.
14   Q.  Do you know, does California have access
15 to WAC prices?
16   A.  Well, I'm sure they would, California
17 would to the extent that they have access to any
18 of these repositories.
19   Q.  And you use -- I believe California uses
20 First DataBank.
21   A.  Medi-Cal uses --
22   Q.  Or rather Medi-Cal uses First DataBank;

Page 167

1  correct?
2    A.  Yes.
3    Q.  Okay.  Why don't we set that document
4  aside for now.
5        Would you mark this as 8.
6        (Exhibit Ahrens 008 marked)
7    MR. CYR:  Do you recognize this
8  document, Ms. Ahrens?
9        Take a moment to look it over.
10       You can look over as much of the
11 document as you like, but I'm going to ask you
12 about California's response to interrogatory 8,
13 which begins on page 14; interrogatory 16, which
14 begins on -- and interrogatory 16, which begins on
15 page 36.
16   A.  Interrogatory 8?
17   Q.  8, yeah.
18   MR. GLASER:  And 16?
19   MR. CYR:  And 16, yeah.
20   THE WITNESS:  I've not seen this
21 document before.  This document does not look
22 familiar to me.

Page 168

1        I shouldn't say I haven't seen it
2  before.  I don't recall having seen it.
3        MR. CYR:  Q.  Okay?  You've had a chance
4  to look at it?
5    A.  Yes.
6        MR. CYR:  For the record, this is State
7  of California's Objections and Responses to
8  Defendant Abbott Laboratories' First Set of
9  Interrogatories.  It was served in this action on
10 December 21st, 2007.
11   Q.  If you turn to page 14, interrogatory 8,
12 it reads "Identify all actions taken by You and
13 Ven-A-Care to insure the preservation of evidence,
14 witness testimony, data or other information
15 relevant to or discoverable in this litigation,
16 including, without limitation, the date on which
17 the action was taken, the persons who took the
18 action, the specific direction to preserve
19 evidence, the persons to whom it was communicated,
20 and the parties to the communication relating to
21 the preservation of evidence."
22       Did I read that correctly?

Page 169

1    A.  Yes.
2    Q.  Okay.  You had mentioned before that you
3  had assisted in preparing responses to
4  interrogatories in this action; is that correct?
5    A.  Correct.
6    Q.  Is interrogatory 8 that I just read into
7  the record, is that one of the interrogatories
8  that you assisted in preparing a response to?
9    A.  No.
10   Q.  No?
11       Have you had a chance to review the
12 response to interrogatory number 8?
13   A.  Yes.
14   Q.  Okay.  Do you recall ever getting any
15 instructions from anyone to preserve documents in
16 connection with this case?
17   A.  I recall having gotten or received
18 information about this case.  But as far as
19 specific instructions related to document
20 retention for this case, I don't recall
21 specifically having received that -- or not
22 having.  I know we were noticed that we were going

                              43 (Pages 166 to 169)

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                    May 20, 2009
                    Sacramento, CA

Page 170

1  to be involved in this.  But as far as the
2  document retention goes, I don't recall any
3  specific e-mail that said -- mentioned the type of
4  documents to retain or not destroy.
5      Q.  Okay.  If you look at paragraph number
6  6.
7      A.  On?
8      Q.  On page 17.  I'm sorry.
9      A.  Okay.
10     Q.  Paragraph 6 reads "On December 9, 2005
11 OLS sent an e-mail notice to all the branches and
12 offices listed in paragraph Number 5 above
13 notifying them of the pending litigation and the
14 need to preserve all documents that could be
15 discoverable."  Did I read that paragraph
16 correctly?
17     A.  Yes.
18     Q.  Okay.  Do you have an understanding of
19 what's meant by the acronym "OLS" here?
20     A.  Yes.
21     Q.  What is your understanding?
22     A.  Office of Legal Services.

Page 171

1      Q.  And if you look above that paragraph 5,
2  it lists a number of departments --
3          MR. GLASER:  Are you on paragraph 6?
4          MR. CYR:  I'm on paragraph 5 now on page
5  16.
6      Q.  I guess it lists a number of units or
7  divisions within the Department of Health
8  Services.  Is that correct?
9      A.  It lists divisions and sections and
10 branches, yes, different offices.
11     Q.  Okay.  Is the Department -- or the
12 branch or unit that you were in on December 2nd,
13 2005 -- rather December 9th, 2005, is that
14 included on this list?
15     A.  Yes.
16     Q.  And what department is that?  Or which
17 unit is that, rather?
18     A.  Pharmacy Policy.
19     Q.  Okay.  Reading paragraph 6 in
20 conjunction with the list on paragraph 5, does
21 that refresh your recollection about receiving an
22 e-mail to preserve documents?

