# EXHIBIT 1



**Notice:** This opinion is subject to formal revision before publication in the advance sheets of <u>Southern Reporter</u>. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ({334} 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is printed in <u>Southern Reporter</u>.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2009-2010

---

### 1071439

---

AstraZeneca LP and AstraZeneca Pharmaceuticals LP

v.

State of Alabama

---

### 1071440

---

AstraZeneca LP and AstraZeneca Pharmaceuticals LP

v.

State of Alabama

---

1071704

---

Smithkline Beecham Corporation d/b/a Glaxosmithkline

v.

State of Alabama

---

1071759

---

Novartis Pharmaceuticals Corporation

v.

State of Alabama

**Appeals from Montgomery Circuit Court**
(CV-05-219.10; CV-05-219.11; CV-05-219.68; and CV-05-219.52)

WOODALL, Justice.

AstraZeneca LP and AstraZeneca Pharmaceuticals LP (hereinafter referred to jointly as "AstraZeneca");[1] Smithkline Beecham Corporation d/b/a Glaxosmithkline ("GSK"); and Novartis Pharmaceuticals Corporation ("Novartis") appeal from judgments entered on jury verdicts in favor of the State

---

[1]AstraZeneca LP and AstraZeneca Pharmaceuticals LP have stipulated that they are to be regarded as one entity for purposes of trial and appeal.

2

1071439, 1071440, 1071704, & 1071759

of Alabama in actions alleging that AstraZeneca, GSK, and Novartis fraudulently inflated the prices of their prescription drugs for purposes of reimbursement by the Alabama Medicaid Agency ("the AMA"). We reverse the trial court's judgments and render judgments for AstraZeneca, GSK, and Novartis.

### I. Factual and Procedural Background

This is the third time some aspect of this litigation has been before us. See Ex parte Novartis Pharmaceuticals Corp., 975 So. 2d 297 (Ala. 2007) ("Novartis I"), and Ex parte Novartis Pharmaceuticals Corp., 991 So. 2d 1263 (Ala. 2008) ("Novartis II"). These cases are exemplary of litigation currently pending in state and federal courts involving allegations that the nationwide pricing policies of pharmaceutical manufacturers caused states to over-reimburse providers of prescription drugs under the states' respective Medicaid programs.

"The Medicaid program was created in 1965, when Congress added Title XIX to the Social Security Act, 79 Stat. 343, as amended, 42 U.S.C. § 1396 et seq. ... [('the Medicaid Act')], for the purpose of providing federal financial assistance to

3

1071439, 1071440, 1071704, & 1071759

States that choose to reimburse certain costs of medical treatment for needy persons." Harris v. McRae, 448 U.S. 297, 301 (1980). "Although participation in the Medicaid program is entirely optional, once a State elects to participate, it must comply with the requirements of Title XIX." 448 U.S. at 301. Medicaid provides "joint federal and state funding of medical care for individuals who cannot afford to pay their own medical costs." Arkansas Dep't of Health & Human Servs. v. Ahlborn, 547 U.S. 268, 275 (2006). The "[f]ederal financial participation," 42 C.F.R. § 430.1, was, during the time relevant to this dispute, approximately 70% of the amount of the expense the AMA incurred under its Medicaid program.

At the federal level, Medicaid is administered by the Centers for Medicaid and Medicare Services ("the CMS"), formerly known as the Health Care Financing Administration. See Centers for Medicare & Medicaid Services; Statement of Organization, Functions and Delegations of Authority; Reorganization Order, 66 Fed. Reg. 35,437 (July 5, 2001); Statement of Organization, Functions, and Delegations of Authority, 49 Fed. Reg. 35,247 (Sept. 6, 1984); Reorganization Order, 42 Fed. Reg. 13,262 (Mar. 9, 1977). The CMS monitors

4

1071439, 1071440, 1071704, & 1071759

the states' compliance with federal law to, among other things, ensure that "payments [are] sufficient to enlist enough providers so that services under the [program] are available to recipients at least to the extent that those services are available to the general population." 42 C.F.R. § 447.204.[2] "Providers" are typically physicians and retail pharmacies that disburse prescription drugs to persons eligible for Medicaid benefits.

The AMA reimburses providers for drugs they dispense to eligible recipients. Reimbursement must, however, be made consistent with a methodology adopted with the approval of the CMS that takes economy into account. See 42 C.F.R. § 447.512 (formerly 42 C.F.R. § 447.331). For the brand-name drugs at issue in these appeals, reimbursement must not exceed, in the aggregate, the lesser of "(1) [the Estimated Acquisition Cost ('the EAC') of the drug] plus reasonable dispensing fees ...; or (2) [p]roviders' usual and customary charges to the general public." 42 C.F.R. § 447.512(b). EAC is defined as "the agency's best estimate of the price generally and currently

---

[2]According to the current commissioner of the AMA, "federal law requires [the State] ... to provide comparable access to services for a Medicaid recipient that [anyone] would receive in the private market."

5

1071439, 1071440, 1071704, & 1071759

paid by providers for a drug marketed or sold by a particular manufacturer or labeler in the package size of drug most frequently purchased by providers." 42 C.F.R. § 447.502.  In other words, Medicaid reimbursements may be made on the basis of what providers <u>actually paid</u> for each drug or on the basis of an <u>estimated</u> cost.  Various reimbursement methodologies are employed by the various state Medicaid agencies to obtain the EAC for each drug disbursed under their Medicaid programs. The goal is to produce a payment rate sufficient to encourage providers to participate in the Medicaid program, while, at the same time, minimizing Medicaid costs.

Federal financial participation in the state Medicaid programs is made contingent upon a methodology that, in the view of the CMS, sufficiently addresses the somewhat competing objectives of adequate compensation and economy.  However, the CMS has afforded the states flexibility in the formulas by which they attempt to arrive at the EAC.  Formulation of these methodologies ordinarily involves the use of information supplied by pharmaceutical manufacturers to a national price compendium, such as First DataBank, Inc. ("DataBank"). DataBank defines itself as a "point of care database company

6

1071439, 1071440, 1071704, & 1071759

whose purpose it is to provide custom drug [information] according to Medicaid specifications focused on providing accurate drug pricing."

Drug-pricing information is typically reported in the form of "wholesale acquisition cost" ("WAC") or in the form of both WAC and "average wholesale price" ("AWP"). Definitions for AWP and WAC have varied throughout the industry during the period relevant to this dispute. However, AWP was defined in DataBank, _Monthly Interest_ (September 1991), as:

> "[A]n average price which a wholesaler would charge a pharmacy for a particular product. The operative word is _average_. AWP never means that every purchase of that product will be exactly at that price. There are many factors involved in pricing at the wholesale level which can modify the prices charged even among a group of customers from the same wholesaler. AWP was developed because there had to be some price which all parties could agree upon if machine processing was to be possible."

(Emphasis in original.)

In 1992, the Health and Human Services State Medicaid Manual ("the Medicaid manual") explained that "AWP levels overstate the prices that pharmacists actually pay for drug products by as much as 10-20 percent because they do not reflect discounts, premiums, special offers or incentives, etc." (Emphasis added.)

7

1071439, 1071440, 1071704, & 1071759

In 1996, the Congressional Budget Office published <u>CBO Papers: How the Medicaid Rebate on Prescription Drugs Affects Pricing in the Pharmaceutical Industry</u> (1996). That publication stated, in pertinent part: "The average wholesale price (AWP) is the published <u>(list) price</u> that manufacturers <u>suggest</u> wholesalers charge their customers. <u>Wholesalers usually charge pharmacists a price that is lower than the AWP, which is the price that is most widely available in published form</u>." <u>Id</u>. at 20 (emphasis added).

A similar definition for AWP appeared in Novartis, <u>Pharmacy Benefit Report:  Facts & Figures</u> (2000):

> "Average wholesale price (AWP) -- A published <u>suggested</u> wholesale price for a drug, based on the average cost of the drug to a pharmacy from a representative sample of drug wholesalers.  There are many AWPs available within the industry.  AWP is often used by pharmacies to price prescriptions.  Health plans also use AWP -- <u>usually discounted</u> -- as the basis of reimbursement of covered medications."

(Emphasis added.)

WAC was specifically defined in the Medicare Prescription Drug Improvement and Modernization Act of 2003, Pub. L. No. 108-173, § 303, 117 Stat. 2066, 2242 (2003), codified at 42 U.S.C. § 1395w-3a(c)(6)(B), as follows:

8

1071439, 1071440, 1071704, & 1071759

> "The term 'wholesale acquisition cost' means, with
> respect to a drug or biological, the manufacturer's
> list price for the drug or biological to wholesalers
> or direct purchasers in the United States, not
> including prompt pay or other discounts, rebates or
> reductions in price, for the most recent month for
> which the information is available, as reported in
> wholesale price guides or other publications of drug
> or biological pricing data."

(Emphasis added.) Public Law No. 108-173, § 303(i)(4)(B)(iii),

amended the Medicaid Act to incorporate this definition of WAC

into the Medicaid statutory scheme.   See 42 U.S.C. § 1396r-

8(b)(3)(A)(iii)(II).   Not all such industry publications have

defined WAC/AWP  as "suggested" or "list" prices.

