# EXHIBIT 1

Hughes, Ph.D., James W. - Vol. II                            May 6, 2009
                          Chicago, IL

Page 297

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL            )
INDUSTRY AVERAGE WHOLESALE       ) MDL No. 1456
PRICE LITIGATION                 )
_____      ) Master File
                                 ) No. 01-CV-12257-PBS
THIS DOCUMENT RELATES TO:        )
_____      ) Subcategory
                                 ) No. 06-CV-11337-PBS
United States of America,        )
ex rel. Ven-A-Care of the        )
Florida Keys, Inc., v.           )
Abbott Laboratories, Inc.,       )
CIVIL ACTION NO. 06-11337-PBS)     VOLUME II


        Videotaped Deposition of JAMES W.
HUGHES, Ph.D., at 77 West Wacker Drive, 35th
Floor, Chicago, Illinois, commencing at the hour
of 9:09 a.m. on Wednesday, May 6, 2009.

Page 342

sufficient, you would say well, they're not sufficient because?
    MR. BERLIN: Objection, form.
    THE WITNESS: He is saying that $10.16 is an Abbott NDC and only an Abbott NDC. Right now his assurances are zero. All he is saying is that Abbott has an NDC that's $10.16.
    What I'm arguing that he needs to do is to provide a basis for that conclusion. And one way to do that would be to say I have gone to where NDC AWPs reside, First Databank or the Red Book or whichever one is appropriate for the system that he's using, I have examined this for the appropriate quarter and the appropriate time, and it is my opinion that only Abbott, or excuse me, here is all of the NDCs that have a price of $10.16 at this time.
BY MR. LAVINE:
    Q. And on what objective basis are we going to be able to say that --
    MR. BERLIN: Were you done with your answer?

Page 343

    THE WITNESS: No, not even close.
    MR. BERLIN: Can you please let the witness finish his answer?
    MR. LAVINE: Well, much of it's nonresponsive. And if we want to chance to finish this deposition today, we're losing it quickly.
    MR. BERLIN: Okay. Well, go ahead and let the record reflect the witness is not complete with his answer.
BY MR. LAVINE:
    Q. What is the standard that you would apply to determine when Professor Duggan has demonstrated a sufficient basis for his assumptions?
    A. When he offers evidence that he has checked the accuracy of his assumption, that $10.16 is only an Abbott NDC.
    Q. And what is the standard to let us decide when he has offered sufficient evidence to the effect that he's checked the accuracy of his numbers?
    MR. BERLIN: Objection, form.

Page 344

    THE WITNESS: Because AWPs for each NDC come from one of the compendia. That's the source of shall we say the truth of what AWP is at any particular time in any particular quarter in any particular state. Although of course compendia are national, correct.
    So if he says I have gone to the source of truth for NDCs, excuse me, I've gone to the source of truth for AWPs, I've gone to where the Medicare carriers go to get AWPs, I've gone to the compendia, and I have checked that compendia and at that time here's a list of the NDCs that have $10.16. Or the only one that has $10.16 is Abbott. Therefore, I am confident that when I see $10.16, that it is indeed an Abbott NDC, yes, an Abbott AWP I mean to say.
    The standard that you keep asking me about is that he goes to the source of the data, the compendia, and verifies his heretofore assumption that $10.16 can only be an Abbott NDC. That's the standard.
BY MR. LAVINE:

Page 345

    Q. And there's no general rule that you could describe that would tell us when he's reached that point.
    A. Yes --
    MR. BERLIN: Objection, form.
    Go ahead.
    THE WITNESS: Yes. When you're doing data analysis, you want your data to be as accurate as possible. That's the standard.
BY MR. LAVINE:
    Q. So Professor Duggan has failed to state his assumptions, he's failed to support his assumptions, and he's failed to demonstrate that his numbers were as accurate as possible?
    A. He's failed to state his assumption, he's failed to state his basis for his assumption, and he's failed to take feasible steps, reasonable steps, to verify the accuracy of his assumption.
    Q. Is there any other standard that he's failed to meet in that regard?
    MR. BERLIN: Objection, form.
BY MR. LAVINE:

