# EXHIBIT 3

Duggan, Ph.D., Mark G.                  July 14, 2008
Washington, DC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL | ) | MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | ) | CIVIL ACTION |
| PRICE LITIGATION | ) | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | ) | |
| U.S. ex rel. Ven-a-Care of | ) | Judge Patti B. Saris |
| the Florida Keys, Inc. | ) | |
| v. | ) | Chief Magistrate |
| Abbott Laboratories, Inc., | ) | Judge Marianne B. |
| No. 06-CV-11337-PBS | ) | Bowler |

- - - - - - - - - - - - - - - -

Volume I

Videotaped deposition of MARK G. DUGGAN PH.D.

Washington, D.C.

Monday, July 14, 2008

9:00 a.m.

Page 46

1  But my understanding is that the distinction as
2  between my phrase difference as an economist and the
3  legal term damages, that they are -- are they exactly
4  synonymous? They're essentially -- that that is
5  reflective of damage.
6      Q.  Are they the same, difference and damage?
7          MR. LAVINE: Object to form.
8      A.  I would -- once again, there's a lot that
9  goes into my calculation of this difference value. So
10 it's my understanding that -- as an economist, it
11 represents the -- may I read from my report or --
12     Q.  Sure.
13     A.  "What the federal government reimbursed for
14 certain pharmaceutical products, provided to Medicaid
15 and Medicare recipients during the eleven year period
16 and what the federal government would have reimbursed
17 for the same products during the time period if prices
18 reflective of the actual prices at which Abbott was
19 transacting business had been used for the AWP, WAC
20 and direct price of Abbott products."
21     Q.  Are you saying that damages is not an
22 economic term?

Page 47

1      A.  That's not what I'm saying. It is
2  primarily a legal term in the context of litigation.
3      Q.  What experience do you have, Dr. Duggan, in
4  calculating and doing damage calculations for
5  litigation?
6          MR. LAVINE: Objection to form.
7      A.  So in the -- we've talked so far about my
8  work in the Texas case and my work here in the federal
9  case and in which the Texas work that I did was quite
10 analogous to what I'm doing here in the federal case.
11 And so I would consider that to be experience in
12 calculating -- in conducting analyses that the court
13 would find useful in assessing damages.
14     Q.  Is it fair to say that apart from this case
15 and your work in the Texas litigation you've never
16 done work to assist a court in calculating damages in
17 a civil suit?
18         MR. LAVINE: Objection to form.
19     A.  That's correct.
20     Q.  Have you ever published any articles on
21 that topic?
22         MR. LAVINE: Objection to form.

Page 48

1      A.  Just it -- I think the analysis that I
2  undertake here is very similar to the analysis that
3  I've undertaken in a large share of my empirical work,
4  which is to get at the causal effect of one or more
5  things on an outcome variable of interest. And so I
6  believe that my prior research is very relevant for
7  this analysis.
8      Q.  Move to strike as nonresponsive.
9          Apart from your work -- let me ask this
10 question again. Strike that.
11         Have you written any articles regarding the
12 calculation of damages in litigation?
13     A.  I've produced the two reports that we've
14 talked about here today.
15     Q.  Have you read any economic or legal
16 scholarship regarding what should be in a damage
17 calculation used for litigation?
18         MS. THOMAS: Objection to form.
19     A.  There are many documents that I have read
20 in the course of my career and also in connection with
21 this case. And so -- but it's hard for me to pick out
22 a particular study right now.

Page 49

1      Q.  When you set out to do the engagement in
2  Texas and again in the engagement in this case, did
3  you make any effort to review literature regarding how
4  to calculate damages in litigation?
5      A.  I believe that my report outlines in a very
6  transparent way what it is that my analysis does. And
7  so I reviewed some documents related to AWP
8  litigation, reports by other experts, for example,
9  quite some time ago. But I believe that what I set
10 out to do in this report and the assumptions that I
11 made in carrying this out are very clear.
12         And to the extent that the court or others
13 assess -- this report is, this algorithm that I have
14 designed, is something that I believe is well-suited
15 to the question that I posed, which is how much more
16 did the federal government spend for the products.
17 And I could go through the whole thing.
18     Q.  I would actually like you to go through the
19 whole thing.
20     A.  Okay. "What the federal government
21 reimbursed for certain pharmaceutical products
22 provided to Medicaid and Medicare recipients during

