# EXHIBIT 4

Page 222

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL | ) | MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | ) | CIVIL ACTION |
| PRICE LITIGATION | ) | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | ) | |
| U.S. ex rel. Ven-a-Care of | ) | Judge Patti B. Saris |
| the Florida Keys, Inc. | ) | |
| v. | ) | Chief Magistrate |
| Abbott Laboratories, Inc., | ) | Judge Marianne B. |
| No. 06-CV-11337-PBS | ) | Bowler |

- - - - - - - - - - - - - - - -

Videotaped deposition of MARK G. DUGGAN PH.D.

Volume II

Washington, D.C.

Tuesday, July 15, 2008

9:00 a.m.

Page 243

1    A.   Around this specific time or just
2 generally?
3    Q.   At any point.
4    A.   I believe that I requested especially data
5 for the states that accounted for a disproportionate
6 share of Medicaid spending on complaint products. For
7 example, Illinois. For example, Florida. And so
8 forth.
9    Q.   And why did you --
10   A.   And so -- just to clarify --
11   Q.   Sure.
12   A.   -- so I certainly recall requesting data
13 for those large states.
14   Q.   Did you not want claims data for all 50
15 states?
16   A.   I believe that if -- I wasn't opposed to
17 having data for other states, but I felt for the
18 purposes of my analysis it would be -- just a sort of
19 diminishing returns sense. It would be most important
20 to start with the places that account for the largest
21 amount of Medicaid spending.
22   Q.   Did you want claims data for all 50 states

Page 244

1 to do your analysis?
2        MS. THOMAS: Objection.
3    A.   I believe that -- so as I outline in my
4 report, there are three different sets of Medicaid
5 data that I used. Data from state Medicaid agencies,
6 CMS Medicaid claims data for all 50 states and the
7 District of Columbia, and state drug utilization data.
8 I certainly did request that we acquire the CMS data,
9 which did include claims data for all 50 states and
10 the District of Columbia.
11   Q.   That's a different type of claims data than
12 the claims data that you had for certain states,
13 correct?
14   A.   There are some differences between the two
15 states with --
16   Q.   Two sets you mean or states?
17   A.   Between the two sets of data, between
18 the -- once again, it's going to depend, the magnitude
19 of the differences. It may be that in -- so -- but in
20 general there are some differences between the data
21 provided by the state Medicaid agencies and the data
22 provided by CMS, the claims data provided by CMS.

Page 245

1    Q.   Would you have preferred to have claims
2 data for all 50 states, yes or no?
3        MR. LAVINE: Objection to form.
4    A.   I believe that -- that's something that I
5 would need to think a bit about. What I can say is
6 that I believe that if I did have perfect data for
7 every state -- perfect data from state Medicaid
8 agencies for every state, for every NDC in every time
9 period that the results that I describe in my report
10 for this variable difference, for the number of claims
11 with difference greater than zero and so forth, would
12 have been higher.
13        And I go through that in my report about
14 why I believe that to be true. So I believe that in
15 my report that I undertook the necessary amount of
16 data acquisition to arrive at an accurate, though
17 conservative, finding.
18   Q.   Move to strike as nonresponsive.
19        My question was not what the results --
20 what you think your results would have been if you had
21 data for all 50 states throughout the claim period for
22 all NDCs. It was whether or not you would have

Page 246

1 preferred to have claim data for all 50 states and for
2 all the time period. That's the question.
3        MS. THOMAS: Objection.
4    A.   I believe that in my analysis I did
5 precisely what I preferred given the available data
6 and so forth. So can the caveat that -- and so I
7 guess I won't discuss the issue I just mentioned. But
8 I did exactly the analysis that I wanted to do, taking
9 all factors into account.
10   Q.   And one of the factors was the availability
11 of the data, correct? Yes or no?
12       MR. LAVINE: Objection to form.
13   A.   It would depend on the specific state. But
14 I believe that for some states in some time periods
15 that would be true.
16   Q.   So is it your testimony that in doing your
17 analysis for this case and your opinions that you
18 would not have preferred to have data for all 50
19 states? Is that your testimony?
20       MS. THOMAS: Objection.
21       MR. LAVINE: Objection to form.
22   A.   As an economist I've done quite a lot of

