# EXHIBIT 7

Young, Steven J.                                     May 13, 2009
                        Chicago, IL

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL ) | |
| INDUSTRY AVERAGE       ) | MDL No. 1456 |
| WHOLESALE PRICE LITIGATION ) | Master File No. |
| _____ ) | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO: ) | Subcategory No. |
| _____ ) | 06-CV-11337-PBS |
| United States of America, ) | |
| ex rel. Ven-A-Care of the ) | |
| Florida Keys, Inc., v.    ) | |
| Abbott Laboratories, Inc., ) | |
| CIVIL ACTION NO.          ) | |
| 06-11337-PBS              ) | |

VOLUME I of II

    The video taped deposition of STEVEN J.
YOUNG, called by the United States for
examination, pursuant to subpoena and pursuant to
the Federal Rules of Civil Procedure for the

Page 134

1  that I've done for Par have gotten into pretty
2  specific detail as to the whole process of sales
3  and distribution and contracting related to the
4  pharmaceutical or generics within the
5  pharmaceutical industry involved, you know,
6  discussions with the client, things of that
7  nature.
8      I think those are two of the bigger areas,
9  but kind of more globally, you know, they're
10 back -- my career really started, I did a couple
11 years of audit, but by probably '85, I started
12 doing government contracts work in general, some
13 of which related to healthcare, which became a
14 bigger percentage over time. But there was a lot
15 of work that I've done historically related to
16 analyzing sales, pricing, discount, rebate,
17 catalog price information for all sorts of
18 industries related to the Federal Supply Schedule
19 GSA and the Federal Supply Schedule and associated
20 with those, a lot of stuff that I had to kind of
21 do on the claims processing side and on the -- the
22 pharmaceutical side.

Page 135

1       Since I was a CPA, a lot of what I did was
2  to calculate historic issues with either
3  noncompliance with federal contracting, you know,
4  either most favored customer pricing or cost-based
5  contracting principles or helping attorneys
6  through that process or on the reverse side, when
7  there was a change order quantifying how much more
8  the company should be paid because of that change
9  order.
10      And then also, that kind of evolved into
11 then the health plan related proposal preparation
12 work that you may have seen in my CV that relates
13 to understanding the Tri-Care program and working
14 with Medicare contractors, more on their
15 government contract side, understanding how their
16 operations work, understanding their medical
17 management programs, helping them quantify the
18 cost estimates for that, go through head count
19 reduction, determinations for their competitive
20 bidding process and really becoming kind of
21 intimate with their operations, to be able to
22 do -- to help them through the process of -- of

Page 136

1  preparing the proposal for the bid.
2       There may be more, but I think those are
3  the -- kind of the bigger areas that are
4  summarized in my CV.
5    Q.  Those are the areas where you're acting as
6  an expert in connection with the report in this
7  case?
8    A.  Those are the past experiences that
9  bear -- that -- that give me experience that is
10 helpful in reaching some of the opinions in this
11 case, yes.
12   Q.  So when you are at a cocktail party and
13 somebody asks you what you do, what do you tell
14 them?
15   A.  I do healthcare consulting.
16   Q.  And not -- the -- the accountant
17 background is really not something you brought too
18 bear in this case, is it?
19   A.  No. I mean the reason why -- obviously,
20 the reason why I've had all those experiences is
21 everything that we do. I shouldn't say
22 "everything."

Page 137

1       Most of what I've done over the course of
2  my career relates to quantification of historic
3  issues or projections of, you know, costs into the
4  future. So most everything I do relates to
5  financial data, accounting analyses of the various
6  accounting records that are maintained related --
7  whether it's health plan reimbursement, whether
8  it's drug sales and distribution, whether it's,
9  you know, most favored customer pricing under the
10 GSA schedule, it all is basically kind of that
11 accounting side of things that -- that I look at.
12 I don't look at -- I don't do technical proposals
13 for healthcare. I don't tell people how to do
14 medical management. I help quantify the
15 implications of medical management, for example.
16   Q.  The -- your formal education background is
17 that you have a bachelor's degree in accounting;
18 right?
19   A.  That's correct.
20   Q.  From -- from Northern Illinois University?
21   A.  That's correct.
22   Q.  And you don't have any other degrees;

Young, Steven J.                                          May 13, 2009
Chicago, IL

Page 138

1  right?
2  A.  No.
3  Q.  Have you -- sorry. Let me start over. We
4  have one minute left, so I'll keep this as a short
5  question.
6  A.  Okay.
7  Q.  Have you taken any other formal
8  postgraduate courses other than continuing
9  professional education?
10  A.  Other than continuing professional
11  education, no.
12  Q.  Okay. And you are a CPA in the State of
13  Illinois?
14  A.  That's correct.
15  Q.  And still active?
16  A.  That's correct.
17  Q.  In good standing?
18  A.  Yes.
19      MR. LAVINE:  We are down to a minute so I
20  might as well stop.
21      THE VIDEOGRAPHER:  Going off the record at
22  12:32 p.m.

