# EXHIBIT 8

Hughes, Ph.D., James W. - Vol. II                           May 6, 2009
                              Chicago, IL

Page 297

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL            )
INDUSTRY AVERAGE WHOLESALE       ) MDL No. 1456
PRICE LITIGATION                 )
_____) Master File
                                 ) No. 01-CV-12257-PBS
THIS DOCUMENT RELATES TO:        )
_____) Subcategory
                                 ) No. 06-CV-11337-PBS
United States of America,        )
ex rel. Ven-A-Care of the        )
Florida Keys, Inc., v.           )
Abbott Laboratories, Inc.,       )
CIVIL ACTION NO. 06-11337-PBS)     VOLUME II

     Videotaped Deposition of JAMES W. HUGHES, Ph.D., at 77 West Wacker Drive, 35th Floor, Chicago, Illinois, commencing at the hour of 9:09 a.m. on Wednesday, May 6, 2009.

Page 302

1          PROCEEDINGS
2
3      THE VIDEOGRAPHER: Today's date is May
4  6, 2009. We are on the record at 9:09 a.m.
5
6      JAMES W. HUGHES,
7  having been previously duly sworn, was examined
8  and testified further as follows:
9
10     EXAMINATION (Continuing)
11 BY MR. LAVINE:
12     Q. Welcome back, Dr. Hughes.
13     A. Thank you.
14     Q. I just wanted to ask some follow-up
15 questions about some of your points that you made
16 regarding Dr. Duggan's analysis of the Medicare
17 arrays.
18     A. Yes.
19     Q. And let me just go through the points.
20 I think I might be able to ask one question about
21 all of them. If we need to separate them out,
22 just let me know.

Page 303

1      You said that he hasn't shown the
2  correct Abbott NDCs were in each array. He hasn't
3  shown that Abbott's price moved the median.
4      He hasn't shown all the arrays to be,
5  well, I have the word "identical," but similar
6  enough within the sample or the extrapolation.
7      There's no evidence that Abbott was the
8  only manufacturer whose AWP was higher than the
9  actual average selling price. And that he hasn't
10 shown that a hundred percent of the sales of the
11 products under that J-Code were of Abbott
12 products.
13     And the question about all of those is
14 what is the underlying scientific methodology that
15 you say Dr. Duggan failed to follow with respect
16 to each of those issues?
17     A. Why don't you give them to me one at a
18 time, and then we'll run through them because I
19 understand it forms a single question but it
20 doesn't really form a single answer.
21     Q. Okay. Fair enough.
22     So first, that he hasn't shown the

Page 304

1  correct Abbott NDCs were in every array.
2      A. Okay. So that is the point that he
3  looked to find a price that matched an Abbott
4  price but doesn't offer, doesn't know with any
5  degree of certainty that it is in fact the Abbott
6  price, that there was not some other drug, some
7  other NDC, that was either in the array
8  legitimately or in the array by mistake that could
9  have that price.
10     He said that he had, in his rebuttal he
11 says that he had checked, but, again, it's not
12 clear to me exactly what he had checked.
13     So as to the exact, I'm sorry,
14 scientific methodology?
15     Q. Yes.
16     A. Okay. So I mean he's forming, in effect
17 he's forming a hypothesis, and the hypothesis is
18 that $10.16 whenever I see that, that's always an
19 Abbott price.
20     Again, the idea is that it's an
21 assumption on his part. There's no scientific
22 basis on his part for assuming that every time you

Page 305

1  look at a Medicare array and see $10.16, there's
2  no scientific principle, no scientific
3  methodology, that says oh, well, that must be an
4  Abbott price.
5      So, again, when one is making an
6  assumption, and as I said before, I'm not against
7  assumptions, I'm not against all assumptions, but
8  you need to provide, you need to provide a basis
9  in the evidentiary record or some sort of basis,
10 economic theory if you like, that if there's some
11 economic law that says $10.16 is a price that is
12 reserved for Abbott NDCs -- I'm being facetious
13 but you understand what I'm saying -- that he
14 provides no such basis to support that assumption
15 that he's making.
16     Again, the evidence that he does have
17 given that there's no set methodology for forming
18 arrays, there's no set methodology for deciding
19 whose products are in the arrays, which products
20 are in the arrays, products get into arrays by
21 mistake, products of the wrong dosage, products of
22 the wrong type, get into the arrays.

