# EXHIBIT 9

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL ) | |
| INDUSTRY AVERAGE WHOLESALE ) | MDL No. 1456 |
| PRICE LITIGATION ) | |
| _____ ) | Master File |
| | ) No. 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO: ) | |
| _____ ) | Subcategory |
| | ) No. 06-CV-11337-PBS |
| United States of America, ) | |
| ex rel. Ven-A-Care of the ) | |
| Florida Keys, Inc., v. ) | |
| Abbott Laboratories, Inc., ) | |
| CIVIL ACTION NO. 06-11337-PBS) | VOLUME I |

Videotaped Deposition of JAMES W.
HUGHES, Ph.D., at 77 West Wacker Drive, 35th
Floor, Chicago, Illinois, commencing at the hour
of 9:13 a.m. on Tuesday, May 5, 2009.

Page 126

1    Q. And do your opinions in this case also
2  draw upon any expertise you have in law and
3  economics?
4    A. Well, to the extent if you define law
5  and economics as being restricted to the idea of
6  the common law moving away from inefficient rules
7  towards efficient rules, probably not.
8       But to the extent that law and
9  economics is a discipline with a certain outlook
10 on how markets and actors within those markets
11 work, I can't say it doesn't influence my
12 thinking at all. But I don't think I can point
13 to something in my report that says yes, this is
14 a law and economics point.
15      I mean all of these are just applied
16 micro-fields, and my point is I'm a broadly
17 practicing applied micro-economist.
18   Q. So your area of expertise or areas of
19 expertise you're drawing upon in connection with
20 this case include applied micro-economics, health
21 economics, labor economics, industrial
22 organization, antitrust, and law and economics?

Page 127

1    A. You know, I think that's kind of overly
2  broad. I mean they're all subfields of, they're
3  all fields of applied micro-economics.
4       So I only hold myself out here as being
5  an applied micro-economist. That's the main
6  thing one needs to understand to understand
7  what's going on in this case in my opinion.
8    Q. Now, the consulting work that you've
9  done over the years in the health arena, what
10 experience do you have as a result of your
11 consulting work that qualifies you as an expert
12 to testify in this case?
13   A. Well, I believe, as I said before, in
14 my role as a consulting and testifying expert,
15 I've had to familiarize myself several times over
16 the years with drug reimbursement policies of
17 state Medicaid agencies, Medicare, third-party
18 payors, pharmacy benefit managers, and the like.
19      The assignments have called on me to
20 familiarize, I would say to deepen my
21 familiarization with medical markets of all
22 kinds, but, you know, particularly in the

Page 128

1  pharmaceutical areas since that was the area
2  where I was doing most of the work.
3    Q. When have you worked on drug
4  reimbursement policies as related to Medicare and
5  Medicaid in the past?
6    A. I would say fairly confidently in every
7  one of the class certification matters in
8  pharmaceuticals.
9    Q. Were there any other of your consulting
10 engagements that provided or support any of your
11 expertise in drug reimbursement policies for
12 Medicare and Medicaid?
13   A. Well, certainly my previous work in
14 Connecticut and Montana, Nevada.
15      It came up in, well, that was a class
16 certification matter.
17      Certainly in my role as a consultant in
18 Cardizem. That was the, I spoke about serving as
19 a consultant when there was an opt-out plaintiff,
20 which was a third-party payor. So I had to, in
21 order to construct the damage estimates that we
22 made, I had to become familiar with the ins and

Page 129

1  outs and the practices of that particular
2  third-party payor, what their policies were
3  towards reimbursement, what their policies were
4  towards putting brand drugs versus generic drugs
5  on the formulary, where on the formulary they
6  would put them, under what circumstances, what
7  would change when they would carve out their
8  pharmacy benefit and have it run by a pharmacy
9  benefit manager, what sorts of rebates and under
10 what circumstances that they could get, did get
11 or could get, from brand name pharmaceutical
12 manufacturers, what sorts of incentives they were
13 given by state, federal, or simply profit motives
14 for moving from brands to generics on the
15 formularies, things like that.
16      Very detailed, it required getting very
17 detailed knowledge about how a number of
18 different reimbursement systems were working.
19   Q. Did any of your prior cases involve
20 analysis of the individual claims paid by a
21 portion of the Medicaid programs?
22   A. There was time that we, in many of the

