```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                          )
                                )  CA No. 01-12257-PBS
PHARMACEUTICAL INDUSTRY AVERAGE )  CA No. 06-11337-PBS
WHOLESALE PRICE LITIGATION      )  Pages 1 - 111
                                )
```

MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
October 20, 2009, 2:10 p.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S:

2

     FOR THE PLAINTIFFS:

3

         GEORGE B. HENDERSON, ESQ. and JAMES J. FAUCI, ESQ.,
4    Assistant United States Attorneys, Office of the United
     States Attorney, United States District Court, Suite 9200,
5    1 Courthouse Way, Boston, Massachusetts, 02210.

6        MARK A. LAVINE, ESQ. and ANN ST. PETER-GRIFFITH, ESQ.,
     Assistant United States Attorneys, Office of the United
7    States Attorney, 99 NE 4th Street, Suite 300, Miami,
     Florida, 33132.

8
         LAURIE A. OBEREMBT, ESQ., United States Department of
9    Justice, P.O. Box 14271, Washington, D.C., 20044.

10       JAMES J. BREEN, ESQ., The Breen Law Firm,
     3562 Old Milton Parkway, Alpharetta, Georgia, 30005.

11

12   FOR THE DEFENDANTS:

13       DAVID S. TORBORG, ESQ., Jones Day,
     51 Louisiana Avenue, N.W., Washington, D.C., 20081-2113.

14
         JAMES R. DALY, ESQ. and JASON G. WINCHESTER, ESQ.,
15   Jones Day, 77 West Wacker, Chicago, Illinois, 60601-1692,
     for Abbott Laboratories.

16
         HELEN WITT, ESQ. and ERIC GORTNER, ESQ.,
17   Kirkland & Ellis, LLP, 300 North LaSalle, Chicago, Illinois,
     60654.

18
         MARISA A. LORENZO, ESQ. and SARAH L. REID, ESQ.,
19   Kelley Drye & Warren, LLP, 101 Park Avenue, New York,
     New York, 10178.

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE CLERK:  In Re:  Pharmaceutical Industry

3     Average Wholesale Price Litigation, Civil Action 01-12257

4     and 06-11337, will now be heard before this Court.  Will

5     counsel please identify themselves for the record.

6              MR. HENDERSON:  For the plaintiffs, United States

7     of America, George Henderson, AUSA.

8              MR. FAUCI:  James Fauci with the United States

9     Attorney's Office.

10             MS. ST. PETER-GRIFFITH:  Ann St. Peter-Griffith

11    from the United States Attorney's office, Southern District

12    of Florida.

13             MR. LAVINE:  Mark Lavine with the U.S. Attorney's

14    office, Southern District of Florida.

15             MS. OBEREMBT:  Laurie Oberembt.  I'm with the

16    Civil Division.

17             MR. BREEN:  Jim Breen for the relator, Ven-A-Care

18    of the Florida Keys.

19             MR. DALY:  Good afternoon, your Honor.  Jim Daly

20    on behalf of Abbott Laboratories.

21             MR. TORBORG:  David Torborg, also on behalf of

22    Abbott Laboratories.

23             MR. WINCHESTER:  And Jason Winchester for Abbott.

24             MS. WITT:  Good afternoon, your Honor.  Helen Witt

25    on behalf of the Roxane defendants.

1          MR. GORTNER:  Good afternoon.  Eric Gortner on

2    behalf of Roxane defendants.

3          MS. REID:  Good afternoon, your Honor.  Sarah Reid

4    on behalf of the Dey defendants.

5          MS. LORENZO:  And Marisa Lorenzo on behalf of the

6    Dey defendants.

7          THE COURT:  Weren't there more people?

8          MR. HENDERSON:  That's it, I think, for counsel.

9          THE COURT:  All right.

10         MR. HENDERSON:  Your Honor, I want to apologize on

11   behalf of all parties, all counsel, for raising some false

12   hopes that we'd have an agenda for you today.  I think I can

13   speak on behalf of all counsel.  We did confer in the spirit

14   of cooperation, but there are many issues.  Every party has

15   its own agenda, so --

16         THE COURT:  Well, let me just ask you this.  As I

17   understand, the only case we have comes out of Florida?  Or

18   is there a separate case out of Massachusetts?

19         MR. HENDERSON:  That's a loaded question, your

20   Honor.

21         THE COURT:  In other words, is this case going to

22   trial in Florida?

23         MR. DALY:  The Abbott case is, your Honor.

24         THE COURT:  Abbott is.  Are any of the others not?

25         MR. HENDERSON:  Let me clarify.  Dey and Roxane

1   are here before your Honor for all purposes.

2         THE COURT:  Dey and Roxane are here for all

3   purposes?

4         MR. HENDERSON:  Yes.  The United States may well

5   seek to transfer the Abbott case from Florida to your Honor.

6   That would be a future matter, and I'm sure it would be

7   disputed by Abbott.

8         THE COURT:  Well, I ask that because I did not

9   finish reading all the briefs.  It was overwhelming,

10  overwhelming.  You had all begged for these long page

11  limits, and I had assumed it was because you had to go

12  through different states' laws.  It got very repetitive, and

13  there would be some new issues nestled in one or the other.

14  I mean, despite three days of reading, I didn't get through

15  it all.  So the issue is, at the end of the day, I don't

16  know how much we're going to accomplish today and whether

17  I'll need a second day.

18        Now, the second thing is, if it's my case and I'm

19  going to keep it and try it, it's a jury trial.  Everyone

20  agrees on that, right, it's a jury trial?  I don't know that

21  I need to write extensively.  I mean, you all want me to

22  find summary judgment on elements.  You don't find summary

23  judgment on elements.  You find them on claims.  Or you want

24  me to find summary judgment on two years out of a ten-year

25  spread.  I'm not sure why I should do that.

1          There are a couple of crosscutting legal issues,

2     to the extent I got through all the briefs.  There was a due

3     process challenge.  I think that's a question of law, and I

4     should probably do something with that.  There may be a

5     relation-back issue, those kinds of things.  But you're all

6     asking me to dissect this element by element and year by

7     year in terms of summary judgment, and I don't know why I

8     would do that.

9          That's my overarching question to all of you:  Why

10    should I spend six months reading through all these briefs,

11    which have made it as complicated as possible?  Why doesn't

12    it make more sense for me to just rule on the overarching

13    legal issues and rule on the remainder of them after I

14    finish the trial?  I have to deal with a Daubert issue on

15    damages, I think.  I think I have to deal with the

16    spoliation issue, the due process issue, and maybe the

17    relation-back issue.  But I think the government wants me to

18    rule element by element, and typically one doesn't do that

19    in summary judgment if you're not going to resolve a whole

20    claim.

21          MR. HENDERSON:  Well, I understand, your Honor.

22    Rule 56 does permit the Court to rule on less than all of a

23    party's case.

24          THE COURT:  Oh, definitely, but typically not

25    element by element.

1          MR. HENDERSON:  Well, in our case, we moved for

2     summary judgment as to liability on certain aspects of the

3     case.  Today that's what I'd like to focus on.

4          THE COURT:  Well, let me ask, the government

5     knowledge is a defense, isn't it?

6          MR. HENDERSON:  Yes, asserted by the defendants.

7          THE COURT:  Right, so you want summary judgment on

8     that?

9          MR. HENDERSON:  Yes.

10          THE COURT:  So, I mean, that's a defense.  I

11     imagine that's okay.  But I had thought you were asking for

12     summary judgment element by element.

13          MR. HENDERSON:  Well, we would like summary

14     judgment on the falsity of the prices.  We think those will

15     be important for going into trial.

16          THE COURT:  So even if I think that the government

17     knowledge defense and knowingness are interrelated, you

18     would still want something on the falseness?

19          MR. HENDERSON:  That's correct.

20          THE COURT:  I don't know.  I mean, one is

21     overwhelmingly tempted, rather than reading the -- how many

22     pages of briefs all together?

23          MR. HENDERSON:  Probably 600 or something.  There

24     was plenty.

25          THE COURT:  I gave it plenty of time all weekend,

1   last night, the night before, and I have not finished it.

2   And I found so much of it redundant that what I was looking

3   forward to today is to have people just start distilling the

4   key issues they feel I need to resolve.

5           MR. HENDERSON:  Well, and probably what's going to

6   happen today to a certain extent, your Honor, is the parties

7   will be ships passing in the night arguing different issues

8   that they'd like you to address.

9           THE COURT:  So what would you like?  I'm telling

10  you where I need some help.  It's clear that there are some

11  key overarching legal issues, and I don't know that I'm

12  going to want to go through the boxes of documents and deal

13  with every single one.  I think it makes more sense for me

14  to learn the case and try it.

15          MR. HENDERSON:  Well, I'll tell you what I'd like

16  to start off with, and that is really where --

17          THE COURT:  So do you want half an hour, and then

18  you get half an hour, and then we'll see where we are on the

19  overarching issues?  Does that make some sense?

20          MR. HENDERSON:  A half an hour will just barely

21  touch on --

22          THE COURT:  Well, what do you want?  What's your

23  dream organization?  You know, like, help me here because I

24  do know that usually the individual briefs are just little

25  cleanups, and they weren't here.  There were whole new

1    issues on the individual briefs.  I mean, I'm going to have

2    to do a half an hour and a half an hour for each company.

3              MR. HENDERSON:  What I'd like to do, your Honor,

4    is have about forty-five minutes to focus on where about

5    80 percent of the money is at stake here.  Of the three

6    cases we've got, we've got single damages of about

7    $1.4 billion.

8              THE COURT:  1.4?

9              MR. HENDERSON:  Billion.

10             THE COURT:  I thought I heard the B word.  All

11   right, so that's crosscutting issues.

12             MR. HENDERSON:  Well, I'm just putting this in

13   perspective.  Right today, I want to go for where the money

14   is, and 80 percent of that, your Honor, is in Medicare on

15   one drug, ipratropium bromide.

16             THE COURT:  All right, so I just want to get a

17   game plan for today.  So you'd like to spend how much time

18   on your core dollar --

19             MR. HENDERSON:  Forty minutes, forty-five minutes.

20             THE COURT:  Okay.  And that's going to hit all

21   these crosscutting issues?

22             MR. HENDERSON:  No.

23             THE COURT:  So you're not helping me here.

24             MR. HENDERSON:  It's going to hit where the money

25   is on Medicare on a summary judgment area that I think you

1    can and should decide because it's pretty narrow.  The First

2    Circuit has cleared away a lot of the brush.

3            THE COURT:  Well, I can't spend forty-five minutes

4    on ipratropium bromide, so why don't you do this:  I'm going

5    to give you half an hour for starters just to talk, and then

6    I'll give -- it's your drug, right?

7            MR. DALY:  No.  The one Mr. Henderson is talking

8    about is not.

9            THE COURT:  Who's the deep pocket here on the

10   ipratropium bromide?  She stands.

11           MS. WITT:  We both are, your Honor.

12           THE COURT:  You both are, okay.  So then maybe

13   we'll give you a certain period of time to respond, and then

14   see how much time is left and start moving to some of these

15   crosscutting issues.  Does that make sense?

16           MR. DALY:  Well, Judge, I mean, from your

17   comments, I mean, I tend to agree with where you seem to be

18   coming from initially, which is that the Court has looked at

19   summary judgment in the Mylan case, for example, and found

20   that you couldn't enter summary judgment on scienter, and

21   therefore that was it.  And I don't know -- I'm not sure

22   what we're doing here in the sense that the arguments that

23   the government is making are, "Let's decide this issue."

24   It's like a motion in limine in the guise of a summary

25   judgment motion:  "Don't let them use this evidence."

1    Well --

2            THE COURT:  Yes, but the big difference with Mylan

3    is, that was a WAC case where WAC wasn't as well defined,

4    whereas AWP is clearly false.  So, I mean, I can parse the

5    apple that way.

6            Let me do this.  You aren't helping me at all.  I

7    have a sense of the issues.  The government will do

8    forty-five minutes focusing on what you want, what you think

9    is most important, and then you'll do forty-five minutes on

10   what each of you thinks is the most important, and then I'll

11   see what else I need.  I don't know how else to do it.

12   You're not helping me.

13           MR. HENDERSON:  And I understand your Honor's

14   frustration, and if we have time, which I hope to, we'll

15   address the Medicaid issues, which are more difficult

16   crosscutting issues, but, quite frankly, the Medicare

17   program in this drug account for nearly 80 percent of the

18   dollars in this case.

19           THE COURT:  Okay, so go ahead.

20           (Discussion off the record.)

21           THE COURT:  Mr. Henderson, I'm just going to give

22   you till 3:00 o'clock, and then I'll give opposing counsel a

23   certain period of time, the remaining time, and we'll see

24   where we go from there.

25           MR. HENDERSON:  Very well.  Thank you.

1          MS. REID:  Your Honor, Sarah Reid.  I wanted to

2     introduce.  I have not had the honor of appearing before

3     you, so I --

4          THE COURT:  Well, welcome to the crowd.

5          MS. REID:  Thank you.  I just wanted to say, and

6     we can proceed, that when we conferred on the agenda, the

7     defendants' belief was that today's hearing would focus on

8     common issues on the government's side, a common

9     presentation on the defense side, and then with each of us

10    speaking to what we thought were common issues.  So it comes

11    as something as a surprise that today's hearing from the

12    government's point of view is going to be on ipratropium

13    bromide.  That's fine, we'll deal with it, but it's likely

14    that our presentations will be more focused on what we

15    believed to have been the agenda for today, which was the

16    common crosscutting issues.

17         MS. WITT:  Your Honor, and if I might just

18    supplement, we also believed that we had an agreement with

19    the government that the issue that relates to the NovaPlus,

20    which is a specific Roxane issue, would also be put down to

21    the bottom of the agenda.

22         THE COURT:  Well, is NovaPlus ipratropium bromide?

23         MS. WITT:  Correct, and we will deal with that

24    today because it's a huge part of the --

25         THE COURT:  Well, I asked everybody to send me a

1    game plan, and no one has.  And I kept saying to Mr. Alba,

2    what do you want to do, what do you want to do?  So I can't

3    rule at this point.  I'll let you each use your time as you

4    want, and then you're just going to have to suffer if I get

5    it wrong.

6              MS. WITT:  Thank you, your Honor.

7              THE COURT:  All right?

8              MR. HENDERSON:  Our summary judgment on this

9    particular piece of our case is limited to liability, not

10   damages.  It focuses on one Medicare carrier, a DMERC,

11   Cigna, which is for Region D.  It covers a specific period

12   of time, which will be clear in a little bit, covering the

13   second quarter of 1997 through the third quarter of 2001.

14   Our complaint covers a broader period, up through the end of

15   2003; but, as you'll see, our motion for summary judgment is

16   more narrow, and I do suggest that this piece of our case is

17   a bellwether that will clarify and focus the trial issues.

18              Very briefly --

19              THE COURT:  I'm curious, why didn't you tell them

20   this is what you were going to do?

21              MR. HENDERSON:  Well, we debated back and forth

22   how much would be spent on common issues, how much would be

23   spent on separate issues.

24              THE COURT:  But did you tell them you were going

25   to make this your flagship?

1          MR. HENDERSON:  I told Mr. Gortner that I was

2    expecting to spend a fair amount of time on that after we

3    failed to get agreement.

4          MR. GORTNER:  I will respectfully disagree with

5    what Mr. Bunker is representing.  We spoke, and the

6    agreement that I understood is that we would discuss on

7    crosscutting issues and common issues, and that there was

8    some particular Roxane-specific issues, the NovaPlus and

9    ipratropium bromide issue and an alterego issue that both

10   the government and myself and Roxane representatives agreed

11   was best served for a subsequent company-specific, shorter

12   hearing, and that was my understanding that we had reached

13   an agreement.

14         THE COURT:  Well, I wish you had focused them on

15   it and me because, truthfully, I've spent hundreds of pages

16   on it, and I would have focused on this piece of it myself.

17         MR. HENDERSON:  And I hope to have time to cover

18   the Medicaid piece, but, your Honor, if I spend time on

19   Medicaid --

20         THE COURT:  No, excuse me.  But you should let me

21   know.  You don't understand, each of you, on the major

22   briefs, there were a couple hundred pages just on the

23   initial briefs coming out of it, not to mention the replies

24   and the surreplies.  There must be 500 or 600 pages' worth

25   of briefing on this.  So anyway, I mean, go ahead.

1              MR. HENDERSON:  Okay.  On the issues of falsity,

2      your Honor, I don't know if you can see the first slide

3      here.

4              (Discussion off the record.)

