**TAB 336**

1

```
                UNITED STATES DISTRICT COURT

         FOR THE DISTRICT OF MASSACHUSETTS


     ----------------------------------x
     IN RE PHARMACEUTICAL INDUSTRY      :
     AVERAGE WHOLESALE PRICE            : MDL NO. 1456
     LITIGATION                         : MASTER FILE NO. 01-CV-12257-PBS
     ----------------------------------x SUBCATEGORY NO. 06-CV-11337-PBS
     THIS DOCUMENT RELATES TO:          :
     UNITED STATES OF AMERICA EX REL.   : JUDGE PATTI B. SARIS MAGISTRATE
     VEN-A-CARE OF THE FLORIDA KEYS,    : JUDGE MARIANNE B. BOWLER
     INC., ET AL. V. BOEHRINGER         :
     INGELHEIM CORPORATION, ET AL.,     :
     CIVIL ACTION NO. 07-10248-PBS      :
          and                          :
     UNITED STATES OF AMERICA EX REL.   : OCTOBER 14, 2009
     VEN-A-CARE OF THE FLORIDA KEYS,    : 12:03 P.M.
     INC., ET AL. V. DEY LABORATORIES.  :
     ----------------------------------x
```

                    VIDEOTAPE DEPOSITION OF:

            30(b)(1) and 30(b)(6) REPRESENTATIVE

             OF PALMETTO DMERC (ROBIN K. STONE)

                        TAKEN AT:

              Law Offices of Nelson, Mullins,

                  Riley & Scarborough

               1320 Main Street, 17th Floor

                      Columbia, SC


     REPORTED BY:   TERRI L. BRUSSEAU, RPR, CRR

Palmetto DMERC (Robin K. Stone)                October 14, 2009
Columbia, SC

2  (Pages 2 to 5)

**2**

1  APPEARANCES OF COUNSEL:
2    ATTORNEYS FOR THE PLAINTIFF
3      UNITED STATES OF AMERICA:
4      DEPARTMENT OF JUSTICE
5      UNITED STATES ATTORNEY'S OFFICE
6      BY: JAMES J. FAUCI, AUSA
7      John Joseph Moakley Federal Courthouse
8      1 Courthouse Way, Suite 9200
9      Boston, MA  02210
10     (617) 748-3298
11     jeff.fauci@usdoj.gov

12    ATTORNEYS FOR THE DEFENDANTS BOEHRINGER
13     INGELHEIM CORP., BOEHRINGER INGELHEIM
14     PHARMACEUTICALS, INC., BOEHRINGER
15     INGELHEIM ROXANE, INC. and ROXANE
16     LABORATORIES, INC.:
17     KIRKLAND & ELLIS, LLP
18     BY: ERIC GORTNER
19     300 North LaSalle Street
20     Chicago, IL  60654
21     (312) 862-2285
22     eric.gortner@kirkland.com

**3**

1  APPEARANCES: (CONTINUED)
2    ATTORNEYS FOR THE DEFENDANT
3      DEY LABORATORIES:
4      KELLEY, DRYE & WARREN, LLP
5      BY: MARISA A. LORENZO  (BY TELEPHONE)
6      101 Park Avenue
7      New York, NY  10178-0002
8      (212) 808-7697
9      mlorenzo@kelleydrye.com

10
11    ATTORNEYS FOR BLUECROSS/BLUE SHIELD
12     OF SOUTH CAROLINA:
13     KENDALL R. WALKER
14     I-20 @ Alpine Road AA-270
15     Columbia, SC  29219
16     (803) 264-6632
17     kendall.walker@bcbsc.com
18
19    ALSO PRESENT: Alan Metts, Video Technician
20
21
22

**4**

1          I N D E X
2  WITNESS: ROBIN K. STONE              PAGE
3      BY MR. GORTNER              9
4      BY MR. FAUCI              160
5
6
7          E X H I B I T S
8  NUMBER          DESCRIPTION          PAGE
9  Exhibit Roxane 252   Exhibit 98, Exhibit to the
10         July 24, 2009 Declaration
11         of George B.  Henderson, II    7
12  Exhibit Roxane 253   Document, Redbook 2000 Drug
13         Topics, with attachments      43
14  Exhibit Roxane 254   Document, Redbook 2001 Drug
15         Topics, with attachments      46
16  Exhibit Roxane 255   Document, DMERC Medication
17         Pricing, with attachments    68
18  Exhibit Roxane 256   Detailed Product Information
19         sheets for Ipratropium
20         Bromide              106
21  Exhibit Roxane 257   Detailed Product Information
22         sheets for Atrovent          106

**5**

1          E X H I B I T S (CONTINUED)
2  NUMBER          DESCRIPTION          PAGE
3  Exhibit Roxane 258   Detailed Product Information
4         sheets for Ipratropium
5         Bromide-NovaPlus          106
6  Exhibit Roxane 259   Document, Diltiazem HCL      150
7  Exhibit US Stone 001  Document, Tab 171, with
8         attachments          160
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

3  (Pages 6 to 9)

6

1          STIPULATION

3          It is stipulated by and among Counsel
4    that this deposition is being taken in accordance
5    with the Federal Rules of Civil Procedure; that all
6    objections as to Notice of this deposition are
7    hereby waived; that all objections except as to
8    form are reserved until the time of trial; and that
9    the witness waives reading and signing of this
10   deposition.
11        *    *    *    *    *    *    *    *    *    *    *    *

7

1          (Exhibit Roxane 252, Exhibit 98,
2    Exhibit to the July 24, 2009 Declaration of
3    George B. Henderson, II In Support of Plaintiffs'
4    Motion For Partial Summary Judgment and In
5    Opposition To Dey's Motion For Partial Summary
6    Judgment, was marked for identification.)
7          VIDEO TECHNICIAN:  We are now on the
8    record.  Today's date is October 14th, 2009.  The
9    time is 12:02 PM.  This is the videotape
10   deposition of Robin Kreush Stone, 30(b)(1) and
11   30(b)(6) representative of Palmetto DMERC, taken
12   by counsel for the Defendant.  The location is
13   Nelson Mullins, 1320 Main Street, 17th Floor,
14   Columbia, South Carolina.
15         My name is Alan Metts, legal
16   videographer, representing Henderson Legal
17   Services.  The Court Reporter is Terri Brusseau.
18   This deposition is taken in the matter of the
19   Pharmaceutical Industry Average Wholesale Price
20   Litigation relating to the United States of
21   America ex rel. Ven-A-Care of the Florida Keys,
22   Incorporated, et al., versus Boehringer Ingelheim

8

1    Corporation, et al., Civil Action Number
2    07-10248-PBS and also cross-noticed in the United
3    States of America ex rel. Ven-A-Care of the
4    Florida Keys, Incorporated, et al., versus Dey
5    Laboratories, Master File Number 01-CV-12257-PBS
6    in the United States District Court for the
7    District of Massachusetts.
8          And if counsel now identify yourselves.
9          MR. GORTNER:  Eric Gortner from
10   Kirkland & Ellis representing Roxane Laboratories
11   and Boehringer Ingelheim Corporation and related
12   entities.
13         MR. FAUCI:  Jeff Fauci on behalf of the
14   United States.
15         MR. WALKER:  Kendall Walker for
16   Palmetto GBA, I'm in-house counsel for Blue Cross
17   and Blue Shield of South Carolina.
18         VIDEO TECHNICIAN:  And would the Court
19   Reporter now swear in the witness.
20         MR. GORTNER:  We have someone on the
21   phone, I believe.
22         MS. LORENZO:  This is Marisa Lorenzo

9

1    from Kelley, Drye & Warren for the Dey
2    defendants.
3          VIDEO TECHNICIAN:  I couldn't hear her,
4    I'm sorry.
5          MR. GORTNER:  Hey, Marisa, could you
6    speak up a little bit?
7          MS. LORENZO:  Sure.  This is Marisa
8    Lorenzo from Kelly Drye & Warren for the Dey
9    defendants.
10         VIDEO TECHNICIAN:  And would the Court
11   Reporter now swear in the witness.
12         ROBIN K. STONE being first duly
13   sworn, testified as follows:
14         MR. FAUCI:  And before we begin, I just
15   want to state for the record that although the
16   deposition was noticed 30(b)(1), the parties
17   don't have any objection to this being both
18   30(b)(1) and 30(b)(6) deposition testimony
19   consistent with Mrs. Stone's prior testimony as a
20   30(b)(6) witness for Palmetto DMERC.
21         EXAMINATION
22         BY MR. GORTNER:

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

4  (Pages 10 to 13)

10

1     Q.  Good afternoon, Mrs. Stone.  As you
2  know, my name is Eric Gortner.  I represent
3  Roxane defendants and certain companies that have
4  been sued by the Department of Justice involving
5  certain Medicare claims.  I'm aware that you have
6  been deposed before in this case sometime earlier
7  in 2008, is that right?
8     A.  That's right.
9     Q.  And you're familiar with the general
10  rules of a deposition which include that all
11  answers need to be spoken answers, head nods and
12  head shaking won't work?
13     A.  Yes.
14     Q.  And it will be helpful to the extent
15  that you're able to speak up loudly and clearly
16  so that the Court Reporter who is taking down
17  every word that you say can hear it, that will be
18  helpful.  And the other thing that we should try
19  to do as best as we're able is to not talk over
20  each other so there may be some times where you
21  will anticipate where my question is likely to
22  end. I'll ask you as best as possible to

11

1  patiently wait for me to finish the question so
2  that we can get clear questions and answers on
3  the transcript.
4     A.  Okay.
5     Q.  And you understand that you're under
6  oath, of course?
7     A.  Yes.
8     Q.  If at any point I ask a question that
9  you don't understand, feel free to ask me to
10  clarify the question and I'll do the best I can.
11     A.  Okay.
12     Q.  I'm going to hand you what we have
13  premarked as Roxane Exhibit 252 and this is a
14  declaration that you prepared in the Department
15  of Justice Roxane matter.  Do you recognize that
16  document?
17     A.  Yes, I do.
18     Q.  I was hoping to get a little bit of a
19  background in terms of how this -- how you came
20  to be involved in this document.  Can you tell me
21  who contacted you?
22     A.  For this particular document?

12

1     Q.  Right.
2     A.  Bunker Henderson and Jeff Fauci.
3     Q.  And do you know on or about when they
4  contacted you to prepare this declaration?
5     A.  I can't remember the exact dates but I
6  want to say probably a few months ago.
7     Q.  I'm sorry, look -- if you look at the
8  back of the document, maybe this will help
9  refresh your recollection.  The document says it
10  was -- that you executed the signature on July
11  23rd, 2009. Do you recall whether you were
12  contacted some -- a few days before July 23rd, a
13  week, two weeks, something like that?
14     A.  I don't remember the exact date prior
15  to July 23rd.
16     Q.  Okay.  Do you think it was a couple
17  days?
18     A.  I don't remember.  I mean, I received
19  e-mails, you know, and things like that, you
20  know, notifying me that this was coming down but
21  I don't remember the exact dates.
22     Q.  And who e-mailed you?

13

1     A.  I want to think it started out with
2  Bunker Henderson.
3        MR. FAUCI:  I'll just counsel the
4  witness to be cautious -- being cautious to not
5  answer any questions regarding the substance of
6  your communications with either myself or Mr.
7  Henderson but proceed for right now.
8        THE WITNESS:  Okay.  I don't recall the
9  exact dates.  My day-to-day schedule is very busy
10  and I don't keep track of time in that manner.
11  This, as it states, was signed on July 23rd.  I
12  do not recall, you know, if it was days before
13  that or may have been a week before that.  In
14  reference to the declaration there were, you
15  know, other requests as far as notification
16  notifying me that this was coming down which I
17  believe may have been like the 1st of July
18  because I think the first communication was when
19  I was going on vacation, which was during that
20  time period.
21        MR. GORTNER:  Jeff, what's the basis of
22  your objection about the contacts between Bunker

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

5  (Pages 14 to 17)

---

14

1   and you and Mrs. Stone?
2         MR. FAUCI:  A, I wasn't trying to make
3   an objection but, B, the government -- the United
4   States is certainly taking the position that
5   Palmetto is a government contractor who
6   administers a federally-funded program pursuant
7   to federal contracts that Miss -- the government
8   has consistently and continues to take the
9   position that the attorney/client privilege
10  encompasses communications between employees of
11  DMERC and the United States.
12        MR. GORTNER:  Any communications
13  rendering legal advice, right?
14        MR. FAUCI:  Yes, which would include
15  communications regarding the drafting of this
16  affidavit.  We can address this on a --
17        MR. GORTNER:  Okay.
18        MR. FAUCI:  I haven't counseled her not
19  to answer any specific questions and I cautioned
20  her to be careful in what she answers and I think
21  we can handle it on a case-by-case basis.
22        BY MR. GORTNER:

---

15

1      Q.  Do you recall what the content of the
2   e-mails were that were sent to you by Bunker and
3   Mr. Fauci?
4      **A.  Just notifying me that I would be**
5   **deposed at one point and there was some**
6   **communication regarding, you know, the CD's that**
7   **we used, CD's --**
8      Q.  You're talking about the Redbook CD's?
9      **A.  Yeah.**
10     Q.  You're referring to the additional CD's
11  that were produced in this case?
12     **A.  Right.**
13     Q.  Sometime this summer?
14     **A.  Right.**
15     Q.  Well, let's just stick for now in terms
16  of this declaration that you submitted.  Did you
17  have conversations with Mr. Fauci and Mr. Bunker
18  about the contents of this declaration?
19     **A.  Just, you know, confirming that I could**
20  **attest to, you know, everything that I've said in**
21  **here.**
22     Q.  Now, I take it that the words that are

---

16

1   in Roxane Exhibit 252, those aren't words that
2   you wrote?
3         MR. FAUCI:  Objection to form.
4         THE WITNESS:  I provided -- I mean, I
5   didn't, of course, write every detail but I gave
6   them, you know, my input to these items here.
7   It's not word-for-word verbatim but the content
8   of it I approved.
9         BY MR. GORTNER:
10     Q.  Okay.  So the way --
11     **A.  The final content.**
12     Q.  I'm sorry, I didn't mean to interrupt
13  you.  So the way it worked mechanically was phone
14  conversations back and forth to the Department of
15  Justice attorneys, you then, I presume, saw a
16  draft of Roxane Exhibit 252 and reviewed it for
17  content and approved it?
18     **A.  This is 252?  Yes.**
19     Q.  Were there different versions that you
20  reviewed?
21     **A.  There was another version I believe in**
22  **which, you know, I clarified what would be**

---

17

1   **correct.**
2      Q.  And what was the subject matter of what
3   you clarified?
4         MR. FAUCI:  Objection to form.  And
5   again, I counsel Miss Stone not to get into any
6   of the details of conversations between Mr.
7   Henderson or myself.
8         BY MR. GORTNER:
9      Q.  With that instruction answer the
10  question as best you can.
11     **A.  Okay.  I don't recall exactly which**
12  **ones but there were a few, you know, things that**
13  **based on my conversation, you know, when written**
14  **that I disagreed with and they went back and**
15  **corrected them.**
16     Q.  Did any of those corrections have to do
17  with the classification of the NovaPlus
18  Ipratropium Bromide product?
19        MR. FAUCI:  Objection to form, same
20  instruction.
21        THE WITNESS:  I'm not sure exactly
22  which ones I had disagreed with.  They were very,

---

Henderson Legal Services, Inc.

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

6 (Pages 18 to 21)

18

1  you know, minor.  I'm not sure which ones exactly
2  I may have had them change the verbiage on.
3          BY MR. GORTNER:
4      Q.  That's okay.  When we go through the
5  declaration, if anything triggers your memory let
6  me know, okay?
7      A.  Okay.
8      Q.  Now, in reviewing this declaration and
9  discussing the content of it, did you talk to any
10  other Palmetto DMERC employee regarding this
11  declaration?
12     A.  No.
13     Q.  So is it fair to say that the content
14  of what's in your declaration that we've marked
15  as Roxane Exhibit 52, it's all based upon your --
16  either your memory or recollections or the
17  information that you knew?
18     A.  That is correct.
19     Q.  So you didn't go back to anyone who
20  worked on the pricing arrangements and ask them
21  about the NovaPlus product, is that right?
22     A.  No.

19

1      Q.  I'm sorry, the answer was no?
2      A.  No.
3      Q.  Just a slight pause, make sure we don't
4  overlap.  No, it's okay.
5      A.  I'm sorry.
6      Q.  Now, in preparing this declaration, did
7  you, yourself, go back and look at the Palmetto
8  pricing range where the NovaPlus product was
9  included?
10     A.  Yes, I did.
11     Q.  Did you look at all of them?
12     A.  I went back and skimmed through some of
13  my files and other files that were -- you know,
14  that I had available to me just to make sure that
15  I was correct in not recalling.
16     Q.  Let me stop there for a second.  When
17  preparing this declaration, did you have a
18  specific memory of the Roxane NovaPlus
19  Ipratropium Bromine products and how they had
20  been categorized in the Palmetto arrays?
21     A.  When initially prepared, no.  I had to
22  go back and look at the information.

20

1      Q.  What was the information that you
2  looked at?
3      A.  The arrays and the various files that
4  we had provided with the dec -- well, not the
5  declaration, but the suit itself.
6      Q.  What are the various files you're
7  talking about?
8      A.  Just array files, the fee calculation
9  array files, looked at procedures, looked at
10  another file that categorized products brand
11  versus generic.
12     Q.  Anything else?
13     A.  I mean, those were the files, you know,
14  that I was provided, you know, that I was looking
15  at, the array files.  I'm trying to think.  I
16  don't think there was anything else.  The array
17  files, the procedures.  Oh, the Redbook CD's.
18     Q.  Okay.  And you mean the CD/ROM's?
19     A.  Yes.
20     Q.  And you were able to actually open
21  those up and look at them?
22     A.  Um-hum.

