UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL No. 1456 Civil Action 01-12257-PBS |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | Subcategory 06-11337-PBS |
| | ) | |
| *United States of America, ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*, CIVIL ACTION NO. 07–CV-11618-PBS | ) ) ) ) | Hon. Patti B. Saris |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

VEN-A-CARE'S MEMORANDUM OF LAW IN RESPONSE TO
ABBOTT'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ................................................................................................. 1

I.   FACTUAL BACKGROUND ....................................................................... 3

    A.   Abbott's "Conduct" As Initially Alleged By Ven-A-Care ................... 3

    B.   Government Knowledge .................................................................. 8

II.   SUMMARY JUDGMENT STANDARD ..................................................... 9

III.   ARGUMENT ......................................................................................... 10

    A.   Ven-A-Care's Claims Are Not Barred by the Statute of Limitations ................... 10

        1.   FERA legislative amendment of FCA ..................................... 10

        2.   Notice is not required ........................................................... 12

        3.   "Conduct, transaction, or occurrence set out – or attempted to be set out" ................................................................................. 13

        4.   Added "Ery" NDCs share common, unique pricing structure ................... 15

    B.   Tolling ........................................................................................ 16

    C.   The Impact of So-Called "Government Knowledge" on Causation After 2001 Is Not a Ground for Summary Judgment Due to "Genuine" Fact Issues ................................................................................. 17

IV.   Fact Issues Exist As to Whether Abbott Is Liable for "Anti-Kickback" Claims ............. 22

V.   Damages ............................................................................................... 24

    A.   Causal Connection Between Abbott's Prices and Medicaid Damages ................. 24

    B.   Formulation of Damages Under the FCA ......................................... 26

    C.   Actual Claims Data Forms the Basis for Ven-A-Care's Damages Calculations ................................................................................. 27

i

D.      Dr. Duggan Made Appropriate Economic Extrapolation in Calculating
        Damages..................................................................................................................29

VI.     Ven-A-Care Only Seeks Recovery for Claims Brought on Behalf of the
        United States That It Has Not Released...........................................................30

CONCLUSION.....................................................................................................................31

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

CASES

*Barbour v. Dynamics Research Corp.*,
    63 F.3d 32 (1st Cir. 1995).................................................................................9

*Bigelow v. RKO Radio Pictures, Inc.*,
    327 U.S. 251 (1946)..............................................................................26, 30

*Blue Cross Blue Shield of Mass. v. AstraZeneca Pharms. LP*,
    C.A. No. 08-1056, 2009 U.S. APP. LEXIS 20977 (1st Cir. Sept. 23, 2009) at p. 75.............19

*BMY-Combat Sys. Div. of Harsco Corp. v. United States*,
    44 Fed.Cl. 141 (1999)...............................................................................26

*Carcieri v. Norton*,
    398 F.3d 22 (1st Cir. 2005)...........................................................................9

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).................................................................................9

*Illinois Physicians Union v. Miller*,
    675 F.2d 151 (7th Cir.1982).........................................................................29

*In re Pharmaceutical Industry Average Wholesale Price Litigation*,
    491 F. Supp. 2d 20 (D. Mass. June 21, 2007)..............................................4, 8, 25

*Toepleman v. United States*,
    263 F.2d 697 ......................................................................................21

*United States ex rel. Anti-Discrimination Center of Metro New York v. Westchester County*,
    2009 WL 1108517 (S.D.N.Y. April 24, 2009) .......................................................26

*United States ex rel. Butler v. Hughes Helicopters Co.*,
    1993 WL 841192 (C.D. Cal. Aug. 25, 1993).........................................................18

*United States ex rel. Dye v. ATK Launch Systems, Inc.*,
   2008 WL 4642164 (D. Utah Oct. 16, 2008 ) ......................................................21

*United States ex rel. El-Amin v. George Washington Univ.*,
   522 F. Supp. 2d 135 (D.D.C. 2007) ...................................................................29

*United States ex rel. Fago v. M & T Mortg. Corp.*,
   518 F. Supp. 2d 108 (D. D.C. October 2, 2007) .................................................24

*United States ex rel. Ferguson v. General Dynamics Corp.*,
   No. 90-4703-MRP at 7-8 (C.D. Cal. Apr. 28, 1994) ..........................................21

*United States ex rel. Franklin v. Parke-Davis*,
   2003 WL 22048255 (D. Mass. Aug. 22, 2003) at p. 4.........................................19

*United States ex rel. Hyatt v. Northrop Corp.*,
   91 F.3d 1211 (9th Cir. 1996) ..............................................................................16

*United States ex rel. Jordan v. Northrop Grumman Corp.*,
   No. CV 95-2985 ABC at 33-35 (C.D. Cal. Aug. 6, 2002).................................21

*United States ex rel. Loughren v. UnumProvident Corp.*,
   604 F. Supp. 2d 259 (D. Mass. 2009) .................................................................28

*United States ex rel. Magid v. Wilderman*,
   2004 WL 945153 (E.D. Pa. 2004) .......................................................................30

*United States ex rel. Marcus v. Hess*,
   317 U.S. 537, 87 L.Ed. 443 (1943)................................................................21, 26

*United States ex rel. Marcus v. Hess*,
   41 F. Supp. 197 (D. Pa. 1941)............................................................................21

*United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.*,
   565 F.Supp. 2d 153 (D.D.C. 2008) .....................................................................29

*United States ex rel Pogue v. Diabetes Treatment Ctrs. Of Am., Inc.*,
   474 F. Supp. 2d 75 (D.D.C. 2007) ......................................................................16

*United States ex rel. Repko v. Guthrie Clinic, P.C.*,
   557 F. Supp. 2d 522 (M.D. Pa. 2008) .................................................................16

*United States ex rel. Roby v. Boeing Co.*,
   302 F.3d 637 (6th Cir. 2002) ..............................................................................21

*United States ex rel. Roby v. Boeing Co.*,
   79 F. Supp. 2d 877 (S.D. Ohio 1999) .................................................................26

*United States v. Ruttenberg*,
    625 F.2d 173 (7th Cir. 1980) ...................................................................................23

*United States ex rel. Sanders v. Allison Engine Co.*,
    Case No. 1-95-970 at 4 (S.D. Ohio Apr. 9, 2002) ..................................................21

*United States ex rel. Shaver v. Lucas Western Corp.*,
    237 F.3d 932 (8th Cir. 2001) ...................................................................................23

*United States ex rel. Tyson v. Amerigroup Illinois, Inc.*,
    488 F. Supp. 2d 719 (N.D. Ill. 2007) .....................................................................29

*United States ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott*,
    538 F. Supp. 2d 392 at p. 13 (D. Mass. March 13, 2008)................................12, 15

*United States ex rel. Ven-A-Care v. Abbott*,
    491 F. Supp. 2d 12 (D. Mass. 2007) ........................................................22, 23, 25

*United States ex rel. Ven-A-Care v. Actavis Mid Atlantic LLC et al.*,
    C.A. 08-cv-10852, 2009 U.S. Dist. LEXIS 92945 (D. Mass. Oct. 2, 2009)................... passim

*United States ex rel. Ven-A-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp.*,
    No. 01-12257, 2007 WL 4287572 (D. Mass. Dec. 6, 2007)("Roxane") ......................11,13,15

*United States ex rel. Ven-A-Care of the Florida Keys, Inc. v Dey*,
    498 F. Supp. 2d 389 (D. Mass. 2007) ...........................................................7, 11, 12

*United States v. Baylor Univ. Med. Ctr. et al.*,
    469 F.3d 263 (2d Cir. 2006)............................................................................11, 12

*United States v. Cabrera-Diaz*,
    106 F. Supp. 2d 234 (D.P.R. 2000)..........................................................................29

*United States v. Consolidated Aeronautics*,
    No. CV 90-3408-AWT at 2 (C.D. Cal. Feb. 11, 1991)............................................21

*United States v. Killough*,
    848 F.2d 1523 (11th Cir. 1988) ..............................................................................26

*United States v. Mackby*,
    339 F.3d 1013 (9th Cir. 2003) ................................................................................26

*United States v. Salti*,
    Case No. 1:96CV1065 (N.D. Ohio Feb. 2, 2000)...................................................18

*United States v. Southland Mgmt. Corp.*,
   288 F.3d 665 (5th Cir. 2002) ................................................................18

*United States v. Southland Mgmt. Corp.*,
   326 F.3d 669 (5th Cir. 2003) ................................................................18

*United States v. Williams*,
   216 F.3d 1099 (D.C. Cir. 2000) ............................................................30

*United States v. Woodbury*,
   359 F.2d 370 (9th Cir. 1966) ................................................................26

STATUTES AND RULES

31 U.S.C. § 3729(a) ..................................................................................24

31 U.S.C. § 3730(b) ..................................................................................31

31 USCA § 3731(c) ...................................................................................10

Fraud Enforcement and Recovery Act of 2009 ("FERA").................................10,11,12

Rule 15 ...................................................................................................13

Rule 15(1)(A) ...........................................................................................13

Rule 15(c)(1) ....................................................................................... passim

Rule 15(c)(1)(A) .......................................................................................10

Rule 15(c)(1)(B) .......................................................................................13

Rule 15(c)(2) ............................................................................................13

Rule 56.1 .................................................................................................14

**<u>INTRODUCTION</u>**

This brief sets forth responsive legal arguments and raises fact issues with respect to partial summary judgment sought by Defendant, Abbott, on grounds summarized as (1) statute of limitations, (2) "government knowledge" which allegedly disrupts causation, (3) sufficiency of proof of damages, (4) purported anti-kickback claim insufficiency, and (5) assertions of settlement and release of United States FCA claims.  Abbott is not entitled to summary judgment.

