**ANDERSON EXHIBIT 1**

ProTEXT Transcript Condensing for Windows

```
  SHEET 1    PAGE 1
00001
  1              UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS
  2
  3   In re:  PHARMACEUTICAL          )
      INDUSTRY AVERAGE WHOLESALE      ) MDL No. 1456
  4   PRICE LITIGATION                ) Civil Action No.
                                      )    01-12257-PBS
  5                                   )
      THIS DOCUMENT RELATES TO:       )
  6                                   )
      United States of America,       ) Hon. Patti Saris
  7   ex rel. Ven-a-Care of the       )
      Florida Keys, Inc., v.          )
  8   Abbott Laboratories, Inc.,      )
      and Hospira, Inc.               )
  9   CIVIL ACTION NO. 06-11337-PBS   )
 10
      *******************************************************
 11
                   NO. D-1-GV-04-001286
 12
      THE STATE OF TEXAS         ) IN THE DISTRICT COURT
 13                              )
      ex rel.                    )
 14     VEN-A-CARE OF THE        )
```

```
  PAGE 2
        FLORIDA KEYS, INC.,      )
 15        Plaintiffs,           )
                                 )
 16   VS.                        ) TRAVIS COUNTY, TEXAS
                                 )
 17   ABBOTT LABORATORIES INC.,  )
      ABBOTT LABORATORIES, and   )
 18   HOSPIRA, INC.,             )
          Defendant(s).          ) 201ST JUDICIAL DISTRICT
 19
 20   *******************************************************
              ORAL AND VIDEOTAPED DEPOSITION OF
 21                    DEBRA DEYOUNG
 22                   March 20, 2007
 23                    CONFIDENTIAL
 24   *******************************************************
 25
00002
  1      ORAL AND VIDEOTAPED DEPOSITION OF DEBRA DEYOUNG,
  2   produced as a witness at the instance of the
  3   Plaintiffs, and duly sworn, was taken in the
  4   above-styled and numbered cause on the 20th of March,
  5   2007, from 9:04 a.m. to 5:25 p.m., before CYNTHIA
  6   VOHLKEN, CSR in and for the State of Texas, reported
  7   by machine shorthand, at the offices of Jones Day, 77
  8   W. Wacker, Suite 3500, Chicago, Illinois, pursuant to
```

```
  PAGE 3
  9   the Texas Rules of Civil Procedure and the provisions
 10   attached previously.
 11
 12
 13
 14
 15
 16
 17
 18
 19
 20
 21
 22
 23
 24
 25
00003
  1           A P P E A R A N C E S
  2   FOR THE PLAINTIFF THE STATE OF TEXAS:
  3       Mr. Raymond C. Winter
          Ms. Margaret Moore
  4       Assistant Attorneys General
          Office of the Attorney General
  5       State of Texas
          Post Office Box 12548  (78711-2548)
```

```
  PAGE 4
  6       300 W. 15th Street, 9th Floor
          Austin, Texas  78701
  7
      FOR THE RELATOR:
  8
          Mr. C. Jarrett Anderson
  9       Anderson LLC
          1300 Guadalupe, Suite 103
 10       Austin, Texas  78703
 11   FOR THE DEFENDANTS ABBOTT LABORATORIES INC. AND
      HOSPIRA, INC.:
 12
          Ms. Toni-Ann Citera
 13       Jones Day
          222 East 41st Street
 14       New York, New York  10017-6702
 15   FOR THE PLAINTIFF UNITED STATES OF AMERICA:
 16       Mr. Gejaa Gobena
          Trial Attorney
 17       (By telephonic means)
          Commercial Litigation, Fraud
 18       U.S. Department of Justice
          Civil Division
 19       601 D Street, N.W.
          Patrick Henry Building - 9133
 20       Washington, D.C.  20004
```

