**ANDERSON EXHIBIT 2A**

FILED
IN CLERK'S OFFICE

FEB 15  3 33 PM '01

U.S. DISTRICT COURT
DISTRICT   MASS.

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br>**Ex Rel**<br>    VEN-A-CARE OF THE<br>    FLORIDA KEYS, INC.<br>    a Florida Corporation,<br>    by and through its principal<br>    officers and directors,<br>    ZACHARY T. BENTLEY and<br>    T. MARK JONES,<br><br>                        Plaintiff,<br><br>v.<br><br>ABBOTT LABORATORIES, INC.;<br>APOTHECON, INC.;<br>BRISTOL-MYERS SQUIBB<br>COMPANY;<br>DEY, INC.;<br>MYLAN PHARMACEUTICALS, INC.;<br>ROXANE LABORATORIES, INC.;<br>SCHEIN PHARMACEUTICAL, INC.;<br>SCHERING-PLOUGH CORPORATION;<br>and WARRICK PHARMACEUTICALS<br>CORPORATION;<br><br>                        Defendants. | CIVIL ACTION NO. 00 CV10698 ~~MLW~~  *MEL*<br><br>FILED IN CAMERA AND UNDER SEAL<br><br><br>FIRST AMENDED COMPLAINT<br>For Money Damages and Civil<br>Penalties Under the False Claims Act<br>31 U.S.C. §§3729-3732 |

## FIRST AMENDED COMPLAINT
### FOR MONEY DAMAGES AND CIVIL PENALTIES UNDER THE FALSE
### CLAIMS ACT 31 U.S.C. §§3729-3732

CIVIL ACTION NO.  00 CV 10698 MLW

COMES NOW, the UNITED STATES OF AMERICA ("UNITED STATES" or "GOVERNMENT"), by and through VEN-A-CARE OF THE FLORIDA KEYS, INC. ("VEN-A-CARE" or "the Relator"), and its principal officers and directors, ZACHARY T. BENTLEY and T. MARK JONES, and by and through the undersigned attorneys on behalf of the UNITED STATES and on the Relator's own behalf and brings this action against ABBOTT LABORATORIES, INC.; APOTHECON, INC.; BRISTOL-MYERS SQUIBB COMPANY; DEY INC.; MYLAN PHARMACEUTICALS, INC.; ROXANE LABORATORIES INC.; SCHEIN PHARMACEUTICAL, INC.; SCHERING-PLOUGH CORPORATION; and WARRICK PHARMACEUTICALS CORPORATION, (sometimes referred to collectively as "DEFENDANTS"), for money damages and civil penalties arising out of the DEFENDANTS' violations of the Federal False Claims Act, 31 U.S.C., §§3729-3732 from on or about April 7, 1994, to the present date.

## TABLE OF CONTENTS

Page No:

SECTION NO. 1                                                                          6
     SUMMARY OF THE ACTION:  DRUG MANUFACTURERS'
     FALSE PRICE REPRESENTATIONS INVOLVING RETAIL
     PHARMACIES

SECTION NO. 2                                                                          8
     THE PARTIES

SECTION NO. 3                                                                         13
     JURISDICTION & VENUE

SECTION NO. 4                                                                         19
     BACKGROUND OF HOW UNITED STATES' MONIES ARE PAID
     FOR DRUG CLAIMS UNDER THE STATES' MEDICAID
     PROGRAMS

CIVIL ACTION NO.  00 CV 10698 MLW

<u>TABLE OF CONTENTS</u>                                      Page No:

SECTION NO. 5                                                        30
     THE FALSE CLAIMS SCHEME

     a.    A description of the False Claims Scheme          30

     b.    The DEFENDANTS each acted knowingly              33

     c.    The DEFENDANTS directly benefitted through increased   36
          sales

     d.    The DEFENDANTS' False Claim Scheme deprived the   39
          Government of the protection of The Federal Upper Limits
          ("FUL")

SECTION NO. 6                                                        42
     THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS
     OF DEFENDANT ABBOTT

SECTION NO. 7                                                        47
     THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS
     OF DEFENDANT APOTHECON/BRISTOL-MYERS

SECTION NO. 8                                                        52
     THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS
     OF DEFENDANT DEY

SECTION NO. 9                                                        55
     THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS
     OF DEFENDANT MYLAN PHARMACEUTICALS

SECTION NO. 10                                                       109
     THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS
     OF DEFENDANT ROXANE

SECTION NO. 11                                                       112
     THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS
     OF DEFENDANT SCHEIN

CIVIL ACTION NO.  00 CV 10698 MLW

## TABLE OF CONTENTS

Page No:

SECTION NO. 12                                                                          116
    THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS
    OF DEFENDANT WARRICK


