**ANDERSON EXHIBIT 2B**

CIVIL ACTION NO. 00 CV 10698 MLW

| DRUG STRENGTH & SIZE, NDC# | BRISTOL-MYERS REPORTED WAC | RELATOR'S COST McKESSON 3/31/00 | FLORIDA MEDICAID PAYMENT @ WAC+7% | DIFFERENCE BETWEEN RELATOR'S COST & FLORIDA MEDICAID REIMBURSEMENT |
|---|---|---|---|---|
| PRAVACHOL 20mg. 90's 00003-5178-05 | $174.96 | $183.79 | $187.21 | $3.42 (under 2 %) |

| DRUG STRENGTH & SIZE, NDC# | BRISTOL-MYERS REPORTED WAC | RELATOR'S COST McKESSON 3/31/00 | FLORIDA MEDICAID PAYMENT @ WAC+7% | DIFFERENCE BETWEEN RELATOR'S COST & FLORIDA MEDICAID REIMBURSEMENT |
|---|---|---|---|---|
| MONOPRIL 10mg. 90's 00087-0609-42 | $66.96 | $71.44 | $71.65 | $0.21 (under 1/2 %) |

| DRUG STRENGTH & SIZE, NDC# | ROXANE'S REPORTED WAC | RELATOR'S COST McKESSON 3/31/00 | FLORIDA MEDICAID PAYMENT @ WAC+7% | DIFFERENCE BETWEEN RELATOR'S COST & FLORIDA MEDICAID REIMBURSEMENT |
|---|---|---|---|---|
| MARINOL 5mg. 100's 00054-2602-25 | $505.66 | $539.48 | $541.06 | $1.60 or (under 1/2 %) |

| DRUG STRENGTH & SIZE, NDC# | SHERING/PLOUGH'S REPORTED WAC | RELATOR'S COST McKESSON 3/31/00 | FLORIDA MEDICAID PAYMENT @ WAC+7% | DIFFERENCE BETWEEN RELATOR'S COST & FLORIDA MEDICAID REIMBURSEMENT |
|---|---|---|---|---|
| PROVENTIL REPETAB 4 mg. 100's 00085-0431-02 | $66.94 | $70.78 | $71.63 | $0.85 or (under 2 %) |

CIVIL ACTION NO. 00 CV 10698 MLW

59.    The representations of drug prices made by the DEFENDANTS to First Data Bank and directly to the States' Medicaid Programs are material for the establishment of reasonable reimbursements to be made by the States' Medicaid Programs.

### SECTION NO. 5
### THE FALSE CLAIMS SCHEME

**a.    A description of the False Claims Scheme.**

60.    The DEFENDANTS are each liable under the False Claims Act because they caused the States' Medicaid Programs to pay claims for certain of their generic prescription drugs in exorbitant amounts, far in excess of the reasonable reimbursement permitted under the applicable statutes and regulations.  The DEFENDANTS manufactured and/or distributed the specified prescription drugs in this action and sold the specified prescription drugs either directly to the pharmacies or indirectly through such intermediaries as wholesalers and group purchasing organizations.  The false claims for excessive reimbursement were then submitted to the States' Medicaid Programs by the DEFENDANTS through their false price statements and by their customers (the pharmacies) who thereby received a windfall financial benefit in the amount by which the Governments' approved "reimbursement" exceeded a reasonable estimate of acquisition cost.

61.    The DEFENDANTS also caused the submission of false claims by actively marketing their specified drugs to pharmacies by the use of financial inducements created by " the Spread"  between the DEFENDANTS' true wholesaler prices to the pharmacies

30

CIVIL ACTION NO. 00 CV 10698 MLW

and the States' Medicaid Programs reimbursements based on the DEFENDANTS' falsely

inflated wholesaler prices reported to the States' Medicaid Programs and their

subcontractors. The financial inducements were in many cases enhanced by such things

as free goods, discounts, and rebates.

62.    The DEFENDANTS knew that the States' Medicaid Programs would not pay

or approve claims for the specified drugs if it were disclosed to the States' Medicaid

Programs that said claims were for amounts that included illegal remuneration prohibited

by the anti-kick back statutes, 42 U.S.C. §1320a-7b(b)(2) and 1395nn(a)(1)(B).

63.    The DEFENDANTS also knew that pharmacies, in presenting claims for the

specified drugs to the States' Medicaid Programs, would not and did not disclose that the

claim amounts included the remuneration prohibited by 42 U.S.C. §1320a-7b(b)(2) and

1395 nn(a)(1)(B).

64.    The claims in question are each false claims under the False Claims Act, in

part, because they were each supported by and the payment amount determined due to

the false and misleading price and cost information provided by the DEFENDANTS for the

Government's use in connection with their respective specified drugs. The false and

misleading representations of wholesaler prices by the DEFENDANTS were material in

that the information was used in setting the States' Medicaid reimbursement amounts.

