**ANDERSON EXHIBIT 6D**

specific prices and costs of their drugs along with instructions, if necessary, which allowed the price publishing companies to report the drug manufacturers' pricing information. This pricing information was then reported to and utilized by Medicare, Medicaid and others in determining reimbursements for prescription drugs. The drug manufacturers were aware their pricing information was reported to Medicare, Medicaid and others.

73. During the relevant time period of this Complaint, a form entitled "New Product Submission Form" was provided by First DataBank to drug manufacturers to transmit information, including their prices, to First DataBank. A copy of this form is attached hereto as **EXHIBIT "4"**. The form permitted drug manufacturers to submit prices expressed in terms of Wholesale (Distributor) Price, Direct Price and AWP Price. After causing new products to be added to a national drug data formulary maintained by First DataBank, drug manufacturers, including DEFENDANTS, thereafter reported additional updated price representations and verifications of their price representations, including Wholesale Net Price, Direct Price and AWP Price to First Databank.

74. During the relevant time period of this Complaint, forms titled "Product Listing Verification" and "New Product Information Form" were provided by Medical Economics/*Red Book* to drug manufacturers to transmit information, including their prices, to Medical Economics/*Red Book*. The forms permitted drug manufacturers to submit prices expressed in terms that include, but are not necessarily limited to, AWP. Drug manufacturers, including DEFENDANTS, provided updated price and cost representations

to Medical Economics Red Book expressed in terms that include, but are not necessarily limited to, AWP.

75. Each of the DEFENDANTS was the source of the price and cost information reported by First DataBank, Medical Economics and MediSpan to the Medicare and States' Medicaid Programs at all times at issue in this action. The Relator provided to the Government its information about the DEFENDANTS' false reporting of their price data to these publishers, including specific identification of representatives of First DataBank and Medical Economics to whom such information was reported. Thereafter, the Government conducted an investigation which confirmed the information supplied by the Relator, including the false information that each of the DEFENDANTS repeatedly and systemically communicated to First DataBank, Medical Economics and Medi-Span with the express purpose and effect of causing First DataBank, Medical Economics and Medi-Span to report falsely inflated prices and costs of the specified drugs in amounts set by the DEFENDANTS.

76. The DEFENDANTS also regularly made direct representations of false price and cost information directly to the various state Medicaid agencies.

## SECTION NO. 5
## ROLE OF THE DRUG WHOLESALER

77. The majority of the DEFENDANTS' drugs, including the specified drugs at issue in this action, are distributed through drug wholesalers who resell and distribute the drugs to hospitals, pharmacies, physicians and clinics.

78.     Four companies, McKesson Drug, Cardinal, Bergen Brunswig and Ameri-Source have comprised approximately eighty (80%) of the over $70 billion dollar annual U.S. wholesale drug market during the relevant time period of the Complaint. On August 29, 2001, Bergen Brunswig and AmeriSource merged to form AmeriSource Bergen Corporation. Wholesalers generally sell to any health care provider (such as pharmacies, physicians and clinics) who can lawfully dispense or administer prescription drugs.

79.     Throughout the time period covered by this Complaint, each DEFENDANT closely monitored and was aware of the prices it charged wholesalers for its drugs, including the specified drugs, and the impact which rebates, charge-backs, discounts and any other factors had upon the prices of the drug to wholesalers and Providers.

80.     Throughout the time period covered by this Complaint, each DEFENDANT also closely monitored and was aware of the prices which wholesalers charged Providers for its drugs and the net impact which rebates, volume discounts and any other off-invoice discounts had upon the prices to the Provider.

81.     The DEFENDANTS' "charge-back" arrangements with wholesalers were used to conceal from Medicare/Medicaid prices generally and currently available in the marketplace and to facilitate reports of inflated prices. In the charge-back arrangements at issue here, the drug manufacturer directly negotiated with entities for the sale of drugs at negotiated contract prices, with the knowledge that such contract prices would be significantly less than the reported wholesale prices. These customers contracted directly with the drug manufacturer for favorable prices, but, nevertheless received the drugs from

wholesalers. The wholesaler routinely received manufacturer invoices stating prices significantly higher than the actual cost of the drug to the wholesaler and significantly higher than what the wholesaler actually charged its customer under the charge back arrangement.

