**ANDERSON EXHIBIT 6F**

CIVIL ACTION NO. 00 CV10698 MEL

157.   The DEFENDANT DRUG MANUFACTURERS participated in the Medicaid Rebate Program (the "Rebate Program") mandated by the Federal Omnibus Budget Reconciliation Act of 1990 ("OBRA '90") and thus were required to pay rebates to State Medicaid Programs.  The goal of the Rebate Program was to provide Medicaid with the benefit of the drug manufacturers' best prices, as defined by 42 U.S.C. §1996r-8(c)(1)(C). In reporting prices to the Rebate Program, it was in the economic interests of the DEFENDANT DRUG MANUFACTURERS to report the lowest Average Manufacturers Price ("AMPs") possible based upon the data available to them.

158.   Each DEFENDANT DRUG MANUFACTURER was on notice that it was prohibited by federal statute from paying, directly or indirectly, money or other financial benefit to induce its customers to order the specified drugs when the Medicare or State Medicaid Programs would be paying reimbursement claims. 42 U.S.C. §1320a-7b(b)(2).

159.   Notwithstanding the requirements of the False Claims Act, Anti-Kickback laws, Anti-Referral laws, and Food Drug and Cosmetic Act, the DEFENDANTS, acting individually and in concert with one another, purposely created confusion and made false and misleading statements about drug pricing in order to deceive the United States Government and the States' Medicaid Programs.  For several years, various Governmental agencies, including the HHS Office of Inspector General ("OIG") and the General Accounting Office ("GAO"), attempted to inquire into the reasonableness of reimbursements by the Medicare and States' Medicaid Programs for many of the drugs at issue in this Third Amended Complaint.  The DEFENDANTS thwarted the efforts of the OIG and GAO by withholding

and concealing pertinent information.  The OIG and GAO attempted to discover whether unreasonable reimbursements were being made; however, they were unsuccessful due to the DEFENDANTS' actions.   The DEFENDANTS concealed and disguised the unreasonable reimbursements that they caused the Medicare and the state Medicaid programs to make by the following devices and circumstances:

        a.      The DEFENDANTS reported the prices and costs generally and currently available in the marketplace for many of their drugs yet concealed and disguised the false inflated prices and costs reported for certain other drugs, including those referenced in this Third Amended Complaint.

        b.      Some of the DEFENDANTS reported or caused the reporting of cost and price in terms of "List Price," "Wholesale Net," "Direct Price" ("DP" or "DIRP"), or "Wholesaler Acquisition Cost" ("WAC"), to which Medical Economics and First DataBank applied mark-up factors supplied by those DEFENDANTS to calculate AWPs for those DEFENDANTS' drugs.  Those DEFENDANTS inflated their reports of cost and price to First DataBank, claimed First DataBank set the AWPs for their drugs, and therefore utilized First DataBank to conceal and disguise their false inflated reports of cost and price.

        c.      Some of the DEFENDANTS made or caused inflated representations of cost and price in terms of both AWP and DP (or DIRP) to First DataBank and/or Red Book.  These DEFENDANTS relied on First DataBank and Red Book to report the inflated representations of cost and price to conceal the source of the reported costs and prices.

Some DEFENDANTS reported false inflated WACs or other prices to First Databank and/or Red Book to conceal and disguise the source of the reported costs and prices.

## SECTION NO. 11
## DAMAGES TO GOVERNMENT PROGRAMS CAUSED
## BY THE DEFENDANTS' FRAUD SCHEMES

160.   Damages are recoverable from the Defendants based on a number of factors including reimbursement rates, number of reimbursement claims paid and rebates paid under the Medicaid Rebate Program.

161.   First, because of the excessive reimbursements paid by governmental health care programs for the specified drugs by reason of the DEFENDANTS' false price representations, the United States has been damaged to the extent of the excessive reimbursements paid by Medicare.  Further, the United States has been damaged to the extent of its share of the excessive reimbursements paid by the state Medicaid programs for those drugs.  In addition, the DEFENDANTS' underpayment of rebates under the Medicaid Rebate Program has damaged the United States in the amount by which the federal share of the expense of the state Medicaid programs would have been reduced had the DEFENDANTS not made falsely concealed, avoided or reduced their obligation under the Rebate Program.

