**ANDERSON EXHIBIT 10B**

137

Mr. GREENWOOD. The gentleman's time has expired.

The gentleman from New York, Mr. Engel, is recognized for 5 minutes.

Mr. ENGEL. Well, thank you, Mr. Chairman.

If this was another hearing in talking about Medicare and reimbursements and what Medicare pays for, I'd be talking about how Medicare can pay for syringes but not for the drug insulin to—which is used in the syringes. I'm constantly confused by what goes on.

But since we're talking about home infusion, infusion therapy, I want to talk a little bit—and I thank you, Mr. Connaughton, for mentioning it in your testimony. I want to highlight my bill, which is H.R. 2750. We called it the Medicare Home Infusion Therapy Act, and what it does is it addresses the particular problems associated with home infusion therapy.

Medicare's reimbursement policy for home infusion therapy is simply outdated. Modern medicine has made the administration of many drugs safe and effective in the home. Because of these ridiculous reimbursement provisions, many senior citizens are forced to stay in hospitals or trek to physicians' offices on a daily basis to receive their treatment, when this treatment can be given to them in their homes.

It's much cheaper. It's much easier for everyone around, and yet we can't do that. It can be conducted in the home safely, and it could be at a fraction of the cost.

So, to address that issue, the bill directs the Secretary of Health and Human Services to set up a fee schedule for drug reimbursements and provider reimbursements that would ensure adequate and fair payments to providers. I very strongly feel that this legislation appropriately addresses the needs of seniors and providers together and could serve as a model for a broader approach to the problems with AWP, and I'm hoping that we as a committee will examine the legislation.

Mr. Connaughton, since you mentioned it, I'm wondering if you could expand on some of your remarks, because as I mentioned, the bill doesn't only reform how currently covered home infusion drugs are regulated, but it would also extend coverage to drugs that are not currently covered, such as home antibiotic therapy; and I wonder if you could just talk about that expansion. And what do you think this bill would do for Medicare beneficiaries?

Mr. CONNAUGHTON. Let me just make a couple of comments.

First of all, I think your bill is absolutely consistent with the five principles the chairman enunciated earlier when he was speaking with Mr. Scully. Medicare, as I've mentioned in my testimony, is losing the advantage of infusion therapy in the home. The coverage by Medicare for home infusion is extremely narrow. Managed care is taking advantage of that opportunity, and indeed Medicare's use of home infusion is less than 20 percent of what home infusion companies do.

There are many therapies that are not covered by Medicare now that could be covered by Medicare and are covered by managed care in the home. It would make tremendous savings.

The key to your bill I think, Mr. Engel, is that it spells out a reimbursement scheme and recognizes that these services are a value

138

in the home, but it spells out a reimbursement scheme that is based upon costs of a product and the costs of the services and recognizes that there are standards for those services that are recognized in the private sector; and we think it's a very, very good piece of legislation.

Mr. ENGEL. Thank you.

Let me ask you this: If Medicare were to adopt the same quality standards that are used in the private sector, how do you think this would affect the care provided to Medicare beneficiaries?

Mr. CONNAUGHTON. Well, it would ensure they are getting the same quality of care that they're getting in the private sector. In the private sector there are standards; they spell out the services. Medicare, for whatever reason, just does not recognize that these services exist; and I think it's important for them to recognize them and spell out the standards.

Mr. ENGEL. And as things have evolved in health care—obviously, when Medicare was first put into place, we couldn't have anticipated the changes and the improvements we've made, and therefore I think it's fair to say—and I'm sure you would concur—that we need to change some of the—to update, I think that's a better word, some of the procedures that we have now.

Mr. CONNAUGHTON. I would agree with that.

In the case of home care, technology is going to allow us to do a lot more things. Infusion therapy is a current issue, but I hope over time that Medicare will be able to take advantage of those technologies.

Mr. ENGEL. Now, I want to make sure that I understand something you mentioned earlier. I think the chairman also—I'm sorry. Mr. Brown, I think, mentioned it before.

The costs of acquiring the drug for home care suppliers are in many cases less than the cost of administering it.

Mr. CONNAUGHTON. That's the case. On average—it varies from therapy to therapy, but on average, our survey that was conducted, about 26 percent of the cost of providing the therapy is the drug.

Mr. ENGEL. So obviously that is something we need to fix. I'm sure that's why Mr. Brown mentioned it, and I think it's something that the committee ought to look at.

I'm wondering if anyone else would want to comment on that. Yes.

Ms. LAMPHERE. Indeed, the services that you were talking about and the quality standards that you were talking about are very important. The nursing coordination, the patient education, the pharmacy operations, all of these direct services, at least in the case of home infusion and respiratory therapy, account for 46 percent of the total cost of providing respiratory and home infusion services in the home.

Mr. ENGEL. Yes. I think that's a shocking statistic, and I certainly think it shows that things are broken and need to be fixed. I thank you.

Thank you, Mr. Chairman.

Mr. GREENWOOD. I thank the gentleman.

The gentleman from Iowa, Mr. Ganske, for 5 minutes.

Mr. GANSKE. I thank the members of the panel for staying for a long day.

139

I think that there's been a consensus today, from the previous participants, that the way that we've calculated reimbursement for drugs and Medicare needs to be made more accurate, and that we need to take into account the true costs of the administration and the services to get those drugs to the patients. And I think your testimony has been effective. I thank you and I yield back.

Mr. GREENWOOD. The gentleman, Mr. Norwood for 5 minutes.

Mr. NORWOOD. Thank you, Mr. Chairman. I will be relatively brief, but I'm interested in a couple of things.

Dr. Norton, you listed in your testimony a number of services that clearly the oncologist has to perform for the patient if they are to get good care. Those services presently are not recognized by Medicare.

Mr. Scanlon, I'm curious, since the GAO seems to know a lot about this subject, why aren't—well, let me go back a minute. You said, "not explicitly." That means no, I gather.

Mr. SCANLON. No, it doesn't. Excuse me. Not recognized, but paid for. And the difference is that the way that Medicare practice expense fees are determined is that all the costs of the practice are taken into account, so presumably these kinds of activities generate costs which are carried on the books; and those should be taken into account when practice expense payments are determined.

Mr. NORWOOD. Dr. Norton, do you believe that that is actually the case?

Mr. NORTON. You know, I am an expert in statistics; that, I am, even though I'm not an expert in economics. And my understanding is that the methods that are used to actually make these determinations are filled with approximations. It's approximation upon approximation—approximation of expense, approximation of time, calculations, multiplications of submitted procedures and various percentages.

I question, just as a scientist—and I'm not an economist. As a scientist, I question the validity of some of these methods, frankly.

I would like to see a method that starts with the actual procedure and builds up and calculates the cost on that basis. You know, if it's going to be a half an hour of somebody's time to talk to a patient, then it should be a half an hour of this hour that's reported into the equation, and that's the way it ought to be calculated.

If we do it that way, we very well might come up with a different number. And I'm not even saying that I know for sure we'll come up with a different number. I just think that the science of actually coming up with the cost estimates could be improved.

Mr. NORWOOD. Well, Mr. Scanlon, and then you.

It appears that the providers of this care, though their services aren't listed, feel that they aren't compensated. That's fairly clear to me.

Now, Mr. Scanlon, I presume that a lot of your numbers are the result of estimations.

Mr. SCANLON. The numbers are based upon samples, samples both of the practices in terms of reporting their actual costs that they incurred; and then panels of experts that were put together, doing what Dr. Norton suggested, which is to take for each procedure and to say, this is our estimate as to how much nurse time,

140

how much other staff time, how much supplies, et cetera, it takes to provide that procedure.

The flaw that was discovered in that method is, when you add it up, for all of the times and all of the different costs that the panels had, they didn't match the data that the practices were actually writing checks for. And that's why it was critical to bring both of these pieces of information together.

Think of it in terms of, if we were all asked to tell everyone how we spent yesterday, give every activity that you were engaged in and the amount of time, it might not add up to 24 hours, but there were still only 24 hours in yesterday. And the problem is, it's very hard in the abstract sense to say this is going to take 50 minutes, this is going to take an hour, et cetera. So the data of costs that practices actually incur is a very good and strong benchmark in terms of being able to calibrate these expert panel estimates.

I agree with Dr. Norton, in a sense, that the data need to be improved. We need to get data that are going to be more robust, have smaller variance in terms of the estimate of the true values. I don't agree that the method is invalid.

The method is valid. We just need better information with which to execute it.

Mr. NORWOOD. Well, isn't it then true that perhaps the reason we are having this hearing is, the data is not robust, as you put it? As far as I know, the oncologist did not come up with a plan for how to be reimbursed in terms of the cost of drugs. I presume that our old agency, HCFA, dreamed that up.

