**ANDERSON EXHIBIT 10J**

372

CRS-4

Sections 10616 and 4616 of the House bills had recommended that in any case where payment was not made on a cost or prospective basis, payment would equal 95% of the average wholesale price and that the change should apply to drugs and biologicals furnished on or after January 1, 1998.

Section 5526 of the Senate bill had recommended a similar provision, except that the average wholesale price would have been "as determined by the Secretary." It added that beginning in 1998, the payment amount could not exceed the amount payable on May 1, 1997, and in subsequent years, it could not exceed the previous year's amount increased by the percentage increase in the Consumer Price Index. For any other drug or biological, the annual increase for any year following the first year for which payment is made would be limited to the percentage increase in the CPI. If payment was made to a licensed pharmacy, the Secretary (as the Secretary determined appropriate) would pay a dispensing fee (less applicable deductible and insurance amounts). It also required the Secretary to conduct studies and surveys as necessary to determine the average wholesale price (and such other prices the Secretary determined appropriate) and report the results to appropriate congressional committees within six months of enactment.

To conform to the 1997 statutory change, HCFA proposed revising section 415.517 of title 42 of the Code of Federal Regulations, which relates to payment for drugs and biologicals not on a cost or prospective payment basis. Drugs and biologicals paid on this basis are not only those furnished incident to a physician's service, but also drugs furnished by pharmacies under the durable medical equipment (DME) benefit, and drugs furnished by independent dialysis facilities that are not included in the end-state renal disease (ESRD) composite rate payment. 63 *Fed. Reg.* 30846 (June 5, 1998).

HCFA proposed eliminating the estimated acquisition cost (EAC), which had been one basis for payment, the other being 100% of the average wholesale price (AWP), and paying at the lower of the actual charge on the Medicare claim or 95 percent of AWP. HCFA also proposed revising the method of calculating the average wholesale price. Regulations then in effect provided that for multiple source drugs, the AWP was equal to the median AWP of the generic forms of the drug. The AWP for the brand name products was ignored on the presumption that the brand AWP always was higher than the generic AWPs. HCFA said that while this presumption may have been true when the policy first was promulgated in 1991, it was not always true in 1998. Consequently, it proposed that the AWP for multiple source drugs would be equal to the lower of the median price of generic AWPs or the lowest brand name AWP. *Id. See id.* at 30878 for the text of the proposed regulation, 42 C.F.R. § 517 (Payment for drugs and biologicals that are not paid on a cost or prospective payment basis).

The final rule adopting HCFA's proposed rule with modifications was published on November 2, 1998. The charge allowed by Medicare for drugs and biologicals would be the lower of 95 percent of the median generic AWP or 95 percent of the lowest brand AWP. A brand product was defined as a product marketed under a labeled name that is other than the generic chemical name of the drug or biological. The allowed charge for drugs and biologicals that do not have an AWP would be determined by the local Medicare contractor based on prices paid by physicians and suppliers who use them. 63 *Fed. Reg.* 58850 (Nov. 2, 1998). *See id.* at 58905 for the text of the final rule, 42 C.F.R. § 405.517.

In section 4316 of the Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251, 390-391 (1997), Congress amended paragraphs (8) and (9) of section 1842(b) of the Social Security Act, 42 U.S.C. § 1395u(b). The amendment authorizes the Secretary of Health and Human Services, by regulation, to describe factors to be used in determining the cases of

373

CRS-5

items or services in which application of Part B (other than physicians' services) results in the determination of an amount that, because of its being grossly excessive or grossly deficient, is not inherently reasonable, and to provide in those cases for factors to be considered in determining an amount that is realistic and equitable. Notwithstanding such a determination, the Secretary may not apply factors that would increase or decrease a payment under Part B during any year for any particular item or service by more than 15 percent from such payment during the preceding year unless certain determinations are made.

Without issuing a notice of proposed rulemaking, HCFA issued an interim final rule implementing inherent reasonableness authority by amending section 405.502 of title 42 of the Code of Federal Regulations. 63 *Fed. Reg.* 687 (Jan. 7, 1998). The authority applied the inherent reasonableness standard to all Part B services, other than services of physicians, described in section 1861(s) of the Social Security Act, 42 U.S.C. § 1396x(s), which appears to include drugs furnished as an incident to a physician's professional service. *See id.* at 689-690 for the text of section 405.502 (Criteria for determining reasonable charges).

Late in 1998, HCFA reportedly attempted to use the inherent reasonableness authority, as amended by section 4316 of the Balanced Budget Act, to reduce what it considered excessive reimbursement for several items. One item, albuterol, a drug used with a nebulizer to treat patients suffering from asthma and emphysema under the durable medical equipment (DME) benefit, reportedly was targeted for an 11 percent fee reduction. Office of the Inspector General, Department of Health and Human Services, *Medicare Reimbursement for Prescription Drugs*, OEI-00-00310, 2 (Jan. 2000).

Congress suspended the inherent reasonableness authority in section 223 of the Medicare, Medicaid, and SCHIP Balanced Budget Refinement Act of 1999, contained in the Consolidated Appropriations Act, Fiscal Year 2000, Pub. L. No. 106-113, 113 Stat. 1501A-352-353 (1999), until the General Accounting Office released a report and the Secretary of Health and Human Services published a notice of final regulations that responded to comments received in response to the January interim final regulation. The General Accounting Office issued its report on July 5, 2000, and reportedly found that inherent reasonableness reductions for some items were justified, but questioned the methodology that durable medical equipment regional carriers (DMERCs) used to collect pricing data for albuterol sulfate. *Id.* at 2-3.

The joint explanatory statement of conference managers explained that the House bill, H.R. 3075, 106th Cong., 1st Sess., prohibited the Secretary from exercising inherent reasonableness authority until after the Secretary had issued a final rule, which must be proceeded by a new proposed rulemaking and a minimum 60 day public comment period. The Senate bill, S. 1788, 106th Cong., 1st Sess., prohibited the Secretary from using this authority until 90 days after the General Accounting Office issued a report on this issue. H. Rep. No. 479, 106th Cong., 1st Sess. 876-877 ((1999).

