# ANDERSON EXHIBIT 10K

387

learned that HCFA submitted a Request for Proposal to develop a solution to the problem of price variances between Medicare carriers, but no contract was ever entered into, and it does not appear that the issue has been resolved. The December 1997 OIG report noted, "[t]he rate at which physicians and suppliers are paid for drugs should not depend on which carrier providers bill." I strongly concur with this statement, and am deeply disturbed that it appears that HCFA has failed to remedy this problem in the two and a half years since it was first identified by the Inspector General.

In her response to the OIG report, then-Deputy Administrator Min DeParle also stated that HCFA would pursue other "appropriate ways" to eliminate the markup for drugs billed to Medicare, beyond those legislative initiatives contained in the President's budget. I understand that a rulemaking was initiated, but never completed, to utilize your authority to adjust Medicare reimbursements that are not inherently reasonable. I wish to learn by what other "appropriate ways" HCFA has attempted to address the problem of excessive reimbursements for Medicare-covered drugs. Accordingly, I request that, pursuant to Rules X and XI of the U.S. House of Representatives, you provide the following information to the Committee no later than May 26, 2000.

1. Please identify all actions taken by HCFA to date to independently investigate and assess the accuracy of the AWP as a measurement of wholesale drug prices.

2. Please identify all actions taken by HCFA to date to independently investigate and assess the discrepancies between the prices paid by Medicare and other non-governmental entities for Medicare-covered drugs.

3. Please identify the other "appropriate ways," mentioned in then-Deputy Administrator Min DeParle's response to the OIG report, that HCFA has utilized to address the problem of excessive reimbursements for Medicare-covered drugs. In your answer, please describe all actions that have been taken relating to these efforts.

4. Please identify whether the electronic file, also identified in then-Deputy Administrator Min DeParle's response to the OIG report, has been developed and is now operational. If the electronic file is not yet operational, please identify whether other actions have been taken to insure that all Medicare carriers are now reimbursing a uniform allowed amount for each HCPCS drug code.

If you should have any questions, please have your staff contact Mr. Charles Clapton, Committee Counsel, at (202) 225-2424. I appreciate your cooperation in this matter.

Sincerely,

Tom Bliley
Chairman

Attachments

cc: The Honorable John D. Dingell, Ranking Member

Response

response.pdf

deparle.pdf

388

VOL 2   7

## Medicare Drug Pricing Manipulation

Menu
Home
Action
Feedback
Search
Site Map
Also See
Response
Related Links

CORRECTED VERSION

September 25, 2000

The Honorable Nancy-Ann Min DeParle
Administrator
Health Care Financing Administration
200 Independence Avenue, S.W.
Washington, DC 20201

Dear Administrator Min DeParle:

I am writing in response to your September 8, 2000 letter, in which you announced that the Health Care Financing Administration ("HCFA") provided new pricing data to its Medicare carriers to limit excessive reimbursements for Medicare-covered drugs. I wish to express my concerns about the way in which the Administration has proceeded with respect to this matter and how these changes will be implemented. In addition, I am writing to bring to your attention very troubling information uncovered by a Committee on Commerce investigation strongly suggesting that certain drug manufacturers may be deliberately inflating the reported "average wholesale price" for their Medicare-covered drugs -- upon which Medicare reimbursement is set -- in order to increase the sales of their drugs.

HCFA has known for many years that it was paying inflated prices for certain drugs, yet the legislative proposals made by the Administration to remedy the problem have been deeply flawed, in part because they ignored the rampant price manipulations in which certain drug manufacturers have been engaged. It was refreshing to see that, through your action, HCFA and the Administration have at least acknowledged that they have a responsibility to protect Medicare and America's senior citizens from indiscriminate price gouging on certain pharmaceutical products. Your actions also demonstrate that HCFA already possesses -- and indeed has always possessed -- the authority to remedy this problem itself, without need of new legislation or any other Congressional action.

I remain deeply concerned, however, over the actions taken by the Administration to resolve this problem, which seem more intended to generate favorable media coverage than to respond to substantive public policy issues. Specifically, I refer to the correspondence I received from Health and Human Services Secretary Shalala on May 30, 2000, declaring that new pricing information would be provided to Medicare carriers in June of this year.

