**ANDERSON EXHIBIT 11**

```
                                    Fiske, Joseph - Vol. I
0001
 1              UNITED STATES DISTRICT COURT
 2                DISTRICT OF MASSACHUSETTS
 3
       In re: PHARMACEUTICAL          )
 4     INDUSTRY AVERAGE WHOLESALE     )
       PRICE LITIGATION               )   MDL No. 1456
 5                                    )
                                      )
       THIS DOCUMENT RELATES TO:      )   Civil Action No.
 6                                    )      01-12257-PBS
       US ex rel Ven-A-Care of        )
 7     the Florida Keys, Inc.         )
       v. Abbott Laboratories, Inc.)
 8     No. 07-CV-11618-PBS            )
 9
10
            VIDEOTAPED ORAL DEPOSITION OF JOSEPH E. FISKE
11
                              Volume 1
12
                          February 17, 2009
13
14
15            DEPOSITION upon videotaped oral
16     examination, of the witness, JOSEPH E. FISKE, taken
17     on behalf of Ven-A-Care of the Florida Keys, Inc. in
18     the above entitled cause pending in the United States
19     District Court, District of Massachusetts, before
20     TAMMY POZZI, Certified Shorthand Reporter in and for
21     the State of Texas, on February 17, 2009, in the law
22     offices of Jones Day, 77 West Wacker, 35th Floor,
23     Chicago, Illinois, between the hours of 9:05 a.m. and
24     4:49 p.m., pursuant to due notice and the Federal
25     Rules of Civil Procedure.
0002
 1                    A P P E A R A N C E S
 2     COUNSEL FOR VEN-A-CARE OF THE FLORIDA KEYS, INC.:
 3          ANDERSON LLC
            Mr. C. Jarrett Anderson
 4          208 West 14th Street, Suite 203
            Austin, Texas 78701
 5          (512) 469-9191
 6     COUNSEL FOR ABBOTT LABORATORIES INC.:
 7          JONES DAY
            Mr. Eric P. Berlin
 8          Ms. Tara A. Fumerton
            77 West Wacker Drive, Suite 3500
 9          Chicago, Illinois 60601
            (312) 782-3939
10
       COUNSEL FOR THE STATES OF WISCONSIN, ILLINOIS,
11     KENTUCKY, IDAHO, HAWAII, ALASKA AND SOUTH CAROLINA:
                                        (not present)
12          MICHAEL WINGET-HERNANDEZ
            Mr. Michael Winget-Hernandez
13          101 College Street
            Dripping Springs, Texas 78620
14          (512) 858-4181
15     COUNSEL FOR THE STATES OF ALABAMA AND MISSISSIPPI:
                                        (not present)
16          BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES,
            P.C.
17          Mr. Paul Lynn
```

Fiske, Joseph - Vol. I

```
 5     yesterday -- I take it you reviewed those -- reviewed
 6     those documents yesterday with Mr. Berlin, correct?
 7          A.   There were documents that we reviewed
 8     yesterday, as well as documents that I had reviewed
 9     at other times, like I said, when I was reading the
10     depusi- -- depositions --
11          Q.   Uh-huh.
12          A.   -- and I don't recall whether we reviewed
13     any documents when we met a few weeks ago.
14          Q.   Other -- other than reviewing documents
15     with Mr. Berlin and reviewing deposition exhibits
16     that were a part of the DeYoung, Joe Fiske, and Beth
17     Garvin depositions, did you review any other
18     documents?
19          A.   I looked at some bid schedules.  I looked
20     at some contract documents.  I looked at some price
21     increase notifications.  I believe that's the extent
22     of what I looked at.
23          Q.   Did you review any documentation from the
24     Managed Care division or department?
25          A.   No, I didn't.
0015
 1          Q.   Did you review any bid materials exchanged
 2     between Abbott and customers, such as GPOs or chain
 3     pharmacies or wholesalers who would request that
 4     Abbott bid for placement of its drugs on those
 5     customers' formularies?
 6          A.   Only to the extent that they may have been
 7     part of the documents that I reviewed that were part
 8     of previous depositions.
 9          Q.   Did you review any government documentation
10     such as OIG reports?
