**ANDERSON EXHIBIT 12**

## IN MEMORY OF TERRENCE L. BARNICH

## HON. MARK STEVEN KIRK

OF ILLINOIS

IN THE HOUSE OF REPRESENTATIVES

*Wednesday, June 3, 2009*

Mr. KIRK. Madam Speaker, I rise today to honor the life of Terrence L. Barnich. Terry served as Chairman of the Illinois Commerce Commission (ICC) in the early nineties, and spent the last two years as Deputy Director of the Iraq Transition Assistance Office in Baghdad. Terry died on Memorial Day after his convoy was hit by a roadside bomb on the outskirts of Fallujah.

Terry was appointed Chairman of the ICC by Gov. Jim Thompson in 1989, serving for three years before joining the private sector. In 2007 he took a leave of absence from his job as CEO of Paradigm Resources Group to spend a year working with the State Department in Baghdad. After that year, Terry volunteered to stay in Iraq to continue his work helping the Iraqis build modern public utility systems. He embodied the American commitment to the people of Iraq, and his work was helping us fulfill that commitment.

Terry died after inspecting a new wastewater treatment facility that will provide essential services to Fallujah and Anbar Province. His patriotism and love of his work are evident in a quote he gave a Chicago newspaper shortly after he arrived in Baghdad. He said:

"To those back home who say the Iraqi experience has made the Iraqis unready or incapable for democracy, I say come work with me. I deal with Iraqis who daily brave physical hardship, violence and threats of violence to make their contribution to building a government that deserves the consent of the governed."

Funeral services were held today in Chicago, and I hope my colleagues will join me in sending our condolences to Terry's family as we remember his dedication to public service.

## IN HONOR OF LARRY CAVITT'S 40 YEARS OF TEACHING EXCELLENCE

## HON. PETE SESSIONS

OF TEXAS

IN THE HOUSE OF REPRESENTATIVES

*Wednesday, June 3, 2009*

Mr. SESSIONS. Madam Speaker, I rise today to honor a teaching legend, Mr. Larry Cavitt and to celebrate his forty years of dedicated service at St. Mark's School of Texas. I am proud to represent St. Mark's in the 32nd Congressional District of Texas.

Mr. Cavitt first joined St. Mark's faculty on August 28, 1969 after receiving his M.A. from Southern Methodist University. In his current role, he serves as the 5th grade humanities teacher and senior class advisor. During his tenure at St. Mark's, he has also taught 7th, 8th, and 9th grade Social Studies, 8th grade Humanities, U.S. History, and Advanced Placement Law and Government. Outside of the classroom, members of the basketball and baseball team know him as "coach." In his forty years of service, he has helped shaped young impressionable minds, providing them a firm educational foundation for success. He always encourages his students to chase their dreams and I know these young men have greatly benefitted from his teaching, wisdom, and insight. St. Mark's is a successful institution because of dedicated and caring teachers such as Mr. Cavitt.

I admire him for his passion for teaching and ask my colleagues to join me in expressing our gratitude for his continued service. I congratulate Mr. Cavitt on reaching his forty-year milestone and wish him all the best.

## FRAUD ENFORCEMENT AND RECOVERY ACT OF 2009

SPEECH OF

## HON. HOWARD L. BERMAN

OF CALIFORNIA

IN THE HOUSE OF REPRESENTATIVES

*Monday, May 18, 2009*

Mr. BERMAN. Madam Speaker, I rise today in support of the Fraud Enforcement & Recovery Act of 2009. I want to specifically address the language in this bill that will strengthen the provisions of our Nation's most effective fraud-fighting tool, the federal False Claims Act. With our Nation spending hundreds of billions of dollars to revitalize our faltering economy, now is the time to plug the loopholes that have been created in the False Claims Act over the last quarter century. Now is the time to update this law to ensure that it reaches the modern fraud schemes that are draining our public fisc with impunity. As one of the authors of both the 1986 False Claims Act Amendments and the relevant language in S. 386 which we consider today, I submit this statement to clarify the true intent of the False Claims Act and to send a clear message that all government funds should be protected from fraud.

### I. HISTORY OF THE FALSE CLAIMS ACT

Before I get into the provisions of the bill we are considering today, Madam Speaker, I'd like to provide some background on the False Claims Act, how it came to be and how it has been amended in the past.

Congress enacted the False Claims Act in 1863, in response to complaints about "the frauds and corruptions practiced in obtaining pay from the Government during the [Civil] War." Proposed by President Lincoln, the legislation offered private citizens a reward if they assisted the Government in combating fraud. The sponsor of the original False Claims Act explained that the statute, "offers, in short, a reward to the informer who comes into court and betrays his coconspirator, if he be such; but it is not confined to that class."

The 1863 Act authorized private individuals, called "qui tam relators," to bring lawsuits on behalf of the United States to prosecute fraud against the Government and to recover funds that were wrongfully obtained. The Act provided for double damages and a $2,000 civil penalty per false claim, and private individuals who successfully pursued claims under the Act were entitled to half of the Government's recovery. The Act did not authorize the Government to intervene in the private individual's case, nor did it preclude qui tam actions based upon the source of the relator's information.

Nearly eighty years later, in the midst of World War II, Attorney General Francis Biddle requested that Congress make changes to the False Claims Act that would prevent parasitic lawsuits. Biddle was concerned that qui tam complaints were being filed based solely on information contained in criminal indictments. Biddle argued that such cases contributed nothing new and could interfere with the Government's criminal prosecutions. So, he urged Congress to repeal the authorization for qui tam actions.

