**ANDERSON EXHIBIT 15**

```
                                        Parker, Theresa _Tip_
0001
 1              UNITED STATES DISTRICT COURT
 2               DISTRICT OF MASSACHUSETTS
 3   In re: PHARMACEUTICAL       )
     INDUSTRY AVERAGE WHOLESALE  )
 4   PRICE LITIGATION            )   MDL No. 1456
                                 )
 5   THIS DOCUMENT RELATES TO:   )   Civil Action No.
                                 )       01-12257-PBS
 6   US ex rel Ven-A-Care of     )
     the Florida Keys, Inc.      )
 7   v. Abbott Laboratories, Inc.)
     No. 07-CV-11618-PBS         )
 8
 9
        VIDEOTAPED ORAL DEPOSITION OF THERESA "TIP" PARKER
10
                        February 19, 2009
11
12
13
14          DEPOSITION upon videotaped oral
15   examination, of the witness, THERESA "TIP" PARKER,
16   taken on behalf of Ven-A-Care of the Florida Keys,
17   Inc. in the above entitled cause pending in the
18   United States District Court, District of
19   Massachusetts, before TAMMY POZZI, Certified
20   Shorthand Reporter in and for the State of Texas, on
21   February 19, 2009, in the law offices of Jones Day,
22   77 West Wacker, 35th Floor, Chicago, Illinois,
23   between the hours of 9:08 a.m. and 2:29 p.m.,
24   pursuant to due notice and the Federal Rules of Civil
25   Procedure.
0002
 1                  A P P E A R A N C E S
 2   COUNSEL FOR VEN-A-CARE OF THE FLORIDA KEYS, INC.:
 3        ANDERSON LLC
          Mr. C. Jarrett Anderson
 4        208 West 14th Street, Suite 203
          Austin, Texas 78701
 5        (512) 469-9191
 6   COUNSEL FOR ABBOTT LABORATORIES INC.:
 7        JONES DAY
          Ms. Tara A. Fumerton
 8        77 West Wacker Drive, Suite 3500
          Chicago, Illinois 60601
 9        (312) 782-3939
10   COUNSEL FOR THE STATES OF WISCONSIN, ILLINOIS,
     KENTUCKY, IDAHO, HAWAII, ALASKA AND SOUTH CAROLINA:
11                                     (Via telephone)
          MICHAEL WINGET-HERNANDEZ
12        Mr. Michael Winget-Hernandez
          101 College Street
13        Dripping Springs, Texas 78620
          (512) 858-4181
14
     COUNSEL FOR THE STATES OF ALABAMA AND MISSISSIPPI:
15                                     (Via telephone)
          BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES,
16        P.C.
          Mr. Paul Lynn
17        218 Commerce Street
          Montgomery, Alabama 36104
                              Page 1
```

```
                                Parker, Theresa _Tip_
 7      9.
 8           A.   Okay.  (Reviews document.)  Okay.
 9           Q.   Are you familiar with any of the pages of
10      documents shown in Fiske Exhibit 9?
11           A.   Other than the fact that it says a price
12      change effective date, a notice, and a list, it's a
13      familiar format.
14           Q.   Which page specifically for the record?
15           A.   Page 3 and 4.
16           Q.   Okay.  Page 3 and 4 of Fiske Exhibit 9
17      appear to be a price change notification?
18           A.   That's correct.
19           Q.   And have you been involved in the
20      communication of this type of price change
21      information in the past?
22           A.   No.  I do not communicate price change
23      information.
24           Q.   Who does?
25           A.   Strategic Pricing Department.
0083
 1           Q.   And how do they go about sending that out?
 2      Is it like a mail merge list or a fax blast; do you
 3      know?
 4           A.   I don't know how they do it today.  They
 5      have used multiple means over time.
 6           Q.   Such as?
 7           A.   A fax blast was a process.
 8           Q.   Where a contractor would actually send out
 9      price change notifications such as these two pages to
10      the industry; is that correct?
11           A.   We controlled the "to" list.  It -- it had
12      a "send to," and there was a -- a list of people that
13      they communicated with.
14           Q.   I see.  The -- Abbott itself sent out the
15      faxes?
16           A.   Abbott didn't send the faxes.  A service
17      company --
18           Q.   Uh-huh.
19           A.   -- sent them on Abbott's behalf to a list
20      maintained by Abbott.
21           Q.   I see.  Right.  And that list would
22      typically cover pharmacies throughout America and
23      wholesalers, etcetera, right?
24                MS. FUMERTON:  Objection, form.
25           A.   I'm familiar with the purchasing customer
0084
 1      part of the list.  I don't know beyond the
 2      wholesalers and the chain warehouse customers who
 3      else was on the list.
