# ANDERSON EXHIBIT 26A

# PRESCRIPTION DRUG REBATE PROGRAM

## HEARING

BEFORE THE

SUBCOMMITTEE ON
HEALTH AND THE ENVIRONMENT

OF THE

COMMITTEE ON
ENERGY AND COMMERCE
HOUSE OF REPRESENTATIVES

ONE HUNDRED SECOND CONGRESS

SECOND SESSION

ON

**H.R. 2890, H.R. 3405 and H.R. 5614**

BILLS TO AMEND THE PUBLIC HEALTH SERVICE ACT AND THE SOCIAL SECURITY ACT TO ESTABLISH LIMITS ON CERTAIN DRUG PRICES

JULY 31, 1992

**Serial No. 102-156**

Printed for the use of the Committee on Energy and Commerce

F/W PL 102-585

U.S. GOVERNMENT PRINTING OFFICE

60-270

WASHINGTON : 1992

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402
ISBN 0-16-039696-4

## COMMITTEE ON ENERGY AND COMMERCE

JOHN D. DINGELL, Michigan, *Chairman*

JAMES H. SCHEUER, New York
HENRY A. WAXMAN, California
PHILIP R. SHARP, Indiana
EDWARD J. MARKEY, Massachusetts
AL SWIFT, Washington
CARDISS COLLINS, Illinois
MIKE SYNAR, Oklahoma
W.J. "BILLY" TAUZIN, Louisiana
RON WYDEN, Oregon
RALPH M. HALL, Texas
DENNIS E. ECKART, Ohio
BILL RICHARDSON, New Mexico
JIM SLATTERY, Kansas
GERRY SIKORSKI, Minnesota
JOHN BRYANT, Texas
RICK BOUCHER, Virginia
JIM COOPER, Tennessee
TERRY L. BRUCE, Illinois
J. ROY ROWLAND, Georgia
THOMAS J. MANTON, New York
EDOLPHUS TOWNS, New York
C. THOMAS McMILLEN, Maryland
GERRY E. STUDDS, Massachusetts
PETER H. KOSTMAYER, Pennsylvania
RICHARD H. LEHMAN, California
CLAUDE HARRIS, Alabama

NORMAN F. LENT, New York
CARLOS J. MOORHEAD, California
MATTHEW J. RINALDO, New Jersey
WILLIAM E. DANNEMEYER, California
DON RITTER, Pennsylvania
THOMAS J. BLILEY, Jr., Virginia
JACK FIELDS, Texas
MICHAEL G. OXLEY, Ohio
MICHAEL BILIRAKIS, Florida
DAN SCHAEFER, Colorado
JOE BARTON, Texas
SONNY CALLAHAN, Alabama
ALEX McMILLAN, North Carolina
J. DENNIS HASTERT, Illinois
CLYDE C. HOLLOWAY, Louisiana
FRED UPTON, Michigan

JOHN S. ORLANDO, *Chief of Staff*
ALAN J. ROTH, *Chief Counsel*
MARGARET A. DURBIN, *Minority Chief Counsel/Staff Director*

---

### SUBCOMMITTEE ON HEALTH AND THE ENVIRONMENT

HENRY A. WAXMAN, California, *Chairman*

GERRY SIKORSKI, Minnesota
TERRY L. BRUCE, Illinois
J. ROY ROWLAND, Georgia
EDOLPHUS TOWNS, New York
GERRY E. STUDDS, Massachusetts
PETER H. KOSTMAYER, Pennsylvania
JAMES H. SCHEUER, New York
MIKE SYNAR, Oklahoma
RON WYDEN, Oregon
RALPH M. HALL, Texas
BILL RICHARDSON, New Mexico
JOHN BRYANT, Texas
JOHN D. DINGELL, Michigan
(Ex Officio)

WILLIAM E. DANNEMEYER, California
THOMAS J. BLILEY, Jr., Virginia
JACK FIELDS, Texas
MICHAEL BILIRAKIS, Florida
ALEX McMILLAN, North Carolina
J. DENNIS HASTERT, Illinois
CLYDE C. HOLLOWAY, Louisiana
NORMAN F. LENT, New York
(Ex Officio)

KAREN NELSON, *Staff Director*
ANDREAS G. SCHNEIDER, *Counsel*
HOWARD COHEN, *Minority Counsel*

