**ANDERSON EXHIBIT 26B**

15

6

1    under the medicaid program (as provided under sec-

2    tion 2(a) of this Act); and

3        (2) the limitation on prices for covered drugs

4    provided to the Department of Veterans Affairs (as

5    provided under section 1 of this Act).

6    (b) REPORT.—Not later than 1 year after the date

7    of the enactment of this Act, the Secretary of Veterans

8    Affairs shall submit a report on the study conducted under

9    subsection (a) to the Committees on Veterans' Affairs of

10    the Senate and the House of Representatives, together

11    with a report on the status of contract negotiations be-

12    tween the Secretary and manufacturers of covered drugs

13    and biological products, including a description of any ne-

14    gotiations that are not resolved at the time the Secretary

15    submits the report.

O

16

I

102D CONGRESS
1ST SESSION

# H. R. 3405

To amend the Public Health Service Act to provide for affordable prices
for drugs purchased by certain entities receiving financial assistance
under such Act, and for other purposes.

---

## IN THE HOUSE OF REPRESENTATIVES

SEPTEMBER 24, 1991

Mr. WYDEN (for himself and Mr. COOPER) introduced the following bill; which
was referred to the Committee on Energy and Commerce

---

# A BILL

To amend the Public Health Service Act to provide for
affordable prices for drugs purchased by certain entities
receiving financial assistance under such Act, and for
other purposes.

1    *Be it enacted by the Senate and House of Representa-*

2    *tives of the United States of America in Congress assembled,*

3    **SECTION 1. SHORT TITLE.**

4        This Act may be cited as the "Public Health Clinic

5    Prudent Pharmaceutical Purchasing Act".

6    **SEC. 2. REBATES FOR THE PURCHASE OF CERTAIN DRUGS.**

7        Part B of title III of the Public Health Service Act

8    (42 U.S.C. 243 et seq.) is amended—

17

2

1       (1) by redesignating section 317A as section

2    317B; and

3       (2) by inserting after section 317 the following

4    new section:

5    "REBATES FOR THE PURCHASE OF CERTAIN DRUGS

6    "SEC. 317A. (a) REQUIREMENT.—An entity receiv-

7 ing financial assistance under this Act may not purchase

8 any drug from a manufacturer unless there is in effect

9 an agreement with the Secretary that requires the manu-

10 facturer to provide a rebate, as determined under sub-

11 section (c), to covered entities for the purchase of the

12 drug, except that such an agreement may not require a

13 rebate in the case of any quantity of a drug for which

14 reimbursement has been made under title XIX of the So-

15 cial Security Act.

16    "(b) DEFINITIONS.—For purposes of this section:

17       "(1) The term 'drug' means a drug as defined

18    in section 1927(k)(2) of the Social Security Act, and

19    any over-the-counter drug or birth control device,

20    that is purchased and dispensed by a covered entity.

21       "(2) The term 'covered entity' means any of the

22    following entities:

23         "(A) A migrant health center receiving fi-

24       nancial assistance under section 329.

25         "(B) A community health center receiving

26       financial assistance under section 330.

18

3

1        "(C) An entity receiving financial assist-
2    ance under section 340.
3            "(D) An alcohol or drug treatment entity
4    or mental health entity receiving financial as-
5    sistance under title V or title XIX.
6            "(E) A family planning project receiving
7    financial assistance under section 1001.
8            "(F) An entity receiving financial assist-
9    ance under title XXVI.
10           "(G) A black lung clinic receiving financial
11   assistance under this Act.
12           "(H) A clinic that treats sexually transmit-
13   ted diseases and is receiving financial assistance
14   under this Act.
15       "(3) The term 'financial assistance' means a
16   grant, cooperative agreement, or contract.
17       "(c) AMOUNT.—The amount of a rebate for a drug
18   for purposes of subsection (a) shall be the amount of the
19   rebate applicable to the drug under section 1927(c) of the
20   Social Security Act. This subsection may not be construed
21   as limiting the right of a covered entity to negotiate with
22   a manufacturer of a drug the price at which the covered
23   entity will purchase the drug.
24       "(d) NEGOTIATION OF CONTRACTS.—The Secretary
25   shall attempt, on behalf of and in cooperation with covered

