**ANDERSON EXHIBIT 26C**

39

About one-third of the community health center patients are treated under Medicaid, but two-thirds are not. They are in a situation where they have not been able to get the favorable drug prices which was extended to the Medicaid program. These clinics have suffered the other side of the coin, which is the drug price increases.

What we did in the Labor Committee, as you mentioned earlier, was to unanimously report out legislation providing favorable drug prices to the clinics. Republicans and Democrats alike, unanimously adopted legislation which will deal with that issue. We also had the support of the pharmaceutical manufacturers including Pfizer, Searle, Merck, Warner-Lambert, Syntax, Astra, and Lilly.

Our bill also has some important administrative protections as well.

We know that the Veterans' Committee in the Senate is going to be addressing this issue next week. We are working with them to try and ensure that whatever they are going to do, will include protection for these public health clinics.

We would just urge, as you move forward, no matter how you address the problem of achieving the lowest possible drug prices for Medicaid, that you also be sensitive to the needs of the clinics.

I ask unanimous consent that my full statement be included in the record.

Mr. WAXMAN. Thank you very much, Senator Kennedy.

[The statement of Senator Kennedy follows:]

STATEMENT OF HON. EDWARD M. KENNEDY, A U.S. SENATOR FROM THE STATE OF MASSACHUSETTS

Americans are increasingly concerned about the cost of health care, and one of the principal flashpoints for that concern is the high cost of prescription drugs. Patients should not have to go to the bank before they go to the local pharmacy. Yet, that is what is happening to more and more families across America who need prescription drugs.

In 1990, under the leadership of Senator Pryor and Representatives Wyden and Cooper, Congress began to take notice—and to take appropriate action. One of the most important steps so far has been the enactment of legislation to reduce the cost of such drugs for Medicaid patients.

But that legislation dealt with only part of the problem. It did not extend the Medicaid discount drug prices to the wide array of Public Health Act clinics that also serve the needy.

These clinics have the worst of both worlds. They can't get the Medicaid discounts—and they're now paying even higher prices as manufacturers shift costs to offset the Medicaid discounts.

Numerous public health officials have told me about the impact of drug price increases on their programs.

A community health center in East Kentucky, which sponsors a black lung clinic, reports that price increases to treat black lung disease ranged from 26 to 47 percent over the past 3 years.

At a Senate Labor Committee hearing last fall, the director of Maryland's drug treatment program testified that methadone prices had climbed 150 percent over the previous 2 years. As a result, he lost all of the new treatment slots he anticipated from increased Federal funds.

The medical director of a community mental health clinic in Rhode Island testified that the price of prolixin, a drug to treat severe mental illness, had increased by 750 percent. This drug makes the difference between living in the community and long-term institutionalization.

Last fall, Senator Pryor, Representatives Wyden, Cooper and I, introduced new legislation—S. 1729 and H.R. 3405—to give Public Health clinics access to discount drug prices.

The public health system has only limited ability to absorb price increases. Their programs must compete for scarce Federal dollars. These clinics are our first line of defense in the battle against drug abuse and disease. If they are forced to pay more for drugs, they have no choice but to cut back the services they provide.

Earlier this year, the Senate Labor Committee unanimously adopted legislation, with the commendable participation and support of a number of pharmaceutical manufacturers, including Pfizer, Searle, Merck, Warner-Lambert, Syntex, Astra and Lilly.

The bill will extend discount prices to Public Health Service clinics based on the negotiated price for drugs in the Federal Supply Schedule, or a flat discount, patterned after the Medicaid rebate, whichever yields the lower price.

The flat discount is based on the average manufacturer's price for the drug less 12½ percent in the first year following enactment, and 15 percent in the second year.

The flat discount is adjusted upward for drug price increases which exceed the growth of the consumer price index.

Price discounts in the Federal Supply Schedule are determined by negotiations between the Department of Veteran's Affairs and drug manufacturers. The legislation caps the Federal Supply Schedule discount for public health clinics at 25 percent, even if the VA has negotiated a deeper discount.

The bill includes important administrative safeguards, such as a prohibition against resale of discounted drugs, a provision to prevent multiple discounts under other Federal or State programs, and an audit and dispute-resolution provision.

In addition, the bill also reduces administrative burdens and helps public health clinics purchase drugs more wisely, by providing the discounts upfront—either through wholesalers or directly from the drug manufacturers.

