**ANDERSON EXHIBIT 26D**

50

that the CBO numbers are questionable and inconsistent with their own experience. The bottom line is that we simply do not know the nature and extent of any problem that may exist for these purchasers. For this reason, it would seem to be unwise and premature to rush to make any changes in this portion of the Medicaid rebate law at this time.

In the end, the GAO and other objective reports may show that the "best price" component of the law is causing significant and unacceptable cost shifting to private purchasers. As I have communicated to all interested parties, I will be open to considering all alternatives to address this problem as long as they treat the States fairly and provide the Medicaid program the discounts that a program of its scope and nature deserve.

In conclusion, Mr. Chairman, while not surprising, it is certainly disappointing that the drug industry has apparently decided to maintain record-breaking profits and multi-billion dollar marketing campaigns, rather than to be sensitive and compassionate to the purchasers of their products. Their actions, however, have confirmed what I always have felt: The only way to truly contain prescription drug costs is to enact legislation that protects all purchasers—older Americans, the uninsured of our Nation, hospitals, HMO's, and the government—from the industry's price gouging. I am committed to doing this, and I hope and invite all your impressive witnesses to join me in this effort. Until we come together in this endeavor, I fear we will only continue to play the unproductive cost-shifting games that divide us and benefit only one interest—the drug manufacturers.

Mr. Chairman, I thank you for the opportunity to testify. I look forward to working with you on this and other critical health care reform issues.

Mr. WAXMAN. Thank you, Senator Pryor. I want to commend you on an excellent statement, I think it lays the issue right on the line.

Let me ask this question more of the Senator than my colleague, Mr. Slattery. I don't know what this committee will do, if anything, but if we do pass legislation, do we have a chance this year with the short period of time that is left to us before we adjourn to adopt legislation? Would the Senate be receptive, if we were to act by September, to working on a conference and trying to work out legislation and get it to the President before we leave?

Senator ROCKEFELLER. Mr. Chairman, my answer would be absolutely. In fact, on the Veterans' Committee there is a great bipartisan sense on this issue.

The approaches are slightly different. For example, when the Republicans on the committee wanted to try a different approach, I said, can we just back off for a few weeks while we try to work out something else? They said, of course. It is often quite bipartisan on that committee in the Senate.

On this issue, it is not. Yes, we will, we will be able to pass it and we will be able to pass it and send it to the President, in my judgment.

Senator PRYOR. I would just like to echo, Mr. Chairman, I think if we have the will—and, definitely, I think we have the will—we will find the way. I want to pledge every effort that I can to Senator Rockefeller and others in working with them to ensure that programs like the VA are given access to more affordable drugs.

Mr. WAXMAN. Thank you very much.

Mr. Dannemeyer.

Mr. DANNEMEYER. I want to thank the members of the panel for your statements. I want to emphasize to each of you that I have an open mind about whether or not we need legislation in this area.

I was appreciative of the comments of Senator Pryor about, you know, the reference to Congressman Rivers, in categorizing your assessment of where this issue is today. When we look at our Med-

51

icaid and Medicare problem nationally—I don't mean this to be critical of anyone other than ourselves. I think when we go down the road of taking people of a country with the idea that when we consume a health care service, it is somebody else's nickel that is being spent, either the Government's or the insurance companies', we really are going down a road where there is no restraint in the consumption of a service or a good. Are we really putting ourselves as risk when we travel in this pattern?

I have found in life something very simple and very true—not easy, but true. If I can consume a service or buy a good and in my mind somebody else has got to pay for it, I have less of a restraint on the consumption of the good or service because, after all, it is not my money.

Now, I understand what is, I think is, the basis for the compassion of the American people. We are a people who say as a matter of policy we are not going to deny health care services and drugs to people in this country because that is a value that we Americans affirm for ourselves as a matter of conscience.

But I am just asking the question, if we continue down this road—and we need to look at the expansion of spending in Medicaid and Medicare far beyond the rate of inflation, far beyond the rate of medical inflation—don't you think it is about time we begin to ask a question? Maybe we should begin a program whereby when any of us, as consumers, consume a health care service or, in this instance, a drug, that we as a consumer have to have a consciousness in our heads that we are going to have to pay a piece of it no matter what our station in life?

Senator ROCKEFELLER. Mr. Chairman.

Mr. DANNEMEYER. I think I asked a question.

Senator ROCKEFELLER. I would be willing to answer it.

