**ANDERSON EXHIBIT 26E**

61

the delivery of health care . . . I have spoken with enough hospital directors now who I respect, who tell it straight to me, that we're getting hurt by this legislation and ultimately veterans are getting hurt because they're going to be denied care. That's the bottom line."

In favorably reporting H.R. 2890, the Veterans' Affairs Committee sought to avert that result. Alerted to the problem which provoked H.R. 2890, congressional appropriators subsequently included a provision in the Act for fiscal year 1992, Public Law 102–139, apparently aimed at stimulating a voluntary rollback in VA prices. At its core, the pertinent provision in Public Law 102–139 essentially adopted a position which had been recommended by the Pharmaceutical Manufacturers Association (PMA). (PMA has opposed H.R. 2890 and similar remedial measures.) In capsule, the act provided that VA pharmaceutical prices would be excluded from Medicaid rebate calculations for the period through June 30, 1992 (or until the enactment of other remedial legislation, whichever occurred first).

What impact did Public Law 102–139 have? Did it reduce prices on drugs VA uses to any significant extent? Our committee learned that the VA's efforts to renegotiate prices under the "protection" of the "best price" exclusion in Public Law 102–139 produced marginal success at best. Most of the 130 companies which VA approached did not even respond to the Department's price reduction efforts. Only one major company (Bristol Myers Squibb) reduced prices in a manner resulting in some significant benefit to VA. Several major companies took public relations credit for voluntary rollbacks, but in reality were extremely selective in their choice of targets for discount. Typically, their discounts were on drugs for which there exist competitor products available at lower prices. In all, as reflected in both an interim and final report to the Congress on Public Law 102–139, and that law and the time-limited spotlight it placed on VA drug prices yielded price reductions totalling no more than $5–$10 million (in relation to estimated systemwide pharmacy costs for fiscal year 1992 of $847 million).

Given the market's response to OBRA 1990, it is clear that legislation which would simply exclude VA prices from future Medicaid rebate calculations, cannot be expected to undo the damage done to VA or to win meaningful reductions in the prices VA pays for drugs.

While it's clear that the drug-pricing provision of Public Law 102–139 provided no solution for VA, it is becoming apparent that pharmaceutical manufacturers are again raising VA's prices (or are poised to do so) because the law's exclusion from "best price" has expired.

Where does this leave VA, and what are the implications for the Congress? VA is "hurting." But more significantly, the veterans who rely on VA are being hurt. Our patients may not know precisely what has hit them, but they are the victims of a law which—by virtue of the price increases it triggered—has had the effect of depriving VA of almost $100 million of its available funding. This loss is forcing dramatic changes—depriving veterans of high-cost, but often safer and more effective drugs at most VA hospitals, and cutting many veterans off from treatment entirely at others.

Ironically and tragically, Congress' efforts to provide Medicaid beneficiaries with drugs at rates as favorable as VA had negotiated has resulted in manufacturers moving to single-tier drug pricing, leaving veterans as helpless victims.

Legislation is needed. H.R. 2890 would answer the veteran's cry for help. It would re-establish a level playing field between VA and pharmaceutical manufacturers, a field on which VA could once again purchase drugs at fair prices.

Pharmaceutical manufacturers have criticized H.R. 2890 but have proposed no credible solution for VA and the veterans. Drug company spokesman attack H.R. 2890 rhetorically as "an unwarranted disruption of the U.S. free-market system." The pharmaceutical industry, however, owes its profits to government intrusion into the market through the grant of monopolies in the form of patents. We do not hear the industry questioning that intrusion into the market.

OBRA itself altered the pharmaceutical marketplace. Surely it is appropriate for Congress to remedy problems resulting from that legislation. H.R. 2890 is such a remedy. Industry has mischaracterized the bill as "price-fixing". But that label won't stick. To the contrary, the bill would set up a mechanism to stimulate negotiation of fair prices between VA and pharmaceutical manufacturers. It would free manufacturers from being penalized economically for providing reasonable contract prices to the Federal Government. The bill would provide that only in the absence of agreement on a reasonable contract price would drug price levels be determined by reference to pre-OBRA prices, which would be adjusted to account for the effects of inflation. To encourage a willingness to negotiate on the part of both sides, the

62

bill would require VA to report on pharmaceutical contract negotiations under the bill and specifically on unresolved negotiations.

