# ANDERSON EXHIBIT 26F

72

Mr. BILIRAKIS. Thank you, sir. I would like to think that the committee here is really going to address this, whether it be H.R. 2890 or a hybrid of it. Something should be done here.

Thank you, Mr. Chairman.

Mr. WAXMAN. Thank you, Mr. Bilirakis.

Mr. Sikorski.

Mr. SIKORSKI. Thank you, Mr. Chairman. After 10 years, I think I have found something I can agree with Mr. Dannemeyer on and that is the demonstration of respect and genuine affection that all of us have for Chairman Montgomery. I am pleased that I was able to join with you in sponsorship of your legislation. I thank all of you for quick but to-the-point testimony which is, as you know, more valuable than the longer list of the point.

I join with Congressman Wyden and the chairman in thanking you for your assistance. I do disagree with the gentleman from California, however, on his confusion as to what—where the problem is here. I don't think you need to smash atoms and part time in order to come up with a conclusion Deep Throat articulated from a garage during the Watergate period. You just have to follow the money.

You followed the money and now it is time for us to follow the money and undo the unpatriotic greed that has been demonstrated. I commend you and pledge 100 percent effort to turn this back.

Thank you, Mr. Chairman.

Mr. WAXMAN. Thank you Mr. Sikorski.

Mr. Lent.

Mr. LENT. I would just take a minute to come to the defense of my colleague from California. I think he said it exactly right. We realize that when government interferes with the market which we did with OBRA 1990, we distort the market. When we fix prices, we get into trouble. We found that out with natural gas and we are now finding that out when we fixed prices on pharmaceuticals.

The drug companies were bled by legislation passed in this Congress back in 1990, the OBRA 1990, and it literally forced the pharmaceutical companies to get rid of their best prices that they had been offering to the veterans. The veterans aren't getting that anymore. The universe of veterans is but a pittance when compared with the universe of Medicaid recipients.

When OBRA 1990 forced the rebates to be extended to a much, much larger universe, it was very natural that the pharmaceutical companies would have to reduce the rebates that they were giving to veterans. If we are looking for a boogie man, you can pick the pharmaceutical companies, they seem to be one of them but also, the Congress for passing price fixing legislation in OBRA 1990.

The Congressional Budget Office told us, I want to remind the members, that this would happen. And the deep discounts that the VA was enjoying were lost because of OBRA 1990. And I might also add that the money that the government saved in the Medicaid program as a result of these rebates was just not really saved, we invented 6 or 8 more Medicaid programs—add-ons to Medicaid and that money has long since been spent.

The Medicaid savings went for expansions in the Medicaid programs. As far as the pharmaceutical industry goes—and we are all knocking that industry because it has a profit, one of the things

73

the pharmaceutical company does, it spends about $15, $16 billion a year in research. It is—we wish our automobile industry in this country was as bold and innovative and dynamic and as much as being the acknowledged leader in the world as is our pharmaceutical industry.

We have a positive balance of payments with respect to our pharmaceutical industry. They are extremely successful. And, you know, I hate to see this hearing turn into a dumping operation on the pharmaceutical. I think we here on this bench share some of the blame because we supported that OBRA and we decided that price fixing was the way to go. And whenever government gets into that business, we can generally screw things up. We did it, as I said, with natural gas and we are going it with pharmaceutical. If we go much further, our pharmaceutical industry will be where our automobile industry is. I hope that never happens.

Thank you, Mr. Chairman.

Mr. WAXMAN. Thank you, Mr. Lent. Dr. Rowland.

Mr. ROWLAND. Thank you, Mr. Chairman.

I want to thank all of you for your testimony here. You certainly point out some very poignant problems taking place in our Department of Veteran Affairs' health care delivery system. I do not have to remind any of you sitting at the table of the ever-present struggle to adequately fund our hospital and health care system. You know about it. You know that the commission on the long-term mission of the VA has indicated we have a $3 billion shortfall now if we are to do what is necessary to provide appropriate care for the veterans in our country.

So this is like the straw that breaks the camel's back, it seems to me. What do these increased costs to pharmaceuticals—in general, what do you see taking place in the near future if something is not done to correct that situation? Let me just ask you, can you briefly—you have given some specifics but briefly what do you see in general happening if this situation is not corrected?

