**ANDERSON EXHIBIT 26H**

100

reimbursement claim with ADAP, which pays the pharmacy for the drug, as well as a dispensing fee. This system insures the broadest and most expeditious means of access to ADAP-eligible drugs for program participants.

Because New York State reimburses pharmacies directly for drugs which patients purchase, we would not be able to receive an up-front discount as proposed in Senate 1729. AIDS drug assistance programs in the states of Massachusetts, Michigan, New Jersey, Pennsylvania, and Washington operate in a similar fashion and would also be unable to benefit from S.1729. (See Attachment 2 for a list of programs and program directors.)

To overcome this barrier, New York State would **recommend that any agreed upon bill employ a rebate**, rather than a discount, for eligible entities who purchase directly from pharmacies and therefore cannot benefit from a "discount" program. The provisions of H.R.3405 would meet our needs in this regard. Alternatively, a combination of rebates and discounts could be employed if doing so ensured that all eligible entities benefit.

In addition, **we recommend that confidentiality protections be added to the bill** to protect information which eligible entities must share with federal agencies or manufacturers in complying with the legislation's requirements. As patient names are often attached to documents entities may be required to share with regulators or manufacturers, providing confidentiality protections will ensure that such names are kept confidential. (See Attachment 3 for draft language.)

In closing, I would like to comment briefly on the emergence of "voluntary" drug discount programs being promoted by drug manufacturers. The fact that such efforts are voluntary is testimony to their inadequacy. These programs generally have restrictive eligibility criteria, are available only to select pools of patients or service providers, cover a limited number of drugs, and function at the whim of manufacturers.

One must wonder whether these voluntary discount programs are sincere efforts to make treatments more affordable, or just politically expedient measures implemented by drug companies to quiet public outcry over high drug prices, fight off Congressional mandates, or garner favorable press. It's no wonder that many in the AIDS community interpret drug manufacturer's willingness to forgo profits as proof that AIDS drug prices are exorbitant.

Federal legislation must be enacted to guarantee broad, substantial, and legally-protected access to drug price discounts. Voluntary manufacturer efforts should be complementary or in addition to any government-mandated relief.

Again, I thank you for the opportunity to testify this morning. Mr. Cross and I would be glad to respond to any questions you may have.

101

ATTACHMENT 1
## DRUG REIMBURSEMENT PROGRAMS

| | Approved Drugs on Formulary as of October 1991 | Projected No. of Drugs on Formulary as of September 1992 | Reduction/ Discontinuation of Program |
|---|---|---|---|
| Alabama | 7 | 7 | September 1992 |
| Alaska | N/A | N/A | Possible FY '92 Reduction |
| Arizona | 2 | 2 | February 1992 Reduction |
| Arkansas | 1 | 2 | |
| California | 2 | 13 | |
| Colorado | 8 | 8 | |
| Connecticut | 1 | 1 | * April 1, 1992 |
| Delaware | 10 | 7 | |
| Florida | 1 | 2 | January 1, 1992 |
| Georgia | | | September 1992 - Discontinuation |
| Hawaii | 5 | 11 | No |
| Idaho | 5 | 5 | January 1, 1993 Reduction |
| Illinois | 4 | 5 | July 1, 1992 Reduction |
| Indiana | 13 | 15 | Already a Reduction |
| Iowa | All FDA Approved | 6 | April 1, 1992 Reduction |
| Kansas | 7 | 7 | * Reduction |
| Kentucky | | | |
| Louisiana | 1 | 9 | No |
| Maine | 6 | 30 | No |
| Maryland | 3 | 18 | No |
| Massachusetts | 5 | 11 | October 1992 |
| Michigan | 29 | 43 | Reduction in FY '92 |
| Minnesota | 50 | 60 | * No |
| Mississippi | | | |
| Missouri | 10 | 10 | January 15, 1993 |
| Montana | 1 | 4 | Yes - Reduction |
| Nebraska | 138 | 17 | Immediate Red.-Only HIV rel. drugs avail. |
| Nevada | 1 | 1 | No |
| New Hampshire | 9 | 23 | Possible Reduction in 1-2 years |
| New Jersey | 3 | 7 | October 1992 - Discontinuation |
| New Mexico | | | |
| New York | 25 | 57 | No |
| North Carolina | 1 | 2 | September 30, 1992 |
| North Dakota | 2 | 6 | Possible January 1993 |
| Ohio | 7 | 8 | Jan-Feb 1993 |
| Oklahoma | | | |
| Oregon | 1 | 2 | No, but have a wait list |
| Pennsylvania | 5 | 14 | Not this Year |
| Rhode Island | 4 | 9 | No |
| South Carolina | 1 | 1 | No |
| South Dakota | | | |
| Tennessee | 2 | 4 | October 1992 |
| Texas | 7 | 9 | No, but subsidized thru state funds |
| Utah | 1 | 11 | No, but state $ to supplement |
| Vermont | 12 | Added as Needed | No |
| Virginia | 1 | 4 | No |
| Washington | 9 | 9 | Yes, Sometime in 1993 |
| West Virginia | 4 | 4 | October 1992 |
| Wisconsin | 3 | 6 | All State Funded |
| Wyoming | all | all | No |
| Puerto Rico | 16 | 22 | Reduction, only 4 drugs to be provided |

