**ANDERSON EXHIBIT 26I**

118

Medicaid pharmacy expenditures are based on AWP, the rebate law provides an inflation adjustment rebate based on AMP. The point here is that Medicaid is not exempt from the drug cost increases that occur in the market. In Arkansas and other states, the average price per prescription has increased. Accordingly, states are concerned about any diminution of the rebate revenues that currently help offset the increased costs.

In general, state Medicaid agencies view proposed changes to the prescription drug rebate program within the context in which the OBRA 90 amendments were enacted. The provisions were designed to give Medicaid the benefit of drug prices paid by large volume purchasers and others who had effectively used various tools to encourage competition among manufacturers such as formularies, therapeutic substitution, and prior authorization. While there is disagreement in Congress and elsewhere as to whether Medicaid is a purchaser of drugs in the same way that hospitals and health maintenance organizations are, Medicaid drug payments constitute roughly 12 percent of all drug sales nationally. State agencies believe very strongly that Medicaid should not pay top dollar for vital medications. Medicaid is a taxpayer supported program intended to provide medical/coverage for the poor. Because Medicaid is, in fact, a significant payer and serves a vital public interest, the program should have access to significant discounts.

## Response to Various Proposals

*Veterans Administration Protections*: The legislation introduced by Representative Montgomery (H.R. 2890) raises some interesting issues, not the least of which is that Medicaid may lose rebate revenue through a permanent exemption from the Best Price formula. The OBRA 90 amendments were predicated on the ability of institutional purchasers, such as the VA, to gain good discounts, and that Medicaid should "piggyback" on those institutional abilities. Now Congress is considering exempting the VA from Medicaid Best Price. State Medicaid agencies question whether the VA could, in fact, regain its ability to negotiate prices using cost control tools, such as formularies, that Medicaid no longer has at its disposal. We also understand that since last year's exemption of the VA federal supply schedule from Medicaid Best Price, VA prices have not substantially declined. This leads us to question whether a permanent VA

119

exemption will restore VA prices absent an effort by the VA to become more aggressive about negotiating.

The Montgomery bill seems to anticipate that the VA will not, on its own, obtain large drug discounts and would then require manufacturers to roll back VA prices to October 1990 levels. Manufacturers choosing not to comply are prohibited from participating in the Medicaid program. State Medicaid agencies are concerned that there may be manufacturers of sole source drugs who may decide simply to withdraw from Medicaid rather than roll back prices paid by the VA. State Medicaid agencies are alarmed with the prospect that some important drugs for which there are no alternatives might not be covered by Medicaid.

*Community Health Centers*: The biggest state Medicaid agency concern with any proposal to extend Medicaid prices to CHCs is that the administrative burden on state agencies not increase as a result.  Administering the rebate program has proven to be a highly complex and time consuming proposition.  States do not want to be in a position of accounting for clinic utilization when sending Medicaid drug utilization data to manufacturers.  It appears that Representative Wyden's bill, H.R. 3405, would not require Medicaid agencies to account for clinic rebates through Medicaid utilization data, thus avoiding the need for costly state systems changes and avoiding the possibility of more disputes with manufacturers over utilization data.

*Eliminating the Generic Product Rebate*: While there is no specific legislation to eliminate generics from the rebate program, I understand this issue is under discussion.  State agencies are aware that many generic manufacturers face particular problems with respect to the rebate law, and state agencies are working with participating pharmacists to address manufacturer concerns regarding coding on claims.  Removing generic manufacturers from the rebate program would result in lost revenues for Medicaid, which is clearly a concern of states.  It has been argued that removing generics from the rebate program would produce administrative savings to offset revenues losses.  We would challenge this assumption because states generally have not been able to increase their staff to work on the rebate program.  It has also been argued that removing generics from the rebate program will produce savings because the industry will become more

120

competitive thus offsetting revenue losses.  We do not support this assumption because generics are a highly competitive industry and will remain so, even in a rebate environment.  State agencies also question how this proposal would be implemented.  Systems modifications will be needed to be able to identify and pay for drugs that, under current law and operation, cannot be covered under Medicaid.  These modifications will cost money and take time to implement.  In general, we believe there are some fiscal and operational issues that need to be addressed before such a proposal moves forward.

*Substituting Best Price Formula With a Flat Rebate*:  Most state agencies believe that the information is simply not available upon which to make a sound decision on changes at this time.  While there is no absolute consensus on the part of state Medicaid agencies regarding a flat rebate at this time, there is a growing sentiment that policy changes should not be decided until more and better information is available.

State agencies have serious questions about the estimates produced by the Congressional Budget Office, which are the basis of Representative Slattery's proposal to give Medicaid a declining flat rebate (H.R. 5614).  Because of the confidentiality provisions of OBRA 90, states admittedly are operating somewhat in the dark with regard to how much of the rebate revenues are due to Best Price, the minimum rebate, or the inflation adjustor rebate.  Nevertheless, states have seen their rebate revenues increase substantially between 1991 and thus far in 1992.  Because the increase is not totally explained in terms of increased utilization or inflation, states believe that the Best Price concept continues to work well and provides for increased rebates.   States attribute this increase to the fact that the statutory ceiling on Best Price rebates increased in 1992 — up to 50 percent of AMP from last year's ceiling of 25 percent of AMP.

