**ANDERSON EXHIBIT 26J**

137

contractual agreements and canceling existing contracts."[3] Normal 3 year contracts are being shortened to 1 year or less by many manufacturers. Administrative costs for these purchasers are subsequently increasing rapidly.

## Pending Legislative Solutions

Several legislative measures have been introduced to address the issues raised by interested parties since the enactment of OBRA 90. They include the following:

**H.R. 5614, The Medicaid Prescription Drug Amendments Act of 1992 Representative Jim Slattery**

H.R. 5614, introduced by Representative Jim Slattery (D-KS) on July 9, 1992, would stop cost shifting by pharmaceutical manufactures and restore prescription drug discounts to various federal programs and private purchasers. H.R. 5614 rescinds the "best price" provisions of OBRA 90 and replaces it with a guaranteed percentage rebate or "flat rate discount phased in over four years," for single source and innovator multiple source drugs offered to the Medicaid program.

The flat percentage rebate would yield equivalent revenue to the Medicaid program this year and in all future years. The flat rebate would rise to 22% in FY93, 19% in 1994, 17% in 1995, and 16% thereafter. The percentage rebate used in H.R. 5614 is derived from Congressional Budget Office analysis of the amounts necessary for budget neutrality.

**• AmeriNet Position**

AmeriNet wholeheartedly endorses H.R. 5614 and commend Representative Slattery on this initiative. It eliminates "best price" and the numerous problems it is causing for private and public purchasers. A guaranteed percentage rebate will ensure that the benefits of OBRA 90 are not lost by Medicaid programs in future years. A guaranteed percentage rebate will restore the market forces that have allowed purchasers like

---

[3] HHS/OIG (A-14-91-02057) "Medicaid Drug Rebates: Impact of the Omnibus Budget Reconciliation Act of 1990 on Drug Expenditures Including Best Prices," September 25, 1991, p. 5

138

AmeriNet to restrain rising drug costs.

Most importantly, the measure extends the prices obtained by Medicaid to other vital federal programs, and it achieves this without imposing price controls or other governmental regulations.

Representative Slattery has stated that he would be willing to accept a "fixed flat rate discount."  AmeriNet would support the establishment of a fixed flat rate percentage discount that would extend in perpetuity.

### H.R. 3405, Representative Ron Wyden

Representative Wyden's bill extends the rebates provided in the Medicaid law to health facilities covered under the Public Health Service Act.  It does not alter the rebate mechanism, nor does it extend the rebates to the DVA.

The bill includes a provision directing the Secretary of HHS in cooperation with the various PHS facilities to "attempt" to negotiate for new contracts that would rollback prices to those experienced in 1990, with a consumer price index (CPI) adjustment for 1991.

Representative Wyden has indicated support to repeal the "best price" provision and replace it with a flat percentage of 22% for all years.  His proposal would extend the flat rebate and additional rebate to the DVA; it also extends the Medicaid rebate to users of the federal supply schedule, health facilities covered by the PHS and Medicare "disproportionate share" hospitals.

### • AmeriNet Position

AmeriNet applauds Representative Wyden's interest and leadership in replacing the prescription drug rebate mechanism with a flat percentage of 22% for all years.

While we are pleased that he is addressing public programs' concerns in his measure, private and public purchasers alike have experienced higher drug costs.  The rebate formula should not penalize other purchasers who obtain market-based discounts or rebates from pharmaceutical manufac-

139

turers. The intent of OBRA was to focus on cost control measures on man-
ufacturers and not to have Medicaid beneficiaries or private purchasers
absorb the cost of these efforts. Accordingly, we respectfully request that
private health care providers' concerns also be addressed in any solution.

AmeriNet vigorously opposes the roll back provision because of its price-
setting characteristics.

One last comment on the Wyden proposal...initiatives to create a new re-
bate provision to benefit disproportionate share hospitals raise many con-
cerns from an equity standpoint. We believe that eliminating the pervasive
incentives of OBRA's "best price" provisions will substantially return mar-
ket forces to pharmaceutical purchases for all providers.

**H.R. 2890, Representative G.V. (Sonny) Montgomery**

This measure extends the Medicaid rebate to the Department of Veterans'
Affairs by including the DVA as a participant in the rebate program. H.R.
2890 also includes a rollback to September, 1990, and makes no reference to
the additional rebate found in the Slattery bill.

• AmeriNet Position

AmeriNet is concerned that while H.R. 2890 will afford necessary protec-
tion to the DVA it does not extend similar protection to other public and
private purchasers. In addition, AmeriNet opposes the rollback provision
of H.R. 2890 because of its price-setting implications.

