**ANDERSON EXHIBIT 26K**

157

tainty and declining rebates, as has been documented by the recent CBO analysis showing best prices evaporating from the market.

The only groups wedded to best price are those few who want a one price system—a one high price. Do the American people benefit from paying uniformly high drug prices? Certainly, nursing home residents do not.

The so-called best price formula also imposes a significant administrative burden on HCFA and the State Medicaid agencies. Tracking best prices is an administrative nightmare. The people who work on the front lines of the rebate program can attest to the blizzard of paperwork and the numerous disputes that the best price formula has created. The formula should be simplified.

Fortunately, a common solution is within our grasp. We support Congressman Slattery's bill, H.R. 5614, which would replace best price with a flat percentage rebate that tracks the analysis of the Congressional Budget Office. H.R. 5614 is budget neutral and would not reduce the rebate revenue now flowing to the States. A flat percentage rebate would guarantee the State Medicaid programs the gains they made in OBRA 1990, while righting a now dysfunctional market.

Congressman Wyden is also proposing a similar change in the law that would replace best price with a flat percentage rebate that is the same for all years and would extend the Medicaid rebates to other federally-funded health clinics. Congressman Wyden is to be lauded for his efforts in this area. We look forward to seeing his proposal developed and working with him.

Because of the similarity of these proposals, I hope the subcommittee can craft an acceptable solution. The adverse effects of OBRA 1990 need to be corrected this year.

Mr. Chairman, thank you for your time and the opportunity to speak before you today.

[The prepared statement of Mr. Green follows:]

STATEMENT OF WILLIAM E. GREEN, EXECUTIVE VICE PRESIDENT AND CHIEF OPERATING OFFICER, ALLCARE MEDICATION SERVICES, INC., ON BEHALF OF AMERICAN SOCIETY OF CONSULTANT PHARMACISTS

Mr. Chairman, committee members: I am Bill Green, the Chief Operating Officer and Executive Vice President of Allcare Medication Services, Inc. and a consultant pharmacist. I speak here on behalf of the American Society of Consultant Pharmacists, representing more than 4,800 long-term care pharmacists in the United States. As consultant pharmacists, we serve the pharmacy needs of many of the Nation's elderly, nursing homes, and other long-term care institutions.

As the community of consultant pharmacists has grown in recent years, so has the quality of pharmacy services they provide to long-term care institutions. Patients and residents of long-term care institutions and nursing homes have benefitted from these improvements in terms of better controlled drug therapy, more comprehensive prescription drug monitoring, and reduced cost in the handling and distribution of medications. These improvements are directly related to the efficiencies that consultant pharmacists bring to bear.

Consultant pharmacists serve a protective role for many of our most vulnerable citizens. With the help of Congress in OBRA 1987, we have made great strides in preventing such past destructive practices as "chemical strait-jackets." We have been, and want to continue to be, in the forefront of creating new and better services for our institutional clients and the patients they serve.

The services provided by consultant pharmacists represent successful advances in the provision of medical care for the elderly, patients with chronic illnesses, and those patients whose mobility is impaired. Consultant pharmacists frequently are involved in and oversee the efficient acquisition, disposition, handling, storage, and

158

administration of pharmaceuticals in the long-term institutional setting. We provide drug regimen review, improved assurance of drug therapy compliance and drug availability, inspections of storage facilities, and auditing of administration practices within long-term care facilities by on-site observation. Consultant pharmacists have made possible the effective implementation of laws and regulations governing drug utilization review.

The job of the consultant pharmacist is focused on identifying and resolving or preventing drug-related problems. As a consultant pharmacist, I have a singular concern—the well-being of the residents of the institutions I serve. It is this singular concern that brings me here this morning.

The sharply increased prices we have suffered since the enactment of OBRA 1990 threaten to weaken our ability to continue to develop and provide new important services. The Medicaid rebate provisions of OBRA 1990 created serious and unanticipated disruption in the market for outpatient pharmaceuticals. The manufacturers who had provided us with discounts have generally ceased doing so.

Under the "best price" formula, these manufacturers are required to offer to the Medicaid program rebates equal to the difference between their deepest discount in the market and the average manufacturer's price for that drug. Not surprisingly, these rebates have come not from the manufacturers' bottom lines; rather, the "best price" formula has caused contractual discounts to evaporate. The result has been sharp increases in the prices for prescription drugs for us and the institutions we serve. All that we have worked to accomplish on behalf of these elderly citizens may be in jeopardy as our costs for acquiring medications continue to rise dramatically.

