**ANDERSON EXHIBIT 26L**

169

Mr. McMILLAN. I didn't suggest a price fix. The inevitable result of government doing that is that it raises the cost; it doesn't lower it.

What we have done is raise costs, not lower costs across the board. I applaud what they are trying to do. We should be enabling buying groups like that, through volume purchases and negotiations, and whatever impact that has on marketing costs that truly lowers the cost of distribution, get passed on to the people they are trying to benefit. That is constructive.

Mr. WAXMAN. Absolutely. Of course this group is arguing that we are preventing them from doing that because we have pegged the Government's price to the price they have been able to negotiate. Obviously, it happened that their price is going up as a result.

Mr. McMILLAN. I am thinking out loud a little bit but why doesn't the government negotiate a price?

Mr. WAXMAN. That is a very good question.

Mr. McMILLAN. I mean, negotiate it with frequency. If you are going to have discounts, then the government, on what it has a legitimate reason to purchase, ought to negotiate based on the true cost. If the VA assumes the cost of distribution effectively, maybe it should be justified in getting a discount that covers that. Get something that is rational instead of something non-rational.

Mr. WAXMAN. Those are important points for us to discuss as we look at this legislation.

Mr. Lent.

Mr. LENT. I have no questions, Mr. Chairman.

Mr. WAXMAN. Mr. Hastert.

Mr. HASTERT. Thank you, Mr. Chairman. As you know, I am coming in after the barn door was left open or the horse got out or something like that. These folks here—and I'm sorry I missed your testimony too. But, AmeriNet and Health One and Allcare Medication, we all are familiar with. You basically bought drugs in large quantities prior to OBRA 1990. Is that correct?

You nod your heads. You warehouse those drugs; is that correct? Some say yes and some say no. Basically you distributed them to users. That was part of the cost, wasn't it? Is that why you got the discount? Somebody.

Mr. PENNA. In part, that is why we got the discount. It was trying to marry together the ability to negotiate with the manufacturer for things like one point shipping. In other words, instead of distributing it to 20 sites, to one site. That is a piece of it.

But a bigger piece is guaranteeing use of a product. In other words, we will go to them and say that of the drugs out there in a certain therapeutic class, one of which you have, we consider them to be all pretty much the same. We will make a decision based on what our medical staff tells us, that we will use that drug for which we get the best long-term deal. To do that gives us a big edge in negotiating better prices.

Mr. HASTERT. So it was competition. I imagine maybe because there were drugs for therapeutic use, the same type of drug that was manufactured by four or five different companies, there was competition in price, wasn't there?

Mr. PENNA. There was some, yes.

170

Mr. HASTERT. So the deals you were able to cut were we will buy X quantity of drugs if you give us the best price and give it to us in bulk quantity. We will distribute it and get it out to our people and make sure it is distributed the right way. That was why the discount was given to you, correct?

Mr. PENNA. That is correct.

Mr. HASTERT. I would guess that when the VA does that or when Medicaid negotiates with drug companies, they don't necessarily take all those drugs at one spot, do they? They don't take a bulk delivery. Most people go out with their prescription and go to the drug store.

Mr. PENNA. The VA has medical centers that fill prescriptions and they have some warehousing capability.

Mr. HASTERT. When Medicaid people get it, they get prescriptions. So I can see we are comparing apples and oranges. What happened after OBRA 1990 and Medicaid got its reduction—and it is a good thing for State government, I understand that. We are scrimping and scraping pennies to try to pay for the Medicaid programs—when they got the "best price", it was not based on competition. It was an artificial best price.

When that happened all of a sudden, that best price was based on an accumulation or an average of what your prices were. All of a sudden, your best prices disappeared. Is that really the grievance that you have?

Mr. PENNA. That is correct.

Mr. HASTERT. You are saying the best price Medicaid gets is an artificial best price that makes any competitive bidding advantage that you have disappear?

Mr. PENNA. That is correct. In addition, the manufacturers are beginning to get rid of the best prices that we have enjoyed in the past because of our negotiated and formulary activities because they don't want to pass those prices on to Medicaid. The best price Medicaid currently enjoys is evaporating.

There is a further aspect that I think the committee needs to be aware of. That is besides acquisition costs and negotiating with the manufacturers, another thing we try to deal with is do our patients really need these prescription drugs. Comments were made earlier today about therapeutic straitjackets and about the problem of overmedication of some of our people.

