**ANDERSON EXHIBIT 26O**

212

10

Moreover, just last month, the Congressional Budget Office nearly doubled the estimates it made in the Fall of 1990 of the savings that will be achieved by the OBRA 90 Medicaid drug-rebate program -- from $3.4 billion during FY 1991-FY 1995 to $6.4 billion during that period.

With that background on the research-based pharmaceutical industry, I will now turn to a discussion of H.R. 2890.

H.R. 2890

H.R. 2890 would further distort the U.S. free-market system beyond the major market changes already caused by OBRA 90. The bill would require that, to participate in DVA procurement, manufacturers must agree to provide drugs to DVA through the Federal Supply Schedule and its drug-depot system at September 1, 1990 prices, adjusted by the inflation factor of the Medical Care Account of the DVA. Beyond that, manufacturers would not be eligible to participate in the basic Medicaid drug-rebate program unless they agreed to the price rollback for DVA.

H.R. 2890 would constitute a far more radical and intrusive disruption of the free-market system than was caused by the Medicaid rebate program. The rebate provisions of OBRA 90 specify the amount of the rebate to be paid by manufacturers to the Medicaid program. But H.R. 2890 would actually set the

213

11

prices at which the DVA would acquire prescription drugs.

The two-year price rollback required by the legislation is
inherently unfair and unprecedented.  It would penalize forever
those companies that traditionally gave DVA highly discounted
prices.  In effect, the legislation would reach back in time to
pick then-existing price levels and then would apply an index
that has no relation at all to the cost of developing new drugs.
No reason has been shown why the pharmaceutical industry should
be singled out from others that freely negotiate the prices of
their products with the DVA and the other departments and
agencies of the Federal Government.

In the last few years, moreover, countries all around the
world have scrapped price controls as unworkable and have adopted
free-market principles as the best way to spur economic growth.
It would indeed be ironic, to say the least, for this country to
change course and establish price controls when other countries
at long last have abandoned them as a total failure.

H.R. 3405

The purpose of H.R. 3405 is to obtain for the "covered
entities" receiving funds from the Public Health Service the same
rebates provided by pharmaceutical manufacturers to the Medicaid
program.  The bill also would require the Secretary of Health and

214

12

Human Services, on behalf of each entity, to attempt to negotiate prices comparable to, or lower than, those charged as of September 1, 1990, increased by the Consumer Price Index.

We have very basic concerns about the approach taken in H.R. 3405.

The Public Health Service-funded Community and Migrant Health Centers are listed in a directory published by the Public Health Service.  Similarly, a directory of the Homeless Health Care Project is published by the National Association of Community Health Centers.  The entities listed in subsections (b) (2) (A), (B) and (C) of H.R. 3405 constitute more than 600 centers and more than 2,000 actual clinics.

We do not have a list of the other "covered entities" nor do we know how many there are.  We understand that in some cases the Public Health Service grantees are integral elements of larger health facilities.  In other cases, they may be as small as an individual physician's office.

It appears that the "covered entities" listed in H.R. 3405 are not reimbursed by the Federal Government for the pharmaceuticals they purchase and dispense, and that they receive pharmaceuticals through normal commercial distribution systems, including wholesalers and buying groups.  Therefore, providing

215

13

special prices or rebates to them would be totally different
administratively and far more complex than providing discounts or
rebates to state Medicaid programs or through contracts with the
DVA.

Since no one seems to know the number of covered entities or
the overall volume of their purchasing and dispensing, it is
impossible to estimate with any assurance the total "savings"
they might realize.  Perhaps as important, it is impossible to
estimate the administrative costs that the entities, HHS and the
industry would incur if the bill were enacted.

Subsection (d) seems to envision that the HHS Secretary will
negotiate individual contracts on behalf of the covered entities
with pharmaceutical companies.  We understand that more than 200
pharmaceutical companies have signed agreements with the Health
Care Financing Administration to provide Medicaid rebates.
Assuming that there are several thousand entities that would be
covered by H.R. 3405, the complexities of attempting to track the
pharmaceuticals on which a discount would be required under the
contracts and to provide a necessary audit trail to verify such
use would appear to be prohibitively expensive, if it were
possible at all.

