**ANDERSON EXHIBIT 26P**

[The information follows:]

JOHNSON & JOHNSON,
ONE JOHNSON & JOHNSON PLAZA,
*New Brunswick, NJ, September 8, 1992.*

Hon. HENRY WAXMAN,
Chairman, Subcommittee on Health and the Environment,
*Washington, D.C.*

DEAR CHAIRMAN WAXMAN: At the July 31st hearing before the Subcommittee on Health and the Environment, you requested that individual pharmaceutical companies provide the percentage their Medicaid rebates represent of their total Medicaid sales. For calendar year 1991 Johnson & Johnson rebates represented 29 percent of Medicaid sales.

As I testified at your hearing, in 1992 we project that Johnson & Johnson will rebate 39 percent of our Medicaid sales, or more than three times the minimum rate.

We appreciate your effort and interest as well as that of the entire Subcommittee in attempting to address the problems in the current Medicaid rebate law.

Sincerely,

P.T. TATTLE.

Mr. WAXMAN. Mr. Hastert.

Mr. HASTERT. Thank the chairman.

Let me ask a couple questions here that I have asked the other groups, and I need to get a straight answer and see where we are at. My understanding is that, traditionally, the reason that Medicaid didn't get the discounts prior to OBRA 1990 was it didn't perform off the economies that were out there. Otherwise, it was a sale to individual purchasers instead of wholesale sales or huge lot sales to one distribution point.

Can everybody agree on that? Is that a yes or a no? OK.

Then, we come along with OBRA 1990 and all of a sudden Medicaid through government or through law, through statute, is the most favored purchaser. But you still sell that product out through the same distribution system as before; is that correct? As a matter of fact, Mr. Tattle, you asked the question to the chairman, why don't you change the system.

Mr. TATTLE. No, I didn't really suggest it. I said I probably wasn't the best person to answer the question.

Mr. HASTERT. Fine. I thought you asked something else.

Then, let me ask the question. Based on what your costs are to manufacture a product and to distribute a product and to advertise a product and to research a product, are you making any profits on your sales to Medicaid customers? I don't see anybody volunteering. Start yes? No?

Mr. ZABRISKIE. Yes.

Mr. BOWLER. I don't feel competent to answer that question. I assume we are.

Mr. TATTLE. It depends on how you define profit, but I would say, yes.

Mr. INGRAM. The answer is yes.

Mr. WAXMAN. For the record, each one of the witnesses answered in the affirmative. Some people just shook their heads.

Mr. HASTERT. I think I got an answer from everybody.

Now, when you take this one step farther, and you are saying the best price that other people enjoyed, private purchasers, group health care groups, that their margins of discount are disappearing. That was the testimony we had from these people on the panel

227

before you. Is that because there is a cross-subsidization? Otherwise, the discounts that Medicaid is getting—the discounts that the other companies are getting are shifting. Are we shifting costs or is that an increase in research costs or increase in liability insurance? Why have their prices gone up?

Mr. ZABRISKIE. Our prices to those customers are going down.

Mr. HASTERT. OK. So they are paying less than they paid before OBRA 1990?

Mr. ZABRISKIE. That is right. It is one company, it is our company.

Mr. HASTERT. Fine, great.

Mr. HASTERT. Let me clarify. Your company is even-based pricing. You didn't do deep discounting before; is that right?

Mr. ZABRISKIE. That is right.

Mr. BOWLER. Our policy was the same. Our discounting was largely to the Government. We have continued the same procedures and the same policy. We have substantial discounts to the VA, which are, in fact, then as I said, driving—that is our best price and affecting in a large way our Medicaid rebate.

Mr. HASTERT. OK. So Medicaid is getting the rebate and VA customers are still getting a good deal? Their prices are going down?

Mr. BOWLER. Not going down, but they haven't gone up.

Mr. HASTERT. So they are stable?

Mr. BOWLER. Yes.

Mr. HASTERT. The gentleman from Johnson & Johnson.

Mr. TATTLE. As I said in my testimony, the VA gets very deep discounts, ranging between 40 and 50 percent, despite the current legislation.

Mr. HASTERT. Is that more or less than what it was before?

