**ANDERSON EXHIBIT 26R**

267

- 3 -

Specifically, section 4401 requires pharmaceutical manufacturers, as a condition of Medicaid coverage of their prescription drug products, to give individual state Medicaid programs their "best price" for an individual drug, subject to minimum and maximum quarterly rebates calculated as a percentage of the average manufacturer's price. The "best price" is the lowest price available from the manufacturer to any wholesaler, retailer, nonprofit entity, or governmental entity. Over a five-year period it was estimated that the new law would save Medicaid $1.9 billion.

The new law was designed to control federal and state outlays for prescription drugs. Based on reports showing that between 1981 and 1988 prescription drug prices rose by 88% compared with 28% general inflation.

### HIGPA's Experience Since OBRA 90

Shortly after the law's enactment, HIGPA data shows that significant pharmaceutical cost shifting began to occur as a result of the implementation of the law's best price provision. As pharmaceutical prices started rising, massive cost shifting to the private and public sectors occurred. Reductions in pharmaceutical company's income arising from the implementation of Medicaid best price provisions are being offset by price hikes to other segments of the marketplace. Price hikes, discontinued purchasing contracts and discounts previously given by drug makers since OBRA 90 was passed are offsetting expected savings to Medicaid, shifting costs to other government programs, and substantially increasing the cost of health care to the private sector through higher drug prices.

We have found that the legislation has all but ended the deep discounts and long term contracts health care institutions formerly obtained from drug manufacturers. Through negotiated contracts with manufacturers and other organizations providing the goods and services used by health care providers, the group purchasing industry has contributed significantly to reducing Medicare, Medicaid, and private insurance expenditures by hundred of millions of dollars. Considering the success of our members' contributions to these federal programs' cost effectiveness, we are

268

- 4 -

well aware of the substantial cost savings that can result from an increased role of pharmaceutical manufacturers in such cost containment efforts.

Under the "best price" formula, when a manufacturer considers whether to give a discount to a private purchasers, there are two possibilities: 1) give that discount to the Medicaid program and to the private purchaser; or 2) raise the price of the drug to the private purchaser, to minimize the amount the manufacturer will be required to give to the Medicaid program. The manufacturer must ask whether it is worth extending the discount to the larger volume of purchases under Medicaid, a $5 billion annual consideration. Our experience, the Congressional Budget Office's (CBO) analysis, and the actions of the manufacturers all make the manufacturer's choice undeniable clear — raise the "best price."

While the law has resulted in reducing federal and state Medicaid expenditures, the "best price" provision of the Act has also induced the establishment of an artificial "price floor" for all buyers of drugs — including VA, DOD, PHS, and other federal purchasers — causing price increases to private payors and institutional providers. Our members have experienced the elimination of discounts, some drug manufacturers' unwillingness to bid on group purchasing drug contracts, and some drug manufacturers' refusal to provide price stability for traditional contract periods.

As others have testified, this rebate program has had a number of unintended and deleterious consequences. The cause of these consequences is straightforward: OBRA 90 creates great incentives for drug manufacturers to close the gap between their "average price" and their "best price." The manufacturers did this not by lowering their "average price," but rather by increasing their "best price" — by reducing and, in some cases, eliminating the discounts offered to their "best" customers.

Study after study has documented this effect; indeed, a Congressional Budget Office (CBO) report issued on June 22, 1992 confirms the drug pricing patterns we have seen. The CBO report shows that in the near future, neither manufacturers nor the Medicaid program will be able to procure drugs at prices below the artificial floor set

269

- 5 -

in OBRA 90. The 1990 OBRA legislation has so skewed the market for pharmaceutical products that, in effect, there will eventually be no "best price."

CBO found that, in 1991 alone, manufacturers eliminated or reduced discounts on 57% of the drugs studies. A study by the Department of Veterans Affairs confirms and quantifies this finding. The VA estimated that OBRA 90 would increase costs for VA hospitals by at least $117 million annually.

A 1991 survey of HIGPA members supports these conclusions. We have found that pharmaceutical manufacturers responded to OBRA 90 by substantially increasing the price they charged to our members, hospitals, HMOS, long term care facilities, etc. Some of our members reported that, on average, the prices manufacturers charged rose 25-30% in the year after OBRA 90 took effect. Our members tell us that most products increased between 10% and 50%, with some experiencing product price increases of 600 to 1300%.

During the last two years, the prices paid under HIGPA members' contracts with most drug manufacturers have risen significantly. In addition, manufacturers previously negotiated five year contracts so providers could budget their drug costs. We now typically can only get six- to twelve-month contacts, leaving providers drugs budgets open to great uncertainty.

