**ANDERSON EXHIBIT 34**

# EXHIBIT 7

Case 1:01-cv-12257-PBS   Document 6625-118   Filed 11/02/09   Page 3 of 5
Case 1:01-cv-12257-PBS   Document 6395-8   Filed 08/21/2009   Page 2 of 4

Page 1

1 of 1 DOCUMENT

Copyright © 1989 F-D-C Reports Inc.

The Pink Sheet

*51(30): 5-7*

July 24, 1989

**LENGTH:** 1430 words

**TITLE:** V-A OBTAINS Rx DRUG PRICE DISCOUNTS OF 41% FOR SINGLE-SOURCE, 67% FOR MULTISOURCE DRUGS NOT DISTRIBUTED BY DEPT., PRYOR DRUG PRICE HEARING TOLD

**TEXT:**

   The Veterans Affairs Department obtains prescription drug price discounts of 67% for single-source drugs and 41% for multiple-source drugs *not* stored and dispensed by the department, Veterans Affairs Department Pharmaceutical Products Division Chief Dennis Styrsky testified at a July 18 hearing before the Senate Special Committee on Aging.

   The department "obtains discounts through its Federal Supply Schedule program averaging 41% for single-source prescription drugs and 67% for multiple-source drugs when measured against wholesale prices," Styrsky said. He emphasized that "these prices represent the cost to the government through commercial distribution channels and not drugs owned and distributed through depot stock."

   When V-A purchases high volumes of pharmaceuticals for warehousing and distribution through its own depot stock program, Styrsky said discounts for single-source drugs "vary from 22% to 90% when compared with the average wholesale price, the variance being based on the manufacturers' pricing policies and willingness to negotiate for a market they possess." For multiple-source products, he continued, the department "typically" obtains "discounts ranging from 39% to 93%, but most multiple-source drugs in our depots are currently being purchased with discounts of greater than 80%" off AWP.

   Committee Chairman Pryor (D-Ark.) suggested that the Medicare drug benefit could be saved from projections of drug cost overruns, which threaten the program, if V-A assumes responsibility for negotiating purchase prices with manufacturers.

   Styrsky explained that V-A can obtain favorable prices by approaching brandname drug companies with information about "discounting practices for all classes of trade," including hospitals and HMOs. "Bidders complete a discount schedule and marketing data section of the solicitation with this information," V-A's drug expert said. A department computer program compares the price offered to the government to each manufacturer's "most favored customer."

   Brandname companies are often unwilling to negotiate prices for their single-source products, Styrsky noted. The "single problem" in such circumstances "generally relates to the market share" represented by V-A, he explained. "A decade ago V-A was one of the five largest customers to the pharmaceutical industry"; however, because of "consortia, buying groups and health maintenance organizations, it is not even among the 10 largest buying organizations in the U.S."

   Pryor held up stock bottles of *Motrin* 800 mg and declared that the same bottle is priced at $ 29 to the public -- including Medicare -- but only $ 8 to hospitals and $ 5 to V-A. The published price (AWP), he said, is $ 32.

Case 1:01-cv-12257-PBS Document 6625-118 Filed 11/02/09 Page 4 of 5
Case 1:01-cv-12257-PBS Document 6399-8 Filed 08/21/2009 Page 3 of 4

Page 2

© 1989 F-D-C Reports, Inc., The Pink Sheet, July 24, 1989

Besides containing information about V-A's efforts to acquire price discounts, the hearing addressed the largely unsuccessful efforts of pharmacy buying groups and Kansas' state Medicaid bidding program to attract participation by manufacturers of single-source products.

Pharmaceutical Manufacturers Association President Mossinghoff was asked why brandname companies refuse to negotiate the prices of their single-source products. "That's an individual corporate decision, and competitors can't decide [as a group] whether or not they are going to bid on a given program," Mossinghoff replied. Although PMA companies are prohibited from agreeing not to participate in such programs, he noted that "PMA works very hard to rule out formularies," and the Kansas system establishes a formulary of bid-winners' products. The association is "institutionally opposed" to formularies in that they "keep diverse pharmaceuticals out of the hands of the people that need them."

