# ANDERSON EXHIBIT 3

TO

OPPOSITION TO EXCLUDE TESTIMONY
OF EXPERT MARK G. DUGGAN PH.D.

Depo-Gerzel-April-02-20-09I

0001
```
 1              UNITED STATES DISTRICT COURT
 2               DISTRICT OF MASSACHUSETTS
 3
       In re: PHARMACEUTICAL      )
 4     INDUSTRY AVERAGE WHOLESALE )
       PRICE LITIGATION           )   MDL No. 1456
 5                                )
       THIS DOCUMENT RELATES TO:  )   Civil Action No.
 6                                )     01-12257-PBS
       US ex rel Ven-A-Care of    )
 7     the Florida Keys, Inc.     )
       v. Abbott Laboratories, Inc.)
 8     No. 07-CV-11618-PBS        )
 9
10
           VIDEOTAPED ORAL DEPOSITION OF APRIL GERZEL
11
                     February 20, 2009
12
13
14
15          DEPOSITION upon videotaped oral
16     examination, of the witness, APRIL GERZEL, taken on
17     behalf of Ven-A-Care of the Florida Keys, Inc. in the
18     above entitled cause pending in the United States
19     District Court, District of Massachusetts, before
20     TAMMY POZZI, Certified Shorthand Reporter in and for
21     the State of Texas, on February 20, 2009, in the law
22     offices of Jones Day, 77 West Wacker, 35th Floor,
23     Chicago, Illinois, between the hours of 8:32 a.m. and
24     12:13 p.m., pursuant to due notice and the Federal
25     Rules of Civil Procedure.
```
0002
```
 1                 A P P E A R A N C E S
 2     COUNSEL FOR Ven-A-Care OF THE FLORIDA KEYS, INC.:
 3          ANDERSON LLC
            Mr. C. Jarrett Anderson
 4          208 West 14th Street, Suite 203
            Austin, Texas 78701
 5          (512) 469-9191
 6     COUNSEL FOR ABBOTT LABORATORIES INC.:
 7          JONES DAY
            Mr. Eric P. Berlin
 8          Ms. Tara A. Fumerton
            77 West Wacker Drive, Suite 3500
 9          Chicago, Illinois 60601
            (312) 782-3939
10
       COUNSEL FOR THE STATES OF WISCONSIN, ILLINOIS,
11     KENTUCKY, IDAHO, HAWAII, ALASKA AND SOUTH CAROLINA:
                              (Via telephone)
12          MICHAEL WINGET-HERNANDEZ
            Mr. Michael Winget-Hernandez
13          101 College Street
            Dripping Springs, Texas 78620
14          (512) 858-4181
15     COUNSEL FOR THE STATES OF ALABAMA AND MISSISSIPPI:
                              (Not present)
16          BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES,
            P.C.
17          Mr. Paul Lynn
            218 Commerce Street
```

Depo-Gerzel-April-02-20-09I
18      Montgomery, Alabama 36104
        (800) 898-2034
19
ALSO PRESENT:
20
        MARY ELIZABETH GAASCH,
21           Videographer
22
23
24
25
0003
1                        INDEX
                                              PAGE
2
Appearances. . . . . . . . . . . . . .      2
3
APRIL GERZEL
4       Examination by Mr. C. Jarrett Anderson. . .    4
        Examination by Ms. Tara A. Fumerton . . . .  127
5
Witness's Signature Page/Corrections . . . . . .  133
6
Reporter's Certificate . . . . . . . . . . . .  135
7
8                      EXHIBITS
        DESCRIPTION                    IDENTIFIED
9
1    11/4/03 E-mail to Kay Morgan from April Gerzel,
10       Subject: 11/4/03 Price Increase - Tarka . .   31
11   2   Manufacturer Directory Information Form . .    51
12   3   Abbott Pharmaceuticals information. . . . .    62
13   4   12/29/99 E-mail to Jerrie Cicerale from Terri
         Factora, Subject: Abbott Hospital report
14       (First DataBank as of 12/29/99) . . . . . .   77
15   5   First DataBank The Blue Book Annual Product
         Update Report . . . . . . . . . . . . . .     80
16
6    Letter from Chris Bovard. . . . . . . . . .    84
17
7    NDDF 1994 . . . . . . . . . . . . . . . .      88
18
8    Wholesale Unit Price and Date . . . . . . .   102
19
9    AWP Policy Correspondence . . . . . . . . .   108
20
10   7/13/04 AWP Policy Correspondence . . . . .   127
21
22
23                     *-*-*-*-*
24
25
0004
1                      PROCEEDINGS
2             THE VIDEOGRAPHER:   We are on the
3    record.  It is Friday, February 20th, 2009.  It is
4    8:32 a.m.   This is the beginning of tape 1.
5             Will the court reporter please swear
6    in the witness?
7             APRIL GERZEL,
8    having been first duly sworn, testified as follows:
9                      EXAMINATION
10   BY MR. ANDERSON:

Page 2

Depo-Gerzel-April-02-20-091
```
11      Q.    Good morning.  Could you state your name
12 for the record, please?
13      A.    April Gerzel.
14      Q.    Have you gone by any other last names?
15      A.    My maiden name.
16      Q.    What was that?
17      A.    April Harder.
18      Q.    Harder?
19      A.    Harder.
20      Q.    Okay.  Ms. Gerzel, I am Jarrett Anderson.
21 I represent the relator, Ven-A-Care of the Florida
22 Keys that's brought a lawsuit on behalf of the
23 government against Abbott.
24            You understand that you're being
25 deposed today, and that your testimony can be used as
0005
1  though it were in a court of law; is that --
2       A.    Yes.
3       Q.    Okay.  And you understand you're under
4  oath?
5       A.    Yes.
6       Q.    Have you been deposed before?
7       A.    No.
8       Q.    Okay.  A couple of important ground rules.
9  Number one, if for whatever reason you don't
10 understand my question, let me know and I'll rephrase
11 it so that there's no miscommunications and we can
12 rely upon your testimony.  Is that agreeable?
13      A.    Uh-huh.  Yes.
14      Q.    And, then, secondly, you've already caught
15 yourself, but you do have to answer verbally, you
16 can't just nod your head or -- or kind of do some
17 other nonverbal things that we do in conversation, so
18 that the court reporter can take it down.
19      A.    Okay.
20      Q.    And, lastly, since we do have a
21 transcription being made, let's make sure we don't
22 speak over one another like we might do if we were
23 just talking informally, okay?
24      A.    Okay.
25      Q.    All right.  How long have you worked for
0006
1  Abbott?
2       A.    12 years.
3       Q.    So roughly back to '97?
4       A.    I started in December of '96.
5       Q.    Okay.  And have you always been in the
6  Pricing Department?
7       A.    No.
8       Q.    Where did you start with -- in Abbott?
9       A.    I started in the Hospital Pharmaceutical --
10 or Hospital Products Division.
11      Q.    Okay.  What department?
12      A.    Home Infusion.
13      Q.    How long were you in Home Infusion?
14      A.    Five years.
15      Q.    So roughly until 2001 or so?
16      A.    Correct.
17      Q.    Were you there in May of 2001?
18      A.    Yes.
19      Q.    Do you recall there being some pretty
20 dramatic price decreases taken by the Home Infusion
21 grou- -- pardon me, the Hospital Products Division on
```
Page 3

Depo-Gerzel-April-02-20-09I
```
22    some injectable and other products?
23              MS. FUMERTON:  Objection, form.
24        A.   No, I don't.
25        Q.   (BY MR. ANDERSON):  Okay.  What did you do
0007
1     in Home Infusion?
2         A.   I was -- I -- I held various jobs.
3         Q.   Uh-huh.
4         A.   I was a Reimbursement Technician, a
5     Reimbursement Specialist and a Financial Analyst.
6         Q.   Did you start as a Reimbursement
7     Technician?
8         A.   Yes.
9         Q.   Then you were promoted to a Reimbursement
10    Specialist?
11        A.   Yes.
12        Q.   And then you took the position as Financial
13    Analyst?
14        A.   Yes.
15        Q.   How many years were you either a
16    Reimbursement Technician or a Reimbursement
17    Specialist?
18        A.   I was a technician for about a year and a
19    half, and I was a specialist roughly two years.
20        Q.   And what were your basic job duties in
21    those positions?
22        A.   As a technician, I was responsible for
23    billing and trying to collect on Home Infusion
24    claims.
25        Q.   Were you involved in billings made by Home
0008
1     Infusion to Medicaid?
2              MS. FUMERTON:  Objection, form.
3         A.   I do believe so, yes.
4         Q.   (BY MR. ANDERSON):  Were you involved in
5     billings by Abbott Home Infusion to private
6     insurance?
7         A.   Yes.
8         Q.   And you did that for roughly three years,
9     is that right?
10        A.   I -- yes, I believe about three years.
11        Q.   As a -- a -- a financial analyst what were
12    your job duties?
13        A.   I was responsible for performing what were
14    called risk analysis to determine of the outstanding
15    accounts receivable balances what was our risk to
16    collecting all of those monies, and -- and how much
17    we'd collect based on trends and history of what we
18    had done over time.
19        Q.   In your reimbursement role and in your
20    financial analyst role at Abbott Hospital Products
21    Home Infusion, did you become familiar with drug
22    pricing?
23              MS. FUMERTON:  Objection, form.
24        A.   What do you mean when you say "familiar
25    with"?
0009
1         Q.   (BY MR. ANDERSON):  For instance, did you
2     learn of some drug pricing terms?
3              MS. FUMERTON:  Objection, form.
4         A.   I don't -- I -- I don't recall our pricing
5     structure.
6         Q.   (BY MR. ANDERSON):  Were you aware of a
```
Page 4

```
 7    pricing term known as "AWP"?
 8         A.    I am aware of a pricing term called "AWP,"
 9    but I don't recall when I actually became aware of
10    that acronym.
11         Q.    Do you think you were aware of AWP in the
12    context of your reimbursement role at Home Infusion?
13         A.    I don't recall.
14         Q.    Before you went to work for Abbott, had you
15    worked in the drug industry in any way?
16         A.    No.
17         Q.    Okay.  What was your job prior to that?
18         A.    My immediate job prior to that was at a
19    company called Safety Guard.
20         Q.    Okay.  And what business are they in?
21         A.    They made like plastic gloving, plastic
22    gloves and things like that.
23         Q.    Okay.  Had you had any dealings with drug
24    billings or drug reimbursement prior to your
25    employment by Abbott Home Infusion?
0010
 1         A.    No.
 2         Q.    All right.  After you were an Abbott Home
 3    Infusion Financial Analyst, did you go to work in
 4    PPD?
 5         A.    Yes.
 6         Q.    In the Pricing Department?
 7         A.    Yes.
 8         Q.    So that would have been roughly 2001,
 9    correct?
10         A.    Correct.
11         Q.    And today you're still in the Pricing
12    Department, correct?
13         A.    Yes.
14         Q.    So from 2001 to now, early 2009, have your
15    job duties changed at Abbott PPD?
16         A.    Yes, they have.
17         Q.    Okay.  What were your initial job duties?
18         A.    Initially I was the Supervisor of Rebates.
19         Q.    Rebates paid to whom?
20         A.    Entities like pharmacy benefit managers,
21    HMOs, health maintenance organizations.
22         Q.    Were you involved at all in rebates paid by
23    Abbott under the federal law know as -- known as OBRA
24    '90?
25                   MS. FUMERTON:  Objection, form.
0011
 1         A.    Managed care rebates under the --
 2         Q.    (BY MR. ANDERSON):  No.
 3         A.    I -- I don't understand the question.
 4         Q.    Okay.  Let me phrase it slightly
 5    differently.  Have you ever been involved in the
 6    calculation of any pricing information or the payment
 7    of any rebates by Abbott to state Medicaid programs?
 8                   MS. FUMERTON:  Objection, form.
 9         A.    Yes, I have.
10         Q.    (BY MR. ANDERSON):  Okay.  But initially,
11    that wasn't one of your job duties?
12         A.    Correct.
13         Q.    Okay.  How long were you the supervisor of
14    rebates to managed care entities and PBMs?
15         A.    Roughly 14 months.
16         Q.    And what was your next position in PPD?
17         A.    My next position was Supervisor of
```

Depo-Gerzel-April-02-20-09I

```
18      Chargebacks and membership.
19          Q.    How long did you hold that?
20          A.    Roughly two years.
21          Q.    So that would have been, like, mid 2002
22      through like two-thou- -- early 2005?
23          A.    It was early 2003 --
24          Q.    Okay.
25          A.    -- to at some point in 2005.
0012
1           Q.    All right.  And you were a Supervisor of
2       Chargebacks.  Can you describe what those basic job
3       duties involved?
4           A.    Managing the chargeback team involved
5       working with wholesalers regarding the chargebacks
6       they submitted from themselves to Abbott on behalf of
7       the products they sold to our contracted customers,
8       as well as working with the wholesalers in reference
9       to the deductions they may have taken when they
10      disagreed with how Abbott had paid --
11          Q.    Okay.
12          A.    -- the chargebacks.
13          Q.    After your role as Supervisor of
14      Chargebacks, what position did you take?
15          A.    After the chargeback area in Membership, I
16      went to the Government Team.
17          Q.    What did that entail?
18          A.    When I initially started, I was responsible
19      for the ASP calculation.  And since then, I've moved
20      on to various rolls in Government.
21          Q.    ASP calculations are calculations made with
22      respect to Medicare?
23          A.    The MMA 2003.
24          Q.    Right.  And by "MMA," you're referring to
25      the Medicare program?
0013
1           A.    Yes.
2           Q.    All right.  What are your current job
3       duties?
4           A.    My current job duties include managing the
5       state contracting, federal contracting, and data
6       maintenance.
7           Q.    By "contracting," are you referring to, for
8       instance, state prison systems that may purchase
9       drugs?
10          A.    No.  I'm actually talking about
11      supplemental contracts to the federal Medicaid
12      program.
13          Q.    Is that also sometimes known as
14      "supplemental rebate programs"?
15          A.    Correct.
16          Q.    And those supplemental rebate programs have
17      to do with, for instance, a given Abbott brand drug
18      having some preferred status on a Medicaid formulary?
19          A.    That's correct.
20                MS. FUMERTON:  Objection, form.
21          A.    That is correct.
22          Q.    (BY MR. ANDERSON):  Okay.  And in exchange
23      for that status, Abbott pays a supplemental rebate in
24      addition to any other rebates it may have been paying
25      under federal law?
0014
1           A.    That's correct.
2                 MS. FUMERTON:  Objection, form.
```

Page 6

Depo-Gerzel-April-02-20-09I

```
 3       Q.    (BY MR. ANDERSON):  Thank you.  Okay.  In
 4  any of these roles, did you have job responsibilities
 5  or duties with respect to price reporting to pricing
 6  compendias such as FirstDataBank and Red Book?
 7       A.    Yes, I did.
 8       Q.    For what time period?
 9       A.    From roughly 2003 to 2005.
10       Q.    Do you understand who held those job --
11  well, strike that.
12             Other than yourself for that time
13  period, was there anyone else who was responsible for
14  price reporting by Abbott to compendias such as
15  FirstDataBank and Red Book?
16       A.    No, it was my responsibility.
17       Q.    Okay.  Do you understand who has that
18  responsibility now?
19       A.    Yes, I do.
20       Q.    Who?
21       A.    Dana Chavira.
22       Q.    Okay.  And did she take over from you in
23  2005?
24       A.    Yes, she did.
25       Q.    Prior to --
0015
 1       A.    Can I interject?
 2       Q.    Sure.  How --
 3       A.    Actually, Dana did up until recently have
 4  that responsibility, and it moved, like, a couple of
 5  weeks ago --
 6       Q.    Okay.
 7       A.    -- to her manager Lisa Flanigan.
 8       Q.    Okay.  Thank you.  Prior to 2003, did you
 9  understand who was responsible for price reporting by
10  Abbott to the compendia?
11       A.    The whole time prior to 2003?
12       Q.    No, immediately prior to --
13       A.    Oh.
14       Q.    -- 2003.
15       A.    Oh, yes.
16       Q.    And who was that?
17       A.    Tina Calvert.
18       Q.    And do you understand how long Tina held
19  that role?
20       A.    I don't.
21       Q.    So if I'm understanding your testimony, it
22  looks like the price reporting responsibilities to
23  the compendia also coincided with your position as
24  Supervisor of Chargebacks; is that true?
25       A.    Correct.  I was Supervisor of Chargebacks
0016
 1  and Membership, and I also held the responsibility of
 2  pricing to them.
 3       Q.    Is it your understanding the price
 4  reporting responsibilities go along with the
 5  Supervisor of Chargeback position?
 6             MS. FUMERTON:  Objection, form.
 7       A.    It did at the time I was supervisor.
 8       Q.    (BY MR. ANDERSON):  Does it still?
 9       A.    No, it does not.
10       Q.    Did it until a few weeks ago when Lisa
11  Flanigan --
12       A.    Yes, it did.
13       Q.    Okay.
```

Page 7

Depo-Gerzel-April-02-20-09I

14    A.    Uh-huh.
15    Q.    Do you know why now that role of reporting
16 prices to pricing services or compendia like
17 FirstDataBank and Red Book has been transferred to
18 Ms. Flanigan?
19    A.    I don't know.  I would have to speculate as
20 to why.
21    Q.    I don't want you to take a wild guess, but
22 if you have some information, I would like to know
23 it.
24    A.    I -- I don't --
25         MS. FUMERTON:  Objection, form.
0017
1    A.    -- know why.
2    Q.    (BY MR. ANDERSON):  You don't know --
3    A.    I haven't been told by --
4    Q.    You haven't been -- you haven't been --
5    A.    I haven't been priv- -- privy to any
6 conversation --
7    Q.    Okay.
8    A.    -- regarding that.
9    Q.    Did you receive any training or any other
10 type of information as to how to report prices to the
11 pricing services like FirstDataBank and Red Book?
12    A.    Yes.
13    Q.    From whom?
14    A.    From Tina Calvert.
15    Q.    Your predecessor?
16    A.    Correct.
17    Q.    Anyone else?
18    A.    No.
19    Q.    Have you ever received any instructions
20 from any personnel in the PPD Pricing Department
21 other than Ms. Calvert about price reporting to the
22 compendia?
23         MS. FUMERTON:  Objection, form.
24    A.    Not that I recall.
25    Q.    (BY MR. ANDERSON):  Did you receive any
0018
1 instruction from PPD pricing managers such as Joe
2 Fiske or Deb DeYoung regarding price reporting to the
3 compendia?
4         MS. FUMERTON:  Objection, form.
5    A.    We -- I'm not sure how to respond to that
6 question.  When you -- part of price reporting is
7 also product reporting, and I did receive information
8 from Deb DeYoung regarding government FDA indicative
9 information to report to the government.  Not
10 specifically how to report it, but what to report.
11    Q.    (BY MR. ANDERSON):  Okay.  The FDA
12 information that you're referring to would be
13 clinical information?
14    A.    They are items like is it Medicaid or VA
15 eligible, what is the market entry date.  And there
16 might be others, but I don't recall all the
17 specifics.
18    Q.    Did -- did you ever report or publish any
19 pricing information to the FDA?
20    A.    To the FDA?  No.
21    Q.    Okay.  Other than your publication of
22 pricing information to the compendia such as
23 FirstDataBank and Red Book, did you ever publish any
24 pricing information to any government?

