# ANDERSON EXHIBIT 6

TO

OPPOSITION TO EXCLUDE TESTIMONY
OF EXPERT MARK G. DUGGAN PH.D.

Depo-Hughes-James-05-06-09

297

1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3

4   IN RE:  PHARMACEUTICAL        )

5   INDUSTRY AVERAGE WHOLESALE    ) MDL No. 1456

6   PRICE LITIGATION              )

7   _____) Master File

8                                ) No. 01-CV-12257-PBS

9   THIS DOCUMENT RELATES TO:     )

10  _____) Subcategory

11                               ) No. 06-CV-11337-PBS

12  United States of America,     )

13  ex rel. Ven-A-Care of the     )

14  Florida Keys, Inc., v.        )

15  Abbott Laboratories, Inc.,    )

16  CIVIL ACTION NO. 06-11337-PBS)    VOLUME II

17

18          Videotaped Deposition of JAMES W.

19  HUGHES, Ph.D., at 77 West Wacker Drive, 35th

20  Floor, Chicago, Illinois, commencing at the hour

21  of 9:09 a.m. on Wednesday, May 6, 2009.

22

298

1   APPEARANCES:

2

3   ON BEHALF OF THE UNITED STATES OF AMERICA:

4       R. ALEXANDER ACOSTA

Page 1

Depo-Hughes-James-05-06-09

```
 5        UNITED STATES ATTORNEY

 6        SOUTHERN DISTRICT OF FLORIDA

 7        BY:  MR. MARK A. LAVINE

 8             99 N.E. 4th Street

 9             3rd Floor

10             Miami, Florida 33132

11             305.961.9303

12             mark.lavine@usdoj.gov

13

14   ON BEHALF OF THE RELATOR, VEN-A-CARE OF THE

15   FLORIDA KEYS, INC.:

16        THE BREEN LAW FIRM, P.A.

17        BY:  MR. JAMES J. BREEN

18             5755 Northpoint Parkway

19             Suite 260

20             Alpharetta, Georgia 30022

21             678.735.5040

22             jbreen@breenlaw.com
```

                                                    299


```
 1   APPEARANCES:  (CONTINUED)

 2

 3   ON BEHALF OF ABBOTT LABORATORIES:

 4        JONES DAY

 5        BY:  MR. ERIC P. BERLIN

 6             MS. CAROL P. GEISLER

 7             77 West Wacker Drive

 8             35th Floor

 9             Chicago, Illinois 60601-1692

10             312.782.3939
```

Depo-Hughes-James-05-06-09

```
11          epberlin@jonesday.com

12          cgeisler@jonesday.com

13

14  ON BEHALF OF THE STATE OF ALABAMA:

15      HAND ARENDALL, LLC

16      BY:  MS. WINDY COCKRELL BITZER

17          (via teleconference)

18          P.O. Box 123

19          Mobile, Alabama 36601

20          251.694.6263

21          wbitzer@handarendall.com

22
```

300

```
 1  APPEARANCES:  (CONTINUED)

 2

 3  VIDEOGRAPHER:

 4      STEPHAN HOOG, Videographer

 5      Legal Visual Services

 6

 7  REPORTED BY:

 8      DONNA M. KAZAITIS, CSR, RPR, CLR, CRR

 9      Illinois CSR No. 084-003145

10

11

12

13

14

15

16
```

Depo-Hughes-James-05-06-09

17
18
19
20
21
22

301

1                    I N D E X

2  WITNESS:  JAMES W. HUGHES                    PAGE

3           Examination by Mr. Lavine............ 302

4           Examination by Mr. Breen............. 431

5

6

7                  E X H I B I T S

8  NUMBER              DESCRIPTION              PAGE

9  Exhibit Hughes 009 - Summary of Revisions to

10                     Medicaid Analyses......... 408

11  Exhibit Hughes 010 - Comparison of Actual

12                     Medicare Claim vs.

13                     MMA 2007.................. 411

14  Exhibit Hughes 011 - Exhibit 9 to Dr. Hughes'

15                     expert report............. 456

16  Exhibit Hughes 012 - Exhibit 4 to Dr. Hughes'

17                     expert report............. 545

18

19

20

21

22

Depo-Hughes-James-05-06-09

302

```
 1              P R O C E E D I N G S
 2
 3              THE VIDEOGRAPHER:  Today's date is May
 4     6, 2009.  We are on the record at 9:09 a.m.
 5
 6                   JAMES W. HUGHES,
 7     having been previously duly sworn, was examined
 8     and testified further as follows:
 9
10                   EXAMINATION (Continuing)
11     BY MR. LAVINE:
12          Q.   Welcome back, Dr. Hughes.
13          A.   Thank you.
14          Q.   I just wanted to ask some follow-up
15     questions about some of your points that you made
16     regarding Dr. Duggan's analysis of the Medicare
17     arrays.
18          A.   Yes.
19          Q.   And let me just go through the points.
20     I think I might be able to ask one question about
21     all of them.  If we need to separate them out,
22     just let me know.
```

303

```
 1              You said that he hasn't shown the
 2     correct Abbott NDCs were in each array.  He hasn't
 3     shown that Abbott's price moved the median.
```

Page 5

Depo-Hughes-James-05-06-09

4          He hasn't shown all the arrays to be,

5     well, I have the word "identical," but similar

6     enough within the sample or the extrapolation.

7          There's no evidence that Abbott was the

8     only manufacturer whose AWP was higher than the

9     actual average selling price.  And that he hasn't

10    shown that a hundred percent of the sales of the

11    products under that J-Code were of Abbott

12    products.

13          And the question about all of those is

14    what is the underlying scientific methodology that

15    you say Dr. Duggan failed to follow with respect

16    to each of those issues?

17     A.   Why don't you give them to me one at a

18    time, and then we'll run through them because I

19    understand it forms a single question but it

20    doesn't really form a single answer.

21     Q.   Okay.  Fair enough.

22          So first, that he hasn't shown the

304

1     correct Abbott NDCs were in every array.

2     A.   Okay.  So that is the point that he

3     looked to find a price that matched an Abbott

4     price but doesn't offer, doesn't know with any

5     degree of certainty that it is in fact the Abbott

6     price, that there was not some other drug, some

7     other NDC, that was either in the array

8     legitimately or in the array by mistake that could

9     have that price.

Page 6

Depo-Hughes-James-05-06-09

10          He said that he had, in his rebuttal he
11   says that he had checked, but, again, it's not
12   clear to me exactly what he had checked.
13          So as to the exact, I'm sorry,
14   scientific methodology?
15      Q.   Yes.
16      A.   Okay.  So I mean he's forming, in effect
17   he's forming a hypothesis, and the hypothesis is
18   that $10.16 whenever I see that, that's always an
19   Abbott price.
20          Again, the idea is that it's an
21   assumption on his part.  There's no scientific
22   basis on his part for assuming that every time you

305

1   look at a Medicare array and see $10.16, there's
2   no scientific principle, no scientific
3   methodology, that says oh, well, that must be an
4   Abbott price.
5          So, again, when one is making an
6   assumption, and as I said before, I'm not against
7   assumptions, I'm not against all assumptions, but
8   you need to provide, you need to provide a basis
9   in the evidentiary record or some sort of basis,
10   economic theory if you like, that if there's some
11   economic law that says $10.16 is a price that is
12   reserved for Abbott NDCs -- I'm being facetious
13   but you understand what I'm saying -- that he
14   provides no such basis to support that assumption
15   that he's making.
                    Page 7

Depo-Hughes-James-05-06-09

16            Again, the evidence that he does have
17   given that there's no set methodology for forming
18   arrays, there's no set methodology for deciding
19   whose products are in the arrays, which products
20   are in the arrays, products get into arrays by
21   mistake, products of the wrong dosage, products of
22   the wrong type, get into the arrays.


                                                          306


 1            And without some assurance that there's
 2   been a fairly rigorous checking, it's still at the
 3   end of the day the only information he has is
 4   $10.16 and it remains an assumption on his part,
 5   which, again, lacks scientific basis.  It remains
 6   an assumption on his part that that is indeed an
 7   Abbott price.
 8       Q.   Would you be able to go and point to a
 9   book or some type of peer-reviewed literature, a
10   learned treatise, and point to some particular
11   methodology or technique that would address that
12   issue?
13       A.   Well, Dr. Duggan doesn't point to any
14   technique.
15       Q.   But my question is what would you point
16   to?
17       A.   I will answer your question, I'd be
18   happy to answer your question.
19            He doesn't point to any particular
20   technique that says $10.16 is always an Abbott
21   price.
                        Page 8

Depo-Hughes-James-05-06-09

22          Again, it's another one of his unstated

307

1    assumptions, that when, you know, I mean he makes
2    the statement when I see an Abbott price, but he
3    offers no evidence that these are indeed Abbott
4    prices except for the fact that Abbott has an AWP
5    of $10.16 and he sees $10.16 in another array.
6          So I think that the, can I name a book
7    that I can go to now, no.  But I think if one were
8    to submit this work to a peer-reviewed economic
9    journal, that criticism that I'm making would come
10   back is then how do you know, what is your basis
11   for assuming that every time you see $10.16 that
12   this is indeed an Abbott price.
13         Again, the best practices, as I
14   understand them in economics, is that everybody
15   has to make assumptions at times but you need to
16   have a basis in your area of research, you need to
17   have a basis from the data, you need to have a
18   basis from somewhere.
19         Or you need to be able to say I searched
20   the electronic Red Book at this time for the
21   number $10.16, and the Abbott one was the only one
22   that came up.

308

1          That would be a way for Dr. Duggan to
Page 9

2    have done this that would satisfy this criticism.

3         Q.    But you can't identify some generally-

4    accepted scientific technique by name that he's

5    violating when he fails to show the correct Abbott

6    NDCs were in every array?

7         A.    In applied micro-economics you don't

8    make unfounded assumptions.

9              So I'm relying not on a textbook, but I

10   am relying on my expertise and experience as an

11   applied micro-economist.  I'm applying my

12   expertise and experience as having been a, like

13   Dr. Duggan, having been a referee for peer-

14   reviewed journals in economics, I am relying on my

15   expertise as an economist as someone who has

16   conducted empirical research and had to deal with

17   the consequences of assumptions that one feels one

18   needs to make in order to move the analysis

19   forward.

20             And based on that, again, it's my

21   opinion that best practices in economics is that

22   assumptions are just that, they are rebuttable


                                                     309


1    presumptions.

2              And that you strengthen your analysis,

3    any time you're making an assumption, you

4    strengthen your analysis by offering evidence that

5    that assumption is indeed reasonable under the

6    circumstances.  And my criticism is that he has

7    not done that.

                        Page 10

Depo-Hughes-James-05-06-09

8    Q.   So are you saying that there's an
9    economic methodology that requires that one of the
10   best practices that needs to be applied is to
11   never make unfounded assumptions?
12         Is that the methodology that you're
13   applying here?
14         MR. BERLIN:  Objection, form.
15         THE WITNESS:  You're taking it again to
16   an extreme.
17         One of the best practices is when you're
18   making assumptions is to always state them, which
19   Dr. Duggan never does in his original report.
20         I let you finish your question.  Let me
21   finish my question.
22         So that when one makes assumptions, you

                                                    310

1    put them out there.  And then it's up to the
2    reader to decide, and this is true in the economic
3    literature as I understand it, you put your
4    assumptions forward because sometimes you have to
5    make them in order to move the analysis forward,
6    and then it's up to the reader, it's up to the
7    journal editor, it's up to referees, if the paper
8    is published it's up to the people who read it to
9    decide whether they think that assumption is well
10   founded.
11         There's plenty of examples of say
12   journal articles where a researcher will find a
13   certain result, you know, particularly in economic

                          Page 11

Depo-Hughes-James-05-06-09

14  theory.  But the result may depend on an

15  assumption that nobody really believes in.

16          So that piece of work may go forward,

17  may even be published, but it doesn't have much

18  impact because the consensus of the readers is

19  that that assumption just doesn't make any sense

20  under the circumstances.

21  BY MR. LAVINE:

22      Q.   So when Dr. Duggan in his analysis fails

311

1  to show the correct Abbott NDCs were in the

2  arrays, that fails to meet a standard in economics

3  of not being allowed to make unfounded

4  assumptions?

5      A.   State your assumptions and state your

6  foundation for the assumptions, neither of which

7  Dr. Duggan does, that's my criticism, all right.

8          Then it's up to readers to decide

9  whether or not that's a reasonable assumption

10  under the circumstances.

11      Q.   I just want to make sure I'm

12  understanding.

13          One of the critiques is that Dr. Duggan

14  hasn't shown the correct NDCs were in the array,

15  and the standard that he's failing to meet is the

16  requirement that in economic analysis your

17  assumptions need to be stated, and he's failed to

18  do that.

19      A.   The assumptions need to be stated, and

Depo-Hughes-James-05-06-09

20  they need to be supported.  You need to say here's

21  why I'm making this assumption.

22          I mean if somebody does an economic

312

1  analysis that as one of the assumptions that their

2  analysis is based on is that demand curves don't

3  really slope downward but demand curves slope

4  upward, first of all, that assumption needs to be

5  stated.

6          Second of all, the researcher needs to

7  put a reason why contrary to everything else

8  everybody knows, everybody believes about demand

9  curves, this person is saying that they slope

10  upwards.  And then you put the work out there and

11  people, readers, will choose to believe or not

12  believe your work based on whether they believe or

13  don't believe that assumption.

14      Q.   All right.  So when Dr. Duggan fails to

15  show the correct Abbott NDCs were in the array,

16  he's failed to state his assumption and he's

17  failed to support his assumption?

18          MR. BERLIN:  Objection, form.

19          THE WITNESS:  Well, yes, he's failed to

20  state his assumption, he's failed to support his

21  assumption.

22          But, remember, he's assuming that these

313

Depo-Hughes-James-05-06-09

1    are Abbott NDCs.  He's using that to calculate his

2    damage calculation, he's using it to calculate his

3    damages for that carrier for that period.  He's

4    then attributing a hundred percent of that damage

5    to Abbott.

6           It certainly seems well within the

7    expectations of best practices in economics that

8    you provide some basis for the belief that just

9    because I see $10.16 that that is representative

10   of an Abbott NDC and not representative of

11   something that's in there either intentionally or

12   by mistake.  And he fails to do that.

13   BY MR. LAVINE:

14      Q.   Where would I go to see an objective

15   description of those requirements you just

16   described?

17           MR. BERLIN:  Objection, form.

18           THE WITNESS:  Could you read back my

19   response, please, my last response.

20              (The record was read back as

21   requested.)

22           THE WITNESS:  As I was saying yesterday,

314

1    when one's performing, when one uses

2    extrapolation, one's by definition introducing

3    error into the analysis because you are not using

4    actual data, you're extrapolating from one

5    situation into another.

6           So statistically speaking, you're going

Depo-Hughes-James-05-06-09

7    to be introducing error because you're creating

8    data, you're not using actual data.

9            That error from extrapolation is going

10   to be compounded if where you're extrapolating to,

11   the data that you're extrapolating to, in this

12   case -- excuse me.  Let me try that again.

13           The data that you're using for the

14   extrapolation, in this case the purported Abbott

15   NDC that he says that he sees in arrays, if that's

16   not accurate he's introduced yet another degree of

17   error into his extrapolations.

18           MR. LAVINE:  I object, move to strike as

19   nonresponsive.

20   BY MR. LAVINE:

21       Q.   My question was is there an objective

22   source, a peer-reviewed material, a learned

315

1    treatise, anything of the sort, that would

2    articulate the standards that you're describing so

3    that we could look it up and determine whether or

4    not Professor Duggan was meeting those standards?

5        A.   Well, one could look to an econometrics

6    book at the problems that are introduced into

7    estimation when you have problems, so-called

8    errors in variable.

9        Q.   What would the rule say?

10       A.   The rule would say is that when your

11   independent variables are mismeasured, your

12   estimates lose precision.

Page 15

Depo-Hughes-James-05-06-09

13      Q.   So is that the standard that we should

14   use to judge whether or not Dr. Duggan handled

15   things appropriately with respect to showing the

16   Abbott NDCs were in the array?

17           MR. BERLIN:  Objection, form.

18           THE WITNESS:  My objection to Dr.

19   Duggan's analysis is we have to rely on his word

20   for how accurate these extrapolations are.

21           He's not performing anywhere in his

22   report, he performs no statistical test of

316

1   accuracy, he offers no confidence intervals, he

2   offers no test of statistical significance.

3           He offers nothing of the sort, nothing

4   of the type of thing that it would be standard

5   practice, and I'm sure is contained in every bit

6   of Dr. Duggan's published econometric work, the

7   measures of accuracy and the measures of goodness

8   of fit and all of these other measures that

9   economists and statisticians typically use to

10   measure the accuracy of somebody's estimation.

11           We have extrapolations with reasons to

12   believe that there's been error introduced to

13   these extrapolations.

14           First of all, from the very act of

15   extrapolation.  And, secondly, because of the lack

16   of certainty or the lack of evidence offered that

17   he actually has the correct NDCs in the array.

18           There are lots of things in statistics

Depo-Hughes-James-05-06-09

19   books and lots of things in econometrics books

20   that talk to how regression analysis, which is not

21   what Dr. Duggan has done here, but how economic

22   analysis generally is affected when you think you

317

1   have one variable and you actually have something

2   else.

3            And there are ways for approaching those

4   problems, there are ways for handling those

5   problems.

6            When one is faced with such a problem in

7   an econometric analysis, one acknowledges the fact

8   and then either takes corrective action or adjusts

9   their standard, does adjustments to standard

10  errors and does adjustments to their confidence

11  intervals to take those things into account.

12           None of that's done here.  We have no

13  reason to accept the accuracy of Dr. Duggan's

14  extrapolations but Dr. Duggan's word that these

15  are all Abbott NDCs.

16           And given, you know, he's a well-

17  published empirical economist, just giving in the

18  academic world, in academic research, just giving

19  the editor, or giving reviewers your word that

20  these are really good estimates would not fly.

21           That's my objection, is that this is not

22  meeting any sort of standard of accuracy that's

318

1    generally accepted in the economics profession.

2    BY MR. LAVINE:

3        Q.   We were talking about the particular

4    point made by you that Dr. Duggan hasn't shown the

5    correct Abbott NDCs were used in the arrays.

6             What is the standard of accuracy in

7    economics that that fails to meet?

8        A.   Well, as I said, if you look at Dr.

9    Duggan's empirical published work, you're going to

10   see hypothesis tests, you're going to see tests of

11   significance, you're going to see goodness of fit

12   statistics, you're going to see all sorts of

13   statistical tests that are generally employed by

14   economists because that's how we decide whether

15   statistical, that's how we decide whether data

16   analysis is sufficiently accurate or not.

17       Q.   But there's nowhere in your report where

18   you say Dr. Duggan has failed to meet the

19   appropriate standard when he didn't demonstrate

20   the correct NDCs were in the array because he

21   failed to perform a goodness of fit test?

22       A.   Well, you asked me a question and I'm

319

1    answering it now.

2             I mean I said he doesn't, I said in my

3    report that he doesn't provide any evidence that

4    he's got the correct Abbott NDCs.

Depo-Hughes-James-05-06-09

5          You asked me well, what standard does

6    that violate, and I just told you the standard.

7          I mean I'm answering your question.  I'm

8    not sure what your objection is.

9      Q.    But today for the first time you're

10   reaching the opinion that Dr. Duggan should have

11   done a goodness of fit test?  Is that what you are

12   saying?

13         MR. BERLIN:  Objection, form.

14         THE WITNESS:  You were asking me by what

15   standards do economists judge accuracy of data

16   analysis, and I've answered that question, that

17   the standard is generally in academic research

18   that one performs statistical tests.

19         This is a damage analysis.  This is

20   supposed to be a damage analysis.  This isn't

21   supposed to be a journal article.  But the same

22   objections that hold.

320

1          So, for example, if one is reviewing an

2    academic article and somebody submits a paper

3    where there is an error that their variable, say

4    an independent variable, is measured with error

5    and the author totally ignores that fact, then

6    that's going to be an issue with the readers and

7    the editors and the reviewers of the journal.

8          What I'm saying here is I'm applying the

9    same principle that when something is measured

10   with error, one needs to acknowledge it, one needs

Page 19

Depo-Hughes-James-05-06-09

11  to perhaps run some analyses to what we call

12  sensitivity analysis, what if this is wrong.

13          There's all sorts of things that can be

14  done to acknowledge that there's some error here,

15  and that can be affecting the precision of Dr.

16  Duggan's estimates.

17          My point is, like I would if I were

18  reading an academic paper, is he's got a problem

19  here in that he has no basis for concluding that

20  each and every time he sees $10.16 that that's

21  indeed an Abbott NDC.

22          And I am pointing that out as a problem

                                                    321

1  in the analysis that in my view introduces

2  additional error into his estimates, and it's an

3  assumption that he neither acknowledges nor a

4  problem that he makes any attempt to compensate

5  for.

6  BY MR. LAVINE:

7      Q.   Are you able to give a name to the

8  general scientific method, principle, technique,

9  that is violated when Professor Duggan fails to

10  show the correct Abbott NDCs were in each array?

11      A.   The common sense principle is certainly

12  if you've got the wrong numbers in your analysis,

13  the numbers that come out of your analysis is

14  going to be wrong, are going to be wrong.

15      Q.   We don't need an expert to testify about

16  common sense; right?  A jury can do that.

                    Page 20

Depo-Hughes-James-05-06-09
17      A.   A jury certainly can do that and a jury
18  will do that in the end.
19      Q.   So is there a name of an economic
20  principle, econometric principle, that's violated
21  when Dr. Duggan fails to show the correct Abbott
22  NDCs were in every array?

322

1       A.   Well, one name for it is measurement
2   error.
3            So if you have a variable that's
4   measured with error, econometric textbooks are
5   replete with what that means for your estimates.
6       Q.   So what is the rule there?  That in
7   economics you shouldn't do an analysis that
8   includes measurement error?
9       A.   That measurement error has consequences
10  for your analysis and that can affect the accuracy
11  of your analysis, it can affect the validity of
12  your analysis, that there are consequences for
13  using in your analysis variables that are measured
14  with error.
15      Q.   And to decide whether the measurement
16  error was acceptable or not, it's just up to the
17  opinion of Dr. Hughes to review it and make that
18  decision based on his subjective analysis?
19           THE WITNESS:  Could you read that back
20  for me, please.
21               (The record was read back as
22  requested.)

Page 21

Depo-Hughes-James-05-06-09

323

1          THE WITNESS:  No.
2              For example, if you have measurement
3      error in a statistical regression analysis, which,
4      again, is not what Dr. Duggan is doing, but if you
5      have measurement error in a statistical regression
6      analysis your standard errors will be bigger than
7      they would be if there was no measurement error.
8              If the measurement error is bad enough,
9      the standard errors of your estimates can be so
10     large that they are no longer statistically
11     significant, meaning that you do not have, you
12     cannot reject a null hypothesis that the
13     independent variable has no effect on the
14     dependent variable of interest.
15             So it's not up to Dr. Hughes sitting
16     here saying well, there's either measurement error
17     that's too big or it's too small.  But in
18     statistics if there's sufficiently large
19     measurement error, your analysis will be
20     invalidated because you won't be able to reject
21     the null hypothesis that there's no effect of your
22     independent variable on your dependent variable.

324

1              In Dr. Duggan's analysis, I'm saying
2      that he has not provided us with any assurance
3      that what he calls the Abbott NDCs in his array
                        Page 22

Depo-Hughes-James-05-06-09

4    are indeed Abbott NDCs.

5         That absent that evidence, he has got an

6    issue that he has not addressed, an issue that

7    affects the accuracy of his estimates, and hence,

8    my conclusion that his estimates are inaccurate

9    and unreliable because this is an issue that he

10   simply hasn't addressed.

11      Q.   So you're saying he's failed to show the

12   correct Abbott NDCs were in every array, and

13   that's a violation of an accepted economic

14   principle that you need to state your assumptions

15   underlying your analysis; is that right?

16         MR. BERLIN:  Objection, form.

17   BY MR. LAVINE:

18      Q.   What I'm trying to understand is how do

19   we evaluate when Professor Duggan has met the

20   standard you're setting up for him.

21         How do we know?  Because right now I

22   understand you're saying he's failed by failing to

325

1    state his assumptions, he's failed by not

2    supporting his assumptions.

3         What other standard are you saying that

4    he's failed to meet?

5         MR. BERLIN:  Objection, form, asked and

6    answered repeatedly, and misstates his testimony.

7         MR. LAVINE:  Please confine your

8    objections to form.

9         MR. BERLIN:  Are you asking me solely to

Page 23

Depo-Hughes-James-05-06-09

10      say "Objection, form"?

11              MR. BREEN:  Yes.

12              We'll ask you if we want to know what

13      the form objection is.

14              MR. BERLIN:  Okay.  And I won't be

15      waiving any objection by merely saying "Objection,

16      form."

17              MR. LAVINE:  The Rules of Civil

18      Procedure will address that issue.

19              MR. BERLIN:  Well, no, no.  The Rules of

20      Civil Procedure don't say that.  But we had an

21      agreement in the litigation as to the extent of

22      the objection.

                                                        326

1               I want an agreement that by saying only

2       "Objection to form," you will not argue that I

3       waive any explanation as to objection to form.

4               We've generally followed what has become

5       practice in the case of essentially the Texas

6       rules but not the Rules of Federal Civil

7       Procedure.

8               Federal Civil Procedure do permit me to

9       state the basis of the objection to form.  And

10      what I want is an agreement that by not --

11              MR. LAVINE:  The federal rules say that?

12              MR. BERLIN:  Yes, they do.

13              MR. LAVINE:  That's news to me.

14              MR. BERLIN:  Well, you ought to study

15      up.

Depo-Hughes-James-05-06-09

16          What I want is an agreement that I'm not
17   waiving an objection to form by only stating
18   "Objection, form."
19          MR. BREEN:  I think you should state
20   whatever objections you think are appropriate
21   under the rules.  And if I think you're coaching
22   the witness or making a speaking objection, I'll

                                                      327

 1   say so.
 2          MR. BERLIN:  Okay.
 3          I just say that because it has been the
 4   practice that we have been saying only "Objection,
 5   form."
 6          And I'm happy to do that as long as
 7   you're not going to argue that by only stating
 8   "Objection, form" I've waived some explanation as
 9   to what the objection to form is.
10          MR. LAVINE:  Why don't we move on.
11          MR. BERLIN:  Okay.  Well, I'm going to
12   have to state all my objections now.
13          MR. LAVINE:  I don't know where you're
14   basing your practice on, but you understand what
15   the federal rules say.
16          MR. BERLIN:  Your assertion --
17          MR. LAVINE:  I'm not going to make any
18   promise that on the spur of the moment that might
19   be something different than the rules.  We're
20   following the Rules of Civil Procedure.  You
21   object to form and that's it.
                    Page 25

Depo-Hughes-James-05-06-09

22          MR. BERLIN:  Is your assertion that

328

 1   saying "Objection, form, asked and answered" is an
 2   improper objection under the Federal Rules of
 3   Civil Procedure?
 4          MR. LAVINE:  Yes.  The rules say you
 5   should object to the form.  And if you think, if
 6   you think we might argue something that's
 7   different, then you can make your argument to the
 8   judge that you were right and I was wrong.
 9          But we're not going to change the rules
10   here in the middle of a deposition.  And I'd like
11   to get back to the deposition because if you do
12   want to schedule additional deposition time where
13   you can ask questions to clarify things, you're
14   welcome to do that.  But the objections should be
15   to form.  And let us move on.
16          Can you go back to my last question,
17   please.
18          (The record was read back as
19   requested.)
20          THE WITNESS:  Okay.  Let's take a
21   counter-example.
22          Suppose Dr. Duggan had made the

329

 1   assumption that when he doesn't have the arrays
                        Page 26

Depo-Hughes-James-05-06-09

2    that he just assumes that the Abbott price, that

3    there's an Abbott price in every array, that every

4    median that I see in the payment data is an Abbott

5    price.

6            So, therefore, every median is an Abbott

7    price.  When I change the AWP to my but-for AWP,

8    that's going to lower the median, and that's going

9    to cause a difference, and I'm going to attribute

10   a hundred percent of that difference to the

11   movement in the Abbott prices, so I'm going to

12   attribute a hundred percent of the difference to

13   Abbott, all right.

14           Clearly, I think everybody, and disagree

15   with me if you will, but I think clearly everybody

16   would say well, that's pretty silly, okay, we

17   don't know that every median, every reimbursement

18   that I see in the Medicaid data when I don't have

19   an array is an Abbott price.

20           You'd want some proof.  You'd want a

21   pricelist that showed that these were indeed

22   Abbott prices.

                                                    330

1            One would easily say well, you know,

2    that's a pretty heroic assumption that every

3    single median that I see in the payment data is an

4    Abbott price.

5            So one would then come to the conclusion

6    that since they probably aren't all Abbott prices

7    that his estimates of difference would be

                      Page 27

Depo-Hughes-James-05-06-09

8  overdone.

9        Granted, he doesn't do that.  He says
10  every time I see a payment that matches an Abbott
11  price, $10.16, I'm going to assume that that's an
12  Abbott price.

13        There is something that one could
14  provide evidence for relatively easily.  Are there
15  any other NDCs that have that $10.16 price, "Yes"
16  or "No."

17        If "Yes," then you've got to be, if Dr.
18  Duggan were being conservative, and he says he
19  always wants to be, then I would expect him to say
20  well, you know, there's $10.16 for the Abbott,
21  there's $10.16 for the Baxter product, I can't
22  tell which one it is and so being conservative,

                                                  331

1  I'm going to throw it out.  But, instead, he just
2  says I see $10.16, it's an Abbott price.

3        So without that additional evidence that
4  he has demonstrated to some degree that readers
5  should have a reasonable degree of confidence that
6  these are indeed Abbott prices, then we have to
7  say, or then without that you have my objection to
8  his analysis that his estimates are going to be
9  inaccurate because he could be attributing to
10  Abbott damages that are not attributable to Abbott
11  because it wasn't really an Abbott NDC.

12  BY MR. LAVINE:

13      Q.   Now, I'm not trying to be facetious, but

                      Page 28

Depo-Hughes-James-05-06-09

14    I assume you'll agree with me that the standard
15    you're setting up for Professor Duggan isn't just
16    that he needs to demonstrate that his assumptions
17    are not silly.  Do you agree with that?  That's
18    not the standard?
19         MR. BERLIN:  Objection.
20    BY MR. LAVINE:
21         Q.   As long as he shows it's not silly,
22    that's sufficient?

                                                    332

1         A.   No.  I used the term "silly" in relation
2    to my hypothetical, which I stated is not
3    something that Dr. Duggan is doing.
4         Q.   And then you need to, you said he needed
5    to show it was appropriate to some degree.  What
6    degree?
7         A.   Check, explain to the reader what you're
8    checking, give us some assurance other than well,
9    this happens to be an Abbott price, give us some
10    assurance that it's not also somebody else's price
11    in there for a legitimate product or a product
12    that's in there by mistake.
13         Q.   When do we decide that Dr. Duggan's
14    demonstrated it to the appropriate degree?
15              What is that standard that could be
16    articulated and applied objectively rather than
17    just satisfying Dr. Hughes that it's to the
18    appropriate degree?
19              MR. BERLIN:  Objection, form, asked and
                    Page 29

Depo-Hughes-James-05-06-09

20   answered.  Object to characterization of

21   testimony.

22               THE WITNESS:  Again, it's not --

333

 1               MR. LAVINE:  Eric, please limit your

 2   objections to form.

 3               MR. BERLIN:  Okay.  But this is what I

 4   want --

 5               MR. LAVINE:  No.  We don't need to

 6   renegotiate the Rules of Civil Procedure.

 7               MR. BERLIN:  Okay.  Then I'm going to

 8   make the objection that I think I need to make.

 9               Where in the Rules of Civil Procedure

10   does it say that I'm only allowed to say

11   "Objection, form"?

12               MR. LAVINE:  I'm not going to pull out

13   the rules.

14               MR. BERLIN:  Pull it out and show me,

15   because you're wrong.

16               MR. LAVINE:  I don't think so.

17               MR. BERLIN:  Okay.  Well, Jim, you

18   understand?  This is an agreement that we've had

19   among depositions and I want to make sure that the

20   agreement is going to continue here.

21               That if I say "Objection, form," I'm not

22   waiving the basis for my objections as to form,

334

Depo-Hughes-James-05-06-09

1   and that you're not going to go in and say he

2   didn't tell us what the objection to form is, he's

3   waived it, you can't now argue that it's asked and

4   answered when it's not clear that the objection to

5   form was asked and answered.

6           That's all I'm saying.  I won't state

7   objections beyond that if you agree to that that

8   by saying "Objection, form" I'm not waiving an

9   objection to form.

10          MR. BREEN:  Here's the problem:  These

11  cases started under the Texas rules of evidence

12  and have very explicit --

13          MR. BERLIN:  Exactly.  Under the Texas

14  rules you can only say "Objection, form."

15          MR. BREEN:  -- rules regarding the form

16  and the explanation.  I believe the federal rules

17  emulate that to a significant degree.

18          All of that said, the main problem is we

19  don't want anybody calling something a form

20  objection when it's not.  Then the other

21  objections are not form objections and you are

22  waiving those if you don't make them.

                                                    335


1           MR. BERLIN:  I agree.  But I don't need

2   to state an objection that's not to form.  I'm not

3   waiving them because I can't waive them by not

4   making them.  The federal rules say I don't waive

5   them by not waiving them.  I need to say

6   objections to form concisely in a nonargumentative

                        Page 31

Depo-Hughes-James-05-06-09

7   fashion.
8            MR. BREEN:  My understanding is if it's
9   a true form objection and you make your objection
10  and you give us a fair opportunity to inquire,
11  which I often do --
12           MR. BERLIN:  Yes.  That's why I'm
13  directing this to you because I think we've done
14  this appropriately.  But I'm hearing now that I
15  need to state it more fully because I might be
16  waiving it.
17           MR. BREEN:  -- that that is consistent
18  with the federal rule.
19           Now, if there's another interpretation
20  of it, we can take a break if we really need to
21  drill down.  But it's been acceptable to me that
22  you make a form objection as long as it's form

                                                    336

1   objection and not a hearsay objection or
2   something, if that's relevant, and that's fine.
3            So that's my perspective.  Mark, do we
4   need to take a break on it?
5            MR. LAVINE:  I don't think so.  As far
6   as I know, in every deposition we've done in this
7   case the objections have been limited to form,
8   unless there's some privilege.
9            MR. BERLIN:  Are you saying that I
10  should just say "Objection, form," and when I say
11  that if you want to know what the objection to
12  form is you'll ask me.  But, otherwise, I'm not

Depo-Hughes-James-05-06-09

13   waiving an objection to form by stating quote
14   "Objection, form" unquote.
15         MR. BREEN:   Fine by me for form
16   objections.
17         MR. BERLIN:   But I don't need to be
18   stating another objection other than as to
19   privilege.
20         Is that our agreement?
21         MR. BREEN:   In this deposition.   That
22   may not be the case in all depositions, but in

337

1    this deposition you're probably right.
2          MR. LAVINE:   But your position is that's
3    not the way the Rules of Civil Procedure set this
4    up?
5          MR. BERLIN:   It's the way we generally
6    have been conducting these cases because many of
7    the depositions were taken simultaneously under
8    the Texas rules which specifically say --
9          MR. LAVINE:   But that's not the case
10   here.
11         MR. BERLIN:   So when I stated an
12   objection to form, you said don't do that.
13         So what I said is I'm happy not to do
14   that as long as you're not going to later argue
15   that I've waived the particular objection to form
16   by not stating the particular objection.
17         MR. LAVINE:   So you think the Federal
18   Rules of Civil Procedure would let me do that?
                    Page 33

Depo-Hughes-James-05-06-09

19          MR. BERLIN:  Yes, I do.  I do think that

20    the Federal Rules of Civil Procedure potentially

21    could and you could potentially argue, the

22    government has certainly shown that it's willing

338

 1    to argue whatever it thinks it can get away with

 2    in this case, and I don't want that to happen.

