# ANDERSON EXHIBIT 7

TO

OPPOSITION TO EXCLUDE TESTIMONY
OF EXPERT MARK G. DUGGAN PH.D.

Depo-Young-Steven-05-13-09

00001
1              UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF MASSACHUSETTS
3
4    IN RE:  PHARMACEUTICAL      )
5    INDUSTRY AVERAGE            )   MDL No. 1456
6    WHOLESALE PRICE LITIGATION  )   Master File No.
7    _____)   01-CV-12257-PBS
8    THIS DOCUMENT RELATES TO:   )   Subcategory No.
9    _____)   06-CV-11337-PBS
10   United States of America,   )
11   ex rel. Ven-A-Care of the   )
12   Florida Keys, Inc., v.      )
13   Abbott Laboratories, Inc.,  )
14   CIVIL ACTION NO.            )
15   06-11337-PBS                )
16
17                    VOLUME I of II
18
19        The video taped deposition of STEVEN J.
20   YOUNG, called by the United States for
21   examination, pursuant to subpoena and pursuant to
22   the Federal Rules of Civil Procedure for the
00002
1    United States District Courts pertaining to the
2    taking of depositions, taken before Cynthia J.
3    Conforti, Certified Shorthand Reporter, at 77 West
4    Wacker Drive, 35th Floor, Chicago, Illinois,
5    commencing at the hour of 9:05 a.m. on the 13th
6    day of May, A.D., 2009.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
00003
1    A P P E A R A N C E S:
2
3             MARK A. LAVINE, Esq.
4             Special Attorney for the
5             Attorney General
6             99 N.W. 4th Street
7             3rd Floor
8             Miami, Florida  33132
9             305.961.9303
10            305.536.4101 (Fax)
11            mark.lavine.usdoj.com
12
13       THE BREEN LAW FIRM, P.A.
14       BY:  JAMES J. BREEN, Esq.
15            575 Northpoint Parkway
16            Suite 260

```
                          Depo-Young-Steven-05-13-09
17              Alpharetta, Georgia  30022
18              770.740.0008
19              770.740.9101 (Fax)
20              jbreen@breenlaw.com
21          On behalf of the Relator, Ven-A-Care
22          of the Florida Keys, Inc.;
00004
 1    A P P E A R A N C E S:   (Continued)
 2
 3          JONES DAY
 4          BY:   DAVID S. TORBORG, Esq.
 5                51 Louisiana Avenue, N.W.
 6                Washington, D.C.  20001-2113
 7                202.879.3939
 8                202.626.1700 (Fax)
 9                dstorborg@jonesday.com
10                   -AND-
11                CAROL GEISLER, Esq.
12                77 West Wacker Drive
13                Chicago, Illinois  60601-1692
14                312.782.3939
15                312.782.8585 (Fax)
16                cgeisler@jonesday.com;
17          On behalf of Abbott Laboratories;
18
19
20
21
22
00005
 1    A P P E A R A N C E S:   (Continued)
 2
 3          HAND ARENDALL,LLC
 4          BY:   TRACY R. DAVIS, Esq.
 5                (Via Telephonic Connection)
 6                2001 Park Place North
 7                Suite 1200
 8                Birmingham, Alabama  35203
 9                (205) 502-0127
10                (205) 397-1304 (Fax)
11                tdavis@handarendall.com
12          On behalf of the State of Alabama.
13
14    ALSO PRESENT:
15    Stephan Hoog, The Videographer
16
17
18
19
20
21
22
00006
 1                      INDEX
 2
 3    MAY 13, 2009
 4    WITNESS                          EXAMINATION
 5    STEVEN J. YOUNG                       8
 6
 7
 8                 DEPOSITION EXHIBITS
 9    NUMBER/DESCRIPTION               IDENTIFIED
10    Exhibit Young 001    44 pages         16
                          Page 2
```

Depo-Young-Steven-05-13-09

| | | | |
|---|---|---|---|
| 11 | Exhibit Young 002 | 5 pages | 38 |
| 12 | Exhibit Young 003 | 6 pages | 57 |
| 13 | Exhibit Young 004 | 28 pages | 61 |
| 14 | Exhibit Young 005 | 3 pages | 66 |
| 15 | Exhibit Young 006 | 1 page | 68 |
| 16 | Exhibit Young 007 | 7 pages | 87 |
| 17 | Exhibit Young 008 | 6 pages | 120 |
| 18 | Exhibit Young 009 | 1 page | 179 |
| 19 | Exhibit Young 010 | 5 pages | 179 |

20
21
22
00007
1           THE VIDEOGRAPHER:  This is Stephan Hoog
2  representing Henderson Legal Services.  I'm the
3  operator of this camera.
4           This is the videotaped deposition of
5  Steven Young that's being taken pursuant to
6  Federal Rules of Civil Procedure.
7           We are on record May 13th, 2009.  The
8  time is 9:05 a.m. as indicated on the video
9  screen.
10           We are at the offices of Jones Day,
11  77 West Wacker Drive, Chicago, Illinois.
12           This deposition is being taken In Re
13  Pharmaceutical Industry AWP, Case Number
14  01-12257-PBS.
15           Will the attorneys please identify
16  themselves for the video record.
17           MR. LAVINE:  Mark Lavine on behalf of the
18  United States.
19           MR. BREEN:  Jim Breen.  I represent the
20  Relator Ven-A-Care of the Florida Keys.
21           MS. GEISLER:  Carol Geisler representing
22  Abbott Laboratories.
00008
1           MR. TORBORG:  David Torborg from
2  Jones Day, also on behalf of Abbott Laboratories.
3           You don't have to introduce yourself.
4           THE WITNESS:  Okay.  Steven Young.
5           MR. TORBORG:  No, you don't have to.
6           THE WITNESS:  Oh, I -- okay.
7           THE VIDEOGRAPHER:  The court reporter
8  today is Cynthia Conforti from Henderson Legal
9  Services.
10           Can you please swear in the witness.
11                (Witness duly sworn.)
12                STEVEN J. YOUNG,
13  called as a witness herein, having been
14  first duly sworn, was examined and testified
15  as follows:
16                    EXAMINATION
17  BY MR. LAVINE:
18     Q.    Could you just state your full name,
19  please.
20     A.    Steven J. Young, with a V.
21     Q.    And who are you employed by?
22     A.    Healthscape Advisers, LLC.
00009
1     Q.    What kind of company are they?
2     A.    Basically a healthcare consulting firm.
3     Q.    What is your connection to Huron
4  Consulting Group?
                                        Page 3

Depo-Young-Steven-05-13-09

```
 5        A.    I was employed by Huron Consulting Group
 6   until April 30th of this year.
 7        Q.    So you have no current position with Huron
 8   at this point?
 9        A.    No, I do not.
10        Q.    What is your position at Healthscape?
11        A.    I'm a managing director.
12        Q.    Have you prepared an updated CV that
13   includes that information?
14        A.    I have a -- I do not have it here with me,
15   but I did prepare one related to a recent report
16   that was issued last week.
17        Q.    In connection with the expert services
18   you're providing to Abbott in this case, does
19   Healthscape play a role in it?
20        A.    Yes.  Basically, that work will now be
21   done by Healthscape.
22        Q.    Did other employees from Huron Consulting
00010
 1   Group also join Healthscape?
 2        A.    Yes.
 3        Q.    Some of the people that were providing
 4   support --
 5        A.    Yes.
 6        Q.    -- in connection with this case?  Okay.
 7              Sir, are you represented by counsel here
 8   today?
 9        A.    Personally or I mean Abbott's counsel is
10   here today.
11        Q.    Personally though.
12        A.    Personally, no.
13        Q.    I know you've testified before in
14   deposition, so let me just remind you that one
15   thing we have already done that we have to make
16   sure we don't do is to speak at the same time.
17              My questions sometimes come out slowly
18   and, you know, so often it'll be my fault, but
19   I -- and you'll probably know answers before I
20   finish the question, but let's just try to pay
21   attention for that.  It makes the court reporter
22   happy.
00011
 1        A.    Okay.
 2        Q.    Any time you need a break, just let me
 3   know and we can take a break.
 4        A.    Okay.
 5        Q.    If you don't understand my question, let
 6   me know.  Otherwise, I'll assume that you do
 7   understand my question.
 8        A.    Okay.
 9        Q.    And are you on any medicines or suffering
10   from any illness that might affect your ability to
11   answer questions today?
12        A.    No.
13        Q.    And you're appearing today as an expert on
14   behalf of Abbott; right?
15        A.    That's correct.
16        Q.    When was the first time you were ever
17   retained to be an expert in any of the cases
18   related to AWP issues?
19        A.    I do not recall the exact date.  I think
20   the first one was related to -- I was retained by
21   TAP related to the Lupron cases.  I believe it was
```

Page 4

Depo-Young-Steven-05-13-09
22  early 2005, but I'm not sure about that.  I know
00012
 1  it was early in the year, but I don't remember
 2  what year for certain.
 3      Q.   And which Lupron case was that in
 4  connection with?
 5      A.   I don't recall whether it was the -- I
 6  think it was the class action, but it might have
 7  been the Stetser case.  I'd have to go through my
 8  past testimony.
 9          MR. BREEN:  Did you say "Stetler case"?
10          THE WITNESS:  Stetser.
11          MR. BREEN:  Stetser?
12  BY MR. LAVINE:
13      Q.   And by the class action, are you referring
14  to what was called the -- the "Lupron MDL"?
15      A.   Yes.
16      Q.   Okay.  And you were also retained in the
17  Stetser matter?
18      A.   That's correct.
19      Q.   And in the Walker matter?
20      A.   That's correct.
21      Q.   Were those all at -- at or about the same
22  time?
00013
 1      A.   I believe so, yes.
 2      Q.   And how about any other AWP-related cases?
 3      A.   I've done certain work for the joint
 4  defense team related to the MDL.  I believe 1456
 5  in those cases.  In addition, I did a Montana and
 6  Nevada report.
 7      Q.   Was that one combined report?
 8      A.   No.  I did -- I had two separate clients
 9  in those matter.  One was Abbott, and I had a
10  second client, TAP.
11      Q.   You said the Montana case was Abbott and
12  TAP, and Nevada was Abbott and TAP?
13      A.   I'm not certain about that.  I believe
14  that I -- both clients in -- in both states.  I
15  could go back and check.
16      Q.   Were those Lupron cases?
17      A.   No, I'm sorry.  Those were state, state
18  cases under the MDL, not Lupron related.
19      Q.   But the more generalized AWP issues?
20      A.   More generalized AWP.
21      Q.   And approximately when were you retained
22  on the last three cases you described?
00014
 1      A.   I'd have to go -- I didn't study that
 2  before I came.  It was a while ago.  I would have
 3  to go back and -- and look at the arrangement
 4  letters.
 5      Q.   Approximately more than a couple of years
 6  ago at least?
 7      A.   Yes.  I believe it was more than a couple.
 8  It was definitely after the Lupron matter, and I
 9  believe that it was after -- those two states were
10  after the joint defense teamwork.
11      Q.   Okay.  Have you been retained in any other
12  AWP matters?
13      A.   Oh, I believe related to Track 2 I did a
14  specific report for Abbott also, Track 2 under the
15  MDL.
                              Page 5

Depo-Young-Steven-05-13-09

16      Q.    And that would have been a separate
17  engagement from work you did for the joint defense
18  team?
19      A.    That's correct.
20      Q.    Any others in the AWP area?
21      A.    I do not believe so, no.
22      Q.    What about in connection with any case
00015
1   brought by State of Alabama?
2       A.    Oh, I'm sorry.  Yes.  In -- in addition,
3   more recently, I've been named for the State of
4   Alabama as an expert.
5             In addition, I did a report related to
6   Ery Tab under this same case or erythromycin.
7       Q.    As -- so the Ery, you're referring to a
8   case that was part of the AWP MDL?
9       A.    Right, the Ven-A-Care.
10      Q.    What about West Virginia?
11      A.    I would have to -- I'm not certain related
12  to West Virginia whether I was named as an expert.
13      Q.    Could the -- let me just see if I can
14  refresh your recollection about West Virginia.
15            Is that something that might have related
16  to the Medicaid Rebate Act?
17      A.    Virginia Medicaid Rebate Act.  I would
18  have to go back and look.  I don't recall.
19      Q.    And -- well, just to be clear, as far as
20  you can remember, we've now described all the
21  AWP-related matters you've been retained in?
22      A.    Yes, that I can recall.  I do have a
00016
1   listing attached to my CV.  I could check that to
2   make sure that I've covered everything.
3       Q.    Oh, okay.  Well, why don't we just do
4   that.
5             Let me get a copy of your report.
6             MR. LAVINE:  Mark this as Exhibit 001,
7   please.
8                         (Whereupon a brief interruption
9                         was had in the deposition
10                        proceedings.)
11                  (Exhibit Young 001 marked.)
12            MR. LAVINE:  Okay.  We just marked Exhibit
13  Young 001.
14            MR. TORBORG:  What are we going to call
15  these, Exhibit Young 001 or something or?
16            THE REPORTER:  I did.
17            MR. LAVINE:  Exhibit Young 001.
18  BY MR. LAVINE:
19      Q.    And it's a letter-sized document entitled
20  "Expert Report of Steven J. Young."
21            Do you recognize this document?
22      A.    Yes, I do.
00017
1       Q.    What is it?
2       A.    It was the report that I submitted in this
3   matter.
4       Q.    Are you looking at Exhibit 1B to that
5   report?
6       A.    Yes, I am.
7             Okay.
8       Q.    Has that refreshed your recollection as to
9   whether there are any other AWP-related cases
                        Page 6

Depo-Young-Steven-05-13-09

```
10   you've worked on?
11        A.    The ones that we cited were the ones that
12   I recall issuing a report or being deposed on,
13   yes.
14        Q.    Have you been retained in other
15   AWP-related cases where you haven't issued a
16   report or been deposed?
17        A.    I have not been named as an expert in any
18   other cases.
19        Q.    So you've been retained in other
20   AWP cases, but right now you're not -- or they --
21   let me start over.
22              In any other AWP-related cases you've been
00018
1    retained on, you have not been identified as a
2    testifying consultant or expert?
3              MR. TORBORG:   Object to form.
4              THE WITNESS:   I have not been named as an
5    expert in any other AWP cases.
6    BY MR. LAVINE:
7         Q.    Okay.   Approximately how many other
8    AWP cases have you been retained on?
9         A.    The only ones that I've been retained on
10   as an expert are the ones that we have discussed.
11        Q.    What about as a consultant?
12        A.    I have been engaged on other cases as a
13   consultant.
14        Q.    Related to AWP?
15        A.    Related to AWP.
16        Q.    How many?
17        A.    I do not know the specific number.
18        Q.    Can you give me an approximate number?
19        A.    Maybe three others, three or four, I'm not
20   sure.
21        Q.    And are you at liberty to disclose to me
22   the names of the parties who retained you in those
00019
1    matters?
2         A.    No, I do not believe so.
3         Q.    What about the cases that you've been
4    retained on?
5              MR. TORBORG:   Object to form.
6              THE WITNESS:   No, I do not believe so.
7    BY MR. LAVINE:
8         Q.    So for the consultant matters there's
9    nothing else you can tell me to describe the
10   client or the subject matter of the retention?
11        A.    That's correct.
12        Q.    Okay.   And that's based upon your
13   understanding of the confidentiality requirements
14   that you're under in connection with those
15   matters?
16        A.    That's correct.
17        Q.    Okay.   Are those three to four other
18   matters current, they're something you're working
19   on now?
20        A.    I've not done any work recently.
21        Q.    By that you mean this year?
22        A.    Yes.
00020
1         Q.    All right.   Going back to the specific
2    cases you identified, I just wanted you to -- I
3    just want to go through and identify who it is
```

Page 7

Depo-Young-Steven-05-13-09

```
 4   that retained you in each matter.
 5       A.   Okay.
 6       Q.   So for the -- the Lupron MDL, who was your
 7   client in that case?
 8       A.   TAP Pharmaceuticals.
 9       Q.   And in the Stetser case?
10       A.   TAP Pharmaceuticals.
11       Q.   Walker?
12       A.   TAP Pharmaceuticals.
13       Q.   And I think on the Montana and Nevada
14   cases, you thought both of those were Abbott and
15   TAP, although you were not 100 percent sure.
16       A.   Yeah.  I believe I was separately engaged
17   by Abbott and TAP on those matters.
18       Q.   So that would have been a separate
19   agreement for each?
20       A.   That's correct.
21       Q.   Okay.  It wasn't Abbott and TAP combined
22   together to retain you?
00021
 1       A.   That's correct.
 2       Q.   And the joint defense team, who was it
 3   that retained you in that matter?
 4       A.   It was actually the various members of the
 5   joint defense team.
 6       Q.   And by "members," are you referring to the
 7   underlying pharmaceutical companies?
 8       A.   That's correct.
 9       Q.   So how would we identify who they were?
10       A.   I believe that in the engagement letter
11   there was an attachment that discussed the
12   companies that were participating in the payment
13   for the services, and I believe that that
14   attachment would be the best source that I can
15   think of.
16       Q.   But that wasn't among any of the documents
17   produced in connection with this case, was it?
18       A.   The engagement letter?
19       Q.   For -- right, the engagement letter for
20   the joint defense matter.
21       A.   I do not believe so, no.
22       Q.   Would there be a court pleading that would
00022
 1   identify who those parties were, something public?
 2       A.   There may be.  I'm not certain.
 3       Q.   And you still have a copy of the
 4   engagement letter?
 5       A.   Yes.
 6       Q.   You also mentioned you were engaged as an
 7   expert in connection with the Track 2 MDL.  Who
 8   was it that retained you in that matter?
 9       A.   I believe I did a separate report, one for
10   the joint defense team, and one for Abbott.
11       Q.   And in the Alabama case, you were retained
12   by Abbott?
13       A.   That's correct.
14       Q.   Anybody else?
15       A.   No.
16       Q.   Okay.  And in the Ery case, who retained
17   you?
18       A.   Abbott.
19       Q.   When were you retained in this case?
20       A.   I'm not certain of that either.  I do have
```

Page 8

Depo-Young-Steven-05-13-09
21    the engagement letter back at my office.  I
22    believe it was the spring of last year.
00023
 1       Q.    Did you start working on this case right
 2    away?
 3       A.    I'm not certain if it was right away, but
 4    it was prior to -- we started work prior to
 5    Dr. Duggan's report being issued.
 6       Q.    And the previous cases we've discussed
 7    where you've been retained by TAP or Abbott, was
 8    that always in connection with the Jones Day law
 9    firm?
10       A.    That's correct.
11       Q.    In the previous AWP cases, when have you
12    been deposed?
13       A.    On the Stetser matter, it was June 1st
14    and 2nd of 2004, which would have meant that I
15    would have been retained, obviously, I believe in
16    early 2004, so it would not have been 2005.
17             In the multidistrict litigation, my
18    deposition was taken on July 13th, 2004.
19             In the Walker matter, in the State of
20    New Jersey I had a deposition taken on
21    August 13th, 2004.
22             In the 1456 work, I believe that's for the
00024
 1    joint defense team, I was deposed on November 18th
 2    and 19th of 2004.
 3       Q.    And for that one are you referring to the
 4    fourth item down on Exhibit 1B?
 5       A.    Yeah.  Let me make sure that I'm --
 6       Q.    Because that one describes it as testimony
 7    taken, and the other ones were called
 8    "depositions."  I'm just wondering if that's
 9    different than the --
10       A.    No.  Given the fact that it -- I believe
11    that was -- that probably should say "deposition,"
12    but I can go back and check to make sure, but I
13    believe that was a deposition.
14       Q.    The next item is described as hearing
15    testimony in the Walker case.  The best of your
16    recollection, is that accurate?
17       A.    Yes, that was a hearing.
18       Q.    So it's not a deposition.
19       A.    That's correct.
20       Q.    Did you testify at any actual trial in
21    these cases?
22       A.    No.  I have not, other than I -- the
00025
 1    hearing was not a trial.
 2       Q.    Any other AWP-related cases where you've
 3    been deposed?
 4       A.    No.
 5       Q.    And on Exhibit 1B, the first four items
 6    look to be complete in the Stetser case.  It was
 7    two days, and the next case it was one day and
 8    then one day and then two days?
 9       A.    That's correct.
10       Q.    So have we now discussed every time you've
11    been retained or deposed in connection with the
12    AWP litigation?
13       A.    As an expert, yes, that's correct.
14       Q.    Have you -- all right.  Have you been

Depo-Young-Steven-05-13-09

15    retained as -- I'm sorry.
16            Can you clarify that?  You're referring to
17    the testifying expert status, is that what you
18    mean?
19      A.    Yes.
20      Q.    And you were not deposed in some capacity
21    other than as an expert, were you?
22      A.    That's correct.
00026
1      Q.    That's a "you were not"?
2      A.    I was not.
3      Q.    Okay.  And you also prepared various
4    declarations in the AWP cases; right?
5      A.    That's correct.
6      Q.    Would they all have been in the context of
7    the cases that we've just discussed?
8      A.    Yes, that we have discussed thus far.
9      Q.    I mean, the declarations were only in
10   cases where you've been retained and disclosed as
11   an expert?
12     A.    That's correct.
13     Q.    And same thing for any reports you issued?
14     A.    That's correct.
15     Q.    Have you been retained as an expert in
16   other non-AWP cases?
17     A.    Yes, I have.
18     Q.    Okay.  Approximately how many times?
19     A.    I believe it was probably four that I can
20   recall for certain.
21     Q.    Are those identified on Exhibit 1B?
22     A.    I'm looking through them.
00027
1      Q.    Just to clarify, Exhibit 1B to Deposition
2    Exhibit Young 001.
3      A.    Right.  All of the instances where I was
4    deposed are listed there.
5            There was one other case that I submitted
6    a report, an arbitration case that I submitted a
7    report related to, but I was not deposed and did
8    not testify.
9      Q.    On the -- the Exhibit 1B, am I right there
10   are three cases identified there even though
11   there's five listings?
12     A.    That's correct.
13     Q.    And the three times that the Pentech
14   versus Par Pharmaceuticals case is listed, those
15   were all the same engagement?
16     A.    That's correct.
17     Q.    So that was one non-AWP case, and then the
18   AdvancePCS was the second, Sacred Heart was the
19   third, and then the arbitration was the fourth?
20     A.    That's correct.
21     Q.    Any others?
22     A.    No others that I was retained as an
00028
1    expert.
2      Q.    What was the subject matter of the
3    AdvancePCS Health versus Takeda Pharmaceuticals
4    case?
5      A.    It was basically a case related to a
6    dispute between a pharmacy benefits manager and a
7    manufacturer regarding the contract between the
8    two parties.

Page 10

Depo-Young-Steven-05-13-09

9     Q.    The -- who was it that retained you in
10   that case?
11      A.    Takeda Pharmaceuticals North America.
12      Q.    Is that the Takeda that's the -- that was
13   the 50 percent owner of the TAP Pharmaceuticals
14   joint venture?
15      A.    I'm not certain, but I don't believe so.
16      Q.    Is there some connection you know of
17   between that Takeda Corporation and TAP
18   Pharmaceuticals?
19      A.    I'm not certain.  They're -- I'm not
20   certain at this point.  I know that there was --
21   there may have been an acquisition, but I'm not
22   sure whether it was Takeda North America that did
00029
1    the acquisition of TAP or whether it was Takeda
2    Japan, but there may now be a relationship.
3       Q.    There may not be?
4       A.    There may now be.
5       Q.    Oh.  Who is the -- who are the -- is it
6    right TAP Pharmaceuticals is a joint venture?
7       A.    That's my understanding, yes.  I'm sorry.
8    At -- at the time of my work, I believe that it
9    was, yes.
10      Q.    Okay.  And who were the partners in that
11   joint venture?
12      A.    I think -- I believe there were two
13   shareholders, Abbott and Takeda Japan.  I'm not
14   sure of the exact legal title of the entity.
15      Q.    So when you -- you were retained by TAP
16   Pharmaceuticals, which was a joint venture of
17   Abbott and Takeda Japan, but you're not certain of
18   the relationship between Takeda Japan and
19   Takeda Pharmaceuticals America?
20      A.    I believe it's a complex corporate
21   structure, but I believe that Takeda North America
22   is owned by Takeda whatever the corporate entity
00030
1    is in Japan.  I'm not certain exactly the
2    structure, but I believe that it's a wholly-owned
3    subsidiary.
4       Q.    And the AdvancePCS Health case, which law
5    firm was it that you worked on, the law firm
6    representing Takeda?
7       A.    It was Hogan & Hartson.
8       Q.    Who was your primary contact there?
9       A.    I should know his name.  I can't recall
10   his name right now.  John Reese was one of the --
11   I don't believe that he was a partner.  He might
12   have been an associate.  I know that he was
13   involved in the case.  I cannot right now --
14      Q.    Which -- sorry.
15      A.    I'm sorry.  I can't right now remember the
16   partner's name that I worked with primarily.
17      Q.    Which Hogan & Hartson office?
18      A.    Washington, D.C.
19      Q.    What was the subject of the -- I'm sorry.
20   Let me go back.
21         The Pentech Pharmaceuticals versus
22   Par Pharmaceuticals, who did you represent in that
00031
1    case?  I'm sorry.  Let me ask that again.
2         Which party was it that retained you as an
Page 11

Depo-Young-Steven-05-13-09

3   expert in that case?
4       A.    Par Pharmaceuticals.
5       Q.    And what was the subject matter of that
6   case?
7       A.    It was a dispute between two parties under
8   a licensing agreement, licensing/royalty agreement
9   between the two manufacturers related to a
10  specific generic product.
11      Q.    What was the product?
12      A.    I can't believe that I can't remember
13  this.
14            Paroxetine, which is the generic, I can't
15  remember the branded name of -- of it, but the
16  name of the product is Paroxetine.
17      Q.    Can you take a stab at spelling that?  If
18  you decline, we understand.
19      A.    No, no, that's okay.  P-A-R-O-X-E-T-E-N-E
20  I believe.
21      Q.    Thank you.
22      A.    The brand -- I do remember.  I believe
00032
1   that the brand of drug was Paxil.
2       Q.    And in connection with the Sacred Heart
3   versus Humana Military Health Care Services case,
4   who was it that retained you as an expert in that
5   case?
6       A.    Sacred Heart Health Systems.
7       Q.    What was the nature of that matter?
8       A.    It was a dispute between a health system
9   and a government contractor that administered the
10  Tri-Care program in that locality related to
11  underpayments under the provider's contract with
12  Humana.
13      Q.    What types of underpayments?
14      A.    Basically the health system, Sacred Heart,
15  had a contract with the Humana to be paid based on
16  a percentage of charges, different percentage of
17  charges at different points in time.  Humana made
18  payments based on a different methodology, and the
19  dispute was over the difference in payments
20  between the contractual amount and the amount that
21  was paid by Humana.
22      Q.    Did you issue a report in the case?
00033
1       A.    Yes, I did.
2       Q.    Did that report actually calculate a
3   dollar value for damages?
4       A.    No.  That report focused on the fact that
5   Humana had alleged that it was infeasible to
6   calculate damage under the report, and my report
7   was focusing on the fact that in fact it was
8   feasible and that I would be able to do it if the
9   case was brought to trial.  Ultimately I would
10  have performed a damage calculation, but the case
11  settled before that occurred.
12      Q.    Did you do substantial work beyond -- let
13  me start over.
14            You said -- you talked about how you --
15  you did a report regarding whether the
16  calculations were feasible.  Did you move to the
17  next stage and start actually doing calculations?
18      A.    No.  We never received the data to begin
19  the calculation process.

