# Exhibit A

```
                                                                        1


                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS


      IN RE:                        )
                                    )  CA No. 01-12257-PBS
      PHARMACEUTICAL INDUSTRY AVERAGE )  CA No. 06-11337-PBS
      WHOLESALE PRICE LITIGATION    )  Pages 1 - 111
                                    )




                            MOTION HEARING

                BEFORE THE HONORABLE PATTI B. SARIS
                    UNITED STATES DISTRICT JUDGE




                                     United States District Court
                                     1 Courthouse Way, Courtroom 19
                                     Boston, Massachusetts
                                     October 20, 2009, 2:10 p.m.







                            LEE A. MARZILLI
                       OFFICIAL COURT REPORTER
                     United States District Court
                     1 Courthouse Way, Room 7200
                         Boston, MA  02210
                           (617)345-6787
```

1  causation is established by the fact that any reduction of
2  1 percent or more of the Dey drugs will establish causation
3  as to Dey, and as to the Roxane drugs, any reduction of
4  1 percent or more.
5       So this Court does not have to decide what is the
6  appropriate "but for" AWP. You don't have to decide what's
7  the appropriate spread, speed limit. All of our drugs have
8  spreads way in excess of 30 percent. And so any reasonable
9  reduction, any reasonably honest AWP would have affected the
10 median. So we're not asking the Court to determine damages
11 for us. So that's why I think this piece of our case -- and
12 we're just talking -- this looks like $3.52 as opposed to
13 $1.70 or something, but when this is multiplied out through
14 the case, the effects are very substantial.
15      I would like to jump to the last array in this
16 time period, which is the third quarter of 2001. You can
17 see on the screen, your Honor, this is a more sophisticated
18 array. It's in a spreadsheet. Almost all of the arrays in
19 this case were produced in electronic format, and therefore
20 it's actually rather easy to substitute different numbers to
21 see what happens, and I'd like to do that with a replicate
22 of this array in Excel format.
23      THE COURT: Where is this?
24      MR. HENDERSON: This is a replicate of what you
25 just saw.

23

1       THE COURT: What I just saw was what number so I
2  can follow it? In other words, Mr. Henderson, I'll never
3  remember this tomorrow.
4       MR. HENDERSON: That's right. This is a replicate
5  of the page marked Page 35 of 74 of the same --
6       THE COURT: Thank you.
7       MR. HENDERSON: And for your information, in the
8  bottom right-hand corner of the document is a footer, which
9  was actually added for purposes of litigation, which shows
10 the electronic production pathway, just for purposes of all
11 parties to show exactly where that is, but that footer also
12 identifies the year and the quarter when the array was in
13 effect.
14      In this particular replication that's on the
15 screen, your Honor, I've eliminated a few or I've hidden a
16 few columns so everything can fit on one page so I don't
17 have to be looking around too much. But you'll see the
18 cursor is on Dey's product, first product, package of 25s.
19 And if that is lowered to just $3.50, and I do that for each
20 one, you can see the generic median here where I have the
21 cursor went down from $3.52 to $3.51.
22      The brand names are shown in this lower panel.
23 The lowest brand is $3.52, which is Roxane's ipratropium
24 bromide NovaPlus drugs, but the allowable amount has changed
25 to $3.51. And the same is true if we changed the numbers

24

1  for Roxane products: Just lowering them by two cents would
2  change the median and the allowed amount.
3       Now, this impact exists, as I said, up through the
4  third quarter of 2001. A declaration of Ian Dew -- let me
5  just refer your Honor to the language of Carolyn Helton's
6  declaration where she says -- I'm sorry -- with regard to
7  both companies, that for this period, any reduction of
8  1 percent or more in the AWPs of the Dey products would
9  lower the median and the allowed amount. The same is true
10 as to the Roxane products.
11      And our consultant Ian Dew prepared a summary of
12 the claims data. The claims data of the Cigna DMERC
13 Region D claims for this product shows that about a million
14 claims were paid by Cigna for ipratropium bromide; and of
15 those, approximately 90 percent, over 900,000, were paid at
16 either $3.52 or 95 percent of that $3.52, which is $3.34.
17 The rest of the paid claims, approximately 10 percent, were
18 paid at an amount consistent with the provider's charged
19 amount.
20      Now, we have not moved for summary judgment for
21 the time period after 2001 quarter three. At that point in
22 time things are a little bit different, and I'm going to
23 come back to this same spreadsheet and illustrate this
24 because Dey has moved for summary judgment on a piece of the
25 case which relates to our view that the combined impact of

25

1  Dey and Roxane must be considered.
2       In short, after the third quarter of 2001, we can
3  change the AWPs of Dey down to a penny, and it doesn't
4  change the outcome, the median calculation. We can change
5  the AWPs of Roxane down to 1 cents, and it still doesn't
6  change the median calculation. However, if we change the
7  AWPs, if we lower the AWPs of both Dey products and Roxane
8  products by 1 percent or more, it does affect the median.
9       And I think it's helpful to see why this happens,
10 and what I'm going to do is go to a replicate of the next
11 quarter when things change. This array is virtually
12 identical with one exception: Apotex has entered the market
13 with a new product. We can see that their AWP for a package
14 of 25s is fairly high. It's $4.48, which is higher than the
15 Dey products and the Roxane products.
16      Now, under Dey's theory of the case on which they
17 seek summary judgment, because there is one more company
18 that has entered the market with an inflated AWP, according
19 to Dey, the United States cannot recover a penny because
20 Dey's products in isolation do not affect the median;
21 likewise, Roxane products in isolation do not affect the
22 median; and, according to their view of the case, the United
23 States' ability to prove damages and recover evaporates
24 because one additional company has entered the market. And
25 I would suggest to your Honor, that just cannot be. We have

