# EXHIBIT D

| STATE OF WISCONSIN | CIRCUIT COURT BRANCH 9 | DANE COUNTY |
|---|---|---|

STATE OF WISCONSIN,

                    Plaintiff,

    v.                                  Case No. 04 CV 1709

PHARMACIA CORPORATION,

                    Defendant.

FILED SEP 30 2009 STATE OF WISCONSIN CIRCUIT COURT FOR DANE COUNTY

## DECISION AND ORDER ON REMAINING FORFEITURES ISSUES

### NUMBER OF FORFEITURES

    The jury's clearly erroneous verdict answer setting the number of false statements or representations knowingly made or caused to be made by Pharmacia at 1.44 million has created a considerable task for this court in resolving the remaining forfeitures issues in this case. Hence, the unfortunate delay in issuing this decision.

    For starters, this court's standard for reviewing the jury's verdict has been called into question. Defendant argues that because the verdict is so lacking in integrity on this one question due to plaintiff's misleading closing argument, the answer should be scrapped altogether. Moreover, if this court is intent on doing anything other than zeroing out this answer, it should decide the number of misrepresentations, if any, *ab initio* applying the middle burden of proof (on which the jury was instructed) to the existing factual record.

    While a tempting argument given the circumstances, it is ultimately unsustainable. Review of pertinent appellate decisions reveals that this case is not the first in the annals of Wisconsin litigation where a jury has completely missed the boat. Unsurprisingly, a body of case law has evolved to deal with just this type of circumstance. See, for example, *Reyes v. Greatway Insurance Company*, 220 Wis. 2d 285, 301 *et seq.* (Ct. App. 1998) in which the jury simply created out of whole cloth an award of future medical expense that was almost four times the amount actually supported by the credible evidence in the record. The trial court's remedy, according to the court of appeals, was to reduce the amount of the award to the maximum

"supported by the credible evidence in the record." *Id.* at 302. Accordingly, even where a jury simply makes up an answer to a jury verdict question that creates an award vastly in excess of what the evidence supports, the court does not become the fact finder after tossing the defective verdict. Rather, this court is compelled by appellate authority to determine an award that is supported by credible evidence. I see no reason to distinguish the situation in which a jury verdict is erroneous due to the mistaken argument of counsel from that in which the jury errs all by itself, especially since our legal system frowns on punishing the client for the sins of its attorney, at least where, as here, there is no compelling evidence that the client was complicit in the sin. In *Reyes*, apparently the jury was correctly instructed and the jury question properly framed. The same is true in the case at bar.

Applying the "credible evidence" standard here is where the real predicament begins. It has required the court to reread the entire trial transcript and most exhibits[1], because the credible evidence on this question is scant at best, widely scattered, and none too clear. This is mostly due to the plaintiff's adopting an unsustainable theory of recovery (equating claims paid with misrepresentations made), thereby largely eschewing the presentation of evidence that would have been right on point. In short, plaintiff went "all in" on a predictably losing long shot, leaving a mess behind for the court to clean up.

Be that as it may, credible evidence in the record supports that (1) all of Pharmacia's published AWPs were false, (2) plaintiff's Medicaid program reimbursed pharmacies for dispensing certain Pharmacia drugs (largely patent drugs; sometimes, but only rarely generics) based upon these published AWPs, (3) the plaintiff received all of its false Pharmacia AWP pricing information from compendia published by First DataBank which, in turn, obtained it from Pharmacia, and (4) Pharmacia knew that plaintiff would and did rely on the false AWPs published in First DataBank in determining the amount to reimburse the participating pharmacies for dispensing certain Pharmacia products. Indeed, the jury's verdict determined the evidence on these points to be largely clear and convincing.

