# EXHIBIT D

2

1    Page 1

2

3     UNITED STATES DISTRICT COURT

4

5     FOR THE DISTRICT OF MASSACHUSETTS

6    - - - - - - - - - - - - - - - x

7    IN RE: PHARMACEUTICAL : MDL NO. 1456

8    INDUSTRY AVERAGE WHOLESALE : CIVIL ACTION:

9    PRICE LITIGATION : 01-CV-12257-PBS

10   THIS DOCUMENT RELATES TO :

11

12   U.S. ex rel. Ven-a-Care of : Judge Patti B.

13   the Florida Keys, Inc. v. : Saris

14   Abbott Laboratories, Inc., : Chief Magistrate

15   No. 06-CV-11337-PBS : Judge Marianne B.

16   - - - - - - - - - - - - - - - x Bowler

17   State of California ex rel. :

18   Ven-a-Care of the Florida Keys, :

19   Inc. v. Abbott Laboratories, Inc.,:

20   No. 03-CV-11226 :

21   - - - - - - - - - - - - - - - x

22   Miami, Florida

23   Wednesday, May 9, 2007

24

25    Videotaped deposition of T. MARK JONES,

26

71

Page 70

1 in that fashion.

2 Q. Are handwritten notes -- first of all,

3 does Ven-a-Care have any handwritten notes that are

4 kept?

5 A. We do.

6 Q. Are those also Bates stamped and control

7 numbered?

8 A. They are.

9 THE VIDEOGRAPHER: Excuse me. Could we

10 take a 30-second break, please.

11 MR. COOK: Absolutely. Is this a good

12 time for a bathroom break?

13 THE WITNESS: That would be great.

14 THE VIDEOGRAPHER: 10:05 a.m., going off

15 the record, end of Videotape No. 1.

16 (Thereupon, a recess was taken, after

17 which the following proceedings were held:)

18 THE VIDEOGRAPHER: 10:18 a.m. Videotape

19 No. 2. We are back on the record.

20 BY MR. COOK:

21 Q. Mr. Jones, we started describing earlier

22 sort of the business of Ven-a-Care in 1987 and the

72

Page 71


1 documents that generated in the business that you

2 had.

3 Am I correct in assuming that the business

4 of Ven-a-Care remained largely the same from 1987

5 through 1992, or did it change at all?

6 A. It remained largely the same, but it began

7 changing in '91, '92.

8 Q. In what way did it begin changing?

9 A. Well, we got into the lawsuit with three


10 of our physician referral sources. They -- they

11 went -- they brought a proposal to us from an NMC

12 home care ventures company that wanted to do what we

13 were doing, only they wanted to be able to do it

14 also in the physicians' offices.

15 Q. Okay.

16 A. That is what the -- what spurned the

17 lawsuit was we had -- three of the physicians were

18 also shareholders of Ven-a-Care, and we had them in

19 a noncompete, and they sued us based on the

20 noncompete, saying that it was not a legal -- or a

21 legal thing in Florida.

22 Q. And so beginning in 1992, some of the

Mark Jones 5-9-2007

73

Page 72

1 efforts of Ven-a-Care were diverted to a lawsuit, I

2 take it?

3 A. A significant amount.

4 Q. Once the lawsuit was initiated in 1992 -5

MR. BREEN: Objection to form.

6 MR. COOK: You are right, I probably have

7 that wrong.

8 MR. BREEN: I tell you it was '91.

9 BY MR. COOK:

10 Q. Once the lawsuit was initiated, how much

11 of your business continued on providing infusion

12 services as it was before?

13 A. I want to say that it decreased

14 significantly quickly. Statistically, it is hard

15 for me to tell you. Because they opened up their

16 own competing pharmacy, they were able to refer

17 their patients to themselves. So a lot of our

18 patients were lost to them.

19 Now, we had some patients, and we

20 continued to take care of them. But, no, it was

21 dramatically different. I mean, that was part of

22 our countersuit, you know.

Mark Jones 5-9-2007

74

Page 73

1 Q. And so if we measure the volume of

2 Ven-a-Care's business by patients -

3 A. Uh-huh.

4 Q. -- it dropped substantially with -- about

5 the time that this lawsuit was initiated with these

6 three physicians?

7 A. Yeah.

8 Q. Did it ever pick back up again?

9 A. No.

10 Q. And so the records from 1991 or '92 to the

11 present of patient records, those would represent

12 the services that Ven-a-Care was providing to that

13 reduced patient flow; correct?

