# EXHIBIT E

1                 UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF MASSACHUSETTS

3       - - - - - - - - - - - - - - -x

4     IN RE:  PHARMACEUTICAL          :   MDL NO. 1456

5     INDUSTRY AVERAGE WHOLESALE   :   CIVIL ACTION

6     PRICE LITIGATION                :   01-CV-12257-PBS

7       - - - - - - - - - - - - - - -x

8     THIS DOCUMENT RELATES TO:       :

9     U.S. ex rel. Ven-a-Care of   :   Hon.  Patti B. Saris

10    the Florida Keys, Inc.          :

11          v.                        :

12    Dey, Inc., et al.               :

13    No. 05-11084-PBS                :

14      - - - - - - - - - - - - - - -x

15

16        (CROSS NOTICED CAPTIONS ON FOLLOWING PAGES)

17

18         CONTINUED DEPOSITION OF T. MARK JONES

19                 Washington, D.C.

20             Monday, December 8, 2008

21                   VOLUME III

22

750

1    a false claims case.

2    BY MR. KATZ:

3        Q.    This is the same NMC?

4        A.    Yes.

5        Q.    And the lawsuit was brought pursuant to

6    the federal False Claims Act?

7        A.    Yes.

8        Q.    Ven-A-Care was a relator?

9        A.    Yes.

10       Q.    Can you briefly describe the nature of

11   the NMC case in 1994?

12       A.    The false claims case?

13       Q.    Yes.

14       A.    The nature of it.

15             MR. BREEN:   Again, this is all 30(b)(1)

16   testimony, correct?

17   BY MR. KATZ:

18       Q.    Yes.

19       A.    In a nutshell, NMC had an outpatient

20   dialysis unit that we happened to investigate

21   during the course of our lawsuit with them.   And

22   they were, what we found, falsifying --

751

1    falsifying certificates of medical necessity to

2    qualify patients that are receiving ESRD

3    treatments, which is end stage renal disease, to

4    qualify them for a nutritional supplement called

5    IDPN, intradialytic parenteral nutrition.  Very

6    few patients could ever qualify to receive it

7    through the program itself and we were able to

8    point out the false clams that they were

9    submitting, basically.

10        Q.   How was this case resolved?

11        A.   Well, it was through the Boston U.S.

12   Attorney's Office.  The Boston U.S. Attorney

13   settled it.

14        Q.   How much was it settled for?

15        A.   I think that the total settlement was

16   over half a million -- half a billion dollars.

17   That's not the settlement that Ven-A-Care was

18   credited for.  I think Ven-A-Care's portion was a

19   little over 300 million.  And I don't -- I'm not

20   sure that's exactly accurate.  There were other

21   relators involved that brought other claims

22   during the investigation.

787

1   you.  Having said that, I'll let the witness

2   answer to the best of his ability.

3   BY MR. KATZ:

4       Q.   Go ahead.

5       A.   Could you repeat that, please?

6       Q.   On an NDC by NDC basis, or a drug by

7   drug basis, does Ven-A-Care allege to be the

8   original source of the information?

9       A.   Ven-A-Care typically gave all of its

10  pricing and cost information in its complaints,

11  and to the federal government.  Yes.  Ven-A-Care

12  has provided the federal government with, you

13  know, our price and cost information as being an

14  industry insider.  I think Ven-A-Care certainly

15  can say this information came from within Ven-A-

16  Care, yes.

17      Q.   And so Ven-A-Care contends that it has

18  direct knowledge with respect to each of these

19  NDCs, is that right?

20      A.   Yes.

21      Q.   And that direct knowledge would relate

22  to pricing, is that what you said?

788

1      A.   Our pricing and cost records.  Correct.

2      Q.   Any other types of knowledge?

3      A.   I believe all of our information came

4   from our pricing records, GPO records, wholesale

5   records.  Now, we did have some companies

6   courting us like Pulmidose that would give us

7   information and prices on them as well.  But no,

8   we had GPO -- contracts with several GPOs.  We

9   had McKesson wholesaler.  We had, you know,

10  traditional wholesalers.  We had the special

11  wholesalers like JJ Balan, and ANDA and RDI.  Our

12  information definitely came from that

13  marketplace.

14  BY MR. KATZ:

15     Q.   What is Pulmidose?

16     A.   Pulmidose was a company that was

17  courting Ven-A-Care and Criticare back in the

18  '90s.  It was sort of a split fee situation where

19  Pulmidose would supply a particular amount of

20  drugs, and then pay a fee for supplying it.

21  There was some issues back in the '90s when they

22  didn't allow DME companies to bill for the

815

1    chargeback the $30 to Dey, right?

2        A.   Yes.

3        Q.   And this is a concept that was

4    explained to the state and federal government

5    agencies, right?

6        A.   I believe it was a part of our

7    presentations.

8        Q.   And with respect to the federal

9    government, since 1995, Ven-A-Care has

10   continuously provided pricing information

11   relating to Dey's drugs, right?

12       A.   I believe it was 1995 when Ven-A-Care

13   first provided the pricing information for Dey's

14   drugs.

15       Q.   And you can look on the interrogatory

16   responses if it refreshes your recollection.

17       A.   That's what it says.

18       Q.   So 1995, right?

19       A.   1995.

20       Q.   Where did Ven-A-Care obtain the pricing

21   information which it provided to the federal

22   government?

816

1          MR. BREEN:  Objection.  Form.

2          THE WITNESS:  Well, I believe -- and I

3    need to look at it to be sure, but we had GPOs in

4    '95 that had Dey's prices in there.  We also had

5    wholesalers that would give us prices all the

6    time.

7    BY MR. KATZ:

8        Q.    And there were few occasions where Ven-

9    A-Care obtained some prices directly from Dey?

10       A.    I know that Lewis Cobo had some

11   communications with Dey.  I wasn't aware of them.

12   I mean, I've seen -- I've seen the document where

13   one of the sales reps were talking to Lewis.  So

14   yes, he could have gotten them directly from Dey.

15       Q.    And then Mr. Cobo would then have

16   provided that information to Ven-A-Care and Ven-

17   A-Care would then have provided that information

18   to the federal government, is that right?

19         MR. BREEN:  Objection.  Form.

20         THE WITNESS:  Well, I think Mr. Cobo,

21   if he was at Ven-A-Care doing it, would do it for

22   Ven-A-Care.