# EXHIBIT G

1059

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x

IN RE: PHARMACEUTICAL            :   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE       :   CIVIL ACTION

PRICE LITIGATION                 :   01-CV-12257-PBS

- - - - - - - - - - - - - - - -x

THIS DOCUMENT RELATES TO:        :

U.S. ex rel. Ven-a-Care of       :   Hon. Patti B. Saris

the Florida Keys, Inc.           :

    v.                             :

Dey, Inc., et al.                :

No. 05-11084-PBS                 :

- - - - - - - - - - - - - - - -x

(CROSS NOTICED CAPTIONS ON FOLLOWING PAGES)

CONTINUED DEPOSITION OF T. MARK JONES

Washington, D.C.

Tuesday, December 9, 2008

VOLUME IV

Jones, T. Mark - Vol. IV 12-9-2008

1143

1      A.  Oh, what I was saying was, Roxane
2  didn't price their generic higher than BI's
3  brand, because that -- I'm just saying that was
4  one of the things we had focused on, was watching
5  the evolution of brands losing their patents and
6  the generic market coming in, and utilization
7  issues, pricing issues; that -- that sort of
8  stuff.  And so Roxane's drug fell right in the
9  middle of that --
10     Q.  Is it fair --
11     A.  -- mess.
12     Q.  Is it fair to say that -- that
13 Ipratropium Bromide was one of those drugs that
14 Ven-A-Care was focused on fairly early in its
15 investigation?  And the reason I ask that is,
16 because as I looked at your document production,
17 I saw charts with respect to inhalation drugs,
18 and in particular, Ipratropium Bromide, as well
19 as Albuterol, that seemed to be tracking payments
20 and prices from 1995 or 1996 onward.
21     A.  I -- I think we -- we -- obviously,
22 because it was an inhalation drug, it was, you

1144

1    know, in that mix with Albuterols and cromolyns
2    and all of that.  So we did have pricing
3    information on it early on.  But Atrovent didn't
4    come off of patent till '96, so we really didn't
5    start seeing a whole lot of change in the
6    marketplace until '97, '98 and '99.
7            And I think that's what our chart
8    reflects, yes.  We had prices early on for
9    Ipratropium, but we didn't really see the
10   blooming of the spread until later on in the late
11   '90s.
12        Q.   And do you recall that when Atrovent
13   came off patent, it was approximately mid 1996?
14   Does that sound right to you?
15        A.   I believe you.  I think that's
16   somewhere around there.
17        Q.   And for a period of time, based on your
18   investigations, did you conclude that Dey and
19   Roxane were the two sole manufacturers of the
20   generic of Ipratropium Bromide for a period of
21   time, from '96 until the late '90s?
22        A.   I think what we saw were Dey and Roxane

1233

1  BY MR. GORTNER:
2      Q.  No.  I under -- I understand that.  And
3  let me -- I'll certainly -- let me include that
4  in the question as well, is that aside from
5  Roxane's statements in congressional hearings and
6  the documents and testimony provided in
7  litigation involving Roxane, did Ven-A-Care have
8  any other source of information with respect to
9  what Roxane's sales forces were telling customers
10 regarding the spread?
11         MR. BREEN:  Objection.  Form.
12         THE WITNESS:  Well, I mean, the only
13 way I could reduce it down and feel totally
14 comfortable with this -- with this yes-or-no
15 answer is, if I was able to say, "Look.  We -- we
16 were GPO customers.  GPOs frequently represented
17 Roxane's prices, just like they represented
18 Warrick's or Dey's or Abbott's.
19         And when they represented them, they
20 often would give you the price.  They'd give you
21 the spread amount.  So that's, to me, marketing
22 the spread.  That's something that a sales force

1234

1  person would do or be in charge of.  Was it --
2  was it someone personal doing it?  No.  But it
3  was the GPO marketing spread with Roxane product.
4  BY MR. GORTNER:
5      Q.  Okay.  So you're referring to this --
6  this -- the category you're distinguishing are --
7  are communications from GPOs, for instance, to --
8  to Ven-A-Care?
9      A.  Right.  Because you're trying to --
10 what you're doing is, you're asking me to
11 distinguish marketing and -- and sales reps and
12 what they do and what they say.
13     Q.  Well, let me just take a step back.
14         Are you -- I am trying to refer to
15 individuals that you -- that we could agree on
16 that were Roxane employees versus employees of a
17 GPO, okay?  Can we make that distinction?
18     A.  Yes.
19     Q.  Okay.  So my question here is that what
20 you're referring to in this case were situations
21 where GPO employees have communications with Ven-
22 A-Care.  Okay.  Sticking with that particular

1255

1          MR. BREEN:  You mean -- when you say

2  "that allegation," can you -- to be real clear on

3  the record --

4          THE WITNESS:  Number 63.

5          MR. BREEN:  -- do you mean --

6          MR. GORTNER:  The employees at BIPI in

7  concert with the employees of Roxane.

