# EXHIBIT H

1

1          UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF MASSACHUSETTS

3     - - - - - - - - - - - - - - -

4     IN RE:  PHARMACEUTICAL        ) MDL NO. 1456

5     INDUSTRY AVERAGE WHOLESALE    ) CIVIL ACTION

6     PRICE LITIGATION              ) 01-CV-12257-PBS

7     THIS DOCUMENT RELATES TO      )

8     U.S. ex rel. Ven-A-Care of    ) Judge Patti B. Saris

9     the Florida Keys, Inc.,       )

10    vs.                           ) Chief Magistrate

11    Abbott Laboratories, Inc.,    ) Judge Marianne B.

12    No. 06-CV-11337-PBS           ) Bowler

13    - - - - - - - - - - - - - - -

14        (Captions continued on following pages)

15                  VOLUME I

16      DEPOSITION OF VEN-A-CARE (T. MARK JONES)

17      Videotaped deposition of T. Mark Jones, held at

18    the Law Offices of Hunton & Williams, LLP, 1111

19    Brickell Avenue, Suite 2500, Miami, Florida, 33131,

20    on Tuesday, March 18, 2008, commencing at 9:06 a.m.,

21    before Donald W. McKay, RMR, CRR, a Notary Public

22    for the State of Florida.

1      Q.   Do you have an understanding of what

2   Ven-A-Care's business plan was in 1987?

3      A.   I believe I do.

4      Q.   Can you tell me what was Ven-A-Care's

5   business plan in 1987.

6      A.   I believe that Ven-A-Care was started

7   to provide a need or provide a service to

8   something that was needed in Key West.  Key West

9   -- and Mr. Cobo has testified to this -- had a

10  large population of HIV patients.  You know,

11  there were a lot of gay men that lived in Key

12  West.  It was a resort for them.  And many of

13  them were very ill, very sick.  But the type of

14  illnesses that they had, because they were

15  opportunistic infections, they'd move in and out

16  of hospitals frequently.  And a lot of times,

17  while they were sick, they were ambulatory, they

18  could function, but they had to go into hospitals

19  to have medications administered.  It was just

20  cumbersome for them.  So Ven-A-Care's pharmacy, a

21  home infusion pharmacy, was a new concept for Key

22  West, which allowed myself, other nurses, Luis,

102

1   to take these and treat these patients in their

2   homes.

3       Q.   Now, the business aspect of this was,

4   of course, to start a business in which you

5   provided those services and generated a profit

6   from it.  Correct?

7       A.   We were a commercial business.  We were

8   billing primarily -- or at least in the very

9   beginning -- just commercial insurance companies,

10  yes.

11      Q.   I'm sure that there were also certain

12  altruistic aspects to that.  I'm not trying to

13  suggest that this was, in any way, inappropriate.

14  But as a business, Ven-A-Care was looking to make

15  a profit.  Right?

16      A.   Ven-A-Care was a for-profit

17  corporation.

18      Q.   Can you tell me how was it that Ven-A-

19  Care in 1987, planned to make a profit from

20  providing home infusion pharmacy services to

21  patients in Key West?

22      A.   Well, fundamentally, Ven-A-Care would

Mark Jones 3-18-2008

285

1          MR. COOK:  Can we go off the record for

2     just a minute while I rearrange some exhibits.

3          THE VIDEOGRAPHER:  We're going off the

4     record.  The time is 3:43.

5               (Thereupon, a recess was taken,

6     after which the following proceedings were had:)

7          THE VIDEOGRAPHER:  We're now back on

8     the record.  Videotape No. 6.  The time is 3:56.

9               (Exhibit Abbott 704 was thereupon

10    marked.)

11    BY MR. COOK:

12         Q.   Mr. Jones, I've handed you a copy of

13    what we've marked Abbott Exhibit 704, which is a

14    November 4, 1994 letter that you sent to Peter

15    Barbera from the Office of the Inspector General

16    in Jacksonville, Florida.  Do you see that?

