# EXHIBIT N

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

\- - - - - - - - - - - - - - - - - - x

IN RE: PHARMACEUTICAL : MDL NO. 1456
INDUSTRY AVERAGE WHOLESALE : CIVIL ACTION:
PRICE LITIGATION : 01-CV-12257-PBS
THIS DOCUMENT RELATES TO :

U.S. ex rel. Ven-a-Care of : Judge Patti B.
the Florida Keys, Inc. v. : Saris
Abbott Laboratories, Inc., : Chief Magistrate
No. 06-CV-11337-PBS : Judge Marianne B.
\- - - - - - - - - - - - - - - - - - x Bowler
State of California ex rel. :
Ven-a-Care of the Florida Keys, :
Inc. v. Abbott Laboratories, Inc.,:
No. 03-CV-11226 :
\- - - - - - - - - - - - - - - - - - x

Miami, Florida
Wednesday, May 9, 2007

Videotaped deposition of T. MARK JONES,

Page 70

1 in that fashion.

2 Q. Are handwritten notes -- first of all,
3 does Ven-a-Care have any handwritten notes that are
4 kept?

5 A. We do.

6 Q. Are those also Bates stamped and control
7 numbered?

8 A. They are.

9 THE VIDEOGRAPHER: Excuse me. Could we
10 take a 30-second break, please.

11 MR. COOK: Absolutely. Is this a good
12 time for a bathroom break?

13 THE WITNESS: That would be great.

14 THE VIDEOGRAPHER: 10:05 a.m., going off
15 the record, end of Videotape No. 1.

16 (Thereupon, a recess was taken, after
17 which the following proceedings were held:)

18 THE VIDEOGRAPHER: 10:18 a.m. Videotape
19 No. 2. We are back on the record.

20 BY MR. COOK:

21 Q. Mr. Jones, we started describing earlier
22 sort of the business of Ven-a-Care in 1987 and the

documents that generated in the business that you had.

Am I correct in assuming that the business of Ven-a-Care remained largely the same from 1987 through 1992, or did it change at all?

A. It remained largely the same, but it began changing in '91, '92.

Q. In what way did it begin changing?

A. Well, we got into the lawsuit with three of our physician referral sources. They -- they went -- they brought a proposal to us from an NMC home care ventures company that wanted to do what we were doing, only they wanted to be able to do it also in the physicians' offices.

Q. Okay.

A. That is what the -- what spurned the lawsuit was we had -- three of the physicians were also shareholders of Ven-a-Care, and we had them in a noncompete, and they sued us based on the noncompete, saying that it was not a legal -- or a legal thing in Florida.

Q. And so beginning in 1992, some of the

Page 72

1 efforts of Ven-a-Care were diverted to a lawsuit, I
2 take it?
3 A. A significant amount.
4 Q. Once the lawsuit was initiated in 1992 -5
MR. BREEN: Objection to form.
6 MR. COOK: You are right, I probably have
7 that wrong.
8 MR. BREEN: I tell you it was '91.
9 BY MR. COOK:

10 Q. Once the lawsuit was initiated, how much
11 of your business continued on providing infusion
12 services as it was before?
13 A. I want to say that it decreased
14 significantly quickly. Statistically, it is hard
15 for me to tell you. Because they opened up their
16 own competing pharmacy, they were able to refer
17 their patients to themselves. So a lot of our
18 patients were lost to them.
19 Now, we had some patients, and we
20 continued to take care of them. But, no, it was
21 dramatically different. I mean, that was part of
22 our countersuit, you know.

Page 73

1 Q. And so if we measure the volume of
2 Ven-a-Care's business by patients -
3 A. Uh-huh.
4 Q. -- it dropped substantially with -- about
5 the time that this lawsuit was initiated with these
6 three physicians?
7 A. Yeah.
8 Q. Did it ever pick back up again?
9 A. No.
10 Q. And so the records from 1991 or '92 to the
11 present of patient records, those would represent
12 the services that Ven-a-Care was providing to that
13 reduced patient flow; correct?
14 A. In general. In general. Well, because
15 sometimes we had long-term patients. I mean, there
16 may have been someone that we did for five years,
17 you know.
18 Q. There may have been someone who was with
19 you before -20
A. Right.
21 Q. -- and stayed with you after the lawsuit
22 and the diminution in your patient flow?

Page 80

Fresenius; correct?
A. Correct.
Q. As I understand it, Ven-a-Care also continued investigatory activity relating to drug pricing issues as well throughout the '90s; is that correct?
A. That's correct.
Q. My question is, what types of investigatory activities did Ven-a-Care undertake throughout the '90s and into -- after 2000 until today relating to drug pricing?
A. Well, I think, to the best of my recollection, the easiest way for me to describe it, in the beginning we started to understand -- I mean, the lawsuit with ImmuneCare, the biggest allegation that I recall, the one that really stuck in my craw was the physicians referring to themselves and splitting the -- splitting the profits with the pharmacy of NMC home care and NMC ventures, whoever the -- I can't remember who their actual venture partner was, you know.
Q. Uh-huh.

Page 82

we knew and had worked with. And, actually, my wife and I had socialized with him, and he was a gay doctor, and his partner, John Denitkus, owned probably the most successful medical practice in town at the time, and they were doing most of the HIV care. So we had social ties.

And so we were pretty dumbfounded when he came there and gave us the proposal from NMC for ImmuneCare that contemplated, you know, us taking and giving them all of our patients and coming to work for them.

