# EXHIBIT U

```
                                                              611

 1              UNITED STATES DISTRICT COURT

 2           FOR THE DISTRICT OF MASSACHUSETTS

 3    ----------------------------------X  MDL NO. 1456

 4    IN RE:  PHARMACEUTICAL INDUSTRY    :  CIVIL ACTION:

 5    AVERAGE WHOLESALE PRICE LITIGATION :  01-CV-12257-PBS

 6    ----------------------------------X

 7    THIS DOCUMENT RELATES TO:          :

 8    U.S. ex rel. Ven-A-Care of the     :  CIVIL ACTION:

 9    Florida Keys, Inc. v. Abbott       :  06-CV-11337-PBS

10    Laboratories, Inc.                 :

11    ----------------------------------X

12             IN THE CIRCUIT COURT OF

13           MONTGOMERY COUNTY, ALABAMA

14    ----------------------------------X

15    STATE OF ALABAMA,                  :  CASE NO.

16           Plaintiff,                  :  CV-05-219

17        v.                             :

18    ABBOTT LABORATORIES, INC.,         :  JUDGE

19    et al.,                            :  CHARLES PRICE

20           Defendants.                 :

21    ----------------------------------X

22    Deposition of DAVID TAWES, Volume III
```

Tawes, David - Vol. III  12-13-2007

704

1  there wasn't an F drive.
2       Q.   And do you know what the source was of
3  the catalog information that was compiled for the
4  1997 report that's been labeled Abbott Exhibit 002?
5            MR. WINGET-HERNANDEZ:  Objection, form.
6            THE WITNESS:  We received drug pricing
7  catalogs from Ven-A-Care.
8  BY MR. GORTNER:
9       Q.   Do you know if the entire report was
10 based upon information that you received from
11 Ven-A-Care?
12      A.   I don't know.
13      Q.   Do you have any reason to believe that
14 the prices that are documented in Roxane Exhibit
15 013 and Roxane Exhibit 014 were not received from
16 Ven-A-Care?
17      A.   No.
18      Q.   I'm going to hand you what's been
19 previously marked as Roxane Exhibit 002.  This
20 particular version will not have the designation of
21 Roxane Exhibit 002, but it, in fact, was marked as
22 Roxane Exhibit 002.  And I prefer not to mark

705

1   identical copies with different exhibit numbers.
2                For the record, this is a document
3   Bates labeled HHD009-0977 through 0981.
4                At the top of the document, there is
5   a title that states:  Excessive Medicare
6   reimbursement for prescription drugs and has a
7   paren with the actual number of the report, and
8   then it says:  Information compiled from Ven-A-Care
9   exhibits.
10               Could you flip through this document
11  quickly, Mr. Tawes, and let me know whether you
12  recognize it?
13       A.   No, I do not recognize it.
14       Q.   This isn't a document that you worked on?
15       A.   No.
16       Q.   But this was a document that was located
17  in the working files of this 1997 report?  I will
18  represent to you that that's what we were informed.
19       A.   Okay.
20       Q.   The document appears to contain a variety
21  of pricing information on several drugs.  I would
22  ask you to kind of look over the drugs on this

706

1  document, and let me know if they correspond with
2  the drugs that were, in fact, reported on in the
3  December 1997 Office of Inspector General report.
4      A.   Yes, they are.
5      Q.   In particular, I would like you to turn
6  to Page 4 of this document that's Bates labeled
7  HHD009-0980.
8      A.   (Witness complies.)
9      Q.   Do you see that there is a listing there
10 for Ipratropium Bromide?
11     A.   Yes.
12     Q.   Do you see that?  And it appears to list
13 three different NDCs.
14          Do you see that?
15     A.   Yes.  Actually, it is three of the same
16 NDCs.
17     Q.   I'm sorry, you are correct, three NDCs.
18 But under the column entitled Ven-A-Care, do you
19 see that there are three entries on the row? One
20 row reads PC, one row reads IV med, and one reads
21 HSCA, do you see that?
22     A.   Yes.

707

1    Q.    And do you have any idea what that stands
2    for?
3    A.    It would look like that it is the
4    catalogs or the pricing source.
5    Q.    And would you characterize those as three
6    different pricing sources?
7    A.    I can't say for sure whether any of those
8    are related or not.
9    Q.    And then you can see that if you follow
10   the rows off further to the right, there is a
11   column that reads NDC, and there are three prices
12   there.  Do you see that, $31.13?
13   A.    Yes.
14   Q.    Would that suggest to you that here, the
15   Office of Inspector General, in fact, had compiled
16   the pricing on Ipratropium Bromide for these NDCs
17   from Ven-A-Care?
18   A.    Yes.
19   Q.    Do you know whether the Office of
20   Inspector General, in its normal course of duties,
21   prepares sheets like this that compile information
22   that they receive on drug prices?

