# EXHIBIT Z

259

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL ) | |
| INDUSTRY AVERAGE WHOLESALE ) | MDL NO. 1456 |
| PRICE LITIGATION ) | CIVIL ACTION: |
| THIS DOCUMENT RELATES TO ) | 01-CV-12257-PBS |
| U.S. ex rel. Ven-A-Care of ) | Judge Patti B. Saris |
| the Florida Keys, Inc. v. ) | |
| Abbott Laboratories Inc., ) | Chief Magistrate Judge |
| No. 07-CV-11618-PBS ) | Marianne B. Bowler |

HIGHLY CONFIDENTIAL

CONTINUED VIDEOTAPED 30(b)(6) DEPOSITION OF

JOHN M. LOCKWOOD, M.D.

Volume II

(Taken by Defendant Abbott Laboratories Inc.)

April 24, 2009

9:44 a.m.

Suite 800

1420 Peachtree Street, N.E.

Atlanta, Georgia

Reported by:   F. Renee Finkley, RPR, CRR, CLR, CCR-B-2289

289

1  it is.  It says it's a product listing catalog and
2  the date is here, and the cover says that it's
3  AmerisourceBergen over-the-counter and, I guess,
4  prescription drug price list.
5       Q.    At any time did Ven-A-Care provide any
6  information about the named Ery NDCs to the OIG?
7            MR. BREEN:  You're including anybody in
8       the OIG in that question?
9            THE WITNESS:  I would say that in regards
10      to the OIG, we started sending information to
11      the OIG in, I think, July of 1999 regarding
12      concerns about drugs that -- and oral drugs that
13      if they had had accurate price reporting,
14      meaning an accurate WAC price reported, a real
15      WAC price, meaning the actual transaction WAC
16      prices reported, that the FUL would have been a
17      different number than what it was.
18           So we started interacting with the OIG on
19      that subject or that topic, and it really
20      culminated in, I think, my discovery in 2000
21      that there was a similar problem with these Ery
22      drugs.  And when we went to talk about these

290

1  drugs as we were adding them to the Boston
2  complaint, my recollection is the people in the
3  room at that time included members of the
4  Department of Justice and the OIG and a number
5  of other government officials. So they were
6  part of that meeting that occurred.
7      I think 1/18 or 1/19 of 2001 we did a
8  Power Point that -- where we discussed other
9  issues, but we discussed the Ery drugs that we
10 were adding to the complaint within the
11 following month, as I recall. I could check the
12 date that we filed the first amended complaint
13 in Boston that included the Ery drugs. But we
14 discussed the drugs that were added at that time
15 with the members of the OIG and DOJ.
16     And one of the factors that we discussed
17 in particular was really a follow-up to our
18 discussions about the FUL and drugs that, had
19 they been accurately reported, it was part of
20 that whole thing that we were doing and the OIG
21 was present.
22 Q.   (By Mr. Berlin)  Who from the OIG was

1        there's a question there.
2        Q.    (By Mr. Berlin)  Prior to September 2000,
3   did you express to anyone in the -- you being
4   Ven-A-Care, anyone from Ven-A-Care express to anyone
5   in the federal government that you believed that
6   Abbott's Ery drugs -- that Abbott had misreported
7   prices on Abbott's Ery drugs?
8        A.    I would say that we started talking with
9   Mr. Stephens about these issues in the August to
10  September time frame, however, you know, I think
11  we -- we delivered catalogs, including the McKesson
12  catalog in its entirety for November, I think, of '99
13  and the Bergen printouts from '98 and '99, to the OIG
14  in the form of Mary Reardon and the Department of
15  Justice earlier in 2000 so that there was information
16  regarding the Ery drugs in that -- in those catalogs
17  and in those printouts.  And we referenced some of
18  that information during, I guess, my more intensive
19  look at this issue that, the best of my knowledge,
20  started somewhere in August or September of 2000 in
21  regards to these Ery drugs.
22       Q.    I think I may have the slide show of the

