# EXHIBIT 1

Page 1

```
            IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
                   EASTERN DIVISION


US ex re. VEN-A-CARE OF THE   )
FLORIDA KEYS, INC.,           )
                              )
            Plaintiffs,       )
                              )
       vs                     ) NO.
                              ) 07-CV-11618-PBS
ABBOTT LABORATORIES, INC.,    )
                              )
            Defendants.       )
                              ) MDSL No. 1456
                              ) No. 01-12257-PBS
                              )
```

        The deposition JOHN CHRISTOPHER PAVLIK

taken in the above-entitled cause before Denise A.

Andras, a notary public within and for the County

of Cook and State of Illinois, taken pursuant to

the Federal Rules of Civil Procedure for the

United States District Courts, at 77 West Wacker

Drive, Chicago, Illinois, on the 22nd day of

January, A.D., 2009, scheduled to commence at

9:00 o'clock a.m.

Page 30

1    Q.    And what did you learn?
2    A.    That there was AWP pricing out
3  there.  I didn't know how it was -- at the time I
4  didn't know how it was really put together from
5  our perspective because I really never got
6  involved in I would say calculating that for
7  people.
8    Q.    You mean calculating it like -- in
9  what sense do you mean calculating it?
10    A.    Our AWPs at Abbott typically have
11  not been published since I've been around, most of
12  my career.  Especially, I would say from, I'm
13  thinking about '95 on, AWPs were just something
14  that we didn't see too often.
15    Q.    How did you come to learn in 1995
16  how the AWPs were published?
17    MR. BERLIN:  Objection, form.
18  BY THE WITNESS:
19    A.    Probably from one of my customers.
20  BY MR. ANDERSON:
21    Q.    And is that when you learned that
22  the AWPs were published in relation to the WAC
23  prices?
24    A.    Boy, I don't know when I -- I just

Page 31

1  knew that was a function of WAC.  It might have
2  been around that time.
3    Q.    Did you understand Abbott was
4  publishing WAC prices?
5    A.    Yes.
6    Q.    And did you understand Abbott was
7  controlling those WAC prices?
8    MR. BERLIN:  Objection, form.
9  BY THE WITNESS:
10    A.    I would say that we set our WAC
11  prices.  I'm not sure we controlled them.  It was
12  -- they are published.
13  BY MR. ANDERSON:
14    Q.    Yes, sir.  But did you understand
15  that Abbott was the entity setting the prices that
16  were in turn published?
17    A.    Yes.
18    Q.    Okay.  What was --
19    MR. BERLIN:  In that question you are
20    referring to WAC, right?
21    MR. ANDERSON:  Yes.
22  BY MR. ANDERSON:
23    Q.    Sir, what was the relationship
24  between the WAC price and the AWP?

Page 32

1    A.    I'm not positive --
2    MR. BERLIN:  I'm sorry.  Let me --
3    objection form, foundation.  Go ahead.
4  BY THE WITNESS:
5    A.    I wasn't positive how that all
6  played out from a -- I know branded drugs.  All I
7  remember is that AWP for Abbott was never
8  published by Abbott, and that there was branded --
9  I know branded products at Abbott were basically a
10  20 percent AWP, and my customers told me that.
11  And then on the generic side or the erythromycin
12  side, that was tabulated in a different way, I
13  believe, and I'm not sure if that was WAC.  I
14  think it was WAC times 1.25, I believe.
15    Q.    And so did you ever gain an
16  understanding why the mark-up from WAC to create
17  the AWP was higher for the erythromycins than it
18  was for the other Abbott PPD products?
19    A.    No.
20    Q.    Do you understand what the acronym
21  AWP -- strike that.  I'll rephrase it to be more
22  specific.
23    Do you understand the words that
24  the acronym AWP stands for?

