# EXHIBIT 2

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

In re: PHARMACEUTICAL      )
INDUSTRY AVERAGE WHOLESALE )
PRICE LITIGATION           )    MDL No. 1456
                           )
THIS DOCUMENT RELATES TO:  )    Civil Action No.
                           )       01-12257-PBS
US ex rel Ven-A-Care of    )
the Florida Keys, Inc.     )
v. Abbott Laboratories, Inc.)
No. 07-CV-11618-PBS        )


VIDEOTAPED ORAL DEPOSITION OF JOSEPH E. FISKE

Volume 1

February 17, 2009


DEPOSITION upon videotaped oral

examination, of the witness, JOSEPH E. FISKE, taken

on behalf of Ven-A-Care of the Florida Keys, Inc. in

the above entitled cause pending in the United States

District Court, District of Massachusetts, before

TAMMY POZZI, Certified Shorthand Reporter in and for

the State of Texas, on February 17, 2009, in the law

offices of Jones Day, 77 West Wacker, 35th Floor,

Chicago, Illinois, between the hours of 9:05 a.m. and

4:49 p.m., pursuant to due notice and the Federal

Rules of Civil Procedure.

Page 2

1          A P P E A R A N C E S
2    COUNSEL FOR VEN-A-CARE OF THE FLORIDA KEYS, INC.:
3       ANDERSON LLC
          Mr. C. Jarrett Anderson
4         208 West 14th Street, Suite 203
          Austin, Texas 78701
5         (512) 469-9191
6    COUNSEL FOR ABBOTT LABORATORIES INC.:
7       JONES DAY
          Mr. Eric P. Berlin
8         Ms. Tara A. Fumerton
          77 West Wacker Drive, Suite 3500
9         Chicago, Illinois 60601
          (312) 782-3939
10
       COUNSEL FOR THE STATES OF WISCONSIN, ILLINOIS,
11   KENTUCKY, IDAHO, HAWAII, ALASKA AND SOUTH CAROLINA:
                (not present)
12      MICHAEL WINGET-HERNANDEZ
          Mr. Michael Winget-Hernandez
13        101 College Street
          Dripping Springs, Texas 78620
14        (512) 858-4181
15   COUNSEL FOR THE STATES OF ALABAMA AND MISSISSIPPI:
                (not present)
16      BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES,
          P.C.
17        Mr. Paul Lynn
          218 Commerce Street
18        Montgomery, Alabama 36104
          (800) 898-2034
19
     ALSO PRESENT:
20
        MARY ELIZABETH GAASCH,
21        Videographer
22
23
24
25

Page 3

## INDEX

                              PAGE
Appearances. . . . . . . . . . . . . . . . .    2
JOSEPH E. FISKE
     Examination by Mr. C. Jarrett Anderson. . .    5

Witness's Signature Page/Corrections . . . . . .  263

Reporter's Certificate . . . . . . . . . . . .  265

## EXHIBITS

DESCRIPTION                    IDENTIFIED
1    Abbott Laboratories Inc.'s Responses to
     Ven-A-Care's 30(B)(6) Notice of Deposition of
     Abbott Laboratories Inc. . . . . . . . . . .   31
2    Ery Contract Pricing 2003-2005. . . . . . .   53
3    Abbott Laboratories Inc. Multi Source
     Erythromycins Wholesaler Acquisition Cost
     Effective July 1, 2003. . . . . . . . . . .   53
4    Abbott Laboratories Inc. Multi Source
     Erythromycins Wholesaler Acquisition Cost
     July 1, 2001 Thru June 30, 2003 . . . . . .   53
5    Ery Deal Issue in CPCC 11/13/02 . . . . .   69
6    Abbott Laboratories Inc. Multi Source
     Erythromycins Wholesaler Acquisition Cost
     July 1, 1995 Thru June 30, 1996 . . . . . .   77
7    PPD New Product Set-Up Process Map . . . . .  122
8    NAM Mission Statement for a New Product
     Launch. . . . . . . . . . . . . . . . .  131

9    Fax to Medical Economics Company from
     Pharmaceutical Products Division. . . . . .  134
10   Micromedex Price List Verification 2004 . .  145
11   Micromedex Price List Verification. . . . .  152

Page 4

1              EXHIBITS CONTINUED
2    DESCRIPTION                    IDENTIFIED
3    12  10/4/04 E-mail string, Subject: Synthroid
         00048 NDCs. . . . . . . . . . . . . . .   161
4
5    13  Handwritten Notes . . . . . . . . . . .  220
6    14  3/7/01 Interoffice Correspondence, Re: Rules
         of The Road . . . . . . . . . . . . . .   221
7    15  Price Reduction Response Statement. . . .  227
8    16  6/14/01 Chicago Tribune article . . . . .  229
9
10                 *-*-*-*-*

Page 5

## PROCEEDINGS

1             THE VIDEOGRAPHER:  We are on the
2    record.  It is Tuesday, February 17th, 2009.  It is
3    9:05 a.m.  This is the beginning of tape 1.
4             Will the court reporter please swear
5    in the witness?
6                 JOSEPH E. FISKE,
7    having been first duly sworn, testified as follows:
8                 EXAMINATION
9    BY MR. ANDERSON:
10       Q.  Good morning, sir.  How are you?
11       A.  I'm fine, thanks.
12       Q.  Can you state your name for the record,
13   please?
14       A.  Joseph E. Fiske.
15       Q.  Mr. Fiske, you and I have met once before,
16   and you've been deposed and -- and that deposition is
17   now part of this case.  Do you understand that?
18       A.  Yes, I do.
19       Q.  Okay.  Accordingly, I'm not going to
20   belabor too much of the background experiences and
21   what have -- have you that you've had, but I do have
22   some questions along those lines.
23             Have you been deposed in any cases
24   since roughly March of 2007 when you were previously

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 6

1 deposed in the deposition that's part of this case?
2    A. Yes, I have.
3    Q. How many times?
4    A. I don't know exactly. At least two.
5 Perhaps more.
6    Q. Were those depositions part of a case
7 involving price reporting such as AWP?
8    A. No.
9    Q. What were those cases about generally?
10    A. One was regarding Tri-Cor litigation, and
11 the other one was Norvir litigation -- the repricing
12 of Norvir.
13    Q. What do you mean by "repricing"?
14    A. In 2003, Abbott repriced Norvir to reflect
15 its value in the marketplace. It was basically a
16 different product than when it was originally
17 introduced.
18    Q. And did the price go up or go down?
19    A. The price went up.
20    Q. What about Tri-Cor? What was the basic
21 thrust of that case?
22    A. I don't know all the details of the case.
23 I -- I think there were allegations that Abbott was
24 thwarting generic competition.
25    Q. The pat- -- it's -- it -- it had to do with

Page 7

1 the expiration of a patent?
2    A. It had to do with the introduction of new
3 formulations of Tri-Cor.
4    Q. Near the expiration of an existing patent
5 on a Tri-Cor formulation?
6    A. That's correct.
7    Q. Okay. All right. Do you understand that
8 you're here today to testify on behalf of Abbott as a
9 corporation?
10    A. Yes, I do.
11    Q. And when did you gain an understanding that
12 you would be testifying as the corporate
13 representative?
14    A. Many months ago. I -- I couldn't tell you
15 precisely when.
16    Q. Have you taken steps to gather information
17 in order to testify as the corporate representative?
18    A. Yes, I have.
19    Q. Did you speak to individuals at Abbott in
20 preparing to testify?
21    A. Yes, I did.
22    Q. Who?
23    A. I spoke with Dale Johnson who is the
24 Divisional Vice President of State Government
25 Affairs. I spoke with Virginia Tobiason who is

Page 8

1 Senior Director of Reimbursement at Corporate. I
2 spoke with Tip Parker who is Director of Trade
3 Relations. I spoke with Ruey Tu from our
4 International Pricing Group. I spoke with John King
5 who is a Regional Sales Manager for our Government
6 Reimbursement Policy and Long-Term Care's group. I
7 spoke with Martha Schrader who is our Divisional Vice
8 President of Public Policy and Strategy. I spoke
9 with Charlie Aubuchon who currently works in Creative
10 Services within Abbott, but sometime ago, in the late
11 '80s and early '90s, was a promotional manager for
12 the Ery products among other products.
13    Q. What's his -- I'm sorry to interrupt you,
14 but what is his current position?
15    A. We have an in-house Creative Services
16 group, or in-house ad agency. He works in that
17 group.
18       I spoke with a number of people -- oh,
19 I'm sorry. Excuse me. I spoke with Mark Turon who
20 worked in Pricing and Planning for approximately
21 eleven years. Nine of those years, he was Manager of
22 Pricing Operations, responsible for the chargeback
23 group; the people that reported price to the various
24 entities when we took price changes, etcetera.
25       I spoke with a number of current and

Page 9

1 previous employees who had responsibility for price
2 reporting, including Krista Kleidon, Tina Calvert,
3 April Gerzel, Dana Chavira.
4       I spoke with a number of people who
5 worked in our chargeback area, as well as people who
6 had responsibility for responding to various bid
7 requests, including Donna Arnold, Donna Dunski, Lori
8 Eidson, spelled E-i-d-s-o-n.
9       I spoke with Ronny Lancaster who is
10 our Senior Manager of Strategic Pricing for Public
11 Payor Markets.
12       I may have spoken with others that
13 I've forgotten. If I think of them, I'll try and
14 remember to tell you.
15    Q. Thanks. That was quite a list. I tried
16 desperately to keep up. As we go through the topics
17 for which you've been designated, I may have some
18 specific questions about what you've learned from
19 different individuals that you've talked with.
20    A. Sure.
21       MR. BERLIN: That- -- that's fine.
22 And we -- and, you know, we -- I had written to you
23 on, I guess, the 6th, and we talked after Tara had
24 written to you on the 6th --
25       MR. ANDERSON: Uh-huh.

3 (Pages 6 to 9)

efa2704b-8ab7-411a-b06f-06f9869a5ea3

1          MR. BERLIN:  -- and his investigation,
2    in fact, went beyond what I told you we were going to
3    do but I didn't feel -- I -- I -- I mean, I hope
4    that's okay.  I figured you -- "beyond" was -- I
5    didn't give no- -- give you notice that we were going
6    beyond.
7          MR. ANDERSON:  No, that's not --
8          MR. BERLIN:  But I mean --
9          MR. ANDERSON:  -- a problem.
10          MR. BERLIN:  -- that's -- that's -- we
11    that -- wanted to make sure it was thorough.
12          MR. ANDERSON:  Thanks.
13    A.  I also did speak with both internal counsel
14    as well as external counsel preparing for the case.
15          MR. BERLIN:  And you don't have a
16    question pending obviously, but -- I mean, I do- --
17    it's worth noting that we'll be claiming privileges
18    as to those conversations but -- we're going to
19    in- -- to -- we're going to interpret your questions
20    as not asking for attorney-client privilege
21    information unless you are explicitly asking for
22    that.
23          MR. ANDERSON:  Well, I'll tell you,
24    I -- I think the better course would be, Eric, if you
25    feel like one of my questions is calling for

1    Mr. Fiske to disclose privileged information, then
2    assert the objection, and then I can -- I can frame
3    my questions so that we avoid that.
4          MR. BERLIN:  Okay.
5          MR. ANDERSON:  I'm not -- my goal is
6    not to obtain attorney-client privileged --
7          MR. BERLIN:  I --
8          MR. ANDERSON:  -- information.
9          MR. BERLIN:  I understand.  I
10    assumed --
11          MR. ANDERSON:  But I --
12          MR. BERLIN:  -- you wouldn't.
13          MR. ANDERSON:  -- I -- I -- it would
14    be -- it's going to -- it's not going to work unless
15    you assert the privileges when you feel like you need
16    to, so that I can then work around it.
17          MR. BERLIN:  Okay.  Well, let's see
18    how it goes.
19          MR. ANDERSON:  Okay.
20    Q.  (BY MR. ANDERSON):  Who in the Abbott
21    in-house counsel did you talk with?
22    A.  Sara Weil.
23    Q.  What's the last name?
24    A.  Weil, W-e-i-l, I believe.
25    Q.  Is -- is that -- was her maiden name Like,

1    or is that a --
2    A.  I don't --
3    Q.  -- different Sara?
4    A.  -- believe so.
5    Q.  Okay.  And then as far as external legal
6    counsel, Mr. Berlin was someone you talked with?
7    A.  Eric Berlin.
8    Q.  Yes.
9    A.  There may have been other people on some of
10    the phone conversations.  I apologize, I don't recall
11    every single person that may have been a part of the
12    phone conversations that I also had.
13    Q.  Okay.  How -- how many hours would you say
14    you spent talking with these individuals?
15    A.  I spent a total of probably 40 to 50 hours
16    preparing for the case.  I spoke with most of those
17    individuals for about an hour apiece, some of them as
18    short as 15 minutes.
19          I spent a couple of phone
20    conversations with Mr. Berlin as well as some other
21    people from legal counsel.  I also met with him
22    briefly about two weeks ago for a couple of hours and
23    probably nine hours yesterday.
24    Q.  Did you review any documents in preparing
25    to testify?

1    A.  I was shown a number of documents.  I also
2    saw documents in some depositions that I read in
3    preparation for this.
4    Q.  Which depositions did you read?
5    A.  I read my previous deposition for the Texas
6    case.  I read Debbie DeYoung's deposition for that
7    same case.  Both of those were from March of 2007.
8    Q.  Uh-huh.
9    A.  I read a more recent deposition by Beth
10    Garvin that was taken in December of '08 related to
11    this particular case.
12    Q.  And you reviewed some of the exhibits to
13    those depositions; is that correct?
14    A.  Not all of the exhibits were attached.  I
15    re- -- I looked at the ones that were.
16    Q.  What other documents did you review?
17    A.  There were numerous documents that I was
18    shown yesterday that apparently have been presented
19    in other depositions and -- and others that were
20    not.  I couldn't tell you exactly which documents
21    I've seen.  I've seen so many.
22          I can certainly -- if -- if I see
23    them, I can make note of it if I remember that it's
24    one that I've seen before.
25    Q.  Okay.  Thank you.

Fredericks Reporting & Litigation Services, LLC
AUSTIN  (512) 241-3600   -   HOUSTON  (713) 572-8897

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 14

1      A.  Quite honestly, I'm not sure I'll recall if
2   I saw them recently or from a former time that I may
3   have seen them.
4      Q.  Right.  Other than reviewing documents
5   yesterday -- I take it you reviewed those -- reviewed
6   those documents yesterday with Mr. Berlin, correct?
7      A.  There were documents that we reviewed
8   yesterday, as well as documents that I had reviewed
9   at other times, like I said, when I was reading the
10  depusi- -- depositions --
11     Q.  Uh-huh.
12     A.  -- and I don't recall whether we reviewed
13  any documents when we met a few weeks ago.
14     Q.  Other -- other than reviewing documents
15  with Mr. Berlin and reviewing deposition exhibits
16  that were a part of the DeYoung, Joe Fiske, and Beth
17  Garvin depositions, did you review any other
18  documents?
19     A.  I looked at some bid schedules.  I looked
20  at some contract documents.  I looked at some price
21  increase notifications.  I believe that's the extent
22  of what I looked at.
23     Q.  Did you review any documentation from the
24  Managed Care division or department?
25     A.  No, I didn't.

Page 15

1      Q.  Did you review any bid materials exchanged
2   between Abbott and customers, such as GPOs or chain
3   pharmacies or wholesalers who would request that
4   Abbott bid for placement of its drugs on those
5   customers' formularies?
6      A.  Only to the extent that they may have been
7   part of the documents that I reviewed that were part
8   of previous depositions.
9      Q.  Did you review any government documentation
10  such as OIG reports?
11     A.  Not at this point in time.  I've seen such
12  documents over the -- over the course of my career in
13  Pricing.
14     Q.  When -- let me back up a step.  When I
15  refer to the "OIG," do you understand I'm referring
16  to the Office of Inspector General for Health and
17  Human Services?
18     A.  Yes.
19     Q.  Okay.  When -- strike that.
20         In what context in the past have you
21  reviewed OIG reports?
22     A.  Periodically people would send me reports,
23  and I can't tell you exactly in what context.  One I
24  remember is a report regarding GPO admin fees that
25  was issued -- I believe it was OIG that issued it --

Page 16

1   indicating that -- I believe that a number of GPOs
2   were passing those admin fees along to their
3   customers, which would imply that they were a
4   discount rather than just an admin fee.
5      Q.  Can you remember the subject matter of any
6   other OIG reports that you reviewed?
7      A.  Not that I reviewed.  There -- there -- I'm
8   sure there are others that I have seen.  I just --
9      Q.  Uh-huh.
10     A.  -- don't recall right off the top of my
11  head.
12     Q.  Other than the -- the OIG reports
13  pertaining to administrative fees of GPOs, are you
14  aware of any other OIG reports reviewed by Abbott
15  personnel --
16     A.  Yes.
17     Q.  -- specifically?  Which ones?
18     A.  Martha Schrader was familiar with OIG
19  reports that were issued regarding the fact that AWP
20  pricing reported by the data agencies did not reflect
21  actual acquisition costs by retail pharmacies.
22     Q.  That -- you gained that information in your
23  discussion with Ms. Schrader recently?
24     A.  Yes.
25     Q.  When did Ms. Schrader review those reports?

Page 17

1      A.  She didn't give me a specific time frame.
2   I didn't ask her for a specific time frame.
3      Q.  Did Ms. Schrader provide you with those --
4   any copies of those reports?
5      A.  No, she didn't.
6      Q.  What was your understanding of the findings
7   of these reports?
8      A.  They were reports that were issued, I
9   believe, to Health and Human Services -- and
10  obviously available, actually, for the public, which
11  means states and others would have access to them --
12  that, as I described previously, indicated that AWP
13  as reported by the -- by the data agencies overstated
14  acqu- -- actual acquisition costs versus what
15  pharmacies were actually paying for product.
16     Q.  Do you have any understanding of the
17  specific findings with respect to how much AWP
18  overstated actual acquisition cost?
19     A.  No, I don't.
20     Q.  Do you have any information about the
21  findings of these reports with respect to generic
22  drugs versus brand drugs?
23     A.  No, I don't.
24     Q.  Do you have any information about the
25  findings of these reports with respect to any given

5 (Pages 14 to 17)

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 18

1  manufacturer's drugs?
2      A.  No, I don't.
3      Q.  Do you know whether it was one single
4  report or multiple reports that Ms. Schrader had
5  reviewed?
6      A.  From my discussion, I believe it was
7  multiple reports, but I can't state that with
8  certainty.
9      Q.  Did you gain any understanding about the
10  context in which Ms. Schrader reviewed these reports?
11      A.  Martha Schrader is, as I described
12  previously, our Divisional Vice President for Public
13  Policy and Strategy.
14      Q.  Uh-huh.
15      A.  She had previously worked for another
16  manufacturer.  I don't know exactly what her
17  responsibilities were there.  But in the course of
18  her job responsibilities, she keeps abreast of
19  legislation, reports that are coming out from the
20  government, etcetera, as it might affect the industry
21  in general.
22      Q.  Has Ms. Schrader or anyone working for
23  Ms. Schrader ever had any responsibility for setting
24  of prices on Abbott drugs?
25      A.  No.

Page 19

1      Q.  To your knowledge, has anyone at Abbott
2  who's ever had any responsibility for setting prices
3  on Abbott drugs reviewed any OIG reports concerning
4  AWP?
5          MR. BERLIN:  Objection, form and
6  scope.
7      A.  I don't know because I don't know whether I
8  have actually specifically seen such a report
9  myself.  I -- as I indicated, I believe I've seen and
10  read a -- a number of OIG reports, but I do an awful
11  lot of reading in my job, and I can't remember
12  specifically everything I've read.
13      Q.  (BY MR. ANDERSON)  Do you have any copies
14  of any OIG reports in your files concerning published
15  pricing such as AWP pricing?
16      A.  I don't believe so, but I may have.  I
17  don't know.
18      Q.  Have you searched for those?
19      A.  When we searched for files for production
20  for this case, we looked through any files that may
21  have been labeled "AWP" or -- and I don't have a file
22  that's called "OIG," so...  We produced everything
23  that we had.
24      Q.  So if you had any --
25      A.  I couldn't have looked through every file

Page 20

1  that I have, quite honestly.
2      Q.  Well, I understand, but I'm saying, to your
3  knowledge, as the Abbott corporate representative,
4  any OIG reports that would have been maintained in
5  the files of Abbott personnel responsible for price
6  setting would have been located in your prior
7  searches; is that correct?
8          MR. BERLIN:  Objection, form, scope.
9      A.  I -- I can't state for certainty.  My
10  personal experience is that we have very man- -- you
11  know, many, many files.  We try and produce
12  everything that's related to a case when it's -- when
13  the information is listed out for us in terms of what
14  we need to provide.
15          It's possible that things may have
16  been overlooked by somebody, but to the best of my
17  knowledge, everything was produced that was
18  available.
19      Q.  (BY MR. ANDERSON)  Is your awareness of
20  any Abbott personnel's review of OIG reports limited
21  to what you learned from Ms. Schrader?
22      A.  Yes, I believe so.
23      Q.  And Ms. Schrader didn't share with you any
24  documentation regarding any OIG reports that she had
25  reviewed, did she?

Page 21

1      A.  No, she did not.
2      Q.  And you're not able to recall any of the
3  specifics about the time frame for which the report
4  was published, etcetera?
5          MR. BERLIN:  Objection, form.
6      A.  I didn't specifically ask that question.
7      Q.  (BY MR. ANDERSON)  Okay.  Do you have any
8  information whatsoever that Ms. Schrader shared her
9  awareness of the OIG reports concerning AWP pricing
10  with any other Abbott personnel, other than you,
11  obviously, in preparing to testify?
12      A.  I'm going to answer the question this way,
13  but I -- it is somewhat speculative.  She manages a
14  group of people.  And, in fact, one of the people who
15  worked for her at one point in time used to do web
16  searches for different kinds of information affecting
17  the industry, and she -- she may have shared such
18  information with one of her employees or he may have
19  been the source for the -- for the report but I don't
20  know.
21          To my knowledge, she did not share
22  that information with Pricing and Planning, but I
23  wa- -- I want to be careful because the employee,
24  Tom -- I can't recall his last name right now -- used
25  to actually copy us periodically on, like, a -- a --

Page 22

1  a daily newsletter of key happenings, just excerpts
2  of things.
3            But I don't recall specifically an OIG
4  report coming from Martha's group to us.
5       Q.  How long has Martha been in her -- well,
6  strike that.
7            How long has Ms. Schrader been with
8  Abbott?
9       A.  Six years.
10      Q.  So the earliest time frame that she could
11  have been reviewing OIG reports while at Abbott would
12  have been 2003 -- 2002 at the earliest?
13      A.  Correct.  But she -- as I indicated, she
14  had similar responsibilities, I believe, at another
15  company.  But at Abbott, that's a correct statement.
16      Q.  Right.  What was that other company?
17      A.  I think it was Amgen, but I --
18      Q.  Okay.
19      A.  -- I don't want to be -- I may be mistaken.
20      Q.  But not a company that was affiliated in
21  any way with Abbott?
22      A.  Not to my knowledge.
23      Q.  Okay.  All right.  We'll come back to that
24  potentially.
25            What did you discuss with Ms. Tobiason

Page 23

1  in prep- -- preparation to testify as the corporate
2  representative?
3       A.  I actually just reviewed the various topics
4  that I was supposed to be prepared to testify on and
5  actually went through them one by one with her.  She
6  had very little knowledge about most of those
7  issues.
8            Her title is Senior Director of
9  Reimbursement for Corporate.  She's held -- I think
10  she's been with Abbott since 1994.  She started off
11  in the Hospital Products Division where she was
12  Director of Reimbursement for the Home Infusion
13  group --
14      Q.  Uh-huh.
15      A.  -- subsequently worked in ADD as Director
16  of Reimbursement.  Her focus was not on oral
17  pharmaceuticals.  Her focus has always been on -- on
18  "Part B drugs," I'll refer to them as -- I'm sure
19  you know what I mean --
20      Q.  Uh-huh.
21      A.  -- Medicare Part B, or devices.
22            And so when I talked with her, she --
23  she really did not know a lot about the
24  pharmaceutical business that I work in.
25      Q.  It was -- it was your understanding that

Page 24

1  Ms. Tobiason started with Abbott back in 1974?
2       A.  I said '94.
3       Q.  Yes, sir.
4       A.  I think.  I -- I could have a mis- --
5  mi- -- mistaken memory.  Maybe she said that she
6  worked in HPD Home Infusion from '94, but I think she
7  told me she started in '94.  I could be mistaken.
8            MR. BERLIN:  Do you know?
9       Q.  (BY MR. ANDERSON):  I believe she's been
10  with the company for years and years and --
11      A.  That's possible.
12      Q.  (BY MR. ANDERSON):  -- years.  I thought
13  maybe you misspoke.  I don't know.
14      A.  Well, you know what?  I have the '94 date
15  in my mind, and maybe that's when she was in Home
16  Infusion.  Or maybe I'm just having poor memory.
17      Q.  Well, you -- you spoke to a lot of people.
18  I'm -- you know, I'm not trying to --
19      A.  I'm certainly not trying to misrepresent
20  facts at all.
21      Q.  Yeah.  Well, I -- I just want to --
22            MR. BERLIN:  I --
23      Q.  -- double-check it.
24            MR. BERLIN:  I don't remember.  I
25  mean, if I -- if I knew for a fact, I would --

Page 25

1            MR. ANDERSON:  Yeah.
2            MR. BERLIN:  -- alleviate our --
3            MR. ANDERSON:  Yeah.
4            MR. BERLIN:  -- curiosity, but --
5            MR. ANDERSON:  Well, I --
6            MR. BERLIN:  -- just don't recall.
7       Q.  (BY MR. ANDERSON):  I mean, for what's it
8  worth, I'm fairly certain she was with Abbott
9  Hospital for many, many years, maybe dating back into
10  the '80s and I think even potentially back into the
11  70s, but I'm fairly confident she was with Abbott HPD
12  in the -- in the '80s for sure.  But anyway --
13            MR. BERLIN:  In the 1980s?  We're not
14  talking, like, Civil War here, right?
15            MR. ANDERSON:  No, she's not --
16            MR. BERLIN:  Not that many years?
17            MR. ANDERSON:  No, and I won't tell
18  her you said that either.
19            MR. BERLIN:  Thank you.
20      Q.  (BY MR. ANDERSON):  So -- anyway, so you
21  walked through the different topics for which you've
22  been designated to testify on behalf of Abbott today
23  with Ms. Tobiason, and she conveyed to you that she
24  didn't have any information on those topics; is that
25  correct?

Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600   -   HOUSTON   (713) 572-8897

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 26

1     A.  I -- I don't want to say that she had no
2  information.  She had very little that's relevant.
3  She knew, for example, that some Medicaid
4  reimbursement was based on AWPs.
5     Q.  Uh-huh.
6     A.  She didn't know where the Medicaid agencies
7  obtained those AWPs from, how those AWPs were
8  determined.  She -- she had no knowledge regarding
9  industry setting of prices, no knowledge regarding
10  PPD's reporting of prices.  She did know that HPD had
11  reported prices to the pricing compendia.
12        That's why I said she had very little
13  knowledge that's relevant, I think, to -- this
14  discussion.
15     Q.  Okay.  So she -- other than generally
16  knowing that Medicaid agencies used AWPs to set
17  reimbursement, she didn't really have any other
18  information that was pertinent to your testimony on
19  behalf of Abbott in this case; is that correct?
20     A.  That's correct.
21     Q.  Were there other individuals who you spoke
22  to where you went through the topics that you've been
23  designated to testify?
24     A.  A number of them.
25     Q.  A num- -- okay.  So that was a standard

Page 27

1  line of communication you had with these people in
2  preparing to testify?
3     A.  Not every individual, but a number of them.
4     Q.  I see.  Okay.  Well, let's -- let's dive
5  into the topics themselves, then, and -- oh.  One
6  clerical thing.
7        Charlie -- I missed his last name --
8  the -- the gentleman who's now in Creative Services
9  and was previous a promotional manager for the Erys?
10     A.  Aubuchon.  And I probably am not going to
11  spell it correctly myself.
12     Q.  All right.
13     A.  I believe it's A-u-b- -- I don't -- I don't
14  know what the next letter is, it could be an "a", a
15  "u" or "o" --
16     Q.  Okay.
17     A.  -- -c-h-o-n, I believe, is the last part of
18  it.
19     Q.  And when you say he previously was a
20  promotional manager, can you describe what that
21  position would entail?
22     A.  There was a group in PPD in the late '80s
23  and very early '90s called National Accounts.  They
24  had responsibility for products that were our older
25  products, products like K-Tab, products like the

Page 28

1  erythromycins.
2     Q.  Uh-huh.
3     A.  And one of res- -- vitamins, etcetera.  The
4  product managers would come up with concepts for
5  doing -- I'll call them "deals" where you would
6  periodically offer a spe- -- have a special price
7  offering on a product to try and create some demand
8  in the marketplace for it, at a special price, like I
9  said.
10        Charlie worked with creative agencies
11  to develop materials to promote those deals, as well
12  as other things, to communicate information that they
13  wanted to try to communicate.
14     Q.  Is it true that this position Mr. Aubuchon
15  held as promotional manager was a position that was
16  different from a product manager?
17     A.  That's correct.
18     Q.  Okay.  Did you speak to anyone who
19  previously held any responsibilities as a product
20  manager for any of the erythromycin products?
21     A.  I couldn't find any of those people.  I
22  don't believe they're employed by Abbott any longer.
23     Q.  Did Mr. Aubuchon have any information about
24  any promotional efforts on the Erys?
25     A.  No, other than the -- the -- some of the

Page 29

1  creative things that he had done.
2     Q.  So he -- he did recall some specifics about
3  different pieces or materials that had been created
4  for the Erys?
5     A.  I did not get into a very detailed
6  discussion with him regarding all of the pieces he
7  had created.
8     Q.  Uh-huh.
9     A.  Quite frankly, the reason I spoke with
10  Charlie was because of something that had been
11  presented as a -- I'm sorry, what do you call the --
12     Q.  Exhibit?
13     A.  -- exhibit, thank you, in the Texas case.
14     Q.  Which document, just generally?
15     A.  I think it was the Texas case.  It may have
16  been in Beth Gar- -- Beth Singer's deposition.  It's
17  a piece regarding -- I -- I'm going to call it an
18  "Ery gang" piece, and it was regarding the
19  classification of the erythromycins as generics.
20     Q.  And what did you learn from Mr. Aubuchon
21  about the Ery gang advertising piece?
22        MR. BERLIN:  Objection, form.
23     A.  That it preceded the time period that this
24  deposition covers.
25     Q.  (BY MR. ANDERSON):  When was that piece

Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600   -   HOUSTON   (713) 572-8897

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 30

1    used in advertisements by Abbott?
2        A.   To Charlie's best recollection, it was
3    created in the '88 to '91 time frame based on the
4    files that he had, and -- but he -- he didn't know
5    precisely where it was used or how it was used other
6    than he had the -- the -- the mock-up for the piece.
7        Q.   What's your understanding of why that piece
8    was created?
9            MR. BERLIN:  Objection, form, scope.
10       A.   I asked Charlie that same question, and all
11   we can determine is from what it says.  It says it's
12   to make the marketplace, I'll say, aware of the fact
13   that Abbott's erythromycins had been classified as
14   generics.
15       Q.   (BY MR. ANDERSON):  And in that context,
16   the marketplace would be primarily pharmacies,
17   correct?
18           MR. BERLIN:  Objection, scope.
19       A.   I -- I -- I don't know who all that piece
20   was sent to, but it might have relevance to
21   wholesalers as well as retailers.
22       Q.   (BY MR. ANDERSON):  But it -- it -- at the
23   minimum, certainly, retailers, including retail
24   pharmacies, would be part of the marketplace for the
25   Erys, correct?

Page 31

1        A.   That's correct.
2        Q.   Okay.  I'm going to -- I'm going to go
3    through some of the topics, Mr. Fiske, and -- and
4    I'll -- I'll read you the topic before we get into
5    the specific questioning to help you frame what I'm
6    talking about, okay?
7        A.   Okay.
8            MR. BERLIN:  Actually, if you're going
9    to do that, I'm going to show him the response so
10   that he can --
11           MR. ANDERSON:  Sure.
12           MR. BERLIN:  -- stay focused on the --
13   you know, what the actual designation is.
14           MR. ANDERSON:  Yeah.  In fact, if you
15   want, we can mark it as an exhibit and --
16           MR. BERLIN:  Okay.
17           MR. ANDERSON:  You don't mind if I
18   mark your copy, do you?
19           MR. BERLIN:  No, that's -- I can
20   always make another copy.
21           MR. ANDERSON:  Yeah.
22           (Exhibit 1 marked.)
23       Q.   (BY MR. ANDERSON):  Okay.
24           MR. BERLIN:  Do you have -- do you
25   want me to make you a copy of the --

Page 32

1            MR. ANDERSON:  Well, I actually have
2    my copy, but it's all marked up.
3            MR. BERLIN:  Of the re- -- response?
4            MR. ANDERSON:  Yeah.
5            MR. BERLIN:  Okay.  Then --
6            MR. ANDERSON:  Yeah.
7            MR. BERLIN:  He'll have this
8    (indicating).  I have a copy that's also marked up.
9            MR. ANDERSON:  Okay, good.
10           MR. BERLIN:  So we're all happy.
11           MR. ANDERSON:  Excellent.
12       Q.   (BY MR. ANDERSON):  Okay.
13           MR. BERLIN:  So let me just tell --
14   that -- that -- he -- he was going to read you the
15   topics, but the topics essentially have been amended
16   by the designations that we've made but also by an --
17   a -- well, you know, we could do this as well,
18   although he -- I don't think it's necessary since he
19   outlined to -- to whom he spoke.
20           MR. ANDERSON:  Yeah.
21           MR. BERLIN:  So I -- he -- I just
22   want to make sure that you were staying focused on
23   the actual designations, which in s- -- for some
24   topics narrow the -- the -- the actual topic to which
25   you're designated.  For some, it doesn't.

Page 33

1            THE WITNESS:  Okay.
2            MR. ANDERSON:  I -- I don't want to
3    get in an argument about it, Eric.  I've -- I'll read
4    the topics.  I appreciate that in your responses
5    you've started objections or limitations, and we- --
6    we'll deal with those as we approach them, okay?
7            MR. BERLIN:  Uh-huh.
8        Q.   (BY MR. ANDERSON):  All right.  I'm going
9    to start with a -- I think a relatively easy one,
10   Mr. Fiske.  If you could, look at topic number 7
11   which is on page 6?
12       A.   (Reviews document.)
13       Q.   And for the benefit of the record, I'll
14   read it.  "Abbott's efforts to evaluate or optimize
15   the appropriate levels at which to set wholesale
16   invoice prices for the Drugs.  For instance, any
17   efforts by Abbott to consider the impact of prompt
18   pay discounts and/or the dollar volume of chargebacks
19   processed; including the monitoring of Base Deal
20   prices, wholesale acquisition costs, or other
21   wholesale prices."
22           Did you prepare to testify on behalf
23   of Abbott as to this topic, sir?
24       A.   Yes, I did.
25       Q.   And who did you speak with, or what efforts

9 (Pages 30 to 33)

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 34

1   did you undertake to prepare to testify?
2       A.   Well, I'm the person in the Pricing and
3   Contracting department that's responsible for
4   directing the analytics related to these issues.  So
5   in general, I would be aware of any analytic- --
6   analysis related to this.
7       Q.   Okay.
8       A.   I also, in -- in the course of preparing,
9   reviewed at least one or more documents that
10  discussed some evaluation of base deal pricing.
11      Q.   Was that a document that you understood had
12  been marked as a deposition exhibit?
13      A.   I can't recall that it was a deposition
14  exhibit or not.  It may have been, but I don't
15  recall.
16      Q.   How -- can you explain -- well, strike
17  that.  I'll back up.
18          Does Abbott seek to evaluate the
19  impact of prompt pay discounts paid by Abbott on
20  wholesale invoice prices?
21      A.   General- --
22          MR. BERLIN:  Ob- -- I'm sorry.
23  Just --
24          THE WITNESS:  Sure.
25          MR. BERLIN:  -- give me a chance to...

Page 35

1          Ob- -- objection to scope, and that --
2   that objection is just that this says "Drugs," and
3   the only way we really can narrow this as to time
4   period and to define -- make sure that we're on the
5   same page, that "Drugs" refer to the Erys indices
6   named in the complaint.
7          MR. ANDERSON:  Yeah, that's fine.
8   I'll do that.
9       Q.   (BY MR. ANDERSON):  Sir, when -- when you
10  were preparing to testify, you -- you recognized that
11  the drugs that -- that are named in this case are
12  erythromycin products, correct?
13      A.   Marketed and sold by the Pharmaceutical
14  Products Division, I believe.
15      Q.   Yes, sir.  Did you understand that?
16      A.   Yes.
17      Q.   Okay.  And the time frame is from January
18  of '94 to the present.  Did you understand that?
19      A.   Yes, I did.
20      Q.   Okay.  With those understandings, can you
21  describe how, if at all, Abbott considers the impact
22  of prompt pay discounts paid by Abbott to wholesalers
23  on a -- based on wholesale invoice prices?
24      A.   There's not much evaluation done.  The --
25  the -- I will actually describe the document that I

Page 36

1   saw because, quite honestly, I wasn't able to draw
2   much conclusion from it other than the fact that
3   we -- we must have done an evaluation of possibly
4   raising base deal price and -- but it -- but it
5   wasn't done to determine the two-percent prompt pay
6   discount.  It was done to evaluate whether there was
7   an opportunity to increase base deal pricing or not.
8          Certainly when you -- when you are
9   evaluating base deal pricing, it has -- it -- it may
10  have an impact on a chargeback to a wholesaler that
11  buys at base deal pricing.  It may have a -- an
12  impact on their prompt pay discount if they qualify
13  for base deal pricing.  But in the normal course of
14  events, there wasn't much analysis done related to
15  the impact of prompt pay discounts, and -- and
16  chargebacks wasn't evaluated at all.
17      Q.   You also understand that you've been
18  designated to testify about topic number 8, correct?
19      A.   (Reviews document.)  Yes.
20      Q.   Can -- look -- in answering questions about
21  topic number 7, it may actually help if we also
22  discuss topic number 7.  Can you des- --
23          MR. BERLIN:  8.
24          MR. ANDERSON:  I mean 8, yes.  Thank
25  you.

Page 37

1       Q.   (BY MR. ANDERSON):  Can you describe the
2   reasoning behind Abbott instituting base deal pricing
3   for the erythromycins as?
4       A.   Nobody that I talked with could help me
5   understand why base deal pricing was ever
6   originated.
7          Tip Parker, who is our Director of
8   Trade Relations, has been in the industry for years.
9   Back in 1981 time frame, if I've got the date correct
10  in my mind, she worked for a company by the name of
11  Gray Drug, and she seems to recall that base deal
12  pricing may have existed as far back as then and that
13  reps came in and discussed it with her.  But she has
14  no idea why it was ever developed, and it may have
15  existed before it was ever presented to her.
16          There's nobody -- as I indicated,
17  there's nobody at Abbott that I've been able to speak
18  with that can remember why base deal pricing was ever
19  developed.
20          MR. BERLIN:  And just -- that -- that
21  goes before the time period, but -- I mean, go ahead
22  and question him about that, without -- we're not
23  waiving the objection as to time period but it's --
24  it- -- I mean --
25          MR. ANDERSON:  Okay.

Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600   -   HOUSTON   (713) 572-8897

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 38

1          MR. BERLIN:  -- it's fine.
2     Q.  (BY MR. ANDERSON):  What was the -- what --
3  what was the time period that Ms. Parker recalls
4  there may have been base deal pricing in place?
5     A.  She seems to remember from her days with
6  Gray Drug, which was back in 1981, that base deal
7  pricing may have existed all the way back then, and
8  that Abbott sales representatives may have discussed
9  it with her.  She has a very vague rememory, she --
10  or mem- -- memory, I'm sorry.
11     Q.  Uh-huh.
12     A.  She -- she couldn't tell me much more than
13  to -- to think that she remembered that it existed
14  all the way back then.
15     Q.  Okay.  So back in the early '80s when
16  Ms. Parker was a pharmacist with Gray Drug, she is
17  saying there might have been base deal pricing in
18  place then?
19     A.  I don't know what her official title was.
20     Q.  Uh-huh.
21     A.  She is a pharmacist by training.
22     Q.  Uh-huh.
23     A.  She was with Gray Drug.
24     Q.  Okay.  Do you have an understanding or
25  belief that base deal prices were utilized by Abbott

Page 39

1  on the erythromycins to minimize prompt pay discounts
2  paid to wholesalers?
3     A.  I don't know that that's a fact.
4     Q.  Do you have any reason to believe that base
5  deal prices utilized for the erythromycin products
6  did not effectively lower the prompt pay discounts
7  paid by Abbott to wholesalers?
8     A.  Wholesalers that qualified for the deal, I
9  already told you, and qualified for base deal pricing
10  would have had a lower invoice price and, therefore,
11  a lower prompt pay discount.
12     Q.  And so, in turn, that would have saved
13  Abbott money that they would have been paying to
14  wholesalers in the form of prompt pay discounts,
15  correct?
16     A.  It would have reduced the deductions that
17  wholesal- -- wholesalers took at the time they paid
18  their invoice.
19     Q.  Now, back to topic number 7, Mr. Fiske,
20  over the years from the mid '90s to July of 2003, are
21  you aware of any efforts by Abbott to evaluate the
22  appropriate levels for setting base deal prices?
23     A.  It -- I wouldn't describe it as an
24  "appropriate level" to set base deal pricing.  It
25  wasn't quite that sophisticated.

Page 40

1          When we took a contract price
2  increase, we -- on selected products, we would
3  sometimes increase the base deal pricing.
4     Q.  What about when --
5     A.  By a -- by a same amount -- a similar
6  percentage, I should say, not a similar amount.
7     Q.  Okay.  So if the contract prices for the
8  erythromycin products were going up, then the base
9  deal prices would, in turn, go up?
10     A.  If the contract prices went up, at least --
11  I believe in 2001 time frame, there was a -- same
12  percentage increase in the base deal pricing.
13     Q.  Not limited to the 2001 time frame, but
14  just talking generally from 1994 to the present, is
15  it true that as Abbott took contract price increases
16  on the erythromycins, it would also typically take
17  base deal price increases?
18     A.  I don't think that's true for every time.
19     Q.  Now, with respect to contract price
20  decreases over time, when Abbott decreased contract
21  prices, was there any effort to decrease base deal
22  prices?
23          MR. BERLIN:  Objection, form.
24     A.  I don't believe that Abbott decreased
25  contract prices in the time period '94 to present.

Page 41

1  I'm -- I could be mistaken, but I don't think that we
2  did.
3     Q.  (BY MR. ANDERSON):  Is that because the
4  erythromycin drugs had been subject to generic
5  competition in years prior to '94 and, therefore, had
6  reached a market price equilibrium?
7          MR. BERLIN:  Objection, form.
8     A.  We evaluated a number of things in terms of
9  the pricing of the erythromycins, we evaluated the
10  competitive circumstances in the marketplace, we
11  evaluated our own market share for the products and
12  determined if we felt we could take price actions.
13     Q.  (BY MR. ANDERSON):  I understand that.  I'm
14  asking a more straightforward question, which is:
15  Prior to '94, the Erys had been subject to generic
16  competition, correct?
17     A.  They have been subject to generic
18  competition for the entire period of time under
19  question as well as long before then.
20     Q.  Right.  And as a result, the prices had
21  plateaued, correct?
22          MR. BERLIN:  Objection, form.
23     A.  I -- I think that that's probably a fair
24  characterization.
25     Q.  (BY MR. ANDERSON):  And the reason for that

11 (Pages 38 to 41)

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 42

1  relatively static pricing in the marketplace on the
2  Erys is because once the competitors had all entered
3  and there had been price deterioration, then at some
4  point, the market leveled out, and the prices
5  remained relatively flat, correct?
6           MR. BERLIN:  Objection, form.
7    A.   As -- partly because some of the generic
8  competition withdrew from the marketplace, at least
9  as it relates to the Erys.
10   Q.   (BY MR. ANDERSON):  Well, right.  There --
11 there were generic competitors that entered in the
12 late '80s and the prices decreased significantly and
13 then the prices remained relatively flat for many
14 years.  And then at some point in the 2000 time frame
15 or so some competitors began exiting the marketplace,
16 correct?
17   A.   That's correct.
18   Q.   And at that point, then, there was an
19 opportunity to actually take some marketplace
20 increases, correct?
21   A.   On selected products.
22   Q.   Right.  Now, with that as a background,
23 going back to my question about evaluation of any
24 prompt pay discounts with respect to the base deal
25 prices, is it true that there really wasn't any

Page 43

1  reason to evaluate the extent of the prompt pay
2  discounts on the base deal prices because the
3  market -- underlying market contract prices weren't
4  changing?
5    A.   The fact is we generally don't evaluate the
6  impact of prompt pay discounts on any pricing we do.
7    Q.   Okay.  I'll -- I'll back up, then, and ask
8  a bigger question.  Does Abbott evaluate the levels
9  at which it sets WAC prices on products after launch?
10          MR. BERLIN:  Objection, scope.  Are
11 you -- let me just -- I -- so I don't have to do
12 that, are all your questions -- can we interpret them
13 as limited to the erythromycin drugs?
14          MR. ANDERSON:  Well, this is actually
15 a bigger question just talking about generally, so
16 this is not limited to the erythro- --
17          MR. BERLIN:  Okay.
18          MR. ANDERSON:  I -- I'm doing that as
19 a way of background to go back to the Erys, but --
20          MR. BERLIN:  That's fair enough,
21 but --
22          MR. ANDERSON:  Yeah.
23          MR. BERLIN:  -- we'll still assert
24 the --
25          MR. ANDERSON:  Yeah, of course.

Page 44

1           MR. BERLIN:  -- assert the objection
2  to scope.
3    A.   May I ask you to read back the question or
4  repeat the question?
5    Q.   (BY MR. ANDERSON):  Sure.  I'll -- I'll --
6  I'll rephrase it.
7           After launch of drugs by the PPD
8  division, does -- does PPD do anything to evaluate
9  the levels at which the WAC prices are set?
10          MR. BERLIN:  Objection, scope.
11   A.   Yes.
12   Q.   (BY MR. ANDERSON):  What?
13          MR. BERLIN:  Objection, scope.
14   A.   Abbott manage- -- I'm sorry.  Abbott
15 monitors pricing actions on competitive products, not
16 only competitive products, but all of the top 50 to a
17 hundred pharmaceuticals.  We monitor inflation rates,
18 we monitor our cost of goods sold, but the primary
19 focus is on competitive pricing.
20          In fact, we have a blended price model
21 that evaluates the price of our products relative to
22 competitive products, and we determine periodic --
23 whether periodic price increases can be justified in
24 order to maximize revenues.
25   Q.   And Abbott PPD is able to evaluate the

Page 45

1  possibility for price increases with respect to most
2  of its product line because most of its product line
3  is comprised of innovator brand drugs, correct?
4           MR. BERLIN:  Objection, scope.
5    A.   The majority of our products are innovator
6  brand drugs.
7    Q.   (BY MR. ANDERSON):  Now, with respect to
8  the erythromycin drugs which are marketed as generics
9  by Abbott, was there any effort, to your knowledge,
10 to evaluate the rates at which the wholesale prices
11 were being maintained?
12          MR. BERLIN:  Objection, form.
13   A.   To evaluate the level at which the
14 wholesaler prices were being maintained?
15   Q.   (BY MR. ANDERSON):  If -- if that's
16 confusing, I'll rephrase it.
17   A.   Our efforts were focused on contract
18 pricing to our ultimate customers.
19   Q.   The ultimate customers, being, for
20 instance, the chains?
21   A.   The retailers.
22   Q.   Including the chain pharmacies, correct?
23   A.   Chain pharmacies are amongst the retailers
24 that our contracting efforts were focused on.
25   Q.   Yes, sir.  And then also the independent

12 (Pages 42 to 45)

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 46

1  pharmacy retailers, such as those that were members
2  of retail buying groups, correct?
3      A.  That is correct.
4      Q.  And that's why Abbott had specific prices
5  titled "chains" and specific prices titled "RBG
6  prices" which it contracted with retailers on the
7  Erys for, correct?
8      A.  That's correct.
9      Q.  But Abbott also maintained wholesale prices
10 known as "base deal" prices, correct?
11         MR. BERLIN:  Objection, form.
12     A.  There was an opportunity for wholesalers
13 and others to qualify for base deal pricing.
14     Q.  (BY MR. ANDERSON):  What efforts, if any,
15 did Abbott undertake to monitor the levels of those
16 prices?
17     A.  To the best of my knowledge, we weren't
18 really monitoring those prices relative to
19 competitive prices.
20     Q.  What information did Abbott consider in
21 setting those wholesale prices?
22         MR. BERLIN:  You're referring to the
23 base deal prices?
24         MR. ANDERSON:  Yeah.  I'll make it
25 more specific.

Page 47

1      Q.  (BY MR. ANDERSON):  What information did
2  Abbott consider in setting the base deal prices for
3  the erythromycins from January of '94 through July of
4  2003?
5      A.  To the best of my knowledge, based on my
6  personal experience with this, the only thing that we
7  ever did was, if we took a contract price increase,
8  we, at times, increased the base deal price by the
9  same percentage.
10     Q.  With respect to the published WAC prices,
11 what information did Abbott consider in monitoring
12 those prices on the erythromycins from January of '94
13 through July of 2003?
14     A.  We monitored inflation rates.  We monitored
15 the competitive situation in terms of number of
16 competitors in the market share that we had based on
17 the contracting activities that we did.  We had a lot
18 of that information.
19         And we took periodic price
20 adjustments, not annual, sometimes every few years.
21 I think we took a total of five in- -- five price
22 increases since 1994, ranging from maybe three
23 percent to as high as six percent.
24     Q.  Why did Abbott raise the WAC prices on the
25 erythromycins five times, from 1994 to now?

Page 48

1      A.  To maximize margin.
2      Q.  How did the erythromy- -- pardon me.
3  Strike that.
4         How did the WAC prices on the
5  erythromycins relate to the prices paid by customers
6  to Abbott?
7         MR. BERLIN:  Objection, form.
8      A.  Well, there were customers that purchased
9  at WAC, there were customers that purchased at list
10 price, and there were customers that purchased at
11 contract price.
12     Q.  (BY MR. ANDERSON):  I have also reviewed
13 your testimony that's part of this case -- your prior
14 testimony that's part of this case, Mr. Fiske, and --
15 do you recall testifying that the WAC prices were
16 rarely sold by Abbott to wholesalers?
17     A.  I'm not sure if I said that.  We've always
18 had about five to ten percent of our sales at WAC or
19 list price for the erythromycins.
20     Q.  "Always" for what time period?
21     A.  I've been in Pricing since 1993, so I
22 believe that for the period that we're talking about,
23 that five to ten percent of our sales were at WAC
24 and, probably in more recent years, at an even higher
25 percentage.

Page 49

1      Q.  Why would the percentage be higher in
2  recent years?
3      A.  Fewer -- fewer competitors in the
4  marketplace.
5      Q.  Is it true that in January of 2- -- I mean,
6  pardon me, July of 2003, Abbott discontinued base
7  deal prices for the erythromycins?
8      A.  We did.
9      Q.  So as a result, after July of 2003, any
10 sale to a wholesaler for erythromycin products would
11 be at WAC and only WAC, correct?
12     A.  That's correct.
13     Q.  So from July of 2003 to now, the published
14 WAC is on the invoice for the erythromycins, correct?
15     A.  The invoice prices, the published WAC,
16 since mid-2003.
17     Q.  But prior to July of 2003 and all the way
18 back to at least January of 1994, the large majority
19 of the transactions between Abbott and wholesalers
20 for the erythromycins resulted in the base deal price
21 being the wholesale invoice price, correct?
22         MR. BERLIN:  Objection -- I'm sorry.
23 Objection, form.
24     A.  Wholesalers who met the qualifications for
25 base deal pricing would have been invoiced at WAC --

13 (Pages 46 to 49)

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 50

1  I'm sorry, at the base deal price.
2      Q.  (BY MR. ANDERSON):  And virtually all of
3  the wholesalers did meet those requirements, didn't
4  they?
5          MR. BERLIN:  Objection, form.
6      A.  A large number of wholesalers qualified for
7  that but not always from the -- not on all
8  purchases.  An individual wholesaler could eventually
9  qualify for base deal pricing but not qualify it for
10  the entire year.  It depends upon their purchase
11  patterns.
12      Q.  (BY MR. ANDERSON):  Why did Abbott
13  discontinue invoicing wholesalers at base deal price
14  on the erythromycins?
15      A.  Our contracts expired mid-year 2003 on the
16  erythromycins.  And we had done a significant
17  evaluation of the competitive situation and took very
18  significant price increases on at least three of the
19  different presenta- -- "salts" I'll call them, okay,
20  Ery base, Ery stearate, and especially Ery-Tab, where
21  prices were increased from 20 percent to as high as I
22  believe 150 percent of the previous contract price.
23          The new prices exceeded the base deal
24  pricing that was out there, and we decided to
25  eliminate the base deal pricing.

Page 51

1      Q.  How did Abbott ascertain the appropriate
2  levels to set the WAC prices after July of 2003 on
3  the erythromycins?
4      A.  It was somewhat speculative in terms of
5  what we thought we could -- if you want to call it
6  "take" and still be able to sell our products based
7  on the market share that we had and the number of
8  competitors that were selling the same salt.
9      Q.  Is it true that not all of the underlying
10  contract prices on the erythromycins were increased
11  to levels above the existing base deal prices in
12  Ju- -- July of 2003?
13      A.  Not all of the salts were increased, that's
14  correct.
15      Q.  For those products where the underlying
16  contract prices were not increased above base deal
17  prices, why were the base deal prices discontinued?
18      A.  We just decided to eliminate base deal
19  pricing completely.
20      Q.  I understand that it was decided that all
21  base deal prices would be discontinued, but do you
22  have any information that explains why the base deal
23  prices were discontinued for the products where the
24  contract prices were not being increased above the
25  existing base deal price?

Page 52

1      A.  I re- -- I can't recall the math, so I'd
2  have to look at something.  But I -- I -- I to
3  have increased the base deal prices on the products
4  that we took the 150-percent price increases on by a
5  similar percentage, I believe, we would have put the
6  base deal pricing above WAC, and we just decided to
7  eliminate the base deal pricing completely.
8      Q.  In that answer, you're referencing a
9  situation where -- well, strike that.
10          What math are you talking about?
11      A.  I told you previously in my testimony that
12  when we took previous increases on products, we took
13  a similar percentage change in the base deal price.
14  I told you that I took 150-percent price increases on
15  Ery-Tab.
16      Q.  Right.  I understand.  I'm -- my questions
17  now, sir, are limited to the products for which the
18  price increases were not 150 percent.
19      A.  It was -- it was just a decision to
20  eliminate it completely because it -- it -- like I
21  just described, we would have happened -- for
22  example, if you do the math, Ery-Tab was priced at
23  about a six -- the -- the base deal pricing for
24  Ery-Tab, I believe, was around 60 percent -- I
25  mean -- let me make sure I've got this right in my

Page 53

1  mind.
2          I -- I -- I can't do this, but the --
3  a decision was simply made to eliminate the base deal
4  pricing.
5          MR. BERLIN:  Do you need a break?
6          THE WITNESS:  Sure.
7          MR. BERLIN:  Do you need a break?
8          THE VIDEOGRAPHER:  We are off the
9  record at 10:11 a.m.  This is the end of tape 1.
10          (Recess taken.)
11          (Exhibits 2-4 marked.)
12          THE VIDEOGRAPHER:  We are back on the
13  record at 10:24 a.m.  This is the beginning of tape
14  2.
15      Q.  (BY MR. ANDERSON):  Mr. Fiske, I'm going to
16  show you some documents that may assist you in this
17  line of questions.  They are marked as Fiske Exhibit
18  2, 3, and 4.  Exhibit 2 is a two-page document Bates
19  labeled ABT_ERY-E00024993 and 94, and the other two
20  documents are prior deposition exhibits.
21      A.  (Reviews documents.)
22          MR. BERLIN:  And he's going to hand me
23  a copy, I believe, right, Jarrett?
24          MR. ANDERSON:  Yes.  And, Eric,
25  there's a set for you (indicating).

14 (Pages 50 to 53)

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 54

1         MR. BERLIN: Those are 2 -- 2, 3, and
2    4; is that what you're saying?
3         MR. ANDERSON: Right, and they're in
4    order.
5         MR. BERLIN: And we're -- we're still
6    on the same topics?
7         MR. ANDERSON: Yes.
8         MR. BERLIN: Okay.
9    Q. (BY MR. ANDERSON): So directing your
10   attention to Exhibit 2, Mr. Fiske, have you seen this
11   document before?
12        MR. BERLIN: And he's --
13   A. I'm sorry. Which one --
14        MR. BERLIN: -- talking --
15   A. -- please?
16        MR. BERLIN: -- well --
17   Q. (BY MR. ANDERSON): Exhibit 2.
18   A. I don't know that I have or not. I may
19   have. Not recently.
20   Q. Okay. Exhibit 3 and Exhibit 4, have you
21   seen those before?
22   A. I -- I know I've seen Exhibit 4. I may
23   have also seen Exhibit 3.
24   Q. Did you review Exhibit 3 and 4 in preparing
25   to testify?

Page 55

1    A. I know I reviewed Exhibit 4 in preparing to
2    testify. It indicates that Exhibit 3 was part of
3    the -- a -- an exhibit shown in the Garvin
4    deposition. I reviewed the Garvin deposition, so I
5    must have seen the document before.
6    Q. Okay. You've referenced this morning that
7    in July of 2003 there were some price increases taken
8    on erythromycin products, correct?
9    A. Yes, that's correct.
10   Q. Looking at Exhibit 2 -- and I've found,
11   Mr. Fiske, that the best way to review Exhibit 2 is
12   to -- is to possibly disconnect the page and overlay
13   it, or just bend it back (indicating). But the way
14   the spreadsheet printed out, in order to make the
15   columns line up, you have to have them side by side.
16        But in looking at Exhibit 2, do you --
17   do you see some price increases noted there?
18   A. I do.
19   Q. And it appears that the price increases for
20   the Ery-Tabs were the most significant; is that
21   correct?
22   A. That's correct.
23   Q. And is that true; that the price increases
24   on the Ery-Tabs were the most significant in relation
25   to the other Erys in July of 2003?

Page 56

1    A. The contract price increases were the most
2    significant, yes.
3    Q. And looking at the last column on the
4    right-hand side of Exhibit 2, the change percentages
5    are shown there of the net price changes for the
6    different products, correct?
7    A. Yes.
8    Q. In looking down the column about --
9         MR. BERLIN: Actually, Jarrett,
10   I'm sorry to interrupt you. Just to voice an
11   objection --
12        MR. ANDERSON: Sure.
13        MR. BERLIN: -- is to the scope --
14        MR. ANDERSON: Okay.
15        MR. BERLIN: -- because I don't know
16   that you have one that goes to contract. But go
17   ahead and question, but let me have the objection
18   just so --
19        MR. ANDERSON: Okay.
20        MR. BERLIN: I don't -- I don't think
21   it's particularly material. I think he can --
22        MR. ANDERSON: All right.
23        MR. BERLIN: -- testify about that,
24   but...
25   Q. (BY MR. ANDERSON): And, sir, if you could,

Page 57

1    go down about the ninth entry which pertains to the
2    drug Erythromycin Stearate 500 milligrams?
3    A. Yes.
4    Q. And I think it has a product code of -- of
5    6316. Are you with me?
6    A. Yes.
7    Q. I notice there that the contract price
8    taken on that erythromycin was only three percent,
9    correct?
10   A. Correct.
11   Q. And the WAC price that is shown that was
12   effective in August of 2003 for that drug is $21.08,
13   correct?
14   A. Yes.
15   Q. Now, if you could, look at Fiske Exhibit
16   3. And for that same drug, which is near the lower
17   third of the document, do you see there a -- a WAC
18   price that's being listed of 21.08?
19   A. Yes.
20   Q. And that's consistent with the WAC price on
21   Fiske Exhibit 2 for that drug, correct?
22   A. It is.
23   Q. And then if you could, look at Fiske
24   Exhibit 4 and toward the lower middle portion of the
25   page for the Erythrocin Stearate product with the

Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600   -   HOUSTON   (713) 572-8897

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 58

1  labeler co- -- I mean, of -- pardon -- pardon me, the
2  product code of 6316, case price is listed of 21.08,
3  correct?
4      A.  Yes.  The case price is the same as our WAC
5  price.
6      Q.  And then to the far right-hand column is
7  the base deal price that was in an -- effect up until
8  June 30th of 2003 of $14.50, correct?
9      A.  Correct.
10     Q.  And the -- there's a percentage shown there
11 that appears to represent the percentage discount off
12 of the WAC price down to the base deal price,
13 correct?
14     A.  Yes.
15     Q.  Why did Abbott choose to begin invoicing
16 the wholesalers at $21.08 in July of 2003 when the
17 underlying contract price for that product was only
18 going up roughly three percent?
19     A.  As I had testified earlier, we eliminated
20 base deal pricing on all products in July of '03.
21     Q.  Why was the base deal price eliminated for
22 all products, even those that weren't experiencing
23 significant market price increases?
24         MR. BERLIN:  Objection, asked and
25 answered.

Page 59

1      A.  You know, our base deal price provided that
2  you had to purchase $500 dollars worth of
3  erythromycins in order to qualify for it.
4          It -- with all the changes we were
5  making in contract pricing, I think it would have
6  just been very confusing to people to have some with
7  and some without base deal.  We just eliminated base
8  deal pricing at that time completely.
9      Q.  (BY MR. ANDERSON):  It would have been
10 confusing to have some products that had base deal
11 pricing and some products that did not?
12     A.  Yes.
13     Q.  When Abbott chose to discontinue all base
14 deal pricing -- strike that.
15         Over the years when Abbott has
16 published base deal pricing to wholesalers, have the
17 wholesalers complained?
18         MR. BERLIN:  Objection, form.
19     A.  Not that I've heard.
20         MR. BERLIN:  I'm sorry.  You -- I
21 wasn't done with my objection.
22         THE WITNESS:  I'm sorry.  Excuse me.
23         MR. BERLIN:  I'm sorry.  Objection,
24 form and scope.  Go ahead.
25         THE WITNESS:  I apologize.

Page 60

1      Q.  (BY MR. ANDERSON):  After July of 2003 when
2  base deal pricing was discontinued, did wholesalers
3  complain?
4      A.  I didn't hear of any complaints.
5      Q.  Are you aware of any complaints?
6      A.  You know, I didn't specifically ask Tip
7  Parker that question, so I -- I don't know whether
8  there were any complaints.  I -- I'm not aware of
9  any.
10     Q.  Did the discontinuation of base deal price
11 impact the way in which Abbott reported prices to
12 price compendias such as First State Bank and
13 Red Book?
14     A.  No.  We have always reported our published
15 WAC and list price to the pricing compendia.
16     Q.  Did Abbott ever consider publishing its
17 base deal pricing to the compendia?
18     A.  No.
19     Q.  Why not?
20     A.  It wasn't our WAC or our list price.
21 That's all we reported to the pricing compendia.
22 Base deal price was a discounted price.  We don't
23 ever report discounted pricing.
24     Q.  In what way was base deal price, when it
25 was in effect, discounted?

Page 61

1      A.  You had to qualify for it by meeting
2  purchase -- certain purchase requirements, and it was
3  a -- effectively, a contract price.
4      Q.  Were there contracts for base deal pricing?
5      A.  It was a deal that was offered and loaded
6  into our pricing systems, and it was communicated to
7  the wholesalers in terms of what they needed to do to
8  qualify.
9      Q.  Do you recall testifying previously that
10 there was a time period for which base deal pricing
11 was qualified for automatically?
12     A.  Yeah.  I actually do recall testifying to
13 that, and after I went back and talked with people in
14 preparation for this case, I found out that I was
15 wrong.  There were always qualifications loaded into
16 the system that they had to meet in order to qualify
17 for it.
18     Q.  Is it --
19     A.  Our system would not allow the discount to
20 occur unless they actually purchased the minimum
21 requirements.
22     Q.  Right.  Did -- do you think the reason you
23 had the impression that the qualification for base
24 deal was automatic was a result of the fact that the
25 wholesalers always qualified?

16 (Pages 58 to 61)

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 62

1    A.  No, because they didn't always qualify.  I
2  think I was mistaken.
3    Q.  Did -- did you review any documents in
4  preparing to testify that indicated to you the
5  billing system that PPD utilized was using the base
6  deal pricing to invoice wholesalers?
7        MR. BERLIN:  Objection, form.
8    A.  Could you repeat the question, please?
9    Q.  (BY MR. ANDERSON):  Did you review any
10  information in preparing to testify that indicated to
11  you that the billing system that PPD utilized in
12  billing wholesalers was populating the invoices to
13  wholesalers with base deal pricing?
14        MR. BERLIN:  Objection, form, and it
15  mischaracterizes the evidence.
16    A.  I don't know what you're representing to
17  me.  If you're representing to me that the billing
18  system charged base deal pricing when they didn't
19  qualify for it, I'm not aware of that because I
20  was -- the way the deal was loaded in the system,
21  that should never have occurred.  It was an error if
22  that ever did occur.
23        As I explained to you, the deal was
24  loaded into the system with a qualification that they
25  must purchase a minimum of $500 on a single invoice

Page 63

1  before they could ever qualify.
2    Q.  (BY MR. ANDERSON):  I -- yeah.  I
3  understand that testimony.
4        MR. ANDERSON:  Objection,
5  nonresponsive.
6    Q.  (BY MR. ANDERSON):  And I'm not
7  representing to you anything.  I'm asking a question,
8  which is:  Did -- did you review any information that
9  indicated to you that the billing system utilized by
10  PPD was billing wholesalers at base deal price?
11    A.  To the best of my knowledge, wholesalers
12  who qualified for base deal pricing were invoiced at
13  base deal pricing.  Those that did not were billed at
14  WAC price.
15    Q.  (BY MR. ANDERSON):  Did you gain any
16  information about the frequency with which
17  wholesalers were billed at WAC price while Abbott had
18  base deal prices in effect on the erythromycins?
19    A.  I --
20        MR. BERLIN:  Objection, form.
21    A.  As I testified earlier, I told you that
22  there were always five to ten percent of our sales at
23  WAC or list price.  Some of those sales were to
24  wholesalers.  And as you've even presented to me,
25  since July of 2003, all -- all sales to wholesalers

Page 64

1  were at WAC price.
2    Q.  (BY MR. ANDERSON):  What information do you
3  base the testimony upon that about five to ten
4  percent of the erythromycin sales prior to July of
5  2003 were at WAC price?
6    A.  Sometime ago, I had been working with
7  outside counsel related to --
8        THE WITNESS:  Is -- am I violating
9  privilege?
10        MR. BERLIN:  Well, I think we should
11  talk about it.  I think we need to go off the record
12  if he's concerned about privilege and -- because I --
13  I -- I can't answer that sitting here.
14        THE WITNESS:  Okay.
15        MR. BERLIN:  We need to --
16        THE WITNESS:  I'm sorry.
17        MR. BERLIN:  -- go outside --
18        THE WITNESS:  I think I may be
19  violating privilege.  Can we go off the record?
20        THE VIDEOGRAPHER:  We're off the
21  record at 10:39 a.m.
22        (Off the record.)
23        THE VIDEOGRAPHER:  We are back on the
24  record at 10:41 a.m.
25        MR. BERLIN:  Why don't you ask a

Page 65

1  question, and then we'll go from there?
2        MR. ANDERSON:  Okay.
3        MR. BERLIN:  And -- and there is some
4  sensitivity as to attorney-client and work product in
5  this general area, so if you can sort of try to
6  phrase it to not get into that, and then I'll give
7  you slack to try to get to the information --
8        MR. ANDERSON:  Okay.
9        MR. BERLIN:  -- you're seeking.
10    Q.  (BY MR. ANDERSON):  Other than
11  communications with attorneys, have -- do you have
12  any information to support your statement that prior
13  to July of 2003 approximately five to ten percent of
14  the erythromycin sales were at WAC price?
15        MR. BERLIN:  Well, I know you're
16  trying, and I'm going to try to -- I'm going to
17  object to attorney-client privilege and work product
18  doctrine.  I mean, he was doing some analyses for
19  attorneys --
20        MR. ANDERSON:  Uh-huh.
21        MR. BERLIN:  -- and -- and that's -- I
22  mean, that's part of the issue that's here.
23        So the way that you phrase it, I don't
24  know that he can answer it in that way.  I'm trying
25  to get it so you can get at -- I mean the bottom line

Page 66

1  is he did some analyses --
2         MR. ANDERSON: Uh-huh.
3         MR. BERLIN: -- he did some
4  spot-checking --
5         MR. ANDERSON: Uh-huh.
6         MR. BERLIN: -- and the spot-checking
7  indicated in that it was five to ten percent.
8         Although -- I -- I -- I -- you know,
9  the -- the numbers are going to bear out what it
10 was.  You know what I mean?  You have data and we
11 have data, and we can run and determine what --
12        MR. ANDERSON: Uh-huh.
13        MR. BERLIN: -- what the sales were,
14 so, I mean, it is what it is.
15        I just want to -- I say that because I
16 don't want to -- I -- I'm not preventing you from
17 getting at the underlying data that will answer your
18 question, and I want the record to be clear about
19 that, because if I were and it were the only way that
20 you could get at the data, that would be a slightly
21 different issue.  But the bottom line is we can each
22 go home and run the data and it will tell us what the
23 actual sales of WAC were.
24        MR. ANDERSON: Okay.
25     Q.  (BY MR. ANDERSON)  Other than your work

Page 67

1  with attorneys or for attorn- -- at the direction of
2  attorneys, do you have any information to support
3  your belief that prior to July of 2003 roughly five
4  to ten percent of the erythromycin sales were at WAC?
5     A.  No.
6     Q.  When -- well, strike that.
7         What types of customers were
8  purchasing the erythromycin products at WAC in that
9  situation prior to July of 2003 where five to ten
10 percent of the sales were at WAC?
11    A.  There were wholesalers that purchased at
12 WAC --
13    Q.  Uh-huh.
14    A.  -- those that did not qualify for the base
15 deal pricing.  Our WAC pricing is also available to
16 any contract -- non-contract customer who purchases
17 in a full case quantity, thus the "case price".  It's
18 the same as WAC.
19        And entities other than wholesalers
20 who purchased -- who did not have a contract price
21 and purchased less than a full case quantity
22 purchased at list price --
23    Q.  Yes, sir --
24    A.  -- if they purchased directly from Abbott.
25    Q.  Yes, sir, I understand that.  That's why I

Page 68

1  was asking my question.
2         What types of customers were pur- -- I
3  well, can you approximate what percentage of the WAC
4  sales prior to July of 2003 were to wholesalers or
5  pharmacies?
6     A.  I didn't analyze it in that level of
7  detail.  Most of our direct buying customers are
8  wholesalers or pharmacies.
9     Q.  Yes, I understand that, and I'm -- I'm
10 trying to ascertain if you know the breakdown of the
11 WAC sales prior to July of 2003 and which customers
12 were purchasing at WAC.
13        Were they primarily wholesalers, or
14 were they primarily pharmacies who were buying cases?
15    A.  I haven't done that analysis.
16    Q.  Do you know for what time period the OPS
17 system was in place at PPD?
18    A.  No, I do not.
19    Q.  Do you have approximate time range for when
20 the SAP system was utilized in PPD?
21        MR. BERLIN: Objection to scope as to
22 both questions.  Go ahead.
23    A.  Oh, boy.  SAP?  I think -- did we acquire
24 SAP with -- I think around maybe 2001 time frame when
25 we acquired Knoll, I -- I think.  That's the best

Page 69

1  recollection I have.  I may be mistaken.
2     Q.  (BY MR. ANDERSON)  Do you recall any issue
3  with the computer systems or billing systems that
4  PPD utilized which prevented a WAC price from being used
5  in invoicing customers for the sale of erythromycins?
6         MR. BERLIN: Objection, scope.
7     A.  Do I have knowledge of any problems with
8  the computer system that would have prevented us from
9  using WAC for billing the erythromycins?  Was that
10 your question to me?
11    Q.  (BY MR. ANDERSON)  Yes, sir.
12    A.  No.
13        (Exhibit 5 marked.)
14    Q.  (BY MR. ANDERSON)  If you could,
15 Mr. Fiske, please review what's been marked as Fiske
16 Exhibit 5.
17    A.  (Reviews document.)  Okay.
18    Q.  Have you seen this document before?
19    A.  I may have seen this document before.
20 This -- it says it was part of Garvin deposition.  I
21 probably did see it before.
22    Q.  It -- the -- the memo is titled "Ery Deal
23 Issue in CPCC" November 13th, 2002, correct?
24    A.  Yes.
25    Q.  After reviewing this exhibit, does this

18 (Pages 66 to 69)

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 70

1  refresh your memory in any way with some billing
2  issues that existed regarding the Erys?
3      A.  Only to the extent that I saw this document
4  before when I looked at the Garvin deposition.  I
5  was -- I -- I don't recall being aware of the issue
6  at the time.
7      Q.  Okay.  Did you do anything subsequent to
8  your review of this document recently, in the context
9  of your review of the Garvin deposition, to get to
10  the bottom of this issue?
11     A.  No, I did not.
12     Q.  Specifically, did you undertake any efforts
13  to understand how the actual billings have occurred
14  over the years for the erythromycins?
15     A.  No, I did not.
16     Q.  Looking at the bullet number 1, or
17  paragraph number 1 in Fiske Exhibit 5, it reads,
18  "When the Ery deal was set up in OPS, the customers
19  qualified quickly for the deal price by purchasing
20  $500 of product within the first invoice."  Did I
21  read that correctly?
22     A.  That's what it says on this paper.
23     Q.  And is that a correct statement as to how
24  the Ery deal worked in the past?
25     A.  This implies, if you read it quickly and

Page 71

1  don't understand the situation, that maybe all
2  customers -- not all customers did qualify for the
3  deal by purchasing $500 of product on the first
4  invoice.  I know that for a fact.
5      Q.  How do you know that?
6      A.  Pardon me?
7      Q.  How do you --
8      A.  Because there were wholesalers that did not
9  purchase $500 of product on the first invoices during
10  the year, and some of them did not qualify until
11  sometime later in the year.  Some didn't qualify.
12     Q.  How do you know that some wholesalers prior
13  to July of 2003 did not qualify for the deal price at
14  all?
15     A.  I told you earlier in my testimony, and
16  this is true, that there were wholesalers -- there
17  were always some wholesalers that were paying WAC
18  price for our product.  That's because they did not
19  qualify for the base deal pricing.  The qualification
20  was to purchase $500 on a single invoice.
21     Q.  Right.  I understand that.  I'm -- I'm
22  asking -- and I'm -- I'm not trying to invade the
23  work you did with attorneys, but other than any work
24  you did with attorneys, how do you know that that's
25  true?

Page 72

1      A.  I did not go back and look at invoices for
2  every customer early in the year, if that's your
3  question, to confirm that.
4      Q.  Well, I'm -- my question is --
5      A.  I'm basing it on the --
6      Q.  Yeah.
7      A.  -- on -- on the work that was done with the
8  attorneys.
9          MR. ANDERSON:  Eric, I feel like I've
10  got to do this in order to cover my bases, and -- and
11  I understand if you as- -- you assert privilege,
12  that's your right and we can hash that out later.
13     Q.  (BY MR. ANDERSON):  But, sir, can you
14  describe to me the findings that you reached in
15  working with the attorneys concerning the frequency
16  where which WAC prices were used to bill wholesalers
17  for the erythromycins?
18         MR. BERLIN:  Objection.  We will
19  assert the attorney-client privilege and attorney
20  work product doctrine, and I'll instruct you not to
21  answer.
22     Q.  (BY MR. ANDERSON):  Will you abide by that
23  instruction?
24     A.  I will.
25         MR. BERLIN:  And let me just add, just

Page 73

1  because -- I'm not just doing this for the sake to
2  have a fight over attorney-client privilege, I mean,
3  I just feel like we need to preserve that.  You know,
4  we are -- I -- we have -- we have to, I mean, but
5  it's not that I'm trying to prevent you from getting
6  at the underlying information.
7          And so I -- you know, I think we both
8  have an ability to crunch the data because we've
9  produced that data to you.  So you can go and see --
10  I mean, the sales are going to be what -- and I've
11  kind of been -- I --
12         And, again, I'm not looking for an
13  argument, so I probably shouldn't editorialize, but
14  I've been curious that you've been asking all the
15  witnesses this because you can just go and whatever
16  they think, I mean, is going to get trumped by
17  whatever the data says which we, you know, believe
18  was kept in the normal course of business.
19         So I think you'd have a potential
20  argument to get it if you didn't have access to that
21  data, but I know you do, so I think that's an
22  important part of our ability to assert the
23  privilege.
24     Q.  (BY MR. ANDERSON):  Looking at the -- well,
25  strike that.  I've got some specific questions about

19 (Pages 70 to 73)

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 74

1  this -- this deal requirement.
2       The -- the requirement was to purchase
3  $500 of product; is that true?
4       A.  On a single purchase order, single
5  invoice.
6       Q.  And -- and which products were part of the
7  basket of products that had to total to $500?
8       A.  There were a number of them.  I -- I could
9  refer you back to the Ery contract pricing document,
10  Exhibit No. 2, that lists most of those products,
11  if -- if not all of them.
12       Q.  Okay.  And so they were -- they were Ery
13  products, and if a wholesaler purchased $500 of those
14  Ery products in total on an invoice, they would
15  qualify for the deal price, correct?
16       A.  That's correct.
17       Q.  And you mentioned that they may not qualify
18  on the first invoice, but they may qualify
19  subsequently.  Can you describe how that would
20  happen?
21       A.  So -- if they purchased $300 today and they
22  purchased another $200 next week, it wouldn't be
23  until they actually had purchased the total -- in
24  individual purchased the total 500.  The first ones
25  don't count.

Page 75

1       Q.  And ag- -- once they hit the $500 aggregate
2  upon the second invoice, for instance, then from that
3  second invoice forward for the rest of the year, they
4  would be receiving deal prices, correct?
5       A.  I want to make sure you didn't
6  misunderstand me, because the way you positioned it,
7  you may have.  I -- because the example I gave was
8  300 and 200 --
9       Q.  Uh-huh.
10       A.  -- and maybe I should have given an example
11  of 300 and 300.  That does not constitute 500 in the
12  aggregate.  It's not until they purchase 500 on a
13  single invoice that they would qualify, and that may
14  be many purchases later.
15       Q.  Okay.  So where it's the first invoice,
16  the second invoice or the 22nd invoice, once a
17  wholesaler purchases $500 of erythromycin products,
18  they qualify for the deal price?
19       A.  Once they purchase 500 on a single invoice,
20  they would qualify.
21       Q.  Right.  And once they qualify on that
22  single invoice, do they qualify, then, for the
23  remainder of the year?
24       A.  Yes, they do.
25       Q.  Regardless of whether they purchase $500 or

Page 76

1  not?
2       A.  Yes.
3       Q.  Okay.  So a wholesaler could purchase $500
4  early in the year, qualify for base deal on that
5  particular invoice, and then also ensure that they
6  would qualify for all future invoices for
7  erythromycins for the remainder of the year, correct?
8       A.  They could.
9       Q.  And that -- theoretically, they could be
10  purchasing the remainder of their erythromycin
11  products in $20 increments per invoice and still
12  receive the deal prices, correct?
13       A.  Theoretically.
14       Q.  Okay.  Now, shifting gears slightly,
15  Mr. Fiske.  Is it true that most wholesalers, because
16  they're buying in bulk and then, in turn,
17  distributing out to pharmacies and other customers
18  such as hospitals, could easily achieve the $500
19  erythromycin deal threshold?
20            MR. BERLIN:  Objection, form.
21       A.  They could if they were thoughtful enough
22  to do that.
23       Q.  (BY MR. ANDERSON):  And -- and one of the
24  mechanisms by which Abbott notified them of this
25  requirement was through publication of documents such

Page 77

1  as Exhibit 16, correct?  I mean -- I'm using a -- an
2  exhibit I haven't marked yet, Exhibit 6, and I'll
3  allow you to look at it, of course.
4            (Exhibit 6 marked.)
5       Q.  (BY MR. ANDERSON):  You previously reviewed
6  this in your other deposition.  It was Exhibit 536.
7       A.  (Reviews document.)
8            MR. BERLIN:  I apologize.  I lost the
9  question in that.
10       Q.  (BY MR. ANDERSON):  The question was:  Is
11  Exhibit 6 an example of the mechanism by which Abbott
12  would notify the wholesalers of the deal
13  requirements?
14       A.  I -- I -- I don't know whether this
15  specific document was used for that purpose, but a
16  similar document, yes.
17       Q.  That would state the terms such as those
18  stated above in the first paragraph, correct?
19       A.  Yes.
20       Q.  All right.  Now back to Exhibit 5,
21  Mr. Fiske.  In looking at paragraph 3, I'm going to
22  read the second -- no, pardon me, the third sentence
23  beginning with the acronym "CPCC".
24            Well, first, let me ask a couple of
25  background questions.  CPCC is a computer system

20  (Pages 74 to 77)

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 78

1  utilized by Abbott, correct?
2      A.  It is.
3      Q.  And, similarly, OPS was a computer system
4  utilized by Abbott, correct?
5      A.  Yes.
6      Q.  And same, SAP also was utilized by
7  Abbott --
8      A.  Correct.
9      Q.  -- correct?
10     A.  Correct.
11     Q.  And all of those systems were utilized in
12 maintaining pricing information and/or billing
13 customers, correct?
14     A.  That's correct.
15     Q.  And the computers would interface with one
16 another to share the pricing information that would
17 be billed to a customer when they placed an order,
18 correct?
19     A.  Yes.
20     Q.  Okay.  Now, reading the third sentence of
21 the third paragraph in Exhibit 5, quote, "CPCC can
22 only pick up WAC, comma, contract price or deal
23 price.  Therefore, CPCC is picking up the Ery deal
24 price for the chargebacks".  Did I read that --
25     A.  Yes.

Page 79

1      Q.  -- correctly?
2          In -- were you aware back in 2002 or
3  earlier that the computer systems could only pick up
4  one price?
5      A.  I may have been.  I don't recall.
6      Q.  Does -- have -- strike that.
7          Have you been aware that there was
8  ever any situation where WAC prices may have been the
9  prices that should have been billed a wholesaler but
10 were not?
11     A.  No.
12     Q.  Are you aware -- I'm now focussing back on
13 topic number 7, and then I'll probably be moving on
14 to other topics, Mr. Fiske.
15         Are you aware of any efforts to
16 monitor the setting of WAC, W-A-C, or wholesale
17 acquisition prices?
18     A.  Am I aware of the activities involved in
19 setting the WAC prices?
20     Q.  Yes, sir.
21     A.  Yes, I am.
22     Q.  And how is that done?
23     A.  Are we talking specifically for the
24 erythromycin products?
25     Q.  Yes, sir.  I'll be more specific.  In fact,

Page 80

1  I'll be specific as to time frames.
2          Prior to July of 2003 for the
3  erythromycin products, how were the WAC prices that
4  were published by Abbott to the compendia such as
5  First DataBank and Red Book set?
6      A.  I -- I think I testified to this already
7  today.  I think that I explained that we evaluate
8  competitive circumstances in the marketplace.  It's
9  no different for WAC pricing than it is for contract
10 pricing, because, remember, we always have customers
11 that are purchasing at WAC and list price and we want
12 to maximize our margins.
13         We evaluated the -- we evaluate the
14 competitive situation, what kind of market share do
15 we have for our products, what has inflation been
16 over time.
17         In -- in this case, we al- -- we also
18 look at the WAC pricing for our competitors.  It's
19 hard to discern contract pricing for competitors.
20 That information is not readily available.  But after
21 we have done that, we determine if there's an
22 opportunity to take a price increase.
23         I told you that we took a total of
24 five price increases from 1994 to present.
25     Q.  Did you negotiate with wholesalers

Page 81

1  regarding the WAC prices?
2      A.  We don't negotiate WAC pricing.  We set it.
3      Q.  Did you negotiate deal prices with
4  wholesalers?
5      A.  Not to my knowledge.
6      Q.  Did you --
7      A.  It was an offer that we made.
8      Q.  Did you negotiate any pricing with
9  wholesalers?
10         MR. BERLIN:  Again, time frame in
11 Ery?
12         MR. ANDERSON:  Yeah.
13     Q.  (BY MR. ANDERSON):  For the erythromycin
14 products, has Abbott ever negotiated any pricing to
15 wholesalers?
16     A.  I -- yes.
17     Q.  In what context?
18     A.  The only negotiation I specifically
19 remember regarding contract pricing on the Erys was
20 with Cardinal, for access to their Source Program.
21     Q.  The Source Program being an effective
22 retail buying group that Cardinal manages for its
23 member pharmacies?
24     A.  That's correct.  The pricing is really for
25 the benefit and meant for the "members," I'll call

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 82

1 them, that are attached to that contract. It's not
2 for Cardinal.
3    Q. It's -- the con- -- the prices --
4    A. It's for the --
5    Q. -- were negotiated between the --
6    A. -- the pharmacists that access that retail
7 buying group pricing.
8    Q. Yes, sir. And I'll -- I'm going to
9 rephrase it, just so we have a clean record because
10 we were talking over one another a little.
11        The -- the pricing that would be
12 negotiated between Cardinal and Abbott with respect
13 to their Source Program would be retail buying group
14 pricing that ultimately would be paid by pharmacies,
15 correct?
16    A. Pharmacies and maybe other providers that
17 could access that pricing, yes.
18    Q. Other providers that may be members of
19 Cardinal's Source Program?
20    A. Yes.
21    Q. Okay. Other than the retail buying group
22 pricing, were there any other prices that were
23 negotiated between Cardinal -- I mean, pardon me,
24 between wholesalers and Abbott?
25    A. Not to my knowledge.

Page 83

1    Q. With respect to topic number 8 concerning
2 the reasoning behind the business decision to
3 institute, use, and then subsequently discontinue
4 base deal pricing for the erythromycins, I believe
5 we've already talked about the reason to institute,
6 and -- and it's your testimony that Abbott doesn't
7 have any corporate knowledge about why they were
8 instituted; is that correct?
9        MR. BERLIN: Objection, form.
10 Objection, scope.
11    A. I could find no one who knew why we had
12 instituted base deal pricing. It had existed for
13 many, many years before I came to Pricing and
14 Contracting, based on my discussions with Tip Parker
15 at least.
16    Q. (BY MR. ANDERSON): From 1994 through 2002,
17 did you have any understanding of why base deal
18 pricing continued to be utilized for the
19 erythromycins in selling drugs to wholesalers?
20    A. Because it was always there. I -- I -- I
21 never questioned it, to be honest with you.
22        And -- and in the course of preparing
23 for this, others didn't know why de- -- base deal
24 pricing was ever -- ever developed and why it
25 existed.

Page 84

1    Q. Did you read the deposition testimony of
2 Russ Lehn?
3    A. No, I did not.
4    Q. Do you have any understanding as to the
5 reasoning behind the discontinuation of base deal
6 pricing for the erythromycin products?
7    A. Do I have any knowledge as to the reason it
8 was discontinued? I --
9    Q. Yes, sir.
10    A. -- already explained to you it was
11 discontinued because our contract pricing was bumping
12 up against actually exceeding our base deal pricing.
13    Q. And --
14    A. So we discontinued it.
15    Q. And you'll agree with me, won't you, that
16 that dynamic only existed for a few of the
17 erythromycin products?
18    A. That's true.
19    Q. And, yet, the decision was made to
20 discontinue the base deal pricing for all of the
21 erythromycin products, correct?
22    A. Yes.
23    Q. Can you provide any reasoning for that
24 decision?
25        MR. BERLIN: Objection, asked and

Page 85

1 answered twice. You can go ahead and answer again
2 now.
3    A. I -- I've already answered that question a
4 couple of times that it didn't make sense to main- --
5 I -- I -- I don't even remember all the thought
6 processes that went on at the time. It was five
7 years ago. We -- five to six years ago.
8        The Ery-Tab pricing in particular was
9 bumping up against the base deal pricing. There were
10 other products where we took significant price
11 increases of 20, I think, to 40 percent. It's on
12 that other sheet. There were others that we took
13 much lower prices on -- price increases on. But the
14 fact is, we just decided to eliminate base deal
15 pricing at that time.
16    Q. (BY MR. ANDERSON): I -- I understand that,
17 and I'm -- I'm not trying to be redundant here. I'm
18 just trying to make sure --
19    A. Well, let me give you --
20    Q. -- I've exhausted your knowledge --
21    A. -- an example of --
22        MR. BERLIN: Hold on. Hold on. Let
23 him --
24        THE WITNESS: I'm sorry. I'm sorry.
25        MR. BERLIN: Let him finish his --

Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600   -   HOUSTON   (713) 572-8897

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 86

1        THE WITNESS: I'm interrupting him --
2   yeah.
3        Q.  (BY MR. ANDERSON):  And -- and -- and if
4   you've told me everything that Abbott knows about
5   that decision, then I understand.  But other than the
6   fact that there was a decision made to discontinue
7   base deal pricing altogether, other than that simple
8   fact, do you have any information as to why base deal
9   pricing was eliminated for the erythromycin products
10  that were not experiencing market price increases
11  that exceeded the existing base deal price?
12       MR. BERLIN:  Objection.  That was also
13  asked and answered right after the break.  Go ahead,
14  though.
15       A.  We just made a decision to eliminate it
16  entirely for all products when it was decided that it
17  didn't make sense to maintain it for Ery-Tab.
18       Q.  (BY MR. ANDERSON):  Looking at Exhibit -- I
19  mean, pardon me, topic number 10, Mr. Fiske, which
20  reads, "The use, if any, of WAC pricing in the sales
21  and billing of the named Drugs by Abbott to
22  wholesalers," do you see that?
23       A.  Yes.
24       Q.  What did you do to prepare to testify about
25  that topic?

Page 87

1        A.  Well, I -- I discussed it with the peo- --
2   I talked with Beth Garvin who was actually part of
3   the group that -- what is her -- I apologize.
4            I didn't have to actually talk with
5   anybody.  I -- I mean, I -- I knew what the situation
6   was.  We -- if people qualified for base deal pricing
7   prior to mid-year 2003, we invoiced them at base deal
8   pricing.  If they didn't, they would have been
9   invoiced at WAC pricing.  Subsequent to July of 2003
10  when base deal pricing no longer existed, wholesalers
11  were invoiced at WAC price.
12       Q.  Prior to July of 2003, have you seen
13  anything today that causes you to question whether or
14  not WAC prices were actually even capable of being
15  billed wholesalers?
16       A.  There was never a question about whether
17  the wholesalers were billed the WAC pricing.  The
18  question of -- the question that came up in that
19  document, sir, related to was the chargeback being
20  processed appropriately.
21       Q.  So the -- the bill may have actually been
22  at WAC, but the chargeback may have been processed
23  using the base deal price?
24       A.  Yes.  And then the wholesaler would have
25  complained and we would have made a correction if

Page 88

1   appropriate.
2        Q.  Because the chargeback would have been
3   insufficient, correct?
4        A.  The base deal pricing was less than the WAC
5   price, so the whole- -- the wholesaler would have
6   received the difference between the base deal pricing
7   and the contract price rather than the higher
8   difference that perhaps they should have been
9   entitled to if they purchased, in fact, at WAC.
10       Q.  Right.  And that's why a wholesaler would
11  complain, because they would be expecting a much
12  greater chargeback all the way up to the level of the
13  WAC invoice price, as opposed to a chargeback that
14  only was processed from the lower base deal price,
15  correct?
16       A.  Yes.
17       Q.  Looking at topic number 11, Mr. Fiske, what
18  information do you have to support the assertion that
19  all actions taken by Abbott with respect to any of
20  the matters alleged in this complaint were taken in
21  good faith?
22       A.  (Reviews document.)  Everything that we do
23  in terms of our business, I think, is done in good
24  faith.  And based and my discussions with people when
25  we actually went through these questions, I don't

Page 89

1   know that they focused on the good faith part of this
2   so much as they focused on the industry practice.
3   But I think that I can state for the record that
4   everybody at Abbott is doing things in good faith to
5   comply with laws, etcetera.
6        Q.  You mentioned that people were more focused
7   on the industry practice.  What industry practices
8   did you gain information about in preparing to
9   testify?
10       A.  There were numerous questions regarding
11  industry practices.  There were industry practice
12  questions related to the setting of WAC, list price,
13  etcetera.
14       Q.  Uh-huh.
15       A.  We know very little about industry
16  practices regarding setting of WAC and list price.
17  We only know our own practices for setting those, and
18  those of companies that we've acquired, such as Knoll
19  and Kos, which their practices don't -- didn't appear
20  to be much different than ours.  They would do
21  similar evaluations in terms of competitive
22  circumstances, inflation rates, etcetera.
23            I can't speak for other companies.
24  It's illegal for us to talk with them, and we don't.
25  There were questions about data reporting to the data

Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600    -    HOUSTON   (713) 572-8897

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 90

1  agencies.  I don't have firsthand knowledge about
2  what they reported to the data agencies, but people
3  at Abbott, in the course of conversations with other
4  individuals, have learned what other manufacturers
5  do.
6          For example, Mark Turon, in the course
7  of his responsibilities, had an occasion, at least
8  once, if not more frequently, to have a conversation
9  with First DataBank -- a former Abbott employee,
10 actually, Kay Morgan, who worked at First DataBank.
11         And this was when Abbott still
12 actually reported an estimated AWP to the data
13 agency.  And it was a discussion about the -- I don't
14 know the full discussion, but Kay related to Mark
15 that there were other manufacturers that were
16 reporting AWPs similar to the 125-percent estimated
17 AWP that we provided, and others were reporting much
18 higher AWPs, 133 percent, and generic manufacturers
19 sometimes even multiples of a WAC number.
20         But that's the only knowledge we have;
21 not firsthand knowledge so much as what somebody at a
22 data agency told somebody at Abbott.
23   Q.  All right.  We'll get into the specific
24 data agency questions in a moment.
25         With respect to industry practices in

Page 91

1  invoicing wholesalers at deal prices, does Abbott
2  have any information that other drug companies
3  invoiced wholesalers at prices other than the
4  published WAC prices?
5   A.  I don't have such information, but I'm
6  assuming if they sold to them at a contract price,
7  they were invoiced at the contract price.  That's
8  purely speculative and common sense.
9   Q.  Do you -- do you have any -- does Abbott
10 have any information that the way it billed
11 wholesalers for the erythromycin products prior to
12 July of 2003 was in conformity with any industry
13 practice?
14         MR. BERLIN:  I'm sorry.  Can I have
15 that either restated or read back -- maybe read
16 back?
17         (Requested testimony read back.)
18         MR. BERLIN:  Objection, form.
19   A.  Our base deal price was a contract price
20 that was offered to purchasers.  I'm sure other
21 manufacturers have contract pricing that they offer
22 to purchasers.
23         When you offer contract purchas--
24 price to a purchaser and they buy product under that
25 contract, then they get the contract pricing and

Page 92

1  that's what they're invoiced at.
2          So to the extent that it's common
3  sense, it probably was industry practice.  I'm sure
4  that other manufacturers weren't billing or invoicing
5  their customers for more than a -- a contract price
6  that was called for.
7          MR. ANDERSON:  Objection,
8  nonresponsive.
9   Q.  (BY MR. ANDERSON):  I -- you broadened your
10 answer, Mr. Fiske, to purchasers and contract
11 prices.  I'm asking a very specific question about
12 billings to wholesalers.  And I'm going to rephrase
13 it, but it's -- it's a very specific question.
14         Does Abbott have any information that
15 the way it billed wholesalers for the erythromycin
16 drugs prior to July of 2003 was in conformity with
17 any industry practice?
18   A.  I answered your question.  I told you it
19 was a contract price.  I'm sure other manufacturers
20 have contract pricing.  That's industry practice.
21         I'm sure that all manufacturers
22 invoice at a contract price when they sell it to a
23 contract customer.  The contract customer in this
24 case for our erythromycins was the wholesaler.  We
25 invoiced them at the contract price.  That's industry

Page 93

1  practice.
2   Q.  Do you have any information that other drug
3  companies typically invoiced wholesalers at contract
4  prices from 1994 through July of 2003?
5   A.  I will say this:  I am aware that other
6  manufacturers offer deals, and I'm sure that when
7  they offer a deal, they're billing at the deal
8  price.
9   Q.  To wholesalers?
10  A.  If the deal is to the wholesaler, yes.
11  Q.  Do you have any information, as Abbott's
12 corporate representative, that other drug companies
13 were offering deals, deal prices, contract prices,
14 any prices that were lower than WAC to wholesalers as
15 the invoice price from 1994 through 2003?
16  A.  I don't have evidence.  I have knowledge
17 from my conversations with some of my peers at Abbott
18 there are companies that offer year-end deals and the
19 opportunity to buy at a price that is lower than the
20 current WAC.
21         I know that from a conversation
22 with -- what's the guy's name?  I can't think of
23 the individual's name, excuse me.  He's -- he's in
24 our -- he worked -- he used to work for another
25 manufacturer and told me about year-end deals that

24  (Pages 90 to 93)

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 94

1  they did.  So I know that these year-end deals occur
2  and that pricing is offered to wholesalers.
3      Q.  The -- the base deal pricing that Abbott
4  offered was not on a year-end basis, though; it was
5  on a continual basis, correct?
6      A.  In the case of the erythromycins, that's
7  true.
8      Q.  Okay.
9      A.  We had other products that we offered
10  deals on that were periodic deals.  That's just the
11  way we --
12      Q.  Well --
13      A.  -- happened to select to do business on
14  this particular product line.
15      Q.  Limiting to the erythromycins, what
16  information, if any, does Abbott have that the way it
17  billed wholesalers from 1994 through June of 2003 was
18  in conformity with industry practice through the use
19  of contract prices or deal prices in billing
20  wholesalers?
21      MR. BERLIN:  Objection, form.
22  Objection scope.
23      A.  I don't -- I don't know that you're asking
24  me a different question than I've already answered a
25  multiple of times.  I -- I don't know mean to be rude

Page 95

1  or anything, but I've already told you that it was a
2  contract price.
3      Are you asking me whether I know what
4  our competitive -- competitors in the erythromycin
5  market were doing?  I don't know what they were
6  doing.
7      Q.  Okay.  That -- I am asking about
8  specifics.  I'm -- I'm definitely asking about
9  specifics, sir, and I appreciate your testimony to
10  that.  But it's -- I'm not just asking about the
11  erythromycins, per se.
12      I'm asking:  Do you have any
13  information as, Abbott's corporate representative,
14  that any other drug company was billing for any of
15  their drugs to wholesalers at contract prices or deal
16  prices or any other prices lower than the published
17  WAC for those drugs, such as Abbott was doing for the
18  erythromycins from 1994 through June of 2003?
19      MR. BERLIN:  Objection, form.
20      A.  The deal periods may have been different,
21  but I already told you -- and I wish I could remember
22  the name of the individual.  He's in a group that we
23  call GPO.  It's mature pro- -- MPO, I'm sorry, Mature
24  Products Organization, and he used to work for
25  another pharmaceutical manufacturer and they did

Page 96

1  periodically offer deals.
2      Some of those were quarter-end deals
3  or other time periods, and I'm sure that when those
4  deals were offered, they were invoiced at the deal
5  price.
6      Q.  (BY MR. ANDERSON):  When did you
7  approximately have this conversation with this
8  gentleman?
9      A.  Within the last three months.
10      Q.  So would it be fair to say that prior to
11  the last three months, you didn't have that
12  information, correct?
13      A.  I've known that deals were offered by
14  various manufacturers going all the way back to 1991
15  when I was a financial analyst supporting the
16  national accounts group.
17      We were doing vitamin deals, we were
18  doing other deals, and I was aware that we were doing
19  them in response to deals that were being offered by
20  other manufacturers.
21      Q.  "We" being Abbott?
22      A.  Correct.
23      Q.  And you understood Abbott was offering
24  deals on vitamins in response to competitive deals
25  offered by other drug companies?

Page 97

1      A.  We were doing deals similar to what other
2  companies were offering, not necessarily on vitamins,
3  but it --
4      Q.  Okay.
5      A.  -- it was a -- it's a standard practice in
6  the industry -- or it was probably more of a practice
7  back then, but a number of manufacturers offered
8  deals to achieve sales ob- -- short-term sales
9  objectives, quite frankly.
10      Q.  I -- I understand that, and I'm aware of
11  some short-term deals.
12      Now shifting gears, sir, to the
13  existence of the base deal pricing offer that was in
14  place from Abbott from at least 1994 through June of
15  2003, was Abbott offering that in response to any
16  competitive offer from any other drug company?
17      A.  I told you earlier, I don't know why the
18  base deal pricing was implemented, and it just
19  continued because it just continued.
20      Q.  How is it, then, sir, that that process of
21  invoicing prices to wholesaler at amounts lower than
22  published WAC is in conformity with industry
23  practice?
24      MR. BERLIN:  Objection, form.
25      A.  I explained to you previously, base deal

Fredericks Reporting & Litigation Services, LLC
AUSTIN  (512) 241-3600   -   HOUSTON  (713) 572-8897

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 98

1   pricing is an offer of a contract price.  If you meet
2   the requirements, then you will --
3          MR. BERLIN:  Just wait a second.  I --
4   I -- I don't know how long that's going to go on.  I
5   don't --
6          MR. ANDERSON:  Well, we'll have to
7   stop it if it goes on too much more because it
8   interrupted him in mid-answer.
9          MR. BERLIN:  While we're stopping for
10  a second -- and I'm sorry, we're -- this is all in
11  the middle of your answer, but hopefully that was one
12  isolated noise.
13         Just on scheduling issue --
14         MR. ANDERSON:  Uh-huh.
15         MR. BERLIN:  -- assuming that
16  everything goes smoothly and we're not interrupted by
17  noises, you know, I just wanted to apprise you of --
18  of Mr. Fiske's request that we break on the earlier
19  side for lunch.  So --
20         MR. ANDERSON:  That's --
21         MR. BERLIN:  -- not -- I don't know
22  mean early like now, I mean that we don't end up
23  doing it at, like, 1:00 and that we break at, like,
24  sometime between noon and 12:20.  So --
25         MR. ANDERSON:  Let's -- let's -- let's

Page 99

1   do this.  I'm going to rephrase -- I'm going to --
2   I'm going to have my question read back.  We can get
3   to the end of this line of questions, and we can
4   break for lunch and then hopefully you can talk to
5   the contractors and see if they can take it easy this
6   afternoon.
7          MR. BERLIN:  Well, I don't know that I
8   have any -- you're -- you're way overestimating my
9   power within the firm.
10         The -- the -- and I'm not suggesting
11  we need to break now.  I just didn't want to have a
12  situation where we went long and then we came back
13  and we went for ten minutes and told you that we
14  needed a break.  I just --
15         MR. ANDERSON:  That's fine.
16         MR. BERLIN:  -- wanted to --
17         MR. ANDERSON:  Yeah.
18         MR. BERLIN:  -- apprise you.  Okay.
19         (Requested testimony read back.)
20   A.   And -- and I'll repeat what I've said
21  several times over.  Our base deal price was, in
22  effect, a contract price.  It's industry practice to
23  invoice purchasers who are buying at a contract price
24  at that contract price.  The wholesalers were
25  purchasing at a contract price from us.

Page 100

1    Q.   (BY MR. ANDERSON):  I -- I appreciate that,
2   and I'm going to put a fine point on this.
3          Does Abbott have any information that
4   any other drug companies had a program in place that
5   li- -- lasted for years and years at which
6   wholesalers could be invoiced at contract prices?
7          MR. BERLIN:  Hold -- hold on.
8   Objection, form.  Objection, scope.
9    A.   I never evaluated that, and the people that
10  I talked with never brought that issue up.
11   Q.   (BY MR. ANDERSON):  So with respect to that
12  particular activity, there's no evidence that that
13  was in conformity with industry practice?
14         MR. BERLIN:  Objection, form.
15   A.   I think you're misrepresenting what I said,
16  and I won't agree with that.
17   Q.   (BY MR. ANDERSON):  Specific to
18  transactions between drug companies and wholesalers,
19  are you aware of any drug company other than Abbott
20  PPD -- I'm going to rephrase.
21         Sir, what -- specific to transactions
22  between drug companies and wholesalers, are you aware
23  of any drug company other than Abbott PPD selling its
24  drugs at contract prices or deal prices to
25  wholesalers for extended periods of time, such as

Page 101

1   year after year after year, and those contract prices
2   being invoiced those wholesalers?
3    A.   I'm not aware of that, but I'm not aware
4   that there weren't.
5          MR. ANDERSON:  Okay.  We can take a
6   break now for lunch and --
7          MR. BERLIN:  I just -- before we go
8   off the record, I'm not at all suggesting we need to
9   break now for lunch.  I mean, we're -- I -- we're
10  happy to continue or we're happy to take a quick
11  break and come back and go for another 45 minutes.
12  I -- I -- I just wanted to let you know --
13         MR. ANDERSON:  Sure.
14         MR. BERLIN:  -- so that we didn't, you
15  know, break and -- you know that I'm saying?  I
16  didn't want you breaking 20 minutes from now and then
17  come back and have to tell you that.  So...
18         MR. ANDERSON:  That's fine.
19         THE VIDEOGRAPHER:  We are off the
20  record at 11:30 a.m.  This is the end of tape 2.
21         (Lunch recess taken.)
22         THE VIDEOGRAPHER:  We are on the
23  record.  It is, sorry, 12:36 p.m.  This is the
24  beginning of tape 3.
25   Q.   (BY MR. ANDERSON):  All right.  Mr. Fiske,

26 (Pages 98 to 101)

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 102

1    welcome back.
2        A.   Thank you.
3        Q.   We were focused on topic number 11, and I
4    was asking you some questions about the underlying
5    basis for Abbott's awareness of industry practice.
6             Do you have any understanding, as the
7    Abbott corporate representative, of the price
8    reporting practices of other drug companies?
9        A.   Only to the extent that I explained to you
10   previously -- it's our understanding that most
11   manufacturers report WAC and list price, but I did
12   tell you that when Mark Turon had a conversation with
13   Kay Morgan at First DataBank, that she also talked
14   with him about some manufacturers' practices with
15   respect to reporting AWP.
16       Q.   And what did she express to him again?
17       A.   She -- she made note of the fact that the
18   estimated AWP that Abbott had provided was 125
19   percent of WAC, she made a comment that some other
20   manufacturers were reporting AWPs as high as 133
21   percent of WAC, and in the case of some specialty
22   companies, they were even multiples of WAC.
23            She also went on to say that the data
24   agencies -- that it didn't really matter what
25   manufacturers were reporting because the data

Page 103

1    agencies did surveys of wholesalers to confirm what
2    the AWP really should be.
3        Q.   When did Ms. Morgan and Mr. Turon have this
4    conversation?
5        A.   I don't know precisely when. He -- so he
6    was Manager of Pricing Operations, I believe it was,
7    from 1991 till about 2000, and it -- it was sometime
8    during the course of that time frame.
9        Q.   Why did Mr. Turon ask Ms. Morgan about the
10   practices of other drug companies?
11       A.   He didn't ask.  She volunteered it.
12       Q.   Oh.  Did you have any understanding --
13   strike that.
14            Do you, as Abbott's corporate
15   representative, have any understanding of how other
16   drug manufacturers set the prices such as WAC prices
17   that they, in turn, publish or report to pricing
18   services like First DataBank?
19       A.   Only to the extent that we acquired a
20   company by the name of Knoll, or "Knoll," some people
21   say, Pharmaceutical.  We also acquired a company by
22   the name of Kos Pharmaceuticals, and their practices
23   were not much different than our own in terms of --
24   in terms of setting WAC.
25            It was done based on surveys or

Page 104

1    inflation estimates or monitoring pricing actions by
2    competitors.
3        Q.   What was the name of that second company?
4        A.   Kos Pharmaceuticals, K-o-s.
5        Q.   It -- does Abbott have different procedures
6    for setting the published WAC prices of brand drugs
7    that are marketed and sold as brands as compared to
8    the erythromycins?
9             MR. BERLIN:  Objection, scope.
10       A.   No.
11       Q.   (BY MR. ANDERSON):  Do you have any
12   understanding of other drug companies having
13   different practices for setting WAC prices that they
14   published to the pricing services for brand drugs as
15   compared to generic drugs?
16       A.   I don't know.
17       Q.   Do you have any understanding as to why
18   some generic drugs or generic drug companies cause
19   AWPs to be published that are multiples of WAC as
20   opposed to just 25 percent higher than WAC?
21       A.   I don't know that they cause them to be
22   published.  I am saying that that is what Kay Morgan
23   represented that some companies were reporting to the
24   data agencies.  I don't know that you can say that
25   one leads to the other necessarily.

Page 105

1        Q.   Okay.  Well, do you have an understanding
2    of why some --
3        A.   Especially given her feedback that, in
4    fact, the data agencies do surveys of wholesalers to
5    verify what an appropriate AWP should be.
6        Q.   Do you have any understanding of how those
7    surveys are conducted?
8        A.   I don't.
9        Q.   Do you have any un- --
10       A.   You'd have to ask her.
11       Q.   Do you have any understanding of how the
12   wholesalers obtain information about the AWPs?
13       A.   Well, they sell their product --
14            MR. BERLIN:  I'm sorry.  I -- I -- I
15   was slow to object, so I --
16            THE WITNESS:  Sure.
17            MR. BERLIN:  -- apologize.  Objection
18   to form.
19       A.   It's purely speculative.  They sell the
20   product to the ultimate customer.  Who would be in a
21   better position to estimate what their average
22   selling price is than them?
23       Q.   (BY MR. ANDERSON):  Is the AWP for a given
24   drug the selling price from the wholesaler to the
25   pharmacy?

27 (Pages 102 to 105)

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 106

1         MR. BERLIN:  Objection, form.
2    Objection -- well, I'll leave it at that.
3         A.  I actually don't know what it is.  I can
4    tell you that there was a book that I read many years
5    ago written by somebody by the name of Mick Kolassa,
6    and he defined AWP, I believe, as to be the average
7    selling price from the wholesaler to their
8    customers.  But I think it's an antiquated term
9    today, because that was -- that was their selling
10   price when maybe most of them were selling at a 20-
11   to 25-percent markup.
12         Again, this is all from his book.
13   It's not me knowing all this, other than from what I
14   had read.  I read the book many times after I
15   obtained it back in the '90s.  So other than that, I
16   don't know.
17        Q.  (BY MR. ANDERSON):  Other than Mick
18   Kolassa's book and the explanation of AWP that you
19   just explained, do you have any other information
20   about the meaning of AWP?
21        A.  No.
22         MR. BERLIN:  Wait.  Can I just --
23   which topic is that under?
24         MR. ANDERSON:  Well, we were talking
25   about industry practices and the practices of drug

Page 107

1    companies.  It's -- it falls under 11 to some extent,
2    although 11 is very broad because of the statement in
3    the answer, but it also falls under number 2 and
4    number 3 specifically.
5         MR. BERLIN:  All right.  Well, I mean,
6    I'm going to object to the scope of the question.  He
7    gave his answer, which is fine.  That's his --
8         MR. ANDERSON:  Okay.
9         MR. BERLIN:  -- his personal answer.
10   I did think -- I guess I -- the last few questions I
11   thought were -- not that one, I don't know that's
12   under anything, but the other was under 3, and I know
13   you may have more on 11 and I think he has more on
14   11.  But I just wanted to clarify that one particular
15   question.
16         MR. ANDERSON:  Okay.
17        Q.  (BY MR. ANDERSON):  Let's go to topics
18   number 2 and number 3 specifically, Mr. Fiske, since
19   we're talking about drug pricing.
20         You've -- you've reviewed those topics
21   before today, correct?
22        A.  Yes.
23        Q.  And you're prepared to testify about those
24   topics on behalf of Abbott, correct?
25        A.  I'm prepared to testify based on the

Page 108

1    discussions I had with the individuals I talked with
2    you about earlier.
3         Q.  And your own experience and --
4         A.  And my own personal experience.
5         Q.  Yes, sir.  In preparing to testify, did you
6    gain any information that Abbott understands how
7    other drug companies set their AWPs?
8         A.  No.
9         Q.  Did you gain any understanding of how any
10   other drug companies set any, quote, list prices?
11        A.  No.
12        Q.  Without understanding how other drug
13   companies are setting prices that they publish such
14   as AWPs, how can Abbott know whether or not it's in
15   conformity with industry practice?
16         MR. BERLIN:  Objection, form.
17   Objection, scope.
18        A.  The information that we report to the data
19   reporting agencies, the WAC and the list price --
20   hang on for a second.
21         We -- we know that the companies that
22   we acquired, that it was either the WAC or the list
23   pricing.  Not both of the companies that we acquired
24   actually had both metrics.  It was what they were
25   reporting to the data agencies.

Page 109

1         So I -- I can only base it on the
2    companies that I know firsthand knowledge of.  I
3    don't have firsthand knowledge of competitors of ours
4    and exactly what they're reporting.
5         Q.  (BY MR. ANDERSON):  The -- when did the
6    Knoll acquisition occur?
7         A.  2001.
8         Q.  When did the Kos ac- -- acquisition occur?
9         A.  2006.
10        Q.  What, if any, information did Abbott
11   understand with respect to the industry practices of
12   other drug companies in publishing AWP prices prior
13   to 2001?
14        A.  Could you ask your question again?  I'm --
15        Q.  Sure.
16        A.  -- sorry for not listening carefully.
17        Q.  What information, if any, did Abbott hold
18   or understand prior to 2001 with respect to how other
19   drug companies published AWPs?
20        A.  I don't know exactly when Mark Turon's
21   conversation occurred with Kay Morgan.  I think
22   that's the only thing that I learned in my
23   investigation of talking with people.  Most people
24   were not familiar with the way other companies set --
25   this is not the question you asked, but set WACs or

Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600   -   HOUSTON   (713) 572-8897

efa2704b-8ab7-411a-b06f-06f9869a5ea3

1    list prices.
2            In fact, they're not even familiar
3    with the way we set them at Abbott. They're not
4    involved in the setting of those prices. So most of
5    the people that I talked with had no knowledge about
6    how anybody in the industry sets any of these prices.
7            They are aware that First DataBank
8    publishes a WAC, a list price, and an AWP. They
9    don't always publish a list price for all companies.
10           That's pretty much the extent of most
11   of those people's knowledge.
12       Q.   Has Mark Turon ever had responsibility for
13   setting any Abbott prices?
14       A.   No. He actually didn't set the prices.
15   Pricing was communicated to him. He was responsible
16   for making sure that the those prices were loaded
17   into the systems and for reporting price changes --
18   changes to our WAC and our list price, that is -- to
19   the data vendors, as well as to wholesalers and --
20   and selected customers.
21       Q.   Would it be fair to say that Mark Turon was
22   basically the person in charge of taking the prices
23   that had been set by others within Abbott and, in
24   turn, disseminating that out to the price compendia,
25   or the wholesalers, for instance?

1        A.   I think that's a fair way to present it.
2        Q.   But he didn't have any responsibility for
3    setting any of the prices?
4        A.   No.
5        Q.   How, if at all, did the information Mark
6    Turon gained in this conversation with Kay Morgan
7    that you learned of recently impact the way Abbott
8    set any price on erythromycins?
9        A.   It didn't impact it at all. I might add a
10   comment. You know, Kay Morgan used to work at Abbott
11   Laboratories. I don't know exact- -- exact- --
12   exactly how close she was to some of the decisions
13   regarding erythromycin contracting, or not the
14   decision so much as knowing we had a base deal price
15   and so forth. But, you know, she never told us that
16   we should be reporting anything differently than the
17   WAC and the list price that we were reporting to
18   them.
19           She actually had responsibility at one
20   point in time for reporting those prices to the data
21   agencies herself. It would have been a perfect
22   opportunity to inform us if we were doing it
23   incorrectly, and she never took advantage of that to
24   tell us.
25       Q.   Do you feel like it was Kay's job

1    responsibility when she was at First DataBank to
2    instruct Abbott on how to report its prices?
3        A.   If we were doing something incorrectly.
4        Q.   Who ultimately controls the prices that
5    were reported by Abbott to compendias such as First
6    DataBank?
7            MR. BERLIN: Objection, form.
8        A.   I don't know the answer to that question
9    actually. We always reported what we always
10   reported, which was our WAC and our list price. Our
11   WAC being our non-discounted price to the
12   wholesaler. List being that, our published list
13   price in the catalogs that we issued.
14       Q.   (BY MR. ANDERSON): What -- strike that.
15           With respect to that specific practice
16   of reporting a WAC price that was a list price, what
17   steps, if any, did Abbott undertake to understand if
18   that was within industry practice?
19       A.   Our WAC price wasn't our list price. It
20   was 95 percent of our list price. Our WAC price was
21   our -- our price to the wholesaler. It was also our
22   full case quantity discount price to anybody that
23   purchased directly from Abbott.
24           You asked me something beyond that,
25   and I apologize. I just wanted to --

1        Q.   Yeah, and I --
2        A.   -- make sure there wasn't a
3    misunderstanding that list was our WAC, if not.
4        Q.   Okay. Let -- I'll -- I'll find your prior
5    testimony, and I'll -- I didn't try to misstate it on
6    purpose.
7            THE REPORTER: His last answer?
8            MR. ANDERSON: No, keep going.
9            THE REPORTER: That one (indicating)?
10           MR. ANDERSON: Yeah, that's it.
11   That's it.
12       Q.   (BY MR. ANDERSON): Okay. I'll rephrase my
13   question now that I've seen your prior testimony.
14           What steps, if any, did Abbott
15   undertake to understand whether its policy of
16   reporting a WAC price as a non-discounted price to
17   the pricing services comported with industry
18   standard?
19       A.   If you read Mick Kolassa's book that's what
20   he defines WAC as. Wholesale acquisition cost is the
21   non-discounted price that a manufacturer has for the
22   product for the wholesaler.
23       Q.   Did Abbott set its WAC prices based on Mick
24   Kolassa's book?
25       A.   WAC prices, when a product is launched into

Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600    -    HOUSTON   (713) 572-8897

Page 114

1    the marketplace, are based on studies, etcetera.  WAC
2    price is our price to wholesaler.  It's the
3    non-discounted price.  That's what we always reported
4    it to the pricing compendia.  Similarly, our list
5    price is what we always reported to the pricing
6    compendia.
7        Q.   Has -- has Abbott ever become aware that
8    other drug manufacturers report to the compendia WAC
9    prices that are known as wholesale invoice prices?
10            MR. BERLIN:  Objection, form.
11       A.   I don't know for sure whether I'm aware of
12   that or not.
13       Q.   (BY MR. ANDERSON):  Have you ever --
14       A.   I don't recall.
15       Q.   Have you ever known that WAC price is known
16   as wholesale invoice price?
17       A.   Well, our WAC prices are wholesale invoice
18   price if the wholesaler pays WAC for the product.
19       Q.   And, likewise, it's not your wholesale
20   invoice price when the wholesaler pays deal price,
21   correct?
22       A.   No, but we still have a WAC price out there
23   that some wholesalers are paying for the product, as
24   well as other customers.
25       Q.   Right.  Do you have any understanding of

Page 115

1    how other drug manufacturers report or choose to
2    report specific wholesale prices for a given drug at
3    a given time?
4        A.   No.
5        Q.   So, for instance, other drug companies may
6    choose to report as their WAC their actual wholesale
7    invoice prices --
8            MR. BERLIN:  Objection, form.
9        Q.   (BY MR. ANDERSON):  -- correct?
10       A.   I have no knowledge what other
11   manufacturers report to the data agency.
12       Q.   How does Abbott know that its selection of
13   its published WAC price as opposed to its deal prices
14   comports with industry standard?  I'll rephrase.  I
15   can see a confused look on your face.
16           How does Abbott know that it's choice
17   to publish its WAC price to the compendia as opposed
18   to its deal prices to the compendia comports with
19   industry standard?
20       A.   I already told you that the companies that
21   we acquired had contract pricing out there available
22   to customers.  They didn't report the contract
23   pricing to the compendia.  They reported their WAC
24   and their list price to the compendia if they had a
25   list price.  They always reported WAC.

Page 116

1            Kos didn't have a list price.  They
2    didn't sell directly to customers.
3        Q.   So -- you're referencing Kos and -- and
4    Knoll in --
5        A.   They're the --
6        Q.   -- that answer?
7        A.   -- two companies I actually have personal
8    knowledge of.
9        Q.   I see.  Okay.  But beyond Kos and Knoll,
10   does Abbott have any knowledge that other drug
11   manufacturers were choosing to not report certain
12   wholesale invoice prices and, rather, report other
13   higher wholesale invoice prices as WAC?
14       A.   I don't know if other manufacturers were
15   reporting a lower contract price.  I would imagine
16   that they would not because it's confidential
17   information, and you ensure that with a data agency
18   for publication to anybody out there that wanted to
19   see the number.
20       Q.   What was confidential about Abbott's deal
21   price?
22       A.   It was meant for the benefit of our
23   customers.
24       Q.   And every single wholesaler was made aware
25   of that, weren't they?

Page 117

1        A.   In order for customers to take advantage of
2    a -- an offer that you're making, you have to make
3    them aware of it, yes.
4        Q.   So what was confidential about the deal
5    price, given that every wholesaler was made aware of
6    that exact deal price?
7        A.   It wasn't out there for our competitors to
8    see.
9        Q.   Do you know how Abbott's published WAC
10   prices on the erythromycins compared to competitors'
11   published WAC prices?
12       A.   Not right off the top of my head, no.
13       Q.   Have you made any effort to understand that
14   as the Abbott corporate representative --
15       A.   I --
16           MR. BERLIN:  Wait.  I'm sorry.  The --
17   that -- I -- I --
18       Q.   (BY MR. ANDERSON):  -- understand how
19   Abbott's published WAC prices compared to competitive
20   drug companies' WAC prices on the erythromycins?
21           MR. BERLIN:  Objection, form.
22       A.   Okay.  I think maybe a better way to have
23   answered the other question is I -- I tal- -- talked
24   to you about the evaluation we do at the time that
25   we're evaluating whether to change contract pricing,

Page 118

1    and, you know, we look at the WAC pricing that's out
2    there for First DataBank and it's largely not
3    relevant.
4           Now, I don't know what the competitors
5    sell to wholesalers for, but I -- I do know from the
6    feedback that we get from our national trade
7    executives that the pricing that we need to be
8    offering to the retailer is significantly different
9    than that WAC pricing.
10          So -- I don't know whether I've really
11   answered your question or not, but I -- I -- I just
12   want you to realize that the WAC pricing for some of
13   those generic companies -- there may be a small
14   percentage of their sales at that WAC pricing.
15          But I don't know.  All I know is that
16   there is a WAC price that they report to the data
17   agency.
18   Q.  (BY MR. ANDERSON):  I don't want to belabor
19   your prior testimony, but I'm going to ask a couple
20   of questions by way of background.
21          Do you recall testifying previously
22   that WAC is known as the wholesale invoice price?
23   A.  I may have said that.  It is the wholesale
24   invoice price for those that are paying WAC for the
25   product.

Page 119

1    Q.  When looking at a competitor's published
2    WAC price, how would Abbott know whether or not that
3    WAC price was, in fact, the wholesale invoice price?
4    A.  I wouldn't.
5    Q.  How would anybody, other than the drug
6    company itself, know whether its published WAC prices
7    were or were not actually the wholesale invoice
8    prices?
9           MR. BERLIN:  Objection, form.
10   Objection to scope.
11   A.  I don't even know whether I have knowledge
12   of how to answer that question.  I --
13   Q.  (BY MR. ANDERSON):  Is there any mechanism
14   that you're aware of to check that?
15   A.  Not that I'm aware.
16   Q.  Okay.  Now I'm shifting a little bit -- we
17   were talking about primarily topic 2 there, sir.  Now
18   I'm focussing more on topic 3.
19          Has Abbott in the past for the
20   erythromycin products reported AWPs to the compendias
21   such as First DataBank and Red Book?
22   A.  Remember reported an estimated AWP until
23   about 2001 or 2002.
24   Q.  And how was that represented?  When -- when
25   the price report was actually made by Abbott to the

Page 120

1    compendia, how was the estimated AWP represented?
2    A.  How was it represented?
3    Q.  Was it --
4    A.  What you mean by that?
5    Q.  Was it literally titled "estimated AWP"?
6    A.  It was for a period of time.  Before that,
7    it was actually labeled "AWP".  It was felt that it
8    would be more correct to say it was an estimated
9    AWP.  So at the -- at the last couple of years, it
10   was reported as an estimated AWP.  It always was an
11   estimated AWP.
12   Q.  What was Abbott's understanding, if any, of
13   the industry practice of other drug companies in
14   reporting prices to the compendia that were labeled
15   "AWP"?
16          MR. BERLIN:  Objection, form.
17   A.  All I can relate to you is what Mark Turon
18   learned when he had the conversation with Kay
19   Morgan -- and it's being repetitive, but that was
20   that some manufacturers were reporting AWPs -- I
21   think he actually told me that -- that they ranged
22   from 118, 120, 125 percent of WAC and Kay Morgan
23   specifically related that some of them were as high
24   as 133 percent of WAC and some generic manufacturers
25   were reporting much higher multiples of WAC.

Page 121

1    Q.  (BY MR. ANDERSON):  I under- -- I
2    understand your testimony about that conversation
3    between Ms. Morgan and Mr. Turon.
4           I'm really -- I was asking -- or
5    trying to ask a different question, and that is:
6    With respect to the actual representation of a column
7    of pricing with the title "AWP," what, if any,
8    information did Abbott have about the industry
9    practices of other drug companies?
10          MR. BERLIN:  I'm sorry.  Objection to
11   scope.
12   A.  I -- I -- I don't know if we had any.
13   Q.  (BY MR. ANDERSON):  Along these lines,
14   Mr. Fiske, I'm going to have some exhibits for you.
15          (Exhibit 7 marked.)
16   Q.  (BY MR. ANDERSON):  If you could, take a
17   look at what's been marked as Exhibit 7.
18   A.  (Reviews document.)
19   Q.  Do you recognize this type of document?
20   A.  I believe I've seen this document in
21   preparation for the deposition.
22   Q.  In the lower right-hand corner, there's a
23   person's first initial and then a last name, P.
24   Lukas; is that correct?
25   A.  Yes.

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 122

1    Q.  Who is that?
2    A.  Peter Lukas.  He works in Business Systems.
3    Q.  Business Systems being a -- a description
4  of like a data function or a computer system
5  function?
6    A.  Information technology group that supports,
7  at that time, the Pricing and Contracting Department,
8  among others.
9    Q.  I see.  Okay.  Thank you.  And this is
10  titled "PPD New Product Set-Up Process Map," correct?
11    A.  Correct.
12    Q.  In what context did you review this
13  document in preparing to testify?
14    A.  It was just put in front of me, and I
15  was -- I -- I don't think I can tell you what I was
16  asked -- asked if I would -- had seen it before.  And
17  I said I may have seen documents similar to this; I
18  didn't know whether I had seen this one or not.
19    Q.  What -- was this a document that was shown
20  to you by a lawyer?
21    A.  It was.
22    Q.  Other than you, were there any other
23  non-lawyers in the room?
24    A.  No.
25    Q.  Okay.  I notice in the "Trade Relations"

Page 123

1  section, there's some information listed.  Is that
2  basically some of the tasks that the Trade Relations
3  department must perform when a new product is
4  launched?
5    A.  Trade Relations doesn't set the launch
6  date.  They communicated in conjunction with the
7  product team.  Similarly, they -- they don't
8  obviously get the FDA approval.  They communicate or
9  share some of that information, but, in fact, it
10  comes from our Regulatory Affairs group.
11        A lot of information on here is
12  inaccurate, actually, we'll -- I imagine we'll get to
13  other columns, but -- I just wanted to point out that
14  Peter's complete under- -- Peter's understanding is
15  not a hundred percent factual and correct about what
16  people do.
17    Q.  Right.  Like, for instance, Trade Relations
18  may not get the actual FDA approval, but they may be
19  in charge of obtaining that information from the
20  Regulatory group at Abbott and, in turn, sharing that
21  with the IT function?
22    A.  That's correct.
23    Q.  Okay.  Okay.  The last item there read- --
24  under "Trade Relations" reads "Notify: Pricing
25  Operations".  What does that refer to?

Page 124

1        MR. BERLIN:  Can I -- I don't -- I
2  want to try to get his -- broad of breadth as
3  possible, but can you identify what topic this is
4  under?
5        MR. ANDERSON:  Well, yeah.  It- --
6  it's some foundational stuff about price reporting,
7  frankly, because my focus is on the next column, but
8  I'm trying to, from a pure discovery standpoint,
9  understand what "Pricing Operations" refers to there.
10        MR. BERLIN:  Okay.  Well, I -- I'll
11  object to scope as to the line of questioning, at
12  least for now, and -- but go ahead and continue.
13        MR. ANDERSON:  Okay.
14    Q.  (BY MR. ANDERSON):  I'll rephrase, sir, so
15  the record is clear.
16        What does "Pricing Oper- --
17  Operations" refer to?
18        MR. BERLIN:  Same objection.
19    A.  It's Pricing Operations.  It is a group
20  within Pricing that has responsibility for cha- --
21  processing chargebacks, rebates.  They have
22  responsibility for actually loading WAC pricing and
23  list pricing into our internal systems.
24        There are people that report in to the
25  Pricing Operations manager, who have responsibility

Page 125

1  for communicating information to the data vendors at
2  the time that a product is launched, as well as to
3  wholesalers and selected other customers.
4    Q.  (BY MR. ANDERSON):  And -- and while deal
5  prices were in effect for the erythromycins prior to
6  July of '03, they would have also been loading the
7  deal prices for purposes of processing chargebacks,
8  correct?
9    A.  The people -- I don't know.  There -- there
10  are a group of people that handled -- people who are
11  responsible for responding to bids and quotes were
12  responsible for loading contract pricing.  I actually
13  think it would have been done by that function rather
14  than the Pricing Operations people, because base deal
15  pricing was actually a contract price.  It was not a
16  WAC or a list price.
17    Q.  Look, if you could, at the lower row and
18  the far left-hand side.  Do you see that row that --
19  I mean that column that reads "Pricing Operations"
20  "Tina Calvert"?
21    A.  Yes.
22    Q.  And then the second paragraph reads, If
23  "Deal" setup AES item master with "Deal" pricing.
24  Did I read that correctly?
25    A.  I'm -- I'm apparently mistaken.  I -- I

Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600   -   HOUSTON   (713) 572-8897

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 126

1  apologize.  It wasn't intentional.
2      Q.  All right.
3      A.  I -- I said I wasn't certain.  I -- I --
4  I thought it could have been the other group, but...
5      Q.  I know.  I -- I appreciate that.  That's
6  why I was pointing this out to you.
7      A.  Okay.
8      Q.  Does that indicate to you, sir, that the
9  Pricing Operations personnel would be inputting base
10 deal pricing information for purposes --
11     A.  No.
12     Q.  -- purposes of --
13     A.  I -- I may not be wrong in terms of my
14 supposition that it was the other people, and the
15 reason I respond this way is because when a product
16 launches into the marketplace, for a very brief
17 period of time, we have a deal on the initial
18 purchase by wholesalers -- and it may only be this
19 deal.
20         Now, it may be base deal as well, but
21 it -- it may be limited to this type of deal, because
22 the other is a contract price.  This -- this could be
23 eval- -- could be looked upon as a contract price as
24 well also.
25     MR. BERLIN:  And that was --

Page 127

1      A.  I don't know.  I don't know the answer to
2  your question.
3      MR. BERLIN:  I -- I'm sorry.  And that
4  was part of my objection is that this is lea- -- I --
5  I don't know this document and -- but it does -- is
6  labeled "New Product" and none of the -- the -- we're
7  not dealing with new products in the case.
8          So I -- again, I'll object to scope,
9  but, I mean, you -- I'm not -- certainly not at this
10 point stopping him from answering his questions.
11     Q.  (BY MR. ANDERSON):  What -- what is the
12 "AES item master"?
13     A.  I don't know.
14     Q.  Looking at the second from the right column
15 on the upper portion of the document that reads
16 "Government Reimbursement" "Deb DeYoung"?
17     A.  Yes.
18     Q.  What is that column referring to?
19     A.  Well, that's -- that's one of the items
20 where I take issue to the things that are worded,
21 because it -- it suggests that she determines what
22 Medicaid reimbursement is going to be for products,
23 and clearly Abbott doesn't determine what Medicaid
24 reimbursement is going to be for a product.
25         What she does do is communicate

Page 128

1  information to the Medicaid agencies regarding new
2  product launches, providing them copies of the new
3  product inserts and the pricing information at the
4  time that a product is launched.
5      Q.  Why does Abbott provide the pricing
6  information to the Medicaid programs?
7      A.  Well, you know, we have a Medicaid rebate
8  agreement like many manufacturers, and we want to
9  ensure that our products are all listed by the
10 various states and that the patients have access to
11 these drugs.
12     Q.  By reporting the pricing information to the
13 Medicaid programs at launch, is Abbott providing
14 information that will set Medicaid reimbursement?
15     A.  I don't know.
16     MR. BERLIN:  I just --
17     Q.  (BY MR. ANDERSON):  Do you think --
18     MR. BERLIN:  I'm sorry.  I -- I do
19 want -- can I have a continuing objection to the line
20 of questioning as to scope, or do you want me to
21 voice it at each question?
22     MR. ANDERSON:  I -- you can just say
23 "scope" if you -- you know, "Objection, scope".
24     MR. BERLIN:  Okay.
25     MR. ANDERSON:  It won't be that

Page 129

1  disruptive.
2      Q.  (BY MR. ANDERSON):  Mr. Fiske, do you
3  believe that the reason the reference here is made to
4  setting Medicaid reimbursement is that Abbott
5  appreciated, when it was reporting pricing
6  information to the Medicaid programs, that that
7  information was being used?
8      MR. BERLIN:  Objection, form.
9  Objection, scope.
10     A.  I don't know.
11     Q.  (BY MR. ANDERSON):  Does it seem
12 reasonable, sir, that Abbott -- strike that.
13         As the corporate representative, is it
14 true, sir, that Abbott knew, when it was reporting
15 pricing information to the Medicaid programs, that
16 Medicaid programs would, in turn, be using that
17 information to determine drug reimbursements?
18     MR. BERLIN:  Objection, form.
19 Objection scope.
20     A.  I don't know whether they relied on that
21 information solely or not.  There was a lot of
22 information we provided to CMS that they apparently
23 didn't rely on that they could have, such as our
24 AMPs.
25     MR. ANDERSON:  Objection,

33 (Pages 126 to 129)

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 130

1    nonresponsive.
2        Q.  (BY MR. ANDERSON):  Sir, I'm asking about
3    the information provided to the state Medicaid
4    programs at launch.  The AMPs can't be provided at
5    launch, can they?
6        A.  That's a true statement.
7        Q.  Okay.  With respect to the information that
8    Abbott was reporting to the Medicaid programs
9    directly at launch, did Abbott expect that the
10   Medicaid programs would be using that pricing
11   information to set drug reimbursement?
12           MR. BERLIN:  Objection, form.
13   Objection, scope.
14       A.  I -- I'm assuming that -- there is a
15   practice in place -- I apologize that I don't know
16   the answer to your questions, but I -- I -- it may
17   very well have been for that reason.
18           We always reported our WAC and our
19   list price to the Medicaid agencies along with the
20   other product indicative information, the -- a copy
21   of the product insert, etcetera, and, I'm assuming,
22   so that it would be reimbursed by the states --
23   reimbursable by the states so they'd have a reference
24   point.  But I don't know.
25       Q.  (BY MR. ANDERSON):  In addition to the WAC

Page 131

1    and the list price, is it true that over the years
2    Abbott, also provided the AWP prices?
3        A.  There were -- some period of time when I
4    believe that AWP prices were provided.  They have not
5    been provided more recently, probably since -- I
6    don't know when we stopped reporting it.
7           (Exhibit 8 marked.)
8        Q.  (BY MR. ANDERSON):  Now, if you could, take
9    a look at Exhibit 8 which may bear upon this.
10       A.  (Reviews document.)
11       Q.  Do you recognize this document as a
12   document pertaining to the launch of a new product?
13          MR. BERLIN:  Objection, scope.
14       A.  I don't know recognize the document.
15       Q.  (BY MR. ANDERSON):  Do you see toward the
16   bottom of the first page the second to last bullet
17   reads "Notification of State Medicaids"?
18          MR. BERLIN:  Objection, scope.
19       A.  I see the bullet.
20       Q.  (BY MR. ANDERSON):  And then below that,
21   another bullet that reads "Notification to data
22   service companies"?
23          MR. BERLIN:  Objection, scope.
24       A.  I see that.
25       Q.  (BY MR. ANDERSON):  What --

Page 132

1        A.  This is a variable document.  It certainly
2    precedes 1994 because I believe that Kay Morgan was
3    gone by that point in time.
4        Q.  Do you believe that the pricing information
5    that is included in the notifications to state
6    Medicaid programs and the data service companies
7    included not only WAC and list but also AWP?
8           MR. BERLIN:  Objection, scope.
9        A.  I told you that for a period of time I
10   believe that that information was reported to the
11   data agencies.
12       Q.  (BY MR. ANDERSON):  And --
13       A.  And that it was discontinued in the 2002
14   time frame.
15       Q.  2002?
16       A.  I believe that's correct.
17       Q.  Okay.
18       A.  2001, 2002 time frame.
19       Q.  All right.  Looking at the middle of the
20   list of bullets, do you see one that reads "Pricing,
21   dash, WAC, comma, LIST & estimated AWP"?
22          MR. BERLIN:  Objection, scope.
23       A.  Yes.
24       Q.  (BY MR. ANDERSON):  How did Abbott set the
25   estimated AWPs?

Page 133

1        A.  Basically reverse-engineering.  We looked
2    at what the data agencies -- agencies were
3    reporting.  And you can see that they have -- who
4    knows what their formula is, but it -- the numbers
5    that they reported were generally 125 percent of our
6    WAC -- not consistently, not consistently across data
7    vendors, and not consistently even within a single
8    data vendor.
9        Q.  Well, with respect to the launch of a
10   product, how could Abbott reverse-engineer an AWP
11   that hasn't yet been published?
12          MR. BERLIN:  Objection, form.
13   Objection, scope.
14       A.  If the data agencies are consistently
15   applying what appears to be a formula of 125 percent
16   of WAC, I think it's a reasonable conclusion that you
17   can estimate an AWP on that same basis, especially
18   given that they've communicated to you that they go
19   out and actually verify what the correct AWP should
20   be.
21       Q.  (BY MR. ANDERSON):  Are you aware of any
22   instances where the estimated AWP published by Abbott
23   to the pricing compendia was not ultimately published
24   by the pricing compendia?
25          MR. BERLIN:  Objection, form.

34 (Pages 130 to 133)

Page 134

1    Objection, scope.
2        A.   No, I'm not.
3        Q.   (BY MR. ANDERSON):  Are you aware of any
4    information where the estimated AWP reported by
5    Abbott to the compendia was somehow disputed by a
6    wholesaler?
7            MR. BERLIN:  Objection, form.
8    Objection, scope.
9        A.   Well, I wasn't the one that was verifying
10   it with the wholesaler, so I wouldn't have been aware
11   of that.  It would have been First DataBank or other
12   data vendors that were doing that verification
13   process.  You'd have to ask them.
14           (Exhibit 9 marked.)
15       Q.   (BY MR. ANDERSON):  Mr. Fiske, please take
16   a look at what's been marked as Exhibit 9.
17       A.   Am I missing an 8?  Oh, never mind.  I've
18   got it.  (Reviews document.)
19       Q.   Do you recognize any of the pages shown in
20   Exhibit 9?
21       A.   I don't recognize this document.  I don't
22   think I've seen it before.
23       Q.   Have you seen these types of documents
24   before?
25           MR. BERLIN:  Objection, form.

Page 135

1        A.   I think I've seen something similar to
2    this.
3        Q.   (BY MR. ANDERSON):  Which -- which page or
4    pages are similar to what you've seen before?
5        A.   (Reviews document.)  I saw some document
6    in preparing for the deposition that showed receipt
7    by First -- by Red Book, actually.  I don't recall
8    whether it was an Ery price list or not.  I -- I
9    can't recall.
10       Q.   And it -- it looked -- it had the same type
11   of form cover letter that's shown on the second page
12   of Exhibit 9?
13       A.   I'm -- I'm -- I'm sorry.  I recall this
14   (indicating).
15       Q.   The stamp?
16       A.   The stamp, that's all I specifically
17   recall.
18       Q.   All right.
19       A.   I don't -- I don't remember what we
20   reviewed.
21       Q.   Does Exhibit 9 appear to you, sir, to be an
22   example of a standard communication that Abbott sent
23   out to the pricing compendia?
24       A.   It -- it looks like a communication to a
25   pricing compendia, yes.

Page 136

1        Q.   And there's -- I notice the first page is a
2    fax cover sheet from Abbott in this case to Medical
3    Economics, correct?
4        A.   Yes.
5        Q.   Do you believe that this same type of fax
6    cover sheet would have been utilized to transmit the
7    same type of information to First DataBank as well?
8        A.   Something similar to that.
9        Q.   So looking at the second page of Exhibit 9,
10   I -- do you agree with me that that is a form cover
11   letter that Abbott would create to transmit
12   information to data vendors?
13       A.   I would agree with that, yes.
14       Q.   And the data vendors would include First
15   DataBank and Red Book and Medi-Span, correct?
16       A.   Yes.
17       Q.   And those are the same three data service
18   companies that were referenced at the bottom of the
19   first page of Exhibit 8, correct?
20       A.   (Reviews document.)  Yes.
21       Q.   Why did --
22       A.   Well, two of them.
23       Q.   Why -- why did Abbott report information to
24   the data vendors such as that shown in Exhibit 9?
25           MR. BERLIN:  Objection, form, asked

Page 137

1    and answered.
2        A.   It was our standard practice whenever we
3    launched a product to report the pricing information
4    to the data vendors.  It had always been done.
5        Q.   (BY MR. ANDERSON):  Other than the fact
6    that it was something Abbott itself had always done,
7    was there any other information that underlied Abbott
8    reporting this type of information to the data
9    vendors?
10       A.   Not that I became aware of during my
11   investigation.
12       Q.   I notice on the third page of Exhibit 9 is
13   the beginning of a price list, correct?
14       A.   Yes.
15       Q.   And there's -- there's three different
16   types of prices listed.  One is list price, the other
17   is case price, and the last one is AWP price,
18   correct?
19       A.   Yes.
20       Q.   And so those would be prices that Abbott
21   had set and, in turn, communicated to the data
22   vendors, correct?
23       A.   Yes.
24       Q.   How did Abbott --
25       A.   Well, we communicated an estimated AWP.  We

35 (Pages 134 to 137)

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 138

1  set the WAC and the list price.
2      Q.  Where --
3      A.  The WAC price being the case price.
4      Q.  Where is the AWP information noted to be an
5  estimate?
6      A.  I'm telling you that it was always an
7  estimate.  We actually changed the column at a
8  subsequent date to read that it was an estimate to
9  avoid any confusion.
10     Q.  How might it be confusing if the AWP
11  weren't noted to be an estimate?
12     A.  I don't have an answer for that question.
13     Q.  Do you agree that to the extent Abbott was
14  reporting, quote, "AWPs" to the data vendors, it
15  would appear that Abbott is setting the AWPs?
16         MR. BERLIN:  Objection, form.
17  Objection, scope.
18     A.  I don't agree with that.
19     Q.  (BY MR. ANDERSON):  What information would
20  indicate that Abbott is not controlling this AWP?
21     A.  Pardon me?
22         MR. BERLIN:  Objection, form.
23  Objection, scope.
24     Q.  (BY MR. ANDERSON):  What -- what
25  information would indicate that Abbott is not

Page 139

1  controlling the setting of these AWPs?
2         MR. BERLIN:  Objection, form.
3  Objection, scope.
4      A.  There's no information on this sheet that
5  says that.
6      Q.  (BY MR. ANDERSON):  Is there any
7  information other -- beyond this sheet that you know
8  of?
9         MR. BERLIN:  Objection, form.
10  Objection, scope.  But you -- you can answer.
11     A.  All -- all I can continue to go back to,
12  Mr. Anderson, is the conversation that Mark Turon
13  had, for example, with Kay Morgan; that despite the
14  fact that manufacturers may have been providing
15  estimated AWPs, that the data vendors, especially
16  First DataBank, was actually verifying or confirming
17  what a correct AWP should be with the wholesalers
18  themselves.
19     Q.  (BY MR. ANDERSON):  Did Mark indicate how
20  long that conversation list- -- lasted?
21     A.  No, he didn't.  Knowing Mark Turon, it
22  could have been an hour.  He's a very -- very
23  talkative man.
24     Q.  And Mr. Turon is still with Abbott today?
25     A.  He -- he works for Ross Pharmaceuticals.

Page 140

1  I -- actually, it's called Abbott Nutritionals, Inc.
2  today, which is a division of Abbott Laboratories.
3      Q.  Was he with Ross when he had this
4  conversation with Kay?
5      A.  No.  He worked in the Pharmaceutical
6  Products Division as Pricing Operations Manager.
7      Q.  Other than the conversation between Kay and
8  Mark that occurred sometime between 1991 and 1999, is
9  there any other information that would indicate that
10  Abbott did not set the AWPs?
11         MR. BERLIN:  Objection, scope.
12     A.  For the period nine- -- of between 1991 and
13  1999?
14     Q.  (BY MR. ANDERSON):  No, for -- for the
15  entire time period of this case, from '94 through the
16  present.
17     A.  Yes, there is.
18     Q.  What's that information?
19     A.  So -- at later dates they were actually
20  labeled as estimated AWPs.  At later dates they
21  weren't provided, and if asked for, we declined to
22  provide them because we indicated that that
23  information was information that Abbott did not set;
24  that that information, if it was desired, could be

Page 141

1  obtained from the data agencies themselves.
2      Q.  Okay.  And that -- those types of notations
3  about an estimate began sometime around 2001, 2002,
4  correct?
5      A.  In 2000 we still reported AWPs.  Beginning
6  in 2001, I believe we reported estimated AWPs, and we
7  stopped reporting AWPs in 2002.
8      Q.  Well, that was going to be my next
9  question.  And since 2002, has Abbott done anything
10  to alter the information it conveys concerning AWP,
11  if -- if any?
12         MR. BERLIN:  I -- I -- objection,
13  form.
14     A.  For the most part, we do not communicate
15  AWPs to anybody.  There are some exceptions to that.
16  But for the most part, if somebody asks us for an AWP
17  or asks us to verify an AWP, we tell people where
18  that information can be obtained rather than
19  providing it.  We have some exceptions to that, in
20  terms of we can provide AWP information to some of
21  our managed care customers.
22     Q.  (BY MR. ANDERSON):  You mentioned the
23  verification of an AWP.  Do you know whether or not
24  Abbott has been verifying AWPs published by the
25  compendia in recent years?

36 (Pages 138 to 141)

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 142

1           MR. BERLIN:  Objection, form.
2     Objection, scope.
3           A.   I don't believe we've been verifying AWPs
4     in recent years.
5           Q.   (BY MR. ANDERSON):  How has Abbott
6     responded to requests from pricing compendia, if any,
7     for verification of AWPs in the past three or four
8     years?
9           MR. BERLIN:  Objection, scope.
10          A.   Pricing compendia?
11          Q.   (BY MR. ANDERSON):  Pricing services, like
12    First DataBank or Red Book.
13          A.   Asking us to verify AWPs?
14          Q.   Yes, sir.
15          A.   The only situation I'm aware of where
16    anybody approached us regarding an AW- -- telling us
17    what an AWP would -- I'm sorry.  Let me...
18          The only situation I'm aware of where
19    there was a discussion regarding an AWP by a pricing
20    compendia to Abbott was an exchange from Red Book
21    actually telling us that if we did not give them an
22    AWP, that they would set the AWP at, I believe it
23    was, 120 percent of our WAC.
24          I believe we responded to that with an
25    e-mail indicating that we did not set AWPs for our

Page 143

1     product; that they had their own business practices
2     that they -- they should evaluate and follow and do
3     whatever they saw was appropriate.
4           I don't know if that's a correct
5     representation exactly of what was said, but that's
6     the thought process.
7           Q.   What information do you have to underlie
8     that statement?
9           A.   What information do I have?
10          Q.   Uh-huh.
11          A.   I can tell you that I've actually seen
12    those e-mail exchanges in the last couple of days in
13    preparing for this.
14          Q.   What was the time period for those e-mail
15    exchanges?
16          A.   Hmm.  Probably more than three years ago,
17    but I don't think it was more than six years ago.  I
18    don't know exactly the date.
19          Q.   Prior to -- well, strike that.
20          Is it your understanding that
21    currently Abbott refuses to verify any AWPs published
22    by First DataBank or Red Book?
23          A.   We don't set AWPs, and we will not confirm
24    them.  We ask people -- or suggest to people if they
25    need to confirm them, that they do so with the data

Page 144

1     agencies themselves.
2           Q.   When did -- well, no, I'm -- I'm talking
3     about communications from the data agencies, so I'll
4     rephrase to be more specific.
5           Currently, sir, is it Abbott's
6     practice to reply to a data vendor or a data service
7     such as First DataBank or Red Book's request for
8     Abbott to verify an AWP to instruct that data service
9     that Abbott will not verify the AWP?
10          A.   We tell them that we do not set AWPs, that
11    however they choose to calculate that is their
12    methodology and it's their business.
13          (Exhibit 10 marked.)
14          Q.   (BY MR. ANDERSON):  Let me show you a
15    document, and I'll put some specifics on this and it
16    may assist the questioning.
17          Take a look, if you could, at Fiske
18    Exhibit 10.
19          A.   (Reviews document.)
20          MR. BERLIN:  Can you show this to
21    him?  It's Red Book -- produced by Red Book and
22    marked "Confidential".
23          MR. ANDERSON:  Yeah.  It's produced in
24    the MDL.  It's part of the Red Book production.  We
25    actually deposed Red Book.  Y'all were there.

Page 145

1           MR. BERLIN:  No, no, I know, but is
2     there any -- I -- I -- it's not my client, so it's
3     not -- I just raise this if we need some protection
4     as to whether we can show him --
5           MR. ANDERSON:  Oh, oh, oh.
6           MR. BERLIN:  -- documents produced by
7     Red Book that are marked "Confidential".
8           MR. ANDERSON:  Oh, I'm -- the pro- --
9     I'm pretty sure the pro- -- I'm positive the
10    protective order has allowances for using documents
11    with witnesses.
12          MR. BERLIN:  Okay.  I'll -- I just
13    wanted to raise the issue.  I'm --
14          MR. ANDERSON:  Yeah.
15          MR. BERLIN:  I -- I'll -- I -- I just
16    am not party to it.
17          MR. ANDERSON:  Yeah.
18          MR. BERLIN:  If your -- that's your
19    representation that we're operating under --
20          MR. ANDERSON:  Well, I mean, we're all
21    operating under the MDL protective order.  I -- you
22    know, if we need to get him to execute a --
23          MR. BERLIN:  I just didn't --
24          MR. ANDERSON:  -- compliance
25    agreement --

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 146

1     MR. BERLIN: -- remember what the --
2  the procedure is because I haven't faced that issue
3  rec- -- at least not recently.
4     MR. ANDERSON: Yeah.
5     MR. BERLIN: So I just wanted to make
6  sure that we weren't doing anything to upset some
7  other party.
8     A. (Reviews document.) Yes.
9     Q. (BY MR. ANDERSON): Have you finished your
10 review of Exhibit 10?
11    A. I have.
12    Q. Have you seen documents similar to this
13 before?
14    MR. BERLIN: Objection, form.
15    A. No.
16    Q. (BY MR. ANDERSON): Does this appear to be
17 a document sent by Red Book to Abbott requesting
18 price verification?
19    A. Yes.
20    Q. And it's titled "Abbott Pharmaceutical
21 Micromedex Price List Verification 2004," correct?
22    A. Yes.
23    Q. And then, in turn, do you agree that there
24 appears to be handwritten notes and signatures on the
25 pages by April Gerzel of Abbott?

Page 147

1     A. Yes.
2     Q. April Gerzel works in your Pricing
3  department at Abbott, correct?
4     A. She does.
5     Q. And in the 2003 time frame, did she have
6  authority to correspond with the pricing services
7  such as Red Book?
8     A. Part of her responsibilities was reporting
9  our WAC and our list price to the data agencies.
10    Q. Did April have the authority to verify
11 AWPs?
12    A. She had the authority to verify the WAC and
13 the list price.
14    Q. Okay. In looking at the pricing
15 verification listing with all the NDC numbers which
16 starts on the fourth page of Exhibit 10, do you see
17 there a pricing column for "AWP" as well as "WAC"?
18    A. I do.
19    Q. And those -- that pricing column is
20 populated with prices for each of these drugs,
21 correct?
22    A. It is.
23    Q. Including the erythromycin products,
24 correct?
25    A. (Reviews document.) It's populated with an

Page 148

1  AWP for all of the products.
2     MR. BERLIN: That are listed here.
3     A. That are listed here.
4     Q. (BY MR. ANDERSON): In looking at the page
5  that's down in the lower right-hand corner Bates
6  labeled Red Book 01344?
7     A. Yes.
8     Q. Do you see Ms. Gerzel's signature there?
9     A. I do.
10    Q. And it's dated October 10th, 2003, correct?
11    A. Yes.
12    Q. And there's a listing there of various AWP
13 and WAC prices for erythromycin products, correct?
14    A. Yeah.
15    Q. And those are Abbott's products, correct?
16    A. Yes.
17    Q. And she has marked the box that says "OK as
18 is"; is that right?
19    A. Yes.
20    Q. Did Ms. Gerzel have the authority to make
21 that notation?
22    A. Yes, with respect to the WACs and the list
23 prices.
24    Q. Do you see anywhere on this document where
25 Ms. Gerzel is notifying Red Book that the AWPs are

Page 149

1  not verified?
2     A. No, but I would like to point out that on
3  the pages where she corrects the WAC and the list
4  price, she makes no change to the AWP, which implies
5  that she is not doing anything to establish what an
6  AWP should be, either right or wrong.
7     For example, if you look at 1345,
8  you'll note that she made numerous changes where the
9  WAC and the list prices that she corrected were
10 higher than the old ones. And, clearly, she was not
11 suggesting any change to AWP, implying that she does
12 nothing to verify or set such numbers.
13    Q. When -- when --
14    A. It doesn't state that on the form, I'll say
15 that. I -- you asked me that question and I'll agree
16 with that, but I think you need to draw some
17 conclusions from what you see as well.
18    Q. Did Abbott understand that when it changed
19 its published WAC prices, that, in turn, there would
20 be changes in the published AWP prices?
21    MR. BERLIN: Objection to form.
22 Objection to scope.
23    A. It was often the case -- I'm assuming that
24 the data agencies did their homework and confirmed
25 what the correct information should be with the

Fredericks Reporting & Litigation Services, LLC
AUSTIN  (512) 241-3600   -   HOUSTON  (713) 572-8897

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 150

1    wholesalers.
2         MR. BERLIN:  Is your answer complete?
3    I -- I -- I just want to --
4         THE WITNESS:  Yes.
5         MR. BERLIN:  Okay.  Because I want to
6    say -- so it won't be an issue of coaching is just --
7    you need to make sure that you're testifying within
8    the scope, and none of ours permit general testimony
9    about what Abbott knew or what Abbott understood and
10   you're --
11        I'm not stopping you from testifying.
12   It's just important as a corporate representative,
13   you maintain your testimony within the scope.
14   Q.   (BY MR. ANDERSON):  Why didn't Abbott
15   notify Red Book that it would refuse to verify AWPs?
16        MR. BERLIN:  Objection, form.
17   Objection, scope.
18   A.   I don't know why April didn't do that on
19   here.
20   Q.   (BY MR. ANDERSON):  Is there -- is there a
21   time when Abbott began notifying the data services
22   such as First DataBank and Red Book that it would not
23   be verifying AWPs?
24   A.   I don't think that we sent out a
25   notification that we wouldn't be verifying them.

Page 151

1    Rather, when we -- it- -- it's my understanding that
2    these come on an annual basis from some of the data
3    vendors where they ask us to verify WACs and list
4    prices, and that if some -- such information came
5    after a certain point in time, we would have declined
6    to verify the AWP.  I don't know why it wasn't done
7    in this particular case.
8    Q.   Have you seen any documentation where
9    Abbott has notified the data services that it refuses
10   to verify AWP?
11   A.   I didn't see any.  I was basing that on
12   some conversations that I had had with April.
13   Q.   In preparing to testify?
14   A.   Yes.
15   Q.   Recently?
16   A.   Yes.
17   Q.   Has Tina Calvert also been responsible for
18   communicating pricing information from Abbott to the
19   data services?
20   A.   She was at one point in time, yes.
21   Q.   And when Ms. Calvert or Ms. Gerzel or other
22   responsible persons in Abbott were completing these
23   price verifications from Abbott or First DataBank on
24   an annual basis, were they doing so within the course
25   and scope of their employment?

Page 152

1    A.   Yes, they were.
2         (Exhibit 11 marked.)
3    Q.   (BY MR. ANDERSON):  If you could, take a
4    look at another example which is marked as Exhibit
5    No. 11.
6    A.   (Reviews document.)
7    Q.   In looking at Exhibit 11 --
8         MR. BERLIN:  Hold on.  I think he's
9    still --
10        MR. ANDERSON:  Oh.
11        MR. BERLIN:  -- looking.  I'm sorry.
12        MR. ANDERSON:  Oh, I thought he was
13   done.  I'm sorry.
14        THE WITNESS:  He can -- he can go.
15   A.   You can go.
16   Q.   (BY MR. ANDERSON):  Okay.  Mr. Fiske, in
17   reviewing Exhibit No. 11, do you agree this appears
18   to be another product verification form completed by
19   Abbott?
20   A.   It appears to be.
21   Q.   And this one also includes the pricing
22   information for the erythromycin products including
23   AWPs and WACs, and it's signed by Tina Calvert,
24   correct?
25   A.   The front page is signed by Tina.

Page 153

1    Q.   Yes, sir.  In looking at the page that's
2    Bates labeled 1139?
3    A.   Yes.
4    Q.   You see that page contains the pricing for
5    some erythromycin products, correct?
6    A.   It does.
7    Q.   And over in the far right-hand column,
8    there's a field titled "Effective Change/Deact Date,"
9    correct?
10   A.   Uh-huh.  Yes.
11   Q.   And then for these erythromycin products,
12   there's a -- most of them, there's a price change
13   date of July 2nd, 1999, correct?
14   A.   Yes.
15   Q.   Do you have any understanding of the
16   circumstances surrounding price changes instituted in
17   July of '99?
18        MR. BERLIN:  Objection, scope.
19   A.   Yes.
20   Q.   (BY MR. ANDERSON):  Why were the -- when --
21   how were the prices changed on the erythromycins in
22   July of '99?
23   A.   I can't remember the specific percentage
24   change, but they were increased at that time.
25   Q.   And why were they increased?

Fredericks Reporting & Litigation Services, LLC
AUSTIN  (512) 241-3600  -  HOUSTON  (713) 572-8897

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 154

1    A.  Because competitive circumstances permitted
2  us to do so.
3    Q.  Were the chain and retail buying group
4  prices also increased in July of '99?
5    A.  I don't know think so.
6    Q.  What competitive circumstances are you
7  referring to that allowed the WAC prices to be
8  increased?
9    A.  It had been -- to my best recollection, it
10 had been a couple of years since we had taken a price
11 increase, there had been inflation over that period
12 of time, and we determined that we should increase
13 our WAC and our list price and take advantage of the
14 incremental margin it would generate for us.
15   Q.  When Abbott did that, did it appreciate
16 that in July of '99 or shortly thereafter its
17 published AWP prices would also be increasing?
18   A.  I don't know that we ever took that into
19 consideration.  It's not something that we generally
20 would have thought about.
21   Q.  Is there any reason why Abbott, in July
22 of '99, would not have understood that its AWPs would
23 have gone up as a result of its increased WACs?
24        MR. BERLIN:  Objection, form.
25 Objection, scope.

Page 155

1    A.  No, but it's not something that we would
2  have taken into consideration in terms of the price
3  increase.  It didn't influence our price increase in
4  any way.
5    Q.  (BY MR. ANDERSON):  Oh, I see.  You're
6  saying you -- you agree that Abbott would have known
7  of the cause-and-effect relationship, but you're
8  saying the fact that the AWP would go up was not the
9  influencing factor to cause Abbott to raise the WACs?
10        MR. BERLIN:  Objection, form.
11 Objection, scope.
12   A.  I think we were familiar with the fact that
13 when Abbott took price increases, data agencies
14 generally changed the AWP for our products.  It
15 didn't influence our pricing decision.
16   Q.  (BY MR. ANDERSON):  And so if you're
17 looking at this page of Exhibit 11, for instance,
18 where these AWPs are being published by Red Book and
19 sent to Abbott in late 2002, Abbott didn't take any
20 steps to lower these AWPs back down to where they
21 were before 1999, correct?
22        MR. BERLIN:  Objection, form.
23 Objection, scope.
24   A.  The only --
25   Q.  (BY MR. ANDERSON):  I'll rephrase.

Page 156

1    A.  -- interaction that we had with the data
2  agencies was to report our WAC and list price.  I
3  understand this is a verification form.  We took no
4  steps to change the AWP that they were reporting.
5    Q.  Okay.  And so -- as -- as a specific
6  example, for instance, in July of '99 when Abbott
7  raised its WAC prices, it notified the data agencies
8  including Red Book, correct?
9    A.  Yes.
10   Q.  And then subsequent to that time period,
11 the data agencies, like First DataBank and Red Book,
12 published those WACs as well as increased AWPs,
13 correct?
14   A.  I'm assuming that's a correct conclusion.
15 I know they published the new WACs and list prices,
16 but I don't monitor the AWPs for the erythromycins.
17   Q.  And then subsequent to that publication by
18 Red Book and First DataBank, Abbott would have been
19 made aware of that increased AWP through a
20 verification form such as Exhibit 11, correct?
21        MR. BERLIN:  Objection, form.
22 Objection, scope.
23   A.  The form was sent to an Abbott person.
24   Q.  (BY MR. ANDERSON):  And in turn, Abbott
25 took no steps to stop the publication of the

Page 157

1  increased AWP?
2        MR. BERLIN:  Objection, form.
3  Objection, scope.
4    A.  No.
5    Q.  (BY MR. ANDERSON):  I'll rephrase.  I think
6  I got an answer, but I -- I put a --
7        MR. BERLIN:  You did get an answer.
8    Q.  (BY MR. ANDERSON):  -- double-negative in
9  there.  As a result of Abbott -- strike that.
10        In response to Abbott receiving a
11 pricing verification --
12   A.  Excuse me.  I'm sorry.
13   Q.  -- from the pricing services like First
14 DataBank and Red Book, Abbott didn't take any steps
15 to stop those pricing services from publishing the
16 increased AWPs, did it?
17   A.  No.
18        MR. BERLIN:  Object- -- I'm sorry.
19 Objection, form.  Objection scope.
20        THE VIDEOGRAPHER:  You have five
21 minutes.
22        MR. ANDERSON:  How many?
23        THE VIDEOGRAPHER:  Five.
24        MR. ANDERSON:  We can take a break.
25        THE VIDEOGRAPHER:  Okay.  We are off

40 (Pages 154 to 157)

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 158

1  the record at 1:52 p.m.  This is the end of tape 3.
2       (Recess taken.)
3       THE VIDEOGRAPHER:  We are back on the
4  record at 2:05 p.m.  This is the beginning of tape 4.
5       Q.  (BY MR. ANDERSON):  All right.  Mr. Fiske,
6  after any of the five WAC price increases that Abbott
7  took on the erythromycins from 1994 to the present,
8  did Abbott ever take any steps to prevent First
9  DataBank or Red Book from publishing increased AWPs?
10      MR. BERLIN:  Objection, form.
11      A.  We don't tell the data agencies what to
12  do.  We just inform them of what our WAC and our list
13  price are at the time of launch, and we report
14  changes in the WAC and list price.  That's all the
15  communication that we generally have with data
16  agencies regarding pricing.
17      Q.  (BY MR. ANDERSON):  Subsequent to those WAC
18  price increases when Abbott was notified through
19  annual price verification forms that the AWPs had
20  also increased, did Abbott take any steps to lower
21  those AWPs or otherwise stop the publication of those
22  AWPs?
23      A.  We don't set the AWPs; therefore, we would
24  have no reason to communicate that they should be
25  changed.

Page 159

1       Q.  Prior to the 2001 time frame when Abbott
2  was directly reporting AWPs to the pricing services
3  in connection with increased AWPs, for instance, did
4  Abbott take any steps to make sure those AWPs did not
5  increase?
6       A.  I think you misstated your question.
7       Q.  For instance --
8       A.  We didn't take any steps regarding the
9  setting of AWP that I recall --
10      Q.  Well, prior to --
11      A.  -- other than providing an estimated AWP.
12      Q.  An estimated AW- -- okay.  I'll -- I'll
13  include that word in the question then.
14          Prior to 2001 when Abbott was directly
15  reporting estimated AWPs to the pricing services,
16  when Abbott took a WAC price increase, did it also
17  report an increase in estimated AWP?
18      A.  I believe at that time that we -- the
19  new -- we provided a new AWP at the time we provided
20  a new WAC -- an estimated AWP, if we took a WAC
21  increase.
22      Q.  Right.  And that new estimated AWP was
23  going up just like the WAC?
24      A.  Correct.
25      Q.  And Abbott expected that that AWP would be

Page 160

1  published by the pricing services to the state
2  Medicaid programs, correct?
3       A.  I --
4       MR. BERLIN:  Objection -- I'm sorry.
5  Objection, form.  Objection, scope.
6       A.  I don't know if we had an expectation of
7  what they would publish.
8       Q.  (BY MR. ANDERSON):  Did Abbott know that
9  state Medicaid programs obtained pricing information
10  from the data services like First DataBank and
11  Red Book?
12      A.  We kn- -- we knew that state Medicaid
13  agencies had, in some cases, reimbursement formulas
14  based on AWP.  Where they actually obtained their
15  data from, I don't know.
16          (Exhibit 12 marked.)
17      Q.  (BY MR. ANDERSON):  Mr. Fiske, take a look
18  at what's been marked as Exhibit No. 12, please.
19      A.  (Reviews document.)
20      Q.  For completeness, I've provided you the
21  entire e-mail chain, but I'll tell you that my
22  questions are going to be focused on the last page,
23  which is a message from Ruey Tu to several people and
24  you got a copy.
25      A.  (Reviews document.)  Okay.  I've read it.

Page 161

1       Q.  In looking at the last page of Exhibit 12,
2  do you agree that looks like an e-mail from
3  Liang-Ruey Tu to several people in PPD including
4  yourself?
5       A.  I was copied on the e-mail according to
6  this.  I don't know whether I recall having read it
7  in the past.
8       Q.  And in the first line of the e-mail, she
9  writes, As you probably remember, we left the 00048
10  NDCs for Synthroid active in the First DataBank
11  sys- -- system since we expected potential
12  reimbursement to exist.  Did I read that correctly?
13      A.  Yes.
14      MR. BERLIN:  It -- you read that
15  correctly.  I have an objection to -- first of all,
16  Ruey would be slightly offended, but can you tell me
17  under what -- what topic this is -- this falls?
18      MR. ANDERSON:  Yeah.  I think it falls
19  under 2, 3, 1.  It's got to do with price reporting
20  and Medicaid.
21      MR. BERLIN:  But it's all limited
22  to -- I mean, this is about Synthroid, and every
23  topic is limited to the erythromycins.
24      MR. ANDERSON:  Well, yeah, this is
25  referencing Synthroid, but I don't think it's limited

Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600   -   HOUSTON   (713) 572-8897

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 162

1  to Synthroid.
2        MR. BERLIN: Okay. Objection to
3  form. Is there a question pending actually? I think
4  I'll let the question be answered.
5        There's a -- the question was whether
6  you read it correctly, but I do have an objection to
7  the use of this document as to the scope. Go ahead.
8     Q. (BY MR. ANDERSON): I'm going to rephrase
9  so we'll have a clean record.
10        Mr. Fiske, did I read that sentence
11 correctly?
12        MR. BERLIN: Objection, form, scope.
13    A. Yes.
14    Q. (BY MR. ANDERSON): And what do you
15 understand -- is this a man or a woman, Ruey Tu?
16    A. It's a man.
17    Q. Okay. What do you understand Mr. Tu to be
18 conveying there?
19    A. Synthroid was a product that we acquired
20 from Knoll Pharmaceutical. When we acquired Knoll,
21 we acquired product that was under their labeler code
22 00048. We subsequently packaged the product in our
23 own packaging, and it would have been under the 00074
24 labeler code subsequent to that period of time.
25        He is saying that we left the previous

Page 163

1  NDC labeler-coded product information out there at
2  the various data agencies, didn't discontinue those
3  because we knew that there was product in the
4  marketplace that would be dispensed to patients and
5  we wanted it to be reimbursable under the various
6  programs, whether it be a private payor or otherwise.
7     Q. How would having information such as drug
8  price information published in the First DataBank
9  system enable drug reimbursement to exist?
10        MR. BERLIN: Objection, form.
11 Objection, scope.
12    A. We knew that data published by the various
13 data agencies was used by numerous third-party
14 payors --
15    Q. (BY MR. ANDERSON): And --
16    A. -- from our experience in managed care.
17    Q. And that encompassed the erythromycins as
18 well, correct?
19    A. It may have.
20    Q. There's no reason to believe that the
21 published pricing for the erythromycins that Abbott
22 sent to First DataBank were not also used for
23 reimbursement purposes, as was the case for the other
24 drugs, correct?
25    A. Actually, there -- they may have ver- --

Page 164

1  there may very well be a good reason. You have to
2  keep in mind that the erythromycin products were
3  multisource pharmaceuticals, and often third-party
4  payors, whether it be government agencies or others,
5  don't reimburse based off of an AWP. They actually
6  reimburse based on some MAC formula.
7     Q. Uh-huh.
8     A. That MAC may be based on AWP. It may be
9  based on other factors.
10    Q. Okay. And we --
11    A. Maximum allowable cost, excuse me.
12    Q. Yeah. And we -- we discussed that before
13 in your deposition, so I won't delve into that too
14 much but I'll address your comment.
15        In situations where the drug
16 reimbursement calculation may be lower than the MAC,
17 do you agree that Abbott knew having published
18 pricing in the First DataBank system enabled drug
19 reimbursement by third-party payors to occur?
20        MR. BERLIN: Objection, form.
21 Objection, scope.
22    A. I apologize. I didn't understand your
23 question. I was -- I couldn't follow it.
24    Q. (BY MR. ANDERSON): Okay. I'll rephrase
25 it. In situations where a calculated drug

Page 165

1  reimbursement is less than a MAC, do you agree that
2  Abbott was aware the pricing published by First
3  DataBank enabled third-party payors such as Medicaid
4  to reimburse for Abbott drugs?
5     A. Where pricing reimbursement is less than
6  the MAC, that the AWP formula provided information
7  for them to reimburse for the drugs?
8        MR. BERLIN: Objection. I don't think
9  he --
10    A. I -- I don't know that it makes sense in my
11 mind. I apologize.
12    Q. (BY MR. ANDERSON): Okay. I -- I -- I'll
13 come at it from a slightly different angle.
14        Assuming that the drug reimbursement
15 calculated by a given third-party payor such as a
16 Medicaid program at AWP minus a percentage or
17 wholesale price plus a percentage would result in a
18 reimbursement amount less than the MAC, do you agree
19 Abbott knew that allowing its products to continue to
20 have their prices published in First DataBank's
21 system would, in turn, enable third-party payors to
22 set reimbursement for Abbott drugs?
23        MR. BERLIN: Objection, form.
24 Objection, scope.
25    A. I -- I think the answer is "yes". How they

42 (Pages 162 to 165)

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 166

1   set their reimbursement, etcetera, was their business
2   practice, though.  It's not something that we had any
3   influence over.
4       Q.  (BY MR. ANDERSON): The very specific
5   formula you didn't influence, but the fact that the
6   pricing that was published through First DataBank,
7   for instance, was utilized, you did have an awareness
8   of?
9           MR. BERLIN: Objection, form.
10  Objection, scope.
11      A.  I -- I think I communicated earlier that we
12  were aware that information public by the --
13  published by the various pricing compendia was
14  utilized by third-party payors in their formulas.
15      Q.  (BY MR. ANDERSON): Yes, sir.  And so now,
16  going back to my original line of questions, to the
17  extent Abbott was raising the published WAC prices or
18  raising the published estimated AWPs, then, in turn,
19  Abbott had an awareness that that information would
20  be transmitted to third-party payors such as
21  Medicaid?
22          MR. BERLIN: Objection, form.
23  Objection, scope.
24      A.  The information that we reported to the
25  data agencies was our WAC and our list price.  Any

Page 167

1   changes to our WAC and list price, we did so in good
2   faith with the expectation that that was the
3   information we should be providing.
4           Nobody told us to do anything
5   differently than that, including Kay Morgan who
6   certainly had the opportunity because she knew what
7   our practices were.
8           So did we know that that might result
9   in the pricing compendia publishing a -- a different
10  WAC?  How they use that information, how they
11  determine what an appropriate AWP for the product
12  should be was their business.  That's not something
13  that we influenced.  And who they sold their data to
14  we didn't influence either.
15      Q.  (BY MR. ANDERSON): Okay.  Now, looking at
16  topic number one, Mr. Fiske, do you understand that
17  you've been designated to testify about Abbott's
18  knowledge and understanding of the laws, practices,
19  and policies of state Medicaid agencies regarding
20  reimbursement for Abbott's drug products, including
21  Abbott's knowledge and understanding concerning state
22  Medicaid agencies' use of prices?
23          MR. BERLIN: Objection, form.  It
24  misstates the designation.
25          MR. ANDERSON: Oh, well -- okay.  I

Page 168

1   understand that.  I'll rephrase.
2       Q.  (BY MR. ANDERSON): Sir, have you read
3   topic number 1 before?
4       A.  I have.
5       Q.  Do you understand that you've been
6   designated to testify to that topic with some
7   limitations?
8       A.  Yes, I do.
9       Q.  Okay.  What is Abbott's understanding of
10  state Medicaid agencies' use of published prices from
11  compendia such as First DataBank?
12          MR. BERLIN: Objection, form.
13  Objection, scope.  That is beyond the scope of his
14  designation.  Go ahead.
15      A.  A number of people I spoke with were aware
16  the state Medicaid agencies had reimbursement
17  formulas that were based upon AWP.  In some cases,
18  they had other formulas that may have been based on
19  WAC pricing.  Which specific data agency's
20  information they were using, we weren't privy to.
21      Q.  (BY MR. ANDERSON): Were -- strike that.
22          Was Abbott aware that state Medicaid
23  agencies also utilized published WAC pricing in
24  setting drug reimbursements?
25      A.  I just stated that.

Page 169

1       Q.  Okay.  Well, I thought maybe you had, but I
2   wanted to make double-dog sure.
3       A.  I did.
4       Q.  So in your prior answer, you said AWP and
5   WACs?
6       A.  In some cases, yes.
7       Q.  Okay.  Thank you.  How did Abbott come to
8   that understanding?
9       A.  There are a number of people at Abbott that
10  would have had occasion to know that information and
11  use that information specifically in their job.
12          For example, I told you that I spoke
13  with Dale Johnson, who is our DVP of State Government
14  Affairs, and -- I'll tell you a little story that
15  you'll find quite interesting, I'm sure -- that he
16  had conversation, for example -- their -- their --
17  their job, by the way, was to influence state
18  legislation.  That's what their -- that -- that's
19  not apparent from their title, but that's what their
20  job is, is to try and influence legislation and --
21  and to track it and the impact that it might have on
22  Abbott Laboratories.
23          And around the 2002 time frame,
24  numerous states were implementing supplemental rebate
25  agreements with manufacturers, demanding that they

Page 170

1  pay supplemental rebates in order for their products
2  to be reimbursable under the Medicaid program and
3  includable on a PDL, preferred drug list.
4       Dale Johnson had a con- -- a
5  conversation with an administrator from the state of
6  California specifically related to generic drug
7  reimbursement -- and it seems to me I remember
8  numbers that he even threw out there.
9       Anyway, this -- this state
10  administrator in the Medicaid program out there, Dale
11  was telling them that when they're reimbursing at AWP
12  minus seven percent, they're reimbursing at far too
13  high a level for generic pharmaceuticals; that the
14  actual acquisition price is probably much lower than
15  that.
16       The state official responded by
17  saying, "Well, we can't cut the -- the pharmacy
18  reimbursement number; they wouldn't be making enough
19  of a profit."
20  Q.  When did Dale relay this conversation to
21  you?
22  A.  I believe it was Monday of last week.
23  Q.  Prior to Monday of last week, were you
24  aware of any communications such as that?
25  A.  No.

Page 171

1  Q.  Did -- to your knowledge --
2  A.  There -- I'm sorry.
3  Q.  To your knowledge, has Dale Johnson ever
4  conveyed that type of information to anybody in
5  Abbott who's responsible for setting or publishing
6  prices?
7  A.  No.  In -- in fact, I had a conversation
8  with him specifically did he -- did he contact
9  anybody in our department -- he had -- he had not
10  talked with me specifically, but people like Debra
11  DeYoung, who was senior manager in my group for many
12  years responsible for government programs, etcetera.
13       The people that I talked with had
14  knowledge about things that they used in the
15  performance of their job responsibilities.  It wasn't
16  information that they communicated to others that
17  they didn't -- necessarily knew even had a need or
18  use for that information.
19       Another example would have been --
20  I -- so this is going back to the question you asked
21  me earlier because I didn't finish my answer.
22       John King who was a Regional Sales
23  Manager for the Government Reimbursement -- it's the
24  GRP -- sorry, Group Reimbursement and Policy and
25  Long-Term Care Group.  It's a little bit of a

Page 172

1  misnomer.  Their primary responsibility, I think I
2  explained to you earlier on was, re- -- re- -- not
3  reimbursement issues, I'm sorry, Synthroid
4  substitution issues at retail.
5       They had issues regarding Hydrocodone
6  classification as a -- a Schedule III versus a
7  Schedule II drug.  It was basically to influence
8  things that might improve utilization of our
9  products.  But more recently, since 2002, they're
10  involved in negotiation of state supplemental
11  rebates.
12       And of course, the individuals that
13  actually call upon the states may -- might have
14  occasion to know the actual reimbursement formulas
15  for those states, but they don't communicate them
16  generally in-house other than to the extent that if
17  we're bidding for a PDL, the state itself might
18  communicate that formula.
19       So -- you were asking do we have
20  knowledge of the state formulas.  That's the extent
21  of our knowledge, I think, for the most part; not the
22  formulas, but that they used AWP as a reference point
23  because me- -- a number of the formulas reference
24  AWP.  I apologize for the long answer.
25  Q.  No, I understand.  Other than this

Page 173

1  conversation that Mr. Johnson relayed to you on
2  Monday, is there any other information that you
3  gathered about state Medicaid programs' position on
4  generic drug reimbursement?
5  A.  No.
6  Q.  Did you gather any information from Ginny
7  Tobiason about state Medicaid programs' drug
8  reimbursement?
9  A.  No.  As I explained to you, when I spoke
10  with Ginny, her title being Director of
11  Reimbursement, I thought that she would have much
12  more familiarity with the Medicaid program, but her
13  focus was on the Medicare program and Part B
14  reimbursement for Part B drugs which are primarily
15  injectables and infusion drugs --
16  Q.  Uh-huh.
17  A.  -- as well as devices.
18  Q.  Other than what you've described with
19  respect to Martha Schrader, did any of the Abbott
20  personnel to your knowledge review OIG reports
21  pertaining to state Medicaid drug reimbursement?
22  A.  Not to my knowledge.
23  Q.  Did they review any GAO, general accounting
24  office, reports pertaining to state Medicaid
25  reimbursement?

44 (Pages 170 to 173)

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 174

1    A.  They may have.  I don't know.
2    Q.  Do you -- strike that.
3        Does Abbott have an understanding of
4  state Medicaid reimbursement for drugs typically
5  being comprised of two components; one component
6  being drug cost reimbursement and the other component
7  being dispensing fees?
8    A.  Yes.
9    Q.  Does Abbott have an understanding about
10 what the regulations say concerning the drug cost
11 reimbursement?
12       MR. BERLIN:  A- -- a- -- a- -- again,
13 as a sort of standing objection to scope that his
14 answers are limited to the investigation that he
15 pursued.
16       MR. ANDERSON:  Okay.
17    A.  I -- I don't know what you're actually
18 asking me.
19    Q.  (BY MR. ANDERSON):  I'll -- I'll be a
20 little more specific.  Are -- is Abbott familiar with
21 a concept known as estimated acquisition cost in the
22 context of drug reimbursement?
23    A.  I've heard that term.
24    Q.  And what's your understanding of that term?
25    A.  It's the estimated acquisition cost for the

Page 175

1  provider, meaning what did they actually pay for the
2  product; the provider being the entity that's
3  dispensing the product to the patient.
4    Q.  And does Abbott understand that one
5  component of Medicaid drug reimbursement is estimated
6  acquisition cost?
7    A.  Yes.  It may be.
8    Q.  What is Abbott's understanding as to how
9  Medicaid drug reimbursement programs go about
10 estimating acquisition cost?
11       MR. BERLIN:  Same objection.
12    A.  It's my understanding that in some cases,
13 states actually do surveys of retail pharmacies.  In
14 other cases, they might rely on data that's reported
15 by data agencies.
16    Q.  (BY MR. ANDERSON):  For the erythromycin
17 products, how does the published pricing such as AWP
18 and WAC pricing relate to the prices paid by the
19 pharmacies?
20    A.  The price -- the WAC price and the list
21 price are prices that are generally available in the
22 marketplace.  It's the price that we always reported
23 to the data agencies.
24       MR. ANDERSON:  Objection,
25 nonresponsive.

Page 176

1    Q.  (BY MR. ANDERSON):  I know y'all have
2  always reported it.  I'm asking a different
3  question.
4        What, if any, relationship exists
5  between the published WAC prices, the published list
6  prices, and the published AWP prices for the
7  erythromycin products from 1994 to the present, and
8  the prices that pharmacies actually pay for those
9  drugs?
10    A.  It was the acquisition cost for those
11 pharmacies that paid WAC and list price for it.
12    Q.  Yes, sir.  But I believe you've testified
13 at length that those occasions were relatively rare,
14 correct?
15    A.  I said that they were five to ten percent
16 of customers that purchased at that price.
17    Q.  Right.  Okay.  What about for the other 90
18 to 95 percent of the pr- -- pharmacies?
19    A.  Their acquisition price would have been
20 whatever they paid for the product.
21    Q.  Yes, sir.  In those contexts, how do the
22 published prices on the erythromycins from 1994 to
23 the present relate to the prices paid by the
24 pharmacies?
25       MR. BERLIN:  Objection, form.

Page 177

1    A.  WAC prices are always different than
2  contract prices.
3    Q.  (BY MR. ANDERSON):  So is the answer they
4  don't relate?
5       MR. BERLIN:  Objection, form.
6    A.  They're higher.
7    Q.  (BY MR. ANDERSON):  Other than the --
8    A.  They're different.
9    Q.  Eith- -- yes, sir.  Other than being
10 higher, is there some known relationship or markup or
11 some other way to ascertain from the published WAC
12 price and the published AWP price for the
13 erythromycins what most of the pharmacies are
14 actually paying for the drugs?
15       MR. BERLIN:  Objection, form.
16    A.  No.
17    Q.  (BY MR. ANDERSON):  How, if at all, would
18 state Medicaid agencies be able to estimate the
19 acquisition cost of pharmacies for the erythromycins
20 based on Abbott's published WAC price or AWP price?
21    A.  They could use surveys of retail pharmacies
22 like some of the states did.
23    Q.  (BY MR. ANDERSON):  Okay.  Other than
24 surveys of pharmacy invoices, how, if at all, could
25 state Medicaid programs estimate providers'

Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600   -   HOUSTON   (713) 572-8897

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 178

1    acquisition costs based on the published pricing?
2         MR. BERLIN: Hold on.  Objection,
3    form, foundation.
4         A.  I can't think of another way.  They -- they
5    could have done the surveys as I suggest that other
6    states were doing it.
7         Q.  (BY MR. ANDERSON):  With respect to the --
8    the dispensing fees, does -- what is Abbott's
9    understanding of how state Medicaid programs
10   calculate or ascertain dispensing fees?
11        MR. BERLIN: Objection, form, scope.
12        A.  I don't think anybody has an understanding
13   of how they calculate them.  They're set all over the
14   place.
15        Q.  (BY MR. ANDERSON):  Does Abbott --
16        A.  They vary significantly by state, as do the
17   reimbursement formulas for the drugs themselves.
18        Q.  Does Abbott have any understanding of --
19   strike that.
20             When Abbott sets any of its
21   erythromycin prices that are published by Abbott,
22   such as the WAC prices, does Abbott consider the
23   adequacy of the dispensing fees paid by Medicaid
24   programs?
25        MR. BERLIN: Objection, form.

Page 179

1    Objection, scope.
2         A.  It's not something we even think about.
3         Q.  (BY MR. ANDERSON):  How do Medicaid
4    dispensing fees relate to private insurance
5    dispensing fees?
6         MR. BERLIN: Objection, form.
7    Objection, scope.
8         A.  I don't know.
9         Q.  (BY MR. ANDERSON):  Is it true that managed
10   care or private insurance dispensing fees are
11   typically much less than Medicaid dispensing fees?
12        MR. BERLIN: Objection, form.
13   Objection, scope.
14        A.  I've only heard that or read that in
15   articles since DRA 2005 when all of the retail
16   pharmacists were complaining about all of changes in
17   potential reimbursement.
18        Q.  (BY MR. ANDERSON):  And when you read that,
19   you gained an understanding that most private
20   insurance drug reimbursement dispensing fees are less
21   than Medicaid dispensing fees, correct?
22        MR. BERLIN: Objection, form.
23   Objection, scope.
24        A.  That is correct.
25        Q.  (BY MR. ANDERSON):  Did you gain an

Page 180

1    understanding of how Medicaid drug cost reimbursement
2    relates to private insurance reimbursement?
3         MR. BERLIN: Objection, form.
4    Objection, scope.
5         A.  I don't know exactly when I became aware of
6    this, but, you know, I -- I -- most of my contracting
7    experience for many years was with managed care.
8             We knew that some of the more
9    restrictive or -- what else -- I guess I'll call them
10   larger PBMs, more powerful because of their size,
11   were reimbursing at significant discounts, discounts
12   as deep as AWP minus 15, and I've heard of AWP minus
13   17 reimbursement levels even.
14             I have heard of state reimbursement
15   levels of AWP minus five, and I've often thought it's
16   a misuse of government funding.  Clearly, managed
17   care entities are doing a much better job of
18   negotiating with retail pharmacy than our own
19   government entities are.
20        Q.  (BY MR. ANDERSON):  So to your knowledge,
21   as the Abbott corporate representative, the drug cost
22   reimbursements paid by Medicaid are typically higher
23   than the drug cost reimbursements typically paid by
24   private managed care insurance pro- -- reimbursers?
25        A.  Especially when you combine the two, both

Page 181

1    the reimbursement plus the dispensing fee.
2         Q.  Right.  Because the dispensing fees on the
3    private side are actually less, and so are the drug
4    cost reimbursements?
5         A.  Yes.  But it probably goes back to the
6    comment by the guy from California that they wanted
7    to give the pharmacists greater profits.
8         MR. ANDERSON: Objection,
9    nonresponsive.
10        Q.  (BY MR. ANDERSON):  Mr. Fiske, have you
11   become aware of any Abbott personnel who stayed
12   abreast of Medicaid regulations or requirements?
13        A.  Not for reimbursement purposes.  I --
14   people in my department kept abreast of them for
15   government reporting purposes of AMBP and the
16   calculations of those metrics, including myself.
17        Q.  With respect to drug reimbursement by
18   Medicaid programs, are you aware of any individuals
19   who -- that reviewed or otherwise considered
20   pertinent Medicaid regulations?
21        MR. ANDERSON: I'm sorry.  Can I have
22   that read back, please?
23        MR. ANDERSON: I'll rephrase it.
24        Q.  (BY MR. ANDERSON):  With respect to drug
25   reimbursement, sir, are you aware of anybody at

46 (Pages 178 to 181)

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 182

1    Abbott reviewing pertinent Medicaid regulations?
2        A.   Not reviewing regulations.  Martha
3    Schrader, in -- in the performance of her job
4    responsibilities, would monitor proposed changes to
5    legislation, both as it affected metrics that we
6    would calculate, pay rebates on, etcetera, and the
7    potential financial impact to us, but she would also
8    monitor potential changes to reimbursement formulas.
9        Q.   Is Martha based in Washington, D.C.?
10       A.   No, she's not.
11       Q.   Is -- is the group that's based in
12   Washington, D.C. part of her chain of command?
13       A.   She has an indirect reporting relationship
14   with -- with the VP of Government Affairs -- the
15   Federal VP of Government Affairs.
16       Q.   Well -- and Martha is the Divisional VP for
17   PPD?
18       A.   That is correct.
19       Q.   I see.  And so she's based in --
20       A.   La-- --
21       Q.   -- Abbott Park?
22       A.   Yes.
23       Q.   Okay.  And, in turn, she's reporting to the
24   same corporate leadership that the individuals based
25   in Washington, D.C. that work for Abbott are

Page 183

1    reporting to?
2        A.   No, I'm sorry.  Martha reports to Sayed
3    Matahari who is one of the vice presidents who
4    reports to our division president.  But she has a
5    dotted line relationship with Elaine Leavenworth who
6    is the -- I -- I don't know -- Corporate Vice
7    President of Government Affairs.  I -- I probably
8    don't have the right title, but...
9        Q.   I see.  Okay.  So there is a connection
10   there between Martha at the PPD level and Elaine
11   Leavenworth who's based in Washington?
12       A.   Correct.
13       Q.   Did you learn of any efforts by Abbott
14   personnel, including the personnel in Washington,
15   D.C., to stay abreast of Medicaid rules,
16   requirements, and regulations concerning drug
17   reimbursement?
18            MR. BERLIN:  Objection, form, asked
19   and answered.
20       A.   Only to the extent that -- as I explained,
21   that I know that Tom Conroy who used to work for
22   Martha Schrader monitored proposed changes in
23   legislation, and it was part of this periodic
24   newsletter that he would issue just informing people
25   of potential changes.

Page 184

1        Q.   (BY MR. ANDERSON):  And Tom began working
2    for her back sometime in or after 2000, correct?
3        A.   Yeah.  I don't know exactly when he
4    started, and he's been gone for about two years --
5        Q.   Okay.
6        A.   -- and there's nobody that does that today.
7        Q.   And prior to Tom's working for Martha,
8    nobody else was doing any kind of circulation of drug
9    reimbursement information, correct?
10       A.   I -- I wouldn't say that exactly.  There --
11   there's some people that just took it upon themselves
12   to do some ad hoc -- if they saw something in the
13   pink sheet, they'd -- they'd share it with others,
14   etcetera.  So I can't say that there weren't others
15   that did that, but it was sort of people doing it on
16   their own.
17       Q.   Why --
18       A.   It wasn't part of their job
19   responsibilities that I'm aware of.
20       Q.   Why would Abbott personnel have taken an
21   interest in pink sheet articles about drug
22   reimbursement?
23            MR. BERLIN:  Objection, form.
24   Objection, scope.
25       Q.   (BY MR. ANDERSON):  I'll be more specific.

Page 185

1    Why were Abbott personnel, if at all, interested in
2    information about Medicaid drug reimbursement?
3            MR. BERLIN:  Same objection.
4        A.   We worked in the drug industry.  We're
5    interested in things that affect the marketplace.
6    A -- we -- many of us read articles of interest.
7    Medicaid is -- is one of the areas of interest.
8    There- -- there's many areas of interest.
9            I read articles about competitors of
10   ours that don't even have drugs that compete with
11   ours just because I find it interesting.  And -- and
12   some of those people that find it interesting share
13   the same information with others who may not find it
14   so interesting.
15       Q.   (BY MR. ANDERSON):  Have -- have you ever
16   known of any Abbott personnel reviewing any OIG
17   guidelines that have been issued about drug price
18   reporting or drug reimbursement?
19            MR. BERLIN:  Hold on a second,
20   please.  Okay.  Go ahead.
21       A.   Could you ask the question again, please?
22       Q.   (BY MR. ANDERSON):  Sure.  Have you become
23   aware of any Abbott personnel reviewing guidelines
24   issued by the Office of Inspector General regarding
25   drug price reporting or drug reimbursement?

Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600   -   HOUSTON   (713) 572-8897

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 186

1     A.  Yes.
2     Q.  What -- what have you learned in that
3  regard?
4     A.  There are people in our legal department
5  that do that.
6     Q.  Okay.  Outside of Abbott's legal
7  department, are you aware of any Abbott business
8  personnel being aware of or otherwise reviewing any
9  OIG guidelines concerning drug price reporting or
10 drug reimbursement?
11    A.  If it's related to -- I don't know.  I
12 don't want to speculate.  I'm sorry.
13    Q.  Do you know whether or not the OIG in the
14 past four or five years issued guidelines concerning
15 how drug manufacturers should set or report prices?
16    A.  No.  Are you talking WAC and list price?
17 Or are you talking about AMP and the reporting of
18 AMP, MVP?
19    Q.  No.  This -- it's doesn't necessar- -- no,
20 it's not limited to AMP.  It's regarding published
21 pricing, including WACs, AWPs, etcetera.
22       Are you aware of any guidelines that
23 have been issued that regard?
24    A.  Not that I recall.
25    Q.  Okay.  Shifting now to topic number 4,

Page 187

1  Mr. Fiske.
2     A.  (Reviews document.)
3     Q.  Have -- have you prepared to testify in
4  response to topic number 4?
5     A.  Yes, I have.
6     MR. BERLIN:  As -- as limited, right?
7  That's your -- we've --
8     MR. ANDERSON:  Yeah, I understand --
9     MR. BERLIN:  Same -- same --
10    MR. ANDERSON:  -- y'all have placed a
11 limitation on the designation.  I'm not -- you know,
12 throughout this deposition, I'm not wanting to argue
13 with you about the --
14    MR. BERLIN:  No, no, I'm not wanting
15 to argue either.
16    MR. ANDERSON:  Yeah.
17    MR. BERLIN:  It's just -- you said
18 that in your last question.
19    MR. ANDERSON:  Oh --
20    MR. BERLIN:  So --
21    MR. ANDERSON:  -- yeah.  Well -- yeah,
22 I'm not laying a trap there.  I -- you know, you have
23 your position, I have mine.  I'm -- we're not going
24 to litigate the -- the designations, but I appreciate
25 your point.

Page 188

1     Q.  (BY MR. ANDERSON):  What information were
2  you able to gather with respect to topic number 4?
3     A.  Abbott provided information to the
4  government since 1991 regarding average manufacture
5  price.
6        If there was any concern that the AWPs
7  that were reported by the pricing compendia didn't
8  represent what providers may have been paying for the
9  product, they had the information at hand to
10 determine what a -- what a close approximation of
11 that number was since AMP is, in fact, a calculation
12 of manufacturers' sales to wholesalers and/or
13 retailers of a -- to wholesalers for resell in the
14 retail class of trade, net of any discounts, rebates,
15 and any other price concessions.
16       In addition, I think I shared with you
17 the fact that there were -- Martha Schrader was aware
18 of OIG reports that informed Health and Human
19 Services -- and the states would have had access to
20 the same information -- that AWPs that were reported
21 by the data vendors didn't represent actual
22 acquisition costs.
23       So I think the information was out
24 there.  Nobody asked us for anything different than
25 that.  Nobody advised us that we should be reporting

Page 189

1  something different to the data agencies.
2        We, in fact, always acted in good
3  faith in terms of the information that we reported to
4  the data agencies on -- and -- and, in fact, you
5  know, the WAC and the list prices that we developed
6  and reported were -- were, like I said, done so in
7  good faith with no intent to influence
8  reimbursement.
9        I told you that we didn't even
10 consider reimbursement issues when we reported those
11 products to the data agencies.
12    Q.  Did -- where did you gain that information?
13    A.  Which piece of that?
14    Q.  All -- all of it.  Did -- is that based on
15 your personal experience, or did you --
16    A.  I told you part of it was based on personal
17 experience.  Part of it was based on my conversations
18 with Martha Schrader.
19    Q.  Right.  And we discussed those earlier; you
20 learned of those recently -- you learned of her
21 review of an OIG report recently.
22       Other than conversations with Martha
23 Schrader and your own personal experience, do you
24 have other sources for that information?
25    A.  Well, some of it -- no, that's it.  Yes,

48 (Pages 186 to 189)

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 190

1   that's it.
2       Q.   Have you any information that Abbott, from
3   1991 until 2005, reported AMP prices for the
4   erythromycin drugs to any state Medicaid program?
5       A.   I believe that AMPs are reported to four
6   or -- I think it's four state Medicaid programs.
7       Q.   What do you mean by that "for"?
8       A.   Pardon me?
9           MR. BERLIN:  He -- what does he mean
10  by the number four?
11      A.   Didn't you -- didn't you ask me what -- if
12  we reported them, and I said I think we report them
13  to four state Medicaid programs.
14      Q.   (BY MR. ANDERSON):  Oh, "to four".  I
15  thought you said --
16      A.   I'm sorry.
17      Q.   -- for, like f-o-r.
18      A.   Oh, I'm sorry.  No, to the number four --
19      Q.   Okay.  When --
20      A.   -- state Medicaid agencies.
21      Q.   Whi- -- which -- which state Medicaid
22  programs?
23      A.   Texas; Maine, I believe; Vermont, I
24  believe.  And I apologize, the last one slips my
25  memory at this point in time.

Page 191

1       Q.   And do you know when those four state
2   Medicaid programs began receiving AMP information
3   from Abbott?
4       A.   I don't know that number off the top of my
5   head, but it's based on requirements from the State,
6   so it could be easily ascertained.
7       Q.   Is it true that as a general matter, the
8   requirements to send state Medicaid programs AMP
9   information directly have only come about in the past
10  four or five years?
11      A.   I -- I think that's a fair statement.  But
12  you have to keep in mind, we did report it to CMS and
13  they could have disbursed that information to the
14  states themselves.
15      Q.   Well, that was going to be my next
16  question.  From 1991 until sometime 2003 or so,
17  Abbott was only reporting AMP prices for the
18  erythromycin products to CMS, correct?
19      A.   That's correct.
20      Q.   Do you have any information to support your
21  testimony that CMS could have shared those AMPs with
22  the states?
23      A.   If -- if I recall, the information was
24  supposed to be confidential and couldn't be made
25  public, but it could be shared with the states.  I --

Page 192

1   I -- I can't remember exactly where it is in the
2   original -- whe- -- whether it's the law or the
3   guidance, but I recall seeing this.
4       Q.   Do you, as Abbott's corporate
5   representative, have any information or knowledge
6   that CMS did, in fact, ever share an AMP price on the
7   erythromycins to any state Medicaid program?
8       A.   I don't have that knowledge.  I don't know
9   if the states ever asked for it.
10      Q.   Other than the AMP information, what other
11  information did you gather with respect to topic
12  number 4?
13          MR. BERLIN:  Well, I -- objection,
14  asked and answered.  He -- he gave you a fairly
15  detailed answer that went well beyond --
16          MR. ANDERSON:  Okay.
17          MR. BERLIN:  -- AMP.
18          MR. ANDERSON:  Okay.  I'll try to
19  address that.
20      Q.   (BY MR. ANDERSON):  In- -- other than the
21  AMP information that we just discussed and the
22  discussion you had with Martha Schrader, what other
23  information did you gather as Abbott's corporate
24  representative with respect to topic number 4?
25          MR. BERLIN:  Still same objection.

Page 193

1   And if you want to --
2           MR. ANDERSON:  I --
3           MR. BERLIN:  Well, it's --
4           MR. ANDERSON:  All right.
5           MR. BERLIN:  -- the same -- the
6   same -- there's an easy way to get around it, but
7   it's the same objection.  He gave a long list that
8   you're not incorporating.
9       A.   And then -- and then I gave the other
10  example also about Dale John's discussions with the
11  State of California, not specifically related to
12  Abbott's AWPs but just an A- -- a discussion in
13  general about the fact that reimbursement rates based
14  on the AWP did not necessarily reflect the
15  acquisition costs by retail pharmacies for especially
16  generic products.
17      Q.   (BY MR. ANDERSON):  Did Dale mention to you
18  that he shared that information with anyone at
19  Abbott, other than yourself recently?
20      A.   He didn't.  He didn't mention that he did.
21      Q.   Do you have any reason to believe that
22  anyone at Abbott ever set a price for any of their
23  erythromycin drugs based on Dale Johnson's
24  conversation with California Medicaid?
25      A.   No reason to believe that at all.

Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600   -   HOUSTON   (713) 572-8897

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 194

1      Q.  Has -- is there any other information, sir,
2  that you gathered, other than what we just discussed
3  with respect to topic number 4?
4      A.  Not that I recall.
5      Q.  Okay.  Now moving to topic number 5.  Do
6  you understand you've been designated to testify, at
7  least in part, to topic number 5?
8      A.  (Reviews document.)  Yes.
9      Q.  What information ha- -- did you gather on
10  behalf of Abbott in respect to topic number 5?
11      A.  Nobody at Abbott could have had the
12  understanding that the U.S. government had knowledge
13  of Abbott's causing the publication of wholesale
14  prices higher than wholesale prices generally and
15  currently billed because we didn't have such a
16  practice.
17         Most of the people I talked to had no
18  knowledge of what we reported to the government.
19  None of them was aware that -- of -- of what the
20  government knew about what we were reporting, where
21  they were getting their information from, etcetera.
22         I told you that the only awareness was
23  people knew that reimbursement was based off of AWP
24  in some cases, and that's the extent of it.
25      Q.  Prior to the discontinuation of base deal

Page 195

1  prices in July of 2003, did any Abbott personnel have
2  any reason to believe that the government approved of
3  Abbott reporting WAC prices that were not the prices
4  typically billed wholesalers on the erythromycin
5  drugs?
6         MR. BERLIN:  Objection, form.
7      A.  The pricing that we reported to the pricing
8  compendia were the WAC and the list price -- the
9  published WAC and list price, the -- the WAC price
10  before any discounts to any of our customers,
11  including the wholesalers.  That was our practice.
12  We always acted in good faith by doing that.  Nobody
13  ever told us that we should do anything differently
14  than that.
15         MR. ANDERSON:  Objection,
16  nonresponsive.
17      Q.  (BY MR. ANDERSON)  I appreciate your
18  testimony on that and you've testified to that a
19  couple of times, but what I'm asking is:  Did Abbott
20  have any knowledge that the government approved of
21  Abbott causing WAC prices to be published for the
22  erythromycins from January of '94 up through June of
23  2003 that were not typically invoiced wholesalers?
24      A.  That's a --
25         MR. BERLIN:  Hold on --

Page 196

1      A.  -- misrepresentation --
2         MR. BERLIN:  Hold on.
3      A.  -- of the facts.
4         MR. BERLIN:  Hold --
5         THE WITNESS:  I'm sorry.
6         MR. BERLIN:  Hold on -- hold on a
7  second.  Sorry.  Everyone wants to jump in.
8  I -- I'm going to object to form and
9  to the scope.  I mean, in fairness to you, he did
10  kind of answer the original when you started to ask
11  him, so hopefully both of you will focus on what the
12  actual designation is.  So -- I just leave it at
13  that.
14      A.  It's a misrepresentation.  First of all, we
15  didn't cause the publication of AWPs.
16      Q.  (BY MR. ANDERSON)  Oh, I didn't --
17      A.  We reported --
18      Q.  I'm sorry.  I -- if you heard "AWPs," let
19  me interject.  I --
20      A.  O- --
21      Q.  I --
22      A.  You're saying --
23      Q.  I said WAC.
24      A.  Okay.  And -- and we didn't cause the
25  publication of WAC prices that were not generally

Page 197

1  available in the marketplace.
2         The WAC price and the list price that
3  we reported to the data agencies was a price that
4  customers paid for our products.  It was a price that
5  was generally available in the marketplace.  There
6  was no intent to misrepresent anything.
7      Q.  Mr. Fiske, I understand your testimony on
8  that, but I didn't ask about generally available.  I
9  said generally paid.
10         And I think you've agreed that before
11  July of 2003, the WAC prices were not the prices
12  generally paid by wholesalers?
13      A.  They were the prices that were generally
14  paid by the purchasers that -- that paid at WAC.
15  Prices that were generally paid by the purchasers
16  that purchased at base deal price were generally paid
17  at base deal price.
18      Q.  Right.  Well, I mean, if you look at the
19  erythromycin drugs and then, in turn, you look at the
20  class of customers known as "wholesalers," prior to
21  July of 2003, the Ery drugs were selling to the
22  wholesalers most of the time at a price that was
23  lower than WAC, right?
24      A.  There were more purchases at base deal
25  prices than there were at WAC.

50 (Pages 194 to 197)

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 198

1    Q.  Right.
2    A.  I'll --
3    Q.  A lot more?
4    A.  -- agree to that.
5         MR. BERLIN:  Objection, form.
6    Q.  (BY MR. ANDERSON):  It was only about five
7  or ten percent that were not, correct?
8    A.  But that was our WAC price, and that was
9  our list price.
10   Q.  It was --
11   A.  And the price -- we were --
12   Q.  What made it your WAC price?
13   A.  "WAC" is a defined term.  It is our price
14  to wholesalers before any discounts -- without any
15  discounts.  It was our published WAC price.  It was
16  our case quantity discount price.  There were
17  customers that always paid that price.  It was a
18  price that was generally available in the
19  marketplace.  It's a real price.
20   Q.  Who defined it?
21   A.  Pardon me?
22   Q.  You said it was a defined term.  Who
23  defined it?
24   A.  It -- it's defined in Mick Kolassa's book.
25  It's a price that everybody at Abbott understood as

Page 199

1  the price that we were su- -- supposed to be
2  reporting to the data agencies.
3    Q.  Because it was, quote, "WAC"?
4    A.  Yes.  And, in fact -- let's go back.  I
5  told you that -- the -- about the conversation with
6  Kay Morgan and Mark Turon.  Who would have been
7  better prepared to inform us if we weren't reporting
8  what we should have been than her?  And she didn't
9  tell us that we should be reporting anything
10  different than we had.
11   Q.  Did -- would it bear upon your view of how
12  Abbott reported its prices at all if most drug
13  companies, when they report their prices to the
14  compendia, actually report the WAC that's on the
15  invoices to the wholesaler?
16        MR. BERLIN:  Objection, form.
17   A.  Without specific guidance from either the
18  government or -- and -- and probably I'll -- I'll
19  leave it there -- that we should be reporting
20  something different than we are, I don't know that we
21  would change our -- our reporting practices.
22        We've always reported the same thing,
23  for many, many years, for decades.  Nobody has re- --
24  told us that we re- -- should report anything
25  different than we have.  There's been many

Page 200

1  opportunities for people to have seen that there are
2  such differences.
3         We talked about HCFA being able to see
4  what our AMP price is relative to the AWPs that are
5  reported by the data agencies.  Nobody has told us to
6  report anything differently than we did.
7         We were acting in good faith reporting
8  what we thought we should report.
9    Q.  (BY MR. ANDERSON):  You know Abbott has
10  been sued by lots of states, right?
11   A.  Being sued doesn't mean you've done
12  anything wrong.
13   Q.  But it -- do -- you'll agree with me that
14  it means the states aren't happy with what you're
15  reporting, won't you?
16        MR. BERLIN:  No.  I'm sorry.  That's
17  just -- I didn't mean that.  That slipped out.
18  Objection, form.
19   A.  I can't comment.
20   Q.  (BY MR. ANDERSON):  What?
21   A.  I can't comment.
22   Q.  Well, no, I'm being serious.  You say that
23  nobody has ever told you to report any differently.
24  Doesn't the fact that many states have sued Abbott
25  indicate to you that they're not happy with the way

Page 201

1  Abbott is reporting its prices?
2    A.  It means they think there's a chance to try
3  and get some money out of a company.  That's all it
4  means.
5    Q.  Why do you say that?
6    A.  Because that's what I believe.
7    Q.  You don't think it really has anything to
8  do with the relative accuracy of the published prices
9  of Abbott?
10   A.  I don't think that --
11        MR. BERLIN:  Hold on.  First -- first
12  of all, this -- this is -- I'm going to object to
13  scope, but you can go ahead and cross-examine him on
14  this if you want.
15   A.  I don't think it implies that there's any
16  wrongdoing on the part of manufacturers.  There may
17  have been on the part of some, but not us.  We acted
18  in good faith when we were reporting the information
19  that we did.
20   Q.  (BY MR. ANDERSON):  You mentioned that
21  there was a -- this definition of "WAC".  Where is
22  it?
23        MR. BERLIN:  Objection, form, asked
24  and answered.
25   Q.  (BY MR. ANDERSON):  Other than Mick

51 (Pages 198 to 201)

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 202

1  Kolassa's book.
2      A.  It was also the understood definition of
3  "WAC" for as long as I've been with Abbott within
4  the Pricing Department.  I do- -- I don't know about
5  it before I came to Pricing.
6      Q.  Okay.  Well, let's talk about, for
7  instance, Abbott's own drugs, like Biaxin, for
8  instance.
9          Will you agree that the way Abbott
10 invoiced wholesalers for the erythromycins prior to
11 July of 2003 was different than the way it invoiced
12 wholesalers for most of the PPD drugs like Biaxin?
13         MR. BERLIN:  Objection, form.
14     A.  No.
15     Q.  (BY MR. ANDERSON):  Why not?
16     A.  We invoiced wholesalers for the WAC price
17 if they were not buying at the deal price, and if
18 they were buying at the deal price, they got the
19 other price.
20     Q.  And it --
21     A.  I told you that we had deal pricing on
22 products when they first launched into the
23 marketplace.  Wholesalers were invoiced at that deal
24 pricing when the products first launched into the
25 marketplace.

Page 203

1      Q.  But as it turns out, the only drugs that
2  had deal prices in place for years after years were
3  primarily the erythromycins, right?
4      A.  That was a contract offer that was
5  available to them --
6      Q.  Right.
7      A.  -- if they took advantage of it.
8      Q.  And the Erys were unique in that regard,
9  weren't they?
10     A.  That was the only product that we offered
11 base deal pricing on, yes.
12     Q.  And will you agree that ultimately the
13 existence of those lower wholesale invoice prices on
14 the Erys causes the way that Ery WACs were published
15 to be different than the way they were published for
16 all the other drugs?
17         MR. BERLIN:  Objection, form.
18     A.  No, I don't agree with that.
19     Q.  (BY MR. ANDERSON):  Will you agree that to
20 the extent the WAC prices that are published on all
21 the other Abbott drugs do reflect what wholesalers
22 are actually being invoiced and actually paying, but
23 they don't for the Erys because only five to ten
24 percent of the time the WAC is used, that could be
25 misleading?

Page 204

1          MR. BERLIN:  Ob- --- objection, form.
2      A.  The pricing that we reported to the
3  operating compendia was a price that was always
4  available and, in fact, taken advantage of.
5      Q.  (BY MR. ANDERSON):  Why -- why do you focus
6  on the word "available"?
7          MR. BERLIN:  Objection, form.
8      A.  It's a real price.  We reported a real
9  price which is exactly what we thought we were
10 supposed to report, the WAC and the list price.  The
11 other price was a contract price.  We don't
12 reprice -- we don't report contract pricing to
13 pricing compendia.  It's private information that we
14 do not want made public.
15     Q.  (BY MR. ANDERSON):  Is there any regulatory
16 basis or any other basis that you're aware of as
17 Abbott's corporate representative that a price merely
18 needs to be available in order for it to be
19 published?
20         MR. BERLIN:  Can I -- I'm sorry.  Can
21 I have that read back, please?
22         (Requested testimony read back.)
23     A.  It -- the price was a real price.  It was a
24 price that we sold product at.  I don't understand
25 the concept that you're trying to -- I don't know

Page 205

1  what you're asking me.
2      Q.  (BY MR. ANDERSON):  Let me come at it this
3  way --
4      A.  Our WAC pricing and our list pricing for
5  Ery was a real price.  We sold product at that
6  price.  We made margin -- higher margin by adding
7  that price out there in the marketplace.
8      Q.  Is it important at all, with respect to the
9  publication of a price, for Abbott to consider the
10 frequency with which it's actually selling at that
11 price?
12     A.  I -- I don't know that it's relevant.
13     Q.  In what way would it not be relevant to the
14 relative accuracy of the pricing representation?
15     A.  I'm not aware of a document that tells me
16 what I'm supposed to report.  What we reported is
17 what we always re- --- have reported, and nobody has
18 told us to report anything differently.
19         So all of the questions you're asking
20 are, like, suppositions as opposed to -- or
21 speculative answers on my part, and I'm not going to
22 speculate.
23         I'm going to tell you what we reported
24 and why we reported it.  We reported it because we
25 believed that that was what we were supposed to

Page 206

1  report, and nobody asked us for anything different
2  than that.
3       Q.  Have you reviewed Mick Kolassa's definition
4  of "WAC" in the book that he published back in the
5  early '90s recently?
6       A.  Probably as recently as yesterday.
7       Q.  And -- and when you reviewed it yesterday,
8  can you -- can you recall literally what it says?
9       A.  I -- I think it says that it is the
10  manufacturer's price to wholesalers before any
11  discounts.
12       Q.  And what is --
13       A.  It's not for word -- that's not verbatim,
14  but that's what it says I believe.
15       Q.  And -- and -- and I'm aware also -- well,
16  I'll -- I'll leave it at that.  Okay.
17            So you -- do -- as best you can
18  recall, Mick Kolassa defined it as the price to the
19  wholesaler before discounts; is that right?
20       A.  Correct.
21       Q.  Okay.  What is it about the deal price that
22  was being invoiced by Abbott to wholesalers on the
23  erythromycins prior to July of 2003 that was
24  discounted?
25       A.  You had to qualify for the deal by buying a

Page 207

1  minimum of $500 worth of product.  If you didn't
2  qualify for the deal, you would have paid the WAC
3  price.  It was a discount contract price, for all
4  practical purposes.
5       Q.  Was the deal prices -- were the deal prices
6  on the erythromycins to the wholesalers subject to a
7  literal written contract?
8       A.  There was the --
9            MR. BERLIN:  Oh -- oh -- hold -- I'm
10  sorry.  Objection, form, in that it calls for a legal
11  conclusion, and in that sense, it's beyond the
12  scope.  Go ahead.
13       A.  There was, I'll call it, an offer letter
14  that -- that set forth what the deal was, and the
15  deal was loaded into an Abbott system.  If they met
16  the qualifications, if their order totalled $500,
17  then they would have gotten the base deal pricing.
18  If they didn't, they wouldn't have qualified for the
19  base deal pricing.
20       Q.  (BY MR. ANDERSON)  How did the operation
21  of those prices and the implementation of those
22  prices in the pricing system differ from the contract
23  prices that were offered by Abbott to chain drug
24  stores, for instance, or retail buying groups?
25       A.  There were oth- -- there were other

Page 208

1  contracts that actually had signed contracts, but
2  there were other deals offered that did not; deals
3  that were offered, for example, when a new product
4  launched in the marketplace that were communicated
5  very similarly to the base deal pricing opportunity.
6       Q.  But those deals --
7       A.  It doesn't mean that it's not a contract
8  price.
9       Q.  The -- the -- the -- let's take this step
10  by step.  The re- -- the chains had physical written
11  Ery contracts, right?
12       A.  That's correct.
13       Q.  The retail buying groups had physical
14  written Ery contracts, right?
15       A.  That's correct.
16       Q.  Sometimes, at the launch of a product,
17  there would be a short-lived deal offered on PPD
18  drugs, correct?
19       A.  That's correct.
20       Q.  But those were only for a month or two?
21       A.  But the contract requires performance
22  before you get that pricing, and --
23       Q.  Right.
24       A.  -- so it is a contract.
25       Q.  Okay.  And then --

Page 209

1       A.  And there is consideration involved.
2       Q.  Yeah, and it's --
3       A.  Yeah.
4       Q.  -- less than a year in term, correct?
5            MR. BERLIN:  Which I'm -- objection,
6  form.
7       A.  I believe the Ery deal is actually one year
8  in length.
9       Q.  (BY MR. ANDERSON)  Well, I know.  We're
10  going to -- we're going to get to the Ery deal in a
11  second, but right -- for the -- for these other
12  drugs, these launch deals, for instance, those were
13  less than a year, correct?
14       A.  A couple of weeks.
15       Q.  Yeah, a couple of weeks.  And -- but the
16  Ery deals, those were sometimes two years in length.
17  I've seen the deal price offers, and they're, like,
18  2001 to 2003, 2003 to 2005, for instance.
19            MR. BERLIN:  Objection, form.
20       Q.  (BY MR. ANDERSON)  Correct?
21       A.  That may be.
22       Q.  Okay.  But it's your testimony that the
23  fact that those were considered by Abbott to be
24  contract prices makes them a contract?
25       A.  It makes it a discounted price.

53 (Pages 206 to 209)

Fredericks Reporting & Litigation Services, LLC
AUSTIN  (512) 241-3600   -   HOUSTON  (713) 572-8897

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 210

1    Q.   And why is -- that's -- was my original
2  question.  Wh- -- why is the price considered
3  discounted?
4    A.   Because they have to qualify for it, and
5  it's not -- it's a lower price than our WAC price.
6    Q.   You probably recall, Mr. Fiske, in your
7  prior deposition, I showed you a government
8  definition of WAC as a net price.  Do you recall
9  that?
10   A.   Was that in the review article, I believe?
11   Q.   Yes, sir, in a HCFA spring review.
12   A.   Yeah, I remember that.
13   Q.   Uh-huh.
14   A.   That was a- -- actually not a definition
15  from HCFA at all.  It was a definition from Emory
16  University.
17   Q.   It was an -- it was a definition by some
18  industry experts, including a professor from Emory,
19  correct?
20        MR. BERLIN:  Objection, form.
21   A.   It was a definition from Emory University.
22  It was sourced -- it -- the reference was made in the
23  article.
24   Q.   (BY MR. ANDERSON):  That's -- right.  The
25  reference in the article was to a woman named

Page 211

1  Kathleen Gondeck and a woman named Kathleen Adams,
2  and then also there was a reference to a Dr. David
3  Krailing, correct?
4    A.   I don't remember.
5    Q.   Oh, okay.  Well, regardless of the
6  sourcing, you recall the definition?
7    A.   That was a definition that was used in that
8  article.
9        MR. BERLIN:  Do you recall the
10  definition specifically?  Do you have the article
11  with you?
12        MR. ANDERSON:  I don't.  I'm -- if he
13  doesn't recall, you know, he doesn't recall.
14        MR. BERLIN:  That's fine.  I just want
15  us to be specific and not get into the realm of kind
16  of --
17   A.   Yeah.  I'm sorry, all I --
18        MR. BERLIN:  -- philosophical --
19   A.   -- remember is a reference to wholesale
20  net.  That's all I remember.
21   Q.   (BY MR. ANDERSON):  Have -- have you
22  undertaken any effort to ascertain what any entity
23  other than Abbott considers to be the meaning of the
24  term "WAC"?
25        MR. BERLIN:  Objection, form, asked

Page 212

1  and answered.
2    A.   You know, beyond what I've already
3  discussed, no, but I -- for -- you know, Mick Kolassa
4  is regarded as an expert on the pharmaceutical
5  industry, and his elements of pricing --
6  pharmaceutical pricing is used by many people.
7        I actually obtained the book at a
8  meeting that I attended years ago when I first came
9  to the Pricing and Contracting area to learn more
10  about pricing in general.
11        I'm sure that many people have read
12  that book, and I have to believe that Mick Kolassa,
13  having come from academia, had done adequate research
14  to know what he was talking about.
15        So I think that, in general, that is
16  what most people in the industry probably understand
17  WAC to be.
18   Q.   (BY MR. ANDERSON):  And do you know whether
19  or not most drug companies consider WAC to be the
20  invoice price between them and wholesalers?
21   A.   I don't know what other pharmaceutical
22  companies think.
23   Q.   Have you ever had any conversations with
24  Mick Kolassa about pricing terms?
25   A.   No.

Page 213

1    Q.   Have you ever reviewed any of his testimony
2  about the meaning of WAC?
3    A.   No.
4    Q.   Have you ever had any contact at all with
5  Mick Kolassa?
6    A.   I think I have.  I don't recall in what
7  context.  I attended a seminar that he presented at.
8    Q.   How recently?
9    A.   Oh, my gosh.  Probably in the late '90s.
10        THE VIDEOGRAPHER:  You have five
11  minutes.
12   Q.   (BY MR. ANDERSON):  I'm now some on topic 5
13  and also on topic 8 which concerns the
14  discontinuation of deal pricing.
15        When you were deposed earlier,
16  Mr. Fiske, do you recall testifying that the deal
17  pricing was discontinued in light of government
18  investigations into drug pricing?
19   A.   Yeah.  I -- I actually recall that.
20   Q.   Do you stand by that testimony today?
21   A.   No.
22   Q.   You're changing it?
23   A.   You know, when I answered the question, I
24  was -- back then, I had not done as thorough an
25  investigation as I have this time.

54 (Pages 210 to 213)

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 214

1    And I had consulted with legal
2  department at the time that we discontinued the base
3  deal pricing, because it was such a big change
4  relative to what we had done for years.
5    And when we did the huge price
6  increase -- I'll call it a huge price increase for
7  this deposition -- on the Erys because 140 percent
8  of -- on the contract price is pretty significant,
9  it -- we felt it was appropriate to talk with legal.
10   I -- I think that's probably the
11 extent of what I probably should say because it's
12 probably privileged conversation.
13   Q.  Did you ever --
14   A.  But I did consult with legal --
15   Q.  Yeah.  Did you --
16   A.  -- regarding the base deal price.
17   MR. BERLIN:  So, I mean, in that -- in
18 that sense -- list- -- his question, didn't, in
19 itself, call for attorney-client privilege
20 information, so make sure you listen to that.
21   Q.  (BY MR. ANDERSON):  Is it your testimony
22 today, though, that the discontinuation of base deal
23 pricing did not have anything to do with government
24 investigations into drug price reporting by drug
25 companies?

Page 215

1    A.  I don't believe it did.
2    Q.  And you agree that that testimony today is
3  different than the testimony you provided previously?
4    A.  I agree with that.
5    Q.  Did you decide to change that testimony, or
6  did you discuss that change with others?
7    A.  I --
8    MR. BERLIN:  Let me object to the form
9  of that, although, I don't -- I think that the answer
10 doesn't -- if you think the answer calls for
11 attorney-client privilege information, we should step
12 out, but I -- I don't know that it does.
13   A.  I -- when I read the deposition, I actually
14 realized that I had made a misstatement of fact
15 because I had already done some of the fact-finding
16 for th- -- for this deposition.
17   And, you know, many of us say things
18 in depositions thinking that we're stating the facts,
19 and that was a misstatement of fact on my part.  It
20 was not an error, so...
21   MR. ANDERSON:  Objection,
22 nonresponsive.
23   Q.  (BY MR. ANDERSON):  I appreciate that,
24 but -- and I understood that from your prior
25 testimony, but I'm now asking you, sir:  Did you

Page 216

1  decide to do that on your own when you were reading
2  the deposition, or did you discuss the need to change
3  the testimony with another person who caused you to
4  decide to change it?
5    MR. BERLIN:  Well -- wait.  Hold on.
6  What do you mean by "change the testimony"?  I mean,
7  the topic is -- you asked him a question.  He didn't
8  come in here and say, "I want to revise something
9  that I said earlier".
10   You asked him a question about the
11 investigation he did about termination of base deal
12 price, and he gave you the result of his
13 investigation.
14   MR. ANDERSON:  No, I -- what -- we've
15 highlighted the specific testimony about --
16   MR. BERLIN:  And he's now said it's
17 inaccurate.  But I don't understand what you --
18 you're sort of saying that he's come in here and
19 changed testimony, where he had the testimony which
20 was based on his individual knowledge in the earlier
21 defi- -- deposition.
22   You've now come in and specifically
23 designated him on a topic.  He investigated it and
24 learned that his in- -- individual knowledge was
25 inaccurate, and he said it's inaccurate, and you're

Page 217

1  asking whose decision was that to -- for you to
2  testify.
3    That's -- that's your decision.  I
4  mean, you -- you designated him on the topic.  He
5  investigated it and has come in and told you the
6  result of his investigation.
7    MR. ANDERSON:  I -- I don't want to
8  argue with you.  I don't even understand why there's
9  a problem.  I'm just trying to get to the root source
10 of the change.
11   Q.  (BY MR. ANDERSON):  Mr. Fiske, I re- --
12 appreciate that you read your deposition recently.
13 Did you decide solely to change that testimony, or
14 did you receive some instruction or suggestion from
15 someone else to change the testimony?
16   A.  I noted that I made the error myself, and I
17 decided to testify what the facts were today.  I did
18 inform counsel that I had made an error in my
19 previous testimony.
20   Q.  Did you discuss at any time changes in drug
21 pricing that were contemplated by HPD personnel?
22   A.  I'm sorry?
23   Q.  Did you discuss at any time changes in
24 pricing that were contemplate- -- published pricing
25 that were contemplated by HPD personnel?

55 (Pages 214 to 217)

Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600   -   HOUSTON   (713) 572-8897

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 218

1          MR. BERLIN:  Objection to form.
2    Objection to scope.  And objection because I do think
3    that the answer -- or the question potentially calls
4    for attorney-client information.
5          So you may answer the question without
6    disclosing if, in fact, there is any communications
7    with an attorney on that.
8      A.  In preparation for this deposition?
9      Q.  (BY MR. ANDERSON):  Well, no, I'm not
10   limiting it to preparation for this deposition.
11     A.  I was aware that at some point in time HPD
12   did some repricing of products.  That's about the
13   extent of what my knowledge is.
14     Q.  And did you discuss -- how did you gain
15   that awareness?
16         MR. BERLIN:  And -- objection to
17   form.  Objection to scope.  And objection to the
18   extent that the question calls for communi- --
19   privileged communications with counsel.  I'm
20   instructing you not to answer with respect to those.
21     A.  I think I first became aware when Debbie
22   DeYoung told me that that was going to occur -- or
23   had happened.  I don't know which it was.
24     Q.  (BY MR. ANDERSON):  Do you know a gentleman
25   by the name of Mike Sellers?

Page 219

1      A.  I knew Mike.
2      Q.  Did you discuss at any time changes in
3    published pricing there were contemplated by Abbott
4    with Mike Sellers?
5      A.  No.
6          MR. BERLIN:  Before --
7      A.  Not that I recall.
8          MR. BERLIN:  Before you mark another
9    document --
10         MR. ANDERSON:  Uh-huh.
11         MR. BERLIN:  -- I just want to remind
12   you that you're --
13         MR. ANDERSON:  Okay.  Well, let's take
14   a break now, because this is going to be a line of
15   questions.
16         THE VIDEOGRAPHER:  We are off the
17   record at 3:24 p.m.  This is the end of tape 4.
18         (Recess taken.)
19         THE VIDEOGRAPHER:  We are back on the
20   record.  It is 3:42 p.m.  This is the beginning of
21   tape 5.
22     Q.  (BY MR. ANDERSON):  Before the break,
23   Mr. Fiske, I had asked you about any conversations
24   you had had with Mike Sellers regarding published
25   price changes, correct?

Page 220

1      A.  Correct.
2      Q.  And -- and you don't recall any; is that
3    right?
4      A.  I don't recall any, no.
5          (Exhibit 13 marked.)
6      Q.  (BY MR. ANDERSON):  If you could, take a
7    look at what's been marked as Exhibit 13.
8      A.  (Reviews document.)
9      Q.  Do you see your name noted on Exhibit 13?
10     A.  I do.
11     Q.  And it's in the context of a statement that
12   reads, "Fiske to evaluate volume risk with AWP drop
13   2/22/01," correct?
14     A.  I see that, yes.
15     Q.  Does that refresh your memory at all about
16   any conversations you may have had with Mike Sellers
17   back in February of '01?
18     A.  It doesn't.  I don't know why we would have
19   a discussion regarding Ery-Ped and EES suspension.
20   They had nothing to do with those products that I'm
21   aware of.
22         And I actually didn't have very many
23   conversations with Mike Sellers over my career, other
24   than when we actually integrated -- when -- when HPD
25   was spun off and we took some of the products into

Page 221

1    PPD.  That would have been in the 2004 time frame.
2          (Exhibit 14 marked.)
3      Q.  (BY MR. ANDERSON):  Just hold that for a
4    moment, and take look at what's been marked as Fiske
5    Exhibit 14.  It's also been previously marked as
6    Exhibit 1144.
7      A.  (Reviews document.)
8      Q.  In looking at Exhibit 14, will you agree
9    that the cover page appears to be a memo from Mike
10   Sellers to Meeting Attendees dated March 7th, 2001?
11     A.  Yes.
12     Q.  So just a few days, apparently, after his
13   note marked as Exhibit 13?
14     A.  (Reviews document.)  Okay, yes.
15     Q.  And then if you look at the third page of
16   Exhibit 14, under a section at the top titled "Policy
17   Implementation," do you see a section there that
18   reads, quote, "Discussed price adjustment with other
19   Divisions:  PPD - Standard WAC prices at five percent
20   below List; potential exposure on Ery products which
21   are sold at 40 to 60 percent below List; some sales
22   volume risk with lower List price".  Did I read that
23   correctly?
24     A.  That's what this document says.
25     Q.  Now, looking back at Exhibit 13, do you see

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 222

1  that reference that I pointed out earlier about the
2  note that you were to evaluate volume risk with AWP
3  drop?
4      A.  I know what -- I know that's what the
5  document says, sir.  I don't recall any of this.
6      Q.  Do either of these documents refresh your
7  memory in any way about any evaluation you made with
8  respect to sales volume drops on the Erys?
9      A.  No.
10     Q.  Do you have any explanation for why this
11 information was contained in these two exhibits?
12     A.  I don't know.  I don't recall.  If I did,
13 I'd tell you.  I don't recall.  I don't recall any of
14 this, and I have pretty good memory once things are
15 put in front of me, but I don't recall.
16     Q.  There's not another person with the last
17 name "Fiske" at Abbott PPD, is there?
18     A.  No.  There's a -- a Teresa Fiske, but I
19 don't even know where she works.
20     Q.  Okay.  She's at Abbott, but big Abbott in
21 some other division?
22     A.  I don't even know her.  Not a relative or
23 anything.
24     Q.  Right.  Is it true that back in the early
25 2001 time frame some Ery products were sold at

Page 223

1  roughly 40 to 60 percent below list price?
2      A.  (Reviews document.)  Our contract pricing
3  was that low.
4      Q.  It --
5      A.  Even our base deal pricing, you saw in that
6  one document, there were products that were as deep
7  as a 60-percent discount below WAC, not list.
8      Q.  And WAC was just five percent lower than
9  list, correct?
10     A.  That's correct.
11     Q.  Have you ever undertaken any evaluation of
12 sales decreases or sales volume risks of --
13 associated with changes in list prices or AWP prices?
14     A.  Not that I recall.
15     Q.  Has anyone to your knowledge evaluated any
16 sales decreases or sales volume risk in relation to
17 changes in list prices or AWP prices at PPD?
18     A.  Not that I recall.
19     Q.  Did you appreciate that Abbott divisions
20 such as TAP and HPD were under government
21 investigation for drug pricing issues prior to
22 Jan- -- pardon me, July of 2003?
23         MR. BERLIN:  Objection, scope.
24     A.  Yes.
25     Q.  (BY MR. ANDERSON):  Because other Abbott

Page 224

1  divisions were under investigation or had paid
2  settlements with respect to drug pricing, did -- did
3  you or anyone else at PPD ever consider lowering the
4  published pricing for the Erys?
5         MR. BERLIN:  Objection, form.
6  Objection, scope.
7      A.  I'd like to talk with my attorney regarding
8  a privilege, if I could.
9         MR. BERLIN:  We can.  We must.
10        THE VIDEOGRAPHER:  We are off the
11 record at 3:50 p.m.
12        (Recess taken.)
13        THE VIDEOGRAPHER:  We are back on the
14 record at 3:53 p.m.
15        MR. BERLIN:  Can you read back the
16 question, please?
17        (Requested testimony read back.)
18        MR. BERLIN:  You can answer that
19 question.
20     A.  I'm not sure that that was a
21 consideration.  I think that the fact that they were
22 being investigated, that it made me question whether
23 we had any issues in PPD that we might be faced with.
24     Q.  (BY MR. ANDERSON):  And what did you
25 determine outside of what you learned from your

Page 225

1  lawyers?
2         MR. BERLIN:  Okay.  Well, that is --
3  we do object to that based on the attorney-client
4  privilege and potentially work product doctrine
5  issues as well, and I'm going to instruct you not to
6  answer that question.  I don't think it's answerable
7  without disclosing attorney-client privilege.
8         MR. ANDERSON:  Well, I don't know
9  about the attorney-client, but I'll address the work
10 product.
11     Q.  (BY MR. ANDERSON):  Other than information
12 you learned as a result of work you did at the
13 direction of attorneys, and other than information
14 you learned in communications with attorneys, what
15 did you learn with respect to whether or not PPD
16 should lower any published prices?
17        MR. BERLIN:  You can an- -- I mean,
18 I -- I don't know whether you did learn anything
19 beyond what you --
20     A.  They were all privileged conversations.
21 There- -- there's nothing I learned that was outside
22 of a discussion with an attorney.
23     Q.  (BY MR. ANDERSON):  Outside of discussion
24 with an attorney or something you learned at the
25 direction of an attorney, do you have any

Page 226

1    understanding of why HPD, in roughly May of 2001,
2    would have caused the publication of lower published
3    prices for its drugs and, yet, PPD would not have
4    caused the same lower prices to be published for the
5    erythromycins?
6           MR. BERLIN: Objection to form.
7    Objection to scope. And to the extent there is
8    anything that's not covered by the attorney-client
9    privilege -- in other words, not wi- -- in terms of
10   what he said, not arising from your communications
11   with attorneys, you can answer it.
12      A.  I don't think that I can answer the
13   question. I think it was all privileged
14   communication.
15      Q.  (BY MR. ANDERSON): Is there any
16   consideration today to lower the published prices on
17   any of the erythromycin products?
18      A.  No.
19           (Exhibit 15 marked.)
20      Q.  (BY MR. ANDERSON): I'm now going to be
21   asking you some more questions about WAC and industry
22   practice with respect to WAC. If you could, take a
23   look at what's been marked as Exhibit 15.
24      A.  (Reviews document.)
25      Q.  And primarily, Mr. Fiske, I'm going to

Page 227

1    focus your attention on the terms that are defined on
2    the second page of Exhibit 15.
3       A.  (Reviews document.) Yes.
4       Q.  Do you see the second page of Exhibit 15 up
5    at the top has a date and time stamp of June 14th,
6    '01, 5:36 p.m.?
7       A.  I see that, yes.
8       Q.  And then there's some terms that are
9    defined, correct?
10      A.  Yes.
11      Q.  And the definition for WAC reads, "The
12   price of a product when sold to a drug wholesaler and
13   eligible for chargeback processing after the end sale
14   to a healthcare provider." Did I read that
15   correctly?
16           MR. BERLIN: It -- let me just
17   instruct you that even though his questions relate
18   just to the particular terms, you are welcome, if you
19   want to, to read the whole document. It's not --
20   I -- if it were, like, a 20-page document, we might
21   have a different position, but I don't think it
22   will take you very long to --
23      A.  I --
24           MR. BERLIN: -- flip through it and
25   put it in context.

Page 228

1       A.  I read this relatively quickly. This is
2    not a document that I've seen in the past. It
3    appears to be a document that may have been created
4    with respect to the Hospital Products Division and
5    what their interpretation of certain things were,
6    which may not have been consistent with PPD.
7           You know, it's almost like two
8    different companies sometimes. I know that maybe
9    people don't see it that way, but that's the way
10   it's -- often operates.
11      Q.  (BY MR. ANDERSON): Okay. Looking at that
12   definition of WAC, would you say that that definition
13   is different than PPD's definition of WAC?
14      A.  I don't know that it's all that much
15   different. It doesn't carry the provision in it that
16   it's the undiscounted price to a drug wholesaler. I
17   told you what the PPD definition of WAC was that we
18   used.
19      Q.  Do you agree that for PPD products, WAC is
20   normally the starting point from which chargebacks
21   are processed?
22      A.  Yes.
23      Q.  And do you agree that with respect to the
24   erythromycin products prior to July of 2003, that
25   roughly 90 to 95 percent of the time, deal price was

Page 229

1    the starting point for the processing of chargebacks?
2           MR. BERLIN: Objection, form.
3       A.  To do otherwise, we would have been paying
4    the wholesaler -- or reimbursing the wholesaler at
5    too high a level.
6       Q.  (BY MR. ANDERSON): I understand,
7    Mr. Fiske. So the answer to my question is "yes"?
8       A.  Yes.
9       Q.  You- -- you've lived in Chicago or the
10   Chicago area for many years, right?
11      A.  Most of my life.
12      Q.  Yeah. Do you subscribe to the Chicago
13   Tribune?
14      A.  I do.
15           (Exhibit 16 marked.)
16      Q.  (BY MR. ANDERSON): I'll show you a copy of
17   a Chicago Tribune article that's marked as Exhibit
18   16.
19      A.  (Reviews document.)
20      Q.  Do you recall this article, sir?
21      A.  I don't know whether I've seen it or not.
22   I may have. It doesn't --
23      Q.  Do you recall the basic circumstances that
24   are described in the article?
25      A.  I remember that the Hospital Products

58 (Pages 226 to 229)

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 230

1  Division adjusted some of their prices.
2      Q.  Looking at the very first paragraph of the
3  article dated June 14th, 2001, it reads, "Abbott
4  Laboratories has quietly lowered prices on dozens of
5  drugs and medical treatments amid multiple state and
6  federal investigations alleging that U.S. drug
7  companies lied to the government about the wholesale
8  prices of certain pharmaceuticals."  Did I read that
9  correctly?
10     A.  That's what the article says.
11     Q.  Is -- is this about the same time frame
12 when you became aware of ongoing investigations into
13 Abbott's drug pricing?
14     A.  I believe so.
15     Q.  Does that paragraph indicate to you that
16 the government was okay with how the prices were
17 being published?
18          MR. BERLIN:  Objection, form.
19 Objection, scope.
20     A.  It says that there were allegations that
21 certain drug companies had misrepresented
22 information.
23     Q.  (BY MR. ANDERSON):  Does the fact that the
24 government had made allegations about drug companies
25 lying to the government about wholesale prices

Page 231

1  indicate to you the government approved of the ways
2  those drug companies were reporting prices?
3          MR. BERLIN:  Objection, form.
4      A.  It would imply that they did not.
5      Q.  (BY MR. ANDERSON):  Looking at the second
6  page of Exhibit 16, does -- the second full paragraph
7  discusses TAP Pharmaceuticals.  Do you see that?
8      A.  Yes.
9      Q.  And there's a reference there to the
10 negotiation of a settlement that could top $800
11 million?
12     A.  Yes.
13     Q.  Are you aware that TAP is a joint venture
14 between Takada and Abbott?
15     A.  It was at that time.
16     Q.  And are you aware that at that time --
17 strike that.
18          Were you aware back in 2001 that TAP
19 was also under -- under investigation?
20     A.  Yes, I was.
21     Q.  And are you aware that ultimately TAP did
22 pay a settlement that exceeded $800 million to the
23 government?
24     A.  I don't recall the exact amount of the
25 settlement.  I was agree--- I am aware that there

Page 232

1  was a settlement.
2      Q.  You mentioned earlier in your testimony
3  that Debbie DeYoung had notified you about some
4  pricing changes on Abbott products in other
5  divisions; is that correct?
6      A.  I believe that's how I first became aware
7  that there was some repricing that would be done by
8  the Hospital Products Division.
9      Q.  And what did she convey to you about that?
10          MR. BERLIN:  Objection, scope.
11     A.  I don't recall exactly other than the fact
12 that -- that they were repricing a number of their
13 products because there were very few sales at the
14 actual WAC price that they had published.
15     Q.  (BY MR. ANDERSON):  And did that cause you
16 to consider the relative infrequency at which the
17 Erys were being sold at WAC?
18     A.  I -- I told you that when I heard about
19 these investigations in my earlier testimony, that it
20 made me question whether we had any issues that we
21 needed to be concerned about in PPD.
22     Q.  Including the published pricing of the
23 Erys?
24          MR. BERLIN:  Objection, form.
25     A.  The Ery base deal pricing was one of the

Page 233

1  issues that I thought that we should check into.
2      Q.  (BY MR. ANDERSON):  Did you ever gain an
3  understanding of -- of what the frequency was at HPD
4  for sales at the published WAC for the HPD generics
5  and how that compared with the frequency at which the
6  erythromycins were sold at WAC prior to July of 2003?
7      A.  I think those were privileged discussions.
8      Q.  Okay.  I'll -- I'll frame the question
9  differently and determine if you have any information
10 that's nonprivileged.
11          Other than information you learned
12 from attorneys, or information you learned because
13 you conducted work at the direction of attorneys, did
14 you ever gain an understanding of the relative
15 infrequency at which the HPD generics were actually
16 sold at the published WAC and compare that to the
17 infrequency with which the erythromycins at PPD were
18 actually sold at the published WAC prior to July of
19 2003?
20     A.  I don't believe so.
21     Q.  Outside of privileged communications with
22 lawyers, do you have any understanding of why PPD has
23 kept the published prices on the erythromycins high,
24 if not higher than they were in 2001, whereas, HPD
25 caused the published prices to be dramatically

Fredericks Reporting & Litigation Services, LLC
AUSTIN  (512) 241-3600   -   HOUSTON  (713) 572-8897

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 234

1  decreased?
2          MR. BERLIN: Objection, form.
3      A.  Our WAC and list price have always been
4  real prices in the marketplace that purchasers paid
5  for the product.  And, in fact, the number of
6  purchases at WAC and list price have actually
7  increased over time.
8      Q.  (BY MR. ANDERSON):  What was not real about
9  the WACs for the HPD generics?
10     A.  I'm not --
11         MR. BERLIN: Objection, form.  That
12  misstates char- -- testimony.
13     A.  I didn't say that theirs weren't.  I said
14  that ours were actual prices available in the
15  marketplace.
16         I don't know many facts about the HPD
17  situation at all.  I'm not somebody that can testify
18  upon those facts.
19     Q.  (BY MR. ANDERSON):  Is there -- you
20  mentioned the word "available" again.  Is there
21  something about -- well, strike that.
22         Where did you gain an understanding
23  that the -- the kind of governing rule for a
24  published price was whether or not it was available?
25         MR. BERLIN: Objection, assumes facts

Page 235

1  not in evidence.
2      A.  Maybe "available" is the wrong term.  It is
3  a price that people purchase the product at.  The
4  reason I say it was available is -- it's because it
5  was a price that was offered to customers.
6          Customers who chose not -- or -- or --
7  or -- chose not to participate in our base deal
8  pricing program purchased in less than full case
9  quantities in the case of the list price.
10         So when I say "available," it was a
11  price that was out there, and certain customers
12  purchased at that price.
13     Q.  (BY MR. ANDERSON):  Is there any threshold
14  requirement that you're aware of at Abbott that a
15  price actually be paid with any type of frequency by
16  customers in order to be published or otherwise
17  justify the publication of that price?
18         MR. BERLIN: Objection, form, asked
19  and answered.
20     A.  I'm not aware of any such threshold.
21     Q.  (BY MR. ANDERSON):  Would you agree that to
22  the extent a published price is frequently actually
23  paid by a customer, that would make that published
24  price more representative of the marketplace pricing
25  of the product?

Page 236

1          MR. BERLIN: Objection, form.
2      A.  We had a number of marketplace prices for
3  our product; our WAC price, our list price, our base
4  deal price, our contract price.
5      Q.  (BY MR. ANDERSON):  All right.  I'll --
6  I'll limit it, then, by the different markets.  Do
7  you agree, sir --
8      A.  I'm sorry.  Excuse me.
9      Q.  That's fine.  And if you need a drink of
10  water, that's fine.
11     A.  No, I'm fine.
12     Q.  Okay.  Would you agree, sir, that for
13  instance, with respect to the wholesaler class of
14  trade, that a published WAC is going to be more
15  representative of the actual transactions between
16  Abbott and a wholesaler if it's frequently the price
17  paid by the wholesaler?
18         MR. BERLIN: Objection, form.
19     A.  I don't -- I don't know that.  That's
20  debatable.  The -- the WAC price that we have out
21  there is a price that customers paid for the product,
22  including wholesalers.  It was a real price.
23     Q.  (BY MR. ANDERSON):  I understand your
24  testimony on that point, sir.  What I'm trying to do
25  is ascertain if there's any way to measure when a

Page 237

1  price becomes real, what frequency -- with what
2  frequency does the price actually have to be paid by
3  somebody in order for it to be considered real in
4  Abbott's view?
5          MR. BERLIN: Objection, form, assumes
6  facts not in evidence.
7      A.  I don't know how to answer your question
8  than the way I've answered this and other questions,
9  and that is, I don't know -- I don't know that
10  there's a frequency, but if it's a contract price, as
11  opposed to our undiscounted WAC price, then that
12  wouldn't be a price that we would report.
13     Q.  (BY MR. ANDERSON):  Okay.  I'm going to
14  come at it at a slightly different angle.
15  Hypothetically, if the PPD products that are at issue
16  in this case, the erythromycins, were only sold at
17  WAC one percent of the time and the other 99 percent
18  of the time they were sold at deal price, would one
19  percent still be enough to justify the publication of
20  that WAC?
21     A.  I don't know the answer to that question.
22  It requires speculation.  I don't know.  That's not
23  the case.
24     Q.  Would four percent be enough?
25     A.  I don't know the answer to that.

Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600    -    HOUSTON   (713) 572-8897

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 238

1    Q.  But it is your testimony that somewhere
2  between five and ten percent is enough?
3         MR. BERLIN:  Objection, form.
4  Misstates testimony.
5    A.  I'm telling you that there are sales at WAC
6  and list price five to ten percent of the time.  We
7  report the WAC and the list price to the compendia
8  because that's what we believe we're supposed to be
9  reporting to the compendia.  Nobody has told us any
10  differently than that.  We've done so in good faith.
11    Q.  (BY MR. ANDERSON):  Well, back before July
12  of 2003, how would anyone outside of Abbott know to
13  correct Abbott and say, "Hey, you're only selling
14  these erythromycins about five to ten percent of the
15  time at WAC, you need to change the way you're
16  publishing these WACs"?
17    A.  Mr. Anderson, what was the date that you
18  mentioned?  Prior to when?
19    Q.  July 2003.
20    A.  I -- I testified earlier, you know, HCFA
21  knew that the AWPs for the products were
22  significantly more than the AMPs that we were
23  reporting.
24    Q.  What do you base that on?
25    A.  Because I sent the AMPs to HCFA on a -- a

Page 239

1  monthly basis beginning in 1991 -- I'm sorry,
2  quarterly basis beginning in 1991 under the Medicaid
3  rebate program.
4         So the government can't say that they
5  didn't know that there was a difference between the
6  AWP and the average manufacture price that we were
7  actually selling those products for.  We were
8  reporting that number.
9         Where they were getting the AWP from,
10  I don't know which data agency they may have obtained
11  it from, but they could have seen that there was a
12  difference.  They could have asked us if they thought
13  that there was something wrong.
14    Q.  Did Abbott make any disclosures to any
15  state Medicaid program about the discrepancies
16  between its AWPs and its AMPs?
17         MR. BERLIN:  Objection, form.
18  Objection to the term "discrepancy".
19    A.  Did we?
20    Q.  (BY MR. ANDERSON):  Yes, sir.
21    A.  No.  Other than the states -- once we were
22  required to report AMPs, the -- the four states that
23  we had to report them to.
24    Q.  The four states in the past three or four
25  years or so?

Page 240

1    A.  It may have been longer with Texas, but
2  yeah, that's right.
3    Q.  Now I'm shifting, Mr. Fiske, to topic
4  number 6.  I'll ask some foundational questions
5  first.  Did Abbott publish direct or list prices for
6  the erythromycins?
7    A.  We communicated a WAC and a list price.
8    Q.  And -- and generally, the -- the list price
9  was simply five percent higher than the WAC price,
10  correct?
11    A.  Correct.
12    Q.  And was the list price set off of the WAC
13  or vice versa?
14    A.  WAC was established and divided by .95 to
15  arrive at the list price.
16    Q.  Okay.  And, likewise, WAC was the starting
17  point for the calculation of the estimated AWP by
18  Abbott, correct?
19    A.  Yes.
20    Q.  With respect to topic number 6, did you
21  gather any information in preparing to testify?
22         MR. BERLIN:  Make sure you're --
23  the -- the designation goes on to the second page of
24  what you have.
25    A.  (Reviews document.)  The individuals I

Page 241

1  spoke with had no knowledge regarding this topic
2  whatsoever.
3         People within the Pricing and
4  Contracting Department, including myself and Ronny
5  Lancaster, who is our Senior Manager for Government
6  Pricing, replaced Debbie DeYoung, are aware of the
7  fact that we have reported AMPs to the government
8  since 1991 and that -- you know, that this whole
9  thing, the way it's worded, is -- it sort of
10  misrepresents the facts.
11         We didn't cause publication of direct
12  or list prices that were higher than the prices
13  generally paid because we had a WAC and a list price
14  that was generally paid by purchasers at all times,
15  as was a base deal price generally paid by other
16  customers, as was a contract price, as I said before,
17  generally paid by the customers that purchased that
18  contract price.  So --
19         MR. BERLIN:  I think we need to -- I
20  think he may have misspoken, and I need to talk to
21  him to get him to clarify that now.
22         MR. ANDERSON:  Well, I -- I'd like to
23  follow up on that.  I may clarify it now.
24         MR. BERLIN:  Well -- well, no.  I
25  think that he -- he said that no one he spoke to

Page 242

1    about a certain thing, and I happen to know from my
2    prior discussions with him that that's not accurate.
3    So --
4            MR. ANDERSON: Oh, okay. Well, yeah,
5    if you need to talk to him, then go ahead.
6            MR. BERLIN: And that's why I waited
7    for him to finish --
8            THE VIDEOGRAPHER: We are off the
9    record at 4:22 p.m.
10           (Off the record.)
11           THE VIDEOGRAPHER: We are back on the
12   record at 4:23 p.m.
13   A.   Eric reminded me that when I spoke with
14   Martha that she told me about the OIG reports that
15   showed that the government was aware that AWPs did
16   not reflect the actual acquisition costs by retail
17   pharmacies for various products.
18   Q.   (BY MR. ANDERSON): And that's -- that's no
19   different than the information you conveyed earlier
20   this morning about your conversation with Martha,
21   correct?
22   A.   That's true.
23   Q.   And you haven't been able to gain any
24   copies of those documents or any other information
25   other than what you conveyed today?

Page 243

1            MR. BERLIN: Objection, form.
2    Misstates the testimony.
3    A.   I didn't ask her for copies of those
4    documents.
5    Q.   (BY MR. ANDERSON): Well, looking at
6    subsection "c" of -- of topic 6, do you see that
7    request for the identity of each document relied
8    upon?
9    A.   I see that.
10   Q.   Do you know if those documents even exist?
11           MR. BERLIN: You- -- objection,
12   scope. I mean, you're talking about an a- -- aspect
13   that we -- we had narrowed it beyond that. Go
14   ahead. You can answer.
15   A.   I don't know whether those documents are
16   still in her files or not.
17   Q.   (BY MR. ANDERSON): Other than her, are you
18   aware of anyone else at Abbott who's reviewed any OIG
19   documents?
20           MR. BERLIN: Based on your
21   investigation.
22   A.   Not based on my investigation. That
23   doesn't mean that there weren't. And -- and as I
24   testified, I believe, earlier this morning, I can't
25   say that I, myself, haven't seen them. I just don't

Page 244

1    recall.
2    Q.   (BY MR. ANDERSON): You -- in your prior
3    answer, Mr. Fiske, you mentioned that the list prices
4    and the WAC prices were generally paid. Do you
5    recall that a few moments ago?
6    A.   By the purchasers who purchased at WAC
7    price and list price, those were the -- not only
8    generally paid, they were the prices they paid.
9    Q.   Well, I understand that, but the request in
10   6 isn't limited to causing the publication of direct
11   or list prices that were higher than prices generally
12   and currently paid by purchasers buying at direct and
13   list prices.
14   A.   What does "generally and currently paid"
15   mean? The -- the -- the purchase price for an
16   individual entity, regardless of whether it's a
17   retail pharmacy or a wholesaler, is the price that
18   they paid for at the time that they purchased the
19   product and, in fact, that is the price that they
20   generally paid at that point in time.
21           If they qualified -- if -- if they did
22   not qualify for base deal pricing, they were paying
23   WAC or list price. That is a price that they were
24   generally paying.
25   Q.   You raise a good question, and so I'll --

Page 245

1    I'll pose it to you, Mr. Fiske.
2            Does Abbott have an understanding of
3    what "generally paid" means for a given drug at a
4    given time?
5            MR. BERLIN: Objection, form.
6    Objection, scope.
7    A.   I don't know what "generally paid" means.
8    It could be defined in many different ways.
9    Q.   (BY MR. ANDERSON): Would you agree that
10   "generally paid" does not mean five percent of the
11   time?
12           MR. BERLIN: Objection, form.
13   Objection, scope.
14   A.   The -- if you're talking about a specific
15   price, a price is generally paid by the purchasers
16   who are purchasing at that price. If you're talking
17   about an average price or something, that's something
18   else, and that's probably something that nobody
19   pays.
20           So I don't know how to answer your
21   question any differently than I have.
22   Q.   Well, at any given time, for instance,
23   Abbott is selling erythromycins to this day out into
24   the marketplace, correct?
25   A.   Yes.

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 246

1    Q.  Okay.  And today it's your testimony that
2  WAC prices are generally paid for the erythromycins,
3  because every time a wholesaler buys an erythromycin,
4  they are invoiced at WAC -- the published WAC,
5  correct?
6    A.  Yes.
7    Q.  Okay.  But prior to July of 2003, that
8  wasn't true, was it?
9       MR. BERLIN:  Objection, form.
10    A.  Prior to 2003, it wasn't true that
11  wholesalers were being pa- -- were -- were paying WAC
12  or list price for the product?  Yes, it was true.
13    Q.  (BY MR. ANDERSON):  No, sir.  Prior to --
14    A.  Some of them were.
15    Q.  I'll rephrase to make it specific enough to
16  address your concern.
17       Prior to July 1, 2003, wholesalers
18  were buying the erythromycin products 90 to 95
19  percent of the time at deal price, correct?
20    A.  That's a true statement, sir.
21    Q.  So is it true that prior to July 1 of 2003,
22  the WAC prices were not generally paid by
23  wholesalers?
24    A.  Sir, I will say this.  The WAC prices were
25  paid by some of the wholesalers some of the time.

Page 247

1  There were more purchases made by wholesalers at base
2  deal price than were made at WAC.  I will agree to
3  those two statements.
4    Q.  And since there were more sales at deal
5  price than WAC, wouldn't you agree that the deal
6  price was the price generally paid, because it was
7  more often than not that that was the price paid?
8       MR. BERLIN:  Objection, form.
9    A.  It was the price that was generally paid
10  for the -- by the people that were buying at base
11  deal price.
12    Q.  (BY MR. ANDERSON):  And it was the price
13  that was generally paid for the entire class of
14  customers known as wholesalers?
15       MR. BERLIN:  Objection, form.  I --
16  I -- I -- and -- and asked and answered, to add to
17  it.
18    A.  You know, I -- I -- I've answered your
19  question a number of times, sir, and I don't know
20  that I'm going to change the way I'm answering your
21  question, because as I've stated a number of times,
22  those purchasers who were paying -- purchasing, I'm
23  sorry, at WAC or list price because they didn't
24  qualify for base deal pricing generally, if not
25  always, paying WAC or list price.

Page 248

1       Those customers who qualified for base
2  deal pricing, once they qualified, were generally, if
3  not always, paying base deal pricing.
4       And those that qualified for contract
5  pricing were generally, if not always, paying that
6  contract price.
7    Q.  (BY MR. ANDERSON):  I totally understand
8  your differentiation, Mr. Fiske.  It's not that I
9  don't understand it.  I'm trying to ask you a more
10  broad question, which is:  Will you agree with the
11  simple assertion that as a matter of fact, prior to
12  July 1 of 2003, the class of customers known as
13  "wholesalers" were generally paying deal price, not
14  WAC price?
15    A.  I told you that --
16       MR. BERLIN:  Wait.  Can I have that
17  question back?
18       (Requested testimony read back.)
19       MR. BERLIN:  Objection, form.
20    A.  I will agree that there were more wholesale
21  purchases at base deal price -- significantly higher
22  percentage of purchase at base deal price than there
23  were at WAC.
24    Q.  (BY MR. ANDERSON):  Okay.  Likewise, now
25  shifting over to direct, or also known as "list

Page 249

1  price," will you agree that for the erythromycin
2  products, the pharmacies generally pay chain price or
3  RBG, retail buying group price, not list price?
4    A.  I will agree that the chain pharmacies and
5  members of RBG contracts usually paid the contract
6  price for the product, and there were more purchases
7  at contract price than there were at WAC or list
8  price.
9    Q.  So, accordingly, the WAC or list prices for
10  pharmacies did not reflect the prices generally paid
11  by pharmacies, did they?
12       MR. BERLIN:  Objection, form.
13    A.  It reflected a price that certain payors
14  were paying for the product, and I told you that I
15  agreed that there were more purchases made at the
16  contract price than there were at the list or WAC
17  price.
18    Q.  (BY MR. ANDERSON):  Do you have any
19  information other than what you've conveyed here
20  today that the government approved of Abbott
21  publishing WAC prices that were not typically the
22  transaction prices for wholesalers prior to July of
23  2003?
24       MR. BERLIN:  Objection to form.
25  Misstates standard, misstates e- -- the evidence,

Page 250

1   assumes facts not in evidence, calls for speculation,
2   lack of foundation, and outside the scope.
3        A.   Other than what I've already stated, no.
4        Q.   (BY MR. ANDERSON):  Do you have any
5   information other than that that you've conveyed here
6   today that the government approved of Abbott's
7   publication of list prices that were not the prices
8   typically paid by pharmacies for the erythromycins?
9            MR. BERLIN:  Ob- -- same objections.
10       A.   I -- I still think it misrepresents facts,
11  because there were purchases made at list price.  But
12  other than what I've already stated in my testimony,
13  no.
14       Q.   (BY MR. ANDERSON):  And what you've stated
15  in your testimony today can be summarized as a
16  conversation that Martha Schrader -- I mean -- pardon
17  me, not a conversation, a description that Martha
18  Schrader provided to you a few weeks ago of her
19  review of some OIG reports, correct?
20       A.   That's one of the items.
21       Q.   A conversation that an Abbott
22  representative had with a California Medicaid
23  representative, correct?
24       A.   Correct.
25       Q.   And your general knowledge that AMP prices

Page 251

1   have been transmitted from Abbott to the United
2   States Health and Human Services Commission from 1991
3   to the present?
4        A.   And to some states for a shorter period of
5   time, that's correct.
6        Q.   Yes, sir.  And there's not any other
7   information that you're aware of?
8            MR. BERLIN:  Objection, form.
9   Misstates testimony.
10       A.   Not that comes to mind at this time.
11       Q.   (BY MR. ANDERSON):  Looking at the actual
12  designation to topic number 6, Mr. Fiske, do you see
13  there in the fourth line there's a reference to the
14  phrase "generally and contemporaneously available"?
15       A.   (Reviews document.)  Generally and
16  currently avail- -- paid?  Where are you talking --
17  I'm sorry.  Which -- I -- yes, I see.
18       Q.   In the designa- -- I'm sorry.  I should
19  have been a little more specific.  It -- you're --
20  you're right that in my topic it reads "generally and
21  currently paid," but --
22           MR. BERLIN:  What topic number are you
23  back on?
24           MR. ANDERSON:  I'm on 6 --
25           MR. BERLIN:  Uh-huh.

Page 252

1            MR. ANDERSON:  -- where we were.
2        Q.   (BY MR. ANDERSON):  But then in the actual
3   language of the, quote, "Objection & Designation,"
4   you see in the fourth line, there's a reference there
5   to "generally and contemporaneously available"?  Do
6   you see that?
7        A.   I see that.
8        Q.   Do you have any understand- --
9   understanding of what that phrase means?
10       A.   Well -- I don't know what
11  "contemporaneously available" means, but I think it
12  means that the list prices that were reported to the
13  data agencies by Abbott were the prices that were
14  available in the marketplace.
15       Q.   So it's kind of like a self-fulfilling
16  prophecy in the sense that once it's published, it's
17  available, and since it's available, it's okay to be
18  published?
19       A.   More importantly, it's a price that people
20  purchased at.
21       Q.   But for the Erys, that's not true?
22       A.   It absolutely is true.  They did purchase
23  at WAC and list price.
24       Q.   Just not normally?
25           MR. BERLIN:  Objection, form.

Page 253

1        A.   There were much --
2            MR. BERLIN:  Go ahead.  Let me get my
3   objection out.  It's --
4            THE WITNESS:  Sure.
5            MR. BERLIN:  It's asked and answered
6   multiple times.  It's getting to the point where it's
7   just argumentative.  Go ahead.  You may answer it
8   again.
9        A.   There were always purchases at WAC and list
10  price, albeit at a smaller percentage of sales than
11  those purchased at either contract price or base deal
12  pricing.
13       Q.   (BY MR. ANDERSON):  I hate to bounce around
14  like this, Mr. Fiske, but I need to go back to topic
15  number 3 for a moment.
16       A.   3?
17       Q.   Without belaboring the -- your prior
18  testimony, but just by way of background, I believe
19  you've testified that Abbott knew First DataBank was
20  publishing AWPs that were 125 percent of the
21  published WAC prices for the Erys, correct?
22           MR. BERLIN:  Objection, form.
23       A.   Reverse-engineering things, that's the --
24  the number that we saw for the Erys, yes.
25       Q.   (BY MR. ANDERSON):  And -- and Abbott

Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600    -    HOUSTON   (713) 572-8897

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 254

1    actually estimated AWPs for its drugs and reported
2    those as, quote, "AWPs," using that same formula of
3    125 percent; is that correct?
4        A.  It's -- it's my understanding that's how we
5    arrived at that factor to begin with.
6        Q.  Right.  Why did Abbott allow the
7    publication of its AWPs based on that formula and
8    markup from WAC?
9            MR. BERLIN:  Objection, form, and
10   asked and answered.
11       A.  As I explained to you earlier, I don't know
12   that we set AWPs.  We communicated an estimated AWP.
13   We communicated a WAC and a list price.  I told you
14   about the conversation that Mark Turon had with Kay
15   Morgan.
16          I don't know that you can say that we
17   allowed the publication.  We were told by a -- an
18   executive at a data agency that they were verifying
19   what the appropriate calculations for AWP were.  I
20   don't know what their formula was, what their method
21   for verifying those prices were other than that --
22   than Mark Turon was told that it was done in
23   conjunction with wholesalers.
24          I don't know that it was our position
25   to question wh- -- how they were arriving at an AWP.

Page 255

1        Q.  (BY MR. ANDERSON):  Look, if you could,
2    Mr. Fiske, at Exhibit No. 16 again, please.
3        A.  Yes.
4        Q.  And if you could, loo- -- focus on the last
5    page of Exhibit 16.
6        A.  (Reviews document.)
7        Q.  And, specifically, there's a quote there
8    attributable to a First DataBank executive toward the
9    middle of the page?
10       A.  Which page am I supposed to be looking at,
11   please?
12       Q.  Oh, I'm sorry.  It's not the last page.
13   It's the second to last page.
14       A.  Yes.
15       Q.  The -- I'm look- -- focussing on the
16   paragraph that begins with the word "But"?
17       A.  Yes.
18       Q.  And I'm reading for the record, quote, "But
19   First DataBank Executive Vice President and Chief
20   Operating Officer Jim Wilson said the company has
21   'nothing to do with setting the prices.  We simply
22   collect the information from drug companies and
23   wholesalers and pass it along' to governments and
24   other insurers".  Did I read that correctly?
25       A.  Yes, you did.

Page 256

1        Q.  Do you think back in 2001 you had an
2    understanding that First DataBank's position was that
3    they were just republishing information gained from
4    wholesalers and drug companies?
5            MR. BERLIN:  Objection, form.
6        A.  I don't know what --
7            MR. BERLIN:  It doesn't -- it doesn't
8    state that.
9        A.  -- their position was.  I don't know what
10   their position was.  This is what one individual is
11   saying.  All I could relate to you is a conversation
12   that Mark Turon had with Kay Morgan.
13          Based on some information that's been
14   in the newspapers in recent years, there's been some
15   admissions that First DataBank didn't do some of the
16   things that they said they were doing, or maybe did a
17   poor job of them, but -- they were supposedly doing
18   surveys of wholesalers but it turns out maybe they
19   weren't wholesalers multiple but maybe one.
20          But is it my responsibility as a
21   manufacturer to police the activities of a data
22   agency?  I don't know the answer to that question,
23   but I think not.
24       Q.  (BY MR. ANDERSON):  With respect to what
25   Abbott could control, when Abbott received the annual

Page 257

1    price verifications, couldn't Abbott have simply
2    drawn a line through all of the AWPs and said "do not
3    publish"?
4            MR. BERLIN:  Objection, form.
5        A.  It calls for speculation.  I don't know.
6        Q.  (BY MR. ANDERSON):  Well, are you aware of
7    any reason why Abbott was somehow prevented from
8    causing the data agencies to not publish AWPs?
9        A.  I didn't cause the data agencies to publish
10   the AWPs that they published.
11          MR. ANDERSON:  Objection,
12   nonresponsive.
13       Q.  (BY MR. ANDERSON):  Sir, are you aware of
14   any prohibition that would have prevented Abbott from
15   instructing the data companies to not publish AWPs
16   for Abbott drugs?
17       A.  No.
18       Q.  So to the extent Abbott had any problems
19   with the AWPs or the manner in which the AWPs were
20   published for the -- erythromycin specifically,
21   Abbott could have simply told the data services
22   "don't publish," correct?
23       A.  I don't know.  I don't know.
24       Q.  Now, going back into the pre-2001 time
25   frame when Abbott was actually submitting a field of

Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600   -   HOUSTON   (713) 572-8897

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 258

1  data known as AWP to the pricing services, why did
2  Abbott do that?
3      A.  I don't know that either.  It's because
4  they had done it for a long time.  Nobody could tell
5  me why we were reporting it.
6      Q.  Other than the fact that it was done for a
7  long time, it's your testimony that Abbott, as an
8  organization, doesn't have any other information
9  reasonably available to it on why these AWPs were
10 published?
11         MR. BERLIN:  Objection, form.
12 Objection, scope.
13     A.  Are you asking me why they were published
14 by the data agencies or why -- what are you -- what
15 are you asking me, please?
16     Q.  (BY MR. ANDERSON):  I'll -- I'll be very
17 specific, and I'll focus on this 2001 -- roughly 2001
18 time period back to 1994.
19         With that understanding, please
20 describe all information that Abbott has as to why
21 Abbott sent prices titled "AWPs" to the data
22 services.
23         MR. BERLIN:  Objection, form.
24 Objection, scope.
25     A.  I actually asked Mark Turon why we reported

Page 259

1  what we had -- had reported, because he actually had
2  been in the Pricing Department longer than I had, and
3  his response was "because that's what we had always
4  done".
5          That's what he thought he had been
6  instructed to do by Russ Lehn, I believe, at the time
7  was the pricing manager.  He was probably following
8  what his predecessor had reported.  That -- that is
9  frequently the way things happen.
10         Why those were the numbers that
11 originally started being reported, I don't know the
12 answer to that.  The WAC and the list price that we
13 reported was what we thought we should report.
14     Q.  (BY MR. ANDERSON):  Is it true that one of
15 the reasons why Abbott was sending AWPs to the
16 pricing services was so the AWPs would be published
17 out to third-party payors like Medicaid for
18 reimbursement?
19         MR. BERLIN:  Objection, form.
20     A.  I don't know.
21     Q.  (BY MR. ANDERSON):  At the minimum, you'll
22 agree, won't you -- and I believe you've already
23 testified several times -- that Abbott knew the AWPs
24 that were being published were being used for
25 reimbursement, correct?

Page 260

1          MR. BERLIN:  Objection, form.
2      A.  Yes.
3      Q.  (BY MR. ANDERSON):  And Abbott didn't
4  somehow disregard that knowledge or forget that
5  information when the AWPs were published, did it?
6      A.  No, but, sir, I don't think we ever had to
7  report the AWPs.  Clearly, we don't report the AWPs
8  today, and they still get reported by a data agency.
9          They're developing them some way or
10 another, and they have ever since we stopped
11 reporting an estimated AWP.  So clearly we never had
12 to report an AWP.
13     Q.  Yeah, the -- the "some way or another" is
14 the specific markup that they've attributed to
15 Abbott's drugs and notified Abbott of in those
16 e-mails you reviewed, correct?
17     A.  That certain Abbott people reviewed.
18         MR. ANDERSON:  I'm actually going to
19 be moving on to a different topic.  I can do that and
20 we can go for a few more minutes, or we can break.
21         MR. BERLIN:  What time is it?
22         MR. ANDERSON:  Ten till.
23         MR. BERLIN:  I mean, we're going to
24 break at 5:00, so it's really -- and -- and Joe is
25 prepared to go till 5:00, but it's your choice.

Page 261

1          I don't -- I mean, it doesn't really
2  matter one way or another, I think.  We can wait till
3  tomorrow.  I -- I mean -- how much -- do we know how
4  much time is on the video?  How much has total--
5  totally elapsed?
6          THE VIDEOGRAPHER:  We have 15 minutes
7  left on this tape.
8          MR. BERLIN:  No, my question is how
9  much total video time has elapsed?
10         THE VIDEOGRAPHER:  All day?
11         MR. BERLIN:  Yeah.
12         THE VIDEOGRAPHER:  About five-15 --
13 about five hours and 15.
14         MR. BERLIN:  Are you intending to --
15 how much time do you think you need tomorrow?
16         MR. ANDERSON:  I don't think I'm going
17 to need more than a couple of hours, actually.
18         MR. BERLIN:  Okay.  Whatever you --
19 whatever you want to do, Jarrett.  We have ten
20 minutes.  You can use it or we can --
21         MR. ANDERSON:  I think --
22         MR. BERLIN:  -- pack it up.
23         MR. ANDERSON:  -- it's more convenient
24 to just start fresh tomorrow on a new topic.
25         MR. BERLIN:  Okay.  Your choice.

Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600   -   HOUSTON   (713) 572-8897

Page 262

1    That's fine.
2          THE VIDEOGRAPHER:  We are off the
3    record at 4:49 p.m.  This is the end of tape 5.
4          (Deposition recessed.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 263

1          CHANGES AND SIGNATURE
2    WITNESS NAME: JOSEPH F. FISKE      February 17, 2009
3    PAGE/LINE CHANGE          REASON
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 264

1          I, JOSEPH F. FISKE, have read the foregoing
2    deposition and hereby affix my signature that same is
3    true and correct, except as noted above.
4
5
          JOSEPH F. FISKE
6
7
8
9    THE STATE OF            )
10   COUNTY  OF              )
11
12       Before me,                , on this
13   day personally appeared JOSEPH F. FISKE, known to me
14   [or proved to me on the oath of
15   or through            (description of
16   identity card or other document)] to be the person
17   whose name is subscribed to the foregoing instrument
18   and acknowledged to me that he executed the same for
19   the purposes and consideration therein expressed.
20       (Seal) Given under my hand and seal of office
21   this        day of            , 2009.
22
23
24
          Notary Public in and for
25           the State of Texas

Page 265

1    THE STATE OF TEXAS)
2    COUNTY  OF BEXAR )
3
4          I, TAMMY POZZI, Certified Shorthand
5    Reporter in and for State of Texas, do hereby certify
6    that, pursuant to agreement of counsel, there came
7    before me on February 17, 2009 at 9:05 a.m. in the
8    law offices of Jones Day, 77 West Wacker, 35th Floor,
9    Chicago, Illinois, the following named person,
10   to-wit: JOSEPH F. FISKE, who was by me duly sworn to
11   testify to the truth and nothing but the truth of his
12   knowledge touching and concerning the matters in
13   controversy in this cause; that he was thereupon
14   carefully examined upon his oath and his examination
15   reduced to typewriting under my supervision; and that
16   the deposition is a true record of the testimony
17   given by the witness.
18          I further certify that I am neither
19   attorney nor counsel for, nor related to or employed
20   by, any of the parties to the action in which this
21   deposition is taken, and further that I am not a
22   relative or employee of any attorney or counsel
23   employed by the parties hereto nor financially
24   interested in the action.
25

67 (Pages 262 to 265)

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 266

```
1          IN WITNESS WHEREOF I have hereunto set my
2    hand and seal on this the 2nd day of March, 2009.
3
4
     C.S.R. NUMBER 5629        TAMMY POZZI, Certified
5    Expires 12/31/10          Shorthand Reporter in
                               and for the State of Texas.
6
7    FIRM NUMBER 611
     Expires 12/31/10
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600   -   HOUSTON   (713) 572-8897

efa2704b-8ab7-411a-b06f-06f9869a5ea3

Page 267

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

In re: PHARMACEUTICAL        )
INDUSTRY AVERAGE WHOLESALE   )
PRICE LITIGATION             )    MDL No. 1456
                             )
THIS DOCUMENT RELATES TO:    )    Civil Action No.
                             )      01-12257-PBS
US ex rel Ven-A-Care of      )
the Florida Keys, Inc.       )
v. Abbott Laboratories, Inc.)
No. 07-CV-11618-PBS          )


VIDEOTAPED ORAL DEPOSITION OF JOSEPH E. FISKE

Volume 2

February 18, 2009


DEPOSITION upon videotaped oral

examination, of the witness, JOSEPH E. FISKE, taken

on behalf of Ven-A-Care of the Florida Keys, Inc. in

the above entitled cause pending in the United States

District Court, District of Massachusetts, before

TAMMY POZZI, Certified Shorthand Reporter in and for

the State of Texas, on February 18, 2009, in the law

offices of Jones Day, 77 West Wacker, 35th Floor,

Chicago, Illinois, between the hours of 9:08 a.m. and

11:59 a.m., pursuant to due notice and the Federal

Rules of Civil Procedure.

78d0f838-8a4b-451a-b83a-8d22e725708a

Page 268

```
 1        A P P E A R A N C E S
 2  COUNSEL FOR VEN-A-CARE OF THE FLORIDA KEYS, INC.:
 3      ANDERSON LLC
        Mr. C. Jarrett Anderson
 4      208 West 14th Street, Suite 203
        Austin, Texas 78701
 5      (512) 469-9191
 6  COUNSEL FOR ABBOTT LABORATORIES INC.:
 7      JONES DAY
        Mr. Eric P. Berlin
 8      Ms. Tara A. Fumerton
        77 West Wacker Drive, Suite 3500
 9      Chicago, Illinois 60601
        (312) 782-3939
10
    COUNSEL FOR THE STATES OF WISCONSIN, ILLINOIS,
11  KENTUCKY, IDAHO, HAWAII, AND SOUTH CAROLINA:
                  (via telephone)
12      MICHAEL WINGET-HERNANDEZ
        Mr. Michael Winget-Hernandez
13      101 College Street
        Dripping Springs, Texas 78620
14      (512) 858-4181
15  COUNSEL FOR THE STATES OF ALABAMA AND MISSISSIPPI:
                  (via telephone)
16      BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES,
        P.C.
17      Mr. Paul Lynn
        218 Commerce Street
18      Montgomery, Alabama 36104
        (800) 898-2034
19
    ALSO PRESENT:
20
        MARY ELIZABETH GAASCH,
21         Videographer
22
23
24
25
```

Page 269

```
 1           INDEX
                       PAGE
 2
    Appearances. . . . . . . . . . . . . . . . . . 268
 3
    JOSEPH E. FISKE
 4     Examination by Mr. C. Jarrett Anderson. . . 270
 5  Witness's Signature Page/Corrections . . . . . 380
 6  Reporter's Certificate . . . . . . . . . . . . 382
 7
             EXHIBITS
 8  DESCRIPTION               IDENTIFIED
 9  17  PPD User Acceptance Testing - Imany Medicaid
        8.4.1 Release 3.0 . . . . . . . . . . . 287
10
    18  Potential Issues and Talking Points . . . . 302
11
    19  MS Word Document - Potential Issues and
12      Talking Points. . . . . . . . . . . . . 302
13  20  Abbott Laboratories Pharmaceutical Products
        Division, Subject: Federal Health Care Program
14      and Other Third Party Payor Requirements -
        United States - Reimbursement Information and
15      Support . . . . . . . . . . . . . . . . . 309
16  21  Neoral Profit Analysis. . . . . . . . . . 323
17  22  Abbott R-04 Rebate Mail 3Tier, Rebate, Mail
        Order Rebate Report 1/1/2004 Thru 3/31/2004 360
18
19
20           *-*-*-*-*
21
22
23
24
25
```

Page 270

```
 1              PROCEEDINGS
 2        THE VIDEOGRAPHER:  We are on the
 3  record.  It is Wednesday, February 18th, 2009.  It is
 4  9:08 a.m.  This is the beginning of tape 6.
 5        Will you the court -- oh, sorry.
 6  We're already -- you're already under oath, so you
 7  can begin.
 8        EXAMINATION CONTINUED
 9  BY MR. ANDERSON:
10     Q.  Good morning, Mr. Fiske.
11     A.  Good morning.
12     Q.  We're going to continue your deposition
13  this morning, okay?
14     A.  Sure.
15     Q.  All right.
16        MR. WINGET-HERNANDEZ:  Jarrett?
17        MR. ANDERSON:  Ye- -- Oh, yeah, sure.
18        MR. WINGET-HERNANDEZ:  This is Michael
19  Winget-Hernandez.  I'm making an appearance today on
20  behalf of my clients which are the states of
21  Illinois, Wisconsin, Kentucky, South Carolina, Idaho,
22  Hawaii and Arkansas pursuant to cross-notices filed
23  yesterday.
24        MR. BERLIN:  And this is Eric Berlin
25  for Abbott Laboratories.  And we have an objection to
```

Page 271

```
 1  the notices coming so late, but without waiving that
 2  objection, we're going to permit counsel to listen in
 3  on this session today.
 4        MR. WINGET-HERNANDEZ:  Right.  And
 5  I -- just for the record, we discovered that these
 6  depositions, including Mr. Fiske's deposition, were
 7  to take place only yesterday morning.  So just --
 8  that -- you know, I'm -- I'm -- I understand that
 9  you're reserving your objections and so on, but I
10  thought I would go ahead and make mention of that.
11        I -- I -- I probably won't have any
12  questions today, so I'll just sit -- sit here and
13  listen and -- and if it turns out that I do have
14  questions, we can work that out.
15        MR. BERLIN:  Yeah.  I think we'll
16  cross that bridge if -- if we actually come to it.
17  Okay.  Great.
18        MR. WINGET-HERNANDEZ:  Thank you.
19        MR. BERLIN:  Go ahead, Jarrett.
20        MR. ANDERSON:  Sure.  I'm also going
21  to just, for what it's worth, note on the record that
22  this deposition today is not only a continuation of
23  not only yesterday's deposition, but technically it's
24  a continuation of some -- an additional deposition
25  that Mr. Fiske provided in March of 2007, in the
```

Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600   –   HOUSTON   (713) 572-8897

78d0f838-8a4b-451a-b83a-8d22e725708a

Page 272

1  sense that that deposition -- we are not -- I am
2  purposefully trying not to duplicate lines of
3  questions that were pursued in March of 2007.  For
4  what it's worth.
5       MR. BERLIN:  Right.  Understood.  And
6  we have an agreement as to -- to what extent previous
7  depositions could be used in this litigation.
8       I don't know that I view this as a
9  continuation of the earlier deposition, but I don't
10  think we necessarily disagree with anything else that
11  you said, and -- and we -- we would expect you not to
12  go over things that were went over in the previous
13  deposition.
14       Q.  (BY MR. ANDERSON):  Okay.  With all of the
15  statements behind us, Mr. Fiske, if you could, direct
16  your attention again to topic number 1 in the --
17  Exhibit 1 which is your deposition notice.
18       And this topic pertains to Abbott's
19  knowledge of Medicaid agency policies, practices,
20  etcetera, regarding reimbursement, correct?
21       A.  Yes, it does.
22       Q.  Okay.  Does Abbott understand -- and I
23  touched on this some yesterday, but I'm going to just
24  ask a couple of foundational questions again to get
25  back into this area.

Page 273

1       Does Abbott understand that Medicaid
2  regulations require Medicaid programs to estimate
3  provider acquisition cost?
4       A.  Yes, we have that understanding.
5       Q.  And what departments specifically within
6  Abbott have that understanding?
7       MR. BERLIN:  Based on your
8  investigation.
9       THE WITNESS:  Yes.
10       A.  There are people who work in State
11  Government Affairs that have that understanding.
12  Martha Schrader who is our Divisional Vice President
13  of Public Policy and -- I always get confused with
14  her title, I apologize -- Strategy has that
15  understanding.
16       I don't know when I became aware of
17  that, but I know that I have that understanding.  If
18  I didn't have it before the depositions, I certainly
19  became aware of it during the depositions.  I don't
20  remember exactly when I became aware of it.
21       Q.  (BY MR. ANDERSON):  The -- the depositions
22  that you're referring to include your deposition back
23  in March of 2007?
24       A.  I'm specifically referring to that
25  deposition, yes.

Page 274

1       Q.  Okay.  And you're -- of the -- of the
2  departments or people that you just listed, you're
3  the one who would be in a pricing -- price setting or
4  price publication position, correct?
5       A.  I don't actually set prices, but I am
6  responsible for implementing price actions when
7  people decide upon them, and we are responsible for
8  price reporting in my department, yes.
9       Q.  Does Abbott understand that under federal
10  regulation, estimated acquisition cost is defined as
11  the cost generally and currently paid by providers?
12       MR. BERLIN:  Objection, form, and
13  objection to scope.
14       A.  I think that's the general understanding of
15  the people that know about the provision, yes.
16       Q.  (BY MR. ANDERSON):  Okay.  Is it more
17  likely than not, sir, that prior to your preparation
18  for your deposition in March of 2007, that you did
19  have some understanding of Medicaid's efforts to
20  estimate acquisition costs?
21       A.  I -- I believe so, because while I don't
22  focus on reimbursement issues, I was quite involved
23  with DRA two-thousand-fi- -- yeah, the Defect
24  Reduction Act of 2005 and some of the changes for the
25  Medicaid re- -- rebate program.  I was primarily

Page 275

1  focused on those changes affecting manufacturers in
2  terms of reporting issues, though.
3       Q.  Re- -- reporting issues in that context
4  pertaining to AMPs and BPs?
5       A.  The calculation and reporting of those
6  numbers, yes.
7       Q.  Okay.  When -- did any of your -- I take
8  it that some of your work with respect to the
9  defitit- -- Deficit Reduction Act of 2005 did touch
10  upon Medicaid drug reimbursement issues; is that
11  true?
12       A.  The only thing that I really was aware of
13  was that the government was evaluating changes in the
14  reimbursement formula as it relates to multisource
15  drugs and I guess the determination of federal upper
16  limits.
17       Q.  And what -- can you summarize what you
18  learned in that regard?
19       A.  So -- federal upper limits used to be
20  established, prior to DRA 2005, when I believe it was
21  three more or our drugs were available on the
22  marketplace, meaning at least two AB-rated generics
23  plus a brand.  And there were various formulas, but
24  one of the references that you see frequently is to
25  150 percent of the lowest AWP but then it goes on to

3 (Pages 272 to 275)

Page 276

1  say or estimated acquisition cost or usual and
2  customary.  There's -- there's a number of different
3  things, and I, quite frankly, don't recall all of
4  them because I -- I don't really track all of that.
5         DRA changed that in two major
6  respects.  F- -- federal upper limits would be
7  established under DRA when a -- a first generic
8  launched.  In other words, as soon as there were two
9  drugs on the marketplace that were AB-rated to one
10  another, an FUL might be established.
11        And the FUL would be established based
12  on the average manufacturer price reported by
13  manufacturers rather than based on an A- -- AWP.
14        MR. WINGET-HERNANDEZ:  Excuse me.  I'm
15  sorry for interrupting, but it would be very nice
16  indeed if we could move the conference phone a little
17  closer to the witness.
18        MR. BERLIN:  Yeah, we're doing it.
19        MR. ANDERSON:  Oh, sorry.
20        MR. BERLIN:  So -- that's okay.  So,
21  you know, listen for a little bit, and if there's a
22  natural break, let us know if that is not
23  sufficient.
24   Q.  (BY MR. ANDERSON):  Did you understand that
25  any sector of the pharmaceutical industry objected to

Page 277

1  the proposal that FULs, or federal upper limits, be
2  calculated based upon reported AMP prices?
3         MR. BERLIN:  Objection to form as to
4  "the pharmaceutical industry," and objection to
5  scope.
6   A.  Retailers were upset.  Some of the retail
7  trade organizations such as NACDS and National
8  Community Pharmacy Association, I believe even some
9  of the wholesalers' associations lobbied not only in
10  terms of the information that would be includable in
11  the calculation of the average manufacture price, as
12  well as the multiple of AMP that they would be
13  reimbursed at.
14   Q.  (BY MR. ANDERSON):  Do you have an
15  understanding if the proposed changes in the
16  calculation of federal upper limits was ever actually
17  implemented?
18   A.  There's a lawsuit that's pending, and no,
19  they have not been implemented yet --
20   Q.  As a result --
21   A.  -- to the best of my knowledge.
22   Q.  And the FUL changes were not implemented as
23  a result of a lawsuit filed by multiple groups
24  including pharmacies, correct?
25   A.  I believe that's a correct statement.

Page 278

1   Q.  Okay.
2   A.  I think it was pharmacy trade organizations
3  actually, wasn't it?  I -- I may be wrong.
4   Q.  Did you understand that prior to this
5  proposal with the DRA, that FULs were based on lowest
6  published prices, including, for instance, wholesale
7  prices such as WAC?
8   A.  I -- as I explained earlier, actually, I --
9  I -- I don't know that that's a completely correct
10  statement because I believe that FULs were based on
11  any number of different factors.
12        As I explained, there -- there was a
13  look at usual and customary charges from retail
14  pharmacies, estimated acquisition costs by retail
15  pharmacies.  Some of them were determined by states
16  doing surveys.  Some of them, in fact, may have been
17  based on information reported by pricing compendia.
18   Q.  What -- other than the FUL issues, what
19  other drug reimbursement knowledge did you gain from
20  your work with respect to the DRA 2005?
21   A.  I don't recall -- excuse me.  I don't
22  recall that I did, but I -- it -- you know, if
23  something comes up, I'll tell you it reminds me.
24        My focus was, as I stated earlier, in
25  really on the impact on the manufacturer in terms of

Page 279

1  the calculating and reporting of AMPs and BPs.
2   Q.  Okay.  Other than personnel in State
3  Government Affairs such as Mr. Johnson -- well,
4  strike that.  Let me back up.
5         When you referenced State Government
6  Affairs in your prior answer about departments that
7  were aware government Medicaid programs were
8  estimating acquisition costs to pharmacies, were you
9  limiting that knowledge to Mr. Johnson, or was that
10  more broad knowledge held by other individuals?
11   A.  Mr. Johnson indicated to me when I spoke
12  with him that the individuals who report to him that
13  actually monitor activities in the various states
14  would have been aware of the individual state
15  formulas perhaps in --
16   Q.  Uh-huh.
17   A.  -- as it related to their work.  But that's
18  the extent of it, I believe.
19   Q.  Okay.  Did you get the understanding that
20  Mr. Johnson's personnel in the State Government
21  Affairs Department also understood that state
22  Medicaid programs were trying to estimate the prices
23  generally and currently paid by pharmacies?
24        MR. BERLIN:  Objection, form.
25   A.  Mr. Johnson didn't communicate that to me

Fredericks Reporting & Litigation Services, LLC
AUSTIN  (512) 241-3600   -   HOUSTON  (713) 572-8897

78d0f838-8a4b-451a-b83a-8d22e725708a

Page 280

1  when I went through the list of topics that I was
2  supposed to prepare on. He didn't -- he indicated
3  that all they had knowledge of was that there were
4  reimbursement levels that were based on AWP.
5          He didn't know where those AWPs
6  actually came from. He assumed they came from a
7  pricing compendia, but he didn't know, in fact, where
8  they came from or whose they used, how they were
9  determined, etcetera.
10  Q.  He didn't go into that level of detail
11  about his personnel's understanding of EAC; is that
12  true?
13  A.  Mr. Anderson, as I told you earlier, Dale
14  Johnson was one of the people that I actually went
15  through each of the topics that I was expected to
16  prepare on --
17  Q.  Uh-huh.
18  A.  -- and actually provided him a copy of the
19  document --
20  Q.  Uh-huh.
21  A.  -- so that we could discuss each of them,
22  and he -- he pretty much had no knowledge regarding
23  most of the topics that we discussed, and only gave
24  me the information I have related to you so far.
25  Q.  Okay. And -- I understand that. And so,

Page 281

1  accordingly, for instance, with respect to topic
2  number 1, he didn't provide you with any specific
3  information about the knowledge that people in his
4  department held with respect to EAC representing the
5  prices generally and currently paid by providers; is
6  that true?
7          MR. BERLIN: Object- -- I'm sorry.
8  Objection, form.
9  A.  That's true.
10  Q.  (BY MR. ANDERSON): With respect to any
11  other Abbott personnel that you are aware of, other
12  than State Government Affairs, Martha Schrader, and
13  yourself in Pricing, are you aware of anyone else at
14  Abbott that knew state Medicaid programs were trying
15  to estimate acquisition costs to providers?
16  A.  Not from the investigation that I did, no.
17  Q.  Are you aware of any communications that
18  Abbott has received from any government officials
19  indicating the Medicaid programs have approved or
20  otherwise gone along with Abbott's price reporting
21  practices?
22  A.  No.
23  Q.  Are you aware of any communications that
24  Abbott has received that government officials have
25  approved of the specific manners in which Abbott has

Page 282

1  reported prices for the erythromycin products?
2          MR. BERLIN: Objection, form.
3  A.  We neither received anything indicating
4  that they have approved, nor we have -- have we
5  received anything that said they didn't approve,
6  other than the lawsuits.
7  Q.  (BY MR. ANDERSON): And -- and you and I
8  know this, but I need to state this for the record.
9  The lawsuits that you're referring to are the
10  different lawsuits that have been filed against
11  Abbott by various states related to Abbott's price
12  reporting practices; is that true?
13  A.  Yes.
14  Q.  Okay. Including the lawsuit for which --
15  one of the lawsuits for which we're here today which
16  was brought by my client on behalf of the United
17  States of America?
18  A.  That's correct.
19  Q.  Okay.
20          MR. BERLIN: Well, actually, let me --
21  let- -- let- -- let's just be clear on that, because
22  the -- because I don't know whether Mr. Fiske
23  remembers that the government has chosen not to
24  participate in this lawsuit.
25          So his original question is going back

Page 283

1  to the point of whether it's government disapproval,
2  and I don't know whether you mean to include this
3  lawsuit as part of government disapproval.
4          MR. ANDERSON: But my other question
5  was related to state Medicaids.
6          (Phone ringing.)
7          MR. ANDERSON: Michael? He must -- he
8  must have dropped off.
9          MR. WINGET-HERNANDEZ: Yeah, sorry.
10  That- -- that's probably my phone malfunctioning.
11  Can you pick that up?
12          MR. BERLIN: Hello?
13          MR. WINGET-HERNANDEZ: Yeah, it's --
14  that's -- that's my phone so just hang that up, I'd
15  appreciate it.
16          MR. ANDERSON: Okay.
17          MR. WINGET-HERNANDEZ: I'm sorry.
18          MR. ANDERSON: That was -- that was
19  that was -- pretty wild, okay.
20          MR. WINGET-HERNANDEZ: Yeah, I
21  apologize for that.
22          MR. ANDERSON: No problem.
23          MR. WINGET-HERNANDEZ: Uh-huh.
24  Q.  (BY MR. ANDERSON): All right. Where were
25  we? Okay. I'll -- I'll go on to a new line of

Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600   -   HOUSTON   (713) 572-8897

78d0f838-8a4b-451a-b83a-8d22e725708a

Page 284

1  questions.
2          Yesterday, Mr. Fiske, you described a
3  conversation you had with Martha Schrader where she
4  described her prior review of some OIG reports
5  concerning differences between published AWPs and
6  pharmacy cost, correct?
7      A.  That's correct.
8      Q.  Okay.  Has Martha Schrader or any other
9  Abbott personnel that you're aware of -- strike
10 that.  Let me rephrase.
11         How has -- has Martha Schrader or any
12 other Abbott personnel reviewed or interpreted any
13 OIG reports or other government reports as showing
14 government approval of Abbott's price reporting
15 practices?
16     A.  I don't think that they considered them as
17 a commentary on any manufacturers' price reporting
18 practices.
19     Q.  And, likewise, sir, are you aware of any
20 Abbott personnel, but specifically Ms. Schrader since
21 she's the one that you're aware of, reviewing or
22 interpreting any government reports about
23 pharmaceutical prices as approval of Abbott's price
24 reporting practices with respect to the erythromycin
25 drugs?

Page 285

1          MR. BERLIN:  Objection, form as to --
2  and my objection is just to the sort of undefined OIG
3  reports.  It may be a little confusing as to what
4  you're referring to.
5      A.  I apologize.  I lost track of the front end
6  of your question.
7      Q.  (BY MR. ANDERSON):  It's a similar
8  question.  I'm just making it specific to
9  erythromycins, but I'll rephrase it.
10     A.  Thanks.
11     Q.  And I'll ask it -- I'll break it up --
12     A.  Okay.
13     Q.  -- because it got a little long-winded.
14         Martha Schrader is the only person
15 that you're aware of at Abbott that's reviewed any
16 OIG or government reports on drug pricing, correct?
17     A.  That's the only person I became aware of in
18 my investigation.
19     Q.  Yes, sir.  Has Martha Schrader -- strike
20 that.
21         How has Martha Schrader, if at all,
22 interpreted the OIG reports or other government
23 reports on drug pricing as government approval of the
24 way Abbott has published prices for the erythromycin
25 drugs specifically?

Page 286

1      A.  Based on my conversation with Martha
2  Schrader, I don't think that she viewed the OIG
3  reports as a commentary on manufacturers' reporting
4  of prices.  I think that they were a commentary on
5  the publication of prices, perhaps, by data
6  agencies.  But they had nothing to do with
7  manufacturers' reporting of prices.
8      Q.  Okay.  Now switching topics slightly.  Are
9  you aware of any mechanism by which Abbott personnel
10 have been able to review or otherwise rely upon
11 internal deliberations of government personnel that
12 were not made public?
13         MR. BERLIN:  Objection, form.
14 Actually, can I have that read back?  I got --
15         (Requested testimony read back.)
16     A.  We wouldn't have been privy to internal --
17         MR. BERLIN:  I know, I was confused by
18 that.
19     A.  -- discussions by government personnel.
20     Q.  (BY MR. ANDERSON):  Are you aware of any
21 government personnel reviewing or otherwise relying
22 upon any government analysis or discussion of drug
23 pricing issues that were not made public?
24     A.  No.
25     Q.  One of the primary responsibilities of your

Page 287

1  Pricing Department is the calculation of Medicaid
2  rebate prices such as AMPs and BPs, also known as
3  best prices, correct?
4      A.  Yes.
5          (Exhibit 17 marked.)
6      Q.  (BY MR. ANDERSON):  And as a part of that
7  process, does your department utilize software
8  created by a company known as Imany?
9      A.  Yes.
10     Q.  And has it done so for many years?
11         MR. BERLIN:  Objection, form.
12     A.  Several years.
13     Q.  (BY MR. ANDERSON):  If you could, take a
14 look at what's been marked as Fiske Exhibit 17.
15     A.  (Reviews document.)
16     Q.  Do you recognize this document?
17     A.  I don't know whether I've actually seen the
18 document before.
19     Q.  It's titled "PPD User Acceptance Testing,
20 dash, Imany," correct?
21     A.  It is.
22     Q.  Do you know what that references?
23     A.  When we get new releases of a product,
24 Imany's software, we have to test it to make sure
25 that it works as it's supposed to and does the

Fredericks Reporting & Litigation Services, LLC
AUSTIN    (512) 241-3600    -    HOUSTON    (713) 572-8897

78d0f838-8a4b-451a-b83a-8d22e725708a

Page 288

1  calculations correctly,, this is a document that lays
2  out the -- the user acceptance testing to be
3  performed at the time that we implemented Release
4  8.4.1.
5      Q.  And that -- that release is a version of
6  the software that Imany sells to or licenses to
7  Abbott and other drug companies so they can calculate
8  Medicaid rebate pricing, correct?
9          MR. BERLIN:  Objection, form.
10 Objection, scope.
11     A.  I'm -- yes, the -- in general I'll say yes.
12     Q.  (BY MR. ANDERSON):  What is the -- you
13 meant -- you mentioned some calculations.  What is
14 meant by the phrase "Medicaid RPU calculation"?
15         MR. BERLIN:  Objection, form.
16 Objection, scope.
17     A.  "RPU" is defined as rebate per unit.
18     Q.  (BY MR. ANDERSON):  Is that synonymous with
19 unit rebate amount?
20         MR. BERLIN:  Objection, form.
21 Objection, scope.
22     A.  It would be the same.
23     Q.  (BY MR. ANDERSON):  And the RPUs are a
24 function of the calculations pursuant to federal
25 regulations of AMP and best price, correct?

Page 289

1          MR. BERLIN:  Objection, form.
2  Objection, scope.
3      A.  Yes.
4      Q.  (BY MR. ANDERSON):  Okay.  If you could,
5  look at what's Bates labeled Abbott Ery, dash,
6  E24936.  It's the third page from the back.
7      A.  (Reviews document.)
8      Q.  And this page is titled "RPU Calculation
9  Procedures," correct?
10     A.  Medicaid rebate per unit calculation.  Oh,
11 yes.  The top of the document is, yes.
12     Q.  And then there's some different tasks that
13 are listed, correct?
14     A.  (Reviews document.)  Yes.
15     Q.  And under the subsection titled "Test Case
16 7.0 Medicaid RPU Calculation," I note that task 7.5
17 reads "Load AWP & WAC Pricing into Imany Medicaid".
18     A.  Yes, it does.
19     Q.  What does that reference?
20         MR. BERLIN:  Objection, form.
21 Objection, scope.
22     A.  Well, you have to keep in mind that -- that
23 this would have been 2004 time frame or later,
24 because there's reference to "Hospira" in here.
25 Hospira didn't exist prior to that date.

Page 290

1          In 2002 we started contracting with
2  states on supplemental rebate programs.  Many of
3  those state supplemental rebate programs include
4  supplemental rebates based on an AWP formula, and so
5  we have to load the AWPs from a data reporting agency
6  in order to calculate the rebates that those states
7  would be due.
8      Q.  (BY MR. ANDERSON):  So in that regard --
9  well, strike that.  I'll ask a background question.
10         Why do some of the states utilize AWP
11 and WAC pricing for purposes of supplemental
12 rebates?
13         MR. BERLIN:  Objection, form,
14 foundation.  Objection, scope.
15     A.  I suppose you'd have to ask them because
16 some of them use an AMP formula, some of them use an
17 AWP formula, some of them use a WAC formula.
18     Q.  (BY MR. ANDERSON):  Do you -- does -- does
19 Abbott have any understanding of why AWPs and WACs
20 are utilized by state Medicaid programs in the
21 context of supplemental rebate programs?
22         MR. BERLIN:  Objection, form.
23 Objection, scope.
24     A.  We've never asked them to my -- to the best
25 of my knowledge.  We simply use the formula that they

Page 291

1  provide.
2      Q.  (BY MR. ANDERSON):  At least in that
3  context, when Abbott is loading these AWPs and WACs
4  for purposes of rebates, Abbott is aware that those
5  prices are being utilized by the Medicaid programs?
6          MR. BERLIN:  Objection, form.
7  Objection, scope.
8      A.  At least in terms of the supplemental
9  rebate calculation.
10     Q.  (BY MR. ANDERSON):  Does Abbott understand
11 that some of the supplemental rebates are calculated
12 off of those prices because those prices,
13 specifically being AWP and WACs, are utilized by
14 Medicaids for drug reimbursement?
15         MR. BERLIN:  Objection, form.
16 Objection, scope.
17     A.  Yes.
18         MR. BERLIN:  Wait.  Hold -- I mean --
19         THE WITNESS:  I'm sorry.
20         MR. BERLIN:  -- this is so far beyond
21 the scope, a -- a -- state supplemental rebates in
22 this case that you're bringing on behalf of the
23 federal government, and there's nothing in the notice
24 that would --
25         Can you at least give us a clue as to

Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600   -   HOUSTON   (713) 572-8897

78d0f838-8a4b-451a-b83a-8d22e725708a

Page 292

1  how -- what your argument would be as to why this is
2  in any --
3         MR. ANDERSON:  Absolutely.  The last
4  question I asked was about drug reimbursement and use
5  of published pricing such as AWP and WAC, and that's
6  right within the language of topic 1.
7         MR. BERLIN:  Are you reading rebates
8  as part of reimbursement?
9         MR. ANDERSON:  The rebate questions
10 were foundational leading up to my last question
11 which Mr. Fiske answered "yes" about reimbursement.
12 It just provides a -- a context for using that
13 information.
14        MR. BERLIN:  And that question and --
15 well, I -- let's not argue about it.  We have
16 objections.  I mean, I'm happy to if you want to
17 argue about it, but...
18        MR. ANDERSON:  No, I -- I don't.  In
19 fact, given Mr. Fiske's answer, I'm -- I'm through
20 with that line of questions.
21        Q.  (BY MR. ANDERSON):  Is this a document
22 which -- I'm referencing Exhibit 17, sir -- that
23 Imany creates or Abbott?
24        MR. BERLIN:  Objection, form.
25 Objection, scope.

Page 293

1         A.  U-- -- the user acceptance testing is
2  performed by Abbott personnel, and some of the
3  testing is specific to Abbott's policies and
4  procedures.  Whether we start with an Imany document
5  or not, I couldn't tell you.  That would be a
6  question that only somebody in Business Systems could
7  answer.  They're the ones that actually coordinate
8  this process.
9         Q.  (BY MR. ANDERSON):  I see.  The Business
10 Systems being a -- kind of IT-related department
11 within Abbott?
12        A.  That's correct.
13        Q.  Loo- -- in section 7.6, Mr. Fiske, I see
14 that that task reads "Activate AWP & WAC Pricing in
15 Imany Medicaid".  What is the difference between
16 loading it and activating it?
17        A.  I don't know.
18        Q.  Probably some computer deal?
19        MR. BERLIN:  Objection, form.
20 Objection --
21        A.  I don't know.
22        MR. BERLIN:  -- scope.  Make sure you
23 leave me time to object.
24        THE WITNESS:  I'm sorry.
25        MR. BERLIN:  Particularly if he uses

Page 294

1  like a George Bush term like "computer deal".
2         Q.  (BY MR. ANDERSON):  Do you know --
3         MR. BERLIN:  I need to object to that.
4         Q.  (BY MR. ANDERSON):  Do you know the -- the
5  source that Abbott utilizes to load AWP and WAC
6  prices?
7         A.  We use Analy$ource data which is First
8  DataBank.
9         Q.  And in your prior deposition, you testified
10 about Abbott's use of PriceProbe from First DataBank,
11 correct?
12        A.  I did.
13        Q.  And both PriceProbe and AnalySource contain
14 published pricing such as AWP and WAC pricing,
15 correct?
16        A.  That's correct.
17        Q.  Has Abbott always had -- to your knowledge
18 from 1994 to the present, had subscriptions to
19 PriceProbe or AnalySource?
20        A.  I believe so, and I believe we also, for a
21 period of time, subscribed to Red Book.
22        Q.  Did you subscribe to Red Book's electronic
23 data much like First DataBank's electronic PriceProbe
24 data, or was it only the physical printed Red Books?
25        A.  I don't recall.

Page 295

1         Q.  But -- I take it from your answer that --
2  that Abbott PPD no longer subscribes to the Red Book
3  data; is that correct?
4         A.  I don't know that.
5         Q.  Oh.  It's possible; you're just not sure?
6         A.  Correct.
7         Q.  Okay.  This falls within topic number 12,
8  Mr. Fiske, and it also is related to some of your
9  testimony yesterday -- not 12, pardon me, 11 -- some
10 of your testimony yesterday regarding good faith --
11        A.  Yes.
12        Q.  -- the good faith actions of Abbott.
13        Would you consider Abbott's
14 publication of prices for reimbursement purposes with
15 knowledge that pharmacies are interested in those
16 prices for reimbursement purposes to be price
17 reporting done in good faith?
18        MR. BERLIN:  Objection, form.
19        A.  Abbott reported WAC and list price to the
20 data agencies in good faith without regard to any
21 reimbursement.
22        None of our price setting was done
23 with any reimbursement considerations, and none of
24 our price reporting was done with any reimbursement
25 considerations.

8 (Pages 292 to 295)

78d0f838-8a4b-451a-b83a-8d22e725708a

Page 296

1      We always reported the WAC and list
2  price. It's the numbers that we thought we should
3  report, and we reported them in good faith thinking
4  that's what we should report.
5      Nobody told us any differently.  There
6  were opportunities for the government to have told us
7  differently.  There were opportunities for people at
8  the data agencies to have told us differently.
9      I don't think that anybody can say
10 that we did not operate in good faith.
11     Q.  (BY MR. ANDERSON):  What is it about the
12 price reporting by Abbott -- well, strike that.  I'll
13 back up and ask another question.
14     Mr. Fiske, you've testified that
15 Abbott knew published prices such as its own WACs and
16 the AWPs that were a function of its WACs were used
17 by customers for reimbursement, correct?
18         MR. BERLIN:  Objection, form.
19     A.  They were two of many numbers that were
20 considered for reimbursement.
21     Q.  (BY MR. ANDERSON):  Right.  And Abbott was
22 aware of that?
23         MR. BERLIN:  Objection, form.
24 Objection, scope.
25     A.  Yes.

Page 297

1      Q.  (BY MR. ANDERSON):  When Abbott was
2  publishing WACs which were 40, sometimes much more
3  percent higher than the prices paid by pharmacies,
4  knowing pharmacies were being reimbursed off of WAC
5  or AWP, was that done in good faith?
6          MR. BERLIN:  Objection, form.
7  Objection, misstates testimony, misrepresents facts
8  in evidence.
9      A.  There were pharmacies, there were
10 wholesalers that were purchasing at the reported WACs
11 and the list prices.  We were not misreporting any
12 information.  We were reporting -- the information we
13 reported was reported in good faith, and they were
14 real numbers that products were purchased at.
15     Q.  (BY MR. ANDERSON):  Okay.  And -- and I
16 won't belabor your testimony yesterday about the
17 frequency of those prices being used to transact
18 business, but it's true, isn't it, that those
19 published prices were only utilized about five, maybe
20 ten percent of the time?
21     A.  That doesn't change the fact that those
22 were real numbers that re- -- that customers
23 purchased at.  Those were numbers available in the
24 marketplace.  Those were numbers that customers
25 purchased at.

Page 298

1      Q.  And is that position the foundation for
2  Abbott's good faith?
3      A.  I explained our good faith effort.  We
4  reported the numbers that we thought we should
5  report.  The numbers we reported were always actual
6  prices that were not only available in the
7  marketplace; they were prices that customers, in
8  fact, purchased at.
9      Q.  Is it --
10     A.  Nobody told us that we should report
11 anything differently than we were reporting.
12     Q.  Except for the lawsuits?
13         MR. BERLIN:  Wait.  That misrepresents
14 his testimony yesterday.  He said -- you had a long
15 discussion about what lawsuits were and that he
16 didn't interpret them that way.
17         MR. ANDERSON:  I -- I disagree with
18 that and object to the side-bar.  His -- you know,
19 the testimony will speak for itself.
20         MR. BERLIN:  It -- it -- it will, so
21 I don't know why you're asking this now for the third
22 time.  Go ahead.
23     Q.  (BY MR. ANDERSON):  Mr. Fiske, do you
24 believe that it's appropriate for Abbott personnel to
25 discuss customers' reimbursement concerns with

Page 299

1  customers?
2      A.  In the 2003/2004 time frame, it was made
3  very clear to Abbott personnel that we should not be
4  discussing reimbursement concerns with our customers.
5      Q.  To the extent reimbursement concerns are
6  discussed with customers, would that indicate
7  Abbott's not reporting in good faith?
8      A.  Not necessarily.
9      Q.  When did Abbott purchase Synthroid -- I
10 mean, pardon me, Knoll?
11     A.  Abbott acquired Knoll in 2001.
12     Q.  Are you familiar with a person named Carol
13 Nauta?
14     A.  I am.
15     Q.  Was Carol Nauta -- or is Carol Nauta an
16 Abbott PPD sales representative?
17     A.  She's a National Trade Executive today.
18     Q.  Uh-huh.  Did Carol have prior experience
19 with Knoll?
20     A.  No.
21     Q.  What about Dave Lutz?  Is he an Abbott
22 National Trade Executive?
23     A.  Dave Lutz is the National Trade Executive.
24     Q.  Did Dave Lutz have any prior experience
25 with Knoll?

9 (Pages 296 to 299)

78d0f838-8a4b-451a-b83a-8d22e725708a

Page 300

1      A.  I don't recall whether Dave joined Abbott
2  from Knoll or if he was a former Abbott employee.  I
3  don't recall.  He may have been a -- a Knoll
4  employee, but I don't recall for sure.
5      Q.  After Abbott purchased Knoll, was there a
6  time when Abbott was selling Knoll's products, such
7  as Synthroid, under the Knoll label?
8          MR. BERLIN:  Objection, scope.
9      A.  When we acquired Knoll, we acquired product
10  that was packaged under the Knoll labeler code, and
11  yes, we were selling that product for a period of
12  time until we re- -- until we began manufacturing and
13  packaging the product in our own packaging.
14      Q.  (BY MR. ANDERSON):  Roughly what time frame
15  would that have been?
16          MR. BERLIN:  Objection, scope.
17      A.  It occurred over time as the inventories
18  were bled off.  I couldn't tell you exactly -- the
19  inventories of the old labeler coded product.
20      Q.  (BY MR. ANDERSON):  It would have started
21  no sooner than the date of acquisition in 2001,
22  correct?
23      A.  That's correct.
24      Q.  And then do you have any kind of
25  approximation as to how many months or years the

Page 301

1  marketing by Abbott personnel of the Knoll products
2  lasted?
3          MR. BERLIN:  Objection, scope.
4      A.  Well -- the marketing of the Knoll
5  products?  We -- we were Ab- -- we were marketing the
6  Abbott products because they were Abbott products at
7  that point in time.  We weren't marketing the Knoll
8  products.
9      Q.  (BY MR. ANDERSON):  Yeah, I understand,
10  I -- and I -- that wasn't a trap.  The -- they are
11  products that are owned by Abbott as a function of
12  Abbott's purchase of Knoll as a company, but they're
13  products that have the "Knoll" label on them?
14      A.  We -- we don't market a -- a labeler code.
15  We -- we market a brand, and the brands remain the
16  same.  So, yes, we were marketing Synthroid, and we
17  were marketing other products that had been
18  previously sold by Knoll.
19      Q.  The "brand" being the name of the
20  product -- the innovator product as opposed to the
21  name of the company?
22      A.  Correct.
23      Q.  Okay.  Can you -- back to my original
24  question.  Can you approximate from 2001 how many
25  months or years it took for Abbott personnel to

Page 302

1  deplete the existing inventories of products labeled
2  with "Knoll"?
3          MR. BERLIN:  Ob- -- objection, scope.
4      A.  It's pure speculation.  I don't know
5  whether it's valuable to speculate.  I'm not going
6  to.
7      Q.  (BY MR. ANDERSON):  Well, if you're not
8  able to answer the question, I understand.
9      A.  I don't know the answer to the question.
10          (Exhibit 18 marked.)
11      Q.  (BY MR. ANDERSON):  Okay.  Take a look at
12  what's been marked as Exhibit 18, please.
13      A.  (Reviews document.)
14      Q.  Do you recognize what's been marked as
15  Exhibit 18?
16      A.  No.
17          (Exhibit 19 marked.)
18      Q.  (BY MR. ANDERSON):  Take a look at
19  what's -- I've marked as Exhibit 19, which I'll
20  represent to you is a document reflecting the
21  custodian and author of this electronic document
22  that's been printed as Exhibit 18.  And if you're
23  looking at Exhibit 19, you see the custodian is
24  listed as Carol Nauta?
25      A.  Yes.

Page 303

1      Q.  And that's an Abbott employee, correct?
2      A.  Yes.
3      Q.  And then the author is listed as Dave Lutz,
4  and then there's a semicolon "BASF Corporation",
5  correct?
6      A.  Correct.
7      Q.  Was BASF the owner of Knoll Pharmaceuticals
8  prior to Abbott?
9      A.  It was.
10      Q.  And, now, looking back at Exhibit 18,
11  specifically focussing your attention on the section
12  on the second page titled "AWP Spread," the first
13  bullet reads, "Chains want more spread between AWP
14  and actual cost to offset MCO reimbursement
15  contracts".  Did I read that correctly?
16      A.  Yes.
17      Q.  Is that statement consistent with Abbott's
18  awareness that pharmacies, including chain
19  pharmacies, were interested in reimbursement spreads?
20          MR. BERLIN:  Objection, form.
21      A.  I agree that we knew that chains were
22  interested in making more money than less money and
23  that they were reimbursed based on AWPs.
24      Q.  (BY MR. ANDERSON):  Did Abbott provide such
25  spreads by publishing high WAC prices which, in turn,

10 (Pages 300 to 303)

78d0f838-8a4b-451a-b83a-8d22e725708a

Page 304

1 triggered the publication of AWP prices?
2        MR. BERLIN: Objection, form.
3 Objection, argumentative.
4    A.  No.
5    Q.  (BY MR. ANDERSON): Did Abbott provide
6 spreads by reporting high inflated estimated AWPs or
7 AWPs to the pricing compendia?
8        MR. BERLIN: Objection, form.
9    A.  No.
10    Q.  (BY MR. ANDERSON): With respect to the
11 erythromycins that were selling for much less than
12 the AWPs, will you agree that Abbott was enabling
13 chains to achieve more reimbursement spread on those
14 drugs?
15        MR. BERLIN: I'm sorry.  Could I have
16 the question back?
17        (Requested testimony read back.)
18        MR. BERLIN: Objection, form.
19    A.  No.
20    Q.  (BY MR. ANDERSON): Why not?
21        MR. BERLIN: Objection, form.
22    A.  Numerous reasons.  As I've indicated, we
23 reported the WAC and the list price that we were
24 actually selling product for in the marketplace.
25 Some of those purchasers were, in fact, retailers.

Page 305

1        In addition, the actual reimbursement
2 for the products in question were not a- -- not
3 always even based on AWPs.  There are, as we
4 discussed previously, numerous formulas for
5 determining what a maximum allowable cost will be for
6 a product, and some of those have no relationship to
7 AWP whatsoever.  So the answer is "no".
8    Q.  (BY MR. ANDERSON): Would you agree that
9 for the time period around 2001 and prior when Abbott
10 was directly reporting AWPs to the pricing services,
11 Abbott was enabling chain pharmacies and other
12 pharmacies to achieve spreads between AWPs and the
13 actual prices they paid?
14        MR. BERLIN: Objection, form,
15 misstates evidence.
16    A.  No.
17    Q.  (BY MR. ANDERSON): Why not?
18    A.  As I stated in previous testimony, we know
19 from conversations with people at First DataBank,
20 specifically Kay Morgan, that they were representing,
21 at least, that they were actually doing surveys of
22 their own to determine what a correct AWP should be
23 for the product.
24        All we were providing was an estimated
25 AWP which was calculated based on re-en- --

Page 306

1 reverse-engineering the formula that they had used in
2 the past.
3    Q.  (BY MR. ANDERSON): But you agreed
4 yesterday, Mr. Fiske, that, to your knowledge, the
5 estimated AWPs published by Abbott to First DataBank
6 were, in fact, ultimately the same AWPs that were
7 published by First DataBank, correct?
8    A.  They were the same numbers.  I don't know
9 how they calculated their numbers.
10    Q.  Well, the numbers were the same.
11    A.  Doesn't mean they used my number.  They
12 re- -- they -- they represented to us -- specifically
13 Kay Morgan represented to Mark Turon that they were
14 actually verifying and calculating the numbers
15 themselves and determining what the correct number
16 should be in conjunction with wholesalers.
17    Q.  Well, you don't think that the fact that
18 over the years, all of the AWPs that Abbott sent to
19 the data services coincided to the number with the
20 actual published AWPs is a fluke, do you?
21        MR. BERLIN: Objection, misstates
22 evidence, assumes facts not in evidence.
23    A.  I have to rely upon the conversation that
24 Kay had with Mark, as well as publications in Wall
25 Street Journal and other reports that First DataBank,

Page 307

1 in fact, represented more recently that that's
2 exactly what they were doing.  And then, of course,
3 it came out that they apparently were only doing such
4 evaluations with a single wholesaler, McKesson, I
5 believe.
6        MR. ANDERSON: Objection,
7 nonresponsive.
8    Q.  (BY MR. ANDERSON): Looking at the "AWP
9 Spread" section of Exhibit 18, Mr. Fiske, you see
10 that last bullet reads, "Government is starting to
11 scrutinize what impact this spread has on state,
12 slash, federal reimbursement".  Did I read that
13 correctly?
14    A.  You did.
15    Q.  Does this document appear to be a document
16 that would have been created at least in the 2000 or
17 later time frame?
18        MR. BERLIN: Objection, form.
19    A.  It's pure speculation, but I would imagine
20 that it was created at the time that -- of the
21 transition from PISF to Abbott, in terms of in all
22 products.
23    Q.  (BY MR. ANDERSON): Which would have been
24 around 2001, correct?
25    A.  Correct.

11 (Pages 304 to 307)

Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600   -   HOUSTON   (713) 572-8897

78d0f838-8a4b-451a-b83a-8d22e725708a

Page 308

1     Q.  Do you -- do you believe that the
2  government first really started scrutinizing
3  reimbursement spreads in 2001?
4     A.  I don't know when they started to
5  scrutinize reimbursement spreads.
6     Q.  Does Abbott have any information that the
7  government had started to scrutinize AWP
8  reimbursement spreads -- or strike that.  I'll make
9  it more broad.
10         Does Abbott have any information that
11  prior to 2001, the government was scrutinizing
12  reimbursement Medicaid spreads?
13     A.  I apologize.  I did not get -- and I wish I
14  had not only gotten copies of the reports, but I
15  didn't get the date of the reports that Martha
16  Schrader had actually reviewed in terms of the OIG
17  reports.  The government may have been looking at
18  that information earlier.
19     Q.  You're leaving open the possibility that
20  Martha reviewed reports that predated 2001?
21     A.  It's possible.  I don't know.
22     Q.  Do you have plans to go back to Martha and
23  ask her for those reports?
24     A.  I haven't decided yet.
25     Q.  When you were preparing to testify, did you

Page 309

1  appreciate that the notice had specific requests for
2  the identity of documents such as the reports?
3         MR. BERLIN:  Ob- -- ob- -- Objection,
4  form.  And that misstates -- I mean, I guess the
5  notice did, but the designation did not.
6     A.  Yeah.  With no disrespect intended, when I
7  actually spoke with Martha, it was a telephone
8  conversation, and I actually didn't have the -- this
9  in front of me and I had forgotten about that part of
10  it.
11         (Exhibit 20 marked.)
12     Q.  (BY MR. ANDERSON):  Mr. Fiske, I'm marking
13  what you've already seen in your March 2007
14  deposition as Exhibit 20, a document titled "Federal
15  Health Care Program and Other Third Party Payor
16  Requirements - United States - Reimbursement
17  Information and Support".
18     A.  (Reviews document.)  Yes.
19     Q.  You recognize this, don't you?
20     A.  I do.
21     Q.  And you were actually the initiator of this
22  back in late 2004, correct?
23     A.  That's correct.  I -- I want to just state
24  that this one is not signed, and this may not be the
25  ab- -- absolute final document.

Page 310

1     Q.  Well, you know, I've -- I've sought any
2  copies of this that were more final.  Do you think
3  that there was a final version that's different than
4  this?
5     A.  I -- I don't know.  I'm just stating that
6  there is a final procedure that has signatures on
7  it.  It may be identical to this.  It may not.  It
8  won't be much different.  But I just want to state
9  that for the record.
10     Q.  And for the record, the signatures would be
11  where?  Next to the "Approved" section with the
12  names?
13     A.  Yes.
14     Q.  And that's why the date would be filled in
15  there next to the signature?
16     A.  That's correct.
17         MR. ANDERSON:  Well, Eric, I -- months
18  ago, I asked Tara for all of these, and -- and I was
19  assured that I had them but I don't -- I don't know.
20  We need to track that down, because apparently I
21  don't have them.
22     Q.  (BY MR. ANDERSON):  Mr. Fiske, if you
23  could, I'm going to focus your attention on page 3 of
24  Exhibit 20.
25     A.  Yes.

Page 311

1     Q.  And you see a section there titled "Average
2  Wholesale Price Information," correct?
3     A.  Yes.
4     Q.  And the first subsection reads, No PPD
5  employees shall provide Average Wholesale Price
6  information to Customers and must refer all queries
7  to outside drug databases, except that helplines
8  approved by a Centralized Reimbursement Department
9  may inc- -- may communicate AWP information that is
10  included in an actual drug database listing or,
11  subject to approved PPD Procedures, and then it
12  continues on.
13         Is that the current policy for PPD
14  regarding AWP?
15     A.  Yes.
16     Q.  Prior to late 2004 when this policy was put
17  into place, were PPD employees providing AWP
18  information to customers?
19     A.  From time to time they did, yes.
20     Q.  And why was it decided that that type of
21  action was against company policy?
22         MR. BERLIN:  Objection, form.
23  Objection, scope.  Objection to the extent it seeks
24  information that is protected by attorney-client
25  privilege.

78d0f838-8a4b-451a-b83a-8d22e725708a

Page 312

1        So you may answer only to the extent
2  that you will not be relating any communication with
3  counsel.
4       A.  I won't be able to answer that question.
5  It is privileged communication.
6       Q.  (BY MR. ANDERSON):  Are you aware of any
7  information published by the government, such as the
8  OIG guidelines that came out in 2003, which caused
9  PPD to implement a policy such as this AWP price
10  information policy?
11        MR. BERLIN:  Objection, form.
12  Objection, scope.  The "objection, form" includes
13  facts not in evidence.
14        Also, do you have a copy of
15  what you're referring to?  That might help him
16  determine --
17        MR. ANDERSON:  No.
18        MR. BERLIN:  Okay.
19       A.  I don't know the --
20        MR. BERLIN:  Well, actually, I -- I
21  need you to pause, because I'm a little concerned
22  with the question as it's phrased because you have a
23  linkage in there that could potentially force him, if
24  he were to answer it fully, to disclose
25  attorney-client information.

Page 313

1        I mean, you have assumed in there that
2  the OIG policy led to this (indicating), and in order
3  for him to answer, he almost needs to confirm or deny
4  that, which could disclose --
5        MR. ANDERSON:  Well, I -- I appreciate
6  that, Eric.  I'm not -- I'm not assuming that.  I'm
7  asking him that, if there was a linkage.
8        I'll rephrase the question to avoid a
9  request for attorney-client privileged information.
10  How is that?
11        MR. BERLIN:  That -- let- -- let- --
12  let's -- that's a good start.  Let's see where we go.
13        MR. ANDERSON:  Okay.
14        MR. BERLIN:  Thank you.
15       Q.  (BY MR. ANDERSON):  Sir, without disclosing
16  information you learned from attorneys, is -- did
17  Abbott institute this AWP price information policy in
18  late 2004 in relation to any government information,
19  such as the OIG guidelines that were published in
20  2003?
21        MR. BERLIN:  So you can only answer --
22  it's a "yes" or "no" question.  You can only answer
23  based on information aside from legal
24  communications.
25       A.  I think I can state this, and maybe it will

Page 314

1  end it all.  All of the corporate policies and
2  division procedures were developed in conjunction
3  with the legal department, and they were all
4  privileged communication.
5       Q.  (BY MR. ANDERSON):  The -- I note on the
6  first page of this policy that you're note as the
7  initiator.  Was it your idea to propose that this
8  type of policy be created?
9       A.  No.
10       Q.  Okay.  Whose idea was it?
11       A.  It was done -- done in conjunction with the
12  legal department and the Office of Ethics and
13  Compliance.
14       Q.  Okay.  Were you involved in any
15  communications with the Office of Ethics and
16  Compliance that didn't involve attorneys?
17       A.  None to my recollection.
18       Q.  Who -- what nonlawyer in the Office of
19  Ethics and Compliance was involved in the creation of
20  this policy?
21        MR. BERLIN:  He just said not to his
22  recollection.
23        MR. ANDERSON:  No, he s- -- he said
24  lawyers were always involved.  I'm asking what
25  nonlawyer -- what -- not law- --

Page 315

1        MR. BERLIN:  Well, go ahead.
2        MR. ANDERSON:  Yeah.
3        MR. BERLIN:  I mean, I -- go ahead and
4  answer.  If -- if -- it -- it assumes there was one.
5        Was there a nonlawyer that was
6  involved that -- that you -- with whom you had
7  communications outside of communications with
8  lawyers?
9       A.  I don't think -- well, Debbie DeYoung and I
10  were on a committee that worked with the lawyers on
11  the policies and procedures.
12       Q.  (BY MR. ANDERSON):  And to your knowledge,
13  you and Ms. DeYoung were the only two non-lawyers?
14       A.  I believe Jenny Tobiason may have been part
15  of that committee.  I don't recall the others.
16       Q.  Reading down in the next section that's
17  titled "Margin Information and Reimbursement
18  Modeling," the first subsection reads, "PPD employees
19  --"
20       A.  I'm sorry.  Okay.
21       Q.  Yeah, I'm -- I'm in Exhibit 20.
22       A.  I -- I -- I got it.
23       Q.  Okay.
24       A.  I'm sorry.
25       Q.  And I'm in paragraph "c," little "i".  It

13 (Pages 312 to 315)

78d0f838-8a4b-451a-b83a-8d22e725708a

Page 316

1    reads, quote, "PPD employees may not use or provide
2    Customers with tools to enable reimbursement modeling
3    which may be used to determine the margin between
4    acquisition cost and reimbursement amounts, open
5    parens, quote, ('spread'), close parens.  Examples of
6    such tools include reimbursement calculators, charts
7    and spreadsheets."  Did I read that correctly?
8         A.   Yes.
9         Q.   Prior to late 2004, were PPD employees
10   providing that type of information to customers?
11        A.   They may have.  I don't know.
12        Q.   Outside of anything that you learned from
13   discussions with counsel, are you aware of why Abbott
14   chose to prohibit that type of information?
15        A.   Those are all attorney-client privileged
16   communications.
17        Q.   In what context has Abbott provided AWP
18   information to customers in the past?
19             MR. BERLIN:  Objection, form, assumes
20   facts not in evidence.  Objection to scope.
21        A.   "In the past" meaning what?  Before today?
22        Q.   (BY MR. ANDERSON):  Before 2004, for
23   instance, late 2004 when this policy was
24   implemented.
25             MR. BERLIN:  Same objection.

Page 317

1         A.   I -- I certainly won't be aware of all of
2    them.  You know, our managed care customers are still
3    covered by a -- an exception under the procedure and
4    policy.
5              Our -- our -- our managed care
6    customer is reimbursed based on AWPs.  For them to
7    understand what the value of a rebate is that we're
8    offering them, we will often share with them some AWP
9    information.
10             I believe that prior to the
11   implementation of the policy, if a customer asked for
12   information, it may have been provided by sales reps
13   and others because there was no pro- -- prohibition
14   of -- against us off- -- providing the information.
15        Q.   (BY MR. ANDERSON):  Prior to the
16   implementation of the AWP price information policy in
17   late 2004, is it true that Abbott personnel shared
18   AWPs with pharmacy customers in the context of bids?
19             MR. BERLIN:  Objection, form,
20   foundation, and objection as to scope.  So you can
21   answer your personal knowledge.
22        A.   I actually think that's a true statement.
23        Q.   (BY MR. ANDERSON):  Okay.  Is it true that
24   that AWP information was shared with customers such
25   as pharmacies and wholesalers through the routine

Page 318

1    publication of stocking sheets?
2              MR. BERLIN:  Same objection.
3         A.   Yes.
4         Q.   (BY MR. ANDERSON):  Is it true that the
5    publication of AWP information was shared by Abbott
6    with customers such as wholesalers through the use of
7    forms known as NWDA forms, or other standard
8    wholesaler forms?
9              MR. BERLIN:  Same objections.
10        A.   I don't know what an "NWDA" form is.
11        Q.   (BY MR. ANDERSON):  Okay.  Is it true
12   that -- that AWP information was shared by Abbott
13   with pharmacies through standard letters such as
14   "retail buying group member" letters?
15             MR. BERLIN:  Same objections.
16        A.   I don't know.
17        Q.   (BY MR. ANDERSON):  Would it be true that
18   since the institution of this policy in late 2004,
19   the prior examples of Abbott sharing AWP information
20   with pharmacies and wholesalers would be prohibited?
21             MR. BERLIN:  Objection, scope.
22        A.   People are not supposed to do so, that's
23   correct.
24        Q.   (BY MR. ANDERSON):  Are you aware of any
25   instances where Abbott personnel have violated the

Page 319

1    policy on AWP price information instituted in late
2    2004?
3              MR. BERLIN:  Objection, scope.
4         A.   I think that's a privileged communication
5    actually.  The only way I know is from some
6    privileged communications, I believe.  I -- I may
7    have other knowledge, but I'm not recalling any
8    other.
9         Q.   (BY MR. ANDERSON):  The -- you -- you may
10   have -- you're -- you're saying you do have
11   knowledge, but it was gained from an attorney?
12        A.   I believe that's the only knowledge I have,
13   but I may have others that I don't recall.
14        Q.   When did you gain that awareness?
15        A.   In the course of preparing for this
16   deposition.
17        Q.   So in the past few weeks?
18        A.   Yes.
19        Q.   What department or division was potentially
20   violating the policy?
21             MR. BERLIN:  Objection, and --
22   objection to attorney-client privilege, and I'm going
23   to instruct you not to answer that question.
24             MR. ANDERSON:  Well, wait a second.
25   I'm -- I'm entitled to the underlying facts.  I'm

Page 320

1  just not entitled to the legal analysis.
2        Can I -- can I get at least the
3  division? I don't know. I -- it seems like --
4        MR. BERLIN: Let me -- let me talk to
5  him about the -- I -- I think I need to learn more
6  about the communication.
7        MR. ANDERSON: Okay.
8        MR. BERLIN: And --
9        MR. ANDERSON: Let's take a break.
10       MR. BERLIN: -- I actually have a --
11 have a feeling like there may be some bit of a
12 miscommunication going on. So let me see if I can
13 determine the privilege.
14       MR. ANDERSON: Okay.
15       MR. BERLIN: And -- and -- and maybe
16 it's an appropriate time for us to -- I mean, how
17 much time is left on the video?
18       THE VIDEOGRAPHER: It's time to get
19 off.
20       MR. BERLIN: It's time anyway?
21       THE VIDEOGRAPHER: We have five
22 minutes.
23       MR. BERLIN: So that -- that -- that
24 would be an appropriate time to break anyway.
25       MR. ANDERSON: Okay.

Page 321

1        MR. BERLIN: Is that all right?
2        MR. ANDERSON: Yeah.
3        MR. BERLIN: Okay.
4        THE VIDEOGRAPHER: We are off the
5  record at 10:20 a.m. This is the end of tape 6.
6        (Recess taken.)
7        THE VIDEOGRAPHER: We are back on the
8  record at 10:34 a.m.
9        MR. BERLIN: And I probably should
10 clarify that on the record, that -- that we have been
11 able to determine that there was some confusion as to
12 the questions and answering, and that there -- there
13 is a privilege that applies to some of this
14 communication that, quite frankly, led to the
15 confusion.
16       MR. ANDERSON: Okay.
17       MR. BERLIN: So we can go from there.
18    Q.  (BY MR. ANDERSON): I'll start where we
19 were, Mr. Fiske. Other than information you've
20 learned from attorneys, are you aware of any
21 instances where Abbott personnel have violated the
22 policy instituted in late 2004 regarding the
23 communication of AWP price information?
24    A.  Not that I can think of.
25    Q.  Okay. Are there some instances but you've

Page 322

1  only learned of those through attorneys?
2    A.  Not that I'm aware of.
3    Q.  Did you learn of some communication of AWP
4  information by Abbott personnel subsequent to late
5  2004 in the course of preparing to testify as their
6  corporate representative?
7        MR. BERLIN: Well, I'm going to let
8  him answer that because I've -- I'm -- I -- in an
9  effort to try to clear up the confusion --
10       MR. ANDERSON: Uh-huh.
11       MR. BERLIN: -- without waiving any
12 attorney client privilege, if you'll agree to that.
13       MR. ANDERSON: Sure.
14       MR. BERLIN: I mean, that doesn't --
15       MR. ANDERSON: Yeah.
16       MR. BERLIN: -- mean all of a sudden
17 you can get into all the conversations that we had in
18 prep, but I think it's worth it to try to alleviate
19 this confusion and move on.
20    A.  I don't think I'm aware of any potential
21 violations that -- is that what your last question
22 was? I -- I'm not --
23    Q.  (BY MR. ANDERSON): Yes.
24    A.  -- aware of anything that was communicated
25 to me in preparation for this case --

Page 323

1    Q.  Okay.
2    A.  -- related to potential violations of --
3    Q.  Right.
4    A.  -- of AWP.
5    Q.  Right. How long has Abbott sold Neoral?
6    A.  We haven't sold Neoral ever.
7    Q.  Who -- who -- do you know which drug
8  company manufactures and sells Neoral?
9    A.  I believe it's Novartis.
10   Q.  Is -- is Neoral a competitive product to an
11 Abbott product?
12   A.  It is.
13   Q.  Which product?
14   A.  Gengraf.
15       (Exhibit 21 marked.)
16   Q.  (BY MR. ANDERSON): Take a look, if you
17 could, at what's been marked as Exhibit 21.
18   A.  (Reviews document.)
19       MR. BERLIN: And can you just give
20 some tie-in to the notice, just because we're on a
21 drug that is a non-Abbott drug that doesn't compete
22 one of -- with one of the drugs? So --
23       MR. ANDERSON: It's -- it has to do
24 with the reimbursement modeling and what have you,
25 and I would contend it has to do with the -- much of

15 (Pages 320 to 323)

78d0f838-8a4b-451a-b83a-8d22e725708a

Page 324

1  the notice, but specifically the good faith.
2      MR. BERLIN:  Although the good faith
3  relates just to -- it relates to this case which
4  relates to Ery.  So I'm going to object to the scope,
5  and you can answer within -- and I'm sure you didn't
6  have discussions with this under the notice, but you
7  can answer this with respect to your -- your personal
8  knowledge of -- of what he has to ask, if you have
9  any.
10     A.  (Reviews document.)
11     Q.  (BY MR. ANDERSON)  Have you seen this
12 document before?
13     A.  I may have.  I don't recall.
14     Q.  Have you seen documents similar to this
15 with profit analysis?
16         MR. BERLIN:  Objection, form.
17     A.  Yes.
18     Q.  (BY MR. ANDERSON)  Is this a type of
19 document that Abbott personnel have created?
20     A.  I don't know whether they created this
21 one.
22     Q.  I know -- I realize that.  I'm saying, have
23 you seen documents similar to this that have been
24 created by Abbott personnel?
25     A.  Yes.

Page 325

1          MR. BERLIN:  Well, can -- can --
2  objection to form as to what you mean by "similar,"
3  and objection to scope.
4      A.  Yes.
5      Q.  (BY MR. ANDERSON)  Mr. Fiske, in what
6  context have you seen documents similar to this that
7  provide profit analysis?
8      A.  I don't recall when these documents may
9  have been prepared, however, and that's one of the
10 things I'm struggling with, because I don't know
11 where you're going with it.  But at the time that we
12 launched Gengraf, Gengraf was a generic AB-rated to
13 Neoral.
14         I know that there was some modeling
15 done regarding what the value of Gengraf was relative
16 to Neoral.
17     Q.  When was Gengraf launched as a generic by
18 Abbott?
19     A.  I don't recall.
20     Q.  And when you say there was some modeling
21 done, you're talking about modeling conducted by
22 Abbott personnel, correct?
23     A.  Yes.
24     Q.  Who specifically?
25     A.  People in my department.

Page 326

1      Q.  And when the modeling was created
2  intern- -- what -- who was it shared with?
3      A.  People in the managed care -- managed care
4  marketing group.
5      Q.  So personnel at Abbott who would be calling
6  on managed care customers?
7      A.  As well as people who might be calling on
8  retail accounts, I believe.
9      Q.  Such as the national trade executives?
10     A.  I don't believe that it was shared with
11 them, but it may have been.
12     Q.  Was it shared with people in Trade
13 Relations such as Tip Parker to your knowledge?
14     A.  I believe so.
15     Q.  Why?
16         MR. BERLIN:  Objection, form.
17     A.  We were seek- --
18         MR. BERLIN:  Objection, scope.
19     A.  We were attempting to contract with
20 retailers as well as other organizations, hospitals
21 through purchasing organizations, etcetera, to have
22 them stock our product as a generic.
23     Q.  (BY MR. ANDERSON)  And this information
24 concerning profit analysis could be shared by Abbott
25 personnel to customers to influence them in stocking

Page 327

1  Gengraf?
2          MR. BERLIN:  Objection, form.
3  Objection, scope.
4      A.  I don't know whether it was or not.
5      Q.  (BY MR. ANDERSON)  Was that why it was
6  created?
7      A.  It was created for us to evaluate the
8  situation.
9      Q.  "The situation" being the relative
10 profitability of Gengraf versus its generic
11 competitor Neoral?
12     A.  Correct.
13     Q.  And what was ultimately determined?
14     A.  That not only was Gengraf going to cost
15 payors less money, but it was likely that pharmacies
16 would make more money on the product.
17     Q.  And ultimately was Gengraf marketed by
18 Abbott?
19     A.  It was.
20         MR. BERLIN:  I'm sorry.  I --
21 objection to scope, and objection to scope goes to
22 the entire line of testimony.
23     Q.  (BY MR. ANDERSON)  When -- when was
24 Gengraf launched roughly?
25         MR. BERLIN:  Objection to scope.

Page 328

1    A.  I -- I told you I don't recall.
2    Q.  (BY MR. ANDERSON):  Okay.  That's what --
3  the date that you were having trouble recalling?
4    A.  That's correct.
5    Q.  Was it within the past five years?
6        MR. BERLIN:  Objection, scope.
7    A.  I don't recall.  I don't think so, but I
8  don't recall.
9    Q.  (BY MR. ANDERSON):  So it would have
10  been -- well, let's -- I -- I -- I appreciate you
11  don't recall and I -- I know that you may not recall
12  the precise date, but if you can at least give me a
13  time frame within a decade, early or late '90s, for
14  instance, was that when Gengraf was launched?
15        MR. BERLIN:  Objection, form.
16  Objection, scope.
17    A.  I know that it seems like I should know,
18  but I -- I -- I don't recall whether it was late '90s
19  or early thousands.
20    Q.  (BY MR. ANDERSON):  Okay.  Was this type of
21  profit analysis created for purposes of conveying
22  this information to pharmacies?
23        MR. BERLIN:  Objection, form.
24  Objection, scope.
25    A.  I don't recall whether it was used for that

Page 329

1  purpose or not.
2    Q.  (BY MR. ANDERSON):  I -- I appreciate
3  you're not able to recall whether it was used for
4  that purpose.  I'm asking, was it created for that
5  purpose?
6        MR. BERLIN:  Same objections.
7    A.  It was originally created to evaluate
8  things in-house.  I don't know whether it was used
9  for other purposes or not.  I just don't recall.
10    Q.  (BY MR. ANDERSON):  What is Tip Parker's --
11  strike that.
12        What was Tip Parker's role in the
13  marketing of Gengraf upon its launch?
14        MR. BERLIN:  Objection, form.
15  Objection, scope.
16    A.  Well, I don't recall the time that it
17  launched --
18        MR. BERLIN:  Actually, I'm going to
19  ask you to hold on a second.  You --- can you answer
20  whether you know of any investigation or complaint
21  under seal relating to Gengraf in Abbott's sale and
22  use of Gengraf?
23        MR. ANDERSON:  No, I -- I don't think
24  I can answer that, but that's not what this is all
25  about.

Page 330

1        MR. BERLIN:  Well, these are questions
2  that don't relate in any way to Ery, and we've had
3  this experience before where counsel has come in and
4  asked questions that relate not to -- at all to the
5  case that is actually being prosecuted and
6  essentially conducting -- and I'm not accusing you of
7  doing this, I'm telling you what my concern is --
8        MR. ANDERSON:  Uh-huh.
9        MR. BERLIN:  -- that -- that -- of
10  counsel coming in and conducting essentially a civil
11  investigation where we should be put on notice of
12  that but without putting us on notice of it.
13        And -- and I just -- that -- you've
14  had this long quest-- -- this long sets of questions
15  about Gengraf, and there is absolutely no link at all
16  to erythromycin.  Now -- I mean, is -- is there a
17  link to erythromycin in this?
18        MR. ANDERSON:  Well, absolutely.
19  That's why I'm asking all the questions, because it's
20  my contention that this bears upon the knowledge of
21  all the personnel.  When they're marketing one
22  product, it's not as if they don't know those same
23  things when they're marketing another product.
24        MR. BERLIN:  But it -- it -- he
25  didn't say that it was any knowledge that it was used

Page 331

1  by Marketing, and that's kind of where you left it
2  and where it left me concerned.
3        I mean, he's saying to his knowledge,
4  it was used internally and that it may have been used
5  with Managed Care, which, of course, there's an
6  exception to the policy for Managed Care.
7        MR. ANDERSON:  I -- I'll -- the
8  testimony will speak for itself.  I don't think
9  that's accurate.  And, you know, I can't really see
10  how the dialogue you and I are having is productive,
11  but I -- I feel like this is within the scope of
12  discovery of this pending case, and I'm not trying to
13  somehow do some underhanded civil investigation, if
14  that's what you're worried about.
15        MR. BERLIN:  Well, I'm con--- in --
16  in part concerned about that, and then I'm even more
17  concerned about it that you tell me that you can't
18  tell me whether there is an --
19        MR. ANDERSON:  Well, if -- if it's
20  under seal, I can't disclose.  But that's -- I mean,
21  that -- that -- that's -- even if I were to address
22  the question, you know, I can't --
23        MR. BERLIN:  Yeah, but the fact is --
24        MR. ANDERSON:  -- I -- I don't --
25        MR. BERLIN:  I understand you --

17 (Pages 328 to 331)

78d0f838-8a4b-451a-b83a-8d22e725708a

Page 332

1          MR. ANDERSON: -- I can't -- you
2  can't put me --
3          MR. BERLIN: -- might not be able
4  to --
5          MR. ANDERSON: -- in that spot.
6          MR. BERLIN: I know -- understand you
7  might not be able to disclose that to me --
8          MR. ANDERSON: Yeah.
9          MR. BERLIN: -- but if you knew that
10 there was not one and -- and -- and you knew that for
11 a fact, you could disclose to me that there is not
12 one. So it raises -- it raises at least the -- and
13 I'm not -- again, I'm not accusing you of this --
14         MR. ANDERSON: Yeah.
15         MR. BERLIN: -- and I don't -- and you
16 know I don't like to have these discussions on the
17 record, and generally we have not, but it is a very
18 sensitive issue in fact -- if in fact this is
19 occurring either intentionally or unintentionally
20 that it's essentially discovery that something is
21 under seal and that -- you know, that this -- this is
22 going on without us having notice --
23         MR. ANDERSON: I -- I'm --
24         MR. BERLIN: -- of that.
25         MR. ANDERSON: -- telling you crystal

Page 333

1  clear that that's definitely not happening.
2          MR. BERLIN: Not intentionally, you're
3  not --
4          MR. ANDERSON: Right.
5          MR. BERLIN: But there may be under
6  seal and there -- essentially someone is getting
7  discovery about -- about Gengraf --
8          MR. ANDERSON: Well, it's not me.
9          MR. BERLIN: -- about -- about Gengraf
10 where -- where -- and I just don't see the link to --
11 I mean, ask the questions about Ery if you want, did
12 -- did -- "did this occur with Ery," "did this occur
13 with Ery," "did you do this with Ery".
14         But sitting and going in-depth as
15 to -- at -- what -- what went on with Gengraf, I
16 don't see is -- is -- it's definitely not within the
17 notice, and if it were a -- just an individual
18 deposition, maybe there would be more slack, but it's
19 not even -- I mean, it's not even close to within the
20 notice.
21         Everything here has been --
22         MR. ANDERSON: Well, you --
23         MR. BERLIN: -- pared down to Ery.
24         MR. ANDERSON: Well, you -- you can
25 object to the -- the scope of the notice and -- and

Page 334

1  he can answer the questions, and whether or not he's
2  speaking on behalf of the corporation can be resolved
3  later.
4          I told you that I think it goes to
5  the knowledge, and I think, therefore, it bears upon
6  the -- the good faith as y'all have pled it. And
7  granted, that's a very broad topic, but, I mean,
8  y'all pled it. I didn't plead it.
9          MR. BERLIN: Yeah, but --
10         MR. ANDERSON: So --
11         MR. BERLIN: -- what -- what that
12 was -- and, again, I'm not going to belabor this much
13 longer -- why Abbott's actions relevant to this case
14 were taken in good faith. I mean, that's what he's
15 designated to test about --
16         MR. ANDERSON: Uh-huh.
17         MR. BERLIN: -- testify about. So --
18 how much more questioning do you have on Gengraf?
19         MR. ANDERSON: Well, actually, when
20 you interjected, I was primarily asking questions
21 about Tip Parker and her role, so it's getting to be
22 more of -- you know, it's wrap-- -- I'm wrapping it
23 up. But I need to --
24         MR. BERLIN: Okay.
25         MR. ANDERSON: I need to understand

Page 335

1  some more about --
2          MR. BERLIN: Okay.
3          MR. ANDERSON: -- what her role was.
4          MR. BERLIN: Well, I'm going to have a
5  continuing objection to scope on -- on all -- on all
6  of this, but go ahead.
7          MR. ANDERSON: Okay.
8          MR. BERLIN: Even Tip Parker's role is
9  not -- I mean, you could have had a -- a -- a topic
10 that is what were the role of each of these
11 individuals, so I don't even think that is within the
12 s- -- in -- that alone is within the scope. But go
13 ahead.
14      Q.   (BY MR. ANDERSON): What -- back to the
15 question, Mr. Fiske, after all that. What was Tip
16 Parker's role, as you understood it, in the launch of
17 Gengraf?
18         MR. BERLIN: Objection, scope.
19      A.   If I recall correctly, Tip Parker was
20 Director of Trade Relations at the time that we
21 launched Gengraf, in a different capacity, a
22 different kind of role than she has today, and
23 responsible for the national trade executives. They
24 may not have had that title back then, but they still
25 were responsible for negotiating contracts with

18 (Pages 332 to 335)

78d0f838-8a4b-451a-b83a-8d22e725708a

Page 336

1 retail pharmacies to chains primarily for the
2 inclusion -- for them to carry Gengraf.
3     Q.  (BY MR. ANDERSON):  And so she was
4 receiving information such as that in Exhibit 21 to
5 assist her and the people reporting to her in the
6 marketing of Gengraf, correct?
7     A.  She would have been in meetings with myself
8 and other people in the Managed Care Organization to
9 talk about our product relative to the competitive
10 products.
11         MR. BERLIN:  And I -- I missed an
12 objection to scope, and it goes to all of these
13 questions.
14     Q.  (BY MR. ANDERSON):  And -- and the reason
15 she would have been in those meetings and the reason
16 she would have been provided information such as that
17 in Exhibit 21 is to assist in the marketing of the
18 drug, correct?
19     A.  To assist us in determining what a correct
20 price point might need to be for us to be successful
21 with the product on our contract pricing.
22     Q.  And also on your published pricing,
23 correct?
24         MR. BERLIN:  Objection, scope.
25     A.  And also our published pricing.

Page 337

1     Q.  (BY MR. ANDERSON):  So is it true that with
2 respect to the setting of the published prices,
3 Abbott did consider the relative reimbursement spread
4 of its product versus a competitive product?
5         MR. BERLIN:  Objection, scope.
6     A.  I don't think so, because I think our WAC
7 had been determined and we were going to determine
8 what our discount price was.  I don't -- I don't --
9 our -- our reimbursement didn't enter into our
10 determination of what our WAC price was.
11     Q.  (BY MR. ANDERSON):  You -- I notice in
12 Exhibit 21 there are several different pages showing
13 the AWP of Neoral, correct?
14     A.  Yes.
15     Q.  And in order to conduct an analysis of
16 Gengraf compared to Neoral -- well, strike that.
17         The first page is for Neoral, correct?
18     A.  That's what it states.
19     Q.  And then are the next pages the AWP and
20 other pricing information for Gengraf?
21     A.  (Reviews document.)
22         MR. BERLIN:  Same objections.
23     A.  I don't know.
24     Q.  (BY MR. ANDERSON):  Well, you'll -- you'll
25 see -- and you'll agree with me, won't -- won't you,

Page 338

1 that the AWPs that are listed for Neoral on the first
2 page are different than the AWPs that are listed for
3 the other drugs on the other pages?
4     A.  Yes.
5     Q.  Does that indicate to you that those are
6 the Gengraf AWPs?
7         MR. BERLIN:  Same objections.
8     A.  They may be.  I don't know.
9     Q.  (BY MR. ANDERSON):  Isn't it likely that --
10     A.  If they're in the relative range, they --
11 they may be.
12     Q.  Okay.  And so is it true that with respect
13 to the setting of the market prices on Gengraf,
14 Abbott was also considering the reimbursement spreads
15 on Gengraf?
16         MR. BERLIN:  Objection, form.
17 Objection, scope.
18     A.  As I said, the WACs had already been
19 established for the product by that point in time.  I
20 don't know that -- I don't know that that's a -- a
21 correct characterization of things.
22         We certainly looked at it from the
23 customers's point of view, but you have to remember
24 that this would be contract customers' point of
25 view.  And if you actually look at what we garnered

Page 339

1 in terms of business, there were many, many customers
2 for this product that purchased at WAC.
3         So I -- I don't know where you're
4 headed with it, but the reimbursement is going to
5 depend upon what people paid for the product -- or
6 the -- I'm sorry, the reimbursement spread is going
7 to depend on what people paid for the product, and
8 this is just a look at one particular customer.  Not
9 a customer specifically.  I'm talking about --
10     Q.  (BY MR. ANDERSON):  In --
11     A.  -- a potential contract customer.
12     Q.  In looking at page 2 of Exhibit 21, which
13 price is the WAC price --
14         MR. BERLIN:  Object-- --
15     Q.  (BY MR. ANDERSON):  -- if any?
16         MR. BERLIN:  I'm sorry.  Objection,
17 form.  Objection, scope.
18     A.  (Reviews document.)  I don't see a WAC
19 price listed.
20     Q.  (BY MR. ANDERSON):  What is the base price
21 representing?
22         MR. BERLIN:  Objection, form.
23 Objection, scope.
24     A.  I don't know.
25     Q.  (BY MR. ANDERSON):  Did Abbott offer Base

Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600    -    HOUSTON   (713) 572-8897

78d0f838-8a4b-451a-b83a-8d22e725708a

Page 340

1  Deal prices or base prices on Gengraf?
2          MR. BERLIN:  Objection, form.
3  Objection, scope.
4      A.  There was no Base Deal pricing for Gengraf.
5      Q.  (BY MR. ANDERSON):  For Gengraf, did Abbott
6  understand that the AWP was a function of the
7  published WAC?
8          MR. BERLIN:  Ob- -- objection, form.
9  Objection, scope.
10     A.  The estimated AWP was based on the WAC for
11 this analysis, I'm sure.
12     Q.  (BY MR. ANDERSON):  What was the formula
13 that Abbott utilized to estimate these AWPs that are
14 shown on the second page of Exhibit 21?
15         MR. BERLIN:  Objection, form.
16 Objection, scope.
17     A.  Without the WAC price being on there, I
18 wouldn't know.
19     Q.  (BY MR. ANDERSON):  Is it --
20     A.  But I would speculate that it was 125
21 percent of WAC.
22     Q.  Bear with me for just a moment.  I'm going
23 to do a little math.  Well, I've done the math, and
24 the -- the base price is less than $41.25 divided by
25 1.25.

Page 341

1      A.  I know.  I did the same math.
2      Q.  So --
3          MR. BERLIN:  Let -- let the record
4  reflect that Mr. Fiske did his in his head, and
5  Mr. Anderson and I needed to use a calculator.
6          MR. ANDERSON:  Well, Mr. Fiske is an
7  accountant, I'm not, so that -- he's good with
8  numbers.
9          MR. BERLIN:  We were -- we were just
10 having a little bit of fun.
11     Q.  (BY MR. ANDERSON):  Did -- did Abbott
12 conduct analysis similar to that shown in Exhibit 21
13 with respect to the erythromycins?
14     A.  Not to my knowledge, not ever.
15     Q.  Why would Abbott conduct this type of
16 analysis with respect to Gengraf and its generic
17 competitors but not erythromycins and their generic
18 competitors?
19         MR. BERLIN:  Objection, form.
20     A.  It was a newly-launched product.  We
21 were -- we were hoping, but we weren't the first --
22 we were hoping to be the first generic in the market,
23 and we were trying to figure out how do we need to
24 price the product, not only to create value for the
25 payor but also for the provider --

Page 342

1      Q.  (BY MR. ANDERSON):  In that --
2      A.  -- which would provide profitability for
3  all parties.
4      Q.  And by "payor," you mean the reimburser?
5      A.  Correct.
6      Q.  And so -- and by "provider," you mean
7  pharmacies, as well as, potentially, hospitals and
8  what have you, correct?
9      A.  That would be correct.
10     Q.  And so how did pharmacies' profitability
11 factor into the pricing?
12         MR. BERLIN:  Objection, scope.
13     A.  Ultimately it didn't, to the extent that we
14 were second to market and we had to be competitive
15 with the way the other generic was pricing their
16 product.
17     Q.  (BY MR. ANDERSON):  Is it true that the --
18 that ultimately the Gengraf generic was more
19 profitable to the pharmacy than the Neoral generic?
20     A.  The competitive generic --
21         MR. BERLIN:  I -- I'm sorry.
22 Objection, scope.
23     A.  The competitive generic was probably the
24 most profitable to the pharmacy.  I told you we were
25 second to market.  We never priced our product --

Page 343

1  generally did not price our product as low as the
2  competitive product.
3      Q.  (BY MR. ANDERSON):  Which competitive
4  product are you referring to?
5      A.  I -- I believe Sidmak was first to market.
6  I can't recall.
7      Q.  Oh, you're profit- -- okay.  I know what
8  you're saying.  Gengraf was determined to be more
9  profitable for the pharmacy by Abbott as compared to
10 Neoral, but it was not more profitable as compared to
11 a generic made by Sidmak?
12     A.  I believe that was the company, yes.
13     Q.  Okay.
14         MR. BERLIN:  And, again, continuing
15 objection to scope.
16     Q.  (BY MR. ANDERSON):  And did that ultimately
17 re- -- did that situation ultimately result in Sidmak
18 garnering more of the sales than Abbott?
19         MR. BERLIN:  Scope.
20     A.  Actually, no.
21     Q.  (BY MR. ANDERSON):  Did Abbott -- I think
22 you testified a few moments ago that Abbott
23 ultimately wasn't too successful in selling Gengraf
24 to pharmacies; is that true?
25     A.  Not with respect to pharmacies.

78d0f838-8a4b-451a-b83a-8d22e725708a

Page 344

1    Q.   Right.  So with respect to pharmacies, did
2  ultimately Sidmak's generic do better in the
3  marketplace and sell more than Gengraf?
4            MR. BERLIN:  Scope, and objection to
5  form as well.
6    A.   I -- I -- I know this gets cer- -- I'm
7  going to say no, and you can ask me more questions.
8    Q.   (BY MR. ANDERSON):  Why?
9            MR. BERLIN:  Objection to scope.
10   A.   Our product had been -- unlike most generic
11 products, we actually did clinical studies on our
12 product.  If you knew the brand name product well,
13 you would find out that it caused tremendous body
14 odor.  Our product didn't.
15           Our product was tested in patients --
16 these are transplant rejection drugs.
17   Q.   (BY MR. ANDERSON):  Uh-huh.
18   A.   And our product had -- as I said, clinical
19 studies had been done on the product.
20           So we were actually able to
21 demonstrate superiority versus brand because it
22 didn't cause this tremendous body odor issue, and it,
23 in fact, was demonstrated that it did prevent
24 rejection -- organ rejection.
25           Competitive generics entering the

Page 345

1  marketplace had no such studies to fall back on.  We
2  promoted our product actually to physicians and in
3  hospitals, transplant centers, and it was widely
4  accepted by those physicians and they were more
5  willing to accept the generic substitution of our
6  product, but it was also written for patients that
7  were new transplant patients.
8            So despite the fact that a significant
9  number of pharmacies, including CVS, declined our
10 contract offer, they ended up buying an awful lot of
11 our product at WAC because ours was the most
12 prescribed generic.
13   Q.   So that was a function of -- of the
14 Gengraf, although it was AB-rated, actually being
15 marketed and detailed by Abbott successfully as a
16 brand to the physicians?
17           MR. BERLIN:  Objection, scope.
18   A.   Yeah, it's a pretty unusual strategy in the
19 marketplace, but it's a unique market as well.
20   Q.   (BY MR. ANDERSON):  And, in turn, when the
21 pharmacies were dispensing Gengraf often, they did
22 not have an option to dispense the generic Sidmak
23 version bec- -- or the Neoral because it -- the
24 physicians were writing for Gengraf brand name only,
25 correct?

Page 346

1            MR. BERLIN:  Objection, form.
2  Objection, scope.
3    A.   Or when they called, the physician would
4  decline to allow the substitution, yeah.
5    Q.   (BY MR. ANDERSON):  Yes.  Okay.  But with
6  respect to the -- the pharmacies' profitability,
7  Abbott ascertained that the Sidmak generic was more
8  profitable than the Gengraf, correct?
9            MR. BERLIN:  Objection, scope.
10   A.   Well, since a MAC is established when
11 there's three or more products in the marketplace, at
12 that point in time, I think -- and since pharmacies
13 were representing to us that our price was higher, I
14 guess if you do the math, it must have been more
15 profitable for them to sell Sidmak than Gengraf.
16   Q.   (BY MR. ANDERSON):  Given that -- well,
17 strike that.
18           I believe you just testified that this
19 Gengraf situation was relatively unique, and it was a
20 unique marketing strategy for an AB-rated drug,
21 correct?
22   A.   To my knowledge.
23   Q.   Would you agree that the marketing strategy
24 Abbott implemented for the erythromycins was more of
25 a standard generic marketing plan?

Page 347

1            MR. BERLIN:  Objection, form.
2    A.   You know what?  I'm not a marketing person,
3  and I don't know what a "standard generic marketing
4  plan" is for a product.
5    Q.   (BY MR. ANDERSON):  Well, what were you
6  basing your statement that Gengraf was relatively
7  unique upon?
8    A.   I -- I haven't heard of manufacturers doing
9  clinical studies and promoting AB-rated generics
10 generally to physicians.
11   Q.   Right.  Typically a generic drug is not
12 marketed on its clinical features because those
13 features are the same as all the other generics that
14 it competes with, correct?
15   A.   That's what people represent.
16   Q.   And so, in turn, one of the ways that
17 generic drugs such as the erythromycins are marketed
18 is based on contract price, correct?
19   A.   Correct.
20   Q.   And then also, generic drug companies
21 appreciate, and Abbott appreciated, that pharmacies
22 are interested in reimbursement issues, correct?
23   A.   We understood that pharmacies were
24 interested in reimbursement issues, yes.
25   Q.   And so, for instance, with a generic, then

Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600    -    HOUSTON   (713) 572-8897

78d0f838-8a4b-451a-b83a-8d22e725708a

Page 348

1  one of the attributes of that product can be and is
2  the relative reimbursement that it provides to the
3  pharmacy when it's dispensed versus a competitive
4  generic --
5        MR. BERLIN: Objection, form.
6     Q. (BY MR. ANDERSON): -- correct?
7        MR. BERLIN: Objection, form.
8     A. If there's any difference at all.
9     Q. (BY MR. ANDERSON): And sometimes there is
10 because there's variation in the published prices or
11 there's variation in the contract prices between the
12 competing generics, correct?
13    A. Well, contract pricing is something
14 different than reimbursement. Reimbursement based on
15 a MAC, there wouldn't be any difference.
16    Q. Right. Well, we'll get to the MAC in a
17 second. And I agree with you that contract pricing
18 is different than the prices that are published --
19    A. Oh.
20    Q. -- and then used by reimburse- --
21 reimbursement entities, so I'll -- I'll ask you an
22 additional question to frame this.
23       The reimbursement is based on prices
24 that are used for reimbursement, such as the
25 published WAC or the published AWP and, on the other

Page 349

1  hand, the contract price is actually paid by the
2  pharmacies, correct?
3     A. Would you say that again, please?
4     Q. The reimbursement profits, or the
5  reimbursement spread, is calculated on the one hand,
6  you have the published prices that are used for
7  reimbursement like AWP or WAC, and on the other hand,
8  you have the actual prices paid by the pharmacies,
9  correct?
10       MR. BERLIN: Objection, form.
11    A. That's a misrepresentation of what actually
12 occurs. That may be the case with some products, but
13 as we've discussed many times in this deposition,
14 there are numerous reimbursement formulas that are
15 used by the states to determine what their MACs are,
16 and it may not bear any relationship to a published
17 WAC or AWP for a multisource product.
18    Q. (BY MR. ANDERSON): Right. Because
19 sometimes a MAC, a maximum allowable cost, is part of
20 the formula, correct?
21    A. It usually is for a multisource drug.
22    Q. Yes. But likewise, Abbott appreciated that
23 also usually part of the formula for reimbursement
24 would be estimated acquisition costs set by the
25 Medicaid programs based on published prices such as

Page 350

1  AWPs or WACs?
2     A. Or more --
3        MR. BERLIN: Objection -- hold on.
4  Objection, form. Objection, scope.
5     Q. (BY MR. ANDERSON): Is that --
6     A. Or, more appropriately, based on a survey
7  of retail pharmacies to find out what their actual
8  acquisition cost was, as -- which was the case with
9  some states.
10    Q. What -- why do you say that's more
11 appropriate?
12    A. Because that's probably the best indication
13 of what an actual acquisition cost is --
14    Q. And how --
15    A. -- is to actually survey the pharmacies
16 themselves.
17    Q. How often --
18    A. They know what they paid for the products,
19 sir.
20    Q. How often do you think Medicaid programs
21 should survey pharmacies?
22       MR. BERLIN: Objection, form.
23 Objection, scope.
24    A. As often as somebody at that level deems
25 appropriate.

Page 351

1     Q. (BY MR. ANDERSON): Do you know how
2  expensive surveys are?
3     A. I don't know.
4     Q. Does Abbott have any information about the
5  relative costs and benefits of conducting surveys of
6  pharmacies?
7     A. With -- with all due respect, sir, it would
8  be no more expensive for them to require the retail
9  pharmacist to report that information than it is for
10 manufacturers to report AMPs.
11    Q. It -- it wouldn't?
12    A. I don't know why it would be.
13    Q. Ex- -- explain what you mean.
14    A. By federal law, we're required to report an
15 average manufacture price on a quarterly basis. They
16 could require all of the major chains and other
17 pharmacies to report estimated acquisition costs on a
18 quarterly basis. It would give them the right number
19 every time, wouldn't it?
20    Q. So really what you're saying is that --
21 that there should have been different laws in place?
22       MR. BERLIN: Objection, form.
23    A. I'm just saying, sir, that some states
24 actually did surveys of retail pharmacies. I don't
25 know the frequency of those surveys, but some states

22 (Pages 348 to 351)

78d0f838-8a4b-451a-b83a-8d22e725708a

Page 352

1   did so. And that is a reasonable approach to
2   determining what the actual acquisition cost is for a
3   retail pharmacy. Ask them.
4        Q. (BY MR. ANDERSON): Okay. But you don't --
5   as Abbott's corporate representative, you don't have
6   any information on the relative costs of the surveys,
7   the relative accuracy of the surveys, or any type of
8   information to support that statement, do you?
9             MR. BERLIN: Objection, form.
10       A. No, sir.
11       Q. (BY MR. ANDERSON): And you don't have a
12  position, as Abbott's corporate representative, on
13  how accurate a survey would be after it was
14  conducted, given that prices change in the
15  marketplace, correct?
16       A. No, sir.
17       Q. Okay. So going back to my original
18  question which is the evaluation of reimbursement
19  spreads, do you agree that on the one hand you have
20  the drug cost reimbursement calculation which
21  includes published prices such as AWPs and WACs, but
22  also may include a MAC, and on the other hand, you
23  have the providers' actual costs, such as the price
24  the pharmacy pays, correct?
25       A. That's part of the determination of the

Page 353

1   pharmacy profit. There's also a dispensing fee
2   involved.
3        Q. Right. And with respect to this
4   calculation of ingredient cost or reimbursement
5   spread, did Abbott consider that in marketing its
6   drugs, such as the information shown in Fiske Exhibit
7   21?
8        A. I don't know whether it was considered in
9   terms of the marketing of the drugs. Not to the best
10  of my knowledge, but I -- I may not be correct.
11       Q. What would you consider this function in
12  which it was utilized in the context of Exhibit 21?
13       A. Well --
14            MR. BERLIN: Objection, scope.
15       A. I -- I -- I'm trying to draw a distinction
16  between whether we used something for internal
17  evaluation purposes to determine corr- -- an
18  appropriate contract price to establish for a product
19  versus "marketing" implies that you're perhaps
20  com- -- communicating all of that to the respective
21  customer.
22       Q. (BY MR. ANDERSON): Oh, I see. Okay. And
23  I appreciate your -- your testimony earlier that
24  you're -- it could have been communicated out to the
25  customers; you're not sure if it was or wasn't,

Page 354

1   correct?
2        A. Correct.
3        Q. Okay. I'll limit this question, then, to
4   just internal evaluations, what you do know occurred.
5             Will you agree, sir, that in setting
6   prices, Abbott considered relative reimbursement
7   spreads based on ingredient cost reimbursement in
8   setting prices?
9        A. For setting contract pricing on Gengraf, we
10  did.
11       Q. Okay. Was that type of consideration
12  conducted on other drugs?
13       A. Not to my recollection.
14       Q. Why was Gengraf special?
15       A. It -- it -- as a --
16            MR. BERLIN: Objection, form.
17  Objection, scope.
18       A. As it's a brand name pharmaceutical
19  manufacturer, it was very unusual for us to ever --
20  the Pharmaceutical Products Division is a brand name
21  pharmaceutical manufacturer and seller.
22            The products that are generic are
23  products that were brands that have gone generic, an
24  exception to that is Gengraf, where somebody
25  identified this unique opportunity to actually do

Page 355

1   these clinical studies and perhaps make something
2   more of a generic drug than others.
3             We subsequently found out that we
4   actually aren't a generic company and don't -- don't
5   do a very good job of being a generic company. But
6   it was a unique drug, and it was an isolated, unusual
7   situation in terms of the evaluation that we were
8   doing.
9        Q. (BY MR. ANDERSON): Given that Abbott
10  marketed the erythromycins as generics as well, do
11  the same considerations that were reflected in
12  Exhibit 21 for Gengraf apply to erythromycins?
13       A. They could have applied, but I don't recall
14  them ever having been discussed in any of our
15  considerations for pricing of the product.
16       Q. Do you have any information that for the
17  erythromycins, the type of analysis reflected in
18  Exhibit 21 for Gengraf was not done?
19       A. I think I can state this for a fact, that
20  it has never been done during the 15 to 16 years I've
21  been in the Pricing and Contracting Department.
22            I was a financial analyst supporting
23  National Accounts in probably 1990 or '91 time frame,
24  and I don't recall an analysis like that having been
25  done at that point in time either.

Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600   -   HOUSTON   (713) 572-8897

78d0f838-8a4b-451a-b83a-8d22e725708a

Page 356

1    Q.  Why do you think that analysis was
2  considered important for purposes of Gengraf's
3  generic launch, but it wasn't considered important
4  for the erythromycin generic launch back in the late
5  '80s?
6    A.  There never was a generic launch of the
7  Erys.  The Erys were branded products that
8  subsequently faced generic competition.  And now
9  you're going back further than I have any
10  recollection or knowledge of events, so -- other than
11  to state that -- that fact.
12    Q.  Well, I mean, maybe they weren't launched
13  in the sense that they were launched as a new NDC
14  number, but they were launched as generics that were
15  AB-rated and eligible for generic substitution,
16  correct?
17    A.  I don't know.
18    Q.  You don't know?  Okay.
19        There was at least a decision to
20  market the erythromycins as generics as opposed to
21  brands, correct?
22    A.  Well -- well, yes and no.  I mean, we saw
23  the document that -- or talked about the document
24  that I discussed with Charlie Aubuchon regarding the
25  classification of the products as a generic back in

Page 357

1  the '88 to '91 time frame, but they were always
2  marketed as a brand at the same time.
3    Q.  Right.  They were -- they -- they had an
4  NDC number that was a brand NDC number, as it had
5  been for many, many years back into the '70s, and
6  then they also had a new NDC number that was marketed
7  as a generic, and that's what led to, for instance,
8  the advertisements known as "the Ery gang"
9  advertisements that notified the industry that drugs
10  were eligible for generic substitution, correct?
11    A.  No.
12    Q.  "No"?
13    A.  No.
14    Q.  What led to Abbott advertising that the
15  products were eligible for generic substitution?
16    A.  I don't know the events that transpired
17  back then, but there were not different NDC numbers.
18    Q.  How can the same NDC number be marketed as
19  a brand and marketed as a generic?
20        MR. BERLIN:  Objection, form.
21    A.  The same way Gengraf was.  It was branded a
22  generic.  You pro- -- I'm saying that they were
23  promoted based on their existing brand names.  They
24  were priced competitively with generics in the
25  marketplace.  So that's how you market them both as a

Page 358

1  brand and a generic.
2    Q.  (BY MR. ANDERSON):  If a physician in the
3  late '90s wrote a prescription for erythromycin and
4  wrote "brand only," which company's product would
5  have been dispensed?
6    A.  Well, I can't imagine that situation ever
7  actually occurring.
8    Q.  So it's just -- it's an -- it's an
9  impossible hypothetical?
10    A.  I can't imagine writing "brand name only"
11  for -- "brand only" for an Ery product.
12    Q.  Okay.  So the truth is that, it's your
13  testimony, the Abbott erythromycins from the late
14  '80s on were marketed purely as generics?
15    A.  I want to caveat that to the extent that we
16  still had our brand name equity that we took
17  advantage of.
18    Q.  Right.  The -- such as the tag line, "the
19  erythromycin company," etcetera?
20    A.  Yes.
21    Q.  Okay.
22    A.  And Ery-Tab is a well- -- well-respected
23  brand.  It's the most dispensed Ery even today.
24    Q.  Right.  Okay.  With respect to the
25  marketing of the erythromycins as generics, do you

Page 359

1  have any information that the same considerations
2  about reimbursement and spreads or profits that are
3  shown in Exhibit 21 that applied to Gengraf were not
4  considered with respect to erythromycins?
5    A.  I have no knowledge that they ever were.
6    Q.  Do you have any knowledge that they
7  specifically were not?
8        MR. BERLIN:  Objection, form.
9    Q.  (BY MR. ANDERSON):  Was there -- what I'm
10  getting at, was there some policy in place that it's
11  okay to market with these types of considerations
12  about pharmacy profit for Gengraf, but it's not okay
13  to market with considerations about pharmacy profit
14  for erythromycins?
15        MR. BERLIN:  Objection, form, and
16  misstates the testimony in evidence.
17    A.  No.
18    Q.  (BY MR. ANDERSON):  Okay.
19        MR. BERLIN:  Is -- do you mind if we
20  take a very brief break, a personal break?
21        MR. ANDERSON:  Sure.
22        MR. BERLIN:  Thanks.
23        THE VIDEOGRAPHER:  We are off the
24  record at 11:20 a.m.
25        (Recess taken.)

Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600    -    HOUSTON   (713) 572-8897

78d0f838-8a4b-451a-b83a-8d22e725708a

Page 360

1           THE VIDEOGRAPHER: We are back on the
2   record at 11-- 11:31 a.m.
3       Q. (BY MR. ANDERSON): Okay. I think just one
4   last exhibit.
5           (Exhibit 22 marked.)
6       Q. (BY MR. ANDERSON): If you could -- golly.
7   I keep doing that. Mr. Fiske, take a moment and
8   review what's been marked as Exhibit 22.
9           MR. ANDERSON: And, Eric, I'm sorry, I
10  don't have an extra copy of this one. It's actually
11  been marked before in the Kadish deposition also as
12  Exhibit 1, but you're welcome to --
13          MR. BERLIN: May I just take a look at
14  it --
15          MR. ANDERSON: Sure.
16          MR. BERLIN: -- before?
17          MR. ANDERSON: Sure. And I'll tell
18  you what pages I'm going to look at, and you can look
19  at those too. The specific pages are 305184, I'm
20  going to ask some questions about that page.
21          MR. BERLIN: Just that page or --
22          MR. ANDERSON: Well, there's a very
23  similar page, -95.
24          MR. BERLIN: I'll give it to you in a
25  moment --

Page 361

1           THE WITNESS: Sure. That's fine.
2           MR. BERLIN: The -- basically they're
3   the charts and then there are the documents at the
4   back?
5           MR. ANDERSON: Right.
6           MR. BERLIN: Okay. 8495, two pages,
7   but --
8           MR. ANDERSON: 84 and 95, yeah.
9           MR. BERLIN: Yeah, but I -- I -- you
10  know, look through the whole thing.
11      A. (Reviews document.) Okay.
12      Q. (BY MR. ANDERSON): Do you recognize
13  Exhibit 22?
14      A. I don't think I've ever seen it before.
15      Q. Do you know what it is?
16      A. Yes, I do.
17      Q. What is it?
18      A. It's a rebate calculation -- well, I -- I
19  want to be careful. (Reviews document.) It's --
20  if -- if -- if, in fact, this entire document goes
21  together, so some of -- this is somewhat speculative,
22  but it appears to be a rebate claim for a company by
23  the name of Caremark, a large PBM.
24          It appears to be information regarding
25  our products as well as competitive products that are

Page 362

1   probably defined in our agreement where they're
2   providing us competitive information for calculating
3   market shares to determine if, in fact, they qualify
4   for certain incentives.
5           This information, I believe, is
6   actually on a report created by a company named Data
7   Niche Associates, who we contracted with at that time
8   to scrub the information provided by the PBMs looking
9   for duplicate prescriptions, unusual sized scripts,
10  etcetera, and we would not pay on such scripts that
11  were not qualified under the terms of our agreement.
12      Q. All right. So a PBM -- this document
13  pertains to Abbott's business dealings with a
14  pharmacy benefits manager known as Caremark, correct?
15      A. It appears to.
16      Q. And Caremark would be actually reimbursing
17  pharmacies when prescriptions for their member
18  patients were dispensed?
19      A. Correct.
20      Q. Okay. And if Caremark reimbursed for
21  certain amounts of units, then they may be entitled
22  to some additional rebate from Abbott, correct?
23      A. It depends upon the terms of our rebate
24  agreement exactly how it was defined for this period
25  of time in terms of what their rebates would be and

Page 363

1   how they would be calculated.
2       Q. I understand the specifics may vary, but as
3   a general proposition, the -- the concept was that
4   Caremark would -- would reimburse for Abbott products
5   and potentially prefer Abbott products on its
6   formulary for reimbursement over others, and then
7   in -- if it satisfied certain levels of
8   reimbursement, then may be entitled to a rebate from
9   Abbott?
10      A. More likely, if they weren't disadvantaged
11  relative to other brand name competitive products
12  that were defined in the contract, they might be
13  eligible for a rebate, than to say that they were
14  actually preferring our products.
15      Q. Oh, I see. Abbott wasn't so much looking
16  for preference for its brands, but just at least not
17  a disincentive to use Abbott's over a competing
18  brand?
19      A. Correct.
20      Q. Okay.
21      A. But there may have been market share
22  incentives to actually promote the brand.
23      Q. I see. All right. My questions -- my
24  specific questions are focused on page 184.
25      A. Yes.

25 (Pages 360 to 363)

78d0f838-8a4b-451a-b83a-8d22e725708a

Page 364

1    Q.   And there's some fields at the top of this
2  spreadsheet titled, for instance, Rx Market Share
3  Percentage?
4    A.   Yes.
5    Q.   That's prescription market share?
6    A.   Correct.
7    Q.   What does that mean?
8    A.   I told you that some of these contracts had
9  performance incentives based upon market share.
10 Market share was almost always for our
11 performance-based contracts based on prescription
12 market share of our products relative to the other
13 products in that defined market.  The contract would
14 define what the market was.
15   Q.   So the number -- the prescriptions, though,
16 specifically reference the number of prescriptions
17 written for Biaxin in comparison to other brands that
18 are within its therapeutic class?
19   A.   As defined in the contract, right.
20   Q.   Okay.  And then you've got a unit market
21 share percentage, which I'm assuming is the same, but
22 it's just -- rather than on the paper script, it's
23 based on the number of actual Biaxin products
24 dispensed, correct?
25   A.   I'm assuming that's the way it's

Page 365

1  calculated.
2    Q.   Okay.
3    A.   It's not a number we would have used.
4    Q.   What number would y'all have used?
5    A.   Prescription market share.
6    Q.   Okay.  And, then, likewise, there's a
7  column titled Total AWP and then AWP Market Share.
8  Do you understand what AWP Market Share references
9  there?
10   A.   I can only assume that it's done the same
11 way that a prescription market share is.  It's
12 totally irrelevant to us.  We never paid based on AWP
13 market share.  I -- I don't even know how meaningful
14 it is.  It's -- you know, you've got all different
15 prices of products out there at different price- --
16 at -- so you've got many different pri- -- products
17 out there at different prices.  I don't know what it
18 means to have an AWP market share that --
19   Q.   Well, that --
20   A.   -- you're comparing it to.
21   Q.   Yeah.  That was going to be my question,
22 is:  How is AWP pricing or AWP market share
23 calculated or --
24        MR. BERLIN:  Ob- -- objection --
25   Q.   (BY MR. ANDERSON):  -- if you know?

Page 366

1        MR. BERLIN:  Objection, form, and --
2  and scope.  I mean, it's not --
3    A.   Right.  So it -- it would be speculation on
4  my part.  I don't understand this at all, but this is
5  a DNA document, and they may use that for some of
6  their scrubbing efforts.  But it -- it -- the only
7  information we would have used off this document is
8  prescription market share.  They have standard
9  reports that they issue is my speculation.
10   Q.   (BY MR. ANDERSON):  Does -- does the AWP in
11 this context have any meaning different than the AWP
12 that's utilized as published, for instance, by the
13 compendia?
14        MR. BERLIN:  Objection, form.
15 Objection, scope.
16   A.   I don't know what it means.  I don't know
17 whether it was the AWP reported by the plans
18 themselves or if it's some num- -- some number that
19 Data Niche calculated.  I don't know where it came
20 from.
21   Q.   (BY MR. ANDERSON):  Are you aware of any
22 pricing known as average wholesale price or known by
23 the acronym of "AWP" other than the pricing that's
24 published through the compendia?
25   A.   I'm not aware of it.

Page 367

1    Q.   So you're not aware of -- of any kind of
2  AWPs that Caremark creates, are you?
3    A.   I'm not aware of it.
4    Q.   Okay.  Are you aware of Data Niche creating
5  any AWPs?
6        MR. BERLIN:  Objection, scope.
7    A.   No.
8    Q.   (BY MR. ANDERSON):  All right.  Now look,
9  Mr. Fiske, if you could, at the page that ends with
10 the numbers "195".
11   A.   Yes.
12   Q.   And that's got some grand totals for the
13 different fields that we just talked about, including
14 a grand total of over $10 million for total AWP.  Do
15 you see that?
16   A.   Yes.
17   Q.   Does that indicate to you that they're
18 utilizing AWP as some way to quantify in dollars the
19 value of the drugs that they're reimbursing?
20        MR. BERLIN:  Objection, form.
21 Objection, scope.
22   A.   All right.  So -- I -- I -- I've done too
23 much speculation already.  I don't know whether this
24 is a document that came from DNA or if it's a
25 document that came from Caremark.  I don't know

Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600    -    HOUSTON   (713) 572-8897

78d0f838-8a4b-451a-b83a-8d22e725708a

Page 368

1   what -- why there's any AWP information on here and
2   what the relevance of the market share would mean.
3   It has no relevance to me whatsoever.
4        Q.  (BY MR. ANDERSON):  Do you -- just big
5   picture, Mr. Fiske, do you have an awareness that
6   sometimes AWP is utilized as a gauge of the value of
7   a drug?
8        A.  No.
9        Q.  For instance, I've reviewed some packages
10  of information provided to the field sales force that
11  details Abbott's brand drugs, and I've seen
12  references to the AWP prices of Abbott's product and
13  the AWP prices of competing brand products.  Are you
14  familiar with those types of documents?
15       MR. BERLIN:  Objection, form.
16  Objection, scope.
17       A.  Provided to the sales force?
18       Q.  (BY MR. ANDERSON):  Yes, sir.  That's --
19  it -- they typically are thick packages, and at the
20  bottom it says "For Sales Representatives" in big
21  bold letters?
22       MR. BERLIN:  Same objections.
23       A.  I -- I don't know for sure whether I'm
24  aware of them or not.  I'm -- I don't recall.
25       Q.  (BY MR. ANDERSON):  Let me see if I can

Page 369

1   find one for you.  Well, I don't -- I don't have one
2   on me.  I'll -- I'll ask a different question.
3        Do you -- do you know of instances
4   where Abbott has utilized AWP as an indicator of the
5   value of a drug?
6        A.  I -- I think I will say yes.
7        Q.  Okay.  What context?
8        A.  I told you that one of the things that we
9   do when we evaluate price actions is to evaluate the
10  cost of our product relative to other brand name
11  competitive products.
12       The best way to do that is not on a
13  tablet of Biaxin versus a tablet of Syn- -- of -- of
14  Zithromax, but, rather, what does an average Biaxin
15  prescription cost, or what does a -- an average day
16  use of Biaxin cost relative to the average
17  prescription or day use of the competitive product --
18  cost per day is what I meant to say.
19       We do that blended price analysis
20  using both WAC and AWP.
21       Q.  Yes, sir.  And that's -- those -- you've
22  just described the documents that I was familiar with
23  from Abbott's production.  Why does Abbott utilize
24  AWPs in those blended pricing models?
25       A.  Because it's one of the metrics that's

Page 370

1   reported by First DataBank, and we do it to see if
2   there's changes that occur over time.
3        I think I told you that back -- maybe
4   I didn't pres- -- describe the specific time frame,
5   but I told you that data agencies' formulas changed
6   over time.
7        And one of the reasons that we often
8   track pricing both on a WAC and an AWP basis is to
9   see if the data agencies are changing their formula,
10  because the best reflection of the price increases by
11  the manufacturer are on a WAC basis, not on an AWP
12  basis.  If, in fact, the data agencies are changing
13  their formula, you might see a bigger or lower price
14  increase than the manufacturer actually implemented.
15       Q.  We'll get to the WAC in a moment.  With
16  respect to the AWP, does Abbott utilize the AWP as a
17  gauge of the cost of a drug product, for instance, on
18  a per-day basis because AWPs can reflect the cost of
19  the product?
20       MR. BERLIN:  Objection, form.
21       A.  I don't know that AWPs ever reflect the
22  cost of the product.  I -- you know, some people in
23  the industry refer to AWP as "ain't what's paid," so
24  I don't think it's ever reflects what people are
25  paying for the product.

Page 371

1        Q.  (BY MR. ANDERSON):  Why does Abbott choose
2   to utilize some of the AWPs in its blended pricing
3   models?
4        A.  We just do.
5        Q.  Is it true, sir, that for most brand drugs,
6   the AWPs are a reliable indicator of the actual
7   prices paid?
8        MR. BERLIN:  Ob- -- objection, form.
9   Objection, scope.
10       A.  I think it provides you a relative price
11  comparison.  I think that's the only thing that I
12  could agree with.
13       Q.  (BY MR. ANDERSON):  And -- and --
14       A.  It doesn't provide an absolute price
15  comparison at all.
16       Q.  Right.  It's not absolute, but if you mark
17  it down roughly somewhere between 16-and-two-thirds
18  percent and 20 percent, you can approximate what a
19  brand drug is really selling for to pharmacies,
20  correct?
21       A.  I don't know what they're selling them to
22  pharmacies for.
23       Q.  What does a markdown off of a brand drug
24  AWP of 16-and-two-thirds percent or 20 percent
25  represent?

27 (Pages 368 to 371)

78d0f838-8a4b-451a-b83a-8d22e725708a

Page 372

1      A.  Well, a 20-percent off of a -- an AWP
2   that's 125 percent of WAC would take you back to the
3   WAC price.
4      Q.  Okay.
5      A.  That may be a -- I don't -- I can't do the
6   other one in my head as quickly as I did the last
7   time, but --
8      Q.  Well, it's 20- --
9      A.  -- that may be true for --
10     Q.  -- I'll tell you --
11     A.  -- the other one as well.
12     Q.  I'll tell you, a 16-and-two-thirds-percent
13  markdown is the reciprocal of a 20-percent markup.
14     A.  I'll take your word for it.
15     Q.  Okay.  So -- so you're familiar with the
16  fact that AWPs for brand drugs can be reliable
17  indicators of actual market prices, correct?
18     A.  No, I wouldn't say that necessarily.  It
19  depends upon whether there is contracting efforts
20  going on.  But it is -- it may be -- I -- you -- I
21  think you have to look at the WAC price and
22  determine -- and use -- and perhaps rely on the WAC
23  price as a real price in the marketplace and the list
24  price as a real price in the marketplace.
25     Q.  Okay.  I'll get to WAC in just a moment.

Page 373

1   Let's do this, then.  With respect to AWP, will you
2   agree that it's been known for many years that AWPs
3   for most brand drugs are either 20 or 25 percent
4   higher than the WACs?
5      A.  I think it's been known for years that the
6   AWPs reported by the data agencies are approximately
7   20 to 25 percent higher than the WACs published by
8   manufacturers.
9      Q.  Okay.  Now with respect to the WACs, will
10  you agree that the WAC prices for most brand drugs
11  are reliable indicators of actual prices paid for the
12  drugs?
13         MR. BERLIN:  Objection, form.
14     A.  They are for Abbott.
15     Q.  (BY MR. ANDERSON):  And those prices that
16  are paid -- strike that.
17         The WAC prices that are paid for most
18  Abbott drugs, within the PPD Division at least, are
19  paid at WAC by pharmacies, correct?
20     A.  May I ask you to repeat that question?
21     Q.  Sure.  And that was my fault.  I didn't
22  phrase it well.
23         Is it true that for most brand drugs
24  sold and marketed by PPD, that the WAC prices reflect
25  what pharmacies actually pay to acquire the drug?

Page 374

1         MR. BERLIN:  Objection, form.
2      A.  Yes.
3      Q.  (BY MR. ANDERSON):  All right.  Is that one
4   of the reasons why Abbott utilizes WAC prices in its
5   blended pricing models in comparison -- comparing the
6   cost of its brand versus the cost of competing
7   brands?
8      A.  Yes.
9      Q.  And how can that cost information be
10  utilized by Abbott sales personnel in detailing a
11  brand drug to a physician?
12     A.  I can't --
13         MR. BERLIN:  Objection -- I'm sorry.
14  Objection, form.  Objection, scope.
15     A.  I want to be careful, because I do think
16  there may be some materials that are ultimately
17  approved that can show the cost of our drug relative
18  to the other products.  So I don't know all those
19  rules, I apologize.
20         So as long as you are very clear in
21  disclosing what the comparison is, I don't -- I think
22  that's all that's important.  If -- if you're
23  comparing WACs to WACs, people can draw their own
24  conclusions if they believe that those are the same
25  numbers reported by everybody.

Page 375

1      Q.  (BY MR. ANDERSON):  Okay.  Why does Abbott
2   provide that type of WAC-to-WAC analysis?  That's
3   where -- that's where I'm really getting at.
4         MR. BERLIN:  Objection, form.
5   Objection, scope.
6      A.  I think just to show the relative cost of
7   one drug versus another.
8      Q.  (BY MR. ANDERSON):  Does -- does Abbott
9   have reason to believe that physicians take relative
10  cost into consideration when they're writing
11  prescriptions?
12     A.  I think that Abbott believes in general
13  physicians don't know the relative cost of one drug
14  versus another.
15     Q.  But if they're educated about the cost of
16  one drug versus another, that could potentially
17  influence them in -- in writing a prescription for
18  one brand as opposed to the other?
19     A.  It may.
20     Q.  Is that one of the reasons why that type of
21  WAC comparison is provided in the information to
22  physicians?
23     A.  I -- I -- I don't know for sure whether it
24  is being provided to physicians, so I -- I want to be
25  careful.  I don't -- I'm not a salesperson, and I

Fredericks Reporting & Litigation Services, LLC
AUSTIN   (512) 241-3600   -   HOUSTON   (713) 572-8897

78d0f838-8a4b-451a-b83a-8d22e725708a

Page 376

1    don't see the sales materials.  It may be, but --
2        Q.  Okay.
3        A.  -- so I don't know whether it is being
4    provided to physicians.
5        Q.  I understand.  At least from your
6    perspective in the pricing department, you understood
7    that's one of the reasons why the materials were
8    created, but whether that information concerning
9    WAC-to-WAC comparisons is actually shared with the
10   physicians, you're not sure?
11       A.  It may --
12           MR. BERLIN:  Objection, scope.
13           THE WITNESS:  Sorry.
14       A.  It may be specifically for rep education.
15   I don't know.
16       Q.  (BY MR. ANDERSON):  Abbott sales rep
17   education?
18       A.  Yes.
19           THE VIDEOGRAPHER:  We have five
20   minutes.
21           MR. ANDERSON:  I've got five minutes
22   left on the tape, and I've got one quick question
23   from yesterday.
24       Q.  (BY MR. ANDERSON):  In the context of
25   Exhibit 13 which were the handwritten notes of

Page 377

1    Mr. Sellers --
2        A.  Yes.
3        Q.  -- I had asked you if you knew of any other
4    persons with the last name "Fiske," and you had said
5    you actually knew of a woman named Teresa Fiske.
6    I -- I just need to tie that down a little more.
7            Do you have any reason to believe,
8    Mr. Fiske, that the "Fiske" referred to in the
9    context of these notes about evaluating volume risk
10   with AWP drops is anyone other than yourself?
11           MR. BERLIN:  Well, I -- objection to
12   form, because that -- he testified that he didn't
13   have any reason to believe that he was involved in
14   that.
15       A.  I don't know whose notes these are.  I
16   don't have any reason to believe that it's anybody
17   other than myself.  I don't know why the notes were
18   ever taken, because I don't recall any discussions
19   regarding this topic with Mr. Sellers.
20       Q.  (BY MR. ANDERSON):  Yeah, I understand that
21   you don't recall the discussion, and -- and
22   Mr. Sellers has already testified about the
23   discussion and, you know, his testimony will be what
24   it is.
25           But what I'm asking you, sir, is:  Is

Page 378

1    there any other person with the last name "Fiske"
2    that you have reason to believe would be referenced
3    in his notes other than you?
4        A.  No.
5        Q.  Okay.  And Teresa Fiske doesn't have
6    anything to do with pricing or anything else with
7    respect to the erythromycins, does she?
8        A.  I have no idea what she does.
9        Q.  You just know she works at Abbott, and
10   that's it?
11       A.  She -- she did work at Abbott.  I don't
12   know whether she's still there or not.
13       Q.  Okay.  And you knew that because maybe
14   sometimes you got e-mails that were supposed to go to
15   her?
16       A.  I think -- I think there's been three
17   Fiskes at Abbott, and I'm no relation to any of the
18   other two.
19       Q.  See, I have the common last name
20   "Anderson," so I run across other Andersons all the
21   time on -- get the wrong mail and what have you.  I
22   understand.
23           MR. ANDERSON:  Okay.  Well, with that,
24   I'll pass the witness.
25           MR. BERLIN:  We have -- we have no

Page 379

1    questions, so...
2            MR. WINGET-HERNANDEZ:  As I said
3    before, I don't have any questions at this time.
4            MR. BERLIN:  Great.
5            THE VIDEOGRAPHER:  That's it?  We are
6    off the record at 11:59 a.m.  This is the end of tape
7.
8            (Deposition concluded.)

29 (Pages 376 to 379)

78d0f838-8a4b-451a-b83a-8d22e725708a

Page 380

1        CHANGES AND SIGNATURE
2    WITNESS NAME: JOSEPH E. FISKE    February 18, 2009
3    PAGE/LINE CHANGE        REASON
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 381

1        I, JOSEPH E. FISKE, have read the foregoing
2    deposition and hereby affix my signature that same is
3    true and correct, except as noted above.
4
5
6          JOSEPH E. FISKE
7
8
9    THE STATE OF      )
10   COUNTY OF      )
11
12       Before me,        , on this
13   day personally appeared JOSEPH E. FISKE, known to me
14   [or proved to me on the oath of
15   or through      (description of
16   identity card or other document)] to be the person
17   whose name is subscribed to the foregoing instrument
18   and acknowledged to me that he executed the same for
19   the purposes and consideration therein expressed.
20     (Seal) Given under my hand and seal of office
21   this     day of     , 2009.
22
23
24
          Notary Public in and for
25        the State of Texas

Page 382

1    THE STATE OF TEXAS)
2    COUNTY OF BEXAR )
3
4        I, TAMMY POZZI, Certified Shorthand
5    Reporter in and for State of Texas, do hereby certify
6    that, pursuant to agreement of counsel, there came
7    before me on February 18, 2009 at 9:08 a.m. in the
8    law offices of Jones Day, 77 West Wacker, 35th Floor,
9    Chicago, Illinois, the following named person,
10   to-wit: JOSEPH E. FISKE, who was by me duly sworn to
11   testify to the truth and nothing but the truth of his
12   knowledge touching and concerning the matters in
13   controversy in this cause; that he was thereupon
14   carefully examined upon his oath and his examination
15   reduced to typewriting under my supervision; and that
16   the deposition is a true record of the testimony
17   given by the witness.
18       I further certify that I am neither
19   attorney nor counsel for, nor related to or employed
20   by, any of the parties to the action in which this
21   deposition is taken, and further that I am not a
22   relative or employee of any attorney or counsel
23   employed by the parties hereto nor financially
24   interested in the action.
25

Page 383

1       IN WITNESS WHEREOF I have hereunto set my
2    hand and seal on this the 3rd day of March, 2009.
3
4
5
    C.S.R. NUMBER 5629    TAMMY POZZI, Certified
6    Expires 12/31/10    Shorthand Reporter in
          and for the State of Texas.
7
    Firm No. 611
8    Expires 12/31/10
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

AUTHENTIC COPY
the original certified E-Transcript
was electronically signed
using RealLegal technology

30 (Pages 380 to 383)

78d0f838-8a4b-451a-b83a-8d22e725708a