# EXHIBIT 10

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

```
In re: PHARMACEUTICAL      )
INDUSTRY AVERAGE WHOLESALE )
PRICE LITIGATION           )   MDL No. 1456
                           )
THIS DOCUMENT RELATES TO:  )   Civil Action No.
                           )     01-12257-PBS
US ex rel Ven-A-Care of    )
the Florida Keys, Inc.     )
v. Abbott Laboratories, Inc.)
No. 07-CV-11618-PBS        )
```

VIDEOTAPED ORAL DEPOSITION OF APRIL GERZEL

February 20, 2009

    DEPOSITION upon videotaped oral examination, of the witness, APRIL GERZEL, taken on behalf of Ven-A-Care of the Florida Keys, Inc. in the above entitled cause pending in the United States District Court, District of Massachusetts, before TAMMY POZZI, Certified Shorthand Reporter in and for the State of Texas, on February 20, 2009, in the law offices of Jones Day, 77 West Wacker, 35th Floor, Chicago, Illinois, between the hours of 8:32 a.m. and 12:13 p.m., pursuant to due notice and the Federal Rules of Civil Procedure.

Page 42

1    A.  Correct.
2    Q.  In your form letter to the data vendors
3  noted in the second page of Gerzel Exhibit 1, at the
4  first full paragraph under the pricing, you have a
5  sentence that reads, "Third Party Program
6  administrators have been notified of these changes."
7  Do you see that?
8    A.  Yes.
9    Q.  Do you know why that sentence was included
10 in these letters?
11   A.  No, I don't.
12   Q.  Were -- did you ever have any involvement
13 at all in drafting these letters?
14   A.  No, I didn't.  I --
15   Q.  Who would --
16   A.  In -- in drafting the template, I -- I
17 changed, like, the tab section, the dates and the
18 products.
19   Q.  Okay.  Thank you.  You would change the
20 salutation, and you would change the pricing
21 information, correct?
22   A.  Pricing and/or product depending on --
23   Q.  Right.
24   A.  Yes.
25   Q.  But the actual language, such as the

Page 43

1  paragraph that I was just focussing on, who was
2  responsible for drafting that?
3    A.  I don't know.
4    Q.  Did that language ever change during the
5  two-plus years that you were responsible for
6  communicating these letters to the compendia?
7    A.  Not that I recall.
8    Q.  Do you think the reference to "third party
9  program administrators" has anything to do with drug
10 reimbursement?
11   A.  I -- I have no idea.
12   Q.  Do you have any reason to believe that that
13 reference doesn't pertain to drug reimbursement?
14       MS. FUMERTON:  Objection, form.
15   A.  I -- I don't know what it pertains to.
16   Q.  (BY MR. ANDERSON):  What are third party
17 program administrators?
18       MS. FUMERTON:  Objection, form.
19   A.  I don't know.
20   Q.  (BY MR. ANDERSON):  Have you heard private
21 insurance and Medicaid referred to as third party
22 programs?
23   A.  I have heard "third party" before, but I'm
24 not -- I don't recall in what reference.
25   Q.  Can you recall anything about the context

Page 44

1  of the reference to "third party"?
2    A.  No.
3    Q.  Can you think of any references to third
4  party programs other than third party drug
5  reimbursers like private insurance and Medicaid?
6    A.  The only thing I recall ever hearing is
7  third party payors, and --
8    Q.  Right.
9    A.  -- I don't know in reference to what or
10 who.
11   Q.  I've -- I've heard them referred to as
12 third party payors as well.
13       Have you heard third party payor to
14 refer to entities that reimburse pharmacies for
15 drugs, like Medicaid programs and private insurance?
16   A.  I -- I don't know what they refer to or --
17 or anything.
18   Q.  Can you remember anything about the context
19 of where you've heard the phrase "third party payor"?
20   A.  No.
21   Q.  Do you have any idea what the third parties
22 would be paying for?
23   A.  No.
24   Q.  Do you have any idea at all why Abbott was
25 reporting prices to the compendia?

