# EXHIBIT 12

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE:  PHARMACEUTICAL INDUSTRY | ) MDL NO. 1456 |
| AVERAGE WHOLESALE PRICE | ) |
| LITIGATION | ) CIVIL ACTION: |
| THIS DOCUMENT RELATES TO | ) 01-CV-12257-PBS |
| U.S. ex rel. Ven-A-Care of the | ) Judge Patti B. Saris |
| Florida Keys, Inc. v. Abbott | ) Chief Magistrate |
| Laboratories, Inc., | ) Judge Marianne B. Bowler |
| No. 07-CV-11618-PBS | ) CONFIDENTIAL |

VIDEOTAPED DEPOSITION OF MATTHEW PERRI, III, Ph.D.

Taken on Behalf of the Defendant

DATE TAKEN:    May 1, 2009

TIME:          8:30 a.m. - 4:35 p.m.

PLACE:         Hyatt Regency Airport
               9300 Airport Boulevard
               Yeager Conference Room
               Suite 1066
               Orlando, Florida

Stenographically Reported by:

Karen S. Rhine, FPR

Page 86

1  BY MR. BERLIN:
2     Q.  Do you understand?
3     A.  With regard to that the MAC price, that would
4  be used by the -- in this example by the Arkansas
5  Medicaid program, that could be true, but the AWP prices
6  that were reported would still influence to whatever
7  extent other third-parties were reimbursing for these
8  products.
9     And then again, the actual level of prices that are
10 reported by the pharmacists reporting their actual
11 acquisition cost would need to be considered in
12 conjunction with their net prices that they were paying
13 once all rebates and incentives were filtered out.
14    So without knowing exactly what these pharmacists
15 reported, if they reported a net acquisition cost, net
16 of all rebates and other incentives, then I could begin
17 to agree with that statement.
18    Q.  But then so the pharmacy is essentially -- is
19 going to get paid the same amount regardless of which
20 product it dispenses, right?
21       MR. ANDERSON:  Objection to form.
22       THE WITNESS:  My understanding, which this is

Page 87

1     somewhat outside the scope of the marketing analysis
2     that I've done in this case, but my understanding is
3     that the Maximum Allowable Cost establishes
4     reimbursement amounts.
5  BY MR. BERLIN:
6     Q.  So the answer to my question is yes, that the
7  pharmacist is going to get paid the same amount
8  regardless of which manufacturer's NDC it dispenses,
9  right?
10       MR. ANDERSON:  Objection to form.
11       THE WITNESS:  The pharmacist would get paid
12    that maximum amount in this example in the Medicaid
13    program in Arkansas regardless of which Erythromycin
14    he dispenses.
15 BY MR. BERLIN:
16    Q.  So if the -- well, can Abbott market the spread
17 under that scenario?
18    A.  Depending on what -- as I said, depending on
19 what the actual acquisition costs are and what prices
20 Abbott is actually selling and what pharmacists are
21 reporting, it would be simply a different benchmark that
22 is used to calculate the reimbursement amount if that

Page 88

1  MAC is higher or lower than Abbott's acquisition cost
2  for the Abbott products.
3     In the event that the MAC is set at a point A and
4  pharmacists can purchase it at A minus some percent,
5  again, the level of playing field being in place, if
6  that spread was better than another company's spread,
7  Abbott could still market that spread to the pharmacists
8  doing the purchasing.
9     Q.  The spread that Abbott would be marketing would
10 be the difference between its sale price and the MAC
11 that the program set.
12    A.  By definition it would be, yes.
13    Q.  And Abbott would not be able to go out and say
14 look how high our AWP is.  Yes, you're paying more for
15 our drug, but in the end you're going to get reimbursed
16 more.
17    They wouldn't be able to do that under the scenario
18 we described with the Arkansas MAC, right?
19    A.  I'm a little uncomfortable with the Arkansas
20 MAC that you've been giving me.  I don't -- it's not
21 part of the analysis I've undertaken here.
22    Number two, pharmacists routinely purchase in

