# EXHIBIT 19

Page 591

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

MDL NO. 1456

CIVIL ACTION NO. 01-12257-PBS

----------------------------------------x

In re:  PHARMACEUTICAL INDUSTRY

AVERAGE WHOLESALE PRICE

LITIGATION

----------------------------------------x

THIS DOCUMENT RELATED TO:

United States of America ex rel.

Ven-a-Care of the Florida Keys, Inc. v.

Boehringer Ingelheim Corp. et al.,

CIVIL ACTION NO. 07-10248-PBS

----------------------------------------x

            CONTINUED VIDEOTAPED DEPOSITION OF:

        THEODORE R. MARMOR, Ph.D. - VOLUME III

               Friday, February 13, 2009

                  New York, New York



Reported in stenotype by:

Rich Germosen, CCR, CRCR, RPR, CRR, CLR

Marmor, Ph.D., Theodore R. - Vol. III                                February 13, 2009
                              New York, NY

```
                                     Page 860                                              Page 862
 1      A.  That's my understanding.                 1   bundled sales if you have something that's a
 2      Q.  Okay.                                    2   bundled sale that you need to deal with, correct?
 3          Would you agree with me that that's a    3       A.  I would have to see more about bundled
 4   detailed definition?                            4   sales to understand that, but I see the -- I see
 5      A.  Yes.                                     5   what it is that you're, you're saying.
 6      Q.  Okay.                                    6       Q.  Okay.
 7          And it goes through various parts,       7           Is it fair to say that this agreement is
 8   right, it says it's the average unit price paid to 8  an authoritative statement as you might, as you
 9   the manufacturer for drugs in the states        9   would construe that term in, in your work in this
10   distributed to the retail pharmacy class of trade, 10 case?
11   right?                                         11           MS. THOMAS:  Objection.
12      A.  Correct.                                12           Form.
13      Q.  And there is terms in there that are    13       A.  Well, it is a formal, formal agreement
14   further defined in the agreement.  I'll represent 14 and it specifies who put the parties to the formal
15   that to you, the capitalized terms like covered 15   agreement.  It leaves no doubt as to what the
16   outpatient drug is a defined term.  So there is, 16  secretary of Health and Human Services is
17   there is detail --                              17  requesting to be done.
18      A.  Oh.                                     18       Q.  Okay.
19      Q.  -- in the agreement?                    19       A.  So it's a statement of AMP policy under
20      A.  The capital, capitalized expression.    20   the rebate program.
21      Q.  Right.                                  21       Q.  So it's an authoritative statement of
22      A.  Uh-huh.                                 22   AMP policy under the rebate program?

                                     Page 861                                              Page 863
 1      Q.  So it tells you what drugs are covered,  1       A.  That's the way I would understand this
 2   right?                                          2   absent evidence to the contrary.
 3      A.  It gives you certainly guidance as to    3       Q.  Okay.
 4   which drugs are covered.                        4           So is it fair to say that when the
 5      Q.  Okay.                                    5   United States government wanted to give
 6          And then it tells you which prices are   6   manufacturers a directive as to the reporting of
 7   not included, correct?  Because it said federal  7   AMP, it was certainly able to do that?
 8   supply --                                       8       A.  I would put it more strongly.  It did
 9      A.  Yeah.                                    9   it.
10      Q.  -- schedule price, they're not included? 10      Q.  Okay.
11      A.  Yeah.                                   11           So it wanted to put manufacturers on
12      Q.  Okay.                                   12   notice of the price that they were to report and
13          And then it tells you that it's supposed 13  they did that?
14   to be including cash discounts and other        14      A.  It's as, it's as it says.
15   reductions in price, correct?                   15      Q.  Okay.
16      A.  Correct.                                 16      A.  I mean this is a specification of a
17      Q.  And then it tells you it's weighted      17  policy.
18   average that's supposed to be calculated during a 18      Q.  So this is the specification of the AMP
19   quarter under certain, pursuant to certain      19   policy and it tells the manufacturers what they're
20   criteria, right?                                20   supposed to do in an authoritative way?
21      A.  Correct.                                 21           MR. GOBENA:  Objection to the form.
22      Q.  And then it tells you how to deal with   22      Q.  Correct?
```

