# EXHIBIT 25

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Health Care Financing Administration**

**42 CFR Parts 413, 430 and 447**

**45 CFR Parts 1 and 19**

**[BERC–356–F]**

**Medicare and Medicaid Programs; Limits on Payments for Drugs**

**AGENCY:** Health Care Financing Administration (HCFA), HHS.

**ACTION:** Final rule.

**SUMMARY:** This rule eliminates current Departmental procedures for setting limits on payments for drugs supplied under certain Federal health programs; and revises Medicaid rules concerning the methodology for determining upper limits for drug reimbursement. This rule enables the Federal and State governments to take advantage of savings that are currently available in the marketplace for multiple source drugs. It also maintains State flexibility in the administration of the Medicaid program.

**EFFECTIVE DATE:** The regulations are effective October 29, 1987. State agencies have 90 days from the publication date of this regulation until the effective date in which to submit a State plan amendment and the required attachment.

**FOR FURTHER INFORMATION CONTACT:** Anthony Lovecchio, (301) 594–4010.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

*A. Existing System*

In 1976, the Department implemented drug reimbursement rules at 45 CFR Part 19 under the authority of statutes pertaining to upper payment limits for Medicaid and other programs. The authority to set an upper payment limit for services available under the Medicaid program is provided under section 1902(a)(30)(A) of the Social Security Act.

The Department rules are intended to ensure that the Federal government acts as a prudent buyer of drugs under certain Federal health programs. The rules set limits on payments for drugs supplied under Medicaid and other programs. Of the Federal programs involved, these rules have the greatest impact on the Medicaid program. Specifically, these regulations provide that the amount the Department recognizes for drug reimbursement or payment purposes will not exceed the lowest of—

• The maximum allowable cost (MAC) of the drug, as established by HCFA's Pharmaceutical Reimbursement Board for certain multiple source drugs (generic drugs), plus a reasonable dispensing fee;

• The estimated acquisition cost (EAC) of the drug (the price generally and currently paid by providers for a particular drug in the package size most frequently purchased by providers), as determined by the program agency, plus a reasonable dispensing fee; or

• The provider's usual and customary charge to the public for the drug.

The regulations provide that the MAC will not apply if the prescriber has certified in his own handwriting that a specific brand of that drug is medically necessary for the patient.

The regulations at 45 CFR Part 19 also establish within HCFA a Pharmaceutical Reimbursement Board (PRB). The PRB identifies multiple source drugs for which significant amounts of Federal funds are or may be expended and is responsible for establishing the MAC for those drugs. The process by which a MAC is established includes PRB consultation with the Food and Drug Administration (FDA), opportunity for public comment on a proposed notice of the MAC limit published in the Federal Register, a public hearing, and publication of the final MAC determination in the Federal Register. The PRB sets the MAC at the lowest unit price at which the drug is widely and consistently available. In addition to limiting the level of payment for multiple source drugs, the MAC program tends to promote substitution of lower cost (generic) drug products for brand-name drugs, since the latter are frequently available only at prices higher than the MAC limits.

Similar to the Department regulations (45 CFR Part 19) that set limits to Federal payments for drugs are the Medicaid regulations at 42 CFR 447.331 through 447.334. The regulations at §§ 447.331 through 447.334 limit the amounts that State Medicaid agencies may claim for Federal matching purposes under the Medicaid program. These limits are the same as those specified in 45 CFR Part 19. Thus, the Medicaid agency must claim no more for each drug than the lowest of—

• The MAC of the drug, as established by the HCFA PRB for certain multiple source drugs, plus a reasonable dispensing fee;

• The EAC of the drug (that is, the Medicaid State agency's best estimate of the price generally paid by providers) plus a reasonable dispensing fee; or

• The provider's usual and customary charge to the public for the drug.

The Medicaid regulations also provide that the MAC will not apply if the prescriber has certified in his own handwriting that a certain brand of that drug is medically necessary for the patient.

*B. Problems and Concerns*

In 1983, a Departmental Task Force was established to review the Department's drug reimbursement regulations at 45 CFR Part 19. Specific concerns presented to the Task Force included—

• The quality of multiple source drugs;

• The interpretation of "widely and consistently available" as related to the process used by the PRB in setting MAC limits;

• The adequacy of drug reimbursement; and

• Problems in administering the MAC and EAC programs (for example, the short time that the Medicaid agencies have to implement MAC limits once they become effective, and the lack of a mechanism for raising the MAC limits quickly when necessary due to changes in the market).

We agree that the process of approving a MAC for a specific drug is lengthy. This has been of concern particularly since the passage of the Drug Price Competition and Patent Term Extension Act of 1984 (Pub. L. 98–417). This law streamlines the FDA approval process for certain drugs. The result of this law is that therapeutically equivalent (generic) drugs will be coming into the marketplace more quickly than in the past. As evidenced by the current MAC program, we are interested in encouraging the use of therapeutically equivalent drugs. We would like to adopt a Medicaid drug policy that would allow us promptly to adjust payment upper limits to reflect the availability of new drug equivalents as they enter the marketplace.

Based on the concerns addressed above and the Department's desire to take advantage of savings that are currently available in the marketplace for multiple source drugs, we published a Notice of Proposed Rulemaking (NPRM) on August 19, 1986 (51 FR 29560). The NPRM announced proposed revisions to our procedures for establishing upper limits for drug payments and provided a 30-day public comment period. On September 18, 1986, we published a second notice in the Federal Register (51 FR 33086) announcing an extension of the comment period, the availability of new data to anyone wishing to perform an

independent review and analysis, and clarifications to the proposal.

II. Provisions of the Proposed Regulations

We proposed to remove the Departmental rules at 45 CFR Part 19 that limit drug reimbursement under certain Federal health programs including Medicaid, Medicare, Public Health Service (for example, Indian Health Services), and other Departmental grantees. We proposed the removal of these rules because they have little impact upon programs other than Medicaid and because similar rules exist in the Medicaid regulations. In the NPRM, we noted that to the extent that specific limits are useful for those other programs, other authorities exist for applying the limits.

We also proposed three alternative approaches to the current Medicaid rules (42 CFR 447.331 through 447.334) regarding upper limits for drug reimbursement and invited public comment on all three as well as suggestions for alternatives which would improve any of the three, including possible combinations of options. The three approaches were intended to enable the Medicaid program to take advantage of the savings available in the marketplace for therapeutically equivalent multiple source drugs. We proposed that all three approaches would be subject to "physician override". This means that the upper limits established for multiple source drugs would not apply if the prescribing physician certifies that a brand name drug is medically necessary.

We stated that under the final rule, which would adopt one of these approaches, State agencies would be required for purposes of Federal financial participation (FFP) to adhere to the upper limits set by the adopted approach. However, in accordance with State flexibility in the administration of the Medicaid program, a State agency would be permitted to utilize an alternative drug reimbursement system if aggregate payments under that system would not exceed the upper limits set by the adopted approach. Specifically, the maximum amount of State drug expenditures that would qualify for FFP could not exceed, in the aggregate, the upper limit of payment for certain drugs described in listings established by HCFA under the approach adopted under the final rule.

The three approaches are discussed below and include the Pharmacists' Incentive Program, a proposed revision of the existing MAC program, and the Competitive Incentive Program.

