# EXHIBIT 31

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - -

IN RE: PHARMACEUTICAL              ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE         ) CIVIL ACTION NO.

PRICE LITIGATION                   ) 01-CV-12257-PBS

- - - - - - - - - - - - - - - - - - - - - - - - -

THIS DOCUMENT RELATES TO:                            )

The City of New York v. Abbott Labs., et al.         )

(S.D.N.Y. No. 04-CV-06054)                           )

County of Suffolk v. Abbott Labs., et al.            )

(E.D.N.Y. No. 03-CV-229)                             )

County of Westchester v. Abbott Labs., et al.        )

(S.D.N.Y. No. 03-CV-6178)                            )

County of Rockland v. Abbott Labs., et al.           )

(S.D.N.Y. No. 03-CV-7055)                            )

[Caption continues on Next Page]                     )


                    Washington, D.C.

                    Monday, May 20, 2008

                    9:30 a.m.

        VIDEOTAPED DEPOSITION OF GAIL SEXTON

Page 46

1  topics of conversation. And there were probably
2  very few, but I'm sure there were times when I
3  did speak with her about the program in general.
4      Q.  But is it fair to say you wouldn't be
5  knowledgeable about the process, for example,
6  that Ms. Gaston used to establish FULs during
7  the period of time where she was the lead?
8          MR. FAUCI: Objection, form.
9      A.  No.
10     Q.  Or the information on which she chose
11 to rely while she was the lead for setting FULs?
12         MR. FAUCI: Objection, form.
13     A.  No.
14     Q.  Or the objectives that she sought to
15 achieve when she was setting FULs? You wouldn't
16 have any knowledge of that?
17         MR. FAUCI: Objection, form.
18     A.  No, I would not.
19     Q.  Just so we set out a clear time period
20 here, it's my understanding that CMS hasn't
21 updated its FUL list since December of 2006. Is
22 that consistent with your understanding?

Page 47

1      A.  That's correct.
2      Q.  And the reason that CMS hasn't updated
3  a FUL list since 2006 is because of the advent of
4  the DRA?
5      A.  Correct.
6      Q.  And what do you understand me to mean
7  by the DRA, just so the term is clear on the
8  record?
9      A.  The DRA is the Deficit Reduction Act of
10 2005. And there were several provisions passed
11 in the Deficit Reduction Act that changed the
12 federal upper limit program, changed the
13 definition of a multiple source drug, changed the
14 methodology by which the federal upper limit is
15 calculated.
16     Q.  What methodology for calculating the
17 federal upper limit was proposed in the DRA?
18         MR. FAUCI: Objection, form.
19     A.  The DRA establishes the federal upper
20 limit to be 250 percent of the lowest average
21 manufacturer price for the lowest therapeutically
22 and pharmaceutically equivalent average

Page 48

1  manufacturer price within a drug group.
2      Q.  Sounds like you've stated that before.
3  What is an average manufacturer's price?
4          MR. FAUCI: Objection, form.
5      A.  The average manufacturer price, my
6  understanding of that is the price that the
7  wholesaler obtains the drug from the
8  manufacturer.
9      Q.  Is it otherwise known as AMP?
10     A.  Yes.
11     Q.  And there's a statutory definition of
12 AMP or average manufacturer's price, correct?
13         MR. FAUCI: Objection, form.
14     A.  In our drug rebate rule, our major rule
15 that we published in July of 2007, even though I
16 did not have the lead on the AMP definition or
17 the entities that were included or excluded from
18 AMP, that is discussed in that regulation.
19     Q.  But there's a definition of AMP that
20 exists to your knowledge?
21         MR. FAUCI: Objection, form.
22     A.  I believe that there is in the drug

