# EXHIBIT 32

Page 287

                UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL       )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE   )  CIVIL ACTION

PRICE LITIGATION             )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO     )

U.S. ex rel. Ven-a-Care of   )  Judge Patti B. Saris

the Florida Keys, Inc.       )

      v.                     )  Chief Magistrate

Abbott Laboratories, Inc.,   )  Judge Marianne B.

No. 06-CV-11337-PBS          )  Bowler

- - - - - - - - - - - - - - -

       (cross captions appear on following pages)


          Videotaped deposition of SUE GASTON


                    Volume II


                  Washington, D.C.

                  Wednesday, March 19, 2008

                  9:00 a.m.

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                March 19, 2008
                        Washington, DC

Page 432

1  BY MR. BUEKER:
2      Q.  Ms. Gaston, do you have in front of you
3  what's been marked as Exhibit 4 for
4  identification?
5      A.  Yes.
6      Q.  And would you agree with me that
7  Exhibit 4 is a three page exhibit consisting of
8  three separate e-mails?
9      A.  Correct.
10     Q.  And are you familiar with e-mails like
11 those reflected in Exhibit 4?
12     A.  It looks familiar.
13     Q.  What is it?
14     A.  From my recollection, there was a
15 period of time where we were soliciting comments
16 from states or I think some of the pharmacy
17 associations on a FUL list that was placed out
18 there without manual review.  And we established
19 a federal upper limit e-mail box where they could
20 send in their comments to give us some feedback
21 on this draft FUL list.
22     Q.  And that FUL list that you're referring

Page 433

1  to that was sent out without manual review, that
2  took place in 2000, right?
3      A.  I'm not sure.  It appears so because of
4  the date on the e-mail.
5      Q.  But in or about 2000?
6      A.  Correct.
7      Q.  And you said you set up an e-mail
8  mailbox to get complaints?
9      A.  Feedback.
10     Q.  Feedback?  Sorry.
11         And did you get a lot of feedback?  Did
12 CMS get a lot of feedback?
13     A.  I can't remember.
14     Q.  Okay.  Just looking at the e-mails that
15 are contained in Exhibit 4, it looks like you got
16 feedback here from Albertson's, Omni Care and it
17 looks like Eckerd or Brooks Pharmacy.  I take it
18 one source of feedback was the pharmacy
19 community, pharmacists?
20     A.  Correct.
21     Q.  And you also said associations and --
22     A.  Yeah.  State Medicaid agencies.

Page 434

1      Q.  Okay.  Do you recall the nature of the
2  feedback at all?
3      A.  Basically they were giving us feedback
4  whether they felt that the FUL prices or the
5  drugs were correctly on the FUL list or needed
6  adjust or shouldn't -- or weren't available.  I
7  think it was feedback about the whole list that
8  was put out at that time.
9      Q.  Okay.  Do you recall what if anything
10 CMS did in response to receiving feedback?
11     A.  I can't remember.  I don't know if we
12 just reverted back to the list that was still in
13 place.  I don't have a recollection of that.
14     Q.  Do you know whether CMS withdrew the
15 list that had been sent out without manual
16 review?
17     A.  I would assume that that's what
18 occurred.
19     Q.  Other than in this time period, the
20 2000 to 2001 time period, were there other ways
21 in which CMS received feedback on its FULs?
22     A.  Yes.

Page 435

1      Q.  How?
2      A.  We would get phone calls, e-mails,
3  sometimes letters or faxes.
4      Q.  And who would receive that feedback?
5      A.  I would.  Or Larry Reed.
6      Q.  And what kind of feedback would CMS
7  typically receive?
8      A.  It would be comments maybe from the
9  pharmacy saying that the product is not available
10 or that the pricing appears to be either too low
11 or too high.  Mostly availability issues.
12     Q.  And when you got feedback from some
13 source that a drug wasn't available, what if any
14 steps would CMS take?
15     A.  What we would do is call the
16 manufacturer or wholesaler and verify if that was
17 a fact.  Sometimes it might be just one state
18 that's having an availability problem.  But we
19 have to make sure that it's an availability
20 problem that would affect the FUL list for all
21 the states.
22     Q.  And what if you learn that, for

38 (Pages 432 to 435)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                    March 19, 2008
Washington, DC

Page 448

1     A.  Correct.
2          MR. WINGET-HERNANDEZ:  Objection, form.
3  I apologize.  I withdraw that objection.  I just
4  was confused about what number you were looking
5  at.
6  BY MR. BUEKER:
7     Q.  Okay.  And you see there's a number
8  that's crossed out that's .2999 over in the left-
9  hand side just before the bolded text we were
10  talking about?
11     A.  Correct.
12     Q.  And that -- because it's cut off,
13  perhaps it would help to refer to Exhibit 5.  But
14  that's the FUL price that the FULs system
15  calculated, correct --
16     A.  Correct.
17     Q.  -- the crossed out number .2999?
18     A.  Correct.
19     Q.  And that FUL number that's calculated
20  by the system would have been based on this low
21  price of .1999, correct?
22     A.  Correct.

