EXHIBIT 36

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------X

In re:  PHARMACEUTICAL INDUSTRY ) MDL No. 1456

AVERAGE WHOLESALE PRICE         ) Master File No.

LITIGATION                      ) 01-CV-12257-PBS

-------------------------------X

United States of America ex rel.) Hon. Patti B. Saris

Ven-A-Care of the Florida Keys, )

Inc., et al. v. Dey, Inc., et   ) 30(b)(6) VIDEO

al., Civil Action No.           ) DEPOSITION OF

05-11084-PBS, and United States ) NONPARTY STATE OF

of America ex rel. Ven-A-Care of) WYOMING DEPARTMENT

the Florida Keys, Inc., et al.  ) OF HEALTH by and

v. Boehringer Ingelheim Corp.,  ) through ROXANNE

et  al., Civil Action No.       ) HOMAR

07-10248-PBS, and U.S. ex rel.  )

Ven-A-Care of the Florida Keys, )

Inc., v. Abbott Laboratories,   ) DECEMBER 2, 2008

Inc., Nos. 06-CV-11337-PBS and  ) CHEYENNE, WYOMING

07-CV-11618-PBS                 )

-------------------------------X

17f2424e-f10c-4fbd-b051-3856666b1910

Page 198

```
 1       A.  In terms of program integrity, which
 2   Colleen Jones works on, there may have been some
 3   instances when she has spoken to providers
 4   directly regarding that type of an issue.
 5       Q.  What is Ms. Jones' position with
 6   Wyoming Medicaid?
 7       A.  She's our program integrity pharmacist.
 8       Q.  And is she the one who would have the
 9   most knowledge about whether and the nature of
10   any contact that Wyoming Medicaid has had with
11   providers regarding their cost of dispensing?
12       A.  I don't know if she would have the most
13   knowledge.  In terms of direct -- if there was
14   going to be some direct provider contact, the
15   only reason I can think of that comes to mind
16   about some reimbursement issues may be the
17   program integrity pharmacist contacting them
18   about, you know, an issue.  So that's just a --
19   in general.
20       Q.  We're going to turn back to Roxane-
21   Wyoming Exhibit 8.  It's probably in that stack
22   there.  It's the Myers and Stauffer 1999 survey.
```

Page 199

```
 1       A.  Okay.
 2       Q.  Do you have that in front of you?
 3       A.  I do.
 4       Q.  Please take a look at Page 5, the
 5   second-to-last paragraph.
 6       A.  Okay.
 7       Q.  Myers and Stauffer recommended that
 8   Wyoming Medicaid add 50 cents to the average cost
 9   of dispensing prescription drugs to allow for
10   profit, correct?
11       A.  It reads:  Myers and Stauffer
12   recommends adding 50 percent -- 50 cents to allow
13   for profit to this average cost.
14       Q.  Myers and Stauffer reported in this
15   1999 survey that the pharmacies' dispensing costs
16   averaged $5.47, correct?
17       A.  Yes, that's what it states.
18       Q.  Myers and Stauffer's recommendation to
19   add 50 cents onto the average cost of dispensing
20   a product would result in a dispensing fee of
21   $5.97 in 1999, correct?
22       A.  That's what it says, yes.
```

Page 200

```
 1       Q.  Wyoming Medicaid did not implement the
 2   recommendation of Myers and Stauffer to add 50
 3   cents to the average dispensing cost of $5.47 as
 4   its dispensing fee, did it?
 5           MS. THOMAS:  Objection.
 6           MS. WILKERSON:  Objection.
 7       A.  We implemented a $5 dispensing fee when
 8   we implemented our change.
 9       Q.  (BY MS. LIEBERMAN)  So Wyoming Medicaid
10   did not implement the recommendation of Myers and
11   Stauffer to set Wyoming Medicaid's dispensing fee
12   at $5.97.
13           MS. THOMAS:  Objection.
14       Q.  (BY MS. LIEBERMAN)  Did it?
15       A.  Well, there was other factors we take
16   into place.  It's not only Myers and Stauffer.
17   And at this time our Medicaid budget was --
18   Medicaid prescription drug and overall Medicaid
19   budget was in a deficit.  The -- and my
20   recollection is that there wasn't a feeling that
21   the legislature -- even though they don't
22   directly -- they don't directly approve, that
```

