# EXHIBIT 37

Page 1

                    UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL           )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE       )  CIVIL ACTION

PRICE LITIGATION                 )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO         )

U.S. ex rel. Ven-a-Care of       )  Judge Patti B. Saris

the Florida Keys, Inc.           )

     v.                          )  Chief Magistrate

Abbott Laboratories, Inc.,       )  Judge Marianne B.

No. 06-CV-11337-PBS              )  Bowler

- - - - - - - - - - - - - - - -

           (captions continue on following pages)



         Videotaped deposition of FRANK T. TETKOSKI



                       Baltimore, Maryland

                       Thursday, December 11, 2008

                       9:00 a.m.

Tetkoski, Frank T.                                                December 11, 2008
                                    Baltimore, MD

Page 126

1         BY MR. TORBORG:
2     Q.   Does it appear that at page 469 of Abbott
3  Maryland Exhibit 14 that Maryland had established MACs
4  on a large number of erythromycin products?
5     A.   There's a lot of erythromycin products
6  listed here, yes.
7     Q.   And then if we go to the Bates page 490 and
8  491, at the bottom of the page and then carrying over
9  there's a number of various generic sequence numbers
10 for sodium chloride, right?
11    A.   Right.
12    Q.   Injection and irrigation, right?
13    A.   Right.
14    Q.   And if we go to the Bates page ending 496,
15 does it appear as though MACs had been established for
16 vancomycin?
17    A.   Right.  I think though -- I would like to
18 point out I think we're going on one assumption here
19 that I'm not sure.  You're taking this date as the
20 date of initial establishment.  This might just be the
21 date of the last update.
22    Q.   It could have been established earlier?

Page 127

1     A.   It could have been established before and
2  she just printed out the last one, because when we do
3  them we say we're putting this on and this is an
4  effective date.  If it had an IDC on prior to that day
5  it would just bump the history down and put this new
6  one over it.
7     Q.   Because this schedule doesn't have any --
8  it never has more than one date per line?
9     A.   Yeah.  So I would assume that that's the
10 latest -- this is drawn out to see how many we have a
11 rate on and what the latest one was.  Or maybe that's
12 just part of the database and it printed it out.
13    Q.   And we talked about this a little earlier,
14 but what pricing sources did the department use to set
15 its IDC amounts?
16         MS. YAVELBERG:  Objection, form.  Time
17 period?
18    Q.   Throughout the time you were there.
19    A.   Oh.  Well, it changed.  Initially the way
20 the regs were -- again, it's in -- whatever we did was
21 in regulations.  We would take the two wholesalers.
22 We had the microfiche for each wholesaler.  And we

Page 128

1  would compare the lowest price from one wholesaler to
2  the lowest price from another wholesaler and take the
3  higher of those two, the idea being that whatever
4  wholesaler a pharmacy used it would always have that
5  lowest price for that particular wholesaler.  We would
6  meet that at least.
7     Q.   You didn't use the prices in the compendia
8  at all for setting IDC amounts, right?
9     A.   Compendia?  What compendia?
10    Q.   Are you familiar with what a compendia is?
11 First Databank?
12         MS. YAVELBERG:  Objection, form.
13    Q.   Are you familiar with First Databank?
14    A.   First Databank did our -- yeah.  They did
15 our formulary.
16    Q.   And are you familiar with the publication
17 known as the Red Book?
18    A.   Right.  Yes.
19    Q.   You're aware that there are certain prices
20 in First Databank, right?
21         MS. YAVELBERG:  Objection, form.
22    A.   That's their business, prices.  I mean, I'm

Page 129

1  not sure what you mean -- you mean certain generic
2  prices?
3     Q.   Average wholesale price --
4     A.   Oh, okay.  Right.  Yeah, we didn't use, at
5  least at that time -- well, when we're doing them we
6  use the prices for our IDC off the microfiche from
7  wholesalers.
8     Q.   You don't use the prices in First Databank
9  at all for that, right?
10    A.   Later on we broadened our regulations so
11 that we expanded it that we can -- so when these
12 prices became unavailable we might have took some sort
13 of derivative of that where we used the lowest EAC
14 price as a possibility.  And we also kept the ability
15 to use the wholesaler's price if available.  But we
16 just wanted to expand that so that we had something.
17    Q.   But in setting the IDC amount itself you
18 did not rely upon any prices in First Databank, right?
19         MS. YAVELBERG:  Objection, form.
20    A.   If we had the microfiche from the
21 wholesaler we used that where we could get them.
22    Q.   Are you aware of any instance where the

