# EXHIBIT 39

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------X

IN RE:   PHARMACEUTICAL INDUSTRY     )

AVERAGE WHOLESALE PRICE LITIGATION ) MDL No. 1456

---------------------------------) Civil Action

THIS DOCUMENT RELATES TO:            ) No. 01-12257-PBS

United States of America, ex. rel. ) Hon. Patti Saris

Ven-a-Care of the Florida Keys,    )

Inc., v. Dey, Inc., et. al., Civil )

Action No. 05-11084-PBS; and United)

States of America, ex. rel.        ) December 2, 2008

Ven-a-Care of the Florida Keys,    ) 8:57 a.m.

Inc., v. Boehringer Ingleheim      )

Corp. et. al., Civil Action        )

No. 07-10248-PBS.                    ) VOLUME I

---------------------------------X

Deposition of THE NEBRASKA DEPT. OF HEALTH AND HUMAN

SERVICES by GARY CHELOHA, taken by Defendants, pursuant

to Notice, held at the Cornhusker Hotel, Lincoln, Nebraska,

before Shana W. Spencer, a Certified Shorthand Reporter

and Notary Public of the State of Nebraska.

Page 122

1   A.  Review of all of the federal upper
2   limit prices to assure that Nebraska pharmacies
3   could buy the drugs at that cost and if there was
4   enough of the drug available so that the
5   prescriptions written for Nebraska Medicaid could
6   be filled with the generic versions.
7        (Exhibit Dey 908 was marked for
8   identification.)
9   Q.  (BY MS. LORENZO) Okay.  I'll have you
10  take a look at what I'm going to mark as Dey 908
11  which is a document dated July 27th, 1998, with
12  the Bates number NEB305.  Do you recognize this
13  document?
14  A.  Yes, I do.
15  Q.  And it appears to be a letter to you
16  from Curtis Woods?
17  A.  Yes.
18  Q.  Okay.  Could you tell me a little bit
19  about who Curtis Woods is?
20  A.  Curtis Woods is the vice president --
21  at that time was the vice president of Pace
22  Alliance, which is a purchasing group that

Page 123

1   purchased or arranged for purchasing of generic
2   drugs for its member pharmacies.  He's still in
3   that capacity today.
4   Q.  Okay.  And how did you come to meet or
5   form a relationship with Curtis Woods, if you can
6   recall?
7   A.  One place I know him was at the
8   Nebraska Pharmacists Association's annual
9   convention or meeting at the exhibitor's hall.
10  Q.  Now, it looks like Pace is based out of
11  Lawrence, Kansas?
12  A.  Yes.
13  Q.  Do they sell to pharmacies within
14  Nebraska as well?
15  A.  Yes.
16  Q.  Okay.  And it appears from this
17  document that you had forwarded a federal upper
18  limit list to Mr. Woods and asked him for his
19  comments?  Is this what you --
20  A.  Yes.  His comments and recommendations,
21  that's correct.
22  Q.  And if you kind of flip through on, for

Page 124

1   example, page 0313 at the bottom, for Dicyclomine
2   Hydrochloride, it says that the FUL is way too
3   low, and he's made other notes as well throughout
4   the document.
5        Would you ask him to look at federal
6   upper limit prices and see how those drugs could
7   be purchased and what rates they could be
8   purchased at in Nebraska?
9   A.  Yes.  I did ask him to do that.
10  Q.  Okay.  And it seems like this is
11  something you would do periodically?
12  A.  Yes, it is.
13  Q.  Do you still correspond with Mr. Woods
14  and ask him for his information?
15  A.  Barbara Mart does.
16  Q.  Okay.  Are there any other purchasing
17  organizations or pharmacy groups that you
18  periodically correspond with relating to FUL or
19  MAC prices?
20  A.  No.
21  Q.  So when you would receive information
22  from Mr. Woods about a FUL being too low or

Page 125

1   things not being able to be obtained in Nebraska
2   for certain prices, what would you do with that
3   information?
4   A.  These were recommendations, and I could
5   either correspond with him to determine what
6   would be a more reasonable price that they could
7   be acquired, we could implement as-is, or we
8   could not implement as a FUL at all.  We could
9   also, and did, contact pharmacies directly about
10  purchasing these drugs and ask for
11  recommendations.  You know, if this is way too
12  low, what would be a more reasonable price?
13       We did both correspond with Curtis
14  Woods and then also with pharmacies through the
15  regulation that says the Medicaid Advisory
16  Committee at the MPA is available for the
17  development of state MACs.  In lieu of a FUL,
18  this could have been become a state maximum
19  allowable cost.
20  Q.  And the concern was that if you set a
21  maximum allowable cost, be it a FUL or a state
22  MAC, that the pharmacists who were prescribing

