# EXHIBIT 40

Reid, Robert Paul                                       December 15, 2008
                           Columbus, OH

Page 1

                    UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF MASSACHUSETTS

      - - - - - - - - - - - - - - -  ) MDL No. 1456

      IN RE: PHARMACEUTICAL INDUSTRY  ) Master File No.

      AVERAGE WHOLESALE PRICE LITIGATION) 01-12257-PBS

      ---------------------------------)

      THIS DOCUMENT RELATES TO:       ) Hon. Patti B.

      United States of America ex rel. ) Saris

      Ven-A-Care of the Florida Keys,  )

      Inc, et al. v. Dey, Inc., et al., )

      Civil Action No. 05-11084-PBS    )

      ---------------------------------


              VIDEOTAPED DEPOSITION OF ROBERT PAUL REID

                       Monday, December 15, 2008

                       9:59 o'clock a.m.

                       Jones Day

                       325 John H. McConnell Boulevard

                       Suite 600

                       Columbus, Ohio 43215

                    SHAYNA M. GRIFFIN

               REGISTERED PROFESSIONAL REPORTER

Reid, Robert Paul                                         December 15, 2008
                              Columbus, OH

| Page 106 | Page 108 |
|---|---|
| 1  words, the New York attorneys -- Attorney | 1       "Question:  Did you believe that you |
| 2  General's office was not telling states that they | 2  could shave 20, 30 percent off of it" -- and I'm |
| 3  had to do something because of this information. | 3  referring to AWP here. |
| 4       MR. TORBORG:  I'd like to mark as | 4       A.  Uh-huh. |
| 5  another exhibit -- this will be Abbott/Reid 3. | 5       Q.  -- "and get a reliable number of what |
| 6  This is an excerpt from a deposition that I took | 6  pharmacies and physicians actually paid for |
| 7  of an individual by the name of Harry Leo | 7  drugs? |
| 8  Sullivan. | 8       "Answer:  Well, it would depend on -- I |
| 9       A.  I know Leo, Tennessee. | 9  mean, are we talking brand or generic? |
| 10      Q.  Okay.  He was -- he had your job in | 10      "Question:  Both right now.  Would you |
| 11 Tennessee is your understanding? | 11 draw a distinction? |
| 12      A.  Yes, yes.  A little different slant | 12      "Answer:  Oh, yeah, yeah. |
| 13 to it because they were mostly managed care. | 13      "Question:  All right. |
| 14      Q.  Sure. | 14      "Answer:  The generic drugs, you know, |
| 15      A.  And we weren't at the time. | 15 you could pay AWP minus 80 percent and still the |
| 16      Q.  I'd like you, if you would, to go to | 16 pharmacists make money for some, I assume.  But |
| 17 the second page of -- | 17 AWP minus 25 might be below cost for a brand name |
| 18           - - - | 18 drug for a rural pharmacy that has very small |
| 19      (And, thereupon, Exhibit Abbott-Reid | 19 volume.  Okay.  So there is -- there is a |
| 20 003 was marked for purposes of identification.) | 20 difference between brand and generic. |
| 21           - - - | 21      "In Tennessee, it wasn't as pronounced |
| 22 BY MR. TORBORG: | 22 because, you know, what I did as part of my job, |

