# EXHIBIT 41

Page 1

                    UNITED STATES DISTRICT COURT

                      DISTRICT OF MASSACHUSETTS

    ------------------------------x
    In re: PHARMACEUTICAL INDUSTRY  )
    AVERAGE WHOLESALE PRICE         )
    LITIGATION                      )
    ------------------------------)
    United States of America ex rel.) MDL No. 1456
    Ven-A-Care of the Florida Keys, )
    Inc. v. Abbott Laboratories,    ) Civil Action
    Inc., Civil Action No. 06-      ) No. 01-12257-PBS
    11337-PBS; and United States of )
    America ex rel. Ven-A-Care of   ) Honorable
    the Florida Keys, Inc., v. Dey, ) Patti B. Saris
    Inc., et al., Civil Action No.  )
    05-11084-PBS; and United States )
    of America ex rel. Ven-A-Care   )
    of the Florida Keys, Inc., v.   )
    Boehringer Ingelheim Corp., et  )
    al., Civil Action No. 07-10248- )
    PBS                             )
    ------------------------------x

Page 50

1   A.  Yes.
2   Q.  What prompted the department to make
3   this change to the reimbursement formula?
4   A.  That's -- I was basically a little bit
5   more -- got a little bit more involved here at
6   this point.  But basically, Mr. Hanley just knew
7   that one of the other states was doing this and
8   wanted to see if we could -- could try it.  So we
9   attempted it, basically.  I mean, that's it in a
10  nutshell.
11  Q.  Did -- you had mentioned before that
12  Arkansas often does surveys --
13  A.  Uh-huh.
14  Q.  -- or hires Myers & Stauffer --
15  A.  Uh-huh.
16  Q.  -- to do surveys before they change the
17  dispensing fee.  Was there any survey that
18  supported going to the increased discount off of
19  AWP for chains?
20  A.  We didn't have a specific survey to
21  support this.  We used another state survey to
22  support this, from what I remember.  I don't

Page 51

1   remember that we specifically had a Myers &
2   Stauffer survey at this time.  I don't recall
3   that, if we did.
4   Q.  And what was the goal here of the State
5   in making this change to the reimbursement
6   formula?
7   A.  Well, in essence, we felt and Mr.
8   Hanley, from what I recall, felt fairly certain
9   that the chain reimbursement -- that the chains
10  could purchase at a much better price than the
11  independents, and so the purpose was to get up
12  closer to the actual -- what that pharmacy was
13  actually paying for the drug for a chain.  So
14  that was his intent.
15  Q.  And then I notice here that the -- this
16  reimbursement formula was only in effect for
17  approximately nine days?
18  A.  Uh-huh.
19  Q.  Nine or ten days.  What happened?
20  A.  A lot was going on at that time.  So
21  what I can recall is CMS approved it.  I have to
22  assume that the legislature approved it.  We

Page 52

1   implemented it, and then we knew that Wal-Mart
2   and Walgreens were going to file a lawsuit.  So I
3   don't know if there was an agreement to just pull
4   it back, but we -- we terminated it at that point
5   in time.  But I just -- I don't know every little
6   piece that transpired to -- to cause us to pull
7   it, but due to upcoming litigation, we withdrew.
8   Q.  And -- and did -- did Wal-Mart and
9   Walgreens actually sue the State over this?
10  A.  That's correct.  Now -- I don't know
11  that they sued.  They filed litigation.  I don't
12  know.  I don't know how to answer that.  I don't
13  know if it was law -- it was a lawsuit.
14  Q.  All right.  And do you know what the
15  end result of the litigation was?
16  A.  Well, we were not allowed to pursue the
17  AWP minus 17 percent on chains.  I -- yes, they
18  did file a lawsuit.  I guess my thought of
19  lawsuit, I was thinking of financial lawsuit, but
20  yes, they pursued a lawsuit, and we lost.  Sorry
21  about that.
22      MS. OBEREMBT:  I think this is a good

