# EXHIBIT 42

Walsh, Jude E.                                                    March 26, 2008
                              Augusta, ME

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------

IN RE:   PHARMACEUTICAL        ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     ) CIVIL ACTION

PRICE LITIGATION               ) 01-CV-12257-PBS

THIS DOCUMENT RELATES          )

U.S. ex rel. Ven-A-Care of     ) Judge Patti B. Saris

the Florida Keys, Inc.         )

    vs.                       ) Chief Magistrate

Abbott Laboratories, Inc.,     ) Judge Marianne B.

No. 06-CV-11337-PBS            ) Bowler

----------------------------


    VIDEOTAPED DEPOSITION OF JUDE E. WALSH,

taken pursuant to notice dated March 18, 2008, at

the offices of the Maine Attorney General, Burton M.

Cross Building, 6th Floor, 6 State House Station,

Augusta, Maine, on March 26, 2008, commencing at

9:06 A.M., before Tammy L. Martell, Registered

Professional Reporter, a Notary Public in and for

the State of Maine.

Walsh, Jude E.  March 26, 2008
Augusta, ME

Page 74

1  Q.  -- Ms. Walsh?
2  A.  Yes.
3  Q.  What is your understanding of what this
4  document is?
5  A.  They survey states and we give them the
6  information so they can publish it.
7  Q.  And by -- by they do you mean -- is
8  this the National Pharmaceutical Company or --
9  A.  Council.
10 Q.  Council?
11 A.  Yes, that's correct.
12 Q.  And this document lists all 50 states
13 and their dispensing fees, copayment, ingredient
14 reimbursement basis, formulary and formulary
15 status; is that correct?
16 A.  That's correct.
17 Q.  And on the first page Maine is listed
18 as having a dispensing fee of $3.35 and an
19 ingredient reimbursement basis of AWP/AWP minus 5
20 percent.
21     Has -- do you -- do you recall -- I
22 recognize that you didn't have any direct

Page 75

1  responsibility with this prior to 2000, but do
2  you recall how long Maine has had a dispensing
3  fee of $3.35 for its Medicaid program?
4     MS. ST. PETER-GRIFFITH:  Object to the
5  form.
6  A.  The pharmacies say forever.
7  Q.  And why do they say that?
8  A.  Because it hasn't increased forever.
9  Q.  And you -- you hear complaints about
10 that in your current role?
11 A.  Yes, I do.
12 Q.  Do you know why it says AWP/AWP minus 5
13 percent --
14 A.  No.
15 Q.  -- for the ingredient reimbursement
16 basis?  Okay.  I would ask you to turn to page --
17 well, the 1996 page of this document.  I think it
18 is at the bottom it says 3-24.
19 A.  Mm-hmm.
20 Q.  And here the Maine ingredient
21 reimbursement basis is listed as AWP minus 10
22 percent and there is also a dispensing fee of

Page 76

1  3.35-5.35.  Do you recall hearing about this
2  change in reimbursement mechanism back in 1996?
3  A.  No.
4  Q.  And let's flip to the 2002 page which
5  at the bottom I believe is 4-45 and at the top of
6  the page it says Pharmacy Payment And Patient
7  Cost Sharing.  Here we have Maine with an
8  ingredient reimbursement basis of AWP minus 13
9  percent.  Do you recall this change in AWP
10 reimbursement?
11 A.  Yes, I do.
12 Q.  This was during your time with the
13 Maine state Medicaid program, correct?
14 A.  Correct.
15 Q.  What do you recall about this change in
16 reimbursement?
17 A.  We had to meet certain budget targets
18 and in our analysis it looked like we were paying
19 more than was appropriate for prescription drugs
20 at retail pharmacies and changed our dispensing
21 fee from AW -- or our reimbursement mechanism
22 from AWP minus 10 to AWP minus 13.

