# EXHIBIT 43

Olympia, WA

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------X

IN RE: PHARMACEUTICAL INDUSTRY     ) MDL No. 1456

AVERAGE WHOLESALE PRICE            ) Civil Action No.

LITIGATION                         ) 01-12257-PBS

---------------------------------X

THIS DOCUMENT RELATES TO:          ) Hon. Patti B.

United States of America ex rel.   ) Saris

Ven-A-Care of the Florida Keys,    )

Inc. v. Abbott Laboratories, Inc.,) Chief Magistrate

Civil Action No. 06-11337-PBS;     ) Judge Marianne

United States of America ex rel.   ) B. Bowler

Ven-A-Care of the Florida Keys,    )

Inc. v. Dey, Inc., et al., Civil   ) DEPOSITION OF

Action No. 05-11084-PBS; and       ) WA DEPT. OF

United States of America ex rel.   ) SOCIAL AND HEALTH

Ven-A-Care of the Florida Keys,    ) SERVICES by AYUNI

Inc. v. Boehringer Ingelheim       ) HAUTEA-WIMPEE

Corp., et al., Civil Action No.    )

07-10248-PBS                       ) NOVEMBER 24, 2008

---------------------------------X

Page 38

1  all aspects of the Medicaid program.
2  BY MS. FORD:
3     Q.  Okay.  Just generally what is your
4  understanding of Washington's Medicaid program
5  and what it provides for?
6     A.  Our mission is to provide the medical
7  care needed by our clients in the most cost
8  effective way we can and make sure that they get
9  access to the care that they need.
10    Q.  And who are, just generally speaking,
11 who are the clients that are served by
12 Washington's Medicaid program?
13    A.  We have categorically needy clients, we
14 have medically needy clients, we have clients who
15 are under state only programs, like the general
16 assistance unemployable, we have clients who are
17 under the alcohol program and we have children's
18 health, we have the S-chip program, So we have a
19 wide variety of categorically needy and state
20 only clients.
21    Q.  I'm going to hand you what we'll mark
22 as Exhibit 3.

Page 39

1          (Exhibit Hautea-Wimpee 003 marked
2  for identification)
3       Ayuni, this is another document that
4  was produced by the State of Washington.  And for
5  the record, this is U.S. v. Abbott WA-00000450
6  through 00000491, and it's entitled Annual
7  Report, Washington State Medical Assistance,
8  Fiscal Year 1990.  Do you recognize this
9  document?
10    A.  Yes.
11    Q.  And during the time that you were
12 employed by MAA has Washington State produced an
13 annual report -- or excuse me, has MAA produced
14 an annual report?
15    A.  We used to, but I don't believe we have
16 done so the last few years.  I don't know when it
17 stopped but, yeah --
18    Q.  Okay.
19    A.  -- I have not seen one in awhile.
20    Q.  If you could turn to the page that is
21 actually marked page one that's a few pages into
22 the document.

Page 40

1     A.  (Witness complies).
2        MR. REALE:  Could you give the Bates
3  number on that?
4        MS. FORD:  The last three numbers are
5  453.
6  BY MS. FORD:
7     Q.  Are you on that page?
8     A.  Yes.
9     Q.  Okay.  And about not quite a third of
10 the way down where it says Mission Statement, do
11 you see where it says:  The mission of the
12 Medical Assistance Program is to assure that
13 necessary medical care is available to all
14 eligible low-income persons?
15    A.  Yes.
16    Q.  And is that your understanding as an
17 employee of MAA from 1991 to 2002, that was the
18 mission of MAA?
19    A.  Yes.
20    Q.  And I believe you mentioned earlier
21 that part of the mission was to assure that those
22 services were administered in a cost effective

Page 41

1  manner; is that correct?
2     A.  Yes.  That was always the instruction
3  to us, being the rates people, we were always
4  under the constant direction to look at cost
5  effective ways to provide the care.
6     Q.  And if you'd turn to page three of the
7  document, the last three Bates numbers on that
8  page is 455.  Do you see where it lists
9  Eligibility Groups?
10    A.  Yes.
11    Q.  Going on to the next few pages, pages
12 three, four and five of the document, are these
13 some of the groups that you were mentioning were
14 the clients of the Medicaid program?
15    A.  Yes.
16    Q.  How was Washington -- Washington's
17 Medicaid program funded from the years 1991 to
18 2002, if you know?
19    A.  I'm not sure what you mean.  Could you
20 explain that?
21    Q.  Sure.  Did some of the funding for the
22 Medicaid program come from the state budget?

