# EXHIBIT 45

Page 1

                    UNITED STATES DISTRICT

            FOR THE DISTRICT OF MASSACHUSETTS



    ----------------------------X

    IN RE:   PHARMACEUTICAL        )   MDL NO. 1456

    INDUSTRY AVERAGE WHOLESALE     )   CIVIL ACTION

    PRICE LITIGATION               )   01-CV-12257-PBS

    THIS DOCUMENT RELATES TO       )

    U.S. ex rel. Ven-a-Care of     )

    of the Florida Keys, Inc.      )

         v.                        )   No.06-CV-11337-PBS

    ABBOTT LABORATORIES, INC.,     )

    ----------------------------X


        (cross captions appear on following pages)


            Deposition of HARRY LEO SULLIVAN

                       Volume I

                  Nashville, Tennessee

               Tuesday, March 12, 2008

                       9:05 a.m.

Sullivan, Harry Leo                                            March 12, 2008
                                Nashville, TN

Page 58

1   you're talking specifically about a MAC process?
2       Q.   The data that would tell me essentially
3   what was paid and how it was determined what
4   would be paid.
5       A.   Nothing in the computer will tell you
6   how the price was determined.  But there should
7   be records of -- because that was all manually
8   input at that time.  And I, I'm the one that did
9   it.
10          I would literally go -- I could log
11  into the mainframe and change prices.  It would
12  put a date on there.  It would even print an
13  audit trail, of any changes, because, you know, I
14  had a user name and anything I did in that
15  computer there was an audit trail printed out to
16  -- and I guess, I would assume, some taped copy
17  as well.
18          And you needed that because, and you
19  needed historical information in the claims
20  processing system because Medicaid claims
21  typically can be submitted all the way back 365
22  days a year.

Page 59

1           But you may have cases like SSI
2   determination that may take two or three years
3   for the patient to be determined SSI eligible,
4   automatically Medicaid eligible, and they can
5   submit back from the beginning of that
6   determination period all their pharmacy claims.
7           So you have to be able to process those
8   claims and pay the price that was appropriate at
9   that time of dispensing.
10          There should be records of that.
11      Q.   We'll talk about the MAC program a
12  little bit later, but if you wanted to change a
13  price for a particular drug, you had the ability
14  to go into the computer and change the price?
15      A.   Yes.  I did.  I don't -- I wouldn't say
16  that was true in every state.
17      Q.   Okay.  What authorities, if any, would
18  you have to go through in order to change a price
19  for a particular drug?
20      A.   That was my responsibility. I, I, I
21  would do it as part of my job, as part of making
22  sure that -- two things occurred, particularly

Page 60

1   with multi-source drugs.  One, is that we didn't
2   pay too much.  And, two, is that we paid enough
3   to insure an incentive for pharmacists to take
4   the extra step to, if necessary, call a physician
5   and get the prescription changed to a multi-
6   source drug.
7       Q.   And when you talk about an incentive
8   you're talking about a financial incentive?
9       A.   Yes.
10      Q.   And what kind of financial incentive
11  would you provide?
12      A.   What, what I tried to make sure I did
13  during this time, this -- I would say from '89 to
14  '94, was, was make sure that there, there was
15  profit to be made for a pharmacist for dispensing
16  generic drugs.  It -- these, these folks are
17  pretty savvy.
18          If I'm paying based on what I have
19  submitted to HFCA at the time or CMS today on a
20  state plan that says I will pay AWP minus 10 plus
21  $4 or 3.91 or $4, whatever, for a brand name, and
22  I'm setting MAC prices on the corresponding

Page 61

1   generic that pay the pharmacist his or her net
2   cost, it's not going to take them very long to
3   figure out which drug to process.
4           When they can buy the drug at, you
5   know, AWP minus 18, 20, 22, versus selling it at
6   cost plus a dispensing fee, they're going,
7   they're going to figure that out.  And I'm
8   shooting myself in the foot from a budget
9   standpoint, from a, trying to be a responsible
10  manager for the state's taxpayers.
11          So you, you want to -- you want there
12  to be some measure of profit, some incentive over
13  and above a dispensing fee, to incentivize
14  pharmacists to use the generic.
15      Q.   We'll talk about some other
16  communications that you have had with some other
17  state Medicaid programs, but was that issue
18  creating a financial incentive to promote the use
19  of multiple-source drugs something that you
20  discussed with other state pharmacy
21  administrators?
22      A.   Maybe at national meetings where there

16 (Pages 58 to 61)

Page 62

1  might be some, some discussion on, you know,
2  brand versus generic, or to use a MAC or not to
3  use a MAC.
4        You also have issues in different
5  states of do they allow dispenses written?  Do
6  they have a two-line prescription form?  Or what
7  are their particular guidelines for physicians
8  and pharmacists when it comes to being able to
9  substitute a generic?  So, but I don't remember
10 saying, you know, I'm paying 2 cents apiece for
11 generic penicillin, what do you pay?  What -- I
12 don't, I don't think anybody ever did that.
13     Q.  From your experience, do you think it
14 was well accepted amongst the Medicaid pharmacy
15 administrative community that you would want to
16 pay some profit on multiple-source drugs to
17 incentivize their use?
18          MS. DAMOULAKIS:  Objection.
19     A.  It's just so fundamental, I don't
20 remember discussing that with anybody.  I think
21 it's just -- it's something you -- you know, I
22 mean it's just -- makes good sense.  I don't, I

