# EXHIBIT 46

Page 1

```
                UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - -
IN RE:  PHARMACEUTICAL           )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE       )  CIVIL ACTION

PRICE LITIGATION                 )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO         )

U.S. ex rel. Ven-a-Care of       )  Judge Patti B. Saris

the Florida Keys, Inc.           )

    v.                           )  Chief Magistrate

Abbott Laboratories, Inc.,       )  Judge Marianne B.

No. 06-CV-11337-PBS              )  Bowler
- - - - - - - - - - - - - - - -


        Videotaped 30(b)(6) deposition of

THE STATE OF MARYLAND DEPARTMENT OF HEALTH AND

        MENTAL HYGIENE BY JOSEPH L. FINE


                        Baltimore, Maryland

                        Tuesday, December 9, 2008

                        9:00 a.m.
```

Page 106

1       MR. DAVIS: Objection.
2    A.  I didn't say that. I said we looked at it
3  separately. Okay? When we reviewed the Myers &
4  Stauffer survey we knew that we were underpaying.
5  Okay? When we looked at the acquisition cost of
6  products we knew that we were not at the actual
7  acquisition cost or estimated acquisition cost where
8  there was a differential in what the pharmacist paid
9  for it to what we allowed. We understood this.
10       But we didn't set up a policy, well,
11  because we're higher here and lower here it's okay.
12  We looked at each one individually. And that's the
13  best way I can answer that to you. It wasn't our
14  policy to combine them both and say we're okay.
15    Q.  Did you talk with your attorneys about
16  this?
17    A.  I have not talked to the attorneys --
18    Q.  About this issue?
19    A.  Have I talked to the attorneys about this
20  issue?
21       MS. YAVELBERG: We're not going to allow
22  the witness to testify about what he talked to the

Page 107

1  attorneys about.
2    Q.  So Maryland knew that it was underpaying on
3  the dispensing fee side?
4       MS. YAVELBERG: Objection, form.
5    A.  We realized that -- it was an actuality.
6  Our dispensing fee was approximately 3.70 at the time
7  and it was a four-dollar-and-some cent statement from
8  Myers & Stauffer. Okay? The federal government did
9  not say we had to take what the survey amount was and
10  use that as the dispensing fee. It was just to use it
11  as a reference point to understand.
12    Q.  And it knew, as you just testified, that it
13  was allowing more than the actual acquisition cost on
14  the ingredient side, correct?
15       MS. YAVELBERG: Objection, form.
16    A.  Yes.
17    Q.  It just didn't have a written policy that
18  said that was happening?
19       MS. YAVELBERG: Objection, form.
20    A.  The requirements of the federal government
21  were not to pay pharmacies the actual acquisition
22  cost. The requirements of the federal government was

Page 108

1  to give the best estimate of acquisition or estimate
2  acquisition cost. There is no way that the State of
3  Maryland could know what the actual cost the
4  pharmacist paid for because it was understood by the
5  State of Maryland that a volume purchase of a large
6  active pharmacy compared to a small pharmacy was
7  different.
8       Therefore the discounting was different.
9  And you had to look at the reasonableness of the
10  estimated acquisition cost to allow for the
11  differential. Otherwise it would have been impossible
12  unless you audit each and every pharmacy to know what
13  that individual price would be.
14       MR. TORBORG: Let's mark this as Abbott
15  Maryland 6.
16         (Exhibit Abbott Maryland 006
17          was marked for
18          identification.)
19       BY MR. TORBORG:
20    Q.  For the record, this is a document that is
21  an opinion from the Department of Health and Human
22  Services Departmental Appeals Board Appellate Division

Page 109

1  dated March 18th 1992. It's opinion number 1315. Let
2  me ask you first, Mr. Fine, once you've had a chance
3  to look at it, whether or not you're familiar with
4  this opinion.
5    A.  (Reading). I recall that Pennsylvania had
6  a problem with their payment of generic drugs. I
7  recall this in reading this.
8    Q.  Do you know what the Departmental Appeals
9  Board is of the Department of Health and Human
10  Services?
11    A.  I understood that if there was a
12  disallowance that the state's remedy would be to go to
13  the appeals board and ask for a remedy to disallow or
14  to return the disallowed dollars or argue the issue.
15    Q.  So this is when there is a dispute between
16  the federal government and the states about allowances
17  paid by the federal government to the states?
18    A.  Again, it's the federal financial
19  participation portion, the federal share that was
20  disallowed.
21    Q.  And this is the board who decides who's
22  right between HCFA and the states, correct?

