# EXHIBIT 47

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------X

In Re: PHARMACEUTICAL INDUSTRY    )

AVERAGE WHOLESALE PRICE LITIGATION)

---------------------------------X MDL No. 1456

THIS DOCUMENT RELATES TO:         ) Master File No.

United States of America ex rel.  ) 01-CV-12257-PBS

Ven-A-Care of the Florida Keys,   ) Subcategory Case

Inc., et al. v. Dey, Inc., et al.,) No. 06-11337

Civil Action No. 05-11084-PBS     ) Hon. Patti B.

---------------------------------X Saris


        VIDEOTAPED DEPOSITION OF:  ALLEN D. CHAPMAN

                    December 15, 2008

      PURSUANT TO AMENDED NOTICE AND SUBPOENA,

the deposition of ALLEN D. CHAPMAN was taken on

behalf of Defendant Dey, Inc., at 1701 California

Street, Silverton Room, Denver, Colorado 80202, on

December 15, 2008, at 10:06 a.m., before Tammie E.

Singer, Professional Court Reporter and Notary

Public within Colorado.

Chapman, Allen D.                                                December 15, 2008
                              Denver, CO

```
                                Page 46                                          Page 48
 1    Q. (BY MR. KATZ) Okay. And when Colorado      1        MR. ANDERSON: Objection, form.
 2  set its reimbursement rate for prescription     2    A. I'm not sure I would use the word
 3  drugs, it had to set its reimbursement rate high 3  lobby, but --
 4  enough to ensure that enough providers          4    Q. (BY MR. KATZ) Well, they would discuss
 5  participated, right?                            5  --
 6        MR. ANDERSON: Objection, form.            6    A. They -- they would have input.
 7    A. I'm sure that was one of the criteria.     7    Q. Okay. And are you aware that the --
 8  It wasn't the only criteria.                    8  that these pharmacy associations would lobby
 9    Q. (BY MR. KATZ) Okay. What were some of      9  branches of government?
10  the other criteria?                            10    A. I'm sure they did.
11    A. Studies that were done within the        11    Q. Like they lobbied the legislature --
12  state, negotiation.                            12    A. Correct.
13    Q. And when you say studies, you're         13    Q. -- and maybe the governor?
14  referring to studies regarding dispensing costs 14       Did you ever -- did the governor's
15  and acquisition costs?                         15  office -- did the legislature ever discuss things
16    A. Correct.                                  16  that they heard from the pharmacists with the
17    Q. And when you say negotiations, you're    17  Medicaid agency?
18  referring to negotiations with the pharmacy    18    A. I don't remember any direct
19  community, right?                              19  conversations like that with the governor.
20        MR. ANDERSON: Objection, form.           20    Q. But you were aware that these pharmacy
21    A. And other parties.                        21  associates were talking to the elected officials
22    Q. (BY MR. KATZ) Well, let's start with     22  of Colorado, right?

                                Page 47                                          Page 49
 1  the pharmacy community. Okay?                   1    A. Yes.
 2    A. Okay.                                      2        MR. ANDERSON: Objection, form.
 3    Q. So the state would consider what the      3    Q. (BY MR. KATZ) And that's part of the
 4  pharmacy community had to say about what the   4  process, and there's nothing wrong with that,
 5  reimbursement rate should say, right?           5  right?
 6    A. That's correct.                            6        MR. ANDERSON: Objection, form.
 7    Q. And the pharmacy community had advocacy   7    A. I don't know the --
 8  groups to assist them in this process, right?  8    Q. (BY MR. KATZ) You didn't think there
 9    A. That's correct.                            9  was anything wrong with the pharmacy associations
10    Q. What are those pharmacy associations in  10  expressing their opinion as to what the rate
11  Colorado?                                      11  should be, right?
12    A. At the present time, the main one is    12    A. I guess I'm not sure I know the
13  the Colorado Pharmacists Association.         13  definition of "anything wrong."
14    Q. Okay. Any others?                        14    Q. Well, it was allowed, right?
15    A. I'm not sure how active -- there used   15    A. There were discussions -- we were open
16  to be another one that I don't remember the   16  to the public.
17  acronym for that was for the independent      17    Q. Okay.
18  pharmacies.                                    18        MR. GOBENA: Before you go on, can I
19    Q. Okay. And these pharmacy associations,  19  just have a standing objection to all these
20  they would lobby the Colorado Medicaid agency 20  leading questions? I don't want to make the
21  when reimbursement rate changes were being    21  objection over and over again. But as far as I
22  discussed, right?                              22  can tell, it's as if you're doing the testifying
```

