# EXHIBIT 50

Collins, Theodore M.                                October 30, 2007
                        Madison, WI

Page 1

STATE OF WISCONSIN: CIRCUIT COURT: DANE COUNTY
_____

STATE OF WISCONSIN,

             Plaintiff,

        -vs-              CASE NO. 04-CV-1709

AMGEN, INC., et al.,

             Defendants.

_____


        VIDEOTAPE DEPOSITION OF THEODORE M. COLLINS, was taken at the instance of the Defendants, under and pursuant to the provisions of Chapter 804.05 of the Wisconsin Statutes and athe applicable Hawaii Statutes, and the acts amendatory thereof and supplementary thereto, before me, KATHY HALMA, Registered Professional Reporter and Notary Public in and for the State of Wisconsin, at the offices of the Attorney General of the State of Wisconsin, 17 West Main Street, Madison, Wisconsin, on the 30th day of October, 2007, commencing at 9:30 o'clock in the forenoon.

Collins, Theodore M.  October 30, 2007
Madison, WI

Page 82

1  or maybe even mid '90's probably. It was added
2  to -- it was a form that was actually added to
3  the handbook that they had. I'm not quite sure
4  when it was done.
5      Q. And this is the Pharmacy Provider
6  Handbook?
7      A. Pharmacy Provider Handbook.
8      Q. But setting aside whether or not the
9  process was formal in the 1979 to '84 time
10 period, if you set a MAC that too low, you would
11 hear about it from pharmacists?
12     A. That's correct.
13     Q. And then the formal process came in at
14 some point in the '80's, you don't know when, but
15 when you came back in '98, '99, in that timeframe
16 and resumed the responsibility for setting the
17 Wisconsin Medicaid MAC, there was a formal
18 process in place?
19     A. Yes, I believe that was true at that
20 period, yes.
21     Q. And how does the formal process work?
22     A. It's a form they can fax in with a copy

Page 83

1  of the invoice. Sometimes they just fax in the
2  copy of the invoice. It's a formal process, but
3  we're realistic and if they provide us with
4  documentation, an invoice, then we don't always
5  make them fill out the form. Our objective is
6  that we establish a price that's reasonable and
7  not stand on format.
8      Q. You indicated there was an individual
9  in the time Wisconsin Medicaid program that
10 received this information. Who was that?
11     A. It varied over time. It was Carrie
12 Gray at one time. It was Kathy Zimmerman at one
13 time. It was Carol Nino at one time, and it
14 currently is Susan -- she will hate it I don't
15 remember her name. I don't recall her name.
16 Anyway, it was a clerical job that changed
17 frequently.
18     Q. And this person, this individual at the
19 Wisconsin Medicaid program was responsible for
20 collecting, it sounds like, invoices that showed
21 the price at which a pharmacy was purchasing and
22 sending --

Page 84

1      A. It was an invoice.
2      Q. -- and sending that price information
3  along to you?
4      A. Yes.
5      Q. And that price information was
6  something that you would have incorporated in the
7  process of setting Wisconsin MACs?
8      A. That's true.
9      Q. And if a pharmacist faxed in an invoice
10 that showed they couldn't purchase at the price
11 that had been set for the MAC, what would happen?
12     A. Well, we would evaluate it. If it
13 perhaps was a product that was a very high volume
14 and that they had purchased one small bottle and
15 we knew they bought it short, we wouldn't always
16 change. We would wait until we had another
17 submission of an invoice. But if it was -- it
18 appeared to be part of the routine purchasing
19 process, that would generate then an
20 investigation in which I would go back and look
21 at my available sources and make a determination
22 whether that reflected what my sources had for

