# EXHIBIT 52

Indianapolis, IN

Page 362

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---------------------------X

| | |
|---|---|
| IN RE: PHARMACEUTICAL ) | MDL No. 1456 |
| INDUSTRY AVERAGE WHOLESALE ) | Master File No. |
| PRICE LITIGATION ) | 01-CV-12257-PBS |
| ---------------------------) | Subcategory Case |
| THIS DOCUMENT RELATES TO: ) | No. 06-11337 |
| United States of America ex ) | |
| rel. Ven-A-Care of the ) | Hon. Patti B. Saris |
| Florida Keys, Inc., et al. ) | |
| v. Dey, Inc., et al., Civil ) | |
| Action No. 05-11084-PBS, and) | VIDEOTAPED DEPOSITION |
| United States of America ex ) | OF THE INDIANA FAMILY |
| rel. Ven-A-Care of the ) | AND SOCIAL SERVICES |
| Florida Keys, Inc., et al. ) | ADMINISTRATION by |
| v. Boehringer Ingelheim ) | CARL MARK |
| Corp., et al., Civil Action ) | SHIRLEY, R.Ph. |
| No. 07-10248-PBS ) | VOLUME II |

---------------------------X

DECEMBER 3, 2008

INDIANAPOLIS, INDIANA

IN Family and Social Svcs Administration (Carl Shirley) - Vol II                    December 3, 2008
Indianapolis, IN

Page 407

1  Q. Okay. I'd ask you to turn to page 14.
2  And I would ask you if you would agree with me --
3  well, I would ask you if you would explain to me
4  what you think that the information represented
5  on page 14 means, what it appears to be.
6  A. This is the process Myers & Stauffer
7  used in going about establishing state MAC rates.
8  Q. Okay. And you would agree it appears
9  to explain the process that was effective for
10 several time periods on this page and continuing
11 through to page 16?
12 A. Yes.
13 Q. Can I ask you to just quickly review
14 any one of these, the section for process
15 effective June 2002 through March 2005 on page
16 14.
17     (Witness complied with request.)
18 Q. Is it your understanding that Myers &
19 Stauffer was recommending -- or was stating that
20 the multiplier to average actual acquisition
21 costs in the state MAC program would be 1.2?
22     MS. ST. PETER-GRIFFITH: Object to the

Page 408

1  form.
2  A. States the multiplier was 1.2.
3  Q. Was for that period?
4  A. Yes.
5  Q. And if you continue looking at the
6  other periods discussed, which are April 2005 to
7  July 2005, and continuing on to the next two
8  pages after August 2005, September 2005 to March
9  2006 and April 2006 and thereafter, that it
10 appears that the same 1.2 multiplier was used?
11 A. Yes, that's correct.
12 Q. Is that consistent with your
13 recollection of how the MAC program multiplier
14 was set?
15 A. That's the history of the MAC
16 multiplier, to my knowledge.
17 Q. What is the -- do you know what the MAC
18 multiplier is right now?
19 A. I believe it's 1.2.
20 Q. Do you understand why the multiplier
21 was set at 1.2 rather than 1.0?
22 A. I understand the purpose of the

Page 409

1  multiplier. It's as stated. And I am not
2  familiar with the derivation of the 1.2 figure.
3  Q. Okay. This document, I'm just looking
4  at page 14, for June 2002 through March 2005
5  states that "An adjustment multiplier was applied
6  to the base rate to ensure that the applicable
7  state MAC rate is sufficient to allow reasonable
8  access by providers to the drugs at or below the
9  established state MAC rate. The multiplier was
10 1.2, meaning that the state MAC rate is equal to
11 120 percent of the base rate." And that section
12 also describes base rate as being the average
13 actual acquisition costs.
14     So do you understand that the
15 multiplier of 1.2 was chosen to ensure that
16 applicable state MAC rate is sufficient to allow
17 reasonable access by providers to drugs at or
18 below established state MAC rates?
19 A. That appears to be what the fourth
20 bullet point is stating.
21 Q. Now, it's my understanding that the
22 base rate discussed is the average actual

Page 410

1  acquisition costs; is that correct?
2  A. That's what the document states.
3  Q. Okay. So when Indiana chose to
4  reimburse drugs at average -- chose to set its
5  MAC rate program -- its MAC program at a
6  multiplier of 1.2 of average actual acquisition
7  costs, it was seeking to make sure that there was
8  reasonable access MAC for providers to
9  pharmaceuticals -- pardon me, strike that.
10     So it's your understanding that the MAC
11 rate is set above average actual acquisition
12 costs in Indiana; is that correct?
13 A. Since the state MAC rate is 1.2 times
14 the base rate, that would be the case, yes.
15 Q. Okay. The state MAC rates exceed
16 average actual acquisition costs by 20 percent;
17 is that correct?
18 A. That's correct.
19 Q. And that was Indiana's choice to make?
20 They were not -- Indiana was not forced to choose
21 to pay a 20 percent premium to average actual
22 acquisition costs; is that correct?

13 (Pages 407 to 410)

Henderson Legal Services, Inc.
202-220-4158                              www.hendersonlegalservices.com