# EXHIBIT 54

Page 1

```
              UNITED STATES DISTRICT COURT

               DISTRICT OF MASSACHUSETTS

-----------------------------------x
In Re:   PHARMACEUTICAL INDUSTRY    ) MDL No. 1456
AVERAGE WHOLESALE PRICE LITIGATION  ) Civil Action
-----------------------------------x 01-12257-PBS
THIS DOCUMENT RELATES TO:           )
United States of America, ex rel.   ) Hon. Patti B.
Ven-A-Care of the Florida Keys,     )    Saris
Inc., v. Abbott Laboratories, Inc., )
Civil Action Nos. 06-11337-PBS and  )
07-CV-11618-PBS and United States   )
of America ex rel. Ven-a-Care of    ) Video 30(b)(6)
the Florida Keys, Inc., v. Dey,     ) Deposition of
Inc., et al., Civil Action No.      ) State of North
05-11084-PBS and United States of   ) Carolina Dept.
America ex rel. Ven-a-Care of the   ) of Health &
Florida Keys, Inc., v. Boehringer   ) Human Services
Ingelheim Corp., et al., Civil      ) by Lisa Weeks
Action No. 07-10248-PBS             ) Raleigh, NC
-----------------------------------x October 21, 2008
Reporter: Marisa Munoz-Vourakis-RMR, CRR, Notary Public
```

| Page 54 | Page 56 |
|---|---|
| 1   A.  Okay. | 1   A.  I'm not understanding the question. |
| 2   Q.  Okay.  This is the letter dated October | 2   Q.  Well, I think you said that the state |
| 3  4, 2001 from CVS Pharmacy to Sharman Leinwand, | 3  MAC program would deal with generic drugs, is |
| 4  coordinator drug utilization review North | 4  that correct? |
| 5  Carolina Department of Health Human Services, | 5   A.  Yes. |
| 6  Division of Medical Assistance. | 6   Q.  And so the CVS response here deals |
| 7       Did Sharman work part time in the | 7  specifically with their view of whether or not |
| 8  pharmacy division that you work in now? | 8  the state MAC list would be beneficial to the |
| 9   A.  Yes. | 9  state program.  And what is their view of what |
| 10  Q.  And what does this letter from CVS to | 10  the state MAC list might do to the state's -- |
| 11 North Carolina DMA discuss?  What does it refer | 11 forget it. |
| 12 to? | 12      I need to show you another document. |
| 13  A.  A pharmacist's position on the proposed | 13      MS. YAVELBERG:  Mark this as Exhibit 4. |
| 14 state MAC list. | 14      (The document referred to was |
| 15  Q.  Does CVS support the MAC list? | 15 marked Plaintiff's Exhibit Weeks 004 for |
| 16  A.  No. | 16 identification.) |
| 17  Q.  What are its argument as to why it does | 17  Q.  Take a minute to look that letter over. |
| 18 not support the MAC list? | 18      (Pause.) |
| 19  A.  I believe their concern was that it | 19  Q.  Okay.  This is the letter dated October |
| 20 would possibly move pharmacies to dispense the | 20 5, 2001 to Sharman Leinwand of DMA, and it is a |
| 21 more expensive brand name alternative. | 21 letter on behalf of the North Carolina Retail |
| 22  Q.  And did North Carolina implement a MAC | 22 Merchant's Association signed by Fran Preston? |

