# EXHIBIT 60

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -x

IN RE:  PHARMACEUTICAL          :  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE      :  CIVIL ACTION

PRICE LITIGATION                :  01-CV-12257-PBS

THIS DOCUMENT RELATES TO        :

U.S. ex rel. Ven-a-Care of      :  Judge Patti B. Saris

the Florida Keys, Inc.          :

     v.                         :

Abbott Laboratories, Inc.,      :  Chief Magistrate

No. 06-CV-11337-PBS             :  Judge Marianne B.

- - - - - - - - - - - - - - -x     Bowler

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.  May 15, 2007
Washington, DC

Page 50

1   Administration.  And not planning to go back into the
2   government, but I ran into Secretary Thompson or
3   something, and a mutual friend had recommended that
4   he encourage me to do this.  So it was largely
5   through Secretary Thompson.  And since I had a long
6   history with the Bush Administration, hopefully I was
7   an acceptable choice to the White House.
8       Q.   And you stayed there until -- you stayed
9   as administrator of HCFA and CMS, which was one of
10  the first things you did was to change the name,
11  until what, the end of --
12      A.   Technically, it was January 4th of 2004,
13  was my technically last day.
14      Q.   Will you mark this?  This will be 181, I
15  believe.  Exhibit Abbott 181.
16           MS. MILLER:  Mary Miller on behalf of the
17  Florida Attorney General's office.  Florida reserves
18  the right to strike all testimony relating to
19  documents used as exhibits here today with respect to
20  the Mylan case and cross-noticed case, due to failure
21  to produce said documents based on properly served
22  request for production of documents.

Page 51

1           (Exhibit Abbott 181 was
2            marked for identification.)
3           BY MR. DALY:
4       Q.   Mr. Scully, I'm handing you what
5   apparently the government did not properly serve on
6   the Florida qui tam, which is a copy of your CV,
7   resume that was, I think, provided to us by
8   Mr. Gobena last week.  Is that indeed your current
9   resume?
10          MS. MILLER:  Objection to form.
11  Clarification.  It wasn't the government that failed
12  to produce said documents.  It was the Mylan
13  defendants who failed to produce said documents.
14          MR. GOBENA:  I'm confused by her
15  objection.
16          MR. DALY:  I didn't have an objection.
17          MS. MILLER:  It was the Mylan defendants
18  and the other defendants who failed to produce the
19  documents.  It wasn't the government who was required
20  to produce the documents.
21          MR. ESCOBAR:  I'm Phil Escobar on behalf
22  of the Mylan defendants.  You say that you're

Page 52

1   objecting to a document that the Mylan defendants did
2   not give you that came from the government?
3           MS. MILLER:  That we had properly served.
4   It's to the extent that it should have been produced
5   to document requests properly served on the
6   defendants in the cross-noticed case.  We reserve
7   that right.  I just wanted to clarify what my
8   objection was, so the Abbott counsel was clear about
9   this.
10          MR. BREEN:  Just so the record is clear,
11  in the Florida ex rel Ven-a-Care Mylan action, the
12  state has requested documents from Mylan.  And Mylan
13  has objected, I believe, to the lack of a protective
14  order or something at this point in time.  And I
15  believe the AG's objection is simply that if any of
16  those documents are used in this deposition today,
17  with respect to the deposition is used in the Mylan
18  case, Florida is objecting.  It's that simple, right,
19  Mary?
20          MS. MILLER:  Yes.  It is that simple.
21  Thank you.
22          MR. GOBENA:  The only subpoena we received

