# EXHIBIT 69

Page 1

```
            UNITED STATES DISTRICT COURT

         FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------X

In Re: PHARMACEUTICAL INDUSTRY    ) MDL No. 1456

AVERAGE WHOLESALE PRICE LITIGATION) CIVIL ACTION:

---------------------------------X 01-CV-12257-PBS

THIS DOCUMENT RELATES TO:         )

U.S. ex rel. Ven-A-Care of the    ) Judge Patti B.

Florida Keys, Inc., v. Abbott     ) Saris

Laboratories, Inc., No.           )

06-CV-11337-PBS; U.S. ex rel.     ) Magistrate Judge

Ven-A-Care of the Florida Keys,   ) Marianne Bowler

Inc. v. Abbott Laboratories, Inc.,)

No. 07-CV-11618-PBS; U.S. ex rel. )

Ven-A-Care of the Florida Keys,   )  DEPOSITION OF

Inc. v. Dey, Inc., et al., No.    )   JERRY WELLS

05-11084-PBS; U.S. ex rel.        )

Ven-A-Care of the Florida Keys,   ) DECMEBER 15, 2008

Inc., et al. v. Boehringer        )  TALLAHASSEE, FL

Ingelheim Corp., et al., No.      )

07-10248-PBS                      )

---------------------------------X
```

Page 102

1  A. I don't recall the name. It would have
2  been their government affairs representative that
3  called on me.
4  Q. Okay. Can you recall anything at all
5  about the conversation other than your assumption
6  that it must have taken place?
7       MS. ST. PETE-GRIFFITH: Objection.
8       MS. WALLACE: Object to the form.
9       MR. BREEN: Objection, form.
10      THE WITNESS: I can remember the office
11 I was in at the time, and I don't remember who
12 the Abbott rep was because they changed over
13 time. But I remember getting their catalog out
14 and being shown another catalog that had
15 specialty contract pricing, and for the purpose
16 of proving to me how difficult it would be for a
17 customer to comply with that contract. Their
18 premise was that most of these sales that were
19 showing up at the much lower prices were diverted
20 merchandise from hospital contracts, and that it
21 wasn't really generally available to the retail
22 market.

Page 103

1  BY MR. COOK:
2  Q. Now, that -- did you believe the Abbott
3  rep?
4  A. I had suspicions, but, you know,
5  they're business people, and they were trying to
6  ensure that I continued to reimburse at the
7  higher AWP minus or WAC plus level.
8  Q. As of May 23rd, 1996, you believed the
9  majority of sales were under contracts providing
10 very favorable pricing and terms for these
11 products, correct?
12 A. That was -- the was the statement --
13      MS. ST. PETE-GRIFFITH: Object to the
14 form.
15      MS. WALLACE: Objection, form.
16      THE WITNESS: That was the statement I
17 made in a letter to CMS to encourage them to look
18 a little deeper into this issue, because I was
19 becoming suspicious that they were more widely
20 available than I was being led to believe by
21 industry reps.
22 BY MR. COOK:

Page 104

1  Q. And you made that statement because you
2  believed it to be true, correct?
3  A. That's correct.
4  Q. And because you, in fact, had
5  participated in the invoice study as to which
6  this was a response?
7       MS. ST. PETE-GRIFFITH: Object to the
8  form.
9       MS. WALLACE: Objection, form.
10      THE WITNESS: Well, we had provided
11 data to the OIG's office, and the primary purpose
12 for this letter was to point out to them that
13 they had priced birth control pills -- the
14 pricing data they got from invoices for birth
15 control pills was a pharmacy -- a single pharmacy
16 in Miami that completely distorted the study, who
17 was purchasing birth control pills as a 340B
18 provider and buying them for about less than 10
19 cents on the dollar.
20 BY MR. COOK:
21 Q. But you reviewed -- in the second
22 paragraph it indicates that you received the OIG

