# EXHIBIT 77

Oklahoma City, OK

Page 1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------X
In Re:  PHARMACEUTICAL INDUSTRY       ) MDL No. 1456
AVERAGE WHOLESALE PRICE LITIGATION    ) Master File No.
----------------------------------)  01-CV-12257-PBS
THIS DOCUMENT RELATES TO:             )
United States of America ex rel.      ) Hon. Patti B.
Ven-A-Care of the Florida Keys,       )    Saris
Inc., et al., v. Dey, Inc., et al.,   )
Civil Action No. 05-11084-PBS;        )
and United States of America ex       ) DEPOSITION OF
rel. Ven-A-Care of the Florida        )  THE OKLAHOMA
Keys, Inc., et al., v. Boehringer     )  HEALTH CARE
Ingelheim Corp., et al., Civil        )   AUTHORITY
Action No. 07-10248-PBS;              )   by NANCY
and United States ex rel. Ven-A-Care  )   NESSER
of the Florida Keys v. Abbott         )
Laboratories, Inc., Civil Action      )  DECEMBER 12,
Nos. 06-CV-11337 and 07-CV-11618      )    2008
----------------------------------X

Page 54

 1  just thinking about acquisition.
 2      Q.  Okay. When did you first become aware
 3  of the difference between AWP and actual
 4  acquisition costs for generic drugs?
 5      A.  That probably would have been later
 6  than that. I mean, not all the way to '99, but
 7  maybe '95, '96, somewhere in there.
 8      Q.  And in '95, '96 what was your
 9  understanding of the difference between AWP and
10  actual acquisition costs for generic drugs?
11      A.  That sometimes there was a wide
12  difference. Not always.
13      Q.  Can you describe what you mean by "wide
14  difference"?
15      A.  Just that it was -- it was variable.
16  It wasn't a standard. It wasn't, like, with the
17  brand name where you could -- you can see it's
18  consistent. If you pulled two manufacturers
19  brand-name products off the shelf, the markup is
20  going to be about the same. If you pulled two --
21  even of the same generic drug, the -- there's no
22  consistency between the AWP and the acquisition.

Page 55

 1      Q.  So is it your understanding that there
 2  was no particular formula or specified markup
 3  between AWP and actual acquisition costs for
 4  generic drugs starting in, you know, around 1995?
 5      A.  That would -- that would be a fair
 6  statement, yes.
 7      Q.  Okay. You mentioned earlier that -- at
 8  least with reference to the brand drugs, you
 9  might, in purchasing drugs, consider the gap
10  between the AWP and the actual acquisition cost.
11  Did you choose who to buy your prescription drugs
12  from based on that spread between AWP and actual
13  acquisition costs?
14      A.  Not typically. You know, there were a
15  few products where -- for example, I'm not going
16  to be able to -- Prinivil and Zestril were both
17  Lisinopril made by two different companies. But
18  they typically were priced almost to the penny
19  the same.
20          So when there were brand drugs where
21  you had two manufacturers, they seemed like they
22  would just price them pretty close. So there's

Page 56

 1  no benefit to getting one over the other.
 2      Q.  While you were working at any of the
 3  pharmacies prior to working for Oklahoma
 4  Medicaid, were you aware of anyone marketing the
 5  spread?
 6      A.  I think I -- I remember being sort of
 7  told, not exactly, but -- that was pointed out to
 8  me. Not by a sales person, but by my boss.
 9      Q.  Okay. And what was pointed out to you
10  by your boss, exactly?
11      A.  Just that -- just that -- that certain
12  -- certain generics had this lower price and that
13  we've got paid -- not necessarily based on AWP,
14  but we would get paid based on a maximum
15  allowable cost. And so you -- you wanted to find
16  the least expensive one because payors were
17  starting to put in maximum allowable cost
18  programs. And so you wanted to make sure you
19  were getting the best deal.
20      Q.  Was it ever discussed, not just in
21  relation to maximum allowable costs, but in
22  relation to the difference between the price at

