# EXHIBIT 95

Anchorage, AK

Page 1

```
    IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

       THIRD JUDICIAL DISTRICT OF ANCHORAGE

-----------------------------------X

STATE OF ALASKA,                    )

     Plaintiff,                     )

vs.                                 )

ALPHARMA BRANDED PRODUCTS DIVISION, )

INC., et al.,                       )

     Defendants.                    )

-----------------------------------X

Case No. 3AN-06-12026 Civil         )

-----------------------------------X

        CAPTIONS CONTINUED ON FOLLOWING PAGE


      VIDEOTAPED DEPOSITION OF DAVID L. CAMPANA

           and STATE OF ALASKA 30(b)(6)

              Taken August 19, 2008

           Taken by the Defendants at

         Captain Cook Hotel, Whitby Room

              939 West 5th Avenue

                Anchorage, Alaska

       Reported by:  Mary A. Vavrik, RMR
```

Page 90

1  competition have anything to do with patent
2  protection?
3      A.  Yes.
4          MR. BURNHAM:  Objection, foundation.
5  BY MR. MANGI:
6      Q.  What is the relationship between those
7  two things?
8          MR. BURNHAM:  Objection, foundation.
9          THE WITNESS:  A brand named drug, when
10 it's an innovator, comes out onto the market and
11 with its patent, there is a certain amount of
12 protection on that patent.  When that patent is
13 up, then a generic manufacturer can bring that
14 drug in.  And when they bring it in, they bring
15 it in at a discount off of the brand name's
16 selling price.
17 BY MR. MANGI:
18     Q.  Do you have an understanding as to why
19 they do that?
20     A.  Because of competition.
21     Q.  And when a generic manufacturer is able
22 to enter the market, in other words, when patent

Page 91

1  protection is expired, is it fair to say, sir,
2  that whoever wants to can enter that market
3  space?
4      A.  Well, what time period are you asking
5  about?
6      Q.  Well, let's talk about today, to begin
7  with.
8      A.  Okay.  Today there is a period of
9  exclusivity where it's given to one or two
10 manufacturers that they can produce that drug.
11 And that's about six months.
12     Q.  And that is to provide an incentive for
13 entry into the market, correct, sir?
14         MR. BURNHAM:  Objection, foundation.
15         THE WITNESS:  I don't know that.
16 BY MR. MANGI:
17     Q.  Fair enough.  After that period
18 expires, then any number of generic manufacturers
19 can enter the market space, correct?
20     A.  That's right.
21     Q.  And if you go back further in time,
22 similarly when generics enter the market and more

Page 92

1  than one enters, and then they start to compete
2  with each other, as well as with the brand
3  manufacturer if they remain in the space, right?
4      A.  Yes.
5          MR. HENDERSON:  Objection.
6  BY MR. MANGI:
7      Q.  And it's that competition that results
8  in prices going down, right?
9          MR. BURNHAM:  Objection, foundation.
10         THE WITNESS:  That competition should
11 make prices go down.
12 BY MR. MANGI:
13     Q.  Now, throughout this time period, sir,
14 when you were in pharmacy school right up until
15 1990, was it generally your understanding that in
16 most cases generic drugs were going to be cheaper
17 than branded drugs?
18     A.  Yes.
19     Q.  Now, they will be cheaper for both a
20 cash paying-customer as well as for a third-party
21 payer, such as a private insurer or a Medicaid
22 entity, correct?

Page 93

1      A.  Yes.
2      Q.  Is it your understanding, sir, that
3  generally payers for drugs prefer the use of
4  generics versus branded drugs when clinically
5  appropriate?
6          MR. BURNHAM:  Objection, foundation.
7          THE WITNESS:  Yes.  They try to push
8  the generic drugs.
9  BY MR. MANGI:
10     Q.  Why is that?
11     A.  Because --
12         MR. BURNHAM:  Same objection.
13         THE WITNESS:  -- of a money saving.
14 BY MR. MANGI:
15     Q.  Now, we have spoken about benchmark
16 prices.  Did you come to an understanding, sir,
17 at any point during this time period, from 1960s
18 right up until 1990, whether the differential
19 between the benchmark price and the actual price
20 being paid by a pharmacy for drugs was greater
21 for generic drugs than it was for branded drugs?
22     A.  Yes, I've come across that information.

