# EXHIBIT 96

Page 336

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-------------------------------x
In re: PHARMACEUTICAL INDUSTRY   )
AVERAGE WHOLESALE PRICE          )
LITIGATION                       )
-------------------------------)
United States of America ex rel.) MDL No. 1456
Ven-A-Care of the Florida Keys,  )
Inc. v. Abbott Laboratories,     ) Civil Action
Inc., Civil Action No. 06-       ) No. 01-12257-PBS
11337-PBS; and United States of  )
America ex rel. Ven-A-Care of    ) Honorable
the Florida Keys, Inc., v. Dey,  ) Patti B. Saris
Inc., et al., Civil Action No.   )
05-11084-PBS; and United States  )
of America ex rel. Ven-A-Care    )
of the Florida Keys, Inc., v.    )
Boehringer Ingelheim Corp., et   )
al., Civil Action No. 07-10248-  )
PBS                              )
-------------------------------x

06db8d46-1900-438e-b5fa-9bac07802652

Page 337

```
 1                December 11, 2008
 2                     Volume II
 3      VIDEOTAPED DEPOSITION OF SUZETTE BRIDGES,
 4   produced, sworn, and examined on the 11th day of
 5   December, 2008, between the hours of nine o'clock
 6   in the forenoon and six o'clock in the evening of
 7   that day, at the offices of United States Attorneys'
 8   Office, 425 West Capitol, Suite 500, Metropolitan
 9   Building, Little Rock, Arkansas, before BRENDA
10   ORSBORN, a Certified Court Reporter within and for
11   the State of Missouri, in a certain cause now
12   pending before the United States District Court,
13   District of Massachusetts, In re: Pharmaceutical
14   Industry Average Wholesale Price litigation.
```

Page 338

```
 1            INDEX OF EXAMINATION
 2
 3                                              Page
 4   Continued Questions by Mr. Reale ............... 345
 5   Questions by Mr. Berlin ........................ 465
 6   Questions by Ms. Mangiardi ..................... 531
 7
 8            INDEX OF EXHIBITS
 9   Exhibit Roxane 017, HHD014-0764 to 0782        345
10   Exhibit Roxane 018  (Cover Letter)             345
11   Exhibit Roxane 019  HHC902-1091                353
12   Exhibit Roxane 020  HHC011-2260 to 2268        359
13   Exhibit Roxane 021  HHD006-0231 to 0235        367
14   Exhibit Roxane 022  HHD127-0119 to 0123        371
15   Exhibit Roxane 023  HHC011-2189 to 2190        378
16   Exhibit Roxane 024  HHC010-1007 to 1008        380
17   Exhibit Roxane 025  HHD084-0411 to 1006        383
18   Exhibit Roxane 026  HHC010-0969 to 0970        387
19   Exhibit Roxane 027  HHC010-0956                390
20   Exhibit Roxane 028  HHC010-0775 to 0776        391
21   Exhibit Roxane 029  HHC902-0711 to 0713        396
22   Exhibit Roxane 030  HHC010-0868                402
```

Page 339

```
 1   INDEX CONTINUED:                          PAGE
 2   Exhibit Roxane 031  HHC010-0857 to 0860       405
 3   Exhibit Roxane 032  HHC010-0849 to 0852       410
 4   Exhibit Roxane 033  HHC010-0842 to 0843       415
 5   Exhibit Roxane 034  HHC010-0802 to 0807       417
 6   Exhibit Roxane 035  HHC010-0798 to 0807       418
 7   Exhibit Roxane 036  ARK00003068 to 3071       419
 8   Exhibit Roxane 037  ARK00003245 to 3247       421
 9   Exhibit Roxane 038  ARK00003267 to 3272       423
10   Exhibit Roxane 039  ARK00002256 to 2264       424
11   Exhibit Roxane 040  HHC014-0232 to 0235       428
12   Exhibit Roxane 041  ARK00000054 to 0055       430
13   Exhibit Roxane 042  ARK00000140 to 0146       431
14   Exhibit Roxane 043  ARK00000133               432
15   Exhibit Roxane 044  ARK00006568 to 6585       435
16   Exhibit Roxane 045  ARK00006586 to 6632       437
17   Exhibit Roxane 046  ARK00006495 to 6502       440
18   Exhibit Roxane 047  ARK00006504 to 6519       440
19   Exhibit Roxane 048  VACMDL75947 to 75951      446
20   Exhibit Roxane 049  VACMDL74706 to 74720      446
21   Exhibit Abbott-ARK 001 (Subpoena)             465
22   Exhibit Abbott-ARK 002 HHC024-0672 to 0674    503
```

