# EXHIBIT 97

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------X

IN RE: PHARMACEUTICAL          ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     ) CIVIL ACTION:

PRICE LITIGATION               ) 01-CV-12257-PBS

-------------------------------X

THIS DOCUMENT RELATES TO:      ) Judge Patti B. Saris

U.S. ex rel. Ven-A-Care of     )

the Florida Keys, Inc. v.      ) Magistrate Judge

Abbott Laboratories, Inc.,     ) Marianne B. Bowler

et al.                         )

Case No. 06-CV-11337-PBS       )

-------------------------------X

--oOo--

WEDNESDAY, MARCH 19, 2008

--oOo--

VIDEOTAPED DEPOSITION OF

JAMES KEVIN GOROSPE

Reported By:  JOANIE MURAKAMI, CSR No. 5199

              Registered Merit Reporter

              Certified Realtime Reporter

```
                                                   Page 2                                                      Page 4
 1          A P P E A R A N C E S                        1       A P P E A R A N C E S (CONTINUED)
 2                                                       2
 3   For Plaintiff United States:                        3   For Defendant Warrick:
 4                                                       4
 5       United States Department of Justice             5       Ropes & Gray
 6       BY:  GEJAA GOBENA, TRIAL ATTORNEY               6       BY:  DANIEL J. BENNETT, ATTORNEY AT LAW
 7       601 D Street, NW                                7       One International Place
 8       Washington, D.C.  20004                         8       Boston, Massachusetts  02110-2624
 9       (202) 307-1088                                  9        (617) 951-7000
10                                                      10
11   For Plaintiff State of California:                 11   For Defendant Dey:
12                                                      12
13       Office of the Attorney General                 13       Kelley, Drye & Warren LLP
14       California Department of Justice               14       BY:  ANTONIA F. GIULIANA, ATTORNEY AT LAW
15       Bureau of Medi-Cal Fraud & Elder Abuse         15       101 Park Avenue
16       BY:  NICHOLAS N. PAUL,                        16       New York, New York  10178
17           SUPERVISING DEPUTY ATTORNEY GENERAL       17        (212) 808-7941
18           JOHN FISHER, DEPUTY ATTORNEY GENERAL      18
19       PO Box 85266                                  19
20       110 West A Street, Suite 1100                 20
21       San Diego, California  92186                  21
22       (619) 688-6099                                22

                                                   Page 3                                                      Page 5
 1       A P P E A R A N C E S (CONTINUED)              1       A P P E A R A N C E S (CONTINUED)
 2                                                       2
 3   For Relator (VAC):                                  3   For Defendant B. Braun Medical, Inc.:
 4                                                       4
 5       Krause, Kalfayan, Benink & Slavens              5       Locke, Lord, Bissell & Liddell LLP
 6       BY:  DAVID B. ZLOTNICK, ATTORNEY AT LAW        6       BY:  KARIN B. TORGERSON, ATTORNEY AT LAW
 7       625 Broadway, Suite 635                         7          (Via telephone)
 8       San Diego, California  92101                    8       2200 Ross Avenue, Suite 2200
 9       (619) 232-0331                                  9       Dallas, Texas  75201
10                                                      10        (214) 740-8725
11   For Defendant Abbott Laboratories, Inc.:           11
12                                                      12
13       Jones Day                                     13   For Defendant Sandoz, Inc.:
14       BY:  JEREMY P. COLE, ATTORNEY AT LAW          14
15           ANDREA CARON, ATTORNEY AT LAW             15       White & Case LLP
16          (Via telephone)                             16       BY:  LARA BERWANGER, ATTORNEY AT LAW
17       77 West Wacker Drive, Suite 3500              17          (Via telephone)
18       Chicago, Illinois  60601                      18       1155 Avenue of the Americas
19       (312) 782-3939                                19       New York, New York  10036-2787
20                                                      20        (212) 819-2549
21                                                      21
22                                                      22
```

2 (Pages 2 to 5)

Page 6

```
 1       A P P E A R A N C E S  (CONTINUED)
 2
 3  Also Present:
 4
 5       State of California
 6       Department of Health Services
 7       Office of Legal Services, MS 0010
 8       BY:  JANET M. ALEXANDER, STAFF COUNSEL
 9       1501 Capitol Avenue, Suite 71.5001
10       Sacramento, California   95899-7413
11       (916) 440-7832
12
13       SUZANNE GRAYDON, Investigative Auditor II
14
15       THOMAS TEMMERMAN
16
17       MONTY GORDON, Videographer
18
19            --oOo--
20
21
22
```

