# EXHIBIT 98

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------X

IN RE: PHARMACEUTICAL INDUSTRY    ) MDL No. 1456

AVERAGE WHOLESALE PRICE           ) Civil Action No.

LITIGATION                        ) 01-12257-PBS

---------------------------------X

THIS DOCUMENT RELATES TO:         ) Hon. Patti B.

United States of America ex rel. ) Saris

Ven-A-Care of the Florida Keys,   )

Inc. v. Dey, Inc., et al., Civil  )

Action No. 05-11084-PBS; and      )

United States of America ex rel.  )

Ven-A-Care of the Florida Keys,   )

Inc. v. Boehringer Ingelheim      )

Corp., et al., Civil Action No.   )

07-10248-PBS                      )

---------------------------------X

Videotaped deposition of

THE DELAWARE DIVISION OF MEDICAID AND MEDICAL

ASSISTANCE by CYNTHIA DENEMARK

December 9, 2008 - Newark, Delaware

Page 2

```
 1           A P P E A R A N C E S:
 2
 3   Counsel for the United States of America
 4       UNITED STATES ATTORNEY'S OFFICE
 5       BY:  BARBARA HEALY SMITH, ESQUIRE
 6       barbara.h.smith@usdoj.gov
 7       Assistant U.S. Attorney
 8       John J. Moakley U.S. Courthouse
 9       1 Courthouse Way
10       Boston, Massachusetts 02110
11       617-748-3100
12
13   Counsel for the State of Delaware
14       DEPARTMENT OF JUSTICE
15       BY:  A. ANN WOOLFOLK, ESQUIRE
16       ann.woolfolk@state.de.us
17       BY:  SUSAN PURCELL, ESQUIRE
18       spurcell@state.de.us
19       Carvel Office Building, 6th Floor
20       820 N. French Street
21       Wilmington, Delaware 19801
22       302-577-8400
```

Page 3

```
 1       A P P E A R A N C E S: (CONTINUED)
 2
 3   Counsel for EDS and the Witness
 4       EDS, LLC
 5       BY:  ANNE SHUTTEE, ESQUIRE
 6       anne.shuttee@eds.com
 7       5400 Legacy Drive
 8       H3-3A-05
 9       Plano, Texas 75024
10       972-605-5509
11
12   Counsel for Dey, Inc., Dey, L.P.
13   and Dey L.P., Inc.
14       KELLEY DRYE & WARREN LLP
15       BY:  BRENDAN J. CYR, ESQUIRE
16       bcyr@kelleydrye.com
17       101 Park Avenue
18       New York, New York 10178
19       212-808-5021
20
21
22   (CONTINUED)
```

Page 4

```
 1       A P P E A R A N C E S: (CONTINUED)
 2
 3   Counsel for Abbott Laboratories
 4       JONES DAY
 5       BY:  HILARY A. RAMSEY, ESQUIRE
 6       haramsey@jonesday.com
 7       51 Louisiana Avenue, N.W.
 8       Washington, D.C. 2001-2113
 9       202-879-3939
10
11
12   ALSO PRESENT:
13
14       Chris Weiss, Videographer
```

Page 5

```
 1                 I N D E X
 2
 3   WITNESS:  Cynthia Denemark              PAGE
 4       Examination By Mr. Cyr................... 008
 5
 6            D E Y   E X H I B I T S
 7   NUMBER          DESCRIPTION              PAGE
 8   Exhibit Dey 602 - Amended Notice of Deposition
 9                    of the State of Delaware,
10                    Division of Medicaid and
11                    Medical Assistance........... 011
12   Exhibit Dey 603 - Resume of Denemark........... 035
13   Exhibit Dey 604 - Contract for items or
14                    services delivered to
15                    Delaware Medical Assistance
16                    program eligibles in the
17                    Department of Health and
18                    Social Services.............. 070
19   Exhibit Dey 605 - Pharmacy Billing Manual,
20                    Revision Table............... 076
21   Exhibit Dey 606 - Pharmacy Provider Specific
22                    Policy, Revision Table....... 096
```

