# EXHIBIT 100

# EXHIBIT 100

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------X

IN RE: PHARMACEUTICAL           ) MDL No. 1456

INDUSTRY AVERAGE WHOLESALE      ) Master File No.

PRICE LITIGATION                ) 01-CV-12257-PBS

----------------------------) Subcategory Case

THIS DOCUMENT RELATES TO:    ) No. 06-11337

United States of America ex )

rel. Ven-A-Care of the      ) Hon. Patti B. Saris

Florida Keys, Inc., et al.  )

v. Dey, Inc., et al., Civil )

Action No. 05-11084-PBS, and) VIDEOTAPED DEPOSITION

United States of America ex ) OF THE INDIANA FAMILY

rel. Ven-A-Care of the      )  AND SOCIAL SERVICES

Florida Keys, Inc., et al.  )   ADMINISTRATION by

v. Boehringer Ingelheim     )      CARL MARK

Corp., et al., Civil Action )    SHIRLEY, R.Ph.

No. 07-10248-PBS            )       VOLUME I

----------------------------X

DECEMBER 2, 2008

INDIANAPOLIS, INDIANA

Indianapolis, IN

Page 2

 1    The videotaped deposition upon oral examination
 2  of CARL MARK SHIRLEY, R.Ph., a witness produced and
 3  sworn before me, Dana S. Miller, RPR, CRR, Notary
 4  Public in and for the County of Hendricks, State of
 5  Indiana, taken on behalf of the Defendants Dey and
 6  Defendant Abbott at the Hilton Indianapolis North
 7  Hotel, 8181 North Shadeland Avenue, Indianapolis,
 8  Indiana, on December 2, 2008, at 9:07 a.m.,
 9  pursuant to the Federal Rules of Civil Procedure.

Page 3

 1              A P P E A R A N C E S
 3  FOR THE PLAINTIFF:
 5    OFFICE OF INDIANA ATTORNEY GENERAL
 6    Gary Bippus, Esq.
 7    302 West Washington Street, Fifth Floor
 8    Indianapolis, IN  46204

11    FAMILY AND SOCIAL SERVICE ADMINISTRATION
12    Scott Linneweber, Esq.
13    402 W. Washington Street, Room W451
14    Indianapolis, IN  46204

17    UNITED STATES ATTORNEY'S OFFICE
18    SOUTHERN DISTRICT OF FLORIDA
19    Ann M. St. Peter-Griffith, Esq.
20    99 N.E. Fourth Street
21    Miami, FL  33132

Page 4

 1           A P P E A R A N C E S (CONTINUED)
 3  FOR THE DEFENDANTS, DEY:
 5    KELLEY DRYE & WARREN, LLP
 6    Douglas E. Julie, Esq.
 7    101 Park Avenue
 8    New York, NY  10178

11  FOR THE DEFENDANT, ABBOTT LABORATORIES:
13    JONES DAY
14    R. Christopher Cook, Esq.
15    51 Louisiana Avenue, N.W.
16    Washington, D.C.  20001-2113

20  ALSO PRESENT:  James David - Videographer

Page 5

 1                    I N D E X
 3  WITNESS: CARL MARK SHIRLEY, R.Ph.          PAGE
 4    EXAMINATION BY MR. DOUGLAS JULIE............ 009
 6                   E X H I B I T S
 7  NUMBER           DESCRIPTION              PAGE
 8  Exhibit Dey 501 - Subpoena..................... 018
 9  Exhibit Dey 502 - Provider Agreement for
10         Indiana Medicaid............. 117
11  Exhibit Dey 503 - Drug Claim Form for
12         Pharmacy..................... 122
13  Exhibit Dey 504 - Chapter 7 of Indiana Medicaid
14         Provider Manual.............. 146
15  Exhibit Dey 505 - Government's Complaint....... 149
16  Exhibit Dey 506 - State Plan Amendment,
17         IN-00000045 - 0061........... 217
18  Exhibit Dey 507 - State Plan Amendment,
19         IN-00000082 - 0099........... 224
20  Exhibit Dey 508 - Transmittal and Notice of
21         Approval of State Plan
22         Material, IN-00000016 - 0028. 229

2 (Pages 2 to 5)

Page 6

|  |  |
|---|---|
| 1 | E X H I B I T S  (CONTINUED) |
| 2 | NUMBER          DESCRIPTION              PAGE |
| 3 | Exhibit Dey 509 - State Plan Amendment, |
| 4 | IN-00000100 - 0120........... 246 |
| 5 | Exhibit Dey 510 - Medicaid Pharmacy - Actual |
| 6 | Acquisition Cost of Generic |
| 7 | Prescription Drug Products, |
| 8 | HHD022-0318 - 0333........... 302 |
| 9 | Exhibit Dey 511 - Excessive Medicare |
| 10 | Reimbursement for Ipratropium |
| 11 | Bromide Report............... 339 |

