# EXHIBIT 102

Walsh, Jude E.                                    March 26, 2008
                        Augusta, ME

                 UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS

        --------------------------

        IN RE: PHARMACEUTICAL    ) MDL NO. 1456

        INDUSTRY AVERAGE WHOLESALE ) CIVIL ACTION

        PRICE LITIGATION         ) 01-CV-12257-PBS

        THIS DOCUMENT RELATES     )

        U.S. ex rel. Ven-A-Care of ) Judge Patti B. Saris

        the Florida Keys, Inc.    )

            vs.                   ) Chief Magistrate

        Abbott Laboratories, Inc., ) Judge Marianne B.

        No. 06-CV-11337-PBS        ) Bowler

        --------------------------


             VIDEOTAPED DEPOSITION OF JUDE E. WALSH,

        taken pursuant to notice dated March 18, 2008, at

        the offices of the Maine Attorney General, Burton M.

        Cross Building, 6th Floor, 6 State House Station,

        Augusta, Maine, on March 26, 2008, commencing at

        9:06 A.M., before Tammy L. Martell, Registered

        Professional Reporter, a Notary Public in and for

        the State of Maine.

8e8c0070-c540-4f61-a0f2-1edca3a788ed

Walsh, Jude E.                                      March 26, 2008

Augusta, ME

| Page 2 | Page 4 |
|---|---|
| 1  A P P E A R A N C E S : | 1         I N D E X |
| 2 | 2  WITNESS:  JUDE E. WALSH                PAGE |
| 3  On Behalf of the United States of America: | 3    EXAMINATION BY MR. MALONE.................. 008 |
| 4     Ann St. Peter-Griffith, Esq. | 4    EXAMINATION BY MR. KATZ.................... 166 |
| 5     (by telephone) | 5 |
| 6     U.S. Attorney's Office | 6 |
| 7     99 NE 4th Street, | 7       A B B O T T   E X H I B I T S |
| 8     Miami, Florida 33132 | 8  NUMBER        DESCRIPTION           PAGE |
| 9     (305) 961-9001 | 9  Exhibit Abbott 850-United States' Second |
| 10        -and- | 10          Supplemental Disclosures, |
| 11     Jeff Fauci, Esq. | 11          12/18/07.................... 014 |
| 12     John Joseph Moakley Courthouse | 12  Exhibit Abbott 851-Notice of Deposition of |
| 13     1 Courthouse Way | 13          Jude E. Walsh.............. 016 |
| 14     Boston, Massachusetts 02110 | 14  Exhibit Abbott 852-Internet Printout of Jude |
| 15     (617) 748-3290 | 15          Walsh Bio.................. 042 |
| 16 | 16  Exhibit Abbott 853-Letter With Attached Notice |
| 17  On Behalf of Abbott Laboratories: | 17          Of Agency Rule-making |
| 18     Sean P. Malone, Esq. | 18          Adoption and Portions Of The |
| 19     Jones Day | 19          MaineCare Benefits Manual, |
| 20     51 Louisiana Avenue, N.W. | 20          9/20/02.................... 078 |
| 21     Washington, D.C., 20001-2113 | 21  Exhibit Abbott 854-Memo From Mr. Gessow To |
| 22     (202) 879-3939 | 22          Interested Parties, 6/26/02. 083 |

