# EXHIBIT 103

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL INDUSTRY    ) MDL NO. 1456

AVERAGE WHOLESALE PRICE           )

LITIGATION                        ) CIVIL ACTION:

                                  ) 01-CV-12257-PBS

                                  ) Judge Patti B. Saris

                                  ) Magistrate Judge

                                  ) Marianne B. Bowler

THIS DOCUMENT RELATES TO

U.S. ex rel. Ven-A-Care of the

Florida Keys,Inc., v.

Abbott Laboratories, Inc., et al.

No. 06-CV-11337-PBS

(Caption continues on next page.)

_____


VIDEOTAPED DEPOSITION OF

CODY WIBERG

Taken March 14, 2008

Commencing at 9:13 a.m.

Page 2

```
 1            COMMONWEALTH OF KENTUCKY
 2           FRANKLIN CIRCUIT COURT - DIV 1
 3             CIVIL ACTION NO. 04-CI-1487
 4  COMMONWEALTH OF KENTUCKY              PLAINTIFF
 5  ex rel. JACK CONWAY, ATTORNEY GENERAL
 6  v.
 7  ALPHARMA USPD, INC., et al.
 8
 9            VIDEOTAPED DEPOSITION OF
10                  CODY WIBERG
11              Taken March 14, 2008
12              Commencing at 9:13 a.m.
13
14     REPORTED BY:  SUZANNE HAGEN, RPR, CRR, CBC
15     Videotaped Deposition of Cody Wiberg, taken on
16  March 14, 2008, commencing at 9:15 a.m., at the law firm
17  of Meagher & Geer, 33 South Sixth Street, #4400,
18  Minneapolis, Minnesota, 55402, before Suzanne Hagen,
19  Registered Professional Reporter, Certified Realtime
20  Reporter, Certified Broadcast Captioner, and Notary
21  Public of and for the State of Minnesota.
22              **********
```

Page 3

```
 1                   APPEARANCES
 2
 3  On Behalf of Abbott Laboratories:
 4  CHRISTOPHER COOK, ESQUIRE
 5  JONES DAY
 6  51 Louisiana Avenue, N.W.
 7  Washington, D.C. 20001-2113
 8  202-626-3939
 9  CHRISTOPHERCOOK@JONESDAY.COM
10
11  On Behalf of the Deponent, Cody Wiberg:
12  TIERNEE MURPHY, ASSISTANT ATTORNEY GENERAL
13  MANAGER, HEALTH LICENSING DIVISION
14  STATE OF MINNESOTA ATTORNEY GENERAL
15  Bremer Tower, Suite 1400
16  445 Minnesota Street
17  St. Paul, Minnesota 55101-2131
18  tiernee.murphy@state.mn.us
19
20
21
22
```

Page 4

```
 1              APPEARANCES CONTINUED
 2
 3  On Behalf of Dey, Inc., Dey, L.P., and Dey, L.P., Inc.:
 4  MARISA A. LORENZO, ESQUIRE
 5  KELLEY & DRYE
 6  101 Park Avenue
 7  New York, New York 10178
 8  212-808-7697
 9  mlorenzo@kelleydrye.com
10
11  On behalf of the U.S. Attorney's Office for the District
12  of Massachusetts:
13  JEFF FAUCI, ESQUIRE
14  THE UNITED STATES DEPARTMENT OF JUSTICE
15  1 Courthouse Way
16  John Joseph Moakley Courthouse
17  Boston, MA 02210
18  612-748-3100
19  Jeff.Fauci@USDOJ.gov
20
21
22
```

Page 5

```
 1              APPEARANCES CONTINUED
 2
 3  On behalf of Ven-A-Care:
 4  LARRY BLACK, ESQUIRE
 5  7039 Comanche Trail
 6  Austin, Texas 78732
 7  512-402-1745
 8  lblack@larryblacklaw.com
 9
10  On behalf of Roxane Laboratories, Inc., et al
11  (via teleconference):
12  MIRIAM LIEBERMAN, ESQUIRE
13  KIRKLAND & ELLIS
14  200 East Randolph Drive
15  Chicago, Illinois 60601-6636
16  United States
17  312-861-2000
18
19
20
21
22
```

|                                                                 Page 6 |
| --- |

```
 1              APPEARANCES CONTINUED
 2
 3   On behalf of Bristol-Myers
 4   (via teleconference):
 5   EVA DIETZ, ESQUIRE
 6   HOGAN & HARTSON
 7   875 Third Avenue
 8   New York, NY 10022
 9   212-918-3000
10   eldietz@hhlaw.com
11
12   On behalf of Sandose, Inc.
13   (via teleconference):
14   MILANA SALZMAN, ESQUIRE
15   WHITE AND CASE
16   1155 Avenue of the Americas
17   New York, New York
18   10036-2787
19   212-819-8711
20   msalzman@whitecase.com
21
22
```

