# EXHIBIT 104

Clifford, Margaret                    October 29, 2008
Concord, NH

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X

In Re: PHARMACEUTICAL INDUSTRY      ) MDL No. 1456

AVERAGE WHOLESALE PRICE LITIGATION ) Master File No.

--------------------------------) 01-CV-12257-PBS

THIS DOCUMENT RELATES TO:            )

United States of America ex rel.    ) Hon. Patti B.

Ven-A-Care of the Florida Keys,     )     Saris

Inc., et al. v. Dey, Inc., et al., )

Civil Action No. 05-11084-PBS,      ) VIDEOTAPED

and United States of America ex     ) DEPOSITION

rel. Ven-A-Care of the Florida      ) OF MARGARET

Keys, Inc., et al. v. Boehringer    ) CLIFFORD

Ingelheim Corp., et al., Civil      )

Action No. 07-10248-PBS and United ) OCTOBER 29, 2008

States, ex rel. Ven-A-Care of the   )

Florida Keys v. Abbott              )

Laboratories, Inc. Civil Action     )

Nos. 06-CV-11337 and 07-CV-11618    )

--------------------------------X

Clifford, Margaret                           October 29, 2008
                        Concord, NH

---

Page 2

1    Videotaped Deposition of MARGARET CLIFFORD
2               Concord, New Hampshire
3             Wednesday, October 29, 2008
4                    9:30 a.m.
5
6
7
8
9          A P P E A R A N C E S
10
11   On behalf of the United States of America:
12
13      GEORGE B. HENDERSON, ESQ.
14      Assistant United States Attorney
15      United States Courthouse
16      1 Courthouse Way
17      Suite 9200
18      Boston, MA  02210
19      617-748-3272
20      george.henderson2@usdoj.gov
21
22   (CONTINUED)

---

Page 4

1          A P P E A R A N C E S (CONTINUED)
2
3    On behalf of Abbott Laboratories, Inc.:
4
5       ERIC P. BERLIN, ESQ. (Via telephone.)
6       Jones Day
7       77 West Wacker
8       Chicago, IL  60601-1672
9       312-269-4117
10      epberlin@jonesday.com
11
12   ALSO PRESENT:  Patrick Battle, Videographer
13              Dwight Schwader (DOJ Associate)
14
15
16
17
18
19
20
21
22

---

Page 3

1          A P P E A R A N C E S (CONTINUED)
2
3    On behalf of the Witness:
4       DEBORAH WEISSBARD, ESQ.
5       Assistant Attorney General
6       Department of Justice
7       Office of the Attorney General
8       33 Capitol Street
9       Concord, NH  03301
10      603-271-1196
11      deborah.weissbard@doj.nh.gov
12
13
14   On behalf of Dey, Inc.:
15
16      CLIFFORD KATZ, ESQ.
17      Kelley Drye & Warren LLP
18      101 Park Avenue
19      New York, NY  10178
20      212-808-7609
21      ckatz@kelleydrye.com
22

---

Page 5

1                I N D E X
2
3    WITNESS:  MARGARET CLIFFORD          PAGE
4    Examination By Mr. Katz.................... 009
5    Examination By Mr. Berlin................. 166
6    Examination By Mr. Henderson............... 196
7    Examination By Mr. Katz.................... 248
8    Examination By Mr. Berlin................. 285
9    Examination By Mr. Henderson............... 318
10
11
12          D E Y   E X H I B I T S
13   NUMBER       DESCRIPTION          PAGE
14   Exhibit Dey 200-HHD127-0322 to 0326 US DHHS
15             OIG Survey.................... 073
16   Exhibit Dey 201-OIG Report, August 1998
17             HHD121-0987 to 1004............ 115
18   Exhibit Dey 202-Ipratropium Chart............. 127
19   Exhibit Dey 203-Dey letter of 8/10/99
20             Marked Confidential
21             DL-0050553.................... 160
22   Exhibit Dey 204-Grant Thornton Study........... 268

---

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

3eda5f7f-7115-47a9-9291-d4198c3ab619

Clifford, Margaret                          October 29, 2008
                      Concord, NH

1          U S A   E X H I B I T S
2   NUMBER            DESCRIPTION           PAGE
3   Exhibit Clifford USA 001-Figure 1: Abbott's FDB
4            Direct Price Vs. Avg.
5            Price for Vancomycin
6            chart................ 245
7   Exhibit Clifford USA 002-Figure 2: Abbott's FDB
8            Direct Price Vs. Avg.
9            Price for Vancomycin
10           chart................ 245
11
12
13         A B B O T T   E X H I B I T S
14  NUMBER            DESCRIPTION           PAGE
15  Exhibit Abbott Clifford 001-Vancomycin 1gm
16           Vial chart......... 303
17
18
19
20
21
22

