# EXHIBIT 105

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

---------------------------------X

IN RE: PHARMACEUTICAL INDUSTRY    ) MDL NO. 1456

AVERAGE WHOLESALE PRICE           ) CIVIL ACTION:

LITIGATION                        ) 01-CV-12257-PBS

---------------------------------X

THIS DOCUMENT RELATES TO          )

ALL CLASS ACTIONS                 )

---------------------------------X


VIDEOTAPED DEPOSITION OF THE NEW JERSEY DEPARTMENT

OF HUMAN SERVICES by EDWARD J. VACCARO


C O M P U T E R I Z E D   T R A N S C R I P T

of the stenographic notes of the proceedings in the

above-entitled matter as taken by and before MARY T.

NOVAK, a Certified Shorthand Reporter and Notary

Public of New Jersey, at the U.S. Attorney's Office,

402 East State Street, Trenton, New Jersey on

Tuesday, December 2, 2008 commencing at fifteen

minutes after nine o'clock in the forenoon.

|  | Page 2 |  | Page 4 |
|---|---|---|---|
| 1 | A P P E A R A N C E S | 1 | I N D E X |
| 2 |  | 2 |  |
| 3 | Attorneys for United States and United States ex | 3 | WITNESS: EDWARD J. VACCARO        PAGE |
| 4 | rel. Ven-a-Care of the Florida Keys v. Abbott | 4 | EXAMINATION BY MS. YAVELBERG.............. 009 |
| 5 | Laboratories, Inc., Dey Labs and Roxane | 5 | EXAMINATION BY MR. KIM.................... 181 |
| 6 | UNITED STATES DEPARTMENT OF JUSTICE | 6 |  |
| 7 | BY: JAMIE ANN YAVELBERG, ESQ. | 7 |  |
| 8 | Commercial Litigation Branch | 8 | E X H I B I T S |
| 9 | Ben Franklin Station, P.O. Box 261 | 9 | NUMBER         DESCRIPTION         PAGE |
| 10 | Washington, D.C. 20044 | 10 | Exhibit Vaccaro 001 - Subpoena................. 013 |
| 11 | (202) 514-6514 | 11 | Exhibit Vaccaro 002 - Federal Register, Vol. 52, |
| 12 | jamie.yavelberg@usdoj.gov | 12 | No. 147, Friday, July 21, |
| 13 |  | 13 | 1987 / Rules and |
| 14 | Attorney for the State of New Jersey and | 14 | Regulations.............. 035 |
| 15 | Edward J. Vaccaro | 15 | Exhibit Vaccaro 003 - Chapter 51, Pharmaceutical |
| 16 | STATE OF NEW JERSEY | 16 | Services, Division of |
| 17 | BY: ZOE J. McLAUGHLIN, ESQ., | 17 | Medical Assistance And |
| 18 | DEPARTMENT OF LAW & PUBLIC SAFETY | 18 | Health Services |
| 19 | 25 Market Street | 19 | Pharmaceutical Services |
| 20 | Trenton, New Jersey  08625 | 20 | Manual N.J.A.C. 10:51 |
| 21 | (609) 341-3689 | 21 | dated January 20th, 2004. 041 |
| 22 | zoe.mclaughlin@law.dol.lps.state.nj.us | 22 | (CONTINUED) |

|  | Page 3 |  | Page 5 |
|---|---|---|---|
| 1 | A P P E A R A N C E S  (CONTINUED) | 1 | E X H I B I T S  (CONTINUED) |
| 2 |  | 2 | NUMBER         DESCRIPTION         PAGE |
| 3 | Attorneys for Dey, LP and Dey, Inc. | 3 | Exhibit Vaccaro 004 - Attachment 4.19B......... 051 |
| 4 |  | 4 | Exhibit Vaccaro 005 - Department of Health and |
| 5 | KELLEY DRYE & WARREN, LLP | 5 | Human Services document |
| 6 | BY:  SUNG W. KIM, ESQ., | 6 | dated August 12, 1994 |
| 7 | 101 Park Avenue | 7 | from Director, Medicaid |
| 8 | New York, New York  10178 | 8 | Bureau................... 097 |
| 9 | (212) 808-7962 | 9 | Exhibit Vaccaro 006 - Memorandum dated December |
| 10 | sukim@kelleydrye.com | 10 | 6, 1996 from Michael |
| 11 |  | 11 | Mangano for June Gibbs |
| 12 |  | 12 | Brown.................... 123 |
| 13 | APPEARING TELEPHONICALLY | 13 | Exhibit Vaccaro 007 - Letter dated January 1996 |
| 14 |  | 14 | to Edward Vaccaro on the |
| 15 | Attorneys for Abbott Laboratories | 15 | letterhead of Dey |
| 16 |  | 16 | Laboatories.............. 140 |
| 17 | JONES DAY | 17 | Exhibit Vaccaro 008 - United States First |
| 18 | BY: ERIC P. BERLIN, ESQ., | 18 | Amended Complaint........ 147 |
| 19 | 77 West Wacker Drive | 19 | Exhibit Vaccaro 009 - United States' Complaint, |
| 20 | Chicago, Illinois  60601 | 20 | United States District |
| 21 | (312) 269-4117 | 21 | Court, District of |
| 22 |  | 22 | Massachusetts............ 150 |

