# EXHIBIT 116

Page 323

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

------------------------------X

In re: PHARMACEUTICAL            ) MDL No. 1456

INDUSTRY AVERAGE WHOLESALE       ) Civil Action No.

PRICE LITIGATION                 ) 01-12257-PBS

------------------------------X

THIS DOCUMENT RELATES TO:        ) Hon. Patti B. Saris

United States of America         )

ex rel. Vena-A-Care of the       )

Florida Keys, Inc.,              )

v. Dey, Inc., et al., Civil      )

Action No. 05-11084-PBS          )

------------------------------X


Continued Videotaped Deposition Of

THE STATE OF NEW JERSEY DEPARTMENT

OF HUMAN SERVICES by EDWARD J. VACCARO


DECEMBER 3, 2008

TRENTON, NEW JERSEY

9:04 A.M.

Page 352

1  that it is entirely permissible for states to use
2  EAC to compensate pharmacists for inadequate
3  dispensing fees; correct?
4         MS. YAVELBERG: Objection, form.
5         THE WITNESS: Repeat the question,
6  please.
7         MR. KIM: Sure.
8  BY MR. KIM:
9     Q. In 1992, based on your review of this
10 document, the Appeals Board is saying in this
11 decision that it's entirely permissible for
12 States to use the estimated acquisition cost, the
13 ingredient cost portion to compensate pharmacists
14 for inadequate dispensing fees?
15        MS. YAVELBERG: Objection, form.
16 BY MR. KIM:
17    Q. Do you agree or not agree?
18    A. I agree with the statement, yeah.
19    Q. Okay. And this statement is binding on
20 HCFA?
21        MS. YAVELBERG: Objection, form.
22 BY MR. KIM:

Page 353

1     Q. Do you agree --
2     A. That's correct.
3     Q. -- or not agree?
4     A. I agree.
5     Q. Do you also agree that the 1994 letter
6  that you were shown earlier does not address the
7  separate question of whether a State could pay
8  above an appropriately determined EAC to
9  compensate for inadequate dispensing fees?
10        MS. YAVELBERG: Objection, form.
11        THE WITNESS: I agree.
12        MR. KIM: Like to mark this as -- as
13 the next exhibit.
14        (Exhibit Vaccaro 024, multipage
15 document, the first page of which is entitled
16 medicaid Action Transmittal dated September 1984,
17 is marked for identification.)
18 BY MR. KIM:
19    Q. Do you need a second to review the
20 document?
21    A. Yes, please.
22    Q. Sure.

Page 354

1         (Reviewing document.)
2     A. Okay. Thank you.
3     Q. Okay. This appears to be a September,
4  1984 Medicaid transmittal attaching an OIG report
5  from June, 1994.
6         MS. YAVELBERG: September.
7         MR. KIM: The -- the transmittal is
8  September; right? There was a date on this
9  document.
10 BY MR. KIM:
11    Q. Well, all right. So let's just say
12 1984 OIG report. The Medicaid trans --
13 transmittal -- action transmittal number is 84-
14 12.
15        Do you see that, sir.
16    A. Yes, I do.
17    Q. It's on the front page.
18        And the OIG report is titled Changes To
19 The Medicaid -- second page -- Changes To The
20 Medicaid Prescription Pro -- Prescription Drug
21 Program Could Save Millions.
22        Do you see that, sir.

Page 355

1     A. Yes.
2     Q. Would you turn to Page 3?
3         In the -- the first paragraph there is
4  a sentence, I think it's the fourth one down
5  where it starts with "AWP means," do you see
6  that.
7     A. Yes.
8     Q. Okay. Could you just read that
9  sentence, sir?
10    A. Does that sentence start with the word
11 "Currently?"
12    Q. No, it's the one right below it.
13    A. "AWP means non-discounted list price.
14 Pharmacies purchase drugs at prices that are
15 discounted significantly below AWP or list price.
16 Because of the widespread use of AWP by State
17 Medicaid agencies, however, the Medicaid program
18 does not receive any benefit from these
19 discounts."
20    Q. Okay. That's fine.
21        Now, if you turn to Page 4, the -- the
22 third paragraph, could you just read the -- the

9 (Pages 352 to 355)

