# EXHIBIT 117

CA Dept of Health Care Services (Gorospe, PharmD, J. Kevin)                                    December 3, 2008
                              Sacramento, CA

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-------------------------------X

IN RE PHARMACEUTICAL INDUSTRY    )

AVERAGE WHOLESALE PRICE          )   MDL No. 1456

LITIGATION                       )

-------------------------------X

THIS DOCUMENT RELATES TO         )   Civil Action:

State of California, ex rel.    )   01-12258-PBS

Ven-A-Care v. Abbott             )

Laboratories, Inc., et al.       )

-------------------------------X

--oOo--

WEDNESDAY, DECEMBER 3, 2008

--oOo--

VIDEOTAPED DEPOSITION OF

THE CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES

by J. KEVIN GOROSPE, Pharm.D.

--oOo--


Reported By:  CAROL NYGARD DROBNY, CSR No. 4018

Registered Merit Reporter

```
                                          Page 46
 1   of the claims that come in from providers; is
 2   that right?
 3       A.  That's correct.
 4       Q.  Okay.  And that includes pharmacy
 5   provider claims?
 6       A.  That's correct.
 7       Q.  Okay.  Is there ever a circumstance
 8   where California would bring the federal
 9   government in to that claims process?
10       A.  Yes.
11       Q.  When would that happen?
12       A.  When Medicare is the primary payer and
13   California is the secondary payer, the provider
14   would submit the claim to Medicare first, and the
15   fiscal agent for Medicare would then cross that
16   claim electronically over to California for
17   payment of whatever portion is Medi-Cal's
18   responsibility.
19       Q.  So you're talking about the dual
20   eligible situation?
21       A.  The dual -- dual eligible situation,
22   that is correct.
```

```
                                          Page 47
 1       Q.  Dual eligible, just tell me if I have
 2   this right, is where you have a Medi-Care
 3   beneficiary who's also a Medicaid-eligible
 4   recipient of care?
 5       A.  That is correct.
 6       Q.  So Medicare pays it's portion, and
 7   then, if they have a co-pay or coinsurance, Medi-
 8   Cal in this case or Medicaid will pay that part
 9   of the claim?
10       A.  That is correct, up to the allowable.
11       Q.  Okay.  In the -- in a regular
12   circumstance, assume just a regular Medicaid
13   beneficiary's claim where Medicare isn't a
14   factor, is there ever a circumstance where the
15   federal government will be brought in to
16   adjudicate a claim for coverage for a provider?
17       A.  No.
18       Q.  Is it fair to say that -- that one of
19   the -- the factors that impacts the design of the
20   Medi-Cal program and the way that the --
21           Strike that.
22           Is it fair to say that one of the
```

```
                                          Page 48
 1   things that impacts the proposals that -- that
 2   Medi-Cal makes in its state plan is sort of the
 3   local political process?
 4           MR. PAUL:  Objection to form.
 5           THE WITNESS:  That is correct.
 6   BY MR. ROBBEN:
 7       Q.  And I think you might have been asked
 8   about this before.
 9           One of the ways that manifests itself
10   is that pharmacists will lobby the Legislature or
11   even yourself concerning aspects of the program
12   that are going to be proposed to the federal
13   government for approval; is that -- is that fair?
14       A.  That's correct.
15       Q.  Okay.  So if, for example, there's a --
16   there's a reimbursement proposal or a change to
17   reimbursement that's proposed, pharmacists and
18   their -- and their lobby or their lobbyists might
19   become involved in that process to try and affect
20   how that -- how that legislation results; right?
21       A.  That's correct.
22       Q.  So like, as we talked about a few
```

```
                                          Page 49
 1   minutes ago, when the -- the trailer bill was
 2   proposed that had the -- the change in MAIC,
 3   pharmacists went to the Legislature, they came to
 4   your office, and they made their concerns about
 5   the legislation known to everybody who would
 6   listen; right?
 7       A.  That's correct.
 8       Q.  Okay.  And that has an impact on the
 9   result of -- of the legislation -- at least
10   sometimes; doesn't it?
11           MR. PAUL:  Objection to form.
12           THE WITNESS:  Sometimes.
13   BY MR. ROBBEN:
14       Q.  Sometimes.
15           And is it -- is it fair to say that
16   generally keeping pharmacists enrolled in the
17   Medicaid program is a -- is a goal of the
18   Legislature and a goal of Medi-Cal?
19           MR. PAUL:  Objection to form.
20           THE WITNESS:  No.
21   BY MR. ROBBEN:
22       Q.  No?
```

13 (Pages 46 to 49)

CA Dept of Health Care Services (Gorospe, PharmD, J. Kevin)                                         December 3, 2008
Sacramento, CA

Page 282

1  Q. Okay. And aside from that the AWP
2  minus 17 percent component remained in place?
3  A. That is correct.
4  Q. And still remains in place today?
5  A. This is the currently active statute.
6  Q. Okay. This is Exhibit 27.
7     Has -- has the Department been able to
8  implement the feature that would use AMP data in
9  determining reimbursement?
10 A. No, we have not.
11 Q. Why not?
12    What's your understanding of why you
13 have not been able to?
14 A. Because just after CMS issued its first
15 two monthly instances of AMP information to the
16 states, which would have been in November --
17 October/November month -- in the months of
18 October/November of 2007, there was a Federal
19 Court injunction barring CMS from continuing that
20 practice.
21    That injunction also barred CMS from
22 implementing the FUL based on Average

