# EXHIBIT 118

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE:   PHARMACEUTICAL INDUSTRY | MDL NO. 1456 |
| AVERAGE WHOLESALE PRICE LITIGATION | Civil Action: |
| | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO U.S. | Judge Patti B. Saris |
| Ex rel. Ven-A-Care of the Florida | Magistrate Judge |
| Keys, No. 06-CV-11337-PBS | Marianne B. Blower |
| | / |

    The Videotaped Deposition of JAMES KENYON,

    Taken at 2860 Eyde Parkway,

    East Lansing, Michigan,

    Commencing at 4:13 p.m.,

    Tuesday, March 25, 2008,

    Before Cynthia A. Chyla, CSR 0092.

```
                                         Page 18                                                Page 20
 1          MR. HENDERSON:  And, for the record,    1      A.   I would say I have no reason to, no.
 2   Mr. Kenyon, don't take these exhibits home with you.   2   BY MR. GABEL:
 3          MR. GABEL:  I'll concur in that.        3      Q.   What do you understand that statement to be
 4   BY MR. GABEL:                                  4   saying?
 5      Q.   I'd like to place before you Abbott Exhibit   5          MR. HENDERSON:  Objection.
 6   657.                                           6      A.   Well, my opinion would be that it says that
 7          Have you seen this document before?     7   they have adequate compensation taking the two into
 8      A.   Yes, I have.                           8   effect.
 9      Q.   This document was drafted prior to you   9   BY MR. GABEL:
10   working for Michigan Medicaid; is that right?  10      Q.   So, is it fair to say that if drug costs
11      A.   That's my understanding.              11   were high enough, that could offset a dispensing fee
12      Q.   What was the occasion on which you saw this   12   that was too low?
13   document?                                     13          MR. HENDERSON:  Objection.
14      A.   I don't recall.  I've seen it since it was   14      A.   I would say yes.
15   put into place.  I don't recall the circumstances as   15   BY MR. GABEL:
16   to, you know, how it was presented or why.  I don't   16      Q.   Are you aware of whether that was occurring
17   recall.                                       17   in any other states aside from Michigan?
18      Q.   Is this something that's available to  18          MR. MATUS:  Objection; I don't think
19   employees at Michigan Medicaid?               19   he concluded that it was occurring in Michigan.  I
20          MR. HENDERSON:  Objection.             20   don't think you established that.
21      A.   I've seen it.  I don't know as to its  21          MR. GABEL:  No, I didn't mean to
22   availability to everyone, I do not know.      22   make -- have that assumption be part of my question.

                                         Page 19                                                Page 21
 1   BY MR. GABEL:                                   1   BY MR. GABEL:
 2      Q.   Okay.  Do you recall who gave this to you?   2      Q.   With respect to states other than Michigan?
 3      A.   I would say Sandy Kramer.              3      A.   I can't say what the other states are
 4      Q.   If I could have you focus your attention on   4   reimbursing at.  I do not know.
 5   the page marked MSA 33.                        5      Q.   Okay.  Prior to your deposition I gave your
 6      A.   Okay.                                  6   counsel Mr. Matus a copy of the Complaint and the
 7      Q.   In the fourth paragraph, which is the   7   Government's First Amended Complaint.
 8   paragraph that appears right below the bullet points --   8          Did you have an opportunity to look
 9   do you see that?                               9   at those?
10      A.   The one that starts with EAC focuses?  10      A.   Yes, I did.
11      Q.   Correct.  I'd like to look at the second   11      Q.   With respect to the factual allegations
12   sentence of that paragraph as well as the third, which   12   against Abbott, do you have any personal knowledge
13   reads: "The process of setting EAC screens is closely   13   regarding any of the factual allegations in the
14   linked and balanced with setting dispensing fees.   14   Complaint?
15   Payers are able to have low dispensing fee rates if   15      A.   No.
16   they have high EAC screens."                   16      Q.   Do you have any personal knowledge regarding
17          Do you see that?                        17   any of the paragraphs in the Complaint?
18      A.   Yes.                                  18      A.   I have personal knowledge as fact as the
19      Q.   In your experience as a pharmacist and as   19   Medicaid false claims and that information and what
20   working for Michigan Medicaid, do you have any reason   20   Medicaid is reimbursing at, but as far as you're saying
21   to disagree with that statement?              21   Abbott's actions -- is that what you're saying?
22          MR. HENDERSON:  Objection.             22      Q.   Yes.
```

