# EXHIBIT 120

Page 1

```
          UNITED STATES DISTRICT COURT

       FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------------X

In Re: PHARMACEUTICAL INDUSTRY      ) MDL No. 1456

AVERAGE WHOLESALE PRICE LITIGATION  ) Master File No.

-----------------------------------) 01-CV-12257-PBS

THIS DOCUMENT RELATES TO:           )

United States of America ex rel.    ) Hon. Patti B.

Ven-A-Care of the Florida Keys,     )    Saris

Inc., et al. v. Dey, Inc., et al., )

Civil Action No. 05-11084-PBS,      ) VIDEOTAPED

and United States of America ex     ) DEPOSITION

rel. Ven-A-Care of the Florida      ) OF THE NEW

Keys, Inc., et al. v. Boehringer    ) HAMPSHIRE DEPT.

Ingelheim Corp., et al., Civil      ) OF HEALTH &

Action No. 07-10248-PBS and United  ) HUMAN SERVICES

States, ex rel. Ven-A-Care of the   ) BY LISE C.

Florida Keys v. Abbott              ) FARRAND

Laboratories, Inc. Civil Action     )

Nos. 06-CV-11337 and 07-CV-11618    ) OCTOBER 28, 2008

-----------------------------------X
```

Page 38

```
 1          MR. HENDERSON:  Objection to form.
 2          THE WITNESS:  Yes.
 3   BY MR. KATZ:
 4     Q.   The federal government didn't tell New
 5   Hampshire exactly how to set its reimbursement
 6   methodology for prescription drugs, right?  They
 7   gave it some flexibility to come up with its own
 8   reimbursement methodology, right?
 9     A.   Yes.
10          MR. HENDERSON:  Objection to form.
11   Ma'am, if you could kind of pause just a half a
12   second after the question to allow me to make my
13   objection, I would be grateful.
14   BY MR. KATZ:
15     Q.   And New Hampshire's been aware that
16   different states have used different
17   reimbursement methodologies, right?
18          MR. HENDERSON:  Objection to form.
19          THE WITNESS:  Correct, each state has
20   its own reimbursement methodology.
21   BY MR. KATZ:
22     Q.   And New Hampshire chose one that would
```

Page 39

```
 1   fit its needs, right?
 2          MR. HENDERSON:  Objection.
 3          MS. WEISSBARD:  Objection.
 4   BY MR. KATZ:
 5     Q.   So that -- let me rephrase.  New
 6   Hampshire chose a reimbursement methodology which
 7   it believed complied with the federal regulations
 8   and statutes, right?
 9          MR. HENDERSON:  Objection.
10          THE WITNESS:  Yes.
11   BY MR. KATZ:
12     Q.   And this reimbursement methodology was
13   submitted to the federal government in the form
14   of a State Plan and, when it was revised, in the
15   form of State Plan amendments, right?
16     A.   Yes.
17     Q.   And for the entire time you've been at
18   New Hampshire Medicaid, the reimbursement
19   methodology used by New Hampshire Medicaid was
20   always approved by CMS?
21          MR. HENDERSON:  Objection.
22          THE WITNESS:  Yes.
```

Page 40

```
 1   BY MR. KATZ:
 2     Q.   From time to time there have been
 3   proposals and, in fact, implementation of certain
 4   reductions in reimbursement for prescription
 5   drugs under the New Hampshire Medicaid program,
 6   right?
 7          MR. HENDERSON:  Objection.
 8          THE WITNESS:  Yes.
 9   BY MR. KATZ:
10     Q.   And New Hampshire Medicaid would put
11   out notice to providers letting them know that
12   they intended to do this, right?
13          MR. HENDERSON:  Objection.
14          THE WITNESS:  Yes.
15   BY MR. KATZ:
16     Q.   Did New Hampshire Medicaid receive any
17   responses in response to those notices from the
18   providers?
19     A.   I don't know.
20     Q.   Are you aware whether or not any
21   providers or provider associations have expressed
22   any complaints or disagreement with any proposed
```

