EXHIBIT 160

Page 250

```
              UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - - -
IN RE:   PHARMACEUTICAL         )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE      )  CIVIL ACTION

PRICE LITIGATION                )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO        )

U.S. ex rel. Ven-a-Care of      )  Judge Patti B. Saris

the Florida Keys, Inc.          )

       v.                       )  Chief Magistrate

Abbott Laboratories, Inc.,      )  Judge Marianne B.

No. 06-CV-11337-PBS             )  Bowler
- - - - - - - - - - - - - - - -

         (cross-captions on following pages)


                    Washington, D.C.

                    Thursday, February 27, 2007

                    9:00 a.m.


    Videotaped deposition of DEIRDRE DUZOR

              Volume II
```

Page 251

```
 1      IN THE COURT OF THE SECOND JUDICIAL CIRCUIT
 2          IN AND FOR LEON COUNTY, FLORIDA
 3   THE STATE OF FLORIDA
 4   ex rel.
 5   ------------------
 6   VEN-A-CARE OF THE FLORIDA KEYS,   )
 7   INC., a Florida Corporation, by and )
 8   through its principal officers and  )
 9   directors, ZACHARY T. BENTLEY and   )
10   T. MARK JONES,             )
11       Plaintiffs,       ) Civil Action
12    vs.              ) No. 98-3032G
13   MYLAN LABORATORIES INC.; MYLAN   )
14   PHARMACEUTICALS INC.; NOVOPHARM   ) Judge William
15   LTD., SCHEIN PHARMACEUTICAL, INC.; ) L. Gary
16   TEVA PHARMACEUTICAL INDUSTRIES   )
17   LTD.; TEVA PHARMACEUTICAL USA; and )
18   WATSON PHARMACEUTICALS, INC.,   )
19       DEFENDANTS.        )
20   ------------------
```

Page 252

```
 1           IN THE CIRCUIT COURT OF
 2         MONTGOMERY COUNTY, ALABAMA
 3   ---------------
 4   STATE OF ALABAMA,       )
 5       Plaintiff,   )
 6    vs.          ) Case No. CV-2005-219
 7   ABBOTT LABORATORIES, INC.,  ) Judge Charles Price
 8   et al.,          )
 9       Defendants.   )
10   ---------------
11              Washington, D.C.
12              Thursday, February 27, 2007
13              9:00 a.m.
14       Videotaped deposition of DEIRDRE DUZOR, called
15   for examination by counsel for Abbott Laboratories
16   in the above-entitled matter, taken at the law
17   offices of Jones Day, 51 Louisiana Avenue, N.W.,
18   Washington, D.C. 20001-2113, the proceedings being
19   recorded stenographically by Jonathan Wonnell, a
20   Registered Professional Court Reporter and Notary
21   Public of the District of Columbia, and transcribed
22   under his direction.
```

Page 253

```
 1       A P P E A R A N C E S   O F   C O U N S E L
 2
 3   On behalf of the United States of America:
 4
 5       ANA MARIA MARTINEZ, ESQ.
 6       United States Department of Justice
 7       99 N.E. 4th Street
 8       Miami, Florida 33132
 9       (305) 961-9431
10       ana.maria.martinez@usdoj.gov
11
12
13   On behalf of the U.S. Department of Health &
14   Human Services:
15
16       BRIAN A. KELLEY, ESQ.
17       U.S. Department of Health & Human Services
18       Office of General Counsel, CMS Division
19       330 Independence Avenue, S.W., Room 5345
20       Washington, D.C. 20201
21       (202) 205-8702
22
```

Page 254

```
 1         A P P E A R A N C E S (Cont'd)
 2
 3   On behalf of the State of Alabama:
 4
 5       H. CLAY BARNETT, III, ESQ. (via phone)
 6       Beasley, Allen, Crow, Methvin, Portis &
 7       Miles, P.C.
 8       218 Commerce Street
 9       Montgomery, Alabama 36104
10       (800) 898-2034
11       clay.barnett@beasleyallen.com
12
13   On behalf of the State of California:
14
15       RITA HANSCOM, ESQ. (via phone)
16       California Attorney General's Office
17       Civil Prosecutions Unit
18       P.O. Box 85266
19       110 West A Street, #1100
20       San Diego, California 82186
21       (619) 688-6099
22       rita.hanscom@doj.ca.gov
```

