# EXHIBIT 168



experience *does* matter

**CASE:  In re:  Pharmaceutical Industry Average Wholesale Price Litigation**
**DATE:  March 16, 2008**

Enclosed is the Original of the transcript of the testimony of **Michael Sellers** along with the errata sheet in the above-titled case.  Please have the witness read the deposition and sign the signature page before a Notary Public.

After the signature page has been notarized, please return the original transcript and errata sheets to the custodial attorney within 30 days of receipt for proper filing.

Thank you for your attention to this matter and please feel free to contact us with any questions or concerns.

Sincerely,

Henderson Legal Services

Encl.

Page 1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


In re:  PHARMACEUTICAL        )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    )  CIVIL ACTION

PRICE LITIGATION              )  01-CV-12257-PBS

_____


Videotaped Rule 30(b)(6) Deposition

of MICHAEL SELLERS, at 77 West Wacker

Drive, Chicago, Illinois, commencing

at 9:00 a.m. on Sunday, March 16,

2008, before Donna M. Kazaitis, RPR,

CSR No. 084-003145.

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                              March 16, 2008

Page 242

```
 1      Q.   I guess let me ask you which page was
 2   the actual attachment?
 3      A.   This page to the attendees.
 4   (Indicating.)
 5           The others are pretty much the same
 6   document.  And they were prepared for Laura
 7   Schumacher to give her some background on --
 8           MS. TABACCHI:  I'm going to caution the
 9   witness not to reveal any communications between
10   yourself and Ms. Schumacher.
11           THE WITNESS:  -- prices.
12
13   BY MS. ST. PETER-GRIFFITH:
14      Q.   Prices or pricing terms; is that it?
15      A.   Yes.
16      Q.   That's the last page, which appears to
17   also be the second page with a line through it;
18   right?
19      A.   Yeah.  The first page, or the second
20   page, did not have the last paragraph.
21      Q.   The parameter pricing, okay.
22      A.   Yeah.
```

Page 243

```
 1      Q.   Now, let's go to Page 3.  It says "Per
 2   directions from last meeting, discussed price
 3   adjustment with other divisions."
 4           Who did you talk to?
 5      A.   I only recall talking to Joe Fiske in
 6   PPD.  I may have talked to Ross and SPD, but
 7   that's not in my memory.
 8      Q.   Is RPD Ross Products Division?
 9      A.   Yes.
10      Q.   And SPD is --
11      A.   At that time it was called Specialty
12   Products Division.  It was animal health and
13   agricultural products.
14      Q.   On your PPD discussion it says "Standard
15   WAC prices at five percent below list."  Do you
16   see that?
17      A.   Uh-huh.
18      Q.   What did that mean?
19      A.   This has been a few years.
20           I think basically that their
21   wholesale acquisition cost was five percent below
22   what they publish as their list price, yes.
```

Page 244

```
 1      Q.   Then it says "Potential exposure on Ery
 2   products which are sold at forty to sixty percent
 3   below list."  Do you see that?
 4      A.   Yes.
 5      Q.   What did that mean?
 6           MS. TABACCHI:  Objection, beyond the
 7   scope.
 8           THE WITNESS:  Erythromycin was a drug
 9   that had gone off patent by 2001.  It had been off
10   patent for in fact a number of years prior.
11   Abbott was the innovator of that drug.
12           So because there were other generic
13   companies in competition with our pharmaceutical
14   brethren in Abbott, they had seen a price decline,
15   as we would have expected, on their products in
16   order to remain competitive with the generics.
17           So I think what I was reflecting on
18   there is the same kind of disparity that we were
19   talking about was probably in existence on
20   erythromycin products.  They had not reduced their
21   list price, at least as of this.
22   BY MS. ST. PETER-GRIFFITH:
```

