# EXHIBIT 169

Page 1

```
              UNITED STATES DISTRICT COURT

                 DISTRICT OF MASSACHUSETTS



- - - - - - - - - - - - - - - - -x

In re:  PHARMACEUTICALS INDUSTRY : MDL No. 1456

AVERAGE WHOLESALE PRICE          : Civil Action No.

LITIGATION                       : 01-12257-PBS

_____  :

                                 :

THIS DOCUMENT RELATES TO:        : Judge Patti B.

                                 :    Saris

United States of America, ex     :

rel. Ven-a-Care of the Florida   : Magistrate Judge

Keys, Inc.,                      :    Marianne B.

CIVIL ACTION NO. 06-11337-PBS    :    Bowler

- - - - - - - - - - - - - - - - -x
```

                        Washington, D.C.

                        Thursday, August 30, 2007

  HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

         Videotaped Deposition of ROSEMARY HAAS, a

witness herein, called for examination by counsel

for the United States of America in the

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                                                      August 30, 2007

Washington, DC

Page 2

1  above-entitled matter, pursuant to notice, the
2  witness being duly sworn by KAREN YOUNG, a Notary
3  Public in and for the District of Columbia, taken at
4  the offices of Jones Day, 51 Louisiana Avenue,
5  Northwest, Washington, D.C., at 9:05 a.m. on
6  Thursday, August 30, 2007, and the proceedings being
7  taken down by Stenotype by KAREN YOUNG, and
8  transcribed under her direction.
9
10 APPEARANCES:
11
12    On Behalf of the Class Plaintiffs in the State
13       of Arizona:
14
15        JENNIFER FOUNTAIN CONNOLLY, ESQ.
16        Wexler Toriseva Wallace
17        55 West Monroe Street
18        Suite 3300
19        Chicago, Illinois 60603
20        jfc@wtwlaw.com
21        (312) 346-2222
22

Page 3

1  APPEARANCES:
2     On Behalf of the United States of America:
3        GEJAA T. GOBENA, ESQ.
4        JENNIFER CHORPENING, ESQ.
5        U.S. Department of Justice
6        Civil Division
7        Commercial Litigation - Fraud Section
8        601 D Street, Northwest
9        PHB - 9028 / P.O. Box 261
10       Washington, D.C. 20044
11       Gejaa.Gobena@usdoj.gov
12       (202) 307-1088
13
14    On Behalf of the State of California:
15       NICHOLAS N. PAUL, ESQ.
16       Bureau of Medical Fraud & Elder Abuse
17       Civil Prosecutions Unit
18       P.O. Box 85266
19       110 West A Street, #1100
20       San Diego, California 92186
21       nichols.paul@doj.ca.gov
22       (619) 688-6099

Page 4

1  APPEARANCES:
2     On Behalf of Ven-a-Care of the Florida Keys,
3        Inc.:
4        RAND J. RIKLIN, ESQ.
5        Goode Casseb Jones Riklin Choate & Watson
6        2122 North Main Avenue
7        Post Office Box 120480
8        San Antonio, Texas 78212
9        riklin@goodelaw.com
10       (210) 733-6030
11
12    On Behalf of Abbott Laboratories:
13       TINA M. TABACCHI, ESQ.
14       Jones Day
15       77 West Wacker
16       Chicago, IL 60601-1692
17       TMTABACCHI@JONESDAY.COM
18       (312) 269-4081
19
20    ALSO PRESENT:
21       Shelly Sanders Kreider, Videographer
22

Page 5

1           C O N T E N T S
2  THE WITNESS:
3  ROSEMARY HAAS
4    By Mr. Gobena ...................... 8
5    By Mr. Riklin .................... 262
6    By Mr. Paul ...................... 332
7    By Ms. Tabacchi .................. 340
8    By Mr. Paul ...................... 340
9
10          E X H I B I T S
11 EXHIBIT NO.                                PAGE NO.
12 Plaintiff's Exhibit 1350  Federal Register, 6/5/91 ................ 20
13 Plaintiff's Exhibit 1351  Medicare Working Group Meeting ..........108
14                           Minutes, 3/6/97
15 Plaintiff's Exhibit 1352  Handwritten note, ABT-DOJ 295986 ........ 119
16 Plaintiff's Exhibit 1353  Landsidle memo to Taylor, 8/21/97 ....... 124
17 Plaintiff's Exhibit 1354  Landsidle memo to de Lasa, 11/7/97 ...... 125
18 Plaintiff's Exhibit 1355  Haas memo to Luniak, 11/19/97 ........... 127
19 Plaintiff's Exhibit 1356  Article from the Pink Sheet, 4/10/00 .... 138
20 Plaintiff's Exhibit 1357  Handwritten Notes, ABT-DOJ 296395 ....... 138
21 Plaintiff's Exhibit 1358  Handwritten Notes, 5/3/00 ............... 147
22 Plaintiff's Exhibit 1359  Article from the Pink Sheet, 6/5/00 ..... 175

                                                                     2 (Pages 2 to 5)

Page 6

```
 1             EXHIBITS
 2  EXHIBIT NO.                              PAGE NO.
 3  Plaintiff's Exhibit 1360   HCFA Program Memoranda .................. 181
 4  Plaintiff's Exhibit 1361   Parver memo to NAIT Members, 9/19/00 .... 189
 5  Plaintiff's Exhibit 1362   Haas memo to Barmak, 10/27/00 ........... 206
 6  Plaintiff's Exhibit 1363   Stark letter to White, 10/31/00 ......... 212
 7  Plaintiff's Exhibit 1364   Program Memorandum, 11/17/00 ............ 219
 8  Plaintiff's Exhibit 1365   Haas e-mail to Johnson, 11/22/00 ........ 222
 9  Plaintiff's Exhibit 1366   Landsidle fax to Schumacher, 1/4/01 ..... 236
10  Plaintiff's Exhibit 1367   Leavenworth e-mail to Haas, 8/28/01 ..... 249
11  Plaintiff's Exhibit 1368   Leavenworth e-mail to Witenstein, ...... 254
12             8/27/02
13  Plaintiff's Exhibit 1369   Abbott Position on Medicare Reform ..... 288
14             Key Participants
15  Plaintiff's Exhibit 1370   Handwritten Notes, ABT-DOJ 296822 ....... 300
16  Plaintiff's Exhibit 1371   Haas e-mail to Mershimer and Lane, ..... 308
17             11/27/02
18  Plaintiff's Exhibit 1372   Haas e-mail to Mershimer, 11/27/02 ...... 316
19  Plaintiff's Exhibit 1373   Patel e-mail to Schroeder et al., ...... 319
20             12/9/02
21
22             - - -
```

