# EXHIBIT 170



*experience does matter*

## CASE: In Re: Pharmaceutical Industry Average Wholesale Price Litigation
## DATE: July 30, 2007

Enclosed is the Original of the transcript of the testimony of **Miller, James E.** along with the errata sheet in the above-titled case. Please have the witness read the deposition and sign the signature page before a Notary Public.

After the signature page has been notarized, please return the original transcript and errata sheets to the custodial attorney within 30 days of receipt for proper filing.

Thank you for your attention to this matter and please feel free to contact us with any questions or concerns.


Sincerely,

Henderson Legal Services



Encl.

Henderson Legal Services
Phone: 202-220-4158
Fax: 202-220-4162
Website: www.hendersonlegalservices.com

Page 1

```
          IN THE UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF MASSACHUSETTS



-------------------------------X

IN RE:   PHARMACEUTICAL         )

INDUSTRY AVERAGE WHOLESALE      )

PRICE LITIGATION                ) MDL No. 1456

-----------------------------)  Civil Action

This document relates to:       ) No. 01-12257-PBS

United States of America,       )

ex. rel. Ven-a-Care of the      )

Florida Keys, Inc.,             ) Hon. Patti Saris

    vs.                         )

Abbott Laboratories, Inc.,      ) Magistrate Judge

CIVIL ACTION NO. 06-11337-PBS ) Marianne Bowler

-------------------------------X


              VIDEOTAPED DEPOSITION OF

                 JAMES E. MILLER

                  CHICAGO, IL

                 JULY 30, 2007
```

|  | Page 2 | | Page 4 |
|---|---|---|---|
| 1 |  | 1 | APPEARANCES: (CONTINUED) |
| 2 | Videotaped deposition of JAMES E. MILLER, | 2 |  |
| 3 | called by the Plaintiffs for examination, taken | 3 | BERGER & MONTAGUE, P.C. |
| 4 | pursuant to notice, agreement and by the provisions of | 4 | BY: SUSAN SCHNEIDER THOMAS, ESQ. |
| 5 | the Rules of Civil Procedure for the United States | 5 | 1622 Locust Street |
| 6 | District Courts pertaining to the taking of | 6 | Philadelphia, Pennsylvania 19103 |
| 7 | depositions, taken before DEBORAH HABIAN, a Notary | 7 | (215) 875-3000 |
| 8 | Public within and for the County of Cook, State of | 8 | on behalf of the Realtor, Ven-a-Care; |
| 9 | Illinois, and a Certified Shorthand Reporter of said | 9 |  |
| 10 | State, at the offices of Katten Muchin Rosenman, | 10 |  |
| 11 | 525 West Monroe Street, 19th Floor, Chicago, Illinois, | 11 | WEXLER TORISEVA WALLACE, LLP |
| 12 | on the 30th day of July, 2007, at 9:12 a.m. | 12 | BY: CHRISTOPHER J. STUART, ESQ. |
| 13 |  | 13 | 55 West Monroe Street |
| 14 |  | 14 |  Suite 300 |
| 15 |  | 15 | Chicago, Illinois 60602 |
| 16 |  | 16 | (312) 346-2222 |
| 17 |  | 17 | on behalf of the State of Arizona |
| 18 |  | 18 | and the MDL Plaintiffs; |
| 19 |  | 19 |  |
| 20 |  | 20 |  |
| 21 |  | 21 |  |
| 22 |  | 22 | (CONTINUED) |

