EXHIBIT 171

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-----------------------------X

In re: PHARMACEUTICAL          )   MDL No. 1456

INDUSTRY AVERAGE WHOLESALE     )   CIVIL ACTION

PRICE LITIGATION               )   No. 01-12257-PBS

-----------------------------X


VIDEOTAPED DEPOSITION OF MICHAEL TOOTELL

OCTOBER 25, 2007

CHICAGO, ILLINOIS


Videotaped Deposition of MICHAEL TOOTELL, at

71 South Wacker Drive, 32nd Floor, Chicago,

Illinois, commencing at 9:00 a.m. on Thursday,

October 25, 2007, before Donna M. Kazaitis, RPR,

CSR  No. 084-003145.

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Tootell, Michael                                              October 25, 2007
                              Chicago, IL

| Page 2 | Page 4 |
|---|---|
| APPEARANCES OF COUNSEL: | APPEARANCES OF COUNSEL:  (CONTINUED) |
| FOR THE UNITED STATES: | FOR THE DEPONENT: |
|    U.S. DEPARTMENT OF JUSTICE |    MAYER BROWN LLP |
|    CIVIL DIVISION |    BY:  MR. JAMES R. FERGUSON |
|    BY:  MS. ANN ST. PETER-GRIFFITH |    71 South Wacker Drive |
|    99 N.E. 4th Street |    Chicago, Illinois 60606 |
|    Miami, Florida 33132 |    (312) 701-7282 |
|    (305) 961-9003 |    jferguson@mayerbrownrowe.com |
|    ann.stpeter-griffith@usdoj.gov | |
| FOR THE STATE OF CALIFORNIA: | ALSO PRESENT: |
|    STATE OF CALIFORNIA DEPARTMENT OF JUSTICE |    Anthony Micheletto, Videographer |
|    BUREAU OF MEDI-CAL FRAUD & ELDER ABUSE | |
|    BY:  MR. ELISEO SISNEROS | |
|       (via teleconference) | |
|    110 West A Street, Suite 1100 | |
|    San Diego, California 92101 | |
|    (619) 688-6043 | |
|    eliseo.sisneros@doj.ca.gov | |

| Page 3 | Page 5 |
|---|---|
| APPEARANCES OF COUNSEL:  (CONTINUED) |     I N D E X |
| FOR THE RELATOR VEN-A-CARE OF THE FLORIDA | WITNESS:  MICHAEL TOOTELL    PAGE |
| KEYS, INC.: |    Examination By Ms. St. Peter-Griffith..... 007 |
| |    Examination By Mr. Anderson............... 222 |
|    ANDERSON LLC | |
|    BY:  MR. C. JARRETT ANDERSON |     E X H I B I T S |
|    1300 Guadalupe, Suite 103 | NUMBER    DESCRIPTION    PAGE |
|    Austin, Texas 78701 | Exhibit Tootell 001, MT 01286-01510............ 009 |
|    (512) 469-9191 | Exhibit Tootell 002, Two CDs, ABT-DOJ-E 0545292 |
| |    -941 and ABT-DOJ 0309695 |
| FOR ABBOTT LABORATORIES: |    -997...................... 011 |
| | Exhibit Tootell 003, MT 01260-01261............ 030 |
|    JONES DAY | Exhibit Tootell 004, ABT-DOJ-E 0545739-770..... 114 |
|    BY:  MR. JASON G. WINCHESTER | Exhibit Tootell 005, ABT-DOJ-E 0545771-791..... 153 |
|    77 West Wacker Drive | Exhibit Tootell 006, ABT-DOJ-E 0545901-922..... 167 |
|    Chicago, Illinois 60601-1692 | Exhibit Tootell 007, ABT-DOJ-E 0545899-900..... 188 |
|    (312) 782-3939 | Exhibit Tootell 008, ABT-DOJ-E 0545620-653..... 216 |
|    jgwinchester@jonesday.com | Exhibit Tootell 009, ABT 52704-707............. 295 |
| | Exhibit Tootell 010, ABT 52795-797............. 299 |
| | Exhibit Tootell 011, ABT 53177-180............. 303 |
| (CONTINUED) | Exhibit Tootell 012, ABT-DOJ 296250-256........ 307 |

                                                    2 (Pages 2 to 5)

