# EXHIBIT 173

Miller, James E.                                                                                               July 30, 2007

Chicago, IL

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------X
IN RE:   PHARMACEUTICAL         )
INDUSTRY AVERAGE WHOLESALE      )
PRICE LITIGATION                ) MDL No. 1456
------------------------------) Civil Action
This document relates to:       ) No. 01-12257-PBS
United States of America,       )
ex. rel. Ven-a-Care of the      )
Florida Keys, Inc.,             ) Hon. Patti Saris
   vs.                           )
Abbott Laboratories, Inc.,      ) Magistrate Judge
CIVIL ACTION NO. 06-11337-PBS   ) Marianne Bowler
-------------------------------X


VIDEOTAPED DEPOSITION OF

JAMES E. MILLER

CHICAGO, IL

JULY 30, 2007

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                                                                       July 30, 2007
                                                    Chicago, IL

|  | Page 2 |  | Page 4 |
|---|---|---|---|
| 1 |  | 1 | APPEARANCES: (CONTINUED) |
| 2 | Videotaped deposition of JAMES E. MILLER, | 2 |  |
| 3 | called by the Plaintiffs for examination, taken | 3 | BERGER & MONTAGUE, P.C. |
| 4 | pursuant to notice, agreement and by the provisions of | 4 | BY:  SUSAN SCHNEIDER THOMAS, ESQ. |
| 5 | the Rules of Civil Procedure for the United States | 5 | 1622 Locust Street |
| 6 | District Courts pertaining to the taking of | 6 | Philadelphia, Pennsylvania  19103 |
| 7 | depositions, taken before DEBORAH HABIAN, a Notary | 7 | (215) 875-3000 |
| 8 | Public within and for the County of Cook, State of | 8 |     on behalf of the Realtor, Ven-a-Care; |
| 9 | Illinois, and a Certified Shorthand Reporter of said | 9 |  |
| 10 | State, at the offices of Katten Muchin Rosenman, | 10 |  |
| 11 | 525 West Monroe Street, 19th Floor, Chicago, Illinois, | 11 | WEXLER TORISEVA WALLACE, LLP |
| 12 | on the 30th day of July, 2007, at 9:12 a.m. | 12 | BY:  CHRISTOPHER J. STUART, ESQ. |
| 13 |  | 13 | 55 West Monroe Street |
| 14 |  | 14 |  Suite 300 |
| 15 |  | 15 | Chicago, Illinois  60602 |
| 16 |  | 16 | (312) 346-2222 |
| 17 |  | 17 |     on behalf of the State of Arizona |
| 18 |  | 18 |     and the MDL Plaintiffs; |
| 19 |  | 19 |  |
| 20 |  | 20 |  |
| 21 |  | 21 |  |
| 22 |  | 22 | (CONTINUED) |

|  | Page 3 |  | Page 5 |
|---|---|---|---|
| 1 | APPEARANCES: | 1 | APPEARANCES: (CONTINUED) |
| 2 |  | 2 |  |
| 3 |   STATE OF CALIFORNIA DEPARTMENT OF JUSTICE | 3 | JONES DAY |
| 4 |   BUREAU OF MEDI-CAL FRAUD & ELDER ABUSE | 4 | BY:  TINA M. TABACCHI, ESQ. |
| 5 |   BY:  ELISEO SISNEROS, ESQ. | 5 | 77 West Wacker Drive |
| 6 |       DEPUTY ATTORNEY GENERAL | 6 | Chicago, Illinois  60601-1692 |
| 7 |   110 West A Street | 7 | (312) 782-3939 |
| 8 |   No. 1100 | 8 |     on behalf of the Defendants; |
| 9 |   San Diego, California  92101 | 9 |  |
| 10 |   (619) 688-6043 | 10 | KATTEN MUCHIN ROSENMANN, LLP |
| 11 |       on behalf of the State of California; | 11 | BY:  GIL M. SOFFER, ESQ. |
| 12 |  | 12 |       DEAN V. HOFFMAN, ESQ. |
| 13 |   U.S. DEPARTMENT OF JUSTICE | 13 | 525 West Monroe Street |
| 14 |   COMMERCIAL LITIGATION, FRAUD | 14 | Chicago, Illinois  60661-3693 |
| 15 |   BY:  REBECCA A. FORD, ESQ. | 15 | (312) 902-5200 |
| 16 |   601 D Street, N.W. | 16 |     on behalf of the deponent. |
| 17 |   Patrick Henry Building - 9133 | 17 |  |
| 18 |   Washington, D.C.  20044 | 18 |  |
| 19 |   (202) 514-1511 | 19 | ALSO PRESENT: |
| 20 |       on behalf of the United States; | 20 |     ANTHONY MICHELETTO, VIDEOGRAPHER |
| 21 |  | 21 |     HENDERSON LEGAL SERVICES |
| 22 | (CONTINUED) | 22 |  |