Page 172

1      A.  I remember receiving an e-mail.  I could
2  not tell you when.
3      Q.  Okay.
4      A.  And that was the whole thing, when we
5  were put on notice that this lawsuit or the
6  potential, I do remember discussions around that
7  and the need to preserve documents.
8          But we preserve documents anyway.
9  You've seen how old some of these documents are in
10 our pile.  So it's like they're not telling us
11 anything we don't already do.
12     Q.  Well, you preserve documents in the
13 normal course of business; right?
14     A.  Right.
15     Q.  Okay.  But sometimes documents -- strike
16 that.
17         Do you recall -- you had mentioned
18 conversations regarding the case.  Do you recall
19 if you -- were those conversations -- I might have
20 missed this.  Did those conversations entail the
21 need to preserve documents?
22     A.  I don't remember.

Page 173

1      Q.  Okay.  Do you remember gathering
2  documents as part of -- in response to this case?
3      A.  Oh, yes.
4      Q.  Okay.  Where did you look for documents
5  that you gathered in relation to this case?
6      A.  Anywhere documents may have been stored
7  that were responsive to the request for
8  production.  So within our section it would have -
9  - each pharmacist was responsible for producing
10 responsive documents.
11     Q.  Okay.
12     A.  So however many that there are of us
13 that would have been involved with any of the --
14 as defined in the request for production would
15 have produced documents.
16         I personally didn't go through
17 everybody's files to find documents.
18     Q.  Okay.  Did you go through your files to
19 look for documents?
20     A.  Yes.
21     Q.  Files stored in your office?
22     A.  Yes.

                              44 (Pages 170 to 173)

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                      May 20, 2009
                    Sacramento, CA

Page 174

1    Q.  Okay.  Do you also store some of your
2  files in another location?
3    A.  No.  On the computer.
4    Q.  Okay.
5    A.  But no.
6    Q.  Do you recall going through your e-mails
7  stored on your computer?
8    A.  No.
9    Q.  Do you know if that was done?
10   A.  Yeah.
11   Q.  Someone else went through it?
12   A.  Someone else went through the e-mails.
13  I think our -- well, our machines were all
14  downloaded, weren't they, for e-mail?  I don't
15  recall.  I mean we didn't -- I didn't have to go
16  through each and every e-mail.
17   Q.  Okay.  Do you recall when the download
18  of e-mails took place?
19   A.  No.
20   Q.  Okay.  Do you recall about how many
21  documents you determined were responsive to the --
22   A.  No.

Page 175

1    Q.  No?
2        Can you give an approximation?
3    A.  Thousands.
4    Q.  Thousands?  Thousands of pages or
5  thousands --
6    A.  Thousands of pages.
7    Q.  Okay.  Of just your documents?
8    A.  I don't know.  Mine may have been
9  several hundred.  I worked there for a long time.
10   Q.  Okay.
11   A.  So I can't say how many of mine were
12  responsive.
13   Q.  Okay.  Do you know approximately how
14  many pages of your documents -- documents within
15  your possession were responsive?
16   A.  No.
17   Q.  Okay.  Did anyone ask you any questions
18  about the documents that you gathered?
19       MR. GLASER:  I'm going to object and
20  caution the witness not to give any information
21  that you might have shared with your counsel at
22  DHCS or the Attorney General's office.

Page 176

1        But otherwise, you can answer the
2  question.
3        MR. CYR:  I'll qualify it.
4    Q.  Any questions that were posed to you by
5  someone other than an attorney.
6    A.  No.
7    Q.  All right.  Let's turn to page 36 of the
8  interrogatories.
9        And you've had a chance to review this
10  interrogatory and the response?
11   A.  Yes.
12   Q.  Okay.  And at the top of the page, under
13  the heading "INTERROGATORY NUMBER 16," it reads
14  "Identify all persons currently or formerly
15  employed by You or serving as a contractor to You
16  with any knowledge that at any time the
17  reimbursement for a pharmaceutical drug product
18  based on AWP or Direct Price might result in
19  reimbursement to a provider in excess of actual
20  acquisition cost."
21       And then there's a -- the response
22  includes some objections and then it gives a list

Page 177

1  of names and addresses; is that correct?
2    A.  Correct.
3    Q.  I'm sorry.  Did I read the interrogatory
4  correctly?
5    A.  I believe so.
6    Q.  Okay.
7        MR. GLASER:  And, Brendan, I'm just
8  going to object and reassert the same objections
9  that are in our original response.
10       MR. CYR:  Okay.  Understood.
11   Q.  If you turn to page 37 and the third
12  name down, that's you, isn't it?
13   A.  Yes.
14   Q.  Okay.  Do you have knowledge that at any
15  point in time the reimbursement for a
16  pharmaceutical drug product based on AWP or Direct
17  Price might result in reimbursement to a provider
18  in excess of actual acquisition cost?
19       MR. GLASER:  Same objections.
20       MR. CYR:  Before you answer that, Randy,
21  do you just want to have any question I ask about
22  this be a standing objection?