In the 1970s, the AMA merely reimbursed providers on the

basis of their actual acquisition price.   Indeed, in a letter

to the "hearing clerk" of the United States Food and Drug

Administration, dated February 13, 1975, Sam T. Hardin, then

director of the AMA Pharmaceutical Services Medical Services

Administration, objected to any proposed rule that would

replace the AMA's actual-cost basis, then current, with a

methodology based on AWP.   More specifically, he stated:

"Based on a study recently conducted for several of our top

200 drugs, a savings is being realized by use of actual cost

1071439, 1071440, 1071704, & 1071759

vs. AWP ...." Nevertheless, in the early 1980s, the AMA began reimbursing providers at a rate of <u>100% of AWP</u>.[3]

In June 1985, however, Richard Morris, associate regional administrator of the Department of Health and Human Services ("the DHHS") sent a letter to then AMA Commissioner Faye Baggiano ("the Morris letter"), threatening to withdraw federal financial participation from the Alabama Medicaid program because of the AMA's use of 100% of AWP as the basis for reimbursement. The letter stated:

> "This is to inform you of corrective action being pursued by this office to secure compliance with Federal regulations regarding Medicaid prescription drug reimbursement and to request your assistance in implementing certain changes by October 1, 1985.

> "The Federal regulations at 42 CFR 447.331 [currently 42 C.F.R. § 447.512] provide that the State Agency may not pay more for prescribed drugs than the lower of ingredient cost plus a reasonable dispensing fee or the provider's usual and customary charge to the general public. Costs for certain multiple source drugs are subject to the lower of 'estimated acquisition cost' (EAC) or the 'maximum allowable cost' (MAC) limit as published in the Federal Register. For all other drugs, the allowable cost limit is the State Agency's best estimate of what price providers generally are paying based on the package size providers most frequently purchase -- 42 C.F.R. 447.332(c).

---

[3]At all times relevant to this dispute, the AMA was receiving, pursuant to a contract with DataBank, drug-pricing information from DataBank.

1071439, 1071440, 1071704, & 1071759

"As early as 1975 the [DHHS] cautioned against the use of AWPs as estimates of drug ingredient costs by stating in the preamble to the final Federal Regulations that published wholesale prices are not closely related to prices actually paid by providers. This has been reiterated by the [DHHS] over the years to State Medicaid Agencies through policy issuances which have stated that the estimated acquisition cost (EAC) should be 'as close as feasible to the price generally and currently paid by providers.' In June 1984, the DHHS Office of Inspector General issued a Report to Congress and HCFA [currently the CMS] recommending action to reduce inflated Medicaid drug reimbursement. The IG's recommendations were based on a national review of State practices through intensive sample surveys in six States. The reviews consistently showed that Medicaid EACs were primarily based on published average wholesale prices (AWPs) which were inflated by an average of 15.96 percent. HCFA acceptance samples in Florida and Georgia confirmed the IG's findings.

"On the face of this substantial data, we convened a workgroup comprised of Region IV State Medicaid Consultant Pharmacists to develop a range of options to reduce the inflated levels of drug reimbursement caused by use of AWP as 'estimated acquisition cost' (EAC). The Alabama representative, Mr. Sam Hardin, was an active participant in the workshop and his contributions were appreciated. In two meetings during April and June 1985, State and Regional Office staff reached an agreement on the following methodology for obtaining the Estimated Acquisition Cost (EAC):

> "Obtain the Wholesale Acquisition [Cost] (WA[C]) for each drug in the State formulary and add 5.01 percent to that price. The product obtained will be the maximum allowable amount payable.

11

1071439, 1071440, 1071704, & 1071759

"The methodology set forth above should produce a price that is 13.9 percent below AWP and result in an EAC adjusted to <u>more realistically reflect actual cost</u> in the package size providers buy most frequently.

"In the past, States which utilized the AWP as 'estimated acquisition cost' have not been found to be out of compliance with Federal regulations. Further, no sanctions or penalties have been applied. However, based on <u>current conclusive evidence that the published AWP does not reflect the true cost of drug products we do not consider it acceptable for use as the State's EAC, unless the AWP has been reduced significantly to reflect a more accurate representation of the true estimated acquisition cost of a drug</u>. As an alternative, HCFA will find acceptable either the methodology developed by the Region IV EAC workgroup or another methodology that would result in equivalent reductions.

"Based on our understanding of current Alabama practice, your current EAC methodology does not result in 'estimated acquisition cost' consistent with the intent of the regulations at 42 CFR 447.331-447.332. Therefore, it is our opinion that Alabama compliance with these Federal requirements is in question. Unless we receive evidence that Alabama has effected changes in the EAC determination methodology consistent with the principles previously described, effective no later than October 1, 1985, this issue will be reported to the HCFA Central Office on the compliance report for the quarter ending September 30, 1985. In addition, Federal financial participation (FFP) will not be available beyond September 30, 1985, in payments for prescribed drugs in excess of the amounts that would have been achieved had Alabama implemented the EAC methodology developed by the Region IV Drug Reimbursement Workgroup (i.e. wholesale acquisition [cost] (WA[C]) plus 5.01 percent), or a comparable

12

1071439, 1071440, 1071704, & 1071759

methodology approved by the Health Care Financing
Administration prior to implementation.

"Please advise this office by July 8, 1985 of your
time frame for implementing the new EAC.
methodology. As always, we stand ready to be of
assistance upon request."

(Emphasis added.)

Baggiano responded to the Morris letter on June 26, 1985.

Her letter stated:

"This is in response to your letter of June 18
concerning corrective action being pursued by your
office to secure compliance with federal regulations
with regard to Medicaid prescription drug
reimbursement.

"This Agency plans to pursue and implement the
methodology for establishing the estimated
acquisition cost (EAC) for drugs payable under the
program (i.e., wholesale acquisition [cost] (WA[C])
plus 5.01%) to be effective October 1, 1985.

"It is our opinion this change will place Alabama in
compliance with the intent of the regulations at 42
C.F.R. 447.331-.332."

(Emphasis added.)

On September 6, 1985, the AMA sent "Provider Notice 85-
18" to "all pharmacies and dispensing physicians participating
in the Alabama Title XIX (Medicaid) Pharmaceutical Program,"
notifying providers of the change in reimbursement
methodology.  The notice stated, in pertinent part:

13

1071439, 1071440, 1071704, & 1071759

> "Through intensive sample surveys, the Department of
> Health and Human Services (HHS) has determined that
> published AWPs (average wholesale prices) are
> inflated and that AWP is not the [AMA's] 'best
> estimate of what price providers generally are
> paying for a drug.' The reviews consistently showed
> that Medicaid EACs were primarily based on published
> average wholesale prices. In order to comply with
> federal regulations, the methodology used to
> determine estimated acquisition cost will be changed
> effective October 1, 1985. The [AMA] will obtain
> the wholesale acquisition [cost] plus a percent to
> arrive at the estimated acquisition cost. This
> methodology will result in an EAC which more
> realistically reflects the actual cost in the
> package size providers buy most frequently."

(Emphasis added.)

Immediately afterward, the AMA conducted its own survey
of wholesale drug companies to determine what providers were
actually paying. On November 22, 1985, Baggiano sent Morris
a letter reporting the results of this survey. In that
letter, she also requested approval from the DHHS to increase
the markup from WAC + 5.01% to WAC + 8.45%, based on the
survey results. Specifically, the letter stated:

> "In accordance with federal regulations 42 CFR
> 447.332 [now 42 C.F.R. 447.512] effective October 1,
> 1985, the [AMA] adopted the price methodology for
> pharmacy programs as suggested by HCFA [now CMS]
> regional office (WA[C]) plus 5.01%) for
> reimbursement.
>
> "Studies have since been conducted, and an
> alternative methodology is being forwarded for your

14

1071439, 1071440, 1071704, & 1071759

approval. Studies considered the top 100 most frequently prescribed drugs (600 entities) supplied to Alabama Medicaid recipients. The [AMA] will utilize the following methodology for obtaining estimated acquisition cost: obtain the wholesale acquisition [cost] (WA[C]) for each drug in the state formulary and <u>add 8.45% to that price</u>.

"Studies were accomplished for Medicaid by the two primary wholesale drug companies (Walker Drug Company and Durr-Fillauer Medical, Inc.), serving 80% of Alabama pharmacies. Copies of these studies are attached for your review. <u>The studies indicated that the average percentage markup on WA[C] that Alabama pharmacies are paying are 7.3% (Walker) and 7.6% (Durr-Fillauer)</u>. The average of these percentages is 7.45%. We are adding an additional 1% to compensate for higher cost paid by some pharmacists who are <u>unable to take advantage of discounts</u>. Discounts are offered only if they make timely payments (twice monthly) and/or if they are able to purchase in large volumes. With your approval, we plan to implement this program effective January 1, 1985 [sic].

"Your consideration and approval of this alternative methodology is appreciated."

(Emphasis added.) On November 26, 1985, Morris replied to Baggiano, stating that the DHHS accepted her "proffered methodology and implementation date for implementing the [AMA's] best estimate of the price providers generally are paying for a drug(s)."

In March 1987, Carol Herrmann, then an official at CMS, received an internal memorandum regarding "Initiative on

15

1071439, 1071440, 1071704, & 1071759

Lowering Drug Acquisition Cost and the State of Alabama" ("the

Initiative").  The memorandum stated, in pertinent part:

> "In approximately March 1985, under a HCFA [now CMS] PATROL Initiative, States were instructed (through HCFA Regional Offices) to obtain better estimations of acquisition costs on single source drugs.  Most States were using <u>average wholesale price (AWP) listings which are usually about 20 percent higher than acquisition costs</u>.  A few regions, including Atlanta, threatened States with noncompliance if they didn't change their policy by October 1, 1985, and revise their AWP listings."

(Emphasis added.)