Page 398

1   and not a fraudulent price.
2           For example, my criticism about his
3   treatment of MAC prices where MAC prices are
4   negotiated between providers and state Medicaid
5   agencies in my opinion represent the state's best,
6   the state's and the provider's best estimate, best
7   attempt at finding a mutually agreeable price.
8           So reimbursing at such a MAC price he
9   considers as being fraudulent. And I object to
10  that and say that a price that was arrived at
11  through a considered state agency policy should
12  not in a blanket sense simply be considered a
13  fraudulent price.
14          But he doesn't take any of the access
15  issues, he doesn't take any of the viability
16  issues, he doesn't take any of the state policy
17  issues that are raised throughout the deposition
18  testimony that he did not read, takes none of that
19  into account and simply performs this mechanical
20  here's the reimbursement that was paid, here's the
21  but-for reimbursement based on my but-for AWP,
22  here's the difference, absolutely everything else

Page 399

1   stays the same.
2       Q.  But based on the methodology established
3   by Professor Duggan, you're not of the opinion
4   that he applied his methodology incorrectly;
5   right?
6       A.  He applied an incorrect methodology
7   correctly as he believes would I guess be the way
8   to characterize my opinion.
9       Q.  Right.
10          But under the methodology as he set it
11  up, if the price based upon a hundred twenty-five
12  percent of the average was lower than the MAC, it
13  was appropriate to calculate it on the basis of
14  that lower hundred twenty-five percent of the
15  average price rather than the MAC?
16      A.  Well, yes. I mean he did what he said
17  he did.
18          But I'm objecting to the treatment of a
19  MAC price as being fraudulent as opposed to being
20  a price negotiated between providers and the
21  states that takes into account all of these other
22  things that I'm objecting that Dr. Duggan doesn't

Page 400

1   take into account.
2           The states and the providers arrive at
3   MACs as their best estimate of the minimum amount
4   that providers can accept and still be willing to
5   participate in the Medicaid program.
6           So it addresses the, these negotiated
7   MAC prices address these issues of cost
8   containment and access to the best of the states'
9   abilities.
10      Q.  Would it be fair to say that that's
11  another example of a violation of the standard of
12  needing to base your methodology on a realistic
13  but-for world?
14      A.  Yes. I think that would be a fair way
15  to characterize it, yes.
16      Q.  Does that also -- I'm sorry. Let me
17  start over.
18          Are there any other standards that you
19  would say Professor Duggan has failed to meet in
20  connection with his, the criticism you say that
21  his calculations were mechanical?
22      A.  Yes. I think sitting here today, to the

Page 401

1   best of my recollection, we've covered them all.
2       Q.  Now, with respect to the selection of
3   the arrays that were used for the basis of an
4   extrapolation regarding, we talked about some of
5   the other ones earlier that haven't shown the
6   correct NDCs were in the arrays, haven't shown
7   that Abbott's price is the only one who would have
8   changed, et cetera. But you also talked about how
9   there were too few arrays and they were not
10  randomly selected.
11          So what is the economic principle that
12  you say Professor Duggan failed to meet in his
13  selection or reliance upon those arrays?
14      A.  In his reliance upon those arrays, as I
15  believe I say in my report, he's using what
16  economists refer to as a sample of convenience,
17  using the data that are there as being
18  representative of the population without any
19  investigation or any assurance that such sample is
20  indeed representative of the, in this case,
21  population of arrays.
22      Q.  So the rule that he's violated is that

Page 402

1  if you're going to use a sample of convenience,
2  you need to demonstrate that it's reasonable to do
3  so?
4       A.  Well, if you're claiming that your
5  sample of convenience is representative, which is
6  something that somebody might claim, you need to
7  provide evidence that it is indeed representative.
8            If you are stuck with the sample that
9  you're stuck with, then it also seems to me it's
10 incumbent upon a researcher to examine the
11 consequences for their analysis from the fact that
12 their sample is not representative of the
13 population.
14      Q.  Are there any other principles or
15 methods that you say Professor Duggan should have
16 applied in connection with his selection of the
17 arrays, the sample of arrays?
18      A.  Well, I mean as I understand it, Dr.
19 Duggan did none of the selecting.  As I understand
20 it, Dr. Duggan was provided with a set of arrays
21 by the government.
22           So I think it mischaracterizes as I