Duggan, Ph.D., Mark G.  July 14, 2008
Washington, DC

Page 214

1  MR. LAVINE: Objection to form.
2  A.  The analyses in my report shed light on how
3  federal government expenditures for Abbott products
4  and the J codes listed in the complaint would have
5  differed if Abbott had reported the alternative prices
6  that I described in my report to First Databank, Red
7  Book and so forth and the state Medicaid agencies and
8  the federal government used those numbers. So
9  absolutely I do believe that the -- given the
10 assumptions that I outline in my report, the report
11 estimates the impact of alternative prices on federal
12 government spending, holding other factors constant.
13      And I should note that in some of these
14 other papers that I mention here I perform -- some of
15 these other publications, I perform similar analyses.
16 So for example had a Medicaid recipient not been in an
17 HMO, but instead been in a fee for service, what would
18 government spending otherwise have been. Had a
19 Medicaid recipient not taken this specific
20 prescription drug, what would Medicaid spending
21 otherwise have been and so forth. That is quite
22 consistent with much of my previous research, the

Page 215

1  approach that I used here.
2  Q.  Are you providing expert opinion in this
3  case on whether the state Medicaid programs or
4  Medicare would have used the alternative prices that
5  you calculate in your report?
6      MR. LAVINE: Objection to form.
7  A.  It is my understanding -- and I try to be
8  specific about this in my report. It is my
9  understanding that -- it is my assumption that if
10 Abbott had reported alternative prices to First
11 Databank as I described in my report and to the Red
12 Book that state Medicaid agencies and Medicare
13 insurance carriers would have used those prices when
14 adjudicating Medicaid and Medicare claims. That is a
15 sort of -- that is an assumption that I am making in
16 my report. And I try to be clear about that.
17 Q.  Yes, you are. And I did get that. I just
18 wanted to make sure that I have it.
19 A.  Yeah.
20 Q.  The question of whether Medicare and
21 Medicaid would have used the revised pricing is an
22 assumption in your report, correct? It's not a

Page 216

1  subject of your testimony?
2      MR. LAVINE: Objection to form.
3  A.  Well, once again, I'm not certain about
4  what I will end up discussing in testimony. But for
5  the purposes of my report for the analyses that emerge
6  from my report that are summarized in the executive
7  summary and in the tables and so forth and throughout
8  the text, so I -- that is an assumption that I make in
9  my report. What I will say about that issue later
10 it's hard for me to speculate now at this point.
11 Q.  Have you done any analysis, reviewed the
12 factual record, to determine if Medicare or Medicaid
13 programs would have used the prices that you calculate
14 in your report?
15     MS. THOMAS: Objection.
16 A.  Well, I have observed in the data that when
17 the prices reported in First Databank and in the Red
18 Book changed for the Abbott products at issue in this
19 case that Medicaid reimbursement and subsequently
20 Medicare reimbursement did decline. So that is an
21 example of one kind of thing that I did to -- does
22 that represent everything that I've done, I'm not

Page 217

1  sure. I would need to go back and look at it.
2      But that's certainly consistent with what
3  one would expect given that assumption Medicaid
4  spending for Abbott products declined -- for the 44
5  Abbott products declined from -- in 2000 and
6  especially 2001, with the details of that varying a
7  bit.
8  Q.  You mentioned something that you saw or did
9  on that point whether or not the Medicare and Medicaid
10 programs would have used those prices. Have you done
11 the analysis you believe would be necessary as an
12 economist to provide an expert opinion on whether the
13 Medicare and Medicaid programs would have used the
14 prices that you calculate in your report?
15     MR. LAVINE: Objection to form.
16 A.  I'm confused by that question. Maybe you
17 can ask it again. I'm not trying to be difficult.
18 It's just a long day.
19 Q.  Have you done the analysis you believe
20 would be necessary as an economist to provide an
21 expert opinion on whether Medicare and Medicaid would
22 have used the revised prices that you calculate in

55 (Pages 214 to 217)