Page 247

1  research and have followed the research. And it is
2  rarely true -- I'm not sure it's ever been true --
3  that a study has perfect data. And I would need to
4  think a bit about whether the -- if someone were to
5  drop CDs here in my lap with perfect data -- in
6  general as an economist I would always like more data
7  to produce because as I said, in the research I've
8  done, in the research I've followed, one never has
9  perfect data.
10      And it is part of what I'm trained to do
11 and economists like me are trained to do is to make
12 the absolute best use of the data that is available to
13 produce the most accurate findings possible.
14      Q. So applying those general principles to
15 your work here, you would have preferred to have more
16 data?
17      MR. LAVINE: Objection to form.
18      A. As an economist there is this term free
19 disposal. So one can always dispose of something that
20 one receives. So at some level there is no cost to
21 receiving it. So in general any economist would say
22 if they could be provided with more data about an

Page 248

1  issue they're studying they would prefer to have it
2  rather than not and they could always just dispose of
3  it, not use it. So this term of free disposal in
4  general is one that economists frequently mention in
5  the course of carrying out research.
6       Q. I note that in your list here on page 294
7  of Exhibit 1101 you've got Pennsylvania and North
8  Carolina as states. If you had received data from
9  those two states would you have disposed of it?
10      MR. LAVINE: Objection to form.
11      A. At some level if these are two states that
12 if I -- I wouldn't necessarily dispose of it. I might
13 consider it.
14      Q. Is that a way of saying that you don't know
15 what you would do with it until you have it?
16      A. Well, if I recall these two states are
17 states for which some data was provided by state
18 Medicaid agencies. And it was my -- and these states
19 I believe are numbers 11 and 13 or 11 and 14 with
20 respect to spending on Abbott products listed in the
21 complaint during the time period of interest. And I
22 considered the availability of this data provided by

Page 249

1  the states. But I ultimately used the claims data
2  that was provided by CMS. And of course in using the
3  CMS claims data I -- well, we can end there.
4       Q. Are you familiar with how Pennsylvania
5  calculated its maximum allowable costs?
6       MR. LAVINE: Objection to form.
7       A. I may have known this at one point, but I
8  don't have it -- I can't recall it exactly right now.
9       Q. In your report you have a separate section
10 or sections that address particular states, correct?
11 I think it's twelve different states. Is that right?
12      A. For Medicaid.
13      Q. For Medicaid?
14      A. I believe it is twelve, yes.
15      Q. And it is for those twelve states that you
16 use claims data that was produced by the state
17 Medicaid program; is that right?
18      MS. THOMAS: Objection.
19      Q. Strike that.
20      It is for those twelve states minus Indiana
21 for which you use claims data provided by the Medicaid
22 program?

Page 250

1       MS. THOMAS: Objection.
2       A. Provided by the state Medicaid agencies
3  or --
4       Q. Yes.
5       A. That is my -- yes. That is correct.
6       Q. And how is it that you came to use the
7  claims data provided by the states for those eleven
8  states?
9       MS. THOMAS: Objection.
10      A. Well, as I mentioned at the outset, as an
11 economist I set out to answer a question, which was
12 the effect of what we've been discussing on federal
13 government expenditures. And so if one lines up the
14 50 states from largest spending to lowest spending, it
15 is the case that a state like Illinois or Florida will
16 have a larger effect on this parameter or set of
17 parameters that I set out to estimate than will a
18 state such as Vermont, Wyoming or Alaska.
19      So it is natural as an economist to begin
20 with -- given that -- it is natural to begin with the
21 states that are going to have the largest effect on
22 the parameter that I set out to determine, or set of