Page 139

1       (Whereupon a recess was had.)
2       THE VIDEOGRAPHER:  Beginning videotape
3  nnumber four. We're back on the record at
4  1:37 p.m.
5       MR. LAVINE:  David, do you want to just
6  quickly clarify that you --
7       MR. TORBORG:  Sure.
8       MR. LAVINE:  -- provided amended
9  objections?
10      MR. TORBORG:  Yeah.
11      During the lunch break, we had discovered
12  there were a couple of things that were not on the
13  consideration list -- not consideration list -- in
14  the bullet point list of the objections and
15  responses to the latest subpoena that were not on
16  the list that we needed to add because he did
17  review them, and then there were a couple of
18  things that -- that were not considered by him
19  that were on the list. So I orally conveyed the
20  changes to Mr. Lavine and have served upon him by
21  hand an amended objections and responses as well
22  as provided him copies of documents that were

Page 140

1  reviewed by Mr. Young in preparation for his
2  deposition.
3       MR. LAVINE:  And, of course, I have not
4  reviewed what you produced. We'll just deal with
5  it separately afterwards. You know, of course, we
6  don't waive any -- any of our positions we might
7  want to take in that respect.
8  BY MR. LAVINE:
9  Q.  I think we left off squeezing in some
10  questions about you are currently a CPA in the
11  State of Illinois in good standing, that's
12  correct; right?
13  A.  That's correct.
14  Q.  Okay. Are you Certified -- are you a
15  Certified Fraud Examiner?
16  A.  No, I am not.
17  Q.  Have you ever taken any courses in
18  economics?
19  A.  Other than my undergraduate degree, no.
20  Q.  And do you have any degree in economics or
21  econometrics?
22  A.  No.

Page 141

1  Q.  And am I right the only publication that
2  you've played a role in as an author, you're a
3  coauthor with three other folks on an article
4  regarding Medicare as a secondary payer?
5  A.  That's correct.
6  Q.  But no other publications besides that?
7  A.  No.
8  Q.  What is Chris Rohn's educational
9  background?
10  A.  I don't know his undergraduate degree for
11  certain, but he has an undergraduate degree from
12  University of Indiana and an MBA from
13  Northwestern.
14  Q.  And would I be correct that you're not --
15  you would not be familiar with any postgraduate
16  courses or education he's taken or other
17  publications he's --
18  A.  Other than the MBA that I mentioned, no.
19  Q.  Is -- is there any other thing that you
20  can describe regarding Mr. Rohn's background that
21  informed or supported the expertise he was
22  utilizing and the support he provided you in

36 (Pages 138 to 141)

Page 214

1  that I've ever seen, extrapolation occurs and is
2  accepted based on my past experience only when
3  it's an entire population with a randomly selected
4  sample. That's the normal methodology that I've
5  seen used in my experience.
6     Q. So you don't actually have any experience
7  with the approach taken by Dr. Duggan?
8        THE REPORTER: Sorry. I didn't hear after
9  "actually." You said "actually."
10 BY MR. LAVINE:
11    Q. You don't have actually have any
12 experience with the method utilized by Dr. Duggan.
13       MR. TORBORG: Object to form.
14       THE WITNESS: That's right. Of the
15 probably two-dozen calculations I've seen one way
16 or another, I've never seen anyone do it like
17 Dr. Duggan has done.
18 BY MR. LAVINE:
19    Q. But you're not an economist; right?
20    A. That's correct.
21    Q. But there are Ph.D. economists that were
22 retained by Huron Consulting, right, that -- that

Page 215

1  were employed by Huron?
2     A. There are economists that work for Huron,
3  at least I believe there are still economists that
4  work for Huron, that's correct.
5     Q. And you're not a statistical expert;
6  right?
7     A. No. I apply statistics, as most CPAs do
8  in -- in the normal course of my work.
9     Q. And although you disagree with the
10 extrapolation that was performed in this case for
11 various reasons, you didn't actually perform any
12 quantitative analysis to evaluate the scope of the
13 error you contend was caused thereby?
14    A. I was asked to critique his analysis, and
15 his analysis did not take it to the stage that
16 there could be quantitative critiques made of --
17 since he didn't, he chose to ignore all of the
18 issues in his calculation, it was possible to do
19 quantitative -- it was not possible for me to do
20 quantitative calculations of the impact of those,
21 no.
22    Q. Well, when you say that the variability of

Page 216

1  the claims in the ten states is different than the
2  variability of the claims in the 38 states, you're
3  saying there's no way to quantify that variability
4  and why it's too different to extrapolate?
5     A. The -- again, the normal approach in these
6  situations would be to get the full claims data
7  set, draw a statistically valid random sample,
8  come up with a point estimate and a range within
9  which that point estimate applied.
10       I did not have the claims data sets
11 necessary to perform that approach or to analyze
12 that claims data in relationship to the claims
13 data that he looked at to do any type of
14 quantification.
15       I wasn't asked to do that. The Myers &
16 Stauffer summary combined with some of the
17 information that was included on your list from
18 yesterday demonstrates that there's not
19 homogeneity between the populations, and I believe
20 that that's adequate to reach the conclusion that
21 he hasn't properly -- given the fact that he's
22 deviated from the -- the normal way that I've ever

Page 217

1  seen this calculation done supports my conclusion.
2     Q. Yeah. Because Abbott only hired you to do
3  the critique and not to actually quantify the
4  scope of the error, you didn't actually do
5  anything to quantify the scope of the error;
6  right?
7        MR. TORBORG: Object to form.
8        THE WITNESS: I was not asked to do that,
9  no.
10 BY MR. LAVINE:
11    Q. Okay. So what is the methodology that you
12 say that Dr. Duggan failed to follow when he based
13 his extrapolation on data related to ten states?
14       MR. TORBORG: Object to form.
15       THE WITNESS: Could you repeat that
16 question?
17 BY MR. LAVINE:
18    Q. What -- what is the principle or standard
19 that you say Dr. Duggan failed to meet when he
20 based his extrapolation on a sample of ten states?
21    A. Based on my past experience in performing
22 overcalculation and undercalculation -- or