Page 310

1  put them out there. And then it's up to the
2  reader to decide, and this is true in the economic
3  literature as I understand it, you put your
4  assumptions forward because sometimes you have to
5  make them in order to move the analysis forward,
6  and then it's up to the reader, it's up to the
7  journal editor, it's up to referees, if the paper
8  is published it's up to the people who read it to
9  decide whether they think that assumption is well
10 founded.
11        There's plenty of examples of say
12 journal articles where a researcher will find a
13 certain result, you know, particularly in economic
14 theory. But the result may depend on an
15 assumption that nobody really believes in.
16        So that piece of work may go forward,
17 may even be published, but it doesn't have much
18 impact because the consensus of the readers is
19 that that assumption just doesn't make any sense
20 under the circumstances.
21 BY MR. LAVINE:
22    Q.  So when Dr. Duggan in his analysis fails

Page 311

1  to show the correct Abbott NDCs were in the
2  arrays, that fails to meet a standard in economics
3  of not being allowed to make unfounded
4  assumptions?
5     A.  State your assumptions and state your
6  foundation for the assumptions, neither of which
7  Dr. Duggan does, that's my criticism, all right.
8        Then it's up to readers to decide
9  whether or not that's a reasonable assumption
10 under the circumstances.
11    Q.  I just want to make sure I'm
12 understanding.
13        One of the critiques is that Dr. Duggan
14 hasn't shown the correct NDCs were in the array,
15 and the standard that he's failing to meet is the
16 requirement that in economic analysis your
17 assumptions need to be stated, and he's failed to
18 do that.
19    A.  The assumptions need to be stated, and
20 they need to be supported. You need to say here's
21 why I'm making this assumption.
22        I mean if somebody does an economic

Page 312

1  analysis that as one of the assumptions that their
2  analysis is based on is that demand curves don't
3  really slope downward but demand curves slope
4  upward, first of all, that assumption needs to be
5  stated.
6        Second of all, the researcher needs to
7  put a reason why contrary to everything else
8  everybody knows, everybody believes about demand
9  curves, this person is saying that they slope
10 upwards. And then you put the work out there and
11 people, readers, will choose to believe or not
12 believe your work based on whether they believe or
13 don't believe that assumption.
14    Q.  All right. So when Dr. Duggan fails to
15 show the correct Abbott NDCs were in the array,
16 he's failed to state his assumption and he's
17 failed to support his assumption?
18        MR. BERLIN: Objection, form.
19        THE WITNESS: Well, yes, he's failed to
20 state his assumption, he's failed to support his
21 assumption.
22        But, remember, he's assuming that these

Page 313

1  are Abbott NDCs. He's using that to calculate his
2  damage calculation, he's using it to calculate his
3  damages for that carrier for that period. He's
4  then attributing a hundred percent of that damage
5  to Abbott.
6        It certainly seems well within the
7  expectations of best practices in economics that
8  you provide some basis for the belief that just
9  because I see $10.16 that that is representative
10 of an Abbott NDC and not representative of
11 something that's in there either intentionally or
12 by mistake. And he fails to do that.
13 BY MR. LAVINE:
14    Q.  Where would I go to see an objective
15 description of those requirements you just
16 described?
17        MR. BERLIN: Objection, form.
18        THE WITNESS: Could you read back my
19 response, please, my last response.
20        (The record was read back as
21 requested.)
22        THE WITNESS: As I was saying yesterday,

Page 314

1  when one's performing, when one uses
2  extrapolation, one's by definition introducing
3  error into the analysis because you are not using
4  actual data, you're extrapolating from one
5  situation into another.
6         So statistically speaking, you're going
7  to be introducing error because you're creating
8  data, you're not using actual data.
9         That error from extrapolation is going
10 to be compounded if where you're extrapolating to,
11 the data that you're extrapolating to, in this
12 case -- excuse me.  Let me try that again.
13        The data that you're using for the
14 extrapolation, in this case the purported Abbott
15 NDC that he says that he sees in arrays, if that's
16 not accurate he's introduced yet another degree of
17 error into his extrapolations.
18        MR. LAVINE:  I object, move to strike as
19 nonresponsive.
20 BY MR. LAVINE:
21     Q.  My question was is there an objective
22 source, a peer-reviewed material, a learned

Page 315

1  treatise, anything of the sort, that would
2  articulate the standards that you're describing so
3  that we could look it up and determine whether or
4  not Professor Duggan was meeting those standards?
5      A.  Well, one could look to an econometrics
6  book at the problems that are introduced into
7  estimation when you have problems, so-called
8  errors in variable.
9      Q.  What would the rule say?
10     A.  The rule would say is that when your
11 independent variables are mismeasured, your
12 estimates lose precision.
13     Q.  So is that the standard that we should
14 use to judge whether or not Dr. Duggan handled
15 things appropriately with respect to showing the
16 Abbott NDCs were in the array?
17        MR. BERLIN:  Objection, form.
18        THE WITNESS:  My objection to Dr.
19 Duggan's analysis is we have to rely on his word
20 for how accurate these extrapolations are.
21        He's not performing anywhere in his
22 report, he performs no statistical test of