**Page 130**

1  class certification cases I would make use of
2  these, what's the acronym, the state utilization,
3  state Medicaid utilization data that appears on
4  the web, or at least used to appear on the web.
5  So that's aggregate rather than individual claims
6  data.
7        But there was analysis and manipulation
8  of those data in the course of that work. And
9  that was two or three or four of those cases that
10 we've talked about before.
11     Q.  Are you talking about what is referred
12 to as the STUD data, S-T-U-D?
13     A.  I think so.
14     Q.  Have you ever worked with the SMRF/MAX
15 data before?
16     A.  I have not, no.
17     Q.  Your work with the STUD data -- I'm
18 sorry. Did you base any of your work on that
19 data?
20     A.  I'm sorry. I need to correct something
21 previously.
22        There was individual Medicaid claims

**Page 131**

1  data that we analyzed in the Connecticut matter.
2  I'm sorry. I left that out.
3        Was that SMRF data, was that MAX data,
4  I don't recall, but it was individual claims data
5  that was provided by the state.
6        It just seems to me there was, HUGR,
7  H-U-G-R, was the acronym that I remember that as
8  I recall was data that was provided to us by
9  Connecticut Medicaid.
10     Q.  Was that claims level data?
11     A.  Yes.
12     Q.  So it would show on a particular date a
13 particular person got "X" units of a particular
14 drug?
15     A.  Yes.
16     Q.  Did that data cover, well, describe the
17 scope of that data.
18     A.  Well, it was specific to the drugs at
19 issue which were primarily Taxotere and Anzemet,
20 which were Aventis drugs.
21        So it was, you know, relative to other
22 Medicaid data I think it was relatively small

**Page 132**

1  because these were, they're not chemo drugs but
2  they are anti-hematics, to relieve nausea in
3  chemo patients. So it was a relatively small
4  market because it was restricted to the State of
5  Connecticut. But, as I recall, there were still
6  several thousand of those claims.
7        So what we were doing was that the
8  plaintiff's expert had said, and I'll always
9  remember this number, that Medicaid reimbursed
10 for these drugs at 90.25 percent of AWP.
11       So we went into the claims data to
12 review exactly what was the reimbursement because
13 regardless of what plaintiff's expert was saying,
14 the state regulations for part of the period said
15 that these drugs would be reimbursed on an
16 as-billed basis up to $499. And then if the
17 doctor billed more than $499, the claim would be
18 reviewed, rejected, reduced. But up to $499 it
19 would simply be accepted.
20       So we got into looking at the
21 individual claims data to see what was actually
22 reimbursed and in effect what was the

**Page 133**

1  relationship between these reimbursements to the
2  reimbursement formulas that the plaintiff's
3  expert was claiming, what was the relationship of
4  the individual reimbursements to the amounts that
5  the state was saying it was reimbursing.
6     Q.  Just one quick clarification and then
7  we're done with the tape.
8        The Connecticut data related to several
9  thousand claims? Is that what you said?
10    A.  To the best of my recollection.
11    Q.  So it was smaller than the data we're
12 dealing with this case?
13    A.  Well, it was one state. It was two
14 relatively restrictive drugs. And it was over,
15 yes, several thousand would be about right, yes.
16       MR. LAVINE: We better take a break.
17       THE VIDEOGRAPHER: Going off the record
18 at 12:06 p.m.
19       (A recess was taken.)
20       THE VIDEOGRAPHER: Beginning of
21 Videotape No. 3. Back on the record at 12:15
22 a.m.

Page 134

1  BY MR. LAVINE:
2      Q.  With respect to your prior experience,
3  in any of the other cases that you worked on as
4  an expert or a consultant, did you get the actual
5  underlying claims data and perform any analysis
6  on it?
7      A.  It's my understanding that's what we
8  did in Connecticut, yes, to the best of my
9  recollection.
10     Q.  But does that mean you didn't do it but
11 somebody else did it?
12     A.  Yes.  Somebody else did it at my
13 direction, yes.
14     Q.  Were there any other cases where you
15 actually got Medicare and Medicaid data and did
16 an analysis of the paid claims?
17     A.  Well, the paid claims, like I said,
18 I've used the utilization data that's online, but
19 that's not, what I used was not individual claims
20 data.
21         Again, in the Cardizem case it was
22 individual claims data from a third-party payor