5              MR. HENDERSON:  Just so your Honor understands the

6      spreads --

7              THE COURT:  Now, what's this?  What am I supposed

8      to be looking at?

9              MR. HENDERSON:  This is -- is it not on your

10     screen?

11             THE COURT:  It is, but where is it in here?

12             MR. HENDERSON:  Okay, this is Tab A.

13             THE COURT:  Okay.

14             MR. HENDERSON:  And I'll go much faster if I can

15     just rely on the screen, your Honor, because these graphs,

16     we'd really have to find them.

17             This is a graph prepared by the government's

18     expert accountant, Mr. Simon Platt.  It's an exhibit before

19     the Court in which Mr. Platt has taken the transaction data,

20     internal transaction data from Roxane, summarized it and

21     compared it to the published prices.

22             At the very top, the top blue straight line, that

23     is the published AWP for Roxane's ipratropium bromide

24     product.  The red line is their WAC, which is irrelevant for

25     purposes of Medicare because Medicare did not use WACs.

1   They just used published AWPs.  And the yellow line that

2   gradually gets lower is Mr. Platt's calculation of the

3   actual average prices at which Roxane sold in its indirect

4   sales to the retail pharmacy class of trade.

5          And the next slide is a numerical quantification

6   of these spreads.  Roxane had three different products,

7   ipratropium bromide products, three different package sizes.

8   Here is their package size of 25s and their package size of

9   60s.

10          Now, let me capture a little bit more of this so

11  we can see the AWP spread, which has been calculated in

12  accordance with your Honor's instructions in the

13  multidistrict case.  We can see that the spreads start, the

14  AWP spread over on the right starts at about 77 percent at

15  the time Roxane launched this product in 1996; and through

16  the end of our summary judgment time period in late 2001,

17  the spread was up to about 400 percent.  Our complaint goes

18  through the end of 2003 where it gets up to 500 percent.

19  And those figures are roughly consistent amongst all of its

20  ipratropium bromide products.

21          Roxane admits that they reported their AWPs to

22  Red Book, and I refer the Court to Paragraph 18 of our

23  statement of facts and Roxane's response where they

24  effectively admit that they reported these AWPs to the

25  Red Book.

1          The picture with Dey is essentially the same.  We

2     have graphs prepared by our expert which show the spreads on

3     the ipratropium bromide products.

4          THE COURT:  Where is this?  Still in A?

5          MR. HENDERSON:  No.  This would be in B, which is

6     a copy of Mr. Simon Platt's declaration in the Dey case.

7     And both in Roxane and Dey, he set forth the spreads,

8     calculations of the spreads.

9          Again, here at the top we have the AWPs as

10    reported by the Red Book.  We then have the WACs, which in

11    the case of Dey declined over time.  And then there are the

12    actual average sales prices calculated from Dey's

13    transaction data.

14         And, similarly, Mr. Platt prepares calculations of

15    the AWP spreads.  Dey entered the market for this drug in

16    1997.  They were the second entrant after Roxane.  Their

17    spread at the time of launch was approximately 129 percent.

18    By late 2001 or during 2001, it grew to about 238 percent

19    and kept on growing after that.

20         And similar spreads exist for the other

21    ipratropium bromide package products.  They, like Roxane,

22    had package sizes of 25 vials, 30 vials, and 60 vials.  And

23    these graphs, they're all pretty much the same in terms of

24    characterizing the spreads.

25         And Dey, as in the case of Roxane, Dey does not

1    dispute that they reported AWPs to Red Book, and Red Book

2    published those AWPs.  And I'll respectfully refer the Court

3    to our Paragraph 58 of our Rule 56 statement of facts and

4    Dey's response, and also Paragraph 142 and Dey's response,

5    in which they acknowledge that when they launched in January

6    of 1997, they provided an AWP of $44.10 to First DataBank

7    and Red Book, which was published by those databases.

8            The government's position, as set forth in our

9    brief, is that because of these spreads, these mega spreads

10   way in excess of any 30 percent speed limit, establish

11   essentially, under the Medicare program, falsity.  And

12   neither of the defendants present any evidence to dispute

13   these basic facts.  They present lots of legal arguments,

14   which I hope to get to.

15           I do want to talk a little bit about causation.

16   As your Honor knows, Medicare Part B used the Healthcare

17   Common Procedure Coding System.  They used HCPCS codes.

18   Ipratropium bromide had two codes.  Throughout the time

19   period, Medicare Part B paid the lower of the amount billed

20   by the provider or the allowed amount calculated by the

21   DMERC carrier.  The allowed amount calculated by the DMERC

22   carrier, before January 1, 1998, was 100 percent of the

23   median AWP of the generic products, unless there was a

24   brand.  If that was the only one there, they would set it at

25   the brand AWP.

1          After January 1, 1998, and after the Balanced

2     Budget Act of 1997, the allowed amount calculated by the

3     DMERC was 95 percent of the median AWP, or, if there was a

4     lower-price brand AWP, they would set it according to that

5     brand AWP.

6          The DMERCs typically created arrays in which they

7     did these calculations, and in the declaration of Carolyn

8     Helton, the first page of which is here on this screen,

9     Ms. Helton sets forth how she did her pricing determinations,

10    including the arrays that she on behalf of --

11         THE COURT:  Which tab is this now?

12         MR. HENDERSON:  This would be C.

13         THE COURT:  Oh, so I'm just going in order?

14         MR. HENDERSON:  Yes, I'm just going in order.

15    Hopefully it will all work out.

16         THE COURT:  All right.

17         MR. HENDERSON:  And I wanted to give you a few

18    examples of some arrays so your Honor can understand how

19    this worked.  I will skip to this array which is part of

20    this same exhibit.  And this is an early array, handwritten,

21    and this only has -- this was before our summary judgment

22    time period.  This would be in Ms. Helton's declaration

23    somewhere, at the ECF Document No. 308-4, or Page 22 of 74.

24    And here the only product in the array is the brand product,

25    which is not the subject of our complaint, so we don't seek

1    any liability or damages for pricing, for payments made on

2    the basis of this array.

3         When we go to the next quarter, which is the

4    second quarter of 1997, here we can see an array that's been

5    put into a spreadsheet format that she uses.  You can see

6    that both Dey and Roxane's generic products are in the

7    array.  The package price -- for example, the Dey of $44.10

8    is the AWP price for that first product -- has been

9    converted to a price per milligram so that there is just one

10   common measure.  And the median is calculated at $3.52.

11   That's a median calculation that was constant throughout the

12   time period that our motion focuses on.

13        I will then jump to the last --

14        THE COURT:  So how did she calculate this?

15        MR. HENDERSON:  She took the median of the price

16   per milligrams.  And since they're essentially all the same,

17   it's pretty easy, $3.52.  And at this time, payment was

18   based on 100 percent of the median AWP, so Cigna paid claims

19   at $3.52 per milligram for this drug, ipratropium bromide,

20   unless the provider charged a lower amount.

21        THE COURT:  Well, how many other people

22   manufactured ipratropium bromide?

23        MR. HENDERSON:  At this time the only other

24   manufacturer was the brand product Atrovent, so at this time

25   only Dey and Roxane were in the generic market.

1          THE COURT:  Well, why wouldn't its brand, if it

2     had been accurate, have brought it lower?

3          MR. HENDERSON:  If an accurate AWP for the brand

4     had been lower, it would have determined the allowed amount.

5     We haven't sued for that product.  It's not part of our

6     case.  We have no proof as to what their actual acquisition

7     costs were.  We don't have any proof that their AWP was

8     false.

9          THE COURT:  Well, tell me, so what if Dey's price

10    had been accurate?

11         MR. HENDERSON:  The declaration of Ms. Helton

12    states -- she has reviewed all of the arrays for this

13    summary judgment time period, and she states that any

14    reduction of the Dey products of 1 percent or more would

15    lower the median, and therefore the allowed amount; and

16    similarly, with respect to Roxane, any reduction in the AWPs

17    of 1 percent or more would lower the median and the allowed

18    amount.

19         THE COURT:  So you all are looking for the

20    increment of the 1 percent?

21         MR. HENDERSON:  No.  We're just saying we have

22    established falsity and causation.  We will leave damages to

23    another day.  But the fact that any reduction would lower

24    the allowed amount establishes, in our view -- well, the

25    falsity is established by the spreads.  The causation,

1   causation is established by the fact that any reduction of

2   1 percent or more of the Dey drugs will establish causation

3   as to Dey, and as to the Roxane drugs, any reduction of

4   1 percent or more.

5            So this Court does not have to decide what is the

6   appropriate "but for" AWP.  You don't have to decide what's

7   the appropriate spread, speed limit.  All of our drugs have

8   spreads way in excess of 30 percent.  And so any reasonable

9   reduction, any reasonably honest AWP would have affected the

10  median.  So we're not asking the Court to determine damages

11  for us.  So that's why I think this piece of our case -- and

12  we're just talking -- this looks like $3.52 as opposed to

13  $1.70 or something, but when this is multiplied out through

14  the case, the effects are very substantial.

15           I would like to jump to the last array in this

16  time period, which is the third quarter of 2001.  You can

17  see on the screen, your Honor, this is a more sophisticated

18  array.  It's in a spreadsheet.  Almost all of the arrays in

19  this case were produced in electronic format, and therefore

20  it's actually rather easy to substitute different numbers to

21  see what happens, and I'd like to do that with a replicate

22  of this array in Excel format.

23           THE COURT:  Where is this?

24           MR. HENDERSON:  This is a replicate of what you

25  just saw.

1          THE COURT:  What I just saw was what number so I

2     can follow it?  In other words, Mr. Henderson, I'll never

3     remember this tomorrow.

4          MR. HENDERSON:  That's right.  This is a replicate

5     of the page marked Page 35 of 74 of the same --

6          THE COURT:  Thank you.

7          MR. HENDERSON:  And for your information, in the

8     bottom right-hand corner of the document is a footer, which

9     was actually added for purposes of litigation, which shows

10    the electronic production pathway, just for purposes of all

11    parties to show exactly where that is, but that footer also

12    identifies the year and the quarter when the array was in

13    effect.

14          In this particular replication that's on the

15    screen, your Honor, I've eliminated a few or I've hidden a

16    few columns so everything can fit on one page so I don't

17    have to be looking around too much.  But you'll see the

18    cursor is on Dey's product, first product, package of 25s.

19    And if that is lowered to just $3.50, and I do that for each

20    one, you can see the generic median here where I have the

21    cursor went down from $3.52 to $3.51.

22          The brand names are shown in this lower panel.

23    The lowest brand is $3.52, which is Roxane's ipratropium

24    bromide NovaPlus drugs, but the allowable amount has changed

25    to $3.51.  And the same is true if we changed the numbers

1    for Roxane products:  Just lowering them by two cents would

2    change the median and the allowed amount.

3           Now, this impact exists, as I said, up through the

4    third quarter of 2001.  A declaration of Ian Dew -- let me

5    just refer your Honor to the language of Carolyn Helton's

6    declaration where she says -- I'm sorry -- with regard to

7    both companies, that for this period, any reduction of

8    1 percent or more in the AWPs of the Dey products would

9    lower the median and the allowed amount.  The same is true

10   as to the Roxane products.

11          And our consultant Ian Dew prepared a summary of

12   the claims data.  The claims data of the Cigna DMERC

13   Region D claims for this product shows that about a million

14   claims were paid by Cigna for ipratropium bromide; and of

15   those, approximately 90 percent, over 900,000, were paid at

16   either $3.52 or 95 percent of that $3.52, which is $3.34.

17   The rest of the paid claims, approximately 10 percent, were

18   paid at an amount consistent with the provider's charged

19   amount.

20          Now, we have not moved for summary judgment for

21   the time period after 2001 quarter three.  At that point in

22   time things are a little bit different, and I'm going to

23   come back to this same spreadsheet and illustrate this

24   because Dey has moved for summary judgment on a piece of the

25   case which relates to our view that the combined impact of

1  Dey and Roxane must be considered.

2          In short, after the third quarter of 2001, we can

3  change the AWPs of Dey down to a penny, and it doesn't

4  change the outcome, the median calculation.  We can change

5  the AWPs of Roxane down to 1 cents, and it still doesn't

6  change the median calculation.  However, if we change the

7  AWPs, if we lower the AWPs of both Dey products and Roxane

8  products by 1 percent or more, it does affect the median.

9          And I think it's helpful to see why this happens,

10 and what I'm going to do is go to a replicate of the next

11 quarter when things change.  This array is virtually

12 identical with one exception:  Apotex has entered the market

13 with a new product.  We can see that their AWP for a package

14 of 25s is fairly high.  It's $4.48, which is higher than the

15 Dey products and the Roxane products.

16          Now, under Dey's theory of the case on which they

17 seek summary judgment, because there is one more company

18 that has entered the market with an inflated AWP, according

19 to Dey, the United States cannot recover a penny because

20 Dey's products in isolation do not affect the median;

21 likewise, Roxane products in isolation do not affect the

22 median; and, according to their view of the case, the United

23 States' ability to prove damages and recover evaporates

24 because one additional company has entered the market.  And

25 I would suggest to your Honor, that just cannot be.  We have

1    clearly demonstrated that these companies --

2              THE COURT:  Well, couldn't you get penalties

3    anyway?

4              MR. HENDERSON:  Yes.

5              THE COURT:  So why does -- I mean --

6              MR. HENDERSON:  The False Claims Act allows us to

7    recover our losses.

8              THE COURT:  When you say you can't collect a

9    penny, I mean, wouldn't knowingly false presentation of

10   claims money create a penalty situation even if you can't

11   prove damages?

12             MR. HENDERSON:  Well, that would be our position.

13   I'm sure the defense would argue that there's no causation

14   because it wouldn't have affected the amount of the claim.

15             THE COURT:  So you still need the causation, even

16   if it's completely false?

17             MR. HENDERSON:  We would probably have a disputed

18   legal argument on that, your Honor, but I think it's evident

19   that we have proven this demonstrates that Dey and Roxane

20   combined have a large impact on the allowed amount.  And the

21   law doesn't leave us without a remedy for these losses,

22   putting aside the civil penalty issue.  The Restatement of

23   Torts, Section 442-A, Comment D, I'll just read it for you,

24   your Honor, quickly:  "A force due to an act of a third

25   person, which is wrongful toward another who is harmed, may

9e4f9c2e-bf42-4a9b-a9d2-c3e8285926eb

1   be only a contributory factor in producing the harm.  If so,

2   both the actor and the third person are concurrently liable.

3   This is true although the actor's conduct has ceased to

4   operate actively and has merely created a condition which is

5   made harmful by the operation of the intervening force set

6   in motion by the third party's negligent or otherwise

7   wrongful conduct."

8           And then it goes on to say, your Honor, "However,

9   while there is concurrent liability, the two forces are not

10  concurrent causes, as that term is customarily used.  To be

11  a concurrent cause, the effects of the negligent conduct of

12  both the actor and the third person must be an active and

13  substantially simultaneous operation."

14          And here we have the effects of the wrongful

15  conduct of both Dey and Roxane in effect in simultaneous

16  operation affecting the outcome of the median calculation.

17          Just so I can highlight to you --

18          THE COURT:  You know, I struggled with this

19  mightily in the big class action suit.

20          MR. HENDERSON:  Yes, I'm aware of that.

21          THE COURT:  I struggled with it, and there were no

22  good cases on this.  There's that sort of abstract

23  Restatement of Torts language.  It's a very hard issue.

24          MR. HENDERSON:  Well, in that case, of course,

25  your Honor only had one company before it, and there was

1    proof of liability only with respect to one company; and

2    when you substituted the arrays in that case, it didn't

3    change the median.  And in fact we followed that approach in

4    the case of Dey with respect to its albuterol drug, a same

5    drug.  We didn't sue all of the other parties in there.  And

6    the damages we've calculated against Dey are very small,

7    tens of thousands of dollars.

8            THE COURT:  You're saying the difference here is,

9    there are two fraudulent actors, if you will?

10           MR. HENDERSON:  That's correct, and we've proven

11   wrongful conduct on the part of both of them, and their

12   combined impact establishes/demonstrates a big loss.  And

13   there can be no question, your Honor, that the Medicare

14   program suffered substantial losses as a result of the

15   combined impact of false pricing.

16           THE COURT:  Okay, since we only have ten minutes

17   left, why don't you deal with the purple elephant in the

18   room, which is the government knowledge defense.  Does that

19   apply to this drug?