21

1      Q.  Okay.  And what did you look at on
2  those CD's, do you recall?
3      A.  Just looking at the way different
4  things worked, how they -- how the data was
5  presented because I wasn't very familiar, I
6  didn't work real closely with the CD's, and just
7  going back and trying to look at them in
8  comparison to the hard copy manuals.
9      Q.  When you say hard copy manuals --
10     A.  The annual hard copy books, Redbook.
11     Q.  The Redbook manual?
12     A.  Yes.
13     Q.  You said a moment ago that the files
14  that were provided to me.  I wanted to understand
15  what you meant by that.  You mean that -- who
16  provided those files to you?  Did you select them
17  or did someone provide them to you?
18     A.  There were just things that, you know,
19  I was asked to kind of look over and get familiar
20  with to see, you know, if what I had stated here
21  by looking at them still held -- was true.
22     Q.  And what did the fee calculation or the

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

7  (Pages 22 to 25)

22

1   arrays, what did that tell you about whether what
2   you said in the declaration was true?
3       A.  Well, some of the fees --
4           MR. FAUCI:  Objection to form.
5           BY MR. GORTNER:
6       Q.  You can answer.
7       A.  Okay.  Some of the fees of the fee
8   array, the way it was structured, it had a G on
9   the end of the file, which insinuated or could
10  have been speculated that these sources were
11  considered generic but that wasn't the case.
12  That was the basis of the fee calculation being
13  based on generic and therefore it was misleading.
14      Q.  Let me stop you right there.  What I'd
15  like to do is why don't I pull out the actual --
16  what we have been calling the arrays but you may
17  also be calling the fee calculation.  Let me get
18  those documents so we can look at them together
19  and make sure we're on the same page, okay?
20          This is a document that's previously
21  been marked as Roxane Exhibit 46.  And maybe you
22  could turn to -- it may be useful to turn to --

23

1   how about the page that's Bates labeled
2   AWQ022-0071. They're consecutive so the 71 might
3   get you where you are.  And what I think you were
4   just referring to in your testimony is that far
5   right-hand column on this chart and on this
6   particular page, the one that's Bates labeled
7   0071, you can see that the Ipratropium Bromide
8   NovaPlus products are there in the middle of the
9   page and I think you were testifying as to that
10  far right column that has either a G or a B in
11  it?
12      A.  Um-hum.
13      Q.  And what I believe you were just saying
14  or what you said in your declaration is that your
15  understanding of that column is that that
16  reflects whether the fee that was ultimately set
17  for that particular J code, whether it was set up
18  on a brand drug or a brand source, which is a
19  generic drug or generic source, is that right?
20      A.  That's correct.
21      Q.  And what that column -- in reviewing
22  this, what that column told you is that for --

24

1   for this quarter, for these J codes, the fee was
2   set based upon the median of the generics, is
3   that right?
4       A.  Yes.
5       Q.  And in every instance in these arrays
6   when the source column has a G in it, it means
7   that the actual fee that Palmetto set to pay for
8   Medicare claims for that particular J code was
9   based upon the median generic, not on a brand,
10  right?
11      A.  That's what my research of the
12  documents I was looking at.
13      Q.  And then at a later point in time the
14  -- which may have coincided with you switching to
15  an SAS program, I'm not sure if that's correct,
16  but there's a -- there's not -- the source column
17  changes to a term that I think says O type.  And
18  if you want, you can flip these to 0075, a couple
19  pages over, and you can see that there's now a
20  far right column that I read as O type on the far
21  right that has that same G and B designation, do
22  you see that?

25

1       A.  Yes.
2           MR. FAUCI:  Objection to form.
3           THE WITNESS:  O type.
4           BY MR. GORTNER:
5       Q.  I'm sorry, what's that?
6       A.  It says type.
7       Q.  Okay, type.
8           MR. GORTNER:  And was that the basis of
9   your objection, Jeff?
10          MR. FAUCI:  That and I'm not sure what
11  you meant by SAS program.
12          BY MR. GORTNER:
13      Q.  Okay.  Let's strike that.  I thought
14  Palmetto at one point had changed to an automated
15  program but let's just ignore that, let me go
16  back to this, on this particular array with the
17  Bates label AWQ022-0075. Is it your
18  understanding that that far right column that's
19  either O type or type is in effect representing
20  the same information that the source column
21  represented in the earlier arrays?
22      A.  Yes.

Palmetto DMERC (Robin K. Stone)                October 14, 2009
Columbia, SC

---

26

1      Q.   And what that's telling you here is,
2   for instance, J code, J6 -- J7644KO, which you
3   can see at the very bottom of this page, that the
4   payment for not just those drugs but all the
5   drugs under that J code are set by the median
6   generic there?
7      A.   Yes.
8      Q.   And I'll represent to you, Mrs. Stone,
9   in looking over all these arrays, it appears to
10  me that all the Ipratropium Bromide payments for
11  these arrays that are marked in this exhibit have
12  the indication under either the source or the
13  type column that the payment was set by G, by a
14  generic, median generic set the price and not the
15  brand, is that consistent with your recollection?
16     A.   Can you repeat that again, please?
17     Q.   Sure.  In reviewing these arrays that
18  have been marked as Roxane Exhibit 46 on the
19  Palmetto DMERC, I looked at all the entries for
20  payment source for Ipratropium Bromide and the
21  different J codes and in every instance the entry
22  in the source column or the type column had a G

---

27

1   for that particular drug.  And my question to
2   you:  Is that consistent with your recollection?
3      A.   I'm not sure I understand exactly what
4   you're saying but I see one here that has a B.
5   If I'm not mistaken I was understanding you to
6   say that they all had G's?
7      Q.   Let me correct the question then.  Let's
8   focus on just the time period where Ipratropium
9   Bromide NovaPlus was in the array.
10     A.   Just NovaPlus?
11     Q.   Yeah.  That might make it a little bit
12  easier.  And my recollection in reviewing these
13  arrays was that every time that NovaPlus
14  Ipratropium Bromide was in the array, it had a G
15  next to the source column or the type column
16  which according to your testimony suggested the
17  payment was based on the median of the generic
18  prices and not based upon any brand price.  Is
19  that consistent with your recollection of how
20  payments occurred?
21     A.   The payment for all Ipratropium
22  Bromide, my sources would have been based off of

---

28

1   the generics because the generics are the -- I
2   mean, the generic was the lowest of the median
3   and of the lowest brand.
4      Q.   Okay.  That was really my question.  I
5   just wanted to confirm that during the time that
6   Ipratropium Bromide NovaPlus was in the arrays,
7   it didn't set the payment amount, it wasn't based
8   upon its location of the brand array, the payment
9   amount was set based on the median generic?
10     MR. FAUCI:  Objection to form.
11     THE WITNESS:  Yes, if it was -- if it
12  was based on generics, the Ipratropium Bromide
13  NovaPlus price would have been considered in
14  developing the fee but if the brand was not
15  lower, then it is based on the median of the
16  generics if it's the lower sources.
17     BY MR. GORTNER:
18     Q.   And that's reflected by a G in either
19  the source column --
20     A.   That is correct.
21     Q.   -- or the type column?  Okay.  Now, you
22  said you also reviewed procedures in considering

---

29

1   the content of your declaration.  What procedures
2   are you referring to?
3      A.   Our internal procedures.
4      Q.   And what are those?  Are those written
5   down?
6      A.   Yes, they are.
7      Q.   What are they called?
8      A.   Drug pricing instructions, procedures.
9   I don't know the precise name.
10     Q.   Okay.  Let me see if I can locate
11  something like that and let me know if this is
12  what you're referring to.  I'm going to hand you
13  what's been previously marked as Roxane Exhibit
14  42.  It appears to be a December 1, 1999 letter
15  from you to it seems the HCFA central office and
16  the regional administrators.  And at the back it
17  has attached a document that's entitled Medicare
18  Professional Reimbursement Desk Procedure and
19  then it has another heading that says Drug
20  Pricing Procedure, Medicare Part A, B, SAD or
21  SADMERC and DMERC.  Do you see that document?
22     A.   Um-hum.

---

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

9  (Pages 30 to 33)

---

**30**

1    Q.  Is that what you're referring to by
2  your internal procedures?
3    A.  Yes.
4    Q.  Okay.  And taking a step back, can you
5  just explain to me what is this document, who
6  creates it, who updates it, who uses it?
7    **A.  This is created by the pricing unit**
8  **which is now Palmetto GBA.  Initially it was**
9  **created as a Part B document, I'm not sure who**
10  **the initial creator was, and then once we took**
11  **the DMERC or took on the DMERC contract, we**
12  **merged it into a standard procedure used by all**
13  **departments trying to encompass everyone's**
14  **requirements into one procedure.**
15    Q.  Let me stop you there just for a
16  second, Mrs. Stone, make sure I understand what
17  you're saying.  You're not sure who initially
18  developed it but is it your understanding it was
19  initially developed by a DMERC or some Medicare
20  carrier?  I'm just trying to distinguish whether
21  it was created by HCFA or by a DMERC.
22    **A.  No, it was initially created by Blue**

---

**31**

1  **Cross/Blue Shield as the Medicare Part B carrier**
2  **for South Carolina.  Then when we became the**
3  **DMERC contractor, those functions were handled in**
4  **one department or one unit, division, whatever**
5  **you -- however you want to refer to it, and**
6  **eventually those procedures were merged together**
7  **for consistency.**
8    Q.  Okay.  When did -- when did Blue
9  Cross/Blue Shield or Palmetto, depending on what
10  the designation was, become a DMERC contractor?
11    **A.  In 1992 or '93.  I can't recall the**
12  **exact date because I think there was some delay.**
13    Q.  But at some point in the early '90s
14  this document was a document that was authored
15  and updated by Palmetto?
16    **A.  It was actually Blue Cross/Blue Shield**
17  **before that.**
18    Q.  Fair enough.
19    **A.  And became Palmetto.**
20    Q.  Do you know about when it became
21  Palmetto?  I'm not trying to pin you to any
22  particular date.

---

**32**

1    **A.  I don't remember when they did all that**
2  **change.**
3    Q.  Okay.  And what was the purpose of this
4  document?
5    MR. FAUCI:  Object to form.
6    THE WITNESS:  The document provided
7  guidance.
8    BY MR. GORTNER:
9    Q.  To whom?
10    **A.  To the associates doing the**
11  **calculations.**
12    Q.  I'll represent to you that I've seen
13  this document -- or let me correct that.  This
14  document has been produced by other DMERC's.  Is
15  it your understanding or do you have an
16  understanding whether this document was
17  distributed to other DMERC's like Cigna or
18  Administar?
19    **A.  It probably has been shared as the**
20  **DMERC's tried to consolidate.  I'm not sure if it**
21  **was shared in that capacity or if it was shared**
22  **when we were doing some -- this may -- there was**

---

**33**

1  **one document that I saw that we worked on**
2  **together and I'm not sure if it was shared at**
3  **that time or what point in time it was actually**
4  **shared but it was our procedure to collaborate**
5  **with each other on final drug fees developed.**
6    Q.  And why were you trying to do that?
7    **A.  To standardize nationally.**
8    Q.  By standardize nationally, you mean
9  making sure that the DMERC's were doing -- were
10  setting fee payments consistently?
11    **A.  Yes.  Or let me back up, actually to**
12  **make sure that the fees -- the drug fees are**
13  **national, there's not one fee for one state, you**
14  **know, they shouldn't differ among the states for**
15  **DMERC so our goal was to make sure that one**
16  **contractor did not establish a fee different from**
17  **another.**
18    Q.  Right, because all the methodologies
19  for setting fees should have been the same across
20  the DMERC's, correct, the governing -- the
21  governing statute at least as of 1998 required
22  them to determine to pay the lowest -- the

---

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

10  (Pages 34 to 37)

---

34

1   generic Medicare appropriate drugs to pay the
2   lower of the median of the generic AWP's or a
3   brand name AWP if it was lower, right?
4        MR. FAUCI:  Objection to form.
5        THE WITNESS:  Say that again, please.
6        BY MR. GORTNER:
7   Q.  Let's just simplify this.  The payments
8   that the DMERC's or the fees that they were
9   setting for Medicare Part B drugs, for instance,
10  those should have all been the same because
11  wasn't there one statute governing the payments
12  for Part B drugs?  It didn't differ by state, did
13  it?
14       MR. FAUCI:  Objection to form.
15       THE WITNESS:  Not that I'm aware of.  I
16  mean, we -- each carrier I think had their own
17  policies for establishing drugs.  They were never
18  -- it was never something that each individual
19  Part B contractor collaborated on but as we moved
20  into the DMERC world and began collaborating on
21  all fee schedules nationwide, we also began
22  collaborating on DMERC drugs for consistency.

---

35

1        BY MR. GORTNER:
2   Q.  But that was a concern that had been
3   voiced at some point in the 1990s, right, the OIG
4   had written reports expressing concern that
5   DMERC's were not setting the same payment rates
6   for certain drugs; isn't that right?
7        MR. FAUCI:  Objection to the form.
8        THE WITNESS:  I can't recall exactly.  I
9   know there were a lot of OIG reports and
10  everything but most of our work was driven from
11  CMS change requests.
12       BY MR. GORTNER:
13  Q.  Let's take a look at this document,
14  Roxane Exhibit 42.  Go to the first page of this
15  document, if you would, which is --
16       MR. FAUCI:  Are we on the first page of
17  the drug pricing procedure or the actual --
18       BY MR. GORTNER:
19  Q.  The first page of Roxane Exhibit 42 is
20  a letter from you, Mrs. Stone, to HCFA and the
21  office of regional administrators.  Do you see
22  that?

---

36

1   A.  Um-hum.
2   Q.  And in the first -- in the first
3   paragraph you write:  The subject of this letter
4   references the Uniform Drug Pricing Project -
5   Action - Reply due December 1, 1999.  Do you see
6   that?
7   A.  Um-hum.
8   Q.  What is this Uniform Drug Pricing
9   Project?
10  **A.  I don't recall the actual content of**
11  **the CMS request but they were trying to find out**
12  **what differences existed between different**
13  **contractors and their fee calculation practices.**
14  Q.  What -- did the title of Uniform Drug
15  Pricing Project suggest to you that they were
16  interested in uniform drug pricing?
17  A.  Yes.
18  Q.  And then on that same first page of the
19  December 1999 letter under a heading of 1,
20  there's a Question Number 1:  How do you
21  determine AWP? What references do you use and how
22  do you get them?

---

37

1        You then wrote:  Palmetto GBA follows
2   the desk procedures in Attachment I.  Do you see
3   that?
4   A.  Yes.
5   Q.  And you're referring -- Attachment I,
6   you're referring to this Medicare drug pricing
7   procedure?
8   A.  Yes.
9   Q.  And so you were telling HCFA and the
10  office of regional administrators that the drug
11  pricing procedure was -- were the procedures
12  followed by Palmetto, is that right?
13  A.  Yes.
14  Q.  And in that same response you also make
15  a reference that Palmetto is currently using
16  quarterly updates of the Redbook Windows CD.  Let
17  me stop there.  Is that a reference to the
18  Redbook CD's that were produced this summer?
19  A.  Yes.
20  Q.  And then also the Drug Topics Redbook
21  monthly publication as well?
22  A.  Yes.

---

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

11  (Pages 38 to 41)

---

**38**

1    Q.  So you were using both the CD/ROM and
2  paper copies of these Redbooks, right?
3    **A.  That's correct.**
4    Q.  Now, going back to the drug pricing
5  procedure guide on the first page which is Bates
6  labeled at the end 0880.  It looks like there's
7  an entry there that the document was created on
8  December 12, 1995 and that it was updated on June
9  28th, 1999.  Do you see that?
10   **A.  Yes.**
11   Q.  Do you recall at some point in this
12  litigation searching for all copies of the drug
13  pricing procedure that would be available in your
14  office, either electronically or hard copy?
15   **A.  What was produced was everything we**
16  **had.**
17   Q.  So is it your understanding that the
18  June 28th, 1999 update is the last version of it?
19   **A.  1999.  I don't recall for sure.  I**
20  **mean, I haven't looked at dates that correspond**
21  **with updates.**
22       MR. FAUCI:  Objection, form.

---

**39**

1       BY MR. GORTNER:
2    Q.  Okay.  Well, when you were talking
3  earlier about looking at your procedures with
4  respect to the declaration you submitted in this
5  case, is this the type of document or is this the
6  actual document that you reviewed?
7    **A.  Yes.**
8    Q.  Was this document kept internally or
9  did you put it up on a Web site?
10   **A.  I don't recall during this particular**
11  **time.  I want to think it was probably hard copy**
12  **or kept on our network.  Of course with**
13  **technology and change, now, today, they are on --**
14  **you know, they are available on a desktop.**
15   Q.  Have you looked at the -- is it still
16  called drug pricing procedure or does it have a
17  different name?
18   **A.  I don't recall the exact name.**
19   Q.  How about in the 1999 to 2004 time
20  period, do you know one way or the other whether
21  this document was publicly available?  What I
22  mean by that, was it published on your Web site

---

**40**

1  or mailed out to providers, for instance?
2    **A.  No, no, these were internal.**
3    Q.  Internal to Palmetto and any other
4  DMERC you may share it with?
5    **A.  True.  We could possibly share it with**
6  **the other DMERC's.  I don't know to what extent**
7  **we did share with the other DMERC's.**
8    Q.  And obviously you shared it with HCFA
9  and regional offices?
10   **A.  Right.**
11   Q.  I wanted to draw your attention to the
12  second page of this document Bates labeled 0881.
13  And under the heading Step 2 it says:  Use
14  generics.  There is a paragraph entry at the very
15  bottom that reads:  To determine if a drug is
16  generic or brand, look at the bold upper-case
17  name of the drug.  If there is another name for
18  the drug immediately below it in lower-case
19  letters, paren, the generic name, close paren,
20  the entries following are generally brands.  If
21  there is no lower-case drug name immediately
22  below the boldface upper-case name, the boldface

---

**41**

1  upper-case name is the generic name and all
2  entries below are generics.  In either case, if
3  an entry below the drug name refers to another
4  page, that entry would be for a brand name.
5       Let me just stop there.  Now, this --
6  in the drug pricing procedure manual used by
7  Palmetto, this describes how to distinguish
8  between generics and brands, doesn't it?
9    **A.  Yes.**
10   Q.  Did you ever implement this criteria in
11  classifying drugs as generic or brand?
12       MR. FAUCI:  Object to form.
13       THE WITNESS:  Repeat that, please.
14       BY MR. GORTNER:
15   Q.  Did Palmetto ever implement this
16  criteria in classifying drugs as generic or
17  brands?
18   **A.  Yes.**
19   Q.  And can you tell me when they used this
20  criteria?
21   **A.  This looks like it's in reference to**
22  **the hard copy manuals the way it is written.**

---

Palmetto DMERC (Robin K. Stone)                October 14, 2009
Columbia, SC

12  (Pages 42 to 45)

---

42

1    Q.  When you mean by hard copy manuals you
2  mean --
3    **A.  The Redbook, the hard copy monthlies.**
4    Q.  So when they look to the paper version,
5  they would use this criteria for classifying a
6  drug as a generic or a brand, is that right?
7    **A.  That's right.**
8    Q.  Now, that's a different criteria than
9  what you said Palmetto used with respect to
10  NovaPlus Ipratropium Bromide in your declaration;
11  isn't that right?
12    MR. FAUCI:  Objection to form.
13    BY MR. GORTNER:
14    Q.  And I'll refer you specifically to
15  Paragraph 8 of your declaration if that helps you
16  on Page 3.
17    **A.  Here it is making reference to how they**
18  **are defined on the CD in 8.  There are two**
19  **different names on the CD and if they differed,**
20  **then that name was considered branded product.**
21    Q.  My question was:  That criteria,
22  whether the name is different than -- let me ask

---

43

1  you to stop there.  What are you referring to?
2    **A.  There is a product name or a generic**
3  **name of a drug such as Ipratropium Bromide.  If**
4  **anything is added to or differentiates from**
5  **Ipratropium Bromide, it is considered branded.**
6    Q.  But that applies to the Redbook CD's,
7  if you're looking at the Redbook CD's, is that
8  what you're saying?
9    MR. FAUCI:  Objection to form.
10    THE WITNESS:  I would have to see the
11  situation in the hard copy because I haven't, you
12  know, really looked at every situation.
13    BY MR. GORTNER:
14    Q.  Okay.  Let's --
15    **A.  Specifically NovaPlus, I don't think**
16  **I've seen it in the hard copy to say how it's**
17  **listed to confirm that.**
18    Q.  Okay.  Well, let's take a look at a
19  hard copy.  Let's mark this as Roxane 253.
20    MR. GORTNER:  This is 253, counsel.
21    (Exhibit Roxane 253, Document entitled
22  Redbook 2000 Drug Topics, with attachments, was

---

44

1  marked for identification.)
2    BY MR. GORTNER:
3    Q.  And I'm going to hand you what's been
4  marked as Roxane 253.  I'll represent to you it's
5  an excerpt of the 2000 annual Redbook that has in
6  the middle and the right column the listings for
7  Ipratropium Bromide just to orient you, Mrs.
8  Stone. Let me know if you locate the entries for
9  Ipratropium Bromide in there.
10    **A.  Yes, I have them.**
11    Q.  Okay.  Now, referring to this criteria
12  that's listed in the Palmetto drug pricing
13  procedure, the document we were looking at a
14  moment ago, that in a nutshell was referring to
15  whether the product was -- whether it had a
16  capitalized name and then a smaller cap name
17  underneath it. And I'm simplifying that, that
18  statement, just to orientate you to this
19  document, okay?  So, for instance, if you look on
20  the far right column of the Roxane 253, you'll
21  see that there's an entry there for Ipratropium
22  Bromide Hydrous.  Do you see that, Medisca?