Ven-A-Care pleading amendments relate back to the initial "Ery" allegations filed February 15, 2001 in the First Amended Complaint because such amendments are founded upon the conduct, transaction, or occurrence initially set out or attempted to be set out;  even though Rule 15(c)(1) does not require such a stringent showing.  Therefore, the claims regarding additional Erythromycin formulations and the derivative AWPs and Direct prices properly relate back.

The question of whether government knowledge, if any, negates or disrupts causation of damages cannot be decided at summary judgment because numerous genuine fact issues exist. Even Abbott's own briefing trickery and concealment actually proves the government did not have knowledge of large AWP discounts to retail pharmacies.  Abbott falsely cites its misleadingly incomplete SOF Exh. 16 (aka MTD Exh. 11) for the proposition that the National Association of Retail Druggists ("NARD") "submitted a comparison of the contract prices (available to members of its organization) and published AWPs."  (See Abbott SOF ¶ 29.) NARD's members were retail pharmacies.  NARD represented 40,000 independent pharmacies responsible for nearly 85% of the Medicaid pharmaceutical services. NARD did not provide the "Prucare" prices to Congress to show retail pharmacies were receiving low prices. These Prucare

prices were represented to be "hospital prices."   NARD's point was that only <u>non</u>-retail pharmacies such as hospitals, HMOs, and mail order, for instance, were getting discounts beyond 15% off of AWP. (See Anderson Dec. Exh. 26 at p. 286, 295 and 301.) The full version of the July 1992 Congressional record shows NARD was presenting the low prices as "hospital" prices which "were discounted beyond the amount (AWP-15%) that might be available to retail pharmacists."   (See Anderson Dec. Exh. 26 at p. 295 and 301.)  NARD continued in stating, "Any way you slice it our members are getting a raw deal."  Id.

Furthermore, this "defense" is a cloaked effort at imposing a legally inapplicable and factually unsupportable duty to mitigate upon the government.

Ven-A-Care and its expert have properly presented actual Medicaid claims data and appropriate, accepted economic analysis of such data concerning proffered Medicaid damages. These calculations are tied directly to Abbott's pricing manipulations and concealment because of the almost universal mechanism by which Medicaid programs pay the "lesser of" an individual NDC's EAC, MAC, FUL, or U&C.  Summary judgment is certainly not appropriate as the fact finder, which Abbott is trying to avoid, must determine the weight of this evidence.

Ven-A-Care does not instantly pursue claims it has settled, but rather only pursues claims on behalf of the United States which have not been settled or released by the United States in any form or fashion in the context of any California or Texas state settlements.

Abbott's instant Motion for Partial Summary Judgment should be denied.

I.     **FACTUAL BACKGROUND**

    A.     Abbott's "Conduct" As Initially Alleged by Ven-A-Care

    Ven-A-Care brings this case on behalf of the United States asserting False Claims Act

("FCA") causes of action against Abbott concerning the publication of misleading pricing

information for erythromycin drugs which are widely known as "Ery" drugs.  Abbott's illegal

pricing scheme for the Ery drugs was unique within the responsible Pharmaceutical Products

Division and consistent throughout this specific "Ery" product line. (*See* Docket #6416 -VAC's

Motion for Partial Summary Judgment with Memo in Support and Docket #6417- VAC's SOF.)

To avoid unnecessarily duplicative briefing, Ven-A-Care will not repeat its previously stated

argument and facts showing the illegal Ery pricing manipulations, but rather incorporates such

by reference herein.[1]

    Ven-A-Care first brought False Claims Act claims concerning Abbott drugs which were

formed using erythromycin salts through a First Amended Complaint filed under seal in U.S.

---

[1]     Ven-A-Care's Motion for Partial Summary Judgment, Memo in Support (Docket
#6416), and Statement of Facts (Docket #6417) set forth conclusive evidence of Abbott's
purposeful Ery pricing scheme.  Ven-A-Care also will not unnecessarily restate the procedural
history of its other case against Abbott concerning injectable drugs and fluid products.  That case
was initially brought by Ven-A-Care in a different court and alleged False Claims Act violations
with respect to very different drugs managed by a separate unincorporated Hospital Products
Division.  Those HPD drugs do not possess any chemical similarities to the Ery drugs and were
not administered orally, but rather through injection or intravenous methods.  *See* Anderson
Declaration Exh. 1  (DeYoung 288:10-289:6);  *see* also Thomas Exh. 2 (Fiske 321:1-322:1).
PPD is widely known as the brand drug side of Abbott while HPD sold primarily multi-source
(also referred to as generic) drugs.  *See* Thomas Exh. 2 (Fiske 321:5-10).  The Ery drugs were
priced and sold by PPD through unique pricing misrepresentation practices such as concealment
of usual gross prices billed wholesalers, known as Base Deal prices, as well as actual wholesaler
costs.  (*See* Docket #6416- VAC Motion for Partial Summary Judgment, Docket #6423- VAC
Memo in Support, generally; *see* also Docket #6417- VAC Statement of Facts in Support
("SOF")¶ ¶ 6-10).

District Court for the District of Massachusetts on February 15, 2001.  *See* Anderson Dec. Exh 2 (First Amended Complaint under Docket 00-cv-10698).  These initially named erythromycin drugs, as well as, all other specific erythromycin NDCs later made a part of this case, are referred to by Abbott in its Motion as the "Ery" products as referenced throughout the case.  (*See* Anderson Dec. Ex. 3 (Lockwood 4/23/09 11:10-12:6).  The base ingredient erythromycin salts used in these Ery drugs are created by Abbott in special fermentation tanks which required minimum production quantities.  *See* Anderson Dec. Ex. 1 (DeYoung 3/20/07 288:10-291:2).  The Erys were priced in a manner unique within the Abbott PPD division in order to maintain high unit sales volumes and meet minimum production requirements; this pricing structure was concealed from the government.  *Id.*; *see* also Docket #6417-VAC-SOF ¶¶ 6-10.  The Ery NDCs named in this case are simply different "formulations" of erythromycin.  *See* Docket #6423 (VAC Memo in Support of Summary Judgment at p. 3).

As a pharmacy insider, Ven-A-Care timely brought this Ery case after Ven-A-Care was able to analyze (a) the actual Ery drugs' market pricing generally and currently paid by wholesalers and pharmacies, in contrast to, (b) the inflated published pricing for those same Ery drugs.  *See* Anderson Dec. Exh. 3 (Lockwood 4/23/09 at 12:7-15:16;  40:8-41:4;  42:2-43:3; 46:12 – 47:18).  This analysis by Ven-A-Care was conducted after Ven-A-Care received industry insider market pricing in the form of an electronic database known as Econolink in April 2000.  *Id*.  Contrary to Abbott's characterization, this database was not simply a price list.  *See* Docket #6441 (Abbott's Memo of Law at p. 1).  This database is not to be confused with published List prices (known at Abbott as "Direct" prices) or other published pricing information such as WAC or AWP.  Instead, these proprietary market prices were kept confidential by the pharmaceutical

sellers and buyers. *See* Anderson Declaration Exh. 3 (Lockwood 4/23/09 222:12-227:11).  In this case, McKesson only provided these Abbott prices to Ven-A-Care as a properly qualified and licensed pharmacy.  *Id*.  As this Court well knows after many years of litigation, drug market prices are closely guarded as proprietary and trade secret information by the drug manufacturers, wholesalers, and pharmacies alike.  See *In re Pharmaceutical Industry Average Wholesale Price Litigation,* 491 F. Supp. 2d 20, 71 (D. Mass. June 21, 2007).   These types of proprietary prices disseminated by wholesalers are not available to state or federal government personnel involved in Medicaid drug reimbursement.  *See* Anderson Declaration Exh. 4 ( Lyle 7/22/08 296:6 – 15); see Anderson Dec. Exh 8 (Tawes 12/13/07 802:6-803:1; 703:20-704:17).