You may have up to 3 Header and 3 Footer Lines

SHEET 41   PAGE 161

1  that are addressed to you, such as the Medicaid rebate
2  manual.  Are you familiar with that document?
3     A.   We have --
4          MS. CITERA:  Objection to the form.
5  Outside the scope.  I'm not really sure what the
6  relevance is, but go ahead.
7     A.   I have a copy of the manual.
8     Q.   (BY MR. ANDERSON)  And you -- you, in fact,
9  also receive other notifications from HCFA, now known
10 as CMS, regarding Medicaid rebate issues, don't you?
11         MS. CITERA:  Objection to the form.
12 Outside the scope.
13    A.   CMS issues guidance letters and those are
14 sent out to all the manufacturers.
15    Q.   (BY MR. ANDERSON)  Right.  And for Abbott,
16 you're one of the contact persons to receive those
17 documents, correct?
18    A.   Yes, I am.
19         MS. CITERA:  Objection to the form.
20 Outside the scope.
21    Q.   (BY MR. ANDERSON)  What efforts, if any, did
22 you or others in Abbott take to understand and comply
23 with Medicaid reimbursement requirements and
24 regulations?
25         MS. CITERA:  Objection to the form.
00158

PAGE 162

1  Outside the scope.
2     A.   I don't know what you're referring to when
3  you're talking about Medicaid reimbursement
4  requirements.
5     Q.   (BY MR. ANDERSON)  The phrase "Medicaid
6  reimbursement" is confusing to you?
7     A.   I don't know what you're looking for in terms
8  of steps that I would take on reimbursement.  I deal
9  with Medicaid rebate.
10    Q.   Well, you also deal with Medicaid
11 reimbursement, also, don't you?
12         MS. CITERA:  Objection to the form.
13 Outside the scope.
14    A.   I don't deal with Medicaid reimbursement.
15    Q.   (BY MR. ANDERSON)  Well, if I understood your
16 testimony correctly this morning you actually are the
17 point person for reporting prices to Texas Medicaid,
18 correct?
19         MS. CITERA:  Objection to the form.
20 Outside the scope.
21    A.   I filled out the Texas Vendor form.
22    Q.   (BY MR. ANDERSON)  And you understood that
23 that was part of the reimbursement process by Texas
24 Medicaid, correct?
25         MS. CITERA:  Objection to the form.
00159

PAGE 163

1  Outside the scope.
2     A.   I understood that I had to fill out the Texas
3  Vendor form in order for my product to be considered
4  for a state Medicaid formulary.  That's all I knew.
5     Q.   (BY MR. ANDERSON)  And when you say
6  "considered," you mean eligible for Medicaid
7  reimbursement, correct?
8          MS. CITERA:  Objection to the form.
9  Outside the scope.
10    A.   That a Medicaid prescription could be written
11 and filled with one of my products.
12    Q.   (BY MR. ANDERSON)  Right.  And so if you
13 didn't submit the prices that were requested by Texas,
14 then your Abbott drugs wouldn't be eligible for
15 reimbursement in Texas, correct?
16         MS. CITERA:  Objection to the form.
17 Outside the scope.
18    A.   It was my understanding that the Texas form
19 that has many pieces of information on it had to be
20 filed in order for my product to be on their
21 formulary.
22    Q.   Right.  And the reason -- why was it
23 important to Abbott to take steps to have its products
24 eligible for reimbursement in Texas?
25         MS. CITERA:  Objection to the form.
00160