SECTION NO. 13
    DEFENDANT DEY'S MEDICAID REBATE FRAUD                                          119

    a.    DEY's Medicaid Rebate Fraud Scheme                                       120

    b.    Required Medicaid Rebate for Single Source and Multi-                    121
        Source Innovator Drugs

    c.    Required Medicaid Rebate for Other Drugs (Generic)                       122

    d.    Distributor of Innovator Drug Must Pay the Same Medicaid                  122
        Rebate as the Innovator

    e.    Facts of DEY's Medicaid Rebate Fraud                                     122

    f.    False Reports to Red Book                                                124

    g.    Damages Caused by Overstated WACs and Understated                        125
        AMPs

    h.    DEY's SEC Filings                                                        126

    i.    Conclusion                                                              131


COUNT I                                                                                 132
    FALSE CLAIMS ACT; CAUSING PRESENTATION OF FALSE
    OR FRAUDULENT CLAIMS

COUNT II                                                                                133
    FALSE CLAIMS ACT; CAUSING A FALSE RECORD OR
    STATEMENT TO BE MADE OR USED TO GET A FALSE OR
    FRAUDULENT CLAIM PAID OR APPROVED BY THE
    GOVERNMENT

CIVIL ACTION NO. 00 CV 10698 MLW

## TABLE OF CONTENTS                                    Page No:

COUNT III                                                           134
    FALSE CLAIMS ACT; CAUSING FALSE RECORDS OR
    STATEMENTS TO BE USED TO CONCEAL AN OBLIGATION
    TO PAY MONEY TO THE GOVERNMENT

COUNT IV                                                            136
    FALSE CLAIMS ACT; CAUSING PRESENTATION OF
    FALSE OR FRAUDULENT CLAIMS; ILLEGAL REMUNERATION

COUNT V                                                             138
    FALSE CLAIMS ACT; CAUSING A FALSE RECORD OR
    STATEMENT TO BE MADE OR USED TO GET
    A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY
    THE GOVERNMENT; ILLEGAL REMUNERATION

COUNT VI                                                            140
    FALSE CLAIMS ACT; CAUSING PRESENTATION OF
    FALSE OR FRAUDULENT CLAIMS; PROHIBITED REFERRALS,
    CLAIMS AND COMPENSATION ARRANGEMENTS

COUNT VII                                                           141
    FALSE CLAIMS ACT; CAUSING A FALSE RECORD OR
    STATEMENT TO BE MADE OR USED TO GET
    A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY
    THE GOVERNMENT; PROHIBITED REFERRALS,
    CLAIMS AND COMPENSATION ARRANGEMENTS

COUNT VIII                                                          143
    FALSE CLAIMS ACT; CAUSING FALSE RECORDS OR
    STATEMENTS TO BE USED TO DECREASE AN OBLIGATION
    TO PAY MONEY OR PROPERTY TO THE GOVERNMENT

REQUESTS FOR RELIEF                                                 145

DEMAND FOR JURY TRIAL                                               148

CERTIFICATE OF SERVICE                                              149

CIVIL ACTION NO.  00 CV 10698 MLW

SECTION NO. 1
SUMMARY OF THE ACTION
DRUG MANUFACTURERS' FALSE PRICE REPRESENTATIONS
INVOLVING RETAIL PHARMACIES

1.     This is an action for damages, treble damages, civil penalties and costs
against the DEFENDANTS for violation of the False Claims Act as set out in Counts I
through VIII, pages132 through 147.  The DEFENDANTS falsely represented the prices
that they charged wholesalers for certain of their generic prescription drugs (hereinafter
sometimes referred to as the "specified drugs") in order to cause various State Medicaid
Programs to pay claims in excessive amounts.   More than half of the amounts paid
consisted of federal funds from which the States were required to pay claims based upon
the drug's Estimated Acquisition Cost ("EAC") to the pharmacy submitting the claim.  42
CFR §447.331.

2.     The DEFENDANTS knew that each of the States' Medicaid Programs had
implemented a mechanism to estimate acquisition cost of prescription drugs to a
pharmacy and that most states, including but not limited to Alabama, Colorado, Florida,
Maryland, Massachusetts, Ohio, Rhode Island, and Texas (hereinafter sometimes referred
to as "WAC STATES") relied on the DEFENDANTS' representation of the prices they
charged wholesalers for the specified drugs.   The DEFENDANTS' false price
representations were made directly to the WAC STATES and other States by the
DEFENDANTS and through First Data Bank ("FDB"), the company that assembles drug
price data for the State Medicaid Programs.

6

CIVIL ACTION NO.  00 CV 10698 MLW

3.     The DEFENDANTS each knew that the WAC STATES' Medicaid Programs relied on the DEFENDANTS' representations of the prices that the DEFENDANTS charged wholesalers in setting the amount to be reimbursed to a pharmacy.  This information was used to determine the Wholesaler Acquisition Cost ("WAC") for the specified drugs to which a percentage was added to estimate the acquisition cost of a pharmacy purchasing from a wholesaler.  The DEFENDANTS reported truthful prices for most drugs and the States' Medicaid Programs were thus able to accurately estimate acquisition costs when paying claims.  In the case of the specified drugs, however, the DEFENDANTS falsely inflated their reports of the prices charged to wholesalers so that Medicaid pharmacy providers would be paid excessive amounts and thus choose the specified drugs over competing generic versions.