Each DEFENDANT acted knowingly, as defined in the False Claims Act, in providing the

false and misleading representations of wholesaler prices that caused the States to pay

claims for the DEFENDANTS' drugs in excessive amounts.  The wholesaler prices

31

CIVIL ACTION NO.  00 CV 10698 MLW

provided by the DEFENDANTS were provided to cause the States' Medicaid Programs to pay amounts based on the information and thus constituted claims submitted to the Government.

66. False claims at issue in this action were also submitted to the States' Medicaid Programs by or on behalf of the pharmacies that sought and received payment in excessive amounts because of the false wholesaler price representations made by the DEFENDANTS directly or indirectly to the States' Medicaid Programs. The specific false claims are thus each and every claim submitted to the States' Medicaid Programs for which the payment amount was determined by use, in whole or to any degree, of the false and misleading price representations of the DEFENDANTS. The false claims at issue number in the tens of thousands and each claim is in the possession of the individual state's Medicaid Program or fiscal agent to which it was submitted. The Relator has identified the specific false claims to the UNITED STATES by providing the truthful prices concealed from the States by the DEFENDANTS for each drug, providing information about the DEFENDANTS' exploitation of the States' Medicaid Programs through the use of financial inducements for the specified drugs, specific identification information about the prescription drugs, and the specific false price representations at issue in this case.

66. The damages sought herein include, but are not limited to, those arising from the false claims for the specified drugs set out in Sections 6 through 12 and elsewhere throughout this Complaint. The false claims for the specified drugs set out herein are alleged to meet the specificity and particularity requirements for pleading under the Federal

32

CIVIL ACTION NO.  00 CV 10698 MLW

Rules of Civil Procedure.  The damages sought herein encompass all damages and penalties recoverable due to the false claim scheme of the DEFENDANTS alleged herein relating to all drugs of all sizes about which false price and cost representations or records were used in connection with, considered or made available in, caused, aided or otherwise affected the presentment, payment or approval of false claims.  These claims also encompass recovery of the funds paid for false claims due to the DEFENDANTS' false drug price and cost representations, regardless of the Government program that actually expended the funds, the person or entity that ultimately received the funds or the person or entity from which the UNITED STATES ultimately recovers the funds.

> **b.    The DEFENDANTS each acted knowingly.**

67.    The DEFENDANTS are prohibited by the False Claims Act from making false representations in connection with claims for Government funds, are required by the Food and Drug Act to report true prices and are prohibited by the Medicare and Medicaid Anti-Kickback laws from arranging financial inducements for providers.

68.    The patients and the States' Medicaid Programs were not aware of the prices actually paid for the specified drugs by the pharmacies presenting the claims for payment. The DEFENDANTS concealed from the States' Medicaid Programs price reductions occurring due to competition in the marketplace and falsely or fraudulently represented drug prices that far exceeded the truthful prices.

69.    At all times material to this action, each of the DEFENDANTS acted "knowingly" as that term is defined at 31 U.S.C. §3729(b) by:

33

CIVIL ACTION NO.  00 CV 10698 MLW

a) Causing the presentation of false or fraudulent claims for payment or approval by the States' Medicaid programs, and

b) Making or using false statements or records for the purpose of getting false or fraudulent claims approved or paid by the States' Medicaid programs.

70. The DEFENDANTS were clearly placed on notice that their conduct would cause the States' Medicaid programs to pay claims for the specified drugs in amounts exceeding that permitted by applicable law, in part, because:

a) Each of the DEFENDANTS was on notice of federal statutes and regulations limiting payment of Medicaid claims for the specified drugs to an amount necessary to cover the cost of the drug.

b) Each of the DEFENDANTS was on notice that the States' Medicaid programs were not authorized or permitted by applicable law to pay claims for the specified drugs in excessive amounts.

c) Each of the DEFENDANTS was on notice that federal statutes and regulations prohibited them from making misleading representations about the specified drugs, including misleading price or cost representations.

71. Each of the DEFENDANTS was on notice that federal statutes and regulations governing food and drugs  prohibited them from making misleading representations about the specified drugs, including misleading price or cost representations, in part, because:

34

a)    Each of the DEFENDANTS is required to comply with the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §301 et. seq., and the regulations promulgated pursuant thereto.

b)    The price and cost representations about the specified drugs constitute advertising that is included in the "labeling" provisions of the Federal Food, Drug and Cosmetic Act and related regulations. 21 U.S.C. §§321; 352.

c)    Each of the DEFENDANTS is prohibited from disseminating any information about their prices or costs of the specified drugs that is "false or misleading in any particular . . ." 21 U.S.C. §§352(a).

d)    Each of the DEFENDANTS was on notice that it possessed a duty to assure that representations about prices and costs of the specified drugs were not misleading, taking into account:

> " . . . not only representations made or suggested by statement, word, design, device, or any combination thereof, but also to the extent to which the labeling or advertising fails to reveal facts material in light of such representations"

21 U.S.C. §321(a) .

e)    The DEFENDANTS can and do make truthful representations of wholesaler prices for most of their other drugs.