82. The DEFENDANTS negotiated prices for their prescription drugs individually with hospitals, Government entities, closed pharmacies, mail order pharmacies, HMO's, physicians, and group purchasing organizations ("GPOs"). GPOs are comprised of smaller Providers such as pharmacies and often are managed by wholesalers. GPOs provide members with negotiated prices for specific drugs from manufacturers. The GPO member is able to purchase the drugs at the negotiated price, in some cases directly from the manufacturer and in others, from a wholesaler that has a charge-back agreement with the specific manufacturer. Numerous wholesalers have participated to some degree in the DEFENDANTS' charge-back system.

## SECTION NO. 6
## BACKGROUND OF HOW UNITED STATES' MONIES ARE PAID FOR DRUG CLAIMS UNDER THE MEDICARE PROGRAM

83. HHS, through CMS, provides health insurance benefits to aged and disabled Americans pursuant to the provisions of the Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. §1395 et seq.

84.     The Medicare program provides covered health care benefits to certain targeted populations such as those persons who are over age 65, persons who are disabled, and persons who have end stage renal disease.

85.     The Medicare program is divided into two distinct parts: (A) Medicare Part A (Hospital Insurance for the Aged and Disabled) which covers services and goods furnished by hospitals, home health agencies, hospices, and skilled nursing facilities; and (B) Medicare Part B (Supplementary Medical Insurance for the Aged and Disabled) which covers physician services and a range of other noninstitutional services, such as durable medical equipment ("DME"), oxygen concentrators, diagnostic laboratory tests, X-rays, and certain limited drug products and supplies.

86.     Medicare Part B pays a limited benefit for drugs that are provided: (a) incident to a physician's services and typically cannot be self-administered; or (b) in conjunction with a medically necessary infusion pump, nebulizer or other DME device payable under Medicare's DME benefit. Because this limited drug benefit is provided on an "incident to a physician's service" basis, or in conjunction with the medical necessity of a DME device, Congress' statutes and the corresponding HHS regulations and CMS policies have sought to limit Medicare's payments for claims for the drugs at issue to a reasonable amount based upon the cost of the drug. This is due, in part, to the fact that the Medicare program pays additional amounts for the physician's professional fees, home health care services and the covered DME equipment. The inflated reimbursement amounts on covered drugs caused by the DEFENDANTS' false price and cost

representations have thwarted the fundamental requirements of the Medicare and States' Medicaid Programs that reimbursement payments for the specified drugs be limited to reasonable amounts to cover the cost of the drugs.

87. CMS administers the Medicare program. CMS awards cost-reimbursement contracts to private companies to evaluate and to process Medicare beneficiaries' claims for payment. Under Part A, CMS refers to contractors as "intermediaries." Under Part B, CMS refers to contractors as "carriers" and durable medical equipment regional carriers ("DMERCs"). Under Part B, CMS pays the carriers and the DMERCs to process claims for covered benefits supplied to eligible beneficiaries and to make payments to the Providers or to the Medicare beneficiaries for the covered services rendered under Medicare Part B. 42 U.S.C. §1395u.

88. The Medicare Program pays eighty percent (80%) of the "reasonable cost" of drugs covered under Part B pharmaceutical claims from federal funds with the balance paid by the beneficiary. The Medicare Program reimbursed claims for Part B covered drugs based on the reported AWP of those drugs.

89. During at least part of the period of time covered by this action, Medicare paid claims for Part B covered drugs categorized as multiple source drugs based on an analysis of an array of reported AWPs for those multiple source drugs. At times, the array may have included the reported AWP for the "brand" or therapeutically equivalent single source drug originally placed on the market. The analysis of the array to establish the

reimbursement for multiple source drugs is hereinafter referred to as the "J-Code Medicare Reimbursement Methodology."

90.    Part B drug claims are submitted either in hard copy form or through an electronic claims filing procedure.

91.    Providers submit claims for payment to the Medicare Program for the specified drugs at issue in this case using HCFA's Common Procedure Coding System ("HCPCS" or the "J Code System"). The HCPC system for pharmaceuticals is a 5 digit alphanumeric code, such as Leucovorin, 50 mg.; HCPCS Code J0640.