162.   As explained in Section 8, infra, the Rebate Program requires manufacturers whose drugs are paid for by Medicaid to pay rebates to the States every quarter.  The rebates are paid based on whether a drug is classified as an innovator, or brand drug, or

as a non-innovator drug, or generic drug.  Manufacturers pay higher rebates for innovator

drugs than they do for non-innovator drugs.

163.   For innovator drugs, commonly referred to as brand drugs, Defendants pay

to each state quarterly, for each drug, a Medicaid Rebate equal to the total number of units

of each dosage form and strength paid for under the State Medicaid reimbursement plan

(the "utilization"), multiplied by the greater of (a) AMP minus BP or (b) the minimum rebate

percentage of the AMP (currently 15.1%)[2].  The calculation of rebate due is made for each

dosage form and strength of each drug.

164.   For non-innovator drugs, commonly referred to as generic drugs, Defendants

pay to each state quarterly, for each drug, a Medicaid Rebate equal to the total number of

units of each dosage form and strength paid for under the State Medicaid reimbursement

plan multiplied by the applicable rebate percentage of the AMP (currently 11%)[3].

165.   AMP, a price used in calculating the manufacturers' Medicaid Rebate

obligations for both innovator and non-innovator drugs, as described infra in Section 8, is

defined by statute as the average price paid to the manufacturer for the drug in the United

States by wholesalers for drugs distributed to the retail pharmacy class of trade, after

---

[2]Since January 1, 1996 the applicable percentage for rebates for innovator drugs has been 15.1 percent.  Prior to that date, the minimum rebate percentage was as follows: 12.5 percent after December 31, 1990, and before October 1, 1992; 15.7 percent after September 30, 1992, and before January 1, 1994; 15.4 percent after December 31, 1993, and before January 1, 1995; and 15.2 percent after December 31, 1994, and before January 1, 1996.  Additionally there was a temporary limitation on maximum rebate amount prior to January 1, 1992 the rebate for innovator drugs could not exceed 25 percent of the AMP and after December 31, 1991, and before January 1, 1993, the rebate for innovator drugs could not exceed 50 percent of the AMP. 42 U.S.C. §1396r-8(c)(1)(B).

[3]Before January 1, 1994, the applicable percentage was 10 percent, and for after December 31, 1993 to the present date, the applicable percentage is 11 percent.  42 U.S.C. §1396r-8(c)(3)(A) and (B).

deducting customary prompt pay discounts.  The manufacturer calculates AMPs for its drugs based on its own business records and information and reports its AMPs to the Department of Health and Human Services.  42 U.S.C. §1396r-8(k)(1).

166.    Additionally, for each dosage form and strength of an innovator drug, drug manufacturers must pay an additional rebate based upon the amount, if any, by which the drug's AMP has risen more quickly than the rate of inflation as determined by reference to the national CPI.


### Best Price and Bundled Sales

167.    Pharmaceutical manufacturers, including the DEFENDANTS, often marketed and sold their drugs in "bundles" featuring rebates or discounts to the purchaser.    A "Bundled Sale", as defined in the Medicaid Rebate Agreement, refers to the packaging of drugs of different types where the condition of rebate or discount is that more than one drug type is purchased, or where the resulting discount or rebate is greater than that which would have been received had the drug products been purchased separately.    Pursuant to Medicaid regulations and the terms of Rebate Agreements between drug manufacturers and the Government, discounts, or other price reductions, must be allocated proportionately to the dollar value of the units of each drug sold under the bundled agreement when calculating "best price".

168.    Proportionate allocation of discounts within bundles is thus required when calculating the correct rebate amounts to be paid by drug manufacturers, including the

90

Defendants, under the Medicaid Rebate Program.  To determine correctly the "best price" for each covered drug for each quarter, it must be determined whether the drug was ever sold in a bundle during the quarter.  If so, the proportionate impact of any discounts on any drugs in all such bundles must be accounted for in calculating the "best price" of each drug.

169.   Proportionate allocation of discounts within a bundle is required with respect to any innovator drugs which were bundled with another drug.  The higher the reported best price, the smaller the rebate due on an innovator drug, subject to the minimum of 15.1%. Throughout the time periods specified herein, the best price of any innovator drug bundled with another drug (hereinafter referred to as "the Bundled Drugs") was required  to be calculated by proportionately allocating all discounts among all drugs in the bundle. Therefore, to the extent the Defendants did not allocate the discount on drugs proportionately within a bundle, they necessarily reported a falsely inflated best price for any Bundled Drug.