Mr. SCANLON. There are two elements; I mean, in terms of why we may be having this discussion. One is data, and we—and I've talked about that. The other that I mention in my testimony is the fact that the method that I'm saying is valid, the method I think that needs to be applied for all specialties, is not the method that was used to calculate the fees for chemotherapy administrative services, as well as for other services where there's not direct physician involvement.

We believe that CMS needs to calculate all fees, using what we've referred to as the basic method, which in our mind, appropriately allocates total practice expenses across the procedures that specialties have, takes into account to the greatest extent possible differences in the costs of delivering a service by one specialty versus another.

Oncology, again, is affected by what HCFA did in the past. It took the chemotherapy administration services and put them in a pool with all other similar types of services from other specialties and calculated fees on the basis of that average. We don't think that is appropriate.

So if we were to apply the method appropriately, we would get a different result. It's the chemotherapy fee—administration fees would change 16 percent; overall fees to oncologists would change 7 percent. So those are the kinds of things that we have been talking about.

Mr. NORWOOD. Dr. Norton, I heard Chairman Tauzin say that he knew that Mr. Scully would be greatly interested in your organization's input, and I know you're interested in doing that. You're president of your society, are you not?

141

Mr. NORTON. That's right, sir.

Mr. NORWOOD. How many members do you have?

Mr. NORTON. About 17,000.

Mr. NORWOOD. American Society of Clinical Oncology. What is your pay as president?

Mr. NORTON. Oh, I don't get any pay at all. This is voluntary. My institution gets some money—I actually don't even know the amount—to compensate partially for the time I spend. But since I spend essentially 100 percent of my time doing this job as well as 100 percent doing my other job, it's nowhere near compensation. I receive no funds whatsoever.

Mr. NORWOOD. So I want to point out to our chairman that you are a volunteer organization, and sometimes it is not as simple as it seems when a voluntary organization is asked to defend itself against a Federal organization—a Federal agency that has thousands and thousands of employees who sometimes don't get in a hurry.

I may be wrong about that, but a lot of times it's very difficult on the other end to do what we're asked to do.

And I don't frankly understand, for example, why CMS doesn't list the services and determine, with the help of people like Dr. Norton, what a fair, reasonable fee is, and make it so much simpler for everybody; rather than putting the onus on the back of a volunteer organization, oh, it's all your fault because you're not being reimbursed.

I know I'm running out of time. I've got two quick things, Mr. Chairman, if I could finish.

Mr. Scanlon, just yes or no. Do you happen to know, is it GAO that told President Johnson that the cost of Medicare in 1990 was going to be $9 billion?

Mr. SCANLON. No.

Mr. NORWOOD. Okay. Just checking. I know one of the agencies did. I just can't remember which one.

Dr. Emanuel, God forbid if you should ever have cancer, where would you choose to be treated?

Mr. EMANUEL. Think it depends on the kind of cancer. I would try to find the right oncologist for the cancer.

Mr. NORWOOD. Would you prefer to be treated in the United States?

Mr. EMANUEL. Well, certainly compared to other—certain other countries which are struggling.

Mr. NORWOOD. You implied that our oncology care in America is pretty poor and listed reasons why you thought perhaps they were poor, and I wondered if that's what you meant to imply.

Mr. EMANUEL. No. I think what I said, or certainly what I meant to say, is that we at this moment cannot guarantee every American who has cancer the highest quality oncological care for that cancer. We know that there are problems. We know that there is underuse and we know that there is overuse, and part of the issue is to make sure that we can guarantee everyone that they get the right care at the moment.

Mr. NORWOOD. We can't guarantee everyone we can stay out of the way of an airliner. How can we guarantee everyone?

142

Mr. EMANUEL. Well, we don't even have a monitoring system to make sure that Americans do——

Mr. NORWOOD. And who do you want to determine who gets the care, if you don't want the people who are trained in oncology to determine it?

Mr. EMANUEL. I think we need——

Mr. NORWOOD. Some oncologists decided a patient shouldn't get the treatment, or should. Okay. If you don't like them deciding, who do you want to decide?

Mr. EMANUEL. I'm—at the moment, I certainly think oncologists have to be part of it. I'm actually at the moment the head of the ASCO Task Force on the Quality of Cancer Care. One of the things I think we do need is to have a monitoring system to make sure that people who are diagnosed with cancer get referred to the right person, get the right procedures, not too much and not too little, and who——

Mr. NORWOOD. Who is "we"?

Mr. EMANUEL. I think that's a collective responsibility, and as a matter of fact, ASCO, the American Society of Clinical Oncology, has undertaken a $5 million study to try to find out where the flaws in the system are. We know that there are flaws in the system and that it's not working perfectly; and I think it would be wrong at this point in time to say, just because I'd like to be treated in the United States, that we have a flawless system.

We know we have quality problems, and we know we need to have oversight and to improve the quality of cancer care delivery. The issue is, where are the problems, how can we monitor them, and how can we collectively—oncologists, the government, nurses, hospitals, insurers—improve that system.

Mr. NORWOOD. I see the red light, Mr. Chairman.

Mr. GREENWOOD. The time of the gentleman from Georgia has expired. I thank the gentleman for his questions, and let me advise the gentleman from Georgia that it is my intent, in the legislation that we introduce, to fix this problem; that we will, in fact, direct CMS to do the work with these associations, but certainly to provide the technical support so that we can develop the data, so that they are adequately compensated. And that will not be a burden placed on the backs of the voluntary organizations exclusively.

Mr. NORWOOD. And, Mr. Chairman, if the organization has a white paper on—at least their opinion on how to go about fixing the problem, shouldn't at least CMS have a white paper on how they think the problem ought to be fixed?

Mr. GREENWOOD. Well, we're going to make them work so fast that they won't even have time for a white paper.

The Chair asks unanimous consent to submit for the record the following documents: two volumes of committee documents; the opening statements of—the statements submitted by Congressman Stark and other members' opening statements; two letters to the committee from U.S. Oncology, clarifying the documents obtained by the committee.

And I would ask unanimous consent that we hold the record open for members to submit questions.

With that, we thank the final panel for your testimony, for your presence, for your endurance as well. This committee does intend

143

to fix this problem. We intend to fix it in short order. We intend to fix it rationally and fairly for the benefit of the taxpayers, the beneficiaries and the valued health care providers. Thank you.

The committee hearing is adjourned.

[Whereupon, at 3:15 p.m., the subcommittee was adjourned.]

[Additional material submitted for the record follows:]

STATEMENT OF
CONGRESSMAN PETE STARK
FOR THE SUBCOMMITTEES OF HEALTH AND OVERSIGHT AND INVESTIGATIONS
OF THE HOUSE ENERGY AND COMMERCE COMMITTEE
Joint Subcommittee Hearing on
Medicare Drug Reimbursements: A Broken System for Patients and Taxpayers
September 21, 2001

GAO Investigation Proves Major Drug Companies Have Abused Medicare and the
Public through Distortions of the Average Wholesale Price; Recommends Scrapping
the AWP

Congratulations to the General Accounting Office (GAO) and the Health and Human Services' Office of the Inspector General (IG) for their outstanding work in exposing the abuse of Medicare beneficiaries, the public and private health programs by some of the nation's leading pharmaceutical companies and some physicians. These investigations leave no doubt that drug manufacturers inflate the Average Wholesale Price (AWP) of their products in order to bribe physicians to prescribe their drugs.

The investigation confirms what many of us have been saying for years. Pharmaceutical companies manipulate the AWP to increase profits, which increases costs to patients and taxpayers by influencing physician-prescribing practices. This raises serious questions about the legitimacy of Medicare spending in this area, and, even more importantly, the quality of treatment and whether patients are being prescribed the right drugs. Previous evidence has shown that patients may be given inappropriate drugs as a result of the financial incentives in the current system.

I have introduced legislation in the past to stop these abusive practices, and the previous Administration had also tried to put an end to this policy. Numerous lawsuits have been filed on this issue and at least one has been settled this year alone. The evidence against the manufacturers and others involved in this scheme is overwhelming.

According to GAO, the AWP is 13 to 23 percent greater, on average, than the actual costs charged to physicians. In some cases, the spread between the AWP and actual costs is as much as 65 percent and 86 percent. As we have longsuspected, this

144

translates into unjustified, higher costs for Medicare, the taxpayers, and Medicare beneficiaries and it should be stopped.

I've advocated for years that we move toward a system based on acquisition costs. Now GAO is further substantiating the need to take immediate action to fix the widespread abuse of the AWP system. The integrity of federal health care delivery depends upon it. According to the IG, AWP abuse increases costs to beneficiaries and Medicare by up to $1.9 billion annually. Because beneficiaries pay 20 percent co-insurance on covered Part B services, this means that America's senior citizens and disabled persons who use these services are overpaying by nearly $400 million each year. Given that very few outpatient drugs are even covered under Medicare, it is simply unconscionable that these beneficiaries, and the taxpayers, are not getting the best possible price.