The conference agreement included elements of both House and Senate provisions with modifications to prohibit the Secretary from using this authority until after GAO issued a report on the Secretary's recent use of that authority and the Secretary published a notice of a final rule in the *Federal Register* that responded to the report and to comments received in response to the Secretary's interim final regulations published on January 7, 1998. *Id.* The conference managers believed that inherent reasonableness authority should be administered judiciously and applied only after public concerns and suggestions about proposed administrative criteria have been addressed openly. Moreover, the rule should include an

374

CRS-6

explanation of the Secretary's costing methodology which should be based on statistically reliable and relevant data. *Id.*

Some actions before and after enactment of the Balanced Budget Act merit attention. The Administrator of HCFA, Nancy-Ann Min DeParle, indicated to Congress that she was considering whether to change from a reimbursement system based on AWP to one based on physician acquisition costs, but Congress reportedly did not accept this proposal in 1997 and 1998. In 1999, the Clinton administration proposed that HCFA pay 83 percent rather than 95 percent of the AWP, a reduction that HCFA actuaries estimated would save the program $2.9 billion over ten years. Bureau of National Affairs, *Health Care Daily*, vol. 5, no. 107 (June 2, 2000).

In May of 2000, HCFA reportedly announced plans to use newly available AWPs developed for Medicaid by the Department of Justice and the National Association of Medicaid Fraud Control Units. Bureau of National Affairs, *Health Care Daily*, vol. 5, no. 107 (June 2, 2000). It formally informed intermediaries and carriers in September of 2000 to begin using these alternative AWPs for 32 listed drugs which accounted for an estimated 75% of Medicare spending, but not for 14 chemotherapy drugs and three clotting factors. Health Care Financing Administration, Department of Health and Human Services, Program Memorandum Intermediaries/Carriers, Transmittal No. AB-00-86 (Sept. 8, 2000).

Two months later, HCFA notified intermediaries and carriers that they should *not* use Department of Justice data attached to the September 8 program memorandum and added that, "While we continue to believe that the AWPs reported in the usual commercially available sources are inaccurate and inflated above the true wholesale prices charged in the marketplace, congressional action may preclude the use of this alternative source. To avoid the disruption that would result from a decrease in payment allowances followed by an immediate increase due to final congressional action, we are deferring use of the DOJ AWP data until further notice." HCFA, DHHS, Program Memorandum Intermediaries/Carriers, Transmittal No. AB-00-115 (Nov. 17, 2000).

Shortly thereafter, Congress passed section 429 of the Benefits Improvement and Protection Act (BIPA) as part of the Consolidated Appropriations Act of 2000, Pub. L. No. 106-554, 114 Stat. 2763A-522-524 (2000). Section 429 directs the Comptroller General, the head of the General Accounting Office, to study reimbursement for drugs and biologicals under the current methodology pursuant to section 1842(o) of the Social Security Act, 42 U.S.C. § 1395u(o), and for related services under Part B of title XVIII. In the study, the Comptroller General is required to identify average prices at which such drugs are acquired by physicians and other suppliers, quantify the difference between such average prices and the reimbursement amount under that section, and determine the extent to which (if any) payment under Part B is adequate to compensate physicians, providers of services, or other suppliers for costs incurred in administering, handling, or storing such drugs. Not later than nine months after the date of enactment (December 21, 2000 was the enactment date) the Comptroller General is required to submit to Congress and the Secretary of Health and Human Services a report on the study and recommendations for revised payment methodologies.

In addition, section 429 also charges the Comptroller General with providing specific recommendations for revised payment methodologies for reimbursing drugs and for related services under Medicare, including an adjustment under section 1848(c) of the Social Security Act, 42 U.S.C. § 1395w-4(c). Specific recommendations also should be provided for the practice expense component of the physician fee schedule for costs incurred in

375

CRS-7

administering, handling, or storing certain categories of drugs and proposals for new payments to providers of services or suppliers for such costs, if appropriate.

Section 429 mandates that the Secretary of Health and Human Services, notwithstanding any other provision of law, should revise the payment methodology for drugs based on recommendations contained in the report of the Comptroller General. To the extent that the Secretary determines appropriate, the Secretary may provide for adjusting payments for the practice expense component and for new payments to providers of services or suppliers, but in no case may the estimated aggregate payments for drugs under the revised system, including for additional payments, exceed the aggregate amount of payment for such drugs, as projected by the Secretary, that would have been made under the payment methodology in effect under section 1842, *i.e.*, 95 percent of AWP.

The section also imposes a moratorium, effective for drugs furnished on or after January 1, 2001, on any direct or indirect decrease in reimbursement for drugs under the current payment methodology until the Secretary has reviewed the report of the Comptroller General. *See* H. Rep. No. 1033, 106th Congress, 2d Session 514 (2000) for iteration of section 429 in the joint explanatory statement.

During this moratorium, *i.e.*, before completion of the report of the Comptroller General, HCFA notified intermediaries and carriers that while the moratorium prohibited lowering a payment allowance based on a change in methodology, *e.g.*, reducing a rate from 95 percent of AWP to 90 percent or using an alternative source for AWP, the agency believed that it did not apply to any change in payment allowance resulting from marketplace factors. For example, if reimbursement was based on 95 percent of the AWP for a single source brand name product and a new generic form of the product should became available at a lower AWP, a new lower payment allowance based on 95 percent of the new lower priced generic would result. A similar reduction would result from a manufacturer lowering its AWP for a product as reflected in a subsequent issue of a carrier's usual source of AWP. HCFA, DHHS, Program Memorandum Intermediaries/Carriers, Transmittal AB-01-66 (May 3, 2001)

### Conclusion

This memorandum has provided a chronicle of regulatory and legislative developments regarding use of the average wholesale price as the basis for Medicare Part B reimbursement of drugs that cannot be self-administered and are furnished incident to a physician's professional service. The AWP appears in guides such as *Drug Topics Red Book*, *Price Alert*, and *Medispan* and is based on prices submitted to publishers by drug manufacturers, suppliers, and distributors. In 1991, the Health Care Financing Administration adopted a fee schedule for services of physicians, but chose not to include these drugs in that schedule. Instead, it decided to pay for the drugs themselves and require carriers to use a consistent method of payment. Prior to this time, some carriers had been paying for these drugs on the basis of estimated acquisition costs to physicians using the *Red Book* or other wholesale price guides while others used actual acquisition costs determined in carrier surveys.

In June of 1991, HCFA proposed reimbursement at the rate of 85% of AWP based on studies of the Medicaid program by the Inspector General of the Department and Health and Human Service which indicated that pharmacies were receiving discounts of about 15% from the prices listed in the guides and on HCFA's belief that physicians were receiving similar discounts. In November of 1991, HCFA modified its proposal to require, beginning on January 1, 1992, reimbursement at the lower of the estimated acquisition cost or 100% of

376

CRS-8

AWP. The estimated acquisition cost was to be determined from surveys of actual invoice prices paid for each drug, taking into account factors such as inventory, waste, and spoilage. Reimbursement for multiple source drugs was to be based on the lower of the estimated acquisition cost or the wholesale price defined as the median price for all sources of the generic form of a drug.