In subsequent meetings between my staff and HCFA representatives, it quickly became apparent that this announcement had been made without careful consideration of how these price changes would impact quality and access to care issues, and further that it would be impossible for HCFA to implement these changes within the time frame specified in Secretary Shalala's letter. I was hardly surprised, therefore, when I learned that HCFA had in fact failed to meet the Administration's own deadline. Obviously, the Administration had decided to declare a new policy without any meaningful

389

analysis beforehand.

On September 8, 2000, I received your letter indicating that HCFA finally had issued new pricing information to Medicare carriers, which could then be used to establish more accurate reimbursement rates that would take effect January 1, 2001. However, your letter specifies that this new pricing information will not be applied to certain drugs used in oncology and hemophilia treatments. As your letter also notes, payments for these drugs constitute 30 percent of Medicare's expenditures for covered drugs and 25 percent of the estimated savings that would result from any change in Medicare reimbursements. Yet, according to your letter, it has been determined that these particular drugs should be excluded from the proposed price change because of a conclusion by HCFA that "Medicare payments for services related to the provision of chemotherapy drugs and clotting factors used to treat hemophilia and similar disorders are inadequate." If this problem does indeed exist, it is one that HCFA should have been aware of and remedied long before I first wrote to Secretary Shalala, rather than tacitly allowing an alleged cross-subsidization between drug reimbursement rates and practice expenses to continue to exist. I am particularly disturbed by both HCFA's continuing failure to address this type of problem, and the practical consequences of such failure, which obstruct efforts to implement an accurate payment system for Medicare-covered drugs and cause further delay in giving financial relief to America's vulnerable Medicare beneficiaries.

In your September 8, 2000 letter, you also noted that HCFA will continue to gather more information relating to the reimbursements for certain drugs. In order to further this inquiry, I wish to share with you some of the information uncovered during the investigation that the Committee on Commerce has conducted into the setting of reimbursements for Medicare-covered drugs. To date, this investigation has revealed troubling patterns involving certain drug manufacturers, which appear to have deliberately manipulated the spreads between the prices they charge to providers and the Medicare reimbursement levels that are set based upon information they provide. These spreads, consisting of extra Medicare dollars available to providers, were in turn used to create profit-based incentives for providers to use a particular manufacturer's drug. This evidence shows that, in many instances, Medicare reimbursements -- which are based under Federal regulations upon the manufacturer- reported Average Wholesale Price (AWP) -- have little relationship to market-based prices, and have been used as a means to increase drug manufacturers' market share by providing improper financial incentives to health care providers.

The information obtained over the course of the Committee's investigation cumulatively demonstrates that the current reimbursement methodology for Medicare-covered drugs and HCFA's oversight of that program are so deeply flawed that they invite rampant abuse -- allowing drug manufacturers to essentially determine, as part of their sales and marketing strategies, how much particular health care provider groups will be reimbursed under Medicare. As a consequence of these critical flaws, Medicare and the senior citizens, disabled individuals and others who depend on Medicare to pay for certain drugs have paid billions of dollars in inflated drug prices.

As a result of what has been uncovered by the Committee's investigation, I am deeply fearful of proposals that rely upon an unreformed HCFA to administer an expanded drug benefit for all Medicare beneficiaries. Absent

390

significant reforms, such proposals can only result in the exponential growth of this type of abuse, with the inevitable loss of additional billions of scarce Medicare and Medicare beneficiary dollars. Such a course can be described only as reckless and irresponsible, given the rampant level of abuse that the Committee's investigation has uncovered to date in the limited drug benefit currently provided under Medicare. I support a drug benefit program that will help senior citizens pay the high costs of prescription drugs, but we must guarantee that the benefit will be structured in a way that does not result in similar price gouging of either the intended beneficiaries or the Medicare system itself.

The Committee began its investigation into the setting of Medicare reimbursements for covered drugs over one and a half years ago. Over the course of the investigation, the Committee contacted numerous drug manufacturers and requested information and internal documents relating to their sales and marketing practices for particular drugs. Committee staff reviewed almost 100,000 pages of internal documents from drug manufacturers relating to pricing, interviewed several drug manufacturer employees, and have been in contact with State and Federal investigators to obtain information relating to their pending inquiries into drug manufacturer practices and reimbursement issues generally.

By disclosing the inappropriate practices and other disturbing findings of this extensive Committee investigation, it is my hope that this information can be used to develop appropriate safeguards to protect Medicare and its beneficiaries from this type of abuse in the future. In order to further your efforts relating to this issue, I have summarized some of the information obtained in the course of the Committee's inquiries below, and attached several documents that shed greater light on the types of practices and abuses that the Committee has uncovered.