11          A.   Not at this point in time.  I've seen such
12     documents over the -- over the course of my career in
13     Pricing.
14          Q.   When -- let me back up a step.  When I
15     refer to the "OIG," do you understand I'm referring
16     to the Office of Inspector General for Health and
17     Human Services?
18          A.   Yes.
19          Q.   Okay.  When -- strike that.
20               In what context in the past have you
21     reviewed OIG reports?
22          A.   Periodically people would send me reports,
23     and I can't tell you exactly in what context.  One I
24     remember is a report regarding GPO admin fees that
25     was issued -- I believe it was OIG that issued it --
0016
 1     indicating that -- I believe that a number of GPOs
 2     were passing those admin fees along to their
 3     customers, which would imply that they were a
 4     discount rather than just an admin fee.
 5          Q.   Can you remember the subject matter of any
 6     other OIG reports that you reviewed?
 7          A.   Not that I reviewed.  There -- there -- I'm
 8     sure there are others that I have seen.  I just --
 9          Q.   Uh-huh.
10          A.   -- don't recall right off the top of my
11     head.
12          Q.   Other than the -- the OIG reports
13     pertaining to administrative fees of GPOs, are you
14     aware of any other OIG reports reviewed by Abbott
15     personnel --
```

Fiske, Joseph - Vol. I

16     A.   Yes.
17     Q.   -- specifically?  Which ones?
18     A.   Martha Schrader was familiar with OIG
19 reports that were issued regarding the fact that AWP
20 pricing reported by the data agencies did not reflect
21 actual acquisition costs by retail pharmacies.
22     Q.   That -- you gained that information in your
23 discussion with Ms. Schrader recently?
24     A.   Yes.
25     Q.   When did Ms. Schrader review those reports?
0017
1     A.   She didn't give me a specific time frame.
2 I didn't ask her for a specific time frame.
3     Q.   Did Ms. Schrader provide you with those --
4 any copies of those reports?
5     A.   No, she didn't.
6     Q.   What was your understanding of the findings
7 of these reports?
8     A.   They were reports that were issued, I
9 believe, to Health and Human Services -- and
10 obviously available, actually, for the public, which
11 means states and others would have access to them --
12 that, as I described previously, indicated that AWP
13 as reported by the -- by the data agencies overstated
14 acqu- -- actual acquisition costs versus what
15 pharmacies were actually paying for product.
16     Q.   Do you have any understanding of the
17 specific findings with respect to how much AWP
18 overstated actual acquisition cost?
19     A.   No, I don't.
20     Q.   Do you have any information about the
21 findings of these reports with respect to generic
22 drugs versus brand drugs?
23     A.   No, I don't.
24     Q.   Do you have any information about the
25 findings of these reports with respect to any given
0018
1 manufacturer's drugs?
2     A.   No, I don't.
3     Q.   Do you know whether it was one single
4 report or multiple reports that Ms. Schrader had
5 reviewed?
6     A.   From my discussion, I believe it was
7 multiple reports, but I can't state that with
8 certainty.
9     Q.   Did you gain any understanding about the
10 context in which Ms. Schrader reviewed these reports?
11     A.   Martha Schrader is, as I described
12 previously, our Divisional Vice President for Public
13 Policy and Strategy.
14     Q.   Uh-huh.
15     A.   She had previously worked for another
16 manufacturer.  I don't know exactly what her
17 responsibilities were there.  But in the course of
18 her job responsibilities, she keeps abreast of
19 legislation, reports that are coming out from the
20 government, etcetera, as it might affect the industry
21 in general.
22     Q.   Has Ms. Schrader or anyone working for
23 Ms. Schrader ever had any responsibility for setting
24 of prices on Abbott drugs?
25     A.   No.
0019

```
                          Fiske, Joseph - Vol. I
 1        Q.   To your knowledge, has anyone at Abbott
 2   who's ever had any responsibility for setting prices
 3   on Abbott drugs reviewed any OIG reports concerning
 4   AWP?
 5             MR. BERLIN:  Objection, form and
 6   scope.
 7        A.   I don't know because I don't know whether I
 8   have actually specifically seen such a report
 9   myself.  I -- as I indicated, I believe I've seen and
10   read a -- a number of OIG reports, but I do an awful
11   lot of reading in my job, and I can't remember
12   specifically everything I've read.