The Senate and House of Representatives each considered Attorney General Biddle's request, and the House went so far as to pass a bill, H.R. 1203, proposing repeal of the False Claims Act's qui tam provisions. The Senate demurred. The House Judiciary Committee then considered legislation providing that jurisdiction would be barred on qui tam suits that were based on information in the possession of the Government, unless the relator was an original source of that information. Without explanation, the resulting conference report dropped the reference to "original sources."

The 1943 amendments changed the False Claims Act in several ways. Most significantly, these amendments authorized the Department of Justice to take over cases initiated by relators. The 1943 amendments required relators to submit all of their supporting evidence to the Department of Justice at the time the relator filed his complaint and gave the Department sixty days to decide whether or not to intervene and take exclusive control of the suit. If the Government elected to intervene, the relator would have no role in the case and no voice in its resolution.

The 1943 amendments also included a "government knowledge bar," which deprived courts of jurisdiction over qui tam actions that were "based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought." The 1943 amendments also significantly reduced the amount of the relator's share of any recovery. In fact, under the 1943 amendments, relators were not assured of a minimum recovery at all. The amendments provided that if the Government prosecuted the suit, the court could award the informer "fair and reasonable compensation" not to exceed 10–percent of the proceeds. If the Government did not intervene, the informer's award could not exceed 25–percent of the proceeds.

These changes put the False Claims Act into hibernation. By the 1980s, it had become evident that the False Claims Act was no longer an effective tool against fraud. In particular, some courts, for example in *United States ex rel. State of Wis. (Dept. of Health and Social Services)* v. *Dean*, 729 F.2d 1100 (7th Cir. 1984), had broadly interpreted the government knowledge bar adopted in 1943, holding that the bar precluded all qui tam cases involving information already known to the Government, even when the qui tam relator had been the source of that information.

Additionally, the changes to the amount of the relator's share undermined the Act's usefulness. Individuals with information about fraud against the Government were far less likely to become relators without some guarantee that they would be rewarded if they prevailed, particularly since relators often exposed fraud by their employers and were terminated from their jobs as a result. The 1943 amendments did not provide relators with an adequate incentive to bring qui tam actions. Consequently, from 1943 to 1986, fewer than

ten False Claims Act cases were brought each year.

As a result of the problems that arose following the 1943 amendments, by the 1980s, fraud against the Government had grown to unprecedented levels. A 1981 three-volume General Accounting Office report, Fraud in Government Programs:—How Extensive is It?—How Can it Be Controlled, concluded that fraud against the Government was "widespread." The report also noted that false or fraudulent claims against the Government result both in monetary losses and a broad spectrum of non-monetary losses. These include, for example, loss of confidence in Government programs, Government benefits not going to intended recipients, and harm to public health and safety. During this same period, several legal scholars began discussing the merits of increased use of the False Claims Act to address fraud against the Government.

In response to these concerns, Senators CHARLES GRASSLEY, CARL LEVIN, and Dennis DeConcini introduced S. 1562 in 1985. The Committee on Administrative Practice and Procedure of the Senate Committee on the Judiciary held hearings on S. 1562 and S. 1673, a similar bill supported by the Reagan Administration. The House of Representatives took up a similar bill, H.R. 3317, and the Subcommittee on Administrative Law and Governmental Relations of the House Committee on the Judiciary held hearings on that measure.

Both Committees heard from a range of witnesses, including whistleblowers and the Department of Justice. The Senate Committee heard testimony that "45 of the 100 largest defense contractors—including 9 of the top 10—were under investigation for multiple fraud offenses." In addition, the Committee learned that, due to limited Government resources, "[a]llegations that perhaps could develop into very significant cases are often left unaddressed at the outset due to a judgment that devoting scarce resources to a questionable case may not be efficient. And with current budgetary constraints, it is unlikely that the Government's corps of individuals assigned to anti-fraud enforcement will substantially increase." The Senate and House bills sought to address this resource problem by constructing legislation which would empower private citizens with knowledge of fraud or false claims to come forward and bring the resources of private counsel to bear on Government investigations under the Act.

In response to the problems Congress identified, as well as concerns raised by the Department of Justice and potential defendants, Congress adopted the False Claims Amendments Act of 1986. President Reagan signed the bill into law on November 23, 1986. The 1986 amendments made a number of changes to the False Claims Act. Although the amendments did not include a provision for recovering consequential damages, they increased the penalty provision, which had been unchanged for more than 100 years, from double damages to treble damages. In order to limit interference with Government investigations, the amendments provided that qui tam actions be filed under seal for sixty days and served on the United States, but not the defendant, to provide the Government time to determine whether to take over the action. However, while the amendments limited the seal period to sixty days, they permitted the Government the opportunity to request and receive an extension for good cause. The amendments also provided the Government, for the first time, the option of intervening later in a case, even if it had initially declined to join, if it had "good cause" to do so. Furthermore, the legislation provided that a qui tam relator would remain a fully participating party even if the Government joined the case, but provided that a court could, under specified circumstances, restrict the relator's role.

Additionally, in order to incentivize individuals to report false claims and fraud, Congress eliminated the uncertainty of purely discretionary rewards. Rather, since 1986, rewards to qui tam relators have been based on the relator's contributions. In most cases, relators would be guaranteed at least a 15-percent share of the Government's recovery. The 1986 amendments also eliminated a potent disincentive for relators, by creating a new right of action for any employee who is retaliated against for lawful acts in furtherance of False Claims Act proceedings. Under the 1986 amendments, employees who suffered retaliation would be entitled to all relief necessary to make them whole, including double back pay and attorneys' fees. The 1986 amendments also sought to replace the government knowledge bar with a "public disclosure bar" that would only bar truly parasitic relators whose complaints were "based upon allegations or transactions in a . . . [Government proceeding] or investigation, or from the news media," and were not an "original source" as defined under the Act. Congress also authorized the award of attorneys' fees to a defendant prevailing in a suit that "the court finds . . . was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment."