 4           Q.   (BY MR. ANDERSON):  All right.  At -- what
 5      you know is that chain warehouse purchasers and
 6      wholesaler purchasers were on the list?
 7           A.   That's correct.
 8           Q.   I see.  Did you get copies of the price
 9      change notifications routinely?
10           A.   We were --
11                MS. FUMERTON:  Objection, form.
12           A.   We were communicating internally, yes.
13           Q.   (BY MR. ANDERSON):  But you weren't
14      actually responsible for, then, sending it out to the
15      customers, because that was already being done by the
16      Pricing Department?
17           A.   That's correct.
                                             Page 35
```

Parker, Theresa _Tip_

```
18        Q.   In looking at the price change list, which
19   prices were set by Abbott?
20        A.   The price referred to as "Case Price" and
21   "List Price" are Abbott set prices.
22        Q.   How did Abbott go about including these
23   AWPs in announcing this price change?
24             MS. FUMERTON: Objection, form.
25        A.   Again, I didn't create this, so -- other
0085
 1   than the -- it would be estimated, which has been
 2   Abbott's standard practice.
 3        Q.   (BY MR. ANDERSON): Yes, ma'am. So not
 4   only would Abbott be estimating AWPs at launch of a
 5   drug, but Abbott would also estimate AWPs when it
 6   took price changes; is that correct?
 7             MS. FUMERTON: Objection, form.
 8        A.   That would be what this document indicates.
 9        Q.   (BY MR. ANDERSON): And is that true, based
10   on your experience, that Abbott estimated AWPs after
11   the launch of a product when it took price changes?
12             MS. FUMERTON: Objection, form.
13        A.   On the 1991 document, there is such
14   information.
15        Q.   (BY MR. ANDERSON): I know that. I -- I --
16   I see it too. I'm asking beyond the document.
17             Is it your experience that when you
18   got the price change notifications, that historically
19   those notifications also included new AWPs?
20        A.   I don't recall.
21        Q.   You're not sure one way or the other?
22        A.   I don't know what --
23        Q.   Do you have any reason to believe that
24   prior to the 2001/2000 time frame, the routine price
25   change notifications did not include AWPs from
0086
 1   Abbott?
 2        A.   I don't --
 3             MS. FUMERTON: Objection, form.
 4        A.   -- know what was on them other than
 5   important to the customers, meaning list and WAC. I
 6   can't -- I -- I couldn't possibly say whether it was
 7   or it wasn't on the document.
 8        Q.   (BY MR. ANDERSON): Well, that --
 9             MS. FUMERTON: And, Jarrett, are you
10   asking generally about just the pricing compendia, or
11   to other people as well?
12             MR. ANDERSON: Oh, no.
13             MS. FUMERTON: Because this document
14   deals only with what is being reported to pricing
15   compendia.
16             MR. ANDERSON: Oh, no, I don't think
17   so. I think she said it went out to all the chains
18   and the wholesalers too.
19             MS. FUMERTON: I don't think that's
20   what the record states, but --
21             MR. ANDERSON: Well --
22             THE WITNESS: Okay.
23             MR. ANDERSON: -- we'll let it speak
24   for itself. I mean --
25             THE WITNESS: Okay.
0087
 1             MR. ANDERSON: Yeah.
 2             THE WITNESS: Okay?
```

Page 36

                              Parker, Theresa _Tip_
14   it -- I was -- it wasn't -- she didn't say it very
15   loudly, which was why I asked for the answer to be
16   read back, because I thought she just said "I don't
17   know" but wasn't sure and that's why I had asked the
18   court reporter to read it back.
19              MR. ANDERSON:  You've got to stop
20   talking so the court reporter can show me the
21   answer.
22              THE REPORTER:  That's her answer
23   (indicating).  She said, "I don't know."
24              MR. ANDERSON:  Right.  Where was the
25   "no" though?
0090
 1              THE REPORTER:  Oh, that was back up --
 2   I was in a different spot in the transcript where you
 3   saw that response.  This (indicating) was her answer
 4   the first time, and then it was again --
 5              MR. ANDERSON:  Let -- let me see the
 6   answer and question.
 7              THE REPORTER:  Okay.  Here's the
 8   answer (indicating).
 9              MR. ANDERSON:  Okay.
10       Q.   (BY MR. ANDERSON):  Okay.  Do you have any
11   reason to believe, Ms. Parker, that Abbott created
12   two sets of routine price notification lists, one set
13   that included AWPs and went to the pricing compendia,
14   and a different set that did not have AWPs that went
15   to the wholesalers and the chain warehouses?
16              MS. FUMERTON:  Objection to the form.
17       A.   I don't know that there were two sets.
18       Q.   (BY MR. ANDERSON):  Okay.  So, accordingly,
19   is it true you don't have any information or reason
20   to believe that there were two different formats for
21   the price notification list?