# CONTENTS


Page

Text of:
- H.R. 2890 ..... 10
- H.R. 3405 ..... 16
- H.R. 5614 ..... 23

Testimony of:
- Bowen, Robert P., executive vice president, Amerinet, Inc ..... 130
- Bowler, M. Kenneth, vice president, Federal Government Relations, Pfizer Inc ..... 175
- Brinck, Michael F., national legislative director, AMVETS ..... 66
- Camacho, Jose, executive director, Texas Association of Community Health Centers, on behalf of National Association of Community Health Centers, Inc ..... 77
- Day, MacGregor, executive vice president, Parkland Memorial Hospital, on behalf of National Association of Public Hospitals ..... 82
- Fenster, Dee, president, Generic Pharmaceutical Industry Association ..... 234
- Givans, David W., staff writer, Disabled Veterans of America ..... 66
- Green, William E., chief operating officer, Allcare Medication Services, Inc., on behalf of American Society of Consultant Pharmacists ..... 156
- Grotting, John, executive vice president, Health One Corp., on behalf of American Healthcare Systems ..... 142
- Hanley, Ray, director, Arkansas Office of Medical Services and Chair, State Medicaid Directors' Association, American Public Welfare Association ..... 115
- Henry, Jane, director of pharmacy services, Olathe Medical Center, on behalf of American Society of Hospital Pharmacists ..... 159
- Ingram, Robert A., group vice president, GLAXO Inc ..... 197
- Kennedy, Hon. Edward M., a U.S. Senator from the State of Massachusetts ..... 38
- Mank, Russell W., national legislative director, Paralyzed Veterans of America ..... 65
- Marrone, Vincent, deputy policy director, Government Affairs, AIDS Institute, New York State Department of Health ..... 96
- Montgomery, Hon. G.V. (Sonny), a Representative in Congress from the State of Mississippi ..... 58
- Mossinghoff, Gerald J., president, Pharmaceutical Manufacturers Association ..... 201
- Penna, Peter M., pharmacy director, Group Health Cooperative of Puget Sound, on behalf of Group Health Association of America ..... 145
- Pryor, Hon. David, a U.S. Senator from the State of Arkansas ..... 46
- Rivers, Larry, executive director, Veterans of Foreign Wars ..... 67
- Robertson, Steve A., deputy director, National Legislative Commission, American Legion ..... 63
- Rockefeller, Senator John D., a U.S. Senator from the State of West Virginia ..... 40
- Slattery, Hon. Jim, a Representative in Congress from the State of Kansas ..... 44
- Stump, Hon. Bob, a Representative in Congress from the State of Arizona ..... 62
- Tattle, Peter T., company group chairman, Johnson & Johnson ..... 194
- Volpe, Carl, senior policy analyst, National Governors' Association ..... 106
- Zabriskie, John L., senior vice president, Merck & Co ..... 172

Zeiger, Martin, executive vice president, Rugby-Darby Group Companies, on behalf of Generic Pharmaceutical Industry Association and National Association of Pharmaceutical Manufacturers .......... 234

Material submitted for the record by:

American Pharmaceutical Association, statement .......... 240

Bristol-Myers Squibb Co.: letter dated July 29, 1992, from Wayne Davidson to Chairman Waxman re opposition to pending legislation .......... 245

CIBA-GEIGY Corp., statement .......... 250

Cranston, Senator Alan, chairman, Committee on Veterans' Affairs, statement .......... 55

Generic Pharmaceutical Industry Association, final report .......... 255

Health and Human Services Department: Letter dated August 14, 1992, from William Toby, Jr., to Chairman Waxman re administration's estimates of budget effects .......... 36

Health Industry Group Purchasing Association, statement .......... 265

Johnson & Johnson, letter dated September 8, 1992, from P.T. Tattle to Chairman Waxman re percentage of Medicaid rebates .......... 226

Kaiser Permanente: Letter dated August 17, 1992, from David Lawrence to Chairman Waxman re support of amendments of Public Law 101-508 .......... 271

Lederle Laboratories, American Cyanamid Co., statement .......... 273

Merck & Co., Inc.: Letter dated September 14, 1992, from John L. Zabriskie to Chairman Waxman .......... 230

National Association of Retail Druggists, statement .......... 280

# PRESCRIPTION DRUG REBATE PROGRAM

---

FRIDAY, JULY 31, 1992

HOUSE OF REPRESENTATIVES,
COMMITTEE ON ENERGY AND COMMERCE,
SUBCOMMITTEE ON HEALTH AND THE ENVIRONMENT,
*Washington, DC.*

The subcommittee met, pursuant to notice, at 9:45 a.m., in room 2123, Rayburn House Office Building, Hon. Henry A. Waxman (chairman) presiding.

Mr. WAXMAN. The subcommittee will come to order.

Two years ago the administration and the House and the Senate leadership held a budget summit. As part of their efforts to reduce the budget deficit, they agreed that the Medicaid program should get the benefit of the price discounts on prescription drugs that other large purchasers were getting.

The rebate provisions went into effect in spring 1991. According to the Congressional Budget Office, the Federal Government will be owed about $705 million in rebates from drugs sold during the current fiscal year, and about $5.2 billion in rebates from drugs sold over the next 5 fiscal years.