19

4

1  entities, to negotiate new contracts or renegotiate current

2  contracts for drugs purchased or dispensed by such enti-

3  ties with a view toward achieving a price comparable to,

4  or lower than, the price charged such entities by the man-

5  ufacturer on September 1, 1990, increased by the fiscal

6  year 1991 consumer price index, as determined by the

7  Secretary.

8      "(e) CLAIMS AND PAYMENT.—

9          "(1) SUBMISSION OF CLAIM.—

10              "(A) IN GENERAL.—Each covered entity

11              eligible for a rebate under this section shall

12              submit to the Secretary a rebate claim for the

13              total number of dosage form units of each drug

14              purchased, and the average price paid for each

15              such units, during a period which is no later

16              than 60 days after the end of the calendar

17              quarter or other applicable reporting period and

18              as required by th- Secretary.

19              "(B) EXCEPTION.—Notwithstanding sub-

20              paragraph (A), if a covered entity is of the type

21              described in subparagraph (D) or (H) of sub-

22              section (b)(2), the Secretary may permit such

23              entities to consolidate rebate claims on a State

24              or project area basis.

20

5

1          "(2) PAYMENTS.—Not later than 30 days after

2      the end of each applicable reporting period as de-

3      scribed in paragraph (1)(A), the Secretary shall con-

4      solidate all rebate claims received for such period

5      and notify the manufacturer of each drug for which

6      such a claim is submitted of the amount that such

7      manufacturer shall provide as a rebate with respect

8      to the particular covered entities submitting such

9      claims. The manufacturer shall promptly remit to

10     the Secretary the amounts due under such claims

11     and the Secretary shall forward such amounts to the

12     appropriate claiming entities.

13         "(3) TIME PERIOD.—In the agreements de-

14     scribed in subsection (a), the manufacturer shall

15     agree to remit amounts due under any rebate deter-

16     mined under this section to the Secretary not later

17     than 30 days after the receipt of the notice under

18     paragraph (2) concerning the total number of dosage

19     form units of each drug purchased during the cal-

20     endar quarter or other applicable reporting period.

21         "(f) NO REDUCTION IN AMOUNT OF ASSISTANCE.—

22  Notwithstanding any other provision of law, grants award-

23  ed under Federal law to covered entities shall not be re-

24  duced as a result of such entities receiving rebates under

25  this section.

·21

6

1    "(g) REPORT.—Not later than 1 year after the date
2  of the enactment of the Public Health Clinic Prudent
3  Pharmaceutical Purchasing Act, the Secretary shall pre-
4  pare and submit to the appropriate committees of Con-
5  gress a report that shall contain—

6         "(1) a description of the drugs purchased under
7       agreements entered into under this section and the
8       amounts of such purchases;

9         "(2) an assessment of the effectiveness of the
10      rebate program under this section, including the sav-
11      ings achieved and the administrative costs associated
12      with such program;

13        "(3) an assessment of the feasibility of making
14      drugs available to covered entities under this section
15      through the utilization of the Federal supply sched-
16      ule, or the Federal depot system, or both;

17        "(4) recommendations for legislation that would
18      improve such program, including the establishment
19      or utilization of recommended distribution networks
20      for making drugs available to clinics under this sec-
21      tion; and

22        "(5) any other information determined appro-
23      priate by the Secretary.

24    "(h) PROHIBITION ON RESALE.—A covered entity
25  that receives a rebate under this section for the purchase

22

7

1  of a drug may not resell such drug. A covered entity found

2  to have sold a drug in violation of this subsection shall

3  be subject to a civil penalty in the amount of $25,000 for

4  each such violation.''.

O

23

I

102D CONGRESS
2D SESSION

# H. R. 5614

To amend title XIX of the Social Security Act to repeal the use of the best price mechanism to determine rebates for covered outpatient drugs under the medicaid program, and to require manufacturers of such drugs to enter into discount pricing agreements with the Department of Veterans Affairs in order to receive payment for such drugs under the medicaid program.

---

## IN THE HOUSE OF REPRESENTATIVES

JULY 9, 1992

Mr. SLATTERY introduced the following bill; which was referred to the Committee on Energy and Commerce

---

# A BILL

To amend title XIX of the Social Security Act to repeal the use of the best price mechanism to determine rebates for covered outpatient drugs under the medicaid program, and to require manufacturers of such drugs to enter into discount pricing agreements with the Department of Veterans Affairs in order to receive payment for such drugs under the medicaid program.