I have also been working with the Senate Veterans Affairs Committee to address the price increases that some companies have charged the Veterans Administration over the past 2 years. The extension of price discounts to public health clinics makes it doubly important that we reach a satisfactory solution to this problem.

All of us have strong interest in ensuring reasonable drug prices for VA, DOD, and public health clinics. To achieve our goals, it is important to avoid intra-government cost shifting. The most desirable approach is a comprehensive one that is sensitive to the concerns of all taxpayer-supported purchasers of prescription drugs. Clearly, the intent of the Medicaid rebate law is to reduce government expenditures for the $5 billion Medicaid prescription drug program—not shift them to other government health programs.

We also have concerns about the burdens of the Medicaid law on private drug purchasers such as HMO's. But the public health clinics need help now, and I hope that we can act on this important legislation. They should not have to wait any longer for lower drug prices. We need to act now to stretch our scarce Federal dollars further.

Mr. WAXMAN. Senator Rockefeller.

### STATEMENT OF HON. JOHN D. ROCKEFELLER, IV

Senator ROCKEFELLER. Thank you, Mr. Chairman.

As Senator Kennedy indicated, next week we will take this up in the Senate Veterans' Committee, and I think we have a good chance of resolving it. VA health, of course, as you know, is an appropriated item. It is not an entitlement, which many people think, like several other health care programs are, so every extra dollar that has to be spent to cover the cost of prescription drugs means a dollar less for something else, outpatient care, inpatient care, new equipment and the rest.

The VA budget is too tight. It cannot absorb increases in prescription drugs of 12 to 80 percent, much less the increases in—numerous individual increases jumping by well over 100 percent in some cases. There is no recourse but for the VA to reduce the care that it provides. So the VA desperately needs relief.

Assistant Secretary Tony Principe testified before the House Veterans' Committee; he said veterans were going to be hurt, because

they are going to be denied care because some in the drug industry refused to believe the Federal Government will no longer accept business as usual. Those were his words.

It is critical that the drug manufacturers understand that when cost Congress says "cost containments," we mean it. Just as we set a precedent when we said "reasonable discounts should be available to Medicaid," so are we setting a precedent in responding to industry attempts to circumvent the law. The word should go forth that we will not accept another set of excuses about the potentially grave impact on international competitiveness by exempting a fair for the best customer.

If the rampant cost shifting continues, if Congress had the luxury of unlimited dollars, we could obviously just give the VA $92 million or some dollars to make up the difference to cover the cost. But our budget does not allow that. We have constraints for domestic discretionary budgetary programs which I need not elaborate on.

I will introduce legislation next week to help remedy in a fair way this unfair situation that resulted from some of the prescription drug manufacturers who thought they could compensate for the Medicaid-imposed rebates—which were set—I thought was 3 a.m., but the chairman said 4 a.m., so it was 4 a.m.—by taking it out of the hide of the VA budget. I banded with my colleagues, Senators Kennedy, Pryor, Mikulski, Cranston and others to get this forward. I believe this will be a bipartisan effort.

So I consider this legislation surgical, a specific fix to remedy the general outlandish response of the drug industry. My legislation will exempt Federal purchasers from OBRA's "best price" mechanism and, in return for that, requires a rollback of the prices to the pre-OBRA levels with an adjustment for inflation. Companies will be asked to sign an agreement with the government's General Services Administration, asserting that they will abide by these provisions if they want to do business with the government.

I am told that a very minute adjustment, seven-tenths of 1 percent in the Medicaid rebate, will pay for the rebate. That is likely how we will finance it, but I am flexible on that, open to other suggestions. I welcome suggestions from the drug industry on that, but I can't wait long. We are going to mark up very quickly. The veterans cannot wait long either.

We will also establish, in concluding, a unified pharmaceutical award contract that would allow the VA to join with other government purchasers to form buying groups to negotiate even better prices than those achievable on the Federal supply schedule. These would be limited volume contracts, defined to help the VA and others proffer better contracts from the existing contract.

Mr. Chairman, I will just stop there.

Mr. WAXMAN. Thank you.

[The statement of Senator Rockefeller follows:]

STATEMENT OF HON. JOHN D. ROCKEFELLER, IV, A U.S. SENATOR FROM THE STATE OF WEST VIRGINIA

Thank you, Mr. Chairman. Thank you for holding this hearing to review the Medicaid Prudent Purchasing Act's ramifications on the costs of prescription drugs and,

42

ultimately, its affect on the millions of Americans whose health and quality of life are dependent upon access to affordable pharmaceuticals.