Mr. Chairman and Congressman, I absolutely agree. I think that is one of the contexts that is being overlooked, when one looks at what this legislation that we are talking about means. We are not talking about being punitive. We are not talking about trying to withhold. We are not talking about anything but, frankly, what the Congressman implies, which is cost containment.

We are talking about a health care system. We are, in fact, talking about a single-payer health care system, the only one in this country. The Government does it all, 172 hospitals, the Veterans Administration. If we cannot contain costs of everything, including prescription drugs, in a reasonable way, in a single-payer Veterans Administration, federally run system, at a time when cost containment is as important as the coverage itself, access to prescription or health insurance itself, then we have very little future for health care in this country.

So I look at this in the context of cost containment. Self-restraint or imposed restraint where self-restraint does not come forward, but all of it comes down to the same thing; and that is the containing of costs as we can in every fashion, in every way.

Mr. SLATTERY. May I respond?

Let me observe also that the gentleman is raising an interesting proposition. That is that if we are able, say, as a purchaser of pharmaceuticals and drugs for the Government, to contain that part of the cost of the overall drug and pharmaceutical industry, then the

52

question arises as to what is going to happen with the rest of the drug and pharmaceutical industry, because we cannot get our hands around there. We are not buying those drugs.

I am concerned, frankly, that to the extent that we are able to hold down the cost on the purchases of drugs for the Government—whether it is VA, the health centers, HMO's or for Medicaid—it might result in significant increases on that part of the drug industry that we don't have our hands around. That is a problem.

I acknowledge that that is a legitimate concern that we should have. You did not really make that point directly, but I wanted to use this opportunity to make that observation.

Senator PRYOR. Congressman Dannemeyer, may I address that in 60 seconds under the category of "someone else's nickel." Someone else's nickel today in the manufacture of pharmaceuticals and all-time high profits of the pharmaceutical companies, someone else's nickel is the American taxpayer and the American consumer. We have given to the pharmaceutical companies research and development grants and write-offs in the tax code. We give them a multi-year patent where no one else can sell the drugs they manufacture.

Then, under our section 936 tax code provisions, each time a drug company hires someone in Puerto Rico, they are getting a tax credit of $71,000 per employee. We have created a tax haven for the drug companies, and what do we get in return? The highest drug prices in the world. This is what we are getting in return.

Mr. DANNEMEYER. Let me just respond.

You know, there is a lot about this I don't know, I will admit that. But maybe if somebody is making a profit in this country, at least somebody is paying corporate income tax; and we the people of the country are getting some of that corporate income tax, at least I hope, unless the Congress has created loopholes in the conference committees that give some of these so-called people in the private sector the means of avoiding the incidence of taxation in the finest tradition of the U.S. Congress.

Mr. WYDEN [presiding]. The time of the gentleman has expired.

All three of you have made excellent presentations. I remember talking with you in the conference in 1990, each of you—Senator Pryor, and Senator Rockefeller. I want to be on record as saying I hope we will have another conference this September of 1992 and have a chance to do this job right. I don't know if we need pizza boxes and 3-o'clock-in-the-morning sessions, but I have to tell you, what concerns me is if we go program by program, we do something that is terribly necessary for the public health clinics and we do something terribly necessary for the veterans' programs. We do something terribly necessary for DOD.

What is going to happen otherwise is that the drug companies are going do continue this divide-and-conquer strategy and every single time we move to patch a hole in one place—say, we pass Jay's excellent veterans bill, then they will move to shove it over somewhere else. We are going to have to have a strategy that pools all those public programs together—VA, DOD, Medicaid, Medicare, all of them—and gives some relief to the private people and the public hospitals.

As I understand it, your bill is moving ahead. Senator Kennedy's bill is moving ahead. Any one of those bills on the Senate side

53

could be a vehicle possibly for us in September to get together and see if we could have a conference strategy.

Senator ROCKEFELLER. That is true.

Mr. WYDEN. Mr. Kostmayer.

Mr. KOSTMAYER. No questions at this point.

Mr. WYDEN. Mr. Bilirakis.

Mr. BILIRAKIS. I am not sure what your definition of pulling all these programs together is, but if you are talking about one public medical program, you have a lot of veterans in this room who would disagree with something like that. The Congress should be cognizant of that.

Gentlemen, I, too, thank you for a good presentation. I think everyone feels cost containment has to be part of anything we come up with. I think you would agree with that.

I would ask you very quickly. Do you feel that whatever legislation, if any, takes place here should contain language that would address the cost containment, the self-restraint aspects that Senator Pryor, Congressman Dannemeyer have talked about here?