CBO's review of H.R. 2890 projects modest costs based on the belief that exempting Federal Supply Schedule prices from the computation of "best price" would affect the level of Medicaid rebates. The cost issue is not at all insurmountable, however, because CBO also projects that fractional increases in the law's minimum rebate percentages would offset those costs. The minimal changes needed to achieve budget neutrality should certainly not stand in the way of favorable consideration of this bill. Veterans, who are reeling from the effects of a law which has had close to a $100 million impact on VA, certainly have reason to call on the Congress for relief and, insofar as there is a funding question, to ask this committee to look to the Medicaid rebate formula as a means to resolve it.

Given the scope of jurisdiction of the Veterans Affairs Committee, H.R. 2890 does not address as wide a spectrum of the market as other bills before this committee or other proposals under discussion. In that regard, we recognize that a legislative remedy to the veteran's problem does not necessarily lie in a bill addressed exclusively to VA pharmaceutical procurement. Our goal is straightforward. We simply seek a solution.

## STATEMENT OF HON. BOB STUMP, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF ARIZONA

Mr. STUMP. Mr. Chairman, thank you for allowing us to testify here today in support of the Nation's veterans and on behalf of the Veterans Affairs Committee.

Although it is my belief that the Omnibus Budget Reconciliation Act did not intend to penalize the Department of Veterans Affairs, it assuredly has. In April, the VA reported to the Appropriations Subcommittee on HUD and Independent Agencies that the sudden price increases it was experiencing could cost increases of $149 million in fiscal year 1991. Of that increase, $92.6 million was directly attributable to price increases by drug manufacturers in response to OBRA.

Veterans have and will continue to suffer the effects of OBRA 1990 until this committee takes favorable action on a measure to reverse the VA's downhill trend.

Mr. Chairman, veterans have waited over a year for final action on H.R. 2890, and I would urge you to seriously consider this bill. We should not be penalized for lack of agreement on the broader issue.

Thank you for allowing us to testify.

Mr. Chairman I do have a full statement I would like to insert in the record.

[The prepared statement of Mr. Stump follows:]

STATEMENT OF HON. BOB STUMP, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF ARIZONA

Mr. Chairman and members of the subcommittee, thank you for the opportunity to testify in support of our Nation's veterans and on behalf of the Veterans' Affairs Committee. As you know, we have been working on a solution to the VA's problem of unprecedented and unanticipated pharmaceutical price hikes for well over a year now. Our committee reported H.R. 2890 on November 25, 1991 and still there is no relief in sight for the Nation's 27 million veterans.

Although it is my belief that OBRA 1990 did not intend to penalize the Department of Veterans Affairs, it most assuredly has. In April 1992 the VA reported to the Appropriations Subcommittee on HUD and independent agencies that the sudden drug price increases it was experiencing could cause cost increases of $149 million in fiscal year 1991. Of the $149 million only $79 million could be attributed to normal inflation. The remainder, $92.6 million is directly attributable to price increases by drug manufacturers in response to OBRA. Any member who has followed veterans' issues even remotely must know that VA cannot absorb any un-appropri-

63

ated cost increases. Veterans have and will continue to suffer the effects of OBRA 1990 until this committee takes favorable action on a measure to reverse VA's current downhill trend.

The committee attempted an administrative fix. We appealed to the Secretary of HHS to exclude the Federal Supply Schedule from definitions of "best price". We also appealed to the Office of Management and Budget. These appeals were to no avail.