Mr. ROBERTSON. We are in the process of downsizing the active duty forces. I think the demand on the VA will increase as more GI's are discharged with disabilities. There are lots of guys with disabilities and they will need VA assistance when they get off active duty.

Mr. ROWLAND. There is going to be an increasing number and we see this situation causing more problems.

Mr. ROBERTSON. They are turning veterans away now. As the load increases, it will be a priority assessment.

Mr. RIVERS. Dr. Rowland, if I could add one comment, we noticed over the past 3 years or so some 80 percent of discretionary care has been eliminated from the VA hospital system already because of the dire financial straits. We envision the fact more discretionary care will be eliminated, probably all of it.

Envision the possibility of service-connected veterans not being treated for their nonservice-connected conditions because of the severe budget problems. This may be—I think, you hit it on the head.

Mr. ROWLAND. It is imperative that this situation be addressed immediately this year, in my opinion.

Thank you, Mr. Chairman. I yield back.

74

Mr. WAXMAN. Thank you, Dr. Rowland.

Mr. Hastert.

Mr. HASTERT. Thank you, Mr. Chairman.

Since joining this committee in the last term, it seems every time we turn a corner, we are jumping into a new problem. As a neophyte, when you jump into a problem, you find out sometimes that you are way over your head and you feel like you have lead weights around your ankles. In my analysis, any time you start shifting costs, especially in the health industry and when you start to establish global budgets, what happens in the end is that you take from one person to give to another.

We are always told that we'll have savings. However, many times we find in this business, if any savings are realized, those savings disappear and are spent. My understanding of the drug sales program prior to OBRA 1990 is that drug companies went to their biggest customers—the VA, HMO's, and other big buyers— and they had a negotiated set price. Big buyers, like the VA, got discounts or rebates, whatever you want to call them.

When OBRA 1990 was passed by this committee and then the House, Medicaid began to receive very significant discounts.

When that happened, the other drug purchasers who used to get the rebates and discounts were all of a sudden having to pay a higher price, because the drug companies, in their wisdom or—and we can debate whether it was right or wrong—said we can't give the tremendous discounts to Medicaid—a total of $4 billion in savings to Medicaid—and still give discounts to everybody else.

With the best price given to Medicaid, savings of about $4 billion were accrued. But what happened to those savings? Well, in the wisdom of this subcommittee and of the Congress, we increased from 100 percent to 133 percent of poverty the coverage for pregnant women and infants.

We also passed legislation that increased the coverage of children—a gradual increase from 6 years of age to 18 years of age under Medicaid at 100 percent of poverty. All of a sudden those savings aren't there any more and that is a problem. And you know, this subcommittee has to take responsibility for that. We made those changes and the Congress voted for it, but nobody is hoarding billions of dollars. We spent that money. And now we have to find ways to mend the problems that we created.

I am still trying to come up for air in this pool and I am over my head and I am not sure what the solution is. It is a grave situation. Anytime you start to shift costs from somebody receiving a benefit to somebody else, we are going to pay and, in this case, we picked the pockets of the veterans.

Mr. WAXMAN. Mr. Hall.

Mr. HALL. I thank you, Mr. Chairman. I want to join in the accolades to all of you men and the job you are doing, this awesome responsibility you have representing people. But for those you represent, we probably wouldn't even have an opportunity to listen to these other panels.

I am particularly grateful to you. As a guy that had the pleasure of serving in World War II, with my only brother in both theaters, my father walked across Europe in World War I, I grew up in a home bought with a veterans pension and my dad died in Lisbon

75

Veteran's Hospital. I don't know how I could be more hooked on the program you have. I am very respectful of each of you.

Larry, you look a little too young to have the job you have. I am skeptical of anybody under 40. I think this is a very important hearing. As I understand it, OBRA 1990, they left out the Medicaid prescription drug rebate but that, because of the diligence of General Montgomery and Bob Stump and those with whom they work, that you put it in the appropriations bill.