* CT - Waiting for Legislation to allow establishment of a waiting list.
 IN - Waiting list for over three months.
 KS - Wait list has already been established.
 MN - Drug reimbursement is top priority. Other programs would be cut first.

Survey of the National Association of State and Territorial AIDS Directors

July 23, 1992 dd

102

ATTACHMENT 2

## AIDS DRUG REIMBURSEMENT PROGRAM

**NEW YORK**
Mr. Lanny Cross
Program Director
AIDS Drug Assistance Program
P.O. Box 2052
Empire Station
Albany, NY  12220
Telephone: (518) 473-2873

**MASSACHUSETTS**
Mr. Stewart Landers
HIV Drug Reimbursement Program Coordinator
MA Department of Public Health
AIDS Office
150 Tremont Street, 11th Floor
Boston, Massachusetts  02111
Telephone: (617) 727-0368

**MICHIGAN**
Mr. Randolph Pope
Michigan Department of Public Health
Special Office of AIDS Prevention
3423 North Logan
Lansing, Michigan  48906
Telephone: (517) 335-8371

**NEW JERSEY**
Mr. Carmine Grosso
NJ State Department of Health
Division of AIDS Prevention and Control
363 West State Street
Trenton, New Jersey  08625-0363
Telephone: (609) 984-6328

**PENNSYLVANIA**
Mr. John F. Folby
Spec. Pharmaceutical Benefits
Program Coordinator
Department of Public Welfare
Division of Outpatient Programs
P.O. Box 8043
Harrisburg, Pennsylvania  17105
Telephone: (717) 782-6147

**WASHINGTON**
Mr. David Baird
Program Administrator
AIDS Prescription Drug Program
Airdustrial Park, Bldg. 9
Mail Stop LJ-17B
Olympia, Washington  98504
Telephone: (206) 586-4979

ATTACHMENT 3

## DRAFT CONFIDENTIALITY LANGUAGE FOR H.R. 3405

"(a) No patient identifying information shall be collected, maintained or disclosed pursuant to this title unless reasonably necessary to implement this title or unless otherwise required by law.

(b) All patient identifying information shall be confidential.

Mr. WAXMAN. I want to thank you for your testimony.

What I heard each of you saying is that simply exempting you from the best price formulation is not an answer. It is not going to take care of your problem.

Is that a fair statement?

Mr. CAMACHO. I think it is a good first step, but it will not take care of all the problem.

Mr. WAXMAN. But you are being hurt under the formulation that we have where we tried to give the Medicaid program the benefit of best price. Unfortunately, the best price to others is being raised, which means that clinics and community health centers and those involved in AIDS activities and veterans programs, are paying a higher price as a result.

Mr. CAMACHO. That is correct.

Mr. WAXMAN. Mr. Slattery, our colleague on this committee, introduced a bill that has a different approach. It is a rebate approach.