While CBO may be correct that Best Prices are eroding, state agency experience indicates that this erosion, insofar as Medicaid rebates are concerned, may be much slower than CBO anticipates.  Further, it seems possible that Medicaid rebates could still increase even while private sector discounts are in decline because under the current law, Best Price rebate ceilings may still be below the discounts available to the private sector.  If private sector discounts are

- 4 -

121

diminishing, it may be that an equilibrium between increasing Medicaid rebates and declining private sector discounts — the point at which Medicaid Best Price rebates peak and at which private sector discounts are substantially diminished — is still some years away.  On the other hand, Best Price may never decline as pharmaceutical manufacturers continue to operate in a highly competitive market place.

Overall, it is probable that the pharmaceutical market has not sufficiently stabilized to make accurate predictions of what the market will look like in the future.  There appear to be numerous factors currently at work.  Making assumptions about the relationship between Medicaid and private sector prices/rebates is a very complex proposition given that the market is still changing and adjusting, and the rebate program specifications are still changing.

States believe a minimal flat rebate could undermine the intent of OBRA 90 to provide Medicaid access to some of the best prices available to the private sector.  Furthermore, state agencies strongly disagree with the concept of a declining flat rebate.  States question whether a declining flat rebate will be truly budget neutral and believe that the concept of a minimal flat rebate is a circular one in the context of the law's original intent.  It is argued that moving to a flat rebate percentage for Medicaid would allow the private sector to better negotiate significant discounts.  If this occurs, and Best Price is thereby bolstered in the private sector, what becomes of the basic goal of the original law, which is giving Medicaid access to some of the lowest private sector prices?  If Medicaid is left with a rebate equal to 16 or 17 percent of AMP while the private sector obtains substantially larger discounts, it seems that the original intent of the law will be undermined.

Significant Medicaid cost containment tools have been greatly compromised by the OBRA 90 law including formularies, prior authorization, coverage and cost limits for new drugs, and ingredient cost reimbursement.  Accordingly, Medicaid agencies are keenly concerned about any proposal that may, in the long term, limit the rebate revenue potential.  If rebates are to be limited without sufficient knowledge of future market behavior under the Best Price formula, Medicaid programs could be in for significant losses.  In states where the OBRA 90 amendments

– 5 –

122

resulted in increased costs, the prospect of losses is not tenable.  In all states, the prospect of reduced revenues without other significant cost containment potential is of great concern. Medicaid cost containment ability was diminished under terms of OBRA 90 in exchange for greater reliance on the private sector's ability to negotiate discounts through the use of the cost containment tools that Medicaid gave up.  To separate Medicaid from private sector and public institutional purchasers at this point in time is highly problematic and of great concern.

Given the number of single source drugs going off patent in the coming years, it is not clear that manufacturers can sustain a policy of not negotiating with large purchasers.  State Medicaid agencies tend to believe that the competition to get onto formularies, the desire to avoid prior authorization, and the need to compete within a multi-source environment will force manufacturers to negotiate prices with purchasers.  It is not clear that manufacturers can sustain a position of non-negotiation over the longer term in a competitive environment.

## Conclusion

State Medicaid agencies find it regrettable that we are at odds with institutional bulk purchasers on this issue at this time.  We do not doubt that many of their discounts have been affected by the law and believe that the real issue here is the behavior of the drug manufacturers, not the behavior or intent of the either the Medicaid programs or the bulk purchasers.  We should not lose sight of the overarching issue of manufacturer behavior and drug pricing, which is the issue that the original rebate legislation introduced by Senator Pryor and Representative Wyden sought to address.  However, as administrators of the Medicaid programs — some of which have paid substantially for the 'open access' provisions of the OBRA 90 law — we cannot support a change to a minimal flat rebate without knowing more about the future.  We believe that state experience and the CBO numbers are too much at odds to give us any assurance that CBO assumptions or methodology are correct.  States can ill afford a costly mistake at this time; too much is at stake for the overall Medicaid program in tight financial times such as these.

– 6 –

123

To be clear, we are not saying that state agencies would oppose any discussion of change to a flat rebate or another alternative in the future. We believe that such a discussion should be based ton more concrete information than is currently available, such as more state expenditure and rebate data that captures changes in the rebate amounts over time and the awaited GAO report on private sector discounts. A discussion of change should also include a look at other program costs such as those of the new C-rated and other drugs coming onto the market for the first time, the cost impact of eliminating Medicaid formularies, costs associated with the protected status under Medicaid of new drugs on the market, and the overall administrative complexity of the current program. State agencies also believe it is critical that we have access to the information on AMP, Best Price, and the inflation adjustment in order to better analyze current and future trends.

There are many issues to be considered in any discussion of change to the Medicaid rebate formula. At this time I believe we have many more questions than answers. It is important that any policy change be based on information that is able to better account for the various factors at work among purchasers, manufacturers, and Medicaid. State Medicaid agencies do not believe we have this information at this time.

I appreciate the opportunity to speak with you today and will be happy to answer any questions you may have.

124

Mr. WAXMAN. Let me ask you this, Mr. Volpe: You testified that the Governors, "see no compelling reason to change the program at this time."

Earlier this morning Chairman Montgomery testified that the Medicaid rebate program was costing the VA $100 million per year, forcing the Agency to cut back on services to veterans. Don't you consider this a compelling reason to revisit the issue?