<u>Recommendations</u>

Mr. Chairman, the rising costs of health care, and particularly the costs of
prescription drugs, threaten the availability of needed services for many
Americans. It is time that we act to stop this upward spiral and encourage
the manufacturers of prescription medicines to once again offer the dis-
counts and price concessions that benefit us all.

The disruption caused by cost shifting and the loss of discounts by both fed-
eral and private purchasers of prescription drugs calls for legislation to

140

remedy the unintended consequences of OBRA 90. AmeriNet is actively supporting responsible measures that help contain the escalating cost of pharmaceuticals for <u>all</u> purchasers, including the Medicaid program.

Specifically, AmeriNet supports Representative Slattery's initiative as the best way to achieve the objectives intended by OBRA, specifically by assuring the Medicaid program and other purchasers access to discounted prices for prescription drugs. It is a responsible and actuarially sound starting point for negotiations. H.R. 5614 solves the problems generated by OBRA 90 by providing a broader solution that is comprehensive in scope, for it pertains to both private as well as public sector purchasers.

AmeriNet supported the enactment of the Medicaid best price provisions in OBRA 90 and continues to believe that state Medicaid programs should receive discounts for pharmaceuticals procured for indigent beneficiaries in their respective states. Certainly, Medicaid prescription drug costs should continue to be at a more favorable level than was the case prior to the enactment of OBRA 90 and those costs should be stable and predictable.

But, Mr. Chairman, we seem to be fighting a circular battle over the definition of "best price." Of course, Medicaid and other public programs should be getting as favorable discounts as is the private sector, but these discounts must be obtained through prudent group purchasing practices, not by trying to capture any one sector's "best price" and mandating that it be spread around. "Best price" is leaving the market — the GAO has said it, CBO has said it, the OIG has said it, and health care providers are saying it as well.

The rebate formula should not penalize other government and private purchasers who obtain market-based discounts or rebates from pharmaceutical manufacturers.

With the elimination of the best price from the Medicaid discount formula, large purchasers of pharmaceuticals such as AmeriNet will be able to negotiate discounts with the manufacturers, based upon the volume of purchases. Medicaid's flat discount rate would no longer have an impact on these negotiated prices.

141

A flat percentage rebate for the Medicaid program is essential to reestablishing a competitive market for pharmaceuticals and restoring the negotiating position of pharmaceutical purchasers. Other advantages a guaranteed flat percentage rebate has over the "best price"-based rebate include:

• A guaranteed percentage rebate for the Medicaid program will assure that the states realize substantial and sustained savings on their drug purchases in future years.
• A flat rebate will give the Medicaid program certainty about the size of the rebates that can be expected as well as restore competitive forces in the prescription drug market.
• A flat rebate will eliminate drug manufacturers' incentives to raise prices across the board and will encourage them to again negotiate with large volume purchasers.
• Replacing the best price formula with a simple flat percentage rebate off the average manufacturer's prices would be easy to administer.

In order to achieve the spirit of the "best price" and also allow a return to market forces in the drug market, the Medicare rebate law should be revised to replace the "best price" provision with a guaranteed flat percentage rebate. A flat percentage rebate would be auspicious for the Medicaid program as well as high volume purchasers in both the private and the public sector. Such a rebate would restore market forces, returning the power to negotiate to bulk purchasers such as the DVA, public and private hospitals, HMOs, GPOs, and others.

Conclusion

On behalf of the 2,400 health care providers serviced — and the patients they care for — AmeriNet wants to be able to resume effective and responsible negotiations with prescription drug manufacturers. In order to achieve this objective, we feel that the "best price" provisions contained in OBRA 90 must be repealed and an alternative formula for the Medicaid rebates must be adopted. AmeriNet believes that the most effective solution would be to substitute a guaranteed percentage rebate to the states for the "best price" formula mechanism.

Replacing the mechanism used to calculate the rebate with a guaranteed percentage of the AMP will serve to remedy the unintended adverse effects of the rebate calculation, i.e., cost shifting to other payors. Of equal importance, however, a guaranteed percentage rebate for the Medicaid program will assure that the states will realize substantial and sustained savings on their drug purchases in the future.

We enthusiastically support the Slattery legislation and the adoption of an actuarially sound fixed percentage rebate formula to replace the best price provisions of OBRA 90.

Mr. Chairman, thank you again for this opportunity to appear before your panel. I would be happy to entertain any questions you or other committee members might have.

142

Mr. WAXMAN. Mr. Grotting.

## STATEMENT OF JOHN GROTTING

Mr. GROTTING. Mr. Chairman, my name is John Grotting. I am Executive Vice President of Health One based in Minneapolis, Minnesota. We operate 15 hospitals, principally in the State of Minn., but also in Michigan, Wisconsin, Iowa, and South Dakota. We also assist roughly 80 small rural hospitals with their purchasing needs through our organization.