I can affirm for the subcommittee that the increases that ASCP members have experienced across the board are very significant and directly related to the so-called "best price" proviso. Over 75 percent of the drugs purchased by our group purchasing organization under contract prior to OBRA 1990 have increased in price dramatically since enactment. Some manufacturers have ceased contracting with us all together. These have been the principal adverse effects of OBRA 1990 on long-term care pharmacies. They cannot be ignored. The "wait and see" attitude of those who oppose reform of the Medicaid rebate system is nothing more than "ostrich economics."

It obviously was not the intention of Congress in enacting OBRA 1990 to provide a rebate for our Medicaid system and transfer the cost to other government and private drug purchasers. But that clearly has been the case. The market has been thoroughly disrupted.

Last month, the Congressional Budget Office (CBO) released its report on the effects of the OBRA 1990 rebate provisions and the revenues that the law is expected to produce. What the CBO found confirms what long-term care pharmacies have experienced in our prescription drug purchases since early 1991. "Best prices" are leaving the market.

CBO's findings are not only consistent with our experience, they match common sense. It is no surprise that drug manufacturers reacted to the so-called "best price" formula by raising their contract prices. The so-called "best price" formula creates a powerful incentive to eliminate the discounts that we had been able to negotiate because of the volume of our purchases.

Under the "best price" formula, when a manufacturer considers whether to give a discount to a private purchaser, there are two possibilities: (1) Give that discount to the Medicaid program and to the private purchaser; or (2) raise the price of the drug to the private purchaser, to minimize the amount the manufacturer will be required to give to the Medicaid program. The manufacturer must ask whether it is worth extending the discount to the larger volume of purchases under Medicaid. Our experience, the CBO's analysis, and the actions of the manufacturers all make the manufacturer's choice undeniably clear—raise the "best price."

Under "best price," our contracts with the manufacturers have been for much shorter terms. Other testimony today illustrates that for some provider groups contracts now average only 9 months, when in the past the same contracts had been for 3 years. The twin effects of uncertainty in planning and the extraordinary costs of renegotiating contracts again and again serve to drive up our operating costs. This is in addition to the increased prices we now pay for prescription pharmaceutical products.

What is even more significant than our own experience with rising prices, however, is that consultant pharmacists are suffering the exact same adverse effects of OBRA as other groups represented in this room. Except for a few, everyone here faces serious problems with OBRA 1990. We on this panel of health care providers, who are also purchasers of large quantities of prescription drugs, face much higher procurement costs for prescription pharmaceuticals. The Department of Veterans

159

Affairs, the community health centers, and other public purchasers have the very same problem—the cause is no different. The State Medicaid programs face uncertainty and declining rebates in the future as "best prices" evaporate from the market. Soon the rebates going to the States will fall to the minimum percentages set forth in the law. The discounting drug manufacturers have had their marketing structures up-ended—which benefits only those manufacturers who never discounted their drugs. The only groups wedded to "best price" are those who want a "one-price system"—a "one-HIGH-price" system. Do the American people benefit from paying uniformly high drug prices? Certainly nursing home residents do not.

Just so pharmaceutical purchasers don't feel singled out, the so-called "best price" formula imposes a separate burden on HCFA, the State Medicaid agencies, and the pharmaceutical manufacturers. Tracking "best prices" is an administrative nightmare. The people who work on the front lines of the rebate program can attest to the blizzard of paperwork that the "best price" formula has created. It is not necessary to eliminate the program to correct this problem—the formula should be simplified. A budget neutral flat rebate would guarantee the States the same amount in rebates, and it would get the money there sooner and easier.

Despite the clear community of interests, each threatened group is fighting for its own narrow solution. Is it not the job of the Congress to find the common interest and craft laws that will provide comprehensive solutions to our problems? Or will we again allow the forces of "divide and conquer" to push this issue to next year, and the year after, and the year after?

Fortunately, a common solution is within grasp. We support Congressman Slattery's bill, H.R. 5614, which would replace "best price" with a flat percentage rebate that tracks the analysis of the Congressional Budget Office. It is budget neutral, and will not reduce the rebate revenue now flowing to the States. H.R. 5614 would guarantee the Medicaid program the gains it made in OBRA 1990, while righting a now dysfunctional market. Congressman Ron Wyden is proposing a similar change in the law that would replace "best price" with a flat percentage rebate that is the same for all years and would extend the Medicaid rebates to other federally-funded health clinics. Because of the similarity of these proposals, perhaps the subcommittee can craft an acceptable solution to a problem that has seriously affected not only our pharmacy and the long-term care institutions we serve, but all types of health care providers across the Nation.