It is important to realize that if a patient does not need a drug, the best savings is not to give it to them at all.

Mr. HASTERT. I guess it is confusing to me and a bit befuddling, but it seems to me, when we start to create artificial prices or artificial markets for products in the free enterprise system, we really screw things up. The screwing up has not been to your benefit. What you were able to negotiate because of your distribution practices, you have lost because we have created an artificial type of market with Medicaid.

Mr. PENNA. That is correct.

Mr. HASTERT. Thank you, Mr. Chairman.

Mr. WAXMAN. Just to follow up Mr. Hastert's points, because I am trying to think this through as well: You have been successful negotiators. The Government has not been a very successful negoti-

171

ator even though the Government is buying more drugs for government-insured patients.

But, Mr. Penna, you are with Group Health. Are you all big purchasers of drugs for your clients? When you negotiate, do you negotiate based on your ability to choose a therapeutic equivalent drug that might be just as good as another drug and lower the price based on the fact that there is competition?

Mr. PENNA. At times we do. It depends on the therapeutic class that we are dealing with. If we can focus on one drug and make sure our physicians all know how to use it correctly, we not only have the potential for getting a better price, but make sure our patients are getting the best possible care.

Mr. WAXMAN. When Senator Pryor first introduced his bill, he said the States should be able to go out and purchase drugs that were the cheapest in a therapeutic class. After he made that recommendation, there was a tremendous lobbying campaign. The pharmaceutical companies opposed it on the basis that the government was now going to decide what drugs would be the equivalent. They said this is a terrible idea. They fought against the idea of giving us that leverage to make us more successful in actual negotiations.

When that was defeated and we were trying to get savings for the Government in what we spend under Medicaid, then they said why can't the government get the same good price everybody else is getting. That was the progression of it.

If anything, we should have allowed the Government to use its beverage in the marketplace and not tied the hands of the State Medicaid programs and let them go in and do what you group purchasers do. If there is a therapeutic equivalent, you do not let the drug companies block you from negotiating as to what would be a cheaper therapeutic equivalent.

You say to the drug companies, if you don't give us a better price on this drug, we are going to go out and buy that drug which we think is pretty much the same, just as good, and that is cheaper.

That is called competition. If you have that kind of negotiation, you can get a better price. It is one of the reasons you do get better prices. The Government's hands have been tied because of the lobbying efforts of the pharmaceutical manufacturers who have told us we cannot really use what leverage we have. When we try to use it, we use it in a way that causes other problems that were not intended. I wanted to point that out.

If any other member wants to ask questions before we move on. You are all shaking your heads. Do you agree?

Mr. PENNA. Mr. Chairman, you are precisely right in your assessment.

Mr. WAXMAN. Thank you very much. I thank you for your presentation and for agreeing with my position and for your contribution to this hearing. We look forward to working with you.

Our next panel represents manufacturers of a single source and innovative multiple source drugs. They are the subject of the Medicaid Rebate Program at issue today.

Dr. John Zabriskie is senior vice president of Merck and Company; Ken Bowler is Vice President for Federal Government Relations at Pfizer; Peter Tattle is Company Group Chairman of John-

172

son & Johnson; Robert Ingram is Group Vice President at GLAXO; and Gerald Mossinghoff is President of the Pharmaceutical Manufacturers Association.

We want to welcome you to our hearing today. I think the last time this group testified before us was in 1990 when we were looking at this very question. So I am interested, in light of the testimony we received then and all that has happened since then—and especially in light of the criticisms that have been leveled—what your evaluations of the situation are and your recommendations to us.

Your prepared statement will be in the record. Please limit your oral presentation to only 5 minutes.

STATEMENTS OF JOHN L. ZABRISKIE, SENIOR VICE PRESIDENT, MERCK & CO.; M. KENNETH BOWLER, VICE PRESIDENT, FEDERAL GOVERNMENT RELATIONS, PFIZER, INC.; PETER T. TATTLE, COMPANY GROUP CHAIRMAN, JOHNSON & JOHNSON; ROBERT A. INGRAM, GROUP VICE PRESIDENT, GLAXO, INC.; AND GERALD J. MOSSINGHOFF, PRESIDENT, PHARMACEUTICAL MANUFACTURERS ASSOCIATION

Mr. ZABRISKIE. Thank you. I am Dr. John Zabriskie, Senior Vice President at Merck. I welcome the opportunity to appear before you today and give you our views on the current debate.