Even with respect to the Medicaid rebates, where pharmacies
are actually reimbursed by the states based on reports submitted

216

14

to them, we understand that many states are still trying to
provide accurate figures.  And that system is well established
and substantially less complicated than the web of disparate
entities that would be covered by H.R. 3405.

Finally, we are concerned about the effects that the rebate
that would be required by H.R. 3405 and the Medicaid rebate would
have on each other.  The interaction of the two rebates would
sequentially force prices lower until they reach zero -- the so-
called "death spiral."  Each new rebate calculation could result
in a new "best price," thus continually driving the price of a
particular drug down until it reached zero.

Mr. Chairman, that concludes my prepared Statement.  I would
be pleased to answer any questions you or any other Members of
the Subcommittee may have.

217

Mr. WAXMAN. Thank you very much for your testimonies.

Mr. Tattle and Mr. Ingram, your companies provide deep discounts, substantial discounts for some groups that buy your drugs. I gather, Mr. Zabriskie and Mr. Bowler, your companies don't provide those deep discounts. Why do you provide deep discounts and then I will find out why you don't?

Mr. BOWLER. I think there are two reasons why we provide deep discounts. First of all, there are historical reasons. We were already providing deep discounts in part because of the nature of our product line.

One of our major product lines, as I am sure you realize, is oral contraceptives and we have a history of making them available to family planning clinics at very low prices, substantially below the nominal price, with a discount of at least 90 percent.

So, historically, we had already established that precedent. We were doing it both for commercial reasons as well as reasons we thought were very justified in making these products available to patients that otherwise would have had substantial difficulty in obtaining them.

We also do it, and we will be quite open, for competitive reasons from time to time. It is our concern about the removal of these competitive reasons with reference to best price that in our estimation is causing the distortion we are talking about today.

Mr. WAXMAN. What are the competitive reasons, to get a market penetration with your drug and have people familiar with it? Is that one of the competitive reasons?

Mr. TATTLE. That is a very legitimate reason. Another reason would be a quantity purchase which we have heard discussed today. Another reason might be distribution economies. There is a variety of reasons to drive the market system.

Mr. WAXMAN. How about the Government, which buys drugs for the Medicaid program, certainly a volume purchaser? Why wouldn't the Government get those discounts in the past?

Mr. TATTLE. The problem, I think, is because the government under Medicaid is the payer as opposed to the purchaser. The drugs are purchased in the normal distribution system. Also, the Government is then reimbursing those costs and does not have the classical ability to apply leverage as you heard from the gentlemen on the panel before us.

Mr. WAXMAN. Who is the purchaser?

Mr. TATTLE. The purchaser is the Medicaid recipient.

Mr. WAXMAN. When you had this last panel of volume drug purchasers, how are they different from the Medicaid?

Mr. TATTLE. They are very different. They are buying en masse for large numbers of people. Under Medicaid, the individual recipient would purchase that product in the normal distribution channel, namely pharmacies.

Mr. WAXMAN. Why wouldn't the government do the same thing, purchase large amounts of drugs for those people?

Mr. TATTLE. I think that is a question I would ask you.

Mr. WAXMAN. All right.

Mr. Ingram, what do you think about that?

Mr. INGRAM. Mr. Chairman, when you look at GLAXO's discounts, our deepest discounts go to the Department of Veterans Af-

218

fairs which represents about 1 percent of our business. As you and
other members of the subcommittee recognize, the Veterans Affairs
and their hospitals actually train about one-third of the physicians
in this country. That is an incentive for us to provide discounts
from our point of view.

Mr. WAXMAN. Because those doctors go out and practice else-
where.

Mr. INGRAM. Yes. They buy our products in large quantities,
warehouse them. They save us in terms of cost of distribution;
whereas, as you know, Medicaid is a reimbursement program. It
does not buy drugs, it does not warehouse them.