Mr. TATTLE. Probably more than it was before, but we tried very hard not to move significantly away from these deep discounts.

Mr. HASTERT. You were a deep discounter to start out with?

Mr. TATTLE. Absolutely.

Mr. HASTERT. Yes. The other gentleman?

Mr. INGRAM. We were also a deep discounter to Department of Veterans Affairs, and we have been able to maintain that deep discount.

Mr. HASTERT. It is perplexing. I don't know why the VA is here complaining. Thank you gentlemen. I know it is touchy questions I asked. I think it is legitimate. I can see the gentleman at the end wants to say something.

Mr. ZABRISKIE. Very quickly, Mr. Chairman, I think what you just heard, the four companies represented here at the table do provide substantial discounts to the VA and they have not changed since the law was enacted. I would guess we probably account for about 20 percent of the business, VA's business.

Mr. HASTERT. Thank the gentleman.

Mr. WAXMAN. I have to ask this question, then. You are all saying with pride you give discounts to the VA, but the testimony we got was the VA was paying $100 million more last year for pharmaceuticals, which they have maintained is as ,a result of OBRA 1990. Now, are they wrong?

Mr. TATTLE. Mr. Chairman, I would like to clarify my point. I said we have tried very hard to maintain those deep discounts.

Mr. WAXMAN. But you haven't been able to.

Mr. TATTLE. We haven't been able to. We are discounting in 40 to 50 percent, but in cases we have had to increase that price and we have done so. That is the pressure that we felt as a result of the rebate burden we have been carrying. Our discounts even after these changes continue to be in the 40 to 50 percent range.

Mr. WAXMAN. You are still giving discounts, but the VA is paying $100 million more for pharmaceuticals. They are upset about it, obviously. What Sonny Montgomery, Chairman of the Veterans Affairs Committee, has recommended, Congressman is to go and roll back the prices for the VA to what they were before OBRA 1990. Some people have suggested that we move to this rebate idea that Mr. Slattery has. I assume none of you are for rolling back the prices; is that correct?

Mr. MOSSINGHOFF. On that issue, the board of PMA is unanimously opposed to that because it is unfair.

Mr. WAXMAN. Unfair because it is Government setting price?

Mr. MOSSINGHOFF. When you sneak up on a company and say that was your price September 1990 and that is your price forever more, whether the situation has changed, it seems to me that is something Congress shouldn't do. It is inherently unfair.

Mr. WAXMAN. I think we have to give an answer to the veterans. Let's say we move to a system of rebates across the board. Is there any commitment you could give us the Veterans' Administration will get the kind of discounts comparable to those you gave before 1990?

Mr. TATTLE. If we move ahead with the fixed percentage rebate we are suggesting, we would be prepared to suggest that as a minimum rebate for the VA.

Mr. WAXMAN. What?

Mr. TATTLE. The fixed percentage, the 22 percent suggested in Congressman Slattery's legislation for 1993.

Mr. WAXMAN. You would give them the same discount you would give Medicaid?

Mr. TATTLE. We would suggest that as a minimum and allow them to negotiate like they have historically for whatever the market will accommodate. I would suggest in many cases it would be substantially greater than 22 percent, as it already is with our company.

Mr. WAXMAN. Anybody else have further questions before we move on?

Mr. MCMILLAN. If I could pursue that point.

Mr. WAXMAN. I yield.

Mr. MCMILLAN. Under that—Mr. Tattle, if you go to that system, what happens to the distribution of the costs based on differentials in real distribution costs?

Mr. TATTLE. Our situation, we would propose that it moves to more equitable distribution costs across the range of pharmaceutical companies, and in that situation we would move away from Medicaid rebate approaching 40 percent to one that would be even across all pharmaceutical companies and that would allow us to be more competitive in other situations where market force is dictated.

229

Mr. WAXMAN. I want to thank this panel for your presentation to us. You have given us a unique perspective on this problem, and we will continue to work with you as we look at it to see what the best policy will be for the country. Thank you for being with us.