## Pending Legislation

HIGPA fully supports the Medicaid Program's ability to negotiate with drug manufacturers to secure prudent pharmaceutical purchase savings for Medicaid. However, HIGPA believes that the present mechanism to achieve those savings fails to accomplish the worthy objective of Medicaid cost containment because it has forced other providers, including the Medicare program, to absorb the cost of such initiatives. More significantly, the American Public Welfare Association (APWA) has found in a recent study that rebates to states, even though larger than anticipated, are quickly being eroded by the rising cost of pharmaceuticals.

270

- 6 -

HIGPA strongly supports Congressman Jim Slattery's bill, H.R. 5614, which would replace "best price" with a flat percentage rebate that tracks the analysis of the Congressional Budget Office. It is budget neutral, and will not reduce the rebate revenue now flowing to the states. H.R. 5614 would guarantee the Medicaid program the gains it made in OBRA 90, while righting a now dysfunctional market. We feel that this approach represents a responsible way to address the unintended effects-of the best price calculation on certain public and private entities while assuring the Medicaid program a discount comparable to the one it currently receives.

Congressman Ron Wyden is proposing a similar change in the law that would re-place "best price" with a flat percentage rebate that is the same for all years and would extend the Medicaid rebates to other federally-funded health clinics. We ap-plaud Congressman Wyden for his efforts in this area, and look forward to the op-portunity to look at his ideas more closely. While we oppose rollbacks because of their administered pricing characteristics, we appreciate the position of the Department of Veterans Affairs, and we hope that they will join us in supporting the members of this Subcommittee, as they work to create a comprehensive solu-tion to the problems best price provisions have presented for all purchasers, public and private.

### Recommendations

The Health Industry Group Purchasing Association recommends that Congress modify the Medicaid prescription drug provisions of OBRA 90 by replacing the "best price" language with a flat rebate this year. We believe this action will allow the Medicaid program to continue to be well served with lower costs for their drug re-quirements, while removing the unanticipated barriers to free and open negotia-tions for all other providers in the health industry marketplace.

We urge Congress to look at the broader picture of reform of this law for both public and private entities, since both are significantly affected by the increases in drug prices resulting from the Medicaid "best price" discount calculation language. The impact of not making this change or making an adjustment for just one segment of drug purchasers, would be to encourage further cost shifting on the most efficient of health care providers, discourage cost efficient pharmacy practices, and disrupt cost effective buying practices by bulk purchasers.

Mr. Chairman, we support the efforts of Congressman Slattery and Congressman Wyden to address this issue in a comprehensive and expedient manner and would be pleased to work with you the Committee to solve this pressing problem.

Thank you.

271

Executive Offices, Ordway Building

August 17, 1992

The Honorable Henry Waxman
United States House of Representatives
Washington, D.C.   20515-0524

Re:  July 31, 1992 Hearing on  Proposals to Reform the Medicaid
     Prescription Drug Rebate Program of the Subcommittee on Health
     and the Environment

Dear Representative Waxman:

    On behalf of the Kaiser Permanente Medical Care Program
("Kaiser Permanente"), I am writing in support of amendments to the
Prescription Drug Reform Act of 1990, P.L. 101-508 ("OBRA 90") that
would:

    o    provide an annual percentage rebate to state
         Medicaid programs at least equal to the
         amounts expected to be rebated to the Medicaid
         programs when OBRA 90 was enacted;
    o    extend   such   rebates   to   the   Veterans
         Administration, family planning clinics and
         community and migrant health centers; and
    o    repeal the "best price" provisions and restore
         the ability of private purchasers to negotiate
         economically justified discounts.

    Kaiser Permanente is the nation's largest privately-sponsored
health care program.  We arrange and provide comprehensive health
care services for over 6.6 million members in 16 states and the
District of Columbia.  Since January 1991, Kaiser Permanente has
experienced substantial increases in pharmaceutical costs on a
national basis.  For example, between January and August 1991, our
contracts with 10 brand name pharmaceutical companies covering 26
products expired and we experienced an unweighted average price
increase of 380 percent.  The highest increase for an individual
drug was 1,800 percent; the lowest was 19 percent.

    We are paying much higher prices for single source and
innovator multiple source drugs as present contracts expire.  To
date, the impact on Kaiser Permanente has been relatively
manageable because we have some significant multi-year contracts
with drug companies still in effect.  We also purchase large
quantities of drugs prior to the expiration of almost all

Kaiser Foundation Health Plan, Inc.
One Kaiser Plaza  Oakland, California 94612  510-271-5910

272

contracts.  However, when all existing contracts expire, we expect <u>annual</u> increases in drug costs to be as much as $120,000,000.  We would need to increase the dues on our health benefits plans by approximately 1.35 percent per member per month to compensate for the additional drug costs.