Pryor asked whether brandname companies' refusal to participate in the Kansas bidding program represented a violation of the antitrust laws. Mossinghoff responded that the Robinson-Patman Act "has been litigated" at least four times, most recently in 1984, in cases involving the pharmaceutical industry. "The act itself gives aggrieved parties a private cause of action," he said. "I would submit that the act is probably pretty well understood by the industry."

Kansas Social and Rehabilitation Services Department Secretary Winston Barton declared that the Kansas Medicaid bidding program in two years of existence "covers only a half-dozen" single-source products. He testified that companies are afraid the state program "will cut into their profits."

Noting that "physicians in many states receive only about one-half their normal fees when they care for Medicaid recipients" and that "pharmacists are fortunate to cover actual costs when they fill prescriptions for Medicaid recipients," Barton said: "I contend that pharmaceutical companies are the only entity in the health care field that do not pay their fair share in meeting the health care needs of the poor of this country."

While pharmaceutical companies have raised prices 88% since 1981, Barton asserted, pharmacist dispensing fees have increased only 5-10%. "To contain Medicaid [costs] in Kansas, we have not had the money to increase the rates to the pharmacist," he added. "We've had to hold his load because we have to pay the cost of the drug."

Manufacturer participation in the Kansas program would mean substantial savings for Medicaid, he said. Noting that Kansas Medicaid "pays over $ 2 mil. per year" for H[2] antagonists, Barton said the state "could save $ 500,000 on this one drug" category with a "bid savings of 25%, which is very realistic." Nationally, "states pay over $ 200 mil. for this drug; a 25% savings would be $ 50 mil.," he continued. "Expand that savings to other prescribed drugs, and it is not difficult to realize the potential savings."

To realize savings for Medicaid programs in other states and for the Medicare drug program, Barton recommended that the Health Care Financing Administration "actively seek ways to incorporate a bidding procedure in the Medicare program" and "encourage states to implement bid programs" through regulations. He also asked Congress to provide increased federal funding for states with bidding programs.

Hospitals and HMOs have a key advantage over pharmacy buying groups in negotiating bids because they can exert control over physician prescribing to establish a formulary. Without therapeutic substitution authority, pharmacies must dispense prescriptions as prescribed. However, some pharmacy buying groups apparently obtain greater brandname product discounts when they simply fail to carry products not discounted.

A briefing paper prepared by the committee's majority staff reports that buying groups "whose member pharmacies adhere to the recommended list of drug products negotiated by the group are more successful in obtaining discounts from manufacturers."

The report notes that price discounts for hospitals, HMOs, nursing homes, and repackagers who supply dispensing physicians often are *not* contingent upon either the volume of the purchase or the purchaser's for-profit/nonprofit tax

Case 1:01-cv-12257-PBS    Document 6625-118    Filed 11/02/09    Page 5 of 5
Case 1:01-cv-12257-PBS    Document 6395-8    Filed 08/21/2009    Page 4 of 4

Page 3

© 1989 F-D-C Reports, Inc., The Pink Sheet, July 24, 1989

status.  Such institutions "that contract with wholesalers to purchase prescription drugs from a predetermined list are able to achieve discounts of up to 99% off the manufacturer's published [AWP] even for brandname products," the briefing paper states.  The report is titled, "Prescription Drug Prices: Are We Getting Our Money's Worth?"

According to the committee staff's briefing paper, "interviews with various buyers in the market" indicated that "manufacturers are more likely" to offer discounts to buyers with "certain key attributes."

Such attributes include the ability to ensure "increased market share," which hospitals guarantee by including the discounted product on a restricted formulary.  Another element is a "captive" group of physicians and patients -- as offered by a hospital, nursing home, HMO, or other managed care plan -- who can become "used to relying on a given product." In addition, it helps if the buyer largely assumes responsibility for distribution and requires the service of fewer manufacturer's marketing representatives.

However, pharmacy buying groups apparently do not meet the criteria for obtaining discounts off brandname drug prices, "even after patent expiration," the report continues.  "Some manufacturers make it their 'policy' not to supply bids when approached by pharmacy buying groups, including groups representing thousands of pharmacies in many states," the paper states.  Such policies "possibly" violate federal antitrust law.