Page 8

Depo-Gerzel-April-02-20-09I
25          MS. FUMERTON:   Objection, form.
0019
1          A.   I was responsible for sending out what were
2   called fax -- fax blasts that had our listing WAC on
3   them, and some of them were to Medicaid agencies.
4          Q.   (BY MR. ANDERSON):   The -- the Medicaid
5   programs were part of the list of recipients of fax
6   blasts?
7          A.   I don't specifically know what programs
8   were part of that list.  I don't recall.
9          Q.   I know.  I -- I appreciate that.  But
10  you're saying you knew some Medicaid programs, if not
11  all, were on the list?
12         A.   There was a list that was called "Medicaid
13  Administrator" to the Medicaid administrator --
14         Q.   Uh-huh.
15         A.    -- is what the list was entitled.  What
16  was on that list, I don't know.
17         Q.   And, accordingly -- and I think I've seen
18  son of these letters -- there were actually letters
19  that were styled "Dear Medicaid Administrator,"
20  correct?
21         A.   That is correct.
22         Q.   Okay.  And th- -- you understood there was
23  a list of Medicaid programs that were reflected in
24  the "Medicaid Administrator" list?
25         A.   There was --
0020
1          MS. FUMERTON:   Objection, form.
2          A.   There was a list of peoples' names and
3   their faxes.  What they were, I don't know, or what
4   companies they were with, their programs, I have no
5   idea.
6          Q.   (BY MR. ANDERSON):   You -- you understood
7   they were with Medicaid, but you don't know which
8   ones?
9          MS. FUMERTON:   Objection, form.
10         A.   I -- I believe they were going to
11  administrat- -- Medicaid administrators.
12         Q.   (BY MR. ANDERSON):   Okay.  In addition to
13  sending out the fax blasts when you would launch a
14  product, is it true you would also send out fax
15  blasts when you would have price changes?
16         A.   That is correct.
17         Q.   And what prices were included in the price
18  change fax blasts?
19         A.   It was prices and WAC prices.
20         Q.   Did those price change notifications go to
21  Medicaid administrators as well?
22         A.   Yes.
23         Q.   Did they go to the pricing compendia?
24         A.   Yes.
25         Q.   Did they go to customers such as
0021
1   wholesalers and pharmacies?
2          A.   Yes.
3          Q.   What other sectors of the industry or
4   groups received the fax blast?
5          MS. FUMERTON:   Objection, form.
6          A.   The ones you named are actually the only
7   ones that I recall.
8          Q.   (BY MR. ANDERSON):   Who was the custodian
9   of the -- the lists of fax blast recipients?
Page 9

Depo-Gerzel-April-02-20-09I

```
10          A.    Excuse me.   There was a company called
11   Xpedite that maintained those lists.
12          Q.    Did anyone at -- at Abbott have a copy of
13   the list?
14          A.    Not that I'm aware of.   I don't know.
15          Q.    Did you see the list?
16          A.    I could have visibility to it if I wanted
17   to.
18          Q.    Oh, by acce- -- accessing the Xpedite
19   systems?
20          A.    Correct.
21          Q.    Is Xpedite a contractor of Abbott's?
22          A.    Today or then?
23          Q.    Then.
24          A.    We did contract with them to do this, yes.
25          Q.    But you don't now, I take it?
0022
 1          A.    I have no idea.
 2          Q.    Oh, I see.  Do you know where the company
 3   known as Xpedite is located?
 4          A.    I don't know.
 5          Q.    Is it true that when fax blasts of Abbott
 6   pricing information were made by Xpedite either with
 7   new product launch pricing or price change pricing,
 8   that that was done at Abbott's direction?
 9          A.    That is correct.
10          Q.    Are you aware of any instances where
11   Xpedite was publishing or reporting prices through
12   fax blasts without Abbott's authority?
13          A.    I'm not aware of any, no.
14          Q.    Okay.  Did you receive any training
15   materials that were written or electronic regarding
16   reporting prices by Abbott to compendias such as
17   FirstDataBank and Red Book?
18          A.    Not that I recall, no.
19          Q.    It was all just verbal between you and
20   Tina?
21          A.    Correct.
22          Q.    Other than the fax blasts, were there other
23   standard ways in which Abbott conveyed pricing
24   information to compendia, and customers, and Medicaid
25   programs such as mass mailings?
0023
 1                MS. FUMERTON:   Objection, form.
 2          A.    An e-mail -- we would send an e-mail out.
 3          Q.    (BY MR. ANDERSON):   Would that be done by a
 4   PPD, or would that be done by a contractor?
 5          A.    That would be done by me.
 6          Q.    By you?
 7          A.    Uh-huh.
 8          Q.    So you had a -- I take it a -- a really
 9   large address book?
10          A.    The -- I sent it to the pricing compendia,
11   and then internal -- I -- I did not send it --
12   everybody that was fax-blast was not sent via e-mail.
13          Q.    Okay.
14          A.    It was sent to the pricing compendia via
15   e-mail, and then internal departments in Abbott that
16   needed to know, like Customer Service, what PPD was
17   doing as far as changing list or WAC pricing or
18   launching new product.
19          Q.    I see.  Did you understand that, in turn,
20   Customer Service individuals at Abbott would be
```

Page 10

Depo-Gerzel-April-02-20-09l

```
21   notifying customers of price changes via e-mail?
22        A.   I -- I have no idea.
23        Q.   You don't know?
24        A.   I don't know.
25        Q.   Were you notifying customers of price
0024
 1   changes via e-mail?
 2        A.   No.
 3        Q.   Okay.  You -- but you were notifying price
 4   compendia like FirstDataBank and Red Book of price
 5   changes taken by Abbott via e-mail?
 6        A.   Sometimes.
 7        Q.   What were the circumstances where you would
 8   notify the compendia via fax blast versus e-mail?
 9        A.   I -- I don't recall.
10        Q.   How did you know whether to use e-mail or
11   fax blast?
12        A.   New product launches, we would always do
13   e-mail.  As far as price increases, I don't recall if
14   there was one standard reason to do e-mail versus fax
15   blast or if they had a question.  But working via
16   e-mail with them was something that was done
17   periodically.
18        Q.   Okay.  So price change notifications
19   sometimes occurred via fax blast and sometimes
20   occurred via e-mail, and you're not exactly sure why
21   one method was chosen or the over?
22             MS. FUMERTON:  Objection,
23   misrepresents the testimony.
24        A.   They always were done via fax blast.
25   Sometimes I believe there were questions or
0025
 1   correspondence about they didn't get the e- -- they
 2   didn't get the fax blasts or had questions.
 3        Q.   (BY MR. ANDERSON):  Okay.  Good.  Thank you
 4   for that clarification, and -- and I'm going to
 5   double back just so we can clear this up.
 6             Am I correct in understanding that the
 7   price change notifications were always sent via fax
 8   blast to the customers we listed and the Medicaid
 9   programs and the compendia, but there were also
10   situations sometimes when, in addition to the fax
11   blast, the price change notification would be sent by
12   you to the compendia like FirstDataBank and Red Book
13   via e-mail?
14             MS. FUMERTON:  Ob- --
15        A.   That is correct.
16             MS. FUMERTON:  Ob- -- just give me a
17   second to -- objection --
18             THE WITNESS:  Okay.
19             MS. FUMERTON:  -- misrepresents prior
20   testimony.
21             MR. ANDERSON:  Thank you.  Well, she
22   said "that's correct".  I don't know how it can be
23   representing --
24             MS. FUMERTON:  Well, you were
25   referring to Medicaid programs, and actually she
0026
 1   didn't previously say that she --
 2             MR. ANDERSON:  Medicaid
 3   administrators.  Sorry.
 4        Q.   (BY MR. ANDERSON):  When you were working
 5   on the chargebacks and supervising the chargeback
```

Page 11

Depo-Gerzel-April-02-20-09I

6  process, where did you input the pricing that was
7  utilized in the chargebacks?
8              MS. FUMERTON:   Objection, lack of
9  foundation.
10     A.     Pricing -- what kind of pricing?
11     Q.     (BY MR. ANDERSON):   Well, that's -- I'll
12 back up and just ask a broader question.
13             When you were supervising the
14 chargebacks, were you involved at all in the
15 inputting of pricing information into Abbott computer
16 systems?
17     A.     Yes, I was.
18     Q.     Okay.  What prices did you input?
19     A.     I input list, WAC, PHS, FFS pricing and
20 deal pricing.
21     Q.     Which system or systems maintained by
22 Abbott did you input these prices into?
23     A.     AES.
24     Q.     Only the AES computer system?
25     A.     I believe so.
0027
1      Q.     And it was your understanding that that
2  system, in turn, processed the chargebacks?
3      A.     No, it did not.
4      Q.     Okay.  Which system processed the
5  chargebacks?
6      A.     CPCC.
7      Q.     And was CPCC interfacing with AES?
8      A.     Yes.
9      Q.     Okay.  You mentioned that you input the WAC
10 prices.  What is your understanding of what the WAC
11 prices represented?
12     A.     Wholesale acquisition cost.
13     Q.     Other than those plain words, what does
14 "wholesale acquisition cost" mean, if anything?
15     A.     It represents a cost charged to wholesalers
16 and any other customers who purchase a case quantity
17 of more -- or more of our products.
18     Q.     Okay.  Have -- have you known wholesale
19 acquisition costs to be known as the wholesale
20 invoice price?
21     A.     No.
22     Q.     Do you consider wholesale acquisition cost
23 to be the wholesale invoice price?
24     A.     No.
25     Q.     What is the deal price?
0028
1      A.     A deal price can be numerous things.  It's
2  a price that is offered regarding a special promotion
3  Abbott may be doing on products or product launches
4  relating to either a discounted price or special
5  terms if customers meet certain requirements and
6  qualifications.
7      Q.     What fields in AES did you input WAC prices
8  into?
9      A.     That- -- that's always a WAC field.  I
10 mean, it was called, like -- I don't recall the
11 actual number of the field.  They had alphanumeric
12 numbers.  I don't recall the specific WAC one, but
13 there was a location for WAC price.
14     Q.     And was there a different location for
15 deal?
16     A.     Correct.

Page 12

Depo-Gerzel-April-02-20-09I

```
17        Q.    And that was an alphanumeric field
18   identifier as well?
19        A.    No.  It was a separate part of AES called
20   AES deals.
21        Q.    Okay.  And do you understand how -- strike
22   that.  I'll back up.
23              Were you familiar with how chargebacks
24   were processed for the erythromycin products?
25        A.    I'm familiar with how chargebacks are
0029
 1   processed in general.
 2        Q.    Do -- do you recall prior to July of 2003,
 3   which would have been in the early part of your
 4   tenure as Supervisor of Chargebacks, ha- -- having
 5   any dealings with how chargebacks were processed for
 6   the erythromycin products?
 7        A.    I -- I don't recall.
 8        Q.    Do you remember anything that was unique
 9   about how process -- pardon me, pricing was selected
10   for purposes of processing chargebacks on the
11   erythromycin products prior to July of 2003?
12        A.    I don't know.
13        Q.    We'll -- we'll get into that a little
14   later.  What was your understanding of what list
15   price represented?
16        A.    List price represents a price that
17   customers pay, other than wholesalers, if they
18   purchase less than a case quantity.
19        Q.    Is it not possible for wholesalers to pay
20   list price?
21        A.    I'm not completely sure.
22        Q.    Did you ever have any awareness that
23   wholesaler- -- wholesalers could purchase at list
24   price?
25              (Sneezing.)
0030
 1              THE WITNESS:  Bless you.
 2        A.    I don't know.
 3        Q.    (BY MR. ANDERSON):  In AES, was there a
 4   field for AWP?
 5        A.    No, there's not.
 6        Q.    In any Abbott computer system was there a
 7   field for AWP?
 8              MS. FUMERTON:  Objection, form.
 9        A.    When you say "computer system," does that
10   also include databases?
11        Q.    (BY MR. ANDERSON):  Yes.
12        A.    Yes, there is.
13        Q.    Okay.  Which data- -- database?
14        A.    In our Imany Medicaid system, I'm aware of
15   a field there.
16        Q.    And you- -- you've actually been involved
17   with that system, correct?
18        A.    Correct.
19        Q.    And you've been involved in the loading of
20   AWP information into the Imany system, correct?
21        A.    Not personally.  My staff.
22        Q.    Oh, I'm sorry.
23        A.    Yeah.
24        Q.    How many people report to you?
25        A.    Directly, three.  Indirectly, six.
0031
 1        Q.    I see.  And so people reporting to you are
```

Page 13

Depo-Gerzel-April-02-20-09l

```
 2    responsible for loading AWPs into the Imany computer
 3    system maintained by Abbott?
 4         A.   Correct.
 5         Q.   And they're obtaining those prices from
 6    FirstDataBank, correct?
 7         A.   It's a -- it's called Analy$ource.  I'm not
 8    sure if it is or isn't owned by FirstDataBank.
 9         Q.   Do you understand Analy$ource is a source
10    of FirstDataBank pricing information?
11         A.   I'm not a hundred percent sure of that.
12    I -- I have, I think, that general understanding, but
13    I don't have firsthand knowledge of that.
14         Q.   Okay.
15                   (Exhibit 1 marked.)
16         Q.   (BY MR. ANDERSON):  Ms. Gerzel, if you
17    could, take a look at what's been marked as Gerzel
18    Exhibit 1.
19         A.   (Reviews document.)
20         Q.   Is Gerzel Exhibit 1 an example of price
21    change notifications that you sent out to the pricing
22    services via e-mail?
23         A.   Yes, it is.
24         Q.   And this would have not only -- this
25    particular one went to FirstDataBank, correct?
0032
 1         A.   Yes, it did.
 2         Q.   And I also see a -- an e-mail address there
 3    next to the FirstDataBank address of man- --
 4    mfgdata@drugfacts.com.  What's that?
 5         A.   I don't recall.  I don't know.
 6         Q.   Would -- would this type of e-mail also
 7    have been sent to Red Book and Medi-Span?
 8         A.   It -- it could have been.  I don't recall.
 9              MR. ANDERSON:  Hello?
10              MR. WINGET-HERNANDEZ:  Hey, Jarrett,
11    it's me.
12              MR. ANDERSON:  Okay.  Michael, why
13    don't you go ahead and -- and make your appearance.
14    We got started a little early?
15              MR. WINGET-HERNANDEZ:  Oh, okay.
16              MR. ANDERSON:  Okay?
17              MR. WINGET-HERNANDEZ:  Sure.  Are we
18    on the record?
19              MR. ANDERSON:  Yes.
20              MR. WINGET-HERNANDEZ:  This is Michael
21    Winget-Hernandez.  I'm here today on behalf of the
22    States of Wisconsin, Illinois, Kentucky, South
23    Carolina, Idaho, Alaska, and Hawaii.
24              MR. ANDERSON:  Okay.
25              MR. WINGET-HERNANDEZ:  And I apologize
0033
 1    for the interruption.
 2              MR. ANDERSON:  Oh, no problem.
 3         Q.   (BY MR. ANDERSON):  Okay.  Ms. Gerzel, you
 4    were saying that -- that they -- these types of
 5    e-mail notifications also could have been sent to
 6    Red Book and Medi-Span, correct?
 7         A.   Correct.
 8              MS. FUMERTON:  Objection, form.
 9         Q.   (BY MR. ANDERSON):  Would -- would -- would
10    that have been sent in a separate e-mail and,
11    therefore, that's why those addresses aren't shown
12    here, or is that Drug Facts address somehow related
```