 3          It's a pretty simple agreement.  If I

 4    say "Objection, form," you're not later going to

 5    come in and say he didn't state the bases for his

 6    objection to form, and therefore, he's waived that

 7    objection.

 8          MR. BREEN:  I don't think we have a

 9    disagreement here.

10          Just be careful though.  I mean hearsay

11    objections are not form objections, and as long as

12    it's an expert witness and the hearsay is

13    otherwise admissible under that rule, then it's

14    probably not an issue.  But if it was a fact

15    witness and you don't make a hearsay objection and

16    you try to use that testimony, it may be a

17    subsequent issue.

18          So my point is --

19          MR. BERLIN:  I don't think you have to

20    make hearsay objections during a deposition.  Do

21    you think you do?

22          MR. BREEN:  I don't know.  I'm just

Page 34

Depo-Hughes-James-05-06-09

339

1   saying if it's form, it's form.
2           MR. LAVINE:  Substantive objections are
3   preserved.  Objections to form are not, unless you
4   object to form.  That's what you need to do is
5   object to the form.
6           MR. BERLIN:  What the rules say is you
7   must state your objection in a concise,
8   nonargumentative fashion.
9           It does not say you're only permitted to
10  say "Objection, form."  And what I'm only asking
11  is pretty simple, and I think it's in your favor,
12  is if I say "Objection, form" and only "Objection,
13  form" --
14          MR. LAVINE:  Yes.  That preserves your
15  objections to form.
16          MR. BERLIN:  Okay.
17          MR. BREEN:  That only took about fifteen
18  pages.
19          MR. BERLIN:  Go ahead.
20          MR. BREEN:  Can we move on?
21          MR. BERLIN:  Now we can.
22  BY MR. LAVINE:

340

1       Q.   My last question was trying to
2   understand the precise standard that you're saying
3   Dr. Duggan failed to meet.  Obviously it's not
4   that it just needs to get beyond the silly stage,

Page 35

 5   it needs to be precise to some specific degree.

 6   But what is that degree?

 7        A.   Assurance that when he says $10.16 is an

 8   Abbott price, that $10.16 is only an Abbott price.

 9        Q.   What level does that assurance need to

10   reach?

11        A.   I think I just stated it, that when he

12   says $10.16 is an Abbott price, that he has

13   checked the compendia, that he has checked the

14   compendia and that he has seen that the only NDC

15   that has $10.16 is the Abbott product that he

16   thinks it is.

17        Q.   Who is it that gets to decide when the

18   assurance gets to a level that would be accepted

19   in the field of economics?

20             MR. BERLIN:  Objection, form.

21             THE WITNESS:  Right now there's no

22   assurance.  Right now we say oh, there's an Abbott


                                                   341


 1   NDC that's $10.16, there's $10.16, that must be

 2   Abbott.

 3             So this all goes to my overriding

 4   conclusion that his estimates are inaccurate and

 5   unreliable because we have no, he offers no

 6   evidence other than well, there is an Abbott NDC

 7   that's $10.16, that that's the NDC that he's

 8   actually seeing when he sees $10.16 in the payment

 9   data.

10   BY MR. LAVINE:

                    Page 36

Depo-Hughes-James-05-06-09

11        Q.    So Professor Duggan can articulate his
12   position and say that he thinks his assurances
13   were sufficient, and then you would say I don't
14   think they are, and the jury just gets to pick one
15   of the opinions or the other?
16        A.    No.  I think that a jury would -- well,
17   I don't know what a jury would do.  I don't want
18   to characterize what a jury would do.
19        Q.    Well, what is the objective standard
20   that you would say Professor Duggan has failed to
21   meet?
22              When he says his assurances are

                                                        342

 1   sufficient, you would say well, they're not
 2   sufficient because?
 3              MR. BERLIN:  Objection, form.
 4              THE WITNESS:  He is saying that $10.16
 5   is an Abbott NDC and only an Abbott NDC.  Right
 6   now his assurances are zero.  All he is saying is
 7   that Abbott has an NDC that's $10.16.
 8              What I'm arguing that he needs to do is
 9   to provide a basis for that conclusion.  And one
10   way to do that would be to say I have gone to
11   where NDC AWPs reside, First Databank or the Red
12   Book or whichever one is appropriate for the
13   system that he's using, I have examined this for
14   the appropriate quarter and the appropriate time,
15   and it is my opinion that only Abbott, or excuse
16   me, here is all of the NDCs that have a price of
                        Page 37

Depo-Hughes-James-05-06-09

17    $10.16 at this time.

18    BY MR. LAVINE:

19         Q.   And on what objective basis are we going

20    to be able to say that --

21              MR. BERLIN:  Were you done with your

22    answer?

343

1              THE WITNESS:  No, not even close.

2              MR. BERLIN:  Can you please let the

3    witness finish his answer?

4              MR. LAVINE:  Well, much of it's

5    nonresponsive.  And if we want to chance to finish

6    this deposition today, we're losing it quickly.

7              MR. BERLIN:  Okay.  Well, go ahead and

8    let the record reflect the witness is not complete

9    with his answer.

10    BY MR. LAVINE:

11         Q.   What is the standard that you would

12    apply to determine when Professor Duggan has

13    demonstrated a sufficient basis for his

14    assumptions?

15         A.   When he offers evidence that he has

16    checked the accuracy of his assumption, that

17    $10.16 is only an Abbott NDC.

18         Q.   And what is the standard to let us

19    decide when he has offered sufficient evidence to

20    the effect that he's checked the accuracy of his

21    numbers?

22              MR. BERLIN:  Objection, form.

Depo-Hughes-James-05-06-09

344

1          THE WITNESS:  Because AWPs for each NDC
2    come from one of the compendia.  That's the source
3    of shall we say the truth of what AWP is at any
4    particular time in any particular quarter in any
5    particular state.  Although of course compendia
6    are national, correct.
7          So if he says I have gone to the source
8    of truth for NDCs, excuse me, I've gone to the
9    source of truth for AWPs, I've gone to where the
10   Medicare carriers go to get AWPs, I've gone to the
11   compendia, and I have checked that compendia and
12   at that time here's a list of the NDCs that have
13   $10.16.  Or the only one that has $10.16 is
14   Abbott.  Therefore, I am confident that when I see
15   $10.16, that it is indeed an Abbott NDC, yes, an
16   Abbott AWP I mean to say.
17         The standard that you keep asking me
18   about is that he goes to the source of the data,
19   the compendia, and verifies his heretofore
20   assumption that $10.16 can only be an Abbott NDC.
21   That's the standard.
22   BY MR. LAVINE:

345

1       Q.   And there's no general rule that you
2    could describe that would tell us when he's
3    reached that point.
                      Page 39

Depo-Hughes-James-05-06-09

 4      A.   Yes --

 5           MR. BERLIN:  Objection, form.

 6           Go ahead.

 7           THE WITNESS:  Yes.  When you're doing

 8  data analysis, you want your data to be as

 9  accurate as possible.  That's the standard.

10  BY MR. LAVINE:

11      Q.   So Professor Duggan has failed to state

12  his assumptions, he's failed to support his

13  assumptions, and he's failed to demonstrate that

14  his numbers were as accurate as possible?

15      A.   He's failed to state his assumption,

16  he's failed to state his basis for his assumption,

17  and he's failed to take feasible steps, reasonable

18  steps, to verify the accuracy of his assumption.

19      Q.   Is there any other standard that he's

20  failed to meet in that regard?

21           MR. BERLIN:  Objection, form.

22  BY MR. LAVINE:


                                                   346


 1      Q.   With respect to identifying that the

 2  correct Abbott NDCs were in each array.

 3      A.   As I stated in my report, that was the

 4  objection to that, yes.

 5      Q.   Now, with respect to the next criticism

 6  that Dr. Duggan hasn't shown that Abbott's price

 7  moved the median.

 8           Are we at the same point?  He's failed

 9  to state the basis for his assumption, he's failed

Depo-Hughes-James-05-06-09

10    to support his assumption, and he's failed to

11    demonstrate that his approach was feasible and

12    reasonable?

13              MR. BERLIN:  Objection, form.

14              THE WITNESS:  This is a different point.

15              This is the idea that he's performing

16    his analysis by only changing the Abbott AWP and -

17    -

18    BY MR. LAVINE:

19        Q.   I'm sorry.  But my question is what is

20    the standard that he's failed to meet by not doing

21    that?

22              I understand the substantive criticism.

                                                    347

1     But what is the scientific methodology that would

2     be applicable to an economist performing this

3     analysis that he's failed to meet?

4         A.   When one does a damage analysis, one

5     needs to put forth a vision of the but-for world

6     that is consonant with the world that would have

7     actually existed absent the alleged wrongful

8     actions.

9              Dr. Duggan conducts his analysis by

10    saying that only, by in effect assuming that only

11    the Abbott AWP was artificially inflated, in a

12    but-for world only the Abbott AWP would move, and,

13    therefore, only the Abbott AWP would move the

14    median.

15              I disagree with the characterization of

                       Page 41

Depo-Hughes-James-05-06-09

16   the but-for world that somehow Medicare would put

17   forth a regulation that says only Abbott has to

18   report a hundred twenty-five percent of average

19   contract selling price as its AWP.

20          And so in a more realistic but-for world

21   where all pharmaceutical companies had to report a

22   hundred twenty-five percent of contract ASP, then

348

 1   it would not be the case that in a hundred percent

 2   of the situations that the Abbott price would be

 3   the one that would move the median.

 4          So the standard that he has violated is

 5   the standard that is stated in the paper that I

 6   cite from Professor Blair in my report that a

 7   valid vision of the but-for world has to encompass

 8   more than just the change in the price but has to

 9   encompass other realistic and other likely

10   consequences of the move from the allegedly

11   unlawful behavior to lawful behavior.

12      Q.   But isn't it fair to summarize that as

13   saying that he's failed to demonstrate that his

14   calculations were based upon a realistic but-for

15   world?

16          THE WITNESS:  I'm sorry.  Could you just

17   give that back to me?

18               (The record was read back as

19   requested.)

20   BY MR. LAVINE:

21      Q.   Isn't it fair to summarize what you just

Page 42

Depo-Hughes-James-05-06-09

22    described as saying that he's failed to

                                                          349

1    demonstrate that his calculations were based upon
2    a realistic but-for world?
3         A.    Well, I mean my objection here is that
4    his calculations are based on an unrealistic but-
5    for world.
6              So maybe we're saying the same thing in
7    opposite ways.
8         Q.    But the standard he's failed to meet is
9    that he hasn't used a realistic but-for world?
10        A.    He has not used a but-for world that
11   takes into account factors that would change,
12   would be reasonably expected to change when one
13   moves from the actual world to the but-for world.
14        Q.    But those factors are the support for
15   the proposition that it's not realistic.  The
16   standard he needs to meet is the fact whether it's
17   realistic or not?
18        A.    Well, and realism is, according to
19   Professor Blair, and with whom I agree, that it's
20   got to take into account other changes that could
21   reasonably be expected to happen as we move from
22   the actual world to the but-for world.

                                                          350

1         Q.    So let me see if I understand the
                        Page 43

Depo-Hughes-James-05-06-09

2   standards that you're saying that Professor Duggan

3   has failed to meet so far.

4           He's failed to state his assumptions,

5   that he's failed to support his assumptions, that

6   he hasn't shown that he's done what is feasible

7   and reasonable, and that he's failed to create a

8   realistic but-for world.

9           MR. BERLIN:  Objection, form.

10          THE WITNESS:  That states where we are

11  so far, yes.

12  BY MR. LAVINE:

13      Q.   Are there any other standards that

14  you're articulating that Professor Duggan has

15  failed to meet?

16      A.   I'm sure there are.  But without

17  speaking about a specific point in my report, I

18  can't list them out for you.

19      Q.   All right.  Well, your point was that

20  Professor Duggan hadn't shown that Abbott's price

21  moved the median.

22          Is there any other standards he's failed

                                                    351

1   to meet with respect to that point beyond the four

2   we just discussed?

3           THE WITNESS:  I'm sorry.  Could I have

4   that again.

5                   (The record was read back as

6   requested.)

7           THE WITNESS:  I'm just, I'm sorry.

Page 44

Depo-Hughes-James-05-06-09

8    Could you just ask, rephrase the question --

9              MR. LAVINE:  Sure.

10             THE WITNESS:  -- because it just seems

11   to me that you've mischaracterized something.

12             I just don't want to answer a different

13   question than you're asking.

14   BY MR. LAVINE:

15      Q.   I want to make sure I understand all of

16   the underlying bases for your criticism of

17   Professor Duggan when you say that he has not

18   shown Abbott's price moved the median and that the

19   reason that he's, scientific or other

20   methodological failings on that point are that

21   he's failed to state his assumptions regarding

22   that.  Is that one of the points?

                                                        352

1       A.   For Abbott not moving the median?

2       Q.   Right.

3       A.   Well, yes.  He's failed to state the

4    assumption that --

5       Q.   I don't mean to cut you off, but I'm

6    just asking the first point, without getting into

7    all the underlying reasons.

8       A.   I know, but --

9       Q.   So Step One is that he's failed to state

10   his assumptions.

11      A.   Okay.  You don't want to cut me off, I

12   don't want to cut you off, but I want the answer

13   to your questions to be my words and not yours.

                        **Page 45**

Depo-Hughes-James-05-06-09

14          So that's why when, you know, you may

15   understand it but I feel the need to make sure

16   that I'm answering your question with my words.

17       Q.   Are there no basic standards that apply

18   to the type of analysis Professor Duggan has done?

19          MR. BERLIN:  Objection, form.

20          THE WITNESS:  We've been through a

21   number of them.

22   BY MR. LAVINE:

                                                    353

1        Q.   Well, I thought that one of them was

2    that when you're doing this type of analysis, you

3    have to state any assumptions that you're making.

4        A.   Yes.  You need to state the assumptions

5    that one is making.

6           And in the particular objection of mine

7    that we're talking about is that Dr. Duggan does

8    not provide a basis for his assumption that only

9    the Abbott AWP would change in the but-for world.

10          That is in my opinion an unrealistic

11   view of the but-for world because I cannot

12   envision how such a change in reporting could only

13   apply to Abbott in the but-for world.

14       Q.   Is there a difference between the rule

15   itself and the application of that rule to the

16   facts of a particular situation?

17          MR. BERLIN:  Objection, form.

18          THE WITNESS:  I'm sorry.  I don't

19   understand the question at all.

                        Page 46

Depo-Hughes-James-05-06-09

20   BY MR. LAVINE:

21        Q.   Isn't it possible to state the rule

22   that's being applied to a situation as Step One of

354

1    the analysis, and then the next thing you do is

2    you would describe how that applies to the

3    particular facts of the rules?

4         A.   I'm sorry.  Isn't that what we have been

5    doing for the past hour?

6         Q.   But my question is only limited to Step

7    One.  I want to know what the rule is that's being

8    applied.

9              We talked about the way that you're

10   applying it.  I want to make sure I understand the

11   specific rule that's being applied.

12             And I think we're in agreement that one

13   of the rules that you're applying is that when you

14   perform an analysis, as Dr. Duggan has done, that

15   you need to state your assumptions.

16             MR. BERLIN:  Hold on.  There's no

17   question pending.

18   BY MR. LAVINE:

19        Q.   Is that correct?

20             MR. LAVINE:  Please.  He understands it

21   was a question.  You don't have to direct him not

22   to answer.

355

Page 47

Depo-Hughes-James-05-06-09

1         THE WITNESS:  I'm sorry, guys.  I am
2    getting lost between the two of you.
3    BY MR. LAVINE:
4         Q.   I just want to separate the principle
5    from the application of the principle to the
6    facts.
7              What I'm trying to understand, and I
8    think we're in agreement on, is the principle is
9    that you need to state your assumptions.
10        A.   The principle is you need to state your
11   assumptions, you need to provide a basis for those
12   assumptions, right, and you need to provide some
13   evidence, some argument, some something that will
14   lead people to agree with you that, yes, in this
15   situation that is a reasonable assumption to be
16   making.
17             The other standard that's particularly
18   applicable to the objection that we're talking
19   about that he doesn't demonstrate that the Abbott
20   AWP would move the median, that is the standard
21   that I understand is to be applied to damage
22   analyses, that the statement of the but-for world

                                                    356

1    include more than just a change in price from an
2    allegedly illegal price to a legal price but also
3    takes into, the but-for world also takes into
4    account the likely changes in incentives, likely
5    changes in behavior, likely changes in this case
6    in systems and government policies that may result
                         Page 48

Depo-Hughes-James-05-06-09

7    from changing those prices.

8        Q.    Can you separate, in that last point you

9    made regarding the but-for world, can you separate

10   the principle from the application of that

11   principle to the facts in this case and just

12   describe the principle?

13           MR. BERLIN:  Objection, form.

14           THE WITNESS:  I think I did just

15   describe the principle.  And the application is --

16   BY MR. LAVINE:

17       Q.    My question is about the principle, not

18   the application.

19           Are we in agreement that the principle

20   you're describing is that to perform an analysis

21   of the type done by Dr. Duggan, that it needs to

22   be based upon a realistic but-for world?

357

1        A.    That is one of the principles that I've

2    been talking about for the last period of time,

3    yes.

4            And the application is he hasn't done

5    it.

6        Q.    I understand your position.  I want to

7    understand what the principle is.

8            So the standard is when you're

9    performing an analysis of the type that Dr. Duggan

10   does in his report, that it needs to be based upon

11   a realistic but-for world.  That's what your

12   opinion is as to the standard that he needs to

Depo-Hughes-James-05-06-09

13    meet.

14         A.   That's correct.

15         Q.   One of them, one of the standards.

16         A.   Yes.

17         Q.   And then he has to state his assumptions

18    is another standard you say applies.

19         A.   State his assumptions.  It's not just

20    one.  It's state his assumptions, it's provide a

21    basis for his assumptions, state his assumptions,

22    provide a basis for his assumptions such that

                                                        358

1    people will agree that, people will reach the

2    conclusion that this is a reasonable assumption to

3    make under the circumstances.

4         Q.   Now, do we agree that we just talked

5    about four general standards?

6         A.   I would have to ask the Reporter To read

7    it back.

8         Q.   Well, the first one is the standard

9    you're articulating is you have to state your

10   assumptions; is that right?

11             MR. BERLIN:  Objection, form.

12             THE WITNESS:  Okay.  There's one.

13   BY MR. LAVINE:

14        Q.   The second would be that Professor

15   Duggan has an obligation to support his

16   assumptions.

17        A.   To provide a basis for his assumptions,

18   yes.

Page 50

Depo-Hughes-James-05-06-09

19      Q.   And demonstrate that it's a reasonable
20   assumption to make under the circumstances.
21           Is that part and parcel the same
22   standard?

                                              359

1           MR. BERLIN:  Objection, form.
2           THE WITNESS:  Providing the basis is
3   demonstrating that your assumption is reasonable,
4   yes.
5   BY MR. LAVINE:
6      Q.   And you also said one of the standards
7   that needs to be met is that you need to base your
8   analysis on a realistic but-for world?
9      A.   That's correct.
10     Q.   Earlier we started to talk about a
11   fourth one that was based on the idea that you
12   need to have done what is feasible and reasonable.
13           Is that the same as what we've already
14   discussed regarding the support for the assumption
15   needs to be reasonable under the circumstances?
16           MR. BERLIN:  Objection, form.
17           THE WITNESS:  No.  The feasible and
18   reasonable --
19   BY MR. LAVINE:
20     Q.   That's a separate standard.
21     A.   Excuse me.  I'm not really done.
22           The term "feasible" and "reasonable"

360

1   came up in the context of the standard was you
2   want your data to be as accurate as possible or
3   you want to demonstrate that your data are as
4   accurate as possible.
5           So that one should undertake feasible
6   and reasonable steps to give people the assurance
7   that the data that you're employing in your
8   analysis are in fact accurate.
9       Q.   Let's move to the next point, which is
10  that Professor Duggan hasn't demonstrated that
11  Abbott was the only manufacturer whose compendium
12  AWP was greater than its average selling price.
13          Which of the standards demonstrate that
14  Professor Duggan -- or I'm sorry.
15          In making that assumption or failing to
16  make that showing, which standard has Professor
17  Duggan failed to meet?
18      A.   Well, he's made the assumption -- again,
19  I don't know what assumption he's made because he
20  doesn't state it.
21      Q.   So he's failed to state his assumption?
22      A.   Well, number one, I don't know what

361

1   assumption that he's making.
2           But his analysis proceeds as if only
3   Abbott is failing to report its average selling
4   price and those other prices, the other AWPs

5    reported by the other manufacturers, are by his

6    failure to adjust them or do anything to them,

7    that it appears that, well, his analysis proceeds

8    as if those prices are somehow okay.

9        Q.   But, again, I'm trying to focus on what

10   standard he's failed to meet by not doing that.

11          So I think you're saying, and correct me

12   if I'm wrong, that the standard he's failed to

13   meet is that he has not stated or supported his

14   assumptions -- I'm sorry.  I combined two

15   standards there.  Let me start again.

16          You're saying that first he failed to

17   state his assumptions regarding the other

18   manufacturers who were listed in the compendium.

19   Is that one standard he's failed to comply with?

20       A.   It's probably easier if you let me do it

21   rather than for you to do it and then say "is that

22   correct."

                                                362

1        Q.   Except I'm trying to --

2        A.   Go ahead.  I'm sorry.

3        Q.   -- do what I can to speed things up --

4        A.   Okay.

5        Q.   -- and limit our discussion to the

6    standard itself and not the application of the

7    standard to the facts of the case.

8        A.   Okay.  Then in this instance where he

9    has failed to show that the other companies were

10   in fact reporting ASP, he's failed to state

                    Page 53

Depo-Hughes-James-05-06-09

11    exactly what his assumption is, he's failed to

12    provide a basis for that assumption.  And the

13    assumption that only Abbott was reporting an AWP

14    higher than its average selling price is at odds

15    with the standard that one needs to have a

16    realistic but-for world.

17         Q.   Any other standards with respect to that

18    point where you say Professor Duggan has failed to

19    meet?

20         A.   To the best of my knowledge sitting

21    here, that's it on that point.

22         Q.   Now, an additional point you made

363

1    regarding the arrays is that Professor Duggan has

2    failed to show that Abbott was responsible for one

3    hundred percent of the sales and that therefore

4    it's inappropriate to attribute a hundred percent

5    of the damages to Abbott.

6              What standards has Professor Duggan

7    failed to make with respect to that part of his

8    analysis?

9         A.   He's failed to state his assumption,

10    he's failed to support his assumption, he's failed

11    to have a realistic vision of the but-for world,

12    and it is well within if Abbott did indeed make a

13    hundred percent of the sales during any carrier's

14    area during any quarter, it's within his ability

15    to figure that out.

16              Let me try that again.  It's within his

Page 54

Depo-Hughes-James-05-06-09

17  ability to present evidence that that's indeed

18  true.

19      Q.   So the standard there is that he hasn't

20  done what is feasible?

21      A.   He's assuming that Abbott is responsible

22  for a hundred percent of the damages, which what

364

1  follows from that is Abbott was responsible for a

2  hundred percent of sales.

3          That seems to be well within his ability

4  to ascertain from the data that he had available

5  to him.

6      Q.   But the standard is that if there was

7  additional work that he could have done to

8  demonstrate his point that was feasible, that he

9  needed to have done that?

10      A.   Well, again, provide a basis for one's

11  assumption.  There is something relatively

12  straight forward and feasible that he can do to

13  demonstrate the validity of that assumption and he

14  has failed to do it.

15          And he's also failed that if he tried to

16  do that, as I am fairly confident he would find

17  that Abbott did not account for a hundred percent

18  of the sales in any quarter for any carrier, and

19  so he's failed to adjust his analysis and take

20  that into account to say what would happen if in

21  fact Abbott wasn't responsible for a hundred

22  percent of the sales.

365

1        Q.   But you don't think that Professor
2   Duggan was suggesting that Abbott represented a
3   hundred percent of the sales?
4        A.   Well, if he stated how he came, what
5   assumptions he was using to come to the conclusion
6   that Abbott was responsible for a hundred percent
7   of the damages, then we could have that
8   discussion.
9        Q.   You understand, don't you, that if the
10  median changes for the reimbursement for any
11  particular J-Code, that it affects the
12  reimbursement on a hundred percent of what's
13  reimbursed under that J-Code; right?
14       A.   Yes, it does.
15       Q.   And your point is you would not
16  attribute that to Abbott?
17            MR. BERLIN:  Objection, form.
18            THE WITNESS:  Okay.  Again, this is part
19  and parcel of the previous point is that what is
20  the basis for the assumption that in the but-for
21  world only the Abbott AWP would change in those
22  arrays and everybody else's arrays would stay the

366

1   same, excuse me, not everybody else's arrays,
2   everybody else's AWPs would stay the same.  Sorry.
3   BY MR. LAVINE:
                    Page 56

Depo-Hughes-James-05-06-09

4        Q.    But we are agreeing that if Abbott did

5   affect the median, it would affect it with respect

6   to the reimbursement for all companies that had

7   products reimbursed under that J-Code; right?

8        A.    In those instances when Abbott's, a

9   change in Abbott's AWP changed the median, it

10  would change the median for a hundred percent of

11  the transactions.

12            And when it was in a more accurate but-

13  for world where all the company's AWPs are

14  changing, when another company's AWP would have

15  been the one that would have moved the median,

16  then it would change for a hundred percent of the

17  transactions.

18            But none of those damages would be

19  attributable to Abbott because it wasn't their AWP

20  that moved the median.

21       Q.    So another failing on this point with

22  respect to Professor Duggan's analysis, according

                                                        367

1   to you, is that he failed to meet the standard

2   regarding the creation of a realistic but-for

3   world?

4        A.    I believe I've stated that before, yes.

5        Q.    All right.  What other standards did his

6   decision to attribute one hundred percent of the

7   damages to Abbott without showing a hundred

8   percent of the sales were attributed to Abbott

9   violate?

                        Page 57

Depo-Hughes-James-05-06-09

10      A.   I think that we've been over all of

11 them, to the best of my recollection, sitting

12 here.

13      Q.   Okay.  In preparing your report, what

14 was your understanding of what the term "AWP"

15 means?

16      A.   AWP was a price that was reported by

17 compendia, that was published by compendia, by

18 like First Databank or Red Book.

19      Q.   And that was the only understanding of

20 the term "AWP" that you used in the course of

21 preparing your opinions in this case?

22      A.   Well, I mean I took the question to say

                                                    368

1 what was my understanding of what it was.  And

2 that's what it was.  It was a price that's

3 published by the compendia.

4      Q.   So I think that was a yes, that you

5 didn't use any other meaning or understanding or

6 definition of "AWP" underlying any of the opinions

7 that you've provided in connection with your

8 report in this case?

9      A.   I'm not positive I understand the

10 question enough to agree with you or disagree with

11 you.

12           I mean there's lots of issues

13 surrounding AWP that I certainly used to inform my

14 analysis, but the definition of AWP was a price

15 that's published by the compendia.

Depo-Hughes-James-05-06-09

16        Q.    And when we see you refer to the term

17   "AWP" --

18              MR. LAVINE:  Sorry.  We need to take a

19   break.

20              THE WITNESS:  Okay.

21              THE VIDEOGRAPHER:  Going off the record

22   at 10:28 a.m.


369


 1              (A recess was taken.)

 2              THE VIDEOGRAPHER:  Beginning of

 3   Videotape No. 2.  We're back on the record at

 4   10:40 a.m.

 5   BY MR. LAVINE:

 6        Q.    The question I asked about AWP, I think

 7   we're in agreement, I just want to understand when

 8   you refer to AWP in your report, what you're

 9   referring to are the prices published in the

10   compendia?

11        A.    Yes, correct.

12        Q.    And by compendia we're talking about the

13   Red Book or First Databank?

14        A.    That's correct, yes.

15        Q.    And also in connection with the opinions

16   expressed in your report, what is your

17   understanding of or assumption regarding what it

18   is that Abbott did wrong?

19              MR. BERLIN:  Objection, form.

20              THE WITNESS:  I mean I accept what's in

21   the government's complaint that Abbott reported a

Depo-Hughes-James-05-06-09

22    price to the compendia that were, whatever the

370

1    language was, artificially inflated and something
2    like that, whatever is, again, I accept the
3    government's allegation as true for purposes of my
4    report.
5            So it would be whatever is in the
6    complaint is the characterization of Abbott's
7    behavior that I used in my report.
8    BY MR. LAVINE:
9        Q.    Let me just ask you to look at Paragraph
10    19 in your report.  Is that Exhibit 8?
11        A.    Exhibit 8.
12        Q.    On Page 10.
13        A.    I'm sorry.  Paragraph 19, okay.
14        Q.    Yes.  The first two sentences, "Abbott
15    announced list price changes annually for its
16    hospital products.  Because of the competitive
17    nature of the market for these products, these
18    changes were generally limited to no more than the
19    relevant rate of inflation."
20            What is the basis for your statement on
21    that point?
22        A.    That the changes were limited to no more

371

1    than relevant rate of inflation, I show that with

Page 60

2  Exhibit 4.  That maps the list price against, an

3  index of the list price against an index of

4  inflation.  And that by and large the price

5  changes were consistent with the rate of inflation

6  as shown in Exhibit 4.

7       Q.   Well, am I correct that you didn't

8  actually dig into all the details of the manner in

9  which Abbott set list prices.  You're referring

10  only to your observation that it did match the

11  rate of inflation?

12          MR. BERLIN:  Objection, form.

13          THE WITNESS:  Correct.

14          I mean I looked at the pricelists, I

15  looked at the inflation rate, and compared the

16  two.

17          So I did not make any inquiry into how

18  or to what end Abbott was setting its prices.  But

19  these are pretty regular, pretty consistent price

20  changes.

21          So I have to say as an economist it

22  didn't strike me as a particularly strategic

                                            372

1  pricing strategy.

2  BY MR. LAVINE:

3       Q.   What did you do to determine the

4  competitive nature of the market for these

5  products?

6       A.   Well, you've got ten, fifteen, twenty

7  competitors all producing functionally identical

Depo-Hughes-James-05-06-09

8     products that's consistent with what economists

9     would refer to as a competitive market.

10          You've got lots of manufacturers

11    producing identical products.  And if memory

12    serves, I believe in looking at some of the either

13    Abbott documents or Mr. Sellers' deposition seems

14    to me that, to the best of my recollection sitting

15    here, that Abbott felt that it was participating

16    in a market that was very competitive.

17    Q.   Beyond the materials you just

18    referenced, did you do any additional research to

19    support your analysis regarding the competitive

20    nature of the market for these product?

21    A.   Well, again, as an economist it seems

22    pretty obvious, I mean the structure of the market

373

1     is consistent with one that is competitive.

2          The movement of prices, you don't see

3     companies, I mean you certainly don't see Abbott

4     making large increases in their price in such a

5     way that it would be consistent with somebody who

6     was exercising some market power.

7          But then again, it also seemed to me

8     that Abbott was in the best position to

9     characterize the market that they were selling in.

10    And, again, to the best of my recollection sitting

11    here, that either Abbott documents or Abbott

12    deposition testimony talked to some extent about

13    how they felt that this was a very competitive

Page 62

Depo-Hughes-James-05-06-09

14  market.

15      Q.   Are you saying that it was a competitive

16  market with respect to all of the fifteen other

17  companies making these products?

18      A.   I'm not quite sure what that question

19  means.  Could you try it again?

20      Q.   Well, you do refer to several other

21  companies that make the same products; right?

22      A.   Yes.

                                                  374

1       Q.   I think you say there's up to fifteen

2   other companies making these products.

3       A.   I actually say that somewhere in the

4   report.  I have the number, let's say, to keep

5   things moving, let's say it's fifteen.  I could

6   check, but something like that.

7       Q.   Do you consider each and every one of

8   those other manufacturers to be competitors of

9   Abbott Laboratories on these products?

10          MR. BERLIN:  I'm sorry.  Can I have that

11  question back?

12              (The record was read back as

13  requested.)

14          MR. BERLIN:  Objection, form.

15          THE WITNESS:  I did not reach a

16  conclusion on that.  It wasn't something that my

17  analysis depended on.

18  BY MR. LAVINE:

19      Q.   Do you know who the primary competitors

Depo-Hughes-James-05-06-09

20    of Abbott Laboratories are on these products?

21         A.   Well, I know Baxter is there and then

22    there's a bunch of smaller firms whose names that

375

1    I don't recall.

2         Q.   At one point in your report you refer to

3    these products as legacy hospital products.

4              Where do you get that term from?

5         A.   I get that from my experience in

6    pharmaceutical, just dealing with pharmaceutical

7    markets, pharmaceutical matters.

8         Q.   Do you agree that the hospital market is

9    not at issue in this case?

10        A.   Sales to hospitals under Medicare and

11   Medicaid are paid through a different system than

12   the one at issue here.  So it's my understanding

13   that hospital sales are not at issue.

14        Q.   Even though you've referred to them as

15   legacy hospital products, you do agree they need

16   to comply with all the normal laws governing drugs

17   in the United States?

18        A.   Sure, absolutely.

19             The legacy simply refers to that these

20   are products that predate the modern requirements

21   for, these products were in use long before FDA

22   regulations on safety and efficacy and everything

376

Depo-Hughes-James-05-06-09

1    else were in place.  There's no patent protection,
2    probably never was, although I don't know for
3    certain to the product itself.
4        Q.   But under the current regulatory system
5    they're subject to all the rules otherwise
6    governing?
7        A.   Oh, absolutely.  You can't run tap water
8    into a Zip-Lock bag and sell it to a hospital.
9        Q.   Do you agree that the methodology
10   utilized by Dr. Duggan to perform his calculations
11   is testable and repeatable?
12       A.   Yes.  Somebody else could take the data
13   that he took and do what he did with it, yes.
14       Q.   And Dr. Duggan's methodology as it
15   relates to examining some data in detail and then
16   using that as a basis to extrapolate is a
17   technique that is generally accepted by
18   economists?
19            MR. BERLIN:  Objection, form.
20            THE WITNESS:  Well, yes and no.  I mean
21   in his rebuttal report Dr. Duggan sites to several
22   academic studies that have used extrapolation and

                                                    377

1    I believe he talks about a study where he himself
2    has used extrapolation.
3            But as I understand in Dr. Duggan's
4    study that he cites in his rebuttal, what he did
5    was he extrapolated from a set of states, if
6    memory serves, that the extrapolations were from
                        Page 65

Depo-Hughes-James-05-06-09

7    states where a policy had been implemented to

8    states where a policy had not been implemented.

9            So he had the ability to calculate

10   before and after actual policy, excuse me, before

11   and after actual policy was enacted and then to

12   take that and extrapolate it to other states.

13           So the point is that I believe his study

14   was well, what happens when Medicaid physicians go

15   from fee for service to go to managed care.  And

16   he calculates a change in Medicaid expenditures by

17   comparing what the expenditures were under fee for

18   service and what the expenditures were under

19   managed care.

20           That change in expenditure is the

21   consequence of a whole raff of different things

22   that were changing when you go from fee for

378

1    service to managed care, how particular diseases

2    are managed, how hospitalization is used, what

3    kind of drugs are used, how long doctors spend in

4    offices, all sorts of things that are the actual

5    actions are unobservable but it shows up in the

6    change in the expenditures and then he

7    extrapolates from there.