Page 12

Depo-Young-Steven-05-13-09

```
20      Q.    And who's the law firm that retained you
21  in that case?
22      A.    It was a local law firm by the name of
00034
 1  Beggs & Lane.
 2      Q.    Do you know who represented the defendant
 3  in that case?
 4      A.    I can't recall at this time.
 5      Q.    I'm sorry.  Just to step back in the --
 6  the Par Pharmaceutical matters, what law firm was
 7  it that retained you in connection with that
 8  matter?
 9      A.    I'm not very good with names.  It's a
10  large New York law firm, Cravath, Swaine I
11  believe.
12      Q.    And who -- and the other matter you
13  described about an arbitration report, who were
14  the parties in that case?
15      A.    Two generic pharmaceutical companies.  One
16  was Par Pharmaceuticals and one was Apotex.  I
17  believe Apotex.
18      Q.    So you were retained by Par in that case
19  again?
20      A.    Yes.  I believe it was Apotex.  It was a
21  Canadian pharmaceutical company that had a license
22  agreement with Par for Par to sell its products in
00035
 1  the U.S.
 2      Q.    And what was the nature of the -- the
 3  issue you addressed in that case?
 4      A.    The nature of the dispute was that my
 5  client, Par, had an agreement to distribute
 6  products for the other manufacturer within the
 7  United States, and there were allegations that Par
 8  did not optimize the pricing at which those
 9  products were sold in the marketplace in the
10  United States I believe was the primary.
11      Q.    What does it mean to "optimize the
12  pricing"?
13      A.    Well, without going into too much detail
14  in the pharmaceutical industry, the kind of -- for
15  generics, the key thing is having a very large
16  portfolio of products that you sell.  The more
17  products you get in your portfolio, the easier it
18  is for people to buy from you because then
19  basically they have to go to multiple vendors.
20            What Apotex had done, I believe it was
21  Apotex, they wanted Par to include their products
22  within the portfolio of products that Par had sold
00036
 1  to make sure that, obviously, you get the
 2  distribution channels.  You get to take advantage
 3  of all those contracts.
 4            There was some allegations that basically
 5  Par was selling -- pushing its products as opposed
 6  to Apotex -- as opposed to the other
 7  manufacturer's products, and there were also
 8  allegations that a discount was being shifted away
 9  from other Parr products into the portfolio to the
10  other manufacturer's products under the contracts
11  that Par had negotiated with -- with various
12  customers.
13      Q.    And what was the nature of your opinion?
```

Page 13

Depo-Young-Steven-05-13-09

14        A.    It was basically to describe how
15   generics -- you know, general background as to how
16   generics are sold and to explain the portfolio
17   issues and discounting practices, and then to also
18   analyze the data to be able to assess whether or
19   not the allegations of -- of either shifting of
20   the product or shifting of discount were supported
21   by the sales data during the period in time.
22        Q.    Did you express an opinion on the
00037
1    liability of the company in that case?
2         A.    Yes, I did.
3         Q.    What was that opinion?
4         A.    That there was not shifting of the nature
5    alleged.
6         Q.    So have we now gone through every other
7    case in which you've been retained as an expert in
8    non-AWP cases?
9         A.    That's correct.
10        MR. TORBORG:   Object to that last question
11   to form.
12   BY MR. LAVINE:
13        Q.    And on Exhibit 1B, are the descriptions of
14   your testimony accurate?  These are -- the first
15   four indicate depositions, and then the last one
16   is testimony at trial.
17        A.    Yes, those are.  The -- the one exception
18   would be the one that we already talked about
19   that -- I believe the -- the fourth one down
20   should have been deposition taken, but I believe
21   everything else is an accurate --
22        Q.    All right.  Okay.
00038
1         A.    -- description -- oh, I'm sorry, related
2    to the bottom five, yes.
3         Q.    Those are -- those are on there, okay.
4              And then you said in the -- the Par-Apotex
5    matter there was no deposition, right, the
6    arbitration?
7         A.    That's correct.
8         Q.    So out of all the matters we've discussed,
9    the only case in which you were retained as an
10   expert by the plaintiff was the Sacred Heart case?
11        A.    That's correct.
12             (Exhibit Young 002 marked.)
13   BY MR. LAVINE:
14        Q.    What we just marked as Exhibit Young 002,
15   a five-page document entitled "Issued by the
16   United States District Court, Northern District of
17   Illinois," reflecting a signature date of
18   March 11, 2009, have you ever seen this document
19   before?
20        A.    Yes, I have.
21        Q.    Describe how it is that you came to see
22   this.
00039
1         A.    The attorneys at Jones Day provided it to
2    me.
3         Q.    And the last two pages of the exhibit,
4    there's some requests for documents.  Do you see
5    that?
6         A.    Yes.
7         Q.    Are there any additional documents

Page 14

Depo-Young-Steven-05-13-09

8   responsive to the subpoena that you've brought
9   with you today?
10      A.   I believe that there were some yesterday
11   that -- that were identified.  Beyond that, I
12   guess there's one correction to my report that
13   would probably fall within -- may fall within this
14   discussion or this item.
15      Q.   A correction to the report that hasn't
16   been provided to us yet?
17      A.   Yes.  In preparation for my deposition
18   late yesterday and yesterday evening, I identified
19   actually this error and one other wording error in
20   the report.
21      Q.   And then yesterday also some other related
22   materials were produced; right?
00040
1      A.   That's correct.
2      Q.   And some additions made to your documents
3   that you relied upon?
4      A.   Yes, documents relied upon or considered,
5   yes.
6         MR. LAVINE:  Can we get copies of the hard
7   copies of the materials that were sent yesterday
8   and whatever the correction is to his report?
9         MR. TORBORG:  Let me make -- the only
10   correction I think we have right in front of you,
11   so, yeah, of course.
12         On the additional documents, we did send
13   them to your hotel.  There's some additional ones.
14         As I understand it, we didn't send you
15   copies of every one in the bullet point list to
16   your hotel, just the ones that were not in the
17   public -- not in the record.
18         If you tell me which ones that you don't
19   have that you need, we can certainly, yeah.
20         MR. LAVINE:  I never got notified by the
21   hotel that there were any materials sent over.
22         MS. GEISLER:  I -- I stood right at the
00041
1   desk when they gave it to the bellman to bring to
2   you about 6:45 last night, shortly after you sent
3   the e-mail, and it contained the subpoena response
4   and the documents.
5         MR. TORBORG:  This is what we sent you.
6         MS. GEISLER:  That's what we sent you last
7   night.
8         MR. LAVINE:  So this is an extra set of
9   that?
10         MR. TORBORG:  Yeah.
11         MR. LAVINE:  Thank you.
12         MR. TORBORG:  And there are -- just to
13   clarify, there are -- I think the approach that we
14   took -- that we took is we sent you hard copies of
15   documents that were not already in the record.
16         MS. GEISLER:  Right.
17         MR. BREEN:  Did the report correction that
18   Mr. Young testified about, was that part of a --
19   any of the documents you provided us yesterday?
20         MS. GEISLER:  No.
21         MR. TORBORG:  No, because it wasn't found
22   at the time.
00042
1         MR. BREEN:  So there is no paper on that.
Page 15

Depo-Young-Steven-05-13-09

2          MR. TORBORG:   There is right now.
3          MS. GEISLER:   There is now.
4          MR. BREEN:   Well, it has not been given to
5     us yet.  It will be given to us.
6          MR. TORBORG:   Correct.
7          MR. BREEN:  I just want to clarify that.
8     Thanks.
9          MR. LAVINE:  Is this -- that's your
10    copies?
11         THE WITNESS:  Yes.
12         MR. LAVINE:  We'll take one each if that's
13    okay.
14         MR. TORBORG:  Okay.
15              (Whereupon a brief interruption
16              was had in the deposition
17              proceedings.)
18    BY MR. LAVINE:
19    Q.   So now is that everything additional that
20    there is to provide to the United States?
21    A.   Yes.
22         MR. TORBORG:  On the documents, I think he
00043
1     did indicate to you there was one other correction
2     to his report as well.  I don't know if that falls
3     under your request or not.
4     BY MR. LAVINE:
5     Q.   Others, there is another correction to
6     your report not reflected by any documents?
7     A.   That's correct.  A typographical error.
8     Q.   What was that?
9     A.   AK was listed as Arkansas as opposed to
10    Alaska.  It should have been Alaska in the report.
11    Q.   So what's the correct postal abbreviation
12    for Alaska?
13    A.   I don't know.  Oh, no, AK.  AK is Alaska.
14    I don't -- Arkansas I think is AR.
15    Q.   So it was listed as Arkansas, and it
16    should have been Alaska?
17    A.   It should have been Alaska, that's
18    correct.
19         MR. BREEN:  So the report is AR?
20         THE WITNESS:  Well, the report says --
21    indicates Arkansas.  The source document that it
22    came from, it was the abbreviation for Alaska.
00044
1          MR. BREEN:  I got you.
2          THE WITNESS:  I just put Arkansas in as
3     opposed to Alaska.  The report did read Arkansas.
4     It should have read Alaska.
5     BY MR. LAVINE:
6     Q.   And that's something in the body of the
7     report itself?
8     A.   Yes, that's correct.
9          I can --
10    Q.   Do you know where?
11    A.   It will just take me a minute.
12    Q.   You know, why don't we just move on and
13    we'll -- we'll try to identify that later.
14    A.   I'm sorry.  I -- I --
15    Q.   Oh, you found it?
16    A.   I have found it.
17         On page 19, the first full bullet point,
18    last line, "Arkansas" should be replaced with
                          Page 16

Depo-Young-Steven-05-13-09

```
19    "Alaska."
20        Q.    Are there any other changes or corrections
21    to your report that you've identified?
22        A.    No.
00045
 1        Q.    Now, on Exhibit Young 002, can you look at
 2    the last three items?  I'm sorry.  Where --
 3    Exhibit Young 002 to your deposition, not to the
 4    report.
 5              MS. GEISLER:   To your subpoena do you
 6    mean?
 7              MR. LAVINE:   Yes.
 8              MS. GEISLER:   To the subpoena?
 9              MR. LAVINE:   Yes.
10              MS. GEISLER:   Okay.
11    BY MR. LAVINE:
12        Q.    What efforts, if any, did you undertake to
13    collect those materials that were described in the
14    last three items, paragraphs 10, 11 and 12?
15        A.    The contracts that I have with other
16    pharmaceutical manufacturers have confidentiality
17    provisions in them that do not allow me to release
18    those.
19        Q.    So does that mean you didn't look for them
20    because you knew that there were confidentiality
21    provisions in them?
22        A.    That's correct.
00046
 1        Q.    And you're talking about the retention
 2    agreement as an expert?
 3        A.    Or any consulting agreements.
 4        Q.    Anything else that you did to locate
 5    materials described in 10, 11 and 12?
 6        A.    Again, I believe they're all covered by
 7    confidentiality provisions.
 8        Q.    So does that mean you didn't go to look or
 9    find any of those?
10        A.    I know that as a requirement of our
11    agreements we always put confidentiality
12    provisions in there.  Our clients require it, and
13    we do that on all our engagements.
14        Q.    So, again, you didn't -- you didn't
15    actually look for any of these materials?
16        A.    I did not pull each one of them and
17    confirm that because our standard practice is that
18    it must always be in there.
19        Q.    Did you --
20              MR. TORBORG:   I'd like to -- excuse me.
21    Just want to object to form to the last question.
22    BY MR. LAVINE:
00047
 1        Q.    Did you pull any of those documents?
 2              MR. TORBORG:   Object to form.
 3              THE WITNESS:   I -- same answer is that I
 4    did not pull the agreements to confirm that the
 5    standard language was in there, but I'm confident
 6    that it was.
 7    BY MR. LAVINE:
 8        Q.    What about item 10 where it talks about
 9    transcripts, affidavits, declarations or
10    statements under oath, you didn't look to see if
11    you had any of those in your possession either?
12              MR. TORBORG:   Object to form.
```

Page 17

Depo-Young-Steven-05-13-09
13          THE WITNESS:  My understanding is that
14   related to the previous -- well, let me just read
15   that requirement one more time, please.
16          My understanding is that the attorneys at
17   Jones Day provided this information related to my
18   Abbott and TAP work.
19   BY MR. LAVINE:
20      Q.   But they didn't get it from you?
21          MR. TORBORG:  Object to form.
22          THE WITNESS:  They have copies of it, but
00048
 1   we also have copies.  I'm not sure if my staff
 2   provided them our copy.  I know that we pulled it.
 3   I'm not sure if Jones Day transmitted the copy
 4   that we had or the copy that they had, but they
 5   would be the same.
 6          MR. LAVINE:  We need to take a break
 7   because the tape's running out.
 8          THE VIDEOGRAPHER:  Going off the record at
 9   10:02 a.m.
10              (Whereupon a recess was had.)
11          THE VIDEOGRAPHER:  Beginning videotape
12   number two.  Back on the record at 10:16 a.m.
13   BY MR. LAVINE:
14      Q.   And we were talking about paragraphs 10,
15   11 and 12 to Deposition Exhibit Young 002.
16          I just want to clarify.  I think you said
17   you didn't take any steps at all to actually find
18   these materials; is that right?
19          MR. TORBORG:  Object to form.
20          THE WITNESS:  Actually, if you're
21   referring to 10, 11 and 12, yeah, my staff did
22   pull various information related to these items.
00049
 1   BY MR. LAVINE:
 2      Q.   Is that something you asked them to do?
 3      A.   Yes.
 4      Q.   And who did you make that request to?
 5      A.   Chris Rohn.
 6      Q.   What's Chris's position?
 7      A.   He is currently a managing director at
 8   Healthscape.
 9      Q.   When did you ask Chris to do this?
10      A.   It would have been short with -- you know,
11   within a week or so of this, the date of this, so
12   it would have been when he was with -- that's why
13   I hesitated.
14          He was actually with Huron Consulting at
15   the time, so he was a managing director with Huron
16   when he pulled this information together.
17      Q.   And what did you ask Chris to do?
18      A.   Basically to -- related to the affidavits,
19   declarations, statements under oath, he pulled all
20   of the AWP-related matters that I had worked on,
21   and then -- yes, and I believe that that covers 12
22   also.
00050
 1      Q.   But what -- what did you actually ask him
 2   to do?
 3      A.   To -- well, we did do, you know, some of
 4   it jointly with Jones Day, but basically we got on
 5   the phone and discussed what would be responsive
 6   to this, and I don't remember the specifics of,
                    Page 18

Depo-Young-Steven-05-13-09

7  you know, each step of the process, but basically
8  the objective was to be responsive with this in a
9  manner that wouldn't violate any confidentiality
10 provisions I had with other clients.
11     Q.    And you're talking about a phone call with
12 you and Mr. Rohn and who else?
13     A.    Yes.  I believe that Carol was on one of
14 the calls.
15     Q.    So at the end of the call, what was it
16 that Chris -- what was your understanding of what
17 it was that Chris was going to do?
18     A.    To basically pull all the information that
19 would be responsive to this that didn't violate
20 any confidentiality provisions of other clients.
21     Q.    Did you ever see what it was that Chris
22 found as a result of the -- this inquiry?
00051
1      A.    I did not review what he provided to
2  Jones Day, no.
3      Q.    And so your understanding is he sent it
4  all directly to Jones Day?
5      A.    That's correct.
6      Q.    Do you know whether he sent all of it to
7  Jones Day or just some portion of it?
8      A.    It -- I don't know for certain, but he
9  would have sent all of it to -- there was nothing
10 that would indicate to me that he wouldn't send it
11 all to Jones Day.
12     Q.    But you don't actually know what he sent?
13     A.    I did not review what he sent, no.
14     Q.    So he may have been instructed to only
15 send a portion of it.  You don't know one way or
16 the other?
17     A.    I did not discuss that with him, no.
18     Q.    Now, going back to Exhibit Young 001 of
19 your report, Exhibit 1A of that report, and
20 that -- that's a copy of your CV that was current
21 as of the time you signed the report?
22     A.    That's correct.
00052
1      Q.    And you do have an updated CV you can
2  provide us with that reflects that you now are
3  employed at Healthscape?
4      A.    That's correct.
5      Q.    Where is Healthscape located?
6      A.    200 North LaSalle Street, Suite 1720,
7  Chicago, Illinois, 60601.
8      Q.    Are there differences in the types of work
9  performed by Huron Consulting as compared to
10 Healthscape?
11     A.    Yes.
12     Q.    What -- what's the difference between the
13 two companies?
14     A.    Huron is a large, publicly traded company
15 that provides various forms of business and
16 operational consulting-type activities.
17        Healthscape is a narrowly focused
18 healthcare consulting firm that works primarily on
19 health plan and reimbursement-type issues.
20     Q.    How long has Healthscape been in business?
21     A.    It -- the inception was May 1 of this
22 year.  Actually, the -- there may have been -- it
00053

Page 19

Depo-Young-Steven-05-13-09
```
 1  may have been incorporated -- I should correct
 2  that.
 3          It may have been incorporated in March,
 4  but all but one of the employees started in on
 5  May 1.
 6      Q.    So this is a new company that you started?
 7      A.    Myself and others, that's correct.
 8      Q.    And how large is it?
 9      A.    I believe currently we have 21 employees.
10      Q.    Can you break that down a little bit?  How
11  many are supported and how many other types of
12  workers?
13      A.    There's one office manager, and I'll try
14  to get these numbers right.  There are four
15  managing directors.  There are two directors, and
16  at the end I'll explain a little bit about the
17  relative levels, but I'm going down in level of
18  seniority.
19          Managers -- make sure I get this right.  I
20  believe that there are three managers.  Then the
21  rest are either experienced consultants or
22  consultants, senior consultants or consultants.
00054
 1      Q.    And how many of those people you just
 2  described are actual owners of the company?
 3      A.    Three.
 4      Q.    So who are the owners?
 5      A.    Myself, John Steel and Arjun Aggarwal.
 6          THE REPORTER:  Arjun?
 7          THE WITNESS:  Aggarwal, A-G-G-A-R-W-A-L.
 8  BY MR. LAVINE:
 9      Q.    And were all three of you also partners
10  over at Huron?
11      A.    We were managing directors --
12      Q.    Sorry, managing directors.
13      A.    -- with Huron.  It's a publicly traded
14  company.
15      Q.    But you were considered as having equity
16  positions in that company?
17      A.    They're -- not when I departed, but there
18  was a -- over the course of it, part of the
19  compensation plan, there was some stock that was
20  awarded and invested over time.
21      Q.    And, I'm sorry, you said:
22          Huron is a publicly traded company; right?
00055
 1      A.    That's correct.
 2      Q.    And I assume Healthscape is not.
 3      A.    That's correct.
 4      Q.    So have you had to enter into a new
 5  agreement with Abbott Laboratories in connection
 6  with your switching over to Healthscape?
 7      A.    I guess the answer to that would be yes
 8  and no.  Basically as part of the separation
 9  process with Huron Consulting, there was an
10  agreement that certain clients and engagements
11  could be assigned to the new entity, so it was
12  actually the engagement letter is the same.  It
13  was just assigned from Huron over to ours with the
14  client's consent.
15      Q.    Was the consent of the client in writing?
16      A.    Yes.
17      Q.    What form did that take?
```
Page 20

Depo-Young-Steven-05-13-09
```
18       A.   It was -- as best I can describe it, I'm
19  not a lawyer, so it was kind of a two-part
20  agreement that the first page or two pages was
21  basically between Healthscape and Huron to assign
22  the engagement, and then the last page was a
00056
 1  release between Abbott and Huron related to the
 2  work after assignment, after the date of
 3  assignment.
 4            MR. LAVINE:   Could we get a copy of that,
 5  please?
 6            MR. TORBORG:   I think --
 7            MR. LAVINE:   I mean, it's within the scope
 8  of a retention agreement.
 9            MR. TORBORG:   Yeah.  Yeah, I think we can.
10            Is there any confidentiality issues
11  associated with that?
12            MS. GEISLER:   No.
13            THE WITNESS:   No.
14            MR. TORBORG:   I think we can.
15            THE WITNESS:   It would be marked -- I mean
16  there's no confidentiality provisions or anything.
17  It would be marked confidential.  I assume it
18  wouldn't be...
19  BY MR. LAVINE:
20       Q.   But it was something signed on behalf of
21  Abbott Laboratories; right?
22       A.   Yes, that's correct, yes.
00057
 1            MR. TORBORG:   Abbot saying --
 2            THE WITNESS:   It would be subsumed within
 3  our opinion --
 4  BY MR. LAVINE:
 5       Q.   Abbott saying it's okay --
 6       A.   -- it's a protection.
 7       Q.   -- to take this work from your employment
 8  at Huron to the new company you're setting up,
 9  Healthscape?
10       A.   Yes.
11            MR. TORBORG:   Yeah, we can get it for you
12  at -- at a break.
13            Do we have it here, Carol?
14            MS. GEISLER:   Yes.
15            MR. TORBORG:   Okay.
16  BY MR. LAVINE:
17       Q.   Were there any changes in the terms of the
18  retention that you'd consider material?
19       A.   No.
20            (Exhibit Young 003 marked.)
21  BY MR. LAVINE:
22       Q.   Just marked as Exhibit Young 003 a
00058
 1  six-page document, and the front page is on the
 2  letterhead of Jones Day reflecting a date of
 3  May 21, 2008.
 4            Do you know what this document is?
 5       A.   Yes.  This is the retention of myself
 6  under this engagement.
 7       Q.   Is there any other agreement besides the
 8  assignment we just talked about or any -- any
 9  other document besides that assignment that
10  articulates any of the terms of the agreement
11  between Abbott Labs and Huron or Healthscape?
```
Page 21

Depo-Young-Steven-05-13-09

12      A.    No.
13      Q.    So this -- this is everything.
14      A.    That's my understanding.  There -- yeah.
15  The billing policy is attached to it, so, yes,
16  that's the entirety of the agreement.
17      Q.    Now, here it says that Abbott's retaining
18  Huron as the expert; right?
19      A.    I believe that there -- I guess it does
20  say "Huron," but they were retaining me as an
21  employee of Huron, that's correct.
22      Q.    You think the only change in that would
00059
1   be -- it would be Healthscape with you as the
2   employee?
3       A.    That's correct.
4       Q.    And all the fees stayed the same?
5       A.    That's correct.
6       Q.    So when you're at Huron and there was
7   money collected in a matter in which you were an
8   expert, how was that distributed to the company,
9   and did any of that end up being directly paid to
10  you?
11      A.    None of it was directly paid to me.  It
12  would be recognized as revenue when the hours are
13  incurred.  It would be billed, and then it would
14  be collected, and it would be revenue on the
15  income statement and distributed shareholders if
16  it ended up in profit, so none of it was -- we did
17  not have any agreement that a percentage of
18  anything went to me or anything like that.
19      Q.    Was it something taken into account at the
20  end of the year in connection with bonuses that
21  were provided?
22      A.    No, not really, other than, you know,
00060
1   obviously, all work that we do for clients and --
2   and revenue is -- is kind of in the subjective
3   process of determining what those bonuses might
4   be.
5       Q.    Okay.  And you didn't have any connection
6   with the Analysis Group in connection with any of
7   the work you've done for Abbott in this matter,
8   did you?
9       A.    The Analysis Group?
10      Q.    Right.  Never heard of a company by the
11  name of "Analysis Group"?
12      A.    No, I don't believe so.
13      Q.    So is there anything in this agreement
14  about any understanding between you and Abbot or
15  Jones Day regarding assistance you might get from
16  any other entity besides Huron?
17      A.    Not that I'm aware of, no.
18      Q.    What about assistance that Huron might
19  have provided to other parties?
20      A.    Not that I'm aware of, no.
21      Q.    Well, what about in connection with any
22  support for Dr. Hughes?
00061
1       A.    I was not involved in that work.  I'm not
2   sure whether there was a separate engagement or
3   whether that was billed under this engagement.
4   I'm not certain.
5       Q.    Who would know that?

Depo-Young-Steven-05-13-09

6      A.    I could find it out pretty easily.
7      Q.    Was that something you think Chris Rohn
8  would know?
9      A.    Yes.
10     Q.    I guess you have not seen anything that
11  would indicate any kind of separate invoices being
12  sent to Abbott in connection with support provided
13  to Dr. Hughes?
14     A.    Chris takes care of all that, so I
15  actually don't --
16     Q.    But you haven't seen anything --
17     A.    No, I have not.
18     Q.    -- to suggest that?  I'm sorry.
19     A.    I have not, no.
20               (Exhibit Young 004 marked.)
21  BY MR. LAVINE:
22     Q.    We just marked as composite Exhibit Young
00062
1  004 several documents, each separated by a colored
2  piece of paper, and the top page is -- reflects a
3  letterhead for Huron Consulting Group, date May 7,
4  2008.   Just take a look at those, and tell me if
5  you can identify this document.
6      A.    These are the -- I believe that these are
7  the billings related to this matter from
8  Huron Consulting to Abbott.
9      Q.    And with the exception of the invoice for
10  work done in March of 2009, are any invoices
11  missing?
12     A.    No.  I -- we haven't -- with the
13  transition process, we have not prepared our April
14  billings from Huron yet.  We need to kind of
15  coordinate that with the company since we are not
16  employees of the company any more, so we haven't
17  prepared those yet.  There will be a bill
18  forthcoming for April services.
19     Q.    And then anything in May would be
20  Healthscape?
21     A.    The first week would still be Huron, and
22  then anything from Saturday forward would be
00063
1  Healthscape, that's correct.
2      Q.    All right.  But at least -- at least
3  through March 11, 2009, which is the last document
4  I see there --
5      A.    Um-hmm.
6      Q.    -- are -- is this a complete set of all
7  invoices sent from Huron to Abbott in connection
8  with services rendered in this matter?
9           MR. TORBORG:  Object to form.
10          THE WITNESS:  Yes, I believe so.  I'd have
11  to go back to make sure that one didn't get
12  dropped out or something, but it appears so.
13  BY MR. LAVINE:
14     Q.    Well, there -- I don't see any in there
15  between September and February, September of 2008
16  and February of 2009.  Why would that be?
17          MR. TORBORG:  Object to form.
18          THE WITNESS:  I would have to go back and
19  check for certain, but I do know that during that
20  period of time we probably were not doing very
21  much work on this matter.
22  BY MR. LAVINE:

Page 23

Depo-Young-Steven-05-13-09

00064
```
 1        Q.    Were you told to stop work for a time?
 2        A.    I don't know if it was necessarily that we
 3  were told to stop work, but there wasn't any work
 4  being done during that period.
 5        Q.    Could we just look at the first document.
 6        A.    Um-hmm.
 7        Q.    There's -- there's a cover letter dated
 8  May 7th and then two attachments.   What are each
 9  of those attachments?
10        A.    Basically, there -- with the way that
11  we -- that Huron prepared the billings, there was
12  always two copies.   Usually, one we would ask be
13  sent back with the actual payment, and then one,
14  the client could retain in their files for tax
15  purposes.
16        Q.    And then the job number that's referenced,
17  that relates to the engagement by Abbott of Huron
18  in connection with this case?
19        A.    It's part of the engagement number.
20  There's actually three digits that --
21        Q.    Is that what's on the first -- on the
22  cover letter --
```
00065
```
 1        A.    Oh, I'm sorry.
 2        Q.    -- the dash -- dash 036?
 3        A.    That's correct.
 4        Q.    So 01511 is the client, and 036 is the
 5  matter, would that be right?
 6        A.    That's correct.
 7        Q.    Does this mean there are 36 different
 8  matters that you were retained on by Abbott?
 9        A.    I would not know.
10        Q.    Who would?
11        A.    I'm sure that the CFO of Huron would know
12  of engagements related to Abbott.
13        Q.    Who is that?
14        A.    Gary Burge.
15        Q.    And is it right that Christopher Rohn was
16  in charge of submitting these invoices?
17        A.    That's correct.
18        Q.    Did you play any role in that?
19        A.    No.
20        Q.    And do each of these monthly invoices
21  represent everything that was ever sent to Abbott
22  to explain the work that was being done by
```
00066
```
 1  Huron Consulting in connection with this case?
 2        A.    To the best of my knowledge, yes.
 3        Q.    In other words, Huron just sent an invoice
 4  describing the work done as for professional
 5  services rendered through April 30th, 2008 for
 6  $218,662.50, and that invoice was paid with no
 7  request for any kind of additional backup
 8  material?
 9        A.    I believe so, although I do know that on
10  occasion clients do ask for more detail.   I'd have
11  to check with Chris as to whether any more detail
12  was ever requested related to these.
13        Q.    Do you know the approximate total of how
14  much has been paid by Abbott to Huron in
15  connection with this case?
16        A.    No, I don't.   I could add up these months,
```
Page 24

Depo-Young-Steven-05-13-09
```
17   and that should -- at least through the last
18   billing should reflect that.
19                  (Exhibit Young 005 marked.)
20          MR. LAVINE:  Mark this Exhibit Young 005.
21   BY MR. LAVINE:
22       Q.   We've just marked as Exhibit Young 005, a
00067
 1   three-page document dated April 6, 2009.  So is
 2   that the invoice for the March services provided
 3   by Huron to Abbott in connection with this case?
 4       A.   That's correct.
 5       Q.   And was -- that's for approximately
 6   another $150,000?
 7       A.   That's correct.
 8       Q.   And if we added that Exhibit Young 005
 9   together with all the amounts on Exhibit Young
10   004, that would be the approximate payments in
11   connection with this case; is that right?
12       A.   Yes, the billings through March 31st.
13       Q.   Not including April --
14       A.   April.
15       Q.   -- or May.
16       A.   That's correct.
17       Q.   Does it -- does it sound right that the
18   approximate amount paid by Abbott to Huron in
19   connection with this case was $1.5 million?
20       A.   I'd probably have to go through and do a
21   quick addition.  Would you like me to do that?
22       Q.   Sure.
00068
 1       A.   Roughly.
 2       Q.   Okay.
 3       A.   That sounds about right.
 4       Q.   Approximately $1.5 million?
 5       A.   Yes.
 6          MR. LAVINE:  Exhibit Young 6?
 7          THE REPORTER:  Yes.
 8          MR. LAVINE:  Sorry.  I can't keep track.
 9                  (Exhibit Young 006 marked.)
10   BY MR. LAVINE:
11       Q.   Okay.  We just marked as Exhibit Young 006
12   a one-page document entitled
13   "Engagement/Timekeeper/Time Card List.  What is
14   this document?
15       A.   This is a summary that Chris prepared for
16   me out of the timekeeping system from
17   Huron Consulting that summarizes the hours that I
18   charged to this engagement.
19       Q.   So is this the full and complete summary
20   of the hours you've worked on this matter through
21   March 31st of 2009?
22       A.   I believe that it is, yes.
00069
 1       Q.   So it would be 162 hours up to that date;
 2   right?
 3       A.   That's correct.
 4       Q.   Approximately how many hours have you
 5   worked on this matter since that time?
 6       A.   I was meaning to check that before I came
 7   over, but I -- I did forget to do that.
 8       Q.   Can you estimate?
 9       A.   Well, maybe -- this would be a rough
10   estimate, but maybe another 20 or 30 last month
```
Page 25

Depo-Young-Steven-05-13-09
```
11  and --
12      Q.    That's March?
13      A.    April.
14      Q.    April?
15      A.    April.
16      Q.    Oh, I'm sorry.   This includes March.
17      A.    Right.
18      Q.    Sorry.
19      A.    And then maybe -- I don't know, maybe
20  another 20 or 30 or so getting ready this month
21  for the deposition.
22      Q.    And the rate at which you're billed is
00070
1   $425 per hour?
2       A.    That's correct.
3       Q.    So would -- would it be fair to say the
4   approximate number of hours you've worked on this
5   case to date is 200 hours?
6       A.    Yeah, little over 200 hours, yes.
7       Q.    And the remainder of the $1.5 million that
8   was paid by Abbott to Huron Consulting, who was it
9   that was doing that work?
10      A.    It was Chris Rohn and -- and our staff.
11      Q.    How many different people?
12      A.    I would not know the exact number of
13  people.
14      Q.    Approximately?
15      A.    Over the course of the last year, maybe
16  12 to 15 different people, different people at
17  different times likely.
18      Q.    Was Chris the primary person managing this
19  project?
20      A.    Well, basically, I was giving the
21  direction, and then Chris was working for me to
22  execute what I had asked him to do, that is
00071
1   correct.
2       Q.    The day-to-day stuff.
3       A.    Right.
4       Q.    So all the -- the -- the many different
5   tables and things that we saw in the big database
6   where Dr. Duggan's work was replicated, that was
7   something that Chris worked on day-to-day?
8       A.    That's correct.   Chris and I talked about
9   it, and I asked him to -- to do that replication
10  process and he and -- and -- and the staff were
11  the ones that were performing those actions.
12      Q.    But with your guidance then, he would be
13  the guy writing the code that went into that?
14      A.    In some cases, but the actual code would
15  normally be done by somebody at a lower level
16  than -- than Chris.
17      Q.    Do you have any idea approximately how
18  many hours were put into this project by
19  Huron Consulting, all the different employees?
20      A.    No, I'm not -- I'm not certain.
21      Q.    So how would you differentiate your role
22  in this project from the work that was done by the
00072
1   other employees?
2       A.    Well, I mean, basically, I was the one
3   that was directing the work.   So I was the one
4   that would meet with counsel, understand the scope
```
Page 26

Depo-Young-Steven-05-13-09
```
 5   of what I was asked to do.
 6          I would then sit down with Chris, and, you
 7   know, we talked about some of the past reports
 8   that we've done and -- and -- and similarities and
 9   kind of accumulating different aspects of -- of
10   what we were asked to do similar to what we had
11   done before.  So we don't recreate the wheel,
12   obviously, and then also to do kind of -- after
13   they have summarized his -- his approach,
14   Dr. Duggan's approach, I would analyze that,
15   direct them as to different analyses that -- that
16   I would like to have done, potentially different
17   research into the discovery, and they would then
18   perform those activities, and I would review them
19   and work with Chris to draft the report, meet with
20   the attorneys to discuss that.  And then I would
21   review the report finally and -- and ensure that
22   it represented my opinions accurately.
00073
 1     Q.    Was the work related to the replication of
 2   Dr. Duggan's work, was that a substantial part of
 3   what was done by Huron Consulting?
 4     A.    It was a significant amount of work, yes.
 5     Q.    Can you estimate what percentage of the
 6   project was related to the replication efforts?
 7     A.    I couldn't, no.
 8     Q.    Was it more than half, do you think?
 9     A.    The -- the base replication process may
10   not have been more than half, but probably with
11   the follow-on inquiries after the initial process
12   was done that I asked for it would have.  Yes, it
13   would have definitely been over half of the work
14   on the engagement.
15     Q.    So what is the -- what other categories of
16   work was done by Huron in connection with this?
17          MR. TORBORG:   Object to form.
18          THE WITNESS:   You know, that is a pretty
19   broad question.
20          Do you have -- I mean something
21   specific -- I mean I can't recall all the
22   different activities that happened over the last
00074
 1   year specifically.  Do you have something specific
 2   in mind?
 3   BY MR. LAVINE:
 4     Q.    Well, I don't know.  Are there different
 5   ways that you had in your mind that you consider
 6   to be discrete components of this project?
 7          MR. TORBORG:   Object to form.
 8   BY MR. LAVINE:
 9     Q.    I mean stage one, did you consider
10   stage one to be replication and on to stage two or
11   something of the sort?
12     A.    No.   There was no formal structure of that
13   nature.
14     Q.    Was there any comparable structure, even
15   if it was informal?
16          MR. TORBORG:   Object to form.
17          THE WITNESS:   I mean, I'm not sure --
18   structure is difficult.  I'm trying to -- I mean,
19   basically there was -- if you want to look at it
20   in very broad terms, there were, you know,
21   obviously, the replication, an inquiry process
```
Page 27