Page 26

1 clearly demonstrated that these companies --
2     THE COURT: Well, couldn't you get penalties
3 anyway?
4     MR. HENDERSON: Yes.
5     THE COURT: So why does -- I mean --
6     MR. HENDERSON: The False Claims Act allows us to
7 recover our losses.
8     THE COURT: When you say you can't collect a
9 penny, I mean, wouldn't knowingly false presentation of
10 claims money create a penalty situation even if you can't
11 prove damages?
12     MR. HENDERSON: Well, that would be our position.
13 I'm sure the defense would argue that there's no causation
14 because it wouldn't have affected the amount of the claim.
15     THE COURT: So you still need the causation, even
16 if it's completely false?
17     MR. HENDERSON: We would probably have a disputed
18 legal argument on that, your Honor, but I think it's evident
19 that we have proven this demonstrates that Dey and Roxane
20 combined have a large impact on the allowed amount. And the
21 law doesn't leave us without a remedy for these losses,
22 putting aside the civil penalty issue. The Restatement of
23 Torts, Section 442-A, Comment D, I'll just read it for you,
24 your Honor, quickly: "A force due to an act of a third
25 person, which is wrongful toward another who is harmed, may

Page 27

1 be only a contributory factor in producing the harm. If so,
2 both the actor and the third person are concurrently liable.
3 This is true although the actor's conduct has ceased to
4 operate actively and has merely created a condition which is
5 made harmful by the operation of the intervening force set
6 in motion by the third party's negligent or otherwise
7 wrongful conduct."
8     And then it goes on to say, your Honor, "However,
9 while there is concurrent liability, the two forces are not
10 concurrent causes, as that term is customarily used. To be
11 a concurrent cause, the effects of the negligent conduct of
12 both the actor and the third person must be an active and
13 substantially simultaneous operation."
14     And here we have the effects of the wrongful
15 conduct of both Dey and Roxane in effect in simultaneous
16 operation affecting the outcome of the median calculation.
17     Just so I can highlight to you --
18     THE COURT: You know, I struggled with this
19 mightily in the big class action suit.
20     MR. HENDERSON: Yes, I'm aware of that.
21     THE COURT: I struggled with it, and there were no
22 good cases on this. There's that sort of abstract
23 Restatement of Torts language. It's a very hard issue.
24     MR. HENDERSON: Well, in that case, of course,
25 your Honor only had one company before it, and there was

Page 28

1 proof of liability only with respect to one company; and
2 when you substituted the arrays in that case, it didn't
3 change the median. And in fact we followed that approach in
4 the case of Dey with respect to its albuterol drug, a same
5 drug. We didn't sue all of the other parties in there. And
6 the damages we've calculated against Dey are very small,
7 tens of thousands of dollars.
8     THE COURT: You're saying the difference here is,
9 there are two fraudulent actors, if you will?
10     MR. HENDERSON: That's correct, and we've proven
11 wrongful conduct on the part of both of them, and their
12 combined impact establishes/demonstrates a big loss. And
13 there can be no question, your Honor, that the Medicare
14 program suffered substantial losses as a result of the
15 combined impact of false pricing.
16     THE COURT: Okay, since we only have ten minutes
17 left, why don't you deal with the purple elephant in the
18 room, which is the government knowledge defense. Does that
19 apply to this drug?
20     MR. HENDERSON: Well, we're talking about the
21 Medicare context, so I suggest the government knowledge is
22 really resolved to the government's favor by the First
23 Circuit's recent decision, in which they effectively upheld
24 your interpretation of "average wholesale price." Certainly
25 all the government knowledge --

Page 29

1     THE COURT: Well, that's absolutely true, they
2 did. On the other hand, I didn't deal with -- I don't
3 remember whether ipratropium bromide was on a list in the
4 OIG reports and whether or not there was a DOJ price for
5 them. I mean, it was different in those branded drugs
6 factually, not in terms of the standard but factually.
7     MR. HENDERSON: I understand, your Honor, and
8 there have been -- there was one OIG report focusing on
9 ipratropium bromide.
10     THE COURT: In what year?
11     MR. HENDERSON: I think it was the early 2000s.
12 What was the year? 1998? Okay, I'll take Roxane's word for
13 it.
14     THE COURT: And what does it do? It lists the
15 true price?
16     MR. HENDERSON: It indicates -- it evaluates the
17 discounts that were available in the market and discusses
18 that the AWPs for ipratropium bromide were inflated.
19     THE COURT: At the levels that you have them in
20 that graph? Do you remember?
21     MR. HENDERSON: I don't recall. There are some
22 significant inflations there. But let's assume for argument
23 that the OIG understood at that time and had some specific
24 evidence that there was inflation in ipratropium bromide
25 prices. Obviously, the government does not agree that an