But these findings are insufficient to answer Question No. 5, i.e. *how many false statements or representations of material fact for use in determining rights to Wisconsin Medicaid payment did Pharmacia Corporation knowingly make or cause to be made?*

Plaintiff posits the answer to this question, based upon what it alleges to be the credible evidence in the record, to be 30,485, later reduced to 26,319. Its proof consists of a simple mathematical calculation based upon the testimony of former

---

[1] This task has substantially validated this court's decision to sever the trials against each individual defendant in this mass litigation. Had all cases been tried together, this court would have been faced with the virtually unendurable burden of combing a massive transcript from months of trial to glean the credible evidence pertinent to calculating each of over 30 defendants' misrepresentations under the Medicaid fraud statute-- a burden entirely caused by just one fallacious, overreaching jury argument. Needless to say, this jury argument will not be repeated in any future trial, absent further directive to the contrary from the appellate courts.

Medicaid Director Mark Moody regarding the frequency with which Wisconsin Medicaid (through its agent EDS) obtained AWP updates on Pharmacia drugs from First DataBank, pursuant to its contract. Multiplying the number of Pharmacia drugs by (1) the frequency per quarter of the First DataBank updates and by (2) the number of quarters First DataBank published AWPs for each Pharmacia drug yields the answer.[2]

Not surprisingly, defendant demurs to plaintiff's methodology on a number of grounds, the most salient being these. First, defendant contends that plaintiff's math does not measure misrepresentations made or caused to be made by Pharmacia, but the number of times Wisconsin Medicaid chose, by contract, to look at these misrepresentations. By analogy-- admittedly oversimplified--, the defense argument is that the forfeiture statute is directed at the number of times defendant constructed a billboard publishing a false AWP, or caused others to construct such false billboards (i.e. defendant's culpable conduct), while plaintiff is measuring the number of times it chose to look at the billboard (i.e. the consequences of defendant's culpable conduct). The former is the standard determined by this court's prior rulings, while the latter suffers from the same flaw as the jury's answer.

I disagree with the defense analysis, at least insofar as it attacks the basic methodology advanced by plaintiff.

Here, credible evidence supports that defendant Pharmacia knew that the pricing compendia such as First DataBank would periodically update AWP pricing, and that Pharmacia actively participated in that process by supplying AWP information on its drugs to these compendia. In doing so, it knew First DataBank would in turn sell these updates to its customers (including Wisconsin Medicaid) and, in fact, intended this to happen, or at least took no steps to ensure that it would not happen. In short, defendant Pharmacia caused First DataBank to publish false AWP updates to Wisconsin Medicaid, within the meaning of the statute, and each time these updates were purchased by Wisconsin for each drug, a separate misrepresentation occurred sanctionable under §49.49 (4m) (a) 2, Stats., provided that the other prerequisites to imposing forfeitures under that statute exist [e.g. materiality, (see below)].

This situation differs fundamentally from the defect in the jury's verdict equating claims paid with misrepresentations made. In paying a pharmacy's claim, Wisconsin Medicaid (through its agent EDS) consults its own computer database containing the AWP update and so, in that process, no additional misrepresentation has been made or caused to be made by Pharmacia. The representation was made previously, i.e. at the point where the AWP update was sold to Wisconsin Medicaid by First DataBank, as contemplated and facilitated by defendant Pharmacia. Whether the AWP update sold was a new price or simply reiteration of the existing price is immaterial, because credible evidence supports the proposition that *all* Pharmacia AWPs were false.

---

[2] The proposed answer was reduced by plaintiff from 30,485 to 26,319 upon discovery that the frequency of updates obtained by Wisconsin Medicaid from First DataBank was not constant, but varied over the years, depending upon the particular contract in play at any given time.

3

Defendant Pharmacia's AWP practices were thus a substantial factor in every AWP update by First DataBank to Wisconsin Medicaid, either by participating in these new updates by providing the information to First DataBank, or through knowingly allowing old false pricing information to be repeatedly sold.