14 A. In general. In general. Well, because

15 sometimes we had long-term patients. I mean, there

16 may have been someone that we did for five years,

17 you know.

18 Q. There may have been someone who was with

19 you before -20

A. Right.

21 Q. -- and stayed with you after the lawsuit

22 and the diminution in your patient flow?

Page 80

1 Fresenius; correct?

2 A. Correct.

3 Q. As I understand it, Ven-a-Care also

4 continued investigatory activity relating to drug

5 pricing issues as well throughout the '90s; is that

6 correct?

7 A. That's correct.

8 Q. My question is, what types of

9 investigatory activities did Ven-a-Care undertake

10 throughout the '90s and into -- after 2000 until

11 today relating to drug pricing?

12 A. Well, I think, to the best of my

13 recollection, the easiest way for me to describe it,

14 in the beginning we started to understand -- I mean,

15 the lawsuit with ImmuneCare, the biggest allegation

16 that I recall, the one that really stuck in my craw

17 was the physicians referring to themselves and

18 splitting the -- splitting the profits with the

19 pharmacy of NMC home care and NMC ventures, whoever

20 the -- I can't remember who their actual venture

21 partner was, you know.

22 Q. Uh-huh.

82

Page 81


1 A. And Zach and I had -- Zach Bentley and I

2 had been up here at a conference just before this

3 happened with Mershon Sawyer, and I don't know if

4 Mershon Sawyer is a law firm that still exists here.

5 And they were actually doing for health care

6 providers a symposia -- symposium on Stark 1 and

7 physician self-referral issues.

8 And we got invited -- I can't remember how

9 it came about that we got invited up. And this was


10 pre the ImmuneCare lawsuit.

11 Q. Uh-huh.

12 A. And we were given information on, you

13 know, things you can do to make sure that you are

14 not put in a position where, you know, a referring

15 physician is construed as being self-referring.

16 And it was just coincidental that just a

17 month or two after we had been here, Dr. Siegel

18 approached us, and I think the date that he actually

19 approached us was August 27th, 1991, it was kind of

20 hard to forget it, and told us that he had a great

21 business plan for us.

22 And, you know, Dr. Siegel is a doctor that

Mark Jones 5-9-2007

83

Page 82

1 we knew and had worked with. And, actually, my wife

2 and I had socialized with him, and he was a gay

3 doctor, and his partner, John Denitkus, owned

4 probably the most successful medical practice in

5 town at the time, and they were doing most of the

6 HIV care. So we had social ties.

7 And so we were pretty dumbfounded when he

8 came there and gave us the proposal from NMC for

9 ImmuneCare that contemplated, you know, us taking

10 and giving them all of our patients and coming to

11 work for them.

12 And there were, you know, issues in there

13 about the rent, getting paid more rent than what the

14 market -- what the market allowed, and then

15 offered -- and I can't remember the pro formas

16 exactly. We have those, and if they are

17 discoverable, you will certainly see them. Offered

18 to make us millionaires in five years. You know,

19 they wanted to take this and turn it into a

20 prototype outpatient HIV treatment center and turn

21 it into what they had done with the SRD facilities.

22 And Mr. Ham -- Dr. Hamper is who Larry -

Mark Jones 5-9-2007

Page 83

1 Larry Siegel was an old colleague of his, is the one

2 who approached Larry or Larry approached him and

3 came up with the concept.

4 What I'm trying to say is Dr. Hamper and

5 Larry were pioneers in developing outpatient end

6 stage renal disease treatment facilities, so they

7 had a history of doing that.

8 The glitch with us was we would have to

9 give up our autonomy, our business. They were -

10 the way that they produced the pro formas, they were

11 taking a patient population that we had been

12 servicing for the last few years and tripling or

13 quadrupling the services.

14 And we were like, you know, where is that

15 coming from? The patient population isn't changing.

16 If anything, it is declining because HIV patients in

17 general were dying. They didn't have the protease

18 inhibitors and the oral therapies that are on the

19 market now that make their lives more of a chronic

20 illness and, you know, increase the quality of it.

21 That was one of the statements that

22 Dr. Siegel made to us, was, well, we have ways

85

Page 84

1 of billing -- NMC has ways of billing that you've

2 never heard of. Immediately that piqued our

3 attention, you know.