8          MR. BREEN:  Okay.

9  BY MR. GORTNER:

10    Q.  And I understand what your testimony

11 earlier was saying, is that -- is that Ven-A-Care

12 had the ability to see the published AWPs, for

13 certain Roxane products, in compendia, like Red

14 Book, for instance, and then through information

15 sources like the McKesson, Econolink or GPOs, or

16 other wholesalers, you could see the prices that

17 -- that were -- were there and could calculate

18 the difference between the two.  That -- that's

19 something that Ven-A-Care was doing or was able

20 to do.  Is that fair to say?

21    A.  It's something Ven-A-Care did all the

22 time.

1256

1   Q.   Okay.  And from -- and from those two
2   pieces of information, the published AWP and the
3   -- the price that was offered by the particular
4   GPO or the wholesaler, when there was a spread,
5   Ven-A-Care would make the inference that Roxane
6   was purposely creating that spread.  Is that a
7   fair statement?
8   A.   Well, yeah.  I mean, purposely in that
9   they are in control of their prices, and they're
10  the ones that submitted the prices to the
11  compendia.
12       Whether they submitted an AWP and a
13  WAC, or a WAC that was calculated to be in an
14  AWP, it was theirs.  They owned it.  It was their
15  responsibility.
16  Q.   But that goes back to my earlier
17  question that Ven-A-Care didn't have a contact or
18  a source that worked within Roxane, so you had to
19  make inferences about --
20  A.   Correct.
21  Q.   -- what Roxane was intending to do?
22  A.   Yeah.  I'll agree with that.

1257

1    Q.   Okay.  I'm going to ask you a few
2 questions about disclosure statements.
3         Is it correct that at each point prior
4 or contemporaneous with filing a qui tam
5 complaint in this case, that Ven-A-Care submitted
6 what we've been referring to as a disclosure
7 statement or amendments to the disclosure
8 statement related to those particular complaints?
9    A.   Ven-A-Care was in the habit of
10 submitting disclosure statements.  It was also in
11 the habit of submitting just disclosures all the
12 time.
13         You know, whenever it found drugs that
14 it was interested in, using an amendment,
15 whenever it found any kind of information that
16 was appropriate to a particular case that was
17 maybe going to be amended, we would always give
18 it to someone in that, you know, either the DOJ,
19 the U.S. attorney, the OIG.
20    Q.   Okay.  Well, let's -- let's tick
21 through some of the disclosure statements.  And
22 I'll represent to you that on the privilege log

```
                                                        1258
```

1   produced by Ven-A-Care, and perhaps in an
2   interrogatory response, Ven-A-Care has identified
3   that it, at points just before or at the time
4   they filed the amended complaints, that they were
5   submitting disclosure statements from them as to
6   the federal government.  Okay?
7          What I wanted to ask you first is in
8   regard to the first disclosure statement.  What -
9   - what was sent with relationship to the April
10  2000 complaint that's been marked previously as
11  Roxane 90?
12         Can you tell me what specific facts
13  Ven-A-Care disclosed to the government about
14  Roxane specifically, and in particular, Roxane's
15  sales prices on its drugs?
16      A.   Well, what I would immediately be able
17  to say is, that we disclosed all of our price and
18  cost lists.  You know, all of our GPO prices, all
19  our wholesale prices, any specialty wholesaler
20  prices, any -- any fliers that we had that may
21  represent, you know, any kind of marketing of
22  Roxane drugs.

1259

1  Let's see.  If we had done any kind of
2  a corporate search, you know, any kind of a
3  relationship search, we would have submitted
4  that.
5       Q.   Well, let's stick with Roxane's prices
6  for its drugs --
7       A.   Uh-huh.
8       Q.   -- in the marketplace, which, in the
9  instance of Ven-A-Care, would -- would refer to
10 prices that were offered by either group
11 purchasing organizations like ServAll or
12 Innovatix --
13      A.   Uh-huh.
14      Q.   -- or wholesalers like McKesson or
15 ANDA.
16      A.   Uh-huh.
17      Q.   Given that that was Ven-A-Care's source
18 for prices, what specific prices were provided to
19 the government on or before April 10th, 2000 in
20 that disclosure statement?
21      A.   (No audible response.)
22           MR. BREEN:  Can I make a suggestion?