17         A.   I do.

18         Q.   Do you recall writing this letter?

19         A.   Actually writing it, no.

20         Q.   Do you recall this letter?

21         A.   I do recall this letter.

22         Q.   Why did you write Mr. Barbera this

286

1    letter in November 1994?

2         A.    Peter Barbera was working with Maritza

3    Howery or Penniston with the OIG audit in

4    Jacksonville.  We had met with her and her boss

5    out of Atlanta, Jerry Dunham, in February of the

6    previous year -- no, I'm sorry -- February this

7    year.  I believe it's February of '94.  And they

8    were, I think -- I'm trying to figure out how we

9    made contact with them.  But they were actually

10   interested in looking at excessive reimbursement

11   of the TPN program.  So we had had conversations

12   back and forth.  And I think this was something

13   he requested from me, if I had information on

14   particular drugs and prices.  So I responded with

15   this letter.  I have to read it.  I haven't read

16   it in a while.

17        Q.    And when you refer to excessive

18   reimbursement for TPN, that's the same subject as

19   your letter to Dr. Vladeck with the toilet seat

20   in 1997.  Right?

21        A.    Yes.

22        Q.    And that's also the same subject as the

287

1    overcharges worksheets that we just looked at

2    that Ven-A-Care submitted to Medicare with its

3    repayments in 1994.   Correct?

4         A.    Ven-A-Care repaying, yes.

5         Q.    That would have been just before and

6    just after this letter to Mr. Barbera.   Correct?

7         A.    I'm sorry.  What was the question?  I'm

8    confused.

9         Q.    540, 541, and 542 were sent just before

10   this letter to Mr. Barbera and after this letter

11   to Mr. Barbera.   Correct?

12        A.    Well, yeah, they're within the same

13   month, couple months.

14        Q.    And you were submitting to Mr. Barbera,

15   a contract that Ven-A-Care had through a GPO

16   called CPN/PPO, for the purpose of certain

17   products.  Right?

18        A.    This would be our Abbott contract with

19   CPN/PPO, yes.

20        Q.    And you attach a copy of that contract.

21   It appears at the third page of Exhibit 704.

22   Right?

288

1      A.    It's the fourth -- well, the cover

2   sheet is the third, yeah.

3      Q.    Well, the third page is actually the

4   contract, itself.  Right?

5      A.    Um-hmm.  Yes.

6      Q.    And then attached to that as Exhibit A

7   is page 20 of a product list that listed the

8   products you could purchase under your contract

9   with Abbott.  Right?

10      A.    That's right.

11      Q.    As I understand, the purpose of the

12   submission to Mr. Barbera was to give Mr. Barbera

13   the true cost that Ven-A-Care paid for TPN so

14   that -- and here, I'm referring to the last

15   paragraph of your letter -- so that the

16   government could calculate a reasonable overhead

17   for TPN reimbursement.  Right?

18      A.    An overhead consideration in

19   calculating a reasonable reimbursement for TPN.

20      Q.    And you were attempting to help the OIG

21   and CMS to determine how much above cost Medicare

22   should pay for TPN.  Right?

1        A.   I think, in this situation, yes.

2        Q.   So again, in this context, in the

3    context of TPN, Ven-A-Care agrees that it's

4    appropriate for Medicare to pay providers more

5    than their cost for the product cost of the TPN.

6    Right?

7             MR. BREEN:  Objection, form.

8             THE WITNESS:  I think that what this

9    was focused on, they were looking to see if there

10   were any types of charge -- how they could come

11   up with a reasonable reimbursement for TPN that

12   would cover the preparation of TPN and its

13   administration.

14            MR. BREEN:  Objection, non-responsive.

15            I'd ask that the question be read back

16   to the witness.

17               (The question referred to was

18   thereupon read by the reporter as above

19   recorded.)

20   BY MR. COOK:

21       Q.   And do you agree with me, Mr. Jones?

22       A.   Well, I thought -- can I hear my

Mark Jones  3-18-2008