And there were, you know, issues in there about the rent, getting paid more rent than what the market -- what the market allowed, and then offered -- and I can't remember the pro formas exactly. We have those, and if they are discoverable, you will certainly see them. Offered to make us millionaires in five years. You know, they wanted to take this and turn it into a prototype outpatient HIV treatment center and turn it into what they had done with the SRD facilities.

And Mr. Ham -- Dr. Hamper is who Larry -

Page 83

Larry Siegel was an old colleague of his, is the one who approached Larry or Larry approached him and came up with the concept.

What I'm trying to say is Dr. Hamper and Larry were pioneers in developing outpatient end stage renal disease treatment facilities, so they had a history of doing that.

The glitch with us was we would have to give up our autonomy, our business. They were - the way that they produced the pro formas, they were taking a patient population that we had been servicing for the last few years and tripling or quadrupling the services.

And we were like, you know, where is that coming from? The patient population isn't changing. If anything, it is declining because HIV patients in general were dying. They didn't have the protease inhibitors and the oral therapies that are on the market now that make their lives more of a chronic illness and, you know, increase the quality of it.

That was one of the statements that Dr. Siegel made to us, was, well, we have ways

Page 84

1 of billing -- NMC has ways of billing that you've
2 never heard of. Immediately that piqued our
3 attention, you know.
4 Q. And so as I understand it, in terms of the
5 investigations that you undertook, part of it was
6 research to determine both, I guess, the legal -
7 legal basis and educate yourself about the legal
8 basis; correct?
9 A. Well, we hired Mr. Breen. He represented
10 us, and we started learning, you know, as much as we
11 could.
12 Q. And you undertook factual investigations,
13 as I understand it, both in that case and in later
14 drug pricing investigations; correct?
15 A. We did.
16 Q. Could you tell me, what activities did you
17 undertake as part of your factual investigations in
18 the drug pricing cases?
19 MR. BREEN: Objection to form. I would
20 also caution the witness that -- and I'm not
21 instructing the witness not to answer, but I
22 will interpose an objection at the appropriate

Page 85
1 time if it gets into investigations that were
2 conducted with counsel that may fall under the
3 work product privilege. I'm not going to
4 impose any objection yet, but I will just
5 caution the witness if we get to that point,
6 let me object and then we will discuss it.

7 MR. COOK: Sure.

8 BY MR. COOK:

9 Q. I'm asking now just for general
10 descriptions of what you have done as opposed to the
11 results of the investigation or what you actually
12 learned. But if you can, at a 50,000-foot level,
13 describe sort of what investigations you undertook.
14 A. Off the top of my head, we restarted
15 researching the reimbursement issues. Well,
16 remember -- or let me give you some information.
17 Most of the patients that we took care of
18 were HIV patients, the majority, you know. I want
19 to tell you 90 percent. And the drugs that we were
20 using to treat them were single source drugs. They
21 were drugs that were brand new. I mean, I gave you
22 an example of pentamidine. Well, the other good

Page 86

1 example is Cytovene, which is a drug produced by
2 Sentex Labs, for CMV retinitis, which is another -3
which was a really, very opportunistic infection.
4 Many of them were going blind from it.
5 So, I mean, we were even on the level when
6 we first started doing this, doing
7 experimental therapy -- DHPG was the precursor to
8 Cytovene. So we were able to work through our
9 physicians with whomever, whatever pharmaceutical

10 company was sponsoring it.
11 The point is, I'm rambling, that a lot of
12 what we were looking at in drugs were -- were brand
13 named, single source drugs, you know, didn't -- you
14 didn't have opportunities to buy except in
15 certain -- certain ways.
16 Q. Uh-huh.
17 A. So we started looking at all of the drugs.
18 Because one of the drugs that they used in their pro
19 forma was that, and one was IVIG. They were using
20 IVIG, which is a biological drug that is used
21 primarily for autoimmune disorders, say like
22 Guillain-Barre or -- there is a few other, I just

Page 87

1 can't recall off the top of my head what their
2 indications were.
3 But they were using doctors -- doctors can
4 off use something off label, you know. And they
5 were using IVIGs on patients to -- to boost their
6 immune system, so to speak. That is the best way I
7 can put it.
8 And that was one of the drugs that, you
9 know, we started looking at, how you can buy it and
10 how you can get reimbursed. And, you know, we
11 called different insurance companies, we talked to
12 different, you know, third party payors. We also
13 would call Medicaid -- not Medicaid, more of their
14 Consult Tech or Unisist, the ones that administered,
15 you know, the payment of claims and the
16 reimbursement part. I don't know. And Florida had
17 either Consult Tech or Unisist. I can't remember.
18 They had both. I can't remember which one at the
19 time.
20 We would call up and give them NDC
21 numbers, and they would give us the reimbursement
22 amount. And we started compiling lists and watching

Page 88

1 what ImmuneCare was doing in prescription, you know,
2 in prescribing out there.
3 Q. You described on several occasions
4 telephone conversations that you would have as part
5 of your factual investigations.
6 A. Uh-huh.
7 Q. Would you keep any record of those
8 telephone conversations?
9 A. I think we have some handwritten records
10 of telephone conversations. I'm not going to sit
11 here and tell you how many or, you know, where they
12 exist. We kept notes at times, sure.
13 Q. There would be handwritten notes of your
14 conversations?
15 A. Yes.
16 Q. Would you ever do a formal memorandum of a
17 telephone interview?
18 A. I believe if a formal memorandum was done,
19 it would have been done through our counsel. We
20 would have called, given the information, counsel
21 would have put together a memorandum for us -22
Q. Leaving aside counsel preparing something,