797

1  testified to this before, that you have not done a
2  study of utilization of particular drugs as a
3  function of AWP prices, have you?
4      A.   No.
5      Q.   And is it correct to say that you have
6  never worked in a pharmacy?
7      A.   No.  Sorry.  I have not worked in a
8  pharmacy.
9      Q.   I twisted that one up on you a little
10 bit.
11           Would it also be correct to say that
12 you, as part of your responsibilities for the OIG,
13 you have never done a study to determine how
14 pharmacies actually acquire the drugs that they
15 dispense?
16     A.   Correct.
17     Q.   Now, there has been a lot of testimony
18 and conversation about Ven-A-Care -- I will try and
19 say it right -- Ven-A-Care of the Florida Keys.  And
20 I don't want to go through all of that again, but
21 it is correct to say that Ven-A-Care provided
22 pricing information for a number of the reports

Tawes, David - Vol. III  12-13-2007

798

1  that we have looked at; correct?
2        A.   Either provided the pricing information
3  or provided us access to get the pricing
4  information.
5        Q.   And when you say provided the pricing
6  information, you are talking about the catalogs
7  that Ven-A-Care provided; correct?
8        A.   Yes.
9        Q.   Did they provide catalogs on just one
10 occasion that you are aware of or was it multiple
11 occasions?
12       A.   Multiple occasions.
13       Q.   Do you know when the first time
14 Ven-A-Care provided pricing catalogs?
15       A.   No.
16       Q.   Are they still providing pricing catalogs
17 to you?
18       A.   No.
19       Q.   Do you still -- I understand the other
20 source of information that they have given you is
21 access to on-line pharmacy prices; correct?
22       A.   Yes.

811

1  against First Databank?
2       A.   No.
3       Q.   What is your understanding of how the DOJ
4  AWPs were calculated?
5       A.   They were calculated based on information
6  provided by Ven-A-Care.
7       Q.   Do you know what information -- and
8  provided by whom -- sorry, provided by Ven-A-Care
9  to whom?
10      A.   I don't know.
11      Q.   Do you know what information Ven-A-Care
12 provided that formed the basis of the DOJ AWPs?
13      A.   Catalog prices.
14      Q.   Do you believe that the information that
15 Ven-A-Care provided that form the basis of the DOJ
16 AWPs was the same information that you utilized in
17 publishing your reports?
18      A.   I don't know.
19      Q.   Did you ever have any conversations with
20 anyone at the DOJ regarding those DOJ AWPs?
21      A.   Not that I recall.
22      Q.   Do you know if the DOJ AWPs were based on

Tawes, David - Vol. III 12-13-2007

```
                                                              869
 1    purchasing organizations?
 2         A.   Not that I know of.
 3         Q.   Do you know whether Ven-A-Care ever
 4    provided you or your office, anyone else at OIG
 5    with pricing information from group purchasing
 6    organizations?
 7         A.   Yes, they did.
 8         Q.   And was that information otherwise not
 9    available to OIG?
10              MS. TORGERSON:  Objection to form.
11              THE WITNESS:  I don't believe that
12    it would have been.
13    BY MR. AZORSKY:
14         Q.   You indicated earlier that Ven-A-Care
15    provided OIG with access to on-line wholesaler
16    prices; is that correct?
17         A.   Yes.
18         Q.   And by providing access to those on-line
19    wholesaler prices, do you mean to say that those
20    prices were password-protected?
21         A.   Yes.
22         Q.   And without a password, OIG did not have
```

                                                              872

1    BY MR. AZORSKY:
2         Q.   And to your knowledge, did Ven-A-Care
3    provide McKesson's pricing sheets for prices of
4    pharmaceuticals to pharmaceutical providers, did
5    they provide those sheets to OIG?
6         A.   Yes.
7         Q.   And in fact, generally, the prices that
8    Ven-A-Care provided to OIG to your knowledge
9    consisted of confidential prices that were not
10   accessible, unless it came from an industry
11   insider; is that correct?
12             MR. GABEL:  Objection.
13             MR. GORTNER:  Objection, form.
14             MS. TORGERSON:  Objection.
15             MS. REID:  Objection.
16             THE WITNESS:  Yes.
17             MR. AZORSKY:  I have no further
18   questions.
19             THE VIDEO TAPE OPERATOR:  Off the
20   video, 2:06.
21             THE VIDEO TAPE OPERATOR: Back on the
22   video, 2:06.

Tawes, David - Vol. III 12-13-2007