296

1  presentation you made in January 2001.  Let me just
2  take 30 seconds and see if I can find it.
3          MR. BREEN:  Just for the record, we have
4      designated that and all these preliminary
5      communications highly confidential, and I would
6      designate any discussions about the substance of
7      those to be highly confidential in the -- in
8      the -- in the deposition so the Department of
9      Justice has a chance to decide how they want to
10     handle it.  Why don't we go off the record so
11     we're not just burning tape.
12         THE VIDEOGRAPHER:  We're off the record at
13     10:37 a.m.
14         (A recess was taken.)
15         (Exhibit Lockwood Ery 011 was
16     marked for identification.)
17         THE VIDEOGRAPHER:  This is the beginning
18     of tape number two.  The time is 10:46 a.m. and
19     we're back on the record.
20     Q.   (By Mr. Berlin)  Dr. Lockwood, I've put in
21 front of you Exhibit Number 11.  Is that the
22 presentation to which you were referring to earlier?

Lockwood, M.D., John M. - 30(b)(6) - Vol. II  4-24-2009

297

1    A.   Yes, sir.
2    Q.   And for the record, could you read the
3　title of it out loud?
4    A.   18 January 2001, Presentation to
5　United States Attorney's Office, District of
6　Massachusetts, Drug Price Reporting Fraud by Dey,
7　Warrick, Roxanne, and Bristol, Causes Injury to
8　Medicare and Medicaid Programs, Ven-A-Care of the
9　Florida Keys, Inc., and Wampler Buchanan & Breen,
10　P.A.
11    Q.   What did you understand to be the purpose
12　of this presentation?
13    A.   These were companies that we had filed a
14　lawsuit on in, as I recall, March or April of 2000 in
15　Boston.  And the U.S. Attorney's Office in
16　discussions with our attorneys and us were very
17　interested in updates on those companies in
18　particular and we had agreed to discuss those and
19　prepare information on those and then discuss new
20　defendants that we would be adding, and so we did a
21　Power Point presentation on these.
22    Q.   Was there a separate Power Point

298

1   presentation or any sort of written presentation made
2   about Abbott?
3       A.   Well, the -- we discussed Abbott.  As I --
4   my recollection is we met -- we started meeting in
5   the morning and we did this Power Point presentation
6   and then in the afternoon we discussed the new cases
7   that we were going to be adding.  And I had a laptop
8   with the Econolink system on it which we left for
9   them and I showed it to the people in the room and
10  then they had me go and work with an OIG -- or not --
11  well, he's an auditor.  I don't know actually.  I
12  think he was a Department of Justice auditor, but a
13  fellow named Paul Restigian.
14          And as I recall, there was a junior DOJ
15  lawyer that kind of looked over our shoulders, but I
16  spent several hours that afternoon showing and
17  explaining to Mr. Restigian and that lawyer how the
18  Econolink system worked, how to make it work.  I
19  think we had two updates to it at that time and gave
20  them a disk and showed them how to install and what
21  to do and basically gave them a multiple-hour
22  tutorial on how it worked; showed them various things

299

1  they could do, how it could be updated.
2          So I was doing that and our lawyers were
3  discussing issues associated with this presentation
4  and with the new drugs in the afternoon with the
5  people in the room.
6      Q.   What other defendants or what other
7  manufacturers did you discuss in the afternoon in
8  addition to Abbott and the manufacturers listed in
9  the Power Point presentation?
10     A.   I would probably need to look at some
11 materials to give you the answer to that.
12     Q.   What materials would you look at?
13     A.   Our amended complaint that was the first
14 amended complaint and to make sure that I tell you
15 the correct manufacturers, cause we were there to
16 present information on those people prior to doing
17 the amendment.
18     Q.   And you referred in your testimony just
19 before the break that there was another issue and the
20 DOJ recommended that you split it into two.  What was
21 the other issue to which you were referring?
22          MR. BREEN:  I'm going to object on the