Page 33

1    A.    Yes.
2    Q.    And what are those words?
3    A.    Average wholesale price.
4    Q.    Other than those plain words, do you
5  have any understanding of an industry standard
6  meaning for AWP?
7    A.    I'm not sure I understand what you
8  are asking.
9    Q.    Other than those words, do you have
10  an understanding of the term AWP?
11    A.    Not really.
12    Q.    Do you have an understanding of any
13  industry meaning or industry standard definition
14  of the term AWP?
15    A.    Not really.
16    Q.    What's your understanding of the
17  meaning of the term WAC?
18    A.    WAC is basically our selling price
19  to wholesalers.
20    Q.    Is a WAC price the invoice price
21  that Abbott bills wholesalers?
22    A.    Correct.
23    Q.    Has that always been the case for
24  the erythromycin products to your knowledge?

9 (Pages 30 to 33)

Fredericks Reporting & Litigation Services, LLC
AUSTIN  (512) 241-3600  -  HOUSTON  (713) 572-8897

Page 34

1      A.    I'm not sure how the invoices read
2  quite frankly.  Wholesalers have contracts with
3  Abbott, and I'm not sure if they are billed at
4  contract or if they are billed at WAC and then a
5  chargeback, I'm not sure how that occurs.
6      Q.    Do you know what words the acronym
7  WAC stands for?
8      A.    Wholesale Average Cost.
9      Q.    Are you aware of any meaning of the
10 term WAC other than the words Wholesale Average
11 Cost?
12     A.    Wholesale Acquisition Cost, I'm
13 sorry.
14     Q.    Okay.  Are you aware of any meaning
15 other than the words Wholesale Acquisition Cost?
16     A.    No.
17     Q.    Are you aware of any industry
18 standard meaning of the term WAC?
19     A.    I believe it's a price that all
20 wholesalers buy product at.  That's how I perceive
21 it.  I don't know how it relates to other
22 companies.
23     Q.    Are you familiar with a price known
24 as base deal price?

Page 35

1      A.    Yes.
2      Q.    What is base deal price?
3      A.    Base deal price was a price that on
4  our erythromycin line, that wholesalers could buy
5  our product.  I believe they had to buy $500 worth
6  of product to get that deal price.
7      Q.    Did you find that wholesalers always
8  met the $500 minimum purchase order?
9      A.    I can't speak for all wholesalers,
10 but I know for some it's a stretch, even the small
11 guys.
12     Q.    Did you find that those, the small
13 guys as you say, the smaller wholesalers, could
14 meet the $500 minimum?
15         MR. BERLIN:  Objection form,
16     foundation.
17 BY THE WITNESS:
18     A.    Sometimes they couldn't.
19 BY MR. ANDERSON:
20     Q.    And in those instances, what would
21 happen?
22     A.    They would be charged WAC.
23     Q.    And did you learn of this?
24     A.    I knew that if they didn't buy $500

Page 36

1  they were going to be charged WAC, yes.
2      Q.    And did the customers complain to
3  you about being charged WAC?
4      A.    None of mine did.
5      Q.    Were your customers -- do you know,
6  sir, that your customers -- strike that.  I'll be
7  more specific.
8          Do you know, sir, of any
9  instance where one of your wholesaler customers
10 was billed at WAC while the base deal program was
11 in place for the erythromycins?
12     A.    Yes.
13     Q.    Who?
14     A.    Capital, Prescription Supply, Miami
15 Luken.
16     Q.    How did you come to learn of that?
17     A.    They called and told me that they
18 didn't place the order, that they didn't make the
19 $500, they couldn't.
20     Q.    And were they upset?
21     A.    They understood --
22         MR. BERLIN:  Objection, form,
23     foundation.
24