Page 45

1        MS. FUMERTON:  Objection, asked and
2  answered.
3    A.  I believe that's what our obligation was
4  that they wanted us to report to them.
5    Q.  (BY MR. ANDERSON):  How did you gain that
6  understanding?
7    A.  Through my training, when I came to the
8  position.
9    Q.  What was the obligation?
10   A.  To inform the pricing compendia of new
11 product launches, price changes to list or WAC, or
12 any discontinued products that we were no longer
13 going to manufacture and sell.
14   Q.  What was the authority that the pricing
15 compendia had to require Abbott to report prices?
16       MS. FUMERTON:  Objection, form.
17   A.  I don't know.
18   Q.  (BY MR. ANDERSON):  Did you believe that
19 Abbott literally had to report the prices?
20       MS. FUMERTON:  Objection, form.
21   A.  That was what I was known to do with -- and
22 trained to, "When these instances happened, here's
23 our process".
24   Q.  (BY MR. ANDERSON):  Well, I understand that
25 you were told to do it by Abbott people.  I'm asking

12 (Pages 42 to 45)

Page 126

1  transaction tried to go past that date, anything that
2  was on that deal to override a normal sale --
3      Q.  (BY MR. ANDERSON):  Uh-huh.
4      A.  -- would not be used anymore.
5      Q.  I got it.  Did -- other than the AES
6  involvement, did you have any other role whatsoever
7  with the discontinuation of base deal pricing on the
8  erythromycins?
9      A.  No.
10         MR. ANDERSON:  All right.  I'll pass
11  the witness.
12         MS. FUMERTON:  Okay.  I need to take a
13  quick break.  I just sent an e-mail looking for a
14  document.  So can we just take a quick break and then
15  I will be back and ask a couple of questions?
16         Is there -- Michael, are you there?
17  Okay.  I'm assuming he doesn't have any questions.
18  Let's go off the record.
19         THE VIDEOGRAPHER:  We're off the
20  record at 11:27 a.m.
21         (Recess taken.)
22         REPORTER'S NOTE:  (Mr. Jarrett Anderson
23         is participating via telephone through
24         the continuation of the deposition.)
25         (Exhibit 10 marked.)

Page 127

1          THE VIDEOGRAPHER:  We are on the
2  record at 12:07 p.m.
3              EXAMINATION
4  BY MS. FUMERTON:
5      Q.  Ms. Gerzel, do you recall that prior to
6  taking a break, Mr. Anderson was asking you a series
7  of questions about communications you had with
8  Red Book regarding AWP?
9      A.  Yes.
10     Q.  Can you please take a look -- and -- and do
11  you recall that you also testified that you recalled
12  sending an e-mail to Red Book explaining that Abbott
13  did not set AWP and -- do you recall that?
14     A.  Yes.
15     Q.  Could you please take a look at Exhibit
16  No. 10?
17     A.  (Reviews document.)
18     Q.  And I'm specifically going to draw your
19  attention to the fifth page of the document that has
20  the Bates range Red Book 01413.
21     A.  Okay.
22     Q.  On the page that's marked Red Book 01413,
23  do you see what appears to be an e-mail that you sent
24  to Traci Kellam at Red Book?
25     A.  Yes, I do.

Page 128

1      Q.  Could you please -- do you recall sending
2  this e-mail to Traci Kellam?
3      A.  I -- yes, I do.
4      Q.  Could you please read the text of the
5  e-mail to Traci for the record?
6      A.  "Traci, I believe it is important for me to
7  clarify what occurred in April 2003.  As you may be
8  aware, in April 2003, Ms. Voeck wrote, 'In the
9  absence of the manufacturer provided AWP or a
10  manufactured calculated markup to establish an AWP,
11  we will be implementing a 20-percent markup above
12  WAC to calculate AWP.'  Later in that same letter,
13  Ms. Voeck wrote, 'This is in accordance with our
14  company policy for calculation of AWP.'  Of course,
15  Abbott does not control how Red Book does its
16  business nor does Abbott provide AWP or a calculated
17  markup to establish an AWP.  Consequently, Abbott
18  concluded that there were no need to respond to Ms.
19  Voeck's April 2003 letter.  Abbott trusts that Red
20  Book will continue to conduct its business as it sees
21  fit and that it will get independent legal advice
22  when Red Book deems it appropriate.  Thank you for
23  your attention to this matter."
24     Q.  And do you recall why you sent this e-mail?
25     A.  I recall that it was in response to an