Page 89

1  different ways.  From a wholesaler they might be
2  purchasing AWP minus fourteen percent for example.
3     If they reported AWP minus fourteen to the Arkansas
4  Medicaid program and that was used to establish the MAC,
5  then AWP is still a factor.  Without knowing
6  specifically exactly what prices and in what ranges the
7  pharmacist is reporting, it's very difficult to say.
8  I will agree with you though that if a MAC level is
9  established, that the spread then becomes MAC minus the
10 acquisition cost of the pharmacy.
11    My belief is that AWP is still going to factor in
12 based on the fact that pharmacists are purchasing either
13 at AWP minus or at WAC plus or on a contract or some
14 other way.  Without defining all those parameters I
15 don't know that I can answer your question.
16    Q.  Do you see any evidence that purchases of Ery
17 were made at AWP minus a certain percent?
18    A.  In the testimony that I read where this issue
19 of how often a price was being transacted, that was not
20 a base deal price or a contract price, I learned from
21 the Abbott records that that was somewhere between five
22 and ten percent of the time.

23 (Pages 86 to 89)

Page 90

1     In those five to ten percent of the time cases those
2    transactions could have occurred at AWP minus or WAC
3    plus, depending on the price that the wholesaler
4    negotiated with the pharmacy purchaser.  So the answer
5    to your question would be yes.
6         Q.   So let's review the prices that providers pay .
7    If they're going directly to Abbott they're purchasing
8    -- and they're purchasing not on contract, they're going
9    to purchase it at WAC or list price, right?
10            MR. ANDERSON:  Objection to form.
11            THE WITNESS:  Well it depends.  It depends on
12       which wholesale cost and I purposely did not say
13       wholesale acquisition cost, WAC, that is being
14       employed with that customer.
15            For example, with the Ery products the base
16       deal was a wholesale cost, but they also had a WAC
17       price.  So whether the customer was buying it at WAC
18       or at base deal would have made a difference in the
19       answer to your question.
20   BY MR. BERLIN:
21        Q.   Okay.  Let me rephrase my question then to
22   capture that.  If a customer is going directly to Abbott

Page 91

1    and they're not on contract, they would purchase at list
2    price or WAC or if they're purchasing during a certain
3    period of time more than $500.00 of Ery product, they'd
4    get base deal price.  Is that accurate?
5             MR. ANDERSON:  Objection to form.
6             THE WITNESS:  If I followed you, they would
7        either have purchased at WAC -- through the
8        wholesaler at WAC plus or AWP minus or they would --
9        did you say if they bought directly from Abbott?
10   BY MR. BERLIN:
11        Q.   Yes.
12        A.   Okay.  So that's not the scenario --
13        Q.   They're going directly to Abbott, a customer is
14   going directly to Abbott and they're not on contract,
15   they're going to pay, as you understand it, list price,
16   WAC or if they're purchasing more than $500.00 of Ery,
17   base deal price during a certain period of time.
18            MR. ANDERSON:  Objection to form.
19            THE WITNESS:  Base deal or list price, yes.
20   BY MR. BERLIN:
21        Q.   And then according to what you've seen, the
22   vast majority of customers were on contract, right?

Page 92

1        A.   There were many customers that were on contract
2    directly with Abbott, as well as the chains of directly
3    on contract, as well as the retail buying groups that
4    had contracts and then the pharmacists that were members
5    of those retail buying groups, which in some cases
6    included the chains.  That would be true.
7        Q.   The allegation in this case is that those
8    contract prices had no relationship to the WAC or list
9    or AWPs, right?
10       A.   I'm not sure about when you use the phrase
11   allegations in this case.  I'm really not involved with
12   the allegations here.  I believe I can answer your
13   question that based on my knowledge of the levels of
14   prices I saw.
15       Q.   And what's your answer then?
16       A.   The prices didn't bear the kind of relationship
17   that we would have expected to see as an industry
18   between the transaction prices, the WAC and the AWPs.
19       Q.   So would you agree, given those facts, that if
20   a Medicaid program is calculating its MAC by calling up
21   pharmacists and asking what they pay and taking the
22   average of that, that the impact of Abbott's AWP on the