69 (Pages 860 to 863)

```
                                Page 864
 1      A.   In a clear way is the way I would put it
 2   and in a way that's official and formal.
 3      Q.   Okay.
 4           Now, in your review of the record and in
 5   preparing your report did you find a directive
 6   like this definition of AMP that called for drug
 7   manufacturers to report any other type of price?
 8      A.   Let's go through that once again.  Did I
 9   -- let me just see if I can understand.  You tell
10   me whether I understand the question.
11      Q.   Sure.
12      A.   Did I find in other areas of
13   pharmaceutical agreements and statements of policy
14   as detailed and clear a statement of what the
15   government was expecting, is that your question?
16      Q.   Yes.
17      A.   This is certainly at the end, at the end
18   of the distribution of more extensive and clearer.
19      Q.   Okay.
20           But did you find anything else that was
21   on par with this?
22           MR. GOBENA:  Objection to form.

                                Page 865
 1      A.   I didn't ask that question so I don't
 2   know off the top of my head that I -- I think I
 3   feel more comfortable just saying that I know what
 4   the other standards were and they were more
 5   flexible than this.  This is more specified in
 6   detail.
 7      Q.   Well, what are the other standards that
 8   you're referring to?
 9      A.   Ones like estimated acquisition cost.
10   Taking into account questions about what --
11   whether or not this ought to be net of discounts.
12      Q.   You mean estimated acquisition costs?
13      A.   Whether estimated acquisition costs
14   should be net of discounts that your estimation
15   process.
16      Q.   Let me just -- I don't mean to cut off
17   your answer, but I just want to stop you because
18   I'm talking about prices that the government
19   directed manufacturers to report specifically.
20      A.   Oh, excuse me.
21           No, this is actually the only example I
22   know of the Medicare/Medicaid officials directly

                                Page 866
 1   telling the manufacturers what price to provide
 2   them for purposes of a rebate or anything else.
 3   The other were directed to the carriers and to the
 4   state governments.
 5      Q.   Okay.
 6           So this -- as far as you know this is
 7   the only statement of policy by the United States
 8   Government to manufacturers that they should
 9   report a price within specific guidelines?
10      A.   There may be others.  I just am not
11   aware of it.  I'm aware of what the government
12   policies, official and public policies were and
13   they were directed to, to other actors, but I
14   believe they were directed to other actors in the
15   assumption that the manufacturers would provide
16   data on their prices to satisfy the estimated
17   acquisition cost standard.
18      Q.   Okay.
19           Was this when you were talking -- I
20   think it might have been when Mr. Berlin was
21   asking his questions when you said that the OIG
22   reports and the other publications of HCFA or CMS

                                Page 867
 1   should have indicated to manufacturers what their
 2   AWP reporting should have been?
 3      A.   I think --
 4           MR. GOBENA:  Objection to form.
 5      A.   My understanding of the realities of
 6   American commerce and politics is that when -- I
 7   think I said that, something along those lines,
 8   yes.
 9      Q.   Well, there is nowhere -- there is no
10   evidence you can point to, is there, that the
11   government directed to manufacturers or indicated
12   to manufacturers a definition or a methodology of
13   coming to AWP that meets the same level of detail
14   as this definition of average manufacturers price?
15      A.   Well, the same level of detail.  I mean
16   when -- oh, you mean how to do AWP as opposed to
17   how to discount it?
18      Q.   Right.
19      A.   Yeah.  No, I think this is more
20   explicit, but that's perfectly consistent with
21   the, with my understanding of the flexibility
22   given to states about --
```

70 (Pages 864 to 867)

Page 872

1   prices into the system of reimbursement, but
2   whether they were required to do that is different
3   from whether they would be expected to do that in
4   order to be reimbursed.
5       Q.  Okay.
6           So are you saying there might have been
7   a practical reality that you needed to have a
8   price so that there could be -- so the billing
9   system would work, but there is no official policy
10  requiring that they report any particular price?
11      A.  Any particular --
12          MS. THOMAS:  Objection.
13      A.  Yeah, any particular price, no.  That
14  they conform to the expectations surrounding this
15  policy, yes.
16      Q.  In your opinion --
17          Strike that.
18          How does your opinion of what AWP should
19  have represented differ from what AMP is defined
20  as in the rebate agreement?
21          MR. GOBENA:  Objection.
22          MS. THOMAS:  Objection.

Page 873

1       Form.
2       A.  The difference I see is along the lines
3   we've just been discussing.  This is explicit.
4   It's clearly what's required and it produces a
5   number coming from each quarter from manufacturers
6   if it's complied with, whereas I think the AWP and
7   the WAC and the various standards of lower of is
8   less, less specified as to what the price that
9   will be reimbursed will be because it gives the
10  states or the carrier some degree of discretion
11  about which ones to use and how.
12      Q.  If manufacturers had reported their AMP
13  -- or let me say this carefully.
14          If what manufacturers reported as their
15  AWP was the AMP or met the AMP definition, would
16  that be sufficient in your view?
17          MS. THOMAS:  Objection.
18          Form.
19      A.  Sufficient for what?
20      Q.  Well, in other words --
21      A.  Just only my simple question is
22  sufficient for what purpose?  If you meant by that

Page 874

1   one purpose would be to lower the estimated
2   acquisition cost the answer would be yes.
3       Q.  Would it have met the standard that the
4   government was setting in your view in the reports
5   it issued that you say the manufacturers should
6   have been aware of?
7           MR. GOBENA:  Objection to form.
8       A.  It certainly would have been a candidate
9   for satisfying that condition because it would
10  have been closer to the actual acquisition costs
11  and closer to then the estimated acquisition cost.
12      Q.  Now, the -- is it your --
13          Well, strike that.
14          Do you understand that the AMP numbers
15  were reported to HCFA that later CMS on a
16  quarterly basis by manufacturers?
17      A.  That certainly is what the policy called
18  for and I would expect, but don't know that that's
19  what was done.
20      Q.  Okay.
21          If that policy had been followed, is it
22  fair to say that CMS or HCFA depending on the

Page 875

1   relevant period would have had the AMPs of the
2   manufacturers for each of the drugs?
3           MR. GOBENA:  Objection to form.
4       Q.  Doesn't that follow logically?
5           MR. GOBENA:  Same objection.
6       A.  Well, it's interesting.  I'm a little
7   bewildered here about this.  I think it follows
8   logically that if they had accurate
9   representations of the average manufacturer prices
10  they would know what the average prices were as --
11          COURT REPORTER:  I can't understand what
12  you're saying.
13      A.  If HCFA or CMS were provided accurate
14  representations of average manufacturer prices as
15  defined here, they would necessarily know the
16  answer to the question of what was reported as
17  average management, average manufacturers price.
18          What they wouldn't know is whether or
19  not it was accurate.
20      Q.  But putting aside whether it was
21  accurate, the procedure called for by the
22  agreement was that you would report the AMPs on a