A. Pharmacists' Incentive Program (PhIP)

As proposed, PhIP would have replaced the current Federal MAC program for multiple source drugs. Other drugs would continue to be paid the EAC or the provider's usual and customary charge to the general public, whichever is lower.

We proposed to base PhIP on a specific formula that would establish payment levels above which Federal financial participation (FFP) would not be recognized. A PhIP limit would be established only for those multiple source drugs for which: (1) All of the formulations of the drug approved by FDA have been evaluated as therapeutically equivalent; and (2) at least three suppliers advertise the drug (which has been classified by the FDA as category "A" in the FDA's therapeutic equivalence evaluations publication) in either the *Red Book* or *Blue Book*, whichever we would choose to use. We proposed that the PhIP limit be set at 150 percent of the lowest priced multiple source drug advertised in the *Red Book* or *Blue Book*, whichever is lower. Thus, the pharmacist could be reimbursed the ingredient costs of a drug at 150 percent of the lowest priced multiple source drug plus the State-established dispensing fee. In order to ensure that the PhIP upper limits for multiple source drugs would be reasonable for extremely low cost and high cost drugs, we proposed to set minimum and maximum markups. We proposed a minimum markup of $1.50 over the cost of the least costly advertised drug product and a maximum markup of $4.00 over the cost of the least costly advertised drug product. While PhIP would reimburse drug ingredients at a rate that is slightly above the lowest cost at which they may be obtained, it would have the advantages of being easily administrable (once drug prices are obtained), easily updated for new drug prices, and likely to produce substantial savings for the Medicaid program.

B. Revisions to the MAC Program

We alternatively proposed to apply MAC limits to drugs purchased under the Medicaid program using a revised process. Under that process, we proposed to eliminate the PRB and to streamline the procedures for establishing MAC limits for selected multiple source drugs. Other drugs would continue to be paid for at the EAC plus a dispensing fee, or the provider's usual and customary charge to the general public, whichever is lower.

We proposed that the MAC program be operated directly by HCFA rather than under a special board. We also proposed to continue to use much of the current process for establishing MAC limits. We would continue to publish the proposed MAC limits in the **Federal Register**; utilize a comment period; and after considering all of the comments, publish the final notice in the **Federal Register**. However, the process would be shortened by not conducting a public hearing before the PRB and eliminating the requirement for specific PRB consultation with FDA for each drug.

We proposed three new requirements that we would consider before establishing a MAC limit. The first requirement would be that all of the formulations of the drug approved by the FDA have been evaluated as therapeutically equivalent. The second requirement would be that at least three suppliers advertise the drug (which has been classified by the FDA as category "A" in the FDA's therapeutic equivalence evaluations publication) in the *Red Book* or *Blue Book*. Finally, we specified that we would expect to reduce total State and Federal Medicaid expenditures by at least $50,000 annually for any drug for which a MAC limit is to be established.

We specified in the proposed regulations that we would survey drug wholesalers for assurances that they: (1) Are carrying the multiple source products at or below the proposed MAC limits; or (2) would carry the products in the event that limits are established. We also stated that, initially, we would conduct surveys to determine the prices at which the multiple source drugs that meet the MAC criteria are widely and consistently available.

In order to provide some flexibility in the MAC limits, we proposed to waive specific MAC limits in a State upon the State Medicaid agency's request and demonstration that the volume of the drug in that State is too low to justify administering the limit or that there are availability problems in that State for that particular product under the MAC limit. We also proposed to suspend or raise temporarily a MAC limit if the product becomes unavailable at or below the limit.

C. Competitive Incentive Program (CIP)

As proposed, CIP would have replaced the current MAC and EAC programs. Under CIP, the starting point for establishing an upper limit for reimbursement for all drugs would be the price that the pharmacy charges private retail customers for that drug, at that time, and in that quantity. Because

CIP payment would be based on the pharmacist's retail charge, Medicaid would participate in the retail pharmaceutical market in a way similar to that of a pharmacy's non-Medicaid customer or third party payor. CIP would depend upon the competitive market place to regulate prices.

Under CIP, we proposed to apply a mandatory discount to the pharmacist's retail charge and a screen of charges to protect the Medicaid program from excessive charges. The mandatory discount on leading brand name drugs would be greater than the discount applied to other drugs. Thus, an incentive would be created for the pharmacist to use non-brand multiple source drugs (generics). We proposed that the mandatory discount on leading brand name and multiple source drugs would apply only to certain drugs. These would be drugs for which: (1) All of the formulations of the drug approved by the FDA have been evaluated as therapeutically equivalent; and (2) at least three suppliers advertise the drug (which has been classified by the FDA as category "A" in the FDA's therapeutic equivalence evaluations publication) in the *Red Book* or *Blue Book*.

In the notice published on September 18, 1986, we clarified the proposal and proposed further alternatives relating to the screen of charges under CIP.

**III. Discussion of Comments**

We received approximately 123 timely items of correspondence in response to the proposed notice. The commenters represented trade associations, manufacturers, State pharmacy associations, State agencies and drug stores. In general, comments were negative to portions of all three proposals. For example, regarding the CIP proposal, 35 of the 39 State agencies responding indicated that CIP would be costly from an administrative viewpoint. Regarding PhIP, some State agencies questioned the use of the *Red Book* and *Blue Book*, stating that average wholesale prices listed in these publications are often overstated. With respect to the MAC proposal, commenters indicated that the MAC rate setting process would remain a time consuming and burdensome process.

After review of all comments and further deliberation within the Department, we decided that prescribing a preferred payment method would be unnecessary and counterproductive. Instead, we decided that encouragement of State flexibility is the most important aspect of reform in terms of avoiding disruption and bringing drug payments into conformance with the flexibility we allow States for other Medicaid services. In addition to this general conclusion, each option had significant weaknesses.

We have decided to eliminate the PhIP, CIP and MAC revisions as proposed. We decided to eliminate the MAC requirements because of the commenters and our concerns that the MAC rate setting process is too lengthy and time consuming. We determined that MAC would not achieve timely budget savings, simplified program administration, or increased State flexibility in the design and operation of drug payment systems.

We did not implement CIP as discussed in the NPRM due to the consensus expressed by many State agencies regarding administrative costs and implementation problems. However, in the context of State flexibility, we are allowing State agencies to use the CIP concept of competitive pricing should the State select this option.

For the purpose of determining an aggregate limit to State spending (but not as a payment method for individual prescriptions), we are adopting that part of PhIP that relates to the formula concept for setting upper limits for multiple source drugs because it is the least burdensome administratively for HCFA and the State agencies, responds to changes in drug pricing so that Medicaid program payments will reflect savings achievable from lower price multiple source drugs, and is readily updated. Furthermore, by setting an aggregate limit for multiple source drugs, we believe that we can provide more than adequate flexibility to States to use payment standards that reflect the prices and availability of particular drugs. Additionally, as we stated in the NPRM, based on a study of the 60 entities that would be listed initially, we can be assured of an adequate supply of the product at or below the limit. We note that this list of 60 entities includes those drugs for which a current MAC limit has been established.

A summary of the comments and our responses to them follows.