Page 49

1  rebate agreement.
2      Q.  Okay. And in your role as the program
3  lead on FULs you say that the FUL list hasn't
4  been updated since December of 2006, correct?
5      A.  Correct.
6      Q.  So it fair then to assume that the DRA
7  methodology, the 250 percent of AMP, hasn't been
8  implemented as of today?
9          MR. FAUCI: Objection, form.
10     A.  Correct. We have not published any
11 federal upper limit prices under that
12 methodology.
13     Q.  So then is it fair to assume that the
14 period of time for which you've reviewed and
15 updated the FUL list really is December of 2004
16 to December of 2006, so it's the 2005-2006
17 period?
18         MR. FAUCI: Objection, form.
19     A.  At some point after October 31st 2004
20 until December 2006 as far as the updates on the
21 FUL.
22     Q.  I'm from here on out going to try and

13 (Pages 46 to 49)

Sexton, Gail                                                                May 20, 2008
Washington, DC

Page 50

1  concentrate my questions on that, that period of
2  October 31, 2005 to December of 2006.  So if you
3  would just kind of keep that in mind in your
4  answers things will go smoothly.
5       MS. OBEREMBT:  John, did you mean to
6  say October of 2004?
7       MR. BUEKER:  I did.  What did I say?
8       MS. OBEREMBT:  2005.
9       MR. BUEKER:  Oh.  Sorry.
10 BY MR. BUEKER:
11    Q.  Just so the record is clear, I'm going
12 to try and confine my questions to October 2004
13 to December 2006.  If you'd keep that in mind it
14 would be appreciated.
15    A.  Sure.
16      MR. BUEKER:  I ask the court reporter
17 to mark at this time two exhibits, Sexton Exhibit
18 4 for identification is a one page document that
19 bears the Bates number HHD 175-1456.
20         (Exhibit Sexton 004 was marked for
21 identification.)
22      MR. BUEKER:  And at the same time,

Page 51

1  because I think they're related, let's mark HHD
2  175-1455 as Exhibit 5 for identification, please.
3          (Exhibit Sexton 005 was marked for
4  identification.)
5       THE WITNESS:  (Reading.)
6  BY MR. BUEKER:
7     Q.  Ms. Gaston, please let me know when
8  you've had a chance to look at Exhibit 4 and
9  Exhibit 5.
10    A.  I'm Ms. Sexton.
11      MR. FLESSNER:  You said Gaston.
12      MR. BUEKER:  Gosh I'm having a rough
13 morning.
14      MS. OBEREMBT:  Do you want some coffee?
15      MR. BUEKER:  I do.
16      THE WITNESS:  Okay.
17 BY MR. BUEKER:
18    Q.  Just for the record, would you identify
19 and explain what Exhibit 4 is?
20    A.  Exhibit 4, this would be a printout
21 sheet from the federal upper limit software
22 system.  This is what the sheets look like when

Page 52

1  they're printed off.
2     Q.  Okay.  And what is Exhibit 5?
3     A.  Exhibit 5, this is my handwriting, and
4  this is -- appears to be the information from the
5  federal upper limit system.  However, I do not
6  know why I would have -- usually if I was
7  obtaining information myself through one of the
8  compendia I would handwrite in information.  So I
9  don't know if I put this together before the
10 information was downloaded into the compendia or
11 -- I don't know the exact reason why.  But I
12 wrote this, I guess.
13    Q.  I just will note for the record that
14 this is not a drug that's at issue in the New
15 York Counties.  I just thought this might be an
16 easy way to illustrate kind of your process.  By
17 why don't you just walk us through what you
18 typically do in terms of setting a federal upper
19 limit.
20    A.  Okay.  When it's determined that a drug
21 is available as a multiple source drug and we
22 have several sources to use for that, the FDA --

Page 53

1  there's an FDA website.  We use a resource from
2  the Food and Drug Law Institute.  The different
3  sources that we would use to identify when a drug
4  is available as a multiple source drug; then we
5  would look at the drug to determine whether it
6  met the criteria under the federal regulations
7  statute whereby we would have two As in the FDA's
8  Orange Book.
9         If there was a B-rated drug or a
10 formulation other than an A-rated drug in the FDA
11 Orange Book then we would have needed three As as
12 our first criteria.  And then we would have to
13 have three suppliers from our compendia.
14 Generally we would get that information from one
15 of the three compendia that we use.
16    Q.  And those are the criteria you'd apply
17 in establishing a federal upper limit?
18      MR. FAUCI:  Objection, form.
19    A.  Yes.
20    Q.  Those are the criteria that CMS would
21 apply in establishing a federal upper limit?
22    A.  Yes.