Page 449

1     Q.  And if you go up and look at the list
2  of published prices above, you would agree with
3  me that there's no published price that's below
4  that .2999 number, right?
5     A.  Correct.
6     Q.  Except the one price in which the FUL
7  was based?
8     A.  Yes.
9     Q.  Or I shouldn't say based.  Was
10  calculated by the system.
11          So does that help to refresh your
12  recollection that indeed this warning, "FULs
13  price not greater than another supplier," was
14  essentially an occasion that the FULs system had
15  detected that by basing a FUL on the lowest
16  published price the FUL was being set at below
17  the next published price?
18     A.  Correct.
19     Q.  Is that a warning -- you talked the
20  last time in your last deposition about certain
21  flags that the system had to tell you and your
22  colleagues that you needed to conduct a manual

Page 450

1  review.  Is this one of those flags?
2     A.  Yes.
3     Q.  And why was it important that the FULs
4  system cautioned you to look at or manually
5  review a FUL that was set in this manner?
6     A.  Because if we allowed the FUL to be set
7  at this price then it would be an availability
8  issue.
9     Q.  In other words, that if you allowed a
10  FUL to be set at this price based on this lowest
11  published price, then you'd have an availability
12  issue and that's a problem, it's not a reasonable
13  FUL?
14     A.  Correct.
15     Q.  And so that number is crossed out and a
16  different number is written in that's .5718,
17  right?
18     A.  For the FUL price.
19     Q.  For the FUL price.
20     A.  Correct.
21     Q.  And that appears to be based on from
22  the note on the bottom a United Research Labs or

Page 451

1  URL's WAC?
2     A.  Correct.
3     Q.  And URL's WAC was not the lowest
4  published price in this instance, right?  Because
5  we've seen for example Major Pharmaceuticals had
6  a lower published price?
7     A.  Well, I thought you meant excluding
8  that published price.
9     Q.  No.  I didn't mean that.
10     A.  Yeah.  Major's was the next lowest.
11  The next lowest was URL.
12     Q.  So what we see in Exhibit 6 is another
13  situation in which, exercising its discretion,
14  CMS chose to set a FUL not based on the lowest
15  published price but based on the next lowest
16  published price because that's what was
17  reasonable to do in terms of ensuring access,
18  correct?
19     A.  Correct.
20     Q.  And for the record, why is it that CMS
21  would have chosen to ignore the lowest published
22  price?

42 (Pages 448 to 451)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                            Washington, DC

Page 496

1  12 reflects the manual evaluation that was being
2  done in the October 2001 time period as to
3  whether or not to establish or reestablish a FUL
4  for -- or revise the FUL for the 90-microgram
5  albuterol inhaler?
6      A.  Correct.
7      Q.  And Exhibit 3 is the CMS transmittal
8  that comes out November 20th 2001, so shortly
9  after the analysis we see in Exhibit 12?
10     A.  Correct.
11     Q.  And if you flip to the second page,
12  page 2, of Exhibit 3 you'll see that there's no
13  FUL established for the 90-microgram albuterol
14  inhaler? There's other albuterol FULs but not for
15  the inhaler, correct?
16     A.  Correct.
17     Q.  Which is consistent with the note you
18  wrote in Exhibit 12, remove FUL greater than most
19  AWPs, correct?
20     A.  Correct.
21     Q.  So in other words, CMS didn't establish
22  or reestablish a FUL -- or revise the FUL for the

Page 497

1  90-microgram inhaler in this 2001 time period; it
2  actually removed the FUL?
3      A.  Correct.
4      Q.  And it did so despite the fact there
5  are shown on this sheet a series of
6  manufacturers' reported published prices, right?
7      A.  Correct.
8      Q.  There's a published price for Warrick,
9  there's a published price for Schering, Martec,
10  Zenith and Glaxo-Wellcome, among others?
11     A.  I think Schering is discontinued.
12     Q.  Oh, I'm sorry.  You're right.  But the
13  note at the bottom -- Ms. Bergin's note at the
14  bottom would indicate that there were at least
15  reported published prices for Warrick, Martec and
16  Zenith?
17     A.  Correct.
18     Q.  In other words, there were three
19  manufacturers who were reported published prices
20  for the 90-microgram inhaler?
21     A.  Correct.
22     Q.  And so in other words the conditions

Page 498

1  necessary for CMS to establish a FUL were met at
2  this time?
3          MS. MARTINEZ:  Objection, form.
4      A.  The conditions were met, but the
5  pricing condition wasn't met.
6      Q.  What pricing condition was that?
7      A.  It was that if you would take the
8  prices that are remaining and multiply by 150
9  percent you're going to have a price that's, it
10  looks like, over what the AWPs are.  So you're
11  sort of defeating the purpose of the FUL program.
12     Q.  Which was, again, soft savings?
13     A.  Soft savings to the states.  The states
14  can set their own reimbursement level at that
15  point.
16     Q.  So as we've kind of seen throughout,
17  CMS is trying to establish a FUL that's not too
18  low and not too high to achieve a cost savings,
19  but also not set it too low to create an access
20  issue; that's the balance CMS is trying to
21  strike?
22     A.  Correct.

Page 499

1      Q.  And you did that -- the balance was
2  struck, sometimes the computer program worked as
3  it was supposed to and that balance was struck by
4  the computer program, but other times it was the
5  result of manual intervention?
6      A.  Correct.
7      Q.  And the manual intervention resulted in
8  CMS making a choice in its discretion, correct?
9      A.  Correct.
10         MR. BUEKER:  Anyone keeping track of
11  how many drugs we've covered?
12         MS. MARTINEZ:  No.
13         MR. BUEKER:  Well, we're going to do
14  another one.  Can I ask the court reporter to
15  mark as Exhibit 13 for identification a five page
16  document that's Bates labeled HHD 175-1073 to
17  1077.
18         (Exhibit NY Counties 013 was
19  marked for identification.)
20  BY MR. BUEKER:
21     Q.  Not a rush, but just let me know when
22  you're ready.

                                    54 (Pages 496 to 499)

96c95944-eee1-42b5-b77a-388fc0daf3d5