Page 201

```
 1   they -- the -- the legislature would not have a
 2   comfort level with increasing our dispensing fee
 3   that much, especially when we looked at
 4   surrounding states to see what their dispensing
 5   fees looked like, similar states to us.
 6       Q.  (BY MS. LIEBERMAN)  So is it fair to
 7   say that Wyoming Medicaid did not implement Myers
 8   and Stauffer's recommendation because it would
 9   not have been politically possible to set a
10   dispensing fee at $5.97 in 1999?
11           MS. WILKERSON:  Objection.
12           MS. THOMAS:  Objection to form.
13       A.  Well, we -- let's see.  We didn't think
14   it would be politically possible.  As I say, it's
15   -- it's one of the factors.  We take a number of
16   factors into account.  And we didn't feel that
17   this dispensing fee would -- would -- yeah, would
18   -- you know, given the fact that we were having
19   deficits in our prescription drug budget that we
20   would be able to go in and adequately --
21   adequately defend increasing the dispensing fee
22   that much, especially, as I said, when we saw the
```

Page 202

1  other states around us did not have dispensing
2  fees in those ranges.
3      Q.  The $5 dispensing fee that Wyoming
4  Medicaid did implement did not include the 50
5  cent profit component that Myers and Stauffer
6  recommended in 1999, did it?
7          MS. WILKERSON:  Objection.
8          MS. THOMAS:  Objection to form.
9      A.  As it's stated here, the 50 percent --
10 the 50 cents -- I'm sorry -- component that
11 they're talking about -- when we implemented a $5
12 dispensing fee, we just -- we didn't take into
13 account this 50 cent component one way or the
14 other.
15     Q.  (BY MS. LIEBERMAN)  Okay.  The $5 would
16 not even cover the cost of dispensing
17 prescription drugs that Myers and Stauffer
18 reported as being $5.47 on average, correct?
19         MS. WILKERSON:  Objection.
20     A.  Well, with the way this reads, $5 is
21 less than $5.47 or $5.97.  So it would have been
22 less than what they have listed here.

Page 203

1      Q.  (BY MS. LIEBERMAN)  As the cost of
2  dispensing, correct?
3      A.  Yes.
4      Q.  The $5 of dispensing fee that Wyoming
5  Medicaid implemented would not cover the average
6  cost of dispensing that Myers and Stauffer
7  reported as being $5.47?
8      A.  That's correct.
9      Q.  $5 is still the dispensing fee today in
10 Wyoming Medicaid?
11     A.  Yes, it is.
12     Q.  The dispensing fee today in Wyoming
13 Medicaid is less than the cost of pharmacies to
14 dispense drugs as determined by Wyoming Medicaid
15 through Myers and Stauffer in 1999?
16         MS. WILKERSON:  Objection.
17         MS. THOMAS:  Objection to form.
18     A.  Can you -- I'm sorry.  Can you repeat
19 that question.
20     Q.  (BY MS. LIEBERMAN)  The dispensing fee
21 that Wyoming Medicaid has, as part of its
22 reimbursement formula today, is less than the

Page 204

1  cost of pharmacies to dispense prescription drugs
2  as determined by Wyoming Medicaid through Myers
3  and Stauffer in 1999, correct?
4      A.  Our current dispensing fee is still $5.
5      Q.  Wyoming Medicaid's dispensing fees --
6  strike that.  Wyoming Medicaid's dispensing fee
7  did not increase with inflation?
8          MS. THOMAS:  Objection.
9      A.  No, there was not a component for it to
10 increase with inflation.
11     Q.  (BY MS. LIEBERMAN)  Did Wyoming
12 Medicaid meet with Wyoming Pharmacist Association
13 to discuss the results of the Myers and Stauffer
14 1999 survey?
15     A.  I don't recall a specific meeting.  I'm
16 sure that we probably did talk to somebody about
17 it.  That would have been our procedure.  I just
18 don't -- I don't recall a specific meeting,
19 however.
20     Q.  Do you recall generally what the
21 Wyoming Pharmacist Association said or commented
22 regarding the Myers and Stauffer 1999 survey?