33 (Pages 126 to 129)

Tetkoski, Frank T.                                           December 11, 2008
                                Baltimore, MD

|  | Page 158 |
|---|---|
| 1 | WAC plus 10 was generally equivalent to AWP minus 10, |
| 2 | right? |
| 3 | A.  At the time that was instituted. |
| 4 | Q.  And that's what Ms. Freeze says in the last |
| 5 | paragraph -- before that.  The second sentence, "The |
| 6 | current WAC plus 10 pricing is generally equivalent to |
| 7 | average wholesale price (AWP) less 10 percent," right? |
| 8 | A.  That was this -- right.  The rule of thumb |
| 9 | or whatever you want to call it. |
| 10 | Q.  And OIG had informed the department that it |
| 11 | found that for generic drugs this discount -- the |
| 12 | average discount off of AWP was about 42 percent, |
| 13 | correct? |
| 14 | A.  That's what they found, yes. |
| 15 | Q.  Right? |
| 16 | So if you take 42 percent minus 20 percent |
| 17 | or add 20 percent, what do you get? |
| 18 | MS. YAVELBERG:  Objection, form. |
| 19 | A.  What calculation are you performing?  What |
| 20 | are you trying to arrive at? |
| 21 | Q.  OIG told Maryland that on average the |
| 22 | discount from AWP for generic drugs was 41.9 percent, |

|  | Page 159 |
|---|---|
| 1 | correct? |
| 2 | A.  That sounds like the figure that they've |
| 3 | got here. |
| 4 | Q.  Maryland knew that there was a 20 percent |
| 5 | difference between AWP and WAC, right? |
| 6 | MS. YAVELBERG:  Objection, form. |
| 7 | A.  That implies for brand names.  It might not |
| 8 | say it.  But that's how I understood it. |
| 9 | Q.  You're saying that they had a different |
| 10 | understanding for generic drugs? |
| 11 | A.  For brand-name drugs that holds more.  For |
| 12 | generic drugs -- they're a little more, right.  That |
| 13 | 20 percent is not necessarily as consistent as it is |
| 14 | for brand-name drugs. |
| 15 | Q.  It could be even -- what was your |
| 16 | understanding as to generic drugs between the |
| 17 | relationship between AWP and WAC? |
| 18 | A.  That the AWP for generic drugs could be off |
| 19 | more than it is for brand names. |
| 20 | Q.  How about the relationship between AWP and |
| 21 | WAC for generic drugs?  What was the department's |
| 22 | understanding? |

|  | Page 160 |
|---|---|
| 1 | MS. YAVELBERG:  Objection, form. |
| 2 | A.  You mean percentage-wise? |
| 3 | Q.  Yes. |
| 4 | A.  I don't know if we had a percentage that we |
| 5 | were going with, actually.  We just used -- we didn't |
| 6 | look too much at the AWP on the generics.  We had -- |
| 7 | since we were using WAC we thought that was a lot more |
| 8 | stable and more reliable. |
| 9 | Q.  Ms. Freeze says in her memo "The current |
| 10 | WAC plus 10 pricing is generally equivalent to average |
| 11 | wholesale less 10 percent," right?  That's what she |
| 12 | says? |
| 13 | A.  That's what she's stating, yes. |
| 14 | Q.  She doesn't say the current WAC plus 10 |
| 15 | pricing is generally equivalent to average wholesale |
| 16 | less 10 percent for brand name drugs? |
| 17 | A.  Right.  She doesn't say that. |
| 18 | Q.  She doesn't draw the distinction? |
| 19 | MS. YAVELBERG:  Objection, form. |
| 20 | A.  Right.  She doesn't draw the distinction. |
| 21 | Q.  In the first paragraph she stated that "The |
| 22 | WAC plus 10 methodology far exceeds the true |

|  | Page 161 |
|---|---|
| 1 | acquisition cost to the pharmacy," right? |
| 2 | A.  That's what she states. |
| 3 | Q.  So at this time Maryland was aware that the |
| 4 | WAC plus 10 methodology far exceeds the true |
| 5 | acquisition cost to the pharmacy, right? |
| 6 | MS. YAVELBERG:  Objection, form. |
| 7 | A.  She is stating that.  Let me see what we've |
| 8 | got here.  (Reading). |
| 9 | It depends what you mean by "far exceeds." |
| 10 | That is her words, but -- |
| 11 | Q.  They're not my words. |
| 12 | A.  No, no, no.  I said it was her words. |
| 13 | Q.  That's what she said? |
| 14 | A.  Yeah.  They were her -- |
| 15 | Q.  Right? |
| 16 | A.  Far, I mean, I guess the question is what |
| 17 | do we mean by far.  WAC we look at as basically a |
| 18 | base.  So if 10 percent is the upper limit of -- |
| 19 | outside of that is 10 percent plus that and that's |
| 20 | far. |
| 21 | Q.  In the third paragraph she says "The OIG |
| 22 | report specifically excluded drug acquisition costs |