Page 126

1  drugs in Nebraska had to be able to obtain prices
2  -- or drugs at that price?
3      A.  The pharmacies -- the concern -- No. 1,
4  if they could not buy it at that price, they
5  would let us know.  They're a very vocal group,
6  and they're actually dispensing the medications.
7  I mean, they just -- they would let us know.
8      Q.  So in order to avoid having complaints
9  or comments from pharmacists, you would, before
10 implementing a certain price, try to ascertain
11 whether or not those prices were reasonable?
12     A.  Yes.  That's correct.
13     Q.  Okay.  Would you also -- you said that
14 pharmacists were a vocal group.  Would you
15 receive letters and other -- phone calls you
16 mentioned, but letters and correspondence like
17 that?
18     A.  Yes.  We received written
19 correspondence as well.
20     Q.  Have you -- would you save those, or
21 what would you do with that correspondence?
22     A.  If they were saved, I did not come

Page 127

1  across any of them in my review of all of those
2  files.  So they were saved for some length of
3  time, because we're always subject to audit.  And
4  -- but they -- I didn't find any in the records
5  that I went through.
6      Q.  Okay.  And is it accurate to say that
7  the complaints and comments by pharmacists and
8  other providers were taken into consideration by
9  Nebraska Medicaid?
10     A.  Yes, they were.  Yes.  That's correct.
11     Q.  So that's one of the pieces we talked
12 about that kind of plays a role in setting
13 reimbursement?
14     A.  Yes.
15     Q.  And would you agree that if there was a
16 federal upper limit in place that is used as a
17 price for a particular claim, that average
18 wholesale price is not a factor in the payment of
19 that claim; it's paid at FUL?
20         MR. MAO:  Objection.  Form.
21         THE WITNESS:  It's possible that an EAC
22 could be lower than the FUL, depending -- on an

Page 128

1  NDC-by-NDC basis.
2      Q.  (BY MS. LORENZO)  If the claim was
3  actually paid out at the FUL, it was paid out at
4  the level that was set by CMS or by Nebraska
5  Medicaid?
6      A.  That's correct.
7      Q.  So you don't have to refer back to it,
8  but back on 904, it says the next kind of factor
9  in product costs is the state MAC, or SMAC?
10     A.  Yes.
11     Q.  So could you describe to me your
12 understanding of what a state MAC is?
13     A.  Yes.  A state MAC is a price set by the
14 Department for almost all -- I mean, almost
15 entirely for generic drugs.  It's a way to set an
16 upper limit on the cost portion of the
17 calculation which is determined by the -- by the
18 State.
19     Q.  To your knowledge, how long has
20 Nebraska been setting state MAC?
21     A.  I'm sorry.  I don't know the begin
22 date.  I'm sorry.  I don't know for sure.

Page 129

1      Q.  Okay.  Well, we'll probably look at
2  some documents to get a sense of that.  But could
3  you tell me, at least today, how does the State
4  determine what drugs to set state MACs for?
5      A.  Okay.  Because the database is between
6  the current FULs and state maximum allowable
7  cost, as new generic versions of drugs become
8  available, we concentrate on those.  And when --
9  generally, when the six-month period of
10 exclusivity for the first generic is past, we
11 determine the state maximum allowable cost,
12 although sometimes it can be done immediately.
13 And we look at the availability of the product
14 and the pricing and the net pricing as much as
15 possible to see whether it's cost effective to
16 move the market share to the generic version
17 versus the brand.
18     Q.  Okay.  And so that's for drugs that are
19 currently entering into the generic market.  I
20 guess, previously, before -- or when Nebraska
21 first implemented its MAC, how did it kind of
22 determine what drugs to take MACs on?