| Page 107 | Page 109 |
|---|---|
| 1       Q.  I'd just like to read to you some of | 1  as soon as a drug became multi-source, and after |
| 2  his testimony and get your response to it. | 2  OBRA '90, as soon as that drug -- the multisource |
| 3       A.  The second page, okay. | 3  version of the drug was cheaper than the brand |
| 4       Q.  Second page, starting at page 100 in | 4  name net-net of Medicaid rebates, we MACed it.  So |
| 5  the top right corner.  There are four pages per | 5  AWP wasn't an issue on the generic side." |
| 6  -- four pages of transcript -- | 6       A.  Correct. |
| 7       A.  Oh, 100.  Yeah, I got it. | 7       Q.  "Question:  And why did you --" then |
| 8       MS. GEOPPINGER:  Bear with me just one | 8  the answer, "But to say 20, 30 percent, use that |
| 9  second. | 9  number, you would have to distinguish between |
| 10      Mr. Reid, how it works on these | 10 brand and generic." |
| 11 transcripts is it reads down this way, okay. | 11      Do you see that? |
| 12      THE WITNESS:  I got you.  So this is | 12      A.  I got it. |
| 13 100 here? | 13      Q.  Do you have an understanding of what |
| 14      MS. GEOPPINGER:  Yes. | 14 his testimony was there? |
| 15 BY MR. TORBORG: | 15      MS. GEOPPINGER:  Object to the form of |
| 16      Q.  I'll be asking you to follow along as | 16 the question. |
| 17 I read page 100, line 13.  See the little 13 on | 17      You can answer if you know. |
| 18 the left side there? | 18      A.  I can say that I don't know what -- |
| 19      A.  Yes. | 19 where Mr. Sullivan was coming from, but I would |
| 20      Q.  Down to page 101, 18.  I'll go ahead | 20 say generally that I might have responded to |
| 21 and read into the record, if you will follow | 21 those questions in the same manner.  He's making |
| 22 along. | 22 a clear distinction between trade name drugs and |

28 (Pages 106 to 109)

Reid, Robert Paul                                           December 15, 2008
                              Columbus, OH

Page 110

1  generic drugs, and that is true.
2      Q.  That's something that you understood
3  as well?
4      A.  Yes.
5      Q.  That discounts were higher on the
6  generic side than they were on the brand name
7  side?
8      A.  The representation of AWP, the
9  difference between AWP and AAC was greater on the
10 generic side than it was on the trade name side.
11     Q.  That's something that you were aware
12 of?
13     A.  Yes, I was aware of that.
14     Q.  Now, Ohio at some point used
15 something called wholesale acquisition cost to
16 reimburse pharmacies --
17     A.  Yes.
18     Q.  -- correct?
19     A.  Yes.
20     Q.  What was your understanding of what
21 wholesale acquisition cost represented?
22     A.  Well, what the wholesaler paid for

Page 111

1  the drugs from the manufacturer.
2      Q.  Did you have an understanding -- what
3  understanding did you have regarding the
4  relationship between AWP and WAC, WAC being short
5  for wholesale acquisition cost?
6      A.  Uh-huh.  We always used the baseline
7  if the AWP was a dollar, the WAC would be 80
8  cents for trade name drugs.
9      Q.  How about for generic drugs?
10     A.  All over the board.
11         MR. TORBORG:  Mark as Abbott/Reid 4
12 another document.
13         - - -
14     (And, thereupon, Exhibit Abbott-Reid
15 004 was marked for purposes of identification.)
16         - - -
17 BY MR. TORBORG:
18     Q.  For the record, what I've marked as
19 Abbott/Reid 4 bears the Bates No. OH004755
20 through 56.  Appears to be a February 25, 1997,
21 letter from Mr. Reid to an Ernie Boyd, Executive
22 Director, Ohio Pharmacists Association.

Page 112

1      A.  Okay.
2      Q.  Mr. Reid, do you -- after you've had
3  a chance to look at this document -- take all the
4  time you need --
5      A.  Thank you.
6      Q.  -- my first question will be just
7  whether you recall it?
8      A.  Okay.  I do recall it.
9      Q.  Did you draft this letter?
10     A.  I did.
11     Q.  Okay.  On or around February 25th,
12 1997?
13     A.  Correct.
14     Q.  And then you've copied a Bill Ryan
15 and a Patrick Lanahan.  Who are they?
16     A.  Bill Ryan was the director of the
17 department, and Patrick Lanahan was the bureau
18 chief before Robyn Colby.
19     Q.  They were people with -- that were
20 employed by Ohio, those two people?  Mr. Ryan --
21     A.  Yes, Yes.
22     Q.  Now, in the first paragraph you've