Page 53

1   time for a break.  We're about at the end of our
2   tape, so why don't we go off the record.
3       VIDEOGRAPHER:  Going off record at
4   10:07 a.m, ending Tape 1.
5       (Whereupon, a break was taken.)
6       VIDEOGRAPHER:  Back on record at 10:16
7   a.m.
8       MS. OBEREMBT:  I'd like to mark as
9   Exhibit 10 a series of pages from Arkansas State
10  Plan Amendment 2000-02, and the Bates numbers are
11  ARK3057 to 3067.
12      [Marked Exhibit Bridges 010]
13  Q.  (By Ms. Oberembt) Does Exhibit 10
14  appear to be a series of pages from Arkansas
15  State Plan Amendment 2000-02 dealing with
16  pharmaceutical reimbursement?
17  A.  Yes, it does.
18  Q.  And does the State Plan Amendment here
19  appear to be consistent with the reimbursement
20  formula listed for the time period May 8th, 2000
21  through February 28, 2002 on the summary chart
22  that's Exhibit 3?

14 (Pages 50 to 53)

Page 62

1    Q.  (By Ms. Oberembt) Does this appear to
2  be a document issued by DHS?
3    A.  Yes, ma'am.
4    Q.  Does it appear it be another update to
5  the pharmacy provider manual?
6    A.  Let me look carefully.  It looks like a
7  combination.  What it appears to me to be would
8  be a manual update that was going -- going to the
9  legislature for rules and regs, yes.
10   Q.  And if you would turn to Bates Page
11 795.
12   A.  Uh-huh.
13   Q.  Does the formula reflected there, is
14 that consistent with the formula on Exhibit 3
15 from March 1st, 2002 to the present?
16   A.  That's its intent, yes, ma'am.
17   Q.  I'm going to ask you to turn back, if
18 you could, to Exhibit No. 2, which was the
19 federal regulation.
20   A.  Okay.
21   Q.  Could you turn to Page 2 of Exhibit 2,
22 Section 447.332, entitled "Upper Limits for

Page 63

1  Multiple Source Drugs"?  Is that what you
2  understand to be the federal upper limit?
3    A.  Yes, ma'am.
4    Q.  And what is the "federal upper limit"?
5    A.  The federal upper limit is a maximum
6  allowable cost that's applied to generically
7  equivalent brands and generics.
8    Q.  Does the State set that amount?
9    A.  Not on the federal upper limits, no.
10   Q.  Who sets the federal upper limits?
11   A.  CMS.
12   Q.  We've looked at the State of Arkansas'
13 reimbursement formula since 1990.  Does -- has
14 the state consistently defined EAC with reference
15 to AWP?
16   A.  Yes.
17   Q.  Have you seen the State define AWP as
18 anything other than the -- the plain meaning of
19 the words, average wholesale price?
20   A.  No, ma'am.
21   Q.  What was the State's -- what is the
22 State's goal in using AWPs for reimbursement

Page 64

1  purposes?
2    A.  Well, the AWP is the benchmark that we
3  use for the reimbursement.  I mean, that's
4  basically what it is, is a benchmark.  And that's
5  why we have to use the AWP minus a percent to --
6  as our best estimate for what the AWP
7  reimbursement would be, just, basically, a
8  benchmark.
9    Q.  And what is -- what is DHS's
10 understanding of where FDB obtains its AWP?
11   A.  It's the State's understanding that
12 they are supplied to First DataBank from the
13 manufacturer.
14   Q.  Does Arkansas' current reimbursement
15 scheme represent its best estimate of estimated
16 acquisition costs?
17   A.  Yes, ma'am.
18   Q.  Does the State set maximum allowable
19 cost for certain drugs?
20   A.  We do.
21   Q.  What is a "maximum allowable cost"?
22   A.  A maximum allowable cost is the maximum

Page 65

1  amount per unit that we'll reimburse for -- for a
2  drug.
3    Q.  Can you tell me just generally how the
4  State sets a MAC?
5    A.  Generally when a -- generic equivalents
6  become available for a brand and we are made
7  aware of that, we'll -- we'll review the generic
8  products that are out there and try to obtain
9  from pharmacies what they say that they pay for
10 that product and then go from there to set the
11 MAC.
12   Q.  As part of the MAC process, does
13 Arkansas compared -- compare the EAC of a drug
14 that might be MAC'd with the proposed MAC?
15   A.  We will -- I -- we look at that, yes.
16 We'll look at what the brand EAC is versus the --
17 the different generic prices.
18   Q.  And what if when you do that
19 comparison, what if the brand EAC is lower than
20 the proposed MAC? What do you do then?
21   A.  There wouldn't be a reason to set the
22 MAC.