Page 77

1  Q.  You said in your analysis it looked
2  like you were paying more than was appropriate.
3  What did you use for your analysis, if you
4  remember?
5  A.  Claims data and acquisition costs.
6  Some acquisition costs from pharmacies.
7  Q.  Did you conduct a survey of some kind?
8  A.  Not really a survey, but we also looked
9  at what other insurers were reimbursing, again
10 looking at our public purchasers and see what
11 they were reimbursing, to help us determine what
12 was appropriate, and other states.
13 Q.  If the governor had not asked for a
14 reduction in budget do you think that the Maine
15 Medicaid program would have conducted a survey
16 and tried to reduce payment?
17     MS. ST. PETER-GRIFFITH:  Object to the
18 form.
19 A.  I don't know.
20 Q.  Would you agree that the impetus for
21 the change was the governor's call for a
22 reduction in the Medicaid budget?

20 (Pages 74 to 77)

Page 94

1        MS. ST. PETER-GRIFFITH:  Object to the
2   form.  I'm sorry, Sean.
3        Q.   In the state Medicaid program?
4        A.   That's correct.
5        Q.   Do you know how the state went -- goes
6   about setting a MAC?
7        A.   Yes.
8        Q.   And how does it do that?
9        A.   We look at the number of generic
10  manufacturers.  It is typically for generics, the
11  generic manufacturers that are producing
12  medications.  We look at invoices to see the
13  spread between the reimbursement and the
14  acquisition, and we -- we implement caps on the -
15  - setting caps for the maximum amount that we'll
16  reimburse for those drugs.
17       Q.   Does Maine set a MAC for all generic
18  drugs?
19       A.   No.
20       Q.   Why not?
21       A.   There has to be more than one supplier
22  typically to drive competition in the

Page 95

1   marketplace.
2        Q.   If there is more than one supplier,
3   would you say that Maine as a matter of course
4   will set a generic?
5        A.   Depends on the --
6            THE REPORTER:  I'm sorry, as a matter
7   of course will?
8            MR. MALONE:  Will set a MAC.
9            THE REPORTER:  Thank you.
10           MS. ST. PETER-GRIFFITH:  I am going to
11  enter an objection to the form, too.
12           THE DEPONENT:  Can you repeat that
13  question?
14       Q.   Yeah, let -- let me try something
15  different.  Can you look at the complaint again.
16  This is Abbott Exhibit 19.  And on page 10 and 11
17  I asked you earlier to look at the drugs listed
18  there.  There are also some drugs listed on page
19  12.  And you testified earlier, I believe, that
20  these were injectable drugs; is that correct?
21  Primarily?
22           MS. ST. PETER-GRIFFITH:  Objection to

Page 96

1   the form, mischaracterizes prior testimony.
2        A.   I don't think I testified -- I -- there
3   is one list that were NDCs and one list that were
4   on J codes that you asked me to look at and these
5   are NDCs so.
6        Q.   Okay.
7        A.   Some of them are injectables, maybe all
8   of them.
9        Q.   Are many of these infusion drugs?
10       A.   I am not sure.
11           MS. ST. PETER-GRIFFITH:  Object to the
12  form.
13       A.   I am not sure.
14       Q.   Do you know by looking at these drug
15  names and NDC codes whether Maine has set a MAC
16  for these drugs?
17       A.   I don't think so.
18       Q.   Why do you think not?
19       A.   Well, they are not generic.  I mean
20  Vancomycin is a brand name.  There might be a
21  generic equivalent, but I don't -- I don't know.
22  There also has to be competition in the