11 (Pages 38 to 41)

Page 98

1  sent out when there were changes to the program?
2      A.  Yes.
3      Q.  Okay.  And then MAA would expect that
4  pharmacists would insert this page into their
5  manual; is that correct?
6      A.  Yes.
7      Q.  Okay.  And do you see at the bottom of
8  the page where it lists high volume pharmacies,
9  mid-volume pharmacies, low volume pharmacies, and
10 unit dose systems?
11     A.  Yes.
12     Q.  And are these the dispensing fees that
13 were applicable starting July 1st, 1996, for
14 these various tiered pharmacies?
15     A.  Yes.
16     Q.  And so did I understand you correctly
17 that after the MMIS system determined the
18 ingredient cost for a reimbursement claim, it
19 would add the dispensing fee, depending on which
20 tier the pharmacy fell -- fell under?
21     A.  Correct.
22     Q.  And that would include -- and then

Page 99

1  those two components would equal the total
2  reimbursement for that claim; is that correct?
3      A.  Yes.
4      Q.  Okay.  How were dispensing fees -- or
5  it looks like in this situation effective July
6  1st, 1996, there was an increase in the
7  dispensing fee; is that correct?
8      A.  Yes.
9      Q.  And how did the Department go about
10 making changes to the dispensing fee?
11     A.  A lot of times it depended on whether
12 there was a vendor rate increase authorized by
13 the Legislature, so most of the time it was a
14 matter of applying the vendor rate increase
15 across the board.  So whatever was existing
16 before, we increased by the percentage allowed by
17 the Legislature, and that was the way it was
18 done.  And, obviously, the vendor rate increases
19 were not always in keeping with inflation
20 elsewhere but, you know, that -- that was the
21 procedure; whatever was allowed by the
22 Legislature got applied to the program.

Page 100

1      Q.  So it sounds like this is a situation
2  where there would be a change in Washington State
3  law that would allow MMA to increase the
4  dispensing fees to providers?
5      A.  Yes.
6      Q.  Is that correct?  That's correct?
7      A.  Correct.
8      Q.  Okay.  I want to go back to something
9  that we discussed a little bit earlier and that
10 is we were discussing the FDB I believe you
11 called it a drug file; is that correct?
12     A.  Yes.
13     Q.  And the drug file was sent, at least an
14 update was sent to MAA on a weekly basis; is that
15 right?
16     A.  Correct.
17     Q.  And then were those updates added to
18 the MMIS system?
19     A.  Yes.
20     Q.  Do you know whether they were done on
21 the same day every week or was there a pattern
22 there?

Page 101

1      A.  They tried to do it on the same day so
2  that it would be consistent.  It did not always
3  work out that way.  I know that there were a few
4  occasions were there were difficulties.  For
5  example, if there's -- if there's a holiday in-
6  between sometimes, you know, it threw off the
7  schedule, or if there were some system problems,
8  computer system problems that we were
9  experiencing, but they did try to have it
10 consistently on the same day so that it would at
11 least balance out everything.
12     Q.  And do you know what day of the week
13 that was?
14     A.  I believe that was Tuesday night, but I
15 could be wrong.
16     Q.  Okay.  And then barring some computer
17 problem or some holiday, the expectation would be
18 that that system, MMIS system --
19     A.  Yes.
20     Q.  -- would be updated on that day every
21 week?
22     A.  Um hum.

26 (Pages 98 to 101)

WA Dept of Social and Health Services (Ayuni Hautea-Wimpee)                    November 24, 2008
Olympia, WA

Page 194

1  A. Yes.
2  Q. And you said the federal regulations
3  are something that Washington Medicaid heeds?
4  A. We certainly keep track of them and we
5  read them. We try to make sure that we are in
6  compliance.
7  Q. States like Washington, though, are
8  provided with some discretion under those rules
9  to determine certain aspects of their Medicaid
10 program; is that correct?
11 A. Yes.
12 Q. Like, for example, the federal
13 government doesn't tell Washington what payment
14 rate it must use to reimburse prescription drugs;
15 is that correct?
16 A. That is correct.
17 Q. We've talked a little bit about the
18 term access to care. Can you explain to me in
19 your own words what access to care means?
20 A. We have a lot of services and I think
21 that, you know, it's not always feasible for our
22 clients to get the care, the medical care they

Page 195

1  need. For one thing, even though we say we cover
2  a particular service, our rates are fairly low in
3  comparison to other payers and it's not always
4  attractive to providers to accept our clients
5  into their practice. So one of the challenges,
6  one of the major challenges we face is to try to
7  make sure that there's enough -- the
8  availability, that there is availability of
9  providers to accept our clients and serve them.
10 Q. And the access to care mandate, is that
11 a federal requirement?
12 A. It's not explicitly stated as such. I
13 -- I think except in probably the early and
14 periodic screening diagnosis and treatment
15 program, but that is certainly something that
16 Medicaid agencies in general I would think try to
17 ensure occurs. I mean, the main point of the
18 program is to make sure that there's coverage for
19 low income people so, you know, if you have it in
20 theory, but you don't really get that, then it
21 sort of negates the whole -- the whole program,
22 you know, the point of the program.