Page 63

1  don't remember any specific discussions with
2  anybody on, you really need to make it profitable
3  so that they will have an incentive to use it.
4  BY MR. TORBORG:
5      Q.  In your view it's just one of those
6  fundamental tenets of how you operate a state
7  Medicaid pharmacy program.
8      A.  One of my bosses long ago told me that
9  the color of health care is green, and that's
10 true.
11     Q.  In your time as the director of
12 pharmacy services, did you have communications
13 with the federal government concerning drug
14 payments?
15     A.  I don't know in what context you would
16 -- I mean can you -- is there another way you can
17 ask that question?
18     Q.  I'll try.
19         In determining how much the state
20 should be paying for drugs, both as an ingredient
21 cost component and as a dispensing cost
22 component, did you have discussions with the --

Page 64

1  any representatives from CMS then known as HFCA.
2      A.  I couldn't name any individual in HFCA
3  or CMS, and I don't remember -- and I couldn't
4  tell you the exact time.  I would say in the, in
5  the early Nineties HFCA putting directives out to
6  the state, and it was, it was as if they're
7  suggesting that, you know, we're going to be
8  looking -- kind of giving you a heads-up, the way
9  they would do with, with policy.  That, you know,
10 we're aware that a lot of states are, are paying
11 AWP minus 5 or whatever.  And we really think
12 that y'all need to get to maybe 10 percent.  I
13 don't know where -- you know, if OIG or somebody
14 gave them some number.  They wanted everybody to
15 get to 10.  Or some convoluted calculation of WAC
16 or acquisition costs or however you could get
17 there that would demonstrate to HFCA that you're
18 doing about AWP minus 10.
19          Tennessee was -- and this may -- there
20 may be various constraints on other states.  For
21 example, some state may -- reimbursement may be
22 subject to legislation within the state.  May

Page 65

1  have to be legislated.  It may be up to the
2  Medicaid director or the pharmacy director, it
3  may be tied to a cost-to-dispense study from a
4  state university, college of pharmacy, or
5  something like that.  So it -- I'm sure it varied
6  wide, widely from state to state on their
7  flexibility to comply with, with such a -- and it
8  wasn't a mandate at that time.  But it was -- you
9  could clearly tell that HFCA was wanting
10 something done with reimbursement for pharmacy
11 services that, that I guess saved money or more
12 closely approximated what people were really
13 paying for drugs.
14     Q.  You made a comment or some comments
15 about some of the -- tell me if I'm paraphrasing
16 you wrong here -- but there might be some
17 roadblocks that would come between a state
18 pharmacy director and wanted to comply with what
19 HFCA wanted to do.  Is that fair to say?
20     A.  Well, no, ultimately, in Tennessee, for
21 example, at that time, and really pretty much
22 still today, two-thirds of the bill's paid by the

Page 106

1  compendia were matching the actual market prices
2  as they lowered on generic drugs?
3      A.  For multi-source drugs?
4      Q.  Yes.
5      A.  I had no knowledge, and I didn't care
6  because if it was up to me, I think, as my job,
7  to find out what the net cost was to the
8  pharmacist.
9          Two things, availability, statewide, in
10 Tennessee, of the generic, and, secondly, what
11 are they paying?  I have to know that in order to
12 get back to what we were talking about earlier,
13 providing the proper incentive to dispense
14 generic for the pharmacist to do whatever
15 intervention was necessary with either the
16 patient or the physician, or both, to get the
17 generic substitution accomplished.
18     Q.  Now where would you get the information
19 that you would use in the MAC program regarding
20 what pharmacists were -- pharmacies were actually
21 paying for drugs?
22     A.  My, my system was, was not very

Page 107

1  sophisticated or very scientific, but nonetheless
2  believe it to have been very effective.
3          What I did was, I knew I had a contact
4  within the largest generic distributor in our
5  area, and one of the most -- one of the more
6  popular.  Again during this time that I, that I
7  was setting MAC prices, rather than MCOs or PBMs,
8  the, the best deal on generic weren't coming
9  from, from big wholesalers.  They were coming
10 from generic distributors.
11         So I had contacts within this one
12 particular company who would tell me, who would
13 first of all keep me apprized any time they, they
14 were able to distribute new generic drugs, also
15 give me information if, if there was some problem
16 with an existing generic drug's availability, and
17 also tell me and give -- send me catalogs that
18 they sent to the pharmacists and then tell me
19 additionally what am I looking at for this drug
20 X, Y, Z, what does a hundred of them cost a
21 pharmacy?  I didn't look at Red Book or Blue Book
22 or First Data; I called the people that sell it.