Page 110

1   A.   Yes.  The answer is yes.  I would say so.
2   Q.   Let's go to page 8, if we could, of the
3  document in the upper right-hand corner.  It's page 8
4  of 12.  The first sentence in the top of that page
5  that starts with "section 447.333(b)."  Do you see
6  that?
7   A.   Mm-hmm.
8   Q.   It states "Section 447.333(b) of 42 C.F.R.
9  provides in pertinent part that a state's drug
10 payments may not exceed 'in the aggregate' the
11 specific limits established by HCFA for each drug plus
12 a reasonable dispensing fee for each drug.  Since the
13 focus of the regulations is on a state's overall
14 payment level, the state could reasonably have
15 concluded that it could offset a lower than reasonable
16 dispensing fee with ingredient costs which were higher
17 than HCFA's specific limits as well as higher than the
18 costs to the pharmacies themselves."
19  A.   I'm well aware of that aggregate rule.
20  Q.   If you go to page 12, the last page, it
21 states -- this is the first paragraph.  It starts with
22 "the regulation."  Do you see that?

Page 111

1   A.   Mm-hmm.
2   Q.   It says "The regulation can reasonably be
3  read to permit states to pay more than an
4  appropriately determined EAC for drug ingredient cost
5  but less than a reasonable dispensing fee so long as
6  the payments did not in the aggregate exceed the upper
7  limit."  Do you see that?
8   A.   Yes.
9   Q.   Is this statement consistent with the
10 department's understanding of the "in the aggregate"
11 rule on the regulation?
12  A.   Yes.
13  Q.   So Maryland's understanding that it was
14 paying a dispensing fee at one time of less than the
15 Myers & Stauffer study showed to be the cost to
16 dispense, but was allowing more on the ingredient cost
17 side than the provider paid is consistent with these
18 regulations, right?
19      MS. YAVELBERG:  Objection, form.
20  A.   We're talking about generic drugs here.
21 This is generic drugs.  This is not single-source
22 drugs.  And I think that's an important point because

Page 112

1  this dealt with the implementation of the federal
2  upper limit.  The upper limit set by the federal
3  government.  The federal upper limit was the ceiling
4  price that the federal government would allow for
5  certain drugs.
6       If the state program paid less in some
7  cases -- and in Maryland we had an IDC -- paid less in
8  some cases and paid more in other, so long as in the
9  aggregate it was equal to or less than, then it was --
10 then we fell within the limits and this was fine.  And
11 it's my understanding that this is the way Maryland
12 did this.  And this is nothing unusual.  And this is
13 something that we were very aware of when we priced
14 our drugs.
15          (Exhibit Abbott Maryland 007
16           was marked for
17           identification.)
18      BY MR. TORBORG:
19  Q.   For the record, what I've marked as Abbott
20 Maryland 7 is another Departmental Appeals Board
21 decision, this one an earlier one, August 13th 1991,
22 related to Oklahoma.  I ask you first, Mr. Fine, if

Page 113

1  you reviewed this opinion?
2   A.   No, I have not.
3   Q.   Now, if we go back to the other one, the
4  other DAB opinion that I showed you, it was citing an
5  opinion of the board in the Oklahoma case, if you look
6  at page 12.
7   A.   Which one are we talking about?  Are we
8  talking about the Oklahoma department?  Okay.
9   Q.   I'm pointing you to the language I quoted
10 on page 12 of DAB 1315.  This opinion, that language I
11 was quoting from came from a decision that the board
12 did in Oklahoma; is that right?  Is that what it looks
13 like?
14  A.   That's what it looks like, yes.
15  Q.   And the opinion in Oklahoma did not relate,
16 if you look at it, just to upper limits, or did it?
17 The federal upper limits?
18  A.   I'm not certain.
19      MR. DAVIS:  Do you want the witness to
20 review the document?
21  A.   I haven't seen it.  I don't know.  I would
22 have to read through this.