Page 106

     1       MR. ANDERSON:  Objection, form.  I --
     2       Q.  (BY MR. KATZ)  Take a look at that, and
     3  let me know if that's accurate.
     4       MR. ANDERSON:  Cliff, I gotta tell you
     5  what's going on is beginning to become abusive
     6  because you are literally testifying in every
     7  single question.
     8       This man has no connection to this
     9  letter.  He's had no connection to a 1984 report.
    10  If you have exhibits that he's involved in,
    11  perhaps you want to use those.
    12       I'm going to have questions for the
    13  guy.  And at this rate, there's no way you're
    14  going to be able to pass the witness in a timely
    15  manner so that we can complete the deposition
    16  today.
    17       Q.  (BY MR. KATZ)  You can look at the
    18  paragraph.
    19       A.  But wouldn't Medicaid drug rebates be
    20  rebates that are supplements that are
    21  subsequently paid?
    22       Q.  Okay.  You're right.  So in the sense

Page 107

     1  that rebates are paid subsequent to the
     2  transaction --
     3       A.  Right, irregardless of who they are
     4  paid to.
     5       Q.  Right.  Okay.  And that was something
     6  that you were aware of in the 1980s about these
     7  rebates subsequently paid, right?
     8       A.  Correct.
     9       Q.  Now I would like you to take a look at
    10  the last page of this letter.  And if you look at
    11  the second-to-the-last paragraph, second
    12  sentence, it says, "For multiple-source drugs, I
    13  would make extensive use of state upper limits as
    14  neither the FUL or AWP mean anything for generic
    15  drugs."
    16       Do you agree with Mr. Hazelwood's
    17  statement that the AWP does not mean anything for
    18  generic drugs?
    19       MR. ANDERSON:  Objection, form.
    20       A.  I guess my comment was there's probably
    21  more of a variation between AWP and actual cost
    22  with generic than there are the other.

Page 108

     1       Q.  (BY MR. KATZ)  "The other" would be
     2  brand?
     3       A.  Brand -- no -- the other would be
     4  brand, right, but --
     5       Q.  And that was something you were aware
     6  of going back to the 1980s?
     7       A.  I think that -- but I guess what I
     8  think he's -- what he was talking about in this
     9  memo was a push to try to have state MACs for
    10  generic products that the federal government did
    11  not have federal upper limits for and the basis
    12  for that.
    13       Q.  And the --
    14       A.  This is what he's really trying to do
    15  here.
    16       Q.  And the reason for having state maximum
    17  allowable cost or federal upper limits for
    18  generic drugs is that it was known that the AWPs
    19  for generic drugs exceeded the actual acquisition
    20  costs of providers, right?
    21       A.  I'm not sure that --
    22       MR. ANDERSON:  Objection --

Page 109

     1       A.  I'm not sure that was his -- that -- in
     2  my mind, that wasn't his basis for doing that --
     3       Q.  (BY MR. KATZ)  Well, I'm asking you as
     4  someone who was formerly employed by Colorado --
     5       A.  I thought you were asking me what he
     6  was thinking.
     7       Q.  No, no, no.  The reason why state
     8  maximum allowable costs were used in federal
     9  upper limits was because it was known that the
    10  AWPs for generic drugs were in -- exceeded the
    11  actual acquisition costs of providers.
    12       MR. ANDERSON:  Objection, form.
    13       A.  I guess I would say it is that -- the
    14  reason that one would want to do something like
    15  this is to be able to sort of fine-tune the
    16  system, to have a state -- have the states have
    17  the ability to look at their individual state and
    18  come up with methodologies that went beyond where
    19  the feds were going at that time.
    20       Q.  (BY MR. KATZ)  Okay.  And when you say
    21  go beyond, do you mean have additional upper
    22  limits for additional drugs?