Page 85

1  price information.
2      Q. And if you determined that the drug
3  wasn't uniformly available at the MAC price, what
4  would you do?
5      A. I would suggest to the clerical person
6  who was responsible for administering the MAC
7  program in the sense of adding -- doing the
8  paperwork that that price be changed and
9  establish a date that usually was at least back
10 to the period in which they were requesting it.
11 So it would be backdated.
12     Q. Okay. So just so we're clear, you
13 would increase the MAC price, right?
14     A. I don't recall anybody ever asking us
15 to decrease the price, which was always
16 interesting.
17     Q. Actually, I have seen documents. I
18 have one example we can look at in a little
19 while. There's at least one truly honest?
20     A. I'm sure there's always one example to
21 prove the rule, I guess.
22     Q. But generally speaking you would get

22 (Pages 82 to 85)

Page 86

1   these invoices and you would increase the MAC
2   price if you, after investigation, decided it was
3   appropriate to do so?
4       A.  That's true.
5       Q.  And it was you that was responsible for
6   making the decision during the 1999 to the
7   present period?
8       A.  I think that is true, yes.
9       Q.  And what criteria did you use?
10      A.  I went back and looked at the sources
11  that I had and used both their invoices as well
12  as the pricing sources I had established to make
13  the change.
14      Q.  And when you say "these pricing
15  sources," we're talking about Cardinal and IPC
16  and --
17      A.  Vet Net Purchasing, yes.
18      Q.  Okay.  You talked about the concept of
19  backdating.  What was backdated?
20      A.  Well, the date of -- The pharmacists in
21  Wisconsin have I think it's up to a year they can
22  rebill, if we make a change, and get the

Page 87

1   different prices, if we raised the price, for
2   instance.  So if, in fact, they believe 30 days
3   ago they purchased this product which was at a
4   price that was much more than the MAC price, then
5   we would backdate it to that period that they
6   requested in which they had an invoice and would
7   -- and they were then able to go back and rebill
8   and -- Reverse and rebill is what they do.  They
9   reverse the claim, they rebill and get the higher
10  amount.
11      Q.  I think I know the answer to this, but
12  why would you backdate?  What was the purpose
13  behind that?
14      A.  The purpose was if, in fact, during the
15  time period in which we had established a MAC
16  that didn't reflect what the marketplace was, it
17  gave them the opportunity to get reimbursed at
18  that higher rate.
19      Q.  And by "them" you mean pharmacists?
20      A.  Pharmacists, yes.
21      Q.  So, in other words, backdating was an
22  attempt to make sure that pharmacists were

Page 88

1   adequately compensated for dispensing generic
2   drugs?
3       A.  Right, for that time period.
4       Q.  Focusing back now on Exhibit Collins
5   003 for identification, we were looking at the
6   bullet that says MAC Drug Selection.  There's --
7   the second bullet under that heading says, "MAC
8   prices must be at least 25 percent less than
9   innovator prices."  What does that mean?
10      A.  Well, not that 25 is a hard and fast
11  rule.  Reality is that the -- when compared -- a
12  generic when compared to a brand has a different
13  rebate.  I wasn't privy to the rebate
14  information.  That wasn't something I had access
15  to, except on a rare occasion, but since at a
16  minimum the rebates for brand named drugs were 15
17  and one-half percent and for generics were 11,
18  there was a difference in that cost to the
19  program, and traditionally the rebates were more
20  than the minimum 15.5 percent, particularly the
21  products that had gone generic.  So there were
22  circumstances in which there was no MAC because

Page 89

1   the MAC price would have still been higher than
2   the net cost of a brand name product.
3       Q.  Let me see if I can understand what you
4   have just said.  You made reference to rebates.
5   Let's start there.  Rebates -- and the rebates
6   you are talking about are rebates that the
7   manufacturers pay to the State of Wisconsin
8   Medicaid program?
9       A.  Yes.
10      Q.  So the defendant manufacturers in this
11  case pay rebates to the Wisconsin Medicaid
12  program; correct?
13      A.  Yes.
14      Q.  And you said the rebate that a
15  manufacturer would pay to the Wisconsin Medicaid
16  program is different for branded products than it
17  is for generic products?
18      A.  That's correct.
19      Q.  And you talked about some formulas it
20  sounds like?
21      A.  Yes.
22      Q.  And you said typically with a branded

23 (Pages 86 to 89)