| Page 55 | Page 57 |
|---|---|
| 1  list even after it received this letter from CVS? | 1       MR. KATZ:  It's not signed. |
| 2   A.  Yes. | 2       MS. YAVELBERG:  I'm sorry? |
| 3   Q.  And did the MAC list in fact result in | 3       MR. KATZ:  I said it's not signed. |
| 4  an increase of brand drug use versus generic drug | 4   Q.  Lisa, have you seen this document |
| 5  use? | 5  before? |
| 6   A.  Not that I'm aware of, no. | 6   A.  Yes. |
| 7   Q.  Turn to the second page, the bottom | 7   Q.  And where have you seen it before? |
| 8  paragraph section in bold there, if you could | 8   A.  Mercer had it.  Mercer had it. |
| 9  read those two sentences for me? | 9   Q.  And have you seen it -- this is a |
| 10  A.  The cost associated with generic | 10 letter dated from 2001.  So have you seen it more |
| 11 pharmaceuticals are not the problem.  Retail | 11 recently than 2001? |
| 12 pharmacy reimbursement is not the problem. | 12  A.  Yes, I reviewed it recently. |
| 13  Q.  And what is your understanding of what | 13  Q.  And did you provide it to anyone? |
| 14 CVS -- what is the state's understanding of what | 14  A.  Yes. |
| 15 CVS was referring to when it made those | 15  Q.  To who? |
| 16 statements? | 16  A.  As part of the subpoenas for Abbott, |
| 17      MR. KATZ:  Objection to form. | 17 Dey and the United States Department of Justice. |
| 18  A.  I believe that the pharmacy providers | 18  Q.  It was provided in response to those |
| 19 felt that the brand name drugs were more | 19 subpoenas? |
| 20 problematic than the generics. | 20  A.  Yes. |
| 21  Q.  And how does that have to do with the | 21  Q.  So this was gathered in response to |
| 22 state MAC list? | 22 that subpoena? |

Page 70

```
 1  part of the State of North Carolina?
 2      A.  The general assembly.
 3      Q.  And what was the reason for that change
 4  by the state?
 5      A.  To encourage pharmacists to dispense
 6  generics.
 7      Q.  And how would that change encourage
 8  pharmacists to dispense generics?
 9      A.  It would encourage them to dispense
10  generics by providing them a higher dispensing
11  fee.
12      Q.  As compared to what?
13      A.  As compared to the dispensing fee
14  provided for the brand name drugs.
15      Q.  And why would North Carolina want the
16  pharmacies to dispense generics versus brands?
17      A.  Generally they are less expensive than
18  brands.
19      Q.  And does that have an overall impact on
20  the Medicaid reimbursement outlay?
21      A.  Yes, it reduces expenditures for
22  pharmacy.
```

Page 71

```
 1      Q.  Instead of changing the dispensing fee
 2  for brands or generics to give the generics a
 3  higher dispensing fee and the brands a lower
 4  dispensing fee, why not instead take the brand
 5  name drugs and significantly reduce the
 6  reimbursement on the ingredient side, for
 7  example, by changing the reimbursement
 8  methodology to AWP minus 50 percent for example?
 9          MR. KATZ:  Objection, form.
10      A.  It's not easy to do that.  It's not
11  easy to change the reimbursement formula.
12      Q.  Why not?
13      A.  Because well, first of all, it requires
14  a state plan change, and there also has to be buy
15  in from legislators, providers, the division, the
16  department.
17      Q.  And when you said it's not easy to do
18  that because it would require a state plan
19  change, why is it difficult to change a state
20  plan?
21      A.  A change in a state plan takes years
22  sometimes to do that, because there's -- it has,
```

Page 72

```
 1  like I say, there's a process that involves
 2  divisions, the departments, secretary's office,
 3  the legislators, the provider community.  There
 4  has to be, you know, consensus, and then at that
 5  point it gets submitted to CMS, and then it takes
 6  CMS time to review it, and sometimes CMS
 7  disagrees with the state plan change request.
 8  It's a big process.
 9      Q.  And absent the challenges that might be
10  involved in changing the state plan, the
11  reimbursement methodology through the state plan
12  process, are there any other reasons why taking a
13  very significant discount off of AWP would be --
14  why didn't the state do that in order to
15  encourage the dispensing of generics versus
16  brands?  Why didn't it say well, for brands,
17  we're going to reimburse AWP minus 50 percent,
18  for example?
19          MR. KATZ:  Objection to form.
20      A.  Well, that the state often is concerned
21  with, like I've mentioned earlier, access issues
22  for the patients, Medicaid recipients.
```

Page 73

```
 1      Q.  And what does that have to do with the
 2  reimbursement rate?
 3      A.  Because the state, again, tries to
 4  cover cost of the drugs for the pharmacy to
 5  provide to the Medicaid recipient.
 6      Q.  And taking a bigger discount off of
 7  AWP, what would the relationship be to the cost?
 8          MR. KATZ:  Objection, form.
 9      A.  Possibly some pharmacies may not be
10  able to purchase a drug at a significantly
11  discounted reimbursement.
12      Q.  Reimbursement meaning?
13      A.  AWP minus, you know, ten percent, but
14  the discount.
15      Q.  Are you familiar with the North
16  Carolina Association of Pharmacist's association
17  initiative to increase voluntarily the generic
18  dispensing of drugs for Medicaid patients?
19      A.  Yes.
20      Q.  How did this come about?
21      A.  It was a proposal by the pharmacy
22  community as an alternative, I believe, to the
```