Page 53

1   was from Abbott Labs.  We provided -- asking for the
2   resume.  We provided it to you, so there is nothing
3   improper that we did in terms of nonservice.
4           BY MR. DALY:
5       Q.   I don't think so either, but I -- at least
6   in terms of this resume.
7           MR. GOBENA:  Fair enough.
8           THE WITNESS:  Hopefully, there is nothing
9   bad on my resume.  I'd hate to be in the Joe Biden
10  camp here.
11          BY MR. DALY:
12      Q.   So this is indeed a copy of your current
13  resume, Mr. Scully?
14      A.   I think so.  It looks like it is.
15      Q.   Okay.  Now, after you left CMS in January
16  of '04, you went to work for Alston & Bird?
17      A.   Simultaneously Welsh Carson and Alston &
18  Bird.
19      Q.   And you're still at Alston & Bird?
20      A.   Yes.
21      Q.   And what do you do there?
22      A.   I started the health care practice, and I

14 (Pages 50 to 53)

Scully, Thomas A.   May 15, 2007
Washington, DC

Page 94

1  that I was asked, but I would be more than happy to
2  go do that.
3      Q.   This will be Exhibit Abbott 182.
4           (Exhibit Abbott 182 was
5            marked for identification.)
6      BY MR. DALY:
7      Q.   Mr. Scully, I've handed you what we've
8  marked as Exhibit Abbott 182, which is the Notice of
9  Deposition for your deposition today, along with a
10 subpoena duces tecum, and I'm just wondering if
11 you've ever seen this before?
12     A.   I have not.
13          MR. GOBENA:  I'll represent, actually,
14 that we did send a copy to Mr. Scully.  And just so
15 we don't have to revisit this issue later on.
16          THE WITNESS:  It's very possible it was
17 sent to me, but I didn't see it.  I'm frequently in
18 New York and Washington and --
19     BY MR. DALY:
20     Q.   I understand, and so just to --
21     A.   Probably was not a priority for my
22 assistant.

Page 95

1      Q.   Oh, for your assistant.  It was for you --
2      A.   For either of my assistants in my paying
3  jobs.  So I apologize.
4      Q.   And just keep that for a minute because I
5  do want to ask -- and just to confirm, if you look on
6  the second to last page under Exhibit A, you see a
7  document request -- documents requested.  I take it
8  that you did not conduct any search at least up to
9  now for the five categories of documents that are
10 mentioned?
11     A.   I have not, but I can tell you the only
12 one that's any issue is potentially number three,
13 which is whether I have any personal documents.
14 There is nothing, nothing else that would be -- would
15 be relevant.  It's possible I have some old
16 documents, but I very much doubt it, but I would be
17 happy to look, and I can show you.
18     Q.   Well, I guess I would ask then since
19 you -- since you maybe didn't see it, even though it
20 may have been sent to you, if you would conduct that
21 search.  And you know, confer with Mr. Gobena or
22 others within DOJ, and let us know if you find any

Page 96

1  documents that might be responsive to these requests.
2      A.   Certainly will.
3      Q.   Thank you.  And while I'm getting that
4  exhibit, those documents, if they, if there are any
5  that might be responsive would be located where?
6      A.   Almost certainly at my Alston & Bird
7  office in Washington.
8           (Exhibit Abbott 183 was
9            marked for identification.)
10     BY MR. DALY:
11     Q.   Mr. Scully, I'm going to hand you what
12 we've marked as Exhibit Abbott 183, which I believe
13 is a copy of your September 21, 2001 written
14 submission to the House Energy and Commerce
15 Subcommittee.  Is that what you recognize it to be?
16     A.   Yes.
17     Q.   And this is a document that you submitted
18 in connection with your testimony on September 21,
19 2001?
20     A.   Yes.  Yes.
21     Q.   And just to give the process, this is the
22 way it's typically done.  In other words, if you're

Page 97

1  going to testify before Congress, you come in and you
2  give them a written statement, and then you go in and
3  talk to them and answer questions.  Is that the
4  process?
5          MR. GOBENA:  Object to the form.  Sorry.
6          THE WITNESS:  Yes.
7      BY MR. DALY:
8      Q.   And okay, so you -- based on earlier
9  testimony today, you started as a consultant in
10 February or March of 2001, correct?
11     A.   Yes.
12     Q.   With CMS and then you were actually
13 confirmed when?
14     A.   May, May 10th, I think, somewhere in
15 there.  Middle of May.
16     Q.   And so -- and is this the first testimony
17 that you can recall before Congress on the issue of
18 AWP and Medicare?
19     A.   On this issue, I think it probably was.
20 I'm not certain.
21     Q.   In the first paragraph right in the middle
22 on the second page, there is a sentence that says,