Page 105

1  -- I'm sorry, it's the second paragraph of the --
2  the third paragraph of the letter that we'll
3  have, the May 23rd, 1996, letter.
4  A. Okay.
5  Q. You received from the OIG their data
6  files relating to this invoice study, correct?
7  A. Yes.
8  Q. And as I understand the invoice study,
9  the OIG, through the offices of the Medicaid
10 program, sent requests for actual invoices to
11 pharmacies in the state of Florida, right?
12 A. That's correct.
13 Q. And that included infusion and IV
14 pharmacies, correct?
15      MR. BREEN: Objection, form.
16      MS. WALLACE: Objection, form.
17      THE WITNESS: I don't recall that. It
18 may have.
19 BY MR. COOK:
20 Q. Did you look at any of those invoices?
21 A. No, I didn't look at the invoices.
22 They went directly to the OIG.

Page 122

1    A.  I don't know that I had.
2    Q.  Do you recall reading this newspaper
3 article after it came out with -- with you being
4 quoted in it?
5    A.  I don't.  I do not.
6    Q.  You will agree with me that the
7 difference between acquisition cost and average
8 wholesale price was the reason that you urged
9 HCFA not to use average wholesale price as a
10 pricing mechanism, correct?
11       MS. ST. PETE-GRIFFITH:  Object to the
12 form.
13       MS. WALLACE:  Objection, form.
14       THE WITNESS:  The reason we encouraged
15 them to allow us to use a WAC plus reimbursement
16 basis was because I felt like AWP was being
17 manipulated.
18 BY MR. COOK:
19    Q.  And you had that belief back in 1987,
20 correct?
21    A.  I did.
22       MS. ST. PETE-GRIFFITH:  Object to form.

Page 123

1 BY MR. COOK:
2    Q.  And you communicated that to HCFA back
3 in the 1980s, correct?
4       MS. ST. PETE-GRIFFITH:  Object to the
5 form.
6       THE WITNESS:  I did.
7       MR. COOK:  This is a good time for a
8 break.
9       THE VIDEOGRAPHER:  The time is 11:27
10 a.m.  We are going off the record.
11       We are off the record.
12       (Thereupon, a recess was taken,
13 commencing at 11:27 a.m. and concluding at 11:37
14 a.m. of the same day.)
15       THE VIDEOGRAPHER:  This is the
16 beginning of Tape 3 of the videotaped deposition
17 of Jerry Wells taken on December 15, 2008.  The
18 time is 11:37 a.m. and we are back on the record.
19       (Exhibit Abbott-Wells 1006 was
20 marked for identification.)
21 BY MR. COOK:
22    Q.  Mr. Wells, I've handed you what we have

Page 124

1 marked as Exhibit 1006.  It is -- for the record,
2 it is a document entitled Legislative Proposal
3 Analysis dated October 1, 1998.  Do you recognize
4 this document?
5    A.  I think I do.
6    Q.  You are listed as the contact name on
7 this Legislative Proposal Analysis.  Do you see
8 that?
9    A.  I do.
10    Q.  Is it fair to assume that you probably
11 wrote this Legislative Proposal Analysis?
12    A.  I had something to do with writing it.
13    Q.  What's the subject matter of this
14 Legislative Proposal Analysis?
15    A.  This is parenteral and enteral
16 pharmacies.  It was, I think, drafted after or
17 before a meeting with parenteral and enteral
18 pharmacies and some legislators.
19    Q.  Was Ven-a-Care included in that
20 meeting?
21    A.  I don't know that for sure.  I think
22 they were.  They probably were.  Should have