Page 57

 1  which you could acquire drugs and the AWP-based
 2  reimbursement?
 3      A.  I don't remember that specifically.
 4      Q.  Okay. I would like to start with a
 5  picture of how the Medicaid program works in
 6  Oklahoma.
 7      A.  Okay.
 8      Q.  And in the federal government.
 9  Medicaid in generally is partnership between the
10  federal government and the state governments;
11  correct?
12      A.  Correct.
13      Q.  Are you familiar with the term federal
14  matching assistance percentage?
15      A.  Yes.
16      Q.  What is federal matching assistance
17  percentage?
18      A.  That is the amount that the federal
19  government contributes to a state's Medicaid
20  program.
21      Q.  Essentially the federal government pays
22  a part of Oklahoma's expenditures under its

                                    15 (Pages 54 to 57)

Page 74

1   We'll come back to it shortly.  I'm handing you
2   what has been marked Roxane Oklahoma Exhibit 4,
3   which is Bates labeled HHC 010-0685.  Do you
4   recognize this document?
5       A.  No.  I've never seen this document
6   before.
7       Q.  This is the Oklahoma state plan
8   amendment 90-4 submitted by Oklahoma on March
9   26th, 1990 to HCFA; correct?
10      A.  That is what the document says, yes.
11      Q.  Do you have any reason to believe
12  that's not the case?
13      A.  No, I do not.
14      Q.  State plan amendment 90-4 by Oklahoma
15  Medicaid was approved by HCFA on February 1st,
16  1991; correct?
17      A.  Again, that's what it's showing here.
18      Q.  Do you have any reason to believe
19  that's not the case?
20      A.  No.
21      Q.  The state plan amendment by Oklahoma
22  for 90-4 had an effective date of March 1st,

Page 75

1   1990; correct?
2       A.  Right.
3           (Exhibit Roxane-OK 005 marked.)
4       Q.  I'm handing you what has been marked
5   Roxane Oklahoma Exhibit 5 Bates labeled HHC 010-
6   0687 to HHC 010-0688.  Do you recognize this
7   document?
8       A.  No.  I've never seen this document.
9       Q.  This document is a letter from Oklahoma
10  Medicaid to HCFA on January 24th, 1991 regarding
11  state plan amendment 90-4 that we just reviewed;
12  correct?
13      A.  Yes.
14      Q.  Please, read paragraph 1 to yourself.
15      A.  Okay.
16      Q.  Under state plan amendment 90-4
17  effective March 1st, 1990, Oklahoma reimbursed
18  prescription drugs for the ingredient cost at the
19  lower of estimated cost defined as AWP minus 10.5
20  percent, the federal upper limit, the state
21  maximum allowable cost or the usual and customary
22  charge?

Page 76

1       A.  Yes.
2       Q.  Under state plan amendment 90-4
3   effective March 1st, 1990, Oklahoma reimbursed
4   prescription drugs for a dispensing fee at an
5   amount charged by the provider, but with a
6   maximum of $5.10; correct?
7       A.  That does seem to be what it says, yes.
8       Q.  Do you have any reason to believe
9   that's not the case?
10      A.  No.
11          (Exhibit Roxane-OK 006 marked.)
12      Q.  I'm handing you what has been marked
13  Roxane Oklahoma Exhibit 6 Bates labeled HHC 010-
14  0674.  Do you recognize this document?
15      A.  I don't believe I've ever seen this
16  document.
17      Q.  This document is the Oklahoma state
18  plan amendment 95-19 submitted by Oklahoma to
19  HCFA on November 14th, 1995; correct?
20      A.  Yes.
21      Q.  Oklahoma state plan amendment 95-19 was
22  approved by HCFA on May 2nd, 1996?

Page 77

1       A.  Yes.
2       Q.  State plan amendment 95-19 had an
3   effective date of October 1st, 1995?
4       A.  Yes.
5       Q.  The subject of this Oklahoma state plan
6   amendment 95-19 was "dispensing fee"?
7       A.  Yes.
8       Q.  Are you aware that state plan amendment
9   95-19 reduced the dispensing fee to $4.15?
10      A.  I don't see that reflected on this
11  page.
12      Q.  Are you aware that state plan amendment
13  95-19 reduced dispensing fee to $4.15?
14      A.  I was not aware that it was reduced by
15  this state plan number, no.
16      Q.  Were you aware that in October, 1995
17  Oklahoma Medicaid reduced its dispensing fee to
18  $4.15?
19      A.  I was aware that in the year 1995 that
20  it was reduced to $4.15.
21      Q.  Is it consistent with your
22  understanding that this state plan amendment