24 (Pages 90 to 93)

David L Campana and State of Alaska 30(b)(6)                                    August 19, 2008
                                    Anchorage, AK

Page 94

1    Q.  What is your understanding of what
2  happens in that area?
3        MR. BURNHAM:  During what time period?
4  BY MR. MANGI:
5    Q.  Let's start with -- well, back up.
6  When you say you have come across that
7  information, when did you first become aware of
8  that phenomenon?
9    A.  I don't remember time period.
10   Q.  Would it be fair to say it's a long
11 time ago?
12   A.  Yeah.
13       MR. HENDERSON:  Objection.
14 BY MR. MANGI:
15   Q.  In other words, would you say that's --
16 perhaps bucketed by decades, would it be fair to
17 say that's perhaps sometime in the '60s or the
18 '70s as opposed to the '80s or the '90s?
19   A.  It's hard to say when I became aware of
20 that.
21   Q.  Well, would it be fair to say it was
22 before 1990?

Page 95

1    A.  Yes.
2    Q.  And what generally did you become aware
3  of, sir?
4    A.  That the net cost to the pharmacy for
5  generics that have been out for a long time was
6  very low compared to the benchmark.
7    Q.  And benchmark that we are talking about
8  here, so the record is clear, is AWP, correct?
9    A.  Correct.
10   Q.  So in other words, at some point prior
11 to 1990, you became aware that when generics come
12 into the market, there is increased competition,
13 correct?
14       MR. BURNHAM:  Objection, foundation.
15       THE WITNESS:  There is increased
16 competition the longer the generic is available.
17 BY MR. MANGI:
18   Q.  And one manner in which that increased
19 competition manifests itself in the market is
20 increasing discounts, correct?
21       MR. BURNHAM:  Objection, foundation.
22       THE WITNESS:  Yes.

Page 96

1  BY MR. MANGI:
2    Q.  In other words, it's price competition
3  between the different manufacturers of the
4  generic product?
5    A.  Yes.
6    Q.  And as a result of that price
7  competition, there becomes a greater differential
8  between that benchmark AWP and the actual price
9  that pharmacies are paying than exists for
10 branded drugs, correct?
11       MR. HENDERSON:  Objection.
12       THE WITNESS:  Yes, there is a greater
13 differential.
14 BY MR. MANGI:
15   Q.  And indeed, the extent of that
16 differential will depend on the number of
17 generics and the extent of competition, correct?
18       MR. HENDERSON:  Objection.
19       THE WITNESS:  The number of
20 manufacturers making that drug.
21 BY MR. MANGI:
22   Q.  Absolutely.  And to put it another way,

Page 97

1  then, if there is just one generic manufacturer
2  that's in the market competing only with the
3  manufacturer of the brand, that's a different
4  situation from where, let's say, there are five
5  generic manufacturers all putting the same drug
6  in the marketplace, correct?
7    A.  Correct.
8    Q.  In the latter situation where you have
9  many manufacturers selling what's essentially the
10 same drug, there will be a greater degree of
11 competition because they are all competing with
12 each other for the same market space, correct?
13   A.  Correct.
14   Q.  And in that situation, there will be
15 more discounts and a greater differential between
16 the published AWP and the actual price pharmacies
17 are paying than there would be where there is
18 little competition, correct?
19       MR. BURNHAM:  Objection, foundation.
20       MR. HENDERSON:  Objection.
21       THE WITNESS:  Yes.
22 BY MR. MANGI:

25 (Pages 94 to 97)

Page 98

1  Q. And is it fair to say, sir, that the
2  extent of the differential, therefore, is a
3  product of and a function of marketplace
4  competition?
5      MR. BURNHAM: Same objection.
6      THE WITNESS: Yes.
7  BY MR. MANGI:
8  Q. Is it fair to say, sir, that there is,
9  therefore, no predictable relationship between
10 the AWP of a generic drug and the actual price
11 that a pharmacy is paying to purchase that
12 generic drug?
13     MR. BURNHAM: Objection, form.
14     MR. HENDERSON: Objection.
15     THE WITNESS: I have never seen a
16 formula to exactly determine that.
17 BY MR. MANGI:
18 Q. In other words, you understand that
19 it's just something that's going to vary for
20 generic drugs depending on the extent of
21 competition, correct?
22     MR. BURNHAM: Objection.