Page 340

```
 1   INDEX CONTINUED:                          PAGE
 2   Exhibit Abbott-ARK 003 ARK00000115 to 0118    511
 3   Exhibit Abbott-ARK 004 HHC013-0554 to 0555    516
```

|  | Page 341 |  | Page 343 |
|---|---|---|---|
| 1 | A P P E A R A N C E S | 1 | APPEARANCES CONTINUED: |
| 2 | For the United States: | 2 | |
| 3 | Ms. Laurie A. Oberembt (By Telephone) | 3 | For the Defendant Boehringer Ingelheim |
| 4 | U.S. Department of Justice | 4 | Corp.: |
| 5 | Commercial Litigation Fraud | 5 | Mr. John W. Reale |
| 6 | P.O. Box 261 | 6 | Kirkland & Ellis, LLP |
| 7 | Ben Franklin Station | 7 | 200 East Randolph Drive |
| 8 | Washington, D.C. 20044 | 8 | Chicago, Illinois 60601 |
| 9 | (202)514-3345 | 9 | (312)861-3452 |
| 10 | Laurie.oberembt@usdoj.gov | 10 | Jreale@kirkland.com |
| 11 | | 11 | |
| 12 | For the Witness and Arkansas Department of | 12 | The Videographer: |
| 13 | Human Services: | 13 | Mr. Keith Montgomery |
| 14 | Ms. Carmen Mosley-Sims | 14 | |
| 15 | Arkansas Department of Human Services | 15 | |
| 16 | 700 Main Street, Slot S-260 | 16 | |
| 17 | Little Rock, Arkansas 72203 | 17 | |
| 18 | (501)602-1366 | 18 | |
| 19 | Carmen.mosley-sims@arkansas.gov | 19 | |
| 20 | | 20 | |
| 21 | | 21 | |
| 22 | | 22 | |

|  | Page 342 |  | Page 344 |
|---|---|---|---|
| 1 | APPEARANCES CONTINUED: | 1 |     IT IS HEREBY STIPULATED AND AGREED, by |
| 2 | | 2 | and between counsel for Plaintiff and counsel for |
| 3 | For the Defendant Abbott: | 3 | Defendant, that the VIDEOTAPED DEPOSITION of |
| 4 | Mr. Eric P. Berlin (By Telephone) | 4 | SUZETTE BRIDGES may be taken in shorthand by Brenda |
| 5 | Jones Day | 5 | Orsborn, a Certified Shorthand Reporter, and |
| 6 | 77 West Wacker | 6 | afterwards transcribed into typewriting; and the |
| 7 | Chicago, Illinois 60601 | 7 | signature of the witness is expressly not waived. |
| 8 | (312)782-3939 | 8 |     * * * * * |
| 9 | epberlin@jonesday.com | 9 |     VIDEOGRAPHER:  We're on the record. |
| 10 | For the Defendants Dey, Inc.; Dey, L.P. | 10 | Today's date is December 11, 2008, and the time is |
| 11 | and Dey, L.P., Inc.: | 11 | 9:00 a.m. This is the continuation of the videotaped |
| 12 | | 12 | deposition of Suzette Bridges. |
| 13 | Ms. Anne M. Mangiardi (By Telephone) | 13 |     MR. REALE:  Good morning, Ms. Bridges. |
| 14 | Kelley Drye & Warren, LLP | 14 |     THE WITNESS:  Good morning. |
| 15 | 100 Park Avenue | 15 |     MR. REALE:  I do want to do a roll call |
| 16 | New York, New York 10178 | 16 | for everybody on the phone, just to be safe. |
| 17 | (212)808-7898 | 17 |     VIDEOGRAPHER:  Would all the attorneys |
| 18 | Amangiard@kellydrye.com | 18 | please introduce themselves? |
| 19 | | 19 |     MR. REALE:  John Reale on behalf of the |
| 20 | | 20 | Roxane Defendants |
| 21 | | 21 |     MS. MOSLEY-SIMS:  Carmen Mosley-Sims on |
| 22 | | 22 | behalf Arkansas Department of Human Services. |