Page 8

```
 1       E X H I B I T S  (CONTINUED)
 2  NUMBER           DESCRIPTION             PAGE
 3  Exhibit Gorospe 008, CAAG/DHS0067253 - 0067257. 126
 4  Exhibit Gorospe 009, CAAG/DHS0077185 - 0077188. 138
 5  Exhibit Gorospe 010, CAAG/DHS0071578 - 0071627. 141
 6  Exhibit Gorospe 011, CAAG/DHS0072839 - 0072843. 168
 7  Exhibit Gorospe 012, CAAG/DHS0076407 - 0076412. 176
 8  Exhibit Gorospe 013, CAAG/DHS0076413........... 184
 9  Exhibit Gorospe 014, CAAG/DHS0076371 - 0076376. 188
10  Exhibit Gorospe 015, Excerpt from OIG-RPT...... 205
11  Exhibit Gorospe 016, CAAG/DHS0071157 - 0071224. 208
12  Exhibit Gorospe 017, Excerpt from Federal
13           Register.................. 224
14  Exhibit Gorospe 018, Review of Pharmacy
15           Acquisition Costs For
16           Drugs Reimbursed Under the
17           Medicaid Prescription Drug
18           Program of the CDHS....... 227
19  Exhibit Gorospe 019, Medicaid Pharmacy - Actual
20           Acquisition Cost of
21           Prescription Drug Products
22           For Brand Name Drugs...... 234
```

Page 7

```
 1             I N D E X
 2
 3  WITNESS: JAMES KEVIN GOROSPE                PAGE
 4    Examination by Mr. Cole..................... 013
 5    Examination by Mr. Gobena................... 336
 6    Further Examination by Mr. Cole........ 375, 387
 7    Further Examination by Mr. Gobena........... 383
 8
 9          E X H I B I T S
10  NUMBER           DESCRIPTION             PAGE
11  Exhibit Gorospe 001, Subpoena Duces Tecum...... 022
12  Exhibit Gorospe 002, Curriculum Vitae.......... 031
13  Exhibit Gorospe 003, Excerpt from California
14           Administrative Register
15           77, No. 6-B............... 089
16  Exhibit Gorospe 004, West's Ann.Cal.Welf.&Inst.
17           Code Section 14105.45..... 092
18  Exhibit Gorospe 005, Excerpt from Medicare and
19           Medicaid Guide Section
20           34,157.................... 094
21  Exhibit Gorospe 006, CAAG/DHS0073715 - 0073765. 101
22  Exhibit Gorospe 007, CAAG/DHS0067324 - 0067325. 119
```

Page 9

```
 1             E X H I B I T S
 2  NUMBER           DESCRIPTION             PAGE
 3  Exhibit Gorospe 020, Medicaid Pharmacy - Actual
 4           Acquisition Cost of
 5           Generic Prescription Drug
 6           Products.................. 241
 7  Exhibit Gorospe 021, CAAG/DHS0071684 - 0071692. 262
 8  Exhibit Gorospe 022, Medicaid Pharmacy -
 9           Additional Analyses of the
10           Actual Acquisition Cost of
11           Prescription Drug Products 268
12  Exhibit Gorospe 023, CAAG/DHS0078007 - 0078013. 250
13  Exhibit Gorospe 024, CAAG/DHS0072820 - 0072822. 277
14  Exhibit Gorospe 025, CAAG/DHS0068472 - 0068570. 282
15  Exhibit Gorospe 026, CAAG/DHS0072991 - 0072996. 289
16  Exhibit Gorospe 027, Memorandum dated August
17           10, 2001.................. 296
18  Exhibit Gorospe 028, Medicaid Pharmacy - Actual
19           Acquisition Cost of
20           Generic Prescription Drug
21           Products.................. 297
22  Exhibit Gorospe 029, CAAG/DHS0073141 - 0073156. 300
```

Page 10

```
 1              E X H I B I T S
 2  NUMBER           DESCRIPTION           PAGE
 3  Exhibit Gorospe 030, Remarks by the President
 4              in Radio Address to the
 5              Nation.................... 321
 6  Exhibit Gorospe 031, US' First Amended
 7              Complaint................. 324
```

Page 12

```
 1  Laboratories, et al. in the case number 01 dash
 2  CV dash 12257 dash PBS.
 3          This is the beginning of tape one,
 4  volume one in the deposition of Kevin Gorospe on
 5  March 19th, 2008.  We are located at 1300 I
 6  Street in Sacramento, California.
 7          Counsel, will you please identify
 8  yourself starting with the questioning attorney.
 9          MR. COLE:  Jeremy Cole from Jones Day
10  for Abbott Laboratories, Inc.
11          MR. BENNETT:  Dan Bennett from Ropes
12  and Gray for Schering-Plough Corporation and
13  Warrick Pharmaceuticals Corporation.
14          MR. TEMMERMAN:  Tom Temmerman from
15  California Attorney General's Office.
16          MR. GOBENA:  Gejaa Gobena, United
17  States Department of Justice on behalf of United
18  States.
19          MR. ZLOTNICK:  David Zlotnick of Krause
20  Kalfayan for the Relator Ven-A-Care.
21          MS. GIULIANA:  Antonia Giuliana from
22  Kelley Drye for Day.
```