Page 6

1   D E Y   E X H I B I T S   (CONTINUED)
2   NUMBER        DESCRIPTION              PAGE
3   Exhibit Dey 607 - Handwritten notes............ 146
4   Exhibit Dey 608 - HHCO 11-0513 to 0528......... 170
5   Exhibit Dey 609 - HHD 021-0118 to 0119......... 175
6   Exhibit Dey 610 - HHD 144-0179 to 0187......... 183
7   Exhibit Dey 611 - HHD 021-0121 to 0122......... 185
8   Exhibit Dey 612 - HHD 141-0277 to 0293......... 188
9   Exhibit Dey 613 - HHD 014-0235-0253............ 204
10  Exhibit Dey 614 - OEI-03-01-00410 with
11                    attachments.................. 208
12  Exhibit Dey 615 - Department of Health and
13                    Human Services Office of
14                    Inspector General.  Excessive
15                    Medicaid Reimbursement for
16                    Ipratropium Bromide.......... 211
17  Exhibit Dey 616 - DEY-MDL-0105083-0105089...... 213
18  Exhibit Dey 617 - Grant Thornton, LLP, January
19                    2007, Prepared for the
20                    Coalition for Community
21                    Pharmacy Action, CCPA........ 223
22

Page 7

1           P R O C E E D I N G S
2
3           THE VIDEOTAPE OPERATOR:  This is Chris
4   Weiss, a Certified Legal Videographer, and the
5   court reporter today is Kathy McHugh.  We are
6   here representing Henderson Legal Services,
7   Washington, D.C. The time is 9:17 a.m. on
8   Tuesday, December 9th, 2008.
9           We are documenting the videotaped
10  deposition of Cynthia Denemark, who is a
11  representative of the State of Delaware
12  Department of Health and Social Services, in the
13  matter of In Re:  Pharmaceutical Industry,
14  Average Wholesale Price Litigation, MDL No. 1456,
15  Master File No.  01-CV-12257-PBS, in the United
16  States District Court for the District of
17  Massachusetts.
18          We are at the location of the Hilton
19  Wilmington Christiana, 100 Continental Drive,
20  Newark, Delaware.
21          Will the attorneys please state their
22  appearance for the record.

Page 8

1           MR. CYR:  Brendan Cyr from Kelley Drye
2   & Warren for Dey, Inc., Dey, LP and Dey, LP, Inc.
3           MS. RAMSEY:  Hilary Ramsey from Jones
4   Day representing Abbott Labs.
5           MS. HEALY SMITH:  Barbara Healy Smith,
6   Assistant U.S. Attorney for the United States.
7           MS. WOOLFOLK:  Ann Woolfolk, attorney
8   for the State's designee, Cynthia Denemark.
9           MS. SHUTTEE:  Anne Shuttee for the
10  witness Cynthia Denemark and Electronic Data
11  Systems, LLC, her employer.
12          THE VIDEOTAPE OPERATOR:  And will the
13  court reporter please administer the oath.
14
15          CYNTHIA DENEMARK,
16  having been duly sworn, was examined and
17  testified as follows:
18
19          EXAMINATION
20  BY MR. CYR:
21      Q.  Good morning, Ms. Denemark.  Could you
22  spell your name for the record, please?

Page 9

1       A.  C-Y-N-T-H-I-A.  Last name, D-E-N-E-M-A-
2   R-K.
3       Q.  And could you please give us your
4   business address?
5       A.  248 Chapman Road, Suite 200, Newark,
6   Delaware, 19702.
7       Q.  And your home address, please?
8       A.  3 Timber Ridge Court, Newark, Delaware,
9   19711.
10      Q.  I'm just going to go over some general
11  ground rules.  First of all, you understand that
12  you're under oath today and required to tell the
13  truth?
14      A.  Yes.
15      Q.  If I ask a question and you don't
16  understand the question, don't try to answer it.
17  Please ask me to clarify the question.
18      A.  Understood.
19      Q.  If you need a break at some point in
20  the deposition, just let me know and we'll try to
21  accommodate you.  I might just ask that if I have
22  a question pending that you answer the question

Page 150

1  AWP for a generic drug was too large, some of the
2  -- some of the pharmacists would be reimbursed at
3  an amount below their actual cost, their cost to
4  acquire the drug; is that correct?
5      A.  That is not correct.
6          MS. HEALY SMITH:  Objection.
7  BY MR. CYR:
8      Q.  Could you explain why that isn't
9  correct.
10     A.  Yes.  It's not correct because the
11 program was concerned that if a pharmacy
12 purchased a generic product simply based on the
13 AWP of that NDC, that the manufacturer might
14 inflate it, and so we wanted to bring into
15 consideration what the overall product was and
16 not reward smart purchasing by the providers.
17     Q.  So how was the AWP minus 14 percent and
18 the AWP minus 16 percent, how were those decided?
19 Why were those decided as the rates?
20     A.  The -- those were not actually the
21 published rate for what the program was willing
22 to pay the providers.  At the time that the