Page 7

 1              P R O C E E D I N G S
 2
 3          VIDEOGRAPHER:  On the record at 9:07
 4  a.m. on December 2nd, 2008.  Here begins the
 5  videotaped deposition of Mark Shirley on behalf
 6  of the State of Indiana Family and Social
 7  Services Administration.
 8          This case regards the Pharmaceutical
 9  Industry Average Wholesale Price Litigation, MDL
10  No. 1456, in the United States District Court,
11  District of Massachusetts.
12          This deposition is taking place at the
13  Hilton Hotel, 8181 N. Shadeland Avenue,
14  Indianapolis, Indiana.
15          My name is James David, Certified Legal
16  Video Specialist.  And our court reporter is Dana
17  Miller.  We're both working with Henderson Legal
18  Services.
19          Will our counsel please state your
20  appearance for the record.
21          MR. JULIE:  My name is Douglas Julie
22  from Kelley, Drye & Warren.  And I'm counsel for

Page 8

 1  defendants Dey, Inc., Dey L.P., Inc. and Dey,
 2  L.P.
 3          MR. BIPPUS:  And -- go ahead.
 4          MR. COOK:  I'm Christopher Cook from
 5  Jones Day representing Abbott.
 6          MR. BIPPUS:  And Gary Bippus from the
 7  Office of the Indiana Attorney General.
 8          MR. LINNEWEBER:  Scott Linneweber, L-I-
 9  N-N-E-W-E-B, as in boy, E-R, Family and Social
10  Service Administration.
11          MS. ST. PETER-GRIFFITH:  Ann St. Peter-
12  Griffith from the United States Attorney's
13  Office, Southern District of Florida on behalf of
14  the United States.
15          VIDEOGRAPHER:  Will our court reporter
16  please swear or affirm the witness.
17
18          CARL MARK SHIRLEY, R.Ph.,
19  having been first duly sworn to tell the truth,
20  the whole truth, and nothing but the truth,
21  relating to said matter, was examined and
22  testified as follows:

Page 9

 1
 2              EXAMINATION
 3  BY MR. DOUGLAS JULIE:
 4      Q.  Good morning, Mr. Shirley.  Thank you
 5  for making yourself available today.  Can I ask
 6  you to please state and spell your name for the
 7  record.
 8      A.  Yes.  My name is Carl Mark Shirley,
 9  that's C-A-R-L M-A-R-K S-H-I-R-L-E-Y.
10      Q.  Thank you.  And are you here today to -
11  - are you here today on behalf of the Indiana
12  Family and Social Services Administration?
13      A.  Yes.
14      Q.  You're their corporate designee?
15      A.  Yes.
16      Q.  Thank you.  As I stated before, my name
17  is Douglas Julie.  I'm counsel for Dey, Inc.,
18  Dey, L.P., Inc.  and Dey, L.P.  I'll refer to
19  those three collectively today as Dey.
20          Are you currently on any medications
21  which might affect your memory?
22      A.  No.

3 (Pages 6 to 9)

Page 142

1  reimbursement amounts into ingredient portion and
2  a dispensing-fee portion?
3      A.  The reimbursement for pharmacy
4  reimbursement is comprised of estimated
5  acquisition cost plus dispensing fee, if
6  applicable, MAC plus dispensing fee, if
7  applicable, and usual and customary charge.
8          So you had said aside from the state
9  MAC -- or excuse me, the usual and customary
10 piece, set that aside, then your two remaining
11 possible pieces of the algorithm would be EAC and
12 state MAC.
13     Q.  Okay.  And on usual and customary-based
14 reimbursement, there is no dispensing fee paid to
15 providers?
16     A.  It's very important to understand that
17 the providers submit a charge, which is his usual
18 and customary charge, may or may not at that
19 provider's discretion include a dispensing fee.
20 That's totally up to the provider.
21     Q.  And if a provider submitted a claim
22 that contains a usual and customary charge, that