| Page 3 | Page 5 |
|---|---|
| 1  A P P E A R A N C E S :  (CONTINUED) | 1    A B B O T T   E X H I B I T S (CONTINUED) |
| 2 | 2  NUMBER        DESCRIPTION            PAGE |
| 3  On Behalf of Dey Laboratories: | 3  Exhibit Abbott 855-Memo From Christine Zukas- |
| 4     Clifford Katz, Esq. | 4          Lessard To Peter Walsh |
| 5     Kelley Drye & Warren, LLP | 5          Entitled Request For |
| 6     101 Park Avenue, | 6          Executive Approval Of |
| 7     New York, New York 10178 | 7          Administrative Rule-making, |
| 8     (212) 808-7609 | 8          8/5/03..................... 089 |
| 9 | 9  Exhibit Abbott 856-U.S. Department of Health |
| 10  On Behalf of the Maine Attorney General's Office: | 10          and Human Services, Office |
| 11     James E. Fortin, Esq. | 11          of Inspector General State |
| 12     Thomas F. Bradley, Esq. | 12          Medicaid Drug Cost |
| 13     Maine Department of the Attorney General | 13          Containment Strategies |
| 14     State House Station #6 | 14          Survey..................... 139 |
| 15     Augusta, Maine 04333-0006 | 15  Exhibit Abbott 857-Payment Rates With |
| 16     (207) 626-8800 | 16          Attachments................. 147 |
| 17 | 17  Exhibit Abbott 858-Letter From Christine Zukas- |
| 18 | 18          Lessard, 2/3/04............. 151 |
| 19  Videographer:  Cindy Spencer | 19  Exhibit Abbott 859-OIG Report................. 155 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22  (CONTINUED) |

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

8e8c0070-c540-4f61-a0f2-1edca3a788ed

Walsh, Jude E.                                            March 26, 2008
                          Augusta, ME

---

Page 6

1        D E Y   E X H I B I T S
2   NUMBER        DESCRIPTION           PAGE
3   Exhibit Dey 050-Invoice........................ 193
4   Exhibit Dey 051-Medicaid Rebate Invoice........ 201
5   Exhibit Dey 052-Invoice........................ 203
6   Exhibit Dey 053-Medicaid Drug Rebate Invoice... 207
7   Exhibit Dey 054-State Information Survey....... 255
8   Exhibit Dey 055-Notice of Agency Rule-making
9            Adoption With Attachment....... 264
10
11
12
13
14
15
16
17
18
19
20
21
22

---

Page 8

1        MR. FAUCI:  Jeff Fauci representing the
2   United States.
3        MR. BRADLEY:  Tom Bradley with the
4   Maine Attorney General's office.
5        MR. FORTIN:  James Fortin also with the
6   Maine Attorney General's office representing the
7   witness.
8        THE VIDEOGRAPHER:  Counsel on the
9   phone.
10        MS. ST. PETER-GRIFFITH:  Ann St. Peter-
11   Griffith, United States Attorney's office,
12   Southern District of Florida, on behalf of the
13   United States.
14        THE VIDEOGRAPHER:  Ms. court reporter,
15   would you please swear the witness.
16
17            JUDE E. WALSH,
18   having been sworn by the Notary Public, was
19   examined and deposed as follows:
20
21            EXAMINATION
22   BY MR. MALONE:

---

Page 7

1        P R O C E E D I N G S
2
3        THE VIDEOGRAPHER:  Good morning.  We're
4   on the record.  This is the 26th day of March
5   2008.  The time is approximately 9:08 a.m.
6   eastern time.  We're here today in the matter of
7   Pharmaceutical Industry Average Wholesale Price
8   Litigation in a cause known as U.S. ex relator
9   Ven-A-Care of the Florida Keys, Incorporated,
10   versus Abbott Laboratories, Incorporated.  Case
11   No. 06-CV-1137-PVS.  This is civil action in the
12   United States District Court for the District of
13   Massachusetts.  This is the videotaped deposition
14   of Sue -- no.  Your name, please?
15        THE DEPONENT:  It is Jude Walsh.
16        THE VIDEOGRAPHER:  Jude Walsh.
17   Counsel, could we go around the room and on the
18   phone and introduce yourselves, please.
19        MR. MALONE:  This is Sean Malone with
20   Jones Day, I represent Abbott Laboratories.
21        MR. KATZ:  Cliff Katz with Kelley Drye
22   representing the Dey defendants.