|                                                                 Page 7 |
| --- |

```
 1              APPEARANCES CONTINUED
 2   On behalf of Warrick-Schering and B. Braun Medical
 3   (via teleconference):
 4   KARIN TORGERSON, ESQUIRE
 5   LOCKE, LORD, BISSELL & LIDDELL
 6   2200 Ross Avenue
 7   Suite 2200
 8   Dallas, Texas 75201
 9   214-740-8725
10   ktorgerson@lockeliddell.com
11
12   On behalf of Pfizer
13   (via teleconference):
14   KATHRYN POTALIVO
15   MORGAN, LEWIS & BOCKIUS
16   1701 Market St.
17   Philadelphia, PA 19103-2921
18   215-963-5233
19   kpotalivo@morganlewis.com
20
21   Also Present:
22   Kelly Leber, Videographer
```

|                                                                 Page 8 |
| --- |

```
 1                     INDEX
 2
 3   WITNESS: CODY WIBERG                        PAGE
 4
 5   EXAMINATION BY MR. COOK:                  11, 356
 6         MS. LORENZO:                            245
 7         MS. LIEBERMAN:                          275
 8         MR. FAUCI:                         282, 375
 9         MR. BLACK:                         309, 382
10
11
12
13   EXHIBITS MARKED:
14   Exhibit Abbott 650, JDWIBERG0015 to 0022         9
15   Exhibit Abbott 651, KY_DMS_00000000117257      207
16   Exhibit Dey 124,   DEY-MDL-0105083 to 0105089  245
17
18
19
20
21
22
```

|                                                                 Page 9 |
| --- |

```
 1        (Deposition Exhibit Abbott 650
 2        marked for identification.)
 3        VIDEOGRAPHER:  Good morning.  We are
 4   going on the record.  This is the videotaped
 5   deposition of Cody Wiberg, taken on March 14, 2008.
 6   Time now is approximately 9:12 a.m.  The
 7   deposition is being taken in the matter of
 8   Pharmaceutical Industry, Average Wholesale Price
 9   Litigation.  Also, Commonwealth Kentucky, Jack
10   Conway, Attorney General, versus ALPHARMA USPD,
11   Inc., et al, in United States District Court for
12   the District of Massachusetts, case number
13   01-CV-12257-PBS.  Also taken in the matter of State
14   of Texas versus Abbott, District Court of Travis
15   County, Texas.
16        The deposition is taking place in
17   Minneapolis, Minnesota.  My name is Kelley Leber;
18   I'm the videographer representing Henderson Legal
19   Services. Will counsel please identify themselves
20   for the record?
21        MR. COOK:  I'm Christopher Cook from
22   Jones Day.  We represent Abbott Laboratories.
```

Wiberg, Cody                                                            March 14, 2008

Page 50

1    A. Oh, yes, yes, indeed.
2    Q. We'll get to that in detail later, but could
3  you describe that work at a high level of
4  generality?
5    A. Well, basically, again, under federal law,
6  states are allowed to set reimbursement rates for
7  pharmaceuticals. And so since we managed the fee
8  for service pharmacy program, we obviously had a
9  lot to say about what those rates should be.
10   Q. And you -- did you work with the legislature
11 and the legislature's passing of laws that related
12 to dispensing fees and reimbursement formula?
13   A. That's correct. Unlike some other states,
14 where Medicaid reimbursement rates can be set by
15 the agency, by rule, in Minnesota, unless things
16 have changed, and at least in the pharmacy area,
17 and I think in most areas, the legislature
18 establishes the rates.
19       MR. COOK: Mr. Wiberg, let me hand you
20 what we have marked in previous depositions as
21 Exhibit Abbott 19.
22       THE WITNESS: It's a copy of the

Page 51

1  complaint in this case.
2       MR. BLACK: I just want to see which
3  case.
4       MR. COOK: It is the complaint that was
5  originally filed or the complaint and intervention
6  filed by the Department of Justice. And it's
7  Abbott.
8       MR. BLACK: Intervention?
9       MR. COOK: It's the complaint and
10 intervention. And for the record -- it was filed
11 in March of 2006.
12 BY MR. COOK:
13   Q. Just as an initial matter, Mr. Wiberg, have
14 you ever seen this document before, to your
15 knowledge?
16   A. I'm not sure. Unless you've -- folks sent it
17 to me, then I don't believe that I have, no.
18   Q. Okay. Well, actually what I'd like to turn
19 your attention to is the very last two pages of the
20 document that are labeled Exhibit 1. And it's a
21 list of drugs.
22   A. Uh-huh.