1       THE WITNESS:  Yes.
2       VIDEOGRAPHER:  We are now recording and
3   on the record.  My name is Patrick Battle.  I am
4   legal video specialist on behalf of Henderson
5   Legal Service.  Our business address is 1015,
6   15th Street, NW, Suite 525, Washington, DC,
7   20005.  Today's October 29, 2008 and the time is
8   9:25.  This is the deposition of Margaret
9   Clifford in the matter of Pharmaceutical Industry
10  Average Wholesale Price Litigation versus United
11  States of America ex rel., Ven-a-Care of the
12  Florida Keys, Inc., et al., v. Dey, Inc., et al.,
13  Civil Action Number 05-11084-PBS; and in the
14  United States of America ex rel., Ven-a-Care of
15  the Florida Keys, Inc., et al. v. Boehringer
16  Ingelheim Corp., et al., Civil Action Number 07-
17  10248-PBS; and United States of America, ex rel.,
18  Ven-a-Care of the Florida Keys, Inc., et al., v.
19  Abbott Laboratories, Inc., Civil Action Number
20  06-CV-11337 and 07-CV-11618.
21       This deposition is being held, taken at
22  129 Pleasant Street, Concord, New Hampshire,

1          P R O C E E D I N G S
2
3       MS. WEISSBARD:  What are we doing about
4   swearing in?
5       MR. KATZ:  Do it the same as yesterday.
6       MR. HENDERSON:  Same stipulations.  Is
7   Eric Berlin on the line?
8       MR. BERLIN:  I am.
9       MR. HENDERSON:  I understand the
10  parties attending this deposition will stipulate
11  that although the stenographer is not authorized
12  to administer the oath in New Hampshire,
13  nonetheless we will accept her administration of
14  the oath in this case as if it were properly
15  authorized.
16      MR. KATZ:  Dey agrees with that.
17      MR. BERLIN:  I agree with that.  And it
18  seems to me that we ought to get the witness's
19  agreement to that as well.
20      MS. WEISSBARD:  Well, I'll agree for
21  the witness.  I mean, you agree to tell the truth
22  so, right?

1   03301.  The court reporter is Jane Eaton of
2   Henderson Legal Services.  Counsel will state
3   their appearances and the court reporter will
4   administer the oath.
5       MR. KATZ:  Cliff Katz, Kelley Drye and
6   Warren, representing the Dey defendants.
7       MR. HENDERSON:  George Henderson,
8   Assistant U.S. Attorney representing the United
9   States of America.
10      MR. BERLIN:  Eric Berlin on behalf of
11  Abbott Laboratories.
12      MS. WEISSBARD:  And I'm Deborah
13  Weissbard with the New Hampshire Attorney
14  General's office here for Ms. Clifford.
15      MARGARET CLIFFORD, Having been
16  first duly sworn, was examined and testified as
17  follows:
18
19          EXAMINATION
20  BY MR. KATZ:
21      Q.  Please state and spell your name for
22  the record?

3 (Pages 6 to 9)

3eda5f7f-7115-47a9-9291-d4198c3ab619

Clifford, Margaret                                    October 29, 2008
                          Concord, NH

---

Page 50

1 low it was compared to other states.
2     Q.  Was there ever a time where a pharmacy
3 called and complained that they might not be able
4 to continue as a Medicaid provider due to the
5 level of reimbursement?
6     A.  Not that I'm aware of.
7     Q.  Did you have any communications with
8 pharmacy associations?
9     A.  Yes.
10    Q.  Which ones?
11    A.  NHPA.
12    Q.  And what does that stand for?
13    A.  New Hampshire Pharmacists Association.
14    Q.  Any others?
15    A.  NACDS.  National Association Of Chain
16 Drug Stores.  Also spoke with retail merchants
17 and NHIPA, New Hampshire Independent Pharmacy
18 Association.
19    Q.  Are you a member of any of these
20 organizations?
21    A.  No.
22    Q.  Have you ever been a member of any