Page 6

## EXHIBITS (CONTINUED)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit Vaccaro 010 | Graph entitled Figure 1: Abbott's FDB Direct Price vs. Abbott's Direct Average Price for Vancomycin | 153 |
| Exhibit Vaccaro 011 | Reimbursement Comparison Worksheet | 165 |
| Exhibit Vaccaro 012 | Notice of Subpoena | 182 |
| Exhibit Vaccaro 013 | Subpoena Duces Tecum | 185 |
| Exhibit Vaccaro 014 | New Jersey Medicaid Agency Organizational Chart | 187 |
| Exhibit Vaccaro 015 | Letter from the Northern Medicaid Pharmacy Administrators Association to HCFA dated September 16, 1985 | 229 |
| Exhibit Vaccaro 016 | Letter to Health Care Financing Administration from Alvin N. Geser | 271 |

Page 7

## EXHIBITS (CONTINUED)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit Vaccaro 017 | News Release from the American Pharmaceutical Association dated September 27, 1985 | 278 |
| Exhibit Vaccaro 018 | State Plan of New Jersey | 298 |
| Exhibit Vaccaro 019 | Newsletter dated March 11, 1991, Bates stamped JN-AWP-00000743 | 305 |
| Exhibit Vaccaro 020 | MC6 Claim Form Bates stamped NJ-AWP-00000533 | 315 |

Page 8

            PROCEEDINGS

    THE VIDEOGRAPHER:  We are here today, December 2nd, 2008 for the videotape deposition of Edward Vaccaro.
    This deposition is being taken in the matter of the Pharmaceutical Industry Average Wholesale Price Litigation which is filed in the Superior Court, the United States Superior Court, District of Massachusetts.
    I am the videographer, Daniel Grbich, and I represent Henderson Legal Services.  The court reporter is Mary Novak of Henderson Legal Services.  At this time will counsel please announce their appearance for the record.
    MS. McLAUGHLIN:  Zoe McLaughlin, Deputy Attorney General.  I represent the witness.
    MS. YAVELBERG:  Jamie Ann Yavelberg, United States Department of Justice.
    MR. KIM:  Sung W. Kim representing the Dey entities.
    MR. BERLIN:  Eric Berlin representing

Page 9

Abbott Laboratories.
    THE VIDEOGRAPHER:  The time is now 9:17.  Will the court reporter please swear in the witness.

    E D W A R D  J.  V A C C A R O,
10 Wagonwheel Drive, Frenchtown, New Jersey 08825, having been duly sworn testifies as follows:

            EXAMINATION
BY MS. YAVELBERG:
    Q.  Good morning, Mr. Vaccaro.  I represent the United States and United States ex rel. Ven-a-Care of the Florida Keys v. Abbott Laboratories, Dey Labs and Roxane and their associated entities which is otherwise known as the In Re:  Pharmaceutical Industry Wholesale Price Litigation in which those three companies are defendants.
    Mr. Vaccaro, do you understand that you are testifying under oath today?