Page 412

1   the -- let's go to the -- the third -- the second
2   full paragraph first.
3        So if you read that paragraph, Thomas
4   Russo is proposing a discount cutoff from $24.99
5   to $34.99 which will result in savings of an
6   additional hundred thousand dollars.
7        Do you see that, sir.
8     A. Yes, I do.
9     Q. And when he talks -- when he's talking
10  about discount cutoff, and I believe you
11  testified about this yesterday, he's talking
12  about the -- the dollar amount of the total
13  prescription that's submitted for reimbursement;
14  is that correct?
15    A. Correct.
16    Q. And the cutoff being that if it's
17  under, at this time, $24.99, you would be
18  reimbursed at the full AWP without a discount?
19        MS. YAVELBERG: Objection, form.
20        THE WITNESS: I'm trying to think.
21  BY MR. KIM:
22    Q. I could restate the question if you

Page 413

1   don't understand it.
2     A. I believe the discount applied only to
3   claims up to a $25 cap.
4     Q. Right. So if it was under $25.00, then
5   there would be no discount --
6     A. Correct.
7         MS. YAVELBERG: Objection, form.
8   BY MR. KIM:
9     Q. Okay. So what he's proposing here, Mr.
10  Russo, to HCFA is to raise the discount cap from
11  the 24.99 to 34.99?
12    A. That's correct.
13    Q. Okay. He's also proposing to revise
14  the discount structure and here used the -- he's
15  using the term structure, I just want you to take
16  note of that, to expand the range to 1 point -- 1
17  percent to 10 percent from its current level 0
18  percent to 6 percent.
19        So the 0 percent to 6 percent, as you
20  understand, is the discount off of AWP; is that
21  correct.
22    A. Correct.

Page 414

1     Q. So what he's proposing here is to raise
2   the discount from 0 percent to 6 percent to 1
3   percent to 10 percent; correct?
4     A. Correct.
5     Q. And when he's talking about the
6   discount structure, he's talking about the
7   discount off of AWP; is that correct?
8     A. Correct.
9     Q. Okay. Now, if you just go -- skip a
10  paragraph and go to the paragraph that starts
11  with: While -- while I believe, the second
12  sentence he says, "I expect strong resistance
13  from the provider community and a long and
14  arduous negotiation."
15        What does he mean by negotiation.
16    A. As I indicated in testimony yesterday,
17  we often, even back in the '80s, I would imagine,
18  we often sat across the table from professional
19  organizations in the State, professional pharmacy
20  organizations, to discuss our intentions
21  regarding changes in -- typically reimbursement,
22  and this is an example of that.

Page 415

1     Q. Okay. And this is prior to Medicaid
2   agencies submitting a State plan for approval?
3     A. Yes.
4     Q. Okay. And it is the Medicaid agency
5   that's responsible for submitting the State plan
6   for approval? Who submits --
7     A. The Department of Human Services is
8   designated as the payor -- as the -- as the
9   receiver of the funds from CMS. The Division is
10  responsible for moving up the chain, if you will,
11  any proposals that ultimately result in a change
12  of regulations and/or the State plan to the
13  Commissioner for his or her signature.
14    Q. I see. Okay.
15    A. I'm -- single State agency is the word
16  I'm thinking of, that's what the department is.
17    Q. And you mentioned yesterday that the
18  Appropriations Act is a legislative -- it's a
19  legislation that is created by the -- the State
20  legislature or --
21    A. Yes.
22    Q. -- the State Governor's office? Okay.

24 (Pages 412 to 415)

Page 492

1  industry came to the plate and said, well, you
2  know, we'll end up -- we'll -- we'll pay more
3  taxes on the corporate side so that you don't put
4  a PDL out there, preferred drug list.
5      Q.  Okay.
6      A.  That's an example of the kind of
7  negotiation that takes place in the big picture.
8      Q.  Okay.
9      A.  And it has an impact on decisions
10 relative to prescription prices and Medicaid.
11     Q.  Okay.  So point taken, but I think my
12 question was a little bit more narrower when I
13 asked for sound policy reasons behind the, you
14 know, the different methodology with respect to
15 generics.
16         The reimbursement rate proposal, and if
17 we can just focus on that --
18         MS. YAVELBERG:  Objection, form.
19         THE WITNESS:  I need a better
20 understanding of what you're asking.  I really
21 don't understand what you're asking for.
22 BY MR. KIM:

Page 493

1      Q.  Okay.  Well, let me -- all right.  I'll
2  -- I'll rephrase the question.
3          So you testified, you know, just --
4  just before that there were greater margin
5  percentages between AWP and actual acquisition
6  costs for generics than there are for brands;
7  correct.
8      A.  Correct.
9      Q.  And the AWP for brands tend to be
10 higher than the AWP for generics; correct?
11         MS. YAVELBERG:  Objection, form.
12         THE WITNESS:  Correct.
13 BY MR. KIM:
14     Q.  Okay.  So by maintaining -- and I'm --
15 I'm asking whether this was a policy reason,
16 whether it was a factual actual policy reason,
17 but if you maintained the same reimbursement
18 rates for both generics and brands, would you
19 expect providers -- would that encourage
20 providers to dispense more generics?
21     A.  As it does today, yes.
22     Q.  Okay.  And that ultimately saves New

Page 494

1  Jersey Medicaid money?
2          MS. YAVELBERG:  Objection, form.
3  BY MR. KIM:
4      Q.  Correct?
5      A.  Only if there's a -- two different
6  reimbursement rates for generic and brand,
7  otherwise it...
8      Q.  If -- I'm sorry.  Let me -- let me
9  clarify that.
10     A.  You know what I'm getting at.  You have
11 to have the policy change first.
12     Q.  Well, let me -- let me clarify -- no,
13 what I mean was:  If you have the same
14 reimbursement rate for brands and generics --
15     A.  Uh-huh.
16     Q.  -- and that en -- that those encourage
17 providers to dispense more generics than brands -
18 -
19     A.  Yes, it does.
20     Q.  -- having providers dispense more
21 generics than brands ultimately saves New Jersey
22 Medicaid more money?

Page 495

1      A.  Because generics are less costly than
2  brands, yes.
3      Q.  Now, during this time -- actually,
4  strike that.
5          Let's go to Page 2 of the report, sir.
6          And if you look at the -- under this,
7  there's only one section, it's called Scope and
8  if you look at the second paragraph, sir -- let
9  me see if you're on the right page.  Looking at
10 the --
11     A.  Oh, of the report itself?
12     Q.  Yeah.
13     A.   Okay.  Go ahead.
14         Okay.  I'm there.
15     Q.  Okay.  So in the second paragraph it
16 says, "Our review was limited to ingredient costs
17 and did not address other areas such as the
18 effect Medicaid business as a con -- contribution
19 to other store sales, the cost to provide
20 professional services other than dispensing a
21 prescription such as therapeutic interventions,
22 patient education, and patient -- physician

Page 648

1  acquisition costs were at a discount that was
2  higher --
3      A.  Yeah.
4      Q.  -- off of AWP than the discount that
5  New Jersey used off of AWP; right?
6      A.  Yes, Eric, I would agree with that.
7          THE VIDEO TECHNICIAN:  There are --
8  BY MR. BERLIN:
9      Q.  And New Jersey --
10         THE VIDEO TECHNICIAN:  Sorry.  This is
11 the videographer.  There are two minutes
12 remaining.
13         MR. BERLIN:  Well, let's break right
14 here.
15         THE WITNESS:  Okay.
16         THE VIDEO TECHNICIAN:  Okay.
17         MR. KIM:  Great.
18         THE VIDEO TECHNICIAN:  This concludes
19 Tape Number 6 of the video deposition of Edward
20 Vaccaro.  The time is 4:18.  We are off the
21 record.
22         THE VIDEO TECHNICIAN:  This is the

Page 649

1  beginning of Tape Number 7 of the video
2  deposition of Edward Vaccaro.  The time is 4:25
3  p.m.  We are on the record.
4  BY MR. BERLIN:
5      Q.  Mr. Vaccaro, relating back to the three
6  reports that we just discussed the '84, '96 and
7  '02 reports, did New Jersey increased its
8  discounts off of AWP to match the discounts that
9  were in those OIG reports?
10     A.  I'm sure knowledge of those reports
11 contributed to the process that led to those
12 changes, yes.
13     Q.  But they didn't actually increase the
14 discounts to match the discounts that were
15 reflected in the reports; right?
16     A.  In the testimony in the past couple
17 days I've indicated the time frames for changes
18 in discounts, and to the extent that they relate
19 to when the reports came out, they may have
20 played a role in support offered -- in supporting
21 a change at those times to the volume discount.
22     Q.  Well, New Jersey Medicaid accepted the

Page 650

1  validity of the numbers in those reports; right?
2      A.  Yes, they did.
3      Q.  And what is the discount off of AWP
4  right now in 2008?
5      A.  It's AWP less 15 percent.
6      Q.  So the less 15 percent is still not as
7  great a discount off of AWP as the AWP minus 16
8  percent that was shown in the 1984 report 24
9  years ago; right?
10     A.  You -- you are correct.
11     Q.  So during that period of time, the last
12 24 years, New Jersey has known that it is paying
13 Medicaid ingredient cost payments that are
14 greater than the actual acquisition costs found
15 in those OIG reports; right?
16         MS. YAVELBERG:  Objection, form.
17         THE WITNESS:  Yes.
18 BY MR. BERLIN:
19     Q.  And is there any particular reason why
20 New Jersey has done that other than that some of
21 these rates were made as a point of compromise
22 with providers?