Page 283

1  Manufacturer Price, and then subsequent to that
2  Congress passed some additional legislative
3  language that delayed the implementation of those
4  pieces of the program until October of 2009.
5     So the Department is waiting for all of
6  that to transpire before we can begin work on the
7  AMP-based reimbursement.
8  Q. Okay. Manufacturers -- do
9  manufacturers not report, generally speaking,
10 their AMP data directly to California?
11 A. Manufacturers are only required to
12 report AMP data in relationship to a supplemental
13 rebate agreement.
14 Q. Okay. And for that AMP data -- does --
15 does California recognize any confidentiality
16 restrictions on the use of that AMP data?
17 A. Yes, we do.
18 Q. How so?
19 A. Until such time as the CMS begins
20 publishing the AMP -- AMP data as pursuant to the
21 federal statute, the Department will hold that
22 AMP data as confidential pursuant to federal law.

Page 284

1  Q. Has the Department always treated AMP
2  data as confidential?
3  A. Yes.
4  Q. For example, I think in earlier
5  testimony today you discussed a period between
6  1994 and May of 1996, I think, when there were --
7  there was a supplemental rebate requirement that
8  all manufacturers pay a supplemental rebate of 10
9  percent of AMP or based upon 10 percent of AMP.
10    During that period to your knowledge
11 did the Department treat the AM -- any AMP
12 information that they may have received during
13 that time as confidential?
14 A. Yes.
15 Q. And did the Department have any
16 position about whether or not that confidential
17 treatment would prevent the Department from using
18 AMP information for purposes of determining
19 reimbursements paid to pharmacies?
20    MR. BUEKER: Objection as to form.
21    THE WITNESS: Yes.
22 BY MR. HENDERSON:

Page 285

1  Q. And what was that position?
2     MR. BUEKER: Same objection.
3     THE WITNESS: That if the Department
4  established a formula for reimbursement based on
5  AMP, that somebody could reverse engineer out of
6  that reimbursement rate the Average Manufacturers
7  Price for a particular drug, and, therefore,
8  breach the confidentiality.
9  BY MR. HENDERSON:
10 Q. Now, with respect to the federal
11 Medicaid rebate program, is it -- does the
12 California Medi-Cal program receive any AMP data
13 pursuant to the federal rebate program?
14 A. No, we do not.
15 Q. Am I correct in understanding that CMS
16 does provide so-called unit rebate amount
17 information to California?
18 A. On a quarterly basis they send unit
19 rebate amount for the majority of -- of national
20 drug codes.
21    Sometimes the unit rebate amount is
22 blank or zero for whatever reason.

72 (Pages 282 to 285)

Page 290

1  whereby it was able to recognize --
2     A.  Correct.
3     Q.  -- figures to the right of the decimal
4  place?
5     A.  That is correct.
6     Q.  When did that occur?
7     A.  I believe that occurred with the
8  implementation of the national -- NCPDP, which is
9  a claims processing version 5.1 for HIPPA
10 compliance on or around October of 2002.
11    Q.  Okay.  In the adjudication of a
12 particular claim, when a price change occurs on a
13 given date, for example, an AWP price change, --
14    A.  Correct.
15    Q.  -- is that price change applied
16 effective as the date of service, the date of
17 adjudication, or some other date in the claims
18 processing system?
19    A.  Claims are paid based on date of
20 service.
21    Q.  Okay.  Are there any circumstances in
22 which a published price from First DataBank might

Page 291

1  be overwritten with some nonpublished price,
2  entered manually, for example?
3     A.  Potentially, yes.
4     Q.  Can you describe when that might occur?
5     A.  If a potential published price in the
6  First DataBank data feed when we were on monthly
7  updates was found to be incorrect and First
8  DataBank notified us that on the next monthly
9  update there would be -- there would be a
10 retroactive change, the Department could at that
11 time enter in a different dollar value in order
12 to pay claims appropriately.
13        Otherwise, if it didn't do so, it would
14 then subsequently after a retroactive date --
15 date a new price change would occur.  They would
16 go back and -- and reprocess those claims in and
17 in the process note as an erroneous pay
18 correction.
19    Q.  Okay.  If a -- if First DataBank does
20 not have a published AWP for a drug as normally
21 reimbursed under California methodology based on
22 AWP, how is that handled -- if you know?