Page 26

1  Q. Okay. What did you mean when you stated we
2  use comparable MAC prices?
3  A. Okay. From the analysis that Sandy Kramer
4  had done in relation to that, it was my understanding
5  that because of the way we had our maximum allowable
6  cost prices set, that that was meeting the needs of the
7  same AWPs.
8  Q. Did you understand that for some of the MACs
9  that Michigan had, Michigan would, in effect, pay less
10 by using the state MAC than they would by using the
11 AWPs calculated by the DOJ?
12 A. I would say that's a possibility, but I
13 don't know any specifics or recall to know that that
14 would be an accurate statement. It's possible.
15 Q. Okay. When you state because of Michigan
16 AWP minus a percentage, many providers would be
17 underpaid, how did you know that if Michigan used the
18 DOJ AWPs providers would be underpaid?
19 A. That's what I was informed by the individual
20 that did the analysis on the DOJ AWPs.
21 Q. Was that Ms. Kramer?
22 A. Correct.

Page 27

1  Q. What did you mean when you wrote underpaid?
2      MR. HENDERSON: Objection.
3  A. That either her analysis or what she had
4  been told that it would be less than the cost.
5  BY MR. GABEL:
6  Q. Question Number 11 asks whether your agency
7  has the legal authority to change it's reimbursement
8  methodology for new AWPs reported by DOJ/First
9  DataBank.
10     And you wrote: "Yes, consultation
11 of the provider community."
12     Is that what that reads?
13 A. That is correct.
14 Q. Okay. Do you know why there was a
15 requirement that the provider community be consulted
16 with?
17 A. Any changes in reimbursement has to go out
18 for consultation.
19 Q. Do you know why that's a requirement?
20     MR. HENDERSON: Objection.
21 A. I don't know the exact reason legally, no.
22 BY MR. GABEL:

Page 28

1  Q. Do you think it's a good policy to consult
2  the provider community before making changes to the
3  reimbursement levels?
4      MR. HENDERSON: Objection.
5  A. That would be my own personal opinion and I
6  really haven't given it much thought.
7  BY MR. GABEL:
8  Q. Number 12 asks: "If a drug on the DOJ/First
9  DataBank list is subject to a federal upper limit or
10 state MAC, which price is being used?"
11     And your response was: "State MAC
12 because it is usually lower."
13     Did you understand at the time you
14 wrote that that typically state MACs came in lower than
15 the federal upper limits?
16 A. That was my understanding.
17 Q. Do you know whether there were more drugs
18 listed on Michigan State MAC list than there were on
19 the federal upper limit list?
20 A. That would have been my understanding.
21 Q. Do you have any understanding why despite
22 having the ability to do so the federal government

Page 29

1  failed to set federal upper limits for certain drugs?
2      MR. HENDERSON: Objection.
3  A. I don't know why they would fail to set them
4  other than they used different methodologies than we
5  did.
6  BY MR. GABEL:
7  Q. Are you aware that the federal government
8  was criticized for not doing so in an OIG report?
9  A. No.
10 Q. If you look at Question Number 17, it asks:
11 "Have providers or other groups lodged complaints about
12 the new prices?"
13     Did you take the phrase new prices
14 to mean the DOJ AWPs?
15 A. No.
16 Q. What did you understand new prices to mean?
17 A. Looking at the document I would say that was
18 the wrong answer. It would be the DOJ AWPs.
19 Q. Okay. And am I right that your handwriting
20 reads "Only that they could not meet the cost if we use
21 the new AWP at AWP minus"?
22 A. Correct.

8 (Pages 26 to 29)