Page 41

```
 1   reimbursement?
 2     A.   Yes.
 3     Q.   Yes, they have?
 4     A.   Yes.
 5     Q.   Let's start with pharmacy associations.
 6   What pharmacy associations are in New Hampshire?
 7          MS. WEISSBARD:  I'm going to object.
 8   This isn't general policy questions, and I'm not
 9   sure unless you can explain to me how it is
10   relevant to the documents we turned over.  You
11   seem like you're going outside the scope of what
12   we agreed to.
13          MR. KATZ:  Just trying to get a big
14   picture.
15          MS. WEISSBARD:  That's not policy.  I'm
16   going to object.  She's not going to answer those
17   questions.  Move on to something else.
18          MR. KATZ:  If it comes up in a
19   document, we'll come back to it.
20          MS. WEISSBARD:  Okay.  Big picture is
21   different than general policy questions.
22          MR. BERLIN:  I'd like to respond to
```

11 (Pages 38 to 41)

Page 94

1  Q.  As a representative of the state can
2  you testify as to --
3  A.  I did not have anything to do with
4  submitting or preparing State Plan amendments, so
5  I cannot say that, yes, this was submitted with
6  that.  I don't know that.
7  Q.  Who was the person that was in charge
8  of that?
9  A.  We have a policy unit.
10  Q.  Who was in charge of the policy unit?
11  Who was in charge of the policy unit in 1996?
12  A.  I don't know.
13  Q.  Do you know who was in charge of that
14  now?
15  A.  Diane Peterson works in the policy unit
16  at this time.  And I believe she did then, too,
17  but I don't know that for sure.
18  Q.  Did you speak with Ms. Peterson in
19  preparation for this deposition?
20  A.  No.
21  Q.  Do you know where you got this document
22  from for the production in this case?

Page 95

1  A.  Attorney Gallo collected all the State
2  Plan information from the policy unit.
3  Q.  In any event, the first section is
4  titled "Reasonable Dispensing Fee," right?
5  A.  Yes.
6  Q.  And the New Hampshire Medicaid program
7  determined that the $2.50 dispensing fee was
8  reasonable, right?
9  A.  That is what this document states.
10  Q.  And based on the next three paragraphs,
11  you would agree with me that this determination
12  was based upon dispensing fees of other third-
13  party payors?
14  A.  That is what this document says.
15  Q.  For instance, it says that 70 percent
16  of Medicaid providers are also involved with
17  Express Scripts, and Express Scripts had a
18  dispensing fee of $2.50, right?
19  A.  That is what is stated in this
20  document.
21  Q.  It also says that Blue Cross/Blue
22  Shield had $2.50 dispensing fee, right?

Page 96

1  A.  That is what is stated in this
2  document.
3  Q.  And so based on that, New Hampshire
4  Medicaid determined that it, too, could have a
5  $2.50 dispensing fee and that $2.50 dispensing
6  fee would be reasonable, right?
7  A.  That is what is listed in this
8  document.
9  Q.  So this reduction doesn't correspond to
10  a study of dispensing costs but rather a survey
11  of the market as to what other third-party payors
12  were paying, right?
13  A.  From reading this document, that would
14  be correct.
15  Q.  And now let's talk about estimated
16  acquisition costs.  And you'll see here that it
17  says Express Scripts recommended a 12 percent
18  discount be applied to the AWP.  Right?
19  A.  That is what this document states.
20  Q.  And this State Plan Amendment proposes
21  reduction from AWP minus 10 percent to AWP minus
22  12 percent, right?

Page 97

1  A.  Yes.
2  Q.  And so it would be matching what
3  Express Scripts was doing, right?
4  A.  That is what is listed in this
5  document.
6  Q.  And the Blue Cross/Blue Shield plan was
7  using a 13 percent discount, right?
8  A.  That's what this document states.
9  Q.  And so based upon what Express Scripts
10  and Blue Cross/Blue Shield were doing, New
11  Hampshire Medicaid determined that it would be
12  reasonable to apply a 12 percent discount to AWP,
13  right?
14  A.  That's what's stated in this document.
15  Q.  So you would agree with me that the
16  basis for changing the discount off of AWP at 12
17  percent is not based on a survey of providers
18  acquisition costs but rather a survey of other
19  third-party payors and what they were applying to
20  AWP, right?
21  A.  Yes.
22  Q.  And you'll see that in paragraph 3 of

25 (Pages 94 to 97)