2 (Pages 251 to 254)

Page 255

```
 1         A P P E A R A N C E S  (Cont'd)
 2
 3  On behalf of the State of Florida:
 4
 5      MARY S. MILLER, ESQ. (via phone)
 6      Office of the Attorney General of Florida
 7      PL-01, The Capitol
 8      Tallahassee, Florida 32399-1050
 9      (850) 414-3600
10      mary_miller@oag.state.fl.us
11
12
13  On behalf of the City of New York and all New York
14  Counties other than Nassau and Orange; the States
15  of Wisconsin, Illinois, Kentucky, Idaho, Alaska,
16  Hawaii, South Carolina and Mississippi:
17
18      MICHAEL WINGET-HERNANDEZ, ESQ.
19      Winget-Hernandez, LLC
20      3112 Windsor Road, Suite 228
21      Austin, Texas 78703
22      michael@winget-hernandez.com
```

Page 256

```
 1         A P P E A R A N C E S  (Cont'd)
 2
 3  On behalf of Ven-A-Care of the Florida Keys, Inc.:
 4
 5      ROSLYN G. POLLACK, ESQ.
 6      Berger & Montague P.C.
 7      1622 Locust Street
 8      Philadelphia, Pennsylvania 19103-6305
 9      (215) 875-3000
10      rpollack@bm.net
11
12
13  On behalf of Abbott Laboratories, Inc.:
14
15      DAVID TORBORG, ESQ.
16      Jones Day
17      51 Louisiana Avenue, N.W.
18      Washington, D.C. 20001-2113
19      (202) 879-3939
20      dstorborg@jonesday.com
21
22
```

Page 257

```
 1         A P P E A R A N C E S  (Cont'd)
 2
 3  On behalf of Brisol-Myers Squibb:
 4
 5      SANDHYA P. KAWATRA, ESQ. (via phone)
 6      Hogan & Hartson
 7      875 Third Avenue
 8      New York, New York 10022
 9      spkawatra@hhlaw.com
10      (212) 918-3542
11
12
13  On behalf of Dey, Inc., Dey, L.P. and Mylan:
14
15      NEIL MERKL, ESQ.
16      Kelley, Drye & Warren LLP
17      101 Park Avenue
18      New York, New York 10178
19      (212) 808-7811
20      nmerkl@kelleydrye.com
21
22
```

Page 258

```
 1         A P P E A R A N C E S  (Cont'd)
 2
 3  On behalf of Roxane Laboratories and
 4  Boehringer Ingelheim:
 5
 6      JOHN W. REALE, ESQ.
 7      Kirkland & Ellis
 8      200 East Randolph Drive
 9      Chicago, Illinois 60601
10      (312) 861-3452
11      jreale@kirkland.com
12
13
14  On behalf of Sandoz, Inc.:
15
16      LARA A. BERWANGER, ESQ. (via phone)
17      White & Case LLP
18      1155 Avenue of the Americas
19      New York, New York 10036-2787
20      (212) 819-2549
21      lberwanger@whitecase.com
22
```

3 (Pages 255 to 258)

Page 259

```
 1            A P P E A R A N C E S  (Cont'd)
 2
 3   On behalf of Schering-Plough Corporation,
 4   Schering Corporation and Warrick
 5   Pharmaceuticals Corporation:
 6
 7        GINGER APPLEBERRY, ESQ. (via phone)
 8        Locke, Liddell & Sapp
 9        2200 Ross Avenue, Suite 2200
10        Dallas, Texas 75201
11        (214) 740-8459
12        gappleberry@lockeliddell.com
13
14
15
16   ALSO PRESENT:
17
18        CONWAY BARKER, Videographer
19
20
21
22
```