Page 245

```
 1      Q.   Do you know why they didn't reduce their
 2   list price?
 3           MS. TABACCHI:  Object to the form,
 4   beyond the scope.
 5           THE WITNESS:  I was just asked to go
 6   find out.
 7   BY MS. ST. PETER-GRIFFITH:
 8      Q.   Now, if you could look further down
 9   beyond "Proposed Implementation Schedule" where it
10   says "Definite Impact.  Price Lost Due to
11   Reduction."  Do you see that?
12      A.   Yes.
13      Q.   It says "List Price and Special Price
14   Sales," for 2001, $0.9 million.  And is that
15   "Annualized"?
16      A.   Yes.
17      Q.   $1.8 million.
18           What does that line mean?
19      A.   That means that, that goes back to what
20   we were talking about before.  When you reduce
21   your list price, any sales that you would have
22   anticipated making at a noncontract sales are
```

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                    March 16, 2008

Page 246

 1  going to come in at a lower price than what you
 2  would have historically seen versus our 2001
 3  expectation, making the price adjustments that we
 4  were talking about we could expect that we'd get
 5  $900,000 less revenue in 2001 than we were
 6  planning.  And that was definite because that
 7  would happen.
 8      Q.   Does that refresh your recollection from
 9  before as to the impact analysis that you had
10  referenced?
11      A.   Yeah.  I said it was a few million.  I
12  overstated it slightly originally.
13      Q.   Let me ask you this:  What was wrong
14  with keeping your catalog prices or Abbott keeping
15  its catalog prices where they were, meaning not
16  doing the catalog price reduction, but just
17  reporting lower prices to the pricing compendia
18  that were utilized for AWP purposes?
19          MS. TABACCHI:  Object to the form,
20  beyond the scope of the Notice.
21          THE WITNESS:  As far as we saw it, we
22  had one set of published prices.  So what you give

Page 247

 1  to the compendia is what you publish.  So if
 2  you're going to report lower prices, you lower the
 3  published prices.
 4  BY MS. ST. PETER-GRIFFITH:
 5      Q.   With regard to where it says "Inability
 6  to raise FSS prices" --
 7      A.   Yes.
 8      Q.   -- $0.1 million and then 0.2 million?
 9      A.   Yes.
10      Q.   What does that mean?
11      A.   FSS is Federal Supply Schedule.  It's
12  our contract that we had with, it was actually
13  administered by the Veterans' Administration.  It
14  was available for I think all federal government
15  entities to purchase from, both Department of
16  Defense as well as VA as well as a bunch of other
17  agencies.
18          That contract had a provision that
19  said if you raise your catalog prices and you
20  raise your contract prices, you can qualify for
21  raising your FSS prices.
22          It was still a negotiable issue on

Page 248

 1  a year-to-year basis with the contracting officer,
 2  but per the terms of the agreement we could have
 3  increased our FSS prices --
 4      Q.   With regard to --
 5      A.   -- if we took an inflationary increase
 6  on the catalog.
 7      Q.   Okay.  Where it says "Potential Impact -
 8  Volume Lost Due to Reimbursement Reductions."  Do
 9  you see that?
10      A.   Yes.
11      Q.   It says "Alt. Site Product Sales
12  $2.9 million, Annualized $8.8 million."
13      A.   Yes.
14      Q.   First, let me ask you, what do you mean
15  by "volume lost due to reimbursement reductions"?
16      A.   Well, when you're doing something like
17  this, especially if you're reviewing something of
18  a significant change to past practices with
19  management, I always tried to walk in saying these
20  are the impacts, this is what could result from a
21  decision to do this or that, whatever we were
22  talking about at the time.

Page 249

 1          What we were saying here is on a
 2  worst case basis if in fact the theory that AWP
 3  drove product purchase decisions, worst case, this
 4  is how Alternate Site Product Sales would be
 5  impacted by us reducing our list price.
 6      Q.   How did you arrive at that calculation,
 7  or those two calculations, of $2.9 million and
 8  $8.8 million?
 9      A.   Some of it was we looked at a rehash of
10  Lynn Leone's analysis, and by this time we had a
11  little more specific knowledge of what products we
12  were going to change and so on and so forth.  So
13  that's how we did it.
14          We said, okay, if all of a sudden
15  now our list prices are going down significantly
16  and we would assume that we would have the lowest
17  list prices for products, then the theory that the
18  highest list, highest AWP, if it in fact was a
19  function of list, we would lose those sales to our
20  competitor.  That's what we did.
21      Q.   So there was a recognition then that the
22  higher AWP in the market would get the business?