Page 7

```
 1             PROCEEDINGS
 2        THE VIDEOGRAPHER:  Here marks the
 3  beginning of Videotape Number 1 in the deposition of
 4  Rosemary Haas, taken by counsels for the plaintiff
 5  in the matter in re Pharmaceutical Industry Average
 6  Wholesale Price Litigation, in the United States
 7  District Court, District of Massachusetts, MDL
 8  Number 1456, Civil Action Number 01-12257-PBS, held
 9  at the offices of Jones Day, 51 Louisiana Avenue,
10  Northwest, Washington, D.C., on August 30th, 2007.
11  The time indicated on the video screen, the time on
12  the screen is 9:05:42.
13        My name is Shelly Sanders Kreider, and I
14  am the certified legal video specialist operating
15  the equipment today.  The court reporter is Karen
16  Young.  We are employed by Henderson Legal Services.
17  Counsel will now introduce themselves and the
18  parties they represent.
19        MR. GOBENA:  Gejaa Gobena, Department of
20  Justice, on behalf of the United States.
21        MS. CHORPENING:  Jennifer Chorpening,
22  Department of Justice.
```

Page 8

```
 1        MR. RIKLIN:  Rand Riklin on behalf of the
 2  relater, Ven-a-Care of the Florida Keys, Inc.
 3        MS. CONNOLLY:  Jennifer Connolly, Wexler
 4  Toriseva, Wallace, on behalf of the class plaintiffs
 5  in the state of Arizona.
 6        MR. PAUL:  Nicholas Paul, California
 7  Department of Justice, for California.
 8        MS. TABACCHI:  Tina Tabacchi on behalf of
 9  Abbott Laboratories.  At this time we assert an
10  objection to the notice of the class plaintiffs as
11  untimely.
12        THE VIDEOGRAPHER:  You're on the record.
13  Whereupon,
14        ROSEMARY HAAS,
15  called for examination by counsel for
16  The United States of America and having
17  been duly sworn by the Notary Public, was
18  examined and testified as follows:
19             - - -
20       EXAMINATION BY COUNSEL FOR
21        THE UNITED STATES OF AMERICA
22  BY MR. GOBENA:
```

Page 9

```
 1     Q.  Good morning, Ms. Haas.  As I mentioned
 2  earlier, my name is Gejaa Gobena.  I'm a trial
 3  attorney with the United States Department of
 4  Justice, and you're here this morning to give
 5  testimony in several cases, one of which is United
 6  States ex rel. Ven-a-Care of the Florida Keys versus
 7  Abbott Labs.  Have you ever had your deposition
 8  taken before?
 9     A.  Yes.
10     Q.  Could you describe to us the circumstances
11  in which you had that deposition taken?
12     A.  It was a personal matter related to some
13  real estate that my husband and I were involved in.
14  This was about ten years ago.
15     Q.  I see.  So you probably were given some
16  instructions then as to how to respond to questions,
17  but I want to start off by giving you a few
18  instructions here so that we can have the deposition
19  go smoothly this morning.  The first thing is that
20  the most important rule for today is for you to give
21  audible responses.  If you gesture or you give
22  ambiguous answers like uh-huh or things like that,
```

3 (Pages 6 to 9)

Haas, Rosemary                                                                August 30, 2007
Washington, DC

Page 26

1  the last seven years that my recollection is of
2  that.
3     Q.   And when you say the pharmaceutical
4  division, are you talking about the Pharmaceutical
5  Products Division?
6     A.   Yes.
7     Q.   And there's also an M. Heggie there.  Do
8  you know what that -- who that might be referring
9  to?
10    A.   Yes.
11    Q.   Is that Michael Heggie?
12    A.   Yes.
13    Q.   And do you know -- does Michael Heggie
14 still work at Abbott?
15    A.   I don't believe so.
16    Q.   Do you recall approximately the earliest
17 time period in which you had a chance to work with
18 Mr. Heggie on any issues?
19        MS. TABACCHI:  Object to the form.
20    A.   I don't recall the time period.
21    Q.   Do you recall any job titles that
22 Mr. Heggie held at Abbott?

Page 27

1     A.   I don't recall his job titles.
2     Q.   Do you recall the areas of -- types of
3  issues that you worked on with Mr. Heggie?
4         MS. TABACCHI:  Object to the form.
5     A.   I didn't work on any job -- on any issues
6  with Mr. Heggie.
7     Q.   Okay.  Did you ever talk to Mr. Heggie
8  about any topics while at Abbott?
9         MS. TABACCHI:  Object to the form.
10    A.   I don't recall.
11    Q.   So you don't recall any conversations you
12 had with Mr. Heggie at any time period.
13        MS. TABACCHI:  Object to the form.
14    A.   I had conversations with Mr. Heggie, but I
15 can't recall what the issue was.
16    Q.   Do you have any recollection whether or
17 not the conversations related in any way to any
18 legislation that was pending in Congress as it may
19 affect Abbott?
20        MS. TABACCHI:  Object to the form.
21    A.   It's possible, but I don't recall.
22    Q.   We'll look at some documents later on that

Page 28

1  may refresh your recollection.  There's also listed
2  an M. King.  Do you know who that might be a
3  reference to?
4     A.   No.
5     Q.   And a D. Robertson, do you see that there?
6     A.   Uh-huh.
7     Q.   Do you know who that might be a reference
8  to?
9     A.   No.
10    Q.   Did you know a Don Robertson who worked at
11 Abbott Laboratories at some point during your tenure
12 there?
13    A.   The name sounds familiar but I didn't know
14 him.
15    Q.   There's also a J. Ward listed there.  Do
16 you know who that might be a reference to?
17    A.   No.
18    Q.   Did you ever have an opportunity to become
19 acquainted with a John Ward during your time period
20 at Abbott?
21    A.   No.
22    Q.   If you go to the first paragraph there of

Page 29

1  Exhibit 903, it reads, "On June 5th, HCFA published
2  the proposed rule on physician payment reform."
3  Before I go any further, Ms. Haas, do you understand
4  what that HCFA might be a reference to there?
5     A.   Yes.
6     Q.   That would be the Health Care Finance
7  Administration, correct?
8     A.   Yes.
9     Q.   And that's the entity within the
10 Department of Health and Human Services that
11 administers the Medicaid and Medicare programs,
12 correct?
13    A.   Yes.
14    Q.   Let's continue on here.  It says, "This
15 rule included a proposal to lower the payment for
16 drugs," quote, "incident to," unquote, "a
17 physician's services to average wholesale price
18 minus 15 percent."  Do you see that there?
19    A.   Yes.
20    Q.   Okay, and you recall the last exhibit we
21 looked at, Plaintiff's Exhibit 1350, was a proposed
22 rule that discussed lowering the reimbursement for

8 (Pages 26 to 29)