|  | Page 3 | | Page 5 |
|---|---|---|---|
| 1 | APPEARANCES: | 1 | APPEARANCES: (CONTINUED) |
| 2 |  | 2 |  |
| 3 | STATE OF CALIFORNIA DEPARTMENT OF JUSTICE | 3 | JONES DAY |
| 4 | BUREAU OF MEDI-CAL FRAUD & ELDER ABUSE | 4 | BY: TINA M. TABACCHI, ESQ. |
| 5 | BY: ELISEO SISNEROS, ESQ. | 5 | 77 West Wacker Drive |
| 6 |    DEPUTY ATTORNEY GENERAL | 6 | Chicago, Illinois 60601-1692 |
| 7 | 110 West A Street | 7 | (312) 782-3939 |
| 8 | No. 1100 | 8 | on behalf of the Defendants; |
| 9 | San Diego, California 92101 | 9 |  |
| 10 | (619) 688-6043 | 10 | KATTEN MUCHIN ROSENMANN, LLP |
| 11 | on behalf of the State of California; | 11 | BY: GIL M. SOFFER, ESQ. |
| 12 |  | 12 |    DEAN V. HOFFMAN, ESQ. |
| 13 | U.S. DEPARTMENT OF JUSTICE | 13 | 525 West Monroe Street |
| 14 | COMMERCIAL LITIGATION, FRAUD | 14 | Chicago, Illinois 60661-3693 |
| 15 | BY: REBECCA A. FORD, ESQ. | 15 | (312) 902-5200 |
| 16 | 601 D Street, N.W. | 16 | on behalf of the deponent. |
| 17 | Patrick Henry Building - 9133 | 17 |  |
| 18 | Washington, D.C. 20044 | 18 |  |
| 19 | (202) 514-1511 | 19 | ALSO PRESENT: |
| 20 | on behalf of the United States; | 20 |    ANTHONY MICHELETTO, VIDEOGRAPHER |
| 21 |  | 21 |    HENDERSON LEGAL SERVICES |
| 22 | (CONTINUED) | 22 |  |

2 (Pages 2 to 5)

Page 50

1   A.  Yes.
2   Q.  Okay.  And what were Mr. Moorehead's
3  instructions to you?
4   A.  I do not recall specifically, but it
5  was generally to call a meeting of these people
6  who were responsible for I'm going to call it
7  insurance coverage in the divisions and certain
8  corporate functions that were interested.
9       MR. SOFFER:  Why don't we have a break
10 now?
11      MR. SISNEROS:  Okay.
12      THE WITNESS:  Okay.
13      THE VIDEOGRAPHER:  We are off the
14 record at 9:56 a.m.
15      (Recess taken.)
16      THE VIDEOGRAPHER:  We are back on the
17 record at 10:08 a.m.
18 BY MR. SISNEROS:
19  Q.  Mr. Miller, I'm going to have the court
20 reporter read off a couple of questions and
21 answers just before we took the first break
22 because I want to follow up with some questions

Page 51

1  to your response.
2       (Record read as follows:
3   Q.  Have you heard of the Medicare Working
4  Group?
5   A.  Yes.
6   Q.  What is it?
7   A.  The Medicare Working Group was a --
8  it's called a working group of personnel from the
9  divisions and interested corporate functions on
10 product reimbursement.")
11 BY MR. SISNEROS:
12  Q.  Mr. Miller, what did you mean by the
13 words "interested corporate functions on product
14 reimbursement"?
15  A.  The corporate groups that I remember
16 attending via person or in phone was Public
17 Affairs and the Washington office and, obviously,
18 my department.
19  Q.  If you know, is there a reason why Mr.
20 Moorehead asked you to create this group?
21  A.  I do not remember a specific reason.
22  Q.  Do you have a general recollection of

Page 52

1  why you were asked to create this group?
2       MS. TABACCHI:  Object to the form.
3       THE WITNESS:  No.  I'd be guessing.
4       MR. SISNEROS:  Don't guess.
5       (Exhibit Miller 1162 was marked
6  for ID)
7  BY MR. SISNEROS:
8   Q.  I'm handing you what I've marked and
9  identified as Exhibit Miller 1162 to your
10 deposition, pages 1 and 2, and these are two
11 lists.
12      Are -- if you could take a moment and
13 review both lists?
14  A.  (Witness reviewing document.)
15     Okay.
16  Q.  Have you had a chance to review both
17 lists, Mr. Miller?
18  A.  Yes, sir.
19  Q.  All right, the first page of Exhibit
20 Miller 1162 is entitled, "Abbott's Medicare
21 Working Group Key Participants."  Do you see
22 that?

Page 53

1   A.  Yes, sir.
2   Q.  And then the second list is entitled,
3  "Abbott's Medicare Working Group Distribution
4  List;" is that correct?
5   A.  Correct.
6   Q.  And it appears to me that in both lists
7  it's the same group of individuals.  Is that
8  correct?
9   A.  There's sixteen names on both pages.
10  Q.  The difference between page 1 and page
11 2 is that it identifies each of the individuals -
12 - or strike that.
13      Page 1 of the exhibit identifies the
14 division from which those individuals come from;
15 is that correct?
16  A.  Division and corporate function.
17  Q.  That's correct.  Now, who was
18 responsible for the individuals that composed the
19 Medicare working group?
20      MS. TABACCHI:  Object to the form.
21 BY MR. SISNEROS:
22  Q.  All right, let me try it a different