1ae8ed53-7d5b-401c-a289-5df0a2a374b3

Page 54

1    A.  I'm not sure which decisions you're
2  talking about.  This is obviously an industry
3  issue that went on for at least fifteen years
4  now.
5    Q.  Well, let me ask you this: Did you
6  work with any of your reimbursement counterparts
7  in other divisions on Medicaid and Medicare
8  policy issues that affected Abbott as a whole?
9    A.  Yes.
10   Q.  What issues did you work with them on?
11   A.  There were many.  I'd like to be more
12 specific about --
13   Q.  Well, I'm asking you what your
14 recollection of those many issues were.
15       THE WITNESS:  Let's go back to the
16 details of the question, please.
17       MS. ST. PETER-GRIFFITH:  Can you read
18 it back.
19         (WHEREUPON said record was read
20 back as requested.)
21       THE WITNESS:  Yes, I did.  I've given
22 you a couple of examples about inherent

Page 55

1  reasonableness, and in those conversations
2  obviously I worked with colleagues, particularly
3  Ginny.
4        After the Corporate Integrity Agreement
5  when she moved to compliance, she had review
6  responsibilities for all reimbursement documents
7  generated by anybody at Ross as a compliance
8  officer.
9  BY MS. ST. PETER-GRIFFITH:
10   Q.  Okay.  Did you discuss with Virginia
11 Tobiason AWP issues?
12   A.  I don't recall.
13   Q.  Did you work with any organization
14 within Abbott known as the Medicare Working
15 Group?
16   A.  Can you clarify which year that was?
17   Q.  Any year.
18   A.  I believe there was a group in the mid
19 '90s with that name.  I don't remember its
20 membership or the tasks it was assigned.  It's
21 eleven years ago.
22   Q.  What about the Medicare/Medicaid

Page 56

1  Reimbursement Task Force?
2    A.  I believe that group met in the early
3  2000s, but I don't remember its content or its
4  membership.
5    Q.  Do you remember any work that you did
6  on either of those organizations?
7    A.  No, I don't.
8    Q.  Was your work with the Medicare Working
9  Group in the '90s, or the Medicare/Medicaid
10 Reimbursement Task Force in the early 2000s let's
11 say, was that part of your job responsibilities?
12   A.  Yes.
13   Q.  How much time did you spend working on
14 Medicare Working Group or Medicaid and Medicare
15 Reimbursement Task Force matters?
16   A.  Ross is a division in another time
17 zone, so that coordination between Ross and
18 Abbott is not as close as it would be for the
19 Abbott park divisions.
20       I believe they came in a couple of
21 times for each of those groups.  I don't remember
22 the content or the agenda or the outcome of those

Page 57

1  meetings.
2    Q.  What was the purpose of the groups?
3    A.  I don't recall.
4    Q.  How much time did you spend working on,
5  let's start with Medicare Working Group matters?
6    A.  I don't recall.  I had many
7  responsibilities over many years.  Those specific
8  responsibilities associated with that task force
9  I don't recall.
10   Q.  What about the Medicare/Medicaid
11 Reimbursement Task Force, how much time did you
12 spend working on the Medicare/Medicaid
13 Reimbursement Task Force matters?
14   A.  I think there were a couple of trips
15 into Chicago.  Abbott has my calendar.  I don't
16 have my calendar.  And it was probably a minor
17 part of my reimbursement work.
18   Q.  How often did the Medicare/Medicaid
19 Reimbursement Task Force meet?
20   A.  I think only two or three times.
21   Q.  Do you know whether there was a regular
22 monthly meeting that was conducted?

15 (Pages 54 to 57)

Page 58

1  A. I don't recall.
2  Q. What about the Medicare/Medicaid, I'm
3  sorry, the Medicare Working Group, do you recall
4  how often that group met?
5  A. Can you refresh me on the time of that?
6  Q. Sure. That was in the '90s, mid to
7  late '90s.
8  A. I don't recall that one. I don't
9  recall the issues about that group.
10 Q. You don't recall any issues working
11 with the Medicare Working Group at all?
12 A. No.
13 Q. Do you recall whether or not
14 individuals from Washington, D.C., were involved
15 in that group?
16 A. It's likely.
17 Q. Why do you say it's likely?
18 A. One would expect them to be there
19 because the Washington office was in charge of
20 our lobbying activities, and they were
21 responsible for Capital Hill and the Executive
22 Department presentations.