2 (Pages 2 to 5)

Henderson Legal Services
202-220-4158

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                                    July 30, 2007

Chicago, IL

Page 6

1                INDEX
2
3  WITNESS: JAMES E. MILLER                    PAGE
4    EXAMINATION BY ELISEO SISNEROS, ESQ.......... 010
5    EXAMINATION BY REBECCA A. FORD, ESQ.......... 224
6    EXAMINATION BY SUSAN SCHNEIDER THOMAS........ 311
7
8              E X H I B I T S
9  NUMBER          DESCRIPTION             PAGE
10 Exhibit Miller 1160, curriculum vitae.......... 012
11 Exhibit Miller 1161, subpoena duces tecum...... 046
12 Exhibit Miller 1162, Abbott MWG lists.......... 052
13 Exhibit Miller 1163, ABT 52840 to 52842,
14         ABT 52898 to 52899........ 069
15 Exhibit Miller 1164, ABT 52705 to 52707,
16         ABT 52710 to 52712,
17         ABT 52808 to 52811,
18         ABT 52836 to 52838........ 094
19 Exhibit Miller 1165, handwritten notes......... 099
20 Exhibit Miller 1166, ABT 52901 to 52903........ 193
21 Exhibit Miller 1167, ABT 53315 to 53318........ 196
22 Exhibit Miller 1168, ABT 53161 to 53169........ 202

Page 7

1         E X H I B I T S (CONTINUED)
2  NUMBER          DESCRIPTION             PAGE
3  Exhibit Miller 1169, 11/26/96 memoranda........ 216
4  Exhibit Miller 1170, ABT 53140 to ABT 53142.... 264
5  Exhibit Miller 1171  ABT 53217 to ABT 53238.... 266

Page 8

1              PROCEEDINGS
2
3        THE VIDEOGRAPHER:  This is Anthony
4  Micheletto of Henderson Legal Services.  I am the
5  operator of this camera.
6        This is the videotaped deposition of
7  James Miller as being taken pursuant to Federal
8  Rules of Civil Procedure on behalf of the
9  Plaintiffs.
10       We are on the record on July 30th,
11 2007.  The time is 9:12, as indicated on the
12 video screen.  We are located at 525 West Monroe
13 Street, Chicago Illinois.
14       This case is captioned In Re:
15 Pharmaceutical Industry Average Wholesale Price
16 Litigation, Case No. 0112257-PBS.
17       Will the attorneys please identify
18 themselves for the video record?
19       MR. SISNEROS:  Eliseo Sisneros, Deputy
20 Attorney General for the State of California.
21       MS. THOMAS:  Susan Schneider Thomas
22 representing Ven-a-Care.

Page 9

1        MR. STUART:  Christopher Stuart, Wexler
2  Toriseva Wallace representing the State of
3  Arizona and the MDL Plaintiffs.
4        MS. TABACCHI:  Tina Tabacchi from Jones
5  Day on behalf of the Defendants.
6        MR. SOFFER:  Gil Soffer of Katten
7  Muchin Rosenman on behalf of the deponent James
8  Miller.
9        THE WITNESS:  James Miller.
10       THE VIDEOGRAPHER:  The court -- the
11 court reporter is Deborah Habian from Henderson
12 Legal Services.
13       Please swear in the witness.
14       THE REPORTER:  Please raise your right
15 hand, Mr. Miller.
16         (Witness sworn.)
17       THE REPORTER:  Thanks.
18       MS. TABACCHI:  Before we begin, I just
19 need to interject my standard objection to the
20 notice of the Class Plaintiffs as untimely.
21       MR. SISNERO:  Morning, Mr. Miller.
22       THE WITNESS:  Morning.