45 (Pages 174 to 177)

Ahrens, Katherine                              May 20, 2009
                    Sacramento, CA

Page 178

1        MR. GLASER:  Yes.
2        MR. CYR:  Okay.
3     Q.  You can go ahead.
4     A.  The way this interrogatory was
5  structured, it says with any knowledge at any time
6  that might.  That word "might," like we knew, for
7  example, on some of the generic products
8  especially, that acquisition costs from pharmacy
9  providers versus AWP were significantly different.
10    Q.  Okay.
11    A.  So -- but generally speaking -- and we
12  might have knowledge of that information on a
13  drug-by-drug basis.  But generally, no.  The
14  potential always exists because reimbursement --
15  accuracy of reimbursement is contingent on the
16  accuracy of the baseline that we use, which is
17  AWP, which is born out of what manufacturers
18  report.
19    Q.  Okay.  I want to backtrack to one point
20  in your response.  You said you had knowledge that
21  there was a significant difference between -- I
22  think I'm saying that correctly, there was a

Page 179

1  significant difference between the AWP and what a
2  provider could acquire a generic version of a drug
3  for.
4     A.  Correct.
5     Q.  Could you quantify that, significant?
6        First let me withdraw that question and
7  ask a different question.
8        Would the price that the pharmacist
9  could acquire a generic drug for be significantly
10  lower -- the provider's actual acquisition cost
11  for the generic drug be significantly lower than
12  the AWP?
13    A.  I would have to quantify that in that
14  the reports that we would get were anecdotal.  So
15  it might be from a pharmacy provider who shared
16  the information with one of us.
17    Q.  Okay.
18    A.  So in that respect, that's how we would
19  acquire that knowledge, the anecdotal reports that
20  we would get, nothing formal.
21    Q.  Okay.  But you would receive reports
22  from --

Page 180

1     A.  Periodically, not of any high frequency.
2     Q.  Okay.  But could you -- to go back to
3  the question I asked, would the prices be -- would
4  the pharmacist's actual acquisition cost be
5  significantly lower than the published AWP?
6     A.  One drug comes to mind.
7     Q.  Okay.
8     A.  And which is not a product involved in
9  this litigation --
10    Q.  Okay.
11    A.  -- and the difference was more than
12  tenfold for this one provider.
13    Q.  Okay.  What was the product that comes
14  to your mind?
15    A.  It's a product that was single source
16  that became generic.
17    Q.  Okay.
18    A.  And the complaint was -- sometimes what
19  we will do with a drug is that we might look at
20  what our net cost is, especially on newly generic
21  products.
22    Q.  Okay.

Page 181

1     A.  When a single-source drug loses its
2  patent and becomes generic, it's not uncommon for
3  our net cost after CMS or basic rebate would be
4  lower than our net cost for a generic, under which
5  scenario we would label the code, restrict the
6  product to the manufacturer that was of a lower
7  cost.  That's something administratively that we
8  are able to do.
9     Q.  Okay.
10    A.  And as a generalization, the only time
11  we might look is when a drug was going off patent
12  and had high utilization.
13    Q.  Okay.  Going back to my question,
14  though, do you recall the name of the drug that
15  you referenced before where there was a tenfold
16  difference between acquisition cost and the
17  published AWP?
18    A.  Fluoxetine.  It's not a part of this --
19  it's not a drug, though, that's manufactured by
20  the companies that you represent.  It's not an
21  inhalation product.
22    Q.  Okay.  Just for the record, I also

46 (Pages 178 to 181)

Ahrens, Katherine                                      May 20, 2009
Sacramento, CA

Page 182

1  represent a company called Mylan Pharmaceuticals,
2  Inc. --
3      A.  Okay.
4      Q.  -- and they manufacture drugs besides
5  inhalation products.
6          Do you recall when you heard about that
7  significant spread -- or the significant
8  difference between the provider's acquisition cost
9  and the published AWP for fluoxetine?
10     A.  The year?  No.
11     Q.  Was it maybe 10 years ago?
12     A.  I can't say.
13         It would have correlated with when the
14  single-source manufacturer's patent expired and
15  when generics appeared.
16     Q.  Okay.
17     A.  So I don't know that date or the time
18  frame.
19     Q.  Okay.  Do you recall when you first
20  began hearing anecdotal evidence regarding
21  significant spreads between -- or significant
22  differences between provider acquisition cost and

Page 183

1  published AWPs for generic drugs?
2      A.  When I first started hearing it?
3      Q.  Yes.
4      A.  No.
5      Q.  Was it more than five years ago?
6      A.  Could have been.  How long did ago did
7  fluoxetine go off patent?  It probably was.
8      Q.  Okay.  Could it have been 10 years ago?
9      A.  Again it depends upon when fluoxetine
10  would have gone off patent.  I don't know.  That
11  was the first time -- that was the first time that
12  I saw anything with that amount of spread.
13     Q.  Okay.  So fluoxetine was that instance?
14     A.  Correct.
15     Q.  And if we were to go look at -- go
16  backtrack and figure out when fluoxetine went off
17  patent, that would be around the time you first
18  learned that --
19     A.  Approximately.
20     Q.  Approximately.  Okay.
21     A.  Approximately.
22     Q.  Do you recall any other drugs, specific