In 1989, Carol Herrmann came to Alabama to serve as AMA

commissioner.  In that capacity, she sent a letter on February

26, 1992, to the associate regional administrator of the

Health Care Financing Administration (now the CMS).  The

letter contained assurances that the AMA had reviewed "pricing

for multiple source drugs" and had found Medicaid expenditures

to be consistent with federal regulations.  Attached to

Commissioner Herrmann's letter was an excerpt from the

Medicaid manual, stating, in pertinent part:

> "Estimated acquisition costs (EAC) mean the agency's best estimate of the price generally, and currently, paid by providers for a drug marketed or sold by a particular manufacturer or labeler in the package size most frequently purchased by providers.  For example, in the past, many States based the EAC upon Average Wholesale Price (AWP) levels as contained in

16

1071439, 1071440, 1071704, & 1071759

> various commercially available publications. However, a number of studies have shown that in recent years the drug marketplace has changed and there is a preponderance of evidence that demonstrates that such <u>AWP levels overstate the prices that pharmacists actually pay for drug products by as much as 10-20 percent because they do not reflect discounts, premiums, special offers or incentives, etc</u>. Consequently, absent valid documentation to the contrary, a published AWP level as a State determination of EAC <u>without a significant discount being applied</u> is not an acceptable estimate of prices generally and currently paid by providers."

(Emphasis added.)

Meanwhile, on October 29, 1987, the AMA increased the markup used in its reimbursement methodology from WAC + 8.45% to WAC + 9.2%. This change resulted from surveys and analytical studies conducted by the AMA after 1985. However, beginning in approximately 1991, the AMA began supplementing its methodology with the use of a <u>discounted AWP</u>. Specifically, from 1991 through 2002, the AMA used AWP minus 10.2% (hereinafter "AWP - 10.2%") whenever the published AWP was more current than the published WAC. Since 2002, the AMA has used AWP - 10.2% whenever the discounted AWP formula yields a lower number than the marked-up WAC formula. In other words, since 1987, the AMA has -- with two exceptions -- reimbursed providers on the basis of either WAC + 9.2% or AWP

17

1071439, 1071440, 1071704, & 1071759

- 10.2%.  The exceptions are (1) for physician-administered drugs and (2) for a "DEA [Drug Enforcement Administration] 2 (controlled substance)," for which, at least for a portion of the period from 1991 to 2005, the State allegedly reimbursed at 100% of AWP.[4]

As of September 2004, Alabama was one of six states using WAC and AWP formulas as alternate bases for reimbursement. Forty-one states used a CMS-approved, discounted AWP formula without WAC.  However, the percentage that those states' plans discounted from the published AWP price varied considerably. For example, discounts applied in a number of states fell within the 10% to 12% range.  By contrast, the Connecticut plan applied a 40% discount to the published AWP price on generic drugs, and Washington applied a 50% discount to a class of "multiple-source" drugs.

During the trial of the case against GSK and Novartis,[5] Dr. Gerard Anderson, the State's expert witness in the area of drug pricing, testified that "there is a mathematical

---

[4]The use of 100% of AWP as a formula for reimbursement of physician-administered drugs was apparently discontinued in 1999.

[5]The claims against GSK and Novartis were consolidated for trial.

18

1071439, 1071440, 1071704, & 1071759

relationship between ... the WAC price and the AWP price," meaning that, "if the WAC price is not a true price, then, mathematically, the AWP cannot be a true price either." Also, in postjudgment responses filed in the trial court, the State explained that the AWP was calculated "by adding 20% or 25% to the reported WAC" and thus "bore a consistent, formulaic relationship to WAC." In fact, the State concedes that the WAC and AWP formulas are designed to -- and do -- yield roughly the same number.

This mathematical linkage between WAC and AWP was specifically addressed in an internal AMA memorandum dated November 28, 1995, regarding "suggested cost containment measures." The memorandum from Mary Finch, an official of the AMA, to the director of Medical Services for the AMA ("the Finch memo") stated, in pertinent part:

> "Because of the present budgetary situation of the [AMA], certain cost containment measures have been evaluated and are presented to you for further evaluation....
>
> "● Make adjustments in the current pricing methodology: Covered drugs are currently reimbursed at a rate of the wholesale acquisition cost (WAC) plus 9.2%. This is approximately equal to Average Wholesale Price (AWP) minus 10%. Because the accepted figure for the discount received by pharmacies

19

1071439, 1071440, 1071704, & 1071759

<u>receiving the AWP</u> is 14%, there is room to <u>decrease the percentage added to WAC</u>.

"WAC + 9.2%  = AWP - 10%
"WAC + 7.99% = AWP - 11%
"WAC + 6.78% = AWP - 12%
"WAC + 5.57% = AWP - 13%
"WAC + 4.36% = AWP - 14%

"If the percentage added to WAC is decreased to 4.36, <u>approximately $5.6 million could be saved</u>."

(Some emphasis added.)  However, no changes were made to the AMA's reimbursement methodology of WAC + 9.2% or AWP - 10.2%, and those formulas are the formulas currently in use.

On January 26, 2005, the State sued 73 pharmaceutical manufacturers, including AstraZeneca, Novartis, and GSK.  The complaint alleged (1) that the manufacturers fraudulently "provided or caused to be provided false and inflated AWP [and] WAC ... information for their drugs to ... DataBank"; (2) that the reported AWPs and WACs "greatly exceeded the actual prices at which [the manufacturers] sold their drugs to retailers (physicians, hospitals, and pharmacies) and wholesalers," because they did not include "undisclosed discounts, rebates, and other inducements which had the effect of lowering the actual wholesale or sales prices charged to their customers as compared to the reported prices"; (3) that

1071439, 1071440, 1071704, & 1071759

the manufacturers "knew that the false and deceptive inflation of AWP [and] WAC] ... for their drugs would cause [the AMA] to pay excessive amounts for these drugs"; and (4) that the AMA "reasonably relied on the false pricing data in setting prescription drug reimbursement rates and making payment based on said rates." The complaint contained claims of fraudulent misrepresentation, fraudulent suppression, and wantonness and sought compensatory and punitive damages for the period from January 1, 1991, through the first quarter of 2005.[6]

In Novartis I, we issued a writ of mandamus "direct[ing] the trial court to sever the claims against all [the pharmaceutical] companies." 975 So. 2d at 304 (emphasis added). Trial of the claims against AstraZeneca began on February 11, 2008. The claims against Novartis and GSK were presented in a consolidated trial that began on June 16, 2008.

AstraZeneca, Novartis, and GSK each filed timely motions for judgments as a matter of law ("JML"), placing in issue the sufficiency of the evidence as to the fraudulent-misrepresentation and fraudulent-suppression claims. In

---

[6]Although the complaint also contained a claim of unjust enrichment, the State voluntarily withdrew that claim as to AstraZeneca, Novartis, and GSK.

1071439, 1071440, 1071704, & 1071759

particular, they challenged the sufficiency of the <u>element of reliance</u>. After those motions were denied, the juries in both trials returned verdicts in favor of the State.

The jury in AstraZeneca's trial returned a verdict against it on the claims of misrepresentation and fraudulent suppression, awarding $40,000,000 in compensatory damages and $175,000,000 punitive damages. The jury in the Novartis/GSK trial returned a verdict against Novartis and GSK on the claim of fraudulent misrepresentation only, awarding the State $33,257,694 in compensatory damages against Novartis and $80,989,539 against GSK. The juries found in favor of the defendants on the wantonness claims in both trials. The defendants renewed their JML motions postjudgment. Both motions were denied. In AstraZeneca's case, the trial court reduced the punitive-damages award to $120,000,000, leaving a judgment against AstraZeneca for $160,000,000. From those judgments, AstraZeneca, Novartis, and GSK appealed. Cases no. 1071439 and no. 1071440 represent AstraZeneca's appeal, case no. 1071704 represents GSK's appeal, and case no. 1071759 represents Novartis's appeal. Several <u>amici curiae</u>, including

22

1071439, 1071440, 1071704, & 1071759

the National Community Pharmacists Association ("the NCPA"),[7]
filed briefs in support of both sides of the dispute.   We
consolidated these appeals for the consideration and
resolution of an issue raised in the defendants' motions for
a JML that is common to the parties and dispositive of these
appeals:   Whether the State presented substantial evidence
that it <u>reasonably relied</u> on the published WAC and AWP prices
for the pharmaceutical manufacturers' prescription drugs.

## II. Discussion

The standard of review of a ruling on a JML motion is
well settled:

> "'In reviewing a ruling on a motion for a JML,
> this Court views the evidence in the light most
> favorable to the nonmovant and entertains such
> reasonable inferences from that evidence as the jury
> would have been free to draw.' <u>Daniels v. East
> Alabama Paving, Inc.</u>, 740 So. 2d 1033, 1037 (Ala.
> 1999).   'The denial of a defendant's motion for a
> JML is proper only when the plaintiff has presented
> substantial evidence to support each element of the
> plaintiff's claim.' <u>Kmart Corp. v. Bassett</u>, 769 So.
> 2d 282, 284 (Ala. 2000).   '"Substantial evidence" is
> "evidence of such weight and quality that fair-
> minded persons in the exercise of impartial judgment
> can reasonably infer the existence of the fact
> sought to be proved."' <u>Id.</u> (quoting <u>West v. Founders</u>

---

[7]The NCPA claims to "represent[] the pharmacist owners,
managers, and employees of more than 24,000 independent
community pharmacies across the United States, including 598
in the State of Alabama." NCPA's brief, at 1.