Page 403

1  understand what Dr. Duggan is saying because I
2  don't believe he made any claim that he selected
3  the arrays from -- let me put it differently.
4            If Dr. Duggan had twenty more arrays in
5  his possession, I assume he would have used them.
6  I'm not saying that he did have more.  I'm saying
7  that it's my understanding that he used only those
8  that were given to him by the government.
9            So it's not a matter of Dr. Duggan
10 actually performing the selection but rather
11 uncritically using a sample of convenience without
12 any checks as to the representativeness of the
13 arrays that he had been provided.
14      Q.  What standard would you apply to
15 determine that the arrays that were relied upon in
16 Dr. Duggan's analysis were too few in number?
17      A.  There are, in statistics there are
18 formulas for figuring out, I'm trying to remember,
19 it's been a long time, for figuring out minimum,
20 something like minimum required sample size,
21 something like that.
22           I'm sure I don't have the term right,

Page 404

1  but there are formulas for figuring that out.
2       Q.  But you haven't done that analysis in
3  this case?
4       A.  No.  I have not.
5       Q.  Are there any other economic theories or
6  techniques that Dr. Duggan failed to meet in
7  connection with his extrapolation for Medicare
8  damages based on the arrays?
9       A.  Well, I mean this, and let's just keep
10 something in mind, is that in his rebuttal report
11 he talks about other studies that provide
12 extrapolations and so on and so forth.
13           I have not had, I have not reviewed
14 those studies, but I would imagine that those
15 studies provided some measure of statistical
16 accuracy for their extrapolations, as that would
17 be a standard practice.
18           The overarching criticism is that we
19 have no basis for concluding that Dr. Duggan's
20 estimates are too high, too low, or just right
21 because he's simply used the sample that was
22 provided to him, he's gone ahead and extrapolated

Page 405

1  according to his methodology, he comes up with a
2  number and we have no way of knowing whether that
3  number is terribly accurate, wildly inaccurate,
4  whether that number if he was provided with
5  twenty-five different arrays and performed the
6  same analysis would he get a number that was
7  similar to the number that he got or not.
8            Nothing that he does do we have any
9  measure as would be standard practice in any
10 academic economics paper, do we have any measure
11 of accuracy of his estimates of his extrapolations
12 or difference calculations.
13      Q.  Okay.  You received Dr. Duggan's actual
14 report, supplemental report, and rebuttal report;
15 right?
16      A.  Yes.
17      Q.  But you weren't provided with any of the
18 underlying materials related to those reports;
19 were you?
20      A.  I don't know, no.
21      Q.  So your opinion isn't based upon any
22 review of any of the materials that were used to

Page 422

1  and to adjust the administration fees accordingly.
2       That's part of the law. That's what
3  Congress after it got done looking at all of the
4  problems with the previous Medicaid system, that's
5  the conclusion that the Congress came to. And
6  came to after weighing all of the issues of cost
7  containment as well as access.
8       We've been sitting here arguing, you've
9  been arguing with me that I haven't taken into
10 account everything that has changed.
11      Well, then we're in great agreement on
12 Dr. Duggan's report because that's my objection to
13 Dr. Duggan's report. He doesn't take into account
14 everything that would have changed.
15     Q. Do you agree that some of the changes
16 that would have been implemented in a but-for
17 world that complies with your standard would have
18 increased the dollar value of the damages in this
19 case?
20     A. No. I don't reach that conclusion.
21     Q. Every single change that would have been
22 made in your version of the but-for world would

Page 423

1  have resulted in a lower damage figure?
2     A. Well, if, for example, a reduction of
3  ingredient cost by ninety percent in a state would
4  have led to an "X" percent increase in dispensing
5  fees in order to keep the Medicaid system viable,
6  then yes, I think the difference would have been
7  smaller, not larger.
8     Q. Are there any factors at all that would
9  have been part of your but-for world that would
10 have caused the dollar value of damages to move
11 upward?
12    A. Sitting here today, I don't know that, I
13 can't say a hundred percent that there's not, but
14 the main ones, the ones that I have identified in
15 my report, all point to having lower damages, not
16 higher damages.
17      I know that in his rebuttal report Dr.
18 Duggan makes claim of some things that would be,
19 some changes that would be in my but-for world
20 that would make damages higher, but that's fine.
21 That's not the issue.
22      The issue for me is that in constructing