Page 251

1  parameters that I set out to determine.
2     Q.  And do you know how it is that you have
3  claims data from some state Medicaid programs but not
4  others?
5     A.  At my direction Steck Consulting and
6  Patrick Ormond with the -- I guess technically with
7  DOJ or the U.S. Attorney's Office in Boston -- at my
8  direction they initiated conversations with states for
9  the acquisition of data.  Whether they started with
10 Illinois or Florida or New York, I'm not sure exactly.
11 But they made inquiries to states.  If I recall
12 correctly there were cases -- perhaps one.  And I may
13 be misremembering here -- in which when they contacted
14 a state the data might not be available.
15      So, for example, suppose they contacted
16 Vermont and perhaps Vermont did not have data going
17 back to 2001 or earlier.  That's just an example.  I
18 don't recall that specifically.  And so at my
19 direction they initiated these calls and acquired as
20 much data as they could from states.  And I believe
21 that one factor influencing whether or not data was
22 obtained was just the availability of data, whether

Page 252

1  the state Medicaid agency or its contractor had the
2  data.  That I believe was one factor.
3     Q.  If you would go back to the notes on 294
4  that are in front of you -- I'm sorry.  Exhibit 1101
5  at Bates number ending 294 --
6     A.  The same page, right?
7     Q.  The same page.  Under Ohio -- is that
8  "Ohio" under the 1?
9     A.  O-H.
10    Q.  What do the 1, 2 and 3 mean next to those?
11    A.  Next to Ohio?
12    Q.  Well, no.  I'm sorry.  Next to all these
13 states.  There's a 3 next to California and a 1 next
14 to Illinois and a 2 next to Texas.  Would you
15 translate that for me?
16    A.  It's hard for me to recall.  With just
17 Illinois at 1 I would think perhaps it was Medicaid
18 spending for the complaint products.  Florida and
19 Illinois are pretty close.  But with Texas a 2, it
20 could be -- I just don't recall.  It could be where
21 things stood in terms of, you know, what my
22 understanding was, conversations, perhaps the greatest

Page 253

1  progress had been made with Illinois, next-most with
2  Texas.  I'm not sure.  That's one possible thing, but
3  I'm certainly not sure that's the case.
4     Q.  What did you write next to Ohio?
5     A.  "Get" -- something -- "soon."  And I can't
6  read -- "get stuff soon"?
7     Q.  What does the paren say?
8     A.  I believe that says "compound drugs."
9     Q.  And what does that mean?
10    A.  I would want to go back because this may --
11 Ohio may have a specific definition of this.  So I
12 would -- this was written 17 months ago and this is
13 something -- it could be this represents when multiple
14 drugs are combined.  But once again, I would want to
15 go back and look at -- there's a lot -- I would want
16 to go back and look at my full binders and so forth.
17 It's not something -- it's not a term for which the
18 definition crisply leaps to mind.
19    Q.  Was it your understanding that the NDCs at
20 issue in the case were compound drugs?
21       MR. LAVINE:  Object to form.
22    A.  I am not certain what my understanding was

Page 254

1  at this point 17 months ago.
2     Q.  As of today do you have an understanding
3  whether the NDCs at issue in this case are compound
4  drugs?
5     A.  It is my understanding that in some cases
6  the NDCs in this case represent part or all of a
7  compound drug.  But once again, that's something that
8  I would -- that's a pretty specific issue and it's
9  something that I would want to go back to and drill
10 down on some more to do justice to that.
11    Q.  And there's a note to the right, upper
12 right-hand corner.  Could you read that for us?
13    A.  "How drug is reimbursed when compounding."
14 And then -- keep reading?
15    Q.  Yeah.
16    A.  Underneath that "Is AWP used."  Underneath
17 that, "If not then how paid."
18    Q.  And as you sit here today, do you have a
19 guess of why you wrote that?
20       MR. LAVINE:  Object to form.
21    A.  It's just hard to recall.  Once again, it's
22 notes from 17 months ago.  So it is as I outline in my