Page 316

1  accuracy, he offers no confidence intervals, he
2  offers no test of statistical significance.
3         He offers nothing of the sort, nothing
4  of the type of thing that it would be standard
5  practice, and I'm sure is contained in every bit
6  of Dr. Duggan's published econometric work, the
7  measures of accuracy and the measures of goodness
8  of fit and all of these other measures that
9  economists and statisticians typically use to
10 measure the accuracy of somebody's estimation.
11        We have extrapolations with reasons to
12 believe that there's been error introduced to
13 these extrapolations.
14        First of all, from the very act of
15 extrapolation.  And, secondly, because of the lack
16 of certainty or the lack of evidence offered that
17 he actually has the correct NDCs in the array.
18        There are lots of things in statistics
19 books and lots of things in econometrics books
20 that talk to how regression analysis, which is not
21 what Dr. Duggan has done here, but how economic
22 analysis generally is affected when you think you

Page 317

1  have one variable and you actually have something
2  else.
3         And there are ways for approaching those
4  problems, there are ways for handling those
5  problems.
6         When one is faced with such a problem in
7  an econometric analysis, one acknowledges the fact
8  and then either takes corrective action or adjusts
9  their standard, does adjustments to standard
10 errors and does adjustments to their confidence
11 intervals to take those things into account.
12        None of that's done here.  We have no
13 reason to accept the accuracy of Dr. Duggan's
14 extrapolations but Dr. Duggan's word that these
15 are all Abbott NDCs.
16        And given, you know, he's a well-
17 published empirical economist, just giving in the
18 academic world, in academic research, just giving
19 the editor, or giving reviewers your word that
20 these are really good estimates would not fly.
21        That's my objection, is that this is not
22 meeting any sort of standard of accuracy that's

**Page 562**

1    Eli Lilly was the innovator. That's
2  right. I'm sorry.
3    Q.  Are you thinking perhaps erythromycin?
4    A.  Correct.
5    Q.  Abbott was the branded innovator.
6    A.  Was the branded innovator, yes.
7    Q.  As an economist, how much should, in
8  your but-for world, how much should the states
9  have increased their dispensing fees for the drugs
10 in question when Abbott reduced its price reports
11 in the 2000, 2001 timeframe?
12        MR. BERLIN:  Objection, form.
13        THE WITNESS:  I've not done calculation
14 or the surveys or anything that would need to be
15 done to ascertain that. So I don't know.
16 BY MR. BREEN:
17   Q.  But it's your opinion they should have;
18 right?
19   A.  It's my opinion that pharmacies would
20 have found the reimbursements in line with Dr.
21 Duggan's reimbursements to be unremunerative.
22   Q.  My question is how much should they have

**Page 563**

1  increased their dispensing fee for the Abbott
2  drugs when Abbott reported lower prices in the
3  2000, 2001 timeframe, according to your opinion?
4        MR. BERLIN:  Same objection.
5        THE WITNESS:  Again, I don't have a
6  number. I have not done the calculation.
7        But we have seen what the administration
8  fees were increased by under the MMA, which was a
9  substantial amount.
10 BY MR. BREEN:
11   Q.  Well, let's talk about Medicaid now.
12       You've already said that you're aware
13 that the states were already increasing
14 administration fees. You just don't know when or
15 where or who.
16       So do you even know if it was necessary
17 to increase them any more in the post-2000
18 timeframe in connection with the Abbott drugs?
19   A.  Well, again, under Medicaid and under
20 the DRA, states were supposed to review them and
21 states did undertake the review, Texas undertook a
22 review that here's what we need to do if the DRA

**Page 564**

1  goes through.
2        The DRA didn't end up being implemented
3  as yet, but yet the states were undergoing
4  precisely those reviews and at least in the case
5  of Texas were making such determinations.
6    Q.  Okay.  Well, when it came to IV
7  pharmacy, how many states that had already
8  increased their dispensing fees conduct a review
9  and said we have to increase them more?
10   A.  I don't know the answer to that.
11   Q.  So let me get this straight. Let's
12 assume that the dispensing fees for a particular
13 state are adequate, according to your whatever you
14 would decide would be adequate, we'll make you the
15 Zarr, the Medicaid Zarr, and dispensing fees are
16 adequate at a certain point in time.
17       Abbott decides though that they're going
18 to increase their price reports a thousand
19 percent. So that their AWP is a thousand percent
20 higher than the actual selling price generally and
21 currently paid in the marketplace for the drug.
22   A.  A thousand percent, but it may be $2 or