Page 135

1  but not from Medicaid.
2      Q.  Just to clarify.  In Connecticut who
3  did the actual hands-on analysis of the claims
4  data?
5      A.  A company called The Brattle Group was
6  retained to keep custody of the data and to do
7  what I asked them to do.
8      Q.  Can you spell that?
9      A.  Brattle Group?
10     Q.  Yes.
11     A.  Sure, B-R-A-T-T-L-E.
12     Q.  Is there any other reason that the
13 consulting work that you've done helped to
14 qualify you as an expert for the issues you're
15 addressing in this case?
16     A.  Well, again, in virtually every one of
17 the class certification cases, in fact I think in
18 all of the class certification cases --
19     Q.  Pharmacy-related.
20     A.  Pharmacy-related class certification
21 cases, there is the issue of how, I mean these
22 are proposed damage methodologies.

Page 136

1          So in order to assess the adequacy or
2  inadequacy of any particular damage methodology,
3  you've got to go into the nitty-gritty details of
4  everybody who is or wants to be a member of the
5  putative class.
6          So that means going into the payment
7  methods and the practices of all sorts of
8  third-party payors, not just private insurance
9  companies, but also to the extent, also Medicaid,
10 to a lesser extent Medicare, because the drugs
11 that it, for example, Cipro wasn't a drug that
12 would be covered under Medicare Part B.  And
13 prior to Part D Cipro wouldn't be covered under
14 Medicare, but certainly Medicaid was a big user.
15         On the other hand, Taxotere and
16 Anzemet, they're drugs more like the drugs in
17 this case.  So Medicare and Medicaid are both at
18 issue there.
19         But in order to form an opinion about
20 any particular damage methodology, you've got to
21 have a pretty intimate knowledge of what data are
22 going to be available, what are the practices and

Page 137

1  procedures of all of the actors who want to be
2  members of this proposed class.
3          So at least to, and that research,
4  regardless of who was doing data analysis at my
5  direction, that research was all done by me.
6  This was not anything that lawyers gave to me.
7  This was not anything that I told a consulting
8  firm to go find out what you can find out about
9  this.
10         The standard practice was rather for me
11 to do the research and then tell the consultants
12 okay, here's what we know about Medicaid for the
13 Medicaid say CHIP program, Child Healthcare Plan
14 in the state of Illinois, all right, so go look
15 at the data and tell me, you know, are the
16 reimbursements that are supposed to be in this
17 and the copayments that are supposed to be in
18 this and this was actually showing up in the
19 data.
20         So, yes, I considered that through all
21 of this I have a fairly detailed knowledge of
22 Medicaid and Medicare pharmacy reimbursement

Page 142

1   Q. -- as that supports your expertise in
2   this case.
3       You said you were trained in health
4   economics. What training in health economics are
5   you referring to?
6   A. Classwork. I was planning, before I
7   turned to medical malpractice, I was planning on
8   doing my Ph.D. thesis on a healthcare topic.
9       So there was a lot of background
10  reading of journal articles and books that I did
11  in preparation for that. And I just never, I
12  just chose to go a different direction once I got
13  exposed to law and economics. The topic was more
14  interesting, the data were more readily
15  available, so I went that route.
16      So that's why I consider myself to be
17  trained in health economics.
18      Then also when you teach a course,
19  maybe some people do it this way, but the lay
20  person, if I may, may think you pick up a
21  textbook and you teach from that. But that's not
22  really the way teaching works.

Page 143

1       I was certainly qualified, felt
2   qualified, to teach health economics. So then
3   you go through, in my experience when I'm doing a
4   new course I spend six to eight hours preparing
5   for every hour in the classroom.
6       So that's going to be not just dealing,
7   and, in fact, probably not dealing much at all
8   with the textbook, but rather familiarizing one's
9   self with journal articles and other materials
10  that you need to teach the course that you're
11  going to teach.
12  Q. When you talk about classwork, you're
13  referring to when you were a student?
14  A. Well, in that answer I was referring to
15  both.
16  Q. Well, first as a student and then as a
17  teacher.
18  A. Right.
19      But as a student, again, the training
20  was, I simply don't remember. I don't know that
21  I ever had a course entitled "Health Economics,"
22  although I took courses in health law at the