20           MR. HENDERSON:  Well, we're talking about the

21   Medicare context, so I suggest the government knowledge is

22   really resolved to the government's favor by the First

23   Circuit's recent decision, in which they effectively upheld

24   your interpretation of "average wholesale price."  Certainly

25   all the government knowledge --

1          THE COURT:  Well, that's absolutely true, they

2     did.  On the other hand, I didn't deal with -- I don't

3     remember whether ipratropium bromide was on a list in the

4     OIG reports and whether or not there was a DOJ price for

5     them.  I mean, it was different in those branded drugs

6     factually, not in terms of the standard but factually.

7          MR. HENDERSON:  I understand, your Honor, and

8     there have been -- there was one OIG report focusing on

9     ipratropium bromide.

10          THE COURT:  In what year?

11          MR. HENDERSON:  I think it was the early 2000s.

12     What was the year?  1998?  Okay, I'll take Roxane's word for

13     it.

14          THE COURT:  And what does it do?  It lists the

15     true price?

16          MR. HENDERSON:  It indicates -- it evaluates the

17     discounts that were available in the market and discusses

18     that the AWPs for ipratropium bromide were inflated.

19          THE COURT:  At the levels that you have them in

20     that graph?  Do you remember?

21          MR. HENDERSON:  I don't recall.  There are some

22     significant inflations there.  But let's assume for argument

23     that the OIG understood at that time and had some specific

24     evidence that there was inflation in ipratropium bromide

25     prices.  Obviously, the government does not agree that an

1    OIG report that is critical, is certainly not accepting of

2    these or approving of these inflated prices -- in fact,

3    they're complaining about how much this is costing the

4    Medicare program.  And I can't remember exactly when a FUL

5    was ultimately put into place for the Medicaid side.  And as

6    we know, there's a whole history.  Ultimately the Department

7    of Justice tried to get this pricing information changed.

8    It was withdrawn, there were Congressional hearings, and

9    ultimately we got the reform of the MMA.

10             It is the government's position that government

11   knowledge when the defendants, they acknowledge that they

12   never -- they never read any of these reports or relied on

13   them in making their pricing determinations.  We saw in

14   those prices, those AWPs stayed the same the whole time

15   period.  And the evidence is overwhelming that the

16   motivation in setting those AWPs was to create an attractive

17   spread so that their products could be successfully marketed

18   to providers.

19             So, yes, there was evidence indicating that OIG

20   knew that AWPs were inflated for ipratropium bromide

21   products, but that is not a defense.  That sort of

22   government knowledge does not at all establish government

23   approval of this.  In fact, just the opposite.  The

24   government people who were investigating this were

25   complaining about it --

1         THE COURT:  The standard is in a statute, isn't

2    it, that it's got to be AWP, 95 percent of AWP?

3         MR. HENDERSON:  That's correct.

4         THE COURT:  That's a statute at this point, right?

5         MR. HENDERSON:  That's correct.  And the statute

6    had a plain meaning, in our view, and this Court decided

7    that correctly.

8         So that's our simple response to the government

9    knowledge evidence presented by the defendants.

10        I will just point out so that your Honor is aware

11   the NovaPlus issue.  We're not really prepared.  I mean, we

12   can discuss it, but I don't think we'll have time to really

13   to discuss that.  But on this chart, just changing one price

14   here to about 75 cents, which was the approximate real

15   average sales price that our expert uses marked up by

16   25 percent, you can see the dramatic impact that that has.

17   All of a sudden the allowable drops way down to 71 cents.

18        THE COURT:  Because that's a brand?

19        MR. HENDERSON:  Because it's a brand.  And the

20   real impact of that is nearly $500 million.  Of that change,

21   when it's made all across the DMERCs --

22        THE COURT:  All the DMERCs or just the one?

23        MR. HENDERSON:  The four, not just this one.

24        THE COURT:  All right, so NovaPlus involves all --

25        MR. HENDERSON:  Yes, we've moved for summary

Page 32

1   judgment only as to one.

2           THE COURT:  Why?

3           MR. HENDERSON:  One DMERC.

4           THE COURT:  Why?

5           MR. HENDERSON:  Why?  Because if we multiplied our

6   proof by four, you would just be overwhelmed.  I just think

7   it's -- there's too much paper.

8           THE COURT:  So Cigna is just the biggest pot?

9           MR. HENDERSON:  No.

10          THE COURT:  Or it's the clearest evidence?

11          MR. HENDERSON:  It's just straightforward.  At the

12  time we were preparing our motion for summary judgment, we

13  were just wary of loading you up with too much stuff.

14          (Laughter.)

15          MR. HENDERSON:  So we picked one DMERC.

16          THE COURT:  So are you seeking to extrapolate from

17  that one DMERC?

18          MR. HENDERSON:  No.

19          THE COURT:  So that's not part of this

20  extrapolation defense.

21          MR. HENDERSON:  No.

22          THE COURT:  That's only in the Medicaid area?

23          MR. HENDERSON:  Yes.  There is some extrapolation

24  on the Medicare side in the Abbott case.  For Dey and

25  Roxane, ipratropium bromide, there is no extrapolation.  We

1    have the arrays.  There are very few arrays, maybe six or

2    seven or something, maybe ten or so that are missing; but

3    you look on either side of the array, and there's really no

4    doubt as to what the array consisted of.  So it's not an

5    extrapolation.

6              THE COURT:  So prioritizing my time, you want me

7    to look at this issue?

8              MR. HENDERSON:  Yes, your Honor.  It's a lot of

9    money, and I think mixing some judgments on falsity and

10   causation here will really advance the ball, both in terms

11   of settlement, quite frankly, hopefully --

12             THE COURT:  But I'm not sure why it will.  I

13   understand why it might give you money, but some of the

14   toughest issues, as I read it, are the "lower than" and all

15   the different Medicaid methodologies and the issues of

16   extrapolating data from ten states to all of them.  Those

17   are incred- -- this won't help with that at all.

18             MR. HENDERSON:  No.  They're different issues.

19             THE COURT:  Big different issues.  So, I mean, if

20   I rule on this, you just get a big quick bang for your buck,

21   but I still have to work through all the other ones.  It

22   doesn't help me on any of those.

23             MR. HENDERSON:  That's correct.  We just don't

24   have enough time today to work through all the issues, but

25   this is a big-money issue, and I thought it was important

Page 34

1   for the Court to look at.

2           THE COURT:  Okay.  Well, thank you for that.

3           So, now, how do you want to handle this?  It's now

4   3:00 o'clock.  Do you each want half an hour?  Do you want

5   one crosscutting one and then short ones for each of you

6   separately?

7           MS. WITT:  Your Honor, can we have 90 seconds to

8   just confer among the three of us because this is different

9   from what we expected?

10          THE COURT:  Yes, go.  That's fine.

11          (Discussion off the record amongst defense

12   counsel.)

13          MR. HENDERSON:  If I could, just a point of

14   clarification, your Honor?  That presentation addressed the

15   regular ipratropium bromide products.  We really didn't

16   focus on the NovaPlus issues, which are separate, pretty

17   much separate.  I illustrated at the very end, but I didn't

18   want you to be confused, that in the top part of that array,

19   the Roxane and Dey products were their normal generic

20   ipratropium bromide.

21          THE COURT:  Well, at what point did the NovaPlus

22   product come into play?

23          MR. HENDERSON:  That came in I think around 1999,

24   a little bit later, 2000.

25          THE COURT:  Well, why as soon as that came in,

1   assuming Roxane was unlawful, why aren't they the primary

2   cause of the problem as opposed to Dey because they've got

3   the brand?

4           MR. HENDERSON:  In our view, they are.  They are.

5   However, let me point out that if for some reason -- I will

6   say that their utilization under Medicare was very small, a

7   hundred prescriptions probably filled under Medicare.  So

8   that there is an issue that Roxane says is completely unfair

9   because the utilization was so small, and yet it makes a

10  difference of like a billion dollars.  It's a huge

11  difference.  If --

12          THE COURT:  All right, I get it.  I've got to give

13  them their time.  I understand.

14          So what are you doing?

15          MS. WITT:  Your Honor, what I was going to do is

16  have Mr. Daly talk about some of the crosscutting issues,

17  which we do think are applicable, even to the presentation

18  that Mr. Henderson just made, because they relate to issues

19  that were not mentioned in his presentation -- in particular,

20  scienter -- and also address some of the issues that we

21  believe make this case very different than the other cases

22  that you've considered, make the 30 percent yardstick that

23  you determined as a trier of fact after a full record not

24  the appropriate yardstick in a generic case.  Ms. Reid will

25  then talk about the specifics of ipratropium bromide.

1          THE COURT:  Well, you're looking for me just not

2     to grant summary judgment at all, pretty much, other than on

3     a few narrow issues, or do you differ on that?  You just

4     want a trial?

5          MS. WITT:  Certainly we want summary judgment not

6     granted on any of the issues that the government had raised.

7     Each of us has very specific issues that are not anywhere

8     close to the crosscutting issues.  For Roxane we have --

9          THE COURT:  But all of you agree, as I read it,

10    that something goes to trial?

11         MS. WITT:  Correct, correct.  And Ms. Reid will

12    talk specifically about the ipratropium issue and government

13    knowledge to respond directly to Mr. Henderson, and then

14    Mr. Gortner will talk about the NovaPlus issues, because

15    they really are the big gorilla in terms of the damages

16    number, and why it's a billion-dollar case and not in the

17    thousands-of-dollar case.  So that's where we think our time

18    is most productively used.

19         THE COURT:  All right.  So, Mr. Daly, I'm hoping

20    what we'll do here is go for about a half an hour with you,

21    and then we might have to take a break for the court

22    reporter.

23         MR. DALY:  Certainly, your Honor.

24         THE COURT:  And I will say that before we leave

25    here, there are three things that I'd like to accomplish:

1    the date for the Daubert hearing on the damage expert, a

2    date for the spoliation, and a tentative trial date so I can

3    get everybody in the same room, at least for the ones that

4    are mine.  You'll have to worry about the Florida one later.

5            MR. DALY:  Judge, we did come in wanting to talk a

6    little bit, I think, about the crosscutting issues because I

7    think they do go to all of our motions.  Just to clarify,

8    nothing that Mr. Henderson was talking about relates to

9    Abbott.  That's not our drug.  Also, for Abbott, the

10   government has not moved for summary judgment on any

11   Medicare issues.  Their issues are only Medicaid when it

12   comes to Abbott, as well as the Medicaid issues against our

13   codefendants.  And I think, as the Court has observed in

14   other contexts, it's our position that that's going to

15   require -- as I think Mr. Henderson said, you get into a lot

16   of issues when you talk about Medicaid.  Well, that's right.

17   We think it's a 48-state-plus-DC-type issue where each

18   state's system is going to have to be looked at, and --

19           THE COURT:  How come no one briefed?  The only

20   reason I gave in to everyone's demand for these lengthy

21   briefs is because you represented to me that you had to

22   brief all these states, and that in fact never happened.

23           MR. DALY:  I believe the government took that

24   tack, your Honor, because I think when you look at each of

25   the states -- the government's position here is, you know,

1    all this great discovery that we've done for the last two or

2    three years, that's all good, it doesn't matter, it's

3    irrelevant.  They want to try this case regardless of

4    whether anybody was misled, regardless of whether anybody

5    was fooled, regardless of any --

6              THE COURT:  You know, without the rhetoric,

7    though, the False Claims Act is different from 93A and the

8    fraud claims.  It's statutory.  It's different.

9              MR. DALY:  Yes, but it's not a strict liability

10   statute, your Honor.  You still have to prove falsity,

11   causation, scienter, materiality.

12             THE COURT:  Well, scienter is knowingly rather

13   than an intent to deceive.

14             MR. DALY:  Correct.  But our position on this --

15   what we'll want to talk a little bit about is some of the

16   differences between the three cases that are in front of you

17   now and what you've looked at before, and then we want to

18   talk about expectations when it comes to generic drugs.

19   Your Honor has not had a generic drug case yet, and we want

20   to spend a little bit of time talking to you about --

21             THE COURT:  I've had Mylan.

22             MR. DALY:  Well, I don't think that was really in

23   the generic world.  That was a WAC case.

24             THE COURT:  It was WAC.

25             MR. DALY:  These are cases, Judge, where we're

1    talking about generics and the very different expectations

2    that are out there in the states, at CMS, in the state

3    Medicaid agencies.  In terms of Track One -- well, let's

4    talk about, first of all, Dr. Hartman.  Dr. Hartman gave you

5    in T One a 30 percent speed limit.  That was based entirely

6    on brands.  He testified that "I don't have an expectations

7    yardstick for generics."  And what the government has

8    done -- and they don't have anybody in this case that's

9    before you, any of these three cases, who comes forward and

10   says, what are the expectations on brands?  They don't have

11   an expert.  They don't have lay testimony.  They don't have

12   any testimony whatsoever.  They don't even posit what the

13   expectations should be with respect to brands.

14          And even Dr. Hartman testified, when he talked

15   about 30 percent, he said, "With generic, it's even a lot

16   more than that, but I haven't been asked to do that."

17   Dr. Schondelmeyer, the expert that they have in this case,

18   does not have an expectations yardstick for any of these

19   defendants.  He says expectations for generics were much,

20   much higher than they were for generics, but the government

21   doesn't do anything with respect to it.

22          And what the First Circuit did when it affirmed

23   your Honor is, it didn't affirm on the plain-meaning

24   interpretation that the Court gave.  It affirmed on the

25   expectations issue, and talks about how the expectations in

1    the industry, the expectations at CMS, the expectations at

2    the state level are the things that matter.  And the

3    government gives you absolutely nothing on that issue.  You

4    don't know from their briefing what New York expected, what

5    Illinois expected, what California expected.  They don't

6    bother with any of that.  And I think what you heard from

7    Mr. Henderson is, well, it's 30 percent.  Well, it isn't

8    30 percent because expectations -- and the J & J situation

9    was remanded to your Honor to look at the expectations of

10   Class 1 with respect to the drugs there.  What is

11   expectation other than a question of fact?  What did people

12   expect?  What did CMS expect when it comes to generics and

13   the spreads that are involved here?  What did the state

14   Medicaid agencies expect when they looked at these generics?

15            And there are categories of generics that are even

16   more important.  For example, Abbott has infusion drugs.

17   The drugs at issue here are infusion drugs.  They are drugs

18   that are used for I.V., dextrose, saline, sterile water to

19   deliver other kinds of drugs, things of that nature.

20   There's overwhelming evidence in the record that everybody

21   at the CMS level, at the state level, you know, the pharmacy

22   directors, all knew that with respect to Abbott's infusion

23   drugs, the spreads were even greater than what they expected

24   with generics generally, which are all greater than what was

25   expected with respect to branded drugs.  So you have very

9e4f9c2e-bf42-4a9b-a9d2-c3e8285926eb

Page 41

1    particularized situations about what people were expecting

2    in this area when it comes to, A, generics in general, and,

3    B, the defendants' drugs in particular.

4              THE COURT:  In the big case that went up to the

5    First Circuit, the problem is, that was a 93A case.

6              MR. DALY:  Yes, your Honor.

7              THE COURT:  And this is a False Claims Act case.

8              MR. DALY:  Yes, your Honor.

9              THE COURT:  So the standard there was, was what

10   the company did outrageous, egregious, beyond the pale of

11   what's acceptable ethical conduct?  The False Claims Act is

12   different.

13             MR. DALY:  Well, yes, it is, your Honor, and I

14   think that what we would say -- well, we think --

15             THE COURT:  That's why expectations were so

16   essential in the 93A case, and it's completely different

17   here.  The False Claims Act is pretty -- you just go through

18   this check list.  Was it a false price?  Yes.  Was it

19   knowing?  Yes.  Did it cause damage?  Yes.  But then you

20   have a very strong argument:  But the government knew about

21   it.

22             MR. DALY:  Right, and we think --

23             THE COURT:  So that's different than -- you know,

24   the case law is varied on that.  Some go so far as to say

25   that mere knowledge isn't enough; you have to actually have

1    approval.  And others say, well, acquiescence is enough.

2    So, I mean, I have to play with that sparse area of law.

3    But it's different because it's your burden to prove it.

4    It's an affirmative defense, as I understand it.

5              MR. DALY:  Well, but our view is that expectations

6    goes to falsity.  Expectation goes to scienter as well.

7              THE COURT:  Well, it's really not an average

8    wholesale price.  What your argument is, "But everyone knew

9    it."

10             MR. DALY:  Well, it's more than that, Judge.  It's

11   not that everybody knew it.  Our proof, the proof that we

12   have in our briefs is not that everybody knew it; this was

13   policy.  We have evidence, and we can go through it, and I

14   will go through it --

15             THE COURT:  Fine, fine, I'll grant you policy.

16   It's a false price which you say the government acquiesced

17   in because of countervailing policy reasons with respect to

18   access.  It still comes up in that way:  Did the government

19   know and either implicitly or explicitly agree to it?