---

45

1    **A.  Um-hum.**
2    Q.  And looking at the drug pricing
3  criteria, there is a boldface upper-case name,
4  right, that reads Ipratropium Bromide Hydrous,
5  Medisca, do you see that?
6    **A.  Right.**
7    Q.  And then it says:  If there's another
8  drug immediately below it in lower-case, parens,
9  the generic name, the entry is generally a brand.
10  You see there's a lower-case Ipratropium Bromide,
11  the generic name underneath it?
12    **A.  Um-hum.**
13    Q.  Do you see that?  So would that --
14  using that drug pricing criteria, that would lead
15  you to believe that that product would be
16  generally a brand, is that right?
17    **A.  Yes.**
18    Q.  And then directly above it you see the
19  Roxane entries, there are three NDC's there?
20    **A.  Yes.**
21    Q.  And in that instance there's not a bold
22  upper-case name followed by the lower-case

---

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

13 (Pages 46 to 49)

46

1  generic entry underneath it, right?
2      **A. That's correct.**
3      Q. And that would -- under the criteria of
4  Palmetto's desk pricing procedure, that would
5  lead you to believe that those entries would be
6  generic drugs, right?
7      **A. Looking at this, yes.**
8      Q. Okay. Let's now look at another hard
9  copy of Redbook. Let's mark this Roxane Exhibit
10  254.
11         (Exhibit Roxane 254, Document entitled
12  Redbook 2001 Drug Topics, with attachments, was
13  marked for identification.)
14      BY MR. GORTNER:
15      Q. This is just the next year, the 2001
16  annual update of the Redbook. And I will turn to
17  the right page for Ipratropium Bromide which
18  begins midway on the left-hand column.
19      MR. GORTNER: Counsel, this is 254.
20      BY MR. GORTNER:
21      Q. And if you look in the middle of what
22  we've marked as Roxane 254, the 2001 angle

47

1  Redbook, in the middle column on Page 368 do you
2  see again there's that Ipratropium Bromide
3  Hydrous that has the bold upper-case all caps
4  name, smaller generic name underneath it, do you
5  see that?
6      **A. Um-hum.**
7      Q. That same entry that would lead you to
8  believe it was a brand, correct?
9      **A. That is correct.**
10      Q. And then above you can see there are
11  now six entries under the Roxane drug, do you see
12  that? There are three top entries that have
13  NDC's 00054-8402 and then there are the bottom
14  three NDC's that begin with the 0054-8404. Do
15  you see that, six total?
16      **A. Yes.**
17      Q. And all of those, as was the case with
18  the NDC's we looked at in the 2000 Redbook,
19  they're not underneath an entry that has a name
20  in all bold caps with the lower-case generic name
21  underneath, right?
22      **A. That is correct, but during this time**

48

1  we were also using CD's.
2      Q. I understand that. We'll talk about
3  that in a moment. I'm just saying based upon the
4  paper copies, all those entries would be
5  considered generic, wouldn't they?
6      **A. Yes.**
7      Q. Now, the earlier question I asked you,
8  which was whether the methodology that Palmetto
9  used differed from CD's to hard copies. This is
10  a different methodology, isn't it, than what you
11  were using for the CD's?
12      **A. If you note --**
13      MR. FAUCI: Objection to form.
14      THE WITNESS: If you note in our
15  procedure it says, let's see, lower-case entries
16  are generally brands and when we were using the
17  CD's, I think that is when we became aware of
18  branded generics but that's not reflected in the
19  procedure.
20      BY MR. GORTNER:
21      Q. Okay. My question is just that the
22  reflected procedure there in the Palmetto drug

49

1  pricing procedure is looking at whether a drug is
2  capitalized and boldfaced with a lower-case
3  generic name under it and that's the criteria you
4  were using at least for hard copies to determine
5  whether a drug was generic or brand.
6      **A. Yes.**
7      MR. FAUCI: Objection to form.
8      BY MR. GORTNER:
9      Q. Now, I understand that when you went to
10  the Redbook CD's, the Redbook CD's had a
11  different way of listing the products, which
12  we'll talk about in a moment, is that fair?
13      **A. Yes.**
14      Q. And based upon when you would be
15  looking at the Redbook CD's, you applied a
16  different criteria than what's in that drug
17  pricing procedure manual, you looked to whether
18  the product had some name in addition or
19  different than the generic name, am I stating
20  that fairly?
21      MR. FAUCI: Objection to form.
22      THE WITNESS: Yes.

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

14  (Pages 50 to 53)

50

1        BY MR. GORTNER:
2        Q.  Okay.  Well, let's have a look --
3    actually, why don't we take a quick break off the
4    record if you would like, we'll take a real quick
5    one this time today, Jeff, and then we'll come
6    back.  Thanks.
7            VIDEO TECHNICIAN:  This concludes
8    Videotape Number 1 in the videotape deposition of
9    Robin Stone, 30(b)(1) and 30(b)(6)
10   representative.  The time is approximately 12:53
11   PM.  We are now off the record.
12          (A recess transpired.)
13          VIDEO TECHNICIAN:  We are now back on
14   the record.  Today's date is October 14, 2009.
15   The time is 1:02 PM.  This is Tape Number 2 in
16   the videotape deposition of Robin Stone, 30(b)(1)
17   and 30(b)(6) representative of Palmetto DMERC.
18          BY MR. GORTNER:
19          Q.  Okay, Mrs. Stone, going back to the
20   drug pricing procedure I had marked as Roxane
21   Exhibit 42 and in particular that section at the
22   bottom there that indicates how to distinguish

51

1    between generic and brands.  There's a carryover
2    sentence at the bottom of Page 2 of the actual
3    drug pricing document, from 2 to 3, that says:
4    If there is a question as to whether a drug is a
5    brand or generic, consult the PDR, which I
6    imagine is the Physicians Desk Reference,
7    Generics, telephone the drug company or Redbook
8    itself and it gives an 800 number for Redbook.
9            Do you recall ever consulting any of
10   those potential sources to help determine whether
11   a drug was a generic or a brand?
12       **A.  I don't recall specifically looking for**
13   **generic or brand in the PDR.  I know they've used**
14   **reference to the PDR and I can't recall the**
15   **context of that particular sentence.  I know they**
16   **used -- they would consult with medical directors**
17   **and nurses occasionally first and then refer to**
18   **other sources but I don't recall if PDR or if a**
19   **telephone call was made to the drug company or**
20   **Redbook specifically on any occasion.  I mean, we**
21   **have called Redbook but I don't know in what**
22   **context or what content we would have contacted**

52

1    them.
2        Q.  But you knew that that was an available
3    option to you, that if Palmetto was unsure
4    whether a drug should be classified as a generic
5    or brand, it could turn to the Physician's Desk
6    Reference, it could turn to the drug company,
7    call up the drug company and ask it or it could
8    call Redbook as well and get clarification, isn't
9    that right?
10       **A.  Yes.**
11          MR. FAUCI:  Objection to form.
12          BY MR. GORTNER:
13       Q.  You don't have any recollection of ever
14   doing that with respect to a generic or brand
15   classification?
16       **A.  Not -- I don't recall a specific**
17   **situation where that may have occurred.**
18       Q.  And what's your understanding of why
19   the provision would include telephone the drug
20   company as an option to determine whether a drug
21   was generic or brand?
22       **A.  I don't recall why.  Like I said, I**

53

1    **don't recall why that sentence was added.**
2        Q.  Is that something that you as someone
3    in charge for a period of time of supervising
4    these arrays and these classifications, is
5    telephoning a drug company something that you
6    would consider to be helpful in determining
7    whether a drug was a generic or a brand?
8        **A.  Probably.  I mean, you know, if that**
9    **came up to question, you know, to determine it.**
10   **Like I said, though, I don't know if we ever**
11   **would have had a reason to.**
12       Q.  Do you recall ever looking at other
13   compendium, like the First DataBank blue book,
14   for instance, are you familiar with that
15   compendia?
16       **A.  A little bit.  Usually we refer to it**
17   **if we couldn't find it in Redbook.**
18       Q.  You're aware, though, that nothing
19   limited you to just the Redbook, is that right?
20          MR. FAUCI:  Objection to form.
21          THE WITNESS:  I can't recall the
22   details in the CMS IOM.  I think they just listed

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

15  (Pages 54 to 57)

54

1    sources that we could use.
2         BY MR. GORTNER:
3         Q.  Would it surprise you that they listed
4    the First DataBank blue book as a source?
5         A.  I think they did list that in there
6    and, like I said, it was our policy that if we
7    didn't find it in Redbook, then we would refer to
8    Medi-Span.
9         Q.  Let me actually repeat the question
10   because we talked over each other just for a
11   moment there.  Were you aware that the HCFA
12   program memorandum directed to you with respect
13   to drug pricing allowed you to consider sources
14   such as First DataBank blue book?
15        A.  Yes.
16        Q.  Were you also aware that you could
17   consult sources like Medi-Span?
18        A.  Yes.
19        Q.  You could look to those compendia for
20   AWP prices; isn't that right?
21        A.  Yes.
22        Q.  And you could look at those compendia

55

1    and help you determine whether a drug was generic
2    or brand, right?
3         MR. FAUCI:  Objection to form.
4         THE WITNESS:  Yes.
5         BY MR. GORTNER:
6         Q.  Do you have any recollection of ever
7    looking at other compendia to determine whether a
8    drug was a generic or a brand?
9         A.  I don't recall.
10        Q.  Did you know that First DataBank blue
11   book, for instance, has six different indicators
12   of whether a drug is a generic?
13        A.  No, I did not.
14        Q.  Did the issue of how to properly
15   classify drugs as brands or generics ever come up
16   in discussions with other DMERC representatives?
17        A.  I can't recall getting into
18   conversations specifically as to, you know,
19   defining them.  I know internally it had come up
20   trying to distinguish, you know, between I think
21   when we began using the generics when we were
22   looking at products versus the drug name and saw

56

1    differences and I think somewhere we, you know,
2    got into discussion as to generic versus branded
3    generic and the decision was made that if it's
4    branded at all, it is considered a brand.
5         Q.  Okay.  Can you explain to me more what
6    that means, just --
7         A.  That is where if the product name
8    versus the -- I don't know exactly what it's
9    called, it's the drug name on the CD, if it
10   differs, then it's considered a branded generic.
11   And in that case, for example, this Ipratropium
12   Hydrous may have showed the hydrous.  And then
13   the Ipratropium, even though the generic name
14   matched, the hydrous added on to it, it made it
15   branded and that's how we -- you know, if it
16   differentiated it in any way, we considered it a
17   brand because of the term branded generic.
18        Q.  And how was that decision made?  Can
19   you explain to me the decision-making process of
20   who made it?
21        A.  I don't recall the exact decisions
22   behind it, I just recall at one point in time,

57

1    you know, we always saw things as either branded
2    or generic and then branded generic got thrown
3    in.  And the decision was if it had a brand -- if
4    it was a brand of generic, thereby the names
5    differentiating it, we classified it as brand.
6         Q.  When you say we, you mean Palmetto
7    internally?
8         A.  Palmetto, yes.
9         Q.  So what happened was that internally
10   the individuals responsible for making policy
11   decisions at Palmetto made a determination that
12   if a product name had the generic name in its
13   title and something additional, you would
14   classify that as a brand for purposes of the
15   arrays?
16        A.  Yes.
17        MR. FAUCI:  Objection to form.
18        BY MR. GORTNER:
19        Q.  And that criteria was developed
20   internally by Palmetto?
21        MR. FAUCI:  Objection to form.
22        THE WITNESS:  As far as I can recall it

Henderson Legal Services, Inc.

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

16  (Pages 58 to 61)

58

1   was an internal policy.  I don't know if it was,
2   you know, made with collaboration with other
3   contractors or carriers or not.
4           BY MR. GORTNER:
5       Q.  Do you know who would have been
6   involved in that decision-making process?
7       **A.  Probably either nurses by, you know, my**
8   **direct report and, you know, sometimes, I don't**
9   **know if this particular instance would have been**
10  **something that we would have consulted CMS on or**
11  **not, I don't know.**
12      Q.  Who's your direct report?
13      **A.  Carol Courtney at that time.**
14      Q.  What was her job duty?
15      **A.  She was my manager at one point and**
16  **director at another.**
17      Q.  But you weren't involved in that
18  decision-making process?
19      **A.  We would have sat down and discussed**
20  **it, yes.**
21      Q.  Do you have a specific recollection of
22  being involved in that decision?

59

1       **A.  I remember, you know, partially Pat**
2   **tossing it around when we found out that there**
3   **were branded generics.  I don't recall when or,**
4   **you know, all the details but whenever decisions**
5   **were made we would usually consult medical -- our**
6   **medical staff and others, you know, to just see**
7   **if they're on the right track.**
8       Q.  Who was tossing it around that you
9   mentioned?
10      **A.  Well, it would have been within our**
11  **department and we would have probably consulted**
12  **with medical staff and possibly CMS.  I don't**
13  **recall if that topic was, you know, directly**
14  **mentioned to CMS or not.**
15      Q.  And did this decision that you're
16  talking about in terms of categorizing a drug
17  that would have a generic name in its title as
18  well as something in addition as a brand, was
19  that policy memorialized in a document anywhere?
20          MR. FAUCI:  Objection to form.
21          THE WITNESS:  I'm not sure.  I'm not
22  sure.

60

1           BY MR. GORTNER:
2       Q.  Is it possible that it would have been
3   a decision that was made within Palmetto and
4   implemented verbally and not written down in some
5   manual or some drug procedure guide?
6       **A.  That is possible due to the constant**
7   **change that we're up against.**
8       Q.  Now, in practice from the time period
9   of approximately 2000, 2004, that's the time
10  frame I want to focus on because that's the time
11  period when the NovaPlus Ipratropium Bromide was
12  in the arrays approximately.  Palmetto looked
13  only to the Redbook publishing compendia to
14  obtain AWP's, is that right?
15      **A.  2000 and 2004.  I want to say yes but**
16  **I'm not 100 percent positive.  I don't recall**
17  **using Medi-Span or First DataBank or whatever for**
18  **DMERC drugs at that point.  I don't know that the**
19  **other carriers did either.**
20      Q.  And I'll represent to you of the arrays
21  that we have from that time period, 2000 and
22  2004, the indications on the arrays uniformly

61

1   indicate that the pricing sources are, in fact,
2   from Redbook.
3       **A.  I would say that that's probably true.**
4   **Again, like I mentioned previously, if there**
5   **wasn't a source available, we may have referred**
6   **to Medi-Span or First DataBank if we had that**
7   **source, I can't remember, but it seems like we**
8   **had stopped that expense at some point because it**
9   **was rarely used.**
10      Q.  Now, with respect to using Redbook, was
11  there an internal decision at some point in time
12  to rely on the Redbook compendia for prices and
13  not other compendia during this 2000, 2004 time
14  period?
15      **A.  Say that again, please.**
16      Q.  Was there a decision that was made at
17  Palmetto at some point to use either principally
18  or exclusively the Redbook compendia rather than
19  other compendia for creating the arrays?
20          MR. FAUCI:  Object to the form.
21          THE WITNESS:  You know, I don't know
22  what -- what or why we just used Redbook.  At

62

1    that time, like I said, on DMERC we collaborated
2    with for DMERC so I don't know if that had any
3    play in it or not.
4         BY MR. GORTNER:
5         Q.  But would your expectation be that
6    either Palmetto itself or the other DMERC's in
7    conjunction decided to use Redbook for their
8    arrays rather than some other compendia?
9         **A.  Probably.  I mean, we used Redbook, I'm**
10   **sure it was for a reason.**
11        Q.  Do you know the reason?
12        **A.  Probably because we had to pick, you**
13   **know, the one that we were most familiar with**
14   **because you can't sit there and go through and**
15   **use all sources, you know, every time because we**
16   **were on a time frame.  It was a lot of work.**
17        Q.  A lot of time pressures to create the
18   arrays?
19        **A.  Yeah.**
20        Q.  You also indicated that Palmetto
21   transitioned at various times to different types
22   of Redbooks, that sometimes you were using the

63

1    annual Redbook and then you started using a
2    CD/ROM and then at one point I think you went to
3    an Internet-based Redbook.  Do you generally
4    recall that?
5         **A.  Yes.**
6         Q.  And how were those decisions made?  How
7    were decisions made to use different types of
8    Redbook, in some cases electronic, in some cases
9    paper copies?
10        **A.  Well, initially I don't think we were**
11   **aware even if it was available in CD/ROM so of**
12   **course it started out hard copy.  Then with**
13   **technology, as anything changes, we moved towards**
14   **the newer technology and used the CD/ROM's.  In**
15   **that case I think the only time we used the hard**
16   **copy is if it had the drug that had a more**
17   **current AWP.**
18        Q.  So there was a convenience factor in
19   switching to the electronic version versus the
20   paper copy?
21        **A.  I'm sure that came into play.**
22        Q.  Now, would someone outside of the

64

1    Palmetto DMERC, and I'll say or outside of HCFA
2    CMS or the other DMERC's, know which particular
3    format of Redbook you were using to create
4    pricing arrays?
5         MR. FAUCI:  Objection to form.
6         THE WITNESS:  Outside?
7         BY MR. GORTNER:
8         Q.  Yeah.
9         **A.  Of CMS or Palmetto GBA?  I'm not sure.**
10   **For some reason I want to think that there may**
11   **have been some type of publication that may have**
12   **addressed that but I'm not positive.**
13        Q.  You're not aware sitting here today of
14   any publication that said we're using the Redbook
15   CD/ROM rather than the annual update, for
16   instance?
17        **A.  Probably not, but I'm not positive.**
18        Q.  How would you find that out?
19        **A.  You'd have to do some extensive search**
20   **through old advisories but I would think that if**
21   **it was published, it would have been published in**
22   **any of our drug fee schedule publications.**

65

1         Q.  And what was the intended audience, if
2    you know, of those publications?  Was that so the
3    providers could see what they were going to get
4    paid for a particular drug?
5         MR. FAUCI:  Objection to form.
6         THE WITNESS:  Yes.
7         BY MR. GORTNER:
8         Q.  And were those advisories ever mailed
9    to providers directly or how were they made
10   available?
11        **A.  I'm not real sure, I wasn't in that**
12   **department.  You know, I want to think that at**
13   **one time they mailed them.  As with technology**
14   **they probably pushed them through e-mail or**
15   **whatever they use but I don't work in that**
16   **department.**
17        Q.  And you're not aware, are you, of any
18   statute or any regulation that would require
19   Palmetto to use the Redbook CD/ROM versus some
20   other version of Redbook?
21        MR. FAUCI:  Objection to form.
22        THE WITNESS:  Not specifically saying

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

18   (Pages 66 to 69)

66

1    that you have to use this over this.  I think
2    they gave an option.
3          BY MR. GORTNER:
4    Q.   What kind of option?
5    A.   Well, I'm just trying to think back in
6    the old carrier's manual.  I know it makes
7    reference to them and I think it just says like
8    Redbook Medi-Span.
9    Q.   So as far as you knew, you had
10   discretion to use any version of Redbook that you
11   thought was appropriate, right?
12   A.   As far as I know, yes.
13   Q.   And as far as you knew, Palmetto had
14   discretion to use any publishing compendia like
15   Medi-Span or First DataBank if they thought it
16   was appropriate, right?
17   A.   Yes.
18   Q.   Okay, turning to your declaration,
19   which is the exhibit there to your left that we
20   marked earlier as Roxane 252.  And in particular
21   I want to focus again on Paragraph 8 of your
22   declaration.