Subsequent to its First Amended Complaint, Ven-A-Care filed a Second Amended Complaint on February 1, 2002 and a Third Amended Complaint on February 15, 2005.  *See* Anderson Dec. Exh 2 (containing 2/15/01 (00-cv-10698)), Anderson Dec. Exh 5 (containing 2/1/02 (00-cv-10698)), Anderson Dec. Exh 6 (containing 2/15/05 (00-cv-10698)), and Anderson Dec. Exh 7 (containing 8/30/07 (07-cv-11618) Complaints).  Ven-A-Care also filed a fourth amended Complaint styled as the "Complaint" on August 30, 2007 in connection with the unsealing of this proceeding.  *Id*.  This Complaint is the live pleading in the case.  Ven-A-Care did not add any Ery NDCs in 2002, but did add Ery NDCs in 2005 and 2007.  *Id*.  There are currently 43 different Ery drugs named in this suit.  *Id*. at p. 12.

In its First Amended Complaint Ven-A-Care described the different Medicaid drug reimbursement methodologies throughout the United States and specifically described how most Medicaid programs utilized AWP pricing in setting drug reimbursement.   *See* Anderson Declaration Exh. 2 (First Amended Complaint filed 2/15/01 ¶ 31-32.)   Ven-A-Care did focus

Ery allegations against Abbott in this 2001 Complaint upon Abbott's misrepresentation of the wholesaler prices charged by Abbott and the costs actually paid to Abbott by wholesalers.  *See* Anderson Declaration Exh. 2 (First Amended Complaint filed 2/15/01 ¶ 83-84.)   However, in this 2001 Complaint Ven-A-Care also pled other information and allegations related to this "conduct, transaction or occurrence", including;

(a)     First Data Bank published pricing in "terms of AWP and WAC",

(b)     "(m)ore than 90% of the States' Medicaid Pharmacy Programs utilized AWPs and WACs as communicated by First Data Bank",

(c)     "First Data Bank receives and <u>relies</u> upon the drug manufacturers', including the DEFENDANTS', representations of their drug prices and costs including the prices at which the DEFENDANTS sell their drugs to wholesalers (WAC) <u>in determining the drug pricing data that they report to the States</u>", and

(d)     "each of the DEFENDANTS had been the <u>source</u> of the price and cost information which was reported by First Data Bank to the States' Medicaid Programs (emphasis added)."[2]

*See* Anderson Declaration Exh. 2 ( First Amended Complaint filed 2/15/01 ¶ 38, 53, and 56.)

In its Second Amended Complaint, Ven-A-Care included claims regarding Direct prices. *See* Anderson Declaration Exh. 5 (Second Amended Complaint filed 2/1/02 ¶ 141).  These claims derived directly from the inflated and misleading wholesale pricing conduct which Ven-

---

[2]     As noted, in Ven-A-Care's Motion for Partial Summary Judgment and related Statement of Facts, Abbott admits it directly reported WAC, Direct and AWP prices to First Data Bank until at least 2001.  *See* Docket #6423 at p. 1.  These reported AWPs were set at 25% greater than the respective drug's WAC.  *See* Docket #6423 at  p. 3; *see also* US-A-SF ¶88.  Abbott admits it has known since the 1990's that First Data Bank published AWPs which were 25% greater than WACs for the Abbott PPD drugs.  *See* Docket #6417 ¶6.

A-Care initially pled, as noted, in part, above.  Direct prices were set by Abbott at a level simply 5% greater than the false WACs.  *See* Thomas Exhibit 6.  *See* Anderson Dec. Exh. 11 (Fiske 2/17/09 240:3-19).   Because California Medicaid utilized Direct prices in its reimbursement methodologies, Ven-A-Care alleged California program was harmed by these price representations. *See* Anderson Declaration Exh. 2 (Second Amended Complaint filed 2/1/02 ¶ 141).   These Direct price claims merely elaborated on Ven-A-Care's initial allegations and certainly pertained to the same conduct.

In the Third Amended Complaint filed in early 2005, Ven-A-Care more explicitly described how its initial allegations of wholesaler price and cost (referred to by Ven-A-Care as "WAC") misrepresentation by Abbott directly led to the publication of inflated and misleading AWPs as well.  *See* Anderson Declaration Exh. 6 (Third Amended Complaint filed 2/15/05 at ¶192-195).  These AWPs were known by Abbott to be set as a function of WAC.  (See Docket #6417 - VAC SOF in Support of Motion for Partial Summary Judgment at ¶ 14.)  It cannot be credibly disputed that AWPs for all Ery products currently named in this action were calculated to be 25% greater than the corresponding WAC for each given Ery NDC.  *Id*.  This formulaic connection between AWP, Direct, and the root WAC prices establishes a commonality of wrongful pricing practices regarding all the Ery drugs.  Accordingly, Ven-A-Care's allegations all relate to the original Ery allegations as well as derive from the initially pled "conduct, transaction, or occurrence".[3]

---

[3]   Although it has made a clear showing, that it subsequent pleading amendment arise from the same Ery conduct, transaction or occurrence initially pled, Ven-A-Care does not concede it must meet this precise threshold of same "conduct, transaction or occurrence" because as this Court noted in the *Dey* opinion, such a requirement is not explicitly a part of FRCP 15(c)(1) analysis. *United States ex rel. Ven-A-Care of the Florida Keys, Inc. v Dey*, 498 F. Supp. 2d 389, 398 (D. Mass. 2007).

In the fourth amended "Complaint" filed August 30, 2007 in connection with the unsealing of this case, Ven-A-Care named some additional Ery NDCs which shared the already alleged pricing scheme. As previously set forth, the addition of these NDCs likewise relates back to the February 15, 2001 Complaint. The total number of NDCs named in 2007 was forty-three (43) and that list has remained constant to the present.

B.      Government Knowledge

Abbott's own evidence leads to a discovery that the government was not receiving information indicating retail pharmacies could buy drugs at large discounts from AWP. After tracking down a full copy of the incomplete and misleading Abbott SOF Exh. 16 and Abbott MTD Exh. 11 filed and cited by Abbott, Ven-A-Care was able to determine that in fact this July 1992 Congressional record stands for exactly the opposite fact claimed by Abbott. Abbott says the document reveals retail pharmacy prices. (*See* Abbott SOF ¶ 29.) The document says the exact opposite. (*See* VAC SOF ¶ 20 – July 1992 Congressional record p. 295 and 301.) The prices by a large retail pharmacy trade group, the National Association of Retail Druggists ("NARD"), are titled "Southeastern/Prucare" prices and are presented by NARD as "hospital" prices. *Id*. These are not retail pharmacy prices. *Id*. In fact, the NARD is explicitly complaining that its members cannot buy drugs below AWP-15%. (*See* VAC SOF ¶ 20– July 1992 Congressional record p. 301.) Abbott's "government knowledge" argument is just as flawed and false as its so-called citations.

To the contrary, the government was still trying to identify the problem, if any, and then understand it. In the context of describing the late 2001 "perfect storm" of information, this Court appropriately characterized the government as a "pit bull" in its efforts to address drug

pricing issues.  *In re AWP*, 491 F.Supp.2d at 43-44.  The Court quoted 2003 OIG "Guidelines" which clearly stated, "it is illegal for a manufacturer knowingly to establish or inappropriately maintain a particular AWP if one purpose is to manipulate the 'spread' to induce customers to purchase its product."  *Id*.   These guidelines indicate the government did not in any manner approve of AWP or other published price inflation.


II.      **SUMMARY JUDGMENT STANDARD**

"Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Barbour v. Dynamics Research Corp*., 63 F.3d 32, 36-37 (1st Cir. 1995) (*quoting* Fed. R. Civ. P. 56(c)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" *Barbour*, 63 F.3d at 37 (*quoting Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986)). A fact is considered "genuine" for purposes of summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a "material fact" is one which "might affect the outcome of the suit under the governing law." *Carcieri v. Norton*, 398 F.3d 22, 29 (1st Cir. 2005); citing, *Hayes v. Douglas Dynamics, Inc*., 8 F.3d 88, 90 (1st Cir. 1993) (quoting *Anderson*, 477 U.S. at 248). The opposing party must show "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly

probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50. The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour*, 63 F.3d at 36.

## III.   <u>ARGUMENT</u>

### A.   <u>Ven-A-Care's Claims Are Not Barred by the Statute of Limitations</u>

Abbott primarily argues that most of Ven-A-Care's instant FCA claims are time barred. Abbott is incorrect on many fronts, but primarily in its position that all Ven-A-Care amendments to its initial "Ery" Complaint (filed on February 15, 2001) do not relate back to that filing.