PAGE 164

1  Outside the scope.
2     A.   We're a business.  We want our product to be
3  able to be prescribed.
4     Q.   (BY MR. ANDERSON)  Well, what would stop
5  Abbott's products from being prescribed if they were
6  not eligible for Medicaid reimbursement?
7          MS. CITERA:  Objection to form.  Outside
8  the scope.
9     A.   It would be limited, I guess, to commercial
10 customers.  It wouldn't be -- you wouldn't be able to
11 fill a script for a Medicaid patient.
12    Q.   (BY MR. ANDERSON)  So if I follow what you're
13 saying, in essence, it's important for Abbott to have
14 its products eligible for Medicaid reimbursement
15 because otherwise those products won't be able to be
16 dispensed to Medicaid patients and providers wouldn't
17 be reimbursed when they did make such a drug
18 dispensation, correct?
19    A.   I think --
20         MS. CITERA:  Objection to the form.
21 Outside the scope.
22         MR. ANDERSON:  I'll rephrase.  I'll make
23 it real simple.
24         MS. CITERA:  Okay.
25    Q.   (BY MR. ANDERSON)  Are you saying, in
00161

```
  SHEET 42  PAGE 165
 1  essence, Ms. DeYoung, that it was important to Abbott
 2  to have their products eligible for Medicaid
 3  reimbursement because it would help Abbott sell its
 4  products?
 5           MS. CITERA:  Objection to the form.
 6  Outside the scope.
 7      A.   I think we wanted access for our product.
 8      Q.   (BY MR. ANDERSON)  And when you say
 9  "access" --
10      A.   In every environment.
11      Q.   And when you say "access in every
12  environment," you mean eligible for reimbursement by
13  both Medicaid and Medicare and private payers,
14  correct?
15           MS. CITERA:  Objection to the form.
16  Outside the scope.
17      A.   We want our products to be able to be written
18  by a physician and it doesn't matter who that patient
19  is a member of or -- you know, we want our product to
20  be able to be written for anybody that comes into a
21  doctor's office.  So access is very important.
22      Q.   (BY MR. ANDERSON)  Well, Medicaid coverage
23  doesn't stop a doctor from prescribing Abbott drugs,
24  does it?
25           MS. CITERA:  Objection to the form.
00162
```

```
  PAGE 166
 1  Outside the scope.
 2      A.   I don't know if it does or doesn't.
 3      Q.   (BY MR. ANDERSON)  Well, what's your
 4  understanding of how Medicaid coverage might impact
 5  whether a doctor would or would not prescribe Abbott
 6  products?
 7           MS. CITERA:  Objection to the form.
 8  Outside the scope.
 9      A.   I think, you know, from a business
10  perspective you don't want anything that's going to
11  stop a product from being prescribed for any patient.
12      Q.   (BY MR. ANDERSON)  And what is that business
13  perspective?
14      A.   Access.
15      Q.   So, in essence, what you're saying is that a
16  pharmacy is not going to dispense Abbott product if
17  that pharmacy won't in turn be reimbursed when it does
18  so, correct?
19           MS. CITERA:  Objection to the form.
20  Outside the scope.
21      A.   If a doctor doesn't write your product, it
22  won't be reimbursed.
23      Q.   (BY MR. ANDERSON)  Well, you keep going back
24  to the doctor.  Does the doctor when a pharmacy fills
25  a prescription for Abbott drug get the reimbursement?
00163
```

```
  PAGE 167
 1      A.   I don't believe so, no.
 2      Q.   The pharmacy gets --
 3      A.   The pharmacy --
 4      Q.   -- the reimbursement.
 5      A.   -- gets the reimbursement --
 6      Q.   Right.
 7      A.   -- but the doctor is what drives the script.
 8      Q.   All right.  And do you understand that
 9  doctors will refuse to write scripts on Abbott drugs
10  if those Abbott drugs aren't covered by Medicaid?
11           MS. CITERA:  Objection to the form.
12  Outside the scope.
13      A.   It's my understanding that as a business we
14  want access in every environment and that as part of
15  that process in order for my product to be prescribed
16  for Medicaid in Texas I had to fill out that form and
17  provide the information.
18      Q.   (BY MR. ANDERSON)  Who gave you that
19  understanding?
20           MS. CITERA:  Objection to form.  Outside
21  the scope.
22      A.   Well, it was part of a process and we
23  actually have -- I'm trying to think of -- I know when
24  a new product was launched, that that was just part of
25  the process.  When Kay Morgan did it, she had to fill
00164
```

```
  PAGE 168
 1  out a form for Texas.  So when those boxes ended up in
 2  my office, I knew that when a new product came that we
 3  had to fill out a form for Texas.
 4      Q.   (BY MR. ANDERSON)  And why was it that upon
 5  launch of a new product Abbott chose to report prices
 6  to Texas Medicaid?
 7           MS. CITERA:  Objection to the form.
 8      A.   Because in order for Texas to put their drug
 9  on their state Medicaid formulary, they required that
10  form to be filled out.
11      Q.   (BY MR. ANDERSON)  And why was it important
12  to Abbott that Abbott's new drug products be placed on
13  the Texas Medicaid formulary?
14           MS. CITERA:  Objection to the form.
15  Outside the scope.
16      A.   So that it would be available for
17  prescriptions.
18      Q.   (BY MR. ANDERSON)  And when you say
19  eligible -- I mean, "available for prescription," you
20  mean eligible for reimbursement to dispensing
21  providers such as pharmacies, correct?
22           MS. CITERA:  Objection to the form.
23  Outside the scope.
24      A.   My view of that was that a doctor could write
25  a prescription for my product then and that when he --
00165
```