4.     The DEFENDANTS each benefitted from their false price representations because they were able to create a "Spread" between the inflated acquisition cost that they caused the States to calculate and the reasonable and realistic estimate of acquisition cost upon which the States intended to base payments of claims.  The "Spread" thus constituted an unlawful financial inducement arranged by the DEFENDANTS to cause their Medicaid provider customers to order the DEFENDANTS' specified drugs instead of their competitors'.  The DEFENDANTS thus duped the WAC STATES' and other States' Medicaid Programs into paying claims for the specified drugs at inflated amounts in order to increase the DEFENDANTS' sales.  The DEFENDANTS lied about the price of their

7

CIVIL ACTION NO.  00 CV 10698 MLW

specified drugs in order to cause the States to expend Medicaid Program dollars to unwittingly fund unlawful kickbacks to Medicaid providers.

5.      The DEFENDANT DEY, the DEFENDANT MYLAN and others also defrauded the WAC STATES and other States' Medicaid Programs by causing false records or statements to be used to decrease their obligations to pay Medicaid rebate monies or properties to the States' Medicaid Programs as required by law.

6.      The DEFENDANTS' wrongful exploitation of the States' Medicaid Programs caused the UNITED STATES to incur single damages in excess of Ten Million Dollars for which the UNITED STATES and States' Medicaid Programs are entitled to recover treble damages plus up to Ten Thousand Dollars per false claim, interest, costs and attorneys' fees.

## SECTION NO. 2
## THE PARTIES

7.      The Plaintiff in this action is the UNITED STATES.  At all times material to this civil action, the United States Department of Health and Human Services ("HHS") and the Health Care Financing Administration ("HCFA"), were charged with administering the Medicaid program.

8.      The States of Alabama, Colorado, Florida, Maryland, Massachusetts, Ohio, Rhode Island and Texas and other States provided Medicaid benefits to qualified recipients which included payment of claims for the prescription drugs, specified herein, manufactured by the DEFENDANTS and relied upon the false price representations made by the DEFENDANTS in approving and paying claims.  A significant part (a minimun of

8

CIVIL ACTION NO. 00 CV 10698 MLW

50%) of said Medicaid reimbursement was paid from United States Government funds pursuant to 42 U.S.C. § 1396(b).

9.      The Relator, VEN-A-CARE, is a corporation organized under the laws of the State of Florida, with its principal offices in Key West, Florida. The Relator's principal officers and directors include Zachary T. Bentley and T. Mark Jones, who are each citizens of the United States and reside in Key West, Florida. The Relator is a pharmacy providing prescription drugs and is a Florida Medicaid pharmacy provider. The Relator has direct and independent knowledge of the information and is the "original source" of the information on which these allegations are based within the meaning of 31 U.S.C. §3730(e)(4)(A) and (B). The Relator has standing to bring this action pursuant to 31 U.S.C. §3730(b)(1). The information upon which these allegations are based was voluntarily provided by the Relator to the Federal Government beginning on or before November 1996 and thereafter has been frequently supplemented by the Relator.

10.     Ven-A-Care's principals were aware that Medicaid reimbursement for the drugs at issue was required by federal law to be based on an estimation of cost and not provide for windfall profits at the GOVERNMENTS' expense. Ven-A-Care attempted to alert the responsible state and federal government officials to the matters alleged herein; however, the government agencies lacked sufficient resources and expertise to adequately respond. Accordingly, the Relator commenced this action based upon its original source information.

CIVIL ACTION NO. 00 CV 10698 MLW

11.   DEFENDANT, ABBOTT LABORATORIES, INC. ("ABBOTT"), is a corporation organized under the laws of Delaware with its principal offices in Abbott Park, Illinois. At all times material to this civil action, ABBOTT has transacted business in the Federal Judicial District of Massachusetts by, including but not limited to, selling directly or through wholesalers its specified prescription drugs in the District of Massachusetts knowing that the drugs would be supplied to Medicaid recipients and for which claims would be paid from Medicaid funds.

12.   DEFENDANT, APOTHECON, INC. ("APOTHECON"), is a corporation organized under the laws of Delaware with its principal offices in New York City, New York, and is a subsidiary of DEFENDANT BRISTOL-MYERS SQUIBB. At all times material to this civil action, APOTHECON has transacted business in the Federal Judicial District of Massachusetts by, including but not limited to, selling directly or through wholesalers its specified prescription drugs in the District of Massachusetts knowing that the drugs would be supplied to Medicaid recipients and for which claims would be paid from Medicaid funds.