72.    Each DEFENDANT was on notice that it was  prohibited by federal statutes from paying or causing the payment of, directly or indirectly, money or other financial benefit to induce its customers to order the specified drugs when the Medicare or States' Medicaid Programs would be paying claims. 42 U.S.C. §1320a-7b(b)(2) and 42 U.S.C. §1395nn(a)(1)(B).

CIVIL ACTION NO.  00 CV 10698 MLW

73.    Notwithstanding the DEFENDANTS' knowledge that the Government relied upon the DEFENDANTS' representations of price and cost and their knowledge of the applicable statutory requirements and prohibitions, each of the DEFENDANTS repeatedly, systematically and falsely  reported inflated wholesaler prices as specified in Sections 6 through 12.

c.    **The DEFENDANTS directly benefitted through increased sales**.

74.    The DEFENDANTS benefitted directly from their false pricing scheme by maximizing their products' sales volume while capturing market share. An example of how the DEFENDANTS directly benefit from their false pricing scheme is demonstrated by data for the first quarter of 1997 from the State of Florida's Medicaid Program setting out Florida Medicaid's reimbursements paid to pharmacies for the drug Albuterol Sulfate, 0.083% Solution ("Albuterol"), by DEFENDANTS DEY and WARRICK and their competing manufacturers Geneva Zenith/Goldline.

75.    Albuterol is a prescription drug which is administered by inhalation and is used for the treatment of many respiratory illnesses. First quarter, 1997, reimbursement data from the State of Florida's Medicaid Program demonstrates that the wider "the Spread" between the true cost paid by providers versus the reimbursement paid by Medicaid the more a specific manufacturer's product will be utilized instead of a competitor's product. The DEFENDANTS WARRICK and DEY and the pharmaceutical manufacturers Zenith/Goldline and Geneva, have all made representations of Wholesaler Acquisition Cost to the State of Florida as set out in the chart below. As a direct result of the false representations of prices and costs, the DEFENDANTS WARRICK and DEY caused the State of Florida's Medicaid Program to unwittingly pay more than one million

CIVIL ACTION NO.  00 CV 10698 MLW

dollars for the first quarter of 1997 over the reasonable reimbursement amounts which the State intended to pay.  The chart further sets out the number of reimbursed claims, VEN-A-CARE's cost per ml and "the Spread" between Medicaid reimbursement and true cost. A review of the chart clearly demonstrates that the vast majority of providers utilize the manufacturer's pharmaceutical with the greatest "Spread" between the true Wholesaler Acquisition Cost and the inflated false Wholesaler Acquisition Cost reported by the pharmaceutical manufacturer.

## FALSE PRICING SCHEME - "THE SPREAD"

### FLORIDA MEDICAID REIMBURSEMENT (1st Quarter 1997)
### ALBUTEROL SULFATE SOLUTION 0.083%

| Manufacturer | VAC's Cost per ml | Florida Medicaid Reimbursement per ml | The Spread | # of claims | Reimbursement paid by Florida Medicaid |
|---|---|---|---|---|---|
| Warrick | $0.09 | $0.3590 | $0.269 | 12,673 | $763,595.42 |
| Dey | $0.10 | $0.3531 | $0.2531 | 9,792 | $707,220.50 |
| Zenith/Goldline | $0.10 | $0.2138 | $0.1138 | 102 | $4,981.86 |
| Geneva | N/A | $0.1787 | ** | 19 | $1,278.08 |
| TOTAL REIMBURSEMENT BY THE STATE OF FLORIDA MEDICAID PROGRAM (January 1 through March 31, 1997) | | | | | $1,477,075.86 |
| ** | The affect on the Medicaid Program of the use of the spread to falsify claims is evidenced by the fact that WARRICK's and DEY's customers will receive a greater windfall profit by buying DEY's or WARRICK's product than the customers could receive if Zenith/Goldline or Geneva gave the same product to them free of charge. | | | | |

CIVIL ACTION NO.  00 CV 10698 MLW

76.    The grossly inflated payments unwittingly made by the States' Medicaid Programs not only served as an inducement to providers to purchase a particular manufacturer's product but also served to drive over-utilization.  The Relator, prior to filing the Complaint, surveyed three national pharmacy providers of Albuterol to determine their business practices for their sales of Albuterol to the Medicare and States' Medicaid Programs.  The Relator's principals used positions in an affiliated home health care company to pose as an interested customer.  The Relator determined that the payment of kickbacks and/or split fees were common place between the pharmacies and home health care companies who could provide the pharmacies with patient referrals.  One marketing scheme offered by one of the pharmacies was the automatic shipping of refills of Albuterol every month without verifying continuing need with the patient or physician in order to maximize the sales of Albuterol and reimbursement.

> d.    The DEFENDANTS' False Claim Scheme deprived the Government of the protection of The Federal Upper Limits ("FUL").