92.    HCFA requires all Part B Carriers and the DMERCs to report to HCFA Central quarterly claims activity, by HCPCS Code, for all drugs submitted by Providers for reimbursement by the Medicare Program.

93.    Beneficiaries' claims are processed by the carriers as either "assigned" (those claims for which payment is made directly to the Provider) or "unassigned" (those claims for which payment is made directly to the beneficiaries).

94.    All or nearly all drug claims for the charges at issue are assigned.

95.    During the early 90's the Medicare Carriers attempted to survey physicians' actual invoice prices paid for drugs, to comply with the regulation (42 CFR §405.517) but were stopped by a complaint filed by the American Society of Clinical Oncologists ("ASCO") with the Executive Office of Management and Budget, asserting that the Paperwork Reduction Act had been violated. A subsequent effort by CMS to design a new survey to determine physicians' actual invoice costs was also stopped by ASCO. ASCO

complained that the actual prices being paid were discounts and confidential in nature and that the survey had other flaws.

96. At all times at issue in this case, the Medicare program used the drug price and cost information represented by the DEFENDANTS to determine reimbursement amounts.

## SECTION NO. 7
## BACKGROUND OF HOW UNITED STATES' MONIES ARE PAID FOR DRUG CLAIMS UNDER THE STATES' MEDICAID PROGRAMS

### A.  FUNDING FOR MEDICAID

97. The United States Government, under the Secretary of the United States Department of Health and Human Service, is required to pay to each state, for each calendar quarter, an amount equal to the Federal Medical Assistance Percentage ("FMAP") of the total amount expended by the state during the quarter as medical assistance under the state Medicaid plan pursuant to 42 U.S.C. § 1396b(a)(1).

98. Benefits for drugs are optional but all states have opted to provide Medicaid drug reimbursement coverage in their state plans.

99. The federal portion of States' Medicaid payments, Federal Medical Assistance Percentage ("FMAP"), is based on a state's per capita income compared to the national average. The federal portion consists of a minimum of 50% up to a maximum of

83%. For example, Florida's FMAP contributed by the United States in the fiscal year October 1, 2003 to September 30, 2004 was 58.93%.

100.  The States, United States Territories and the District of Columbia are required to implement a State Health Plan containing certain specified minimum criteria for payment of claims in order to qualify for federal funds for Medicaid expenditures. 42 U.S.C. §1396a(a)(30)(A).

101.  Each State Health Plan must, in part, provide a formula for payment of reimbursement claims for prescription drugs, and each state's plan must be approved by the Secretary of HHS. The formula determines the reimbursement amount the state plan will pay for each drug manufactured by each manufacturer whose prescription drugs qualify for Medicaid reimbursement, based upon an estimation of the provider's acquisition cost plus a reasonable dispensing fee. 42 CFR §447.331. Under certain circumstances, the federal Center for Medicare and Medicaid Services ("CMS") may establish a "Federal Upper Limit," binding on all state plans, on the allowable reimbursement for a particular drug.

102.  State and District of Columbia methodologies for arriving at a provider's Estimated Acquisition Cost ("EAC") for each covered drug, as required by 42 CFR §447.331, must be approved by the Secretary of HHS.

103.  To claim its FMAP payment, each state must submit a report to the United States Secretary of Health and Human Services reflecting its anticipated Medicaid expenses for the quarter. The Secretary is required to estimate the state's FMAP

entitlement for the quarter, based on the state's report and such other investigation as the Secretary may find necessary, and pay that amount to the state in such installments as the Secretary may determine, adjusted for any overpayments or underpayments in prior quarters. 42 U.S.C. § 1396b(d)(1), (2A). The Secretary's determination of a state's FMAP entitlement obligates any appropriations available for payments to the state. 42 U.S.C. § 1396b(d)(4).

104. The DEFENDANTS knowingly reported false, inflated price and cost data for the specified drugs to the pharmaceutical pricing compendia relied on by the states, or directly to the states, or both, and therefore caused claims submitted by each state to officers and employees of the UNITED STATES for FMAP to be greater than they would have been but for the DEFENDANTS' false price representations. As a result, the DEFENDANTS caused the United States to expend FMAPs in amounts greater than would have been expended, but for the Defendants' false reports of price and cost data, and thus caused injury to the federal fisc.