170.   To the extent that any DEFENDANT submitted incorrect AMP or BP information to the Government, the calculation of damages to Government programs should be adjusted accordingly.

CIVIL ACTION NO. 00 CV10698 MEL

## SECTION NO. 12
## DEFENDANTS CONSPIRED TO DEFRAUD
## THE MEDICARE AND MEDICAID PROGRAMS

171.   The DEFENDANTS conspired to defraud the Medicare and Medicaid Programs through their conduct alleged as follows:

a.   Each DEFENDANT elected and acted to cause its specified drugs to be listed for reimbursement by the Medicare and Medicaid Programs, and each DEFENDANT knew generally, and knew specifically at least as to other DEFENDANTS with which they competed, that other DEFENDANTS had also elected and acted to cause their corresponding competing drugs to be listed for reimbursement by the Medicare and Medicaid Programs.

b.   Each DEFENDANT knowingly reported inflated price and cost information for its specified drugs to First DataBank, Medi-Span and Red Book with further knowledge that such misleading information would be used by Medicare and Medicaid and would result in those programs setting inflated reimbursement amounts for the specified drugs.

c.   Each DEFENDANT knew generally, and knew specifically at least as to other DEFENDANTS with which they competed, that other DEFENDANTS had also reported inflated price and cost information to First DataBank, Medi-Span and Red Book for their corresponding competing drugs with further knowledge that such misleading information would be used by Medicare and Medicaid and would result in those programs setting inflated reimbursement amounts for the specified drugs.

92

CIVIL ACTION NO. 00 CV10698 MEL

      d.      Each DEFENDANT made a conscious decision to compete with one or more other DEFENDANTS in the marketplace by creating financial inducements for their customers by reporting falsely inflated price and cost information for the specified drugs to First DataBank, Medi-Span and Red Book. Each DEFENDANT also knew that one or more other DEFENDANTS with which it was competing was also reporting falsely inflated price and cost information for their competing drugs to First DataBank, Medi-Span and Red Book for the same purpose.

      e.      At all times material, senior employees of First DataBank and Red Book knew that the price and cost information being reported by the DEFENDANTS for the specified drugs was false and misleading and was being reported by First DataBank and Red Book, to the Medicare and Medicaid programs for their use in setting reimbursement amounts.

      f.      First DataBank and Red Book entered into agreements with and acted in concert with each DEFENDANT to report inflated price and cost information to Medicare and Medicaid notwithstanding its false and misleading nature and with knowledge that each DEFENDANT was reporting the false price and cost information to compete with one or more other DEFENDANTS.

      g.      First DataBank, Medi-Span and Red Book thus acted as essential "hubs" by agreeing with each DEFENDANT (the "spokes") separately to report the false and misleading price and cost information that was essential to the fraudulent and misleading means of competition that each DEFENDANT had elected to engage in.

93

h.      Each of the DEFENDANTS knowingly concealed from the Medicare and Medicaid programs the prices and costs paid for the specified drugs by wholesalers, distributors and GPOs. The wholesalers, distributors and group purchasing organizations included McKesson Corporation, AmerisourceBergen (formerly Amerisource and Bergen), Cardinal, Ultracare, Triad, National Specialty Services, Medical Specialties, Gerimed (and affiliated companies including RxMed and IVmed), Pharmaceutical Buyers, Inc. (PBI), ASD Specialty Healthcare (ASD), Florida Infusion, Oncology Therapeutics Network (OTN), Oncology Supply, Innovatix, Greater New York Hospital Association (GNYHA), Oncology Solutions, International Oncology Network (ION) and Health Care Purchasing Agency (HCPA) (hereinafter the "specified wholesalers, distributers and GPOs")

i.      Each DEFENDANT knew generally, and knew specifically at least as to other DEFENDANTS with which it competed, that other DEFENDANTS had also concealed from the Medicare and Medicaid programs the prices paid for corresponding competing drugs by wholesalers, distributors and GPOs from Medicare and Medicaid.

j.      Each DEFENDANT concealed prices and costs generally and currently available in the marketplace for the specified drugs with knowledge that the concealment would cause the Medicare and Medicaid programs to set inflated reimbursement amounts for the specified drugs.

k.      Each DEFENDANT knew generally, and knew specifically at least as to other DEFENDANTS with which it competed, that other DEFENDANTS had also concealed prices generally and currently available in the marketplace for the corresponding