The GAO investigation and recommendations should stop any efforts by special interest groups or Members of Congress to block efforts to implement long-overdue remedies. I couldn't agree more with GAO's recommendation to scrap the AWP in favor of a system that reimburses drugs at levels that reflect actual market transaction prices. Doctors should be reimbursed for their actual acquisition costs. This measure would eliminate the abuse of AWP and would also contain the ballooning costs of prescription drugs.

Certain physicians will not be pleased with the findings of the IG and GAO. They will try to frighten beneficiaries into thinking that efforts to stop AWP abuses will curtail beneficiary access to physician-provided drugs. That is nothing more than a cynical scare tactic to persuade beneficiaries to support a system that forces them to pay more in order to pad physician income.

Furthermore, physicians should not profit on drug selection. A forthcoming GAO report will examine the adequacy of physician payments for certain activities. If it shows, as we anticipate, that physician fees should be adjusted for certain services, then those payments should be adjusted accordingly. However, that need doesn't support continuance of this corrupt system that rips off Medicare and patients.

The timing of this investigation is particularly important in view of the current debate about adding a prescription drug benefit to Medicare. Prescription drugs are an integral part of medical treatment today and Medicare must be modernized to include them. However, as the largest purchaser, Medicare should not and cannot afford to be paying top dollar for drugs. That is why the AWP should be abolished in favor of a pricing system that guarantees seniors affordable access to covered prescription drugs.

145

September 19, 2001

**SENT VIA FACSIMILE TO (202) 225-1919**

**ATTN: Tom DiLenge**
**Counsel, Subcommittee on Oversight and Investigations**
**House Committee on Energy and Commerce**

The Honorable James Greenwood
Chairman, Subcommittee on Oversight
    and Investigations
U.S. House of Representatives
Committee on Energy and Commerce
2125 Rayburn House Office
Washington, DC 20515

Dear Chairman Greenwood:

Thank you for your willingness to work with US Oncology, Inc. (USON) as part of the House Energy and Commerce Committee's efforts to reform the Medicare program's reimbursement of oncology drug and practice expenses.

USON provides comprehensive management services to community-based oncology practices across the nation. As a management services provider for community-based practices, USON does not actually receive any reimbursement from Medicare or any other payor, but is able to aggregate relevant information from its affiliated practices. In this capacity, USON is able to assist the Committee as the Committee assesses Medicare reimbursement of oncology drugs and practice expenses.

In responding to your letter of September 14, 2001, please be aware that the information below is what we have been able to assemble in the time frame provided. To the extent additional information is needed, USON stands ready to continue its work with you and your staff to answer any questions the Committee may have. Accordingly, the following information is submitted for your review:

**Describe the methodology employed by Ernst & Young in calculating the cost of pharmaceutical purchases by USON, including whether the auditors accounted for**

DC 110886 v.1. 22869.00139

16825 Northchase Drive • Suite 1300 • Houston, Texas 77060  (832) 601-8766

146

The Honorable James Greenwood
Page 2 of 7
September 19, 2001

grants, sponsorships, rebates, free goods or other off-invoice discounts in determining such costs.

**Background and History:** To effectively describe the methodology used in the USON study, a brief history of USON's involvement in this initiative may be helpful. USON and its affiliated cancer caregivers have long maintained that the Medicare program's reimbursement of oncology drugs and practice expenses is flawed: While reimbursement for oncology pharmaceuticals is too high, reimbursement for practice expenses is too low. Moreover, we recognize that any reform effort that focuses only on reducing pharmaceutical reimbursement, without considering practice expense reimbursement, would significantly undermine the ability of oncologists to provide cancer care to their patients. To that end, USON has advocated for some time that Medicare reform is needed:

- In the beginning of 1999, USON (then known as American Oncology Resources, Inc.) first briefed the Subcommittee on Medicare's reimbursement of oncology drugs and practice expenses.

- In 1999, USON sponsored, with other participants in the oncology community, a study entitled, "The Impact of Medicare Payment Policies on Patient Access to Quality Cancer Care" by Barton McCann, M.D. and Julia A. James. This study described oncology drug reimbursement and practice expenses and for the first time ever quantified the extent of the drug overpayment at the physician level.

- In 1999 and 2000, USON actively worked for a GAO study of Medicare's reimbursement for pharmaceuticals and related practice expenses. USON then met with the GAO to offer assistance with its study.

In offering our assistance to the GAO as it undertook its BIPA-mandated analysis, we noted that USON's position enabled it to assemble data regarding Medicare's reimbursement for pharmaceutical and related drug administration services for affiliated practices. We also noted, however, that USON's network of affiliated practices recognizes a number of efficiencies not obtained by most community-based oncologists. Further, we explained that approximately 80% of cancer care is delivered in community office settings and that it is our understanding that the typical oncology practice consists of 3-5 physicians. Thus, we cautioned the GAO that information we provided would not be representative of the experience of most small, community-based oncology practices and that the Health Care Financing Administration (now known as the Center for Medicare and Medicaid Services) should be tasked with a definitive analysis of this complex set of issues.

DC 1/0186 v 1. 22669.00119

147

The Honorable James Greenwood
Page 3 of 7
September 19, 2001

**Study Objective and Methodology:** After discussing these issues with the GAO, we undertook what we believe was the most comprehensive study possible in the GAO's nine month time frame. The sole objective of the study was to analyze the Medicare program's reimbursement to USON's affiliated practices for the year 2000 for pharmaceuticals and related administration services, and the expenses incurred by the affiliated practices for those drugs and their administration.

To achieve this objective, USON established financial procedures designed to report the experience of those affiliated practices, on a consolidated basis, relating to revenues and expenses for drugs and drug administration. The procedures (described in detail within the Ernst &Young (E&Y) reports and in USON-supplied flow sheets and narratives reviewed with the GAO and the Committee) were designed to:

(a)   Consolidate the practices' direct and shared expenses;

(b)   Allocate these expenses to the drug and drug administration categories of services;

(c)   Apply the expenses related to the provision of drugs and drug administration services to Medicare beneficiaries; and

(d)   Calculate the reimbursement received from Medicare for these products and services.

As part of this procedure, USON applied actual utilization data based on products and services provided, as well as actual drug costs (i.e., net of all rebates and all discounts). The information compiled by USON is truly reflective of the costs incurred by USON's affiliated practices in their purchase of pharmaceuticals. These costs include all price concessions (e.g., discounts, rebates) relating to the purchase of pharmaceuticals. As an aside, it is USON's policy that affiliated practices not accept free goods as part of purchasing contracts, other than the drug replacement programs provided to affiliated practices by pharmaceutical companies for the practices' provision of care to indigent and uninsured patients. The provision of free goods for indigent patients is monitored as part of our comprehensive compliance program, and our policy on that topic is attached   (Attachment A)

(a)   **Items Excluded from the Analysis.** In performing the analysis, USON excluded those items not related to pharmaceutical or pharmaceutical administration revenue or expenses. These exclusions fall into two categories: (i) revenue and expenses that would not meet the test for inclusion in a Medicare cost report process for hospitals (given that USON, as described to GAO, attempted to emulate the "Part A" cost report process in our compilation), and (ii) USON revenue and expenses independent of our relationship, and thus not shared, with our affiliated practices.  For example,

DC 1:9186 v 1, 22868.00129

16535 Northchase Drive · Suite 1300 · Houston, Texas 77063   (832) 601-5745

148

The Honorable James Greenwood
Page 4 of 7
September 19, 2001

the amortization of intangible assets, general development, corporate planning and directly associated marketing costs and nonrecurring costs as well as revenues and expenses from USON's separate clinical research and educational, communications and marketing service programs. If these excluded items were included, then the net income in the compilation would be reduced by approximately $13 million.

(b)     **E&Y's Role.** USON retained the independent accounting firm E&Y to perform "agreed upon procedures" according to guidelines established by the American Institute of Certified Public Accountants Auditing Standards Board. As USON has consistently and repeatedly stated to the GAO and the Subcommittee, E&Y was not engaged to, and did not, perform an audit. In two reports, E&Y recomputed calculations performed by USON when USON calculated the costs and reimbursements for Medicare-covered drugs and related practice expenses. The results of E&Y's calculations agreed with the results of USON's calculations. Copies of USON's study, together with E&Y's reports and other relevant information, are attached to this letter. (Attachment B) As noted above, this information previously was supplied to the Subcommittee.