Following a number of studies primarily by the Inspector General which indicated that Medicare may have been overpaying for drugs, Congress reduced the reimbursement rate to 95% of AWP in the Balanced Budget Act of 1997. HCFA in 1998 issued regulations implementing this statutory change by eliminating the estimated acquisition cost as a basis for reimbursement and by clarifying that the allowed charge would be the lower of 95 percent of the median generic AWP or 95% of the lowest brand AWP.

Congress in the Balanced Budget Act of 1997 also authorized the Secretary of Health and Human Services, acting through HCFA, to diverge from a statutorily defined payment method if the Secretary found that such method resulted in payment amounts that were not inherently reasonable and to issue regulations to adjust payments by 15% above or below the rate set pursuant to statute.

In January of 1998, shortly after the Balanced Budget Act was enacted, HCFA, without issuing notice of proposed rulemaking, published an interim final regulation expressing the agency's understanding of this expanded inherent reasonableness authority. Late in 1998, the agency reportedly attempted to use this authority to reduce payment for some drugs, including albuterol, which is used with a nebulizer for asthma and emphysema under the durable medical equipment (DME) benefit.

Congress responded to this attempt in the Medicare, Medicaid, and SCHIP Balanced Budget Refinement Act of 1999 by suspending exercise of the inherent reasonableness authority until the Comptroller General, who heads the General Accounting Office, could conduct a study of the standards being used to determine inherent reasonableness. The Comptroller General in July of 1999 reportedly concluded that reductions based on inherent unreasonableness for some drugs were justified, but questioned the methodology that carriers used to collect pricing data for some drugs.

The Clinton administration in 1999 reportedly proposed reducing reimbursement for some drugs from 95% to 83%. The HCFA Administrator notified Congress that Inspector General and Department of Justice studies indicated that Medicare was overpaying for drugs and that she was considering whether to base reimbursement on estimated acquisition costs rather than the AWP. In May of 2000, HCFA reportedly announced plans to use newly available AWPs for Medicare that had been developed for Medicaid by the Department of Justice and the National Association of Medicaid Fraud Control Units. It informed carriers and intermediaries to use these new AWPs for 32 listed drugs, but not for 14 chemotherapy drugs and 3 clotting factors in September of 2000, but reversed this directive in November, two months later, saying that congressional action was anticipated.

Shortly thereafter, Congress imposed a moratorium on any reductions in reimbursement levels in the Benefits Improvement and Protection Act (BIPA) and directed the Comptroller General to study reimbursement of drugs including the medical practice component and to report findings to Congress and the Secretary of Health and Human Services in late August or early September of 2001. It also mandated that the Secretary should revise the payment methodology based on recommendations of the Comptroller General.

377

### Selected HHS Office of Inspector General Reports

## Medicare and Medicaid Prescription Drug Reimbursement

· 1992 through June 2000

June 2000. <u>Medicare Reimbursement of End Stage Renal Disease (ESRD) Drugs (OEI-03-00-00020 6/00).</u> This inspection compares Medicare payment amounts for end stage renal disease drugs with amounts paid by Medicaid and the Department of Veterans Affairs. The OIG found that Medicare allowed amounts would be nearly halved for 5 ESRD drugs if amounts were based on VA acquisition costs and Medicare would save between 5 and 38 percent for 5 ESRD drugs if its allowed amounts were equal to Medicaid reimbursement including rebates.

June 2000. <u>Medicare Reimbursement of Albuterol (OEI-03-00-00311).</u> This report compares the amount Medicare pays for Albuterol with (1) the amounts reimbursed by Medicaid and the Department of Veterans Affairs, and (2) prices available at pharmacies. The OIG found that the Medicare reimbursement amount for albuterol is almost seven times greater than the VA price and is almost double Medicaid's upper limit of $0.24 per mg. (Note: Prior to 1998, HCFA based payments on milliliters, then changed to milligrams.) Prices at pharmacies ranged from a low of $0.24 per mg to a high of $0.48 per mg for a single box supply. At the median price of $0.38 per mg, Medicare and its beneficiaries could save $47 million per year. If adjusted to the Medicaid level, Medicare could save $120 million per year, and, if adjusted to the amount available to the VA under the Federal Supply Schedule, Medicare could save $209 million per year.

November 1998. <u>Comparing Drug Reimbursement: Medicare and Department of Veterans Affairs (OEI-03-97-00293).</u> This report compares Medicare allowances for prescription drugs with drug acquisition prices currently available to the Department of Veterans Affairs. The OIG found that Medicare and its beneficiaries could have saved $1 billion in 1998 if the allowed amounts for 34 drugs had been equal to prices obtained by the VA. Medicare allowed between 15 and 1600 percent more than the VA for the 34 drugs reviewed.

August 1998. <u>The Impact of High-Priced Generic Drugs on Medicare and Medicaid OEI-03-97-00510).</u> This report determines the impact of high-priced generic drugs on the Medicare and Medicaid programs. The OIG found that Medicare and its beneficiaries could have saved $5 million to $12 million for four drugs if 1997 reimbursement had not been based on higher-priced generic versions. Florida's Medicaid program could have saved half a million dollars for just 8 drugs in 1996 if higher-priced generic drugs had been reimbursed at brand prices.

May 8, 1998. <u>Need to Establish Connection Between the Calculation of Medicaid Drug Rebates and Reimbursement for Medicaid Drugs (A-06-97-00052).</u> The OIG recommended that the Health Care Financing Administration develop and submit a legislative proposal to the Congress that would require drug manufacturers participating in the Medicaid outpatient prescription drug program to pay Medicaid drug rebates based on AWP. The HCFA did not concur, stating that they did not believe such legislation would be feasible at that time. The HCFA did agree, however, that changing from the average manufacturers price (AMP) to AWP would reduce the administrative burden involved in the AMP calculations, and that they are planning a comprehensive study of AWP.