Scope of the Problem

Echoing the previous findings of numerous reports by the Department of Health and Human Services' Office of Inspector General (OIG), the Committee has uncovered substantial evidence that Medicare reimburses health care providers at prices dramatically more than what they actually pay for certain drugs. In fact, the Committee has identified prices that are routinely made available to many providers, but are far below Medicare reimbursement rates. These include 1999 prices for Vancomycin, the Abbott Labs-manufactured antibiotic, which a health care provider could buy for $76.00, but for which the AWP upon which Medicare's reimbursement was based was $261.84. Similarly, in 1998 a health care provider could buy Gensia's Etoposide for $14.00, while the AWP used to determine Medicare reimbursement was $141.97. Also in 1998, Pharmacia-Upjohn's Bleomycin had an AWP of $309.98, but health care providers could purchase it for $154.85. In 1997, Pharmacia-Upjohn's Vincasar could be purchased for $7.50, while the AWP was a staggering $741.50. (Attachment 1)

Note:   The attachment above and the attachments that follow require the
free Adobe Acrobat Reader to view. (www.adobe.com)

It must be stressed that 20% of these inflated Medicare payments come directly out of beneficiaries' pockets. In fact, in numerous instances, the 20 percent co-payment paid for a drug by a Medicare beneficiary alone exceeded the actual cost of the drug to the health care provider, not even

391

including the 80 percent payment made by Medicare. For the chemotherapy drug Leucovorin, a Medicare beneficiary paid $4.36 in 1996, for a drug that his or her health care provider could have purchased for only $1.89. That same provider received a total combined payment from Medicare and the patient of $21.53. (Attachment 2)

In addition, larger provider group practices or businesses employing numerous health care providers often obtain further additional steep discounts, which are often provided in the form of rebates or free goods. Wholesalers also obtain additional discounts through the use of chargebacks, which reflect reduced prices made available to their customers. (Attachment 3)

The Committee also has uncovered evidence that, in some instances, certain manufacturers have returned cash to health care providers purchasing their drugs, describing these questionable payments as educational grants, marketing grants, payments for data gathering or administrative fees, all of which appear to have been provided for the purpose of further lowering the actual cost for particular drugs and increasing the Medicare spreads. (Attachment 4) Many of these schemes are deliberately structured so as to not appear on any invoice or other billing record. As a consequence, any efforts to use actual acquisition costs for drugs to determine reimbursement amounts, including the proposals made in the President's last two budgets, would fail to detect many of these deep discounts.

In addition, the Committee's investigation uncovered a document containing a manufacturer's claim that certain health care providers were using its competitor's drug to fraudulently increase their profits by using less than an entire dose of a drug, but billing Medicare as if a full dose were administered, and then submitting additional bills for the use of the remainder of the dose. (Attachment 5)

Setting and Marketing of the Spread

Several drug manufacturers, in their initial replies to Committee requests for information, stated that they did not establish the amount of reimbursement provided by Medicare for their drugs. However, documents obtained by the Committee clearly indicate that not only do manufacturers routinely report numbers upon which the AWP is set, but also some of these manufacturers are inflating the prices they report in order to artificially increase the Medicare reimbursements, and the corresponding profits available to providers based upon the use of particular drugs. (Attachment 6)

The Committee has discovered evidence that strongly suggests that several drug manufacturers are deliberately promoting the sales of their drugs based on the excess payments for their drugs under Medicare, which constitute a direct monetary windfall for a provider. These excess payments are referred to by a variety of terms, including "spread," "return-to-practice," "return-on-investment," or most explicitly "profit." Manufacturers often prepare side-by-side comparisons of the spreads available on their drugs versus their competitors, which are then sometimes used to promote sales to providers. (Attachment 7)

These comparative analyses are often quite detailed, including estimates of potential profits available to a health care provider over the course of

392

treating a large number of Medicare patients. In one particularly egregious example, GlaxoWellcome marketed its anti-nausea drug Zofran by promoting the fact that a health care provider could make $84.59 in profit every time he or she administered that drug. Glaxo further estimated that the profit available for Zofran was $12.32 more than the profit available from a competitor product manufactured by SmithKline Beecham, and that a medical practice that administered 165,000 doses of Zofran could earn over two million dollars of additional profit for that practice by choosing Glaxo's product. (Attachment 8)