13        Q.   (BY MR. ANDERSON):  Do you have any copies
14   of any OIG reports in your files concerning published
15   pricing such as AWP pricing?
16        A.   I don't believe so, but I may have.  I
17   don't know.
18        Q.   Have you searched for those?
19        A.   When we searched for files for production
20   for this case, we looked through any files that may
21   have been labeled "AWP" or -- and I don't have a file
22   that's called "OIG," so...  We produced everything
23   that we had.
24        Q.   So if you had any --
25        A.   I couldn't have looked through every file
0020
 1   that I have, quite honestly.
 2        Q.   Well, I understand, but I'm saying, to your
 3   knowledge, as the Abbott corporate representative,
 4   any OIG reports that would have been maintained in
 5   the files of Abbott personnel responsible for price
 6   setting would have been located in your prior
 7   searches; is that correct?
 8             MR. BERLIN:  Objection, form, scope.
 9        A.   I -- I can't state for certainty.  My
10   personal experience is that we have very man- -- you
11   know, many, many files.  We try and produce
12   everything that's related to a case when it's -- when
13   the information is listed out for us in terms of what
14   we need to provide.
15             It's possible that things may have
16   been overlooked by somebody, but to the best of my
17   knowledge, everything was produced that was
18   available.
19        Q.   (BY MR. ANDERSON):  Is your awareness of
20   any Abbott personnel's review of OIG reports limited
21   to what you learned from Ms. Schrader?
22        A.   Yes, I believe so.
23        Q.   And Ms. Schrader didn't share with you any
24   documentation regarding any OIG reports that she had
25   reviewed, did she?
0021
 1        A.   No, she did not.
 2        Q.   And you're not able to recall any of the
 3   specifics about the time frame for which the report
 4   was published, etcetera?
 5             MR. BERLIN:  Objection, form.
 6        A.   I didn't specifically ask that question.
 7        Q.   (BY MR. ANDERSON):  Okay.  Do you have any
 8   information whatsoever that Ms. Schrader shared her
 9   awareness of the OIG reports concerning AWP pricing
10   with any other Abbott personnel, other than you,
11   obviously, in preparing to testify?
                              Page 9
```

Fiske, Joseph - Vol. I
12    A.   I'm going to answer the question this way,
13 but I -- it is somewhat speculative.  She manages a
14 group of people.  And, in fact, one of the people who
15 worked for her at one point in time used to do web
16 searches for different kinds of information affecting
17 the industry, and she -- she may have shared such
18 information with one of her employees or he may have
19 been the source for the -- for the report but I don't
20 know.
21           To my knowledge, she did not share
22 that information with Pricing and Planning, but I
23 wa- -- I want to be careful because the employee,
24 Tom -- I can't recall his last name right now -- used
25 to actually copy us periodically on, like, a -- a --
0022
1 a daily newsletter of key happenings, just excerpts
2 of things.
3           But I don't recall specifically an OIG
4 report coming from Martha's group to us.
5    Q.   How long has Martha been in her -- well,
6 strike that.
7           How long has Ms. Schrader been with
8 Abbott?
9    A.   Six years.
10    Q.   So the earliest time frame that she could
11 have been reviewing OIG reports while at Abbott would
12 have been 2003 -- 2002 at the earliest?
13    A.   Correct.  But she -- as I indicated, she
14 had similar responsibilities, I believe, at another
15 company.  But at Abbott, that's a correct statement.
16    Q.   Right.  What was that other company?
17    A.   I think it was Amgen, but I --
18    Q.   Okay.
19    A.   -- I don't want to be -- I may be mistaken.
20    Q.   But not a company that was affiliated in
21 any way with Abbott?
22    A.   Not to my knowledge.
23    Q.   Okay.  All right.  We'll come back to that
24 potentially.
25           What did you discuss with Ms. Tobiason
0023
1 in prep- -- preparation to testify as the corporate
2 representative?
3    A.   I actually just reviewed the various topics
4 that I was supposed to be prepared to testify on and
5 actually went through them one by one with her.  She
6 had very little knowledge about most of those
7 issues.