II. THE CURRENT FALSE CLAIMS ACT

Currently, the False Claims Act permits the Government to recover treble damages from those who knowingly present, or cause to be presented, false claims to a United States Government officer, employee or member of the Armed Forces; or who knowingly make, or cause to be made, false statements to get such claims paid by the United States. The Act also applies to those who make false statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government. It also covers certain conspiracies to violate the Act. In addition to damages, the courts are required to award the Government a civil penalty of $5,500 to $11,000 for each violation of the Act. The Government is entitled to recover such forfeitures upon any showing that a defendant violated the False Claims Act, without needing to prove that the violation resulted in damages in the case at hand. Thus, a defendant may be held liable for these penalties under the False Claims Act whether or not payment was made on the tainted claim.

The Act defines several statutory terms. The term "person" is broadly defined in the law's civil investigative demand provision to include partnerships, associations, and corporations, as well as States and political subdivisions thereof. The statutory definition of "claim" is also intended to be read broadly and, indeed, is not an exclusive list. The definition applies to any request or demand for Government money or property, regardless of whether it is submitted to the Government or to another entity, such as a Government contractor, agency, instrumentality, quasi-governmental corporation, or a non-appropriated fund. In defining the word "claim" so broadly, Congress intended in 1986 to make sure that the FCA would impose liability even if the claims or false statements were made to a party other than the Government, if the payment thereon could potentially result in a loss to the Government or cause the Government to wrongfully pay out money. For example, because any fraud that reduces the effectiveness of programs and initiatives the Government has sought to advance also undermines the Government's purpose in supplying funding support, Congress intended for a false claim to the recipient of a grant from the United States or to a State under a program financed in part by the United States, to be considered a false claim to the United States.

In sum, Congress intended the False Claims Act to protect all Government funds and property, without qualification or limitation. However, over the years, some courts have incorrectly grafted limitations to the reach of the Act, leaving billions of dollars vulnerable to fraud. Most recently, in June 2008, the Supreme Court ruled in the Allison Engine decision that, absent the "Government itself" inking the check or approving a false claim, the Act does not impose liability for false claims on Government funds disbursed for a Government purpose by a Government contractor or other recipient of Government funds, even if such fraud damages the Government or its programs. Because so many inherently governmental functions are carried out by government contractors these days, including contracting and program management functions, this ruling severely limits the reach of the law. The primary impetus for the current corrective legislation is to reverse these unacceptable limitations and restore the False Claims Act to its original status as the protector of all Government funds or property. While we cannot possibly predict the breadth of fraudulent schemes that can be used to target the public fisc, I take this opportunity to stress that, when done knowingly, the following conduct clearly violates the False Claims Act:

Charging the Government for more than was provided.

Seeking payment pursuant to a program for which the claimant was not eligible.

Demanding payment for goods or services that do not conform to contractual or regulatory requirements.

Fraudulently withholding property from the Government or attempting to pay the Government less than is owed in connection with any goods, services, concession, or other benefits provided by the Government.

Fraudulently seeking to obtain a Government contract.

Submitting a fraudulent application for a grant of Government funds.

Submitting a false application for a Government loan.

Requesting payment for goods or services that are defective or of lesser quality than those for which the Government contracted.

Making false statements for a loan guaranteed by the Government that later defaults.

Requesting Government services to which one is not entitled.

Submitting a claim that falsely certifies that the defendant has complied with a law, contract term, or regulation.

Submitting a claim by a person who has violated a statute or regulation, the violation of which is capable of influencing the payment decision.

Submitting a false application in a multi-staged grant application process, where the second stage of the application would not have been granted had the applicant been truthful in the first stage.

Submitting a claim for payment even though the defendant was violating the Government-funded program's conditions of participation or payment.

Submitting a claim that seeks payment for an estimate or opinion that the defendant knows to be false.

Submitting claims based on an interpretation of a regulation or contract that the defendant knows has been rejected by the Government.

Fraudulently cashing a Government check or knowingly keeping Government funds that were initially wrongfully or mistakenly obtained.

The False Claim Act does not specify a particular method for assessing damages. Courts, however, should liberally measure damages to effectuate the remedial purpose of the Act, which is to afford the Government a full and complete recovery. The Government has finite resource. So when a fraudfeasor wrongfully obtains or retains Government owned or administered funds, it prevents the Government from achieving the full purposes and benefits intended to result from its spending or from utilizing funds wasted as a result of fraud or abuse for other purposes. Indeed, when a defendant obtains a Government contract under false pretenses or wrongfully qualifies for a Government-funded program, it has no right to receive payment for the services it provides. In such a case, the Government should be awarded damages of the entire amount paid by the Government. Finally, it has long been the law that where the Government received legitimate value from the defendant's work, any offset occurs after, rather than before, trebling. This assures, for example, that defendants who know they are not eligible to participate in a Government program or contract cannot substantially evade and defeat the purposes of eligibility requirements by contending that the services or products they provided under false pretenses have similar market value to services or products that otherwise would have been provided by persons whom the Government intended to be eligible.

When a court calculates civil penalties under the False Claims Act, it should consider each separate bill, voucher or other demand, concealment of payment, or other prohibited act as a separate violation for which a civil penalty should be imposed. This is true although many such claims may be submitted at one time. For example, a doctor who completes separate Medicare claims for each patient treated will be liable for a civil penalty for each such claim, even though several paper claims forms or electronic requests for payment may be submitted to a Medicare contractor at one time. Likewise, each claim for payment submitted under a contract, loan guarantee, or other agreement which was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim. For example, claims submitted under a contract obtained through collusive bidding are false and actionable under the Act, as are all Medicare claims submitted by or on behalf of a physician who knows he or she is ineligible to participate in the program.