22              MS. FUMERTON:  Objection, form.
23       A.   I don't know about two different lists.
24       Q.   (BY MR. ANDERSON):  All right.  But you do
25   know that the last two pages of Fiske Exhibit 9 are
0091
 1   an example of a price notification list?
 2       A.   I do --
 3              MS. FUMERTON:  Objection, form.
 4       A.   That's correct.
 5       Q.   (BY MR. ANDERSON):  Looking at the second
 6   page of Fiske Exhibit 9, do you recognize that type
 7   of letter?
 8       A.   It says "Dear Data Vendor".  I'm not a data
 9   vendor so, I would never have received a document
10   like this.
11       Q.   Have you ever been involved in the
12   communication of so-called "Data Vendor" letters?
13       A.   No, I have not.
14       Q.   Do consider FirstDataBank, Red Book, and
15   Medi-Span to be data vendors?
16       A.   Yes, I do.
17       Q.   And they're data vendors who are selling
18   subscriptions of pricing data and other drug data to
19   pharmacies and wholesalers across America, correct?
20       A.   Correct.
21              THE WITNESS:  Do you want this
22   (indicating) back in --
23              MR. ANDERSON:  Oh.
24              THE WITNESS:  -- this pile?
                              Page 38

Parker, Theresa _Tip_

```
 25           MR. ANDERSON:  Thank you, yes.  I've
0092
  1    got to keep those organized.
  2                    (Exhibit 5 marked.)
  3         Q.   (BY MR. ANDERSON):  Now, if you could,
  4    Ms. Parker, take a look at what's been marked as
  5    Exhibit 5.
  6         A.   (Reviews document.)
  7         Q.   Are you familiar with documents such as
  8    Exhibit 5?
  9         A.   No, I am not.
 10         Q.   Did you typically receive any bid schedules
 11    or lists of bid pricing?
 12         A.   I did not.
 13         Q.   Looking at this Exhibit 5, do you see
 14    toward kind of the right-hand side, kind of mid to
 15    far right-hand side a column titled "Chains"?
 16         A.   I see it.
 17         Q.   Were you ever involved in communicating
 18    chain pricing to any of your chain contacts -- chain
 19    pharmacy contacts?
 20         A.   I didn't communicate pricing.
 21         Q.   I know.  That's why I'm asking.
 22         A.   No, I said I did not communicate --
 23         Q.   Okay.
 24         A.   -- pricing.
 25         Q.   All right.  Very well.  Is this --
0093
  1              MS. FUMERTON:  Just put it --
  2              THE WITNESS:  This goes in my stack?
  3              MS. FUMERTON:  Yeah.
  4         Q.   (BY MR. ANDERSON):  Did you ever receive
  5    any kind of price verification lists or reports from
  6    any pricing compendia?
  7         A.   No, I did not.
  8         Q.   There was a time period when you not only
  9    held the job responsibilities for Trade Relations at
 10    Abbott, but you also were the manager of the National
 11    Account Managers, what came to be known as the
 12    National Trade Executives, correct?
 13         A.   That's correct.
 14         Q.   What was that time period?
 15         A.   '99 to 2001.
 16         Q.   Did Carol Nauta report to you during that
 17    time?
 18         A.   No, she did not.
 19         Q.   What about Dave Lutz?
 20         A.   No.  He was not employed by Abbott at that
 21    time.
 22         Q.   Have you ever been involved in any kind of
 23    business dealings with Eckerds?
 24         A.   Yes.
 25         Q.   In what sense?
0094
  1         A.   I mean, they were a warehousing chain,
  2    important customer, that operated thousands of stores
  3    in the United States, an important customer to
  4    Abbott.
  5         Q.   What about Wal-Mart?
  6         A.   Another important chain warehousing
  7    customer.
  8         Q.   Over the years did you become aware that
  9    those customers were interested in reimbursement
```

Parker, Theresa _Tip_

```
 6        Q.    (BY MR. ANDERSON):  In all your dealings
 7   with chain drug stores all these many years and, in
 8   fact, your role as a purchaser at a chain, and all of
 9   your involvement at the annual meetings, you've never
10   become aware that chain drug stores are interested in
11   making more profits?
12              MS. FUMERTON:  Objection, form.
13        A.    I said at the beginning that profit was a
14   number-one goal, absolutely.
15        Q.    (BY MR. ANDERSON):  Okay.  And,
16   accordingly, you've become familiar that chains
17   desire more spread, right?
18              MS. FUMERTON:  Objection, form.
19        A.    I -- I don't know what "more spread" means.
20        Q.    (BY MR. ANDERSON):  Well, more rather than
21   less.  They would like to make more money rather than
22   less money?