While the Federal Government has realized savings, others believe that they have been disadvantaged by the OBRA 1990 changes. A number of bills have been introduced to modify the Medicaid rebate program to protect these parties from pharmaceutical price increases: H.R. 2890, introduced by Mr. Montgomery; H.R. 3405, introduced by Mr. Wyden and Mr. Cooper; and H.R. 5614 introduced by Mr. Slattery.

The purpose of today's hearing is to get the views of all affected on these three bills. We will hear from proponents and opponents. We will hear from our colleagues in the Senate. We will hear from veterans' advocates. We will hear from community health centers and public hospitals. We will hear from large group purchasing organizations. We will hear from the States. And we will hear from various sectors of the pharmaceutical industry.

Based on this testimony, the subcommittee will decide which, if any, of these bills it should report. At this point, I am of an open mind. But I recognize that it is late in the Congress, and that if we are to act, we need to do so very soon.

[The opening statement of Mr. Waxman follows:]

OPENING STATEMENT OF HON. HENRY A. WAXMAN

Two years ago, the administration and the House and Senate leadership held a Budget Summit. As part of their efforts to reduce the budget deficit, they agreed that the Medicaid program should get the benefit of the price discounts on prescrip-

tion drugs that other large purchasers were getting. The agreement anticipated $1.6 billion in savings to the Federal Government over 5 years.

The Congress implemented this agreement in the Omnibus Budget Reconciliation Act of 1990. Under that law, Federal Medicaid matching funds are not available for a drug unless the manufacturer has entered into an agreement with the Secretary of Health and Human Services under which the manufacturer provides rebates on its drugs to State Medicaid programs. In exchange, any State covering prescription drugs would have to cover that manufacturer's products.

The rebate provisions went into effect in the spring of 1991. According to the Congressional Budget Office, the Federal Government will be owed about $705 million in rebates from drugs sold during the current fiscal year, and about $5.2 billion in rebates from drugs sold over the next 5 fiscal years.

While the Federal Government has realized savings, others believe that they have been disadvantaged by the OBRA 1990 changes. A number of bills have been introduced to modify the Medicaid rebate program to protect these parties from pharmaceutical price increases: H.R. 2890, introduced by Mr. Montgomery, H.R. 3405, introduced by Mr. Wyden and Mr. Cooper, and H.R. 5614, introduced by Mr. Slattery.

The purpose of today's hearing is to get the views of all affected on these three bills. We will hear from proponents and opponents. We will hear from our colleagues in the Senate. We will hear from veterans' advocates. We will hear from community health centers and public hospitals. We will hear from large group purchasing organizations. We will hear from the States. And we will hear from various sectors of the pharmaceutical industry.

Based on this testimony, the subcommittee will decide which, if any, of these bills it should report. At this point, I am of an open mind. But I recognize that it is late in the Congress, and that if we are to act, we need to do so very soon.

Mr. WAXMAN. I would like to recognize the gentleman from California, Mr. Dannemeyer for an opening statement.

Mr. DANNEMAYER. Mr. Chairman, I think it is appropriate for the Health and Environment Subcommittee of which you are chairman, to hold these hearings to find out what, if anything, we should do in the legislative arena.

I would also hope that sooner rather than later the agenda of this committee would have an opportunity to look at the requests of 49 Governors of the States of this Union, who, in writing, have requested the Congress of the United States to stop loading up Medicaid responsibilities on the States, because in doing so, in some instances we push some of those States close to bankruptcy.

It is a profound problem in this country as to how we are going to strike that delicate balance between providing for the medical needs of our people who cannot afford to take care of those needs themselves and yet give respect to the concerns of taxpayers who have to put up the money to pay the bill.

If the Federal Government is going to continue down the road of mandating that States expand Medicaid, in my State of California, MedCal, then, of course, I think the Federal Government should have the responsibility to pick up the tab more than it does today. But then the problem comes, where is the Federal Government going to get the money? I am not sure we are going to get it out of the hides of some of these drug companies, but let's find out what they say and maybe we can figure it out. Thank you.

Mr. WAXMAN. Mr. Wyden.

Mr. WYDEN. Mr. Chairman, I commend you for all your leadership on this issue and particularly in scheduling this timely hearing.

Mr. Chairman and colleagues, in October 1990, over the vigorous objection goes of the pharmaceutical industry, Congress enacted legislation based on a simple premise; that was, to do business with

the Federal Government, drug companies would have to give Medicaid the best price they gave their preferred customers. On the night before Congress reached final agreement on this legislation, I and others urged the conferees to require that, as part of that legislation, the best price would be frozen as of October 1990 and could not rise faster than inflation. I urged this because I feared that unscrupulous drug companies would simply raise the so-called "best price" on both public and private customers, thereby undermining a significant portion of the law's benefits.