1    *Be it enacted by the Senate and House of Representa-*
2  *tives of the United States of America in Congress assembled,*
3  SECTION 1. SHORT TITLE.
4        This Act may be cited as the "Medicaid Prescription
5  Drug Amendments Act of 1992".

24

2

1 **SEC. 2. REPEAL OF USE OF BEST PRICE IN DETERMINING**
2           **REBATES FOR PRESCRIPTION DRUGS UNDER**
3           **MEDICAID.**

4        (a) IN GENERAL.—Section 1927(c)(1)(B) of the So-
5 cial Security Act (42 U.S.C. 1396s(c)(1)(B)) is amended
6 to read as follows:

7        "(B) for quarters (or periods)—

8             "(i) beginning after September 30, 1992,
9        and before October 1, 1993, 22 percent of the
10        average manufacturer price,

11             "(ii) beginning after September 30, 1993,
12        and before October 1, 1994, 19 percent of the
13        average manufacturer price,

14             "(iii) beginning after September 30, 1994,
15        and before October 1, 1995, 17 percent of the
16        average manufacturer price, and

17             "(iv) beginning after September 30, 1995,
18        16 percent of the average manufacturer price.".

19     (b)    CONFORMING    AMENDMENTS.—(1)    Section
20 1927(b)(3)(A)(i)    of    such    Act    (42    U.S.C.
21 1396s(b)(3)(A)(i)) is amended by striking "and, (for sin-
22 gle source and innovator multiple source drugs), the man-
23 ufacturer's    best    price    (as    defined    in    subsection
24 (c)(2)(B))".

25     (2) Section 1927(c)(1) of such Act (42 U.S.C.
26 1396s(c)(1)) is amended by striking subparagraph (C).

25

3

1    (3) Section 1927(j) of such Act (42 U.S.C. 1396s(j))

2  is amended by striking paragraph (3).

3  SEC. 3.  REQUIREMENT FOR MINIMUM PRESCRIPTION

4           DRUG DISCOUNTS FOR DEPARTMENT OF

5           VETERANS AFFAIRS.

6    (a) IN GENERAL.—Section 1927(b) of the Social Se-

7  curity Act (42 U.S.C. 1396s(b)) by adding at the end the

8  following new paragraph:

9       "(5) AGREEMENTS WITH DEPARTMENT OF VET-

10      ERANS AFFAIRS.—A manufacturer meets the re-

11      quirements of this paragraph if the manufacturer

12      has in effect an agreement with the Secretary of

13      Veterans Affairs under which the Secretary of Vet-

14      erans Affairs may require that the price charged by

15      the manufacturer for a drug procured by the De-

16      partment of Veterans Affairs in a calendar quarter

17      does not exceed an amount equal to the price

18      charged by the manufacturer for the drug under this

19      title in the preceding calendar quarter, less the

20      amount of the basic and additional rebates required

21      under subsection (c) for the drug during the preced-

22      ing calendar quarter.".

23   (b)    CONFORMING       AMENDMENT.—Section

24  1927(b)(1)(A) of such Act (42 U.S.C. 1396s(b)(1)(A)) is

25  amended by striking the period at the end of the first sen-

26

4

1  tence and inserting the following: ", and shall require the

2  manufacturer to meet the requirements of paragraph

3  (5).".

4  **SEC. 4. EFFECTIVE DATE.**

5        The amendments made by this Act shall apply with

6  respect to payments for calendar quarters (or periods) be-

7  ginning on or after January 1, 1993, without regard to

8  whether or not regulations to carry out such amendments

9  have been promulgated by such date.

O

27



CONGRESSIONAL BUDGET OFFICE
U.S. Congress
Washington. DC 20515

Robert D. Reischauer
*Director*
**June 22, 1992**

Honorable John D. Dingell
Chairman
Committee on Energy and Commerce
U. S. House of Representatives
Washington, DC  20515

Dear Mr. Chairman:

Your letter of April 30, 1992, asked a number of questions concerning the Medicaid prescription drug rebates enacted in the Omnibus Reconciliation Act of 1990. The answers to your questions are enclosed.

If you have any additional questions, we will be pleased to answer them.  The CBO staff contacts are Chuck Seagrave and Scott Harrison, who can be reached at 226-2820.