We're here today because in October 1990, Congress enacted that legislation, known as the Pryor amendment, in honor of my distinguished colleague from Arkansas. David Pryor fought diligently for this provision which is based on this simple premise: the Medicaid program, as the single largest purchaser of prescription drugs in America, deserves a reasonable discount for its bulk purchases—the kind any savvy private purchaser would demand as appropriate compensation for high volume purchases. But for a host of reasons in the past, the Federal Government's expected leverage with prescription drug firms just didn't result in the discounts that private buyers received. Until enactment of the Pryor amendment, that lack of leverage was costing the Federal Government—and the American taxpayer—billions of dollars.

I am proud to say that I was in the room—until 4 a.m. or so—working with Senator Pryor on this legislation and in the end, we produced legislation designed to insure that, at a minimum, the Medicaid program would receive the best price available on the market, or a rebate of 12.5 percent (escalating to 15 percent).

Passage of this measure was an advent of the new era of cost containment—a word with which all of us will have to become more and more familiar and comfortable, if we are ever to achieve real health care reform. The Pryor legislation was a first step towards cost containment for prescription drugs—and it's precedent setting.

It shows just how powerful even limited efforts at cost containment can be. We predicted the legislation would yield $3–$5 billion in savings for Medicaid prescription cost. Then, as now, grim budget realities dictated that we needed savings if we wanted to make any improvements in extending health care services. And with those anticipated savings from the Pryor amendment, we were able to make important expansions of health care coverage for some of the most vulnerable Americans—poor children and frail elderly. Without Senator Pryor's legislation of 2 years ago, there is no way we could have improved access to health care for those needy populations.

Happily, the latest studies show that this rebate has achieved even greater savings than we originally projected. CBO now estimates savings for Federal and State Medicaid programs to be $6 billion. In almost every respect, this legislation was a true success. So that's the good news.

Here's the rest of it. I am here to testify about a problem that emerged for other Federal purchasers of prescription drugs following passage of OBRA 1990.

But first, let me tell you why I'm so interested in this problem and an expeditious and fair resolution. In addition to serving as Chairman of the Medicare and Long Term Care Subcommittee and on the full Senate Finance Committee, which has oversight responsibility for the Medicaid program, I am privileged to serve on the Senate Veterans' Affairs Committee. In that capacity, I have been battling to improve health care for veterans since I came to the Senate in 1985. And over the last 7 years, I have witnessed a steady, appalling erosion in the health care benefits that our Nation's veterans receive, despite Congress's valiant efforts to the contrary.

The reaction of some pharmaceutical manufacturers to the cost containment of the Pryor legislation has exacerbated this problem—their actions have caused thousands of veterans to suffer a serious reduction in their health care benefits. It is particularly frustrating for me that so many have opted to raise their prices, when throughout the debate on the Pryor legislation Congress was told that the VA received the best price because drug companies, out of a keen sense of their patriotic duty, already provided the VA with their deepest discounts. CBO's recent analysis suggests otherwise, citing that the VA received manufacturers' best prices only about one-fifth of the time.

As I previously noted, while Medicaid realized savings that allowed us to do some real good, the VA was socked with skyrocketing drug prices following enactment of OBRA 1990. Those bulging drug prices have done real damage to veterans health care—and cannot be tolerated by a program already under a budget siege.

VA health is an appropriated item, not an entitlement like many of the Federal health care programs. So every extra dollar that must be spent to cover spiraling costs of prescription drugs means $1 less for outpatient care, inpatient care, and replacement of aging, lifesaving equipment.

VA's health care budget is too tight. It cannot absorb spiraling increases in prescription drug costs ranging from 12 percent to 80 percent, much less increases of numerous individual prescriptions jumping by well over 100 percent. There is no recourse for the VA, but to reduce the care it provides.

The VA desperately needs relief. As Assistant Secretary Tony Principi testified before the House Veterans Committee in September of last year: veterans will be hurt because they are going to be denied care. Care denied solely because some in the prescription drug industry refuse to believe that the Federal Government will no longer accept business as usual.