We keep talking about cost-containment and self-restraint, but should it be a part of everything that we do.

Senator ROCKEFELLER. When people think of health care and the Government, they think of entitlements, bottomless pits of money. That is not the case in the Veterans Administration. It is an annually appropriated, fought over, bloody battle to try to figure out how much money is possible. There is a shortage of nurses. There is a shortage of all kinds of things. In a sense, it is kind of cost-containment by indirection.

But as a philosophical point, the Congressman is absolutely correct. The coverage of health care access to health care, prescription drugs for health care, none of it makes any difference in the longer run if we don't establish cost-containment in the shorter run. I think the Veterans Administration is the only single-payer, Government-run—you know, if we cannot do it wisely, fairly, and properly there for the benefit of the veterans, Lord knows what kind of problems we are going to have in the fee-for-service or the much less regulated health market elsewhere.

Mr. BILIRAKIS. I am also on the Veterans' Committee and the Veterans' Health Subcommittee in the House. I agree with you when it comes to health care. I guess your answer is that we should be considering cost-containment, along with all the separate pieces of legislation this committee will be considering, as well as others that may arise.

Senator ROCKEFELLER. I don't know the Congressman's definition of cost-containment. To me, it has to be done in a prudent way, which is fair. There are some forms that turn out to be only at the expense of the consumer. Obviously, that is different. Cost-containment is the primary virtue of the future of a balanced health care system in this country.

Mr. SLATTERY. Could I interject also, in response to our friend from Florida, that if you eliminate the best price concept we have now and move toward a flat rebate approach, you achieve the kinds of reductions we looked forward to in OBRA 1990, and you also put in place in 1990 for the large purchaser, including DVA, to negotiate for higher prices. I contend that will have a significant

54

cost restraining diminution in itself. In the approach I am advocating, I continue to have some market forces that will be working to constrain prices and restrain competition in the purchase of as many drugs as possible that the Government requires. I think it will help DVA and also the Medicaid program.

Mr. BILIRAKIS. I received a letter from the State of Florida. They think the "best price" approach is the way to go. I plan to find out more about that and apply it to the legislation correctly.

Mr. WYDEN. The gentleman from Pennsylvania.

Mr. KOSTMAYER. My friend from California, Mr. Dannemeyer—he is my friend; we don't often agree, in fact, we don't ever agree—he said that the cost of Medicaid is going up. I guess he is right. He said the cost of Medicaid is going up beyond the rate of inflation, beyond the rate of inflation in the medical field.

He indicated that part of the reason for that is the unrestrained demand for services. He indicated somehow that if people feel they are not really paying for it, that the third-party billing is paying for it, that is partly responsible.

Is that right; or is another factor, the cost of drugs, what is driving up the cost of Medicaid; or is it the greed of American people, as Mr. Dannemeyer would indicate, in having this free medical system; or is it the greed of others that is driving up the cost? And what is the relationship between the two?

Senator PRYOR. AARP released a study yesterday showing that those who are 65 and older have less protection than any other segment of the population against the unrelenting, spiraling cost of prescription drugs. They are sitting out there unprotected, most of that population, 60 percent, in fact.

Also, people are getting older. We are living longer. The fastest age category now escalating are 85 and up.

Mr. KOSTMAYER. Those are the old old.

Senator PRYOR. I used to think that. I don't think that anymore.

Mr. KOSTMAYER. Now, you think they are the old old old.

Senator PRYOR. I came here with Congressman Montgomery. We were freshmen together. Sonny has not gotten older, but I sure have; I will say that. We had a hearing this week. It was one of the most poignant hearings I have ever been in, the Special Committee on Aging. I had the privilege of chairing it.

Today, there are 4 million children living with their grandparents in our country, 4 million children are being raised by their grandparents, a 40 percent increase in 10 years. This is happening before our very eyes, and we are not even prepared. The laws of our land did not even recognize this relationship as a legal relationship. Programs are not geared to this.

And whatever the reason, whatever the cause, the result is there that we have a whole new way of or a whole new set of problems and challenges. Yes, these are exploding costs. One problem I heard about at this hearing is that grandparents now are sacrificing their limited incomes on drugs and antibiotics for their grandchildren. As a result, they have nothing left to pay for the medications these older Americans so desperately need.

Mr. KOSTMAYER. Thank you, Senator.

Mr. WYDEN [presiding]. The gentleman from New York.