You are aware too that the pharmaceutical industry stated at our hearing that the VA's problem could be fixed by simply exempting the VA's FSS from calculation of "best price". Public Law 102–139 provided the drug industry the opportunity to voluntarily roll back prices to VA without penalty on their Medicaid sales. At its most optimistic, VA estimated that the total impact of the new law was $5–$10 million in savings over a 6-month period. $5–$10 million out of $94 million in increased costs offers little relief to VA and veterans.

Opponents of H.R. 2890 are quick to point out that CBO estimates the costs of lost rebates to Medicaid as a result of enactment of H.R. 2890 to be $13 million for fiscal year 1993. However, without enactment the costs to veterans will be far greater. America's veterans cannot be expected to suffer a loss of essential pharmaceuticals in order to achieve cost-savings for Medicaid recipients.

Another point of contention for the pharmaceutical industry is the notion that H.R. 2890 is a "price-fixing" measure. It is not. The bill sets up a mechanism to stimulate contract negotiations between VA and pharmaceutical manufacturers. Manufacturers would be freed from being penalized economically for providing reasonable contract prices to VA. Mr. Chairman, as we witnessed during the past 6 months of FSS exemption provided in Public Law 102–139, without an incentive for the drug companies to negotiate fairly with the VA, they will be reluctant to do so. Prices would be rolled back to pre-OBRA levels adjusted for inflation only if a company refused to negotiate fairly.

Mr. Chairman, veterans have waited for more than a year for final action on H.R. 2890. I urge you to report this bill. Veterans should not be penalized for a lack of agreement on the broader issue. Thank you for the opportunity to testify.

Mr. WAXMAN. Thank you very much. Your full statements will all be in the record.

Mr. MONTGOMERY. Why don't we start at this end if it is OK.

## STATEMENT OF STEVE A. ROBERTSON

Mr. ROBERTSON. Mr. Chairman, the American Legion appreciates this opportunity to present its views in support of H.R. 2890. We urge you and your colleagues to deal with the measure expeditiously and to report it favorably to the full House.

It has been estimated the recent drug price increases are costing VA more than $90 million a year. These prices are aggravating an already bleak budgetary situation in the VA. During the past decade VA has been forced to do more with less. Its health care funding has grown only one half the rate of the medical CPI.

VA has been forced to deal with budgetary shortages by manipulating its patient admission standards and by cutting its overall health care capacity. Certain VA accounts have been cannibalized to pay salaries of doctors and nurses.

Necessary medical facility maintenance is being delayed for years and the Department faces a $1 billion backlog in the replacement of worn out or obsolete medical equipment. The problem becomes more graphic when considering the backlog exists despite the fact the VA engages in more than 3,000 agreements with military facilities to share such equipment.

Mr. Chairman, we have presented this budgetary background to document the position VA cannot afford another major operational expense in delivering health care. The American Legion certainly understands that your subcommittee does not have the jurisdiction-

64

al authority to solve VA's money problems. But your panel has authority to relieve a portion of the Department's budgetary burden.

Those who manage the VA care system have attempted to negotiate a solution with various pharmaceutical companies, but we understand that effort has been unsuccessful. We are convinced that remedial legislation is the only variable option. Obviously, the members of the House Veterans Affairs Committee agree with us unanimously since they approved H.R. 2890 8 months ago.

We are asking you to reinforce that decision by approving H.R. 2890 and urging your colleges in the Energy and Commerce Committee to report it favorably to the full House for consideration as soon as possible.

[The prepared statement of Mr. Robertson follows:]

STATEMENT OF STEVE A. ROBERTSON, DEPUTY DIRECTOR, NATIONAL LEGISLATIVE COMMISSION, THE AMERICAN LEGION

Mr. Chairman: The American Legion appreciates this opportunity to present it's views in support of H.R. 2890. We urge you and your colleagues to deal with the measure expeditiously and to report it favorably to the full House.

Our organization is shocked by the dramatic increase in prices which VA has been paying for some of its pharmaceuticals during the past year. It has been estimated that these unwarranted and inexcusable price increases are costing VA more than $90 million per year.