And they have three bills now, Mr. Chairman, that you are considering, one of them General Montgomery's—by the way that is the another thing. It is worth a J.G. in the Navy coming to Congress to get to call a general Sonny. Why not pick the best features of those three and go with it?

I don't understand the delay except the chairman explained that there was information out there we didn't have. I saw a bumper sticker the other day that said "Just Do It." I don't really know what they were talking about. It was another generation that was driving the car that passed my pick-up. But not to make anything humorous out of such a serious meeting, this reminds me of a 400-pound woman falling in the street and everybody wanting to help her up and nobody knowing where to take ahold.

I think it is important that we address this this session, this month or next month, and to do it without any further delay. I don't see any reason why we can't. We have three bills here that I understand all three address the veterans problems and we have some other problems and other panels that also need to be addressed but, you know, before we send $1 overseas and deny one veteran access to a dialysis machine or cost of living allowance, it is a shame.

I think all of you men who represent these entities do a very good job. Bob Stump and General, you all do a yeoman's job of putting the veteran's foot forward. As a matter of fact, if we have a bill and there are 400 something votes for it and three against it, I have seen Bob Stump and Sonny run those three down and ask them if they punched the wrong light.

You are well represented here. It is up to Congress. It is time for us to act and, as the gentleman from Oklahoma said, the time is now.

Mr. Chairman, I support that.

Mr. WAXMAN. Thank you very much, Mr. Hall.

Mr. Holloway.

Mr. HOLLOWAY. Thank you, Mr. Chairman. I want to pay respects to Larry Rivers. His wife is my neighbor back home in a town of 350 people. Larry is from a town about 207 miles over, about 500 people. We are both good country people. I appreciate the job that he is doing there. My point may not quite pertain to this hearing, but I think this committee or the Veterans Committee or someone needs to do a hearing on the amount of prescriptions.

One of the greatest problems I hear back home is the fact everyone keeps dishing out pills. Some are taking 20 and 30 type of prescription drugs. I guess somewhere we need to find out is there anyone much reviewing this situation? I think that is a problem, not only with veterans but in the regular health care of our

Nation. We have people that are taking pills that they don't know what they are for anymore. Are they taking so many?

I think that is a hearing that should be either here or in the Veterans Committee or somewhere because I think it is a great problem in the veterans hospitals that we have doctors when the patient comes in and has a different ailment, they give him another pill and another prescription and he has 20 he is already taking. I don't——

Mr. MONTGOMERY. Will the gentleman yield?

Mr. HOLLOWAY. Sure.

Mr. MONTGOMERY. As we get older we find out taking pills kind of helps. More of it may be mental rather than physical. Under the reconciliation act of 1990, our committee made some real cuts. We required a $2 copayment from many veterans who obtain drugs from the VA. The veterans organizations don't like it at all. But it does bring in a lot of money. Now the drug companies come along and increase their prices by another $93 million. Veterans aren't going to remain silent. It is better to give them drugs than to have them in VA hospitals with more serious problems. So giving out the pills and the drugs is really not that bad an issue, but——

Mr. HOLLOWAY. I guess what I am trying to say, Sonny, I know people have been reviewed and they have been taking 20 types of medicine and they give them three or four types and it helps them. That is one of the problems I am hearing from back home. I guess our society feels if you have an ailment, take another pill and you are ready to go. Maybe it is mental. Maybe it does help us out.

Mr. MONTGOMERY. All VA patients records are on computers. I know there can be problems of too many different types of pills for the patient. Now when the doctor prescribes medication the pharmacist can pull up that individual's record and in a few seconds the pharmacist can figure out if that individual is getting the wrong type of pills, or getting too many. We think we have straightened that out.

Mr. HOLLOWAY. I dare not argue with the general.

Mr. HALL. Would the gentleman yield?

Mr. HOLLOWAY. Yes.

Mr. HALL. It is my understanding and under Chairman Waxman's leadership, a session ago and I was on the Conference Committee on the Nursing Home Reform Bill that dealt with physical restraints and provided for monthly medication review, didn't we, Mr. Chairman. That might buy a page that you could tear out to address your concern. I certainly agree with you and others that this $2 charge is a demeaning charge. It may bring in a lot of money, but I think it is ill-directed and ought to be set aside.