Have any of you had a chance to look at that? How do you think that would affect you?

Mr. CAMACHO. We think that because of the fact that FSS pricing is usually lower than the best price, we would prefer the Kennedy approach to our pricing, to give us the three options and let us try to negotiate one of the three options.

I don't know what impact it would have, not knowing exactly what the best price is. In many instances, we are calculating against what we believe the best price might be in certain situations. So it would be hard to assess the overall impact of that.

Mr. WAXMAN. Mr. Day or Mr. Marrone?

Mr. DAY. We believe the best price would be a very good first step. We concur with that. We also really believe that some type of rollback or at a minimum some type of rebate-type program really needs to be a supplement to the best price as a first step.

Mr. WAXMAN. Mr. Marrone?

Mr. MARRONE. With regard to the Medicaid program, New York State supports the best price approach. I am not an expert in that area, but I believe Mr. Carl Volpe, who will speak later, will represent our position on that topic.

Mr. WAXMAN. How about if we took the Slattery bill and amended it to cover those institutions that serve large numbers of poor people?

Mr. DAY. That would be a very good step for the public hospitals and for Parkland Hospital.

Mr. WAXMAN. Thank you very much.

Mr. Dannemeyer.

Mr. DANNEMEYER. I would like to ask the gentleman, the gentleman from Parkland—that is you, Mr. Day; isn't that right?

Mr. DAY. Yes, sir.

Mr. DANNEMEYER. I notice there has been an increase in outpatient drug expense that takes a good jump up in 1991, 1992, and 1993. If you can, is that a reflection of the increase in the population that is being served or is that just the price for a fairly constant population?

Mr. DAY. No, sir. If you look at the graph, it will show from 1990, you know the graph is shaded with the gray being inpatient and

104

the black outpatient. There is a substantial growth, too, but it is not as dramatic as for the outpatient. Parkland has over 700,000 outpatient visits.

The volume we have, with the prescriptions, without any real change in population in Dallas County, these are basically the cost increases.

Mr. DANNEMEYER. I am talking about the people that have been served at our hospital. Have the numbers gone up significantly?

Mr. DAY. No, sir. They have been going up 5 percent each year in the outpatient volume.

Mr. DANNEMEYER. This is a higher than 5 percent increase in drug costs. Maybe each patient is using more drugs?

Mr. DAY. We examined that, sir. Really, there are basically three components to the price change. One component is the price itself, the cost of the drugs to the hospital. The second component is the volume increase that represents only about 5 percent of the growth. Then there is a change in the mix of drugs as a move forward more biotechnical drugs and I only represent another 3 or 4 percent.

Most of the cost increase is related to price increase.

Mr. DANNEMEYER. Why do you think your hospital has realized the significant cost increase in drugs that is reflected here beginning in 1991. What caused that?

Mr. DAY. We believe it was the OBRA 1990, the enactment of that legislation with the shift of the Medicaid rebate to the State of Texas or any other States across the country, that we lost a very valuable purchasing power that we had in terms of our volume purchases. Our costs were increased by the manufacturers, dramatically.

Mr. DANNEMEYER. Maybe we should repeal OBRA?

Mr. DAY. I think what we are talking about is repealing that section that was referred to as a prior amendment as what caused this problem. That is what I am here to testify for.

Mr. DANNEMEYER. There are some of us who did not vote for it in 1990.

Mr. DAY. I think it had unforeseen consequences.

Mr. DANNEMEYER. There is a law of unforeseen consequences that comes as a result of legislation that is adopted. You know, when that package was put together in the fall of 1990, as has been alluded to earlier, some of our colleagues use the anticipated savings in servicing the drug needs of the Medicaid population in order to expand those eligible for Medicaid coverage.

It was not an accident. That was intended. What was not intended, I don't believe, was the realization that if this discount was given to the veterans population that the extension of that same discount could not realistically be given to a much larger universe known as the Medicaid population.