Does the National Governors' Association really believe that the VA should content itself with, in your words, "using the tools of the market?" Judging from the testimony we heard earlier, the VA is the one getting hammered, not the manufacturers. Does the NGA really oppose Chairman Montgomery's bill?

Mr. VOLPE. No, sir. The Association has not considered Mr. Montgomery's bill in detail but if you look at the question of Medicaid getting the best price, we spoke about publicly funded programs. I think the VA system can be considered within that category. We don't see any real intent to hurt the VA system on behalf of the Medicaid system. That is one of the arguments that we have been confronted with. That is why we think the whole issue has to be revised in more detail.

Mr. WAXMAN. I take it from your testimony that the Governors oppose Mr. Slattery's bill H.R. 5614 because it would replace the "best price" method for calculating the rebate with a flat percentage approach.

All the testimony we got this morning plus the testimony we will receive from the next panel suggests that best prices are quickly disappearing from the VA, community health centers, public hospitals and large group purchasers. If the best prices are disappearing, won't the savings from best prices disappear as well? Why are the Governors insisting on the status quo?

Mr. VOLPE. There are two questions there, Mr. Chairman. I think the first has to do with the public health system. I think like I said for the VA system, the Governors' argument about public programs is consistent.

The second question about best price is, I think, a point of debate. I think we are seeing a change in the market. I believe that best price is decreasing. I think we are moving to a new equilibrium point.

Under the current situation, at least with regard to Mr. Slattery's bill, we know for a fact that if Medicaid stays within best price, Medicaid will do no worse than the most prudent purchaser in the market, given that Medicaid does not purchase, nor can Medicaid negotiate.

So we think that at this point, it is a good position to hold to until the issue is revisited in more detail.

Mr. WAXMAN. What is the Governors' position on Mr. Wyden's bill, H.R. 3405, which would extend Medicaid rebates to certain Public Health Service Act grantees without altering the Medicaid rebate program?

Mr. VOLPE. The Governors have no formal position on that, sir.

Mr. WAXMAN. Is there a difference between the NGA position and that of the Bush administration?

Mr. VOLPE. I don't know the Bush administration's position, sir.

Mr. WAXMAN. Thank you very much.

125

Mr. Dannemeyer.

Mr. DANNEMEYER. I would like to ask Mr. Volpe a question and Mr. Hanley can answer for the State of Arkansas.

It is my understanding that Medicaid Federal law authorizes States to require a co-payment for Medicaid population in purchase of drugs?

Mr. VOLPE. Requires, sir?

Mr. DANNEMEYER. No; an option. The State is given the option of having a co-payment, correct?

Mr. HANLEY. Yes, sir. That option exists, but there is a large segment of the Medicaid population to which you cannot apply that.

Mr. DANNEMEYER. If that is a correct statement of Federal policy, how much States in the Union have adopted the option of requiring a co-payment by a recipient or a participant in the Medicaid population?

Mr. HANLEY. Approximately half have some form of co-payment, but it cannot apply to children, nursing home patients or pregnant women, which are a substantial portion of the Medicaid recipients.

Mr. DANNEMEYER. But in those States that have pursued the option of a co-payment, what is the percentage?

Mr. HANLEY. I am sorry. I don't understand.

Mr. DANNEMEYER. The percentage of the co-payment.

Mr. HANLEY. It can range from 50 cents up to $3. Most States make it a fixed amount. It can range from 50 cents to $3 on a scale, depending on how expensive the drug is. We intend to implement this plan in Arkansas, the sliding scale.

Mr. DANNEMEYER. You say about half the States have exercised this option?

Mr. VOLPE. We have data that speaks to this State by State. I will see that you get that.

Mr. DANNEMEYER. I would like to see that because, you know, you talk about half the States. Some are big and some are small. Our State of California has 12 percent of the population that we admit. We have far beyond that that live in the cracks. We are not sure about the number, but it expands at the rate of, we think, 3,000 a day of people coming into California from the southern border of our State without benefit of any legal mission.

I think this whole issue of the policy option that we are dealing with and analyzing how we get out of this, the consequences of the law, the unintended consequences of the OBRA Act of 1990, is very interesting.

This Member of Congress would like to see what States have adopted so that he could analyze that.

Thank you, Mr. Chairman.

[The information follows:]