We basically are a nonprofit organization with a mission of health service to those communities. We are also typical of the some 39 other health care systems that have joined together in American Health Care Systems representing about 1,000 hospitals that do group purchasing together.

Essentially the key point that we would like to share with you today is that the effect of OBRA 1990 was to remove from those of us that are responsible for managing hospitals a key tool in controlling our health care costs: The ability to negotiate pharmaceutical costs. We feel that Congressman Slattery's legislation, H.R. 5614, helps reinstate some of the negotiating ability that we have to continue a true best price in the market.

What I would like to do is just share a couple anecdotes or facts with you that might support this. It might interest you to know that in my—our principal state of business, Minnesota, we have health care costs that are about 20 percent below the national average. About 88 percent of our services are provided to people who are on a fixed or capitated arrangement or a very significantly discounted arrangement, so our focus on cost is extremely intense.

The pharmaceutical costs in our organization represent about $15 million per year, and each of the last 2 years, since the implementation of OBRA 1990, we have seen increases of about 15 percent each of those 2 years. To us, that represents an increase of about a little over $2.25 million a year, and to an organization that is so closely focused on costs, it has had a significant impact on us.

We, as Mr. Bowen has alluded to, are participants in a group purchasing organization, American Health Care Systems, and one of the things we have found as an organization that purchases for some 1,000 hospitals is that in the 3 years prior to OBRA 1990 we saw decreases in our purchasing costs of about 6 percent per year. Following the passage of OBRA 1990, we saw a turnaround in that and have had net increases since that time.

A specific example to share with you is that we, prior to this OBRA 1990 legislation, had purchased a vial of insulin used by a diabetic for $4.15 per vial. Following the passage of OBRA 1990, we were advised by the drug company it would be necessary to increase our prices. Those prices were increased by 73 percent to $7.20 per vial and, again, it was specifically told to us that it was because of OBRA 1990.

Frankly, our position today should be stronger than it has been in the past because we have more hospitals and more volume committed to these purchasing arrangements and yet our purchasing clout in negotiating these arrangements has declined.

143

I think the situation is of great concern to us today, but as we look at the increases in biotechnical drugs in the future we are even more concerned. We are seeing some estimates that our costs will increase to close to 20 percent of our total budgets involved in pharmaceutical purchases.

So I would like to conclude by just urging your support of Congressman Slattery's legislation H.R. 5614. We as hospitals know we have to be very focused on containing and reducing health care costs. We are working very hard at that, and we would appreciate your support in our ability to control our pharmaceutical costs. Thank you very much.

Mr. WAXMAN. Thank you.

[The prepared statement of Mr. Grotting follows:]

STATEMENT OF JOHN GROTTING, EXECUTIVE VICE PRESIDENT, HEALTH ONE CORPORATION

Mr. Chairman, members of the subcommittee, my name is John Grotting. I am Executive Vice President of the Health One Corporation in Minneapolis, Minn. Health One is a health care system which serves 15 communities located in Minnesota, Wisconsin, Michigan, Iowa and South Dakota. We also assist approximately 80 small and rural facilities in this same area by managing their purchasing needs, which include pharmaceutical products. We are a non-profit organization with a specific mission to provide patient care and health care support services to our communities. Health One provides approximately $4 million in pure charity care each year in addition to a wide range of community service activities.

Our annual operating budget for patient care is $459 million. Of this, 3.2 percent, or $15 million, is spent to purchase pharmaceutical products. These costs have risen by 15 percent each year during the last 2 years. This means we have incurred an approximate increase of $2.2 million in the cost of our pharmaceutical products. Health One only has a net margin of $6.9 million (1.5 percent) per year, so a $2.2 million increase is a lot for us to absorb.

It may be of interest to you to know that 88 percent of our patients are cared for under some form of fixed or significantly discounted payment system resulting in an intense focus on our cost of delivering patient care. In our area the effect of managed care increased dramatically in recent years and has helped contribute to health care costs being 18 percent below the national average in our principle state of operation, Minnesota. Additionally, when compared to other States, Minnesota ranks lowest in a number of key statistics concerning the utilization of health care services, indicating a conservative pattern of practice by providers.

In the 1980's, government encouraged hospitals to become more competitive to reduce costs. In 1983, in response to that pressure, Health One joined together with other not-for-profit multi-hospital systems to form American Healthcare Systems (AmHS). The goal of AmHS was to ensure the availability of high quality health care services to patients at a reasonable and affordable price. Since that time AmHS has grown to serve 40 multi-hospital systems in 47 States.