The adverse effects of OBRA 1990 need to be corrected this year. By replacing "best price" with a guaranteed flat percentage rebate, Congressman Slattery's legislation would achieve this. We applaud Congressman Wyden for his efforts in this area as well, and look forward to the opportunity to look at his ideas more closely. While we oppose rollbacks because of their administered pricing characteristics, we appreciate the position of the Department of Veterans Affairs, and we hope that they will join us in supporting the members of this subcommittee, as they work to create a comprehensive solution to the problems identified at this hearing.

Mr. Chairman, thank you for your time and the opportunity to testify before you today.

Mr. WAXMAN. Ms. Henry, I understand I mispronounced—it is Olathe?

Ms. HENRY. Yes.

Mr. WAXMAN. I didn't mispronounce your last name because that is familiar to me. I look forward to hearing from you.

## STATEMENT OF JANE HENRY

Ms. HENRY. Good afternoon, Mr. Chairman, and members of the subcommittee. My name is Jane Henry. I am a pharmacist and Director of Pharmacy Services at Olathe Medical Center in Olathe, Kans. It is a 150-bed acute care facility.

I am speaking in support of H.R. 5614, on behalf of the American Society of Hospital Pharmacists. ASHP is the 25,000-member national professional association representing pharmacists who practice in health care systems, including hospitals, health maintenance organizations, long-term care facilities, home care agencies, and the Department of Veterans Affairs, among other public entities.

160

In surveys conducted by ASHP and in data provided by institutional pharmacists to the GAO, our members and facilities, large and small, have described significant increases in the cost of pharmaceuticals since the enactment of OBRA 1990. Specifically, these increases have ranged from 15 to 28 percent, and in some cases as high as 35 percent. Percentage increases for some drugs have tripled.

At my particular facility, between February of 1991 and February of 1992, the drugs we purchased were 15 percent more expensive than the year before, on average.

When the all-urban CPI of approximately 4 percent is included, the percentage becomes even greater. The rebate provisions of OBRA 1990 require a pharmaceutical company provide Medicaid with a minimum 12 percent discount or the prices charged its best customer, whichever is higher. To reduce the rebates mandated for Medicaid, my colleagues around the country have seen manufacturers lower their discounts, buy out existing contracts and agreements, drastically shorten new contracts, and refuse to bid on contracts routinely coming for renewal.

These actions have led to two predictable results: First, the market-oriented discounts previously negotiated by constitutional settings have been sharply curtailed. Second, as the so-called best price has risen, reflecting the reduction of discounts to the private settings, Medicaid rebates have also declined.

In sum, Mr. Chairman, rather than offering stability to the Medicaid program, the rebates provided thus far have climbed steeply, only to drop later, thanks to the increase in the "best price."

Significant cost shifting to the public and private non-Medicaid setting is well under way. Under OBRA 1990, the pharmaceutical industry was to assume a reasonable burden for providing pharmaceuticals to Medicaid. Instead, industry has placed that burden on the intended beneficiaries and the bystanders.

We recognize that the pharmaceutical manufacturers must develop and sell products vital to our patients' health, but the society believes a method must be found to assure Medicaid receives the prices it deserves for its beneficiaries. The language of the best price provisions of OBRA is not that method.

H.R. 5614 is a logical alternative to best price for two reasons: First, it provides fixed predictable discounts off average manufacturer price, based upon CBO figures drawn from the pharmaceutical industry and the institutional setting that would allow Medicaid to realize the promise of OBRA 1990; second, it shifts the burden from the medical discounts to pharmaceutical companies themselves.

Clearly, some cost shifting will continue, however, H.R. 5614 would restore the competitive pharmaceutical marketplace and allow a return to equitable negotiations between the institutional setting and the pharmaceutical industry. In the past, operation of this marketplace has been a moderating influence on manufacturer pricing to the benefit of the broader health care community.

On behalf of ASHP, I urge your favorable consideration of H.R. 5614. I would be happy to respond to your questions. Thank you.