First of all, let me say that Merck believes by any measure the 1990 OBRA Act has been enormously successful. We originally set out with Congress to save over $3.4 billion over 5 years and now CBO is estimating that the savings will be $6.4 billion, so the program is working in terms of dollars.

More importantly, it is also working in terms of access that poor people have to medicines that were previously denied to them through restrictive formulary practices that were being practiced in some States. That was something we had quite a debate over.

I would like the record to note that Merck's discounts and rebates for all Federal programs in 1992 will be $200 million. We have heard much about criticism here today that the program is not working. Some say it has resulted in cost shifting.

At the very beginning, CBO built into their calculations that the discounts from manufacturers would decrease. The past panel made a very good discussion of the subject. I would like to note for the record that my understanding that the average price discount in the market is 28 percent. That is a CBO estimate. I believe that is a substantial discount that is being negotiated by large customers.

Reductions have occurred but not to the extent originally forecasted. That is why to a large measure the savings are substantially greater than were originally predicted.

Manufacturers cannot easily reduce their best price discounts contrary to other testimony. The pharmaceutical industry is a dynamic marketplace. Medicaid accounts for about 10 percent of the marketplace. Large customers account for about 40 percent of the marketplace and they are growing more and more every day. They have a tremendous amount of leverage on price. If it were easy for

173

manufacturers to negotiate best prices, why would so many lobby for a flat rate? It doesn't make sense.

I would like to remember how the debate began in 1989. It began with Senator Pryor holding up two bottles, one bottle of a same drug purchased by a favored customer at a price and another purchased by Medicaid at the highest price on the market. He asked who got the worst prices and Medicaid was getting the worst price.

Now in 1992, they get the best price in the market. I believe when, if we remember base best price with a rebate, we will be back here in 2 years. GSA regulation also requires that when the Government purchases pens and pencils, for instance, that they get the best price discounts.

In the final analysis, the single overriding question for the subcommittee and Congress to ponder is how would it be possible to justify that a Federal-State program for the Nation's poorest does not have the benefit of the best prices given to a favorite customer.

Mr. Chairman, I would like to comment briefly on H.R. 2890 at this time. We are opposed to H.R. 2890 because the price rollback procedure, we believe, is outright price controls and because the exemption of the VA prices for Medicaid, best price calculation, deviates from the philosophy we believed in and that is best price. However, we are sympathetic to the VA's and manufacturer's concerns expressed here today.

Accordingly, we have developed a proposal that would save the VA tens of millions of dollars, correct the inequity now experienced by some manufacturers due to existing deep discounts, and preserve the best price principle for Medicaid. This principle combines the most desirable features and best price and grandfathers the VA's historical deep discounts.

If it is all right, Mr. Chairman, in the interest of time, I would be glad to discuss this during the questioning period with you and elaborate further.

In closing, the best price discount system is achieving everything and more, $3 billion more than Congress originally set out to achieve and Merck believes that it is the only fair system for the Medicaid system to assure that they pay no higher prices than any other customer in the United States.

Thank you, Mr. Chairman.

Mr. WAXMAN. Thank you, Mr. Zabriskie.

[The prepared statement of Mr. Zabriskie follows:]

STATEMENT OF JOHN L. ZABRISKIE, VICE PRESIDENT, MERCK & CO., INC.

Thank you. Mr. Chairman, members of the subcommittee, I am Dr. John Zabriskie, Senior Vice President of Merck & Company. Mr. Chairman, you are to be commended for calling this hearing in order to bring perspective on the current debate over Medicaid prescription drug rebates.

Merck believes that, by any measure, the prescription drug rebate program enacted by Congress less than 2 years ago has been enormously successful. Consequently, we strongly oppose any changes to the system of rebates.

When I testified before this subcommittee on the same issue in 1990, I cited the four major advantages of a best price rebate program:

—First, it would give the neediest Americans access to all FDA approved drugs.
—Second, it would yield substantial savings to the Medicaid program.
—Third, it would save American taxpayers money.
—Fourth, manufacturers would have access to the Medicaid market without artificial barriers.