Mr. WAXMAN. You have given me good reasons why you would
have deep discounts. Why don't Pfizer and Merck have deep dis-
counts for some of their purchasers? Aren't you interested in
having the new doctors use your drugs so they will always use
them thereafter?

Mr. ZABRISKIE. I think what you are seeing is a fundamental dif-
ference in pricing philosophy among manufacturers, people who
want to treat two customers differently and one customer gets a
deep discount and another customer doesn't.

Merck, for years, has been known for equity in its pricing. We
don't want to favor one customer over another customer. So we
have had relatively flat pricing structure for years. That has been
a principle that we have held very closely to. That is our competi-
tive policy and how we wish to compete.

Mr. WAXMAN. So, if we have a best price policy, your company
benefits because you have never given deep discounted best prices
to anyone else so you will not be stuck with having to give that to
the Federal Government, is that it?

Mr. ZABRISKIE. I am not sure I would say we benefit because,
while our best price discounts would be less than other manufac-
turers who give deep discounts, we still, as I had in the record, will
be providing $200 million worth of savings in all Federal programs
this year to the Federal Government which is substantial.

Our DVA discounts average 22 to 23 percent. So, you know, we
are contributing. I don't see why our pricing policy should be held
against us because somebody else has a different pricing policy.

Mr. WAXMAN. Mr. Tattle, Mr. Ingram, do you think your compa-
nies are bearing a greater burden than Merck and Pfizer under the
existing system?

Mr. TATTLE. I think you have to look at the percentages. Right
now, I can only tell you what our burden is. Our burden in Medic-
aid rebates is $70 million in 1992, which approaches 40 percent of
our sales.

Mr. WAXMAN. How does that compare?

Mr. TATTLE. I cannot compare it to anybody else, but I can com-
pare it to the minimum rebate of 12.5 percent. We are shouldering
about threefold of the responsibility in terms of Medicaid rebate,
and that puts us at a competitive disadvantage.

Mr. WAXMAN. My time is up. Mr. Dannemeyer?

Mr. DANNEMEYER. I would like to find out if the pricing policies
of the four companies that are represented here have changed
since the law was adopted in the fall of 1990.

219

Mr. ZABRISKIE. Our pricing policy is basically the same. I think the subcommittee would be interested to know that we have entered into for the first time negotiations with managed care sectors. This demonstrates my point. While Merck had not done that in the past, we are now doing it. We see the managed care sector having a considerable amount of leverage on the pharmaceutical industry.

Mr. DANNEMEYER. That practice has come into existence since the law was passed?

Mr. ZABRISKIE. That is right. It says our discounts have increased since the law came in.

Mr. BOWLER. Our contract pricing policies have not changed, as I indicated in my statement. We previously offered discounts to the DOD and Department of Veterans Affairs. We continue to do so to the amount of $40 million in 1991. Those discounts have driven in part our Medicaid rebates.

Mr. DANNEMEYER. Mr. Tattle?

Mr. TATTLE. I can tell you we have tried not to vary our policy as a result of the best price legislation. We still offer significant discounts to the VA, as I said before, in the range of 40 or 50 percent.

But I think it would be fair to say in some cases where we had a best price reference to a very small volume clinic that then compelled us to pay a very large rebate across the entire products volume. Then, in those cases we either raised our price or, quite frankly, decided not to compete for that volume.

Mr. DANNEMEYER. Mr. Ingram?

Mr. INGRAM. As I said, the VA, which does receive our deepest discounts, and during last year those discounts resulted in savings of over $45 million. We have worked very hard not to change those discounts.

As we look forward, and if we are going to continue to tie best price, in this case in the case of the VA to 1 percent of our business, I think that provides a disincentive for my company and perhaps for others to continue to look at it in the same way.

Mr. DANNEMEYER. Your company, Mr. Ingram, is still providing discounts to VA?

Mr. INGRAM. That is right.