[The following letter was received:]

230

**MERCK & CO., INC.**
P. O. BOX 2000
RAHWAY, NEW JERSEY 07065-0900

September 14, 1992

J. L. ZABRISKIE
SENIOR VICE PRESIDENT
(908) 594-6813

The Honorable Henry Waxman
Chairman, Subcommittee on Health
 and the Environment
2415 Rayburn Building
Washington, D. C. 20515

Dear Mr. Waxman:

Thank you again for offering Merck & Co., Inc. the opportunity to present its views on a number of important Medicaid, VA, and public health clinic issues at the Subcommittee Hearing on July 31, 1992.

The purpose of my letter to you today is to state concisely what we believe to be the key issues under debate.

Merck sales to Medicaid, the VA, the Military and the Public Health Service amount to about 5% of our U. S. Human Health product sales. Our discounts and rebates off our "ex-manufacturer" (e.g., direct) catalog price to these entities in 1992 will significantly exceed 200 million dollars. To Medicaid, our total discount percentage for 1992 will be about 18%.

We believe it is a fair conclusion from testimony delivered at your subcommittee hearing that major companies, regardless of their discount policies to the private sector, are making substantial discounts to the public sector under current law and industry practices.

As you are well aware, discounts are only meaningful when placed in the context of the "catalog" price which is subject to the discount. A manufacturer providing a discount of, say, 25% off prices that are quite high compared to the competition may be far less "penalized" than another manufacturer discounting 10% off generally lower prevailing catalog prices. From the consumer perspective, getting a 10% discount off an already fair price may be a better deal than getting 25% off a premium price.

231

-2-

Merck has had a reputation of being a firm with innovative products and a relatively narrow price discount structure. The nation's 50,000 plus retail pharmacists invariably applaud our practice of avoiding extensive cost-shifting pricing strategies. However, some have suggested Merck prices not only are not discounted but are, in fact, "high" to everyone. The facts do not support this assertion; indeed, they support our assertion that because we consciously avoid cost-shifting policies, our "catalog" price (paid by virtually all in the private sector) is lower than it would be otherwise.

Attached "Table A" shows the prices at launch for all new Merck products and their direct competition. Vasotec®, our largest product worldwide, was launched at a 22% discount to the market leader, captopril. Mevacor®, our second largest product, was introduced at a 13% discount to cholestyramine. Plendil®, a still very small product launched last year, was introduced at a 28% discount to the market leader, Procardia XL. Zocor®, our second HMGCoA product, was launched at a 10% discount to our own product Mevacor®. And Pepcid®, our third largest product, was introduced at a 13% discount to Zantac. Of relevance, too, since these product launches, our price increases have been below the industry average and since 1989 have been intentionally kept below the CPI as a matter of corporate policy, given stable market conditions and government policy supportive of innovation. For Proscar®, our newest product with no competition, Wall Street financial analysts have criticized us and consumers have praised us for our lower-than-expected introductory price.

To us, here is the key issue: whether the Medicaid Program and the poor and disabled who are uniquely dependent on Medicaid will be fairly treated. The current law does this by encouraging firms to give their best price to the poor and disabled in Medicaid (and, with the VA exemption which we support, the military and VA.)

Abolishing best price says that Congress does not believe the poor and disabled should get the best price. On the contrary, Congress will be creating new policy which says "the big guys" with strong economic leverage such as major health insurance firms, for-profit hospital chains, mail order pharmacists and billion dollar revenue HMOs should get the best price instead of Medicaid.

232

-3-

Moreover, by abolishing best price Congress could be encouraging pharmaceutical firms to adopt high catalog prices which firms could use to subsidize deep discounts to everyone but the Medicaid poor and the majority of individuals who don't have HMO coverage or big chain hospitals in their neighborhood. We must be mindful that in addition to Medicaid Programs, the group that has most suffered from the cost-shifting practices that stem from wide price disparity, is, in fact, the nation's senior citizens under Medicare who don't have drug coverage and, therefore, who often purchase their drugs from community pharmacists.

Government policies at first blush often appear to fall unequally on different firms and can be attacked as being "unfair." Upon further investigation and reflection, the cause is usually because no two firms are the same. In the pharmaceutical industry, they may have different R&D commitments; a different product mix judged according to innovativeness, newness, therapeutic need; different service-to-customer philosophies; different domiciles for manufacturing or taxation and so on. Clearly, the primary question Congress must address is what is best for Medicaid.