Repeal of the "best price" provisions in OBRA 90 would restore our ability to negotiate prescription drug discounts and restore competition to the private sector, while substitution of an annual percentage rebate for state Medicaid and other important federal programs would yield additional revenue to those programs.  As you know, the Congressional Budget Office has indicated this approach would be budget neutral.

I appreciate your attention to these matters.   Should you or your staff need additional information about this issue, please do not hesitate to contact me at (510) 271-5990 or Richard Froh in our Washington, D.C. office at (202) 296-1314.

Very truly yours,

**KAISER FOUNDATION HEALTH
HEALTH PLAN, INC.**

By: _____
David M. Lawrence, M.D.
Chairman and
Chief Executive Officer

j:\lynchps\obra.tes

2

273

**TESTIMONY**

**Lederle Laboratories**
**American Cyanamid Company**

Lederle Laboratories, a division of American Cyanamid Company, is pleased to submit testimony in favor of H.R. 5614.  Lederle supports H.R. 5614 because it is the most rational and equitable approach to structuring Medicaid rebates in order to meet the economic needs of both the federal government and the private sector.

Lederle is a research-intensive pharmaceutical company founded in 1906 by a former New York City Health Commissioner, Dr. Ernst Lederle, whose goal was to serve the public good by preventing disease through immunization.  In addition to our 86-year commitment to preventative medicine, we are pioneers in the development of anti-cancer and anti-infective agents.

We believe H.R. 5614 fulfills the needs of the federal government because it keeps Medicaid revenue intact; it provides financial predictability; it lowers administrative costs, and it guarantees price parameters to the Veterans Administration.  This bill also fulfills the needs of the private sector by restoring free market competitive forces.  To capitalize on its inherent strengths, we urge the committee to extend this bill to also include the public health service programs described in S. 2950.

From Lederle's vantage point, the key issue in the committee's deliberation is the form by which Medicaid rebates should be structured.  We ask you to compare the two different

2

274

methodologies that are under consideration -- the current system, which bases rebates on a company's best price, versus a proposed change to a system that would be based on an equal percentage rebate for all companies.

When the best price structure of Medicaid rebates was formulated in 1990, there were those who felt that the Medicaid program fit the profile of an entity entitled to a company's deepest discounts.  The major premise for this opinion was that the Medicaid program is a manufacturer's single largest customer. However, in fact, Medicaid is a financial mechanism that facilitates payment for product, but never takes possession of product nor dispenses it to the patient.

Neither Lederle nor any other manufacturers sells product directly to Medicaid.  There is no sales transaction between companies and Medicaid -- no exchange of goods or services for money.  Rather, Medicaid is an insurance program in the same way as Blue Cross/Blue Shield.

Medicaid beneficiaries receive prescription drugs through normal commercial channels.  We, as manufacturers, sell to thousands of individual geographically dispersed pharmacies.  They, in turn, dispense our products to the entire spectrum of their customers, some of whom may be insured by Medicaid.

3

275

Because it is not a customer, Medicaid is not analogous to a
volume purchaser like the Veterans Administration.  In sharp
contrast to the Medicaid structure, the VA frequently experiences
best prices because the government actually purchases from
manufacturers, stores, and distributes large volumes of product.

Proponents of a "best price" system argue erroneously that it is
a market-based methodology.  A better description would be
"market-intrusion" methodology.  Best price rebates discourage
competitive discounts.  This occurs because, in many cases, a
product's total sales are substantially discounted in only a
small percentage of cases.

To illustrate this point, the current Medicaid rebate formula
requires a manufacturer to pay a rebate equal to the percentage
difference between average manufacturer's price (AMP) and the
company's best, i.e. lowest, price (BP) available, or 15%,
whichever is greater, times the percentage of total sales that is
reimbursed by Medicaid.  This is shown in Exhibit I.

**276**

Exhibit I

---

$$\underline{(AMP-BP)} \text{ x Sales Reimbursed by Medicaid = Rebate}$$
$$AMP$$

(or the following if greater)

15% Sales Reimbursed by Medicaid = Rebate

---

Lederle, for example, has a product of which nineteen percent of sales are reimbursed by Medicaid. However, only approximately 3% of this product's total sales are sold at a price lower than AMP minus 15%. Therefore, the rebate paid on 19% of sales is dictated by prices of 3% of its sales. (See attached graph.) The return of the sales at the "best price" cannot justify the additional rebate paid, forcing us to walk away from business currently being discounted greater than 15%. It would be irresponsible for a company to do anything but reduce this type of discount under these circumstances, despite the fact that the customers receiving the lowest prices purchase large volumes of the product and assume certain distribution costs.