Page 14

Depo-Gerzel-April-02-20-09l

13  to Red Book and Medi-Span?
14      A.   I don't know where Drug -- who or what Drug
15  Facts is related to, and I don't know if this
16  particular e-mail was also sent anywhere else.
17      Q.   Where would you have been able to obtain
18  the address that's listed there next to
19  FirstDataBank?
20      A.   There -- we had a list of addresses of data
21  vendors or pricing compendia that we had dealt with
22  that had requested that we send them information
23  regarding our products.
24      Q.   You -- you mentioned earlier that the price
25  change notifications were always sent out via fax
0034
1  blast, right?
2      A.   Correct.
3      Q.   Okay.  Is it likely that FirstDataBank and
4  Drug Facts had let y'all know that they hadn't
5  received the fax blast and, therefore, you followed
6  up with an e-mail?
7      A.   I don't know.
8      Q.   Is that typically how it would play out?
9      A.   I -- I real- -- I don't know.  I don't -- I
10  don't recall.
11      Q.   You don't recall this particular instance,
12  I understand that.  I'm not focussing on this
13  particular instance anymore.  I'm asking more
14  generally.
15              How would it normally occur that you
16  would follow up with an e-mail price change notice to
17  the compendia after you had sent out a fax blast
18  price change notice to the compendia?
19      A.   The only -- the only thing I have any
20  recollection of is if there were ever issues with the
21  fax blast, I would get phone calls saying -- because
22  my phone number was on the bottom of all of these --
23  saying that I understand a pricing letter or
24  communication went out, I did not receive it, can you
25  please fax it, or something or -- like that.
0035
1              Specifically when or how often, I
2  have -- I don't know.
3      Q.   Who would typically place those phone calls
4  to you?
5      A.   Who- --
6              MS. FUMERTON:  Objection, form.
7      A.   Whoever had a question or a comment.
8      Q.   (BY MR. ANDERSON):  I -- I'm -- that was a
9  poor question on my part.  It was too broad.
10              What types of entities would typically
11  call you?  Would it be pricing compendia personnel,
12  or would it be customers such as pharmacies?
13      A.   It could have been either that were on the
14  list of fax blasts.
15      Q.   Did you, in fact, get phone calls from both
16  of those types of groups?
17      A.   Over time, yes.
18      Q.   Okay.  How would they have -- how would
19  have -- how would -- without them receiving the fax
20  blast or with them having some type of problem with
21  the receipt of the fax blast, how they would have
22  even known that there was a price change?
23              MS. FUMERTON:  Objection, form.  Lack
Page 15

Depo-Gerzel-April-02-20-09I

```
24   of foundation.
25        A.    I don't know.
0036
 1        Q.    (BY MR. ANDERSON):   But for whatever
 2   reason, they would get wind of some information and
 3   they would call you and ask for a price change
 4   e-mail, correct?
 5        A.    Correct.
 6        Q.    Okay.  And then you would send that out,
 7   and Exhi- -- and Exhibit 1 is an example of that?
 8        A.    Correct.
 9        Q.    Looking at the next page of Exhibit 1,
10   there's a -- a form letter there dated -- pardon
11   me -- there's a form letter on the second page of
12   Gerzel Exhibit 1 that's titled "Dear Abbott, slash,
13   Ross Data Vendor," correct?
14        A.    Correct.
15        Q.    These were form letters that would be
16   created by Abbott either at launch or upon a price
17   change and sent to the compendia, correct?
18        A.    That's correct.
19        Q.    Were there similar form letters that --
20   with slightly different language at the top that were
21   sent to customers that said, for instance, "Dear
22   Wholesaler"?
23        A.    That's correct.
24        Q.    And then if it was to a pharmacy, it would
25   say "Dear Pharmacy"?
0037
 1        A.    I don't know if it actually said "Dear
 2   Pharmacy," but it would say -- there were perhaps
 3   four or five different salutations.
 4        Q.    I -- thank you.  You said that much better
 5   than my question.  Including one salutation that was
 6   "Dear Medicaid Administrator"?
 7        A.    Correct.
 8        Q.    Okay.  Did Abbott maintain copies of each
 9   of those form letters with the different salutations?
10        A.    I did during the time I was there, yes.
11        Q.    You had some templates on your computer?
12        A.    Correct.
13        Q.    Why was it that Abbott was sending out
14   launch pricing and price change notifications after
15   launch to pricing compendia?
16             MS. FUMERTON:   Objection, form.
17        A.    It was my understanding through my training
18   that that was what was required for us to be -- to
19   send them.
20        Q.    (BY MR. ANDERSON):   You were told to do it?
21        A.    Correct.
22        Q.    Right.  But other than the fact that you
23   had been told that this was now something you should
24   do, did you understand why Abbott was choosing to do
25   that?
0038
 1        A.    No.
 2             MS. FUMERTON:   Objection, form.
 3        A.    No.
 4        Q.    (BY MR. ANDERSON):   Did you ever ask?
 5        A.    Not that I recall, no.
 6        Q.    Did you have any understanding about how
 7   the pricing compendia were -- well, strike that.
 8             Did you have any understanding that
```

Page 16

Depo-Gerzel-April-02-20-09I

```
 9    the pricing compendia were, in turn, publishing these
10    prices that you were sending them?
11         A.   Yes, I did.
12         Q.   Okay.  And did you understand why Abbott
13    would want those prices published?
14              MS. FUMERTON:  Objection, form.
15         A.   No -- no, I don't -- I don't recall
16    specifically why.
17         Q.   (BY MR. ANDERSON):  Do you think it had to
18    do with drug reimbursement, like when you had handled
19    reimbursement claims in Home Infusion?
20              MS. FUMERTON:  Objection, form.
21         A.   I -- I don't know.
22         Q.   (BY MR. ANDERSON):  Did you know when you
23    were in Home Infusion that reimburs- -- -- drug
24    reimbursements were paid off of published prices?
25              MS. FUMERTON:  Objection, form.
0039
 1         A.   I have no idea.
 2         Q.   (BY MR. ANDERSON):  You don't?
 3         A.   No.  I don't recall much back then.
 4         Q.   Did you know that --
 5              MR. WINGET-HERNANDEZ:  Excuse me --
 6              MR. ANDERSON:  Mist- -- hello?
 7              MR. WINGET-HERNANDEZ:  Is it feeding
 8    back?
 9              MR. ANDERSON:  Yes.
10              MR. WINGET-HERNANDEZ:  You know, we
11    had this problem -- can we go off the record?
12              THE VIDEOGRAPHER:  Yes?  We are off
13    the record at 9:10 a.m.
14                   (Off the record.)
15              THE VIDEOGRAPHER:  We are back on the
16    record at 9:13 a.m.
17         Q.   (BY MR. ANDERSON):  Ms. Gerzel, did -- was
18    there a set of files that were maintained at Abbott
19    PPD regarding price reporting to the compendia?
20         A.   Yes, there is.
21         Q.   When you took over the responsibilities in
22    2003, did Tina Calvert physically pass those along to
23    you, or do they reside in a given location?
24         A.   They're on our computer share drive.
25         Q.   They're all electronic?
0040
 1         A.   I don't know if they're all electronic or
 2    not.
 3         Q.   Did -- are you aware of any paper files
 4    maintained by Abbott regarding its communications
 5    with pricing compendia like FirstDataBank and
 6    Red Book?
 7         A.   Ever?
 8         Q.   Yes, ma'am.
 9         A.   Yes, I am.
10         Q.   Okay.  And where were those maintained?
11         A.   In our Corporate Records area.
12         Q.   And do they still exist to your knowledge?
13         A.   I -- I have no idea.
14         Q.   When -- when you were responsible for
15    communicating with the pricing compendia from 2003 to
16    2005, were you aware that those written records
17    existed?
18         A.   Yes.
19         Q.   Do you have any reason to believe those
                        Page 17
```

Depo-Gerzel-April-02-20-09I

```
20   written records have been destroyed or lost?
21      A.   No.
22      Q.   When you say "Corporate Records," what are
23   you referring to?
24      A.   It's a location where we do all of our
25   archiving.  It's called "Corporate Records".
0041
 1      Q.   Okay.  Were there any records -- more
 2   current records kept on site?
 3      A.   I -- I believe so.  I believe we kept a
 4   hard copy with the actual paperwork that we did in
 5   the system to get to these prices.
 6      Q.   And those were kept in a file cabinet at
 7   PPD?
 8      A.   For a period of time, until we needed to
 9   archive them to Corporate Records due to space.
10      Q.   How long was the -- strike that.
11           For what period of time would the
12   records be kept at PPD's location and then sent to
13   Corporate Records or archives?
14      A.   I don't know.  There was not a standard
15   length of time before we would send them.  It was
16   more due to space.
17      Q.   How -- once records were sent to archives,
18   how lo- -- also known as Corporate Records, how long
19   were they kept there?
20      A.   I -- I don't know the record retention.
21      Q.   Would -- would a document such as Gerzel
22   Exhibit 1 have been kept in electronic form or paper
23   form or both?
24      A.   Probably both.
25      Q.   At Abbott?
0042
 1      A.   Correct.
 2      Q.   In your form letter to the data vendors
 3   noted in the second page of Gerzel Exhibit 1, at the
 4   first full paragraph under the pricing, you have a
 5   sentence that reads, "Third Party Program
 6   administrators have been notified of these changes."
 7   Do you see that?
 8      A.   Yes.
 9      Q.   Do you know why that sentence was included
10   in these letters?
11      A.   No, I don't.
12      Q.   Were -- did you ever have any involvement
13   at all in drafting these letters?
14      A.   No, I didn't.  I --
15      Q.   Who would --
16      A.   In -- in drafting the template, I -- I
17   changed, like, the tab section, the dates and the
18   products.
19      Q.   Okay.  Thank you.  You would change the
20   salutation, and you would change the pricing
21   information, correct?
22      A.   Pricing and/or product depending on --
23      Q.   Right.
24      A.   Yes.
25      Q.   But the actual language, such as the
0043
 1   paragraph that I was just focussing on, who was
 2   responsible for drafting that?
 3      A.   I don't know.
 4      Q.   Did that language ever change during the
```

Page 18

Depo-Gerzel-April-02-20-09l

```
 5   two-plus years that you were responsible for
 6   communicating these letters to the compendia?
 7      A.    Not that I recall.
 8      Q.    Do you think the reference to "third party
 9   program administrators" has anything to do with drug
10   reimbursement?
11      A.    I -- I have no idea.
12      Q.    Do you have any reason to believe that that
13   reference doesn't pertain to drug reimbursement?
14            MS. FUMERTON:   Objection, form.
15      A.    I -- I don't know what it pertains to.
16      Q.    (BY MR. ANDERSON):   What are third party
17   program administrators?
18            MS. FUMERTON:   Objection, form.
19      A.    I don't know.
20      Q.    (BY MR. ANDERSON):   Have you heard private
21   insurance and Medicaid referred to as third party
22   programs?
23      A.    I have heard "third party" before, but I'm
24   not -- I don't recall in what reference.
25      Q.    Can you recall anything about the context
0044
 1   of the reference to "third party"?
 2      A.    No.
 3      Q.    Can you think of any references to third
 4   party programs other than third party drug
 5   reimbursers like private insurance and Medicaid?
 6      A.    The only thing I recall ever hearing is
 7   third party payors, and --
 8      Q.    Right.
 9      A.    -- I don't know in reference to what or
10   who.
11      Q.    I've -- I've heard them referred to as
12   third party payors as well.
13            Have you heard third party payor to
14   refer to entities that reimburse pharmacies for
15   drugs, like Medicaid programs and private insurance?
16      A.    I -- I don't know what they refer to or --
17   or anything.
18      Q.    Can you remember anything about the context
19   of where you've heard the phrase "third party payor"?
20      A.    No.
21      Q.    Do you have any idea what the third parties
22   would be paying for?
23      A.    No.
24      Q.    Do you have any idea at all why Abbott was
25   reporting prices to the compendia?
0045
 1            MS. FUMERTON:   Objection, asked and
 2   answered.
 3      A.    I believe that's what our obligation was
 4   that they wanted us to report to them.
 5      Q.    (BY MR. ANDERSON):   How did you gain that
 6   understanding?
 7      A.    Through my training, when I came to the
 8   position.
 9      Q.    What was the obligation?
10      A.    To inform the pricing compendia of new
11   product launches, price changes to list or WAC, or
12   any discontinued products that we were no longer
13   going to manufacture and sell.
14      Q.    What was the authority that the pricing
15   compendia had to require Abbott to report prices?
```

Page 19

Depo-Gerzel-April-02-20-09I

16            MS. FUMERTON:  Objection, form.
17      A.   I don't know.
18      Q.   (BY MR. ANDERSON):  Did you believe that
19 Abbott literally had to report the prices?
20            MS. FUMERTON:  Objection, form.
21      A.   That was what I was known to do with -- and
22 trained to, "When these instances happened, here's
23 our process".
24      Q.   (BY MR. ANDERSON):  Well, I understand that
25 you were told to do it by Abbott people.  I'm asking
0046
1 a different question.
2            Did you understand from your training
3 at Abbott that Abbott literally had to report these
4 prices to the compendia like FirstDataBank and
5 Red Book.
6            MS. FUMERTON:  Objection, form.
7      A.   I don't know that I was ever told that by
8 law we had to.  I don't know.
9      Q.   (BY MR. ANDERSON):  You -- but all you do
10 know is that Abbott was instructing you to report the
11 prices?
12      A.   Correct.
13      Q.   Okay.  If you could, take a look at
14 what's -- I'm going to mark as -- well, I'll tell you
15 what.  It's already been marked, so we'll just use
16 that.  It's Fiske Exhibit 9.
17      A.   (Reviews document.)
18            MS. FUMERTON:  I think mine are out of
19 order.  Can I just see what it looks like?
20            MR. ANDERSON:  Here, I've got an extra
21 copy (indicating).
22            MS. FUMERTON:  Oh, thanks.
23            MR. ANDERSON:  Save me some weight on
24 the way home.
25      A.   (Reviews document.)
0047
1      Q.   (BY MR. ANDERSON):  Have you seen documents
2 similar to Fiske Exhibit 9 before?
3      A.   Yes, I have.
4      Q.   In what context?
5      A.   In a request to pull information as part of
6 a legal request from our archiving.
7      Q.   So you found records similar to Exhibit 9
8 in Abbott's records?
9      A.   Correct.
10      Q.   Looking at the second page of Exhibit 9, do
11 you recognize that as a standard form letter that
12 would have been sent by Abbott to the data services?
13      A.   I -- I don't know.
14      Q.   Because it predates 2003?
15      A.   Correct.
16      Q.   In looking at the last two pages of
17 Exhibit 9, do you recognize those pages as a price
18 change notification?
19      A.   Not any that I'm familiar with, no.
20      Q.   In what way is this price change
21 notification different than the ones that you were
22 familiar with?
23      A.   They look -- I mean, they look and feel
24 different.  They -- this -- these aren't the -- this
25 isn't the same template -- template that I used the
0048

Depo-Gerzel-April-02-20-09l

```
 1    time period that I was there.
 2         Q.    Did your templates include AWP information?
 3         A.    No.
 4         Q.    Do you agree that this price change
 5    notification includes AWP information?
 6         A.    This sheet includes AWP, yes.
 7         Q.    Are you familiar with a gentleman named
 8    Darrell Ballard?
 9         A.    I've heard his name.  I do not know him.
10         Q.    Did Darrell Ballard used to work in Abbott
11    PPD Pricing?
12         A.    That's my understanding.
13         Q.    Do you understand that Darrell Ballard also
14    previously was responsible for reporting pricing
15    information by Abbott to Pricing Services?
16         A.    I'm not sure what he did.
17         Q.    Do you have any general understanding of
18    what he did?
19         A.    No.
20         Q.    You just know he used to work at PPD?
21         A.    Correct.
22         Q.    Looking at the first page of Exhibit 9,
23    does that appear to be a fax cover that would have
24    been utilized by Abbott's contractor who sent the fax
25    blasts?
0049
 1         A.    I don't know.
 2         Q.    Is it different than the fax covers that
 3    you are familiar with?
 4         A.    I have never -- to my -- I don't recall
 5    ever seeing a fax cover from Xpedite.
 6         Q.    I see.  Have -- do -- to your knowledge,
 7    did Abbott use contractors other than Xpedite over
 8    the years to send the fax blasts?
 9         A.    Not that I'm aware of.
10         Q.    Are you aware of the time period for which
11    Xpedite had been handling -- strike that.  I'll
12    rephrase it.
13               How many years prior to your
14    involvement do you understand Xpedite had been
15    handling the fax blast for Abbott?
16         A.    I have no idea how long prior.
17         Q.    Did you ever gain an understanding that
18    Xpedite had been handling it for two years, five
19    years?
20         A.    I -- I -- I know that they were handling
21    it when I came on board, but I don't know how long
22    prior to that.
23         Q.    Did you ever receive any price verification
24    requests or price reports --
25               MR. ANDERSON:  Are you okay?
0050
 1               THE WITNESS:  Yeah, I just spilled,
 2    sorry.
 3               MR. ANDERSON:  Oh.
 4               MS. FUMERTON:  Are you --
 5               THE WITNESS:  I'm good.  I was picking
 6    it up.
 7               MR. ANDERSON:  Oh, okay.
 8         Q.    (BY MR. ANDERSON):  I'll rephrase.  Have
 9    you ever received any price verification requests or
10    reports of pricing information from pricing compendia
11    like Red Book and FirstDataBank?
```