8            And what he's done in this study is he's

9    not extrapolating from a real policy that has

10   actually been implemented but he is changing the

11   price only, assuming absolutely nothing else

12   changes, and then extrapolating that absent all of

Depo-Hughes-James-05-06-09

13    the other effects that would show up if he
14    actually had the ability to say okay, here are
15    three states that reduce their reimbursements to a
16    hundred twenty-five percent of average contract
17    selling price minus fifteen percent plus a
18    dispensing fee, and then he would get to observe
19    whether there was a change in the, whether there
20    was a change in access and whether there were
21    other changes in policy and then extrapolate from
22    there.

                                                      379

1            Instead, he's just taking a hypothetical
2    in his nine states and then extending that
3    hypothetical to the other states, and in my
4    opinion that's qualitatively different from the
5    extrapolation studies that he speaks to in his
6    rebuttal report.
7        Q.   Well, my question was attempting to be
8    much more limited.
9        A.   I'm sorry.
10       Q.   And I understand that you assert that
11   the application of the extrapolation in this
12   particular instance as done by Dr. Duggan was
13   incorrect, but the underlying methodology of
14   extrapolating from one dataset to another, that in
15   and of itself is not something you're challenging;
16   are you?
17           MR. BERLIN:  Objection, form.
18           THE WITNESS:  Like any data analysis
                   Page 67

Depo-Hughes-James-05-06-09

19  technique, be it extrapolation, econometric
20  analysis, statistical testing, any data analysis
21  technique can be done well or can be done poorly.
22  But when it's done well, extrapolation is

380

1  obviously an acceptable technique.
2  BY MR. LAVINE:
3      Q.   And am I right that you're not taking
4  issue with respect to any of the actual
5  calculations themselves?
6      A.   That was not my assignment, no.
7      Q.   Now, in connection with your work in
8  this case, you reviewed the state reimbursement
9  methodology summaries that were prepared by Myers
10  & Stauffer; right?
11     A.   Yes.
12     Q.   The documents that summarized how the
13  individual state's reimbursement methodology
14  evolved over the years?
15     A.   Oh, yes, yes, I did.
16     Q.   But as part of your assignment in this
17  case, you didn't do any analysis to go back and
18  verify the accuracy or not of those summaries; did
19  you?
20     A.   I did not.  That was not part of my
21  assignment.
22     Q.   So you don't have any opinion as to

Depo-Hughes-James-05-06-09

381

1   whether or not those are accurate or not?

2       A.   I do not.

3       Q.   And you don't have any dispute regarding

4   the fact that the state Medicaid data that was

5   used by Professor Duggan was in fact data that

6   came from the states?

7       A.   I have no opinion on that.

8            Again, that wasn't something that was my

9   assignment.  I have no opinion on that one way or

10  another.

11      Q.   And you don't have an opinion as to the

12  question of whether that same data represents the

13  Medicaid claims reimbursement data?

14      A.   No.  Again, not my assignment.

15      Q.   And similarly, with respect to the STUD

16  and the SMRF/MAX data, you don't have any opinion

17  about whether the data that he used was in fact

18  the STUD and SMRF/MAX data that came from CMS?

19      A.   Again, not my assignment.

20      Q.   And you don't have any opinion about

21  whether that data, the SMRF/MAX and the STUD data,

22  is obtained by CMS from the states and reflects

382

1   data generated by the states from their Medicaid

2   claims processes?

3       A.   I presume that the data are what the

4   states say they are, yes.

Page 69

Depo-Hughes-James-05-06-09

5      Q.   So you don't have an opinion to the

6   effect that it was the wrong data or not what

7   Professor Duggan represented it to be?

8      A.   I don't have any opinion that Dr. Duggan

9   misrepresented any of the data that he used.

10      Q.   Yesterday you had mentioned a potential

11   flaw that you've seen in the STUD data where the

12   utilization in a particular quarter doesn't match

13   up with what you see in the quarter before and the

14   quarter after.  Do you remember that testimony?

15      A.   Yes.

16           In the aggregate, STUD data, or whatever

17   the acronym is, that, yes, sometimes it's

18   incomplete in particular quarters.

19      Q.   And if you see that, you need to account

20   for that kind of potential error in some way;

21   correct?

22      A.   Correct.

383

1      Q.   Have you seen any kind of a problem of

2   that sort that Dr. Duggan has failed to account

3   for?

4      A.   The details of his calculation at that

5   level were not my assignment.

6      Q.   So you don't have any opinion about an

7   issue related, whether there might have been a

8   potential flaw in the STUD data that wasn't

9   properly dealt with?

10      A.   No.

Page 70

Depo-Hughes-James-05-06-09

11        Q.    And you're not offering any opinions

12    about whether the arrays that were used by Myers &

13    Stauffer and then relied upon by Professor Duggan

14    were arrays that came from the carriers or the

15    medical equipment regional carriers?

16        A.    Yes.  As I think I said yesterday, I

17    don't have any reason to think that Myers &

18    Stauffer when they created those actual arrays did

19    so accurately from truthful data from the

20    carriers.

21        Q.    And you're not offering any opinions

22    about whether the Medicare claims data that was

                                                       384

1     used by Professor Duggan actually came from CMS

2     and contains the actual claims data generated by

3     the carriers and the DMERCs?

4         A.    Again, I don't have any claim that Dr.

5     Duggan has misrepresented the data that he used.

6         Q.    Do you understand what I mean when I use

7     the word "DMERC"?

8         A.    Yes.

9         Q.    One of your criticisms also is that Dr.

10    Duggan extrapolated on the basis of aggregate data

11    in a situation where he could have or should have

12    used the detailed state claims data; is that

13    right?

14        A.    Yes.

15        Q.    And yesterday you referred to the fact

16    that he went back and did a check by doing a

Page 71

Depo-Hughes-James-05-06-09

17    claims level, an analysis based upon the detailed

18    state data and comparing it to his extrapolation;

19    right?

20        A.    Yes.

21              Again, precisely what he did as

22    described in his rebuttal report, it was certainly

385

1    just a summary, but I may be misreading his

2    rebuttal report, but it sounded like from reading

3    it that he had gone back to the claims data and

4    conducted another analysis to compare that to his

5    extrapolations, yes.

6        Q.    But with respect to Dr. Duggan's report,

7    not the rebuttal report, do you agree that he did

8    represent that his extrapolation method would

9    likely produce a lower damages figure than would

10    be the case if he had performed a claim-by-claim

11    analysis on the detailed state data?

12        A.    Well, consistently through his report

13    Dr. Duggan always claimed that he was being

14    conservative.

15              And as I state in my report in a couple

16    of areas, I take issue with whether he is being

17    consistently conservative.

18              But I do agree that it was contained in

19    his report that he believed he was always being

20    conservative in underestimating the value of

21    difference rather than overestimating, that that's

22    his representation of it, yes.

Page 72

Depo-Hughes-James-05-06-09

386

1        Q.   But do you remember that he specifically
2   made the point that if he went to the individual
3   state data and performed the claim-by-claim
4   analysis, that his expectation was that the
5   damages figure would be even larger than what he
6   reached through the extrapolation method?
7            MR. BERLIN:  Objection, form.
8            THE WITNESS:  I don't remember
9   specifically, but it wouldn't surprise me that he
10  would make that claim in the abstract in his
11  original report, and then he made the claim
12  specifically in the rebuttal report.
13  BY MR. LAVINE:
14       Q.   But when he did the analysis in the
15  rebuttal report, what he found was consistent with
16  what he predicted he would find; right?
17           MR. BERLIN:  Objection, form.
18           THE WITNESS:  And it was consistent with
19  my conclusion that his estimates because of the
20  extrapolations were inaccurate.  I mean he claimed
21  he found a significant difference when he used the
22  claims data.

387

1   BY MR. LAVINE:
2        Q.   The difference was as he expected, it
3   was an even higher figure when he went back and
Page 73

Depo-Hughes-James-05-06-09

4    performed the analysis on the claims level data?

5        A.   Again, in the checking that he did, and

6    it's not clear to me what checking he did, but,

7    yes, in the instance that he reported he did find

8    that the difference was higher, as he said

9    significantly higher, I'm sorry, substantially

10   higher, not significantly.

11       Q.   With respect to the extrapolation

12   performed by Professor Duggan regarding the

13   Medicaid claims, one of your opinions is that his

14   selection of the states upon which the

15   extrapolation was based was nonrandom; is that

16   right?

17       A.   That's correct.

18       Q.   And then another criticism was that they

19   were selected on an ad hoc basis?

20       A.   That's my opinion, yes.

21       Q.   And that the states that were the basis

22   of the extrapolation were nonrepresentative of the

                                                    388

1    states to which the extrapolation was performed?

2        A.   Well, my specific objection was he

3    doesn't demonstrate that they are representative,

4    that the nine states that he uses are in fact

5    representative of the remaining states.

6        Q.   And you also said that the manner in

7    which the original, well, you refer to it now as

8    nine states; right?

9        A.   Yes, because it is nine states.

Depo-Hughes-James-05-06-09

10       Q.   The manner in which the nine states were

11   selected was subject to manipulation.

12       A.   Well, the specific criticism was that

13   when he removed Ohio, his damages, extrapolated

14   damages, went up, his extrapolated difference

15   calculation went up.

16            So clearly it seemed to me depending on

17   the states you choose, you can get an entirely

18   different damage calculation.

19            So if he had chosen nine different

20   states other than the ones that he chose and then

21   done the same extrapolations to the nonchosen

22   states, it seemed to be highly likely he could get

389

1    a very different result.

2        Q.   But am I right though, you're not

3    suggesting that he specifically selected states

4    that would lead to a higher extrapolation figure.

5            You're saying that he hasn't

6    demonstrated that the base states were

7    representative of the extrapolated states.

8        A.   Well, again, the whole idea of sampling

9    in statistics is that if you have a population

10   from which you draw a sample and you draw your

11   sample properly, that the results that you get

12   from each repeated properly drawn sample that you

13   get should be pretty much the same.  That's the

14   idea of statistical sampling.

15            When you have a sample that is put

Page 75

Depo-Hughes-James-05-06-09

16    together, and, again, it's another, we don't

17    really know how Dr. Duggan, or I'm sorry, I don't

18    know how Dr. Duggan selected the nine states that

19    he selected, but he does agree that they are in

20    fact not randomly selected.

21           Then that leads us to the conclusion

22    that if you draw repeated samples like this,

                                                           390

1    you're not going to get the same thing that you

2    get from the nine that he chose, but rather you

3    could get difference calculations that are the

4    same, could be higher, could be lower.  But it is

5    a failure of sampling.

6        Q.   So is there a particular scientific

7    methodology or technique -- I'm sorry.  Let me

8    start over.

9           What is the particular standard based

10   upon a scientific methodology that you're saying

11   Professor Duggan failed to meet with regard to the

12   selection of the nine states?

13       A.   Well, I mean every introductory

14   statistics book has a section on sampling and how

15   one is supposed to draw valid samples from

16   populations and what criteria are used.

17           As Dr. Duggan states in his rebuttal

18   report, he did not use any such technique but that

19   he agrees that his sample is in fact nonrandom.

20       Q.   Are you aware of any other basis upon

21   which to select a sample besides a random process?

Depo-Hughes-James-05-06-09

22      A.   Well, I mean "random" is an umbrella

391

1    term.  I mean they're either stratified samples,
2    weighted samples, there's all sorts of different
3    sampling, and it depends on the population that
4    you're looking at.
5            So when I say a random sample, that is
6    an umbrella term for a whole raff of things that
7    are done to draw valid samples under different
8    circumstances.
9      Q.   And you're not aware of any generally-
10   accepted techniques regarding the selection of a
11   sample in a manner as used by Dr. Duggan?
12           THE WITNESS:  Could you give me that
13   back.
14               (The record was read back as
15   requested.)
16           MR. BERLIN:  Objection, form.
17           THE WITNESS:  Could I ask you to restate
18   that because that question is not making a lot of
19   sense to me.
20   BY MR. LAVINE:
21     Q.   Are you saying that the sample utilized
22   by Professor Duggan has no general acceptance by

392

1    any economist?

Page 77

Depo-Hughes-James-05-06-09

2          MR. BERLIN:  Objection, form.

3          THE WITNESS:  Well, I think that any

4    economist looking at this would agree with me and

5    agree with Dr. Duggan that his sample is in fact

6    nonrandom.

7    BY MR. LAVINE:

8          Q.   But is there any support, is there any

9    general acceptance of performing an economic

10   analysis of this type on the basis of something

11   other than a random sample?

12         A.   Is there --

13         THE WITNESS:  I'm sorry.  Could I just

14   have the question back again.

15              (The record was read back as

16   requested.)

17         THE WITNESS:  I'm not exactly sure what

18   you mean by "of this type."

19              But there are instances certainly where

20   researchers will perform economic analyses on

21   samples that are not randomly selected.  But in

22   those instances it's generally considered

                                              393

1    incumbent on the researcher to examine the

2    consequences for their results and the

3    consequences for their analysis of the fact that

4    their sample has not been randomly chosen.

5    BY MR. LAVINE:

6          Q.   So is that one of the basis upon which

7    you're saying Professor Duggan failed to select a

                        Page 78

Depo-Hughes-James-05-06-09

8    proper basis for his extrapolation?

9        A.   Is what one?

10       Q.   You said it's incumbent upon a

11   researcher to examine the consequences of the

12   selection of their data.

13       A.   Yes.  I mean it seems to me that there's

14   lots of different dimensions along which Medicaid

15   systems across states differ that it would have

16   been feasible for Dr. Duggan to, taking these

17   differences between states into account, have

18   formed the sampling procedure that would have

19   given readers of his report more of an assurance

20   that the sample of states that he was using was in

21   fact representative of the states to which he was

22   extrapolating.

                                                    394

1        Q.   What would be the standard that would

2    identify whether or not Professor Duggan has --

3        A.   Well, again, the standards of sampling

4    theory is in any introductory statistics book.

5        Q.   Right.  But this isn't a random sample.

6             So what would be the standards be for

7    selecting a sample of this type?

8        A.   What would the standard be for selecting

9    a sample, of the type that he used?

10       Q.   Yes.

11       A.   Okay.  There's no assurance that it's a

12   representative sample.  So there's no assurance

13   that the states that he is extrapolating from are

Page 79

Depo-Hughes-James-05-06-09

14   representative of the states he is extrapolating

15   to.

16        Q.   So am I stating it right, if you're

17   going to approach it in the manner that was

18   utilized by Professor Duggan, there needs to be an

19   assurance that the selected states are

20   representative of the extrapolated states?

21        A.   "Evidence" is probably a better word

22   than "assurance."


                                                    395


1        Q.   Does it again need to be evidence that

2   it was reasonable to conclude that these base

3   states were representative of the extrapolated

4   states?

5        A.   Well, there is, again, statistical tests

6   that I assume could be applied, which Dr. Duggan

7   does none of.

8        Q.   But you haven't identified any of those

9   in your report; have you?

10       A.   No.  I have not.

11       Q.   And you haven't actually performed any

12   such test?

13       A.   No.  It was not my assignment to do so.

14       Q.   Are there any other principles or

15   methods that you're of the opinion Professor

16   Duggan should have followed in his selection of

17   the nine states?

18       A.   Well, again, aside from what I've said

19   repeatedly, basic sampling theory, that's the

Page 80

Depo-Hughes-James-05-06-09

20   biggest one.

21        Q.   You used the words nonrandom, ad hoc,

22   and nonrepresentative.

396

1             Is there any other standard that you

2   would apply differently to any of those issues?

3             MR. BERLIN:  Objection, form.

4             THE WITNESS:  I'm sorry.  I'm not --

5   BY MR. LAVINE:

6        Q.   The three words that you use in your

7   report in describing or criticizing Professor

8   Duggan's selection of the nine states is that they

9   were nonrandom, ad hoc, and he hasn't demonstrated

10   that they're representative.

11        A.   That's correct.  That's what I said in

12   my report.

13        Q.   So are there any additional principles

14   or methods that would be used to evaluate those

15   issues?

16        A.   Applying sampling theory and taking a

17   representative sample from the population of

18   states would satisfy all three of those

19   criticisms.

20        Q.   Anything else?

21        A.   On what?  I'm sorry.

22        Q.   To evaluate the selection of the nine

397

Depo-Hughes-James-05-06-09

1    states which Professor Duggan used as the basis

2    for his extrapolation.

3        A.    Again, as I sit here today, that sounds

4    like we've covered everything on that.

5        Q.    Another criticism you articulate in your

6    report is that there are mechanical exercises

7    performed by Professor Duggan.

8            Can you briefly explain what you mean by

9    that criticism?

10       A.    Right.  It's a mechanical exercise in

11    that he has a method which he uses to calculate

12    his but-for AWP, he then takes the reimbursement

13    that was actually paid and the reimbursement that

14    would be paid using the state's reimbursement

15    formula using the but-for AWP and he calculates a

16    difference.

17            That is mechanical in the sense that he

18    does that calculation over and over and over again

19    without any attention being paid to changes that

20    might occur in the states, without any attention

21    being paid to whether or not the actual

22    reimbursement price may have in fact been a valid

                                                    398

1    and not a fraudulent price.

2            For example, my criticism about his

3    treatment of MAC prices where MAC prices are

4    negotiated between providers and state Medicaid

5    agencies in my opinion represent the state's best,

6    the state's and the provider's best estimate, best

Page 82

Depo-Hughes-James-05-06-09

7    attempt at finding a mutually agreeable price.

8              So reimbursing at such a MAC price he

9    considers as being fraudulent.  And I object to

10   that and say that a price that was arrived at

11   through a considered state agency policy should

12   not in a blanket sense simply be considered a

13   fraudulent price.

14             But he doesn't take any of the access

15   issues, he doesn't take any of the viability

16   issues, he doesn't take any of the state policy

17   issues that are raised throughout the deposition

18   testimony that he did not read, takes none of that

19   into account and simply performs this mechanical

20   here's the reimbursement that was paid, here's the

21   but-for reimbursement based on my but-for AWP,

22   here's the difference, absolutely everything else

                                                   399

1    stays the same.

2        Q.   But based on the methodology established

3    by Professor Duggan, you're not of the opinion

4    that he applied his methodology incorrectly;

5    right?

6        A.   He applied an incorrect methodology

7    correctly as he believes would I guess be the way

8    to characterize my opinion.

9        Q.   Right.

10             But under the methodology as he set it

11   up, if the price based upon a hundred twenty-five

12   percent of the average was lower than the MAC, it

Depo-Hughes-James-05-06-09

13    was appropriate to calculate it on the basis of

14    that lower hundred twenty-five percent of the

15    average price rather than the MAC?

16        A.    Well, yes.  I mean he did what he said

17    he did.

18            But I'm objecting to the treatment of a

19    MAC price as being fraudulent as opposed to being

20    a price negotiated between providers and the

21    states that takes into account all of these other

22    things that I'm objecting that Dr. Duggan doesn't

                                                    400

1    take into account.

2            The states and the providers arrive at

3    MACs as their best estimate of the minimum amount

4    that providers can accept and still be willing to

5    participate in the Medicaid program.

6            So it addresses the, these negotiated

7    MAC prices address these issues of cost

8    containment and access to the best of the states'

9    abilities.

10        Q.    Would it be fair to say that that's

11    another example of a violation of the standard of

12    needing to base your methodology on a realistic

13    but-for world?

14        A.    Yes.  I think that would be a fair way

15    to characterize it, yes.

16        Q.    Does that also -- I'm sorry.  Let me

17    start over.

18            Are there any other standards that you

Depo-Hughes-James-05-06-09

19    would say Professor Duggan has failed to meet in

20    connection with his, the criticism you say that

21    his calculations were mechanical?

22         A.   Yes.  I think sitting here today, to the

                                                        401

1     best of my recollection, we've covered them all.

2          Q.   Now, with respect to the selection of

3     the arrays that were used for the basis of an

4     extrapolation regarding, we talked about some of

5     the other ones earlier that haven't shown the

6     correct NDCs were in the arrays, haven't shown

7     that Abbott's price is the only one who would have

8     changed, et cetera.  But you also talked about how

9     there were too few arrays and they were not

10    randomly selected.

11              So what is the economic principle that

12    you say Professor Duggan failed to meet in his

13    selection or reliance upon those arrays?

14         A.   In his reliance upon those arrays, as I

15    believe I say in my report, he's using what

16    economists refer to as a sample of convenience,

17    using the data that are there as being

18    representative of the population without any

19    investigation or any assurance that such sample is

20    indeed representative of the, in this case,

21    population of arrays.

22         Q.   So the rule that he's violated is that

                          Page 85

Depo-Hughes-James-05-06-09

402

1    if you're going to use a sample of convenience,
2    you need to demonstrate that it's reasonable to do
3    so?
4         A.   Well, if you're claiming that your
5    sample of convenience is representative, which is
6    something that somebody might claim, you need to
7    provide evidence that it is indeed representative.
8              If you are stuck with the sample that
9    you're stuck with, then it also seems to me it's
10   incumbent upon a researcher to examine the
11   consequences for their analysis from the fact that
12   their sample is not representative of the
13   population.
14        Q.   Are there any other principles or
15   methods that you say Professor Duggan should have
16   applied in connection with his selection of the
17   arrays, the sample of arrays?
18        A.   Well, I mean as I understand it, Dr.
19   Duggan did none of the selecting.  As I understand
20   it, Dr. Duggan was provided with a set of arrays
21   by the government.
22             So I think it mischaracterizes as I

403

1    understand what Dr. Duggan is saying because I
2    don't believe he made any claim that he selected
3    the arrays from -- let me put it differently.
4              If Dr. Duggan had twenty more arrays in

Page 86

Depo-Hughes-James-05-06-09

5    his possession, I assume he would have used them.

6    I'm not saying that he did have more.  I'm saying

7    that it's my understanding that he used only those

8    that were given to him by the government.

9              So it's not a matter of Dr. Duggan

10   actually performing the selection but rather

11   uncritically using a sample of convenience without

12   any checks as to the representativeness of the

13   arrays that he had been provided.

14      Q.    What standard would you apply to

15   determine that the arrays that were relied upon in

16   Dr. Duggan's analysis were too few in number?

17      A.    There are, in statistics there are

18   formulas for figuring out, I'm trying to remember,

19   it's been a long time, for figuring out minimum,

20   something like minimum required sample size,

21   something like that.

22              I'm sure I don't have the term right,

404

1    but there are formulas for figuring that out.

2       Q.    But you haven't done that analysis in

3    this case?

4       A.    No.  I have not.

5       Q.    Are there any other economic theories or

6    techniques that Dr. Duggan failed to meet in

7    connection with his extrapolation for Medicare

8    damages based on the arrays?

9       A.    Well, I mean this, and let's just keep

10   something in mind, is that in his rebuttal report

Depo-Hughes-James-05-06-09

11    he talks about other studies that provide

12    extrapolations and so on and so forth.

13              I have not had, I have not reviewed

14    those studies, but I would imagine that those

15    studies provided some measure of statistical

16    accuracy for their extrapolations, as that would

17    be a standard practice.

18              The overarching criticism is that we

19    have no basis for concluding that Dr. Duggan's

20    estimates are too high, too low, or just right

21    because he's simply used the sample that was

22    provided to him, he's gone ahead and extrapolated

405

1    according to his methodology, he comes up with a

2    number and we have no way of knowing whether that

3    number is terribly accurate, wildly inaccurate,

4    whether that number if he was provided with

5    twenty-five different arrays and performed the

6    same analysis would he get a number that was

7    similar to the number that he got or not.

8              Nothing that he does do we have any

9    measure as would be standard practice in any

10    academic economics paper, do we have any measure

11    of accuracy of his estimates of his extrapolations

12    or difference calculations.

13        Q.   Okay.  You received Dr. Duggan's actual

14    report, supplemental report, and rebuttal report;

15    right?

16        A.   Yes.

Depo-Hughes-James-05-06-09

17       Q.   But you weren't provided with any of the

18  underlying materials related to those reports;

19  were you?

20       A.   I don't know, no.

21       Q.   So your opinion isn't based upon any

22  review of any of the materials that were used to

406

1  support the work done by Professor Duggan?

2       A.   Well, no.  Your question was what

3  standard did he violate or were there other

4  standards that he violated.  And that led me to

5  describe the notion that it would be standard

6  practice in such calculations to provide some

7  statistical measures of accuracy as a way of

8  determining whether or not such extrapolations,

9  such calculations, met statistical standards of

10  accuracy.  And he did not do that.

11            But I didn't, but no, I didn't receive

12  any of the underlying data from his rebuttal.

13       Q.   So just to clarify.  Your opinion of

14  course isn't based upon any review of those

15  underlying materials because you weren't provided

16  with those?

17       A.   Correct.

18            My review is based on the standard that

19  you asked me to articulate, which I applied to Dr.

20  Duggan's calculations.

21       Q.   Are you of the opinion that there can

22  only be damages in this case if the original

Page 89

Depo-Hughes-James-05-06-09

407

1    reimbursement was based upon an AWP figure?

2         A.   Since it's AWP that was supposed to have

3    been manipulated, it strikes me in particular that

4    if a reimbursement were based on a usual and

5    customary charge, then that reimbursement is not

6    affected by such manipulation.

7         Q.   Would that be on the basis of what you

8    would describe as a failure to treat a realistic

9    but-for world?

10        A.   Yes.  I think that would be accurate,

11   that Dr. Duggan doesn't take into account any of

12   the institutional factors, or doesn't take into

13   account all of the institutional factors that come

14   into play in deciding whether reimbursements were

15   in fact wrongful or not.

16        Q.   I just wanted to clarify one point in

17   your report, Paragraph 18, actually Footnote 16.

18             You state that Dr. Duggan calculates the

19   total Medicare/Medicaid spending through Abbott's

20   home infusion pharmacies totaled only $380,499

21   over the period 1992 to 1999; right?

22        A.   Yes.  That's what Footnote 16 says.

408

1         Q.   Let me ask you to take a look at the

2    supplemental report.

3             MR. LAVINE:  Can we mark that.
             Page 90

Depo-Hughes-James-05-06-09

4            (Deposition Exhibit Hughes 009 was
5    marked for identification.)
6    BY MR. LAVINE:
7        Q.    You cite to Page 3 of Professor Duggan's
8    report.
9        A.    Yes.
10       Q.    Now, am I right that the total Medicaid
11   and Medicare payments referred to on Page 3 of
12   Professor Duggan's supplemental report are that
13   payments for Medicaid were $23.01 million for all
14   clients and $5.342 million for customers of
15   Abbott's pharmacy, and that payments for Medicare
16   were $22.653 million with Abbott pharmacy clients
17   accounting for $5.675 million of that amount?
18       A.    I'm terribly sorry.  Where are you?
19       Q.    The last paragraph of Page 3 on
20   Professor Duggan's supplemental report.
21       A.    I'm sorry.  Could you lift up your thing
22   and just point to where you're at?


                                                      409


1        Q.    (Indicating.)
2        A.    Okay, fine.  Thank you.
3        Q.    Because the numbers in your footnote are
4    $380,000 for Abbott's infusion pharmacies, and I
5    see here $5.342 million for Medicaid and another
6    $5.675 million for Medicare.
7             So am I correct that the reference in
8    your footnote is incorrect?
9        A.    No.  The reference since, as I see it
                      Page 91

Depo-Hughes-James-05-06-09

10    Dr. Duggan did not number these pages, to me Page

11    3 is the last text page.

12         Q.   Oh, okay.  I'm sorry.  Then let's switch

13    to that one.

14              So the numbers you're relying on then

15    were the ones on the final page with the

16    signature?

17         A.   Yes.

18         Q.   Okay.

19         A.   Where the paragraph that starts "Tables

20    D and E provide similar information while

21    restricting attention to line items for those

22    pharmaceutical products included in the United

410

1    States Complaint."

2              So the paragraph that you're referring

3    to has at least one line item for the products

4    listed in the United States Complaint.  And Tables

5    D and E restricts attention to just the line

6    items, as I understand it, for those products

7    included in the complaint against Abbott.

8              There it says for Medicaid, clients of

9    Abbott's pharmacy accounted for $110,860 of that

10    spending out of a total of $419,215.

11             Then the next sentence says total amount

12    paid by Medicare across all customers was $2.497

13    million, clients of Abbott's pharmacy accounted

14    for $269,639 of that spending.

15             So the number that appears in Footnote

Depo-Hughes-James-05-06-09

16    16 of my report, $380,499, is the sum of $269,639

17    and $110,860.

18         Q.    So your footnote should have clarified

19    that it was referring only to the products in the

20    complaint?

21         A.    Yes.  It would be clearer if that

22    sentence stated that Dr. Duggan calculates that

411

1     total Medicare and Medicaid spending on those

2     products included in the government's complaint

3     against Abbott through Abbott's home infusion

4     pharmacies totaled only $380,499 over the period

5     1992 to 1999.

6          Q.    So you're not disputing the accuracy of

7     the numbers on I guess it's Page 2, not Page 3?

8          A.    No.  I'm not disputing the accuracy of

9     the numbers.  I'm just, I was citing the numbers

10    that referred to the items that are at issue in

11    this matter.

12               (Deposition Exhibit Hughes 010 was

13    marked for identification.)

14    BY MR. LAVINE:

15         Q.    We have just marked as Exhibit 10 a

16    document of several pages.  On the first page it

17    says Comparison of Actual Medicare Claim vs. MMA

18    2007 CIGNA Example.  (Document tendered to the

19    witness.)

20               Do you recognize these materials?

21         A.    Yes.  They look like they are exhibits

Page 93

Depo-Hughes-James-05-06-09

22    to my report.

412

1         Q.   Can you page through to see if it can
2    refresh your recollection by showing you the
3    additional materials attached after the first few
4    pages.
5         A.   Right.  There's computer code.
6         Q.   But those materials weren't part of the
7    actual exhibit; right?
8         A.   Those were not part of the exhibit, no.
9         Q.   Are those the backup materials?
10        A.   Presumably so, yes.
11        Q.   Did you write the computer code?
12        A.   I did not.
13        Q.   That's something you asked the Huron
14   Group to do for you?
15        A.   That's right.
16        Q.   Chris Rohn?
17        A.   That's who I would have asked.  I don't
18   know who actually did it.  But that's who I would
19   have asked, yes.
20        Q.   And I just want to ask about the, what
21   was the basis for the selection of your examples
22   in this document?

413

1         A.   That we wanted some sodium chloride

Depo-Hughes-James-05-06-09

2  examples and I wanted some dextrose examples.

3      Q.   But in the computer code it looks like
4  you just asked for any claim where the line count
5  is 2; is that right?

6      A.   This is the first I've seen the computer
7  code.

8      Q.   What was it you asked Mr. Rohn to do?

9      A.   I wanted some examples comparing the
10 actual Medicare claims versus the payment from the
11 data from the payment that would have been made
12 under the MMA after that had been enacted.

13     Q.   The example you have regarding dextrose
14 --

15     A.   Yes.

16     Q.   -- what was the administration code that
17 you used in connection with that example?

18     A.   Well, the J-Code is J7060.

19     Q.   Right.  What's the CPT code you were
20 using in that example?

21     A.   Again, I did not do it.  So I could not
22 tell you.  I didn't do the programming.

                                          414

1      Q.   But you did use this as an exhibit to
2  your report?

3      A.   Yes.

4      Q.   But your testimony is you don't know
5  what the J-Code was, I'm sorry, the CPT code you
6  used, which one was used as the basis for this
7  example?

Page 95

Depo-Hughes-James-05-06-09

8       A.   That's my testimony.

9            I asked Huron to provide me with some

10   examples comparing actual Medicare claims with

11   actual Medicare payments before the MMA and then

12   payments under the MMA for the same product.

13       Q.   If the CPT code were used for the

14   administration of chemotherapy and that was

15   combined only with the reimbursement for a bag of

16   dextrose, that wouldn't be a very realistic

17   example of reimbursement under the MMA; would it?

18       A.   Why not?

19       Q.   Well, wouldn't the, if you were billing

20   for administration of chemotherapy, wouldn't you

21   actually be administering some chemotherapy?

22       A.   Right.  But you would be, presumably the

                                                    415

1   chemotherapy is being mixed and blended into the

2   bag of dextrose.

3            So the reimbursement is for that, the

4   administration fee is for that mixing and

5   administration of the bag of dextrose with the

6   chemotherapy product in it.

7            If CPT code is for administration of

8   chemotherapy, as long as it's the same in the 2001

9   example and the 2007 example, I don't know that

10   we've done any violence to the example.

11       Q.   Well, if there were additional money

12   being paid for additional products in connection

13   with the same CPT code, your comparison of the

                        Page 96

Depo-Hughes-James-05-06-09

14    totals is inaccurate; right?

15        A.    No, because the only product price that

16    we're including is the dextrose.

17        Q.    Right.  But you can't bill for the

18    chemotherapy code if you're just administering

19    dextrose; can you?

20        A.    But the administration fee is to take,

21    as I understand it, is to take into account the

22    fact that the chemotherapy agent has to be mixed

                                                          416

1    into the dextrose.  And as long as the CPT code

2    that we took from 2001 is the same as the CPT code

3    that we took in 2007, I'm not seeing an

4    inaccuracy.

5        Q.    And it doesn't matter that the

6    chemotherapy that might have been associated with

7    the chemotherapy code would have changed the

8    dollar totals here?

9            MR. BERLIN:  Objection, form.

10            THE WITNESS:  Say that again, please.

11    BY MR. LAVINE:

12        Q.    Well, what if the chemotherapy product

13    cost an additional $200, then your totals here

14    would be very different; right?

15        A.    Well, and I don't assume that that

16    happened, but if the price of the chemo agent were

17    $200 in 2001 and again in 2007, then those totals

18    would be each $200 higher.  But there would still

19    be a 77 or so dollar difference between the two.

                    Page 97

Depo-Hughes-James-05-06-09

20      Q.   And the percentage difference between

21   those two would be quite different; right?

22      A.   Percentage difference between the two

417

1   would be different.  But that's not the point.

2          I mean the point is is that under the

3   MMA, well, before the MMA when you were

4   administering chemo you had to mix it in with

5   dextrose.  You were paid $10.26 for the product

6   and you were paid $60.54 for the administration of

7   the dextrose chemotherapy mixture.

8          Then under the MMA the ingredient cost

9   dropped from $10 to $1.36, and the administration

10   fee which under the MMA is done from a survey of

11   the actual cost of preparing and administering

12   these products, the administration fee rose by

13   more than a factor of two to take into account how

14   expensive it is to administer these products

15   because you're not just providing somebody with a

16   bag of dextrose, but you're providing them with a

17   bag of dextrose and a chemotherapy agent.

18          So that under this J-Code the government

19   would end up in fact reimbursing more than twice

20   as much under the MMA than they did before the

21   MMA.

22      Q.   So you think this is a fair example of

418

Depo-Hughes-James-05-06-09

1    the reimbursement before and after the MMA?

2        A.    It illustrates the realization by the

3    authors of the MMA that if the government were to

4    reduce ingredient cost to something closer to the

5    actual selling price, that it would be necessary

6    to increase the administration fee.  And this is

7    an illustration of by how much the administration

8    fee had to go up in order to compensate and to

9    compensate providers and to give them the

10   incentive to continue to participate in the

11   Medicare program.

12       Q.    And then part of what you said a few

13   minutes ago is that each number would go up by

14   $200 in my example; right?

15       A.    Correct.

16       Q.    But that actually is not the case

17   because the reimbursement in 2001 may have gone up

18   by $200 but the reimbursement in 2007 under the

19   MMA may have gone up by a much, much lower number

20   just as you have in the example here; right?

21       A.    Yes, correct.

22       Q.    So without knowing what chemotherapy was

                                                    419

1    administered in your chemotherapy example, you

2    can't draw any conclusions from what we're looking

3    at here on this exhibit?