Depo-Young-Steven-05-13-09
```
 22  into that.
00075
  1              There was various activities relating to
  2  the specific items under consideration that are
  3  included in my report.  There was various work
  4  in -- you know, in doing similar types of
  5  calculations like this for other clients, concerns
  6  that I had that required analysis, research,
  7  things of that nature.  And, obviously, there's
  8  the -- the report preparation itself, so I guess
  9  in broad terms those are kind of the -- the
 10  categories of things.
 11  BY MR. LAVINE:
 12     Q.   But work you're referring to for other
 13  clients, isn't that separate and apart from the
 14  work reflected on the invoices that you sent to
 15  Abbott?
 16     A.   Oh, absolutely.  I -- I -- I didn't mean
 17  to misconstrue this.  This is the type of -- you
 18  know, we do these type of calculations all the
 19  time, and we critique them.  So, you know, the
 20  process that we went through is -- is kind of
 21  similar to the process that I might go through on
 22  other engagements for health plans or other
00076
  1  clients.
  2     Q.   Well, from the time that you were retained
  3  in -- let me start over.
  4              From the time that Huron was retained to
  5  work on this project for Abbott, what percentage
  6  of your personal workload was related to matters
  7  in which you were retained as an expert?
  8              MR. TORBORG:  Object to form.
  9              THE WITNESS:  Related to the Abbott DOJ?
 10  BY MR. LAVINE:
 11     Q.   Any expert matters.
 12     A.   Oh.  Well, I guess -- I guess one question
 13  that I would have is are you just talking about
 14  client time or -- I need a little bit more
 15  background.
 16              My role at Huron was I also led a much
 17  broader practice of people, so obviously I had
 18  management responsibilities, and then I did do
 19  client work also.  Are you looking for a
 20  percentage of my total activities at Huron or
 21  client activities?
 22     Q.   Was the client activity identified by the
00077
  1  fact that you were able to bill your hours the way
  2  we saw in Exhibit Young 006?
  3     A.   Yes.  Or under other -- we have other
  4  types of clients for completely different type
  5  work, non-litigation matters.
  6              We have different billing structures,
  7  maybe flat fee or contingent fee, but, yes,
  8  basically hours worked on a revenue-generating
  9  client is how I would describe that category.
 10     Q.   So is it fair to say part of your
 11  responsibilities were administrative, internal to
 12  Huron, and part were oriented towards serving
 13  clients?
 14     A.   Yes.  I would call them management as
 15  opposed to administrative, but yes.
```
Page 28

Depo-Young-Steven-05-13-09

16      Q.    Sorry.
17      A.    No problem.
18      Q.    And can you describe proportionately how
19   much time you spent on each of those duties over
20   the past year?
21      A.    I'd say over the last year maybe 60/40,
22   60 percent being kind of a management of the group
00078
1    overall and other kind of administrative work, if
2    you will, related to salary administration and
3    everything, and probably 40 percent client-related
4    activity.
5       Q.    And do those two categories fairly
6    describe the total nature of your work?
7       A.    In very broad terms.
8       Q.    Right.
9       A.    Yes.  I mean, obviously, I go to
10   continuing professional education, and there's
11   other aspects of what I do that are not management
12   or client related, but in broad --
13      Q.    But on a much smaller basis.
14      A.    Right, exactly.  -- in broad terms I think
15   that that's a fair separation of the two
16   categories.
17      Q.    So now, just talking only about the client
18   side of your workload, what percentage of that
19   related to matters in which you were retained as
20   an expert in the past year?
21           MR. TORBORG:  Object to form.
22           MR. LAVINE:  What's wrong with my form?
00079
1            MR. TORBORG:  Retained as an expert could
2    be as a consultant or as a testifying expert.  I'm
3    not sure you're on the same wavelength with him
4    about what it means to be retained as an expert,
5    you know, consulting versus litigation.  It might
6    be confusing.
7    BY MR. LAVINE:
8       Q.    My question was related to all expert
9    matters, whether testifying or as a consultant.
10      A.    That gets difficult.  Mainly because
11   this -- we may be getting into semantics here, but
12   let me try to clear up the semantics.
13           I mean, obviously, all my engagements, I'm
14   engaged as an expert and a consultant.
15           Are you referring to active litigation
16   matters?
17      Q.    Right.  Okay.  Let's focus a little bit
18   more then on active or threatened litigation.
19      A.    Active or threatened.
20           MR. TORBORG:  Let me object to form.
21           THE WITNESS:  It's still -- I mean,
22   obviously, you know, some of the work that I do
00080
1    is, is we test compliance, so it would -- you
2    know, that would not be.  I think in my mind I
3    would not say compliance work or testing for
4    compliance or analysis.  I do not categorize that
5    as in the category that you've just described, so
6    with that, I would say maybe 25 percent.
7    BY MR. LAVINE:
8       Q.    So approximately 25 percent of the
9    client-related work is something you would
                        Page 29

Depo-Young-Steven-05-13-09
```
10    categorize as litigation related expert work, is
11    that fair?
12        A.    Over the last one-year period, yes.
13        Q.    Has that -- does that change over the
14    years?
15        A.    Yes.
16        Q.    How about since you've been retained in
17    the AWP cases?  Can you just describe that
18    generally.
19        A.    It -- it fluctuates, obviously, based on
20    when the matters are coming up for report and
21    things of that matter.
22              I think that in any given 12-month rolling
00081
 1    period, it may range to as low as 10 to 15 percent
 2    to as high as maybe 30 to 35 percent.
 3        Q.    And when Huron was evaluating your
 4    performance for the year, did they keep track in
 5    any way of the dollar value of the work that you
 6    were identified as being in charge of or
 7    responsible for?
 8              MR. TORBORG:  Object to form.
 9              THE WITNESS:  They did track that
10    information, but given my role, it had a much less
11    significant implication towards my compensation.
12    BY MR. LAVINE:
13        Q.    And you're referring to your role as a
14    managing partner with substantial administrative
15    duties?
16        A.    Well, a practice group head.  We're not
17    partners, so a practice --
18        Q.    Sure.
19        A.    -- group head over other managing
20    directors; correct.
21        Q.    So although it had less of an impact,
22    it -- it still did come into play in evaluating
00082
 1    your compensation at Huron, didn't it?
 2              MR. TORBORG:  Object to form.
 3              THE WITNESS:  It would have had some --
 4    some proportionate impact.
 5              However, due to overall company financial
 6    results issues, last year wouldn't have had any
 7    implications.  Prior year it would have had some
 8    but not significant.
 9    BY MR. LAVINE:
10        Q.    So does that mean Huron did well last year
11    or poorly last year?
12        A.    Poorly last year.
13        Q.    So am I correct that you did spend some
14    time preparing for today's deposition?
15        A.    That's correct.
16        Q.    When -- when did you first start preparing
17    for the deposition today?
18        A.    I don't know.  I probably did a little bit
19    in late April because I had a little bit of
20    available time, but probably most of it was over
21    the course of first day or so -- first day or two
22    last week and then this week.
00083
 1        Q.    Approximately how many hours did you spend
 2    preparing for today's deposition?
 3        A.    I don't know, maybe 30, maybe -- yeah,
```

Depo-Young-Steven-05-13-09

4  maybe a little bit less than that.
5      Q.   Okay.  What did you --
6      A.   Maybe 25 to 30.
7      Q.   Sorry.  What did -- what did you do?
8      A.   There were -- well, I reviewed some of the
9  additional materials that you were provided
10  yesterday.  I read through Dr. Duggan's reports
11  again.  I read through my report again.  Had at
12  least quickly reviewed Dr. Duggan's kind of report
13  that came after my report.
14      Q.   His rebuttal report?
15      A.   Rebuttal report, that's correct.
16           And then I reviewed some additional
17  depositions from Medicaid administrators.
18      Q.   By "additional," do you mean depositions
19  you hadn't read prior to this time?
20      A.   As of the date of my report, correct, I
21  had not reviewed those.
22      Q.   And are those the ones that are listed on
00084
1  the -- the supplemental information that was
2  provided to us yesterday?
3      A.   That's correct.
4      Q.   So those depositions didn't inform the
5  opinions that you expressed in the report; right?
6      A.   The -- I mean the -- they informed my
7  opinions today, obviously, otherwise I would not
8  have -- have read them, but as of the date of the
9  report they were not considered by me in my
10  opinions.
11      Q.   So how was it you ended up reading some
12  additional depositions for the first time after
13  you prepared your report?
14      A.   It was primarily driven by I had read
15  some -- read one of the Medicaid administrator's
16  depositions previously, but there were some
17  opinions that I had in my report that I thought
18  were relatively universally accepted, but then in
19  reading Dr. Duggan's rebuttal report, I thought
20  that further confirmation beyond just the one that
21  I read would be helpful in preparation for today
22  and in preparation in general for this case and
00085
1  trying to inform the jury.
2      Q.   What -- what issues were you referring to
3  that you saw in Dr. Duggan's rebuttal report?
4      A.   Related to -- I can't remember all of them
5  specifically, but I think related to things like
6  access and -- and dispensing fee as -- as part of
7  the overall reimbursement were the two primary
8  ones.  There may have been more, but those were
9  the two primary ones.
10      Q.   Were these additional depositions in your
11  possession prior to the issuance of your report in
12  this matter?
13      A.   You know, personally, I did not have them.
14  Chris may have -- we have access to the discovery
15  in this matter, so if it was related to discovery,
16  I believe that Chris would have had access, and
17  when I asked Chris to pull some depositions, he
18  was able to do that, so.
19      Q.   Did counsel point you to any particular
20  depositions that --

Page 31

Depo-Young-Steven-05-13-09

```
21      A.    In some cases, yes.
22      Q.    On the additional depositions?
00086
 1      A.    In the additional depositions.
 2      Q.    Which ones?
 3      A.    I can't recall specifically.  I mean there
 4  were a handful that -- you know, obviously there
 5  was a lot of depositions, and I did not read them
 6  cover to cover.  I -- I will tell you that right
 7  now.
 8            Some of them -- well, I asked for
 9  administrators, and I think that there were four
10  that I was already looking at related to another
11  matter, and then, in addition, after I read those
12  four, I asked counsel if there were other ones
13  that would have information related to those
14  topics, and they provided me with additional
15  deposition from additional states.
16      Q.    And did they identify particular pages
17  that you should focus on?
18      A.    Related to the additional ones that were
19  provided, yes.
20      Q.    And that was just conveyed to you orally?
21      A.    No.  I asked for the pages that would
22  address issues of that nature, and not all of them
00087
 1  specifically addressed it, but it covered in most
 2  cases what I was concerned about.
 3      Q.    But how did you get the list of pages?
 4  Somebody sent you an e-mail or a letter?
 5      A.    No.  What I asked -- to expedite the
 6  process I did ask the attorneys just to -- to
 7  provide those pages for those depositions, so I
 8  kind of -- I did different processes at different
 9  times.  You know, Dubberly, who was my original
10  one, I -- you know, I did read soup to nuts more
11  so, although that was a while ago.
12            For some of the other ones related to
13  another case, you know, there's keywords.  There's
14  an index with certain keywords in depositions, so
15  I focus on keywords like "access" and
16  "dispensing," and then with the last group, it was
17  the -- counsel provided me, you know, basically
18  binder-clipped pages that were pertinent related
19  to those.
20            MR. LAVINE:  Can we mark this, please.
21            (Exhibit Young 007 marked.)
22            MR. TORBORG:  What are you looking for?
00088
 1            MR. LAVINE:  That's just my only copy of
 2  the --
 3            MR. TORBORG:  This is the thing we served
 4  yesterday?
 5            MR. LAVINE:  Yes.
 6            MR. TORBORG:  You can use my copy.
 7            MR. LAVINE:  Thank you.
 8            MR. BREEN:  Oh, I found it.
 9            MR. TORBORG:  All right.  Can I have my
10  copy back?
11            MR. BREEN:  Did you -- did you mark it?
12  Did you mark that?
13            MR. TORBORG:  Exhibit Young 7.
14            MR. LAVINE:  Yes, we marked it Exhibit
```

Page 32

Depo-Young-Steven-05-13-09

```
15  Young 007.
16  BY MR. LAVINE:
17      Q.   All right.  We just marked document 007 --
18  or Exhibit Young 007, a document entitled
19  "Objections and Responses to Plaintiff's Second
20  Rule 45 Subpoena to Abbott Laboratories, Expert
21  Steven J. Young."
22          Have you seen this document before?
00089
1      A.   No.  I know it was being prepared
2  yesterday.  I have not reviewed it yet.
3      Q.   And the materials identified in paragraphs
4  three, four, five and six, do you recognize that
5  listing?
6          MR. TORBORG:  You mean pages 3, 4, 5 and
7  6, is that what you're talking about?
8          MR. LAVINE:  Yeah.  What did I say?
9          MR. TORBORG:  I thought you said
10  paragraphs, but --
11          MR. LAVINE:  Pages 3 through 6.
12          THE WITNESS:  Yes, this is -- is the list.
13  I didn't go through it in all the detail, but this
14  is the list of the additional information that
15  I've looked at since the report related to this
16  matter.
17          MR. LAVINE:  And on that note, we need to
18  take a break.  The tape is running out.
19          THE VIDEOGRAPHER:  Going off the record at
20  11:14 a.m.
21             (Whereupon a recess was had.)
22          THE VIDEOGRAPHER:  Beginning of videotape
00090
1  number three.  We're back on the record at
2  11:33 a.m.
3  BY MR. LAVINE:
4      Q.   On the exhibit we just marked as Exhibit
5  Young 007 --
6      A.   Yes.
7      Q.   -- on page 4, there's a list of several
8  depositions.  You see that --
9      A.   Um-hmm.
10      Q.   -- starting with Benny Ridout and going
11  all the way down through James Parker.
12          Are those the depositions you were
13  describing earlier where you were provided only
14  with certain pages of the transcripts other than
15  the full transcript?
16      A.   Not all of them.  Let's see if I can
17  remember correctly.
18          Did a more full review of Sullivan,
19  Dubberly.  I'm not sure who Rhode Island was.
20          MR. TORBORG:  Did you review Rhode Island?
21          THE WITNESS:  Yes.
22          MR. TORBORG:  That's not on this list, is
00091
1  it?
2          I don't know the person.  You did that
3  one.
4          MS. GEISLER:  (Inaudible.)
5          THE REPORTER:  Sorry.
6          THE WITNESS:  Oh, yes.
7  BY MR. LAVINE:
8      Q.   Let me clarify.
```

Page 33

Depo-Young-Steven-05-13-09

```
 9              For example, the deposition of
10   Jerry Dubberly, are you saying this -- that's on
11   this list because the first time you ever looked
12   at that deposition was after you --
13       A.    No.
14       Q.    -- issued your report in this case?
15       A.    No.   That's why I'm a little bit confused
16   because I reviewed Dubberly before.   It should
17   have been on my initial list.
18              If it wasn't, I'd -- I'd have to go back
19   and look, but it should have been on my initial
20   list because I reviewed that as part of my
21   original report.
22       Q.    So this time around is it on here because
00092
 1   you received excerpts of that deposition?
 2       A.    You know, it may be because they're -- I
 3   know -- yes, because the ones with the excerpts
 4   had that.   I didn't actually look at the excerpts
 5   because I had already reviewed it, and I was
 6   running out of time yesterday, so I didn't -- yes,
 7   it was in the stack of the excerpt copy stack.   I
 8   did not review it however.   I reviewed that one
 9   previous to my report, so I did not do a second
10   review of portions of it.
11       Q.    So as you went through the stack, you saw
12   it was Mr. Dubberly --
13       A.    Correct, Dubberly.
14       Q.    -- and so you just --
15       A.    I said:
16              I already did that, thank God, and I
17   didn't have to review it again.
18       Q.    But this, this stack of documents you're
19   talking about, that's something that was provided
20   to you by counsel to help you prepare for the
21   deposition today?
22       A.    It was during our discussions yesterday,
00093
 1   yes, that we had talked about reviewing some
 2   additional depositions, and they provided it to me
 3   at that time.
 4       Q.    And -- and we're talking about excerpts of
 5   the depositions; right?
 6       A.    Yes, for those.
 7              The thing that I'm grappling with and I --
 8   you know, I can't remember the exact names of
 9   states.   I think there were three or maybe four
10   that I -- I think maybe three others other than
11   Dubberly that I had looked at related to my work,
12   starting my work in -- in the Alabama case, and
13   they were germane to this, so I thought, since I
14   had reviewed them, they had to be on here.   And
15   then, there were additional ones that were
16   brought -- provided to me yesterday, like Ridout,
17   I know was one, and Wells, McCain.   I'm not sure
18   who Louisiana was.   I think Dubberly is the only
19   one that's a repeat though of -- that shouldn't be
20   on here because I -- I'm almost positive that it
21   was on my original listing, and I did not review
22   it -- any additional review of that since my
00094
 1   initial report went in that -- yesterday.
 2       Q.    But the materials you got yesterday may
```

Page 34

Depo-Young-Steven-05-13-09
3  have been excerpts of the Dubberly deposition?
4      A.    It was.  Yes, it was.
5      Q.    Okay.  Out of the other materials listed
6  on pages 3 through 6, are they all materials that
7  were provided to you by counsel?
8      A.    No.  Some of them, and I can't remember
9  the genesis of each and every one, some of them
10 were materials that either came up during my work
11 with Ery, erythromycin, or Alabama that did
12 impact some of my analysis or was -- was germane
13 to what I had done, so it obviously has to be
14 something that I considered I thought for this
15 deposition also, and then other information was
16 provided to me by counsel yesterday.
17     Q.    Was that set of documents provided by
18 counsel, is that something that's identifiable?
19 You can make a copy of that for us?
20     A.    Yeah.  I believe that the information that
21 was provided to me yesterday I have in a stack, so
22 I could provide that.  It's not here with me.  I
00095
1  apologize, but we could provide that.
2      Q.    Who -- who gave that to you?
3      A.    It was David Torborg.
4           MR. LAVINE:  Dave, do you have a copy of
5  that you could provide to us?
6           MR. TORBORG:  Not in one place, but I'm
7  sure that I could.  I'm sure that I -- I'd have to
8  go -- some of the stuff, I'm frankly more familiar
9  with others, and I know that I had shared with him
10 yesterday, those I got yesterday, so I'll see if I
11 can get them again today and give them to you if
12 you'd like.
13          MR. LAVINE:  Yeah.  I'd like to get a
14 complete set of everything that you provided to
15 him to review.
16          MR. TORBORG:  I could do that.  That's
17 fine.
18          MR. BREEN:  How big of a stack are we
19 talking?
20          MR. TORBORG:  Well, do you want to do this
21 on the record?  I can go through here and tell you
22 which ones.
00096
1           MR. BREEN:  Speed it up.  I don't want to
2  interrupt whatever --
3           MR. TORBORG:  Yeah.  It's -- you know,
4  it's probably -- the stuff yesterday is probably
5  another six documents roughly is my guess, I mean,
6  five to six.
7           THE WITNESS:  Outside of the depositions.
8           MR. TORBORG:  I mean, there was some stuff
9  that was already -- he had already reviewed for
10 prior reports that was not given to him yesterday,
11 but it was considered since his original report,
12 okay?  I think that's what he said.
13          There is some additional things that I
14 provided that we looked at yesterday that I can
15 get you copies of so you can use them because I
16 understand you're not in your office, and I can
17 get them -- get them for you if you'd like.  Just
18 tell me which ones, I'll do it.
19          MR. LAVINE:  Right.  What I'm trying to
Page 35

Depo-Young-Steven-05-13-09
20  get to is just whatever materials you gave to him
21  to help him prepare for today's deposition,
22  whether it was yesterday or sometime over the past
00097
 1  couple of weeks or really any time after the
 2  rebuttal report, that kind of thing, which I
 3  assume is most of what's on this list.
 4            MR. TORBORG:  I don't believe it's the
 5  majority.
 6            MR. LAVINE:  Some of it would be Ery or
 7  Alabama related?
 8            MR. TORBORG:  That's correct.
 9            MS. GEISLER:  Most of what's on that list
10  is related to the work he's done in preparing for
11  Alabama and in preparing the erythromycin report.
12            MR. TORBORG:  To speed things up I can
13  tell you it was stuff at the end of the list that
14  we reviewed yesterday.  That's how it got there,
15  and it was at the end except for the rebuttal
16  reports, which he had already had.
17            MR. LAVINE:  What does "end of list" mean,
18  from where?
19            MR. TORBORG:  Page 5, starting at Abbott
20  Exhibit 657.
21            MR. LAVINE:  And then, but also when were
22  all the deposition experts -- excerpts provided?
00098
 1  That was a separate process?
 2            MR. TORBORG:  I think they're -- depends
 3  on which specific deposition you're talking about.
 4            MR. LAVINE:  Well, is that -- can you sort
 5  that out because it would be a lot easier to just
 6  have the documents instead of testing Mr. Young's
 7  memory on this.
 8            I mean, it's a fair request.  If you've
 9  provided excerpts of depos, then we should know
10  what it was if it's not the whole deposition.
11            MR. TORBORG:  So you -- are you requesting
12  that I give you copies of the excerpts I gave him?
13            MR. LAVINE:  Yes.  Or a list of what it
14  was because, I mean, to say it was the whole
15  deposition when it was something less than that
16  is -- is not helpful.
17            MR. TORBORG:  Is that something you'd be
18  willing to give me from your experts, any --
19  any -- the copies of transcripts in their
20  possession?
21            MR. LAVINE:  I don't think we -- well, I
22  don't -- I don't know.  You're --
00099
 1            And I don't want to start negotiating over
 2  it in the middle of this.
 3            MR. TORBORG:  I understand.
 4            MR. LAVINE:  My request that you provided
 5  specific excerpts of depositions rather than the
 6  whole deposition, so, you know, if -- if you don't
 7  want to do that, let's talk about it later, but --
 8  but that's part of what should be produced.
 9            MR. TORBORG:  I'll be honest with you.
10  If -- if you're willing to do it for your experts,
11  I'm willing to do it for mine, for this expert.
12            MR. LAVINE:  Right.  But, I mean, that's
13  not necessarily the way that this has to happen
                        Page 36

Depo-Young-Steven-05-13-09

14  and, you know, after having Professor Duggan sit
15  for four days of depositions, getting pushed back
16  and asking for a third day on some experts, it was
17  unexpected, so quid pro quo does not seem to be
18  working, but let's -- let's move on to the
19  deposition questions.  I'd rather make progress on
20  that.
21          MR. BREEN:  Just for the record, I think
22  as a -- I think, at least to the extent that I've
00100
1   been involved in this, I provide my excerpts to --
2   I'll give them for a dep to the expert.  At least
3   that's my standard operating procedure.  I can't
4   say it's been done throughout this case as I
5   haven't necessarily asked everybody, but that's
6   how I do it.  My office has been responsible for
7   most of the expert production in this case in
8   general for whatever it's worth.
9           MR. TORBORG:  I -- the reason I say it, I
10  can't, Jim, speak for every expert because I have
11  not been involved in every expert.
12          I know for Professor Duggan, who I was
13  involved with, he had a lot of deposition
14  transcripts on his list, and none of those
15  transcripts were produced, so that's why I bring
16  it up.
17          MR. LAVINE:  Production is not the issue
18  in and of itself.  It's because that's the most
19  efficient way of identifying which excerpts were
20  provided.  You want to give me a list, you know,
21  an itemized list of the excerpts, that would solve
22  it too.
00101
1           But, in general, when we provided things
2   to our experts, they went by e-mail and an
3   attachment or CD-ROM, and you've gotten copies,
4   you know, maybe not on every deposition if you're
5   saying that wasn't included in there, but...
6           MR. TORBORG:  I mean --
7           MR. LAVINE:  I don't think, you know,
8   again --
9           MR. TORBORG:  I don't want to argue about
10  it any more.
11          MR. LAVINE:  -- I don't want to speak for
12  every single thing we ever gave to our experts.
13          MR. TORBORG:  But my underlying concern is
14  that at least from what I've seen with Dr. Duggan
15  there's this huge consideration list that the
16  deposition established he did not even review most
17  of that stuff, and here you're asking for specific
18  excerpts of pages that he was given.  It doesn't
19  seem like it's fair play.  That's -- that's my
20  concern.
21          MR. LAVINE:  That's materials that were
22  provided specifically to prepare for a deposition.
00102
1   That's a little more specific than just general
2   preparation of the report.
3           Again, let's keep going in the deposition.
4   BY MR. LAVINE:
5       Q.  Now, with the -- with the set and the
6   materials that were provided by counsel, would
7   that help refresh your recollection as to which of
                          Page 37

Depo-Young-Steven-05-13-09

8   the items on Exhibit Young 007 were provided to
9   you by counsel as opposed to the ones you on your
10  own secured in connection with the Ery or Alabama
11  cases?
12      A.   You know, if we waited until break, I
13  could go back and -- and look specifically.  I
14  can't recall off the top of my head.
15      Q.   But having the actual documents would help
16  you figure that out, wouldn't it?
17      A.   I don't have the documents here though.
18      Q.   I'm saying if you had them --
19      A.   Right.
20      Q.   -- it would -- it would work; right?
21      A.   It may.  I think, you know, I am trying to
22  remember which ones.  I believe it was
00103
1   Massachusetts, Tennessee, Rhode Island.
2       Q.   What are you describing?
3       A.   I'm sorry.  I'm trying to think.  The ones
4   that I reviewed outside the context of this, I
5   believe that they were obviously Dubberly and then
6   Massachusetts, Tennessee and Rhode Island.  I'm
7   not certain that all of the rest of those were
8   excerpts, but I believe that most of them were.
9       Q.   So the specific depositions you can
10  recollect having read before you concluded the
11  preparation of your report in this case are
12  Georgia, Massachusetts, Tennessee and
13  Rhode Island?
14      A.   No, I'm sorry.  I read Dubberly in
15  preparation for this report.
16      Q.   In preparation for the report, not the --
17  not the deposition?
18      A.   Right, exactly.  And then I believe it
19  was -- well, that's difficult because there
20  were -- there were excerpts from pages from other
21  reports that I reviewed as part of Ery, so, that
22  are -- are subsumed within this list also, so.
00104
1       Q.   Is it fair to say without the actual
2   excerpts it's -- you're not able to separate out
3   one from the other at this point?
4       A.   Yes.  As far as identifying the specific
5   excerpts from yesterday.
6       Q.   Well, what about identifying which ones
7   you looked at prior to your report as compared to
8   the ones that you looked at for the first time
9   after your report?
10      A.   Dubberly was the one that I looked at
11  prior to my report.
12      Q.   But just Dubberly.
13      A.   Yes.
14      Q.   Have you reviewed the testimony of any
15  other expert retained by Abbott in this case?
16      A.   No, I have not.
17      Q.   You -- you didn't see the transcript of
18  the deposition last week of Dr. Hughes?
19      A.   No, I did not.
20      Q.   Was any of that testimony discussed in
21  preparation for your deposition today?
22      A.   No, not specifically, no.
00105
1       Q.   What about generally?