So to underpin its forfeitures claim, plaintiff certainly can rely on the credible evidence establishing the number of times First DataBank published Pharmacia's AWPs, either initially at the time of the particular drug's rollout or on update. But is the credible evidence here sufficient to support either of the two numbers the plaintiff has argued (30,485 or 26,319)? Defendant says no, contending that the evidence utterly fails to demonstrate what update option, among several, Wisconsin Medicaid contracted to purchase on subscription from First DataBank at any particular time. My review of the evidence reveals that defendant is correct. Did Wisconsin Medicaid purchase only updates on drugs subject to price changes, or updates on all Pharmacia AWPs regardless of whether a particular drug's price had changed since the last update, or a combination of both over the years?

The question is ultimately irrelevant. Even if Wisconsin Medicaid had only purchased updates on drugs specifically subject to price changes, First DataBank's response would have constituted an implicit affirmative representation, condoned by Pharmacia, that where a drug was not updated, its AWP remained as previously represented. In other words, there would be an implicit reaffirmation of a false AWP-- a new misrepresentation caused to be made by Pharmacia which, again, knew that Wisconsin Medicaid was relying on its pricing through First DataBank.

A more lethal attack on plaintiff's forfeitures claim inheres in defendant's contention, based upon *State v. Williams*, 179 Wis. 2d 80 (Ct. App. 1993), that plaintiff has failed to establish the *materiality* of defendant's misrepresentations, regardless of how many it made or caused to be made, because plaintiff has failed to prove the number of misrepresentations that actually were used by Wisconsin Medicaid in determining the amount of reimbursements to pharmacies. Did a particular Pharmacia AWP result in one overpayment, or thousands, or none? If none, can the misrepresentation be the basis for the forfeiture? The answer, according to *Williams*, is no.

The forfeitures wellspring is §49.49 (4m) (a) 2, which provides that

"[n]o person, in connection with medical assistance, may:

...

2. Knowingly make or caused to be made any false statement or representation of a material fact for use in determining rights to a benefit or payment."

A forfeiture may be awarded under §49.49 (4m) (b), Stats., for each statement or representation that violates the above section. But the statute is ambiguous concerning whether or not a false statement or representation actually has to be used in determining rights to a benefit or payment before a forfeiture may issue. On the one

4

hand, the statute could be reasonably read to mean that simply making or causing a misrepresentation to be made for purposes of determining rights to a benefit or payment would suffice, regardless of whether the misrepresentation was actually used for that purpose. On the other hand, the statute could be reasonably read to require that the misrepresentation actually be used to determine rights to a benefit or payment, not that it is simply made for that purpose. *State v. Williams, supra,* adopts the latter construction in a case which, while not precisely on point, is awfully close and appears to ordain the result here.

In *Williams*, defendant, a home health aide, was criminally charged with medical assistance fraud in violation of §49.49 (1) (a) 1, Stats., for allegedly billing Medicaid for home health care services on certain days, when such services were, in fact, not provided on those days. At trial, defendant sought to offer proof that his billing statements did not actually affect the amount of medical assistance paid and therefore were not material under the statute. The trial court excluded the evidence as irrelevant because it failed to support a defense to the medical assistance fraud charges. The court of appeals reversed defendant's conviction on fifty-two counts of medical assistance fraud, finding that the trial court erred in excluding the evidence:

> "Essentially, the Williams contend that the trial court erred by excluding this evidence because it is relevant to the issue whether the false statement was *material.*
>
> Materiality is an element of medical assistance fraud. Section 49.49(1)(a) 1, Stats., prohibits persons from "[k]nowingly and wilfully mak[ing] or caus[ing] to be made any false statement or representation of a material fact in any application for any [medical assistance] benefit or payment." The statute's plain language requires that the false statement of fact be material. At issue here is whether the Williams made false statements of facts that were material. The Williams' proffered evidence was intended to demonstrate that the false statements did not affect the amount of medical assistance benefits or payments. The evidence concerning the total hours worked and the billing procedures that led to the allotment of service hours to days on which the services were not performed is directly relevant to the materiality of the Williams' alleged false statements of the dates on which the services were provided.
>
> If the false statements did not affect the amount of benefits or payments made, an issue of materiality is raised. If the statements had no legal effect, the court could determine as a matter of law that the false statements were not material.