4 Q. And so as I understand it, in terms of the

5 investigations that you undertook, part of it was

6 research to determine both, I guess, the legal -

7 legal basis and educate yourself about the legal

8 basis; correct?

9 A. Well, we hired Mr. Breen. He represented

10 us, and we started learning, you know, as much as we

11 could.

12 Q. And you undertook factual investigations,

13 as I understand it, both in that case and in later

14 drug pricing investigations; correct?

15 A. We did.

16 Q. Could you tell me, what activities did you

17 undertake as part of your factual investigations in

18 the drug pricing cases?

19 MR. BREEN: Objection to form. I would

20 also caution the witness that -- and I'm not

21 instructing the witness not to answer, but I

22 will interpose an objection at the appropriate

86

Page 85

1 time if it gets into investigations that were

2 conducted with counsel that may fall under the

3 work product privilege. I'm not going to

4 impose any objection yet, but I will just

5 caution the witness if we get to that point,

6 let me object and then we will discuss it.


7 MR. COOK: Sure.


8 BY MR. COOK:


9 Q. I'm asking now just for general

10 descriptions of what you have done as opposed to the

11 results of the investigation or what you actually

12 learned. But if you can, at a 50,000-foot level,

13 describe sort of what investigations you undertook.

14 A. Off the top of my head, we restarted

15 researching the reimbursement issues. Well,

16 remember -- or let me give you some information.

17 Most of the patients that we took care of

18 were HIV patients, the majority, you know. I want

19 to tell you 90 percent. And the drugs that we were

20 using to treat them were single source drugs. They

21 were drugs that were brand new. I mean, I gave you

22 an example of pentamidine. Well, the other good

Mark Jones 5-9-2007

87

Page 86


1 example is Cytovene, which is a drug produced by

2 Sentex Labs, for CMV retinitis, which is another -3

which was a really, very opportunistic infection.

4 Many of them were going blind from it.

5 So, I mean, we were even on the level when

6 we first started doing this, doing

7 experimental therapy -- DHPG was the precursor to

8 Cytovene. So we were able to work through our

9 physicians with whomever, whatever pharmaceutical



10 company was sponsoring it.

11 The point is, I'm rambling, that a lot of

12 what we were looking at in drugs were -- were brand

13 named, single source drugs, you know, didn't -- you

14 didn't have opportunities to buy except in

15 certain -- certain ways.

16 Q. Uh-huh.

17 A. So we started looking at all of the drugs.

18 Because one of the drugs that they used in their pro

19 forma was that, and one was IVIG. They were using

20 IVIG, which is a biological drug that is used

21 primarily for autoimmune disorders, say like

22 Guillain-Barre or -- there is a few other, I just

88

Page 87


1 can't recall off the top of my head what their

2 indications were.

3 But they were using doctors -- doctors can

4 off use something off label, you know. And they

5 were using IVIGs on patients to -- to boost their

6 immune system, so to speak. That is the best way I

7 can put it.

8 And that was one of the drugs that, you

9 know, we started looking at, how you can buy it and



10 how you can get reimbursed. And, you know, we

11 called different insurance companies, we talked to

12 different, you know, third party payors. We also

13 would call Medicaid -- not Medicaid, more of their

14 Consult Tech or Unisist, the ones that administered,

15 you know, the payment of claims and the

16 reimbursement part. I don't know. And Florida had

17 either Consult Tech or Unisist. I can't remember.

18 They had both. I can't remember which one at the

19 time.

20 We would call up and give them NDC

21 numbers, and they would give us the reimbursement

22 amount. And we started compiling lists and watching

89

Page 88

1 what ImmuneCare was doing in prescription, you know,

2 in prescribing out there.

3 Q. You described on several occasions

4 telephone conversations that you would have as part

5 of your factual investigations.

6 A. Uh-huh.

7 Q. Would you keep any record of those

8 telephone conversations?

9 A. I think we have some handwritten records

10 of telephone conversations. I'm not going to sit

11 here and tell you how many or, you know, where they

12 exist. We kept notes at times, sure.

13 Q. There would be handwritten notes of your

14 conversations?

15 A. Yes.

16 Q. Would you ever do a formal memorandum of a

17 telephone interview?

18 A. I believe if a formal memorandum was done,

19 it would have been done through our counsel. We

20 would have called, given the information, counsel

21 would have put together a memorandum for us -22

Q. Leaving aside counsel preparing something,

Mark Jones 5-9-2007