Jones, T. Mark - Vol. IV 12-9-2008

```
                                                             1294
 1    by looking at the documents, it appears that
 2    throughout -- throughout the '90s, that Ven-A-
 3    Care was routinely sending faxes of pricing
 4    information, or issues like press releases, to
 5    Mr. Stephens.  Is that consistent with your
 6    understanding?
 7         A.   I think that would be a fair
 8    characterization.
 9         Q.   And I believe you testified yesterday
10    that Representative Pete Stark first had contact
11    with Ven-A-Care regarding some earlier litigation
12    that you had?
13         A.   The Immune Care joint venture, which
14    was reflective of the split fee kickback
15    arrangements that Pete Stark's litigation -- I
16    mean, his legislation was trying to prevent in
17    health care.
18         Q.   And how did the transition occur that
19    Ven-A-Care continued to send Representative Pete
20    Stark information on published AWP and actual
21    transactional prices throughout the '90s?  How
22    did that occur?
```

1295

1  A.  He just became the person in Congress
2  that we could talk to about those types of
3  issues.  And he was interested.  I mean, he was -
4  - I don't know -- the chief health care
5  congressman, and, I mean, in the U.S. Congress,
6  he was the one that was the most vocal about
7  health care.
8      Q.  Okay.
9      A.  And he actually became an ear for us
10 when we were trying to figure out the different
11 type -- we learned a lot about reimbursement from
12 him, and, you know, how things were paid, what
13 the legislative actions were.
14     Q.  Right.
15     A.  So --
16     Q.  And I also saw correspondence, in your
17 production, where it appeared that Representative
18 Stark, at various times, was trying to set up
19 meetings with -- with Ven-A-Care principals and
20 individuals like the HCFA administrator, Min
21 DeParle, or the -- you know, heads of the Office
22 of Inspector General.

1296

1  A.  He actually facilitated meetings for
2  us.
3  Q.  And the purpose of those meetings were
4  so that you could educate individuals like Nancy-
5  Ann Min De Parle of your allegations that there
6  was a widespread fraud on AWP and WAC pricing?
7  A.  Correct.
8  Q.  And did you keep Representative Stark
9  informed, throughout your investigative process,
10  to the best of your ability, in terms of what
11  your investigation was revealing?
12      MR. BREEN:  Objection.  Form.
13      THE WITNESS:  Well, I mean, this is a
14  good example.  When you see the two charts that
15  we -- that we did here, I mean, one is -- one was
16  the issue that we thought was an interesting
17  issue, where, you know, the 20 percent co-pay,
18  the payment exceeds the total cost of the drug,
19  and then the Ipratropium Bromide chart with
20  utilization spike.  Now, I think -- I think we
21  kept him informed, or, you know, Zachary did for
22  sure.

1297

1    MR. BREEN: You're referring to Exhibit
2    207 again? Exhibit 207?
3    THE WITNESS: Yeah.
4    BY MR. GORTNER:
5    Q. Yeah. Let's go into Roxane Exhibit
6    207. But before I go one step further, what was
7    Ven-A-Care's understanding of Representative
8    Stark's interest in the health care area? You
9    mentioned that he was the chief. I wasn't sure I
10   understood your answer.
11   A. He was the chairman of the health --
12   Subcommittee on Health, I believe, in the Ways
13   and Means Committee. So, you know, he had an
14   interest in anything that had to do with health
15   care. And especially when it came to Medicare or
16   Medicare Medicaid.
17   Q. Did Ven-A-Care believe that
18   Representative Stark had a voice in the policy
19   that Congress could follow?
20   A. I think Ven-A-Care believed that he had
21   some ability to express his voice. Whether he
22   had an actual voice in -- in making policy

```
                                                        1298
```

1  happen, we never really -- really -- I mean, we
2  never got that far with that relationship.
3      Q.  Now, let's take a look within Roxane
4  207 at the --
5      A.  Okay.
6      Q.  -- at the press release.  And in
7  particular, let's look on -- on the page Bates
8  labeled VAC MDL 44997, at the very bottom of that
9  first page of the September 3rd, 1999 press
10 release.
11     A.  Where are we?
12     Q.  I'm on VAC MDL 44997.
13     A.  And this is Roxane 207?
14     Q.  I believe so.  Are we missing -- let me
15 look at your copy.
16     A.  Your MDL isn't matching up.  You can
17 look at it.
18     Q.  Let me see.  Well, we have the same
19 document.  You have a slightly Bates label.  Let
20 me refer to it in terms of the one that's on your
21 copy, which is VAC MDL 84333.  But it's the
22 September 3rd, 1999 press release.