Page 37

1  BY THE WITNESS:
2      A.    They understood.
3  BY MR. ANDERSON:
4      Q.    Why were they calling you?
5      A.    I think they called me to take care
6  of a handling charge, quite frankly.
7      Q.    Can you explain what you mean?
8      A.    Because they didn't make the minimum
9  order, there was a handling charge, and they asked
10 me to see if I could get the handling charge
11 waived, which is like, I don't know, $10.
12     Q.    When they purchased at WAC, did they
13 still receive prompt pay discounts?
14     A.    They had different terms.
15     Q.    Yes, sir, but, I realize the terms
16 of the prompt pay discount may have been
17 different, but did they still receive a prompt pay
18 discount?
19     A.    They would have received thirty --
20 thirty days, net thirty-one.  Two percent net
21 thirty-one is what they would have received, which
22 are standard terms.
23     Q.    And what were the standard terms on
24 the deal prices?

10 (Pages 34 to 37)

Fredericks Reporting & Litigation Services, LLC
AUSTIN  (512) 241-3600   -   HOUSTON  (713) 572-8897

Page 42

1  BY MR. ANDERSON:
2      Q.    Well, were they uniform?  Was the
3  chain price one single price for one drug at one
4  time that was offered to all --
5      A.    Yes.
6      Q.    -- to all the chains?
7            Yes, sir.  Likewise, are you
8  familiar with a term known as RBG price?
9      A.    I know what RBG stands for.  I am
10 not sure whether I ever -- I have not referred to
11 it as RBG price.
12     Q.    Okay.  Maybe you know it better than
13 as Retail Buying Group price?  Are you familiar
14 with that term?
15     A.    Yes.
16     Q.    Did Abbott maintain Retail Buying
17 Group prices?
18     A.    Yes.
19     Q.    And were those uniform prices that
20 were offered on the erythromycin to all retail
21 buying groups?
22     A.    Probably not all.
23     Q.    Most?
24     A.    I can't even say most.

Page 43

1      Q.    Why did Abbott maintain Retail
2  Buying Group prices?
3      A.    We -- because we did call on some,
4  and I can only speak for the two that I had
5  responsibility for.  I really don't know who else
6  even calls on retail buying groups.  So I can only
7  speak for my two.
8      Q.    Yes, sir.  With respect to your two,
9  how did the Retail Buying Group prices come into
10 play in your dealings with your customers?
11     A.    There was an erythromycin contract
12 that they could sign if they so desired to.
13     Q.    Were the Retail Buying Group prices
14 that were offered as a part of that erythromycin
15 contract different between your two buying groups?
16     A.    No.
17     Q.    Okay.  So at least with respect to
18 your buying group customers, the Retail Buying
19 Group prices were uniform?
20     A.    Yes.
21     Q.    Are you familiar with the term "list
22 price"?
23     A.    Yes.
24     Q.    What's a list price?

Page 44

1      A.    A list price is what a retail
2  customer would buy if they bought one bottle of an
3  Abbott product instead of a case.
4      Q.    How does list price differ from AWP?
5            MR. BERLIN:  Objection, form.
6  BY THE WITNESS:
7      A.    Really not associated to one that
8  I'm aware of.
9
10 BY MR. ANDERSON:
11     Q.    Are you aware of Abbott maintaining
12 more than one type of list price?
13     A.    No.
14     Q.    Would you consider WAC to be a list
15 price?
16            MR. BERLIN:  Objection, form.
17 BY THE WITNESS:
18     A.    No.
19 BY MR. ANDERSON:
20     Q.    All right.  Switching topics,
21 Mr. Pavlik.
22            When you were a NAM in '86, were
23 the erythromycin products being marketed by Abbott
24 as brands or generics?