Page 129

1  e-mail that they had sent regarding their AWP policy
2  and wanting to establish that Abbott does not set AWP
3  or have anything to do with it.
4      Q.  So you sent this e-mail to Red Book to make
5  it clear that Abbott did not care in any way how
6  Red Book would establish an AWP for its products; is
7  that correct?
8          MR. ANDERSON:  Ob- -- Objection,
9  form.  And, Tara, if I could interject.  What's the
10  date of the e-mail?
11         MS. FUMERTON:  The date of the e-mail
12  is July 13th, 2004.
13         MR. ANDERSON:  Okay.  Thank you.
14     A.  That is correct.
15     Q.  (BY MS. FUMERTON):  Thank you.  And,
16  Ms. Gerzel, do you also recall testifying earlier
17  today that you are aware of a system at Abbott that
18  contains AWP information?
19     A.  Yes, I do.
20     Q.  Could you please describe what that system
21  is and what it is used for?
22     A.  The system is called Imany Medicaid, and it
23  is used for calculating and making payments to our
24  Medicaid rebate program and supplemental and ASPAP
25  programs.

33 (Pages 126 to 129)

Page 130

1  Q. Who, to your knowledge, has access to that
2  information?
3  A. I do, as well as the other managers in the
4  government team and the analysts that work on
5  calculating rebate per units and pay Medicaid
6  payments.
7  Q. So is it true that only people involved in
8  calculating Medicaid rebates, whether they be
9  supplemental or otherwise, have access to that
10 information?
11 A. That is correct, with the exception of IT
12 that support Government.
13 Q. And -- and they're there just to support
14 any technical issues that you may have; is that
15 correct?
16 A. That's correct.
17 Q. And you mentioned that you use the
18 system -- or you use the AWPs in the system for
19 calculating state supplemental rebates; is that
20 correct?
21 A. Yes, it is.
22 Q. And isn't it true that -- well, could you
23 please explain how AWP would be used in calculating
24 the state supplemental rebate?
25 A. A -- some states will have a formula to

Page 131

1  calculate their rebates based on AWP minus a certain
2  percent, and those formulas are put into our system
3  to calculate and thus pay the rebates accordingly to
4  those contracts in that state.
5  Q. So is it true that if -- the higher the AWP
6  that Abbott has on a particular product, if that
7  product is subject to a state supplemental rebate,
8  the higher the rebate will be that Abbott pays to the
9  Medicaid agency?
10 A. That is correct.
11 Q. And to your knowledge, does anybody else in
12 the Pricing Department other than those individuals
13 that work with the Medicaid rebate program have
14 access to that AWP information that is contained in
15 the Imany Medicaid system?
16 A. No, they do not.
17 Q. To your knowledge, has anyone at Abbott set
18 prices on any of the erythromycin drugs to increase
19 Medicaid payments?
20 A. No, not to my knowledge.
21 Q. To your knowledge, has anyone at Abbott
22 reported prices on the Ery drugs to increase Medicaid
23 payments?
24 A. No.
25     MS. FUMERTON: Thank you. I have no

Page 132

1  other questions.
2      MR. ANDERSON: Thank you for your
3  time, Ms. Gerzel.
4      THE WITNESS: Thank you.
5      MS. FUMERTON: Thank you.
6      MS. FUMERTON: We're concluded.
7      MR. BERLIN: Okay. Great.
8      THE VIDEOGRAPHER: We are off the
9  record at 12:13 p.m. This is the end of tape 3.
10     (Deposition concluded.)

Page 133

CHANGES AND SIGNATURE
WITNESS NAME: APRIL GERZEL    February 20, 2009
PAGE/LINE  CHANGE           REASON

34 (Pages 130 to 133)