Page 93

1    MAC is, to the extent it's not non-existent, it's
2    miniscule at best?
3             MR. ANDERSON:  Objection to form.
4             THE WITNESS:  I think I understand your
5        question and I want to try to be as clear as
6        possible in my answer.  To the extent that that
7        pharmacist purchases directly from Abbott, Abbott
8        doesn't transact business at AWP.
9             Those pharmacists that purchase directly from
10       Abbott that reported prices to any Medicaid program
11       that called and asked them, had they reported their
12       actual net acquisition cost, I could agree that the
13       AWP in that case was fairly isolated from those
14       providers.
15            However, for some providers that did purchase
16       at AWP, the reported prices would contain AWP and
17       would have been based in part on AWP.  Without
18       knowing the specifics of that mix or the actual
19       levels of pricing and purchasing and discounting at
20       the wholesale level, if indeed they even purchased
21       at AWP minus it could have been wholesale plus.  I
22       would need to know those issues to be able to agree

Page 106

1   A. We agreed with respect to FUL that that would
2   be true --
3   Q. Yes.
4   A. -- with the exception that was noted.
5   Q. And this case isn't about where providers
6   purchase the Ery drugs at the WAC or the list price,
7   right? That's not what the government is complaining
8   about. They're complaining about where there were
9   purchases at a contract price that was lower than what
10  the reported prices were.
11       MR. ANDERSON: Objection to form.
12       THE WITNESS: I think based on my reading of
13   the Complaint, which we talked about just briefly,
14   my understanding was the government was unhappy
15   about the differential in the spread amount between
16   the reimbursement, Medicaid reimbursement, and the
17   actual acquisition cost of providers regardless of
18   which prices, we're specifically looking at WAC,
19   list or AWP.
20  BY MR. BERLIN:
21   Q. And I understand you never were responsible for
22  purchasing at any of the pharmacies you worked at. Is

Page 107

1   that correct?
2    A. I was never responsible for purchasing. I did
3   place orders.
4    Q. For the person who's responsible for
5   purchasing, regardless of which Ery NDC they purchased
6   among the generic equivalents for that, they're going to
7   get the same reimbursement under the FUL, right?
8        MR. ANDERSON: Objection to form.
9        THE WITNESS: Mr. Berlin, I wish I had a
10   greater knowledge of FUL and MAC and everything so I
11   could talk more intelligently with you about this
12   subject. I've been trying really hard for the last
13   hour or so to answer these questions.
14       It is outside the area of my expertise and the
15   expertise that I've applied in this case. I think
16   that it's related and that's why I'm trying to
17   answer these questions the best that I can.
18       But the issue of the FUL and so forth, it
19   troubles me because I'm not one hundred percent sure
20   that I understand how that system works.
21  BY MR. BERLIN:
22   Q. Do you think having an understanding of how

Page 108

1   that system works has marketing significance; not your
2   understanding, but a manufacturer having an
3   understanding of how that works?
4    A. The marketing significance of that issue is how
5   the pharmacists use that in their decision making. FUL,
6   MAC or AWP doesn't matter to the pharmacist. What
7   matters to the pharmacist is the reimbursement spread.
8    Q. Right. And what matters is the reimbursement
9   spread and let's make an assumption that regardless of
10  what product they purchase they're going to get the same
11  reimbursement if the drug is MAC or FUL.
12       MR. ANDERSON: Objection to form.
13       THE WITNESS: Okay.
14  BY MR. BERLIN:
15   Q. So no matter if they say I'm going to buy Mylan
16  or I'm going to buy Abbott, they're going to get the
17  same reimbursement from the Medicaid program.
18   A. Under your assumption, yes.
19       MR. ANDERSON: Objection to form.
20  BY MR. BERLIN:
21   Q. How would Abbott advertising a high AWP impact
22  their purchasing decision under that scenario? It