*A. State Flexibility*

*Comment:* The predominant themes expressed by the commenters were: The proposed rules were unnecessarily intrusive; the Medicaid State agencies should be allowed to design and develop their own payment systems, in order to respond to State-specific marketplace economics; and, Federal regulations should be kept to a minimum. Commenters were concerned that unnecessary Federal regulation would restrict price competition and stifle State innovation in the area of payment policies and practices. Further, commenters were concerned that the proposals would limit the ability of State agencies to monitor timely changes in drug availability, costs and usage patterns, as well as the ability to react to these changes. The commenters indicated that these issues are problems experienced by State agencies under the current regulations and expressed the desire to avoid continued Federal intrusion into existing programs that have proven to be cost-effective and innovative.

*Response:* Although it was not readily apparent judged by the tenor of the comments, we had intended to provide State Medicaid agencies with increased flexibility through the proposed rule. We proposed to establish an upper limit standard that would permit a State agency to design and operate, or maintain the current operation of, its own payment system. The responsibility of the State agency would be to make a finding that the maximum amount of State drug expenditures that would qualify for FFP could not exceed, in the aggregate, the upper limit payment level established by HCFA under the final rule. This approach would allow State agencies to maintain control over their pharmaceutical reimbursement programs while providing the Federal government needed oversight and control of expenditures. In order to clarify our intent, we are revising the language we had proposed.

*Comment:* Several commenters argued that HCFA could save $324 million in combined State and Federal expenditures for prescription drugs between 1986 and 1990 as the result of patents expiring on several drugs, and that no regulatory action was, therefore, necessary to achieve our savings objectives.

*Response:* As discussed in section V.E.3. of this preamble, implementing the 150 percent aggregate limit on listed drugs is estimated to save approximately $270 million over the next five years, taking into account drugs coming off patent and allowing for physician certification of brand named products as being medically necessary. We doubt whether States and HCFA would be assured of realizing those savings, or the savings that commenters estimate, without the kind of limits we are implementing in this rule. We believe that these limits will not operate to constrain dispensing or pricing behavior and it is both appropriate and necessary to establish upper payment limits in order to ensure that program payments reflect the savings available

from lower cost therapeutically equivalent drugs.

*B. State Plans*

*Comment:* Many commenters thought that if a State agency wished to use an alternative payment system to the one that would be established as the upper limit standard, the agency would have to secure a program waiver under the provisions of section 1915 of the Act. The perception was that this process was very rigorous and entailed considerable State efforts for justifying the waiver.

*Response:* It was our intent that, regardless of whether a State agency follows the approach established by HCFA or uses an alternative drug payment system, a State agency would not be required to obtain a program waiver. The NPRM proposed a process under which a State agency would be free to establish any payment system it would choose (except when freedom of choice or provider contracting is involved which would then require a waiver). The State agency must describe the methodology in its State plan which is subject to the usual State plan approval process.

Because the proposed language regarding the State plan approval process caused some confusion, we are revising it to make clear that drug payment methodologies must conform to all State plan requirements as must any other service. Under this final rule, we are clarifying that all State agencies are required to: (1) Describe comprehensively the agency's payment methodology for prescription drugs in its State plan; (2) make two findings, one for therapeutically equivalent multiple source drugs and one for all other drugs, through mathematical computation, analysis and comparison to determine that the payment levels under its payment methodology will not exceed the payment levels that would result from the application of the system promulgated by HCFA as the upper limit; (3) make an assurance to us that it has made such findings; and (4) maintain and make available to HCFA, upon request, documentation to support the finding.

The agency's assurance will serve as the basis for the approval of the State plan. The agency findings will be monitored through State assessments and other evaluations or auditing procedures to review the State documentation underlying the assurance without the need for specialized annual reporting by the States. Consistent with other aspects of the Medicaid program, if HCFA finds a problem with a State's assurance, HCFA can request the State to provide data to support its assurance and, if appropriate, HCFA will disallow FFP or consider whether the State ought to be subject to the statute's compliance procedures.

*C. Implementation of PhIP or CIP.*

*Comment:* Many commenters expressed confusion or raised questions about the absence of operational details for PhIP and CIP. States were particularly concerned about the significant changes that would occur in current operations (for example, data collection, programming modifications, payment screens, monitoring price changes) and accompanying costs, to implement PhIP or CIP.

*Response:* We deliberately did not include specific technical details in the NPRM because the objective of the proposals was to establish a methodology for setting a standard for Medicaid upper payment limits for purposes of FFP. We did not intend to set forth or describe the intricate details of a particular payment system. Nonetheless, we did set forth a sufficient amount of technical detail to allow commenters to identify potential problems and solutions, and we took these into account in reaching the final decision. We do not intend to impose unnecessary or expensive operational requirements on States. Rather, it was our intent to permit State agencies to exercise maximum flexibility in designing a payment system subject only to the maximum payment levels established by this regulation.

*D. Availability and Quality of Drugs*

*Comment:* Several commenters wrote requesting that we demonstrate that the availability and quality of drugs would not be adversely affected under the proposed Medicaid drug reform alternatives.

*Response:* It is our belief that the application of the 150 percent upper limit standard that we are adopting for certain multiple source drugs will yield a payment level that will be great enough to assure widespread availability of drug products. Furthermore, because we are implementing aggregate upper limit standards on the State's Medicaid payments (expenditures) for drugs, a State will have the ability to make payment at levels above the specific standard for certain drugs, provided that the agency makes the payment at levels below the specific standard for other drug products. This added State flexibility will virtually guarantee widespread availability of all affected drugs provided that the State agency can determine that in the aggregate for those drugs, the State achieved savings equal to or greater than the HCFA upper limit standard.

In reference to the quality of those multiple source drugs to which we will apply the 150 percent markup, we believe that the FDA assurance that all of the formulations it has approved have been evaluated as therapeutically equivalent in the most current edition of their publication "Approved Drug Products with Therapeutic Equivalence Evaluations" is adequate.

*E. Additional Compendia*

*Comment:* One commenter requested inclusion of its publication, which is a national compendium of drug cost information, among the publications that will be used in determining the upper limit payment for multiple source drugs.

*Response:* We agree with the commenter that publications other than the *Red Book* and *Blue Book*, which were the only sources we proposed to use, can be used. Thus, we are revising the regulations. The final rules will state that in determining the upper limit payment levels for multiple source drugs, we will select from all available national compendia of drug cost information that reflect drug prices and availability on a national level. As we publish these upper limits in State Medicaid program issuances, we will identify the source of our drug price information. We periodically will publish these upper limits in our *Medicaid Manual* to assure comprehensive knowledge of upper limits for multiple source drugs and to reduce the need for State agencies to do independent research and computation

*F. Dispensing Fees*

*Comment:* Several commenters suggested that either we delete the requirement in current regulations for State surveys of dispensing fee costs or require State agencies to update these fees in a periodic manner.

*Response:* In the interest of State flexibility and to avoid imposing unnecessary Federal procedural requirements as to how State agencies establish such fees, we are deleting the current requirement at § 447.333 regarding dispensing fees. State agencies will still be required to determine reasonable dispensing fees or, if dispensing fees are not paid separarely, to impute an amount equivalent to a reasonable dispensing fee, in order to include those amounts in the calculations and comparisons they make to meet the upper limit standard for FFP. We expect that most States will continue their present activities to establish a reasonable dispensing fee

level and will document these and any new activities in their State plan. Such activities could include: (1) Audits and surveys of pharmacy operational costs; (2) compilation of data regarding professional salaries and fees; and, (3) analysis of compiled data regarding pharmacy overhead costs, profits, etc.