14 (Pages 50 to 53)

Sexton, Gail  May 20, 2008
Washington, DC

Page 110

1   MR. FAUCI: Objection, form.
2   A.  It appears that it was a supply issue.
3   Q.  And that decision was made in part
4   based on feedback that Deirdra Duzor, your
5   superior, received from the National Association
6   of Chain Drug Stores?
7   A.  And feedback that I received as well.
8   And like I said, this was a gray area.  And
9   that's why I took it to Deirdra Duzor to make the
10  decision.
11  Q.  But a judgment was made to remove the
12  FUL?
13  A.  Correct.
14  Q.  Apart from through the PTAG and through
15  the National Association of Chain Drug Stores,
16  how else did you receive feedback on issues like
17  availability in the marketplace?
18  A.  It was from pharmacy providers or
19  states.  I would receive e-mails about -- and
20  other drugs as well on supply issues or cost
21  issues.
22  Q.  Was there a formalized process

Page 111

1   established or how did you receive that feedback?
2   A.  No.  There was no formalized process
3   established.  But the providers would contact me
4   generally by e-mail, sometimes by written letter,
5   that a drug was not available or a drug was not
6   available at cost or within the federal upper
7   limit reimbursement amount.
8   Q.  How frequently did you get that kind of
9   feedback from providers in the marketplace?
10  A.  I would say fairly often.  Not so much
11  just about this drug, but all drugs.
12  Q.  And what if anything did you do in
13  reaction to the feedback you were receiving about
14  a market availability?
15  A.  I would look at the availability in the
16  compendia or I may call suppliers or check -- you
17  know, verify price availability per the criteria.
18  Q.  And can you think of instances in which
19  you made a decision to change the federal upper
20  limit based on the feedback you were receiving?
21  MR. FAUCI: Objection, form.
22  A.  I can't remember individual drugs or

Page 112

1   ingredient, route, strength, dose, product
2   groups.  But yes, changes were made to the
3   federal upper limit based on a pharmacy provider
4   giving us feedback.  Not because they gave us
5   feedback, but it would be the impetus for me to
6   further evaluate the drug.
7   Q.  I know in 2001, which I know was before
8   your time, CMS established a mailbox, an e-mail
9   mailbox for feedback, at least on a particular
10  federal upper limit list.  I'm wondering if that
11  in your tenure still existed.
12  A.  Not that I know of.
13  Q.  So to the extent that you got feedback
14  by e-mail it would come to your e-mail address
15  personally?
16  A.  Correct.
17  Q.  Would you talk to wholesalers in an
18  effort to determine market availability?
19  A.  No.  I would only talk to the companies
20  listed on in the compendia to determine
21  availability or price, or try to determine.
22  Q.  I think we're finally done with

Page 113

1   albuterol.
2   MS. OBEREMBT:  Not all of us.
3   MR. BUEKER:  I ask the court reporter
4   to mark as Sexton Exhibit 12 for identification a
5   one-page document that's Bates labeled HHD 175-
6   2024.
7   (Exhibit Sexton 012 was marked for
8   identification.)
9   BY MR. BUEKER:
10  Q.  Please tell me when you've had a chance
11  to take a look at Exhibit 12, Ms. Sexton.
12  A.  (Reading.) Okay.
13  Q.  Would you state for the record what
14  Exhibit 12 is?
15  A.  It's a pricing sheet generated from the
16  federal upper limit software system.
17  Q.  And there's handwriting on Exhibit 12.
18  Whose handwriting is that?
19  A.  That would be my handwriting.
20  Q.  What drug does Exhibit 12 pertain to?
21  A.  Isosorbide mononitrate.
22  Q.  Can we refer to it as ISMN?

29 (Pages 110 to 113)