Page 205

1      A.  No, I don't recall any specific
2  comments in terms of the survey.  Well, any
3  specific comments in general.  I know that -- I
4  don't recall any pushback from going forward with
5  the changed reimbursement fee to AWP minus 11
6  plus $5.  I don't recall that being disputed or,
7  you know, intense lobbying against that or -- or
8  anything like that, to my recollection.
9      Q.  You'd agree that Wyoming Medicaid's
10 dispensing fee at $5 is not adequate to cover a
11 pharmacy's actual cost to dispense a drug to
12 Medicaid beneficiaries as reported in the Myers
13 1999 survey?
14         MS. THOMAS:  Objection.
15         MS. WILKERSON:  Objection.
16     A.  Well, as I said, it's $5.  And it's
17 less than the amount they state as an average
18 dispensing cost of $5.47.  So it's less than what
19 they suggest here.
20     Q.  (BY MS. LIEBERMAN)  The $5 fee that is
21 currently in place is less than the actual cost
22 to dispense a prescription drug to Medicaid

WY Department of Health (Roxanne Homar)                                December 2, 2008
Cheyenne, WY

Page 214

1  state maximum allowable cost?
2     A.  Yes.
3     Q.  What is the state MAC?
4     A.  What is the state MAC?
5     Q.  Yes.
6     A.  In terms of -- it's a pricing that we -
7  - we contract with Myers and Stauffer and ask
8  them -- they go out and look at multi-source
9  generics and, through a process of surveys, et
10 cetera, help to set an actual lower
11 reimbursement, referred to as the state MAC, on
12 those particular identified products.
13    Q.  Were you ever involved in Wyoming's
14 state MAC program?
15    A.  At a high level.  I didn't -- I've
16 always had a pharmacist that works for me
17 directly administer the program essentially.
18    Q.  When were you first involved in
19 Wyoming's state MAC program?
20    A.  Well, we didn't have a full program, I
21 wouldn't say, until we contracted.  As I said, we
22 started when Colleen Jones came in and, I

Page 215

1  believe, Shannon Whalen.  There were some
2  individual products that they had been made aware
3  of, I think through calls from pharmacies, et
4  cetera, where there had been some individual
5  state MAC's addressed on an individual basis.
6        I don't know that you would call that a
7  program.  That kind of continued into 2002 when
8  we realized we need to have a broader program for
9  state MAC, and that's when we contracted out for
10 it.
11    Q.  And before 2002 when you were hearing
12 from providers and were implementing certain
13 MAC's for certain drugs, do you recall when that
14 began, when Wyoming Medicaid first implemented
15 state MAC's for certain drugs?
16    A.  Not specifically.  But to the best of
17 my recollection, I'm thinking maybe later 2001.
18 But that's about as well as I remember.
19    Q.  Can you describe your involvement in
20 the state MAC program.
21    A.  Well, only from a high supervisory
22 level.  Not hands-on day-to-day running of the

Page 216

1  program.  That would have been my pharmacist that
2  worked for me.
3     Q.  And so what were your responsibilities
4  with regard to the state MAC program?
5     A.  Nothing direct other than to sign off
6  on a contract and in -- and converse with my
7  pharmacist if she had questions, wanted to run
8  something by me, that type of thing.
9     Q.  Since the time that Wyoming first used
10 state MAC's, were you the person who had ultimate
11 authority to set state MAC's?
12       MS. WILKERSON:  Objection.
13    A.  No, not necess -- no, not necessarily.
14 My -- the pharmacist that worked for me could
15 work to set a state MAC or work with a
16 contractor.  They're pharmacists, and so I have
17 trust that they are knowledgeable in what they're
18 doing.
19    Q.  (BY MS. LIEBERMAN)  So if your -- the
20 pharmacist who worked for you made a decision,
21 you had trust that that decision was made with
22 the proper amount of knowledge that Wyoming