41 (Pages 158 to 161)

Page 190

```
 1   limitations."
 2        And then it continues "The state officials
 3   were concerned that without the above disclaimer that
 4   uninformed state officials might overreact to our
 5   report and adjust pharmacy reimbursement without
 6   considering the other aspects of reimbursement."  Do
 7   you see that?
 8        A.   Yes.
 9        Q.   Do you recall that those kind of comments
10   were made in the meeting?
11             MS. YAVELBERG:  Objection, form.
12        A.   Those type of comments?  This reflects on
13   what was at the meeting.  That is, the idea being that
14   you would cut the ingredient cost without affecting
15   the -- adjusting the dispensing fee.
16        Q.   And what's being talked about here is a
17   possibility of having to adjust the fee upwards if you
18   were going to cut the ingredient cost, right?
19             MS. YAVELBERG:  Objection, form.
20        A.   Right.  Adjustments have to be made as more
21   and more it evolved where the prescription was a part
22   of the ingredient cost and the fee would need to be --
```

Page 191

```
 1   if you just unilaterally cut the ingredient cost it
 2   would be hard to put through as well as just a flat
 3   cut which as we discussed before it would be very hard
 4   to even put through.
 5        Q.   What the state officials said is you can't
 6   just look at one side of the equation and adjust it
 7   without looking it other side, right?
 8             MS. YAVELBERG:  Objection, form.
 9        A.   Well, you have to look at everything.  Yes.
10        Q.   Let me ask you about a couple of the
11   specifics here.  There's mention of "the effect of
12   Medicaid business as a contribution to other store
13   sales."  What does that mean?
14        A.   Where are you --
15        Q.   I'm back on the notes here.  The last
16   paragraph on the first page.  "The effect of Medicaid
17   business as a contribution to other store sales."
18   What that's saying, is it not, Mr. Tetkoski, is that
19   generally speaking pharmacies don't get as much
20   crossover business from Medicaid patients as you might
21   from a regular customer?
22             MS. YAVELBERG:  Objection, form.
```

Page 192

```
 1        A.   That's one interpretation.
 2        Q.   And then the next is "the cost to provide
 3   professional services other than dispensing a
 4   prescription such as therapeutic interventions" --
 5   what are therapeutic interventions?  Do you know?
 6        A.   If the pharmacist sees a prescription or a
 7   problem with a therapy, whether there's a drug
 8   interaction or something, and calls the physician to
 9   change or address it or informs the physician that
10   there might be a problem.  That takes time.
11        Q.   So this is talking about the costs that
12   pharmacies incur that's above just your normal
13   dispensing a prescription, putting the pills into a
14   container, right?
15             MS. YAVELBERG:  Objection, form.
16        A.   It's a pharmacist's responsibility and he's
17   required to do that.  So that's all part of the
18   pharmacist's job.  He's required to do it.  So when he
19   sees that problem that's part of the pharmacy cost.
20        Q.   And states weren't paying --
21        A.   Dispensing costs.
22        Q.   -- a separate fee for that, right?  They
```

Page 193

```
 1   were paying a dispensing fee?
 2             MS. YAVELBERG:  Objection, form.
 3        A.   I'm trying to think if there was some way
 4   they reimbursed for that separately, if some ever even
 5   did that.  But really, you're a pharmacist, when you
 6   fill a prescription all that is a package deal.
 7   That's why a pharmacist has to be on duty.
 8             MR. TORBORG:  Why don't we go ahead and
 9   take a break here and I'll take a look at what I have
10   and I'll give you an estimate of what I've got left.
11             THE VIDEOGRAPHER:  Off the record at 2:55.
12             (Recess.)
13                  (Exhibit Abbott Maryland 032
14                  was marked for
15                  identification.)
16             THE VIDEOGRAPHER:  On the record at 3:05.
17             BY MR. TORBORG:
18        Q.   Welcome back.
19        A.   Thank you.
20        Q.   What I've marked as Abbott Maryland 32
21   bears the Bates number MD 0003813 through 3855.  It's
22   a collection of documents that was produced to us in
```