33 (Pages 126 to 129)

Page 130

1  A.  The same general process, looking at
2  the availability and the difference between the
3  price of the brand and the generic.  We would
4  receive recommendations or information from
5  providers, from Pace, mailings from the drug
6  companies about the availability of their generic
7  version of a brand name.  Really, from any
8  source, we would consider, and we'd look at the
9  product for determining its MAC.
10  Q.  And once you determined -- I guess,
11  let's start currently.  Once you determined that
12  there's a particular drug that you'd like to set
13  a maximum allowable cost for, how do you go about
14  setting that actual price?
15  A.  Ask for a recommendation from Pace
16  Alliance.  We'll also call pharmacies to
17  determine the range of costs or range of
18  recommended -- recommendations for SMAC pricing.
19  Q.  Okay.  So if you find out from Mr.
20  Woods at Pace that, for a particular prescription
21  drug, that he can purchase it for, say, 50 cents
22  for that particular dosage, I mean, do you use

Page 131

1  that figure?  Or is there a calculation involved
2  in taking that number and turning it into a MAC?
3  A.  Into an actual SMAC price?
4  Q.  Uh-huh.
5  A.  There is no set formula, and he doesn't
6  provide us -- I think he has -- I believe he has
7  confidentiality agreements for the actual price
8  that the Alliance members can purchase the drug
9  for.  So -- and we rely mostly on the Pace
10  recommendations.
11  Q.  So he'll give you kind of a range, and
12  you'll --
13  A.  He'll generally quote a specific price.
14  He'll say 8 cents, 10 cents.  I recommend this
15  for the SMAC price on it.
16  Q.  And do you know -- you said that
17  there's some confidentiality provisions as far as
18  what they're actually paying.  Do you know if he
19  bills in some percentage or a few cents here or
20  there to make sure that other people can get that
21  or to account for profit or anything like that?
22  A.  All I would know for sure is that it's

Page 132

1  more than the contract price, but I don't know
2  whether he uses a specific formula or how he
3  specifically determines that.  He -- from time to
4  time, on a very limited basis, he and I have
5  discussed -- how will I say it -- the price that
6  the pharmacies pay.  And then I would -- when I
7  was doing it, I made a determination of where to
8  set the MAC price, at something above that.
9  Q.  And did you have a formula, or you were
10  just -- it was a case-by-case basis for --
11  A.  Generally, a case -- it was a case-by-
12  case basis.  I did not have a set formula.
13  Q.  And I'm assuming that the -- you said
14  that Pace is a purchasing organization that has
15  pharmacies in Nebraska, and those pharmacies are
16  participants in the Medicaid program?
17  A.  Yes.
18  Q.  Do you have a sense of how many
19  pharmacies obtain their drugs from Pace?
20  A.  I don't anymore.
21  Q.  Okay.
22  A.  It's -- when I was with the pharmacists

Page 133

1  association, I don't know that I could tell you
2  the number even then.  It's not what it was 20
3  years ago, and I do -- I'm sorry.  I don't know
4  the number in Nebraska.
5  Q.  Okay.  Is it a large percentage, small?
6  I mean, do you remember?
7  A.  I would -- it's a small percentage.
8  Q.  Small.  Okay.  And so I think we had
9  kind of narrowed that -- our previous
10  conversation to the current time period.  Is that
11  the similar process that has always taken place
12  as far as the setting of the actual rates that
13  were paid?
14  A.  I'm sorry.  I missed the first part of
15  what you said.  Is that the --
16  Q.  Has that always been the practice in
17  setting the particular prices for state MACs, or
18  has that changed over time?
19  A.  Many years ago, we had access to the
20  McKesson catalog.  And also, there was a
21  wholesaler in Lincoln, Lincoln Drug Company, and
22  we had access to their catalog information.  And

Page 222

1  or lack of knowledge has been established.
2       THE WITNESS:  I did not have that
3  understanding.  I don't remember understanding or
4  knowing that, you know, this kind of a range --
5  I've, again, not seen this report.  I knew that
6  there was -- based on the Jacobs' survey, that
7  there were discounts available to pharmacies or
8  that pharmacies paid, what, 8.71 percent less
9  than AWP or were purchased directly on average.
10      Q.  (BY MS. LORENZO)  I know that you're
11 not familiar with this report, per se.  Was there
12 a time when Nebraska Medicaid came to understand
13 that there were ranges of discounts off AWP as
14 described in this document?
15      A.  As of the date of this report, I cannot
16 -- I just -- and somebody else was the pharmacy
17 consultant, and I did not know.  I don't remember
18 that I knew, and I don't know what Dan knew at
19 that time, Dan Snodgrass knew at that time.
20      Q.  Okay.  And this report is dated two
21 years before the Jacobs report; is that correct,
22 approximately?  The Jacobs report was in 1986?