Page 113

1  indicated, "Pursuant to our recent meeting, I
2  wanted to respond to your request for the
3  relationship between WAC, wholesale acquisition
4  cost, and AWP, average wholesale price, based on
5  our perceptions here at the department"; right?
6      A.  Right.
7      Q.  And this was something that was
8  happening because on or around this time Ohio was
9  moving to -- from an AWP-based formula for
10 trading drugs to a WAC-based formula; correct?
11     A.  Yes.  Yes.
12         MS. GEOPPINGER:  For the record, I'm
13 just going to object to the form.
14         THE WITNESS:  Okay to answer?
15         MS. GEOPPINGER:  Yes.
16         THE WITNESS:  We went -- I recall that
17 we went from AWP minus 7 percent to WAC plus 11
18 percent. And I think the reason we did that was
19 we were in a budget crunch, and since AWP --
20 since WAC plus 11 percent equated to AWP minus I
21 think it was 11.2, you could see that the -- we
22 were decreasing the reimbursement that we were

Reid, Robert Paul                                                December 15, 2008
Columbus, OH

Page 114

1   paying to pharmacies. And at the time we were
2   paying, to my recollection, for about 30 million
3   prescriptions a year because we didn't have
4   managed care. And all of our patients were in
5   fee for service. So changing the reimbursement
6   level slightly added up to a lot of savings.
7   BY MR. TORBORG:
8       Q.  You indicate in the second paragraph,
9   first sentence, that Ohio is at this time paying
10  trade name drugs at AWP minus seven percent;
11  correct?
12      A.  Yes, right.
13      Q.  And then there were some specific
14  manufacturers that were paid at a direct price?
15      A.  Yes, because they were routinely and
16  commonly purchased by the pharmacies directly.
17      Q.  Okay. And then you indicate in the
18  -- I guess it would be fifth sentence down, "The
19  composite for all trade name drugs has been
20  calculated to be AWP minus 7.44 percent."
21          Do you see that?
22      A.  The composite, yeah. The composite

Page 115

1   for all trade name drugs has been calculated to
2   be AWP minus 7.44 percent. I have no idea how I
3   arrived at that number.
4       Q.  But that was what -- for trade name
5   drugs, that was the average payment amount when
6   you --
7       A.  At the time, yes.
8       Q.  So that would include the direct
9   price-based reimbursements from Lederle, Wyeth
10  and Upjohn?
11      A.  Yeah. I think it says the composite
12  for all trade name drugs. Yes.
13      Q.  Okay. Now, do you recall, what was
14  the -- at this time, do you have a sense for what
15  was the average price of a trade name drug?
16      A.  I don't have a sense.
17      Q.  The next -- the next sentence in that
18  paragraph you wrote, "It is our understanding
19  that wholesalers generally buy from trade name
20  manufacturers at between AWP minus 16 percent and
21  AWP minus 20 percent." And then the next
22  sentence states, "We estimate that the composite

Page 116

1   is approximately AWP minus 19 percent"; right?
2       A.  Okay. Okay.
3       Q.  Do you recall where you got that
4   information for those estimates?
5       A.  I don't recall.
6       Q.  But what you're saying here is that
7   you estimated at that time that, on average,
8   pharmacies were purchasing trade name drugs at
9   AWP minus 19 percent; is that right?
10      A.  I don't think I made that assumption.
11  We estimate that the composite is approximately
12  AWP minus 19 percent. That's -- that's what the
13  wholesalers paid the manufacturers. It didn't
14  have anything to do with the pharmacies.
15      Q.  Okay. And did you have an
16  understanding of the amount that the wholesalers
17  would charge to the pharmacies for trade name
18  drugs in relation to these figures?
19      A.  Well, it would be -- it would be WAC
20  plus something depending on the volume purchase
21  agreement. I think we chose WAC plus 11 because
22  we had to take into consideration rural stores as