Page 242

 1  second full paragraph, OIG reports that it's
 2  estimated that pharmacies pay an average of 42.5
 3  percent less than AWP for drugs sold to the
 4  Medicaid beneficiaries.  Do you see that
 5  language?
 6      A.  Yeah.  I'm trying to read it, actually.
 7      Q.  Okay.  Now, Arkansas never disputed the
 8  findings of this report, correct?
 9          MS. OBEREMBT:  Objection.
10      A.  This was just information.  There was
11  nothing to respond to or comment on, to my
12  knowledge.  I mean, this doesn't look like it's a
13  document to respond to.  It just looks like it's
14  information.
15      Q.  (By Mr. Reale) And it's information
16  that is available to Arkansas' Medicaid Program
17  to consider when it sets its reimbursement rates?
18      A.  Again, it's information for us to -- to
19  be aware of.
20      Q.  And the specific information in this
21  report is the level of discounts that were
22  available, on average, to pharmacies that

Page 243

 1  purchased generic drugs?
 2      A.  Are you asking me a question?
 3      Q.  Yes.
 4      A.  I'm sorry.  I thought you were making a
 5  statement.
 6      Q.  In the information in -- in this report
 7  was the level of discounts that were available to
 8  pharmacies that purchased generic drugs, correct?
 9      A.  This appears to be -- the statement we
10  read in the back referred to -- to generic drugs,
11  yes.
12      Q.  And in 1997, all the way up to the
13  present, Arkansas' Medicaid department has never
14  adopted a reimbursement rate to reflect the
15  average discounts that were reported in 1997?
16          MS. MOSLEY-SIMS:  Objection.
17      A.  Again, although that may not have
18  changed, we -- we still have a State upper limit
19  that -- that would -- based -- based on any type
20  of information like this, that doesn't mean we're
21  not pursuing, because we -- when we're setting
22  State upper limits or our MACs, then we are

Page 244

 1  trying our best to reimburse closer to the
 2  acquisition cost on a generic drug.
 3      Q.  (By Mr. Reale) How long has Arkansas'
 4  Medicaid MAC Program been in place, the State
 5  Upper Limit Program?
 6      A.  When I came onboard, there were State
 7  MACs in place at that point in time.
 8      Q.  And you testified that the MAC prices
 9  -- sorry.  You state -- you testified earlier
10  that the MAC prices set by Arkansas' Medicaid
11  Program were based on actual acquisition cost to
12  pharmacies?
13      A.  I never said that.
14      Q.  Well, how is the MAC Program set up?
15      A.  Again, the -- the MAC Program, we -- we
16  have an individual that currently does that for
17  us today.  Basically, he will -- when we are aware
18  that there are some generics that have become
19  available for a brand, generic equivalents, he
20  will obtain -- he'll -- he'll find out from
21  different pharmacies.  He'll call pharmacies who
22  -- who are willing to work with us, give us their

Page 245

 1  invoice price, what they pay for the drug.
 2          We don't -- their invoice price.  He'll
 3  also get from them the different prices that they
 4  pay for their generics and just kind of --
 5  through some type of an analysis -- I don't know
 6  the full detail of how he does it, but we'll
 7  determine a MAC on -- on that generic -- on the
 8  generic, on the GCN.  Are you familiar with the
 9  GCN?
10      Q.  Yes.  But why don't, for the record,
11  you say what that is?
12      A.  The GCN is a single number that will
13  encompass multiple NDCs, so that rather than
14  having to apply something to each specific NDC,
15  it represents that specific drug, its dosage
16  form, its route of administration, so that you
17  don't have to be with a lot of numbers.
18      Q.  So is -- is it fair to say that a MAC
19  price that's set for a generic drug is not based
20  on AWP?
21      A.  It's not -- it doesn't reimburse off of
22  AWP. We might look at what the acquisition cost