Page 97

1   marketplace, as I said, to set a MAC, and we
2   typically our MACs are for outpatient pharmacy,
3   it is -- has nothing to do with J codes.
4        Q.   But if these drugs were administered in
5   an outpatient pharmacy setting and they were
6   generics would you expect that Maine would have
7   set a MAC for them?
8        A.   Typically we need to look at
9   competition in the marketplace, invoices, the
10  spread between them, and then we would have to
11  decide whether or not you could even put in a MAC
12  in place.  If you have two companies that make it
13  and there is not a price differential there is
14  really no need to set a MAC, our reimbursement
15  would take care of that, so it really depends on
16  the spread that you see.
17       Q.   And what do you mean by the spread?
18       A.   The difference in one manufacturer's
19  drug acquisition cost versus another.
20       Q.   And do you -- what do you mean by
21  acquisition cost?
22       A.   The amount of -- the amount of money it

25 (Pages 94 to 97)

Page 98

1    costs the pharmacy to acquire a medication.
2        Q.  And how would Maine determine that?
3        A.  We -- we ask for invoices.
4        Q.  You ask for invoices in the process of
5    setting a MAC?
6        A.  We do because we have pharmacies that
7    complain that our MACs are too low and we say
8    send us an invoice so we can see.
9        Q.  How often does that occur?
10       A.  We set our MACs monthly.  We are always
11   updating our MAC list.
12       Q.  Do the pharmacists call pretty
13   regularly then?
14       A.  If they have a concern.
15       Q.  When did you first hear the term spread
16   to -- used in the way that you used it a minute
17   ago?
18       A.  I don't recall.
19       Q.  And do you understand it to be the
20   difference between acquisition costs and payment
21   made by the state?
22           MS. ST. PETER-GRIFFITH:  Object to the

Page 99

1    form, that's not what she testified to.
2        Q.  What do you understand the term spread
3    to mean?
4        A.  Can you repeat back what I said?
5            (The reporter read the requested
6    matter.)
7        Q.  Do you have any other understanding of
8    the term spread in the context of payment for
9    prescription drugs?
10       A.  It is a term that's used, you know,
11   frequently when you are looking at trying to set
12   rates.
13       Q.  Does it sometimes refer to the
14   difference between the costs at which a
15   pharmacist or provider can purchase a drug and
16   the cost at which -- or the payment it receives
17   from a Medicaid program or other payer?
18       A.  It could, but I am really -- when I
19   refer to it I focus primarily on the point of
20   sale reimbursement --
21       Q.  Okay.
22       A.  -- and what's an appropriate rate to

Page 100

1    set at the re -- in the retail pharmacy setting.
2        Q.  And the point of sale reimbursement, is
3    that the point when Maine pays providers who are
4    submitting claims?
5        A.  No.
6            MS. ST. PETER-GRIFFITH:  Object to the
7    form.
8        A.  Our point of sale system is called
9    MEPOPS, and that's an electronic claims
10   adjudication system that's hooked up 24/7 to all
11   pharmacies in the State of Maine.  That's a POS,
12   a point of sale system.
13       Q.  And that's different than the Medicaid
14   reimbursement?
15       A.  It is the Medicaid pharmacy claims
16   adjudication system for retail pharmacies which
17   is different than providers submitting HCFA 1500s
18   or CMS 1500s with J codes through a different
19   reimbursement system.
20       Q.  So the point of sale purchases do not
21   receive federal matching funds?
22       A.  They do.  It is -- it is an electronic

Page 101

1    claims adjudication system where all pharmacy
2    claims we do, at the time it was $6 million worth
3    of -- you know, of claims a week for Medicaid
4    through retail -- retail and mail order
5    pharmacies in the state or out-of-state
6    pharmacies, which is different than physician
7    claims.
8        Q.  Okay.  When the state sets a MAC for a
9    drug it does not rely on Average Wholesale Price,
10   does it?
11       A.  All of our reimbursements in the
12   Medicaid program through our point of sale system
13   are based off of AWP.
14       Q.  And where does the state get the AWP
15   data again?
16       A.  We purchase a drug file from Medi-Span
17   now.
18       Q.  Do you know how Medi-Span calculates
19   the Average Wholesale Price?
20           MS. ST. PETER-GRIFFITH:  Object to the
21   form.
22       A.  My understanding is that they do a