Page 196

1  Q. So the access to care requirement is
2  such that --
3  MS. FORD: Objection to form. Sorry.
4  MR. REALE: The access to care
5  requirement is such that Washington Medicaid
6  wants to ensure that a Medicaid beneficiary has
7  the same access to care as the general population
8  in that geographic area?
9  MS. FORD: Objection to form.
10 THE WITNESS: That is the goal.
11 MR. REALE: Now, when it came to
12 setting payment rates for prescription drugs, is
13 it fair to say that Washington has to be mindful
14 of that access to care requirement?
15 MS. FORD: Objection to form.
16 THE WITNESS: Yes, we have to be
17 mindful of it.
18 BY MR. REALE:
19 Q. What is the approximate number of
20 pharmacies in Washington?
21 A. I'm not sure how many there are now,
22 but at one point there were probably 2,500,

Page 197

1  something or other. I -- I mean, you know, it's
2  been awhile and I don't keep track, but --
3  Q. Do you know what percentage of
4  Washington pharmacies participate in the Medicaid
5  program?
6  A. I don't, but I would suspect that a
7  fair number, a fair percentage of the pharmacies
8  statewide do that. Like I said, the prescription
9  drug program is the most widely used program
10 among the programs -- services that we offer.
11 Q. Has the percentage of Washington
12 pharmacies participating in the Medicaid program
13 changed over time?
14 A. I do not know.
15 Q. Now, Washington pharmacies are not
16 required to serve Medicaid beneficiaries,
17 correct?
18 A. That is correct.
19 Q. The participation in the Medicaid
20 program is voluntary for pharmacies, correct?
21 A. Correct.
22 Q. And you agree that when we're talking

50 (Pages 194 to 197)

Page 198

1   about pharmacies within Washington, that they are
2   in the business to make money?
3         MS. FORD:  Objection to form.
4         THE WITNESS:  I would say so.
5         MR. REALE:  How does Washington
6   Medicaid encourage state pharmacies to
7   participate in the Medicaid program?
8         MS. FORD:  Objection to form.
9         THE WITNESS:  Beg.  I'm sorry, but this
10  -- I don't mean to be flippant about it, but we -
11  - we always encourage pharmacies, and not just
12  pharmacists, but all other providers to
13  participate in the program.  It's sort of trying
14  to appeal to their sense of civic duty, you know.
15  We -- we are the payer of last resort, so we know
16  that we don't pay well, but they are a lot of
17  people out there who need the services and we
18  need to have providers participate in the program
19  in terms of caring for those less fortunate.
20        MR. REALE:  Is one of the ways that
21  Washington Medicaid encourages participation in
22  the Medicaid program is to provide a payment

Page 199

1   level to pharmacies that give them an economic
2   incentive?
3         MS. FORD:  Objection to form.
4         THE WITNESS:  One way to try to
5   encourage is to let them know that we do try to
6   pay at least the ingredient cost portion is -- is
7   a fair -- is a fair representation of what their
8   costs are.  To my knowledge, and this is just --
9   this is not something that anybody has told me,
10  but what we have -- what I have always observed
11  in the pharmacy program is that our philosophy
12  seems to be that we would try to cover the costs,
13  it's not necessarily to provide profit, but we
14  would want people to not be absorbing costs, you
15  know, that are not paid, so we would try to cover
16  the costs, but as to profit, well, only if
17  there's anything in there, but that is not --
18  that has not been a primary objective.
19        MR. REALE:  But do you suspect that
20  pharmacies or has it been Washington Medicaid's
21  knowledge that pharmacies participating in the
22  Medicaid program received some level of profit on

Page 200

1   average for each prescription?
2         MS. FORD:  Objection to form.
3         THE WITNESS:  I would suspect that they
4   do, or at least some of them do.  A lot of the
5   complaints is that they don't, but then again, I
6   don't know for sure.
7   BY MR. REALE:
8       Q.  And you said that you try to be fair
9   when setting the ingredient cost reimbursement to
10  providers.  Has that been your assessment of the
11  dispensing fee that's also provided?
12      A.  According to our pharmacists we do not
13  pay their administrative costs or we do not cover
14  their administrative costs.  But, like I said,
15  the problem with the administrative costs is we
16  don't have the discretion to exceed our
17  appropriation and that is a separate pot from,
18  you know, the Legislature.  We can only pay out
19  what the Legislature appropriates for that piece
20  of the program.
21      Q.  And you don't believe that Washington
22  pharmacies are taking a loss on every