Page 108

1          Then I took that information, and never
2  going to take at one source completely at face
3  value, then I would call three or four -- I used
4  independent pharmacists in different parts of the
5  state, and I called.  And I said, I understand,
6  and I wouldn't mention that particular
7  distributor.  They never knew where I got my
8  numbers.  The pharmacists never knew where I got
9  my numbers.  But I would say, I'm thinking, I
10 believe that you can get this new generic, or
11 whatever it is, for five dollars a hundred, and
12 I'm going to set the MAC at 7.50 a hundred.  Does
13 that give you any heartburn?  And that's the way
14 I did business.
15         These, I trusted these people,
16 obviously.  But there are three different sources
17 there who are on the front lines in a pharmacy
18 who are running a business, who they have a
19 personal stake in.  That's why I went to
20 independents.  And then the distributor, who is
21 selling.  And who over the course of that
22 interaction I never found them to be anything but

Page 109

1  honest.
2          So -- and you can, you can quickly tell
3  if you have got something set too low, the phone
4  will ring.
5          So that -- and then I just -- I built
6  in a little, 30 percent or whatever, profit to a
7  generic MAC.  But I would immediately MAC -- AWP
8  was irrelevant.  For generic drugs.
9      Q.  And did you have a practice for doing,
10 for doing this process for all generic drugs?
11     A.  Yes.
12     Q.  And you did this all by yourself.
13     A.  Yes.
14     Q.  One person?
15     A.  Yes.
16     Q.  And you had other duties as well, --
17     A.  Yes.
18     Q.  -- correct?
19     A.  Yes.
20     Q.  And tell me a little bit about --
21     A.  Of course, you know, I, when I went to
22 work there in '89 we already had a MAC program.

28 (Pages 106 to 109)

Sullivan, Harry Leo                                              March 12, 2008
                         Nashville, TN

Page 110

1  Tennessee was I still believe the first state to
2  have a MAC, long before the Feds put in the
3  federal limit program.  And so it wasn't like I
4  had to suddenly do a thousand drug MACs and do
5  all those -- gather all that data and do those
6  calculations.  It's as they come out.  You stay
7  on top of it.
8      Q.  Um-hum.
9      A.  Okay?  There aren't, you know, a
10 hundred different generics coming out each month
11 or something.
12     Q.  And did you have a system that you used
13 to, for lack of a better word, crosswalk various
14 generic products from different manufacturers to
15 the same number --
16     A.  Yes.
17     Q.  -- or something like that?
18     A.  Yes.
19     Q.  How did you do that?
20     A.  There were two, during my career there
21 were two, (coughs) excuse me, different time
22 frames where prior to OBRA -- the full

Page 111

1  implementation of OBRA '90 from a claims
2  processing standpoint for electronic claims
3  processing.  We were still accepting paper back
4  in '89-90.  And at that point in time -- and
5  again we had a very restricted formulary.  We had
6  a five-digit code for every drug, be it brand
7  name or generic.  There was -- you know, if there
8  were 15 different manufacturers of penicillin,
9  250 milligrams, they all had the same code.  I
10 didn't care which manufacturer the pharmacy used,
11 per se.  They bill me penicillin 250 with one
12 five-digit code.  And I maintained those codes
13 and maintained them in the fiscal agent's claims
14 processing system.  I did all the updates to
15 that.
16         Then along came OBRA '90, on top of
17 having the, the mandate of going to electronic
18 claims processing, you're suddenly cognizant of
19 the fact that you have to collect for invoicing
20 purposes NDC level data to get the rebates you're
21 due through the process.
22         So what we did then was switch -- I had

Page 112

1  to, I had to go through and literally this was a
2  hands-on thing, too, crosswalk, build crosswalks
3  between -- well, let me, let me go back.  I don't
4  want to make this too convoluted.
5          We would get updates from I believe
6  Blue Book at that time, which later became First
7  DataBank, I think, through the claims processing
8  system, for all drugs, pricing information, AWPs.
9  For brand and generic.  But we MACed all the
10 generic.  So that was overridden into a different
11 column for the claims processing system that
12 recognized for this drug there is a MAC, and
13 that's how it pays, all right?
14         So all the NDCs went into those codes,
15 those five-digit codes.  We had to totally swap
16 that in the system when you had to go to online
17 claims processing and develop invoices for the
18 rebates.
19         So had to take every one of those five-
20 digit, digit codes and made sure they were all to
21 the right NDC numbers, just totally flip-flopped
22 the whole system.