Page 202

1  that a pharmacist who deals with one of the two major
2  local wholesalers -- and generally pharmacies purchase
3  drugs from one predominant wholesaler and had the
4  second as a backup when they couldn't get the drug.
5      So each local wholesaler carried at least
6  one or two lines of generic drugs.  And the
7  methodology was to take the lowest price of each one
8  of the two wholesalers and then pick the highest price
9  of the two so that any pharmacy using their own source
10 of supply could get the drug for that price and
11 wouldn't have to switch wholesalers just to get that
12 drug to meet the price.  Okay?
13     So we were able to get it with the
14 compliance of the two local wholesalers that they
15 worked with us on this.  It evolved that after several
16 years one local wholesaler went out of business and a
17 national company, McKesson, bought out the other local
18 wholesaler, Lowie.  Bought it out.  So therefore now
19 we were seeing pharmacists getting drug products from
20 a Virginia firm, Bergen Brunswick, and from McKesson,
21 predominantly.  And now we're dealing with national
22 wholesalers who didn't wish to work with us directly

Page 203

1  in setting up our state MAC or the IDC.
2      So we had to find some way to get drug
3  pricing, their files.  And what we did is we went to
4  pharmacies who had business with them, pharmacists
5  that belonged to Maryland pharmacist association who
6  knew it was for the common good anyway and we were
7  able to borrow their files.
8      Q.  So you got pricing information from either
9  wholesalers or a pharmacist who cooperated with the
10 department in giving --
11     A.  But it was from wholesalers.  It was always
12 wholesale prices.  It was the wholesaler file.  But
13 since they wouldn't let us use it directly we had to
14 go through them to get the files.
15     Q.  When you say wholesale file --
16     A.  Meaning the price list.  The drug price
17 list.
18     Q.  We're not talking about the compendia here?
19     A.  No.  Maryland did not use compendia,
20 meaning we did not use First Databank and/or Medi-Span
21 to set our IDC.  We were determined to set our state
22 MAC or IDC based on what local -- what our pharmacists

Page 204

1  could get the drug for if they were working and buying
2  the product from a wholesaler that was selling in
3  Maryland.
4      Q.  And this process of going to get wholesale
5  price lists from either a wholesaler or a pharmacist,
6  some of that was just part of your job, right?
7      A.  Correct.
8      Q.  Something you felt you needed to do to get
9  fair pricing for drugs?
10         MS. YAVELBERG:  Objection, form.
11     A.  Well, the feel -- it's not my feeling.
12 It's what Maryland decided to do to get fair pricing
13 to their pharmacists who fill prescriptions for
14 Maryland medical assistance recipients.
15     Q.  And you received cooperation from the
16 pharmacy providers in this effort?
17         MS. YAVELBERG:  Objection, form.
18     A.  Yes.  Yes.  The pharmacy providers worked
19 with us.
20     Q.  Now, you used two different prices for each
21 drug on the IDC list; is that right?
22     A.  We used two different sources of prices.

Page 205

1  In other words, a source price from one wholesaler and
2  a source price from another wholesaler.  We used two
3  wholesalers' prices that were doing business in
4  Maryland.
5      Q.  And then you paid at the higher of those
6  two prices, correct?
7      A.  We selected the line of generic drugs that
8  had the lowest price for each wholesaler and picked
9  the highest price of those two.  Highest of the
10 lowest, if you can understand that.  So therefore any
11 pharmacy could get it and stay with their same
12 wholesaler they normally did business with.
13         MR. TORBORG:  Why don't I mark this as our
14 next exhibit.  This will be Abbott Maryland 16.
15         (Exhibit Abbott Maryland 016
16          was marked for
17          identification.)
18     BY MR. TORBORG:
19     Q.  For the record, this bears the Bates
20 numbers MD 0019258 through 63.  And I'd like to ask
21 you just about the first page for now.  Do you
22 recognize this document, Mr. Fine?