Chapman, Allen D.                                                December 15, 2008
                                   Denver, CO

|  | Page 134 |
|---|---|
| 1 | down -- |
| 2 | A.  Okay. |
| 3 | Q.  -- starting with "Some public and |
| 4 | private third-party payers." |
| 5 | A.  Okay. |
| 6 | Q.  Can you read that paragraph for the |
| 7 | record. |
| 8 | A.  "Some public and private third-party |
| 9 | payers have proposed -- proposedly -- purposely |
| 10 | kept the dispensing fee low precisely because |
| 11 | there is a spread between AWP and AAC.  In fact, |
| 12 | when pharmacy organizations have sought to |
| 13 | increase -- an increase in dispensing fees, the |
| 14 | AWP spread has been pointed out to legislatures. |
| 15 |      "It's true that ingredient |
| 16 | reimbursement is supposed to be based on |
| 17 | estimated acquisition cost.  The ancillary costs |
| 18 | in dispensing of the drugs are supposed to be |
| 19 | accounted for by the dispensing fee. |
| 20 |      "If the AWP spread disappears, the |
| 21 | dispensing fee may have to be increased |
| 22 | especially for many of the 428 drugs currently in |

|  | Page 135 |
|---|---|
| 1 | question.  Many of these drugs require some type |
| 2 | of compounding or other preparation." |
| 3 | Q.  Okay.  First -- we'll get into more of |
| 4 | this later, but when he refers to the 428 drugs, |
| 5 | do you recall that there were a number of drugs |
| 6 | which AWPs were calculated called Department of |
| 7 | Justice AWPs, or DOJ AWPs? |
| 8 | A.  No. |
| 9 | Q.  Okay.  Setting that aside, do you -- |
| 10 | with respect to Mr. Wiberg's statement that "Some |
| 11 | public and private third-party payers have |
| 12 | purposely kept the dispensing fee low precisely |
| 13 | because there is a spread between AWP and AAC," |
| 14 | do you see that? |
| 15 | A.  Yeah. |
| 16 |      MR. ANDERSON:  Objection, form. |
| 17 | A.  I remember reading that -- |
| 18 | Q.  (BY MR. KATZ)  Was that something that |
| 19 | you were aware of when you were at Colorado |
| 20 | Medicaid? |
| 21 | A.  I don't remember that being a specific |
| 22 | issue. |

|  | Page 136 |
|---|---|
| 1 | Q.  Do you see where it says, "If the AWP |
| 2 | spread disappears, the dispensing fee may have to |
| 3 | be increased"? |
| 4 |      MR. ANDERSON:  Objection, form. |
| 5 | A.  I see that. |
| 6 | Q.  (BY MR. KATZ)  Is that something that |
| 7 | Colorado Medicaid considered when considering |
| 8 | changes to its reimbursement methodology? |
| 9 |      MR. ANDERSON:  Objection, form. |
| 10 | A.  Not specifically.  I don't remember it |
| 11 | that way. |
| 12 | Q.  (BY MR. KATZ)  Okay.  I would like you |
| 13 | to go back to Dey Exhibit 355. |
| 14 | A.  Where are we? |
| 15 | Q.  Dey Exhibit 355. |
| 16 | A.  Okay. |
| 17 | Q.  And the last paragraph in this document |
| 18 | refers to a survey which indicated the cost of |
| 19 | dispensing to be $4.58 for pharmacies. |
| 20 | A.  Okay. |
| 21 | Q.  Now, at this time, Colorado Medicaid |
| 22 | had a dispensing fee of only $4.08, right? |