19 (Pages 70 to 73)

NC Department of Health and Human Services (Lisa Weeks)                                                              October 21, 2008
Raleigh, NC

Page 266

 1  just know that they have a confidential
 2  proprietary database of cost information.
 3     Q.  But it's obvious from this policy that
 4  that actual acquisition cost is some number below
 5  the average wholesale price, right?
 6         MS. HAYES:  Objection, form.
 7         MS. YAVELBERG:  Objection, form.
 8     A.  It says it's between the actual
 9  acquisition cost and actual wholesale price of a
10  generic drug, that's where the price is
11  established.
12     Q.  But with respect to this policy, the
13  state understands that the actual acquisition
14  cost is below the average wholesale price, right?
15         MS. YAVELBERG:  Objection, form.
16     A.  It says between, so, yes, I think you
17  are correct, that would be a correct assumption.
18     Q.  Okay.  And in this policy, there's a 20
19  percent margin built in above the actual
20  acquisition cost, right?
21     A.  Yes.
22     Q.  So this ensures that if a pharmacy

Page 267

 1  purchases the drug at actual acquisition cost,
 2  gets reimbursed at the MAC price, that they will
 3  have a 20 percent margin, right?
 4         MS. YAVELBERG:  Objection, form.
 5     A.  For established generics.
 6     Q.  Right.
 7     A.  That only have one supplier.
 8     Q.  Right.
 9     A.  Yes.
10     Q.  So the pharmacy for establishing
11  generic drugs that are reimbursed under a MAC
12  under this policy, the pharmacy will receive a 20
13  percent margin in comparison to its actual
14  acquisition cost, right?
15     A.  That's what this policy says, yes.
16     Q.  And in fact that the North Carolina
17  Medicaid agency anticipates that usually the
18  margin will be substantially higher than that,
19  right?
20         MS. YAVELBERG:  Objection, form.
21     A.  No, I can't.
22     Q.  It says right here in most cases, MAC

Page 268

 1  pricing is substantially higher than that 20
 2  percent?
 3     A.  Okay.
 4     Q.  So you would have to agree with me then
 5  that the Medicaid agency anticipates that in most
 6  cases, the margin will be higher than 20 percent,
 7  right?
 8         MS. HAYES:  Objection, form.
 9         MS. YAVELBERG:  Objection, form.
10     A.  Yes, it says in most cases, MAC price
11  is substantially higher than this 20 percent.
12     Q.  It's not even just higher than the 20
13  percent, substantially higher, right?
14     A.  That's what this document says.
15     Q.  Okay.
16         (The document referred to was
17  marked Defendant's Exhibit Dey 063 for
18  identification.)
19         MR. KATZ:  Why don't we change the
20  tape.  We only have two minutes left, but no
21  break.
22         THE VIDEOGRAPHER:  End of tape No. 5 in

Page 269

 1  this deposition of Ms. Weeks.  We are off the
 2  record at 3:43.
 3         (Recess.)
 4         THE VIDEOGRAPHER:  This is the start of
 5  tape No. 6 in this deposition of Ms. Weeks.
 6  We're on the record at 3:44.
 7  BY MR. KATZ:
 8     Q.  Ms. Weeks, I've handed you what has
 9  been marked Exhibit 63.  Do you recognize this
10  document?
11     A.  Yes.
12     Q.  What is it?
13     A.  It is a presentation provided on the
14  pharmacy state MAC by the Division of Medical
15  Assistance.
16         (The document referred to was
17  marked Defendant's Exhibit Dey 063 for
18  identification.)
19     Q.  I'd like you to turn to page eight.
20         Now, this is an example of a MAC that
21  is set when there's only one established generic
22  drug, right?

68 (Pages 266 to 269)

Henderson Legal Services, Inc.
202-220-4158                                              www.hendersonlegalservices.com

b568fa66-5d69-4f65-b5c3-21751e4b978e