25 (Pages 94 to 97)

Henderson Legal Services
202-220-4158

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                                            May 15, 2007
Washington, DC

### Page 98

```
 1  "in addition, it is clear that the payment system for
 2  selected outpatient drugs that are now covered by
 3  Medicare is a mess."  Do you see that language?
 4      A.  Yes.
 5      Q.  And did you believe at this point in time,
 6  September 2001, that Medicare was a mess?
 7      A.  Yes.
 8          MR. GOBENA:  Object to the form.
 9          THE WITNESS:  Yes.  You can imagine staff
10  probably didn't write that.
11          BY MR. DALY:
12      Q.  Pardon me?
13      A.  You can imagine staff probably didn't
14  write that sentence.
15      Q.  This is actually you?
16      A.  Most likely.
17      Q.  Up at the top of the next page, page 2,
18  you have part of a sentence that says, "the law
19  mandates that we pay physicians and other providers
20  based on the lower of the billed charge, or 95
21  percent of the drug's average wholesale price."  Do
22  you see that language?
```

### Page 99

```
 1      A.  Yes.
 2      Q.  And that was the result of the 2000
 3  Balanced Budget Act, or that was BBA, wasn't it?
 4          MR. GOBENA:  Object to the form.
 5          THE WITNESS:  I don't recall, but I assume
 6  you're correct.
 7          BY MR. DALY:
 8      Q.  Well, this is the result of legislation
 9  that was passed by Congress in 2000 that set the
10  reimbursement at 95 percent of AWP or the billed
11  charge, correct?
12          MR. GOBENA:  Object to the form.  I think
13  you mean '97, Jim.
14          THE WITNESS:  I think it was 2000 that
15  prohibited us from revisiting it for a year, if I
16  remember correctly.  So we couldn't revisit it until
17  GAO came out with a report.  I think the actual
18  structure came from '97.
19          BY MR. DALY:
20      Q.  Okay.  And in the next sentence, you talk
21  about "numerous studies have indicated that the
22  industry's reported wholesale prices, the data on
```

### Page 100

```
 1  which Medicare payments are based are vastly higher
 2  than the amounts that drug manufacturers and
 3  wholesalers actually charge providers."  Do you see
 4  that language?
 5      A.  Yes.
 6      Q.  And your numerous studies you're referring
 7  to, various OIG, Office of Inspector General reports
 8  that have been prepared over the years?
 9          MR. GOBENA:  Object to the form.
10          THE WITNESS:  I don't remember, but there
11  were many GAO, OIG, other private studies.
12          BY MR. DALY:
13      Q.  Yes.  I'm not asking you to remember any
14  one in particular, but it's the OIG-GAO reports that
15  you're referring to?
16      A.  A series of those.
17          MR. GOBENA:  Same objection.
18          BY MR. DALY:
19      Q.  And a series of those going back at least
20  10 years before your testimony here in September '01?
21          MR. GOBENA:  Objection, form.
22          THE WITNESS:  I think this was probably
```

### Page 101

```
 1  written by staff, so I can't remember specifics.
 2          BY MR. DALY:
 3      Q.  So this sentence -- well, strike that.
 4  You said that the Medicare being a mess sentence on
 5  the first page, that you wrote that, right?
 6          MR. GOBENA:  Object to the form.
 7          THE WITNESS:  The process of this
 8  testimony -- I testified a lot -- was a week before I
 9  met with a couple of staff people.  And I would tell
10  them what I want to say, and they would write it.
11  And then just before I went to the Hill, I would put
12  in a few things to spice it up, you can usually see
13  which is mine, which is not.
14          BY MR. DALY:
15      Q.  So, but my point is that you review -- you
16  reviewed this document before it was submitted to
17  Congress?
18      A.  Probably not that thoroughly, but yes, I'm
19  sure I viewed it.
20      Q.  Skipping down a sentence, you have a
21  sentence here that says -- still staying on page 2 --
22  "some affected physicians and providers have
```