Page 125

1 been.
2    Q.  Why were these pharmacies and
3 legislators and you meeting together in 1998?
4    A.  This was a discussion meeting to
5 establish reimbursement level for parenteral
6 nutrition and to entertain the idea of
7 establishing a new provider type in the pharmacy
8 program, which would be a parenteral or IV
9 provider to address some of the issues that
10 didn't fit the square peg into the round hole of
11 community pharmacy.
12    Q.  What are some of the issues that you're
13 referring to there when you talk about these
14 square peg/round hole problems between infusion
15 pharmacies and community pharmacies?
16    A.  Infusion pharmacies were involved in
17 preparation of sterile product for injectible
18 use, which is a little more involved than putting
19 prescription tablets or capsules into a vial and
20 dispensing in the community environment.  There
21 were some issues with disposal supplies that
22 providers would like to be reimbursed for that we

Wells, Jerry              PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
                                   Tallahassee, FL

Page 206

1  for single source brands.
2    Q.  And for innovator multisource products,
3  what was the discount they were able to receive?
4    A.  It was 43.41 percent.
5    Q.  What are innovator multisource
6  products?
7    A.  That is a product whose patent has
8  expired but is still marketed by the original NDA
9  applicant.
10   Q.  Do you have an expectation for what the
11 discounts from AWP would be for noninnovator
12 multisource products?
13   A.  Because those manufacturers and
14 suppliers tend to overstate their AWPs, you can
15 see 80 or 90 percent in some cases.
16   Q.  And you've known that since at least
17 1995, right?
18       MS. ST. PETER-GRIFFITH:  Object to the
19 form.
20       MS. WALLACE:  Objection to form.
21       MR. BREEN:  Objection, form.
22       THE WITNESS:  I don't know that I know

Page 207

1  that to that extent in 1995.  Certainly in 2001 I
2  knew that.
3  BY MR. COOK:
4    Q.  The sentence after you discussed the
5  discounts from single source brands and innovator
6  multisource products reads, quote, "These are
7  predictable, confirm the ability of closed shop
8  pharmacies to negotiate pricing concessions from
9  pharmaceutical manufacturers that may not be
10 available to community-based pharmacies," closed
11 quote.
12      Do you see that?
13   A.  Yes.
14   Q.  That was true in 2001, correct?
15       MS. ST. PETER-GRIFFITH:  Object to
16 form.
17       MS. WALLACE:  Objection, form.
18       THE WITNESS:  I believed it to be true.
19 That's why I put it in the letter.
20 BY MR. COOK:
21   Q.  And that was the same phenomenon that
22 you had observed in 1998 with the Legislative

Page 208

1  Proposal Analysis we looked at, right?
2        MS. ST. PETER-GRIFFITH:  Object to the
3  form.
4        THE WITNESS:  That was a little
5  different issue, but it would still apply.
6  BY MR. COOK:
7    Q.  And that was the same issues that you
8  saw discussed in response to the 1996 Florida-
9  specific report about pricing for IV drugs and IV
10 fluids, correct?
11       MS. ST. PETER-GRIFFITH:  Object to the
12 form.
13       THE WITNESS:  That was a presumption
14 that we had made in the 1996 period.
15 BY MR. COOK:
16   Q.  Other than the meeting in Richmond in
17 September of 1995, have you had discussions with
18 anybody from HCFA about the deeper level of
19 discounts that are available to purchasers of IV
20 fluids and IV drugs via the pharmacy market?
21   A.  Very likely I have.
22   Q.  Is it fair to say you don't recall the

Page 209

1  specifics of those conversations from years ago,
2  correct?
3        MS. ST. PETER-GRIFFITH:  Object to the
4  form.
5        THE WITNESS:  Right.  I have
6  conversations with lots of people, or I did when
7  I was working.
8  BY MR. COOK:
9    Q.  Do you recall what the reaction of
10 anybody from HCFA was to you describing these
11 deeper discounts for home IV pharmacies?
12   A.  I don't recall reactions.
13   Q.  Do you recall how far back those
14 conversations with individuals at HCFA go?
15   A.  No.
16   Q.  Have you discussed that issue with
17 anyone from other state Medicaid programs?
18   A.  Yes.
19   Q.  Do you recall who in other state
20 Medicaid programs you have had specific levels of
21 conversation with?
22   A.  I don't recall specific instances, but