20 (Pages 74 to 77)

Page 170

1      THE WITNESS:  I don't believe I have
2  the -- the facts necessarily in front of me to
3  definitely state that the profit component was
4  considered separately or exactly what the
5  consideration was.
6      Q.  (BY MS. LIEBERMAN) But your
7  understanding is that a reasonable profit was
8  some consideration, even if you don't know what
9  consideration or what component; correct?
10     A.  Well, it's at least a consideration of
11 Mr. Stauffer.  As for the state, I don't see -- I
12 don't know that there's a discussion of -- of the
13 state's consideration of the profit component.
14     Q.  The state did hire Myers & Stauffer,
15 though, to conduct this survey; correct?
16     A.  Correct.  But the state doesn't always
17 agree 100 percent with any report, even though
18 they may have hired someone.
19     Q.  Okay.  If you turn to page HHD 0227.
20 If you first turn to page HHD 048-0183.  You'll
21 see that this is a -- the report prepared by
22 Myers & Stauffer for Oklahoma Medicaid in 1989?

Page 171

1      A.  Okay.
2      Q.  And the -- and submitted by Oklahoma
3  Medicaid in its brief.
4      A.  Okay.
5      Q.  And then if you go to HHD 048-0227,
6  this is one of the last pages of that report by
7  Myers & Stauffer; correct?
8      A.  Seems to be, yes.
9      Q.  Okay.  Myers & Stauffer concluded in --
10 excuse me.  Strike that.
11         Myers & Stauffer concluded in 1989 that
12 the weighted averages for dispensing costs,
13 assuming AWP minus 10.5 percent reimbursement,
14 was either $5.75 or $5.96, depending on how they
15 weighted it; correct?
16     A.  That seems to be correct, yes.
17     Q.  After this Myers & Stauffer survey
18 report in 1989, Oklahoma implemented a dispensing
19 fee of $4.83 for its interim.  And then in 1990,
20 a dispensing fee of $5.10; correct?
21     A.  I believe that's correct.
22     Q.  Both the $4.83 interim dispensing fee

Page 172

1  and the $5.10 dispensing fee implemented in 1990
2  were both below the two averages of dispensing
3  costs that Myers & Stauffer reported in 1989;
4  correct?
5      A.  Correct.
6      Q.  Oklahoma Medicaid, then, was aware that
7  the dispensing fees that it implemented were
8  below the reported average costs of dispensing
9  fees; correct?
10     A.  Correct.
11     Q.  As we discussed earlier, prior to 1989,
12 the dispensing fee was $3.55; correct?
13     A.  I think that's right, yes.
14     Q.  Then it increased to $4.83 for an
15 interim period; correct?
16     A.  Correct.
17     Q.  Then it increased to $5.10 in 1990;
18 correct?
19     A.  Correct.
20     Q.  And then Oklahoma Medicaid decreased
21 the dispensing fee to $4.15; correct?
22     A.  Correct.

Page 173

1      Q.  Why did Oklahoma Medicaid decrease its
2  dispensing fee to $4.15?
3      A.  I don't have any knowledge of that.
4      Q.  Oklahoma Medicaid still has a
5  dispensing fee of $4.15 in place today; correct?
6      A.  That's correct.
7      Q.  And that $4.15 would not even cover the
8  cost of dispensing that Myers & Stauffer reported
9  in 1989; correct?
10         MR. MAO:  Objection, form.
11         THE WITNESS:  That is likely to be
12 correct, yes.
13     Q.  (BY MS. LIEBERMAN) The dispensing fee
14 today is less than the cost of pharmacies to
15 dispense prescription drugs as determined by
16 Oklahoma Medicaid's Myers & Stauffer report in
17 1989?
18     A.  Correct.
19     Q.  Oklahoma Medicaid's dispensing fees
20 have not increased with inflation since 1990?
21     A.  Correct.
22     Q.  Do you know whether Oklahoma Medicaid

44 (Pages 170 to 173)