Page 99

1      THE WITNESS: Yes.
2  BY MR. MANGI:
3  Q. And you have understood that going back
4  a number of years. You are not sure when
5  exactly, but certainly since before 1990 you have
6  had that understanding, correct?
7  A. Yes.
8  Q. Now, are you familiar, sir, with --
9  withdraw that. Let's turn to the area of branded
10 drugs now and focus on that for a moment. As you
11 have testified this morning, sir, AWP has played
12 different roles in the marketplace at different
13 times, correct?
14     MR. BURNHAM: Objection, foundation,
15 misstates his testimony.
16 BY MR. MANGI:
17 Q. Let me clarify the question. When you
18 first came into the pharmacy area, indeed when
19 you were in pharmacy school, one function that
20 AWP served was as a benchmark or a starting price
21 from which discounts were applied to get to the
22 actual price that a pharmacy would pay to

Page 100

1  purchase drugs, correct?
2  A. Yes.
3      MR. BURNHAM: Objection, misstates his
4  testimony.
5      MR. HENDERSON: Objection.
6  BY MR. MANGI:
7  Q. I'm sorry. I didn't hear your answer,
8  sir.
9  A. Please rephrase the question or ask the
10 question.
11 Q. Sure. A lot of objections makes it
12 hard to hear. Let's back up.
13     When you were in pharmacy school, as
14 you have testified this morning, you came to
15 understand that one function that AWP served in
16 the marketplace was to serve as a benchmark price
17 or a starting price from which discounts would be
18 applied to get to the actual price that a
19 pharmacy would pay to purchase a drug, correct?
20     MR. BURNHAM: Objection, misstates --
21     MR. HENDERSON: Objection.
22     MR. BURNHAM: Misstates his testimony.

Page 101

1      THE WITNESS: The average wholesale was
2  a benchmark and discounts were taken off of that.
3  BY MR. MANGI:
4  Q. Then you -- you continued with your
5  career, you came out of pharmacy school, you went
6  to work in a few different pharmacies. And --
7  sorry. Let me rephrase that question. You then
8  came out of pharmacy school; you went to work in
9  a few different pharmacies in Montana and in
10 Alaska; and you saw that in practice; whereas,
11 you saw that the actual price being paid was
12 different from and lower than the AWP, correct?
13 A. Yes.
14 Q. And of course, the degree of
15 information you had about that was different from
16 pharmacy to pharmacy, correct?
17 A. Yes.
18 Q. In other words, at Turner Drugs in
19 Montana, you saw the actual invoices. At Pay-N-
20 Save, purchasing was done centrally and you only
21 knew about some of discounts; but generally you
22 understood that that basic fact remained true,

26 (Pages 98 to 101)

Page 158

1        THE WITNESS:  Yes.
2   BY MR. MANGI:
3       Q.  And those local circumstances could
4   include, for example, what's required to ensure
5   sufficient access to care, right?
6       A.  Yes.
7        MR. HENDERSON:  Objection.
8   BY MR. MANGI:
9       Q.  Indeed the requirement that a State
10  Medicaid agency provide access to care
11  commensurate with what's available to others in
12  an area, that comes from federal regulation, too,
13  correct?
14       MR. HENDERSON:  Objection, form.
15       THE WITNESS:  It's my understanding
16  that it does.
17  BY MR. MANGI:
18      Q.  And indeed, another aspect of a local
19  circumstance that a state can take account of and
20  must take account of are the political realities
21  in their area, correct?
22       MR. BURNHAM:  Objection, form.

Page 159

1        MR. HENDERSON:  Objection.
2        THE WITNESS:  I don't know that.
3   BY MR. MANGI:
4       Q.  Well, let's break it down.  One of the
5   functions that the Alaska Pharmacy Association
6   serves is as a lobbying group, correct?
7       A.  Yes.
8       Q.  And there is nothing inappropriate
9   about lobbying; that's just part of our political
10  system, correct?
11      A.  Yes.
12      Q.  And one way in which they are lobbied
13  is by reaching out to legislators and advocating
14  their position to them, correct?
15      A.  Yes.
16      Q.  And of course, some legislators are
17  more receptive to their positions than others,
18  correct?
19      A.  Yes.
20      Q.  And of course, legislators are also
21  part of our political system.  They need to be
22  responsive to the needs of their constituents,