Page 357

1  OIG's 1984 report that discussed the acquisition
2  cost of pharmacies in Arkansas. Do you recall
3  that?
4      A. I recall looking at a lot of documents
5  yesterday. I can't say that I specifically
6  remember that particular one, but I know we
7  looked at a lot of documents referring to
8  acquisition costs yesterday.
9      Q. Well, just so that you don't have to
10 take my word for it, let's pull that out so you
11 can see what I'm referring to. This was -- I
12 believe was Roxane Exhibit 9. Is that the
13 number you have?
14     A. Yes.
15     Q. Right. And we examined Roxane Exhibit
16 9 yesterday --
17     A. Okay. We did.
18     Q. -- which was the report that talked
19 about the acquisition costs of pharmacies in
20 Arkansas, among other states, do you recall that?
21     A. I do.
22     Q. And we looked at the various ranges of

Page 358

1  acquisition costs for pharmacies in Arkansas on
2  Page 9.
3      A. Uh-huh. Correct.
4      Q. So now back to Roxane Exhibit 19.
5  This letter in March of 1988, the -- HCFA's
6  regional office states that the average
7  difference between AWP and what pharmacists
8  generally paid in Arkansas and Texas was 12.53
9  percent below AWP. Do you agree that this
10 document reflects that?
11     A. Generally, it was 12.53, not on all
12 drugs. I will agree that the document says that.
13     Q. And, in fact, that the document says
14 that the survey performed by Dallas regional
15 office excluded antibiotic drugs, generic drugs
16 and drugs that were purchased directly from the
17 manufacturer?
18     A. So this would be strictly for brand
19 name drugs. This would not include any generics.
20     Q. And based on what we've seen, you would
21 expect that the discounts available for
22 pharmacies, when purchasing generic drugs, are

Page 359

1  typically greater than the discounts when
2  purchasing branded drug?
3          MS. OBEREMBT: Objection.
4      A. I can only make that assumption based
5  on the survey findings. The survey findings
6  generally show that -- and I'd have to look at
7  the survey again, that the variance on brand is
8  not as great on the variance on generics. I
9  mean, that's common knowledge. I'd guess you'd
10 say.
11         MR. REALE: Let me mark the next one.
12     A. A common assumption. Excuse me. Let
13 me rephrase that.
14         [Marked Exhibit Roxane 020]
15     Q. (By Mr. Reale) Roxane Exhibit 20 has
16 just been passed out. This is Bates Page
17 HHC011-2260 to 2268. And this is a letter from
18 the Arkansas Department of Human Services, and it
19 appears to be dated June 22nd, 1988, and it's
20 from Kenny Whitlock, Director at DHS, to Don
21 Hearn at HCFA in the regional office at Dallas,
22 Texas. This was another document, Ms. Bridges,