Page 11

```
 1          BE IT REMEMBERED, that on Wednesday,
 2  March 19, 2008, commencing at the hour of 8:33
 3  a.m., in the Offices of the California Department
 4  of Justice, 1300 I Street, Conference Room 1624,
 5  Sacramento, California, before me, JOANIE Y.
 6  MURAKAMI, a Certified Shorthand Reporter of the
 7  State of California, there personally appeared
 8
 9          KEVIN GOROSPE,
10  called as a witness by the Defendant Abbott
11  Laboratories, who, being by me first duly sworn,
12  was thereupon examined and interrogated as
13  hereinafter set forth.
14
15          THE VIDEOGRAPHER:  Good morning.  We're
16  on the video record at approximately 8:33 a.m.
17  My name is Monty Gordon in association of
18  Henderson Legal Services in Washington, DC.  The
19  phone number is (202) 220-4158.
20          This is a matter pending before the US
21  District Court, District of Massachusetts, in a
22  case captioned Ven-A-Care, et al. versus Abbott
```

Page 13

```
 1          MS. ALEXANDER:  Janet Alexander for
 2  California Department of Health Care Services.
 3          MR. PAUL:  Nicholas Paul, California
 4  Department of Justice for California.
 5          THE VIDEOGRAPHER:  Will the court
 6  reporter please swear in the witness?
 7          (The witness was then sworn in by
 8  the Court Reporter.)
 9          THE VIDEOGRAPHER:  You may proceed.
10
11             EXAMINATION
12  BY MR. COLE:
13      Q.  Good morning, Dr. Gorospe.
14      A.  Good morning.
15      Q.  We've not met before today; is that
16  right?
17      A.  That's correct.
18      Q.  Would you please state your name and
19  your home address for the record, please?
20      A.  My name is James Kevin Gorospe.  My
21  home address is 2335 Estate Drive, Stockton,
22  California, zip is 95209.
```

Page 62

 1  other years, they didn't?
 2     A.  Yes.
 3     Q.  Are you a member today?
 4     A.  No.
 5     Q.  You're not.  Have you been a member or
 6  were you ever a member during the time that you
 7  worked for the state?
 8     A.  Yes.
 9     Q.  And during the stretches where you have
10  been a member, are you on some sort of mailing
11  list or do you receive publications or
12  announcements from the California Phamacists
13  Association from time to time?
14     A.  Yes.
15     Q.  And what about the California -- I'm
16  sorry -- the American Pharmacists Association.
17  How long have you been a member of that
18  association?
19     A.  Same as California Pharmacists
20  Association, off-and-on.
21     Q.  It's been off-and-on since the time
22  you've been in pharmacy school?

Page 63

 1     A.  Yes.
 2     Q.  Are you a member of the American
 3  Pharmacists Association today?
 4     A.  Yes.
 5     Q.  And I take it from time to time, you
 6  would receive, during the stretches where you
 7  were a member, you would receive information from
 8  that association?
 9     A.  Yes.
10     Q.  As a member of the California
11  Pharmacists Association, would you agree with me
12  that the association pays close attention to
13  pharmacy issues?
14     A.  Yes.
15     Q.  And would you agree that the
16  association pays particularly close attention to
17  pharmacy reimbursement issues?
18         MR. PAUL:  Objection.  Form.
19         MR. GOBENA:  Same objection.
20         THE WITNESS:  Yes.
21  BY MR. COLE:
22     Q.  And has it been your experience that

Page 64

 1  whenever there has been political discussion or
 2  legislative discussion about adjusting the
 3  reimbursement formula, that the California
 4  Pharmacy Association has been involved in that
 5  process?
 6         MR. PAUL:  Objection.  Form.
 7         MR. GOBENA:  Same objection.
 8         THE WITNESS:  Yes.
 9  BY MR. COLE:
10     Q.  Okay.  And is it your experience that
11  whenever there is a proposed reduction in
12  pharmacy reimbursement, that the California
13  Phamacists Association has opposed those proposed
14  reductions?
15         MR. PAUL:  Objection.  Form.
16         MR. GOBENA:  Same objection.
17         THE WITNESS:  Yes.
18  BY MR. COLE:
19     Q.  Okay.  Are you aware of any instance
20  where the California Pharmacists Association
21  supported a proposed reduction in the
22  reimbursement formula?