Page 151

1  published rates were available for comment,
2  several of the large chains that supported the
3  Medicaid program or provide services to the
4  eligibles gave notice that they would terminate
5  being Medicaid providers if our reimbursement was
6  set at the proposed rate.
7          I do not know what the proposed rate is
8  off the top of my head.  I didn't look at it
9  because it became a moot point.  We looked after
10 the chains notified us that they were going to be
11 nonparticipating whether we had an access issue.
12 It was determined with the number of pharmacies
13 that would be left to provide services that we
14 would have an access issue, and so the secretary
15 worked with the provider community leaders to
16 establish a rate that would allow -- would permit
17 them to continue being our providers.
18     Q.  You said before access issue.  What do
19 you mean by that?
20     A.  We are required as a Medicaid program
21 that if we offer a benefit to our eligibles and
22 by regulations the drug benefit is an optional

Page 152

1  benefit, so we don't have to offer it and -- to
2  be a Medicaid program, but if we opt to provide
3  that service, the clients must be able to within
4  reason, and I don't know what the definition of
5  reason, but they must be able to access those
6  services.
7      Q.  Okay.  And the concern with access, the
8  concern that the providers were expressing to
9  DMAA, and the reason that -- the reason that
10 created a concern within DMAA about access was
11 providers would drop out of the program and
12 beneficiaries would not have access to
13 prescription drugs?
14     A.  That's correct.
15     Q.  And do you know, is there -- is there -
16 - strike that.
17         And the provider's specific concern was
18 that they would not receive adequate
19 reimbursement under the proposed changes?
20         MS. HEALY SMITH:  Objection.
21         THE WITNESS:  I don't know what their
22 perception might have been.  I just know for fact

Page 153

1  that they weren't going to be part of the
2  program.
3  BY MR. CYR:
4      Q.  And the reason they gave for
5  withdrawing from the program was the proposed
6  changes?
7      A.  Yes.
8      Q.  And so am I correct in assuming you
9  don't remember the proposed changes but were they
10 greater discounts off of AWP?
11     A.  Yes, they were.
12     Q.  And so you reduced the discounts off of
13 AWP to meet the concerns of those providers?
14     A.  Yes.
15     Q.  And that was addressing the access
16 issue?
17     A.  Yes.
18     Q.  Do you know is there a federal law or a
19 federal rule concerning -- concerning -- strike
20 that.
21         Is there a federal statute or a
22 regulation that requires DMAA to reimburse

39 (Pages 150 to 153)

Page 178

1   had a recollection of --
2       Q.  Okay.  The ingredient portion of the
3   reimbursement formula, that's intended to cover
4   the cost of acquiring the drug; is that correct?
5           MS. HEALY SMITH:  Objection.
6           THE WITNESS:  My understanding of the
7   definition of the ingredient cost is what does it
8   cost the pharmacy to purchase the drug.
9   BY MR. CYR:
10      Q.  Now, when you consider the adequacy of
11  reimbursement to a provider, you need to consider
12  both the dispensing fee and the ingredient
13  portion and the ingredient cost portion; is that
14  correct?
15      A.  Can you ask that question again?
16      Q.  If you want to evaluate the adequacy of
17  a reimbursement to a Medicaid provider for
18  dispensing a drug, you need to consider both the
19  ingredient portion, the ingredient cost portion
20  and the dispensing fee portion of the
21  reimbursement payment; is that correct?
22          MS. HEALY SMITH:  Objection.

Page 179

1           THE WITNESS:  I'm not sure I would
2   agree with how you phrased what the approach
3   would be for consideration of a provider.  I
4   would look at the total fee that the provider is
5   compensated.
6   BY MR. CYR:
7       Q.  And what would the total fee include?
8       A.  The total fee would include the
9   ingredient cost and the dispensing fee.
10      Q.  So if a dispensing fee was inadequate
11  to cover a provider's cost of dispensing, those
12  costs could be covered by the ingredient portion
13  of the reimbursement payment; is that correct?
14          MS. HEALY SMITH:  Objection.
15          THE WITNESS:  Yes.
16  BY MR. CYR:
17      Q.  Was there knowledge among state
18  Medicaid officials at this time that dispensing
19  fees paid by state Medicaid programs were not
20  adequate to cover dispensing costs for drugs?
21          MS. HEALY SMITH:  Objection.
22          THE WITNESS:  And at this time you're