Page 143

1  -- I'm sorry.  A provider can submit a claim that
2  expresses its usual and customary charge in two
3  parts, a part with a dispensing fee and another
4  part?
5      A.  No, we do not allow for that.  The only
6  thing the program accepts and has instructed
7  providers is to submit their usual and customary
8  charge, which if the provider has a dispensing
9  fee of their own, that is part of their usual and
10 customary charge.
11     Q.  I'm not sure I understand what you mean
12 by dispensing fee with respect to usual and
13 customary charge.
14     A.  If a provider has a charge to you as a
15 customer, they're going to typically make that
16 charge up out of what they pay for the drug in
17 some fashion somehow, and something that they use
18 to cover their overhead and everything else
19 associated with the running of the pharmacy.
20 They blend that all together, and that becomes
21 their usual and customary charge.
22         That's what we have told them to

Page 144

1  submit.  We do not tell them bill us only for
2  some amount having to do with the drug and we,
3  Medicaid, will put a dispensing fee on top of
4  that.  We never do that.
5      Q.  Okay.  So -- all right, now I believe I
6  understand.  So you're saying that when a
7  provider -- you know, I think you've said it.
8  There's no reason to summarize.
9      A.  It's complicated.
10     Q.  You stated that one of the ways that
11 Indiana reimburses for pharmaceuticals, Indiana
12 Medicaid reimburses for pharmaceuticals, is that
13 there is reimbursement for EAC --
14     A.  Yes.
15     Q.  -- and a dispensing fee.  Is EAC
16 estimated acquisition cost?
17     A.  That's correct.
18     Q.  When considering the adequacy of reim -
19 - pardon me, strike that.
20         When considering whether the state is
21 providing adequate reimbursement for a covered
22 product, does the state consider both the

Page 145

1  ingredient portion and the dispensing-fee portion
2  as needing to be adequate?
3          MS. ST. PETER-GRIFFITH:  Object to the
4  form.
5      Q.  Do you think of those issues together
6  as providing that total reimbursement must be
7  adequate, or does reimbursement for each
8  individual component need to be adequate?
9          MS. ST. PETER-GRIFFITH:  Object to the
10 form.
11     A.  Once again, my sense on this is that
12 ultimately your reimbursement for the service
13 must be adequate to ensure participation by
14 providers.  And my sense is that providers
15 probably don't much care one way or the other
16 which side of the equation is which, as long as
17 what they get from Medicaid is sufficient for
18 them to render service.
19         So I think, you know, we act
20 administratively in light of that.  It makes
21 sense to have a total reimbursement that is
22 sufficient to maintain provider participation.

Page 234

1    A.  Yes.
2    Q.  Can you very briefly, because I may get
3  to this later, can you tell me your understanding
4  of the difference between brand and generic
5  drugs?
6        What was Indiana's understanding of the
7  difference between brand drugs and generic drugs?
8    A.  Difficult to answer that question.  The
9  difference between brand and generic drugs,
10 according to the FDA, is there is no difference.
11       Generic drugs that are therapeutically
12 substitutable for band-name drugs are the same.
13 But if you're talking about reimbursement, that's
14 a different issue.  So I'm trying --
15   Q.  I am talking about reimbursement, sir.
16   A.  -- to find where you're going.
17   Q.  Thank you.
18   A.  So would you clarify the question.
19   Q.  Sure.  This document, we've said,
20 distinguishes between brand-name drugs and
21 generic drugs for purposes of reimbursement;
22 that's correct?

Page 235

1    A.  Yes.
2    Q.  By generic drugs, does the plan mean to
3  reimburse at a separate rate for innovator drugs
4  and non-innovator drugs?
5    A.  In looking at this document, the only
6  thing I can say is that there is clearly a
7  difference in policy as to how the state is going
8  to reimburse for brand-name drugs and for generic
9  drugs.
10   Q.  Okay.  If I was a provider or I worked
11 for EDS and I wanted to know which drug fit the
12 brand-name formula and which drug fit in for the
13 generic formula, how would I go about determining
14 that?
15   A.  I believe that would come from the
16 First DataBank file that they use in claims
17 processing.
18   Q.  So the distinction here is a
19 distinction drawn on -- from First DataBank?
20   A.  First DataBank and if there is any
21 algorithm that would be developed to pay elements
22 from the First DataBank file that says if you

Page 236

1  look at this, this and this equals generic, if
2  you look at this, it's brand name.
3    Q.  Thank you.  On this document it also
4  appears that the state has instituted for the
5  first time a state Maximum Allowable Cost
6  program?
7    A.  Yes.
8    Q.  Is that -- is this your recollection as
9  to chronologically the origin of the state MAC
10 program?
11   A.  Yes.
12   Q.  And charges for federal upper limit and
13 usual and customary-based reimbursement have been
14 retained --
15   A.  Right.
16   Q.  -- in this plan?
17   A.  Yes.
18   Q.  Thank you.  I'm going to ask you about
19 the state MAC program a little later, but can I
20 ask you now, why did Indiana switch from an AWP
21 minus 10 EAC for all legend drugs to a bifurcated
22 AWP minus 13 for brand-name drugs and AWP minus