---

Page 9

1        Q.  Good morning, Ms. Walsh.
2        A.  Good morning.
3        Q.  As I mentioned a minute ago, I am Sean
4   Malone.  I represent Abbott Laboratories on
5   behalf of Jones Day.  You are probably somewhat
6   familiar with the deposition process, but I just
7   want to go over one or two ground rules before we
8   get started.  First, because we have a -- a court
9   reporter transcribing the deposition I would ask
10   that you try to respond verbally, if possible, to
11   my questions.  From time to time your attorneys
12   may lodge an objection to my questions because I
13   have phrased them poorly or for other reasons,
14   but I ask that you respond anyway unless you are
15   instructed by counsel for reasons of privilege
16   not to answer my questions, you understand that?
17        A.  Yes, I do.
18        Q.  Okay.  Are you represented by counsel
19   here this morning?
20        A.  Yes, I am.
21        Q.  Okay.  And I forgot to mention, I
22   realize that you are a little under the weather,

---

8e8c0070-c540-4f61-a0f2-1edca3a788ed

Walsh, Jude E.                                    March 26, 2008
                         Augusta, ME

Page 74

1    Q.  -- Ms. Walsh?
2    A.  Yes.
3    Q.  What is your understanding of what this
4  document is?
5    A.  They survey states and we give them the
6  information so they can publish it.
7    Q.  And by -- by they do you mean -- is
8  this the National Pharmaceutical Company or --
9    A.  Council.
10   Q.  Council?
11   A.  Yes, that's correct.
12   Q.  And this document lists all 50 states
13  and their dispensing fees, copayment, ingredient
14  reimbursement basis, formulary and formulary
15  status; is that correct?
16   A.  That's correct.
17   Q.  And on the first page Maine is listed
18  as having a dispensing fee of $3.35 and an
19  ingredient reimbursement basis of AWP/AWP minus 5
20  percent.
21      Has -- do you -- do you recall -- I
22  recognize that you didn't have any direct

Page 75

1  responsibility with this prior to 2000, but do
2  you recall how long Maine has had a dispensing
3  fee of $3.35 for its Medicaid program?
4      MS. ST. PETER-GRIFFITH:  Object to the
5  form.
6    A.  The pharmacies say forever.
7    Q.  And why do they say that?
8    A.  Because it hasn't increased forever.
9    Q.  And you -- you hear complaints about
10  that in your current role?
11   A.  Yes, I do.
12   Q.  Do you know why it says AWP/AWP minus 5
13  percent --
14   A.  No.
15   Q.  -- for the ingredient reimbursement
16  basis?  Okay.  I would ask you to turn to page --
17  well, the 1996 page of this document.  I think it
18  is at the bottom it says 3-24.
19   A.  Mm-hmm.
20   Q.  And here the Maine ingredient
21  reimbursement basis is listed as AWP minus 10
22  percent and there is also a dispensing fee of

Page 76

1  3.35-5.35.  Do you recall hearing about this
2  change in reimbursement mechanism back in 1996?
3    A.  No.
4    Q.  And let's flip to the 2002 page which
5  at the bottom I believe is 4-45 and at the top of
6  the page it says Pharmacy Payment And Patient
7  Cost Sharing.  Here we have Maine with an
8  ingredient reimbursement basis of AWP minus 13
9  percent.  Do you recall this change in AWP
10  reimbursement?
11   A.  Yes, I do.
12   Q.  This was during your time with the
13  Maine state Medicaid program, correct?
14   A.  Correct.
15   Q.  What do you recall about this change in
16  reimbursement?
17   A.  We had to meet certain budget targets
18  and in our analysis it looked like we were paying
19  more than was appropriate for prescription drugs
20  at retail pharmacies and changed our dispensing
21  fee from AW -- or our reimbursement mechanism
22  from AWP minus 10 to AWP minus 13.

Page 77

1    Q.  You said in your analysis it looked
2  like you were paying more than was appropriate.
3  What did you use for your analysis, if you
4  remember?
5    A.  Claims data and acquisition costs.
6  Some acquisition costs from pharmacies.
7    Q.  Did you conduct a survey of some kind?
8    A.  Not really a survey, but we also looked
9  at what other insurers were reimbursing, again
10  looking at our public purchasers and see what
11  they were reimbursing, to help us determine what
12  was appropriate, and other states.
13   Q.  If the governor had not asked for a
14  reduction in budget do you think that the Maine
15  Medicaid program would have conducted a survey
16  and tried to reduce payment?
17      MS. ST. PETER-GRIFFITH:  Object to the
18  form.
19   A.  I don't know.
20   Q.  Would you agree that the impetus for
21  the change was the governor's call for a
22  reduction in the Medicaid budget?