Page 52

1    Q. And could you take a look at those drugs and
2  tell me if you -- if you recognize those drugs?
3    A. The top one appears -- the top two appear to
4  be cut off. But otherwise, yes.
5    Q. And does this appear to be a -- to describe
6  them at a -- at a higher level of generality?
7  Sodium saline solution, dextrose solution,
8  vancomycin, and water.
9    A. Uh-huh.
10   Q. What kinds of drugs are -- are those?
11   A. At a high level, I think what you want to
12 know is they're injectable drugs. They're drugs
13 that are commonly used in -- in IV therapy.
14   Q. These wouldn't be the types of pills, for
15 example, that you were dispensing when you were --
16 a community -- community pharmacist, right?
17   A. That's correct.
18   Q. And as we go along, and happy to have you --
19 you keep a copy of that. When I refer to the
20 subject drugs in the federal case, I'm referring to
21 the drugs that are here on Exhibit 1. These are
22 the ones that are the subject of the government's

Page 53

1  lawsuit against -- against Abbott.
2    A. Uh-huh.
3    Q. Do you know what the allegations are that
4  have been made by the Department of Justice in this
5  case against Abbott?
6    A. In this particular case, no. Because I have
7  not read this document.
8    Q. Are you familiar generally with the AWP
9  litigation that's been going on for so many years
10 in the country?
11   A. Yes, I have.
12       MR. FAUCI: Objection, form.
13 BY MR. COOK:
14   Q. What is your understanding of what that AWP
15 litigation relates to?
16       MR. FAUCI: Objection to form.
17   A. I think my understanding is that the basic
18 allegation is that pharmaceutical manufacturers
19 either falsely reported information or withheld
20 information about the true cost of pharmaceuticals
21 that they, in fact, inflated average wholesale
22 prices in an effort to win market share for their

14 (Pages 50 to 53)

Page 110

1   any drug that was already on the federal upper
2   limit list.  And there -- and CMS took a long time
3   after generics became available to put those
4   generics on the federal upper limit list. So that's
5   one thing we couldn't do.  We also had to have the
6   brand name, plus at least two generics.
7       After 2002, when I got that language reversed,
8   we went -- we again had the authority to establish
9   a MAC on anything that had at least one generic.
10  And so that's what we did.  As drugs went off
11  patent and generics were introduced, as soon as
12  those drugs were out in the market, we would MAC
13  the products.
14    Q.  We'll come to it in more detail in a little
15  bit, but you refer to the legislature and influence
16  from affected constituencies affecting eventually
17  legislation, right?
18    A.  Yes.
19    Q.  Was it a political policy decision in
20  Minnesota how much it was that Minnesota Medicaid
21  was paying for prescription drugs?
22    A.  A political -- what's a political policy

Page 111

1   decision?
2     Q.  You're right.
3         MR. BLACK:  Good question.
4   BY MR. COOK:
5     Q.  I can ask that better.  The amount that
6   Minnesota Medicaid was paying for drugs at the end
7   of the day was the result of the political process.
8   Is that a fair summary?
9         MR. FAUCI:  Objection.
10    A.  Well, it was set by the legislature.  The
11  legislature consists of politicians.  That's the
12  way it worked in Minnesota.  It was not a
13  regulatory or bureaucratic decision.  The rates for
14  all Medicaid payments were set by the legislature.
15    Q.  Is this a good time for a short break --
16    A.  Yeah.
17    Q.  -- since we're coming to the end of another
18  tape?
19    A.  Sure.
20        MR. COOK:  We can go off the record.
21        VIDEOGRAPHER:  We are going off the video
22  record at 11:19 a.m.

Page 112

1       (A brief recess was held.)
2       VIDEOGRAPHER:  We are now back on the
3   record.  This is the continuing videotaped
4   deposition of Cody Wiberg, taken on March 14th,
5   2008.  Time now is approximately 11:26 a.m.
6   BY MR. COOK:
7     Q.  Mr. Wiberg, if I could turn your attention
8   back to Exhibit 19, it's the -- the complaint with
9   the list of subject drugs on it.
10    A.  Okay.
11    Q.  In what circumstances -- we started to touch
12  on this a minute ago with the managed care versus
13  the fee for service.  But in what circumstances
14  would the fee for service portion of Minnesota
15  Medicaid pay for these products?
16    A.  Well, directly -- there would be two ways.
17  It would be direct and indirect.  To the extent
18  that the Medicaid program paid for anyone who was
19  hospitalized as an inpatient, that would be one
20  way, which I had nothing to do with, because that's
21  all essentially a capitated arrangement based on
22  what are called DRGs.