---

Page 51

1 pharmacy associations of any sort?
2     A.  I think I may have been a member of
3 NHPA at one time, but I'm not currently.
4     Q.  Does New Hampshire Medicaid receive any
5 pharmacy publications on a regular basis?
6     A.  I don't know if they currently do.  I
7 haven't been there since 2005; but when I was
8 there we would receive the publications.
9     Q.  Which ones?
10    A.  There was one consultant pharmacist
11 one.  I don't recall what the others were,
12 whether it was pharmacy types or drug topics but
13 industry magazines.
14    Q.  So you mentioned a number of pharmacy
15 associations that you had communications with.
16 I'd like to go through that and tell me how that
17 came about in the substance of those
18 communications.
19         Let's start with the New Hampshire
20 Pharmacists Association.
21    A.  I think my conversations with them are
22 privileged.  I don't believe I can discuss those

---

Page 52

1 at this time.
2     Q.  Well, they might be confidential but I
3 don't know, I don't know if they are; but we can
4 always designate the transcript as confidential.
5         MS. WEISSBARD:  Let me step outside and
6 ask her what her concern is.  Okay?
7         MR. KATZ:  Okay.
8         VIDEOGRAPHER:  Time is 10:10.  We are
9 off the record.
10        VIDEOGRAPHER:  Time is 10:25.  We are
11 on the record.
12 BY MR. KATZ:
13    Q.  Ms. Clifford, you just spoke with your
14 counsel about answering questions about your
15 communications with the New Hampshire Pharmacists
16 Association?
17    A.  Yes.
18    Q.  And you've determined that you can
19 answer some of my questions?
20    A.  Yes.
21    Q.  What was your concern?
22        MS. WEISSBARD:  Objection.  Just ask

---

Page 53

1 her the questions.
2 BY MR. KATZ:
3     Q.  Well, tell me in a general sense, what
4 were the subject matters of your communications
5 with New Hampshire Pharmacists Association?
6     A.  The meetings weren't individual with
7 the associations.  All of the associations were
8 invited to the table when -- in November of '95
9 when House Bill 32 was published.  It had a Most
10 Favored Nation clause in there that was going to
11 hold providers to -- the providers would not bill
12 Medicaid any more than the lowest rate they
13 regularly accepted from any other payer.  And
14 pharmacies were concerned that they couldn't live
15 up to that based on at that point in time pretty
16 much all insurance companies were on a point-of-
17 sale system.  And while their usual and customary
18 charge they submitted to all insurance companies
19 was the same, because the language of the law
20 said the lowest rate they regularly accepted,
21 pharmacies were concerned if they accepted a
22 lower rate from another insurer, even though they

---

14 (Pages 50 to 53)

3eda5f7f-7115-47a9-9291-d4198c3ab619

Clifford, Margaret                                October 29, 2008
                        Concord, NH

Page 54

1  bill them all the same, the state might come
2  after them for accepting a lower rate from
3  another payer.
4      Q.  What was the state's position with
5  respect to that concern?
6      A.  We had a series of meetings with
7  representatives from each of those associations,
8  and we came to a verbal agreement that the state
9  would recognize the published rate and that House
10  Bill 32 as the lowest rate that the pharmacies
11  regularly accepted.  I believe that was AWP minus
12  12 plus $2.50 dispense fee.
13      Q.  Basically the state was saying that
14  they were assuming that the AWP minus 10 was
15  equivalent to the lowest rate accepted by the
16  pharmacies?
17      A.  No, the AWP minus 12.
18      Q.  Sorry, AWP minus 12?
19      A.  Plus the $2.50 dispense fee would be
20  recognized as the lowest rate that they regularly
21  accepted.
22      MR. HENDERSON:  AWP minus 12 or AWP

Page 55

1  minus 16?
2      THE WITNESS:  In 1995.
3      MR. KATZ:  Objection.  I mean, he'll
4  get his chance.
5  BY MR. KATZ:
6      Q.  We are talking about 1994 right now?
7      A.  This is 1995, November of 1995 when
8  House Bill 32 was published is when we were first
9  contacted.
10      MR. HENDERSON:  Okay.  Apologize for
11  the interruption.
12  BY MR. KATZ:
13      Q.  In November of 1995, I believe it was
14  AWP minus 10 and then in -- and then shortly
15  after that it went to AWP minus 12?
16      A.  On November, I think, I believe it was
17  3, 1995, House Bill 32 was published which said
18  that the reimbursement rate was going to change
19  in January from AWP minus 10 plus our variable
20  dispense fee to AWP minus 12 plus a $2.50
21  dispense fee.  The variable dispense fee was
22  going away.  But also in that House Bill and what