3 (Pages 6 to 9)

Page 90

1  drug association met with you or met with the
2  Department of Human Services, did they also
3  indicate to you that they were speaking with
4  state legislators?
5      A.  Oh, absolutely.  Absolutely.  In fact,
6  they can identify the ones they were targeting.
7         MS. YAVELBERG:  Thank you.  We'll take
8  a short break.
9         THE VIDEOGRAPHER:  The time is now
10 10:33.  We're going off the video record.
11           (A recess is taken.)
12        THE VIDEOGRAPHER:  The time is now
13 10:47.  This begins videotape number 2 of the
14 videotape deposition.  You may proceed.
15 BY MS. YAVELBERG:
16     Q.  In addition to drug ingredient cost,
17 Mr. Vaccaro, is there another portion of
18 reimbursement for pharmacy claims?
19     A.  Yes.
20     Q.  And what is that?
21     A.  The dispensing fee.
22     Q.  And what is the actual amount of the

Page 91

1  New Jersey dispensing fee?
2      A.  There's a base dispensing fee amount of
3  373 and then there are three add-on components
4  that bring it up to a total of, well, until prior
5  to this year 407.
6      Q.  And when you say 373, is that $3.73?
7      A.  Correct.
8      Q.  And when you say 407, is that $4.07?
9      A.  Yes.
10         MS. YAVELBERG:  Can we take a moment to
11 go off the record.
12         THE VIDEOGRAPHER:  The time is now
13 10:47.  We're going off the video record.
14         MS. YAVELBERG:  This is a fax for me.
15            (Off the record.)
16         MS. YAVELBERG:  We're ready to go back
17 on.
18         THE VIDEOGRAPHER:  Ready to proceed.
19 The time is now 10:51.  We're back on the video
20 record.
21 BY MS. YAVELBERG:
22     Q.  So, Mr. Vaccaro, we were just talking

Page 92

1  about the New Jersey dispensing fee?
2      A.  Yes.
3      Q.  You mentioned that there's a base rate
4  of $3.73 and then I think you referred to
5  something called add-ons?
6      A.  Yes.
7      Q.  What are add-ons?
8      A.  There are three add-ons.  One is an
9  impact allowance that some additional dispensing
10 fee provided to pharmacies who are in high
11 Medicaid areas.  Another add-on is for 24 hour
12 emergency dispensing and the third add-on is for
13 patient consultation services.
14     Q.  And you said that the maximum
15 dispensing fee was $4.07?
16     A.  Prior to this budget year.
17     Q.  And this budget year, what did it
18 change to?
19     A.  I believe it's 3.99.
20     Q.  And so the combination of the impact
21 area, the 24 hour, and the patient consultation
22 could raise the pharmacy's dispensing fee from

Page 93

1  $3.73 to $4.07 until just this year which you
2  think it was reduced to $3.99?
3      A.  Correct.
4      Q.  Is that correct?  And how did a
5  pharmacy apply for or get the add-ons?
6      A.  Again, the FD 70 document was
7  communicated to pharmacies and they would come
8  back to us with an indication as to whether or
9  not they were in an impact area, whether they
10 provided patient consultation, and whether they
11 provided 24 hour emergency services.
12     Q.  And this FD 70 that you referred to,
13 was that also used for the volume, the
14 certification as to annual volume?
15     A.  That's correct.
16     Q.  The same form?
17     A.  Yes.
18     Q.  And that's annually?
19     A.  That's annually, yeah.
20     Q.  And how, the $3.73 base rate, how long
21 has that been the New Jersey base rate for the
22 dispensing fee?

24 (Pages 90 to 93)

Page 94

1   A.  Over 20 years.
2   Q.  And how is the dispensing fee -- where
3   is the dispensing fee written down?
4   A.  In New Jersey Administrative Code
5   10:51.
6   Q.  And if you could take a look at Exhibit
7   3 which we've already marked.  And flip to Page
8   9, Section 1.7.
9       MR. KIM:  I'm sorry.  Page 9?
10      MS. YAVELBERG:  Page 9.
11      THE WITNESS:  The back side.
12      MS. YAVELBERG:  You need Exhibit 3.
13      MS. McLAUGHLIN:  It would be that one.
14      MR. KIM:  This one, okay.
15  Q.  Exhibit 3, Page 9, 10:51, Section 1.7,
16  Prescription Dispensing Fee.
17      Do you see that there, Mr. Vaccaro?
18  A.  Yes.
19  Q.  And does this portion, Section 1.7 of
20  the New Jersey Code reflect the dispensing fee
21  for the State of New Jersey?
22  A.  Yes, it does.