Page 651

1      A.  Your explanation is -- is the primary
2  reason for not being able to move more
3  aggressively in changing discounts rates.
4      Q.  In other words, you would say the sole
5  reason is that providers have stepped in and
6  prevented New Jersey from moving the rates to
7  more accurately reflect the discounts off of AWP
8  shown in those OIG reports?
9      A.  Yes.
10         MS. YAVELBERG:  Objection, form.
11         THE WITNESS:  Yes, that is correct.
12 BY MR. BERLIN:
13     Q.  Well, if it's the provider pressure
14 that prevented New Jersey from changing its
15 discounts off of AWP to reflect the discounts in
16 the OIG reports, can you think of any reason why
17 manufacturers should be held liable for that
18 differential?
19         MS. YAVELBERG:  Objection, form.
20         THE WITNESS:  I don't think I'm going
21 to offer an opinion on that.  I'm not too sure if
22 I know enough about manufacturers' price setting

83 (Pages 648 to 651)

Page 90

 1  drug association met with you or met with the
 2  Department of Human Services, did they also
 3  indicate to you that they were speaking with
 4  state legislators?
 5      A.  Oh, absolutely.  Absolutely.  In fact,
 6  they can identify the ones they were targeting.
 7          MS. YAVELBERG:  Thank you.  We'll take
 8  a short break.
 9          THE VIDEOGRAPHER:  The time is now
10  10:33.  We're going off the video record.
11              (A recess is taken.)
12          THE VIDEOGRAPHER:  The time is now
13  10:47.  This begins videotape number 2 of the
14  videotape deposition.  You may proceed.
15  BY MS. YAVELBERG:
16      Q.  In addition to drug ingredient cost,
17  Mr. Vaccaro, is there another portion of
18  reimbursement for pharmacy claims?
19      A.  Yes.
20      Q.  And what is that?
21      A.  The dispensing fee.
22      Q.  And what is the actual amount of the

Page 91

 1  New Jersey dispensing fee?
 2      A.  There's a base dispensing fee amount of
 3  373 and then there are three add-on components
 4  that bring it up to a total of, well, until prior
 5  to this year 407.
 6      Q.  And when you say 373, is that $3.73?
 7      A.  Correct.
 8      Q.  And when you say 407, is that $4.07?
 9      A.  Yes.
10          MS. YAVELBERG:  Can we take a moment to
11  go off the record.
12          THE VIDEOGRAPHER:  The time is now
13  10:47.  We're going off the video record.
14          MS. YAVELBERG:  This is a fax for me.
15              (Off the record.)
16          MS. YAVELBERG:  We're ready to go back
17  on.
18          THE VIDEOGRAPHER:  Ready to proceed.
19  The time is now 10:51.  We're back on the video
20  record.
21  BY MS. YAVELBERG:
22      Q.  So, Mr. Vaccaro, we were just talking

Page 92

 1  about the New Jersey dispensing fee?
 2      A.  Yes.
 3      Q.  You mentioned that there's a base rate
 4  of $3.73 and then I think you referred to
 5  something called add-ons?
 6      A.  Yes.
 7      Q.  What are add-ons?
 8      A.  There are three add-ons.  One is an
 9  impact allowance that some additional dispensing
10  fee provided to pharmacies who are in high
11  Medicaid areas.  Another add-on is for 24 hour
12  emergency dispensing and the third add-on is for
13  patient consultation services.
14      Q.  And you said that the maximum
15  dispensing fee was $4.07?
16      A.  Prior to this budget year.
17      Q.  And this budget year, what did it
18  change to?
19      A.  I believe it's 3.99.
20      Q.  And so the combination of the impact
21  area, the 24 hour, and the patient consultation
22  could raise the pharmacy's dispensing fee from