Page 292

1     A.  Up until the recent changes in statute
2  where AWP is described as the Average Wholesale
3  Price from the primary price reference source,
4  the regulations in 51513 stated that the
5  Department could use a secondary price reference
6  source, in which case the Department would go to
7  potentially Red Book or some other pricing
8  source.
9     Q.  And would the Department generally find
10 AWP from another pricing source if it could?
11       MR. BUEKER:  Objection as to form and
12 lack of foundation.
13 BY MR. HENDERSON:
14    Q.  Or -- let me -- let me rephrase the
15 question to try to make it more clear.
16       What would happen if -- what would the
17 Department do if there were no AWP published in
18 any publication, whether it's Red Book, First
19 DataBank, MetaSpan?
20    A.  The Department would have to try to
21 figure out a process to -- to find Average
22 Wholesale Price.  Otherwise, we won't be able to

Page 293

1  pursuant to the statute pay claims appropriately.
2     Q.  Okay.  Do you know whether or not the
3  Department ever, for example, would use a WAC,
4  Wholesale Acquisition Cost, published price?
5     A.  We wouldn't be allowed to pursuant to
6  the -- the reimbursement statutes.
7        Statutory change would have to occur
8  for that to -- to be able to do that.
9     Q.  All right.  Mr. Cole asked you some
10 questions about home infusion drugs and costs
11 associated with dispensing or administering those
12 drugs.
13       Did -- did Abbott Laboratories ever
14 come to the Department to your knowledge and tell
15 the Department that the dispensing fees for its
16 drugs were too low?
17       MR. COLE:  Object to the form.
18       THE WITNESS:  No.
19 BY MR. HENDERSON:
20    Q.  Did Abbott Laboratories ever come to
21 the Department and tell the Department that it
22 was inflating the AWPs for its drugs because it

74 (Pages 290 to 293)

Page 294

```
 1  wanted to increase the -- the reimbursement for
 2  providers who purchased its drugs?
 3          MR. COLE:  Object to the form.
 4          THE WITNESS:  No.
 5  BY MR. HENDERSON:
 6      Q.  Did the -- did the Department ever
 7  delegate to drug manufacturers the authority to
 8  determine how much dispensing fees should be paid
 9  to providers?
10      A.  No.
11      Q.  Did the Department ever take a position
12  that drug manufacturers should be permitted to
13  report false AWP pricing information so that --
14  in order to compensate for inadequate dispensing
15  fees?
16          MR. BUEKER:  Objection as to form.
17          THE WITNESS:  No.
18  BY MR. HENDERSON:
19      Q.  In your opinion, Dr. Gorospe, would it
20  be a reasonable government policy to give drug
21  manufacturers the -- the power to increase
22  reimbursements in order to make up for what they
```

Page 295

```
 1  perceive to be inadequate dispensing fees?
 2          MR. BUEKER:  Objection as to form.
 3          THE WITNESS:  No.
 4  BY MR. HENDERSON:
 5      Q.  Why not?
 6          MR. BUEKER:  Same objection.
 7          THE WITNESS:  Why not what?
 8  BY MR. HENDERRSON:
 9      Q.  Well, why wouldn't that be a reasonable
10  policy to pursue?
11          MR. BUEKER:  Same objection.
12          THE WITNESS:  The management of the --
13  the program is -- with the State of California
14  and with -- and the federal government, and to
15  allow a -- what is considered in California a
16  provider type, which a manufacturer is, to set
17  rates for providers would -- would not make
18  sense.
19  BY MR. HENDERSON:
20      Q.  It would give the manufacturer control
21  over how much money is -- of the State's money is
22  spent; is that fair to say?
```

Page 296

```
 1      A.  Potentially.
 2      Q.  To your knowledge has --
 3          Let me withdraw that and ask a
 4  different question.
 5          If Abbott Laboratories reported grossly
 6  inflated Average Wholesale Prices to First
 7  DataBank knowing and intending that those prices
 8  would be used by state Medicaid agencies,
 9  including Medi-Cal, to pay inflated
10  reimbursements to customers, people who bought
11  Abbott drugs, would you consider that to be
12  deceptive?
13          MR. COLE:  Objection.  Form.
14          THE WITNESS:  Yes.
15  BY MR. HENDERSON:
16      Q.  Did Dey ever to your knowledge come to
17  the California Department of Health Care Services
18  and tell the Department that it was reporting
19  grossly inflated Average Wholesale Prices on its
20  drugs?
21          MR. ROBBEN:  Objection as to form.
22          THE WITNESS:  No.
```

Page 297

```
 1  BY MR. HENDERSON:
 2      Q.  And if Dey reported grossly inflated
 3  Average Wholesale Prices to First DataBank
 4  knowing and intending that this would cause state
 5  Medicaid agencies to pay inflated reimbursements
 6  to customers who bought their drugs, would you
 7  consider that to be deceptive?
 8          MR. ROBBEN:  Objection as to form.
 9          THE WITNESS:  Yes.
10  BY MR. HENDERSON:
11      Q.  Likewise, if Roxane Laboratories
12  reported grossly inflated Average Wholesale
13  Prices to First DataBank knowing and intending
14  that those prices would be used by the California
15  Medi-Cal program to pay inflated reimbursements
16  to providers who bought Roxane's drugs, would
17  your consider that to be deceptive?
18          MS. DANNA:  Objection to form.
19          THE WITNESS:  Yes.
20  BY MR. HENDERSON:
21      Q.  Did Roxane ever come to the Department
22  to your knowledge and tell the Department that it
```

75 (Pages 294 to 297)