Page 118

1  right?
2      A.  That's what's listed in this document.
3      Q.  It is not based on a study that was
4  performed on dispensing costs, right?
5      A.  That's not mentioned here.
6      Q.  Rather, New Hampshire Medicaid was
7  using a survey of the market of other third-party
8  payors, right?
9      A.  That is what's stated here.
10     Q.  And the same is true for Estimated
11 Acquisition Costs in that New Hampshire Medicaid
12 reviewed what other third-party payors were
13 applying as a discount to the AWP, right?
14     A.  That's what's listed here.
15     Q.  And it -- it states that -- well, that
16 these discounts varied from 12 to 16 percent?
17     A.  Yes.
18     Q.  And so based upon what other third-
19 party payors were doing, New Hampshire Medicaid
20 determined that a 16 percent discount off of AWP
21 was reasonable; is that right?
22     A.  That is what is stated here.

Page 119

1      Q.  And it wasn't based on a survey of the
2  acquisition costs of providers for purchasing
3  drugs, right?
4      A.  That's not mentioned here.
5      Q.  Now I have a feeling you're not going
6  to know the answer to this question, but I will
7  be able to help you with a document.
8          Do you know whether or not the State
9  Plan Amendment was approved by CMS?
10     A.  I don't know.
11     Q.  Why don't we take a break?  We have to
12 change tapes.  We don't have to go anywhere.
13 Won't take long.
14         VIDEOGRAPHER:  Time is 11:11.  We are
15 off the record.
16         VIDEOGRAPHER:  Time is 11:13.  This is
17 beginning of cassette number 2.  We are on the
18 record.
19         (Exhibit Dey 086 marked for
20 identification.)
21 BY MR. KATZ:
22     Q.  I've handed you a document marked Dey

Page 120

1  Exhibit 86.  Have you had a chance to look at it?
2      A.  Yes, I have.
3      Q.  Tell me what this is.
4      A.  It is a letter to the commissioner from
5  CMS stating that the State Plan Amendment has not
6  been approved.
7      Q.  Do you recall receiving -- do you
8  recall New Hampshire Medicaid receiving this
9  letter in June of 2004?
10     A.  No.
11     Q.  Does this refresh your recollection
12 that this State Plan Amendment was denied by CMS?
13     A.  As I stated before, I had nothing to do
14 with State Plan amendments, so I would not be
15 familiar with this.
16     Q.  Now the letter states that the New
17 Hampshire Medicaid, like every other state
18 Medicaid program, is required to give notice to
19 the providers prior to implementing a
20 reimbursement methodology change, right?
21     A.  Yes.
22     Q.  And you're familiar with that

Page 121

1  requirement?
2      A.  Yes.
3      Q.  And it states in this letter that these
4  methods and procedures may be necessary to assure
5  that payments are consistent with efficiency --
6  strike that.
7          This letter states that these methods
8  and procedures as may be necessary to assure that
9  payments are consistent with efficiency, economy,
10 quality of care, right?
11     A.  That's what this letter states.
12     Q.  So the notice requirements, do you
13 understand how the notice requirements achieve
14 the goal of efficiency, economy and quality of
15 care?
16     A.  A notice requirement meets that?
17     Q.  Do you understand why that sentence is
18 in this letter?
19     A.  No.
20     Q.  Well, you understand that -- well,
21 we'll take a step back.
22         New Hampshire Medicaid was obligated to

31 (Pages 118 to 121)

Page 122

1  give notice to the providers before making
2  reimbursement change, correct?
3      A.  Yes.
4      Q.  And that gave providers the opportunity
5  to express concerns, if it had any, about the
6  reimbursement change, right?
7      A.  Yes.
8      Q.  And one of those concerns could be the
9  reimbursement cut is too low and I'm not going to
10 be able to participate in the Medicaid program if
11 you cut reimbursement down low.  That's a
12 possible concern, right?
13     A.  That could be.
14     Q.  If every single pharmacy in New
15 Hampshire stated that they would drop out of the
16 Medicaid program if the reimbursement change was
17 implemented, that would be a big concern for New
18 Hampshire Medicaid because they would have a
19 problem getting prescription drugs to Medicaid
20 beneficiaries, right?
21     A.  That could be.
22     Q.  And so when it talks about -- when this