Page 260

```
 1              C O N T E N T S
 2
 3   WITNESS: DEIRDRE DUZOR                    PAGE
 4       Examination By Mr. Torborg................ 265
 5
 6
 7              E X H I B I T S
 8   NUMBER          DESCRIPTION                PAGE
 9   Exhibit Abbott 488, Document entitled State
10          Dispensing Fee Activites
11          (No Bates ref)............. 280
12   Exhibit Abbott 489, article in "Drug Topics"
13          entitled Latebreakers: Iowa,
14          Kansas boost dispensing
15          fees" (no Bates refs)...... 286
16   Exhibit Abbott 490, HHC 002-0172 through 0175.. 349
17   Exhibit Abbott 491, HHC 020-0925 through 0928.. 357
18   Exhibit Abbott 492, Shepherd e-mail to McNeill
19          dated 6/23/00 forwarding a
20          Wiberg e-mail (no Bates
21          ref)....................... 419
22   (CONTINUED)
```

Page 261

```
 1          E X H I B I T S  (CONTINUED)
 2   NUMBER          DESCRIPTION                PAGE
 3   Exhibit Abbott 493, Article from "Drug Topics"
 4          entitled "On AMP Issue,
 5          Feds and Pharmacists Are
 6          Wide Apart" (No Bates ref). 427
 7   Exhibit Abbott 494, Power Point presentation by
 8          Steven Stranne 11/10/04
 9          (no Bates ref)............. 447
10   Exhibit Abbott 495, NASMD 0001285 through 1287. 450
11   Exhibit Abbott 496, NASMD 0001288 through 1292. 462
12   Exhibit Abbott 497, NASMD 0001293 through 1295. 467
13   Exhibit Abbott 498, Transcript of testimony of
14          Dennis Smith before the
15          Committee on Finance on
16          Medicaid Fraud and Abuse
17          6/28/05 (No Bates ref)..... 469
18   Exhibit Abbott 499, Transcript of a fall 2006
19          meeting of the National
20          Association of State
21          Medicaid Directors,
22          11/15/06 (no Bates ref).... 478
```

Page 262

```
 1          E X H I B I T S  (CONTINUED)
 2   NUMBER          DESCRIPTION                PAGE
 3   Exhibit Abbott 520, Document on Maryland
 4          Pharmacy Coalition
 5          letterhead entitled Federal
 6          Deficit Reduction Act
 7          (No Bates ref)............. 480
```

4 (Pages 259 to 262)

Page 403

1  (physicians and pharmacies) for deficiencies
2  elsewhere in the payment system.  If and when the
3  method for estimating acquisition costs is
4  altered, it may be desirable to reconsider the
5  payment policy as a whole."  Do you see that?
6      A.  Yes, I do.
7      Q.  Do you recall discussion at the panel
8  meeting that margins or spreads may be
9  compensating providers for deficiencies elsewhere
10 in the system?
11         MS. MARTINEZ:  Objection, form.
12     A.  I don't recall the discussion, but it
13 could have been discussed.
14     Q.  Is that a topic that's been discussed
15 at other meetings that you've been at?
16         MS. MARTINEZ:  Objection, form.
17     A.  Well, after the Deficit Reduction Act
18 was passed we did acknowledge -- CMS did
19 acknowledge in a -- I believe a state Medicaid
20 director's letter -- that when the new federal
21 upper limits went into effect that states may
22 want to review their dispensing fees to assure

Page 404

1  that they are adequate to cover the cost of
2  dispensing.
3      Q.  And that's something that you issued in
4  connection with a decrease in -- a potential
5  decrease in ingredient cost reimbursement; is
6  that right?
7      A.  I believe it was a state Medicaid
8  director's letter discussing or describing the
9  pharmacy provisions of the DRA.
10     Q.  And one of those provisions was to
11 reduce the payment on the ingredient cost through
12 FUL legislation; is that right?
13     A.  Right.  It was a new method by which
14 the federal upper limits would be established.  A
15 new formula.
16     Q.  That CMS expected would decrease the
17 amount for ingredient cost, correct?
18         MR. WINGET-HERNANDEZ:  Objection, form.
19     A.  Yes, that it would on many drugs, that
20 the FULs would be decreased on many drugs.
21     Q.  As the co-lead of CMS's pharmacy team
22 you were not unaware of the dialogue in the