63 (Pages 246 to 249)

Henderson Legal Services, Inc.

202-220-4158          www.hendersonlegalservices.com

00c5aa93-b25b-40ff-b422-e7070d802fa9

30(b)(6) Abbott (Sellers, Michael)                                      March 16, 2008

Page 310

1  be.
2  BY MS. ST. PETER-GRIFFITH:
3     Q.   If you could move on -- oh, let me ask
4  you, at any time from 1991 until 2001 did Abbott
5  ever notify any state or federal official about
6  what its actual contract prices were that it was
7  charging its customers?
8         MS. TABACCHI:  Object to the form,
9  beyond the scope of the Notice.
10        MS. ST. PETER-GRIFFITH:  No, it's not.
11        THE WITNESS:  It was not our
12  understanding that that was a requirement of any
13  entity.
14             We thought the government had a
15  good picture of our nonlist price prices.  They
16  had quarterly publications of our AMP, they had
17  our Federal Supply Schedule prices, we had prices
18  negotiated with the DOD.
19             So we thought if a government
20  agency needed it, it was within the government
21  agency's purview already.
22  BY MS. ST. PETER-GRIFFITH:

Page 311

1     Q.   Were the DOD prices or the Federal
2  Supply Schedule prices that you charged to the
3  United States in line with Abbott's Alternate Site
4  catalog prices?
5         MS. TABACCHI:  Object to the form.
6         THE WITNESS:  Alternate Site did not
7  have a catalog.
8  BY MS. ST. PETER-GRIFFITH:
9     Q.   HPD catalog prices.
10        MS. TABACCHI:  Object to the form,
11  beyond the scope of the Notice.
12        MS. ST. PETER-GRIFFITH:  It is not
13  beyond the scope of the Notice.
14        THE WITNESS:  Federal Supply Schedule
15  prices were contractually negotiated prices that
16  were below our published prices.
17  BY MS. ST. PETER-GRIFFITH:
18     Q.   But were they in line with your contract
19  prices that you were charging to your HPD
20  customers, including your Alt. Site customers?
21        MS. TABACCHI:  Object to the form.
22        THE WITNESS:  I think if you were to ask

Page 312

1  the VA contracting officers, they would tell you
2  yes, they were, because we actually had to
3  disclose across, whenever we either changed the
4  price or renegotiated prices or negotiated a new
5  contract, we had to disclose actual sales in that
6  negotiation.
7  BY MS. ST. PETER-GRIFFITH:
8     Q.   So you disclosed --
9     A.   Our lowest price.
10    Q.   Your lowest price, which is your lowest
11  HPD price that you charged your contractors --
12    A.   Uh-huh.
13    Q.   -- or your customers?
14    A.   Yes.
15    Q.   What indicated to the United States that
16  your Federal Supply Schedule prices or your DOD
17  prices were in line with your actual contract
18  prices that you were charging customers?
19        MS. TABACCHI:  Object to the form.
20        THE WITNESS:  I just went through that.
21  BY MS. ST. PETER-GRIFFITH:
22    Q.   Okay.  So it's the fact that DOD and the

Page 313

1  VA received your lowest price?
2         MS. TABACCHI:  Object to the form.
3         THE WITNESS:  Yes.
4  BY MS. ST. PETER-GRIFFITH:
5     Q.   And what is it about the quarterly --
6     A.   Well, let me go back.
7             They may or may not have been given
8  on a contract our lowest price, but our disclosure
9  to them had to include the lowest prices that we
10  had billed for the products.
11    Q.   Did Abbott at any time ever go to the
12  United States and say hey, you know, our catalog
13  prices are much higher than the prices that we're
14  charging under the Federal Supply Schedule or the
15  DOD prices?
16        MS. TABACCHI:  Object to the form, asked
17  and answered.  He just testified about
18  communications with the government.
19        MS. ST. PETER-GRIFFITH:  Counsel, don't
20  coach the witness.  If you can just let him answer
21  the question, please.
22        MS. TABACCHI:  If you can stop asking

79 (Pages 310 to 313)

00c5aa93-b25b-40ff-b422-e7070d802fa9