Page 30

1  Part B drugs to 85 percent of AWP. Do you recall
2  that?
3      A.  Yes.
4      Q.  And then if you go on further down in this
5  memorandum, there's a subsection titled "Major
6  Issues." Do you see that there?
7      A.  Yes.
8      Q.  And I'm not going to go over every single
9  one of them, but there's a variety of issues there
10 that are listed by Ms. Tobiason. Do you see that
11 there?
12     A.  Yes.
13     Q.  Do you have any knowledge as to whether or
14 not the issues that are listed there, and take a
15 moment if you need to to look at them, were
16 discussed within the government affairs department
17 in approximately June of 1991?
18     A.  I don't have any knowledge of these being
19 discussed in government affairs.
20     Q.  Is it your understanding that perhaps
21 during this time period, that when it came to
22 regulations that were being promulgated by the

Page 31

1  Department of Health and Human Services, that any
2  tracking or analysis of them were done by individual
3  business units within Abbott Laboratories?
4          MS. TABACCHI: Object to the form.
5          BY MR. GOBENA:
6      Q.  And do you understand what I mean by the
7  business units?
8      A.  Yes. I'm not sure.
9      Q.  And did you know that at some point,
10 Ms. Tobiason worked in the business unit within
11 Abbott called the Hospital Products Division?
12     A.  Yes.
13     Q.  All right. Now, you mentioned that you --
14 in the early '90s, you transitioned into a
15 Washington rep --
16     A.  Uh-huh.
17     Q.  -- on behalf of Abbott; is that correct?
18     A.  Yes.
19     Q.  And what were your -- were there any
20 changes relating to your job responsibilities? You
21 talked about the metamorphosis of the job
22 responsibilities over time, but can you give me

Page 32

1  specifically what your responsibilities were once
2  you held that title of Washington rep for Abbott?
3      A.  It involved more engagement outside of the
4  office with our trade associations and representing
5  in business meetings and more closely monitoring
6  legislative activities and providing reports on
7  those. I also had some legislative responsibility
8  for environmental issues.
9      Q.  And did your job title change at any point
10 after you became a Washington representative for
11 Abbott?
12     A.  Yes.
13     Q.  And what was your next sort of job title
14 that you got?
15     A.  My recollection was it was manager of
16 government affairs.
17     Q.  And approximately when did you get
18 promoted -- that was a promotion, right?
19     A.  Yes. It's difficult to say. As I say,
20 there wasn't a clear line of demarcation, and I can
21 say that my duties didn't change significantly from
22 one position to the next; more that it evolved over

Page 33

1  time.
2      Q.  So there was a further evolution from --
3  in your job responsibilities from when you were a
4  Washington rep to now I guess a manager --
5      A.  Uh-huh.
6      Q.  -- for Washington affairs? Was that the
7  title?
8      A.  I don't recall.
9      Q.  It was a manager within the Washington
10 office?
11     A.  It was basically a way to get a promotion.
12     Q.  I see.
13     A.  The title really didn't matter.
14     Q.  Could you describe the evolution of your
15 job responsibilities as you transitioned to a
16 manager within the Washington affairs office?
17     A.  As I said, I took on more responsibility
18 for representing the company at -- inside Washington
19 meetings, with trade associations and business
20 groups and more interaction with Capitol Hill.
21     Q.  So now that you're -- I'm sorry. When you
22 became a manager for Washington affairs, is that the

Haas, Rosemary                                                  August 30, 2007
                                Washington, DC

Page 50

1   it adds language to clarify that the secretary
2   should reimburse for a single-source drug based on
3   the AWP of the drug and not the AWP of a similar
4   drug.  If this language is offered, we hope that
5   Senator Graham will support it.  Thank you, Cindy."
6   The Cindy is a reference to Cynthia Sensibaugh,
7   correct?
8       A.  Yes.
9       Q.  And did you in 1996 work on any of these
10  issues related to proposed legislation as it affects
11  Medicare reimbursement for drugs?
12      A.  No.
13      Q.  So -- and if you turn to the second page,
14  you see some language there.  You see an attachment
15  here that describes some proposed legislative
16  language.  Did you ever review similar types -- or
17  this document or similar types of documents as they
18  relate to the way that Medicare pays for drugs in
19  1996?
20          MS. TABACCHI:  Object to the form.
21      A.  That's a broad question.
22      Q.  Okay.

Page 51

1       A.  Can you be more specific?
2       Q.  Sure.  In 1996, would you have been --
3   would you have been one -- would you have actually
4   looked at documents similar to the ones that are
5   attached here to this fax from Ms. Sensibaugh to
6   Mr. Ribbentrop?
7           MS. TABACCHI:  Object to the form.
8       A.  I did not look at this document.
9       Q.  But in the mid-'90s, '96 time frame, did
10  you review documents that related to the way that
11  Medicare reimbursed for drugs?
12      A.  I don't recall.
13      Q.  If you go to the first section there of
14  this attachment, and this is ABT-DOJ 295991, it
15  says, "Under current law, Medicare payment for
16  outpatient prescription drugs is generally limited
17  to the drugs that cannot be," quote,
18  "self-administered," unquote.  "Unless otherwise
19  required to be made on a prospective payment basis,
20  payments are generally made on the basis of
21  reasonable cost."  Does this language here reflect
22  your understanding of the state of Medicare law in

Page 52

1   1996?
2           MS. TABACCHI:  Object to the form.
3       A.  I wouldn't -- I couldn't answer that.
4       Q.  Is that because you don't recall whether
5   you had that understanding in 1996, that you can't
6   answer the question?
7       A.  I can't answer the question because I
8   wasn't involved with this in 1996.
9       Q.  I'm going to hand you a document that's
10  been previously marked as Exhibit 1170 in this case.
11      A.  Do you want me to be looking at the
12  attachment as well?
13      Q.  Yeah, I want you to look at the
14  attachment, but I'm only going to focus on the first
15  two pages.
16      A.  It only has two pages, so --
17      Q.  You only have two pages?
18      A.  Yes.
19      Q.  Yeah, the attachment has two pages.
20  You're right.  I meant I'm only going to focus on
21  the first two pages of the entire exhibit.
22      A.  Okay.