14 (Pages 50 to 53)

Miller, James E.                                                           July 30, 2007

Chicago, IL

Page 54

1  way. Who picked the members of the Medicare
2  Working Group?
3      A.  The initial participants were suggested
4  by Mr. Moorehead.
5      Q.  And the individuals that are listed in
6  Exhibit Miller 1162, are those the individuals
7  that were suggested by Mr. Moorehead?
8      A.  I do not remember.
9      Q.  Are some of the individuals that are to
10 be found on the list of Exhibit Miller 1162 some
11 of the individuals that Mr. Moorehead suggested?
12     A.  Yes.
13     Q.  What individuals are those?
14     A.  I cannot answer with total accuracy.
15     Q.  To the best of your recollection.
16     A.  I mean there are people -- I don't
17 know. I mean ADD, Paul Landauer had -- well, I'm
18 not -- I'm not sure who was on the original list.
19 I mean that's ten years ago, guys.
20     Q.  From the best of your recollection,
21 were most of the individuals that Moorehead
22 suggested to you in fact the members of the

Page 55

1  Medicare Working Group?
2      A.  I remember there were people that
3  showed up for the initial meetings that said,
4  "Why am I here?"
5      Q.  When was that initial meeting?
6      A.  It would have to be in the fall of '96.
7      Q.  August, September, October, November of
8  '96?
9      A.  Somewhere after I was there.
10         MS. TABACCHI:  Object to form.
11 BY MR. SISNEROS:
12     Q.  And when these individuals asked, "Why
13 am I here," what did you tell them?
14     A.  "It's a working group to share
15 information on the reimbursement products. If
16 you're responsible for that, you belong here. If
17 you're not responsible for that, give me a name."
18     Q.  So at least in the -- in identifying
19 the members that were to be on the Medicare
20 Working Group, they were to be individuals that
21 were responsible for reimbursement issues in
22 their division?

Page 56

1          MS. TABACCHI:  Object to the form.
2          THE WITNESS:  Knowledgeable.
3  BY MR. SISNEROS:
4      Q.  Knowledgeable on reimbursement issues
5  in their division?
6      A.  Yes.
7      Q.  Since your name is on this list, then
8  you are an individual that is knowledgeable on
9  reimbursement issues?
10     A.  No, sir.
11     Q.  Why are you here?
12     A.  I was assigned a coordination role.
13     Q.  And what -- in coordination role, what
14 were your responsibilities?
15     A.  To get the individuals together for a
16 one-hour meeting once a month.
17     Q.  To discuss reimbursement?
18     A.  To discuss --
19         MS. TABACCHI:  Object to the form.
20         THE WITNESS:  To discuss coverage
21 issues for their products. I'm going to
22 interchange "reimbursement" and "coverage" as the

Page 57

1  same word.
2  BY MR. SISNEROS:
3      Q.  Okay.  And "coverage," you mean
4  coverage by third-party payers?
5      A.  Any third-party payer.
6      Q.  Private health insurance?
7      A.  Hospitals, yeah, right.
8      Q.  Medicare/Medicaid?
9      A.  Any third-party payer.
10     Q.  Including Medicare and Medicaid?
11     A.  Yes, sir.
12     Q.  All right. Was Rich Rieger someone who
13 was knowledgeable in reimbursement?
14         MS. TABACCHI:  Object to the form.
15         THE WITNESS:  I do not believe so.
16 BY MR. SISNEROS:
17     Q.  How about Cathy Babington?
18     A.  I do not believe so.
19     Q.  Hank Doyle?
20     A.  I do not believe so.
21     Q.  Don Buell?
22         MS. TABACCHI:  Object to the form.

15 (Pages 54 to 57)

Miller, James E.                                                                July 30, 2007
Chicago, IL

Page 82

1  and HPD agreed.
2      Q.  And as to their divisions, acquisition
3  cost plus was the least unfavorable?
4      A.  Yes.
5          MS. TABACCHI:  Object to the form.
6  BY MR. SISNEROS:
7      Q.  Okay, so -- so -- just so I'm clear
8  that what your thinking is, is "the group"
9  references the HPD and TAP business's divisions?
10         MS. TABACCHI:  Object to the form.
11         THE WITNESS:  Yes.
12 BY MR. SISNEROS:
13     Q.  So going back to Exhibit Miller 1162,
14 which is the list of participants in the Medicare
15 Working Group -- do you have that before you?
16     A.  Yes, sir.
17     Q.  The -- the members of HPD would have
18 been Michael Heggie, Dave Olson, and Ginny
19 Tobiason; is that right?
20         MS. TABACCHI:  Object to the form.
21         THE WITNESS:  Those are the members of
22 the Working Group.