Page 59

1  Q. Do you recall giving any presentations
2  or preparing any presentations jointly with
3  Virginia Tobiason?
4       MR. WINCHESTER: Objection to form.
5       THE WITNESS: I recall working with
6  Ginny, and some of them could have been
7  presentations.
8  BY MS. ST. PETER-GRIFFITH:
9  Q. Do you recall her giving any
10 presentations or your jointly giving
11 presentations?
12 A. I don't recall any that we did
13 together. We probably did.
14 Q. Would they have been significant to
15 you?
16      MR. FERGUSON: Object to form.
17      THE WITNESS: Not sure how you're using
18 the word "significant." It was a part of my job
19 that I was doing, assuming I did presentations
20 with Ginny.
21 BY MS. ST. PETER-GRIFFITH:
22 Q. What about, well, let me ask you this:

Page 60

1  How often were you in contact with Virginia
2  Tobiason?
3  A. It varied over time.
4  Q. What caused it to vary over time?
5  A. Basically our calenders.
6  Q. Do you know why she left her position
7  in the Compliance Department?
8  A. No, I don't.
9  Q. What were your job responsibilities
10 when you were the senior manager for
11 reimbursement?
12 A. Those were in the late '90s, and they
13 built on the same kinds of responsibilities I had
14 before.
15      Medicare's competitive bidding program
16 was beginning to emerge, and I was quite involved
17 in that as an issue. And I continue to be.
18 Q. What other responsibilities did you
19 have?
20 A. We set up a reimbursement corner of
21 what's called Ross.com, which is an Internet data
22 resource publicly available for customers and for

Page 61

1  those interested in reimbursement policies
2  associated with the Ross products.
3  Q. Would AWP information be available on
4  Ross.com?
5       MR. WINCHESTER: Objection, form.
6       THE WITNESS: There were state
7  summaries that summarized the state reimbursement
8  payment policies. There would not be any
9  specific product information, product specific
10 AWPs. We're talking as a policy website.
11 BY MS. ST. PETER-GRIFFITH:
12 Q. Did you help institute that?
13 A. Yes.
14 Q. Was that your idea?
15 A. Yes.
16 Q. What caused you to, why did you come up
17 with the idea? Did you identify a need?
18 A. Yes.
19      MR. FERGUSON: Object to form.
20      THE WITNESS: Yes. I identified a
21 need.
22 BY MS. ST. PETER-GRIFFITH:

Tootell, Michael                                              October 25, 2007
                              Chicago, IL

Page 70

1   reimbursement of concern to people in the
2   industry.
3       Q.  Was AWP reimbursement, the AWP
4   reimbursement, ever a topic of conversation?
5       A.  No.
6       Q.  Did you ever give presentations to,
7   yourself, or prepare presentations for Abbott
8   clients?
9       A.  Yes, for Ross clients.
10      Q.  Who do you recall making presentations
11  to?
12      A.  There were many.
13      Q.  Was Cardinal one of them?
14      A.  Cardinal was one of them.
15      Q.  Huh?
16      A.  Yes.
17      Q.  Why did you give a presentation to
18  Cardinal?
19      A.  They asked for a presentation.
20      Q.  And what did they ask you to present
21  concerning?
22      A.  I've not looked at those slides for a

Page 71

1   long time.
2       Q.  Any other presentations that you can
3   recall?
4       A.  No.
5           MS. ST. PETER-GRIFFITH:  What time are
6   we at?  Why don't we take a break and see if we
7   can get some of the documents.
8           MR. FERGUSON:  Okay.
9           THE VIDEOGRAPHER:  We are off the
10  record at 10:51 a.m. with the end of Tape No. 1.
11          (WHEREUPON a recess was taken.)
12          THE VIDEOGRAPHER:  We are back on the
13  record at 11:14 a.m. with the start of Tape No.
14  2.
15  BY MS. ST. PETER-GRIFFITH:
16      Q.  Mr. Tootell, before the break you had
17  referenced that you had prepared a reimbursement
18  manual.
19      A.  Yes.
20      Q.  Is that a Ross --
21          (WHEREUPON a discussion was had
22  off the record.)

Page 72

1   BY MS. ST. PETER-GRIFFITH:
2       Q.  You were referencing before, Mr.
3   Tootell, the reimbursement manual that you put
4   together.
5           Was that distributed just within Ross,
6   or did it also find distribution to other
7   divisions like HPS, HPD?
8           MR. WINCHESTER:  Objection to form.
9           THE WITNESS:  The manual was related to
10  enterals, enteral nutritional reimbursement.
11  They may have gotten copies in the other
12  divisions, but it would not have been relevant to
13  their product lines.
14  BY MS. ST. PETER-GRIFFITH:
15      Q.  Did you work at all with the Alternate
16  Site Home Infusion Group within the Hospital
17  Business --
18          MR. WINCHESTER:  Objection, form.
19  BY MS. ST. PETER-GRIFFITH:
20      Q.  -- Hospital Products Division?
21          MR. WINCHESTER:  Sorry.  Objection to
22  form.