3 (Pages 6 to 9)

Henderson Legal Services
202-220-4158

22a7552e-50af-408f-9678-8863d73aaafb

Page 14

1   Q. When you worked for Ross Labs, was that
2   right out of college?
3   A. No. I worked -- I'm sorry. I worked
4   for Ford Motor Company in Claycomo, Missouri.
5   Q. How long did you work for Ford?
6   A. About nine months.
7   Q. And what did you do for them?
8   A. I was a Production Foreman.
9   Q. After Ford, you went to Ross?
10  A. Yes, sir.
11  Q. And -- well, let me ask this. When did
12  you graduate from Wilmington?
13  A. December 1968.
14  Q. When did you start working for Ford?
15  A. January of 1969.
16  Q. So you went over to Ross sometime in
17  the fall of '69?
18  A. Yes, sir.
19  Q. And you remained at Ross until you
20  started at Abbott?
21  A. No, MBA program. I went full-time to
22  the MBA program at Wright State University.

Page 15

1   Q. I see. So you worked for Ross from '69
2   until?
3   A. '70.
4   Q. What did you do for Ross?
5   A. I was a Financial Analyst in the
6   Distribution Department.
7   Q. What were your duties?
8   A. I worked on determining the optimum
9   location for distribution points and negotiating
10  with carriers' freight rates.
11  Q. So your focus was to save the company
12  money?
13  A. Yes, sir.
14  Q. All right, after that, then you went to
15  school at Wright State in Dayton to get your
16  master's --
17  A. Yes.
18  Q. -- In Corporate Finance?
19  A. Yes.
20  Q. And thereafter, is -- well, when did
21  you complete that program?
22  A. In 1971.

Page 16

1   Q. Oh, I'm sorry. That's right there.
2   A. Yeah.
3   Q. Then what did you do between -- well,
4   when did you finish your master's, what year --
5   what month in '71?
6   A. I do not remember.
7   Q. Did -- after completing your master's,
8   did you go directly to Abbott Labs?
9   A. No.
10  Q. What did you do next?
11  A. When I was getting my master's, I also
12  was approached by National Cash Register and went
13  to work at National Cash Register while I was
14  finishing my master's in Dayton, Ohio.
15  Q. How long did you work for NCR?
16  A. I worked for them until December '72
17  when I went to work for Abbott.
18  Q. What did you do for NCR?
19  A. I was a Financial Analyst --
20  Q. Any specific duties?
21  A. -- in the factory. Again, I focused on
22  budgeting and cost reductions.

Page 17

1   Q. Okay. All right, thereafter, you went
2   to Abbott?
3   A. (Witness nodding.)
4   Q. Correct?
5   A. Correct.
6   Q. All right. Let's talk a little bit
7   about your career at Abbott. You have there from
8   -- in your CV Exhibit Miller 1160 a list of
9   positions you held from 1972 to 2003. You see
10  that?
11  A. Correct.
12  A. Yes.
13  Q. Is that a full and complete list of all
14  the positions that you held at Abbott during this
15  period of time?
16  A. Yes.
17  Q. So when you started it -- at Abbott,
18  you started as a Cost Accounting Manager here in
19  Chicago?
20  A. North Chicago.
21  Q. North Chicago. I'm from the West.
22     Is that correct?

Miller, James E.                                                          July 30, 2007

Chicago, IL

Page 26

1      MR. SOFFER:  You may answer if you can.
2      THE WITNESS:  I was primarily
3  responsible to assist line management in the
4  identification of causes of cost variances versus
5  budget.
6  BY MR. SISNEROS:
7      Q.  Okay.  All right, then from Hospital --
8  then from FP & A at the Hospital Products
9  Division, you became Division Controller For
10 Corporate Materials Management in 1982; is that
11 right?
12     A.  Yes, sir.
13     Q.  Okay, what is that?
14     A.  Corporate Materials Management was a
15 service division that distributed -- let me back
16 up -- operated distribution centers and trucks to
17 move product from plants to distribution centers
18 and from distribution centers to major customers.
19     Q.  And what was your responsibility?
20     A.  I was again responsible for the
21 accuracy and the integrity of the books for that
22 division.