Page 184

1  drugs --
2      A.  No.
3      Q.  -- regarding which you heard information
4  like this?
5      A.  No.
6      Q.  Okay.  You can put that document aside
7  for now.
8          I want to jump back to some testimony
9  you gave earlier this morning regarding when you
10  worked at Department of Developmental Services,
11  specifically with regards to ordering drugs.  You
12  had mentioned one of the -- when it came down to
13  replenish the facility you worked at, their supply
14  of drugs, one of -- you would sometimes acquire
15  drugs from -- through a Department of General
16  Services contract.  Is that correct?
17     A.  Um-hmm.
18     Q.  Okay.  Do you know how the Department of
19  General Services -- or do you know how the
20  Department of General Services contract operated?
21     A.  No.
22     Q.  Do you know if the Department of General

Page 185

1  Services bought drugs directly from manufacturers?
2      A.  No.
3      Q.  Okay.  Do you have any knowledge about
4  how that --
5      A.  No.  I have absolutely no knowledge.  I
6  didn't then, nor do I now have knowledge of how
7  they contract.
8      Q.  Okay.  To your knowledge, has the
9  Department of Health Services ever purchased drugs
10  directly from manufacturers?  Actually, strike
11  that.
12         Has the Medi-Cal program ever purchased
13  drugs directly from manufacturers?
14     A.  No.
15     Q.  You have no knowledge of --
16     A.  No.  We reimburse providers.
17         To purchase something implies that
18  you're taking possession of the product in my
19  mind.  And I cannot ever think of a time when we
20  would have taken possession of a product for
21  distribution.  There's no reason for it.
22     Q.  Okay.

47 (Pages 182 to 185)

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                        May 20, 2009
                        Sacramento, CA

Page 186

1     A.   There's no reason for it.  We do not
2  dispense.  We don't fill prescriptions.
3         We provide reimbursement to providers
4  who perform that function.
5     Q.   Okay.  So in other words, you rely on
6  providers to actually dispense the drugs to the
7  Medicaid beneficiaries; correct?
8     A.   We rely on providers who have the
9  authority to do that, yes.
10    Q.   Okay.
11    A.   To dispense.
12    MR. CYR:  Okay.  Could we go off the
13 record for a moment?
14    MR. GLASER:  Sure.
15    THE VIDEOGRAPHER:  We are going off the
16 video record at approximately 3:53.
17    We're now back on the video record at
18 approximately four o'clock.
19    MR. CYR:  Q.  Ms. Ahrens, I just have a
20 few more questions.
21    Changing gears, are you familiar with
22 the term "ASP," or Average Sales Price?

Page 187

1     A.   Yes.
2     Q.   Okay.  What is your understanding of
3  that term?
4     A.   It is a number used in Medicare for
5  reimbursement of certain injectables, drugs that
6  are a part of Part B for -- Part B is for like
7  office visits, physician office visits, so they'll
8  use that.  And they're for certain drugs.
9         And then ASP was also a base -- it was a
10 term that we had in our law, and I don't recall
11 the exact verbiage of the law, but I believe it
12 was a number that we were going to require
13 manufacturers to report to us and from there
14 perhaps modify some of our reimbursement
15 methodologies to pharmacy providers.
16    Q.   Okay.  Would ASP be used the same way
17 that AWP is now, as another possible reimbursement
18 basis?
19    A.   It may have been had it -- it's no
20 longer in law.
21    Q.   Okay.
22    A.   So that possibility existed.  It was

Page 188

1  something that we were looking into.
2     Q.   Okay.  It was part of the law at one
3  time; is that correct?
4     A.   Correct.
5     Q.   Okay.  Do you know approximately the
6  time period?
7     A.   I think it was sometime around 2003,
8  2004.
9     Q.   Okay.
10    A.   Somewhere in that neighborhood.
11    Q.   Okay.  And it's no longer --
12    A.   It's no longer part of the law.
13    Q.   Okay.  Do you have an understanding of
14 why it's no longer part of the law?
15    A.   Yes, I do.
16    Q.   What is that understanding?
17    A.   I think I previously had stated that
18 whenever legislation was passed or it became law
19 that impacted our program, then we would have to
20 move toward implementing that piece of the
21 legislation.  And so one of the requirements --
22 well, the requirement -- or the language that was

Page 189

1  in the law around ASP would have required the
2  manufacturers to report ASP to the Department.
3  And so while we were in the process of trying to
4  define what would be included in that calculation
5  and looking --
6     Q.   Sorry.
7     A.   And I believe at that time, too, what we
8  were looking at was how ASP calculation was
9  defined in the Medicare portion of the law to
10 assess what would be appropriate for our purposes
11 -- or relevant to our purposes, and in the midst
12 of all of that we received notice -- and I don't
13 recall how that notice came through, but that the
14 feds were working on changing how -- or changing
15 FULs or were moving towards an AMP-based
16 methodology for establishing FULs or some such
17 thing.
18        So for us to have a reporting
19 requirement that was unique just to California and
20 different from anybody else was not something that
21 -- and setting up that system, including the
22 methodology for reporting and the repository to

                                    48 (Pages 186 to 189)