23

1071439, 1071440, 1071704, & 1071759

<u>Life Assurance Co. of Florida</u>, 547 So. 2d 870, 871
(Ala. 1989))."

<u>Long v. Wade</u>, 980 So. 2d 378, 383 (Ala. 2007).

"'To establish the elements of fraudulent
misrepresentation [the State] ha[s] to show: "(1)
that the [pharmaceutical manufacturers']
representation was false, (2) that it concerned a
material fact, (3) that [the State] relied on the
false representation, and (4) that actual injury
resulted from that reliance."' <u>Consolidated Constr.</u>
<u>Co. of Alabama v. Metal Bldg. Components, L.P.</u>, 961
So. 2d 820, 825 (Ala. 2007) (Bolin, J., concurring
specially) (quoting <u>Boswell v. Liberty Nat'l Life</u>
<u>Ins. Co.</u>, 643 So. 2d 580, 581 (Ala. 1994)).

". . . .

"'The elements of a fraudulent-suppression claim
are "'(1) a duty on the part of the defendant to
disclose facts; (2) concealment or nondisclosure of
material facts by the defendant; (3) inducement of
the plaintiff to act; (4) action by the plaintiff to
his or her injury.'"' <u>McIver v. Bondy's Ford, Inc.</u>,
963 So. 2d 136, 143 (Ala. Civ. App. 2007) (quoting
<u>Freightliner, L.L.C. v. Whatley Contract Carriers,</u>
<u>L.L.C.</u>, 932 So. 2d 883, 891 (Ala. 2005), quoting in
turn <u>Lambert v. Mail Handlers Benefit Plan</u>, 682 So.
2d 61, 63 (Ala. 1996))."

<u>Novartis II</u>, 991 So. 2d at 1275-76.

Moreover, "[u]nder <u>Foremost Insurance Co. v. Parham</u>, 693

So. 2d 409 (Ala. 1997), a party alleging <u>any form</u> of fraud

must present evidence of 'reasonable reliance' on the

purported fraud." <u>Hawk v. Roger Watts Ins. Agency</u>, 989 So. 2d

584, 589 (Ala. Civ. App. 2008) (emphasis added). See <u>Houston</u>

1071439, 1071440, 1071704, & 1071759

<u>County Health Care Auth. v. Williams</u>, 961 So. 2d 795, 814
(Ala. 2006) ("a plaintiff in a suppression case must prove
that [it] was induced to act by [its] reasonable reliance on
the state of affairs as it appeared in the absence of the
suppressed information").

The theory of the State's case is that, throughout the
claim period -- 1991 to 2005 -- the AMA believed that the WAC
and AWP published by DataBank represented <u>actual</u> prices and
that it reimbursed providers on the basis of that belief.
Specifically, the State argues that the AMA understood the AWP
to be "a <u>true</u> average of wholesale prices paid by pharmacy
retailers to wholesalers for a particular drug," and the WAC
to be "the <u>actual</u> price paid by the wholesaler to the drug
manufacturer." State's brief, at 12-13 (cases no. 1071439 and
no. 1071440) (emphasis added).  According to the State, the
AMA <u>did not know</u> that the prices published by DataBank were
merely "list prices," that is, that the prices "did not
include discounts, rebates, chargebacks, prompt-pay discounts,
or other price concessions that reflect the actual price paid
for drugs."  State's brief, at 35 (cases no. 1071439 and no.
1071440).  The State says (1) that AstraZeneca, Novartis, and

25

1071439, 1071440, 1071704, & 1071759

GSK published, or allowed to be published, WACs and AWPs that were <u>not net</u> prices in order to induce the State to overpay providers; (2) that the State was deceived by the publication of those prices; and (3) that it did overpay providers by millions of dollars in reliance on the inflated WACs and AWPs.[8]  This theory "of a broad, systemic fraud" is asserted against all 73 defendants, which, according to the NCPA, comprise "virtually every pharmaceutical manufacturer under Medicaid."  NCPA's brief, at 3.

Novartis, AstraZeneca, and GSK concede that the WAC and AWP prices published by DataBank were <u>not net</u> prices.  They contend, however, that the industry -- and the AMA in particular -- was at all relevant times <u>fully cognizant</u> of the fact that the manufacturer's published drug prices were list prices, which excluded discounts, and that, as a matter of law, the State could not have reasonably relied on the

---

[8]Pharmaceutical manufacturers profit under such a scheme, according to the State's theory, by "marketing the spread," which is the "difference between the amount that a provider ... receives as reimbursement from Medicaid and the amount the provider paid for the drug."  State's brief, at 17 (case no. 1071759).  According to the State, pharmacists tend to fill prescriptions using the drugs manufactured by competitor companies with the widest spread.  See <u>Novartis II</u>, 991 So. 2d at 1268.

1071439, 1071440, 1071704, & 1071759

published prices. Consequently, according to Novartis, AstraZeneca, and GSK, they were entitled to a JML on the State's fraud claims. As Novartis states: "The State knew for decades that WAC and AWP did not represent actual, discounted transaction prices," Novartis's brief, at 65, yet the AMA has not changed its reimbursement methodology since learning of the alleged fraud. Novartis's brief, at 61. "[A]ccordingly, there were no reasonable reliance and no fraud." Novartis's brief, at 65. We agree.

"Knowledge may be established by circumstantial evidence even in the face of professions of ignorance." Liberty Nat'l Life Ins. Co. v. Weldon, 267 Ala. 171, 196, 100 So. 2d 696, 718 (1958). "To claim reliance upon a misrepresentation, the allegedly deceived party must have believed it to be true. If it appears that he was in fact so skeptical as to its truth that he placed no confidence in it, it cannot be viewed as a substantial cause of his conduct." Smith v. J.H. Berry Realty Co., 528 So. 2d 314, 316 (Ala. 1988) (emphasis added). "'If the plaintiff knew that the representations were false ..., he can not complain that he has been misled to his damage by the defendant's attempted deception. ... The idea of a person

1071439, 1071440, 1071704, & 1071759

knowing a representation to be false and at the same time "relying" thereon is a contradiction in terms.'" <u>Shades Ridge Holding Co. v. Cobbs, Allen & Hall Mortgage Co.</u>, 390 So. 2d 601, 610-11 (Ala. 1980).

In <u>Liberty National Life Insurance Co. v. Allen</u>, 699 So. 2d 138, 141 (Ala. 1997), this Court summarized <u>Smith</u> as follows:

> "Smith, who was purchasing a house, asked the realty agent whether the house and the positioning of a fence complied with 'applicable regulations.' The agent told Smith that they did comply. Before the closing, Smith extensively investigated whether the house actually complied with the building code and zoning regulations. After Smith purchased the house, he learned that it did not comply with a zoning regulation. This Court stated:
>
>> "'... <u>The undisputed fact that Mr. Smith was unwilling to accept the statement of the defendant's agent without verification is evidence that he did not rely on it</u>. Based on his own testimony, it is clear that Mr. Smith was unwilling to accept the statement of the defendant's agent regarding the applicable zoning regulations.'"

699 So. 2d at 141-42 (emphasis added). Consequently, the Court in <u>Smith</u> held that evidence of reliance was insufficient as a matter of law. <u>Smith</u>, 528 So. 2d at 316. See also <u>Burroughs v. Jackson Nat'l Life Ins. Co.</u>, 618 So. 2d 1329,

1071439, 1071440, 1071704, & 1071759

1332 (Ala. 1993) ("'If the representee makes an investigation ... that is free and unhampered, and he learns the truth, <u>or conditions are such that he must obtain the information he desires</u> ... he is presumed to rely on his own investigation, and not on the representation.'" (quoting 37 Am. Jur. 2d <u>Fraud and Deceit</u> § 230 (1968)).

Similarly, "[r]eliance requires that the misrepresentation actually induced the injured party to change its course of action." <u>Hunt Petroleum Corp. v. State</u>, 901 So. 2d 1, 4 (Ala. 2004). Thus, where the plaintiff "'"would have adopted the same course irrespective of the misrepresentation and would have sustained the same degree of damages, anyway, it cannot be said that the misrepresentation caused any damage, and the defendant will not be liable therefor."'" <u>Id.</u> (quoting <u>Shades Ridge Holding Co.</u>, 390 So. 2d at 611, quoting in turn Fowler V. Harper and Fleming James, Jr., <u>The Law of Torts</u> § 7.13 (1956)).

Applying these principles in <u>Hunt Petroleum</u>, we held there that the State had not presented substantial evidence that it relied, as an element of its fraud claim, on royalty reports filed by Hunt Petroleum Corporation ("Hunt"). The dispute in that case arose out of a contract between Hunt and

1071439, 1071440, 1071704, & 1071759

the State requiring Hunt to pay royalties, namely, "25% of the gross proceeds" from gas it extracted from wells drilled in Mobile Bay. 901 So. 2d at 2. "Hunt and the State dispute[d] the proper point in the extraction process at which the gas should have been valued, that is, the point at which 'gross proceeds' should have been calculated." Id. The State construed the term "'gross proceeds' ... to mean revenue 'at the tailgate,' net of transportation costs from the tailgate to a pipeline," while Hunt interpreted the term to mean "revenue not only net of the costs of transporting the gas from the tailgate to a pipeline for final sale, but also net of the transportation costs from the wellhead to the treatment plant and the costs of treating the gas." 901 So. 2d at 3. Every month, Hunt "reported royalties to the State based on the value of the gas produced 'at the wellhead.'" Id.