Page 424

1  his tremendously unrealistic but-for world, Dr.
2  Duggan has come up with a set of difference
3  calculations that are unreliable and inaccurate.
4       They could be higher, they could be
5  lower. That's not what I'm here about. What I'm
6  here about is that the ones he's come up with we
7  have every reason to believe are not accurate.
8     Q. But when I asked you a few minutes ago
9  about can you say sitting here today with a
10 reasonable degree of certainty that it's more or
11 less likely, more likely than not that Professor
12 Duggan's damage figure is wrong, you said that you
13 could reach that conclusion.
14      So my follow-up question is since you
15 didn't actually do those numbers, is that just
16 based upon your calculation in your head?
17    A. No. I've just been through this.
18      If administration fees go up, as they
19 did under the MMA, as they did under the DRA, as
20 they did when the Congress of the United States
21 looks at these systems, weighs issues of access,
22 weighs issues of cost containment, and comes to a

Page 425

1  conclusion, they've come to a conclusion that when
2  you lower your ingredient costs down to a level
3  resembling average selling price, that this cannot
4  be done without an increase in dispensing or
5  administration fees.
6       So taking that one by itself into
7  account, which is again one of my principal
8  criticisms of Dr. Duggan's report, I do conclude
9  that I think his damage calculations would in fact
10 be smaller if, for example, his but-for world for
11 the MMA was, suppose the MMA had been implemented
12 fifteen years sooner, suppose the DRA had been
13 implemented fifteen years sooner, then what would
14 the difference have been.
15      For some transactions it would be the
16 reimbursement might be higher, for some
17 transactions the reimbursement might be lower. I
18 don't know.
19      But since the decrease in ingredient
20 costs as we see in the actual world, MMA and DRA
21 are more than offset by increase in administration
22 and dispensing fees, it is my conclusion that Dr.

Page 602

1    Q.  All right.  But when he extrapolates to
2  other carriers and assume that they would have
3  used Abbott AWPs in generally the same frequency
4  as the ones that he actually had information on,
5  that's where you have a criticism?
6    A.  What I have a criticism on is him
7  looking in the claims data and saying oh, here's a
8  reimbursement of $10.16, Abbott has an AWP of
9  $10.16; therefore, this must be an Abbott product
10  and Abbott must be in this array.
11    Q.  And did you look at the information that
12  he provided through counsel to you, including his
13  Red Book analyses and Red Book documentation, to
14  determine whether or not the Red Book was
15  reflecting Abbott at that price and only Abbott at
16  that price at that time?
17    A.  He did not mention in his report that he
18  had done any such checking.  And I did not review
19  Red Book data from him that concluded in any way
20  that this was an Abbott price and only an Abbott
21  price, that it was not possible for it to be
22  another price.

Page 603

1    Q.  Did you study the list of materials on
2  the source log that was provided with respect to
3  Dr. Duggan?
4    A.  I looked at the supporting documents
5  that I felt I needed to look at.
6    Q.  Did you look at the forty-five Red Book
7  excerpts that he had on that log?
8    A.  I did not.
9    Q.  Why not?
10    A.  I didn't.
11    Q.  Okay.  Did you look at anything else on
12  that log to see if it provided a basis for the
13  information since he was referring to those items?
14    A.  Dr. Duggan claims in his report that
15  this must be an Abbott AWP.
16        Again, I understand from his rebuttal
17  report that he claims that he checked to make sure
18  that they were Abbott AWPs.
19        Again, it's still unclear to me exactly
20  what he did check because there are things that
21  appear in the arrays by error, there are things
22  that appear wrong dosage, wrong size, wrong

Page 604

1  product, that I don't know, did he just check the
2  matching the, the products that are the same size
3  and dose as the NDC he was looking at or did he
4  look at other things that may have crept into the
5  array that might have had those prices since we
6  know that the arrays were constructed at times
7  with error.
8    Q.  In the Medicaid side where you criticize
9  his use of the nine state, as you call it, nine
10  state sample to extrapolate to the remaining
11  states, what proportion of the total Medicaid
12  claims dollars for these drugs were encompassed by
13  those nine states?
14    A.  I believe he says something like seventy
15  percent for the ten states.
16    Q.  For the ten states.
17    A.  Right.
18    Q.  Okay.  So in a normal sampling scenario
19  where you basically have a situation where you
20  take the largest participants in terms of the
21  quantity of things you're trying to evaluate and
22  you get up to seventy percent, are you saying