**Page 565**

1  $3 that we're actually talking about.
2    Q.  Well, maybe it's $2 or $3, but when you
3  do infusion pharmacy how many, don't you have to
4  use these bags of solutions every time you give a
5  prescription?
6    A.  It's my understanding it's close to that
7  at least, yes.
8    Q.  So it's $2 to $3 on the bag and then
9  whatever it is on the actual drug that goes in the
10 prescription; correct?
11       MR. BERLIN:  Objection, form.
12       THE WITNESS:  The drug that goes in the
13 prescription? I'm not sure what --
14 BY MR. BREEN:
15   Q.  Let's say it's vancomycin.
16   A.  Okay.
17   Q.  Let's say that the inflated
18 reimbursement is $10 on the bag of fluids and $100
19 on the vancomycin.
20       MR. BERLIN:  Objection, form.
21 BY MR. BREEN:
22   Q.  Every time the vancomycin is

Page 566

1  administered, you need another bag of fluids;
2  correct?
3     A.  Correct.
4     Q.  Anyway, so let's say that Abbott decides
5  to report higher prices that results in a higher
6  AWP one year, and then the next year it decides
7  no, we're going to lower them, we're going to
8  report prices that are consistent with our market.
9        Is it your testimony that that, those
10 two decisions by Abbott to raise it and then lower
11 it again, will somehow cause the Medicaid programs
12 to have to pay a higher dispensing fee?
13    A.  I'm not addressing the raising and then
14 lowering, but I was addressing the lowering to
15 levels commensurate with what Dr. Duggan has
16 proposed.
17    Q.  Well, when you say lowering the levels
18 commensurate with what Dr. Duggan has proposed, is
19 it your opinion that Dr. Duggan's proposal is not
20 consistent with the regulation that required
21 estimation of acquisition cost based upon prices
22 generally and currently paid in the marketplace?

Page 567

1     A.  I haven't reached an opinion on that.
2        But I am saying that the total
3  reimbursement is being reduced to a level that
4  threatens the access by Medicaid patients to
5  healthcare services to approximately the same
6  degree that those services are available to
7  nonMedicaid patients.
8     Q.  That's your opinion?
9     A.  Yes.
10    Q.  But you don't have one scintilla of
11 quantitative evidence that you've actually
12 developed yourself or reviewed that somebody else
13 did relating to the drugs at issue in this case
14 that supports that opinion; do you?
15       MR. BERLIN:  Objection, form.
16       THE WITNESS:  Again, I disagree.
17       For example, the Myers & Stauffer
18 reports speak to the inadequacy at existing levels
19 of EAC in the dispensing fees for pills and
20 tablets and then go on to say that this problem is
21 going to be worse for infusion drugs, which are
22 the drugs like the drugs that are at issue in this

Page 568

1  case, and in those situations even at current
2  levels of EAC the dispensing fees are even more
3  inadequate than they are for pills and tablets.
4  BY MR. BREEN:
5     Q.  Okay.  So for the vancomycin again on
6  Exhibit 4, your Exhibit 4, Deposition Exhibit 12,
7  forgetting the twenty percent range between an
8  actual WAC and an average wholesale price,
9  forgetting that range, how much are the states
10 going to have to increase dispensing fees on
11 vancomycin, Abbott's vancomycin, as a result of
12 Abbott reporting prices that are closer to market
13 based upon the studies you have reviewed?
14    A.  There was not numbers given in the
15 studies that I reviewed.
16    Q.  Okay.  So my question then is if you're
17 going to criticize Dr. Duggan's claim-by-claim
18 drug-by-drug NDC-by-NDC specific damages model,
19 then can you point to any specific quantitative
20 evidence that an economist would utilize to
21 determine how much in your alternate world the
22 Medicaid programs are going to, according to you,

Page 569

1  increasing dispensing fees on vancomycin based
2  upon Abbott's reporting lower prices?
3     A.  Again, to come to the opinions that I
4  came to in my report, I relied on the testimony
5  and the evidence in the reports that the people
6  who know the state Medicaid systems better than I
7  do, better than Dr. Duggan does, better than you
8  do, the people who are actually having to make the
9  rules day in and day out, had stated that if you
10 have drastic reductions, or even not drastic
11 reductions, if you had significant substantial
12 reductions in ingredient cost, you will also have
13 to worry about what's happening on the dispensing
14 fee side, lest you have problems with access.
15       And your expert, Dr. Schondelmeyer, says
16 exactly the same thing in his California report.
17 That reductions in the ingredient cost, modest
18 though they were compared to Dr. Duggan's
19 reduction in ingredient costs, the reductions in
20 ingredient costs in California were going to
21 require increases in dispensing fees, or else, I
22 believe in Dr. Schondelmeyer's words, you were