Page 144

1   Michigan Law School.
2       When I was an undergraduate, I was a
3   research assistant for health economist when I
4   was at Boston University. So there was a lot of
5   training in there.
6       But maybe as an undergrad, I can't
7   remember if I ever took a course that was
8   entitled "Health Economics."
9   Q. In terms of your experience in labor
10  economics, industrial organization, and
11  antitrust, and law and economics, is the basis
12  for those similar as to what you just described
13  for health economics?
14  A. No.
15      I have certainly studied law and
16  economics and of course taught it several times.
17      Labor economics I did not take a course
18  in.
19      Industrial organization I had several
20  courses in, three that come to mind off the top
21  of my head.
22      So there is much more academic training

Page 145

1   there.
2   Q. In any of your work, have you actually
3   calculated a damage figure in a false claims
4   case?
5   A. In a false claims case, no.
6   Q. Have you ever done any data analysis
7   where you would extrapolate from experiences in
8   one Medicaid program to the reimbursement
9   experience you would see in another Medicaid
10  program?
11  A. Not to my recollection, no.
12  Q. Have you had any prior experience in
13  connection with analyzing damages in connection
14  with the Medicare program J-Code reimbursement?
15  A. Calculating damages, no.
16  Q. Any type of reimbursement experience
17  related to Medicare J-Codes?
18  A. Certainly in the AWP litigation, I
19  certainly had to know something about it for the
20  reports that I wrote.
21  Q. Did you look at the way any state
22  Medicaid programs may have reimbursed based upon

Page 250

1  (The record was read back as
2  requested.)
3  BY MR. LAVINE:
4    Q. So am I right though that you have no
5  opinion regarding the level of precision that
6  would be necessary in order to extrapolate from
7  the existing arrays?
8         MR. BERLIN: Objection, form.
9         THE WITNESS: I don't think that's
10 accurate.
11        What I have said now several times is
12 that when one makes an assumption, the assumption
13 needs to be reasonable.
14        The standard for the reasonableness of
15 the assumption is can you point to some evidence,
16 any kind of evidence, that says that this
17 assumption is reasonable, has a basis in the
18 facts of the case, has a basis in the practices
19 in this case of the Medicare carriers, does it
20 have any basis whatsoever.
21        I am certainly not, I'm an economist,
22 I'm not saying that you can do analyses all the

Page 251

1  time, that you can always do analyses without
2  making assumptions.
3         I mean economists, and I'm included in
4  this, we make assumptions in our analyses all the
5  time.
6         But one of the criticisms of Dr. Duggan
7  is he makes assumptions, he doesn't always spell
8  out the assumptions that he's going to be making.
9  And when he doesn't spell out the assumptions
10 that he's going to be making, or when he does or
11 doesn't spell out the assumptions he's going to
12 be making, he rarely if ever provides the basis
13 for the assumption that he's making.
14        So that's where I'm at on the Medicare
15 arrays, is I might believe him if he can give me
16 documents, if he can give me testimony, if you
17 all can provide an affidavit that says that
18 there's standard practice for this, these arrays
19 followed the standard practice, everybody else
20 follows the standard practice, I'm not going to
21 have much of a problem with that.
22        But that's not going to be, and that's

Page 252

1  not going to be a situation where everybody is
2  going to be exactly the same. But, more or less,
3  there's a procedure that's followed, and, more or
4  less, you can look at the arrays that we have and
5  come to the conclusion that for the most part,
6  not a hundred percent of the time, but for the
7  most part people are following those procedures.
8  And you give me that and say well, I'm going to
9  then assume everybody else also follows those
10 procedures, I don't have that much of an
11 objection to that.
12        Again, it's going to depend on what the
13 evidence is that you give me that there are these
14 procedures and everybody's following. You know,
15 give me a basis and then let's kick around
16 whether it's reasonable or not.
17        But at this point Dr. Duggan hasn't
18 given me any basis for that assumption. And the
19 evidence that we do have suggests it's a very bad
20 assumption. And that's what my objection is.
21 BY MR. LAVINE:
22   Q. What is the standard that you're going