20   That's the issue.

21             MR. DALY:  That's one way of looking at it, yes.

22             THE COURT:  It is the issue.  It's an affirmative

23   defense.

24             MR. DALY:  Well, but why isn't it part of falsity,

25   is our position?  Because if somebody says something, says X

1    to a person, and that person knows that that's not true, it

2    goes to falsity.

3              THE COURT:  It's false, but the person doesn't

4    reasonably rely on it.  If somebody said, "That carpet is

5    blue," that's false.  I just would be an idiot to rely on

6    it.

7              MR. DALY:  Well, I think that what the cases talk

8    about, Judge, is that --

9              THE COURT:  Although sometimes patent lawyers

10   can --

11             (Laughter.)

12             MR. DALY:  I think a patent lawyer would tell you

13   it actually is blue, Judge.

14             THE COURT:  They say the lens and the spectrum.

15   They get you to believe it.  But the reality is, that's how

16   I'm thinking about it, which is to say that carpet is blue

17   would be false, but if I bought it anyway, you would have a

18   defense because I bought it knowingly.

19             MR. DALY:  Well, and the question is, and if I

20   tell you it's blue, and because I already know that you know

21   it's not blue, do I have the appropriate scienter?  I mean,

22   and what the cases say is that scienter and falsity blend

23   together.  And Boese speaks to this a lot, and I know your

24   Honor has looked to Boese a lot when it comes to the False

25   Claims Act.  He talks about how you can't really separate,

Page 44

1    and we have a lot of cases that we cite in our brief that

2    talk about not being able to separate falsity and scienter

3    here.  And I disagree.  I don't think false --

4              THE COURT:  Well, sometimes that might be the

5    case.

6              MR. DALY:  Right.

7              THE COURT:  And the reason I denied summary

8    judgment, if I'm remembering correctly, in Mylan is, it was

9    a WAC-based case -- I sometimes blur these cases, I have so

10   many of them -- and it wasn't a hundred percent clear that

11   people understood what WAC meant.  But here AWP under any

12   theory, it wouldn't be, right, an average wholesale price

13   under any theory?  It couldn't possibly.  Everyone agrees.

14   That's the one thing that's come across.  Everyone agrees it

15   has no relationship to the marketplace, so it's plainly

16   false.

17             Your argument, which is strong, is:  Sure, but the

18   government knew it and continued to use it.  And so that's a

19   defense.  And then I have to decide, is it enough to be

20   approval or acquiescence for policy reasons?

21             MR. DALY:  Yes, and I think, you know, I don't

22   think we need a hall pass from CMS or the government to do

23   it.  In other words, it doesn't have to be they write us a

24   letter, "Go ahead and do this."

25             THE COURT:  I agree, I agree.

1          MR. DALY:  Right.  But I still want to hang onto

2     the notion that the knowledge, the expectations, and the

3     policy go to falsity and scienter as well because that's

4     what the cases seem to suggest.  If you have an ambiguous

5     term -- and I need to stop Mr. Henderson short.  We don't

6     have a plain-meaning interpretation of AWP in the Medicaid

7     world.

8          THE COURT:  Medicaid we don't, but I thought the

9     First Circuit -- I didn't read it the way you did, and I

10    certainly -- I thought the expectation piece went to the

11    outrageousness of the conduct one way or another, not to the

12    meaning of the term.  But in the Medicaid world, AWP might

13    mean different things.  I've just never seen it, at least in

14    Massachusetts, which is the one I sort of explored, intended

15    to mean something that was unmoored to the marketplace.

16          WAC is harder because it doesn't say "average,"

17    and it's a wholesale acquisition cost, and do you mean an

18    average?  Do you mean a median?  Does it include the

19    discounts and rebates?  What if there's a pass-through?  I

20    mean, you could see where there would be some confusion

21    perhaps on that.  You know, is it undiscounted or

22    discounted?  Is it the list price of 80 percent of the

23    people who use it and not 20 percent?  But AWP is an average

24    of wholesale prices.

25          MR. DALY:  In the Medicaid world, Judge --

1          THE COURT:  In the Medicare world.

2          MR. DALY:  Right, in the Medicare world, you've

3     construed that, although it was on a different record than

4     the record we have here.  In other words, one thing to

5     remember in these cases, another reason why these cases are

6     different, Judge, is, in T One when you did that, the

7     government asserted the Touhy regulations.  You didn't have

8     any testimony from the government witnesses that we had

9     here.  What you had was the government's amicus brief where

10    they told you what they thought that the Secretary

11    understood and believed.  We've now gone and deposed all

12    those people, and they say that none of that is correct;

13    none of them understood and believed that AWP meant actual

14    average wholesale price.

15         THE COURT:  McLellan said it in my case, the other

16    one, the class action, the former administrator of CMS.

17         MR. DALY:  Right.

18         THE COURT:  So let's not go down that road.

19         MR. DALY:  But the point I'm trying to make is

20    that your Honor says, well, it's false.  Well, we don't know

21    it's false because in the Medicaid world, we have a lot of

22    states that actually define AWP in their statutes.  You

23    don't hear any of that from the government.

24         THE COURT:  Okay, so that's where I need -- that's

25    where I thought I'd get briefs on it.

1       MR. DALY:  The government doesn't want to bother

2   with that.  They just want to say, "Ah, it's false.  You've

3   already decided it."

4       THE COURT:  Neither did you.  Neither did you.  I

5   don't know how I'm going to do this.  I expected my 600

6   pages of briefing would actually help me through the state

7   statutes, which is why I allowed so much.

8       So tell me a state.  Give me an example of a state

9   where AWP is defined not to mean some estimated acquisition

10  cost.

11      MR. DALY:  Judge, take a look at Tab 18 of the

12  document, the notebook I handed to you.  This is just some

13  of the examples, Judge.  And what I want to say about this

14  is, the government moved for summary judgment here.  It's

15  their burden to come in --

16      THE COURT:  I'm not sure these examples do it for

17  you.

18      MR. DALY:  Well, but what they do, Judge, is they

19  say they're all "as set forth in the compendia, as set forth

20  in the compendia."  We have testimony that goes along with

21  this, Judge, that says where these people fully understood

22  that the compendia prices were not actual acquisition costs.

23  Nobody thought it was actual acquisition costs.  And what we

24  have is situation after situation of government policy where

25  you have these state Medicaid agencies sitting around

1    saying, okay -- For example they've got --

2              THE COURT:  Excuse me.  Are these statutes?

3              MR. DALY:  Yes, your Honor.

4              THE COURT:  So that turns out be the same

5    issue, which is, again, it's the government knowledge

6    defense that they knew, and they bought anyway, and they

7    acquiesced in it, they affirmatively acquiesced in it in

8    order to woo providers to stay in the system because the

9    dispensation costs were --

10             MR. DALY:  Yes, the dispensing fee, sure.

11             THE COURT:  I mean, it's the same issue, isn't it?

12             MR. DALY:  It is.  I think we differ.  I believe,

13   A, it's an affirmative defense; B, it really does go to

14   falsity and scienter as well.  In other words, you can't

15   just simply say something is false when somebody knows that

16   it's not true.  It goes to the issue.  This is what Boese

17   talks about, this is what a lot of cases talk about in terms

18   of being unable to separate the elements of scienter and

19   falsity in an area like this, particularly when you have an

20   ambiguous term.

21             And another thing that the First Circuit did,

22   another thing that Professor Berndt did in his report to

23   you, the term "average wholesale price" is ambiguous.  The

24   First Circuit says it's -- if one thing is clear from all

25   this, the meaning of it is unsettled.  Berndt said in his --

1      THE COURT:  You know, I think you misread that

2  case, but we can go on on this.  So one big issue you have

3  is government knowledge defense, and you want trial on that.

4  So give me the best evidence you have about why the federal

5  government acquiesced in it.  Let's just --

6      MR. DALY:  All right, but I just want to clarify

7  one thing, Judge.  When I say it's unsettled, the point I

8  want to make is that under the False Claims Act, when you

9  have a statute that admits of more than one reasonable

10  interpretation, it's very difficult to assess False Claims

11  Act liability, not because -- well, because it goes to the

12  falsity and scienter points.  In other words, if the

13  defendant can show an interpretation that is reasonable and

14  rational, and if others can show alternative interpretations

15  of that phrase, it's very difficult to assess -- this is a

16  penal statute, it's a punitive statute.  It's treble damages

17  plus penalties.  It's very difficult to do that.

18      THE COURT:  I understand your point, but I'm not

19  going to accept that these prices anyone understood to be an

20  average wholesale price.  Now, I've been dealing with this

21  for eight years now.  Maybe I'm wrong.

22      I am somewhat, and that's why I'm moving you on

23  here a little bit, sympathetic to the fact that at some

24  point the OIG started flagging these discrepancies.  They

25  started telling the world that there were these huge

9e4f9c2e-bf42-4a9b-a9d2-c3e8285926eb

1   problems with generic drugs.

2            So now the issue is, CMS is stuck with the statute

3   which says 100 percent of the median AWP or 95 percent of

4   the median AWP.  And you claim at some point what, that

5   they -- they don't have to turn on a dime.  There's a

6   statute that requires it.  So it can't be that the first OIG

7   report that comes out, bingo, gets you off the hook.  You're

8   saying, though, at some point over time they acquiesced

9   affirmatively as opposed to being horrified.  Is that what

10  you're saying?  There was an embracing of the drop for

11  policy reasons?  Isn't that your argument, that they --

12           MR. DALY:  Well, and the question is -- you know,

13  you found a perfect storm for branded drugs in 2001.  We all

14  want to push that storm a lot further back in time.

15           THE COURT:  Right, so help me with that.  That's

16  your big argument, which is how far back would you say that

17  there's a viable government knowledge defense?  It can't be

18  the minute Ven-A-Care brings a complaint because they're

19  supposed to investigate.

20           MR. DALY:  I think it's before that, Judge.

21           THE COURT:  Oh, before.

22           MR. DALY:  Long before that.

23           THE COURT:  So help me.

24           MR. DALY:  Take a look at Slide 9 that I gave you,

25  your Honor.  This is the testimony of Bruce Vladeck.  This

1    is the CMS administrator, the head of the agency from '93 to

2    '97.  And we deposed him, and he's talking about -- we're

3    talking about infusion drugs here.  That's Abbott's drugs,

4    the ones that I've been talking about.  And he's saying, "I

5    recall monthly headlines in Modern Healthcare about group

6    purchasing operations being -- achieving discounts of 98 and

7    99 percent in their purchase of basic infusion products and

8    sterile supplies."  That's our situation.

9            And then he continues, "List prices are

10   essentially -- are entirely meaningless."

11           And then we ask him, "Well --" and this is an

12   example of some of the spreads on an Abbott drug, for

13   example, where it says, "Would you be surprised if one

14   person can get it for $10 and another person with bargaining

15   power can get it for $1?  Answer:  I would not be

16   surprised."  And that's a 900 percent spread.

17           So this is the head guy for CMS putting knowledge

18   of what your Honor calls "mega spreads" on infusion drugs

19   back in the 1980s.  This is the head of the department.

20           Now, another thing to keep in mind here, and

21   another point that I think has gotten lost when we move to

22   the area of generics, is that we have witness after witness

23   who says:  People spend dollars, not percentages.  And so

24   when we depose all these state Medicaid agencies, they talk

25   about wanting to make up for the inadequate dispensing fees

1    by overpaying for the drugs.  And what we have in that

2    situation is that they want to pay them money.

3           So in Abbott's case, AWPs are mostly, you know,

4    below a couple dollars and the costs being 24 cents.  So

5    we're talking about pennies here, and we're talking about --

6    whereas, in your opinion in T One, you approved spreads over

7    $200, so -- because they were within that 30 percent thing

8    that Hartman gave you in that case.  Whereas, in our case,

9    we have a spread of like $1.71.  And it might be 200 or

10   300 percent, but it's a dollar.  And what the state

11   witnesses say over and over again is:  People spend dollars,

12   not percentages.  So that what you need to do -- and let me

13   get that GAO thing --

14          THE COURT:  All right, so that struck me in your

15   brief that that's in defense of the Medicaid claims, and so

16   for how many states do you have those kinds of comments?

17          MR. DALY:  How many states do we what?

18          THE COURT:  Have comments like that from the

19   Medicaid administrators?

20          MR. DALY:  For virtually all of the ones that we

21   did, and we did most of them.

22          THE COURT:  So you have a comment from a state

23   administrator in every state basically that they knew that

24   there was the spread, and they did it for policy reasons?

25          MR. DALY:  Virtually, Judge.  We didn't depose

Page 53

1   every state.  I mean, we had to make concessions to time.

2            THE COURT:  Well, how many states did you depose?

3            MR. DALY:  How many did we do?

4            MR. TORBORG:  About thirty.

5            MR. DALY:  About thirty, your Honor.

6            THE COURT:  Thirty?  And so you would say that you

7   have that, and is that somewhere --

8            MR. DALY:  We have similar testimony.

9            THE COURT:  That's somewhere in this massive -- so

10  it's clear to me that you have that for every state?

11           MR. DALY:  Yes, and we can give you the cites.  I

12  think we've collected that in a couple of paragraphs that I

13  can give you momentarily.

14           THE COURT:  And what about with CMS, do you have

15  quotes like that coming out of CMS?  "We knew that there was

16  a spread, but we thought we needed to do it for dispensing

17  fees?"

18           MR. DALY:  Well, what we have out of CMS is a

19  little different.  What we have is, in the Medicaid world --

20  remember, CMS approves all the state plans.  So we have

21  document after document, and some of them are in the book

22  that I have gave you, where the state, you know, wants

23  to -- OIG does a survey, and they say, well, generic drugs

24  of 85 percent below AWP, and here is Illinois, they want to

25  do AWP minus 11 as their reimbursement level for generics.

1    And what happens is that CMS looks at this and says:  Well,

2    we understand that.  We're having difficulty getting the

3    states to set the reimbursement levels in accordance with

4    what the invoice studies are showing.  But what they keep

5    telling us is that the dispensing fees are inadequate.  And

6    so what the states are doing is, they're overpaying or

7    paying more for the drugs; and because the dispensing fees

8    are inadequate, and, you know, enough of this is happening,

9    that, by God, we're going to let them do it.

10             THE COURT:  So you have CMS documents that say

11   that or witnesses?

12             MR. DALY:  Take a look, Judge, at 31.  Judge, what

13   this is, this is a GAO report where they talk about meeting

14   with HCFA, and they said, "HCFA also noted that because

15   states focus on reducing Medicaid costs, most state programs

16   are not willing to increase dispensing fees, regardless of

17   survey results.  HCFA and state Medicaid officials agreed

18   that pharmacies must often use excess Medicaid

19   reimbursements to cover their dispensing costs."

20             THE COURT:  So you would say that would be a

21   defense to the federal portion of the Medicaid claims?

22             MR. DALY:  Absolutely.

23             THE COURT:  Now, what about with Medicare?

24             MR. DALY:  Well, they're not moving against

25   Medicare against Abbott, first of all, but in the Medicare

1    world, Judge, I think what --

2            THE COURT:  Maybe it would be fairer to leave it

3    to people --

4            MR. DALY:  Well, this is where we've got to go

5    into the world of expectations, and I think expectations is

6    related to knowledge.  It's related to government knowledge.

7    It's related to the defense.  It's also related to the

8    elements.  And what the witnesses say in this case over and

9    over and over again is that the expectations for these drugs

10   are much higher.

11           No one is surprised.  No one at CMS, and we have a

12   lot of witnesses in that regard, and no one at the state

13   level is surprised that there are large spreads here.  And

14   what the evidence shows and what these documents shows over

15   and over again is that what the states were doing was

16   intentionally paying more for the drugs than what they knew

17   to be the acquisition cost, what they did from their own

18   surveys and what they were getting from OIG.  We have state

19   after state that says, "I understand that.  I understand

20   that the drugs cost less than what I'm paying for them, but

21   I've got this problem on the dispensing costs.  And I hear

22   what you're saying.  I have your DOJ AWPs, which, by the

23   way, have Abbott's drugs on them.  I see what the actual

24   prices are.  I know that, but I hereby choose as a matter of

25   policy to pay AWP minus 10 or AWP minus 15 percent as a

1    matter of state policy because I need to keep people in the

2    program, and I need to make up for what are clearly

3    inadequate dispensing fees."  We have a lot of documents,

4    even in what I've put in front of you, Judge.