67

1          MR. FAUCI:  I'll just note for the
2    record that the declaration had exhibits that are
3    not made part of the record.
4          BY MR. GORTNER:
5    Q.   And you attest to in Paragraph 8 that
6    Palmetto classified products as brands or
7    generics based on the product name, correct?
8    A.   Name, yes.
9    Q.   And you also state that if the product
10   name differed from the chemical name, we
11   considered it a brand, right?
12   A.   Right.
13   Q.   And is this that criteria that you're
14   talking about that was developed -- that was
15   developed internally that if the product had
16   something in addition to the chemical name, it
17   would be treated as a brand?
18   A.   Yes.
19         MR. FAUCI:  Objection to form.
20         BY MR. GORTNER:
21   Q.   And that applied to when you were
22   looking at the CD/ROM's, right?

68

1          MR. FAUCI:  Objection to form.
2          THE WITNESS:  Yes.
3          BY MR. GORTNER:
4    Q.   Let's take a look at some of the
5    Redbook CD/ROM printouts.  And what I'd like to
6    do is mark this as Roxane Exhibit 255.
7          (Exhibit Roxane 255, Document entitled
8    DMERC Medication Pricing, with attachments, was
9    marked for identification.)
10         BY MR. GORTNER:
11   Q.   It's in two different sheets but we'll
12   just start with the top one.  And I'll represent
13   to you that these are some additional documents
14   that were produced by Miss Helton from the Cigna
15   carrier.  And we haven't had a chance to talk to
16   her yet about these documents but they appear to
17   be a collection if you flip through, even the
18   first one that's marked there, of the array and
19   then several pages back you'll see that she's
20   including printouts from the Redbook CD/ROM's.
21   One is a product information screening that lists
22   products and then one is a screening that's

69

1    called detailed product information that also
2    lists the products.
3          And maybe I'll point you in particular
4    if you don't mind flipping to what's Bates
5    labeled at the bottom Cigna 0109.  It's a little
6    bit further on in there but we'll be talking
7    about 109 through 119.  If you wouldn't mind just
8    flipping through 109 to 119 quickly just to
9    familiarize yourself with those pages and I'll
10   ask you some questions.
11         MR. FAUCI:  Feel free to familiarize
12   yourself with the documents generally.
13         THE WITNESS:  Okay.
14         BY MR. GORTNER:
15   Q.   And just so if it helps you, Mrs.
16   Stone, to clarify, what I'm really using this
17   document for is to illustrate the Redbook
18   printouts that are behind the arrays.  I won't be
19   asking you any detailed questions about Cigna's
20   arrays or anything of that sort, I just -- she
21   happened to collect the printouts in a way that
22   might be easier for us to talk about them than

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

19 (Pages 70 to 73)

---

70

1   the ones that were on the CD's that you produced
2   to us, so in particular page Bates labeled 1 --
3   110, 110 and 111, those sequence of pages are
4   really the ones that I'll be asking you about.
5       A.  Okay.
6       Q.  And if you could turn to page Cigna
7   0110, the page that says Redbook for TM Windows
8   at the top, product information.
9       A.  What number was it again?
10      Q.  I'm sorry, Cigna 0110.  Are you there?
11      A.  Um-hum.
12      Q.  And up on the right it has a release
13  October 2000 and a list of product information
14  and this appears to be product information
15  related to the various Ipratropium Bromides on
16  that Redbook CD?
17      A.  Um-hum.
18      Q.  Do you see that?  And are you familiar
19  with that screen from the Redbook CD/ROM?
20      A.  Yes.
21      Q.  Okay.  And then in the next page over
22  Bates labeled Cigna 01111 (sic) it has printouts

---

71

1   of what's called the detailed product information
2   for each one of these NDC's, do you see that?
3       A.  Um-hum.
4       Q.  And you're familiar with that screen as
5   well, right?
6       A.  Yes.
7       Q.  And these types of screens were
8   routinely on all the Redbook CD's that you used
9   to creat the Palmetto arrays?
10      A.  Um-hum.
11      Q.  You have to answer verbally.  Is that a
12  yes?
13      A.  Oh, yes.
14      Q.  Okay.  And so what's on these Redbook
15  CD's that you used is first, that's a list of all
16  the product names, if you will, under the column
17  product there on Page 110?
18      A.  Right.
19      Q.  Do you see that?  And then it gives a
20  list of who the manufacturer is, the specific
21  NDC, and then AWP's and WAC's if they're
22  available are on the last two columns, is that

---

72

1   correct?
2       A.  Yes.
3       Q.  Okay.  And then turning over to the
4   detailed product information, you can -- on the
5   screen you can click on a tab, right, that will
6   show you, for instance, for Atrovent, which is on
7   0111 at the top, it gives information about that
8   product, the product name, and it also includes
9   the generic name, doesn't it, under Ipratropium
10  Bromide?
11      A.  Yes.
12      Q.  Let's take a look first at the name
13  Atrovent.  Are you familiar with that, with that
14  product from the pricing arrays that Palmetto
15  created?
16      A.  Yes.
17      Q.  And you classified it as a brand all
18  the time, didn't you?
19      A.  Yes.
20      Q.  And that product name is -- Atrovent is
21  not the generic name of Ipratropium Bromide,
22  right?

---

73

1       A.  I'm sorry, say that again.
2       Q.  The product name Atrovent --
3       A.  Right.  Right.  I'm sorry.
4       Q.  Let me repeat the question.
5       A.  Concentration.  I'm okay.  Yes.
6       Q.  That's not -- Atrovent is not the same
7   thing as Ipratropium Bromide, the generic name,
8   right?
9       A.  That's right.
10      Q.  And in your experience in creating
11  pricing arrays -- well, let me ask you this
12  question:  Are you generally familiar in the
13  process of creating these arrays over time and
14  supervising the arrays was typical naming
15  conventions in the pharmaceutical industry for
16  generic versus brand drugs?
17      MR. FAUCI:  Objection to form.
18      THE WITNESS:  Yes.
19      BY MR. GORTNER:
20      Q.  And the notion that Atrovent, which is
21  a name that's not the underlying generic chemical
22  compound, isn't that a typical name that you see

---

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

20  (Pages 74 to 77)

74

1  in brand drugs?  What I mean by that is using a
2  name like Atrovent or a name like Tylenol or a
3  name like Valium which are names that don't refer
4  to the underlying generic chemical compound.
5      **A.  That would be true, yes.**
6      Q.  But that's pretty standard, isn't it --
7      **A.  Um-hum.**
8      Q.  -- based upon your experience?
9      **A.  Yes.**
10     Q.  Now, looking at the detailed product
11  information for Atrovent, you can see that it has
12  the product name up top, it has the generic name
13  underneath there, right, Ipratropium Bromide?
14     **A.  Right.**
15     Q.  Then it also has a field at the bottom
16  there that says generic, then it has in parens
17  Y/N.  Do you understand that to be is it a
18  generic, yes or no, according to Redbook?
19     **A.  Yes.**
20     Q.  You see there it has an N for no,
21  right?
22     **A.  Yes.**

75

1      Q.  Right.  And you could look at that and
2  see that Redbook was telling you this is not a
3  generic product, this is a brand product, right?
4      **A.  Right.**
5      Q.  Okay.  Now, looking at the next entry
6  below that, there's a product from Allscripts and
7  it's called Ipratropium Bromide, right?
8      **A.  Um-hum.**
9      Q.  And there the generic indicator says
10  yes, this is a generic product, correct?
11     **A.  Right.**
12     Q.  And if you flip through to the next
13  page, you'll see there's an entry there for
14  Alpharma which is also called Ipratropium
15  Bromide, right?
16     **A.  Um-hum.**
17     Q.  And there again Redbook is indicating
18  to you that the product is a generic product,
19  right?
20     **A.  That is correct.**
21     Q.  And then on Page 01113 (sic), there's
22  an entry for Dey's Ipratropium Bromide and again

76

1  that also has a generic yes indicator from
2  Redbook, correct?
3      **A.  Yes.**
4      Q.  And there are a couple other products
5  we can flip to the bottom of Page 0115 which is
6  also labeled Page 5 on the Redbook printout and
7  there's Roxane's label, Ipratropium Bromide, and
8  that was also called Ipratropium Bromide, right?
9      **A.  Right.**
10     Q.  And you classified that as a generic in
11  your arrays at all times, didn't you?
12     **A.  Yes.**
13     Q.  And you can see again that in the
14  generic field indicator from Redbook, that's
15  telling you that that's a generic product,
16  correct?
17     **A.  Correct.**
18     Q.  And that's the same for all the other
19  Roxane labeled products there listed on Page 6 of
20  the Redbook printout.  And if you skip ahead now
21  to Page 8 of the Redbook printout and Page 9,
22  which is Bates labeled Cigna 0118 and 19, there

77

1  you'll see the entries for the product names
2  Ipratropium Bromide and then it has a dash
3  NovaPlus, do you see that?
4      **A.  Um-hum.**
5      Q.  And it has Roxane as the manufacturer,
6  correct?
7      **A.  Right.**
8      Q.  And it also has the generic name listed
9  there, Ipratropium Bromide, correct?
10     **A.  Correct.**
11     Q.  And then it also has another generic
12  indicator.  It indicates that, yes, this is a
13  generic drug, right?
14     **A.  Right.**
15     Q.  And it's the same for the other
16  NovaPlus entries below, there's a different
17  package site below that and one on Page 9 and all
18  three of those Ipratropium Bromide NovaPlus
19  entries, Redbook is telling you that it
20  classifies its product as a generic, right?
21     **A.  Right.**
22     Q.  And this information was available to

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

21  (Pages 78 to 81)

---

**78**

1  you when you were constructing your arrays,
2  correct?
3      A.  Yes.
4      Q.  These were on all the CD's and you
5  could see that and take that into account,
6  correct?
7      A.  Um-hum.
8      Q.  Did you, in fact, take into account
9  Redbook's designation of the Ipratropium Bromide
10 NovaPlus products as a generic?
11     A.  If I recall, this is what prompted
12 conversation that made us aware that there were
13 branded generics, which is not reflected on here,
14 and at that time it was the decision that if
15 there was any branding, it was considered a brand
16 product.
17     Q.  Okay.  Let me make sure I understand
18 this.  Was it -- you have a specific recollection
19 that it was this particular product?
20     A.  No.
21     Q.  Oh, okay.  So let me take a step back
22 because I thought you told me earlier that you

---

**79**

1  don't know when the decision was made on branded
2  generics.
3      A.  I don't know the exact timing.
4      Q.  So you don't know whether it had
5  anything to do with the Ipratropium Bromide
6  NovaPlus?
7      A.  Right.  Right.
8      Q.  Do you have a specific recollection,
9  though, that the decision was made before October
10 2000?
11     A.  That I don't know.  I don't recall the
12 timing when that was made.  I would speculate
13 that when we started using the CD that we may
14 have went into, you know, questions may have come
15 up questioning whether or not because of our
16 policy that product name versus the generic name
17 differed, you know, whether or not it was
18 considered brand.
19         What I don't recall is where we got the
20 branded generic from.  I don't know who brought
21 that to our attention of branded generic and I
22 don't recall when we started realizing that there

---

**80**

1  are -- there is something considered generic,
2  brand and branded generic.
3      Q.  Okay.  And what was Palmetto's
4  definition of a branded generic?
5      A.  That again is the product name
6  differing from the generic name and I think there
7  was probably still even a little confusion with
8  that in some cases because you may have something
9  that has hydrochloride attached to it, you know,
10 and those types of things we would take to
11 medical staff and --
12     Q.  Okay.  So it was unclear how to
13 categorize those particular drugs that had the
14 generic name in the title and something else, is
15 that fair to say?
16     A.  Yes.
17         MR. FAUCI:  Objection to form.
18         BY MR. GORTNER:
19     Q.  Was the answer yes?
20     A.  Yes.  At one time, yes.
21     Q.  At one time it was unclear and you
22 weren't sure whether you should put that in as a

---

**81**

1  generic or as a brand, is that right?
2      A.  Yes.
3      Q.  Because it's a different -- you'd agree
4  with me it's a different name than when you have
5  exclusively a name that has nothing to do with
6  the generic chemical name like an Atrovent or a
7  Valium? In those situations in your mind is there
8  any ambiguity whether those should be classified
9  as a brand?
10     A.  No.
11     Q.  But internally at Palmetto there was
12 ambiguity about what to do with drugs like this
13 where there is a generic chemical name in the
14 title and something else is in it as well?
15     A.  Right.
16         MR. FAUCI:  Objection to the form.
17         THE WITNESS:  Until we learned about
18 branded generics.
19         BY MR. GORTNER:
20     Q.  And what you meant by branded generics
21 were -- was a drug that has that particular kind
22 of title and that's your understanding of a

---

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

22  (Pages 82 to 85)

---

82

1    branded generic?
2         MR. FAUCI:  Object to the form.
3         THE WITNESS:  I want to think that
4    there is some type of classification of a branded
5    generic.
6         BY MR. GORTNER:
7      Q.  Why, have you ever heard of a situation
8    where there are drugs that have multiple
9    competing products in the marketplace but they
10   give themselves a brand name like -- ever heard
11   of a drug called Oxycodone, for instance?
12     **A.  I'm not sure dealing with all the drugs**
13   **we work with every day, I'm not sure.  Oxy what?**
14     Q.  Okay.  I just want to make sure that
15   you weren't trying to make -- it doesn't sound
16   like Palmetto was trying to make a determination
17   of what was the pharmaceutical industry's
18   understanding of what a branded generic is,
19   right, that wasn't your goal --
20        MR. FAUCI:  Objection to form.
21        BY MR. GORTNER:
22     Q.  -- was to figure out what the

---

83

1    pharmaceutical industry understands a branded
2    generic to be, right?
3      **A.  We were just basing it off if it was**
4    **considered branded, it was a brand product.**
5      Q.  I understand that.  I just want to --
6    it may be more helpful if we refer to the actual
7    rule that you implement.  And the rule that you
8    are telling me that you implemented at some point
9    in time was if the product had the generic
10   chemical name in its title and any additional
11   name, it would be -- it should have been
12   categorized as a brand according to Palmetto's
13   procedures, is that right?
14     **A.  It would depend on the differentiation**
15   **in the drug name.  There may have been some --**
16   **some situation where it might have added**
17   **something that might have been considered a**
18   **diluent on the end which would differ from a**
19   **company placing what we called a branded name on**
20   **the end.  And if it was questionable, the staff**
21   **would discuss it with our medical staff or**
22   **whatever that might be -- there may have been**

---

84

1    **cases they used the PDR, may have been cases**
2    **where they contacted Redbook but I don't know**
3    **every, you know, situation that that might have**
4    **occurred in.**
5      Q.  You don't know that.  But there was a
6    process where if there were questions by the
7    front-line staff, if you will, the staff that was
8    actually creating the arrays and making the
9    initial determinations, if they had questions
10   there was a chain of command they could go up
11   within Palmetto or they could turn to outside
12   resources?
13     **A.  True.**
14     Q.  Now, with respect to Ipratropium
15   Bromide NovaPlus, do you have any specific
16   recollection about the decision-making process
17   that Palmetto went through to categorize that
18   product as a brand or a generic?
19     **A.  Other than the fact that the NovaPlus**
20   **-- I don't know if they specifically, you know,**
21   **called or found out that it had a branded generic**
22   **or not, you know, or if it was just taken off**

---

85

1    **that the product name and the additional**
2    **description differed but I would speculate that**
3    **it was based on the product name in comparison to**
4    **the generic name in this situation because**
5    **NovaPlus, I mean, as far as I know, doesn't**
6    **indicate, you know, anything that we would have**
7    **been familiar as a diluent lender such.**
8      Q.  Okay.  So -- but when you're testifying
9    now about what actually specifically occurred
10   with putting the Ipratropium Bromide NovaPlus
11   into the brand arrays, you don't have a specific
12   recollection of what either you did, if anything,
13   related to that decision or --
14     **A.  If it was just following the procedure.**
15     Q.  Right.
16     **A.  But I would speculate it was following**
17   **the procedure.**
18        MR. FAUCI:  Objection to form.
19        BY MR. GORTNER:
20     Q.  But just to use your word, you're
21   speculating on how that actually occurred, right?
22        MR. FAUCI:  Objection to form.