#### 1.   <u>FERA legislative amendment of FCA</u>

With respect to Rule 15(c)(1)(A), Abbott initially argues that recent Fraud Enforcement and Recovery Act of 2009 ("FERA") amendments to the FCA prevent relation-back when the government does not intervene in a relator's action. *See* Docket #6441 (Abbott Memo in Support of Summary Judgment at p. 14-15). This argument is misguided and actually seeks a result contradictory to the current plain language of the FCA and statutory purpose of the FERA amendments.

The plain language of the FERA amendments to the FCA <u>only pertain to FCA cases involving government intervention</u>. The new provision is clearly limited to instances when "the Government elects to intervene." 31 USCA § 3731(c). Therefore, this unambiguous wording does not pertain to this non-intervened action. This Court has already noted this exact distinction, but in a slightly different context, in stating "the very next provision after the tolling provision specifically applies <u>only</u> '[i]f the Government elects to intervene.'" (emphasis added)

*United States ex rel. Ven-A-Care v. Actavis Mid Atlantic LLC et al.*, C.A. 08-cv-10852, 2009 U.S. Dist. LEXIS 92945 *30 (D. Mass. Oct. 2, 2009);  citing, 31 U.S.C. § 3731(c).   Importantly, in connection with this statement this Court allowed Ven-A-Care's allegations in a separate non-intervened AWP action to not only relate-back on a drug-by-drug basis (rather than an NDC-by-NDC basis) but also held that Ven-A-Care had "the right to invoke the provisions of the statute, including the tolling provision." *Id.* at pp. 21 and 23.  The FCA must be read broadly to protect the interests of the real party, the United States. *Dey*, 498 F.Supp.2d at 398.[4]  In another Ven-A-Care non-intervened case, this Court held the FCA "makes clear that both the Attorney General and private persons may bring actions under the FCA." U*nited States ex rel. Ven-A-Care v. Actavis Mid Atlantic LLC et al.*, C.A. 08-cv-10852, 2009 U.S. Dist. LEXIS 92945 *30 (D. Mass. Oct 2, 2009).  This provision of the FCA was unchanged by FERA.  As a result, this language continues to enable Ven-A-Care to proceed for the government in "whose name they act." *Id.* at p. 20.

This result is consistent with the purpose behind the subject FERA amendment to the FCA because such was specifically designed to address the ruling of the Second Circuit in *United States v. Baylor Univ. Med. Ctr. et al.*, 469 F.3d 263, 268 (2d Cir. 2006).  This Court previously refused to follow *Baylor. United States ex rel. Ven-A-Care of the Florida Keys, Inc. v. Dey*, 498 F. Supp. 2d at 396 ("Dey"); *United States ex rel. Ven-A-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp.*, No. 01-12257, 2007 WL 4287572 (D. Mass. Dec. 6, 2007)("Roxane"), and *United States ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott*,

---

[4]   As this court has noted, the Supreme Court found the FCA allows for relation back to a relator's original complaint.  *Dey*, 498 F. Supp. 2d at 398; citing, *U.S. ex rel. Kaplan v. Metro. Ambulance & First-Aid Corp.*, No. 00-Civ. 3010 (ERK)(JMA), unpublished slip op. (E.D.N.Y. July 5, 2007) (citing *Rockwell Int'l Corp. v. U.S. ex rel. Stone*, 127 S.Ct. 1397, 1411(2007).

Docket #5143 at pp. 13-14 (March 13, 2008) ("*Abbott*").  The author of the FERA legislation specifically mentioned *Baylor* in describing the need for this FCA amendment.  *See* Anderson Declaration Exh. 12 (Congressional Record 6/3/09 at E1299).  The legislative history also clearly states that because "(t)he False Claims Act does not expressly provide that the United States may amend the qui tam plaintiff's complaint – or, if more practical, file its own complaint upon intervention" this amendment "clarifies that the Government's complaint in intervention or amended complaint will relate back to the date of the original qui tam complaint."  Id.  Clearly the focus is upon the government's ability to relate back to the relator's complaint.  FERA did not in any manner seek to prevent relator amendments from relating back;  thereby harming the real party in interest, the United States.

Abbott is no stranger to this Court's position on statute of limitations issues.  In response to Abbott's last urging of statute of limitations arguments, this Court flatly stated, "I have written at some length about relation-back issues after <u>Baylor</u> . . . (and) I decline to reconsider those decisions, or write any more on the issue." *United States ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott*, 538 F. Supp. 2d 392, 399  at p. 13 (D. Mass. March 13, 2008).  Yet, Abbott again asks for an effective reversal by this Court of its own refusal to follow *Baylor*.  Ironically, this basis for this argument is an amendment to the FCA intended to effectively invalidate *Baylor*.

### 2.   <u>Notice is not required</u>

This Court has clearly held that notice is not a requirement of FRCP 15(c)(1); particularly, in the context of the FCA which requires the sealing of complaints and "mandates such secrecy". *Dey*, 498 F.Supp.2d at 395, 398.

3.      "Conduct, transaction, or occurrence set out – or attempted to be set out"

Ven-A-Care's claims for each of the 43 Ery NDCs named in this case rightfully relate

back to the February 2001 Complaint.  While FRCP 15(c)(1) "does not contain a specific

requirement that the amended complaint be related to the same 'conduct, transaction or

occurrence' in the original complaint", Ven-A-Care recognizes this Court has found "relation-

back under Rule 15(c)(1) is limited."  *Roxane*, C.A. 01-cv-12257, 2007 WL 4287572 (D. Mass.

Dec. 6, 2007) at p. 5.  But, this Court has not held the former Rule 15(c)(1) standard arises to that

of former Rule 15(c)(2) standard.[5]  In fact, this Court recently specified a standard in analyzing

the relationship of allegations regarding drugs in pricing cases.  *Actavis* at *26.  In *Actavis*, the

Court stated "(a)lthough Defendants argue that relation back should be determined on an NDC-

by-NDC basis, a drug-by-drug analysis is the appropriate standard.  Although different NDCs

have certain different characteristics, such as package size and dosage strength, the fact that the

drug, defendant, and the overall scheme are the same makes any new NDC 'sufficiently related'

to relate back to claims in earlier complaints regarding other NDCs of the same drug."  *Actavis*,

at p. 21.

In accordance with this standard, Ven-A-Care's claims in the 2002, 2005, and 2007

amended Complaints substantially arise from the same "Ery" conduct, transaction, or occurrence

initially pled, or attempted to be pled, on February 15, 2001.  Abbott does not dispute Ven-A-

Care first brought claims regarding Ery drugs in this 2001 Complaint founded upon allegations

that false wholesaler prices had been reported by Abbott.  *See* Docket #6441 (Abbott Memo in

Support at p. 1).  Abbott, however, ignores other key portions of the February 2001 Complaint.

---

[5]   Rule 15 underwent "stylistic" language changes effective Dec. 1, 2007 and Rule
15(c)(1) became Rule 15(1)(A) while Rule 15(c)(2) became Rule 15(c)(1)(B).  Fed. R. Civ. P.
15.

For instance, Ven-A-Care also described how AWP pricing, along with wholesaler pricing such as WACs, were utilized in Medicaid reimbursement. *See* Anderson Declaration Exh. 6 (First Amended Complaint filed 2/15/01 ¶ 31-32, 38, 53, and 56.)   Ven-A-Care also explained that Abbott's wholesale price misrepresentation impacted other published prices, such as AWP. *Id.*; *see* also Anderson Declaration Exh. 6 (First Amended Complaint filed 2/15/01 ¶ 83-84.)   This entire scope of conduct was a key component of Ven-A-Care's Ery allegations in 2001 and remains so today.

The commonality of these allegations is not only alleged but has been evidenced.  Abbott admits its respective AWP (and Direct) prices for the Erys are simply a mathematical function of the false wholesale pricing conduct Ven-A-Care initially alleged to be false. *See* Docket #6417 (VAC SOF in Support of Summary Judgment at ¶ 6-10, 14, 17, and 19);  *see* also Thomas Exhibit 2 (Fiske 2/18/09 349:2-16).  Just as the AWPs were known to be 25% greater than the false WACs, Abbott also knew the Direct prices were 5% greater than the false WACs. *See* Anderson Declaration Exh. 13 (Garvin 45:18-48:8; 98:22-100:5; 101:20-103:10);  *see* Thomas Ex. 6 (DeYoung Exh. 507); *see* Anderson Dec. Exh. 14 (Gerzel 65:4-66:24; 70:1-74:5); *see* 2/19/09 Theresa Parker Tr. 55:20-56:16 (Thomas Exhibit 24); 85:3-8; 104:10 – 105:1; 106:3-11) (Anderson Dec. Exh. 15)  Abbott openly trained their pricing personnel on these mathematical relationships while also calculating and publishing AWP and Direct prices for years using the formulas. *Id.*  The false WAC prices, along with the resulting AWP and Direct prices, were sent by Abbott directly and purposefully to First Data Bank at launch of a product and upon an Abbott decision to change these published prices. *Id.*

14

4.      Added "Ery" NDCs share common, unique pricing structure

All NDCs of Ery drugs (which are formulations of the same core erythromycin salt ingredient[6]) named in this case are grounded in the same alleged pricing conduct, transaction, or occurrence because Abbott published false WAC prices for each while it concealed the much lower gross invoice prices it normally charged wholesalers.  *See* Docket #6423 (VAC Memo in Support of Ven-A-Care's MPSJ at ¶ 6-10 and 17).[7]  This was a unique pricing structure within Abbott PPD.  *Id*. at ¶11.