SHEET 44   PAGE 173

```
 1      Q.   You and others at Abbott knew that when you
 2   reported or caused to be reported pricing information
 3   to Medicaid programs, that that was in part allowing
 4   your products to be eligible for Medicaid
 5   reimbursement.
 6            MS. CITERA:  Objection to the form.
 7   Outside the scope.
 8      A.   I know that when I reported information to
 9   Texas, that I had to do that on that form in order for
10   the product to be on the state formulary and so that
11   prescriptions could be filled when they were presented
12   at the pharmacies.
13      Q.   (BY MR. ANDERSON)  And did you also know that
14   other pricing information reported to entities beyond
15   Texas Medicaid was necessary in order for Abbott
16   products to be eligible for reimbursement by other
17   Medicaid programs?
18            MS. CITERA:  Objection to the form.
19   Outside the scope.
20      A.   I don't understand what you're asking on
21   that.  I only report -- I fill out a Texas Vendor
22   form.
23      Q.   (BY MR. ANDERSON)  And that's it?
24      A.   That's it.  There is AMP.  We do report AMP
25   to Texas and there are a couple of other states that
00170
```

PAGE 174

```
 1   we report.
 2      Q.   Isn't it true that over the years you've
 3   learned that the prices that Abbott reports to First
 4   DataBank and the prices in turn that First DataBank
 5   publishes also enables Abbott's drugs to be eligible
 6   for Medicaid reimbursement?
 7            MS. CITERA:  Objection to the form.
 8   Outside the scope.
 9      A.   I don't know that reporting to First DataBank
10   has anything to do with the Medicaid programs and what
11   they put on their state formularies.
12      Q.   (BY MR. ANDERSON)  You haven't been made
13   aware over the years by various providers and other
14   industry participants that the way First DataBank does
15   or does not publish information for Abbott drugs
16   impacts whether those Abbott drugs will be eligible
17   for reimbursement?
18            MS. CITERA:  Objection to the form.
19   Outside the scope.
20      A.   I don't see how First DataBank has anything
21   to do with whether or not the drug is going to be
22   reimbursed.
23      Q.   (BY MR. ANDERSON)  Okay.  So I take it that's
24   a no.  You've never learned that First DataBank and
25   the information First Data publishes has some
00171
```

PAGE 175

```
 1   involvement in whether or not drugs of Abbott's will
 2   be eligible for Medicaid reimbursement?
 3            MS. CITERA:  Objection to the form.
 4   Outside the scope.
 5      A.   I don't think First DataBank pricing has
 6   anything to do with whether or not a state decides to
 7   put a product on formulary.
 8      Q.   (BY MR. ANDERSON)  Why is it, then, that
 9   Abbott chooses to report prices to First DataBank at
10   all?
11            MS. CITERA:  Objection to the form.
12   Outside the scope.
13      A.   I don't know.  It's been done for years.  I'm
14   not involved in that process.
15      Q.   (BY MR. ANDERSON)  Others in the pricing
16   department are, though, right?
17      A.   Yes.
18            MS. CITERA:  Objection to the form.
19      Q.   (BY MR. ANDERSON)  Specifically people
20   reporting to your boss, Joe Fiske, correct?
21      A.   Yes.
22      Q.   But all these years, 40 something years,
23   you've never learned why it is that Abbott chooses to
24   report prices to Medicaid via First DataBank?
25            MS. CITERA:  Objection to the form.
00172
```