13.   DEFENDANT, BRISTOL-MYERS SQUIBB COMPANY ("BRISTOL-MYERS") f/k/a BRISTOL-MYERS COMPANY ("BRISTOL-MYERS") is a corporation organized under the laws of Delaware with its principal offices in New York, New York. At all times material to this civil action, BRISTOL-MYERS has transacted business in the Federal Judicial District of Massachusetts by, including but not limited to, selling directly or through wholesalers its specified prescription drugs in the District of Massachusetts knowing that

CIVIL ACTION NO.  00 CV 10698 MLW

the drugs would be supplied to Medicaid recipients and for which claims would be paid from Medicaid funds.

14.    DEFENDANT, DEY, INC. f/k/a DEY LABORATORIES, INC. ("DEY"), is a corporation organized under the laws of Delaware with its principal offices in Napa, California. At all times material to this civil action, DEY has transacted business in the Federal Judicial District of Massachusetts by, including but not limited to, selling directly or through wholesalers its specified prescription drugs in the District of Massachusetts knowing that the drugs would be supplied to Medicaid recipients and for which claims would be paid from Medicaid funds.

15.    DEFENDANT, MYLAN PHARMACEUTICALS, INC. ("MYLAN"), is a corporation organized under the laws of West Virginia  with its principal offices in Morgantown, West Virginia.   At all times material to this civil action, MYLAN  has transacted business in the Federal Judicial District of Massachusetts by, including but not limited to, selling directly or through wholesalers its specified prescription drugs in the District of Massachusetts knowing that the drugs would be supplied to Medicaid recipients and for which claims would be paid from Medicaid funds.

16.    DEFENDANT, ROXANE LABORATORIES, INC. ("ROXANE"), is a corporation organized under the laws of Delaware with its principal offices in Columbus, Ohio, and a subsidiary of the Boehringer Ingelheim corporation.  At all times material to this civil action, ROXANE has transacted business in the Federal Judicial District of Massachusetts by, including but not limited to, selling directly or through wholesalers its

11

CIVIL ACTION NO. 00 CV 10698 MLW

specified prescription drugs in the District of Massachusetts knowing that the drugs would be supplied to Medicaid recipients and for which claims would be paid from Medicaid funds.

17.    DEFENDANT, SCHEIN PHARMACEUTICAL, INC. ("SCHEIN"), is a corporation organized under the laws of New York with its principal offices in Florham Park, New Jersey. At all times material to this civil action, SCHEIN has transacted business in the Federal Judicial District of  Massachusetts by, including but not limited to, selling directly or through wholesalers its specified prescription drugs in the District of Massachusetts knowing that the drugs would be supplied to Medicaid recipients and for which claims would be paid from Medicaid funds.

18.    DEFENDANT, WARRICK PHARMACEUTICALS CORPORATION ("WARRICK"), is a corporation organized under the laws of Delaware with its principal offices in Reno, Nevada. SCHERING-PLOUGH CORPORATION, a corporation organized under the laws of New Jersey, with its principal offices in Madison, New Jersey, is the corporate parent of WARRICK and to the extent that the acts of WARRICK at issue herein were performed by or otherwise attributable to SCHERING-PLOUGH CORPORATION, or any subsidiary or affiliate of it, then judgment should be entered against SCHERING-PLOUGH CORPORATION where appropriate. At all times material to this civil action, WARRICK has transacted business in the Federal Judicial District of Massachusetts by, including but not limited to, selling directly or through wholesalers its specified prescription

CIVIL ACTION NO.  00 CV 10698 MLW

drugs in the District of Massachusetts knowing that the drugs would be supplied to Medicaid recipients and for which claims would be paid from Medicaid funds.

19.    Any and all acts alleged herein to have been committed by any or all of the DEFENDANTS were committed by each Defendant's officers, directors, employees, or agents who at all times acted on behalf of their respective DEFENDANT.

## SECTION NO. 3
## JURISDICTION & VENUE

20.    Jurisdiction is founded upon the Federal False Claims Act  (the "Act"), 31 U.S.C. §3729-32, specifically 31 U.S.C. §3732, and also 28 U.S.C. §§1331, 1345.

21.    The Federal False Claims Act reaches the type of fraudulent activity alleged herein in accordance with the express language of the Act as well as precedents arising from applications of the present Federal False Claims Act and earlier versions. See, United States v. Neifert-White Company, 390 U.S. 228, 88 S.Ct. 959 (1968).  Specifically, the United States Supreme Court's application of the Act in Neifert-White applies to this case as follows:

A.    ". . . the Act was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." Neifert-White, 88 S.Ct. at 961.

B.    The Act applies to the conduct of a manufacturer that supplies falsely inflated price information in support of a customer's claim. Neifert-White, 88 S.Ct. at 960.

13

CIVIL ACTION NO. 00 CV 10698 MLW

C.     The Act applies even where the price information supplied by the DEFENDANTS is inflated by only approximately 25% over the truthful price. Neifert-White, 88 S.Ct. at 960.