77.    A representative example of the DEFENDANTS' efforts to deprive the Government of the benefit of the Federal Upper Limit involves the drug Atenolol.  In a letter dated November 7, 1996, DEFENDANT APOTHECON/BRISTOL-MYERS made false price representations about the company's drug Atenolol to the State of Florida Medicaid Agency (Attached hereto as **Exhibit "5"** is a true and correct copy of said letter). Application of Florida's methodology of WAC plus 7%, to the prices represented by DEFENDANT APOTHECON/BRISTOL-MYERS would have resulted in reimbursement for one hundred (100) 50mg tablets, (old NDC #00003-5040-50, new NDC#62269-0256-24), of $59.65 (WAC = $55.75 + 7% = $59.65), plus the professional dispensing fee.  However,

CIVIL ACTION NO.  00 CV 10698 MLW

Atenolol falls under the FUL program and its reimbursement was limited as of January,

1997, to $0.0464 per 50mg tablet or $4.64 per one hundred (100) 50mg tablets.

78.   After having been alerted to the false claim scheme by the Relator,

representatives of the State of Florida's Medicaid Program refused to cover DEFENDANT

APOTHECON/BRISTOL-MYERS' generic Atenolol until such time as the State received

from DEFENDANT APOTHECON/BRISTOL-MYERS what the State considered to be

DEFENDANT APOTHECON/BRISTOL-MYERS' truthful prices for Atenolol.  The fact that

Florida was not covering DEFENDANT APOTHECON/BRISTOL-MYERS Atenolol led to

complaints to DEFENDANT APOTHECON/BRISTOL-MYERS from pharmacies in Florida

who had dispensed DEFENDANT APOTHECON/BRISTOL-MYERS' Atenolol to Florida

Medicaid recipients and who were receiving denials for payment by Unisys, the State's

fiscal agent.

79.   Approximately one month later, a State of Florida official received a

telephone  call  from  a  person  who  stated  he  represented  DEFENDANT

APOTHECON/BRISTOL-MYERS and requested immediate coverage of Atenolol.  The

Florida Medicaid official stated she would not cover the drug unless she received truthful

prices.  The person who represented DEFENDANT APOTHECON/BRISTOL-MYERS

stated words to the effect, "What does it matter?  This drug is covered by the FUL

program".  The Florida official stated that it did matter as it could affect not only the

reimbursement amount the State paid for Atenolol but also, if all manufacturers followed

DEFENDANT APOTHECON/BRISTOL-MYERS' course and conduct of making false

pricing representations, it would cause the entire FUL program to be set at inflated

39

CIVIL ACTION NO. 00 CV 10698 MLW

amounts and completely frustrate the Government policy implemented by the FUL program.

80.    Only when it became clear to DEFENDANT APOTHECON/BRISTOL-MYERS' representative that the Florida official was standing her ground, did DEFENDANT APOTHECON/BRISTOL-MYERS provide a written disclosure dated December 5, 1996, of the truthful prices, (Attached hereto as Exhibit "6" is a true and exact copy of said letter). Applying   Florida's   Medicaid   reimbursement   methodology   to   DEFENDANT APOTHECON/BRISTOL-MYERS' truthful prices, the State pays $4.24 for one hundred (100) 50mg Atenolol tablets (WAC $3.96 + 7% = $4.24). The truthful prices saved the U.S. Government and the State of Florida $0.40 for each one hundred 50mg tablets.

81.    The persistence of the Florida Medicaid representatives curtailed DEFENDANT APOTHECON/BRISTOL-MYERS from circumventing the protections of the FUL program and caused DEFENDANT APOTHECON/BRISTOL-MYERS to report a truthful WAC to First Data Bank. The following table summarizes the above allegations:

| DRUG STRENGTH & SIZE, NDC#s | APOTHECON/ BRISTOL-MYERS ORIGINAL FALSE REPORTED WAC | APOTHECON/ BRISTOL-MYERS TRUE  WAC | FLORIDA MEDICAID PAYMENT @ TRUE WAC+7% | FUL |
|---|---|---|---|---|
| ATENOLOL 50mg 100's 62269-0256-24 | $55.75 | $3.96 | $4.24 | $4.64 |

82.    The following Table illustrates reimbursements and the corresponding harm caused   to   the   States'   Medicaid   programs   as   a   result   of   DEFENDANT APOTHECON/BRISTOL-MYERS' false representations of wholesaler prices for other drugs covered by the FUL program.

40

CIVIL ACTION NO.  00 CV 10698 MLW

| DRUG, STRENGTH & SIZE, NDC#s | APOTHECON/ BRISTOL-MYERS REPORTED FALSE WACs | RELATOR'S COST @ WAC + 6.5% (3/25/00) | MASSACHUSETTS MEDICAID PAYMENTS WITH TRUE WACs +10% | "FUL" 1/1/00 | DIFFERENCE BETWEEN "FUL" AND WHAT MASSACHUSETTS MEDICAID SHOULD HAVE PAID |
|---|---|---|---|---|---|
| AMANTADINE 100mg 100's 62269-0211-24 | $29.26 | $10.12 | $10.41 | $17.62 | $7.21 |
| CEFACLOR 250mg 100's 59772-7491-04 | $156.40 | $43.67 | $44.91 | $119.48 | $74.57 |
| CEFACLOR 500mg 100's 59772-7494-04 | $306.40 | $86.27 | $88.72 | $239.85 | $151.13 |
| ESTRADIOL 0.5mg 100's 59772-0025-03 | $18.80 | $11.18 | $11.49 | $21.52 | $10.03 |
| ESTRADIOL 1mg 100's 59772-0026-03 | $25.06 | $14.91 | $15.33 | $28.87 | $13.54 |
| ESTRADIOL 2mg 100's 59772-0027-03 | $36.59 | $22.37 | $23.00 | $41.92 | $18.92 |
| ETODOLAC 300MG 100's 62269-0360-24 | $100.18 | $35.79 | $36.80 | $59.32 | $22.52 |