### B. MEDICAID PAYMENT OF CLAIMS FOR PRESCRIPTION DRUGS

105. The Food and Drug Administration ("FDA") assigns National Drug Codes, called NDC numbers, to identify each drug of each individual manufacturer, by strength and package size. NDC numbers are generally eleven digits(or 10 digits when the preceding zero is deleted), with the first five digits identifying the manufacturer or labeler, the next four digits identifying the product and the last two digits identifying the package

size. Providers are required to utilize the FDA's NDC numbers when submitting claims for reimbursement for drugs to the States' Medicaid programs.

106. The vast majority of States award cost-reimbursement contracts to private companies to evaluate and process claims for Medicaid reimbursement. The States refer to these contractors as fiscal agents.

107. Prescription drug claims are submitted either in hard copy form or through an electronic claims filing procedure.

108. At all times relevant to this case, all of the States' Medicaid programs used the DEFENDANTS' representations of drug prices and costs to estimate acquisition costs and determine reimbursement amounts.

109. The Secretary has approved state plans whose methodology for arriving at a pharmacy's estimated acquisition cost, as required by 42 CFR §447.331, includes:

    a.    discounting a percentage off the AWP prices as computed or collected by, and reported by, First DataBank;

    b.    adding a percentage to the WAC prices, as computed or collected by, and reported by, First DataBank;

    c.    requiring the drug manufacturers, including the DEFENDANTS, to certify their prices directly in writing to the Texas Medicaid Vendor Drug Program; and

    d.    Basing reimbursement on the manufacturers' reports of direct price (DP).

110. The approved State plans for determining Medicaid reimbursement based on WAC have included the following: (information below is for period of time April through June, 2004)

| STATE | DRUG | DISPENSING FEE |
|---|---|---|
| Alabama | WAC + 9.2% or AWP - 10% | $5.40 |
| Colorado | lesser of AWP - 35% (generic) or AWP - 13.5% (brand) | $4.00 |
| Florida | Lower of WAC +7% or AWP - 13.25% | $4.23 |
| Maryland | Lower of WAC + 8% or AWP - 12% DP + 8% or distributor price | $4.69 |
| Massachusetts | WAC + 6% | $3.50 - $5.00 |
| Ohio | Lower of WAC + 9% or AWP - 12.8% | $3.70 |
| Rhode Island | WAC + 5% | $2.85 - $3.40 |
| Illinois | AWP - 25% (generic) AWP - 12% (brand) | $3.40 - $4.60 |

111. The Texas Medicaid Program has adopted reimbursement policies and procedures designed to ensure that drug manufacturers, including the DEFENDANTS, provide price and cost information that fairly represents the prices and costs generally and currently available in the marketplace. The Texas Medicaid authorities required the DEFENDANTS to certify, in writing, the accuracy of their price and cost representations as a condition to their drugs being covered for reimbursement.

112. The State of Texas paid reimbursement for drugs covered by its Vendor Drug Program at the lesser of the provider's usual and customary charge to the general public or the Estimated Acquisition Cost ("EAC"). In Texas' Pharmacy Provider Handbook, EAC is defined as either the Wholesale Estimated Acquisition Cost ("WEAC") or the Direct Estimated Acquisition Cost ("DEAC"). WEAC is the estimated price paid by Providers purchasing a drug from a wholesaler. DEAC is the estimated price paid by a Provider purchasing the drug directly from the drug's manufacturer.

113. The State of Texas determined the WEAC reimbursement amounts by calculating: 1) the drug manufacturer's "price to wholesaler and/or distributor" (as reported by the manufacturer to the State of Texas) plus 12%, and 2) the manufacturer's AWP, as reported to Texas by the manufacturer, minus a percentage (which percentage has varied throughout the relevant period of the Complaint, but has never exceeded 18%), and then selecting the lesser of the two resulting amounts as the WEAC for payment of claims. DEAC reimbursement represents the drug manufacturers' Direct Price, as reported to Texas by the manufacturer. The Texas Medicaid Program also has often considered the amounts reported by Defendants through First DataBank and prices to chain warehouses as a check or point of comparison to determine if Defendants' direct representations to Texas should be reviewed for correctness.