94

competing drugs with knowledge that the concealment would cause the Medicare and Medicaid programs to set inflated reimbursement amounts for the specified drugs.

l.      Each DEFENDANT made a conscious decision to compete with one or more other DEFENDANTS in the marketplace by concealing from the Medicare and Medicaid programs prices generally and currently available in the marketplace for the specified drugs, such as those paid by wholesalers, distributors and GPOs, and each DEFENDANT knew that one or more other DEFENDANTS with which it was competing was also concealing prices generally and currently available in the marketplace for the corresponding competing drugs, such as those paid by wholesalers, distributors and GPOs.

m.      At all times material, senior employees of the specified wholesalers, distributors and GPOs knew that the price and cost information for the specified drugs being reported by the DEFENDANTS to First DataBank, Red Book and Medi-Span was false and misleading and was being provided to the Medicare and Medicaid programs for use in determining reimbursement amounts.

n.      The specified wholesalers, distributors and GPOs entered into agreements with and acted in concert with each DEFENDANT to conceal from the Medicare and Medicaid programs the prices generally and currently available in the marketplace for the specified drugs, notwithstanding the false and misleading nature of the price reports to First DataBank, Red Book and Medi-Span and despite knowing that each DEFENDANT was reporting the false price and cost information and concealing the price and costs

95

CIVIL ACTION NO. 00 CV10698 MEL

generally and currently available in the marketplace for the specified drugs to compete with one or more other DEFENDANTS.

o.    The specified wholesalers, distributors and GPOs thus acted as essential "hubs" by agreeing with each DEFENDANT (the "spokes") separately to conceal the prices and costs generally and currently available in the marketplace for the specified drugs.   That concealment was essential to the fraudulent and misleading means of competition that each DEFENDANT had elected to engage in.

172.   Because of DEFENDANTS' conduct in violation of the False Claims Act, 31 U.S.C. 3730(a)(3), the United States has sustained damages as described in the Requests for Relief herein.

## SECTION NO. 13
### REBATE DEFENDANTS HAVE FALSELY IDENTIFIED CERTAIN OF THEIR DRUGS TO THE FEDERAL GOVERNMENT AS  NON-INNOVATOR DRUGS IN ORDER TO PAY A SMALLER REBATE AMOUNT TO THE  STATE MEDICAID PROGRAMS UNDER THE MEDICAID REBATE PROGRAM

173.   In addition to the fraud arising from DEFENDANTS' reporting of inflated prices and costs for Medicaid and Medicare reimbursement purposes, DEFENDANTS DEY, INC.; PURDUE  PHARMA,  L.P.;  PURDUE  FREDERICK  COMPANY;  and  SCHEIN PHARMACEUTICAL, INC.  (collectively "the REBATE DEFENDANTS") underpaid the Medicaid rebate amounts each was legally required to pay by falsifying periodic submissions to CMS in violation of 31 U.S.C. §3729(a)(2) and (7).

174.    Throughout the periods specified herein, each of the REBATE DEFENDANTS: 1) knew that CMS used the information the REBATE DEFENDANTS supplied to it to calculate the rebate amounts they owed, 2) knew that CMS transmitted the rebate amounts it calculated to the State Medicaid Programs, which then multiplied those figures by the number of units paid for each drug and 3) knowingly, as that term is defined in 31 U.S.C. §3729(b), supplied to CMS the false information that is the subject matter of this Complaint.

175.    At all times relevant to this Complaint, each of the REBATE DEFENDANTS took advantage of the fact that the rebate amount for a non-innovator drug was less than the rebate amount for an innovator drug by falsely reporting certain drugs to CMS as non-innovator drugs when, in fact, they were innovator drugs.  The drugs in question were drugs the REBATE DEFENDANTS marketed, sold and distributed, sometimes pursuant to an agreement with another drug manufacturer that held the NDA on such drugs.  For Medicaid rebate purposes, REBATE DEFENDANTS were required to identify these drugs as innovator drugs and pay an innovator rebate.  Instead, they made false statements to CMS about the classification of these drugs to conceal, avoid and decrease their rebate obligations under the Medicaid Rebate Program.  REBATE DEFENDANTS consistently misrepresented each of the Rebate Drugs as non-innovator from the time the Rebate Program was implemented in 1991, or from the time each drug first entered the marketplace, to the present.  REBATE DEFENDANTS thus engaged in, and continue to engage in, a consistent, ongoing fraud with respect to each Rebate Drug.  The allegations herein include all the drugs which the REBATE DEFENDANTS falsely identified as non-

innovators for purposes of the Rebate Program.  The Rebate Drugs are identified in **Exhibit "6,"** attached.