**Other Relationships with Pharmaceutical Companies:** In addition to the purchasing relationship that USON has on behalf of its affiliated practices with pharmaceutical companies, USON maintains two other principal relationships with pharmaceutical companies, each of which is operated separately from the purchasing activities. First, USON provides comprehensive FDA-audited services to practices engaged in clinical cancer research with pharmaceutical companies, from study concept and design through regulatory approval, including complete Phase I through IV capability. USON currently supervises 98 clinical trials, with annual accruals of more than 4,000 patients. In this capacity, USON has played a pivotal role in bringing nine new pharmaceuticals and therapies to the market, thereby significantly benefitting cancer patients. It is important to note that research activities are generally conducted at a cost -- not at a profit -- to USON. In 2000, USON subsidized research activities, at our expense, in the amount of approximately $530,000.

Second, USON provides educational, communications and marketing services in the oncology community. As part of these services, USON organizes and facilitates conferences and electronic media communications among pharmaceutical companies, oncologists, oncology nurses and cancer patients. The educational, communications and marketing services to pharmaceutical companies include:

•     Opportunities to make presentations, both at organized conferences and through electronic media, to oncologists and oncology nurses regarding new clinical and scientific developments (in accordance with the Prescription Drug Marketing Act

149

The Honorable James Greenwood
Page 5 of 7
September 19, 2001

and continuing medical education accreditation standards established by the American Medical Association);

• Continuing medical education (CME) training courses;

• Organizing conferences for cancer patients (the description of a recent conference is attached hereto. (Attachment C)

Fees received by USON from pharmaceutical companies and other vendors for these services were retained solely by USON; neither affiliated practices nor their physicians received any of these fees. In addition, any costs incurred in connection with providing these services were borne solely by USON. As a result, these educational, marketing and communication services were operated separate from purchasing and clinical research relationships. Affiliated physicians did not participate in either the revenues or costs associated with these services. Therefore, the revenues and costs were excluded from the analysis performed by USON for the GAO.

(A combined response is offered for the next two inquiries)

**Specify the total dollar amount of any grants or sponsorship of USON activities that USON (or any of its corporate predecessors, including but not limited to Texas Oncology[1] and American Oncology Resources) received at any time, since January 1, 1997, to the present from any pharmaceutical manufacturing company.**

**For each grant or sponsorship included in Request No. 1, provide the date of the grant, the amount of the grant, the alleged purpose of the grant, the activities on which the grant funds were actually expended, and whether the grant was agreed to as part of an overall drug purchasing contract.**

As noted earlier, USON maintains two principal relationships with pharmaceutical manufacturing companies, each of which are operated separately from purchasing and clinical research relationships. First, USON provides comprehensive FDA-audited services to practices engaged in clinical cancer research with pharmaceutical companies. Second, USON provides educational, research and marketing services in the oncology community. As part of these activities, USON organizes and facilitates communications, through both conferences and electronic media, among pharmaceutical companies, oncologists, oncology nurses and cancer patients.

---

[1] Please note that Texas Oncology P.A. is not a predecessor company to USON.

DC 110886 v 1, 22669 00139

1503 North June Drive • Suite 1300 • Houston, Texas 77032  (832) 601-8700

150

The Honorable James Greenwood
Page 6 of 7
September 19, 2001

Fees received by USON from pharmaceutical companies and other vendors for these services are retained by USON. Neither affiliated practices nor their physicians received any of these fees. In addition, any costs incurred in connection with providing these services are borne solely by USON. Therefore, educational, marketing and research service revenues were excluded from the analysis performed by USON for the GAO.

The estimated total revenues provided (from 1997 to 2000) by pharmaceutical manufacturing companies in connection with educational, marketing and research services, and related expenses, are provided below:

| Year | Sponsorship / Grant Revenues (Estimated) | Related Expenses (Estimated) | Net Revenues (Estimated) |
|------|------------------------------------------|------------------------------|--------------------------|
| 2000 | $11,220,000 | $7,941,432 | $3,278,568 |
| 1999 | $6,862,000 | * | * |
| 1998 | $1,998,500 | * | * |
| 1997 | * | * | * |

* Above amounts represent the information we have been able to compile as of the date of this letter. Work continues to identify all relevant sponsorship / grant revenues and related expenses. Please also note that the figures provided for 1998 and the first half of 1999 reflect the figures prior to the merger of AOR and PRN.

State whether USON (or any of its corporate predecessors, including but not limited to Texas Oncology and American Oncology Resources) has ever had any contractual arrangements with any pharmaceutical manufacturing company for the purchase of pharmaceuticals that also required or included as a provision of the contract the provision of any grants or sponsorship of any kind by the pharmaceutical company to USON or any of its corporate predecessors. If so, please provide a copy of each such contract.

It is USON's policy that pharmaceutical purchasing contracts do not require or include any provisions regarding grants or sponsorship, and no current pharmaceutical purchasing contract requires or includes grants or sponsorship. We are aware of one pharmaceutical purchasing contract, which was entered into by a corporate predecessor and terminated in 1999, that included a provision regarding sponsorship services. The sponsorship fees (totaling $250,000 for the twelve-month term, which was included in the 1998-1999 revenues in the table provided in response to the previous question) corresponded to the value of those services provided and were entirely unrelated to and were not conditioned upon the purchase of any pharmaceuticals.

DC 1:2586 r 1, 22864 20 29

15923 Nerthchase Drive • Suite 1500 • Houston, Texas 77060 • (832) 601-8766

151

The Honorable James Greenwood
Page 7 of 7
September 19, 2001

    In conclusion, Mr. Chairman, I want to assure you that we have made, and will continue to
make, every effort to support the reform of Medicare's flawed system for reimbursing drugs and
medical services. Reflecting upon the experiences of our affiliated physicians and nurses, I can offer
that the Committee's initiative, though difficult, will be of tremendous value to assuring that patients
with cancer will continue to enjoy access to the high quality, cost-effective, community-based care
they need. I hope that this letter will assist you in this effort.

    As always, USON remains committed to assisting the Subcommittee in its efforts to reform
the Medicare program's reimbursement of oncology drugs and practice expenses.   Please do not
hesitate to contact me if additional information is needed.

                                Sincerely,

                                / s /

                                Leo E. Sands
                                Executive Vice President
                                Chief Compliance Officer

Attachments

cc:    The Honorable W.J. "Billy" Tauzin, Chairman
       The Honorable John D. Dingell, Ranking Member
       The Honorable Peter Deutsch, Ranking Member
              Subcommittee on Oversight and Investigations

       US Oncology, Inc.
       R. Dale Ross, Chief Executive Officer
       Phillip H. Watts, Esq., General Counsel
       Eric Berger, Vice President, Planning and Public Policy

       Jenkens & Gilchrist, A Professional Corporation
       Susan B. Murphy, Esq.
       Iden Grant Martyn, Esq.
       Robert W. Liles, Esq.

       Ernst & Young, LLP
       Carole Faig

DC (10886 v 1, 22669.00139

152

## Jenkens & Gilchrist
A PROFESSIONAL CORPORATION

1100 LOUISIANA
SUITE 1800
HOUSTON, TEXAS 77002

(713) 951-3300
FACSIMILE (713) 951-3314

www.jenkens.com

AUSTIN, TEXAS
(512) 499-3800

CHICAGO, ILLINOIS
(312) 425-3900

DALLAS, TEXAS
(214) 855-4500

LOS ANGELES, CALIFORNIA
(310) 820-8800

NEW YORK, NEW YORK
(212) 704-6000

SAN ANTONIO, TEXAS
(210) 246-5000

WASHINGTON, D.C.
(202) 326-1500

Susan B. Murphy
(713) 951-3382
smurphy@jenkens.com

September 10, 2001

<u>**SENT BY FAX TO: (202) 225-1919**</u>

Mark Paoletta
Chief Counsel
Subcommittee on Oversight and Investigations
House Energy and Commerce Committee
Rayburn House Office Building
Room 2125
Washington, DC

Re: Request for Information Related to Proposal Prepared by Pharmacia & Upjohn

Dear Mr. Paoletta:

Thank you for your willingness to work with our client, US Oncology, Inc. (USON), as part of the House Energy and Commerce Committee's efforts to reform the Medicare program's reimbursement of oncology drugs and practice expenses.

It is our understanding that you have questions related to a proposal that was prepared in 1997 by Pharmacia & Upjohn. Our client placed a call to your office earlier today in an effort to schedule a meeting with you tomorrow, prior to Wednesday's hearing. Since we have not heard back, we would like to proceed and address your questions as best we can at this time.

At the outset, please note that our initial review indicates that this document was not executed by our client. Moreover, it is important to note that USON did not prepare the document in question. As a result, USON is not in a position to speak to the motives or intentions of the preparers. Nevertheless, to the extent possible, we can provide a general discussion of how grant funds are used in the educational setting.