December 1997. <u>Excessive Medicare Payments for Prescription Drugs (OEI-03-97-00290).</u> This report compares Medicare allowances for prescription drugs with drug acquisition prices currently available to the physician and supplier communities. The OIG found that Medicare allowances for 22 drugs exceeded actual wholesale prices by $447 million in 1996. That amount could have been saved if actual wholesale prices, rather than Average Wholesale Price (AWP) had been the basis for reimbursement. For more than one-third of the 22 drugs reviewed, Medicare allowed amounts were more than double the actual wholesale prices available to physicians and suppliers. The OIG also

378

Selected OIG Drug Reports                                                    Page 2 of 3

found there was no consistency among carriers in establishing and updating Medicare drug reimbursement amounts.

August 4, 1997.  Medicaid Pharmacy - Actual Acquisition Cost of Generic Prescription Drug Products (A-06-97-00011).  The OIG estimated that, on average, actual acquisition cost of generic drugs was 42.5 percent below AWP. Unlike brand name drugs, where reimbursement is predominantly based on a discounted AWP, reimbursement of generic drugs can be limited by Federal upper limit amounts that are established by HCFA. Taking the upper limits into consideration, the OIG calculated a savings of as much as $145.5 million in Calendar Years (CY) 1994 and 1995 for 200 generic drugs with the greatest amount of Medicaid reimbursement in each year, if reimbursement had been based on the findings of this report.

April 10, 1997.  Medicaid Pharmacy: Actual Acquisition Cost of Prescription Drug Products for Brand Name Drugs (A-06-96-00030).  The OIG estimated that actual acquisition cost was a national average of 18.3 percent below AWP. This estimate combined the results for four categories of pharmacies including rural-chain, rural-independent, urban-chain, and urban-independent and excluded the results obtained from non-traditional pharmacies. Using the results of its review, the OIG calculated that as much as $225 million could have been saved for 100 drugs with the greatest amount of Medicaid reimbursements in Calendar Year 1994, if reimbursement had been based on the findings of this report.

June 1996.  A Comparison of Albuterol Sulfate Prices (OEI-03-94-00392).  This report assesses the appropriateness of the amount Medicare allows for albuterol sulfate a prescription inhalation drug used in nebulizers.  The OIG found that fifty-five percent of retail pharmacy stores charged less for generic versions of albuterol sulfate than the $0.43 per millileter that Medicare allowed.  The generic drug prices that five buying groups negotiated ranged from 56 to 70 percent less than the Medicare allowed amount.

June 1996.  Suppliers' Acquisition Costs for Albuterol Sulfate (OEI-03-94-00393).  The OIG found that suppliers paid an average cost of $0.19 per millileter to purchase albuterol sulfate, while Medicare's allowed amounts ranged from $0.40 to $0.43 per ml during the 14-month period of review.  Medicare could have saved $94 million over the 14 months if albuteral sulfate allowances had been based on the average of supplier invoice costs.

May 1996.  Appropriateness of Medicare Prescription Drug Allowances (OEI-03-95-00420).  This report assesses the appropriateness of Medicare Part B allowances for prescription drugs through a comparison with Medicaid reimbursement mechanisms.  The OIG found that under a drug rebate program similar to Medicaid's, Medicare would have saved 14.6 percent ($122 million) of its allowances for 17 drugs in 1994.  Medicare could also have saved $144 million in 1994 had to program employed a discounted AWP drug reimbursement formula like many Medicaid States.  However, the lack of a national drug code-based billing system would prevent HCFA from taking advantage of manufacturer drug rebates and other discounted reimbursement formulas.

February 1996.  Payments for Prescription Drugs Used with Nebulizers (OEI-03-94-00390; 2/96).  This report examines differences in the reimbursement methodologies used by the Medicare and Medicaid programs to pay for prescription drugs, focusing on three inhalation drugs used in nebulizers (Albuterol Sulfate and Metaproterenol .4 and .6 percent).  The OIG projected that if Medicare had revised its payment methodologies and implemented a rebate program (such as the Medicaid program has), Medicare and its beneficiaries could have saved $58 million of the $226 million that was allowed for nebulizer drugs (excluding administrative costs) in 1994.

July 7, 1994.  Medicaid Program Savings Through the Use of Therapeutically Equivalent Generic Drugs (A-06-93-00008 - OEI-03-94-00080), Joint audit/inspection report.  For just 37 high volume brand name drugs, the OIG estimated annual cost savings to the Medicaid program could be as much as $46 million if the reimbursement for those drugs is limited to the amounts set by HCFA for

379

equivalent generic drugs. The cost savings would become even greater in the future as the Federal patents on exclusive drug manufacturing of 60 highly used brand name drugs with more than $10 billion in sales expire between now and 1995.

April 23, 1992.  Medicaid Drug Rebates: Improvements Needed in the Health Care Financing Administration's Procedures to Implement the Medicaid Drug Rebate Program (A-06-91-00102).  The OIG review identified 200 different drug codes in three states involving 22 different drug manufacturers where errors in the average manufacturers' price, base AMP and best price resulted in URAs being overstated. Also, some States did not successfully meet the July 30, 1991 billing deadline for billing manufacturers under the Medicaid drug program.