In addition, the Committee's investigation revealed that manufacturers have carefully analyzed how their competitors' sales representatives were deliberately promoting the profits available from Medicare as a powerful selling tool. In some instances, these companies actually prepared written complaints about such efforts, although they ultimately decided not to forward this information to government authorities, possibly due to fears of exposing their own practices. (Attachment 9)

Impact of the Spread on Utilization Decisions

The Committee's investigation also uncovered evidence indicating that manufacturers believe that the sales and utilization of their drugs could be hampered by smaller spreads, regardless of therapeutic benefit to patients. Documents from various manufacturers explicitly discuss how the profit available to health care providers appeared to be the primary reason why these health care providers were willing to administer the therapeutically equivalent but more expensive drugs of their competitors. (Attachment 10)

One manufacturer in particular was concerned that it would be very difficult to increase the sales of a therapeutically-superior second-generation product, because the spread on its earlier product was so great that health care providers would decline to use the newer drug, even though it had significant clinical advantages in treating patients. (Attachment 11)

The Committee's investigation also uncovered disturbing evidence that many health care providers may be making clinical decisions based more on the profit available from the use of a particular drug than any concern about a therapeutic outcome. The Committee reviewed utilization patterns of biological products in the State of Florida that strongly suggest that an exclusive focus on profit led health care providers to dramatically increase their use of a particular product -- which previously had been rarely utilized -- after the State Medicaid program significantly decreased the reimbursements available for all competitor products. (Attachment 12)

The Committee's investigation identified patterns of drug utilization based upon reimbursement that also may have frightening implications for public health. A review of utilization patterns strongly suggests that the use of vancomycin, the antibiotic of last resort used in treating otherwise deadly bacterial infections, may have dramatically increased as the result of the excessive Medicare spreads effectively created by Abbott Laboratories. (Attachment 13) Many experts believe that, as a result of such types of over-utilization, new vancomycin-resistant bacteria recently have emerged as a growing public health risk.

In addition to the above-referenced documents, the Committee has

393

identified several other documents that relate to these same issues, which I
have included for your review. (Attachment 14)

Each of the examples cited above reveals how price manipulations by
certain drug manufacturers -- as well as HCFA's failure to adequately define
the statutory term "average wholesale price" to prevent such manipulations
-- have caused Medicare to pay amounts far in excess of any reasonable
estimation of a true average wholesale price. Proposals to reform the
current system that continue to attempt to determine reimbursement based
upon a percentage of AWP or actual acquisition cost are therefore doomed
to fail, unless the types of abuses identified above are effectively addressed
by HCFA through more vigorous oversight and improved regulations that
ensure that prices being paid by Medicare reflect actual market-based
prices, consistent with the intent of Federal law.

It is my hope that, by sharing this information with you, HCFA will finally
begin to give this issue the priority it deserves, and will work harder to
eliminate these abuses and better protect Medicare and its beneficiaries. I
request that you provide the Committee with a monthly report detailing
HCFA's progress in addressing this problem. If you should have any
questions regarding any of the information provided above or on any related
matter, please contact me or have your staff contact Charles Clapton,
Committee counsel, at (202) 226-2424.

Sincerely,

Tom Bliley
Chairman

TB:cc

cc: The Honorable John D. Dingell, Ranking Member

Attachment 14

14-1 1131 kb
14-2 820 kb
14-3 254 kb
14-4 490 kb
14-5 217 kb
14-6 303 kb
14-7 99 kb
14-8 694 kb
14-9 228 kb
14-10 386 kb
14-11 527 kb
14-12 1197 kb

http://com-notes.house.gov/cchear/hear.../d2129db5ebeac4f78525696700460e88?OpenDocumen 9/3/01

394

14-13  5 kb
14-14  122 kb
14-15  575 kb
14-16  20 kb
14-17  16 kb
14-18  36 kb
14-19  129
14-20  66 kb
14-21  43 kb
14-22  46 kb
14-23  957 kb
14-24  628 kb
14-25  1575 kb
14-26  231 kb
14-27  40 kb
14-28  872 kb
14-29  534 kb

**Response**

Response Not Received or Response Not Currently Available

**Related Documents and Issues**

Oversight

Medicare and Medicaid Fraud

Medicare Drug Pricing Investigation

| Action | Schedule | News | Contacts | Members |
| Subcommittees | Publications | Commerce-Democrats | Search |