8           Her title is Senior Director of
9 Reimbursement for Corporate.  She's held -- I think
10 she's been with Abbott since 1994.  She started off
11 in the Hospital Products Division where she was
12 Director of Reimbursement for the Home Infusion
13 group --
14    Q.   Uh-huh.
15    A.   -- subsequently worked in ADD as Director
16 of Reimbursement.  Her focus was not on oral
17 pharmaceuticals.  Her focus has always been on -- on
18 "Part B drugs," I'll refer to them as -- I'm sure
19 you know what I mean --
20    Q.   Uh-huh.
21    A.   -- Medicare Part B, or devices.
22           And so when I talked with her, she --
Page 10

Fiske, Joseph - Vol. I

```
 9   can't recall.
10        Q.   And it -- it looked -- it had the same type
11   of form cover letter that's shown on the second page
12   of Exhibit 9?
13        A.   I'm -- I'm -- I'm sorry.  I recall this
14   (indicating).
15        Q.   The stamp?
16        A.   The stamp, that's all I specifically
17   recall.
18        Q.   All right.
19        A.   I don't -- I don't remember what we
20   reviewed.
21        Q.   Does Exhibit 9 appear to you, sir, to be an
22   example of a standard communication that Abbott sent
23   out to the pricing compendia?
24        A.   It -- it looks like a communication to a
25   pricing compendia, yes.
0136
 1        Q.   And there's -- I notice the first page is a
 2   fax cover sheet from Abbott in this case to Medical
 3   Economics, correct?
 4        A.   Yes.
 5        Q.   Do you believe that this same type of fax
 6   cover sheet would have been utilized to transmit the
 7   same type of information to First DataBank as well?
 8        A.   Something similar to that.
 9        Q.   So looking at the second page of Exhibit 9,
10   I -- do you agree with me that that is a form cover
11   letter that Abbott would create to transmit
12   information to data vendors?
13        A.   I would agree with that, yes.
14        Q.   And the data vendors would include First
15   DataBank and Red Book and Medi-Span, correct?
16        A.   Yes.
17        Q.   And those are the same three data service
18   companies that were referenced at the bottom of the
19   first page of Exhibit 8, correct?
20        A.   (Reviews document.)  Yes.
21        Q.   Why did --
22        A.   Well, two of them.
23        Q.   Why -- why did Abbott report information to
24   the data vendors such as that shown in Exhibit 9?
25             MR. BERLIN:  Objection, form, asked
0137
 1   and answered.
 2        A.   It was our standard practice whenever we
 3   launched a product to report the pricing information
 4   to the data vendors.  It had always been done.
 5        Q.   (BY MR. ANDERSON):  Other than the fact
 6   that it was something Abbott itself had always done,
 7   was there any other information that underlied Abbott
 8   reporting this type of information to the data
 9   vendors?
10        A.   Not that I became aware of during my
11   investigation.
12        Q.   I notice on the third page of Exhibit 9 is
13   the beginning of a price list, correct?
14        A.   Yes.
15        Q.   And there's -- there's three different
16   types of prices listed.  One is list price, the other
17   is case price, and the last one is AWP price,
18   correct?
19        A.   Yes.
```

```
                               Fiske, Joseph - Vol. I
20        Q.   And so those would be prices that Abbott
21   had set and, in turn, communicated to the data
22   vendors, correct?
23        A.   Yes.
24        Q.   How did Abbott --
25        A.   Well, we communicated an estimated AWP.  We
0138
 1   set the WAC and the list price.
 2        Q.   Where --
 3        A.   The WAC price being the case price.
 4        Q.   Where is the AWP information noted to be an
 5   estimate?
 6        A.   I'm telling you that it was always an
 7   estimate.  We actually changed the column at a
 8   subsequent date to read that it was an estimate to
 9   avoid any confusion.
10        Q.   How might it be confusing if the AWP
11   weren't noted to be an estimate?
12        A.   I don't have an answer for that question.
13        Q.   Do you agree that to the extent Abbott was
14   reporting, quote, "AWPs" to the data vendors, it
15   would appear that Abbott is setting the AWPs?
16             MR. BERLIN:  Objection, form.
17   Objection, scope.
18        A.   I don't agree with that.
19        Q.   (BY MR. ANDERSON):  What information would
20   indicate that Abbott is not controlling this AWP?