III. PURPOSE OF THE FALSE CLAIMS ACT AMENDMENTS

Since its inception, the central purpose of the False Claims Act has been to enlist private citizens in combating fraud against the U.S. Treasury. Specifically, the Act's qui tam provisions were crafted to provide a clear procedural roadmap, so as to assist and encourage private citizens to not only report fraudulent schemes, but to actively participate in investigating and prosecuting those who steal from the public fisc. However, over the course of the Act's history, courts have embraced a number of conflicting interpretations that have removed protection for billions of federal dollars and discouraged qui tam relators from filing suits under the Act.

The False Claims Act amendments included in S. 386, the Fraud & Enforcement & Recovery Act of 2009, remove some of the confusion that is currently undermining the Act's ability to fully reach those who target the American tax dollar. S. 386 clarifies a number of key provisions and reaffirms that the False Claims Act is intended to protect all Government funds, without qualification or limitation, from the predation of those who would avail themselves of taxpayer money without the right to do so. This legislation is the first step in correcting the erosion of the effectiveness of the False Claims Act that has resulted from court decisions contrary to the intent of Congress. This mounting confusion occurs at a time when the country can least afford weakened antifraud legislation. Particularly now, at a time of dramatically-increased reliance on private contractors to perform what have traditionally been viewed as governmental functions, clarity of purpose and effect must be the hallmarks of the False Claims Act.

The False Claims Act also needs to be amended to bolster protections for qui tam plaintiffs, the individuals who bring fraud on government programs to the attention of the federal government and file FCA suits on behalf of the United States. Qui tam relators have been able to uncover vast amounts of fraud, and their efforts have resulted in the return of billions to the Treasury. In Fiscal Year 1986, the year prior to Congress revitalizing the False Claims Act qui tam provisions, the Department of Justice recovered just $54 million under the Act. Since then, there has been a steady increase in recoveries, culminating in settlements and judgments of more than $5 billion in the past two years. This success has been due, in large part, to qui tam relators who ferreted out and prosecuted False Claims Act violations. Indeed, of the $21.6 billion recovered under the False Claims Act from 1986 to 2008, $13.7 billion was the result of qui tam actions. However, with estimates of fraud and abuse losses remaining in the range of 10% of disbursements to contractors, much remains to be done.

In February 27, 2008, testimony before the Senate Committee on the Judiciary, Michael F. Hertz, Deputy Assistant Attorney General, Civil Division of the U.S. Department of Justice, whose long career as the Government's chief False Claims Act prosecutor predates the 1986 amendments, noted the critical role played by qui tam plaintiffs:

[T]he 1986 qui tam amendments to the Act that strengthened whistleblower provisions have allowed us to recover losses to the federal fisc that we might not have otherwise been able to identify.

Recent testimony heard by the House Committee on the Judiciary underscores the critical role qui tam relators play in uncovering and prosecuting violations of the False Claims Act. The Subcommittee on Courts, the Internet and Intellectual Property and the Subcommittee on Commercial and Administrative Law held a joint legislative hearing on June 19, 2008, on H.R. 4854, the False Claims Act Corrections Act of 2007, a bill I sponsored with Mr. SENSENBRENNER to address many of the same problems that are addressed in S. 386, as amended by the House of Representatives. At that hearing, the Subcommittees heard testimony from Shelley R. Slade, a Washington, D.C. attorney who represents qui tam plaintiffs and serves on the Board of Directors of Taxpayers Against Fraud, a national nonprofit public interest organization dedicated to fighting fraud against the federal and state governments. Ms. Slade, who also handled FCA cases and related matters for the U.S. Department of Justice for ten years, testified that:

Qui tam plaintiffs are key to the Government's efforts to fight fraud, mainly for two reasons. First, as inside witnesses, they produce evidence that can be absolutely critical to establishing liability. Fraudulent activity by its very nature is concealed. . . . Without the help of insiders who brought the Government documents and other hard evidence of the fraud, it would have been extremely difficult for the Government to develop sufficient evidence to establish liability in many of the successful FCA cases. Second, it is the relentless, zealous pursuit of qui tam litigation by qui tam plaintiffs and their counsel that has led to many of the largest FCA cases in the last eighteen years. A close study of the largest recoveries will reveal that, in many instances, the qui tam plaintiff spent years either trying to persuade the Government of the merits of the case before finally achieving an intervention decision, or litigating the case following a Government declination.

Over the course of the last twenty years, it has become increasingly evident that fraud permeates a very wide range of Government programs, ranging from welfare and food stamps benefits to multi-billion dollar defense procurements; from crop subsidies to disaster relief programs; and from Government-backed loan programs to health care and homeland security.

While fraud is not limited to any one Government agency, fraud in the health care arena has been particularly pernicious, covering nearly every facet of this industry from hospitals and laboratory work to drug companies, durable medical equipment makers, nursing homes, and renal care facilities. In the health care arena, recovery in the top twenty hospital fraud cases settled under the False Claims Act totaled more than $3.4 billion. The largest twenty settlements against pharmaceutical companies exceed, in total, $4.6 billion.

While qui tam relators have long increased the efficiency of the Federal Government in identifying fraud and false claims and understanding the mechanics and scope of particular schemes, the role of relators has been particularly important in the health care arena where the complexity of frauds might otherwise thwart a Government investigation.