23        A.    We all would --
24              MS. FUMERTON:  Objection, form.
25        A.    We all would like to make more money --
0100
 1        Q.    (BY MR. ANDERSON):  Sure.
 2        A.    -- rather than less.
 3        Q.    Sure.  And -- and that's what this bullet
 4   point is talking about, correct?
 5              MS. FUMERTON:  Objection, form.
 6        A.    The bulletpoint reads -- I can only tell
 7   you what it reads.
 8        Q.    (BY MR. ANDERSON):  And it reads "chains
 9   want more spread"?
10              MS. FUMERTON:  Well --
11        A.    That's what it --
12              MS. FUMERTON:  -- to be -- to be
13   accurate, it reads, "Chains want more spread between
14   AWP and actual cost to offset MCO reimbursement
15   contracts".
16        Q.    (BY MR. ANDERSON):  That's right.  And
17   that's consistent with your understanding when you've
18   been dealing with chains over the years at Abbott,
19   correct?
20              MS. FUMERTON:  Objection, form.
21        A.    That has not ever been brought to my
22   attention from a customer.
23        Q.    (BY MR. ANDERSON):  It hasn't?
24        A.    No.
25        Q.    How did you become aware of it then?
0101
 1              MS. FUMERTON:  Objection, form.  She
 2   didn't -- lack of foundation.
 3        Q.    (BY MR. ANDERSON):  How did you become
 4   aware that pharmacies would like to make more
 5   profits?
 6        A.    I'll repeat.  I am a pharmacist and have
 7   practiced in both a chain setting and a wholesale
 8   setting prior to coming to Abbott.  I know that
 9   pharmacy is a large percentage of a chain's business,
10   and from the wholesale side, clearly pharmacies and
11   independent pharmacies' profitability is a concern to
12   their customer base.
13              So how do I become aware?  I read.
14   I'm a fairly smart person.  I understand the business
15   process.
16        Q.    I appreciate that.  And -- and I -- I agree
```

Parker, Theresa _Tip_

```
 2   of is cost -- or acquis- -- acquisition cost.  So
 3   Abbott's only response could be in -- in that
 4   particular field or -- I -- I keep using "field"
 5   because, to me, again, it's a data field, but -- you
 6   know, that drives a calculation or something.
 7        Q.   So you're saying Abbott could lower the
 8   prices that it charged the chains, correct?
 9        A.   I -- I guess that would be one method.
10        Q.   Is it true that Abbott also could report
11   higher WACs to the compendia, such as FirstDataBank,
12   and, in turn, trigger the publication of higher AWPs?
13             MS. FUMERTON:  Objection, form.
14        A.   I -- I don't know what's reported to -- I
15   don't know how that's done.
16        Q.   (BY MR. ANDERSON):  You -- you know that
17   AWPs are a function of WAC.  You've already --
18        A.   That's --
19        Q.   -- testified to that.
20        A.   That's correct.
21        Q.   Okay.
22             MS. FUMERTON:  Objection, form.
23        Q.   (BY MR. ANDERSON):  So, therefore, to the
24   extent Abbott raises a WAC, that's going to cause an
25   increased AWP to be published, correct?
0105
 1        A.   That's correct.
 2             MS. FUMERTON:  Objection, form.
 3        Q.   (BY MR. ANDERSON):  Okay.  And so like
 4   Mr. Fiske testified over the past couple of days,
 5   that since 1994, the Abbott erythromycins have
 6   experienced five different price increases?
 7        A.   Okay.
 8        Q.   And, in turn, those five different WAC
 9   price increases have led to five different AWP price
10   increases, correct?
11        A.   Correct.
12             MS. FUMERTON:  Objection, form.
13        A.   I mean --
14        Q.   (BY MR. ANDERSON):  And that --
15        A.   -- that would follow that --
16        Q.   Sure.
17        A.   Again, I -- I don't know it, haven't seen
18   it, but...
19        Q.   Well, you'll agree, won't you, that causing
20   increased AWPs to be published is also a mechanism by
21   which a drug company can respond to a drug store's
22   request for more spread?
23             MS. FUMERTON:  Objection, form.
24        A.   There is only two -- two factors in -- in
25   that, and it's cost and AWP.  And at Abbott -- cost
0106
 1   is the only one that I'm familiar with that Abbott
 2   has any control of.
 3        Q.   (BY MR. ANDERSON):  Do you agree, though,
 4   that by causing increased AWPs to be published, a
 5   drug company can respond to a drug store's request
 6   for more spread?
 7             MS. FUMERTON:  Objection, lack of
 8   foundation.
 9        A.   And that would be outcome, but -- I
10   don't -- I mean, that's, again, drawing conclusion
11   from -- from a -- a hypothetical situation.
12        Q.   (BY MR. ANDERSON):  Well, I- -- I'll tell
```