The drug companies pulled out all the stops to fight this suggestion. Unfortunately, they prevailed.

As a result of the 1990 law, the Medicaid program got real savings, some $4 billion worth, but the concerns I and others related to the conference committee have also been realized. Several drug companies, having defeated the efforts to lock in price discounts at 1990 levels, have spent the last 18 months jacking up the best prices formerly enjoyed by Veterans, the public hospitals, family planning and community health clinics, the Defense Department and a lot of private buyers, like nursing homes and HMO's. In effect, the companies gave Medicaid a little with one hand, and with the other hand grabbed a fistful from just about everybody else.

Almost as soon as the ink was dry on the 1990 law, Congress began to hear from hundreds of drug customers that drug manufacturers were canceling or raising the best prices they previously enjoyed. These were hefty increases. The Department of Veterans Affairs estimated that drug price hikes at the VA cost $28 million more in 1991 than in 1990. This was a 21 percent increase in a program under severe financial constraints.

I held a hearing in January in my district. A Seattle hospital executive stated that the price of one manufacturer's birth control pills had been boosted 150,000 percent. Now, this drug had been exempted altogether from the Medicaid best price provisions, so there was no justification for this hike. What is most tragic is that many drug companies are making their grudging rebate payments to Medicaid while they simultaneously stick it to another group of low income people; and those are the ones who depend on the fragile network of several thousand community and public health clinics.

We will hear today that those programs have had massive price hikes.

Finally, many of the private institutions, such as nursing homes and hospitals, have experienced massive drug price hikes on their frequently purchased products. We will hear more detail about that.

Now, if the fast-fading so-called "best prices" continue to rise at current rates, even the beneficiary of the 1990 law, the Medicaid program, is expected, according to the Congressional Budget Office, to get $1 billion less in savings over the next 5 years. This is going to create a hardship for the States that have to foot much of the Medicaid bill.

So I would like to wrap up by making a specific suggestion. I would hope that Congress acts this year on a strong bill to rein in drug prices across the board. Toward that end, I would propose an

amendment to the fine bill introduced by Chairman Montgomery that would take two steps: First, that all government buyers, veterans, public health services clinics, Medicaid and the 200 public hospitals that serve large numbers of the poor and elderly join forces to become a $10 billion buying group that would receive a flat rebate of between 22 and 25 percent off the average manufacturer's price. This way, we could stop the erosion of Medicaid "best price" discounts, provide tangible relief for the key Federal programs and significant additional relief for the hard-pressed State budgets.

I will propose that such legislation take effect in January of 1993. According to a preliminary budget estimate we have received from the Congressional Budget Office, this proposal would allow the Federal and State Medicaid program to recapture the billion dollars that otherwise would be lost to drug company best price hikes.

Second, I would propose all private buyers like hospitals and the HMO's and private clinics be exempted from the best price law and be allowed to negotiate the best price they can, regardless of the Government's dealings with the drug companies. This would provide immediate relief for the many private health programs that are the innocent victims of the drug industry strategy to get around the 1990 law.

Finally, I would say that with this two-pronged approach, we could marry the excellent proposals already introduced by our colleagues today.

Chairman Kennedy has a fine bill that Jim Cooper and I introduced in the House. Chairman Montgomery and Mr. Slattery have introduced fine bills as well.

I know we will get very helpful suggestions from Senator Rockefeller and Senator Pryor, who, as we all know, has sparked this effort from the beginning. What our challenge is is to put these ideas together and pass a strong drug cost containment bill that finally has no loopholes for the drug industry to exploit.

I look forward to working with our colleagues.

[The opening statement of Mr. Wyden follows:]

OPENING STATEMENT OF HON. RON WYDEN

Mr. Chairman, in October 1990, over the vigorous objections of the pharmaceutical industry, Congress enacted legislation based on a simple premise: to do business with the Federal Government, drug companies would have to give Medicaid the "best price" they give their preferred customers.

On the night before Congress reached final agreement on this legislation, as a member of the conference committee, I and others urged the conferees to require as part of the legislation that the "best price" would be frozen as of October 1990 and could not rise faster than inflation. I said this because I feared that unscrupulous drug companies would simply raise the so-called "best price" on both public and private customers, thereby undermining a portion of the law's benefit.

The drug companies pulled out all the stops to fight this suggestion, and they prevailed.

As a result of the 1990 law, the Medicaid program got its savings, some $4 billion worth, but the concerns I raised in conference have also been realized. Several drug companies, having defeated the efforts to lock in price discounts at 1990 levels, have spent the past 18 months jacking up the "best prices" formerly enjoyed by veterans, public hospitals, family planning and community health clinics, the Defense Department, and many private buyers like nursing homes and HMO's.