Sincerely,

Robert D. Reischauer

Enclosure

cc:     Honorable Norman F. Lent
        Ranking Minority Member

28

## QUESTIONS AND ANSWERS:
## MEDICAID PRESCRIPTION DRUG OPTIONS

CBO has assembled a data base consisting of information on the 100 single source and innovator multiple source drugs on which Medicaid spends the most. The Inspector General's Office of the Health and Human Services Department (IG) provided us with this drug list. The IG had done a survey of Medicaid drug utilization during the first quarter of 1991 and estimated that these 100 drugs accounted for about half of all Medicaid drug spending.

The Health Care Financing Administration (HCFA) allowed us to access their data system. On HCFA's system we were able to obtain manufacturer pricing data, including the average manufacturer's price (AMP), the "best price", and the unit rebate amount. We obtained the available information for each quarter of 1991 and the first quarter of 1992 for each of the top 100 drugs. Also, the Veteran's Administration provided us with Federal Supply Schedule (FSS) price information for our list of drugs, although not all of our sampled drugs were included on the FSS.

We used these data, as well as information we gathered in interviews with drug industry experts, to prepare the enclosed answers to the following questions. All cost and saving figures reflect only the federal share of Medicaid. The state share is 75 percent of the federal share.

QUESTION 1. What are the estimated savings (federal and state) for each of the fiscal years 1991-1997 that Medicaid will realize under current law with respect to the purchase of single source and innovator multiple source drugs as a result of:

1 A. the "best price" (without regard to the 12.5 percent and 15 percent minimum rebates);

1 B. the 12.5 percent and 15 percent minimum rebates; and

1 C. the additional rebates attributable to the indexing of the average manufacturer price (AMP)?

ANSWER. Table 1 displays our rebate estimates. These are not comparable to the savings resulting from the Medicaid prescription drug provision in the Omnibus Reconciliation Act of 1990 (OBRA 90), because the federal government would have received some of these rebates under prior law.

QUESTION 2. What are the estimated savings (federal and state) for each of the fiscal years 1991-1997 that Medicaid will realize under current law with respect to the purchase of other covered outpatient drugs as a result of the 10 percent and 11 percent flat percentage rebates?

ANSWER: Medicaid receives a flat rebate on generic and over-the-counter drugs. Table 1 shows the estimated rebate amounts.

29

TABLE 1. REBATES INCURRED (Federal share only)
(In millions of dollars)

| | FY 91 | FY 92 | FY 93 | FY 94 | FY 95 | FY 96 | FY 97 |
|---|---|---|---|---|---|---|---|
| Flat Rebate | 78 | 248 | 323 | 377 | 422 | 472 | 526 |
| | 44.4% | 35.1% | 39.9% | 42.4% | 41.9% | 40.7% | 38.6% |
| "Best Price" Rebate | 44 | 228 | 170 | 100 | 56 | 31 | 35 |
| | 25.0% | 32.3% | 21.0% | 11.2% | 5.6% | 2.7% | 2.6% |
| Additional Rebate | 33 | 161 | 235 | 311 | 409 | 518 | 641 |
| | 18.6% | 22.8% | 29.0% | 35.0% | 40.6% | 44.6% | 47.0% |
| Subtotal Single Source and IMS | 155 | 636 | 727 | 788 | 887 | 1,021 | 1,203 |
| | 88.1% | 90.2% | 90.0% | 88.6% | 88.1% | 88.0% | 88.2% |
| OTC | 8 | 27 | 31 | 37 | 43 | 49 | 55 |
| | 4.7% | 3.8% | 3.8% | 4.2% | 4.3% | 4.2% | 4.0% |
| Generics | 13 | 42 | 51 | 64 | 77 | 91 | 106 |
| | 7.2% | 6.0% | 6.3% | 7.2% | 7.7% | 7.8% | 7.8% |
| TOTAL | 176 | 705 | 809 | 889 | 1,007 | 1,160 | 1,364 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

QUESTION 3. Have "best prices" for high-expenditure single source and innovator multiple source drugs changed since the beginning of the Medicaid rebate program in January 1991? What has been the extent and direction of any such change?