It's critical that the drug manufacturers and others who comprise the health care sector understand that when Congress says cost containment, it means it. Just as we set a precedent when we said that reasonable discounts should be available to Medicaid, so are we setting a precedent in responding to industry attempts to circumvent the law. The word should go forth that we will not accept another set of excuses about the potentially grave impact on international competitiveness or some other such claim just because the Federal Government insists on fair prices as the prescription drug industry's best customer. The rampant cost-shifting that contrives the current status quo is no longer tolerable. So how can we respond to the dramatic escalation of prescription drug prices?

If Congress had the luxury of unlimited dollars, we could simply give VA an additional $92 million to cover the costs. But our budget constraints for domestic discretionary programs are strict, and what's more, it's only appropriate to ask the parties responsible for the increases to pay.

Next week, I will introduce legislation that will help remedy the unfair situation that resulted from some prescription drug manufacturers who thought they could compensate for the Medicaid imposed rebates by taking it out of the thin hide of the VA budget. I have banded with my colleagues, Senators Pryor, Kennedy, Mikulski and Cranston to push this legislative solution. It will dovetail the legislation that was reported out of Chairman Montgomery's Veterans' Affairs Committee with overwhelming, bipartisan support.

I consider this legislation a surgical, specific fix to remedy the general outlandish response of the drug industry to the Pryor provisions of OBRA 1990. My legislation will exempt Federal purchasers from OBRA's best price mechanism and in return requires a roll-back of prices to the pre-OBRA levels with an adjustment for inflation. Companies will be asked to sign an agreement with the Government Services Administration asserting that they will abide by these provisions if they want to do business with the government. I'm told that a very minute adjustment—just .7 percent—in the Medicaid flat rebate will pay for this rollback and that is likely how we will finance this fix. I'm not wedded to this financing approach. In fact, I welcome, even challenge, the representatives of the drug industry in this room to suggest an approach that may make this legislation more palatable to them. But I can't wait long, the Veterans Committee will be marking up legislation next week and this solution needs to be a part of that markup. I'm committed to resolving this problem—and in this Congress. I want you to know that I am working closely with the staff of the Chairman of the Finance Committee to resolve this problem and develop a viable method to pay for it.

Additionally, my legislation will establish a Unified Pharmaceutical Award contract that would allow the VA to join with other government purchasers to form buying groups to negotiate even better prices than those achievable on the Federal Supply Schedule. These would be limited volume contracts designed to help the VA and others proffer better contracts from the existing contract.

I know full well there will be a hue and cry when this legislation is introduced. We can expect all the same old, worn arguments that were voiced when the Pryor legislation was being considered. You remember the litany: this is price-fixing, it will penalize the deepest discounters, the problem is exaggerated, companies will voluntarily provide discounts to the VA again once the market stabilizes, and drug companies have no choice but to respond to the Medicaid rebate legislation in a manner that will protect their business—read 'profits'. Let me briefly respond for the record.

This legislation is about the Federal Government remembering the adage, 'caveat emptor'. We need to get smart about using our limited health care dollars and demand what others in the private sector have long been successful in achieving. Moreover, the traditional, deepest discounters to the VA should have no problem with my solution because it would only require them to do what they themselves had deemed appropriate and responsible. The problem is all too real—the lack of care is evident in VA centers and hospitals across the country. And I have no confidence that companies will do voluntarily that which they have essentially refused to do even when dictated by statute. Senator Mikulski was promised that a 1 year exemption would assure the VA would once again receive its historic discounts—CBO tells us that just isn't happening.

44

Veterans deserve a better deal than the one that they have been handed as a result of our efforts to improve the Federal Government's purchasing posture for Medicaid. I intend to see that they get it. This is not big dollars—it's a pittance to the drug industry, but it's vital to veterans and other health care purchasers. Congress must demonstrate that it's serious about this cost containment effort. For the sake of those who wait for health care reform, for veterans, and beneficiaries of public health services, it's time to draw a line in the sand.

As always, Mr. Chairman, I look forward to working with you as we forge a solution.

Senator KENNEDY. Mr. Chairman, as you know, we are having a conference on the gag rule. Both you and I are participants. I would like to ask if I could possibly be excused for the purpose of attending the conference.

Mr. WAXMAN. I have no problem with that, although the conference is not until 10:30. If no one else has questions, then we will see you in 10 or 15 minutes.

Mr. Slattery.

## STATEMENT OF HON. JIM SLATTERY

Mr. SLATTERY. Thank you, Mr. Chairman. It is a pleasure to be here today. I appreciate your leadership in this area. I appreciate the leadership of Senators Pryor, Kennedy, and Rockefeller. It is a pleasure to have a chance to work with them in trying to resolve what I think is an enormously complex problem that is costing the taxpayers a ton of money.