The gentleman from Georgia.

55

The gentleman from Illinois.

The gentleman from Texas.

Mr. HALL. Mr. Chairman, I will have some questions to submit, but inasmuch as I have not heard the testimony nor the questions asked, I would surely repeat some of them so I will submit them.

Thank you very much.

Mr. WYDEN. I thank the gentleman.

The gentleman from North Carolina.

The gentleman from Minnesota.

Thank you all. I look forward to working with you.

[The prepared statement of Senator Alan Cranston was submitted:]

STATEMENT OF SENATOR ALAN CRANSTON, CHAIRMAN, COMMITTEE ON VETERANS' AFFAIRS, U.S. SENATE

Mr. Chairman and other distinguished members of the subcommittee, I regret that I am unable to attend today's hearing regarding legislation to reform the Medicaid prescription drug rebate program and ensure that the Department of Veterans Affairs and certain other Federal and non-Federal entities receiving Public Health Service funding have access to reasonable prices for pharmaceuticals. However, I am confident that my distinguished colleagues in the Senate—Senators Rockefeller, Kennedy, and Pryor—will provide compelling testimony regarding the legislation on which we have been working, along with Senator Mikulski, since late last year. I am pleased and grateful that you are conducting a hearing on these important matters and I look forward to reviewing the testimony presented this morning.

As Chairman of the Senate Committee on Veterans' Affairs, I am especially concerned about the unintended, adverse consequences that the Medicaid prescription drug rebate program enacted as part of the Omnibus Budget Reconciliation Act of 1990, has had for the Department of Veterans Affairs' pharmaceutical costs. My remarks will focus on those consequences and the reasons why I believe that they can best be alleviated through comprehensive legislation that addresses the needs faced by all Federal agencies and certain non-Federal health-care facilities that receive VA or PHS funds with regard to the purchase drugs and biologicals at reasonable prices.

I first became aware of the impact of the Medicaid rebate program on VA's pharmaceutical costs nearly 18 months ago. At a February 27, 1992, Committee on Veterans' Affairs hearing on VA's budget for fiscal year 1992, VA officials indicated that the administration's budget request would not be sufficient to absorb the unanticipated, dramatic increases they had begun to encounter in Federal Supply Schedule (FSS) and VA depot prices for drugs and biologicals. VA officials claimed that these increases were due in large part to some manufacturers' efforts to avoid having to provide State Medicaid programs—through the "best-price" mechanism—prices as low as pre-OBRA 1990 FSS prices. VA's experience since that initial warning and across the past 18 months convinces me that Congress must not wait any longer to address this complex problem.

The impact of increases in prices for drugs and biologicals on the VA health-care system has become increasingly evident since the Medicaid rebate program went into effect in January 1991. VA officials estimate that prices for drugs and biologicals listed on the FSS increased an average of 14 percent during fiscal year 1991—a rate more than twice the average annual rate of inflation in FSS prices prior to the enactment of OBRA 1990 and approximately three times the rate of the increase in the general rate of inflation during that period. Costs for some drugs and biologicals rose even more dramatically. Manufacturers refused to sell some drugs and biologicals through the FSS, including certain drugs and biologicals widely used by VA health-care facilities. If drugs and biologicals are neither available through the FSS nor stocked in VA depots, VA health-care facilities have little choice but to purchase them at open market prices. According to VA officials, prices for such drugs and biologicals rose an average of 80 percent during fiscal year 1991.

Since the enactment of OBRA 1990, VA has made efforts to control pharmaceutical costs through management initiatives. VA officials have negotiated depot and single-award contracts—which are exempt from Medicaid "best-price" rebate calculations under OBRA 1990—for many drugs and biologicals previously purchased solely through the FSS. Individual VA health-care facilities have instituted more

rigid controls over physicians' prescribing practices, extensively mandating use of generics and therapeutic equivalents.

Some of these actions constitute prudent and appropriate efforts to manage scarce resource. Others raise questions about the ability of individual VA health-care facilities to furnish high-quality health-care services. Our committee knows of at least one VA medical center that attempted to control pharmaceutical costs by substituting a less expensive combination drug for certain high-cost drugs used to treat hypertension. Not only is this combination drug less effective, it also produces more serious side effects that may discourage patient compliance with the regimen that the physician prescribes. In addition, we know of several VA facilities that allowed their inventory of pharmaceuticals to be depleted at the end of fiscal year 1991, depriving some patients with chronic conditions of necessary medications. Such practices are clearly unacceptable.