Escalating drug prices are aggravating an already bleak budgetary situation at VA. During the past decade, VA has been forced to do more with less. Its health care funding over that period has grown at only one half the rate of the medical CPI.

There have not been enough dollars to even allow VA to fully meet its traditional medical care mission. Yet, during the same period, Congress has mandated VA to assume a variety of additional specialty care obligations to deal with disorders ranging from AIDS to Alzheimers. Those new obligations are certainly legitimate, but there has been a consistent shortage of Federal money to pay for them.

In the research arena, VA has been saddled with a flatlined budget since the mid-1980's. Some of the Department's most promising investigative projects are now in jeopardy, despite a January 1991 report which characterized the overall quality of VA research as "exceptionally high" and recommended an immediate 25 percent budgetary increase.

The relevance of VA research to drug pricing may not be obvious at first glance, but it becomes more apparent when considering that some of VA's projects are clinical trials to test existing drug therapies or to devise new ones. The recently-concluded test examining AZT treatment of certain AIDS patients is a typical example. There are many others such as those dealing with diabetes, cardiopulmonary disease and mental disorders.

From a budgetary perspective, it is also important to note that VA medical care—unlike the two largest Federal health care programs—is not an entitlement. This simple fact places us, as VA advocates, in the position of having to fight for every VA health care dollar every year. We find ourselves completely consumed by the annual competition for a decreasing pool of discretionary money.

Unfortunately, VA has been forced to deal with funding shortages by manipulating its patient admission standards and by cutting its overall health care capacity. Certain VA accounts have been cannibalized to pay the salaries of doctors and nurses.

Necessary medical facility maintenance is being delayed for years, and the Department now faces a $1 billion backlog in the replacement of worn out or obsolete medical equipment. The equipment problem becomes even more graphic when considering the backlog exists despite the fact that VA is now engaged in more than 3,000 agreements with military facilities to share such equipment.

Mr. Chairman, we have presented this budgetary background to document our position that VA cannot afford another major operational expense in delivering health care. The American Legion certainly understands that your subcommittee does not have the jurisdictional authority to solve VA's money problems. But your panel does have the authority to relieve a portion of the Department's budgetary burden.

65

Simply put, the VA medical care delivery system is at a breaking point. Those of us here at the witness table are working hard to devise a plan which would bolster VA's financial base. We are convinced that rolling back drug prices would contribute significantly to our efforts.

Those who manage VA's medical care system have attempted to negotiate a solution with various pharmaceutical companies, but we understand that effort has been unsuccessful. We are convinced that remedial legislation is the only viable option.

Obviously, the members of the House Veterans Affairs Committee agree since they unanimously approved H.R. 2890 8 months ago.

We are simply asking you to reinforce that decision by approving H.R. 2890 and by urging your colleagues on the Energy and Commerce Committee to report it favorably for full House consideration as soon as possible.

Mr. MONTGOMERY. Mr. Chairman, we would like to abide by the rules. We old soldiers, we go by 2 minutes. If we go over 2 minutes, call them so we move on, because you know members would like to ask questions.

Mr. WAXMAN. Why don't we go right down the line and have each witness take 2 minutes.

Mr. Mank.

STATEMENT OF RUSSELL W. MANK

Mr. MANK. Mr. Chairman, members of the subcommittee, I appreciate this opportunity on behalf of the Paralyzed Veterans of America.

How are VA medical centers coping with increased drug costs? Clearly VA can't pass these increased costs on to its patients or to third-party payers. These hospitals are on fixed budgets and must provide all mandated services within these budgets.

I would reemphasize what Senator Rockefeller said a few minutes ago. The Deputy Veterans Secretary had mentioned 10 months ago that hospital directors will have to make decisions on how to manage their facility, and without the dollars to buy their drugs, they have to cut back on the delivery of health care. Veterans will be getting hurt because they're going to be denied care—that is the bottom line.

That testimony was prophetic because VA hospital directors have had to take steps to meet costs. One medical center imposed a new 6-month moratorium on the addition of any new drugs to the hospital's formulary. As a result, this hospital was not providing several new important drugs available to patients in other hospitals in the community.