Mr. HOLLOWAY. I have no further statement other than to say I hope we will continue to monitor it. I think it is not only a problem in veteran's care, I think it is a problem everywhere today and I know of a personal instance where it happened with a family member of my staff. I know the monetary issue we are taking up is very important.

Mr. WAXMAN. Thank you, Mr. Holloway. It should be obvious to this panel that everyone on this subcommittee is concerned about the issue and we want to work on this with you.

Mr. Stump.

77

Mr. STUMP. Mr. Chairman, may I make one statement. This $2 copayment is applied to only nonservice-connected conditions. It makes someone more responsible for what they are doing. We had to make cuts someplace and under the reconciliation act, we took what would be the least painful. Now, I think you find some of these veterans rather than paying that $2 copayment will go down to the cut rate drugstore and buy it cheaper than we are able to give it to them.

Thank you.

Mr. WAXMAN. Thank you very much. We appreciate your testimony to us. We are being summoned to the House Floor for the purpose of a vote. Let us recess to respond to that vote and come back. Let us come back and we will hear from the next panel.

[Brief recess.]

Mr. WAXMAN. Our next panel consists of representatives of community health centers, public hospitals and State drug purchasing programs. Jose Camacho is the Executive Director of the Texas Association of Community Health Centers. MacGregor Day is the Chief Operating Officer of Parkland Memorial Hospital in Dallas, Tex. Vince Marrone is the Deputy Policy Director of the AIDS Institute, New York State Department of Health. He is accompanied by Lanny Cross, Director of the New York State AIDS program.

We ask that you limit your oral presentations to no more than 5 minutes.

STATEMENTS OF JOSE CAMACHO, EXECUTIVE DIRECTOR, TEXAS ASSOCIATION OF COMMUNITY HEALTH CENTERS, ON BEHALF OF NATIONAL ASSOCIATION OF COMMUNITY HEALTH CENTERS, INC.; MacGREGOR DAY, CHIEF OPERATING OFFICER AND EXECUTIVE VICE PRESIDENT, PARKLAND MEMORIAL HOSPITAL ON BEHALF OF NATIONAL ASSOCIATION OF PUBLIC HOSPITALS; AND VINCENT MARRONE, DEPUTY POLICY DIRECTOR, GOVERNMENT AFFAIRS, AIDS INSTITUTE, NEW YORK STATE DEPARTMENT OF HEALTH

Mr. CAMACHO. Thank you, Mr. Chairman. Today I appear on behalf of the National Association of Community Health Centers (NACHC) and the more than 600 community, migrant and homeless health centers serving 6.2 million medically underserved Americans in urban and rural communities across the country.

As you no doubt are aware, Mr. Chairman, the large majority of these are uninsured poor. In many instances these patients would have no access to care if it were not for our centers.

In the past few years we have seen this population grow while funding has remained stagnant or barely increased. Some centers have long patient waiting lists. Some have taken the drastic step of not accepting new clients. We have done quite a bit to save on our costs and reduced costs, but unfortunately we continue to have to deal with significant cost increases in the pharmaceutical area. We are going to have to look at cutting services.

My purpose here today, Mr. Chairman, and the concern of the National Association of Community Health Centers, and for that matter all health centers, is to try to avoid this latter alternative. Since the passage of the Pryor bill we have seen continued cost in-

78

creases. Just to give you an idea or example from Texas to supplement the written testimony, of the type of increases we have seen, from October of 1991 to January of this year, 43.3 percent of the drugs we have on formulary have increased in price. Thankfully, some have also remained at the same price and 25 percent have actually seen a reduction in price. However, what concerns us is that these price increases in the last 3 months of last year were in addition to price increases that we saw during the first 6 months.

During the first 9 months of 1991, 18 percent of our products experienced an increase in price averaging over 40 percent. The impact of these increases is devastating. One of our largest centers which serves one of the poorest counties in the Nation recently reported to us that despite their best effort, they will run out of money to provide drugs some time in September. Their new grant does not start until January.