Now whether we have the determination around here to go and reduce the expansion of the Medicaid population, that 49 Governors in this Union has asked us to do, I am not sure we have votes on this committee to do that. I wish my colleague, Mr. Waxman, could bring himself to do that. I am prepared to do that, but I am not sure that he is.

I yield to my chairman.

105

Mr. WAXMAN. I think you are talking about apples and oranges. The question was, do we get some savings from the pharmaceutical prices that Medicaid was paying? We were able to get some savings. We want to continue to get savings, but we don't want the consequences that we have seen. Then the question is, if you are going to get savings, what are the savings going to be used for?

Some of them will be used to cover additional poor people. I think it is quite reasonable to do that. You might say savings ought to go to deficit reduction. That is a reasonable position. But to say we should not have savings of Government expenditures is quite irresponsible. I hope that is not your position.

Mr. DANNEMEYER. I don't want you to misunderstand me. I am still sorting my way through this problem. I think the government buys a lot of drugs and we should use that buying power to work to best advantage the government funds, the taxpayers money. I accept that. That is part of the give and take of the market system.

I am perfectly willing to work out something that reflects that. Thank you.

Mr. WAXMAN. Mr. Hall.

Mr. HALL. Inasmuch as this is a day when so many members have so many other hearings and we are in session and they are not here to ask their questions, I am sure, Mr. Chairman, you will allow us to submit some questions in writing to the witnesses.

I want to say to my two fellow Texans who are here, welcome. I think I would be remiss, Mr. Chairman, if I did not thank them for the abundance of information and cooperation that they extend to us when we call on them and coming here to testify today, along with the gentleman from New York, is another evidence of the extra mile they all go and that they care.

I particularly want to thank Mr. Camacho for the Greenville operation. It is growing. I guess as they grow in service, they grow in problems because they are growing in a bad economy. That is part of the great problem.

I do thank you for the service that they rendered. I think that is the only one in my district maybe with some outreach work there. I appreciate that and appreciate the good job, Mac Day, that you do in Parkland Memorial Hospital.

I would tell you a story that only you and I probably would gather the significance of. I was a county judge in Rockwall, a little rural county near Dallas. Judge Lou Sterrich was a county judge in Dallas. He accused me of treating someone who needed medical treatment by buying them a 55-cent bus ticket and giving them an address in Dallas.

Mr. DAY. We still accuse the county judge of the same practice.

Mr. HALL. I see he is not letting our folks down. Thank you.

Thank you, Mr. Chairman, for this hearing.

Mr. WAXMAN. Thank you, Mr. Hall. I would like to advise you and all the witnesses today that members may have additional questions in writing that we would request that you respond to in writing for the record.

You have outlined this problem very clearly as it is affecting your institutions. I think this is another reason why the Congress has to take a very hard look at that impact of the OBRA 1990 law.

106

Our next panel reflects the perspective of the States which are involved in what is essentially a joint venture with the Federal Government, to purchase prescription drugs for the poor through Medicaid with the Federal Government paying 57 percent of the cost.

Carl Volpe is appearing on behalf of the National Governors Association.

Ray Hanley is the Director of the Arkansas Medicaid program. He is appearing on behalf of the American Public Welfare Association.

I want to welcome the two of you to our hearing today. Your prepared statements will be placed in the record in full.

## STATEMENTS OF CARL VOLPE, SENIOR POLICY ANALYST, NATIONAL GOVERNORS' ASSOCIATION; AND RAY HANLEY, CHAIR, STATE MEDICAID DIRECTORS' ASSOCIATION, AMERICAN PUBLIC WELFARE ASSOCIATION

Mr. VOLPE. Mr. Chairman and members of the committee, I am Carl Volpe, a Senior Policy Analyst with the National Governors' Association.

I do want to apologize for Mr. Scheppach. He had intended to be here today, but he had an unavoidable conflict. Your staff tried to accommodate him and we are grateful for that, but he sends his regrets.

On behalf of the Nation's Governors, I would like to comment on Mr. Slattery's bill H.R. 5614. The debate about changing the best price strategy to a flat rebate strategy is a rather complex one, we feel.