126

Table 3

*STATE COPAYMENT POLICIES IN EFFECT AS OF JANUARY 1, 1991*

| STATE | SERVICE | CO-PAY AMOUNT * | APPLICABLE TO ** |
|---|---|---|---|
| Alabama | Ambulatory surgical center services | $3.00 | |
| | Durable medical equipment | $3.00 | |
| | Federally qualified health centers | $1.00 | |
| | Inpatient hospital | $50 admission | |
| | Outpatient hospital*** | $3.00 | |
| | Supplies/appliances | $1.00 | |
| | Physician office visits (incl. optometric) | $1.00 | |
| | Prescription drugs | Varies | Age 19+; pregnant women for non-pregnancy related prescriptions |
| | Rural health clinic*** | $1.00 | |
| Alaska | None | | |
| Arizona | Office visits | $1.00 | |
| | Elective surgery | $5.00 | |
| | Non-emergency use of ER | $5.00 | |
| Arkansas | None | | |
| California | Prescription drugs | $1.00 | Age 19+ |
| | Emergency room (inappropriate use) | $5.00 | |
| | Outpatient hospital | $1.00 | |
| | Physician services | $2.00 | |
| Colorado [1] | Community mental health centers | $2.00 | |
| | Inpatient hospital | $15/stay | |
| | Outpatient hospital | $3.00 | |
| | Prescription drugs | $1.00 | |
| | Physician visit | $2.00 | |
| | Rural health clinics | $2.00 | |
| Connecticut | None | | |
| Delaware | None | | |
| DC | Prescription drugs | $0.50 | Age 21+; pregnant women for non-pregnancy related prescriptions. |
| | Eyeglasses | $2.00 | |
| Florida | Dentures | Varies [2] | Age 21+. |
| | Prosthetic devices - hearing aids | Varies [2] | Age 21+. |
| Georgia | None | | |
| Hawaii | None | | |
| Idaho | None | | |
| Illinois | Inpatient hospital | Varies [3] | |
| Indiana | None | | |
| Iowa | Chiropracty | $1.00 | |
| | Dental | $3.00 | Age 21+. |
| | Prescription drugs | $1.00 | |
| | Eyeglasses - optician services | $2.00 | |
| | Medical equipment & supplies | $2.00 | |
| | Optometry | $2.00 | |
| | Podiatry | $1.00 | |
| | Prosthetic devices | | |
| | --hearing aids | $3.00 | |
| | --orthopedic shoes | $2.00 | |
| | Psychology | $2.00 | |
| | Psychotherapy (CMHC only) | $2.00 | |
| | Rehabilitation agency | $2.00 | |
| | Transportation - ambulance | $2.00 | |

SOURCE: NATIONAL GOVERNORS' ASSOCIATION, 1991

127

Table 3 cont.

*STATE COPAYMENT POLICIES IN EFFECT AS OF JANUARY 1, 1991*

| STATE | SERVICE | CO-PAY AMOUNT * | APPLICABLE TO ** |
|-------|---------|-----------------|------------------|
| Kansas | Ambulatory surgery center services | $3.00 | |
| | Audiology | $3.00 | |
| | Chiropracty | $0.50 | |
| | Dental | $2.00 | |
| | Prescription drugs | $1.00 | |
| | Freestanding psychiatric hospital (private) | $25.00/stay | |
| | Home health agency (skilled nursing) | $2.00 | |
| | Hospital - inpatient | $25.00 | |
| | - non-emergency outpatient | $1.00 | |
| | - outpatient surgery | $3.00 | |
| | Medical equipment | $3.00 | |
| | Mental health center | $2.00 | |
| | Optometrist | $2.00 | |
| | Physician office visit | $1.00 | |
| | Podiatry | $1.00 | |
| | Psychology | $2.00 | |
| | Transportation - non-emer. ambulance | $1.00 | |
| Kentucky | None | | |
| Louisiana | None | | |
| Maine | Prescription drugs | 0.75 [4] | |
| Maryland | Prescription drugs | $0.50 | |
| Massachusetts | None | | |
| Michigan [6] | Chiropracty | $1.00 | Age 21+. |
| | Dental | $3.00 | |
| | Prescription drugs | $0.50 | |
| | Optometry | $2.00 | |
| | Podiatry | $2.00 | |
| | Prosthetic devices - hearing aids | $3.00 | |
| Minnesota | None | | |
| Mississippi | Dental | $2.00 | |
| | Prescription drugs | $1.00 | |
| | Home health visit | $2.00 | |
| | Hospital - emergency room | $2.00 | |
| | - inpatient | $5.00 | |
| | Optometry | $2.00 | Age 18+; pregnant women for non-pregnancy related prescriptions. |
| | Rural health clinics - office visits | $1.00 | |
| | Transportation - ambulance | $2.00 | |
| Missouri | Audiology | Varies [5] | Age 18+. |
| | Dental | Varies [5] | |
| | Dentures | Varies [2] | |
| | Prescription drugs | Varies [6] | |
| | Hospital - inpatient | $10.00 | |
| | - outpatient | $3.00 | |
| | Optometry | Varies [5] | |
| | Podiatry | Varies [5] | |
| Montana | Audiology | $0.50 | Age 21+. |
| | Clinic services | $1.00 | |
| | Clinical social worker | $0.50 | |
| | Dental | $1.00 | |
| | Prescription drugs | $1.00 | |
| | Eyeglasses | $1.00 | |
| | Home dialysis for ESRD | $0.50 | |
| | Home health (not including DME) | $1.00 | |
| | Hospital - inpatient | $3.00/day [7] | |
| | - outpatient | $1.00 | |
| | Nurse specialist services | $1.00 | |
| | Occupational therapy | $0.50 | |
| | Optometry | $1.00 | |
| | Physical therapy (outpatient) | $0.50 | |
| | Physician | $1.00 | |
| | Podiatry | $1.00 | |