One of the services AmHS provides Health One is discounted pricing on pharmaceutical products through a group purchasing mechanism. We gave up our individual interest so that on a collective basis we could use our volume purchasing in the market to reduce our health care cost. Each year AmHS purchases $1.2 billion in pharmaceutical products for more than 1,000 health care facilities. Of these purchases, $700 million are at discounted prices negotiated by AmHS from 100 pharmaceutical manufacturers.

Under the AmHS purchasing organization, we have had particularly good experience stabilizing the rise in our cost of pharmaceuticals at a time when new and more costly drugs were being introduced at a rapid rate. We believe that the Medicaid drug rebate provisions of the Omnibus Reconciliation Act of 1990 (OBRA 1990) diminished our ability to realize the advantages of economies of scale in the pharmaceutical market. The impact of this change in the law has resulted in an increasingly difficult task of managing the cost of providing health care services. For example, for the 3 years prior to enactment of OBRA 1990, we successfully negotiated contracts with manufacturers that produced net decreases on our contract prices of 6 percent per year; after enactment, our contract negotiations led to net increases in the past 2 years.

144

A specific example of the negative impact of this involves the cost of insulin, a product which is sold by two pharmaceutical companies. In December of 1990, prior to the passage of the legislation, our cost for insulin was $4.15 per vial. Immediately following the passage of OBRA 1990, we were advised that the hospital discount prices would be leaving the market. In January of 1993, we will be paying $7.20 per vial, although the actual cost to manufacture this pharmaceutical has not increased. The price escalation of insulin over just 2 years has been 73 percent. The manufacturer even told the AmHS pharmaceutical purchasing department that the increase was due to the Medicaid rebate law.

This has become an all-too-common experience for our organization. During the last 2 years, the prices paid under AmHS pharmaceutical contracts with most drug manufacturers have risen significantly. In addition, manufacturers previously negotiated 5 year contracts so hospitals could better budget their drug costs. We now typically can only get 6-month contracts, leaving our hospital drug budget open to great uncertainty.

In analyzing the various factors which could have contributed to this erosion, it became clear to us that the OBRA 1990 change in the Medicaid law is the principle reason. In fact, during this same time period AmHS should have actually experienced a stronger negotiating position in the market place because more hospitals joined our purchasing program and existing members were strengthening their commitment to the group purchasing approach. These two factors gave us increased committed volume available for contracting. The legislation has encouraged pharmaceutical companies to ignore past market realities, such as the volume of purchases or commitment to purchase certain products.

We strongly believe the legislation introduced by Congressman Slattery, H.R. 5614, the "Medicaid Prescription Drug Amendments Act of 1992," would benefit the Medicaid program and restore our ability to negotiate with the pharmaceutical manufacturers.

A Congressional Budget Office (CBO) report issued on June 22, 1992 confirms the drug pricing patterns I have outlined today. The 1990 OBRA has so skewed the market for pharmaceutical products that there is, in effect, no "best price." The CBO report shows that in the near future, neither manufacturers nor the Medicaid program will be able to procure drugs at prices below the artificial floor set in OBRA 1990. In short the Medicaid Program will be unable to rely on our ability to negotiate favorable prices as proponents of the 1990 legislation originally intended. A fixed flat rate off of the Average Manufacturers Price (AMP) which captures the intended savings for Medicaid would be far better than current law. Any group purchaser would be ecstatic to receive a flat discount off of AMP for all its pharmaceutical purchases. As I stated earlier in my testimony, discounts are negotiated for only a little over half of the drugs we purchase. For the rest we pay list price. In addition, a flat discount greatly simplify the administration of the program making less costly for the States.

It is important that we have the tools we need to control our cost of pharmaceuticals. We expect our pharmaceutical purchases to be closer to 20 percent of our operating budget by the year 2000 due to the increasing number of biotech drugs entering the market. A most dramatic example involves a monoclonal antibody known as Centoxin which will be used for treatment of blood infections at an estimated per-dose cost of $4,000. Interlukin-2 which will be used to treat cancer patients is expected to cost $9,000 per course of therapy. There are more than 100 biotech drugs in various stages of development with the potential of being marketed in the near future. Most, if not all, are expected to be very costly.

Short term, we are being hurt by the "best price" provision in the Omnibus Budget Reconciliation Act of 1990. Long term, if we cannot regain our negotiating strength with drug manufacturers, hospitals will face an uncertain future as we struggle to manage the cost of the projected 20 percent share that pharmaceuticals will occupy in our budgets in the year 2000. It could easily be higher if we cannot regain our clout in the market.