[The prepared statement of Ms. Henry follows:]

161

STATEMENT OF JANE HENRY, ON BEHALF OF AMERICAN SOCIETY OF HOSPITAL
PHARMACISTS

Mr. Chairman and Members of the Health and Environment Subcommittee: My name is Jane Henry. I am the Director of Pharmacy Services at Olathe medical Center, a 150-bed acute care facility outside of Kansas City, KS.

My testimony is in support of H.R. 5614, the Medicaid Prescription Drug Amendments Act of 1992 introduced by Representative Jim Slattery. I speak on behalf of the American Society of Hospital Pharmacists (ASHP).

ASHP is the 25,000-member national professional association representing pharmacists who practice in health-care systems, including hospitals, health maintenance organizations (HMO's), long-term-care facilities, and home-care agencies. The Society has extensive publishing and educational programs designed to help members improve pharmaceutical services. It is also a national accrediting organization for pharmacy residency and pharmacy technician training programs.

The Society's interest in the Medicaid rebate and "best price" provisions of the Omnibus Budget Reconciliation Act of 1990 (OBRA 1990), and its support for H.R. 5614, stems from our members' professional expertise, experience, and concern for the patients placed in our care. Our members in the institutional setting are salaried employees of the facilities in which they practice. We do not gain, as individuals, from higher or lower drug costs.

The Society supports H.R. 5614 for two reasons: first, it would guarantee that the Medicaid program would receive the lowest prices for the pharmaceuticals it purchases for its beneficiaries, the goal of OBRA 1990; and second, it would strike at the statute's inequities that have weakened Medicaid and cast the private sector pharmaceutical marketplace into a severe state of disequilibrium.

On the first point, OBRA 1990 requires participating pharmaceutical manufacturers to provide rebates to State Medicaid programs. These rebates are based on either a flat discount off average manufacturer price (AMP), or the difference between AMP and the lowest or so-called "best price" charged a firm's best institutional customers (including the Department of Veterans Affairs (DVA)); whichever is greater. These imposed rebates were designed to allow the Medicaid program to secure favorable prices for the outpatient drugs provided its beneficiaries.

Congressional efforts to win for the public sector the same discounts provided the private sector for the pharmaceuticals it purchases, using the "best price" provisions of OBRA 1990, were commendable but, as events of the last 16 months have revealed, they caused serious disruptions in the pharmaceutical marketplace.

The reaction of the industry to enactment of OBRA in the fall of 1990 was swift. Virtually all of the pharmaceutical industry agreed to participate in the Medicaid rebate program. At the same time, however, many of our members reported that contracts and agreements with the industry were abrogated or bought out; discounts disappeared; bids routinely submitted by drug companies to health-care providers were stalled; negotiations well-underway were halted; and prices began to rise.

In sum, many pharmaceutical companies sought to recover the required rebates at the expense of the private sector and those Federal programs, such as DVA and Public Health Service (PHS)-funded entities, not covered by the rebates.

The industry response to the "best price" language should not have been surprising. From an economic perspective, industry was reacting rationally to maintain its income levels in support of research, marketing, promotion, or maintenance of shareholder confidence and investments.

Last year the Medicaid program enjoyed substantial rebates based upon the "best prices" in existing contracts with the private sector. Meanwhile, by late March, 1991, however, our members were beginning to report to ASHP examples of significant price increases for the pharmaceuticals they purchased. An ASHP telephone survey of hospitals, with more than 310,000 beds, and HMO's, with approximately 795,000 enrollees, demonstrated that the average institution's prices had gone up from 14 percent to 20 percent since October 1990. This increase included the 1990 inflation factor of 8.3 percent for pharmaceuticals.

However, as contracts with hospitals and group purchasing organizations were renegotiated last year and earlier this year, with rebates now based upon higher prices, lower discounts and reduced rebates, the percentage growth in the rebates and the rebates themselves began to decline. In a speech this past May, Richard Kusserow, former HHS Inspector General, reported that "drug manufacturers have reacted to this new legislation by increasing drug prices to offset any lost revenue resulting" from the rebates. Higher "best prices", he said, "may result in Medicaid not achieving full estimated savings anticipated by the Congress."

162

Unintentionally, Congress has placed the Medicaid in a Catch-22. While it may have appeared to be sound public policy to mandate rebates to the Medicaid program based upon lowest prices found in the private sector, these "best prices" could rise as the industry sought simultaneously to finance the rebates and control their growth.