174

Let's look at the record. Savings from the best price program will be over $6.4 billion; nearly double the $3.4 billion originally projected by CBO. Equally important, America's poor now have greater access to medications like our breakthrough product Mevacor to lower high cholesterol.

Thus, we believe the program is being unfairly criticized. Some say it has resulted in cost shifting, claiming that manufacturers are reducing their best price discounts. This should come as no surprise.

Two years ago, CBO predicted manufacturers would reduce their discounts from an average of 25 percent in 1991 to 15 percent by the end of 1992. Reductions did occur, but not to the extent originally forecasted by CBO because market forces continue to work to require manufacturers to discount at a rate higher than the minimum. The new 5 year savings estimates are $6.4 billion, nearly double the original. And CBO has acknowledged that even its current projection of future reductions in discounts is "highly uncertain." We agree.

And the following also should come as no surprise. Manufacturers cannot easily reduce best price discounts. Today's pharmaceutical marketplace is a dynamic one. While Medicaid accounts for about 10 percent of the market, the other 90 percent is increasingly influenced by large purchasers. These large purchasers combined exert more leverage on price discounts than Medicaid. If it were easy for manufacturers to eliminate their best prices, as some claim, why then are some of our competitors lobbying so hard in favor of a flat rate discount? Why would any company advocate a 22 percent flat rate rebate if it could just as easily eliminate its best price and provide a rebate of 15 percent?

Mr. Chairman, also let's remember how the debate over best price began. In 1989, Senator Pryor held up two identical bottles of prescription drugs; one obtained at a bargain price by a favored customer and the other obtained at full market price by Medicaid and asked, "Who gets the worst prices? Medicaid . . . gets the worst . . .!" Today in 1992, Medicaid now gets the best price. Mr. Chairman, if best price is replaced with a higher flat rate rebate, I predict in a few years I'll be here once again testifying that best price is the only sensible public policy. After all, GSA regulations require that the government purchase even pencils and paper at the best prices offered to any customer in the private sector.

In the final analysis, I believe the single overriding question for the subcommittee and Congress comes down to: How would it be possible to justify that a Federal/State program for the Nation's poorest does not have the benefit of the best price available to a favored customer in the private sector?

Turning for a moment to the marketplace, we should not lose sight of the fact that the amount of the discount is not nearly as important as the price of medicine. There is ample evidence that price increases are moderating. For example, Merck and other pharmaceutical companies representing more than 30 percent of the total U.S. market have pledged to keep price increases within the Consumer Price Index. These commitments are having a positive impact on annual drug price increases. The Bureau of Labor Statistics reports for the period June 1991 - June 1992 drug price increases of 6.3 percent, down from 7.8 percent for all of 1991, down from 8.1 percent in 1990 and down from 9.5 percent in 1989. According to the Policy Research Group, price increases cause an increase of just 5.6 percent in Medicaid prescription drug expenditures in 1992. No longer can it be said that price increases are the major contributor to the annual increase in Medicaid drug expenditure costs. I fully expect these trends in drug prices to continue.

Mr. Chairman, let me comment briefly on H.R. 2890 and H.R. 3405.

We are opposed to H.R. 2890 because the price roll-back procedure represents the outright establishment of price controls on our industry.

Merck supports H.R. 3405 in principle; that is, rebates for the needy enrolled in programs under sections 329, 330 and 340 of the Public Health Service Act. But we oppose the bill in its current form because it includes too broad of a range of Public Health Service-funded clinics which number in the thousands. As currently drafted, this will be a very expensive program for both industry and to administer. If the legislation were amended to cover the approximately 600 Migrant Community and Homeless Health Centers established primarily to provide primary healthcare to the poor, and streamlined to address the administrative problems, we could support it.

In closing, Mr. Chairman, the best price discount system is achieving everything and more, $3 billion more, than Congress had set out to achieve. The best price discount system assures that the Federal and State governments will not pay higher prices for medicine under Medicaid than a favored customer pays in the private sector. That is why Merck strongly urges you and your subcommittee to retain best price rebates for Medicaid.

175

Thank you.

Mr. WAXMAN. Mr. Bowler.