Mr. DANNEMEYER. How about your company, Mr. Tattle?

Mr. TATTLE. Yes, it is.

Mr. DANNEMEYER. Mr. Bowler, you are but you are not. Mr. Zabriskie?

Mr. ZABRISKIE. We are still providing that same discount that we have had, and the discounts have not changed. We are sympathetic to the argument that Mr. Ingram makes.

We have a proposal we would like to share with the staff of the subcommittee that would grandfather and exempt products like Mr. Ingram is talking about.

On the other hand, we still believe that the VA should get the best price for all of its products. It is currently only getting best price on 20 to 30 percent of its products. With our proposal, it would get best price on 100 percent of all the products in the market. It would achieve the kinds of savings, in our estimation, that we think the Veterans Administration is looking for.

220

Mr. DANNEMEYER. Mr. Mossinghoff, your organization represents all these companies, right?

Mr. MOSSINGHOFF. Yes, sir.

Mr. DANNEMEYER. You have a great deal of courage showing up here today.

Thank you, Mr. Chairman.

Mr. WAXMAN. Mr. Wyden.

Mr. WYDEN. Gentlemen, we heard from a lot of customers of yours today who are really mad. These veterans are seething. We heard from large private buyers. We heard from some pretty angry people.

My question, let's start with you, Mr. Zabriskie, do you think that the best price is going up the way the witnesses testified today or is this just kind of anecdotal stuff and nothing that Congress ought to be that concerned about?

Mr. ZABRISKIE. Congressman Wyden, I really don't know the answer to your question. What I do know is that it was the original consideration. Discussion and debate on the bill was that there would be a change in the pricing structure in the market. Everybody recognized that. We talked about it the last time we testified here. Whenever a large purchaser of $6 billion enters the market for the first time, there will be some adjustment.

The point I would like to make, though, CBO and I believe HCFA agrees that the average best price discount today is still significant; it is 28 percent off the manufacturers price.

Mr. WYDEN. I wanted an answer to the question. In your opening statement, you seemed to say that the best price was not going up, and if it was we would not have these big discounts.

It seems to me what people are saying is that the best price is going up very dramatically, you know, and there are lots of innocent victims out there. I gather now you are saying you really don't know and we ought to just be pleased because there are still some rebates.

Mr. ZABRISKIE. I can really only speak for ourselves and for Merck, and our discounts are better today than they were prior to 1990.

The second thing I would point out is that the CBO estimate of the rate of decrease of discounts is far less than what was originally anticipated.

Mr. WYDEN. They are still going down. We got very angry buyers all over the country. If any of you other witnesses would like to comment on it, I would like to hear it because I do not see how you can call it anecdotal or say that this is isolated when you have somebody like AmeriNet come in representing 2,400 hospitals, something like one-third, of American hospitals, I guess, a group that buys virtually all the drugs there are, and they say they are getting flattened.

Mr. BOWLER. The prices do change. Every time there is a contract renegotiated there will be changes in the terms of that contract, both prices and the length of the contract. This happened before Medicaid rebates and it will happen afterwards. In part, possibly a lot of the changes that would have occurred anyway in prices in terms of contract are being blamed on Medicaid.

221

Mr. WYDEN. What other factors were involved? Is this a period of extraordinarily large investments in research? I am interested in hearing if there is some other rationale, but it is hard to believe that we have consumers this angry across the board, private and public buyers, and it can just be due to some natural evolution in the contracting process.

Mr. BOWLER. Obviously the changes, according to some of the data, appear to be more dramatic than you might have predicted. On the other hand, CBO estimated that the best price component would raise something like 20 percent of the rebate in 1992. That was by looking at some of these price changes that had occurred or were predicted by people like those on the previous panel. In fact, the best price component raised 30 percent. So we have data moving both ways.

People are saying best price is going away and CBO is saying it doesn't seem to be going away as fast as we thought it would. The whole program has generated twice the revenues predicted.