For your information, we also enclose press clippings from a legislative battle which took place in New Jersey in June. As you will see, America's citizens, when aware of the best price issue, have no trouble in deciding that best price is the best policy. It is no surprise that senior citizens and the New Jersey Legislature (both Republicans and Democrats) overwhelmingly endorsed the best price approach. In testimony, senior citizens emphasized the obvious -- a program for the needy deserves the best price, it is as simple as that.

Mr. Chairman, we support you and your subcommittee's plans to exempt the VA from OBRA '90, and urge that, if you determine to take further action, you consider the principles discussed in this letter.

Very truly yours,

*John Zabriskie*

J. L. Zabriskie

Attachments

/rsk

233

## MERCK: DIRECT PRICES
## RELATIVE TO COMPETITORS AT
## LAUNCH

| Product | Direct Price Per Day | Merck Price Relative to Competition |
|---|---|---|
| Vasotec® (Merck) | $ .42 |  |
| Capoten | .54 | (22)% |
| Mevacor® (Merck) | $ 1.25 |  |
| Lopid | 1.16 | +8% |
| Questran | 1.44* | (13)% |
| Pepcid® (Merck) | $ 1.47 |  |
| Zantac | 1.69 | (13)% |
| Tagamet | 1.54 | (4.5)% |
| Chibroxin® (Merck) | $ .64 |  |
| Ciloxan | 1.28 | (50)% |
| Plendil® (Merck) | $ .64 |  |
| Procardia | .89 | (28)% |
| Cardizem | 1.12 | (43)% |
| Zocor® (Merck) | $ 1.33 |  |
| Mevacor® | 1.47 | (10)% |
| Pravachol | 1.33 | 0% |
| Prinivil® (Merck) | $ .44 |  |
| Vasotec® (Merck) | .51 | (14)% |
| Capoten | .64 | (31)% |
| Zestril | .44 | 0% |
| Vaseretic® (Merck) | $ .50 |  |
| Capozide | .62 | (19)% |
| Prinzide® (Merck) | $ .62 |  |
| Vaseretic® (Merck) | .64 | ( 3)% |
| Capozide | .68 | ( 9)% |
| Zestoretic | .62 | 0% |
| Proscar® (Merck) | $ 1.40 | N/A |

Source: Medispan, Red Book and Physician's Desk Reference (PDR)

*Based on a four times per day dosing regimen which falls within the PDR range of 1-6 doses per day.  Current daily average consumption is 5.4 doses per day.

234

Mr. WAXMAN. For our last panel representing the generic drug manufacturers, Martin Zeiger, Executive Vice President and General Counsel of the Rugby-Darby Group Companies, accompanied by Dee Fensterer, President of the Generic Pharmaceutical Industry Association.

Mr. WAXMAN. Mr. Zeiger, Ms. Fensterer, let me thank you for your patience. This is 4:30 on a Friday afternoon on a Medicaid hearing. I must say I am amazed we have gone this late and had so many members up to this point. Thank you for being here.

Your prepared statement will be in the record in full. We would like you to limit the oral presentation to no more than 5 minutes.

## STATEMENT OF MARTIN ZEIGER, EXECUTIVE VICE PRESIDENT, RUGBY-DARBY GROUP COMPANIES, ON BEHALF OF GENERIC PHARMACEUTICAL INDUSTRY ASSOCIATION AND NATIONAL ASSOCIATION OF PHARMACEUTICAL MANUFACTURERS, ACCOMPANIED BY DEE FENSTERER, PRESIDENT (GPIA)

Mr. ZEIGER. My name is Martin Zeiger. I am Executive Vice President of Administration and General Counsel for Rugby-Darby Group. We are the largest generic drug distributor and one of the largest drug manufacturers in the United States.

I am pleased to appear today on behalf of the generic industries' two principle trade groups: the Generic Pharmaceutical Industry Association and National Association of Pharmaceutical Manufacturers. I am accompanied by Dee Fensterer, the President of the GPIA.

The generic industry is vitally interested in all three bills under consideration today, along with any and all legislation designed to extend or change the rebate provisions of OBRA. We are not opposed to the extension of discounted prices to federally-funded programs. However, for reasons I will discuss in this statement, the rebate program should not include generics.