5

277

There are many companies and many products in this situation.
Simply put, rebates based on best price direct the market away
from the practice of offering discounts.  The forces inherent in
a best price system will ultimately make the Medicaid rebate
become a de-factor flat rebate of 15%, the Medicaid minimum.

The figures generated by the Congressional Budget office
regarding Congressman Slattery's bill prove this point.  How does
one explain declining fixed percentage in this bill while still
keeping the Medicaid program whole with best price assumptions?
The answer is simple:  the CBO recognizes that deep discounts are
and will continue to disappear from the market as companies are
penalized for offering discounts.  Many smaller companies pay a
disproportionately large share of Medicaid rebates, while some of
the industry giants pay proportionately small amounts.

Clearly the most equitable, and the most effective, approach is
the one described in H.R. 5614, in  which each company pays the
same percentage rebate to the Medicaid program.  H.R. 5614 would
provide that companies whose products are utilized in an and
reimbursed by Medicaid to the greatest extent would pay the
greatest rebate in absolute dollars, but all would pay the same
in relative terms.  In addition to being equitable, it would
allow, above all, restoration of free market competitive forces.

6

278

Lederle Laboratories has a history of providing favorable pricing to the armed services dating back to World War II, when we were the major supplier of blood products and vaccines to American troops.  We would like to continue this practice and could do so under the Slattery bill.

For Medicaid, H.R. 5614 brings more than budget neutrality. state governments could predict and budget their revenue from rebates from one year to the next.  The administrative savings to the Health Care Financing Administration would be significant as the volume of data to be processed each quarter would be nearly cut in half.  A stable price climate would be restored to the Veterans' Administration.  Free market competitive forces could once again govern the private sector.

In summary, Lederle Laboratories supports H.R. 5614.  It is the most rational and equitable approach to structuring Medicaid rebates while meeting the needs of both the federal government and the private sector.

We appreciate your consideration of this important matter and thank you for the opportunity to present this testimony in support of H.R. 5614.

7

279



SALES DISTRIBUTION CURVE
FIRST QUARTER , 1992

AMP = AVERAGE MANUFACTURERS PRICE
15% BELOW AMP IS MINIMUM MEDICAID REBATE

280

STATEMENT OF JOHN M. RECTOR
BEFORE THE HEALTH AND THE ENVIRONMENT
SUBCOMMITTEE OF THE
HOUSE ENERGY AND COMMERCE COMMITTEE

JULY 31, 1992

Mr. Chairman, Members of the Subcommittee[1]*:

I am John M. Rector.  I serve as Vice President of Government
Affairs and General Counsel for the National Association of Retail
Druggists.

The National Association of Retail Druggists (NARD) represents
the owners of 40,000 independent pharmacies, where over 75,000
pharmacists dispense more than 70 percent of the nation' s
prescription drugs.  Together, they serve 18 million persons daily
and provide nearly 85 percent of the Medicaid pharmaceutical
services.  NARD has long been acknowledged as the sole advocate for
this vital component of the free enterprise system.

NARD members are primarily family businesses.  We have roots
in America's communities.  The neighborhood independent druggist
typifies the reliability, stability, yet adventuresomeness that has

---

[1]*Henry A. Waxman, (D-California), Chairman
MAJORITY:   (12-D) Reps. Gerry Sikorski (Minn.), Terry L. Bruce
(Ill.), J. Roy Rowland (Ga.), Edolphus Towns (N.Y.), Gerry E.
Studds (Mass.), Peter H. Kostmayer (Pa.), James H. Scheuer (N.Y.),
Mike Synar (Okla.), Ron Wyden (Oregon), Ralph M. Hall (Tex.), Bill
Richardson (N.M.), John Bryant (Tex.)
MINORITY:   (7-R) William E. Dannemeyer (Cal.), Thomas J. Bliley,
Jr. (Va.), Jack Fields (Tex.), Michael Bilirakis (Fla.), Alex
McMillan (N.C.), J. Dennis Hastert (Ill.), Clyde C. Holloway (La.)

1

281

made our country great.