Page 21

Depo-Gerzel-April-02-20-09l

```
12          A.   Yes, I have.
13          Q.   Okay.  Have you received those reports from
14     both Red Book and FirstDataBank?
15          A.   I don't recall which one they were -- I
16     don't recall.
17          Q.   And did you receive instructions about how
18     to review and complete those reports?
19               MS. FUMERTON:  Objection, form.
20          A.   I -- I don't recall what was sent with them
21     or what instructions were sent.
22          Q.   (BY MR. ANDERSON):  Did you ever receive
23     any instruction or information at all from Abbott
24     personnel about how to complete those reports?
25          A.   I don't re- -- I don't recall.
0051
1           Q.   When Tina Calvert trained you, so to speak,
2      did she mention that you would be receiving reports
3      seeking verification of pricing from Red Book and
4      FirstDataBank?
5           A.   Not -- not that I recall.
6           Q.   Were copies of price verification reports
7      or requests from FirstDataBank and Red Book kept in
8      Abbott's files?
9                MS. FUMERTON:  Objection, form.
10          A.   I -- I don't recall if they were or
11     weren't.
12          Q.   (BY MR. ANDERSON):  Do you have any memory
13     that they were not kept?
14          A.   I just don't remember one way or the
15     other.
16          Q.   Are you aware of any reasons why the
17     verification reports may have been discarded?
18               MS. FUMERTON:  Objection, form.
19          A.   No.
20                    (Exhibit 2 marked.)
21          Q.   (BY MR. ANDERSON):  Take a look, if you
22     could, at what's been marked as Gerzel Exhibit 2.
23          A.   (Reviews document.)
24          Q.   Have you seen this type of document before?
25          A.   I -- I -- I don't recall one way or the
0052
1      other.
2           Q.   Do the instructions shown in the lower
3      middle portion of the page look familiar to you?
4           A.   No.
5           Q.   Does this appear to be -- strike that.
6                Did -- when you would receive the
7      Red Book reports, do you recall there being
8      instructions about how to complete the reports?
9           A.   No, I don't recall.
10          Q.   Do you agree that this particular page,
11     Gerzel Exhibit 2, appears to pertain to instructions
12     about how to complete the Red Book reports?
13               MS. FUMERTON:  Objection, form.  Lack
14     of foundation.
15          A.   They appear to be instructions.  To what, I
16     don't know.
17          Q.   (BY MR. ANDERSON):  And the first
18     instruction reads, "Please make all changes directly
19     on the forms.  Mark through the old price (AWP, DIRP,
20     WAC, SRP) and note the new price in the same box."
21     Did I read that correctly?
22          A.   Yes.
```

Page 22

Depo-Gerzel-April-02-20-09l
```
23        Q.    Did you follow those types of instructions
24    when you would complete the reports?
25               MS. FUMERTON:   Objection, form.   Lack
0053
1     of foundation.
2         A.    I recall making changes to list and WAC
3     price in a similar fashion, yes.
4         Q.    (BY MR. ANDERSON):   Do you recall making
5     any changes to AWP?
6         A.    No.
7         Q.    Do you know of any reason why you wouldn't
8     make changes to AWP?
9         A.    Because Abbott -- we have nothing to do
10    with AWP.
11        Q.    What do you mean?
12        A.    I mean, we report pricing on list and WAC.
13    We don't publish or report pricing on AWP.
14        Q.    Accordingly, why didn't you mark through
15    the AWPs?
16        A.    Because I wouldn't know what was correct
17    and what was incorrect with an AWP price.
18        Q.    Are you familiar with the fact that Abbott
19    reported AWPs to the compendia prior to 2003?
20               MS. FUMERTON:   Objection, form.
21        A.    I was familiar with documents that showed
22    AWP on -- with list and WAC on price change
23    notifications.
24        Q.    (BY MR. ANDERSON):   How did Abbott
25    calculate those AWPs?
0054
1                MS. FUMERTON:   Objection, form.
2         A.    I --
3                MS. FUMERTON:   Lack of foundation.
4         A.    I don't know where those AWPs came from.
5         Q.    (BY MR. ANDERSON):   You just know they were
6     sent?
7                MS. FUMERTON:   Objection, form.
8         A.    I know they were on the form.
9         Q.    (BY MR. ANDERSON):   Did you ever ask
10    anybody at the pricing compendia wha- -- how the AWP
11    was calculated?
12        A.    No.
13        Q.    Did you ever notice that the AWPs changed
14    when the WAC prices changed?
15               MS. FUMERTON:   Objection, form.
16        A.    I never looked at AWP pricing.
17        Q.    (BY MR. ANDERSON):   Did you ever compare
18    the AWPs that were in the verification reports sent
19    by FirstDataBank and Red Book to the AWPs that Abbott
20    had?
21               MS. FUMERTON:   Objection --
22        A.    No.
23               MS. FUMERTON:   -- form.
24        Q.    (BY MR. ANDERSON):   Did you ever check the
25    AWPs on the verification reports with the AWPs in
0055
1     Abbott's Imany system?
2         A.    No, I have not.
3         Q.    Let's take a look at one of the
4     verification reports.  It's Exhibit 10 -- Fiske
5     Exhibit 10.
6                MS. FUMERTON:   I don't know what I
7     did.  Somehow I got these out of order.
```
Page 23

Depo-Gerzel-April-02-20-09I

```
 8                    MR. ANDERSON:  That's okay.  I've got
 9   an extra copy of this one too.
10                    MS. FUMERTON:  You know what?  I've
11   got it, I think.
12                    MR. ANDERSON:  Well --
13                    MS. FUMERTON:  You can keep that one.
14   You're just trying to get rid of paper.
15                    MR. ANDERSON:  Just a nice guy.
16        Q.   (BY MR. ANDERSON):  Have you seen Fiske
17   Exhibit 10 before?
18        A.   Can I look at it for a second?
19        Q.   Sure.
20        A.   (Reviews document.)  I believe I have.
21        Q.   Have you seen it recently?
22        A.   I believe so.
23        Q.   Did you see Fiske Exhibit 10 in preparing
24   to testify?
25        A.   Yes.
0056
 1        Q.   Did you discuss Fiske Exhibit 10 with your
 2   lawyers?
 3                    MS. FUMERTON:  I just want to caution
 4   the witness that this will be a "yes" or "no" answer.
 5        Q.   (BY MR. ANDERSON):  Yeah.  That's a "yes"
 6   or "no" answer.
 7        A.   Yes.
 8        Q.   In looking at Fiske Exhibit 10, you'll
 9   agree, won't you, that you signed the second page?
10        A.   Yes, I did.
11        Q.   And did you seek any input from any Abbott
12   personnel about how to complete pricing verification
13   reports such as Fiske Exhibit 10?
14        A.   I don't recall.
15        Q.   I notice that the -- that Fiske Exhibit 10
16   has your contact information typed in.  Would that
17   have been information that you or someone at Abbott
18   typed in, or would that be information that Red Book
19   had provided?
20        A.   I believe Red Book.
21        Q.   Right.  And like at the top, for instance,
22   you made a correction to the company name, correct?
23        A.   Correct.
24        Q.   How did Red Book have your contact
25   information?  Had you provided that previously?
0057
 1        A.   I -- I don't know.
 2        Q.   Most likely had you provided that
 3   previously?
 4        A.   I would imagine so.
 5        Q.   And then at -- looking at the third page of
 6   Fiske Exhibit 10 are those same instructions that we
 7   looked at in Gerzel Exhibit 2, correct?
 8        A.   Correct.
 9        Q.   Does that refresh your memory that you had
10   received instructions about how to complete these
11   forms?
12        A.   No.
13        Q.   Not at all?
14        A.   Not at all.
15        Q.   Do you think you would have looked at the
16   instructions?
17        A.   I would think, yes.
18        Q.   Then looking at the actual report itself,
```

Page 24

Depo-Gerzel-April-02-20-09I
```
19   particularly the section that ends with Bates number
20   01343, it's page 6 of 16, there's several
21   erythromycin products that start there and continue
22   into the next couple of pages.  Do you see those?
23        A.   Yes, I do.
24        Q.   You didn't make any changes to any of the
25   published AWPs there, did you?
```
0058
```
 1        A.   No.
 2        Q.   And you didn't make any changes to any of
 3   the other published pricing, correct?
 4        A.   Correct.
 5        Q.   So as far as you were concerned, is it true
 6   that all those prices were correct?
 7                MS. FUMERTON:  Objection, form.
 8        A.   The prices that I reviewed on the sheet
 9   were listing WAC prices.
10        Q.   (BY MR. ANDERSON):  You ignored the AWPs?
11        A.   Correct.
12        Q.   Did you ask anybody what you should do
13   about the AWPs that were on the forms?
14        A.   Not that I recall.
15        Q.   Why not?
16        A.   I don't recall one way or the other if I
17   asked anybody.
18        Q.   Given that this report is called "Product
19   Listing Verification" and you're signing down at the
20   bottom of each page "OK with changes," do you feel
21   like you should have asked somebody what to do about
22   the AWP?
23                MS. FUMERTON:  Objection, form.  Lack
24   of foundation.
25        A.   I -- I'm not sure if I asked anybody or
```
0059
```
 1   not.  If I didn't, I don't -- I don't know if it
 2   would have been the right thing to do or not.
 3        Q.   (BY MR. ANDERSON):  You agree, don't you,
 4   that you signed off on these erythromycin prices at
 5   the bottom of each page?
 6        A.   I agree I -- yeah, I signed the bottom of
 7   each page.
 8        Q.   And you marked, for instance, "OK with
 9   changes," and there's some changes shown for the
10   Enduronyl products, and then you -- the next page,
11   which is all erythromycins, you marked "OK as is,"
12   correct?
13        A.   Correct.
14        Q.   Do you feel like you were verifying the
15   WACs?
16        A.   WAC and list price.
17        Q.   Did you feel like you were verifying the
18   AWPs?
19        A.   No.
20        Q.   Why not?
21        A.   A- -- Abbott does not report AWP.  I would
22   not know one way or -- the difference about AWP.
23        Q.   Did you note anywhere that you were only
24   verifying WAC, not AWP?
25        A.   (Reviews document.)  I don't appear to have
```
0060
```
 1   written a comment to that effect.
 2        Q.   I'm sorry.  I -- I didn't hear you very
 3   well.
```
                              Page 25

Depo-Gerzel-April-02-20-09I
```
 4        A.   Oh, I said I didn't -- I don't appear to
 5   have written a comment to that effect.
 6        Q.   Oh.
 7        A.   I was just looking to see if I had written
 8   a comment at that --
 9        Q.   Yeah.  How would Red Book or FirstDataBank
10   have known that you were not verifying the AWPs?
11             MS. FUMERTON:  Objection, form.
12        A.   I don't know.
13        Q.   (BY MR. ANDERSON):  Did you or anyone to
14   your knowledge on behalf of Abbott ever notify
15   Red Book that Abbott was refusing to verify the AWPs?
16             MS. FUMERTON:  Objection, form.
17        A.   I -- I don't know.
18        Q.   (BY MR. ANDERSON):  Did you or anyone to
19   your knowledge at Abbott ever tell FirstDataBank that
20   Abbott was refusing to verify the AWPs?
21             MS. FUMERTON:  Objection, form.
22        A.   I -- I don't know.
23             MS. FUMERTON:  Jarrett, we want to
24   take a break sometime soon, so whenever is a good
25   time for you.
0061
 1             MR. ANDERSON:  Okay.  Let's take a
 2   short, like, maybe five or ten minute tops --
 3             MS. FUMERTON:  Okay.
 4             MR. ANDERSON:  -- now.
 5             THE VIDEOGRAPHER:  We are off the
 6   record at 9:40 a.m.  This is the end of tape 1.
 7                  (Recess taken.)
 8             THE VIDEOGRAPHER:  We are back on the
 9   record at 10:00 o'clock a.m.  This is the beginning
10   of tape 2.
11        Q.   (BY MR. ANDERSON):  Ms. Gerzel, you, I
12   believe, testified a few moments ago that you were
13   not verifying the AWPs on the verification forms; is
14   that right?
15        A.   Yes.
16        Q.   Were you told not to verify the AWPs?
17        A.   Not that I recall.
18        Q.   Did you and Ms. Calvert at all discuss the
19   verification of the AWPs in your training?
20        A.   Not that I recall.
21        Q.   And I think I've asked you this question,
22   but I want to make absolutely sure.  You didn't
23   discuss with anybody at Abbott whether or not you
24   should be verifying the AWPs or how you should be
25   completing the verification reports with respect to
0062
 1   AWP; is that true?
 2        A.   I -- I don't recall any questions.
 3        Q.   Or discussions?
 4        A.   Or discussions, right.
 5        Q.   Okay.
 6                  (Exhibit 3 marked.)
 7        Q.   (BY MR. ANDERSON):  Take a look at what's
 8   been marked as Gerzel Exhibit 3.
 9        A.   (Reviews document.)
10        Q.   Do you recognize this type of price report?
11        A.   No.
12        Q.   It's a different format than the one you're
13   familiar with?
14        A.   Yes.
```
Page 26

Depo-Gerzel-April-02-20-09l

```
15        Q.    Look, if you could, at the -- does it
16   appear to you, ma'am, that this is dating from
17   December of '99?
18        A.    (Reviews document.)  Hmm.  I don't see
19   anything.  Well --
20        Q.    Look at that fax --
21        A.    Oh.
22        Q.    -- header or -- yeah.  There's -- you could
23   look at the "Pricing Effective" dates and see that
24   they go up until '99, but also, for instance, look
25   over at the fax header.
0063
1         A.    Oh, I see that.  December of '99?
2         Q.    Yes, ma'am.
3         A.    Yes.
4         Q.    Does that indicate to you that this
5    document dates from 1999?
6              MS. FUMERTON:  Objection, form.  Lack
7    of foundation.
8         A.    It appears that that's when it was faxed.
9         Q.    (BY MR. ANDERSON):  Okay.  Look at -- if
10   you could, at the page that's Bates labeled 967 --
11   Red Book 00967.
12        A.    (Reviews document.)
13        Q.    Are you there?
14        A.    Yes.
15        Q.    Do you see at the bottom of that page it's
16   signed by Krista A. Kleiden?
17        A.    Yes.
18        Q.    Is that a person who worked in PPD Pricing?
19        A.    Yes.
20        Q.    And is that her signature?
21        A.    I don't know.
22        Q.    Looking above that, do you see for an
23   erythromycin product there are handwritten changes to
24   pricing?
25        A.    Yes, I see that.
0064
1         Q.    And an "Effective Date" change as well
2    of -- the handwritten note shows July 2nd, 1999,
3    correct?
4         A.    Correct.
5         Q.    And do you agree, ma'am, that those changes
6    to prices not only include changes to direct price
7    and WAC, but also a change to AWP?
8         A.    That is correct.
9         Q.    Is that in your view a verification or a
10   change of an AWP?
11             MS. FUMERTON:  Objection, lack of
12   foundation.
13        A.    I don't know what it -- I don't know.
14        Q.    (BY MR. ANDERSON):  Do you have any idea
15   how somebody in PPD Pricing such as Ms. Kleiden could
16   have known what the proper AWP pricing should be?
17             MS. FUMERTON:  Objection, lack of
18   foundation.
19        A.    I'm sorry.  Could you repeat the question
20   again?
21        Q.    (BY MR. ANDERSON):  Do you have any idea
22   how Ms. Kleiden could have known to write in an AWP
23   of $205.53?
24             MS. FUMERTON:  Objection --
25        A.    Oh.
```

Page 27

Depo-Gerzel-April-02-20-09I

0065
1                MS. FUMERTON:   -- lack of foundation.
2    You haven't established that she wrote it?
3        A.   No, I -- I don't know.
4        Q.   (BY MR. ANDERSON):   Have you ever heard,
5    Ms. Gerzel, that Abbott knew AWPs were published for
6    its products at 125 percent of WAC?
7                MS. FUMERTON:   Objection, form.
8        A.   That I knew or that everybody knew that --
9        Q.   (BY MR. ANDERSON):   Have you ever heard
10   that people at Abbott knew that Abbott's AWPs were
11   published at 125 percent of its WACs?
12               MS. FUMERTON:   Objection, form.
13       A.   I -- I -- that was something that I have
14   heard before, yes.
15       Q.   (BY MR. ANDERSON):   Did you hear that from
16   other people within Abbott PPD and Pricing?
17       A.   I actually don't know who I heard it from.
18       Q.   How long ago had you been aware of the fact
19   that AWPs were being published at 125 percent of
20   Abbott's WACs?
21               MS. FUMERTON:   Objection, form.
22       A.   I -- I don't recall when I first had that
23   general knowledge.
24       Q.   (BY MR. ANDERSON):   Was it more than four
25   or five years ago?
0066
1        A.   I don't believe it was in my HPD day --
2    time.
3        Q.   Sometime when you got --
4        A.   Cor- --
5        Q.   -- to PPD?
6        A.   Correct.
7        Q.   Probably pretty early in your tenure at
8    PPD, in, like, 2000 or so?
9        A.   I honest- -- I don't know.
10       Q.   I'll tell you, Ms. Gerzel, that I've done
11   the math, and $164.42 which is their handwritten WAC,
12   if you multiply that by 1.25, or 125 percent, you get
13   to $205.53 which is the handwritten AWP on this
14   page.   That -- is that consistent with your
15   understanding about how Abbott was estimating AWPs?
16               MS. FUMERTON:   Objection, form.   Lack
17   of foundation.
18       A.   I don't know that Abbott was estimating
19   AWPs.
20       Q.   (BY MR. ANDERSON):   Is that at least
21   consistent with your understanding that AWPs were
22   being published at 125 percent of WAC?
23               MS. FUMERTON:   Objection, form.
24       A.   It's my general understanding, yeah.
25       Q.   (BY MR. ANDERSON):   If you could, look at
0067
1    what's been marked in this case as Gerzel (sic)
2    Exhibit 4, also DeYoung Exhibit 507, and it's in
3    electronic form on my computer.
4                MS. FUMERTON:   I'm sorry.   I was --
5    De- -- DeYoung what?
6                MR. ANDERSON:   DeYoung 507, also
7    Garvin Exhibit 4.   It's the PowerPoint presentation.
8                MS. FUMERTON:   Do you mind if I --
9                MR. ANDERSON:   No.
10               MS. FUMERTON:   I'm sure if I take a --