4        A.    I disagree.

5        Q.    So it doesn't matter that you're giving

6    an example of reimbursement under the chemotherapy

Depo-Hughes-James-05-06-09

7   code but you don't take into account the

8   difference in the reimbursement for the actual

9   chemotherapy?

10      A.   This is the reimbursement for this J-

11  Code, and that's how these reimbursements are

12  done, right.

13      Q.   So is it your testimony that you could

14  bill a CPT code for chemotherapy administration

15  solely in connection with administering dextrose?

16          MR. BERLIN:  Objection, form.

17          THE WITNESS:  That's not at all what I'm

18  saying.

19          I'm saying this is, here are J-Codes,

20  this is how this is being billed, and this is an

21  example of how the payment under this J-Code

22  differed between the two, between the before and

                                                420

1   after the enactment of the MMA.

2   BY MR. LAVINE:

3       Q.   Did you do any analysis to compare the

4   MMA reimbursement to the reimbursement that would

5   have occurred using the numbers calculated by Dr.

6   Duggan in his report?

7       A.   Quite honestly, I had meant to, but that

8   did not materialize, that did not materialize from

9   Huron.

10          To finish on this example which you

11  claim is misleading, and I just want to point out,

12  this is part of the point of my entire analysis is

Depo-Hughes-James-05-06-09

13    that when you go and change reimbursements, lots
14    of things change.
15           So we're arguing as to whether the
16    reimbursement under the MMA went up by over a
17    hundred percent or went up by only twenty percent.
18    But whatever we end up agreeing or disagreeing
19    about that, the fact that the ingredient cost
20    dropped from $10.26 to $1.36 caused other changes
21    in the reimbursement system to take place, here by
22    an act of Congress, but for states by changes in

                                                              421

1     state policy, if necessary.
2            That's entirely consistent with my
3     point, that this is what Dr. Duggan refuses to do
4     is to take into account that when you cut the
5     price to $10 to $1, you can't pretend that
6     everybody is going to participate without
7     alteration in the administration fees.
8      Q.   But because you didn't perform your own
9     analysis, you can't say sitting here today with
10    any reasonable degree of certainty that it's more
11    likely than not that the numbers that Professor
12    Duggan came up with are wrong?
13           MR. BERLIN:  Objection, form.
14           THE WITNESS:  Yes, I can, absolutely.
15    Because under the MMA they did not lower
16    ingredient cost to average selling price and leave
17    dispensing fees, or in this case administration
18    fees, unchanged.
                    Page 101

Depo-Hughes-James-05-06-09

19          It's right in the law the realization
20   that the administration fees are going to be
21   inadequate and a directive to conduct surveys on
22   what it actually cost to administer these drugs

                                                        422

1    and to adjust the administration fees accordingly.
2          That's part of the law.  That's what
3    Congress after it got done looking at all of the
4    problems with the previous Medicaid system, that's
5    the conclusion that the Congress came to.  And
6    came to after weighing all of the issues of cost
7    containment as well as access.
8          We've been sitting here arguing, you've
9    been arguing with me that I haven't taken into
10   account everything that has changed.
11          Well, then we're in great agreement on
12   Dr. Duggan's report because that's my objection to
13   Dr. Duggan's report.  He doesn't take into account
14   everything that would have changed.
15      Q.   Do you agree that some of the changes
16   that would have been implemented in a but-for
17   world that complies with your standard would have
18   increased the dollar value of the damages in this
19   case?
20      A.   No.  I don't reach that conclusion.
21      Q.   Every single change that would have been
22   made in your version of the but-for world would

Depo-Hughes-James-05-06-09

423

1    have resulted in a lower damage figure?

2        A.   Well, if, for example, a reduction of

3    ingredient cost by ninety percent in a state would

4    have led to an "X" percent increase in dispensing

5    fees in order to keep the Medicaid system viable,

6    then yes, I think the difference would have been

7    smaller, not larger.

8        Q.   Are there any factors at all that would

9    have been part of your but-for world that would

10   have caused the dollar value of damages to move

11   upward?

12       A.   Sitting here today, I don't know that, I

13   can't say a hundred percent that there's not, but

14   the main ones, the ones that I have identified in

15   my report, all point to having lower damages, not

16   higher damages.

17           I know that in his rebuttal report Dr.

18   Duggan makes claim of some things that would be,

19   some changes that would be in my but-for world

20   that would make damages higher, but that's fine.

21   That's not the issue.

22           The issue for me is that in constructing

424

1    his tremendously unrealistic but-for world, Dr.

2    Duggan has come up with a set of difference

3    calculations that are unreliable and inaccurate.

4           They could be higher, they could be

Page 103

Depo-Hughes-James-05-06-09

5    lower.  That's not what I'm here about.  What I'm

6    here about is that the ones he's come up with we

7    have every reason to believe are not accurate.

8        Q.   But when I asked you a few minutes ago

9    about can you say sitting here today with a

10   reasonable degree of certainty that it's more or

11   less likely, more likely than not that Professor

12   Duggan's damage figure is wrong, you said that you

13   could reach that conclusion.

14           So my follow-up question is since you

15   didn't actually do those numbers, is that just

16   based upon your calculation in your head?

17       A.   No.  I've just been through this.

18           If administration fees go up, as they

19   did under the MMA, as they did under the DRA, as

20   they did when the Congress of the United States

21   looks at these systems, weighs issues of access,

22   weighs issues of cost containment, and comes to a

                                                         425

1    conclusion, they've come to a conclusion that when

2    you lower your ingredient costs down to a level

3    resembling average selling price, that this cannot

4    be done without an increase in dispensing or

5    administration fees.

6            So taking that one by itself into

7    account, which is again one of my principal

8    criticisms of Dr. Duggan's report, I do conclude

9    that I think his damage calculations would in fact

10   be smaller if, for example, his but-for world for

                    Page 104

Depo-Hughes-James-05-06-09

11    the MMA was, suppose the MMA had been implemented

12    fifteen years sooner, suppose the DRA had been

13    implemented fifteen years sooner, then what would

14    the difference have been.

15         For some transactions it would be the

16    reimbursement might be higher, for some

17    transactions the reimbursement might be lower.  I

18    don't know.

19         But since the decrease in ingredient

20    costs as we see in the actual world, MMA and DRA

21    are more than offset by increase in administration

22    and dispensing fees, it is my conclusion that Dr.

426

1    Duggan's damage calculation would in fact be

2    smaller.

3         Q.   And that's not a conclusion that's based

4    upon any actual calculation.  It's based upon your

5    estimate, subjective estimate, based upon just the

6    general things that you've described in your

7    report?

8         A.   It's based upon my conclusion that Dr.

9    Duggan's but-for world has no validity, that in my

10   opinion based not on my just sitting here making

11   stuff up, as you're trying to imply, but rather my

12   review of the state deposition testimony, by my

13   review of the federal deposition testimony, by my

14   review of the dozens of reports that have come out

15   over the past forty years it is my conclusion that

16   Dr. Duggan's but-for world is wrong.  And it's

Depo-Hughes-James-05-06-09

17    wrong in a way that leads him to greatly

18    overestimate his damage calculation.

19         Q.    I understand when you say that you think

20    Professor Duggan should have done additional work

21    to support his damages model.

22              But now you're articulating a conclusion

                                                            427

1    that had you gone through and calculated competing

2    damages, you're able to tell without actually

3    doing the analysis that your number would have

4    been less than Professor Duggan's?

5              MR. BERLIN:  Objection, form.

6    BY MR. LAVINE:

7         Q.    Is that your testimony?

8         A.    It's a simple calculation.

9              If I lower my ingredient cost to Dr.

10    Duggan's ingredient cost and I increase dispensing

11    fees by anything, I am going to get a smaller

12    damage number than he gets.

13              You don't have to do a full-blown

14    analysis to come to the conclusion that had he

15    instituted a but-for world that in any way had

16    resembled what the Congress of the United States

17    actually enacted when they reformed these

18    programs, you would come to the same conclusion

19    that I would that the damage calculation would in

20    fact be smaller.

21              It's not a matter of calculation.  It's

22    a matter of applying institutional knowledge and

Page 106

428

1    basic micro-economic theory.
2        Q.   And you think an estimate based upon
3    your review of the materials is a sufficient basis
4    for you to express that opinion that the numbers
5    would come out less?
6        A.   It's, again, my opinion from the start
7    has been Dr. Duggan's but-for world is not
8    realistic.  It's not realistic in a number of
9    different ways, which I have articulated over the
10   past two days at great length, and I don't want to
11   take up everybody's time.  We only have one minute
12   left.
13           But that this is a conclusion that's not
14   just pulled out of the air, but rather it's a
15   conclusion that's based on a review of the
16   evidence in the case that Dr. Duggan has not done,
17   and it's based on looking at the systems that were
18   ultimately imposed that would come up with very,
19   very different damage calculations than those that
20   were conducted by Dr. Duggan.
21           I was not asked to perform an
22   alternative damage calculation, and I have not

429

1    done so.  But I was asked to discuss whether Dr.
2    Duggan's calculations and characterization of the
3    but-for world would lead him to accurate

Depo-Hughes-James-05-06-09

4    estimates, and it was my conclusion that it did

5    not.

6         Q.   What is the methodology that you're

7    using to support your conclusion in that regard?

8         A.   Again, I reviewed the deposition

9    testimony, I reviewed the reports, I reviewed how

10   the federal government changed the Medicare and

11   the Medicaid systems.

12        I found in every instance that how these

13   things, how the state Medicaid agencies felt about

14   the issue of ingredient cost versus dispensing

15   fees, how the Myers & Stauffers report felt about

16   the relationship between dispensing fees and

17   ingredient costs and how Congress of the United

18   States and the MMA and the DRA felt about the

19   relationship between ingredient cost reductions

20   and dispensing fees.

21        Every single one of them was at odds

22   with the but-for world put forth by Dr. Duggan,

430

1    and that's the methodology that I used to conclude

2    that his but-for world lacks realism.

3         Q.   And for all those reasons without having

4    to actually do any calculations, you're able to

5    reach that conclusion; right?

6         A.   I was not asked to do any calculations,

7    and I did not.

8         MR. LAVINE:  We better take a break.

9         THE VIDEOGRAPHER:  Going off the record

Page 108

Depo-Hughes-James-05-06-09

10    at 11:59 a.m.

11                    (A lunch recess was taken and said

12    deposition continued as follows:)

13

14

15

16

17

18

19

20

21

22


                                                    431


1         A F T E R N O O N   S E S S I O N

2

3                    JAMES HUGHES,

4    having been previously duly sworn, was examined

5    and testified further as follows:

6

7              THE VIDEOGRAPHER:  Beginning of

8    Videotape No. 3.  We're back on the record at

9    12:56 p.m.

10

11                    EXAMINATION

12    BY MR. BREEN:

13         Q.   Good afternoon, Dr. Hughes.

14         A.   Good afternoon.

15         Q.   We met for the first time yesterday;

Depo-Hughes-James-05-06-09

16   correct?

17        A.   That's correct.

18        Q.   I'm Jim Breen.  I represent the relator

19   in this case, Ven-a-Care of the Florida Keys.

20             Do you know what Ven-a-Care is?

21        A.   Yes.  It's basically a, my understanding

22   it was a home infusion provider.


                                              432


1        Q.   Where did you gather that understanding

2   from?

3        A.   The complaint would be my guess.

4        Q.   Had you ever heard of them before

5   reading the complaint?

6        A.   No.

7        Q.   Had you ever heard of the False Claims

8   Act before reading the Complaint?

9        A.   I had heard of the False Claims Act.

10        Q.   In what context?

11        A.   Newspaper article or something.  I mean

12   literally just heard of it, not have any specific

13   knowledge of it.

14        Q.   What is your understanding of the False

15   Claims Act?

16        A.   I don't have a legal understanding of

17   it, but that it is illegal to submit false or

18   fraudulent claims for payment to the U.S.

19   government.

20        Q.   And did you gather that understanding

21   from the newspaper article you read?
                    Page 110

Depo-Hughes-James-05-06-09

22      A.    I probably gathered it in passing from

433

1    the complaint.
2         Q.    How are damages calculated under the
3    False Claims Act?
4         A.    I am not familiar with that, with the
5    legal standard.
6         Q.    Do you know this is a false claims case?
7         A.    Yes.
8         Q.    So you're not familiar with the legal
9    standard for calculating damages in the case you
10   are an expert in?
11        A.    Well, I understand there's damages and
12   then there's penalties --
13        Q.    Is that true?
14        A.    Pardon me?
15        Q.    Is that true?
16        A.    I'm sorry.  Is what true, sir?
17        Q.    You are not familiar with the legal
18   standard for calculating damages in a case you're
19   an expert in?
20        A.    I'm not a legal expert, no, sir.
21        Q.    Are you familiar with the standard for
22   calculating damages in this case?

434

1         A.    Not specifically, no.

Page 111

Depo-Hughes-James-05-06-09

2      Q.   How about generally?

3      A.   That you're entitled to recoup the

4  overpayment from the false claim, and then there's

5  also a penalty attached per claim.

6      Q.   How's the overpayment calculated?

7      A.   I'm not familiar with that.

8      Q.   Did you review Dr. Duggan's materials in

9  this case?

10      A.   I did.

11      Q.   All of them?

12      A.   I reviewed his reports, yes.

13      Q.   And did you see anything in there which

14  indicated that Dr. Duggan was attempting in good

15  faith to apply the measure of damages applicable

16  in a false claims case?

17           MR. BERLIN:  Objection, form.

18           THE WITNESS:  I did not, to my

19  recollection, I did not see the term "false

20  claims" in his report.

21  BY MR. BREEN:

22      Q.   Now, when you say you looked at all his

                                                      435

1  materials, describe for the court and the jury

2  what that looked like.

3      A.   When I say what I reviewed is I reviewed

4  his report, I reviewed his supplemental report,

5  and I reviewed his rebuttal report.

6      Q.   Did somebody represent to you that's all

7  that Dr. Duggan produced in connection with his

Page 112

Depo-Hughes-James-05-06-09

8   work in this case?

9       A.   No, not at all.

10          And I reviewed his exhibits and I

11  reviewed some, but not all, of the documents that

12  he produced.

13          Mr. Lavine and I talked about some of

14  the other documents that I had reviewed that he

15  had produced.

16      Q.   Can you describe for the court and the

17  jury the code he wrote for his algorithm?

18      A.   No.  That was not my task.

19      Q.   I didn't ask if it was your task.  I

20  asked if you could describe it.

21      A.   And I answered that that was not my

22  task.  So I cannot describe it for you.


                                              436


1           MR. BERLIN:  Actually, he answered "No,

2   that was not my task."

3   BY MR. BREEN:

4       Q.   Whenever you respond by telling me that

5   something was not your task, I don't know if the

6   answer is no, I don't know, or you're just

7   changing my question and saying it's not your

8   task.

9           So to the extent that I have to repeat

10  myself when you say "No, that was not my task,"

11  that's the reason I have to keep repeating myself.

12  Okay?

13      A.   Sure.

                    Page 113

Depo-Hughes-James-05-06-09

14        Q.   Do you have any idea whatsoever what

15   code Dr. Duggan wrote for the damages calculations

16   in the case?

17        A.   What do you mean by do I have any idea

18   whatever?

19        Q.   Any idea whatsoever.

20        A.   He wrote a computer program.  That's

21   what I know.

22        Q.   What kind of program?

                                                    437

1        A.   I don't know.

2        Q.   What kind of application did he use?

3        A.   The code I saw I thought may have looked

4   like STATA, but I wasn't paying much attention to

5   it.

6        Q.   So you did see the code?

7        A.   I saw pages from the code.  We saw pages

8   from the code today.

9        Q.   Okay.  And did you review his, when you

10   looked at the code did you go through it in order

11   to determine whether or not you could understand

12   the algorithm he was applying in this case?

13             MR. BERLIN:  Objection, form.

14             THE WITNESS:  I did not review the code

15   in that way, no.

16   BY MR. BREEN:

17        Q.   Did you write any econometric code in

18   this case?

19        A.   No.

Depo-Hughes-James-05-06-09

20      Q.   Why not?

21      A.   Because when I needed coding done, I

22   directed Huron to do that for me.


                                                        438


1       Q.   How many econometricians work for Huron?

2       A.   I have no idea.

3       Q.   So what was the qualification of the

4    person that you were directing to write code?

5       A.    I had not looked at their CV, but they

6    had written code in other cases before and they

7    were held out to me by Huron as capable of doing

8    it, and I had no reason to believe otherwise.

9       Q.   Please explain everything you did to

10   test the work that Huron did in connection with

11   writing code for you to ensure that their work was

12   correct.

13      A.   The exhibits that they produced for me,

14   I proofread those to make sure that they were the

15   work that I had asked them to do.

16      Q.   But as far as their quantification goes,

17   their formula, the mathematical functions they

18   performed at your direction, explain the testing

19   you did, statistically or otherwise, to ensure

20   they were correct?

21      A.   I did none of that.

22      Q.   So as far as you know, it's wrong?


                                                        439

Depo-Hughes-James-05-06-09

1      A.    Huron holds itself out as a capable and
2    expert consulting organization.
3            I had no reason to believe otherwise.  I
4    have worked with Huron before, and they have
5    quality control procedures in place which, to the
6    best of my knowledge, that they followed.
7            So as is standard practice for just
8    about any expert in my position, when you need
9    support you certainly trust that the people who
10   are supporting you are doing their jobs correctly.
11     Q.    So is it fair to say that Dr. Duggan
12   wrote his own code and did his own calculations
13   and analyzed his own data, and you relied upon
14   Huron and you have no idea whatsoever even what
15   the academic qualifications are of the person that
16   did it there --
17           MR. BERLIN:  Objection, form.
18   BY MR. BREEN:
19     Q.    -- is that a fair statement?
20           MR. BERLIN:  I'm sorry.  Objection,
21   form.
22           THE WITNESS:  As I understand, no.

                                                    440

1            I understand that Dr. Duggan was
2    supported also by a consulting firm, and it's my
3    belief that that consulting firm did some of the
4    data analysis and some of the programming for him.
5    BY MR. BREEN:
6      Q.    So it's your understanding that Stat
                        Page 116

Depo-Hughes-James-05-06-09

7   Consulting wrote the code and the algorithms for

8   Dr. Duggan.  Is that your testimony?

9       A.   It's my understanding that they

10  supported him in his work, which I had understood

11  to be writing code.

12           But I don't have specific knowledge

13  whether they did or did not.

14      Q.   Well, since you're here to criticize Dr.

15  Duggan and criticize the analysis he conducted,

16  the assumptions he made, and the factual basis for

17  those assumptions, can't you give us any insight

18  whatsoever into your knowledge of the work that he

19  actually performed as opposed to relied upon

20  somebody else?

21           MR. BERLIN:  Objection, form.

22           THE WITNESS:  He lays out in his report

                                                    441

1   what he did, he lays out in the report how he did

2   it, he lays out in the report what the calculation

3   is.

4            I don't need to go to computer code to

5   understand that he took the actual reimbursement,

6   he calculated a but-for reimbursement using his

7   but-for AWP of a hundred twenty-five percent of

8   average contract price, he subtracted the two,

9   that was his difference for that particular claim.

10           And then he aggregated that across, in

11  the case of Medicaid, the nine states that he

12  actually analyzed, and then extrapolated from

                    Page 117

Depo-Hughes-James-05-06-09

13      there.

14              I don't need to look at the computer

15      code to figure out that that's in fact what he

16      did.

17              I trust that he did the computer

18      calculations correctly.  It was not part of my

19      assignment to check whether his computer

20      calculations were in fact correct.

21              As for the factual basis underlying his

22      calculations, the factual basis won't be found in

                                                        442

1       the computer code because the computer code is

2       just the method he used to do his addition,

3       subtraction, and extrapolation.

4       BY MR. BREEN:

5           Q.   Well, let me ask this question:  What

6       Abbott-defined classes of trade did Professor

7       Duggan utilize in calculating the average sales

8       price that you just testified about or the average

9       contract price?

10          A.   I'm sorry.  Is there a question?

11              MR. BREEN:  Would you please read the

12      question back.

13                  (The record was read back as

14      requested.)

15              THE WITNESS:  My recollection is he used

16      the indirect contract sales to the retail sector.

17      BY MR. BREEN:

18          Q.   What retail sector?
                    Page 118

Depo-Hughes-James-05-06-09

19        A.    To the retail class of trade.   Sorry.

20        Q.    Is that the Abbott-defined class of

21   trade, the retail class of trade?

22        A.    That's my understanding.


                                                        443


1              MR. BERLIN:   I'm sorry.   Objection,

2    form.

3    BY MR. BREEN:

4         Q.    So your understanding is that Abbott

5    defines a class of trade as the quote "retail

6    class of trade," and that's the one that Dr.

7    Duggan used in his algorithm?

8              MR. BERLIN:   Objection, form.

9              THE WITNESS:   I don't know sitting here.

10   There are some fifteen or twenty or more classes

11   of trade that are defined by Abbott.   I don't know

12   what Abbott calls each and every class of trade.

13             But Dr. Duggan represented in his report

14   that he wasn't using hospitals, he wasn't using,

15   but he was using pharmacies and the indirect sales

16   to those pharmacies.

17   BY MR. BREEN:

18        Q.    How about mail order pharmacies, did he

19   use mail order pharmacies?

20        A.    No, not to my knowledge.

21        Q.    You don't know?

22        A.    Not to my knowledge, yes, I do not know.


                        Page 119

Depo-Hughes-James-05-06-09

444

1      Q.    When you say "not to my knowledge," do
2  you mean I don't know or I don't think he did?
3      A.    I said not to my knowledge, which means
4  I don't know one way or the other.
5      Q.    You don't know one way or the other.
6            All right.  I think you mentioned
7  Deficit Reduction Act of 2005 in response to Mr.
8  Lavine's questions either today or yesterday.
9            Do you recall that?
10     A.    Yes, I do.
11     Q.    And you talked about how in the DRA of
12  2005 there was a new method of calculating Federal
13  Upper Limits.
14            Do you recall that?
15     A.    Yes.
16     Q.    What was that method?
17     A.    The method is that the ingredient cost,
18  Federal Upper Limit will be two hundred fifty
19  percent of average manufacturer's price as defined
20  in the statute, plus a dispensing fee.
21     Q.    Average manufacturer's price.
22            How do you calculate average

445

1  manufacturer's price under DRA 2005?
2      A.    It's in the statute.  I don't have it
3  memorized.
4      Q.    Do you have any idea whatsoever?

Page 120

Depo-Hughes-James-05-06-09

5      A.   Yeah.  I've been across it.

6           Again, it involves retail sales as

7      opposed to others, as I recall.  But no, I don't

8      have it memorized.

9      Q.   Isn't that one of those alternative

10     worlds that you thought Dr. Duggan should apply in

11     this case, the one that would exist under DRA

12     2005?

13          MR. BERLIN:  Objection, form.

14          THE WITNESS:  Yes.

15     BY MR. BREEN:

16     Q.   So that's one of your alternative

17     worlds, and the best you can tell us is that it's

18     in the statute someplace?

19          How can you say that it's an alternative

20     world that Dr. Duggan should have applied when you

21     don't even know what that alternative world is?

22     A.   I do know what the alternative world is.

                                                  446

1           It's two hundred fifty percent of

2      average manufacturer's price.  And average

3      manufacturer's price is defined as some average of

4      the selling price inclusive or exclusive of

5      discounts to the retail class of trade.

6      Q.   But you gave an opinion under oath that

7      in your opinion applying the DRA 2005 alternative

8      world would have resulted in a lower damages

9      number than Dr. Duggan's world; correct?

10     A.   That's correct.

Page 121

Depo-Hughes-James-05-06-09

11      Q.   Yet you don't know how AMP is calculated

12  in the Deficit Reduction Act of 2005; do you?

13           MR. BERLIN:  Objection, form.

14           THE WITNESS:  I have a general idea of

15  how, but I don't have the statute memorized such

16  that I can recite for you the average manufacturer

17  price formula in DRA 2005.

18  BY MR. BREEN:

19      Q.   But you would agree that unless you

20  understood and comprehended how the DRA 2005

21  calculated average manufacturing price, you

22  couldn't compare it with the results from Dr.

447

1   Duggan's model using the hundred twenty-five

2   percent of average contract price; could you?

3            MR. BERLIN:  Objection, form.

4            THE WITNESS:  Well, again, there's a

5   difference between what I am here and able to

6   recite for you in deposition and what I knew two

7   months ago, three months ago, when I was actually

8   writing the report, is at that time I had been

9   through the documents that I cite in my report.

10  And at the time that I was forming my opinion, I

11  did indeed know precisely how AMP was calculated

12  under DRA 2005.

13           But sitting here today with your memory

14  test, I don't actually know the formula that I can

15  recite for you.  But at the time I was forming my

16  opinion as shown by the documents that I reference

Depo-Hughes-James-05-06-09

17    in my report, yes, I did know exactly what the

18    formula was at the time that I was writing my

19    opinions down in my report.

20    BY MR. BREEN:

21        Q.   Well, this is no memory test.  And this

22    is a very important point, so I'm going to ask we

448

1    take a break right now and you find it because I

2    need to ask questions about how you assumed

3    average manufacturer price was calculated under

4    the Deficit Reduction Act of 2005 so we can

5    compare it with how Dr. Duggan calculated average

6    contract price in the model that you are

7    discrediting.

8            MR. BREEN:  So I'd like to take a break

9    now and ask the witness to do that, if possible.

10           MR. BERLIN:  You want to take a break

11    and have him get the statute so that he can refer

12    to the statute and tell you what the statute says?

13           MR. BREEN:  Absolutely not.

14           He just testified that it's in his

15    working materials, what he assumed the statute

16    said and how he applied it to his opinion in this

17    case.

18           I want him to show me in his working

19    materials so I can ask questions about it because

20    I didn't see it in there.

21           MR. BERLIN:  I don't know if we have a

22    full set of his working materials here.  I guess

Page 123

Depo-Hughes-James-05-06-09

449

 1    we can check.

 2            MR. BREEN:  Let's take a break and

 3    check.

 4            MR. BERLIN:  Okay.

 5            THE VIDEOGRAPHER:  Going off the record

 6    at 1:11 p.m.

 7                    (A recess was taken.)

 8            THE VIDEOGRAPHER:  We're back on the

 9    record at 1:28 p.m.

10    BY MR. BREEN:

11        Q.   Okay.  Did you have an opportunity to go

12    back, Doctor, and figure out what assumptions you

13    made with respect to the method by which average

14    manufacturer price is to be calculated under the

15    Deficit Reduction Act of 2006 provisions for a

16    Federal Upper Limit in Medicaid?

17        A.   I brought back with me the document

18    that's in my, that was in my production.  Do you

19    want me to hand it over to you?

20        Q.   If you want to use it to refresh your

21    recollection, feel free.  But I'd like you to

22    explain to us what classes of trade or what kinds

450

 1    of prices are included in the calculation of AMP

 2    as implemented by the Department of Health & Human

 3    Services pursuant to the Deficit Reduction Act of

Depo-Hughes-James-05-06-09

4    2005?

5         A.    Okay.  My understanding of AMP as

6    designated by the Deficit Reduction Act is that it

7    is the average price for sales of a drug through

8    wholesalers to the retail class of trade, net of

9    all discounts.  And then that is calculated by the

10   manufacturer and submitted to CMS.

11        Q.    Didn't you just describe the AMP

12   definition under OBRA 90?

13        A.    I cannot, no.

14        Q.    Pardon me?

15        A.    I cannot, no.

16        Q.    You cannot "no" or "know"?

17             MR. BERLIN:  What's the question that's

18   pending?  I'm sorry.

19   BY MR. BREEN:

20        Q.    Did you not just describe to me the AMP

21   calculation under the Omnibus Budget

22   Reconciliation Act of 1990?

                                                    451

1         A.    No.

2              It's my understanding that I have

3    described for you what is required under the

4    Deficit Reduction Act of 2005.

5         Q.    And what does it say about including

6    sales to mail order pharmacies?

7         A.    Again, I don't have any information

8    about the exact wording of the statute.

9         Q.    What does it say about sales to classes

                        Page 125

Depo-Hughes-James-05-06-09

10    of trade that purchase drugs at prices
11    substantially less than community pharmacies and
12    chain pharmacies?
13        A.   As I said, it depends on whether mail
14    order pharmacies or these other pharmacies are
15    included in what they call the retail class of
16    trade.
17        Q.   Do you think that Congress defined how
18    AMP is to be calculated, or was it delegated to
19    the Department of Health & Human Services?
20        A.   As I understand it, I don't know whether
21    it was delegated to the Department of Health &
22    Human Services or the exact definition was in the

                                                    452

1     statute.  And it doesn't matter to my opinion.
2         Q.   Well, if it doesn't matter to your
3     opinion, can you please explain now then to the
4     court and jury how you can testify under oath that
5     application of the AMP definition for Federal
6     Upper Limit calculations under the Deficit
7     Reduction Act of 2005 would somehow lead to lower
8     damages than the method applied by Dr. Duggan if
9     you don't know what the Deficit Reduction Act and
10    its implementation provides?
11        A.   Because if you look at Exhibit 9 in my
12    report, you can see that under the new Federal
13    Upper Limits that we've been discussing under the
14    Deficit Reduction Act of 2005 require that the AMP
15    be scaled by two hundred fifty percent is how the
                    Page 126

Depo-Hughes-James-05-06-09

16    ingredient cost is calculated.

17            Dr. Duggan scales his average selling

18    price by only a hundred twenty-five percent.  So

19    unless, excuse me, he scales his, I misstated

20    that.  He scales his average selling price by only

21    twenty-five percent, not a hundred twenty-five as

22    I said previously.


                                                    453


1             So given that these are, the AMP is a

2     selling price to the retail class of trade, and

3     given that Dr. Duggan used something, also used an

4     average selling price to, indirect selling price

5     to the retail class of trade, you can see from the

6     examples that I presented in Exhibit 9 that the

7     reimbursement under the FUL designated by the

8     Deficit Reduction Act of 2005 would lead to a

9     substantially higher reimbursement than Dr.

10    Duggan's calculation.

11    BY MR. BREEN:

12        Q.    But the fact of the matter is, Doctor,

13    in Exhibit 9 you start with the same average

14    price; don't you?

15            Don't you assume that Dr. Duggan's

16    calculated average selling price or average

17    contract price, however you want to characterize

18    it, is the same as the AMP calculated under the

19    DRA 2005?

20            MR. BERLIN:  Objection, form.

21            MR. BREEN:  What's wrong with that

22    question?

454

1         MR. BERLIN:  There's several things that
2    are wrong with that question.
3         The way you started connects it to the
4    other idea which doesn't necessarily --
5         MR. BREEN:  I'll restate the question.
6    BY MR. BREEN:
7    Q.    Listen to the question.
8         In Exhibit 9 of your report when you
9    compare the way a calculation would occur under
10   Dr. Duggan's methodology versus the DRA of 2005,
11   don't you use the same number for the beginning
12   average selling price for Duggan and AMP for DRA
13   2005?
14   A.    It's my understanding that Dr. Duggan's
15   calculation and AMP 2005 are actually different
16   numbers.
17   Q.    How are they different?
18   A.    Dr. Duggan includes only contract sales
19   and the AMP includes all of the sales to the
20   retail trade, retail class of trade, as I
21   understand it.
22   Q.    Which one is a higher number?

455

1    A.    As I understand it, the AMP is higher.

Depo-Hughes-James-05-06-09

2      Q.   The AMP is higher than Dr. Duggan's

3  number?

4      A.   That's right.

5      Q.   That's your assumption; isn't it?

6      A.   That's what I recall that we found in

7  the calculations that we did.

8      Q.   Do you have your report handy?

9      A.   I do have my report handy.

10     Q.   Can you turn to Exhibit 9, because this

11 is important, and if you believe that Dr. Duggan's

12 average selling price is a lower number than the

13 AMP under DRA 2005, I'd like you to make sure that

14 that's clear on the record.

15          MR. BERLIN:  Objection.  Move to strike

16 counsel's commentary on his examination.

17          THE WITNESS:  Where's my stack of

18 exhibits?

19          MR. LAVINE:  I don't think the exhibits

20 were actually marked as an exhibit.

21          MR. BREEN:  I'm sorry.  I thought they

22 were attached to your copy.

                                                    456

1          THE WITNESS:  I thought they were too.

2          MR. BREEN:  I apologize.

3          THE WITNESS:  I had one yesterday.

4          MR. BERLIN:  That's all right.  We'll

5  find it.

6          MR. BREEN:  Well, this is just Exhibit

7  9, right.

Depo-Hughes-James-05-06-09

 8            MR. BERLIN:  But that's what you're

 9    referring to.

10            MR. BREEN:  I'm going to ask the

11    Reporter to mark Exhibit 9 as the next exhibit.

12                (Deposition Exhibit Hughes 011 was

13    marked for identification.)

14    BY MR. BREEN:

15       Q.   All right.  Just to add to the confusion

16    today, we've marked Exhibit 9 as Exhibit 11.  And

17    it's Exhibit 9 from your report, Doctor, I

18    believe, and it will now be Exhibit 11 to your

19    deposition.  (Document tendered to the witness.)

20            Do you have that in front of you?

21       A.   Yes.

22       Q.   Now, can you tell us whether, what's

                                                   457

 1    higher, the Duggan average selling price or the

 2    DRA 2005 AMP?

 3       A.   I'm sorry.  Say that again.

 4       Q.   What's higher, the Duggan average

 5    selling price or the DRA 2005 AMP?

 6       A.   Well, the columns that's on this exhibit

 7    is not AMP, but it's AMP times 2.5 taking into

 8    account the two hundred fifty percent markup to

 9    AMP.

10            So to answer that question, we'd have to

11    get out a calculator and take, divide column,

12    well, Column 4 by 2.5 and we'd have to get a

13    calculator and divide Dr. Duggan's number by 1.25.

Page 130

Depo-Hughes-James-05-06-09

14      Q.   But your opinion though is based upon

15   the assumption that Duggan's alternative selling

16   price or average selling price will be applied

17   across the board to Medicaid reimbursement,

18   correct, to all drugs?

19      A.   Certainly that is my understanding of

20   the thrust of the dozens of cases under litigation

21   regarding the AMP matter, yes.

22      Q.   So in general, if you apply, if you're

458

1   right, and I'm not saying you are, but if you're

2   right and Dr. Duggan's opinion is that the United

3   States government which paid all Medicaid

4   reimbursement based upon this damages calculation

5   that he made, what would that mean in the

6   aggregate for all drugs in terms of the

7   comparative calculation between the FUL under DRA

8   2005 and the Duggan average price?

9      A.   I'm sorry.  I do not understand that

10   question.

11      Q.   Well, in the aggregate is the

12   reimbursement going to be, for all drugs if you

13   add them all up, is it going to be greater under

14   the Duggan methodology or greater under DRA 2005?

15      A.   Is what going to be greater,

16   expenditures or --

17      Q.   Medicaid reimbursement.

18      A.   Medicaid reimbursement?

19           Well, based on what I've calculated for

Page 131

Depo-Hughes-James-05-06-09

20    the drugs we're looking at here in this matter,

21    I've calculated that the reimbursements would be

22    higher under DRA 2005.

                                                              459

1              I haven't examined what would happen

2     under DRA 2005 across the board for all drugs.

3         Q.   Well, on the one hand you've got this

4     opinion that the alternative world is one that Dr.

5     Duggan so erroneously failed to consider as an

6     alternative world where all Medicaid reimbursement

7     is based upon the formula in DRA 2005; correct?