Page 38

Depo-Young-Steven-05-13-09

2      A.    You know, I -- I think that we discussed
3   that related to Hughes, it was kind of split, you
4   know, day and a half between you and a day and a
5   half between -- or I'm sorry -- and a half a day,
6   and I think that's about it.  I mean there was
7   no -- none of the substantive here's, you know,
8   the questions and things.  Oh, and -- and -- there
9   was some discussion that, you know, there -- there
10  was a focus on, you know, methodology and -- and
11  scientific basis or something of that nature, but
12  that's all I can recall.
13     Q.    Did counsel suggest to you that you become
14  familiar with the standards for calculating the
15  AMP under the Deficit Reduction Act of 2005?
16     A.    No.
17     Q.    Did you look at any of the exhibits to
18  Dr. Hughes' report?
19     A.    No.
20     Q.    Any discussions regarding any of the
21  exhibits to Dr. Hughes' report?
22     A.    Not specifically.  I did have a --
00106
1   Dr. Hughes and I were both in the office the day
2   the reports were submitted, and we had a brief,
3   probably 15-minute conversation.
4      Q.    That was a couple of months back when the
5   reports were actually --
6      A.    March.
7      Q.    Okay.
8      A.    The day the reports were submitted or --
9   or maybe the day before.  I'm not certain, but
10  yes.
11     Q.    But since the time of the deposition of
12  Dr. Hughes last week, did you have any discussions
13  or hear, you know, did anybody tell you anything
14  about questions that were asked of Dr. Hughes
15  regarding any of his exhibits to his report?
16     A.    No.
17     Q.    So did you have a face-to-face meeting
18  with counsel yesterday?
19     A.    That's correct.
20     Q.    Any other face-to-face meetings?
21     A.    Yes -- or I'm sorry.  Monday late
22  afternoon we met for a little while.
00107
1      Q.    With who?
2      A.    With Carol and David.
3      Q.    And how long did that last?
4      A.    The one Monday, 2 1/2 hours, and then
5   yesterday --
6      Q.    Also with Carol and David?
7      A.    Yes.  Maybe eight hours, maybe -- maybe
8   nine hours yesterday.
9      Q.    Any other type of telephone conferences of
10  a substantive nature you had to prepare for
11  today's deposition?
12     A.    No.
13     Q.    Did you ask anybody at Huron or -- sorry.
14  It wouldn't be Huron, it would be Healthscape to
15  do any additional analysis for you in preparation
16  for today's deposition?
17     A.    I had asked for a correction of Table 7.
18  I believe it was Table 7 that what I had -- I'm

Page 39

Depo-Young-Steven-05-13-09

19    sorry, Figure 7, and -- and that's it.
20        Q.    How did it come to your attention that
21    Figure 7 needed corrections?
22        A.    During the review process late yesterday
00108
1    afternoon, and then when we went back to our
2    office last night the title on the table gave me
3    some concern.  It related to the provider
4    reimbursed versus paid amount and as -- as a
5    result of that concern, I discovered the error.
6        Q.    You realized Figure 7 in the original
7    report was an example of what the United States
8    would calculate as the damages in this case;
9    right?
10        A.    I'm not going to speak for the
11    United States, so I will say that it was the
12    difference between -- for a given transaction,
13    what the reimbursement data indicated versus what
14    Dr. Duggan's but-for reimbursement analysis, yes.
15        Q.    And the -- the particular providers in the
16    original Figure 7 actually were able to purchase
17    the product for less than the what you discussed
18    was Dr. Duggan's but-for reimbursement; right?
19        A.    Well, you know, the reimbursement is the
20    sum of the dispensing fee and the price per unit,
21    so until you determine what the appropriate
22    dispensing fee is, I can't tell how much of that
00109
1    reimbursement would arguably related to -- to drug
2    cost.
3        Q.    Well, the title of the figure is
4    Underreimbursement to Providers.
5        Isn't it true that the two providers in
6    the original Figure 7 would not have been
7    underreimbursed?  The numbers in the total on
8    those charts would have been positive, not
9    negative, right?
10        A.    Those would be two different questions.
11        Q.    Sorry.  You're right.  Let me ask you the
12    second question.
13        Under Figure 7 there are two numbers
14    listed as differences in the original report, and
15    they're both in parentheses indicating negative
16    numbers, but if you had used the actual
17    acquisition cost of the two companies, those would
18    have been positive numbers; right?
19        A.    The difference that would be shown holding
20    the dispensing fee constant as Dr. Duggan has done
21    would be a small positive number, that's correct.
22        Q.    But that -- that's the way you did
00110
1    Figure 7.  You were following what Dr. Duggan had
2    done; right?
3        A.    No.  Well, you know, there are -- let me
4    see if I can say this clearly.
5        There are various errors in the
6    assumptions that Dr. Duggan applies.
7        This focuses on one aspect or one of the
8    specific errors, but the other errors would also
9    have an implication on the ultimate determination
10    of whether or not there was underreimbursement.  I
11    didn't have data available, and it was not
12    provided to me by Dr. Duggan to -- to quantify the

Page 40

Depo-Young-Steven-05-13-09
13   other inherent problems.
14      Q.    But Figure 7 was in your original report
15   to support a particular point you were making;
16   right?
17      A.    Yes.   And that point was that people could
18   not necessarily purchase the product for the
19   but-for purchase price that Dr. Duggan has
20   asserted.
21      Q.    But the structure of the sample in
22   Figure 7, instead of comparing the reimbursement
00111
1    using Professor Duggan's average plus 125 percent,
2    it used -- it compared it to the amount they were
3    reimbursed under the existing system; right?
4       A.    Yes.   And that was an error.
5       Q.    And you had intended to compare it to
6    their acquisition cost?
7       A.    For the price per unit, that is correct.
8       Q.    If you compared it to the acquisition cost
9    for the two companies in the original figure, your
10   example in Figure 7 would have actually shown that
11   they were able to purchase it for an amount less
12   than the number calculated by Dr. Duggan; right?
13      A.    As it relates to the purchase price?
14      Q.    As to the way you set up Figure 7.
15      A.    As it relates to the purchase price, they
16   were able to make a purchase at slightly less than
17   his but-for assumed prices.
18      Q.    So who did you ask to go pull the -- the
19   information needed to prepare the revised
20   Figure 7?
21      A.    Chris Rohn.
22      Q.    What did you ask him to do?
00112
1       A.    I -- well, based on my review, I
2    determined that the wording of the report was
3    inconsistent with the table and was not what I
4    intended with the table, so I reiterated that I
5    wanted to be able to identify a situation where
6    the provider paid amount was greater than the
7    but-for pricing assumed in his reimbursement
8    calculation to arrive at a negative reimbursement.
9           One thing I actually realized that I made
10   an error.   The -- the -- it is not necessarily
11   true that the provider was able to purchase it at
12   the purchase price that Dr. Duggan calculated, but
13   they would have been able to purchase it just the
14   base cost at less than his scaled number less the
15   appropriate discount that applied in that
16   situation, so, actually, my testimony was not
17   accurate.
18           They were not able to purchase it at his
19   assumed purchase price or his average that he
20   calculated, but at the end of the day, if you
21   isolate out just that piece of it and ignore the
22   issues with the stunting fee and other issues that
00113
1    may exist, you're correct that the difference
2    would be a positive number on that schedule.
3       Q.    So are you now saying that Memorial
4    Community Hospital pharmacy actually paid an
5    amount in excess of the price you have listed
6    there for Dr. Duggan's but-for reimbursement?
Page 41

Depo-Young-Steven-05-13-09

```
 7        A.    The -- you have to understand that when
 8   AWP is used, he calculates a purchase price and
 9   then factors it up by 25 percent.
10        What I'm saying is I believe it was for --
11   I don't have the old exhibit in front of me.
12   Excuse me.
13        So Springville -- Springville Pharmacy, I
14   believe -- and I would have to go because I do not
15   have the numbers in front of me, but I believe
16   that they purchased it at greater than the average
17   purchase price but less than the AWP.
18        Q.    And here when you're talking about AWP,
19   you're -- you're talking about when Dr. Duggan
20   calculated an average price and then scaled it up
21   as a 100 -- to 125 percent of that figure as the
22   basis for his damage calculations; right?
00114
 1        A.    Well, I think he refers to it as
 2   different -- difference calculations, but, yes,
 3   in -- in portions of his calculation that's what
 4   he did.
 5        Q.    So the point you're making is that
 6   Springville Pharmacy paid -- their acquisition
 7   cost was higher than the average but less than the
 8   average plus 25 percent?
 9        A.    That's correct.  I believe so.  I could
10   confirm that, but I believe so.
11        Q.    So when you -- now, you -- you spoke to
12   Mr. Rohn last night to do some updates on
13   Figure 7; is that right?
14        A.    That's correct.
15        Q.    And that was the first time you asked him
16   to -- to look into updating Figure 7; right?
17        A.    Last night, yes.
18        Q.    Okay.  Did you tell him that he should go
19   to the data for these two products and select a
20   customer at random to put into the corrected
21   Figure 7?
22        A.    That wasn't possible to do, and the one
00115
 1   thing that I probably underestimated when I tried
 2   to find an example of this was that there's only a
 3   limited number of claims files that actually have
 4   provider name, and it's not very easy trying to
 5   match up the provider name because there's not a
 6   universal kind of number that -- that's used for
 7   that between the two data sets.
 8        That combined with the fact that the vast
 9   majority of the sales are noncontract sales where
10   Abbott ultimately does not know the purchase
11   price, it was difficult finding transactions that
12   actually existed in the two data sets, so it was
13   not a random one, and I instructed him to find one
14   that was a specific example that would show a
15   negative at the bottom.
16        Q.    So it was hard to find an example of a
17   provider who actually had an acquisition cost in
18   excess of Professor Duggan's but-for price?
19        A.    It was --
20        MR. TORBORG:  Object to form.
21        THE WITNESS:  It was hard to find a
22   provider that showed up in both data sets.
00116
```

Page 42

Depo-Young-Steven-05-13-09
1  Period.
2  BY MR. LAVINE:
3     Q.   And if you had selected an example at
4  random, the odds are you never would have come
5  across one; right?
6           MR. TORBORG:  Object to form.
7           THE WITNESS:  Again, if we would have
8  selected one at random, they would not have
9  appeared in both data sets because of the
10 fundamental problem that the vast majority of the
11 sales are noncontract sales, and, therefore,
12 Abbott has no visibility as to who the ultimate
13 provider is.
14 BY MR. LAVINE:
15    Q.   Which -- which two data sets are you
16 referring to?
17    A.   The claims data versus the sales data.
18    Q.   So in the course of the -- the day and
19 a half of meetings you had Monday and Tuesday to
20 prepare for this case, were there any particular
21 areas in the report that you were asked to focus
22 on?
00117
1     A.   No.  I think it was a discussion
2  summarizing my opinions.  We walked through the
3  report.  We did -- you know, I had spent some time
4  kind of analyzing in even more detail some of the
5  information provided by Myers & Stauffer, and we
6  walked through some of that analysis.  We did, you
7  know, discuss the access and dispensing fee issue.
8           Mr. Torborg and I have not spent as much
9  time together as I have with Carol on this
10 specific matter, so I kind of explained a
11 little -- in a lot more detail, here's how the
12 healthcare industry works.  Here's how those
13 issues are dealt with, and -- and we talked a
14 little bit more about identifying -- you know,
15 further confirmation to what was in the Myers &
16 Stauffer information that I had read -- read in
17 discovery and with Dubberly.
18    Q.   So the most prominent items focused on
19 during the day and a half of preparation were the
20 access issues, the dispensing fee issues and the
21 related Myers & Stauffer issues.  Is that fair?
22           MR. TORBORG:  Object to form.
00118
1           THE WITNESS:  No.  We also -- you know, we
2  also did go through kind of a, you know,
3  page-by-page discussion of the report, and, you
4  know, I kind of explained to David a little bit
5  more detail behind -- you know, we talked about my
6  past experience and how it interrelates to the
7  opinions that I'm reaching and -- and things of
8  that nature.  So we did go through kind of a
9  page-by-page discussion of the report, so we
10 touched on most of the areas within the report to
11 some extent or another.
12 BY MR. LAVINE:
13    Q.   Did you talk about any way that your past
14 experience isn't a direct match to what you were
15 doing in this case?
16    A.   Is or is not?
17    Q.   Was not directly related to what work you
                        Page 43

Depo-Young-Steven-05-13-09
18  were undertaking in this case?
19      A.    I don't know about the term "directly,"
20  but what we were discussing was how it directly or
21  indirectly related to the subject matter of this
22  case.
00119
1       Q.    But weren't there areas that in your --
2   areas in the work you did in connection with this
3   expert report that don't correlate to work you had
4   done in previous experience?
5       A.    No, not really.
6       Q.    I thought earlier you had said you had
7   seen the rebuttal report from Dr. Duggan, but you
8   had only skimmed it; right?
9       A.    I -- yeah, I read through it.  So it
10  was -- I probably took 15, 20 minutes to read
11  through.  I'm a slow reader.
12      Q.    And aside from the -- the reading the
13  initial materials we talked about before, did
14  you -- you didn't do any actual quantitative
15  analysis in response to reading Dr. Duggan's
16  rebuttal report, did you?
17      A.    No.
18      Q.    Ask anyone to do any kind of quantitative
19  analysis?
20      A.    No.
21      Q.    You -- you just went back to look at some
22  additional materials in the access and dispensing
00120
1   fee issues that he mentioned in there?
2       A.    Yes.
3       Q.    Anything else?
4       A.    I mean, not that I can recall.  I'd have
5   to go through and -- and -- obviously, I was
6   preparing for the deposition and read through a
7   lot of stuff, so whether there were other pieces
8   that he was raising that I might -- might have
9   thought about when I was reviewing things, but
10  nothing that I can think of off the top of my
11  head.
12                  (Exhibit Young 008 marked.)
13  BY MR. LAVINE:
14      Q.    Just marked as Exhibit Young 008, a
15  document entitled "Notice of Deposition of
16  Steven J. Young, CPA, and Notice of Subpoena for
17  Production of Documents."  Have you seen this
18  document before?
19      A.    Yes, I have.
20      Q.    You're here today in response to this
21  document?
22      A.    That's correct.
00121
1       Q.    Did you do any -- can you look at the --
2   the last page I believe it is.
3             Did you do any additional work to identify
4   any of the documents listed as items A, B and C on
5   the last page of this exhibit?
6       A.    Additional work from what we did to
7   respond to the first subpoena?
8       Q.    Yes.
9       A.    Just the information that we pulled
10  together yesterday.
11      Q.    So after including those materials, you're
                         Page 44

Depo-Young-Steven-05-13-09

12  saying everything is complete.  All the -- all the
13  materials described here have been turned over
14  now?
15      A.    The one thing, and -- and I can get it for
16  tomorrow, but the -- the time sheets and billing
17  information for April and -- well, actually, I
18  don't think we can get the billing information.  I
19  can get my -- I believe I can get my time sheets
20  through yesterday also.  That I was going to try
21  to do, and I forgot to summarize what my time was
22  before I came up today.
00122
1       Q.    And we've discussed any documents that you
2   reviewed in preparation for the deposition today?
3       A.    Or --
4           MR. TORBORG:  Object to form.
5   BY MR. LAVINE:
6       Q.    Have we already discussed that?
7       A.    Or reviewed related to other reports that
8   could have been kind of considered by me and my
9   opinions in this matter, yes.
10      Q.    For that you're -- you said -- you're
11  talking about the Ery and Alabama things?
12      A.    That's correct.
13      Q.    Are there any other documents besides
14  those?
15      A.    That I considered, no, not that I'm aware
16  of.
17      Q.    Did you have separate counsel assist you
18  in responding to this subpoena?
19      A.    Excuse me?
20      Q.    Did you have any counsel other than
21  Jones Day assist you in responding to the subpoena
22  attached to Exhibit Young 008?
00123
1       A.    No, I did not.
2       Q.    Were there any drafts of the report you
3   prepared in this case?
4       A.    No, there were not.
5       Q.    Who was in charge of -- let me start over.
6           So the only version of the report is the
7   final version that was produced.
8       A.    That's correct.
9       Q.    Okay.  And how did that happen?
10      A.    Basically, the process that we go through
11  is that there are what we call zip drives, which
12  are small things you can plug in your computer.
13          The report is maintained on the zip drive.
14  So it was Chris or I are editing it.  We're
15  basically editing the version that's on the zip
16  drive, and then ultimately that zip drive version
17  is what is made into a printed document, signed
18  and -- and is created into a PDF to provide.
19      Q.    So you just kept the one master copy and
20  only made changes to that one master copy?
21      A.    That's correct.
22      Q.    Okay.  And -- and who else had access to
00124
1   make changes to that besides you and you said
2   Chris.  I assume you mean Mr. Rohn; right?
3       A.    That's correct.
4       Q.    Anybody else besides you and Mr. Rohn?
5       A.    I believe that at times we had it up on
Page 45

Depo-Young-Steven-05-13-09

6    the screen, and one of the staff,
7    Casey Bartolucci, would -- would type edits that
8    I -- I wanted to have made to it, but other than
9    that, I'm not aware of anybody making any edits to
10   it.
11       Q.    Casey a man or a woman?
12       A.    I'm sorry.  It's a -- it's a man, and he's
13   a senior consultant with our company.
14       Q.    Did Mr. Bartolucci have access to the
15   master copy on the zip drive when you or Mr. Rohn
16   were not there?
17       A.    I would not -- would not know that for
18   sure, but I doubt it because Chris was the one
19   that was supposed to hold on to the zip drive.
20       Q.    Was there a password to protect access?
21       A.    No, there was not.
22       Q.    Am I right there would be no document or
00125
1    evidence that would let us evaluate which of the
2    report -- which portion of the report may have
3    been worked on or written by Mr. Rohn as compared
4    to which portion was written by you?
5        A.    That's correct.
6        Q.    And did Mr. Rohn do the bulk of the
7    writing, and you did corrections to it?
8        A.    No.  I -- you know, Chris did do some work
9    to take things that we had written for previous
10   reports and -- and bring them in and try to -- you
11   know, one thing that -- that was an objective with
12   this report was to have a little bit more
13   simplified explanation and, you know, us nerdy
14   consultants can tend to get hung up in all the
15   details of things and -- and relish in that, but
16   that may not be the best way to communicate, so we
17   did do some things to kind of boil down things
18   that we -- explanations that -- of the industry
19   and stuff that we had in previous reports.  He
20   would take a first crack at that.
21             Related to the substantive issues, it
22   would be either me explaining, you know, how I
00126
1    wanted to do it.  He'd do it, and then I'd kind of
2    have to rewrite it, or basically me just writing
3    it myself as far as the -- the major points,
4    but...
5        Q.    But it sound like Mr. Rohn helped to build
6    the basic structure of the report.
7        A.    That's correct, and then I would have --
8    well, I came up with the structure I'd say, and
9    then I'd have to just kind of review it every time
10   that I'd ask him to do something, and he did it
11   to -- to make sure that it was, you know, in
12   accordance with my past experience and the
13   evidence that I've reviewed in this case.
14       Q.    So you'd review, edit and -- and/or
15   correct what he put together?
16       A.    And oftentimes kind of add to or clarify.
17   I mean, I think that it's -- it's a pretty
18   complicated industry, and Chris has not done as
19   many kind of quantifications of overpayments and
20   underpayments as I have, so it was, you know,
21   necessary for me to more fully explain things
22   in -- in the process.
                              Page 46

Depo-Young-Steven-05-13-09

00127
```
 1        Q.   Now, in previous circumstances where
 2  you've prepared expert reports for litigation,
 3  you've had attorneys actually help you with the
 4  typing; right?
 5        A.   I don't know if that's -- the attorneys
 6  have helped with the typing before.
 7             I can't recall.  I know that it -- not on
 8  this expert report, but I believe that all the
 9  typing, that our company did the typing.  I can't
10  tell.  I'm not certain with other reports.  I'm
11  trying to think back.
12             There may have been other cases where
13  drafts, you know, versions of drafts were not
14  there that we would have -- you know, or were not
15  discoverable that we may have done some of that.
16  But, again, it always gets down to I have to
17  review it and -- and then get it to be in
18  accordance with what I know to be the case and
19  based on my past experience what the correct
20  answer is.
21        Q.   You don't recall a previous situation
22  which one of the Jones Day attorneys played the
```
00128
```
 1  role of Casey Bartolucci, typing changes as you
 2  directed?
 3        A.   I can't specifically recall, but I do know
 4  that we have had occasion when we have sat in
 5  their offices before, and my eyes aren't that
 6  great, so I have to be a little closer to the
 7  screen and I -- I have dictated things before, so
 8  it's possible.  You're right.  I think that that
 9  could have happened on occasion.  I can't recall
10  the specific example, but yes, it's possible.
11        Q.   And did you in this case bring the zip
12  drive with you to wherever you were working on
13  this report?
14        A.   Whomever -- yes, whomever was working on
15  it at the time, either Chris or I, would have that
16  with us.  It's the only way you can make edits,
17  obviously.
18             Oh, you know, I should say, obviously, the
19  staff were doing analytics and everything to --
20  you know, before we even started drafting the
21  report and even while the report was going on, but
22  as it related to drafting the report, yes, that's
```
00129
```
 1  correct.
 2        Q.   What is the zip drive?  Is that one of
 3  those Iomega zips?
 4        A.   Actually, I think that for -- what he gave
 5  for that drive to get the drive off of his
 6  computer, it looks kind of like that.
 7        Q.   Something like that, might be described as
 8  a USB thumb drive?
 9        A.   Yes.
10        Q.   All right.
11        A.   Yes.
12        Q.   But did you ever bring that with you to
13  any of your meetings with Jones Day?
14        A.   Yes.
15        Q.   Okay.  And you made changes in the report
16  at that time?
```
Page 47

Depo-Young-Steven-05-13-09

```
17      A.    Yes.  We'd project it up on the screen
18 and -- and discuss it and -- and we would make
19 changes.  I -- I do think though that for this
20 report it was Chris and I that were doing the
21 typing, one of the two of us.
22      Q.    So what is your area of expertise that
00130
 1 you're drawing upon in connection with your
 2 opinions included in your report in this case?
 3      A.    Well, there's various areas of expertise.
 4 You know, it's kind of an accumulation of most
 5 everything that's in my CV as far as my past
 6 experience.
 7            You want me to kind of walk through each
 8 of those areas in -- in more detail or you want me
 9 to chronologically go through what all my past
10 experiences are?  What would be your preference?
11      Q.    Well, I -- I mean the question is to try
12 to identify the area of expertise that you brought
13 to bear upon the opinions you expressed in -- in
14 the report in this case.
15      A.    Well, I think, you know, there's various
16 areas.  You know, the most significant of which is
17 that, you know, I've kind of worked in both the
18 health plan and reimbursement realm and in the
19 pharmaceutical manufacturing realm.  Would be kind
20 of the first two major areas, you know, related to
21 health plans.
22            A lot of work that I do relates to claims
00131
 1 data analysis, claims processing systems,
 2 reimbursement processes and systems, interactions
 3 with the providers that the health plan will do,
 4 and then oftentimes, ultimately, what those
 5 projects entail will be some kind of review of the
 6 process to figure out if there was a breakdown in
 7 the process that caused either overpayments or
 8 underpayments and then some quantification if
 9 there are issues that exist of what those
10 overpayments or underpayments might be.  And
11 within that subsegment, there are all sorts of
12 things that you kind of have to know or you have
13 to understand how the enrollment process works,
14 how the provider contracting and provider relation
15 process works within -- within a health plan or a
16 payer, how the claims processing, obviously,
17 system works and how edits and audits work and --
18 and how claims processors deal with those things.
19 All sorts of aspects of -- of that whole process
20 of a patient going into a provider and ultimately
21 a third-party payer being responsible to cover all
22 or a portion of that.  So that's kind of one
00132
 1 general area that -- that relates to work-related
 2 health plans, reimbursement and quantification of
 3 claims data and claims data issues and over and
 4 underpayments.
 5            A -- a second kind of very broad area
 6 would be kind of the pricing work that I've done
 7 for pharmaceutical manufacturers.  Both in, you
 8 know, the genesis of the majority of that was the
 9 work that I did starting in the early '90s and
10 continuing up while I was at Huron, at least to
```

Page 48

Depo-Young-Steven-05-13-09

11  one extent or another, to do work related to the
12  various government calculations, whether it be the
13  non-FAMP under the VA, the --
14      Q.    I'm sorry to interrupt.  The what?
15      A.    Non-manufacturer -- or I'm sorry, the
16  non-FAMP, non-Federal Average Manufacturer Price,
17  which is a term in -- in the Veterans Healthcare
18  Act.
19          It's a calculation that is the starting
20  point for the determination of pricing for brand
21  of drugs under that.  So that -- there's a
22  separate body of calculations that have to be done
00133
1  related to the Medicaid Drug Rebate Act or
2  Medicaid Drug Rebate Program, both AMP
3  calculations, and for branded products, not
4  necessarily that germane here, but best price
5  determination for branded products.  ASP
6  calculations under Medicare and kind of the work
7  related to those calculations are very similar to
8  what you have to do to analyze the sales data for
9  this case.
10          You know, you have to, first of all,
11  understand how the distribution process works, how
12  the sales and marketing process works, differences
13  between branded and generic and how it's done in
14  the contracting effort.  Understanding the issue
15  of noncontract sales for, you know, for average
16  manufacturer price, there's some delineation of
17  kind of what the government views as the retail
18  class of trade versus what must be excluded from
19  the retail class of trade.  So a whole host of
20  issues related to that and kind of secondarily
21  related to the pharmaceutical industry.
22          You know, some of the, obviously, cases
00134
1  that I've done for Par have gotten into pretty
2  specific detail as to the whole process of sales
3  and distribution and contracting related to the
4  pharmaceutical or generics within the
5  pharmaceutical industry involved, you know,
6  discussions with the client, things of that
7  nature.
8          I think those are two of the bigger areas,
9  but kind of more globally, you know, they're
10  back -- my career really started, I did a couple
11  years of audit, but by probably '85, I started
12  doing government contracts work in general, some
13  of which related to healthcare, which became a
14  bigger percentage over time.  But there was a lot
15  of work that I've done historically related to
16  analyzing sales, pricing, discount, rebate,
17  catalog price information for all sorts of
18  industries related to the Federal Supply Schedule
19  GSA and the Federal Supply Schedule and associated
20  with those, a lot of stuff that I had to kind of
21  do on the claims processing side and on the -- the
22  pharmaceutical side.
00135
1          Since I was a CPA, a lot of what I did was
2  to calculate historic issues with either
3  noncompliance with federal contracting, you know,
4  either most favored customer pricing or cost-based

Page 49

Depo-Young-Steven-05-13-09

5   contracting principles or helping attorneys
6   through that process or on the reverse side, when
7   there was a change order quantifying how much more
8   the company should be paid because of that change
9   order.
10          And then also, that kind of evolved into
11  then the health plan related proposal preparation
12  work that you may have seen in my CV that relates
13  to understanding the Tri-Care program and working
14  with Medicare contractors, more on their
15  government contract side, understanding how their
16  operations work, understanding their medical
17  management programs, helping them quantify the
18  cost estimates for that, go through head count
19  reduction, determinations for their competitive
20  bidding process and really becoming kind of
21  intimate with their operations, to be able to
22  do -- to help them through the process of -- of
00136
1   preparing the proposal for the bid.
2          There may be more, but I think those are
3   the -- kind of the bigger areas that are
4   summarized in my CV.
5   Q.   Those are the areas where you're acting as
6   an expert in connection with the report in this
7   case?
8   A.   Those are the past experiences that
9   bear -- that -- that give me experience that is
10  helpful in reaching some of the opinions in this
11  case, yes.
12  Q.   So when you are at a cocktail party and
13  somebody asks you what you do, what do you tell
14  them?
15  A.   I do healthcare consulting.
16  Q.   And not -- the -- the accountant
17  background is really not something you brought too
18  bear in this case, is it?
19  A.   No.  I mean the reason why -- obviously,
20  the reason why I've had all those experiences is
21  everything that we do.  I shouldn't say
22  "everything."
00137
1          Most of what I've done over the course of
2   my career relates to quantification of historic
3   issues or projections of, you know, costs into the
4   future.  So most everything I do relates to
5   financial data, accounting analyses of the various
6   accounting records that are maintained related --
7   whether it's health plan reimbursement, whether
8   it's drug sales and distribution, whether it's,
9   you know, most favored customer pricing under the
10  GSA schedule, it all is basically kind of that
11  accounting side of things that -- that I look at.
12  I don't look at -- I don't do technical proposals
13  for healthcare.  I don't tell people how to do
14  medical management.  I help quantify the
15  implications of medical management, for example.
16  Q.   The -- your formal education background is
17  that you have a bachelor's degree in accounting;
18  right?
19  A.   That's correct.
20  Q.   From -- from Northern Illinois University?
21  A.   That's correct.

Page 50

Depo-Young-Steven-05-13-09
```
22      Q.    And you don't have any other degrees;
00138
 1  right?
 2      A.    No.
 3      Q.    Have you -- sorry.  Let me start over.  We
 4  have one minute left, so I'll keep this as a short
 5  question.
 6      A.    Okay.
 7      Q.    Have you taken any other formal
 8  postgraduate courses other than continuing
 9  professional education?
10      A.    Other than continuing professional
11  education, no.
12      Q.    Okay.  And you are a CPA in the State of
13  Illinois?
14      A.    That's correct.
15      Q.    And still active?
16      A.    That's correct.
17      Q.    In good standing?
18      A.    Yes.
19            MR. LAVINE:  We are down to a minute so I
20  might as well stop.
21            THE VIDEOGRAPHER:  Going off the record at
22  12:32 p.m.
00139
 1                  (Whereupon a recess was had.)
 2            THE VIDEOGRAPHER:  Beginning videotape
 3  nnumber four.  We're back on the record at
 4  1:37 p.m.
 5            MR. LAVINE:  David, do you want to just
 6  quickly clarify that you --
 7            MR. TORBORG:  Sure.
 8            MR. LAVINE:  -- provided amended
 9  objections?
10            MR. TORBORG:  Yeah.
11            During the lunch break, we had discovered
12  there were a couple of things that were not on the
13  consideration list -- not consideration list -- in
14  the bullet point list of the objections and
15  responses to the latest subpoena that were not on
16  the list that we needed to add because he did
17  review them, and then there were a couple of
18  things that -- that were not considered by him
19  that were on the list.  So I orally conveyed the
20  changes to Mr. Lavine and have served upon him by
21  hand an amended objections and responses as well
22  as provided him copies of documents that were
00140
 1  reviewed by Mr. Young in preparation for his
 2  deposition.
 3            MR. LAVINE:  And, of course, I have not
 4  reviewed what you produced.  We'll just deal with
 5  it separately afterwards.  You know, of course, we
 6  don't waive any -- any of our positions we might
 7  want to take in that respect.
 8  BY MR. LAVINE:
 9      Q.    I think we left off squeezing in some
10  questions about you are currently a CPA in the
11  State of Illinois in good standing, that's
12  correct; right?
13      A.    That's correct.
14      Q.    Okay.  Are you Certified -- are you a
15  Certified Fraud Examiner?
```

Depo-Young-Steven-05-13-09

```
16       A.    No, I am not.
17       Q.    Have you ever taken any courses in
18  economics?
19       A.    Other than my undergraduate degree, no.
20       Q.    And do you have any degree in economics or
21  econometrics?
22       A.    No.
00141
 1       Q.    And am I right the only publication that
 2  you've played a role in as an author, you're a
 3  coauthor with three other folks on an article
 4  regarding Medicare as a secondary payer?
 5       A.    That's correct.
 6       Q.    But no other publications besides that?
 7       A.    No.
 8       Q.    What is Chris Rohn's educational
 9  background?
10       A.    I don't know his undergraduate degree for
11  certain, but he has an undergraduate degree from
12  University of Indiana and an MBA from
13  Northwestern.
14       Q.    And would I be correct that you're not --
15  you would not be familiar with any postgraduate
16  courses or education he's taken or other
17  publications he's --
18       A.    Other than the MBA that I mentioned, no.
19       Q.    Is -- is there any other thing that you
20  can describe regarding Mr. Rohn's background that
21  informed or supported the expertise he was
22  utilizing and the support he provided you in
00142
 1  preparing the report in this case?
 2       A.    I mean to the extent that for a major
 3  portion of Chris's career he had worked within my
 4  groups with the exception of a period of time
 5  right after 2002 until maybe 2005 or maybe even
 6  four.  Much of his experiences are -- are similar
 7  to mine in that he's done government contract
 8  consulting, a lot of financial analysis,
 9  quantification of historic issues, healthcare
10  consulting, worked with health plans and -- and
11  been involved in various -- most of the litigation
12  matters that we've discussed earlier.  He's been
13  involved in with me and has, you know, industry
14  background in healthcare also.
15       Q.    Has he ever been the actual primary person
16  that was retained as an expert in any litigation
17  matter?
18       A.    He's never testified, not that I'm aware
19  of.
20       Q.    And he -- but so he's never been, you
21  know, the -- the lead person who -- who was
22  actually retained as a litigation expert to your
00143
 1  knowledge?
 2            MR. TORBORG:  Object to form.
 3            THE WITNESS:  He has been retained as a
 4  consulting expert in litigation matters as the
 5  primary person.
 6  BY MR. LAVINE:
 7       Q.    Consulting but not -- never progressed to
 8  the point of testifying expert?
 9       A.    That's correct.
```