179 Wis. 2d at 87-88.

The pertinent language in §49.49 (4m) (a) 2, relating to forfeitures in our case is identical to the language at issue in *Williams*, i.e. "knowingly make or cause to be made any false statement or representation of a material fact..." In

*Williams*, a false statement or representation was found to be "material" only if it actually affected the amount of medical assistance benefits or payments made, although the section of the medical assistance fraud statute at issue there suffers from the same ambiguity as the statute in our case. That is to say, the statute in *Williams* could reasonably be read to penalize any false statement or representation of a material fact in any application for a medical assistance benefit or payment regardless of whether or not the false statement or representation was successful in affecting the amount of benefits or payments made. Nonetheless, because the statute prohibits only "material" misrepresentations, the court of appeals construed it to prohibit not simply false statements or representations in any application for a medical assistance benefit or payment, but only such false statements or representations which actually affected the amount of benefits or payments paid. Absent proof that the false statements or representations produced such an effect, "the court could determine *as a matter of law* that the false statements were not material." *Id.* (emphasis added).

Because forfeitures are penal in nature, and thus forfeiture statutes are to be strictly construed, *Williams'* analysis, although emanating from a criminal case, controls here. *See e.g. State v. Braun*, 103 Wis. 2d 617, 630 (Ct. App. 1991). This is because there is no rational basis upon which to adopt one interpretation of statutory language in the criminal context, and a diametrically opposed construction of the same language in a forfeiture case, especially considering the consanguinity of criminal penalties and forfeitures. Therefore, where Pharmacia's false AWPs were not actually "use[d] in determining rights to a benefit or payment", they are not material under §49.49 (4m), and thus cannot support forfeitures.

Here, the credible evidence fails to support the materiality of anywhere near 30,485 or even 26,319 misrepresentations by Pharmacia, as urged by plaintiff, because the proof is entirely lacking for the vast majority of the proven misrepresentations that the particular misrepresentations were actually used by Wisconsin Medicaid in determining pharmacy reimbursements.[3] Certainly the jury found that plaintiff suffered $7 million in damages from defendant's medical assistance fraud under §49.49, Stats. But did a handful of misrepresentations

---

[3] Plaintiff misconstrues two statements from prior decisions by this court in its attempt to escape the consequences of the *Williams'* holding. First, it interprets a passage from this court's May 15, 2009 "Decision and Order on Defendant's Motions after Verdict on Forfeitures", p. 3 as holding that reliance by Wisconsin Medicaid on Pharmacia's false AWPs is immaterial to the issue of forfeitures. The court's entire statement was this: "Pharmacia is subject to forfeiture for each false material statement or representation it made or caused to be made, not each time someone looked at it, or even relied on it." Fairly read in context, this statement is entirely consistent with *Williams*. Secondly, plaintiff points to this court's denial of summary judgment to either party on plaintiff's §100.18 claim as somehow controlling the medical assistance fraud forfeitures issue under §49.49. It doesn't, and plaintiff abandoned its forfeiture claims under §100.18 at the close of the evidence. Regardless, even if these two prior statements offered some support for plaintiff's position here—again, they don't— they would have to yield to the court of appeals' higher authority expressed in *Williams*.

cause most of this, or did thousands? In other words, the rate at which pharmacies dispensed various Pharmacia drugs undoubtedly varied, one drug from the next. How much of the $7 million was caused by thousands of pharmacy reimbursements on an extraordinarily expensive patent drug, all relying on one false AWP downloaded one time into the Wisconsin Medicaid/EDS database?[4] How much was caused by reimbursements relying upon thousands of updates on false AWPs?