Page 45

1      A.    Brands.
2      Q.    So you were a NAM when the decision
3  was made to begin marketing those products as
4  generics, correct?
5      A.    Yes.
6      Q.    What was your understanding of the
7  rationale behind that decision?
8      A.    Our customers had, I think, told our
9  whole group, people who called on the various
10 customers, that if they've got a prescription for
11 erythromycin 250 and they would dispense an Abbott
12 erythromycin that would not be adjudicated, they
13 couldn't use our product.  They had to use an
14 alternative product.  We didn't really understand
15 why.  And then we found out because our drugs were
16 classified by like Medispan or First Data Bank as
17 branded products, so they could only be used on
18 branded prescriptions.  If a doctor wrote
19 Erythrocin 250, they could use erythrocin, but
20 nothing else.  So we could not, quite frankly -- a
21 lot of customers couldn't use our products.  They
22 had to use alternatives.
23     Q.    And would you say that that was,
24 that situation where customers weren't buying

12 (Pages 42 to 45)

Fredericks Reporting & Litigation Services, LLC
AUSTIN  (512) 241-3600   -   HOUSTON  (713) 572-8897

dcc1e8af-6f72-42aa-978f-4cecd2ca75ae

Page 54

1  wholesalers?
2      A.   Yes.
3      Q.   And do they originate from the
4  wholesalers and then in turn you forward it to
5  somebody at Abbott Park in PPD Pricing?
6      A.   I'm not sure.
7      Q.   But you do know that somehow they
8  get completed by personnel within PPD and then get
9  presented to the customers?
10         MR. BERLIN:  Objection, form.
11
12 BY THE WITNESS:
13     A.   Usually given to us to present to
14 the customer.
15 BY MR. ANDERSON:
16     Q.   Us being the NAMs?
17     A.   Yes.
18     Q.   Are you aware of any other standard
19 types of documents that Abbott's been involved in
20 completing or creating to communicate information
21 to customers?
22     A.   Yes.
23     Q.   Like what?
24     A.   I'm just thinking.  A new product

Page 55

1  that we just launched, we had a distribution sheet
2  that was for warehousing chains, nonwarehousing
3  chains and retail independents.
4      Q.   And is that what it's called, a
5  distribution sheet?
6      A.   Yes, I would say it's basically a --
7  somewhat like a stocking sheet, but it's basically
8  instead of a customer buying it into a warehouse,
9  it's actually getting it from the warehouse into
10 the pharmacy.  So I call it a distribution
11 allowance sheet.
12     Q.   Any other standard --
13     A.   We have what is called, I think it's
14 an MSD, it's the material safety handling sheets
15 that typically has to be given on any new product
16 as well.
17     Q.   Okay.  Any others?
18     A.   Those are the ones that --
19     Q.   That come to mind?
20     A.   -- come to mind recently, yes.
21     Q.   The stocking sheets that are also
22 known as the sale sheets, do those include pricing
23 information?
24     A.   Sometimes.

Page 56

1      Q.   Over the years have those sheets
2  included AWP?
3      A.   You know, I know that there were
4  sheets that did, but most recently I know that we
5  never have it on there.
6      Q.   When do you think that change was
7  made to stop placing AWP on the stocking sheets?
8      A.   I don't know the specific year.  I
9  really don't.  I'd have to -- I'd have to look at
10 some materials, you know.
11     Q.   Do you have an approximate time
12 frame, like for instance was it 2003, 2004,
13 earlier?
14     A.   I really don't know specifically.
15     Q.   Okay.  Why were the AWP prices
16 included on the stocking sheets --
17         MR. BERLIN: Objection.
18 BY MR. ANDERSON:
19     Q.   -- previously?
20         MR. BERLIN:  I'm sorry, Jarrett.  I
21 didn't mean to step on your question.
22         MR. ANDERSON:  That's okay.
23         MR. BERLIN:  Objection, form
24 foundation.