Page 109

1   wouldn't, would it?
2        MR. ANDERSON: Objection to form.
3        THE WITNESS: In the scenario that we've been
4   talking about where there's an FUL, accepting the
5   possibility that Abbott's product was the lowest
6   priced product on the market, advertising an AWP
7   would not inform well a pharmacist's understanding
8   of what their reimbursement amount would be.
9        It might provide some information to them about
10   the relative level pricing in the marketplace, but
11   it would not inform their reimbursement amount.
12       So the answer to your question is essentially
13   that the FUL in the scenario that we're talking
14   about, this hypothetical, the ability to market a
15   higher reimbursement spread would not be informed by
16   the AWP.
17       It would, however, be informed by the actual
18   spread, the amount the pharmacist would be getting
19   reimbursed by that Medicaid program which the
20   pharmacist would know.
21  BY MR. BERLIN:
22   Q. Meaning the difference between the

Page 110

1  reimbursement and the purchase price that that
2  pharmacist would obtain?
3      A.  Yes.
4      Q.  So Abbott could either literally or figurative
5  come knocking at the door and say but wait, wait, wait,
6  we have the highest AWP or our AWP is higher than
7  Mylan's.
8      The pharmacist under the scenario that we've been
9  discussing wouldn't care at all, right?
10         MR. ANDERSON:  Objection to form.
11         THE WITNESS:  These scenarios are akin to
12     holding all other things equal I think.  Because in
13     the real world what's happening is this pharmacist
14     isn't just buying Erythromycin Sterate from Abbott.
15     They're buying a lot of products from Abbott.
16         In the real world this pharmacist isn't just
17     being reimbursed by Medicaid.  They're being
18     reimbursed by Medicaid and a slue of other
19     third-party reimbursers which might indeed be using
20     AWP.  And the pharmacists know this.  So we're
21     narrowing it down, Medicaid maybe ten, fifteen
22     percent on average up to eighty percent of an

Page 111

1  individual store's business.
2      It might have a bigger or smaller impact on an
3  individual store.  But to try to isolate these
4  things and to say that a pharmacist isn't going to
5  make a decision based on all the factors, it's very
6  difficult for me to analyze that and to give you a
7  direct answer.
8  BY MR. BERLIN:
9      Q.  One of your opinions was you looked at other
10 Abbott products in PPD and found that there wasn't this
11 spread and there wasn't this marketing of the spread,
12 correct?
13     A.  I don't know if it was an opinion.  I think
14 those are issues that I've identified in my report.
15     Q.  And you understand that this case involves not
16 another private third-party payor or any third-party
17 payor other than Medicaid, right?
18     A.  I understand that in terms of the Complaint and
19 the people involved in this case it's Medicaid.  I also
20 understand that these pharmacies are not operating in a
21 vacuum.  They are operating in a third-party environment
22 that is characterized by many third-party payors which

Page 112

1  impact the pharmacists' decision making and that is a
2  marketing issue.
3      Q.  So let's take the scenario where there's going
4  to be payment based on the FUL.  The lowest reported
5  price is from Mylan and a pharmacist is purchasing the
6  Abbott product because of some other third-party payor
7  that is basing its reimbursement on Abbott's allegedly
8  inflated AWP.
9      That provider then makes a Medicaid claim for the
10 Abbott drug, but they're being paid based on the FUL.
11 What's the harm to the Medicaid program of Abbott having
12 reported that inflated AWP?
13     A.  I can't evaluate the harm to the Medicaid
14 program.  That's just not something that I can do.
15     Q.  I mean can you think of one?
16     A.  I mean you're asking me to provide opinions
17 about something I've never thought about, that I'm not
18 involved in in this case.  I find it very difficult to
19 -- you said what's the harm to the Medicaid program.
20     It sounds like, and based on my knowledge of other
21 experts and other witnesses, there are a lot of people
22 that would be better suited to answer than question

Page 113

1  rather than a marketing person.
2      Q.  Well, I'm asking you that from the perspective
3  of marketing significance.  I mean if Abbott -- if that
4  scenario, there's no harm to the Medicaid program, I
5  don't understand what marketing significance it would
6  have in this case.  Can you explain that?
7         MR. ANDERSON:  Objection to form.
8         THE WITNESS:  This case to my understanding is
9     not about the behavior of Medicaid.  It's about the
10    marketing behaviors of Abbott at least from my
11    perspective.  I'm sure there are other issues in the
12    case of which I'm not privy to or involved in.
13        So to get back to what it's about here is that
14    I can provide you with the best answers I can
15    regarding Abbott's marketing behavior.  I can't
16    provide you with answers about what's good or bad
17    for Medicaid.
18 BY MR. BERLIN:
19     Q.  Let me ask you this.  All this what we've been
20 discussing as how different Medicaid programs calculate
21 the MAC and FUL, did you see any documents in Abbott
22 examining these issues?