### G. Use of "Smart Cards" and "Vouchers"

*Comment:* Several commenters suggested that HCFA adopt the use of a "smart card" or "voucher" payment system for payment of prescription drug claims. These commenters indicated that these systems would save significant amounts of expenditures.

*Response:* As we noted in the preamble to the NPRM, the use of a voucher or bank draft payment (smart card) system by State agencies was not one of the issues addressed in the proposal to establish upper payment limits. The methodology of determining an upper limit for prescription drug payments was the subject of the NPRM, not the claims payment process. The use of a voucher or "smart card" claims payment system is something which State agencies may do at present. If State agencies determine that such a system to process claims is workable, efficient and more cost-effective than their current system, and that system meets Medicaid program requirements, then, indeed, we encourage the individual agencies to adopt such a claims payment system.

### H. Physician's Override

*Comment:* Several commenters recommended that we delete the physician override requirement while one State agency recommended that we strengthen the requirement.

*Response:* We are retaining the physician override requirement as proposed in the NPRM. This requirement is a safeguard that assures that the physician can select the drug that is medically necessary and best suited for his or her patient. This means that the upper limits established for specific (listed) multiple source drugs will not apply if the prescribing physician certifies that a brand name drug is medically necessary. These payments will not be included in the calculation for compliance with the upper limit for multiple source drugs. Instead, in these instances, the upper limit for all other (non-listed) drugs will apply. As under current regulations, a State agency may choose to elaborate and be more stringent regarding this standard if it chooses.

### I. Acceptable Upper Limit Assurance

*Comment:* Several State agencies asked for guidance in making annual findings regarding the upper limit determinations and in deciding what constitutes an adequate assurance regarding the upper limit determinations when proposing State plan amendments.

*Response:* We are requiring in the final rule two findings. We are requiring an annual finding relating specifically to the multiple source drugs which HCFA will identify through Medicaid program issuances.

We also are requiring a separate triennial finding relating to the category of "other drugs".

The finding for the listed multiple source drugs will confirm that the agency's payment rates for these drugs do not exceed the aggregate payment levels determined by applying the upper limit formula plus a dispensing fee. The finding for the category of "other drugs" will confirm that a State agency's aggregate expenditures for these drugs under their chosen payment methodology, will not exceed aggregate payment under the EAC criteria that are retained for this rule. (Under this rule, the EAC criteria are applied as an upper limit on an aggregate basis rather than on a prescription by prescription basis.) The findings for both the listed multiple source drugs or "other drugs" can be supported by any documented acceptable method of sampling, imputation and statistical analysis that the State agency uses in making its determination. The State agency will then make an assurance to HCFA that it has made the required findings. That assurance to HCFA will constitute a presumption of validity of the findings and will serve as the basis for approval of the State plan.

### J. Phase-In Upper Limit Standard for Multiple Source Drugs

*Comment:* One State agency recommended that the upper limit standard for multiple source drugs consist of between 15–20 specific limits established at 60 day intervals. The agency is concerned about having sufficient lead-time for wholesalers and pharmacies to adjust inventories to comply with the upper limit standard.

*Response:* We believe that we are providing an adequate period of time for these adjustments to occur. These regulations are effective October 29, 1987. This allows State agencies 90 days from the date of publication to the effective date of these final regulations in which to submit their plan amendment and required attachment.

### K. Impact Analysis

*Comment:* Several commenters criticized us for not providing sufficient detail in our impact analysis to permit a comparison of the relative effects of the three alternatives presented in the NPRM. In particular, one commenter stated that we failed to support our contentions that all three proposals would reduce "disruptions" of drugs to retail outlets and achieve substantial savings through encouraging the use of low cost generic substitutions.

*Response:* As we explain in section V. of this preamble, the combination of having to analyze an extremely complex industry with very little data makes it difficult to formulate a comprehensive empirically grounded impact analysis. Based on the information available to us at the time of the NPRM, we did not expect any of the three proposals offered in the NPRM to have an annual effect on the economy of $100 million or more. Thus, we were not required under Executive Order 12291 to propose an impact analysis. Yet, because we were concerned, at the time the NPRM was published, that one or more of the proposals might have an annual effect of $100 million or more, and because we expected our proposals to generate considerable public debate, we voluntarily prepared an analysis that met the criteria of the Executive Order.

*Comment:* One commenter claimed that in our impact analysis, we failed to evaluate the effects of our proposals on the research and development of new drugs.

*Response:* It is far from clear to us what impact our proposals would have on the research and development of new drugs. These proposals are attempts on our part to take advantage of the competitive forces at work in the marketplace.

Companies that develop new drugs are provided protection under patent from competition for a certain period of time during which they may charge prices high enough, presumably, to recover their development costs associated with the drug in question or to subsidize the research and development costs of other drugs. Once the patent expires, however, other pharmaceutical firms may copy the drug, and once approved by the FDA, they may market the same drug and set their own price. Our proposals were designed to take advantage of this competition among drugs that are no longer under patent and not intended to prevent the development of new drugs. We were merely seeking to participate in the market as prudent buyers.

*L. Application to Medicare*

*Comment:* One commenter specifically requested clarification that the alternative selected by the Department for the final rule would not apply to the Medicare program and that hospitals and hospital-based skilled nursing facilities would be exempt under Medicare.

*Response:* As we stated in the NPRM, we are deleting the references to the MAC program contained in the Medicare regulations concerning allowable costs for drugs. (In the NPRM, we noted that we would delete § 405.433. However, that regulation has since been redesignated and is now located at § 413.110. Thus, in this final rule, we are deleting § 413.110.) The upper limits for drugs contained in this final rule pertain only to the Medicaid program. They do not apply to hospitals and hospital-based skilled nursing facilities under Medicare.

## IV. Provisions of the Final Regulations

In this final rule, we have attempted to: (1) Respond to the public comments on the NPRM; (2) provide maximum flexibility to the States in their administration of the Medicaid program; (3) provide responsible, but not burdensome Federal oversight of the Medicaid program; and, (4) take advantage of savings resulting from the availability of less costly, but safe and effective, generic drug substitutes.

To accomplish this, we are drawing from various aspects of the proposals. The Federal upper limit standard we are adopting for certain multiple source drugs is based on the application of a specific formula similar to that described in the NPRM. The upper limit for other drugs is similar to that in the NPRM in that it retains the EAC limits as the upper limit standard that State agencies must meet. However, this standard is applied on an aggregate rather than on a prescription specific basis.