Page 217

1  Medicaid had at the time?
2     A.  I'm sorry.  Repeat that question.
3        MS. LIEBERMAN:  Could you repeat that
4  for the record.
5        (Requested portion read by the
6  reporter.)
7        MS. THOMAS:  Objection.
8     A.  I trusted that my pharmacist would come
9  and talk to me if they needed to, and that -- or
10 they would proceed if they felt comfortable.  So
11 from that perspective, yeah, I had trust that
12 they would come talk to me if they needed to.
13    Q.  (BY MS. LIEBERMAN)  Is there anyone
14 else, besides the pharmacist who worked for you,
15 who had responsibility for Wyoming's state MAC
16 program?
17    A.  Colleen Jones, our program integrity
18 pharmacist, wouldn't necessarily have direct
19 responsibility but, certainly, would have had a
20 collaborative effort.
21    Q.  Prior to 2002, how many prescription
22 drugs had a state MAC?

55 (Pages 214 to 217)

Page 230

1    Q.  (BY MS. LIEBERMAN) I'm going to hand
2  you what's been marked as Roxane-Wyoming Exhibit
3  13, which is Bates labeled WY00000171, which is
4  an April 11th, 2006, email from Antoinette Brown
5  to James Shin.  If you could just take a moment
6  to review this document.
7        What was Antoinette Brown's position
8  with Wyoming Medicaid in 2006?
9    A.  Sorry.  Just give me another minute
10 here.
11   Q.  Oh, sure.
12   A.  Okay.  I'm sorry.  Go ahead.
13   Q.  What was Antoinette Brown's position
14 with Wyoming Medicaid in 2006?
15   A.  She was our Medicaid pharmacist.  I
16 don't know if her -- I can't recall if at that
17 point she was technically listed as Medicaid
18 pharmacy program manager, but she essentially
19 operated in that capacity.
20   Q.  Did she have responsibility for
21 implementing Wyoming's state MAC program?
22   A.  Yes.

Page 231

1    Q.  To your knowledge, is James Shin an
2  employee of Myers and Stauffer?
3    A.  Yes, I believe so.
4    Q.  Could you please read the top email on
5  the page.
6    A.  From Antoinette?
7    Q.  Yes.
8    A.  James, We have decided to go with the
9  40 percent markup.  Please let me know if you
10 have any questions.  Thanks, Antoinette.
11   Q.  The 40 percent markup that Antoinette
12 refers to is the 40 percent markup from the Myers
13 and Stauffer analysis in Roxane-Wyoming Exhibit
14 11?
15   A.  I would assume so.  It's dated March
16 23rd, 2006, and this email is April 11th of 2006.
17   Q.  Wyoming Medicaid decided to set the
18 state MAC at 40 percent higher than the average
19 actual acquisition cost for drugs?
20   A.  It appears that, yes, that was what was
21 decided for the state MAC program.
22   Q.  The difference between actual

Page 232

1  acquisition cost and the state MAC for a
2  particular drug represents profit to the provider
3  for that drug, correct?
4        MS. WILKERSON:  Objection.
5    A.  It -- it represents an amount that will
6  cover costs, so it's not only profit.  I mean, I
7  guess when I say profit, I see that amount of
8  money outside of other costs to run the business.
9  So it's cost of running business and then
10 additional profit -- profit perhaps.
11   Q.  (BY MS. LIEBERMAN) Well, let's put it
12 this way.  The difference between actual
13 acquisition cost for a drug and the state MAC for
14 that drug represents profit to the provider on
15 the cost of the drug that that provider can use
16 for whatever purposes it wants, correct?
17       MS. THOMAS:  Objection.
18   A.  Yes.  The reimbursement would be -- the
19 difference would be -- between their actual
20 acquisition cost and what we set the MAC at would
21 be an additional amount of profit.
22   Q.  (BY MS. LIEBERMAN) Wyoming Medicaid's