Page 223

1       A.  That is correct.
2       Q.  Okay. So Nebraska Medicaid would have
3  had this report prior to the --
4       A.  Yes.
5       Q.  -- Jacobs report?
6       A.  Yes.
7       Q.  Okay.  Are you aware that Nebraska was
8  one of 11 states selected for a nationwide review
9  of drug acquisition costs?
10      A.  Am I aware now today?  Yes, I am.
11      Q.  Okay.  That was in the 1994, 1995 time
12 period.  Were you employed at Nebraska Medicaid
13 at that time?
14      A.  I was not.
15          (Exhibit Dey 921 was marked for
16 identification.)
17      Q.  (BY MS. LORENZO)  I'm going to hand you
18 what we're marking as Dey Exhibit 921, which is a
19 copy of an OIG report from December 24th, 1996.
20 Have you seen this document before?
21      A.  Yes, I have.
22      Q.  Okay.  And when did you -- was that in

Page 224

1  preparation for your deposition?
2       A.  Yes.
3       Q.  Okay.  And had you seen it previous to
4  that?
5       A.  I should have seen it.  I was employed
6  by the department at this time as the pharmacy
7  consultant and, as part of my normal duties,
8  should -- I should have seen this.  Do I -- I
9  don't specifically remember at this time, but as
10 part of my normal duties, I should have seen
11 this, yes.
12      Q.  Okay.  And then the cover of the
13 letter, on the first page, it states that the
14 Nebraska Department of Social Services (state
15 agency) was 1 of 11 states randomly selected as
16 part of a nationwide review.  Nebraska reported
17 drug expenditures of 60.3 million in calendar
18 year 1994.
19          Through statistical sampling, we
20 obtained pricing information from 43 Nebraska
21 pharmacies.  We obtained 2,742 invoice prices for
22 brand name drugs and 1,114 invoice prices for

Page 225

1  generic drugs.  The overall estimate of the
2  extent that AWP exceeded pharmacy purchase
3  invoice prices was 18.7 percent for brand name
4  drugs and 44.9 percent for generic drugs.  The
5  national estimates are 18.3 percent and 42.5
6  percent, respectively.
7           So this report indicates that there's a
8  much higher discount off of AWP for generic drugs
9  than brand name drugs; is that correct?
10      MR. DUNNING:  I'm going to object to
11 form, foundation.  The document speaks for
12 itself.
13      THE WITNESS:  Repeat the question.  I'm
14 not sure that -- relatively, what this says, the
15 discount was different for brand than -- or the
16 difference was different for brand than it was
17 for the generic price.
18      Q.  (BY MS. LORENZO)  Right.  And for
19 generic drugs, the overall estimate was that AWP
20 exceeded purchase price invoices was (sic) 44.9
21 percent?
22      A.  That's correct.

Page 226

1  Q. And it was 18.7 percent for brand name
2  drugs; correct?
3  A. That's correct.
4  Q. If you'd turn to the second page of the
5  cover letter, it states: In response to a draft
6  report, the director of the state agency stated
7  that our review was the first information of its
8  type that the state agency has had access to in
9  ten years. The director also stated that the
10 information would be useful to the state agency
11 in setting adequate pharmacy reimbursement rates
12 in the future. The complete text of the
13 director's comments are included in Appendix 4.
14      So would you agree that, as represented
15 here, Nebraska Medicaid had an opportunity to
16 review the draft report?
17 A. Yes.
18 Q. If we turn to Appendix 4, which I
19 believe is the last page of the document, there's
20 a letter here dated October 18th, 1996, from
21 Donald Leuenberger to Ben Jackson. Who is Donald
22 Leuenberger?

Page 227

1  A. He was then the director of the
2  Nebraska Department of Social Services.
3  Q. Do you know how long he held that
4  position?
5  A. I do not know.
6  Q. Okay. And he thanks Ben Jackson of the
7  operational and program reviews for commissioning
8  the report. And it states: I've asked my staff,
9  including our pharmacy consultant, to review the
10 draft report. It appears that your report is
11 reflective of Nebraska pharmacy practice and
12 purchasing.
13      Would you have been the pharmacy
14 consultant at the time that this letter was
15 written?
16 A. Yes. Yes, I was.
17 Q. Okay. And do you recall having any
18 conversations with Mr. Leuenberger or reviewing
19 the draft report?
20 A. I have a vague recollection of
21 reviewing the report. I do not believe that I
22 ever had a conversation with Mr. Leuenberger