Page 117

1   well as big chain stores. Not all of them had
2   the same buying power, so we had to arrive at a
3   number that was what we thought was fair.
4       Q.  You -- because of the issue with the
5   rural pharmacies, you couldn't pay at the average
6   amount the pharmacies paid?
7       A.  Could not.
8       Q.  And that was -- that was an issue
9   that was an access-based concern?
10      A.  Access, right. Right. We needed the
11  access.
12      Q.  In the next sentence you stated,
13  "Thus, if WAC equals 80 percent of AWP" --
14      A.  81, I think it says.
15      Q.  "81 percent of AWP" --
16      A.  Uh-huh.
17      Q.  -- "then WAC plus 9 percent equals
18  88.29 percent of AWP." Do you see that?
19      A.  I see that.
20      Q.  And that's very consistent with the
21  testimony you gave before I even showed you the
22  document --

30 (Pages 114 to 117)

Reid, Robert Paul                                                    December 15, 2008
Columbus, OH

Page 158

1    A.  Well, I think we took into
2  consideration -- let's take the example of
3  Phenergan 12 and a half milligram that we used
4  earlier.  We would try to determine how much
5  pharmacies were paying for each version of that
6  from the various generic companies, and we put
7  them on a grid and picked the one price that was
8  available 65 percent of the time.
9    Q.  Let me back up a little bit.
10       Where did you get the -- those prices
11 from?
12   A.  First DataBank, mostly.
13   Q.  For the generic drugs?
14   A.  Well, they would give us -- they
15 would give us a starting point -- when they sent
16 their monthly reports to us, they would give us a
17 starting point of WAC plus seven for the -- I
18 think it was whatever -- whatever the going rate
19 was at the time. We wouldn't necessarily use
20 those prices, but they would be ones that we
21 would put in that grid to determine which one was
22 the 65th percentile.  Very complicated.

Page 159

1    Q.  Which other prices would you use?
2    A.  Oh, we would call pharmacies and ask
3  them. Pharmacies would call us and volunteer
4  information. And we, in more recent times, were
5  using the MAC prices that were set by other
6  states, all of which were public record.
7    Q.  Which pharmacies would you call?
8    A.  I would call my own, which was
9  Northland Pharmacy, in Columbus.  I would call
10 Cline's Pharmacy in Akron.  And there was a rural
11 store that I called, which has since gone out of
12 business, just to get a feel for what was going
13 on in the market, the dynamics of the
14 marketplace.
15   Q.  And they would provide you with a
16 price at which they actually purchased the drug?
17   A.  Yes.
18   Q.  And those are the prices that you
19 would then put in your grid?
20   A.  Yes.  Sometimes a pharmacy would
21 object to the price that we had set and they
22 would send an invoice as documentation of what

Page 160

1  they were really paying for a product.  And they
2  would encourage us to raise our allowable.  A lot
3  of times there was a lot of other information on
4  that invoice that we would use.
5    Q.  What other information?
6    A.  Well, prices of other drugs.
7    Q.  Okay.
8    A.  Sometimes, you know, stores would
9  black out everything except they would only
10 answer the question.  But other times they would
11 send an invoice -- a copy of an invoice that gave
12 us a lot of information.
13   Q.  And some pharmacies actually called
14 to volunteer this information to you?
15   A.  Once in a while I would get a call --
16 understandably, not very often -- you're paying
17 too much.  And they would be representing
18 themselves as a taxpayer.
19   Q.  So the prices that you used to set
20 the MAC amount, those were based on actual prices
21 that you got from pharmacies; correct?
22   A.  Right.