Page 246

1  of that brand is.
2     Q.  Okay.
3     A.  Okay.  We -- like if -- if you have a
4  -- the easiest way for me to explain it, if you
5  have a brand and you know that -- what we would
6  reimburse based on our reimbursement formula, AWP
7  minus 14 percent, then you -- he also finds out
8  from the pharmacy what that actual cost of that
9  brand is just as a comparison tool, so that when
10 he is setting the MAC, he can make that -- make a
11 comparable determination.
12    Q.  Is -- is the MAC based in part on the
13 invoice price of generic drugs within the GCN?
14    A.  The MAC looks at what the pharmacies
15 tell us are the invoice price for the different
16 NDCs within that GCN.  So he has a -- he'll
17 determine -- he'll put them -- I'm not good at
18 explaining how he does it.  He puts them all on a
19 spreadsheet.  He develops a spreadsheet of all of
20 the NDCs that he can obtain within that GCN and
21 gets the invoice prices from the -- from the
22 pharmacies.

Page 247

1     Q.  Right.  And those invoice prices aren't
2  AWP, but those are the invoice prices at which
3  they actually pay the wholesale of the actual --
4     A.  That's the invoice price.  The invoice
5  price.  We don't know in the -- you know, if
6  there's other discounts involved in that at all.
7  It's strictly the invoice price.  What the
8  pharmacy tells us.  We don't actually see the
9  invoice.  He will call, and they will say this is
10 what I pay.  So it's at our best -- we're taking
11 the pharmacy at their word for what they're
12 saying they actually pay for -- for some
13 products.
14    Q.  Do you have any reason to suspect that
15 the pharmacies are giving you a fraudulent
16 number?
17        MS. OBEREMBT:  Objection.
18    A.  Objection.  Listen to me, objection.
19 No, I'm going -- no, I don't suspect that they're
20 giving us a fraudulent number.  I mean, it's
21 based on trust, so I definitely don't feel like
22 they're giving us a fraudulent number.  I'm just

Page 248

1  saying we don't have a physical invoice to look
2  at.  We're calling them and we're -- we're
3  putting our trust in them that they're giving us
4  an honest number of what they pay for the drug.
5     Q.  (By Mr. Reale) And -- and the MAC price
6  is below the AWP, correct?
7     A.  Yes.
8     Q.  And it's actually below the estimated
9  acquisition cost, correct?
10    A.  Yeah.  That's correct.
11    Q.  So the MAC price is not based on AWP?
12    A.  That's correct.
13    Q.  It's based on actual invoices that --
14    A.  It's based on what pharmacies say they
15 have paid for the prescription.
16    Q.  How many drugs are subject to the MAC?
17    A.  I don't know.  I don't know.
18    Q.  More than 1,000?
19    A.  That's a -- when you say actual drugs
20 or GCNs, there's a big difference.
21    Q.  Well --
22    A.  And so I don't know how to answer that

Page 249

1  question.  There would have been --
2     Q.  How many GCNs are subject to the State
3  MAC?
4     A.  I honestly -- I honestly do not know.
5  I'd have to pull the upper limit list online and
6  look to see which ones are Federal upper limits
7  and which ones are State.  I don't know.
8     Q.  Do you believe it's more than 500 that
9  are subject to a State MAC?
10    A.  I don't know.  I mean, there are --
11 there are several, but I honestly cannot tell you
12 how many.  I've never just gone in to look to
13 count.  That's -- that's not part of what I do.
14 That's not --
15    Q.  And I believe you testified it's an
16 individual EDS that actually surveys the
17 pharmacies to determine their acquisition --
18    A.  He's contracted to do that for us.
19 That's just one of his job duties.  He has
20 several other job duties, but that's one of his.
21    Q.  But one of his job duties is dedicated
22 solely to determining a MAC price?