26 (Pages 98 to 101)

Walsh, Jude E.                                            March 26, 2008
                              Augusta, ME

```
                                Page 126  |                                Page 128
 1    A.  We had another reduction later to AWP       |  1  receive and the volume.  It is all about volume.
 2  minus 15.                                         |  2      Q.  By reimbursement you mean the payment
 3    Q.  That's still a pretty big gap.  Why --      |  3  for the ingredient cost?
 4  why was it that Maine did not try to make up that |  4      A.  The payment --
 5  gap and bring its reimbursement rate more in line |  5          MS. ST. PETER-GRIFFITH:  Object --
 6  with some of the results of this study?          |  6          THE DEPONENT:  Go ahead.
 7         MS. ST. PETER-GRIFFITH:  Object to the    |  7          MS. ST. PETER-GRIFFITH:  Object to the
 8  form.                                            |  8  form.
 9    A.  You can't -- you can't achieve your        |  9      A.  Payment includes ingredient cost plus a
10  savings with AWP points on generics, you have to |10  dispensing fee, that's considered payment, but
11  achieve it through MACing, and we do do that, and|11  volume is important in pharmacies.
12  we did do that then.  Our average reimbursement  |12          MR. MALONE:  All right.  Let's -- let's
13  on generics now is AWP minus 60.  That's what we |13  take a break here and we can pick up after lunch.
14  pay given the -- the way we implement our MAC    |14          THE VIDEOGRAPHER:  We'll go off the
15  list.  So on average -- actually we did an       |15  record at 12:03.
16  analysis last month and it is AWP minus 69, so we|16          (A short break was taken.)
17  do have very aggressive generic pricing.         |17          THE VIDEOGRAPHER:  And we're back on
18    Q.  So since that time Maine has brought       |18  the record after a lunch break, this is Tape No.
19  its payment policy more in line with the results |19  4, the time is 12:57.
20  of this study?                                   |20      Q.  Ms. Walsh, have you had communications
21    A.  Because I haven't read the study fully     |21  with representatives from Abbott Laboratories
22  I -- I can't say.                                |22  over the years?
```

```
                                Page 127  |                                Page 129
 1    Q.  But the numbers that are listed on the     |  1      A.  Yes.
 2  first two pages at least of this memo?           |  2      Q.  On -- in what context?
 3         MS. ST. PETER-GRIFFITH:  Object to the    |  3      A.  I worked with some senior management at
 4  form.                                            |  4  Abbott when we were implementing our HIV waiver
 5    A.  I would say we -- we run a very            |  5  program to look at a demonstration project with
 6  aggressive MAC program in Maine.                 |  6  them.
 7    Q.  Has the dispensing fee changed out in -    |  7      Q.  Would this have been in the early 90s?
 8  - along with the increased discount for AWP      |  8      A.  No.  I wasn't in Medicaid in the early
 9  reimbursement?                                   |  9  90s so it was probably 2003.
10    A.  We haven't had a change in dispensing     |10      Q.  Any other communications with Abbott
11  fee since I started with the Medicaid program.  |11  that come to mind?
12    Q.  How is it then that providers             |12      A.  Well, we work with pharmaceutical
13  pharmacists would have been able to stay in     |13  manufacturers regularly in the course of business
14  business if their dispensing fees have remained |14  so I would have to say that I am sure.  You know,
15  at $3.35?                                       |15  either representatives for their company come to
16         MS. ST. PETER-GRIFFITH:  Object to       |16  our drug utilization review meetings or
17  form.                                           |17  participate in our supplemental rebate
18    A.  My understanding is the dispensing fee    |18  negotiation process or as a course of business I
19  is not how you stay in business in retail       |19  receive correspondence on new drug profiles and
20  pharmacy.                                       |20  news alerts and things of that nature, so I would
21    Q.  And how -- how do you stay in business?   |21  say business as usual except for the
22    A.  It is the reimbursement that you          |22  demonstration project with HIV.
```