Page 201

1   prescription that's dispensed to a beneficiary,
2   correct?
3         MS. FORD:  Objection to form.
4         THE WITNESS:  I'm not sure that they're
5   taking a loss.  That has always been the -- the
6   complaint, but I have also heard that, for
7   example, other payers pay less than we do, pay
8   less than Medicaid in terms of the dispensing
9   fees, so that, for example, some managed care
10  plans or some big, you know, private industry
11  payer pays less.  Then what am I to think?  I
12  don't know.  They don't usually tell us or
13  they're not particularly open in terms of sharing
14  the costs involved in the dispensing fee portion.
15        MR. REALE:  And since the 1990's
16  Washington Medicaid has never surveyed the costs
17  of a pharmacy participating in the Medicaid
18  program to dispense a drug?
19        MS. FORD:  Objection to form.
20        THE WITNESS:  We --
21  BY MR. REALE:
22      Q.  Has there ever been any dispensing cost

51 (Pages 198 to 201)

Page 202

1  surveys of Washington --
2     A.  Not since the 1990s, no, not that I'm
3  aware of.
4     Q.  Is there any particular concern in
5  Washington with ensuring that beneficiaries in
6  the Medicaid program have access to
7  pharmaceuticals?
8        MS. FORD:  Objection to form.
9        THE WITNESS:  We are always concerned
10 about maintaining access, yes.
11 BY MR. REALE:
12    Q.  Is there any concern based on
13 geography, any rural areas make access to care
14 difficult in certain areas?
15    A.  Yes, there is always that concern and
16 we are always mindful of that.  In 2002 when we
17 were talking about changing the discount from AW
18 -- from AWP, from 11% to 14%, we had made sure
19 that in some areas of the state where for example
20 there aren't as many pharmacies available, like
21 in the central part of the state, you know, Omak
22 area, Okanogan region, that there would be

Page 203

1  alternatives or that there would be means of --
2  of -- of trying to make sure that the clients are
3  able to get their medications in some manner.  So
4  we made provisions, for example, to have
5  transportation available to clients to go travel
6  to neighboring towns or cities to make sure that
7  they could get what they needed if there was a
8  problem with availability because somebody would
9  refuse to participate.
10    Q.  Did pharmacies refuse to participate in
11 the Washington Medicaid program in 2002 as a
12 result of this?
13    A.  A few had threatened.  I don't know if
14 they followed through.
15    Q.  But when Washington Medicaid sets its
16 payment rate, it doesn't set one rate for one
17 county, another rate for one county?
18    A.  No, we have a statewide rate.
19    Q.  You mentioned that other payers used
20 different rates for reimbursing prescription
21 drugs?
22        MS. FORD:  Objection to form.

Page 204

1        THE WITNESS:  I had heard that, but I
2  do not know specifically who or what did that.
3  BY MR. REALE:
4     Q.  Did you ever examine the rates used by
5  other payers for prescription drugs?
6     A.  We had tried at one point in time and I
7  can't remember when, but we had tried to canvas,
8  for example, some of our managed care plans to
9  find out what they were paying, but as I said,
10 that information is not something that people
11 readily share.  They consider that as, you know,
12 proprietary, don't want to have their competition
13 be made aware, so we -- as I recall we did not
14 get anywhere with that.
15    Q.  And when you say some of our managed
16 care, you're referring to managed care within the
17 Medicaid program?
18    A.  Yes.
19    Q.  So the managed care had different rates
20 than those used in --
21    A.  That's what we heard, but again, I
22 cannot substantiate any of that.  It's one of

Page 205

1  those things that you hear and then, you know,
2  you try to verify, but you -- you can't do so,
3  because nobody wants to share that info with you,
4  nobody wants to go on record.
5     Q.  Okay.  One thing we have to be mindful
6  of again is the record and so we don't talk over
7  each other.  And I get excited talking about this
8  stuff too, so I apologize if I cut you off.
9        You agree that Washington cannot set a
10 payment rate at a level that pharmacies would
11 refuse to participate in the program?
12       MS. FORD:  Objection to form.
13       THE WITNESS:  We have not experienced I
14 would say any significant drop or whatever in
15 participation.  There -- like I said, there were
16 threats from several pharmacies back in 2002 that
17 they would withdraw from the program.  To my
18 knowledge, I don't think anybody actually
19 followed through on that threat, but if they did,
20 if a handful did that, I believe that others
21 stepped up because we provided, you know,
22 alternatives to say if clients in certain areas