Page 113

1      Q.  Why did Tennessee go through all this
2  trouble?
3      A.  Well, it was just you had -- I, I think
4  part of it was resistance to move to computers.
5  At that time, for example, when we first went to
6  online claims processing, we had I want to say
7  3,000 pharmacies in the state that participated
8  in Medicaid, and FirstHealth, we made FirstHealth
9  buy like 250 laptops.  And we just -- we
10 delivered to drugstores that didn't even have
11 computers.  They were processing just on
12 typewriter --
13     Q.  Um-hum.
14     A.  -- and keeping old records.
15         But there was, there was some
16 resistance to move from, from a paper system even
17 in the -- in the -- those that had computers
18 didn't have the capability to be online.  They
19 had computers that would, once a month, print out
20 on a dot matrix printer on triplicate forms that
21 we sent them all the Medicaid claims and mailed
22 them in to us, and there would be then data

29 (Pages 110 to 113)

Page 114

1  entered into our system, and then paid
2  eventually.
3         Just resistance to change, I guess.
4     Q.  Did you -- did you have any involvement
5  when the MAC program was first started in
6  Tennessee?
7     A.  It preceded me.
8     Q.  And do you have any insight as to the
9  amount of labor involved to get the process
10 underway?
11    A.  It would have been significant, but not
12 anything like you started from square one today,
13 because, number one, there weren't that many
14 drugs.  Weren't that many multi-source drugs.
15 And we had a very restrictive formulary.  So even
16 if there was -- for a lot of drugs, even if there
17 was a generic alternative, even the generic
18 wasn't covered.
19    Q.  When you were the director of pharmacy
20 services, Tennessee Medicaid, from '89 through
21 2004, save the, the nine months, did you believe
22 that you had no choice but to use the AWPs and

Page 115

1  the compendia to set payment rates for generic
2  drugs?
3         MR. DRAYCOTT:  Objection.
4     A.  Had no choice.  As -- well --
5  BY MR. TORBORG:
6     Q.  When you say you had no choice, what do
7  you mean?
8     A.  That was your question, I think, you
9  had --
10    Q.  Did you believe that there was no other
11 practical alternative but to use what was in the
12 compendia --
13        MR. DRAYCOTT:  Objection.
14 BY MR. TORBORG:
15    Q.  -- to reimburse generic drugs?
16    A.  It was, it was the most expedient is
17 all I would say.  And it was going when I got
18 there, and I would say an industry standard that
19 we, that we -- a wheel we couldn't reinvent.
20    Q.  But you used a MAC program to reimburse
21 generic drugs; is that right?
22    A.  Yeah.  Now I thought you were talking

Page 116

1  about brand name in your original question.
2         I keep the two totally separate.  I
3  have never reimbursed anybody for generic based
4  on AWP.
5     Q.  So would it be fair to say that you
6  believed you had another choice to set
7  reimbursement rates for generic drugs?
8     A.  Oh, yes.
9     Q.  Apart from the compendia.
10    A.  Yes.  Yes.  I'm sorry.
11    Q.  You mentioned federal upper limits in
12 one of your previous questions.  I think we both
13 know what that's, what that's all about.
14        Did you become aware at any point
15 during your work with Tennessee that CMS
16 apparently deliberately did not establish federal
17 upper limits for intravenous and injectable drug
18 products?
19        MR. DRAYCOTT:  Objection.
20    A.  I wouldn't say that I ever knew that
21 they intentionally didn't do that, but I -- you
22 know, the -- I don't remember -- I don't remember

Page 117

1  injectables being part of the FUL, but it could
2  have been.  I, I just don't remember that.
3         Again, that's another thing that, in
4  Tennessee, and I'm sure this will vary again from
5  state to state, in Tennessee we chose, for
6  example, in a physician's office, under certain
7  settings, or home health is probably a better
8  example, certainly certain drugs and other
9  things, all of them, we wanted to run through the
10 pharmacy program.  For several reasons.  The
11 reimbursement for drugs on like a HFCA 1500 or
12 whatever the -- would have happened from a home
13 health agency to a home health division within
14 TennCare to process, those folks had no clue that
15 if -- what the difference between what was billed
16 and what should be paid should be.  So typically
17 a hundred percent of bills was paid.  So we
18 didn't want, didn't want that situation.  We
19 wanted it to certainly be fair, but wanted most
20 of those things to come through the pharmacy
21 program to control costs.
22        So in the instance of IV solutions or

Page 150

1  concerns on whether or not the payment for these
2  kind of therapies was, was adequate?
3       A.  Well, my opinion, particularly in the,
4  in the home health arena, was -- and during this
5  specific time period, the growth in Tennessee was
6  such of those type of providers that it wouldn't
7  -- that wouldn't -- not lead you to believe that
8  the reimbursement for Medicaid was inadequate.
9          When people are hollering and screaming
10 or you have trouble getting providers to take
11 care of your patients is when that was more
12 likely a concern.
13      Q.  Well, do you know when the home
14 infusion business really started taking off?
15      A.  Well, it certainly took off in the
16 early Nineties.  And I can't remember -- and
17 Tennessee was a little bit different because we
18 very purposely avoided expansion of home
19 community based services under the Medicaid
20 program because the vast majority of the patients
21 who would receive those services were dual
22 eligibles, which meant they had Medicaid and