52 (Pages 202 to 205)

Page 206

```
 1      A.   I do not recognize this document.
 2      Q.   Do you recognize the handwriting in the
 3   notations under the column IDC?
 4      A.   I can only tell you they are not mine.
 5      Q.   Take a look at the first column, if you
 6   could.  Acyclovir.  Do you see that?
 7      A.   Mm-hmm.
 8      Q.   Do you see there's a section for capsules
 9   and a section for tablet?  Do you see that?
10      A.   Yes, I do.
11      Q.   And then look at the 800 -- the strength
12   identified as 800 is two products.  Do you see that?
13      A.   Yes.
14      Q.   And then there's a calculated price per
15   unit at the right of about 35 cents for the first
16   product and about 65 cents for the second product,
17   right?
18      A.   I don't think so.
19      Q.   Okay.
20      A.   Is it 65 or 6.5, $6.50?
21      Q.   I was looking at the calculation per unit
22   in the far right column.
```

Page 207

```
 1      A.   Pardon me?
 2      Q.   I was looking at the far right column
 3   before the handwritten notation that purports to
 4   calculate the price per unit.
 5      A.   I'm sorry.  Okay.
 6      Q.   One of the prices is 35 cents and the other
 7   is 65 cents, right?
 8      A.   Yes.
 9      Q.   And do the handwritten notations indicate
10   the IDC calculated was 65 cents?
11      A.   Yes.
12      Q.   Correct?
13      A.   Yes.
14      Q.   So in this instance Maryland established an
15   IDC that was about twice as much as the price for the
16   other product, right?
17           MS. YAVELBERG:  Objection, form.
18      A.   From this document it shows that.  And I
19   don't know that this is a Maryland listing.  It
20   doesn't have anything that identifies it as
21   Maryland's.  Do you have anything that tells me it's
22   Maryland's?
```

Page 208

```
 1      Q.   It was produced by Maryland.
 2      A.   Okay.
 3      Q.   It uses the term IDC, which is in my
 4   experience unique to Maryland.  But --
 5      A.   Okay.  Because this is handwritten and
 6   anyone could have put that in there.  You know, I'm
 7   only saying that.
 8      Q.   I can promise you that it was not me who
 9   put those in there.
10      A.   Okay.
11      Q.   Nor any of the people who worked with me to
12   the best of my knowledge.
13           Now, did Maryland -- did the department
14   believe it was paying a fair price when it paid the
15   IDC price that it paid?
16           MS. YAVELBERG:  Objection, form.
17      A.   Maryland believed that the methodology was
18   fair to pharmacy.  There are issues with any kind of
19   pricing as to -- if you notice on the 65-cent product,
20   look at the number of claims.  Pharmacy are very
21   smart.  You have 3 claims at the low price and 22 at
22   the high -- pharmacy knew how to purchase drugs.  And
```

Page 209

```
 1   we were involved with having to follow that
 2   methodology.  And I can best say that that's what we
 3   were responsible to do.
 4      Q.   That was the -- the policy was to pay the
 5   higher price?
 6      A.   The higher of the lower of the two sources.
 7           MR. TORBORG:  I'd like to mark this as our
 8   next exhibit.  We'll make this Abbott Maryland 17.
 9               (Exhibit Abbott Maryland 017
10                was marked for
11                identification.)
12           BY MR. TORBORG:
13      Q.   For the record, what I've marked as Abbott
14   Maryland 17 bears the Bates number MD 0019256 through
15   57.  Let me ask you first, Mr. Fine, if you recognize
16   either of these pages?
17      A.   I do not.
18      Q.   Do you recognize the handwriting on the
19   second page?
20      A.   I do not.
21      Q.   Why don't you take a look at the document
22   for a second and I'll ask you some questions about it.
```