|  | Page 137 |
|---|---|
| 1 | A.  That's what they were establishing with |
| 2 | this.  The survey was before that. |
| 3 | Q.  Okay.  So it would be accurate to say |
| 4 | that the survey found the cost of dispensing |
| 5 | higher than what the dispensing fee that Colorado |
| 6 | Medicaid actually used, right? |
| 7 | A.  What they were proposing in the state |
| 8 | plan, yes. |
| 9 | Q.  And do you recall surveys performed by |
| 10 | Colorado Medicaid with respect to dispensing |
| 11 | costs? |
| 12 | A.  There were none done at the time -- in |
| 13 | the 12 years I was there except for the one year |
| 14 | when I was gone, '95 to '96. |
| 15 | Q.  There was a dispensing cost study -- |
| 16 | A.  It was a cost study done in that year I |
| 17 | was gone. |
| 18 | Q.  Do you know what that cost study found |
| 19 | with respect to dispensing costs? |
| 20 | A.  I don't remember it.  I know that it |
| 21 | was -- that it had been done the year I was gone. |
| 22 | Q.  Okay.  And going back to this document |

35 (Pages 134 to 137)

Chapman, Allen D.                                     December 15, 2008
                              Denver, CO

Page 222

1  don't have a number, I'm asking just for a
2  general area.  I mean, was it your feeling it was
3  10 percent below or 50 percent below or 80
4  percent below?  Can you give any sort of an
5  estimate?
6      A.  No.
7      Q.  While you were working for the hospital
8  -- in other words, prior to your employment with
9  Medicaid, did you have an understanding that
10 there were substantial discounts below AWP?  And
11 by substantial, I mean it's not just 5 percent,
12 but there may be 20 or 30 or even 50 percent
13 below AWP?
14         MR. ANDERSON:  Objection, form.
15     A.  I guess I was -- I was aware of the
16 fact that different types of providers got
17 different pricing based on who they were,
18 nonprofit hospitals, governmental entities.  And
19 I had really spent very little if no thinking
20 about what happened in the retail marketplace
21 until I got to the Medicaid program.
22     Q.  (BY MR. BERLIN)  At the time that you

Page 223

1  were working for the hospital, was it your view
2  that AWP was essentially a list price and that
3  there were discounts below it for different
4  providers?
5      A.  I guess to probably characterize my
6  thought of that, it was something if you looked
7  up a product in the Red Book or the Blue Book,
8  whatever it was, you saw a price there, but it
9  had no relationship to the price that we might be
10 paying in our marketplace.
11     Q.  And then when you started with Colorado
12 Medicaid, you saw that part of their formula was
13 based on AWP minus a percent, right?
14     A.  That was one of the percentages -- that
15 was one of the factors, yes.
16     Q.  Did you raise with anyone in the
17 Medicaid program a concern about using AWP as
18 part of the reimbursement formula?
19     A.  I guess not on my first day or probably
20 -- I'm sure there were discussions about that.  I
21 don't recall -- you know, I think that -- to
22 point out the fact that when I got to Medicaid

Page 224

1  was right before the drug rebate program that
2  OBRA 90 started.
3          And so -- and in that provision, there
4  was a provision for not effecting -- not reducing
5  reimbursement to our providers for four years.
6  And so there really wasn't much talk about
7  reimbursement during that period of time because
8  of the fact that we were preempted from doing
9  much of anything for four years.
10     Q.  And during that moratorium under OBRA,
11 did you -- during that time, did you have an
12 understanding that you, meaning the -- excuse me
13 -- the Medicaid program, was paying ingredient
14 costs to the pharmacies at higher than their
15 actual acquisition costs?
16         MR. ANDERSON:  Objection, form.
17     A.  I guess I don't -- I don't have an
18 answer to that.  I don't know what our thought
19 process was at that time.
20         The reimbursement was -- we were
21 working more on trying to get our systems updated
22 to work with the rebate program, you know, where