26 (Pages 98 to 101)

Page 102

```
 1  suggested that they need these Medicare drug profits
 2  to cross-subsidize what they believe are inadequate
 3  Medicare payments for services related to furnishing
 4  the drugs such as the administration of chemotherapy
 5  for cancer."  Do you see that language?
 6      A.  Yes.
 7      Q.  And you were aware during this time period
 8  that that was the contention of many providers,
 9  correct?
10          MR. GOBENA:  Object to the form.
11          THE WITNESS:  I was aware that that was
12  primarily the contention of oncologists.
13          BY MR. DALY:
14      Q.  And the convention was that the
15  oncologists were using the overpayment on the
16  Medicare Part B drugs to cross-subsidize inadequate
17  service payments under Medicare, is that your
18  understanding?
19          MR. GOBENA:  Object to the form.
20          THE WITNESS:  That was their contention.
21  Yes.
22          BY MR. DALY:
```

Page 103

```
 1      Q.  And you understood that to be their
 2  contention?
 3      A.  I certainly understood that to be their
 4  contention.  Yes.
 5      Q.  If you skip ahead to page 4.  Do you see
 6  under Medicare payment for currently covered drugs in
 7  the second sentence, you say, "traditionally, AWP has
 8  been based on prices reported by drug manufacturers
 9  and published in compendia, such as the Red Book,
10  which is published by Medical Economics Company,
11  Inc."
12          Do you see that language?
13      A.  Yes.
14      Q.  I just want to ask you a couple of
15  questions about that.  Is it your understanding that
16  manufacturers actually report AWP?
17          MR. GOBENA:  Object to the form.
18          THE WITNESS:  It was my understanding at
19  this time that manufacturers basically self-reported
20  to the Red Book, which is then used as AWP as the
21  standard measurement, as a reference matter for most
22  of the carriers.
```

Page 104

```
 1          BY MR. DALY:
 2      Q.  Is your understanding different than that
 3  today?
 4      A.  At the time, I think I believed that that
 5  was basically the -- under the rules, that was what
 6  CMS had used and then we had very little ability to
 7  change that without a full rule making.
 8          I'm not sure in hindsight if that was
 9  correct, but my understanding at the time was, with
10  staff, that we would have to undergo full rule making
11  to change that.  And that essentially the Red Book
12  was the de facto price that was used by the carriers
13  and CMS to pay 95 percent AWP.
14      Q.  What I'm trying to get to is whether or
15  not it's your understanding that as a general
16  proposition, manufacturers submit AWP to the
17  compendia, or they submit some other price to the
18  compendia, which the compendia then marks up to
19  achieve the AWP?
20          MR. GOBENA:  Object to the form.
21          THE WITNESS:  My understanding was that
22  the manufacturers subject a price to the Red Book,
```

Page 105

```
 1  which is then published as the compendia.  That they
 2  submit it.  That was my understanding.  It may not be
 3  correct.
 4          BY MR. DALY:
 5      Q.  All right.  So at this point in time, and
 6  perhaps now, you do not have an understanding that
 7  manufacturers submit a list price or direct price or
 8  WAC or some other price, and that the compendia then
 9  marked that price up by a percentage and lists that
10  as the AWP?
11          MR. GOBENA:  Object to the form.
12          MS. MILLER:  Object to the form.
13          THE WITNESS:  I was not -- my
14  understanding was that they submitted the AWP to the
15  Red Book.
16          BY MR. DALY:
17      Q.  And was it your understanding that the,
18  that the AWP that CMS was using as the benchmark for
19  reimbursement was the AWP that was published in the
20  compendia?
21      A.  For the most part, it was my understanding
22  that the standard practice was that 95 percent of AWP
```