53 (Pages 206 to 209)

Wells, Jerry          PORTIONS HIGHLY CONFIDENTIAL December 15, 2008
                                Tallahassee, FL

Page 266

1  OIG had convinced HCFA that pharmacies were
2  getting fairly substantial discounts below AWP,
3  which was something everybody knew, but they
4  wanted the states to adopt some methodology, some
5  discount below AWP.
6       Q.   And when you said everybody knew that,
7  that was true of Florida Medicaid at that time?
8       A.   It was.
9       Q.   What was your understanding of what
10 discounts -- I'm sorry -- pharmacy providers were
11 paying?  And let me break that into two
12 questions.
13           What was your understanding of what
14 pharmacy providers were paying for single source
15 brand drugs, and, then secondly, what was your
16 understanding of what pharmacy providers were
17 paying for multisource generics?
18      A.   Single source brand drugs were
19 typically at 14 to 15 or even 16 percent discount
20 below the published AWP at that time.  And
21 generic products were all over the map; depended
22 on who you bought them from.  That was before, I

Page 267

1  think, generic manufacturers had really started
2  jacking up their published AWPs.  So, you know,
3  some were fairly accurate and others were
4  inflated to greater or lesser extents.
5       Q.   Okay.  And if I'm not mistaken,
6  discounts of -- speaking about branded drugs of
7  14 to 16 percent off the reported AWP, that was
8  what OIG was informing HCFA as well?
9       A.   That's correct.  That's was their
10 focus.  And, again, that's because, as we talked
11 earlier, that's where all your money goes, is for
12 the branded products.  You don't spend a lot of
13 money on the generics.
14      Q.   Right.  And OIG -- so OIG was telling
15 HCFA that for branded drugs, discounts were in
16 the range of 14 to 16 percent off reported AWPs;
17 and that was your understanding separately from
18 OIG was telling HCFA?
19      A.   Well, I knew that already.
20      Q.   You knew that.  How did you know that?
21      A.   I'm a pharmacist and I actually came to
22 work in the Medicaid program from a retail

Page 268

1  operation and I talked to pharmacists.  I know
2  what the discounts are.
3       Q.   Okay.
4       A.   Or thought I did, anyway.
5       Q.   And you probably covered this in a
6  prior deposition, so I apologize.  When were you
7  a practicing pharmacist?
8       A.   I came to Medicaid in 1984 from a
9  retail pharmacy operation.
10      Q.   Where was that pharmacy operation
11 located?
12      A.   Tallahassee, Florida.  I had worked
13 prior to that several years in central Florida,
14 Lakeland area, for Eckerd, which is a local chain
15 in the south.  CVS now owns them.
16      Q.   Okay.
17      A.   And in between those, I had a stint of
18 11 years with a pharmaceutical manufacturer.
19      Q.   Which manufacturer was that?
20      A.   Hoffmann-La Roche.
21      Q.   What did you do with Hoffmann-La Roche?
22      A.   I started out as a territory

Page 269

1  professional sales rep detailing doctors, then I
2  spent a little time as a medical school rep at
3  the Shands Teaching Hospital in Gainesville, and
4  then came back and became the originator of
5  government affairs for Hoffmann-La Roche in the
6  state of Florida and spent most of my time
7  working on the Medicaid and Medicare programs and
8  other state initiatives rather than calling on
9  doctors.
10      Q.   Now, Mr. Wells, perhaps in the ability
11 to save us a little time, have you covered all of
12 this -- your prior history, I assume, you've
13 covered in one of your prior depositions?
14      A.   Many times.
15      Q.   Okay.  I don't believe that for the
16 state of Idaho -- in fact, I'm almost certain
17 that your prior depositions were not cross-
18 noticed, but perhaps there's a way we can just
19 adopt the testimony that you have already given
20 and I can short-circuit all of this.  Is that
21 acceptable to you?
22      A.   That's fine.  I'm sure that there are