Page 160

1   correct?
2       A.  That's their goal, I believe, to do
3   that.
4       Q.  All right.  And again, there is nothing
5   wrong with --
6        (Interruption in deposition.)
7        MR. MANGI:  I'm sorry.  You are dialed
8   into a conference call.  Please hang up.
9   BY MR. MANGI:
10      Q.  And again, there is nothing wrong or
11  inappropriate about that; that's the way our
12  political system is set up, correct?
13      A.  Yes.
14      Q.  Now, certainly pharmacists can often be
15  important constituents for legislators, correct?
16      A.  Yes.
17      Q.  And the pharmacists are respected,
18  often well-known members of their communities,
19  correct?
20      A.  Yes.
21      Q.  And pharmacists in some cases can also
22  be important financial contributors to political

Page 161

1   campaigns, correct?
2        MR. HENDERSON:  Objection.
3        THE WITNESS:  That's what I believe.
4   BY MR. MANGI:
5       Q.  So certainly there are some legislators
6   who are active proponents of pharmacists' causes,
7   correct?
8        MR. HENDERSON:  Objection.
9        MR. BURNHAM:  Form.
10       THE WITNESS:  I believe that.
11  BY MR. MANGI:
12      Q.  Now, if a professional such as yourself
13  working for the Medicaid program wanted at some
14  point to cut reimbursement rates, certainly one
15  of the issues you would be very concerned about
16  is access, right?
17      A.  That's right.
18      Q.  But in addition to that, another part
19  of the reality on the ground that you would need
20  to consider where your proposals have become
21  reality would be whether or not the political
22  capital exists to make such a change, correct?

41 (Pages 158 to 161)

Page 162

1    A.  Yes.
2    Q.  In other words, you can expect that if
3  you wanted to cut reimbursement rates at any
4  point, you can expect pharmacists would mobilize
5  and advocate against such a cut, correct?
6        MR. BURNHAM:  Objection, form.
7        THE WITNESS:  I believe they would
8  mount some kind of campaign against it.
9  BY MR. MANGI:
10   Q.  And indeed, that's part of what the
11 pharmacy association's role is, to advocate on
12 behalf of the financial interests of their
13 members, correct?
14       MR. BURNHAM:  Same objection.
15       THE WITNESS:  Yes.
16 BY MR. MANGI:
17   Q.  Now, certainly in some states pharmacy
18 associations are stronger than in other states,
19 correct?
20       MR. BURNHAM:  Objection, form.
21       MR. HENDERSON:  Objection, foundation.
22       THE WITNESS:  I understand that to be

Page 163

1  correct.
2  BY MR. MANGI:
3    Q.  And do you have an understanding, sir,
4  as to whether or not the Alaska Pharmacy
5  Association is an entity that has strong lobbying
6  power in the state of Alaska?
7    A.  It has some lobbying power.
8    Q.  And certainly you would expect them to
9  bring that power to bear if cuts to reimbursement
10 were being contemplated, correct?
11   A.  Yes.
12       MR. HENDERSON:  Objection.
13 BY MR. MANGI:
14   Q.  So certainly within the realm of
15 deciding what a reimbursement methodology should
16 be in Alaska, like in any other state, one of the
17 realities that professionals such as yourself
18 have to account for are the political realities
19 in the state and whether or not you have the
20 political capital to force through a change you
21 may think appropriate in the face of potential
22 political opposition, correct?

Page 164

1        MR. BURNHAM:  Objection, form.
2        MR. HENDERSON:  Objection, form.
3        THE WITNESS:  There would be
4  opposition.  I'd have to work through that.
5  BY MR. MANGI:
6    Q.  Now, turning back to Exhibit 5, sir,
7  you will see towards the bottom half of that page
8  there is a section B entitled Other Drugs.  Do
9  you see that section, sir?
10   A.  Yes.
11   Q.  Now, in the middle of that paragraph
12 there is a sentence starting with "The
13 estimated."  It's five lines from the top of that
14 paragraph.
15   A.  I see it.
16   Q.  And it says, "The estimated acquisition
17 costs can be determined through a variety of
18 methods."  Now, what is your understanding, sir,
19 of what an estimated acquisition cost is,
20 generally speaking?
21   A.  Estimated acquisition cost is the
22 estimate of acquisition costs from the pharmacies