Page 360

1  that was produced to us by the Federal Government
2  in this lawsuit. And if you look at the first
3  paragraph of this letter, it's a response from
4  Arkansas to concerns raised by HCFA. Do you
5  agree with that?
6      A. It's a clarification or a modification,
7  according to this.
8      Q. And it has been your experience, hasn't
9  it, that when Arkansas has submitted Plan
10 Amendments to CMS, from time to time they may ask
11 for additional information from the State, either
12 to support certain aspects of the Plan Amendment
13 or for other aspects.
14     A. For a State Plan Amendment, they can
15 request additional information. Is this in
16 reference to a State Plan Amendment? I don't
17 know the -- I mean, I don't know if this is in
18 reference to a State Plan Amendment. Let me
19 rephrase that.
20     Q. Now, if you would turn to the second
21 page of the cover letter, or excuse me, of the
22 letter. And at the top, there's something that

Page 373

1   survey.
2       Q.  On Page 4, we see the response of
3   Arkansas to a question regarding what has helped
4   or would help Arkansas overcome barriers to
5   Medicaid drug cost containment listed above.  Do
6   you see that?
7           MS. MOSLEY-SIMS:  Objection, form.
8       A.  I'm sorry.  Would do you repeat?
9       Q.  (By Mr. Reale) Sure.  And Question 12
10  has asked of the Respondent, "What has helped or
11  would help your state to overcome barriers to
12  Medicaid drug cost containment listed above?"
13  And it refers to "potential barriers" listed
14  above in the table.  Do you see that?
15          MS. OBEREMBT:  Excuse me.  This is
16  Laurie.  John, what's the day on this exhibit?
17          MR. REALE:  Laurie, it is undated.
18          THE WITNESS:  It doesn't have a date.
19          MR. REALE:  But it came out at or
20  obviously before the OIG Report on cost
21  containment strategies.
22          MS. OBEREMBT:  What was the date of

Page 374

1   that report?
2           MR. REALE:  It was in the 2000.  I
3   don't know off the top of my head.
4           MS. OBEREMBT:  Thank you.
5           MR. REALE:  You're welcome.
6       Q.  (By Mr. Reale) All right.  Back to Ms.
7   Bridges.
8       A.  Okay.  It's hard to read this
9   handwriting.  I'm sorry.
10      Q.  Sure.  But I want to first point out
11  that the potential barriers that this Respondent
12  has indicated with respect to drug cost
13  containment are opposition from pharmacies.  Do
14  you see that?  D is selected as yes.  Has your
15  program --
16      A.  I'm sorry.  I was trying to read down
17  below.
18          MS. MOSLEY-SIMS:  Objection.
19      A.  You said 11, and now you're -- you said
20  Question 12, but you're reading off of 11, so
21  you've got me confused.
22      Q.  (By Mr. Reale) Okay.  Well, let me

Page 375

1   start from the top.  Question 11 asks the
2   Respondent to indicate whether or not the program
3   has encountered each of the following barriers in
4   seeking to implement drug cost containment
5   strategies.  Do you see that?
6       A.  I see No. 11, yes.
7       Q.  And one of the oppositions that has
8   faced the Arkansas Medicaid Agency, according to
9   this Respondent, has been opposition from
10  pharmacies.  Do you see that?
11          MS. MOSLEY-SIMS:  Objection.
12      A.  I do see it marked, yes.
13      Q.  (By Mr. Reale) And do you agree there
14  has been, from time to time, opposition from
15  pharmacies regarding drug cost containment
16  strategies?
17          MS. MOSLEY-SIMS:  Objection.
18      A.  I can only say that whenever we tried
19  to implement -- when we implemented the new
20  reimbursement formula, there was opposition from
21  pharmacies.
22      Q.  (By Mr. Reale) And if we look down to

Page 376

1   Question 12, which asks, and I will repeat my
2   earlier question -- what has helped or would help
3   your State to overcome barriers to Medicaid cost
4   containment listed above, we see a response from
5   somebody purporting to act on Arkansas' behalf.
6   Do you see that?
7           MS. MOSLEY-SIMS:  Objection.
8       A.  And again, this only shows AR.  It
9   doesn't show who filled it out or a date or who
10  completed the survey, so what I'm going to say is
11  I can only respond to yes, I see an answer on
12  this page by whomever completed this survey.
13      Q.  And the answer that was provided was
14  that CMS should be more aggressive about the
15  measures they approve.  Do you see that language?
16          MS. MOSLEY-SIMS:  Objection.
17      A.  I see that language.
18      Q.  (By Mr. Reale) And do you agree that
19  CMS should be more aggressive about the measures
20  they approve?
21          MS. MOSLEY-SIMS:  Objection.
22      A.  I don't even know how to answer that.