Page 65

 1         MR. PAUL:  Objection.  Form.
 2         MR. GOBENA:  Same objection.
 3         THE WITNESS:  No, I'm not.
 4  BY MR. COLE:
 5     Q.  Over the years, have you subscribed to
 6  any pharmacy-related publications or periodicals
 7  in order to keep current on pharmacy issues?
 8     A.  Yes.
 9     Q.  List, if you could, list for me those
10  publications, the ones you can recall.
11     A.  I can't recall by name any right now.
12     Q.  Okay.  You don't remember a particular
13  magazine or news publication that you've
14  received?
15     A.  Pharmacist's Letter, Drug Topics.
16     Q.  And who puts out the Pharmacist's
17  Letter?
18     A.  The Pharmacist's Letter.  It's its own
19  publication.
20     Q.  I see.
21     A.  Yeah.
22     Q.  What about Drug Topics?

Page 142

1  for identification.)
2  BY MR. COLE:
3      Q.  I've handed you Exhibit 10.  I'll give
4  you a moment to look at it.
5          The document's titled Report on the
6  Proceedings of the Task Force on Medi-Cal Drug
7  Costs.  It's dated March of 2000.  It's Bate
8  stamped CAAG/DHS 0071578 through 71627.
9          Do you recognize this document?
10     A.  Yes, I do.
11     Q.  Were you part of the task force on
12 Medi-Cal drug costs in or around 2000?
13     A.  Yes.
14     Q.  And was this task force created by the
15 then Governor of the State of California?
16     A.  Yes.
17     Q.  And that was Gray Davis at the time?
18     A.  Yes.
19     Q.  And the document sort of describes some
20 of the background and the organization of the
21 task force.
22         If you could, describe for me in your

Page 143

1  words the genesis of the task force and who
2  comprised the task force.
3      A.  The genesis of the task force is stated
4  at the top of the document, coming from the
5  Governor's Budget, which required a task force be
6  generated headed by the Secretary of Health and
7  Human Services, who was Grantland Johnson, at the
8  time, to discuss options for controlling drug
9  costs in the Medi-Cal program.
10     Q.  Fair to say that the task force was
11 created to explore ways in which the Medi-Cal
12 program could save money?
13     A.  Yes.
14     Q.  How big was the task force in terms of
15 number of people?
16     A.  The numbers of individuals are listed
17 on the very last two pages of the document.
18 Those are the invited participants.
19     Q.  Did you prepare this document?
20     A.  The final document?  This document?
21 No.
22     Q.  Did you have any role -- did you draft

Page 144

1  any sections of it?
2      A.  I have to look to see if any of this --
3  I don't recall.
4      Q.  Well, if you go to page -- if you go to
5  Attachment 1, which is Bate Stamped 71584, it
6  lists -- it says:  Medi-Cal Drug Task Force
7  Grouping of Options for Pro/Con Analysis.
8          Do you see that?
9      A.  Yes.
10     Q.  And then it lists five main categories:
11 Education, disease management, contracting
12 issues, reimbursement issues and other?
13     A.  Yes.
14     Q.  Which of those categories were you
15 involved in?
16     A.  I believe I was involved in all of the
17 categories in terms of organizational --
18 organizing the groups.
19     Q.  Did you focus more on certain
20 categories than others?
21     A.  Not that I can recall.
22     Q.  But you recall being involved or having

Page 145

1  a role in each of the five categories?
2      A.  Yes.
3      Q.  If you go to the preceding page, before
4  Attachment 1, 71583, in the paragraph titled
5  Reimbursement Issues, it says:  Reimbursement
6  issues are those that would impact the payments
7  made to pharmacies for drug ingredient costs or
8  for professional fees.  There was considerable
9  more reluctance by the task force to consider
10 issues of cost containment in reimbursement to
11 pharmacies for either drug ingredient costs or
12 the professional fee.  A primary reason for the
13 reluctance appeared to be a concern over access
14 to services by beneficiaries.
15         Did I read that correctly?
16     A.  Yes.
17     Q.  And is that consistent with your
18 understanding about the conclusions reached by
19 the task force that there was considerable more
20 reluctance to consider cost containment in the
21 context of pharmacy reimbursement because that
22 might negatively impact access to care?