Page 180

1   referring to the time that the 1994 study was
2   done?
3   BY MR. CYR:
4       Q.  That is correct.
5       A.  My recollection of 1994 was that
6   Medicaid programs were answering to legislators
7   as to why our dispensing fees were higher than
8   other commercial payors.
9       Q.  So -- but that wasn't really my
10  question.
11          The question was whether dispensing
12  fees were adequate to cover dispensing costs or
13  whether there was knowledge among Medicaid
14  providers whether dispensing fees were adequate,
15  sufficient to cover dispensing costs?
16          MS. HEALY:  Objection.
17          THE WITNESS:  My recollection is that
18  Medicaid officials realized that current
19  dispensing fees of the time were not sufficient
20  to cover the dispensing function, the cost
21  associated with the dispensing function.
22  BY MR. CYR:

Page 181

1       Q.  Was that seen as a problem by Medicaid
2   officials at the time?
3           MS. HEALY SMITH:  Objection.
4   BY MR. CYR:
5       Q.  Strike that.
6           Was that seen as a problem in terms of
7   ensuring adequate participation in the Medicaid
8   program by providers?
9           MS. HEALY SMITH:  Objection.
10          THE WITNESS:  No.
11  BY MR. CYR:
12      Q.  And was that because the -- there was a
13  margin in the ingredient portion cost of the
14  reimbursement payment?
15      A.  Yes.
16      Q.  Have you ever heard of the term cross
17  subsidization in connection with the ingredient
18  portion as a way to make up for inadequate
19  dispensing fees?
20      A.  I'm not sure that I've heard that
21  specific term but I would agree that it probably
22  applies to the situation.

Page 266

1  that led to the 1996 report were consistent with
2  your understanding that AWP did not represent
3  actual acquisition prices for pharmaceutical
4  products; is that correct?
5      MS. HEALY SMITH:  Objection.
6      THE WITNESS:  That is what I stated
7  earlier.  That is correct.
8  BY MR. CYR:
9      Q.  Would it be fair to say that at that
10 time you understood that AWP had no relation to
11 actual acquisition costs for pharmaceuticals?
12     A.  I don't believe I stated that and I'm
13 not sure that I ever would state that.
14     MS. RAMSEY:  I believe -- could the
15 court reporter reread the question.  I don't
16 think that was the exact question.
17 BY MR. CYR:
18     Q.  Yes, my question wasn't did you testify
19 to that before, but was it your understanding at
20 the time, at the time of the 1995 meeting, that
21 AWP had no relation to actual acquisition costs?
22     A.  No, I believe there's a relationship --

Page 267

1  I believed at the time that there was a
2  relationship of some nature.
3      Q.  But it was your understanding that AWP
4  did not reflect actual acquisition costs; is that
5  correct?
6      A.  That's --
7      MS. HEALY SMITH:  Objection.
8      THE WITNESS:  That's correct.
9  BY MR. CYR:
10     Q.  Is that -- was it the understanding of
11 DMAA at that time that AWP did not reflect actual
12 acquisition costs?
13     MS. HEALY SMITH:  Objection.
14     THE WITNESS:  I'm sorry, can you state
15 the question one more time?
16 BY MR. CYR:
17     Q.  Was it the position of DMAA at that
18 time that AWP did not reflect actual acquisition
19 costs?
20     MS. HEALY SMITH:  Objection.
21 BY MR. CYR:
22     Q.  Strike that.

Page 268

1      Was it DMAA's understanding at that
2  time that AWP did not reflect actual acquisition
3  cost?
4      A.  I would suggest that DMAA regarded me
5  as their expert and they would have had the same
6  opinion as mine because they would have looked to
7  me for guidance, so whatever my opinion was
8  pretty much was at that time what would be
9  accepted.
10     Q.  Okay.  When did you first gain the
11 understanding that AWP didn't reflect actual
12 acquisition cost?
13     MS. HEALY SMITH:  Objection.
14     THE WITNESS:  I would say that when I
15 was hired in 1993 and realized that the state had
16 a limit of AWP -- AWP minus 5.61 is the maximum
17 that they would allow the estimated acquisition
18 or AAC to be, that that was my tip-off that AWP
19 did not reflect AAC.
20 BY MR. CYR:
21     Q.  Okay.  Is it your understanding today
22 that AWP has no predictable relationship to