Page 237

1  20 for generic drugs?
2    A.  I believe at the time the perception
3  was that generic drugs, AWP information was not
4  as accurate for generic drugs as it was for
5  brand-name drugs, that is there was a greater
6  spread on generic drugs.
7        And if I also remember, it seems like
8  there was some input from other states that using
9  AWPs on generic drugs, you should have a higher
10 percentage off of your AWP for your EAC.
11   Q.  When you say generic drug -- I'm sorry,
12 strike that.
13       You had stated that AWP information was
14 not as accurate, though you didn't specify by
15 what reference you were measuring its accuracy.
16 Can you just tell me a little bit about what you
17 were --
18   A.  I think there was a general perception
19 that the AWPs for generic drugs were inflated.
20 Seems like there was also some information from
21 OIG or GAO or both or CMS or all three that
22 questioned the use of AWPs on generics.  And,

Page 238

1   again, I'm going strictly by memory on this.
2        It seems like that was part of the
3   thrust behind the bifurcation of the
4   reimbursement methodology for the two different
5   types of legend drugs.
6        Q.  But you had specifically used the word
7   that it was not as accurate.  And it may very
8   well be that you did not mean to use the word.
9   But I'm just wondering whether when you said
10  accurate, if you were considering whether AWP --
11  when you think about AWP accuracy, with what are
12  you referencing it as a guidepost?  If something
13  is inaccurate, it must be --
14       A.  I think it all has to do with this
15  issue that people have called the spread, the
16  relationship between the published AWP of a drug
17  and an amount that a provider actually ends up
18  paying for the drug.
19       And it seemed like for generics, it was
20  the case that there was this greater spread
21  between the AWP and the actual acquisition cost.
22  And I think that was probably what was behind the

Page 239

1   taking generics to go to a minus 20 percent as
2   opposed to say the minus 13 1/2.
3        Q.  Because Indiana wanted to get closer to
4   -- get AWP-based reimbursement closer to the
5   spread -- I'm sorry, strike that.
6        Did you understand -- I'm sorry, did
7   Indiana Medicaid understand at the time that it
8   moved in 2002 from AWP to minus 10 to AWP minus
9   20 for generics, did Indiana understand that it
10  was not necessarily capturing all of the spread
11  between average wholesale price and average
12  acquisition costs in discounting average
13  wholesale price?
14       A.  Repeat that question.
15       Q.  Did Indiana understand that when it
16  moved in -- I'm sorry, strike that.
17       Can you think of any other
18  considerations that Indiana made other than
19  information disclosed from CMS that caused it to
20  make this switch to -- both to bifurcate brand
21  and generic and to switch to generic minus 20?
22       A.  Looking at the time frame of this,

Page 240

1   which would have been 2002, and again I'm
2   thinking of Myers & Stauffer's role, they
3   typically provided analytic support to the office
4   on cost-containment initiatives.  And this was
5   probably driven partially at least by some type
6   of cost-containment initiative.  There may have
7   been information provided by Myers & Stauffer one
8   way or the other about, you know, this is where
9   the other states are on generics, and this is
10  what the market looks like, and this is what this
11  study shows.  I don't know that for a fact one
12  way or the other.
13       It could be, possibly not, but that's
14  one possible source of additional information,
15  would have been input from Myers & Stauffer.
16       Q.  Can you think of any other
17  considerations that Indiana made at the time?
18       A.  Well, obviously, going through the
19  rule- promulgation process, we would have
20  considered all public comments.
21       And not knowing right here what the
22  public comments were that were made during the

Page 241

1   public hearing for the initiative, it's possible
2   that there would have been other comments from
3   the public.  And the record of the public
4   hearing, I'm sure, would show that.
5        Q.  What role did Indiana's understanding
6   of the prices at which pharmacies could obtain
7   pharmaceutical products play into the decision to
8   reduce the reimbursement for generic drugs to
9   minus 20 percent?
10       A.  State that again, please.
11           MR. JULIE:  Can you re-read that.
12           (The requested material was read
13  back by the reporter.)
14       A.  I quite sincerely do not understand the
15  question.
16       Q.  Okay.  Then I'll reask it a different
17  way.  When Indiana decided to reimburse for
18  generic drugs at AWP minus 20 percent, did it
19  consider in that decision-making process its
20  knowledge of pharmaceutical prices available to
21  provider pharmacies?
22       A.  I'm not certain of the analytic

61 (Pages 238 to 241)