                             20  (Pages 74 to 77)

8e8c0070-c540-4f61-a0f2-1edca3a788ed

Walsh, Jude E.                                        March 26, 2008
                        Augusta, ME

Page 126

1    A.  We had another reduction later to AWP
2  minus 15.
3    Q.  That's still a pretty big gap.  Why --
4  why was it that Maine did not try to make up that
5  gap and bring its reimbursement rate more in line
6  with some of the results of this study?
7      MS. ST. PETER-GRIFFITH:  Object to the
8  form.
9    A.  You can't -- you can't achieve your
10  savings with AWP points on generics, you have to
11  achieve it through MACing, and we do do that, and
12  we did do that then.  Our average reimbursement
13  on generics now is AWP minus 60.  That's what we
14  pay given the -- the way we implement our MAC
15  list.  So on average -- actually we did an
16  analysis last month and it is AWP minus 69, so we
17  do have very aggressive generic pricing.
18    Q.  So since that time Maine has brought
19  its payment policy more in line with the results
20  of this study?
21    A.  Because I haven't read the study fully
22  I -- I can't say.

Page 127

1    Q.  But the numbers that are listed on the
2  first two pages at least of this memo?
3      MS. ST. PETER-GRIFFITH:  Object to the
4  form.
5    A.  I would say we -- we run a very
6  aggressive MAC program in Maine.
7    Q.  Has the dispensing fee changed out in -
8  - along with the increased discount for AWP
9  reimbursement?
10    A.  We haven't had a change in dispensing
11  fee since I started with the Medicaid program.
12    Q.  How is it then that providers
13  pharmacists would have been able to stay in
14  business if their dispensing fees have remained
15  at $3.35?
16      MS. ST. PETER-GRIFFITH:  Object to
17  form.
18    A.  My understanding is the dispensing fee
19  is not how you stay in business in retail
20  pharmacy.
21    Q.  And how -- how do you stay in business?
22    A.  It is the reimbursement that you

Page 128

1  receive and the volume.  It is all about volume.
2    Q.  By reimbursement you mean the payment
3  for the ingredient cost?
4    A.  The payment --
5      MS. ST. PETER-GRIFFITH:  Object --
6      THE DEPONENT:  Go ahead.
7      MS. ST. PETER-GRIFFITH:  Object to the
8  form.
9    A.  Payment includes ingredient cost plus a
10  dispensing fee, that's considered payment, but
11  volume is important in pharmacies.
12      MR. MALONE:  All right.  Let's -- let's
13  take a break here and we can pick up after lunch.
14      THE VIDEOGRAPHER:  We'll go off the
15  record at 12:03.
16      (A short break was taken.)
17      THE VIDEOGRAPHER:  And we're back on
18  the record after a lunch break, this is Tape No.
19  4, the time is 12:57.
20    Q.  Ms. Walsh, have you had communications
21  with representatives from Abbott Laboratories
22  over the years?

Page 129

1    A.  Yes.
2    Q.  On -- in what context?
3    A.  I worked with some senior management at
4  Abbott when we were implementing our HIV waiver
5  program to look at a demonstration project with
6  them.
7    Q.  Would this have been in the early 90s?
8    A.  No.  I wasn't in Medicaid in the early
9  90s so it was probably 2003.
10    Q.  Any other communications with Abbott
11  that come to mind?
12    A.  Well, we work with pharmaceutical
13  manufacturers regularly in the course of business
14  so I would have to say that I am sure.  You know,
15  either representatives for their company come to
16  our drug utilization review meetings or
17  participate in our supplemental rebate
18  negotiation process or as a course of business I
19  receive correspondence on new drug profiles and
20  news alerts and things of that nature, so I would
21  say business as usual except for the
22  demonstration project with HIV.