Page 113

1       In terms of the outpatient setting, we would
2   pay for these -- probably primarily to home I.V.
3   infusion pharmacies, or at least they would be the
4   pharmacies that would be most likely to dispense
5   these sort of products.
6       As I believe I mentioned earlier on, there are
7   some pharmacies that are a hybrid.  I mean, there
8   are some pharmacies, particularly in outstate
9   Minnesota, where the -- the larger home I.V.
10  infusion pharmacies may not have a presence, or
11  where the pharmacist thought that they could
12  compete locally because of the local reputation, or
13  whatever reason.  There's a combination. They run a
14  community pharmacy, and they also have facilities
15  to do home I.V. infusion.  But my -- my guess would
16  be, and it is a guess, but -- because I didn't look
17  at these specific products to see who exactly --
18  which pharmacies exactly we paid for, but it would
19  make more sense that we paid for more of these for
20  home I.V. infusion pharmacies.
21    Q.  Would there also be circumstances in which
22  those particular products would be paid in a

Page 134

1  managers were paying.  At the time, some of the
2  reimbursement -- the reimbursement rate -- there is
3  a report that was put out by -- I think it's called
4  the Pharmacy Benefit Management Institute.  And if
5  I remember the methodology they used, they surveyed
6  500 large employers around the country, and asked,
7  what does the Pharmacy Benefit Manager you contract
8  with, what's the reimbursement rate for pharmacies?
9  They were reporting -- I think it was something in
10 the range of AWP minus 13.5 percent, plus a little
11 over $2 in the dispensing fee.  So part of it was
12 looking at what the private sector was paying,
13 because we knew the argument.  If we tried to
14 undercut the private sector from the pharmacy
15 groups, would be -- you're -- you know, this is a
16 publicly-funded program. It's more difficult to
17 manage Medicaid patients.  You're paying us less
18 than private payers will pay.  That's one thing.
19     But then in Minnesota, Minnesota is unique in
20 one aspect.  Minnesota has the lowest level of
21 uninsured people in the country.  The reason we do
22 that is because we have a program called

Page 135

1  MinnesotaCare.  MinnesotaCare is funded by a 2
2  percent tax, or at least at the time it was 2
3  percent.  It might be down to 1.5 percent now.  But
4  at the time, it was a 2 percent tax on all
5  providers.  Health care providers.  In the case of
6  hospitals, physicians, dentists, those sort of
7  health care providers, it's just a 2 percent tax
8  that they pay. I'm not sure what the -- in their
9  regards, I'm not sure what it is.  I don't know if
10 it's off of gross revenues or whatever, but it's --
11 it's applied directly to them. In the case of
12 pharmaceuticals, it's not applied to pharmacies,
13 it's applied to drug wholesalers.  And the drug
14 wholesalers are allowed to pass that on to
15 pharmacies.  So, in effect -- and, for private
16 payers, pharmacies can pass that on to cash-paying
17 customers, or they can pass it on to other
18 third-party payers.  They can't pass it on to
19 Medicaid.  So in effect, their argument was that
20 that in itself was a 2 percent hit. They're wrong.
21 It's not a 2 percent hit off of a published AWP.
22 It's 2 percent off what their actual acquisition

Page 136

1  cost is.  But there is some percentage that they're
2  -- they have to pay into the state in the form of
3  this tax that they're not -- we're not otherwise
4  considering.  So that's -- so there is a whole
5  bunch of considerations that went into coming to
6  that AWP minus 14.
7     Q.  And, of course, one consideration would be
8  whatever the formula, setting a number that is high
9  enough to ensure access to care for Medicaid
10 beneficiaries, right?
11    A.  Correct.
12    Q.  Because as I understand it, correct me if I
13 am wrong, Minnesota Medicaid is a voluntary
14 program, right? That is, for the pharmacies.
15    A.  Yes, yes.
16    Q.  And so --
17    A.  Provider, yeah.
18    Q.  And so if you don't pay enough money,
19 pharmacies won't participate, Medicaid
20 beneficiaries won't be able to get their drugs,
21 right?
22    A.  Yes, that would be a possibility.