Page 56

1  was concerning to the pharmacies was the Most
2  Favored Nation clause where they had to certify
3  that they would not bill Medicaid any more than
4  the lowest rate they regularly accepted.  And
5  because of that Most Favored Nation clause, the
6  pharmacies were concerned they wouldn't be able
7  to live up to that because reimbursement from
8  different insurers changes on a daily basis; and
9  they wouldn't know on any given day when they are
10  submitting a claim what the lowest rate they
11  might accept later in that day was from another
12  insurer.
13      Q.  Was a decision to change the
14  reimbursement to AWP minus 12 percent plus $2.50
15  arrived at in whole or in part based on
16  negotiations with the pharmacy association?
17      MR. HENDERSON:  Objection.
18      MS. WEISSBARD:  She just answered that
19  question.  Objection.  Don't answer it.  You
20  already answered it.
21  BY MR. KATZ:
22      Q.  Well, let me just make sure the record

Page 57

1  is clear.
2      MS. WEISSBARD:  She just said she had a
3  meeting.  They had negotiations, they sat, they
4  talked with associations, the representatives
5  came to the table.  That's it.  Move on.
6      MR. HENDERSON:  I'm not clear on what
7  the question is.  I guess I would prefer some
8  clarification.
9      MS. WEISSBARD:  All right.
10      MR. HENDERSON:  Just so the record is
11  clear.
12  BY MR. KATZ:
13      Q.  Just so the record is clear, the rate
14  was AWP minus 10 percent?
15      A.  Uh-hum.
16      Q.  The New Hampshire Medicaid proposed the
17  Most Favored Nation clause, New Hampshire
18  Medicaid?
19      MS. WEISSBARD:  Is that accurate?
20      THE WITNESS:  No.  New Hampshire
21  Medicaid didn't propose it.  That was a
22  legislative proposal, House Bill 32.

3eda5f7f-7115-47a9-9291-d4198c3ab619

Clifford, Margaret                                    October 29, 2008
                        Concord, NH

Page 154

1  could be, I mean, I'm not sure.  But my
2  understanding, noninnovator would be generic
3  company and you sometimes have generic that's not
4  a multiple source because the brand name or the
5  innovator drug has been removed for the market
6  and is only generic left.
7       Q.  Wasn't quite clear on what a
8  noninnovator, what you're saying a noninnovator
9  multiple source drug is.  Would that be generic
10 drug?
11      A.  Yes.
12      Q.  And an innovator multiple source drug
13 would also be a generic drug?
14      A.  No.  The innovator is the company, the
15 branded product, the first to market.
16      Q.  So it is your understanding that
17 innovator multiple source drug would be a drug
18 under patent?
19      A.  No.
20      Q.  What would it be?
21      A.  It is the brand name that's still
22 available when generics come to the market.

Page 155

1       Q.  Okay.  I understand.  You see that for
2  generic drugs there's a greater difference.  The
3  noninnovator multiple source drugs has greater
4  difference between AWP and actual acquisition
5  cost than the innovator multiple source drugs.
6  Do you see that?
7       A.  Are we talking in this third bullet?
8       Q.  Yes.
9       A.  Yes.
10      Q.  Last bullet point says "pharmacies
11 purchase drugs at estimated discount of 72.1
12 percent below AWP." So that would mean that if
13 the --
14      A.  Only for multiple source drugs with
15 FULs.
16      Q.  Right.
17      A.  Okay, well, you didn't say that.
18      Q.  Okay.  I'll rephrase and I'll ask it
19 again.  For multiple source drugs with FULs,
20 pharmacies purchase the drugs at estimated
21 discount of 72.1 percent below AWP.  That's what
22 the OIG report says, right?

Page 156

1       A.  That's what the report says, yes.
2       Q.  So for multiple source drug with an
3  FUL, on average if the AWP was 100, that would
4  mean on average the actual acquisition cost would
5  be 27.9, right?
6       A.  Yes.
7       Q.  So that would mean that the AWP is more
8  than three times than the -- more than the actual
9  acquisition cost, right?
10      A.  Roughly, yes.
11      Q.  In the next paragraph it says, "Based
12 on the results of our additional analyses, if
13 states continue to use a reimbursement system
14 based on AWP, we recommend that CMS encourage
15 states to consider using a four-tiered
16 reimbursement methodology."
17      Do you know whether or not CMS
18 encouraged New Hampshire to use a four-tiered
19 reimbursement methodology?
20      A.  I do not know.  But we weren't
21 necessarily paying on AWP.  If something had an
22 FUL, we were paying at the FUL.  If there was