Page 95

1   Q.  And does this also reflect these add-
2   ons that you were referring to?
3   A.  Yes, it does.
4   Q.  Can DMAHS administratively change that
5   dispensing fee if it wants to?
6   A.  No.
7   Q.  If pharmacists complained -- I'm sorry?
8   A.  Let me amend that prior answer.
9   Q.  Please do.
10  A.  DMAHS, like any of the divisions within
11  state government, have the ability or the right
12  to go to the register and change regulations.
13  There would be no support for a change of
14  regulations that impacted reimbursement unless it
15  got the full support of the department and the
16  Governor's Office.
17  Q.  So DMAHS --
18  A.  Has the ability to go to the register
19  for the purpose of changing regulations.  For
20  example, this document is due for sunset.  It has
21  established regulations to keep it going after
22  January 20th of next year.  It would not move

Page 96

1   forward regulations that would impact
2   reimbursement unless it had the full support of
3   the Department of Human Services or the
4   Governor's Office.
5   Q.  So it could propose, it could make
6   proposals?
7   A.  Yes.  It can do proposals, yes.
8   Q.  But it can't make the change without
9   the full support --
10  A.  That's correct.
11  Q.  -- of the department and the Governor's
12  Office?
13  A.  That's correct.
14  Q.  Thank you for that clarification.  If
15  pharmacists complained that overall reimbursement
16  was too low and the dispensing fee needed to be
17  raised to make up the shortfall, could DMS do
18  that on its own?
19  A.  No.
20  Q.  How does the New Jersey dispensing fee
21  compare to the dispensing fees of other states?
22  A.  It's generally higher than other

Page 97

1   states.
2       MS. YAVELBERG:  I'd like to mark this
3   next document as Exhibit 5.
4       (A document entitled Department of
5   Health and Human Services dated August 12, 1994
6   from Director, Medicaid Bureau is received and
7   marked as Exhibit Vaccaro 005 for
8   identification.)
9   Q.  Mr. Vaccaro, I'm handing you a document
10  marked as Exhibit 5.  It is dated August 12, 1994
11  and the heading is Department of Health and Human
12  Services.  It's from the Director, Medicaid
13  Bureau.  Subject:  Expiration of Pharmacy
14  Reimbursement Moratorium Information to All
15  Associate Regional Administrators Division of
16  Medicaid.
17      Do you see that there?
18  A.  Yes, I do.
19  Q.  I'd like you to look on the back side
20  of this document and look at the paragraph near
21  the bottom which starts at "we would also
22  clarify".

Page 170

1  they contain spreads that might be in the range
2  of a thousand percent.
3      A.  Yes.
4          MR. KIM:  Objection to form.
5      A.  Yes.
6      Q.  Do you agree that's what those
7  Complaints, at least, represented?
8      A.  Yes.
9          MR. KIM:  Objection to form.
10     Q.  Now, did New Jersey know that the
11 spreads that are claimed in those Complaints that
12 Abbott and Dey and Roxane may have had were as
13 much as a thousand percent?
14         MR. KIM:  Objection to form.
15     A.  For certain products we were aware of a
16 significant difference between possible
17 acquisition costs and AWP.
18     Q.  And if I draw your attention back to
19 Exhibit 6, which is the 1996 Office of Inspector
20 General Report.  And the third paragraph on the
21 front page of that document.
22     A.  Yes.

Page 171

1      Q.  Is there a discussion about the
2  differences between acquisition cost and average
3  wholesale price in New Jersey pharmacies?
4      A.  Yes.
5      Q.  And what was the difference there?
6      A.  Depending upon the type of drug for
7  generic it was 18.3 percent and for brands it
8  was, I'm sorry, other way around.  For brands it
9  was 18.3 percent and generics was 42.5 percent.
10     Q.  And what about specifically for New
11 Jersey?
12         THE REPORTER:  I'm sorry.  18 point --
13         THE WITNESS:  18.3 percent for brands.
14 And 42.5 percent for generics.
15         That was a national estimate.  For New
16 Jersey it was 19.8 percent for brand and 39.9
17 percent for generics.
18     Q.  And we've already looked at the last
19 two pages of this document which represent the
20 New Jersey --
21     A.  Right.
22     Q.  -- letter in response to that report,

Page 172

1  correct?
2      A.  Correct.
3      Q.  And is this, the differences between
4  acquisition price and average wholesale price
5  represented in this report, is that consistent
6  with what New Jersey knew at that time?
7      A.  Yes.
8      Q.  Now, does New Jersey have any way, have
9  a way of knowing from the prices that are listed
10 in the First DataBank database which ones might
11 have AWPs that are more than, for example, the
12 39.9 percent for generic drugs?
13     A.  No.
14         MR. KIM:  Objection to form.
15     Q.  And which ones may not --
16         MS. YAVELBERG:  I'm sorry.  What was
17 the objection?
18         MR. KIM:  It's, first of all, vague.
19 Are you talking about particular drugs?
20         MS. YAVELBERG:  No.  Let me try to
21 rephrase the question.
22         MR. KIM:  Please do.