Page 93

 1  $3.73 to $4.07 until just this year which you
 2  think it was reduced to $3.99?
 3      A.  Correct.
 4      Q.  Is that correct?  And how did a
 5  pharmacy apply for or get the add-ons?
 6      A.  Again, the FD 70 document was
 7  communicated to pharmacies and they would come
 8  back to us with an indication as to whether or
 9  not they were in an impact area, whether they
10  provided patient consultation, and whether they
11  provided 24 hour emergency services.
12      Q.  And this FD 70 that you referred to,
13  was that also used for the volume, the
14  certification as to annual volume?
15      A.  That's correct.
16      Q.  The same form?
17      A.  Yes.
18      Q.  And that's annually?
19      A.  That's annually, yeah.
20      Q.  And how, the $3.73 base rate, how long
21  has that been the New Jersey base rate for the
22  dispensing fee?

24 (Pages 90 to 93)

Page 94

1     A.  Over 20 years.
2     Q.  And how is the dispensing fee -- where
3  is the dispensing fee written down?
4     A.  In New Jersey Administrative Code
5  10:51.
6     Q.  And if you could take a look at Exhibit
7  3 which we've already marked.  And flip to Page
8  9, Section 1.7.
9        MR. KIM:  I'm sorry.  Page 9?
10       MS. YAVELBERG:  Page 9.
11       THE WITNESS:  The back side.
12       MS. YAVELBERG:  You need Exhibit 3.
13       MS. McLAUGHLIN:  It would be that one.
14       MR. KIM:  This one, okay.
15    Q.  Exhibit 3, Page 9, 10:51, Section 1.7,
16 Prescription Dispensing Fee.
17       Do you see that there, Mr. Vaccaro?
18    A.  Yes.
19    Q.  And does this portion, Section 1.7 of
20 the New Jersey Code reflect the dispensing fee
21 for the State of New Jersey?
22    A.  Yes, it does.

Page 95

1     Q.  And does this also reflect these add-
2  ons that you were referring to?
3     A.  Yes, it does.
4     Q.  Can DMAHS administratively change that
5  dispensing fee if it wants to?
6     A.  No.
7     Q.  If pharmacists complained -- I'm sorry?
8     A.  Let me amend that prior answer.
9     Q.  Please do.
10    A.  DMAHS, like any of the divisions within
11 state government, have the ability or the right
12 to go to the register and change regulations.
13 There would be no support for a change of
14 regulations that impacted reimbursement unless it
15 got the full support of the department and the
16 Governor's Office.
17    Q.  So DMAHS --
18    A.  Has the ability to go to the register
19 for the purpose of changing regulations.  For
20 example, this document is due for sunset.  It has
21 established regulations to keep it going after
22 January 20th of next year.  It would not move

Page 96

1  forward regulations that would impact
2  reimbursement unless it had the full support of
3  the Department of Human Services or the
4  Governor's Office.
5     Q.  So it could propose, it could make
6  proposals?
7     A.  Yes.  It can do proposals, yes.
8     Q.  But it can't make the change without
9  the full support --
10    A.  That's correct.
11    Q.  -- of the department and the Governor's
12 Office?
13    A.  That's correct.
14    Q.  Thank you for that clarification.  If
15 pharmacists complained that overall reimbursement
16 was too low and the dispensing fee needed to be
17 raised to make up the shortfall, could DMS do
18 that on its own?
19    A.  No.
20    Q.  How does the New Jersey dispensing fee
21 compare to the dispensing fees of other states?
22    A.  It's generally higher than other

Page 97

1  states.
2        MS. YAVELBERG:  I'd like to mark this
3  next document as Exhibit 5.
4        (A document entitled Department of
5  Health and Human Services dated August 12, 1994
6  from Director, Medicaid Bureau is received and
7  marked as Exhibit Vaccaro 005 for
8  identification.)
9     Q.  Mr. Vaccaro, I'm handing you a document
10 marked as Exhibit 5.  It is dated August 12, 1994
11 and the heading is Department of Health and Human
12 Services.  It's from the Director, Medicaid
13 Bureau.  Subject:  Expiration of Pharmacy
14 Reimbursement Moratorium Information to All
15 Associate Regional Administrators Division of
16 Medicaid.
17       Do you see that there?
18    A.  Yes, I do.
19    Q.  I'd like you to look on the back side
20 of this document and look at the paragraph near
21 the bottom which starts at "we would also
22 clarify".

25 (Pages 94 to 97)