Page 123

1  letter refers to the federal statute talking
2  about quality of care, you would agree with me
3  that access to care would be a factor in quality
4  of care, right?
5      A.  Yes.
6      Q.  And so that's one reason why that
7  sentence could be in that letter, right?  Do you
8  understand that?
9      A.  Yes.
10     Q.  How many pharmacies are there in New
11 Hampshire?
12     A.  Enrolled -- well, Medicaid provider
13 pharmacies or --
14     Q.  That was going to be my next question.
15 So do you know how many pharmacies are enrolled
16 as Medicaid providers in New Hampshire?
17     A.  There are out-of-state that are also
18 enrolled and we have enrollment of about 390.
19     Q.  And do you know how many total
20 pharmacies there are in New Hampshire?
21     A.  Probably about that, 360, 370.
22     Q.  Okay.  And then the excess pharmacies

Page 124

1  are because you have --
2      A.  Out-of-state.
3      Q.  Pharmacies out of state in all those
4  Medicaid providers, right?
5      A.  Yes.
6      Q.  And it is important to have as many
7  pharmacies as possible participating in the
8  Medicaid program so that Medicaid beneficiaries
9  have access to drugs regardless of where they are
10 in the state, right?
11         MR. HENDERSON:  Objection.
12         THE WITNESS:  Yes.
13 BY MR. KATZ:
14     Q.  Now you see that the State Plan
15 Amendment is denying the reimbursement change,
16 right?
17         MR. HENDERSON:  Objection to the
18 characterization.
19         THE WITNESS:  The State Plan Amendment.
20 BY MR. KATZ:
21     Q.  I'm sorry.  Withdraw that question.
22 You see that this letter from U.S. Health and

Page 125

1  Human Services is denying New Hampshire
2  Medicaid's State Plan Amendment, right?
3      A.  Yes.
4      Q.  What is the current reimbursement
5  methodology in New Hampshire?
6      A.  AWP minus 16 percent.  It is the lesser
7  of.
8      Q.  When was that implemented?
9      A.  I don't remember.
10        (Exhibit Dey 087 marked for
11 identification.)
12     Q.  Handed you a document marked Exhibit
13 87.  I see that the date on the bottom is
14 10/8/2008.  And my understanding was that this
15 was the current regulation; is that correct?
16     A.  I believe so because that would be the
17 date that this was printed off of the website.
18     Q.  That would be the New Hampshire
19 website?
20     A.  Yes, General Court.
21     Q.  Do you know who printed this off?
22     A.  No.

Page 282

1  from 1990 to the present when some court order or
2  budget condition or some other reason existed
3  causing the department to not follow the
4  reimbursement methodology that we've seen
5  described in the exhibits today?
6      A.  No.
7      Q.  Does First Health to your knowledge
8  investigate the published drug pricing
9  information for accuracy?
10     A.  Not that I'm aware of.
11     Q.  Have they ever to your knowledge?
12     A.  I don't know.
13     Q.  Likewise, do you have any information
14 to indicate that EDS investigated the accuracy of
15 the published prices?
16         MR. KATZ:  Objection to form.
17         THE WITNESS:  No.  No.
18 BY MR. HENDERSON:
19     Q.  Do you or other persons in your
20 department have time to investigate the accuracy
21 of published drug prices?
22         MR. KATZ:  Objection, form.

Page 283

1          THE WITNESS:  No.
2  BY MR. HENDERSON:
3      Q.  Would it be difficult to do that given
4  the number of NDCs that are covered by your
5  agency's program?
6          MR. KATZ:  Objection, form.
7          THE WITNESS:  Yes, it would be
8  difficult.
9  BY MR. HENDERSON:
10     Q.  Ms. Farrand, if the prices that
11 manufacturers reported to First Data Bank and
12 that were published had no relation at all to
13 real market prices, would it be appropriate to
14 use that in your view, that type of information
15 for reimbursing for drugs?
16         MR. KATZ:  Objection to form.
17 BY MR. HENDERSON:
18     Q.  Would it be a useful source of
19 information?
20         MR. BERLIN:  Same objection.
21         THE WITNESS:  Repeat your question,
22 please.