Page 405

1  industry about the fact that insufficient
2  dispensing fees were being cross subsidized by
3  margins and spreads on ingredient costs, were
4  you?
5      MS. POLLACK:  Objection to form.
6      MR. KELLEY:  Objection to form.
7      MS. MARTINEZ:  Objection, form.
8      A.  What I was aware of was that there was
9  a spread in the ingredient cost and in some
10 states that may have led to states not keeping
11 their dispensing fees up to date in terms of cost
12 to dispense because the overall reimbursement was
13 generous.
14     Q.  I'd like to ask you to go to 458.
15         MR. TORBORG:  It may be that you have
16 to get, Ani, the Manila folder behind you.  458?
17 Is it in there?
18         MS. MARTINEZ:  Yeah.  It should be.
19 BY MR. TORBORG:
20     Q.  Ms. Duzor, this is a GAO report dated
21 March of 1993.  It's titled "Medicaid, Outpatient
22 Drug Costs and Reimbursements for Selected

Page 406

1  Pharmacies in Illinois and Maryland."  Ms. Duzor,
2  if you would take a look at this to see if this
3  is something that you have ever reviewed in
4  connection with your role as the co-lead of the
5  CMS pharmacy team.
6      A.  No.  I don't recall ever seeing this
7  and note that it was nine years preceding my
8  involvement in Medicaid drug policy.
9      Q.  When you started at CMS on the pharmacy
10 issues in 2002 did you make any effort to go back
11 and review OIG, GAO or other reports pertinent to
12 Medicaid pharmacy?
13     A.  I don't recall whether I did or not.
14     Q.  I'd like to ask you to go to page 6 of
15 this document.  The first paragraph -- this is
16 the GAO report where they wrote "Although total
17 Medicaid reimbursements exceeded the pharmacies'
18 total drug purchase costs for the drugs we
19 reviewed, whether this represents unreasonable
20 benefits for the pharmacies is not clear.
21 Neither HCFA nor the states have determined what
22 would be an appropriate margin between

**Page 403**

1  (physicians and pharmacies) for deficiencies
2  elsewhere in the payment system.  If and when the
3  method for estimating acquisition costs is
4  altered, it may be desirable to reconsider the
5  payment policy as a whole."  Do you see that?
6      A.   Yes, I do.
7      Q.   Do you recall discussion at the panel
8  meeting that margins or spreads may be
9  compensating providers for deficiencies elsewhere
10 in the system?
11         MS. MARTINEZ:  Objection, form.
12     A.   I don't recall the discussion, but it
13 could have been discussed.
14     Q.   Is that a topic that's been discussed
15 at other meetings that you've been at?
16         MS. MARTINEZ:  Objection, form.
17     A.   Well, after the Deficit Reduction Act
18 was passed we did acknowledge -- CMS did
19 acknowledge in a -- I believe a state Medicaid
20 director's letter -- that when the new federal
21 upper limits went into effect that states may
22 want to review their dispensing fees to assure

**Page 404**

1  that they are adequate to cover the cost of
2  dispensing.
3      Q.   And that's something that you issued in
4  connection with a decrease in -- a potential
5  decrease in ingredient cost reimbursement; is
6  that right?
7      A.   I believe it was a state Medicaid
8  director's letter discussing or describing the
9  pharmacy provisions of the DRA.
10     Q.   And one of those provisions was to
11 reduce the payment on the ingredient cost through
12 FUL legislation; is that right?
13     A.   Right.  It was a new method by which
14 the federal upper limits would be established.  A
15 new formula.
16     Q.   That CMS expected would decrease the
17 amount for ingredient cost, correct?
18         MR. WINGET-HERNANDEZ:  Objection, form.
19     A.   Yes, that it would on many drugs, that
20 the FULs would be decreased on many drugs.
21     Q.   As the co-lead of CMS's pharmacy team
22 you were not unaware of the dialogue in the