Page 53

1       Q.  You see it's a document that's dated
2   December 13th, 1996?
3       A.  Yes.
4       Q.  And there's a reference there in the re
5   line to a Medicare working group.  Do you see that?
6       A.  Yes.
7       Q.  And you're one of the addressees of this
8   memorandum, correct?
9       A.  Yes.
10      Q.  So does this document indicate to you that
11  there was a Medicare working group at Abbott in
12  which you were a participant in 1996?
13      A.  Yes.
14      Q.  And do you recall actually attending,
15  whether in person or by phone, meetings involving
16  the Medicare working group?
17      A.  Yes.
18      Q.  And how would you attend?  In person or by
19  telephone?
20      A.  By telephone.
21      Q.  Okay.  And looking at the to line of this
22  memorandum, do you recall any of the people in this

                                                    14 (Pages 50 to 53)

Haas, Rosemary                                              August 30, 2007
                          Washington, DC

Page 54

1   to line that attended meetings of the Medicare
2   working group in or around December of 1996?
3        MS. TABACCHI: Object to the form.
4     A.   I could not say as to whether these people
5   attended.  I wasn't in the room.
6     Q.   I see, so they didn't -- the participants
7   -- well, let me strike that.  Did these meetings
8   take place at Abbott's headquarters in Illinois, the
9   Medicare working group meetings?
10    A.   I believe so.
11    Q.   And when you were in Washington and there
12  were meetings taking place in Illinois, you would
13  phone in, correct?
14    A.   Correct.
15    Q.   But when you called in, no one was
16  identifying -- no one identified themselves at the
17  beginning of the meeting?  Beginning of a given
18  Medicare working group meeting, I should say.
19    A.   That may have happened but I don't recall.
20    Q.   Do you recall being in Medicare working
21  group meetings where Ms. Babington was
22  participating, to the best of your knowledge?

Page 55

1     A.   I frankly do not remember Cathy Babington
2   being on any of the calls personally.
3     Q.   Okay.  And did you recall Mr. Rieger being
4   on the calls?
5     A.   Yes.
6     Q.   How about Ms. Tobiason, do you recall her
7   being on the calls where you were calling into
8   meetings of the Medicare working group?
9     A.   She may have been, but I don't recall her
10  actual participation.
11    Q.   How about Mr. Tootell?  Do you recall him
12  being on the calls you participated in involving the
13  Medicare working group in this time frame of late
14  1996?
15    A.   I could not recall the specific meeting
16  that he would have been participating, but he did
17  participate in some of the calls.  I can recall
18  that.
19    Q.   And Mr. Landsidle's listed there in the to
20  line, correct?
21    A.   Uh-huh, yes.
22    Q.   Did he also participate in these Medicare

Page 56

1   working group meetings as well?
2        MS. TABACCHI: Object to the form.
3     A.   Occasionally.
4     Q.   How frequently would you attend by
5   telephone meetings of the Medicare working group?
6     A.   Periodically, perhaps monthly.
7     Q.   And did Mr. Landsidle always participate
8   in the Medicare working group calls that you were
9   involved in?
10    A.   No.
11    Q.   So sometimes they'd just be you by
12  yourself participating in the Medicare working group
13  calls?
14    A.   Yes.
15    Q.   Did Ms. Sensibaugh participate in Medicare
16  working group calls as well, to your knowledge?
17    A.   I don't see her on the distribution of
18  this one.  She may have been on maternity leave at
19  that time.  I don't know if she participated in any
20  subsequent meetings.
21    Q.   If you go to the first paragraph,
22  Mr. Rieger writes in this memorandum, "In

Page 57

1   preparation for next week's meeting, I'm attaching
2   the most recent version of the proposed Abbott
3   position paper" -- sorry, "proposed Abbott position
4   re Medicare reform for your review."  You've had a
5   chance to look at the attachment, correct?
6     A.   Uh-huh.
7     Q.   Do you recognize that document that's
8   attached to this memorandum?
9     A.   I am sure I saw this document.
10    Q.   And the next sentence of that paragraph on
11  the cover sheet reads, "This is" -- "This is based
12  upon the original document that was presented by Don
13  Buell on November 25th, 1996 and the input that each
14  of you has provided since then."  Do you see that
15  there?
16    A.   Yes.
17    Q.   Do you recall whether you provided input
18  on this proposed Abbott position paper re Medicare
19  reform that was drafted in or around November or
20  December of 1996?
21    A.   No, I do not recall.
22    Q.   Do you recall whether anyone in the

15 (Pages 54 to 57)

Henderson Legal Services
202-220-4158

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Page 58

1  government affairs department provided any input
2  into the draft, or sorry, proposed Abbott position
3  paper re Medicare reform?
4      A.  No.
5      Q.  Do you recall having any discussions with
6  Mr. Landsidle about the proposed Abbott position
7  paper re Medicare reform?
8      A.  No.
9      Q.  Do you know whether the proposed Abbott
10 position paper re Medicare reform was actually
11 finalized?
12     A.  No.
13     Q.  If it was finalized, what's your
14 understanding as to how the position paper would be
15 used?
16         MS. TABACCHI:  Object to the form.
17     A.  Just that because a position paper might
18 have been finalized doesn't mean that it was
19 approved.
20     Q.  Are you familiar with any other position
21 papers that Abbott's put out on public policy
22 issues?

Page 59

1          MS. TABACCHI:  Object to the form.
2      A.  It's possible, but I don't recall
3  specifically.
4      Q.  If there was a position paper put out on a
5  public policy issue, is that something your office
6  would have worked on?
7          MS. TABACCHI:  Object to the form.
8      A.  If it was going to become part of our
9  responsibilities to present that position.
10     Q.  So from time to time, Abbott presents
11 positions that it has on policy issues to
12 governmental entities, correct?
13         MS. TABACCHI:  Object to the form.
14     A.  Position papers would form the basis of
15 what our lobbying strategies would be.
16     Q.  So a paper like this would help guide you
17 in discussions that you had with let's say members
18 of Congress about a particular Medicare reform
19 issue, correct?
20         MS. TABACCHI:  Object to the form.
21     A.  Are you speaking directly to this
22 document?

Page 60

1      Q.  This document or documents like it.  I
2  mean --
3      A.  I believe that's too broad of a question.
4      Q.  Okay.  Let's see if we can make it a
5  little bit simpler.
6      A.  Thank you.
7      Q.  If this paper was finalized and issued --
8      A.  Uh-huh.
9      Q.  The position paper, would you have used it
10 in part -- used it or referred to it in preparing to
11 make presentations to members of Congress about
12 issues related to Medicare reform in this time
13 period?
14         MS. TABACCHI:  Object to the form.
15     A.  If this paper had been finalized and if it
16 had been approved by senior management, including
17 our federal government affairs staff, it would have
18 formed the basis for our messaging with Capitol
19 Hill.
20     Q.  You mentioned approvals by senior
21 management.  Would approval be required from people
22 in the public affairs division within Abbott prior

Page 61

1  to issuance of this type of position paper, to your
2  knowledge?
3          MS. TABACCHI:  Object to the form.
4      A.  Yes.
5      Q.  And why would public affairs be involved
6  in the approval process of a position paper?
7          MS. TABACCHI:  Object to the form.
8      A.  Well, for public affairs particularly
9  being the public affairs professionals, they would,
10 like us, want to be sure that the positions we were
11 representing out in the world were consistent with
12 Abbott's mission.
13     Q.  So they helped make sure that the message
14 was consistent that Abbott was sending out, whether
15 it -- strike that.  So they just wanted to make sure
16 that the public policy positions match up with
17 Abbott's ultimate mission; is that correct?
18         MS. TABACCHI:  Object to the form.
19         BY MR. GOBENA:
20     Q.  Sorry.  What was that?
21     A.  Yes.
22     Q.  I'm going to hand you a document,