Page 83

1  BY MR. SISNEROS:
2      Q.  From HPD?
3      A.  According to this document.
4      Q.  Do you have any disagreement with this
5  document, the way they are identified, in what
6  division they're identified?
7          MS. TABACCHI:  Object to the form.
8          THE WITNESS:  Some of these people I do
9  not recall ever meeting.
10 BY MR. SISNEROS:
11     Q.  Do you remember meeting Michael Heggie?
12     A.  No.
13     Q.  Dave Olson?
14     A.  I -- yes.
15     Q.  Ginny Tobiason?
16     A.  Yes.
17     Q.  All right, then referring again to
18 Exhibit Miller 1162, the representative on the
19 Medicare Working Group would have been John
20 Campbell --
21         MS. TABACCHI:  Object to the form.
22 BY MR. SISNEROS:

Page 84

1      Q.  -- is that right, from TAP?  John
2  Campbell from TAP; is that correct?
3      A.  Yes.
4      Q.  Do you remember meeting him?
5      A.  I'm not sure.
6      Q.  Okay, and so getting back to Exhibit
7  Miller 1163, on your minutes of March 6th, '97,
8  in your -- where you are talking about the group
9  consensus regarding acquisition cost plus, the
10 individuals that we just discussed from TAP and
11 from HPD would have been the individuals that you
12 identified as "the group"?
13         MS. TABACCHI:  Object to the form.
14         THE WITNESS:  I cannot say that. By MR.
15 SISNEROS:
16     Q.  Well, they would have been from that
17 pool of four people; is that right?
18         MS. TABACCHI:  Object to the form.
19         THE WITNESS:  I cannot say that -- I
20 cannot say they attended this meeting.
21 BY MR. SISNEROS:
22     Q.  Okay.  Well --

Page 85

1      A.  I do not know.
2      Q.  You do not know?
3      A.  No.
4      Q.  Would there be any basis for you to be
5  saying "group consensus" --
6      A.  I know that there were representatives
7  from the two divisions.  Who they were, I do not
8  know.
9      Q.  Okay, fair enough.  So when -- so when
10 you're -- in this paragraph when you use the word
11 "group consensus," you are talking about the
12 representatives from TAP and the Hospital
13 Products Division that would have attended the
14 Medicap -- the Medicare Working Group's meeting
15 of March 6th, 1997, correct?
16     A.  That is an accurate representation.
17     Q.  Okay.  All right, back to that -- to
18 that -- to your minutes of the March 6th, 1997
19 Medicare Working Group meeting.  I want to go to
20 your third bullet entitled "AMA proposal."  Do
21 you see that?
22     A.  Which one?

22 (Pages 82 to 85)

Page 102

1    A.  No.
2    Q.  No?
3    A.  No.
4    Q.  Why not?
5    A.  I would say it is information I wanted
6    verified.
7    Q.  Why do you say that?
8    A.  Why do you say I was providing him
9    information?
10   Q.  Because it's directed to him in your
11   note, sir.
12   A.  Right.  But I look at it and say
13   somebody gave me this.  I gave it to Rich to be a
14   verified.
15   Q.  Okay.  So at some point -- and this is
16   undated, correct?
17   A.  It -- there is no date.
18   Q.  At some point, you had information that
19   you believe was provided to you that stated that
20   "AWP equalled acquisition cost plus 20 to 25%
21   markup," right?
22   A.  Yes.