Page 73

1           THE WITNESS:  Some.
2   BY MS. ST. PETER-GRIFFITH:
3       Q.  What was your interaction with Alt.
4   Site Home Infusion?
5       A.  Alternate Site folks would be in the
6   same committees that I would be on.  You
7   mentioned the Medicare Working Group, the task
8   forces, those groups and members of the Alternate
9   Site working group were part of that formal and
10  informal group.
11      Q.  Who do you recall working with from the
12  Alt. Site group?
13      A.  Ginny of course, she was the
14  reimbursement director there.  I know that Mike
15  Heggie worked for her for a while.  Those are all
16  the folks that I remember.
17      Q.  Do you recall whether Abbott Home
18  Infusion sold Ross products or distributed Ross
19  products to their clients?
20      A.  Yes, they did.
21      Q.  Did you interact with anyone in Abbott
22  Alternate Site or Home Infusion concerning the

                                    19 (Pages 70 to 73)

Tootell, Michael                                                    October 25, 2007
                              Chicago, IL

Page 198

1  A. I don't recall.
2  Q. Where would the sales force have gone
3  to identify what the appropriate practices and
4  policies were as endorsed by Abbott?
5  A. To their district manager.
6  Q. And where would the district manager go
7  to identify what Abbott's policies and practices
8  were?
9  A. To the regional manager.
10 Q. And where would the regional manager
11 go?
12 A. Either to me or to the Legal
13 Department.
14 Q. Did you have any inquiries from a
15 district or regional manager concerning spread
16 marketing or reference to AWP by the sales force?
17 A. Not that I recall.
18 Q. Under Item 2 on this document it says
19 "Reimbursement-Based Market Strategies. Do you
20 see that? And Item B says "Improve data
21 reporting to First Databank and associated data
22 warehouses to assure sound calculation of AWP

Page 199

1  rates." What did you mean by that?
2  A. To be sure that the data was accurate
3  as provided to the First Databank and associated
4  compendia.
5  Q. And what did you mean by "to assure
6  sound calculation of AWP rates"?
7     MR. FERGUSON: Object to form.
8     THE WITNESS: They needed to have
9  accurate data to make a calculation of the rates.
10 BY MS. ST. PETER-GRIFFITH:
11 Q. Did you have a concern that there was
12 too large of a spread on Ross products?
13 A. A personal concern?
14 Q. Yes.
15 A. I had a personal concern.
16 Q. Why did you have that concern?
17 A. I was concerned about the potential
18 legal exposures and potential negative
19 consequences for the company should these issues
20 stretch to our product line.
21 Q. Did you communicate those concerns?
22 A. Yes.

Page 200

1  Q. Who did you communicate them to?
2  A. Those are privileged communications.
3  Q. Other than communications with counsel
4  for Abbott -- well, first of all, without telling
5  me the substance of the communication, who did
6  you make the communication to?
7  A. Various people within the Abbott Legal
8  Department.
9  Q. Who within the Abbott Legal Department?
10 You can tell me who you spoke with.
11    MR. FERGUSON: Yes.
12    MS. ST. PETER-GRIFFITH: Just not the
13 substance of the conversations.
14    THE WITNESS: Okay. Melissa Penslavey,
15 Cliff Berman. I don't remember others, other
16 names.
17 BY MS. ST. PETER-GRIFFITH:
18 Q. Were there others, but you just can't
19 recall?
20 A. There were others, but I can't recall.
21 Q. How many others? Can you guesstimate?
22 A. I can't guess.

Page 201

1  Q. Was it under five?
2  A. Approximately.
3  Q. Prior to the implementation of the CIA,
4  were your concerns addressed?
5     MR. FERGUSON: Object to form.
6     MR. WINCHESTER: Objection, form.
7     MR. FERGUSON: I don't want you to, if
8  answering that question requires you to get into
9  the substance of any legal communications, then I
10 don't want you to answer the question.
11    THE WITNESS: I believe answering that
12 question would open up --
13 BY MS. ST. PETER-GRIFFITH:
14 Q. I'm not interested in what counsel
15 communicated to you.
16    I want to find out whether Ross
17 institutionally addressed your concerns.
18    MR. WINCHESTER: Same objection.
19    THE WITNESS: I don't understand your
20 verb. What do you mean by "addressed"?
21 BY MS. ST. PETER-GRIFFITH:
22 Q. Huh?

51 (Pages 198 to 201)

Henderson Legal Services
202-220-4158

1ae8ed53-7d5b-401c-a289-5df0a2a374b3