Page 27

1      Q.  Okay.  And then from there, you got
2  promoted to Division Controller - Home Care in
3  '83, correct?
4      A.  Yes, sir.
5      Q.  Were your duties functionally the same
6  as they had been at the Corporate Materials
7  Management?
8         MS. TABACCHI:  Object to the form.
9         MR. SOFFER:  You may answer if you can.
10 BY MR. SISNEROS:
11     Q.  All right, let me just ask it this way.
12 What were your duties as Division Controller At
13 Home Care?
14     A.  I was responsible for, again,
15 maintaining the integrity and accuracy of the
16 books for that division and for establishing the
17 pricing for our products when we billed Medicare,
18 Medicaid and private insurance companies.
19     Q.  How did you do that?
20        MS. TABACCHI:  Object to the form.
21 BY MR. SISNEROS:
22     Q.  How -- how would you price products in

Page 28

1  the context of Medicare and Medicaid?
2      A.  There were DRGs.
3      Q.  DRG stands for?
4      A.  Diagnosis related codes -- diagnosis
5  related groups.
6      Q.  Well, what products or services were
7  you setting Medicaid/Medicare prices for?
8         MS. TABACCHI:  Object to the form.
9         MR. SOFFER:  If you're able to answer,
10 you may.
11        THE WITNESS:  We were in the total
12 parental nutrition business, the total enteral
13 nutrition business, and the renal care business.
14 BY MR. SISNEROS:
15     Q.  These are products and services that
16 involve infusion therapies; is that right?
17        MS. TABACCHI:  Object to the form.
18        THE WITNESS:  Some of these project --
19 well --
20        MR. SOFFER:  You can answer.
21        THE WITNESS:  Some of these products
22 are injected in human beings, and some of them

Page 29

1  are fed orally to human beings.
2  BY MR. SISNEROS:
3      Q.  When you would -- what did you call
4  that, DRGs?  I'm sorry, DRGs?
5      A.  Right.
6      Q.  When you said pricing -- well, can you
7  explain to me how you would set a pricing through
8  the DRGs?
9         MS. TABACCHI:  Object to the form.
10        MR. SOFFER:  You can answer if you're
11 able.
12        THE WITNESS:  Abbott was a late entrant
13 in this market, and there were lots of
14 competitive pricing available.
15        We were setting the product for the
16 individual components that went into a therapy.
17 Like if you were on home enteral nutrition, you
18 would take a product like Ensure, you would need
19 a tube and other ancillary supplies.  We set the
20 prices for those individual supplies that went
21 within a diagnosis group.
22 BY MR. SISNEROS:

8 (Pages 26 to 29)

Page 30

1  Q. I see. You -- you weren't responsible
2  for -- for a pharmaceutical product. You were
3  responsible for equipment?
4  A. We sold no pharmaceutical products.
5  Q. You sold equipment?
6  A. Yes.
7  Q. Okay. All right, then from there, you
8  went to, again, Assistant Corporate Controller -
9  FP & A?
10 A. Right, correct.
11 Q. And your duties there?
12 A. Abbott has a budget cycle three times a
13 year, and all the groups submit budgets. My job
14 was to help line management review, analyze and
15 make recommendations.
16 Q. What specific areas of budgeting did
17 you review --
18     MS. TABACCHI: Object to the form.
19 BY MR. SISNEROS:
20 Q. (Continuing) -- as Assistant Corporate
21 Controller of FP & A?
22     MR. HOFFMAN: You can answer.