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                          May 20, 2009
                        Sacramento, CA

| Page 190 | Page 192 |
|---|---|

**Page 190**

1   store it and maintain it and all of that wasn't as
2   -- in light of how the feds were moving, just
3   didn't seem like the prudent way to go.
4       Q.   Okay.
5       A.   So for that reason we dumped it, dumped
6   the -- the process just stopped.
7           MR. CYR:  I think at this time I have no
8   further questions for the witness.
9           And subject to subsequent document
10  production by the State of California or any
11  questions that Mr. Glaser has on direct or any of
12  the other attorneys representing plaintiffs in
13  this action have on direct, I'm going to pass the
14  witness.
15
16          EXAMINATION
17  BY MS. BERWANGER:
18      Q.   Mrs. Ahrens, again, for the record, my
19  name is Lara Berwanger.  I represent the defendant
20  Sandoz, Inc., in this action.
21          Have you heard of Sandoz, Inc.?
22      A.   Yes.

**Page 191**

1       Q.   And are you aware that Sandoz, Inc.,
2   used to be known as Geneva Pharmaceuticals, Inc.?
3       A.   No.
4       Q.   I'll represent to you that Geneva
5   Pharmaceuticals, Inc., is the former name of
6   Sandoz, Inc., and that upon the change in name,
7   nothing else changed about the company, just the
8   change in name.
9           Can you agree with me that sometimes
10  when I ask you questions I may use "Sandoz," I may
11  use "Geneva," but I'm speaking about the same
12  company?
13      A.   Okay.
14      Q.   Have you ever spoken to anyone at
15  Sandoz?
16      A.   As the generic or -- see, this is where
17  I get confused.
18      Q.   Sure.
19      A.   And for all my career I've pronounced it
20  Sandoz, so pardon me if I do that.
21      Q.   It's an ongoing debate.
22          That's fine.  I'll understand what

**Page 192**

1   company you're referring to.
2       A.   And I realize that companies may have
3   different -- to me it looks all the same.  If it's
4   Sandoz, Inc., Sandoz, LLC, Sandoz whatever --
5       Q.   Sure.
6       A.   I don't know how to differentiate that.
7   That to me is legalese, it doesn't make a lot of
8   sense to me.
9       Q.   My client in this case, Sandoz, Inc., is
10  a manufacturer of generic products that it markets
11  and sells in the United States.  Does that make
12  things a little bit clearer?
13      A.   It makes it a little bit clearer.
14          So as far as conversations go -- and I
15  don't recall the circumstance under which I would
16  have had this conversation, but I do recall having
17  a conversation with the generic arm of Sandoz, but
18  I don't recall what the drug was or the topic or
19  any of that.
20      Q.   Do you know when this conversation took
21  place?
22      A.   No.

**Page 193**

1       Q.   Was it within the last five years?
2       A.   I wouldn't know.  You know, how fast
3   does time go by?  I can't even begin to estimate.
4           My timeline -- my marker is from when we
5   moved to the east end versus when we were in the
6   other building.  And I don't know if that
7   conversation happened while at the east end or
8   while at 7th and P, so I cannot give you a time.
9       Q.   Could you say whether it was this
10  decade?
11      A.   No.  I couldn't even say that much.
12      Q.   Can you remember who you spoke with?
13      A.   No.
14      Q.   Can you remember anything that was said?
15      A.   No.
16      Q.   Can you remember whether pricing was
17  discussed?
18      A.   No.
19      Q.   Do you know whether there was more than
20  one conversation that you had with anyone from
21  Sandoz?
22      A.   No, I don't remember.

49 (Pages 190 to 193)

Ahrens, Katherine                                    May 20, 2009
                        Sacramento, CA

Page 194

1    Q.  Do you know if you took notes of the
2  conversation?
3    A.  I don't remember.
4    Q.  If you did take notes, would they likely
5  have been notes that you typed up?
6    A.  No.  I don't type up my notes typically.
7    Q.  Typically, do you have handwritten notes
8  when you have conversations with manufacturers?
9    A.  Not typically.
10    Q.  Typically, do you take notes at all?
11    A.  Not typically.
12    Q.  Do you know whether there was any
13  written correspondence in advance of the
14  conversation or to follow up on anything from the
15  conversation?
16    A.  No.
17    Q.  Is it fair to say that sitting here
18  today you have absolutely no recollection of any
19  of the circumstances of the conversation?  Other
20  than the fact that it took place.
21    A.  I think that's how I stated it in the
22  beginning, that all that I remember is that I, for

Page 195

1  whatever reason, made a phone call or answered a
2  phone call.  I just recall -- the reason it sticks
3  out is because I didn't realize that Sandoz had a
4  generic arm.  But that's the only reason that it
5  sticks out in my mind as any memory at all.
6    Q.  Have you ever heard the name Ron
7  Hartmann?
8    A.  That's the guy.  That's the guy.
9    Q.  Okay.
10    A.  Now, yeah.  If I saw his name, I would
11  remember it.
12    Q.  Now that you remember the name of the
13  person you spoke with, do you remember any other
14  details of the call or the conversation?
15    A.  No.  No, I don't.
16    Q.  I'm going to give you a document that
17  may refresh your recollection.
18      (Exhibit Ahrens 009 marked)
19    MS. BERWANGER:  Are we on Exhibit 9?
20    THE REPORTER:  Correct.
21    MS. BERWANGER:  Q.  Okay.  The court
22  reporter has placed in front of you a document