The State sued Hunt alleging fraud on the theory that each one of over 100 monthly royalty reports from late 1993 to August 1997 constituted a misrepresentation that "'net proceeds' were 'gross proceeds' under the lease agreement." 901 So. 2d at 3. A jury returned a verdict in favor of the State for $3,403,200 in compensatory damages and $20,000,000 in punitive damages. Id. Hunt appealed the denial of its

1071439, 1071440, 1071704, & 1071759

motion for a JML as to the fraud claim, arguing that "the State failed to establish that the State relied on the alleged misrepresentations made by Hunt." 901 So. 2d at 4.

This Court agreed with Hunt. It did so, because, despite the State's "bald assertion" to the contrary, the State had never assumed the royalty reports to be true. Instead, it was undisputed that the State had always intended to "audit the royalty calculations." 901 So. 2d at 6 (emphasis added). "If the State merely 'assumed' that the calculations were correct, there would have been no need for an audit." Id. Moreover, the State did not change its course of conduct after actually discovering the discrepancy. Specifically,

> "[t]he only evidence of the effect of the monthly royalty reports on the State's conduct after August 1997 when the State realized the reports were inaccurate is that the State 'adopted the same course,' that is, it accepted the checks and allowed Hunt to sell the gas exactly as ... the State [had done] with the reports it had 'assumed' were accurate."

901 So. 2d at 8. There was, therefore, as a matter of law, no reliance. See also Exxon Mobil Corp. v. Alabama Dep't of Conservation & Natural Res., 986 So. 2d 1093, 1115-16 (Ala. 2007) (there could be no reliance on alleged misrepresentations as a matter of law when the Department of

31

1071439, 1071440, 1071704, & 1071759

Conservation and Natural Resources did not "act[] on the alleged misrepresentations by changing its position" after learning that royalty payments were not being made consistent with its view of certain oil and gas leases).

The sine qua non of the State's fraud claims in these appeals is its assertion that it did not know that the published WACs and AWPs were merely suggested -- or list -- prices, exclusive of discounts and other incentives available to wholesalers and providers. This assertion is untenable in light of the correspondence and internal memoranda involved in the State's formulation of its reimbursement methodology.

As early as 1975, the AMA knew, through Director Sam Hardin, that the published AWPs were higher than the actual prices paid. Nevertheless, by 1985, the AMA was reimbursing providers at the higher rate. Significantly, in that same year, the AMA received a warning from the DHHS that the State stood to lose federal financial participation if the AMA continued to reimburse on the basis of an undiscounted AWP. The Morris letter clearly stated that published AWPs were being inflated by "an average of 15.96 percent." Morris demanded that the AMA formulate a methodology that discounted the published AWP "significantly to reflect a more accurate

32

1071439, 1071440, 1071704, & 1071759

representation of the true estimated acquisition cost of a drug." In AstraZeneca's trial, Dr. Gerard Anderson, the State's expert, testified that, based on Morris's letter, it was "clear as day that [the AMA was] on notice that AWP was not an actual acquisition cost." (Emphasis added.)

The Morris letter set in motion the process culminating in the AMA's current reimbursement methodology. First, then Commissioner Baggiano notified Morris of the AMA's intent to adopt a methodology based on WAC + 5.01%, which, according to the Finch memo, corresponded to a discount from AWP of approximately 13.5%. This intent was then communicated on September 6, 1985, to "all pharmacies ... participating in the Alabama Title XIX (Medicaid) Pharmaceutical Program" through Notice 85-18. In Notice 85-18, the AMA itself acknowledged that "published AWPs ... are inflated and ... [are] not the [AMA's] 'best estimate of what price providers generally are paying for a drug." (Emphasis added.)

The experience of Commissioner Herrmann provides further evidence of the AMA's actual knowledge of the true meaning of AWP. The Initiative she received in 1987 while she worked for the CMS informed her that the AWP listings used by "most states" were "usually about 20 percent higher than [actual]

33

1071439, 1071440, 1071704, & 1071759

acquisition costs." According to the State, however, the Initiative, because it was "not addressed or sent to the AMA, did not give AMA notice of anything." State's brief, at 49 (case no. 1071759). The State's position, in other words, is that any knowledge the future AMA Commissioner acquired in Washington, D.C., <u>did not accompany her to Alabama</u>. We reject this argument out of hand.

Moreover, in 1992, while Herrmann was actually serving as AMA Commissioner, she was acquainted with that portion of the Medicaid manual stating that "AWP levels overstate the prices that pharmacists actually pay for drug products by as much as 10-20% because <u>they do not reflect discounts, premiums, special offers or incentives</u>, etc." (Emphasis added.) Thus, <u>by 1992 at the very latest</u>, the AMA had actual knowledge of what the State now seeks to disavow, that is, that published AWPs were not net prices.

As for WAC, the mathematical linkage between AWP, which is the average quoted price paid by pharmacists to wholesalers, and WAC, the price quoted to wholesalers by manufacturers, was fully explored in the Finch memo. The Finch memo demonstrated that a higher AWP <u>discount</u> logically corresponded to -- and required -- a smaller WAC <u>markup</u>. That

34

1071439, 1071440, 1071704, & 1071759

the AMA understood this linkage is obvious from the undisputed evidence that the use of WAC + 9.2% and AWP - 10.2% was designed to, and did, yield roughly the same number. Otherwise stated, any alleged inflation or overstatement necessarily affected both WAC and AWP proportionately and required proportionate adjustments to both.  Also, in 2003, WAC was specifically defined by the Medicare Prescription Drug Improvement and Modernization Act of 2003 as "the manufacturer's <u>list price</u> for the drug or biological to wholesalers or direct purchasers in the United States, <u>not including prompt pay or other discounts, rebates or reductions in price</u>."  (Emphasis added.)[9]

Moreover, the reimbursement value of WAC currently employed by the AMA was determined from <u>surveys conducted by the AMA, itself</u>, from 1985 to 1987.  The 1985 survey was done for the AMA "by the two primary wholesale drug companies (Walker Drug Company and Durr-Fillauer Medical, Inc.) serving 80% of Alabama pharmacies."  Based on that survey, the AMA

---

[9]The State also relies on <u>dictionary</u> definitions of the words included in the terms WAC and AWP and argues that the "plain meaning" of the words supports its position.  However, any relevance the "plain-meaning" rule might have had in this dispute is negated by the State's actual knowledge of a different meaning.

1071439, 1071440, 1071704, & 1071759

requested, and obtained, from the DHHS permission to increase the WAC markup from the 5.01% suggested by Morris to 8.45%. Subsequent surveys and analytical studies -- also conducted by the AMA -- resulted in the increase, on October 29, 1987, of the WAC markup from 8.45% to its current 9.2%.  Thus, the AMA's understanding of the meaning of WAC derived, not from the manufacturers' misrepresentations or suppressions, but from its own studies and surveys.  A party that reaches a conclusion regarding a state of facts on the basis of that party's own truly independent investigation cannot claim that it relied on an allegedly fraudulent  misrepresentation. Burroughs, supra; Smith, supra.

Thus, the dissent, which focuses on the role of WAC in the State's formulation of its reimbursement methodology, is unpersuasive. At "the eye of [this] hurricane" is AWP, Grant Bagley, John Bentivoglio, and Rosemary Maxwell, Accurate Drug Price Reporting: a Modest Proposal 19 No. 11 Andrews Pharmaceutical Litig. Rep. 13 (January 2004), not WAC.  This is so, because the State neither paid -- nor ever intended to pay -- WAC.  Instead, it has, at times, paid a markup of WAC. This markup was derived, however, not from anything reported

36

1071439, 1071440, 1071704, & 1071759

by the manufacturers, but from the AMA's <u>own</u> studies and surveys.

> "[W]hile AMA has reimbursed pharmacists using a WAC-based formula since the mid-1980s, it has <u>not</u> done so in 'reliance' on a belief that WAC itself represents an actual transaction price; rather, it has done so because, <u>whatever WAC represents</u>, AMA has deemed WAC + 9.2% to be an appropriate measure by which to reimburse all Alabama pharmacists fairly, without regard to size or market power."

GSK's reply brief, at 25 (case no. 1071704) (emphasis in original).

Indeed, the WAC markup has been intended to approximate what the AMA has determined to be the appropriate <u>discount of AWP</u>. In light of the AMA's surveys and the manner in which the AMA ultimately arrived at its methodology, what the AMA thought about WAC is largely irrelevant. There is, as a matter of law, no basis on which the State can plausibly contend that it relied on WAC to determine what to pay providers.

Perhaps, however, the most irrefutable evidence of the State's actual understanding of WAC and AWP is the reimbursement methodology itself. The AMA uses WAC + 9.2% and AWP - 10.2% <u>to arrive at EAC</u>. State's brief, at 7-8 (cases

37

1071439, 1071440, 1071704, & 1071759

no. 1071439 & no. 1071440). The State concedes that "EAC is not a 'list' price or an 'undiscounted price,' but is a 'price paid.'" State's brief, at 6 (case no. 1071704). Remarkably, the State has taken the position that AWP <u>also</u> means "an <u>actual</u> average price" paid. State's brief, at 43 (cases no. 1071439 & no. 1071440) (emphasis added). See also State's brief, at 39 ("AWP is the average price paid by pharmacies to wholesalers for drugs, net of all discounts and other price concessions") (case no. 1071704); State's brief, at 40 (AWP is "an actual average of prices paid by retailers to wholesalers") (case no. 1071759). If these assertions were true, then the State could merely reimburse on the basis of AWP - 0%, as it was doing in 1985.[10] The State, however, has not reimbursed providers on the basis of an undiscounted AWP since 1985 when the DHHS threatened to cut off federal funding on account of that practice. In truth, the State -- as do all the states -- takes a discount from AWP to compensate for the fact that AWP is <u>not a net figure</u>. The AWP discounts are

---

[10]These statements amount to a default to the position the State was taking in 1985, a position that occasioned the Morris letter.