Page 605

1  that's not a sufficient sample size to extrapolate
2  the remaining thirty percent?
3    A.  I'm saying it's not been demonstrated
4  that it's a sufficient sample size.
5        I mean suppose you have as your
6  population of interest a room full of individuals
7  and you want to look at their salaries?  So you
8  take the seventy highest paid people and then say
9  okay, I'm going to take the average of that and
10  extrapolate to the other people.  Well, that may
11  or may not work.
12        If you take seventy men and then try to
13  extrapolate to thirty women, that may not work
14  very well for you, all right.  Precisely because
15  there's no effort to say that the seventy percent
16  that I'm using as the basis of my extrapolation in
17  fact mimics the thirty percent that I'm
18  extrapolating to.
19        Let's take it differently.  I'm from the
20  State of Maine, we're in the state of Illinois.
21  Illinois is one of his exemplar states.  Is the
22  Medicaid reimbursement system in Maine identical

Page 614

1  have to think that the sample of nine states that
2  you're using is in fact representative of the
3  other thirty-nine states that you're extrapolating
4  to.
5        Then that would go back to the author,
6  and the author may come back and say here, here,
7  I've done this, this, that, and the other thing,
8  and here's why I believe it to be representative.
9        Then it would be up to me as a journal
10 referee to say oh, okay, I get it, I agree with
11 him, that's adequate, or no, I don't think that's
12 adequate for whatever the following reasons would
13 be.
14       So I viewed my job, and nobody ever
15 disabused me from it, that my task here was
16 restricted to the same sorts of things that I do
17 in my regular professional life when critiquing
18 the work of a colleague is to look at the methods
19 that he used, look at how he performed his
20 analysis, looking at the assumptions underlying
21 his analysis, looking at the steps that he took,
22 the steps that he didn't take, looking at the

Page 615

1  realism of what he's done, and then passing a
2  judgment and writing that up and handing it in,
3  which is in effect what I've done here.
4     Q.  Back to the seventy percent sample.
5        Now that Dr. Duggan has done more
6  testing and more explanation in his rebuttal
7  report I guess is what we call it here, did that
8  provide at least some more insight as to the
9  appropriateness of the seventy percent sample?
10    A.  Well, as I pointed out here over the
11 past couple of days, the rebuttal report did
12 provide some more insight, but it also raised some
13 other questions because it wasn't always clear
14 from exactly what he, it wasn't clear from what he
15 was saying in the rebuttal report exactly what he
16 was doing.
17       It just wasn't, it wasn't clear to me
18 that take, for example, the checking of the AWPs,
19 like he says oh, I checked to make sure it was
20 right.  Again, what did you check, how extensively
21 did you check?  That wasn't clear.
22       And there were other instances like

Page 616

1  that.
2     Q.  Can you tell the court today within a
3  reasonable degree of certainty in your profession
4  that Dr. Duggan's quantitative estimation, taking
5  away the dispensing fee issue for a moment, but
6  just his quantitative estimation of the Medicaid
7  damages is materially in error?
8     A.  Well, as is replete in my report is yes,
9  I do believe it is materially in error.
10    Q.  When you say material, can you quantify
11 that?
12    A.  I have not made any attempt to quantify
13 that.
14       But yet he has made assumptions that
15 have no basis, he's made claims of
16 representativeness that he does nothing to
17 support, and so on and so forth, as I list in
18 forty-seven pages in my report, leads me to
19 believe that his estimates are inaccurate and
20 unreliable.
21       In fact, in his rebuttal report where he
22 is attempting to address some of these concerns

Page 617

1  where he instead of doing an extrapolation, he
2  goes to the data, the claims data for the other
3  thirty-eight states, he comes and says well, look,
4  if I did it using the claims data it's actually
5  substantially higher estimate of difference than I
6  got from the extrapolation, which in my mind
7  supports my contention that his original
8  methodology was in fact inaccurate and unreliable
9  because when he did it using the actual data he
10 claims he got a substantially different number.
11    Q.  Yet you've done absolutely no
12 quantitative work yourself to try to determine if
13 those numbers are materially wrong, trying to
14 determine how to quantify that?
15       MR. BERLIN:  Objection, form.
16       THE WITNESS:  Again, I've done here what
17 economists do when critiquing the work of
18 colleagues, is that I look at his methods, I look
19 at his procedures, I look at the assumptions, I
20 look at the basis of his assumptions, I look at
21 the reasonableness of his assumptions, I look at
22 what he is substantiating, what he's not

                                    81 (Pages 614 to 617)