Page 253

1  to hold professor Duggan to beyond just saying
2  that what he does needs to be reasonable?
3         MR. BERLIN: Objection, form.
4         THE WITNESS: I did not say what he
5  does needs to be reasonable.
6         I said that his, the assumptions that
7  he makes need to have a reasonable basis in fact,
8  that you're just not making some assumption
9  because it's convenient but you have every reason
10 to believe as I believe we have here to think
11 that this assumption is not valid.
12 BY MR. LAVINE:
13   Q. So if Professor Duggan had a reasonable
14 basis in fact regarding his assumption that the
15 Abbott products were used in the other arrays,
16 then that would be an acceptable methodology, and
17 your problem is he did not articulate that for
18 you?
19        MR. BERLIN: Objection, form.
20        THE WITNESS: We're on to a different
21 subject now. I mean what we were talking about
22 before was the arrays he does have versus the

Page 254

1  arrays that he doesn't have, right.
2       But I am in basic agreement with you
3  that if he says here's the assumption I'm going
4  to make about the similarity or lack of
5  similarity of the arrays I do have to the arrays
6  I don't have, and he's made that assumption, he
7  hasn't stated it but he's made the assumption
8  that the arrays I don't have look like the arrays
9  that I do have. He hasn't stated it but you can
10 figure that out that he is assuming that, and he
11 says in his report here's why I think making that
12 assumption makes sense.
13      To me, an unacceptable reason why this
14 assumption makes sense would be something like I
15 don't have anything else to do, this is all I
16 got, and I got to use the arrays I have, and I'm
17 just stuck with it, and so whether it's right or
18 wrong I just got to use these arrays.
19      That's not a reasonable basis for
20 making the assumption. An assumption is a
21 rebuttable presumption.
22      So if he then were to say in his report

Page 255

1  well, everybody knows that arrays are all
2  constructed in the same way, everybody knows that
3  Medicare has been on the phone with these folks,
4  and everybody knows that there's some standards
5  that are applied to these arrays, so the ones
6  that I don't have are going to be just like the
7  ones that I do have, okay, that's a basis.
8       Then we get to kick around whether it's
9  reasonable or not. And one measure whether it
10 will be reasonable, okay, let's look at the
11 arrays that you do have, are they constructed the
12 same way, do they have the same number,
13 constructed the same way, are they constructed
14 according to the standard that you say has been
15 communicated to the carriers by CMS or HCFA or
16 whoever is in charge at the time.
17      If it does, fine. Then we may well
18 agree that this was a reasonable assumption with
19 a reasonable basis.
20      An example of a more reasonable basis,
21 as I've said before, is that if there were
22 Medicare regulations that said here's how you do

Page 256

1  arrays, and that the arrays that Dr. Duggan had
2  in his possession, again, not a hundred percent
3  of the time but the vast majority of the time
4  it's clear that these carriers followed those
5  regulations in constructing those arrays.
6       And so then he says in his report well,
7  everybody that I do have is following these
8  regulations fairly closely, so I think it's a
9  reasonable assumption to make that the people
10 that I don't have also followed these regulations
11 reasonably closely. So I'm going to assume that
12 the arrays that I have are the same as the arrays
13 that I don't have.
14      He and I could kick that one around and
15 I may well come to agree with him yeah, under the
16 circumstances that's reasonable because the
17 evidence that we have both of the regulations and
18 how those regulations are or are not reflected in
19 the arrays that we have matches up well enough
20 such that yeah, okay, I can see that being
21 reasonable.
22      But we're in a situation now where he's

Page 257

1  just simply making an assumption, and he's
2  provided me, not provided to me, he provides the
3  reader with no basis for why that should be
4  reasonable.
5       And, the evidence that he does have in
6  his possession, the arrays that he does have,
7  suggests that that assumption is not reasonable
8  because these arrays vary greatly in the way that
9  they're constructed and the way that they're put
10 together across carriers and across time.
11 BY MR. LAVINE:
12      Q. And another consequence of that issue
13 is that there would have been no way for Abbott
14 to have known whether it would have gotten a
15 benefit from any alleged AWP manipulation?
16      MR. BERLIN: Objection, form.
17      THE WITNESS: No. That's not quite
18 what I said.
19 BY MR. LAVINE:
20      Q. I apologize. Correct me.
21      A. No, that's okay.
22      What I was saying was because of the