5                THE COURT:  Thank you.  So, now, it's 3:30.  She's

6    been going since 2:15.  I'm thinking we'll take a

7    fifteen-minute break or so.

8                How much time do Dey and Roxane need?

9                MS. REID:  Well, your Honor, given that we're the

10   focus of the argument --

11               THE COURT:  You're in the cross hairs here.

12               MS. REID:  -- if I could have a half an hour, I

13   would appreciate it.

14               THE COURT:  I don't think we're going to have

15   time.  Well, we could give you each a half an hour.

16               MS. REID:  Yes, each would be --

17               THE COURT:  But is it the same argument?

18               MS. WITT:  No, your Honor.  We're going to talk

19   specifically about NovaPlus.  What that will leave at the

20   very end of the time then will be the alterego motion that

21   was filed by Boehringer Ingelheim Pharmaceuticals, Roxane's

22   sister company, and Boehringer Corp.

23               THE COURT:  I'm not going to have argument on

24   that.

25               MS. WITT:  Well, we'd appreciate an argument on

Page 57

1    another day because it is --

2              THE COURT:  Maybe, maybe.  I'm much more focused

3    on -- why does that really matter at this point?

4              MS. WITT:  Because the Department of Justice's

5    position is that those companies are liable for the

6    $1.5 billion for the ipratropium bromide.

7              THE COURT:  Is it a piercing the corporate veil?

8              MS. WITT:  It's a piercing the corporate veil

9    primarily.

10             THE COURT:  I didn't get to that, so let me

11   just --

12             MS. WITT:  We don't need to deal with that today,

13   but I did --

14             THE COURT:  That I haven't read yet, so I'm sort

15   of focused more on these pricing issues.  So we'll come back

16   around quarter of, give you each sort of, let's say, twenty

17   minutes each so there's enough time here, and then some

18   response, I think is probably what we're going to have to

19   do.  Okay, we stand in recess.

20             (A recess was taken, 3:30 p.m.)

21             (Resumed, 3:50 p.m.)

22             THE COURT:  All right, so go ahead.

23             MS. REID:  Thank you, your Honor.  I will try and

24   be brief and as direct as I possibly can, and I want to hit

25   just a series of points and then finish with the ipratropium,

1    which I know was the focus of Mr. Henderson's comments.

2          First, your Honor, not to belabor the point, but

3    as my brother Mr. Daly said, the generics industry is

4    different.  It does not work like the branded industry.  The

5    expectations yardstick of the 30 percent that

6    Professor Hartman put before your Honor doesn't work in the

7    generics industry, and the whole understanding of the

8    industry and how the term "AWP" is used is totally

9    different.  And I think that it's in that context that it's

10   important, you know, to understand that your Honor needs to

11   hear the evidence at the trials of how the generics industry

12   operates because it gives context to whether or not the

13   participants in that industry believed they were doing

14   anything that would come afoul of the False Claims Act.

15         Turning to the next quick subject, you had asked,

16   again, "Mr. Daly, the evidence that you have that it's a

17   policy decision on the state level?"  And I would just point

18   very quickly that you have a document which was attached as

19   Exhibit C to defendants' surreply, a July 28, 2008 e-mail --

20         THE COURT:  Which defendants' surreply?

21         MS. REID:  We did a joint one.  It was only 12

22   pages your Honor, so --

23         THE COURT:  I never got to the surreplies.

24         MS. REID:  The surreply is 12 pages.  It was good

25   and short.  And the only reason that this was attached so

1    late, your Honor, is because these documents were withheld

2    on a claim of privilege for over a year, and Magistrate

3    Judge Bowler just recently ruled they were not, so we could

4    use them.

5              Mr. Dubberly said, "In declining to join AWP

6    litigations, the AWP calculation methodology has not been

7    set forth in any statute or government guidance.  Therefore,

8    a claim that an undefined calculation methodology is unfair

9    or misreported is not one --"

10             THE COURT:  Could you start again.  Who are you

11   reading?

12             MS. REID:  This is the attachment to the July 28,

13   2000 e-mail --

14             THE COURT:  Could you put it on the screen just so

15   I can read along with you.

16             MS. REID:  We don't actually have it on the

17   screen.  We can give you a slide of it if --

18             THE COURT:  Who are you reading?  Who are you

19   quoting?

20             MS. REID:  Jerry Dubberly.

21             THE COURT:  Yes, but who is it?

22             MS. REID:  He is the head of Pharmacy from the

23   State of Georgia's Medicaid agency.

24             THE COURT:  So this is Georgia's person?

25             MS. REID:  Georgia.  They never joined.  They have

1    not sued.  And the reason they didn't sue is --

2               THE COURT:  Well, if they didn't sue them --

3               MS. REID:  Well, the federal share is before your

4    Honor, but the state share, the state government has never

5    joined because, in his view, "A claim that an undefined

6    calculation methodology is unfair or misreported is not one

7    that the department can support."  So that's Georgia.

8               You have as we speak and as we had filed --

9               THE COURT:  About which drug?

10              MS. REID:  At all.

11              THE COURT:  But generics, brands?

12              MS. REID:  Both.  I mean, actually the document in

13   question says that they've underpaid on generics and

14   overpaid on brands, but I don't go into that.  The document

15   in its entirety is attached to the surreply as Exhibit C,

16   Docket 6567.

17              Again, the State of California this year, there is

18   presently in the Ninth Circuit an injunction affirming the

19   issuance of a preliminary injunction against Medi-Cal

20   prohibiting further reductions in it's compendia AWP

21   discounted by 17 percent formula because of concerns over

22   access, where the Ninth Circuit says --

23              THE COURT:  Wait.  The cite is what?

24              MS. REID:  The cite is to Independent Living

25   Center of Southern California, Inc., the David

Page 61

1   Maxwell—Jolly, 572 F. 3rd, 644.

2            THE COURT:  And who is it against?  Who's he, the

3   administrator of Medicaid?

4            MS. REID:  Yes, against Medi—Cal, the

5   administrator, July 9, 2009, where they basically say —— and

6   it included pharmacies —— that they would not allow a

7   further reduction by 10 percent "because there is a robust

8   public interest in safeguarding access to healthcare for

9   those eligible for Medicaid, whom Congress also recognized

10  to be the most needy in the country."

11           Again, this is a plan in 2008 that CMS approved

12  with an AWP on a compendia basis.

13           And, finally, as your Honor knows, and I don't

14  wish to discuss at great length because it's a complicated

15  decision, but we did file yesterday Docket No. 6599, the

16  Alabama Supreme Court reversal of three jury verdicts in

17  cases brought by the Alabama State Attorney General on

18  brand —— it was a brand case, not generics —— noting, the

19  court, that the decision ——

20           THE COURT:  That was there was no reasonable

21  reliance case?

22           MS. REID:  It's a fraud case.

23           THE COURT:  Yes.

24           MS. REID:  But what it said was, it could not have

25  been clearer that the state as a policy matter "determined

1    the inappropriate reimbursement formula based on its own

2    surveys and calculations in order to balance the twin goals

3    of expenditure and to insure pharmacy participation."  The

4    court noted that the amicus brief of the National Community

5    Pharmacy Associations said that, at the levels of the

6    proposed, you know, acquisition costs that are being

7    discussed, and even as we speak today, would have caused

8    Alabama Medicaid to essentially collapse.  And since there

9    was no indication in the record that Alabama Medicaid wished

10   to discontinue its Medicaid program, they, you know, did not

11   consider that to be, you know, what was the actual intent.

12   So --

13              THE COURT:  Is Alabama one of the states here?

14              MS. REID:  Alabama's federal share is.  And, of

15   course, that leads to the whole state-share issue.  The

16   federal government, as I understand, has asked Alabama for

17   any shares of any settlements, and it all becomes very

18   complicated.  It's a very significant decision --

19              THE COURT:  Is that res judicata on the Alabama

20   claim?

21              MS. REID:  That's a very interesting question.

22   It's one that I think may require further thought and

23   briefing as to what the preclusive effect of that opinion

24   is.

25              THE COURT:  So it would only bind with respect to

Page 63

1   Alabama.  I mean, I think I have to do this in all fifty

2   states, or whatever states the government is seeking damages

3   for.

4           MS. REID:  Your Honor, I think that we all need to

5   read that case carefully, and I don't know that I can commit

6   one way or the other.  I just found it -- I thought that

7   your Honor should have that case because it is from the

8   highest court in Alabama, and I do think it is going to

9   have significant --

10          THE COURT:  Law.com got it to me, so thank you.

11          MS. REID:  Before we did?  So that's on the

12   Medicaid side, and I just wanted to point --

13          THE COURT:  I want you to know, that case got more

14   publicity in twenty-four hours than my eight-year case has

15   probably gotten --

16          (Laughter.)

17          MS. REID:  There is no fairness.  There just is no

18   fairness.

19          But let me go back now to Medicare because your

20   Honor asked for the evidence that was collected, and we have

21   collected in the defendants' common statements of fact, at

22   Section C beginning at Paragraphs 104, federal testimony on

23   the meaning of AWP which may be helpful, and it includes the

24   testimony of the administrators.  And you heard Mr. Daly

25   quote Mr. Vladeck, who was the administrator in the 1990s,

1    but --

2            THE COURT:  Excuse me.  I'm not changing my

3    definition of AWP.  It's a matter of law, plain language.

4    I'm not changing it.  That's an appeal issue that's gone up.

5            Now, that's different from what you maybe knew or

6    understood.  It's different from whether there was an intent

7    to deceive or defraud.  It's different from whether the

8    government deliberately veered off the course of that

9    definition, but I'm not changing.

10           MS. REID:  Your Honor, I respectfully understand

11   that.  I would note that the First Circuit in the context of

12   the case before it said it was not reaching the plain-meaning

13   definition because --

14           THE COURT:  I am not reaching it again either,

15   okay.  I'm not touching it.  WAC is different, but AWP,

16   don't waste your breath.  You're preserving the issue.  But

17   that's different than state of mind, I understand that,

18   so --

19           MS. REID:  But I would just point out because you

20   asked, in the Medicare context, you know, what was in the

21   mindset?  Was there approval?  Was there knowledge?  You

22   know, when you have the CMS administrators all saying, among

23   others, "Have you ever heard anybody else who used AWP to

24   refer to the price at which a pharmaceutical firm or

25   wholesaler sells a drug to a retail customer?"

1          "Mr. Scully:  No."

2          I understand your Honor's position, but I think in

3     the record --

4          THE COURT:  I'm not changing it.  But what I do

5     think it may be relevant to is what the government knew and

6     whether they acquiesced in a different price.

7          MS. REID:  Right.

8          THE COURT:  So I just don't want to waste time now

9     because there's so much for us to do.

10         MS. REID:  Let me go quickly then to the next

11    point, which is, in the case of Dey and also Roxane, you're

12    dealing with inhalation drugs.  It's a very different thing

13    than the Abbott drugs, and there are different dispensing

14    fee issues.  And I would note that at the time that the MMA

15    was enacted, the dispensing fees changed dramatically for

16    inhalation drugs.  They raised them to $57, then ultimately

17    lowered it back down to $33; but the bottom line was, they

18    realized that these types of drugs, particularly as they

19    were administered often through home healthcare, had higher

20    dispensing costs.

21         THE COURT:  So how much of a spread would it take

22    to compensate for that dispensing fee?

23         MS. REID:  It's really the dollars, not the

24    spread.  I mean --

25         THE COURT:  Well, just I'm saying, your big

1   argument, which has some support in the record, is that they

2   deliberately, "they," the government officials, deliberately

3   shut their eyes to the spread because they understood the

4   dispensing fee was too small.  So what was the dispensing

5   fee?  It was what, like $8 or something.

6              MS. REID:  It was about $5 --

7              THE COURT:  $5.

8              MS. REID:  -- in prior.  And in our expert's

9   report, you know, Dr. Bradford goes through showing that

10  ultimately -- it is a more complicated answer than you're

11  going to want, I think, to hear in this short time, but what

12  happens is, you initially go from a low dispensing fee, high

13  ingredient cost.  You then go down to a much lower

14  ingredient cost, higher dispensing fee.  Dispensing fee

15  begins to come down, but then what you find is, in the

16  inhalation drug area, you start seeing compounded drugs that

17  are being dispensed rather than just plain, you know,

18  individual ipratropium or albuterol.  So that ultimately the

19  Medicare reimbursement level and the amount of dollars does

20  not really go down that much.  In fact, it's interesting to

21  see that progress, and it's something that I think at

22  trial --

23             THE COURT:  I know, but you're right, that's more

24  complicated.

25             MS. REID:  I know, so --

1          THE COURT:  Let me just ask you this:  Your big

2     argument is that the government deliberately yielded to

3     these spreads to subsidize dispensing costs.  So I need some

4     evidence about, what kind of spread are we talking about

5     that you'd need to do that?

6          MS. REID:  Well, in terms of the actual amount, I

7     would say, you know --

8          THE COURT:  Maybe you don't have it in the record.

9     Maybe that's why you say I need a trial, but --

10          MS. REID:  In terms of the amount, I can't give

11     you a mathematical figure at this point in time.

12          THE COURT:  Do any of these documents do it out?

13          MS. REID:  No, because the OIG reports never

14     looked at the dispensing costs, with the exception of ones

15     out of Chicago where they would say that in order to

16     actually look at the whole thing, you've got to look at the

17     rebates, dispensing costs, and ingredient costs.  But in the

18     reports that are primarily before your Honor, they're only

19     looking at ingredient costs.  But what I think in terms of,

20     you know, looking at the issue of --

21          THE COURT:  Would the extent of the spread end up

22     in, you know, like $100 for a dispensing fee when the only

23     reasonable one would be $33?  Has anyone done the math or

24     any expert looked at it?

25          MS. REID:  I think our expert on the inhalation

1    context has looked at the generic industry and has looked at

2    the progress.  I mean, I don't think there's anybody out

3    there who can say to you what the absolute kind of Aquinian

4    true price should be for any particular drug at a point in

5    time.  It is, after all, a competitive --

6               THE COURT:  You're not hearing me at all.

7               MS. REID:  I'm sorry.

8               THE COURT:  So when you're saying dispense a drug,

9    is that the pharmacy?

10              MS. REID:  Or it could be the home healthcare

11   administrator.

12              THE COURT:  Or the home healthcare.  So what does

13   it mean to dispense the drug?  Does it just mean for a woman

14   to go count 20 pills, and she then puts it in a bag?  What

15   are we talking about?

16              MS. REID:  The dispensing cost is supposed to

17   cover the cost of, in this case, the pharmacy, you know, to

18   some extent its overhead.  I mean, when you look at the

19   Myers & Stauffer's report, that's what they go through:  the

20   employees' salaries, the overhead, the cost of keeping the

21   pharmacy in business in essence.  When you look at the home

22   healthcare administrator, it's a different --

23              THE COURT:  But is it more for your drugs than for

24   other drugs?

25              MS. REID:  I don't think that's always true.  I

1    think he would say the infusion drugs, it's even higher.

2            THE COURT:  What do they pay in dispensing fees

3    now under Medicare?

4            MS. REID:  Under Medicare and for our inhalation

5    drugs, I think they are higher.

6            THE COURT:  I found that a very difficult piece of

7    the record because while it may be true, as it was in the

8    other case, there was some cross-subsidization, it was

9    pretty clear that 30 percent did it in the branded drug

10   world, and that any argument that the 500 percent was

11   necessary was ridiculous.  But now we're in generics.  But

12   no one's pride me the actual dollars and cents about what it

13   would take to cross-subsidize for the real cost of

14   dispensing.  Is it the 1,000 percent spread you're talking

15   about, or would it be a 200 percent spread?

16           MS. REID:  Your Honor, you have to look at the

17   pharmacy in question --

18           THE COURT:  No, you don't.

19           MS. REID:  -- at the different class of trade.

20           THE COURT:  No, but you have to set policy.  So

21   obviously someone was setting this policy that a certain

22   percent is what was needed to keep the pharmacies in the

23   system, right?  Someone made that decision, that's your

24   theory of the case.

25           MS. REID:  Right.

Page 70

1          THE COURT:  So do we have those calculations

2     somewhere so that we know what their expectations were?

3          MS. REID:  In the Medicaid context, I think you do

4     have much more because you have a lot of the states that

5     have done the actual surveys and reports, which were the

6     Myers & Stauffer's reports of what is the acquisition cost,

7     what should be a normal dispensing fee, recommendations on

8     that.

9          THE COURT:  So where would I find it because it

10    wasn't really briefed that way?