---

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

23 (Pages 86 to 89)

86

1      THE WITNESS:  Following, you know, the
2   -- our comparison of the product to generic name,
3   it would have been branded.
4      BY MR. GORTNER:
5      Q.  And you said a moment ago about the
6   diluent -- are you referring to situations with a
7   product name as Ipratropium Bromide
8   hydrochloride, just to throw that name out there,
9   how would that be categorized under your
10  procedure?
11     A.  It's been a long time since we've
12  actually been calculating drugs and I can't
13  recall exactly but I think that is a situation
14  that was questionable.
15     Q.  And what happens when it's
16  questionable?
17     A.  That's when they ask -- they go to
18  medical staff to try and find determination.
19     Q.  But was there a rule internally at
20  Palmetto that if it had a diluent name on it, it
21  would classify it as a generic versus a brand?
22     A.  I can't remember.  I don't recall the

87

1   final decision on that but I do know that that
2   was a situation that was questioned but I haven't
3   been calculating drugs for some time now and
4   don't look at those in comparison in how they
5   might have been used.  There's a lot of drugs out
6   there, a lot of drug sources.
7      Q.  At the time or any time where these
8   arrays are being constructed with the Ipratropium
9   Bromide NovaPlus in them, did you know about
10  NovaPlus drugs?  Was that a name you're familiar
11  with?
12     A.  Not off the top of my head.  I mean, we
13  didn't really pay attention to a certain company
14  or drug name.  Our goal was to get in there and
15  get the work done and get the fees out.
16     Q.  So I take it you didn't know that these
17  were drugs that were being sold to Novation Group
18  Purchasing Organization, GPO members?
19     A.  No.
20     Q.  You didn't know that?
21     A.  No.
22     Q.  Did you have any idea whether these

88

1   drugs were even being submitted for reimbursement
2   to Medicare?
3      A.  Nope.
4      Q.  Did you have any understanding whether
5   the provider community understood this drug
6   generally to be a generic or a brand?
7      MR. FAUCI:  Objection to form.
8      THE WITNESS:  No, not unless they
9   brought it to our attention and I don't recall,
10  you know, any communication to that off the top
11  of my head.
12     BY MR. GORTNER:
13     Q.  Did you have any understanding whether
14  Roxane understood this product to be a generic or
15  a brand?
16     A.  No.
17     Q.  And going back to that initial
18  question.  So at the time that you had these
19  Redbook CD printouts that were telling you that
20  this was a generic drug, what did you do with
21  that information here in the generic code that
22  was saying yes to you?

89

1      A.  Say that again, I'm sorry.
2      Q.  At the time that you had these Redbook
3   CD's and the generic field indicator in the
4   Redbook compendia is telling you that it
5   considers the Ipratropium Bromide NovaPlus drugs
6   to be a generic, what did you do, if anything,
7   with that information?
8      A.  That's what prompted I think the
9   communication or the discussion regarding, you
10  know, questioning was it generic or brand because
11  it didn't match -- product and generic name did
12  not match.  And as I stated before, that's when
13  we found out about branded generic and we
14  classified it as branded.
15     Q.  Okay.  Who -- I'm just trying to
16  understand how you became informed about branded
17  generic.  What does that mean?
18     A.  It's a term that was -- I don't know
19  where it came from, who brought it to our
20  attention, but that's, you know, pretty much I
21  think where we started looking at the difference
22  between the product name, any difference between

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

24  (Pages 90 to 93)

---

**90**

1  **the product name and the generic name.**
2  Q.  Okay.  So some internal group at
3  Palmetto --
4  **A.  I'm not sure if it was internally or**
5  **not.**
6  Q.  You don't know who it was?
7  **A.  I don't know who all the players were.**
8  Q.  You don't know who the players were but
9  there was some internal decision-making process
10 about what to do in these circumstances where
11 there's a generic chemical name and something
12 else in the title, right?
13 **A.  Right.**
14 Q.  Have I got that right?
15 **A.  Yes.**
16 Q.  And one of the reasons that that
17 process occurred is because it's -- there is
18 ambiguity with respect to that particular name,
19 there is a generic chemical name and something
20 added to it and based on your rule, that fell
21 somewhere in the middle before you had this
22 internal decision process, is that right?

---

**91**

1  MR. FAUCI:  Objection to form.
2  THE WITNESS:  Say that again, I'm
3  sorry.  I'm visualizing --
4  BY MR. GORTNER:
5  Q.  No, let me try this -- let me try to
6  break this into steps, it might be a little bit
7  easier.
8  **A.  Okay.**
9  Q.  I'm just trying to understand what I
10 think you're trying to explain about how Palmetto
11 tried to make decisions and rules about how to
12 classify a drug like Ipratropium Bromide
13 NovaPlus, okay?
14 **A.  Okay.**
15 Q.  So let me know if I got this correct.  I
16 believe you were testifying that in situations
17 like this where you have a drug that has both a
18 generic name and something else added to its
19 title, that created ambiguity at Palmetto as to
20 whether to classify it as a brand or a generic?
21 **A.  Yes.**
22 Q.  Okay.  And furthermore, when you have a

---

**92**

1  situation here where the compendia that you're
2  relying upon, the Redbook compendia CD
3  specifically classifies a drug with that
4  particular title as a generic drug, that also
5  created a source of potential ambiguity for how
6  you would classify the drug, is that right?
7  **A.  Yes.**
8  Q.  Now, why would that create ambiguity
9  for you where the compendia is specifically
10 telling you that this is a generic drug?
11 **A.  Because of the rule that we were**
12 **following where the product differed from the**
13 **generic name.**
14 Q.  Okay.  And in situations here where the
15 product had the generic name and something else,
16 it clearly didn't fit under that rule, is that
17 right?
18 **A.  Right.**
19 MR. FAUCI:  Objection to the form.
20 BY MR. GORTNER:
21 Q.  And what that requires you to do was to
22 figure out -- for Palmetto to figure out what it

---

**93**

1  was going to do under these particular
2  circumstances where the product did not clearly
3  fit the rule, is that right?
4  **A.  Yeah.**
5  Q.  Okay.  And what then happened
6  thereafter was Palmetto either internally or you
7  don't recall, maybe in consultation with other
8  people, came up with an additional rule which was
9  when we run across generic products that have the
10 generic chemical name in them and something else,
11 we will classify them as a brand, is that right?
12 MR. FAUCI:  Objection to form.
13 THE WITNESS:  It would have -- I think
14 they did research, you know, I can't -- I can't
15 say, I wasn't doing it myself, they would call me
16 as they needed.  But if it didn't match and if it
17 was questionable, then they would do research to
18 try and make that determination.
19 BY MR. GORTNER:
20 Q.  Okay.  And this is an example of that
21 where it didn't match those questionable, right?
22 MR. FAUCI:  Objection to form.

---

Palmetto DMERC (Robin K. Stone)                October 14, 2009
Columbia, SC

25  (Pages 94 to 97)

94

1        THE WITNESS:  I can't say for certain
2   if that one would have been questionable because
3   it didn't match or that NovaPlus was considered
4   automatically branded because NovaPlus doesn't
5   make any reference to, say, another type of drug
6   or diluent, per se, but I would say that, you
7   know, it could have been questionable.  I don't
8   know or recall at this time if that particular
9   drug was.
10       BY MR. GORTNER:
11       Q.  Now, did you ever consider examining
12  the published AWP's between drugs that you
13  weren't sure were generic and a brand with drugs
14  that you knew for sure were a brand or drugs that
15  you knew for sure were generic?
16       **A.  There were different types of analysis**
17  **done but I don't recall to what extent.**
18       Q.  Let's take a look back at the product
19  information sheet, the one that overall lists
20  them. It's on Cigna 0110, two pages back.  I
21  mean, just looking at the sheet, you can see that
22  there are six Ipratropium Bromide products that

95

1   have Roxane as a manufacturer, right?
2        **A.  Um-hum.**
3        Q.  And three of them have only the
4   Ipratropium Bromide generic name, no confusion
5   there, right, that that's a generic product,
6   correct?
7        **A.  Right.**
8        Q.  And three of them also have the
9   Ipratropium Bromide generic name but then have a
10  dash with NovaPlus added on the end, do you see
11  that?
12       **A.  Yes.**
13       Q.  And you can see that the package sizes
14  respectively, they have identical AWP's, right?
15  And if you look at the Roxane Ipratropium Bromide
16  25's, they have an AWP of $44.06 and the
17  Ipratropium Bromide NovaPlus 25's have the exact
18  same $44.06 AWP.  Do you see that?
19       **A.  Um-hum.**
20       Q.  The same situation with the 30's, the
21  Roxane generic product has $52.87 and the
22  Ipratropium Bromide NovaPlus 30's have the exact

96

1   same $52.82 (sic) AWP?
2        **A.  Um-hum.**
3        MR. FAUCI:  Try and answer with yes or
4   no.
5        THE WITNESS:  Yes.
6        MR. FAUCI:  Thank you.
7        BY MR. GORTNER:
8        Q.  Okay.  Was that something that you ever
9   considered, the fact that the AWP's were
10  identical between these two products and --
11       **A.  It was not our procedure to go in and**
12  **compare AWP's per se unless there was a reason,**
13  **you know, for us to go in and look at a specific**
14  **situation.  This may have never been a situation**
15  **that, you know, anybody caught on to.**
16       Q.  During your work supervising the array
17  and construction process and working at Palmetto
18  over the years, were you generally familiar with
19  the concept that brand AWP's for a product tended
20  to be higher than generic AWP's for product?
21       **A.  That --**
22       MR. FAUCI:  Objection to form.

97

1        THE WITNESS:  That was not always true.
2        BY MR. GORTNER:
3        Q.  Was that something you investigated and
4   studied?
5        **A.  We had seen situations where brand was**
6   **lower than generics.**
7        Q.  But in this situation, I mean, there's
8   no doubt here that Atrovent is a brand, right?
9        **A.  Right.**
10       Q.  You classified it as a brand every
11  time, correct?
12       **A.  Correct.**
13       Q.  And there's no doubt looking at this
14  sheet you agree with me on Cigna 110 that every
15  single product on this sheet has the name
16  Ipratropium Bromide in it except for Atrovent;
17  isn't that right?
18       **A.  That's right.**
19       Q.  Wouldn't that jump out at you that
20  there's something specifically different about
21  Atrovent compared to all the other products?
22       MR. FAUCI:  Objection to the form.

98

1          THE WITNESS:  No, because I know there
2    were brand situations that were lower than
3    generics.
4          BY MR. GORTNER:
5      Q.  But in this situation you agree with me
6    that the AWP for Atrovent for its 25's is $63.72?
7    Do you see that at the top?
8      A.  Um-hum.
9      Q.  It was significantly higher than the
10   NovaPlus AWP's, right?
11     A.  Right.
12     Q.  And significantly higher than the
13   Roxane AWP's's?
14     A.  Right.
15     Q.  In terms of your analysis of
16   Ipratropium Bromide NovaPlus and whether it
17   should be categorized as a generic or a brand,
18   would the fact that not only Redbook but that the
19   First DataBank on all six of its generic
20   indicators identify the Ipratropium Bromide
21   NovaPlus products as a generic, would that
22   information have been useful to you in making

99

1    your determination?
2      A.  I'm sorry, say that again.
3          MR. GORTNER:  Can you read that back to
4    her?  Or I can repeat it.
5          (The Court Reporter read the question
6    commencing on Page 82 Line 21.)
7          BY MR. GORTNER:
8      Q.  Let me repeat it, it will be easier.
9    Let me repeat my question.  Would the fact that
10   First DataBank on all six of its generic
11   indicators identify the Ipratropium Bromide
12   NovaPlus product as a generic, would that have
13   been useful information for you to evaluate in
14   deciding whether this drug should be classified
15   as a brand or a generic in the arrays?
16         MR. FAUCI:  Objection to the form.
17         THE WITNESS:  I'm not familiar with
18   those classifications so I'm not sure without
19   seeing them.
20         BY MR. GORTNER:
21     Q.  Okay.  Did you know that most of the
22   Medicaid programs use First DataBank blue book

100

1    for pricing in generic versus brand
2    classifications?
3          MR. FAUCI:  Objection to form.
4          THE WITNESS:  I'm not sure if I was
5    aware of that or not.  I mean, it doesn't -- it
6    doesn't ring a bell, it may have been, you know,
7    I may have come across it somewhere in time but
8    didn't think anything about it.
9          BY MR. GORTNER:
10     Q.  Do you know of any reason why the
11   Medicaid and Medicare program should be
12   classifying drugs as generics or brands
13   differently?
14         MR. FAUCI:  Objection to form.
15         THE WITNESS:  I'm not sure how they
16   classify or calculate their drugs.
17         BY MR. GORTNER:
18     Q.  What about the fact that DMERC-A
19   classified its Ipratropium Bromide NovaPlus drugs
20   as generics the entire time that you were
21   classifying them as brands?
22     A.  I don't recall ever seeing their actual

101

1    worksheets at any given point.  I don't know that
2    we would have even focused on that.  Our goal was
3    to make sure our end result was the same.  In
4    most cases our end result differed when we were
5    using the database and the database may have
6    included more current AWP information.  I don't
7    recall ever getting any -- into discussions
8    whether they may have used a brand versus a
9    generic product differently from us.
10     Q.  When you say that your focus was on
11   making sure that the end result was the same,
12   what you mean by that is making sure that the fee
13   payment that's set for that J code is the same
14   across all four DMERC's, is that right?
15     A.  Yes.
16     Q.  And in this particular instance because
17   the fee payment was at all times an Ipratropium
18   Bromide NovaPlus in the arrays was being set by
19   the median generic, it didn't matter whether the
20   product had been classified in the brand or the
21   generic arrays, is that right?
22         MR. FAUCI:  Objection to form.

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

27 (Pages 102 to 105)

102

1       THE WITNESS: Just that that's the way
2   it fell.
3       BY MR. GORTNER:
4       Q. I'm sorry?
5       A. That's the way the calculation came out
6   based on the sources that were available.
7       Q. Okay. So --
8       A. Except the generic.
9       Q. So if there were confusion at Palmetto
10  about whether Ipratropium Bromide NovaPlus should
11  be categorized as a brand or a generic, was there
12  any part of the standard procedure that would
13  have you call up another DMERC and say, what are
14  you doing with this drug, how are you classifying
15  it?
16      A. If we had unresolved differences, then
17  we usually try to work out those differences, I
18  just don't know if it ever was the result of
19  generic versus brand classification.
20      Q. That's what I'm saying, how would you
21  know that there were differences in the DMERC-A's
22  classification of NovaPlus versus your

103

1   classification, for instance?
2       A. I wouldn't if there wasn't a reason for
3   me to question it.
4       Q. And the reason for you to question it
5   would be if the fee came out different, right?
6       A. If the fee came out different.
7       Q. Okay. And the fee came out the same in
8   this instance, right?
9       A. As far as I know. I mean, I don't have
10  our comparison sheet to look at. I would have to
11  look -- go back and look and see if there was any
12  discussion or resolution for it, the final fee.
13      Q. Now, as far as you know, was DMERC-A
14  following the same procedures that you were
15  following in classifying drugs or had they come
16  up with something different?
17      MR. FAUCI: Object to the form.
18      THE WITNESS: If I recall -- I don't
19  know exactly what their procedure was but I do
20  recall that they were usually different from
21  everybody, for whatever reason I don't know.
22      BY MR. GORTNER:

104

1       Q. So it's possible that they didn't --
2   they didn't reach the internal rule that you did
3   of if a drug has a generic name and something
4   else, we're going to classify it as a brand?
5       A. I don't know what their procedure was.
6       Q. Did you speak to anyone at any other
7   DMERC about how to classify Ipratropium Bromide
8   NovaPlus?
9       A. I don't recall.
10      Q. Is it a concern for you as a Palmetto
11  representative that one of your fellow DMERC's is
12  classifying a drug in the office the way that you
13  are over a period of years?
14      MR. FAUCI: Objection to the form.
15      THE WITNESS: We never got into that
16  discussion other than, you know, comparing our
17  fees.
18      BY MR. GORTNER:
19      Q. I'm not asking for discussion.
20      A. Yeah.
21      Q. I'm just saying as a representative of
22  Palmetto, is that a concern for you that one

105

1   DMERC thinks this is a generic over the course of
2   years and another DMERC is classifying it as a
3   brand over that same course of years?
4       MR. FAUCI: Object to the form.
5       THE WITNESS: If I would have known, we
6   probably would have gotten into discussion or if
7   it, you know, would have stuck out or was -- you
8   know, we considered it a problem in
9   differentiating fees. But our goal, you know, we
10  -- everybody did their calculations separately
11  and then we came together at the end to resolve
12  the differences. That was our practice.
13      BY MR. GORTNER:
14      Q. So you wouldn't consider it a problem
15  as long as the fees came out the same?
16      MR. FAUCI: Object to the form.
17      THE WITNESS: We probably would have
18  entered into some discussion as to why, you know,
19  they considered it one way and we considered it
20  another.
21      BY MR. GORTNER:
22      Q. Okay. Why don't we take a quick break,

Palmetto DMERC (Robin K. Stone)                October 14, 2009
Columbia, SC

28  (Pages 106 to 109)

---

**106**

1  okay?
2       VIDEO TECHNICIAN:  This concludes
3  Videotape Number 2 in the videotape deposition of
4  Robin Stone, 30(b)(1) and (30)(b)(6)
5  representative. The time is approximately 2:00
6  PM.  We are now off the record.
7       (A recess transpired.)
8       (Exhibit Roxane 256, Detailed Product
9  Information sheets for Ipratropium Bromide, was
10 marked for identification.)
11      (Exhibit Roxane 257, Detailed Product
12 Information sheets for Atrovent, was marked for
13 identification.)
14      (Exhibit Roxane 258, Detailed Product
15 Information sheets for Ipratropium
16 Bromide-NovaPlus, was marked for identification.)
17      VIDEO TECHNICIAN:  We are now back on
18 the record. Today's date is October 14, 2009.
19 The time is 2:09 PM.  This is Tape Number 3 in
20 the videotape deposition of Robin Stone, 30(b)(1)
21 and 30(b)(6) representative of Palmetto DMERC.
22      BY MR. GORTNER:

---

**107**

1       Q.  Mrs. Stone, I'm going to be handing you
2  what we've collectively marked as Roxane Exhibits
3  256, 257 and 258.  What these are are printouts
4  for three particular drugs that were on the
5  Redbook CD's that you produced to us in late
6  summer of this year.  The first one, Roxane 256,
7  I'll represent to you is the detailed product
8  information sheet from the Redbook CD/ROM's for
9  the Roxane label of Ipratropium Bromide.  Exhibit
10 257 is the same detailed product information
11 sheets for Atrovent. And Roxane 258 are the
12 detailed product information sheets for
13 Ipratropium Bromide-NovaPlus.  And again, I
14 understand that the government has stipulated to
15 the authenticity of these documents as coming
16 from the Redbook CD's that you produced. I just
17 want to have you look at them quickly and confirm
18 that those, in fact, appear to be accurate and
19 correct copies of the detailed product
20 information that were on those CD's.
21      MR. FAUCI:  I'll just state on behalf
22 of the United States I've skimmed through these

---

**108**

1  and they certainly appear to be what they were
2  represented.  We reserve the right if we notice
3  that there is a difference later.
4       MR. GORTNER:  Okay.
5       THE WITNESS:  Okay.
6       BY MR. GORTNER:
7       Q.  And we can set those aside for now just
8  to kind of keep the exhibits completely from
9  overwhelming you.
10      Now, I wanted to go back to your
11 declaration and in particular on Page 3 and look
12 at Paragraph 8 where you stated that Palmetto
13 classified products as brands or generics based
14 on the product name and if it differed from the
15 chemical name you considered it a brand.  And you
16 go on to say:  This was the case with NovaPlus.
17 And you state:  Because this product had the
18 trade name NovaPlus added to the chemical name,
19 we considered it a brand product, right?  Do you
20 see that statement?
21      **A.  Yes.**
22      Q.  And from what we were talking about

---

**109**

1  earlier, that particular paragraph is not coming
2  from a specific recollection of exactly how you
3  classified the product or the decision-making
4  process behind that classification, it's rather
5  you looking at the arrays now and the procedures
6  and reconstructing what you think likely
7  occurred, is that a fair characterization?
8       MR. FAUCI:  Object to the form.
9       THE WITNESS:  I mean, we looked at the
10 product name and compared it to the generic name
11 and would for the most part, unless something,
12 you know, made us question it, would use that as
13 our procedure to distinguish a brand.
14      BY MR. GORTNER:
15      Q.  What I'm saying is sitting here today
16 or when you wrote this declaration, you didn't
17 recall specifically what Palmetto actually did
18 with the NovaPlus product?
19      **A.  The product versus the generic name was**
20 **pretty much our practice.**
21      Q.  I understand that, but you don't recall
22 specifically how that practice was applied in

---

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

29 (Pages 110 to 113)

110

1   this specific instance, right?
2       A.  Oh.  Right.  I mean...
3       Q.  You said right?
4       A.  I can't -- I mean, I can't say that
5   that would be true.  I mean, we would have used
6   the brand -- the product versus generic for
7   NovaPlus products for Ipratropium and if there
8   was any reason to think that we needed to go
9   further and determine that, then we would.
10      Q.  But that's again a different rule than
11  the rule that we saw in the drug pricing
12  procedure manual that we went through a little
13  bit earlier which looked at capitalization
14  issues, right?
15          MR. FAUCI:  Object to the form.
16          THE WITNESS:  Which was specific to the
17  book.
18          BY MR. GORTNER:
19      Q.  Right.  Okay.  So what I'm saying is
20  you had one rule that you applied to the CD/ROM
21  and you had another rule that you applied when
22  looking at the printed product, correct?