Simply put, the later addition of more "Ery" NDCs did not constitute the addition of different drugs with different pricing schemes, but rather was merely the addition of different formulations of a common underlying drug compound which all shared the unique fraudulent pricing practice utilized by Abbott PPD to conceal real WACs.  This is consistent with this Court's statute of limitations ruling in the other Ven-A-Care case against Abbott in which the Court held (quoting its prior *Roxane* opinion), "subsequent amendments involving [certain drug] properly relate back to the initial complaint . . . as each involves the same alleged pricing scheme for the same drug against the same defendant."  *United States ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott*, 538 F. Supp. 2d 392 (D. Mass. Mar. 13, 2008) ("*Abbott*");  citing, *United States ex rel. Ven-A-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp.*, C.A. 01-cv-12257, 2007 WL 4287572 (D. Mass. Dec. 6, 2007) ("*Roxane*").  This approach is also in conformity with this Court's even more recent ruling regarding relation-back in a non-intervened

---

[6]  In its instant Motion, Abbott itself, refers to the Erys as a group and states each NDC is simply a different "formulation" of the same antibiotic salt compounds. *See* Docket #6442 at ¶52- (Abbott Rule 56.1 SOF in Support of Abbotts Motion for Summary Judgment).

[7]  These concealed invoice prices, known as Base Deal, prices were still subject to routine chargebacks, discounts and rebates which caused the true wholesale cost to be even lower.  (See Docket #6417 – VAC SOF at ¶19.

Ven-A-Care *qui tam* discussed and quoted above.  *Actavis*.  Ven-A-Care's Ery claims all relate back to its initial filing;  therefore, all claims from February 15, 1995 (six (6) years before 2/15/01) to the present are viable without yet considering the effects of tolling.

      B.    <u>Tolling</u>

The False Claims Act also provides for the tolling of the six-year statute (for up to three years) such that VAC may bring FCA claims from April 1994 to present.   This Court recently clearly decided the tolling provisions of the FCA statute of limitations are available to relators in non-intervened cases generally and to this actual relator, Ven-A-Care, specifically.  *Actavis Mid Atlantic LLC, et al*., C.A. 08-cv-10852, U.S. Dist. LEXIS 92945 *30 (D. Mass. Oct. 2, 2009).

This approach is particularly appropriate when applied to the facts of this case and this relator.  As expressed in *Actavis*, the FCA (in section 3730) "makes clear that both the Attorney General and private persons may bring actions under the FCA."  *Actavis*, at 30.  "As the relator has the right to conduct the action, the relator has the right to conduct the action, the relator has the right to invoke the provisions of the statute, including the tolling provision."  Id.  The Court adopted this *Pogue* rationale because it "seems most consistent with the language of the statute." *Actavis*, at p. 30;  citing, *United States ex rel Pogue v. Diabetes Treatment Ctrs. Of Am., Inc.*, 474 F. Supp. 2d 75, 82-89 (D.D.C. 2007).  A similar rationale was set forth by the Ninth Circuit in *United States ex rel. Hyatt v. Northrop Corp.*, 91 F.3d 1211 (9th Cir. 1996), which stated, "we conclude that Congress did not intend to restrict the tolling provisions of the Act to apply to suits brought by the Attorney General alone, but intended the tolling provision to apply to *qui tam* plaintiffs as well."  *Id*. at 1216.   Specifically, the Court reasoned the use of the word "government" encompassed relators because (1) such a ruling was consistent with the plain

16

meaning of the statute, (2) other sections of the FCA refer to the "'Government' … as a shorthand for saying 'the plaintiff'" and (3) relators "are merely agents suing on behalf of the government, which is always the real party in interest";  therefore, the government should not be harmed by a broad exclusion of the tolling provision to relators.  *Id.* at 1215.[8]

Ven-A-Care clearly seeks to recover for the government.  In fact, Ven-A-Care has brought other drug pricing claims which have recovered approximately $1,000,000,000.00 (one billion) to date for the benefit of the United States and individual states.  *See* Anderson Declaration Exh. 3 (Lockwood 4/23/09 128:17-129:3).  Accordingly, tolling is appropriate in this circumstance to protect the rights of the real party in interest, the United States.

C.    The Impact of So-Called "Government Knowledge" on Causation After 2001 Is Not a Ground for Summary Judgment Due to "Genuine" Fact Issues

Many fact issues exist as to the extent, nature, and meaning of Abbott's claimed "government knowledge."   Accordingly, how, if at all, "government knowledge" disrupts causation cannot be a matter resolved at summary judgment and most by decided by the trier of fact.  Abbott apparently appreciates this is a fact issue for trial because it only makes a passing reference in its Memo stating, "If necessary, Abbott will prove at trial . . . (information) precludes damages well before 2001."  *See* Docket #6441 (Abbott Memo at p. 20).  Ven-A-Care is confident no such showing will be made at trial because the evidence is irrelevant and, even if admissible, insufficient;  however, if any such showing is to be made, trial is the only appropriate arena.  For the sake of brevity and to avoid redundance, Ven-A-Care incorporates by reference the facts and arguments cited in its Memo in Support of Summary Judgment (Docket #6423) and

---

[8]  This approach has been adopted by District Courts (outside of the Ninth Circuit) which found this reasoning sound.  *United States ex rel. Repko v. Guthrie Clinic, P.C.*, 557 F. Supp. 2d 522, 530 (M.D. Pa. 2008).

its Statement of Facts (Docket #6417), as well as its Response to Abbott's Motion to Dismiss to be filed herewith which discuss many of the same or similar government reports.

Abbott focuses most of its attention regarding causation to another argument which is a misguided attempt to fault the government for failing to mitigate damages. Abbott argues that the filing of a *qui tam* complaint stops them from causing damage to the United States for a fraudulent course of conduct they initiated and continue to execute. In short, Abbott maintains that the claims period ends when a relator files a *qui tam* complaint along with the precedent disclosures of underlying information. This argument is premised on the incorrect notion that the U.S. Department of Justice's knowledge gleaned from Ven-A-Care's complaint and disclosure statement "preclude(s) damages at least from February 2001 forward." *See* Docket #6441 (Abbott Memo at p. 21).

Abbott's arguments are contradicted by the structure and operation of the FCA and case law. The FCA provides for cases to be filed under seal to permit the government to conduct an investigation and determine whether to intervene, and further permits extensions of the seal period. The FCA's seal provisions were *never* designed to shield defendants from findings of liability or damages. *See United States ex rel. Harrison v. Westinghouse Savannah River* Co., 352 F.3d 908, 917 (4th Cir. 2003) (identifying "instances in which a government entity might choose to continue funding the contract despite earlier wrongdoing by the contractor"); *United States v. Salti*, Case No. 1:96CV1065 (N.D. Ohio Feb. 2, 2000) (knowledge of ongoing scheme by government does not preclude recovery under the FCA). Not surprisingly, Abbott cannot cite

a single FCA case that reaches this unique conclusion.  Instead, Abbott cites to precedent which (1) it misconstrues, (2) has been reversed, or (3) is completely off-point.[9]

For instance, Abbott claims the FCA "adds a heightened causation element."  (Id. at 21).  This Court has held the opposite and also noted in citing to a seminal decision from the Supreme Court that "the FCA is a remedial statute, it should not be given a cramped reading."  Id. at 6; citing, *United States v. Neifert-White Co.*, 390 U.S. 228, 233, 19 L.Ed.2d 1061 (1968).  Finding that another drug company misstated the legal standard for causation, this Court stated "(t)he FCA does not provide a special definition for causation, and neither the Supreme Court nor any Circuit . . . has grafted such a special definition on the FCA. *United States ex rel. Franklin v. Parke-Davis*, 2003 WL 22048255 (D. Mass. Aug. 22, 2003) at p. 4.  Absent an FCA-specific definition of causation, the Court will apply common-law tort causation concepts of actual causation and proximate causation.  *Id*.  Actual causation is shown if the "defendant's conduct was a 'substantial factor' in producing the harm while proximate causation is shown when the injury is foreseeable."  *Id*.  After finding the relator in that non-intervened case had provided "enough evidence . . . to create at least a genuine issue of material fact" on actual causation, the Court also held that proximate causation could be shown because a drug company could not only foresee that pharmacies would submit false Medicaid claims for its drugs but that such claims submission was actually "an intended consequence of the alleged scheme of fraud."  *Id*. at 5-6.