PAGE 176

```
 1   Outside the scope.
 2      A.   I don't think that First DataBank prices has
 3   anything to do with whether or not a product is put on
 4   a Medicaid formulary.
 5      Q.   (BY MR. ANDERSON)  Does it have anything to
 6   do with whether or not the product will be
 7   reimbursable by a Medicaid program?
 8            MS. CITERA:  Objection to the form.
 9   Outside the scope.
10      A.   I don't know that it would have anything to
11   do with whether or not it was reimbursable.  I think
12   the state chooses what products they want on their
13   formulary.
14      Q.   (BY MR. ANDERSON)  And how do you understand
15   a state chooses which products will be on their
16   formulary?
17            MS. CITERA:  Objection to the form.
18   Outside the scope.
19      A.   Well, for Texas, you fill out the Texas
20   Vendor form and provide information and it's my
21   understanding that they put it on the formulary.
22      Q.   (BY MR. ANDERSON)  And what about other
23   programs?  Do you have any understanding what they
24   review in determining what to cover on their
25   formulary?
00173
```

```
 SHEET 45   PAGE 177
 1             MS. CITERA:  Outside the scope,
 2   objection.
 3      A.   I know that over the past few years they are
 4   using a preferred drug list and that in order to be on
 5   that preferred drug list they are looking for
 6   additional rebates.
 7      Q.   (BY MR. ANDERSON)  What about prior to the
 8   last few years when there were no preferred drug
 9   lists?
10             MS. CITERA:  Objection to the form.
11   Outside the scope.
12      A.   It was my understanding that products were
13   added to the formularies, that there wasn't a
14   restriction on it.
15      Q.   (BY MR. ANDERSON)  And do you know how
16   products were added to the formularies?
17             MS. CITERA:  Objection to the form.
18   Outside the scope.
19      A.   I believe they have what they call P&T
20   committees and they review the clinical attributes of
21   the products.
22      Q.   (BY MR. ANDERSON)  Does pricing information
23   have any role whatsoever in whether or not a product
24   will be covered or the extent to which it will be
25   covered for Medicaid reimbursement?
00174
```

```
 PAGE 178
 1             MS. CITERA:  Objection to the form.
 2   Outside the scope.
 3      A.   I don't have information related to each
 4   specific state and what determinations they make.
 5             MR. ANDERSON:  Objection, nonresponsive.
 6      Q.   (BY MR. ANDERSON)  I'm not asking about a
 7   specific state.  I'm asking generally have you ever
 8   gained an understanding that pricing information,
 9   specifically pricing information published or caused
10   to be published by Abbott, is, in fact, important in
11   whether or not Abbott drugs will be covered by various
12   Medicaids for Medicaid drug reimbursement?
13      A.   I know in --
14             MS. CITERA:  Objection to the form.
15   Outside the scope.
16      A.   I know in the case of preferred drug lists
17   that costs are reviewed because they're asking us for
18   additional rebates.
19      Q.   (BY MR. ANDERSON)  Cost to review, is that
20   what you said?
21      A.   That cost is reviewed.
22      Q.   What do you mean by that, cost?
23      A.   I believe they look at the cost of the
24   product.  You know --
25      Q.   And what --
00175
```

```
 PAGE 179
 1      A.   -- that's just my general understanding.
 2      Q.   How do they gauge the cost of the product?
 3      A.   I don't know.
 4             MS. CITERA:  Object to form.  Outside
 5   the scope.
 6      Q.   (BY MR. ANDERSON)  Well, what do you -- what
 7   do you understand they review in order to ascertain
 8   the cost?
 9      A.   I don't know what --
10             MS. CITERA:  Objection to the form.
11   Outside the scope.
12      A.   I don't know what they specifically review in
13   their review of product cost.
14      Q.   (BY MR. ANDERSON)  Well, what's your general
15   understanding?
16             MS. CITERA:  Objection to the form.
17   Outside the scope.
18      A.   My general understanding is that when we are
19   asked to participate or if we want our product
20   included on a preferred drug list, what we receive
21   from the State is a formula that we're supposed to use
22   in order to represent what we are going to offer in
23   terms of an additional rebate.
24      Q.   (BY MR. ANDERSON)  And are those the formulas
25   that you previously testified this morning were based
00176
```

```
 PAGE 180
 1   off of AWP?
 2             MS. CITERA:  Objection to the form.
 3   Outside the scope.
 4      A.   I don't recall testifying on something like
 5   that.
 6      Q.   (BY MR. ANDERSON)  What pricing terminology
 7   is utilized in these formulas?
 8      A.   There's -- there are some that are based on
 9   AWP.  There are some that are based on WAC as of the
10   first day of the quarter or the last day of the
11   quarter.  There is also a term called guaranteed net
12   unit price.
13      Q.   And it's your understanding, as you testified
14   this morning, that the AWP information and the WAC
15   information is being obtained by the Medicaids from
16   primarily First DataBank, correct?
17             MS. CITERA:  Objection to the form.
18   Outside the scope.
19      A.   Yes.
20      Q.   (BY MR. ANDERSON)  All right.  And you
21   understood and you have understood for many, many
22   years that those WACs that First DataBank publishes
23   come directly from Abbott, correct?
24             MS. CITERA:  Objection to the form.
25   Outside the scope.
00177
```