D.     The Act applies even if the DEFENDANTS did not submit the false price information directly to the Government and even though the DEFENDANTS received no payment of funds from the Government.

E.     The Act applies even though the inflated portion of the price was received by customers of the DEFENDANTS who are not parties to the case. Neifert-White, 88 S.Ct. at 960.

22.     Venue in the District of Massachusetts is appropriate under 31 U.S.C. §3732(a) and sufficient contacts exist for jurisdiction in that each of the DEFENDANTS transacted business in the District of Massachusetts by selling directly or through wholesalers their specified prescription drugs in the District of Massachusetts which the respective DEFENDANTS knew would be supplied to Medicaid recipients and for which the DEFENDANTS knew that grossly excessive and unreasonable payments for claims would be made to the pharmacies by the States' Medicaid programs.

23.     A copy of the initial Complaint and this First Amended Complaint and written disclosure of substantially all material evidence and information VEN-A-CARE possesses were served on the Government pursuant to Rule 4(i)(1)(A) and (B), Fed.R.Civ.P., prior to the filing of the initial Complaint and this First Amended Complaint in camera and under seal by delivering a copy of the initial Complaint and this First Amended Complaint,

14

CIVIL ACTION NO.  00 CV 10698 MLW

material evidence and information to the United States Attorney for the District of Massachusetts and by sending a copy of the initial Complaint and this First Amended Complaint, material evidence and information by certified mail to the Attorney General of the United States at Washington, District of Columbia.

24.     The Relator alleges:  (A) that no allegation or transaction of defrauding the UNITED STATES was made prior to the filing of the Complaint in public disclosures regarding the subject matter herein against any of the DEFENDANTS;  (B) that none of the DEFENDANTS was named in public disclosures made prior to the filing of the Complaint regarding the subject matter herein; and (C), if the Court makes a finding against the Relator as to the allegations set forth in (A) and/or (B), that the Relator has direct and independent knowledge of the information on which these allegations are based within the meaning of 31 U.S.C. §3730(e)(4)(A) and (B) and has voluntarily provided the information to the Government before filing the Complaint which is based on the information provided by the Relator to the Government and the Relator is the original source.

25.     Federal Court jurisdiction also exists over this cause for reasons which include, but are not limited to, the following:

A)     The Relator, due to its status as an industry insider, has acquired substantial information that is of significant value to the Government about the DEFENDANTS' false claims scheme and has provided said information to the Government in accordance with the False Claims Act.

CIVIL ACTION NO. 00 CV 10698 MLW

B)     The Relator has expended substantial time, money and resources, and has incurred substantial financial and other risks in reviewing its own information and in acquiring, analyzing and disclosing to the Government its information about the DEFENDANTS' false claims scheme, prior to commencing this action.

C)     The remedies provided by the False Claims Act include, in part, an award to the Relator for providing to the Government the information about the DEFENDANTS' false claims scheme that is at issue in this action.  In order to secure redress of its right to such award, the Relator has complied with the requirements of the False Claims Act that it initiate this action under seal and disclose all its information to the Government.

D)     This False Claims Act case constitutes the only lawful mechanism whereby the Relator may receive redress in the form of compensation for providing information about the DEFENDANTS' false claims scheme  and for assisting the Government in recovering amounts paid, multiple damages and penalties.

E)     The False Claims Act provides a mechanism whereby the Relator may secure redress for its cause of action, to wit, its right to compensation for benefitting the Government through use of its information about the false claims scheme in the manner contemplated by the False Claims Act.

F)     The Relator is also entitled, under the False Claims Act, to litigate the Government's right to damages and penalties, arising from the false claims scheme and

16

CIVIL ACTION NO. 00 CV 10698 MLW

has a stake in the outcome in that the Relator is entitled by the False Claims Act to share in any recovery secured by or on behalf of the Government.

G)     The DEFENDANTS each possess a substantial interest in disproving the Relator's allegations of violations of the False Claims Act and the Relator possesses a substantial interest in proving said allegations, as well as the investment of the Relator's time, costs and its overall compliance with the pre-filing and post filing procedural and jurisdictional provisions of the False Claims Act, because the determination of these issues under the False Claims Act will establish whether:

(i)     The DEFENDANTS violated the federal False Claims Act;

(ii)    The DEFENDANTS are liable for treble damages, penalties, costs, Relator's expenses and attorneys' fees.

(iii)   The Relator is entitled to redress in the form of compensation for providing its information about the false claims scheme to the Government and for assisting the Government in the manner required by the False Claims Act;

(iv)   The Relator is entitled to redress, on behalf of the Government, in the form of damages and penalties from the DEFENDANTS.

(v)    The Relator is entitled to redress in the form of its Relator's share of the award of damages and penalties.

CIVIL ACTION NO.  00 CV 10698 MLW

(vi)     The Relator is entitled to redress in the form of compensation for its expenses, incurrence of risk, and investment of time and resources in acquiring and providing to the Government its information about the false claims scheme.