## SECTION NO.  6
### THE SPECIFIC FALSE PRICE AND COST REPRESENTATIONS OF DEFENDANT ABBOTT

83.   At various times from on or after April 7, 1994, and continuing through the present date, DEFENDANT ABBOTT knowingly caused the States' Medicaid programs to pay false or fraudulent claims for drugs specified in this Section and further made or used

41

false or fraudulent records and/or statements to get such claims paid or approved. As a result of the actions of DEFENDANT ABBOTT and those persons and entities acting directly or indirectly in concert with DEFENDANT ABBOTT, the States' Medicaid Programs paid grossly excessive, unreasonable and unlawful amounts for claims for the drugs specified in this Section. The acts committed by DEFENDANT ABBOTT that caused the States' Medicaid Programs to pay or approve said false or fraudulent claims included, but were not necessarily limited to, knowingly making false or fraudulent representations about the wholesaler prices of the drugs specified in this Section which DEFENDANT ABBOTT knew would be relied upon by the States' Medicaid Programs in paying or approving claims for the drugs specified in this Section. Each of said representations were material and were relied upon by the States' Medicaid Programs in paying or approving claims for the drugs specified in this Section.

84.    DEFENDANT ABBOTT knowingly caused its false or fraudulent wholesaler price representations to be transmitted by First Data Bank's automated services, made or used false records or statements regarding its wholesaler prices of the drugs specified in this section and submitted them to the States' Medicaid Programs continuously throughout the years specified in this section. Within this paragraph is a table, organized by drug and NDC number, which reflects the recent false wholesaler prices in First Data Bank's automated services. The information in the table under the heading "ABBOTT'S False Reported WAC" reflects DEFENDANT ABBOTT'S false representations of price it charged wholesalers for drugs. The heading "Relator's Cost" reflects the true price that DEFENDANT ABBOTT charged the Relator for the drug or caused another entity to charge the Relator for the drug.

CIVIL ACTION NO.  00 CV 10698 MLW

| DRUG STRENGTH & SIZE, NDC#s | ABBOTT'S FALSE REPORTED WAC | RELATOR'S COST (in or about January 2001) |
|---|---|---|
| Erythromycin Base 250 mg Tab 100's 00074-6326-13 | $11.16 | $7.40 |
| Erythromycin Base 250 mg Tab 500's 00074-6326-53 | $56.19 | $35.89 |
| Erythromycin Stearate 250 mg Tab 100's 00074-6346-20 | $11.00 | $7.86 |
| Erythromycin Stearate 250 mg Tab 500's 00074-6346-53 | $52.25 | $38.18 |
| Erythromycin Stearate 500 mg Tab 100's 00074-6316-13 | $19.88 | $15.30 |
| Erythromycin Stearate UD 250 mg Tab 100's 00074-6346-38 | $14.28 | $10.03 |
| ERY-TAB E/C 250 mg, 30's 00074-6304-30 | $6.36 | $2.76 |
| ERY-TAB E/C 250 mg, 100's 00074-6304-13 | $21.31 | $7.72 |
| ERY-TAB E/C UD 250 mg, 100's 00074-6304-11 | $23.20 | $9.90 |
| E.E.S. 200 Susp. 100 ml 00074-6306-13 | $3.82 | $3.45 |

CIVIL ACTION NO.  00 CV 10698 MLW

| DRUG STRENGTH & SIZE, NDC#s | ABBOTT'S FALSE REPORTED WAC | RELATOR'S COST (in or about January 2001) |
|---|---|---|
| ERY E-Succ/Sulfisoxazole 200 mg, 100 ml 00074-7156-13 | $10.21 | $4.21 |
| ERY E-Succ/Sulfisoxazole 200 mg, 150 ml 00074-7156-43 | $15.31 | $6.32 |
| ERY E-Succ/Sulfisoxazole 200 mg 200 ml 00074-7156-53 | $19.86 | $8.42 |

85.     The false price and cost representations, as they were submitted to the State of Texas on or after April 7, 1994, are organized in a chart within this paragraph by "Drug", "NDC Number", Texas Medicaid Payment Amount ("WEAC"/"DEAC"), "Relator's Cost", the "Gross Profit" and the percentage of "Gross Profit."  The amount under the heading "Relator's Cost" is the true price that DEFENDANT ABBOTT charged the Relator for the drug or caused another entity to charge the Relator for the drug.  A comparison of the Relator's cost with DEFENDANT ABBOTT'S price representations shows the falsity of DEFENDANT ABBOTT'S price representations for the specified drugs.  Furthermore, the table shows the materiality of DEFENDANT ABBOTT'S false statements because it shows health care providers made a profit for prescribing DEFENDANT ABBOTT'S drugs.  Texas Medicaid, which intended to pay for drugs based upon estimated acquisition costs, never intended to pay the amounts under the heading "Gross Profit."