114. The State of Texas required the DEFENDANTS, when applying for inclusion of drugs on the Texas Medicaid formula, to state the prices of the drugs on a specified Texas Medicaid Vendor Drug Program form and to certify as follows:

> I hereby certify that the information submitted is correct to the best of my knowledge . . . I also agree to inform the Texas Department of Health of any changes in . . . price . . . within fifteen (15) days of such change.

Attached hereto as **Exhibit "5"** is a true and correct copy of a certification required by the Texas Medicaid Vendor Drug Program during the relevant time period of this Complaint.

115.  CMS sets "Federal Upper Limit" (FUL) amounts limiting the maximum per unit reimbursement any Medicaid Program may pay for certain multiple source drugs. CMS may impose a FUL on any multiple source drug if:

   a.  All formulations of the drug have been evaluated as therapeutically equivalent by the FDA in the most current publication of *Approved Drug Products with Therapeutic Equivalence Evaluations*;

   b.  At least three (3) companies list their version of the drug and their prices in current national price publishing compendia; and

   c.  The above criteria are met, and the drug is available for sale nationally.

116.  CMS sets the FUL for a drug meeting the above criteria at 15% of the price of the drug with the lowest reported price. That price then becomes the FUL for all manufacturers' forms of the drug, or the maximum per unit amount a State Medicaid Program can pay for the drug.

117.  State Medicaid Programs reimburse pharmacies for prescription drugs at the lower of:

   a.  Each State's CMS-approved plan (e.g., in the case of Massachusetts, WAC+ 6%);

   b.   the pharmacy's usual and customary charge to the general public; or

   c.   the Federal Upper Limit ("FUL") (the FUL does not apply to certified brand drugs),

plus a reasonable professional or dispensing fee.

118.   Some States' Medicaid Programs also receive price and cost representations directly from the DEFENDANTS to compute reimbursement amounts, and they confirm the accuracy of the direct price and cost representations by using the prices reported in the industry compendia.

## SECTION NO. 8
## BACKGROUND OF THE MEDICAID REBATE PROGRAM

119.   After hearings in 1989, Congress concluded that the Federal government, as the largest payer for prescription drugs, was paying significantly more under the States' Medicaid Programs than certain private payors. See, e.g., Skyrocketing Drug Prices: Hearings Before the Special Committee on Aging, United States Senate, 101st. Congress, 290-297 (1989).

120.   Congress addressed this inequity in the Omnibus Budget Reconciliation Act of 1990 ("OBRA 1990"), which established the Medicaid Rebate Program (the "Rebate Program"). PL101-508, 104 Stat. 1388 (1990). The stated purpose of the Medicaid Rebate Program was to give the State Medicaid Programs the "benefit of the best price for which a manufacturer [sold] a prescription drug to any . . . private purchaser." H.R. Rep. No. 881, 101st Cong., 2d Sess. 96 (1990).

121.    The Rebate Program requires all manufacturers whose drugs are paid for by Medicaid to enter into an agreement with the Secretary of the Department of Health and Human Services, under which the manufacturer agrees to pay each State a quarterly rebate based on that state's utilization of the manufacturer's drugs. The amount received by a State in rebates is considered a reduction in the total amount expended under any given State's plan. Therefore, the less any given State receives in rebates, the greater the total amount expended by the State and the more the Federal government must correspondingly pay to each State (because the Federal government contributes a set percentage of the total amount each State expends on Medicaid). 42 U.S.C. §1396 b(a); 42 U.S.C. §1396 r-8(b)(1)(B).

122.    Whether a drug is classified under the Rebate Program as an innovator or a non-innovator is important to drug manufacturers such as DEFENDANTS, because the rebate they must pay under the Medicaid Rebate Program depends on that classification. The Medicaid rebate statute defines "innovator multiple source drug" as a multiple source drug that was originally marketed under an original new drug application ("NDA") approved by the Food & Drug Administration ("FDA"). 42 U.S.C. §1396r-8(k)(7)(A)(ii). Innovator drugs are also commonly referred to as "brand" drugs. A "non-innovator multiple source drug" is any multiple source drug that is not an "innovator multiple source drug." 42 U.S.C. §1396r-8(k)(7)(A)(iii). Non-innovator drugs are also commonly referred to as "generic" drugs.