176.   REBATE DEFENDANTS acted knowingly, as that term is defined in 31 U.S.C. 3729(b), in misrepresenting to CMS that their respective Rebate Drugs were non-innovators.  Whether a drug was classified under the Rebate Program as an innovator or as a non-innovator was important to drug manufacturers such as REBATE DEFENDANTS, because classification as a non-innovator might result in materially smaller financial obligations to the government under the Medicaid Rebate Program and thus greater revenue and profit for the manufacturer.

177.   The Medicaid Rebate fraud scheme alleged herein is based, in part, on the requirement that all companies, including distributors, re-packagers, and re-labelers, who distribute a prescription drug under an NDA, must pay the same Medicaid rebate that the manufacturer who holds the NDA is required to pay, because they are all included in the definition of "manufacturer" in the rebate statute.  42 U.S.C. § 1396r-8(k)(5)(B).  Also, the Medicaid rebate statute defines "innovator multiple source drug" as a multiple source drug that was originally marketed under an original new drug application ("NDA") approved by the Food & Drug Administration ("FDA").  42 U.S.C. §1396r-8(k)(7)(A)(ii).

178.   The allegations herein include all the drugs which the REBATE DEFENDANTS falsely identified as non-innovators for purposes of the Rebate Program, except for drugs included by the Relator, and identified by name, in a separate action under

the False Claims Act arising from fraud in connection with the REBATE DEFENDANTS' submissions to CMS under the Rebate Program.

179.   The REBATE DEFENDANTS had an additional financial motive for falsely representing that their Rebate Drugs were non-innovators under the Rebate Program.  By falsely reporting a drug as being a non-innovator, they also stood to gain more financially from reporting inflated prices and costs for their drugs for Medicaid reimbursement purposes.  This was because the rebate calculation formula for an innovator drug is the number of units sold times the greater of (a) the difference between AMP minus BP or (b)15.1% of AMP.  If a drug manufacturer increased the Spread on an innovator drug by offering discounts off reported costs or prices, the BP number for rebate calculation purposes would decrease, thereby directly increasing the amount of rebate the manufacturer must pay under the Rebate Program.  On the other hand, if a drug was classified as a non-innovator, the rebate calculation was not affected by the BP.  Therefore, drug manufacturers could offer deep discounts off the reported costs and prices of non-innovator drugs without increasing their rebate obligation.

180.   Each of the REBATE DEFENDANTS knowingly misrepresented to CMS that certain of its drugs were non-innovator drugs when either 1) it held the NDA, or 2) it distributed the drugs by agreement with another manufacturer that held the NDA.  REBATE DEFENDANTS' quarterly submissions to CMS regarding these drugs: 1) consistently were fraudulent in this regard with respect to each Rebate Drug, 2) resulted (and continue to result) in under-payments to State Medicaid Programs under the Medicaid Rebate Program,

and 3) constituted the knowing use of false records or statements to conceal, avoid and decrease the REBATE DEFENDANTS' financial obligations under the Medicaid Rebate Program, in violation of the False Claims Act, 31 U.S.C. 3729(a)(2) and (a)(7). The attached **Exhibit "6"** identifies each of these drugs by NDC number and the time period during which the false reporting has taken place.

181.   THE REBATE DEFENDANTS were required to identify their respective Rebate Drugs as innovator drugs for Medicaid rebate purposes. THE REBATE DEFENDANTS' quarterly submissions to CMS regarding these certain drugs resulted in under-payments to the Medicaid program and constituted false claims in violation of 31 U.S.C. §3729(a)(7). Furthermore, in violation of 31 U.S.C. §3729(a)(2), the REBATE DEFENDANTS' false statements to CMS that the Rebate drugs were non-innovator drugs caused each State's Medicaid Program to submit claims for corresponding increases in the periodic calculations of drug reimbursement costs to the federal government, pursuant to 42 U.S.C. § 1396(b), which are used by the federal government to calculate the federal funding due each State's Medicaid drug reimbursement program.

182.   As a result of REBATE DEFENDANT'S submissions of false claims, the United States suffered actual damages in excess of one million dollars ($1,000,000), all in violation of 31 U.S.C. §3729 et seq.