USON uses educational funding provided by pharmaceutical companies to present accredited Continuing Medical Education (CME) for USON affiliated practices. USON contracts with an independent third-party which maintains complete direction over the curriculum and content of the programs. Pharmaceutical companies are required to relinquish all control over how the training is presented and the information provided is unbiased and meets all requirements for certification. In

DC 110728 v 1; 22869-00191

153

# Jenkens & Gilchrist
### A PROFESSIONAL CORPORATION

Mark Paoletta
September 10, 2001
Page 2

this manner, affiliated physicians, nurses and other medical professionals are able to receive the
education necessary to deliver the highest quality patient care and treatment.

As always, USON remains committed to assisting the Committee in its efforts to reform the
Medicare program's reimbursement of oncology drugs and practice expenses. Please do not hesitate
to contact me if additional information is needed.

Very truly yours,

Susan Murphy
by: RBWu
Susan B. Murphy

cc:     David Marventano
        Chief of Staff
        House Energy and Commerce Committee

        Patrick Morrisey
        Deputy Chief of Staff
        House Energy and Commerce Committee

154

MICHAEL BURANS, FLORIDA
JIM BARTON, TEXAS
FRED UPTON, MICHIGAN
CLIFF STEARNS, FLORIDA
PAUL E. GILLMOR, OHIO
JAMES C. GREENWOOD, PENNSYLVANIA
CHRISTOPHER COX, CALIFORNIA
NATHAN DEAL, GEORGIA
STEVE LARGENT, OKLAHOMA
RICHARD BURR, NORTH CAROLINA
ED WHITFIELD, KENTUCKY
GREG GANSKE, IOWA
CHARLIE NORWOOD, GEORGIA
BARBARA CUBIN, WYOMING
JOHN SHIMKUS, ILLINOIS
HEATHER WILSON, NEW MEXICO
JOHN B. SHADEGG, ARIZONA
CHARLES "CHIP" PICKERING, MISSISSIPPI
VITO FOSSELLA, NEW YORK
ROY BLUNT, MISSOURI
TOM DAVIS, VIRGINIA
ED BRYANT, TENNESSEE
ROBERT L. EHRLICH, JR., MARYLAND
STEVE BUYER, INDIANA
GEORGE RADANOVICH, CALIFORNIA
CHARLES F. BASS, NEW HAMPSHIRE
JOSEPH R. PITTS, PENNSYLVANIA
MARY BONO, CALIFORNIA
GREG WALDEN, OREGON
LEE TERRY, NEBRASKA

ONE HUNDRED SEVENTH CONGRESS

**U.S. House of Representatives**
**Committee on Energy and Commerce**
**Washington, DC 20515–6115**

W.J. "BILLY" TAUZIN, LOUISIANA,
CHAIRMAN

CHUCK CLAPTON

JOHN D. DINGELL, MICHIGAN
HENRY A. WAXMAN, CALIFORNIA
EDWARD J. MARKEY, MASSACHUSETTS
RALPH M. HALL, TEXAS
RICK BOUCHER, VIRGINIA
EDOLPHUS TOWNS, NEW YORK
FRANK PALLONE, JR., NEW JERSEY
SHERROD BROWN, OHIO
BART GORDON, TENNESSEE
PETER DEUTSCH, FLORIDA
BOBBY L. RUSH, ILLINOIS
ANNA G. ESHOO, CALIFORNIA
BART STUPAK, MICHIGAN
ELIOT L. ENGEL, NEW YORK
TOM SAWYER, OHIO
ALBERT R. WYNN, MARYLAND
GENE GREEN, TEXAS
KAREN McCARTHY, MISSOURI
TED STRICKLAND, OHIO
DIANA DEGETTE, COLORADO
THOMAS M. BARRETT, WISCONSIN
BILL LUTHER, MINNESOTA
LOIS CAPPS, CALIFORNIA
MICHAEL F. DOYLE, PENNSYLVANIA
CHRISTOPHER JOHN, LOUISIANA
JANE HARMAN, CALIFORNIA

DAVID L. MARVENTANO, STAFF DIRECTOR

September 14, 2001

R. Dale Ross
Chief Executive Officer & Chairman
US Oncology
16825 Northchase Dr.
Suite 1300
Houston, Texas 77060

Dear Mr. Ross:

As you know, the Committee on Energy and Commerce is reviewing the Medicare drug reimbursement system, and has had several communications with U.S. Oncology (USON) regarding the issue of inflated drug reimbursements, as well as your contention that these profits on drugs are necessary to cover other expenses of your member practices for which Medicare allegedly does not provide full reimbursement.

I am aware that, in connection with the ongoing Congressional inquiries, USON hired the accounting firm Ernst & Young to conduct an audit of USON reimbursements and expenditures for Medicare-covered drugs, as well as other related practice expenses and reimbursements. The results of this audit would appear to indicate that USON received roughly $92 million in excessive Medicare drug reimbursements, while receiving under-reimbursement from Medicare for practice expenses totaling roughly $83 million.

Committee staff have reviewed the report and have questions about whether the audit's calculations of USON's drug expenditures are truly reflective of the costs USON incur in purchasing drugs, thus possibly inflating the total costs and decreasing the margin of profit it receives from Medicare. For example, the Committee has obtained documentation indicating that USON and/or its predecessors received rebates and free goods from pharmaceutical companies as part of its drug purchasing arrangements. The Committee also has documentation reflecting that USON and/or its predecessors also received significant grants from pharmaceutical companies for various purposes and uses. Yet we are not certain whether Ernst & Young included these other payments or in-kind contributions from the drug companies when calculating USON's true cost of purchasing pharmaceuticals.

155

R. Dale Ross
Page 2

Because two calls to your outside counsel to discuss this matter have not been returned, and because we have re-noticed a hearing on Medicare drug reimbursements for next Friday, September 21, 2001, I am writing to you today to request information about USON's true cost of purchasing drugs and your contractual relationships with pharmaceutical companies. Specifically, I am requesting that, pursuant to Rules X and XI of the U.S. House of Representatives, USON provide to the Committee the following information by Wednesday, September 19, 2001:

1. Specify the total dollar amount of any grants or sponsorship of USON activities that USON (or any of its corporate predecessors, including but not limited to Texas Oncology and America Oncology Resources) received at any time since January 1, 1997 to the present from any pharmaceutical manufacturing company.

2. For each grant or sponsorship included in response to Request No. 1, provide the date of the grant, the amount of the grant, the alleged purpose of the grant, the activities on which the grant funds were actually expended, and whether the grant was agreed upon as part of an overall drug purchasing contract.

3. State whether USON (or any of its corporate predecessors, including but not limited to Texas Oncology and America Oncology Resources) has ever had any contractual arrangement with any pharmaceutical manufacturing company for the purchase of pharmaceuticals that also required or included as a provision of the contract the provision of any grants or sponsorships of any kind by the pharmaceutical company to USON or any of its corporate predecessors. If so, please provide a copy of each such contract.

4. Describe the methodology employed by Ernst & Young in calculating the cost of pharmaceutical purchases by USON, including whether the auditors accounted for such grants, sponsorships, rebates, free goods or other off-invoice discounts in determining such costs.

If you have any questions about the above request, please contact Mr. Mark Paoletta, Committee Chief Counsel for Oversight and Investigations, at (202) 225-2927. Thank you for your prompt reply to these requests.

Sincerely,

James Greenwood, Chairman
Subcommittee on Oversight and
Investigations

cc:    The Honorable W.J. "Billy" Tauzin, Chairman
       The Honorable John D. Dingell, Ranking Member
       The Honorable Peter Deutsch, Ranking Member
       Subcommittee on Oversight and Investigations

156

**Table of Contents for**
**Panel I Questions & Related Documents**    VoL. 1

**A**                                    **DRUG MANUFACTURERS SET AWP**
      1      01-12-1995    Immunex: Letter to Roni Lane (Red Book), from Mary
                           Lipinsky (Immunex)
      2      05-24-1991    Immunex: Letter to Beth Rader (First Data Bank)
      3      08-07-1997    Bayer: E-mail from Christopher Cheney

**B**                                    **DRUG MANUFACTURES' INTERNAL MEMOS**
                                         **ACKNOWLEDGING THAT MANIPULATING**
                                         **AWP PRICES FOR MARKET SHARE CANNOT**
                                         **WITHSTAND SCRUTINY**
      1      10-25-1994    Glaxo Memo: Issue considerations on Zofran pricing
                           strategies
      2      02-1995       Florida Infusion Chemonet: "Zofran: Higher AWP . .
                           .higher reimbursement"
      3      03-15-1996    HealthIQ: Letter to Bob Boste (SmitKline Beecham),
                           from J. Alvarado
      4      02-28-1994    AWP and WAC Prices