380

VOL 2 5

APPENDIX E

## Medicare Savings Based on Physician/Supplier Costs

| HCPCS CODE | GENERIC DRUG NAME | MEDICARE MEDIAN | CATALOG MEDIAN | PERCENT SAVINGS* | 1999 ALLOWED CHARGES | ESTIMATED MEDICARE SAVINGS |
|---|---|---|---|---|---|---|
| J0640 | Leucovorin Calcium, 50 mg | $18.02 | $2.94 | 83.7% | $66,740,227 | $55,851,422 |
| J1260 | Dolasetron Mesylate, 10 mg | $14.82 | $8.29 | 44.1% | $46,647,272 | $20,553,758 |
| J1440 | Filgrastim, 300 mcg | $171.38 | $144.30 | 15.8% | $47,893,675 | $7,567,748 |
| J1441 | Filgrastim, 480 mcg | $273.03 | $229.90 | 15.8% | $67,411,261 | $10,648,821 |
| J1562 | Immune Globulin, 5g | $396.63 | $300.00 | 24.4% | $43,239,398 | $10,534,309 |
| J1626 | Granisetron HCl, 100 mcg | $18.54 | $13.81 | 25.5% | $46,432,246 | $11,845,983 |
| J2405 | Ondansetron HCl, 1 mg | $6.09 | $5.49 | 9.9% | $47,721,885 | $4,701,664 |
| J2430 | Pamidronate Disodium, 30 mg | $243.56 | $223.26 | 8.3% | $112,916,846 | $9,411,283 |
| J2820 | Sargramostim, 50 mcg | $27.41 | $23.13 | 15.6% | $23,533,251 | $3,674,656 |
| J7608 | Acetylcysteine, per g | $5.05 | $3.38 | 33.1% | $35,908,222 | $11,874,600 |
| J7619 | Albuterol Sulfate, per mg | $0.47 | $0.13 | 72.3% | $246,136,877 | $178,056,464 |
| J7644 | Ipratropium Bromide, per mg | $3.34 | $1.53 | 54.2% | $250,916,635 | $135,975,781 |
| J9000 | Doxorubicin HCl, 10 mg | $42.92 | $10.08 | 76.5% | $27,831,805 | $21,295,351 |
| J9045 | Carboplatin, 50 mg | $101.37 | $87.79 | 13.4% | $116,254,013 | $15,573,932 |
| J9170 | Docetaxel, 20 mg | $283.65 | $238.86 | 15.8% | $58,661,193 | $9,262,947 |
| J9201 | Gemcitabine HCl, 200 mg | $88.46 | $74.49 | 15.8% | $75,256,901 | $11,884,907 |
| J9202 | Goserelin Acetate, 3.6 mg | $446.49 | $375.99 | 15.8% | $321,485,273 | $50,761,969 |
| J9206 | Irinotecan, 20 mg | $117.81 | $98.63 | 16.3% | $79,914,022 | $13,010,364 |
| J9217 | Leuprolide Acetate, 7.5 mg | $592.60 | $499.03 | 15.8% | $620,102,889 | $97,912,635 |
| J9265 | Paclitaxel, 30 mg | $173.49 | $146.10 | 15.8% | $249,940,717 | $39,459,774 |
| J9310 | Rituximab, 100 mg | $420.29 | $353.93 | 15.8% | $71,072,780 | $11,221,751 |
| J9350 | Topotecan, 4 mg | $573.75 | $507.32 | 11.6% | $31,504,581 | $3,647,668 |
| J9390 | Vinorelbine Tartrate, 10 mg | $75.50 | $64.11 | 15.1% | $24,325,270 | $3,669,733 |
| Q0136 | Epoetin Alfa, per 1000 units | $11.40 | $10.72 | 6.0% | $379,708,697 | $22,649,291 |
| TOTAL FOR 24 HCPCS | | | | | $3,091,555,936 | $761,046,810 |

* To determine percent savings, we subtracted the catalog price from the Medicare reimbursement amount. We then
  divided this number by the Medicare reimbursement amount.

381

### Estimated Medicare Savings if Acquisition Costs Were Used for 1996 Prescription Drug Reimbursement

| HCPCS Code | Drug Description | 1996 Allowances | Estimated Savings | Percent Saved |
|---|---|---|---|---|
| J9217 | Leuprolide Acetate | $577,547,780 | $104,365,435 | 18% |
| J7620 | Albuterol Sulfate 0.083% | $175,399,846 | $92,199,355 | 53% |
| J9265 | Paclitaxel | $125,093,980 | $22,757,465 | 18% |
| J9202 | Goserelin Acetate Implant | $84,187,487 | $11,215,983 | 13% |
| J0640 | Leucovorin Calcium | $57,323,221 | $52,514,021 | 92% |
| J9045 | Carboplatin | $67,530,797 | $12,539,724 | 19% |
| J1440 | Filgrastim, per 300 mcg. | $54,460,250 | $11,592,740 | 21% |
| Q0136 | Epoetin Alpha (Non-ESRD Use) | $79,558,670 | $10,399,198 | 13% |
| J2405 | Ondansetron Hydrochloride | $47,331,513 | $14,319,348 | 30% |
| J1625 | Granisetron Hydrochloride | $49,691,403 | $13,399,842 | 27% |
| J1561 | Immune Globulin | $35,104,622 | $24,808,622 | 71% |
| J7670 | Metaproterenol Sulfate 0.4% | $14,203,070 | $9,935,367 | 70% |
| J1441 | Filgrastim, per 480 mcg. | $40,592,257 | $8,470,488 | 21% |
| J9182 | Etoposide, 100 mg. | $25,739,111 | $13,362,365 | 52% |
| J9000 | Doxorubicin HCL, 10 mg. | $17,410,833 | $12,480,751 | 72% |
| J9031 | BCG (Intravesical) | $16,544,398 | $2,682,097 | 16% |
| J9181 | Etoposide, 10 mg. | $13,381,243 | $5,909,155 | 44% |
| J7672 | Metaproterenol Sulfate 0.6% | $6,595,854 | $4,805,175 | 73% |
| J9293 | Mitoxantrone Hydrochloride | $14,522,607 | $2,712,650 | 19% |
| J9185 | Fludarabine Phosphate | $15,462,970 | $2,049,320 | 13% |
| J9010 | Doxorubicin HCL, 50 mg. | $14,541,250 | $10,513,722 | 72% |
| J3370 | Vancomycin HCL | $8,234,140 | $4,213,709 | 51% |
| TOTAL | | $1,540,457,302 | $447,246,532 | 29% |

382

TABLE 3:

MEDICARE AND WHOLESALE CATALOGS
UNIT COSTS AND BENEFICIARY COINSURANCE

| HCPCS CODE | GENERIC DRUG NAME | 2000 MEDIAN PRICES | | CATALOG PRICE AS PERCENTAGE OF MEDICARE PRICE | 20% MEDICARE COINSURANCE | |
|---|---|---|---|---|---|---|
| | | MEDICARE | CATALOGS | | CURRENT | BASED ON CATALOG PRICE |
| J0640 | Leucovorin Calcium, 50 mg | $18.02 | $2.94 | 16.3% | $3.60 | $0.59 |
| J1260 | Dolasetron Mesylate, 10 mg | $14.82 | $8.29 | 55.9% | $2.96 | $1.66 |
| J1440 | Filgrastim, 300 mcg | $171.38 | $144.30 | 84.2% | $34.28 | $28.86 |
| J1441 | Filgrastim, 480 mcg | $273.03 | $229.90 | 84.2% | $54.61 | $45.98 |
| J1562 | Immune Globulin, 5g | $396.63 | $300.00 | 75.6% | $79.33 | $60.00 |
| J1626 | Granisetron HCl, 100 mcg | $18.54 | $13.81 | 74.5% | $3.71 | $2.76 |
| J2405 | Ondansetron HCl, 1 mg | $6.09 | $5.49 | 90.1% | $1.22 | $1.10 |
| J2430 | Pamidronate Disodium, 30 | $243.56 | $223.26 | 91.7% | $48.71 | $44.65 |
| J2820 | Sargramostim, 50 mcg | $27.41 | $23.13 | 84.4% | $5.48 | $4.63 |
| J7608 | Acetylcysteine, per g | $5.05 | $3.38 | 66.9% | $1.01 | $0.68 |
| J7619 | Albuterol Sulfate, per mg | $0.47 | $0.13 | 27.7% | $0.09 | $0.03 |
| J7644 | Ipratropium Bromide, per mg | $3.34 | $1.53 | 45.8% | $0.67 | $0.31 |
| J9000 | Doxorubicin HCl, 10 mg | $42.92 | $10.08 | 23.5% | $8.58 | $2.02 |
| J9045 | Carboplatin, 50 mg | $101.37 | $87.79 | 86.6% | $20.27 | $17.56 |
| J9170 | Docetaxel, 20 mg | $283.65 | $238.86 | 84.2% | $56.73 | $47.77 |
| J9201 | Gemcitabine HCl, 200 mg | $88.46 | $74.49 | 84.2% | $17.69 | $14.90 |
| J9202 | Goserelin Acetate, 3.6 mg | $446.49 | $375.99 | 84.2% | $89.30 | $75.20 |
| J9206 | Irinotecan, 20 mg | $117.81 | $98.63 | 83.7% | $23.56 | $19.73 |
| J9217 | Leuprolide Acetate, 7.5 mg | $592.60 | $499.03 | 84.2% | $118.52 | $99.81 |
| J9265 | Paclitaxel, 30 mg | $173.49 | $146.10 | 84.2% | $34.70 | $29.22 |
| J9310 | Rituximab, 100 mg | $420.29 | $353.93 | 84.2% | $84.06 | $70.79 |
| J9350 | Topotecan, 4 mg | $573.75 | $507.32 | 88.4% | $114.75 | $101.46 |
| J9390 | Vinorelbine Tartrate, 10 mg | $75.50 | $64.11 | 84.9% | $15.10 | $12.82 |
| Q0136 | Epoetin Alfa, per 1000 units | $11.40 | $10.72 | 94.0% | $2.28 | $2.14 |

TABLE 4:

MEDICARE AND WHOLESALE CATALOGS:
POTENTIAL MEDICARE AND BENEFICIARY SAVINGS

| HCPCS CODE | GENERIC DRUG NAME | 2000 MEDIAN PRICES | | PERCENT SAVINGS | 2000 ALLOWED CHARGES | POTENTIAL SAVINGS | | |
|---|---|---|---|---|---|---|---|---|
| | | MEDICARE | CATALOGS | | | MEDICARE | BENEFICIARY | TOTAL |
| J0640 | Leucovorin Calcium, 50 mg | $18.02 | $2.94 | 83.7% | $69,228,203 | $46,346,784 | $11,586,696 | $57,933,480 |
| J1200 | Dolasetron Mesylate, 10 mg | $14.82 | $8.29 | 44.1% | $82,482,309 | $29,074,736 | $7,268,684 | $36,343,420 |
| J1440 | Filgrastim, 300 mcg | $171.38 | $144.30 | 15.8% | $51,133,657 | $6,663,762 | $1,615,941 | $8,079,703 |
| J1441 | Filgrastim, 480 mg | $273.03 | $229.90 | 15.8% | $83,837,285 | $10,594,886 | $2,648,721 | $13,243,607 |
| J1562 | Immune Globulin, 5g | $396.63 | $300.00 | 24.4% | $49,903,101 | $9,726,217 | $2,431,554 | $12,157,771 |
| J1626 | Granisetron HCl, 100 mcg | $18.54 | $13.81 | 25.5% | $42,674,561 | $8,709,846 | $2,177,461 | $10,887,307 |
| J2405 | Ondansetron HCl, 1 mg | $6.09 | $5.49 | 9.9% | $55,003,100 | $4,335,220 | $1,083,805 | $5,419,025 |
| J2430 | Pamidronate Disodium, 30 mg | $243.56 | $223.26 | 8.3% | $156,095,768 | $10,408,094 | $2,602,023 | $13,010,117 |
| J2820 | Sargramostim, 50 mcg | $27.41 | $23.13 | 15.6% | $27,758,142 | $3,467,489 | $866,872 | $4,334,361 |
| J7608 | Acetylcysteine, per g | $5.05 | $3.38 | 33.1% | $22,452,105 | $5,939,804 | $1,484,951 | $7,424,756 |
| J7619 | Albuterol Sulfate, per mg | $0.47 | $0.13 | 72.3% | $261,270,168 | $151,203,161 | $37,800,790 | $189,003,951 |
| J7644 | Ipratropium Bromide, per mg | $3.34 | $1.53 | 54.2% | $310,310,047 | $134,529,625 | $33,632,406 | $168,162,031 |
| J9000 | Doxorubicin HCl, 10 mg | $42.92 | $10.08 | 76.5% | $30,586,166 | $18,722,268 | $4,680,567 | $23,402,835 |
| J9045 | Carboplatin, 50 mg | $101.37 | $87.79 | 13.4% | $140,046,625 | $15,009,041 | $3,752,260 | $18,761,302 |
| J9170 | Docetaxel, 20 mg | $283.65 | $238.86 | 15.8% | $110,792,891 | $13,995,878 | $3,498,970 | $17,494,848 |
| J9201 | Gemcitabine HCl, 200 mg | $88.46 | $74.49 | 15.8% | $100,322,242 | $12,674,671 | $3,168,668 | $15,843,338 |
| J9202 | Goserelin Acetate, 3.6 mg | $446.49 | $375.99 | 15.8% | $375,955,270 | $47,490,150 | $11,872,538 | $59,362,688 |
| J9206 | Irinotecan, 20 mg | $117.81 | $98.63 | 16.3% | $117,789,071 | $15,341,391 | $3,835,348 | $19,176,739 |
| J9217 | Leuprolide Acetate, 7.5 mg | $592.60 | $499.03 | 15.8% | $633,720,145 | $80,050,211 | $20,012,553 | $100,062,764 |
| J9265 | Paclitaxel, 30 mg | $173.49 | $146.10 | 15.8% | $284,530,532 | $35,936,556 | $8,984,139 | $44,920,694 |
| J9310 | Rituximab, 100 mg | $420.29 | $353.93 | 15.8% | $135,054,269 | $17,059,081 | $4,264,770 | $21,323,851 |
| J9350 | Topotecan, 4 mg | $573.75 | $507.32 | 11.6% | $34,885,298 | $3,231,275 | $807,819 | $4,039,094 |
| J9390 | Vinorelbine Tartrate, 10 mg | $75.50 | $64.11 | 15.1% | $27,866,679 | $3,363,194 | $840,799 | $4,203,993 |
| Q0136 | Epoetin Alfa, per 1000 units | $11.40 | $10.72 | 6.0% | $536,916,452 | $25,621,276 | $6,405,319 | $32,026,595 |
| | TOTAL FOR 24 DRUGS | | | | $3,740,614,986 | $709,394,617 | $177,323,654 | $886,618,271 |