*The Committee on Commerce*
*2125 Rayburn House Office Building*
*Washington, DC 20515*
*(202) 225-2927*
*Feedback*



Sep-18-2001  14:38   From:OFFICE MAX          8723040413          T-703  P.002  F-804



**March 1997**

(C) Copyright 1997
The Cancer Letter Inc
All rights reserved

# Cancer Economics

AOR, Immunex In Partnership
On Clinical Studies
. . . Page 2

Bristol-Myers Gains Access
To Incyte's Gene Database
. . . Page 4

RPR, Alberta Cancer Board
Form Taxotere Study Group
. . . Page 4

Boston Biomedica Subsidiary
Wins NCI Specimen Contract
. . . Page 4

## Administration Proposes Cut Of Markup On Outpatient Drugs

The Administration's budget proposal for fiscal 1998 eliminates the markup on drugs and biologicals administered in physicians' offices and reimbursed under the Medicare program.

If adopted, the proposal would eliminate a major source of revenue for oncologists and, according to many observers, may lead physicians to administer chemotherapy in the hospitals, thereby actually increasing healthcare costs.

Under the existing law, Medicare reimburses 80 percent of the average wholesale price of a drug, and the patient pays the remaining 20 percent. Under the Administration's proposal, Medicare would reimburse 80 percent of the physicians' "actual acquisition cost."

In materials circulated on Capitol Hill, the American Society of Clinical Oncology said the proposal is "unworkable and unfair," and "may make it impossible for physicians to carry on their practices."

Under the Administration proposal, reimbursement would be the lowest of:

- The physician's actual acquisition cost.
- The average wholesale price.
- The median actual acquisition cost of all claims for the drug or biological for the 12-month period.

The proposal defines the actual acquisition cost as "the physician's... cost based on the most economical case size in inventory on the date of dispensing or, if less, the most economical case size purchased within six months of the date of dispensing whether that specific drug was furnished to an individual whether or not enrolled under this part. The actual acquisition cost includes all discounts, rebates, or any other benefit in cash or in kind (including, but not limited to, travel, equipment, or free products)."

Under the proposal, pharmacies could be paid "reasonable" dispensing fees.

In a critique of the proposal, ASCO said:

—The Proposal Is Not Based on True Acquisition Cost. Although ostensibly basing Medicare payment o

(Continued to page 2)

## Insurers Are Eliminating Markup On Cancer Drugs, Official Says

Health insurers are starting to eliminate the oncologists' markup on chemotherapy drugs, a senior managed care company official said at a meeting of the National Cancer Centers Network earlier this month.

"You are going to have to make chemotherapy a cost-neutral equation," Lee Newcomer, chief medical officer at United HealthCare Corp. of Minneapolis, said in a keynote address at the NCCN guideline conference March 3. "I will tell you that the industry is probably going to do this for you.

"Without [eliminating the markup on drugs], I really do fear that you are going to lose credibility within organizations outside," said Newcomer, formerly a practicing oncologist. "Employers are already bringing this up to me' What are you doing about oncologists who are making too much money on drugs?'

The excerpted text of Newcomer's remarks follows:

"You need to go out and measure your performance, and you need to do it tomorrow. The only thing that makes you different from anybody else down the street is what you can come back and show me that you do.

"When you [measure performance], a couple of things are going to happen. First, you are not going to

(Continued to page 2)

Supplement to the Cancer Letter

396

## ASCO Criticizes Administration Proposal On Drug Markup

(Continued from page 1)

on a physician's acquisition cost, the proposal would actually establish arbitrary rules that are only remotely connected to the acquisition cost of the drug being reimbursed. Actual acquisition cost would be capped by a national median based on prices 6-18 months old regardless of current market conditions. These rules would result in out-of-pocket losses by physicians.

—The Proposal Ignores Costs Incurred by Physicians. Even if acquisition cost were accurately computed, reimbursement on that basis would not cover all the costs. Additional costs include staff time in procuring and storing the drug; the opportunity cost of the capital tied up in drug inventory; wastage and spillage; sales tax in several states; and unpaid coinsurance

—The Proposal Would Create an Accounting Nightmare for Physicians. Drug companies may offer pricing that covers more than one product; there may be year-end rebates based on the amount of drug purchased; the purchase of one product may earn a discount on another product; free vials may accompany a number of purchased vials, etc. Physician practices are in no position to sort through these complexities and determine the cost of each drug, but if they make any errors in calculating the cost of a particular drug, they may be charged with making false claims.