21        A.   Pardon me?
22             MR. BERLIN:  Objection, form.
23   Objection, scope.
24        Q.   (BY MR. ANDERSON):  What -- what
25   information would indicate that Abbott is not
0139
 1   controlling the setting of these AWPs?
 2             MR. BERLIN:  Objection, form.
 3   Objection, scope.
 4        A.   There's no information on this sheet that
 5   says that.
 6        Q.   (BY MR. ANDERSON):  Is there any
 7   information other -- beyond this sheet that you know
 8   of?
 9             MR. BERLIN:  Objection, form.
10   Objection, scope.  But you -- you can answer.
11        A.   All -- all I can continue to go back to,
12   Mr. Anderson, is the conversation that Mark Turon
13   had, for example, with Kay Morgan; that despite the
14   fact that manufacturers may have been providing
15   estimated AWPs, that the data vendors, especially
16   First DataBank, was actually verifying or confirming
17   what a correct AWP should be with the wholesalers
18   themselves.
19        Q.   (BY MR. ANDERSON):  Did Mark indicate how
20   long that conversation list- -- lasted?
21        A.   No, he didn't.  Knowing Mark Turon, it
22   could have been an hour.  He's a very -- very
23   talkative man.
24        Q.   And Mr. Turon is still with Abbott today?
25        A.   He -- he works for Ross Pharmaceuticals.
0140
 1   I -- actually, it's called Abbott Nutritionals, Inc.
 2   today, which is a division of Abbott Laboratories.
 3        Q.   Was he with Ross when he had this
 4   conversation with Kay?
```

Fiske, Joseph - Vol. I

14  Q.  Did Abbott make any disclosures to any
15 state Medicaid program about the discrepancies
16 between its AWPs and its AMPs?
17       MR. BERLIN:  Objection, form.
18 Objection to the term "discrepancy".
19  A.  Did we?
20  Q.  (BY MR. ANDERSON):  Yes, sir.
21  A.  No.  Other than the states -- once we were
22 required to report AMPs, the -- the four states that
23 we had to report them to.
24  Q.  The four states in the past three or four
25 years or so?
0240
 1  A.  It may have been longer with Texas, but
 2 yeah, that's right.
 3  Q.  Now I'm shifting, Mr. Fiske, to topic
 4 number 6.  I'll ask some foundational questions
 5 first.  Did Abbott publish direct or list prices for
 6 the erythromycins?
 7  A.  We communicated a WAC and a list price.
 8  Q.  And -- and generally, the -- the list price
 9 was simply five percent higher than the WAC price,
10 correct?
11  A.  Correct.
12  Q.  And was the list price set off of the WAC
13 or vice versa?
14  A.  WAC was established and divided by .95 to
15 arrive at the list price.
16  Q.  Okay.  And, likewise, WAC was the starting
17 point for the calculation of the estimated AWP by
18 Abbott, correct?
19  A.  Yes.
20  Q.  With respect to topic number 6, did you
21 gather any information in preparing to testify?
22       MR. BERLIN:  Make sure you're --
23 the -- the designation goes on to the second page of
24 what you have.
25  A.  (Reviews document.)  The individuals I
0241
 1 spoke with had no knowledge regarding this topic
 2 whatsoever.
 3       People within the Pricing and
 4 Contracting Department, including myself and Ronny
 5 Lancaster, who is our Senior Manager for Government
 6 Pricing, replaced Debbie DeYoung, are aware of the
 7 fact that we have reported AMPs to the government
 8 since 1991 and that -- you know, that this whole
 9 thing, the way it's worded, is -- it sort of
10 misrepresents the facts.
11       We didn't cause publication of direct
12 or list prices that were higher than the prices
13 generally paid because we had a WAC and a list price
14 that was generally paid by purchasers at all times,
15 as was a base deal price generally paid by other
16 customers, as was a contract price, as I said before,
17 generally paid by the customers that purchased that
18 contract price.  So --
19       MR. BERLIN:  I think we need to -- I
20 think he may have misspoken, and I need to talk to
21 him to get him to clarify that now.
22       MR. ANDERSON:  Well, I -- I'd like to
23 follow up on that.  I may clarify it now.
24       MR. BERLIN:  Well -- well, no.  I

Page 100