Of the 6,199 qui tam False Claims Act cases filed between 1986 and 2008, more than half (3,306) focused on fraud against Government health care programs, such as Medicare and Medicaid. These cases were responsible for recovering $10.1 billion, or more

than 74-percent of the total $13.7 billion recovered in qui tam cases. Along with fraud against the health care programs, fraud against the Department of Defense still appears to be pervasive, with about 12-percent of recoveries, or $1.7 billion, recovered due to qui tam actions involving DoD contracts. The cost of fraud cannot be measured only in dollars and cents. GAO pointed out in its 1981 report, fraud erodes public confidence in the Government's ability to efficiently and effectively manage its programs. General Accounting Office, Fraud in Government Programs: How Extensive is It?—How Can it Be Controlled? (1981).

Thus, fraud continues to drain funds from the public fisc, and the Government is increasingly relying on relators to uncover these fraudulent schemes. However, there are mounting legal divisions and uncertainties among the circuit courts that are jeopardizing Government funds and discouraging potential qui tam relators from filing actions. The bill on the floor today, S. 386, is a critical first step needed to remove the confusion and to ensure that qui tam actions continue to assist the Government in protecting its limited resources.

The False Claims Act amendments in S. 386 clarify the reach of the Act's liability provisions, strengthen anti-retaliation protections, and remove impediments to the Government's investigative powers under the Act. Other corrections and clarifications that are needed to the False Claims Act have not been included in S. 386 due to the particular overall purpose of S. 386. Those additional False Claims Act corrections and clarifications should be taken up in separate legislation. However, I rise today to clarify the intent behind the False Claims Act amendments that are included in S. 386.

A. SECTION 4(A): LIABILITY PROVISIONS

In Section 4(a), the legislation updates the liability provisions of Section 3729(a) of the False Claims Act to address misreadings of the Act by the courts, to remove ambiguities created by inconsistency of language in the present provisions, and to clarify how the Act should be applied when the Government implements its programs with the help of contractors and intermediaries or administers funds on behalf of beneficiaries such as another government or a Tribal authority. Existing provisions of Section 3729(a) are also renumbered. I want to go through each of the issues addressed.

1. Fraud Against Government Contractors and Grantees

In *United States ex rel, Totten* v. *Bombardier Corp.*, 380 F. 3d 488 (D.C. Cir. 2005), the D.C. Court of Appeals ruled that, notwithstanding the FCA's broad definition of the term "claim," liability will not lie under subsection (a)(1) of 31 U.S.C. § 3729, which imposes liability for knowing false claims, unless the false claims are presented directly to the United States Government itself. According to the D.C. Court of Appeals, when third parties disburse federal funds in furtherance of federal contracts, they are not the same as the "U.S. Government" for purposes of this liability provision. Following that decision, a number of courts held that the False Claims Act does not reach false claims that are (i) presented to Government grantees or contractors and (ii) paid with Government grant or contract funds. In *Allison Engine Co.* v. *United States ex rel.*

*Sanders*, 128 S.Ct. 2123 (2008), the U.S. Supreme Court similarly ruled that liability will not lie under subsection (a)(2) of 31 U.S.C. Section 3729, which imposes liability for knowing false statements, unless the false statements are made to get false claims paid by the United States Government itself. Moreover, the Supreme Court held that plaintiffs must show that the fraudfeasor "intended" for its false statements to cause the "Government itself" to "rely" on the false statements as a "condition of payment."

With the Government increasingly relying on private entities to disburse Government funds, it is a rare instance in which the "Government itself" would be paying the claims. The implications are considerable. The amendments clarify that liability under Section 3729(a) attaches whenever a person knowingly makes a false claim to obtain money or property, any part of which is provided by the Government without regard to whether the wrongdoer deals directly with the Federal Government; with an agent acting on the Government's behalf; or with a third party contractor, grantee, or other recipient of such money or property. To ensure that the Act is not interpreted to federalize fraud that threatens no harm to Government purposes or federal program objectives, the Amendment explicitly excludes from liability requests or demands for money or property that the Government has paid to an individual as compensation for federal employment or as an income subsidy, such as Social Security retirement benefits, with no restrictions on that individual's use or the money or property at issue.

The amendments also clarify that the False Claims Act may be used to redress fraud on Medicare's new Part D prescription drug benefit program and fraud on Medicare managed care. Both of these programs are administered by Government contractors. The legislation eliminates any argument that the False Claims Act does not reach false claims submitted to State-administered Medicaid programs, as some have argued under the Totten case (and as the Atkins court held).

The amendments clarify that the False Claims Act can be used to redress false claims submitted to recipients of federal block grants administered by state agencies or other third parties. Such claims undermine the purpose of those grants by diverting funding away from the objectives that the federal program sought to achieve and cause harm to the United States. Thus, for example, if a large non-minority owned business falsely applied for grant funds that the Government provided a municipality to assist small, minority-owned businesses, the business entity would be subject to False Claims Act liability.

These clarifications are consistent with what Congress intended to achieve in 1986. By removing from Section 3729(a)(1) language that can be narrowly read to limit liability to persons who present false claims directly "to an officer or employee of the Government, or to a member of the Armed Forces," the amendments finish the job Congress intended to complete in 1986, when it defined actionable "claims" in the current Act to include "any request or demand . . . for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."

2. Fraud Against Funds Administered by the United States

In a 2006 decision involving Iraq reconstruction fraud, a federal trial court in Virginia held that the False Claims Act does not reach false claims against funds administered, but not owned, by the U.S. Government. This was *United States ex rel. DRC, Inc.* v. *Custer Battles, LLC*, 376 F. Supp. 2d 617, 636–641 (E.D. Va. 2006). This result is not consistent with what Congress intended in 1986. When the United States Government elects to invest its resources in administering funds or managing property belonging to another entity, it does so because use of such investments or property for their designated purposes will further interests of the United States. Misdirection of such money or property as the result of false or fraudulent conduct by contractors frequently creates funding gaps which either thwart federal interests or require infusions of federal money to see program goals achieved. Accordingly, false claims made against Government-administered funds damage the interests of the United States in essentially the same way as does misappropriation or wasting of funds owned by the United States. Whenever money directed to address Government interests is wasted, it becomes necessary either to redirect other funds to complete the contemplated task at hand or to make do with diminished returns on Government program investments. The amendments address this problem by defining "claim" to include, among other things, requests or demands for money or property that are presented to an officer, employee, or agent of the United States "whether or not the United States has title to the money or property." See new 31 U.S.C. 3729(b)(2)(A). This amendment to the existing statutory language clarifies that FCA liability attaches to knowingly false requests or demands upon the United States for money or property administered by the United States on behalf of another person.