In effect, the companies gave Medicaid a little with one hand, and with the other hand grabbed a fistful from just about everybody else.

Almost as soon as the ink was dry on the 1990 law, Congress began to hear from hundreds of drug company customers that drug manufacturers were canceling or raising the "best prices" they previously enjoyed. And these were not small increases.

The Department of Veterans Affairs (VA) has estimated that drug price hikes cost VA health programs $28 million more in 1991 than in 1990. This is a 21 percent increase in a program under extremely tight financial constraints.

In testimony before a hearing I held in January, a Seattle hospital executive stated that the price of one manufacturer's birth control pills had been boosted 150,000 percent. I'd like to point out that this drug had been exempted altogether from the Medicaid best price provisions, so there is just no justification for this drug price hike.

What's most tragic is many drug companies are making their grudging rebate payments to Medicaid, while they are simultaneously sticking it to another group of low-income people—those who depend on the fragile network of several thousand community and public health clinics. Later today, the subcommittee will hear that prices for the drug products most commonly used by these clinics shot up by an average of 24 percent in just 1 year.

Finally, many private institutions such as nursing homes and hospitals have experienced massive drug price hikes on their most frequently purchased products. The "safety net" hospitals will report later this morning that drug costs have shot up an average of almost $2 million per hospital.

The drug companies say they are taking this extra pound of flesh because Congress required that the industry give Medicaid a fair shake. But this member believes it is wrong for this industry to pad an already healthy bottom line by wringing scarce dollars from public health programs that serve our veterans and the poor, and private programs trying to hold down health costs.

If these fast-fading, so-called "best prices" continue to rise at current rates, even the beneficiary of the 1990 law, the Medicaid program, is expected, according to the Congressional Budget Office (CBO), to get $1 billion less in savings over the next 5 years. This will create extra hardship for States that must foot much of the Medicaid bill.

I hope that Congress will act this hear on a strong bill to rein in drug prices across the board. Towards that end, I would propose an amendment to Chairman Montgomery's bill that would require:

1. That all government buyers, the Veterans, the Public Health Service, Medicaid, and the 200 public hospitals that serve large numbers of the poor and elderly, join forces to become a $50 billion buying group that will receive a flat rebate of between 22 and 25 percent off the average manufacturers price.

This proposal would stop the erosion of Medicaid "best price" discounts, provide tangible relief for key Federal programs, and significant additional relief for hard-pressed State budgets. Such legislation should take effect in January 1993. According to a preliminary estimate from CBO, this proposal would allow the Federal and State Medicaid programs to recapture the billion dollars that otherwise would be lost to drug company "best price" hikes.

2. That all private buyers, such as hospitals, and health maintenance organizations, and private medical clinics, be exempted from the best price law and allowed to go out and negotiate the best price they can, regardless of the Government's dealings with the drug companies. This should provide immediate relief for private health programs that are also innocent victims of the drug industry's strategy for getting around the 1990 law.

The advantage of such a two-pronged program is that it would marry the excellent proposals already introduced by our colleagues that will be testifying today. Chairman Kennedy (whose bill I've introduced in the House with Jim Cooper as H.R. 3405), Chairman Montgomery, and Congressman Slattery already have introduced fine bills to effect some of these ideas. The challenge now is to put these ideas together and pass a strong drug cost containment bill that leaves no loopholes for the drug industry to exploit.

Mr. Chairman, Americans from coast to coast are up in arms about paying 400 percent mark-ups on lifesaving medicine. Thomas Paine, the great patriot, once argues that there is such a thing as a "just price". He claimed that when the lives of citizens were at stake, human health has to come first. After 200 years, it's time to get moving on his ideas.

Mr. WAXMAN. Thank you, Mr. Wyden.

Mr. Bilirakis.

Mr. BILIRAKIS. Thank you, Mr. Chairman. I have just a short statement.

There is no question that this is a problem. I am sure I speak for many of us when I say a large share of the complaints that I get from my constituents has to do with the high cost of drugs. There is no question about that.

It is also a very complex issue. The fact that you have eight panels scheduled for today is indicative of that. I hope, as we always should do up here, we sit here open minded and objective and in an effort to learn, more than anything else, before we act; and that we listen to all of these groups and try to get all the viewpoints before we ultimately do act.

Having said all that, sir, I will return the balance of my time.

Mr. WAXMAN. Thank you.

Mr. Synar.

Mr. SYNAR. Thank you, Mr. Chairman.

This is the people's body. It is our responsibility to weigh competing economic interests, to untangle them and to achieve policies that advance the public interests. I hope in today's hearing all of us, in trying to value these interests, will not lose sight of how this problem affects the ordinary citizen.

Let me share with you a letter I have from a constituent, Ralph Beckwith from Grove, Okla.