ANSWER. "Best price" discounts have generally decreased since the rebate program started in January 1991. The "best price" discount is the percentage by which the "best price" is below the AMP. The median "best price" discount for our sample drugs fell to 18 percent, in the first quarter of 1992, from 24 percent, in the first quarter of 1991. "Best price" discounts fell for 57 percent of the drugs, and rose for 38 percent of the drugs. However, the 38 percent figure may be misleading in that actual price decreases occurred for only 12 percent of the drugs.

CBO expects "best price" discounts to continue to decline. We expect most, but not all, discounts to fall below the level of the minimum rebate by 1997. We came to this conclusion based on discussions with knowledgeable industry sources.

2

30

QUESTION 4. For a subsample of single source and innovator multiple source drugs for which Medicaid rebates are currently greater than 12.5 percent of AMP, how do (a) the amounts that would be paid by Medicaid in FY 93 under current law (i.e., price less rebate) compare with (b) Federal Supply Schedule (FSS) prices in effect in 1992 and (c) FSS prices in effect during September 1990, indexed to rise no faster than the rate of increase in the producer price index (PPI) through September, 1993.

> ANSWER. Our data do not include the actual drug price paid by Medicaid. We can, however, compare the average manufacturer's price less the Medicaid rebate to the FSS price. We are presenting this comparison as you requested. However, it may not be a meaningful comparison since the FSS price is the true price at which government agencies can purchase drugs, while Medicaid recipients can not purchase drugs at the AMP.

> Using the method presented in the previous paragraph, we compared the AMP less rebate with the best FSS price in effect during the first quarter of 1992. We found that 21 drugs were not listed on the FSS during the quarter; 19 drugs had lower prices on the FSS. For 60 drugs, the AMP less rebate was lower.

> In our sample of 100 drugs, 32 were not listed on the FSS on September 1, 1990. The 1990 "best FSS price" indexed by the CPI-U was greater than the AMP less rebate in the first quarter of 1992 for 46 of the drugs. For the other 22 drugs, the FSS price was less than the 1992 AMP less rebate.

QUESTION 5. Under current law, manufacturers are required, for the period before January 1, 1994, to remit an additional rebate for single source and innovator multiple source drugs that reflects the difference between the actual AMP for each drug and the AMP increased by the percentage rise in the Consumer Price Index from October 1, 1990.

5 A. What savings to Medicaid (federal and state) do you estimate will result in FY 92 and FY 93 from this additional rebate with respect to high-expenditure single source and innovator multiple source drugs?

> ANSWER. The additional rebates are shown in Table 1. Again, these are not the savings attributable to OBRA 90.

5 B. What would be the cost of eliminating this additional rebate provision?

> ANSWER. The cost of eliminating the additional rebate provision, effective January 1, 1993 would be about $120 million in FY 1993, $290 million in FY 1994, $380 million in FY 1995, $490 million in FY 1996, and $610 million in FY 1997. These figures represent increases in outlays, not changes in rebates incurred. In addition, drug manufacturers could raise prices more easily if the additional rebate were eliminated.

3

31

QUESTION 7. Under current law, P.L. 102-139, FSS prices are excluded from the calculation of "best price" for purposes of determining the amount of the Medicaid rebate. This exclusion expires on June 30, 1992. What is the cost to Medicaid (federal and state) of extending this exclusion through September 30, 1992? Through December 31, 1992? Through September 30, 1993?

ANSWER. We estimate that the Federal share of rebates lost by extending the exclusion of FSS prices from the calculation of "best prices" until September 30, 1992, would be $5 million. If the exclusion were extended until December 31, 1992, we would estimate the lost rebates at $9 million. We estimate that if the exclusion ran to September 30, 1993, lost Federal rebates would total $22 million.

QUESTION 8. What is the cost to Medicaid (federal and state), over the period FY 1993-1997, of enactment of H.R. 2890 as reported by the House Veterans' Affairs Committee, which would, among other changes, exclude FSS prices from the computation of "best price" for purposes of determining the amount of the Medicaid rebate on single source and innovator multiple source drugs, effective October 1, 1991?

If H.R. 2890 were enacted and current Medicaid law was otherwise left unchanged, at what level would the minimum rebates (currently 12.5 percent and 15 percent of AMP) need to be set in order to offset the cost of H.R. 2890 and achieve budget neutrality in each FY 1992-1997?