As you know, I have introduced H.R. 5614, the Medicaid Prescription Drug Amendments of 1992. I believe this bill addresses a serious problem that has developed as a result of efforts to help lower the cost of prescription drugs for State Medicaid programs.

I am sure, Mr. Chairman, that you can recall some late-night negotiating sessions also during the conference on OBRA in 1990 when the Medicaid Best Price Discounts program was agreed to. As you recall, this agreement was reached in order to insure funding for the Medicaid expansion that you and I worked on, along with Mr. Wyden and our colleague from Oklahoma, in trying to pass funding for the Medicaid expansion provisions for poor children, which I sponsored with your support.

A specific goal of the Medicaid Best Price Discounts program was to obtain the same sharp discounts on drugs for the Medicaid program that often were obtained by hospitals, HMO's, long-term care pharmacies, group purchasing organizations and the Department of Veterans Affairs. Under the OBRA 1990 amendments, manufacturers were required to provide drugs to Medicaid at the best price available in the market.

Unfortunately, implementation of OBRA 1990 provisions prompted many drug manufacturers to significantly increase prices charged to hospitals, HMO's, and others including the DVA, who were already receiving discounts, clearly not what Congress intended nor the type of behavior the drug companies had promised. Because prices charged to these large purchasers, such as the DVA, were often the best prices offered on drugs, these manufacturers dramatically increased the prices charged to DVA in order to avoid being required to significantly lower prices charged to Medicaid customers. Some estimates place the cost of the price hikes to the DVA at roughly $150 million a year. These price hikes are increas-

ing prescription drug costs to consumers at a time when health care costs are already soaring.

I believe that this is the kind of abuse that OBRA 1990 was designed to stop. I have cosponsored H.R. 2890, legislation that would solve the problems of OBRA 1990 amendments for the DVA, but that alone is not enough. I am offering this legislation in an attempt to address the real problem: inappropriate pricing behavior and cost shifting by prescription drugs manufacturers in response to the incentives created by OBRA 1990. I believe the problem lies in setting the Medicaid rebate requirements at "best price" levels. Manufacturers are not restricted from raising the "best prices," and, as we have seen, the "best prices" are disappearing.

One way to correct this problem would be to set the Medicaid discounts at a flat rate. Using information from the CBO, my legislation would establish a flat rate discount, phased in over 4 years, for State Medicaid programs that would capture the OBRA 1990 intended savings for Medicaid. The discount rate included in my legislation is budget neutral. I would, of course, be willing to work with you, Mr. Chairman, and my colleagues, Mr. Wyden and certainly Chairman Montgomery, to set a fixed flat rate discount, instead of the phased-in rates to capture savings for Medicaid.

Further, I am committed to obtaining similar relief from rising drug prices for community health centers and other public health service grantees and will work with my colleagues to achieve this goal.

With the elimination of the "best price" from the Medicaid discounts formula, large purchasers of pharmaceuticals, including the DVA, would again be able to negotiate discounts with the manufacturers based upon the volume of their purchases. Medicaid's flat discount rate would have no impact on these negotiated prices.

Mr. Chairman, I believe a flat rate discount for the Medicaid program is essential to reestablishing a competitive market for pharmaceuticals and restoring the negotiated position of pharmaceutical purchasers. As I indicated above, I will be pleased to work with you, Mr. Chairman, and all of our colleagues in trying to develop a comprehensive solution to this pressing problem. I think a compromise can be reached this year. I look forward to negotiating with the interested parties on this issue.

So, Mr. Chairman, I again commend you for holding this hearing. I know you have a long and lengthy hearing today.

I would like to ask unanimous consent to have inserted in the record a copy of a statement from the Kansas Secretary of Social and Rehabilitation Services, Donna Whiteman, who administers the Medicaid program in my State. In her statement, she is endorsing House Resolution 5614. She provides some additional comments and suggestions in her letter. I would like for you to have that included in your record.

Mr. WAXMAN. Without objection, that will be included in the record.

Thank you very much, Mr. Slattery.

[The statement referred to follows:]

STATEMENT OF KANSAS DEPARTMENT OF SOCIAL AND REHABILITATION SERVICES

The Kansas Department of Social and Rehabilitation Services appreciates the opportunity to address comments to this subcommittee on H.R. 5614, the Medicaid Prescription Drug Amendments Act of 1992.