The impact of drug-price increases on VA is not confined to its pharmacies. Many VA facilities are coping with increases in pharmaceutical costs by diverting to drug purchases funds from other aspects of their operations. Partly as a result of these increased costs, some VA facilities have reduced their outpatient rolls, canceled outpatient clinics, instituted hiring freezes, and delayed maintenance projects, or are planning such actions. For the individual veteran, such actions mean longer waiting times for scheduled appointments or the inability to be treated by VA, fewer nurses on inpatient wards to respond to patient needs, and the continued use of worn-out or out-dated medical equipment. Because reduction of discretionary workload is one of VA's most widely utilized methods for reducing expenditures, the situation is particularly serious for veterans who are eligible for, but not entitled to, the VA health-care services they have received in the past and who otherwise may not have access to such services.

Concerned about the impact of increases in pharmaceutical costs on VA's medical care budget, on July 15, 1991, Representative G.V. "Sonny" Montgomery, Chairman of the House Committee on Veterans' Affairs, introduced H.R. 2890. That legislation—which your subcommittee is considering today—would exempt FSS prices from Medicaid "best-price" rebate calculations and roll back FSS prices to pre-OBRA 1990 levels adjusted for inflation. H.R. 2890, which was jointly referred to the House Committee on Veterans' Affairs and the Committee on Energy and Commerce was unanimously approved by the House Committee on Veterans' Affairs on November 13, 1991.

I congratulate Chairman Montgomery, ranking minority member Bob Stump, and other members of the House Committee on Veterans' Affairs on their leadership in this area and their fine work on this bill. Recently, Representative James Slattery introduced a bill, H.R. 5614, which would replace the "best-price" or minimum percentage discount mechanism currently used to determine Medicaid rebates for single source and innovator multiple source drugs and biologicals with a higher minimum percentage discount mechanism. H.R. 5614 also would require manufacturers to sell such drugs and biologicals to VA at prices no greater than the net prices Medicaid would pay for such drugs and biologicals under the proposed rebate mechanism. I appreciate Representative Slattery's interest in ensuring VA's access to reasonable prices for drugs and biologicals.

However, I believe that a better alternative exists than either H.R. 2890 and H.R. 5614. Such an alternative, which would incorporate certain aspects of both Chairman Montgomery and Representative Slattery's bills, would address the impact of the Medicaid rebate program on VA's pharmaceutical costs as part of a comprehensive effort to ensure that all Federal agencies and certain federally-funded health-care programs have access to reasonable prices for drugs and biologicals and eliminate cost-shifting among them.

I will highlight briefly the three main components of such legislation. First, like Chairman Montgomery's bill, such legislation would stabilize FSS and VA, Department of Defense, and Public Health Service depot prices at pre-OBRA 1990, FSS and Federal depot prices for drugs and biologicals were among the lowest prices available to any purchaser. In many cases, FSS and depot discounts were considerably more generous than the discounts Medicaid currently receives under its rebate program. Thus, any attempt to help VA by only establishing the same percentage discount for the FSS and Federal depots would still force VA to absorb price increases of significant magnitude for many drugs and biologicals. Unless FSS and Federal depot prices are anchored to a pre-OBRA 1990 benchmark, there may be no guarantee that prices will return to anywhere close to those levels. Legislation establishing a pre-OBRA 1990 benchmark is consistent with the provisions of the original Medicaid rebate legislation introduced by Senator Pryor and Representatives Wyden and

57

Cooper as well as recommendations made by the Department of Health and Human Services Inspector General in a September 25, 1991, report.

Second, such legislation would establish minimum percentage discounts for drugs and biologicals which Federal agencies did not purchase through the FSS or Federal depots prior to the enactment of OBRA 1990. The intent of such a minimum percentage discount provision would be similar to that of Representative Slattery's bill—to ensure that FSS and VA depot prices are no higher than the net prices paid by Medicaid under the rebate program. During the coming years, increasing numbers of expensive, genetically-engineered drugs are expected to be approved by the Food and Drug Administration. For example, within the next year, FDA is expected to approve a monoclonal antibody, known as HA-1A, to treat gram negative sepsis, an infection common among patients in intensive-care units. VA officials estimate that use of this potentially life-saving drug could cost VA $60 million per year.

Because no therapeutic equivalents are likely to be available for many of these genetically-engineered drugs, VA may have great difficulty obtaining at reasonable prices these and other drugs and biologicals approved by FDA in the future unless legislation is enacted to provide minimum price discounts.