In another instance, a major metropolitan teaching hospital was forced to temporarily discontinue for months provision of newer and safer drugs to treat hypertension and heart disease, as well as cholesterol-reducing drugs and dietary supplements. Clearly these actions compromise the quality of patient care.

Most of the medical centers we surveyed not only cut back on the drugs they provided, but also were forced to offset pharmacy costs by cannibalizing other critical hospital operation budgets. With rare candor, one VA official responded to increased drug costs by instituting a policy which barred patients from receiving further needed care in its out patient clinics.

Mr. Chairman, the status quo is intolerable. Legislation caused these problems. America's veterans implore you to move the legislation Chairman Montgomery sent you.

66

Mr. WAXMAN. Mr. Brinck.

### STATEMENT OF MICHAEL F. BRINCK

Mr. BRINCK. Thank you, Mr. Chairman. We would like to thank you for 27 million veterans at the hearing today.

We are here to stress the impact of drug pricing increases on the disabled and sick veterans who depend on the VA. Our organization surveyed VA hospitals in your own districts. Please remember the hospitals that serve your veterans operate within fixed budgets. They can't run deficits.

To illustrate the situation, a midwest VA hospital was hit with an increase in pharmacy costs, due to OBRA, of nearly $1 million. Here are some examples: Dilantin used to prevent seizures increased from $28.51 a bottle to $102. Nitroglycerin went from 69 cents per bottle to $3.21. These price hikes of 451 percent and 365 percent respectively are a little bit higher than next year's 3.2 percent cost of living increase some veterans will get.

This typical shortfall may seem like small change. But to a hospital director, $1 million represents 8,000 outpatient visits and may mean cutting about a thousand patients off the treatment rolls.

It is not a one-time problem. Congress attempted to provide a quick fix for drug prices in Public Law 102-139. That legislation has provided no significant relief, and its expiration has given drug companies an excuse to unleash yet another round of often shocking price hikes. For instance, since the end of June 1992: Bactrin, the drug used to treat pneumonia common in AIDS patients, increased 1,000-fold in price. The VA treated over 11,000 AIDS and HIV patients in 1991.

Heparin, commonly used to treat blood clots, doubled in price, its common use to prevent heart attacks and strokes. When the VA is trying to increase treatment of women veterans, it is hit with a 266 percent increase in Premarin, a vital estrogen replacement.

High usage rates makes even a relatively low double digit price increase devastating. For example, the 22 percent increase for Tenormin, a hypertensive drug of choice, is likely to have a mega-million dollar impact on the VA.

In closing, how do you think any VA medical center can be expected to meet its obligations to the veterans in the face of the fiscal havoc brought by OBRA 1990. I ask this committee not to allow the pharmaceutical industries to become the OPEC of 1990.

Mr. WAXMAN. Mr. Givans.

### STATEMENT OF DAVID W. GIVANS

Mr. GIVANS. You heard my colleagues describe the severe problems increases in pharmaceutical costs but we are not here today to plead for institutions.

We are here, Mr. Chairman, to plead for people. People who had the courage to answer America's call to defend democracy time and again. These people are this Nation's 27 million veterans and these veterans are your neighbors, they are your relatives and they are your constituents.

They are the veterans who stopped the rise of Hitler and ended the reign of Hirohito. They are the champions of freedom who won

67

the cold war, suffered through the heat and heartbreak of Vietnam, and boosted our national pride with their heroic efforts in the Persian Gulf.

Many of these veterans are no longer young and still more are no longer healthy. To treat their service-incurred illnesses, they rely on the VA hospitals which serve your districts. And they rely on the VA pharmacy system to provide them the medication they need to lead productive lives.

But something is drastically wrong in this country, Mr. Chairman, when many VA hospitals cannot afford to accept new patients and are forced to limit treatment for many of their existing patients.

In other hospitals, the VA is being forced to ration high cost drugs. A recent Time Magazine cover story painted a terrible, but true, picture involving the drug Clozaril.