Mr. Chairman, the solution to the overall problem of drug pricing is complex, and we do not propose to offer any solutions to the overall problem. However, our solution to our problem is much, much simpler, and I think can be achieved quickly. We appreciate the attention that both the House of Representatives and the Senate have paid to our problem and the attention that they have given is in the form of S. 1729 and H.R. 3405 by Congressmen Wyden and Cooper.

In general we support the approach taken in S. 1729 with regard to pricing. S. 1729 would allow centers to receive either best price FSS pricing or the lowest price which can be negotiated by those centers.

We would, however, ask that the cap of 25 percent on its FSS pricing be removed. Generally, our prices are between 36 and 42 percent higher than FSS pricing. There is no rational reason for capping the pricing under FSS at 25 percent. It is going to set up a system that is going to be harder to administer than just giving us the FSS pricing up front. We support the approach taken in S. 1729 also because not all the drugs used by the centers are available under FSS, and in some cases historically our prices have been slightly lower than even FSS pricing when we receive those particular drugs from other companies.

Health centers also prefer point of purchase discounts due to their administrative efficiencies and also prefer the ability to continue to purchase products through buying groups so that we may bargain for better prices and also realize administrative economies. We are not sure requiring centers to purchase from the Federal depot itself would necessarily be the most efficient distribution arrangement due to the size and location of the centers and the disruption of avenues, distribution avenues, which might occur.

Finally, Mr. Chairman, since the passage of S. 1729 by the Senate Labor and Human Resources Committee, centers have been contacted by some, but not all pharmaceutical companies. However, these voluntary efforts cannot be relied upon. When we ask for the same voluntary efforts on best price, we contacted all the distributors that we dealt with and only 29 responded and only 5 of those were willing to offer us voluntary pricing. Obviously, the actions in Congress have brought forward more companies, but it is still not enough. Thank you very much.

79

[The prepared statement of Mr. Camacho follows:]

STATEMENT OF JOSE CAMACHO, EXECUTIVE DIRECTOR OF THE TEXAS ASSOCIATION OF COMMUNITY HEALTH CENTERS, ON BEHALF OF THE NATIONAL ASSOCIATION OF COMMUNITY HEALTH CENTERS, INC.

Mr. Chairman and Members of the Subcommittee: My name is Jose Camacho. I am Director of the Texas Association of Community Health Centers, which represents 28 community and migrant health centers in the State of Texas. This year these 28 centers will serve in excess of 270,000 low-income, uninsured and medically underserved Texans. I appreciate the opportunity to speak with you today, on behalf of the National Association of Community Health Centers (NACHC) and the more than 600 community, migrant and homeless health centers serving 6.2 million medically underserved Americans in urban and rural communities across the country.

A large majority of the population served by our centers in Texas, and nationwide, are the least fortunate of our society. In many instances these patients would have no access to primary health care were it not for our centers. In the past few years we have seen this population grow while our funding has remained stagnant or barely increased. Some of our centers now have long patient waiting lists. Some centers have even taken the drastic step of not accepting any new clients.

In order to deal with the ever-growing demand for our services, without significant increases in our budgets, health centers nationwide have implemented a multitude of cost-saving measures aimed at reducing the cost of our operations without affecting services to our clients. An example of this is the pharmaceutical purchasing group in Texas. Since 1987, the Texas Association of Community Health Centers has operated this group. As a result, members of the group have realized tremendous savings. In a time of escalating pharmaceutical prices, the pharmaceutical expenditures of the Texas centers have decreased an average of 20 percent overall. During the past 2 years, the group has added centers from Colorado and California. Unfortunately we have done all that we can in the area of cost-cutting. If our centers are faced with further significant cost increases, there is only one thing left for us to do: Cut services.

My purpose here today—and the concern of NACHC and all health centers—is to try and avoid this latter alternative. Since the passage of the Medicaid Anti-Discriminatory Drug Price and Patient Restoration Act of 1990 (The Pryor Bill) we have seen our drug prices increase dramatically. We are concerned that our centers in many instances may be unable to afford even the limited number of medications we now provide to our patients. Our concern is not caused by the so-called Medicaid drug rebate legislation, but by the way in which many pharmaceutical companies have reacted to the legislation.