We see three major questions in the discussion: Does Medicaid deserve the best price? Has the rebate program cost shifted unfairly? And will the best price discount disappear?

I would like to address each one briefly, if I may.

Does Medicaid deserve the best price? The Governors feel absolutely strongly that the answer to that is yes. I know that I will be preaching to the choir before this committee, but Medicaid, we all know, is an essential national program that provides health care to poor individuals. It is a strong public program and a program that is funded with taxpayer dollars. The taxpayers deserve the right to have those dollars used as efficiently as possible.

There has been some argument that because Medicaid is a payer and not a purchaser, it does not deserve to have the best price. We believe that, in fact, approximately 12 percent of the market and its public policy objectives clearly override that distinction.

Has the rebate program cost shifted unfairly? We think that is a matter of perspective. If one looks at since OBRA 1990, one has seen the cost shift. A program that had 12 percent of the market getting the worse prices moving to 12 percent of the market getting close to the best prices clearly causes a cost shift in the market.

The question is what happened before then? Before OBRA 1990, Medicaid was paying the worst prices. We believe that what we are seeing now is a readjustment and a recalibration of the market.

Will the best price discount disappear? That is a very, very tough question. That debate has been focused primarily on a CBO study

107

that I think you referred to earlier, the June 22 study. I would like to make some observations about that study.

The first point in that study is that CBO readily admitted that when OBRA 1990 was originally passed, that best price would disappear by 1992. Clearly that is not the case. They also said at the passage of OBRA 1990 that for 1991, the Federal rebate would result in about a $75 million savings. At the moment, that number is $110 million and there is some suggestion that it may go even higher.

The third and most crucial point is the analysis that shows that best price will decline through 1996. That has been the basis of a lot of discussion and pointed to as evidence for a predictive model that says the best price will disappear.

We have had discussions with CBO. We asked them to talk to us about the model. They told us the model is not predictive. It is an assumption. They assumed that in 1996 the best price would probably disappear and they modeled it. It is merely an arithmetic analysis of an assumption.

Given that kind of assumption, the model could show no other effect for best price but to disappear. We think that is very serious. We are not criticizing CBO. We think CBO has a very, very tough, tough task ahead of something to model something that is almost completely unpredictable.

However, that study is the basis for some of the legislation that we have before us.

I need to point out at this point that the Governors have no formal policy at this point, but a consensus is emerging among them. The consensus is that a flat rebate approach is probably not a viable option.

Currently, Mr. Chairman and members of the committee, there is very little that one can control in terms of the pharmaceutical market. If manufacturers have it in their ability under the free market system to move in any direction, they can to maximize their prices and the only ability that we have is to deal with competition. We think competition needs to remain in the system.

Mr. Chairman, we need to look at this carefully. We are not sure there is any data to support it. Just because some people like the change, we are not sure there is real evidence to support it at this time.

Thank you, sir.

Mr. WAXMAN. Thank you.

[The prepared statement of Raymond C. Scheppach follows:]

108

**Statement of Raymond C. Scheppach**
**Executive Director, National Governors' Association**

Good morning, Mr. Chairman and members of the subcommittee. I am Raymond Scheppach, executive director of the National Governors' Association. I appreciate the opportunity to talk with you today, on behalf of the nation's Governors, about the Medicaid prescription drug rebate program established under the Omnibus Budget Reconciliation Act of 1990 (OBRA '90).

The growth of the Medicaid program over the last five years has been nothing short of phenomenal. In 1992, total spending for the Medicaid program is expected to exceed $120 billion, representing more than 14 percent of total state spending. The Congressional Budget Office (CBO) recently predicted that between 1990 and 1995 Medicaid will grow about 120 percent. Medicaid remains the fastest-growing part of virtually all state budgets. These data only confirm what the Governors have been saying for more than five years -- the Medicaid budget is out of control. As each day passes, it becomes more critical for the federal government and the states to join together as stewards of this program to ensure that every opportunity is taken to administer it efficiently.