SOURCE: NATIONAL GOVERNORS' ASSOCIATION, 1991

128

STATE COPAYMENT POLICIES IN EFFECT AS OF JANUARY 1, 1991

| STATE | SERVICE | CO-PAY AMOUNT * | APPLICABLE TO * * |
|---|---|---|---|
| Montana con't. | Private duty nursing | $0.50 | |
| | Prosthetic devices | $0.50 | |
| | - hearing aids | $0.50 | |
| | - medical equip. & supplies | $0.50 | |
| | Psychological | $0.50 | |
| | Speech pathology | $0.50 | |
| Nebraska | None | | |
| Nevada | None | | |
| New Hampshire | Prescription drugs: | | |
| | - generics | $0.50 | |
| | - brand names | $1.00 | |
| New Jersey | None | | |
| New Mexico | None | | |
| New York | None | | |
| North Carolina | Chiropracty | $0.50 | |
| | Clinic | $0.50 | |
| | Dental | $2.00 | |
| | Eyeglasses (each pair and repair of $4+) | $2.00 | Age 18+ |
| | Hospital - outpatient | $1.00 | |
| | Optometry | $1.00 | |
| | Physician | $0.50 | |
| | Podiatry | $1.00 | |
| | Prescription drugs | $0.50 | |
| North Dakota | Eyeglasses - replacement lenses & frames within 1 yr. of original prescription. | $3.00 | |
| Ohio | None | | |
| Oklahoma | None | | |
| Oregon | None | | |
| Pennsylvania | Prescription drugs | $0.50 | |
| | Inpatient | $3.00/day [8] | |
| | Non-emergency service in a hospital | Varies [9] | |
| | Emergency room | Varies [9] | |
| | All other allowable services | Varies [10] | |
| Rhode Island | None | | |
| South Carolina | Prescription drugs | $1.00 | Age 21+; and pregnant woman for non-pregnancy related prescriptions. |
| South Dakota | Ambulatory surgery center | Varies [2] | |
| | Chemical dependency treatment | Varies [2] | |
| | Chiropracty | $0.50 | |
| | Dental | $1.00 | |
| | Dentures | $3.00 | |
| | Durable medical equipment | Varies [2] | |
| | EPSDT screening | $1.00 | |
| | Hospital - outpatient (except lab) | Varies [2] | |
| | Mental health centers | Varies [2] | |
| | Optometry | $0.50 | |
| | Physician | $3.00 | |
| | Podiatry | $2.00 | |
| | Prescription drugs | $1.00 | Pregnant woman for non-pregnancy related prescription drugs. |
| | Psychotherapy | $2.00 | |
| | Rehab hospital outpatient (except lab) | Varies [2] | |
| Tennessee | None | | |
| Texas | None | | |
| Utah | None | | |
| Vermont | Prescription drugs | $1.00 | |
| Virginia [11] | Clinic | $1.00 | |
| | Hospital - inpatient | $30.00 | |
| | - outpatient, nonemergency | $2.00 | |
| | Optometry - eye exams | $1.00 | |
| | Physician | $1.00 | |
| | Prescription drugs | $1.00 | |
| Washington | None | | |
| West Virginia | Prescription drugs | Varies [12] | |
| Wisconsin | Audiological testing | $1.00 | |
| | Chiropracty | $1.00 | |
| | Day treatment service | $0.50 | |

129

Table J Con L

## STATE COPAYMENT POLICIES IN EFFECT AS OF JANUARY 1, 1991

| STATE | SERVICE | CO-PAY AMOUNT * | APPLICABLE TO ** |
|---|---|---|---|
| Wisconsin (cont.) | Dental | Varies [13] | |
| | Prescription drugs | $0.50 [14] | |
| | Durable medical equipment | $1.00 | |
| | Eyeglasses | Varies [15] | |
| | Hospital - inpatient, general | $3.00/day [16] | |
| | - inpatient, mental diseases | $3.00/day [16] | |
| | - outpatient | $3.00 | |
| | - surgery | $3.00 | |
| | Optometry | Varies [5] | |
| | Oral surgery | $1.00 | |
| | Orthodonty | Varies [17] | |
| | Physician visits [18] | | |
| | - consultations | $3.00 | |
| | - diagnostic procedure in office | $1.00 | |
| | - eye exams | $2.00 | |
| | - home | $1.00 | |
| | - lab procedure performed in office | $1.00 | |
| | - radiology procedure in office | $2.00 | |
| | - office | $1.00 | |
| | - outpatient hospital | $1.00 | |
| | Prosthetic devices - hearing aids | Varies [5] | |
| | Prosthodontic appliance | $3.00 | |
| | Psychotherapy | Varies [15], [19] | |
| | Rural health clinics | $2.00 | |
| | Speech/hearing/language | Varies [20] | |
| | Therapy, physical & occupational, per 15 minutes | $0.50 [21] | |
| | Transportation, ambulance/ non- emergency | $2.00/trip | |
| Wyoming | Prescription drugs | $1.00 | |

KEY:
CMHC = Community Mental Health Center
DME = Durable medical equipment.
ESRD = End stage renal disease.

* Unless otherwise specified, co-pay amounts are paid per service visit
** This column refers to specific groups of people for whom states have opted to impose charges through provisions of law. Source: US Department of Health & Human Services; Health Care Financing Administration Analysis of State Medicaid Program characteristics. 1986, Aug. 1987, p. 75-79.
*** For these services the state requires the copayment be paid per claim for all Medicaid beneficiaries who are also Medicare-eligible. All other Medicaid beneficiaries - the copayment is per visit.