In addition, H.R. 2890, which was reported by the House Veterans Committee on November 13, 1991, would roll back prices for drugs purchased by VA hospitals and clinics to 1990 levels. it would not, however, address the new biotech drugs now coming onto the market. Congressman Slattery's bill, H.R. 5614 would guarantee a flat discount for these drugs, and in our view is a more favorable program for VA hospitals.

Mr. Chairman, our public policy priority must be a focus on health care cost containment. At Health One our hospitals operate in a highly managed care environment with increasing number of our patients being cared for on a fixed price or capitated basis. We expect that any solution to the Nation's health care problems will,

145

and should, place additional cost pressures on hospitals. We must, therefore, have the ability to manage our input pharmaceutical prices in order to contribute to the national goal of controlling health care costs.

Please pass H.R. 5614 this year.

Mr. WAXMAN. Mr. Penna.

### STATEMENT OF PETE PENNA

Mr. PENNA. Good afternoon, Mr. Chairman, and members of the subcommittee. My name is Pete Penna, I am Pharmacy Director at Group Health Cooperative of Puget Sound, a 365,000-member staff model HMO located in the Seattle area of Washington State.

We operate 37 clinics and two hospitals, as well as an inpatient unit in a third hospital, and will be opening a skilled nursing facility at the end of the summer. Each facility has a pharmacy to serve the prescription drug needs of all our members.

I appear here today on behalf of the GHAA, the oldest and largest trade association for HMO's, whose member organizations serve approximately two-thirds of the 38.6 million individuals enrolled nationwide in 550 HMO's.

GHAA strongly supports H.R. 5614, introduced by Congressman Slattery, which would repeal the best price Medicaid discount language under the Prescription Drug Reform Act and replace it with a required flat percentage drug rebate for single source and innovator multiple source drugs.

We feel that this approach represents a responsible way to address the unintended effects of the best price calculation on certain public and private entities while assuring the Medicaid program a discount comparable to the one it currently receives.

To date, however, the impact of OBRA 1990 on the private sector and certain government agencies such as the VA has been disturbing. Specifically, the impact of this law on HMO's has been to discourage cost efficient pharmacy practices. Under the best price calculation, manufacturers have no incentive to give HMO's and other large volume purchasers significant discounts because they would also have to give the same discounts to Medicaid. This inevitably results in higher prescription drug costs for providers like HMO's and, ultimately, consumers. And, in turn, this results in a smaller discount for Medicaid as these discounts deteriorate.

Let me briefly explain how HMO's have been successful in managing pharmacy benefits in the past. Over the years, many HMO's have developed highly sophisticated pharmaceutical delivery systems. Through the use of P and T committees, formularies, generic and therapeutic substitution systems, HMO's have been able to negotiate discounts with drug manufacturers in exchange for volume purchases and directed use of their products, based on appropriate therapeutics.

At Group Health, we are able to meet the pharmaceutical needs of our patients in both inpatient and outpatient settings through the use of negotiated contracting activities, as well as our formulary management activities. We have done this at a cost of 55 percent less than what it would cost to deliver equivalent drugs and therapeutics to the average U.S. citizen. However, since the introduction of this law, our ability to maintain this differential has eroded significantly.

146

In 1991, at Group Health we have found annual drug expenses to have increased over normal drug expectations in 1991, from $32,135,000 to $34,106,000 as a result of OBRA 1990. This could have been used in smoking cessation programs, improvement in our programs for infants and children and so on.

We have based this analysis on pricing trends going back 10 years, defining actual rates of inflation each year, versus expected rates of inflation based on past history and trends. It is through this analysis that we attribute this 6.1 percent increase directly to price increases, contract cancellation, et cetera, resulting from OBRA 1990.

Prior to OBRA 1990, we had been able to meet the pharmaceutical needs of our patients at a cost of approximately 45 percent of the national average. It is now starting to cost us substantially more to provide the same benefit. We attribute this to cost shifting, contract cancellation, and aggressive pricing practices by the pharmaceutical manufacturers to OBRA 1990.

Further, we have had experience with several drug companies who readily admit that they were increasing prices or canceling contracts because of OBRA 1990. In other cases, drug companies apparently decided that it would not be in their best interest to cancel contracts or publicly state that they were changing prices because of this law.

Instead, they have maintained most of their contracts, but made up the difference by increasing the prices dramatically for some of their very popular drugs which were not under contract. These companies appear to abide by the law, while at the same time pass along price hikes to the rest of society that would more than pay for their donation to Medicaid. There were some companies who continued doing business in good faith with us.

In conclusion, we strongly support the notion of reducing prescription drug costs to the Medicaid program. However, the unintended effect of the best price calculation has significantly impacted the ability of HMO's to provide affordable health care to its members.