H.R. 5614 would stop industry's gaming of the system. It would replace the confusing, vulnerable "best price" provisions with an annual percentage discount off AMP developed last month by the Congressional Budget Office (CBO). The CBO identified budget-neutral percentage discounts would yield Medicaid revenues equivalent to those projected by OBRA 1990 for fiscal 1993 and succeeding years.

These discounts would be phased in for Medicaid over a period of 4 years. The Society supports Representative Slattery's intention to work toward fixed-rate discount for Medicaid that would realize the benefit of these savings sooner. We commend him, too, for his interest in obtaining for community health centers and other Federal programs similar relief from the inequity of rising drug prices.

ASHP's second reason for endorsing H.R. 5614 is that it would restore equilibrium to the pharmaceutical marketplace without imposing price controls. Prior to enactment of OBRA 1990, hospitals, HMO's and other health care institutions, either operating alone or with others through group purchasing arrangements, were able to make long-term commitments for the large quantities of drugs they purchased, often at substantial discounts.

The resulting contracts negotiated with industry offered a textbook illustration of how the interplay of market forces allowed manufacturers to realize a profit and institutional pharmacy to help restrain drug and other health care costs.

By enactment of OBRA 1990, Congress rightly sought a mechanism for Medicaid to share in the benefits of this market relationship. But, in the process, it has jeopardized both the Medicaid program and the negotiating ability of institutional health care providers.

Since passage of the "best price" provisions of OBRA 1990, our members in the private setting and DVA have found themselves unable to negotiate with pharmaceutical manufacturers to keep in check climbing drug costs. OBRA 1990 has reversed the economic incentive for manufacturers to enter into negotiations that could lead to these discounts. To the contrary, there is a countervailing incentive to eliminate institutional discounts. However regrettable industry's behavior, it was economically rational. Yet, however economically rational, industry behavior has, in fact, lowered Medicaid's rebates and raised the prices found in the institutional setting.

Passage of H.R. 5614, with its guaranteed percentage rebates, would fulfill the promise of OBRA 1990 for predictably lower prices now and in the future to benefit the Medicaid program. It would encourage a long-overdue equality within the marketplace that characterized the earlier relationship between manufacturers and health-care providers. Our members doubt the return of these earlier discounts, but the renaissance of a climate conducive to negotiations with the industry would strengthen enormously our efforts to control pharmaceutical costs over the long term.

Mr. Chairman, we urge you and the other members of the subcommittee to support H.R. 5614 to help the Medicaid program receive the prices it deserves and to restore to the clinical setting the opportunity for meaningful negotiations with the pharmaceutical industry. Thank you for this opportunity to present our views.

Mr. WAXMAN. Thank you very much for your testimony. We are being summoned to the House Floor for a vote. We will recess for as long as it will take to get there and vote and come back. I have some questions. We will be right back.

[Brief recess.]

Mr. WAXMAN. Let me ask this first question for any of you who want to respond to it. The witnesses we had earlier representing the State governments, testified in opposition to moving away from the current best price formula. They appear to think it is more difficult for manufacturers to game a best price program and that best price guarantees that Medicaid will fare no worse than the best negotiator in the market.

You, on the other hand, argue the best price approach gives manufacturers an incentive to raise prices across the board and

163

moving to a flat rebate approach, like Mr. Slattery's bill, will give the States "substantial and sustained savings on their drug purchases in the future."

We have here a profound difference of opinion. The State seems to think you group purchasers will force manufacturers to cough up best prices that the States can benefit from. You think as long as Medicaid follows the best price approach best prices will disappear, and both you and the States will lose.

I don't think anyone on the subcommittee has any interest in making the States worse off. How would you respond to their concerns?

Mr. GREEN. Would you mind repeating the question?

Mr. WAXMAN. The States are relying on you to get the best price.

Mr. GREEN. Now, I got you. I will take a little stab at it. Actually, the way we are looking at it, we have lost the best prices; they are evaporating rapidly. The States don't see that they should come and visit any one of the people that have submitted testimony. On the other hand, the flat rebate seems to be the best hedge going forward. It is a guarantee, whatever the percentage is going to be, it is there and it is on all drugs, not just the drugs that have been subjected to best price.

I would like to have that deal. I would like to have a flat percentage rebate on every product that I buy. I think that is a real good bet and the States should grab it.

Mr. WAXMAN. Anybody else want to respond? Mr. Grotting?