### STATEMENT OF M. KENNETH BOWLER

Mr. BOWLER. Mr. Chairman, my name is Ken Bowler. I am vice president for Federal Government relations for Pfizer Inc. I will comment on the three bills that are the subject of this hearing.

H.R. 3405 introduced by Mr. Wyden as stated by Senator Kennedy's testimony this morning, Pfizer has sometimes been on record as supportive of a discount program for federally-supported public health service clinics. We stand ready to work with the subcommittee to try to develop an administratively sound and acceptable program.

In terms of H.R. 2890, Chairman Montgomery's bill, frankly, we are not sure what to do about the VA issues that have been raised. We are opposed to the price rollback provision. We are not convinced that the exemption of the FSS schedule, as contained in that bill, is appropriate. Pfizer has not altered its contracting procedures with the VA or other purchasing entities since the enactment of the Medicaid Rebate Program.

A recent GAO report confirms that Pfizer has not changed its contracting procedures with regard to the Department of Veterans Affairs or DOD. Our overall pricing last year totaled 1.4 percent and our discounts totaled $40 million.

With regard to Mr. Slattery's legislation, H.R. 5614, Pfizer believes that Medicaid deserves our best price. Her rebates for 1991 will total $40 million. The major advantage of the best price provision is that it allows for at least a portion of the Medicaid rebates to be determined through contract negotiations that take place in the marketplace. In other words, the Government involvement in price setting is limited.

I think we need to remember that the Medicaid rebate is a result of three components. One component is the best price. Another component is the minimum amount which is set in the law. Then there is a third component which is the price inflation adjustment. In other words, if we raise our prices over CBI, that increases our rebate. So you have three components: Two of them are set by the government, the best price is the one market-determined element.

The alternative approach suggested in Mr. Slattery's legislation would replace this one market-determined element in the current rebate with an artificial Government-set Medicaid discount. CBO initially estimated that the revenues from the best price component would largely disappear by the end of this year because they said companies would eliminate their discounts.

Most recently, CBO has estimated this disappearance is not going to occur in 1992, possibly in 1994 or 1997. We don't think this revised assumption is any more accurate than the original one.

We think the change in this assumption and the estimates supports our position that competition in the marketplace does result in discounts which are and will continue to be passed on to Medicaid if we maintain the best price component.

Mr. Chairman, the Medicaid Rebate Program is still new, still being implemented. Although significant progress has been made

176

in working out the administrative problems, remember it is really just over a year old. Pfizer alone has invested over $1 million in personnel and new equipment.

We don't think the implementation should be disrupted at this point with major changes, particularly like the one suggested by Mr. Slattery, that could redistribute the amount of rebates among the States creating winners and losers among States resulting in a new set of problems for States, manufacturers and the Federal Government.

Furthermore, because the program is new, much of the relevant data is inconclusive and a number of ongoing studies are incomplete. At this early stage, the one thing that is clear as has been pointed out is that the program is generating a higher level of rebates than was anticipated. The new CBO estimates suggest almost twice as much.

In conclusion, we believe the program is working. It is producing more revenues than expected. We do not think changes to the current law are warranted at this time. Thank you.

Mr. WAXMAN. Thank you, Mr. Bowler.

[Testimony resumes on p. 194.]

[The prepared statement and attachment of Mr. Bowler follow:]

STATEMENT OF M. KENNETH BOWLER, VICE PRESIDENT, FEDERAL GOVERNMENT RELATIONS, PFIZER, INC.

Mr. Chairman, Mr. Dannemeyer, Members of the Subcommittee: My name is Ken Bowler, and I am vice president of Federal Government Relations for Pfizer, Inc. I thank you for the opportunity to present our views on the bills H.R. 3405, H.R. 2890 and H.R. 5614 to the subcommittee. I would like to begin with some background information about Pfizer.

Pfizer is a U.S., research-centered, diversified health care company, with annual sales of nearly $7 billion. Established in 1849 in Brooklyn, NY—where we still operate one of our major facilities—Pfizer's corporate headquarters is in Manhattan. Our pharmaceutical research headquarters is in Manhattan. Our pharmaceutical research headquarters and largest research facility is in Groton, Connecticut. As of 1991, Pfizer had 19,000 employees in the United States, with facilities in 20 States that employ over 100 people. Pfizer is also a worldwide company. In 1991, 45 percent of our sales were in international markets, and we contributed to the $1.2 billion positive trade balance the pharmaceutical industry achieved last year.