Mr. WYDEN. I would like to ask each of you to tell the subcommittee your position on my proposal and what your position would be, and if you don't support it, why not.

To repeat the concepts briefly, I propose that all government buyers, all the key government buyers, would get a flat fixed rebate, between 22 and 25 percent off the average manufacturer's price, and that the private buyer, who we heard quite irate today, would be exempted for themselves. This is not a question of your commenting on legislation, but I would like to know what your position would be on those two concepts. If you cannot support it, why not? Mr. Mossinghoff?

Mr. MOSSINGHOFF. Congressman, I am really going to have to back away from that question. The board of PMA has not reached an agreement, as you see before you, on the issue of agreement on best price. I am not in a position to give you an association position.

Mr. WYDEN. Mr. Chairman, I know my time is up, but can we get it?

Mr. WAXMAN. Let's go very quickly; you like it or you don't like it?

Mr. INGRAM. Mr. Wyden, I think GLAXO likes the fixed rate approach. I think we find the CBO estimates very compelling. We would certainly commit to working with you and your staff, as well as Mr. Slattery, to pursue that concept.

Mr. TATTLE. Congressman, conceptually the concept appeals to Johnson & Johnson. We do have a concern, and I think it was alluded to by Mr. Mossinghoff in his testimony, which is we only sell a very small portion of the Public Health Service clinics on a direct basis.

Administratively, I think there are a number of issues that we would have to work with the committee on to be sure that it accomplished what the committee was trying to accomplish. So I guess I am saying, conceptually, it has appeal.

I think there are a number of administrative issues that would have to be very clearly thought through.

Mr. BOWLER. Mr. Wyden, we are remaining with the best price proposal, as I have stated, so I assume we would have problems

with your first proposal. We simply, as a company, have not taken a position or looked at the proposal to exempt private buyers.

Mr. ZABRISKIE. Not to sound like an echo, Congressman Wyden, but obviously we would stay with the best price and we would not favor an exemption for HMO's, because we believe that HMO's would set a best price below the flat rebate, and we feel very strongly from a public policy point of view that Medicaid should get the very best price.

Second, on the public health clinics, we believe that there should be help for the public health clinics. I suppose it would come as no surprise that we favor a best price rebate approach for public health clinics. We are working with Congress on that. We have already made a voluntary program available.

Mr. WAXMAN. Thank you, Mr. Wyden.

Mr. McMillan.

Mr. McMILLAN. I think Mr. Mossinghoff's position is only slightly less complicated than ours. You just have to deal with it within the industry. We have to deal with it within the industry and then with all the other groups that are affected. This is not an easy thing to do.

I am a little curious about the estimates of savings. Perhaps Mr. Zabriskie would like to comment. You define them as $6.4 billion. I believe you were referring to over 5 years, a reestimate for Medicaid. Is that correct?

Mr. ZABRISKIE. That is right, sir.

Mr. McMILLAN. What would have been the effect to the cost to the VA system during the same period of time if all the other assumptions are correct?

Mr. ZABRISKIE. I don't know the answer to that, but the numbers I have heard, that there has been a burden of somewhere between $90 and $100 million placed on the VA system because, that is what other people have said, because of OBRA and the cost shifting, so you can assume what it would be.

Mr. McMILLAN. From your perspective, I will make this a generalization: Who is paying for the $6.4 billion, if, in fact, it is a real discount or savings to the Government? It comes from somewhere. It did not just descend? The Federal Reserve did not make up funds?

Mr. ZABRISKIE. It is coming from the earnings of the pharmaceutical companies. Remember, Medicaid, originally, there were no rebates given to Medicaid. Some of us went forward and said that this is not right and we think that Medicaid should get rebates. So at a very minimum, Congress decided that Medicaid would get 15 percent rebates supplemented by the best price provisions if prices were better.

Mr. McMILLAN. I am one who does not consider profits predatory or necessarily greedy. They basically belong to a whole array of interests and go to sustain the dynamic development of a new product which is a benefit to the society. But I do question whether or not we are operating under illusion if we think we legislate a rebate and it comes out of some corporate pot and the rest of the public does not pay a price. I just don't think that occurs. The general price levels may go up, which brings me to my next question.