I read with interest Congressman Wyden's op/ed piece in the July 24th, Washington Post. Congressman Wyden is advocating a competitive market approach for containing health care costs, but he goes on to say, an enforceable budget cap should be available to kick in in situations where market forces are unsuccessful in restraining prices. In our opinion, this proposal warrants serious consideration.

Our industry certainly understands the ability of market competition to keep prices low. We live with it every day. We are the white hats. Currently, the use of generic drugs is one of the only proven strategies for health care cost containment. I have listened to every speaker today, and I haven't heard one criticize generic drug pricing. But at the same time, the brand name prices are going through the roof, our prices dictated by competition and the forces in the industry and the method of reimbursement which I will touch upon, keeps our prices very low.

Considering the intense competition that exists within our industry, it is unfortunate that generic drug manufacturers were swept into the rebate program, and that is what happened, we were swept into it.

Two recently completed studies, which we have submitted for the record, have demonstrated the harm that has been visited upon the generic drug manufacturing industry by the rebate law.

The first study, conducted by the Philadelphia College of Pharmacy and Science, asked generic drug companies about manufacturing costs and selling prices for selected drug products, as well as opinions on the impact of the rebate law.

The study showed the following: One, current price competition in the generic industry is an effective tool in ensuring reasonably priced medications; two, a fixed percentage rebate across all generic product lines may drive competitively priced generics from the market; three and four, we are a highly competitive industry and the rebate law tends to destabilize that industry and depress research into new products.

The other study by a nationally-recognized expert, Dr. Steven Schondelmeyer of the University of Minnesota, also included this sobering conclusion: Generic firms lost almost 31 percent of their net income due to Medicaid rebates, from a 2.97 percent net profit to a 2.05 net profit.

If Congressman Hastert were here now to ask me the profitability of the generic industry on the Medicaid rebate program, I could tell this committee that in many cases it would be a resounding no. Dr. Schondelmeyer also discovered that the basic rebate had a substantially greater impact on generic companies than on brand name firms.

Mr. Chairman, there are several compelling reasons why generic drug manufacturers should not be required to pay rebates. First, the competitiveness of our industry; second, in 1987 when HCFA imposed upper limits on what the Federal Government will reimburse to pharmacists for generic products, these upper limits were so low they actually provide pharmacies with a financial incentive to dispense highest branded product. For example, the reimbursement for 100 Valium tablets is approximately $78. Reimbursement for 100 tablets of the generic equivalent is only $1.80.

I submit to you, and make no mistake about it, the upper limits imposed by HCFA in 1987 is a form of price control on the generic industry. There is no other way to describe it.

Mr. Chairman, because of these factors we are urging the drafting of legislation that would: One, exempt generic drug manufacturers from the rebate provisions of OBRA 1990; two, remove the disincentive to dispense generics by replacing the reimbursement formula with a more cost-effective reimbursement system based on AWP, the AWP concept in the catastrophic bill, as you will recall.

In the June 8, 1992, issue of Drug Topics, a pharmacist was quoted as saying, under HCFA pricing for generics, he said, it makes more sense for me to pay a messenger to travel by cab to the physician's office to pick up a new script for the brand. I will still make more profit dispensing the brand than I would dispensing the generic at the HCFA price. We submit this is crazy.

[The prepared statement of Mr. Zeiger follows:]

### STATEMENT OF MARTIN ZEIGER

Mr. Chairman, my name is Martin Zeiger. I am the executive vice president of administration and the general counsel for the Rugby Darby Group, the largest ge-

neric drug distributor and one of the largest generic drug manufacturers in the United States. I am pleased to appear today on behalf of the generic drug industry's two principal trade groups, the Generic Pharmaceutical Industry Association and the National Association of Pharmaceutical Manufacturers. I am accompanied by Dee Fensterer, president of the GPIA.

The generic industry is vitally interested in all three bills under consideration today, along with any and all legislation designed to change or extend the rebate provisions of the Omnibus Reconciliation Act of 1990 (OBRA 1990). We are not opposed to the extension of discounted prices to federally-funded programs; however, for reasons I will discuss in this statement, the rebate program should not include generics.