We appreciate the opportunity to appear before the Subcommittee to express our views on the Proposals to Reform the Medicaid Outpatient Prescription Drug Rebate Program, H.R 2890, H.R. 3405, and H.R. 5614. We continue to be especially interested in equitable cost containment that recognizes the actual source of the escalating costs of the outpatient prescription drug program and that provide the program equal access to manufacturer prices now available generally to Medicaid and to other nonprofit entities, including those serving indigents. The scandalous reality is that although Medicaid served exclusively indigent persons, until 1991 Medicaid had been denied access to the prices available for other comparable programs and entities that received the "best" price. Instead of a first class program with equal access to prices for comparable entities, we had first class prices and a second class program.

Price equity for the Medicaid Outpatient Prescription Drug Program has been a top priority for our organization since 1985. The pharmacist under this Federal program is required by the "lower of" reimbursement formula to provide Medicaid the "best price." Basic equity required that manufacturers whose product accounted for the lion's share of the programs budget also provide "best price". The Medicaid Anti-discriminatory Drug Price and Patient Benefit Restoration Act and the Medicaid Prescription Drug Fair Access and Pricing Act consequently were our top legislative priority in 1990.

2

282

Today we reaffirm our support for the 1990 amendments and note that, although our opponents argued that revenues yielded by the rebate provisions would be insignificant, that even the first year met our $600 million dollar estimate.

At your Subcommittee's September 14, 1990, hearing, I stated independent pharmacy's support in part as follows:

> The basic equity of this long overdue approach enjoys wide support among consumer groups and especially those interested in the wellbeing of Medicaid recipients. The bill also enjoys strong bipartisan cosponsorship. The cosponsors include Senators Kerry, Lott, Breaux, Baucus, Jeffords, Burdick, Exon, Conrad, Johnston, Bumpers, Adams, and Kohl....

> No one in the hearing room this morning needs to be reminded, however, that there is another point of view. In his remarks to his Senate colleagues on July 25, 1990, "Drug Manufacturers: Making Profits on Backs of Poor," Chairman Pryor explained the activities of our opponents. In summary he characterized their approach as "untrue and insulting." Interestingly, the opponents have focused almost exclusively on what the proposal is not. Although at times their approach has been unpleasant, at best, we are heartened by their collective failure to pose one sound argument in opposition to the actual equal access provisions of the Senate legislation.

> Principally, beyond personal attack on Senator Pryor, they have focused attention on the so-called "or else" clause. This eq the sanction to assure that equal access pricing is made available for Medicaid. Therapeutic exchange was the "or else" in S. 2605; more recently, denial of access to the Medicaid outpatient prescription drug program is the "or else."

> Recently, Health and Human Services Secretary Sullivan told the Senate Appropriations Committee in response to a question about what could be done administratively to encourage equal access for Medicaid, in part that "....we have been unable to assist the states in overcoming their major problem of the refusal of drug manufacturers to submit bids."

> This legislation provides the essential incentive-- the "carrot," "hammer," "stick," "sugar"--to assure that the program will not in the future be denied equal access

3

283

to prescription drug pricing as it has been in the past
and is presently. The "or else" could have been a loss
of special tax credits. The point is that a sufficient
incentive is required to assure equity for Medicaid.

Our opponents have miscast this legislative effort
as one that would mandate the "cheapest" prescription
drug. The truth is that it will encourage all
prescription drugs to be made available at the "cheapest"
or "best" price.

Our opponents have argued that the legislation will
mandate second-class treatment. The truth is that price
equity for Medicaid will help assure that Medicaid
recipients will have even fuller access to prescription
drugs.

Our opponents have argued that the legislation
mandates the "or else" provisions. The truth is that,
unless there is an industry-wide criminal conspiracy not
to provide Medicaid <u>equal access</u>, no one could honorably
suggest that the "or else" provisions are mandated.

Our opponents have argued that the savings would be
insufficient. The truth is that price discrimination so
permeates the prescription drug marketplace, and the
price discrepancies are so radical when compared to other
markets, that assuring Medicaid the 'best' price will
yield significant savings.

Our opponents have argued that an unnecessary,
burdensome, costly new bureaucracy would be required.
The truth is that existing marketplace mechanisms, long
ago established to provide the best price for nonprofits
generally, including those like Medicaid that serve
exclusively indigent persons, are already available to
deliver price equity for the <u>most eligible</u> "best price"
customer: the Medicaid outpatient drug program.

Our opponents have disingenuously claimed that
because retail pharmacy pays the "highest price" for
prescription drugs Medicaid should pay the "highest
price." The truth is that all consumers are entitled to
<u>equal access</u> and that discrimination in the general
marketplace against retail pharmacy hardly supports
continued discrimination against the Medicaid outpatient
drug program.