Page 28

Depo-Gerzel-April-02-20-09I

```
11              MR. ANDERSON:   Yeah, you'll --
12              MS. FUMERTON:   -- look at it, I'll --
13              MR. ANDERSON:   -- you'll recognize the
14   first page immediately.  And I'm only going to ask
15   her about the first page too.
16              MS. FUMERTON:   Okay.  But take time to
17   look at the --
18              MR. ANDERSON:   Yeah.
19              MS. FUMERTON:   -- whole document.
20              MR. ANDERSON:   You can look at the
21   whole thing if you want.
22              MS. FUMERTON:   So you can just scroll
23   up and down to --
24              THE WITNESS:   Oh , okay.
25              MS. FUMERTON:   -- see it.
0068
1               THE WITNESS:   Sorry.
2               MS. FUMERTON:  I'm go back up to the
3    top and I'll pull it up to you so you can see.
4         A.    (Reviews document.)  Okay.
5         Q.    (BY MR. ANDERSON):   Does Garvin Exhibit 4
6    appear to be --
7               MS. FUMERTON:   Gerzel.  Is it not
8    Gerzel?
9               MR. ANDERSON:   No, it's actually
10   Garvin.
11              THE WITNESS:   It's --
12              MS. FUMERTON:   Oh, you're not
13   remar- -- I am sorry.  So --
14              MR. ANDERSON:   No.
15              MS. FUMERTON:   -- it's Garvin Exhibit
16   4?
17              MR. ANDERSON:   It's Garvin Exhibit 4.
18   It's also been marked as DeYoung 507.
19              MS. FUMERTON:   Okay.
20        Q.    (BY MR. ANDERSON):   Does Garvin Exhibit 4,
21   Ms. Gerzel, appear to be a PowerPoint presentation?
22        A.    Yes.
23        Q.    And if you could, focus on the first page
24   which has six slides.
25        A.    Okay.
0069
1         Q.    Do you agree it's dated September 2001?
2         A.    (Reviews document.)  Hang on.
3         Q.    In the upper left-hand corner, the -- that
4    slide in the upper left-hand corner?
5         A.    It -- yeah, it -- yes, September 2001.
6         Q.    And you were in the PPD Pricing Department
7    in that time, correct?
8         A.    I started in September 2001.
9         Q.    And look, if you could, at the middle slide
10   on the right-hand side.  Do you see an org chart
11   there?
12        A.    Uh-huh.
13        Q.    And you're actually shown as a member of
14   the Pricing Department, correct?
15        A.    Correct.
16        Q.    Do you believe you attended a -- a meeting
17   where this presentation was made or otherwise was
18   provided a copy of this presentation?
19        A.    In September 2001?
20        Q.    At all.
21        A.    At all?  I -- I have attended training
```
                              Page 29

Depo-Gerzel-April-02-20-09I

22   sessions, yes.
23        Q.    Have you seen that PowerPoint presentation
24   before?
25        A.    It looks familiar, yes.
0070
1         Q.    Okay.  Looking down in the lower right-hand
2    corner at the slide that -- that's titled "Price
3    Definitions"?
4         A.    Uh-huh.
5         Q.    Do you see a definition of AWP?
6         A.    Yes, I do.
7         Q.    And that definition defines AWP as average
8    wholesale price, correct?
9         A.    Correct.
10        Q.    And then it notes that AWP is estimated at
11   125 percent of WAC, correct?
12        A.    Correct.
13        Q.    Is that consistent with your training at
14   PPD?
15                  MS. FUMERTON:  Objection, form.
16        A.    It's consistent with my general knowledge,
17   yeah.
18        Q.    (BY MR. ANDERSON):  And then there's
19   actually a notation that Abbott was -- pardon me,
20   that AWP was known to be used in reimbursement,
21   correct?
22        A.    As a reimbursement reference, yes.
23        Q.    And were you aware of that when you were in
24   PPD?
25        A.    I have become aware of that in my current
0071
1    roles.
2         Q.    Were you aware of that back in the 2001,
3    2000 time frame when you started in PPD?
4         A.    I believe it's something that's -- I've
5    gained over time in my more current roles within
6    Government.
7         Q.    Is it -- is it likely that you had an
8    understanding that AWP was used for reimbursement
9    back in 2001, 2002?
10        A.    Probably not.
11        Q.    Do you think -- you said you've seen that
12   document before.  Were you trained on that document?
13                  MS. FUMERTON:  Objection, form.
14   Misrepresents testimony.
15        A.    I believe that I have been in training
16   classes with this document, but I don't -- that
17   doesn't mean that I have a full understanding of
18   everything that was prevent- -- presented.
19        Q.    (BY MR. ANDERSON):  Do you believe you were
20   at least presented the price definitions that are set
21   forth on the first page of Garvin Exhibit 4?
22        A.    Yes.
23        Q.    Okay.  Do you -- do you think that at that
24   point at least, at some level, you were made aware
25   that AWP was used for reimbursement?
0072
1         A.    I believe that it was put up there and --
2    yeah.
3         Q.    Okay.  And that awareness would have
4    preceded your work in reporting prices to the
5    compendia, correct?
6         A.    If I had attended this training before

Page 30

Depo-Gerzel-April-02-20-09I

```
 7   then, yes.
 8        Q.    And you -- and you most likely did,
 9   correct?
10        A.    I don't know when I attended this
11   training.
12        Q.    Do you have any reason to think that a
13   PowerPoint dated September 2001 would not have been
14   presented to you until sometime after 2003?
15        A.    I -- I don't know when the training classes
16   were held.  We don't have them on a
17   regularly-scheduled basis.
18        Q.    Well, it wouldn't take two years to hold
19   it, would it?
20              MS. FUMERTON:  Objection, form.
21        A.    I -- I don't know -- I don't know when I
22   had this training.
23        Q.    (BY MR. ANDERSON):  All right.  Is it most
24   likely, Ms. Gerzel, that when you were getting
25   pricing reports from the compendia that had AWP
0073
 1   information on it, that you knew at some level that
 2   AWP was used for reimbursement?
 3        A.    I -- I don't know.  I don't recall knowing
 4   that.
 5        Q.    Do you have any reason to think that when
 6   you were getting the pricing reports from the
 7   compendia that showed AWP for Abbott drugs, you did
 8   not know AWP was used for reimbursement?
 9        A.    I really only had a general knowledge of
10   AWP then in my -- in my role.  My role was to report
11   list and WAC and to make product and price changes.
12              MR. ANDERSON:  Objection,
13   nonresponsive.
14        Q.    (BY MR. ANDERSON):  Ma'am, do you have any
15   reason to think you didn't know AWP at some level was
16   used for reimbursement prior to 2003?
17        A.    I -- I had no -- I -- I don't know why I
18   would know that.  It was not involved in any of my
19   roles and responsibilities.
20        Q.    Well, it was included in this training
21   correct?
22        A.    Correct.
23        Q.    And the training is dated September 2001,
24   correct?
25        A.    Correct.
0074
 1        Q.    And you believe you participated in the
 2   training, correct?
 3              MS. FUMERTON:  Objection, form.
 4        A.    At some point in time I participated in
 5   training.  I started in mid-September.  I don't know
 6   if I participated in this training in September.
 7        Q.    (BY MR. ANDERSON):  I know.  But I'm not
 8   limiting it to September.  I'm saying, prior to 2003,
 9   don't you think you were trained on that particular
10   Garvin Exhibit 4?
11        A.    I don't know.
12              MS. FUMERTON:  Objection, form.
13        Q.    (BY MR. ANDERSON):  Do you have any --
14              MS. FUMERTON:  Asked and answered.
15        Q.    (BY MR. ANDERSON):  Do you have any reason
16   to think you were trained on Garvin Exhibit 4 after
17   2003?
```

Page 31

Depo-Gerzel-April-02-20-09I

```
18        A.    I just don't know when I was trained on
19   it --
20        Q.    Okay.
21        A.    -- or when I saw this presentation.
22        Q.    Okay.  So you don't have any reason to
23   think that it wasn't presented to you until after
24   2003, do you?
25        A.    No.
0075
1         Q.    Okay.  And you'll agree with me that it's
2    most likely that that training shown in Garvin
3    Exhibit 4 on reimbursement and AWP was presented
4    prior to 2003, correct?
5               MS. FUMERTON:  Objection, form.
6         A.    I believe it was presented probably at some
7    point in time each year.  Whether I attended it or
8    not, I have no idea.  I don't recall.
9         Q.    (BY MR. ANDERSON):  Do you have any reason
10   to think you wouldn't have attended?
11        A.    I don't --
12              MS. FUMERTON:  Objection, form.
13        A.    I --
14              MS. FUMERTON:  Attended when?
15        A.    I do not attend all of the new hire
16   trainings and all of the trainings any year.
17        Q.    (BY MR. ANDERSON):  Well, let's focus,
18   then, on 2001.  You were a new hire in 2001, right?
19        A.    September of 2001, yes.
20        Q.    So it's most likely that you would have
21   been attending the training?
22              MS. FUMERTON:  Objection, form.
23        A.    If it was a training that was not
24   overlapping with something else that I had to do that
25   was more important, I would have attended.  I don't
0076
1    know if I attended this training and when.
2         Q.    (BY MR. ANDERSON):  Let's put it this way.
3    You were a new hire in 2001, right?
4         A.    Yes.
5         Q.    And the training was focused on new hires,
6    correct?
7         A.    Correct.
8         Q.    So most likely you would have been there
9    because it was focused on people such as yourself?
10              MS. FUMERTON:  Objection, form, and
11   asked and answered.
12        A.    I don't -- I don't know when I attended
13   this training.  I don't recall attending training in
14   2001 at all, one way or the other.
15        Q.    (BY MR. ANDERSON):  Right.  You're just
16   saying that was over eight years ago and I don't
17   remember -- or almost eight years --
18        A.    Yeah --
19        Q.    -- ago?
20        A.    -- correct.  I --
21        Q.    Okay.  But I'm -- I'm not asking if you
22   specifically recall sitting in the meeting.
23              I'm saying, do you specifically recall
24   any reason why as a new hire in 2001 you would not
25   have attended the new hire training in 2001?
0077
1         A.    I don't recall a re- -- specific reason I
2    would not, no.
```

Page 32

Depo-Gerzel-April-02-20-09I

```
 3          Q.    Okay.
 4                          (Exhibit 4 marked.)
 5          Q.    (BY MR. ANDERSON):   Ms. Gerzel, if you
 6    could, take a look at what's been marked as Exhibit
 7    4.
 8          A.    (Reviews document.)
 9          Q.    My questions are going to be focused on the
10    second page primarily.
11                MS. FUMERTON:   But take a minute to
12    just quickly review the whole document though.
13          A.    Okay.  (Reviews document.)
14          Q.    (BY MR. ANDERSON):   Do you recognize the
15    type of document that's shown starting on page 2 of
16    Exhibit 4?
17          A.    No.
18          Q.    Have you seen National Drug Data File
19    reports before?
20          A.    Hmm.  They don't look familiar.
21          Q.    What types of reports did you receive from
22    FirstDataBank?
23                MS. FUMERTON:   Objection, form.  Can
24    you specify a time period?
25          Q.    (BY MR. ANDERSON):   At any time have you
0078
 1    ever received any reports from FirstDataBank?
 2          A.    Not that -- not that I recall.
 3          Q.    Did you ever review any FirstDataBank
 4    reports that were in the files of Abbott PPD?
 5          A.    No, not that I recall.
 6          Q.    Looking at the second page of Exhibit 4, do
 7    you see that -- toward kind of the middle right-hand
 8    side of the page there are different price columns
 9    listed?
10          A.    Yes.
11          Q.    And there's a price titled "WHLNET".  Do
12    you know what that stands for?
13          A.    No.
14          Q.    Have you ever heard of a pricing term known
15    as "wholesale net"?
16          A.    No.
17          Q.    Next to that there's a price "DIR".  Do you
18    know what that means?
19          A.    I believe direct price.
20          Q.    And what about the next price, "AWP"?  What
21    does that stand for?
22          A.    Average wholesale price.
23          Q.    Do you see anywhere on this page a request
24    for WAC prices?
25          A.    I don't see anything that would say
0079
 1    "W-A-C," which is what I would expect to see for
 2    WAC.
 3          Q.    Are you aware of any price on this -- shown
 4    on this page that's synonymous with WAC?
 5          A.    No, I'm not.
 6          Q.    Did FirstDataBank ever send you a set of
 7    instructions regarding how to complete product update
 8    reports?
 9                MS. FUMERTON:   Objection, lack of
10    foundation.
11          A.    By "product update reports," do you mean
12    also product launch information?
13          Q.    (BY MR. ANDERSON):   No.  This would be more
```

Page 33

Depo-Gerzel-April-02-20-09I

```
14    along the lines of updating prices for products that
15    have already been launched.
16        A.    Oh.  I -- I don't recall.
17        Q.    Did they send you materials on how to
18    report prices at launch?
19        A.    I -- yes.
20        Q.    And were those kept in Abbott's files?
21        A.    For the time period I was there, I recall
22    saving those, yes.
23        Q.    And how many pages were they, if --
24        A.    It was one form.
25        Q.    One single she- -- piece of paper?
0080
 1        A.    Yes.
 2        Q.    And -- and what were the instructions?
 3        A.    It was just a form that said what -- that
 4    had various name, strength, etcetera, etcetera.
 5        Q.    Did it have pricing information on it or
 6    requests for pricing information?
 7        A.    I believe so.  I don't specifically know
 8    what.
 9        Q.    Wh- -- you don't know which prices --
10        A.    No.
11        Q.    -- were requested?
12        A.    No, I don't recall.
13        Q.    Do you know if it requested wholesale net
14    or "WHLNET" prices?
15        A.    Not that I recall, no.
16        Q.    Do you know if it requested AWP prices?
17        A.    Not that I recall, no.
18        Q.    Do you know if it requested WAC prices?
19        A.    I -- I don't recall what it requested.
20        Q.    Okay.
21                    (Exhibit 5 marked.)
22        Q.    (BY MR. ANDERSON):  Take a look at
23    Exhibit -- Gerzel Exhibit 5.  And I'll tell you that
24    this is information that did not come from Abbott's
25    files, okay, but I want you to let me know if you
0081
 1    recognize any of this type of information.
 2        A.    (Reviews document.)
 3              MS. FUMERTON:  I'm sorry.  Can you
 4    repeat back -- did you ask a question?
 5              MR. ANDERSON:  Yeah, I'm ask- --
 6              MS. FUMERTON:  Can you --
 7              MR. ANDERSON:  Yeah.  Well, it's
 8    simple.  Review the document, then I'll rephrase.
 9              MS. FUMERTON:  Okay.  I just missed
10    the question.
11              MR. ANDERSON:  It's no problem.
12        A.    (Reviews document.)
13        Q.    (BY MR. ANDERSON):  Have you finished your
14    review of Gerzel Exhibit 5?
15        A.    Yes.
16        Q.    Do you recognize any of the pages?
17        A.    No.
18        Q.    Look at the third page of Gerzel Exhibit
19    5.  Does that look like what you were just
20    describing, the new product addition information?
21        A.    No.
22        Q.    It doesn't?
23        A.    No.
24        Q.    You'll agree that it's got "NDC Number" and
```

Page 34

Depo-Gerzel-April-02-20-09I
```
25      "Strength" like you described, correct?
0082
1           A.    Correct.
2           Q.    And then it's got some prices listed,
3       correct?
4           A.    Correct.
5           Q.    Next to the dollar signs?
6           A.    Uh-huh.  Correct.
7           Q.    And the three prices that are listed are
8       Wholesale Net, Direct, and AWP, correct?
9           A.    Correct.
10          Q.    Is there anywhere on this page a request
11      for WAC?
12          A.    I don't see one, no.
13          Q.    Do you have any reason to believe that
14      FirstDataBank would have been sending to Abbott new
15      product addition forms that were different than what
16      they sent to any other drug company?
17                MS. FUMERTON:  Objection, form.  Lack
18      of foundation.
19          A.    I -- I -- I don't know.
20          Q.    (BY MR. ANDERSON):  In what way does -- if
21      any that you can recall, does the third page of
22      Gerzel Exhibit 5 differ from the launch form that you
23      were recalling?
24          A.    The launch form that I -- it wasn't a very
25      formal looking document, as well as it was just very
0083
1       big writing with -- it wasn't, like, boxed or
2       anything.  I would just have -- it said "Product" and
3       then maybe a line and "Strength" and a line, and it
4       just went down just one general form.
5                 And they were very similar between --
6       I -- I don't know if it was a form that they sent us
7       or it's one we put together, but it was a form that
8       we used to send out new product information.
9           Q.    You'll agree that the third page of Gerzel
10      Exhibit 5 reads "New Product Additions," correct?
11          A.    Correct.
12          Q.    And it appears to be a form that
13      FirstDataBank would send to drug companies about
14      launching a drug, correct?
15                MS. FUMERTON:  Objection, form.  Lack
16      of foundation.
17          A.    Correct.
18          Q.    (BY MR. ANDERSON):  Your answer was
19      "correct"?
20          A.    Uh-huh.
21          Q.    Okay.
22          A.    Yes.
23          Q.    Now, if you could, take a look at what's
24      going to be marked as Gerzel Exhibit 6.
25                     (Exhibit 6 marked.)
0084
1           A.    (Reviews document.)
2                 MS. FUMERTON:  Jarrett, do you know if
3       there's writing up here (indicating)?
4                 MR. ANDERSON:  Not writing.  It's --
5       it- -- there's text, typed text December 1998, "Dear
6       Valued Customer".
7                 MS. FUMERTON:  Do you know if there's
8       anything above that?
9                 MR. ANDERSON:  No, I don't believe so?
```