8         A.   Yes.

9         Q.   Okay.  So if that's the alternative

10    world that you think Dr. Duggan should have

11    applied, I'm asking you what that alternative

12    world would look like in terms of Medicaid

13    reimbursement across the board for all drugs

14    because you seem to think it should be applied to

15    brands and everything else.

16             So my question is if the Medicaid

17    programs of the various states were to apply this

18    alternative world that you think Dr. Duggan should

19    have and reimbursement would now be based upon the

20    FUL definition in DRA 2005, if you add up all the

21    reimbursements for brands, for the drugs in this

22    case, for all the drugs, would more be paid for

                                                              460

Depo-Hughes-James-05-06-09
1  reimbursement under DRA 2005 or will more be paid
2  under Duggan's model?
3          MR. BERLIN:  Objection, form.
4          THE WITNESS:  I don't know because I
5  haven't done that calculation.
6          But whether it's higher under Dr.
7  Duggan's method or whether it's higher under DRA
8  2005 is immaterial to my opinion in this matter.
9  BY MR. BREEN:
10     Q.   So when you talk about an alternative
11 world, you talk about alternative world for all
12 drugs.  But then when you do your calculations,
13 like you do in Exhibit 9, you just do it on a
14 drug-by-drug basis; is that right?
15     A.   No.  I have a -- yes, the calculation is
16 on a drug-by-drug basis.
17         But my opinion is about Dr. Duggan's
18 damage calculation as it applies to the drugs at
19 issue here.  And the alternative, one of the
20 factors in the alternative world that I say that
21 Dr. Duggan should have applied is --
22         THE WITNESS:  I'm sorry.  I lost my

                                              461

1  train of thought.
2          Could you read back where I started with
3  that?
4              (The record was read back as
5  requested.)
6          THE WITNESS:  Okay.  Thank you.
                    Page 133

Depo-Hughes-James-05-06-09

7            So my opinion on Dr. Duggan's

8    methodology is that his but-for world is

9    unrealistic.

10           Why?  Because there is this alternative

11   enacted by Congress where Congress has taken into

12   account all of the concerns over access and over

13   cost containment and has come up with this new

14   system, DRA 2005.

15           This new system is wildly at odds with

16   what Dr. Duggan calculates in his calculation, and

17   that's part of the basis for my conclusion that

18   his but-for world is simply unrealistic.

19           It is possible that if all drugs were

20   reimbursed under DRA 2005, which I do believe is

21   the alternative world rather than Dr. Duggan's

22   alternative world, if all drugs were reimbursed

                                                   462

1    under DRA 2005 it's possible that government

2    expenditures might be higher under the DRA than

3    they would be under Dr. Duggan's approach, it

4    might be that they're lower under the DRA than

5    they are under Dr. Duggan's approach.

6            But that's immaterial to my opinion

7    about the validity of Dr. Duggan's vision of the

8    but-for world as articulated in this report.

9    BY MR. BREEN:

10       Q.   If I understand the reason that you so

11   strongly point to the DRA 2005 as the most

12   reasonable assumption of a but-for world, it's

Depo-Hughes-James-05-06-09

13   because Congress passed the statute and that's
14   what's being implemented today; correct?
15       A.   Well, no --
16            MR. BERLIN:  Object -- go ahead.
17            THE WITNESS:  The DRA has not yet, it's
18   been stayed by litigation and it's not yet being
19   implemented.
20   BY MR. BREEN:
21       Q.   Has it now?  Why was it stayed?
22       A.   As I understand it, certain groups have

463

1   sued the government claiming in effect that the
2   reimbursements under the DRA are not sufficient.
3       Q.   Not sufficient for all drugs or not
4   sufficient for some drugs?
5       A.   I haven't read the lawsuits in
6   particular, no.
7       Q.   Have you read Dr. Schondelmeyer's expert
8   opinion in the case that you're talking about?
9       A.   Which -- no.  I assume that I haven't.
10   I read his expert opinion in this case but not in
11   any other.
12       Q.   Are you aware that he's the expert in
13   that case also --
14       A.   No, I'm not.
15       Q.   -- opposing the government's position?
16       A.   No, I'm not.
17       Q.   And has opined on the Deficit Reduction
18   Act?
                    Page 135

Depo-Hughes-James-05-06-09

19    A.   I am not aware of any of that, no.

20    Q.   And has opined on the Department's

21 calculation of AMP?

22    A.   No.

464

1    Q.   Do you know that the AMP as calculated

2 on the Deficit Reduction Act because they apply to

3 all drugs, at least in the opinions of some

4 people, would reimburse less than cost even at two

5 hundred fifty percent of AMP?

6          MR. BERLIN:  Can I have that back.

7              (The record was read back as

8 requested.)

9          MR. BREEN:  For some drugs.

10         MR. BERLIN:  Objection, form.

11         THE WITNESS:  I'm not aware of that.

12 But, again, it's not material for my opinion

13 because in the case here Dr. Duggan's, on the

14 drugs at issue here Dr. Duggan's methodology is

15 reimbursing even less.

16 BY MR. BREEN:

17    Q.   For these drugs?

18    A.   For these drugs which are at issue, yes.

19    Q.   All right.  Now, let's talk about that.

20         As I understand it, you assume that the

21 most logical but-for world is to use your

22 understanding of the DRA 2005, which even you

Depo-Hughes-James-05-06-09

465

1    admit is not even implemented; correct?

2              MR. BERLIN:  Objection, form.

3              THE WITNESS:  Those are your words, not

4    mine.  I did not say anything like this is he best

5    or the most likely.  I said it was one that could

6    have informed his vision of the but-for world but

7    did not.

8              My objections to his characterization of

9    the but-for world, as I've said repeatedly over

10   the last two days, is that he is lowering

11   ingredient cost only in Medicaid and he is

12   assuming that everything else stays the same in

13   contradiction to the volumes of testimony and the

14   volumes of reports that have occurred over the

15   past forty years that say that if one is to reduce

16   ingredient cost even moderately, that there's

17   going to have to be more attention paid to perhaps

18   increasing the dispensing fees so that the

19   providers still have the incentive and still are

20   getting remunerative reimbursements in order to

21   participate in Medicaid.

22             I then use DRA 2005 as an example of a

466

1    government policy where it was explicitly

2    recognized that when altering ingredient costs,

3    lowering ingredient costs, that dispensing fees

4    would need to be adjusted in that states were

Page 137

```
 5   specifically directed to review their dispensing

 6   fees to make sure that they were adequate.

 7           But my characterization of DRA 2005 is

 8   it's a place that he could have looked for an

 9   example of how those competing mandates of cost

10   containment and access could be taken into account

11   in the way that they were taking into account by

12   the U.S. government.

13   BY MR. BREEN:

14       Q.   So do you deny that your calculations in

15   Exhibit 9 to your report are based upon

16   calculations that you think would occur under DRA

17   2005 under the FUL program which has not even been

18   implemented?

19           Do you agree that this is the FUL

20   program that has been stayed and not implemented?

21       A.   This is the formula in the FUL program

22   that has been stayed and not implemented.
```

467

```
 1       Q.   And yet that's the one that you

 2   criticize Dr. Duggan for not using?

 3       A.   Correct.

 4       Q.   You think he should have used the

 5   formula that's been stayed and blocked by the

 6   federal courts and not been implemented?

 7       A.   Well, if DRA 2005 is inadequate for

 8   drugs, including inadequate for these drugs, and

 9   is causing lawsuits and is causing people to

10   threaten if this goes into effect to withdraw from
```

Page 138

Depo-Hughes-James-05-06-09

11  the Medicaid system, my conclusion is that Dr.

12  Duggan's system would have even bigger problems

13  than this for these drugs because, after all, his

14  reimbursements are lower than what is mandated

15  under DRA 2005.

16          But, again, I provided the example of

17  the DRA 2005 as an illustration of my criticism

18  that Dr. Duggan claims that one can lower

19  ingredient cost reimbursements under Medicaid for

20  some states by seventy, eighty, even more than

21  ninety percent without adjusting dispensing fees

22  by a penny and still have Medicaid participants

                                                    468

1  have the same access to these services as the

2  public at large, which is what's mandated under

3  the Medicaid Act.

4          I found at the time that I wrote my

5  report, and I find sitting here today, that to be

6  an unrealistic assumption.

7          So my criticism is Dr. Duggan needed to

8  have a more realistic vision of the but-for world

9  where he's free to lower ingredient cost to

10  whatever he wants, but that he needed to inform

11  his vision of the but-for world from the reports

12  that the government commissioned or that the

13  government conducted and from the deposition

14  testimony in this case from state and federal

15  officials that said that lowering dispensing fees,

16  excuse me, lowering ingredient cost could not be

Page 139

Depo-Hughes-James-05-06-09

17    done in isolation from changing dispensing fees.

18          The other thing that's happened and has

19    been alluded to in deposition testimony, and I

20    know from my previous experience, is that states

21    over the years have tried to lower ingredient cost

22    but much smaller amounts than Dr. Duggan is

469

1    proposing here only to meet resistance and have to

2    either modify their reduction in ingredient cost

3    so that the reduction is not so great or to

4    abandon that change altogether.

5          Again, DRA 2005 was an example of a

6    change that could inform Dr. Duggan's analysis.

7     Q.   All right.  I'm going to try this one

8    more time.

9          My question has to do with Exhibit 9,

10    and I need an answer that is responsive to Exhibit

11    9.

12          Does Exhibit 9 encompass your criticism

13    or reflects your criticism of Dr. Duggan to the

14    extent that you say he should have used an

15    alternate world that followed the formulas of the

16    FUL calculation in DRA 2005?

17          MR. BERLIN:  Objection, form.

18          THE WITNESS:  Can you read that back to

19    me, please.

20              (The record was read back as

21    requested.)

22          THE WITNESS:  Okay.  Again, I am not

Page 140

Depo-Hughes-James-05-06-09

470

1    saying that Dr. Duggan had to follow the formulas
2    contained in DRA 2005.  I have not said that in my
3    report and I have not said it in the deposition
4    testimony.
5            Speaking to Exhibit 9, as you've asked
6    me to do, I will say that Exhibit 9 is an
7    illustration of my criticism of Dr. Duggan's
8    report that when one seeks to lower ingredient
9    cost, that policy makers not just in DRA 2005 but
10   on all the reports and the deposition testimony
11   that I just spoke about, maintain that one needs
12   to increase dispensing fees, increase
13   administration costs, in such a way so that
14   reimbursements to the providers are still
15   remunerative.
16           So this is an illustration of that
17   criticism, yes.
18   BY MR. BREEN:
19      Q.   All right.  Now, is it your
20   understanding that the drugs at issue in this
21   case, including those that you have in Exhibit 9,
22   are some of the drugs that the DRA 2005 criticism

471

1    are aimed at?
2            In other words, do you think these are
3    the drugs that people are up in arms about not
                    Page 141

Depo-Hughes-James-05-06-09

4    being able to purchase for the FUL amounts?

5              MR. BERLIN:  Objection, form.

6              THE WITNESS:  I don't know one way or

7    the other.

8    BY MR. BREEN:

9         Q.   Okay.  Well, in that case let me ask you

10   this:  Since you're relying upon the DRA 2005 and

11   Federal Upper Limits for so much of your opinion,

12   can you explain to us how Medicaid reimbursement

13   would have been impacted with respect to the

14   formulas applied by the state Medicaid programs

15   had they implemented the FULs and DRA 2005?

16             MR. BERLIN:  Move to strike the

17   commentary.

18             MR. BREEN:  I'll restate the question.

19   BY MR. BREEN:

20        Q.   Tell the court and the jury how state

21   Medicaid programs would have utilized the FULs

22   provided for in DRA 2005 in conjunction with their

                                                    472

1    existing reimbursement formulas.

2         A.   The FULs, as I understand it, the FULs

3    under DRA 2005 for those states that use a

4    reimbursement system of lesser of, scaled AWP,

5    MAC, usual and customary charge, or FUL, that this

6    would take the place of any previous FUL that was

7    in place for drugs.

8         Q.   So would they all pay the FUL or would

9    they pay the lesser of the FUL or their estimated

                    Page 142

Depo-Hughes-James-05-06-09

10    acquisition cost or usual and customary or state

11    MAC?

12          A.   Again, as I understand it, they would

13    pay the lesser of.

14          Q.   The lesser of.

15               So are you representing to the court and

16    the jury in this case that the FULs provided by

17    DRA 2005 are actually the amounts that are

18    expected to be reimbursed, or are you representing

19    that they're just one of the several lesser of

20    potential price points?

21          A.   It is one of the lesser of price points,

22    just like Dr. Duggan's but-for calculation is one

                                                      473

1     of the lesser of price points.

2          Q.   So what would the estimated acquisition

3     cost be, price point be, for the drugs that you've

4     got listed in Exhibit 9?

5          A.   I don't have that information in front

6     of me.

7          Q.   So you don't know whether the estimated

8     acquisition cost would be less than or equal to or

9     more than Dr. Duggan's alternate price; do you?

10          A.   I don't.

11               But at the same time you also have to

12    keep in mind that under the DRA states were

13    directed to look at their dispensing fees to make

14    sure that they were adequate.

15               And so in response to your question

Depo-Hughes-James-05-06-09

16    well, you know, what would the states have done,

17    one of the things that they would have done, had

18    it been implemented, is they would have reviewed

19    their dispensing fee policy in line with the

20    federal guidelines.

21           So it's not at all clear exactly what

22    states would have done.  I mean we can't say

                                                      474

1    sitting here what states would have done, but they

2    would have had to adjust their dispensing fees,

3    which could have led to adjustments in changes in

4    their reimbursement rules for EAC, or

5    reimbursement calculation for EAC.

6           Once you change one of these things,

7    exactly what states do one doesn't know.

8      Q.   Are you aware of what the states already

9    did to their administration and dispensing fees

10    for infusion pharmacy drugs?

11      A.   When and in what way?  I'm not sure what

12    you're saying.

13      Q.   Any time prior to today.

14           MR. BERLIN:  Objection, form.

15    BY MR. BREEN:

16      Q.   You're assuming that they're going to

17    change their dispensing fee for IV drugs from your

18    last response.

19           So I'm asking you if you're assuming

20    they're going to change that dispensing fee, do

21    you have any idea what they've already done to it?
                    Page 144

Depo-Hughes-James-05-06-09

22      A.   What I'm saying, what my response to the

                                                     475

1    previous question was is that the DRA directs them
2    to make sure that their dispensing fees are
3    adequate.  And I would expect if the DRA were
4    implemented, that they would make those
5    adjustments.
6        Q.   All right.  And I'm asking you for IV
7    drugs, the drugs at issue in this case, do you
8    know if the states already adjusted their
9    dispensing fees?
10       A.   It's my understanding some states have
11   adjusted them over the years.
12       Q.   When?
13       A.   I don't have --
14            MR. BERLIN:  Objection to form.
15            THE WITNESS:  I don't have the specific
16   dates memorized.
17   BY MR. BREEN:
18       Q.   Which states?
19       A.   I don't have the specific states
20   memorized.
21       Q.   How much?
22            MR. BERLIN:  Objection, form.

                                                     476

1            THE WITNESS:  I don't have the specific
                        Page 145

Depo-Hughes-James-05-06-09

2    amounts memorized.

3    BY MR. BREEN:

4        Q.   Do you have any basis whatsoever to

5    opine that in your opinion the states would

6    increase their dispensing fees and administration

7    fees for IV pharmacy, the IV pharmacy products at

8    issue in this case, had they reimbursed the Duggan

9    amounts?

10            MR. BERLIN:  Objection, form.

11            MR. BREEN:  I'll restate the question.

12   BY MR. BREEN:

13       Q.   Do you have any basis whatsoever to

14   render an opinion that the states would have

15   increased their dispensing or administration fees

16   for the IV drugs at issue in this case had they

17   used the Duggan prices for reimbursement?

18       A.   Okay.  Again, deposition testimony,

19   Myers & Stauffer reports, OIG reports, reports

20   from other government agencies going back over

21   forty years speaking to the inadequacy of

22   dispensing fees relative to the actual cost of

                                              477

1    administration.

2            Some of these reports also pointing out

3    that the dispensing fees that states are paying

4    are inadequate to cover the costs of dispensing

5    pills and tablets, and that these dispensing fees

6    are even more inadequate in the case of infusion

7    drugs.

                    Page 146

Depo-Hughes-James-05-06-09

8          And those reports were done at the,

9    referring to the existing levels of

10   reimbursements, the existing levels of EAC.

11          Now, Dr. Duggan is coming along with his

12   proposal that one can reduce in some states

13   reimbursements, ingredient cost reimbursements on

14   these drugs, by ninety percent or more without

15   taking into account any of these state concerns,

16   without taking into account any of the concerns

17   expressed by the people who have been hired to

18   study the adequacy of dispensing fees.

19          So all of that evidence from the

20   deposition testimony and other things, which Dr.

21   Duggan says he didn't refer to, leads me to

22   believe that yes, if you were, if a state were to

                                                478

1    reduce its ingredient cost reimbursement for these

2    drugs to the level that Dr. Duggan suggests in his

3    report, that states would in fact have to

4    undertake efforts to revise and increase their

5    dispensing fees.

6          So my basis is in the testimony and

7    other things in the record in this case.

8     Q.   Okay.  Economically speaking, for the

9    drugs listed in your Exhibit 9 tell the court and

10   the jury how much the State of California would

11   have increased their dispensing or administrative

12   fees for those drugs had they been supplied with

13   the pricing information that Dr. Duggan utilized?

Page 147

Depo-Hughes-James-05-06-09

14          MR. BERLIN:  Objection, form.

15          THE WITNESS:  I don't have the

16   California regulations committed to memory.

17   BY MR. BREEN:

18      Q.   How about Florida, can you tell us about

19   Florida?

20          MR. BERLIN:  Same objection to the line

21   of questioning.

22          THE WITNESS:  I don't have Florida's

479

1    reimbursement rules memorized.

2    BY MR. BREEN:

3       Q.   Did California or Florida already

4    increase their administration or dispensing fees

5    for IV pharmacy?

6       A.   California had increased dispensing fees

7    for pharmacy, which I believe included IV

8    pharmacy.

9       Q.   Have any of these states, to your

10   knowledge, increased the dispensing fees or

11   administrative fees for IV pharmacy to the point

12   where it's greater than the drugs that are

13   dispensed through a community pharmacy?

14      A.   I don't have a specific recollection

15   here.  I don't have those regulations memorized.

16      Q.   Well, if you don't know whether they've

17   already increased these dispensing fees or not,

18   how can you opine that they would have had to

19   increase them had Dr. Duggan's numbers been

Page 148

Depo-Hughes-James-05-06-09

20    applied?
21        A.   Well, two things:  If they are
22    increasing general pharmacy dispensing fees which

                                                           480

 1    fall under this, then if you're going to, and
 2    remember, I mean California was talking about a
 3    relatively small reduction in ingredient cost
 4    which necessitated an adjustment in dispensing
 5    fees.
 6            So, again, if you're going to take the
 7    Draconian cuts that Dr. Duggan has proposed, it
 8    stands to reason that they're going to have to
 9    increase the dispensing fees by form.
10        Q.   Oh, so California is talking about IV
11    pharmacy?  Is that your testimony?
12        A.   I don't remember whether it's IV
13    pharmacy.
14            I know that they reduced their
15    ingredient cost and adjusted their dispensing
16    fees.
17        Q.   Are you talking about the ten percent
18    across the board reduction due to the budgetary
19    crisis in California that was proposed?
20        A.   What timeframe are you talking about? I
21    don't think so.
22        Q.   Within the last two years.

                                                           481

Depo-Hughes-James-05-06-09

1        A.    I don't believe that's what I'm talking
2    about.
3        Q.    Then what are you talking about?
4              MR. BERLIN:  Objection, form.
5              THE WITNESS:  Again, I don't have the
6    times and the regulations memorized.  So I'm not
7    going to know the answer to your question.
8    BY MR. BREEN:
9        Q.    Well, your opinion is that Dr. Duggan is
10   wrong because he should have considered the fact
11   that states would have increased dispensing fees.
12   A lot of your opinion is based on that.
13             So I need to find out if you really know
14   anything about dispensing fees and whether they've
15   already been increased or not.
16             So I'm trying to find out.  So let me
17   ask this question:  Do you know anything about the
18   state of dispensing fees and administrative fees
19   for IV pharmacy in the Medicaid programs and
20   changes that had been made over the last five
21   years?
22       A.    I don't --

                                              482

1              MR. BERLIN:  Hold on, please.  Move to
2    strike commentary, objection to form.
3              THE WITNESS:  Again, I don't have
4    anybody's regulations memorized.
5    BY MR. BREEN:
6        Q.    Not regulations.
                   Page 150

Depo-Hughes-James-05-06-09

7          I want to know whether you know anything
8   about what kind of dispensing fees they're paying
9   and increases they've already made.
10       A.   Again, at the time I was writing my
11  report, included in a bunch of the reports I was
12  made aware of adjustments that had been made in
13  dispensing fees in certain states.
14          But sitting right here today, I don't
15  recall specific states or specific changes in
16  dispensing fees for IV pharmacy.
17       Q.   My last question was for the last five
18  years.
19          Let's go back to 1998.  Let's go back
20  eleven years.  Would your answer be the same?
21       A.   Yes, it would.
22          MR. BERLIN:  You meant the previous

                                                    483


1   question, not the last question.  You got me all
2   excited.
3          MR. BREEN:  My previous question, my
4   penultimate question.
5   BY MR. BREEN:
6       Q.   All right.  Now, if I understand your
7   testimony correctly -- well, let me just ask, if
8   you think Dr. Duggan should have considered the
9   DRA of 2005 and this other information you've been
10  talking about and based upon that adjusted his
11  damages model for anticipated increased dispensing
12  fees, why didn't you do that?  Why didn't you
                    Page 151

Depo-Hughes-James-05-06-09

13   figure it out?

14        A.   I mean it wasn't part of my assignment.

15   It wasn't what I was asked to do.  And doing the

16   calculation would have no affect on my opinion

17   that a valid damage calculation would need to take

18   such things into account.

19        Q.   So let's understand how this works, and

20   let's just back up and kind of go back to basics.

21             You're an expert witness in this case;

22   correct?

                                                        484

1        A.   Correct.

2        Q.   You're being paid for your testimony

3    just like my experts are; correct?

4        A.   I'm being paid for my time, yes.

5        Q.   Thank you for correcting me.  I said

6    that wrong.  You're being paid for your time.

7             You're going to testify truthfully as

8    you see it, whether it helps one side or the

9    other; right?

10        A.   Correct.

11        Q.   That's what independent experts are

12   supposed to do?

13        A.   That's correct.

14        Q.   And you're being paid how much an hour

15   for your time?

16        A.   $575.

17        Q.   575.  Is that your ordinary rate?

18        A.   It is.

                    Page 152

Depo-Hughes-James-05-06-09

19      Q.   Do you make more as an expert than you
20  do as a college professor?
21          MR. BERLIN:  Objection, form.
22          THE WITNESS:  I haven't really done the

                                                    485

 1  addition.  It depends on the year.
 2  BY MR. BREEN:
 3      Q.   You've made over $100,000 on this case;
 4  haven't you?
 5      A.   I haven't done the addition, but that
 6  sounds about right.
 7      Q.   Do you have to share that with the
 8  college or do you get to keep it?
 9      A.   I don't have to share it with the
10  college, no.
11      Q.   And that's the same for the rest of the
12  professors there at that college I would assume;
13  correct?
14          MR. BERLIN:  Objection, form.
15          THE WITNESS:  Is what the same?
16  BY MR. BREEN:
17      Q.   If they want to be experts or
18  consultants, they can do that for a certain amount
19  of time?
20      A.   Yes.
21      Q.   There's nothing wrong with that is my
22  point; correct?

                        Page 153

Depo-Hughes-James-05-06-09

486

1          A.    Okay.

2          Q.    Right?

3          A.    I don't see anything wrong with it.

4          Q.    So you're an expert.  And you didn't ask

5     to get on this case, the defendants asked you;

6     correct?

7          A.    That's correct.

8          Q.    As a matter of fact, the first folks

9     that called you up and got you involved in an AWP

10    case were the lawyers representing GlaxoSmithKline

11    at Covington & Burling; right?

12         A.    In an AWP case?

13         Q.    I'm sorry, Aventis -- or what was the

14    first AWP case you got involved in?

15         A.    Aventis in Connecticut, yes.

16         Q.    And that was Covington that called you

17    up?

18         A.    No.

19         Q.    Who was it?

20         A.    Shook Hardy & Bacon in Kansas City.

21         Q.    Shook Hardy & Bacon, okay.

22               And then it was GSK after that; correct?

487

1          A.    No.  I don't think I've ever worked on

2     with GSK on an AWP case.

3          Q.    All right.  I've got you confused then,

4     or I've got me confused.

Page 154

Depo-Hughes-James-05-06-09

5      Who was the next defendant you provided

6 services in connection with?

7      A.   It's been Aventis and it has been

8 Abbott.

9           I was retained by Barr, but the case

10 settled before I really did any work to speak of.

11 So it's really only been Aventis and Abbott.

12     Q.   Well, the Aventis case when you were

13 working with Shook Hardy, was it on the Anzemet

14 drugs?

15     A.   Anzemet and Taxotere, yes.

16     Q.   And Taxotere.

17          Anzemet was the house drug; right?

18 Marion Russell was the one that came up with that

19 drug?

20     A.   By the time I was involved, it was an

21 Aventis drug.  It didn't matter who had actually

22 come up with them.

488

1      Q.   What kind of spreads were on the Anzemet

2 drug?

3      A.   I don't remember at this point.

4      Q.   Did you do any spread calculation?

5      A.   I don't remember.

6      Q.   Do you know what that case was about?

7      A.   Yes.

8      Q.   What was it about?

9      A.   The Attorney General of Connecticut was

10 bringing suit believing that the state Medicaid

Page 155

Depo-Hughes-James-05-06-09

11   system was overpaying for those drugs.

12        Q.   Were you aware that there was a federal

13   case regarding the Anzemet drug also?

14        A.   No, I wasn't.

15        Q.   A federal qui tam case?  Were you aware

16   of that?

17        A.   No.

18        Q.   All right.  So you get hired by the

19   lawyers to help in their cases.

20             Did the lawyers typically ask you how

21   you feel you could be of assistance?

22        A.   No.


                                                    489


1         Q.   Have you ever had a lawyer do that?

2         A.   Not in those words, no.

3         Q.   No lawyer has ever called you up and

4    said you're the expert, here's my case, here's

5    some of the issues, how can you help me?

6         A.   Everything up to the last phrase.

7         Q.   The "How can you help me" part?

8         A.   Correct.

9         Q.   So the Abbott lawyers, who was the first

10   one that you met?

11        A.   Tina Tabacchi and Jim, I'm not going to

12   remember his last name.

13        Q.   Daley?

14        A.   Daley, yes.  Thank you.

15        Q.   Okay.  So Ms. Tabacchi and Mr. Daley

16   contact you.  Did they tell you what this case is

Depo-Hughes-James-05-06-09

17   about?

18        A.   In fairly broad terms, yes.

19        Q.   Did they tell you that, did they tell

20   you what Abbott did with its prices for

21   vancomycin?

22        A.   They told me generally what the

                                                      490

1    accusations were, yes.

2         Q.   But did they tell you what Abbott did

3    with their prices for vancomycin?

4         A.   At that first meeting I don't believe

5    so.

6         Q.   How about later?

7         A.   I don't think anybody ever sat me down

8    and said here's what the prices were for

9    vancomycin.

10        Q.   Did they tell you that back in the mid

11   '90s after OBRA 90 was passed they actually

12   started lowering the reported prices of vancomycin

13   for a short period of time?

14        A.   I think I became aware of that from the

15   Abbott deposition testimony.

16        Q.   Did they, well, I want to know what the

17   lawyers told you.  This is one of the few times I

18   get to ask that question.

19             Did the lawyers tell you about that?

20        A.   Not in those terms.  But I believe they

21   said things along the lines of there was a

22   divergence between the prices, over time there was

                            Page 157

Depo-Hughes-James-05-06-09

491

1    a divergence between the prices at which the drugs
2    were being sold at and the AWPs.
3         Q.   Did they tell you what happened in their
4    marketplace when they lowered the reported prices?
5         A.   No.  The lawyers did not tell me that.
6         Q.   Do you have any idea what happened?
7         A.   Again, I remember seeing something in
8    the Abbott deposition testimony that then the
9    price was readjusted, but I don't remember
10   exactly.
11        Q.   Readjusted back to where it started
12   from?
13        A.   I don't remember precisely.
14        Q.   You know where it went; don't you?
15             MR. BERLIN:  Objection, form.
16   BY MR. BREEN:
17        Q.   It went up; didn't it?
18        A.   That's my recollection is that it went
19   up, yes.
20        Q.   It went way up above the brand price;
21   didn't it?
22        A.   I don't know that, I don't remember that

492

1    specifically.
2         Q.   Do you remember that generally?
3         A.   I don't remember it generally either.

Page 158

Depo-Hughes-James-05-06-09

4          Q.    Okay.  So what happens when Abbott

5     causes the average wholesale price of a drug like

6     vancomycin to go up if it's being reimbursed by

7     Medicaid programs based upon formulas that use

8     that average wholesale price?

9               MR. BERLIN:  Objection, form.

10              THE WITNESS:  Could you read back the

11    question.

12                   (The record was read back as

13    requested.)

14              THE WITNESS:  Okay.  What happens to

15    what, I'd like you to clarify for me.

16    BY MR. BREEN:

17         Q.    What happens to the Medicaid

18    reimbursement?

19              MR. BERLIN:  Same objection.

20              THE WITNESS:  When the AWP for any drug

21    rises, if the EAC formula doesn't change, then the

22    reimbursement will increase.


                                                    493


1     BY MR. BREEN:

2          Q.    And you were speaking earlier about how

3     the Medicaid reimbursement is necessary that it

4     remunerate the pharmacists; correct?

5          A.    That the ingredient cost plus the

6     dispensing fee needs to be remunerative to the

7     pharmacy, yes.

8          Q.    So if Abbott causes its average

9     wholesale price to go up and if that causes the

Depo-Hughes-James-05-06-09

10    Medicaid reimbursement that's based upon EAC to go
11    up, does it cause an increase in the remuneration
12    to the pharmacist, the pharmacy?
13              MR. BERLIN:  Objection, form.
14              THE WITNESS:  Yes, it would.
15    BY MR. BREEN:
16         Q.   So you would agree with me that to the
17    extent that Abbott can control its average
18    wholesale price, it has the ability to cause an
19    increase in remuneration to pharmacies?
20         A.   Yes.
21         Q.   Now, are you familiar with a term called
22    "estimated acquisition cost"?

                                                   494

 1         A.   Yes, I am.
 2         Q.   What does that mean to you?
 3         A.   Estimated acquisition cost is the I call
 4    it term of art within Medicaid for the ingredient
 5    cost that Medicaid will reimburse, or one of the
 6    ways that Medicaid will reimburse for the drug.
 7         Q.   And when did you first learn about the
 8    term "estimated acquisition cost" in connection
 9    with Medicaid?
10         A.   Long time ago.  Probably '94, '95,
11    something like that.
12         Q.   Do you know whether it's a creature of
13    federal regulation or not?
14         A.   No.  The estimated acquisition costs are
15    set by the states and approved by the federal
                    Page 160

Depo-Hughes-James-05-06-09

16    government in the state implementation plans.

17         Q.   Okay.  Well, maybe my question wasn't

18    clear.

19         Do you know whether the term as it's

20    used by state Medicaid programs known as estimated

21    acquisition cost, do you know whether that term is

22    a creature of federal regulation?


495


1         A.   Yes.  I believe there's a federal,

2    there's words in federal regulation that says

3    estimated acquisition cost should be this.

4         Q.   Are you aware of any state plan that

5    does not include a provision for Medicaid

6    reimbursement of drugs, including those at issue

7    in this case, that does not include a provision

8    that says we'll pay the estimated acquisition cost

9    if it's lower than its other means of determining

10    reimbursement?

11         MR. BREEN:  We can read that question

12    back if it'll help.

13         THE WITNESS:  Okay.  Thanks.

14             (The record was read back as

15    requested.)

16         THE WITNESS:  It's my understanding, I

17    can't quote you all fifty states, but it's my

18    understanding that it is common for states to use

19    the lesser of EAC, MAC, FUL, usual and customary,

20    that that's standard across states.

21             There may be one or two that don't use

Depo-Hughes-James-05-06-09
22    it that I don't know of here, but it's a very

                                                                    496

1    common way that states do this.
2    BY MR. BREEN:
3        Q.    All right.  Fair enough.
4              Now, when a state pays based upon
5    estimated acquisition cost, does it pay any
6    different dispensing fee than it would pay if it
7    was paying based upon a MAC or based upon the
8    Federal Upper Limit?
9        A.    It's my understanding that when they pay
10   based upon the MAC or the FUL, that they pay the
11   same dispensing fee.
12       Q.    Okay.  So whenever a state makes a
13   reimbursement election through its formula between
14   MAC, FUL, and EAC, it will pay the same dispensing
15   fee even if the EAC is less than the MAC or the
16   FUL; correct?
17       A.    Yes.
18       Q.    So if dispensing fees are so directly
19   related to ingredient cost reimbursement, as you
20   seem to believe in your opinion, why is that the
21   case?
22             Why aren't they different depending upon

                                                                    497

1    which price point a state reimburses on?
                      Page 162

Depo-Hughes-James-05-06-09

2      A.   Well, two things:  First of all, MACs
3  are negotiated generally.  And so that the
4  ingredient cost component of a MAC price is in my
5  opinion a statement by the state, by the agency
6  and the providers, that here's the lowest
7  ingredient cost that we can accept commensurate
8  with the dispensing fee that is available.
9           FUL, on the other hand, is itself based
10  on a hundred fifty percent of the lowest AWP.  So
11  a hundred fifty percent -- I'm sorry.  It's not a
12  hundred fifty percent of the lowest AWP.  Anyway -
13  -
14      Q.   Maybe I can refresh your recollection.
15           Is it a hundred fifty percent of the
16  lowest published price.
17      A.   Thank you.  A hundred fifty percent of
18  the lowest published price.
19           And so the point is that there's not the
20  divergence, generally it's my understanding that
21  there's not the divergence between those
22  quantities to the same extent there's a divergence

                                                498

1  between EAC as it's done through scaled AWP and
2  Dr. Duggan's calculation.
3           Dr. Duggan's alternative EAC is
4  substantially lower than the existing EAC and also
5  in my opinion is substantially lower than the
6  MACs, well, there's no FULs for these drugs, but
7  substantially lower than the MACs for states that
                        Page 163

Depo-Hughes-James-05-06-09

8      have MACs.

9           Q.   All right.  When you say Dr. Duggan's

10     EAC is substantially lower than the existing EAC,

11     are you saying he's using a different EAC formula

12     --

13          A.   No, sir.

14          Q.   -- or are you saying he's getting to a

15     different EAC result?

16          A.   No, sir.

17               I understand that Dr. Duggan applies,

18     whatever the scaled AWP formula in a particular

19     state is, he applies that to his alternative AWP.

20               But because his alternative AWP is

21     substantially below the existing AWPs that he uses

22     in the calculations, that leads to a substantially

499

1      lower EAC.

2           Q.   But you understand that Dr. Duggan did

3      not use a different EAC formula; correct?

4           A.    If we're talking about the scaled AWP

5      formula, I agree with you that he did not use a

6      different scaled AWP formula than whatever was

7      relevant in that particular state at that

8      particular time.

9           Q.   And some states rather than using a

10     scaled AWP formula they use a WAC plus formula;

11     correct?

12          A.   Yes.

13          Q.   And where that was the case, Dr. Duggan

Page 164

Depo-Hughes-James-05-06-09

14   emulated that; right?