Page 52

Depo-Young-Steven-05-13-09
```
10        Q.   Okay.  You -- you started at Huron in
11   2002; is that right?
12        A.   That's correct.
13        Q.   And before that, you were with
14   Arthur Andersen?
15        A.   Yes, that's correct.
16        Q.   And just very briefly, what were your --
17   what was your job at Arthur Andersen?
18        A.   When I left, I headed up the practice that
19   came over to Huron that focused in health plan and
20   pharmaceutical consulting and government contract
21   consulting.
22        Q.   So the whole group moved from
00144
 1   Arthur Andersen over to Huron?
 2        A.   For the most part, yes.
 3        Q.   And part of the work that you did at
 4   Arthur Andersen included work for other
 5   pharmaceutical companies; right?
 6        A.   That's correct.
 7        Q.   Including the -- the Boehringer Group?
 8        A.   Yes.
 9        Q.   Okay.  Boehringer Ingelheim, is that
10   their --
11        A.   Yes.
12        Q.   Okay.  And DiT, Inc.?
13        A.   That's correct.
14        Q.   And also for the Secor Group, for Genesee
15   & Secor?
16        A.   That's correct.
17        Q.   And at Huron, you've also done other work
18   for Schering-Plough; right?
19        A.   I'd have to look back.  I may have.
20        Q.   Well, let me -- let me try again.
21             Has -- has Huron Consulting done work for
22   Schering-Plough, but maybe not you personally?
00145
 1        A.   I believe that Huron Consulting has done
 2   work for Schering.
 3        Q.   But you can't think of any personal role
 4   you played in that?
 5        A.   No, not that I can think of.  Not that I
 6   can remember or recall.
 7        Q.   And, also, while you were at Huron, did
 8   you also do work for Bayer Laboratories?
 9        A.   The work was for a law firm, but the --
10   their ultimate client was Bayer, yes.
11        Q.   And, again, for Boehringer and DiT while
12   you were at Huron?
13        A.   That's correct.
14        Q.   Any other pharmaceutical companies that
15   you performed worked for at either Healthscape,
16   Huron or Andersen?
17        A.   Not Healthscape, that's for sure.  Let's
18   see.
19             In addition, I've done work for
20   GE Healthcare, which does have a pharmaceutical
21   unit, and Baxter.
22        Q.   And now the work you've done for these
00146
 1   other companies we have just discussed, none of
 2   that was related to AWP issues; is that right?
 3        A.   That's correct.
```
                         Page 53

Depo-Young-Steven-05-13-09

4      Q.    Have you ever done any work for any
5  pharmaceutical company regarding its role, if any,
6  in -- in reporting AWPs?
7      A.    No.
8      Q.    Have you provided any professional
9  services to a pharmaceutical company regarding the
10  anti-kickback statute before now?
11      A.    No.
12      Q.    Before you got involved in the AWP cases,
13  did you have any understanding as to how the AWP
14  was arrived at for any particular drug?
15      A.    Other than, you know, a general
16  understanding based on my past work that it was
17  normally 20 to 25 percent, calculated 20 to 25
18  percent above the WAC.
19      Q.    Are there any other connections, any --
20  any other relationship between Healthscape and
21  Abbott that we haven't discussed?
22      A.    No.
00147
1      Q.    Anything you can think of, any other
2  relationship between Huron Consulting and
3  Jones Day?
4      A.    Not that I know of, but Jones -- or Huron
5  has a large financial consulting, litigation
6  consulting turnaround practice, and -- and I'm
7  guessing that there are probably other engagements
8  that other people would do that Jones Day would be
9  involved with.
10      Q.    Do you know whether or not Jones Day
11  actually provided legal services to
12  Huron Consulting?
13      A.    I do not believe so, but I don't know that
14  for certain.
15      Q.    Are you aware of any situation in which a
16  court has found you qualified to be an expert on
17  any matter?
18      A.    Well, I mean in the AWP matter there was a
19  motion, obviously, to found -- find me not, and it
20  was denied, and my report was cited in the judge's
21  opinion, so.
22      Q.    Was that the motion to strike your -- your
00148
1  report or declaration?
2      A.    I think in general to -- to strike me as
3  an expert witness in the MDL was denied, yes.
4      Q.    Any other situation of that type where you
5  were qualified to testify as an expert?
6      A.    There --
7      Q.    Where a court has found you qualified?
8      A.    There's never been a situation when I've
9  been found not qualified, so...
10      Q.    But apart from the motion that you
11  referenced that was denied, has any court found
12  you qualified to be an expert on any matter?
13      A.    Well, the other time that I testified
14  there was no finding that I wasn't, and they
15  considered the information that I provided in the
16  ultimate decision.  Did they give me a piece of
17  paper saying that I was qualified?  No, and -- and
18  I have not received a -- a document from the court
19  saying "You've been found qualified."
20      Q.    Is it the arbitration case you're
                    Page 54

Depo-Young-Steven-05-13-09
```
21  referring to?
22       A.    No.  It was the Pentech matter.
00149
 1       Q.    And that -- is that one where you
 2  testified --
 3       A.    Yes.
 4       Q.    -- at trial?
 5       A.    Yes.  I believe it was the last item on
 6  that list.
 7       Q.    Have you ever actually been employed at a
 8  pharmaceutical company?
 9       A.    As an employee?
10       Q.    Yes.
11       A.    No.
12       Q.    Okay.  Have you ever been employed at a
13  health plan or health insurer?
14       A.    As an employee, no.
15       Q.    Have you ever been employed as -- at a
16  pharmacy of any type?
17       A.    As an employee, no.
18       Q.    Have -- have you ever been an employee of
19  the Medicare program or any state Medicaid
20  program?
21       A.    No.
22       Q.    Prior to your work in the AWP cases, had
00150
 1  you had any experience in readjudicating claims
 2  for drug reimbursement submitted to the Medicaid
 3  program for any state?
 4       A.    Related to readjudication of
 5  Medicaid-specific claims, no, I don't -- well, I
 6  believe that it depends on the definition of
 7  Medicare -- Medicaid.
 8            I believe that one of our clients that we
 9  do the Medicare coordination of benefits work for
10  is a managed care company that is a Medicaid
11  entity, and we would have done work for that
12  managed care company that obviously has a contract
13  with the Medicaid agency, not a fee-for-service
14  contract, but a managed care HMO-type contract.
15  Other than that, nothing specific that I can think
16  of.
17       Q.    And nothing like that for Medicare claims
18  or the Medicare program?
19       A.    To?
20       Q.    Take individual claims and process them?
21       A.    To -- to process them --
22            MR. TORBORG:  Object to form.
00151
 1            THE WITNESS:  To process them, usually you
 2  have a computer system that processes it.  I have
 3  prior to this work worked for a former Medicare
 4  carrier doing analysis of claims related to a
 5  matter that they had.
 6  BY MR. LAVINE:
 7       Q.    Did you actually have to take their claims
 8  data and readjudicate the claims to verify the
 9  results?
10            MR. TORBORG:  Object to form.
11            THE WITNESS:  It was not a full
12  readjudication.  It was an assessment of whether
13  the claim had a quantifiable mistake, and our
14  assessment of what the quantification of that
```
Page 55

Depo-Young-Steven-05-13-09

15    mistake might be.
16    BY MR. LAVINE:
17        Q.    Can you estimate approximately how many
18    claims you reviewed in connection with that
19    matter?
20        A.    I can't recall specifically, but it was
21    not a full claims data set analysis.  It was a
22    contemporaneously taking statistical sample over
00152
1    time that was involved.
2        Q.    Is that something you would consider a
3    typical sample?
4        A.    Not -- not necessarily within the context
5    that it was being used, no.
6        Q.    How about in terms of the size of the
7    sample?
8        A.    It -- it was -- it was -- it's a little
9    hard to answer that.  It's a little bit different
10    than the type of sample that you think of as
11    having a -- at one point in time having a
12    population of claims, and then selecting from that
13    population a statistically valid sample.
14            This was actually a sample that was drawn
15    over time to assess accuracy of claims payment as
16    a recurring process under a contract for a
17    several-year period of time that was done, looked
18    at, at some point in the future to assess
19    different issues.
20        Q.    Like a quality control process?
21        A.    Yes.
22        Q.    Can you just describe generally the basis
00153
1    for the selection?  Is it one out of every hundred
2    claims or one out of a thousand claims?
3        A.    I can't recall specifically, but it was a
4    stratified sample that was selected during the
5    time.  So there was certain claims over a specific
6    dollar amount were selected, and then a random
7    sample, I believe, of claims below that amount
8    would be selected as part of the process.
9        Q.    Would it be fair to say the sample size
10    was probably less than 1 percent of the total
11    claims?
12        A.    I would assume most statistically valid
13    random samples are so, yes, I would assume that it
14    was.
15        Q.    Have you ever calculated damages as an
16    expert in a case based upon the False Claims Act
17    where you came up with this part of your opinion
18    an actual damages figure?
19        A.    Various work that I have done relates to
20    overpayments and underpayments for the federal
21    government or -- or between a contractor and a
22    federal government or an entity and the federal
00154
1    government.
2            Whether or not those would be deemed to be
3    false claims is -- is something, (A), for the
4    lawyers to decide and, (B), never actually
5    resolved due to settlement of the matters, but
6    they usually came within the context of either
7    a -- the ones that you would be interested in,
8    either in the context of a voluntary disclosure, a
                           Page 56

Depo-Young-Steven-05-13-09

 9   government audit or investigation or the belief
10   based on subpoenas or otherwise that there may be
11   a sealed QUITAM suit involved.
12       Q.    Did any of those progress to actual
13   litigation?
14       A.    Let me think about that.
15             No, I believe that all of them that I'm
16   aware of reached settlement and were not litigated
17   at court -- in court.
18       Q.    Have -- have you ever been engaged to work
19   on a project where you had to use data from one
20   state's Medicaid program to extrapolate to data
21   from another state's Medicaid program?
22       A.    No.  Generally, based on my experience,
00155
 1   that's not the way claims overpayments and
 2   underpayments have been done before, and I've not
 3   done that, no.
 4       Q.    What were you hired to do in this case?
 5       A.    Well, my report provides a detailed
 6   description.  I could refer to that and -- and
 7   walk -- walk you through that if you'd like.
 8       Q.    Well, I saw that in paragraph 12 it says
 9   you've been asked to review, evaluate and comment
10   upon the analysis conducted by Dr. Duggan that led
11   to his $107.1 million difference calculation; is
12   that -- is that correct?
13       A.    Yes, that's -- I believe that's what...
14       Q.    And then in paragraph 13 it talks about
15   you've been asked to comment upon certain
16   assertions made in the United States' first
17   amended complaint.  Is that accurate as well?
18       A.    Yes.
19       Q.    So in a broad sense, those two paragraphs
20   describe what you've been retained to do in this
21   case?
22       A.    Generally, yes.
00156
 1       Q.    So are there -- are you able to describe
 2   the primary categories in which your opinions fall
 3   that you expressed in your expert report?
 4       A.    Yes, I am, and probably be easier if I
 5   walked through the summary of opinions in my
 6   report.
 7       Q.    Sure.  If it would be easier for you, go
 8   ahead.
 9       A.    I know that would probably be easier.
10       Q.    Just want to try to see --
11       A.    Right.
12       Q.    -- if you would group them together in any
13   particular way.
14       A.    Yes.  You know, I think the first category
15   of opinions lists some of the primary concerns
16   that I have related to Dr. Duggan's approach.
17             You know, I think the first is the
18   extrapolation issue from two perspectives, his
19   underlying process and approaches related to
20   the -- the ten states that he did look at.
21       Q.    So it's the process of the selection of
22   the base population that he examined in detail?
00157
 1       A.    That along with how he actually did the
 2   analysis that --
                    Page 57

Depo-Young-Steven-05-13-09
```
 3    Q.    But that -- that's part of the --
 4    A.    -- were led to those states.
 5    Q.    Sorry.  That's -- that's part of number
 6   one?
 7    A.    Yes.  That would be included within that,
 8   and then he basically -- the second side of it is
 9   that he, in essence, extrapolated that out to an
10   unknown population that varied widely based on the
11   information available from his source population
12   and across populations and time periods, so it's
13   kind of that extrapolation -- broad extrapolation
14   type issue.
15         Related to his Medicare calculation, he
16   does not actually appear to calculate a difference
17   related to claims for Abbott's products.  He
18   broadly applies it to all claims that may fall
19   within a code that an Abbott product would fall
20   into.
21         Then related to his calculated prices, I
22   have various issues related to both the fact that
00158
 1   he looked at a very small segment of the -- the
 2   retail population that related to contracts and
 3   ignored the much larger noncontract segment of the
 4   retail sales population, and, also, did appear to
 5   do no real variability testing within the
 6   population, at least adequate assessment of
 7   variation from high to low within a given category
 8   on a transactional basis.
 9    Q.    I'm sorry.  There you're describing --
10   you're still describing the analysis of the Abbott
11   transactions?
12    A.    The calculated prices based on Abbott
13   transactions, yes, that's correct.
14         And then when you move on into the
15   fundamental analysis of the drug reimbursement, he
16   does not look at the dispensing fee aspect of that
17   in the interrelationship between the two, which is
18   essential in determining the adequacy of the
19   payment, and then, in addition to that, you know,
20   there's -- there's going to -- various other kind
21   of calculation errors and certain other
22   assumptions that he's made that probably aren't
00159
 1   quite the headline level but are detailed later on
 2   in the report.
 3         And then I was also asked to look at
 4   certain -- as -- as you alluded to, certain other
 5   things related to the allegations as far as, you
 6   know, other available sources of products, kind of
 7   the context of the spread more on a per-claim-unit
 8   basis type thing, analysis of certain unit sales
 9   that I was asked to do, and then the number of
10   annual price changes that were submitted by
11   Abbott.
12         I guess the one thing that I would
13   probably add to that -- sorry for that after the
14   long break -- but to be able to set all of that
15   up, I felt that it was necessary to kind of give a
16   little bit of background about Abbott's products
17   and the industry and how reimbursement works and
18   things of that nature.
19         Those aren't necessarily opinions related
```
Page 58

Depo-Young-Steven-05-13-09

20    to Dr. Duggan's analysis but more background
21    information that I felt necessary to understand
22    some of the critiques that I have of that.
00160
 1         Q.    So you're talking about the -- the
 2    beginning of the report where you lay out some
 3    context for the opinions you express later?
 4         A.    That's correct.
 5         Q.    And you did that without actually reading
 6    any deposition of any Abbott employee; right?
 7         A.    No, I did not review any deposition of
 8    Abbott employees.  I -- I did not specifically
 9    related to this case, but historically had a
10    meeting with Mr. Sellers of Abbott and discussed
11    particularly a lot of the background information
12    that you see within the report about, you know,
13    how they distributed products in the unique
14    aspects of hospital products and IV solutions and
15    things of that nature.  So I did not review any
16    depositions, but I did have that discussion, which
17    I considered in this process.
18         Q.    So you've interviewed Michael Sellers?
19         A.    Yes.
20         Q.    When did that happen?
21         A.    I think it was maybe a couple years ago.
22         Q.    Was that recorded in any fashion?
00161
 1         A.    No, it was not.
 2         Q.    Did you take any notes during that
 3    meeting?
 4         A.    No, I did not.
 5         Q.    How long did the meeting last?
 6         A.    I think I got there right before or after
 7    lunch, most of the afternoon, so maybe -- it was a
 8    while ago, but it may -- might have been four or
 9    five hours.
10         Q.    Why didn't you take any notes?
11         A.    Generally speaking, when I'm working on
12    litigation matters, I don't take notes.
13         Q.    So what part of your report, if any, was
14    based upon the information you learned from
15    Mr. Sellers?
16         A.    Well, it's somewhat difficult sometimes to
17    parse out information that's inside your brain
18    because, obviously, a lot of these things I've
19    touched on aspects of it elsewhere, but some of
20    the more unique aspects of it was understanding
21    better kind of IV solutions and -- and hospital
22    products in -- in the context.
00162
 1              A lot of the work that I had done
 2    historically was more in the retail setting of
 3    things and -- and traditional
 4    physician-administered drugs as opposed to
 5    hospital products and IV solutions and things of
 6    that nature.  So there's a lot of discussion
 7    around that, you know, how the products are
 8    distributed, how historically that process at
 9    Abbott has evolved from a direct to an indirect
10    process.  Some of the unique considerations
11    that -- that they have to trying to compare and
12    contrast that to a more traditional kind of
13    self-administered drug setting, which is, you

Page 59

Depo-Young-Steven-05-13-09

14   know, another aspect of Abbott's products, which
15   are unrelated to this, so a comparing and
16   contrasting of that process, understanding in
17   general kind of what their -- you know, their
18   process with customers are, how they interact with
19   customers, how they, you know, contract with
20   customers, how their noncontract sales function,
21   so a lot of background focusing, I think,
22   primarily on the more unique aspects of some of
00163
1   the IV solution and the pricing and contracting
2   related to that.
3       Q.   Did Mr. -- did Mr. Sellers tell you
4   anything about the manner in which Abbott set its
5   list prices?
6       A.   No, we did not discuss that.
7       Q.   So are there any particular pieces of your
8   opinions in your report that rely upon information
9   conveyed to you by Mr. Sellers?
10          MR. TORBORG:   Objection, asked and
11   answered.
12          THE WITNESS:   Again, you know, if -- if
13   you look at the areas that I talked about before,
14   I applied those -- I think that you have to have
15   that fundamental understanding to reach many of
16   the conclusions that I have, at least as it
17   relates to the pricing information side and the
18   sales side of Abbott.
19          It was less formative related to some of
20   the claims and -- and reimbursement-type issues
21   with the exception of understanding the unique
22   aspects of IV solutions in that it really does
00164
1   fall within a unique category within kind of the
2   normal reimbursement process, so I think that
3   practically speaking that information along with a
4   lot of other information from my past experience
5   and information I gathered in this case is kind of
6   interwoven through, and I can't necessarily parse
7   it out into each opinion that it would have
8   affected.
9   BY MR. LAVINE:
10          Q.   But the only information you directly got
11   from the mouth of any Abbott employee was a single
12   four- to five-hour meeting with Michael Sellers a
13   couple of years ago where you didn't take any
14   notes; is that right?
15          A.   I believe so.   The only other thing might
16   have been at -- at some point related to other
17   calculations I probably looked at.
18          I think they had some data people that did
19   have a deposition, and not in preparation for this
20   specific case, but there may have been -- again,
21   trying to parse out what you may have thought
22   about in your mind, there might have been
00165
1   something from that, but that's the only thing I
2   can think of.
3       Q.   And did -- did counsel for Abbott ever
4   tell you that hundreds of depositions of Abbott
5   employees have been taken in this case?
6       A.   Related to the opinions that I reached --
7   the conclusion and opinions I reached in my
Page 60

Depo-Young-Steven-05-13-09
8    report, I didn't think it was necessary to review
9    Abbott depositions.  I thought I had enough
10   information from Mr. Sellers to understand the
11   background that I needed to reach my conclusions.
12       Q.   Okay.  Is it right then, you're not really
13   expressing any opinion as to Abbott's conduct?
14       A.   Yes, I believe that I'm not reaching any
15   opinion as to Abbott's conduct.
16       Q.   Yeah.  At trial, we wouldn't hear you
17   articulate an opinion regarding whether or not
18   Abbott's practices were typical of other
19   pharmaceutical companies, anything along those
20   lines?
21            MR. TORBORG:  Object to form.
22            MR. LAVINE:  Yeah.
00166
1            THE WITNESS:  Not that I can think of
2    right now.  I mean, obviously, if -- if there
3    are -- I'm going to have to be able to comment on
4    Dr. Duggan's calculation, and, you know, to the
5    extent that I would need to talk about their sales
6    information or their practices to be able to do
7    that, that would be the only area, you know,
8    that -- that would impact that.
9    BY MR. LAVINE:
10       Q.   So but there won't -- you're not
11   expressing an opinion as to the propriety or
12   legality of Abbott's conduct in this case; right?
13       A.   Definitely not legality, no.
14       Q.   Well, what about propriety?
15       A.   You know, I'd probably have to be asked a
16   specific question as to -- I mean, there could be
17   a, you know, situation where somebody had asked --
18   would ask me at trial whether -- I don't know if I
19   would say that.  I probably would not conclude
20   that it's proper or improper, but whether
21   something was consistent with what I've seen
22   elsewhere.  If that question came up, I would
00167
1    probably be able to answer it based on my past
2    experience, but I -- as -- as a main opinion
3    related to this case, this report contains, unless
4    Dr. Duggan introduces something new, what those
5    opinions are.
6        Q.   So would it be fair to say right now you
7    can't identify any particular aspect of Abbott's
8    conduct which informed your opinion in this case?
9        A.   Yes.  I guess I'm not exactly clear about
10   conduct, but I can't think of anything about their
11   conduct that would have formed the basis of my
12   opinions or required to reach the conclusions that
13   I've reached.
14       Q.   Well, for example, you're not expressing
15   an opinion on whether Abbott was marketing the
16   spread?
17       A.   I'm not reaching an opinion on that.
18       Q.   And no opinion on the factors that went
19   into the list prices that Abbott established for
20   its products?
21       A.   You mean regarding how they established
22   their list prices, no, there wouldn't be anything
00168
1    about that.
                         Page 61

Depo-Young-Steven-05-13-09
```
 2      Q.    And you're not offering any opinion about
 3   whether Abbott may have gained or lost market
 4   share as a result of any of the issues related to
 5   this case, are you?
 6      A.    No.
 7      Q.    And no opinion as to whether any
 8   particular customer of Abbott may have gained or
 9   lost market share as a result of any of the issues
10   in this case?
11      A.    No.
12      Q.    And you haven't read the expert reports
13   prepared by Dr. Marmor or Dr. Perry, have you?
14      A.    No.
15      Q.    So you won't be expressing any opinions
16   about what was contained in those two reports.
17      A.    No.
18      Q.    Have you seen any of the reports prepared
19   by any of the other Abbott experts, Dr. Helms?
20      A.    No.
21      Q.    Dr. Rossiter?
22      A.    No.
00169
 1      Q.    Mr. Montanez?
 2      A.    No.
 3      Q.    I think you said you had not seen
 4   Dr. Hughes' report either?
 5      A.    No.
 6      Q.    And I don't remember, is -- is it Mr. or
 7   Dr. Rossiter?
 8           MS. GEISLER:   It's -- I think it's Dr.
 9           MR. TORBORG:   I think it's Dr., correct.
10   I think it's Dr. Montanez too.
11           MR. LAVINE:   Oh, is it?
12           MR. TORBORG:   Yeah.
13   BY MR. LAVINE:
14      Q.    You haven't seen a report by Dr. Rossiter,
15   have you?
16      A.    No.
17      Q.    Okay.   Now, did you review any of the
18   state reimbursement methodologies that were
19   prepared by Myers & Stauffer in connection with
20   this case?
21      A.    Yes.
22      Q.    Okay.   Have you identified any particular
00170
 1   dispute as to the accuracy of the descriptions
 2   contained in those Myers & Stauffer reports?
 3      A.    There's been -- there were a few things
 4   that came to my attention, but I have not done an
 5   exhaustive analysis as to the completeness or
 6   accuracy of those summaries.
 7      Q.    Will you be expressing any opinion about
 8   the accuracy of those summaries?
 9      A.    I think only as it would relate to the
10   opinions that I already -- you know, if it entered
11   into somehow the opinions that I've already
12   entered in -- or stated in my report regarding the
13   extrapolation process and the implications of the
14   variability to the extrapolation process.
15      Q.    But there's no particular flaw you've
16   identified in Professor Duggan's report that was
17   the result of some inaccuracy in any of the
18   Myers & Stauffer statement and knowledge
```
Page 62

Depo-Young-Steven-05-13-09

19  summaries; right?
20      A.    I think that -- that -- yes.   Dr. Duggan's
21  failings would have occurred even if the errors
22  didn't exist, that's correct.
00171
1       Q.    So I think that was -- we were in
2   agreement that none of their -- the -- none of
3   your opinions in the report are based upon some
4   inaccuracy that you've identified in a Myers &
5   Stauffer state reimbursement summary.
6          MR. TORBORG:   Objection to form.
7          THE WITNESS:   That's correct.   They may
8   increase the number that -- that I would conclude
9   if there were, you know, other points of
10  variability that they missed in the process, but,
11  since Dr. Duggan didn't recognize the variability
12  that Myers & Stauffer did identify, I don't
13  believe that it would have impacted his
14  conclusions had they included additional
15  information.
16  BY MR. LAVINE:
17      Q.    So your opinion wouldn't be any different
18  whether the Myers & Stauffer reports corrected any
19  of the inaccuracies you say that were noted in
20  there?
21      A.    The summary level opinions wouldn't be --
22  if I had to go and if I had -- did have to explain
00172
1   every single instance or example of why my
2   concerns and criticisms exist, there might be a
3   few more, but they would be very small in number
4   in relationship to the ones I already know about
5   from Myers & Stauffer.
6       Q.    So to make sure your criticism is accurate
7   based on what you've described in connection with
8   the Myers & Stauffer report, you'd want to make
9   sure it was based upon what you would want to
10  correct in those reports?
11      A.    Yes.   But it -- it would be -- I think to
12  shortcut the process, it would be a small impact
13  in -- in relationship to the overall information
14  that's already available through Myers &
15  Stauffer's summaries.
16      Q.    And you don't -- you don't have any
17  dispute that the state Medicaid data that was used
18  by Professor Duggan is, in fact, data that came
19  from the states and does, in fact, represent
20  Medicaid claims reimbursement data?
21         MS. GEISLER:   Object to form.
22         THE WITNESS:   Only a -- well, only a
00173
1   subset was claims data.
2   BY MR. LAVINE:
3       Q.    I'm -- I'm sorry.   What -- what are you
4   referring to?
5       A.    In other words, various data sets were
6   used.   Actual claims data, SMURF, SDUD, all those
7   other -- the claims data is the only actual claims
8   reimbursement data.   The other data sets are not
9   claims reimbursement data.
10      Q.    Well, let me -- let me clarify.
11         The state Medicaid data, setting aside the
12  SDUD or SMURF max data, the data that's identified

Depo-Young-Steven-05-13-09

13  as having been produced by the states, you don't
14  dispute that, in fact, that came from the states,
15  do you?
16      A.    To the best of my knowledge, I believe it
17  came from the states, yes.
18      Q.    And I mean you haven't identified any
19  issue that maybe that's not actually the state
20  data, have you?
21      A.    No.  I haven't identified any issue.
22  Whether it's a complete set of the state data, I
00174
1   wouldn't -- I don't know.  You know, it appears
2   that there was probably things taken out, but
3   it -- the data that we did receive probably was
4   the state data was provided by the state.
5       Q.    And then same thing with respect to the --
6   the SDUD, S-D-U-D --
7           THE REPORTER:   S-D-U-D?
8           MR. LAVINE:   D.
9           THE REPORTER:   D.
10  BY MR. LAVINE:
11      Q.    -- and SMURF max data, I mean you --
12  there's no dispute that what was identified by
13  Dr. Duggan as SDUD and SMURF max data was, in
14  fact, the SDUD and SMURF max data, was there?
15      A.    No.  I don't know of anything that would
16  indicate that it was not the SDUD and SMURF max
17  data.
18      Q.    And do you agree that that data is data
19  that's obtained by CMS from the states and
20  reflects data that the states generated as part of
21  their Medicaid claims processing systems?
22      A.    I don't know all of the processes that
00175
1   they go through that, but that's a general
2   description of my understanding, yes.
3       Q.    And do you have any disagreement with
4   Professor Duggan with regards to his description
5   of how the durable medical equipment regional
6   carriers and the other Medicare carriers
7   determined the allowed amounts to be paid under
8   the Medicare program?  Just the process I'm asking
9   about.
10          MR. TORBORG:   Object to form.
11          THE WITNESS:   The -- I'm sorry.   Could you
12  repeat the question?
13  BY MR. LAVINE:
14      Q.    Do you have any disagreements with
15  Professor Duggan's description of how the Medicare
16  carriers determined the allowed amounts under the
17  Medicare program?
18          MR. TORBORG:   Object to form.
19          THE WITNESS:   Yeah.   His description of
20  how they calculate the Medicare allowed amount, I
21  think in general terms that it's a median of
22  what -- of some of the NDCs that are identified,
00176
1   yes, that would be my understanding also.
2   BY MR. LAVINE:
3       Q.    And you -- you don't have any dispute
4   about the arrays that were identified by Myers &
5   Stauffer and then used by Dr. Duggan?
6           Were the actual arrays used by the
                        Page 64

Depo-Young-Steven-05-13-09

```
 7   carriers of the DMERCs in determining the allowed
 8   amounts?
 9        A.    I don't know that for certain, and I don't
10   know how those specific ones were selected, but I
11   don't know of anything that would indicate that
12   the ones that were selected are not actual arrays.
13        Q.    So -- all right.  I think we are agreeing.
14              You would not have an opinion one way or
15   another regarding the -- that the arrays that were
16   used by Myers & Stauffer and Dr. Duggan were
17   arrays that came from the carriers?
18        A.    There's nothing I know of that would
19   dispute that.
20        Q.    And with respect to the Medicare claims
21   data, you haven't had -- you don't have any
22   dispute with the idea that that data actually came
00177
 1   from CMS and contains the actual claims data that
 2   were generated by the carriers and the -- the
 3   durable medical equipment regional carriers?
 4        A.    No, I had no indication that there's a
 5   problem with that.
 6        Q.    In the course of your report when you
 7   refer to AWP, what do you -- what is the meaning
 8   that you're utilizing?
 9        A.    An amount that's published in the
10   compendia.
11        Q.    What -- what is your understanding of what
12   the United States is alleging in this case?
13              MR. TORBORG:  Object to form.
14              THE WITNESS:  I don't know if I can get
15   into all the nuances of it, but basically it would
16   probably be easier -- I mean, I was obviously
17   focused more on what Dr. Duggan did, and I can
18   go -- go through that, but I don't think that's
19   the question you have.  So the -- so the
20   allegations, I guess as I understand them are that
21   the government contends that the published list
22   prices by Abbott should have been an average
00178
 1   calculation and that as a result of that they
 2   believe that they would have paid less related to
 3   reimbursements.
 4   BY MR. LAVINE:
 5        Q.    And you're familiar, I guess, with the
 6   products upon which the United States is suing?
 7        A.    Yes, I am.
 8        Q.    Those are the ones that are identified in
 9   the complaint?
10        A.    That's correct.
11        Q.    Do you still have Exhibit 007 with you?
12        A.    Yes.
13        Q.    Now, last night you asked Mr. Rohn --
14        A.    You're referring to Figure 7; correct?
15        Q.    I'm sorry, Figure 7.
16              MR. TORBORG:  Did you mark that as an
17   exhibit?
18              MR. LAVINE:  Now, I called -- we -- we
19   haven't.  Why don't we do that.
20              Will you mark that, please.
21              MR. TORBORG:  So this will be Exhibit
22   Young 009; is that right?
00179
```

Page 65

Depo-Young-Steven-05-13-09
1          MR. LAVINE:  Yeah.  Why don't we mark this
2    at the same time.
3          THE REPORTER:  Okay.
4                (Exhibit Young 009 marked.)
5                (Exhibit Young 010 marked.)
6    BY MR. LAVINE:
7      Q.    We just marked as Exhibit Young 009, a
8    one-page document entitled "Figure 7" and Exhibit
9    Young 010 is a four-page -- five-page document,
10   and the front page is entitled "Figure 7," the
11   upper right-hand corner states "Draft."
12         Now, am I correct Exhibit Young 009 is the
13   corrected version of Figure 7 that you asked
14   Mr. Rohn to prepare for you last night?
15     A.    That's correct.
16     Q.    And can you identify Exhibit Young 010?
17     A.    It is the original Figure 7 with certain
18   additional support attached to it.
19     Q.    In Exhibit Young 010, the support that's
20   attached, are those materials that Mr. Rohn
21   prepared?
22     A.    Mr. Rohn and the staff.
00180
1      Q.    Have you ever seen them before today?
2      A.    Yes.
3      Q.    So is it Mr. Rohn though that actually
4    prepared the version of Figure 7 that was in your
5    final report filed in this case?
6      A.    With the support of staff, but, yes, he
7    was the one that put it together.
8      Q.    Okay.  Did you give him any particular
9    instructions as to what you wanted him to do in
10   connection with Figure 7?
11     A.    Yes, I did, and -- well, yes.
12     Q.    What did you tell him?
13     A.    Basically, I thought that it would be
14   informative to come up with a specific example
15   that isolated one of the issues related to
16   Dr. Duggan's analysis and to identify a situation
17   in which the provider paid more than Dr. Duggan's
18   benchmark with any adjustments to come up with the
19   reimbursement assuming you did hold -- assuming if
20   dispensing fee was held constant to isolate out
21   that one issue.
22     Q.    So -- so you were trying to show that --
00181
1    look at the price that Professor Duggan came up
2    when -- when his methodology, it's actually lower
3    than the actual acquisition cost for some of these
4    Abbott customers?
5      A.    The price for the product that he came up
6    with, right, from the sales data was lower than
7    the sales price to aid the specific provider in
8    that category.
9      Q.    And now in Exhibit Young 009, you are of
10   the opinion you corrected the flaw from your
11   original Figure 7; right?
12     A.    Yes, I believe I have.
13     Q.    And then, if we look at the first example
14   under Phillips Drug Store?
15     A.    Um-hmm.
16     Q.    This is a 1000 ML product; right?
17     A.    Um-hmm.
                                    Page 66