In short, plaintiff had the burden on this motion of demonstrating at least credible evidence establishing not only the number of misrepresentations Pharmacia made or caused to be made, but that at least one pharmacy reimbursement claim was actually paid based upon each of these misrepresentations.[5] We turn now to the trial record to determine if such credible evidence exists.

Plaintiff is correct that we start with exhibits P436M and P436N. Plaintiff's expert DeBrock testified that these contain the First DataBank records from 1993 through 2006 for the average wholesale price (AWP) history for each Pharmacia drug NDC. (Transcript, Day 5, page 12).[6] These records constitute credible evidence that First DataBank published (i.e. "reported") Pharmacia prices quarterly, and that Wisconsin Medicaid reimbursed pharmacies at least once for each of the reported quarterly AWPs. Accordingly, tallying up the quarterly AWPs listed after June 3, 1994 in exhibits P436M and P436N yields a reasonable basis for establishing forfeitures under the credible evidence standard.

That tally totals **4,578**.[7] That there may be credible evidence establishing that prices were updated more frequently than quarterly is insufficient to increase the number of misrepresentations subject to forfeitures, because there is no way on this record, short of sheer speculation, to calculate how many of these more frequent updates, if any, resulted in a reimbursement to a pharmacy, as required by *Williams*.

---

[4] Exhibit 436H to Dr. DeBrocks testimony illustrates the point. There, one First DataBank false AWP for Pharmacia's Celebrex resulted in 377,740 pharmacy reimbursements, damaging the plaintiff $88,813. Plaintiff seeks a forfeiture for each pharmacy reimbursement (i.e. 377,740)-- the argument that led the jury astray-- and not just the one false AWP which was actually used in making the reimbursements.

[5] Again, the jury's answer to Question No. 5 addressed neither. It simply measured claims paid based upon discounted AWPs, irrespective of the number of misrepresentations.

[6] Actually, Professor DeBrock was testifying regarding exhibit P436G, which was a summary of the data sources for his overpayment computations. Exhibit P436G simply summarized First DataBank's "reported" average wholesale price history for each drug, the basis for which was exhibits P436M and P436N.

[7] Based upon totaling the numbers in the second column of Exhibit C to "Plaintiff's Request for Leave to File an Amended Forfeiture Count Based on New Information", dated July 23, 2009. Plaintiff's numbers have not been independently verified by the court, because they appear to derive from trial exhibits exhibits P436M and P436N.

## AMOUNT OF FORFEITURE

Section 49.49(4m)(b), Stats., provides that for each of the 4,578 false statements or representations made or caused to be made, Pharmacia "may be required to forfeit not less than $100 nor more than $15,000." The statute reflects the legislature's intention to accord this court a *"wide range of discretion"* in fixing the amount of the forfeiture and to fashion an appropriate forfeiture award based upon the particular facts of this case. *Cf. State v. Chrysler Outboard Corp.*, 219 Wis. 2d 130, 174 (1998) (emphasis in original).

As a starting point in setting the forfeiture amount, this court must take as a given that Pharmacia knowingly defrauded the State of Wisconsin Medicaid system to the tune of $7 million over 15 years, because that is what the jury found (albeit with two dissents—one on all questions, one on damages only). Both the magnitude and duration of Pharmacia's fraud are aggravating factors which must be accorded substantial weight, consistent with the respect owed to the jury's verdict.

Another aggravating factor is that almost all of the misrepresentations resulted in multiple overpayments by Wisconsin Medicaid.

However, there is no evidence that any of the $7 million in Medicaid overpayments to Wisconsin pharmacies, which formed the basis for the jury's damages award, made its way directly into Pharmacia's pockets. While directly profiting from its misrepresentations is not a prerequisite to Pharmacia's forfeitures exposure, it is a factor mitigating the amount of the forfeiture. On the other hand, it is no stretch to conclude that Pharmacia indirectly benefitted from these overpayments in that Wisconsin pharmacies were incented to sell Pharmacia products. So the mitigation from this factor is minimal at best, because the extent to which Pharmacia benefitted from the overpayments is largely unascertainable from this record.