Page 57

1  BY THE WITNESS:
2      A.   I believe they were on there
3  probably because it was expected to be on there by
4  our customers, and I believe it always was
5  asterisked with an estimated AWP.  I don't think
6  it was ever a specific AWP.
7      Q.   What was your understanding of how
8  Abbott was estimating AWP?
9      A.   I'm not sure how that was estimated,
10 but I know that we always told customers to refer
11 to, you know, data sources.  You know, I guess it
12 would be Red Book or First Data Bank, Medispan to
13 get the published AWP.
14     Q.   And that was true over your 20-plus
15 tenure as a NAM?
16     A.   I would say overall it's been, you
17 know, pretty true because we really have not -- we
18 never really had a -- what do I want to say -- a
19 real education on AWP, so to speak.  It was more
20 of this published in the Red Book type of thing or
21 Medispan, First Data Bank.
22     Q.   Did you understand why customers
23 were expecting the AWPs to be included in these
24 stocking sheets?

15 (Pages 54 to 57)

dcc1e8af-6f72-42aa-978f-4cecd2ca75ae

Page 58

1    A.    Not always. I know it was expected
2  to be there. They had asked for it.
3    Q.    Did you have some awareness of why
4  they were expecting it to be on the sheets?
5        MR. BERLIN: Objection, form,
6      foundation.
7  BY THE WITNESS:
8    A.    I would say honestly, no, not
9  completely. I think there was inference, but
10  never a hundred percent positive.
11  BY MR. ANDERSON:
12    Q.    What was your inference?
13    A.    Inference would be they would want
14  to know from a third-party plan perspective, you
15  know, and then the other thing they wanted to
16  know, some customers I know, one of mine
17  specifically, would say we priced to our customers
18  off of AWP. So that was the only customer that I
19  can recall where that was important.
20    Q.    You just referenced third-party
21  plans in your testimony. Are you referring to
22  third-party plans like private insurance or
23  government programs like Medicaid that reimbursed
24  for drugs?

Page 59

1    A.    I would mostly be looking at
2  third-party managed care plans, not Medicaid.
3    Q.    Like private insurance?
4    A.    Yes.
5    Q.    But drug reimbursement nonetheless?
6    A.    Yes.
7    Q.    And you don't have any reason to
8  testify that customers wanted AWPs on the stocking
9  sheets, only to gauge private insurance
10  reimbursement, do you?
11    A.    I'm not really sure why they wanted
12  it, to be honest with you.
13    Q.    But you did know that they wanted it
14  for third-party reimbursement purposes?
15    A.    Not totally. That was just --
16    Q.    That was your inference?
17    A.    Yeah.
18    Q.    Okay. Let's take a look, if we
19  could, at what's been marked as Exhibit 1.
20            (Document marked as
21             Exhibit No. 1 for
22             identification.)
23
24

Page 60

1  BY MR. ANDERSON:
2    Q.    Do you recognize the type of
3  document that's been marked as Pavlik Exhibit 1?
4    A.    I'm assuming that I saw this at one
5  time since it's NAM, but I don't remember it
6  specifically.
7  BY MR. ANDERSON:
8    Q.    You don't remember this specific --
9  these two pages, but do you remember this type of
10  document?
11    A.    Yes.
12    Q.    Okay. And it's titled NAM mission
13  statement for a new product launch, correct?
14    A.    Yes.
15    Q.    And then it lists some elements of a
16  new product launch, correct?
17    A.    Yes.
18    Q.    Are those elements that are listed
19  there consistent with your experience?
20        MR. BERLIN: Is there a time period?
21  BY MR. ANDERSON:
22    Q.    Over your tenure as a NAM.
23    A.    I would say on new product launches,
24  most of this stuff has been there for most of the

Page 61

1  part.
2    Q.    Okay. Looking at the bullet points,
3  I noticed lower-middle part of the list there is a
4  bullet that reads "pricing"?
5    A.    Yes.
6    Q.    Are you with me there?
7    A.    Uh-huh.
8    Q.    And then it says, "WAC list and
9  estimated AWP," is that correct?
10    A.    Yes.
11    Q.    And is that consistent with your
12  memory that prior to a launch, Abbott would set
13  those prices?
14    A.    I would say in the 90's possibly.
15  Certainly not today.
16    Q.    What about in the 80's?
17    A.    I really don't -- I don't remember.
18    Q.    You are not remembering that far
19  back?
20    A.    Yes, I don't think we had a whole
21  lot of new products in the late 80's when I first
22  started this job.
23    Q.    Which of those prices, WAC, list and
24  estimated AWP is Abbott currently not setting?