Perri, III, Ph.D., Matthew CONFIDENTIAL  
Orlando, FL  
May 1, 2009

Page 130

1  Abbott had a marketing plan to market the spread.  And
2  you clarified that there wasn't any marketing plans.
3     So let me just expand the question to incorporate if
4  in fact there was any sort of intent, purpose, plan, any
5  motive or anything like that to market the plan if that
6  was -- market the spread, if that was an intent or
7  policy or however broadly you can express it why would
8  an employee refuse to do so.
9     And one reason you said was maybe they felt that
10 they shouldn't do so, and you were suggesting maybe you
11 had another.
12    A.  The corporate policy that was implemented would
13 be one reason why they would not do that.  They were
14 directly told not to discuss reimbursement with the
15 exception of the managed care folks.
16    The perception on the part of some Abbott employees
17 that this was something they should not talk about did
18 go back prior to that corporate policy and could have
19 stemmed from the perception that there was something
20 inappropriate about utilizing that as a marketing or
21 promotional technique.
22    Q.  Do you have an understanding as to why Abbott

Page 131

1  felt it was okay or at least expressed it was okay for
2  employees to discuss AWP or spread with managed care
3  entities?
4     A.  Just from the perspective of possibly
5  negotiation of fees -- negotiation of prices or
6  reimbursements.  I really don't know beyond that.
7     Q.  And what you just said got me onto something
8  that I did want to discuss with you, this distinction
9  between intent and consequence.
10    Is it your opinion that Abbott intended and did
11 market the spread or is it just that the consequences of
12 Abbott's actions, regardless of Abbott's purpose or
13 intent was that the spread got marketed?
14    A.  To evaluate intent, and I think that as a
15 marketer I might use intent a little bit different than
16 you as a lawyer might use that word, but intent would be
17 akin to saying did they plan to do this or did they plan
18 to do that.
19    I can evaluate that in terms of the behaviors that I
20 saw demonstrated.  Did they plan to have a base deal
21 price that was a wholesale acquisition cost in addition
22 to their wholesale acquisition cost that was a reported

Page 132

1  price.  And yes, the answer to that is yes.  So there is
2  intent involved in terms of planning the way I interpret
3  intent.
4     Now, beyond that I can't say that I can answer your
5  question in much more detail.  For some behaviors there
6  was definitely a decision that was made to engage this
7  behavior, which in a marketing sense it was a planned
8  behavior.
9     Q.  One thing you said in the Texas dep was -- and
10 you're welcome to refer to it although I'll read it and
11 quote it accurately.
12    I just don't know that they realize the implications
13 of their communications.  Is it possible that Abbott
14 marketed the spread without intending to do so?
15    A.  The quote that you've just read related
16 specifically to discussions with sales reps with
17 customers, if I'm taking that in the proper context.
18    In fact the statement was that the sales reps had
19 denied that they marketed the spread.  The full context
20 of that quote was that they did not recognize the full
21 implications of their actions or they had a different
22 definition of what marketing the spread is than I do.

Page 133

1        MR. ANDERSON:  Hey, Eric, I'm sure you quoted
2  it accurately, but if you don't mind, could you cite
3  the page and line number so that it will be in the
4  record?
5        MR. BERLIN:  Page 177.
6        MR. ANDERSON:  Thanks.  I want to review that
7  just so if I need to invoke the Rule of Optional
8  Completeness I can.
9        MR. BERLIN:  I think he just put it in context
10 so --
11       MR. ANDERSON:  It sounds like he did.
12       MR. BERLIN:  -- I don't think there's any other
13 need to.
14 BY MR. BERLIN:
15    Q.  When did Abbott start marketing the spread on
16 Ery?
17    A.  The documents that I reviewed that covered the
18 time period from 1994 through the present day even
19 though I would acknowledge I've seen very few documents
20 from current day.  I've seen some, but not very many
21 documents.
22    So the -- when did Abbott begin -- when the generic