We want to emphasize that as a result of our adopting aggregate limits as the upper limit standards, State agencies are encouraged to exercise maximum State flexibility in establishing their own payment methodologies. We do not intend that our adoption of the formula approach to set limits for multiple source drugs be construed as an indicator of the Federally preferred payment system. The use of the formula approach is primarily due to the straight-forward application and administrative ease in setting upper limits. We encourage State agencies to establish any program that will substitute lower-priced alternatives for drugs. We hope that the State agencies will be innovative in these programs and find ways to assure the availability at reasonable prices of multiple-source drugs. One way they could do this would be to encourage retail pharmacy participation in the Medicaid program by permitting them to retain profits from the sale of listed drugs to Medicaid recipients. Other alternative payment systems could include, for example, contracting on a competitive basis for pharmaceutical services with selected pharmacies to which recipients may go for drugs without incurring a copayment or a system which entails charge screens and/or mandatory discounts. Additionally, State agencies may initiate or retain already existing so-called "mini-MAC" programs, which they have established on specific drugs either at levels lower than those established under the current Federal MAC limits or on drugs not now covered by MAC limits. This system of aggregate upper limits will allow State agencies to alter payment rates for specific listed drugs without first having to obtain permission from HCFA. The agencies then will be able to respond rapidly to sudden price fluctuations, which may threaten the supply of specific drugs on the HCFA list, without having to pursue a cumbersome approval process. A final advantage of the aggregate limit methodology is the ease of administration at the Federal level and the lack of administrative burden on State programs.

### A. Multiple Source Drugs

The Federal upper limit standard that we have adopted for certain multiple source drugs is based on an aggregate payment amount equal to an amount that includes the ingredient cost of the drug calculated according to the formula described below and a reasonable dispensing fee. HCFA will determine to which drugs the formula will be applied. The listing of these drugs and any revisions to the list will be provided to State agencies through Medicaid program issuances on a timely, periodic basis (possibly semi-annually). The effective date of the new prices will be subsequent to the issuance of the listing. As did the NPRM, the final rule will specify that the drugs to which this formula will be applied must have been evaluated as therapeutically equivalent by the FDA. Similar to the NPRM, the final rule will specify that at least three suppliers list the drug in a national compendium. The NPRM stated that three suppliers would advertise the drug in the *Red Book* or *Blue Book*.

The formula to be used in calculating the upper limit of payment for certain multiple source drugs will be 150 percent of the least costly therapeutic equivalent that can be purchased by pharmacists in quantities of 100 tablets or capsules (or if the drug is not commonly available in quantities of 100, the package size commonly listed), or in the case of liquids, the commonly listed size. As we stated in the NPRM, we chose the markup of 150 percent in order to meet the following two objectives: (1) That the markup be high enough to assure that pharmacists can normally obtain and stock an equivalent product without losing money on acquisition costs of incurring the expense of departure from normal purchasing channels, and (2) that the markup not be so high as to cost the Medicaid program unnecessary money. In other words, the 150 percent is intended to balance the interests of both pharmacists and the government in achieving efficiency, economy and quality of care as specified in section 1902(a)(30) of the Act.

In the NPRM, we stated that we would use the *Red Book* or *Blue Book* to determine the least costly therapeutic equivalent that can be purchased by pharmacists. In this final rule, however, we are deleting the reference to these specific sources and are specifying that we will publish and use the list of all current editions (or updates) of acceptable published drug compendia available for sale nationally. Although State agencies will need to calculate or impute a dispensing fee (if they do not pay for the dispensing fee separately) in order to determine if they meet the upper limit standard for certain multiple source drugs, we are deleting the current § 447.333 that recommends how agencies are to establish the dispensing fee.

As originally proposed under all options, this final rule will provide that if a physician certifies that a brand name drug is medically necessary, the upper limit for payment based on the formula will not apply. The upper limit for payment of "other drugs" (discussed in section IV.B ) will apply.

In the future, the formula approach to setting an upper limit will be evaluated. We are aware of several State agencies now in the process of negotiating competitive bids for discounts or rebates from drug manufacturers and suppliers. Other agencies are considering selective contracting with providers or pharmacies (preferred provider organizations). Additionally, the interaction of competitive pricing and creative marketing may cause dynamics in the market that would necessitate a revision of our policy. Thus, we will monitor the implementation of this

policy, as well as the various payment systems used by State agencies and the dynamics of the marketplace, in order to make timely revisions to the policy for Medicaid upper limits for drug payments.

### B. Other Drugs

In this final rule, we specify that the agency payment for certified brand name drugs and drugs other than multiple source drugs for which a specific limit has been established must not exceed, in the aggregate, the level of payment calculated by applying the lower of (1) the EAC plus a dispensing fee; or (2) the provider's usual and customary charges to the general public.

Under these rules, the Federal requirement for States to use the EAC method of payment will be eliminated. However, because the rule merely establishes an upper limit concept and does not describe the specific methodology for payment, State agencies may continue their practice of establishing EACs for the ingredient costs and adding to it a dispensing fee. Such practices will be acceptable, as will a system of establishing charge/payment screens based on Statewide or regional customary and usual prices.

The State's findings in regard to whether the Statewide aggregate upper limit test is met must demonstrate that aggregate payments do not exceed payment as calculated under the EAC principles.

### C. State Plan Requirements, Findings and Assurances

We are revising the proposed language concerning State agency assurances regarding drug payment systems. We are clarifying that all agencies, regardless of the payment system used, will be required, in accordance with § 447.333(b)(1) of this final rule, to make two separate and distinct findings that expenditures for listed multiple source drugs on the one hand, and for all other drugs on the other, under their payment methodology will not exceed the upper limits established by HCFA. All State agencies will be required to maintain the supporting documentation and to provide HCFA with an assurance that they have made the required findings.

We note that we also have changed the requirements for findings and assurances to differ with regard to each drug category. We will require an annual finding for multiple source drugs and a triennial finding for all other drugs. The findings for multiple source drugs will be required at least annually because the State agencies efforts will be directed primarily at comparing State payments, in the aggregate, to the maximum ingredient costs published by HCFA. However, for all other drugs, State agencies will first have to determine the estimated acquisition costs before making comparisons on the aggregate basis. It is because of the various activities States will need to pursue in order to make the findings for all other drugs that we are requiring that this be done at least every three years. We anticipate that the triennial findings and assurances for all other drugs will lessen the administrative/reporting burdens on State agencies and maintain a level of accountability for purposes of FFP.

Apart from the initial plan submission, and subsequent assurances, an agency, which has determined that it is adopting a new methodology or making significant changes in its payment rates or to its existing system, will be required to provide HCFA with the requisite State plan amendments and the assurance that it has made the necessary findings.

### D. Other Changes

As proposed, this final rule will remove the Departmental rules at 45 CFR Part 19 that limit drug reimbursement under certain Federal health programs. These rules have little impact upon programs other than Medicaid, and the Medicaid regulations concerning upper limits for drug payments are being revised under this final rule. We also are deleting cross references to 45 CFR Part 19 contained in 42 CFR 430.0(b)(2)(ii) and 45 CFR 1.2, and the reference to MAC limits in 42 CFR 413.110.

## V. Regulatory Impact Statement

### A. Introduction

Executive Order (E.O.) 12291 requires us to prepare and publish a final regulatory impact analysis for any final regulation that meets one of the E.O. criteria for a "major rule"; that is, that would be likely to result in: An annual effect on the the economy of $100 million or more; a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic or export markets.

The local character of retail pharmaceutical markets, the large number of parties that participate in those markets, the variety of products sold, the numerous distribution channels through which these products flow, and a general lack of data adequately describing these various aspects of the market all make it extremely difficult for us to determine how and to what degree this final rule will affect market participants. For these reasons, we cannot say with any degree of certainty whether this rule will meet or exceed the Executive Order's criteria for a major rule. However, because of its controversial nature, we are providing a regulatory impact analysis.