Page 233

1  policy intended that there be some profit
2  component in implementing its state MAC program?
3        MS. THOMAS:  Objection.
4    A.  Yes.  We didn't want to disincentivize
5  providers to use generics.  That would not be a
6  good move.
7        THE WITNESS:  I really have to go to
8  the bathroom.  Can we -- can we break real quick?
9  I'm sorry.
10       MS. LIEBERMAN:  Sure.
11       THE WITNESS:  Really have to go.
12       THE VIDEOGRAPHER:  We are going off the
13 record.  The time is 2:40.
14          (Break from 2:40 p.m. to 2:46
15 p.m.)
16       THE VIDEOGRAPHER:  We are back on the
17 record continuing the deposition of Roxanne
18 Homar.  The time is 2:46.
19   Q.  (BY MS. LIEBERMAN) Ms. Homar, if a
20 state MAC is set for a particular drug,
21 reimbursement for that drug will not be based on
22 AWP, correct?

59 (Pages 230 to 233)

Page 338

 1  drug therapy incur different costs than your
 2  typical retail pharmacy that is just dispensing
 3  pills; is that correct?
 4      A.  You know, I'm not -- I'm not incredibly
 5  familiar with this area.  I have just a very
 6  general understanding that --
 7      Q.  And what's your general understanding?
 8      A.  In terms of mixing products and some of
 9  the things that might be required in terms of --
10  sorry.  I'm blanking on some of my terms.  You
11  know, if there's chemotherapy or some of those
12  types of things, there's some additional
13  precautions.  Parenteral therapy.  Those are --
14  you know, some of those things take more time, is
15  my understanding.  That would be my general
16  understanding of -- of maybe an additional cost
17  other than if you're just -- you know, if you're
18  counting out pills versus mixing up products.
19      Q.  Sure.  And so as -- as part of a
20  pharmacy that's dispensing home ID drug therapy
21  drugs, like the ones listed on Schedule 1, may
22  incur additional cost because of the time that it

Page 339

 1  takes -- additional time it takes to dispense
 2  these products and any additional equipment that
 3  they may need to take special precautions,
 4  correct?
 5      A.  Yes, they sure could.
 6      Q.  And are you -- are these pharmacies
 7  that dispense these type of drugs reimbursed in
 8  the same manner as we've been discussing all day?
 9      A.  Yes, they would be reimbursed in the
10  same manner.  These products may come in as a
11  compound.  And, you know, a compound would have
12  multiple NDC's.  So each of those products would
13  be reimbursable.
14      Q.  And so prior to 2001, when you had the
15  change in the reimbursement formula, these
16  pharmacies were being reimbursed at AWP minus 4
17  percent plus a dispensing fee of $4.70; is that
18  correct?
19      A.  That or the lower of if their usual and
20  customary was lower.  Whatever the lower of would
21  be.
22      Q.  Sure.

Page 340

 1      A.  And that would be for, you know, each
 2  of the products.
 3      Q.  Were these pharmacies compensated in
 4  any way for the additional costs that they incur
 5  or the additional time that it takes for them to
 6  dispense these products?
 7      A.  Not specifically that I'm aware of.
 8      Q.  If you could take -- turn the page of
 9  Abbott-Wyoming Exhibit 1.  Turn the page one
10  page.  It says Schedule 2.
11      A.  Okay.
12      Q.  And can you please just quickly review
13  the drugs that are listed there.
14      A.  Uh-huh.
15      Q.  Are you familiar with the drug
16  erythromycin?
17      A.  Yes.
18      Q.  It's typically a generic -- well, it's
19  a -- it's a generic drug, correct?
20      A.  Yes, it's available generically.
21      Q.  So this is -- do you -- are you aware
22  whether or not this drug is currently MAC'd by

Page 341

 1  Wyoming?
 2      A.  No, I'm not specifically aware if it's
 3  MAC'd or not.
 4      Q.  Would you expect it to be?
 5      A.  I would sure think so.
 6      Q.  Are you aware of whether or not this is
 7  one of the drugs that was MAC'd internally by
 8  Wyoming Medicaid prior to enlisting the help of
 9  Myers and Stauffer?
10      A.  No, I'm not specifically aware if it
11  was or not.
12      Q.  Do you know who would know that?
13      A.  At that time it would have been my
14  pharmacy program manager, Shannon Whalen, or
15  Colleen Jones.
16      Q.  And we talked a little bit about MAC
17  earlier.  But I just wanted to clarify what the
18  procedures were for setting the MAC in Wyoming.
19      We looked at some documents that showed
20  that Myers and Stauffer surveyed pharmacies for
21  their acquisition costs and then set, at least
22  currently, the MAC price at 40 percent above the