Page 228

1  about this letter or the response.
2  Q. Okay. Would you agree with the
3  sentence that says it appears that your report is
4  reflective of Nebraska pharmacy practice and
5  purchasing? Would that have been a correct
6  statement at the time?
7  A. Yes.
8  Q. And it goes on to state that your study
9  is the first information regarding the difference
10 in costs between AWP and pharmacy's actual
11 acquisition costs that has been accessible to the
12 state since our former pharmacy consultant made
13 an acquisition cost, EAC, and dispensing fee
14 survey in 1986. That's the survey that we've
15 been discussing today?
16 A. Yes.
17 Q. Okay. Therefore, the information that
18 you've presented will be useful to us as a
19 reference plan in the future to assure that we
20 set adequate pharmacy reimbursement rates which
21 assure access for our recipients while
22 maintaining a prudent policy in terms of setting

Page 229

1  acquisition costs and total reimbursement.
2       The Department will, in the near
3  future, be surveying pharmacies across the state
4  to determine their non-Medicaid average
5  dispensing fee. When we combine the results of
6  that survey with the benchmark information that
7  you have provided for us from your review, we
8  will be able to make a well-informed decision on
9  adequate and reasonable reimbursement rates for
10 Nebraska pharmacy providers.
11 A. Yes. That's accurate.
12 Q. It says that the Department will be
13 surveying pharmacies for a dispensing fee survey.
14 Do you know if that was done?
15 A. I know it was not done.
16 Q. It was not done. Do you know why it
17 was not done?
18 A. Why it was not done? I don't know that
19 -- I was the consultant, probably the only person
20 working in the program. I know that I had to bid
21 the drug use review project, and this got
22 shuffled back due to -- as I recall, due to

58 (Pages 226 to 229)

Page 234

1  come about?
2      A.  That was a -- the gross margin was a
3  calculated number.  The pharmacy determined what
4  they charged for each prescription, and they were
5  instructed to get their actual cost of the drug.
6  And the difference between the two -- it was the
7  difference between those two and not necessarily
8  a number that they added consciously to the cost
9  of the drug.  It was a calculated number.  They
10 set the price that they sold the prescription
11 for.
12     Q.  Right.
13     A.  They were instructed to find their cost
14 of the drug to determine what their actual gross
15 margin was.
16     Q.  Okay.  So I think that's the piece --
17 they're the ones who set the --
18     A.  Selling --
19     Q.  -- selling price, set by the pharmacies
20 themselves?
21     A.  Yes.  That's correct.
22     Q.  Okay.  Thank you.  And do you have any

Page 235

1  idea what was taken into account by the
2  pharmacies in setting that selling price?
3      A.  That's the proprietor or owner's
4  determination, and I do not know how they set
5  their prices, what they took into consideration.
6  We know it was an actual price.
7          MS. LORENZO:  We've been going for
8  almost an hour.  Do you want to take another
9  break?
10         THE WITNESS:  Yes.  That would be --
11         MR. DUNNING:  Sure.  Why don't we go
12 off the record.
13         VIDEOGRAPHER:  Off the record.
14         (Short recess.)
15         VIDEOGRAPHER:  We're back on the
16 record.
17     Q.  (BY MS. LORENZO) I think we had been
18 looking at Dey Exhibit 921, which is a 1996 OIG
19 report, and I just had a few additional questions
20 about that.
21         So at the time that Nebraska received
22 this report, which showed discounts off of AWP

Page 236

1  ranging for brand drugs at 18.7 percent and for
2  generic drugs at 44.9 percent, what was
3  Nebraska's EAC?
4      A.  EAC was AWP minus 8.71 percent for
5  direct.
6      Q.  Okay.  And I think that you've
7  testified previously that, several years later,
8  that was recalculated to be an EAC -- AWP minus
9  10 percent, and that was cost neutral?
10     A.  That's correct.
11     Q.  Okay.  Do you think that that would
12 have been the case if that calculation was
13 performed at that time?  We can --
14     A.  Well, part of that answer maybe goes
15 back to that -- you know, did we include the SMAC
16 drugs or not in the original survey, because
17 that's a large consideration.  Are you asking for
18 my opinion or knowledge of --
19     Q.  You know, why don't -- that was
20 probably not the best question to begin with, so
21 why don't I withdraw that.
22         Regardless of what it became at this