Page 161

1    Q.  They are not based on --
2    A.  Well, partly, yeah.
3    Q.  What else were they based on?
4    A.  Well, we would take the First
5  DataBank price into consideration, although
6  rarely use it on the grid, unless it was
7  reasonable, comparable.
8    Q.  So if the First DataBank price was
9  not comparable to the other prices, you wouldn't
10 use it?
11   A.  No.  I would consider it to be an
12 outlier.
13   Q.  If it was an outlier, it wouldn't
14 even go into the 65th percentile calculation?
15       MS. GEOPPINGER:  Object to the form of
16 the question.
17       You can answer.
18   A.  Yes.
19   Q.  And you did all this by yourself?
20   A.  I did it all by myself up until 2001.
21   Q.  Now, it says here that --
22       MS. GEOPPINGER:  What are we looking

41 (Pages 158 to 161)

Henderson Legal Services, Inc.
202-220-4158                                      www.hendersonlegalservices.com

af69f64b-a1fb-4f21-a237-a09d2632bad5

Reid, Robert Paul                                              December 15, 2008
                              Columbus, OH

### Page 162

1  at? I'm sorry.
2  BY MR. TORBORG:
3      Q.  Back to Section C.  Reimbursement --
4      A.  C, okay.
5      Q.  Yeah.  This is the last sentence of
6  that section.
7          MR. HENDERSON:  Still on Exhibit 7?
8          MS. GEOPPINGER:  Yes.
9          MR. TORBORG:  Yes, sir.
10 BY MR. TORBORG:
11     Q.  It says "Reimbursement for state MAC
12 drugs shall be based on the 65th percentile of
13 the estimated acquisition cost"; right?
14     A.  Yes.
15     Q.  Now, if there was a state MAC
16 established for a drug, that was the price that
17 was paid?
18     A.  Right.
19     Q.  Right?
20         And then if we go under Section D,
21 "Estimated Acquisition Cost."
22     A.  Uh-huh.  Those were trade name.

### Page 163

1      Q.  Okay.  It states there "All products
2  other than those designated as MAC items will be
3  considered EAC items."
4      A.  Right.
5      Q.  What does that mean?
6      A.  Estimated acquisition cost.
7      Q.  So this -- this is saying -- tell me
8  if I'm reading this right.  This is saying that
9  if a drug has a MAC on it, it's not even
10 considered an EAC item; right?
11         MS. GEOPPINGER:  Object to the form of
12 the question.  The statute speak for itself.
13         You can answer the question if you
14 know.
15     A.  Well, the term "EAC" could refer to a
16 MAC item or it could refer to a trade name drug.
17 But generally we use the term "EAC" for trade
18 name drugs and we use the term "MAC" for
19 generics.
20     Q.  Generally, MAC drugs were not EAC
21 items; right?
22         MS. GEOPPINGER:  Object to the form of

### Page 164

1  the question.
2          You can answer.
3      A.  Generally right, correct.
4      Q.  So if we could go back to the first
5  page of this exhibit, 406, it states,
6  "Reimbursement for drugs is based on the lowest
7  of the following."
8          MS. GEOPPINGER:  Where are you?  I'm
9  sorry.
10         MR. TORBORG:  406.
11         MS. GEOPPINGER:  Right.  What section?
12         MR. TORBORG:  First page, Section A(2).
13         MS. GEOPPINGER:  Right here.
14         THE WITNESS:  A(2), got it.
15 BY MR. TORBORG:
16     Q.  This is where it says lowest of the
17 following --
18     A.  Uh-huh.
19     Q.  -- the submitted UNC, we talked about
20 that; right?
21     A.  Uh-huh.
22     Q.  It says the estimated acquisition

### Page 165

1  cost; right?
2      A.  That would be for the trade name
3  drugs, right.
4      Q.  Okay.  That's just the trade names?
5      A.  Right.
6      Q.  Right.  If a MAC is on a drug, that
7  one doesn't even apply?
8      A.  Right.  That's -- those are generics.
9      Q.  Okay.  And then C is the MAC;
10 correct?
11     A.  Right.
12     Q.  Do you know why Ohio chose to set the
13 payment amount for MACs at the 65th percentile?
14         MS. GEOPPINGER:  Object to the form of
15 the question.
16         You can answer if you know.
17     A.  The director of the department at
18 that time was Paul Offner (phonetic), now
19 deceased.  And he came up with the number.  I'm
20 sure it was somewhat arbitrary.  Seemed like a
21 nice average number.
22     Q.  So what you would do is you would

42 (Pages 162 to 165)