Page 298

1  FUL price that had also been set, correct?  For
2  drugs for which there was a FUL they were
3  purchased at rates on average of 45.9 percent of
4  the FUL?  In other words, the FUL minus about 54
5  percent; isn't that correct?
6      A.  I don't know.  I'm trying to -- I'm
7  trying to make sure I'm -- I'm answering
8  correctly.  It's just saying 45.9 percent of the
9  FUL.  It's not saying what it is off of the AWP.
10 That's why I'm a little bit concerned.
11     Q.  Oh, I'm sorry.  I meant off the FUL.
12 So the FUL minus 54 percent.  Let me -- let me
13 ask that again.  If I was -- if I said that
14 incorrectly.
15         Even for drugs for which a FUL had been
16 set, the average acquisition cost for pharmacies
17 was at a level below the Federal upper limit;
18 isn't that correct?
19     A.  That's what this is stating, that these
20 were -- that's what this is stating.
21         MR. REALE:  I can only assume that
22 they're letting us out, right?

Page 299

1          VIDEOGRAPHER:  Going off record at 4:19
2  p.m. ending Tape 6.
3         (Whereupon, a break was taken.)
4         (At this point in the proceedings, Ms.
5  Oberembt left the deposition.  Rebecca Ford
6  entered the deposition telephonically.)
7         VIDEOGRAPHER:  Back on record at 4:27
8  p.m.
9      Q.  (By Mr. Reale) Continuing with Roxane
10 Exhibit 16, on Bates Page 6936, Myers and
11 Stauffer, excuse me, presents its conclusions.
12 Do you see that section of the report?
13     A.  I'm sorry.  I went ahead of you.
14     Q.  And you can review that first paragraph
15 if you'd like.
16     A.  I see it.
17     Q.  Do you agree that there are several
18 factors that should be considered in determining
19 an appropriate Medicaid pharmacy reimbursement
20 formula, other than dispensing and drug
21 acquisition costs incurred by pharmacies?
22     A.  I see that.

Page 300

1      Q.  Do you agree with that statement?
2          MS. MOSLEY-SIMS:  Objection.
3      A.  Do I agree with that statement?  It
4  depends on in what way you mean I agree with that
5  statement.  I think there should be several
6  factors as far as it relates to maintaining
7  access.
8      Q.  (By Mr. Reale) Right.  So one of the
9  factors that Arkansas must consider when it sets
10 the reimbursement rate is the need to maintain
11 sufficient access to services for Medicaid
12 recipients throughout the state; is that correct?
13     A.  That's correct.
14         MS. FORD:  Objection to form.
15     Q.  (By Mr. Reale) And another factor that
16 Arkansas must consider are the politics and
17 provider relations; is that correct?
18         MS. MOSLEY-SIMS:  Objection.
19     Q.  (By Mr. Reale) Okay.  So do you
20 remember the question?
21     A.  Yes.  I think I'm with you now.
22     Q.  Okay.  So another factor that Arkansas

Page 301

1  must consider when it sets its reimbursement rate
2  are politics.  Do you agree with that?
3      A.  I think that that's the -- the
4  consideration of politics and provider relations
5  are -- will also be involved, yes.  I don't
6  disagree.
7      Q.  And how have politics played a role in
8  Arkansas' setting of the reimbursement rate?
9      A.  Well, I hate to use the word
10 "politics", but provider relations more than
11 anything.  When we set the rate as we had talked
12 about earlier today at AWP minus 25 percent and
13 the pharmacy community was very vocal that they
14 felt that -- those that were vocal felt that 25
15 percent, they could not purchase all of their
16 generics at that price, so that -- and that 20
17 percent was a recommendation or a suggestion.
18     Q.  Did pharmacies at that time tell you
19 that on average, they couldn't acquire their
20 multiple-source drugs at rates of AWP minus 25
21 percent?
22     A.  Honestly, I don't remember the exact

76 (Pages 298 to 301)