33 (Pages 126 to 129)

Walsh, Jude E.  
Augusta, ME  
March 26, 2008

Page 134

1    Q.  Okay.
2    A.  -- but we provide quarterly drug
3  utilization data by NDC for each state by drug
4  class, and pharmaceutical manufacturers log in to
5  the website to review the potential market
6  available to them for the particular drug they
7  are interested in providing an offer on, and then
8  they will come up with an offer that's usually in
9  the form of a discount off of WAC or a guaranteed
10 net price offer, and then we can -- we negotiate
11 back and forth with this -- you know, we look at
12 it -- all of the six states and decide which one
13 of us, if all of us, none of us, are interested
14 in that offer, how many lives it will affect,
15 where the place is on our individual PDLs, and
16 whether or not we -- we want to accept it.
17   Q.  So you don't -- in setting -- in
18 negotiating the supplemental rebates is Average
19 Wholesale Price one of the benchmarks used?
20   A.  Average Wholesale Price is the
21 benchmark that's used to pay the pharmacies; but
22 when we negotiate supplemental rebates we have

Page 135

1  two algorithms, a percent off of wholesale
2  acquisition cost and a guaranteed net price.
3  Sometimes we'll take AWP, but mostly in the
4  supplemental rebate world it is WAC and GMP.
5    Q.  On drugs, pardon me, for which there is
6  no supplemental rebate and no FUL or MAC Maine
7  continues to use Average Wholesale Price,
8  correct?
9        MS. ST. PETER-GRIFFITH:  Object to the
10 form.
11   A.  We always use Average Wholesale Price
12 when we pay the pharmacies.  The use of
13 guaranteed net price and WAC are things that are
14 done on the administrative side in looking at
15 collecting and billing for rebates, but the
16 procurement or the purchase of a drug is done off
17 of AWP or FUL or MAC or usual and customary at
18 the point of sale.
19   Q.  Do you know why Maine originally
20 decided to use Average Wholesale Price?
21   A.  No.
22   Q.  You mentioned earlier acquisition

Page 136

1  costs, and I think -- when you refer to
2  acquisition costs are you referring to invoice
3  price?
4    A.  Are you referring to J codes?
5    Q.  Yes.
6    A.  When doctors bill for J code drugs they
7  bill us on a HCFA 1500 with an office visit fee,
8  and they are supposed to bill us their
9  acquisition cost, the price that it costs them to
10 obtain that drug, on the HCFA 1500.
11   Q.  And pharmacists do not use acquisition
12 costs in submitting claim forms?
13       MS. ST. PETER-GRIFFITH:  Object to the
14 form.
15   A.  Pharmacists use a different payment
16 system where -- where we use a point of sale
17 system, and they bill off of usual and customary
18 -- they bill off -- according to our policy
19 Section 80 off our usual and customary AWP minus
20 15 plus 3.35 FUL MAC.
21   Q.  Okay.  But it sounds like you mentioned
22 usual and customary is the primary means used?

Page 137

1    A.  That's typically not the primary means
2  used.  Usual and customary is something that is -
3  - is again I think a misnomer, it could just be
4  in their system and that is potentially what they
5  charge someone without insurance coming into the
6  pharmacy, but I don't know that for sure.
7    Q.  So of those options, usual and
8  customary, MAC, FUL, and AWP minus 15?
9    A.  Mm-hmm.
10   Q.  Which would you say is the primary
11 method of reimbursement, if -- if you can say?
12       MS. ST. PETER-GRIFFITH:  Object to the
13 form and can we get a time frame on this
14 question?
15       MR. MALONE:  Currently.
16   A.  I would say for brand name drugs it is
17 typically AWP reimbursement and for generic drugs
18 it is a combination of AWP, MAC or FUL.
19   Q.  Do you have any knowledge of how that
20 breakdown would be in 2000 or how -- pardon me,
21 how it was in the -- around the year 2000?
22       MS. ST. PETER-GRIFFITH:  Object to the