52 (Pages 202 to 205)

Page 206

1  could not access the care, we would provide
2  transportation or other means, a mail order
3  pharmacy alternative to -- to these clients so
4  that they would continue receiving their
5  medications.
6         MR. REALE:  Right, but there is a limit
7  to the payment levels that Washington pharmacies
8  will accept in dispensing a drug to a Medicaid
9  beneficiary, correct?
10        MS. FORD:  Objection to form.
11        THE WITNESS:  I'm not sure what they're
12 willing to accept, but if they're participating
13 in our program, then that is proof to me that
14 they are willing to accept our payment.
15        MR. REALE:  Why don't you set the
16 payment rate at AWP minus 70% for all multi-
17 source drugs?
18        MS. FORD:  Objection to form.
19        THE WITNESS:  Our understanding of the
20 Estimated Acquisition Cost is we would try to set
21 the fee or set the level of reimbursement at what
22 we believe is their acquisition cost, and that's

Page 207

1  what we have tried to do.  Whether it's 70% I
2  would say of AWP in some cases I know in the past
3  had occurred for some multi-source drugs that we
4  put in MAC.  When you compare the prices that we
5  would pay under MAC for some of those drugs, they
6  are -- they would be at that level in terms of
7  discount off AWP.
8  BY MR. REALE:
9     Q.  Would they be higher than AWP minus
10 70%?
11    A.  You mean paid less than 30% of AWP?
12    Q.  That pharmacies were acquiring drugs at
13 discounts off of AWP in excess of 70%?
14        MS. FORD:  Objection to form.
15        MR. REALE:  That was something that
16 you've discovered surveying MAC prices in the
17 '80s and '90s?
18        MS. FORD:  Objection to form.
19        THE WITNESS:  I would say that when we
20 had -- we had a few drugs that we found were, you
21 know, when you look up the -- the actual MAC
22 price that we set and what the AWP reported, what

Page 208

1  the AWP was, that I would say that they were at
2  30% of AWP.  And those drugs, you know, were not
3  that many, but there were -- they were primarily
4  as I recall some old-time antibiotics, something
5  that had been in place for a long time or had
6  been on the market for a long time.  And I know
7  that -- that we did some comparisons at one point
8  and it was -- you know, those -- those drugs were
9  fairly very well discounted when you think about
10 it; the actual acquisition costs certainly were a
11 lot less than what the AWP would indicate.
12        MR. REALE:  Now, on average, what were
13 the discounts off of AWP that you discovered
14 during your work for Washington's MAC program off
15 of AWP?
16        MS. FORD:  Objection to form.
17        MR. REALE:  Did you ever undertake to
18 determine what the average discount off of AWP
19 was for multi-source drugs?
20        MS. FORD:  Objection to form, and if
21 you could clarify which time period you're
22 discussing.

Page 209

1  BY MR. REALE:
2     Q.  We'll say, we'll start in the 1980's.
3     A.  I don't know that we actually did an
4  average of the discount off AWP for multi-source
5  drugs.  Like I said, this was at some point we
6  had some isolated reviews for specific drugs and
7  there was a question about something, you know,
8  from whatever source, whether legislative or
9  outside stakeholders, I don't remember, but we
10 would respond to them and we did on a couple of
11 occasions find out that the MACs that we set
12 were, like I said, highly discounted off AWP when
13 -- when -- when it came right down to it.
14    Q.  In some instances in excess of 70%?
15    A.  Yes.  I believe there was one that we
16 found was at 25% or 28%.
17    Q.  Do you remember what drug that was?
18    A.  No, I don't know.  It was a long time
19 ago.
20    Q.  Well, you remembered --
21    A.  But, like I said, as a -- as a rule, as
22 a class, the old antibiotics generally were in

Page 210

1  the -- in the low end of the scale in terms of --
2  in terms of the pricing.
3      Q.  So Erythromycin would be one of those
4  drugs?
5          MS. FORD:  Objection to form.
6          THE WITNESS:  Could have been.  Could
7  have been.  I don't know.
8  BY MR. REALE:
9      Q.  And was this work that you did in the
10 1980's or what time frame are we talking about
11 right now when you said that you learned of
12 spreads?
13     A.  This would have been in the '90s, I
14 think, because I'm thinking that that was in
15 response to at least a request from somebody or a
16 question from outside that we, you know, we
17 checked on a particular drug.  And as I said, my
18 recollection is it had something to do with
19 antibiotics, but I don't know exactly which ones.
20     Q.  Today does Washington Medicaid still
21 ask wholesalers the price at which they sell
22 their drugs to pharmacies?