Page 151

1  Medicare.  And Medicare home health was, was
2  truly exploding.  We had hundreds of providers in
3  Tennessee of home health services.  I dare say
4  there's, you know, maybe 20 now.  Because there
5  was, there was indeed a bonanza on the Medicare
6  side in Tennessee.  Other states didn't face it
7  quite as -- if they had chosen to expand or had
8  very aggressive home community-based services
9  through Medicaid, might have had a little bit
10 different policy issues.  We purely shifted to
11 Medicare, cost shifted to Medicare, with the
12 duals.  And so it wasn't maybe not as, as intense
13 on a Medicaid issue in Tennessee as it might be
14 elsewhere is what I'm saying.
15      Q.  The page starting with -- at 425 and
16 then going over to 426, there is a discussion of
17 what some states are doing in the home IV
18 reimbursement area, Minnesota indicates
19 compounding or a dispensing fee of $8 for IV
20 drugs, and then Washington indicates that they're
21 paying a compounding amount, Ohio as well.
22          Do you have an understanding of what

Page 152

1  they're talking about when they talk about a
2  compounding fee?
3       A.  Yes.
4       Q.  And what, what is that?
5       A.  Well, certain, be it -- I mean you can
6  compound IV drugs if you have the right equipment
7  and filters and hoods to keep it, make it a
8  sterile product.
9          And you can compound drugs for
10 inhalation.  If you have, again, the right
11 equipment, similar to what would be in a
12 hospital, to, to handle sterile products.
13         And you take the raw ingredient and
14 mimic whatever, generally, the brand name or the
15 innovator product was.
16      Q.  And do you know in Tennessee, either
17 before TennCare or after TennCare was paying a
18 compounding fee for IV?  Do you know if that was
19 something that was being paid?
20      A.  Ah, no.  But there's, there's ways to
21 pay it without, without having a separate -- you
22 know, I noticed on here that one form is for

Page 153

1  payment, one form is for reimbursement of
2  supplies, one form is for -- you know, they're,
3  they're making a variety to submit multiple
4  forms.  And I wouldn't -- I can't tell you a
5  specific product or specific time period, but one
6  of my strategies was in issues like this, where
7  compounding was involved, I didn't want to go
8  down the road, at least in the early Nineties, of
9  getting into paying for compounded prescriptions,
10 because that can -- that could range from a
11 sterile product all the way down to an ointment,
12 okay?
13         And, and our claims reimbursement
14 system hadn't evolved to the current NCPDP
15 sophistication of today.  So it was very hard to
16 put in a, a set compounding fee for what, what
17 products?
18         One may take a minute to make, one may
19 take an hour and a half.
20         So getting back to, to the MAC issue,
21 some, sometimes for certain products in this
22 arena, you would take that into account for the

Page 154

1   MAC.
2       For example, I might say, I'm not
3   paying for the tape that you use to hold the IV
4   needle into place.  I'm not paying for the IV
5   needle or the tube set.  I'm not going to -- I
6   don't want bills for that.  I know you've got to
7   do it to administer this drug.  So we're going to
8   add on the cost of this drug X, because I know
9   this, this and this always goes with it, and I
10  know there is a fixed cost for that, but I don't
11  want five bills.  I want 10 different places.
12  Bill me for the drug.  And I'll make sure that
13  the -- whatever the MAC is incorporates all your
14  other costs.  And you have to talk with providers
15  and know what that is.  I mean, you know.
16      Q.  So, in short, you would use the payment
17  for the drug itself to cross-subsidize other
18  things that might need to be paid to fairly --
19      A.  And that would include compounding.
20      Q.  And it may include nursing services
21  that were not included, things of that nature?
22      A.  (Nodding yes.)

Page 155

1       Q.  Did anyone in the federal government
2   ever tell you that you were not allowed to do
3   that?
4       A.  No.
5       Q.  And if they had told you that, what
6   would you have said?
7       A.  That I wasn't allowed to pay for
8   compounding or --
9       Q.  That you weren't allowed to use the
10  payment for the drug to cross-subsidize those
11  other services or supplies.
12      A.  If they had told me I couldn't do it,
13  what would I do?
14      Q.  Yes.
15      A.  I would have had to have found another
16  way to, to handle the billing.
17      Q.  But they never told you that.
18      A.  No.
19      Q.  Do you know if other states were doing
20  -- were adopting similar type strategies to run
21  the programs?
22      A.  No, I don't -- I mean it may be

Page 156

1   addressed in this letter.  I don't know.  It
2   seems to talk about different states, but I'm
3   sure there were varying levels of complexity in
4   the billing process, and what was and wasn't
5   billable and what was and wasn't included, but I
6   don't know it and I didn't discuss it with folks.
7       Q.  Have you heard the term cross-subsidy
8   or cross-subsidization in the context of pharmacy
9   reimbursement?
10      A.  No, not -- no, I haven't.
11      Q.  I'm going to show you another, another
12  -- going to mark that as another exhibit.
13          MR. TORBORG:  I think this is 578.
14          (Exhibit Abbott 578 marked.)
15  BY MR. TORBORG:
16      Q.  For the record, what we have marked as
17  Exhibit 578 bears the Bates numbers HHC 002-0400
18  through 407.  It's another Medicaid pharmacy
19  bulletin.  This one dated January-February of
20  1988.
21          Mr. Sullivan, if I could ask you to go
22  to Bates page ending in 402.  In particular the