53 (Pages 206 to 209)

Page 318

1  to set an AWP before a product is first sold and not
2  to subsequently change that AWP."  Do you see that
3  there?
4      A.  Yes.
5      Q.  Is that consistent with Maryland's
6  understanding of the way AWPs were reported?
7      A.  When I looked at this I was kind of alarmed
8  by it because you set an AWP price and invariably at
9  least once or twice a year from our experience the
10 price changes.  The price changes.  The AWP changes.
11 It doesn't just stay at that AWP price.  It could stay
12 for a year, six months, but no longer than that.
13     MS. YAVELBERG:  I have no more questions.
14     MR. TORBORG:  I do have a few follow-ups.
15     THE VIDEOGRAPHER:  We have about seven
16 minutes remaining.  Should I change tapes?
17     MR. TORBORG:  I probably will get done in
18 seven minutes, but let me try.
19 FURTHER EXAMINATION BY COUNSEL FOR ABBOTT LABORATORIES
20     BY MR. TORBORG:
21     Q.  Mr. Fine, you gave some testimony in
22 response to questioning from the DOJ attorney that you

Page 319

1  have to depend upon the prices in the compendia --
2      A.  Yes.
3      Q.  -- to set the reimbursement amounts, right?
4      A.  Yes.
5      Q.  For generic drugs you did not use that
6  pricing for many drug products, correct?
7      A.  For generic -- I don't follow you.  Which
8  set of generic products are we talking about?
9      Q.  For many drug products.
10     A.  Okay.  For the generic products that are
11 used for the IDC we used the lowest of the highest
12 methodology.  I explained that to you.
13     Q.  Correct.
14     A.  Okay?  Or we used the FUL.  They could be
15 mutually the same products or Maryland could have
16 products that don't have the same requirements as the
17 FUL which restricts -- it's a smaller list than what
18 the Maryland program would have in IDC because the
19 federal program has to have at least three sources
20 where Maryland only required two sources to make that
21 list.  Those products that are outside the IDC we use
22 the EAC methodology, which we explained many times

Page 320

1  today.
2      Q.  For those products that were in the IDC
3  program you didn't use the compendia price to set the
4  amount, correct?
5      A.  We used the wholesalers that the
6  pharmacists were buying the products from in the State
7  of Maryland for pricing.
8      Q.  You did not use the compendia prices for
9  those products on the IDC, correct?
10     A.  Correct.
11     Q.  Okay.  And so when you see a document such
12 as DOJ 24, which is the United States complaint
13 against Dey which talked about fraudulently inflated
14 prices sometimes 1,000 percent higher than Dey's
15 actual prices, if you had an IDC on those drugs for
16 those prices --
17     A.  We were protected.
18     Q.  You were protected?
19     A.  Yes.
20     Q.  And that was part of your job?
21     A.  Absolutely.
22     Q.  To make sure that you protected yourself --

Page 321

1      MS. YAVELBERG:  Objection, form.
2      Q.  -- correct?
3      A.  The reason we set our EAC with the four
4  different possibilities was to protect the payment --
5  the State of Maryland's, you know, expenditures to
6  ensure that to the best of our knowledge we could come
7  as close as possible.  But those four different
8  modalities, the wholesale acquisition cost, et cetera,
9  we depended on the compendia for that information.
10     Q.  But for prices where there's IDC, you
11 didn't use the compendia?
12     A.  No.
13     Q.  And you didn't rely upon the compendia?
14     A.  No, we did not.
15     Q.  You indicated that in the 1980s you were
16 getting manufacturer catalogs.
17     A.  Yes.  Mm-hmm.  '70s and '80s.
18     Q.  '70s and '80s.  Tell me what you were
19 getting.
20     A.  I had a whole series of books, Squibb,
21 Abbott, whoever was selling direct, and we were able
22 to set our prices based on that for those products