Page 225

1  we had to, you know, make sure that people were
2  billing by the right NDC and that type of thing.
3  And issues of AWP was not on my A pile at that
4  time.
5      Q.  (BY MR. BERLIN)  So is it fair to say
6  that you knew there was a moratorium and that you
7  couldn't change reimbursement, so because of
8  that, you just didn't spend time thinking about
9  it?
10     A.  I guess what I'm saying is we -- we
11 were working on other issues at that point.  But
12 that doesn't answer your question about whether I
13 thought about whether AWP was the right
14 methodology or not.
15         It was -- it was one of the
16 methodologies we had.  And it was not the one
17 that -- that paid -- I don't remember what the
18 percentages were about paying, whether it was
19 usual and customary or federal upper limit or
20 what, but it was one of the factors.
21     Q.  And I wanted to follow up on that
22 point.  Do you have any recollection during any

                                          57 (Pages 222 to 225)

Page 334

1  the federal definition of estimated acquisition
2  cost?
3      MR. KATZ: Objection to form.
4      A.  To me this appears like that there was
5  a lot of negotiations with the pharmacy
6  community, with their input, and then the
7  concerns about that and . . .
8      Q.  (BY MR. ANDERSON) Yeah, like the
9  pharmacy community --
10     A.  Yeah.
11     Q.  -- was setting forth some different
12 reasons why there should be some deductions --
13     A.  Uh-huh.
14     Q.  -- correct?
15         MR. KATZ: Objection to form.
16     A.  They were -- they were -- some
17 deductions from the percent off --
18     Q.  (BY MR. ANDERSON) Basically the
19 pharmacies --
20     A.  What they were saying is that the --
21 that the -- when you add in the Narcotics Class
22 II, you reduce it by .131 and that type of thing.

Page 335

1      Q.  And the pharmacies were saying if you
2  add in the Class II narcotics, that --
3      A.  Right.
4      Q.  -- adds a --
5      A.  Lowers it down --
6      Q.  -- little bit of --
7      A.  Yeah.
8      Q.  -- expense, right?
9      A.  Right.
10         THE COURT REPORTER: I'm sorry. You're
11 -- so where I left off with was "And the
12 pharmacies were saying if you add in the Class II
13 narcotics . . ."
14     Q.  (BY MR. ANDERSON) -- it adds a little
15 expense; is that correct, sir?
16         MR. KATZ: Objection to form.
17     A.  That's the .31 that was on the
18 percentage here.
19     Q.  (BY MR. ANDERSON) And that .31
20 additional cost percentage, in turn, was deducted
21 from the potential discount off of AWP in setting
22 EAC reimbursement, correct?

Page 336

1      MR. KATZ: Objection to form.
2      A.  And what was up here is the -- the 3.8
3  percent raw to AWP differential on 3.
4      Q.  (BY MR. ANDERSON) Then looking at that
5  next paragraph in Section 6, Mr. Chapman --
6      A.  Okay.
7      Q.  -- do you see a paragraph there that
8  discusses the data sources used by the state of
9  Colorado Medicaid?
10     A.  I see that.
11     Q.  And one of those is First DataBank
12 electronic price updates, correct?
13     A.  I see that, but I don't remember that -
14 - when did this letter get written? I didn't
15 remember that they had a contract with First
16 DataBank because when I arrived in July, then --
17 then two people were still manually doing the
18 updates. But they might have just changed to
19 that. I don't know. But that was --
20     Q.  That was --
21     A.  It was short-lived.
22     Q.  Yes, sir. And that's shortly after you

Page 337

1  arrived --
2      A.  That's right.
3      Q.  -- at Colorado Medicaid, the transition
4  to the electronic data took place?
5      A.  That's correct.
6      Q.  Oh, one last question about this
7  Exhibit Chapman 4. In paragraph 3, there's some
8  discussion about wholesalers. Do you see that?
9      A.  I see that.
10     Q.  And did Colorado Medicaid understand
11 that pharmacies were buying some drugs from
12 wholesalers?
13         MR. KATZ: Objection to form.
14     A.  I knew they bought drugs from whole --
15 everybody knew that they bought drugs from
16 wholesalers, but I'm not sure what this question
17 is about.
18         (Deposition Exhibit Chapman 005
19 was marked.)
20     Q.  (BY MR. ANDERSON) Well, that was just
21 leading me into this document, Mr. Chapman. If
22 you could, take a look at Exhibit 5.