27 (Pages 102 to 105)

Scully, Thomas A.                                                                                           May 15, 2007

Washington, DC

Page 106

1  was the AWP that was published in the Red Book.
2    Q.   And that's what you understood the law and
3  regulations to require?
4    A.   That's what I understood at the time.  At
5  the time, that's what I believe the law and
6  regulations required.  It's my recollection.  I
7  probably knew it better at the time than I do now.
8    Q.   In the next paragraph, you state, "this
9  committee," which is the Energy and Commerce
10 Committee, "CMS and the OIG have long recognized the
11 shortcomings of AWP as a way for Medicare to
12 reimburse for drugs."  Do you see that language?
13   A.   Yes.
14   Q.   And you had been aware of the shortcomings
15 of AWP as a way for Medicare to reimburse drugs since
16 your work on this in '90-'91 as we discussed this
17 morning, correct?
18        MR. GOBENA:  Object to the form.
19        MR. BREEN:  Object to the form.
20        BY MR. DALY:
21   Q.   Go ahead.
22   A.   Yes.  Generally, I was aware.

Page 107

1    Q.   And in the next sentence, you say, "the
2  IG," that's the Inspector General, "has published
3  numerous reports showing that true market prices for
4  the top drugs billed to the Medicare program by
5  physicians, independent dialysis facilities and DME
6  suppliers are actually significantly less than the
7  AWP reported in the Red Book and like publications."
8  Do you see that language?
9         MR. GOBENA:  Object to the form.
10        THE WITNESS:  Yes.
11        BY MR. DALY:
12   Q.   And the numerous reports referred to here
13 are the various OIG reports that you had been
14 familiar with during this time period, correct?
15        MR. GOBENA:  Object to the form.
16        MR. BREEN:  Object to the form.
17        THE WITNESS:  Yes.  I think GAO is one.
18        BY MR. DALY:
19   Q.   GAO reports as well?
20   A.   GAO as well.
21   Q.   If you go over to -- we are on page 5 now,
22 in the carryover paragraph at the top.  You have a

Page 108

1  sentence that says, "by offering physicians and
2  providers deep discounts compared to the price they
3  could bill Medicare, the drug manufacturers are able
4  to use profit margins to manipulate physicians and
5  providers to use their products for Medicare
6  beneficiaries."  Do you see that language?
7    A.   Yes.
8    Q.   And is that something you believed at the
9  time?
10   A.   Something I still believe.
11   Q.   You're aware of how generic drugs are
12 reimbursed under Medicare, correct?
13   A.   Yes.
14   Q.   In the sense that if there are multiple
15 source drugs, they are typically reimbursed under a J
16 Code, correct?
17   A.   Yes.
18   Q.   And the J Code is typically the median AWP
19 between all of the participants in the J Code,
20 correct?
21        MR. GOBENA:  Object to the form.
22        THE WITNESS:  Yes.

Page 109

1         BY MR. DALY:
2    Q.   Is that your understand --
3    A.   Generally.
4    Q.   Okay.  And so if you have, I mean, five
5  participants in a J Code, five different brands of a
6  particular drug that are captured within a single J
7  Code, if a provider were to use that J Code, the
8  provider would put in whatever the J Code median is
9  for that J Code, correct, as his reimbursement?
10        MR. GOBENA:  Object to the form.
11        MR. BREEN:  Objection to the form.  Breen,
12 objection, form.
13        MR. GOBENA:  And Gobena, objection, form.
14        THE WITNESS:  I'm generally familiar with
15 it.
16        BY MR. DALY:
17   Q.   And is what I said generally correct?
18        MR. GOBENA:  Object to the form.
19        THE WITNESS:  I believe so.  Yes.
20        BY MR. DALY:
21   Q.   So that I just want to understand in terms
22 of what you wrote here, if you're within a J Code,

28 (Pages 106 to 109)

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                                May 15, 2007
Washington, DC