68 (Pages 266 to 269)

Wells, Jerry            PORTIONS HIGHLY CONFIDENTIAL  December 15, 2008
                                    Tallahassee, FL

Page 338

```
 1         HIGHLY CONFIDENTIAL
 2   customary charge.  That remains in the Federal
 3   Code of Federal Regulations today.
 4   BY MR. COOK:
 5       Q.  The 1987 article that Mr. Breen
 6   referred you to where you referred to AWP as a
 7   sticker price, you said that the sticker price
 8   analogy doesn't apply to generics, right?
 9           MS. ST. PETER-GRIFFITH:  Objection to
10   form.
11           MR. BREEN:  Objection to form.
12           THE WITNESS:  At this point that would
13   not be an appropriate analogy to use for generic
14   products.
15   BY MR. COOK:
16       Q.  And you said that it didn't apply to
17   generics because the pricing of generics is all
18   over the place, right?
19       A.  It is now, and probably was even, to
20   some extent, at that point.
21       Q.  And just so I can nail down the
22   distinction you're drawing here, are you drawing
```

Page 339

```
 1         HIGHLY CONFIDENTIAL
 2   a distinction between brands and generics in the
 3   sense that the relationship between published
 4   prices and acquisition prices for generics are
 5   not -- do not bear a predictable relationship?
 6           MR. BREEN:  Object to the form.
 7           MS. WALLACE:  Objection, form.
 8           THE WITNESS:  The analogy for the
 9   automobile window sticker that I used was
10   specifically related to brand name drugs in the
11   mid to late 1980s.
12   BY MR. COOK:
13       Q.  In the article, there are quotes
14   referring to AWP as, quote, "meaningless" and,
15   quote, "a joke."
16           MS. ST. PETER-GRIFFITH:  Object to
17   form.
18           MR. BREEN:  Objection to form.
19   BY MR. COOK:
20       Q.  Would that be a better characterization
21   for AWP with respect to generics?
22           MS. ST. PETER-GRIFFITH:  Object to
```

Page 340

```
 1         HIGHLY CONFIDENTIAL
 2   form.
 3           MS. WALLACE:  Object to form.
 4           THE WITNESS:  I don't know that that
 5   article said that.  There was a letter from Ven-
 6   a-Care that mentioned that AWP was a joke.
 7           AWP was a pricing reference point that
 8   is a reasonable indicator of approximate cost for
 9   brand name drugs.  It is no longer a reasonable
10   indicator for generic drugs and I don't know when
11   that diversion occurred.  At one point it
12   probably was a reasonable indicator for generic
13   drugs.
14   BY MR. COOK:
15       Q.  Certainly by 1990 it was no longer a
16   reasonable indicator of price for generic drugs,
17   correct?
18           MS. WALLACE:  Object to form.
19           MS. ST. PETER-GRIFFITH:  Object to the
20   form.
21           MR. BREEN:  Object to form.
22           THE WITNESS:  I think that by 1990 that
```

Page 341

```
 1         HIGHLY CONFIDENTIAL
 2   would be a valid statement.
 3           MR. COOK:  I don't have any more
 4   questions.
 5           MS. ST. PETER-GRIFFITH:  I have nothing
 6   further.
 7           MR. COOK:  I think we're done.  Thank
 8   you very much.
 9           MR. YOUNG:  Mr. Wells, just one or two
10   question to follow up.
11
12              EXAMINATION
13   BY MR. YOUNG:
14       Q.  Mr. Wells, just to follow up on some of
15   the questions Mr. Cook was just asking you, when
16   you were talking about average prices in response
17   to questions by Mr. Breen, were you responding
18   with respect to branded drugs as well?
19           MS. ST. PETER-GRIFFITH:  Object to the
20   form.
21           THE WITNESS:  I don't recall the
22   context of the question.
```

86 (Pages 338 to 341)