Page 165

1  -- or from the wholesaler or the suppliers to the
2  pharmacies.
3    Q.  And I appreciate that's what the term
4  EAC stands for, estimated acquisition cost.  Let
5  me focus my question.  Is it your understanding,
6  sir, that estimated acquisition cost is a term
7  that comes from regulations regarding the
8  Medicaid program?
9    A.  Yes.
10   Q.  And estimated acquisition cost is a
11 term that's used to refer to the formula that a
12 state uses to reimburse for drugs, correct?
13   A.  Yes.
14   Q.  So if a state is reimbursing at AWP
15 minus X percent, taking into account the access
16 issues, the political constraints, that's
17 referred to as that state's estimated acquisition
18 cost or EAC, correct?
19   A.  Yes.
20   Q.  Now, EAC is not -- it's not the actual
21 price that a pharmacist is paying to purchase a
22 drug, correct?

Page 166

1      MR. BURNHAM: Objection, form.
2      THE WITNESS: It's the estimated cost.
3  BY MR. MANGI:
4      Q. But even -- withdraw that. Well, it's
5  not -- it's not purely the Medicaid agency's
6  closest estimate of what a pharmacist is paying;
7  rather, it's an estimate that incorporates the
8  need to maintain access and political realities,
9  correct?
10     MR. HENDERSON: Objection, leading,
11  foundation, mischaracterizes.
12     MR. BURNHAM: Objection, form.
13     THE WITNESS: The estimated acquisition
14  cost is a cost that is determined after looking
15  at surveys and then what's finally approved by
16  the Feds under the HCFA and then approved in the
17  State plan.
18  BY MR. MANGI:
19     Q. But part of that process, sir,
20  involves, doesn't it, accounting for the need to
21  ensure access?
22     MR. HENDERSON: Objection.

Page 167

1      THE WITNESS: The whole reimbursement
2  formula is predicated on maintaining access.
3  BY MR. MANGI:
4      Q. So when you are setting the EAC for
5  Alaska or any other state, is it fair to say that
6  you are not looking purely at, for example, a
7  survey reflecting what pharmacists are paying and
8  then automatically setting that as a formula?
9  Rather you are starting with information, such as
10  surveys, but then you also need to take into
11  account what sort of a reimbursement methodology
12  would ensure access and factors like that, is
13  that correct?
14     MR. BURNHAM: Objection, form,
15  foundation.
16     MR. HENDERSON: Objection.
17     THE WITNESS: And that was established
18  before I started, so as far as how that was done
19  in '89 and how we determine it now are -- may be
20  different.
21  BY MR. MANGI:
22     Q. Well, let's take each of those in turn.

Page 168

1  When the rate was first determined, you are aware
2  that a survey was done, correct?
3      A. Yes.
4      Q. What was -- who conducted that survey?
5      A. The cost survey was done by Verme
6  Associates. V-E-R-M-E Associates.
7      Q. And what was the conclusion of Verme &
8  Associates as to what discount off of AWP would
9  reflect generally the price pharmacists were
10  paying to purchase drugs?
11     A. The study -- the study actually had
12  limits on it and -- because they were a small
13  sample, and they were concerned that there
14  weren't enough individual sole proprietor stores
15  involved in that.
16     Q. What was the rate that they -- that
17  Verme & Associates said represented the
18  acquisition price that pharmacies were paying to
19  purchase drugs?
20     MR. BURNHAM: Objection, form.
21     THE WITNESS: From that survey, the
22  estimated acquisition for those pharmacies that

Page 169

1  were included in the survey appeared to be about
2  13 percent off AWP.
3  BY MR. MANGI:
4      Q. Now, the rate that was eventually set
5  for the Medicaid program was AWP minus five
6  percent, correct?
7      A. That's correct.
8      Q. Do you have an understanding as to why
9  the program elected to reimburse at the AWP minus
10  five percent rather than 13 percent, as reflected
11  in the survey?
12     MR. BURNHAM: Objection, form.
13     THE WITNESS: Because they could not
14  determine what those sole proprietors' stores
15  actually received as a discount, and in order to
16  maintain the access, they went with the five
17  percent.
18  BY MR. MANGI:
19     Q. Now, you say "in order to maintain the
20  access." What do you mean by that?
21     A. The access of pharmacies for the needy
22  in the state.