11 (Pages 373 to 376)

Page 461

1  but I don't know that that word is in it, but
2  that's --
3      Q.  Well, why don't -- just, by now you
4  know that I would prefer not to reply on my word,
5  and let's take a look at --
6      A.  It's going to be one of the bottom
7  ones.
8      Q.  Yes, it will be.
9      A.  It's No. 2, I think.  I don't know if
10 it is.
11     Q.  What is the second page of that, up at
12 the top, 447, Paragraph 204?
13     A.  Uh-uh.  That's not it.
14     Q.  Let me see.  Yes.  If you look at the
15 top section --
16     A.  Sorry.
17     Q.  No.  That's okay.  And this access that
18 we've been talking about comes from a section in
19 the Code of Federal Regulations.  And what is
20 that --
21     A.  I'm sorry.
22     Q.  And what is that regulation entitled?

Page 462

1      A.  "Encouragement of Provider
2  Participation".
3      Q.  Right.  So Arkansas has to set a
4  payment level that encourages or incentivizes
5  providers to participate in the program?
6          MS. MOSLEY-SIMS:  Objection.
7      A.  The agencies payments must be
8  sufficient to enlist enough providers to provide
9  services.  I will agree with you there.
10     Q.  (By Mr. Reale) Right.  And because
11 Medicaid is voluntary, pharmacies can look at
12 that payment rate as being set by the State and
13 decide whether or not they want to participate in
14 the program?
15     A.  They could.
16     Q.  Now, there's also, as part of the
17 State's determination of estimated acquisition
18 costs, this concept of provider relations that
19 you've mentioned at several points.  And by that,
20 you mean that you have to make sure that the
21 providers who are going dispense drugs to
22 Medicaid beneficiaries are going to agree to do

Page 463

1  so at the rates proposed by the State?
2      A.  By their contract, they agree to accept
3  the rates proposed by the State.
4      Q.  Right.  But if you change those rates,
5  you need to make sure that providers will
6  continue to participate in the program.
7  Otherwise, it threatens the access mandate of
8  Federal regulations, correct?
9      A.  We, as per the Code of Federal
10 Regulations, we -- the State will pursue their
11 best estimate on what will be sufficient to
12 maintain access for these providers, yes.
13     Q.  And when the State determined in early
14 2001, 2002 time frame that it wanted to define
15 "estimated acquisition cost" as AWP minus 25
16 percent, ultimately, because access was
17 threatened, it had to resort to a definition of
18 AWP minus 20 percent, right?
19         MS. MOSLEY-SIMS:  Objection, asked and
20 answered.
21     A.  That's true.  I mean, once it was
22 proposed, the pharmacists did say that they felt

Page 464

1  access would be an issue.
2      Q.  (By Mr. Reale) So it's fair to say that
3  the State's determination of estimated
4  acquisition cost is a balance of all the factors
5  that we talked about today, not solely the cost
6  of the drug to some pharmacies?
7      A.  Well, again, and I know I've said this
8  and repeated it a lot of times, but there is
9  always that variance off of the AWP.  So we know
10 that AWP is discounted.  We don't want to -- so
11 we're going to set something that's a balance
12 that will allow access to be maintained by the
13 providers.
14     Q.  And it's a balance, on the one hand,
15 between Arkansas' own budget pressures and the
16 need to try to ensure the efficiency and economy
17 in its Medicaid program, and on the other hand,
18 we have pressures from providers who voluntarily
19 participate in the program and the need to ensure
20 that there's access for Medicaid patients.  Would
21 you say that's a fair representation?
22         MS. MOSLEY-SIMS:  Objection.