|  | Page 146 |  | Page 148 |
|---|---|---|---|
| 1 | MR. PAUL: Objection. Form. | 1 | A. Yes. |
| 2 | MR. GOBENA: Same objection. | 2 | Q. And would you agree that it was the |
| 3 | THE WITNESS: Yes. | 3 | view of DHS, at this time, that whatever Medi-Cal |
| 4 | BY MR. COLE: | 4 | was paying for drug ingredient costs, did not |
| 5 | Q. And sort of put in plain terms, the | 5 | approximate the pharmacy's actual acquisition |
| 6 | concern was if you drop the reimbursement level, | 6 | cost? |
| 7 | then Medi-Cal beneficiaries might not get the | 7 | MR. PAUL: Objection. Form. |
| 8 | care that they need -- | 8 | MR. GOBENA: Same objection. |
| 9 | MR. PAUL: Objection. Form. | 9 | THE WITNESS: Are you referring to the |
| 10 | BY MR. COLE: | 10 | statement that's in this document as proof of |
| 11 | Q. -- because pharmacies will either go | 11 | DHS's position? |
| 12 | out of business or withdraw from the program. | 12 | BY MR. COLE: |
| 13 | MR. PAUL: Sorry. I didn't mean to | 13 | Q. Yes. |
| 14 | interrupt you. | 14 | A. I would disagree with that comment |
| 15 | Objection. Form. | 15 | then. |
| 16 | MR. GOBENA: Same objection. | 16 | Q. I'm just asking you if -- let me put it |
| 17 | THE WITNESS: Yes. | 17 | this way: Would you agree with me that DHS |
| 18 | BY MR. COLE: | 18 | understood, in 2000, that there were ways, if it |
| 19 | Q. If you go to Page 23 of this document, | 19 | so desired, to come up with a reimbursement |
| 20 | it's 71611, it's in a section titled Cost Control | 20 | formula that more closely approximated |
| 21 | Options Matrix, and for various topics, it has | 21 | pharmacists' actual acquisition costs? |
| 22 | sort of a summary of what the proposed change | 22 | MR. PAUL: Objection. Form. |

|  | Page 147 |  | Page 149 |
|---|---|---|---|
| 1 | would be, and then it lists some pros for the | 1 | MR. GOBENA: Same objection. It's also |
| 2 | change and some cons for the change. | 2 | my understanding this witness is not here to |
| 3 | Do you see that? | 3 | testify on behalf of the agency. |
| 4 | A. Yes. | 4 | BY MR. COLE: |
| 5 | Q. Do you remember drafting any of these | 5 | Q. You can go ahead and answer. |
| 6 | pro/con matrices? | 6 | A. Yes. |
| 7 | A. No, I do not. | 7 | Q. And then it describes the current |
| 8 | Q. Do you remember having any input in the | 8 | formula, and then in the next bullet, it says: |
| 9 | drafting of these pro/con matrices? | 9 | Replaces AWP and the direct price reimbursement |
| 10 | A. Yes. | 10 | methodology with AWP minus X percent or wholesale |
| 11 | Q. Do you know who drafted these Pro/Con | 11 | acquisition costs plus Y percent, and then it |
| 12 | matrices? | 12 | says: State regulation change or legislation is |
| 13 | A. I don't recall which individuals did | 13 | required. |
| 14 | that. | 14 | Do you see that? |
| 15 | Q. Okay. Page 23 of Exhibit 10, it says: | 15 | A. Yes. |
| 16 | Change ingredient cost reimbursement of drugs, | 16 | Q. And under the pros section, one of the |
| 17 | and then it lists -- has some bullet points | 17 | bullets listed, the fourth one down, says: Would |
| 18 | there: Decrease the amount Medi-Cal pays for | 18 | be in line with methodology other states use for |
| 19 | drug ingredient costs to something that more | 19 | reimbursement. |
| 20 | closely approximates the pharmacy's actual | 20 | Do you see that? |
| 21 | acquisition cost. | 21 | A. Yes. |
| 22 | Do you see that? | 22 | Q. Do you know what that means? |

38 (Pages 146 to 149)

Page 222

1  $17.
2      A.  Based on the information we've just
3  discussed, yes.
4      Q.  Are you familiar with the term
5  "spread"?
6      A.  Yes.
7      Q.  And what do you understand that to
8  mean?
9      A.  My understanding of spread, as it
10 relates to pharmaceuticals or prescription drugs,
11 is the difference between what a provider
12 purchases a product for and what they are
13 reimbursed for that same product.
14     Q.  Looking solely at this column, average
15 wholesale price minus five percent, would you
16 agree with me that there are wide variations in
17 the AWPs for this particular generic product?
18     A.  Yes.
19     Q.  And again, the numbers listed here
20 aren't the AWPs.  They're AWPs minus five
21 percent, but if you gave each one of them a boost
22 to compensate for that, you would have some of

Page 223

1  the products having an AWP of somewhere around,
2  in the $21 range, and some products having an AWP
3  of half of that, correct?
4      A.  As you previously discussed, the AWP
5  would be somewhere in the $17 range for the
6  upper, the higher priced products, and the other
7  products would be below, because these numbers
8  include the dispensing fee, as you previously
9  noted.
10     Q.  Good point.  The AWP, at least to that
11 second product, would be somewhere in the $17
12 range, and if we looked at this first product
13 listed, the one from Goldline, if you back out
14 the dispensing fee, that figure drops to $5.37?
15     A.  That's correct.
16     Q.  So the AWP would be somewhere between -
17 - somewhere around $6 roughly, maybe a little
18 less?
19     A.  Yes, that's correct.
20     Q.  I wasn't a math major.  So you would
21 have one product with an AWP of around $17, one
22 generic product, and a therapeutically equivalent