Page 269

1  actual acquisition costs?
2      MS. HEALY SMITH:  Objection.
3      THE WITNESS:  I know of no pattern that
4  could be put to the AWP to approximate AAC.
5  BY MR. CYR:
6      Q.  Would you say over time -- have you
7  come to understand as a general rule that --
8  strike that.
9      Over time, has your understanding --
10 strike that.
11     Over time, have you come to understand
12 that -- well, let me ask it this way.
13     Do you believe now that actual
14 acquisition costs, the discount off of AWP --
15 strike that.
16     Do you understand actual acquisition
17 cost to be on average a greater discount off of
18 AWP today than you understood it to be in 1993
19 when you started at Delaware Medicaid?
20     MS. HEALY SMITH:  Objection.
21     THE WITNESS:  I would not say that is
22 my understanding.

Page 273

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X

IN RE: PHARMACEUTICAL INDUSTRY      ) MDL No. 1456

AVERAGE WHOLESALE PRICE             ) Civil Action No.

LITIGATION                          ) 01-12257-PBS

--------------------------------X

THIS DOCUMENT RELATES TO:           ) Hon. Patti B.

United States of America ex rel.    ) Saris

Ven-A-Care of the Florida Keys,     )

Inc. v. Dey, Inc., et al., Civil    )

Action No. 05-11084-PBS; and        )

United States of America ex rel.    )

Ven-A-Care of the Florida Keys,     )

Inc. v. Boehringer Ingelheim        )

Corp., et al., Civil Action No.     )

07-10248-PBS                        )

--------------------------------X

Videotaped deposition of

THE DELAWARE DIVISION OF MEDICAID AND MEDICAL

ASSISTANCE by CYNTHIA DENEMARK - VOLUME II

December 10, 2008 - Newark, Delaware

Page 350

1  begin receiving these at some point?
2      A.  Yes.
3      Q.  Okay.  Do you recall when that was?
4          MS. SHUTTEE:  Strike that -- I'm sorry.
5  I said strike that.  That's not what I meant to
6  say.
7          Excuse me.  When you said receiving
8  these, did you --
9          MS. RAMSEY:  Medicaid Pharmacy
10 Bulletins.
11         MS. SHUTTEE:  -- mean these from
12 Lederle or these from Parke-Davis or these from
13 another provider?
14         MS. RAMSEY:  Any Medicaid pharmacy
15 provider.
16         MS. HEALY SMITH:  Any Medicaid.
17         Thank you very much.  Pardon for my
18 interruption.
19         THE WITNESS:  My recollection of
20 receiving Medicaid Pharmacy Bulletin goes fairly
21 back to when I first started.  They were valuable
22 publications, but exactly when I started to

Page 351

1  receive them, I don't know.
2  BY MS. RAMSEY:
3      Q.  Okay.
4      A.  It would have been in the early to mid-
5  '90s.
6      Q.  Now, the first column, the title is
7  home intravenous IV reimbursement is a complex
8  issue for Medicaid Pharmacy Programs.
9          And then the second paragraph it
10 states, because home IV therapy involves a host
11 of additional pharmacy services; storage,
12 preparation, delivery, patient instruction, et
13 cetera, it is generally agreed that it is more
14 expensive to dispense this type of medication
15 than to dispense other outpatient drugs.
16         Did I read that correctly?
17     A.  You read it correctly.
18     Q.  And do you agree with that sentence?
19     A.  No.
20     Q.  Why not?
21     A.  Because some of the functions that are
22 mentioned are not specific to the dispensing

Page 352

1  function and more subject to other facets of
2  delivering health care.
3      Q.  Such as what?
4      A.  Such as delivery.
5      Q.  And what about compounding?
6      A.  Preparation is what's listed here.  And
7  in some situations preparation may be longer,
8  yes.
9          I also would disagree with patient
10 instruction being part of the dispensing
11 application or function for these products.  In
12 most situations that I am aware of with IV-
13 administered drugs, you're going to have a home
14 health component, such as a visiting nurse, and,
15 therefore, I believe that the charges associated
16 with patient instructions would be done onsite at
17 the home or the facility where the person was
18 receiving the drug.
19     Q.  So you do agree that there are
20 additional costs and services that home IV
21 providers would incur versus a traditional retail
22 pharmacist dispensing a drug; is that correct?