                              33 (Pages 126 to 129)

8e8c0070-c540-4f61-a0f2-1edca3a788ed

Walsh, Jude E.                                    March 26, 2008

Augusta, ME

Page 146

1   - of prescription drugs?
2      A.   I mean the ones that I saw were related
3   to the pharmacy benefit.
4      Q.   Did -- did the Maine Medicaid program
5   rely upon this guidance in formulating its
6   policy?
7      A.   Sometimes.
8      Q.   No. 15 in the survey asks are there any
9   further actions that CMS could take that would
10  assist your program to contain drug costs and you
11  list broader FUL lists with timely response to
12  market changes.  What did you mean by that?
13     A.   Well, I -- I believe I meant by the
14  time we get a FUL we have had it MACed for a
15  long time.  The federal government is extremely
16  slow in capping their generic pricing, and we
17  actually do it faster and better and tighter, and
18  we take their FUL list but typically our MACs are
19  -- are lower in reimbursement than the Federal
20  Upper Limit payments.
21     Q.   And finally on No. 16 says please feel
22  free to share -- share any additional comments or

Page 147

1   suggestions on Medicaid drug cost containment,
2   and you wrote we need a better way to calculate a
3   true EAC that would be fair and equitable to
4   providers and provide the best price to the
5   state.  What did you mean by that?
6      A.   Well, I think that everybody knows that
7   the AW fee is a very -- AWP is arbitrary
8   somewhat, the whole way we reimburse drugs are
9   arbitrary, and it would be, in my opinion, much
10  better to really understand how much drugs really
11  do cost and then set a payment reimbursement
12  system in place to address actual costs instead
13  of these surveyed kind of arbitrary figures.
14     MR. MALONE:  Okay.  I will ask a few
15  questions about the process of state plan
16  amendments, and for that purpose I would like to
17  mark another exhibit which we'll call Abbott
18  Exhibit 857.  For the record this is a four page
19  document which is Bates labeled HHC006-0124
20  through 0127.
21     (Exhibit Abbott 857, Payment Rates
22  With Attachments, marked for identification.)

Page 148

1      Q.   Ms. Walsh, on the second page there is
2   a -- a letter which extends for a couple of pages
3   and it is signed -- well, it appears to be signed
4   by Larry Reed but there is someone else's
5   signature there?
6      A.   Yes.
7      Q.   Do you recognize either the signature
8   or the name?
9      A.   It is Deirdre Duzor.
10     Q.   Okay.  And do you know a Ms. Duzor?
11     A.   She is the coleader of the pharmacy
12  team at CMS.
13     Q.   And are you also familiar with Larry
14  Reed?
15     A.   Yes, I am.
16     Q.   And also can I ask I see there is a CC
17  Jude Welsh, would that be Jude Walsh?
18     A.   I believe so.
19     Q.   Okay.  Were you typically copied or
20  provided correspondence of this nature?
21     A.   Yes.
22     Q.   And turning back to the first page this

Page 149

1   letter is dated November 25th, 2003, and it
2   states we have reviewed Maine State Plan
3   Amendment, SPA, 03-008 that proposes to modify
4   the state's payment methodology for drugs on the
5   state's direct supply list.  We are unable to
6   approve it as submitted.  And then it appears
7   that the state lists a number of questions that
8   it wants answers to.
9      Can you describe generally the
10  interaction between your office and CMS when it
11  comes to providing state plan amendments or
12  approving state plan amendments?
13     MS. ST. PETER-GRIFFITH:  Object to the
14  form.
15     A.   CMS is the approving body for state
16  plan amendments and when we want to make policy
17  changes that affect reimbursement we go through a
18  regulatory process within the state and we go
19  through a state plan amendment process at the
20  federal level, and we submit a state plan
21  amendment, which you have here, and a lot of
22  times they submit RAIs, Requests for Additional

38  (Pages 146 to 149)