Page 137

1     Q.  And, as I understand it, that aspect of the
2  policy-making would be taken care of by pharmacies
3  essentially lobbying their representatives in the
4  legislature.
5     A.  In terms of trying to -- to make sure that we
6  didn't cut reimbursement.
7     Q.  Well, the legislature didn't cut
8  reimbursement too much.
9     A.  Excuse me.  Right. That the legislature
10 didn't adopt our proposals to cut reimbursement.
11 Certainly, there were -- there would be the
12 Minnesota Pharmacists' Association was lobbying
13 against what we were doing. I -- I believe the
14 National Association of Chain Drugstores.  I don't
15 know this, but I presume that there were individual
16 pharmacists around the state buttonholing their
17 individual legislators, probably.
18    Q.  Did you ever actually look at compendia that
19 published AWPs, whether it's First DataBank, Red
20 Book or some others?
21    A.  We had -- yeah, but not for -- not for
22 purposes of doing pricing.  We got -- we received

35 (Pages 134 to 137)

Page 170

1  considerations at the time.
2      So if you wanted to make it -- and you would
3  have three choices, basically. You could either
4  make it -- try to make it as close as you could to
5  revenue-neutral. You could try to recoup savings.
6  And therefore, you -- you're going to set the
7  dispensing fee maybe not as high as you would if
8  you were going make it revenue-neutral. Or you
9  could try to actually pay providers more money
10 then, and you would set it a little bit higher.
11 But I basically -- when this came out, and at that
12 conference I mentioned, where -- where Mr. Lup --
13 Mr. Lupinetti and I both were presenters at a
14 conference. We were talking about different
15 issues, and I was not talking about this particular
16 issue, per se. But he was talking about this
17 issue. And I did basically bring up that, you
18 know, you really have to understand how the
19 pharmacy reimbursement system works. You can't --
20 you have to understand that there's two sides of
21 the equation, that the dispensing fees are kept
22 artificially low. That if you just reduce the

Page 171

1  ingredient reimbursement to actual acquisition
2  cost, and don't do anything with the dispensing
3  fee, there's at least the possibility that you're
4  going to have access problems for patients, because
5  pharmacies at that point might drop out of the
6  system.
7      Now, there's an argument that it really
8  wouldn't make much difference, because the very
9  large national pharmacy chains don't necessarily
10 make their money on the prescriptions. They make
11 the money on what you buy in the front end of the
12 store. And if they use pharmacy sales or
13 prescription sales as a loss leader, they'll still
14 sign up for Medicaid.
15   Q. There will be a retail pharmacy, correct?
16   A. Yeah.
17   Q. Not a closed pharmacy like an infusion
18 pharmacy.
19   A. No, no. So there's that argument. But
20 anyway, the argument I made is that you can't --
21 you can't look at one side of the equation. You
22 have to look at both sides of the equation. You

Page 172

1  have to understand that we know, and this is a
2  serious aspect of ain't what paid -- "ain't what's
3  paid." We know AWP, "ain't what's paid." But if we
4  move towards more transparency and we get closer to
5  reimbursing on the ingredient side at what
6  providers actually pay, then we have to look at the
7  dispensing fee side in the case of pharmacies,
8  because we've always kept that below what we think
9  the true cost of dispensing is to make up for the
10 fact that there is some money being made on the
11 ingredient side. So to the extent, again, that you
12 start paying people a dispensing fee or a total
13 reimbursement that does not even get back the cost
14 of the drugs, plus the cost of labor and the
15 computer systems and the lights and all that, you
16 could have providers stop -- you know, start
17 dropping out of Medicaid. And then this creates an
18 access issue for very poor people. So -- yeah.
19     MR. BLACK: Objection, form.
20 Nonresponsive.
21 BY MR. COOK:
22   Q. And so would it be your understanding that if

Page 173

1  we were -- if one were to go to this ideal world in
2  which AWP actually represented acquisition costs,
3  the Medicaid programs would no longer use an AWP
4  minus a percentage.
5    A. To the extent that -- that whatever was used,
6  revamped AWP or an ASP or an AMP, whatever you use
7  as a basis of a cost reimbursement, or -- or excuse
8  me, ingredient reimbursement to the extent that
9  that closely reflected the average actual price the
10 providers paid, then you would -- right. You would
11 no longer be taking percentages off.
12   Q. And, in fact, are you familiar with the
13 manner in which the federal legislation has changed
14 the calculation of federal upper limits to be
15 two-and-a-half times the Average Manufacturer's
16 Price?
17   A. If that's a recent change within the last
18 two-and-a-half years, I wouldn't know.
19   Q. And we've already talked about Medicare
20 paying ASP plus some percentage, correct?
21   A. 6 percent, I believe it is, yep.
22   Q. Once you learned what the actual amounts were

44 (Pages 170 to 173)