Page 157

1  something we had a state MAC at, we were paying
2  at the state MAC.  I mean, if you want to call
3  that a tiered formulary or lesser of formulation,
4  that was in a sense a tiered formulary.
5       Q.  This report shows that drugs, multiple
6  source drugs without FULs -- withdraw that.
7       This report states that noninnovator
8  multiple source drugs without FULs had a 54.2
9  percent difference between AWP and actual
10 acquisition cost, while the difference between
11 AWP and actual acquisition cost for single source
12 innovator drugs was 17.2 percent.
13      Did New Hampshire Medicaid consider
14 using a different methodology for these two types
15 of drugs?
16      A.  Well, for the multiple source drugs
17 that didn't have an FUL, but there were multiple
18 source, we may have had a state MAC.  I mean, you
19 would have to have a specific example to look to
20 know whether or not we did or not.
21      Q.  That wasn't my question.  My question
22 was whether or not, to your knowledge, has New

40 (Pages 154 to 157)

3eda5f7f-7115-47a9-9291-d4198c3ab619

Clifford, Margaret                        October 29, 2008
Concord, NH

Page 174

1     Q.  So New Hampshire then struck a deal
2  with these providers that even if they got paid
3  less, that you would treat the lowest payment as
4  AWP minus 12 percent and $2.50?
5     A.  We had the verbal agreement that we
6  would recognize that as the lowest rate that they
7  regularly accepted.
8     Q.  And what was the reason for entering
9  that agreement with the providers at that time?
10    A.  Because they were arguing that Most
11 Favored Nation, the way it was written as the
12 lowest rate that they regularly accepted, was
13 unenforceable; and that also was a concern that
14 there might be a plan out there that at the time,
15 you know, paid less but was not a popular plan.
16 So on average their reimbursement that they were
17 accepting would have been around AWP minus 12
18 plus the $2.50, but they might have one odd ball
19 here or there that might dip lower than that.
20 And they were concerned that that would expose
21 them to, you know, the state coming back on them
22 after an audit.

Page 175

1     Q.  When they were supposed to report the
2  lowest rate as part of the Most Favored Nations
3  provision, it was just one number; is that
4  correct?
5     A.  It was difficult because of the way the
6  billing system worked we asked for their usual
7  and customary charge.  And the way it was defined
8  in the Most Favored Nation said they wouldn't
9  bill us any more than the lowest rate they
10 regularly accepted which contradicts them billing
11 their usual and customary charge.
12    Q.  Let me see if I can ask a better
13 question because mine was a little unclear.  What
14 I'm asking is you weren't asking them to report
15 separately the payment they received for
16 ingredient costs and payment they received for
17 dispensing fee; you were asking them in total, in
18 the aggregate, what is the lowest that you're
19 receiving for this particular drug; is that
20 correct?
21       MR. HENDERSON:  Objection.
22       THE WITNESS:  No.  We were asking them

Page 176

1  to bill us their lowest rate that they regularly
2  accepted.  And their argument was that that was
3  impossible.  And the way that the point-of-sale
4  billing system is designed, pharmacies submit
5  their usual and customary charge on a claim.  And
6  that's the same no matter who the third-party
7  payer is.
8  BY MR. BERLIN:
9     Q.  Okay.  And you're doing great.  It is
10 totally me.  I'm not making this question clear
11 enough so I just want to try again.
12       When the Most Favored Nations clause
13 was  going to go into effect, was it contemplated
14 by New Hampshire Medicaid that the providers
15 would be reporting one number, which was the
16 number in aggregate for what they were being paid
17 or reimbursed for dispensing that NDC, or did you
18 want them to break it down into the ingredient
19 costs and separately the dispensing fee?
20       MR. HENDERSON:  Objection.
21       THE WITNESS:  The Most Favored Nation
22 was put in as a legislative change, and I don't

Page 177

1  believe anybody from the department had any input
2  on that.  To my knowledge, nobody -- I did not
3  have any input on that.  It was a legislative
4  mandate so I would have to say no on that.
5  BY MR. BERLIN:
6     Q.  No as -- I'm unclear as to what you're
7  answering no.  Could you clarify that?
8     A.  Well, you asked me did the department,
9  was the department asking the pharmacies to
10 submit -- I don't know.  Can you repeat your
11 question?
12    Q.  Let me -- I'm sorry we're spending so
13 much time on this but I think I can clarify it
14 for you.
15       My real question is:  When you were
16 expecting the pharmacies to provide a number to
17 you as in their most favored payment, did you
18 expect that they would be giving you one number;
19 or did you expect that they would break down
20 estimated acquisition costs -- or excuse me --
21 the ingredient cost and separately the dispensing
22 fee that they were being paid?

45 (Pages 174 to 177)