Page 173

1      Q.  Now, I think you testified earlier that
2  New Jersey used the First DataBank drug reference
3  file; is that correct?
4      A.  Correct.
5      Q.  And New Jersey covers about 50,000
6  drugs?
7      A.  Correct.
8      Q.  So based on the drug reference file
9  that New Jersey used for, and it did use for
10 reimbursement purposes; is that correct?
11     A.  Correct.
12     Q.  Did New Jersey have any way of knowing,
13 from the database that it received, which AWPs in
14 the database might exceed the, for example, 39.9
15 percent that's listed in this OIG report?
16     A.  No, we did not.
17     Q.  Could you tell from looking at the
18 database?
19     A.  No.
20     Q.  If a manufacturer reported inflated
21 prices to First DataBank --
22         MR. KIM:  Objection to form.

Page 238

1   Q.  So what I'm asking is, as long as it's
2   approved in the State Plan, the states have the
3   authority to propose state plans, would you
4   agree?
5   A.  Yes.
6   Q.  And part of the State Plan proposals
7   include reimbursement methodology?
8   A.  Yes.
9   Q.  Correct?
10  A.  Yes.
11  Q.  And choosing a benchmark such as WAC or
12  AWP is within the power of the states to do so
13  within the State Plan; is that correct?
14  A.  Yes.
15      MS. YAVELBERG:  Objection.  Form.
16  Q.  And different states have the ability
17  to do this; is that correct?
18  A.  That's correct.
19  Q.  And each state had to set its
20  reimbursement rates high enough to insure an
21  adequate number of providers that participate in
22  the program; is that correct?

Page 239

1       MS. YAVELBERG:  Objection.  Form.
2   A.  Correct.
3   Q.  Actually, let's stick with that same
4   exhibit.  The first paragraph that I read to you
5   on the second page says, "without incurring the
6   wrath of National Pharmacy Associations."
7       Do you see that?
8   A.  Yes.
9   Q.  During your time at Medicaid -- I'm
10  sorry.  Let me clarify it.
11      During the 1990's, was that a concern
12  to not incur the wrath of National Pharmacy
13  Associations when you were developing
14  reimbursement methodology?
15      MS. YAVELBERG:  Objection.  Form.
16  A.  I think there was a strategy
17  implemented by the agency starting in the early
18  90's and forward that brought interested parties,
19  advocates to the table before they made decisions
20  that impacted, for example, reimbursement.
21  Q.  When you say agency, which --
22  A.  Advocates.  We're talking about whether

Page 240

1   it be beneficiary advocacy groups or if we were
2   going to somehow impose changes on eligibility.
3       In the case of pharmacy we brought the
4   associations to the table, including Pharma, when
5   it was appropriate to do so, for the purpose of
6   taking in their recommendations regarding
7   reimbursement.  For example, if we were proposing
8   a certain level of reimbursement that we knew
9   would be antagonistic we would ask them for their
10  own proposals as alternatives to a change in
11  reimbursement if indeed a goal was to save
12  dollars.  That kind of thing.
13      So what I think you're looking at here
14  is in the 90's our efforts to try and, you know,
15  reduce the rhetoric, if you will, from the
16  various professional organizations, state or
17  national, they would bring their national
18  advocates in with them.  Okay.  And to try and
19  work things out with interested parties ahead of
20  time before we put something in place.
21  Q.  Okay.  It says National Pharmacy
22  Associations.

Page 241

1   A.  Right.
2   Q.  To your knowledge, they don't include
3   manufacturers; is that correct?
4   A.  (No verbal response.)
5   Q.  When you've heard the term National
6   Pharmacy Associations, have you typically
7   included manufacturers as part of that group of
8   National Pharmacy Associations?
9   A.  No.
10      MR. KIM:  Thank you.  Mark another
11  exhibit.  This was previously marked as Dey-81,
12  Exhibit Dey-81.
13      I think I'm just going to hand this to
14  the witness.  We don't have to remark it, right?
15      THE REPORTER:  No.
16      MR. KIM:  Okay.
17  Q.  This is a section of the CFR, Subpart
18  B, Payments for Services.  And Section 447.204
19  and it says, the brief title is Encouragement of
20  Provider Participation.  Are you familiar with
21  this regulation?
22  A.  Yes.

61 (Pages 238 to 241)