Page 284

1  BY MR. HENDERSON:
2      Q.  Let me repeat the question.  If average
3  wholesale prices had no relation whatsoever to
4  real prices, in your opinion would those types of
5  prices be useful for purposes of reimbursement?
6          MR. KATZ:  Objection, form.
7          THE WITNESS:  You're asking my opinion.
8  No, it wouldn't be in my opinion.
9  BY MR. HENDERSON:
10     Q.  Why not?
11     A.  You need to --
12         MR. BERLIN:  Same objection.
13 BY MR. HENDERSON:
14     Q.  He's objecting.
15     A.  Okay.  You need to be able to depend
16 upon the validity of your information that you're
17 basing reimbursement on.
18     Q.  And if AWPs had no relation to real
19 prices, they wouldn't reflect any acquisition
20 cost at all; is that fair to say?
21         MR. KATZ:  Objection to form.
22         THE WITNESS:  Not accurately.

Page 285

1  BY MR. HENDERSON:
2      Q.  And if average wholesale prices were
3  simply random numbers with no predictable
4  relationship to actual prices, would the First
5  Data Bank AWPs be of any value in determining
6  reimbursement in your opinion?
7          MR. KATZ:  Objection, form.
8          THE WITNESS:  In my opinion, no.
9  BY MR. HENDERSON:
10     Q.  Would it be practical for Health and
11 Human Services to not use published prices but
12 instead rely entirely on surveys that its
13 auditors conducted to try to determine actual
14 acquisition costs that pharmacists paid for their
15 drugs?
16         MR. KATZ:  Objection, form.
17 BY MR. HENDERSON:
18     Q.  Would that be a practical way of
19 determining reimbursement?
20         MR. KATZ:  Objection, form.
21         THE WITNESS:  Not with the amount of
22 manpower that we presently have.

72 (Pages 282 to 285)

Page 286

 1  BY MR. HENDERSON:
 2     Q.  And, okay.
 3     A.  And since there is a hiring freeze,
 4  there won't be any more manpower coming into the
 5  department to be able to do any extra surveys
 6  like that.
 7     Q.  Would surveys have -- in order to rely
 8  on surveys entirely for purposes of determining
 9  an estimate of acquisition costs, would surveys
10  have to be done frequently or infrequently in
11  your opinion?
12        MR. KATZ:  Objection, form.
13        THE WITNESS:  Probably at least
14  quarterly.
15  BY MR. HENDERSON:
16     Q.  And by the time the survey data were
17  compiled and evaluated, would it be still up to
18  date with current prices?
19        MR. KATZ:  Objection, form.
20        THE WITNESS:  It would still have a lag
21  time.
22  BY MR. HENDERSON:

Page 287

 1     Q.  Mr. Katz asked you some information
 2  about Average Manufacturer Price data.  And this
 3  information I think you indicated comes in --
 4  actually it is unit rebate amounts that are
 5  received by First Health from CMS?
 6     A.  Yes.
 7     Q.  Do you recall those questions?
 8     A.  Uh-hum.
 9        MR. KATZ:  Objection to form.
10  BY MR. HENDERSON:
11     Q.  Have department employees such as
12  yourselves ever received unit rebate amount data
13  from CMS directly?
14        MR. KATZ:  Objection, form.
15        THE WITNESS:  No, it goes to the
16  technical contact which has always been whatever
17  fiscal agent or First Health that has handled the
18  rebate.
19  BY MR. HENDERSON:
20     Q.  Do you or any other department employee
21  ever regularly review that URA information?
22        MR. KATZ:  Objection, form.

Page 288

 1        THE WITNESS:  No.
 2  BY MR. HENDERSON:
 3     Q.  Have you ever yourself personally
 4  reviewed it?
 5     A.  No.
 6     Q.  The URA information, do you understand
 7  that it is submitted for the Medicaid rebate
 8  program; is that correct?
 9     A.  Correct.
10     Q.  Does your agency ever use it for
11  purposes of determining reimbursement?
12        MR. KATZ:  Objection, form.
13        THE WITNESS:  No.
14  BY MR. HENDERSON:
15     Q.  Do you have an understanding as to
16  whether or not -- let me back up.
17        Mr. Katz asked you some questions about
18  whether it is possible to sort of reverse
19  engineer and calculate, using URA numbers, to
20  calculate the Average Manufacturer Price?
21        MR. KATZ:  Objection, form.
22  BY MR. HENDERSON:

Page 289

 1     Q.  Have you ever done that?
 2     A.  No.
 3     Q.  To your knowledge, has any employee in
 4  your agency ever done that?
 5     A.  No.
 6     Q.  Do you have any understanding as to
 7  whether or not the Average Manufacturer Prices
 8  that manufacturers report to CMS, whether or not
 9  those prices are to be considered confidential in
10  any way?
11     A.  All the rebate information I believe is
12  confidential.
13     Q.  Do you have any understanding whether
14  or not that might prohibit you from using Average
15  Manufacturer Price as a basis for determining
16  estimated acquisition costs?
17        MR. KATZ:  Objection, form.
18        THE WITNESS:  I don't believe we can.
19  I'm not sure.
20  BY MR. HENDERSON:
21     Q.  Just to clarify, do I understand that
22  you don't believe you're permitted to use --

Page 290

1   A.   Yes.
2   Q.   -- AMP information for purposes of
3   determining reimbursement?
4   A.   Yes.
5   Q.   I'd like to ask you to look at Dey
6   Exhibit 95, if you can find it, and also Dey
7   Exhibit 96.  Do you have those in front of you?
8   A.   Yes.
9   Q.   Now Dey Exhibit 95 appears, appears to
10  have been produced by the state of New Hampshire
11  according to the numbering in the lower right-
12  hand corner.  If you look at this, do you see
13  there are some parts of this that refer to a
14  Supplemental Rebate Agreement?  And let me back
15  up.
16       Did the state of New Hampshire begin to
17  implement a so-called Supplemental Rebate Program
18  sometime in 2004?
19  A.   Yes, we developed a preferred drug
20  list, and the preferred drug list products are
21  what gives us the supplemental rebate for the
22  most part.

Page 291

1   Q.   And do you understand that just in
2   general, the agreement provides that in return
3   for -- that if a manufacturer pays a supplemental
4   rebate on a particular drug, in return the state
5   will put that drug on the preferred drug list?
6   Is that part of the, part of the deal, so to
7   speak?
8   A.   It is part of the deal.  You can still
9   put prior authorization requirements -- you can
10  still put utilization management tools on a drug
11  even if the manufacturer does participate in the
12  supplemental.
13  Q.   Okay.  But at least in some sense, if
14  the manufacturer pays a supplemental rebate, some
15  preference will be given to that manufacturer's
16  drug?
17  A.   It could be.
18  Q.   Now, this Exhibit 95 includes some
19  amendments to the Supplemental Rebate Agreement,
20  but I don't see the Supplemental Rebate Agreement
21  itself in its entirety in this exhibit.  Have I
22  described the exhibit in that fashion accurately?

Page 292

1   A.   I believe that this Exhibit A is the
2   actual supplemental agreement.
3   Q.   Let's see what page you're referring
4   to.
5   A.   NH 00102.  Wait a minute, maybe not.
6   Q.   It says "participating state
7   amendment."
8   A.   You want the agreement between the
9   manufacturer and the state?
10  Q.   As I look at this, it has some
11  amendments to the Supplemental Rebate Agreement,
12  but it does not have the entirety of the
13  Supplemental Rebate Agreement itself.
14  A.   Amendments are done whenever another
15  manufacturer joins.  I don't know where the
16  original agreement lies.
17  Q.   Okay.  Now, if you turn to page 96,
18  Bates stamped 96 in the lower right-hand corner?
19  A.   Yes.
20  Q.   This is part of the approved
21  supplemental, I'm sorry, this is part of the
22  approved State Plan Amendment that describes the

Page 293

1   Supplemental Rebate Agreement.  And is it your
2   understanding that the state of New Hampshire
3   received approval for its -- from the federal
4   government for its Supplemental Rebate Agreement?
5   A.   Yes.
6   Q.   Could you read aloud the last bullet
7   point on this page 96?
8   A.   "The unit rebate amount is confidential
9   and it cannot be disclosed in accordance with
10  Section 1927(b)(3)(d) of the Social Security
11  Act."
12  Q.   And is that consistent with your
13  understanding of unit rebate amounts, whether or
14  not they pertain to a supplemental rebate or
15  whether or not they pertain to the national
16  rebate agreement?
17  A.   Yes, it is.
18  Q.   And looking at Exhibit 96, Dey Exhibit
19  96, do you know whether or not Health and Human
20  Services employees receive these executed copies
21  that have been executed by the manufacturers?
22  A.   I believe the commissioner has to sign