**Page 405**

1  industry about the fact that insufficient
2  dispensing fees were being cross subsidized by
3  margins and spreads on ingredient costs, were
4  you?
5          MS. POLLACK:  Objection to form.
6          MR. KELLEY:  Objection to form.
7          MS. MARTINEZ:  Objection, form.
8      A.   What I was aware of was that there was
9  a spread in the ingredient cost and in some
10 states that may have led to states not keeping
11 their dispensing fees up to date in terms of cost
12 to dispense because the overall reimbursement was
13 generous.
14     Q.   I'd like to ask you to go to 458.
15         MR. TORBORG:  It may be that you have
16 to get, Ani, the Manila folder behind you.  458?
17 Is it in there?
18         MS. MARTINEZ:  Yeah.  It should be.
19 BY MR. TORBORG:
20     Q.   Ms. Duzor, this is a GAO report dated
21 March of 1993.  It's titled "Medicaid, Outpatient
22 Drug Costs and Reimbursements for Selected

**Page 406**

1  Pharmacies in Illinois and Maryland."  Ms. Duzor,
2  if you would take a look at this to see if this
3  is something that you have ever reviewed in
4  connection with your role as the co-lead of the
5  CMS pharmacy team.
6      A.   No.  I don't recall ever seeing this
7  and note that it was nine years preceding my
8  involvement in Medicaid drug policy.
9      Q.   When you started at CMS on the pharmacy
10 issues in 2002 did you make any effort to go back
11 and review OIG, GAO or other reports pertinent to
12 Medicaid pharmacy?
13     A.   I don't recall whether I did or not.
14     Q.   I'd like to ask you to go to page 6 of
15 this document.  The first paragraph -- this is
16 the GAO report where they wrote "Although total
17 Medicaid reimbursements exceeded the pharmacies'
18 total drug purchase costs for the drugs we
19 reviewed, whether this represents unreasonable
20 benefits for the pharmacies is not clear.
21 Neither HCFA nor the states have determined what
22 would be an appropriate margin between

Duzor, Deidre - Vol. II                                           February 27, 2008
Washington, DC

---

Page 423

1  Q. Do you recall knowing or have you been
2  aware of the fact that states, at least
3  Minnesota, according to Mr. Wiberg, considered
4  the spread between AAC and AWP when determining
5  what to pay for dispensing fee?
6      MR. KELLEY: Objection, form.
7      MS. MARTINEZ: Objection, form.
8  A. As I said, I have never seen this e-
9  mail before. So no, I was not aware that
10 Minnesota thought of that in setting theirs, in
11 setting their ingredient cost.
12 Q. Does this --
13 A. Dispensing fee. I'm sorry.
14 Q. Does this surprise you, this language?
15     MS. MARTINEZ: Objection, form.
16 A. No. It doesn't surprise me. But I
17 think it's a well established fact at this point
18 in time. I'm not sure whether this would have
19 been surprising or not back in 2000. He may have
20 been ahead of his time. This may have been a
21 revelation at that point.
22 Q. Or it could have been just what

Page 424

1  everyone knew at the time who was operating in
2  the state pharmacy area?
3      MS. MARTINEZ: Objection to form.
4  A. I can't speak to that. I wasn't part
5  of that at that time.
6  Q. If I can skip a paragraph, Mr. Wiberg
7  wrote "Some public and private third party payors
8  have purposely kept dispensing fee low precisely
9  because there is a spread between AWP and AAC."
10 Do you see that?
11 A. Yes, I do.
12 Q. Is that repeating the same sentiment
13 that he made earlier?
14     MS. MARTINEZ: Objection to form.
15 A. It seems to be, with the extension of
16 it to private third parties in addition to public
17 payors.
18 Q. He says "In fact when pharmacy
19 organizations have sought an increase in
20 dispensing fees, the AWP spread has been pointed
21 out to legislatures." Do you see that?
22 A. Yes, I do.