16 (Pages 58 to 61)

Haas, Rosemary                                                          August 30, 2007
                            Washington, DC

Page 62

1  Ms. Haas, that's been previously marked as
2  Plaintiff's 1121 in this case, and I'm only going to
3  ask you about the first three pages of it, so why
4  don't you take a minute to look at that. Ms. Haas,
5  you're listed as a recipient of this interoffice
6  correspondence from Richard Rieger dated December
7  20th, 1996, correct?
8      A.  Yes.
9      Q.  And in the re line, it says, "The Medicare
10 working group." Do you see that there?
11     A.  Yes.
12     Q.  And you were still a member of the
13 Medicare working group as of December 20th, 1996,
14 correct?
15     A.  Yes.
16     Q.  If you go to the first paragraph, it says,
17 "Attached is the information that Mike Tootell
18 referenced in our most recent Medicare working group
19 meeting and which he asked me to circulate. It
20 addresses the topics of average wholesale prices and
21 competitive bidding." Do you see that there?
22     A.  Yes.

Page 63

1      Q.  Do you recall participating in Medicare
2  working group meetings where the issue of average
3  wholesale price was discussed?
4      A.  I recall participating in meetings where
5  Mike and others presented proposed position papers.
6      Q.  So you recall Mike Tootell specifically as
7  being someone who spoke and presented papers during
8  those Medicare working group meetings, correct?
9      A.  Yes.
10     Q.  Now, you said -- you mentioned others. Do
11 you have any recollection who those others were who
12 participated in Medicare working group discussions
13 about average wholesale price?
14     A.  About average wholesale price?
15     Q.  Yes.
16     A.  No.
17     Q.  But during these calls, other people
18 spoke, correct, about average wholesale price?
19         MS. TABACCHI: Object to the form.
20     A.  Perhaps.
21     Q.  Do you have any understanding as to why in
22 December of 1996, the Medicare working group was

Page 64

1  discussing average wholesale price?
2      A.  I believe at that time Congress was
3  looking to make changes in the program.
4      Q.  I want to turn your attention to the
5  attachment, the first one, or the one I asked you to
6  look at, Medicare Part B payment for drugs, average
7  wholesale price issue. Actually, first I want to
8  jump ahead to ABT -- there are so many Bates numbers
9  here, so let's pick one. 53269?
10     A.  Uh-huh.
11     Q.  And in the top there, there's an entity
12 listed called the Coalition To Preserve Health Care
13 Quality and Competition. Do you see that?
14     A.  Yes.
15     Q.  I guess that's a group within something
16 called the National Association of Medical Equipment
17 Services. Do you see that?
18     A.  Yes.
19     Q.  Are you familiar with either entity?
20     A.  No.
21     Q.  So they're not one of the trade groups
22 that you worked with during your time period as a

Page 65

1  Washington rep or afterwards, or other titles at
2  Abbott?
3      A.  No.
4      Q.  Okay. Let's go through the issue portion
5  of this attached document. It reads in the first
6  sentence first paragraph, "Currently, Medicare pays
7  for those drugs that are not reimbursed on a
8  prospective payment basis or cost basis at the
9  lesser of average wholesale price or the actual
10 acquisition cost of the drug." Do you see that
11 sentence there?
12     A.  Yes.
13     Q.  Is that consistent with your understanding
14 as to how Medicare paid for drugs in this time frame
15 of December 1996?
16         MS. TABACCHI: Object to the form.
17     A.  Assuming that whoever wrote this document
18 was accurate.
19     Q.  But you had an understanding in December
20 1996 as to how Medicare reimbursed for drugs,
21 correct?
22         MS. TABACCHI: Object to the form.

17 (Pages 62 to 65)

fd2f8eb1-a8c4-464a-9ad3-80373686656b

Haas, Rosemary                                                                August 30, 2007
Washington, DC

Page 66

1     A.   At a very top level.
2     Q.   And you knew that average wholesale price
3  was an element of how Medicare reimbursed for drugs
4  in December of 1996, correct?
5     A.   Yes.
6     Q.   Do you recall reviewing this document, by
7  the way, Ms. Haas?
8     A.   No.
9     Q.   Would this have been the kind of material
10 that you would have reviewed when you received this
11 interoffice correspondence regarding the Medicare
12 working group in this time period?
13    A.   If I was working on this issue.
14    Q.   Were you working in some way on the issue
15 of average wholesale price in 1996 or so?
16    A.   No, I was not.
17    Q.   Who in your office would have been the
18 person most likely to have been tracking these
19 average wholesale price issues in the '96-'97 time
20 frame?
21       MS. TABACCHI:  Object to the form.
22    A.   I would say I don't know if there was

Page 67

1  anyone tracking these particular issues in this time
2  frame.
3     Q.   Well, we saw a previous exhibit where
4  there's a fax from Ms. Sensibaugh to a Dick
5  Ribbenthorp in June '96 related to average wholesale
6  price issues, correct?
7     A.   Correct.
8     Q.   So is it fair to say that Ms. Sensibaugh
9  was at least one of the people in your office who
10 was working on average wholesale price related
11 issues in this '96-'97 time frame?
12       MS. TABACCHI:  Object to the form.
13    A.   I can't say that she was working on AWP
14 issues.  Apparently according to this memo, she was
15 working on a particular legislative position on the
16 issue, but as to whether she was tracking or
17 monitoring, I have no knowledge of that.
18    Q.   Let's skip ahead to the industry options
19 portion of this memo.  Actually, no, strike that.
20 Let's stick with the first section, the issue part.
21 In the second paragraph, it reads, "There have been
22 several studies and investigations into the

Page 68

1  appropriateness of using AWP as a determining factor
2  for payment."  Were you aware of studies and
3  investigations taking place in the mid-'90s
4  regarding AWP?
5     A.   Yes.
6     Q.   And did you ever review the actual studies
7  or any reports related to AWP in this time period?
8        MS. TABACCHI:  Object to the form.
9     A.   No, no.
10    Q.   You just had an awareness that there were
11 reports out there regarding the AWP issue.
12    A.   Yes.
13    Q.   Did anyone in your office to your
14 knowledge collect and review reports from let's say
15 the Department of Health and Human Services
16 regarding AWP issues?
17    A.   I don't recall.
18    Q.   Do you recall ever seeing copies of any
19 reports from HHS or HHS OIG regarding AWP related
20 issues?
21       MS. TABACCHI:  Object to the form.
22    A.   Yes.