Page 103

1    Q.  All right, let's go back now to Exhibit
2    Miller 1164, to Mr. Rieger's January 15th, 1997
3    memo to the Medicare Working Group starting at
4    ABT 52808.  Are you there, sir?
5    A.  Yes, sir.
6    Q.  Okay.  Back to the first bullet point.
7    Mr. Rieger has identified some areas that -- for
8    the agenda -- some topics for the agenda for the
9    January 21, 1997 Working Group meeting; is that
10   correct?
11   A.  Correct.
12   Q.  And one of those is "a discussion of
13   the average wholesale price versus the actual
14   cost issue."  Do you see that?
15   A.  Yes, sir.
16   Q.  Does that have any meaning to you, that
17   bullet point?
18   A.  No.
19   Q.  Okay.  And underneath that bullet
20   point, there has been -- he has identified
21   basically four products from Abbott in which this
22   item -- this item is of concern -- well, I don't

Page 104

1    -- strike that.
2        Underneath the first bullet point, the
3    products that he's identified, Abbott products
4    he's identified for this discussion are "Lupron,
5    Medical Nutritionals, Calcijex, and Other Abbott
6    Products"; is that correct?
7    A.  Correct.
8    Q.  And Lupron, I believe from your earlier
9    testimony, would be TAP?
10   A.  Correct.
11   Q.  The Medical Nutritionals, what division
12   would that be, if you know?
13   A.  Ross Laboratories.
14   Q.  Calcijex?
15   A.  Hospital Products.
16   Q.  And do you recall what other Abbott
17   products might have been discussed at the January
18   21, '97 meeting?
19   A.  I do not, sir.
20   Q.  Okay.  And then the second bullet point
21   is "a review of proposed legislation regardings
22   to -- regarding diabetes outpatient self

Page 105

1    management service."
2        Do you see that?
3    A.  Yes, sir.
4    Q.  All right, so would it be fair to say
5    that one of the points of discussion that would
6    be brought up before the Medicare Working Group
7    was pending legislation?
8        MS. TABACCHI:  Objection to form.
9        (Witness reviewing document.)
10       THE WITNESS:  Yes.
11   BY MR. SISNEROS:
12   Q.  Okay.  And, finally, with regard to Mr.
13   Rieger's January 15th, 1997 memo to the Medicare
14   Working Group, towards the end of that memo, he
15   is identifying two attachments for your reading.
16   One is a document relating to AWP.  Another one
17   is President Clinton's expected '98 budget
18   proposal.
19       Do you see that?
20   A.  Something's not in order.  Blah-blah-
21   blah-blah.  Here's Clinton's proposal.  Oh, wait.
22   Q.  Actually, I'm just referring to his

27 (Pages 102 to 105)

Miller, James E.                                                                July 30, 2007
                                    Chicago, IL

Page 110

1    Q.  -- actual cost?
2    A.  Yes, sir.
3    Q.  Well, that's interesting because in
4  that Exhibit number -- that last one I had,
5  Exhibit Miller 1165, can you turn to that?
6    A.  Exhibit Miller 1165?  Which is Exhibit
7  Miller 1165?
8    Q.  It's your handwritten note to Rich
9  Rieger on AWP.
10   A.  Um-hum.
11   Q.  Do you see that last line, "AWP equal
12 acquisition cost plus a markup of 20 to 25%"?
13   A.  Right.
14   Q.  Although we're uncertain where that
15 information came from, at least that would be one
16 of the viewpoints an accountant might have about
17 the relationship of acquisition cost to AWP?
18       MS. TABACCHI:  Object to the form.
19       THE WITNESS:  No, no, no.  You're
20 changing the words.  Actual cost and acquisition
21 cost are not synonymous.
22  BY MR. SISNEROS:

Page 111

1    Q.  What's the difference?
2    A.  Acquisition cost could be defined as
3  what somebody paid for a service or product.
4  Actual cost is something that is only calculated,
5  in my understanding, for somebody like the IRS in
6  a tax suit.
7    Q.  Okay, well, let's talk about
8  acquisition cost in your handwritten notes on
9  Exhibit Miller 1165.
10       With regard to your last line there,
11 "AWP equals acquisition cost plus a markup of 20
12 to 25%," would "acquisition cost" in that context
13 reference what one of your customers bought the
14 product for?
15       MS. TABACCHI:  Object to the form.
16       THE WITNESS:  I do not know.  Someone
17 gave me that information.  Who at Abbott, I do
18 not recall.
19  BY MR. SISNEROS:
20   Q.  Well, let me ask you -- let me ask you
21 this, and this is backing off a little bit.
22 Earlier, you gave testimony about generally what