Page 31

1     THE WITNESS: Every division and every
2  corporate staff function submitted a budget, a
3  budget -- yeah, submitted a budget.
4  BY MR. SISNEROS:
5  Q. So you reviewed all aspects of the
6  business for every division?
7     MS. TABACCHI: Object to the form.
8     MR. SOFFER: You can answer if you can.
9     THE WITNESS: I assisted line
10 management in that task.
11 BY MR. SISNEROS:
12 Q. Those that you supervised?
13 A. No, accounting does not supervise
14 operating units.
15 Q. Well, this particular position then,
16 your duties required that you worked with
17 individuals from the different divisions?
18 A. Yes, and corporate management.
19 Q. And corporate management.
20 A. (Witness nodding.)
21 Q. Did you have a contact in Hospital
22 Products Division?

Page 32

1  A. I would have worked with the division
2  controller.
3  Q. Do you recall who that would have been?
4  A. No.
5  Q. Can you give me an example of what you
6  would have been reviewing with a representative
7  from the Hospital Products Division?
8     MS. TABACCHI: Object to the form.
9     THE WITNESS: It could be as simple as
10 the wage -- the annual merit wage increase they
11 built in, the annual wage progression they built
12 in to -- could.
13 BY MR. SISNEROS:
14 Q. Well, let me ask you this specific
15 question. Would you -- would your duties have
16 required for a review, for example, of product
17 price increases?
18 A. No.
19 Q. Was there anyone in the controller's
20 office who would have been responsible for that
21 type of review?
22     MS. TABACCHI: Object to form.

Page 33

1     THE WITNESS: At the corporate level?
2  BY MR. SISNEROS:
3  Q. Yes.
4  A. No.
5  Q. At the divisional level?
6     MS. TABACCHI: Object to the form.
7     MR. SOFFER: You can answer if you
8  know.
9     THE WITNESS: Yes.
10 BY MR. SISNEROS:
11 Q. And at the divisional level, who had
12 responsibility for reviewing price increases?
13     MS. TABACCHI: Object to the form.
14     THE WITNESS: At that point in time, I
15 cannot tell you. I -- I do not know.
16 BY MR. SISNEROS:
17 Q. And, actually, I'm not looking for an
18 individual's name. I'm looking for a position.
19 Who -- what position in -- within a
20 division would be responsible for reviewing that
21 division's increase -- a price increase of
22 product?

9 (Pages 30 to 33)

Page 34

1        MS. TABACCHI:  Object to the form.
2        MR. SOFFER:  You can answer if you know
3    the answer to the question.
4        THE WITNESS:  You -- you can -- Abbott
5    was six companies -- is six companies.  Well, I
6    don't know what it is today.  When I was there,
7    it was six companies.
8        You cannot generically say this
9    individual in this division is responsible for
10   that.  They're all organized differently.
11   BY MR. SISNEROS:
12       Q.  So the responsibility for that duty
13   within that division would -- would have been
14   identified within the division?
15       A.  Yes, sir.
16       Q.  Thereafter, you went to Area Finance
17   Director - Europe International?
18       A.  Yes, sir.
19       Q.  Were you actually in Europe?
20       A.  No.
21       Q.  Okay, what were your duties?
22       A.  My first duty was to close the Paris

Page 35

1    office and bring it back.
2        Q.  Was that a cost saving?
3        A.  A million dollars.
4        Q.  What else did you do for them?
5        MS. TABACCHI:  Object to the form.
6    BY MR. SISNEROS:
7        Q.  Well, what else did you do as Division
8    Vice President of Finance International?
9        A.  I was responsible for the accuracy and
10   integrity of the books at the -- financial books
11   at the division level and each of the hundred
12   affiliates.
13       Q.  And I see that during this period of
14   time you also became a CPA?
15       A.  Yes, sir.  Well, I was a CPA before I
16   went to International.
17       Q.  I see.  That's correct.  Are you
18   currently a CPA?
19       A.  I am a retired CPA.
20       Q.  Okay, are you -- are you doing any kind
21   of work presently?
22       MS. TABACCHI:  Object to the form.