Page 196

1  marked Exhibit 9.  It is an e-mail from you to
2  Mike Namba in 2002 regarding Ron Hartmann's phone
3  number.
4      For the record, this document was
5  produced to us by California, the Bates stamp is
6  CAAG/DHS-E0038815.
7      Do you recognize this document?
8    A.  Only that it has my name on it and that
9  it was from me.  But no.
10    Q.  Do you know why Mike Namba wanted the
11  number of the representative for Geneva?
12    A.  No.
13    Q.  Do you know if Mike Namba called Ron
14  Hartmann?
15    A.  No.
16    Q.  If you look at the date of the e-mail,
17  you sent Ron Hartmann's contact information to
18  Mike Namba on August 9th of 2002; correct?
19    A.  Correct.
20    Q.  Does that refresh your recollection of
21  when your conversation with Ron Hartmann took
22  place?

Page 197

1    A.  No.
2    Q.  Do you know how you came to have Ron
3  Hartmann's contact information in your file?
4    A.  I don't recall.
5    Q.  Sitting here today, you don't recall Ron
6  Hartmann ever making representation to you about
7  pricing that you found to be false or misleading,
8  do you?
9    MR. GLASER:  Object as to form.
10    THE WITNESS:  Because I don't remember
11  the context of the conversation, I can't say that
12  -- I mean the way that that question is stated, it
13  sort of implies that there would have been a
14  conversation around pricing.  But because I don't
15  remember what the conversation was about, I can't
16  say -- I can't answer that question the way it's
17  phrased.
18    MS. BERWANGER:  Q.  Well, to your
19  recollection today, you can't recall whether Ron
20  Hartmann ever discussed pricing with you in a way
21  that you found to be false and misleading; is that
22  correct?

50 (Pages 194 to 197)

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                      May 20, 2009
                        Sacramento, CA

Page 198

1        MR. GLASER:  Object as to form.
2        THE WITNESS:  I can't recall the
3   conversation, so I can't recall any aspect of the
4   conversation.
5        MS. BERWANGER:  You can put that exhibit
6   aside.
7      Q.   Are you aware of any supplemental rebate
8   agreements that California had with Sandoz?
9        And by "Sandoz," for the record, I'm
10  referring to the generic manufacturer.
11     A.   No.
12       MS. BERWANGER:  Mark this Exhibit 10,
13  please.
14       (Exhibit Ahrens 010 marked)
15       MS. BERWANGER:  Q.  The court reporter
16  has placed in front of you Exhibit 10 to your
17  deposition.  It is a document that was produced to
18  us by the State of California, it bears a Bates
19  stamp CAAG/DHS0079918 through 79921.
20       Do you recognize this document?
21     A.   I recognize the format of the document.
22       So are you asking me do I specifically

Page 199

1   remember this particular document?
2      Q.   We can start there.
3      A.   I don't remember this particular
4   document.
5      Q.   But you remember documents similar to
6   this document?
7      A.   Correct.
8      Q.   Could you describe this document?
9      A.   It's a database of contracts that -- or
10  it's like the history of contracts that the
11  Department would have had with different
12  manufacturers.
13     Q.   Is it fair to say that this is a
14  database of contracts for supplemental rebates
15  that the Department would have had with
16  manufacturers?
17     A.   I think that you saw from the earlier
18  contract that had no supplemental rebate that
19  there were occasions where we would have contracts
20  with no supplemental rebate.  So this is a
21  database of contracts, period, that manufacturers
22  had with the Department.

Page 200

1      Q.   If you look on the first page, about a
2   third of the way down there's an entry where it
3   says "Geneva" under the Labeler Name and
4   "Lorazepam" under the Drug Description.  Do you
5   see that?
6      A.   Correct, yes.
7      Q.   Do you recall a supplemental rebate
8   program involving generic manufacturers for the
9   drug Lorazepam?
10     A.   When you say "supplemental rebate
11  program," the entire program, that's the whole
12  program, whether it's generic or single source.
13     Q.   Do you remember a program -- scratch
14  that.
15       Do you remember a program for the drug
16  Lorazepam in which California tried to enter into
17  supplemental rebate contracts with both generic
18  and brand-name manufacturers?
19     A.   The program is still in existence.  It's
20  a State supplemental rebate program.  And I do
21  recall an attempt to contract with generic
22  manufacturers with Lorazepam being the drug that

Page 201

1   we sort of did -- experienced the feasibility or
2   the outcomes or the results of contracting with
3   generic companies.  So...
4      Q.   Based on this document, does it appear
5   to you that Geneva did in fact enter to a
6   supplemental rebate agreement with California for
7   Lorazepam?
8      A.   Yes.
9      Q.   And based on this document, it looks
10  like the original expiration date was June 30th,
11  2003; correct?
12     A.   Correct.
13     Q.   Do you recall the length of the
14  supplemental rebate agreement for Lorazepam?
15     A.   No.
16     Q.   From this document, can you tell when
17  Geneva would have initially entered into the
18  supplemental rebate agreement with Lorazepam --
19  with California for Lorazepam?  Excuse me.
20     A.   No.
21     Q.   You can put that away.
22       I'll mark this Exhibit 11.