38

1071439, 1071440, 1071704, & 1071759

meant to offset the discounts and other price concessions that are available to providers.

Aside from the fact that the State's current position flatly contradicts the DHSS mandate stated in the Morris letter, if, in fact, the AMA believed, as it now claims, that the published AWPs were, like EAC, prices actually paid, then, undisputedly, the State, by discounting the published AWPs by 10.2%, must have intended to reimburse its providers at an average of approximately <u>10% below their actual cost</u>. The State points to the fact that it has continued to reimburse providers for the distribution of <u>two classes</u> of drugs at 100% of AWP as proof that it believed the published AWPs were actual acquisition costs for <u>all drugs</u>. However, these reimbursements actually prove the opposite. Specifically, in the GSK/Novartis trial, Finch testified for the State, as follows:

> "Q. [State's counsel]: In that methodology, does the State of Alabama use 100 percent of AWP for anything?
>
> "A. [Finch]: We do.
>
> "Q. Okay. Tell us about that.
>
> "A. Well, during the period that I talked about a moment ago in the late eighties when this directive came down from the federal

39

1071439, 1071440, 1071704, & 1071759

> government, we went through a process of
> determining how we could appropriately comply
> with the federal law that says we have to pay
> what's generally and currently being paid, our
> best estimate of what that is.
>
> "What we did is during that time <u>conducted a
> couple of surveys of wholesalers</u>, and <u>we found</u>
> that for drugs that are controlled drugs, <u>the
> estimated acquisition cost for those drugs was
> actually AWP</u>. Because we were under a federal
> directive to discount off of AWP, we
> corresponded back with the federal government,
> shared our findings with them, and they
> actually approved for us for that group of
> drugs -- those controlled drugs -- to continue
> to pay AWP and then to take a discount off of
> <u>the other drugs</u>, which is where our current
> formula is."

(Emphasis added.)   The unmistakable inference from Finch's

testimony is that, for all the "other drugs," the State <u>knew</u>

that "the estimated acquisition cost ... was [<u>not</u>] actually

AWP."

     Although the trial judge disallowed the proffered

testimony of pharmacists who would have provided evidence as

to what the AMA actually knew, the NCPA states in its <u>amicus</u>

brief that a practice of discounting by 10% an actual AWP

"would cause pharmacies to lose money on every prescription

they filled on behalf of a Medicaid recipient" and would

"force many pharmacies to discontinue participation in the

Medicaid program altogether."   NCPA's brief, at 5-6.   In other

1071439, 1071440, 1071704, & 1071759

words, reimbursing Alabama providers at approximately 90% of their actual cost would drive them from, and, perhaps, effectively terminate, Alabama's Medicaid program.

Because there is no evidence indicating or contention that the State intends to discontinue its Medicaid program, it must not have intended to discount the _actual_ AWP by 10.2%. Indeed, testifying for the State in the trial of Novartis and GSK, Finch agreed that the AMA could not legally reimburse providers at 9% or 10% less than EAC, or true AWP. Thus, the State's argument that it believed the published AWPs to represent actual AWPs is simply untenable. On the contrary, it is clear beyond cavil that the reimbursement methodology adopted by the AMA is the product of a conscious and deliberate policy decision, which seeks to "balance (i) the amount [it] reimburse[s] pharmacies that dispense drugs to Medicaid patients, and (ii) the requirement -- established by federal law -- to set reimbursement sufficiently high to ensure participation in the Medicaid program by retail pharmacies." NCPA's brief, at 3.

Thus, we agree with AstraZeneca when it contends that this litigation is essentially an "attempt to use tort law to re-define [the AMA's] Medicaid reimbursement obligations."

41

1071439, 1071440, 1071704, & 1071759

AstraZeneca's brief, at 32.  Such regulation by litigation raises, of course, serious questions of federal preemption and supremacy, none of which we address here.  However, given the State's particularized knowledge of the challenged reporting practices, a claim of common-law fraud -- with its element of reasonable reliance -- is, like the proverbial "square peg in a round hole," particularly ill-suited for the task to which it was put in this dispute.

In short, the State determined for itself the appropriate reimbursement formulas based on its own surveys and calculations. It cannot, therefore, "claim reliance upon [the alleged] misrepresentation[s]." Smith, 528 So. 2d at 316. Although the State does not explain when, or how, it first began to take issue with the pharmaceutical manufacturers' methods of reporting, it is undisputed that the relevant reimbursement methodology has not changed since 1987.  In other words, the State has never altered its course of conduct since taking issue with the reporting methods.  See Hunt, 901 So. 2d at 8 (reasonable-reliance requirement was not met where the State did not change its course of conduct after discovering the alleged discrepancy).  In Hunt, the State never assumed the royalty reports to be true, while in this

42

1071439, 1071440, 1071704, & 1071759

case, the State did not accept the published AWP reports as true, nor did it rely on the truthfulness of the published WAC reports. In <u>Hunt</u>, the State always intended to audit the royalty calculations, while here, the State always used the formula it deemed appropriate. Indeed, the State contends that it <u>should not have to change its conduct</u> but that the manufacturers should have to change <u>their conduct</u> by "report[ing] real prices paid." State's brief, at 68 (case no. 1071704).

### III. Conclusion

In summary, this case is controlled by <u>Hunt</u> and the authority on which <u>Hunt</u> relied. The State failed to produce substantial evidence that it reasonably relied on the misrepresentations and/or fraudulent suppression it alleged AstraZeneca, GSK, and Novartis engaged in in these cases. Consequently, the trial court erred in denying the motions for a JML of AstraZeneca, Novartis, and GSK. The judgments in favor of the State are reversed, and judgments are hereby rendered in favor of AstraZeneca, Novartis, and GSK.

```
1071439 -- REVERSED AND JUDGMENT RENDERED.
1071440 -- REVERSED AND JUDGMENT RENDERED.
1071704 -- REVERSED AND JUDGMENT RENDERED.
1071759 -- REVERSED AND JUDGMENT RENDERED.
```

43

1071439, 1071440, 1071704, & 1071759

Lyons, Stuart, Smith, Bolin, and Shaw, JJ., concur.

Cobb, C.J., and Murdock, J., concur in the result.

Parker, J., dissents.

1071439, 1071440, 1071704, & 1071759

COBB, Chief Justice (concurring in the result).

To the extent that the main opinion relies on <u>Hunt</u> <u>Petroleum Corp. v. State</u>, 901 So. 2d 1 (Ala. 2004), I cannot concur in its rationale, because I believe that <u>Hunt</u> unduly restricts the jury's consideration of reliance issues in fraud cases. The application of <u>Hunt</u> to the facts of this case is as wrong in this case as it was in <u>Exxon Mobil Corp. v.</u> <u>Alabama Department of Natural Resources</u>, 986 So. 2d 1093 (Ala. 2007), in which I dissented. I discussed my concerns in this respect at length in my dissent in <u>Exxon</u>. However, unlike the situation in <u>Exxon</u>, I believe that the facts of this case fail to raise an issue of fact for the jury with respect to the issue of reliance. In addition to the fact that the wholesale acquisition cost ("WAC") is statutorily defined as a cost not including various discounts, see 42 U.S.C. § 1395w-3a(c)(6)(B) and 42 U.S.C. § 1396r-8(b)(3)(A)(iii)(II), the record contains compelling evidence indicating that the State was aware that neither the average wholesale price ("AWP") nor the WAC were actual costs. For example, in discussing her February 26, 1992, letter to the CMS, AMA Commissioner Carol Herrmann testified as follows:

45

1071439, 1071440, 1071704, & 1071759

"Q. [MR. CHRISTIAN, defense counsel:] And this is --
this is dated February 26th, 1992, the letter is?

"A. Yes.

"Q. All right. Could you -- and this says, 'However,
a number of studies have shown that in recent years,
the drug marketplace has changed, and there is a
preponderance of evidence that demonstrates that
such AWP levels overstate the prices that
pharmacists actually pay for a drug product by as
much as 10 to 20 percent because they do not reflect
discounts, premiums, special offers, or incentives.'
And then they say, 'Don't do that,' in effect,
right?

"MR. O'REAR [State's counsel]: Objection. That's
overbroad.

"MR. CHRISTIAN: I'll go ahead and read it.

"Q. 'Consequently, absent valid documentation to the
contrary, a published AWP level as a state
determination of EAC [estimated acquisition cost]
without a significant discount being applied is not
an acceptable estimate of prices generally and
currently paid by the providers.' Is that exactly
what it says?

"A. That's exactly what it says.

"Q. And this would be important information for you
to know, would it not?

"A. Yes.

"Q. So at least on February the 26th, 1992, you knew
that -- about all of these studies that have been
made that told you that these -- that this AWP
overstated the price by about as much as 10 to 20
percent?

1071439, 1071440, 1071704, & 1071759

> "A. We knew that CMS believed that there was a preponderance of evidence. Our AWP had already reflected a 10 percent reduction. And again, it gets to guesstimating by how much they're overestimating their AWP instead of reporting an accurate price to begin with."