11         MR. DALY:  Judge, if I may on the Myers &

12    Stauffer?

13         THE COURT:  Yes.

14         MR. DALY:  If you look at Tab 17 in what I gave

15    you, Judge, this is one example, and this is about infusion

16    drugs.  And Myers & Stauffer, by the way, they go out and

17    they do a lot of surveys of states.  They're also the DOJ's

18    consulting expert in this case, but they end up being a fact

19    witness.  This is the report, and we have another one at

20    Tab 34 for Louisiana.  But looking at California, what it's

21    saying is, "In every dispensing cost survey, the provision

22    of this service, home infusion," Abbott's drugs, "of this

23    service has been associated with higher dispensing costs.

24    Dispensing costs range from $20 to $40."

25              And in this particular document, what they're

1   doing, Judge, is, they're saying -- California is thinking

2   about changing, and what Myers & Stauffer says in the third

3   call-out is that if you keep it at AWP minus 5 percent,

4   which is what you do in California, "it is estimated that

5   such an average prescription would yield a margin on

6   ingredients of approximately $42."  So if you keep it at AWP

7   minus 5, you'll be paying your pharmacist a profit, an

8   intentional profit of $42.  "This margin typically allows

9   for adequate reimbursement of dispensing costs"; in other

10  words, the 40 bucks that it actually cost to dispense this

11  kind of drug.

12          So what Myers & Stauffer, the DOJ's consulting

13  expert, says, is, "So long as the ingredient reimbursement

14  rate remains at AWP minus 5 or any other relatively high

15  level," I mean, if you keep it high, "then the need for the

16  department," California, "to set a separate dispensing

17  fee --" in other words, increase your dispensing fee, you

18  don't have to do it because you're paying them 42 bucks which

19  covers it.

20          THE COURT:  Good.  That's the kind of thing I was

21  talking about.

22          MR. DALY:  Okay.

23          MS. REID:  Your Honor, I've been advised -- and

24  we'll got the cite for you -- there is the GAO 2001 report

25  which attempted to look at dispensing fee costs for

Page 72

1    inhalation drugs and found a range which, you know, ranging

2    from over -- I'm not sure the bottom range, but up to

3    somewhere in the 50s.  We will supply that cite to you and

4    reference, if that would be helpful.

5                THE COURT:  But no more briefs.

6                MS. REID:  No more briefs, I promise, I promise.

7                THE COURT:  Okay, go ahead.

8                MS. REID:  Let me just quickly turn to the

9    ipratropium and the OIG information regarding Dey's

10   ipratropium and the various ipratropium reports.  All of

11   them are in the record.  Particularly Dey's statement of

12   fact 128-131 is comparing starting in 1998, comparing drug

13   reimbursement, Medicare and Department of Veteran Affairs,

14   which found the median prices versus the Medicare allowable,

15   and had with it -- actually, Dey's actual invoices were part

16   of the working papers on that.  January, 2001, Medicare

17   reimbursement of prescription drugs also dealt with

18   ipratropium.  No. 3, excessive Medicare reimbursement for

19   ipratropium bromide, March, 2002.  No. 4, update January 20,

20   2004, on excessive Medicare reimbursement for ipratropium.

21   In the working files for the early reports, not only were

22   there invoices, there were Federal Supply Schedule prices --

23                THE COURT:  All right, so let's take that they

24   knew.  Let me just say, in the Medicaid context --

25                MS. REID:  No, that was Medicare.

1          THE COURT:  I understand.  In the Medicaid

2     context, there's some evidence that they knew and they

3     agreed to it to subsidize dispensing fees.  So it was more

4     than just knowledge; that they sort of held their nose and

5     did it because they thought it was the right thing to do to

6     provide access.  Do you have any such documents in the

7     Medicare area?

8          MS. REID:  In the Medicare context, your Honor,

9     it's the actions.  It's the program memoranda.  It's the

10    fact that they instruct their DMERCs to use the compendia

11    prices at the same time that they know that these compendia

12    prices are inflated.  Their 30(b)(6) witness testified that

13    the only thing that constituted government knowledge was the

14    regulations in the program memoranda and the statute.  And

15    they conceded that they continued to use the compendia

16    price, to direct the DMERCs to use the compendia price,

17    although they knew that the AWPs were, quote/unquote,

18    "inflated."  They issued that program memoranda --

19          THE COURT:  And they say that in the depositions,

20    "We did that even though we knew"?

21          MS. REID:  Yes.  I mean, not -- in the two that we

22    talked to.  I mean, they know the prices.  In the case of

23    Dey, at the same time that they are publishing their AWP,

24    which they believe to be their generic entry-level price

25    benchmarked to tell people there's a generic on the market,

1   Dey is publishing -- in the same publications, declining

2   WACs, which show the prices are going down.  They're giving

3   CMS the AMPs, which turn out to be, the price is very

4   close --

5           THE COURT:  AMPs are a little different but --

6           MS. REID:  But, you know, this is CMS.

7           THE COURT:  This isn't "should have known."

8           MS. REID:  But they did know.

9           THE COURT:  Right, it's got to be "did know," and

10  did know affirmatively and acquiesced.  So that's what I

11  need.  I need maybe not, as you say -- it was a very good

12  metaphor -- maybe not a hall pass, but they had to do more

13  than just know.

14          MS. REID:  But the AMPs were sent in to the CMS,

15  the very people who, you know -- I mean, your Honor, it was

16  public knowledge.  The FSS prices were publicly available.

17          THE COURT:  So when was the first time that there

18  was a public report about the ipratropium bromide?

19          MS. REID:  It was 1998, and for Dey's other drug,

20  albuterol, it's even earlier.  It's '96.

21          THE COURT:  And when were these launched, in 1992?

22          MS. REID:  Albuterol launched in like '92, and

23  ipratropium for Dey launched in '97.  So within a year, in

24  both cases, the government has got reports out that the

25  ingredient costs were in both cases Dey's actual invoices

1    costs in their records.

2         THE COURT:  Those are the hard issues here.  Thank

3    you.

4         MS. REID:  Thank you, your Honor.

5         MS. WITT:  Your Honor, I just want to direct the

6    Court's attention to two specific documents that are on the

7    same issues that Ms. Reid just talked about on the same

8    issues, and then Mr. Gortner will talk briefly about the

9    specific issue on NovaPlus.  And both of these documents we

10   do have some slides for that I won't put up, but we'll hand

11   them to the government and your clerk with the citations on

12   them.  One deals specifically -- and I acknowledge

13   completely at the front that it's a 2008 document, and it's

14   dealing with Medicare Part D.  It's Roxane's statement of

15   facts, Paragraph 97, Tab 126.

16        THE COURT:  It's a what?

17        MS. WITT:  It's a Medicare Part D document.

18        THE COURT:  What year?

19        MS. WITT:  2008.  But the significance of the

20   document is that it is very explicit when evaluating the

21   issues of spreads that it's finding in Medicare Part D, that

22   "They encourage the use of generic drugs, since their use

23   provides good value to both the beneficiary and the

24   taxpayer, and we note that the incentives are aligned to

25   encourage promotion of generics by community pharmacies."

1       Now, the significance of the language there that
2   the incentives are in line is its reference to the spreads,
3   the different profit margins the pharmacies are making on
4   generics because the spreads for the generic drugs are,
5   relative to the spreads of the brand drugs, large enough
6   that a community pharmacy will use a generic drug, so that
7   the government still ends up paying less for the drug than
8   it would if it were paying for the brand.  So it's a point
9   that we see less directly, a lot more subtly in the Medicare
10  documents earlier than this date, but the practice was
11  exactly the same; that the spreads in the generic drugs
12  provided an incentive that still saved the government money.
13  So that there was a lot of, in addition to the
14  acknowledgment of the spreads and the knowledge, there's a
15  lot of looking the other way on the generic size of the
16  spread because of the dollar amount and because of the
17  incentives.

18       THE COURT:  That's a legal question, though.
19  Looking the other way may not be enough.  Affirmatively
20  embracing will be enough.  Acquiescence, I don't know what
21  it is.

22       MS. WITT:  Well, your Honor, if looking the other
23  way is embracing and acquiescing without saying, "We are
24  embracing and acquiescing," because that runs into a huge
25  battle of another sort, but if you say, "Here's what the

1    spreads are for these generic drugs, and you know what, this

2    is a good thing and it's a positive thing for the program

3    overall because --"

4         THE COURT:  Okay, I've got the argument.  Thank

5    you.  So what are the next --

6         MS. WITT:  And then the other one I just want to

7    direct your attention to is the CMS approval of state plans.

8    And this is a critical document, which is Roxane

9    Exhibit 128, because it shows the federal government looking

10   at what the states are doing and saying, "You know what,

11   sometimes the states want to pay more than what we know

12   based on the surveys is the actual acquisition cost, and

13   they have all these negotiations --"

14        THE COURT:  What's the date of this document?

15        MS. WITT:  This is a 2002 document.  "We know that

16   the states are negotiating with your their pharmacy

17   associations.  We know that there's political issues here in

18   the states, so we're going to approve their state plans,

19   even if their state plans come to us and say, we want to pay

20   more than the acquisition cost."  And the specific

21   guidelines that are incorporated in this document explicitly

22   say, "We are going to tell all of these regional offices to

23   approve it if the state thinks it's good for them."

24        THE COURT:  Thank you.

25        MR. GORTNER:  And, your Honor, I'd like to speak

1    just briefly on the NovaPlus issue.  I have a couple of

2    handouts I'll refer to, if I may approach.

3            THE COURT:  I have a confession for you first.

4            MR. GORTNER:  Okay.

5            THE COURT:  I didn't get to NovaPlus.  I got to

6    most of these other issues but not this one, so --

7            MR. GORTNER:  Well, it might be useful then to

8    give you a broad overview of the issue, since it gets

9    somewhat complicated in the briefing.

10           Your Honor, you earlier saw from Mr. Henderson an

11   array where one of the DMERCs, at least, had put the

12   NovaPlus ipratropium bromide product in the brand array.

13   Now, the evidence here is that this product has always been

14   considered a generic product by just about everyone

15   except --

16           THE COURT:  You can have -- can't you have branded

17   multi-source?

18           MR. GORTNER:  Yes, and I will talk in a moment

19   about the branded multi-source, but let me explain why this

20   product falls under the generic category.

21           Now, in this situation, the undisputed evidence is

22   that Roxane always considered this to be a generic drug.  It

23   named it "ipratropium bromide," which is the generic

24   chemical compound name.  It's an inhalation drug.  The

25   addition of the term "NovaPlus" at the end referred to --

1    unlike the ipratropium bromide Roxane-labeled product, the

2    NovaPlus product was sold only to Novation GPO members,

3    which were hospital members, and they needed some way to be

4    able to identify the difference between the Roxane

5    ipratropium bromide and their ipratropium bromide.  And as

6    I'll show you in a moment, every other generic ipratropium

7    bromide in the marketplace was also called "ipratropium

8    bromide," the generic chemical name.  The brand was called

9    "Atrovent," nothing related to the generic chemical compound

10   name, like Valium or Tylenol versus acetaminophen or

11   ibuprofen.

12            Now, what has occurred in this case, as you may

13   recall, is that these NovaPlus drugs were added at the close

14   of fact discovery at the very end of the case because during

15   the course of fact discovery, what we found out was that

16   some of the DMERCs had classified the ipratropium bromide

17   NovaPlus product as a brand, and others had classified it as

18   a generic.  And during the course of the deposition

19   testimony, Mr. Henderson, during the questioning of one of

20   the DMERCs, even said, "Now, I'll represent to you,

21   Ms. Eiler," which is one of the DMERC representatives," that

22   NovaPlus actually has always been a generic product, not a

23   brand product."  And he went on to say, "In fact, the

24   NovaPlus NDCs are generic drugs, and if you'd done some

25   additional research," DMERC, "besides looking just at the

Page 80

1   Red Book, you might have determined --"

2          THE COURT:  Well, did the Red Book call it a

3   brand?

4          MR. GORTNER:  If you turn quickly to Slide No. 2,

5   what I handed you, your Honor, this is a printout from the

6   Red Book CD that the Department of Justice claims that all

7   the DMERCs were looking at to classify the NovaPlus

8   ipratropium bromide product as a brand or a generic.  And if

9   you look at the highlighted yellow portion there -- this is

10  just a printout from the screen they had available to them

11  the whole time -- it has a specific generic indicator, a

12  "yes" and "no," and it indicates "yes," this is a generic

13  product, not a brand product.

14         Your Honor, in our papers and in the undisputed

15  record, First DataBank also classified it on all six of its

16  generic indicators as a generic product.

17         Now, this is consistent with all of Roxane's

18  behavior here.  They called it after the generic chemical

19  name.  The AWPs were set identical with the Roxane-labeled

20  product that no one disputes is a generic product, the same

21  10 percent off the brand AWP.  The NovaPlus product had

22  those same AWPs.  The contract prices were the same or lower

23  than the Roxane-labeled generic product.  So simply put,

24  there's nothing here in the record for them to establish

25  causation, and these are catastrophic type of damages

1    they're talking about.

2              THE COURT:  Well, why isn't this just a fact

3    dispute?

4              MR. GORTNER:  Well, because, your Honor, under the

5    False Claims Act, they have to be able to establish

6    proximate causation here.  They have to be able to

7    establish --

8              THE COURT:  No, no, no, wait a minute.  Whether

9    it's a generic or a bromide -- maybe I misspoke -- why isn't

10   that a fact dispute someone would have to resolve at trial?

11             MR. GORTNER:  Well, your Honor, again, there is --

12   with respect to what it actually was, the issue that has to

13   occur here is whether it was foreseeable to Roxane.  That's

14   the evidence they'd have to show up here.  It may have

15   turned out that under some particular view of the world, it

16   may have been considered by somebody to be a brand, but the

17   issue here to establish treble damage causation --

18             THE COURT:  What does brand mean?  It means -- I

19   mean, now that I'm forcing myself to think about it, branded

20   means -- typically in my previous litigation it meant it was

21   subject to a patent and had a name on it, a specific, you

22   know, selling like Lipitor or Claritin or something like

23   that.

24             MR. GORTNER:  Exactly, and that is --

25             THE COURT:  So you have a specific name on it, and

1    you're saying that's not enough to give it a brand.

2             MR. GORTNER:  Well, no.  I mean, one issue, you

3    raised the issue of the patent, your Honor.  The patent on

4    Atrovent, the brand expired in 1996.  The Roxane label

5    "ipratropium bromide" came on the market in June, 1996.  Dey

6    came in 1997.  This product didn't enter the marketplace

7    until mid-1999.  It didn't show up in the arrays and the

8    DMERCs until 2001.  By the time it's --

9             THE COURT:  You're saying there's no difference

10   between this product and your generic?

11            MR. GORTNER:  No, it's the exact same product.

12   There's the generic ipratropium bromide --

13            THE COURT:  Well, why did you put a brand name on

14   it?

15            MR. GORTNER:  Well, your Honor, it's not a brand

16   name.  We put "Ipratropium Bromide Inhalation Solution

17   2 Percent" on it.  The "NovaPlus" addition is the

18   identification of a label.  It would be the same if we put

19   "Ipratropium Bromide Roxane" or "Ipratropium Bromide Dey."  It

20   identifies whose label, whose product it is.  It doesn't

21   identify -- it's a completely different issue than a

22   proprietary name like Atrovent or Valium.  I mean, it makes

23   no --

24            THE COURT:  This is a proprietary name, though,

25   right, because you called it "NovaPlus"?  So I guess the

1    question would be, would that be enough to transform it into

2    a brand if it's the exact same ingredient as everything

3    else?

4              MR. GORTNER:  It's identical, and if you turn to

5    Slide 4, your Honor, this is the slide that lists the

6    Red Book CD printouts of all the ipratropiums.  And what

7    we've done is, we've put in red "Atrovent" which stands out

8    as a brand name product, a proprietary name for the product.

9    And then we also have listings in green is the Roxane-labeled

10   product, and in yellow is the ipratropium bromide.

11             THE COURT:  Is Atrovent yours?  No.

12             MR. GORTNER:  Atrovent is Boehringer Ingelheim.

13             THE COURT:  Who's your sister company?

14             MR. GORTNER:  Is a sister corporation with brand

15   drugs.  So you can clearly see that when a company is

16   intending to identify a product as their brand on the

17   marketplace, they give it a specific proprietary name.  They

18   don't call it under the generic chemical compound name as

19   every other generic has on this list.  They don't give it an

20   AWP that's below the brand AWP?  I mean, everything of this

21   product -- the AWPs, the contract prices, the generic

22   chemical name -- was identical with the Roxane label.  And

23   guess what?  Some of the DMERCs figured that out.  In the

24   first array that I gave you, DMERC A classified it as a

25   generic the whole time.  But some of them used different

Page 84

1    procedures, and as we've seen in other instances, they were

2    confused in terms of what they actually implemented.