111

1           MR. FAUCI:  Object to the form.
2           THE WITNESS:  Well, I mean, as far as I
3   can recall, yes.
4           BY MR. GORTNER:
5       Q.  Okay.  Now, what's your definition or
6   what's Palmetto's definition of a trade name?
7       A.  Anything differing from the product and
8   the chemical name.  NovaPlus added on to the
9   generic name would make it a trade name to us.
10      Q.  Well, how about a diluent?  You
11  indicated earlier that a diluent might not cause
12  it to be classified as a brand.
13      A.  And that's where I said that we would
14  get into the discussion of does the diluent
15  change the drug or is it considered part of the
16  chemical drug itself.
17      Q.  And how did you decide?  What was the
18  criteria for deciding whether it changed the name
19  or not?
20      A.  That's when we would probably get input
21  from the medical staff.
22      Q.  And what was their criteria if you know

112

1   it?
2       A.  I don't recall exactly what the
3   specific decision was on diluents or specific
4   diluents.  There's a lot of -- you know,
5   depending on the situation there are exceptions
6   to the rules that might have been considered.
7       Q.  Was the definition of a trade name
8   something that Palmetto created on its own?
9           MR. FAUCI:  Object to the form.
10          THE WITNESS:  The trade name, I mean, a
11  trade name, I don't know exactly where the
12  terminology comes from.  Again, trade name is
13  just saying that, you know, there's another name
14  added on to the generic name.
15          BY MR. GORTNER:
16      Q.  Who would make --
17      A.  Terminology.
18      Q.  Who would make that decision, would it
19  be the front-line person?  I don't know if
20  there's an employee title that I should be using
21  for the person who's actually assigning
22  categorizations of drugs into the particular

113

1   arrays.
2       A.  Usually we follow the procedure and in
3   the case if the product name and/or the generic
4   name differed, it would be looked at.  If it was
5   -- looked like it was a trade name or a brand
6   name, it would be treated as a brand.
7       Q.  But that wasn't your role at the time,
8   though, right, 2002, 2004, you weren't the person
9   that was actually looking at the Redbook printed
10  version or the CD/ROM's and deciding where to put
11  the drugs; isn't that right?
12      A.  Right.
13      Q.  You were supervising, you were higher
14  up, okay?
15      A.  I was the lead.
16      Q.  That's higher up?
17      A.  Yeah.
18      Q.  Okay.  And then there were -- how many
19  employees would be involved in the construction
20  of this -- of this Ipratropium Bromide array,
21  would it be one person who would do that?
22      A.  I'm trying to think.  Either one or two

Palmetto DMERC (Robin K. Stone)                October 14, 2009
Columbia, SC

30  (Pages 114 to 117)

114

1  **for DMERC, there was one specific person for Part**
2  **B.**
3      Q.  But the one or two person for DMERC,
4  would they split up the J codes?  They wouldn't
5  be duplicating the work, would they?
6      **A.  That's what I'm trying to think, I**
7  **can't remember if they traded off or if one**
8  **person was doing it all together at one time.  I**
9  **just -- I can't remember how they were splitting**
10 **that work but I want to think one person was**
11 **doing it in any given time but they always -- we**
12 **were always cross-training people along the way.**
13     Q.  Okay.  But generally speaking there was
14 one person that would have been looking at some
15 format of the Redbook and with respect to this
16 particular -- or the particular J codes where the
17 Ipratropium Bromide NovaPlus product was in, they
18 had to make a determination is this product name
19 one that should be classified as a generic or a
20 brand according to the rule you issued in your
21 declaration, right?
22     **A.  Um-hum.**

115

1      Q.  Is that a yes?
2      **A.  Yes.**
3      Q.  Okay.  And that person then had to
4  determine whether NovaPlus was a trade name,
5  right?
6      **A.  Right.**
7      Q.  And my question to you is:  Do you know
8  how that person -- how did that person make a
9  determination?
10     MR. FAUCI:  Object to the form.
11     THE WITNESS:  I mean, it's probably --
12 once you establish a calculation, you've got --
13 you're using the same files from the previous
14 quarter going into the new quarter.  So if it had
15 been determined prior to them calculating, they
16 wouldn't question it.
17     BY MR. GORTNER:
18     Q.  Okay.  That's fair enough.  What
19 happens here is that the first time it shows up
20 in the array, and let's say I think that's
21 October 2000, assuming that's the case, that
22 determination of whether Ipratropium Bromide

116

1  NovaPlus goes to the brand or the generic array,
2  that determination holds across every subsequent
3  quarter, it's not reevaluated?
4      **A.  Unless there's given reason to.**
5      Q.  You're not aware of any reason here
6  when they reevaluated it?
7      **A.  No.**
8      Q.  So someone when it first showed up in
9  the array made -- according to your declaration
10 made the determination that NovaPlus was a trade
11 name and put the product in the brand portion of
12 the array?
13     **A.  Without seeing the first time it was**
14 **used in a calculation, I can't say, but I would**
15 **think that that would be what the case would have**
16 **been.**
17     Q.  Okay.  And my question is:  How did
18 that individual determine that NovaPlus was a
19 trade name?
20     MR. FAUCI:  Object to the form.
21     THE WITNESS:  Looking at the product
22 compared to the generic name and if it was

117

1  questionable, it would have entered into
2  discussion for review for final determination.
3      BY MR. GORTNER:
4      Q.  And you don't know whether it -- that
5  this product, whether it entered into review for
6  determination?
7      **A.  Yeah, I don't know if this particular**
8  **Ipratropium Bromide product would have prompted**
9  **that determination or if that determination would**
10 **have been made prior to that.**
11     Q.  Okay.  At what point would you have any
12 input into determining whether NovaPlus was a
13 trade name or not?
14     **A.  If -- I mean, if it got questioned,**
15 **they would usually come to myself or whoever was**
16 **acting, you know, their report at that time.  At**
17 **one time I was DMERC only and took on Part B**
18 **later but it would just depend on who the person**
19 **was mentoring with and if they, you know, were**
20 **questionable with their mentor, then they would**
21 **come to me for a final determination.**
22     Q.  Was there any written definition of

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

31 (Pages 118 to 121)

---

**118**

1    what a trade name is at Palmetto?
2        **A.   Not that I'm aware of.**
3        Q.   Was there any written definition about
4    when you determined that a product that has a
5    generic -- the generic chemical name in it should
6    not be classified as a generic?
7        MR. FAUCI:  Object to the form.
8        THE WITNESS:  I don't know per se
9    without going through everything and looking back
10   at everything but I don't know when that changed.
11       BY MR. GORTNER:
12       Q.   So is it fair to say that the
13   classification of Ipratropium Bromide NovaPlus
14   depended on the judgment of this individual who
15   was constructing that particular array when it
16   first came into the Palmetto arrays?
17       MR. FAUCI:  Object to the form.
18       THE WITNESS:  Like I said before, it
19   would depend on when the determination on the
20   product versus the generic name, how all that
21   rolled out as to when Ipratropium Bromide
22   NovaPlus came in for calculation.

---

**119**

1        BY MR. GORTNER:
2        Q.   Okay.  Well, we can look in here.  We
3    can look at the arrays and I can tell you exactly
4    when it first shows up in the arrays if that
5    would be helpful for you.
6        **A.   Well, what I'm saying, I don't know**
7    **when the rules using product versus generic name,**
8    **you know, were established as to what they were**
9    **doing that would have prompted the question for**
10   **this particular drug.**
11       Q.   I see what you're saying.  I see what
12   you're saying.  So if Palmetto's rule about
13   establishing whether something was a generic or a
14   branded generic under the definition of and
15   including the generic name plus some additional
16   term or terms, if that rule had been established
17   before Ipratropium Bromide NovaPlus could enter
18   the arrays, that rule would control the
19   classification of the product?
20       **A.   I would say yes.  There's --**
21       Q.   But wouldn't it require the individual
22   that's constructing the arrays to still make a

---

**120**

1    determination whether this Ipratropium Bromide
2    product met that rule or not?
3        **A.   For the first time, yes.**
4        Q.   For the first time there's an
5    individual at Palmetto that has to --
6        **A.   Say that.**
7        Q.   -- say one of two things according to
8    your testimony.  One is that we have an
9    established rule that when a product has a
10   generic name in it and something more that's not
11   a diluent, that product should be classified as a
12   brand or if there's no such rule, it might prompt
13   a discussion about what to do with this product,
14   is that right?
15       **A.   Yes.**
16       Q.   And in this particular case you don't
17   know what happened?
18       **A.   No, none, not at that time.**
19       Q.   Now -- and there was no written rule
20   explaining this generic versus branded generic
21   distinction, correct?
22       MR. FAUCI:  Object to the form.

---

**121**

1        THE WITNESS:  I don't know off the top
2    of my head.  I mean, procedures, you know, were
3    updated, I just -- I don't know if it was ever
4    updated based on what I'm seeing here to say it
5    was or wasn't.
6        BY MR. GORTNER:
7        Q.   But it may have been more of an
8    informal person where the person who is
9    constructing the arrays is talking to the
10   supervisor and you're talking to the medical
11   director, if necessary, and that's how it
12   generally works here, is that there's a process
13   by which folks are talking back and forth, make
14   these types of decisions when it's a close call?
15       MR. FAUCI:  Object to the form.
16       THE WITNESS:  Yes.
17       BY MR. GORTNER:
18       Q.   And theoretically this same internal
19   decision-making process has to occur at the three
20   other DMERC's, right, each one of them has to
21   determine at some point whether Ipratropium
22   Bromide NovaPlus should go into a generic or a

---

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

32  (Pages 122 to 125)

---

122

1    brand array, right?
2       **A.  Yes.**
3       Q.  And the four of you aren't doing this
4    all in a concertive collective effort, right?
5          MR. FAUCI:  Object to the form.
6          THE WITNESS:  Not that I can recall to
7    that level.
8    BY MR. GORTNER:
9       Q.  And the outcome was, you know, DMERC-A
10   decides under whatever their rules are, we think
11   this product belongs in the generic array the
12   whole time, right?
13      **A.  It could.  I don't recall.**
14      Q.  Now, you have CVS pharmacies down here,
15   don't you?
16      **A.  Yes.**
17      Q.  It's a big kind of retail pharmacy
18   chain, is that right?
19      **A.  Um-hum.  Yes.**
20      Q.  Do you have a Walgreens down here as
21   well?  Is Walgreens --
22      **A.  Yes.**

---

123

1       Q.  Okay.  I'm not sure, there's all these
2    regional differences in pharmacies so I want to
3    be sure.  I thought I saw a CVS when I was
4    driving in.  Is CVS a trade name?
5          MR. FAUCI:  Object to the form.
6          THE WITNESS:  I would guess.  They're
7    not -- they're not called a pharmacy but...
8    BY MR. GORTNER:
9       Q.  So if you had a product that was called
10   Ipratropium Bromide and had a dash CVS, under
11   your criteria you would classify that as a brand,
12   wouldn't you, it's not a generic?
13      **A.  They've branded it.**
14      Q.  I'm sorry, say that again.
15      **A.  They've branded it.**
16      Q.  Under your view that's a brand product?
17          MR. FAUCI:  Object to the form.
18          THE WITNESS:  Again, we probably would
19   open discussion on that but I would say that that
20   would be a branded product, they've put their
21   name on it.
22    BY MR. GORTNER:

---

124

1       Q.  And why would you open discussion on
2    it?
3       **A.  I don't know that I would or not, I'm
4    just saying that it is -- it differs and they've
5    put their name on it; therefore, they have
6    branded it with their name.**
7       Q.  Okay.  And the same would go for
8    Walgreens if there was a product that said
9    Ipratropium Bromide, had a dash Walgreens, that
10   would be classified as a brand product?
11      **A.  Probably.  I've never seen it so, you
12   know, it's hard to say.**
13      Q.  But these are things that if you saw a
14   product that said Ipratropium Bromide dash
15   Walgreens, I mean, you -- a reasonable response
16   in your view would be to have a discussion
17   internally about whether that fits Palmetto's
18   definition of a brand or a generic, correct?
19          MR. FAUCI:  Objection to the form.
20          THE WITNESS:  That might have been --
21   prompted conversation, yes.
22    BY MR. GORTNER:

---

125

1       Q.  Right.  Because people within Palmetto,
2    couldn't there be reasonable disagreement when
3    someone says, no, it's got the generic chemical
4    name Ipratropium Bromide in the title, it's just
5    identified in the Walgreens supplier, I don't
6    think that's the same as the product that's
7    called Atrovent, that would be a reasonable
8    discussion that you could have with Palmetto,
9    right?
10          MR. FAUCI:  Eric, are you talking about
11   that CVS -- just for clarification, are we
12   talking about a situation where CVS and Walgreens
13   appears in the drug's name?
14          MR. GORTNER:  Yes.
15          BY MR. GORTNER:
16      Q.  Let me be clear for all these questions
17   and correct your answer if I'm not being clear.
18   I'm assuming that the product name is -- I'm
19   replacing NovaPlus with CVS or Walgreens so the
20   product says Ipratropium Bromide dash CVS just as
21   it's listed in the Redbook CD but instead of
22   NovaPlus it has a pharmacy.

---

Palmetto DMERC (Robin K. Stone)                October 14, 2009
Columbia, SC

33  (Pages 126 to 129)

126

1      A.  My first response would be or thought
2  would be that it would be considered branded
3  generic.
4      Q.  Okay.
5      A.  It could prompt additional discussion
6  what the outcome would have been, you know, I
7  don't know, I can't recall what decision went
8  behind NovaPlus in saying that, okay, it is a
9  branded generic.
10     Q.  My question isn't so much the ultimate
11 outcome but rather that that initial assessment
12 is something that involves ambiguity, that people
13 at Palmetto could see it differently, right?
14     A.  Um-hum.
15         MR. FAUCI:  Object to the form.
16         BY MR. GORTNER:
17     Q.  And in your view that wouldn't be
18 unreasonable, would it, for someone at Palmetto
19 involved with the array process to say, no, I
20 don't think Ipratropium Bromide dash Walgreens
21 should be thought of as a brand, I think it's
22 closer to a generic, a brand name like Atrovent?

127

1         MR. FAUCI:  Object to the form.
2         THE WITNESS:  It -- I mean, we would --
3  it could hold discussion but, I mean, there would
4  be research.
5         BY MR. GORTNER:
6      Q.  And what would the research be?
7      A.  Based on any input given back from the
8  medical director, the nurses and if we had a
9  pharmacy available to us, which sometimes -- a
10 pharmacist, you know, it would involve, you know,
11 different discussions with those.
12     Q.  But what would be the nature of -- I
13 know you don't know specifically what they're
14 saying on a drug-on-drug basis, I'm just trying
15 to understand what is the retail pharmacist on
16 staff, for instance, what's his input into this
17 process?
18     A.  Just to give his guidance.
19     Q.  Would you anticipate that they would
20 look to whether a product like Ipratropium
21 Bromide dash Walgreens, whether that product was
22 considered generic by pharmacists, is that

128

1  something that they would consider?
2         MR. FAUCI:  Object to the form.
3         THE WITNESS:  I don't know.  I don't
4  know.  Unless, you know, I'm put in that position
5  to look at that specific situation because drugs,
6  there's many exceptions.
7         BY MR. GORTNER:
8      Q.  But you know -- let me ask you as a
9  consumer.  When you walk into CVS and you see a
10 product that says ibuprofen CVS and next to it
11 there's a product named Tylenol, is there a
12 question in your mind that the CVS ibuprofen is a
13 generic product?
14         MR. FAUCI:  Objection to the form.
15 That's beyond the scope of this deposition.
16         BY MR. GORTNER:
17     Q.  You can answer the question.
18     A.  You know, I don't know.  I mean, I go
19 in, I don't usually think about it, I know what
20 I'm buying and I go in.  I guess I've never
21 looked at it from over-the-counter drug
22 perspective.