---

[9]   The causation analysis set for in the Southland District Court opinion, as cited by Abbott, was not "affirmed on other grounds", but rather was reversed and then on rehearing the Fifth Circuit only affirmed the grant of summary judgment on contractual grounds rather than causation grounds.  *United States v. Southland Mgmt. Corp.*, 288 F.3d 665 (5th Cir. 2002); *United States v. Southland Mgmt. Corp.*, 326 F.3d 669 (5th Cir. 2003).  Therefore, the causation analysis cited by Abbott was reversed and provides no precedent whatsoever concerning the FCA causal standard.  Likewise, the District Court analysis cited by Abbott in *United States ex rel. Butler v. Hughes Helicopters Co.*, 1993 WL 841192 (C.D. Cal. Aug. 25, 1993) not only is an unpublished opinion, but the cited causation analysis was not affirmed by the Ninth Circuit.  *Butler*, 71 F.3d 321 (9th Cir. 1995).

19

Ven-A-Care has made the same allegation and showing in this case.   *See* Docket #6417 (Ven-A-Care's SOF in Support ¶ 15-16);   *see* also Thomas Exhibit 24 ( Parker 61:10-62:6; 133:17-136:10).

The First Circuit recently upheld an AWP judgment rendered by this Court by writing in the context of causation that "findings are more than adequate to justify the district court's conclusions that, under the circumstances of this case, 'the fact that the (payors) have been slow to change their reimbursement systems does not negate causation.'"   *Blue Cross Blue Shield of Mass. v. AstraZeneca Pharms. LP*, C.A. No. 08-1056, 2009 U.S. APP. LEXIS 20977 (1st Cir. Sept. 23, 2009) at p. 75.   In finding the showing of causation sufficient, the First Circuit quoted the relevant consumer protection statute's causation standard as "requiring the plaintiff to show a 'causal connection between the deception and the loss and that the loss was foreseeable as a result of the deception.'"   *Id.*   This is a similar standard to the FCA standard and one which Ven-A-Care has met by showing that not only was it foreseeable that Medicaid would reimburse for Abbott Ery drugs, but that Abbott itself actually intended for its drugs to be reimbursed in order to better market its drugs.   *See* Thomas Exhibit 24 (Parker 61:10-62:6); *see* Exh.1 (DeYoung 161:1-7, 166:3-167:10); *see* also Docket #6417 (Ven-A-Care's SOF in Support at ¶ 15).

This analysis is particularly applicable to issues in this case.   While maximum (*i.e.*, "ceiling") prices such as MAC and FUL often served as the basis for reimbursement, this occurred only because Abbott published false, inflated Ery prices.[10]   Ven-A-Care only seeks

---

[10]  Since Medicaid programs' almost universally utilized "lesser of" reimbursement formulas which compared maximum prices with NDC-specific, calculated EACs, then most reimbursements would have been lower if Abbott had reported honest, lower prices.  *See* Docket #6417 (Ven-A-Care's SOF in Support ¶¶ 53, 62-70; *see* also "Damages" discussion section infra with supporting citations.)  Reimbursement calculation based, in part, upon Abbott published prices was not only foreseeable, but Abbott corporate representatives and other personnel admitted to an actual awareness.  *See* Thomas Exh. 2 (Fiske 2/18/09 347:17-21); *see* Exh. 1

damages where its experts have ascertained that lower EACs would have resulted in Medicaid paying reimbursement below maximum prices such as MACs or FULs  or pharmacy-submitted prices such as U&C.

Abbott's constricted view of the FCA causation standard not only diverges from this Court's rulings, but also contradicts other precedent.  The Sixth Circuit has explained in depth that "FCA damages 'typically are liberally calculated'" and that "the Supreme Court indicated that 'restitution to the government of money taken from it by fraud' was the motivating purpose of the FCA . . . to make sure that the government would be made completely whole.'"  *United States ex rel. Roby v. Boeing Co.*, 302 F.3d 637, 646 (6th Cir. 2002);  citing, *United States ex rel. Compton v. Midwest Specialties*, 142 F.3d 296, 304 (6th Cir. 1998), and *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 549, 87 L.Ed. 443 (1943).

The truth is that Abbott's causation argument is something else entirely.  What Abbott seeks to characterize as a "causation" issue is nothing more than a variation on the affirmative defense of failure to mitigate.  As a matter of law, however, mitigation is not required in suits brought under the False Claims Act.  *See, e.g., Toepleman v. United States*, 263 F.2d 697; *United States ex rel. Dye v. ATK Launch Systems, Inc.*, 2008 WL 4642164 (D. Utah Oct. 16, 2008 ) (defense of failure to mitigate is an improper defense to an FCA action); *United States ex rel. Jordan v. Northrop Grumman Corp.*, No. CV 95-2985 ABC at 33-35 (C.D. Cal. Aug. 6, 2002); (*United States ex rel. Sanders v. Allison Engine Co.*, Case No. 1-95-970 at 4 (S.D. Ohio Apr. 9, 2002) ("[M]itigation of damages cannot be asserted as a defense in a False Claims Act case."); *United States ex rel. Ferguson v. General Dynamics Corp.*, No. 90-4703-MRP at 7-8 (C.D. Cal. Apr. 28, 1994) ("As a matter of law, General Dynamics may not assert its Seventh Affirmative

---

(DeYoung  176:13-177:2);  *see* Thomas Exhibit 6 (3/20/07 DeYoung Ex. 507);  *see* also Docket #6417 (Ven-A-Care SOF in Support at ¶ 15-16).

Defense of 'failure to mitigate damages' against the government's claims brought under the False Claims Act."); *United States v. Consolidated Aeronautics*, No. CV 90-3408-AWT at 2 (C.D. Cal. Feb. 11, 1991) ("[A]s a matter of law under the False Claims Act, the government has no legal duty to mitigate damages"); *United States ex rel. Marcus v. Hess*, 41 F. Supp. 197 (D. Pa. 1941).  Abbott's motion for partial summary judgment for damages that post-date the filing of relator's complaints should be denied, and the Relator should be awarded partial summary judgment with respect to the affirmative defense of failure to mitigate as it relates to claims asserted under the FCA.

## IV.   Fact Issues Exist As to Whether Abbott Is Liable for  "Anti-Kickback" Claims

Abbott argues Ven-A-Care has insufficiently pled and developed an anti-kickback claim. Ven-A-Care has properly pled these claims by stating, in addition to its other allegations, that Abbott not only caused the publication of inflated and misleading prices, but also "knowingly used the spread as an unlawful inducement."   *See* Anderson Dec. Exh 7 (Ven-A-Care's Complaint ¶¶49 – 70).  This pleading satisfies this Court's previously stated pleading threshold for these types of claims.  *United States ex rel. Ven-A-Care v. Abbott*, 491 F. Supp. 2d 12, 18-19 (D. Mass. 2007).[11]

Furthermore, Ven-A-Care has set forth significant evidence to support its allegations that Abbott's pricing manipulations and concealment caused the publication of inflated pricing and

---

[11]   While the Court previously assumed reimbursement is based upon "a median of AWPs" for "Abbott's multi-source drugs", this assumption is incorrect in the context of almost all state Medicaid programs which use "lesser of" reimbursement formulas and would have paid lower reimbursements if Abbott had reported actual wholesale costs or actual pharmacy prices which were generally and currently paid.  *See*  Docket #6441(Abbott's Memo citing to *Abbott*, 491 F. Supp. 2d at 24-25).  Ven-a-Care explains the California Medicaid use of a "lower of" reimbursement approach in detail in the "Damages" section *infra*.

that Abbott perpetrated this conduct while aware that such prices affected reimbursement spreads which pharmacies considered in purchasing generic drugs.  *See* Docket #6417 (Ven-A-Care's SOF in Support at ¶ 6-10, 14-19).   For instance, Ven-A-Care presents evidence that (1) Abbott knew pharmacies were interested in relative reimbursement between generics, (2) Abbott knew its published prices were a part of the reimbursement calculations, and (3) Abbott actively communicated or enabled the communication of reimbursement information, such as AWPs for its drugs, to be compared with actual pharmacy prices to pharmacies via retail buying group correspondence, price change notification fax blasts, price reporting to pricing compendia, and pharmacy operation software tools.  *See* Docket #6417 (VAC's SOF in Support at ¶ 15-16);  *see also* Anderson Dec. Exh. 17 (Warren 286:13-294:17), Anderson Dec. Exh 18 (Warren Exh. 2); Anderson Dec. Exh. 4 (Lyle 139:19-141:5, 161:3-162:1, 183:7-185:16); Anderson Dec. Exh 1 (DeYoung 299:8-300:20);  Anderson Dec. Exh 15 (Parker 101:3-12, 133:17-136:10);  Thomas Exhibit 10 (Lehn 126:23-130:24), Anderson Dec. Exh 20 (Lehn Ex. 9).