SHEET 72   PAGE 285

```
 1       Q.   So in other words, you haven't changed
 2   anything with respect to how you're reporting prices
 3   to Texas Medicaid now as opposed to how you were
 4   reporting prices to Texas Medicaid in 1999?
 5            MS. CITERA:  Objection to form.
 6       A.   I haven't changed anything, other than there
 7   have been changes to the form, certain questions --
 8       Q.   (BY MR. ANDERSON)  Yeah.
 9       A.   -- and things have changed over time.
10       Q.   For instance, you know now that the form
11   specifically states that all prices are to be reported
12   as net prices, net of discounts and chargebacks,
13   correct?
14            MS. CITERA:  Objection to the form.
15       A.   That wasn't my understanding.
16       Q.   (BY MR. ANDERSON)  You -- you haven't seen
17   the forms recently that you've signed that include a
18   definition of price as a net price?
19            MS. CITERA:  Objection to form.
20       A.   Can you show me --
21       Q.   (BY MR. ANDERSON)  Yeah.
22       A.   -- what you're referring to?
23       Q.   Yes, we can show you one of those, but -- but
24   as you sit right now, you don't remember that the
25   Texas form for several years now has defined price as
00282
```

PAGE 286

```
 1   a net price?
 2            MS. CITERA:  Objection to the form.
 3       A.   The price that I'm supplying, they've added
 4   the AMP, which I can't supply at the time that I'm
 5   filling out the form.
 6       Q.   (BY MR. ANDERSON)  Right.
 7       A.   The pricing that I have is my net pricing.
 8       Q.   Your AMP is your net pricing?
 9       A.   Well, the list price and the WAC price --
10       Q.   Yes.
11       A.   -- that's my price.
12       Q.   It is?
13       A.   Yes.  That's what I'm selling that product
14   at.
15       Q.   Well, but we just spent several minutes here
16   talking about these bid schedules and other prevailing
17   prices that are lower.
18            MS. CITERA:  Objection to the form.
19       Q.   (BY MR. ANDERSON)  Are you submitting those
20   now?  Are you submitting the --
21       A.   When I fill out the Vendor form --
22            MS. CITERA:  Objection to the form.
23       A.   When I fill out the Texas Vendor form, that
24   is the pricing that I have, that I filled out on the
25   form.  I don't -- there is no bid schedule pricing for
00283
```

PAGE 287

```
 1   a new product.
 2       Q.   (BY MR. ANDERSON)  Okay.  So you're limiting
 3   your responses to new products?
 4            MS. CITERA:  Objection to the form.
 5       A.   I only fill out the form for a new product.
 6   And when that product is launched, that is -- the
 7   pricing that I've put on that form is the pricing that
 8   I had.
 9       Q.   (BY MR. ANDERSON)  And -- and --
10       A.   And I update that pricing and I thought that
11   I was being compliant with what was being asked for by
12   submitting to Texas the updates that I take to that
13   catalog pricing every time that there's a change.
14       Q.   Do you believe that sending Texas, for
15   instance, a copy of the pertinent bid schedules for
16   all the PPD products on an annual basis would help
17   Texas Medicaid better estimate acquisition cost?
18            MS. CITERA:  Objection to the form.
19   Outside the scope.
20       A.   I don't know how they would use this bid
21   schedule to ascertain what their providers were paying
22   for product and what was an appropriate reimbursement.
23       Q.   (BY MR. ANDERSON)  Well, could you take out
24   the chain prices of the bid schedule and send those in
25   a letter to Texas Medicaid?
00284
```

PAGE 288

```
 1            MS. CITERA:  Objection to the form.
 2       A.   I don't know why I would be doing that.
 3       Q.   (BY MR. ANDERSON)  Do you -- let's -- I'll
 4   rephrase it.  You -- you said your --
 5       A.   Every chain does not -- every chain doesn't
 6   participate in chain pricing.  Every provider doesn't
 7   participate in contrast.
 8       Q.   So is it Abbott's position that in providing
 9   responses to Texas Medicaid's request for chain
10   pricing, that those prices only had to be provided if
11   every single chain in America was participating?
12            MS. CITERA:  Objection to the form.
13   Outside the scope.
14       A.   I don't know.  I -- you know, I didn't -- I
15   didn't see the relevance for Texas if those prices
16   aren't being obtained in Texas.
17       Q.   (BY MR. ANDERSON)  Did you make any effort to
18   determine which chain drug stores operating in Texas,
19   such as Walgreens, CVS, Eckerds, Rite Aid, Wal-Mart,
20   HEB, et cetera, were or were not buying erythromycin
21   on chain bid schedule pricing?
22            MS. CITERA:  Objection to the form.
23   Outside the scope.
24       A.   I didn't look at what -- I don't have access
25   easily to what providers are paying in Texas or retail
00285
```