H)     In the event that the Government intervenes with respect to some or all of the Relator's allegations and claims, then the Relator is entitled to participate in the litigation to the extent and under the conditions specified in the False Claims Act and to further pursue redress in the form of its right to share in any award and receive compensation for its costs and expenses.

I)     In the event that the Government does not intervene with respect to some or all of the Relator's allegations and claims, then the Relator's causes of action alleged herein are directed at further redress in that only by prevailing in litigation based on its information about the false claims scheme will the Relator receive:  redress in the form of deterrence of ongoing and future conduct injurious to the Relator; compensation for its information about the DEFENDANTS' false claims scheme; compensation for the assistance and benefit it provided to the Government; compensation for its expenses, risks and devotion of time and resources in acquiring and providing information to the Government; and compensation for establishing the DEFENDANTS' liability for damages and penalties.

18

CIVIL ACTION NO.  00 CV 10698 MLW

## SECTION NO. 4
## BACKGROUND OF HOW UNITED STATES' MONIES
## ARE PAID FOR DRUG CLAIMS UNDER
## THE STATES' MEDICAID PROGRAMS

26.     The UNITED STATES GOVERNMENT partially funds state sponsored medical assistance programs for the poor pursuant to Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq.

27.     Benefits for prescription drugs are optional but all states have opted to provide Medicaid drug reimbursement coverage.

28.     The federal portion of States' Medicaid payments, the Federal Medical Assistance Percentage ("FMAP") is based on a state's per capita income compared to the national average.  The federal portion consists of a minimum of 50% up to a maximum of 83%.  By way of example, the FMAP contributed by the UNITED STATES in 1995 was: Alabama 70.45%, Colorado 53.10%, Florida 56.28%, Maryland 50.0%, Massachusetts 50.0%, Ohio 60.69%, Rhode Island 55.49% and Texas 63.31%.

29.     The States, United States Territories and the District of Columbia are required to implement a State Health Plan containing certain specified minimum criteria for coverage and payment of claims in order to qualify for federal funds for Medicaid expenditures.  42 U.S.C. §1396a(a)(30)(A).

30.     State Health Plans must, in part, provide for payment of claims for prescription drugs pursuant to a formula approved by the Secretary of HHS which determines the maximum allowable claim amount for each drug manufactured by each manufacturer whose prescription drugs qualify for Medicaid reimbursement based upon

19

CIVIL ACTION NO. 00 CV 10698 MLW

an estimation of the pharmacy's acquisition cost of the drug plus a reasonable dispensing fee. 42 CFR 447.331.

31.   Drug manufacturers, including the DEFENDANTS, the Medicare and the Medicaid Programs, drug price and cost reporting services, hospitals, pharmacies, physicians, wholesalers, third party payors (e.g. insurance companies), and others involved in the health care industry, communicate about prescription drug prices and costs by describing the price and cost with terms such as:

       a)   Average Wholesale Price ("AWP")

       b)   Wholesaler Acquisition Cost ("WAC")

       c)   List Price

       d)   Direct Price ("DP")

       e)   Wholesale Net Price

32.   HCFA has approved state plans whose methodology formulae for arriving at a pharmacy's estimated acquisition cost as required by 42 CFR 447.331 includes:

       a.   discounting a percentage off of the AWP prices as computed by or collected by and published by First Data Bank ;

       b.   adding a percentage to the WAC prices as computed by or collected by and published by First Data Bank ; and,

       c.   requiring the drug companies, including the DEFENDANTS, to certify their prices directly in writing to the Texas Medicaid Vendor Drug Program.

CIVIL ACTION NO.  00 CV 10698 MLW

33.    The HCFA approved State plans for the WAC STATES at issue are:

|  | Drug | Dispensing Fee |
|---|---|---|
| Alabama | WAC+9.2% | $5.40 |
| Colorado | lesser of AWP-10% or WAC+18% | $4.08 |
| Florida | WAC+7% | $4.23 |
| Maryland | WAC+10% | $4.21 |
| Massachusetts | WAC+10% | $3.00 |
| Ohio | WAC+11% | $3.70 |
| Rhode Island and | WAC+5% | $2.85-$3.40 |
| Texas direct certification of price by the drug companies |  | $5.27 + 2% |

34.    The Texas Medicaid Program has gone to exceptional lengths  to verify that drug manufacturers, including the DEFENDANTS, provide truthful price and cost information for reimbursement purposes. The Texas Medicaid authorities, acting pursuant to 25 Texas Administrative Code 35.801, required the DEFENDANTS to certify, in writing, the accuracy of their price and cost representations as a condition to their drugs being covered for reimbursement.  The Relator's investigation has revealed that each of the DEFENDANTS, when responding to Texas about their specified drugs, either affirmatively lied about their true prices, or omitted material information in order to mislead the Texas Medicaid officials.