44

CIVIL ACTION NO.  00 CV 10698 MLW

| DEFENDANT ABBOTT | | | | | |
|---|---|---|---|---|---|
| Drug | NDC # | WEAC<br><br>DEAC | Relator's Cost (in or about January 2001) | WEAC Provider's Gross Profit $<br><br>DEAC Provider's Gross Profit $ | WEAC Provider's Gross Profit %<br><br>DEAC Provider's Gross Profit % |
| Erythromycin Base 250 mg Tab 100's | 00074-6326-13 | $12.46<br>$12.45 | $7.40 | $5.06<br>$5.05 | 41%<br>41% |
| Erythromycin Base 250 mg Tab 500's | 00074-6326-53 | $59.705<br>$59.15 | $35.89 | $23.815<br>$23.26 | 40%<br>39% |
| Erythromycin Stearate 250 mg Tab 100's | 00074-6346-20 | $12.98<br>$12.28 | $7.86 | $5.12<br>$4.42 | 39%<br>36% |
| Erythromycin Stearate 250 mg Tab 500's | 00074-6346-53 | $61.665<br>$58.35 | $38.18 | $23.485<br>$20.17 | 38%<br>35% |
| Erythromycin Stearate 500 mg Tab 100's | 00074-6316-13 | $24.42<br>$22.19 | $15.30 | $9.12<br>$6.89 | 37%<br>31% |
| ERY-TAB E/C 250 mg, 100's | 00074-6304-13 | $<br>$21.20 | $7.72 | $<br>$13.48 | %<br>64% |
| ERY E-Succ/ Sulfisoxazole 200 mg, 100 ml | 00074-7156-13 | $<br>$10.75 | $4.21 | $<br>$6.54 | %<br>61% |

45

CIVIL ACTION NO. 00 CV 10698 MLW

| DEFENDANT ABBOTT | | | | | |
|---|---|---|---|---|---|
| Drug | NDC # | WEAC ___ DEAC | Relator's Cost (in or about January 2001) | WEAC Provider's Gross Profit $ ___ DEAC Provider's Gross Profit $ | WEAC Provider's Gross Profit % ___ DEAC Provider's Gross Profit % |
| ERY E-Succ/ Sulfisoxazole 200 mg, 150 ml | 00074-7156-43 | $ ___ $15.90 | $6.32 | $ ___ $9.58 | % ___ 60% |
| ERY E-Succ/ Sulfisoxazole 200 mg 200 ml | 00074-7156-53 | $ ___ $20.90 | $8.42 | $ ___ $12.48 | % ___ 60% |

86.     As a direct and proximate result of the actions of the DEFENDANT ABBOTT alleged herein, the UNITED STATES has sustained damages recoverable under the False Claims Act, together with treble damages, penalties, attorneys' fees and costs.

### SECTION NO. 7
### THE SPECIFIC FALSE PRICE AND COST
### REPRESENTATIONS OF DEFENDANT
### APOTHECON/BRISTOL-MYERS

87.     At various times from on or after April 7, 1994, and continuing through the present date, DEFENDANT APOTHECON/BRISTOL-MYERS knowingly caused the States' Medicaid programs to pay false or fraudulent claims for drugs specified in this Section and further made or used false or fraudulent records and/or statements to get such claims paid or approved.  As a result of the actions of DEFENDANT APOTHECON/ BRISTOL-MYERS and those persons and entities acting directly or indirectly in concert with DEFENDANT APOTHECON/BRISTOL-MYERS, the States' Medicaid Programs paid

grossly excessive, unreasonable and unlawful amounts for claims for the drugs specified in this Section. The acts committed by DEFENDANT APOTHECON/BRISTOL-MYERS that caused the States' Medicaid Programs to pay or approve said false or fraudulent claims included, but were not necessarily limited to, knowingly making false or fraudulent representations about the wholesaler prices of the drugs specified in this Section which DEFENDANT APOTHECON/BRISTOL-MYERS knew would be relied upon by the States' Medicaid Programs in paying or approving claims for the drugs specified in this Section. Each of said representations were material and were relied upon by the States' Medicaid Programs in paying or approving claims for the drugs specified in this Section.