**C**                                    **MEDICARE DOES NOT REALIZE ANY**
                                         **SAVINGS WHEN DRUG PRICES FALL**
      1      08-1994       Florida Infusion Chemonet: Prices for Etoposide
      2      10-1995       Florida Infusion Chemonet: Prices for Etoposide
      3      02-1996       Florida Infusion Chemonet: Prices for Etoposide
      4      01-1997       Florida Infusion Chemonet: Prices for Etoposide
      5      08-1994 to    Medicare &Medicaid Continue to Pay . . .
             01-1997

**D**                                    **DRUG MANUFACTURER RAISES AWP PRICES**
                                         **EVEN AS IT LOWERS REAL PRICES**
      1      03-10-1994    Letter from Clifford J. Krajewski of Abbott to Mr. Rudy
                           Ciccarello of Florida Infusion
      2      05-26-1994    Memo from Steve Kipperman to Field Sales Force
                           District Managers, re: Current Red Book AWP's
      3                    1994 Red Book:  Vancomycin
      4                    1995 Red Book:  Vancomycin
      5      12-1994       Florida Infusion Chemonet: Vancomycin
      6      12-1995       Florida Infusion Chemonet: Vancomycin

**E**                                    **DRUG MANUFACTURERS EXPLICITLY**

157

|   |   |   | **MARKET SPREAD TO INDUCE PROVIDERS TO BUY THEIR DRUGS** |
|---|---|---|---|
|   | 1 |   | Lupron Checkbook |
|   | 2 |   | Urology/Oncology Business Unit: TAP: The Total Package |
|   | 3 |   | Oncology Therapeutics Network: Anzemet |
| **F** |   |   | **DRUG MANUFACTURERS RAISE AWP PRICES (TO CREATE SPREAD) TO GAIN MARKET SHARE** |
|   | 1 |   | Baxter: AWP=Points to Consider |
|   | 2 | 08-07-1997 | Bayer: E-mail from Christopher Cheney |
|   | 3 | 03-21-1996 | SmithKline Beecham: Memo to R. de Souza, from D. Tasse |
|   | 4 |   | Venoglobulin-S 5% Solution Solvent Detergent |
|   | 5 |   | Gamimune N Alternate Site Strategy: Reimbursement |
|   | 6 | 09-19-1996 | Alpha Therapeutic Corporation: Memo from Christine Chow, Re: New AWP's |
|   | 7 | 06-11-1996 | Baxter: Memo to Pete O'Malley, from Kyle Bush, re: AWP/WAC |
|   | 8 | 08-06-1997 | Baxter: Memo from Kyle Bush, re: AWP History |
|   | 9 | 10-27-1994 | Memo to Scott Haviland, from David Cory, re: Zofran Pricing Recommendation |
| **G** |   |   | **DRUG MANUFACTURER RAISES AWP AFTER CONGRESS CUTS REIMBURSEMENT TO 95% OF AWP – EVIDENCE OF BROKEN SYSTEM** |
|   | 1 | 10-30-1997 | Letter to William Quan (Comprehensive Cancer Center, Inc), from Dan Bell |
|   | 2 | 10-21-1997 | E-mail: Market Company Alert—October 1997 Price Increase |
|   | 3 | 09-1996 | Florida Infusion Chemonet: Bleomycin Prices |
|   | 4 | 11-1997 | Florida Infusion: Bleomycin Prices |
|   | 5 | Fall 1998 | Florida Infusion Chemonet: Bleomycin Prices |
| **H** |   |   | **SWITCHING TO SYSTEM USING CURRENT WAC DEFINITION IS ALSO FLAWED** |
|   | 1 | 05-30-1995 | Dey Laboratories: Memo from Helen Burnham, re: Albuterol WAC Pricing |

158

| I | | | **PROVIDERS REAP MORE PROFITS THAN REFLECTED BY GAO AND IG NUMBERS BASED ON REBATES FROM DRUG MANUFACTURERS** |
|---|---|---|---|
| | 1 | 06-26-1996 | SmithKline Beecham: Letter to Bob Wren (Physician Reliance Network), re: amend Kytril Agreement dated 10-16-1995 |
| | 2 | 12-11-1996 | SmithKline Beecham: Check to Physician Reliance Network, Inc. |
| | 3 | 02-01-1994 | Miles: Letter to Don Whiteaker, re: Gamiune-N 10% promotion and Kogenate promotion |
| | 4 | | Quarterly Sandoglobin: Performance rebate |
| | 5 | 10-06-1994 | Check from Sandoz, to Caremark Prescription Service |
| | 6 | | Rebate form: Quantum Health Resources |
| J | | | **PROVIDERS REALIZE MORE PROFITS THAN WHAT IS REFLECTED IN GAO AND IG NUMBERS BASED ON OFF-INVOICE PRICE REDUCTIONS, SUCH AS GRANTS ETC.** |
| | 1 | 10-01-1996 | Bayer: Memo—Volume Sales Opportunities-Kogenate |
| | 2 | 01-07-1994 | Caremark: Purchase order for Gammagard |
| | 3 | 05-26-1994 | Oncology Purchasing Agreement between Pharmacia and Texas Oncology |
| | 4 | 06-05-1995 | Pharmacia: Memo—Texas Oncology Contract Review Meeting |
| | 5 | 03-24-1997 | American Oncology Resources letter to Pharmacia &Upjohn—Re: 1997 commitment to key medical education activities |
| | 6 | | AOR/Pharmacia &Upjohn partnership proposal: Elements of proposal |
| | 7 | 09-29-1995 | Pharmacia e-mail, re: Texas Oncology |
| | 8 | 03-02-1995 | Quantum Health Resources: Letter to Miles, Inc—Re: Status of Procong Discussions Remainder of 1995 |
| | 9 | | Free Goods Mask Final Price |
| K | | | **IN AWP SYSTEM, PROVIDERS REAP UNUSUAL PERCENTAGE OF REVENUE DOLLAR FROM DRUG SALES** |
| | 1 | | Distribution of a "Normal" dollar of Revenue from a Retail Prescription in 1998 |

159

| | 2 | | Distribution of the Medicare Dollar for Ipratropium Bromide |
| | 3 | | Distribution of the Medicare Dollar for Etoposide 100mg |
| | 4 | | Distribution of a Medicaid Dollar for Bristol's Generic Cefadroxil |
| **L** | | | **ONCOLOGISTS REAP SIGNIFICANT PROFITS FROM DRUGS (EXAMPLE)** |
| | 1 | | Profit from drugs for one Florida practice |
| | 2 | 12-1997 | Chemo Drugs—YTD drug profits |
| | 3 | Spring 1997 | ION Link Newsletter: A word from Jeffrey Scott, MD |
| | 4 | 01-27-1997 | Letter from PNU (John Thompson) to AOR (Bryan Manning)—Re: Outline of potential partnership |
| **M** | | | **ONCOLOGISTS REAP SIGNIFICANT PROFITS FOR EACH CANCER PATIENT (TWO CASE EXAMPLES)** |
| | 1 | | "A 42 year old female is diagnosed with stage 2 breast cancer . . ." |
| | 2 | | 2001 Breast Cancer Drug Profits Per Dose |
| | 3 | | "Total Profit on Drugs from Medi-Cal for Total of 4 Treatments is . . ." |
| | 4 | | "61 year old female with stage 3 colon cancer . . ." |
| | 5 | | 2001 Colon Cancer Drug Profits Per Dose |
| | 6 | | "Total Profit on Drugs from Medi-Cal for Total of 6 Treatments is . . ." |
| **N** | | | **SPREADS DRAMATICALLY INCREASE CO-PAY FROM BENEFICIARY** |
| | 1 | 06-2001 | HHS: Medicare Payments for Prescription Drugs |
| | 2 | | Medicare 20% Co-payments |
| **O** | | | **PROVIDERS SELECT DRUGS BASED ON SPREADS/PROFITS** |
| | 1 | | Lupron Depot—4 Month 30 mg: The Launch |
| | 2 | | SmithKline Beecham: Memo to Ursula Barttlei and Ashok Chainans, from Louis Deppe—Re: Zofran Downdosing and Pre-Mix Bag Sales |
| | 3 | 12-07-1998 | Anzemet contract for 1999 |