384

Comparison of VA Prices to Medicare Reimbursement Amounts for Selected Part B Injection and Infusion Drugs
OEI-03-01-00620

| HCPCS CODE | DRUG | 1998 VA | 1998 CMS | SPREAD | 1999 VA | 1999 CMS | SPREAD | 2000 VA | 2000 CMS | SPREAD | 2001 VA | 2001 CMS | SPREAD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Leucovorin Calcium, 50 mg | $1.18 | | $19.27 | $1.63 | $19.71 | $17.08 | $1.63 | $18.02 | $16.39 | $1.59 | $17.59 | $16.53 |
| | Dolasetron Mesylate, 10 mg | | | | $5.15 | $14.84 | $9.69 | $4.95 | $14.92 | $9.97 | $4.97 | $15.92 | $10.96 |
| | Filgrastim, 300 mcg | $106.69 | $153.24 | $46.55 | $127.37 | $197.94 | $29.67 | $133.72 | $171.38 | $44.06 | $123.73 | $172.32 | $49.89 |
| | Filgrastim, 480 mcg | $169.55 | $244.09 | $74.51 | $232.90 | $280.14 | $47.24 | $208.23 | $273.03 | $64.80 | $198.81 | $285.05 | $86.57 |
| | Immune Globulin, IV, 500 mg | $110.83 | $203.55 | $203.55 | $105.40 | $415.10 | $319.04 | $110.54 | $415.74 | $262.62 | $113.98 | $413.28 | $266.27 |
| | Glatiramer HCl, 100 mcg | $8.42 | $15.15 | $8.43 | $8.42 | $17.01 | $8.43 | $8.31 | $18.74 | $10.73 | $9.08 | $18.44 | $19.46 |
| | Ondansetron HCl, 1 mg | $2.43 | | $3.37 | $3.94 | $9.61 | $1.87 | $3.94 | $6.09 | $2.15 | $4.08 | $27.46 | $2.01 |
| | Pamidronate Disodium, 30 mg | $104.39 | | $92.51 | $166.59 | $307.83 | $40.74 | $203.45 | $247.55 | $460.11 | $173.51 | $523.21 | $79.70 |
| | Sargramostim, 50 mcg | $7.47 | | $14.02 | $10.06 | $23.51 | $13.69 | $10.06 | $27.45 | $17.26 | $10.06 | $27.42 | $17.36 |
| | Doxorubicin HCl, 10 mg | $7.46 | | $35.77 | $6.84 | $42.26 | $38.41 | $6.29 | $49.02 | $38.63 | $6.36 | $411.61 | $36.87 |
| | Carboplatin, 50 mg | $39.50 | $44.16 | $44.66 | $40.09 | $85.51 | $55.01 | $41.14 | $101.12 | $60.23 | $42.55 | $207.86 | $65.95 |
| | Docetaxel, 20 mg | $146.07 | | $89.96 | $147.88 | $257.29 | $109.41 | $151.77 | $258.65 | $131.88 | $157.00 | $322.13 | $140.83 |
| | Gemcitabine HCl, 200 mg | $37.46 | $71.15 | $37.69 | $37.36 | $81.16 | $43.88 | $74.86 | $268.46 | $152.00 | $77.45 | $444.99 | $24.08 |
| | Granisetron HCl, 0.1 mg | $206.29 | $390.84 | $193.69 | $209.36 | $417.26 | $207.92 | $214.87 | $545.40 | $231.52 | $154.91 | $157.75 | $291.58 |
| | Irinotecan, 20 mg | $75.49 | | $21.05 | $75.45 | $104.43 | $26.38 | $75.45 | $617.49 | $42.26 | $75.45 | $675.17 | $90.03 |
| | Leuprolide Acetate, 7.5 mg | $259.36 | $511.92 | $214.22 | $287.69 | $504.92 | $367.03 | $257.09 | $592.90 | $335.60 | $227.21 | $692.04 | $305.59 |
| | Paclitaxel, 30 mg | $109.36 | | $84.14 | $110.99 | $373.92 | $62.51 | $107.59 | $173.46 | $65.90 | $107.53 | $170.89 | $652.88 |
| | Rituximab, 100 mg | | | | $237.92 | $422.66 | $162.36 | $239.58 | $238.72 | $168.71 | $247.20 | $242.85 | $82.58 |
| | Topotecan, 4 mg | $269.35 | $461.72 | $184.02 | $269.37 | $200.93 | $291.56 | $307.25 | $573.75 | $309.50 | $177.64 | $633.34 | $194.10 |
| | Vincristine, Tartrate, 10 mg | $40.72 | $81.47 | $20.75 | $45.01 | $63.03 | $18.02 | $46.20 | $75.90 | $30.30 | $47.80 | $47.85 | $11.44 |
| | | $9.73 | $123.72 | $5.21 | $7.17 | $11.15 | $3.09 | $7.22 | $11.40 | $4.18 | $7.39 | $11.85 | $31.48 |

* Code J1561 changed from 1 mg to 10 mg in 2000. In 1999, we calculated a price for 10 mg from the listed 1 mg code.

385

Medicare Allowed Charges for Selected Part B Injection and Infusion Drugs
OEI-03-01-00620

| HCPCS CODE | DRUG | 1998 ALLOWED CHARGES | 1999 ALLOWED CHARGES | 2000 ALLOWED CHARGES | 1998 ALLOWED SERVICES | 1999 ALLOWED SERVICES | 2000 ALLOWED SERVICES |
|---|---|---|---|---|---|---|---|
| J0640 | Leucovorin Calcium, 50 mg | $54,744,992 | $67,175,585 | $69,228,203 | 3,087,171 | 3,098,084 | 3,163,995 |
| J1260 * | Dolasetron Mesylate, 10 mg | | $47,433,589 | $82,482,309 | | 32,079,369 | 8,300,669 |
| J1440 | Filgrastim, 300 mcg | $49,841,275 | $48,392,363 | $51,133,667 | 330,897 | 310,453 | 309,728 |
| J1441 | Filgrastim, 480 mcg | $57,551,703 | $44,061,836 | $83,837,285 | 249,785 | 276,073 | 316,750 |
| J1562 | Immune Globulin, 5g | $38,786,741 | $46,849,323 | $49,903,101 | 265,290 | 142,625 | 144,668 |
| J1626 | Granisetron HCl, 100 mcg | $46,133,312 | $48,075,093 | $42,674,561 | 2,727,860 | 2,662,312 | 2,334,230 |
| J2405 | Ondansetron HCl, 1 mg | $46,261,258 | | $55,003,100 | 7,986,231 | 8,271,301 | 9,110,882 |
| J2430 | Pamidronate Disodium, 30 mg | $76,486,770 | $114,573,719 | $156,065,768 | 377,982 | 528,343 | 647,867 |
| J2820 | Sargramostim, 50 mcg | $17,203,115 | $23,804,844 | $27,758,142 | 740,033 | 963,239 | 1,041,938 |
| J9000 | Doxorubicin HCl, 10 mg | $30,220,312 | $28,567,420 | $30,586,166 | 717,728 | 736,113 | 733,873 |
| J9045 | Carboplatin, 50 mg | $98,057,972 | $117,677,241 | $140,046,625 | 1,109,100 | 1,252,177 | 1,409,185 |
| J9170 | Docetaxel, 20 mg | $37,471,267 | $59,753,301 | $110,792,691 | 148,832 | 225,449 | 398,565 |
| J9201 | Gemcitabine HCl, 200 mg | $47,229,063 | $376,387,442 | $100,322,242 | 634,608 | 914,109 | 1,106,717 |
| J9202 | Goserelin Acetate, 3.6 mg | $260,634,728 | $322,817,323 | $375,955,270 | 642,528 | 745,347 | 852,449 |
| J9206 | Irinotecan, 20 mg | $55,706,247 | $81,056,351 | $117,789,971 | 563,989 | 737,042 | 1,013,684 |
| J9217 | Leuprolide Acetate, 7.5 mg | $587,281,075 | $622,883,124 | $633,720,145 | 1,216,483 | 1,266,177 | 1,278,050 |
| J9265 | Paclitaxel, 30 mg | $206,261,616 | $253,442,999 | $284,530,532 | 1,200,900 | 1,477,268 | 1,665,594 |
| J9310 | Rituximab, 100 mg | | $72,190,943 | $135,054,269 | | 187,717 | 325,024 |
| J9350 | Topotecan, 4 mg | $26,063,176 | $31,814,926 | $34,885,298 | 53,846 | 62,010 | 61,003 |
| J9390 | Vinorelbine Tartrate, 10 mg | $21,887,564 | $24,584,308 | $27,866,679 | 361,621 | 377,151 | 379,607 |
| Q0136 | Epoetin Alfa, per 1000 units | $212,643,312 | $386,180,879 | $536,916,452 | 18,307,594 | 32,924,548 | 46,146,497 |
| TOTAL | | $1,979,461,498 | $2,585,888,107 | $3,146,582,666 | 40,722,248 | 89,246,907 | 80,746,675 |

* Code J1260 Changed from 1 mg to 10 mg in 2000.

386

Committee Correspondence

**Vol 2 6**

Menu
Home
Action
Feedback
Search
Site Map
Also See
Response
Related Links

# Examination of the Prices That Medicare Pays for the Limited Number of Medicare-Covered Outpatient Drugs

May 5, 2000

The Honorable Donna E. Shalala
Secretary
Department of Health and Human Services
200 Independence Avenue, S.W.
Washington, D.C. 20201

Dear Secretary Shalala:

I am writing to express my concerns over the excessive reimbursements that the Medicare program is paying for certain covered pharmaceuticals and other related products. Further, I wish to learn what actions the Health Care Financing Administration (HCFA) and the Department of Health and Human Services (HHS) have taken to address this problem.

As you know, the Office of Inspector General at HHS has issued a series of reports that have identified significant discrepancies between the prices Medicare pays for certain drugs and the prices that are available to private sector purchasers of these same drugs. In its December 1997 report, the Office of Inspector General (OIG) estimated that, in 1996 alone, Medicare could have saved $447 million by reducing the Medicare-allowed price for just 22 drugs to the actual prices available in the private wholesale sector. The OIG also found that Medicare could have saved at least 40 percent of the current allowance for almost half of the 22 drugs, and 93 percent for one particular drug, by limiting reimbursement to the available private sector prices for those drugs. As you know, Medicare is supposed to pay only 95 percent of the Average Wholesale Price (AWP) of these drugs under Federal law.

These findings are supported by additional investigative work that the Committee on Commerce has conducted. The Committee has written to several drug manufacturers, inquiring about the prices they charge to wholesale purchasers. The responses the Committee received confirmed that Medicare does in fact pay considerably more for certain drugs than the actual average price paid by such wholesalers. In addition, the Committee is continuing to investigate the practices of certain drug manufacturers relating to allegations that they manipulated the AWP of particular drugs in order to increase the sales of these drugs. I have enclosed for your review letters that the Committee has recently sent to several drug manufacturers regarding this investigation.

The information revealed in the OIG report and through the Committee's investigation is particularly troubling. I firmly believe that improper expenditures in the Medicare program, whether due to waste, abuse or fraud, are unacceptable. In the time that I have been Chairman of the Committee, we have held numerous hearings that have sought to prevent the payment of such improper expenditures throughout the Medicare and Medicaid programs. As Congress considers ways to expand the scope of Medicare's coverage of prescription drugs, it is essential that this Administration be able to assure Congress, the beneficiaries of the Medicare program, and the American people that it has done all that it can to prevent waste and abuse in the current limited Medicare drug program.

The December 1997 OIG report contained several specific recommendations relating to actions HCFA could take to address this problem, including requiring all Medicare carriers to reimburse a uniform allowed amount for each HCFA Common Procedure Coding System (HCPCS) drug code. In response to this report, then-Deputy Administrator Nancy-Ann Min DeParle wrote to the Inspector General, indicating that HCFA had convened a workgroup to develop an electronic file consisting of the AWPs for drugs covered by Medicare. She further stated that HCFA would then distribute this file to Medicare contractors for their use in paying claims for drugs.

To date, it appears that these efforts have not been implemented. The Committee has