### Cancer Economics
**A Monthly Supplement to The Cancer Letter**

Editor: Paul B. Goldberg
Associate Editor: Kirsten Goldberg

P.O. Box 9905, Washington, D.C. 20016
Tel. (202) 362-1809  Fax: (202) 362-1681
Editorial e-mail: paul@www.cancerletter.com

Published 12 times a year by The Cancer Letter Inc. as a supplement to The Cancer Letter. Also publisher of The Clinical Cancer Letter. All rights reserved. None of the content of this publication may be reproduced, stored in a retrieval system, or transmitted in any form (electronic, mechanical, photocopying, facsimile, or otherwise) without prior written permission of the publisher. Violators risk criminal penalties and $100,000 damages.

—The Proposal Would Lead to Overall Inadequate Reimbursement. The current payment system for drugs compensates for Medicare's gross underpayment for the administration service. Currently, the Medicare payment for the basic infusion service is only about $53 even though the direct costs (staff, supplies) of the service have been determined by Medicare to be $102 and total costs (including rent, utilities, etc.) may be about $185. Until Medicare rectifies the payment amount for the administration service, physicians rely on the drug payments to cover their costs. If their costs are not covered, physicians cannot carry on their practices.

—The Proposal Would Be Anti-Competitive. Under the proposal, physicians would have no incentive to seek lower drug prices and manufacturers would have no incentive to compete on the basis of price. Drug prices could rise as a result. Because of the adverse incentives of cost reimbursement, Medicare is moving away from other services.

## Health Insurance Official Says Industry Is Ending Markup

(Continued from page 1)

like what you find. You are human. You are just like any other doctor out there. Your performance will not be good.

"But then you know where to start. And you know what to improve. And you know what to do next. . .

"At United HealthCare, we have a concept that I call accountable autonomy.

"I don't want to be in the business of micromanaging. What I want to do instead is say, here are the standards. This is what you need to get to. You get there the way that works best for you. It may be the NCCN guidelines. It may be something entirely different. It may be that you need to work with your hospital to become more efficient.

"What we want to do is set the standards and set the rewards for meeting those standards and get out of the way.

"I think these guidelines are too complex for the average practicing doctor. Maybe what they need to do is measure how well they do on five or three key points of those guidelines as a starting points. There are too many branches and trees out there that it would take a very sophisticated computer system to get it all

397

done. You might be able to do that at NCCN locations, but you probably aren't going to get it out of the average oncologist's office.

"Today there is no extra incentive or financial payment for collecting data, but it is your key to staying in business five—well, actually two-to-five—years from now. Because the people who can come in and say, I can perform at an X level, and I have the data to prove it are the people who are going to be differentiated.

"Already, this year, we've gone to all the centers in our network who do high dose chemotherapy with some type of hematologic rescue, and we've set performance standards. For each diagnosis and stage, we said you have to hit this survival, and if you don't we are going to find someone else who can. What we are interested in is performance; not production.

"The second thing I'd ask you to do is become the personal care physician for the cancer patient. My fear for medical oncologists is that they are becoming nothing more than chemotherapy technicians. When you look at what's happened to oncology practices over the last five years, they've gone from being the cancer consultants to being chemotherapy givers.

"My case managers are coming to me and saying that about half my patients are dying within two weeks of their last chemotherapy course. So where was the oncologist saying, it's time for palliative care. Let me give you good supportive care and pain relief. Let me get you into a hospice. Let me help you with those things that are now important at this stage of your illness. Instead what is happening is they continue to get treated, and treated, and treated.

"And more and more we are finding that the type of treatment you get is directly related to which doctor you see first. If you are dealing with a cancer that has three options, surgery, radiation and oncology, what happens is you get surgery if you see a surgeon, radiation therapy if you see a radiologist, and chemotherapy if you see an oncologist.

"I think the oncologist should be the gateway for these folks into all the rest of the healthcare system. But to do that, you have to remain the general consultant for oncology.

"The markups for chemotherapy medicines are getting to be so high that the public is beginning to react. You are losing credibility from that. What you will see happening in my company and, I suspect, others, is that you will no longer be getting reimbursed at [Average Wholesale Price]. You will be getting reimbursed at catalogue prices. The reason for doing that is to make this decision truly a decision made because it's the right thing to do; not because you have a financial incentive.

"You shouldn't be making the decisions with the incentive that may not be the right incentive for you.