3. Conspiracy

Currently, Section 3729(a)(3) imposes liability on persons "who conspire to defraud the Government by getting a false or fraudulent claim allowed or paid." This wording can be construed to apply only to conspiracies that violate subsections 3729(a)(1), (2) or (7). Some courts have interpreted the section to be even more limited. For example the court in *United States ex rel. Huangyan Import & Export Corp.* v. *Nature's Farm Products, Inc.*, 370 F. Supp. 2d 993 (N.D. Cal. 2005) held that section 3729(a)(3) does not extend to conspiracies to violate section 3729(a)(7). The current provision does not explicitly impose liability on those who conspire to violate other provisions of the False Claims Act, such as delivery of less Government property than that promised the Government or making false statements to conceal an obligation to pay money to the Government. Section 4(a) of S. 386 amends current Section 3729(a)(3) to clarify that conspiracy liability can arise whenever a person conspires to violate any of the provisions of Section 3729 imposing False Claims Act liability. Because this expands conspiracy liability to other sub-sections of 3729, this particular amendment is a substantive

change. The rest of the Section 4 amendments are meant to merely clarify the existing scope of False Claims Act liability.

4. Wrongful Possession, Custody or Control of Government Property

The amendments to the False Claims Act in S. 386 also update current Section 3729(a)(4) of the False Claims Act, which makes the Government's ability to recover for conversion of Government assets dependent upon issuance of an inaccurate certificate or receipt. This language is unchanged from the original Act as drafted in 1863. This outmoded phraseology led the court in *United States ex rel. Aakhus* v. *Dyncorp, Inc.*, 136 F.3d 676 (10th Cir. 1998), to dismiss a case on the technical grounds that no receipt was provided. Where knowing conversion of Government property occurs, it should make no difference whether the person committing the offense receives an inaccurate certificate or receipt documenting the transaction. The updated provision eliminates reference to such documentation. It appears in the renumbered provisions of the Act as Section 3729(a)(1)(D).

5. Wrongful Retention of Government Money or Property

Currently, Section 3729(a)(7) of the False Claims Act imposes liability for "reverse" False Claims Act violations when a person makes or uses false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government. This liability provision is analogous to the liability established under current Section 3729(a)(2) for making false records or statements to get false or fraudulent claims paid or approved. The Act, however, currently contains no provision that expressly imposes liability on a person who wrongfully avoids a duty to return funds or property to the United States by remaining silent. The amendments address this issue by expressly imposing liability on anyone who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the United States." This language is intended to make clear that a person who retains an overpayment, while avoiding a duty to disclose or return the overpayment that arises from a statute, regulation or contract, violates the False Claims Act. Indeed, to address any potential confusion among the courts as to what is intended to be encompassed within the term "obligation" as used in Section 3729(a)(7), the amendments define that term in new Section 3729(b)(3) as encompassing legal duties that arise from the retention of any overpayment.

A legal obligation to disclose or refund an overpayment can arise in various ways. Examples include, but are not limited to: (i) Government contracts that incorporate a rule of the Federal Acquisition Regulations that requires disclosure of an overpayment, and (ii) criminal statutes that penalize a party's non-disclosure of an overpayment in order to fraudulently secure the overpayment. Importantly, the amendments do not impose liability in situations in which the law clearly permits the recipient of the overpayment to retain the overpayment without disclosure pending a reconciliation process.

Liability for all non-disclosed overpayments of the same type also should be imposed once an organization or other person is on notice that it has been employing a practice that has led to multiple instances of overpayment. For example, if a corporation learns after-the-fact that it has been violating a billing rule or a contract requirement in its billing, and it nonetheless fails to comply with a legal obligation to disclose the resulting overpayments, this amendment renders the corporation liable under the Act for all overpayments resulting from the violation of the billing rule or contract requirement, even those not specifically identified or quantified.

We use the term "disclose" in this provision to mean full disclosure of all the pertinent facts concerning the overpayment to the appropriate Government officials with authority to determine what actions, if any, the recipient of the overpayment should take to remedy the situation.

The amendments also define the term "obligation" to include fixed and contingent duties owed to the Government, a term intended to encompass, among other things, ad valorem and other customs duties, such as custom duties for mismarking country of origin on imported products. The amendments are intended to overrule the result reached in American Textile Manufacturers Institute, Inc., supra, as applied to ad valorem duties imposed for import violations. Reference to that particular custom duty is not intended to exclude other types of customs duties or statutory obligations that are similar in effect and purpose or that otherwise meet the definition set forth in the proposed amendments.

B. SECTION 4(B): GOVERNMENT COMPLAINTS-IN-INTERVENTION

Section 4(b) of S. 386 deals with the Government's ability to intervene in a relator's case. The False Claims Act does not expressly provide that the United States may amend the qui tam plaintiff's complaint—or, if more practical, file its own complaint upon intervention in a qui tam case—subject to the same rules on "relation back" of amended claims as would apply if it were amending its own complaint. Federal Rule of Civil Procedure 15(c)(2) provides that a party's amendment of a pleading will relate back to the date of its original pleading when the claim "asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." In *United States* v. *Baylor Univ. Medical Center*, 469 F.3d 263 (2d Cir. 2006), the Second Circuit suggested that the United States may not be able to avail itself of this rule when amending a qui tam plaintiff's complaint. The implication of this ruling is that the United States could sometimes be forced to forgo a thorough investigation of the merits of qui tam allegations in order to ensure that it does not lose claims due to the running of the statute of limitations.