He writes,

> I am a 76-year-old disabled veteran and have had eye surgery. I have to use eye drops twice a day, along with other medications for different problems. My eye surgeon told me if I didn't use these drops, I would go blind. When I refill this medicine each month, it continues to increase in price and I cannot afford it. My income is approximately $400 a month. After I pay my other bills, I don't have very much money left to buy medicine with.
>
> When I was in World War II fighting for my country, I was a good S.O.B., but now I am old and no good. They have forgotten all of us veterans.
>
> Must I go blind now so some pharmaceutical company can get rich off of the old people?

Mr. Chairman, the drug companies of this country are at a crossroads. The public has sent a powerful message to the Congress and to the pharmaceutical industry. Either this industry will act voluntarily to restrain price increases and assist those hardest hit by drug price inflation, or we in Congress must accept that responsibility and intervene.

I urge this industry and my colleagues to take a bold step in the context of broader health care reform: We must reduce drug prices and ensure access to affordable drug treatments for people like Ralph Beckwith.

Thank you.

Mr. WAXMAN. Thank you, Mr. Synar.

Mr. WAXMAN. Mr. Bliley.

Mr. BLILEY. Thank you, Mr. Chairman. I have a statement which I will ask unanimous consent to insert in the record.

Mr. WAXMAN. Without objection, that will be the order.

Mr. BLILEY. This is a complex issue, as Mr. Bilirakis said, as evidenced by the eight panels and the large number of witnesses. I have come here to listen and learn. Therefore, I will not trespass any more on our witnesses' time.

Mr. WAXMAN. Thank you, Mr. Bliley.

[The opening statement of Mr. Bliley follows:]

OPENING STATEMENT OF HON. THOMAS J. BLILEY, JR.

Mr. Chairman: I appreciate you calling this hearing this morning. This issue of Medicaid drug rebates is one of the most difficult topics to understand that this committee deals with, so I welcome the opportunity to hear today's testimony.

So I'm here to listen and learn. I can promise you that I ensure to see that the rebates continue, and that the singly largest purchaser of pharmaceuticals receives a fair rebate. I do not look at this as the opportunity to raise more revenues so that we can expand programs pell-mell. If savings from a revision in this law drastically outpaces projections under current law, I would prefer to see that this goes towards deficit reduction, not more Medicaid mandates and expansions.

Another thing, I think it is totally fair to ask the pharmaceutical companies to provide the Medicaid program with a rebate, simply because of the volume of their purchases. What I do not believe to be fair is asking the pharmaceutical companies to pay more than their fair share. Just because this industry is profitable is no reason to force them to pay punitive rebates. Rebates, yes. Punishment, no. This industry is one of America's most competitive industries, providing for hundreds of thousands (if not millions) of jobs and maintaining a healthy trade surplus. I don't believe any effort should be made to set rebates at a rate that is crippling to this industry.

One last thing: I see that Mr. Montgomery of the Veterans Committee is testifying before us today. The work Chairman Montgomery has for this country's veterans has never been matched. I, too, would like to see the Veterans Administration provided some relief from the unintended effects of the OBRA 1990 Medicaid drug agreement. While Medicaid is merely an accounting service—they purchase no goods, warehouse no goods and dispense no goods. On the other hand, the Veterans Administration earns their discount. The Veterans Administration has hospitals, doctors, pharmacists, pharmacies, warehouses, depots, shipping and receiving, prescribing and distribution, and many other value-added services which deserve to be compensated or encouraged via discounts and highly competitive supplier prices. I do remain wary of Chairman Montgomery's approach to solving this problem. I do not support the notion of price controls in any legislation. What I do support is the Veterans Administration getting the problem fixed, and I promise to work with any and all members to see that this is accomplished.

Mr. WAXMAN. Mr. Studds.

Mr. STUDDS. I, too, will spare everybody my opening statement especially since one of the distinguished Senators waiting is a constituent.

I would just say that it is clear that the "best price" proposition comes in a category that seemed like a good idea at the time. There is clearly work to be done. I salute all those working on this, and I look forward to doing some learning.

Thank you.

Mr. DANNEMAYER. Mr. Chairman, Mr. McMillan wanted to have his statement placed in the record. He had to go to another meeting.

Mr. WAXMAN. Without objection, Mr. McMillan's statement will be placed in the record and all members will have the opportunity to insert a statement in the record. Also, before proceeding to our other witnesses, without objection, there will be inserted in the record at this point three documents relating to cost estimates for the bills before us this morning, a letter dated June 22, 1992, from Robert Reischauer, Director of the CBO; a memorandum dated July 24, 1992, from Scott Harrison, a analyst at CBO; and a memorandum dated July 28, 1992, from the Health Care Financing Administration.

[Testimony resumes on p. 38.]