ANSWER. We estimate the costs of the lost rebates from H.R.2890, effective July 1, 1992, as follows: $18 million in FY 1993, $13 million in FY 1994, $8 million in FY 1995, $5 million in FY 1996, and $4 million in FY 1997.

We currently estimate that increases in the minimum rebate percentages necessary to offset a continuation of the exemption would be: 1 percentage point for the remainder of 1992, 0.7 points in 1993, 0.4 points in 1994, 0.2 points in 1995, and 0.1 points thereafter.

QUESTION 9. One alternative to current law that has been suggested would be to replace the "best price" mechanism for calculating Medicaid rebates for single source and innovator multiple source drugs with a flat percentage discount off the average manufacturer price (AMP) of each product. At what percentage would the flat discount have to be set in order to avoid any budget effect during the period FY 93-FY 97 assuming:

9 A.  the extension of the additional rebate provisions in current law?

ANSWER. We now estimate that if the best price provision were removed from the rebate calculation, and the additional rebate provision were retained, the minimum rebate percentage would have to rise to 22 percent in 1993, 19 percent in 1994, 17 percent in 1995, and 16 percent thereafter, in order to maintain budget neutrality. These estimates are very uncertain.

We know the extent to which "best price" discounts have fallen over the last year. We also have talked to drug company executives, to drug purchasers, and to academics with knowledge of the drug industry. Universally, we have been told that as current prescription

4

32

drug contracts expire, "best price" discounts will continue to fall. On the other hand, some "best price" discounts may remain. We have been told that these discounts will be particularly important when Medicaid is only a small portion of the market for a drug. Our estimates reflect these assumptions.

9 B. the elimination of the additional rebate provisions in current law?

ANSWER. If there were no longer a best price provision or an additional rebate provision, manufacturers could raise prices for their prescription drugs in order to offset the Medicaid rebates. We do not feel we could estimate such a proposal.

QUESTION 10. Another alternative that has been suggested is to calculate the rebate for single source and innovator multiple source drugs as the lower of (a) the FSS prices in effect as of September 1990 (indexed by the PPI), or (b) the rebates provided for by current law. Assuming the extension of the current law additional rebate provisions, and assuming this change were effective January 1, 1993, what would be the savings to Medicaid for FY 93 - FY 97?

ANSWER. The proposal states that the current "best price" provision would be replaced with a provision that the "best price" would be the lesser of the current "best price" or an indexed 1990 FSS price. The minimum rebate provision would remain, and the additional rebate provision would remain. Our preliminary estimate is that the proposed change would save federal outlays of $150 million in 1993, $300 million in 1994, $420 million in 1995, $540 million in 1996, and $640 million in 1997.

QUESTION 11. What is the cost to Medicaid (federal and state) of reducing the current flat rebate percentage applicable to multiple source drugs from the current level of 10 percent (through December 31, 1993) and 11 percent (beginning January 1, 1994) to (a) 8 percent (effective January 1, 1993) or (b) 5 percent (effective January 1, 1993).

ANSWER. Shown in Table 2 are CBO's preliminary estimates of reducing the flat percentage rebates on drugs other than single source and innovator multiple source drugs (also called generic drugs), effective January 1, 1993.

TABLE 2. COST OF REDUCING REBATE FOR GENERIC DRUGS
(In millions of dollars)

| Rebate | FY 93 | FY 94 | FY 95 | FY 96 | FY 97 |
|--------|-------|-------|-------|-------|-------|
| Flat Rate of 8% | 9 | 22 | 31 | 37 | 42 |
| Flat Rate of 5% | 23 | 48 | 63 | 73 | 85 |

33

QUESTION 12. Another alternative that has been suggested is to modify the additional rebate mechanism described in questions 5 and 6, which currently incorporates the CPI-U as an index in calculating the amount of the additional rebate. What savings to Medicaid (federal and state) do you estimate would result in FY 93 - 97 from the following changes:

12 A. alter the index to CPI-U minus 1 percentage point? minus 2 percentage points? and make no other change in current law;

12 B. same as (a), but also remove the "best price" provision from the rebate calculation without altering the flat rebate percentages set forth in current law;

12 C: same as (a), but eliminate "best price" provision from the rebate calculation and establish the following flat rebate percentages: 22 percent in 93, 19 percent in 94, 17 percent in 95, and 16 percent thereafter.