As you are probably aware, OBRA 1990 changed the Medicaid drug program to cover all drugs for which HHS and the manufacturer had entered rebate agreements. One intended effect of these provisions was to provide necessary pharmaceuticals to the Medicaid program at or below the "best price" the manufacturer offered the drugs to any other purchaser. OBRA 1990 phased-in these rebates based on the difference between AMP and "best price" by limiting rebates to 25 percent of AMP through December 31, 1991, and 50 percent of AMP through December 31, 1992.

The initial rebates under this policy were at 24 percent of AMP, indicating that "best price" was significantly more than 12.5 percent below AMP. This 24 percent figure is particularly significant in light of the OBRA 1990 limitation that rebates for the first year could be no higher than 25 percent of AMP. Rebate levels are now at approximately 22 percent of AMP and expected to continue to fall in the absence of intervention.

The decrease in rebates can be directly attributed to one factor, the dramatic rise in "best price" offered by drug companies. Following the implementation of OBRA 1990, drug companies dramatically changed their pricing structures resulting in higher drug costs to former "best price" customers (such as the Department of Veterans Affairs, the University of Kansas Medical Center, and the Kansas State Hospitals.) This also results in lower rebates to Medicaid than originally anticipated, increasing the cost of providing needed drug therapy at all levels of government.

We support Representative Slattery's attempt to correct this provision of OBRA 1990 which has not worked as intended. We do, however, suggest a modification to the proposed rebate levels contained in the bill. Representative Slattery has proposed that rebate levels begin at 22 percent for FFY 1993 reducing to 16 percent in FFY 1996. We recommend (1) the rebate level be set at 24 percent and (2) not decrease over time.

We suggest a rebate level of 24 percent because this is the actual level which resulted from OBRA 1990 before the change in pricing policies. It has been suggested that if it were not for the 25 percent maximum rebate included in OBRA 1990 this figure would be in the 30 percent to 50 percent range, however we do not have data to demonstrate this conclusively. We do know it to be true for specific drugs, however do not have access to data to demonstrate the impact of those drugs on the overall Medicaid drug costs. Setting a flat rebate off AMP also breaks the link between "best price" and Medicaid, removing the incentive to eliminate "best price" contracts.

Our opposition to the decreasing rebate levels is because they are based on, as Congressman Slattery put it in his remarks on July 9, 1992 "inappropriate pricing behavior by prescription drug manufacturers in response to the incentives created by OBRA 1990." Because the rebate percentages proposed in this bill are based on budget neutrality, they represent a projection of the future decrease in the rebate levels we can expect under OBRA 1990 with the dramatic price increases we have experienced. This is in sharp contrast to the expectation inherent in the phased-in maximum rebates contained in OBRA 1990. In essence the drug company price increases manipulated the meaning of "budget neutral" to include an extreme inflationary increase. Unless the base on which the rebates are premised is expected to continue to increase dramatically (such as the increases in "best price" since implementation of OBRA 1990 began) there is no need for the decreasing rebate levels.

With these modifications, we urge you to pass this proposal. We hope these changes will somewhat simplify the administration of the Medicaid program. We see the primary benefits of this legislation as accruing to the other agencies who have lost the "best price" benefits. We believe this bill is a good compromise, providing reasonable rebates to the Medicaid program without that cost being picked up by other government agencies.

Mr. WAXMAN. Senator Pryor.

## STATEMENT OF HON. DAVID PRYOR

Senator PRYOR. Mr. Chairman, thank you. I want to thank my colleagues here, Mr. Chairman, and members of the committee. I want to express my appreciation to all of you for holding this very

47

timely hearing. Mr. Chairman, many people in our country may not realize that the Federal Government is the largest purchaser of pharmaceuticals. The Federal Government, Medicare, Medicaid, VA, the Department of Defense bought or paid for over $19 billion worth of pharmaceuticals in 1991 alone.

In spite of this very large buying power and this ultimate leverage that we should be using, most Federal Government health programs have traditionally not had access to the discounts for pharmaceuticals that manufacturers provided to private institutional purchasers of drugs, nor has the Federal Government had access to the same discounts that these same pharmaceutical companies give overseas. We pay the highest cost for drugs of anyone. In the case of Medicaid, the largest single purchaser of prescriptions, Mr. Chairman, States tried for years to no avail to obtain discounts.