An appropriate minimum percentage discount for such drugs and biologicals would reflect the Congressional Budget Office's estimate of the median percentage discount received by the Medicaid program during the first quarter of calendar year 1991 under the "best-price" and minimum-percentage-discount mechanisms. Because the "best prices" for many drugs or biologicals have risen dramatically since the Medicaid rebate program was established in January 1991, the median Medicaid discount for the first quarter of calendar year 1991 would represent a close approximation to pre-OBRA 1990 discount levels for drugs and biologicals for which pre-OBRA 1990 FSS prices are not available.

Finally, such legislation must contain a mechanism to require manufacturers to sell drugs and biologicals through the FSS and Federal depots in accordance with the pricing mechanisms established in the legislation. The pharmaceutical industry is partially immune to many of the market forces which promote price competition in other industries. There are many drugs and biologicals for which no generic or therapeutic equivalents are available. Even when such drugs and biologicals are available for substitution, there are limits to the appropriateness of substituting one drug for another.

Moreover, VA's share of the U.S. pharmaceutical market—approximately 1 percent—is too small to provide strong incentives for manufacturers to lower their prices to VA. The same is true of State Veterans Homes, DOD, PHS, and PHS-funded clinics. Unless the market shares of these Federal agencies and federally-funded health-care facilities are combined with those of other, larger, federally-funded health-care programs, theoretical market forces are not likely to be sufficient to ensure that these agencies and facilities are charged reasonable prices for and have access to all the drugs and biologicals they need.

In closing, I once again thank you, Chairman Waxman, for holding this hearing. I hope that in the coming weeks you will be able to work with Representative Dingell, the distinguished Chairman of the Energy and Commerce Committee, and Representatives Montgomery, Slattery, and Wyden, and others to develop comprehensive legislation and forward such legislation to the full House of Representatives for its consideration. Time is running out for VA and other Federal agencies that purchase drugs and biologicals. Unless Congress acts quickly the shortfalls in VA health-care facilities' pharmacy budgets will grow more severe, resulting in further cutbacks in VA health-care services. Our Nation's veterans and other beneficiaries of Federal health-care programs cannot afford to wait until next year for Congress to address this issue.

Mr. WYDEN. Our next panel will be the Honorable G.V. Montgomery, Chairman, Committee on Veterans' Affairs; the Honorable Bob Stump, ranking minority member, Committee on Veterans' Affairs; Steve A. Robertson, Deputy Director, National Legislative Commission, The American Legion; Russell Mank, National Legislative Director, Paralyzed Veterans; Michael F. Brinck, National Legislative Director, AMVETS; David W. Givans, Staff Writer, Communications Department, Disabled Veterans of America; and Larry Rivers Executive Director, Veterans of Foreign Wars. Very pleased to have the panel.

58

Chairman Montgomery is universally acknowledged as the leading advocate for the veterans in Congress. Representative Stump serves with distinction as the ranking minority member on Mr. Montgomery's committee.

Our excellent panel of witnesses are all outstanding advocates for our veterans. Gentlemen, we thank you for appearing before the subcommittee. Without objection, your written statements will be included in the record.

Chairman Montgomery, the subcommittee would like to allot you 15 minutes for your panel's presentation. Please allot this time as you choose and we look forward to your testimony.

STATEMENTS OF THE HON. G.V. (SONNY) MONTGOMERY, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF MISSISSIPPI; HON. BOB STUMP, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF ARIZONA; STEVE A. ROBERTSON, DEPUTY DIRECTOR, NATIONAL LEGISLATIVE COMMISSION, AMERICAN LEGION; RUSSELL W. MANK, NATIONAL LEGISLATIVE DIRECTOR, PARALYZED VETERANS OF AMERICA; MICHAEL F. BRINCK, NATIONAL LEGISLATIVE DIRECTOR, AMVETS; DAVID W. GIVANS, STAFF WRITER, DISABLED VETERANS OF AMERICA; AND LARRY RIVERS, EXECUTIVE DIRECTOR, VETERANS OF FOREIGN WARS

Mr. MONTGOMERY. Thank you very much, Mr. Chairman. I will summarize my remarks.

I would like to report a hit and run incident that has happened. The victim is the American veteran. The driver was the pharmaceutical industry. The vehicle was OBRA 1990.