While more than 9,000 VA patients with psychiatric disorders could be helped by this new drug, the VA can afford to provide that drug to only 300 veterans. For the remaining 8,700 veterans still scarred by the ravages of war, there is no hope on the horizon.

Mr. Chairman, the Clozaril story illustrates how excessively high drug prices have forced the VA health care system to turn its back on thousands of veterans with service-incurred disabilities. A moment ago, I said something is drastically wrong in this country. What is drastically wrong, Mr. Chairman, is that corporate greed seems far more important than veterans' needs.

Ten months ago, the House Veterans' Affairs Committee under the leadership of Chairman Sonny Montgomery and ranking minority member Bob Stump had the courage to change that mentality by recommending passage of H.R. 2890.

Today, Mr. Chairman, the 1,400 million members of the Disabled American Veterans ask you and your colleagues to show veterans in this room and all across this Nation that this committee and that this Congress has the courage to insure that the veterans' needs are truly far more important than corporate greed.

Thank you.

Mr. WAXMAN. Thank you, Mr. Givans.

Mr. WAXMAN. Mr. Rivers.

### STATEMENT OF LARRY RIVERS

Mr. RIVERS. Thank you, Mr. Chairman. It is truly an honor to share this table this morning with Chairman Montgomery and Mr. Stump, two gentlemen who truly understand the needs of America's veterans and have their fingers on the pulse of this Nation's veteran community and my fellow veteran service members and veteran advocates.

What we have heard today, Mr. Chairman, is a plea for reasonable and fair action by this committee. We are not asking you to bankrupt or drive the drug companies out of business, we only ask for fairness and legislation that allows justice to be served. Apparently, working in unison, drug companies throughout our country have taken advantage of flaws in the OBRA law to perpetuate outrageous increases in the prices they charge for the pharmaceuticals that are provided to America's sick and disabled veterans.

For America's veterans, this goes beyond the issue of unfair and unconscionable business practices, it is a matter of life and death to many of them and an as issue of quality of life for many others.

You have heard here today specific examples of how the adverse effects of OBRA have impacted America's veterans. These massive price increases have caused formularies tó be modified and doctors can often no longer prescribe the drug of choice for treatment. Hospital administrators often divert financial resources from other departments to make up for shortfalls in their pharmacies.

VA must curtail hiring medical staff and purchasing equipment to meet these escalating drug costs. The veterans health care system is now rationing care by limiting inpatient visits, shortening drug treatment courses, and even denying care to America's veterans. The VA is today forced to play a zero sum game in which often the losses are measured in veterans' lives.

The VA alone is only 1.5 percent of the U.S. drug market. If we add DOD and the Public Health Service, we have a market share of some 3 to 5 percent. This is hardly a significant market share to an industry that is one of the most profitable in the world. The drug industry spends as much on advertising—a good portion of which is devoted to advertising profitable over-the-counter drugs—as it does on research and development. This is not about reasonable profit, it is about a contrived windfall that is damaging to both veterans and the health care of the Nation.

We do not dispute the value and desirability of maintaining a healthy pharmaceutical industry. No rational person would argue against that, and I am sure industry representatives will expound on that point at length here this morning. But, if for no other reason, the very important and particularly the strength of this industry, should persuade you they must not be allowed to set the rules for this Nation's health care system. It seems to us the pharmaceutical industry must be made to serve the Nation out of which it was borne, as have the American veterans, not the other way around.

H.R. 2890 will save the American taxpayer money. American taxpayers are clamoring for national health care reform. And what message will we send to them and not only veterans, but the country if you allow this vital segment to play robber baron.

A vote for H.R. 2890 is a vote for fairness and compassion for this Nation's veterans. If this bill passes, not one drug company will go under. If it does not, thousands of veterans may not receive the earned medical treatment they so desperately need.

Thank you, Mr. Chairman.

Mr. WAXMAN. Thank you very much, Mr. Rivers.