At the outset I want to make it clear that Senator David Pryor and Congressmen Ron Wyden and Jim Cooper should be commended for their efforts to save the Medicaid program an estimated $3 billion over the next 5 years. I believe, however, that there was an assumption that the legislation would cause Medicaid prices to be reduced to those prices charged by manufacturers to their best customers. While some originally predicted that drug manufacturers would react to this legislation by increasing their drug prices, including their best prices, to offset any loss of revenue, certainly no one expected that the price of some drugs would more than double, as was recently reported by the HHS Inspector General, Richard P. Kusserow.

But this, in fact, is happening and will continue to an even greater degree as long-term contracts expire. A survey on pharmaceutical price increases being experienced since September, 1990 by community and migrant health centers was conducted by the National Association of Community Health Centers in the spring of 1992. Of 141 respondents, 75 centers did not operate their own pharmacies, guaranteeing the full impact of drug price increases on their uninsured low-income patients whom they refer to other pharmacy providers. For the 66 responding centers that operated their own pharmacies, the overall average price increase experienced for 282 lots of their top five most commonly purchased pharmaceutical products was 24 percent in a single year, much greater than the rate of general inflation. The overall average price increase for just those 223 lots that did increase in price was 43 percent. In some cases, price increases in a single year were over 500 percent. Several reports for nitroglycerin skin patches were given, including increases from 30 cents to $5.40; an electrolytes solution went from $5 to $57.32; another hypertensive went from $35 to $332. Antibiotics increased on average 75 percent and diabetes medications increased over 30 percent.

80

Texas centers also offer many such examples. For nearly 2 years now Texas centers have been paying $152.78 for the 5mg, 1,000 count of glyburide. Glyburide is an oral antidiabetic usually prescribed to adults who develop diabetes after 30 years of age and who do not require insulin shots. The drug, when properly taken, has the effect of controlling uncomplicated cases of diabetes and avoiding the drastic and very costly side effects encountered when individuals do not properly treat this disease. Recently, we were informed by the company that supplies Texas centers that, unless legislation to protect our centers is enacted, our prices would increase to approximately $287 for the same drug at the end of our present contract period. If we assume that this company was making a reasonable profit from Texas centers at the $152 price, then we must ask, "What drastic changes have occurred in this market to cause our pricing to sky-rocket by almost 89 percent?"

Let me give you an example of the devastating effect this price change has on services to our clients. This year we estimate that Texas centers will pay $107,557.12 for this size and strength of glyburide alone. If the quoted price increases are put into effect, our centers will pay an estimated $202,048 for this same product size and strength next year. Translated into human terms, this will mean that Texas centers will provide approximately 2,780 fewer medical visits next year as a result of this company's price increases on just this one product, size and strength.

All totaled, we estimate that Texas centers will pay $175,462 for all strengths and sizes of glyburide in our centers in the current calendar year. Assuming similar price increases are affected for all strengths and sizes of this product during the next calendar year, we estimate that our centers will pay an additional $154,143.36. Unless some meaningful protection is enacted for our centers, this will mean 4,533 fewer visits for clients we presently serve due to price increases in glyburide alone.

This is more than anecdotal evidence of possible price increases. Three health centers in three separate States have recently reported paying prices that varied from $257.01 to $287.84 for the 5mg, 1,000 count of glyburide. I must also emphasize that this is what we have been told will happen by company representatives. And this is just one product.

This year Texas centers will also spend approximately $187,724 on insulin products. Centers around the country have reported large price increases for insulin, which is probably the most commonly used drug at centers, ranging from 162 percent for the price of 70–30 premixed human insulin to 31.6 percent for the semisynthetic human insulin.

These two insulin products are, in fact, our highest volume insulins in Texas. An increase in our prices comparable to those reported by other centers around the country would cost Texas clinics an amount equal to the cost of providing 4,451 patient visits per year.

Based on Bureau of Health Care Delivery and Assistance (BHCDA) Common Reporting Requirements data, centers nationwide spent approximately $58.7 million during 1990 on drugs. This represented a 13 percent increase over 1989. There is no reason to assume that this increased cost is the result of anything other than prescription drug price increases because there has been no major expansion of pharmacy services within community and migrant health centers for some time due to funding limitations.