In fiscal 1985, the Health Care Financing Administration (HCFA) reported that about $2.3 billion state and federal dollars were spent on prescription drugs in the Medicaid program for 13.9 million recipients. By fiscal 1991, the year Congress established the rebate program, Medicaid was spending $5.4 billion for 19.6 million recipients. The Governors' strongly believe that Congress rectified an important pricing inequity in the pharmaceutical market with the passage of OBRA '90. Medicaid was paying for outpatient prescription drugs -- essentially at retail prices -- despite the fact that it is

109

one of the largest purchaser/payers in the market. As a good steward of public funds, Congress amended the Social Security Act, based on legislation introduced by Sen. Pryor and Congressman Wyden, that ensured Medicaid the best prices available in the market. In June 1992, CBO reported that for fiscal 1991, states reported rebate receipts of $111 million (federal share only). Thirty percent of that amount can be attributed to the best price discount in the statute. Simply stated, the program is working.

Congress is now considering major changes to a successful drug rebate methodology. Why? Proponents of the changes cite three arguments that appear to support their case. First, they argue that Medicaid should not benefit from the best price in the market because it is a payor of prescription drugs not a purchaser. Second, they claim the rebate program is resulting in an unfair cost shift to other market purchasers. Third, they argue that in order to maintain benefits in prescription drug rebates, states should accept a flat rebate discount since adjustments in the market will result in the disappearance of the best price discount for Medicaid. Their arguments are not ultimately convincing, and I would like to address each in turn.

**Does Medicaid Deserve The Best Price?**

Absolutely. Medicaid is an essential national program that provides prescription drugs and biologicals to poor and categorically needy people who desperately need them. Moreover, Medicaid pays for those drugs with taxpayer dollars. By assuming responsibility for this population, the American taxpayer deserves the right to reap all financial benefits possible in the purchase of prescription drugs, thereby lowering the taxes needed to fund the program.

2

110

Putting this public policy argument aside, it has been argued that only those who can purchase in bulk deserve the best price. Since Medicaid is a payor and not a purchaser, the argument goes, it should not benefit the most. It is true that Medicaid directly purchases very few of its prescription drugs. However, Medicaid uses an existing product distribution system, and I suspect that the marginal costs to the manufacturer of packaging and transportation are relatively small compared to costs of research, development, and marketing. Since Medicaid is more than 12 percent of the market and the largest payor of prescription drugs, it deserves the benefit.

### Has the Rebate Program Cost Shifted Unfairly?

OBRA '90 changed the market. And some purchasers have indeed seen increases in costs as the market seeks new equilibrium. Is this unfair? We think not. Prior to OBRA '90, Medicaid was getting some of the worst prices in the market. The nation's largest publicly funded health care program for the poor was subsidizing other purchasers -- including those who make profits in the resale of those drugs. OBRA '90 did not cause an unfair cost shift, it caused the market to move toward a more equitable pricing structure. How might these other purchasers cope with such increases? They can use the tools of the market, all of which remain available to them. That is, they can continue to secure better prices by selective purchasing of therapeutic pharmaceutical equivalents -- a technique that is not available to the Medicaid program because of formulary prohibitions imposed by OBRA '90.

### Will The Best Price Discount Disappear?

Not likely. But its predicted demise has been used to support a shift from best price to a descending or flat rebate percentage from average manufacturers' price. However,

3

111

before discussing the behavior of best price in the market, I would like to comment on the June 1992 CBO study upon which the flat discount legislation is based.

The CBO study reports that best price discounts are disappearing and that states will do no better than approximately a 16 percent reduction from average manufacturers' price by 1996. The CBO report admits quite candidly that "...these estimates are very uncertain." We had assumed that the disappearance of the best price discount by 1996 was arrived at through some predictive modeling technique. In discussions with CBO, we learned that this analysis was not a result of predictive modeling, but was based on the assumption that the best price discount would disappear by 1996. If one assumes that the discount will disappear, the model can only show that it will! Any other market behavior, including establishing a new equilibrium point, is completely precluded by such an assumption.