1   Medicaid recipients are subject to a maximum of $120.00 in copayments per year.
2   Co-pay is 5% of reimbursement for these services.
3   $2.00 for per diem of $275 to $325; $3.00 for per diem over $325.
4   $4.50 per month limit on prescriptions.
5   $.50 to $3.00.
6   These co-pay policies are not applicable to individuals who enroll in the physician-sponsored plan.
7   Maximum copay charge of $66.00 per stay.
8   Maximum copay charge of $21.00 per stay.
9   In Pennsylvania the copays for services range from $1.00 - $6.00 depending on the Medicaid fee for the services provided. If the Medicaid fee is:
    $1.00 - $10.00 the copay is $1.00
    $10.00 - $25.00 the copay is $2.00
    $25.01 - $50.00 the copay is $4.00
    $50.01 - more  the copay is $6.00
10  For all other services Pennsylvania has established a copay based on the Medicaid fee for that service.
    Medicaid fee of $1.00 - $10.00 copay is $0.50
    Medicaid fee of $10.01 - $25.00 copay is $1.00
    Medicaid fee of $25.01 - $50.00 copay is $2.00
    Medicaid fee of $50.01 - or more copay is $3.00
11  Virginia's copayments are applicable to beneficiaries age 21+ and to pregnant women for non-pregnancy related service.
12  $.50 on $10.00 or less; $1.00 on $10.01 and over.
13  $.50 to $1.00.
14  Copayment limited to $5.00 per month, per pharmacy.
15  $.50 to $2.00.
16  Maximum copay charge of $75 per stay.
17  $2.00 to $3.00.
18  A cap of $30 cumulative limit per calendar year per physician for all physician services (physician visits, surgery, lab & X-ray services, and diagnostic tests).
19  Copayment may be charged only on the first 15 visits or $500.00 per year.
20  $.50 per 15 minutes for some services; $1.00 per procedure for others
21  Copayment is limited to the first 30 hours or $1,500 of accumulated services, per beneficiary, per calendar year.

SOURCE: NATIONAL GOVERNORS' ASSOCIATION, 1991

Page 4

130

Mr. WAXMAN. Thank you for your testimony.

We will now recess until 2 o'clock when we will come back to this room to complete the testimony.

[Whereupon, at 12:50 p.m., the subcommittee recessed, to reconvene at 2 p.m., the same day.]

AFTER RECESS

Mr. WAXMAN. The meeting of the subcommittee will come back to order.

Our next panel consists of representatives of large group purchasing organizations. Robert Bowen is Executive Vice President of AmeriNet Corporation. John Grotting is Vice President of Health One Corporation, and is appearing on behalf of American Healthcare Systems. Pete Penna is Professional Coordinator of Pharmacy Services Group Health Cooperative of Puget Sound and is appearing on behalf of Group Health Association of America.

William Green is Executive Vice President and Chief Operating Officer of Allcare Medication Services, Inc., appearing on behalf of the American Society of Consultant Pharmacists.

Jane Henry is Director of Pharmacy Services at Olathe Medical Center, Olathe, Kans., and is appearing on behalf of the American Society of Hospital Pharmacists.

Your prepared statements will be part of the record in full. What we would ask each of you to do is limit the oral presentation to no more than 5 minutes.

Mr. Bowen.

STATEMENTS OF ROBERT P. BOWEN, EXECUTIVE VICE PRESIDENT, AMERINET INC.; JOHN GROTTING, EXECUTIVE VICE PRESIDENT, HEALTH ONE CORP., ON BEHALF OF AMERICAN HEALTHCARE SYSTEMS; PETE M. PENNA, PHARMACY DIRECTOR, GROUP HEALTH COOPERATIVE OF PUGET SOUND, ON BEHALF OF GROUP HEALTH ASSOCIATION OF AMERICA; WILLIAM E. GREEN, CHIEF OPERATING OFFICER, ALLCARE MEDICATION SERVICES, INC., ON BEHALF OF AMERICAN SOCIETY OF CONSULTANT PHARMACISTS; AND JANE HENRY, DIRECTOR OF PHARMACY SERVICES, OLATHE MEDICAL CENTER, ON BEHALF OF AMERICAN SOCIETY OF HOSPITAL PHARMACISTS

Mr. BOWEN. Mr. Chairman, good afternoon. My name is Robert Bowen. I am Executive Vice President of AmeriNet, one of the largest health care group purchasing organizations in the country. I appreciate the opportunity to address you today and to express our thoughts and concerns relative to prescription drug costs at AmeriNet's 2,400-member health care providers.

Mr. Chairman, the health care industry has been served by organizations such as AmeriNet for more than 25 years. Over that period of time, countless billions of dollars have been saved by health care providers who acquire their specialized goods and services under the terms of contracts negotiated by group purchasing organizations.

GPO's negotiate prices of goods and services for acute care hospitals, nursing homes, HMO's, physician group practices, and many

131

other health care providers at costs below which those institutions could obtain individually.

These discounts are obtained by utilizing the large dollar volume purchases in conjunction with the ability to move market share from one vender to another.

Mr. Chairman, you have heard and seen testimony today which acknowledges the benefits derived by health care providers and payers, including Federal and State governments, from the activities of group purchasing organizations such as AmeriNet.

Congress has recognized that GPO's can help reduce health care costs for the government and private sector alike by enabling a group of purchasers to obtain substantial volume discounts on the prices they are charged. The testimony provided to you today by AmeriNet and others has quantified the negative impact which OBRA 1990 has brought to the health care industry.