For years, managed care has tried to provide access and the best possible value to its members in terms of a pharmaceutical benefit. We urge Congress to look at the broader picture of reform of this law for both public and private entities since both are significantly affected by the increases in drug prices resulting from the Medicaid best price.

Mr. Chairman, we support the efforts of Congressmen Slattery and Wyden to address this issue in a comprehensive and expedient manner, and would be pleased to work with the committee to solve this problem.

Mr. WAXMAN. Thank you, Mr. Penna.

[The prepared statement of Mr. Penna follows:]

147

STATEMENT OF
GROUP HEALTH ASSOCIATION OF AMERICA, INC.

Good morning Mr. Chairman and members of the Subcommittee, my name is
Pete Penna. I am Pharmacy Director at Group Health Cooperative of Puget
Sound, a 365,000 member staff model HMO located in the Seattle area of
Washington state. We operate 37 clinics and 2 hospitals, as well as an
inpatient unit in a third hospital, and will be opening a skilled nursing
facility at the end of summer.

Each facility has a pharmacy to serve the prescription drug needs of all our
members. This includes our 55,000 members that are federal employees and
their families, 97,000 members who are state and local employees and their
families, some 41,000 Medicare enrollees, as well as, 2,100 Medicaid enrollees.

I appear here today on behalf of the Group Health Association of America, Inc.
(GHAA), the oldest and largest trade association for HMOs, whose member
organizations serve approximately two-thirds of the 38.6 million individuals
enrolled nationwide in 550 HMOs.

GHAA strongly supports the Medicaid Prescription Drug Amendments,
H.R. 5614, introduced by Congressman Slattery. This bill would repeal the
"best price" Medicaid discount language under the Prescription Drug Reform
Act of 1990 (OBRA 90 - P.L. 101-508), and replace it with a required flat
percentage drug rebate for single source and innovator multiple source drugs -
similar to that currently required for generic drugs.

We feel that this approach represents a responsible way to address the
unintended effects of the best price calculation on certain public and private
entities while assuring the Medicaid program a discount comparable to the
one it currently receives.

148

-2-

As you know, the OBRA 90 required drug manufacturers to offer Medicaid the equivalent of their "best price" in the market on single-source and innovator multiple source drugs. Rebates for generic drugs are calculated under the law using a flat percentage (10-11%) off of the Average Manufacturers Price (AMP).

Using calculations off of AMP alone this represents significant savings to the Medicaid programs since, prior to OBRA 90 most states were receiving limited discounts of 5-10% off of the Average Wholesale Price (AWP). ( AWP is typically 18% more than AMP.)

Further, the law provides for what is called an "additional rebate". The additional rebate is one that protects states against inflation and requires an additional rebate for drugs which increase in price at a rate faster than the rate of inflation. States receive significant savings from the additional rebate provision in addition to savings received under the best price and flat percentage calculations of the law.

To date however, the impact of this legislation on the private sector and certain government agencies such as the Department of Veteran's Affairs (VA), has been disturbing.

Specifically, the impact of this law on HMOs has been to discourage cost efficient pharmacy practices. Under the best price calculation, manufacturers have no incentive to give HMOs and other large volume purchasers significant discounts because they would also have to give the same discounts to Medicaid. This inevitably results in higher prescription drug costs for providers like HMOs and consumers. And, in turn, this results in a smaller discount for Medicaid as these discounts deteriorate.

149

-3-

Let me briefly explain how HMOs have been successful in managing pharmacy benefits in the past.

## HMO PHARMACY SERVICES

According to data collected for the 1991 GHAA Industry Profile, 97 percent of all HMOs covered pharmaceuticals in their best selling benefit package. While almost all HMOs required some patient payment for drug benefits in 1990, this was usually in the form of a five dollar copayment per prescription or refill. This benefit is usually offered without a deductible or limit. Overall, 87 percent of all HMO enrollees have prescription drug benefits. At Group Health Cooperative of Puget Sound, 98.6% of our members have a prescription drug benefit -- this includes commercial, small group and public enrollees. We believe that access to an affordable drug benefits is crucial for treatment of episodes of illness as well as treatment for chronic illness.

HMOs are known for their cost efficient use of health care services. Over the years, many HMOs have developed highly sophisticated pharmaceutical delivery systems. Through the use of formularies, generic and therapeutic substitution systems, HMOs have been able to negotiate discounts with drug manufacturers in exchange for volume purchases and directed use of their products, based on appropriate therapeutics.