Mr. GROTTING. Congressman Waxman, the ability that we have as purchasing groups to work with the pharmaceutical manufacturers depends on our ability to bring committed volume, and do that for a long enough period of time that the manufactures can take sales costs out and put some predictability into what they are providing. That is where we are able to obviously derive better prices because we bring something of value to them. We don't have any ability to do that right now. I think the clout or the negotiating strength that we had that created a better pricing arrangement in the marketplace basically is gone because nobody brings that to the market.

Mr. WAXMAN. Medicaid is a bigger purchaser than all of you. You are betting a better price than Medicaid and the government said we want to get Medicaid as good a price as you are getting.

Mr. Green, you think the States ought to grab that rebate and run, but they don't see it that way. That is what is troubling me.

Mr. GREEN. I think they need to do the basic economics and look at the CBO numbers and see the spread between best price and the A and P is shrinking and shrinking very, very quickly, which is going to adversely affect the rebate they are going to see.

They have a lot of dollars flowing into their coffers right now, but the overall cost of drugs has gone up. As the best price evaporates, I think their rebate, as opposed to a flat percentage rebate, will be much smaller and they need to take a look at the numbers. We know the best prices are evaporating for us. It is happening before our eyes. We have been hurt, and I think the States ought to recognize that.

Mr. WAXMAN. Mr. Bowen.

164

Mr. Bowen. Mr. Chairman, I think it is important to understand there is a bit of a timing issue here as well. We understand where the Medicaid directors are coming from. As Bill indicated, they have seen some income of magnitude coming in, which has been of big assistance to them. We are in the frontlines of the so-called best price discount. We are seeing the erosion of that a lot sooner than they are.

I think the myth of the best price is something they are going to realize very shortly down the road, that they are not going to get the benefits out of that approach that they perhaps have. We are seeing they are eroding already.

Mr. Waxman. Most countries around the world have national health insurance systems, and their governments set the price that they will pay the manufacturers of drugs and they set them a lot lower than what our consumers are paying. So when they set a price and the drug companies want to keep their profits up, they go and charge the American payers for pharmaceuticals more money.

So we, then, have come in and said at least the government sector ought to pay less, at least the same price as the best price that others get who have some leverage in the market. Are we always going to find that when government holds down the price of drugs it buys, the price will pop up higher for the private payers of drugs? If that is the reality, we ought to be talking about something to protect all our purchasers of drugs in this country, whether it be governmentally sponsored or privately sponsored.

Mr. Green, you are shaking your head. I guess we need to solve this problem now and see where we go next.

Mr. Green. I agree.

Mr. Waxman. Mr. Dannemeyer.

Mr. Dannemeyer. I would like to have an indication from the members of the panel there how many of you support the concept of a rebate?

I would like to explorer that for a moment as to how that would be administered. We heard testimony here today, we have 27 million beneficiaries in the country that are—I think under Medicaid. A good share of them, I suspect, obtaining drugs for ailments that have been prescribed for them.

Then, we have a rebate procedure. We would have to work out a paperwork system for all these 27 million consumers, who are buying drugs around the country being prescribed by different health care providers, sold to different pharmacies. Aren't we going down the road of a paperwork world that will consume us in terms of the bureaucracy that would have to come into existence in order to establish procedures for the rebate, and then can you imagine the necessity of having appropriate auditors auditing the rebate receipts to make sure the rebates have been properly calculated and paid over?

Do we really need this additional paper world? Does anybody want to——

Mr. Green. If I might take a stab at it. I think the rebate we are supporting through Congressman Slattery's piece of legislation is the same base rebate as we currently are experiencing under OBRA 1990, and that is the rebate would go to the States directly.

165

The present system of rebate is a paper jungle and this best price proviso comes into play.

Mr. DANNEMEYER. It goes to the States?

Mr. GREEN. Yes, sir, to the State Medicaid agency.

Mr. DANNEMEYER. Who would be paying it?

Mr. GREEN. The pharmaceutical company, as they are now, under the law. All we are advocating, we switch the proviso to a flat percentage rate, which would streamline the paperwork.

Mr. DANNEMEYER. I think I understood the rebates go to the government.

Mr. GREEN. State governments.

Mr. DANNEMEYER. If government passes a law, government has always evidenced a willingness to watch out for its own hide. I never surmised government would be in the business of having these rebates go to the consumers.

Mr. GREEN. It is going to the State governments.

Mr. DANNEMEYER. You are saying under this existing law, the rebates now go to the States from the pharmaceutical companies under OBRA?

Mr. GREEN. Yes, sir.

Mr. DANNEMEYER. Whose nickel is the administrative cost of passing on all these rebates?