The success of firms like Pfizer, that invest heavily in research, depends on our ability to continue to discover, develop and market new products that effectively treat disease and improve human health. Pfizer's extensive research efforts have been successful in that they have produced innovative medicines that treat specific conditions more effectively, efficiently, and conveniently than previously existing therapies.

Procardia XL: For example, Procardia LX was approved for treatment of both angina and hypertension in 1989. Procardia XL has an innovative delivery mechanism that allows it to be taken once a day, as compared to our earlier procardia product which had to be taken three times a day. This significantly improves patient compliance, which—along with the constant and even release of the medication—enhances its effectiveness. Also, it has fewer side effects and a lower daily cost than our earlier procardia product. Due to the unique characteristics of Procardia XL, it is currently estimated to be the largest selling cardiovascular drug in the United States.

Diflucan: Diflucan, a product of Pfizer research approved in 1990, is a breakthrough treatment for fungal infections, particularly for the serious, life-threatening types to which patients with compromised immune systems resulting from AIDS, cancer chemotherapy, organ transplants or severe burns are susceptible. Reflecting the FDA's judgment of the importance of this innovative product, Fiflucan was approved in only 11 months, whereas the average approval time for all drugs approved in 1990 was 30.2 months. In addition to its effectiveness in treating fungal infec-

177

tions, it has a substantially lower incidence of negative side effects and is less costly than alternative therapies that require administration in a hospital or clinic.

Zithromax: Another of Pfizer's innovative products is the new antibiotic, Zithromax. Just approved in February of this year, this new antibiotic has a unique ability to target the site of infection and penetrate into tissue, rather than just circulating in the bloodstream. As a result, it is taken only once a day, and usually for no more than 5 days, as compared to alternative treatments that generally must be taken 2 to 4 times a day for 10 days to 2 weeks. In addition, a single, one-time dose of Zithromax effectively treats chlamydia, the most common sexually transmitted disease.

This year Pfizer will spend $880 million, and next year we expect to spend $1 billion, in the discovery and development of products for the treatment of major diseases and life threatening conditions such as Alzheimer's, cancer, heart disease, arthritis, and asthma. The objectives of our research are to find medicines for diseases for which there are no effective therapies, and medicines that are more effective and have fewer side effects than current treatments. Also, we are looking for treatments that are easier to administer: for example, medicines that can be taken once a day or do not have to be administered in a hospital or clinic. Such medications can greatly enhance patient compliance; and, as a result, improve their effectiveness.

Pfizer believes that individuals should have access to prescription drugs and other necessary medical care, which is the common concern of the three bills that are the subject of this hearing. We have attempted to enhance access to our products in a number of ways. Pfizer was an early supporter of Medicaid rebate legislation, and our rebate payments for 1991 total $40 million. Also, Pfizer has a long history of providing discounts to the Department of Defense (DOD) and the Department of Veterans Affairs (VA). Discounts on Pfizer drugs to the DOD and VA in 1991 total an additional $40 million.

For a number of years, at the request of the patient's physician, Pfizer has provided its prescription drugs free where patients are unable to pay. In addition, we are participating in innovative medical access programs in the States of Kentucky and Arkansas, where Pfizer medications are provided free of charge to individuals who meet qualification standards established by these programs. In general, this includes individuals with income below the poverty level, but who do not qualify for Medicaid. We believe the Kentucky and Arkansas programs are excellent models for other States.

Reflecting our concern about rising health care costs, Pfizer announced in February that U.S. prices for any of our prescription medicines would not increase by more than 4 percent in 1992. The average price increase across our product line will be close to 2 percent for this year, since we do not plan to make any price increases on some of our major products.

We hope that the economic and public policy environment will allow us to continue to increase our investment in pharmaceutical research and development, and to continue our access enhancing programs and pricing policies. Supportive government policies are critical, particularly those that allow sufficient incentives and resources for the continued research and advancements in health care that Americans want and expect.

I would now like to turn specifically to the three bills that are the subjects of this hearing.