223

When you talk about savings, you are talking about savings from what? It is a little like my wife might go out and say, I just went to this great sale, they are knocking 20 percent off Mercedes. I would say, why did you want to buy a Mercedes in the first place? Why didn't you get a Ford?

What are we talking about as a point of reference when we define savings? Is there a base price that goes back to 1990 that is a point of reference?

Mr. ZABRISKIE. The calculations showed that Medicaid was not getting any rebates. Then, based upon 1990 and the first year, the rebate was somewhere around 30 percent on average off the manufacturer's price. These are CBO estimates, not my estimates.

The other interesting thing, the phenomenon that is happening in the marketplace, is kind of contrary to the argument that you are taking, is that over this time period, annual price increases have begun to decline dramatically, and nobody has talked about that today.

In 1989, the annual price increases, according to the Bureau of Labor Statistics, were about 9½ or 10 percent a year. The most recent figures from June to June are down to about 6 percent a year. So, as there has been an adjustment, and in seeking a new equilibrium in pricing for discounts, at the same time the annual price increases are coming down as well.

So, I don't think it is going from one pocket out of the other. I think the contributions, the rebates, are coming from the pharmaceutical industry.

Mr. MCMILLAN. I think that may be true. That has occurred. I know that the rate of inflation has been declining, so the pressure is on all your costs, and for that reason it would be relatively less.

I am not arguing and I am not trying to direct this to anyone in particular. I think it is a concern that we have. We are not only considering the cost to Medicaid, but the cost to the entire system.

Isn't a beneficiary under Medicaid with nothing in place able to benefit from discounts to the extent that they receive the service from a provider who falls into a logical pattern of being able to negotiate discounts from standard price? So it is not valid to say that Medicaid beneficiaries are necessarily paying the high price. They may be participating in or receiving the benefit from a hospital or a HMO or whatever that has considerable buying power.

Mr. ZABRISKIE. In the past when the law was enacted, and I believe the same is basically true today, yes, there was some provision for Medicaid in the direction that you set forth, but by and large, the vast majority was not provided through large networks that were negotiated for better prices. That is why Medicaid was paying the very highest price in the marketplace in the past and now they are paying the very best price.

Mr. MCMILLAN. Medicaid is the fastest growing program in the Federal Government by a long shot. I suspect that that or its equivalent is going to continue to be.

So, I will just conclude by making a comment. I don't know quite where I am on this thing. I am struggling for us to do something that fits the logic of the marketplace and the distribution patterns of the marketplace, because to the degree that we are in sync with that, then, we are going to have the right incentives in place that

224

enable you as an industry to respond in the best way for the public as a whole. If that means that we have to make a decision as to whether we are going to subsidize a Medicaid beneficiary who lives in the wrong place, goes to the least leveraged potential buyer of the pharmaceutical, then maybe that is something we need to consider as a matter of policy. But we don't want to achieve that and distort the whole system to get there.

Thank you, Mr. Chairman.

Mr. WAXMAN. Mr. Lent.

Mr. LENT. Thank you, Mr. Chairman.

I would like to ask Mr. Ingram of GLAXO, first question, did your company do anything to help Medicaid save money on drug costs before the enactment of OBRA 1990? Incidentally, OBRA 1990, I remember it well, it was passed in the middle of the night and nobody knew what was in that thing. But we are learning it now in retrospect.

Mr. INGRAM. Mr. Lent, the answer is yes. GLAXO, as did several other companies, had a voluntary rebate program in effect before the enactment of OBRA 1990 legislation. In fact, our own proposal, which offered to Medicaid the same best price that we extended to like customers, and those were other reimbursers, was accepted by 17 States in a very short period of time.

Mr. LENT. How do you think that OBRA 1990 ought to be changed? Do you have any ideas?