I read with interest Congressman Wyden's "op/ed" piece in July 24th's edition of the Washington Post. Congressman Wyden is advocating a competitive market approach for containing health care costs, but he goes on to say that an enforceable budget cap should be available to "kick in" in situations where market forces are unsuccessful in restraining prices. In our opinion, this proposal warrants serious consideration.

Our industry certainly understands the ability of market competition to keep prices low. We live with it every day. Currently, the use of generic drugs is one of the only proven strategies for health care cost containment. At the same time that brand-name drug prices are increasing faster than the rate of inflation, the price-competitive generic industry is not only controlling prescription drug costs, it is rolling back its prices to consumers and government purchasers, and making available to consumers high-quality medicine that costs, on average, half as much as equivalent brand-name drugs.

Considering the intense competition that exists within our industry, it is indeed unfortunate that generic drug manufacturers were swept into the rebate program.

Two recently-completed studies have demonstrated the harm that has been visited upon the generic drug manufacturing industry by the rebate law.

The first study, conducted by the Philadelphia College of Pharmacy and Science, asked generic drug companies about manufacturing costs and selling prices for selected drug products, as well as opinions on the impact of the rebate law.

The study showed the following:

1. Current price competition in the generic industry is an effective tool in insuring reasonably priced medications.

2. A fixed percentage rebate across all generic product lines may drive competitively priced generics from the market.

3. Due to the highly competitive nature of the generic industry, the rebate law could destabilize the generic companies with the lowest net profits.

4. Lower gross margins could decrease the ability of generic firms to invest in research and development and thus preclude access to new generic drugs.

Significantly, the report called for a reassessment of the Medicaid rebate program as it applies to generic drug manufacturers.

The other study, by a nationally-recognized expert, Dr. Stephen Schondelmeyer of the University of Minnesota, also included this sobering conclusion: Generic firms lost almost 31 percent of their net income due to Medicaid rebates—from a 2.97 percent net profit to a 2.05 percent net profit. Dr. Schondelmeyer also discovered that the basic rebate had a substantially greater impact on the profits of generic firms than it did upon the profits of brand firms.

Mr. Chairman, there are several compelling reasons why generic drug manufacturers should not be required to pay rebates:

First, as I stated earlier, the generic marketplace is fiercely competitive, which serves to keep generic drug prices low. Second, in 1987 the Health Care Financing Administration imposed "upper limits" on what the Federal Government will reimburse to pharmacists for generic products dispensed to Medicaid patients. These upper limits are set so low, they actually provide pharmacies with a financial incentive to dispense the highest-priced branded products. For example, the reimbursement for 100 Valium tablets is approximately $78. Reimbursement for 100 tablets of the generic equivalent is only $1.80. The rebate requirement constitutes an additional financial hardship that generic manufacturers are forced to endure and, as the Philadelphia study suggested, could "destabilize" an industry that is providing a valuable public service.

Mr. Chairman, because of these factors, we are urging the drafting of legislation that would:

1. Exempt generic drug manufacturers from the rebate provision in OBRA 1990.

2. Remove the disincentive to dispense generics by replacing the current reimbursement formula with a more cost-effective reimbursement system based on

237

"Median AWP." In the June 8, 1992, issue of "Drug Topics", a pharmacist was quoted as saying, "Under HCFA pricing for generics, it makes more sense for me to pay a messenger to travel by cab to the physician's office to pick up a new script for the brand. Even after paying the messenger and the cab fare, I will still make more profit dispensing the brand than I would dispensing the generic at the HCFA price." As you recall, the Median AWP was included in the catastrophic health bill because this formula provides an incentive to dispense lower-cost prescription drugs. It is a formula that has wide acceptance by health care economists and has been advocated by pharmacy.

3. Require proper enforcement of "brand medically necessary" prescriptions. As you know, HCFA, when it first put upper limits in place, said that brand medically necessary prescriptions for multisource products should not exceed 5 percent. In 1990, 25 percent of California's multisource prescriptions were reimbursed at brand-name prices. If this percentage were reduced to the 5 percent figure HCFA deems reasonable, California would have realized savings of about $57 million in 1990. Imagine what this could achieve nationally. Such savings would be possible under a new reimbursement formula and proper enforcement of brand medically necessary prescriptions.