Today we are pleased to support the efforts by
Congressmen Ron Wyden and Jim Cooper and others to
provide Medicaid equal access. We endorse the "Medicaid
Prescription Drug Fair Access and Pricing Act of 1990."

4

284

We also have endorsed the Senate companion bill, S. 3029, the "Medicaid Anti-Discriminatory Drug Pricing and Patient Benefit Restoration Act of 1990," introduced September 12, 1990, by Chairman Pryor. Market forces have led to the denial of equal access to fair pricing for the Medicaid outpatient drug program. The indigent persons eligible for this Medicaid benefit are entitled to full pharmaceutical services and products. These bills will help guarantee the Medicaid outpatient prescription drug program equal access to prices established by individual corporations for nonprofit entities, especially those, like Medicaid, that serve exclusively indigent persons. We have no trouble with the notion of "nominal" prices being excluded, so long has there is no tax subsidy beyond the actual cost involved.

Substantial savings in the $3.5 Billion dollar outpatient prescription drug program are associated with even modest reductions in the prices available to Medicaid. The Health Care Financing Administration (HCFA) certainly could have achieved price equity for Medicaid through the regulatory process However, the agency had declined to do so, choosing instead to reduce beneficiary coverage and cut pharmacy reimbursement. These initiatives have had virtually no effect on overall prescription drug prices,but they have contributed to the second class stature of the program. We have had price controls for pharmacists in the Medicaid program since the early 70's. One interesting development this summer is that our opponents surprisingly announced their support for these price controls, including the most recent unfair lowering of the price control ceiling. Since 1985, all HCFA efforts to ostensibly control prescription drug costs in the Medicaid outpatient program have either assaulted small businesses participating in Medicaid or limited Medicaid beneficiary coverage. It is no coincidence that the leaders of this Congressional effort to assure a first class program for Medicaid recipients are nationally recognized small business advocates. Senator Pryor recently received the Small Business Advocate award from the Small Business Legislative Council, Congressman Wyden chairs the Regulation, Business Opportunities, and Energy Subcommittee of the Small Business Committee, and Congressman Cooper is an active, key member of the Antitrust, Impact of Deregulation and Privatization Subcommittee of the Small Business Committee. They are familiar with our marketplace; they know that the special monopolistic forces in our market have denied equal access to Medicaid and many other purchasers entitled to price equity. Our members, like these Congressional

5

285

advocates, know that neither HCFA approach addresses the true source of the escalating cost to Medicaid.

We support consumer and Medicaid recipients' efforts for legislation that provides the Medicaid outpatient drug program equal access to manufacturer drug prices now available to Medicaid generally and to other nonprofit entities.  We don't know the total percent of Medicaid expenditures for prescription drugs.  The outpatient program, which is exclusively for drugs, amounts to 7 percent of the Medicaid program.  Each of the largest Medicaid components (ICF--30%, in-hospital--27%, and SNF--13%), however, purchase an undetermined but significant amount of prescription drugs.  A wide range of prices have been established for the same product.  Special drug prices are available to nonprofits.  Such sales are exempt from price discrimination laws.  These prices are not based on economies of scale or whether the purchaser takes possession of the drugs. The nonprofit price is the lowest price.  For example, a nonprofit entity pays $5 for a patented prescription drug while retail pharmacists and Medicaid currently pay $32.  In the extreme, nonprofit entities pay 1(one) cent while retailers and Medicaid pay a dollar.  Our position is that Medicaid, as a pure nonprofit program serving 100% indigent persons, is entitled to the lowest nonprofit charity prices established by the manufacturers.  As noted, these prices are not based on the volume purchased or other economies of scale, but, in fact are based on the nonprofit status of the purchasing entity.  special contracts known in our marketplace as "own use" contracts are written for nonprofit sales, but the regular private drug distribution system is used to store and deliver the product.

These marketplace mechanisms are common, inexpensive, not burdensome, and readily available for implementation of equal access for Medicaid.  In effect, under the legislation, a state Medicaid program will sign an "own use" contract and receive its "best price" rebates via a chargeback or other well-established mechanism, typically from a drug wholesaler.  These business practices are in place in virtually every Congressional district in the country.

The multiple pricing levels for prescription drugs in the United States have been thoroughly documented by this Subcommittee and the Subcommittee on Oversight and Investigations.  In our view, most of this pricing conduct is illegal.

A recent Supreme Court decision, Texaco. Inc.v.