Depo-Gerzel-April-02-20-09I

```
10        A.    (Reviews document.)
11        Q.    (BY MR. ANDERSON):  Do you recognize maybe
12   not these particular sheets of paper, but documents
13   similar to either the first page of Gerzel Exhibit 6
14   or the second page?
15        A.    Not that I recall.
16        Q.    The second page appears to provide some
17   information about a new product launch, correct?
18        A.    Yes.
19        Q.    Is that similar to what you were describing
20   earlier, or is this different also?
21        A.    It looks different.
22        Q.    Okay.  Do you recall ever receiving any
23   correspondence or letters from FirstDataBank such as
24   Gerzel Exhibit 6 -- the first page of Gerzel Exhibit
25   6?
0085
 1        A.    No --
 2              MS. FUMERTON:  Objection, form.  Are
 3   you asking if she just -- in general or this
 4   particular type of letter?
 5        Q.    (BY MR. ANDERSON):  In general.
 6        A.    No -- no, I don't recall.
 7        Q.    You don't remember any correspondence at
 8   all?
 9        A.    Any type of correspondence with
10   FirstDataBank?
11        Q.    No.  Any types of letters for -- written
12   letters as opposed to e-mails.  Did you receive any
13   letters from FirstDataBank?
14        A.    I -- not that I recall.
15        Q.    Okay.  Looking at the -- the second
16   paragraph of the letter shown on the first page of
17   Gerzel Exhibit 6, I'll read for the benefit of the
18   record and ask you some questions.
19              Plea- -- "Please review this
20   printout.  Any changes should be made.  Return the
21   corrected printout with affected dates of pricing
22   changes, discontinued items and NDC changes as soon
23   as possible.  Your assistance in verifying the
24   accuracy of this data can help prevent discrepancies
25   in third party billing, inaccuracies in Medicaid drug
0086
 1   rebates, and omission of your products from our drug
 2   file databases."  Did I read that correctly?
 3        A.    Yes.
 4        Q.    Did you ever receive any type of
 5   information or instruction that's similar to that
 6   from FirstDataBank?
 7        A.    Not that I recall.
 8        Q.    Did you receive any type of information
 9   similar to that from Red Book?
10        A.    Other than the item we've already looked
11   at, nothing --
12        Q.    Okay.
13        A.    -- that I recall.
14        Q.    Are you -- are you able to testify that, to
15   your knowledge, Abbott did not receive any
16   instructions similar to that from FirstDataBank?
17        A.    No.
18        Q.    You just don't remember one way or the
19   other?
20        A.    I don't re- -- remember receiving anything,
```

Page 36

Depo-Gerzel-April-02-20-09I

```
21   no.
22       Q.   Right.  But do you know that it didn't
23   happen?
24       A.   No, I don't.
25       Q.   Okay.  Did you ever receive anything known
0087
1    as a National Drug Data File manual or ever review
2    any such manual?
3        A.   Hmm.  It -- not that I recall.
4        Q.   Did you have any type of access to
5    PriceProbe?
6        A.   Yes, I did.
7        Q.   Was there a user manual that went along
8    with PriceProbe?
9        A.   Not -- not that I recall.
10       Q.   Did you review any manuals or other types
11   of information that concerned FirstDataBank
12   information, such as the National Drug Data File or
13   PriceProbe?
14            MS. FUMERTON:  Objection, form.
15       A.   Did you ask me if I've ever reviewed
16   PricePro- --
17       Q.   (BY MR. ANDERSON):  Yes, ma'am.
18       A.   -- -Probe?  Yes, I have.
19       Q.   No, no, no.  I understand you've had access
20   to PriceProbe, and other witnesses have talked about
21   where you could access it and what have you --
22       A.   Uh-huh.
23       Q.   -- at PPD.  I'm asking a different
24   question.  That is, did you ever review any kind of
25   user manuals or other information that would guide a
0088
1    person with respect to FirstDataBank information,
2    such as National Drug Data File information or
3    PriceProbe information?
4            MS. FUMERTON:  Objection, form.
5        A.   Not that I recall.
6            (Exhibit 7 marked.)
7        Q.   (BY MR. ANDERSON):  Take a look, if you
8    could, at what's been marked as Gerzel Exhibit 7.
9        A.   (Reviews document.)
10       Q.   Does this document look familiar to you at
11   all?
12       A.   No, it doesn't.
13       Q.   You mentioned that there were some hard
14   copy files that were kept by Abbott regarding the
15   pricing compendia, correct?
16       A.   Correct.
17            MS. FUMERTON:  Objection, form.
18       Q.   (BY MR. ANDERSON):  Did you ever actually
19   have reason to review those files?
20            MS. FUMERTON:  Objection, form.
21       A.   The -- the price increase files that I
22   referred to earlier?
23       Q.   (BY MR. ANDERSON):  Well, ye- -- those I
24   understand you reviewed.  I'm talking about any other
25   files that were kept by Abbott.
0089
1            Were there any other files kept by
2    Abbott with respect to the pricing compendia?
3        A.   There were --
4            MS. FUMERTON:  Objection, form.
5        A.   When I went to Corporate Records, I went
```

Page 37

Depo-Gerzel-April-02-20-09I

```
 6   through all of the pricing files -- the product and
 7   pricing maintenance files to look for the price
 8   increase letters.
 9        Q.   (BY MR. ANDERSON):   And you found price
10   increase letters, correct?
11        A.   Correct.
12        Q.   That were sent by Abbott to compendia like
13   Red Book and FirstDataBank?
14        A.   I -- I don't know if they were sent, but
15   they were letters that were in the file.
16        Q.   Presumably they were in the file because
17   they were copies of what had been sent, correct?
18        A.   I -- I don't know.
19        Q.   Can you think of any other reason why
20   they'd be in the file?
21        A.   They could have been sent to our internal
22   customers too.
23        Q.   Well, were -- was there any indication
24   about whether the letters had been sent to the
25   compendia or customers or both?
0090
 1             MS. FUMERTON:   Objection, form.
 2        A.   Not that I recall, no.
 3        Q.   (BY MR. ANDERSON):   How -- how -- how would
 4   you have re- -- how would Abbott -- strike that.
 5             Did Abbott keep records of when it
 6   sent price increase notifications?
 7             MS. FUMERTON:   Objection, form.
 8        A.   I did, yes.
 9        Q.   (BY MR. ANDERSON):   In what form?
10        A.   In electronic form on our computer share
11   drive.
12        Q.   And to your knowledge, have those been
13   produced in this litigation?
14             MS. FUMERTON:   Objection, form.
15        A.   I don't know.
16        Q.   (BY MR. ANDERSON):   Did you share those
17   with your attorneys?
18             MS. FUMERTON:   Objection, form.  To
19   the extent that she's had communications with her
20   attorney as to what documents, that's going to be
21   covered by the attorney-client privilege.
22             MR. ANDERSON:   Well, no.  I'm asking
23   her if she shared the electronic records with you or
24   someone else.  That's not -- that's not privileged.
25   That's definitely not -- that definitely not.
0091
 1   That's -- there's no legal advice that's being
 2   rendered.  I'm just asking for a fact.
 3             MS. FUMERTON:   Be careful in what you
 4   answer, but you can answer whether or not you
 5   provided files to Legal.
 6        A.   I have provided paths to our share drives
 7   of where our files are at.
 8        Q.   (BY MR. ANDERSON):   Did you provide a path
 9   to any legal counsel or personnel working with legal
10   counsel that went directly to the electronic records
11   of the price notification submission?
12        A.   Not that went directly there, no.
13        Q.   Okay.  Do you have any information that
14   your attorneys are aware that you have records of the
15   price change submissions?
16             MR. BERLIN:   Well, I -- I'm going to
```

Page 38

Depo-Gerzel-April-02-20-09l
```
17      instruct the witness not to answer that question on
18      the basis of attorney-client privilege.
19           Q.   (BY MR. ANDERSON):  Are you refusing to
20      answer that question, ma'am?
21           A.   Yes.  I will take the advice of --
22           Q.   Okay.
23           A.   -- my counsel.
24                MR. ANDERSON:  Look, I -- I want to --
25      Tara, I want to have these records of the price
0092
1       change submissions.  I've been asking for all of the
2       communications with the compendia for months.
3                MS. FUMERTON:  Yeah, you have.
4                MR. ANDERSON:  Okay.
5                MS. FUMERTON:  And to the extent that
6       there needs to be discussion about document
7       production issues, we can do that off the record and
8       I will discuss with you what I know about the
9       situation, but to ask the witness what her attorneys
10      know is inappropriate.
11               You can ask the witness what she had
12      provided, which she did, and which I allowed you to
13      do.  But the other question you asked is
14      inappropriate, and I am more than happy to have a
15      discussion off the record with you about any issues
16      that you have with respect to document production.
17               MR. ANDERSON:  Well, that's -- that's
18      fine.  We -- I mean, certainly I'm interested in
19      discussing it, but my point is, I've sought all of
20      the information pertaining to the communications for
21      a long time and it sounds like there's some
22      information out there that I don't have.
23               So, you know, if you want to prevent
24      me from learning what that information is, I think
25      that's inappropriate.  I just want to learn what's
0093
1       out there, and I want to learn what she's provided to
2       y'all.
3                And, you know, I'm not trying to get
4       into your communications with her or some kind of
5       discussion about the production of the information.
6       I'm trying to ascertain what she has shared --
7                MS. FUMERTON:  You --
8                MR. ANDERSON:  -- with her lawyers.
9                MS. FUMERTON:  You have -- well,
10      but -- but there is -- there -- therein lies the
11      rub.  You have asked her about files and whether or
12      not she understands certain files exist or do not
13      exist and what they are.  You also -- which I allowed
14      her to answer.
15               You also asked her what information or
16      documents she provided to attorneys, and she answered
17      that information.
18               The questions you're asking are
19      inappropriate and go beyond that.
20               MR. ANDERSON:  Okay.  I'm going to --
21      I'm going to tie this up and then we'll -- we'll go
22      back to where we were.
23           Q.   (BY MR. ANDERSON):  Ms. Gerzel, do you have
24      an awareness that Abbott has records, whether they be
25      electronic or paper, that reflect when Abbott sent
0094
1       price change notifications?
```
Page 39

Depo-Gerzel-April-02-20-09I
2            MS. FUMERTON:  Objection, form.
3        A.   From the time frame that I did this job, I
4    shar- -- saved the price letters that we talked about
5    with those various salutations onto the share drive,
6    yes.
7        Q.   (BY MR. ANDERSON):  And have those letters
8    that you saved electronically on the share drive been
9    provided by you to counsel?
10       A.   I have been asked by legal over the course
11   of -- I'm not sure when, or related to this case, to
12   provide paths to where those letters exist, and I
13   have provided that path.
14       Q.   Okay.  Other than providing that path, have
15   you provided any other information?
16       A.   No, I have not.
17       Q.   All right.  Would that electronic storage
18   of the letters reveal when the letters were sent?
19       A.   I believe they have a date, like the one
20   that we looked at, that said "effective" with
21   such-and-such a date, price change -- the price has
22   been changed.
23       Q.   Okay.  And would those letters also reveal
24   the entities that received the letters?
25       A.   No, they would not.
0095
1        Q.   They just have the general salutations of
2    the categories we've discussed?
3        A.   That is correct.
4        Q.   One being Medicaid administrators, correct?
5        A.   Correct.
6        Q.   One being data vendors, correct?
7        A.   Correct.
8        Q.   One being customers?
9        A.   Correct.
10       Q.   And there's potentially another one that
11   you're not remembering?
12       A.   One being wholesalers.
13       Q.   Wholesalers, right.
14            I understand your testimony that the
15   data vendor letters would encompass FirstDataBank,
16   Red Book, and Medi-Span, correct?
17       A.   I believe so.
18       Q.   Would -- and the Medicaid administrators
19   include a list of persons that were identified as
20   Medicaid administrators, correct?
21       A.   Correct.
22       Q.   Where are the lists kept of the Medicaid
23   administrators and all of the other customers and
24   wholesalers and price -- and data vendors that are
25   covered by the different salutations?
0096
1        A.   With Xpedite.
2        Q.   Only with Xpedite?
3        A.   That I'm aware of.
4        Q.   And has there been any effort to go to
5    Xpedite and get those?
6            MS. FUMERTON:  Objection, form.
7        Q.   (BY MR. ANDERSON):  To your knowledge.
8        A.   I don't know.
9        Q.   Has there been any effort to obtain --
10   did -- did Abbott control the -- strike that.  I'll
11   rephrase.
12            Did Abbott have control over which
Page 40

Depo-Gerzel-April-02-20-09I

13    entities were part of the Xpedite lists?
14    A.    Yes.
15    Q.    How?
16    A.    By going into Xpedite's database and adding
17    and/or deleting those lists.
18    Q.    I see.  So while the list was an electronic
19    list kept on Xpedite's computer, Abbott personnel had
20    access to it via the internet and could modify it?
21    A.    Correct.
22    Q.    Can Abbott personnel also go via the
23    internet and retrieve the list?
24         MS. FUMERTON:  Objection, form.
25    A.    I don't know.
0097
1     Q.    (BY MR. ANDERSON):  Do you have any reason
2    to believe that Abbott personnel cannot retrieve the
3    list from Xpedite?
4     A.    No.
5         MS. FUMERTON:  Objection, form.  And
6    are you asking today?
7         MR. ANDERSON:  Well, I realize they
8    may have switched, but --
9     Q.    (BY MR. ANDERSON):  I'm -- I'm asking,
10    during your experience, was there anything that
11    prevented Abbott from retrieving the list from
12    Xpedite?
13    A.    Not -- not that I know of.  I don't know.
14    Q.    Okay.  Now, going back to the hard copy
15    files, were you ever able to review the hard copy
16    files kept by Abbott with respect to FirstDataBank,
17    Red Book, and Medi-Span?
18         MS. FUMERTON:  Objection, form.  Lack
19    of foundation.
20    A.    I'm not sure what hard copy files you're
21    referring to.
22    Q.    (BY MR. ANDERSON):  Are there any hard copy
23    files other than the electronic letters that you've
24    described?
25    A.    The -- the --
0098
1         MS. FUMERTON:  Objection, form.
2    A.    The only ones that I'm aware of are the
3    ones that we discussed that I had to go back to for
4    legal to obtain copies of any price letters that
5    existed in our hard copy files.
6     Q.    (BY MR. ANDERSON):  Okay.  I'm going to --
7    I -- I appreciate that.  Other than these letters
8    that had the salutations that were letters created by
9    Abbott and sent out by Xpedite, other than those
10    letters, are there any other files, whether they be
11    electronic or hard copy, that Abbott maintained with
12    respect to Abbott communications with data vendors
13    like FirstDataBank and Red Book?
14         MS. FUMERTON:  Objection, form.
15    A.    The only thing I know of that I would have
16    kept would have been additions and product launch
17    information that would have been sent to them, as
18    well as product discontinuations that would have been
19    sent to them.
20    Q.    (BY MR. ANDERSON):  And would those have
21    been kept electronically or in paper form or both?
22    A.    Definitely on the share drive.
23    Q.    What about in any paper form?
Page 41

Depo-Gerzel-April-02-20-09I

```
24        A.   I -- I don't know.  I don't recall one way
25   or the other.
0099
1         Q.   Okay.  For instance, we've -- you've seen
2    today some Red Book price verification reports,
3    correct?
4         A.   Uh-huh.
5         Q.   And you recognize that you completed those
6    in the past, correct?
7         A.   Uh-huh.
8         Q.   Were copies of those kept by Abbott?
9         A.   I -- I don't know.  I don't remember if I
10   kept my copy or not.
11        Q.   Do you have any reason to believe you did
12   not keep a copy?
13        A.   I have no reason to believe one way or the
14   other.  I don't know.
15        Q.   Have you had -- are you aware of any search
16   of records to ascertain whether those documents were
17   kept?
18             MS. FUMERTON:  To the extent that you
19   have independent direct knowledge, you can answer the
20   question.  To the extent that it's something you
21   learned from attorneys or you -- then you cannot
22   answer the question.
23        A.   The only thing that I know I was asked for
24   was a link to where information was kept, and that's
25   the same link I've been referring to that I provided,
0100
1    a very speci- -- a very -- a link that went directly
2    to where I saved any information.
3         Q.   (BY MR. ANDERSON):  Okay.  Did you or
4    anyone else to your knowledge, outside of what you
5    learned from a lawyer, search any hard copy files at
6    Abbott PPD or Abbott Corporate Records, slash,
7    archives?
8         A.   I don't know.
9             MS. FUMERTON:  Objection, form.
10        A.   I don't know.
11        Q.   (BY MR. ANDERSON):  You don't know that
12   that's been done?
13        A.   I don't know anything about it one way or
14   the other.
15        Q.   Okay.  Do you -- back to Gerzel Exhibit 7
16   now.  Do you have any reason to believe that Abbott
17   would have destroyed any user manual information it
18   would have received from FirstDataBank?
19        A.   No.
20        Q.   Is it your experience that Abbott has some
21   type of routine document destruction policy?
22        A.   We have archive retention schedules.
23        Q.   But you don't know what those are?
24        A.   No.
25        Q.   Do you have a general idea?
0101
1         A.   I mean, I have a general idea of where to
2    go to see what they are, but my general understanding
3    is, you know -- I just -- I just know where to go to
4    see what the -- if I need to see what it is.
5         Q.   Have you ever had any reason to go to
6    Corporate Records to try to track down some old
7    documents in any context?
8         A.   Yes.
```