15       A.   That's correct.

16       Q.   You don't have any criticism of how he

17   did that aspect of his model?

18       A.   No.

19       Q.   Okay.  So then is it your understanding

20   that all Dr. Duggan did was recalculate the

21   existing EAC formulas based upon the assumption

22   that Abbott had reported a lower price?

500

1       A.   Yes.  He calculated an alternative EAC

2   calculation based on the idea that Abbott would

3   have reported his version of average selling price

4   rather than the price that they did report to the

5   compendium.

6       Q.   Now, do you know that the definition of

7   EAC, as used by the federal regulations, as

8   required by the federal regulations, defines it as

9   being the state's best estimate of acquisition

10   cost based upon the prices that are quote

11   "generally and currently paid" end quote in the

12   marketplace?

13       A.   If you represent that to me as true,

14   that sounds like the language I'm familiar with.

15   But unlike you I don't have it memorized, but I'll

16   take your representation.

17       Q.   Okay.  But you will agree with me it

18   doesn't say based upon the prices that are a

19   thousand percent higher than the prices generally

Depo-Hughes-James-05-06-09

20    and currently paid in the marketplace?

21              MR. BERLIN:  Objection, form.

22              THE WITNESS:  It doesn't say anything

                                                              501

1     like that.  I agree with you.

2     BY MR. BREEN:

3         Q.   And it doesn't say based upon the prices

4     that are five thousand percent higher than those

5     generally and currently paid in the marketplace.

6     It doesn't say that either; does it?

7              MR. BERLIN:  Same objection.

8              THE WITNESS:  I agree with you.  It does

9     not say that.

10    BY MR. BREEN:

11        Q.   So you understand that all Dr. Duggan

12    did was take the prices that the relator and the

13    government will assert at trial would have been

14    reported but for Abbott's false statements and

15    then ran those prices through the formula.  You

16    understand that; right?

17        A.   I mean I guess I understand that's the

18    government's allegation, yes.

19        Q.   And that the government, and that those

20    are the prices that Duggan uses in his formula;

21    correct?

22        A.   I'm sorry.  Which prices, what prices

                                                              502

Depo-Hughes-James-05-06-09

1    are we talking about?

2       Q.   Prices the government contends would

3    have been reported but for the false statements.

4       A.   Well, again, just let me be clear.  I

5    accept for the purposes of my report the

6    government's allegations as true.  But I don't

7    have any opinion as to whether the prices reported

8    by Abbott were fraudulent or anything else.  The

9    prices reported by Abbott were the prices reported

10   by Abbott.

11      Q.   Right.

12      A.   But I agree with your characterization

13   of the government's allegations.

14      Q.   Okay.  So just so that everybody

15   understands what you're saying and in your

16   opinion, you think as an economist that when

17   there's a lawsuit about false prices being given

18   to the government, somehow the government has got

19   to recreate its reimbursement world to look like

20   the world that would have existed had false prices

21   not been reported?

22          MR. BERLIN:  Objection, form.

                                          503

1          THE WITNESS:  When the government wants

2    to have companies report prices to the compendia

3    like those that Dr. Duggan has calculated, it is

4    my opinion that the government needs to make

5    adjustments to its reimbursement policy so that

6    providers will still wish to participate and still

                    Page 167

Depo-Hughes-James-05-06-09

7    find it remunerative to participate in the

8    Medicare and Medicaid programs.

9    BY MR. BREEN:

10        Q.   And you think that the drug company that

11    reports the false prices should get some kind of

12    offset against its damages based upon this theory

13    of yours; correct?

14             MR. BERLIN:  Objection, form.

15             THE WITNESS:  Well, again, Dr. Duggan's

16    difference calculation is the difference in what

17    the government paid and what the government would

18    have paid had the government -- let me try that

19    again.

20             Dr. Duggan's difference calculation is

21    supposed to be the difference between what the

22    government actually paid and what the government

                                                          504

1    would have paid had Abbott reported to the

2    compendia the prices that he, Dr. Duggan, claims

3    should have been reported.

4    BY MR. BREEN:

5        Q.   All right.

6        A.   I'm sorry.  My answer isn't finished,

7    but with all that movement I really lost my train

8    of thought.

9        Q.   I apologize.

10        A.   It's okay.

11             THE WITNESS:  Could you read back his

12    question and just let me take another crack at the

Depo-Hughes-James-05-06-09

13    answer.

14              (The record was read back as

15    requested.)

16              THE WITNESS:  So just taking my

17    disagreement with Dr. Duggan is he says he's

18    calculating a difference between what the

19    government actually paid and what the government

20    would have paid.  And my area of disagreement is

21    that simply lowering the actual world EAC to Dr.

22    Duggan's but-for EAC is not a full description of

505

1     the difference in government expenditures between

2     the actual world and the but-for world because

3     with unchanged dispensing fees providers would

4     find Dr. Duggan's ingredient cost plus those

5     dispensing fees to be unremunerative, and

6     therefore, would stop providing services to

7     Medicare and Medicaid recipients, an opinion

8     that's supported by all of these reports and

9     deposition testimony from state and federal

10    officials that I have been talking about

11    repeatedly.

12              So it's not a matter of giving Abbott a

13    credit, but rather it is being true to what Dr.

14    Duggan says that the damages are going to be the

15    difference between what the government paid for

16    this prescription in the actual world versus what

17    the government paid for this prescription in the

18    but-for world and that what the government paid is

Depo-Hughes-James-05-06-09

19    the combination of both ingredient cost as well as
20    dispensing or administration fees.
21        Q.   All right.  But you would agree though
22    that the way Dr. Duggan does it assumes that the

                                                        506

 1    state would have paid the claim exactly as it did
 2    pay the claim based upon the exact formula it used
 3    when it paid the claim; correct?
 4             MR. BERLIN:  Objection, form.
 5             THE WITNESS:  I'm sorry.  You're going
 6    to have to read that one back to me.
 7                  (The record was read back as
 8    requested.)
 9             THE WITNESS:  Okay.  If I understand
10    your question correctly, Dr. Duggan assumes that
11    the state paid the claim using his new version of
12    the EAC, I'm sorry, his new version of the AWP
13    according to the same formula that they used to
14    calculate the EAC in the actual world and the same
15    dispensing fee that they used in the actual world.
16    BY MR. BREEN:
17        Q.   Correct.  Is that correct?
18        A.   Then yes, if that's what you said, then
19    I'm going to agree with you.
20        Q.   And what you're saying is if he's going
21    to do this damages model, he should have used the
22    dispensing fees and the formulas that were used

                            Page 170

Depo-Hughes-James-05-06-09

507

1  when the claim was actually paid, he should have
2  figured out what would have happened in the
3  alternative world if all claims were paid based
4  upon lower AWPs?
5      A.   I actually am not taking any issue with
6  the EAC formula.
7          So if EAC in a state was AWP minus
8  fifteen percent in the actual world and he uses
9  AWP minus fifteen percent in the but-for world, I
10 have rendered no opinion or any objection to that.
11         But his but-for AWP minus fifteen
12 percent let's say in a state is in my opinion
13 inadequate to be remunerative to the provider.
14 And, again, that's based on all of the testimony
15 from the state officials, all the testimony from
16 the federal officials, the Myers & Stauffer
17 reports that repeat in state after state after
18 state that when looking at reimbursements states
19 need to look not just at ingredient cost in
20 isolation but need to look at the combination of
21 ingredient cost plus dispensing fee.
22         So it is my opinion that if you do what

508

1  Dr. Duggan does and states change nothing but the
2  AWP that they use, that that's an unrealistic but-
3  for world because for these drugs and others
4  perhaps that reimbursement will not be

Page 171

Depo-Hughes-James-05-06-09

5  remunerative.

6            MR. BREEN:  Are you done with that

7  answer?

8            THE WITNESS:  Yes, I am.

9            MR. BREEN:  We're out of tape.  Let's

10  take a break.

11            THE WITNESS:  Okay.

12            THE VIDEOGRAPHER:  Going off the record

13  at 2:32 p.m.

14                (A recess was taken.)

15            THE VIDEOGRAPHER:  Beginning of

16  Videotape No. 4.  We're back on the record at 2:57

17  p.m.

18  BY MR. BREEN:

19      Q.   All right.  Just to finish up where we

20  left off before we move on to the next area, I

21  just want to make sure the record is real clear on

22  this.

509

1            I understand you but this is important.

2  When Duggan calculated damages, he ran the

3  formulas that were in existence in the states at

4  the time the claims were paid; correct?

5      A.   Yes.  He assumed that nothing of the

6  reimbursement system in a state would change,

7  which is what I objected to, yes.

8      Q.   I understand that.

9      A.   Okay.

10      Q.   Your position is if reimbursements would

Page 172

Depo-Hughes-James-05-06-09

11  have been based upon the estimated acquisition

12  cost resulting from these lower AWPs, they would

13  have had to pay a higher dispensing fee?

14      A.   Yes.

15      Q.   Got that.

16           But going back to the formulas that were

17  in place at the time that the claims were paid,

18  are you aware of any formula that automatically

19  adjusted the dispensing fee based upon a reduction

20  in the ingredient cost calculation?

21      A.   There are states that had dispensing

22  fees that weren't fixed, that there would be one

510

1   dispensing fee up to a certain amount, another

2   dispensing fee after that.  I'm aware that such

3   things existed.

4       Q.   But in terms of the, and I don't want to

5   use the term "materiality" because that's a legal

6   term and not an economics term.

7       A.   Okay.

8       Q.   But in terms of whether or not there's

9   significant error in your opinion in Duggan's

10  methodology, would I be correct in saying that

11  there does not appear to be a significant error in

12  connection with the application of any formula

13  based upon what should have been a formulaic

14  adjustment of the dispensing fee?

15      A.   As I understand the formulas that Dr.

16  Duggan used as were outlined for the states that

17    he did the actual calculations in, those formulas

18    did indeed adjust dispensing fees in ways that

19    were consistent with the state regulations plan at

20    that time.

21         Q.   Okay.  Now, let's now move to the part

22    of your opinion where you diverge from Dr.

511

1    Duggan's opinion, which is the, as you describe

2    it, his assumption that the reimbursement system

3    would not have changed based upon dispensing fee

4    amounts, which is the assumption you take greatest

5    issue with; correct?

6         A.   I'm not sure that's exactly stated, I'm

7    not sure that's exactly stated right, but I think

8    you're on the right track.

9         Q.   All right.

10         A.   I understand Dr. Duggan's assumption is

11    that ingredient costs would be reduced in line

12    with his but-for AWP calculation which would

13    reduce the EAC calculation, which would reduce the

14    ingredient cost reimbursement.

15              And he is assuming, as he has

16    calculated, that in states where the ingredient

17    cost reimbursements in total could be reduced by

18    eighty or ninety percent with no change in

19    dispensing fees, that he's assuming that access

20    to, that the viability and the willingness of

21    Medicaid providers to remain in the system and the

22    access by Medicaid patients to the services

Depo-Hughes-James-05-06-09

512

```
 1    provided by those pharmacies would not be
 2    affected.
 3            And I find that, again, based on all of
 4    the testimony and reports that I've talked about
 5    numerous times over the past two days, I find that
 6    assumption to be at odds with what the state and
 7    federal officials believed was the relationship
 8    between ingredient cost and dispensing fees.
 9        Q.   But in taking issue with that
10    assumption, are you not assuming that Duggan's
11    model would reduce reimbursement across the board
12    for all drugs?
13        A.   What I'm saying is I understand Dr.
14    Duggan from his rebuttal report is saying that
15    well, this is just whatever it is, forty-four NDCs
16    out of 25,000.
17            I don't think it's forty-four NDCs out
18    of 25,000 for the following reason:  These are
19    home infusion pharmacies, they're not stocking
20    25,000 NDCs, they're not involved with 25,000
21    NDCs.  I don't have an exact count, but my guess
22    would be that for the home infusion pharmacy with
```

513

```
 1    all the chemo and other infusion drugs that they
 2    do, we might be talking about two, three, four
 3    hundred NDCs that are dealt with through such
```

Page 175

Depo-Hughes-James-05-06-09

4    pharmacies.

5             But yet some of the products, three of

6    the four products that are at issue here, saline,

7    water, and dextrose, are things that are used in

8    great volume every single day by these home

9    infusion pharmacies.

10            So that if you were to reduce the

11   ingredient cost reimbursements like Dr. Duggan

12   does on these products, which the home infusion

13   pharmacies are using numerous units every single

14   day, that they would not find it remunerative to

15   participate in the Medicaid program because one of

16   the, three of the NDCs that they use day in day

17   out have had the ingredient cost reimbursement

18   reduced by eighty, ninety, percent.  That's going

19   to be a big chunk of the revenue for these types

20   of facilities.

21            And so, yes, they are going to go

22   screaming to the Medicaid agencies and they're

                                                    514

1    going to go screaming to their state legislators,

2    just like everybody else that has faced these

3    situations.  And it's not going to be the case

4    that the Medicaid agency is going to be able to

5    just say oh, yeah, dispensing fees will stay the

6    same even if we reduce ingredient cost by some

7    ninety percent.

8             The other thing is that it just strikes

9    me as being incredibly unrealistic to say that oh,

                          Page 176

Depo-Hughes-James-05-06-09

10  well, this is just forty-four out of 25,000 NDCs.
11          I mean this action that brings us
12  together here today is just one of several Dr.
13  Duggan has testified in and Dr. Duggan has found
14  differences, as I understand it, on hundreds of
15  NDCs beyond the ones that are at issue in this
16  case.
17          Dr. Hartman has found difference on
18  hundreds of NDCs in the cases that he's testified
19  in.  And there's litigation across the country,
20  probably dozens of cases at the state and federal
21  levels, that all have in effect the basic element
22  of Dr. Duggan's but-for world is that yes,

515

1  reimbursements, the AWP basis of reimbursement
2  would be reduced to something resembling average
3  selling price.
4          I mean that's certainly what Dr. Hartman
5  did in the cases that I was familiar with.
6          So this litigation taken as a whole is
7  in my opinion indeed talking about a wholesale
8  change in the way that AWP is reported, the way
9  that the providers are going to be reimbursed for
10  drugs generally.
11          So, again, I don't agree that this is
12  just forty-four out of 25,000 NDCs because this is
13  nationwide litigation involving almost all of the
14  drug companies that I'm aware of and the products
15  that they sell.
                    Page 177

16    Q.    So then are you considering your

17  knowledge of these other cases and the existence

18  of these other cases to inform your opinion about

19  the necessity of including an increased ingredient

20  cost factor in any damages formula?

21    A.    Okay.  Two things:  Small scale and

22  large scale.  The small scale is that these are


                                                        516


1  home infusion pharmacies, they deal with not

2  25,000 NDCs, they deal with a handful, more than a

3  handful of NDCs.  But it's in the let's say the

4  hundreds rather than in the thousands because of

5  the relatively limited services that they provide.

6            These are products, saline, dextrose,

7  and water, that they use every single day.  These

8  are home infusion pharmacies.  This isn't Rite-

9  Aid, this isn't Walgreens.

10           So if they're taking a loss on their

11  prescription pharmacy products, they're not

12  selling cosmetics, toiletries, beer, and chips at

13  a profit which allows them to make up for that

14  loss the way Walgreens does.

15           The home infusion pharmacies, as I

16  understand it, and you can correct me if I'm

17  wrong, this is what they do.  They provide home

18  infusion services, chemotherapy or whatever other

19  types of therapy has to be administered in this

20  way.

21           So on the small scale for a product that
                        Page 178

Depo-Hughes-James-05-06-09

22   is so important to their only business, it is my

517

1   opinion that the home infusion pharmacies, were
2   the reimbursements to be lowered to the levels
3   that Dr. Duggan is talking about, would be running
4   screaming to the state Medicaid agencies and would
5   be running screaming to the state legislature
6   saying we cannot survive on this combination of
7   lower ingredient cost and fixed unchanging
8   dispensing fees because as we saw in, as I saw in
9   Connecticut, the testimony from the Connecticut
10  Director of, whatever the office was, I believe he
11  was the Director of Medicaid services, is they had
12  tried on more than one occasion to institute
13  relatively minor, compared to Dr. Duggan's
14  reductions, relatively minor reductions in
15  ingredient costs.
16         And those attempts were met full force
17  with oncologists and other providers coming to
18  Medicaid, showing how that they couldn't, that
19  these were not remunerative and they could not
20  continue to participate in the program.
21  Testifying before the state legislature, doing TV,
22  newspaper interviews, doing everything that they

518

1   could to bring to the public and to bring
Page 179

Depo-Hughes-James-05-06-09

2    political pressure that this was not going to be

3    remunerative reimbursements, such that in all of

4    the cases that I can remember at this point with

5    Connecticut and all of the cases that the state

6    Medicaid agency backed off and said okay, we won't

7    be reducing these reimbursements in the way that

8    we thought.

9            Based on that, given the similarity in

10    those drugs that were at issue in that case and

11    the drugs that are at issue in this case, I would

12    assume that if you try to do what Dr. Duggan is

13    proposing the home infusion pharmacies would have

14    a very similar reaction and the attempt to hold

15    the dispensing fees constant would in fact not be

16    successful.

17            On a larger scale, tens, numerous,

18    practically every pharmaceutical manufacturer I

19    know of is involved in some sort of AWP

20    litigation.  Numerous states are involved in AWP

21    litigation.  Relators like Ven-a-Care involved in

22    AWP litigation.

519

1            Not on forty-four out of 25,000 NDCs but

2    on hundreds and hundreds of NDCs, all with the

3    same basic but-for world that we're going to

4    change AWP from what's currently reported by

5    pharmaceutical companies to the compendia, we're

6    going to change that AWP to something related to

7    some measure of average selling price.  The

Page 180

8    details are unimportant, but basically the same

9    sort of thing that Dr. Duggan has proposed.

10          So, yes, on the large scale because of

11   this isn't just Abbott and these forty-four NDCs

12   but this is nationwide litigation involving

13   numerous pharmaceutical companies and hundreds, if

14   not thousands, of NDCs that yes, what we're

15   talking about here is a wholesale change in the

16   way that AWP is reported to the compendia and a

17   wholesale change in the way that ingredient costs

18   are reimbursed to providers.

19     Q.   Do you understand that the -- well,

20   first off, as we proceed on this maybe it would

21   help if we, as you just did in your answer, if I

22   accept your sort of border or the distinction you

520

1    make between the bigger picture, the bigger

2    market, and the home infusion market.

3      A.   Okay.

4      Q.   Because as I understand it, I think the

5    rationale for your opinion is the same for both,

6    but one, the home infusion market is a bit more

7    specific --

8      A.   Yes.

9      Q.   -- with a more limited basket of drugs.

10   And the same forces would apply and the same

11   interests would apply, except that one would go to

12   the whole market and the other would go to home

13   infusion; correct?

Page 181

Depo-Hughes-James-05-06-09

14      A.   Yes, basically.  But these units of

15   saline, dextrose, and water, I mean these are

16   things, as I understand it, are used in large

17   volume by the home infusion pharmacies.

18      Q.   That's what I'm saying.  That's the

19   smaller market, more specific market directly at

20   issue in this case --

21      A.   Right.

22      Q.   -- and then we've got the bigger

                                                521

1   picture.

2      A.   Uh-huh.

3      Q.   All right.  Let's go to the big picture

4   first.

5           Do you understand that the Ven-a-Care

6   and United States allegations are such that the

7   spread that we're talking about is not the entire

8   spread between a WAC and an average wholesale

9   price, that we're talking about inflated spreads

10   relating from what we allege are inflated

11   representations of average wholesale price?

12      A.   I'm sorry.  I didn't think the spread at

13   issue here was between WAC and AWP.  I thought it

14   was between --

15      Q.   It's not.  I want to make sure you

16   understand that.

17      A.   Okay.  Then I think we're on the same

18   page.

19      Q.   In other words, that the allegations

Page 182

Depo-Hughes-James-05-06-09

20    that we've made in this case are that the

21    representations that resulted in the average

22    wholesale price reports cause it to be far greater

522

1    than a twenty or twenty-five percent range from

2    WAC.

3              Do you understand that?

4        A.    Yes, I do.

5        Q.    And that when, for example, the Medicare

6    Modernization Act of 2003 -- which is another one

7    of the legislative endeavors that you look to for

8    guidance; correct?

9        A.    Yes.

10        Q.    When it modified the Part B

11    pharmaceutical reimbursement to ASP plus six

12    percent, it was applying it to all drugs that were

13    reimbursed under Part B with certain exceptions;

14    correct?

15        A.    Yes.

16        Q.    Now, do you understand that an ASP plus

17    six percent is going to reduce reimbursement even

18    within that twenty percent range that we're not

19    even talking about here?

20        A.    To the extent that I follow you, yes,

21    sure.

22        Q.    ASP plus six percent would be something

523

Page 183

Depo-Hughes-James-05-06-09

1    less than ninety-five percent of AWP if AWP is

2    twenty percent above a WAC; right?

3        A.   Okay.

4        Q.   So this new world that we're moving

5    towards through the various legislative endeavors

6    seeks to remove the profit on spread to pharmacies

7    and other providers that would be within that

8    range that we're not even alleging is at issue

9    here.

10              Do you understand that?

11              MR. BERLIN:  Objection, form.

12              THE WITNESS:  I understand that it's

13   different, but they're seeking to remove profit

14   off of spread whether the spread is $100 or the

15   spread is $20 or the spread is $10.  They're

16   seeking to remove the profit that providers can

17   make off of the difference between AWP and ASP.

18              So I think we're saying the same thing.

19   BY MR. BREEN:

20       Q.   Okay.  My point is that you seem to

21   assume that if Dr. Duggan's model, which is only

22   applied to that portion of the spread that we

                                                    524

1    allege is based upon these false representations

2    and not the other part of the spread, but you seem

3    to assume that Dr. Duggan's model encompasses the

4    whole thing, the entire spread including the

5    twenty percent range for all drugs everywhere, and

6    that seems to be your assumption.  Is it?

                        Page 184

Depo-Hughes-James-05-06-09

7      A.   You're going to have to try to explain

8   your characterization of my assumption to me again

9   because I have to apologize but I'm not really

10   following what you're claiming that I'm assuming.

11      Q.   Let's take a branded drug.  Take a drug

12   known as Biaxin.

13      A.   Okay.

14      Q.   Manufactured by Abbott Laboratories.

15           These are not actual numbers, but let's

16   just assume that the average wholesale price is

17   fifty bucks and the WAC is forty bucks.  All

18   right?

19      A.   Uh-huh.

20      Q.   And the average reimbursement is forty-

21   five bucks by Medicaid for ingredient cost.

22      A.   By Medicaid?

                                                    525


1      Q.   Medicaid.

2      A.   Okay.

3      Q.   For ingredient cost.  All right.

4           And let's assume that an ASP times a

5   hundred six percent type model were applied to it

6   instead.

7           If that were the case and if ASP was

8   something close to the WAC, the reimbursement

9   would be $42.40; right?

10      A.   Okay.

11      Q.   As opposed to the $45.

12      A.   Okay.

                        Page 185

Depo-Hughes-James-05-06-09

13      Q.    So for every prescription of Biaxin, the
14  government is going to save about $2.60 based upon
15  this new world.

16      A.    Correct.

17      Q.    Do you understand that that $2.60 we're
18  not even contending is fraud.  We're contending is
19  just part of the reimbursement system.

20            And if the government tightens up its
21  reimbursement formulas and pulls that out, then
22  those will be savings to the program that might in

                                                      526

1   fact be used to fund additional dispensing fees.

2             You understand that?

3       A.    Okay.

4       Q.    What our case is directed at are the
5   reimbursement spreads that are far outside of any
6   twenty or twenty-five percent range.

7       A.    Yes.  But they're not always outside a
8   $20 range.

9       Q.    Well, that may or may not be the case.

10            I just want to make sure you understand
11  that we're talking about reimbursement spreads
12  that are outside this twenty to twenty-five
13  percent range from WAC.  I just want to make sure
14  you understand that.

15      A.    No.  That's no problem.

16      Q.    And had you conducted any kind of a
17  study, be it a formal study or a thought about it
18  with your feet up on the table, as you testified

Depo-Hughes-James-05-06-09

19    yesterday you do and a lot of people do, have you
20    done anything to try to figure out what kind of
21    savings would inure to the federal government in
22    one of your but-for alternative worlds, such as a

527

1    hundred six percent of ASP, what kind of global
2    aggregate savings might inure to the federal
3    government?
4         A.   I have not done such analysis, and it
5    would have no particular affect on my opinion.
6              MR. BERLIN:  Let me just say he said his
7    feet were up, not on the table, in case his wife
8    reads the transcript.
9              MR. BREEN:  Okay.  Well, I'll stipulate
10   to that.
11             THE WITNESS:  No way my wife's reading
12   the transcript.
13   BY MR. BREEN:
14        Q.   Anyway, but you're saying it wouldn't
15   affect your opinion?
16        A.   Correct.  It would have no bearing on my
17   opinion.
18        Q.   But if the necessary savings to fund
19   these increased dispensing fees that are in your
20   but-for world would all come from the portions of
21   the spread that we're not even contending are
22   fraudulent, why would you think that Abbott would

Page 187

Depo-Hughes-James-05-06-09

528

1    get an offset against the portion of the spread
2    that is fraudulent?
3              MR. BERLIN:  Objection, form.
4              THE WITNESS:  Well, again, I don't have
5    any opinion on the issue of fraud.  If you say
6    it's fraudulent, it's fraudulent.
7              But, again, I'm just following Dr.
8    Duggan that the measure of damages is the
9    different between what the government actually
10   paid and what the government would have paid.  And
11   I'm simply saying that in my opinion he's leaving
12   out a portion of what I believe the government
13   would have had to pay with these lower AWPs that
14   Dr. Duggan has calculated and substituted, they
15   would have to pay more in addition to that in
16   order to keep people, keep providers, in the
17   Medicare and Medicaid programs.
18             So I'm not talking about cutting anybody
19   committing fraud a break.  I'm coming at it from
20   the other angle is I think that it's clear from
21   the record that changes in the dispensing fees
22   with these kinds of Draconian reductions in AWP

529

1    would be absolutely necessary to keep people in
2    the program.
3    BY MR. BREEN:
4         Q.   And I'm saying assuming you're correct,

Page 188

Depo-Hughes-James-05-06-09

5   then you've got to, you would have to agree with
6   me that there's going to be savings program-wide
7   from all the drugs where Medicaid is reimbursing
8   currently for ingredient cost above a hundred six
9   percent of ASP; correct?
10       A.   I'm sorry.  Just say that again.
11       Q.   You would agree with me that there would
12   be savings in this but-for world program-wide on
13   any drug where Medicaid is currently reimbursing
14   more than a hundred six percent of ASP for
15   ingredient cost.
16            MR. BERLIN:  Objection, form.
17            THE WITNESS:  Okay.  If they're
18   currently paying more than a hundred six percent
19   of ASP for ingredient cost, then there would be
20   savings on ingredient cost, yes.
21   BY MR. BREEN:
22       Q.   What I'm saying is how do you know

                                                        530

1    there's not going to be sufficient savings
2    program-wide just from reducing the reimbursement
3    on pharmaceutical products in general sufficient
4    to fund increased ingredient cost without taking a
5    contribution to that increased ingredient cost
6    from the portion that we're suing for in this case
7    and contending is the portion of the spread
8    created by fraud?
9        A.   You're going to have to read that back
10   because I think you said ingredient cost and you

                        Page 189

Depo-Hughes-James-05-06-09
11  might have meant dispensing fees.

12        Q.   I'll restate the question.

13        A.   Okay.

14        Q.   Let me work on this one because this is

15  not an easy question.  You can help me.

16        A.   Okay.

17        Q.   All right.  How do you know that in the

18  but-for world where Medicaid reimburses across the

19  board for all drugs at a hundred six percent of

20  ASP that there's not going to be sufficient

21  savings in the ingredient cost for the normal

22  range of twenty to twenty-five percent sufficient


                                                      531


1   to fund the increased dispensing fees, from

2   savings in that range alone, how do you know

3   there's not going to be enough savings there so

4   that you wouldn't even have to take the money from

5   that portion of the spread that's outside the

6   twenty or twenty-five percent range which we

7   contend results from fraud?

8             MR. BERLIN:  Objection, form.

9             THE WITNESS:  We're looking at it a

10  different way in the sense that I am not seeing

11  the connection between whatever the savings is

12  that you propose from these other drugs and my

13  contention that if on these drugs at issue here,

14  if you don't raise the dispensing fees after

15  lowering the AWP the way Dr. Duggan proposes, that

16  you're just not going to have people who are going

                        Page 190

Depo-Hughes-James-05-06-09

17    to, you're not going to have providers who are

18    going to participate in Medicare and Medicaid.

19          It's not a matter of what the government

20    is saving.  It's a matter of whether the

21    reimbursement is remunerative to the provider or

22    not.  That's what I've been focusing on.

532

1    BY MR. BREEN:

2        Q.   All right.  Well, let's say this another

3    way then.

4        A.   Okay.

5        Q.   Assume that you're going to have to

6    increase the dispensing fees over and above

7    wherever they are to maintain access to care.

8          Why does it follow that that calculation

9    has to be made to reduce Dr. Duggan's difference,

10    because what you're doing is you're funding that

11    now out of the money that the government contends

12    Abbott should repay, when if you have a new world,

13    a hundred six percent of ASP, you're going to have

14    savings coming from all kinds of places, most of

15    which are from reimbursements the government does

16    not even contend have any inflated reimbursement

17    in it.

18        A.   But I don't see how those savings in the

19    other areas do anything to keep home infusion

20    pharmacies in the system if you hold your

21    dispensing fees constant.

22        Q.   Well, I'm not assuming you're holding

Depo-Hughes-James-05-06-09

533

1   them constant.
2           What I'm saying is let's just assume
3   that the government saves a billion dollars a year
4   by going to ASP times a hundred six percent and
5   that billion dollars, it saves a billion dollars
6   on the drugs where there's no inflated spread
7   right now.
8       A.   Okay.
9       Q.   Let's just assume that a billion dollars
10  is enough to cover all the increased dispensing
11  fees, including for IV pharmacy.
12      A.   Okay.  What do you mean by cover the
13  increased dispensing fees?
14      Q.   Fund the difference, fund the
15  differential.
16      A.   Okay.
17      Q.   So let's assume that.
18          And that the government still has a
19  problem with drug companies reporting prices that
20  result in this extra layer of spread, which we
21  contend is a fraud.
22          Why would you offset the fraud damages

534

1   when you're going to have savings program-wide
2   anyway and you're going to have sufficient funds
3   to fund any increase in dispensing fees that you
                    Page 192

Depo-Hughes-James-05-06-09

4    might necessarily need?

5              MR. BERLIN:  Objection, form.

6              THE WITNESS:  Okay.  Dr. Duggan stated

7    that his measure of damages is the difference

8    between what the government actually paid and what

9    the government would pay if Abbott had reported

10   what he says that they, what he proposes that they

11   should have reported as a version of average

12   selling price.

13             So if we're doing a damage analysis and

14   we take the measure of damage as the difference

15   between what the government did pay and what the

16   government would have paid to reimburse pharmacies

17   under Medicare and Medicaid for these drugs, then

18   my contention is what you, my contention is

19   twofold.

20             When you do a damage analysis, it is

21   incumbent upon an economist to come up with a

22   vision of the but-for world that's grounded in

535

1    theory and grounded in evidence that would mimic

2    the world that would exist had Abbott reported to

3    the government, excuse me, to the compendia the

4    different prices that Dr. Duggan says that they

5    should have.

6              His assumption, not assumption, his

7    contention is that these ingredient costs could be

8    reduced and everybody would still stay within the

9    program.

Page 193

Depo-Hughes-James-05-06-09

10          So his measure of damages is saying,

11   well, the government actually reimbursed this, the

12   government's but-for reimbursement would have been

13   that, and all I'm looking at is ingredient cost

14   because I assume that the dispensing fees don't

15   change.

16          My objection has always been that when

17   you do a damage analysis in economics, you've got

18   to make a reasonable attempt to create, to look at

19   a but-for world, to look at a valid vision of the

20   but-for world.

21          And my contention is the difference

22   between what the government actually paid and what

536

1    the government would have paid has got to take

2    into account what I believe, based on everything

3    that I've looked at and everything that I've

4    testified to over the past two days, you've got to

5    look at, that you've got to add to what the

6    government would have spent in the but-for world

7    and increase in dispensing fees.

8          Now, your example of the MMA and the

9    hundred six percent of ASP, it bears, whatever the

10   savings is under the MMA, whatever the savings

11   would be under the MMA, I think it's important to

12   remember that, as I recall, the MMA specifically

13   directs a review, specifically directs a review of

14   dispensing fees to make sure that they're adequate

15   and to alter them when they're not.

Page 194

Depo-Hughes-James-05-06-09

16           And the examples in my exhibits, which I

17  know that we disagree about the validity of those,

18  but the examples in there was supposed to in my

19  mind illustrate the fact that when that review,

20  when those surveys were done of what the actual

21  dispensing fees were for these drugs, I'm sorry,

22  administration fees, the administration fees had

537

1  to rise.

2           As that's what's happened under the MMA,

3  it's my opinion that Dr. Duggan failed in his duty

4  to find a valid vision of the but-for world but

5  not taking that into account.

6  BY MR. BREEN:

7      Q.   But had he taken that into account,

8  would you agree with me he would also have to take

9  into account the program-wide savings from the

10  changes in the formulas if any of those would have

11  occurred?

12      A.   No.  I mean I don't see why that's the

13  case.

14      Q.   So your but-for world would be a hundred

15  six percent of ASP but you wouldn't consider how

16  much the government would save at a hundred six

17  percent of ASP?

18      A.   But, again, I'm talking about what Dr.

19  Duggan is doing, which is just looking at the

20  drugs that he looked at.

21      Q.   Well, no, you're not.  Because you're

Page 195

22    talking about a hundred six percent of ASP, which

538

 1    Dr. Duggan didn't look at.  You're bringing that
 2    into the discussion.
 3            So if you're going to bring that into
 4    the discussion, then you don't you also have to
 5    bring into the discussion the savings the
 6    government would benefit from program-wide if they
 7    go to a hundred six percent of ASP?
 8        A.    Not if we're looking at, as Dr. Duggan
 9    proposes and as I am, the few places I'm agreeing
10    with him, if we're looking at the difference
11    between what the government paid for these drugs
12    in the actual world and what the government paid
13    for these drugs in the but-for world.
14            That's what Dr. Duggan did, and that's
15    what I'm commenting on and what I'm criticizing.
16    And I don't see any reason to bring in possible
17    savings from the MMA and other areas.
18        Q.    One of your areas of expertise is law
19    and economics; correct?
20        A.    Yes, sir.
21        Q.    And you explained very well yesterday
22    the two I guess fields or subfields.

539

 1            One has to do with just studying our

Depo-Hughes-James-05-06-09

2 economies and whether laws improve as they become

3 more economically efficient due to experience;

4 correct?

5     A.   Correct.

6     Q.   The common law contract is probably one

7 of the best examples of that.

8     A.   Yes.  That's one of the ones that you

9 use as an example when you teach the class, yes.

10     Q.   And there's nothing unnoble or illegal

11 about breaching our contracts in this country as

12 long as we pay the consequences; correct?

13     A.   Never really thought about it that way,

14 but, yeah, as long as you pay the consequences.

15     Q.   Isn't that one of the theories of

16 contract damages, that if I'm in a contract, if I

17 have a contract with Mr. Berlin here that I'm

18 going to bring him his lunch for five bucks, all

19 right, and somebody else offers me $10 to bring

20 him lunch.  And if I don't bring Mr. Berlin lunch

21 and he has to send somebody else down to get it,

22 it's going to cost him six, I can make an economic

                                        540

1 analysis.  I'll pay him the $6 damages, he's

2 whole, and I'll make an extra four bucks from

3 somebody else who wants me to go get them their

4 lunch; right?