Depo-Young-Steven-05-13-09

```
18          THE REPORTER:  I -- I do need a "yes" or
19  "no," sir.
20          THE WITNESS:  I'm sorry.  Yes.
21  BY MR. LAVINE:
22     Q.   Right.  We see under units it says a
00182
 1  thousand?
 2     A.   Yes.
 3     Q.   So that means the -- according to the
 4  numbers you have here, the provider, Phillips Drug
 5  Store was actually purchasing this one-liter bag
 6  of sodium chloride for $8.12; right?
 7          MR. TORBORG:  Object to form.
 8  BY MR. LAVINE:
 9     Q.   Well, it wasn't paying 8/100 of a penny --
10     A.   Right.  Right.  No.  Yeah.  No.  I --
11     Q.   -- or even 1/1000 of a penny --
12     A.   I'm just doing the math.  I'm just doing
13  the math.
14     Q.   Okay.
15     A.   Sorry.  Yes.
16          MR. TORBORG:  Well, I withdraw my
17  objection.
18          THE WITNESS:  Yes, I believe it was.
19          MR. TORBORG:  Took me a second to catch
20  up, so.
21          THE WITNESS:  I was just doing the math,
22  yes.
00183
 1  BY MR. LAVINE:
 2     Q.   So it's a thousand units.  If we move the
 3  decimal over three points --
 4     A.   Right.
 5     Q.   -- it's $8.12, and you're saying
 6  Dr. Duggan's reimbursement price in his
 7  methodology was $1.46 for that same bag?
 8     A.   Yes, that's my understanding.
 9     Q.   So reimbursement under Dr. Duggan's
10  approach would be based on this $1.46 price for
11  this Drug Store that actually paid $8 for that
12  same bag of product; right?
13     A.   Under Dr. Duggan's approach, yes.
14     Q.   Now, the underlying data that supports
15  that $8 price, you never looked at it, did you?
16     A.   I did not look at the specific
17  transaction, no.
18     Q.   You just relied on what Mr. Rohn gave you.
19     A.   That's correct.
20     Q.   Same -- same thing is true with respect to
21  the first version of Figure 7, it was incorrect;
22  right?
00184
 1     A.   That's correct.
 2     Q.   Okay.  Now, this $8.12 price, if we went
 3  back and looked at the purchases by Phillips Drug
 4  Store, you know, we would see if they bought 24 of
 5  those, they would have paid 24 times $8.12, right,
 6  something like that?
 7     A.   24 1000-liter bags, yes, that would be my
 8  understanding, yes.
 9     Q.   And this is $8?
10     A.   Right.
11     Q.   Per bag?
```

Page 67

Depo-Young-Steven-05-13-09

12      A.    Per bag, yes.
13            MR. LAVINE:   We have two minutes left.
14  Let's just stop right here.
15            THE VIDEOGRAPHER:   Going off the record at
16  2:33 p.m.
17                   (Whereupon a recess was had.)
18            THE VIDEOGRAPHER:   Beginning videotape
19  number five.   We are back on the record at
20  2:45 p.m.
21  BY MR. LAVINE:
22      Q.    Now, back to Exhibit Young 010, the
00185
 1  transaction number one on Exhibit Young 010 is an
 2  example related to Memorial Community Hospital
 3  Pharmacy; right?
 4      A.    Yes.
 5      Q.    And the NDC on that one is 00074-7101-13;
 6  right?
 7      A.    That is correct.
 8      Q.    And transaction number 2 on Exhibit Young
 9  010 relates to Springfield Pharmacy; right?
10      A.    That's correct.
11      Q.    And the NDC is 00074-7922-03; right?
12      A.    That's correct.
13      Q.    Now, on the revised Figure 7, Exhibit
14  Young 009, is two completely different companies
15  and two completely different NDCs than the ones on
16  the original Figure 7; right?
17      A.    That's correct.
18      Q.    Now, is that because the two companies on
19  the original Figure 10 actually were acquiring the
20  products for prices less than Dr. Duggan's
21  but-for reimbursement price?
22            MR. TORBORG:   Object to form.
00186
 1            THE WITNESS:   The -- I'm not certain
 2  whether over their entire history the numbers
 3  always would have ended up being a positive on the
 4  table.   The difference would have always been
 5  positive on the table.   I know that for the two
 6  transactions that were cited it would result in a
 7  positive number at the bottom of the table.
 8  BY MR. LAVINE:
 9      Q.    So both of the companies listed here -- so
10  Figure 7 is wrong, first of all, because the two
11  companies that were selected for Figure 7 actually
12  were purchasing the product for less than
13  Dr. Duggan's price?
14      A.    After grossing it up for the -- the
15  25 percent, yes.
16      Q.    Right.   Well, that's what you put on the
17  chart, right, Dr. Duggan's but-for reimbursement?
18      A.    Right.
19      Q.    And then Figure 7 is also wrong because
20  you're comparing Dr. Duggan's but-for
21  reimbursement not to the actual cost to these two
22  providers, but you're comparing it to the
00187
 1  reimbursement under the existing methodology based
 2  on AWP; right?
 3      A.    That's correct, it's based on the
 4  provider -- the per unit was based on the provider
 5  reimbursement amount.
                            Page 68

Depo-Young-Steven-05-13-09
```
 6      Q.    And so now on the revised Figure 7 you've
 7   had to switch to completely new Abbott customers;
 8   right?
 9      A.    That's correct.
10      Q.    And you've also had to switch to
11   completely new drugs from what were on the
12   original Figure 7?
13      A.    That's correct.
14      Q.    Now, did you ask Mr. Rohn to find examples
15   related to the same drugs?
16      A.    No, I did not.
17      Q.    Okay.  So you just said:
18            Go out and find any -- any other example
19   that should have been what we put in Figure 7 to
20   begin with?
21      A.    That's correct.
22      Q.    And so Exhibit Young 009 is what he came
00188
 1   back with?
 2      A.    That's correct.
 3      Q.    Now, on Exhibit Young 009 under the date
 4   of service, there's what looks to be in
 5   superscript 1B and then 2B, do you see that?
 6      A.    Yes, I do.
 7      Q.    What does that mean?
 8      A.    In -- in looking at the support binder
 9   from the previous one, I would assume that -- but
10   I don't know this for certain -- that this may
11   have been the support copy, and they didn't delete
12   out the 1B and the 2B to make a table that would
13   just be dropped into the report.
14      Q.    Okay.  So you're referring to page 2 of
15   Exhibit Young 010, which has similar notations?
16      A.    I believe so, yes.  That's what I'm
17   referring to, yes.
18      Q.    Well, can you explain that to me?  On
19   page 2 of Exhibit Young 010, it shows a date of
20   service in the box under Figure 7 of December 21,
21   '98 and June 14th of 2001 -- oh, I'm sorry.  Let
22   me -- let me take another look at this.
00189
 1            On the second page of Exhibit Young 010
 2   underneath the actual chart, there's under the
 3   item one, date, A is a date of sale.  Is that
 4   shown anywhere on the chart?
 5      A.    No, it is not.
 6      Q.    But that would have been -- well, you
 7   didn't actually look at this, so you -- you don't
 8   know what that is; right?
 9      A.    That would have been the -- I actually did
10   look at this at the time, and it -- it would
11   relate to the date of sale for the transaction
12   that should have been dropped in, but then for
13   some reason they dropped in the reimbursement
14   amount as opposed to the sale amount, and I am not
15   certain whether we've replicated this support
16   package for the new exhibit yet or not.
17      Q.    But for the original Figure 7 you flagged
18   a particular date of sale, which I -- are you
19   saying that would have been the date on which that
20   customer purchased it from Abbott Laboratories;
21   right?
22      A.    I believe it was the closest sale date to
```
Page 69

Depo-Young-Steven-05-13-09

00190
1    the date of reimbursement before the date of
2    reimbursement.
3         Q.    So you would have looked at the date of
4    service, not reimbursement, date of service;
5    right?
6         A.    Date of service, I'm sorry.
7         Q.    And then looked to the next prior purchase
8    of that same product by that customer?
9         A.    That's my understanding, yes.
10        Q.    And then just match those up?
11        A.    That's correct.
12        Q.    And as far as you know, that's the same
13   process that was followed in the new Exhibit 007?
14        A.    That's correct.
15        Q.    Now, if we looked up the actual prices at
16   which Phillips Drug Store was purchasing
17   NDC 000784-7138-09 --
18             THE REPORTER:   I'm sorry.  Can you say
19   that one more time?
20             MR. LAVINE:   Sorry.
21   BY MR. LAVINE:
22        Q.    -- 74-7138-09 in the transaction data for
00191
1    Abbott and found that their actual cost of
2    purchasing this product in the year 2000 was $1.02
3    and not $8.12.
4             That would mean this revised Figure 7
5    would be completely wrong also; right?
6         A.    I'm sorry.  What was the date that you
7    provided?
8         Q.    Dates of service for the year 2000 prior
9    to August 28th, 2000.  Dates of purchase.  I'm
10   sorry.
11             So if we looked up the average price at
12   which Phillips Drug Store was purchasing this
13   product prior to August 28th of 2000 and the
14   average actually turned out to be $1.02, your
15   revised Figure 7 would be completely wrong also;
16   right?
17             MR. TORBORG:   Object to form.
18             THE WITNESS:   We would -- I don't think
19   we'd ever pick an average.  We would pick an
20   actual transaction, so I would have to look at the
21   transaction detail.
22   BY MR. LAVINE:
00192
1         Q.    Well, if they were buying a case of 12 for
2    a total of $12.24, what would be their cost per
3    unit?
4             MR. TORBORG:   Object to form.
5             THE WITNESS:   I can't do that math in my
6    head.
7    BY MR. LAVINE:
8         Q.    Can I offer you a pencil and some paper?
9             Yeah.  I didn't mean to make it a math
10   test for you.
11        A.    Okay.
12        Q.    It's $12.24 to purchase 12 units.  Let me
13   ask it this way:
14             If you looked up in the transaction data
15   and the extended price was $12.24 and the quantity
16   was 12, to get the price per unit you would just
Page 70

Depo-Young-Steven-05-13-09

17   divide $12.24 by 12; right?
18        MR. TORBORG:  Object to form.
19        THE WITNESS:  You know, frankly, I would
20   probably have to look at claims detail just to --
21   or I'm sorry -- the transaction detail at this
22   point, so, because part of it is I don't know what
00193
1   transactions are out there for this drug, and --
2   and it is a complicated process to sometimes
3   translate the units of measure properly, and if
4   there was a mistake, we would clearly correct it,
5   so I would have to ask that I would be able to go
6   back and look at the transaction detail to
7   understand it better because I haven't reviewed
8   all the transaction detail as it relates to this
9   prior to coming in here today.
10   BY MR. LAVINE:
11        Q.   You just let Mr. Rohn handle that; right?
12        A.   Yes, that's correct.
13        Q.   And you didn't even get the backup sequel
14   coding that was used for the new version of
15   Figure 7, did you?
16        A.   At the late time that I identified this
17   issue, no, I did not receive that.
18        Q.   Is that something you could contact
19   Mr. Rohn about right now and get an answer on
20   that?
21        MR. TORBORG:  Object.  Answer on what?
22        MR. LAVINE:  Well, on whether Phillips
00194
1   Drug Store was actually paying $8.12 per unit for
2   that NDC in the year 2000 or whether it was
3   actually $1.02.
4        MR. TORBORG:  Object to form.
5   BY MR. LAVINE:
6        Q.   Can you -- can you -- could you -- you'd
7   have to call Mr. Rohn and ask him to -- to look
8   that up for you; right?
9        A.   I would -- and -- and given the fact that
10   I recognize that we probably tried to put this
11   thing together quickly to be prepared for today, I
12   would prefer to be able to look at it this
13   evening, and, if you'd like, we could talk about
14   it tomorrow morning because, again, I don't want
15   to waste our time.
16        If there's a mistake, I definitely want to
17   correct the mistake, and I will correct the
18   mistake, but I don't want to make another mistake
19   in the process of trying to correct the mistake,
20   so if I could have time this evening, I could look
21   into this, and if it's incorrect, we will correct
22   it.
00195
1        Q.   Okay.  So I mean clearly just something
2   you can't address right now?
3        A.   Not while I'm sitting here, no.
4        Q.   Just so that tomorrow we're able to finish
5   this process, can we make sure that you have all
6   the information you need to address any of the
7   other figures in the report as well?
8        MR. TORBORG:  If you would give him what
9   you're reading, it might help.  You're -- you seem
10   to be reading some sort of sales data.  You're
Page 71

Depo-Young-Steven-05-13-09
```
11  asking him questions about it without showing it
12  to him.  If you want him to be prepared to address
13  what you're talking about, then you should print
14  that out, identify it, explain what it is, give it
15  to him so he can assess it.
16          MR. LAVINE:  Well, remember, this is
17  something you sprung on us this morning.
18          MR. TORBORG:  Fair enough.
19          MR. LAVINE:  It's not like we took a lot
20  of time to prepare for this --
21          MR. TORBORG:  I have --
22          MR. LAVINE:  -- and have some exhibits
00196
 1  ready.
 2          MR. TORBORG:  Pardon.  I have no criticism
 3  what you're doing whatsoever.  I'm just saying if
 4  you want him to come here ready to talk about that
 5  tomorrow, give him what you're looking at so he
 6  can look at it.
 7          MR. LAVINE:  Let's discuss that later.  I
 8  think --
 9          MR. BREEN:  Just from my --
10          MR. LAVINE:  -- Mr. Rohn should be the one
11  to provide him the source for his answers.
12          MR. BREEN:  Just from my perspective, I
13  mean, it's his -- his expert report.  I'll be
14  asking questions tomorrow about anything in his
15  report where I'm going to assume that he's, you
16  know, understanding and has command of the backup
17  information, so if we have to get anything here
18  for him to give a complete deposition tonight,
19  such as his backup data or whatever it is, I think
20  we ought to do it.  Otherwise, we can't ask him
21  questions.
22  BY MR. LAVINE:
00197
 1      Q.    Well, let's move on.
 2            Again, on Exhibit Young 009, why are you
 3  comparing the two numbers that you find in the
 4  totals there?
 5            For example, on Phillips Drug Store under
 6  totals you show 6.19 as compared to $13?
 7      A.    Basically, what it would be demonstrating
 8  is -- and I believe the paragraph right before the
 9  table isolates just one of the many issues related
10  to Dr. Duggan's calculation, and this is merely
11  illustrative to give an example of isolating this
12  specific issue.
13      Q.    Okay.  Well, let me try to focus in a
14  little bit more.
15            Why are you adding the dispensing fee to
16  those totals?
17      A.    Because in every case any time -- Dr.
18  Duggan never calculated a difference that I'm
19  aware of that did not include the dispensing fee,
20  and this is really just trying to replicate his
21  process with only one issue specifically looked
22  at.
00198
 1      Q.    But on the provider paid amount, you're
 2  mixing apples and oranges, aren't you?  You're
 3  showing their cost per unit, and you're comparing
 4  it to their charges that they get reimbursed for
```
Page 72

Depo-Young-Steven-05-13-09

5    as a dispensing fee.   You're combining a cost and
6    a charge and comparing it to the reimbursement
7    that would have been paid under Dr. Duggan's
8    methodology; right?
9              MR. TORBORG:   Object to form.
10             THE WITNESS:   I don't know that this is a
11   charge.   This would be just merely replicating and
12   carrying down the unit and dispensing fee that
13   Dr. Duggan used.   This is not meant to be a -- the
14   charge from a provider.
15   BY MR. LAVINE:
16      Q.   Well, the first row, Dr. Duggan's
17   reimbursement would be that the reimbursement on
18   that product, I presume you would multiply the
19   price per unit times the 1,000 to get a price of
20   $1.46, take 90 percent of that and add it to the
21   dispensing fee; is that correct?
22      A.   That's what Dr. Duggan did, that's
00199
1    correct.
2       Q.   Well, is that what you did here in this
3    chart?
4       A.   I'd have to go through the math and -- and
5    whether the $1.46 is net of the 10 percent or not,
6    I'm not certain, but, yes, in essence, what you're
7    saying is correct.
8             We would take it down to what his but-for
9    reimbursement would be using his calculation
10   methodology.   That was the intent was to replicate
11   that.
12      Q.   But when you say "you'd have to do the
13   math," that means you don't really know what you
14   did in this figure, do -- right?
15             MR. TORBORG:   Object to form.
16             THE WITNESS:   Yes, I do know that what we
17   did in this form was to replicate the total
18   reimbursement amount that Dr. Duggan arrived at.
19   BY MR. LAVINE:
20      Q.   Well, was it done accurately?
21      A.   Yes, it was done accurately.
22      Q.   So under Dr. Duggan's world the
00200
1    reimbursement would have been $1.46 less
2    10 percent, less the dispensing fee; right?
3       A.   Less the dispensing fee.
4       Q.   Under your -- under your example for a
5    total of $6.19?
6       A.   Plus the dispensing fee, correct.
7       Q.   So what is the point of taking the actual
8    acquisition cost of Phillips Drug Store and
9    running that price through the reimbursement
10   methodology and adding a dispensing fee to the
11   cost?
12      A.   The purpose is to replicate every aspect
13   of Dr. Duggan's calculation except for the
14   per unit price and compare the two.
15      Q.   And so what does that show us?
16      A.   That basically even if one were to accept
17   the incorrect premise that the dispensing fee is
18   held constant, that in this case the provider
19   would end up negative.
20      Q.   And what does it mean that they'd end up
21   negative?

Page 73

Depo-Young-Steven-05-13-09
```
 22      A.    That this plus what they lost on the
00201
  1  dispensing fee would be what they lost on this
  2  transaction.
  3      Q.    Well, this isn't addressing anything
  4  related to the -- what you just called the loss on
  5  the dispensing fee, is it?
  6      A.    It's not, but I want to make sure it's
  7  clear that it's not.
  8      Q.    But the point of this was to isolate that
  9  one issue related to the ingredient cost; right?
 10          MR. TORBORG:  Objection, asked and
 11  answered.
 12          THE WITNESS:  Yes, to isolate that one
 13  issue and -- and not take into account the other
 14  issue related to dispensing fee.
 15  BY MR. LAVINE:
 16      Q.    So what does that $13 represent?
 17      A.    That represents the price paid by the
 18  provider plus the allowed dispensing fee.
 19      Q.    And what does that have to do with any
 20  reimbursement methodology utilized by any state
 21  Medicaid program?
 22      A.    I'm not necessarily saying that it does,
00202
  1  but it was my understanding that what Dr. Duggan
  2  was attempting to calculate was the price paid by
  3  the provider plus the state dispensing fee.
  4      Q.    Is that as much justification as you can
  5  offer as to the point of showing that $13 there?
  6      A.    Yes.
  7      Q.    Nothing else you can add to that?
  8      A.    I think that was a fair description of it,
  9  yes.
 10      Q.    Okay.  Of course, in order to find this
 11  particular example, you had to have Mr. Rohn
 12  search through the data and -- and cherrypick one
 13  particular example of a provider who may have paid
 14  a price that exceeded Dr. Duggan's but-for
 15  reimbursement; right?
 16          MR. TORBORG:  Object to form.
 17          THE WITNESS:  I don't think that I would
 18  refer to it as cherrypicking.
 19          We identified an example for illustrative
 20  purposes and, obviously, that was a very -- it was
 21  difficult to do because the vast majority of the
 22  sales transactions are noncontract sales so Abbott
00203
  1  does not have any visibility as to what the -- the
  2  pharmacy would ultimately pay for that.
  3  BY MR. LAVINE:
  4      Q.    But there were $28 million worth of sales
  5  at a minimum that you agree with Dr. Duggan should
  6  have been part of this analysis; right?
  7          MR. TORBORG:  Object to form.
  8          THE WITNESS:  That was $28 million worth
  9  of sales to all pharmacies across the country and
 10  not related to the few states where not only did
 11  we have claims data, but we had claims data that
 12  included provider name and that there was an
 13  actual match of the provider name between the two
 14  given -- obviously, you can understand there would
 15  be naming conventions, differences between a sales
```
Page 74

Depo-Young-Steven-05-13-09
16    data set and a claims data set.
17    BY MR. LAVINE:
18         Q.   Well, is this example supposed to give us
19    an understanding of the situation that exists with
20    the general population of Abbott customers?
21         A.   Given the fact that the majority of the
22    retail class of trade in relationship to the small
00204
 1    piece that Dr. Duggan looked at is through
 2    noncontract sales, it would be impossible to -- to
 3    give any general conclusions because Abbott does
 4    not know who the ultimate retail buyer of the
 5    product is.
 6         Q.   So you were not able to evaluate whether
 7    or not the example you used to prove your point
 8    was an outlier?
 9         A.   This was merely illustrative in nature.
10         Q.   So it may have been an outlier?
11         A.   Anything is possible.
12         Q.   So you think the use of an outlier is an
13    appropriate way to make a point about the
14    propriety of the reimbursement amount selected by
15    Dr. Duggan for reimbursement under the Medicare
16    and Medicaid programs?
17         A.   The purpose of this was to establish the
18    fact that it was possible for a provider to be
19    paid less -- or to pay more than what Dr. Duggan
20    is asserting that the provider is paying.
21              Whether it's an outlier or not, I don't
22    know, because Abbott does not have the data, and
00205
 1    Dr. Duggan does not have the data to determine
 2    that.
 3         Q.   So you have not even made an attempt to
 4    figure out if this example you used is an outlier
 5    or not?
 6              MR. TORBORG:   Object to form.
 7              THE WITNESS:   It would be impossible to
 8    determine that based on the data available.
 9    BY MR. LAVINE:
10         Q.   Well, you never went to any of the
11    noncontract distributors to ask them that, did
12    you?
13         A.   No, I did not go to any of the noncontract
14    distributors to ask them that.
15         Q.   Okay.  But your -- $1.5 million worth of
16    analysis in this case, and you can't tell us
17    whether or not the example you used is an outlier
18    or illustrative of a typical claim?
19         A.   The data necessary to do that was not
20    included in the discovery in this case.
21         Q.   And you didn't ask for it either?
22         A.   I can't recall that I asked for wholesaler
00206
 1    data, no, and I would add that Dr. Duggan did not
 2    ask for the data necessary -- as far as I know at
 3    least, he did not analyze the data necessary to
 4    assess noncontract sales.
 5         Q.   Well, you're the one who's saying that
 6    data prices that were invisible to Abbott
 7    should -- should somehow be relevant to assessing
 8    the damages to be paid by Abbott in this case;
 9    right?
                              Page 75

Depo-Young-Steven-05-13-09

10      A.     No.   What I'm saying is that if Dr. Duggan
11  intends to -- to calculate an average price that
12  pharmacies pay for the product, he would have to
13  consider that, and he failed to.
14      Q.     But you can't tell us whether this is one
15  provider out of a million that might end up paying
16  these prices, can you?
17      A.     Again, since Dr. Duggan didn't analyze the
18  vast majority of the transactions, he didn't do
19  it, and I can't critique it.
20      Q.     And you really believe that there's
21  substantial portions of the noncontract providers
22  that are paying this type of price.
00207
1       A.     Yes.
2       Q.     Okay.   But despite working on this case
3   for a year and spending $1.5 million, you didn't
4   go out and actually verify that point; right?
5       A.     I was limited to the data that was
6   available in discovery, and it wasn't available in
7   discovery, and, you know, the -- based on my past
8   experience, I'm relatively confident that people
9   that sign a contract with the company get better
10  pricing than people that don't sign a contract
11  with the company, but since they didn't sign a
12  contract there is no visibility that I'm aware of
13  that a manufacturer would ever have into that
14  data, so, and neither does the state other than to
15  go to the people that purchased the product or
16  people that sell the product, which would be the
17  wholesaler or the provider that they're paying the
18  money to.
19      Q.     Who was it at Abbott Laboratories that you
20  asked regarding whether or not they had any
21  visibility on contract prices?
22      A.     I discussed it with Mr. Sellers and on --
00208
1   on every other engagement that I've worked on that
2   dealt with manufacturing sales data, and the
3   government regulations related to that make it
4   clear.
5       Q.     Anything else you relied upon besides your
6   conversation with Mr. Sellers?
7       A.     And the extensive data analysis I've done
8   throughout my career and the Medicaid Rebate Act
9   regulations.
10      Q.     I'm sorry.   Let me -- let me narrow it
11  down to --
12          MR. TORBORG:   Why don't you let him finish
13  his response, then you can narrow it.
14          THE WITNESS:   Those are the three primary
15  areas that I can think of as I'm sitting here
16  right now.
17  BY MR. LAVINE:
18      Q.     I'm sorry.   Can you -- Mr. Sellers and
19  then what else?
20      A.     The extensive work that I've done doing
21  pricing calculations for pharmaceutical
22  manufacturers and the specific guidance
00209
1   surrounding the Medicaid Rebate Act both pre and
2   post DRA.
3       Q.     So based on extensive work in other cases,
Page 76

Depo-Young-Steven-05-13-09

4    you've become aware of the prices at which
5    noncontract sales are made.  Even though they're
6    invisible to Abbott you learned what those prices
7    were in other cases.
8            MR. TORBORG:  Object to form.
9            THE WITNESS:  I believe that you misstated
10   what I said.
11           What I said was that Abbott and any other
12   manufacturer has no visibility to that, and that's
13   what I've learned both on my discussions with
14   Mr. Sellers, my work with other manufacturers and
15   the guidance regarding the Medicaid Drug Rebate
16   Program, both pre and post DRA.
17   BY MR. LAVINE:
18     Q.    And any information that a drug company
19   might have -- be able to acquire from IMS wouldn't
20   change that analysis?
21     A.    At the transaction level, no, it would
22   not, that I'm aware of, change that.
00210
1      Q.    So Abbott just has no idea whatsoever what
2    those resale prices are in noncontract customers;
3    right?
4      A.    Yeah.  On a customer-by-customer,
5    transaction-by-transaction basis, I'm not aware of
6    anything that they would have, no.
7      Q.    And so that brings us back to the point
8    where this one example that you flagged you think
9    that there may be many other customers paying
10   comparable prices out there in the noncontract
11   world?
12     A.    Yes.
13           MR. TORBORG:  Object to form.
14           THE WITNESS:  Since this is a contract
15   sale, and my past experience would indicate that
16   contract sales happen below the pricing at which
17   noncontract sales happen.
18   BY MR. LAVINE:
19     Q.    Did you ask anybody at Abbott whether or
20   not they had any rebates that they paid any of
21   those noncontract customers?
22     A.    A rebate arrangement would be considered a
00211
1    contract.
2      Q.    So a noncontract customer purchasing
3    through the noncharge back distributors that you
4    identified would never have a rebate agreement
5    with Abbott.
6      A.    I could never say "never," but it's my
7    understanding that based on my discussions with
8    Mr. Sellers that that would be uncommon.
9      Q.    Now, in the process of selecting the four
10   different examples that were plugged into the
11   different versions of Figure 7, what do you call
12   that method of selecting those four examples?
13   What is that?
14     A.    Scanning the data and identifying a
15   transaction.
16     Q.    And you don't need -- in your opinion,
17   selecting that on a random basis isn't necessary?
18     A.    For purposes of illustrative purposes,
19   that's correct, and I didn't assert in my opinion
20   that it's extrapolatable or anything of that

Page 77

Depo-Young-Steven-05-13-09

```
21  nature.
22      Q.    You know that we could -- it would be
00212
 1  possible -- let me start over.
 2              You could just as easily pick examples
 3  where providers were acquiring the product for
 4  less than Mr. -- Dr. Duggan's but-for
 5  reimbursement; right?
 6      A.    That's correct.
 7              MR. TORBORG:  Object to form.
 8  BY MR. LAVINE:
 9      Q.    In fact, in the original Figure 7, that's
10  what you did by accident.
11      A.    Yes, you can do that.
12      Q.    Now, one of your criticisms is that
13  Professor Duggan limited his review of actual
14  claims data to nine states; right?
15              MR. TORBORG:  Object to form.
16  BY MR. LAVINE:
17      Q.    I'm sorry.  To ten states.
18      A.    Yes.
19      Q.    You say:
20              Dr. Duggan limited his analysis of actual
21  detailed claims data to ten states and that in no
22  state did he look at actual claims data over the
00213
 1  entire 11-year time period.
 2      A.    That's correct.
 3      Q.    Okay.  And, therefore, his extrapolation
 4  was flawed for these reasons among others.
 5      A.    Among others, yes.
 6      Q.    So are we in agreement though that -- that
 7  the general methodology of extrapolation is an
 8  accepted method in the field of accounting?
 9              MR. TORBORG:  Object to form.
10              THE WITNESS:  Again, extrapolation, but
11  not in the form that I've seen it done here.
12  BY MR. LAVINE:
13      Q.    Well, extrapolation, when properly applied
14  is an accepted methodology, isn't it?
15      A.    Extrapolation, when properly applied, will
16  give you an estimate plus or minus an error range,
17  yes.
18      Q.    Dr. Duggan wasn't inventing some new
19  theory when he said he would extrapolate; right?
20  Your criticism is the application of the theory.
21      A.    Actually, as an accountant and related to
22  any quantification of overpayment or underpayment
00214
 1  that I've ever seen, extrapolation occurs and is
 2  accepted based on my past experience only when
 3  it's an entire population with a randomly selected
 4  sample.  That's the normal methodology that I've
 5  seen used in my experience.
 6      Q.    So you don't actually have any experience
 7  with the approach taken by Dr. Duggan?
 8              THE REPORTER:  Sorry.  I didn't hear after
 9  "actually."  You said "actually."
10  BY MR. LAVINE:
11      Q.    You don't have actually have any
12  experience with the method utilized by Dr. Duggan.
13              MR. TORBORG:  Object to form.
14              THE WITNESS:  That's right.  Of the
```