Substantially complicating and mitigating the forfeitures issues is the role of the plaintiff, through its legislative and executive branches, in setting the formulas for reimbursing pharmacies dispensing Pharmacia products within the Wisconsin Medicaid system. The evidence is compelling that a political tug-of-war between various interest groups spanning a number of successive biennial budget sessions resulted in the adoption of reimbursement formulas that were known to overcompensate participating Wisconsin pharmacies.[8] In this respect, plaintiff's case has a Captain Renault quality to it, insofar as the plaintiff professes to be "shocked- shocked!" that the AWP system has resulted in overpayments to pharmacies. The jury's finding of fraud on the part of Pharmacia

---

[8] To be sure, credible evidence also demonstrates that there may have been no occasion for this political tussle had Pharmacia reported accurate pricing over the years. However, given the record in this case, it is certainly possible, maybe likely, that politics would have hijacked the reimbursement formulas anyway.

does not in any way exonerate the State of Wisconsin's own role in causing its damages since, as the jury was properly instructed, there may be more than one cause for their losses. Considered in the context of evidence detailing the raw politics that drove (and continues to drive) this issue at the State Capitol, in which both the legislative and executive branches fully participated and in which compromises (unrelated to Pharmacia) were made that knowingly sacrificed more accurate reimbursement formulas even up through the current budget, it is more than a little unsavory to think of rewarding the State with a substantial forfeitures windfall here. In short, there is plenty of blame to go around.

Forfeitures under §49.49 are designed to deter and punish the type of fraudulent conduct found by the jury, but not serve as a source for compensating the plaintiff, which is deemed to have been made whole by the jury's damages verdict.

It is largely wishful thinking to believe that imposing forfeitures on a corporation of Pharmacia's magnitude actually punishes it, unless the maximum amount $68,670,000 is awarded, or some sum reasonably close (which would be unjustifiable and rank overkill on these facts). The penalty would be simply passed on to Pharmacia's consumers in the form of price increases, just like a windfall tax.[9] The money has to come from somewhere, and ultimately the interests of those dependent upon Pharmacia's products for their health, well-being and even their very existence-- i.e. the end consumers who pay for Pharmacia's products, either directly or indirectly -- have to be considered. This factor also mitigates against a substantial forfeiture.

On the other hand, as this litigation demonstrates, the entire Medicaid pharmaceutical reimbursement system demands reform on a national scale. I am not so naïve as to think that this court's forfeiture award will move mountains. However, to fulfill the deterrent purpose of forfeitures, both against Pharmacia and others, and to spur on the process of reform, the first step is to bring attention to the problem, generally before the public but more specifically before the shareholders and board of directors at Pharmacia. This suggests that more than simply a *de minimis* forfeiture amount is indicated, because $100 per false representation ($457,800) would not register so much as a blip on Pharmacia's multi-billion dollar annual fiscal radar screen.

Accordingly, weighing all of these factors, this court imposes a $1000 forfeiture-- ten times the statutory minimum-- for each of the 4,578 misrepresentations Pharmacia made or caused to be made, for a total forfeiture award of **$4,578,000**.

Dated this 30th day of September, 2009.

---

[9] Unlike generics, branded drugs on patent have no competitive alternative that would serve to neutralize the impact on the consumer of any price increases.

BY THE COURT:

*[signature]*

Richard G. Niess
Circuit Judge

CC: Attorney Charles J. Barnhill (by facsimile transmission) 255-5380
Attorney John C. Dodds (by facsimile transmission) 215-963-5000
Mr. Xavier A. Santistevan, Legal Assistant at Quarles & Brady LLP
(for immediate service on all parties via Lexis/Nexis per
usual practice in this case)