16 (Pages 58 to 61)

dcc1e8af-6f72-42aa-978f-4cecd2ca75ae

Page 62

1    A.    AWP.
2    Q.    Is there a difference between AWP
3  and estimated AWP?
4    A.    I'm not sure.
5    Q.    What department did you understand
6  was responsible for setting the estimated AWP at
7  Abbott?
8    A.    I'm not sure of that either.  I'm
9  not sure who did that.  I just know it was always
10  on the sheets back then.
11    Q.    And these were sheets that were
12  coming from Abbott obviously?
13    A.    Yes.
14    Q.    So somebody at Abbott was creating
15  an estimated AWP?
16      MR. BERLIN:  Objection, form.
17  BY THE WITNESS:
18    A.    Potentially yes.
19      MR. BERLIN:  Well, he is asking if
20    you know or not.
21      THE WITNESS:  I'm not sure if it
22    came from somebody at Abbott or somebody
23    else.  I'm not sure.
24

Page 63

1  BY MR. ANDERSON:
2    Q.    But you know it was appearing on
3  sheets that were printed by Abbott?
4    A.    On new products, yes.  That's where
5  I remember seeing estimated AWPs.
6    Q.    Looking down the list of elements of
7  a product launch, do you see the last bullet
8  reads, "notification to data service companies"?
9    A.    Yes.
10    Q.    And then there's a parenthetical by
11  pricing to Medispan, First Data Bank, et cetera,
12  did I read that correctly?
13    A.    Yes.
14    Q.    Did you understand that these
15  estimated AWPs were being set by Abbott and then
16  sent to the data companies like First Data Bank?
17      MR. BERLIN:  Objection, form.
18  BY THE WITNESS:
19    A.    I knew we were probably sending a
20  WAC price to them, and they were probably setting
21  the final AWP.
22  BY MR. ANDERSON:
23    Q.    Do you know, sir, whether or not
24  Abbott was sending AWPs?

Page 64

1    A.    I don't know that.
2    Q.    Do you know that Abbott was not
3  sending AWPs?
4    A.    I don't know that either.
5    Q.    So if the documents show Abbott
6  sending AWPs to the compendia, that -- you don't
7  have any information to disagree with the
8  documents, do you?
9      MR. BERLIN:  Well, hold on a second.
10    Objection to form and objection to -- I
11    mean, if you have documents that say and you
12    want him to see it, show it to him.  I mean
13    it's like saying to a murderer -- someone
14    who is accused, if we had a picture of you
15    pulling the trigger of a gun, you wouldn't
16    have any reason to believe -- either he
17    knows or he doesn't.
18      MR. ANDERSON:  Well, you can
19    object, Eric, and he can answer the
20    question.
21      MR. BERLIN:  I agree.  But I think
22    it's sort of a harassing, abusive
23    question, and that's why I stated a
24    longer objection.  You can answer if you

Page 65

1    can.
2      THE WITNESS:  Why don't you restate
3    it?
4      MR. ANDERSON:  Sure.
5  BY MR. ANDERSON:
6    Q.    Sir, if there are documents that
7  show Abbott reporting AWPs to the compendia, do
8  you have any information to contradict that Abbott
9  was sending AWPs to the compendia?
10      MR. BERLIN:  Same objection.
11  BY THE WITNESS:
12    A.    All I can tell you is that I believe
13  we sent -- I don't know what we sent to the
14  compendia, other than a WAC price.  I don't know
15  anything beyond that.  It's really not my job.
16  BY MR. ANDERSON:
17    Q.    Why was it that the data service
18  companies like Medispan and First Data Bank and
19  Red Book were notified of a product launch?
20    A.    Primarily so they would get it into
21  the pharmacy systems and the various customers out
22  there who get their pharmacy updates, get their
23  pricing information, the NDC, so they can load it
24  into their pharmacy system.