34 (Pages 130 to 133)

Perri, III, Ph.D., Matthew CONFIDENTIAL   May 1, 2009
Orlando, FL

Page 150

1  is to market the spread.  However, I saw behaviors and
2  activities that intricately wove together patterns of
3  behavior that were marketing behaviors that resulted in
4  spread marketing.
5      Q.  And that's what you described in your report,
6  right?
7      A.  Yes.
8      Q.  Okay.  I'm still going to need to ask you these
9  questions.  I quite frankly anticipate the answer to
10 these questions are going to be no.  And then after you
11 answer them I'll give you an opportunity to tell me why
12 these questions don't matter.  Okay?  Can we proceed
13 that way?
14     A.  That's fair enough.
15     Q.  I think having that sort of an explanation
16 after each one we'll be here forever.  So let's go back
17 to my question which is did you see evidence of
18 documentation as how to best market the message of
19 provider profitability, any analysis like that?
20     A.  Should I also assume these are all with respect
21 to Ery products?
22     Q.  Yes, these are all with respect to the Ery

Page 151

1  within PPD, products that are at issue in this lawsuit.
2      A.  So will you be accepting the example I cited in
3  my report with the Gengraf?
4      Q.  We're going to get to that later and a
5  discussion of why that impacts your decision as to Ery.
6  Here you're saying Abbott marketed the spread on Ery.
7  So I'll ask you to include two things, either a
8  document that is specific to Ery or a document that is
9  so broad that you read it to incorporate Ery.  But if
10 it's just about another drug, I don't include that in
11 what I'm asking you.
12     A.  Okay.
13     Q.  So the question still is documentation as how
14 best to market the message of provider profitability.
15         MR. ANDERSON:  Objection to form.
16         THE WITNESS:  I'm thinking of a group of
17     documents that I reviewed where I believe the title
18     of the document was Talking Points and the document
19     discussed the issue of provider profitability from
20     the perspective of chains want bigger spreads and I
21     believe that document would provide some evidence of
22     what your questioning is asking.

Page 152

1  BY MR. BERLIN:
2      Q.  Actually you already have it.  It's Exhibit 18.
3  My first question for you is is this the document to
4  which you're referring?  It's double sided.
5      A.  This is it.
6      Q.  And does that document -- and you're referring
7  to a section that discusses AWP, right?  It's on page 2
8  of the document?
9      A.  The section is entitled AWP Spread.  That's
10 correct.
11     Q.  And does that discuss how best Abbott could
12 market its message that its spread was superior to
13 others?
14         MR. ANDERSON:  Objection to form.
15         THE WITNESS:  I believe what this document does
16     is it spells out the areas within which there were
17     going to be discussions at Abbott about these
18     issues.
19 BY MR. BERLIN:
20     Q.  Did you see any document following up on this?
21     A.  Again, I did not see a specific document.
22     Q.  Did you see any evidence of research on the

Page 153

1  correct message and materials to be used by
2  representatives to promote the spread?
3      A.  No, but I did see materials that were provided
4  to both customers and representatives that would inform
5  them about spread-related issues such as estimated AWPs
6  after a certain period before that listed AWPs.
7      In particular with Ery products, the sheets that
8  were designed for the retail buying groups that listed
9  the NDC numbers and the Ery products, the price, and the
10 AWP price and then the customer's price could be filled
11 in on the column.
12     Q.  We'll get to that document as well.  The
13 documents that contain AWP information on them, without
14 having the contract price, right?  Those are the other
15 types you're referring to?
16     A.  Some of them don't have contract prices, yes.
17     Q.  If Abbott's interested in marketing the spread,
18 why wouldn't it do that?  Why wouldn't it put the spread
19 on the sheets?  Why wouldn't it put the spread compared
20 to its competitors' spreads on the sheet as opposed to
21 just putting AWP?
22     A.  In the pharmacy world to a good many people,

39 (Pages 150 to 153)