In addition, we generally prepare a final regulatory flexibility analysis that is consistent with the Regulatory Flexibility Act (RFA) (5 U.S.C. 601 through 612), unless the Secretary certifies that a final regulation will not have a significant economic impact on a substantial number of small entities. Although the most direct effect of this rule will be on States, States are not small entities under the RFA. The economic size of Medicaid participating retail pharmacies range from large national corporate chains to small independent single-owner outlets. Yet because retail pharmaceutical markets appear to be largely local in nature, retail pharmacies operate in these markets as small entities. For purposes of the RFA, therefore, we consider pharmacies to be small entities. Other entities that may be affected by this final rule, for example, wholesale distributors and manufacturers, also may qualify as small entities under the RFA, but are more likely to participate in regional or national markets, and thus, are more likely to take on the characteristics of large firms. For this reason, plus the fact that this rule is not explicitly directed at these other entities or expected to affect them directly, we are not considering them as small entities for purposes of this rule.

### B. Objectives

Through promulgation of this final rule, we hope to achieve several objectives we view as essential for providing acceptable care to Medicaid recipients and for increasing the efficiency with which pharmaceutical products and services are delivered to recipients. These objectives are to:

• Establish simple, administrable methods of applying two separate and distinct upper limits on State Medicaid expenditures: one for certain therapeutically equivalent multiple source drugs, and one for all other drugs.

• Promote wider and more efficient distribution of pharmaceutical products and services, and avoid potential disruptions in the supply of drug

products that appear to be a major drawback of the present method of reimbursing retail pharmacists under the MAC program.

• Conserve scarce Federal and State resources through encouraging the more judicious purchasing of pharmaceuticals on behalf of Medicaid recipients, thus achieving some budget savings, while preserving or enhancing current levels of service.

In pursuing these objectives, we also wish to give State agencies the incentive to encourage prudent purchasing practices on the part of retail pharmacists and foster price competition among wholesale suppliers and manufacturers of multiple source drugs.

*C. Impact on State Agencies*

The aggregate payment limit on HCFA listed drugs as well as the general limit on sole-source and non-listed multiple source drugs, afford State agencies wide latitude in developing their own payment schemes to suit local conditions and unusual circumstances that may arise from time to time. For example, State agencies may retain already existing so called "mini-MAC" programs, which they have established on specific drugs either at levels lower than those established under the Federal MAC limits or on drugs not now covered by MAC limits. Also, under the aggregate limits, State agencies are free to experiment with alternative payment systems, for example, letting contracts on a competitive basis for pharmaceutical services with selected pharmacies to which recipients may go for drugs without incurring a copayment, or systems identical or similar to PhIP or CIP. This system will also allow States to alter payment rates for specific listed drugs without first having to obtain permission from HCFA. States then will be able to respond rapidly to sudden price fluctuations which may threaten the supply of specific drugs on the HCFA list without having to pursue a cumbersome approval process. A final advantage of the aggregate limit methodology is ease of administration at the Federal level and the lack of administrative burden on State programs.

*D. Small Entities Affected*

The drug industry is highly complex and multi-layered, with a variety of manufacturing, distribution, and retail sales arrangements that not only differ according to geographic location, but also vary by product. Further, under the Medicaid program, the immediate payor (that is, the State) is distinct from the purchaser (usually the recipient) or the orderer (the physician), both of whom are key decision makers for each specific purchase of drugs. These rules will directly affect only the State, and even then, these rules do not control the option available to the State, but establish limits on the extent that we will share in the State's overall expenditures for covered drugs. It is each State's actions, taken in some measure in response to these upper limits, that will in turn affect other parties.

As a result, it is difficult for us to clearly identify the entities affected by these regulations, and nearly impossible to fix the magnitude of any impact. At best, we can only identify broad categories of small entities that may be affected in some fashion by this rule, such as retail drug outlets and pharmacists, wholesale drug distributors, and manufacturers.

Through requiring States to establish programs to make payments which reflect the availability of lower cost alternatives when three or more therapeutically equivalent generic alternatives are available, this rule will affect the behavior of retail pharmacists who receive Medicaid payments. As a result of the response of pharmacists to State programs, we expect there to be effects on drug manufacturers and wholesale distributors. Also, it is conceivable that this rule might make physicians more aware of the availability of low cost generic drugs that could be substituted for higher cost leading brand drugs, and thus produce changes in physician prescribing practices. Furthermore, by making payments more prudent, we hope to affect Medicaid recipients positively by improving the States' and Federal government's financial ability to provide for needed services.

*E. Expected Impact of Limits Placed on Listed Drugs*

1. Increased State Flexibility

As described in section IV of this preamble and in §§ 447.332(a) and 447.331 of the rule, HCFA will prescribe aggregate upper limits on certain therapeutically equivalent multiple-source drugs we determine to be readily available, and on sole source and other multiple-source drugs. The limit for readily available drugs is to be based on 150 percent of the lowest known price for each drug on the list. The limit for sole source and other multiple-source drugs will be based on the amounts paid by other payors. Since we are setting separate aggregate limits on what we are calling "listed drugs" and on "other drugs", States will be free to make payments for individual drugs on any reasonable basis as long as total payments for each group of drugs do not exceed the aggregate limit on that group. This approach should help avoid disruptions in the supply of listed drugs in circumstances in which acquisition costs may exceed the listed price used in establishing the HCFA limits.

State agencies should determine, independent of the 150 percent formula, appropriate payment levels for the listed multiple-source drugs. We would not expect a State agency to adopt directly the upper limit methodology as a payment method because it does not gear payments to markups appropriate to the actual costs of acquiring and dispensing these drugs. Under these final regulations, State agencies will be able to make higher payments for some listed drugs as long as they pay at rates lower than those listed for other drugs on the list. By providing this measure of flexibility, we expect that State agencies will be able to ensure that listed drugs will be generally available to recipients.

As a counterpart to allowing State agencies the freedom to set their own minimum price floor on drugs in order to cover pharmacists' ingredient costs, they also have the authority to set an upper limit on the mark-up of specific drugs on the HCFA list. Since we are not placing maximum payment limits on individual drugs, drugs with high compendia prices could generate extremely high payment levels. Unless an agency's payment methodology ensured otherwise, a Medicaid agency could end up paying inappropriately high rates for some drugs while still being in compliance with the aggregate upper limit. Nevertheless, we believe States may establish maximum payment limits in order to offset the minimum payment levels necessary to ensure reasonable compensation for very low priced drugs.

Similarly, State agencies may employ essentially the same approach in meeting the limits for all other drugs. That is, the same principal of balancing payment increases for some drugs with decreases for other drugs also applies in determining whether aggregate payments exceed the limit. For reasons of economy, availability, or therapeutic efficacy, a State agency may want to raise or lower the amount it pays for certain drugs in efforts to influence the supply of specific drugs. Under the aggregate limit methodology any change in payments above or below the lower of the EAC or customary charges for specific drugs must be balanced with a corresponding reduction or increase in payments for other drugs within the all "other" drug payment category.