Page 342

1  providers' acquisition cost; is that correct?
2       MS. THOMAS: Objection to form.
3       A. I believe that's the information we
4  reviewed for Myers and Stauffer. That was around
5  2006, I recall -- if I recall correctly.
6       Q. (BY MS. FUMERTON) Is that your
7  understanding, though, of how MAC is currently
8  calculated in Wyoming for Wyoming Medicaid?
9       A. I'm not specifically aware of it being
10 done differently than that. I just -- I don't
11 work in -- in it on a day-to-day basis.
12      Q. So Wyoming Medicaid, according to the
13 information that we reviewed earlier, intended to
14 reimburse pharmacies at 40 percent above what
15 they paid for the drug for generic drugs such as
16 erythromycin, correct?
17      MS. THOMAS: Objection to form.
18      A. Yes. And that reimbursement was less
19 than it would have been had we reimbursed off of
20 AWP.
21      Q. (BY MS. FUMERTON) Can you please take
22 -- pull out again Roxane-Wyoming Exhibit 8.

Page 343

1       A. Okay.
2       Q. And can you please turn to Page 6 of
3  that exhibit.
4       A. Okay.
5       Q. In the middle of the page there is a
6  table with a heading "Table 2.1 Wyoming Medicaid
7  Pharmacy Reimbursement." Do you see that?
8       A. Yes.
9       Q. And in that table, the first line after
10 the heading, it says: Non-MAC. And then under
11 Dispensing Fee, it says: $4.70 + .07(AWP).
12      Do you see that?
13      A. Yes.
14      Q. Could you explain what that means.
15      A. Well, as I understand it, my
16 predecessor submitted a reimbursement formula
17 that read AWP minus 11 and then had the 7 percent
18 of AWP tied over to dispensing fee. In actual
19 practice, it was not implemented specifically
20 that way in the drug payment claim system. It
21 was just implemented as AWP minus 4 percent plus
22 4.70.

Page 344

1       Q. So do you know where -- I mean, is that
2  just a typo then, do you believe?
3       A. No. As I stated, if you take -- if you
4  take 11 minus 7, that's a -- a 4 percent
5  difference. It's just two different ways of --
6  of stating it. This is the way it was, as I
7  understand, submitted to CMS. But the way it was
8  put into the system was at AWP minus 4.
9       Q. You're saying that the .07 AWP should
10 have been moved over to the Ingredient
11 Reimbursement column?
12      A. That's how it had to be implemented,
13 actually, in claims payment processing.
14      Q. Okay. And if you'd turn back to Page
15 5, please, of that same exhibit.
16      A. Okay.
17      Q. If you look in the middle of the page,
18 it's discussing the findings with respect to
19 acquisition costs.
20      A. Uh-huh.
21      Q. In the third bullet point down, it
22 says: The weighted acquisition costs for MAC

Page 345

1  drugs exhibited much greater variation, but
2  averaged 26.62 percent of AWP or 51.56 percent of
3  the MAC prices.
4       Is that correct?
5       A. That -- that is what it states, yes.
6       Q. Is it your understanding that Myers and
7  Stauffer found that, even utilizing MAC prices,
8  Wyoming Medicaid, on average, was over-
9  reimbursing -- or was reimbursing pharmacies in
10 excess of their acquisition costs by almost 50
11 percent?
12      MS. THOMAS: Objection to form.
13      A. Well, that would have been, you know,
14 back in 1999.
15      Q. (BY MS. FUMERTON) And this is for the
16 -- the prices that were already MAC'd, correct?
17      MS. THOMAS: Objection to form.
18      A. You know, the thing I'm not following
19 in this, when they're referring to MAC, is I
20 don't remember specifically having MAC's in place
21 in 1999. So I'm not following specifically what
22 they're referring to here.