Page 237

1  point for certain drugs, Nebraska was reimbursing
2  at 8.71 percent off AWP?
3      A.  That is correct.
4      Q.  Okay.  And it received information that
5  -- the OIG calculated that, at least for generic
6  drugs, the discount was higher than 8.71 percent;
7  correct?
8      A.  Yes.
9      Q.  Okay.  And it was also higher,
10 approximately 10 percent higher, for brand name
11 drugs?
12     A.  Yes.
13     Q.  Okay.  And did Nebraska do anything
14 with this information that it received from the
15 OIG?
16     A.  In terms of implementing these actual
17 prices, I believe that was not done.
18     Q.  By actual prices, you're referring to
19 the percentage?
20     A.  Yes.  Or the prices for the products,
21 either, specific products.  This was used as a
22 reference point, as is said in the letter.  And

Page 306

 1  Vancomycin Injectable.
 2      Q.  Okay.
 3      A.  So that wasn't just one labeler or two
 4  -- one or two NDCs.  In an algorithm, I spread
 5  that pricing across all of the products in that
 6  class or category, not just one labeler or one
 7  strength.  I mean, if we had it for a different
 8  strength, it would be across all the 500
 9  milligrams or across all the 1 grams or if it was
10  a 10 gram.  It would be consistent for all of the
11  NDCs in those -- for those -- what is this called
12  again?  The therapeutic class.
13      Q.  For the therapeutic class?
14      A.  Yes.
15      Q.  Okay.  So at least as of 1999, there
16  were some MACs for Vancomycin?
17      A.  Yes.
18      Q.  If not earlier?
19      A.  Yes.
20      Q.  Okay.  And do you know why -- and maybe
21  I missed it.  But I didn't see some of my
22  client's other drugs that are at issue, like,

Page 307

 1  sodium chloride or dextrose or sterile water.  Do
 2  you know why those were not MAC'd?
 3      A.  My recollection is that we did MAC some
 4  of those but at a later time.
 5      Q.  And if you want, you know, if you could
 6  look at this and then maybe get back to me
 7  tomorrow if they're here and I'm just missing it,
 8  if your counsel will agree to that.
 9      A.  I'm sorry.  Get back to you with what
10  in --
11      Q.  In terms of whether or not sodium
12  chloride or dextrose or sterile water is on this
13  list?  I didn't see that but --
14          MR. DUNNING:  I tell you what.  We can
15  -- if you want to -- you know, you've requested a
16  white paper.  You've requested a report and then
17  this issue here.  If you want to send us
18  correspondence relating to those three items, we
19  can reply to that outside the deposition.
20          MS. CITERA:  Okay.
21      Q.  (BY MS. CITERA)  And then my last
22  question is:  Do you know -- I also did not see

Page 308

 1  on here erythromycin.  Do you know whether that
 2  was MAC'd?
 3      A.  Are you asking about erythromycin oral
 4  or erythromycin injectable?
 5      Q.  Oral.
 6      A.  To the best of my knowledge, it was
 7  MAC'd, and I believe that the description in here
 8  would be macrolide antibiotic.
 9      Q.  Okay.  So maybe I'm just not looking at
10  the right -- I'm looking for a specific term
11  versus the therapeutic --
12      A.  That's correct.
13          MS. CITERA:  Okay.  I will, you know,
14  pass the witness.  Obviously, I would like more
15  time, but I understand that you guys need to go
16  for the day.  And so I will pass the witness to
17  Mr. Mao.
18          MR. DUNNING:  All right.  Thank you
19  very much.
20          MS. CITERA:  Thank you for your time.
21          MR. DUNNING:  All right.  So we will
22  resume tomorrow.  And just for the record, you're

Page 309

 1  finished with Mr. Cheloha, and Marissa is
 2  finished with Mr. Cheloha for today.  Marissa,
 3  you've reserved potential for some redirect after
 4  Mr. Mao finishes tomorrow; correct?
 5          MS. CITERA:  As would I, you know, like
 6  to take another --
 7          MR. DUNNING:  Okay.  And we will resume
 8  tomorrow.  I'd like to resume at 9:00 a.m.  I
 9  think we should not have any problem finishing by
10  noon.  You know, we went a little over today.  If
11  we need to go a little over tomorrow, we can do
12  that; all right?
13          VIDEOGRAPHER:  This concludes day one
14  of the deposition of Gary Cheloha.  We're off the
15  record.
16          MR. DUNNING:  It's the 30(b)(6) of the
17  State of Nebraska.  Thank you.
18          (Deposition adjourned at 5:34 p.m.)