35 (Pages 134 to 137)

Walsh, Jude E.                                              March 26, 2008
                          Augusta, ME

Page 138

 1  form.
 2      A.  I just took over the drug benefit in
 3  2000, and I -- I could only guess that our
 4  generic use rate and our brand use rate at that
 5  time might have been 60 percent brand and 40
 6  percent generic, but I don't know that for sure.
 7      Q.  Is it one of Maine's policies to
 8  encourage the use of generic drugs?
 9      A.  Only when they are cost effective to
10  the Medicaid program.
11      Q.  What ways would Maine encourage the use
12  of generic drugs?
13      A.  We have a statute in Maine that
14  requires mandatory generic substitution; however,
15  in the statute it says unless it is not cost
16  effective to the Medicaid program, and in --
17  there are cases in Medicaid program where after
18  we look at our OBRA 90 rebate and our
19  supplemental rebate our brand name drugs are
20  cheaper than the generic version.
21          MR. MALONE:  I would like to mark
22  another exhibit.  And this one is Abbott Exhibit

Page 139

 1  856.
 2          (Exhibit Abbott 856, U.S.
 3  Department of Health and Human Services, Office
 4  of Inspector General State Medicaid Drug Cost
 5  Containment Strategies Survey, marked for
 6  identification.)
 7      Q.  Do you recognize this document, Ms.
 8  Walsh?
 9      A.  Yes.
10          MR. MALONE:  And for the record it is
11  entitled U.S. Department of Health and Human
12  Services, Office of Inspector General State
13  Medicaid Drug Cost Containment Strategies Survey.
14  At the bottom of the page there is Bates Nos HHD
15  127-0252 and the document goes through 0256.
16      Q.  Is that your handwriting at the top of
17  the page, Ms. Walsh, it says entered 12/18/02?
18      A.  No, it is not.
19      Q.  Okay.  What is this document?
20      A.  It appears to be a survey from the
21  Office of the Inspector General.
22      Q.  And you are designated as the contact

Page 140

 1  person from Maine?
 2      A.  I was at that time.
 3      Q.  Do you remember filling this survey out
 4  or responding to this?
 5      A.  No.
 6      Q.  Would you have responded to similar
 7  surveys from OIG on occasion?
 8      A.  On occasion, yes.
 9      Q.  Question No. 1 asks has your program
10  measured total cost savings resulting from any
11  combination of Medicaid drug -- drug cost
12  containment strategies, and it asks for a -- in
13  Section B a list of the cost containment
14  strategies in effect during this time period that
15  contributed to this savings.
16          You -- were you responsible, if you can
17  recall, for typing these responses?
18          MS. ST. PETER-GRIFFITH:  Object to the
19  form.
20      A.  I am sure that this is mine, you know.
21      Q.  One of the responses you listed as a
22  cost containment strategy is reimbursement change

Page 141

 1  to AWP minus 13, correct?
 2      A.  That's what the survey says.
 3          MS. ST. PETER-GRIFFITH:  Object.
 4      Q.  We have spoken about a number of these
 5  on the list.  Can you tell me what TPL cost
 6  avoidance is?
 7      A.  That's third-party liability, and when
 8  someone -- about 25 percent of the Medicaid
 9  population has a third-party coverage, and so we
10  instituted an electronic cost avoidance system at
11  the point of sale so that we wouldn't have to pay
12  and chase.  So we don't pay for a drug if someone
13  has a third-party, we make them -- we make the
14  pharmacy go out, bill to two -- to the third-
15  party, and then we balance bill and adjudicate
16  the claim on Medicaid thus lowering our costs.
17      Q.  Do you need to take a break?
18      A.  No, sorry.  I just wanted to shut the
19  ringer off.
20      Q.  It looks like you marked in response to
21  question No. 1 yes that there was a cost savings
22  resulting from the items that you have listed