Page 211

1      A.  I don't know.
2      Q.  It has that ability to ask, correct?
3          MS. FORD:  Objection to form.
4          THE WITNESS:  It has that ability.  I
5  don't know if they're still doing that.  Like I
6  said, I have not been involved with the pharmacy
7  program since 2003, so I'm not sure what the
8  current practices are.
9          MR. REALE:  When did -- when did they
10 stop asking wholesalers, if that -- I mean,
11 strike that.  Did they ever stop asking
12 wholesalers the price at which they sell drugs to
13 pharmacies?
14         MS. FORD:  Objection to form.
15         THE WITNESS:  I don't know.  I know
16 that I asked wholesalers when I was doing it.
17 Now, whoever replaced me, I don't know if they
18 continued doing that or if they adopted some
19 other -- some other methodology.
20 BY MR. REALE:
21     Q.  So up until 2002 you asked wholesalers
22 the prices at which they sold drugs to

Page 212

1  pharmacies?
2      A.  We received copies of their microfiche
3  prices and we used -- we consulted that, at
4  least.
5      Q.  Up to 2002?
6      A.  Yes, to my knowledge.
7      Q.  Has Washington Medicaid ever asked
8  pharmacies the price at which they acquire their
9  drugs?
10     A.  Yes.  I would say that when we -- when
11 -- when I would set the MAC and I send out the
12 worksheet to the pharmacist, to selected
13 pharmacists who, you know, were members of the
14 Washington State Pharmacy Association, and those
15 members would review those worksheets and those
16 members represented different wholesalers, when
17 they come back with their comments in terms of
18 availability of certain products at the
19 particular prices given or suggested, then I
20 would say that yes, they have responded.  You
21 know, we have asked them if those prices -- if
22 those products were available at those prices and

Page 213

1  they have responded.
2      Q.  They've responded with the prices at
3  which they acquired drugs?
4      A.  Yes, on occasion they have.
5      Q.  And those were the final prices that
6  those pharmacies paid? In other words, it
7  included all discounts?
8          MS. FORD:  Objection to form.
9          THE WITNESS:  I do not know if they
10 were the final prices that they paid, but they
11 indicated that they were able to get them at
12 those prices.
13 BY MR. REALE:
14     Q.  Did you maintain the communications
15 that you would receive from pharmacies regarding
16 the prices at which they acquired their drugs?
17     A.  We -- we kept -- I kept them as long --
18 because they -- they were usually, you know,
19 there were usually multiple iterations of a
20 particular -- of a particular process.  I did not
21 keep them afterwards, after we published the
22 final prices, no.

54 (Pages 210 to 213)

Page 222

 1  investigation into learning the percentage of
 2  pharmacies that purchased their drugs through
 3  wholesalers as opposed to directly from a
 4  manufacturer?
 5     A.  We were told at the time -- most of the
 6  time that the bulk of them purchased from their
 7  wholesalers and that my understanding -- my
 8  understanding was that most of them purchased
 9  directly from pharm -- from manufacturers only
10  for a very small percentage of drugs.  And
11  basically that was sort of like if they can't get
12  it any other way or if their wholesaler was
13  constantly out of a particular product, then they
14  would order it directly, but that was my
15  understanding. Now, whether that was their actual
16  practice or not, I -- I can't say.
17     Q.  But that's what Washington Medicaid was
18  told?
19     A.  That's what we were told, yes.
20     Q.  And you relied on that when you set the
21  MAC prices?
22     A.  Yes.

Page 223

 1     Q.  Now, is -- the subscriber prices are
 2  something different than what has been referred
 3  to earlier as Wholesale Acquisition Cost,
 4  correct?
 5     A.  Yes, I'm not using the term Wholesale
 6  Acquisition Cost in the same sense of, you know,
 7  what their cost was when they ordered from that
 8  wholesaler.  I'm using Wholesale Acquisition Cost
 9  as the method that other states, like Texas for
10  example, used as part of their payment
11  methodology.
12     Q.  So the subscriber price wasn't the same
13  thing as the Wholesale Acquisition Cost that
14  would appear in First DataBank's drug pricing
15  file, correct?
16     A.  I'm using the subscriber price as the
17  price that the pharmacist would have paid or the
18  base price, you know, that was the price that
19  they would have paid in the case of one
20  wholesaler, and the base price that we applied
21  the up-charge to to represent their acquisition
22  cost.