Page 157

1   discussion on the first full paragraph about
2   Montana Medicaid.  Do you see that?
3       A.  Yes.
4       Q.  Where it says, Similarly, Montana
5   Medicaid compensates for the additional time and
6   expense of dispensing compounded drugs by
7   allowing the provider's usual and customary
8   charge up to 2.5 times the cost of ingredients,
9   paren, reimbursement for other outpatient drugs
10  is a lower of AWP minus 10 percent, or the cost
11  of the drug, end paren.  Do you see that?
12      A.  Yes.
13      Q.  Is that the, the type of thing that
14  Tennessee was doing?
15      A.  It's a different approach to -- yeah.
16  Make -- paying the provider for the, for the
17  compounding without -- and setting a limit on
18  what I will pay up to two and a half percent.
19  It's just a different, different twist.
20      Q.  Does it -- does this refresh your
21  recollection about any other types of approaches
22  like this that other states were using?

Page 166

 1  exhibit.
 2       (Exhibit Abbott 579 marked.)
 3  BY MR. TORBORG:
 4      Q.  For the record what we have marked as
 5  Abbott Exhibit 579, bears the Bates numbers HHC
 6  902-0657 through 65, excluding 61 and 62.
 7      A.  Hmm.
 8      Q.  Mr. Sullivan, I take it from your
 9  reaction to the document that you're familiar
10  with at least some of the material contained
11  within this?
12      A.  Well, it's just interesting that you
13  threw this out right after you asked the previous
14  question.  That's why, what made me giggle.
15      Q.  If you would take a look at that and
16  let me know if you're familiar with any of these
17  documents and then I'll ask you some questions
18  about it.
19      A.  Okay.
20      Q.  I'll be starting with 660 and then
21  working my way sort of chronologically through
22  the document.

Page 167

 1      A.  Okay.
 2          Yeah.
 3          Yeah, yeah, this came from NACDS.
 4          I don't remember seeing this.  I
 5  remember the discussion.  I don't remember seeing
 6  this document.
 7      Q.  Which document is that?
 8      A.  The second page.
 9      Q.  The second page?
10      A.  This was... hmm.  So yeah.  Yeah, this
11  was another good idea that didn't work.
12      Q.  Okay.  Let me try to paraphrase what I
13  think was, what's reflected in these documents,
14  at least in part.
15      A.  Okay.
16      Q.  And you can tell me if I'm wrong just
17  to kind of speed things up.
18          It appears as though sometime in 1991,
19  December 1991, Tennessee -- your, your Medicaid
20  (c) issued a bulletin that indicated that usual
21  and customary charges should be the amount that
22  is no greater than the lowest contract price to

Page 168

 1  another customer.
 2      A.  That's right.
 3      Q.  And an organization called the national
 4  association of trained drug stores took exception
 5  to that.
 6      A.  To say the least.
 7      Q.  And indicated that was not consistent
 8  with the moratorium that had been put on changes
 9  to drug reimbursement in the OBRA '90.
10      A.  OBRA '90, yes.
11      Q.  And then there was some communication
12  from the regional office of HFCA to your office,
13  or Tennessee Medicaid.
14      A.  (Nodding yes.)
15      Q.  And then there is some correspondence
16  that you may not have been aware of from the
17  regional office to HFCA headquarters.
18      A.  Um-hum.
19      Q.  Is that a fair recitation of what these
20  reflect?
21      A.  Yes.
22      Q.  And do you recall this, this issue?

Page 169

 1      A.  Yes.
 2      Q.  Okay.  Tell me what you recall about
 3  this.
 4      A.  Um, we -- I thought, that the OBRA '90
 5  was irrelevant, but because North Carolina had a
 6  most favored nation policy, and vigorously
 7  enforced it, when I put out this bulletin saying
 8  we're going to do the same thing, NACDS was, was
 9  real upset and took the approach with HFCA that
10  this was something new, and it had -- and it
11  violated the OBRA '90 thing on some moratorium on
12  changes to pharmacy reimbursement.
13          The -- we had some ongoing negotiations
14  with NACDS, started out very contentious at first
15  and wound up pretty, pretty amiable.
16          The, the best argument they had was our
17  reimbursement rate with Tennessee Medicaid was
18  pretty low, was lower than most states, and that
19  it approached the ground level anyway, of what
20  they were getting that moment in time, from other
21  third-party payers.  So the juice of enforcement
22  really wasn't worth the squeeze of the benefit.