Page 322

1   that were very popular.
2       Q.  And those were prices that represented
3   prices to pharmacists?
4       A.  To pharmacy.
5       Q.  It wasn't a compendia price?
6       A.  No.
7       Q.  Are manufacturers participants in the
8   Maryland Medicaid program?
9       A.  I don't follow you.
10      Q.  Ms. Yavelberg asked you some questions
11  about whether you relied upon participants in the
12  Medicaid program to be honest.  Correct?
13      A.  What I was relating to -- and I don't
14  recall the question.  The expectation is that the
15  published prices are what they're supposed to be.  As
16  far as the providers and their billing, we expected
17  that billing be -- that they be honest.
18      Q.  One shouldn't interpret your testimony
19  about the ability of nursing homes to get discounts
20  and hospitals to get discounts to mean that the
21  department didn't believe that large retail chains
22  like CVS and Rite Aid had no negotiating power to get

Page 323

1   discounts, should it?
2           MS. YAVELBERG:  Objection to form.
3       A.  It was a different kind of discount.  It
4   was volume discount as opposed to preferred or
5   selected drug discount, exclusivity.  The chain drug
6   stores as a retail commercial open to the public
7   outlet, they could not influence or direct the
8   price -- the use of a certain drugs or not.  So it was
9   volume.  Like any kind of business if you can buy more
10  units of one product you get a better discount.
11          MR. TORBORG:  We need to go off the record.
12  Sorry.  I have one question and I know she's going to
13  have more than one.
14          THE VIDEOGRAPHER:  This is the end of tape
15  4.  We're going off the record at 6:16.
16          (Recess.)
17          THE VIDEOGRAPHER:  This is the beginning of
18  tape 5 in the 30(b)(6) deposition of DHMH by Joseph
19  Fine.  On the record at 6:18.
20          BY MR. TORBORG:
21      Q.  Mr. Fine, Ms. Yavelberg asked you some
22  questions about whether Maryland was reimbursing

Page 324

1   certain supplies for home infusion, needles, tubing,
2   alcohol swabs, heparin flushes.  Did Maryland provide
3   compensation for any nursing services that were
4   associated with home IV therapy if the patient was not
5   homebound?
6           MS. YAVELBERG:  Objection, form.
7       A.  Pardon me.  If the patient were --
8       Q.  Was not homebound.
9       A.  That would go under our nursing rules and
10  regulations.  Certainly if a patient were in a nursing
11  facility that would have been taken care of.  If the
12  patient were at home a nurse could -- if a doctor or
13  so ordered could be -- the nursing services could be
14  paid for by Medicaid as a separate bill.
15      Q.  If the patient was not homebound would it
16  be paid for, if you know?
17          MS. YAVELBERG:  Objection, form.
18      A.  And I don't follow you by not homebound.
19  It depends where -- what place of service are we
20  talking about for a nurse to do her duty then?  I'm
21  not following you.
22      Q.  I'm trying to make it clear.  I just don't

Page 325

1   want to take too much time.
2       A.  Okay.
3       Q.  But my understanding of a lot of states'
4   regulations for home health services there are
5   regulations about whether or not the nursing service
6   will be covered depending on whether or not the
7   patient himself is homebound as opposed to just having
8   therapy in the home but able to go elsewhere.
9       A.  I'm not familiar with the requirements of
10  the Maryland nursing program.
11          MR. TORBORG:  Then I have no more
12  questions.
13          THE VIDEOGRAPHER:  On the phone, do you
14  have questions?
15          MS. MANGIARDI:  Just a few.
16          Dave, can you please hand the witness the
17  document behind tab 5?
18          MR. TORBORG:  Excuse me.  I don't know that
19  I saw that, but I'll see if I can find it.
20          FURTHER EXAMINATION BY COUNSEL FOR DEY,
21              INC., DEY, L.P. AND MYLAN
22          BY MS. MANGIARDI:

82 (Pages 322 to 325)