Page 194

1  that is that you create provider access issues where
2  some providers can't get the drug for the price
3  you've set it at.  Is that correct?
4         MR. GOBENA:  Object to the form.
5  Mischaracterizes the witness's testimony.
6         THE WITNESS:  My concern would be the
7  opposite.  You can create 2 percent of AWP and AWP is
8  a completely invented number, so it's 2 percent of
9  whatever number you make up.
10        So my experience if you charge 85 percent
11 of AWP versus 95 percent of AWP, all people do is
12 raise the AWP, because it's not a real number.  It's
13 a completely contrived number.  And you can multiply
14 any number you want by AWP, because it's not a number
15 and never has been for the vast bulk of
16 manufacturers.
17        BY MR. DALY:
18    Q.   Are you saying that you didn't tell
19 Congress under oath that dropping the percentage of
20 AWP would cause provider access problems?
21    A.   Temporarily, if you paid 95 percent AWP
22 one month and 85 percent the next, before people were

Page 195

1  able to jack up the prices, they would provide
2  provider access problems in the short term.
3         But the reality is AWP is, as I've said
4  repeatedly, is air.  AWP is to me a completely --
5  it's nobody's fault, it's a stupid policy, but AWP is
6  a self-reported number and you could multiply 85
7  percent of whatever number you felt like making up.
8  And that's what happened.  So in the short term,
9  quarter by quarter, maybe even for six months until
10 people adjusted, it could have provided access
11 problems.  But in the long run, the problem with AWP
12 was AWP itself, no matter what your multiplier was.
13    Q.   To use your example, if after
14 reimbursement was cut to 85 or 80 percent of AWP and
15 then the AWP did not get raised, then the provider
16 access problems would persist?
17        MR. GOBENA:  Object to the form.
18        THE WITNESS:  In theory, possibly, but I
19 never -- in reality, nobody ever kept -- it just
20 never happened.  80 percent of AWP -- AWP was a
21 number that was self-reported and made up.  So I
22 mean, that's why we obviously didn't adopt AWP.  We

Page 196

1  looked at adopting AMP and other things which were
2  much more appropriate.  But average wholesale price
3  is a number that's created for exactly this purpose,
4  so that the government will pay a percentage of it.
5         BY MR. DALY:
6     Q.   And in 2000 -- I'm sorry, in 1991-'92, the
7  first Bush Administration proposed that reimbursement
8  be reduced to 85 percent of AWP, correct?
9     A.   Yes.
10    Q.   And I think as you mentioned, the program
11 memoranda that we are looking at ran into political
12 issues with Congress, and in fact, the directive to
13 the carriers to not use these DOJAWPs for
14 reimbursement purposes was retracted, is that
15 correct?
16        MR. GOBENA:  Object to the form.
17        THE WITNESS:  I believe particularly in
18 years that are rounded by fours, particularly
19 September, October and November, it's difficult to
20 make tough policy calls.
21        BY MR. DALY:
22    Q.   So was -- does that mean that the program

Page 197

1  memorandum was withdrawn?
2     A.   I believe that the program memorandum was
3  never actually carried out in a meaningful way.
4            (Exhibit Abbott 185 was
5             marked for identification.)
6         BY MR. DALY:
7     Q.   And I'll hand you what's been marked
8  Abbott Exhibit 85.  I'm sorry.  Exhibit Abbott 185.
9  And this appears to be a program memorandum from CMS
10 to the carriers directing them not to use the AWPs.
11 And my question is, is that what you recognize this
12 document to be?
13    A.   Yes.  I'm not sure I was administrator at
14 this point.  It may have been before I was confirmed,
15 but yes, I'm sure that's what it is.
16    Q.   That was sometime in May that you were
17 confirmed, May of '01, right?
18    A.   Yes.
19    Q.   And prior to that, you said you'd be
20 working as a consultant?
21    A.   Yes.
22    Q.   And when you say as a consultant, were you

50 (Pages 194 to 197)

Henderson Legal Services
202-220-4158

934268fd-66d9-4c40-b8d6-725605bc72fb