33 (Pages 461 to 464)

Page 465

1   A. I would say it's a fair statement. I
2  don't know if it's complete, but it's fair.
3   Q. (By Mr. Reale) And there may be other
4  factors that play in the cost, determination of
5  estimated acquisition cost. Yes?
6   A. There could be. Right off the top of
7  my head, I don't have any answer for you.
8       MR. REALE: Okay. I have no questions
9  further at this time. I don't know if Eric or
10 Anne want to go next, but I know you both have
11 documents, so give me a minute to pull those out
12 for you.
13      MR. BERLIN: We do, and actually, we
14 hadn't spoken as to which of us should go first.
15 Anne, do you have a preference?
16      MS. MANGIARDI: I don't. Either way.
17      (Whereupon an off-the-record was held.)
18      [Marked Exhibit Abbott-ARK 001]
19
20         EXAMINATION QUESTIONS BY MR. BERLIN:
21  Q. First, actually, I've already forgot.
22 You prefer Suzette, but if I have to call you by

Page 466

1  your proper name, which would you prefer?
2   A. Mrs. Bridges.
3   Q. Okay. Let me just -- first of all, I
4  introduced myself yesterday, but let me do that
5  again. I'm Eric Berlin, and I'm with the firm of
6  Jones Day, and we represent Abbott Laboratories
7  in a few of the suits that are captioned on our
8  subpoena. First of all, can you hear me well?
9   A. Yes, I can.
10  Q. Great. And because I'm a bit away, I
11 won't always be able to tell when you're about to
12 speak or sometimes when you're not done speaking,
13 and I'll try to be careful not to step on your
14 words, and I would just ask that you do the same
15 for me. As you see it's important that we have
16 the full record. Is that fine?
17  A. I'm trying very hard to do that.
18  Q. That's all I can ask you to do, and I
19 appreciate that. The other thing is that my
20 client is not going to trial together with Mr.
21 Reale's client or the other Defendants involved
22 here, so I'm going to have to retread some of the

Page 467

1  area that you went over with Mr. Reale, and --
2  and I will try to do that as efficiently as
3  possible, wasting as little of your time as
4  possible, but I just wanted to let you know that,
5  so I don't think they're going to be precisely
6  the same questions, but there will be some
7  questions that are limited, and I wanted to let
8  you know that up front so that you didn't become
9  frustrated, that you may feel like you're
10 answering something another time. Is that fine?
11  A. I appreciate that. Thank you.
12  Q. Okay. And the other thing is that
13 sometimes I will refer back to the testimony that
14 you gave yesterday and this morning, and I'll try
15 to do that carefully, and I have absolutely no
16 intent of misrepresenting your testimony, but if
17 I do that, I would just ask you that you let me
18 know, that you don't have to sit idly while I do
19 that, and that for you to also know, if I do it,
20 it's unintentional. Is that fine?
21  A. Okay. Great.
22  Q. Could you please look at Abbott Exhibit

Page 468

1  1, and let me know whether you have seen this
2  document before?
3   A. Yes, sir.
4   Q. When did you see this document?
5   A. As far as a specific time, I don't know
6  the exact date or time that I received it.
7   Q. You understand that you are designated
8  as the representative from Arkansas, the Arkansas
9  Department of Human Services, to testify about
10 these topics as the sort of government
11 organizational representative, right?
12  A. I do.
13  Q. And occasionally I'm going refer to you
14 as you, but when all of this testimony is -- I'm
15 seeking is your knowledge as the representative
16 as opposed to your particular knowledge. Do you
17 understand?
18  A. Yes.
19  Q. Great. Thanks a lot. Bear with me for
20 a moment, please. The first thing I would
21 actually like to cover with you is the State MAC.
22 MAC stands for Maximum Allowable Cost, correct?

34 (Pages 465 to 468)