Page 224

1  product with an AWP of roughly one-third of that.
2      A.  That is accurate.
3      Q.  And again, anyone in DHS who you know
4  was pouring through or reading this report, would
5  be able to -- would have learned that there were
6  these wide variations in AWPs for generic
7  products --
8          MR. GOBENA:  Object to --
9  BY MR. COLE:
10     Q.  -- correct?
11         MR. GOBENA:  Sorry.  Objection.
12         THE WITNESS:  That is correct.
13         (Exhibit Gorospe 017 was marked
14 for identification.)
15 BY MR. COLE:
16     Q.  I marked Exhibit 17.
17         Dr. Gorospe, this is a Proposed Rule
18 excerpt from the Code of Federal Regulations,
19 Federal Register, Volume 39, Number 230, dated
20 November 27, 1974, and I'm reading from the
21 bottom of the document.
22         Have you ever referred to or seen this

Page 225

1  regulation, proposed regulation before?
2      A.  Not that I can recall.
3      Q.  Okay.  You were probably in junior high
4  or high school at the time.
5      A.  High school.
6      Q.  Okay.  But since the time that you've
7  joined Medi-Cal, did you ever have occasion to
8  review this proposed rule?
9      A.  Not that I can recall, no.
10     Q.  If you look towards the top of the
11 middle column, it says -- there's a section
12 called "acquisition costs."
13     A.  I'm sorry.  Where?  Oh, I see it.
14     Q.  It says:  In referring to drug cost,
15 current regulations specify cost as determined by
16 the state.  Most states use average wholesale
17 price.  Red Book data, Blue Book data, survey
18 results or similar standard costs.  Such standard
19 prices are frequently in excess of actual
20 acquisition costs to the retail pharmacist.
21 Thus, to achieve maximum savings to the Medicaid
22 program, the proposal requires the use of actual

Page 238

 1     A.  No.
 2     Q.  Did you have occasion to read Barron's
 3  during your time at DHS?
 4     A.  No.
 5     Q.  Okay.  Do you have any reason to
 6  disagree with what's stated here, as reported by
 7  Barron's, in that the true cost for the drugs
 8  they looked at, that Barron's looked at, that the
 9  acquisition cost was 60 to 85 percent below AWP
10  for generic drugs?
11         MR. PAUL:  Objection.  No foundation.
12         MR. GOBENA:  Same objection.
13         THE WITNESS:  I don't have a basis to
14  know whether or not the statement is accurate.
15  BY MR. COLE:
16     Q.  In your experience as a pharmacist,
17  before you joined Medi-Cal, was it your
18  understanding that the acquisition cost -- that
19  the percentage discount off of AWP was greater
20  for generic drugs than for brand name drugs?
21         MR. GOBENA:  Objection.  Form.
22         MR. PAUL:  Same objection.

Page 239

 1         THE WITNESS:  Yes.
 2  BY MR. COLE:
 3     Q.  In other words, the spread on generic
 4  drugs was greater than the spread on brand name
 5  drugs?
 6         MR. GOBENA:  Objection.  Form.
 7  BY MR. COLE:
 8     Q.  Is that fair?
 9     A.  I can't speak to whether that's true or
10  not.
11     Q.  In your experience?
12     A.  I don't recall if the spread was
13  greater in one versus the other.
14     Q.  Okay.  But these reports that we've
15  looked at earlier today indicate that, correct?
16         MR. PAUL:  Objection.  No foundation.
17         MR. GOBENA:  Same objection.
18         THE WITNESS:  Given the definition of
19  "spread," I would have to know two points of fact
20  which would be the acquisition cost and the
21  reimbursement rate.
22  BY MR. COLE:

Page 240

 1     Q.  Okay.  Fair enough.  If you were
 2  looking at spread as simply the difference
 3  between AWP and acquisition cost, would you --
 4  has it been your experience, in your 25 years as
 5  a pharmacist, that the spread for generic drugs
 6  is greater than the spread for brand drugs?
 7         MR. GOBENA:  Objection.  Form.
 8         THE WITNESS:  Yes.
 9  BY MR. COLE:
10     Q.  And that's what these reports that
11  we've looked at today seem to indicate, correct?
12         MR. PAUL:  Objection.  No foundation.
13         MR. GOBENA:  Same objection.
14         THE WITNESS:  Based on our previous
15  discussion, yes.
16  BY MR. COLE:
17     Q.  And this report notes, or at least in
18  reference to the Barron's article, that the
19  discount off of AWP for generic drugs was 10 to
20  20 percent while the discount off of AWP for
21  generic drugs -- do I need to start that over?
22  Yes, I do.