Page 353

1          MS. HEALY SMITH:  Objection.
2          THE WITNESS:  Yes.  To some degree.
3  BY MS. RAMSEY:
4      Q.  How did Delaware reimburse provider of
5  home IV medications --
6          MS. HEALY SMITH:  Objection.
7  BY MS. RAMSEY:
8      Q.  -- during the relevant time period?
9      A.  Can you redefine the relevant time
10 period?
11     Q.  Beginning in 1991 and going through
12 approximately 2001.
13     A.  We reimbursed the pharmacy providers
14 for the ingredient costs plus a $3.65 dispensing
15 fee.
16     Q.  Were there any additional -- strike
17 that.
18         Did Delaware provide any additional
19 reimbursement or compensation other than the
20 ingredient costs and the $3.25 dispensing fee?
21     A.  We reimbursed a dispensing fee of
22 $3.65.

21 (Pages 350 to 353)

Page 354

 1     Q.  Sixty-five.  I'm sorry.
 2     A.  That is all we reimbursed for the
 3  pharmaceutical.
 4     Q.  So all providers in Delaware were
 5  reimbursed under the same formula, regardless of
 6  the pharmacy type; is that correct?
 7     A.  Correct.  I'm sorry.  To what year
 8  again, just to double-check?
 9     Q.  I believe we were talking about 1991
10  through the end of 2001.
11     A.  Okay.  Good.  Yes.
12     Q.  After 2001, did this change?
13     A.  It was 2003 where we split out the
14  reimbursement module to traditional and
15  nontraditional.
16     Q.  Now, was Delaware aware that other
17  states provided additional reimbursement to
18  nontraditional pharmacies, such as home IV
19  pharmacies, to compensate them for increased
20  dispensing costs?
21         MS. HEALY SMITH:  Objection.
22         THE WITNESS:  I think the Division was

Page 355

 1  aware that there were different approaches to
 2  reimbursing for the services, and I would agree
 3  that the Division would know that some Medicaid
 4  Programs had a compounding dispensing fee
 5  separate and unique from their regular dispensing
 6  fee, yes, I would agree to that.
 7  BY MS. RAMSEY:
 8     Q.  Now, Delaware did not believe that it
 9  was significantly cheaper for nontraditional
10  pharm -- pharmacies to operate in Delaware versus
11  in the State of Washington, is that fair to say?
12         MS. HEALY SMITH:  Objection.
13         THE WITNESS:  Can you read back one
14  more time?
15         (Requested testimony read back.)
16         MS. RAMSEY:  I believe I had, for
17  example, in the State of Washington.
18         THE WITNESS:  My only concern in why
19  I'm pausing to make sure that I answer the
20  question correctly is, I would believe that the
21  Division would consider that there may be a
22  difference in salaries for pharmacists between

Page 356

 1  the State of Washington and in the general
 2  Delaware region.
 3         But as far as the work effort for a
 4  pharmacy in Washington compared to the work
 5  effort in Delaware, that should be the same,
 6  regardless of where in the country the work was
 7  being performed.
 8  BY MS. RAMSEY:
 9     Q.  And I believe you tested [sic]
10  yesterday that Delaware's approach to
11  reimbursement was an in-the-aggregate system; is
12  that correct?
13         MS. HEALY SMITH:  Objection.
14         THE WITNESS:  Yes.
15  BY MS. RAMSEY:
16     Q.  What did you mean by an aggregate
17  system?
18     A.  I believe that I was referencing
19  aggregate system and methodology when we were
20  talking about the preparation for the change in
21  pricing methodology that took place in 1997.  So
22  we -- we talked about how was that decision made

Page 357

 1  to change the methodology, and that's where I was
 2  referencing in the aggregate.
 3     Q.  Because before 1997, you reimbursed
 4  based on AAC plus a dispensing fee, or usual and
 5  customary charge, whichever was lower; is that
 6  correct?
 7     A.  Correct.  Given that we also included
 8  FUL, but basically, yes, you're stating this
 9  correctly.
10     Q.  Okay.  And so there was a change in
11  1997 where you went to a lower-of system, --
12         THE COURT REPORTER:  Lower?  I'm sorry?
13  Lower?
14         MS. RAMSEY:  A lower-of system.
15  BY MS. RAMSEY:
16     Q.  -- which was the lower of the DMAC, the
17  FUL, the UNC or the AWP minus 12.5 methodology;
18  is that correct?
19     A.  I just -- number one, it was 12.9
20  percent.
21     Q.  12.9.
22     A.  And we used a lower-of approach prior

22 (Pages 354 to 357)