Page 425

1  Q. And do you have any knowledge about
2  that?
3  A. No, I don't.
4  Q. Do you have any reason to believe that
5  what Mr. Wiberg was saying here was not correct?
6      MR. KELLEY: Objection to form.
7      MS. MARTINEZ: Objection to form.
8  A. No, I have no reason to have any
9  opinion on it. It's not something I am familiar
10 with.
11 Q. If we go to the next paragraph, he ends
12 it with the sentence "However, the problem should
13 be approached in one of two ways. One, state
14 Medicaid agencies should be allowed to work out
15 their own solutions (by increasing the discount
16 off of AWP, adjusting the dispensing fee,
17 establishing MACs, et cetera); or two, a national
18 solution should be pursued that accounts for all
19 aspects of the problem and that is developed by
20 and with input from all interested parties
21 (NAMFCU, state Medicaid agencies, private third
22 party payors, First Databank, pharmacy

Page 426

1  organizations, et cetera.)" Do you see that?
2  A. Yes.
3  Q. Have you heard any discussion with
4  states or within CMS that on this issue of
5  pharmacy reimbursement the state agencies should
6  be able to work out their own pricing, their own
7  solutions to what they think is most effective?
8      MS. MARTINEZ: Objection, form.
9  A. No. I don't recall ever being part of
10 any discussions.
11 Q. Is that something that you have
12 considered in your role as the co-lead of the CMS
13 pharmacy team charged with approving state plans
14 for payment of drugs?
15     MS. MARTINEZ: Objection, form.
16     MR. WINGET-HERNANDEZ: Objection, form.
17 A. There is a regulation that says that
18 state Medicaid payments should be estimated
19 acquisition cost plus reasonable dispensing fee.
20 So I would have to say that the answer is no,
21 that we wouldn't think it appropriate to allow
22 states to be totally on their own because to the

45 (Pages 423 to 426)

Page 427

1  extent that what they would do would be
2  inconsistent with our regulation we would have an
3  obligation to review their state plan and these
4  prices have to be in their state plan.
5           (Exhibit Abbott 493 was marked for
6  identification.)
7  BY MR. TORBORG:
8      Q.  For the record, what I've marked as
9  Exhibit 493 is a September 3rd 2007 article from
10 Drug Topics titled "On AWP issue feds and
11 pharmacists are wide apart."  And Ms. Duzor, if
12 you would take a look at this document and let me
13 know if you are familiar with it.
14     A.  No.  I'm not familiar with it.
15     Q.  This is an article that quotes you; is
16 that right?
17     A.  I haven't gotten that far.
18     Q.  I'm sorry.
19     A.  (Reading.)  Okay.  I've completed
20 reading it.
21     Q.  This is an article that's quoting you;
22 is that right?

Page 428

1      A.  Yes, it does.
2      Q.  And it concerns a topic we covered
3  earlier today, which is the use of AMP to
4  calculate federal upper limits; is that right?
5      A.  Yes.  Indirectly.  It doesn't actually
6  talk about federal upper limits, but --
7      Q.  Well, the average manufacturer price
8  final rule referred to in the second and third
9  sentences of this article, can you think of any
10 other AMP final rule besides the federal upper
11 limit rule?
12     A.  No.  I agree with you it is -- the AMP
13 final rule does deal with the issue of the new
14 federal upper limits.
15     Q.  In the fourth paragraph the article
16 states "In contrast, Duzor" -- that would be you,
17 right?
18     A.  That would be me.
19     Q.  "Said the AMP rule would allow Medicaid
20 to pay more appropriately for drugs since the
21 agency has been overpaying for these products
22 using former sources of pricing that overstated

Page 429

1  costs.  Duzor acknowledged that CMS is concerned
2  about whether AMP will hurt patient access to
3  care, but she believes things will work out for
4  pharmacies as long as states figure out how to
5  make it work."  Do you see that?
6      A.  Yes, I do.
7      Q.  What did you mean when you said "as
8  long as states figure out how to make it work"?
9      A.  Actually, that last sentence doesn't
10 sound to me like something I said.  So I think
11 it's probably -- it's their reworking of
12 something I said.  I don't believe I said that we
13 had concerns about whether AMP will hurt patient
14 access to care.  We don't have any concerns.  We
15 don't believe it will.
16     Q.  So --
17     A.  I mean, if it did have an adverse
18 effect on patient care we would care about that.
19 But we don't believe that it would.
20     Q.  So it's your testimony that you've been
21 in this article misquoted?
22         MS. MARTINEZ:  Objection, form.