Page 69

1     Q.   So there were copies in your office.
2        MS. TABACCHI:  Object to the form.
3     A.   Yes.
4     Q.   Do you recall whose office you might have
5  seen copies of those reports related to AWP issues
6  in?
7        MS. TABACCHI:  Object to the form.
8     A.   There may have been copies in my office.
9     Q.   I see.  So you might have received copies
10 of the reports, correct?
11    A.   Yes.
12       MS. TABACCHI:  Object to the form.
13       BY MR. GOBENA:
14    Q.   But it's your testimony today that you
15 don't recall actually reviewing the reports that
16 were issued by the Department of Health and Human
17 Services or OIG relating to AWP?
18       MS. TABACCHI:  Object to the form.
19    A.   I don't recall reading them, but I was
20 aware of the issues around the appropriateness of
21 AWP.
22    Q.   And what do you recall were some of the

18 (Pages 66 to 69)

Haas, Rosemary August 30, 2007
Washington, DC

| Page 86 | Page 88 |
|---|---|
| 1  work that led up to passage of the Part D drug<br>2  benefit in 2002 and 2003.<br>3      Q.   Did part of that work involve tracking any<br>4  proposed changes in the way that Medicare was<br>5  reimbursing -- was going to be reimbursing for drugs<br>6  after passage of the Medicare Modernization Act?<br>7      A.   No.<br>8      Q.   So as we -- as you testified earlier,<br>9  you're aware that that was a transition from using<br>10 AWP to using ASP that was part of the Medicare<br>11 Modernization Act of 2003.  You remember that<br>12 testimony?<br>13     A.   Yes.<br>14     Q.   Okay.  And is it your testimony that you<br>15 weren't the one in the Washington affairs office who<br>16 was following that part of the legislation?<br>17     A.   That was not an issue we followed and<br>18 participated in as part of the Medicare Part D drug<br>19 benefit.<br>20     Q.   This has been previously marked,<br>21 Ms. Sensibaugh, as Plaintiff's 1123.<br>22         MS. TABACCHI:  Ms. Haas. | 1  and the subject matter, is this the kind of document<br>2  that you would have personally reviewed after<br>3  receiving it?<br>4      A.   Not necessarily.<br>5      Q.   And why do you say not necessarily?<br>6      A.   This was an internal activity to discuss<br>7  issues that were policy issues that were being<br>8  presented in Congress, and I might have -- I wasn't<br>9  working on these particular issues, so if I got<br>10 this, saw the cover, I might have just put it aside.<br>11     Q.   As you go to the re line, it says re<br>12 Medicare working group meeting.  Do you see that?<br>13     A.   Yes.<br>14     Q.   And we've already established that you<br>15 participated in multiple Medicare working group<br>16 meetings, correct?<br>17     A.   Yes.<br>18     Q.   And it says in the first paragraph the<br>19 next Medicare working group meeting will be held on<br>20 Tuesday January 21st, 1997 from 8:00 a.m. to 9:30<br>21 a.m. in a conference room.  Do you see that there?<br>22     A.   Yes. |
| Page 87 | Page 89 |
| 1          BY MR. GOBENA:<br>2      Q.   Oh, sorry.  Did I call you Ms. Sensibaugh?<br>3      A.   We're both short, so --<br>4      Q.   You guys do look kind of alike.<br>5      A.   She's from South Carolina.  I'm from<br>6  Pittsburgh, so --<br>7      Q.   Why don't you take a moment, Ms. Haas, to<br>8  look at the first three pages of this document that<br>9  I've handed you.  You've had a chance to review the<br>10 document?<br>11     A.   Yes.<br>12     Q.   If you look at the top, this piece of<br>13 interoffice correspondence is from Richard Rieger,<br>14 and it's dated January 15th, 1997, and there are a<br>15 bunch of addressees listed, among which we find you,<br>16 Ms. Haas.<br>17     A.   Uh-huh.<br>18     Q.   Taking a look at this document, do you<br>19 recall receiving it?<br>20     A.   My name is on it.  It probably arrived in<br>21 my in box.<br>22     Q.   Just based on your review of this document | 1      Q.   It goes -- Mr. Rieger goes on to say,<br>2  "Based upon input from several of you, I am<br>3  proposing the following agenda for the meeting," and<br>4  the first bullet point is discuss the average<br>5  wholesale price versus actual cost issue.  Do you<br>6  see that there?<br>7      A.   Yes.<br>8      Q.   Okay.  Now, this is the second memorandum<br>9  that we've seen today, Ms. Haas, where there's been<br>10 a reference to a discussion by the Medicare working<br>11 group about average wholesale price, correct?<br>12     A.   Correct.<br>13     Q.   So it's fair to say based on these<br>14 memoranda that there were multiple conversations<br>15 about the issue of average wholesale price held by<br>16 the Medicare working group.<br>17         MS. TABACCHI:  Object to the form.<br>18     A.   I would say so.<br>19     Q.   Were you personally involved in more than<br>20 -- in meetings of the Medicare working group where<br>21 the issue of average wholesale price was discussed?<br>22         MS. TABACCHI:  Object to the form. |

23 (Pages 86 to 89)

Henderson Legal Services
202-220-4158

Page 90

1   A.  I recall that I participated in three or
2 four of these meetings.  I don't recall -- I do not
3 recall the subject matter of those meetings beyond
4 what we see here in front of us, and I did not
5 participate in those discussions.
6   Q.  So you said three or four meetings.  Are
7 you talking about three or four meetings of the
8 Medicare working group that -- where the issue of
9 AWP was discussed?
10  A.  Three or four meetings of the Medicare
11 working group.  I don't recall what the agenda
12 topics were.
13  Q.  Let me ask you your best recollection.
14 Was the issue of AWP discussed multiple times -- was
15 AWP -- issue of AWP discussed in multiple meetings
16 that you participated in of the Medicare working
17 group?
18      MS. TABACCHI:  I object to the form.
19  A.  Possible.
20  Q.  If you go to the bottom of the page there,
21 that paragraph after the bullet points, Mr. Rieger
22 goes on to write, "In preparation for the meeting, I

Page 91

1 am attaching two documents.  The first document is
2 an article related to AWP and President Clinton's
3 expected 1998 budget proposal.  This is in addition
4 to the documents that I previously sent you on
5 December 20th, 1996 regarding AWP and competitive
6 bidding."  Do you see that there?
7   A.  Yes.
8   Q.  So does this language in Mr. Rieger's
9 memorandum refresh your recollection that President
10 Clinton was proposing changes to the way Medicare
11 reimbursed for drugs as part of his 1998 budget
12 proposal?
13      MS. TABACCHI:  Object to the form.
14  A.  Yes.
15  Q.  And in fact, if you turn to the third page
16 of the exhibit, there's an article there where if
17 you go to the second paragraph of the -- or
18 actually, it's the first paragraph of the article,
19 it reads, in capital letters, "Clinton
20 administration expected to propose Medicare
21 outpatient drug," and then small letters, "Coverage
22 be based on actual cost rather than AWP as part of