Page 112

1  the purpose of the Medicare Working Group was.
2    A.  (Witness nodding.)
3    Q.  Remember that?
4    A.  Yes.
5    Q.  And do you -- and do you recall that
6  you testified, you said you folks -- that you
7  folks were looking at how third-party payers were
8  being paid -- were being reimbursed?
9        MS. TABACCHI:  Object to the --
10 BY MR. SISNEROS:
11   Q.  Is that accurate?
12       MS. TABACCHI:  Object to the form.
13 BY MR. SISNEROS:
14   Q.  Or at least -- strike it.
15       Was one of the things your group was
16 looking at was how third-party payers were being
17 reimbursed?
18       MS. TABACCHI:  Object to the form.
19       THE WITNESS:  We were updated, as I
20 stated earlier, on proposed pending legislation
21 in the federal government or the states.
22 BY MR. SISNEROS:

Page 113

1    Q.  Concerning reimbursement?
2    A.  Concerning financial coverage of
3  products.
4    Q.  Okay, and I think you testified earlier
5  that when you say "financial coverage of
6  products," it would be another word for the word
7  "reimbursement"?
8        MS. TABACCHI:  Object to the form.
9        THE WITNESS:  But not specific product
10 pricing.
11 BY MR. SISNEROS:
12   Q.  You were interested in the formula? -
13       MS. TABACCHI:  Object to the form.
14 BY MR. SISNEROS:
15   Q.  (Continuing)-- for reimbursement?
16       MS. TABACCHI:  Object to the form.
17       THE WITNESS:  I don't know if I can
18 answer that.
19 BY MR. SISNEROS:
20   Q.  Well, I don't think I understand what
21 it is that you were doing.
22       How -- I mean I don't understand how

29 (Pages 110 to 113)

Miller, James E.                                                    July 30, 2007
                              Chicago, IL

Page 114

1  you could -- why were you doing -- looking at the
2  coverage of product to third-party payers?
3       MS. TABACCHI: Object to the form.
4       THE WITNESS: Recognize this was a one-
5  hour meeting every six weeks. It wasn't an in-
6  depth study of anything.
7  BY MR. SISNEROS:
8       Q. I understand that.
9       A. Okay.
10      Q. But this was one of your first
11 assignments when you had been promoted -- you had
12 received a promotion -- I think you testified
13 earlier this was 30 days into your new promotion
14 this was laid on your lap; is that right?
15      A. But this didn't -- was not, as I stated
16 earlier, this was not my primary job duties.
17      Q. I understand. But your boss gave you
18 this job, your immediate supervisor; is that
19 right?
20      A. I understand.
21      Q. Okay. And so what I'm trying to
22 identify here is when you say you were looking at

Page 115

1  the coverage of product for third-party payers,
2  what you mean by that.
3       A. We're looking at proposed sweeping
4  changes to reimbursement levels or methodology
5  for products.
6       Q. And to understand the impact of
7  proposed legislation on reimbursement
8  methodology, wouldn't you have to understand the
9  existing methodology of reimbursement?
10      A. That responsibility rests with a
11 division. Divisions market and sell products, not
12 corporate.
13      Q. Now, I understand that, but did you as
14 a member of this Working Group get some type of
15 basic knowledge on how reimbursement worked?
16      MS. TABACCHI: Object to the form.
17      THE WITNESS: I understand the broad
18 concepts of reimbursement.
19 BY MR. SISNEROS:
20      Q. And would Exhibit Miller 1165 at least
21 demonstrate a concept someone fed to you?
22      A. Yes.

Page 116

1       Q. Okay. All right, now back to Mr.
2  Rieger's memo dated January 15th, 1997 directed
3  to the Medicare Working Group starting at ABT
4  52808.
5           In the second sentence of the last
6  paragraph, he -- it states, "This is in addition
7  to the documents that I previously sent to you on
8  12/20/96 regarding AWP and competitive bidding."
9           Do you see that?
10      A. Yes, sir.
11      Q. So it suggests that the Medicare
12 Working Group was already receiving at least
13 background information of some sort in late 1996;
14 is that right?
15      MS. TABACCHI: Object to the form.
16      THE WITNESS: The memo states he mailed
17 something. I don't know.
18 BY MR. SISNEROS:
19      Q. Okay. But that would have been in late
20 '96?
21      A. 12/26, right.
22      Q. Okay, all right. All right, now