Page 36

1    BY MR. SISNEROS:
2        Q.  Consulting?
3        A.  Yes.
4        Q.  What -- do you have your own company?
5        A.  No.
6        Q.  What -- who do you consult for?
7        A.  From a Fortune 500 to a baby company.
8        Q.  And pharmaceutical companies?
9        A.  No, sir.
10       Q.  All right.  After a stint as Division
11   Vice President - Finance International, you went
12   -- became Divisional Vice President - Corporate
13   Planning?
14       A.  Yes, sir.
15       Q.  What were your duties there?
16       A.  The primary duties were product
17   acquisition either through purchase or licensing.
18       Q.  Okay.  What -- what -- give me some
19   examples of what you did --
20       A.  Um-hum.
21       Q.  -- as Corporate Planning product
22   acquisition.

Page 37

1        MS. TABACCHI:  Object to the form.
2        MR. SOFFER:  You may answer if you can.
3        THE WITNESS:  Okay.  I had -- let's
4    back up.
5        Our job was to analyze business areas
6    we were not in to see if they would fit with the
7    overall Abbott portfolio and to find products at
8    small companies generally that would be licensed
9    that would complement Abbott's existing strengths
10   in its product portfolio.
11   BY MR. SISNEROS:
12       Q.  You were looking to license products
13   developed by others?
14       A.  Yes, sir.
15       Q.  Would that include looking for products
16   that had been patented by other companies?
17       A.  Yes.
18       Q.  Would it include products that had been
19   patented by other institutions, say,
20   universities?
21       A.  Yes.
22       Q.  This is something I guess you did for a

10 (Pages 34 to 37)

Miller, James E.                                                                July 30, 2007

Chicago, IL

Page 38

```
 1  couple of years?
 2      A.  Yes.
 3      Q.  In your -- in this position, about how
 4  many products did you license from other
 5  institutions?
 6          MS. TABACCHI:  Object to the form.
 7          THE WITNESS:  Other institutions?
 8  BY MR. SISNEROS:
 9      Q.  Universities, other companies.
10      A.  Oh.
11          MS. TABACCHI:  Object to the form.
12  BY MR. SISNEROS:
13      Q.  Let me -- let me rephrase the question.
14          You've testified that as part of your
15  duties, you were looking for a product that may
16  have been patented by another company or other
17  institutions like a university, correct?
18      A.  Um-hum.
19      Q.  Yes?
20      A.  Yes.
21      Q.  And my question is, to your best of
22  your recollections, how many products did you
```

Page 39

```
 1  license for Abbott --
 2          MS. TABACCHI:  Object to the form.
 3  BY MR. SISNEROS:
 4      Q.  (Continuing) -- from other
 5  institutions?
 6          MS. TABACCHI:  Object to the form.
 7          MR. SOFFER:  If you're able, you may
 8  answer.
 9          THE WITNESS:  Well, let me -- let me
10  rephrase, okay?
11          We would identify a product either with
12  or without a division.  Corporate does not market
13  -- I guess -- corporate really doesn't market
14  products.  Divisions sell products at Abbott.  So
15  -- can I give a real example?
16          MR. SOFFER:  Why don't we have the
17  question asked again.
18  BY MR. SISNEROS:
19      Q.  Well, look, let me ask this.
20          MR. SOFFER:  Go ahead.
21  BY MR. SISNEROS:
22      Q.  Did Abbott -- did you at this time at -
```

Page 40

```
 1  - as Division Vice President - Corporate Planning
 2  get involved in the licensing of a product that
 3  had not been manufactured by Abbott?
 4      A.  Yes.
 5          MS. TABACCHI:  Object to the form.
 6  BY MR. SISNEROS:
 7      Q.  Could you give me some examples?
 8      A.  Yeah.
 9      Q.  Please for the record give me some
10  examples.
11      A.  There was a product called Synagis
12  marketed by Ross Division, which was -- which is,
13  I assume -- I don't know about -- it's -- the
14  manufacturer's Medimmune.
15      Q.  Okay, there were others?
16      A.  Oh, yeah.
17      Q.  All right.  And so my question is with
18  respect to your duties at this time as Division
19  Vice President of Corporate Planning, you were
20  concerned with budgets for acquiring product from
21  other companies or institutions and licensing
22  them through Abbott; is that accurate?
```