51 (Pages 198 to 201)

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                    May 20, 2009
Sacramento, CA

Page 202

1    I apologize, I only have one copy of
2  this document.
3      (Exhibit Ahrens 011 marked)
4    MR. BERWANGER:  Q.  The court reporter
5  has placed in front of you Exhibit 11, which is a
6  document that was produced by my client and is
7  Bates-stamped SANDOZ CALI 3000314 through 3000368.
8  It is a letter dated August 4th, 1992 from Ron
9  Hartmann to Michael Neff with attachments.
10   A.  Okay.
11   Q.  Have you ever seen this document before?
12   A.  No.
13   Q.  Have you ever seen any documents like
14  it?
15   A.  No.
16   Q.  Who is Michael Neff?
17   A.  He was -- when I met him, which was
18  after this date, he was the chief of our -- of the
19  Medi-Cal Contracting Section.
20   Q.  If you look at the second paragraph to
21  this letter, Ron Hartmann represents that he is
22  including a printout identifying the AMP and

Page 203

1  calculated rebate for certain products; correct?
2    A.  Correct.
3    Q.  Actually, if you look at the last
4  sentence of the first paragraph, the products he's
5  referring to are the drugs reimbursed from January
6  1th, 1992 through March 31st, 1992; correct?
7    A.  Correct.
8    Q.  And if you turn with me to the page
9  Bates-stamped 3000342.  Starting there and
10  continuing on -- actually, I'm sorry, I want you
11  to turn to the next page, page Bates-stamped
12  SANDOZ CALI 300343.
13      There is a chart there for the first
14  quarter of 1992; correct?
15   A.  Correct.
16   Q.  And to the left of the chart is a column
17  for Item Number and then to the right of that is a
18  column for the product, which appears to list the
19  generic name of the product; is that correct?
20   A.  Correct.
21   Q.  And then to the right of that there is a
22  column for Average Manufacturing Cost; correct?

Page 204

1    A.  Correct.
2    Q.  And based on Ron Hartmann's letter where
3  he said that he was including a printout
4  identifying AMP, would you agree with me that that
5  column is likely to represent AMP?
6    A.  That would be an assumption.
7    Q.  I can represent to you that this column
8  is the same as AMP for these products and that
9  that is what my client was transmitting.
10     12.
11      (Exhibit Ahrens 012 marked)
12     MR. GLASER:  This is number?
13     MS. BERWANGER:  12.
14   Q.  Exhibit 12 is a document Bates-stamped
15  CAAG/DHS-SAN000063 through 000078.
16   A.  Okay.
17   Q.  Have you ever seen this document before?
18   A.  No.
19   Q.  If you would turn to the third page of
20  the document, Bates-stamped 000065, there's
21  another cover letter from Ron Hartmann, which
22  again he says he is including a printout

Page 205

1  identifying the AMP and calculated rebate for the
2  period of October 1st, 1994 through December 31st,
3  1994; correct?
4    A.  Correct.
5    Q.  And if you flip two pages in from that,
6  again there is another schedule which lists the
7  AMPs for several products; correct?
8      MR. GLASER:  Object as to form.
9      THE WITNESS:  The list is Average
10  Manufacturer Cost, which you have said meant the
11  manufacturer intended to mean AMP.  So that's
12  listed there.
13     MS. BERWANGER:  You can put that
14  document away.
15     13.
16      (Exhibit Ahrens 013 marked)
17     MS. BERWANGER:  Exhibit 13 is a document
18  Bates-stamped CAAG/DHS-SAN000296 through 239, a
19  multiple-page document that begins with what looks
20  to be -- what appears to be a copy of a check from
21  Geneva to the Department of Health Services
22  Accounting Section.

52 (Pages 202 to 205)

815266ff-cebf-43a1-a132-c18555842121

Ahrens, Katherine                                    May 20, 2009
                        Sacramento, CA

Page 206

1    A.  Okay.
2    Q.  Have you ever seen this document before?
3    A.  No.
4    Q.  If you turn to the fourth page of the
5  document, Bates-stamped 000299, there's another
6  letter from Ron Hartmann to the State of
7  California in which again he says that he is
8  including a printout identifying the AMP and
9  calculated rebate for the period October 1st, 1995
10  through December 31st, 1995; correct?
11    A.  Correct.
12    Q.  And he also notes that there is an
13  adjustment for a 10 percent supplemental rebate;
14  correct?
15    A.  Yes.
16    Q.  And if you turn to page Bates-stamped
17  303 you'll see a schedule like the last two that
18  we looked at.  This one is for the fourth quarter,
19  1995 and includes the AMPs for several products;
20  correct?
21        MR. GLASER:  Object as to form.
22        THE WITNESS:  Again it includes the