(Emphasis added.)   Similarly, when Commissioner Herrmann testified as to a March 1987 memorandum she had received from the Center for Medicaid and Medicare Services ("CMS"), she stated: "States were instructed through [CMS] Regional Offices to obtain better estimations of acquisition costs on single-source drugs. Most states were using average wholesale price, AWP, listings which are usually about 20 percent higher than acquisition cost."   (Emphasis added.)

Thus, I conclude that the State failed to meet its burden of showing that it reasonably relied on the AWP and WAC as actual costs, and the drug manufacturers--AstraZeneca, GSK, and Novartis--would therefore be entitled to judgments as a matter of law under a more appropriate legal analysis than the analysis in Hunt.  See, e.g., Ex parte Alabama Farmers Coop., Inc., 911 So. 2d 696 (Ala. 2004); Alfa Mut. Fire Ins. Co. v. Thomas, 738 So. 2d 815 (Ala. 1999); and AT & T Info. Sys., Inc. v. Cobb Pontiac-Cadillac, Inc., 553 So. 2d 529, 532 (Ala. 1989).  Accordingly, I concur in the result.

1071439, 1071440, 1071704, & 1071759

PARKER, Justice (dissenting).

I respectfully dissent from the holding of the main opinion. I do agree that the Alabama Medicaid Agency ("the AMA") cannot claim lack of knowledge that the average wholesale price ("AWP") was not a true average wholesale price paid, as evidenced by the fact that the AMA's reimbursement formula for pharmacies -- AWP - 10% -- reduced the AWP. This formula is the product in large part of studies the AMA had conducted in 1985 and 1987 by two large pharmaceutical wholesalers of the average prices paid by pharmacies for prescription drugs.

I dissent, however, from the holding in the main opinion that the AMA did not reasonably rely on the wholesale acquisition cost ("WAC") because the AMA also knew that the WAC was not a true price paid by wholesalers to the pharmaceutical manufacturers net of purchaser discounts. I do not believe that either the surveys performed by Alabama pharmaceutical wholesalers for the AMA or the Medicare Prescription Drug Improvement and Modernization Act of 2003, Pub. L. No. 108-173, emphasized in the main opinion, put the AMA on notice that the WAC was not a net price. There is no evidence indicating that the surveys examined the WAC, and

48

1071439, 1071440, 1071704, & 1071759

there is no credible evidence that the 2003 Medicare Modernization Act affected the WAC for state Medicaid reimbursement.

### The 1985 and 1987 Surveys

In a November 22, 1985, letter, then AMA Commissioner Faye Baggiano told regional director of the United States Department of Health and Human Services ("DHHS") Richard Morris about the results of surveys that had been performed for the AMA <u>by</u> two Alabama pharmaceutical wholesalers:

> "Studies were accomplished for Medicaid <u>by</u> the two primary wholesale drug companies (Walker Drug Company and Durr-Fillauer Medical, Inc.) serving 80% of Alabama pharmacies. Copies of these studies are attached for your review. The studies indicated that the average percentage <u>markup on WA[C]</u> that Alabama pharmacies are paying is 7.3% (Walker) and 7.6% (Durr-Fillauer). The average of these percentages is 7.45%. We are adding an additional 1% to compensate for higher cost paid by some pharmacists who are unable to take advantage of discounts. Discounts are offered only if they make timely payments (twice monthly) and/or if they are able to purchase in large volumes. With your approval, we plan to implement this program effective January 1, 1985[sic]."

(Emphasis added.) As the Baggiano letter states, the AMA did not survey pharmaceutical wholesalers; the AMA had two pharmaceutical wholesalers survey pharmacies. These studies were <u>by</u> two pharmaceutical wholesalers, not <u>of</u> the

1071439, 1071440, 1071704, & 1071759

wholesalers. The focus was the <u>markup on the WAC</u> paid by

pharmacists; the focus was not the WAC itself.

Another survey was conducted for the AMA in 1987 by the

same two pharmaceutical wholesalers:

> "Effective October 29, 1987, the percentage markup
> was increased to 9.2%. Analytical studies were once
> again accomplished for Medicaid <u>by</u> the two primary
> wholesale drug companies servicing Alabama
> pharmacies (Walker Drug Company and Durr-Fillauer
> Medical, Inc.). The studies indicated average
> percentage <u>markups on WA[C]</u> for Alabama pharmacies
> as 7.95% (Walker) and 8.45% (Durr-Fillauer). The
> average of these percentages is 8.2%. The
> additional 1% was again added to compensate for
> higher cost paid by pharmacists who are unable to
> take advantage of discounts offered."

(Emphasis added.)

Thus, these two surveys, the one completed in 1985 and

the one in 1987, did not study the prices the pharmaceutical

wholesalers actually paid to the manufacturers -- the WAC;

instead, they focused on the markup on the WAC that pharmacies

were actually paying to the pharmaceutical wholesalers.

These studies did not put the AMA on notice that the reported

WAC was not a true net price.

### 2003 Medicare Law

I believe that the AMA presented substantial evidence

that the 2003 Medicare Modernization Act, cited in the main

1071439, 1071440, 1071704, & 1071759

opinion, had no application to the Alabama Medicaid program and, thus, did not put the AMA on notice that the WAC is a list price, instead of a net price.

On December 8, 2003, Congress passed the Medicare Prescription Drug Improvement and Modernization Act of 2003, Pub. L. No. 108-173, which contained the following definition for WAC, codified at 42 U.S.C. § 1395w-3a(c)(6)(B), applicable to Medicare, not Medicaid:

> "The term 'wholesale acquisition cost' means, with respect to a drug or biological, the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price, for the most recent month for which the information is available, as reported in wholesale price guides or other publications of drug or biological pricing data."

Pursuant to 42 U.S.C. § 1395w-3a(a)(1), "this section shall apply to payment for drugs and biologicals that are described in section 1395u(o)(1)(C) of this title and that are furnished on or after January 1, 2005."

Dr. Gerard Anderson, an expert witness for the AMA, described why the 2003 Medicare Modernization Act did not apply in this case:

> "Q. [COUNSEL FOR THE AMA:] Would you tell the jury if [the 2003 Medicare Modernization Act] did,

1071439, 1071440, 1071704, & 1071759

in fact, have any application to either AWP or
WAC?

"A.  Well, I think in any number of reasons, it
doesn't.  First of all, it doesn't because
as I read the Act - and I'm not a lawyer.
But as I read the Act, it begins in 2005.

"[DEFENSE COUNSEL]: Object, Your Honor.  He's
giving a legal conclusion, saying he's not a lawyer.
It's objectionable by his own admission.

"THE COURT: He just told you he's not a lawyer.
Overruled.

"[ANOTHER DEFENSE COUNSEL]: Your Honor, we'd
also just say that the jurors can read this document
and see whether it's applicable or not.

"THE COURT: The jurors are going to be the final
judge.  Overruled.  All right, [counsel for the
AMA].  Finish up.

"[COUNSEL FOR THE AMA]: Yes, sir.

"A.  So, first of all, it -- I believe it starts in
2005.  Second of all, I believe that it applies
to  physician-administered  drugs,  not  self-
administered drugs. Third of all, I believe
that it applies to the Medicare program only,
not the Medicaid program.  And probably most
importantly, it re -- it's related to a thing
that we've only heard a little bit about in
this thing, which is the ASP, or average sales
price, and that's how they're supposed to pay
drugs  under  Medicare  Part  B  for  --  for
physician-administered drugs. And when there
isn't an average sale price, when there is not
an average sale price, because there hasn't
been any sales yet, then you defer to the WAC
as a system. So the WAC only applies in a new
-- newly issued drug in the first quarter when
there  haven't  been  any  sales.  And  so,

52

1071439, 1071440, 1071704, & 1071759

> therefore, there would be no discounts or rebates or charge-backs or anything else because there have been no sales."

The WAC in the Medicaid program applies to self-administered drugs purchased from retail pharmacies, not to physician-administered drugs, but the WAC adopted in the 2003 Medicare Modernization Act applied to physician-administered drugs. Moreover, the WAC in the 2003 Medicare Modernization Act was a default provision for new drugs having no sales history, applicable in the first quarter only after the drugs were introduced into the market. Therefore, this list-price definition for new-drug launches under Medicare could not put the AMA on notice about a definition for the WAC for Medicaid purposes. In addition, its effective date was less than four weeks before the filing of all the cases against the pharmaceutical manufacturers on January 26, 2005. Accordingly, I disagree with the main opinion's reliance on the 2003 Medicare Modernization Act.

The main opinion further relies on the 2003 Medicare Modernization Act as "incorporat[ing] this definition of WAC into the Medicaid statutory scheme. See 42 U.S.C. § 1396r-8(b)(3)(A)(iii)(II)." ___ So. 3d at ___. This reliance is inappropriate because the definition applies to manufacturer

53

1071439, 1071440, 1071704, & 1071759

information to be furnished to the Secretary of DHHS for the

Federal Medicaid program for rebate purposes:

"(b) Terms of rebate agreement

"(1) Periodic rebates

"(A) In general

"A rebate agreement under this subsection
shall require the manufacturer to provide,
to each State plan approved under this
subchapter, a rebate for a rebate period in
an amount specified in subsection (c) of
this section for covered outpatient drugs
of the manufacturer dispensed after
December 31, 1990, for which payment was
made under the State plan for such period.
Such rebate shall be paid by the
manufacturer not later than 30 days after
the date of receipt of the information
described in paragraph (2) for the period
involved.