3            But this entire classification process is unknown

4    to a manufacturer like Roxane.  What happens is, the four

5    DMERCs construct the arrays internally.  They classify

6    things internally.  We never see how they're classifying the

7    product.  Their procedures --

8            THE COURT:  And this matters only because it says

9    the lower of the median or the brand name?

10           MR. GORTNER:  Exactly, your Honor.  So in one

11   scenario, what we have here is, if the product had been

12   properly classified as a generic, you would have to do a

13   median analysis, and putting in, as the DOJ does, the

14   transactional prices would cause a small shift.  When you

15   allow the misclassification to stay in the brand array, that

16   product now becomes the basis of payment for every claim of

17   every ipratropium bromide for every quarter, irrespective of

18   whether that happened.  It never happened in the real world.

19   Its misclassification wasn't noticed by the different DMERCs

20   because the --

21           THE COURT:  Okay, let me jump to the government

22   because I now get the point.

23           So why is it a brand.

24           MR. FAUCI:  The relevant regulation here, your

25   Honor, is 42 CFR 405, 517.  It's the regulation we've been

Page 85

1    dealing with all along, which lays out reimbursement at the

2    lower of the median or the brand.  Importantly, that was

3    adopted by CMS with several clarifications published in the

4    Federal Register.  Those say, quote, "A brand product is

5    defined as a product that is marketed under a label name

6    that is other than the generic chemical name of the drug or

7    biological.  CMS also made clear that it deliberately chose

8    an expansive definition and that it specifically considered

9    and rejected more narrow definitions."  CMS noted again in

10   the Federal Register, "If a manufacturer chooses to market

11   its product under a proprietary name rather than the generic

12   chemical name of the drug, we believe this is a brand.  We

13   do not limit the definition of brand to the innovator

14   company product."

15            Roxane's argument depends on the idea that there's

16   no difference between ipratropium bromide --

17            THE COURT:  What if it has both names?

18            MR. FAUCI:  We looked -- I think that the language

19   covers that.  If --

20            THE COURT:  What if it's called a generic, and

21   then it's got the tag of a brand?  That's hard.  That's what

22   we're talking about here?  They say it's "Ipratropium

23   Bromide NovaPlus," so it's got both, the brand and -- I know

24   you're emphasizing the "NovaPlus," and they're emphasizing

25   the "Ipratropium Bromide."  It's got all of them in the

1    title.

2              MR. FAUCI:  Well, I mean, if you look at the

3    language, it says, "If a manufacturer chooses to market its

4    product under a proprietary name."  There's no doubt that

5    NovaPlus is a proprietary name.  It's trademarked.  It's

6    owned by Novation.  Roxane entered into an agreement with

7    Novation to get the benefit of it.

8              THE COURT:  What if they market under both names?

9              MR. FAUCI:  Well, I would say that CMS

10   specifically adopted this definition.  There's other

11   language in the Federal Register where CMS says that "We

12   believe that it is an unreasonable burden to require our

13   contractors to determine which of the thousands of AWPs they

14   must look up to determine which of those are innovator

15   drugs."

16             It seems clear that CMS knows that the DMERCs have

17   a lot of things to do, and they set up a very expansive

18   definition, so that when you look, if you look at Page 2 of

19   the exhibit Mr. Gortner handed you, what the DMERCs did --

20             THE COURT:  Can I say, at the very least, let's

21   suppose you're right on the mark in terms of the regulation,

22   but there's some ambiguity, does that make me have to go to

23   trial on the "knowingly"?

24             MR. FAUCI:  Absolutely.  We didn't move for

25   summary judgment on this.

1              THE COURT:  Oh, all right.  So why isn't -- all

2       right, all right.

3              The ball is back in your court.  So you're

4       marketing under two sets of names, generic and brand name.

5       It's not clear what the reg does or doesn't say, and so why

6       did your company pick a brand name?

7              MR. GORTNER:  Well, a couple responses.  We don't

8       agree that it's a brand name.  Novation, which is what

9       NovaPlus is referring to, has a product line of 300 generic

10      drugs.  Roxane didn't pick anything.

11             THE COURT:  So Novation picked it.

12             MR. GORTNER:  Novation picks it, and there are 300

13      generic drugs which are known in the industry as generic

14      drugs that have a NovaPlus label because they are Novation

15      drugs.  So Roxane didn't pick anything here, step one.

16             Step two -- and this is on Slide 3 of what he's

17      referring to -- this is not a regulatory definition.  This

18      is a back-and-forth and a response and comment in the

19      Federal Register.  There isn't a shred of evidence --

20             THE COURT:  It's not an actual regulation he read

21      me?

22             MR. GORTNER:  It's not a regulation.  What

23      happened is --

24             THE COURT:  Ah, it wasn't a regulation.

25             MR. GORTNER:  Yes.  If you look at Slide No. 3 --

1          THE COURT:  I'm looking forward to these briefs.

2    I'm sort of seeing it in realtime right now.

3          (Laughter.)

4          MR. GORTNER:  Let me finish my thought.  It's not

5    a regulation.  It is a response and comment back and forth.

6    There's not a shred of evidence that Roxane knew about it,

7    nor that that could be imputed to Roxane.

8          And the other issue here, your Honor, is the

9    falsity.  What we're claimed to have done isn't a naming of

10   a drug.  Causation analysis is, what's the falsity?  It's

11   reporting an AWP.  If there's a second intervening step

12   where the DMERCs get together, and whatever criteria they

13   use or whatever they do internally, if we don't know about

14   that, we can't know about it.  Even if there's ambiguity, we

15   win.  Under the False Claims Act, when there's ambiguity,

16   you cannot impose --

17          THE COURT:  It strikes me that I'm going to trial

18   on this, or is it me or Florida?

19          MS. ST. PETER-GRIFFITH:  You.

20          MR. GORTNER:  It's you, your Honor.

21          THE COURT:  The happiest moment I saw was when you

22   referred to the Southern District of Florida.

23          (Laughter.)

24          MR. DALY:  That's Abbott, your Honor.

25          MR. GORTNER:  But I reemphasize, your Honor, again

1    that this -- your Honor raised a pointed question, which is

2    that what the statement says, if you choose to market under

3    a proprietary name rather than the generic chemical name.  I

4    mean, here the reading of this particular regulation --

5              THE COURT:  You're saying you didn't market under

6    this name; Novation picked it.

7              MR. GORTNER:  No.  And it was also constructively

8    erasing the generic name from the title.

9              MR. FAUCI:  A few points, your Honor.

10             THE COURT:  Well, what happens if Novation picks

11   it?

12             MR. FAUCI:  Novation operates a private-label line

13   called the NovaPlus line.  It's a trademark.

14             THE COURT:  So Novation is marketing it.

15             MR. FAUCI:  Roxane chose to avail itself of this.

16   It entered agreement --

17             THE COURT:  Everybody uses a GPO.  I have a big

18   antitrust case starting in the beginning of November

19   involving Novation.  Everybody uses GPOs.

20             MR. FAUCI:  Well, and, quite frankly, your Honor,

21   I mean, if you look at this list, all the other generic

22   drugs are called "ipratropium bromide."  This is the only

23   one that has --

24             THE COURT:  So if Novation put it on, I don't

25   know, I mean, this is the trial issue.  But I'm just

1    thinking that maybe this was somewhat of a little area of

2    gray here.

3                MR. FAUCI:  We agree it's gray, and can I just

4    make two quick points?  Novation advertises NovaPlus as a

5    brand name.  Their literature claims that NovaPlus delivers

6    value to suppliers through, quote, "sold brand recognition,"

7    and that the, quote, "NovaPlus brand helps smaller

8    manufacturers compete against larger manufacturers."

9                THE COURT:  Like CVS markets under a CVS brand, so

10   would that -- I mean, I --

11               MR. FAUCI:  If it was included in the product

12   name, then we say "yes."  But what you don't see is that

13   when the product is listed as the product name, it's not

14   called "Acetaminophen CVS."  It's called "Acetaminophen."

15   Here the product is called "Ipratropium Bromide NovaPlus."

16               MR. GORTNER:  Your Honor, with the CVS --

17               THE COURT:  All right, I've got the debate.  I

18   understand it now, and I think it's very worth doing.

19               Now, I think what we need to do is, I need to turn

20   to the government and say, how could I possibly grant

21   summary judgment on this affirmative defense?

22               MR. HENDERSON:  Well, your Honor, and I'll focus

23   on Medicaid.  That's where the big issue is, I think, your

24   Honor.

25               THE COURT:  I couldn't possibly.  It's too much.

Page 91

1   I have to work through a record.

2           MR. HENDERSON:  And let me offer this for what

3   it's worth, your Honor.  I think the government's view is

4   that it's the correct approach.  First of all, expectations,

5   your Honor, government expectations, irrelevant for purposes

6   of 93A.  They're not relevant to falsity under the False

7   Claims Act.  Under the False Claims Act, falsity, you look

8   to the prevailing law; and if the Court can look at the

9   legal standard and make a determination, then that governs

10  the outcome of the falsity determination.  And your Honor

11  recognized this in the Mylan case.

12          THE COURT:  I agree, but get to my question, which

13  is at some point -- I agree with that -- at some point, if

14  the law says you have to buy red rugs for the federal

15  courthouse and I continue to give you blue rugs and you keep

16  taking them, you can see they're blue, at some level, you

17  lose a False Claims Act.

18          MR. HENDERSON:  Well --

19          THE COURT:  You know, that's the problem.  There's

20  a spectrum of cases, right?  Some that say mere knowledge is

21  not enough, and there's another at the other end that seems

22  to say that you can acquiesce in something.  I don't think

23  it can be negligence, but if you actually know, you actually

24  know year after year after year that AWP is a phony number,

25  and you accept that because you're worried about the

1    pharmacies leaving the system, doesn't that support a

2    government knowledge defense?

3              MR. HENDERSON:  On the Medicaid side --

4              THE COURT:  Yes, on the Medicaid.

5              MR. HENDERSON:  No, it doesn't, your Honor, and

6    this is why:  We're not suing for the state share.  We're

7    suing for the federal share.  And the federal regulations

8    set forth a legal paradigm, a legal structure that is based

9    on the words "estimated acquisition cost," that, as you

10   know, the federal regulations for all time have said that

11   the agencies shall not pay any higher than a FUL, if there

12   is one, or the estimated acquisition cost, or the U and C.

13            All states, all states for at least part of the

14   time, and all states for most of the time, have used that

15   structure.  They have reimbursed at the lower of the

16   estimated acquisition cost or the U and C.  If there's a

17   FUL, they add that in, and, of course, if there's a MAC,

18   they add that in.  And that factual foundation for applying

19   the federal regulatory structure is set forth in the

20   declaration --

21            THE COURT:  I agree with that.

22            MR. HENDERSON:  Okay.

23            THE COURT:  I've applied that statute more times

24   than I can tell you.  That's what's supposed to happen.

25   That's what's supposed to happen.

1          MR. HENDERSON:  That's right.

2          THE COURT:  But if the government knows it's not

3    happening, and knows it year after year after year and

4    acquiesces, what happens?

5          MR. HENDERSON:  And I think, obviously, if your

6    Honor decides that the Lachman-type statements that we don't

7    think are admissible --

8          THE COURT:  The what kind?

9          MR. HENDERSON:  Statements of individual state or

10   federal officials saying, "This is what I thought, this is

11   what I thought about the regulation," if all of that --

12         THE COURT:  Not "what I thought about the

13   regulation."  "This is what I knew when I was approving the

14   plan."

15         MR. HENDERSON:  And, your Honor, the United States

16   rests on the structure of the federal regulation.  Government

17   knowledge is not a defense to falsity.  It is a defense to

18   scienter.  And when the defendants --

19         THE COURT:  Well, that might be true.

20         MR. HENDERSON:  Okay.  And if so, if the

21   defendants had no knowledge of all of this, and they

22   presented no evidence that they knew about any of these

23   government reports or relied upon them, if that's the case,

24   then it doesn't help them.  If their claims were false and

25   it caused overpayments and they didn't know about any of

Page 94

1    this government knowledge --

2              THE COURT:  All right, so you're hinging the legal

3    question, so maybe the government knew everything, but they

4    didn't know the government knew.

5              MR. HENDERSON:  That's correct.

6              THE COURT:  So it's a game of double --

7              MR. HENDERSON:  That's correct.

8              THE COURT:  So what do you think about that,

9    there's no evidence that you knew they knew?

10             MS. WITT:  Your Honor, I'd turn to the -- the

11   first example is the AMPs.  At the time the government is

12   saying, "The defendants all thought these were secret prices

13   and didn't want the government to have them," at the same

14   time all of these companies were sending on a quarterly

15   basis an AMP, which is not exactly the same but which tracks

16   what the government says the AWP should have been very, very

17   closely.

18             THE COURT:  "Should have" is the negligence

19   standard.  That's where I'm not willing to go --

20             MS. WITT:  No, but our clients knew that the

21   government had the AMPs, so the idea that they had the

22   information from a source different than the reports, that

23   we can't show that our clients knew about the reports but

24   that they knew that the government had all the information

25   they now say was secret, certainly that's exactly the same

Page 95

1    thing.

2              THE COURT:  Can I ask you this one last question

3    here, which is, I started reading about relation back.  Why

4    am I doing that now?  I've written so much on motion.  Why

5    is this coming up now?

6              MS. REID:  Your Honor, I think that's in

7    connection with the unjust enrichment.

8              THE COURT:  No, it wasn't.  They were talking

9    about the infusion division of the most recent --

10             MS. ST. PETER-GRIFFITH:  Your Honor --

11             THE COURT:  -- amendments, by which it means the

12   early 2000s, and then --

13             MS. ST. PETER-GRIFFITH:  In that regard, Abbott

14   has moved for summary judgment to try to exclude essentially

15   allegations set forth in the government's Abbott amended

16   complaint dealing with its home infusion business unit.

17             THE COURT:  Right.  So why is it coming up now

18   whether it relates back?

19             MS. ST. PETER-GRIFFITH:  Your Honor, we submit

20   that it's not a proper argument, and we don't know why they

21   brought it now.  It's very straightforward, your Honor.

22             THE COURT:  I already did the whole -- I'm not

23   inclined to start reengaging with relation back, and I don't

24   think it's jurisdictional.  Was it triggered by the new

25   statute?  I don't understand why suddenly this briefing.  I

1   got bogged down in it a couple nights ago, why I have to

2   worry about relation back.

3           MR. HENDERSON:  These are the motions to dismiss,

4   I think, your Honor, which --

5           THE COURT:  No, no, no.  They came up again.

6           MR. DALY:  No, the motion to dismiss is separate.

7   We're just making a very narrow argument there, Judge, and

8   it just relates to whether or not these allegations arise

9   out of the same transaction or current so that they would

10  relate back.

11          THE COURT:  Why wasn't that made when we -- you

12  made all these arguments way back when.

13          MR. DALY:  I don't think we made it early on

14  because they amended the complaint to put this in there.

15          THE COURT:  Not till years ago they amended the

16  complaint, right?

17          MS. ST. PETER-GRIFFITH:  Correct, your Honor.

18          THE COURT:  Anyway, I'm not inclined to deal with

19  that unless I'm misunderstanding.

20          Then there's this new issue with the new statute

21  and whether or not it resurrects unjust enrichment.  I don't

22  even know why I need that.

23          MS. REID:  On that one, your Honor, if I may, I

24  would just look at the briefing.  I think that there is an

25  adequate remedy of law under -- and I don't know --

1          THE COURT:  I just don't think I need to decide it

2     now.

3          MS. REID:  No, I don't think you do need to decide

4     it at this point.

5          THE COURT:  You're just preserving it.

6          MS. REID:  Well, actually, the government made the

7     motion to have it relate back to resurrect common law claims

8     back to the time --

9          THE COURT:  Because there's a new statutory

10    amendment, right?

11         MS. REID:  Right, but the question on that is

12    whether or not you can resurrect a common law claim, which

13    the relator could not have brought an unjust enrichment

14    claim in the first place --

15         THE COURT:  And the statute again isn't clear.

16         MS. REID:  And the statute is not clear.  So I

17    think that it's not something your Honor needs to look at

18    because I think the end -- they're going to have to elect.