129

1      Q.  You never thought about whether drugs
2  that have a Costco label on them or CVS or
3  Walgreens label, whether that's --
4      A.  They're cheaper, yeah.
5      Q.  But you never thought about whether
6  they were generic, they should be -- whether you
7  think of them as a generic or a brand?
8      A.  Well, NovaPlus didn't match --
9         MR. FAUCI:  Object to the form.
10        THE WITNESS:  NovaPlus doesn't match
11 the manufacturer and, I mean, I don't know.  I
12 don't know.
13        BY MR. GORTNER:
14     Q.  You don't know the answer to that?
15     A.  I probably would think about it but at
16 the time the procedure was and the decision was
17 to use the product if it differed.  If we saw CVS
18 or Walgreens, we probably would enter into a
19 decision and probably determine that that would
20 be generic. But NovaPlus, like I said, I don't
21 know the -- I don't know the details that went
22 into defining NovaPlus as a brand.  I don't know

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

34  (Pages 130 to 133)

---

130

1  if, you know, that branded generic concept
2  applied to that but, you know, we had guidance to
3  do that and that's what we did.
4      Q.  Fair enough.  I think what I'm trying
5  to understand is whether or not it was an
6  ironclad rule.  What I think you just said --
7      A.  And I can't say that that was.
8      Q.  Exactly.  It was a subject of
9  discussion so when you have situations where a
10 generic name has something in addition to it like
11 in this case where a hypothetical CVS or
12 Walgreens.
13     A.  Right.
14     Q.  That's a subject of discussion at
15 Palmetto, right?
16     A.  Right.
17         MR. FAUCI:  Objection to the form.
18         BY MR. GORTNER:
19     Q.  How about if the product was named
20 Ipratropium Bromide dash Roxane?
21         MR. FAUCI:  Object to the form.
22         BY MR. GORTNER:

---

131

1      Q.  How would you classify that product?
2      A.  I don't know.
3      Q.  Would that also be a subject for
4  discussion?
5      A.  It would be subject for discussion
6  since Roxane also had other products in which
7  they did not add something additional to their
8  name.
9      Q.  And what would be the nature of the
10 discussion?
11     A.  Going through and determining is it
12 considered a branded generic or generic.
13     Q.  And you can't tell me the criteria for
14 branded generic again?
15     A.  I cannot recall what or where that
16 information is that defines branded generic from
17 generic.
18     Q.  There was some internal understanding
19 of a what a branded generic was?
20     A.  Or if it came from, you know, like in
21 the procedures if they contacted Redbook and
22 found that out or if they looked at something

---

132

1  else and found that out, I don't recall.
2      Q.  Now, how about if the product was
3  advertised as Ipratropium Bromide dash NovaPlus,
4  this is a generic drug?  That's the entire title.
5          MR. FAUCI:  Objection to the form.
6          BY MR. GORTNER:
7      Q.  What would you do under those
8  circumstances?
9      A.  It would definitely be up for
10 discussion.
11     Q.  But you don't know whether it would be
12 classified on that basis, a brand or a generic?
13     A.  I would --
14         MR. FAUCI:  Objection to the form.
15         THE WITNESS:  I mean, I would think
16 that it's generic but...
17         BY MR. GORTNER:
18     Q.  You would think it's generic.  And why
19 is that?
20     A.  Well, going out to the site that it
21 does classify it as a generic but, again, it
22 would open up into discussion is it brand, it's

---

133

1  generic.
2      Q.  And the sole reason for that would be
3  the presence of the term NovaPlus in the title in
4  addition to these other words?
5      A.  That would have --
6          MR. FAUCI:  Objection to the form.
7          THE WITNESS:  -- caused us to question
8  it, yes, because of our knowledge of branded
9  generic sources.
10         BY MR. GORTNER:
11     Q.  But if a manufacturer is telegraphing
12 to you in the title something like that, this is
13 a generic drug, that's something that would lead
14 you to believe it's a generic, right?
15         MR. FAUCI:  Object to the form.
16         THE WITNESS:  We probably would still
17 question it even coming from the manufacturer
18 because of the term that we were aware of being
19 branded generic.
20         BY MR. GORTNER:
21     Q.  Let's take a look -- could you go back
22 to the 2001 Redbook printout.  And I need to get

---

Palmetto DMERC (Robin K. Stone)                October 14, 2009
Columbia, SC

35 (Pages 134 to 137)

---

134

1    the --
2         MR. FAUCI:  Talking about the Redbook
3    for CD?
4         MR. GORTNER:  No, I'm sorry, the
5    printed version of the annual Redbook.  Let me go
6    to -- it is -- it was marked as Roxane Exhibit --
7         THE WITNESS:  254?
8         BY MR. GORTNER:
9         Q.  254, thank you.  Before we kind of
10   delve into that right now, just so I can
11   understand, that the -- as you stated in your
12   declaration, the reason why you believe that
13   Palmetto classified this drug as a brand was
14   because of the trade name NovaPlus, right?
15        MR. FAUCI:  Object to the form.
16        THE WITNESS:  Right.
17        BY MR. GORTNER:
18        Q.  Okay.  Let's take a look now at Roxane
19   Exhibit 254 and I just want to go back to what's
20   on Page 368 of this Redbook and orient you again
21   to that middle column where the six NDC's are
22   located underneath Roxane as a manufacturer.  Do

---

135

1    you see that?
2         A.  Um-hum.
3         Q.  And I'll represent to you that the last
4    three NDC's, the ones that have 8404 in the
5    middle, those pertain to the NovaPlus label --
6         A.  Um-hum.
7         Q.  -- Ipratropium Bromide and the top
8    three are the Roxane labeled generic product,
9    right?
10        A.  Um-hum.
11        Q.  Okay.  Now, the word NovaPlus cannot be
12   found on this particular listing, right?
13        A.  That's right.
14        Q.  So using either criteria that we've
15   talked about before, using the criteria that was
16   listed in the drug pricing procedure or the
17   criteria you've talked about with respect to does
18   the name differ from the chemical name, you would
19   classify these three NDC's as generics, wouldn't
20   you?
21        MR. FAUCI:  Object to the form.
22        MR. GORTNER:  What's the basis of your

---

136

1    objection, counsel?
2         MR. FAUCI:  You would classify -- I
3    think it invented assumption and maybe -- if you
4    want, I can get into it.  Is your question that
5    if she was looking at the 2001 printed Redbook,
6    would she classify these --
7         MR. GORTNER:  Yes, yes.
8         BY MR. GORTNER:
9         Q.  Based upon the 2001 annual Redbook that
10   was marked as Roxane Exhibit 254, using either of
11   the criteria we've testified about how Palmetto
12   was classifying drugs, isn't it correct that you
13   would classify those three 8404 NDC's, the Roxane
14   NovaPlus Ipratropium Bromide, as a generic
15   product, not a brand?
16        A.  If this was all we were looking at,
17   yes.
18        Q.  Yes.  And the reason you'd do that is
19   because there is no trade name of NovaPlus
20   anywhere in this listing, correct?
21        A.  Correct.
22        Q.  And the reason you do that under the

---

137

1    desk procedure is because there is no
2    capitalization above Roxane with the generic name
3    listed in small caps underneath it, right?
4         A.  Right.
5         Q.  So it's fair to say then the
6    classification of Ipratropium Bromide NovaPlus as
7    a generic or a brand depends on what particular
8    version of Redbook you're looking at, right?
9         A.  From the classification, yes.
10        Q.  Yes.  If you're looking at the annual
11   Redbook, you would classify Ipratropium Bromide
12   NovaPlus as a generic, wouldn't you?
13        A.  If we had not known of the other
14   situation, yes.
15        Q.  And if you were looking at the Redbook
16   CD under your criteria in terms of looking at
17   whether it had a trade name, you would classify
18   it as a brand, correct?
19        A.  Correct.
20        Q.  But they're both materials from the
21   same Redbook publishing compendia, correct?
22        A.  I understand that.

---

138

1    Q.  Yes is the answer, correct?
2    **A.  Yes.**
3    Q.  Now, with respect to these Redbook
4    CD's, Mrs. Stone, where were the Redbook CD's
5    that you produced this summer?  Where were they
6    located?
7    **A.  They were stored down in some boxes**
8    **that were packed up from a move or something and**
9    **there was like a storage area and they were in**
10   **that.**
11   Q.  And did you find any printouts of the
12   sort that I showed you in Miss Helton's
13   production to us recently?
14   **A.  We didn't normally print them out**
15   **unless somebody asked for information related to**
16   **a specific drug.  It wasn't our practice to print**
17   **out the CD information when we performed**
18   **calculations.**
19   Q.  Did anyone ever ask you to search for
20   the Redbook CD's prior to sometime this summer?
21   **A.  I mean, they had asked us to search for**
22   **drug stuff, drug information and try and produce**

139

1    **everything.  But the CD's, I don't know why they**
2    **weren't, you know, put up for production, I don't**
3    **know, you know, they were, like I said, when we**
4    **went back through stuff, we just recently began**
5    **cleaning out a bunch of our old DMERC records and**
6    **they were in that stuff.  I don't know if someone**
7    **saw them before and didn't think anything about**
8    **it or what, I didn't personally go through**
9    **everything in our files.**
10   Q.  But if I had asked you to identify for
11   me materials that were related to the pricing
12   these arrays, would the Redbook CD's be materials
13   that you would consider to be related to this
14   project?
15   MR. FAUCI:  Object to the form.
16   THE WITNESS:  They were used to
17   calculate the fees.  The information, however, is
18   reproduced in the fee calculations.
19   BY MR. GORTNER:
20   Q.  But in terms of classifying drugs as
21   brands or generics, were the CD's used at least
22   in some point in time to make the determination

140

1    of whether it should be classified as a brand or
2    generic?
3    **A.  Yes.**
4    Q.  So they were certainly related to that
5    issue, weren't they?
6    **A.  Yes.**
7    Q.  And how about printed Redbooks, did you
8    look around for printed Redbooks?
9    **A.  We did search for our printed Redbooks.**
10   **We had a file but those had been -- well, they --**
11   **well, I don't know if they did or didn't.  We do**
12   **have some.  We didn't have the annual ones, the**
13   **older ones.  I don't know if there's a date**
14   **cutoff issue or what.**
15   Q.  And you claim that you used the Redbook
16   CD's beginning at some point in 1999, is that
17   right?
18   **A.  I think it's somewhere around 1999.  I**
19   **can't recall the exact date for -- I don't know**
20   **the exact date.  Let's see.**
21   Q.  I'm looking at the bottom of Page 3,
22   Paragraph 10, if that helps you.

141

1    **A.  Where are you?**
2    MR. FAUCI:  He's in your affidavit.
3    THE WITNESS:  Oh, okay.  I don't have a
4    page number.  Okay.
5    BY MR. GORTNER:
6    Q.  That's okay, I just wanted to establish
7    that at some point you transitioned.
8    **A.  Yeah, I'm sure whatever dates I put in**
9    **there are based on what information I had**
10   **available to me.  I don't remember what I put in**
11   **there.**
12   Q.  But it looks like during the time that
13   the Ipratropium Bromide NovaPlus was in the
14   arrays, which was at some point after 1999 I'll
15   represent to you, these Redbook CD's would have
16   been the material that someone looked at to make
17   the determination of whether this drug should be
18   a brand or generic, correct?
19   **A.  Correct.**
20   Q.  And these were at Palmetto in storage
21   the whole time, is that what you were saying?
22   **A.  The CD's, yes.**

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

37 (Pages 142 to 145)

---

142

1    Q.  The CD's were.  So all the ones that
2  have been produced over the summer, were they in
3  a basement or were they off site?
4    A.  They were -- we have a reference
5  workstation that just has tons of stuff stored in
6  it and they were in those -- in that stuff boxed
7  up.
8    Q.  How did you find them?
9    A.  Going through -- we are focusing on
10  procedures to make sure we don't have, what do
11  you call it, PHI -- PII and going through all of
12  that.  We had to go through and tear everything
13  apart and they were discovered during that time.
14    Q.  You don't have an index that you keep
15  of stuff in storage?
16    A.  No.
17    Q.  Now, there was one quarter with respect
18  to Palmetto's classification of Ipratropium
19  Bromide NovaPlus where you weren't sure whether
20  it was classified as a brand or a generic; isn't
21  that right?
22    A.  I'm not positive about that.

---

143

1    Q.  If you want to, you could look at
2  Paragraph 6 of your affidavit from Pages 2 to
3  really the last sentence at the top of Page 3
4  from Paragraph 6 where you say for one quarter of
5  2003, Q2, I am unable to determine with certainty
6  whether they, meaning the Ipratropium Bromide
7  NovaPlus products, were treated as brands or
8  generics in the fee calculation, right?
9    A.  That statement is in reference to a
10  file that wasn't classified under our normal
11  working files and that was a period I think --
12  well, you know what, 2003, I'd have to see what
13  it is I'm referring to again.  I don't recall.
14    Q.  I'm just looking at -- I mean, you
15  understand this declaration is --
16    A.  I'm sure I had reason to state it.
17    Q.  Well, I hope so.  This is testimony to
18  the court, you know that, right?
19    A.  Yeah.
20    Q.  Okay.  So you stand by that you were
21  unable to determine for that Quarter 2003,
22  Quarter 2, you were unable to determine with

---

144

1  certainty whether they were treated as brands or
2  generics?
3    A.  Yes, I stand by that, I just can't
4  remember why.
5    Q.  Later on in the declaration you --
6  Paragraph 14, Page 5, Mrs. Stone, you explain a
7  little bit more --
8    A.  Okay.
9    Q.  -- as to why you're unable to determine
10  whether there were --
11    A.  Oh, okay.
12    Q.  My question is just a limited question
13  that there is that one quarter where you can't
14  say with certainty whether it was treated as a
15  brand or a generic in the Palmetto arrays?
16    A.  I would say yes.  I know there was a
17  situation I found something else that -- but I
18  can't remember if it's in reference to this and
19  if it was found after this or not.
20    Q.  Do you have any reason to believe that
21  what you stated in that declaration --
22    A.  There was a file that I came across and

---

145

1  I can't remember if it was after this or not that
2  wasn't -- it was an Excel spreadsheet and it had
3  a brand generic indicator in there.  And if I
4  recall, it had a Y for NovaPlus as being a brand
5  but I can't remember if this was the same -- if
6  this was related or not.
7    Q.  Okay.  So as we sit here today, are you
8  standing by what you submitted in this
9  declaration on July 23rd, 2009 that for the
10  second quarter of 2003 you cannot say with
11  certainty whether Palmetto classified the
12  NovaPlus product as a generic or a brand?
13    A.  On that day -- like I said, on that
14  day, I mean, what is in here would be true.
15    Q.  You understand that that's a document
16  that's before the court --
17    A.  Yeah.
18    Q.  Let me finish my question.  And we have
19  a hearing next Tuesday and this is part of the
20  testimonial record of this case.
21    A.  I know.
22    Q.  So you understand that this is a

---

Henderson Legal Services, Inc.

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

38  (Pages 146 to 149)

---

146

1  significant matter for my client, that we're
2  counting on your representations in this
3  declaration to be true and correct, not just as
4  of July 23rd but as of today. Now, can you say
5  with certainty whether that statement in those
6  Paragraphs 18 and 14 are, in fact, correct as of
7  today?
8      MR. FAUCI: What paragraphs are you
9  talking about, Eric?
10     MR. GORTNER: I'm referring to, I'm
11  sorry, Paragraphs 6 and 14. Thank you, Jeff.
12     MR. FAUCI: I believe I have a copy of
13  this exhibit, of this declaration with the
14  exhibits. I see that Paragraph 14 refers to
15  Exhibit E and that is not here. Would you prefer
16  I substitute that in?
17     MR. GORTNER: That's fine, I'm happy to
18  include Exhibit E if that would help clarify the
19  testimony. Would it help you, Miss Stone?
20     THE WITNESS: Yes.
21     MR. GORTNER: Okay, why don't we take a
22  quick break and we'll bring that in here, we can

---

147

1  clarify that.
2      VIDEO TECHNICIAN: We will now go off
3  the record. The time is 2:49 PM.
4      (A recess transpired.)
5      VIDEO TECHNICIAN: We are now back on
6  the record. The time is 2:59 PM.
7      BY MR. GORTNER:
8      Q. Mrs. Stone, at the break and right
9  before the break we were discussing Paragraph 6
10  and 14 of your declaration submitted in this case
11  and we provided you with Exhibit E to help
12  clarify the issue. Has it helped you?
13     A. Yes. Yes.
14     Q. And can you clarify whether it's still
15  the case that you cannot determine with certainty
16  whether NovaPlus Ipratropium Bromide was
17  classified as a brand or generic for the second
18  quarter of 2003?
19     A. That is true.
20     Q. What that means is it's possible that
21  it was treated as a brand for that particular
22  quarter or you don't know one way or the other?

---

148

1      A. Correct.
2      Q. With respect to Palmetto's drug pricing
3  policies, Palmetto for a period of time also
4  reviewed and submitted payments for Medicare Part
5  B drugs that weren't covered under the DMERC
6  coverage, is that correct?
7      A. Payment for drugs that were part of our
8  Part B carrier?
9      Q. Right.
10     A. South Carolina carrier?
11     Q. Right. Palmetto also processed --
12  there was a DMERC --
13     A. Right.
14     Q. -- Palmetto.
15     A. And as a Part B carrier we processed.
16     Q. And a Part B carrier?
17     A. Yes.
18     Q. Can you explain to me in terms of was
19  the Part B carrier located in the same premises
20  as the DMERC carrier or were these different
21  offices?
22     A. They were the same.