Some of the legal support which Abbott cites in support of its kickback argument is of questionable value at best.  For instance, the cited *United States ex rel. Shaver v. Lucas Western Corp.*, 237 F.3d 932 (8th Cir. 2001) case involves a pro se relator in a non-intervened case and the sufficiency of anti-kickback claims is not even addressed.  Likewise, the *United States v. Ruttenberg*, 625 F.2d 173 (7th Cir. 1980) decision, which Abbott cites for the meaning of the word "kickback" was decided by the Seventh Circuit before the First Circuit, this Court, and other courts found anti-kickback claims could be brought under the FCA when "a particular payment was a remuneration . . . rather than a kickback."  *Abbott*, 491 F. Supp. 2d at 19;

quoting, *United States v. Bay State Ambulance & Hosp. Rental Service, Inc.*, 874 F.2d 20, 30 (1st Cir. 1989) (citing *U.S. v. Greber*, 760 F.2d 68, 71 (3d Cir. 1985)).

In light of Ven-A-Care's pleading and added presentation of evidence showing Abbott created reimbursement spreads with knowledge of those spread's potential marketing impact, summary judgment is not appropriate.  Instead, as this Court noted, anti-kickback liability will be "highly fact specific."  *Abbott*, 491 F.Supp.2d at 19.  Accordingly, this is a matter for the fact-finder at trial.  Abbott's request for summary judgment should be denied.

**V.    Damages**

A.    Causal Connection Between Abbott's Prices and Medicaid Damages

There are two types of liability under the FCA, one for civil penalties and one for damages.  *United States ex rel. Fago v. M & T Mortg. Corp.*, 518 F. Supp. 2d 108, 128 (D. D.C. October 2, 2007).  Thus, the relator need not prove that the alleged false statements caused any damages to recover penalties under the Act.  The FCA also mandates that plaintiff is entitled to recover three times "the amount of damages which the government sustains because of" the violation.  31 U.S.C. § 3729(a).

Ven-A-Care has proffered sufficient evidence to demonstrate the government would not have paid the Medicaid claims at the inflated amounts had Abbott not made or caused to be made false statements.  *See* Docket #6417 (Ven-A-Care SOF in Support of Ven-A-Care's MPSJ at ¶ 51-53).  The reported prices and the concealed prices – the subject matter of the false statements – is the source of the government's loss.  *Id*.

Ven-A-Care's damages calculations are clearly connected directly to Abbott's alleged pricing conduct because Ven-A-Care **only** seeks damages where the given Medicaid programs'

"lesser of" (aka "lower of") formulas would have calculated reimbursement, most likely using a lower EAC (ie., estimated acquisition cost), based upon the truthful Abbott prices which Abbott previously concealed.  *See* Anderson Dec. Exh 21 (Ven-A-Care's 8/27/08 Disclosures at "C"); *see* also Docket #6417 (Ven-A-Care's SOF in Support at ¶ 53, 62-70).[12]   This approach with FUL and MAC as well as U&C pricing is appropriate and in accordance with what this Court has already found to be an appropriate causal connection by holding "if BMS had reported a true AWP . . . Medicare would have reimbursed based on that branded drug's AWP, rather than the inflated median, and Plaintiffs would have paid less."  *In re AWP*, 491 F.Supp.2d 20, 98 (D.Mass. 2007).

Try as it might, Abbott cannot conveniently ignore that it concealed truthful prices which would have formed a lower basis for EACs in each and every instance of damage presented by Ven-A-Care.  Abbott's reliance upon this Court's ruling regarding California Medicaid's MAIC claims is misguided.  California Medicaid used a "lower of" formula for reimbursement and continues to pursue drug pricing claims against drug manufacturers which were paid at FUL, but should have been paid at lower levels if drug manufacturers had reported lower prices.  See Anderson Dec. Exh. 32 - (Gorospe Declaration).  California Medicaid rarely paid claims at MAIC prices however because MAIC prices were usually higher than FUL prices.  *Id*. Therefore, FUL, rather than MAIC, prices acted as the effective ceiling prices.  *Id*.  Accordingly, the key inquiry concerning the causal connection between California Medicaid's payments is whether  lower NDC-by-NDC estimated acquisition costs ("EACs"), instead of FUL prices,

---

[12]   To prevent duplicative filings, in responding to Abbott's damages arguments Ven-A-Care incorporates by reference the evidence presented in its Opposition to Abbott's Motion in Limine regarding Dr. Duggan;  specifically Dr. Duggan's Declaration, Expert Report and deposition transcript.  (See Opposition being filed simultaneously with this filing).

would have been the basis for reimbursement if drug companies had reported lower prices for those NDCs. This Court's ruling did not dismiss these claims. *In re AWP*, 478 F.Supp.2d 164 (D.Mass. 2007).

B.    Formulation of Damages Under the FCA

Because each case under the FCA involves unique types of damage to the government, there is no automatic formula by which the Relator or United States is required to calculate damages. Instead, the goal in each case is simply to estimate the damages directly caused by the filing of a false claim. *See BMY-Combat Sys. Div. of Harsco Corp. v. United States*, 44 Fed.Cl. 141 (1999); *United States ex rel. Roby v. Boeing Co.*, 79 F. Supp. 2d 877, 884-85 (S.D. Ohio 1999).

Frequently, the United States measures its damages as the difference between the amount that it paid out because of the false statements and the amount that it would have paid had the claims been truthful. *See United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943); *United States v. Woodbury*, 359 F.2d 370, 379 (9th Cir. 1966); *United States v. Killough*, 848 F.2d 1523, 1532 (11th Cir. 1988). Ven-A-Care's expert has performed calculations under this rubric by calculating the amounts actually paid by the Medicaid programs for Abbott's Ery drugs, and then determining the amounts that would have been paid if defendants had reported truthful prices.[13]

In an FCA case, damages need not be proven with mathematical precision; but rather must only provide an adequate basis for a trier of fact to make a just and reasonable damages

---

[13]   Ven-A-Care may also, however, measure damages as the full amount the government paid out on the false claims. *See United States ex rel. Anti-Discrimination Center of Metro New York v. Westchester County*, 2009 WL 1108517 (S.D.N.Y. April 24, 2009); *United States v. Mackby*, 339 F.3d 1013 (9th Cir. 2003). Ven-A-Care has pled this full measure of damages remedy and still may pursue it at trial. *See* Anderson Dec. Exh 7 (Complaint at ¶ 72); *see also* Anderson Dec. Exh 21 (8/27/08 Disclosures at "C" pp. 4-5).

estimate based on the relevant data.  *See United States v. Killough*, 848 F.2d at 1531; *Bigelow v. RKO Radio Pictures*, *Inc.*, 327 U.S. 251, 263-264 (1946).  In this case, to show damages, the Ven-A-Care needs to demonstrate that the reimbursement for Abbott Ery drugs would have been lower if Abbott had reported accurate prices.  In the light most favorable to the non-movant, Ven-A-Care, the evidence easily shows this to be the case, or at a minimum, that there are triable issues of fact.

C.    Actual Claims Data Forms the Basis for Ven-A-Care's Damages Calculations

Ven-A-Care's damages calculations were based primarily upon actual Medicaid claims data and the few extrapolations performed by Dr. Duggan regarding a small minority of the national Medicaid claims are appropriate, accepted econometric techniques.  (*See* and incorporate by reference Ven-A-Care's Opposition to MOLM regarding Duggan (with exhibits) filed Nov. 2, 2009 (to be filed).

Contrary to suggestion that Ven-A-Care lacks proof of actual claims or actual transactions by defendants, the United States provided defendants and Ven-A-Care with multiple data sets which overlapped and were sometimes redundant but constituted a comprehensive set of state Medicaid claims data.  (See Anderson Dec. Ex. 33 Duggan Declaration ¶ 12-16).  Ven-A-Care in turn provided this Medicaid data along with Abbott's own internal transactional data (produced for the first time in the discovery) for the 43 Ery drugs.