SHEET 73   PAGE 289

accounts. If they have a direct contract, I might have some visibility to that. But if they're being sold by a wholesaler or some other entity, I don't know what they end up paying for that product.
   Q. (BY MR. ANDERSON) Well, did you ever check your direct contract files to see which chains were or were not buying PPD drugs on contract?
       MS. CITERA: Objection to the form.
   A. I didn't check to see what chains were in Texas. I have -- there were contracts for chains. I didn't go to our file to determine --
   Q. (BY MR. ANDERSON) And is it Abbott's --
   A. -- who -- who --
   Q. Is it Abbott's position that Texas really didn't want chain prices?
       MS. CITERA: Objection to the form. Outside the scope.
   A. I -- I won't assume what Texas wanted.
   Q. (BY MR. ANDERSON) But what you do know is that Abbott chose not to report chain prices?
       MS. CITERA: Objection to the form. Outside the scope.
   A. I provided chain pricing on the vendor -- on the Texas Vendor forms and I thought I was -- I thought I was complying with their request for updates

00286

PAGE 290

by linking them to my catalog price increases and changes.
   Q. And just so the record is clear, those catalog price changes aren't reflective of any bid --
   A. They're not contract --
   Q. -- schedule prices?
   A. They're not contract prices.
       MS. CITERA: Objection to the form.
   A. Sorry. They are not contract prices, no.
   Q. (BY MR. ANDERSON) Now, let's mark -- let's -- let's mark for the record Exhibit 511, which is titled "1998 Bid Schedule Pricing; Exhibit 512, titled "1999 Bid Schedule Pricing"; Exhibit 201 -- I mean, pardon me, Exhibit 513, which is titled "2001 Bid Schedule Pricing"; Exhibit 514, which is titled "2002 Bid Schedule"; Exhibit 515, which is titled "2003 Bid Schedule"; Exhibit 516, which is titled "Bid Schedule 2004"; Exhibit 517, which is titled "Bid Schedule 2005"; and Exhibit 518, which is titled "Bid Schedule 2006."
       Now, just to streamline matters, you'll agree with -- with me, Ms. DeYoung, that these are the prevailing bid schedules for the time periods listed, and at least since 1998 Abbott has maintained bid schedules such as Exhibit 510 through Exhibit 516?

00287

PAGE 291

       MS. CITERA: Objection to the form. Outside the scope.
       I'm just going to ask the witness to make sure she looks at these documents.
   Q. (BY MR. ANDERSON) Yeah. You're welcome to look at all of them.
   A. (Witness reviewing documents). They appear to be.
   Q. Okay. And -- and I may not have asked this precise question before, but can you provide some basic framework for how often the bid schedule prices are reviewed and updated and new bid schedules circulated?
       MS. CITERA: Objection to the form. Outside the scope.
   A. I don't know how often they're circulated.
   Q. (BY MR. ANDERSON) Uh-huh.
   A. They should be updated whenever a price change occurs.
   Q. And how does a bid schedule price change occur?
       MS. CITERA: Objection to the form.
   A. Price increases.
   Q. (BY MR. ANDERSON) What about price decreases?

00288

PAGE 292

   A. There might be some changes. Federal Supply Schedule would have to be updated on an annual basis. I don't know how frequently price changes in the other channels.
   Q. Well, let's say --
   A. They may --
   Q. -- for instance --
   A. They may remain the same for some period of time or they may increase.
   Q. Is it your experience that PPD multisource products from time to time do experience price decreases as a result of competitive market pressures?
       MS. CITERA: Objection to the form.
   A. That could occur, but oftentimes we were looking for opportunities to increase prices.
   Q. (BY MR. ANDERSON) And you said "could occur," but is it your experience that, in fact, that does occur from time to time?
       MS. CITERA: Objection to the form.
   A. Multisource products, we don't have a lot of emphasis on multisource products, so to lower the price, it's not really something that we're looking for. We're primarily looking to be able to raise our price. We are not really a generic company, so it's not like we're trying to really beat the competition