35.    The State of Texas pays reimbursement for drugs covered by its Vendor Drug Program at the lesser of the provider's usual and customary charge or  Estimated

21

CIVIL ACTION NO. 00 CV 10698 MLW

Acquisition Cost ("EAC"). In Texas' Pharmacy Provider Handbook, EAC is defined as either the Wholesale Estimated Acquisition Cost ("WEAC") or the Direct Estimated Acquisition Cost ("DEAC"). WEAC is the estimated price paid by providers purchasing a drug from a wholesaler. DEAC is the estimated price paid by a provider purchasing the drug directly from the drug's manufacturer.

36.    The State of Texas required the DEFENDANTS to complete a specific form regarding the prices of their drugs. Immediately before the required signature by the DEFENDANTS' representatives is the following language:

> I hereby certify that the information submitted is correct to the best of my knowledge . . . I also agree to inform the Texas Department of Health of any changes in . . . price . . . within fifteen (15) days of such change.

Attached hereto as **Exhibit "1"** is a true and correct copy of the current certification used by the Texas Medicaid Vendor Drug Program.

37.    The Food and Drug Administration ("FDA") assigns National Drug Codes, ( "NDC") numbers to identify each individual manufacturer and its drugs' strengths and sizes. NDC numbers are eleven digits, with the first five digits identifying the manufacturer or labeler, the next four digits identifying the product and the last two digits identifying the package size.

38.    First Data Bank ("FDB") is a nationally recognized company that specializes in collecting and publishing drug data including pricing. FDB provides prices and costs for approximately 80,000 different drugs, sizes and strengths expressed in terms of AWP and WAC through an electronic or automated service. More than 90% of the States' Medicaid

CIVIL ACTION NO. 00 CV 10698 MLW

Pharmacy Programs utilized the AWPs and WACs as communicated by First Data Bank's automated services in determining reimbursement amounts for Medicaid prescription drug claims.

39.     Pharmacies are required to utilize the FDA's NDC numbers when submitting claims for reimbursement for drugs to the States' Medicaid programs.

40.     Congress has attempted to assist the States' Medicaid programs in limiting reimbursement amounts for certain generic prescription drugs to a reasonable estimate of acquisition cost by empowering the Health Care Financing Administration to set a Federal Upper Limit ("FUL") for drugs paid for by the Medicaid Programs. Under the plan, HCFA may impose a FUL on any generic drug if:

        a.     All formulations of the drug have been evaluated as therapeutically equivalent by the FDA;

        b.     At least three (3) companies list their drugs in current published compendia with their cost; and

        c.     If the above criteria are met, the drugs are available for sale nationally.

41.     HCFA then finds the least costly generic as listed in all available national compendia that can be purchased by pharmacies and multiplies this amount by 150%. The product then becomes the FUL for all manufacturers' generic form of the drug or the maximum amount a State Medicaid Program can pay.

42.     Pharmacies are reimbursed for prescription drugs by the States' Medicaid Programs at the lower of :

CIVIL ACTION NO. 00 CV 10698 MLW

i)      the State's HCFA approved plan (i.e. Massachusetts' WAC+ 10%);

ii)     the pharmacies usual and customary charges to the general public ;

or,

iii)    the Federal Upper Limit ("FUL") plus a reasonable professional or dispensing fee.

43.    The vast majority of States award cost-reimbursement contracts to private companies to evaluate and process Medicaid recipients' claims for payment. The States refer to these contractors as fiscal agents.

44.    Prescription drug claims are submitted in one of two ways. The first is by submitting to the fiscal agent or state agency a completed (hard copy) pharmacy claim form. The second is through an electronic claims filing procedure (on-line claims adjudication) whereby the same information required to be included on the hard copy is transmitted electronically to the Medicaid fiscal agent or state agency.

45.    The majority of the DEFENDANTS' drugs, including the specified drugs at issue in this action, are distributed through drug wholesalers who resell and distribute the drugs to hospitals, pharmacies, physicians and clinics.

46.    Four companies, McKesson Drug, Cardinal, Bergen Brunswig and Ameri-Source, comprise approximately eighty (80%) of the 53 billion dollar annual wholesale drug market. Wholesalers generally sell to any  person or entity (i.e. pharmacies, physicians and hospitals) who can lawfully purchase prescription drugs.

24

CIVIL ACTION NO. 00 CV 10698 MLW

47.    Wholesalers purchase the specified drugs at prices that are unilaterally set and controlled by the DEFENDANTS.  The wholesalers in turn add a percentage (commonly referred to as an "up-charge") to the price that they pay the DEFENDANTS. The "up-charge" covers the wholesaler's expenses such as warehousing, delivery, billing and collections and provides a profit. The percentage of up-charge is negotiated between the pharmacy and the wholesaler and is usually based on the pharmacy's purchasing volume.  By way of example, the Relator's up-charge from McKesson is 6.5%.