88.    DEFENDANT APOTHECON/BRISTOL-MYERS knowingly caused its false or fraudulent wholesaler price representations to be transmitted by First Data Bank's automated services, made or used false records or statements regarding its wholesaler prices of the drugs specified in this section and submitted them to the States' Medicaid Programs continuously throughout the years specified in this section. Within this paragraph is a table, organized by drug and NDC number, which reflects the recent false wholesaler prices in First Data Bank's automated services. The information in the table under the heading "APOTHECON/BRISTOL-MYERS' False Reported WAC" reflects DEFENDANT APOTHECON/BRISTOL-MYERS' false representations of price it charged wholesalers for drugs. The heading "Relator's Cost" reflects the true price that DEFENDANT APOTHECON/BRISTOL-MYERS charged the Relator for the drug or caused another entity to charge the Relator for the drug.

CIVIL ACTION NO.  00 CV 10698 MLW

| DRUG STRENGTH & SIZE, NDC#s | APOTHECON/BRISTOL-MYERS' FALSE REPORTED WAC | RELATOR'S COST (in or about March 2000) |
|---|---|---|
| ALBUTEROL INHALATION AEROSOL 17 gm 59772-6175-01 | $15.79 | $4.61 |
| AMANTADINE HCL 100mg 100's 62269-0211-24 | $29.26 | $10.12 |
| AMOXICILLIN 500mg 100's 00003-0109-55 | $34.73 | $8.36 |
| CAPTOPRIL 12.5 mg 100's 59772-7045-01 | $48.31 | $2.13 |
| CAPTOPRIL 25mg 100's 59772-7046-01 | $52.22 | $2.66 |
| CAPTOPRIL 100mg 100's 59772-7048-01 | $119.25 | $8.52 |
| CEFACLOR 250mg 100's 59772-7491-04 | $156.40 | $43.67 |
| CEFACLOR 500mg 100's 59772-7494-04 | $306.40 | $86.27 |
| CEPHALEXIN 250mg 100's 00003-0749-50 | $47.50 | $7.04 |
| CEPHALEXIN 500mg 100's 00003-0874-50 | $93.10 | $14.62 |
| DOXYCYCLINE 100mg 59772-0940-01 | $50.14 | $3.34 |
| ESTRADIOL 0.5mg 100's 59772-0025-03 | $18.80 | $11.18 |
| ESTRADIOL 1mg 100's 59772-0026-03 | $25.06 | $14.91 |

48

| DRUG STRENGTH & SIZE, NDC#s | APOTHECON/BRISTOL-MYERS' FALSE REPORTED PRICE | RELATOR'S COST |
|---|---|---|
| ESTRADIOL 2mg 100's 59772-0027-03 | $36.59 | $22.37 |
| ETODOLAC 300MG 100's 62269-0360-24 | $100.18 | $35.79 |
| POTASSIUM CHLORIDE 10 mEq (750 mg) 100's 59772-6910-01 | $13.06 | $3.23 |

89.    The false price and cost representations, as they were submitted to the State of Texas on or after April 7, 1994, are organized in a chart within this paragraph by "Drug", "NDC Number", Texas Medicaid Payment Amount ("WEAC"/"DEAC"), "Relator's Cost", the "Gross Profit" and the percentage of "Gross Profit."   The amount under the heading "Relator's Cost" is the true price that DEFENDANT APOTHECON/BRISTOL-MYERS charged the Relator for the drug or caused another entity to charge the Relator for the drug.   A comparison of the Relator's cost with DEFENDANT APOTHECON/BRISTOL-MYERS' price representations shows the falsity of DEFENDANT APOTHECON/BRISTOL-MYERS' price representations for the specified drugs.   Furthermore, the table shows the materiality of DEFENDANT APOTHECON/BRISTOL-MYERS' false statements because it shows health care providers made a profit for prescribing DEFENDANT APOTHECON/BRISTOL-MYERS' drugs. Texas Medicaid, which intended to pay for drugs based upon estimated acquisition costs, never intended to pay the amounts under the heading "Gross Profit."

CIVIL ACTION NO.  00 CV 10698 MLW

| DEFENDANT APOTHECON/BRISTOL-MYERS | | | | | |
|---|---|---|---|---|---|
| Drug | NDC # | WEAC<br>DEAC | Relator's Cost (in or about March 2000) | WEAC Provider's Gross Profit $<br>DEAC Provider's Gross Profit $ | WEAC Provider's Gross Profit %<br>DEAC Provider's Gross Profit % |
| Albuterol<br>17 gm | 59772-6175-02 | $1.12922/gm<br>$19.20<br>$1.06118/gm<br>$18.04 | $5.00 | $14.20<br>$13.04 | 74%<br>72% |
| Cefadroxil<br>500 mg 100's | 59772-7271-04 | $2.57880/ea<br>$257.88<br>$2.42370/ea<br>$242.37 | $82.90 | $174.98<br>$159.47 | 68%<br>66% |
| Cefaclor<br>125 mg/ 5 ml<br>150 ml | 59772-7490-04 | $.16724/ml<br>$25.08<br>$.15720/ml<br>$23.58 | $9.27 | $15.81<br>$14.31 | 63%<br>61% |
| Captopril/<br>HCTZ<br>25 mg-15 mg<br>100's | 59772-5160-05 | $.61009/ea<br>$61.00<br>$.60450/ea<br>$60.45 | $19.17 | $41.83<br>$41.28 | 69%<br>68% |
| Captopril/<br>HCTZ<br>50 mg-25 mg<br>100's | 59772-5163-05 | $1.04784/ea<br>$104.78<br>$1.03810/ea<br>$103.81 | $25.94 | $78.84<br>$77.87 | 75%<br>75% |
| Estradiol<br>2 mg 100's | 59772-0027-03 | $.40985/ea<br>$40.98<br>$.38520/ea<br>$38.52 | $22.37 | $18.61<br>$16.15 | 45%<br>42% |

CIVIL ACTION NO.  00 CV 10698 MLW

| DEFENDANT APOTHECON/BRISTOL-MYERS | | | | | |
|---|---|---|---|---|---|
| Drug | NDC # | WEAC / DEAC | Relator's Cost (in or about March 2000) | WEAC Provider's Gross Profit $ / DEAC Provider's Gross Profit $ | WEAC Provider's Gross Profit % / DEAC Provider's Gross Profit % |
| Potassium Chloride 10 mEq 100's | 59772-6910-01 | $.14627/ea $14.62 / $.13740/ea $13.74 | $3.50 | $11.12 / $10.24 | 76% / 75% |
| Potassium Chloride 10 mEq 1000's | 59772-6910-02 | $.14313/ea $143.13 / $.13453/ea $134.53 | $28.90 | $114.23 / $105.63 | 80% / 79% |

90.    As a direct and proximate result of the actions of the DEFENDANT APOTHECON/BRISTOL-MYERS alleged herein, the UNITED STATES has sustained damages recoverable under the False Claims Act, together with treble damages, penalties, attorneys' fees and costs.

### SECTION NO. 8
### THE SPECIFIC FALSE PRICE AND COST
### REPRESENTATIONS OF DEFENDANT DEY

91.    At various times from on or after April 7, 1994, and continuing through the present date, DEFENDANT DEY knowingly caused the States' Medicaid programs to pay false or fraudulent claims for drugs specified in this Section and further made or used false or fraudulent records and/or statements to get such claims paid or approved.  As a result

CIVIL ACTION NO. 00 CV 10698 MLW

of the actions of DEFENDANT DEY and those persons and entities acting directly or indirectly in concert with DEFENDANT DEY, the States' Medicaid Programs paid grossly excessive, unreasonable and unlawful amounts for claims for the drugs specified in this Section. The acts committed by DEFENDANT DEY that caused the States' Medicaid Programs to pay or approve said false or fraudulent claims included, but were not necessarily limited to, knowingly making false or fraudulent representations about the wholesaler prices of the drugs specified in this Section which DEFENDANT DEY knew would be relied upon by the States' Medicaid Programs in paying or approving claims for the drugs specified in this Section. Each of said representations were material and were relied upon by the States' Medicaid Programs in paying or approving claims for the drugs specified in this Section.

92.     DEFENDANT DEY knowingly caused its false or fraudulent wholesaler price representations to be transmitted by First Data Bank's automated services made or used false records or statements regarding its wholesaler prices of the drugs specified in this section and submitted them to the States' Medicaid Programs continuously throughout the years specified in this section. Within this paragraph is a table, organized by drug and NDC number, which reflects the recent false wholesaler prices in First Data Bank's automated services. The information in the table under the heading "DEY'S Reported False WACs" reflects DEFENDANT DEY'S false representations of price it charged wholesalers for drugs. The heading "Relator's Cost" reflects the true price that DEFENDANT DEY charged the Relator for the drug or caused another entity to charge the Relator for the drug.

52

CIVIL ACTION NO.  00 CV 10698 MLW

| DRUG STRENGTH & SIZE, NDC#s | DEY's REPORTED FALSE WACs | RELATOR'S COST (in or about March 2000) |
|---|---|---|
| ALBUTEROL INHALATION AEROSOL 17 gm 49502-0303-17 | $5.99 | $2.90 |
| ALBUTEROL INHALATION AEROSOL (refill) 17 gm 49502-0303-27 | $5.74 | $2.99 |

93.     The false price and cost representations, as they were submitted to the State of Texas on or after April 7, 1994, are organized in a chart within this paragraph by "Drug", "NDC Number", Texas Medicaid Payment Amount ("WEAC"/"DEAC"), "Relator's Cost", the "Gross Profit" and the percentage of "Gross Profit."   The amount under the heading "Relator's Cost" is the true price that DEFENDANT DEY charged the Relator for the drug or caused another entity to charge the Relator for the drug.  A comparison of the Relator's cost with DEFENDANT DEY'S price representations shows the falsity of DEFENDANT DEY'S price representations for the specified drugs.  Furthermore, the table shows the materiality of DEFENDANT DEY'S false statements because it shows health care providers made a profit for prescribing DEFENDANT DEY'S drugs. Texas Medicaid, which intended to pay for drugs based upon estimated acquisition costs, never intended to pay the amounts under the heading "Gross Profit."