160

| | | | |
|---|---|---|---|
| | 4 | 05-28-1998 | Anzimet Cost Comparison |
| | 5 | 03-02-1994 | GeriMed: Letter to Contracts administrator—formal request for quotation to GeriMed |
| | 6 | 03-08-1996 | GeriMed: Letter to Contracts administrator—formal request for quotation to GeriMed |
| | 7 | | AWP Reimbursement Promotion for GeriMed |
| | 8 | | Pharmaceutical Manufacturers Warrick and Dey's use of the "Spread" to Capture the State of Florida's Medicaid Market for Albuterol 0.083%" |
| P | | | **SPREADS APPEAR TO ENCOURAGE OVERUTILIZATION RESULTING IN EVEN MORE COSTS TO THE MEDICARE SYSTEM NOT REFLECTED IN THE GAO OR IG NUMBERS** |
| | 1 | | Ipratropium Bromide 0.02% sol. |
| | 2 | | Albuterol Sulfate 0.083% |
| Q | | | **SPREADS CONTRIBUTE TO OVERUTILIZATION, HAVE PUBLIC HEALTH CONSEQUENCES** |
| | 1 | 12-13-1999 | HHS OIG Report |
| R | | | **SPREADS CONTRIBUTE TO OVERUTILIZATION, HAVE PUBLIC HEALTH CONSEQUENCES** |
| | 1 | | Etopophos: Executive Summary |
| | 2 | | Hospital Pharmacist Report on *S. aureus* with diminished susceptibility to vancomycin |
| | 3 | | 1995 Red Book: Vancomycin Hydrochloride |
| | 4 | | Florida Infusion 1995 Catalog: Vancomycin |
| | 5 | | 1996 Red Book: Vancomycin Hydrochloride |
| | 6 | | Florida Infusion 1996 Catalog: Vancomycin |
| | 7 | | 2000 Red Book: Vancomycin Hydrochloride |
| | 8 | | McKesson Econolink System, Facility: Ven-a-Care Vancomycin Hydrochloride |
| S | | | **EFFECT OF AWP SPREAD ON MEDICAID** |

161

|  |  |  | **(LOUISIANA)** |
|  | 1 |  | Examples of Excessive Reimbursements for Pharmaceuticals by Louisiana Medicaid Pharmacy Program |
|  | 2 |  | State-to-State Price comparison of Bristol-Myers Cefadroxil |
|  | 3 | 02-07-2001 | WSJ Article: "Facing an Impending Budget Crunch, States Seek to Curb Medicaid Costs" |
| T |  |  | **HCFA DID NOTHING DESPITE BEING AWARE OF PROBLEM** |
|  | 1 | 06-12-1997 | Ven-a-Care Letter to Dr. Bruce Vladeck (HCFA Administrator), re: HCFA's Knowing Squandering of More than One Billion Dollars of Medicare Funds for Parenteral Nutrition |
|  | 2 | 08-13-1997 | Ven-a-Care Letter to Dr. Bruce Vladeck (HCFA Administrator), re: HCFA's knowing Squandering of Tens of Millions of Dollars Annually in Precious Medicare and Medicaid Program Funds by not stopping Carriers and Agencies from paying Providers too much |
|  | 3 | 06-01-1998 | Ven-a-Care Letter to Ms. Nancy-Ann Min DeParle (HCFA Administrator), re: HCFA's Proposed Methodology Revision for Payment of Drugs and Biologicals |
| U |  |  | **TEXAS HAS BEEN THE MOST AGGRESSIVE STATE IN ATTEMPTING TO ENSURE ACCURATE RREPORTING OF PRICES** |
|  | 1 | 04-20-1994 | SmithKline Beecham: Letter to Martha McNeill of Texas Department of Health |
|  | 2 | 05-16-1994 | Letter from McNeil to Gershon of SmithKline Beecham |
|  | 3 |  | Florida Infusion Prices for Kytril |
|  | 4 |  | Texas Anzemet Application |
|  | 5 |  | Prices for Anzemet from Oncology Therapeutics Network |
| V |  |  | **QUESTION ADDRESSING THE CONSERVATIVE NATURE OF THE GAO ESTIMATES OF PROFITS FROM THESE DRUGS** |

162

A-1

# ımmunex

January 12, 1995                    VIA FAX

Roni Lane
Red Book
5 Paragon Drive
Montvale, NJ 07645

Dear Roni:

Below you will find a list of new suggested Average Wholesale Prices (AWPs) for selected Immunex products, along with a new NDC for ▓▓▓▓▓▓▓▓ all effective January 10, 1995.

Also, please note that the following product will no longer be sold in single vials and will be available only in boxes of ten. Its AWP has been multiplied by ten and is in the table below. Each vial size has a new NDC and is now available under Immunex packaging. These changes are effective January 10, 1995.

| Product | Old NDC | New NDC | New Suggested AWP |
|---|---|---|---|
| Leucovorin Calcium for Injection, preservative-free, cryodesiccated powder | | | |
| box of 10 vials | | | |
| 50 mg | 00205-5330-92 | 58406-0621-37 | $215.30 |
| 100 mg | 00205-4646-94 | 58406-0622-35 | $394.10 |
| 350 mg | 00205-4645-77 | 58406-0623-33 | $1379.40 |

Please update your databases accordingly.  A new copy of Immunex's Average Wholesale Price Product Pricing Guide will be sent to you next week.  If you have any questions, call me at (206) 389-4320.  Thank you.

Sincerely,

Mary Lipnitsky
Manager, Health Care Policy

163

A.2

# IMMUNEX

May 24, 1991

Beth Rader, Data Acquisition Coordinator
First Data Bank
11 Bayhill Drive
Suite 350
San Bruno, CA     94066

Dear Beth:

In a conversation with your colleague Larry yesterday, I learned that First
Data Bank currently shows the correct direct prices for LEUKINE™, but that
the AWP prices are not correct. I am therefore requesting that you revise the
AWP prices immediately, so that your customers have correct information
against which to process claims. The pricing data for LEUKINE™ follows:

| NDC NUMBER   | VIAL SIZE | DIRECT PRICE | AWP      |
|--------------|-----------|--------------|----------|
| 58406-002-01 | 250 mcg   | $85.00       | $106.00  |
| 58406-001-01 | 500 mcg   | $160.00      | $200.00  |

Larry indicated that the correction could be made as soon as you received this
written notification, so I am Federal Expressing it to you. Would you please let
me know when the corrections are on your system, and when your customers
will have the correct information?  My number at Immunex is (206) 587-0430,
Ext. 796.

FDB 001129

164

A-3



## Bayer

Christopher Cheney

08/07/97 01:15 PM                                    Pharmaceutical Division

To:        Brian Shortell/WESTH/PH/US/BAYER
cc:
Subject:   Re: Recombinate AWP Change

FYI ... It looks like if the reports are true we will need to follow suit.
——————— Forwarded by Christopher Cheney/BAYER-US-NOTES on 08/07/97 01:13 PM ———————

 **David Mahoney**
08/07/97 12:19 PM                                    

To:        Christopher Cheney/BAYER-US-NOTES
cc:
Subject:   Re: Recombinate AWP Change

Chris, if Baxter has increased their AWP then we must do the same.  Many of the Homecare
companies are paid based on a discount from AWP.  If we are lowed than Baxter then the return
will be lower to the HHC.  It is a very simple process to increase our AWP, and can be done
overnight.  Lets talk about this next week at our meeting in Old Saybrook.
08/06/97 06:35 AM

## Bayer

Christopher Cheney

08/06/97 06:35 AM                                    Pharmaceutical Division

To:        Brian Shortell/WESTH/PH/US/BAYER
cc:        Carole Guthrie/WESTH/PH/US/BAYER, David Mahoney/BAYER-US-NOTES, Terry
           Tenbrunsel/BAYER-US-NOTES
Subject:   Recombinate AWP Change

Carole reports that a rep has heard that Baxter recently increased the AWP for Recombinate from
$1.18 to $1.24.  Do we have any means for verifying this information?   Secondly if the info is
correct would it be possible for us to match their increase?  Would you be able to comment on the
pro's and con's of a change to our AWP?

Call me when you get a chance.

165

B-1

## Glaxo Memo

To:      Jim Dawson
         Andy Hartsfield
         Patti Pozella
         Rick Sluder
From:    Nancy Pekarek
Date:    10/25/94
Subject: Issue considerations on Zofran pricing strategies

Attached is a draft outlining the issues we discussed yesterday regarding Zofran pricing
strategies.  Please review for further discussion this afternoon.

166

### Zofran pricing recommendation considerations

If Glaxo chooses to increase the NWP and AWP for Zofran in order to increase the amount of Medicaid reimbursement for clinical oncology practices, we must prepare for the potential of a negative reaction from a number of quarters. Some likely responses:

1) Press: Glaxo's health care reform messages stressed the importance of allowing the marketplace to moderate prices. On the surface, it seems that in response to the entrance of a competitor in the market, Glaxo has actually raised its price on Zofran — perhaps twice in one year. How do we explain that price increase on a drug that is already been cited in the press as one of, if not the most expensive drug on the hospital formulary?

   If we choose to explain the price increase by explaining the pricing strategy, which we have not done before, then we risk further charges that we are cost shifting to government in an attempt to retain market share.

2) Congress: Congress has paid a good deal of attention to pharmaceutical industry pricing practices and is likely to continue doing so in the next session. How do we explain to Congress an 8% increase in the NWP between January and November of 1994, if this policy is implemented this year? How do we explain a single 9% increase in the AWP? What arguments can we make to explain to congressional watchdogs that we are cost-shifting at the expense of government? How will this new pricing structure compare with costs in other countries?

3) Private insurers, out-of-pocket payers: These groups, and perhaps others, are likely to incur greater costs as a result of this pricing strategy. How will they be affected? What response do we have for them?

### Other questions to consider:

1. What percentage of our Zofran business in the clinical setting is subject to Medicaid reimbursements? If this proportion of the business is relatively small, why implement such a sweeping policy? Have we considered and tried other options for retaining market share short of a pricing strategy that will be seen as an exhorbitant increase?

2. Both before and after the entrance of Kytril on the market, Glaxo's public position has been that the company would not compete on the basis of price, but rather continue to reinforce the message that Zofran provides therapeutic value in the marketplace. If we do try to explain the pricing rationale, we seem to be doing an about face. What does this say about the stability of our product, and the future of a company that has taken the public position that our future depends on the strength of newer products like Zofran?

167

3.  How will SKB respond to Glaxo's new pricing policy?  Are we igniting a price war?  If SKB lowers their price again, how do we respond?

4.  What kind of response can we expect from consumer advocates?  How does Glaxo respond to those advocates?

5.  How do we respond to critics' charges that this policy proves that the pharmaceutical companies are unfairly discriminating against independent pharmacists by offering discounts to different classes of trade as well as other issues in that debate?

6.  Do we have plans to use this same strategy with regard to other Glaxo products?

7.  Does this pricing policy, and similar policies implemented by other companies, provide evidence to reform advocates who support the establishment of government price review boards?  Is the industry helping to moderate health care costs when it implements policies that increase the cost of pharmaceuticals to government?

# FLORIDA INFUSION CHEMONET

1-800-624-0152

**FEBRUARY 1995**

## ZOFRAN: Higher AWP...higher reimbursement

B-2



Effective January 3, 1995, Glaxo has increased the acquisition costs of Zofran injection. The new AWP is set at $233.02. However, the company has provided incentives to the market place which will ensure that the Zofran price to physicians and clinics will be lower than the contractual price available prior to the increase. Effective January 10, 1995 the price of Zofran has been reduced by most distributors to $161.00. We expect this price to be available for the next three or four weeks and we don't expect that the price will afterwards increase considerably.

169

B-3

**HEALTHIQ**

750 THE CITY DRIVE, SUITE 200
ORANGE, CA 92668-4940
TELEPHONE 714.750.4474
800.866.4474
FACSIMILE 714.750.5513
INTERNET INFO@HEALTHIQ.COM

March 15, 1996

Bob Boate
Krystl Special Projects
SmithKline Beecham Pharmaceuticals
One Franklin Plaza
P.O. Box 7929
Philadelphia, PA. 19101-7929

Dear Bob:

Thank you for sending the information regarding Glaxo's new pricing strategy. I understand your intent was for HEALTHIQ to follow-up our recent, and highly effective, correspondence to the Medicare Part B Medical Directors with an update regarding Glaxo's latest attempt to "game" the Medicare system. However, we believe that we will not be in SmithKline Beecham's best interest, for the following reasons:

1. Medicare guidelines state that the Part B benefit stipulates that reimbursement for pharmaceuticals will be based on the lower of the actual charge, the average wholesale price (AWP) for the generic form of the drug, or in the case of multiple source drugs, the median of all the generic AWPs or an estimate of actual acquisition costs. Although HCFA has not implemented a system to monitor actual acquisition costs, and currently "defers" to AWP, there have been, and continue to be, serious discussions regarding this matter.

2. A recent report released by the Department of Health and Human Services Office of the Inspector General, which focused specifically on Medicare payment methodologies for three prescription drugs used by nebulizer patients, concluded that significant cost savings to the Medicare program would result from implementing new reimbursement methodologies, for example, drug rebate programs, discounts off AWP, or "inherent reasonableness" – basing payment of drugs on the estimated acquisition cost.

3. In speaking with Dr. David P. Sheridan, Medical Director for South Carolina, he indicated Medicare had no intention of paying more than cost. As a result, this carrier will require attachment of an invoice with every claim submitted for Zofran pre-filled bag. HEALTHIQ will continue to follow-up with other Medical Directors to determine their policy regarding this issue, and provide SmithKline Beecham with a summary of our findings.

4. From the communications received to date, the letter submitted by Physicians Homecare Associates, Inc., ostensibly written on behalf of physicians and other healthcare providers, appeared to be greatly appreciated by the Medical Directors. A follow-up letter opposing Medicare of an increase in Glaxo's AWP and a preferred discount to purchasers (which would seem to benefit providers), might appear "peculiar" and prompt questions as to the "true" identity of Physician Homecare Associates.

As a result of the issues raised above, HEALTHIQ is concerned that highlighting the difference between the actual acquisition cost and the published AWP may not only increase attention to Glaxo's pricing practices, but may provide the impetus for HCFA to implement a system that could impact not only reimbursement of antiemetics, but all pharmaceutical and biological products. The ramifications could extend well past Medicare to include Medicaid programs (also administered by HCFA) as well as private payers (who tend to mimic policies and procedures implemented by public payers).

Therefore, HEALTHIQ feels it would be best not to pursue this matter with the Medicare Part B Medical Directors.

Bob, please let me know your short plans.

Best regards,

Teresa E. Alvarado
Senior Vice President

170

β·4

02/28/94                       Vick   F-1495  rz  940310.003

## AWP and WAC Prices

Price Strategy

- Prices are low enough to claim "bragging rights" without initiating a market-destabilizing price war

- AWP is high enough to provide an attractive reimbursement margin for customers

- Moderate list price advantage disguises true customer acquisition cost advantage

171

172

C-2

**1-800-624-0152**

**FLORIDA INFUSION**

**ETOPOSIDE**

$49⁰⁰

100mg .............. $49⁰⁰

500mg .............. $295⁰⁰

1gram .............. $580⁰⁰

PHARMACY ONLY

10-09-95 TO 10-13-95

173

C-3

## 1-800-624-0152

# FLORIDA INFUSION

WEEKLY
SPECIALS
02-26-96 TO 03-01-96

## THINGS ARE WARMING UP IN FLORIDA WITH THE HOTTEST SALE OF THE SEASON...

# ETOPOSIDE

Buy 10 at our already reduced price and
## GET ONE FREE

**HUGE SAVINGS**

|  | REGULAR LOW PRICE | AFTER FREE GOODS |
|---|---|---|
| 100mg | $36.00 | $32.73 |
| 500mg | $220.00 | $200.00 |
| 1gram | $420.00 | $381.00 |

174



C-4

C-5

# Medicare & Medicaid Continue to Pay Based on $141.97 Despite True Price Decline of 93.8%

| Company | Drug | NDC | Date | AWP | Relator Cost |
|---------|------|-----|------|-----|--------------|
| Gensia | Etoposide | 00703-5643-01 | 8/94 | $141.97 | $85.00 |
| Gensia | Etoposide | 00703-5643-01 | 4/95 | $141.97 | $67.62 |
| Gensia | Etoposide | 00703-5643-01 | 10/95 | $141.97 | $49.00 |
| Gensia | Etoposide | 00703-5643-01 | 2/96 | $141.97 | $36.00 |
| Gensia | Etoposide | 00703-5643-01 | 9/96 | $141.97 | $18.00 |
| Gensia | Etoposide | 00703-5643-01 | 1/97 | $141.97 | $14.00 |

176

**⊏⅃ ABBOTT**
**Alternate Site**
**Product Sales**

*0-1*

High Tech Products for Alternate Site and Home Health Care

March 10, 1994

Mr. Rudy Ciccarello
Florida Infusion
1053 Progress Court
Palm Harbor, FL 34683

Dear Rudy:

I have recently accepted the position of Manager, Distributor Relations. Jeff Hamlin has accepted a position as one of our hospital based district managers in Raleigh, North Carolina. As part of the transition I found that we had not yet notified you of some price/product adjustments that were recently made to your agreement with us.

The first three pages, identified as *Florida Infusion Price Changes* indicate the products in which prices were changed and their new contract price. Favorable factory costs in 1994 have lead the way for these price reductions! These products have been included in the comprehensive price list that has also been enclosed. These changes were effective February 25, 1994, we apologize for the delay in communicating this information to you.

I look forward to meeting with you in the near future, before then, if there are any questions or concerns that I can assist you with, please do not hesitate to call (708) 937-5916.

Sincerely,

Clifford J. Krajewski
National Account Manager

One Abbott Park Road  • Abbott Park, Il 60064