"We are on a brand new horizon in medical care. We have not known it, but we have been going along with mediocre performance for a long time. The next decade is going to bring superb performance."

**In other developments at NCCN:**

—The Network which includes 15 academic cancer centers, presented its clinical guidelines for sarcoma, melanoma, and cancers of the brain, head and neck, bladder and the pancreas, as well as a guideline on the use of antiemetics.

—Robert Young replaced Joseph Simone as NCCN chairman of the board. Young, formerly NCCN vice chairman, is president of Fox Chase Cancer Center. Simone is executive director of Huntsman Cancer Care Program.

*Oncology Management*

## AOR, Immunex In Partnership On Studies Of Firm's Products

**American Oncology Resources Inc.,** (Nasdaq: AORI) of Houston, and **Immunex Corp.** (Nasdaq: IMNX) of Seattle have formed a Disease Management Partner Program, the companies said.

According to the companies, the program is designed to improve cost effectiveness of cancer treatment delivered by the AOR network.

Under the agreement, AOR physicians will be involved in clinical studies of Immunex products, including a multi-stage study of Novantron in advanced prostate cancer patients, the companies said. Immunex will supply 5 cancer-related therapeutics including Leukine (sargramostim) and Novantrone (mitoxantrone for injection concentrate) as well as generic products.
*   *   *

**Joseph Welfeld** was named president and CEO of Affiliated Physicians Network Inc. of White Plains, NY, a regional network of 120 physicians specializing in oncology.

Welfeld, most recently a consultant, is the former CEO of Ocean State Physicians Health Plan Inc., and regional vice president of United HealthCare Corp.

APN serves the New York metropolitan area

398

Sep-16-2001  14:46    From-OFFICE MAX                    9729946413           T-703  P.023/025  F-604

## ASCO Tells Medicare What Is Acceptable

**ALEXANDRIA, Va.**—The American Society of Clinical Oncology has laid its cards on the table in the impending struggle over Medicare reimbursement for cancer drugs and their administration in the office.

In a "white paper" posted on its Web site this month, ASCO concluded that practice expenses covered by Medicare need to be revised to cover the true costs incurred by physicians in providing chemotherapy services. ASCO also asked that Medicare cover cognitive services as well.

At the same time, ASCO agreed that Medicare payment for drugs could be based on government surveys of wholesaler selling prices, or on the existing average wholesale price system "as modified to limit the permissible difference between actual selling price and published average wholesale price."

In a line in the sand on drug-cost reimbursement, ASCO proposed that three criteria were essential. Payments should be set at amounts that will cover the costs incurred by the vast majority of oncologists and should not require oncologists to alter their typical current procurement method of buying drugs from one or two wholesalers.

Any payment system based on an estimate of market prices should include a 10% add-on to cover additional drug-related costs, such as inventory expenses, bad debt, and wastage. Medicare should also pay state and local sales taxes and gross receipts taxes.

ASCO rejected the concept of a system of reimbursing each physician for the specific costs incurred by the physician for drugs administered to Medicare patients, contending that this has serious defects.

Meanwhile, Brian McCaghs, executive director of the Washington Cancer Institute, part of 791-bed Washington (D.C.) Hospital Center, was quoted this week in *Modern Healthcare* as summing up this issue bluntly.

"For many of the private-practice oncologists, it's not uncommon where up to 50% of their annual take-home pay can be tied directly back to the markup on the drugs they prescribe in their cancer practice," the magazine quoted McCagh, a former president of the Association of Cancer Executives, as saying. "How much longer will HCFA allow us to buy something for X (dollars) and try to sell it for three or four (times) X? Eventually, HCFA and managed-care organizations will crack down on this, and the question is just how much will they chip away at those margins."

## Imatinib Resistance

from page 1

In accelerated-phase CML, the phase-2 data showed a 69% hematologic response lasting four or more weeks—an increase from the 63% hematologic response reported in February. About 70% of patients remain free of progression to the blast crisis after a year of treatment, the company reported.

In blast crisis, the updated data indicate that 52% of patients had some hematologic response, with 29% showing a sustained response for at least four weeks—up from the 26% reported in February.

And 65% of the patients who had achieved a hematologic response in the blast crisis phase have maintained it for six months or more, an estimated median duration of response of 8.1 months. For six severe blast crisis cohorts, irrespective of response, the median survival rate is seven months, vs. three to six months for historical controls.