Section 4(b) clarifies that the Government's complaint in intervention or amended complaint will relate back to the date of the original qui tam complaint so long as the conditions of Federal Rule of Civil Procedure 15(c)(2) otherwise are met. Thus, Section 4(b) adds a new paragraph (c) to Section 3731 that expressly provides that the United States' complaint-in-intervention or amended complaint relates back to the date of the complaint filed by the qui tam plaintiff "to the extent that the claim of the Government arises out of the conduct, transactions, or occurrences set forth, or attempted to be set forth, in the prior complaint of that person."

C. SECTION 4(C)—CIVIL INVESTIGATIVE DEMANDS

The False Claims Act was amended in 1986 to give the Department of Justice an effective investigative tool: civil investigative demands or "CIDs," which are administrative subpoenas for documents, interrogatory responses and sworn testimony that may be used to investigate allegations of potential violations of the False Claims Act. Use of this tool, provided for in Section 3733, is increasingly necessary for effective investigation of False Claims Act allegations. Program agencies are strapped for resources and unable to assign investigators even to meritorious cases, let alone issue Office of Inspector General subpoenas.

Nevertheless, as a result of restrictive language in the False Claims Act's CID provisions, the Department of Justice very rarely uses CIDs. The Assistant U.S. Attorneys and Main Justice trial attorneys are disinclined to use these subpoenas because of the length of time required to obtain review and approval by the Attorney General. Pursuant to Section 3733, the Attorney General may not delegate his authority to issue CIDs.

Moreover, Department attorneys are concerned that the False Claims Act, by limiting access to CID material to Government "custodians" and "false claims law investigators," implicitly may preclude them from showing the documents, interrogatory responses and testimony obtained through CIDs to fact and expert witnesses and consultants, and the parties, in connection with their investigation or litigation of the case or proceeding. While statutory language does permit them to make "official use" of this material, they are nonetheless disinclined to rely on this language alone because of potential ambiguity as to its reach. Without being able to share the evidence in this manner, they fear that they may be unable to make sense of the documents and information produced and, accordingly, rarely employ CIDs.

Section 4(c) of S. 386 facilitates the issuance of CIDs by amending Section 3733 to authorize the Attorney General to delegate the authority to issue CIDs to a designee, and clarifying that CIDs may be issued during the investigation of qui tam allegations prior to the Government's intervention decision. Section 4(c) also clarifies that the Attorney General or his designee may disclose CID material to the qui tam plaintiff when necessary to further a False Claims Act investigation or litigation. Qui tam plaintiffs are not only parties to the False Claims Act proceeding, they often are fact witnesses or experts in the subject matter under investigation. Accordingly, more often than not, it will be necessary for the Department of Justice to show information obtained through CIDs to the relator in order to investigate or litigate the allegations effectively. However, the Department of Justice retains the discretion to evaluate whether disclosure to the relator is appropriate under the circumstances of the case, taking into account such factors as the need to protect the integrity of its investigation.

Finally, to eliminate any ambiguity on the question of whether Department of Justice attorneys may use and disclose the documents, testimony and interrogatory responses obtained through CIDs in connection with the steps law enforcement customarily takes to investigate, and, if required, litigate allegations of wrongdoing, Section 4(c) of the bill clarifies Section 3733 by adding a new definition of "official use" in subsection 3733(1).

The definition provides that "official use" includes "any use that is consistent with the law, and the regulations and policies of the Department of Justice." The new definition of "official use" also includes specific examples of the types of uses that fall within the term "official use." These examples are not meant to be an exhaustive list, but rather illustrative of the ordinary, lawful uses of subpoenaed material in a Department of Justice investigation or litigation that we intend the Department of Justice to employ in False Claims Act cases. Section 4(c) of the bill also removes confusing language in Section 3733(i)(2)(B) and (C) that could be misinterpreted by the courts to prevent the custodian of CID material from sharing the material with other Department of Justice or program agency personnel for these official uses in the absence of authority from regulations or a court.

D. SECTION 4(D): RELIEF FROM RETALIATORY ACTIONS

Section 3730(h) of the False Claims Act imposes liability on any employer who discriminates in the terms or conditions of employment against an employee because of the employee's lawful acts in furtherance of a qui tam action. This section needs to be amended so that it is clear that it covers the following types of retaliation that whistleblowers commonly have faced over the course of the last twenty years: (i) retaliation against not only those who actually file a qui tam action, but also against those who plan to file a qui tam that never gets filed, who blow the whistle internally or externally without the filing of a qui tam action, or who refuse to participate in the wrongdoing; (ii) retaliation against the family members and colleagues of those who have blown the whistle; and, (iii) retaliation against contractors and agents of the discriminating party who have been denied relief by some courts because they are not technically "employees."

To address the need to widen the scope of protected activity, Section 4(d) of S. 386 provides that Section 3730(h) protects all "lawful acts done" . . . in furtherance of . . . other efforts to stop 1 or more violations" of the False Claims Act. This language is intended to make clear that this subsection protects not only steps taken in furtherance of a potential or actual qui tam action, but also steps taken to remedy the misconduct through methods such as internal reporting to a supervisor or company compliance department and refusals to participate in the misconduct that leads to the false claims, whether or not such steps are clearly in furtherance of a potential or actual qui tam action.

To address the concern about indirect retaliation against colleagues and family members of the person who acts to stop the violations of the False Claims Act, Section 4(d) clarifies Section 3730(h) by adding language expressly protecting individuals from employment retaliation when "associated others" made efforts to stop False Claims Act violations. This language is intended to deter and penalize indirect retaliation by, for example, firing a spouse or child of the person who blew the whistle.

To address the need to protect persons who seek to stop violations of the Act regardless of whether the person is a salaried employee, an employee hired as an independent contractor, or an employee hired in an agency relationship, Section 4(d) of S. 386 amends Section 3730(h) so that it expressly protects not just "employees" but also "contractors" and "agents." Among other things, this amendment will ensure that Section 3730(h) protects physicians from discrimination by health care providers that employ them as independent contractors, and government subcontractors from discrimination or other retaliation by government prime contractors.

I should note that this amendment does not in any way require that a qui tam plaintiff must have refused to engage in the misconduct or tried to stop the fraud internally before he or she may avail themselves of the incentives and protections in the False Claims Act. As the Congress recognized when the False Claims Act's qui tam provisions were first enacted in the nineteenth century, and as we have repeatedly affirmed in different contexts, including the new IRS whistleblower law, sometimes it "takes a rogue to catch a rogue." An individual who participates in the fraud, and who for whatever reason does not challenge the misconduct within his or her organization, is still entitled to a relator's award and the protections of Section 3730(h) unless he or she is otherwise barred by a specific provision in the law.

E. SECTION 4(E): SERVICE UPON STATE PLAINTIFFS

Increasingly, qui tam plaintiffs are filing False Claims Act actions on behalf of not only the Federal Government, but also one or more States joined as co-plaintiffs pursuant to state False Claims Act statutes. Such cases ordinarily allege false claims submitted to Medicaid, which is a program funded jointly by the United States and the states. These cases are increasing in number as many states recently have enacted qui tam statutes, and many more are expected to do so in light of provisions in the Deficit Reduction Act of 2005. False Claims Act Section 3732 provides that state law claims may be asserted in a case filed under the federal False Claims Act if the claims arise from the same transaction or occurrence. The statute is unclear, however, as to whether the seal imposed by the U.S. District Court on the case pursuant to Section 3730(b) precludes the qui tam plaintiff from complying with state requirements to serve the complaint, or restricts the qui tam plaintiff and the Federal Government in their ability to serve other pleadings on the States, and disclose other materials to the States.

The amendment in Section 4(e) of S. 386 adds a new paragraph (c) to Section 3732 that clarifies that the seal does not preclude service or disclosure of such materials to the State officials authorized to investigate and prosecute the allegations that the qui tam plaintiff raises on behalf of the State. This paragraph also clarifies that State officials and employees must respect the seal imposed on the case to the same extent as other parties to the proceeding must respect the seal.

F. SECTION 4(F). EFFECTIVE DATE AND APPLICATION

Section 4(f) of S. 386 provides that the amendments in Section 4 take effect upon enactment and apply to conduct on or after the date of enactment, with the exception of the amendment of Section 3729(a)(1)(B), which shall apply to False Claims Act claims pending on or after June 7, 2008, and the amendments set forth in Section 4(b), (c), and (e) of the Bill, each of which shall apply to all cases pending on the date of enactment. We intend for the definition of claim also to apply to all False Claims Act claims pending on or after June 7, 2008, as that definition is an intrinsic part of amended Section 3729(a)(1)(B). The purpose of this amendment is to avoid the extensive litigation over whether the amendments apply retroactively, as occurred following the 1986 False Claims Act amendments.

However, while the amendments state that the remainder of the Section 4(a) liability provisions are not retroactive, the courts should recognize that Section 4(a) only includes one substantive change to existing False Claims Act liability, which is the expansion of the conspiracy liability. All of the other Section 4(a) amendments merely clarify the law as it currently exists under the False Claims Act. With the exception of conspiracy liability, the courts should rely on these amendments to clarify the existing scope of False Claims Act liability, even if the alleged violations occurred before the enactment of these amendments.

In other words, the clarifying amendments in Section 4(a) do not create a new cause of action where there was none before. Moreover, these clarifications do not remove a potential defense or alter a defendant's potential exposure under the Act. In turn, courts should consider and honor these clarifying amendments, for they correctly describe the existing scope of False Claims Act liability under the current and amended False Claims Act. The amended conspiracy provision, on the other hand, is limited to those violations that occur after the enactment of these amendments.

Each of the provisions in S. 386 dealing with the False Claims Act is key to protecting taxpayer dollars, and I urge my colleagues to support this legislation.

---

HONORING THOSE WHO HAVE SERVED IN THE ARMED FORCES

## HON. JOE SESTAK

OF PENNSYLVANIA

IN THE HOUSE OF REPRESENTATIVES

*Wednesday, June 3, 2009*

Mr. SESTAK. Madam Speaker,

A CORPSMAN'S LAMENT

(By HM3 Mike Hall, 5th Marine Division Iwo Jima)

I remember fair-haired dreamers,
Full of themselves, going off to war.
We went willing with visions of heroism in our head.
We felt prepared for what was to come.
Then they opened the door to let reality in;
Fear, blood, and the smell of death.
All around us were the cries for "Doc!"
Who should we help?
I tend to the first, second, and third:
Bandages, Morphine, plasma, and more.
No time for me to feel or think
Keep moving, keep helping; don't sleep.
Then they bring him all battered, near death;
I can't save him.
I look into his eyes and want to cry.
"Doc it's okay, let me go."
I ignore his words; I try.
This man who looks like me . . . he dies.
Tears flow down my cheeks.
No time to grieve, five others lay at my feet.
That day stays with me still.
I shall never forget his words.
"It's okay, Doc.
Let me go."
With his last breath,
He comforted me.