[The statements and documents referred to, and the text of H.R. 2890, H.R. 3405, and H.R. 5614 follow:]

### OPENING STATEMENT OF HON. J. ALEX MCMILLAN

Thank you, Mr. Chairman, for this opportunity to examine the effects of the OBRA 1990 law that required pharmaceutical manufacturers to give Medicaid a rebate on prescription drugs. I did not support that bill back in 1990 because it is the first step toward price regulation by the government, and I do not support price regulation. At the same time, I acknowledge that drug manufacturers have not always acted in the public's best interest.

I was also concerned when this legislation passed because, although it was supposed to save the Federal Government a considerable amount of money, the savings were used to expand Medicaid entitlements.

I am now in a position to hear about the chaos OBRA 1990 has imposed on the drug pricing market, hospitals, States, the Veterans Administration, and individuals. I am anxious to learn more about the ins and outs of pharmaceutical pricing. I am aware that the drug companies are split on how this problem should be resolved, and the States, public health clinics and the Veterans Administration want to be protected. I hope that this hearing will present facts that will clarify the issues so that we have enough information on which to base decisions on whether the current situation should be changed, watched, left alone, or returned to its prior state. (Or should I say prior Pryor state?)

I am concerned that each side in this debate has its own interest at heart, which is only natural, rather than the good of the health care system. However, it is time that each participant in the health care system develop a more objective perspective and ask themselves what is best for this country. If we are going to contain health care costs, increase access to health care services to our citizens, and maintain the best medical quality in the world, hospitals, doctors, patients, insurance companies, and drug manufacturers are all going to have to give a little.

I am also concerned that regardless of what the facts bear out, if there are enough facts, that we will just legislate another "fix", adding regulation upon regulation, without accurately analyzing the issues, without getting to the heart of the matter.

This is the approach that seems most popular when legislation is introduced that would reform our health care system. Although many here would not agree with this, I believe that much of the health care legislation that would reform the system merely imposes one system on another, without in depth analysis.

When this happens, we end up with such a convoluted, contorted system, that no one can sort out or even identify the original problem that generated the need for change in the first place.

Mr. Chairman, thank you for holding this hearing.

---

### OPENING STATEMENT OF HON. EDOLPHUS TOWNS

Mr. Chairman, I commend you for conducting a hearing on the issue of prescription drug pricing to the Veterans Administration, Public Health Clinics and Medicaid. There is no question that this issue is very important because prescription drugs represent our greatest hope for conquering some of our most debilitating diseases, like Alzheimer's and AIDS. At the same time, however, drugs must be made affordable and accessible to those who depend upon them. The three bills before the subcommittee today attempt to accomplish this in a variety of ways.

First of all Mr. Chairman, I think it is important to point out that a number of pharmaceutical companies, including one in my district, have pledged to moderate their prices in line with the general inflation rate. We should commend them for such actions. Furthermore, based on the information I have seen, it appears that the Medicaid rebate law is working well and is providing more savings than anticipated. This has resulted in fiscal relief for many hard-pressed State Medicaid programs around the country.

While I would enthusiastically support a program to provide drug discounts for some of our neediest citizens served by community health centers, as well as for our deserving military veterans, I am concerned by approaches which would employ price controls to accomplish these goals. Such controls, I believe, could have disastrous consequences for an industry which not only produces products of great value, but is also one of this country's most competitive internationally.

In addition, I am concerned about the recent allegations of cost shifting. If cost shifting is going on, it should be stopped; however, the data I have seen has been

short on conclusive evidence to this effect. I understand that the GAO is currently reviewing the impact of the Medicaid law on drug prices in the open market. I would urge Congress to wait until this type of information is completed before considering action, in order that we may make a more informed decision on these matters.

Lastly, the subcommittee is considering a proposal that would replace the current Medicaid rebate formula, which is based on the best price available for a drug in the market, with one based on a fixed percentage. My concern is that such a mechanism could be used to add additional burdens on the States through Medicaid program expansions—a practice that States have been telling us they can no longer endure. In this regard, I will be particularly interested in the testimony of the State government representatives scheduled to appear at today's hearing.

In conclusion, I would simply ask why we are so ready to dramatically alter a program that is providing revenues at twice the rate that was originally estimated and has not even had an opportunity to be fully implemented. And this would be done to substitute alternatives which are well-meaning but based on information that is sketchy at best. This, Mr. Chairman, strikes me as not being a prudent course of action to take at this time.

Thank you, Mr. Chairman.

I

102D CONGRESS
1ST SESSION

# H. R. 2890

To establish limits on the prices of drugs procured by the Department of Veterans Affairs, and for other purposes.

---

IN THE HOUSE OF REPRESENTATIVES

JULY 15, 1991

Mr. MONTGOMERY (for himself, Mr. STUMP, and Mr. HAMMERSCHMIDT) introduced the following bill; which was referred jointly to the Committees on Veterans' Affairs and Energy and Commerce

---

# A BILL

To establish limits on the prices of drugs procured by the Department of Veterans Affairs, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. LIMITATION ON PRICES OF DRUGS PROCURED BY DEPARTMENT OF VETERANS AFFAIRS.**

(a) REQUIREMENT FOR PARTICIPATION IN PROGRAMS OF DEPARTMENT OF VETERANS AFFAIRS.—The Secretary of Veterans Affairs may not make any payment for covered drugs and biologicals to a manufacturer unless the price charged by the manufacturer to the Department of Veterans Affairs for the drugs and biologicals is deter-

mined in accordance with an agreement entered into between the Secretary and the manufacturer that meets the requirements of section 1927(a)(5) of the Social Security Act (as added by subsection (b)(2)).

(b) REQUIREMENT FOR PARTICIPATION IN MEDICAID.—

(1) IN GENERAL.—The first sentence of section 1927(a)(1) of the Social Security Act (42 U.S.C. 1396s(a)(1)), as inserted by section 4401(a)(3) of the Omnibus Budget Reconciliation Act of 1990 (hereafter referred to as "OBRA-1990"), is amended by striking "manufacturer)." and inserting "manufacturer) and an agreement described in paragraph (5) (with respect to drugs dispensed on or after the date of the enactment of that paragraph).".

(2) AGREEMENTS DESCRIBED.—Section 1927(a) of the Social Security Act (42 U.S.C. 1396s(a)), as inserted by section 4401(a)(3) of OBRA-1990, is amended by adding at the end the following new paragraph:

"(5) LIMITATION ON PRICES OF DRUGS PROCURED BY DEPARTMENT OF VETERANS AFFAIRS.—

"(A) AGREEMENTS WITH SECRETARY.—An agreement under this paragraph is an agreement—

"(i) between the Secretary of Veterans Affairs and a manufacturer of covered outpatient drugs that provides that, with respect to a drug described in subparagraph (B) procured in a calendar quarter, the price for the drug charged to the Department of Veterans Affairs may not exceed the applicable price for the drug charged to the entity as of September 1, 1990, increased (in a compounded manner) by the sum of the covered drug updates (as defined in subparagraph (C)) for calendar quarters beginning on or after April 1, 1991, up to and including the calendar quarter during which the drug is procured; or

"(ii) between the Secretary of Veterans Affairs and a manufacturer of covered outpatient drugs that provides for another methodology for determining the prices charged to the entity by the manufacturer for drugs described in subparagraph (B).

"(B) DRUGS COVERED UNDER AGREEMENTS.—Subparagraph (A) shall apply to any

drug or biological product procured by the Department of Veterans Affairs—

"(i) that is purchased under a depot contracting system; or

"(ii) that is listed under the Federal Supply Schedule of the General Services Administration on or after January 1, 1990.

"(C) COVERED DRUG UPDATE.—For purposes of subparagraph (A)(i), a 'covered drug update' is equal to, with respect to a calendar quarter, 25 percent of the percentage increase provided for calculating the cost of inflation in the medical care account of the Department of Veterans Affairs contained in the budget request submitted by the Secretary of Veterans Affairs for the fiscal year in which the calendar quarter occurs.

"(D) EFFECTIVE DATE.—Subparagraph (A) shall apply to drugs and biological products procured by the Department of Veterans Affairs on or after the date of the enactment of this paragraph.".

**SEC. 2. EXCLUSION OF PRICES FOR PRESCRIPTION DRUGS PROCURED BY FEDERAL GOVERNMENT FROM CALCULATION OF BEST PRICES FOR MEDICAID REBATE AGREEMENTS.**

(a) IN GENERAL.—Section 1927(c)(1)(C) of the Social Security Act (42 U.S.C. 1396s(c)(1)(C)), as inserted by section 4401(a)(3) of OBRA-1990, is amended—

(1) by striking "governmental entity" and inserting "governmental entity (other than an entity of the Federal Government)"; and

(2) by striking "(excluding" and all that follows through "Federal Government)".

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to drugs procured for quarters beginning on or after October 1, 1991.

**SEC. 3. STUDY OF EFFECTS OF CHANGES IN PRICING POLICIES FOR DRUGS PROCURED BY DEPARTMENT OF VETERANS AFFAIRS.**

(a) STUDY.—The Secretary of Veterans Affairs shall conduct a study of the effects on the costs and availability of drugs and biological products for programs of the Department of Veterans Affairs of—

(1) the exemption of prices for drugs procured by the Federal Government from the prices used to determine the best price for covered drugs for purposes of covered outpatient drug rebate agreements