ANSWER: Our estimates of savings from proposals (a), (b), and (c) are shown in Table 3

TABLE 3. ADDITIONAL SAVINGS FROM CHANGES IN REBATES
(FY outlays in millions of dollars)

| Rebate Formula | 1993 | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|---|
| (a) Retain Best Price | | | | | |
| (CPI-U)-1% | 20 | 30 | 60 | 80 | 110 |
| (CPI-U)-2% | 30 | 70 | 110 | 160 | 220 |
| (b) Eliminate Best Price[a] | | | | | |
| (CPI-U)-1% | -120 | -90 | -10 | 40 | 80 |
| (CPI-U)-2% | -110 | -50 | 40 | 120 | 180 |
| (c) Eliminate Best Price and Change Flat Rate | | | | | |
| (CPI-U)-1% | 20 | 30 | 60 | 80 | 110 |
| (CPI-U)-2% | 30 | 70 | 110 | 160 | 220 |

a.    Negative figures denote costs.

CBO Analyst:  Scott Harrison (226-2820)
June 22, 1992

6

34

MEMORANDUM                                          July 24, 1992

TO:      Andy Schneider

FROM:    Scott Harrison, CBO

SUBJECT: Preliminary CBO estimates on H.R.2890, H.R.3405,
         and H.R.5614


This memorandum contains preliminary estimates of the
direct spending costs and savings of three different bills
that would affect the Medicaid prescription drug rebate
program.  The estimated budget effects of the three
proposals are presented in Table 1.

H.R.2890 would exempt Federal Supply Schedule (FSS) prices
from the calculation of the "best price" under the Medicaid
drug rebate program.  The proposal would also force drug
manufacturers to sign agreements with the Secretary of
Veterans Affairs, in order to participate in the Medicaid
program.  These agreements are to include prices on drugs
purchased through VA's depot system or through the FSS that
are no higher than prices paid through those systems on
Sept 1, 1990, updated by the cost of inflation in the
medical care account of the VA.  This proposal would
generate budget costs because Medicaid rebates would be
lower if FSS prices were removed from the "best price"
calculation.  The VA and other customers of the FSS would
spend less on drugs under the proposal; however such
spending is made through appropriated accounts and
therefore would not affect direct spending.

H.R.3405 would require many entities under the Public
Health Service Act to purchase pharmaceuticals only from
manufacturers that have entered into rebate agreements with
the Secretary of Health and Human Services.  The rebates
are to be equal to the rebates under the Medicaid rebate
program.  This proposal would not affect direct spending.
However, Public Health Service (PHS) entities would be able
to spend less of their appropriations on pharmaceuticals.
These entities would collect about $75 million per year in
rebates, less the rebates attributable to drugs provided by
the entities to Medicaid recipients.

H.R. 5614 would repeal the "best price" provision of the
Medicaid rebate program, while raising the minimum rebate

35

percentage on single source and innovator multiple source
(SS/IMS) drugs.  Currently, the minimum rebate for SS/IMS
drugs is 12.5 percent of the Average Manufacturer Price
(AMP), for the remainder of 1992, and 15 percent
thereafter.  The proposal would raise the minimum rebate
to: 22 percent in Fiscal Year (FY) 1993, 19 percent in FY
1994, 17 percent in FY 1995, and 16 percent thereafter.
CBO preliminary estimates indicate that this proposal would
be budget neutral.  In addition, manufacturers would have
to provide drugs to the Department of Veterans Affairs at a
price that matches the Medicaid after-rebate price.  This
provision would enable the VA to spend less of its
appropriation on pharmaceuticals.

TABLE 1

PRELIMINARY COST ESTIMATES
(in millions of dollars)

|           | FY93 | FY94 | FY95 | FY96 | FY97 | 93-97 |
|-----------|------|------|------|------|------|-------|
| H.R.2890  | 13   | 13   | 8    | 5    | 4    | 43    |
| H.R.3405  | 0    | 0    | 0    | 0    | 0    | 0     |
| H.R.5614  | 0    | 0    | 0    | 0    | 0    | 0     |

These are preliminary CBO staff estimates.  They have not
been reviewed by the Director of CBO.

2

36

The Honorable Henry A. Waxman
Chairman, Subcommittee on
  Health and the Environment
House of Representatives
Washington, D.C. 20515

Dear Mr. Chairman:

    This is in response to your request for the Administration's
estimates of the budget effect of each of three bills relating to
the Medicaid prescription drug rebate program.

    I have enclosed a copy of the estimates provided earlier to
the staff of the Subcommittee so they could share the information
with the Members for their review prior to the July 31 hearing.

    I would like to point out that these estimates do not reflect
Budget Enforcement Act (BEA) scoring rules.  Official scoring for
the purposes of the BEA will be reported by the Office of
Management and Budget consistent with the requirements of
Section 252 of the BEA.

                              Sincerely,

                              William Toby, Jr.
                              Acting Administrator

Enclosure

37

Preliminary Cost Estimates of Proposed Legislation
Affecting Medicaid Prescription Drug Rebates
Health Care Financing Administration
July 28, 1992

Benefit Costs(-Savings) in Millions

|  | FY93 | FY94 | FY95 | FY96 | FY97 |
|---|---|---|---|---|---|
| **H.R. 2890** | | | | | |
| Lo | 15 | 15 | 15 | 15 | 15 |
| High | 40 | 40 | 40 | 40 | 45 |
| **H.R. 5614** | | | | | |
| Lo | -25 | -15 | 0 | 10 | -5 |
| High | 40 | 50 | 60 | 65 | 50 |
| **H.R. 3405** | | | | | |

(No Medicaid Benefit Cost Impact)

Notes:  1.  The ranges above reflect uncertainty concerning
the fate of "best price" discounts under current
law.

2.  These estimates do not reflect Budget Enforcement
Act (BEA) scoring rules.  Official scoring for the
purposes of the BEA will be reported by the Office
of Management and Budget consistent with the
requirements of Section 252 of the BEA.

Mr. WAXMAN. Our first witnesses this morning are three Senators who have taken a leadership role on this issue and a colleague from the Energy and Commerce Committee who is a lead sponsor of one of the bills before us today. Senator Kennedy's Committee of Labor and Human Resources has already acted on this issue, having reported S. 1729, the Public Health Clinic Prudent Pharmaceutical Purchasing Act, earlier this year.

Senator Pryor is widely recognized as a driving force behind the OBRA 1990 effort to use Medicaid's leverage to get a better price on the drugs it buys for the poor and to end Medicaid's cross subsidies of other purchases.

Senator Rockefeller and I last discussed this issue at about 4 o'clock in the morning on Friday, October 26, 1990, when he chaired the OBRA 1990 Medicaid conference.

Finally, our colleague Jim Slattery, who sits on the both Veterans' Affairs and the Energy and Commerce Committees, has taken a lead in developing a proposal that helps the Department of Veterans Affairs and group purchasers while maintaining savings for the Medicaid program.

I would like to welcome our distinguished first panel and ask you to come forward to the table. We are delighted to welcome you here to our hearing this morning. Your prepared statements will be in put in the record in full. We would like to ask you to try to limit your presentations to 5 minutes.

Senator Kennedy.

## STATEMENTS OF HON. EDWARD M. KENNEDY, A U.S. SENATOR FROM THE STATE OF MASSACHUSETTS; HON. JOHN D. ROCKEFELLER, A U.S. SENATOR FROM THE STATE OF WEST VIRGINIA; HON. JIM SLATTERY, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF KANSAS; AND HON. DAVID PRYOR, A U.S. SENATOR FROM THE STATE OF ARKANSAS

Senator KENNEDY. Mr. Chairman, I will try and be brief. With Congressman Studds here today, I won't have to write my Congressman about this legislation.

I want to acknowledge the extraordinary leadership Senator Pryor has provided in the Senate, on this whole range of prescription drug issues, especially on escalating prices. As you mentioned, Senator Rockefeller has been a real leader, as well, on the finance committee. We have had the opportunity of working closely together.

I acknowledge the important work of Congressman Wyden and Congressman Cooper and your own leadership in this area, Mr. Chairman.

Let me just be very, very brief. There are, according to Dr. Mason about 1,000 unduplicated public health service act grantees providing health care to low income persons in this country. You are very familiar with them. They include the migrant and community health centers, homeless grantees, drug treatment centers, community mental health clinics, Ryan White AIDS grantees, black lung and other clinics that deal with sexually transmitted diseases. They are in a situation in which they have the worst of all worlds.