In 1989, Senate Aging Committee hearings and reports revealed that States, States like West Virginia, States like Kansas and Arkansas, tried in every conceivable way to obtain lower drug prices for the program that serves the poorest of the poor of our Nation. What was the drug industry's response, Mr. Chairman, members of the committee? The drug industry laughed, rejected and ultimately ignored every plea.

In response, you, Mr. Chairman, many of us—Ron Wyden, Jim Cooper, Jay Rockefeller, myself—many of us drafted and passed provisions in 1990. We have talked about that.

That law was shared on two bills that I introduced in 1990. The first bill would have set up buying groups, to give some States some leverage in negotiating. The second bill required manufacturers to give Medicaid, which serves the poorest of the poor, the same discounts they were providing to other large-volume purchasers. That is simple and direct.

How did the drug manufacturers respond this time, Mr. Chairman? First, they decided, that sick and the elderly should continue to subsidize the most enormous profits in the history of the pharmaceutical manufacturing industry. Then, they unfairly, inaccurately, maliciously maligned this legislation. They used false and misleading labels on what we were doing. They described it as second-class medicine. They said it was price-fixing. They did every conceivable thing to undermine our efforts in an attempt to bring sanity and some price relief and moderation.

What followed was an unprecedented lobbying effort by the pharmaceutical manufacturers, unfortunately, to a degree, successful. In fact, if we enacted one or two of the original bills, I don't think the industry today or anyone else could blame the statutory language of the current law for any price increases.

Today, Mr. Chairman, the pharmaceutical manufacturers are going around telling the HMO's and the hospitals, we hate to raise the prices of drugs, but because of Senator Pryor and his colleagues, we have to.

We all know that the "best price" had good intentions. We have discussed that. We believed that this gave the Medicaid program the same approach that we do in "Most Favored Nation" status. As the Nation's largest prescription drug program, we thought it deserved this status. Following enactment of the rebate law, how did the drug industry respond? It responded like it always responds,

Mr. Chairman. It put profits before people and apparently used the new law as an excuse to immediately, within hours, start raising prices.

The GAO issued its first major report on the impact of the law on public sector programs in September of last year. The report found that some of the manufacturers had raised prices to the VA immediately. The report also pointed out, unlike the newly reformed Medicaid prescription drug program, the VA and other medical programs did not have the protection from unrelenting drug manufacture price inflation.

I would like to quote the late Congressman Mendel Rivers. He used to say, "This is so ridiculous, it is ridiculous."

Mr. Chairman, the intent of the Medicaid law that we worked so hard on in night sessions when my friends Senator Rockefeller and yourself were so tired we were about to drop, we were trying, truly, to do the right thing. I am sorry we did not have the cooperation of the drug manufacturers.

In the end, I think, Mr. Chairman, I would like to say that I am very sorry if any cost-shifting is taking place. I don't know whether we should change it now, because I don't think we have the full and complete data. But I want you to know, Mr. Chairman, that in good faith I am joining my friends, Senator Rockefeller, Congressman Slattery, yourself, Senator Kennedy, in attempting to bring something together to see if we can't find a solution to this. I have no pride of authorship.

I would like to conclude by saying that I think we have to deal with this issue. However, we have a larger issue out there that we must face. We have to do something about the escalation of drug prices in general. Maybe the way to do it is to look at section 936. Section 936 is the biggest open money sack that we have ever created in the Federal Government for one industry. I tried it. I got 36 votes on the Senate floor. I am going to try it again.

The other thing I think we ought to look at is a fact of life, and that is that God does not grant patents; the U.S. Government grants patents. We ought to think about shaving a year off the exclusivity of a drug patent, if drugs go over the cost of inflation. I think that is something that we may have to work toward if we do not get more cooperation from the pharmaceutical industry on lower drug prices.

I am sorry I used so much time, Mr. Chairman. I would ask that the full text of my prepared remarks be inserted in the record at this point. Thank you.

[The statement follows:]

STATEMENT OF HON. DAVID PRYOR, A U.S. SENATOR FROM THE STATE OF ARKANSAS

Mr. Chairman and members of the subcommittee, I want to thank you for calling this very important hearing. I sincerely appreciate your giving me the opportunity to present my views on various pieces of legislation regarding the purchase of prescription drugs by Federal health care programs.

Mr. Chairman, many people may not be aware that the Federal Government is the single largest buyer of pharmaceuticals in the United States. In fact, Federal Government health care programs—including Medicare, Medicaid, VA, and DOD—bought or paid for over $19 billion worth of pharmaceuticals in 1991.

In spite of its large pharmaceutical buying power, most Federal Government health care programs have traditionally not had access to the same discounts for pharmaceuticals that manufacturers provide to many private institutional purchas-

49

ers of drugs. This is despite the fact that these purchasers are obviously much smaller than government prescription drug programs.

In the case of Medicaid, States tried for years, to no avail, to obtain discounts. As my 1989 Aging Committee hearings and reports revealed, State appeals for price moderation were consistently rejected or ignored by drug manufacturers. As a result, Medicaid, and the taxpayers who underwrote its costs, were effectively forced to subsidize many of the deep discounts given to the private sector.

Just as skyrocketing prescription drug costs have and continue to place an overwhelming out-of-pocket burden on our citizens, so too were these costs threatening the very viability of Medicaid prescription drug programs. It seemed absurd to me that our taxpayer-supported program for the poor was paying the highest prices in the market for desperately needed medications.

In response, working with you, as well as Ron Wyden and Jim Cooper, we drafted and passed provisions in OBRA 1990 designed to take steps toward containing escalating Medicaid drug costs. This legislation stemmed out of two bills that I introduced.

The first proposal would have allowed the States to set up buying groups and negotiate on their own with drug manufacturers; the second required manufacturers to give to Medicaid the same rebates that they were then providing to other purchasers and then index those prices to inflation.

As they have done with all attempts to bring sanity and price relief to the prescription drug market, the drug industry—financed of course by the sick and elderly who purchase medications—ferociously attacked my legislation. They unfairly, inaccurately, and maliciously maligned the legislation. They used false and misleading labels, such as "second-class medicine" and "price fixing," to undermine our efforts to finally begin to bring cost containment to the drug industry.

While the industry's unprecedented lobbying campaign could not stop our efforts to assist Medicaid, it was unfortunately successful in forcing compromises in order to get something enacted. The fact is, had we enacted either one of my two original bills, neither the industry, nor anyone else, could blame the statutory language of the current law for any subsequent price increases to any other purchasers. Having said this, even though the OBRA 1990 provisions were not my first or even second choice, I do believe they represented a generally reasonable compromise.

As we all know, the provisions enacted in OBRA 1990 require drug manufacturers to give the Medicaid program the "best price" that if offers to any other buyer. This approach is equivalent to a "most favored nation" status for the Medicaid program. As the Nation's largest prescription drug program, as a non-profit health care program for our sick and poor, and as a taxpayer-supported government program, Medicaid unquestionably deserves this status.

Following enactment of the Medicaid rebate law, the drug industry did what it always does. It chose to put profits before people, and apparently used the new law as an excuse to raise prices. Based on their behavior over the past decade, this response was not surprising. In fact, we were concerned about this possibility and that is why we specifically required the General Accounting Office to monitor and evaluate the impact of the Medicaid law on the public and private sectors.

GAO issued its first report on the public sector in September of last year. The report found that some drug manufacturers had raised prices to the VA since enactment of the rebate law. The GAO report also pointed out that, unlike the reformed Medicaid prescription drug program, the VA and other Federal programs did not have protection from unrelenting drug manufacturer price inflation. As was the case with Medicaid, it has become all too clear that drug price inflation has the same potential to devastate the limited health care budgets of these other Federal programs.

Mr. Chairman, the intent of the Medicaid law was to assure that Federal programs serving vulnerable populations of Americans had access to more affordable medications. There is no question that the VA, the DOD, and Public Health Service programs serve such populations. This fact, combined with the GAO's finding that these programs continue to be victimized by the drug industry's pricing practices have convinced me to join with Senators Rockefeller, Cranston, Kennedy and Mikulski to develop a proposal that addresses this problem. Our efforts, which will be briefly outlined by Senator Rockefeller, will assure that all Federal health care programs will be protected against rampant drug price inflation.

At this time, data about the impact of the law on private purchasers is inconclusive and incomplete. The required GAO report on the impact of the Medicaid rebate law on hospitals and HMO's has yet to be delivered. In addition, despite a recent CBO estimate that assumes discounts in this market being eroded, CBO itself remains "very uncertain" about their projections. Finally, the States strongly feel