When Congress closed the deal on OBRA 1990, it gave the pharmaceutical industry a license to speed, even to drive in a reckless manner. As a result, the large segment of the industry slammed VA for double- and triple-digit price hikes. The impact of these price increases has destroyed our budget for pharmacy in the VA. It is to the tune of $93 million a year. We didn't dream this was going to happen to us as a result of OBRA 1990.

The real victims though are the almost 3 million veterans who depend on VA for care. They can't get certain drugs now, because VA doesn't have the money to purchase some drugs. And some medicines are not being bought at all because of a law to gain Medicaid savings.

There were plenty of warning signs about the effect this legislation would have on the VA. Unfortunately, these warnings were ignored, Medicaid savings took priority. Let's not kid ourselves, veterans aren't going to focus their anger on the drug industry. They will blame the Congress if we don't fix this problem.

Mr. Chairman, so my other colleagues will have a chance in this panel to say something, I will summarize very quickly here again. We think that H.R. 2890 is the answer, but, Mr. Chairman and members of this subcommittee, we are not locked into H.R. 2890. If Mr. Slattery's legislation—if Mr. Wyden's legislation can do the job tied in with ours, we have no problems with that at all. We want to work with the subcommittee.

59

I think the price VA pays for its drugs though, must be addressed in any legislation sent to the House. If you don't, veterans will continue to bear a heavy burden as a direct result of the OBRA 1990 legislation.

Our bill has been over here about 9 months now, Mr. Chairman. We have got to take some action. The veterans are not going to let us get away with this. They are going to blame the Congress and I certainly hope we will be able to move this bill or something similar to it. And as I said, we are flexible. We are not locked into H.R. 2890. Thank you for giving us the opportunity to appear before the subcommittee.

Mr. Waxman. Thank you.

[The prepared statement of Mr. Montgomery follows:]

Statement of Hon. G.V. (Sonny) Montgomery, a Representative in Congress From the State of Mississippi

Mr. Chairman and Members of the Subcommittee: I appear before you today as the cosponsor of H.R. 2890, a bill which was referred to the Committee on Energy and Commerce a little more than a year ago, on July 15, 1991, and as the chairman of the Veterans Affairs Committee. That committee and its Subcommittee on Hospitals and Health Care oversee the Department of Veterans Affairs' (VA) operation and administration of a health care system which includes 172 hospitals, some 350 outpatient clinics, and 127 nursing homes.

That medical system, the Veterans Health Administration, provides care in its facilities to some 3 million veterans annually furnishing approximately 1 million episodes of hospitalization and more than 23 million outpatient visits, for example. A budget of some $13.5 billion in fiscal year 1992 provided VA the means to furnish this care.

Congress has directed VA to provide care to veterans who suffer from service-incurred illness or disability as well as veterans who are indigent or are specially eligible by virtue of such service hardship as having been held as a prisoner of war. Overall, however, those seeking VA care are typically poor, and many are elderly and have few if any medical care options.

Mr. Chairman, although many veterans suffer from physical and psychic wounds of combat or are as indigent as Medicaid beneficiaries, the budget process treats VA medical care benefits not as entitlements but as discretionary benefits. As a result, the VA health care budget, which must compete for funding with other discretionary accounts, has not kept pace with the rising costs of medical care. The resultant effort to manage a health care system within what has amounted to an essentially straightlined budget over more than a decade has seen massive closures of hospital beds and other economy-driven measures. VA operates an extremely "lean" health care system.

Mr. Chairman, I offer this profile of the VA health care system and its state of fiscal health to explain the unique problems faced by veterans who depend on VA for care and to set a backdrop to the concerns we have. Given these circumstances, you can appreciate why reports of sudden, sharp increases in pharmaceutical prices to VA prompted the Committee on Veterans Affairs to hold a hearing on that subject last September, and to adopt unanimously and order reported a bill to attempt to reverse the drug price increases VA was sustaining.

Congress generally looks to the Committee on Veterans Affairs to address VA health care issues. The pharmaceutical price increases VA has sustained have created an increasingly grave problem. It is not simply a problem for the VA as an institution, but it is compromising the care on which the veteran depends. Mr. Chairman, in this instance the fate of these veterans lies very much with your committee, a panel with a record of concern for the poor and disabled.

The problem at your doorstep is described in detail in House Report 102-384, filed on November 25, 1991. It is the report from the Committee on Veterans' Affairs to accompany H.R. 2890.

One may ask, what led the House Veterans' Affairs Committee to report out a bill unanimously which would amend provisions of the Social Security Act? The bill's goal is to recreate a level playing field between VA and pharmaceutical manufacturers with respect to the prices VA pays for drugs.

My committee attempted to find a remedy for a problem succinctly described in a letter of August 22, 1991, from VA Secretary Ed Derwinski to the Chairman of the Committee on Energy and Commerce. The Secretary's letter articulated VA's need for legislative relief as follows:

"Dear Mr. Chairman: As you know, the Omnibus Budget Reconciliation Act of 1990 (OBRA 1990) contained provisions to reduce pharmaceutical costs to the Medicaid program . . . the aim being that prices to Medicaid match the "best price" i.e., lowest price accorded to any purchaser in the marketplace.

An unfortunate, though surely unintended, outcome of this legislation was sudden and sweeping drug price increases to Federal Departments and Agencies which procure drugs, the Department of Veterans Affairs being the primary one. It was commonly known that VA, until the enactment of OBRA 1990, was a successful negotiator of discounted prices, which is not surprising since our price negotiations with manufacturers are completely centralized, we are an exceptionally large single purchaser, and pharmaceutical usage by VA provides manufacturers with exposure to 50 percent of this Nation's physicians-in-training.

While VA had anticipated some cost shifting to result from this legislation, we were surprised by its magnitude . . . . We now know the cost impact is so severe it cannot be dealt with by the administrative means available to us . . . .

Clearly, some mechanism needs to be made available to assist VA in controlling its pharmaceutical expenditures, while at the same time allowing VA to continue to provide medically necessary pharmaceuticals to patients. Several legislative proposals have been introduced . . . . Given that the OBRA provision indirectly encourages price increases to VA, stabilization of prices at the pre-OBRA levels and a restoration of marketplace conditions that would allow VA to negotiate unencumbered with manufacturers for fair prices would be indicated.

Exclusion of all Federal prices from the calculation of "best price" as described in OBRA 1990 would eliminate the incentive for manufacturers to escalate prices to their Federal customers. To minimize the additional costs already experienced, VA should have the opportunity to procure pharmaceuticals through FSS or depot at the contract prices in place prior to enactment of OBRA, with an allowance for inflationary price increases. Finally, current pharmaceutical prices to Federal customers, have now been inexorably linked to Medicaid through OBRA, so manufacturers will need some incentive to enter into new contracts with VA. One possible way to provide that incentive would be to make participation in the Medicaid rebate contingent upon entering into new, equitable agreements with VA. . . ."

Our September 11, 1991 hearing on VA pharmaceutical prices before our Subcommittee on Hospitals and Health Care, confirmed our understanding that many pharmaceutical manufacturers had responded to OBRA 1990 by cost shifting, and notably by increasing VA prices dramatically. VA undertook a comprehensive study of its cost and utilization of drugs procured through both its depot system (where prices were exempt from consideration in determining "best price") and its Federal Supply Schedule (a VA-administered list of drugs available to Federal purchasers at prices negotiated by VA authorities, prices which, unfortunately, are included in calculating Medicaid rebates). The Federal Supply Schedule was particularly vulnerable to dramatic price increases because it is administered as a long-term contract, and, by its terms, the generally low pre-OBRA prices VA had obtained years earlier ran only through the end of calendar year 1990. Thus, as OBRA went into effect, VA was left vulnerable to dramatic changes in the market triggered by what amounted to a price control measure established by the Congress.

We learned that in their dealings with VA, manufacturers responded to OBRA in several ways—by deleting numbers of drugs from the Federal Supply Schedule altogether, by raising Federal Supply Schedule prices for many other drugs, and even by raising the prices of drugs sold through VA's depot system (depot prices rose as high as 300 percent despite the fact that these prices were excluded from "best price"). Overall, VA data showed a net increase in its post-OBRA pharmaceutical prices of 21 percent. But prices of numerous drugs important to the care of VA's patients skyrocketed much higher. Given price increases far higher than pre-OBRA pharmaceutical price inflation (about 8 percent annually), VA projected that OBRA's impact on VA's $715 million price-tag for drugs in fiscal year 1990 would swell by almost $150 million. Factoring out "normal" inflation, VA calculated OBRA's impact on an already fiscally-starved system to be $93 million annually.

In testifying before us in September 1991 to the impact of the price increases VA was sustaining, VA's Deputy Secretary Tony Principi warned that, without relief, the Department would be forced to curtail services to veterans. "Clearly," Principi stated, "hospital directors will have to make decisions on how to manage their facility and without the dollars to buy the drugs, they are going to have to cut back on