I want to thank each of you on this panel for your excellent testimony to us. I know Chairman Montgomery and Mr. Stump and all of you are frustrated at the OBRA 1990 impact on the VA and by the inaction of this committee on H.R. 2890.

I want to assure you when we dealt with this bill in 1990, none of the parties to the negotiations—Senator Rockefeller, Pryor, Chafee, Chairman Dingell and myself—none of us had the intention of shifting $100 million in new costs onto the Veterans' Administration. We were responding to a budget summit agreement that called for reduction in spending in the Medicaid program. We had

69

no idea these savings would come at the expense of the Veterans' Administration.

We have not addressed your bill before today because, until last month, we did not have enough information about the way the Medicaid rebate program was working to make an intelligent judgment as to what to do. We are going to hear from many witnesses today and this subcommittee will think through what to do and continue to work with you to resolve this problem. It is intolerable to have these costs shifted onto the Veterans' Administration because we are not saving money at all, we are simply having another program bear the burden.

Let me recognize members of the panel who may wish to ask questions.

Mr. Dannemeyer.

Mr. DANNEMEYER. Nice to have two of my colleagues serving on this distinguished panel. When you bring in Sonny Montgomery, you bring in the top gun because anything he wants to do around here gets done. We all understand that Sonny. Just tell us what to do, it will get done.

Mr. MONTGOMERY. Can I quote you on that?

Mr. DANNEMEYER. It is respect Sonny, you know that and I mean that sincerely. We love you for what you do for the veterans and the people of this country. I mean that sincerely. Congress and the American people were sold that budget summit agreement in the fall of 1990 on the representation that if we didn't do something, the increase to the national debt over the next 5 years would have been a trillion dollars, but if we adopted that OBRA program in the fall of 1990, we would reduce the projected increase of the national debt from a trillion to a half a trillion. Marvelous premise as to how we were able to extrapolating out of the hides of the working men and women of this country an additional tax increase the Nation did not need then, does not need now.

But now we have had the benefit of 2 years since then, almost, and we now realize that rather than achieve the laudable goal of reducing the increase of the national debt by $1 trillion over 5 years, we now know the flat debt will go up $1.3 trillion over the next 5 years looking from the vantage point of October 1990. We never got the reduction and projection of the increase of the national debt even close.

The reason I raise these interesting facts is because they are stubborn to deal with. Since we didn't get what we were told we would get from that agreement, don't you think it is time to repeal that turkey. Wouldn't that solve the consequences visited on the veterans of this Nation? By the way, I didn't happen to vote for that turkey. I don't know how you voted Sonny, I wouldn't want to put you on the spot.

Mr. MONTGOMERY. I voted for the turkey. I don't want to get into the politics of the issue, but I am looking for ways just as you are to reduce the deficit. I supported the balanced budget amendment, but I don't think the deficit has much to do about what we are trying to accomplish with this bill. The pharmaceutical companies continue to increase their profits. With the passage of the OBRA legislation they make up their losses by increasing their costs on drugs sold to VA. I don't think it affects what you are driving at.

70

Mr. DANNEMEYER. I am still learning about what the issue is here. What I suspect happened, if I understand this institution at all, is that the scheme—the people that were involved in that budget summit agreement in the fall of 1990 anticipated the savings by extrapolating the reductions to the Medicaid program and they spent those savings by expanding Medicaid. I suspect that is what's happened. I don't know yet. I will find out.

In this business, you pick up one rock at a time and I appreciate your testimony very much.

Mr. WAXMAN. Mr. Wyden.

Mr. WYDEN. Thank you, Mr. Chairman. Let me tell this panel I think you have given some of the most compelling testimony I have heard up here in a long, long time. It is really amazing that you could even be as restrained and as diplomatic as you have been because it is clear the veterans programs are being bled.

The drug companies, as Sonny mentioned, seem to think they have a constitutional right to charge whatever they can get from anybody. I want you to know, number one, that I am committed to getting relief for the veterans programs this session, period. This has got to be done. We cannot allow the kinds of examples Mr. Brink and Mr. Givans and others have mentioned to continue.

The second point I want to mention, I want to thank you, Sonny, for being willing to work with us to try to come up with a way that we can get the help for the veterans this session, which has to be done and not create a situation where the veterans—where the drug companies go out and just punch another hole in another program and stick to it somebody else. Because if we have that, what will happen is we will all be going through this same drill, session after session.

So, Sonny, you and Ralph on your staff and the other staff over there have been great. We want to get it done this session and the fact that you will work with us to make sure it doesn't ripple somewhere else is a great help.

Mr. MONTGOMERY. I want to thank you. You came to me and Bob Stump about 8 or 9 months ago and you said we got a problem with this drug situation, and the pharmaceutical companies. Your staff person has been very easy to work with and we appreciate that. In preparing your bill you have made some suggestions to us and we can work with you and Mr. Slattery and other members of the subcommittee. We can work this out and we need to do it.

I hope we can move ahead and get legislation passed to stop this tragedy that is happening to our veterans.

Mr. WYDEN. I thank you, Chairman Montgomery, and we would all like to be able to rally behind a comprehensive Montgomery bill with relief for the veterans right now and a kind of wall that would keep the drug companies from going out and trying to skirt it and putting it on someone else.

Mr. STUMP. Will the gentleman yield?

Mr. WYDEN. Mr. Stump.

Mr. STUMP. It would not be fair if we did not acknowledge there was a company that did roll back their prices to the tune of $7 or $9 million. I think that was one of the intents when we introduced this bill, perhaps, that it would get them to voluntarily come in

71

and renegotiate some of these contracts. We do need to give credit to at least one company.

Mr. WYDEN. Number one, I think it is good you mentioned it. Number two, if we can figure out a way to do it right, it seems to me we create an incentive in the private marketplace to have other people do that and we can build on that one that was good enough to show good corporate citizenship.

Thank you.

Mr. WAXMAN. Mr. Bilirakis.

Mr. BILIRAKIS. Mr. Chairman, I want to share with the committee some information, remind the committee of some of the things that took place in the Veterans Committee and maybe also would like a statement from Chairman Montgomery. I received a letter from one of our veterans in the Tampa Bay Area and at the hospital there in Tampa.

They have drawn a line, they have capped the number of veterans that can receive dialysis as a result of OBRA. He wrote us and said he is grateful he is one of those 12, but how about all the others who are dependent upon it and are not able to get it. That is an example of what is happening here.

I am also advised one drug increased 1,200 percent after OBRA. We should remind the committee that the Veterans Committee supported H.R. 2890 or at least supported the need for some legislative action agreeing with Secretary Derwinski that some legislative action needs to be taken whether it be H.R. 2890 or some semblance of it.

The fact of the matter is, as Chairman Montgomery said, some legislative action needs to be taken. That was 100 percent unanimity in the Veterans Committee. There was some concern about precedence and ranking member Stump reminded us I thought there was more than one company but one company did voluntarily roll back.

Mr. MONTGOMERY. There are probably two or three that did roll back, but it is my feeling that the leading companies they are going to try to bluff this thing through. They don't think we can pass this legislation. They think they can block it and go on their merry way.

Mr. BILIRAKIS. I think they are wrong, Sonny. Let me ask you, since we have eight panels, the VA is not one of them. Very quickly, can you summarize for the committee what efforts were made by the VA to try to negotiate this out with the manufacturers? I think—you know we have talked about it during our hearings and markup, but I think the committee here ought to know.

Mr. MONTGOMERY. They did make some effort.

Mr. MONTGOMERY. All they did was write a letter to Chairman Dingell.

Mr. BILIRAKIS. That is all right. It is important, we know. Basically, there weren't adequate efforts made in your opinion.

Mr. MONTGOMERY. I think our committee has done more than anyone on this issue. We had a good hearing. It went for 3 or 4 hours. You were there, when we marked up the bill, we didn't get a single vote against H.R. 2890. It was a bipartisan vote.