If price increases on glyburide and insulin were all we had to concern ourselves with, perhaps we could adjust to meet these increases without affecting services. But this is not the case. As I explained previously, Texas started a pharmaceutical purchasing group in 1987 in order to save money by buying in larger quantities with greater administrative efficiencies. A large majority of the prices we are currently paying were negotiated and went into effect on October 1, 1990, before the enactment of the Pryor Legislation. Although these prices were only effective through September 30, 1991, we asked all the companies participating with our group to extend their pricing through the remainder of 1991. Most companies were willing to accommodate our needs. However, of the 1,012 product sizes and strengths on our formulary, almost 18 percent increased in price an average of 43.34 percent. This bidding cycle helped us realize that drug price increases were not due solely to increases in single source innovator drugs. Generic drugs also are incurring substantial increases. Insulin is a good example of increases in the generic market. But there are others:

—325mg Aspirin tablets increases almost 20 percent;

—500mg Ascorbic Acid tablets, used in the treatment of Vitamin C deficiency increase 27 percent;

—Aspirin, enteric coated tablets increased by an average of 35 percent; and

—some pediatric vitamins increased by over 30 percent.

81

Since aspirin is not covered under Medicaid or prescribed by physicians, and since there has been no substantial research or marketing effort on this particular product since the 1800's, it is hard to fathom why this drug would increase such a great deal.

These price increases are particularly hard for our centers along the U.S.-Mexico border to understand if you consider that, by merely crossing a bridge, in some cases a 5-minute trip, you can obtain some of our most expensive drugs at substantial discounts.

For example:

—This year our clinics will pay approximately $134,474 for 150mg tablets of Ranitidine, used in the treatment of ulcers. This works out to $1.02 per tablet. This medication by the same manufacturer was purchased for $0.344 per tablet in Matamoros, Mexico—a short 5 minute drive from our clinic in Brownsville.

—Similarly the 250mg suspension form of Augmentin, a penicillin used in the treatment of bacterial infections, sells to us for $32.70 per 150ml bottle. In Mexico, the public can obtain a similar quantity of Augmentin for only $12.54 per bottle.

—A 5mg tablet of glyburide sells to the public for $0.78 per 30 tablets or a bit more than $0.02 per tablet in Mexico. Most centers purchase this same medication for approximately $0.15 per tablet. This price is scheduled to increase in January to approximately $0.28 per tablet.

—The 17mg inhaler of Albuterol, used to treat the symptoms of bronchial asthma, chronic bronchitis, emphysema and other lung diseases so common amongst our farmworkers, sells to the Mexican public for $3.72. Although the same company markets this product in both Mexico and the United States, the same product currently sells in the United States for $5.95 per inhaler. Four clinics located in Florida, Maryland and California have been quoted a price of $13.20 per inhaler as their future price.

Mr. Chairman, we appreciate the attention which both the Senate and the House of Representatives are now giving to some form of drug price relief for PHS Act supported programs, particularly S. 1729 which has been approved by the full Senate Labor and Human Resources Committee, and H.R. 3405 which was introduced by Congressmen Wyden and Cooper in the House. The Senate bill provides point of purchase discounts while the House bill provides for rebates to Public Health Service Act programs serving disproportionate numbers of indigent people, including community and migrant health centers and health care for the homeless programs. Nonetheless, because of the way manufacturers have reacted to the Pryor Legislation, we continue to be concerned that additional remedies may be necessary. Richard P. Kusserow, Inspector General, recently recommended, ". . . that a legislative proposal be made to redefine best price under section 1927 on a constant basis, [such as] based upon prices as they existed in October, 1990, and adjusted for increases in the Consumer Price Index-Urban (CPI-U)." Such legislation may be necessary in the future if the Best Price Provisions of the Pryor Bill are to have any meaning.

In fact, we would urge this subcommittee to explore a way to include PHS Act programs in the provisions of H.R. 2890, the bill which would establish limits on drug prices for the Veterans Administration at September 1, 1990 prices generally are the lowest available on the market. And with the price rollback provisions, PHS Act supported programs would not have to continue to absorb the extraordinary price increases they have already experienced. It would be important, however, to ensure that the FSS prices include all the major products utilized by health centers whose patient population is more female and younger rather than older. In general, in any drug relief legislation, health centers prefer point of purchase discounts due to their administrative efficiency, and also prefer the ability to continue to purchase products through buying groups so that they may bargain for better prices and also realize administrative economies. We are not sure that requiring centers to purchase from a Federal depot itself would necessarily be the most efficient distribution arrangement due to the size and locations of centers and the disruptions such new avenues of distribution might cause; rather we are interested in purchasing through existing buying arrangements at FSS prices rolled back to September 1, 1990 and indexed for inflation thereafter.

Finally, Mr. Chairman, since the passage of S. 1729 by the Senate Labor and Human Resources Committee, centers have been contacted by some, but not all, pharmaceutical companies offering various types of discount arrangements on a voluntary basis. We want to make it clear that health centers deeply appreciate these voluntary discount initiatives from pharmaceutical or any other companies. Our national Association has met with representatives from a number of pharmaceutical companies to try to facilitate the flow of information about various discount offers

82

from the companies to the centers and to provide company representatives with information about the centers. However, some of the proposed discount offers have problematic provisions which contradict good management policies—such as a requirement to have an open (to any product sold by a company) formulary versus a limited formulary (which most centers maintain and BHCDA encourages), a requirement to purchase only directly from the manufacturer as opposed to through a buying group or wholesaler (where economies of scale and other administrative efficiencies can be realized), a requirement that the centers certify that they will not dispense a product to a Medicaid eligible patient which was originally purchased at a discount (thus requiring centers to keep two different inventories and record keeping systems for Medicaid and non-Medicaid patients or refer Medicaid patients elsewhere for pharmacy services—neither of which is acceptable policy or practice for a health center). Furthermore, not all companies have offered centers discounts, and the levels of the discounts vary significantly. Very few of the offers correct for the significant increases that centers have already experienced since September, 1990.

To rely upon voluntary proposals would suggest this problem can be resolved without the need for Congressional intervention. We have evidence to suggest otherwise. Last year, the Texas Association of Community Health Centers surveyed 91 manufacturers who participate in our purchasing program. The survey asked one simple question: "Would you be willing to provide the Medicaid 'best price' to the Texas Association of Community Health Centers?". Only 5 of the 29 manufacturers who responded indicated that they would provide us the Medicaid "best price". For this and other reasons we do not believe that a voluntary effort alone would ensure the Medicaid "best price" to our centers. And we do not believe that the Medicaid "best price" is as good in most instances as the VA Federal Supply Schedule prices.

We thank you, Mr. Chairman, Congressmen Wyden and Cooper, and other members of the subcommittee for your leadership on this issue. We urge you to pass legislation now to assist PHS Act supported programs to conserve the public investment of Federal grant dollars for health services for the poor and uninsured by placing parameters on unwarranted drug price increases that may be experienced by these programs. We do not believe that such price discounts for this class of publicly supported programs would at all injure the health of pharmaceutical companies which we recognize do make an important contribution to our health and wellbeing. We look forward to working with you and your staff to draft a workable solution to this serious problem.

Mr. WAXMAN. Thank you very much, Mr. Camacho.
Mr. Day.

## STATEMENT OF MacGREGOR DAY

Mr. DAY. Mr. Chairman and committee members, my name is Mac Day. I am the Executive Vice President and Chief Operating Officer of Parkland Memorial Hospital in Dallas.

It is a 940-bed teaching hospital. It has been a leader in many specialized areas of health care, trauma, intensive care, burn treatment and pediatric trauma. We also serve about 7,000 outpatient visits per year.

Parkland is a public hospital and we receive over 50 percent of our funding from the local taxes we levy to the property owners who live in Dallas county so they are the primary payer of services we provide at Parkland.

I am here today on behalf of Parkland as well as the National Association of Public Hospitals. The National Association of Public Hospitals represents more than 100 major hospitals and hospital systems in metropolitan areas across the country. These hospitals serve the poor and near poor in the Nation's cities.

More than half the people served by the NAPH hospitals are either Medicaid recipients or uninsured or underinsured patients. This is why the NAPH hospitals are often referred to as the safety net hospitals.