In another section of the report, CBO acknowledged that they had previously underestimated the behavior of best price discounts in the market. When CBO developed estimates of the program in 1990, they predicted that the best price discount would disappear by the end of 1992. States continue to benefit from the best price discount. These CBO analyses lead us to conclude that it is very difficult to estimate the budget impact resulting from the drug rebate program and that, once again, CBO may be underestimating the behavior of the best price discount in the market.

The Medicaid Prescription Drug Act of 1992, H.R. 5614, would remove the best price methodology from the rebate program and replace it with a fixed discount from the average manufacturers' price. While the National Governors' Association does not

4

112

currently have formal policy on this issue, a consensus appears to be emerging that would oppose a change at this time and continue to support a best price concept.

Our opinion is that this fixed discount is not a viable option. While such an approach might produce lower prices in the near term (i.e., six months to one year), the option would give the industry the opportunity to reallocate costs and change prices significantly over time in order to increase prices to state Medicaid programs. If this were a perfectly competitive industry with lots of substitutes for a known product and a known cost structure, then a fixed discount would be viable. However, the pharmaceutical industry is characterized by having monopolies on individual drugs and is, for the most part, an oligopoly. That is, a handful of companies dominate the pricing of the industry.

Individual firms in this industry, like other successful firms, attempt to maximize their profits. This is not objectionable; it is one of the basic tenets of our free enterprise system. To maximize profits, however, the industry differentiates prices by various purchasers (e.g., hospital chains, major health maintenance organizations (HMOs), wholesalers, etc.). Essentially, firms have a pretty good measure of the relative slopes of the individual demand curves of each of the segments of the market. That is, market segments that have the greatest opportunity to substitute generic products or similar drugs instead of purchasing from a given manufacturer will have a less steep demand curve. I would suspect that Kaiser Permanente in California, for example, has a moderately sloped demand or less steep curve, and thus can negotiate a lower price. On the other hand, small retailers who have little choice and purchase small quantities of product have a very steep demand curve. They have to pay the highest price.

5

113

The industry knows its costs. Once manufacturers know the slope of the demand curves for each segment of the market, they can maximize their profits by charging the lowest price for those with moderately sloping demand curves (since the purchaser has lots of options for substitutes) while they continue to charge the highest prices to those segments of the market that have the steepest slope demand curves (with little options for substitutes). In fact, this describes precisely what happened to the Medicaid program prior to the inception of OBRA '90. Medicaid participated in the market primarily through small retailers, who have the steepest slope demand curves and pay the highest prices.

The industry, by knowing the demand curve for each market segment, by knowing their own costs for individual drugs, and by having the ability to reallocate costs (particularly research and development, marketing, and fixed costs) across individual drugs, will be able to circumvent easily any fixed percentage of average manufacturers' prices. Simply put, it is much much more difficult to "game" a best price discount.

The ability to negotiate prices among multiple manufacturers of the same or therapeutically similar products is essential to obtain the best price in the market. Since Medicaid does not negotiate its prices, the program benefits under the current methodology from the negotiating powers of others. Moving to a flat percentage discount from average manufacturers' price eliminates that ability. If we remain within best price, we will probably see a modest decline until the market readjusts. At the very least, we can be assured that Medicaid will fare no worse than the best negotiator in the market for each drug. That is a good use of the tax dollars.

While we support the existing best price methodology, we believe that a program that provides health care for poor and categorically needy people might expand benefits

6

114

even beyond the current rebate program. Congress and the administration should consider changing the program so that Medicaid would get the existing best price discount plus an additional discount of two to five percent.

**Conclusions**

The Governors have seen no compelling reason to change the program at this time. We understand that the General Accounting Office (GAO) will be issuing a report in November that examines the program in more detail and focuses the program's affect on hospitals and HMOs. We believe that this study will make a valuable contribution to the debate. In fact, we believe that given the current paucity of available data, the results of that study are essential. Any change before the report is issued could be costly and ill-advised.

Once the GAO study is published, Congress, the administration, and the states will be in a better position to assess the effects of the current best price methodology on prices in the pharmaceutical industry. If changes are to be made, they must be done carefully after consultation with impartial experts. Moreover, they must be consistent with our public policy responsibilities. In the case of any change, the Governors believe that Medicaid must continue to benefit from the market and that such benefit must be commensurate with its share of the market and public policy goals.

The Governors and the National Governors' Association are available to work with Congress and the administration at that time to assess the status of the program. Thank you for your time and consideration.

115

Mr. WAXMAN. Mr. Hanley.

### STATEMENT OF RAY HANLEY

Mr. HANLEY. Thank you, Mr. Chairman.

I am Ray Hanley, Medicaid Director of Arkansas and Chairman of the State Medicaid Directors' Association of the American Public Welfare Association.

I have with me Jane Horvath who is the Director of the Health Policy Unit at APWA. I asked her to sit with me to answer any questions that you might have.

I appreciate the opportunity to be here to talk about OBRA 1990 and the proposed changes. Certainly OBRA 1990 has impacted States in many different ways. These proposed changes will also certainly have great impact.

The cost of drugs has gone up to the States. We are buying drugs for some 27 million people.

I know in Arkansas our costs have gone up considerably. Under OBRA 1990, we gave up some strong cost control measures, like formularies.

We would want to tell you that unlike the average manufacture price these rebates are based on, most Medicaid programs pay off the wholesale price, which is influenced by the inflation the other witnesses testified to. The original intent of OBRA 1990 was to give Medicaid the best price. We very strongly feel like the tax-funded program deserves that as we try to serve the poorest of the poor.

There has been a lot of discussion about the VA. The drug companies are going to be here this afternoon. Are they prepare to restore the discounts and state for the record they will restore discounts to VA if the bill passes? We think maybe the VA could do a better job of negotiating than they seem to have done.

One witness said this morning in response to what have you done, "We wrote a letter."

Community health centers, certainly we appreciate the role the community health centers play out there. Medicaid works with community health centers today. A big part of them are Medicaid providers. In order to assist the community, mental health centers don't require the States to add to their administrative costs by doing the tracking of the prescription drugs that go into these as one bill would.

Representative Wyden's bill, for instance, does not require that.

Eliminating the generic rebate is another proposal here. I think we would oppose that. It would simply take away revenue from the States. We cannot afford that. There is no proven point that that would make a very competitive industry any more competitive than generics already. The point is the flat rebate versus best price.

We strongly feel we need to stay with best price. Perhaps a year from now it might be a different matter to come back and look at. There simply is not enough experience under this program to throw out best price and do away with original intent, which was to give Medicaid the best price. There is no consensus among the States.

116

To the contrary, to those who think that the rebates are declining, we have seen substantial increases in rebates to the States from 1991 to 1992. The trend still seems to be upward and we think it will be for some time to come.

The drug business is highly competitive. Medicaid is 10 to 12 percent of the market, but I have to believe that 88 to 90 percent of the market outside Medicaid cannot still influence this highly competitive market, cannot extract concessions and discounts.

OBRA 1990 was complex. The drug market is complex. It is still not stabilized. We feel like it needs more time. The current system, we think, can work. Let's give it a chance.

A lot was said about cost containment this morning from the institutional provider and community health centers. Medicare has a big role in cost containment. We gave up some of those under OBRA; formularies, the right to do extensive prioritization where warranted. If we are going to talk about reopening this bill and talk about cost containment, if we are going to make changes, perhaps some of those changes need to be to give the States the right to control health care costs, to let us do the formularies the institutions have, that have testified here this morning, and perhaps remove this 6-month provision on new drugs so that we cannot prioritize those.

We regret being at odds with some of our health care partners this morning. That seems to be the case to a certain extent. Let's not lose sight of the fact that the real issue here, and one that was dealt with in OBRA 1990, was the behavior of drug companies that passed along these cost increases—largely unwarranted—to many people and not only to Medicaid.

But to do away with the intent, best price, we think would be a costly mistake at this time. We ask that you give it more time.

We will be happy to answer any questions that you might have.

Mr. WAXMAN. Thank you very much.

[The prepared statement of Mr. Hanley follows:]