We at AmeriNet have felt a very dramatic affect upon our ability to secure favorable pricing on prescription pharmaceuticals for our members since the effective date of OBRA 1990. Of 90 key oral pharmaceuticals under contract in 1990, only 17 increased by less than 10 percent on February 1, 1991—excuse me, January 1, 1991. Fifty-seven products increased between 10 and 50 percent, and 16 items increased by more than 50 percent, with 7 products over 100 percent in increases, and 3 with increases between 600 and 1,300 percent.

Our information reveals a considerable narrowing of the gap between contract pricing and normal published pricing. We calculate this narrowing of price directly attributable to OBRA 1990 cost, AmeriNet member institutions in excess of $18 million in 1991.

We are even more concerned for the future. Many of our long-term agreements with manufacturers did not expire in 1991. More will expire in 1992 and more again in 1993. We at AmeriNet fear significant increases in prices during 1991 will be even greater in 1992 and beyond.

Mr. Chairman, we appreciate the opportunity to share our thoughts with you on this most important matter. We urge you to adopt the corrective legislation proposed by Representative Slattery in H.R. 5614, which we feel will return healthy competitive pressure to the health care pharmaceutical market and at the same time provide much needed financial assistance to all public sector payers, which OBRA 1990 intended.

Thank you for your time.

Mr. WAXMAN. Thank you Mr. Bowen.

[Testimony resumes on p. 142.]

[The prepared statement of Mr. Bowen follows:]

132

**STATEMENT OF
ROBERT P. BOWEN
EXECUTIVE VICE PRESIDENT
AMERINET, INC.**

Mr. Chairman, I am Robert P. Bowen, Executive Vice President of
AmeriNet, Inc., located in St. Louis, Missouri.  On behalf of the 2,400 hos-
pitals, nursing homes, clinics, health maintenance organizations (HMOs),
and other health care providers who are members of AmeriNet — the
largest health care group purchasing organization in the United States —
I appreciate this opportunity to appear before your committee today to
discuss our experience with the rise in prescription drug prices and the
market changes and cost shifting that have occurred since the enactment of
the Omnibus Budget Reconciliation Act of 1990 (OBRA 90, P.L. 101-508).

<u>AmeriNet — The Nation's Largest Health Care GPO</u>

At the present time, AmeriNet represents over 2,400 health care providers
and maintains a portfolio of 800 purchasing agreements covering more
than 900,000 individual items.  Of AmeriNet's 2,400 health care provider
members, 933 are acute care hospitals with more than 141,000 beds.  Today,
AmeriNet services nearly 20% of all the acute care hospitals in the country.

During the year ending December 31, 1991, AmeriNet member health care
facilities purchased approximately $350 million in pharmaceutical prod-
ucts under AmeriNet agreements.  Projected pharmaceutical purchases for
1992 should exceed $475 million, a 36% increase over the previous year.

Many hospitals and other providers have long purchased prescription
drugs in large quantities for use by their patients.  For most hospitals and
health care providers, the prices of these products is negotiated by a group
purchasing organization (GPO) to which the provider belongs or is affili-
ated.

GPOs negotiate prices of goods and services for participating health care
providers at costs below those which the members would be able to obtain
individually.  GPOs are able to obtain significant discounts because of the
large volume of purchases represented by its members and other
economies arising from marketing and distribution that the manufacturer
realizes from this type of sale.

From the time it was founded in 1986, AmeriNet has successfully worked to
reduce health care costs through negotiated contracts with manufacturers
and distributors providing the goods and services used by its member
health care providers in meeting the needs of their patients.

133

Congress has acknowledged the positive impact that GPOs have had on the health care industry, specifically pointing out that "GPOs can help reduce health care costs for the government and the private sector alike by enabling a group of purchasers to obtain substantial volume discounts on the prices they are charged." [1]

Prior to the enactment of OBRA 90, nearly all pharmaceutical manufacturers offered reduced prices to large purchasers in order to increase their volume of sales to these customers and to increase their share of the market in comparison to their competitors. The discounts negotiated by large purchasers like AmeriNet have enabled us to control our drug costs, which, in turn, has had a beneficial effect on overall health care costs.

In 1991, pharmaceutical manufacturers' sales in the United States totaled $40.6 billion; of those sales, almost half were purchased by large private sector purchasers, such as GPOs, hospitals, HMOs, or pharmacies serving long-term care institutions.

### OBRA 90 "Best Price" Provisions

The Medicaid Prudent Pharmaceutical Purchasing provisions of OBRA 90, (Section 4401 of the Omnibus Budget Reconciliation Act of 1990, P.L. 101-508) was an attempt by Congress to achieve program cost reductions through the establishment of mandatory rebates for outpatient prescription drugs purchased under the Medicaid program.

Under OBRA 90, "[A]s of January 1, 1991, the federal government does not provide federal Medicaid matching funds (also known as federal financial participation [FFP]) to states for the drugs of a manufacturer that does not agree to provide each Medicaid program with a specific schedule of rebates for their prescription drug products." [2] The pertinent feature of the law is that in order for drug manufacturers to participate in Medicaid — which according to industry analysts represents 10-13% of the average drug company's business — they have to agree to provide rebates to state Medicaid programs.

[1] Committee on the Budget, U.S. House of Representatives, Report to accompany H.R. 5300 (H. Rpt. 99-727), p. 73
[2] Michael R. Pollard and John M. Coster, "Savings for Medicaid Drug Spending," Health Affairs, Project Hope, Summer 1991 Edition, p. 196

134

States were required to cover all medically accepted outpatient drugs of any manufacturer that signed an agreement with the Health Care Financing Administration (HCFA) acting on behalf of the states, to provide the rebate. In general, the amount of the rebate equals the greater of (1) a sliding percentage of the average manufacturers price (AMP) or (2) the difference between the AMP and the "best price" for a particular drug. It is the "best price" requirement that is usually applicable.

The law requires drug manufacturers who discount their products to other government programs, such as the Department of Veterans Affairs (DVA), and private sector purchasers, such as hospital systems, HMOs, and pharmacies that serve long term care institutions, to report the "best" of these discounts to the Medicaid program. Rebates to Medicaid are based on these discounted prices, which are referred to as "best prices."

### In The Wake Of "Best Price"— Cost Shifting

Mr. Chairman, it was the obvious intent of the legislation to contain the cost of drugs for the Medicaid program, not shift them to other governmental or private purchasers.

Yet, by requiring manufacturers to base their rebates to Medicaid on the greater of a flat discount of the average manufacturers price (AMP) or the difference between AMP and the "best price" charged by the company, the law has encouraged manufacturers to raise their prices to all customers, therefore shifting the costs of the rebate program to the private purchasers as well as the federal government. Furthermore, we believe that these requirements have also discouraged pharmaceutical manufacturers from offering discounts to certain high volume purchasers, like AmeriNet.

Prior to OBRA 90, purchasers could negotiate aggressively with manufacturers to obtain favorable prices, based on competition in the marketplace. After OBRA 1990, many of these negotiated prices have been raised or eliminated by the manufacturers.

According to data provided by the Health Industry Group Purchasing Association (HIGPA) — of which AmeriNet is a member — during 1991, manufacturers refused to submit bids for contracts with large purchasers

135

and the length of contracts signed in 1991 declined from an average of 3 years to an average of 9 months.  Of contracts with manufacturers that were signed during 1991, prices increased by an average of 20%.

From AmeriNet's experience, the impact of OBRA 90 was felt most dramatically in January of 1991.  Of the top 90 oral pharmaceuticals under contract in 1990, only 17 increased by less than 10% on January 1, 1991. Fifty-seven products increased between 10 and 50%, and 16 items increased by more than 50%, with 7 products over 100%, and 3 with increases of 600 to 1300%.

Perhaps even more meaningful is data received from a major pharmaceutical wholesaler, that the average chargeback levels — that is, the difference between wholesale acquisition price and contract price — dropped from 40% to 36% following institution of OBRA 90.

This indicates a considerable narrowing of the gap between contract pricing and normal published pricing.  If this difference is applied to all pharmaceutical purchases of all AmeriNet health care providers, the projected cost increase for AmeriNet members directly attributable to OBRA 90 is in excess of $18 million.

It is important to note that many long-term contracts with manufacturers did not expire in 1991; more will expire in 1992 and 1993.  Large purchasers fear that the significant increases in prices during 1991 will be even greater in 1992 and beyond.

Indeed, since enactment of OBRA 90, public purchasers and private purchasers alike have experienced substantial increases in the prices charged to them by pharmaceutical manufacturers.  These increases have been studied and confirmed by the Congressional Budget Office (CBO), the U.S. General Accounting Office (GAO), and the Office of the Inspector General (OIG) of the Department of Health and Human Services (HHS).

What AmeriNet has seen in the wake of enactment of OBRA 90 is very compelling.  Shortly after the law's enactment, significant pharmaceutical cost shifting began to occur as a result of the implementation of the law's rebate calculation provision.  Pharmaceutical prices started rising, pur-

136

chasing contracts were discontinued or significantly shortened, and levels of discounts previously given by drug makers disappeared.

We maintain that in response to the enactment of the "best price" rebate provisions, pharmaceutical manufacturers have engaged in massive cost shifting to other public as well as private purchasers to minimize the Medicaid "rebates" on drugs they are now required to provide. It is our firm belief that OBRA 90 has led manufacturers to rescind or greatly diminish their discounts to all purchasers. Furthermore, we believe the recent CBO analysis done on this issue substantially supports this belief.

Indeed, the "best price" provisions have resulted in the establishment of an artificial price floor for all buyers of drugs. Again, in our negotiations with pharmaceutical manufacturers, we have generally experienced the following:

• No discounts below the Medicaid rebate percentage with some price increases far exceeding the expected manufacturers offset for Medicaid rebates
• Manufacturers are declining to bid on group purchasing drug contracts thereby leaving the end user with full retail prices for their pharmaceutical requirements, and
• Manufacturers are refusing to provide price stability for the traditional contract periods.

These increased costs of pharmaceuticals used by hospitals and other health care providers in meeting the needs of their patients has resulted in a cost shift to other payors of care. Indeed, soon we will see the cost shifting impact on the Medicare program as the "market basket" will soon reflect these increased costs of providing inpatient hospital care to Medicare beneficiaries.

Other significant behavior by manufacturers is equally disturbing for private purchasers. Private purchasers like AmeriNet argue that not only are our prices going up, but in addition, our contracting costs are rising. The OIG states that "several manufacturers are no longer offering long term