For example, at Group Health Cooperative we use a formulary system under the control of the Pharmacy & Therapeutics (P&T) Committee, which consists of physicians, pharmacists, a physician's assistant, a nurse, and a researcher; all of whom have an interest in and expertise in the use of drugs. In many cases, the P&T committee has determined that most of the drugs in a particular class of drugs are reasonably equivalent for most patients.

150

-4-

In these instances, the decision on which drug should be added to the formulary may be based on economics. In these situations we negotiate with the various manufacturers to obtain the best long-term deal for our members.

For example, several years ago, we were concerned with the use of and expenses associated with a class of drugs called Beta Blockers. These drugs are used widely to treat high blood pressure, heart irregularities, angina, etc. At the time, there were 9 different Beta Blockers available for oral use, and Group Health had 4 of these on it's formulary. Several of our physicians wanted us to consider adding some of the other agents to the formulary. The committee undertook a study to investigate all of the drugs available, and ultimately decided that for all practical purposes, we had more than enough variety of Beta Blockers on our formulary to meet patient needs. Further, the committee determined that for routine use with our patients, these drugs could all be considered therapeutically equivalent. Physicians are encouraged to prescribe selectively among drugs on the formulary before going on to other agents in the class; therefore increasing the use of drugs on the formulary and guranteeing greater volume purchases for these drugs. In this instance, we have already realized savings of several hundred thousands of dollars per year in Beta Blocker expenditures, while promoting the use of a very therapeutically and cost effective agent for use by our patients.

As a result of these types of contracting activities, as well as our formulary management activities, Group Health Cooperative has been able to meet the pharmaceutical needs of our patients in both inpatient and outpatient settings. We have done this at a cost of 55% less than what it would cost to deliver equivalent drugs and theraputics to the average U.S. citizen. However, since the introduction of the Prescription Drug Reform Act

151

-5-

of 1990, our ability to maintain this differential has eroded significantly.

We are concerned that the unintended effects of the best price calculations under the law seriously jeopardize our ability to provide affordable prescription drug benefits to enrollees.

### IMPACT ON HMOs

In April 1991, shortly after the law went into effect, GHAA conducted a preliminary survey of its members that confirmed initial reports that drug manufacturers were in fact modifying their behavior and practices. Specifically, HMOs reported that drug manufacturers were:

- delaying renegotiations for discounts,
- reducing discounts significantly,
- eliminating discounts,
- reducing typical multi-year contracts to single-year and monthly contracts, and
- voiding existing contracts not otherwise up for renegotiation.

Based on data from contracts renegotiated between October 1990 and April 1991, contract price increases ranged from 20 to 1,000 percent as compared to previous year increases that ranged from 0 to 20 percent. The reason cited by drug companies for these increases has overwhelmingly been the passage of the Prescription Drug Reform Act.

At Group Health Cooperative, we have found annual drug expenses to have increased over normal drug expectations in 1991 from $32,135,000 to

152

-6-

$34,106,000 as a result of OBRA 90. We have based this analysis on pricing trends going back 10 years defining actual rates of inflation each year, versus expected rates of inflation based on past history and trends. It is through this analysis that we attribute this 6.1 percent increase directly to price increases, contract cancellation, etc. resulting from OBRA 90.

Whereas, prior to OBRA 90 we had been able to meet the pharmaceutical needs of our patients at a cost of approximately 45% of the national average, it is now starting to cost us substantially more to provide the same benefit. We attribute this to cost shifting, contract cancellation, and aggressive pricing practices by the pharmaceutical manufacturers.

Further, we have had experience with several drug companies who readily admit that they were increasing prices or canceling contracts because of OBRA 90. In other cases, drug companies apparently decided that it would not be in their best interest to cancel contracts or publicly state that they were changing prices because of OBRA 90. Instead, they have maintained most of their contracts, but made up the difference by increasing the prices dramatically for some of their very popular drugs which often have no competitors and were not under contract. These companies appear to abide by the law, while at the same time pass along price hikes to the rest of society that would more than pay for their donation to Medicaid.

Increases of this magnitude seriously jeopardize an HMO's ability to provide access to affordable prescription drug benefits at a reasonable price. These will impact all enrollees of an HMO, including Medicaid and Medicare eligibles, federal, state and local government employees and employer groups, including small employers. These price increases may affect an employer's

153

-7-

ability to arrange for coverage with an HMO and if copayments must be substantially increased to reflect the drug price hikes, it may affect an individual's ability to purchase these drugs.

At the same time, we believe that these increases will also result in smaller discounts to the Medicaid program.

## CBO REPORT

In June, the Congressional Budget Office (CBO) verified the erosion of deep discounts in the market. After collecting information from the Health Care Financing Administration (HCFA), the Department of Veterans Affairs (VA), the Office of the Inspector General at the Department of Health and Human Resources and the private market; CBO estimated that if the "best price" provision was replaced with a budget neutral flat rebate these percentages would be:

22% in 1993,

19% in 1994,

17% in 1995, and

16% thereafter.

The declining percentage reflects the further deterioration of best price rebates as more an more discount contracts come up for renegotiation.

To date, these numbers represent the only estimates done that look to replacing best price with an actuarially sound flat percentage that would guarantee that the Medicaid program remain whole.

154

-8-

H.R. 5614 would replace the current calculation with a budget neutral percentage. We believe that this approach assures the states that they would receive discounts comparable to those they currently receive. Further we believe that this system would be much easier and less costly for the states and HCFA to administer.

**CONCLUSION:**

We strongly support the notion of reducing prescription drug costs to the Medicaid program. However, the unintended effect of one provision of the law has significantly impacted the ability of HMOs to provide affordable health care to its members.

For years, managed care has tried to provide access and the best possible value to its members in terms of a pharmaceutical benefit. We have done this by careful use of a formulary system to help assure appropriate and effective drug use, and a program of contracting with pharmaceutical manufacturers to get the best possible prices in return for increased market share or volume whenever therapeutically appropriate. Most importantly, these discounts for drugs have been passed on to our enrollees in the form of comprehensive and affordable benefits in a time when health care costs are soaring.

We urge Congress to look at the broader picture of reform of this law for both public and private entities, since both are significantly affected by the increases in drug prices resulting from the Medicaid "best price" discount calculation language. The impact of not making this change or making an adjustment for just one segment of drug purchasers, would be to

155

-9-

encourage further cost shifting on the most efficient of health care providers, discourage cost efficient pharmacy practices, and disrupt the HMO practices that served as the very model for the original Medicaid prescription drug reform legislation sponsored by Senator Pryor.

GHAA supports H.R. 5614 because we believe it is a responsible way to address the unintended effects of the best price calculation on certain public and private entities, while assuring the Medicaid program a required discount, comparable the one they currently receive.

Mr. Chairman, we support the efforts of Congressmen Slattery and Wyden to address this issue in a comprehensive and expedient manner and would be pleased to work with the Committee to solve this problem.

156

Mr. Waxman. Mr. Green.

### STATEMENT OF WILLIAM E. GREEN

Mr. Green. Good afternoon, Mr. Chairman, committee members. I am Bill Green, the Chief Operating Officer of Allcare Medication Services, Inc., and a consultant pharmacist. I speak here on behalf of the American Society of Consultant Pharmacists, representing more than 4,800 long-term care pharmacists in the United States. As consultant pharmacists, we serve the pharmacy needs of many of the Nation's elderly, nursing homes, and other long-term care institutions.

Consultant pharmacists serve a protective role for many of our most vulnerable citizens. With the help of Congress in OBRA 1987, we have made great strides in preventing such past destructive practices as "chemical straitjackets." We have been, and want to continue to be, in the forefront of creating new and better services for our nursing facilities and the patients they serve. As a consultant pharmacist, I have a singular concern—the well-being of the elderly patients of the institutions I serve. It is this singular concern that brings me here today.

The sharply increased prices we have suffered since the enactment of OBRA 1990 threaten to weaken our ability to continue to develop and provide new and important services. The Medicaid rebate provisions of OBRA 1990 created serious and unanticipated disruption in the market for outpatient pharmaceuticals. The manufacturers who had provided us with discounts have generally ceased doing so.

Not surprisingly, Medicaid rebates have not come from the manufacturers' bottom lines; rather the best price formula has caused contractual discounts to evaporate. The result has been sharp increases in the prices for prescription drugs for us, the institutions we serve, and our elderly patients. All that we have worked to accomplish on behalf of these elderly citizens may be in jeopardy, as our costs for acquiring medications continue to rise dramatically.

The price increases that ASCP members have experienced across the board are very significant and are directly related to the so-called "best price" proviso. Over 75 percent of the drugs purchased under contract by our group purchasing organization prior to OBRA 1990 have increased dramatically since enactment. Some manufacturers have ceased contracting with the buying groups altogether.

These have been the principal adverse effects of OBRA 1990. They cannot be ignored. The wait and see attitude of some here today is nothing more than ostrich economics.

Obviously, it was not the intent of Congress in enacting OBRA 1990 to provide a rebate for our Medicaid system by transferring the cost to other government, Veterans Administration, and private drug purchasers. But that has been the result of OBRA 1990. The market has been thoroughly disrupted.

The Department of Veterans Affairs, community health centers, and other public purchasers have the same problem as we do—and, the cause is no different. The State Medicaid programs face uncer-