Mr. GREEN. The State governments.

Mr. DANNEMEYER. The State governments pay for it?

Mr. GREEN. They are managing their rebate. They are submitting data, as I understand it, to the pharmaceutical companies representing purchases for that pharmaceutical company's products, and the pharmaceutical company complies with a rebate based on the usage of those products.

Mr. DANNEMEYER. What would be wrong, since I guess their problem began to evidence itself after the adoption of OBRA, if we just repealed the culprit that caused the problem to come to existence and go about our business that way?

Mr. GREEN. I haven't had a chance to think about that option, sir.

Mr. DANNEMEYER. I mean, common sense I think would—let me—maybe we can phrase it this way: Suppose you had a car dealer in Any Town, USA, that had a real feel for local charity, and they said any time that charity got a car, they give them a 5 percent discount. So the State legislature found out about that and they passed a law that said that car dealer, since he is so charitable, had to give that same discount to every other buyer of a car in that region. Now, how long do you think that car dealer is going to continue to give that discount? If I were that car dealer, common sense would be you would stop immediately.

Isn't that what we have got here? I mean, you don't want to make the mistake of mixing logic and politics, but common sense, I think, should have told us that the result of which you are complaining was laid when we adopted OBRA in 1990. Would you want to comment, Ms. Henry?

Ms. HENRY. Yes, Congressman. The issue before us is not OBRA in its entirety; it is the best price and the rebate. Slattery's bill addresses the offending portions of the OBRA language dealing with the best price, and that is what our concern is here today.

166

Mr. DANNEMEYER. Thank you.

Mr. WAXMAN. Thank you, Mr. Dannemeyer.

Mr. Wyden.

Mr. WYDEN. Let me say, first, I have got great sympathy for what you are going through. As I said in my opening statement regarding the conference committee on OBRA in 1990, I and others specifically said the kind of problem we are discussing today was going to happen, period. Basically argued our lungs out and we lost. I would like to see us come up with a remedy that would help you all specifically this year and not patch a hole or burst a hole somewhere else.

If you go back and compare what I said to the veterans groups, you will see quite a similarity, because I think the only way we really turn this around is to build that kind of coalition: veterans, public health programs, the DOD, with large private purchasers like yourself. And what I would really like to do is see if I could walk you all sweetly towards a position that I would hope would move in that direction, and we can all elope and go out and beat some unscrupulous drug companies that have tried to rip-off that 1990 law.

Now, my concern is that if we go with Jim Slattery's bill as it is now written, under the flat declining rebate kind of approach, the best price would be gone altogether and everybody would basically be out in the world with higher prices. Given that, couldn't we all agree on a slight modification of the Slattery bill to have a fixed permanent rebate of, say 22 to 25 percent, and get you all, and these other groups that have been hammered so hard, into a marriage and get something done this year? I mean, you have made a persuasive case.

In fact, to tell you how outrageous what went on in 1990, let me tell you a very short story. We were late that election here in Washington. I went home when all the other members did. It must have been October 20 or something around there. We had just passed the law. Went to visit a hospital. Someone stood up and said, Ron, we are very concerned; our drug manufacturer called and said they were raising prices, and it was because of you and some guy named Pryor. I don't think the President had even signed the bill yet. And I was being told by private buyers in my districts that prices were going up.

I don't want us to get into a situation where we have got you all pitted against Medicaid, because I think Chairman Waxman's question is very correct. I want to get beyond that and get us into a situation where all of you have real leverage in the market place; you can force the vast majority of companies to do the right thing, rather than what we have had since 1990, which is the vast majority of companies haven't done the right thing.

Given that, let me start with you, Mr. Green. Can we make this marriage of a flat fixed rebate, maybe 22 to 25 percent? I am not wedded to the numbers. I don't think we have locked in that number here based on the data we have, and, in effect, having read your testimony, it would be a slight modification in Congressman Slattery's bill.

I have talked with Congressman Slattery about it and Chairman Montgomery, and I think with the support of folks like you, we

167

could get this done this time and not be back here in another year recycling this when a bunch of other legitimately aggrieved buyers are telling us new similar stories.

Mr. Green?

Mr. GREEN. Yes, sir, I think you are right-on. I believe Congressman Slattery suggested this morning he wasn't fixed to his rebate schedule. Although we support his bill, I think we were encouraged to see his consolatory tone, that he is willing to negotiate. I think that is what it is going to take. We are in fear of that.

Mr. WYDEN. Others? Mr. Bowen?

Mr. BOWEN. Mr. Wyden, I think we would support that very strongly.

Mr. WYDEN. Mr. Grotting?

Mr. GROTTING. Congressman Wyden, I think the principles that you outlined this morning made sense, and those are that we would have a comprehensive solution that deals with the whole problem, that we recognize we have got some public institutions that need help, and we find a way to do that. And we enable those of us who have been important in creating the best price through our negotiating ability to create that best price.

I think there is a way to find a marriage between the ideas you outlined here and Congressman Slattery's.

Mr. WYDEN. Mr. Penna?

Mr. PENNA. I agree with my colleagues. I think it is important to note our intent is to make sure Medicaid does not suffer.

Mr. WYDEN. My time is up.

Ms. Henry?

Ms. HENRY. I think the numbers in Congressman Slattery's bill were based upon the CBO study that was done earlier, and the intent was to be budget neutral, and we would have no problem with negotiating a flat rate as long as it would be actuarially sound and based upon sound figures, as the CBO analysis was done prior to this.

Mr. WYDEN. Thank you, Mr. Chairman.

Mr. WAXMAN. Thank you, Mr. Wyden.

Mr. McMillan.

Mr. McMILLAN. Thank you, Mr. Chairman. I am sorry I missed your testimony. I had a conflict I couldn't avoid.

Let me just pick up on a little bit, the train of thought that we have been engaged in. In your judgment, do you think OBRA has achieved the true savings that were set out when it was initiated?

Mr. GREEN. I think the numbers initially are very strong, and if you want to limit the view of what OBRA has done to the 1 or 2 years, the answer would be yes. But I think we are all interested in the long-range picture and I think that is—that goal is not going to be achieved under the present structure.

Mr. McMILLAN. What are you saying? Under the way the system is operating, the general price level is written and offsets the presumed savings—the projected savings?

Mr. GREEN. The driving force behind the savings is the best price, and best prices are rising dramatically and, therefore, the savings that would have been generated by best price are evaporating into thin air.

168

Mr. McMILLAN. Isn't that, in fact, an inevitable result of the process we are engaged in?

Mr. GREEN. Yes, sir, it is. That is why a flat rebate will guarantee the States, on all products, a flat percentage rebate that gives them a much better hedge going forward in the future.

Mr. McMILLAN. What relationship does a flat rebate have to the true cost of the product, both in terms of the production of the product, the sale of the product, and the distribution of the product?

Mr. GREEN. I couldn't speak to that, sir. I don't know.

Mr. McMILLAN. Isn't that really what we should be concerned with? Unless we are doing those kind of things that affect the real cost of the production of the product, the sales and marketing of the product, and the real distribution of the product, we are not really dealing with the underlying cause; we are simply manipulating price. And when we manipulate price, we push down in one place and it pops up somewhere else. We, then, become the arbitrators between the different groups on one side or the other of that issue.

It strikes me that we should be trying to do those things that encourage the kind of activity that is going to produce the most cost-effective pharmaceutical production and distribution system that we possibly can. I am not sure what we have done or are proposing to do really deals with that, because if we look at the broader issue that we have got to address in the not too distant future, we are not just concerned with the cost of the VA program or the cost of Medicare or the cost of Medicaid, we have got to be really concerned about the cost to the entire private sector, and the growing number of people who are uninsured and finding private insurance less and less affordable.

The things that we should be doing should be constructive in terms of making our entire system more cost-effective. I think that means putting the right incentives in the right place, not necessarily the Government trying to micromanage and control every aspect of it. This, to me, is sort of where we are.

Mr. WAXMAN. Would the gentleman yield?

Mr. McMILLAN. Yes.

Mr. WAXMAN. All the points you are making are quite valid, but what is disturbing to me, this group has been able to negotiate from drug companies on behalf of their clients a lower price for a smaller population than the Government has been able to get for itself when we cover all those Medicaid participants.

So the question is why is Government so poor in negotiating and they are so effective? It isn't that we don't have an incentive to spend less money. Are we incapable of it?

And what we finally said as a Government, we don't think our poverty program, health care poverty program, should have to pay more higher prices for drugs than others in the private sector are paying, especially when they are nonprofit organizations, but even profit-making organizations, such as represented here. If we don't set up some object temporary—if you take into consideration the cost of the production of the drugs, all that that is reasonable, and we ought to have a price fix for everybody.