H.R. 3405, introduced by Representative Wyden, is designed to provide prescription drug rebates to Public Health Service (PHS) funded clinics. Since last Fall, we have been working with the Senate Labor and Human Resources Committee on similar legislation. In October of last year, we sent letters to Chairman Kennedy and Senator Hatch, the ranking minority member, in which we stated:

"Pfizer Inc. supports legislation providing certain clinics assisted under the Public Health Service Act with prescription drug rebates similar to those provided to State Medicaid programs. Such legislation should provide these rebates without affecting the current Medicaid program, and without provisions resulting in further government intrusion in the existing market system."

In February, we announced our support for S. 1729, a bill sponsored by Senators Kennedy and Hatch that would provide discounts to PHS clinics. This legislation has been reported out of the Senate Labor Committee; and, while Congress is completing action, Pfizer is working on a voluntary discount program for PHS clinics.

Having worked on Federal legislation and a voluntary program for a number of months, we can tell you that the most difficult problems include the specification of adequate qualification standards, and the identification of eligible clinics. Quite simply, we do not have an adequate approximation of the number of potential clinics that exist, the number that would qualify under the existing bills, or how to

178

keep track of what appears to be a fluctuating universe. H.R. 3405, in our view, does not resolve these basic issues. Obviously, this makes it impossible for companies to estimate the costs of H.R. 3405, and leaves us very concerned about administrative costs and complications associated with this and similar bills. In addition, H.R. 3405 includes price roll-back and indexing provisions. Pfizer has consistently opposed such price control measures as unnecessary, and potentially counterproductive and harmful to the industry.

As indicated, Pfizer has for some time now been on record as supportive of a discount program for federally supported PHS clinics, and stands ready to work with the subcommittee in the development of an administratively sound, acceptable program.

H.R. 2890, introduced by Representative Montgomery, would roll back VA prescription drug prices to September 1990 levels, and permanently exempt the VA Federal Supply Schedule (FSS) prices from the Medicaid rebate calculation.

As stated above, Pfizer opposes the price roll-back provision contained in this bill as an unnecessary and potentially harmful element of government price setting. In setting 1991, the U.S. International Trade Commission submitted a report to the Senate Finance Committee on the global competitiveness of the pharmaceutical industry. On page 10 of the report summary, a copy of which is attached in my testimony, it says:

"The enactment of cost-containment programs, price controls, or both, on a national level often results in decreased levels of R&D spending in that these programs reduce revenues that can be reinvested in R&D programs. Several countries that have implemented such programs have seen their pharmaceutical industries weaken or shift outside their borders."

We are not convinced of the need for either the price roll-back or FSS exemption provisions contained in this bill. Pfizer has not altered its contracting procedures with the VA or other purchasing entities since enactment of the Medicaid rebate program. As has always been the case, with each new round of contract negotiations, the levels of discounts for different products may change and the duration and other terms of the new contract may differ from previous ones. But, as in the past, these changes reflect changing competitive pressures and the negotiation process at the time. A recent GAO report confirms that Pfizer has not changed its contracting procedures with regard to the VA and DOD. Specifically, Pfizer's overall price increase to the military last year, for all its pharmaceutical products, was about 1.4 percent.

According to a September 1991 GAO report, the VA estimated in April 1991 that its prescription drug costs for 1991 would increase by $150 million because of increases in drug prices since the enactment of the Medicaid rebate program. More recently, according to this report, on the basis of a preliminary sample analysis the VA estimated this number to be closer to $28 million. One explanation for these disparate estimates is provided on page 2 of the GAO report, which contains the following statement:

"It is difficult, however, to determine the effect of these price changes on overall VA and DOD costs because neither agency maintains centralized price and utilization information for the prescription drugs it buys. Further, we could not determine how the increases in drug costs experienced by VA and DOD since OBRA's enactment compare with those of previous years because the agencies could not give us historical price data."

H.R. 5614, introduced by Representative Slattery, would amend the Medicaid rebate program enacted in 1990 by replacing the current "best price" formula for determining Medicaid rebates with a flat percentage formula.

In the summer of 1989, Senator Pryor began a series of hearings before the Senate Special Committee on Aging to explore the issue of prescription drug pricing. Among the questions Senator Pryor asked at that time was: Why doesn't Medicaid receive the same discounts for prescription drugs that other large purchasers are able to obtain in the marketplace? At Pfizer, we took this question seriously. We were among the first to develop a legislative proposal establishing a Federal rebate program under which the Medicaid price for prescription drugs would equal the lowest price paid by any other U.S. purchasing entity. In other words, Pfizer and the other pharmaceutical companies would be required to give Medicaid their "best price" on their prescription pharmaceutical products.

Despite our reservations about certain provisions in the rebate program that was finally enacted—particularly those allowing States to limit Medicaid patients' access to medications after an initial 6 month period—Pfizer supports the current program for several reasons. First, the "best-price" formula for determining the rebates does allow Medicaid to achieve parity with other purchasers. Also, the "best-price" for-

179

mula provides a market mechanism for setting the Medicaid rebate, in that the re-
bates are established through a process of competitive negotiations between compa-
nies and purchasing entities. The alternative approach suggested in H.R. 5614 would
replace the current market-determined Medicaid rebate with an artificial, govern-
ment set Medicaid discount.

CBO initially estimated that revenues from the "best price" provision would
largely disappear by the end of this year, because they assumed companies would
eliminate or drastically reduce their discounts to other purchasers. Most recently,
CBO has estimated that this will not occur until 1997. We do not think the revised
assumption about the disappearance of discounts and "best price" rebates is any
more accurate than the initial one. CBO originally estimated that revenues from
the "best price" provision in the first year would be 20 percent of the total amount
of the rebate. CBO now says that 1991 first quarter data indicate that about 30 per-
cent of rebates were due to the best price provision.

We believe the most recent CBO assumptions and estimates support our position
that competition in the marketplace does result in discounts, which are, and will
continue to be, passed on to Medicaid under the "best-price" concept.

Mr. Chairman, the Medicaid rebate program is still new and is still being imple-
mented, although significant progress has been made in resolving administrative
problems. Pfizer alone has invested over $1 million in new computer equipment and
personnel to operate this program. We do not think its implementation should be
disrupted at this point with major changes that could redistribute the amount of
rebate payments among the States and create new problems for States, manufactur-
ers, and the Federal Government. Furthermore, because the program is so new,
much of the relevant data is inconclusive and a number of ongoing studies are in-
complete.

At this early stage, the one thing that is clear is that the program is generating a
higher level of rebates than was initially anticipated. In its report dated June 22,
1991, CBO estimated that the Federal share of Medicaid rebates would total $705
million in fiscal year 1992 and $3.6 billion for fiscal year 1991–1995. This is almost
twice CBO's original estimates of $330 million for fiscal year 1992 and $1.9 billion
for the same 5 year period.

Mr. Chairman, we believe the Medicaid rebate program is working. It is produc-
ing substantially more revenues than expected. We do not think changes to the cur-
rent law are warranted at this time.

Mr. Chairman that concludes my testimony. I would be happy to respond to ques-
tions.

180

# GLOBAL COMPETITIVENESS OF U.S. ADVANCED-TECHNOLOGY MANUFACTURING INDUSTRIES: PHARMACEUTICALS

A Summary of the Report to
the Committee on Finance,
United States Senate, on
Investigation No. 332–302
Under Section 332(g) of the
Tariff Act of 1930

USITC PUBLICATION 2438

SEPTEMBER 1991

United States International Trade Commission
Washington, DC 20436

181

UNITED STATES INTERNATIONAL TRADE COMMISSION

## COMMISSIONERS

Anne E. Brunsdale, Acting Chairman

Seeley G. Lodwick

David B. Rohr

Don E. Newquist

————————————

Office of Industries

Robert A. Rogowsky, Director

————————————

Project Leader

Edmund Cappuccilli

Deputy Project Leader

Elizabeth Nesbitt

*This report was prepared principally by*

Donald Alexander, Aimison Jonnard, Linda Linkins, Edward Matusik,
James Raftery, Edward Taylor, and Stephen Wanser
Office of Industries

William Gearhart, Wayne Herrington, Paul Bardos
Office of the General Counsel

Daniel Shepherdson
Office of Tariff Affairs and Trade Agreements

Joseph Flynn
Office of Economics

*under the direction of*

Norman McLennan, Chief
Services and Electronic Technology Division

*with assistance from*

Brenda Carroll and Sun Park

Address all communications to
Kenneth R. Mason, Secretary to the Commission
United States International Trade Commission
Washington, DC 20436