Mr. INGRAM. If I heard your question, it is how would we feel about changing OBRA 1990. I think as both Mr. Tattle and I and the presiding panel have indicated, it would be GLAXO's recommendation that to continue to provide the desired best savings for the Medicaid program, which was the intent of this legislation, and at the same time to allow companies who wished to offer deeper discounts to the Department of Veterans Affairs and other private purchasers, that the best approach to that would be to make the rebate a fixed rate rebate.

Mr. LENT. Mr. Bowler of Pfizer, two of the three bills before us would require companies to roll back their prices, as we learned, to 1990 levels and put an index cap on future increases. These are major steps toward government controls. Are we sure the situation requires this level of government intervention and that these changes won't create more problems?

Mr. BOWLER. As I have testified, Mr. Lent, as we look at the data pertaining to Veterans Affairs, it is clear that their prices have increased. It is less clear as to why that has occurred. There are a number of components. It is clear that their costs increased. There are a number of components, the price of the product, the volume of patients, prescriptions for patient, the mix of the products that they are using.

At this point, in addition to not having sufficient data to suggest the reason for these cost increases, we can look at our own experience where we have not changed our contracting policy, and on the basis of those policies, we do not think that rolling back the price, capping that with a government index is justified.

Mr. LENT. In your testimony, you indicated the original CBO estimates for Medicaid rebates have been now discovered to have been quite low and the actual savings to the Federal Government is

225

much greater. We are raising a significantly higher level of reve-
nues than originally CBO anticipated. That being the case, why
would we want to make changes now to a program that is raising
more money for Medicaid than was originally estimated?

Mr. BOWLER. Mr. Lent, again, that is precisely our point. We
think that the program, on the one hand, it is quite new. It has
been implemented for just over a year. We are still working out
some of the implementation problems.

The one thing we do know about the program is what you just
stated. It is producing more rebates than was predicted.

Mr. LENT. Could I ask a question of the entire panel, maybe we
start with Mr. Zabriskie on my left. What percentage rebate is
each company represented here today paying to the Medicaid pro-
gram in 1992, or is that an impossible question to respond to?

Mr. WAXMAN. Would the gentleman yield?

Mr. LENT. Yes, I would be happy to.

Mr. WAXMAN. I was going to ask the question in this way. I was
going to ask Mr. Mossinghoff if he could give us information on a
company-by-company basis as to the amount of Medicaid rebates
paid during the first year of the program as a percentage of each
company's gross sales to Medicaid over that period. I think that
would be pertinent. I think it is pretty much the same thing you
are asking. Why don't we see how each company is being affected
by this?

Mr. LENT. And allow the response to come by mail rather than
trying to get the answer tonight?

Mr. WAXMAN. Yes. Because all you could hope for is the answer
for these companies alone.

Mr. LENT. I thank the chairman.

Mr. WAXMAN. Mr. McMillan.

Mr. MCMILLAN. I don't know how to quite ask this because I
think just a flat rebate number with no further detail might be
misleading. One of the reasons there may be greater rebates to
Medicaid than predicted in 1990 is because Medicaid is a lot bigger.
There are a heck of a lot of benefits going out that weren't antici-
pated. That is one factor——

Mr. WAXMAN. Mr. McMillan——

Mr. MCMILLAN [continuing]. That may influence the demands for
various products which may influence which company is getting
more rebates. The product mix needs to be a part of looking at this
if we are going to comprehend or gain information from it. That is
my point.

Mr. WAXMAN. I think we can look at it and try to evaluate that.
Mr. Tattle testified under the best price approach his company
pays a disproportionate share of the Medicaid rebates. If that is the
case, I would be curious to know. We will evaluate what the impact
is on each company.

Mr. Mossinghoff is probably in the best position to get that infor-
mation.

Mr. MOSSINGHOFF. Mr. Chairman, we will try to get that for the
committee. It will have some footnotes about disputed items. We
will undertake to do that for the committee.

Mr. WAXMAN. They won't kill you if you ask. They may get
angry at us.