Mr. Chairman, the generic manufacturing industry is only asking for fair treatment. It simply wants the opportunity to compete in the prescription drug marketplace. The rebate program is a very real threat to this competition. We hope you and the other Members of Congress will seriously consider the reforms we think are necessary to allow generic companies to continue to provide a valuable service to consumers.

Thank you for this opportunity to testify. We will be glad to answer any questions.

Mr. WAXMAN. Mr. Zeiger, I am going to interrupt you because the rest of the statement will be in the record.

I do want to ask you this: You are arguing generic drugs should be exempt from OBRA 1990. Prior to 1990, did generic companies bargain with and charge lower prices to large purchasers such as Veterans' Administration?

Mr. ZEIGER. There were lower prices, but basically it was irrelevant. There is no lowest price in a very tight frame because the pricing is so close because of competition. We don't have the luxury of being unique. We are, in general, a commodity. Therefore, the competition keeps the prices low. So before 1990, the price to the VA would not be that much less than to the corner drug store or the chain drug store because the spread was so little to begin with. That is the point. We don't have the luxury of doing that.

Mr. WAXMAN. What is your industry's position on Mr. Slattery's bill versus current law? Do you prefer the straight flat rebate approach or the mix of best price and the flat rebate in current law?

Mr. ZEIGER. In speaking for myself now, because I don't believe either organizations have met as a group to vote on their position on the Slattery bill, I would prefer a straight rebate. It is cleaner, easier to monitor, and probably will provide more income to the— to the recipient.

I must say to you, though, in either case, it will result in higher prices. If you are sitting in a board room, whether it is the best price, and you try to raise your best price to others to make up for it, which apparently has happened, or it is a rebate and say, OK, guys, we have to give 25 percent rebate. What are we going to do? Raise our prices.

238

One way or the other, I think it will result in higher prices, unless we approach it in Congressman Wyden's approach, in a comprehensive solution to the overall solution.

Mr. WAXMAN. When you say Congressman Wyden's overall approach, you are talking about the op/ed, not the bill.

Mr. ZEIGER. Exactly.

Mr. WAXMAN. Thank you very much. Mr. Dannemeyer.

Mr. DANNEMEYER. I understand the inference. Even under Mr. Wyden's approach, we would have an increase in price?

Mr. ZEIGER. I don't know. I don't sit in the board rooms of the branded companies. If you take one at a time, rather than a comprehensive solution, which is what I think is necessary, and you say, OK, we are going to do rebates at 25 percent, at some point down the line that board of directors will say, how do we make up the amount of that rebate? It is going to come from somewhere. That usually results, especially if you have a monopoly on a property, in a higher price.

Mr. DANNEMEYER. We are back, I think, to the age old argument, what is the best way to serve the consumers of our society. The market and the discipline it brings to the issues that are at work or the benevolent hand of the finest minds we can develop on the part of legislators, assuming we have something to contribute and our staff trying to serve the public interest.

I will be honest with you, between those two forces, my reading of history teaches me that the market is far better to sort all these factors out than all of us can differentiate around with legislative solutions. Here we are 2 years after OBRA recognizing we have had an example of the law of attentive consequences work its mischief. Now, we are trying to figure out how we are going to push. Ma'am, did you want to say something?

Ms. FENSTERER. Yes. In terms of the generic industry, I would have to agree with some of what you just said. In the private market, where consumers are paying for drugs out of their own pockets, pharmacy has testified they have an incentive, economic for themselves, and economic for their patients, to dispense the lowest cost product.

In Medicaid, the incentives have been absolutely turned on their head so that pharmacists now have an incentive under Medicaid to dispense the most expensive product. We are here today in part to urge you to reverse those incentives and capture the savings that you can capture that are captured in the private market every day by dispensing lower cost therapeutically-equivalent generic drugs for higher cost branded product. That is the marketplace that truly would work.

Mr. DANNEMEYER. This incentive to the pharmacist to prescribe the higher price drug, is that coming from that HCFA regulation?

Mr. ZEIGER. It certainly is.

Mr. DANNEMEYER. By setting a cap on a brand.

Ms. FENSTERER. They set the cap on the generic and none on the brand. The cap is so low on the generic there is no money to be made in dispensing it.

239

Mr. DANNEMEYER. Interesting. Thank you very much.

Mr. WAXMAN. Well, I also want to thank you for your testimony. You raised a very valid, important point for us to consider. Thank you.

That concludes our hearing for today, we stand adjourned.

[Whereupon, at 4:45 p.m., the subcommittee was adjourned.]

[The following material was submitted for the record:]

240

Statement of the American Pharmaceutical Association
submitted to the
Subcommittee on Health and the Environment
of the
House Committee on Energy and Commerce
on
Proposals to Reform the Medicaid Prescription Drug Rebate Program
July 31, 1992

*********************************************************

We are pleased to submit testimony on the Medicaid prescription drug rebate program established by the Omnibus Budget Reconciliation Act of 1990. The American Pharmaceutical Association (APhA), the national professional society of pharmacists, represents the nation's third largest health profession with more than 150,000 pharmacy practitioners and pharmaceutical scientists.

We are deeply concerned about escalating drug prices. As pharmacists, we are at the front line when a patient obtains a prescription medication. We know that the high cost of drugs is adversely affecting the health care of many Americans, especially the elderly. Consumers and third party insurers respond to these price increases in ways that may be detrimental to patient care. We have seen too many patients who place themselves or others at risk when, due to their prescription's expense, they (1) ask for a partial prescription, intending to take less than the prescribed dose; (2) do not fill their prescription at all; (3) secure refills later than necessary, or omit them completely; or (4) share their prescription with a relative or friend who suffers from a similar ailment. Some Medicaid

1

241

programs have felt compelled to limit the number of prescriptions per beneficiary per month, or to adopt restrictive formularies (now precluded by OBRA-90), to reduce the cost of the prescription drug benefit. A study of New Hampshire's cap on the number of Medicaid prescriptions showed that increased utilization of nursing homes was an unintended and costly effect.

The high cost of drugs is also affecting the pharmacist-patient relationship. The pharmacist is the most accessible health care professional. Unfortunately, escalating costs and wide variation in pharmaceutical prices among different providers are jeopardizing patients' trust in pharmacists. This is made more acute because patients often feel they have little control in terms of choice of their medication, and where to purchase it.

Prior to OBRA-90, Medicaid patients had at least indirectly subsidized other groups of patients whose drug costs were lower due to access to deeper discounts from manufacturers. Since 1991, Medicaid programs have benefitted directly from those "best prices."

APhA believes that retaining the existing Medicaid "best price", methodology is in the best interest of the government, the general public, and pharmacy for several reasons. First, it establishes a mechanism that reduces the government's Medicaid drug product costs. This mechanism is likely to (1) generate more adequate funding for other parts of the Medicaid program; and (2) provide greater access to pharmaceutical care which has been shown to be the most cost effective outpatient therapy. Rebate

242

revenues, originally projected to be $3.4 billion from FY 1991-FY 1995, were recently re-estimated to reach $6.4 billion. We believe the program is working the way Congress intended in securing lower prices for the nation's health care program for the poor.

Second, price adjustments for non-Medicaid public and private purchasers of drugs that have occurred as a result of the Medicaid rebate program, via the realignment of manufacturers' pricing policies, benefit the public. OBRA-90 best price provisions have begun to restrain double-digit price inflation of the 1980s, an effect well-received by the vast majority of the American public who pay most of their drug charges out-of-pocket. The "best price" mechanism takes advantage of forces that have been operating in other market sectors to drive prices down. In the short time that the rebate program has been in effect, we have witnessed the beginning of the leveling of the playing field of drug prices.

In addition, the best price methodology is ultimately best for the profession of pharmacy. Because most pharmacists have been unable to employ all of the tools that some pharmaceutical buyers use, they have been unable to obtain sharp discounts. The result has been cost shifting and a wide range of prices across purchasers. These differential prices become discriminatory when the purchasers compete in the same patient market, and the price differences are based on factors other than volume or similarly justified considerations. For example, not only are individual pharmacists

3