6

286

Hasbrouck, June 14, 1990, emphasizes that even traditional distinctions in prices between a wholesaler and retailer will be found illegal unless there is a significant value-added aspect to the functional behavior of the wholesaler. This decision serves to highlight the bogus nature of multitier pricing, which provides mail order, drug vendors, nursing homes, HMOs, hospitals, and many other for-profit pharmacies significant competitive advantages to the detriment of independent retail pharmacy and consumers.

It is our view that only true charities, such as Medicaid or those otherwise providing uncompensated care, are entitled to discriminatory prices. There is as mentioned, special treatment in the law for price discrimination to nonprofits. The 1938 Nonprofit Institutions Act (c.283,52 Stat 446, May 26, 1938) exempts nonprofit institutions and those selling to them or facilitating the delivery of such sales from the general antitrust sanction for selling at different prices so long as the products are not resold. (In 1988, Congress enacted the Prescription Drug Marketing Act, Public Law 100-293, developed by this Committee, which made such resales serious felonies.) There is disagreement about the scope of the 1938 Act, but all agree that true charities, those serving indigents such as Medicaid, are entitled to obtain the lowest or "best" price. A major organization representing the pharmaceutical industry, for example, told the Senate Special Committee on Aging last summer that "This Act embodies the strong public policy in favor of allowing sellers to provide products at lower prices to charity purchasers."

Thus, there is a special pharmaceutical marketplace for nonprofit entities. To the best of our knowledge, all manufacturers have established the lowest price for this marketplace. These prices are enjoyed by nonprofit entities including hospitals, HMOs, nursing homes, mail order pharmacies, and others that serve few, if any indigent persons. Basic equity demands that Medicaid have access to this special class of trade. The Wyden-Cooper legislation provides this equity....

In summary, we support Medicaid equal access:

* to provide a fair deal for Medicaid and its beneficiaries

* to stop second-class treatment

* to focus cost containment on the source of

7

287

Medicaid drug costs and save at least $2 billion over 5 years

* to provide to the Medicaid outpatient drug program prices already widely available to other tax-supported and nonprofit programs

* to limit administrative costs by using the time-tested private enterprise system in place today in every state and in every Congressional district....

If I have been asked once, I have been asked a thousand times: Why is the pharmaceutical industry opposed to equal access pricing for Medicaid?  Certainly, it's not our responsibility to answer this question, but perhaps a May 10, 1990, Washington Post article, by Spencer Rich, entitled "Senator Seeks to Stem Rise in Medicaid Drug Costs," provides some insight to the answer.  It read in part as follows:

"...the Pryor plan is strongly opposed by the Pharmaceutical Manufacturers Association, which sees it as an opening wedge to cut prices everywhere. (emphasis added). 'If these misguided policies were adopted at the Federal level in Medicaid, you'd see a lot of attempts to move those policies into the private sector,' said the PMA president..."

In fact, when Senator Pryor introduced S. 2605, he said to his Senate colleagues, on May 10, 1990:

"By now it maybe obvious that while the drug companies don't want to negotiate drug prices with Medicaid programs, Medicaid isn't the issue.  They are deathly afraid that the rest of the American public, those with workplace and retiree health plans, will be able to get the same deals by using the same negotiating strategy. Or in other words, they are afraid the idea will spread and catch on. Mr. President, I would like my colleagues to think about this for just a moment:  when was the last time someone asked us to vote against an idea because it was so good it might catch on?"

We hope that they are right.  We hope that it does catch on!!

Ultimately, we support legislation to insure equal access for fair prices for retail pharmacy and

8

288

consequently for the majority of American consumers who
are presently victimized by multitier pricing.  But for
now and for the remainder of the 101st Congress, Second
Session, our top priority is the enactment of equal
access for Medicaid.

Since the actual effective date of the 1990 ammendments, we
have had several opportunities to express independent pharmacy's
assessment.  In April, 1991, in testimony before Chairman Harkin's
HHS Subcommittee of the Committee on Appropriations, I stressed the
following points:

We strongly supported the enactment of the "Medicaid
Anti-Discriminatory Price and Patient Benefit Restoration
Act of 1990" (MADPA) in OBRA 90.  Since 1985, all HCFA
efforts to ostensibly control escalating drug costs have
either unfairly reduced provider reimbursement or limited
Medicaid patient access to full coverage.

These initiatives have had virtually no effect on
the record breaking increases in drug prices which now
account for 80% of program costs.  It was a program with
first-class prices and second-class care.

The Medicaid outpatient drug program, as the largest
nonprofit, now has equal access to nonprofit prices.
With several important exceptions it appears that HCFA
is implementing MADPA in a reasonable manner.  In short
order, the rebate or "best price" contracts were
developed, and virtually all pharmaceutical corporations
are participating.

Some states failed to provide our members reasonable
notice of the 04-01-91 list of covered products.  It is
our view these pharmacists should be held harmless and
that a portion of the special 75% match for the first
year of MADPA or a portion of the rebates be made
available for this purpose.  It is doubtful that in the
future quarters the problem will be as extensive as in
the first one, but a minimum of two weeks actual notice
in our view would be reasonable.

The MADPA requires a number of studies on the
subject of pharmaceutical pricing, including a Controller
General study due each year on May 1st to inform the
Congress about price changes.  Repeatedly, investigative
inquiries including those by Chairmen Pryor, Dingell and
Brooks have been denied this information.  Now it will be

9

289

available for the Subcommittee and others.   Thus any
allegations about pricing based on anecdotal information,
half-truths, pseudo-facts, wishful thinking or outright
distortions by opponents of equal access to fair pricing,
should be readily disregarded.

Some have claimed that special prices for charities
have been eliminated.  We hope not.  Claims have also
been made that "commercial *nonprofits*" or those serving
virtually no indigents may have experienced price
increases comparable to the double digit increases our
members receive each January.  We welcome a more level
playing field for such competitors.

Lastly, hospital pharmacists and consultant
pharmacists seem to point to a conspiracy by the
pharmaceutical industry to fix prices as a consequence of
MADPA.  To the extent this can be documented, the Justice
Department should appropriately address these charges....

Denying the best price for drugs to the outpatient
poverty program for the past 25 years made a mockery of
common sense.   David Pryor has, with his bipartisan
support, and in spite of the vicious, often racist,
campaign against him, corrected this injustice.   We
commend him and the many members of the subcommittee that
have long supported equal access to fair prices and
economic justice for independent pharmacists and many
indigent persons in the Medicaid program.

MADPA

My statement expresses concern about the effort by
a few to undermine this landmark law.  We will submit for
the record our assessment to Senator Chafee on this
matter.   The best price standard is a marketplace
standard and a fair one.  Given the global economy, its
arguable that Medicaid as the poverty program should
receive the best price established for a particular
product anywhere in the world.  Similarly, especially as
the North American Trade Agreement is finalized, a sound
argument can be made to substitute the best price in
Canada or Mexico for the current statutory standard.

As we have stressed to the Senator from Rhode
Island, neither Medicaid nor Medicare currently benefits
from the price discrimination in our market.  In a Kansas
City investigation by a federal grand jury, it has been
alleged that members of a so-called "organized crime"
family purchased prescription drugs at the discriminatory
nursing home price, involving reductions of as much as
90% off the acquisition price to ourmembers.  While such

10

290

alleged criminals enrich themselves through resale of the
products, neither Medicaid nor Medicare enjoys the
benefits of such pricing when the products are used
legitimately. (See enclosed <u>Kansas City Star</u>, May 11,
1991, page 1, for article entitled "KC mob boss, 4
associates are indicted...Anthony Civilla linked to plan
to divert drugs meant for nursing homes, by John T.
Dauner and Joe Stephens.)....

On June 13, 1991, before the Health Subcommittee of the Ways

and Means Committee, I stated independent pharmacy's assessment in

part as follows:

As the subcommittee is thoroughly aware, price
discrimination permeates the prescription drug
marketplace. To maintain such discriminatory price, even
our independent buying groups are denied equal access to
prices based on economies of scale.

As a witness at your opening hearing on the recently
repealed Medicare Drug Benefit Act, held April 22, 1987,
I can vividly recall an observation of the witness for
the National Council of Senior Citizens who urged
Congress to determine how it is that a prescription drug
costs one consumer $18.25 and the same drug costs another
consumer $0.73.

These practices continue today, yet neither Medicare
nor Medicaid currently benefits from the price
discrimination in our market. For example, last month in
a Kansas City investigation by a federal grand jury, it
was alleged through indictments that members of a so-
called "organized crime" family purchased prescription
drugs at the discriminatory nursing home price, involving
reductions as much as 90% off the acquisition price.
While such alleged criminals enrich themselves through
resale of the products, neither Medicare nor Medicaid
enjoys the benefits of such pricing when the products are
used legitimately. (See enclosed <u>Kansas City Star</u>, May
11, 1991, page 1, for article entitled "KC mob boss, 4
associates are indicted....Anthony Civilla linked to plan
to divert drugs meant for nursing homes, by John T.
Dauner and Joe Stephens.)

If Medicare generally had access to the savings
associated with such prices, perhaps this "windfall"
revenue could finance the non-copayment costs of a
Medicare outpatient prescription drug program with the
characteristics of H.R. 2500.

11