Page 42

Depo-Gerzel-April-02-20-09I

```
 9        Q.    And what was your experience with respect
10   to how old the documents were?
11        A.    Just --
12             MS. FUMERTON:  Objection, form.
13        A.    The specific year I don't recall, but they
14   were old, yellow.
15        Q.    (BY MR. ANDERSON):  Like back into the
16   '80s?
17        A.    I have -- I -- I have no idea of the year.
18        Q.    Were they -- do you have any kind of
19   general impression that Abbott's document retention
20   policy is at least requiring documents to be kept ten
21   years?
22        A.    I -- I have no idea.
23        Q.    Oh, okay.  Back -- I'm sorry.  Back to
24   Exhibit 7, ma'am.  Do you see on the last page in the
25   Table of Contents there's a reference to "Wholesale
0102
 1   Unit Price and Date"?
 2        A.    Yes, I do.
 3        Q.    And then next to that is an acronym "WHN,"
 4   correct?
 5        A.    Correct.
 6        Q.    And then next to that is a page number of
 7   page 148?
 8        A.    Correct.
 9                   (Exhibit 8 marked.)
10        Q.    (BY MR. ANDERSON):  Now, if you could, take
11   a look at page number 148 that's been marked as
12   Deposition Exhibit 8.
13        A.    (Reviews document.)
14        Q.    Have you reviewed Exhibit 8?
15        A.    Yes.
16        Q.    Do you agree it's titled "Wholesale Unit
17   Price and Date"?
18        A.    Yes.
19        Q.    And that same acronym of "WHN" is shown,
20   correct?
21        A.    Correct.
22        Q.    And the -- under the section titled "Field
23   Content," it reads, "This element provides a
24   manufacturer's wholesale net unit price and
25   associated date."  Did I read that correctly?
0103
 1        A.    Yes.
 2        Q.    Do you have any understanding of what a
 3   wholesaler's whole- -- pardon me, a manufacturer's
 4   wholesale net unit price is?
 5        A.    No.
 6        Q.    Did you ever understand FirstDataBank or
 7   Red Book was requesting wholesale net prices?
 8        A.    Wholesale acquisition cost is what they
 9   were requesting, to my knowledge.
10        Q.    Do you consider those to be net prices?
11             MS. FUMERTON:  Objection, form.
12        A.    I -- I consider them to be the wholesale
13   acquisition cost, or WAC price.
14             MR. ANDERSON:  Objection,
15   nonresponsive.
16        Q.    (BY MR. ANDERSON):  I realize that.  Do you
17   wholesale acquisition cost to be a net price?
18        A.    I don't --
19             MS. FUMERTON:  Objection, form.
```

Depo-Gerzel-April-02-20-09I

```
20        A.    I don't con- -- I -- I -- I don't have a --
21   I don't consider net price to be anything.  I don't
22   consider it at all.  I'm not quite understanding your
23   question considering I've not heard of this
24   particular term before.
25        Q.    (BY MR. ANDERSON):  Are you aware of any
0104
 1   documentation showing FirstDataBank requesting WAC
 2   prices from Abbott?
 3        A.    No particular document, no.
 4        Q.    Were you instructed to report WAC prices
 5   specifically by Abbott personnel?
 6        A.    When I was trained, yes.
 7        Q.    Who -- that was Tina Calvert?
 8        A.    Correct.
 9        Q.    Were you -- were you told, quote -- strike
10   that.
11              Were you told to report, quote,
12   "W-A-C" prices, or were you told to report some
13   other prices like wholesale prices?
14        A.    WAC, W-A-C.
15        Q.    Do you have any idea why Tina instructed
16   you to report, quote, "WAC" prices?
17        A.    That was our understanding of what should
18   be reported to FirstDataBank.
19        Q.    What's the basis of that understanding?
20        A.    Mine is my training.
21        Q.    From Tina?
22        A.    Correct.  I don't know Tina's basis.
23        Q.    Okay.  Any other basis that you're aware
24   of?
25        A.    No.
0105
 1        Q.    Have any of these references to wholesale
 2   net, WHN, WHLNET prices caused you to rethink
 3   Abbott's submission of WAC prices to FirstDataBank?
 4              MS. FUMERTON:  Objection, form.
 5        A.    No.
 6        Q.    (BY MR. ANDERSON):  Why not?
 7        A.    Because it- -- it's our -- my understanding
 8   to report list and WAC, and our published WAC price
 9   is our AW- -- A- -- WAC price.
10        Q.    Okay.  But I'm saying, has -- have any of
11   these references to wholesale net prices caused you
12   to rethink Abbott's understanding that it should send
13   WAC?
14              MS. FUMERTON:  Objection, form.
15        A.    No, it has not.
16        Q.    (BY MR. ANDERSON):  Why not?
17        A.    I -- I don't -- I don't think re- -- I
18   think reporting list and WAC is what we're supposed
19   to do, and that's what we've done.
20        Q.    And you base that on your training from
21   Tina?
22        A.    Correct.
23        Q.    How long did that training last?
24        A.    I don't know.  I mean -- I have no idea.
25        Q.    30 minutes?
0106
 1        A.    Training, I mean, can last -- you
 2   crosstrain with someone in and out throughout a day,
 3   sometimes it's a couple of hours, and then another
 4   couple of weeks hours a day.  I mean, it's all --
```

Page 44

Depo-Gerzel-April-02-20-09I

5      Q.    It was just very informal training?
6            MS. FUMERTON:  Objection, form.
7      A.    I -- I don't know what your definition of
8    "informal training" is.
9      Q.    (BY MR. ANDERSON):  It was -- it -- was
10   there any specific time set aside where you and Tina
11   sat down and talked about FirstDataBank submissions,
12   for instance?
13           MS. FUMERTON:  Objection, form.
14     A.    I don't know specifically that, but
15   specific times set aside to train, yes.
16     Q.    (BY MR. ANDERSON):  And -- and describe how
17   the training would take place.
18           MS. FUMERTON:  Objection, form.
19     A.    We would both be sitting in whichev- -- my
20   cube, her cube, going through, "Okay.  Oh, this is
21   what's due today, let's figure out how to do it," or
22   "this is what's due in the next week," "this is your
23   normal job responsibilities, let's go through and
24   I'll show you how to do each one".
25     Q.    (BY MR. ANDERSON):  Thi- -- with respect to
0107
1    this instruction that you received from Tina to
2    submit WAC prices, did she pro- -- show you any
3    documentation at all?
4            MS. FUMERTON:  Objection, form.
5      A.    I -- I don't know -- what's the -- I don't
6    understand the question.
7      Q.    (BY MR. ANDERSON):  Did -- was it purely
8    verbal, or did she show you any paper at all that
9    substantiated her statement that you should report
10   WAC prices?
11           MS. FUMERTON:  Objection, form.
12     A.    I don't know.  I -- I don't recall the
13   specifics of our training.
14           MS. FUMERTON:  Jarrett, can we take
15   another five-minute break sometime soon?  I need
16   to --
17           MR. ANDERSON:   I'll make a --
18           MS. FUMERTON:   I promise it will be --
19           MR. ANDERSON:   Yeah.
20           MS. FUMERTON:   I promise --
21           MR. ANDERSON:   Yeah.
22           MS. FUMERTON:   -- it will be quick.
23           MR. ANDERSON:   Let's start back at
24   11:00.
25           MS. FUMERTON:   All right.
0108
1            THE VIDEOGRAPHER:  We are off the
2    record at 10:54 a.m.
3                 (Recess taken.)
4                 (Exhibit 9 marked.)
5            THE VIDEOGRAPHER:  We are back on the
6    record.  It is 11:03 a.m.  This is the beginning of
7    tape 3.
8      Q.    (BY MR. ANDERSON):  Ms. Gerzel, please take
9    a look at what's been marked as Gerzel Exhibit 9.
10     A.    (Reviews document.)
11     Q.    Have you seen the documents that make up
12   Gerzel Exhibit 9 before?
13     A.    I'm -- I'm assuming so.  They look familiar
14   from my e-mail.
15     Q.    Which particular pages look familiar?

Depo-Gerzel-April-02-20-09I

```
16          A.    Red Book 00599.
17          Q.    Uh-huh.
18          A.    Red Book 00600.  (Reviews document.)  I'd
19    say those two.  Those two.
20          Q.    Have you reviewed these documents recently
21    with your lawyers?
22          A.    No, I have not.
23          Q.    Have you seen document Red Book 00597
24    before?
25          A.    (Reviews document.)  I don't recall it.
0109
1           Q.    Looking at document -599, this appears to
2     be an e-mail between you and Red Book, correct?
3           A.    Correct.
4           Q.    And initially, on July 28th, 2005, you sent
5     some price change notifications to Red Book, correct?
6           A.    Correct.
7           Q.    And then in turn, Traci Kellam from
8     Red Book responded and asked you to confirm an AWP
9     formula; is that correct?
10          A.    That's correct.
11          Q.    And then she's written, apparently, in the
12    upper left -- I mean right-hand corner a note that
13    you had responded verbally; is that correct?
14          A.    That is what she wrote.
15          Q.    Is that true?
16          A.    Not that I recall.
17          Q.    Have you ever spoken with Traci Kellam?
18          A.    I do believe so.
19          Q.    But you do not think that you spoke to her
20    about the AWP formula?
21          A.    I don't believe so.
22          Q.    Why not?
23          A.    It is not -- was not the general policy
24    when I was in this role to discuss AWP, period.
25          Q.    Why not?
0110
1           A.    Because it was not a price type that Abbott
2     was part of publishing or communicating.
3           Q.    Were you told not to talk about AWP?
4           A.    I have a general recollection of having
5     discussions that AWP was not something that Abbott
6     was responsible for and we were not to give any
7     indication that we were.
8           Q.    Did you have discussions with particular
9     people?
10          A.    I don't recall.
11          Q.    Do you -- you don't remember any of the
12    specifics of the discussions?
13          A.    I don't.
14          Q.    Have you or anyone to your knowledge ever
15    instructed Fir- -- Red Book to stop publishing AWP?
16          A.    I have -- no -- no.
17          Q.    Do you believe that you received this
18    e-mail that's shown on Red Book 00599?
19          A.    Do I believe I received it?
20          Q.    Yes.
21          A.    It appears that way, yes.
22          Q.    Do you belie- -- believe you read the
23    portion of he- -- her e-mail to you where she wrote,
24    We currently have AWP equals WAC plus 20 percent per
25    Red Book company policy due to Abbott Pharmaceuticals
0111
```

                          Page 46

Depo-Gerzel-April-02-20-09I

```
 1  no longer supplying Red Book with a calculated AWP?
 2         A.   I don't recall reading this document.  I
 3  don't know.
 4         Q.   You recall getting the e-mail, but you
 5  don't think you read that?
 6         A.   No, I don't recall getting the e-mail.  I'm
 7  saying it appears it was sent to me.
 8         Q.   Okay.
 9         A.   I don't -- I don't have a recollection of
10  this e-mail.
11         Q.   Do you have any reason to believe you
12  didn't get this e-mail?
13         A.   No.
14         Q.   Do you have any reason to believe you
15  didn't read the language contained in the e-mail?
16         A.   No.
17         Q.   Were you aware that Red Book was trying to
18  get Abbott's confirmation about the AWP formula?
19         A.   I am aware in reading this that that's what
20  it's saying, yeah.
21         Q.   And does that refresh your memory about
22  efforts by Red Book to get Abbott's confirmation
23  regarding an AWP calculation?
24         A.   It -- it doesn't -- no, this -- not to get
25  this sp- -- it doesn't refresh my memory on this
0112
 1  e-mail, no.
 2         Q.   Do you have any reason to dispute that
 3  Ab- -- I mean -- pardon me.  Do you have any reason
 4  to dispute Red Book documents or testimony that
 5  Red Book sought to get confirmation from Abbott about
 6  a formula to calculate AWP?
 7         A.   No, but I don't recall -- I -- I don't --
 8  wouldn't have responded as they had written, though,
 9  either.
10         Q.   You think she's lying?
11         A.   I don't believe that I would have discussed
12  AWP policy with her.  That was not in my job.
13         Q.   Do you know why you didn't respond in
14  writing to tell her that Abbott refuses to confirm
15  any AWP formula or calculation?
16              MS. FUMERTON:  Objection, form.  Lack
17  of foundation.
18         A.   Can you repeat the question?
19         Q.   (BY MR. ANDERSON):  Did you respond in
20  writing instructing Red Book that Abbott would not
21  confirm any AWP calculations?
22         A.   To this e-mail?
23         Q.   Ever.
24         A.   I do recall an e-mail that I had written
25  regarding Abbott not having any -- I -- I don't
0113
 1  recall the -- the details of the e-mail -- that
 2  Abbott does not set AWP or have anything to do with
 3  that.
 4         Q.   And have you reviewed that e-mail recently?
 5         A.   I have not.
 6         Q.   Why did you not respond to Ms. Kellam's
 7  e-mail in July of 2005?
 8              MS. FUMERTON:  Objection, form.
 9         A.   I have no --
10              MS. FUMERTON:  It misrepresents
11  testimony.
```

Page 47

Depo-Gerzel-April-02-20-09I

```
12          A.    I have no recollection of this e-mail.
13          Q.    (BY MR. ANDERSON):  Do you think you
14    responded to this e-mail?
15          A.    I don't know.
16          Q.    Similarly, there's another e-mail on the
17    next page Bates labeled Red Book 00600 dated August
18    2nd, 2005, correct?
19          A.    Correct.
20          Q.    And what happened here was you sent in
21    another price change for a different PPD drug,
22    correct?
23          A.    Correct.
24          Q.    And then, in turn, Traci Kellam, again,
25    responded asking for Abbott's confirmation about an
0114
1     AWP calculation, correct?
2           A.    Correct.
3           Q.    Did you respond to this e-mail?
4           A.    I -- I don't know.
5           Q.    You see another note there where she quotes
6     the date and time when you responded verbally?
7           A.    I see that she wrote that, yes.
8           Q.    Do you believe that's a lie?
9           A.    I don't believe I had any conversations
10    with her regarding AWP policy.
11          Q.    Do you have any reason how she could have
12    come up with such a precise date and time for the
13    conversation?
14                MS. FUMERTON:  Ob- -- Objection,
15    form.  It misrepresents what's written there.
16          A.    I don't know.
17                MR. ANDERSON:  What's the
18    misrepresentation?
19                MS. FUMERTON:  Well, it -- you're
20    saying that this notation refers to a conversation
21    regarding AWP policy, and that's simply not what it
22    says.
23                MR. ANDERSON:  Really?  What do you --
24    what do you think it says?
25                MS. FUMERTON:  I'm not testifying as
0115
1     to what it says, but it does not say anything about
2     an AWP policy.
3                 MR. ANDERSON:  Hmm.  All right.
4           Q.    (BY MR. ANDERSON):  Ms. Gerzel, if you
5     could, look at the page of Exhibit 9 that's Bates
6     labeled 00596.
7           A.    (Reviews document.)
8           Q.    Do you agree that appears to be a fax cover
9     sheet from Traci Kellam to you?
10          A.    Yes.
11          Q.    Do you believe you received this?
12          A.    I don't recall it.
13          Q.    It's dated August 9th, 2005, correct?
14          A.    Correct.
15          Q.    Do you have any reason to believe you did
16    not receive this around August 9th, 2005?
17          A.    No.
18          Q.    Do you agree that the date August 9th,
19    2005 coincides with the e-mail notations that were
20    handwritten by Ms. Kellam -- I mean, pardon me,
21    the phone call notations that were handwritten by
22    Ms. Kellam?
```

```
23         A.    Yes, it does.
24         Q.    Okay.  And she writes, "Hi April, Per our
25  conversation today, concerning no changes being made
0116
 1  to the existing AWP policy, please see the attached
 2  AWP confirmation letter from Red Book."  Did I read
 3  that correctly?
 4         A.    Yes, you did.
 5         Q.    Then she gives you her contact information
 6  if you have any questions, correct?
 7         A.    Correct.
 8         Q.    Do you believe you contacted her with any
 9  questions?
10         A.    I don't know.
11         Q.    Looking at the next page which is the
12  actual letter, do you see that it's dated August 9th,
13  2005?
14         A.    Yes.
15         Q.    And it's to you, correct?
16         A.    Correct.
17         Q.    And she's got your correct job title
18  listed, correct?
19         A.    Uh-huh.
20         Q.    And she writes, This letter is in regards
21  to our verbal conversation concerning AWP for Abbott
22  Pharmaceutical's, products on August 9th, 2005 at
23  11:50 a.m.  In the absence of a manufacturer provided
24  AWP or a manufacturer calculated markup to establish
25  an AWP, we will be implementing a 20-percent markup
0117
 1  above WAC to calculate AWP.  Did I read that
 2  correctly?
 3         A.    Yes.
 4         Q.    Do you believe you were made aware of that?
 5         A.    It appears she sent this to me, yes.
 6         Q.    Do you have any reason to dispute the fact
 7  that you were made aware of this calculation of AWP?
 8         A.    No.
 9         Q.    Are you aware of any efforts by Abbott to
10  stop Red Book from publishing AWPs based upon that
11  calculation?
12              MS. FUMERTON:  Objection, form.
13         A.    I -- I wouldn't know.  I don't know.
14         Q.    (BY MR. ANDERSON):  So the answer is you're
15  not aware of any efforts?
16         A.    I don't know.
17         Q.    You don't know of any efforts --
18         A.    I don't --
19         Q.    -- correct?
20         A.    Yeah.
21         Q.    Okay.
22         A.    I don't know of any efforts.
23              MS. FUMERTON:  Jarrett, are you
24  confident this is a complete document?  Because I
25  have seen a version of this document that has sort
0118
 1  of, I think, a key page missing.
 2              MR. ANDERSON:  Hmm.  Well, I don't --
 3  I don't know.  These are sequential.
 4              MS. FUMERTON:  I know, and I'm
 5  wondering if it comes before.
 6              MR. ANDERSON:  I don't know.  I -- I'm
 7  pretty confident that I used this in the Red Book
```

Depo-Gerzel-April-02-20-09l

8     deposition, but maybe -- it's been several months,
9     maybe not.
10         Q.    (BY MR. ANDERSON):   Ms. Gerzel, if you
11    could, take a look at what was marked yesterday as
12    Parker Exhibit 5.
13         A.    (Reviews document.)
14         Q.    Do you recognize this document?
15         A.    No.
16         Q.    Have -- have -- are you familiar at all
17    with bid schedules?
18         A.    I am familiar with the name, yes.
19         Q.    Does this appear to be a bid schedule from
20    2002?
21         A.    Actually, I've never been in the bid
22    schedule file.
23         Q.    You've heard the name, but you've never
24    actually seen the prices?
25         A.    I've never been in the file.
0119
1          Q.    Do you have access to it?
2          A.    I don't know.
3          Q.    Looking at the different types of pricing,
4     you mentioned that you, as a part of your role in
5     chargebacks, would input pricing, correct?
6          A.    Correct.
7          Q.    Would -- and from what source would you
8     gain the prices so that you could input them into
9     AES?
10         A.    It was dependent on what I was putting into
11    AES, if it was a product -- new product launch, or if
12    it was a price increase.
13         Q.    What would you use for the sources for
14    price increases?
15         A.    Typically I would receive notification from
16    Joe Fiske on what the price increase would be.
17         Q.    What about price decreases such as
18    decreases in chain prices or base deal prices?
19         A.    You mean if we had special deals out --
20         Q.    Yes.
21         A.    -- there?  I would -- if it was part of a
22    new product launch, I would typically receive it from
23    Trade Relations.
24         Q.    Okay.  So you would get price increases
25    from Pricing, but you would get special prices from
0120
1     Trade Relations?
2          A.    Yes.
3          Q.    And then, in turn, you would input those
4     into AES?
5          A.    Correct.
6          Q.    And Trade Relations was Tip Parker's
7     department?
8          A.    At the time, it was Kathy Eckerman's
9     department, and Tip worked for her.
10         Q.    Okay.  Would -- who specifically in Trade
11    Relations would send you the special pricing, like
12    chain pricing or RBG pricing or deal pricing?
13         A.    If there were deals associated with new
14    product launches and whatnot, they would typically
15    come from Tip.
16         Q.    Her individually?
17         A.    Yes.
18         Q.    Do you have any idea how Ms. Parker was
                                                      Page 50

Depo-Gerzel-April-02-20-09I

```
19   obtaining those prices?
20        A.    No, I don't.
21        Q.    Looking at the -- the 2002 bid schedule,
22   you see a column second from the right titled 2001
23   through 2003 Base Deal?
24        A.    Yes.
25        Q.    And then looking at the actual products,
0121
 1   there's -- the only product that has any base deal
 2   prices is the various forms of the erythromycins,
 3   correct?
 4        A.    Correct.
 5        Q.    Do you know why that is?
 6        A.    I recall an Ery deal being in effect during
 7   the time I was there, yes.
 8        Q.    Was it pretty unique amongst all the PPD
 9   drugs that Erys had deals that lasted for years?
10             MS. FUMERTON:   Objection, form.
11        A.    I -- I don't know.  I -- I was only there
12   for a certain period of time.  I don't know for --
13   before that or after that.
14        Q.    (BY MR. ANDERSON):  Well, while you were at
15   PPD Pricing, are you aware of any PPD drugs other
16   than the Erys having deal prices in place for years?
17             MS. FUMERTON:   Objection, form.
18        A.    I'm aware of other products having deal
19   prices.  I don't recall them being out there for
20   years.
21        Q.    (BY MR. ANDERSON):  Do you recall that the
22   Erys had deal prices in place for years?
23        A.    I recall that when I came into that role,
24   Ery had a deal price, and sometime during the role
25   when I was there, it -- it went away.
0122
 1        Q.    You're referring to July of 2003?
 2        A.    As what date?
 3        Q.    When Ery was dis- -- Ery deal prices were
 4   discontinued.
 5        A.    Oh, I'm not -- I'm not sure of the exact
 6   date that it was discontinued.
 7        Q.    Do you recall any circumstances around why
 8   the Ery deal price -- deal prices were discontinued?
 9        A.    No, I don't.  I don't know why.
10        Q.    Were you involved at all in notifying the
11   industry of the discontinuation of Ery deal prices?
12        A.    Not that I recall, no.
13        Q.    Now -- looking at the bid schedule, do you
14   see the acronym WAC on the bid schedule at all?
15        A.    (Reviews document.)  I do not see W-A-C,
16   no.  I see something called "wholesale" but nothing
17   WAC.
18        Q.    Did Abbott refer to any of its prices as
19   "WAC prices"?
20        A.    I'm sorry.  What --
21             MS. FUMERTON:   Objection, form.
22        A.    What was your question?
23        Q.    (BY MR. ANDERSON):  Did Abbott refer to any
24   of its prices -- strike that.
25             In the AES system, did Abbott have any
0123
 1   prices referred to as WAC, quote, "W-A-C," close
 2   quote, prices?
 3        A.    In AES, Pricing has an alphanumeric bucket.
```

Page 51

Depo-Gerzel-April-02-20-09l

```
 4        Q.    Oh, right.  Well, do you know if that field
 5   referred to wholesale prices or was it WAC, quote,
 6   "W-A-C"?
 7        A.    Wholesale acquisition cost.
 8        Q.    Where -- where was that written?
 9        A.    I don't -- I don't know where it's
10   written.
11        Q.    Do you know if it is written?
12        A.    I -- I don't know.
13        Q.    Look, if you can, at what's been marked in
14   this case as Garvin Exhibit 13.
15        A.    (Reviews document.)
16        Q.    My questions are going to be pretty
17   straightforward, ma'am.  I'm looking at the second
18   page primarily.
19        A.    Okay.
20        Q.    And I'm just wanting to know a little bit
21   about that July 1st, 2003 e-mail by you.
22        A.    Uh-huh.
23        Q.    You agree that that appears to be an e-mail
24   you sent, correct?
25        A.    Correct.
0124
 1        Q.    And you've got a couple of notifications.
 2   One is an Ery price notice Word document, and the
 3   other is an Ery deal document in Excel, correct?
 4        A.    That's -- yeah, that's what it looks like.
 5        Q.    And you say, "Attached is the new Ery Deal,
 6   it was sent this morning to wholesalers via broadcast
 7   fax," correct?
 8        A.    Correct.
 9        Q.    Why were you the person notifying PPD
10   personnel of this situation?
11        A.    Because it would have been under my roles
12   and responsibility to enter this into AES and,
13   therefore, make the communication.
14        Q.    And how did you -- how -- how did you input
15   the prices into AES?
16        A.    How did I input them?  I --
17        Q.    That might be too vague.  I'm sorry.  Just
18   mechanically, if you can, walk me through what
19   changes you made in AES as a result of the
20   discontinuation of base deal pricing.
21        A.    I can talk to you generally how it's done.
22   I don't specifically remember this particular deal.
23        Q.    Okay.
24        A.    But I can discuss generally how --
25        Q.    Okay.
0125
 1        A.    -- the deals are done.
 2              In AES there's a particular type of --
 3   I don't know if it's called transaction type that you
 4   go down called "AES Deals" that takes you to a screen
 5   where you can input various point- -- types of
 6   information, such as NDC numbers that are going to be
 7   eligible for any special discounting, things like
 8   customer information, customer classes of trade,
 9   other items like what price we might want to give
10   them, is there any special purchasing requirements,
11   any changes to terms, and there might be other things
12   that I'm not aware of.
13        Q.    And so if Ery deal prices were
14   discontinued, what most likely would that have caused
```

Page 52

Depo-Gerzel-April-02-20-09I

15  you to do in AES?
16      A.    If a deal were to be discontinued, I would
17  change the effective dating of the deal to have it
18  end.  You had an effective date and an effective end
19  date -- a start and end date.
20      Q.    And then as a result, the computer wouldn't
21  use that pricing to populate bill- -- invoices and
22  what have you?
23              MS. FUMERTON:    Objection, form.  Lack
24  of foundation.
25      A.    If the -- if the date was put in and a
0126
1   transaction tried to go past that date, anything that
2   was on that deal to override a normal sale --
3       Q.    (BY MR. ANDERSON):  Uh-huh.
4       A.    -- would not be used anymore.
5       Q.    I got it.  Did -- other than the AES
6   involvement, did you have any other role whatsoever
7   with the discontinuation of base deal pricing on the
8   erythromycins?
9       A.    No.
10              MR. ANDERSON:    All right.  I'll pass
11  the witness.
12              MS. FUMERTON:    Okay.  I need to take a
13  quick break.  I just sent an e-mail looking for a
14  document.  So can we just take a quick break and then
15  I will be back and ask a couple of questions?
16              Is there -- Michael, are you there?
17  Okay.  I'm assuming he doesn't have any questions.
18  Let's go off the record.
19              THE VIDEOGRAPHER:  We're off the
20  record at 11:27 a.m.
21              (Recess taken.)
22              REPORTER'S NOTE: (Mr. Jarrett Anderson
23              is participating via telephone through
24              the continuation of the deposition.)
25              (Exhibit 10 marked.)
0127
1               THE VIDEOGRAPHER:  We are on the
2   record at 12:07 p.m.
3                      EXAMINATION
4   BY MS. FUMERTON:
5       Q.    Ms. Gerzel, do you recall that prior to
6   taking a break, Mr. Anderson was asking you a series
7   of questions about communications you had with
8   Red Book regarding AWP?
9       A.    Yes.
10      Q.    Can you please take a look -- and -- and do
11  you recall that you also testified that you recalled
12  sending an e-mail to Red Book explaining that Abbott
13  did not set AWP and -- do you recall that?
14      A.    Yes.
15      Q.    Could you please take a look at Exhibit
16  No. 10?
17      A.    (Reviews document.)
18      Q.    And I'm specifically going to draw your
19  attention to the fifth page of the document that has
20  the Bates range Red Book 01413.
21      A.    Okay.
22      Q.    On the page that's marked Red Book 01413,
23  do you see what appears to be an e-mail that you sent
24  to Traci Kellam at Red Book?
25      A.    Yes, I do.

                    Page 53

Depo-Gerzel-April-02-20-09I

0128
1        Q.    Could you please -- do you recall sending
2   this e-mail to Traci Kellam?
3        A.    I -- yes, I do.
4        Q.    Could you please read the text of the
5   e-mail to Traci for the record?
6        A.    "Traci, I believe it is important for me to
7   clarify what occurred in April 2003.  As you may be
8   aware, in April 2003, Ms. Voeck wrote, 'In the
9   absence of the manufacturer provided AWP or a
10  manufactured calculated markup to establish an AWP,
11  we will be implementing a 20-percent markup above
12  WAC to calculate AWP.'  Later in that same letter,
13  Ms. Voeck wrote, 'This is in accordance with our
14  company policy for calculation of AWP.'  Of course,
15  Abbott does not control how Red Book does its
16  business nor does Abbott provide AWP or a calculated
17  markup to establish an AWP.  Consequently, Abbott
18  concluded that there were no need to respond to Ms.
19  Voeck's April 2003 letter.  Abbott trusts that Red
20  Book will continue to conduct its business as it sees
21  fit and that it will get independent legal advice
22  when Red Book deems it appropriate.  Thank you for
23  your attention to this matter."
24       Q.    And do you recall why you sent this e-mail?
25       A.    I recall that it was in response to an
0129
1   e-mail that they had sent regarding their AWP policy
2   and wanting to establish that Abbott does not set AWP
3   or have anything to do with it.
4        Q.    So you sent this e-mail to Red Book to make
5   it clear that Abbott did not care in any way how
6   Red Book would establish an AWP for its products; is
7   that correct?
8             MR. ANDERSON:  Ob- -- Objection,
9   form.  And, Tara, if I could interject.  What's the
10  date of the e-mail?
11            MS. FUMERTON:  The date of the e-mail
12  is July 13th, 2004.
13            MR. ANDERSON:  Okay.  Thank you.
14       A.    That is correct.
15       Q.    (BY MS. FUMERTON):  Thank you.  And,
16  Ms. Gerzel, do you also recall testifying earlier
17  today that you are aware of a system at Abbott that
18  contains AWP information?
19       A.    Yes, I do.
20       Q.    Could you please describe what that system
21  is and what it is used for?
22       A.    The system is called Imany Medicaid, and it
23  is used for calculating and making payments to our
24  Medicaid rebate program and supplemental and ASPAP
25  programs.
0130
1        Q.    Who, to your knowledge, has access to that
2   information?
3        A.    I do, as well as the other managers in the
4   government team and the analysts that work on
5   calculating rebate per units and pay Medicaid
6   payments.
7        Q.    So is it true that only people involved in
8   calculating Medicaid rebates, whether they be
9   supplemental or otherwise, have access to that
10  information?

Page 54

Depo-Gerzel-April-02-20-09I

11      A.    That is correct, with the exception of IT
12  that support Government.
13      Q.    And -- and they're there just to support
14  any technical issues that you may have; is that
15  correct?
16      A.    That's correct.
17      Q.    And you mentioned that you use the
18  system -- or you use the AWPs in the system for
19  calculating state supplemental rebates; is that
20  correct?
21      A.    Yes, it is.
22      Q.    And isn't it true that -- well, could you
23  please explain how AWP would be used in calculating
24  the state supplemental rebate?
25      A.    A -- some states will have a formula to
0131
1  calculate their rebates based on AWP minus a certain
2  percent, and those formulas are put into our system
3  to calculate and thus pay the rebates accordingly to
4  those contracts in that state.
5      Q.    So is it true that if -- the higher the AWP
6  that Abbott has on a particular product, if that
7  product is subject to a state supplemental rebate,
8  the higher the rebate will be that Abbott pays to the
9  Medicaid agency?
10      A.    That is correct.
11      Q.    And to your knowledge, does anybody else in
12  the Pricing Department other than those individuals
13  that work with the Medicaid rebate program have
14  access to that AWP information that is contained in
15  the Imany Medicaid system?
16      A.    No, they do not.
17      Q.    To your knowledge, has anyone at Abbott set
18  prices on any of the erythromycin drugs to increase
19  Medicaid payments?
20      A.    No, not to my knowledge.
21      Q.    To your knowledge, has anyone at Abbott
22  reported prices on the Ery drugs to increase Medicaid
23  payments?
24      A.    No.
25              MS. FUMERTON:   Thank you.  I have no
0132
1  other questions.
2              MR. ANDERSON:   Thank you for your
3  time, Ms. Gerzel.
4              THE WITNESS:   Thank you.
5              MS. FUMERTON:   Thank you.
6              MS. FUMERTON:   We're concluded.
7              MR. BERLIN:   Okay.  Great.
8              THE VIDEOGRAPHER:   We are off the
9  record at 12:13 p.m.  This is the end of tape 3.
10              (Deposition concluded.)
11
12
13
14
15
16
17
18
19
20
21

Page 55

Depo-Gerzel-April-02-20-09I

```
22
23
24
25
0133
 1                    CHANGES AND SIGNATURE
 2  WITNESS NAME: APRIL GERZEL        February 20, 2009
 3  PAGE/LINE  CHANGE              REASON
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0134
 1          I, APRIL GERZEL, have read the foregoing
 2  deposition and hereby affix my signature that same is
 3  true and correct, except as noted above.
 4
 5
 6                              APRIL GERZEL
 7
 8
 9  THE STATE OF              )
10  COUNTY  OF               )
11
12      Before me,                    , on this
13  day personally appeared APRIL GERZEL, known to me [or
14  proved to me on the oath of                    or
15  through              (description of identity
16  card or other document)] to be the person whose name
17  is subscribed to the foregoing instrument and
18  acknowledged to me that she executed the same for the
19  purposes and consideration therein expressed.
20      (Seal) Given under my hand and seal of office
21  this          day of                    , 2009.
22
23
24
                             Notary Public in and for
25                              the State of Texas
0135
 1  THE STATE OF TEXAS)
 2  COUNTY  OF  BEXAR )
 3
 4               I, TAMMY POZZI, Certified Shorthand
                         Page 56
```

Depo-Gerzel-April-02-20-09I
```
 5    Reporter in and for State of Texas, do hereby certify
 6    that, pursuant to agreement of counsel, there came
 7    before me on February 20, 2009 at 8:32 a.m. in the
 8    law offices of Jones Day, 77 West Wacker, 35th Floor,
 9    Chicago, Illinois, the following named person,
10    to-wit: APRIL GERZEL, who was by me duly sworn to
11    testify to the truth and nothing but the truth of her
12    knowledge touching and concerning the matters in
13    controversy in this cause; that she was thereupon
14    carefully examined upon her oath and her examination
15    reduced to typewriting under my supervision; and that
16    the deposition is a true record of the testimony
17    given by the witness.
18                I further certify that I am neither
19    attorney nor counsel for, nor related to or employed
20    by, any of the parties to the action in which this
21    deposition is taken, and further that I am not a
22    relative or employee of any attorney or counsel
23    employed by the parties hereto nor financially
24    interested in the action.
25
0136
 1                IN WITNESS WHEREOF I have hereunto set my
 2    hand and seal on this the 5th day of March, 2009.
 3
 4
 5
 6    C.S.R. NUMBER 5629          TAMMY POZZI, Certified
      Expires 12/31/10             Shorthand Reporter in
 7                                  and for the State of Texas.

 8    FIRM NO. 611
      Expires 12/31/09
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```