5     A.   Sure.

6     Q.   So economically I'm more efficient now;

7 right?

Page 197

Depo-Hughes-James-05-06-09

8      A.   Yes, the breach was sufficient.

9      Q.   And Mr. Berlin has been made whole.

10     A.   Okay.

11     Q.   Is that the kind of thing that the one

12  field of law and economics would study, that type

13  of concept?

14     A.   Yes, yes.

15     Q.   Now let's go to the other side of law

16  and economics.

17          Doesn't law and economics study from a

18  macro-economic perspective and a micro-economic

19  perspective how our laws act as barriers to what

20  otherwise would be expected behavior based upon

21  economic incentives?

22     A.   I know what you're saying.  I don't know

                                              541

1  that I would put it quite that way.  I would put

2  it a little bit differently, and you may or may

3  not agree that it's the same.

4          But markets, especially free markets,

5  with their prices and, I'm sorry, in free markets

6  prices are information.  Well, actually in

7  monopolized markets prices are also information,

8  and those prices create incentives and changes in

9  prices change incentives.

10          Another big incentive creator in our

11  society is the law, that the law by promoting

12  certain behavior, constraining other behavior,

13  creates incentives.  And economists, law and

                       Page 198

Depo-Hughes-James-05-06-09

14  economics economists, tend to apply this analysis

15  of how changes in price affect people's incentives

16  apply the same analysis to the law, how changes in

17  law would also change people's incentives.

18          So that's my restating to you what I

19  think, I kind of gather we're on the same page.

20      Q.   I think we're saying the same thing, but

21  let me give you an example.

22      A.   Okay.

542

1       Q.   Let's say that Mr. Berlin and I are the

2   only two lawyers in Podunk, okay.  Every time

3   there's a lawsuit, he's got one side and I've got

4   the other, no matter what it is.  He's charging

5   two hundred bucks an hour and I'm charging a

6   hundred seventy-five bucks an hour.

7           And then the guy comes to me, the first

8   guy that wants, and he says look, Berlin's going

9   to do it for a hundred seventy-five, will you go

10  down to a hundred fifty.  Then the next thing they

11  go to him and go Breen will do it for a hundred

12  fifty, will you do it for a hundred twenty-five.

13          So isn't the most economically efficient

14  thing for us to do, logical incentive, is me and

15  him to sit down and say look, let's just have an

16  agreement, I won't go under two hundred and you

17  don't either?  I mean that would be economically

18  logical; right?

19      A.   It wouldn't be legal.

Page 199

Depo-Hughes-James-05-06-09

20      Q.   I'm not talking law.  I'm talking

21 economics.

22            There's nothing in economics that says

543

1 we can't do that; is there?

2      A.   Well, except in economics we do tend to

3 have people follow the law.

4            But let's just put it differently.  I

5 would agree with you, you would certainly have the

6 incentive to do that, yes.

7      Q.   Okay.  There would be a normal economic

8 incentive for us to sit down and do the logical

9 thing, which is to fix prices; right?

10     A.   Okay.

11     Q.   Now, as you correctly said, we would be

12 the former two lawyers in Podunk because we'd both

13 be in the slam if we did that, okay.

14     A.   Okay.

15     Q.   We would be jailhouse lawyers.  What a

16 thought.

17            What law are you aware of that would

18 stop us from doing the rational economic thing and

19 that is agree that lawyers in Podunk will charge

20 no less than two hundred bucks an hour?

21     A.   The Sherman Act.

22     Q.   Sherman Antitrust Act.  Do you know when

544

Depo-Hughes-James-05-06-09

1    that was passed?

2         A.    1898.

3         Q.    1898, okay.

4               Prior to 1898, price fixing and

5    monopolies were normal, relatively normal economic

6    conduct; correct?

7         A.    Yes.

8         Q.    All right.  Now, prior to 1898, would

9    the economists have said there's anything wrong,

10   would the economists have advised the business

11   against monopoly saying there's something wrong

12   with it economically?

13        A.    Well, prior to 1898, I don't know that

14   we really had people that were called economists.

15   They were social philosophers at the time.

16              But would economists have said there was

17   anything wrong with that kind of price fixing?

18              Well, let me put you in the realm of

19   what I can comment on, that if you took an

20   economist like me from the twenty-first century

21   and went back to 1870 and somebody said well,

22   we're going to fix prices, my advice to them would

                                                       545

1    be that that's not a socially acceptable activity.

2    It's privately rational for the two of you, but it

3    is going to cause harm to the rest of society.  So

4    it's something that you should not be doing.

5         Q.    So today in our modern world is there

6    some standard in economics or method or rule that

                         Page 201

Depo-Hughes-James-05-06-09

7    indicates the economist is supposed to tell

8    business consulting clients, for example, what

9    socially economically proper conduct would be?

10            MR. BERLIN:  Objection, form.

11            THE WITNESS:  I don't work in that realm

12   of management consulting.

13            I would like to think that there is, but

14   my guess more often, my guess is more likely that

15   it's, that such advice is couched in terms of, as

16   you say, you're all going to wind up in the

17   slammer if you do that.  But I don't know

18   specifically what management consulting economists

19   might say in such a situation.

20            (Deposition Exhibit Hughes 012 was

21   marked for identification.)

22   BY MR. BREEN:


                                              546


1       Q.   All right.  Could you look at Exhibit 4,

2    Exhibit 12 actually, which is, here we go again,

3    which is your Exhibit 4 from your report.

4    (Document tendered to the witness.)

5       A.   Okay.

6       Q.   These are the charts that you were

7    looking at with Mr. Lavine yesterday; right?

8       A.   Correct.

9       Q.   I've got a yellow sticky on one of them,

10   and I've put it on Mr. Berlin's also, or we did.

11            MR. BERLIN:  Thank you.

12   BY MR. BREEN:

Depo-Hughes-James-05-06-09

13       Q.   And that's the one for vancomycin, one
14  gram vial.  Do you see that?
15       A.   Yes.
16       Q.   Now, look at the 1995 timeframe there.
17       A.   Okay.
18       Q.   I'll ask, when you did this chart were
19  you aware in late March of '95 Abbott reported a
20  price that resulted in an AWP being published at
21  $17.81 for that drug?
22       A.   No.  I'm not aware of that specifically.


                                              547


1        Q.   And then in May of that year, it
2   increased its report to $32.95, which resulted in
3   an AWP of $39.13.
4            Did you know that?
5        A.   I knew that there was some fluctuation
6   in the price in that timeframe.
7        Q.   And then later in May, that same month,
8   it raised its price reports to cause an AWP of
9   $62.86.
10           Did you know that?
11           MR. BERLIN:  Objection, form.
12           THE WITNESS:  In general terms, yes.
13  BY MR. BREEN:
14       Q.   And then by 2001 it raised the AWP all
15  the way up to $76.42.
16           Did you know that?
17       A.   Again, in general terms, yes.
18           MR. BERLIN:  I'm sorry.  Same objection.
                      Page 203

Depo-Hughes-James-05-06-09

19    BY MR. BREEN:

20        Q.   But do you know that during that period

21    of time its actual price fell from around twelve

22    bucks to IV pharmacies, small ones like Ven-a-

548

1     Care, all the way down to about four bucks?

2              MR. BERLIN:  Objection, form.

3              THE WITNESS:  Again, I understand that

4     the price did fall in that period, the selling

5     price did fall in that period.

6     BY MR. BREEN:

7         Q.   And your opinion is that all those price

8     fluctuations are explained by the Consumer Price

9     Index; right?

10        A.   Well, again, what I did in this graph is

11    I took the price announcements, the annual price

12    announcements, that Abbott gave for direct price

13    and assumed that that was the direct price that

14    held throughout the period until the next direct

15    price announcement.

16        Q.   So your assumption would be wrong for

17    1995 if the prices I gave you are correct?

18        A.   If the information that you gave me was

19    correct, it's not reflected in this graph,

20    correct.

21        Q.   As a matter of fact, the graph doesn't

22    reflect the price at all.  It just reflects the

Page 204

549

1    price in relationship to the Consumer Price Index;

2    correct?

3                MR. BERLIN:  Objection, form.

4                THE WITNESS:  Yes.  It's a price index.

5    So that it's in effect the cumulative percentage

6    change in the price from 1991, yes.

7    BY MR. BREEN:

8        Q.   Do you think it's socially economically

9    proper for a drug company to report an average

10   wholesale price of $76.42 when it's selling the

11   drug for four bucks and report that its price goes

12   up every year when in fact in truth the price goes

13   down every year?

14               MR. BERLIN:  Objection, form.

15               THE WITNESS:  I don't have an opinion

16   regarding this drug because, again, I haven't

17   examined this or taken any opinion on whether

18   Abbott's announced prices were appropriate,

19   competitive, anti-competitive, or fraudulent

20   because I'm accepting the allegations in the

21   complaint as being true.

22   BY MR. BREEN:

550

1        Q.   Well, I'm trying to understand what this

2    whole Consumer Price Index chart means then.

3                How is it relevant to your opinions?

4        A.   Just that exactly what is stated in the

                        Page 205

Depo-Hughes-James-05-06-09

5   report that the Abbott price announcements for

6   these products were annual and tended to increase

7   in line with the CPI for medical care.

8          Q.   Well, why would Abbott increase its

9   price for a drug every year, its reported price

10  for a drug every year, when in fact its actual

11  price is dropping?

12              MR. BERLIN:  Objection, form.

13              THE WITNESS:  I am not privy to what

14  Abbott's pricing strategies are, so I could not

15  tell you.

16  BY MR. BREEN:

17         Q.   I mean in normal economics, isn't a

18  company better off publishing a lower price than a

19  higher price?

20         A.   I don't think it's unusual for companies

21  to raise list price and then to increase discounts

22  from the list price.  I don't find that unusual at

                                                    551

1   all.

2          Q.   You did some expert work in the

3   automobile retail side of things; didn't you?

4          A.   Yes.

5          Q.   How many sticker prices on automobiles

6   have you ever had experience with that were more

7   than ten times the actual selling price of the

8   vehicle to the consumer?

9               MR. BERLIN:  Objection, form.

10              THE WITNESS:  Number of automobile

                        Page 206

Depo-Hughes-James-05-06-09

11  stickers that the sticker price was ten times the

12  actual selling price to the --

13  BY MR. BREEN:

14       Q.   To the consumer, ten times.

15            MR. BERLIN:  Same objection.

16            THE WITNESS:  Ten times, I have not seen

17  any like that.

18  BY MR. BREEN:

19       Q.   Five times?

20            MR. BERLIN:  Same objection.

21            THE WITNESS:  Not that I can think of.

22  BY MR. BREEN:

                                                      552

1        Q.   Now, getting back to your charts, they

2   all show this huge drop-off in 2001.

3            Do you see that?

4        A.   Yes.

5        Q.   What's that about?

6            MR. BERLIN:  Objection to form.

7            MR. BREEN:  What's wrong with that

8   question?

9            MR. BERLIN:  What's up with that?

10            MR. BREEN:  That wasn't my question.  I

11  said "What's that about," what is that about.  And

12  that is a good question.

13            MR. BERLIN:  I wish you would just ask

14  "what's up with that."

15            You can answer that if you can.  Go

16  ahead.

Page 207

Depo-Hughes-James-05-06-09

17          THE WITNESS:  Again, I'm not privy to

18  Abbott pricing strategy, and so I don't know

19  exactly why that happened.

20  BY MR. BREEN:

21          Q.   But you know what happened, don't you,

22  because somebody had to have told you by now.  So

553

1   what do you know about it?

2           MR. BERLIN:  Objection, form.

3           THE WITNESS:  Abbott chose to adjust its

4   prices is the extent of what I know, that Abbott

5   made a choice to adjust its prices.

6   BY MR. BREEN:

7           Q.   When did you first find out about this

8   huge drop-off in Abbott prices on the drugs at

9   issue in this case?

10          MR. BERLIN:  Objection, form.

11          THE WITNESS:  I don't know exactly, but

12  I would say relatively early on.

13  BY MR. BREEN:

14          Q.   Did you know it before you graphed it

15  out, or did somebody come and tell you?

16          A.   I had seen graphs like this, well, I had

17  seen the pricelist, so I don't think, no, nobody

18  ever came and told me.  So I guess I must have

19  come across it on my own.  I don't remember

20  specifically.

21          Q.   Did you ask anybody, well, what

22  happened, how did your prices drop so

Page 208

Depo-Hughes-James-05-06-09

554

1    precipitously all of a sudden?

2          MR. BERLIN:  Objection, form.

3          THE WITNESS:  Well, the only one I would

4    have had to ask is counsel, and they're not a good

5    source, I mean they're not my source for

6    information.

7          So I just, I seem to remember something

8    from the Sellers deposition that he said they made

9    a decision to bring direct prices more in line

10   with selling prices, if I'm recalling his

11   testimony correctly.

12   BY MR. BREEN:

13      Q.  Is it your testimony that you did not

14   have a discussion about this with counsel?

15      A.  No, not really, no.

16      Q.  Okay.  So --

17      A.  Because I mean it doesn't affect my

18   opinion in the sense that Dr. Duggan is going to

19   do the same thing with the AWP that results from

20   these direct, from the lower direct prices that he

21   did with the higher direct prices.

22          So the criticism of, all of the

555

1    criticisms that I made of Dr. Duggan's work is not

2    affected by whether there's a sudden drop in the

3    direct price reported by Abbott.

Page 209

Depo-Hughes-James-05-06-09

4        Q.    Do you know Professor Louis Rossiter?

5        A.    I know the name, yes.

6        Q.    Do you know he's another expert for

7    Abbott in this case?

8        A.    If you tell me he is, then I'll take

9    your word for it, but I don't know him.

10       Q.    Professor Louis Rossiter is another

11   expert for Abbott in this case.

12       A.    Okay.

13       Q.    And he's a well-known economist; isn't

14   he?

15       A.    Yes, I would say so.

16       Q.    Used to be the Secretary of Health &

17   Human Resources for the State of Virginia; wasn't

18   he?

19       A.    Not to my knowledge, but I'll take your

20   representation.

21       Q.    Used to be the Secretary of Health &

22   Human Resources for the State of Virginia in 2001.

                                                     556

1    Did you know that?

2        A.    Well, since I didn't know that he had

3    the position --

4        Q.    Fair enough.  Take my representation, in

5    2001.

6        A.    Okay.

7        Q.    And, according to Professor Rossiter,

8    this big price drop that occurred with the Abbott

9    drugs, brought the reported AWPs down within the

Depo-Hughes-James-05-06-09

10   range of the Duggan alternative prices.

11            Do you disagree with that?

12       A.   I don't know what Dr. Rossiter has

13   testified to.

14       Q.   All right.  Let me ask the question:

15   Isn't it true that Abbott's price reductions

16   resulted in the reported average wholesale prices

17   coming down to within a range that was close to

18   the Duggan alternative price that he got to when

19   he added the twenty-five percent on to the average

20   contract price?

21            MR. BERLIN:  Objection, form.

22            THE WITNESS:  I mean without looking at

557

1    it, if you represent it that way I'll take it.

2    But I don't have any specific knowledge that

3    that's true.

4    BY MR. BREEN:

5        Q.   Well, if you hold up this chart, they

6    sure had to get a lot closer, didn't they, if they

7    dropped off that much in that timeframe?

8        A.   Sure.  But that wasn't your question.

9            I don't know how close is close.  Did

10   they get closer?  I'll agree with you on that.

11       Q.   Okay.  So what do you think it did to

12   the EAC calculations were based on Abbott's

13   average wholesale prices for the drugs at issue in

14   this case when Abbott lowered its price reports?

15       A.   The EAC calculations would have been

Page 211

Depo-Hughes-James-05-06-09

16    reduced.

17        Q.   And please tell us how many states

18    increased dispensing fees for the drugs in

19    question as a result of that.

20        A.   Specifically as a result of the change

21    for Abbott, I'm not aware of any.

22        Q.   How many pharmacies or physicians left

558

1     the Medicaid program or ran out of business

2     because of that?

3         A.   I don't know of any.

4         Q.   How many major competitors does Abbott

5     have for its liter bag saline solution and what

6     have you, for its fluids?

7         A.   A handful, you know.

8         Q.   How about two, Baxter and McGall Braun?

9     Does that sound about right?

10        A.   Are you telling me there's nobody else

11    that makes those things?

12        Q.   I'm asking if that sounds right.

13             MR. BERLIN:  Objection, form.

14             THE WITNESS:  It doesn't sound right to

15    me, no.

16    BY MR. BREEN:

17        Q.   Okay.  Who else makes them?

18        A.   Others.  I don't have the names

19    memorized.

20        Q.   Did you know that Baxter and McGall

21    Braun did?

Depo-Hughes-James-05-06-09

22      A.    I knew that Baxter did, yes.


                                                              559


1       Q.    Now, do you know whether or not the
2   government, the United States, would have pursued
3   a false claims case against Abbott if it would
4   have reported prices that were generally
5   consistent with the prices that moved down to in
6   the 2000, 2001 timeframe?
7           MR. BERLIN:  Objection, form.
8           THE WITNESS:  I have no idea what the
9   intent of the U.S. government would have been in
10  that regard.
11  BY MR. BREEN:
12      Q.    So what happened in the infusion
13  pharmacy market -- well, strike that.
14           When Abbott reduced its prices, price
15  reports, as reflected on your charts here, there's
16  a big drop-off --
17      A.    Uh-huh.
18      Q.    -- do you know that after Abbott did
19  that, it sold its Hospital Products Division or
20  spun it off and became a company known as Hospira?
21           MR. BERLIN:  Objection, form.
22           MR. BREEN:  What's wrong with that


                                                              560


1   question?

Page 213

Depo-Hughes-James-05-06-09

2          MR. BERLIN:  You make it sound like the

3     two were related and you said after which has no

4     temporal context.

5          MR. BREEN:  It is temporal.  It happened

6     after.

7          MR. BERLIN:  Did you know that after the

8     birth of Christ they built the Golden Gate bridge?

9          I mean having it in the same sentence

10    sounds like there's a causal connection.

11         MR. BREEN:  All right.  I'm going to fix

12    this question.

13    BY MR. BREEN:

14    Q.   Do you know that Abbott reported lower

15    prices in the 2000, 2001 timeframe, question mark?

16    A.   Yes.

17    Q.   Do you know that Abbott spun off its

18    Hospital Products Division at some point after

19    2001, question mark?

20    A.   Yes.

21         It's my understanding that they sold the

22    Hospital Products Division, as I stated in my

                                             561

1     report, in mid 2004.

2     Q.   And do you know that Hospira lowered the

3     reported prices even more?

4     A.   I was not aware of that.  That's beyond

5     the timeframe for this work.

6     Q.   All right.  Are you aware of anybody,

7     any provider, that has left the Medicaid provider

                     Page 214

Depo-Hughes-James-05-06-09

8     realm since 2001?

9          A.    I don't know specifically anyone, no.

10         Q.    Do you know generally?

11         A.    I don't know generally one way or the

12    other.

13         Q.    Do you know of any studies that show

14    that providers are leaving the Medicaid program

15    since 2001?

16         A.    I am not aware of any such studies, no.

17         Q.    Now, do you know who the brand

18    manufacturer, the innovator of vancomycin was?

19         A.    I believe it was Abbott.

20         Q.    How about Eli Lilly?

21         A.    Oh, right.  I'm sorry.  I'm thinking of

22    a different drug.

562

1                Eli Lilly was the innovator.  That's

2     right.  I'm sorry.

3          Q.    Are you thinking perhaps erythromycin?

4          A.    Correct.

5          Q.    Abbott was the branded innovator.

6          A.    Was the branded innovator, yes.

7          Q.    As an economist, how much should, in

8     your but-for world, how much should the states

9     have increased their dispensing fees for the drugs

10    in question when Abbott reduced its price reports

11    in the 2000, 2001 timeframe?

12               MR. BERLIN:  Objection, form.

13               THE WITNESS:  I've not done calculation

Page 215

Depo-Hughes-James-05-06-09

14   or the surveys or anything that would need to be

15   done to ascertain that.  So I don't know.

16   BY MR. BREEN:

17        Q.   But it's your opinion they should have;

18   right?

19        A.   It's my opinion that pharmacies would

20   have found the reimbursements in line with Dr.

21   Duggan's reimbursements to be unremunerative.

22        Q.   My question is how much should they have

                                                       563

1    increased their dispensing fee for the Abbott

2    drugs when Abbott reported lower prices in the

3    2000, 2001 timeframe, according to your opinion?

4             MR. BERLIN:  Same objection.

5             THE WITNESS:  Again, I don't have a

6    number.  I have not done the calculation.

7             But we have seen what the administration

8    fees were increased by under the MMA, which was a

9    substantial amount.

10   BY MR. BREEN:

11        Q.   Well, let's talk about Medicaid now.

12             You've already said that you're aware

13   that the states were already increasing

14   administration fees.  You just don't know when or

15   where or who.

16             So do you even know if it was necessary

17   to increase them any more in the post-2000

18   timeframe in connection with the Abbott drugs?

19        A.   Well, again, under Medicaid and under

                    Page 216

Depo-Hughes-James-05-06-09

20    the DRA, states were supposed to review them and

21    states did undertake the review, Texas undertook a

22    review that here's what we need to do if the DRA

564

1    goes through.

2          The DRA didn't end up being implemented

3    as yet, but yet the states were undergoing

4    precisely those reviews and at least in the case

5    of Texas were making such determinations.

6       Q.   Okay.  Well, when it came to IV

7    pharmacy, how many states that had already

8    increased their dispensing fees conduct a review

9    and said we have to increase them more?

10      A.   I don't know the answer to that.

11      Q.   So let me get this straight.  Let's

12   assume that the dispensing fees for a particular

13   state are adequate, according to your whatever you

14   would decide would be adequate, we'll make you the

15   Zarr, the Medicaid Zarr, and dispensing fees are

16   adequate at a certain point in time.

17          Abbott decides though that they're going

18   to increase their price reports a thousand

19   percent.  So that their AWP is a thousand percent

20   higher than the actual selling price generally and

21   currently paid in the marketplace for the drug.

22      A.   A thousand percent, but it may be $2 or

565

Page 217

Depo-Hughes-James-05-06-09

1   $3 that we're actually talking about.

2       Q.   Well, maybe it's $2 or $3, but when you

3   do infusion pharmacy how many, don't you have to

4   use these bags of solutions every time you give a

5   prescription?

6       A.   It's my understanding it's close to that

7   at least, yes.

8       Q.   So it's $2 to $3 on the bag and then

9   whatever it is on the actual drug that goes in the

10  prescription; correct?

11          MR. BERLIN:  Objection, form.

12          THE WITNESS:  The drug that goes in the

13  prescription?  I'm not sure what --

14  BY MR. BREEN:

15      Q.   Let's say it's vancomycin.

16      A.   Okay.

17      Q.   Let's say that the inflated

18  reimbursement is $10 on the bag of fluids and $100

19  on the vancomycin.

20          MR. BERLIN:  Objection, form.

21  BY MR. BREEN:

22      Q.   Every time the vancomycin is

                                                    566

1   administered, you need another bag of fluids;

2   correct?

3       A.   Correct.

4       Q.   Anyway, so let's say that Abbott decides

5   to report higher prices that results in a higher

6   AWP one year, and then the next year it decides

                      Page 218

Depo-Hughes-James-05-06-09

7    no, we're going to lower them, we're going to

8    report prices that are consistent with our market.

9           Is it your testimony that that, those

10   two decisions by Abbott to raise it and then lower

11   it again, will somehow cause the Medicaid programs

12   to have to pay a higher dispensing fee?

13      A.   I'm not addressing the raising and then

14   lowering, but I was addressing the lowering to

15   levels commensurate with what Dr. Duggan has

16   proposed.

17      Q.   Well, when you say lowering the levels

18   commensurate with what Dr. Duggan has proposed, is

19   it your opinion that Dr. Duggan's proposal is not

20   consistent with the regulation that required

21   estimation of acquisition cost based upon prices

22   generally and currently paid in the marketplace?


                                                    567


1       A.   I haven't reached an opinion on that.

2           But I am saying that the total

3    reimbursement is being reduced to a level that

4    threatens the access by Medicaid patients to

5    healthcare services to approximately the same

6    degree that those services are available to

7    nonMedicaid patients.

8       Q.   That's your opinion?

9       A.   Yes.

10      Q.   But you don't have one scintilla of

11   quantitative evidence that you've actually

12   developed yourself or reviewed that somebody else

                      Page 219

Depo-Hughes-James-05-06-09

13    did relating to the drugs at issue in this case

14    that supports that opinion; do you?

15              MR. BERLIN:  Objection, form.

16              THE WITNESS:  Again, I disagree.

17              For example, the Myers & Stauffer

18    reports speak to the inadequacy at existing levels

19    of EAC in the dispensing fees for pills and

20    tablets and then go on to say that this problem is

21    going to be worse for infusion drugs, which are

22    the drugs like the drugs that are at issue in this

568

1     case, and in those situations even at current

2     levels of EAC the dispensing fees are even more

3     inadequate than they are for pills and tablets.

4     BY MR. BREEN:

5         Q.   Okay.  So for the vancomycin again on

6     Exhibit 4, your Exhibit 4, Deposition Exhibit 12,

7     forgetting the twenty percent range between an

8     actual WAC and an average wholesale price,

9     forgetting that range, how much are the states

10    going to have to increase dispensing fees on

11    vancomycin, Abbott's vancomycin, as a result of

12    Abbott reporting prices that are closer to market

13    based upon the studies you have reviewed?

14        A.   There was not numbers given in the

15    studies that I reviewed.

16        Q.   Okay.  So my question then is if you're

17    going to criticize Dr. Duggan's claim-by-claim

18    drug-by-drug NDC-by-NDC specific damages model,

Depo-Hughes-James-05-06-09

19   then can you point to any specific quantitative

20   evidence that an economist would utilize to

21   determine how much in your alternate world the

22   Medicaid programs are going to, according to you,

569

1   increasing dispensing fees on vancomycin based

2   upon Abbott's reporting lower prices?

3        A.   Again, to come to the opinions that I

4   came to in my report, I relied on the testimony

5   and the evidence in the reports that the people

6   who know the state Medicaid systems better than I

7   do, better than Dr. Duggan does, better than you

8   do, the people who are actually having to make the

9   rules day in and day out, had stated that if you

10   have drastic reductions, or even not drastic

11   reductions, if you had significant substantial

12   reductions in ingredient cost, you will also have

13   to worry about what's happening on the dispensing

14   fee side, lest you have problems with access.

15        And your expert, Dr. Schondelmeyer, says

16   exactly the same thing in his California report.

17   That reductions in the ingredient cost, modest

18   though they were compared to Dr. Duggan's

19   reduction in ingredient costs, the reductions in

20   ingredient costs in California were going to

21   require increases in dispensing fees, or else, I

22   believe in Dr. Schondelmeyer's words, you were

Page 221

Depo-Hughes-James-05-06-09

570

1    going to have problems with access to the Medi-Cal
2    system.
3        Q.    Did you actually read Dr.
4    Schondelmeyer's report in that California case?
5        A.    I believe I did, but --
6        Q.    Wasn't he talking about the proposed ten
7    percent across the board reduction for all drugs?
8        A.    He was talking about a reduction for all
9    drugs, yes.
10       Q.    Including branded drugs?
11       A.    Yes.
12       Q.    Didn't he really say that if you're
13   going to take ten percent away from the
14   reimbursement for branded drugs, you're going to
15   wind up putting the pharmacist in a position where
16   he's not going to be able to, he's going to be
17   substantially in the red for the branded drugs
18   because he doesn't have that much margin on them?
19       A.    If you reduce ingredient cost, yes,
20   you're going to put the pharmacist into the red.
21       Q.    And wasn't he talking about the
22   approximately eighty percent of the dollars that

571

1    are spent by Medicaid on branded drugs?
2        A.    Well, he was talking about all drugs.
3    And, yes, eighty percent of the dollars are spent
4    on branded drugs.

Page 222

Depo-Hughes-James-05-06-09

 5      Q.   And wasn't the problem that because
 6   eighty percent of the dollars are spent on branded
 7   drugs, if you take the pharmacist's, ten percent
 8   away from the pharmacist, then he's going to wind
 9   up not having enough money to even pay for the
10   branded drugs and be substantially in the red?
11      A.   Yes, sure.
12      Q.   And didn't he say that if you apply that
13   to pharmacies that are treating a large proportion
14   of the poor, heavy Medicaid pharmacies, rural
15   pharmacies, inner-city pharmacies, that you may
16   put them out of business because if you take away
17   ten percent of their ingredient cost on the
18   expensive brands, they may not have enough money
19   to stay in business?
20      A.   Yes.  That's what he's saying.
21           But, again, the general point and the
22   general point of my criticism is, as I say exactly

                                                   572

 1   in my report, you cannot deal with ingredient cost
 2   and dispensing fees as two separate things.
 3           You have to deal with them together to
 4   make sure that reimbursements are remunerative to
 5   the provider or else you're going to have access
 6   problems.
 7      Q.   Okay.  Now, I understand that's your
 8   point, but let's get back to the case that we're
 9   here on and the drugs that we're here on and the
10   conduct that we're here on under the False Claims
                    Page 223

Depo-Hughes-James-05-06-09

11   Act.

12          You come to the conclusion that you've

13   got to look at all the different factors that

14   would occur in this alternate world if

15   reimbursement was based upon lower reported

16   prices.

17          What area of economics tells you to do

18   it that way?

19      A.   As I said several times over the past

20   couple of days, as in the paper by Dr. Blair that

21   I cite to in my report, is that when you're

22   constructing a but-for world you need to construct

573

1   a but-for world that has a theoretical and

2   evidentiary basis that mimics as closely as

3   practicable the world that would exist absent the

4   alleged wrongful behavior.

5          Specifically, damages in antitrust

6   matters can be considered speculative if all that

7   you change is just the price.

8          If all that you change is just the price

9   and you don't take into account any benefits that

10   might have been conferred on the injured party to

11   offset the, in offset of the harm that was done to

12   the injured party, then those damages, according

13   to Dr. Blair, would be considered speculative.

14          So when one does damages analysis, it's

15   not enough to just change the price and say

16   everything else stays the same because prices give

Page 224

Depo-Hughes-James-05-06-09

17    incentives, and people change their behavior when

18    prices change.

19           So based on that, I am saying about Dr.

20    Duggan's report is that you can't just change the

21    price and nothing else, that you have to look at

22    and try to quantify the other changes that are

574

1    likely to occur in the but-for world that you're

2    proposing.

3        Q.    So my old contract example where Mr.

4    Berlin says he'll give me five bucks if I go and

5    get him lunch and I don't do it, it'll cost him

6    six bucks to go get his lunch, what are his

7    damages?

8        A.    He's given you five bucks and he's had

9    to pay six.  So he's been damaged by the

10   difference.

11       Q.    But what if the lunch he wanted me to go

12   get turns out to have salmonella and he went

13   someplace else to get his lunch, do I now get to

14   offset the salmonella that he otherwise would have

15   had had I gotten his lunch?

16       A.    I have no idea what this hypothetical

17   has to do with my opinion, and I actually don't

18   have an opinion about your hypothetical.

19       Q.    All right.  What if a retired person

20   gets her Social Security check every month and

21   uses $50 to buy lottery tickets and they always

22   lose.  But one month as soon as they cash it, they

Page 225

Depo-Hughes-James-05-06-09

575

1    get robbed.

2            Would their damage include the fifty

3    bucks they usually use to buy lottery tickets that

4    they normally lose --

5            MR. BERLIN:  Objection, form -- I'm

6    sorry.

7    BY MR. BREEN:

8        Q.   -- in your but-for world or your concept

9    of speculative antitrust damages?

10            MR. BERLIN:  Objection, form.

11            THE WITNESS:  If somebody -- well, first

12    of all, being robbed is criminal.  So I'm not

13    quite sure where we're going with this.

14            But if somebody is robbed of $100, they

15    in restitution would expect $100 back.

16    BY MR. BREEN:

17        Q.   Even if they would have spent fifty

18    bucks, they would have blown the fifty bucks

19    anyway?

20            MR. BERLIN:  Objection, form.

21            THE WITNESS:  I don't see any reason why

22    not.

576

1    BY MR. BREEN:

2        Q.   Okay.  Now, Professor Blair's article

3    was, as you said, on speculative antitrust

Page 226

Depo-Hughes-James-05-06-09

4   damages; right?

5       A.   Correct.

6       Q.   What is the standard for antitrust

7   damages?

8       A.   According to Professor Blair, the

9   standard is that the but-for world has to have a

10  basis in both theory and evidence that the

11  proposed but-for world is in fact accurate.

12      Q.   And that's based upon what standard?

13      A.   Well, again, you need to have a

14  theoretical and evidentiary basis for your but-for

15  world.

16           Let's just take it from there.  In my

17  opinion Dr. Duggan has certainly no evidentiary

18  basis for his but-for world.  He's just saying I'm

19  going to lower AWP and nothing else.

20      Q.   Right now I'm talking about Dr. Blair

21  and not Dr. Duggan.

22      A.   Well, I'm talking about Dr. Duggan and

577

1   I'm talking about my opinion.

2           And my opinion is that the but-for world

3   that I'm proposing has both a theoretical basis

4   that if you don't pay people enough to cover their

5   costs, they're not going to stay in business and

6   they're not going to stay in the program.

7           That's a theoretical economic basis that

8   people who aren't making any money in the business

9   aren't going to participate in the business

Page 227

Depo-Hughes-James-05-06-09

10    anymore.

11             And I also have an evidentiary basis

12    because there are numerous state Medicaid

13    officials, there are numerous federal Medicare and

14    Medicaid officials, there are numerous reports

15    conducted by the government, there are numerous

16    reports commissioned by the government, all of

17    which point to my conclusion that a but-for world

18    with a Draconian ninety percent reduction in

19    ingredient cost would have to not in my opinion

20    but in the people of people who have given

21    evidence in this matter is that there would have

22    to be an adjustment to dispensing fees.

578

1             So my but-for world follows along with

2    what Dr. Blair is saying, that you need a

3    theoretical and evidentiary basis.

4             Dr. Duggan provides no basis for his

5    but-for world whatsoever.  But he simply assumes,

6    without any evidence that I am aware of that he's

7    ever tried to put forward, that dispensing fees

8    and access and affordability and all of that other

9    stuff will stay exactly the same.  And that's what

10    my criticism is.

11        Q.   I realize you don't want to talk about,

12    you're talking about your opinion, not Dr.

13    Blair's, but my question was about Dr. Blair.  So

14    let's go back to that since you're relying on him.

15             You're relying on Dr. Blair's learned

Depo-Hughes-James-05-06-09

16    treatise; correct?

17        A.    Correct.

18        Q.    And he applied his damage, his damage

19    opinion or his damage studies to antitrust cases;

20    correct?

21        A.    Correct.

22        Q.    Have you ever been an expert in an


                                                      579


 1    antitrust case?  I think you said you have.

 2        A.    Yes.

 3        Q.    Are you advised of the standards in an

 4    antitrust case for what are legal damages and what

 5    are not legal damages?

 6        A.    In the case I was involved in, it didn't

 7    come up, if you will.

 8        Q.    It didn't come up.

 9            MR. BREEN:  All right.  We've got one

10    minute left on the tape.  Why don't we take a

11    break and I'll try to move to another area.

12            THE VIDEOGRAPHER:  Going off the record

13    at 4:14 p.m.

14                (A recess was taken.)

15            THE VIDEOGRAPHER:  Beginning of

16    Videotape No. 5.  We're back on the record at 4:28

17    p.m.

18    BY MR. BREEN:

19        Q.    Just to close out the last topic we were

20    on.

21            Professor Blair's paper was directed at
                        Page 229

Depo-Hughes-James-05-06-09

22    antitrust damages; correct?

580

1         A.    Correct.
2         Q.    Did the lawyers in this case or anybody
3    else suggest to you that the antitrust measure of
4    damages is applicable to the civil False Claims
5    Act?
6         A.    No.
7         Q.    Did you ever ask anybody what the
8    measure of damages should be as far as the matters
9    at issue in a false claims case?
10        A.    No, I mean I didn't ask, I did not ask
11   anybody, and nobody relayed that to me.
12        Q.    So if for some reason the but-for
13   analysis is determined by the court not to be
14   pertinent to a False Claims Act measure of
15   damages, do you have any other criticisms of
16   Professor Duggan's but-for analysis?
17             MR. BERLIN:  Objection, form.
18             THE WITNESS:  Well, it seems to me if
19   the court decides that but-for analysis isn't
20   proper in a False Claims Act, then that would
21   close the issue.
22   BY MR. BREEN:

581

1         Q.    Now, but your but-for methodology where
                    Page 230

Depo-Hughes-James-05-06-09

2      you, correct me if I'm wrong, but you're basically

3      assuming that a measure of damages on a claim-by-

4      claim basis under the False Claims Act necessarily

5      needs to be considered in light of potential

6      changes in the program's method of payment that

7      might occur if that particular measure were

8      applied program-wide?

9          A.   Well, again, I'm basically taking the

10     thrust of my analysis in the same way that Dr.

11     Duggan states his, that he's calculating damages

12     as a difference to what the government paid with

13     the actual world AWPs and what they would have

14     paid with the but-for AWPs that he calculates.

15              Again, it's simply been my contention

16     all along that that difference in government

17     expenditure is not reducible to simply the change

18     in the price, the change in the AWP that he

19     proposes.

20              That such changes, according to the

21     testimony and the reports and the other

22     information that I have cited numerous times over

                                                    582

1      the past couple of days, suggests that there would

2      be other changes that would take place in

3      reimbursements, particularly dispensing fees, that

4      would reduce the difference between what the

5      government paid in the actual world and what the

6      government would have paid in the but-for world.

7      And he doesn't take that into account.

Depo-Hughes-James-05-06-09

8      Q.   I'm just trying to understand what this
9  would have looked like if he would have taken it
10  into account as you say he should have.
11           If I understand your testimony, we're in
12  agreement that there was no existent formulaic
13  basis in the actual claims adjudications that he
14  emulated to make this dispensing fee adjustment;
15  correct?
16      A.   Basically, yes.  But I mean there were
17  dispensing fees that did change depending on what
18  the ingredient cost was.
19      Q.   Okay.
20      A.   But aside from that, yes.
21      Q.   So then if Professor Duggan were to have
22  done what you say he should have done, would he

583

1  have taken the work that he did up to this point
2  and then looked at the but-for world where
3  dispensing fees were different and then calculated
4  some kind of an adjustment against his difference,
5  his total difference that he's already calculated?
6      A.   Well, not quite.
7           I would imagine that in his formulas, as
8  were laid out in his original report, that where
9  he has differences equal to the minimum of this,
10  that, and the other thing and then plus a
11  dispensing fee if the basis is an EAC, MAC, or a
12  FUL, that in there that formula would have been
13  changed to take into account a different

Page 232

Depo-Hughes-James-05-06-09

14    dispensing fee, and then the program I presume

15    could have proceeded apace.

16        Q.    I want to be real clear about this

17    because if the False Claims Act requires us to do

18    a claim-by-claim analysis and show how the claim

19    was paid and how the false statement that we

20    allege made a difference internally in the claim

21    that was paid, assume that's our first obligation,

22    okay.

                                                    584

1             Are you saying that Professor Duggan

2    should have changed the formula that the states

3    were using when they adjudicated these claims and

4    then changed the dispensing fee in the claim-by-

5    claim analysis?

6        A.    Yes.

7        Q.    In other words, he should have not used

8    the formula the states were using for actual

9    adjudications but he should have written some

10    different formula and not shown the court and the

11    jury what the formula would have looked like that

12    the state was actually using.  Is that what you're

13    saying?

14             MR. BERLIN:  Objection, form.

15             THE WITNESS:  No.  I don't think so.

16             The adjudication formula would still be

17    the same.  Minimum of EAC, MAC, FULs, of course

18    there's no FULs here, usual and customary.  With

19    the exception of usual and customary, EAC, MAC,

                        Page 233

Depo-Hughes-James-05-06-09

20    FUL, plus a dispensing fee.  All right.

21           Just like he changed the AWP, have him

22    change the dispensing fee as well to take into

                                                          585

 1    account the fact that he in some states says that

 2    he can reduce ingredient cost by ninety percent

 3    with no effect on anything.

 4    BY MR. BREEN:

 5        Q.    All right.  So you're saying then that

 6    he should have done the exact calculation he did,

 7    but he should have where he applied the dispensing

 8    fee that in fact the state applied, let's say

 9    $5.50 for argument purposes --

10        A.    Okay.

11        Q.    -- that he should have changed that and

12    said it was something more?

13        A.    He could have gone to the evidence

14    that's available in this case about what

15    dispensing fees should have been or what some

16    states thought dispensing fees would need to be in

17    certain circumstances and he could have made an

18    estimate of what would have been a remunerative

19    dispensing fee when the pharmacy is no longer

20    making any margin whatsoever on the, not making

21    any margin whatsoever on the ingredient cost

22    anymore, to go and ask people like Ven-a-Care what

                                                          586

                          Page 234

Depo-Hughes-James-05-06-09

1    does it cost you to administer these things, go to

2    the studies that talked about dispensing fees and

3    how they did not match up with the actual cost of

4    dispensing pharmaceuticals.

5        Q.   Should he assume that the only

6    dispensing fees that were going to change would

7    have been for these drugs or should he assume that

8    the dispensing fees were going to change for all

9    drugs in Medicaid?

10       A.   Well, since he's examining these drugs

11   for the purposes of this study, he would have only

12   had to look at what the dispensing fees would have

13   done for these drugs.

14       Q.   But is it reasonable to assume that the

15   Medicaid program would only change dispensing fees

16   for these drugs as opposed to all drugs?

17       A.   Well, again, when states are directed to

18   look at the adequacy of their dispensing fees,

19   it's certainly my understanding that the states

20   are free to look at dispensing fees separately for

21   infusion drugs versus pills versus tablets.  I

22   mean they're just supposed to review the adequacy

                                                    587

1    of dispensing fees.

2            Having a constant dispensing fee across

3    pills, tablets, liquids, inhalers, infusion drugs,

4    is less of an issue, and lots of state

5    representatives testified that they kept

6    dispensing fees artificially low because they knew

                        Page 235

Depo-Hughes-James-05-06-09

7    that providers were gaining a margin on ingredient

8    cost and they were trying to take that back.  All

9    right.

10           So whether it was the same or whether it

11   was different for the different kinds of drugs was

12   less important because the margin that was keeping

13   the providers in the program was coming on

14   ingredient costs.

15           Okay.  Now, that's pretty much gone.  In

16   Dr. Duggan's but-for world, the margins on

17   ingredient costs are let's say all but eliminated.

18           And then states are directed to go out

19   and say are your dispensing fees adequate.  And

20   now that there's no margin on ingredient costs

21   left by which to cushion the blow, if you will, it

22   stands to reason it would be perfectly possible

                                               588


1    and perfectly permissible for states to look at,

2    as they're directed, what it's actually costing

3    pharmacies to fill these prescriptions, and it's

4    perfectly reasonable to think that they would come

5    up with, that they could come up, with a

6    dispensing fee that may be the same across all

7    drugs or it may differ for counting pills and

8    tablets as opposed to compounding, mixing, and

9    administering an infusion drug.

10      Q.   Do you know Professor Helms?

11      A.   No.

12      Q.   Another one of the experts in this case

                       Page 236

Depo-Hughes-James-05-06-09

13    for Abbott.

14        A.    Never heard of him until this moment.

15        Q.    Dr. Helms actually.

16              Used to be the Assistant Secretary of

17    Health & Human Services back in the late '80s

18    under Ronald Reagan.

19        A.    Okay.

20        Q.    Would you agree with him if he said that

21    it was too speculative for an economist to

22    determine what a dispensing fee would be, what an

589

1    adequate dispensing fee would be?

2        A.    The record is replete with studies that

3    go state by state and say what adequate dispensing

4    fees would be.

5              They've done surveys under the MMA that

6    give us what the government considers adequate

7    dispensing fees to administration fees to be.

8              So I would have to not agree with him

9    because I think people actually do it.

10        Q.    Okay.  Getting back to my question

11    though which I don't think you ever answered.

12        A.    No.  Your question was would I agree

13    with his statement that it was too speculative to

14    come up with a dispensing fee.

15        Q.    That wasn't the question you didn't

16    answer.  The one before that you didn't answer, so

17    I'm going to ask it again.

18              As far as Professor Duggan's methodology
                        Page 237

Depo-Hughes-James-05-06-09

19    goes, would it have made any difference to you if

20    it had said the normal dispensing fee in Florida

21    is $5 and I think it would have been $10 under

22    this but-for world and put the calculation in each

590

 1    claim, that's one way.

 2            Or the other way would be do exactly

 3    what he did and then figure out the number of

 4    claims and figure out a differential per claim for

 5    dispensing fee and apply it there and then just

 6    offset the two totals.

 7        A.   Sitting here as the way that you've

 8    explained it, it doesn't sound to me like those

 9    are different calculations.

10        Q.   It would be presented in two different

11    ways; correct?

12        A.   Right, uh-huh.

13        Q.   Did you try to do that?

14        A.   No.

15        Q.   Are you capable of doing that?

16        A.   I'm capable of multiplying and adding,

17    yes.

18        Q.   Did you have sufficient information

19    provided to you in this record to come to an

20    opinion as to what a reasonable differential in

21    dispensing fees would have been?

22        A.   I had not come to any conclusion about

Page 238

1   what a reasonable differential in dispensing fees
2   would be.
3           But since Dr. Duggan is so fond of
4   talking about standard practice in economics, a
5   standard practice in economics is something called
6   sensitivity analysis.
7           So you can give the reader an idea, say
8   I don't know what states might have done for
9   dispensing fees exactly, but it's my opinion that
10  the dispensing fees would have had to go up.
11          So let's take from the record, from
12  reports by Myers & Stauffer, which Dr. Duggan has
13  relied upon, let's take from changes that have
14  actually taken place in states, let's take, I know
15  you don't like this, but let's take the changes in
16  administration fees that have happened under the
17  MMA, and let's take a couple of different ones of
18  these and figure out what the difference is and
19  see what that offset would be and say that I
20  understand the general principle that dispensing
21  fees would have to rise if the ingredient costs
22  were reduced, here's two or three different bases

592

1   for adjusting those fees and here's how those
2   adjustments would affect my calculation, here's
3   one, here's the second one, here's the third one.
4           Just so that people can say if the

Page 239

5    dispensing fee differential is $5, well, does that

6    make a huge difference or a little difference in

7    the calculation.  If the dispensing fee

8    differential is $75, does that make a big

9    difference or a little difference in the

10   dispensing fee.

11          But to fail to acknowledge at all that

12   dispensing fees, according to practically

13   everybody who testified about it in the state

14   Medicaid agencies says that they would, that

15   Congress and the DRA and the MMA said that they

16   would, to just say that no, no, no, everything's

17   fine, the dispensing fee doesn't have to change,

18   strikes me as an illogical and unrealistic vision

19   of the but-for world.

20          And that it's still possible within a

21   damages analysis to say well, look, here's how my

22   differences, here's how my difference calculation

                                                    593

1    is sensitive to changes in the dispensing fees,

2    and let's look at some numbers and see whether it

3    amounts to a hill of beans or whether it's a

4    significant, does it cut it in half, does it cut

5    it by ten percent, does it cut it by five percent,

6    what's the number.

7          But agreeing with the point that had he

8    looked at the evidence, had he looked at the

9    testimony, he may well have come to the conclusion

10   that well, to assume that dispensing fees are

Depo-Hughes-James-05-06-09

11  going to remain unchanged doesn't seem

12  particularly realistic given the record in the

13  case.  So how am I going to take this into

14  account?  Sensitivity analysis is done all the

15  time in economics and could have been done here.

16       Q.   Now, when you say, this whole answer

17  though is based upon the assumption that you're

18  right that the dispensing fee issue is pertinent

19  to a damages calculation under the False Claims

20  Act; correct?

21       A.   It's my belief that it is pertinent.

22       Q.   Well, you don't even know what the

                                                    594

1   damages standard is under the False Claims Act so

2   how do you know it's pertinent?

3            MR. BERLIN:  Objection, form.

4            THE WITNESS:  Okay.  It's pertinent,

5   again, because, as I said before, Dr. Duggan

6   calculates the difference between government

7   expenditures in the actual world and in the but-

8   for world.  And I'm taking that same approach but

9   saying that his but-for world is inadequate for

10  the reasons that we've just been over.

11  BY MR. BREEN:

12       Q.   The MMA 2003 Title 3, which added the

13  different payments you've been testifying to, do

14  you know that the title is called "Combating

15  Waste, Fraud, and Abuse."

16            Do you know that?

Page 241

Depo-Hughes-James-05-06-09

17    A.   No.

18    Q.   Did you know that particular statute

19  emanated after hearings before the House Commerce

20  & Energy Committee that were held in September of

21  2001?

22         MR. BERLIN:  Objection, form.

595

1          THE WITNESS:  I don't have any specific

2   knowledge of that.

3   BY MR. BREEN:

4     Q.   Do you know that then HCFA administrator

5   Tom Scully testified at those hearings?

6     A.   It wouldn't surprise me that he would.

7     Q.   Did you know that a General Accounting

8   Office study of administrative costs for Part B

9   drugs, some of which we have at issue in this

10  case, was presented at that hearing?

11    A.   I have no specific knowledge --

12    Q.   Do you know --

13    A.   -- of what was presented at the hearing.

14         MR. BERLIN:  Let him finish his answer,

15  please.

16  BY MR. BREEN:

17    Q.   Did you know that the General Accounting

18  Office and HCFA, maybe it was CMS by then, made a

19  determination of how much they felt the

20  administration costs would go up or should go up

21  for IV pharmaceuticals?

22    A.   No specific knowledge of what anybody

Page 242

Depo-Hughes-James-05-06-09

596

1    testified to at those hearings.

2        Q.   Do you have any idea what the proportion

3    was compared with the inflated reimbursement being

4    paid due to inflated average wholesale prices?

5            MR. BERLIN:  Objection, form.

6            THE WITNESS:  I have not looked at those

7    numbers, no.

8    BY MR. BREEN:

9        Q.   Okay.  Would it surprise you if they

10   were about ten to one?

11           MR. BERLIN:  Same objection.

12           THE WITNESS:  I don't know one way or

13   the other.

14   BY MR. BREEN:

15       Q.   All right.  Now, this analysis,

16   sensitivity analysis, figuring out a calculated

17   estimated increase in dispensing fees that you say

18   Dr. Duggan should have done, my question for you,

19   sir, is could you have done it?  As an expert for

20   Abbott, were you capable of doing it?

21       A.   Yes.  I believe I am.

22       Q.   Did you make a decision not to do it?

597

1        A.   I was not instructed to do any such

2    calculation.

3        Q.   Had Abbott or its counsel instructed you

Depo-Hughes-James-05-06-09

4    to do so, could you have?

5         A.   Yes.  I believe I could have.

6         Q.   Do you know if the Huron Group was asked

7    to make that kind of calculation?

8         A.   I'm sorry.  Do I know whether they were

9    asked?

10        Q.   Yes.

11        A.   I do not know whether they were asked.

12        Q.   And you worked with who at Huron Group

13   primarily?

14        A.   Chris Rohn.

15        Q.   And he's the one that did these graphs

16   for you that are in Exhibit 12 of your deposition,

17   4 of your report?

18        A.   I told Chris to do the graphs.  Who

19   actually did the graphs, I couldn't tell you.

20        Q.   And if these graphs didn't reflect the

21   fluctuations in Abbott's vancomycin for the one

22   gram vial in 1995 that we were talking about, who

                                                    598

1    would I ask to have that explained to me?

2         A.   Well, those graphs do reflect what they

3    are held out to be.  And that is the changes in

4    the annual announced direct prices that, the

5    changes that Abbott announced each year.  And

6    that's what it says in my report that they

7    present, and that's consistent with what's on the

8    graph.

9         Q.   Now, with respect to your, again, the
                      Page 244

Depo-Hughes-James-05-06-09

10    fact that you were not asked to calculate an

11    estimated increase in dispensing fees due to the

12    assumed adjustment of reimbursements based upon

13    the Duggan model, if you had been asked to do that

14    about how much time would it have taken you to do

15    it?

16        A.   I have no idea.

17        Q.   Did anybody ever, just in brainstorming,

18    talk to you about the possibility of maybe being

19    asked to do something like that?

20        A.   No.

21        Q.   Did you ever suggest to them that as an

22    economist if they wanted a full and complete and

599

1    truthful explication of damages, that it would be

2    a good idea for you to try to do something like

3    that?

4            MR. BERLIN:  Objection, form.

5            THE WITNESS:  Could you read that

6    question back, please.

7            MR. BREEN:  Please read it back.

8                (The record was read back as

9    requested.)

10           THE WITNESS:  Well, no.  There was no

11    conversation like that.  It's a fairly convoluted

12    question.

13    BY MR. BREEN:

14        Q.   Let me ask it this way:  Did you ever

15    ask Abbott or their lawyers, its lawyers, whether

Page 245

Depo-Hughes-James-05-06-09

16    they wanted you to help them get to a truthful and

17    accurate estimation of damages in this case?

18         A.   I never asked them that because the, as

19    I say in the first paragraph of my report, is that

20    I was hired to comment on the adequacy and

21    validity of the methods and the conclusions of Dr.

22    Duggan.

                                                    600

1         Q.   Okay.  Now, one of the other, couple of

2    the other areas that you critique Dr. Duggan on

3    has to do with his assumptions regarding Abbott's

4    AWPs and his assumption that they were in fact

5    used in the arrays for the carriers that he

6    actually had the array information for; correct?

7         A.   Try that again.

8         Q.   You critique Dr. Duggan because he

9    assumed the carriers that he had information for,

10    the Medicare carriers, that he assumes that the

11    AWPs they were using were actually Abbott's AWPs?

12         A.   Well, if you look at the spreadsheets

13    created by Myers & Stauffer, the quote unquote

14    actual arrays for which they had information,

15    again, assuming on my part, as I have through this

16    entire two days, that Myers & Stauffer took the

17    information from the carriers and transcribed it

18    accurately into those arrays, the NDC and the

19    identification of the drug for the arrays that he

20    got from the government who got them from the

21    carriers, that information was in there.

                        Page 246

Depo-Hughes-James-05-06-09

22          So I don't think that was the criticism

601

1    that I was making.
2          Q.   All right.  So you have no criticism
3    with Dr. Duggan assuming it was an Abbott AWP in
4    the array when he actually got information or one
5    of his helpers got that information from the
6    carrier?
7          A.   Well, as I understand the Myers &
8    Stauffer arrays, that the information that those
9    NDCs that are contained in that array are indeed
10   the Abbott NDCs that are listed in the array, that
11   I am assuming that that information came directly
12   from the carrier.  And I don't have any reason to
13   think that it was inaccurate.
14         Q.   So other than the portion that he
15   extrapolates to in the Medicare damages
16   calculations, do you have any criticism with his
17   assumptions that an Abbott AWP was used in the
18   array?
19         A.   Okay.  When he gets an array from the
20   government and that array contains one or more
21   Abbott AWPs, that I am comfortable to presume
22   that, yes, indeed that was in fact an Abbott AWP.

602

1          Q.   All right.  But when he extrapolates to
                        Page 247

Depo-Hughes-James-05-06-09

2  other carriers and assume that they would have

3  used Abbott AWPs in generally the same frequency

4  as the ones that he actually had information on,

5  that's where you have a criticism?

6      A.   What I have a criticism on is him

7  looking in the claims data and saying oh, here's a

8  reimbursement of $10.16, Abbott has an AWP of

9  $10.16; therefore, this must be an Abbott product

10  and Abbott must be in this array.

11      Q.   And did you look at the information that

12  he provided through counsel to you, including his

13  Red Book analyses and Red Book documentation, to

14  determine whether or not the Red Book was

15  reflecting Abbott at that price and only Abbott at

16  that price at that time?

17      A.   He did not mention in his report that he

18  had done any such checking.  And I did not review

19  Red Book data from him that concluded in any way

20  that this was an Abbott price and only an Abbott

21  price, that it was not possible for it to be

22  another price.

603

1      Q.   Did you study the list of materials on

2  the source log that was provided with respect to

3  Dr. Duggan?

4      A.   I looked at the supporting documents

5  that I felt I needed to look at.

6      Q.   Did you look at the forty-five Red Book

7  excerpts that he had on that log?

Page 248

Depo-Hughes-James-05-06-09

8      A.   I did not.

9      Q.   Why not?

10     A.   I didn't.

11     Q.   Okay.  Did you look at anything else on

12 that log to see if it provided a basis for the

13 information since he was referring to those items?

14     A.   Dr. Duggan claims in his report that

15 this must be an Abbott AWP.

16          Again, I understand from his rebuttal

17 report that he claims that he checked to make sure

18 that they were Abbott AWPs.

19          Again, it's still unclear to me exactly

20 what he did check because there are things that

21 appear in the arrays by error, there are things

22 that appear wrong dosage, wrong size, wrong

                                                    604

1 product, that I don't know, did he just check the

2 matching the, the products that are the same size

3 and dose as the NDC he was looking at or did he

4 look at other things that may have crept into the

5 array that might have had those prices since we

6 know that the arrays were constructed at times

7 with error.

8      Q.   In the Medicaid side where you criticize

9 his use of the nine state, as you call it, nine

10 state sample to extrapolate to the remaining

11 states, what proportion of the total Medicaid

12 claims dollars for these drugs were encompassed by

13 those nine states?

                        Page 249

Depo-Hughes-James-05-06-09

14       A.   I believe he says something like seventy

15  percent for the ten states.

16       Q.   For the ten states.

17       A.   Right.

18       Q.   Okay.  So in a normal sampling scenario

19  where you basically have a situation where you

20  take the largest participants in terms of the

21  quantity of things you're trying to evaluate and

22  you get up to seventy percent, are you saying

605

1   that's not a sufficient sample size to extrapolate

2   the remaining thirty percent?

3        A.   I'm saying it's not been demonstrated

4   that it's a sufficient sample size.

5             I mean suppose you have as your

6   population of interest a room full of individuals

7   and you want to look at their salaries?  So you

8   take the seventy highest paid people and then say

9   okay, I'm going to take the average of that and

10  extrapolate to the other people.  Well, that may

11  or may not work.

12            If you take seventy men and then try to

13  extrapolate to thirty women, that may not work

14  very well for you, all right.  Precisely because

15  there's no effort to say that the seventy percent

16  that I'm using as the basis of my extrapolation in

17  fact mimics the thirty percent that I'm

18  extrapolating to.

19            Let's take it differently.  I'm from the

Page 250

Depo-Hughes-James-05-06-09

20    State of Maine, we're in the state of Illinois.

21    Illinois is one of his exemplar states.  Is the

22    Medicaid reimbursement system in Maine identical

606

1     to that in Illinois?  Is it close to that in

2     Illinois?

3              Is it reasonable that if you figure out

4     what his difference calculation is in the state of

5     Illinois, that that's going to apply, that's going

6     to give you an accurate estimate of the difference

7     within the state of Maine?  I don't know.  But the

8     point is neither does Dr. Duggan and it's my

9     opinion that it's his burden to bear.

10        Q.    All right.  Now, getting back to this

11    issue of whether seventy percent is a big enough

12    sample size in your opinion under these

13    circumstances.

14             Didn't Dr. Duggan use more than one

15    methodology in his initial report and specifically

16    chose the methodology that resulted in the lower

17    number?

18        A.    Dr. Duggan always claims that he is

19    being conservative in his estimates.  Although I

20    did take issue with that on a number of, in a

21    number of places.

22        Q.    So you only recall seeing one

607

Page 251

methodology tried in the first report for Medicaid?

A. That's not what I said.

I was agreeing with you that, yes, he claimed to be conservative, and that he says where there were two places, two choices that he could make, he chose the one always with smaller damages.

I took issue with that on a number of occasions. But I agree with you that it's Dr. Duggan's belief that he was always conservative.

Q. Now, from all the things that you've listed that could have been used to test his sample, the seventy percent sample or whatever it was, it sounded to me like all those things were available in the materials that Dr. Duggan had available to him; weren't they?

A. I suppose so.

Q. The Myers & Stauffer surveys were in there; right?

A. Oh, oh, the things that I've been citing, yes. They were all available.

608

Q. They were all available. They were made available to you; right?

A. That's correct.

Q. And you're a competent economist. You could have tested this if you wanted to; couldn't you?

Depo-Hughes-James-05-06-09

7       A.   I wasn't directed to do that.

8       Q.   That's not my question.

9            Could you have done it if you wanted to?

10      A.   I could have done it if I was directed

11  to.

12      Q.   Okay.  In other words, so your

13  independence only goes so far?  You only do things

14  exactly as you're directed to; is that it?

15           MR. BERLIN:  Objection, form.

16           THE WITNESS:  I perform the assignments

17  that I'm asked to do.  And if I'm not asked to do

18  an assignment, you know, I'm under a

19  confidentiality order like everybody else in this

20  case.  So I'm not free to just take the data and

21  go do what I want with it.

22  BY MR. BREEN:

                                              609

1       Q.   Well, Doctor, what about the

2  confidentiality order stopped you from examining

3  any of the materials we provided to you in

4  connection with Dr. Duggan's opinions?

5       A.   I'm not free, I'm not directed to do,

6  I'm not free to just go, as I understand the

7  Protective Order, I'm not free to go about just

8  willie-nillie doing analyses.

9       Q.   So it's your testimony to the court and

10  the jury that you believe that you were not

11  allowed to do any testing of Dr. Duggan's

12  conclusions by the court order; is that it?

Page 253

Depo-Hughes-James-05-06-09

13      A.   No.

14           MR. BERLIN:  Objection, form.

15           THE WITNESS:  No.  That's not my

16   testimony.

17           What I'm saying is that I am not, that

18   I'm retained to perform certain analyses, I'm

19   retained to do those analyses that I'm directed to

20   do, just like Dr. Duggan is retained to do the

21   analyses that he's directed to do by the U.S.

22   government.  And I do not feel free by the terms

                                                   610

1    of my retention letter to just go off and do an

2    analysis on my own.

3    BY MR. BREEN:

4        Q.   So assume this was not a court case,

5    okay, assume it was you being asked to criticize a

6    colleague like Professor Duggan, who, by the way,

7    like yourself has a good reputation; doesn't he?

8        A.   I'm not aware of Dr. Duggan's

9    reputation, but I have absolutely no reason to

10   think he doesn't have a good one.

11       Q.   Okay.  I guess you never heard of him

12   before this case?

13       A.   I had not come across his name before

14   this case, no.

15       Q.   So --

16       A.   He probably never heard of me either.

17       Q.   Interesting.  Okay.

18           MR. BERLIN:  It's pretty much time to
                    Page 254

Depo-Hughes-James-05-06-09

19    wrap up.
20          MR. BREEN:  I'm going to ask a few more
21    questions and try to wrap it up.
22    BY MR. BREEN:

611

1          Q.   If this wasn't a court case and if a
2     colleague prepared the kind of analysis that Dr.
3     Duggan did, and you had a blank check, free time,
4     spend all the time you want to on it, and says
5     critique it, are you saying that you wouldn't have
6     taken the information and done a little
7     sensitivity analysis to figure out if the seventy
8     percent sample size was right or not?
9          MR. BERLIN:  Objection, form.
10         THE WITNESS:  Well, in my, let's look at
11    how things work in my day job.
12         So I, like Dr. Duggan, am asked by
13    academic journals to do exactly that, to take the
14    paper that's been written, the analysis that's
15    been done by a colleague, and evaluate that
16    analysis, and then give a recommendation to the
17    editor of the journal whether or not this paper
18    should be published as written, should be revised
19    and resubmitted for further review, or should be
20    rejected outright.
21         It is not the practice in the profession
22    of economics, and I know of no instances where it

1    has happened that in the course of such a peer
2    review that the referee would contact the author,
3    take the author's data, do a different analysis of
4    it as part of a critique, and then hand it back
5    and say here's what you should have done.
6            But what would happen in my day job is
7    exactly what's happened here is you read the
8    report, you evaluate the methodology that was
9    used, you form an opinion about the adequacy of
10   the methodology that was used, and then you report
11   back to the editor and very often provide
12   suggestions or provide as part of the critique is
13   that here is how I think this analysis is lacking
14   and here's how I think this analysis needs to be
15   changed before this analysis would be acceptable
16   to this academic journal.
17           So, no, in my day job, in my profession
18   as an economist, it would not be standard
19   practice.  It would, in fact, be considered quite
20   unusual that if I were approached by a colleague
21   like Dr. Duggan and he says hey, have a look at
22   this and I go uhn-uhn, give me your data, I'll get

1    back to you in a couple of weeks.
2            That would be, quite honestly, I think
3    that would be considered a real, I don't know if
4    it's a breach of professional ethics, but it would

Depo-Hughes-James-05-06-09

 5   be considered a faux pas.

 6   BY MR. BREEN:

 7       Q.   All right.  So let's go back to the

 8   litigation scenario then.

 9            If you're hired by a company that wants

10   you to truthfully examine a damages estimate and

11   they want you to take the quantitative information

12   that's available on all the information that's

13   available and use your best efforts as an

14   economist to help them get to the truth, would you

15   then use your skills to try to evaluate whether

16   the seventy percent sample was adequate under the

17   circumstances?

18       A.   Well, again, I am doing here exactly

19   what I would do in my other professional life as a

20   professional economist is you offer your

21   criticisms.  I would say in that situation exactly

22   like I'm saying here is that what basis do you

                                                        614

 1   have to think that the sample of nine states that

 2   you're using is in fact representative of the

 3   other thirty-nine states that you're extrapolating

 4   to.

 5            Then that would go back to the author,

 6   and the author may come back and say here, here,

 7   I've done this, this, that, and the other thing,

 8   and here's why I believe it to be representative.

 9            Then it would be up to me as a journal

10   referee to say oh, okay, I get it, I agree with

                         Page 257

11   him, that's adequate, or no, I don't think that's

12   adequate for whatever the following reasons would

13   be.

14            So I viewed my job, and nobody ever

15   disabused me from it, that my task here was

16   restricted to the same sorts of things that I do

17   in my regular professional life when critiquing

18   the work of a colleague is to look at the methods

19   that he used, look at how he performed his

20   analysis, looking at the assumptions underlying

21   his analysis, looking at the steps that he took,

22   the steps that he didn't take, looking at the

                                                      615

1   realism of what he's done, and then passing a

2   judgment and writing that up and handing it in,

3   which is in effect what I've done here.

4        Q.   Back to the seventy percent sample.

5            Now that Dr. Duggan has done more

6   testing and more explanation in his rebuttal

7   report I guess is what we call it here, did that

8   provide at least some more insight as to the

9   appropriateness of the seventy percent sample?

10       A.   Well, as I pointed out here over the

11   past couple of days, the rebuttal report did

12   provide some more insight, but it also raised some

13   other questions because it wasn't always clear

14   from exactly what he, it wasn't clear from what he

15   was saying in the rebuttal report exactly what he

16   was doing.

Depo-Hughes-James-05-06-09

17          It just wasn't, it wasn't clear to me
18   that take, for example, the checking of the AWPs,
19   like he says oh, I checked to make sure it was
20   right.  Again, what did you check, how extensively
21   did you check?  That wasn't clear.
22          And there were other instances like

616

1    that.
2        Q.   Can you tell the court today within a
3    reasonable degree of certainty in your profession
4    that Dr. Duggan's quantitative estimation, taking
5    away the dispensing fee issue for a moment, but
6    just his quantitative estimation of the Medicaid
7    damages is materially in error?
8        A.   Well, as is replete in my report is yes,
9    I do believe it is materially in error.
10       Q.   When you say material, can you quantify
11   that?
12       A.   I have not made any attempt to quantify
13   that.
14          But yet he has made assumptions that
15   have no basis, he's made claims of
16   representativeness that he does nothing to
17   support, and so on and so forth, as I list in
18   forty-seven pages in my report, leads me to
19   believe that his estimates are inaccurate and
20   unreliable.
21          In fact, in his rebuttal report where he
22   is attempting to address some of these concerns

Page 259

617

1    where he instead of doing an extrapolation, he
2    goes to the data, the claims data for the other
3    thirty-eight states, he comes and says well, look,
4    if I did it using the claims data it's actually
5    substantially higher estimate of difference than I
6    got from the extrapolation, which in my mind
7    supports my contention that his original
8    methodology was in fact inaccurate and unreliable
9    because when he did it using the actual data he
10   claims he got a substantially different number.
11        Q.   Yet you've done absolutely no
12   quantitative work yourself to try to determine if
13   those numbers are materially wrong, trying to
14   determine how to quantify that?
15        MR. BERLIN:  Objection, form.
16        THE WITNESS:  Again, I've done here what
17   economists do when critiquing the work of
18   colleagues, is that I look at his methods, I look
19   at his procedures, I look at the assumptions, I
20   look at the basis of his assumptions, I look at
21   the reasonableness of his assumptions, I look at
22   what he is substantiating, what he's not

618

1    substantiating, and I come to a conclusion as to
2    whether I believe that his estimates are accurate
3    and reliable or not accurate and reliable.  And
                    Page 260

Depo-Hughes-James-05-06-09

4    that's what I've done here.

5              MR. BERLIN:  Are we all done?

6              MR. BREEN:  All right.  I think we're

7    out of time.

8              Obviously we don't waive the right to

9    continue this deposition.  We're going to evaluate

10   whether we need to, and we'll get back to you or

11   not.

12             MR. BERLIN:  Okay.

13             THE VIDEOGRAPHER:  Going off the record

14   at 5:10 p.m.  This concludes the May 6, 2009

15   deposition of James Hughes.

16                 (Said deposition was so adjourned

17   at 5:10 p.m.)

18

19

20

21

22

                                                619


1              SIGNATURE OF THE WITNESS

2

3

4

5

6

7

8                        _____

9                        JAMES W. HUGHES
                         Page 261

Depo-Hughes-James-05-06-09

10      Subscribed and sworn to and before me

11      this _____ day of _____, 20____.

12

13

14      _____

15              Notary Public

16

17

18

19

20

21

22

                                                        620

1      STATE OF ILLINOIS )

2                       )  SS:

3      COUNTY OF C O O K )

4              I, Donna M. Kazaitis, CRR, CLR, RPR, CSR

5      No. 084-003145, do hereby certify:

6          That the foregoing deposition of JAMES HUGHES

7      was taken before me at the time and place therein

8      set forth, at which time the witness was put under

9      oath by me;

10          That the testimony of the witness and all

11     objections made at the time of the examination

12     were recorded stenographically by me, were

13     thereafter transcribed under my direction and

14     supervision and that the foregoing is a true

15     record of same.

Page 262

Depo-Hughes-James-05-06-09

16        I further certify that I am neither counsel

17   for nor related to any party to said action, nor

18   in any way interested in the outcome thereof.

19        IN WITNESS WHEREOF, I have subscribed my name

20   this 13th day of May, 2009.

21        _____

22        DONNA M. KAZAITIS, CSR No. 084-003145