Page 78

Depo-Young-Steven-05-13-09
```
15  probably two-dozen calculations I've seen one way
16  or another, I've never seen anyone do it like
17  Dr. Duggan has done.
18  BY MR. LAVINE:
19      Q.   But you're not an economist; right?
20      A.   That's correct.
21      Q.   But there are Ph.D. economists that were
22  retained by Huron Consulting, right, that -- that
```
00215
```
1   were employed by Huron?
2       A.   There are economists that work for Huron,
3   at least I believe there are still economists that
4   work for Huron, that's correct.
5       Q.   And you're not a statistical expert;
6   right?
7       A.   No.  I apply statistics, as most CPAs do
8   in -- in the normal course of my work.
9       Q.   And although you disagree with the
10  extrapolation that was performed in this case for
11  various reasons, you didn't actually perform any
12  quantitative analysis to evaluate the scope of the
13  error you contend was caused thereby?
14      A.   I was asked to critique his analysis, and
15  his analysis did not take it to the stage that
16  there could be quantitative critiques made of --
17  since he didn't, he chose to ignore all of the
18  issues in his calculation, it was possible to do
19  quantitative -- it was not possible for me to do
20  quantitative calculations of the impact of those,
21  no.
22      Q.   Well, when you say that the variability of
```
00216
```
1   the claims in the ten states is different than the
2   variability of the claims in the 38 states, you're
3   saying there's no way to quantify that variability
4   and why it's too different to extrapolate?
5       A.   The -- again, the normal approach in these
6   situations would be to get the full claims data
7   set, draw a statistically valid random sample,
8   come up with a point estimate and a range within
9   which that point estimate applied.
10      I did not have the claims data sets
11  necessary to perform that approach or to analyze
12  that claims data in relationship to the claims
13  data that he looked at to do any type of
14  quantification.
15      I wasn't asked to do that.  The Myers &
16  Stauffer summary combined with some of the
17  information that was included on your list from
18  yesterday demonstrates that there's not
19  homogeneity between the populations, and I believe
20  that that's adequate to reach the conclusion that
21  he hasn't properly -- given the fact that he's
22  deviated from the -- the normal way that I've ever
```
00217
```
1   seen this calculation done supports my conclusion.
2       Q.   Yeah.  Because Abbott only hired you to do
3   the critique and not to actually quantify the
4   scope of the error, you didn't actually do
5   anything to quantify the scope of the error;
6   right?
7           MR. TORBORG:  Object to form.
8           THE WITNESS:  I was not asked to do that,
```
Page 79

Depo-Young-Steven-05-13-09

```
 9  no.
10  BY MR. LAVINE:
11     Q.    Okay.  So what is the methodology that you
12  say that Dr. Duggan failed to follow when he based
13  his extrapolation on data related to ten states?
14            MR. TORBORG:   Object to form.
15            THE WITNESS:   Could you repeat that
16  question?
17  BY MR. LAVINE:
18     Q.    What -- what is the principle or standard
19  that you say Dr. Duggan failed to meet when he
20  based his extrapolation on a sample of ten states?
21     A.    Based on my past experience in performing
22  overcalculation and undercalculation -- or
00218
 1  overpayment and underpayment calculations between
 2  payers and providers, and even beyond the
 3  healthcare field, and to support those
 4  calculations to the other side, that's the basis
 5  for my conclusion, that it was inconsistent with
 6  that and it would not have been accepted by myself
 7  if I would have presented it to, say, a government
 8  auditor or a provider in the attempt to recoup
 9  money, so it's based on my past experience.
10     Q.    Has your past experience ever involved any
11  attempt to try to engage in this process for all
12  50 states' Medicaid programs?
13     A.    No.  But, you know, we've done
14  calculations that have involved tens of millions
15  of claims before.  It did not cover all 50 states,
16  but, again, if you're going to support an
17  overpayment or underpayment on a claim-by-claim
18  basis and identify a claim as an overpayment, that
19  would be the -- the normal protocol that I would
20  see.
21     Q.    Are you saying that because it wasn't
22  based upon a random sample, it's flawed and that's
00219
 1  that the end of it?
 2            MR. TORBORG:   Object to form.
 3            THE WITNESS:   I'm saying that the
 4  combination of the fact that whenever I've seen it
 5  done before, it was a statistically valid random
 6  sample, and that there are apparent
 7  inconsistencies across all of the different
 8  subsegments of populations, I do not believe that
 9  he's adequately supported, that he's addressed
10  those issues based on what I've seen in the past
11  and what has been acceptable to parties that I've
12  worked for -- for on the other side of.
13  BY MR. LAVINE:
14     Q.    All right.  Are there any -- let's keep
15  going.  What other reasons do you -- let me start
16  over.
17            What other standards do you say Dr. Duggan
18  failed to meet when he performed his extrapolation
19  in this case?
20     A.    I think that that summarizes the basis for
21  the standards that I compared it against.
22     Q.    That in your past experience it's not
00220
 1  approached that way, that it's always been
 2  approached through the use of a statistically
```

Page 80

Depo-Young-Steven-05-13-09
```
 3   valid random sample and that there are
 4   inconsistencies between the base population and
 5   the extrapolated population?
 6       A.    Significant inconsistencies that are in no
 7   way analyzed or assessed to their potential
 8   implications, that's correct.
 9       Q.    So is there some particular standard or
10   principle that you're saying requires the approach
11   you're describing?
12       A.    The standard of what I've seen in the
13   industry historical as to what -- what's
14   acceptable, and, you know, the approach that I've
15   seen taken before is unless you can demonstrate
16   specifically related to that population that there
17   is an overstatement and the amount of that
18   overstatement, and, if you are using
19   extrapolation, the level of precision that you've
20   achieved related to that, I've just -- I haven't
21   seen it done before, and it's my belief that it
22   would not be acceptable in the cases that I've
00221
 1   been involved in.  So it's based on my past
 2   experience over the last 25 years.
 3       Q.    Am I right you're not necessarily saying
 4   that it lacks the precision you would require, but
 5   that that level of precision hasn't been
 6   demonstrated by Dr. Duggan?
 7       A.    Whether it lacks it or not, I can't tell
 8   until he's demonstrated it, which he has not.
 9       Q.    And you didn't go ahead and do that
10   yourself because that wasn't part of what you were
11   hired to do?
12       A.    That's correct.
13       Q.    And what is the objective standard that
14   Dr. Duggan would need to meet to overcome your
15   criticisms on this basis?
16       A.    Again, my -- it would be conjecture on my
17   part as to what that might be.  My -- I've been
18   asked to look at what Dr. Duggan has done and
19   critique the approach he's taken and not design a
20   new approach for him that would be acceptable, so
21   I haven't been asked to do that.
22       Q.    So you can't think of any particular
00222
 1   statistical or other quantifiable test that
 2   Professor Duggan could have undertaken that would
 3   have satisfied your critique?
 4       A.    I guess in simplest terms, if he would
 5   have asked his clients to provide claims data for
 6   all 50 states, taken a statistically valid random
 7   sample, proven for that sample on a claim-by-claim
 8   basis, performed an appropriate extrapolation of
 9   that and then disclosed his point estimate along
10   with the precision and the other variables in the
11   sampling approach, that would likely have provided
12   me a basis to then be able to go back and evaluate
13   it as one example, so.
14       Q.    But no other methodology like that that
15   you can think of --
16       A.    No.
17       Q.    -- no other standard to be applied?
18       A.    I -- as I sit here today, I have not
19   thought of any other ones, no.
```
Page 81

Depo-Young-Steven-05-13-09
20        Q.    Now, is that the same -- are those -- are
21   those the same opinions that support your
22   criticism that in no state did he look at actual
00223
 1   claims data over the entire 11-year period?
 2        A.    I think that is extrapolation, yes.  It
 3   would apply both between the states and within a
 4   state.
 5        Q.    And then you give an example.  Dr. Duggan
 6   only analyzes five quarters of actual claims data
 7   from Michigan?
 8        A.    That's correct.
 9        Q.    Same -- same issues, nothing new for that?
10        A.    I think that if you looked at the -- yes,
11   the discussion, the extrapolation discussion that
12   we previously had, it would cover that issue also.
13        Q.    And you also say that Dr. Duggan
14   extrapolated to other states where he did not look
15   at actual claims data at all.  Explain that to me.
16        A.    It's my understanding that he looked at
17   the claims data for ten states, and for the other
18   states he did not analyze the claims data from the
19   states.
20        Q.    And are you saying that they didn't look
21   at any data for the other states?
22        A.    I think your question was claims data,
00224
 1   wasn't it?
 2        Q.    Well, I was asking you to explain your
 3   statement, and now I'm following up on that.
 4              Are you saying he did not look at any data
 5   at all regarding the 38 states?
 6              MR. TORBORG:  Object to form.
 7              THE WITNESS:  That would be a different
 8   question, and he certainly looked at --
 9   BY MR. LAVINE:
10        Q.    So you're not saying that?
11        A.    Okay.  Why don't you repeat the question,
12   and I will answer the question.
13        Q.    Are you saying that he did not look at any
14   data at all regarding the 38 states to which he
15   extrapolated?
16        A.    No, I am not.
17        Q.    So you understand he did have data
18   relating to those states; right?
19        A.    He had some data related to the
20   expenditures related to drug in those -- drugs in
21   those states; correct.
22        Q.    And you know that he had SDUD data and
00225
 1   SMURF max data; right?
 2        A.    That's correct.
 3        Q.    Okay.  Explain to me why that data isn't
 4   something you would describe as actual claims data
 5   as you do in connection with the data that came
 6   directly from the states.
 7        A.    Claims data has various information that
 8   is helpful in performing overpayment and
 9   underpayment issues.  Understanding the number of
10   units, for example, the provider, the detail of
11   all aspects related to that specific transaction
12   related to charged amount, the adjudication
13   process was used, the basis of payment that was
                         Page 82

Depo-Young-Steven-05-13-09

14  used, you know, I would have to look through all
15  of the fields within the claims data set and say
16  "These are ones that I found valuable before" and
17  then indicate which ones are not available in the
18  different data sets, but, obviously, dispensing
19  fee information is not broken out.  Some of the
20  data sets are at very macro-level, so you don't
21  even have a number of transactions, and quantity
22  information is lacking oftentimes.
00226
1       Q.    Give me an example of a specific field of
2   data missing from the SMURF max data which
3   supports your position on this point.
4       A.    Again, I can go through the data sets.  I
5   believe the SMURF max -- well, the SMURF data, for
6   example, does not have quantity information.
7       Q.    No -- no quantity information at all?
8       A.    I believe so.
9       Q.    Any -- any other examples you can provide,
10  the type information that's missing from the
11  SMURF max data?
12      A.    Again, none of them split -- I do not
13  believe that they split out the dispensing fees
14  separately.  I'm not certain.  I would have to go
15  back and look as to which data sets have the
16  charged amount by claim, if any.
17          When I've seen claims data overpayment and
18  underpayment done before, it has been done on a
19  claim-by-claim basis based on the actual claims
20  data.
21      Q.    Are there specific fields you can identify
22  that are not included in the SDUD data that
00227
1   support your position?
2       A.    The SDUD data is very macro-level
3   information as far as expenditures by NDC, so
4   literally every field on a claim-by-claim basis, I
5   believe, is missing from that.
6       Q.    So is it your opinion you would just never
7   use SMURF max or SDUD data whatsoever in these
8   type of analysis?
9       A.    I never say "never."
10      Q.    Well, when would it be permissible to use
11  SMURF max and SDUD data?
12          MR. TORBORG:   I object to form.
13          THE WITNESS:   I can't think of an example.
14  BY MR. LAVINE:
15      Q.    Do you know if the SMURF max data includes
16  initial claims only or whether it also includes
17  adjustments of some type?
18      A.    I am not certain as to how the SMURF and
19  max data arrived at the last adjudicated claim as
20  to whether it has the initial and adjustments
21  listed separately or it combines the two or it
22  indicates the SMURF data rolls it up.
00228
1       Q.    The difference between the state-based
2   data and the SDUD and SMURF max data that you
3   point to, is there some particular principle that
4   you're relying on that supports your conclusion
5   that that data, this -- I mean the SMURF max data,
6   shouldn't have been used by Dr. Duggan?
7          MR. TORBORG:   Object to form.

Depo-Young-Steven-05-13-09
```
 8          THE WITNESS:  Again, when I've seen
 9   overpayment and underpayment calculations done
10   before, the claims data is the official record by
11   the payer of what they paid.  They retain it, and
12   if they expect to receive recoupment, they, at a
13   minimum, use that data and oftentimes data beyond
14   that to justify the process.
15   BY MR. LAVINE:
16          Q.   So is there an objective standard that you
17   apply or is it just a question of whether or not
18   it appears to you to be something reasonable under
19   the circumstances?
20          A.   The objective standard is what I've seen
21   based on my past experience in every case.
22          Q.   Any other standard or principle that you
00229
 1   say would demonstrate why the use --
 2          A.   No.
 3          Q.   -- of the SDUD or the SMURF max data was
 4   flawed?
 5          A.   No.  It's limited to if someone believes
 6   they have an overpayment, they provide the record
 7   of that overpayment -- or underpayment and can
 8   show, based on that record of payment, why it was
 9   overstated or understated.
10          Q.   Now, you did indicate in your report that
11   Dr. Duggan improperly applied his calculations to
12   the state of Michigan and Missouri; right?
13          A.   Yes.
14          Q.   You said it resulted in an overstatement
15   of the value of difference in excess of $500,000?
16          A.   I believe that was the right amount, yeah.
17          Q.   And that -- that was something that was
18   discovered during the process of replicating the
19   work that Professor Duggan had done.
20          A.   That's correct.
21          Q.   Were you able to find out there was
22   something wrong in the --
00230
 1          A.   Correct.
 2          Q.   -- coding?
 3          A.   We redid the math, that's correct.
 4          Q.   Now, did you see in the rebuttal report
 5   that Dr. Duggan addressed that issue?
 6          A.   The mathematical issue, yes.
 7          Q.   Yes.  Okay.  Are there any other issues of
 8   that type that you still think are outstanding
 9   that need to be addressed in connection with
10   Professor Duggan's report?
11          A.   I didn't do an exhaustive analysis of all
12   the mathematical calculations, but I'm not aware
13   of any other mathematical errors that he made in
14   his report.
15          Q.   After $1.5 million you haven't done an
16   exhaustive check of his mathematical errors?
17          A.   There is a lot of query language, and
18   there are some, you know, immaterial items that
19   are -- that he and I would both agree are -- are
20   not very significant, but I do not believe -- you
21   know, you can never be certain.  I do not believe
22   there's any material mathematical errors in -- in
00231
 1   executing the -- the query logic that he's
```
Page 84

Depo-Young-Steven-05-13-09

2  indicated and the math that he's indicated in his
3  report.
4      Q.   Are you familiar with whether or not
5  there's a variance between Dr. Duggan's
6  calculations for Illinois and Huron Consulting's
7  calculations for Illinois?
8      A.   I'm not certain.
9      Q.   But nothing comes to mind?
10     A.   I -- nothing comes to mind.  Sorry.
11     Q.   Okay.   Another criticism is that
12  Dr. Duggan ignored actual claims data for certain
13  states with significant Medicaid utilization and
14  enrollment such as Texas, Ohio and Pennsylvania.
15  So let me just clarify it.
16          By "ignored" you don't mean that he wasn't
17  aware of it.  You mean that he didn't directly
18  include that in the basis for his calculations;
19  right?
20     A.   That's correct.
21     Q.   But does -- does that issue raise any new
22  underlying matters beyond those that we have
00232
1  discussed before regarding the basis for an
2  extrapolation?
3      A.   Well, again, I guess I never found in his
4  report where he explained why he selected certain
5  of the 50 states and not other of the 50 states,
6  so I guess that's the fundamental issue that
7  that's addressing.  I didn't see where he
8  described why he chose not to look at certain
9  states.
10     Q.   But it would -- would it be fair to put
11  that in the category of it wasn't a random sample
12  that was used to select the states?
13     A.   You could correct that by doing a --
14  getting the entire population and doing a random
15  sample, that's correct.
16          MR. LAVINE:  We need to take a break.
17          THE VIDEOGRAPHER:  Going off the record at
18  3:44 p.m.
19                  (Whereupon a recess was had.)
20          THE VIDEOGRAPHER:  Beginning videotape
21  number six.  We are back on the record at
22  4:01 p.m.
00233
1  BY MR. LAVINE:
2      Q.   Did you do any quantitative testing to
3  evaluate the impact of Dr. Duggan's not utilizing
4  the detailed state claims data for Texas, Ohio and
5  Pennsylvania?
6      A.   No.  Based on my past experience when
7  people kind of talk about the Big 5, it's usually
8  California, Illinois, Texas, Pennsylvania and
9  Florida.  Ohio may be in there too, so maybe it's
10  the Big 6.
11          I was just surprised that two of the
12  biggest Medicaid states were not included in his
13  calculation, but I didn't do any quantification
14  beyond that to understand that they're one of the
15  top five Medicaid states.  I believe they're both
16  top five and definitely both top ten, and he chose
17  not to analyze them.
18  BY MR. LAVINE:

Page 85

Depo-Young-Steven-05-13-09
19      Q.    In your experience pulling random samples,
20   what's the largest number of units you've ever
21   included in a sample?
22            MR. TORBORG:  Object to form.
00234
1             THE REPORTER:  I'm sorry.  You said form?
2             MR. TORBORG:  Object to form.
3             THE WITNESS:  I think --
4    BY MR. LAVINE:
5      Q.    Did I use the right terminology?
6      A.    I believe so.  I think I understand what
7    your question is, yeah.
8             I think -- I -- I don't know if I can say
9    what the largest sample is.  I know that I've
10   taken one -- let me think about that -- as large
11   as about 500 claims that were analyzed in detail.
12            It -- it oftentimes -- requires, you
13   know -- depends on the level of precision that the
14   client's looking for and whether they're willing
15   to accept the lower end of the precision range,
16   but from the work that I've done recently, I think
17   500 was the largest.
18     Q.    And was that a simple random sample or
19   some type of stratified sample?
20     A.    That one was a random sample that was
21   taken after the population was segregated into two
22   pieces.  One where there was 100 percent review of
00235
1    the claims done, very large claims, and this was a
2    random sample of the remaining population with no
3    stratification within that population.
4      Q.    How large was the population from which
5    the 500 were drawn?
6      A.    Boy, I can't remember off the top my head,
7    but it was -- it was a large number of claims,
8    several hundred thousand at least.  Probably over
9    a million because it was the smaller dollar
10   claims.
11     Q.    And by looking at 500 units, you were able
12   to get the precision you needed to extrapolate to
13   the larger population of a million?
14     A.    That's correct.  The level of precision
15   that the client was looking for, yes.
16     Q.    I assume you've never designed a random
17   sample that included 65 percent of the entire
18   universe.
19     A.    No.  I've never seen a random sample that
20   large before.
21     Q.    Do you -- do you agree that the concept of
22   the cost -- let me start over there.
00236
1             Do you -- do you agree that the
2    reimbursement paid to a provider is different than
3    the costs they expended in connection with
4    the claim that led to that reimbursement?
5             MR. TORBORG:  Object to form.
6             THE WITNESS:  I'm not -- I'm not sure what
7    you're getting at.  Maybe you could --
8    BY MR. LAVINE:
9      Q.    Well, a provider might incur costs of $50
10   to provide a service, but the reimbursement could
11   be in a different amount; right?
12     A.    Yeah.  Yes.  Generally speaking, the
Page 86

Depo-Young-Steven-05-13-09
13  reimbursement amount can be a different amount
14  than the cost.
15      Q.    I mean those are two different things, the
16  cost underlying the claim and the reimbursement
17  paid by the insurance company or Medicare/Medicaid
18  programs; right?
19      A.    Yes.
20      Q.    Have you ever done any work in DRGs?
21      A.    Only to the extent that -- not in setting
22  DRGs, but only to the extent of looking at the
00237
1   DRGs that are agreed to under a contract
2   and making sure they're probably applied in a
3   recalculation situation.
4       Q.    And by "DRG," do you understand that to
5   mean a diagnostic related group?
6       A.    Yes.
7       Q.    And that's what hospitals typically use to
8   bill for an inpatient admission; right?
9       A.    Yes.  That's one of the main methods.
10      Q.    And, in general, when a patient requires
11  services that come under a particular DRG, for the
12  most part they get about the same reimbursement;
13  right?
14      A.    Generally speaking, there can be outlier
15  payments if they stay in for a longer period of
16  time, and there can be degrees based, but, it --
17  again, it would be a suffix on the DRG code that
18  would end up doing that, so generally it's the
19  same.
20          If you have severe pneumonia, you get a
21  little bit more than if you don't have severe
22  pneumonia, but, yes, but it would -- if you have
00238
1   severe pneumonia, you're correct that you would
2   get the same amount for all of your severe
3   pneumonia cases under that contract.
4       Q.    And most other hospitals for the same
5   code, they don't get the exact same amount, but
6   pretty close; right?
7       A.    It depends on if you're referring to -- to
8   Medicare, yes, with some adjustments for labor
9   cost and things of that nature.  You're talking
10  about private insurances, you know, different,
11  obviously, based on the negotiations between the
12  parties, but...
13      Q.    So comparing among different hospitals
14  billing for the same DRG in the Medicare program,
15  you can predict reasonably well what the
16  reimbursement would be for those particular DRGs,
17  right, setting aside the outlier issue?
18      A.    Well, it would, you know, probably be
19  easier to -- to look at the fee schedule and then
20  make the adjustments based on specific data for
21  that hospital, but I guess I'm not following your
22  question.
00239
1       Q.    Well, just -- I mean, if hospital A billed
2   for a particular DRG and got paid $1,000, you
3   could look at hospital B billing for the same DRG
4   and expect that their reimbursement would also be
5   in the approximate amount of $1,000; right?
6       A.    If they're in the same geographic area and
Page 87

Depo-Young-Steven-05-13-09

7  urban versus rural, yes.
8      Q.   But even across the country you're going
9  to find hospitals for the same DRG getting paid
10  drastically different amounts.  I'm not talking
11  about the cost, just the -- the DRG reimbursement.
12      A.   I guess it depends on your -- your
13  terminology.  Drastic -- I mean, for example,
14  there's a significant difference between
15  Southern California and Iowa because there are
16  labor cost adjustments, and my understanding is
17  that there's labor cost adjustments in geographic
18  and urban versus rural adjustments that -- that
19  occur and that's why, for example, you see Florida
20  would have a much higher per capita Medicare cost
21  than some of those rural.  So it depends on
22  your -- your definition of "drastic."
00240
1      Q.   Those -- those differentials though,
2  they're -- predictable?  You can tell that -- you
3  can -- you'd be able to figure out what they were
4  and explain why there might be differences?
5      A.   The -- if you had the right data, yes, you
6  could.
7      Q.   What about the cost associated with any
8  particular patient under which -- again, setting
9  aside outliers, if you looked at one hospital and
10  they had ten different patients all billed under
11  that particular DRG, the costs associated with
12  those particular patients, are they always going
13  to be the same?
14      A.   Depends on your definition of cost, but
15  probably not, no.
16      Q.   And isn't the point of the DRG to --
17  regardless of the particular level of services
18  required for a patient, reimbursement will be
19  about the same?
20      A.   Within that hospital, within that
21  diagnosis code, yes, and the cost may not be.
22      Q.   But do you think you could look at the
00241
1  reimbursement paid to a hospital and predict the
2  cost for any particular patient that was billed
3  under that DRG?
4      A.   Not for any particular patient, no.
5      Q.   Just on average, perhaps.
6      A.   Right, there's a cost-to-charge ratio,
7  but, yes.
8      Q.   But you might find a patient under a DRG
9  that needed a very low level of treatment very
10  profitable for the hospital; right?
11      A.   Right.
12      Q.   And then so the point prior to hitting
13  outlier status, you could have particular patients
14  more expensive where the hospital might lose money
15  because of the underlying cost of treating that
16  patient?
17      A.   Under the DRG structure, yes.
18      Q.   And doesn't the same type of analysis
19  apply when you're evaluating the reimbursement in
20  connection with dispensing fees as compared to the
21  cost of the particular prescription at issue?
22          MR. TORBORG:  Object to form.
00242

Depo-Young-Steven-05-13-09
```
 1              THE WITNESS:  No, not necessarily.
 2   BY MR. LAVINE:
 3       Q.    Well, for example, in a particular state,
 4   if the reimbursement was set -- the dispensing fee
 5   reimbursement was set at $5, you could pretty
 6   reasonably predict that every pharmacy billing for
 7   that reimbursement would get a dispensing fee of
 8   $5; right?
 9       A.    Well, first of all, there's not a
10   dispensing fee reimbursement.  I mean there's a
11   reimbursement to dispense a drug, and so, in other
12   words, you can't be paid the fee if there's no
13   drug dispensed, and you can't necessarily get the
14   drug unless it's dispensed.  So it's not two
15   reimbursements.  It's one reimbursement.
16       Q.    But if you looked at all the claims
17   submitted to the Medicaid program of the State of
18   Illinois for a particular year, wouldn't the
19   reimbursement associated with the dispensing fee
20   portion of the reimbursement always be predictably
21   related to the dispensing fee methodology for that
22   state?
00243
 1              MR. TORBORG:  Object to form.
 2              THE WITNESS:  Again, the pharmacy charges
 3   a total, state pays a total, so there is no
 4   dispensing fee reimbursement per se.  There's a
 5   reimbursement in total.
 6   BY MR. LAVINE:
 7       Q.    All right, but the component of that
 8   reimbursement and total associated with the
 9   dispensing of the drug will always be based upon
10   the same number, won't it?
11              MR. TORBORG:  Object to form.
12              THE WITNESS:  Again, it -- it's a
13   reimbursement in total, so it's evaluated in
14   total.
15   BY MR. LAVINE:
16       Q.    Look at your Figure 7.  You used the same
17   dispensing fee for the but-for reimbursement in
18   the provider-paid amount; right?
19       A.    We replicated Dr. Duggan's approach, yes.
20       Q.    Okay.  So you can see that the dispensing
21   fee component is the same for both; right?
22       A.    Under Dr. Duggan's approach; correct.
00244
 1       Q.    Is that not the case for a particular
 2   state's Medicaid program?
 3              MR. TORBORG:  Object to form.
 4              THE WITNESS:  Again, you know, I don't
 5   want to get hung up in terminology here, but in
 6   the healthcare industry, it's viewed as a total
 7   reimbursement.  So I -- I'm concerned when we try
 8   to parse the questions down into attempting to
 9   define it as two separate reimbursements, because
10   based on my experience it's not.
11   BY MR. LAVINE:
12       Q.    And so you think my question requires that
13   you consider them to be two separate
14   reimbursements?
15              MR. TORBORG:  Object to form.
16              THE WITNESS:  Well, when you refer to a
17   dispensing fee reimbursement, I -- I'm sorry, I
```

Depo-Young-Steven-05-13-09
```
18    thought there was an implication that you were
19    considering the dispensing fee to be separately
20    reimbursed.
21    BY MR. LAVINE:
22        Q.   When you evaluate a claim reimbursement by
00245
 1    a particular Medicaid program in order to figure
 2    out the total amount paid, there will be a
 3    greeting cost and a dispensing fee combined
 4    together to come up with a total amount paid;
 5    right?
 6              MR. TORBORG:   Object to form.
 7              THE WITNESS:   By the state?
 8    BY MR. LAVINE:
 9        Q.   Yes.  As in the Medicaid program.
10              MR. TORBORG:   Object to form.
11              THE WITNESS:   Again, they will do a
12    calculation of two components and come up with the
13    payment, correct, to reimbursement.
14    BY MR. LAVINE:
15        Q.   And -- and one of the two components is
16    the amount they designate to cover the dispensing
17    fee; right?
18              MR. TORBORG:   Object to form.
19              THE WITNESS:   Well, again, you know,
20    you're walking down a path -- you know, obviously
21    I have read all those depositions, and -- and the
22    Medicaid administrators make it clear that they
00246
 1    view them in total, which, you know, obviously,
 2    initially everybody in the healthcare industry
 3    that I've ever dealt with used them in total.
 4              The Medicaid administrator depositions
 5    that I reviewed confirmed that that was
 6    consistent, so I'm concerned that you're trying to
 7    walk me down a path of -- of maybe getting a sound
 8    bite that -- that views them as being separate,
 9    and I believe that they're not separate.  They are
10    one reimbursement.
11              MR. BREEN:   Objection, nonresponsive, move
12    to strike.
13              THE WITNESS:   So could you reask the
14    question?
15    BY MR. LAVINE:
16        Q.   I -- I'm at a loss as to how to ask it in
17    a way that you'll answer it.
18              When the -- you know, when you -- when a
19    claim is submitted to a Medicaid program for
20    having administered a drug to a patient, is not
21    the total amount paid to that provider based in
22    part upon an ingredient cost and in part upon an
00247
 1    allowance for the cost of dispensing that
 2    prescription?
 3              MR. TORBORG:   Object to form.
 4              THE WITNESS:   Again, it's established in
 5    the industry that the margin on the ingredient
 6    cost covers part of the cost of dispensing the
 7    drug.  In -- if you want to ask it this way, there
 8    is a field in the data that says "dispensing fee,"
 9    and that will have 488, and there is a field in
10    the data that will be their calculated price based
11    on, for example, compendia price less 10 percent,
```
Page 90

Depo-Young-Steven-05-13-09

12  and the total reimbursement is arrived at by
13  adding the two of those together.
14  BY MR. LAVINE:
15      Q.    And the field in the database for the
16  dispensing fee will be consistent from
17  prescription to prescription over the course of a
18  year for a particular Medicaid program, wasn't it?
19              MR. TORBORG:   Object to form.
20              THE WITNESS:   Not necessarily,
21  particularly for IV solutions versus pills.
22  BY MR. LAVINE:
00248
 1      Q.    Well, but among uniform types of claims,
 2  they'll factor in the same amount, won't they?
 3              MR. TORBORG:   Object to form.
 4  BY MR. LAVINE:
 5      Q.    If it's 48 -- 488 for one particular
 6  claim, it'll be 488 for all other similar claims?
 7              MR. TORBORG:   Object to form.
 8              THE WITNESS:   For pills, that's correct.
 9              Just to clarify, for IV solutions, they're
10  all -- they're all types of components that are
11  done.  Some people play -- pay a flat fee up to a
12  certain amount for the drug, and then that
13  combined.  Some pay a flat fee plus so much per
14  minute, so, you know, there can be variability
15  based on the specific information that's provided
16  in the claim related to IV solutions particularly.
17  BY MR. LAVINE:
18      Q.    Whatever the methodology used to calculate
19  the precise amount of the dispensing fee that
20  would apply to coming up with the total amount
21  paid for any particular prescription will all be
22  applied consistently across any claim that fits
00249
 1  those parameters, won't they?
 2              MR. TORBORG:   Object to form.
 3              THE WITNESS:   In the computer system, yes,
 4  it will be to come up with that amount that goes
 5  into the field.
 6  BY MR. LAVINE:
 7      Q.    I mean, you don't have somebody fill a
 8  script for -- what, a -- for pills and getting
 9  paid -- and having 488 plugged into their total
10  reimbursement and another pharmacy filling a
11  similar script for the same drugs and they get
12  paid $20 --
13              MR. TORBORG:   Object to form.
14  BY MR. LAVINE:
15      Q.    -- as part of the component of computing
16  the total reimbursement.
17      A.    Yes, I think that's -- I would agree with
18  that statement.
19      Q.    So if you looked at similar claims as
20  they're reimbursed under a particular Medicaid
21  program, the dispensing-fee piece of determining
22  the total reimbursement is going to be the same;
00250
 1  right?
 2              MR. TORBORG:   Object to form.
 3              THE WITNESS:   Again, when -- when you
 4  indicate "determining the reimbursement --
 5  BY MR. LAVINE:

Page 91

Depo-Young-Steven-05-13-09

```
 6      Q.    The total --
 7      A.    -- there's an interrelationship between
 8  the margin on the product cost and the dispensing
 9  fee.
10            If the amount -- if you're saying the
11  amount that shows up in that dispensing fee field
12  will be consistent, that's correct in determining
13  the total reimbursement that shows up in the
14  reimbursement field in -- for that claim.
15      Q.    And the reimbursement amount that shows up
16  there is not dependent upon the particular costs
17  incurred by that particular pharmacy for that
18  particular prescription; right?
19            MR. TORBORG:  Object to form.
20  BY MR. LAVINE:
21      Q.    It's dependent upon the state methodology
22  and what they say is the applicable reimbursement
00251
 1  for that piece of overall reimbursement.
 2            MR. TORBORG:  Object to form.
 3            THE WITNESS:  Again, at the end of the
 4  day, whether or not a pharmacy stays in the
 5  program and you have the access to care, the total
 6  payment has to be adequate for them to continue to
 7  participate.  So I am a little bit concerned that
 8  it's going to lead them to the mechanical view
 9  that it's always going to stay the same no matter
10  what.
11  BY MR. LAVINE:
12      Q.    Well, if you wanted to dissect a paid
13  claim under a Medicaid program, you would be able
14  to identify which piece was considered ingredient
15  cost and which piece was identified as for the
16  dispensing component and figure out how those were
17  combined to come up with the total reimbursement,
18  wouldn't you?
19            MR. TORBORG:  Object to form.
20            THE WITNESS:  Again, I'd be able to look
21  at the data and see that there's an amount in the
22  dispensing fee field and an amount in the
00252
 1  ingredient cost field that arrives at a total
 2  reimbursement, which is obviously much different
 3  than a but-for world as to what that total
 4  reimbursement would be.
 5  BY MR. LAVINE:
 6      Q.    And can you look at the amount that was
 7  included with respect to the dispensing fee in
 8  that formula to evaluate the particular costs
 9  incurred by that particular pharmacy for filling
10  that particular prescription?
11            MR. TORBORG:  Object to the form.
12            THE WITNESS:  No, you could not determine
13  the cost by looking at that amount in that field.
14  BY MR. LAVINE:
15      Q.    You would want to go to look to the costs
16  actually -- you would need to go to the -- the
17  provider to learn about the cost; right?
18      A.    Yes, I think that if you wanted to know
19  what it cost to fill a prescription in a pharmacy,
20  you would go to a pharmacy to find that out, yes.
21      Q.    And the costs incurred by pharmacies can
22  differ independently of the reimbursement that's
```

Page 92

Depo-Young-Steven-05-13-09

00253
1   paid to the pharmacy, can't they?
2        A.    In the micro-sense, but in the macro-sense
3   a pharmacy can't be paid in total.
4             My experience is you will have
5   access-to-care issues and people will not stay in
6   the network, and my clients' provider -- network
7   providers won't go into the network if they
8   believe that the total reimbursement, which is the
9   only thing that they look at, is below what they
10  believe is their reasonable cost in total cost
11  margin.
12            MR. LAVINE:   I object as nonresponsive and
13  move to strike.
14  BY MR. LAVINE:
15       Q.    But let me ask, you haven't actually
16  identified any particular providers that have
17  dropped out of any Medicare/Medicaid program based
18  on underreimbursement, have you?
19            MR. TORBORG:   Object to form.
20            THE WITNESS:   Again, no, I have not been
21  asked to do that.
22  BY MR. LAVINE:
00254
1        Q.    Well, one of the criticisms you level at
2   Dr. Duggan's expert report is that he hasn't
3   articulated a sufficient basis to assume that the
4   reimbursement methodologies of the ten states are
5   similar to the 38 states; right?
6        A.    Yes, that's correct.
7        Q.    And as one of the manner -- one of the
8   ways in which you support that is to look at the
9   Myers & Stauffer analyses; is that correct?
10       A.    That's correct.
11       Q.    In paragraph 41 of your report you say:
12            The -- the review of Myers & Stauffer's
13  analyses would suggest that extrapolation is not
14  appropriate given the variability of reimbursement
15  and dispensing fee methodologies implemented by
16  different states at different times; is that
17  right?
18       A.    Yes, that's one of the factual bases for
19  that.
20       Q.    But one of the things that you cite to and
21  quote from Myers & Stauffer to support your
22  position about the variability of reimbursement
00255
1   and dispensing fee methodologies is a Myers &
2   Stauffer study discussing the differences in the
3   costs incurred by particular pharmacies; right?
4             MR. TORBORG:   Object to form.
5             THE WITNESS:   Could we go -- I'm sorry.
6   It might be more helpful for me if we go to the
7   spot in my report that you're referring to and --
8   BY MR. LAVINE:
9        Q.    Paragraph 40.
10       A.    Okay.
11            MR. TORBORG:   Paragraph 40?
12  BY MR. LAVINE:
13       Q.    40, page 16.
14            So your point is that Dr. Duggan tried to
15  extrapolate from ten states to the 38, and that
16  wouldn't be appropriate because of the variability

Depo-Young-Steven-05-13-09

17  of reimbursement and dispensing fee methodologies.
18  That's what you say in paragraph 41.
19          You cite to the Myers & Stauffer reports,
20  and immediately before making that statement you
21  point to a Myers & Stauffer study that
22  determined -- that describes difficulties in
00256
1  determining average dispensing costs.
2      A.    I'm sorry.  You misunderstood the purpose.
3  The -- the --
4      Q.    So you're not trying -- sorry.
5      A.    The quote -- the quote below relates to
6  the bullet point above, not to the paragraph below
7  it.
8          I mean, normally when I have an indented
9  quote, it is support for the bullet point above
10 it, and one thing that Dr. Duggan indicates is
11 that he believes there's homogeneity or, if
12 anything, a bias in Abbott's favor because the
13 cost per claim is higher in the other states, but
14 if you look at Myers & Stauffer, they make it
15 clear that there's this phenomena in the data that
16 they see where different numbers of dispensations
17 can be included in one dispensing, so one pharmacy
18 may do it one for every day, one pharmacy may
19 submit a claim for the week, which would really be
20 the sum of five days, and, therefore, that's
21 indicative of the fact that you can't blindly rely
22 on a very macro-calculation of cost per claim to
00257
1  justify that, and, actually, I think Dr. Duggan in
2  his deposition also had some discussions about why
3  you can't really rely on very macro-level with all
4  the NDCs mushed together, that you really can't
5  rely on per-claim calculations, so I guess that
6  would be two examples of -- of what would support
7  that bullet point about justifying homogeneity
8  based on the cost per claim on a macro-level.
9      Q.    Well, the second bullet point under
10 paragraph 40, Dr. Duggan attempted to compare the
11 average cost per claim for the ten states.  Is
12 that accurate?  Is that what you're saying?  He
13 was determining the average cost, not the average
14 reimbursement?
15     A.    I apologize.  I -- I was thinking cost to
16 the state, but it would be reimbursement, the
17 average reimbursement, the average -- people tend
18 to refer to it as cost per claim as opposed to
19 reimbursement per claim, but, you're right.  If it
20 would be clearer, it would be reimbursement per
21 claim.
22     Q.    So Dr. Duggan's looking at the
00258
1  reimbursement per claim, and then you rely upon
2  Myers & Stauffer report that indicates there's
3  variability in the average cost of dispensing;
4  right?  Those --
5      A.    No, there's --
6      Q.    Sorry.  Go ahead.
7      A.    I'm sorry.  I didn't mean to interrupt.
8          No.  What I'm saying is the indication
9  that you will have multiple dispensings, any -- a
10 wide range of single dispensings versus multiple
Page 94

Depo-Young-Steven-05-13-09
```
11   dispensings within one claim adds an element of --
12   that you may have a higher concentration of that
13   in one state versus another that's driving the
14   higher cost per claim as opposed to higher
15   reimbursements on a per-unit basis or something
16   like that, so, you know, it -- it's getting below
17   the -- the -- it's the multiple dispensings.
18   That's the issue that I'm dealing with with this
19   quotation, and the impact that that would have on
20   a claim, so if you have a claim for one
21   dispensing, and let's just say one dispensing
22   is $15 and five dispensings is $75; right?  If one
00259
 1   state has a higher preponderance of providers that
 2   do one at a time and the state that you're looking
 3   at has a higher preponderance of these five at a
 4   time claims at 75, you may view it as being --
 5   well, one's at $75 a claim, one's at $15 a claim,
 6   therefore, I'm being conservative in doing this.
 7          Taking it even a step further, let's say
 8   that one state is at $15 per dispensing and
 9   another state is at $10 per dispensing, but
10   $15 per dispensing is a state that does on a
11   per -- has a higher preponderance of providers
12   that choose to do it on a per-claim basis.  The
13   five per happens at a greater preponderance of the
14   ten, so you could actually have a state that has
15   higher per-claim amounts at $50 versus 15, while
16   at the same time have lower reimbursements and --
17   and you just don't know given this variable that
18   Myers & Stauffer has identified in their analysis.
19      Q.   So there could be variability in the way
20   that the pharmacies go about processing their
21   claims.  Is that a fair summary?
22      A.   Submitting their claims, yes.
00260
 1      Q.   Submitting claims, sorry.
 2          But the manner in which the claims are
 3   processed will be consistent; right?
 4          MR. TORBORG:  Object to form.
 5   BY MR. LAVINE:
 6      Q.   Reimbursement based upon whatever they do
 7   is always approached in the same manner?
 8      A.   But --
 9          MR. TORBORG:  Object to form.
10          THE WITNESS:   -- his analysis is based on
11   a per-claim amount.
12          It's not a -- a slicing and dicing down to
13   detail levels.  It's the 75 -- comparing the 75 in
14   my example to the 15 and saying the 75 is higher.
15   Therefore, I'm being -- if anything, it's okay to
16   extrapolate from the $15-per-claim state to the
17   $75-per-claim state, even though they had the
18   exact same reimbursement structure, and, in fact,
19   I'm being conservative or going from a 15 to a 10
20   because the ten has a higher reimbursement per
21   claim.
22   BY MR. LAVINE:
00261
 1      Q.   So what -- what should Dr. Duggan have
 2   done to account for this issue?
 3      A.   I think that I was tasked with identifying
 4   an issue that was significant that he did not
```
Page 95

Depo-Young-Steven-05-13-09
```
 5   account for.  I was not necessarily tasked with
 6   solving his problem for him.
 7        Q.   How could you possibly say it was
 8   significant if you did not quantify the impact?
 9             MR. TORBORG:  Object to form.
10             THE WITNESS:  His job, when issues such as
11   this -- my past experience is that if someone is
12   trying to support a damage calculation and is
13   doing -- although I have not seen anybody quite,
14   you know, not really even analyze the population
15   to -- to any great extent and extrapolate over,
16   but if one is going to attempt to do that, it's
17   important to understand all of the issues that
18   exist within the data and the person that's
19   asserting that to assess each one of those and
20   provide the support for their conclusion that it
21   did not have a significant impact.
22   BY MR. LAVINE:
00262
 1        Q.   Okay.  So your criticism isn't really that
 2   it did have a significant impact.  It's just that
 3   Dr. Duggan hasn't shown one way or another whether
 4   that's the case?
 5        A.   That's correct.
 6        Q.   Okay.  And, in your opinion, Dr. Duggan
 7   should have shown that?
 8        A.   That's correct.
 9        Q.   And that -- is that part of your general
10   standards that we discussed earlier?
11        A.   Again, this was a critique of his support
12   for the fact that everything's pretty much the
13   same between the two populations, so it's okay.
14   So clearly this level of support for that position
15   falls well short of any comparison of homogeneity
16   between populations that I've seen.
17        Q.   Okay.  But you can't identify any
18   particular method that Dr. Duggan should have
19   applied that would have convinced you that it was
20   not a significant issue?
21        A.   The method would have been to do a
22   detailed analysis of the -- the populations.  Look
00263
 1   at everything that is different between the -- the
 2   populations and then perform analysis to
 3   demonstrate which ones, if any, had a significant
 4   impact, and then account for the impact of those
 5   in his analysis.  That would be the standard that
 6   I've seen used by others that perform overpayments
 7   and underpayment calculations.
 8        Q.   But how do we know when he's gone far
 9   enough to demonstrate that what he did was
10   appropriate?
11        A.   I think at the end of the day, I guess
12   that would probably be for the trier of fact to
13   decide.  All I can do is to try to inform the jury
14   as to what I've seen in the past, why I think it's
15   an issue, and if at that point in time they think
16   he's gone far enough and I'm unconvincing, then I
17   guess he's gone far enough, and -- and if not,
18   then he hasn't been.
19        Q.   Any other particular standard that could
20   be applied to identify when Dr. Duggan has
21   demonstrated sufficiently that the cost per claim
```
Page 96

Depo-Young-Steven-05-13-09
22  for the ten states -- I'm sorry -- the
00264
1  reimbursement for the per claim for the ten states
2  was sufficient to extrapolate to the 38 states?
3      A.    Again, that's the fact he's using to try
4  to support his argument.
5          Fundamental argument is that the two
6  populations are similar enough to allow for the
7  methodology that he's used, and that is what I'm
8  taking overall exception to, and I do not believe
9  that these two justifications properly support his
10  position that they are.
11      Q.    Okay.  And -- and the two different things
12  you're referring to are that one thing you did was
13  to compare the average reimbursement for the
14  ten states as compared to the 38, and you also
15  confirmed that the 38 states used AWP or WAC in
16  some fashion in their reimbursement methodologies?
17      A.    That's correct.  And -- and the first
18  bullet point based on some additional information
19  that I've -- I've looked at since then is
20  particularly suspect.
21      Q.    But that information is not contained in
22  your expert report?
00265
1      A.    It's in my revised list of documents.
2      Q.    What are you talking about?
3      A.    The OIG performed a detailed analysis of
4  the comparability of reimbursements between states
5  and found that even though people appear to have
6  similar formulas they result in drastically
7  different levels of reimbursement, and, in fact,
8  found that even for the most common reimbursement
9  level of AWP minus 10 percent where every single
10  one had the same reimbursement structure for the
11  28 drugs that they looked at there was a drastic
12  difference and variability in the resulting
13  reimbursements.
14      Q.    That's listed on -- in the objections that
15  were provided to us yesterday as amended today?
16      A.    That's correct.
17      Q.    Okay.  And that's a document you never had
18  before, before yesterday?
19      A.    That's correct.
20      Q.    Provided to you by counsel?
21      A.    Yes, it was.
22      Q.    On page 16, the heading before item 40,
00266
1  you said:
2          Dr. Duggan extrapolated to unanalyzed
3  populations.  Do you see that?
4      A.    That's correct.
5      Q.    And then you say:
6          Extrapolated to unanalyzed 38 other states
7  in the next sentence.
8      A.    Um-hmm.
9      Q.    Okay.  So you're not giving any credence
10  whatsoever to the analysis of the SDUD or
11  SMURF max data, is that -- is that what you're
12  saying here?
13      A.    What -- if you could provide specifically
14  what analysis that you're referring to?
15      Q.    Well, you're -- so you're -- you're just
Page 97

Depo-Young-Steven-05-13-09

16  saying Dr. Duggan never looked -- never analyzed
17  the SMURF max or -- or SDUD data, is that what
18  you're saying?
19      A.   In essence, the indication that I have is
20  that other than for purposes of determining
21  homogeneity between the populations, these are the
22  only things that he's done, and beyond that, the
00267
1   only, I guess, analysis per se would be to say the
2   totals aren't too much different.  So, you know,
3   they must be the same.
4       Q.   So they are analyzed, just not to your
5   satisfaction.
6       A.   Again, that's not addressing -- just
7   because one -- I mean, obviously, they are all
8   supposed to be an accumulation of a total number
9   that's the same, so merely saying the total number
10  in Illinois versus the total number in Illinois
11  does nothing to analyze whether Illinois is
12  homogeneous to Texas.  So the unanalyzed means
13  analyzing the underlying information, not
14  comparing totals.
15      Q.   On page 17, you have a section about not
16  considering variability in Medicaid reimbursement
17  across the states, and, again, say:
18           Dr. Duggan made no attempt to determine
19  the basis of the claims for which he seeks
20  recovery.
21           Is that another example of the reason that
22  you say that extrapolation from the ten to the 38
00268
1   was inappropriate?
2       A.   It is -- it's probably both an element of
3   the extrapolation and the underlying analysis of
4   the ten states.
5       Q.   And that's to support your point, you
6   include Figure 4 in your report; right?
7       A.   That's correct, and, you know, obviously
8   the Myers & Stauffer summaries that -- that we
9   have already discussed related to that -- that
10  variability and had the information that had basis
11  of payment in it.
12           THE REPORTER:  Basis of payment?
13           THE WITNESS:  Basis of payment.
14  BY MR. LAVINE:
15      Q.   Okay.  But I see on page 17, big bold
16  heading:
17           Dr. Duggan's methodology cannot consider
18  the variable of Medicaid reimbursement across
19  states, and then the very next thing that -- very
20  next figure you show right on the same page is
21  this Figure 4, which shows some information
22  relating to the variability of reimbursement for
00269
1   that particular NDC for Kentucky; right?
2       A.   That's correct.
3       Q.   Now, the NDC that you have identified in
4   here is an error, isn't it?
5       A.   You're indicating that I made a
6   typographical error in the NDC that I listed?
7       Q.   Well, can you look at that and tell me if
8   that's a correct NDC?
9       A.   It -- it does not include all of the
Page 98

Depo-Young-Steven-05-13-09
10  digits of the NDC.  My copy is a little blurry,
11  but there's -- you're right.  There's clearly
12  additional digits that would have package size on
13  there I believe.
14      Q.    And do you know if this chart includes
15  just a single package size or is this charting the
16  reimbursement variability in connection with just
17  a particular product?
18      A.    Well, product or package size, I would
19  guess since it does not have package-size
20  specificity, I would have to go back and -- I
21  would have to go back and take a look and see
22  whether these are quantity justified within the
00270
1   package sizes or whether it is related to one
2   package size and whether the reimbursement formula
3   results in anything different.
4           Normally, the AWPs are consistent across
5   package sizes.  Therefore, the reimbursement per
6   unit is consistent across package sizes, but I
7   could go back and confirm that, but I believe that
8   to be the case.
9       Q.    Is this another chart that Mr. Rohn put
10  together for you?
11      A.    Yes.  I directed him to -- to put this
12  together.
13      Q.    Can you explain to me how this chart
14  supports your point?
15      A.    Well, let me, I guess, give you an
16  example.
17          Normally, when you're analyzing claims
18  data, particularly of -- of pharmacy claims data,
19  you definitely want to understand if -- if you're
20  saying reimbursements right or wrong for a given
21  reason, you want to understand what the basis
22  of -- of that reimbursement was.
00271
1           For example, I believe it's the state of
2   New York for these type of drugs based on a Myers
3   & Stauffer analysis appears to have a provision
4   that says:
5           Irrespective of anything else, if you have
6   an IV compound, it would be 50 bucks flat.  We're
7   going to pay you $50 for that.
8           Okay.  If you don't understand the
9   underlying basis of payment, and clearly, that
10  would be unaffected by AWP, at least I believe
11  that it would be, and I believe that Dr. Duggan
12  would likely agree with that, that that $50 flat
13  fee that they chose to -- to give for any
14  compounded solution up to that amount is
15  unaffected by the AWP of whatever happened to go
16  in there if that were the case in my hypothetical,
17  and one merely goes through and adjusts every
18  claim without looking at basis of payment down to
19  some new level, you would be overstating what the
20  issue is that you were trying to define down to,
21  in this case, his AWP-type calculation, and when
22  you have variability like this, not only that --
00272
1   that there's a lot of dots spread around, but,
2   also -- and there may very well be a valid reason
3   for this, but this kind of line that appears that
Page 99

Depo-Young-Steven-05-13-09

4    is inconsistent with the line -- the other lines
5    that appear to exist in the data.
6            Without understanding what's driving that,
7    my past experience is that you will run the risk
8    of not catching all of the issues that you should
9    be dealing with, and that's why we tend to do kind
10   of a combined analysis, and other people that I've
11   seen that do this type of work do a combined
12   analysis where you might do the Myers & Stauffer
13   approach of looking at what people tell you and
14   what the documents say, but you always have to go
15   back to the data, because oftentimes you don't get
16   a full picture by doing that type of thing, so
17   that's -- that's really what I was trying to get
18   to in this section or at least related to this
19   paragraph.   There are other points in subsequent
20   paragraphs.
21       Q.    Sure.   But can we put this in the category
22   of another example as to why Dr. Duggan failed to
00273
1    demonstrate that extrapolating from the ten to the
2    38 was appropriate?
3        A.    No, not necessarily, because it could
4    be -- I mean that -- that is a primary issue, but
5    it could also affect the ten-state analysis that
6    without doing a data analysis it could be an issue
7    related to that also.
8            I mean, I think the primary point here
9    though, you're right, was the extrapolation issue.
10   It could impact the ten, thereby kind of messing
11   up the extrapolation based on the -- the initial
12   population also, but that's the primary concern
13   that I had with this one.
14       Q.    Is there any particular type of
15   quantifiable test that you applied to this issue?
16       A.    No.   That's part of the -- well, the
17   quantifiable test would be analytical review that,
18   you know, every one of these calculations is
19   different, and until you have analyzed the data
20   and understand the data, look for trends in that
21   data, resolve any trends in that data as well as
22   doing a lot of the -- the good fact-finding
00274
1    that -- that Myers & Stauffer did related to the
2    variability, until you execute that, it's been my
3    experience in -- in dealing with trying to justify
4    my calculations to companies and -- and providers
5    and -- and the government that until you've
6    reached that level of justification, they're not
7    going to accept your answer, and that's the
8    standard that I'm applying.
9        Q.    So isn't -- isn't that the same standard
10   as others?   There's variability shown by Figure 4
11   that Dr. Duggan hasn't addressed and explained
12   appropriately in a way to support his initial
13   calculation with respect to the ten or his ability
14   to take the ten and extrapolate to the 38?
15       A.    But variability is a very broad category
16   that there could be many issues buried within
17   variability.   Basis of payment is a very important
18   issue.
19           If the basis of payment would be
20   unaffected by what you are trying to calculate,

Page 100

Depo-Young-Steven-05-13-09
21    what you're trying to achieve, and you don't know
22    what the basis of payment is, then you run the
00275
 1    risk of including something that should not be
 2    included because it had a basis of payment that
 3    was unaffected by what you're analyzing.  So it --
 4    admittedly, you may identify it through
 5    variability or through data analysis, but it's a
 6    discrete issue that you have to understand and
 7    know before you can extrapolate from one
 8    population to another.
 9         Q.    And so Dr. Duggan, by not digging down
10    deeper into this particular issue, might not have
11    identified other issues related to the -- the data
12    and the claims payments.
13         A.    Well, more specifically, would have
14    calculated damages or differences even when he
15    would have admitted there weren't differences had
16    he known about what would have been uncovered in
17    that process.
18         Q.    But you didn't in your analysis identify
19    that had Dr. Duggan done this particular analysis
20    he would have discovered that, you know, some
21    other assumption he made was inappropriate?
22         A.    No.  I'm sorry.
00276
 1             What -- what I was doing was saying if you
 2    apply what is normally applied in these
 3    circumstances, if Dr. Duggan would have done that,
 4    he would have been required to do these analyses,
 5    and that issues may have come to his attention.
 6             I did not attempt to quantify or -- or
 7    provide any quantitative model as to the potential
 8    impact of that.
 9         Q.    And you have not -- you have not even done
10    any particular analysis or -- or -- let me start
11    over.
12             You can't even identify any particular
13    analysis that Dr. Duggan might have found
14    necessary had he drilled down to these issues
15    you're describing?
16         A.    Again, the first step in the analysis is
17    to analyze the data, understand trends in the
18    data, and, when you see trends, resolve those
19    trends.
20         Q.    So you didn't even do the first level of
21    the analysis?
22         A.    He did not do the first step -- he did not
00277
 1    do the first step of the analysis, so until you do
 2    the first step of the analysis, he does not know
 3    what he would have found had he done what people
 4    normally do in these circumstances.
 5         Q.    But you haven't done the first test --
 6    step either.  You're just saying he needed to have
 7    had done it.
 8         A.    That's correct.
 9             He was responsible for the calculation,
10    and I was responsible for critiquing that
11    calculation under my scope of work.
12         Q.    Have we discussed now all of the critiques
13    of Dr. Duggan's opinions that are supported by
14    your Figure 4?
                                                    Page 101

Depo-Young-Steven-05-13-09

15      A.   I believe that covers it.
16      Q.   Okay.  You next discuss in paragraph three
17   the fact that the aggregate spending data, this --
18   this SMURF max and SDUD data includes dispensing
19   fees; correct?
20           MR. TORBORG:  I'm sorry.  Where -- where
21   are you, Mark?
22           MR. LAVINE:  We're at three.
00278
1            THE WITNESS:  Yes.
2    BY MR. LAVINE:
3       Q.   And am I correct that's another example of
4    an issue that could affect the -- the propriety of
5    an extrapolation from the ten to the 38 that
6    Dr. Duggan should have addressed but failed to
7    address in your opinion?
8       A.   That's correct, variability within that
9    component.
10      Q.   Within the -- the dispensing fees as
11   they're -- because they're included in the
12   aggregate data?
13      A.   Well, yes.  That -- that you had to look
14   at both issues, and, you know, differences in not
15   only the -- differences in the overall
16   reimbursement model including, you know
17   compounding fees and things of that nature.
18      Q.   But same position, you've identified a
19   problem, but you have not applied any particular
20   test that Dr. Duggan should have applied; right?
21      A.   Again, my -- the purpose of my report was
22   to indicate what would normally be done in these
00279
1    circumstances, not to execute those for
2    Dr. Duggan.
3       Q.   So...
4       A.   I did not.
5       Q.   Okay.  Thank you.
6            Your next point is relating to
7    extrapolating from one-quarter of data from
8    one state to 38 other states.
9            I think, again, this is an example of not
10   supporting the basis for the extrapolation.
11      A.   That's correct.
12      Q.   And you didn't do any -- identify any test
13   that would have shown this to be appropriate?
14   I'll stop there.
15           MR. TORBORG:  Object to form.
16           THE WITNESS:  Again, there's significant
17   factual basis to indicate that they're not
18   comparable, and those issues have not been
19   addressed or resolved by Dr. Duggan.
20   BY MR. LAVINE:
21      Q.   But any particular methodology that he may
22   have used to establish the -- whether or not that
00280
1    was appropriate, you -- you can't identify any?
2       A.   There is clearly issues that -- and facts
3    that indicate that it's not homogeneous, and I
4    believe it's his responsibility to do that, and he
5    has not done that, and I have not done that for
6    him.
7       Q.   Now, the reference to the Illinois example
8    is just the specific support for your prior point;
Page 102

Depo-Young-Steven-05-13-09
```
 9  right?
10      A.    It's one example, that's correct.  I mean
11  Illinois gives, you know, particular concern, yes.
12      Q.    But to the extent there's other examples,
13  that's -- they're contained in the report
14  somewhere; right?
15      A.    Right.  I think the overall point of if --
16  if you look at the table that talks about the
17  limited data he had and extrapolating it back and
18  down, they're all elements of the problems with
19  extrapolation.  It's not an issue that Illinois is
20  the only issue that he has.  That's merely an
21  example of how his extrapolation methodology isn't
22  supported.
00281
 1      Q.    And then your next bullet point is that
 2  Dr. Duggan did not consider the wide variation of
 3  product reimbursement formulas across states.
 4            Is this any different than what we
 5  discussed earlier in relation to paragraphs 40 to
 6  41?
 7      A.    I think -- I think this is -- well...
 8            Again, 40 and 41 is kind of the
 9  introduction to the section per se, and then
10  there's specific examples that raise concern.  So,
11  for example, you have Texas, which is one of the
12  highest reimbursing Medicaid states in the
13  country, and he chose not to select it just
14  because it's not high for these drugs is
15  concerning.
16            I mean, that, you know, one could look at
17  it objectively, although I haven't been able to
18  quantify this, because, again, my job is to
19  critique, but there is a significant risk when you
20  have one of the biggest Medicaid states and you
21  don't select it because it has a small amount of
22  reimbursements related to these drugs but then
00282
 1  take the percentage that you arrive at for the
 2  high volume for these states and extrapolate it
 3  down that you could be taking from
 4  high-reimbursement states and inappropriately
 5  applying it to a lower-reimbursement state and --
 6  as opposed to objectively saying, "What are the
 7  ten biggest," having an objective measure of --
 8  that couldn't be biased because of that issue and
 9  saying, "Here's the ten largest Medicaid states as
10  it relates to total drug expenditures or total
11  Medicaid expenditures."
12            You know, that -- that even if someone
13  were to attempt an approach like this, you know,
14  which will still have all the other flaws, at a
15  minimum, Texas would strike me as one that would
16  always be included in that analysis, so what we're
17  really trying to do is give some granular examples
18  of what gives me concern.
19            MR. LAVINE:  We need to break.
20            THE VIDEOGRAPHER:  Going off the record at
21  5:00 p.m.
22                      (Whereupon a discussion was had
00283
 1                       off the record.)
 2                      (Whereupon, the deposition was
                         Page 103
```

Depo-Young-Steven-05-13-09
```
 3        continued to 9 a.m. on May 14,
 4        2009.)
 5
 6
 7
 8        _____
 9                SIGNATURE OF THE WITNESS
10
11  Subscribed and sworn to and before me
12  this _____ day of _____, 20____.
13
14
15  _____
16            Notary Public
17
18
19
20
21
22
00284
 1  STATE OF ILLINOIS  )
    COUNTY OF C O O K  )
 2              The within and foregoing deposition of
 3  the witness, STEVEN J. YOUNG, was taken before
 4  CYNTHIA J. CONFORTI, CSR, CRR, Notary Public, at
 5  77 West Wacker Drive, 35th Floor, in the City of
 6  Chicago, Illinois, commencing at 9 a.m., on May
 7  13, 2009.
 8        The said witness was first duly sworn and
 9  was then examined upon oral interrogatories; the
10  questions and answers were taken down in shorthand
11  by the undersigned, acting as stenographer and
12  Notary Public; and the within and foregoing is a
13  true, accurate and complete record of all the
14  questions asked of and answers made by the
15  aforementioned witness at the time and place
16  hereinabove referred to.
17              The signature of the witness was not
18  waived and the deposition was submitted to the
19  deponent as per copy of the attached letter.
20        The undersigned is not interested in the
21  within case, nor of kin or counsel to any of the
22  parties.
00285
 1        Witness my official signature and seal as
 2  Notary Public in and for Cook County, Illinois, on
 3  this 26th day of May, 2009.
 4
 5
 6  _____
 7  CYNTHIA J. CONFORTI, CSR, CRR
 8  License No. 084-003064
 9
10
11
12
13
14
15
16
17
18
```

Page 104

Depo-Young-Steven-05-13-09
19
20
21
22