17 (Pages 62 to 65)

dcc1e8af-6f72-42aa-978f-4cecd2ca75ae

Page 102

1    October 2002, correct?
2        A.    Yes.
3        Q.    So most likely this was a Power
4    Point presentation that you attended, correct?
5            MR. BERLIN:  Objection, form.
6        Objection --
7    BY THE WITNESS:
8        A.    I really don't know.
9            MR. BERLIN:  He either remembers it
10       or not, you are not here to ask him
11       likelihoods.
12   BY MR. ANDERSON:
13       Q.    In what context do you think you
14   would have come to have this presentation?
15           MR. BERLIN:  Objection, form,
16       misstates testimony.
17   BY THE WITNESS:
18       A.    I've seen -- I know I've seen some
19   of these pages.  Okay.
20   BY MR. ANDERSON:
21       Q.    I'll tell you, Mr. Pavlik, this was
22   produced to us in electronic form --
23       A.    Okay.
24       Q.    -- in this case.  And it's my

Page 103

1    understanding the custodian of the document was
2    shown to be you.
3        A.    Okay.
4        Q.    Okay.  Does that --
5        A.    Then.
6        Q.    You don't have any --
7        A.    Either they may have just e-mailed
8    it to me.  I don't know if I was at a meeting.
9        Q.    I see.
10       A.    Okay.
11       Q.    So is it true, sir, you may have
12   received an e-mail of this Power Point without
13   actually physically attending a meeting?
14       A.    Possibly, yes.
15       Q.    I see.  Okay.  In looking at the
16   Power Point presentation, if you could flip to
17   what's page 10 of the presentation.
18       A.    Okay.
19       Q.    And that appears to be a slide
20   pertaining to the First Facts Notification
21   Program, correct?
22       A.    Yes.
23       Q.    And did you know that Cardinal had
24   programs such as First Facts?

Page 104

1        A.    Yes.
2        Q.    Where they would be notifying their
3    pharmacy customers of product launches, et cetera?
4        A.    Yes.
5        Q.    Looking at this particular example
6    of a First Facts Notification, you see that it's
7    got AWP pricing included?
8        A.    Yes.
9        Q.    Did you understand that as recently
10   as, for instance, 2002 Cardinal was sending out
11   AWP information to pharmacies?
12       A.    No.
13       Q.    You knew they were notifying
14   pharmacies about launches but you didn't realize
15   the detailed information they were providing?
16       A.    Not for anything that I participated
17   in, no.
18       Q.    Did you know that Cardinal was
19   communicating AWP information to pharmacies in any
20   way?
21       A.    No.
22       Q.    Look at the -- what's labeled as
23   page 8 of this Exhibit.
24       A.    Okay.

Page 105

1        Q.    You see a reference there to the
2    choice screen savers?
3        A.    Yes.
4        Q.    Are you familiar with or did you
5    become aware over the years that Cardinal had a
6    software program known as Cardinal Choice?
7        A.    I just called it screen savers.  I
8    don't know "Choice screen savers."
9        Q.    I'm actually asking a slightly
10   different question, but I'll address your answer.
11   Did you know that Cardinal marketed products to
12   pharmacies through screen savers?
13       A.    No.
14       Q.    All right.  Did you know that
15   Cardinal offered software to pharmacies?
16       A.    No.
17       Q.    What is it that you do recall about
18   the screen savers?
19       A.    All I know is that anything in this
20   packet, if you participate, you pay for at
21   Cardinal.  None of this is free.  So the First
22   Facts, anything that we would participate in the
23   First Facts I would give to Cardinal or Screen
24   Savers I would give to Cardinal.  If they sent

27 (Pages 102 to 105)