### 2. Possible Effects on Wholesale Distributors and Manufacturers

In the previous section, we discussed the possible effects of building into our rates for ingredients a profit margin for pharmacists. We expressed the hope that States would recognize the advantage of providing pharmacists with an incentive to participate in the Medicaid program and to stimulate pharmacists to engage in prudent purchasing practices and the substitution of lower cost therapeutically equivalent products.

In addition to these effects, we believe that our method of calculating the aggregate upper limit on payment to States may have consequences for other sectors of the industry: In particular on wholesalers and manufacturers. Although these entities may not fit the definition of small entities as discussed section V.A. of this preamble, nevertheless the manner in which this initiative affects these entities may have an impact on pharmacies and on our ability to manage the program.

By using the lowest compendia price for a drug as the benchmark for our listed drug rates, the low price supplier may be encouraged to raise its published price to a point just below the next higher price. Other drug wholesalers and manufacturers may tend to lower their published prices so the range of published prices would begin to narrow and cluster around the low end of the price scale We would expect to see such pricing patterns develop only for those drugs which had sizable portions of their total sales among Medicaid recipients. However, we suspect that price competition would be carried on in the form of discounts, promotional campaigns and other incentives aimed at the retail pharmacists.

Such tactics would work to the advantage of both retail druggists and wholesalers. Retail pharmacists would gain by being able to purchase drugs at prices below the HCFA list price, while wholesalers could gradually push the benchmark price upwards without loosing sales. Although, historically, it has been the large retail outlets that have benefited the most from wholesale discount practices, if adopted by a substantial number of State agencies, our policy of using published prices as a basis for determining payment levels may cause wholesalers to invent new ways of offering discounts to the smaller independent retail outlets, thereby expanding the practice of discounting to those outlets and enabling them to have access to less expensive sources of pharmaceuticals. The drawback is that neither State programs nor the Federal Medicaid program will benefit from such reductions in wholesale prices.

### 3. Savings

Based on current State spending for prescription drugs, and the potential for savings to be gained from drugs currently under patent losing their protection, we estimated savings to the Federal government over the next five fiscal years from implementing an aggregate upper limit on readily available multiple source drugs to be $270 million. (This assumes that the aggregate limits on listed multiple source drugs would be applied to payments for at least 60 drugs which we identified for purposes of applying the proposed PhIP limits in the NPRM.) Our savings estimates also incorporate a factor to account for physicians exercising their privilege of specifying a particular brand in accordance with § 447.331(c). The following table shows the Federal savings by fiscal year (FY), and assumes that actual implementation of the provisions at the State level will begin April, 1988.

FEDERAL SHARE OF MEDICAID—DRUG SAVINGS
[Rounded to the nearest $5 million]

| FY 1988 | FY 1989 | FY 1990 | FY 1991 | FY 1992 |
|---|---|---|---|---|
| $30 | $60 | $60 | $60 | $60 |

These savings estimates are at the limits presented in this rule and represent only the Federal portion, and while we generally calculate the States share of any savings to be about 82 percent of the Federal share (assuming the average FFP rate to be 55 percent), State savings or additional Federal savings will largely depend on the plans State Medicaid agencies adopt in response to the Federal upper limit.

### F. Alternatives Considered

In the NPRM, we proposed three alternative payment schemes for reimbursing pharmacy costs of providing drugs and pharmacy services to Medicaid recipients. Two of the proposals, the PhIP and reformed MAC program, were efforts to strengthen our policies on payments for readily available generic drugs, while the third proposal, CIP, was designed as an all inclusive payment scheme that would cover both multiple and single source drugs.

In evaluating the three alternatives, we considered comments and the availability of resources to implement the proposed alternatives. It became clear almost immediately, that of the three alternative presented, implementation of CIP would be the most problematic. Several obstacles proved insurmountable. These were:

- The added cost of implementing CIP for multiple source drugs appeared to be considerable. Based on comments received and our own research, the administrative costs were estimated to be about $7 million to implement CIP nationally.
- We could not determine the impact of CIP because of the lack of reliable data on retail drug charges.
- CIP could not be implemented quickly.

Our reasons for rejecting the reformed version of the MAC program had to do largely with our conclusion that even with the reforms we were proposing, the program would still prove to be too cumbersome to enable us to respond to the rapidly changing drug market.

Thus, by a process of elimination, the Federal upper limit for selected therapeutically equivalent multiple source drugs is based on an aggregate payment amount equal to the ingredient cost of the drug calculated according to the 150 percent markup formula plus the dispensing fee established by the State agency. The upper limit for all other drugs is an aggregate upper limit that does not exceed the limit as calculated under the EAC principles.

### G. Conclusions

We recognize that we have presented a somewhat limited discussion of the potential effects this rule may have on States and other entities. As we have pointed out, there are many reasons for our inability to present a more thorough analysis. The complex market structures that operate at national, regional and local levels, the proprietary and highly competitive nature of these markets, and the combined effects of different participants (States, pharmacies, physicians, recipients, distributors, manufacturers) interacting with one another create analytical problems that are beyond our capacity to analyze. The flexibility provided the States means that a variety of payment systems or methods will be used subject to the established payment standards noted in this final rule. We cannot predict with

any certainty what decisions the States will make over time, particularly as they experiment with new and improved payment methods.

We do, however, recognize that the establishment of the two upper limits described in section IV of this preamble represents only a partial solution to the problems of drug availability, increased efficiency in the allocation of resources, retail pharmacists satisfaction with payment levels, and the provision of adequate pharmacy services to Medicaid recipients. Each State agency will evolve its own payment methodology and solutions to local problems. Each State agency will have to identify and decide on the trade-offs it wishes to make with the understanding that some of the side effects of a particular payment method may be counter productive with respect to achieving stated objectives.

VI. Paperwork Requirements

Section 447.333 of this rule contains information collection requirements. The public is not required to comply with the information collection requirements until the Executive Office of Management and Budget approves these requirements under section 3507 of the Paperwork Reduction Act (44 U.S.C. 3507). A notice will be published in the Federal Register when approval is obtained. Comments on the information collection requirements should be sent directly to Allison Herron, Office of Information and Regulatory Affairs, Office of Management and Budget, Room 3208, New Executive Office Building, Washington, DC 20503.

List of Subjects

*42 CFR Part 413*

Health facilities, Kidney diseases, Medicare, Reporting and recordkeeping requirements.

*42 CFR Part 430*

Grant programs-health, Medicaid.

*42 CFR Part 447*

Accounting, Administrative practice and procedure, Grant programs-health, Health facilities, Health professions, Medicaid, Reporting and recordkeeping requirements, Rural areas.

*45 CFR Part 1*

Organization and functions.

*45 CFR Part 19*

Administrative practice and procedure, Drugs, Health care, Health maintenance oganizations, Medicare.

42 CFR Chapter IV is amended as set forth below:

I. 42 CFR Part 413 is amended as set forth below:

PART 413—PRINCIPLES OF REASONABLE COST REIMBURSEMENT; PAYMENT FOR END-STAGE RENAL DISEASE SERVICES

A. The authority citation continues to read as follows:

Authority: Secs. 1102, 1122, 1814(b), 1815, 1833(a), 1861(v), 1871, 1881, and 1886 of the Social Security Act as amended (42 U.S.C. 1302, 1320a–1, 1395f(b), 1395g, 1395l(a), 1395x(v), 1395hh, 1395rr, and 1395ww).

B. The table of contents for Subpart F is amended by removing § 413.110.

§ 413.110  [Removed]

C. Section 413.110 is removed.

II. 42 CFR 430.0 is amended as set forth below:

PART 430—GRANTS TO STATES FOR MEDICAL ASSISTANCE PROGRAMS

1. The authority for Part 430 continues to read as follows:

(Sec. 1102 of the Social Security Act (42 U.S.C. 1302))

§ 430.0  [AMENDED]

2. In § 430.0(b)(2)(ii), the reference to "Part 19—Limitations on Payment or Reimbursement for Drugs" is removed.

III. 42 CFR Part 447 is amended as set forth below:

A. The authority for Part 447 continues to read as follows:

Authority: Sec. 1102 of the Social Security Act (42 U.S.C. 1302) unless otherwise noted.

B. The table of contents is amended by adding a new § 447.301 and by revising the entries for §§ 447.331 through 447.333 as follows:

PART 447—PAYMENTS FOR SERVICES

* * * * *

Subpart D—Payment Methods for Other Institutional and Noninstitutional Services

* * * * *

Sec.
447.301   Definitions.
* * * * *
447.331   Drugs: Aggregate upper limits of payment.
447.332   Upper limits for multiple source drugs.
447.333   State plan requirements, findings and assurances.
* * * * *

C. Section 447.301 is added to Subpart D to read as follows:

§ 447.301  Definitions.

For the purposes of this subpart—
*"Brand name"* means any registered trade name commonly used to identify a drug.

*"Estimated acquisition cost"* means the agency's best estimate of the price generally and currently paid by providers for a drug marketed or sold by a particular manufacturer or labeler in the package size of drug most frequently purchased by providers.

*"Multiple source drug"* means a drug marketed or sold by two or more manufacturers or labelers or a drug marketed or sold by the same manufacturer or labeler under two or more different proprietary names or both under a proprietary name and without such a name.

D. Section 447.331 is revised to read as follows:

§ 447.331  Drugs: Aggregate upper limits of payment.

(a) *Multiple source drugs.* Except for brand name drugs that are certified in accordance with paragraph (c) of this section, the agency payment for multiple source drugs must not exceed the amount that would result from the application of the specific limits established in accordance with § 447.332. If a specific limit has not been established under § 447.332, then the rule for "other drugs" set forth in paragraph (b) applies.

(b) *Other drugs.* The agency payments for brand name drugs certified in accordance with paragraph (c) of this section and drugs other than multiple source drugs for which a specific limit has been established under § 447.332 must not exceed, in the aggregate, payment levels that the agency has determined by applying the lower of the—

(1) Estimated acquisition costs plus reasonable dispensing fees established by the agency; or

(2) Providers' usual and customary charges to the general public.

(c) *Certification of brand name drugs.* (1) The upper limit for payments multiple source drugs for which a specific limit has been established under § 447.332 does not apply if a physician certifies in his or her own handwriting that a specific brand is medically necessary for a particular recipient.

(2) The agency must decide what certification form and procedure are used.

(3) A checkoff box on a form is not acceptable but a notation like "brand necessary" is allowable.

(4) The agency may allow providers to keep the certification forms if the forms

will be available for inspection by the agency or HHS.

E. Section 447.332 is revised as follows:

### § 447.332  Upper limits for multiple source drugs.

(a) *Establishment and issuance of a listing.*

(1) HCFA will establish listings that identify and set upper limits for multiple source drugs that meet the following requirements:

(i) All of the formulations of the drug approved by the Food and Drug Administration (FDA) have been evaluated as therapeutically equivalent in the most current edition of their publication, *Approved Drug Products with Therapeutic Equivalence Evaluations* (including supplements or in successor publications).

(ii) At least three suppliers list the drug (which has been classified by the FDA as category "A" in its publication, *Approved Drug Products with Therapeutic Equivalence Evaluations,* including supplements or in successor publications) based on all listings contained in current editions (or updates) of published compendia of cost information for drugs available for sale nationally.

(2) HCFA publishes the list of multiple source drugs for which upper limits have been established and any revisions to the list in Medicaid program instructions.

(3) HCFA will identify the sources used in compiling these lists.

(b) *Specific upper limits.* The agency's payments for multiple source drugs identified and listed in accordance with paragraph (a) of this section must not exceed, in the aggregate, payment levels determined by applying for each drug entity a reasonable dispensing fee established by the agency plus an amount established by HCFA that is equal to 150 percent of the published price for the least costly therapeutic equivalent (using all available national compendia) that can be purchased by pharmacists in quantities of 100 tablets or capsules (or, if the drug is not commonly available in quantities of 100, the package size commonly listed) or, in the case of liquids, the commonly listed size.

F. Section 447.333 is revised as follows:

### § 447.333  State plan requirements, findings and assurances.

(a) *State plan.* The State plan must describe comprehensively the agency's payment methodology for prescription drugs.

(b) *Findings and assurances.* Upon proposing significant State plan changes in payments for prescription drugs, and at least annually for multiple source drugs and triennially for all other drugs, the agency must make the following findings and assurances:

(1) *Findings.* The agency must make the following separate and distinct findings:

(i) In the aggregate, its Medicaid expenditures for multiple source drugs, identified and listed in accordance with § 447.332(a) of this subpart, are in accordance with the upper limits specified in § 447.332(b) of this subpart; and

(ii) In the aggregate, its Medicaid expenditures for all other drugs are in accordance with § 447.331 of this subpart.

(2) *Assurances.* The agency must make assurances satisfactory to HCFA that the requirements set forth in §§ 447.331 and 447.332 concerning upper limits and in paragraph (b)(1) of this section concerning agency findings are met.

(c) *Recordkeeping.* The agency must maintain and make available to HCFA, upon request, data, mathematical or statistical computations, comparisons, and any other pertinent records to support its findings and assurances.

### SUBTITLE A—DEPARTMENT OF HEALTH AND HUMAN SERVICES; GENERAL ADMINISTRATION

IV. 45 CFR Subtitle A is amended as set forth below:

A. The table of contents for Subtitle A is amended by removing "Part 19, "Limitations on Payment or Reimbursement for Drugs".

### PART 1—HHS's REGULATIONS

B. The authority citation for Part 1 continues to read as follows:

(5 U.S.C. 301)

### § 1.2  [Amended]

C. In § 1.2 of Subpart A, the last bullet point entitled "Miscellaneous" is amended by removing the reference to Part 19.

### PART 19—LIMITATIONS ON PAYMENT OR REIMBURSEMENT FOR DRUGS [REMOVED]

D. Subtitle A is amended by removing Part 19, "Limitations on Payment or Reimbursement for Drugs".

(Catalog of Federal Domestic Assistance Program No. 13.714, Medical Assistance Program; 13.773, Medicare—Hospital Insurance; 13.774, Medicare—Supplementary Medical Insurance)

Dated: June 15, 1987.

**William L. Roper,**
*Administrator, Health Care Financing Administration.*

Approved: June 16, 1987.

**Otis R. Bowen,**
*Secretary.*

[FR Doc. 87-17384 Filed 7-30-87; 8:45 am]
**BILLING CODE 4120-01-M**