36 (Pages 138 to 141)

Page 146

1  - of prescription drugs?
2      A.  I mean the ones that I saw were related
3  to the pharmacy benefit.
4      Q.  Did -- did the Maine Medicaid program
5  rely upon this guidance in formulating its
6  policy?
7      A.  Sometimes.
8      Q.  No. 15 in the survey asks are there any
9  further actions that CMS could take that would
10 assist your program to contain drug costs and you
11 list broader FUL lists with timely response to
12 market changes.  What did you mean by that?
13     A.  Well, I -- I believe I meant by the
14 time we get an FUL we have had it MACed for a
15 long time.  The federal government is extremely
16 slow in capping their generic pricing, and we
17 actually do it faster and better and tighter, and
18 we take their FUL list but typically our MACs are
19 -- are lower in reimbursement than the Federal
20 Upper Limit payments.
21     Q.  And finally on No. 16 says please feel
22 free to share -- share any additional comments or

Page 147

1  suggestions on Medicaid drug cost containment,
2  and you wrote we need a better way to calculate a
3  true EAC that would be fair and equitable to
4  providers and provide the best price to the
5  state.  What did you mean by that?
6      A.  Well, I think that everybody knows that
7  the AW fee is a very -- AWP is arbitrary
8  somewhat, the whole way we reimburse drugs are
9  arbitrary, and it would be, in my opinion, much
10 better to really understand how much drugs really
11 do cost and then set a payment reimbursement
12 system in place to address actual costs instead
13 of these surveyed kind of arbitrary figures.
14         MR. MALONE:  Okay.  I will ask a few
15 questions about the process of state plan
16 amendments, and for that purpose I would like to
17 mark another exhibit which we'll call Abbott
18 Exhibit 857.  For the record this is a four page
19 document which is Bates labeled HHC006-0124
20 through 0127.
21         (Exhibit Abbott 857, Payment Rates
22 With Attachments, marked for identification.)

Page 148

1      Q.  Ms. Walsh, on the second page there is
2  a -- a letter which extends for a couple of pages
3  and it is signed -- well, it appears to be signed
4  by Larry Reed but there is someone else's
5  signature there?
6      A.  Yes.
7      Q.  Do you recognize either the signature
8  or the name?
9      A.  It is Deirdre Duzor.
10     Q.  Okay.  And do you know a Ms. Duzor?
11     A.  She is the coleader of the pharmacy
12 team at CMS.
13     Q.  And are you also familiar with Larry
14 Reed?
15     A.  Yes, I am.
16     Q.  And also can I ask I see there is a CC
17 Jude Welsh, would that be Jude Walsh?
18     A.  I believe so.
19     Q.  Okay.  Were you typically copied or
20 provided correspondence of this nature?
21     A.  Yes.
22     Q.  And turning back to the first page this

Page 149

1  letter is dated November 25th, 2003, and it
2  states we have reviewed Maine State Plan
3  Amendment, SPA, 03-008 that proposes to modify
4  the state's payment methodology for drugs on the
5  state's direct supply list.  We are unable to
6  approve it as submitted.  And then it appears
7  that the state lists a number of questions that
8  it wants answers to.
9          Can you describe generally the
10 interaction between your office and CMS when it
11 comes to providing state plan amendments or
12 approving state plan amendments?
13         MS. ST. PETER-GRIFFITH:  Object to the
14 form.
15     A.  CMS is the approving body for state
16 plan amendments and when we want to make policy
17 changes that affect reimbursement we go through a
18 regulatory process within the state and we go
19 through a state plan amendment process at the
20 federal level, and we submit a state plan
21 amendment, which you have here, and a lot of
22 times they submit RAIs, Requests for Additional

38 (Pages 146 to 149)