Page 224

 1     Q.  Okay. Did you ever calculate the
 2  average difference between the AWP and the
 3  subscriber prices that you received from the
 4  wholesalers?
 5     A.  No, I don't recall doing that.
 6     Q.  Why not?
 7     A.  That was a long time ago.  I had other
 8  things to do.  I'm sorry, but there was -- you
 9  know, I mentioned it was mainly myself for the
10  most part.  It was later on that I acquired two
11  staff people to help out with that, but that's a
12  lot, that's a huge program for, you know, for a -
13  - for a handful of people, and a very high volume
14  kind of program in terms of the number of claims.
15  There's just no way to keep up with that.  And I
16  also mentioned earlier it was not the only
17  program that I was responsible for.
18     Q.  Did you take any of the information
19  that you learned from your survey of wholesalers
20  and use that in your calculation of Estimated
21  Acquisition Costs?
22     A.  We may have, I don't recall

Page 225

 1  specifically, but certainly we would always
 2  discuss with the Washington State Pharmacy
 3  Association pricing issues.  In the early -- in
 4  the '80s actually we had monthly meetings with
 5  the stakeholder group, I mean, monthly.  And
 6  they'd be like three-hour meetings, you know.  In
 7  the 1990's I think that we tried to cut down on
 8  that because it got to be too much.  And at one
 9  point I believe in the late '90s we got it down
10  to a quarterly, a quarterly meeting, but the
11  pricing was always an issue.  It was -- it's a
12  constant at every meeting, we would talk. Whether
13  it was for specific drugs or general issues, you
14  know, that was always on the table.
15     Q.  What percentage of claims -- or excuse
16  me, let me start again.  What percentage of
17  multi-source drugs are subject to a Washington
18  MAC?
19        MS. FORD:  Objection to form.
20        MR. REALE:  And we'll say today.
21        MS. FORD:  Objection to form.
22        THE WITNESS:  I don't know.

57 (Pages 222 to 225)

Page 226

1  BY MR. REALE:
2      Q.  Did you have a sense during your work
3  in the 1990s what percentage of multi-source
4  claims were subject to a MAC?
5      A.  I know that we did a look at this at
6  one point, but I don't remember the exact things
7  that came out of it.  What I seem to recall is
8  that at one point generics constituted, I don't
9  know, six -- 60% or more of our claims, but in
10 terms of payment, they were like 45%.  So, I
11 mean, in other words, you know, the single-source
12 drugs were fewer, but they were definitely the
13 big chunk of our expenditures.  So I can't -- in
14 terms of NDCs or whatever numbers, I can't tell
15 you because I don't remember.
16     Q.  And was the -- one of the purposes of
17 the MAC program so that Washington Medicaid
18 didn't have to rely on the AWP?
19         MS. FORD:  Objection to form.
20         THE WITNESS:  That is one purpose, but
21 the main thing for that is that we wanted to make
22 sure that we -- that consumers in general would

Page 227

1  save some money.  I mean, there is a state law
2  that says that -- that requires pharmacists to
3  dispense a generic if a generic is available and,
4  you know, and to give -- to give the consumer
5  basically the benefit of the doubt or the savings
6  as much as possible. I'm paraphrasing here, I
7  don't remember the exact language, but it is in
8  state law, so that has always been state policy
9  in that sense.
10 BY MR. REALE:
11     Q.  Now, putting aside the automated MAC
12 program, once you set a MAC price based on your
13 survey of wholesalers, would that price ever
14 change?
15     A.  The MAC prices?
16     Q.  The ones that were determined through a
17 survey of wholesaler pricing.
18     A.  Oh, yes, of course.
19     Q.  How often?
20     A.  We often -- we often updated the MAC
21 prices as quickly as we can or as often as we
22 can.  You know, I tried to make sure that I did

Page 228

1  them at least twice a year, but sometimes for
2  specific drugs it was more frequent than that,
3  especially if the pricing was fairly volatile or
4  if there was an access issue.
5      Q.  How often, how many times a year were
6  you surveying wholesaler prices to do -- as part
7  of your work in the MAC program?
8      A.  Okay.  Clarify that for me, please.
9      Q.  Sure.  How many times a year did you
10 contact wholesalers to request their pricing?
11     A.  The -- the microfiche prices that they
12 had came every two weeks.  So --
13     Q.  From --
14     A.  -- it's not -- we received -- I
15 received copies of their microfiche pricing, of
16 their pricing on microfiche, I should say, and
17 that was every two weeks in general.  So it
18 doesn't mean that I updated MAC prices every two
19 weeks, I wouldn't ever have time for anything
20 else and I would never finish one for one thing,
21 you know, if I did that.  But definitely, like I
22 said, we tried at least twice a year to -- to

Page 229

1  make sure that I did a full file or a full MAC
2  list update.  And we specifically did certain
3  drugs a lot more frequently than that if there
4  was an issue about it.
5      Q.  So up until you left the pharmacy
6  program in 2002, or the rate program, you
7  received a microfiche from three wholesalers
8  every two weeks?
9      A.  We -- I actually stopped receiving them
10 before that.  There was a problem.  I think that
11 at some point, and I can't remember when that
12 happened, but like one of the wholesalers was
13 absorbed by something, somebody else, you know, a
14 different -- a different company, and that
15 changed, although we continued to receive copies
16 of the prices from that new -- from that new
17 entity.
18     Q.  Up to 2002?
19     A.  Probably not until -- up to 2002, but
20 at least I think until about 1999 or so.
21     Q.  And what about for the other two
22 wholesalers, did you still receive --

58 (Pages 226 to 229)

Page 230

1   A.  We had -- one wholesaler continued to
2   send us something, but then one wholesaler was
3   always difficult to work with and we always had
4   to -- problems, we have had problems with it from
5   the beginning, so it was -- it was always, you
6   know, not -- a sporadic kind of thing.
7       Q.  For the non-difficult wholesaler did
8   you receive pricing for up to 2002?
9       A.  I believe up to 2000.
10      Q.  And although sporadic for the difficult
11  wholesaler, you still received pricing up to
12  2002?
13      A.  No.  In fact, by I think 1998 or '99 no
14  matter what we did, we couldn't get him to -- we
15  couldn't get that company to respond, but the
16  providers who were subscribers to that were
17  usually willing to participate and help out in
18  terms of giving us pricing for specific drugs.
19      Q.  So the pharmacies would actually give
20  you the pricing?
21      A.  For the MAC program, yes.
22      Q.  What was the -- the difficult

Page 231

1   wholesaler's name?
2       A.  Bergen, Bergen Brunswig, actually.
3       Q.  You used the word volatile to -- to
4   describe drug pricing.  What did you mean by that?
5           MS. FORD:  Objection to form.
6           THE WITNESS:  Well, there were some --
7   there were some drugs at points in time that
8   would have availability issues or that, you know,
9   they would change something, the labeling or
10  something would come up and then the availability
11  of the drug is put at issue.  And so for those
12  drugs where we have clients who are dependent on
13  them, we would have all kind of requests and
14  pleas for exceptions to rules basically and, you
15  know, to allow certain things to substitute or
16  whatever, or allow pricing exceptions for like
17  have the brand name drugs or whatnot.  I mean,
18  there were always scenarios where they would say
19  we need to have an exception to this particular
20  rule in this instance because, and then, you
21  know, we would do something like that.  And I
22  thought -- I believe at one point in time like

Page 232

1   anti-hemophilic drugs were in that category.  The
2   pricing was just up and down and we couldn't keep
3   up with some of the changes.
4   BY MR. REALE:
5       Q.  So is it fair to say that the MAC
6   prices weren't set based solely on the lowest
7   price available in the marketplace; there was
8   also an availability concern that Washington
9   Medicaid had?
10      A.  Yes, it was never based on the lowest
11  available price.  As I had explained earlier,
12  what we tried to make sure of is that there was
13  availability from each of the wholesalers, so you
14  know, it's not what -- if one wholesaler relies
15  on a different generic labeler, for example, and
16  somebody else relies on something else and the
17  pricing is different, we would try to encompass
18  all three wholesalers and set the price at a
19  level where there's availability from each of the
20  three wholesalers.  So it was never the lowest
21  per se.  For example, McKesson usually had URL
22  was the labeler, the primary labeler that it

Page 233

1   carried.  Northwestern carried Rugby, I believe,
2   and Gold Line as their main labelers.  And who
3   was the other one?  Bergen.  Bergen also tended
4   to carry, you know, Gold Line and -- what is that
5   Denver based thing?  But, anyway, you get my
6   drift.  They would have different product lines
7   that -- as their primary generic line, so we
8   would have something that would encompass those -
9   - we would price it at the level that would have
10  representatives of those products.
11      Q.  And did you observe that as more
12  manufacturers entered the marketplace for a
13  particular multi-source drug that that had an
14  effect on the prices for that generic drug?
15      A.  Usually the more manufacturers and/or
16  labelers there were, the lower the MAC, because
17  then there was a lot more competition, plus there
18  was a greater availability at a lower price.
19      Q.  And you agree that multi-source drugs
20  compete primarily on price?
21          MS. FORD:  Objection to form.
22          THE WITNESS:  Well, we would -- I would

59 (Pages 230 to 233)