43 (Pages 166 to 169)

Sullivan, Harry Leo                                                          March 12, 2008
Nashville, TN

Page 170

1  So we backed off and never did implement the
2  policy is really, really the way it played out.
3      Q.  Do you know why it was -- were you
4  involved in --
5      A.  And then, and then when's, sometime
6  after that, I wouldn't absolutely swear to it,
7  but I believe then we -- that usual and customary
8  piece, either in a bulletin, I don't want -- or
9  maybe the state plan, something was thrown in
10 there to the cash-paying public or to the general
11 public, or something, some clarification of that.
12     Q.  Were you involved in this issue
13 yourself?
14     A.  Yes.
15     Q.  So even though the letter comes from
16 Manny Martens, --
17     A.  Yeah, I wrote it.
18     Q.  You're the one that wrote it?
19     A.  Um-hum.
20     Q.  And what you were trying to do was to -
21 - is it fair to say that what you were trying to
22 do was to make the usual and customary charge for

Page 171

1  a pharmacy claim submitted by a provider --
2      A.  Well, it was just --
3      Q.  -- mean something real?
4      A.  It was -- no.  It was, it was simpler
5  than that.
6          It was the imposition of something
7  similar to North Carolina, which is a most
8  favored nation clause.
9          If you're willing to accept AWP minus
10 20 plus a dollar from anybody, the State of
11 Tennessee should get that same deal.  That was
12 what I was after.  It didn't work.
13     Q.  Did you believe comparisons to what
14 other third-party payers were paying for drugs is
15 a useful metric regarding what Medicaid programs
16 ought to pay for drugs?
17         MR. DRAYCOTT:  Objection.
18     A.  No.
19 BY MR. TORBORG:
20     Q.  And why is that?
21     A.  Because you do have to factor in the
22 access issue.

Page 172

1          Um, some providers may think that these
2  -- that the Medicaid patients are more difficult,
3  more time-consuming, more expensive patients to
4  deal with.  And you don't want to let that get in
5  the way of still delivering quality care and
6  access to care.
7      Q.  Would it be fair to say, then, that you
8  think that Medicaid programs ought to pay more
9  than what other third-party payers pay?
10         MR. DRAYCOTT:  Objection.
11     A.  I think they need to do, within
12 budgetary limits, all they can to assure access
13 to the best providers in the state.
14         For example, if you look at orthopedic
15 surgeons, or orthopedists, regardless of, of what
16 an MCO and TennCare may be willing to pay those
17 providers, they just, at one point in time just
18 said, We don't do TennCare.  So you got a heck of
19 a problem there.  Reimbursement level may have
20 been more than any other third party, they just
21 wouldn't participate.  So you got to, you got to
22 be careful about that.

Page 173

1  BY MR. TORBORG:
2      Q.  Did your department or the state
3  generally ever prepare studies or commission
4  studies to compare provider acquisition costs to
5  AWP?
6      A.  No.
7      Q.  Whether it be --
8      A.  I don't think so.
9      Q.  Do you recall the organization called
10 Myers and Stauffer?  Do any work with them?
11     A.  I might have.  I don't know.
12     Q.  Did you -- did Tennessee Medicaid
13 either itself or have someone else do any studies
14 on what it cost to dispense prescription drugs in
15 Tennessee?
16     A.  Um, during, during my tenure, no.  But
17 I was aware -- I even had at least two that were
18 done prior to my employment with the state.  My
19 predecessor had left, you know, in his files, and
20 I had reviewed them, done by UT College of
21 Pharmacy in Memphis.
22     Q.  I wanted to ask you another question

44 (Pages 170 to 173)

Page 214

1  just very, very recently in the news as well?
2  First DataBank's role in determining AWP in a
3  settlement.  McKesson chose not to settle and
4  First Databank --
5       MR. DRAYCOTT:  You are correct.  There,
6  there, there is a, I believe, a class
7  certification occurred with respect to First
8  DataBank.
9       THE WITNESS:  McKesson is holding out.
10      MR. DRAYCOTT:  There is also a
11 settlement with respect to First DataBank.
12      THE WITNESS:  Okay.  That, that's the
13 end of this, isn't it?  This is 2000?
14      MR. DRAYCOTT:  I'm going to let Mr.
15 Torborg deal with your questions.
16      MR. TORBORG:  Let me --
17      THE WITNESS:  Okay.  My, my -- the
18 reason for saying that is, I'm more familiar with
19 what's recently going on, and I think it's all
20 related, okay?
21 BY MR. TORBORG:
22   Q.  Well, let me bear, you know, bear down

Page 215

1  the document a little bit --
2    A.  Okay.
3    Q.  -- maybe I can refresh your
4  recollection --
5    A.  All right.
6    Q.  -- about what this specific issue was
7  in play here.
8       The letter refers to, in the second
9  paragraph, a proposal that was discussed at the
10 state pharmacy director's July 1999 national
11 conference.
12   A.  Right.
13   Q.  Apparently there was a presentation
14 made by United States Attorney Reed Stevens,
15 HHSOF OIG associate counsel, Mary Ruden, and the
16 Maryland MFCU director -- and MFCO is M-F-C-O --
17 C-U, Director Carolyn McElroy.
18      Do you recall at all, Mr. Sullivan,
19 that meeting?
20   A.  I probably was there.
21   Q.  Do the names Reed Stevens, Mary Ruden
22 and Carolyn McElroy ring a bell?

Page 216

1    A.  Yes.
2    Q.  You have attended meetings where they
3  have been in attendance?
4    A.  I'm sure I have.
5    Q.  Have you had any conversations with Mr.
6  Stevens at any point in time?
7    A.  No.  No.
8    Q.  How about Ms. Ruden?
9    A.  No.
10   Q.  How about Carolyn McElroy?
11   A.  No.
12      Excuse me.
13   Q.  Look at the next paragraph.  It states,
14 Stated briefly, under impending change to current
15 procedures, FDB will base the average wholesale
16 price as it reports on market prices rather than
17 the prices identified by manufacturers.
18 Additionally, FTB will no longer report a price
19 for a product unless its manufacturer has
20 certified the completeness and accuracy of
21 pricing information submitted.
22      Does this refresh your recollection at

Page 217

1  all about what -- this specific proposal?
2    A.  Yes, sir.
3    Q.  And as refreshed, do you -- can you
4  tell me anything more about your recollection of
5  this initiative?
6    A.  Well, I just -- I'm just not sure
7  whatever happened between then and today that is
8  complying with that statement, whether it was or
9  wasn't.
10      I think, you know, everybody might be
11 missing the boat if, if they want to consider AWP
12 to be an accurate assessment of what people pay
13 for drugs.
14   Q.  And --
15   A.  This isn't going to fix it.
16   Q.  And if you look further down the
17 paragraph, the carryover paragraph on page 110,
18 the second page of the exhibit, the sentence is
19 that starts with More importantly.  Do you see
20 that?
21   A.  Yes.
22   Q.  It says, More importantly, in view of

                                          55 (Pages 214 to 217)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Page 218

1  the Medicaid program's legal obligation to
2  reimburse true provider acquisition costs, such
3  an effort by the states to ensure payment is
4  based on actual prices, it is mandatory.  Do you
5  see that?
6      A.  Yeah, I see it.
7      Q.  Do you recall a discussion at any
8  meeting that state Medicaid programs have a legal
9  obligation?
10     A.  No.  No.
11     Q.  Was that consistent with your
12 understanding of what was required by the state,
13 Tennessee?
14     A.  No.
15     Q.  And what was your understanding of what
16 was required?
17     A.  Well, I mean why -- if there was a
18 legal obligation to only reimburse true provider
19 acquisition costs, then why do we go through the
20 trouble of submitting state plans?  You tell me
21 what reimbursement is going to be.
22     Q.  What do you mean by that?

Page 219

1      A.  Well, why would -- if the federal
2  government is saying you are legally obliged to
3  pay no more than cost, then you tell me what cost
4  is.  Why do I bother submitting a state plan
5  amendment that says I'm going to apply the lesser
6  of this, or AWP minus that, or this or that or
7  the other, that you approve if I'm legally
8  obliged to paying cost.  Obviously -- I mean you
9  don't know what cost is.  You can't -- or else
10 you would dictate it.
11         Does that make sense?
12     Q.  A little bit.
13     A.  That's -- it's impossible to enforce,
14 and I don't ever remember anybody ever telling
15 me, Leo, you got a legal obligation to only pay
16 true provider's cost.  You do that and you won't
17 have a program.
18         Only people that could do that is a
19 340B federally qualified health plan.
20     Q.  If we go down to Paragraph 4 of this
21 letter, or I'm sorry, toward the bottom of the
22 page where there is an indent 4.  Do you see

Page 220

1  that?
2      A.  Um-hum.
3      Q.  It states, If providers concede that
4  reimbursement exceed acquisition costs but
5  maintain that the surplus is necessary to cover
6  ancillary costs of the drugs' administration,
7  e.g., nursing or incidental supply expenses,
8  their argument runs expressly counter to law.
9  Under Medicaid program requirements reimbursement
10 is dependent on the acquisition costs of the
11 drugs, not the overhead costs involved in
12 dispensing them.
13         Do you see that?
14     A.  Yes.
15     Q.  Okay.  Do you agree with that
16 statement?
17     A.  No.
18     Q.  Why not?
19     A.  Well, I mean, in practicality, that's
20 not the way it's done, and, and I never, I never
21 was advised by my bosses or people from the
22 regional office or people from central office of

Page 221

1  HFCA or CMS that that's the way things had to be
2  done.
3      Q.  And do you believe that reimbursement
4  was limited to the actual acquisition costs of
5  the drugs, that you would have an effective
6  program that provided access to care to
7  beneficiaries?
8      A.  It would severely compromise access to
9  care, in my opinion.
10     Q.  And would that be true across all fifty
11 states, in your opinion?
12     A.  There may be some rural versus urban
13 mix that, that might skew that, but I would think
14 so.
15     Q.  The next, next page, the carryover
16 paragraph, first sentence, states, No entity
17 charged with implementation or enforcement of
18 Medicaid program rules can responsibly
19 countenance a reimbursement system that violates
20 the statutory obligation to reimburse provider
21 acquisition costs.
22         Did you -- do you agree with that, Mr.

56 (Pages 218 to 221)