Page 241

 1         Regarding this Barron's article, the
 2  difference between true cost and AWP for brand
 3  name drugs was 10 to 20 percent, while the
 4  difference between the true cost and AWP for
 5  generic drugs was 60 to 85 percent, correct?
 6     A.  That's what this states, yes.
 7     Q.  And if you go flip a few pages back to
 8  the findings and recommendations page, it
 9  indicates that the -- at least in the time period
10  covered by this report, that the invoice price
11  for brand name drugs was a national average of
12  18.3 percent below AWP.
13         Do you see that?
14     A.  Yes, I do.
15         (Exhibit Gorospe 020 was marked
16  for identification.)
17  BY MR. COLE:
18     Q.  Here's Exhibit 20.  This is another
19  HHS-OIG report.  It's dated August 1997 and it's
20  entitled Medicaid Pharmacy Actual Acquisition
21  Cost of Generic Drug Prescription Products.
22         Do you recognize this report?

Case 1:01-cv-12257-PBS   Document 6642-19   Filed 11/03/09   Page 11 of 13

Gorospe, Pharm. D., J. Kevin - Vol. II                                September 22, 2008
                              Sacramento, CA

Page 394

```
              UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS
    -----------------------------x
    IN RE PHARMACEUTICAL INDUSTRY)
    AVERAGE WHOLESALE PRICE      )
    LITIGATION                   )
    _____)
    THIS DOCUMENT RELATES TO     ) MDL No. 1456
    State of California, ex rel. ) Civil Action:
    Ven-A-Care v. Abbott         ) 01-12258-PBS
    Laboratories, Inc., et al.   )
    -----------------------------x
                       VOL. II
                      --oOo--
              MONDAY, SEPTEMBER 22, 2008
                      --oOo--
               VIDEOTAPED DEPOSITION OF
              J. KEVIN GOROSPE, Pharm.D.
                      --oOo--


    Reported By: CAROL NYGARD DROBNY, CSR No. 4018
                 Registered Merit Reporter
```

Case 1:01-cv-12257-PBS   Document 6642-19   Filed 11/03/09   Page 12 of 13

Gorospe, Pharm. D., J. Kevin - Vol. II                          September 22, 2008
                              Sacramento, CA

Page 591

 1    A.  Yes.
 2    Q.  Second to the last paragraph on that
 3  page the first sentence reads "It is clear and well
 4  documented that pharmacy reimbursement
 5  methodologies that rely on AWP and a low dispensing
 6  fee overpay pharmacies for drug ingredient costs
 7  and underpay them for the cost of dispensing the
 8  drug."
 9        Did I read that correctly?
10    A.  Yes.
11    Q.  Is that consistent with your
12  understanding of pharmacy reimbursement methodology
13  that rely on AWP?
14    A.  Yes.
15    Q.  And how long have you had that
16  understanding?
17    A.  Again, as I previously stated, the late
18  nineties.
19    Q.  If you turn to page 2, you'll see that
20  under the heading "Drug Ingredient Costs" the first
21  paragraph goes through some of the findings of the
22  Myers and Stauffer study that we talked about

Page 592

 1  earlier; correct?
 2    A.  Yes.
 3    Q.  And in the last sentence it reads "It's
 4  clear from the information that the Department's
 5  current rate of AWP minus 10 percent does not
 6  accurately reflect the drug acquisition costs in
 7  the marketplace;" correct?
 8    A.  Yes.
 9    Q.  Do you agree with that statement or is
10  that consistent with your understanding at the
11  time?
12    A.  Yes.
13    Q.  The rate referenced there, AWP minus 10
14  percent, was adopted after the study was performed;
15  correct?
16    A.  I don't recall.
17    Q.  The rate of AWP minus 10 percent was --
18  didn't become effective until after the Myers and
19  Stauffer study was released; correct?
20    A.  That's correct.
21    Q.  I take it you don't recall whether the
22  specific legislation or budget proposal that

Page 593

 1  implemented minus 10 percent occurred before or
 2  after June of 2002?
 3    A.  That is correct.
 4    Q.  You would agree with me, though, that
 5  the rate study was referenced in the state's
 6  attempts to -- in the state's communications with
 7  CMS to seek approval of the AWP minus 10 percent?
 8    A.  Yes.
 9    Q.  The last paragraph on that page --
10        Scratch that.
11        The second to the last -- the second to
12  last paragraph in the page, last sentence, states
13  "Therefore, the Department proposed using a single
14  and differentiated rate equal to AWP minus 20
15  percent."
16        Do you understand that to mean that the
17  -- that they were not proposing to reimburse
18  generics differently?
19    A.  That is correct.
20    Q.  And then the first sentence of the
21  following paragraph states "A rate of AWP minus 20
22  percent is still significantly higher than the

Page 594

 1  pharmacy acquisition cost of generic drugs."
 2        Did I read that correctly?
 3    A.  Yes.
 4    Q.  Is that consistent with your
 5  understanding at the time?
 6    A.  Yes.
 7    Q.  Did you have that understanding also
 8  going back to the late nineties, that AWP minus 20
 9  percent is significantly higher than pharmacy
10  acquisition costs for generic drugs?
11    A.  Yes.
12    Q.  Last sentence of that paragraph or that
13  page, I guess, going over to the next page, "The
14  reimbursement of generic drugs will still be
15  significantly above pharmacy's acquisition costs."
16        And then it goes on.
17        Did I read that correctly?
18    A.  Yes.
19    Q.  Do you understand that to --
20        Withdrawn.
21        So was it your understanding to the
22  extent you recall this proposal that the

51 (Pages 591 to 594)

Case 1:01-cv-12257-PBS   Document 6642-19   Filed 11/03/09   Page 13 of 13

Gorospe, Pharm. D., J. Kevin - Vol. II                                September 22, 2008
                                    Sacramento, CA

Page 595

1  reimbursement rate of AWP minus 20 percent was made
2  knowing that reimbursement on that basis would be
3  significantly higher than acquisition costs for
4  generic drugs?
5      A.  Yes.
6      Q.  And then the -- further down on that
7  page there's a paragraph with the heading "Impact
8  on Access" that refers to stakeholder meetings.
9          Do you recall having stakeholder meetings
10 prior to this legislative proposal?
11     A.  Not that I can recall.
12     Q.  Do you recall during any discussions for
13 changing the reimbursement rate having meetings
14 with stakeholders?
15     A.  Not that I -- not that I can recall.
16     Q.  Do you have an understandingas to what
17 the document -- is referring to when it refers to a
18 "stakeholder"?
19     A.  Yes.
20     Q.  Would that be a reference to providers
21 of medical -- Medi-Cal?
22     A.  Yes, amongst others.

Page 596

1      Q.  And others might be beneficiaries, other
2  organizations that have some interest in the -- in
3  the Medi-Cal program?
4      A.  That's correct.
5      Q.  Would you agree that this paragraph
6  reflects consideration on the part of --
7          Or is it your understanding of this
8  paragraph that Medi-Cal was considering whether the
9  proposed change would affect beneficiaries' access
10 to care?
11     A.  Yes.
12     Q.  And do you recall in 2004 when rate
13 changes were discussed considering access to care
14 as a -- a policy matter?
15     A.  Yes.
16         MR. BENNETT:  I think we need to break
17 for a tape.  So --
18         MR. PAUL:  Okay.  Just to restate my
19 concern earlier with regard to this, I think I
20 stated on the record but I'm not sure I mentioned
21 that we were talking about Exhibit 52, although I'm
22 sure it's fairly obvious from the transcript, but I

Page 597

1  want to make sure that that objection's on the
2  record and while we would prevail on whatever
3  motion was required to retract this, I would ask
4  that all the testimony that was given in connection
5  with it be redacted, but, obviously, we'll take
6  that up later.
7          VIDEOGRAPHER:  This is the end of tape
8  two, volume two, of the deposition of Kevin
9  Gorospe.
10         We are off the record at 2:21 p.m.
11         (Thereupon a recess was taken at 2:21
12         p.m. and the deposition resumed at 2:31
13         p.m.)
14         VIDEOGRAPHER:  This is the beginning of
15 tape three, volume two, of the deposition of Kevin
16 Gorospe.
17         We are back on the record at 2:31 p.m.
18         MR. BENNETT:  I'd like to mark this
19 Exhibit 53, I think we're on.
20         (Exhibit Gorospe 053 was marked for
21         Identification.)
22 BY MR. BENNETT:

Page 598

1      Q.  Exhibit 53 has labeled CAAG/DHS 0084626
2  and 627.
3          Dr. Gorospe, do you recognize this
4  document?
5      A.  Yes.
6      Q.  Can you describe it for us?
7      A.  It appears to be a description of
8  Medi-Cal pharmacy reimbursement related to a
9  reimbursement proposal and various data related to
10 acquisition cost of drugs relevant to AWP, also
11 describes briefly points about the -- study of
12 Medi-Cal pharmacy reimbursement.
13     Q.  Did you draft this document?
14     A.  Not that I can recall, no.
15     Q.  Do you recall receiving a copy of the
16 document?
17     A.  Yes.
18     Q.  Do you know who would have drafted it,
19 if not yourself?
20     A.  Somebody within the Pharmacy Section.
21     Q.  And the Pharmacy Section, as you've
22 described with the previous document, encompasses

52 (Pages 595 to 598)