Page 430

1      Q.  Is that fair to say?
2          MS. MARTINEZ:  Objection, form.  This
3  was not a direct quote in that paragraph.
4      Q.  You've been misparaphrased?
5      A.  Yes.  I would say I believe in that
6  last sentence I've been misparaphrased, yes.
7      Q.  Do you believe her article does not
8  fairly reflect what -- did you talk to Judy Chi?
9      A.  No, I didn't.  She --
10     Q.  Do you know where she's getting this
11 from?
12     A.  I did speak to several groups after the
13 final rule was published.  So I assume it was
14 from one of those presentations.
15     Q.  So it's your testimony to the jury that
16 you don't believe that CMS has concerns about
17 whether AMP will hurt patient access to care?
18         MR. WINGET-HERNANDEZ:  Objection to
19 form.
20         MS. MARTINEZ:  Objection, form.
21     Q.  That's your testimony?
22         MS. MARTINEZ:  Objection, form.

```
                                                Page 483
 1  page of the document titled "federal expressions
 2  of intent on increasing dispensing fees under the
 3  Deficit Reduction Act."  Do you see that?
 4       A.  Mm-hmm.
 5       Q.  You were quoted at the bottom at the
 6  meeting that I just showed you a transcript of
 7  which said "The states should be reviewing the
 8  adequacy of Medicaid pharmacy reimbursement."  Do
 9  you see that?
10       A.  Yes, I do.
11       Q.  What did you mean by that?
12           MR. WINGET-HERNANDEZ:  Objection, form.
13       A.  At this point out of context I don't
14  know what I meant by that.
15       Q.  And at the very top Senator Grassley is
16  quoted as saying "CMS should make clear to states
17  that they should reconsider the dispensing fees
18  paid to pharmacies under Medicaid, particularly
19  for generic drugs."  Do you see that?
20       A.  Yes.
21       Q.  Has CMS done that?  Have they made
22  clear to states that they should reconsider the
```

```
                                                Page 484
 1  dispensing fees, particularly for generic drugs?
 2       A.  We haven't stated it that strongly.
 3  But as I was discussing earlier today, we did put
 4  out a letter which encouraged states to look at
 5  their dispensing fees with changes in the
 6  ingredient cost, reimbursement for ingredient
 7  cost.
 8       Q.  You, CMS, drew a connection between the
 9  two, decreasing the ingredient cost and
10  increasing the dispensing fee, correct?
11           MS. MARTINEZ:  Objection to form.
12           MR. KELLEY:  Objection to form.
13       A.  Yes.  I would say we drew a connection.
14  We didn't say states should reconsider.  We said
15  something to the effect of states may want to
16  look at or should review their dispensing fees in
17  light of changes to ingredient cost
18  reimbursement.
19       Q.  And you expected that the dispensing
20  fees would increase, correct?
21       A.  Yes.  We expected that should there be
22  a need for change it would likely be an increase.
```

```
                                                Page 485
 1       Q.  I'd like to ask you to go to in the
 2  Redwell that's in front of you Abbott Exhibit
 3  475.  This is one that we marked at a deposition
 4  last week that's not yet in those binders.
 5           Ms. Duzor, I'll ask you to take a look
 6  at that.  It's a December 2004 paper from the
 7  Congressional Budget Office titled "Medicaid's
 8  Reimbursements to Pharmacies for Prescription
 9  Drugs."  The first question will be whether or
10  not you've had a chance to see this.
11       A.  (Reading.)  I don't recall seeing this
12  document, but I may have.  There are lots of
13  things coming out all the time, so -- but I don't
14  specifically remember seeing this.
15       Q.  If you would go through the document,
16  eventually you will see something with a page 3
17  in the upper right-hand corner.
18       A.  Yes.
19       Q.  It has a figure 1 there?
20       A.  Yes.
21       Q.  It says "markups per prescription."  Do
22  you see that?
```

```
                                                Page 486
 1       A.  Yes.
 2       Q.  And then there's a section to the left
 3  called "measuring markups."  Do you see that?
 4       A.  Yes.
 5       Q.  And CBO wrote "In addition to dollar
 6  terms, the difference between the amount that
 7  Medicaid pays pharmacies for prescription drugs
 8  and the amount that manufacturers charge
 9  pharmacies for the drugs can be expressed in
10  percentage terms as a margin (or gross margin) --
11  that is, the difference between what Medicaid
12  pays a pharmacy and the cost of acquiring the
13  drug from the manufacturer divided by Medicare's
14  payment."  Do you see that?
15       A.  Yes, I do.
16       Q.  Do you have an understanding of what
17  they're talking about there?
18       A.  Yes.
19       Q.  It's referring to two different ways of
20  measuring the markup; one would be an absolute
21  dollar term and one would be as a percentage; is
22  that right?
```

Duzor, Deidre - Vol. II                                         February 27, 2008
Washington, DC

Page 527

1  dispensing fees would be sufficient to ensure
2  that pharmacies would dispense drugs to Medicaid
3  beneficiaries?
4         MS. MARTINEZ: Objection to form.
5     A.  I think that that question would need
6  to be considered on a state by state basis to
7  take into account their dispensing fee.  Given
8  that they're not all the same I think it just
9  follows that there could not be one answer that
10 would be consistent across all states.
11    Q.  Is it fair to say you can think of
12 states where you would not feel comfortable that
13 paying a true acquisition cost with no other
14 changes to the reimbursement system would not be
15 sufficient to ensure access?
16        MS. MARTINEZ: Objection, form.
17    A.  I don't know where the line would be
18 drawn.  But I think that there may be some states
19 that were paying very low dispensing fees where
20 that would not be adequate reimbursement for a
21 pharmacy.
22    Q.  And would you feel comfortable assuming

Page 528

1  that a change to paying actual acquisition cost
2  would not have resulted in any change to
3  dispensing fees at any of the state Medicaid
4  programs?
5         MS. MARTINEZ: Objection, form.
6     A.  No.  I think it may have resulted in a
7  change in dispensing fees.
8     Q.  Do you feel comfortable in assuming
9  that had prices been provided in the compendia
10 that were the actual prices at which pharmacies
11 could buy drugs, if those were provided just
12 overnight, there was a change, would you feel
13 comfortable that some states would want to go
14 back to the old prices, would have actually
15 requested to go back to the old prices?
16        MS. MARTINEZ: Objection, form.
17    A.  Given that there's a regulation saying
18 that you have to pay an actual acquisition cost
19 or estimated acquisition cost, I don't understand
20 your question.  Would states have requested to.
21 It seems like that would be a nonissue or outside
22 of the realm of possibility.

Page 529

1     Q.  Well, are you familiar with what
2  happened when the Department of Justice and
3  NAMFCU attempted to have states use new AWPs for
4  a subset of drugs in 2000?
5     A.  No.  I'm not familiar with that.
6     Q.  Would what happened in that scenario be
7  probative of what happen if there was a sudden
8  change?
9         MR. KELLEY: Objection to form.
10        MS. MARTINEZ: Objection to form.
11    A.  I'm not familiar with what happened
12 there.
13    Q.  Would you feel comfortable in assuming
14 that if the AWP prices in the compendia were the
15 true average acquisition price that the states
16 would not want to have added a markup to drugs to
17 ensure access and a reasonable profit level?
18        MS. MARTINEZ: Objection to form.
19    A.  Indeed I think our regulations would
20 call for them to assure that there was a
21 reasonable dispensing fee such that adequate
22 access would have been maintained for Medicaid.

Page 530

1     Q.  If there had been a sudden change in
2  the way -- a sudden reduction in the AWP prices
3  reported in the compendia, do you feel
4  comfortable in assuming that state legislatures
5  would not have opposed a sudden change in the
6  understanding of what AWPs represented?
7         MS. MARTINEZ: Objection to form.
8     A.  I can't speak to what state
9  legislatures may or may not have done in a
10 hypothetical situation.
11    Q.  Do you feel comfortable in making any
12 assumptions about what the total amount of
13 reimbursement would have been had the AWPs in the
14 compendia actually represented the actual price
15 at which pharmacies purchased drugs?
16        MS. POLLACK: Objection, form.
17    A.  Sitting here I couldn't give you a
18 figure.  I think it would be substantial and that
19 such an estimate would be possible.
20    Q.  And that estimate may depend on the
21 specific drugs at issue?
22    A.  Yes.  For the drugs at issue.

71 (Pages 527 to 530)