Page 92

1 the President's budget request of fiscal year '98."
2 Do you see that there?
3   A.  Yes.
4   Q.  Do you recall seeing articles in I guess
5 this is now early 1997 regarding the Clinton
6 administration's proposed changes to the way
7 Medicare reimbursed drugs from using AWP to using
8 actual cost?
9   A.  I recall that that was a significant topic
10 of discussion throughout that time frame, but I
11 don't recall specific articles or --
12  Q.  So it was a significant issue within the
13 pharmaceutical industry?
14      MS. TABACCHI:  Object to the form.
15      BY MR. GOBENA:
16  Q.  Let me strike that.  Let me make it easier
17 for you.  Was it a significant issue for Abbott
18 during this time frame?
19      MS. TABACCHI:  Object to the form.
20  A.  Not that I recall.
21  Q.  Do you have any -- do you remember having
22 any conversations with anyone else in the Washington

Page 93

1 affairs office about President Clinton's proposed
2 change to Medicare drug reimbursement to shift from
3 using AWP to using actual costs?
4   A.  No, I do not recall.
5   Q.  So you don't recall discussing the issue
6 of President Clinton's proposed change with, let's
7 say, Mr. Landsidle in this time frame?
8   A.  I don't recall.
9   Q.  And you don't recall having conversations
10 with Ms. Sensibaugh about this proposed Clinton
11 administration budget proposal to shift from using
12 AWP to actual cost?
13  A.  I don't recall having that conversation.
14  Q.  You're not testifying that you didn't have
15 it.  You're just saying that you don't remember; is
16 that correct?
17  A.  I don't remember.
18  Q.  But you could have.
19      MS. TABACCHI:  Object to the form.
20      BY MR. GOBENA:
21  Q.  Sorry?
22  A.  I don't remember.

24 (Pages 90 to 93)

Haas, Rosemary                                                          August 30, 2007
Washington, DC

Page 106

1   of things, so I don't recall being asked anything
2   particularly related to e-mails.
3       Q.   Were you given multiple instructions over
4   the years to preserve documents related to AWP?
5       A.   I don't recall if there were multiples of
6   that.
7       Q.   Do you recall definitely at some point
8   being asked to preserve?
9       A.   Yes.
10      Q.   But it's your testimony that you don't
11  recall whether you were asked more than once to
12  preserve.
13      A.   Yes.
14      Q.   And once you started using e-mail more
15  frequently, what kinds of measures did you use to
16  save those e-mails as they related to AWP issues?
17      A.   I did not have significant e-mails on AWP
18  and I was never asked to preserve e-mails on AWP.
19  Ask me about drug importation.  I have a lot of
20  files I'm saving on drug importation.
21      Q.   Understood.  I'm going to hand you what's
22  been previously marked as Plaintiff's 1125, and I'm

Page 107

1   just going to ask you a couple quick questions on
2   it.  We're not going to dwell on it.
3           MS. TABACCHI:  I'm sorry, Gejaa.  What
4   number is this?
5           MR. GOBENA:  It's 1125.
6           MS. TABACCHI:  Of course, it's right
7   there.
8           BY MR. GOBENA:
9       Q.   It's a short memorandum, Ms. Haas.  I just
10  want to know if you've ever seen this memorandum.
11      A.   No, I don't recall seeing this memo.
12      Q.   So I understood your testimony, because it
13  will help us go a lot faster, you didn't work at all
14  on the fiscal year '98 Clinton budget proposal that
15  would shift Medicare reimbursement for drugs from
16  AWP to actual costs?
17      A.   I did not work on that issue.
18      Q.   This has been marked as an exhibit
19  previously.  I just don't know the exact number
20  right now.  Let me take a moment here to check my
21  records and see if I can figure that out.  Why don't
22  we go off the record.

Page 108

1           THE VIDEOGRAPHER:  We're going off the
2   record.  The time on the screen is 11:17:05.
3           (Discussion off the record)
4           THE VIDEOGRAPHER:  We're back on the
5   record, 11:18:05.
6           BY MR. GOBENA:
7       Q.   It's going to be -- actually, Ms. Haas,
8   can I have this document marked as 1351 and then
9   she'll hand it back to you and continue your review.
10      A.   So I need to give this to --
11      Q.   To the court reporter.
12              (Plaintiff's Exhibit 1351
13               was marked for
14               identification.)
15          BY MR. GOBENA:
16      Q.   Have you had a chance to review the
17  document, Ms. Haas?
18      A.   Yes.
19      Q.   On the first page, you'll see it's a
20  distribution list of the Medicare working group, and
21  you're listed there on the first page, correct?
22      A.   Yes.

Page 109

1       Q.   And on the next page, we have a memorandum
2   from Mr. Rieger dated March 7th, 1997 that says --
3   that's to the distribution list, which you're on,
4   and it says, "Re Medicare working group meeting
5   minutes, March 6th, 1997," and it goes on to read,
6   "Due to my absence at the most recent working group
7   meeting, Jim Miller drafted the meeting minutes and
8   they're attached for your review.  As before, please
9   provide me with any changes that you would like
10  incorporated before we publish the final version of
11  the minutes."  Do you see that?
12      A.   Yes.
13      Q.   Do you recall reviewing drafts of minutes
14  prepared after Medicare working group meetings?
15      A.   I may have.
16      Q.   Did you ever provide any comments on any
17  drafts of Medicare working group meeting minutes?
18      A.   Not that I recall, and I would say that at
19  this point I was no longer really participating in
20  these meetings even though I'm on the distribution.
21      Q.   And why do you say that, Ms. Haas?
22      A.   Because I was involved in other issues and

28 (Pages 106 to 109)

Page 110

1   I was not working on these particular issues.
2      Q.   What particular issues had you started to
3   work on in March of 1997 that took you away from the
4   Medicare working group?
5      A.   Part of it was we felt that we didn't need
6   to have three of us on these calls.  As you'll see
7   on the distribution list, we're listed separately as
8   the D.C. Washington office, and we just felt it
9   didn't make sense to have three of us all on these
10  calls.
11     Q.   So there were times when there were
12  Medicare working group meetings where your office
13  participated where three of you, Mr. Landsidle,
14  Ms. Sensibaugh and you, were all participating on
15  the same call?
16     A.   Perhaps earlier in the inception of these
17  groups, but as it went along, it -- we felt we
18  needed to have at least one person on those calls.
19  I don't recall which meetings I sat in on and which
20  I didn't.
21     Q.   And if you didn't sit in on a meeting, who
22  was more likely to sit in, Mr. Landsidle or

Page 111

1   Ms. Sensibaugh, to your knowledge?
2      A.   At that point it would have probably been
3   Cindy or myself.
4      Q.   Is it likely that in connection with this
5   March '97 meeting, either you or Ms. Sensibaugh
6   would have participated in this Medicare working
7   group meeting?
8      A.   I don't recall participating, and I don't
9   know if Cindy participated.
10     Q.   Well, let's go through the meeting minutes
11  and see if that refreshes your recollection as to
12  your potential participation in the meeting that's
13  discussed here.  If you go to the -- we're on the
14  third page here, ABT 52841, and it says, Medicare --
15  in the re line, "Medicare working group meeting
16  minutes," dated March 6th, 1997, and so this
17  memorandum's referencing a meeting that happened on
18  March 6th.  Is that your understanding as well?
19     A.   That's what it says.
20     Q.   Okay.  It goes on to say, The following is
21  a summary of the discussions which occurred at the
22  meeting."  The first bullet point, "Changing

Page 112

1   reimbursement price for drugs administered in
2   physicians' offices from AWP."  Do you see that
3   there?
4      A.   Yes.
5      Q.   By my count, this is the third meeting now
6   that was held -- that the Medicare working group
7   meeting held where the issue of AWP was discussed.
8   Is that consistent with your understanding as well?
9      A.   Based upon --
10         MS. TABACCHI:  Object to the form.
11     A.   Based upon what we looked at, yes.
12     Q.   The next paragraph reads, "Abbott," slash,
13  "TAP has approximately 900 million plus of sales
14  which would be affected by this proposal.  The two
15  largest products are Lupron and Calcijex."  Do you
16  see that there?
17     A.   Yes.
18     Q.   Do you recall being in any Medicare
19  working group meetings where the issue of Medicare
20  reimbursement for Lupron was discussed?
21     A.   No.
22     Q.   How about any Medicare working group

Page 113

1   meetings where the issue of reimbursement for
2   Calcijex was discussed?
3      A.   No.
4      Q.   Did you participate in any Medicare
5   working group meetings where issues related to TAP
6   Pharmaceuticals was discussed?
7      A.   No.
8      Q.   If you go to the last paragraph under this
9   bullet point, it reads, "The group consensus was
10  that," quote, "acquisition cost plus," unquote,
11  "would be the least unfavorable alternative to the
12  current Abbott TAP business."  Do you see that
13  there?
14     A.   Yes.
15     Q.   Do you recall participating in any
16  Medicare working group meetings where discussion of
17  the -- of acquisition cost plus as a way of
18  reimbursing for drugs under Medicare was discussed?
19     A.   No, I do not.
20     Q.   Did you -- do you recall having any
21  discussions within the Washington affairs office,
22  anyone in the Washington affairs office, about the

29 (Pages 110 to 113)

Haas, Rosemary                                                         August 30, 2007
                              Washington, DC

Page 262

1  warrant such questioning, and I will pass the
2  witness to my colleague, Mr. Rand, representing
3  Ven-a-Care of the Florida Keys.
4         MR. RIKLIN:  How much tape do we have
5  left?
6         THE VIDEOGRAPHER:  We have 19 minutes.
7  Would you like to change it now?
8         MR. RIKLIN:  Yeah, why don't we take a
9  break and then start with the new tape.
10        THE VIDEOGRAPHER:  Here marks the end of
11 Videotape Number 4.  We're going off the record.
12 The time is 15:32:35.
13        (Recessed at 3:32 p.m.)
14        (Reconvened at 3:41 p.m.)
15        THE VIDEOGRAPHER:  Here marks the
16 beginning of Videotape Number 5 in the deposition of
17 Rosemary Haas.  The time on the screen is 15:41:22.
18 You're on the record.
19        EXAMINATION BY COUNSEL FOR
20    VEN-A-CARE OF THE FLORIDA KEYS, INC.
21        BY MR. RIKLIN:
22    Q.   Good afternoon, Ms. Haas.  How are you?

Page 263

1  Ms. Haas, my questioning won't be nearly as lengthy
2  as Mr. Gobena's because he's covered a lot of ground
3  I would have covered had I gone first, but there are
4  some things I'd like to clarify, and there probably
5  are -- I can tell you, there will be a few documents
6  that I want to talk to you that Mr. Gobena has not
7  -- did not introduce to you, present to you.
8  Earlier, you told us that you at least at some point
9  participated in the Medicare working group meetings
10 at least by telephone, correct?
11    A.   Yes, correct.
12    Q.   Was one of the purposes of the Medicare
13 working group to monitor any changes that Congress
14 was considering to Medicare reimbursement?
15    A.   Yes.
16    Q.   Okay.  Take a look at Exhibit 1170, which
17 is a December 13, 1996 memo from Richard Rieger to
18 the Medicare working group.
19    A.   I guess I should have kept these in order.
20    Q.   Yeah.  You were shown that document
21 earlier.
22    A.   I just didn't keep them in order.  Let's

Page 264

1  see.  Here's one from Rieger.  What exhibit did you
2  say?
3     Q.   1170.  It's one of the first documents
4  that was introduced this morning.
5     A.   Sorry.  I would have put them in order on
6  the break.
7     Q.   Not a problem.  It's a December 13, 1996
8  memo, interoffice correspondence from --
9     A.   Okay, we got it.
10    Q.   Okay, all right, and you're shown as a
11 recipient of that memo, correct?
12    A.   Yes.
13    Q.   At the time, you were a member of the
14 Medicare working group committee or group.
15    A.   Yes.
16    Q.   And the subject line says, "Medicare
17 working group meeting, 12/16/1996," and it -- and
18 Mr. Rieger starts off, "In preparation for next
19 week's meeting."  Does that indicate to you that
20 there was a Medicare working group meeting on
21 December 12 -- excuse me, December 16, 1996?
22    A.   That's what this says, yes.

Page 265

1     Q.   Okay, and I realize you don't recall
2  whether -- or did you say you thought you did
3  participate by telephone in connection with this
4  meeting?
5     A.   I don't recall.
6     Q.   Okay.
7     A.   I know I participated in some.
8     Q.   During this time period, you did
9  participate in at least some --
10    A.   Yes.
11    Q.   -- Medicare working group meetings by
12 telephone, correct?
13    A.   Yes, correct.
14    Q.   Because some of these people were in
15 Chicago at the time, and then you and your
16 colleagues in government affairs were in Washington.
17    A.   Correct.
18    Q.   Okay.  Mr. Rieger states that, "For next
19 week's meeting, we would like to propose the
20 following agenda," and then he has three bullet
21 points, correct?
22    A.   Yes.

67 (Pages 262 to 265)