Page 117

1  turning to -- your attention to the same exhibit,
2  Exhibit Miller 1164, at Page 52711.
3       A. Okay. Yes, sir.
4       Q. And this is a -- this is a -- this is a
5  memo from Cynthia Sensibaugh in your Washington
6  office to Mr. Rieger dated January 17th, 1997
7  regarding the Medicare conference call; is that
8  right?
9       A. Yes, sir.
10      Q. And in her -- in her memo, she
11 references two articles that she's included, one
12 of which is an article regarding AWP.
13          If you look at the last sentence of her
14 memo, "Also encloses an article about awp," do
15 you see that?
16      A. Yes, sir.
17      Q. Okay, and then the document following
18 her memo is ABT 52712, while Miss Sensibaugh's
19 memo is ABT 52711. So are you at 712?
20      A. Either one.
21      Q. Okay, at 712. ABT 52712, do you see
22 that?

                                           30 (Pages 114 to 117)

Henderson Legal Services
202-220-4158

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                                              July 30, 2007
                                        Chicago, IL

Page 174

 1  would be on the documents.
 2     Q.  Okay, that's -- I understand what you
 3  said, but that wasn't my question.  My question
 4  was there were others outside the distribution
 5  lists who attended the meetings?
 6     A.  If you give me all the documents and
 7  we'll cross reference them back to the members of
 8  the Working Group, I can tell you whether other
 9  people attended.
10     Q.  Is it your belief that they did?
11     A.  I -- I do not know.
12     Q.  Okay, well, then let's get back to that
13  first sentence.
14     A.  Okay.
15     Q.  Is it a fair -- is it reasonable to
16  believe that Mr. Rieger was communicating there
17  that they were trying -- that you two were trying
18  to find a way to communicate to others, other
19  than the ones that are listed in the distribution
20  list of the Medicare Working Group?
21        MS. TABACCHI:  Object to the form.
22        THE WITNESS:  I don't know how to

Page 175

 1  answer that question.  There was no -- the
 2  minutes are the official discussion document, and
 3  if those minutes were distributed to non-members
 4  of the group, I would not have had a problem with
 5  that.
 6  BY MR. SISNEROS:
 7     Q.  Would -- well, let me ask it this way.
 8  Could you have been considering distributing the
 9  minutes to others outside the Medicare Working
10  Group?
11     A.  No.
12     Q.  You would not have considered sharing
13  this information with your supervisor?
14     A.  No.
15     Q.  Why not?
16     A.  If I needed to talk to my supervisor,
17  I'd go to his office and talk to him.
18     Q.  So you would discuss what was going on
19  with the Medicare Working Group, but just not in
20  written form?
21     A.  No, it --
22        MS. TABACCHI:  Object to the form.

Page 176

 1        THE WITNESS:  That's paraphrase.  I
 2  would -- if there was an issue that I felt I
 3  needed my boss's input, I would raise it to him.
 4  BY MR. SISNEROS:
 5     Q.  In what manner?
 6     A.  Either --
 7        MS. TABACCHI:  Objection to form.
 8        THE WITNESS:  This was an information-
 9  sharing group.  It was not a decision-making
10  group.
11  BY MR. SISNEROS:
12     Q.  Would some of that information have
13  been relevant to the decision makers?
14        MS. TABACCHI:  Object to the form.
15        THE WITNESS:  The decision makers were
16  in the divisions.
17  BY MR. SISNEROS:
18     Q.  Would the information of the Medicare
19  Working Group been important information for the
20  decision makers within the divisions?
21        MS. TABACCHI:  Object to the form.
22        THE WITNESS:  If you add in that

Page 177

 1  division, I would say yes.
 2  BY MR. SISNEROS:
 3     Q.  Okay.  Now, isn't it possible when you
 4  read that first sentence that it indicates it
 5  possibly -- couldn't you have been considering
 6  distributing the minutes outside of the Medicare
 7  Working Group?
 8        MS. TABACCHI:  Objection to form.
 9        MR. SOFFER:  Objection.
10        THE WITNESS:  No.
11  BY MR. SISNEROS:
12     Q.  And you can remember that specifically?
13        MS. TABACCHI:  Object to the form.
14        THE WITNESS:  Yes.
15  BY MR. SISNEROS:
16     Q.  All right, and the last part of that
17  sentence, "Jim and I would like to find a way to
18  communicate outside of our Working Group," it is
19  your testimony that it's referencing
20  communicating within your -- within your Working
21  Group?
22        MS. TABACCHI:  Object to the form.

                                              45 (Pages 174 to 177)