Page 41

```
 1          MS. TABACCHI:  Object to the form.
 2          THE WITNESS:  I would say that we were
 3  concerned with licensing products, not budgets.
 4  Our job was to identify and to assist the
 5  divisions in licensing or acquiring products.  We
 6  did not have the budgets.
 7  BY MR. SISNEROS:
 8      Q.  Was cost a consideration in that
 9  process of acquiring those products that you
10  would license?
11          MS. TABACCHI:  Object to the form.
12          THE WITNESS:  Every -- every product
13  had a P & L prepared for it.
14  BY MR. SISNEROS:
15      Q.  What's --
16      A.  A profit and loss statement when you
17  had -- when you went to license it.
18      Q.  All right, thereafter, you went to --
19  by the way, when you were Division Vice President
20  of Corporate Planning, who was your immediate
21  supervisor?
22      A.  During the period of time I was there,
```

11 (Pages 38 to 41)

Miller, James E.                                                    July 30, 2007

Chicago, IL

Page 98

1  this memo identifying points to be discussed at
2  the next -- or, rather, strike that.
3         He is identifying matters that members
4  want to discuss at the next Medicare Working
5  Group meeting, correct?
6         MS. TABACCHI:  Object to the form.
7         THE WITNESS:  That's as stated.
8  BY MR. SISNEROS:
9     Q.  And one of the bullet points that he
10 brings up is they -- someone wants "to discuss
11 average wholesale price versus actual cost
12 issue."
13        Do you see that?
14    A.  That is what's stated.
15    Q.  Do you know what is meant by "average
16 wholesale price"?
17    A.  Do I know what's -- no.
18    Q.  You do not know?  You never heard that
19 term before?
20    A.  I've read the term.
21        MS. TABACCHI:  Object to the form.
22 BY MR. SISNEROS:

Page 99

1     Q.  You've read the term?
2     A.  (Witness nodding.)
3     Q.  What do you mean you've read the term?
4     A.  It's in newspapers, it's in magazines.
5  It's a common term.
6     Q.  You have no idea how it's defined?
7     A.  I've never been responsible for its
8  calculation or setting.
9     Q.  Well, no, I understand that.  My
10 question is do you know what it is?
11        MS. TABACCHI:  Object to the form.
12        THE WITNESS:  No.
13        In 52706, there is a definition.
14        MR. SISNEROS:  We'll get to that in a
15 minute.
16        THE WITNESS:  Okay, fine.
17            (Exhibit Miller 1165 was marked
18 for ID)
19 BY MR. SISNEROS:
20    Q.  All right, I am handing to you for your
21 review what I've -- what's been marked and
22 identified as Exhibit Miller 1165 to your

Page 100

1  deposition.
2         Could you please review that?
3     A.  (Witness reviewing document.)
4     Q.  Have you had a chance to review it?
5     A.  Yes.
6     Q.  Mr. Miller, that is an undated copy of
7  handwritten notes on what appears to be a pad
8  "From the desk of James E. Miller."  Do you see
9  that?
10    A.  Correct.
11    Q.  Is that -- is that you?
12    A.  That's me.
13    Q.  And is that your handwriting?
14    A.  That is my handwriting.
15    Q.  Could you please -- who is it addressed
16 to?
17    A.  Rich Rieger.
18    Q.  And -- and could you please read into
19 the record what you -- what is -- you've written
20 down in this handwritten message?
21    A.  "Medicare allowable equals AWP.
22 Medicare pays physician 80% of Medicare

Page 101

1  allowable.  AWP's equals acquisition cost plus 20
2  to 25%."
3     Q.  And going to that first line where you
4  wrote, "Medicare allowable equals AWP," do you
5  mean by that that that is the amount that
6  Medicare pays or reimburses a provider?
7         MS. TABACCHI:  Object to the form.
8         THE WITNESS:  I have no idea what this
9  buck slip was in relationship to.
10 BY MR. SISNEROS:
11    Q.  Well, okay, but that wasn't my question
12 if what you wrote down was in -- what you wrote
13 down was in relationship to.  But my question was
14 "Medicare allowable," what does that mean to you?
15    A.  It says, "Medicare allowable equals
16 AWP."
17    Q.  And this note, it was -- it was
18 directed at Mr. Rieger, who you supervised; is
19 that correct?
20    A.  That is correct.
21    Q.  Is it fair to say that this was
22 information you were providing him?

26 (Pages 98 to 101)

22a7552e-50af-408f-9678-8863d73aaafb

Miller, James E.                                                    July 30, 2007
                              Chicago, IL

Page 106

```
 1  memo.
 2     A.  Oh, okay fine.
 3     Q.  Let's go to that paragraph --
 4     A.  Okay.
 5     Q.  -- the last paragraph of ABT 52808.
 6         In there, Mr. Rieger is telling the
 7  Medicare Working Group that he is attaching two
 8  documents, one relating to AWP, and an article
 9  relating to President Clinton's '98 budget
10  proposal; is that right?
11     A.  That's what it says.
12     Q.  Okay, and if Mr. -- and earlier, I'd
13  asked you if -- in the normal course of business
14  if Mr. Rieger sent out a memo such as this to the
15  Working Group, including you, you know, would you
16  normally have received it, and I believe you
17  said, "Yes."  Is that right?
18     A.  That is correct.
19     Q.  And if he had attached -- if he had
20  attachments to his memo, would you normally have
21  reviewed them?
22     A.  It depends on how voluminous they were.
```

Page 107

```
 1     Q.  I know what you mean.  But do you
 2  believe that -- if you turn over to Page 52810 --
 3     A.  52810.
 4     Q.  -- which sequentially follows the end
 5  of his memo, 52809.  That's the end of Mr.
 6  Rieger's memo, and then the attachment is 52810.
 7  Do you see that?
 8     A.  Yes.
 9     Q.  And they're talking about "President
10  Clinton's expected proposed Medicare outpatient
11  drug coverage."  Do you see that?
12     A.  Yes.
13     Q.  Okay, and if you look at -- just look
14  to the next page, that particular article ends at
15  52811.  Do you see that?
16     A.  Yes.
17     Q.  All right, with -- with respect to the
18  two-page article, it would -- the attached
19  article would have been only two pages.  Was it
20  your normal practice to review small articles
21  such as that?
22         MS. TABACCHI:  Object to the form.
```

Page 108

```
 1         THE WITNESS:  Yes.
 2  BY MR. SISNEROS:
 3     Q.  And if you could review at the top of
 4  52810, one of the articles attached by Mr. Rieger
 5  to his memo, the -- basically what would be the
 6  second paragraph starting with, "Health News
 7  Daily via Individual, Inc."  Do you see that, the
 8  beginning of that paragraph?
 9     A.  Yes, sir.
10     Q.  And it's an introduction paragraph.  Do
11  you see where they are basically summarizing
12  that, "The new Medicare outpatient drug coverage
13  be based on actual cost rather than AWP."  Do you
14  see -- do you see what that mem -- see that?
15     A.  Yes, sir.
16     Q.  Okay, earlier in your testimony, --
17  well, strike that.
18         Now, if you go back to ABT 5808, the
19  beginning of Mr. Rieger's January 15th, 1997
20  memo, and look at the first bullet point there,
21  "Discussed average wholesale price versus actual
22  cost issue," do you see that?
```

Page 109

```
 1     A.  Yes, sir.
 2     Q.  Do you believe that "actual cost" point
 3  raised in that bullet may reference President
 4  Clinton's proposal that reimbursement of
 5  outpatient drugs be based on actual cost rather
 6  than AWP?
 7         MS. TABACCHI:  Object to the form.
 8         THE WITNESS:  I do not know.
 9  BY MR. SISNEROS:
10     Q.  Does reviewing the article in any way
11  refresh your recollection about the actual cost
12  issue?
13     A.  I would have read this and said,
14  "Actual cost would never be approved."
15     Q.  Why would you say that?
16     A.  I spent nine years in manufacturing
17  accounting.  You can get 40 cost accountants on
18  the head of a pin, and they will never agree on
19  actual cost.
20     Q.  Because each one of them would have a
21  different definition for --
22     A.  Yes, sir.
```

28 (Pages 106 to 109)

22a7552e-50af-408f-9678-8863d73aaafb