Page 207

1  Average Manufacturer Cost.
2        MS. BERWANGER:  Q.  So is it fair to say
3  that from 1992 to 1995, based on the
4  discussion we just had, that California received
5  AMP information from Geneva?
6        MR. GLASER:  Object as to form.
7        THE WITNESS:  What we received was
8  information that the manufacturer reported to us.
9        MS. BERWANGER:  Q.  And the manufacturer
10  told you that that was a printout identifying the
11  AMP of the product; correct?
12    A.  Yes.
13    Q.  Do you know what California -- do you
14  know what the Department did with AMP information
15  that it received from manufacturers in the 1990s?
16    A.  I would only be guessing.  There's a
17  different section that handled rebates, the check
18  disputes, all of that, so I can't speak to why the
19  information would have been generally provided.
20    Q.  If the Department had AMP information,
21  it could have compared that information to the
22  AWPs for the products that were listed in First

Page 208

1  DataBank; correct?
2    A.  Could have.  But why?
3    Q.  Do you know whether anyone ever did?
4    A.  Not that I'm aware of.
5    Q.  And is it fair to say that if someone
6  had compared the AMP to the AWP they would have
7  found that the AMPs were lower than the AWPs for
8  the product?
9    A.  I don't know.
10        Generally speaking, AMP for single
11  source and multiple source is generally lower than
12  the AWP.
13    Q.  But generally it's fair -- so it's fair
14  to say that generally the AMP would have been
15  lower than the AWP for the products?
16    A.  Generally.
17    Q.  And when you were speaking with Mr. Cyr
18  earlier today, I believe that you said that
19  California had access to WAC information.
20    A.  California.  When he says "California,"
21  that's the State of California.  I mean that
22  wasn't quantified as to program.  So to the extent

Page 209

1  that anybody has access to Red Book, anybody can
2  look up WAC.
3    Q.  Could the Department have compared the
4  AMPs it received from manufacturers to the WAC for
5  the product?
6    A.  Could have.
7    Q.  Do you know whether anyone ever did?
8    A.  No.
9    Q.  Just for the record, did you mean by
10  "no" that to your knowledge no one ever did or
11  that you don't know whether anyone ever did?
12    A.  I don't know whether or not anyone did.
13    Q.  Is it fair to say that sitting here
14  today you can't recall a conversation with anyone
15  from Sandoz where that person said something to
16  you about pricing that you found to be false and
17  misleading?
18        MR. GLASER:  Object as to form.
19        THE WITNESS:  If I can't remember the
20  conversation, how can I confirm or deny any
21  portion of the conversation?
22        MS. BERWANGER:  Q.  Well, you can't

53 (Pages 206 to 209)

Ahrens, Katherine                                              May 20, 2009
                           Sacramento, CA

---

Page 210

1  remember any false statement that anyone from
2  Sandoz ever made?
3      A.  How would I know?
4      MR. GLASER:  I'm going to caution the
5  witness to let me interject.
6      I would object as to form.
7      THE WITNESS:  How would I know?  If I
8  don't remember the conversation or any aspect of
9  the conversation, how would I remember if anything
10 was true or false?  I remember nothing about the
11 conversation.
12     MS. BERWANGER:  Q.  And another way of
13 saying that is that you do not remember anything
14 being false?
15     MR. GLASER:  Object as to form.
16     MS. BERWANGER:  Q.  Correct?
17 A.  I would not state it as such.
18     I do not remember any portion of the
19 conversation.
20     MS. BERWANGER:  I have no further
21 questions.
22     Subject to any further document

---

Page 211

1  production by the State of California or any
2  further discovery or questions to the witness,
3  I'll pass the witness.
4      Thank you very much.
5      MR. GLASER:  I have no questions.
6      MR. CYR:  So I guess we're done for the
7  day.
8      THE VIDEOGRAPHER:  This concludes
9  today's deposition of Katherine Ahrens.  We're now
10 off the video record at approximately 4:41.
11
12
13
14     _____
15         KATHERINE AHRENS
16
17 Subscribed and sworn to and before me
18 this _____ day of _____, 20____.
19
20
21 _____
22     Notary Public

---

Page 212

1          CERTIFICATE OF REPORTER
2      I, JOHN P. SQUIRES, a Certified Shorthand
3  Reporter, hereby certify that the witness in the
4  foregoing deposition, KATHERINE AHRENS, was duly
5  sworn by me; that the testimony of said witness was
6  taken down in shorthand by me at the time and place
7  herein stated; that the testimony of said witness was
8  thereafter reduced to typewriting, by computer, under
9  my direction and supervision.
10     I further certify that I am not of counsel
11 or attorney for any of the parties to said cause, nor
12 in any way interested in the outcome of this cause
13 and I am not related to any of the parties thereto.
14     I declare under penalty of perjury that the
15 foregoing is true and correct.  I have hereunto set
16 my hand on May 28, 2009.
17
18     _____
19     John P. Squires, CSR No. 2001
20
21
22

---

54 (Pages 210 to 212)

815266ff-cebf-43a1-a132-c18555842121