"(B) Offset against medical assistance

"Amounts received by a State under this
section (or under an agreement authorized
by the Secretary under subsection (a)(1) of
this section or an agreement described in
subsection (a)(4) of this section) in any
quarter shall be considered to be a
reduction in the amount expended under the
State plan in the quarter for medical
assistance for purposes of section
1396b(a)(1) of this title.

"(2) State provision of information

"(A) State responsibility

1071439, 1071440, 1071704, & 1071759

"Each State agency under this subchapter shall report to each manufacturer not later than 60 days after the end of each rebate period and in a form consistent with a standard reporting format established by the Secretary, information on the total number of units of each dosage form and strength and package size of each covered outpatient drug dispensed after December 31, 1990, for which payment was made under the plan during the period, and shall promptly transmit a copy of such report to the Secretary.

"(B) Audits

"A manufacturer may audit the information provided (or required to be provided) under subparagraph (A). Adjustments to rebates shall be made to the extent that information indicates that utilization was greater or less than the amount previously specified.

"(3) Manufacturer provision of price information

"(A) In general

"Each manufacturer with an agreement in effect under this section shall report to the Secretary--

"(i) not later than 30 days after the last day of each rebate period under the agreement--

"(I) on the average manufacturer price (as defined in subsection (k)(1) of this section) for covered outpatient drugs for the rebate period under the agreement (including for all such drugs that are sold under a new drug

55

1071439, 1071440, 1071704, & 1071759

> application approved under section 505(c) of the Federal Food, Drug, and Cosmetic Act [21 U.S.C.A. § 355(c)]); and
>
> "(II) for single source drugs and innovator multiple source drugs (including all such drugs that are sold under a new drug application approved under section 505(c) of the Federal Food, Drug, and Cosmetic Act), on the manufacturer's best price (as defined in subsection (c)(1)(C) of this section) for such drugs for the rebate period under the agreement;

"(ii) not later than 30 days after the date of entering into an agreement under this section on the average manufacturer price (as defined in subsection (k)(1) of this section) as of October 1, 1990 for each of the manufacturer's covered outpatient drugs (including for such drugs that are sold under a new drug application approved under section 505(c) of the Federal Food, Drug, and Cosmetic Act); and

"(iii) for calendar quarters beginning on or after January 1, 2004, in conjunction with reporting required under clause (i) and by National Drug Code (including package size)--

> "(I) the manufacturer's average sales price (as defined in section 1395w-3a(c) of this title) and the total number of units specified under section 1395w-3a(b)(2)(A) of this title;

1071439, 1071440, 1071704, & 1071759

> "(II) if required to make payment
> under section 1395w-3a of this
> title, the manufacturer's
> wholesale acquisition cost, as
> defined in subsection (c)(6) of
> such section ...."

(Emphasis added.) Subsection (b)(3)(A)(iii)(II), emphasized

above, authorizes manufacturers to use the WAC definition from

the 2003 Medicare Modernization Act, 42 U.S.C. § 1395w-

3a(c)(6)(B), in reporting to the Secretary of DHHS. The states

have a separate reporting responsibility under subsection

(b)(2)(A), also emphasized above, which has nothing to do with

the WAC. There is no provision making the Medicare definition

of the WAC applicable to the states; it applies only to the

manufacturers for federal reporting purposes. The information

furnished by the pharmaceutical manufacturers is required to

be treated as confidential under 42 U.S.C. § 1396r-8(b)(3)(D):

> "(D) Confidentiality of information
>
> "Notwithstanding any other provision of law,
> information disclosed by manufacturers or
> wholesalers under this paragraph or under an
> agreement with the Secretary of Veterans Affairs
> described in subsection (a)(6)(A)(ii) of this
> section (other than the wholesale acquisition cost
> for purposes of carrying out section 1395w-3a of
> this title) is confidential and shall not be
> disclosed by the Secretary or the Secretary of
> Veterans Affairs or a State agency (or contractor
> therewith) in a form which discloses the identity of
> a specific manufacturer or wholesaler, prices

57

1071439, 1071440, 1071704, & 1071759

charged   for   drugs   by   such   manufacturer   or
wholesaler, except--

"(i)  as  the  Secretary  determines  to  be
necessary  to  carry  out  this  section,  to
carry  out  section  1395w-3a  of  this  title
(including     the     determination     and
implementation  of  the  payment  amount),  or
to  carry  out  section  1395w-3b  of  this
title,

"(ii) to permit the Comptroller General to
review  the  information  provided,

"(iii)  to  permit  the  Director  of  the
Congressional  Budget  Office  to  review  the
information  provided,

"(iv)   to   States   to   carry   out   this
subchapter, and

"(v) to the Secretary to disclose (through
a website accessible to the public) average
manufacturer prices.

"The   previous   sentence   shall   also   apply   to
information disclosed under section 1395w-102(d)(2)
or 1395w-104(c)(2)(E) of this title and drug pricing
data reported under the first sentence of section
1395w-141(i)(1) of this title."

There is no evidence cited by the parties indicating that any

of this confidential information was furnished to the states,

or specifically to Alabama.  In contrast, there is a mandatory

provision in this section that "[i]nformation on retail survey

prices ... shall be provided to States on at least a monthly

basis."   42   U.S.C.   §   1396r-8(f)(1)(E).   Thus,   _retail_

58

1071439, 1071440, 1071704, & 1071759

information is to be provided to the states; <u>wholesale</u> information, however, is to be treated as confidential.

The furnishing of protected, confidential information by pharmaceutical manufacturers to the Secretary of DHHS using the definition of WAC in the 2003 Medicare Modernization Act for purposes of the rebate program did not put the AMA on notice that, for Medicaid purposes, the WAC was not a net wholesale figure.

<u>Mathematical Relationship Between the WAC and the AWP</u>

The main opinion recognizes that there is a mathematical relationship between the WAC and the AWP. ___ So. 3d at ___. Conceptually, if the WAC is inflated, then the AWP is likewise inflated. This point was made by GSK's corporate representative:

> "Q. And if that WAC price is false, then the multiplier would simply report a false AWP also, correct?
>
> "A. You've got to make that leap again of an assumption of --
>
> "Q. I'm going to make that leap, and the jury is going to be asked to do it later.
>
> "A. Okay.
>
> "Q. So, if that original WAC price is false, the multiplier simply takes a false price and multiplies against it; am I correct?

1071439, 1071440, 1071704, & 1071759

> "A. It is simply math, yes.

> "Q. Simply math. Exactly."

This point was also made by the State's witness, Dr. Gerard Anderson:

> "Q. If the WAC is false and not a true price, a calculated AWP will also be false and not a true price.

> "A. Okay. There is a mathematical relationship between one -- the WAC price and the AWP price. So -- and essentially if the WAC price is not a true price, then mathematically the AWP cannot be a true price either."

Contrary to the implication in the main opinion, however, I believe that this mathematical relationship is a one-way relationship, not a two-way relationship; dependent, not interdependent. That is, the AWP is based upon the WAC: an increase to the WAC causes an equal increase to the AWP; but the WAC is not tied to the AWP in a fixed relationship: a deduction from the AWP does not cause an equal deduction from the WAC.

The defendants refer to the AWP as a benchmark that is based upon the WAC plus 20% or 25%. The AMA discovered through the retail surveys it had performed by two Alabama pharmaceutical wholesalers that the AWP was not a true representation of the prices that Alabama pharmacies were

1071439, 1071440, 1071704, & 1071759

paying for drugs. Thus, the deduction from the AWP in the formula: AWP - 10%. But the fact that there has to be a deduction from the AWP to more closely approximate the true price paid by pharmacies does not mean that there has to be an equal deduction from the WAC. No party is advocating that here. For these reasons I believe that the fact that the benchmark AWP was not a true price did not put the AMA on notice that the WAC was therefore not a true price.

### The Effect of the WAC in These Cases

The WAC was the primary basis for payment by the AMA in these cases: 83% of the claims for drugs manufactured by AstraZeneca were reimbursed based upon the WAC (State's brief, at 62-63); 85% of the claims for drugs manufactured by GSK were reimbursed based upon the WAC (State's brief, at 62); and 85% of the claims for drugs manufactured by Novartis were reimbursed based upon the WAC (State's brief, at 66). The AWP - 10% formula was used for reimbursement less than 1% of the time for Novartis and less than 2% for GSK and about 8% for AstraZeneca. Therefore, the WAC was the predominant basis for the AMA payments in these cases.

This evidence is undisputed.

61

1071439, 1071440, 1071704, & 1071759

Conclusion

The AMA's own surveys put the AMA on notice that the AWP benchmark was not a true representation of the prices actually paid by pharmacies in Alabama for drugs purchased from pharmaceutical wholesalers. The AMA's reimbursement formula, which deducted 10% from the AWP, graphically codifies the AMA's understanding that the AWP was not a true representation of the price paid by pharmacies in Alabama.

In contrast, the mathematical relationship between the WAC and the AWP, the two surveys by Alabama pharmaceutical wholesalers of the markup on the WAC paid by pharmacies in Alabama, and the 2003 Medicare Modernization Act did not put the AMA on notice that the WAC was not a net figure. The AMA presented substantial evidence indicating that the 2003 Medicare Modernization Act did not apply to Medicaid or to the states, and the main opinion mistakenly draws the wrong conclusions from the two surveys and the dependent relationship of the AWP to the WAC. The evidence is undisputed that the WAC was the primary basis for reimbursement by the AMA.

62

1071439, 1071440, 1071704, & 1071759

Therefore, I respectfully dissent from the holding in the main opinion that the AMA could not reasonably rely on the WAC as a net figure.