19    I think --

20         THE COURT:  Well, I don't know what I'm going to

21    do, but I think if we go to trial, at some point, if I send

22    to it Florida, I don't know what to do with it because I

23    don't want to spend -- it isn't clear on this.  It's clear

24    that that was enacted in response to Baylor, which was an

25    outlier case.

Page 98

1          MS. REID:  Right.

2          THE COURT:  And it's hard unless you give me

3   something in the legislative history to say they even

4   thought about common law claims.  You just -- on the plain

5   language of it, it's not -- they're amending the False

6   Claims Act.

7          MS. OBEREMBT:  Well, Congress stated they were

8   doing a clarifying amendment --

9          THE COURT:  Because people went nuts over Baylor.

10  Isn't that the name of the Judge Jacobs case?  Yes, yes,

11  people were flipping out all over the place.  So unless I

12  saw in the legislative history that it was meant to revive

13  common law claims, I don't know why I would change my mind,

14  but maybe it is there.

15         MS. OBEREMBT:  I believe it is there, your Honor,

16  and the idea is not that the claims were revived.  It's that

17  they were never lost in the first place.

18         THE COURT:  Fine, but I want something in the

19  legislative history to say amending the false means that

20  relation back differs for common law claims, that Congress

21  was even thinking about that.

22         MS. OBEREMBT:  Well, as I said, your Honor,

23  Congress intended a clarifying amendment stating that their

24  earlier amendments to the False Claims Act --

25         THE COURT:  You know what?  Find it for me in the

1   legislative history, in the report language, in the

2   colloquies on the floor, in the submissions from the Justice

3   Department, something that flags for me that common law

4   claims was part of what Congress was worried about.  What

5   everyone was worried about was that Second Circuit case.  So

6   unless somehow someone flagged to Congress the common law

7   claims are a part of this -- has anyone here looked up the

8   legislative history?

9            MS. OBEREMBT:  Well, your Honor, we did brief

10  this.

11           THE COURT:  Yes, but you didn't give me quotes

12  from the legislative history.

13           MS. OBEREMBT:  Well, we'll review our briefing,

14  and we'll file a supplemental --

15           THE COURT:  At least, it was -- you know, as I

16  said, I had 600 pages' worth of briefing, so can I say that

17  it's not in one of those little footnotes I can't read?

18  Maybe.  But just I didn't notice something that explicitly

19  said in the legislative reports or -- even the plain

20  language isn't so plain in the context of amending the False

21  Claims Act.

22           MS. REID:  Your Honor, we'll both look.  We looked

23  at the legislative history and did not finding anything

24  relating to common law.  We found a lot about Baylor.

25           THE COURT:  I bet you did.  I bet you did.

1        But, anyway, so before we leave here today, when

2   can we do the Daubert hearing because the damage issue on

3   extrapolation is of concern to me.  So what will I need, a

4   morning, two mornings?

5        MR. LAVINE:  Your Honor, I believe there's a

6   scheduling order already in place that sets the briefing on

7   that not to be completed until mid-November.

8        THE COURT:  All right, so then let's get a

9   hearing.  Fair enough.  Let's just get a hearing.  Let's get

10  a couple of days blocked off in the afternoon.  And I like

11  to hear from live witnesses because I never understand --

12  you know that quote, "Lies, damn lies, and statistics."  I

13  don't understand these statisticians until they actually

14  show up.  And what I really want is the other statistician

15  to be sitting in the room while they're there because it

16  limits what they can say without being too embarrassed.

17  It's called "hot-tubbing experts," and I let the other

18  expert ask questions.  But it's got to be in plain language

19  for me on the extrapolations because extrapolation is fully

20  appropriate, but it's got to be with a decent methodology.

21        MR. LAVINE:  Yes, Judge, and I think the briefing

22  we just filed will be very helpful in giving you a better

23  understanding of what's going on.

24        THE COURT:  I spent a lot of time reading about it

25  in this set of briefs, maybe too much, since no one focused

1    on it.

2            MR. LAVINE:  The government's first brief was

3    filed just yesterday.

4            THE COURT:  All right, so what do you want, a day

5    for each expert for direct and cross?

6            MR. DALY:  I don't think it would take a whole

7    day, Judge.  I mean, not two days.

8            THE COURT:  A half, a morning or an afternoon.

9            MR. DALY:  Oh, okay.  Yes, I think that would be

10   fine, Judge.

11           THE COURT:  So, Robert, when can we do that, like,

12   say, early December-ish in the afternoon?

13           MR. LAVINE:  Your Honor, our expert has a very

14   tough schedule these days.  I hesitate to --

15           THE COURT:  Who is he?

16           MR. LAVINE:  He's currently a senior economist for

17   Healthcare Policy for President Obama, and he's very hard to

18   get ahold of.

19           THE COURT:  Who is it?

20           MR. LAVINE:  Mark Duggan.

21           THE COURT:  He works for the government now?

22           MR. LAVINE:  Well, just recently he moved over to

23   that position.

24           THE COURT:  And he's going to be the witness?  To

25   be seen.

1          MR. LAVINE:  Well, it's a little late to switch

2     because of where he was, but, yes, he's --

3          THE COURT:  Yes, he is a busy man, but I'm going

4     to need to see him.

5          MR. LAVINE:  No, I understand.  I just wondered if

6     there is a way we can consult his schedule as part of this

7     process and maybe float some dates with him first.

8          THE COURT:  Why don't I come up with a couple of

9     dates for all of you in the room, and then if he can't make

10    it, we'll reschedule it.  So, like, sometime in early

11    December?

12         Now, how long are the Daubert briefing papers

13    because we can't have what happened on this?

14         MR. LAVINE:  The initial motion was 30 pages, and

15    our response was 30.  I don't think there's any specific

16    page limit set for the reply and surreply.

17         THE COURT:  Thirty?  Twenty.

18         MR. TORBORG:  Twenty each?

19         THE COURT:  Well, actually, what does the surreply

20    say in the local rules?

21         MR. HENDERSON:  Local rules don't address --

22         THE COURT:  Why don't we leave it at ten apiece

23    because I can't -- it really was self-defeating for all of

24    your purposes to have so much briefing this last time

25    around.

1          And now we need something on the spoliation issue.

2     Is that evidentiary, or is it just argument?

3          MR. DALY:  It's just argument, Judge.

4          THE COURT:  Just argument?  When do we want to do

5     that?

6          MR. DALY:  At the Court's convenience.  That's

7     fully briefed, so we could do that at or around the same

8     time as --

9          THE COURT:  Is there any other time you're going

10    to be here so I don't bring all these folks back?

11         MR. DALY:  I don't think we have anything else

12    scheduled right now, your Honor, but we could do it in that

13    time period.  We also have our sort of -- each of the

14    defendants, we have some offensive motions that we want to

15    spend a little bit of time with the Court.

16         THE COURT:  Spoliation isn't offensive?

17         MR. DALY:  No, no, we have our offensive motions

18    for summary judgment too that we've moved on and that relate

19    to some of these damages issues.

20         THE COURT:  I thought that's what we did today,

21    people picked their big issues.  No?

22         MR. TORBORG:  No.  Your Honor, I'm sorry, this is

23    Dave Torborg on behalf of Abbott.  We let the government

24    start with their motions first.  We haven't even touched the

25    defendants' offensive motions.  Most of the issues deal with

1    damage-related issues, extrapolation being one of them.

2    Another issue is our contention that claims not paid on a

3    reported price should be out of the case, a big issue.

4            THE COURT:  Yes, I've read all that.  That stuff I

5    did read.  I maybe spent so much time on something that

6    wasn't -- but as I understand that, that's why I want to

7    do -- that's what got my interest piqued for doing the

8    Daubert hearing.

9            MR. DALY:  Well, maybe we could do -- because

10   they're related, Judge, it seems to me -- do it at the same

11   time.

12           THE COURT:  So why don't we do it at the same

13   time.

14           MR. DALY:  Absolutely.

15           THE COURT:  I mean, that's what really got my

16   interest.  As you know, in another case, I'm having to deal

17   with the FUL issue, in the New York County case maybe it is?

18   So that actually rises to the top of my plate, and maybe

19   I'll have a ruling by then.  So, ideally speaking, we'll

20   dovetail those?  That's fine, because those were the primary

21   issues.

22           MR. DALY:  Yes.

23           THE COURT:  And that's where I got the

24   relation-back issue.  So maybe I just read everything in a

25   different order than you were planning to present, which

1    brings me to probably the next time around you should at

2    least give me an agenda of what you're going to focus on so

3    I can focus on it as well.

4              So we've got spoliation, we need just that date,

5    and then I think we're home free, right?

6              MS. WITT:  We still need a date for the B.I.P.I.

7    and B.I.C. summary judgment, the alterego/piercing the

8    corporate veil motion as well, which I think is probably --

9              THE COURT:  We can do that at the same time you're

10   all up here for the Daubert?

11             MS. WITT:  Correct.

12             MS. ST. PETER-GRIFFITH:  And just to briefly

13   clarify, your Honor, the spoliation, it's not quite fully

14   briefed.  We are intending to submit a surreply on that.

15             THE COURT:  How long?

16             MS. ST. PETER-GRIFFITH:  Very brief, your Honor.

17             MS. REID:  And then there is the original-source

18   motion which is in the process.  I mean, I think that's the

19   only other pending motion.

20             THE COURT:  Let's just get the date.  We're all

21   tired here.  So when should we do the Daubert?  And then it

22   will be defendants' motions for summary judgment.  Maybe two

23   days in December, Robert, maybe mid-December?

24             THE CLERK:  Two days back to back?

25             THE COURT:  Well, if we can, or two afternoons

1    back to back.  We'll see if I'm on trial.  Do you have

2    anything?

3            THE CLERK:  We could do --

4            THE COURT:  Are there any whole weeks that we're

5    not on trial?

6            (Discussion off the record between Court and

7    Clerk.)

8            THE COURT:  Well, how about the 10th and the 11th

9    in the afternoon, at least to get us going?  And on the 10th

10   and the 11th, what I'm planning on is the Daubert hearing

11   and defendants' motions.  And if I'm not on trial, we'll go

12   full days, and if I am on trial, then we could swing over

13   into the 21st.  But I know you all want to go home, you're

14   from different areas.  What do we have on December 16?  We

15   have listed summary judgment.

16           MR. BREEN:  I think that may be the Erie case.

17           THE COURT:  Which one?

18           MR. BREEN:  I was thinking about in the Abbott

19   Erie case, your Honor, the declined Abbott case, but maybe

20   not.

21           THE COURT:  Well, we could do the 16th, 17th, and

22   18th if none of you can figure out what that is.  So we'll

23   have 16th, 17th, and 18th in the afternoon.  If we needed

24   to, we could possibly go full --

25           MR. DALY:  Instead of the 10th and 11th, Judge?

1    THE COURT:  Oh, I'm sorry, you're right.  Why

2  don't we do this:  Why don't we do the 10th and the 11th.

3  If I can do full days for you, I will.  If I'm on trial, I

4  can't.  We have the 16th blocked off for AWP, and then if we

5  had to, we can swing into that to come back, because we have

6  a big agenda.  We have your motions for summary judgment, we

7  have spoliation, and we have Daubert, right?

8    MR. DALY:  Right, Judge.

9    THE COURT:  And you need to give me an agenda and

10  work it out, or you should both give me your proposed

11  agendas with what you're focusing on, and I'll set an agenda

12  because this didn't really work so well.

13    MR. DALY:  Judge, we also have pending, and will

14  be fully briefed by then, our motion to dismiss on

15  jurisdictional grounds that raises some issues relating to

16  original source.

17    THE COURT:  I may not do that.  I can only handle

18  so much --

19    MR. DALY:  Just perhaps do that at another time

20  then.

21    THE COURT:  -- at these hearings.

22    MR. DALY:  Okay, thanks, Judge.

23    THE COURT:  So, now, the big issue is, last but

24  not least, should I set a trial date?  It's a jury trial.

25  My guess is it's huge, right, a month anyway, right?

1          MR. HENDERSON:  Considerably.  I'd say it's

2    probably more than that.

3          THE COURT:  At least get everybody on the calendar

4    because I think something is going to go in this court, and

5    this is getting to be an older case.  So, Robert, when could

6    we get it?  And I have so many other cases.  I just set

7    Mylan for trial.  I've got the Neurontin cases, and I just

8    need to get you on my page.  Do you want to do it in May?

9          MS. REID:  Your Honor, there is an issue, in that

10   the government has just moved to consolidate Roxane and Dey

11   for trial, and we need to brief that.

12         THE COURT:  Down there.

13         MS. REID:  No.  Abbott's the one.

14         MR. DALY:  Abbott is the one that's in Florida,

15   Judge.

16         MS. REID:  We're here.  Maybe they'll move us to

17   Florida.  And we, of course, both strongly oppose that

18   motion, so we would need to brief that and --

19         THE COURT:  To what, to transfer --

20         MS. REID:  No, to consolidate us for trial.  We

21   want separate trials.  So, I mean, they've just filed the

22   motion.  We need to oppose it.

23         THE COURT:  Let's just get something on the

24   calendar, get something.  Robert, when can we do it?

25         MS. REID:  I mean, but we don't know which

1    defendant or both defendants.

2          THE COURT:  No, we don't, but if I wait until

3    that's all done, then I -- I'm at the mercy of the First

4    Circuit in terms of getting new law clerks, and I have a law

5    clerk who understands this case perfectly, and I want it

6    done before he leaves, before I start having to train

7    somebody completely different.  So that's my concern.  So we

8    need to do it before the clerkship year ends.

9          MR. HENDERSON:  I was just going to say, I would

10   suggest moving it up maybe one month to May, just for

11   preparation.

12         THE COURT:  Maybe, maybe.  When is school vacation

13   week?  Maybe right after school vacation week?  Robert, do

14   you have that date?

15         THE CLERK:  Yes.  We can do April 26.

16         THE COURT:  Now, that's going to be jumpy a little

17   bit.  There's a First Circuit Judicial Conference I have to

18   go to, and there's something in Washington I need to go to,

19   but at least if we get it on the calendar, we can work

20   around that.  And he'll issue a pretrial order.  And my

21   guess is, I will try Dey and Roxane together.  I haven't

22   heard your briefs.  I don't know about Abbott, whether

23   that's just so different it would be confusing to a jury.

24         MR. DALY:  Judge, remember, we are not in front of

25   you for trial.

1        THE COURT:  I understand.

2        MS. ST. PETER-GRIFFITH:  But, your Honor, it's our

3   objective to try and move it up here.

4        THE COURT:  But let me just say, that may be, but

5   at some level I've got to make simplicity for a jury, and it

6   gets to be too much.  At least those are similar drugs,

7   right?

8        MS. ST. PETER-GRIFFITH:  Correct, your Honor.

9   We're not necessarily advocating at this point in time

10  consolidating all of them, but your Honor is going to be

11  familiar with the experts which overlap in the case, the

12  witnesses that overlap in the case, and to us it makes sense

13  for it to be up here.

14        THE COURT:  Maybe, okay, but --

15        MS. REID:  Your Honor, I just -- you know, there

16  really are strong reasons why it would be prejudicial for

17  Roxane and Dey to be tried together.  We'll lay them out for

18  you.  We'll make it brief.

19        THE COURT:  Sure.  I'm not making a definitive

20  ruling.  I'm just saying --

21        MS. REID:  I mean, they're different drugs in our

22  cases and they're different issues.

23        THE COURT:  Maybe.  I don't need that argument

24  now.

25        MS. REID:  Okay.

1        THE COURT:  I'm just saying I need something on

2   the calendar.  Maybe it's one and not the other, maybe flip

3   a coin.  I need to resolve, I need one, because without a

4   trial date, you're never going to think about settlement.

5             Okay, so now let me go off the record and discuss

6   that, okay, because Lee has been working all afternoon here.

7             (Discussion off the record.)

8             (Adjourned, 5:09 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 112

1                  C E R T I F I C A T E

2

3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )
5

6

7          I, Lee A. Marzilli, Official Federal Court

8   Reporter, do hereby certify that the foregoing transcript,

9   Pages 1 through 111 inclusive, was recorded by me

10  stenographically at the time and place aforesaid in Civil

11  Action No. 01-12257-PBS and 06-11337-PBS, In Re:

12  Pharmaceutical Industry Average Wholesale Price Litigation,

13  and thereafter by me reduced to typewriting and is a true

14  and accurate record of the proceedings.

15          In witness whereof I have hereunto set my hand

16  this 26th day of October, 2009.

17

18

19

20

21          /s/ Lee A. Marzilli
            _____
22          LEE A. MARZILLI, CRR
            OFFICIAL FEDERAL COURT REPORTER
23

24

25