---

149

1      Q. Same office?
2      A. Um-hum.
3      Q. And did you interact much with the Part
4  B folks that were creating arrays for the Part B
5  drugs?
6      A. Yes.
7      Q. And were they subject to the same
8  policies that we have talked about earlier in
9  terms of determining whether a product should be
10  classified as a generic or a brand?
11     A. As far as I can recall, yes.
12     Q. And you can't think of any reason why
13  Palmetto's Part B employees should be
14  constructing arrays with respect to generics or
15  brands differently than the DMERC employees
16  should be doing it, right?
17     A. Not that I can think of. There were
18  variations but I can't recall the different
19  exceptions each time.
20     Q. How about with respect to NovaPlus? I
21  mean, you've testified here repeatedly that the --
22     A. Pretty much I think products, the

---

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

39 (Pages 150 to 153)

| 150 |
|---|
| 1   product situation to determine a brand was the |
| 2   same but they are two different groups who were |
| 3   doing those calculations. |
| 4      Q.  I wanted to show you an exhibit that we |
| 5   can mark as Roxane 259. |
| 6      (Exhibit Roxane 259, Document entitled |
| 7   Diltiazem HCL, was marked for identification.) |
| 8      BY MR. GORTNER: |
| 9      Q.  And I'll represent to you that this is |
| 10  a document that was produced in this litigation |
| 11  from the Palmetto carrier and it appears to be an |
| 12  array for a product called Diltiazem.  I think it |
| 13  was done by the Palmetto Part B carrier.  And as |
| 14  you see, it's a December 2002 date, right? |
| 15     A.  Um-hum. |
| 16     Q.  And as you can see in the top portion |
| 17  it shows the product manufacturer and appears to |
| 18  have a brand name column and then in the next |
| 19  lower portion it has a generics, do you see that? |
| 20     A.  Um-hum. |
| 21     Q.  And you can see that in the generics |
| 22  bottom portion of the array, there is an entry |

| 151 |
|---|
| 1  for Diltiazem HCL NovaPlus. |
| 2     A.  Um-hum. |
| 3     Q.  There's two different NDC's there.  Now, |
| 4  would this indicate to you that the Medicare Part |
| 5  B Palmetto carrier had classified that Diltiazem |
| 6  NovaPlus as a generic product and not a brand? |
| 7     A.  I can't -- I don't know the source name |
| 8   from this so without knowing that, I can't say |
| 9   for certainty because of the date that's December |
| 10  2002 that is when we entered into SDP.  I think I |
| 11  had looked at this before and it was not clear |
| 12  that it was a final file or product.  This was |
| 13  not part of the SDP files that were being |
| 14  calculated at that time for going into January |
| 15  2003 so I cannot say with certainty why it's |
| 16  showing down here in the generics without |
| 17  actually knowing what files this came from. |
| 18     Q.  But do you have any reason to believe |
| 19  that they did not classify this drug with a |
| 20  NovaPlus name in its title as a generic drug in |
| 21  their arrays? |
| 22     A.  In the file it is listed there as |

| 152 |
|---|
| 1   generics but, like I said, I don't know the |
| 2   source, I don't know who.  There's no -- |
| 3     Q.  You've never seen a document like this |
| 4  before? |
| 5     A.  Yes, I have seen the document, that's |
| 6   what I'm saying, I don't know -- I don't -- what |
| 7   I've seen is not part of the final file |
| 8   calculations, it's like a working file and it |
| 9   appeared to be an incomplete file because at that |
| 10  time there was another file, the SDP calculation |
| 11  file that would have had this drug in it that -- |
| 12     Q.  With respect to this particular |
| 13  document that I handed you that we've marked as |
| 14  Roxane 259, do you contend that this is a |
| 15  nonfinal document with respect to the |
| 16  categorization of the Diltiazem NovaPlus as a |
| 17  generic versus a brand? |
| 18     A.  I would say that it most likely is |
| 19   because of the NovaPlus being down in the |
| 20   generics. Without -- like I said, without going |
| 21   back and looking at the context of the file and |
| 22   where it fell in our files, I can't say for |

| 153 |
|---|
| 1  certain. |
| 2     Q.  And that's the basis of you question |
| 3  this document that NovaPlus is categorized in |
| 4  generics rather than brand? |
| 5     A.  Yes, in this document it is. |
| 6     Q.  How about the Amerinet, the two |
| 7  Amerinet names directly above from Abbott?  Do |
| 8  you see that there's a product name that has the |
| 9  Diltiazem, HCL and Amerinet, those are also in |
| 10  the generic field as well, right? |
| 11     A.  Right. |
| 12     Q.  And you'd expect those to be in the |
| 13  brand according to your criteria? |
| 14     A.  I would think so, yes. |
| 15     Q.  Now, were you aware that there are |
| 16  instances where the Cigna DMERC -- excuse me, the |
| 17  Cigna Part B carrier also placed NovaPlus |
| 18  products, products that had the name NovaPlus in |
| 19  addition to the generic chemical name, in its |
| 20  generic arrays and not its brand arrays? |
| 21     A.  I didn't work with Cigna's Part B |
| 22  carrier. |

Palmetto DMERC (Robin K. Stone)                October 14, 2009
Columbia, SC

40  (Pages 154 to 157)

154

1    Q.  So you didn't know that?
2    A.  Hum-um.
3    Q.  But if, in fact, Cigna's Part B carrier
4  had classified some products with the generic
5  chemical name and NovaPlus in the title as a
6  generic and not a brand, would that change your
7  belief that these should be brands?
8    A.  We probably would have questioned it
9  and, you know, taken it again for discussion to
10  determine, you know, what's right or what's
11  wrong.
12    Q.  I'll represent to you that it appears
13  from the evidence in this case that there have
14  been instances where Part B carriers have
15  classified a product that has a generic chemical
16  name and the term NovaPlus in the title as a
17  generic and not a brand drug, okay?
18    A.  Okay.
19    Q.  And you also know that one of your
20  fellow DMERC's classified a drug with the generic
21  chemical name NovaPlus as a generic drug for
22  years in its arrays, you know that, right?

155

1    A.  Now I do.
2    Q.  Okay.  And you, yourself, aren't sure
3  that for that one quarter whether the NovaPlus
4  product was classified as a branded drug -- a
5  branded generic even within Palmetto, correct?
6    A.  I can't determine that and say for
7  certainty because the brand -- there's no brand
8  or generic indicator on that particular report.
9    Q.  Now, the arrays that we've been
10  discussing, and we earlier provided you with a
11  Roxane Exhibit 46 which was a collection of
12  Palmetto arrays that had been produced in this
13  case to us.  It's that document right there.  It
14  has a cover note on it but in the back is a
15  collection of the arrays generally from 1996
16  through 2004.  Maybe you can flip to that
17  document quickly and see if you recognize the
18  arrays that are behind that.
19       Now, Mrs. Stone, let me ask you a
20  general question about these arrays.  Were these
21  particular arrays published on a Web site or in a
22  newsletter from 2000 and 2004?

156

1    A.  The arrays?
2    Q.  Yeah, the actual Excel sheets here or
3  other sheets within Roxane 46 that list, you
4  know, particular manufacturer, product name, the
5  AWP, whether it's been placed in a generic or
6  brand column.
7    A.  Not that I can recall.
8    Q.  You don't have any reason to believe
9  that these were publicly available, do you?
10    A.  Um-um.
11    Q.  You have to answer yes or no.
12    A.  No.
13    Q.  The answer is no?  So as far as you
14  know, Roxane couldn't determine whether Palmetto
15  was putting Ipratropium Bromide product in a
16  generic or brand array, is that right?
17    A.  That's correct.
18    Q.  And the same goes for the Ipratropium
19  Bromide NovaPlus product, Roxane couldn't
20  determine whether you had placed it in the brand
21  or generic portion of the array?
22    A.  That's correct.

157

1    Q.  I wanted to draw your attention
2  specifically to AWPQ022-0038 (sic) and that
3  appears to be the 2001 first quarter array.  And
4  in your declaration you indicated that this was
5  the first array where the NovaPlus product was
6  entered in the Palmetto arrays.  And do you see
7  it there under the J code 7644KO?
8       MR. FAUCI:  Which Bates number?
9       BY MR. GORTNER:
10    Q.  I'm sorry, it's AWQ022-0038.
11    A.  Oh, 38.
12    Q.  And it appears to be an array for the
13  first quarter of 2001 and about three-quarters
14  down the page there are three entries for
15  Ipratropium Bromide NovaPlus in the array, do you
16  see that?
17    A.  Yes.
18    Q.  And as we talked about on the far right
19  next to the three rows of Ipratropium Bromide
20  NovaPlus there is a column entitled TYP, which
21  might stand for type, and it has a G entry which
22  suggests that the fee that was sent was based on

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

41 (Pages 158 to 161)

158

1   the median generic AWP, correct?
2       **A. Correct.**
3       Q.  And what I'm asking you to do is just
4   to flip through the remaining arrays if you
5   wouldn't mind and confirm that in all instances
6   where Ipratropium Bromide NovaPlus was in the
7   arrays, the payment was set upon the median
8   generic AWP and not on a brand AWP.
9           And just so that you don't think it's a
10  trick question, I represent to you that we have
11  gone through it and we see G's next to every
12  entry.
13          MR. FAUCI:  I thought we answered that.
14          BY MR. GORTNER:
15      Q.  Yeah.  If you'll stipulate to that, I
16  just want to make it clear that that was the case
17  and I'll ask a follow-up question so we have it
18  clear on the record, Mrs. Stone.
19      **A. Okay.  That appears to be the case.**
20      Q.  That's the case?  And that indicates to
21  you that Ipratropium Bromide NovaPlus AWP never
22  set the payment rate for Palmetto's fee

159

1   calculation for Ipratropium Bromide, is that
2   correct?
3       **A. That's correct.**
4           MR. GORTNER:  I don't think I have any
5   further questions.  Thank you for your time.
6           MR. FAUCI:  Marisa?
7           MS. LORENZO:  I have no questions.
8           MR. GORTNER:  Marisa?
9           VIDEO TECHNICIAN:  We will now go off
10  the record.  The time is approximately 3:17 PM.
11          (A recess transpired.)
12          VIDEO TECHNICIAN:  We are back on the
13  record at 3:24 PM.
14          BY MR. GORTNER:
15      Q.  Mrs. Stone, I have just a couple more
16  questions.
17      **A. Okay.**
18      Q.  First, have you spoken to anyone else
19  aside from your counsel or the DOJ attorneys with
20  respect to your declaration?
21      **A. No.**
22      Q.  Have you had any contact with Miss

160

1   Helton about her declaration in this case?
2       **A. No.**
3           MR. GORTNER:  Okay.  And I'm going to
4   request that counsel not discuss your testimony
5   with Miss Helton prior to her deposition this
6   Friday and I'll make the same request of you.
7   We'll be speaking with her on Friday and would
8   like to keep this testimony private until that
9   time.  No more questions, thanks.
10          EXAMINATION
11          BY MR. FAUCI:
12      Q.  Mrs. Stone, I just have a couple quick
13  questions just following up on a few matters.
14  I'm going to show you what I'll mark as US Stone
15  Exhibit 1.
16          (Exhibit US Stone 001, Document
17  entitled Tab 171, with attachments, was marked
18  for identification.)
19          BY MR. FAUCI:
20      Q.  Take a moment to familiarize yourself
21  with that document and just tell me if you
22  recognize it.

161

1       **A. Yes, I do.**
2       Q.  What is this document?
3       **A. It is a CMS and/or HCFA, at that time,**
4   **transmittal which gives the contractors**
5   **guidelines and guidance for handling drug**
6   **payments.**
7       Q.  What's the date of the document?
8       **A. December 1998.**
9       Q.  Do you believe that Palmetto, excuse
10  me, received this document?
11      **A. Yes.**
12      Q.  Can you -- can I direct your attention
13  to the heading calculation of the AWP?  Do you
14  see that about midway down?
15      **A. Oh, yes.**
16      Q.  Can you read the language after the
17  Number 2?
18      **A. Okay.  For a multisource drug or**
19  **biological, the AWP is equal to the lesser of the**
20  **median AWP of all of the generic forms of the**
21  **drug or biological or the lowest brand name**
22  **product AWP. A brand name product is defined as a**

Palmetto DMERC (Robin K. Stone)                 October 14, 2009
Columbia, SC

42 (Pages 162 to 165)

|  | 162 |
|---|---|
| 1 | product that is marketed under a labeled name |
| 2 | that is other than the generic chemical name for |
| 3 | the drug or biological. |
| 4 | Q.  Are you familiar with this language? |
| 5 | A.  Yes. |
| 6 | Q.  Did you rely on this language in |
| 7 | deciding whether to classify products as brand or |
| 8 | generics? |
| 9 | MR. GORTNER:  Objection, form. |
| 10 | THE WITNESS:  I'm sure we would have |
| 11 | used this in that determination. |
| 12 | BY MR. FAUCI: |
| 13 | Q.  Earlier you testified that at some |
| 14 | point in time you came to understand that there |
| 15 | were some products that were what you called |
| 16 | branded generics.  Do you recall that testimony? |
| 17 | A.  Yes. |
| 18 | Q.  Did you rely on the language in this -- |
| 19 | the language you just read in determining whether |
| 20 | products you regarded as branded generics were |
| 21 | brands or generics for purposes of Medicare |
| 22 | reimbursement? |

|  | 163 |
|---|---|
| 1 | MR. GORTNER:  Objection, form. |
| 2 | THE WITNESS:  Yes. |
| 3 | BY MR. FAUCI: |
| 4 | Q.  I believe you testified earlier as to |
| 5 | the sources of information that Palmetto used in |
| 6 | determining Medicare reimbursement.  Do you |
| 7 | recall that? |
| 8 | A.  I'm sorry, repeat that. |
| 9 | Q.  I believe you testified earlier as to |
| 10 | the sources and information that Palmetto looked |
| 11 | to in determining Medicare reimbursement amounts? |
| 12 | A.  Yes. |
| 13 | Q.  Was that the Redbook? |
| 14 | A.  Yes. |
| 15 | Q.  And you testified that you used |
| 16 | different versions of the Redbook, is that |
| 17 | correct? |
| 18 | A.  Yes. |
| 19 | Q.  Was there a time -- what was the time |
| 20 | that you came to use an on-line version of the |
| 21 | Redbook? |
| 22 | A.  The on-line?  Oh, gosh.  I want to |

|  | 164 |
|---|---|
| 1 | believe sometime in 2001 or 2002 maybe.  I can't |
| 2 | remember dates exactly. |
| 3 | Q.  Is that the Redbook for Windows? |
| 4 | A.  No. |
| 5 | Q.  I'm sorry, I misspoke then. |
| 6 | A.  Okay. |
| 7 | Q.  I wasn't clear.  Can you tell me the |
| 8 | time that you came to use the Redbook for Windows |
| 9 | program? |
| 10 | A.  The Redbook for Windows, I want to |
| 11 | think -- because I say that in my thing.  I can't |
| 12 | remember dates very well.  I know at least 1999 |
| 13 | and I think I have something that showed me that |
| 14 | we were using it possibly before that but I'm not |
| 15 | sure.  Hang on.  This was dated '99. |
| 16 | Q.  Yeah, if I can -- I believe you're |
| 17 | looking at what's been marked as Abbott Exhibit |
| 18 | 42 -- Roxane Exhibit 42, is that correct? |
| 19 | A.  Yes. |
| 20 | Q.  And I direct your attention to a page |
| 21 | on that beginning drug pricing procedure. |
| 22 | A.  Okay. |

|  | 165 |
|---|---|
| 1 | Q.  Does this suggest to you that you were |
| 2 | using the Redbook CD/ROM by 1999? |
| 3 | A.  Yes. |
| 4 | Q.  In the printed Redbook, were these |
| 5 | conventions that Redbook used to distinguish |
| 6 | between brand name and generic products? |
| 7 | A.  In the? |
| 8 | Q.  In the annual printed Redbook. |
| 9 | A.  In the annual printed Redbook, yes. |
| 10 | Q.  What were those conventions? |
| 11 | A.  I'd have to look at a visual.  The |
| 12 | brand name -- can I refer to -- |
| 13 | Q.  Do they refer to the type face and |
| 14 | capitalization? |
| 15 | A.  Well, yes. |
| 16 | Q.  And were there any such conventions in |
| 17 | the Redbook for Windows program? |
| 18 | A.  In the Redbook for Windows?  Say the |
| 19 | question again, I'm sorry. |
| 20 | Q.  Can you just -- when you looked at |
| 21 | pricing information on the Redbook for Windows |
| 22 | programs, did it make any -- did it distinguish |

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

43  (Pages 166 to 169)

---

166

1    between products as brands or generics according
2    to capitalization or type face?
3        **A.  I don't think that was very clear as**
4    **far as brand and generic.  There was**
5    **capitalization in lower-case -- or upper-case and**
6    **lower-case and I know one contained all and I**
7    **can't remember what the other one contained.  I**
8    **looked at it but I can't remember.**
9        Q.  Can you look at that exhibit that we
10   marked as Roxane Exhibit 255?  I think it was a
11   two-part exhibit.  I believe you testified
12   earlier that the information contained in here
13   was -- represents printouts from the Redbook for
14   Windows program?
15       **A.  Yes.**
16       Q.  Can I direct your attention to the page
17   marked Cigna 0110.
18       **A.  Okay.**
19       Q.  What is this page?
20       **A.  It is a page out of the CD Redbook for**
21   **Windows.**
22       Q.  Does this list various products that

---

167

1    were included within the relevant HCFA code for
2    Ipratropium Bromide?
3        **A.  Yes.**
4        Q.  And does it list Atrovent?
5        **A.  Yes.**
6        Q.  And does it also list Ipratropium
7    Bromide products by brand name manufacturers?
8        **A.  Yes.**
9        Q.  And it also lists Ipratropium Bromide
10   NovaPlus?
11       **A.  Yes.**
12       Q.  Are those products distinguished in any
13   way in terms of capitalization or type face?
14       **A.  No.**
15       Q.  Can you look at Roxane Exhibit 259.  It
16   was the Diltiazem.  I'm sure Mr. Gortner
17   pronounced it better than I did.  Diltiazem.
18   Just a point of clarification --
19           MR. GORTNER:  Can I interrupt you just
20   for a moment?  I'm sorry.  Could you move your
21   microphone up a little bit higher?  Apparently
22   we're -- sorry about that.

---

168

1            MR. FAUCI:  No problem.
2            THE WITNESS:  Okay.
3            BY MR. FAUCI:
4        Q.  This document lists various Diltiazem
5    products and it appears to list several Diltiazem
6    products -- Diltiazem NovaPlus products under the
7    generic section.  Do you see that?
8        **A.  Yes.**
9        Q.  Above the generic section it says
10   package exclusions.  What does that mean?
11       **A.  There are certain exclusions that**
12   **Palmetto GBA would exclude based on what they**
13   **call special packaging.  Preservative-free might**
14   **be excluded if the code itself didn't indicate**
15   **preservative-free.  That's all I can think of**
16   **right now but I know there were some -- there are**
17   **exclusions.**
18       Q.  I think this is my -- so is it fair to
19   say that the products listed under package
20   exclusions were not used to calculate in the
21   arrays?
22       **A.  That would be true.**

---

169

1        Q.  I think I just have one more line of
2    very quick questions.  Mr. Gortner asked you a
3    series of questions about the possibility of
4    products would have other names appearing after
5    the generic chemical names such as CVS or
6    Walgreens. Do you recall that?
7        **A.  Yes.**
8        Q.  Have you ever seen a product that --
9    where the product name had CVS appearing in the
10   product name?
11       **A.  No.**
12       Q.  What about Walgreens?
13       **A.  Not that I can recall.**
14           MR. FAUCI:  I have no questions.
15           MR. GORTNER:  No further questions on
16   my end.
17           VIDEO TECHNICIAN:  This concludes the
18   videotape deposition of Robin Stone, 30(b)(1) and
19   30(b)(6) representative of Palmetto DMERC.  The
20   time is approximately 3:35 PM.  We are now off
21   the record.
22           (The deposition concluded at 3:35 PM.)

---

Palmetto DMERC (Robin K. Stone)                    October 14, 2009
Columbia, SC

170

1                CERTIFICATE OF REPORTER

2

3        I, Terri L. Brusseau, Registered

4    Professional Reporter and Notary Public for the

5    State of South Carolina at Large, do hereby certify

6    that the foregoing transcript is a true, accurate,

7    and complete record.

8        I further certify that I am neither

9    related to nor counsel for any party to the cause

10   pending or interested in the events thereof.

11       Witness my hand, I have hereunto

12   affixed my official seal this 16th day of October,

13   2009 at Charleston, Charleston County, South

14   Carolina.

15

16

17

18   _____

19   Terri L. Brusseau, RPR, CRR

20   My Commission expires

21   March 24, 2016.

22