Dr. Duggan used primarily state-produced actual claims-level Medicaid data.  He also utilized a combination of other claims data submitted to CMS by the states, consisting of CMS State Drug Utilization Data (SDUD), State Medicaid Research Files/Medicaid Analytic eXtract

(SMRF/MAX) data, and Medicaid Statistical Information System ("MSIS") data (which is the raw data from which the SMRF/MAX data is derived). (US-C-SF ¶ 116) CMS directly collects this data from the states in connection with the operation of the Medicaid program. (US-C-SF ¶ 116) The SMRF/MAX data is *claims level data* which includes various data elements such as, for example, the NDC, date of service, charged amount, paid amount, quantity, and date of payment. (US-C-SF ¶ 116) (*See* Docket #6310 (Henderson Common Exhibit 41) (Duggan Decl. ¶ 15)))

An examination of Dr. Duggan's actual use of the data reveals the flaws in Abbott's arguments about Dr. Duggan's work. The state data used by Dr. Duggan represents the great majority of all Medicaid spending on the 43 named Ery drugs. Because Medicaid spending and total number of claims is typically highest in a limited number of states, Dr. Duggan was able to cover most aggregate spending by using state data for only15 state Medicaid programs. (See Anderson Dec. Ex. 33 (Duggan Declaration ¶17-19) Dr. Duggan then used the information from these states, together with the other CMS collected Medicaid data, to estimate damages for the remaining states. Although the SDUD, SMRF/MAX and state data all overlapped substantially, Dr. Duggan used the overlap to confirm the accuracy and reliability of his state data calculations. (Id.;  see also Anderson Dec. Ex. 33 (Duggan Declaration ¶58-61) Dr. Duggan's calculations thus included only data that was directly based upon claims submitted to the state Medicaid programs, and which he had evaluated for reliability. Dr. Duggan's analysis was conduct using widely accepted econometric techniques which he utilizes in much of his normal healthcare economic research that is almost all in non-litigation contexts. (See Anderson Dec. Ex. 33

28

(Duggan Declaration ¶ 4-9, 19, 35, 38, 51).   Much of this work has then been published in prestigious, peer-reviewed economic journals.  Id. at 4-9.

D.     Dr. Duggan Made Appropriate Economic Extrapolation in Calculating Damages

Extrapolation is simply a way to estimate by projecting known data, and it makes particular sense in a nationwide fraud case such as this.  As this Court recently held in an FCA case, extrapolation is a reasonable method for determining the number of false claims, if the statistical methodology is appropriate.  *See United States ex rel. Loughren v. UnumProvident Corp.*, 604 F. Supp. 2d 259 (D. Mass. 2009).   Estimates based on representative sampling can be used when a precise computation is technically possible but logistically impossible.  *United States v. Cabrera-Diaz*, 106 F. Supp. 2d 234, 239 (D.P.R. 2000); *see also, Illinois Physicians Union v. Miller*, 675 F.2d 151, 155 (7th Cir.1982)  Further, failure to include all possible factors in a reasonable estimation of damages is not fatal.  *United States ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F. Supp. 2d 719, 732 (N.D. Ill. 2007).

Dr. Duggan used an extremely measured factual analysis and appropriate statistical methodology in arriving at his damages opinions.  See generally US-C-SF ¶ 136-170.  All of Dr. Duggan's damage calculations, *even the extrapolated portions*, were rooted in actual claims data and were quite conservative.  Using his methodology, Dr. Duggan determined to a reasonable degree of economic certainty damages as the difference between: (1) the amount the federal government actually reimbursed; and, (2) what the federal government would have reimbursed for the same drugs had the defendants reported their actual market prices.  (US-C-SF ¶ 128)

Abbott argues that because Dr. Duggan did not use or have available some state claims data for certain time periods and all state claims data across the states, his opinion is inadmissible

29

or insufficient to prove causation.  As previously explained, the state and federal data used here is more than sufficient to establish both the existence of false claims and damages.   The submission of a "claim" does not need to be established by the actual claim.  In *United States ex rel. El-Amin v. George Washington Univ.*, 522 F. Supp. 2d 135, 141-42 (D.D.C. 2007), the Court found nothing in the language of the FCA requires the actual claim form to be presented to the factfinder.  It is not necessary to produce evidence of every single claim submitted to the Government if, in the instant cases, there is "sufficient evidence of claim submission in general." *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.*, 565 F.Supp. 2d 153, 161 (D.D.C. 2008); *United States ex rel. Magid v. Wilderman*, 2004 WL 945153 (E.D. Pa. 2004); *United States v. Williams*, 216 F.3d 1099, 1103 (D.C. Cir. 2000).  As to damages, a just and reasonable estimate of damages is all that is necessary.  *Bigelow*, 327 U.S. at 263-264.

In sum, Abbott's contentions regarding damages methodology provide no basis on which to obtain partial summary judgment.  In fact, to the extent Abbott criticizes Dr. Duggan's assumptions they oddly do so despite the fact that Dr. Duggan always made conservative assumptions which sought to reduce claimed damages.

## VI.   Ven-A-Care Only Seeks Recovery for Claims Brought on Behalf of the United States That It Has Not Released

Abbott argues that Ven-A-Care improperly seeks to recover for "claims for Texas and California even though Ven-A-Care has settled and agreed not to sue with respect to those claims."  Mem. at 33.  For at least three reasons, Abbott's argument is without merit.

First, the Releases that Ven-A-Care gave Abbott in the Texas and California state actions expressly preserved claims that Ven-A-Care had asserted on behalf of the United States. The definitions of "Covered Conduct" and other relevant provisions were carefully drafted to

preserve claims that had been or could be asserted on behalf of the United States with respect to the matters at issue. (VAC SOF at ¶¶ 68-70). The present action only states claims on behalf of the United States, for damages incurred by the Federal government. The Texas and California settlements expressly preserved and do not bar such claims.

Second, as Abbott is well aware, Ven-A-Care did not and does not have the right to compromise and dismiss claims asserted on behalf of the United States without giving the Department of Justice an opportunity to comment on the settlement and obtaining approval from this Court. See 31 U.S.C. § 3730(b). It is undisputed that the United States has never released any relevant claims it has against Abbott. As with any contract, the releases at issue must be construed in accord with governing law.

Third, the present case was pending when the Texas settlement was reached. Hence, the covenant not to sue contained in that settlement agreement, which only covers future suits, is inapplicable. (VAC SOF at 71).

Thus, while Abbott may arguably be entitled to some offset for funds that the United States received from the Texas and California settlements, that is not an appropriate matter for summary judgment; nor has Abbott established a record to determine the appropriate offset. Abbott's unwarranted request that "the Court grant summary judgment on the Texas and California claims" is neither warranted under the terms of the applicable settlement agreements nor legally allowable.

## CONCLUSION

Abbott is not entitled to summary judgment. Ven-A-Care's Ery pleading amendments relate back to its February 15, 2001 Complaint because the amended pleadings arise from the

conduct, transaction, or occurrence initially set out or attempted to be set out;  even though Rule 15(c)(1) does not require such a stringent showing.  Therefore, the claims regarding additional Erythromycin formulations and the derivative AWPs and Direct prices properly relate back.

The question of whether government knowledge, if any, negates or disrupts causation of damages cannot be decided at summary judgment because numerous genuine fact issues exist. Furthermore, this "defense" is a cloaked effort at imposing an inapplicable duty to mitigate upon the government.

Ven-A-Care and its expert have properly presented actual Medicaid claims data and appropriate, accepted economic analysis of such data concerning proffered Medicaid damages. These calculations are tied directly to Abbott's pricing manipulations and concealment because of the almost universal mechanism by which Medicaid programs pay the "lesser of" an individual NDC's EAC, MAC, FUL, or U&C.  Summary judgment is certainly not appropriate as the factfinder, which Abbott is trying to avoid, must determine the weight of this evidence. Ven-A-Care does not instantly pursue claims it has settled, but rather only pursues claims on behalf of the United States which have not been settled or released by the United States in any form or fashion in the context of any California or Texas state settlement.

For the reasons set forth above, Plaintiff respectfully requests that the Court deny Abbott's motion for summary judgment.

Dated: November 2, 2009                  Respectfully submitted,


/s/ C. Jarrett Anderson
Anderson LLC
208 West 14th Street, Suite 3-B
Austin, Texas 78701
Telephone: (512) 469-9191

JAMES J. BREEN
The Breen Law Firm, P.A.
Suite 260
5755 North Point Parkway
Alpharetta, Georgia 30022
Phone (770) 740-0008

SUSAN S. THOMAS
GARY L. AZORSKY
ROSLYN G. POLLACK
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: 215-875-3000

For the relator, Ven-A-Care of the Florida
Keys, Inc.,

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day caused an electronic copy of the above "MEMORANDUM IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT" to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.


      /s/   C. Jarrett Anderson      _____

Dated: November 2, 2009