00289

```
  SHEET 75  PAGE 297
 1      A.   I know --
 2           MS. CITERA:  Objection to the form.
 3      A.   I believe that there were instructions given
 4  related to AWP.  It may have covered that as well.  I
 5  know that we weren't supposed to be reporting AWP
 6  anymore.
 7      Q.   (BY MR. ANDERSON)  Do you believe that under
 8  Abbott's current policies it's appropriate for Abbott
 9  personnel to provide any type of profit analysis or
10  reimbursement analysis to Abbott customers?
11           MS. CITERA:  Objection to the form.
12  Outside the scope.
13      A.   I don't believe that's appropriate.
14      Q.   (BY MR. ANDERSON)  Do you believe prior to
15  the implementation of Abbott's written policy
16  concerning that issue on or about 2004 it was
17  appropriate for Abbott to provide to customers profit
18  analysis or reimbursement analysis?
19           MS. CITERA:  Objection to the form.
20  Outside the scope.
21      A.   I'm not -- I don't -- what was the question
22  again?  I'm not quite sure what you're asking me.
23      Q.   (BY MR. ANDERSON)  Prior to the
24  implementation to this written policy --
25      A.   Okay.
00294
```

```
  PAGE 298
 1      Q.   -- concerning halting of AWP information
 2  or -- AWP information being disseminated by Abbott,
 3  that is, or profit analysis or reimbursement analysis,
 4  do you believe it would have been appropriate for
 5  Abbott personnel to provide that type of information
 6  prior to 2004?
 7           MS. CITERA:  Objection to the form.
 8  Outside the scope.
 9      A.   I don't believe it would have been
10  appropriate.
11      Q.   (BY MR. ANDERSON)  And so to the extent that
12  that type of information was provided, that would have
13  been in violation of Abbott's policy?
14           MS. CITERA:  Objection to the form.
15  Outside the scope.
16      A.   I don't know that there was a written policy
17  on it --
18      Q.   (BY MR. ANDERSON)  Uh-huh.
19      A.   -- but I -- I recall that there weren't
20  supposed to be discussions related.
21      Q.   Why is it -- why, in your opinion, would that
22  type of profit analysis or reimbursement analysis be
23  inappropriate?
24           MS. CITERA:  Objection to the form.
25  Outside the scope.
00295
```

```
  PAGE 299
 1      A.   I'm not completely sure why it was
 2  inappropriate.  Our marketing is focused on what the
 3  clinical attributes of a product are, not what the
 4  cost is.
 5      Q.   (BY MR. ANDERSON)  Do you believe that
 6  Abbott's ever marketed a product such as erythromycin
 7  to pharmacies based on reimbursement, at least in
 8  part?
 9           MS. CITERA:  Objection to the form.
10  Outside the scope.
11      A.   I think we've -- it's been marketed based
12  upon what our prices versus a competitive price, you
13  know, for -- for the acquisition cost.  That's been
14  the focus of -- you know, we were trying to have our
15  product priced lower than competition so we can take
16  that inventory.
17      Q.   (BY MR. ANDERSON)  Outside of what you've
18  just described as market price competition --
19      A.   Uh-huh.
20      Q.   -- are you aware of any efforts by Abbott to
21  market, for instance, erythromycins and other products
22  based on reimbursement or prices that are the
23  foundation for reimbursement such as AWP?
24           MS. CITERA:  Objection to the form.
25  Outside the scope.
00296
```

```
  PAGE 300
 1      A.   I don't -- I don't believe I've seen
 2  anything, you know, like that.  I believe our emphasis
 3  has always been on what our -- what our cost is from a
 4  competitive standpoint, competitive price standpoint
 5  to other products in the class or, you know, direct
 6  competitor.
 7      Q.   (BY MR. ANDERSON)  Do you believe it would be
 8  wrong for Abbott to market its products based on
 9  reimbursement or prices that are the foundation for
10  reimbursement such as AWP?
11           MS. CITERA:  Objection to the form.
12  Outside the scope.
13      A.   I don't believe that would be appropriate.
14      Q.   (BY MR. ANDERSON)  And why do you believe
15  that would be inappropriate?
16           MS. CITERA:  Objection to the form.
17  Outside the scope.
18      Q.   (BY MR. ANDERSON)  You can go ahead.
19      A.   Oh.  Because our focus has been on the
20  clinical attributes of the product in the marketplace
21  and our competition.  I'm not aware that we were
22  looking at reimbursement.
23      Q.   Well, outside of the fact that you understood
24  Abbott's focus to be clinical, is there any other
25  reason why you think that marketing based on
00297
```