48.    The DEFENDANTS also sell directly and indirectly to hospitals and retail pharmacies through group purchasing organizations ("GPO's") and buying groups. GPO's and buying groups represent smaller providers and provide members with lower costs by negotiating prices for specific drugs from the manufacturers.  The GPO or buying group member is able to purchase the drugs at the GPO's or buying group's negotiated price either directly from the manufacturer or from a wholesaler that has a "charge-back" agreement with the specific manufacturer.

49.    The DEFENDANTS' "charge-back" arrangements with wholesalers allows the DEFENDANTS to sell drugs, including some of the drugs at issue in this case, to the wholesalers at a fictitiously inflated price.  When a wholesaler sells a drug, the price of which has been negotiated with a GPO or buying group, the wholesaler is credited by the DEFENDANT for the difference between the false price and the true price to the DEFENDANTS' customer plus the agreed "up charge" for the wholesaler.  The

25

CIVIL ACTION NO.  00 CV 10698 MLW

DEFENDANTS' exploitation of the "charge-back" scheme allows the DEFENDANTS to control prices charged by wholesalers while fictitiously reporting inflated wholesaler cost.

50.     The "charge-back" scheme is illustrated by the following example of the drug, Nadolol 20mg, bottle of 100, NDC# 59772-2461-01, manufactured by DEFENDANT APOTHECON/BRISTOL-MYERS  and  wholesaled  through  McKesson  Drug  Co. ("McKesson"):

a)     McKesson's March 2000 published wholesale price for Nadolol 20mg, bottle of 100, NDC# 59772-2461-01, is $29.48;

b)     Ven-A-Care is a member of the Servall buying group.  Servall is a McKesson sponsored buying group that is available to any retail pharmacy that purchases prescription drugs from McKesson;

c)     Ven-A-Care's Servall buying group's price for Nadolol 20mg, bottle of 100, NDC# 59772-2461-01, is $7.93.  Therefore, VAC can purchase a bottle of Nadolol 20mg 100's from McKesson for $8.45 which includes McKesson's 6.5% up-charge to Ven-A- Care. This is $21.03 less than McKesson purportedly paid DEFENDANT APOTHECON/BRISTOL-MYERS;

d)     McKesson  claims  a  "charge-back"  from  DEFENDANT APOTHECON/BRISTOL-MYERS of $21.55 which represents the difference in price from what  McKesson  paid ($29.48) versus the price McKesson sold it to VAC ($7.93), not including McKesson's up-charge.

CIVIL ACTION NO.  00 CV 10698 MLW

51.     In order to monitor the wholesalers' compliance, the DEFENDANTS require all drug wholesalers to periodically (generally quarterly) report back to the DEFENDANTS all prescription drug sales by NDC number, provider name and sales price.

52.     A representative example of this practice was demonstrated when VAC was informed by a Glaxo sales representative that Glaxo and other drug manufacturers consider this information vital in determining how and where to market their prescription drugs. The Glaxo representative informed VAC that Glaxo prepared reports for every sales representative based on the information compiled from all wholesalers' reports and that the Glaxo report was broken down by postal zip code, provider, NDC number, quantity and sales prices.

53.     First Data Bank receives and relies upon the drug manufacturers', including the DEFENDANTS', representations of their drug prices and costs including the prices at which the DEFENDANTS sell their drugs to wholesalers (WAC) in determining the drug pricing data that they report to the States.

54.     The Relator's investigation has determined that the DEFENDANTS provide First Data Bank with either the WAC price of its drugs or instructions, if necessary, expressed in a manner that allows First Data Bank to establish the WAC.

55.     During the time covered by this complaint, First Data Bank has defined WAC as "wholesaler acquisition cost" for a particular drug.  A form entitled "New Product Submission Form" is provided by First Data Bank to drug manufacturers, including the DEFENDANTS, to transmit information, including their prices, to First Data Bank.  The

27

form permits drug manufacturers to submit prices expressed in terms of Wholesale (Distributor) Price, Direct Price and AWP Price. Attached hereto is true and exact copy of said form as **Exhibit "2"**.

56.    The Relator's information revealed that each of the DEFENDANTS had been the source of the price and cost information which was reported by First Data Bank to the States' Medicaid Programs at all times at issue in this action. The Relator reported its information to the Government, including specific identification of representatives of First Data Bank to whom such information was reported.

57.    The States' Medicaid Programs also receive price and cost representations directly from the DEFENDANTS and use them to confirm the accuracy of price and cost in computing reimbursement amounts. Attached hereto as Composite **Exhibit "3"** are true and correct copies of price representations made by DEFENDANTS WARRICK and ROXANE to the State of Florida Medicaid Pharmacy Program on or about December 20, 1994 and September 26, 1994. Attached hereto as **Exhibit "4"** is a true and correct copy of price representations provided to Texas Medicaid by DEFENDANT WARRICK on or about March 6, 1997.

58.    The importance that drug manufacturers represent truthful costs and prices and how these representations affect reimbursements is demonstrated by the following examples: