# EXHIBIT 174

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 1

             IN THE UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF MASSACHUSETTS

IN RE:  PHARMACEUTICAL         )

INDUSTRY AVERAGE WHOLESALE     )

PRICE LITIGATION               )  MDL No. 1456

-----------------------------)  Civil Action

This document relates to:      )  No. 01-12257-PBS

United States of America,      )

ex. rel. Ven-a-Care of the     )

Florida Keys, Inc.,            )  Hon. Patti Saris

    vs.                        )

Abbott Laboratories, Inc.,     ) Magistrate Judge

CIVIL ACTION NO. 06-11337-PBS ) Marianne Bowler


          Videotaped 30(b)(6) deposition of DAVID S.

FISHMAN, called by the Plaintiffs for examination,

taken pursuant to notice, agreement and by the

provisions of the Rules of Civil Procedure for the

United States District Courts pertaining to the

taking of depositions, taken before DEBORAH HABIAN, a

Notary Public within and for the County of Cook,

State of Illinois, and a Certified Shorthand Reporter

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

---

**Page 2**

1  of said State, at the offices of JonesDay, 77 West
2  Wacker Drive, 35th Floor, Chicago, Illinois, on the
3  12th day of March, 2008, at 8:34 a.m.
4
5  APPEARANCES:
6
7      U.S. DEPARTMENT OF JUSTICE
8      COMMERCIAL LITIGATION, FRAUD
9      BY:  ANN ST. PETER-GRIFFITH, ESQ.
10     99 N.E. 4th Street
11     Miami, Florida  33132
12     (305) 961-9001
13        on behalf of the United States;
14
15     ANDERSON, LLC
16     BY:  C. JARRETT ANDERSON, ESQ.
17     208 West 14th Street, Suite 3-B
18     Austin, Texas  78701
19     (512) 469-4549
20        on behalf of the Relator, Ven-a-Care;
21
22

---

**Page 3**

1  APPEARANCES (continued):
2
3      JONES DAY
4      BY:  TONI-ANN CITERA, ESQ.
5      77 West Wacker Drive
6      Chicago, Illinois  60601-1692
7      (312) 782-3939
8        on behalf of the Defendants.
9
10 ALSO PRESENT:
11     STEPHAN HOOG, VIDEOGRAPHER
12     HENDERSON LEGAL SERVICES
13
14
15
16
17
18
19
20
21
22

---

**Page 4**

1  I N D E X   O F   E X A M I N A T I O N S
2
3  WITNESS:                DX  CX  RDX  RCX
4  DAVID S. FISHMAN
5  EXAMINATION BY:
6  ANN ST. PETER-GRIFFITH, ESQ.    06
7
8  I N D E X   O F   E X H I B I T S        PAGE
9  Exhibit Fishman 001, Sub 1 through Sub 40
10     ABT-DOJ 0394762 through 0395345      21
11 Exhibit Fishman 002, ABT-DOJ 0302503
12     Abbott Lab Ethics & Compliance Policy  147
13 Exhibit Fishman 003, Notice of Deposition     176
14 Exhibit Fishman 004, TXABT 49911
15     Proposal Analysis              260
16 Exhibit Fishman 005, TXABT 38152
17     Proposal Analysis              260
18 Exhibit Fishman 006, TXABT 38152
19     Injectable Comparison          269
20 Exhibit Fishman 007, ABT-DOJ 0233906
21     Catalog Price Adjustment       351
22

---

**Page 5**

1      THE VIDEOGRAPHER:  This is Stephan Hoog of
2  Legal Video Services, Inc., 205 West Randolph Street,
3  Chicago, Illinois.  I'm the operator of this camera.
4  We're on record March 12th, 2008.  The time is 8:34,
5  as indicated on video screen.
6          This is the videotaped deposition of
7  David Fishman being taken on behalf of Federal Rules
8  of Civil Procedure on behalf of the Plaintiff.  We are
9  at 77 West Wacker Drive, Chicago, Illinois.  This case
10 is captioned In Re: Pharmaceutical Industry Inc. AWP,
11 Case No. 01-12257-PBS.
12         Will the attorneys please identify
13 themselves for the video record?
14     MS. ST. PETER-GRIFFITH:  Ann St. Peter-Griffith
15 from the United States Attorney's Office, Southern
16 District of Florida on behalf of the United States.
17     MR. ANDERSON:  Jarrett Anderson, counsel for
18 the lawyer.
19     MS. CITERA  Toni Citera, counsel for the
20 witness and for the Defendant from JonesDay.
21     THE VIDEOGRAPHER:  The court reporter today is
22 Debbie Habian.  Would you please swear in the witness?

---

2 (Pages 2 to 5)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

Page 30

1    Q.  Where did you search?
2    A.  I searched my files.
3    Q.  Anyone else's files?
4    A.  I talked to people who were -- would have
5  been at Abbott at that time, and nobody had any
6  documents other -- other than what I had.
7    Q.  Do you know why Abbott didn't retain a
8  copy of its Code of Business Conduct --
9    MS. CITERA:  Objection to the form.
10
11  BY MS. ST. PETER-GRIFFITH:
12    Q.  (Continuing) -- for this period from '91
13  through '93?
14    A.  I -- I didn't know that they didn't retain
15  it.
16    Q.  Okay, but your search for that document
17  only involved going to the Office of Ethics and
18  Compliance and going to several people within the
19  Legal Department, right, Miss Goldberg and Miss
20  Sensinoff?
21    A.  Szazdanoff.
22    MS. CITERA:  Szazdanoff.

Page 31

1    MS. ST. PETER-GRIFFITH:  Szazdanoff.
2    THE WITNESS:  That is --
3    MS. CITERA:  Objection to form.
4    THE WITNESS:  That is correct.
5
6  BY MS. ST. PETER-GRIFFITH::
7    Q.  Okay, going back, what other
8  responsibilities did you have for the time period of
9  the fall of '95 through to 2004?
10    A.  As Commercial Attorney for each of those
11  divisions, all the Commercial Attorneys were
12  responsible for providing commercial legal services to
13  those businesses, which ranged from drafting
14  contracts, discussing issues that arose, legal matters
15  that arose, strategic business matters that arose,
16  buying companies, drafting licenses, distribution
17  agreements, whatever -- again, the Commercial demands
18  of the businesses was -- it was providing support for
19  those divisions for the U.S. operations.
20    Q.  Did your responsibilities entail anything
21  pertaining to price reporting or Abbott's relationship
22  with the price reporting compendia?

Page 32

1    MS. CITERA:  Objection to the form.
2    THE WITNESS:  No.
3
4  BY MS. ST. PETER-GRIFFITH:
5    Q.  Did you provide any legal advice
6  concerning price reporting during this time period?
7    MS. CITERA:  Objection to form.  Also I'm
8  obviously going to caution you to reveal any --
9    THE WITNESS:  Right.  To the extent --
10    MS. CITERA:  -- any of your discussions that
11  are privileged.
12    THE WITNESS:  To the extent I did or didn't
13  would be covered by attorney-client privilege.
14  BY MS. ST. PETER-GRIFFITH:
15    Q.  You can answer "yes" or "no" though.  I'm
16  not asking you about communication --
17    A.  What's the question?
18    MS. ST. PETER-GRIFFITH:  Can you read the
19  question back, please?
20    THE REPORTER:  Sure.
21       (Record read.)
22    MS. CITERA:  You can answer "yes" or "no."

Page 33

1    THE WITNESS:  Yes.
2
3  BY MS. ST. PETER-GRIFFITH:
4    Q.  What advice did you give?
5    MS. CITERA:  Objection, privileged.
6    THE WITNESS:  That's -- any advice I would have
7  given would be covered by --
8    MS. ST. PETER-GRIFFITH::  Toni, do you intend
9  to -- does Abbott intend to rely upon an advice of
10  counsel defense?
11    MS. CITERA:  I'm not going there.  You ask this
12  question every deposition.
13    MS. ST. PETER-GRIFFITH:  Yes, I did because I
14  want your -- you to answer.
15    MS. CITERA:  I'm not making any stipulations or
16  statements.  You're here to ask questions of the
17  witness.  You're not here to ask questions of me.
18  This -- your question is clearly privileged.  He's not
19  going to answer it.
20
21  BY MS. ST. PETER-GRIFFITH:
22    Q.  What other responsibilities did you have

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

---

Page 34

1  during this time frame?
2      A.  I think I've answered that question.
3      Q.  Well, I just want to make sure we've
4  exhausted on your responsibilities.  Is there any
5  more --
6      A.  I've provided broad commercial support to
7  the business -- the divisions that my group that I was
8  in represented for U.S. operations.
9      Q.  Did you personally have any interaction
10 with any price reporting compendia?
11     A.  No.
12     Q.  Did you personally have any interaction
13 with anyone outside of Abbott concerning price
14 reporting --
15     MS. CITERA:  Object to the form.
16
17 BY MS. ST. PETER-GRIFFITH:
18     Q.  -- or AWP?
19     MS. CITERA:  Outside the scope.
20     THE WITNESS:  AWP, no.
21
22 BY MS. ST. PETER-GRIFFITH:

---

Page 35

1      Q.  What about price reporting?
2      MS. CITERA:  Same objections.
3      THE WITNESS:  I provided -- I was -- I provided
4  counsel -- what time frame are we talking about?
5
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  This '95 through 2004 time period.
8      A.  I provided counsel for AMP and best price
9  calculations.
10     Q.  Who did you provide that counsel to?
11     A.  HPD.
12     Q.  Who within HPD?
13     A.  Directly, the Contract Marketing
14 organization.
15     Q.  And what advice did you give?
16     MS. CITERA:  I'm going to instruct you not to
17 answer, privileged.
18     THE WITNESS:  Any advice that I would have give
19 would have been privileged.
20
21 BY MS. ST. PETER-GRIFFITH:
22     Q.  But it pertained to the business operation

---

Page 36

1  of Abbott's HPD, correct?
2      MS. CITERA:  I'm going to instruct you not to
3  answer that.
4      MS. ST. PETER-GRIFFITH:  Why are you going to
5  instruct him not to answer?
6      MS. CITERA:  It's privileged.  You're asking
7  him about what the advice pertained to.  That's
8  privileged.
9      MS. ST. PETER-GRIFFITH:  Well, did it pertain
10 to litigation?  That's not privileged, Toni.
11     THE WITNESS:  I would not be -- I would not
12 provide information regarding litigation.  We had a
13 Litigation Department.
14 MS. ST. PETER-GRIFFITH:
15     Q.  So --
16     A.  So I did not do that.
17     Q.  So everything you provided advice
18 concerning then pertained to transactional matters or
19 business matters within Abbott HPD?
20     MS. CITERA:  Objection, form, outside the
21 scope.
22     THE WITNESS:  It's --

---

Page 37

1      MS. CITERA:  I'd Also instruct you not to
2  answer that question based on the basis of privilege.
3      MS. ST. PETER-GRIFFITH:  It's -- he can answer
4  "yes" or "no."
5      THE WITNESS:  You have the word "only" in
6  there, and I don't think that's appropriate.
7
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  Okay, why not?
10     A.  Because I also provided -- you didn't
11 include legal matters.  You just said "transactional"
12 and "business."
13     Q.  Okay, what do you consider legal matters?
14     A.  Interpretation of the law.
15     Q.  What laws did you interpret on behalf of
16 HPD?
17     MS. CITERA:  Again, I'm going to instruct you
18 not to answer -- or caution you not to reveal any
19 privileged discussions.  If you can answer the
20 question without revealing any privileged discussions,
21 you can answer it.  I'm also going to object it's
22 outside the scope.

---

10 (Pages 34 to 37)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                           March 12, 2008

Page 38

1    THE WITNESS:  You're asking -- from the period
2  of '95 through 2004 which laws did I give legal advice
3  on?
4
5  BY MS. ST. PETER-GRIFFITH:
6    Q.  Right.
7    A.  I think I -- I think the question is too
8  broad to answer.  I don't know every law that I gave
9  legal advice on.
10   Q.  Did you provide advice concerning -- on
11  statutes pertaining to Medicaid or Medicare fraud and
12  abuse?
13   MS. CITERA:  Same objection, same instruction.
14   THE WITNESS:  Yes.
15
16  BY MS. ST. PETER-GRIFFITH::
17   Q.  Okay, did you provide advice concerning
18  the antikick -- federal antikickback statute?
19   MS. CITERA:  Same objection, same instruction.
20   THE WITNESS:  Yes.
21
22

Page 39

1  BY MS. ST. PETER-GRIFFITH:
2    Q.  Did you provide advice concerning the
3  Federal False Claims Act?
4    MS. CITERA:  Same objection, same instruction.
5    THE WITNESS:  Yes.
6
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  Did you provide advice concerning Medicare
9  or Medicaid regulations?
10   MS. CITERA:  Same objection, same instruction.
11   THE WITNESS:  How is that differnt from what
12  you described previously?
13
14  BY MS. ST. PETER-GRIFFITH:
15   Q.  Well, now I'm talking about regulations.
16   A.  Some of -- certain of the regulations,
17  safe harbors.
18   Q.  What about State False Claims Act, did you
19  provide any advice concerning any State False Claims
20  Act?
21   A.  Specifically, we --
22   MS. CITERA:  Same objection, same instruction.

Page 40

1    THE WITNESS:  We -- I did not.
2
3
4  BY MS. ST. PETER-GRIFFITH:
5    Q.  What about any other state Medicaid fraud
6  or abuse statute?
7    MS. CITERA:  Same objection, same instruction.
8    THE WITNESS:  Specifically any particular
9  state, no.
10
11  BY MS. ST. PETER-GRIFFITH:
12   Q.  How about a grouping of states?
13   MS. CITERA:  Same objection, same instruction.
14   THE WITNESS:  We gave advice from -- on the --
15  I -- I shouldn't say we.  I -- I can't testify as to
16  what my colleagues specifically would have given in
17  any given instance.  I provided advice in the broader
18  framework of the federal statutory scheme.
19
20  BY MS. ST. PETER-GRIFFITH:
21   Q.  And what is -- what in your background
22  provided you with the background to provide that

Page 41

1  advice?
2    MS. CITERA:  Object to the form, outside the
3  scope.
4    THE WITNESS:  I learned it while I became part
5  of Abbott in-house counsel.
6
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  Okay, and who did you learn it from?
9    A.  My colleagues.
10   Q.  Which colleagues?
11   MS. CITERA:  Again, outside the scope.
12   THE WITNESS:  Honey Lynn Goldberg, Brian
13  Taylor, Mark Habeberger, Maureen McShane, Daphne Pals,
14  'Sil Porembski --
15
16  BY MS. ST. PETER-GRIFFITH:
17   Q.  When you --
18   A.  What time -- what time frame are we
19  talking about?
20   Q.  '95 through 2004.
21   A.  That -- those were just people from in an
22  earlier time frame.  I mean did you want -- we had

11 (Pages 38 to 41)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

Page 42

1  dozens of lawyers in Abbott that we worked
2  collaboratively together with.  I would have learned
3  from them as well.  Do you want -- do you want the
4  names of those people as well?
5      Q.  Sure.
6      A.  Tejal Vakaharia, Kate Collins, Peter
7  Petros, Selena Thomas Lisa Edmonds, who got married
8  and became Lisa Lee, Daniel Lawton, Mike Johannasen,
9  Erin Kraft, Brian Smith, Simi Chabria, Shan Bhati,
10 Michael Elm.
11     Q.  Is there a gentleman whose first name
12 began with an A?
13     MS. CITERA:  Whose first name began?
14     MS. ST. PETER-GRIFFITH: Began -- or, I'm sorry,
15 whose second name -- whose last name began with an A.
16     THE WITNESS:  Jim Albrecht, yes.  He retired
17 soon after I got involved.
18
19 BY MS. ST. PETER-GRIFFITH:
20     Q.  Okay.  Sir, did you participate -- during
21 this '95 through 2004 time period when you were
22 providing legal advice and working on commercial

Page 43

1  matters with HPD and -- commercial and legal matters
2  with HPD, did you help formulate any strategies
3  concerning compliance with -- HPD's compliance with
4  federal or state Medicare or Medicaid statutes --
5      MS. CITERA:  Objection to the form.
6
7  BY MS. ST. PETER-GRIFFITH:
8      Q.  -- or regulations?
9      A.  Indirectly.
10     Q.  How -- what did you do indirectly?
11     MS. CITERA:  And I would just caution you not
12 to reveal any privileged conversations, discussions,
13 et cetera.
14     MS. ST. PETER-GRIFFITH:  I will put on the
15 record that I object to that instruction simply
16 because it's -- you know, it's not privileged for the
17 United -- the United States has every right to
18 discover the business practices and advice concerning
19 business practices within Abbott.
20     MS. CITERA:  You do not have a right to
21 discover legal advice that is given to the
22 corporation.

Page 44

1      Ann, as I said before, he is here to
2  testify about the -- subject to our objections and
3  limitations, the doc -- the topics that you have
4  noticed.  He is not here to testify about legal advice
5  that the -- that was given by lawyers to the company.
6      MS. ST. PETER-GRIFFITH:  And you don't intend
7  to rely upon an advice of counsel defense, right?
8      MS. CITERA:  I am not answering that.
9      MR. ANDERSON:  Well, Toni, regardless, the
10 whole premise of the deposition is to learn of the
11 practices at Abbott regarding the noticed topics.  So
12 we do need that testimony.
13     MS. CITERA:  Well, he is subject to the
14 privilege.  I mean we are not going to disclose
15 privileged matters.  That's -- we said that in our
16 objections, we said that in our limitations.  It's not
17 going to happen.  You're not entitled to it.
18     MR. ANDERSON:  Listen, we're not talking about
19 the advice.  We're saying we need the information
20 about the practices.
21     MS. CITERA:  But she's asking for advice that
22 was given, I believe -- I mean we can reread the

Page 45

1  question, but as I recall, it was something to do with
2  advice given on the strategy.  That's clearly
3  privileged.
4      MR. ANDERSON:  Okay, but --
5      MS. ST. PETER-GRIFFITH:  No, it's not
6  privileged, Toni.
7      MS. CITERA:  I disagree.
8      MS. ST. PETER-GRIFFITH:  It pertains to
9  business --
10     MS. CITERA:  I disagree.
11     MS. ST. PETER-GRIFFITH:  Okay, then we're going
12 to come -- when we come back here, it's going to be at
13 Abbott's expense.
14 BY MS. ST. PETER-GRIFFITH:
15     Q.  Sir, what --
16     MS. CITERA:  If he can answer it without
17 providing privileged testimony -- because I didn't
18 instruct him not to -- I instructed him not to reveal
19 any privileged testimony.
20     If there are things that you can
21 provide that are not privileged, you can answer that
22 question.  If you need to take a break and ask me, we

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 46

1  can do that.
2          But he's not going to provide
3  privileged discussions, conversation.  With that
4  advice.
5      MS. ST. PETER-GRIFFITH:  Can you read back the
6  question?
7      MS. CITERA:  Want to read back the question.
8      THE WITNESS:  Is there an outstanding question?
9      THE REPORTER:  Okay, the last question was,
10 "What did you do indirectly?"  Would you like me to
11 read the one before just for clarification?
12     THE WITNESS:  Please.
13     THE REPORTER:  Okay.
14         (Record read.)
15     MS. CITERA:  So with that instruction in mind.
16     THE WITNESS:  I believe that answering the
17 question would require me to provide privileged
18 information.  I did participate.  What I did in that
19 participation is asking me to disclose privileged
20 information.
21 BY MS. ST. PETER-GRIFFITH:
22     Q.  Well, did you exclusively have

Page 47

1  communications?
2      MS. CITERA:  What do you mean by that?
3      THE WITNESS:  I don't understand that question.
4      MS. ST. PETER-GRIFFITH:  Meaning -- I want to
5  know what he did.  I'm not -- I don't want to discover
6  necessarily -- I do want to discover the
7  communications, and I think your instruction's
8  improper.
9
10 BY MS. ST. PETER-GRIFFITH:
11     Q.  Beyond communications, what did you do?
12     MS. CITERA:  I'm going to object to the form.
13     THE WITNESS:  I don't understand what would
14 exist beyond communications.
15
16 BY MS. ST. PETER-GRIFFITH:
17     Q.  Well, did you formulate or draft any
18 policies or do any -- do any research --
19     A.  Yes.
20     Q.  -- In furtherance of any policies?
21     A.  Yes.  There's two questions.  To the first
22 one, yes.

Page 48

1      Q.  Okay, what about the second one?
2      A.  We -- I would have -- we were -- the Legal
3  Division was current.  We kept current through
4  publications, periodicals, alerts that came from law
5  firms and communications with external counsel on the
6  current state of the law.
7      Q.  What law firms did you obtain information
8  from?
9      A.  On what subject matter?
10     Q.  Medicare/Medicaid fraud abuse.
11     A.  I'm sorry, the question is just very
12 broad, so...  I personally worked with Reed Smith in
13 Washington, D.C.
14     Q.  Any other law firms?
15     A.  Mayer, Brown.
16     Q.  Any other law firms?
17     A.  We're talking '95 to 2004?
18     Q.  Yes.
19     A.  Arnold & Porter.
20     Q.  Anybody else?
21     A.  Not that I can think of.
22     Q.  In formulating its policies and

Page 49

1  procedures, did Abbott rely upon any materials from
2  outside counsel in formulating it -- how it was going
3  to comply with federal and state Medicare and Medicaid
4  fraud and abuse statutes?
5      MS. CITERA:  Objection to the form.
6      THE WITNESS:  We certainly consulted with
7  outside counsel regarding those matters.
8
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  Okay, but you just referenced before that
11 you reviewed materials from them; is that fair?
12     MS. CITERA:  Objection to form.
13     THE WITNESS:  Your earlier question was which
14 law firms did I consult, and previously the answer was
15 which -- what -- what law -- what did I -- what did we
16 do to keep current with the law basically, and so we
17 would have received publications from law firms that
18 we didn't necessarily do business with as -- probably
19 as part of their marketing program.
20
21 BY MS. ST. PETER-GRIFFITH:
22     Q.  Did you consult with them concerning

13 (Pages 46 to 49)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

Page 110

1
2   BY MS. ST. PETER-GRIFFITH:
3       Q.  And you didn't do that, you testified,
4   because you thought they were privileged?
5       A.  Any communi -- I believe any communication
6   that would have subsequently occurred, had a call like
7   that been made, would be privileged.
8       Q.  What advice did Abbott's in-house Legal
9   Department give concerning AWP, spread or spread
10  marketing?
11      MS. CITERA:  Objection to form.
12      THE WITNESS:  That would clearly be --
13      MS. CITERA:  Privileged.
14      THE WITNESS:  -- privileged.
15      MS. ST. PETER-GRIFFITH:  Why is it privileged?
16  It goes to --
17      MS. CITERA:  It's privileged.
18      THE WITNESS:  You asked me about legal advice.
19      MS. CITERA:  Give me a break.  It's privileged.
20      MS. ST. PETER-GRIFFITH:  Okay, are you going to
21  be asserting an advice of counsel defense in this
22  case?

Page 111

1       MS. CITERA:  Oh, God.
2       MS. ST. PETER-GRIFFITH:  Are you, Toni?
3       MS. CITERA:  I'm not going there, Ann.  It's
4   privileged.
5       MS. ST. PETER-GRIFFITH:  I'm asking --
6       MS. CITERA:  I'm not going there.  It's
7   completely privileged.  We're not going there.
8       MS. ST. PETER-GRIFFITH:  Okay, I really think
9   you need to answer the question today because --
10      MS. CITERA:  I'm not answering that question.
11      MS. ST. PETER-GRIFFITH:  Okay, well, when we
12  come back here, it's going to be at Abbott's expense.
13      MS. CITERA:  You know what?  You've already
14  asked for a second day.  So, you know...
15
16  BY MS. ST. PETER-GRIFFITH:
17      Q.  What else did you learn from Mr. Matejh?
18      A.  We talked about LERN, we talked about the
19  audience, the original audience.  He advised me that
20  as -- as the system became more fulsome and from an
21  operational standpoint they expanded -- they expanded
22  the audience to include all sales and marketing

Page 112

1   people, not just field sales.
2       Q.  Anything else?
3       A.  I talked to him about the -- kind of the
4   administrative operational process that he would have
5   been involved in regarding the OEC policies and then
6   the procedures that followed.
7       Q.  Anything else?
8       A.  I think he talked about the Safeguarding
9   Trust CD as well, and that would have -- I mean I may
10  be implying that that would have been something he was
11  involved in.  I don't recall.
12      Q.  Would that again be more of the technical
13  aspects as opposed to the substantive?
14      A.  Correct.
15      Q.  Okay, what about --
16      A.  Rick is not an attorney.
17      Q.  What about Ms. Szazdanoff, what
18  communications did you have with her?
19      A.  I had a phone conversation with her.  We
20  reviewed her tenure, her varied tenure at Abbott.
21  She'd had several different positions over time, and
22  we talked about those positions and how she landed in

Page 113

1   OEC and what her responsibilities were as Senior
2   Counsel within OEC reporting to Charlie Brock when
3   they reported in through the General Counsel.  We
4   talked about the activities OEC and Legal engaged in
5   when the Pharma Code came out in terms of operating --
6   operating guidelines, operating --
7       Q.  When -- oh, when was that, I'm sorry?
8       A.  Summer of 2002, I believe.
9       Q.  And when you say "Pharma," do you mean --
10      A.  I mean Pharma Research, the organization
11  Pharma.
12      Q.  Okay, just wanted to make sure what --
13      A.  No, I've used it twice.  I've used it
14  differently.  I understand.
15      Q.  Okay.
16      A.  And then I would have talked to her about
17  the specific role she played in marshalling the
18  policies and procedures in 2003, 2004 and beyond.
19      Q.  And what did she tell you about that?
20      A.  Which?  The last -- the last item?
21      Q.  The last -- yeah.
22      A.  She told me that, as Charlie's kind of

29 (Pages 110 to 113)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                          March 12, 2008

Page 118

1      Q.   Okay, is there anything else you can
2  recall about your discussions with Ms. Szazdanoff?
3      A.   We talked about the Exceptions Review
4  Committee within the divisions, which addressed
5  something that would have come from -- predominantly
6  from Finance review of expense reports where people,
7  mostly sales reps, submitting sales expense reports
8  would have been raising issues as to whether or not
9  they were adhering to the procedures, policies and
10 procedures.
11     Q.   Anything else?
12     A.   No.
13     Q.   How long did you speak with
14 Ms. Szazdanoff?
15     A.   It was scheduled the same.  I recall we --
16 it didn't last -- it was scheduled late in the day,
17 and it didn't last as long -- I was glad it didn't
18 last until 6:00.
19     Q.   Okay, when you say it was late in the
20 day --
21     A.   5 -- it was a 5 to 6 call, and I was glad
22 it didn't last all the way to 6.  So...

Page 119

1      Q.   Did you just sit down one day and call all
2  these people?
3      A.   No, these were -- these were over periods
4  of time.
5      Q.   Who set up the calls?
6      A.   I believe our Litigation Group.
7      Q.   And did you choose who you were going to
8  speak with or was that -- were these individuals, the
9  list of individuals chosen for you?
10     A.   I'm sure the conversation was privileged.
11 It was conversations with counsel.  It was through
12 counsel.  It was through conversations with counsel
13 identifying people who could fill in areas that I
14 wouldn't necessarily have as much personal knowledge
15 about.
16     Q.   Did you independently request to speak
17 with anybody not suggested by counsel?
18     A.   In reviewing -- in reviewing the subject
19 matter, I would have answered, I don't know that, but
20 so and so probably does.  So the list was probably
21 derived mostly by that.  For instance, you know, when
22 was OEC created, I -- prior to talking to Charlie

Page 120

1  Brock, I couldn't have placed it in time, whether it
2  was 2000 or '99 or 2001.  I could have given
3  general -- general information, but in talking about
4  the subject matter for this deposition would have
5  identified people who could fill in specific gaps that
6  I had in facts.
7      Q.   Do you recall who you identified as people
8  you might want to talk to to fill in those gaps?
9      A.   I would have mentioned Charlie, I would
10 have mentioned Katherine, I would have mentioned
11 Ginny, I would have mentioned Rick Matejh, and I would
12 have mentioned Honey Lynn, I would have mentioned
13 Cliff, I would have mentioned Mike.  I mean I -- I
14 mean all of them.  I mean it's -- it was more of a --
15 it was kind of an interactive process.  So I don't
16 have precise recollection of -- of who I didn't
17 identify.
18     Q.   Okay, is there anyone that you -- in
19 preparation for today's deposition that you thought
20 you should have spoken with but didn't?
21     A.   Nobody that I can think of.
22     Q.   What did you -- what were your

Page 121

1  communications with Mr. Fischer?
2      A.   I spoke with Matt for far less time than
3  an hour.  We probably spoke for ten minutes.
4      Q.   Okay.
5      A.   And it was to ask him about his
6  recollection of conversations and activ -- and a
7  series of conversations and interactions he would have
8  had with Mike Tootell.
9      Q.   Okay, and what were the -- those
10 conversations and communications?
11     A.   It had to do with testimony or --
12 deposition testimony that Mike gave regarding his
13 concern about AWP.
14     Q.   Where did you learn about that testimony?
15     A.   From counsel.
16     Q.   Did you review it?
17     A.   I did not.
18     Q.   Okay.  And what did you learn about that
19 conversation between Mr. Fischer and Mr. Tootell?
20     A.   What I learned from Matt was that Matt did
21 not recall any specific conversation with Mike where
22 the -- a matter about AWP was raised in any alarming,

31 (Pages 118 to 121)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 122

1  concerning way.
2        Part of -- Mike reported to Matt, and
3  part of their collective function was -- was the broad
4  pricing aspects for -- for the Ross business. So he
5  said he would have had general conversations about AWP
6  with Matt -- or with Mike, and he also recalled that,
7  to the extent there was ever any thing that was of
8  concern about his area, pricing generally, that he
9  would not -- he, as the manager of the department,
10  would not have made final decisions, he would have
11  consulted Brian Taylor in the Legal Department.
12     Q.  Okay, and what did you learn about
13  consultations with Mr. Taylor, if any?
14     A.  Any conversations they may have had would
15  be privileged.
16        MS. ST. PETER-GRIFFITH:  Any conversations
17  about pricing and to business decisions concerning
18  pricing --
19        THE WITNESS:  Yes.
20        MS. ST. PETER-GRIFFITH: -- is that your
21  instruction?
22        THE WITNESS:  Yes, if they're seeking

Page 123

1  legal counsel --
2        MS. CITERA:  If they were seeking legal counsel
3  from Mr. Taylor, absolutely.
4        MS. ST. PETER-GRIFFITH:  Are you intending to
5  rely upon advice of counsel in -- as your defense in
6  this case?
7        MS. CITERA:  I'm not answering that.  I'm not
8  answering that.
9        MR. ANDERSON:  In fairness, Toni, I will say
10  that we're here on a 30(b)(6) witness.  We're not here
11  in Mr. Fishman's personal capacity as an attorney.
12  And the -- when this privilege is being asserted
13  offensively, it is thwarting our ability to discover
14  the policies and practices and the compliance
15  therewith by Abbott, and the whole premise of the
16  deposition is the compliance efforts by Abbott.
17        If Mr. Fishman, for instance, to make
18  it very specific to this line of questions, posed an
19  inquiry to counsel, which he's testified he did, about
20  AWP and spread concerns that Mr. Tootell had, and that
21  was passed along to Mr. Taylor, if not through this
22  witness, how could we ever discover Abbott's

Page 124

1  information concern that?
2        MS. CITERA:  Okay, first of all, he spoke to,
3  you know, Mr. Taylor and asked him the questions.  So
4  you can get to that.  Not Mr. Taylor.  Mr. --
5        MS. ST. PETER-GRIFFITH:  Fischer.
6        MS. CITERA: -- Fischer.  No, no --
7        THE WITNESS:  Mr. Taylor.
8        MS. CITERA: -- Taylor.  And he spoke to
9  Ms. Pence-Levy and he spoke to Mr. Berman and asked if
10  Mr. Tootell raised those concerns.  So you can ask
11  about that.
12        What he has just said is that any
13  conversations that Mr. Taylor would or would not have
14  had would have been privileged.  So I guess, you
15  know -- I don't see where you're not getting what you
16  noticed from -- what you noticed up for, and, you
17  know, obviously, subject to our limitations and
18  objections.
19        You wanted to know whether it was --
20  whether --
21        MR. ANDERSON:  Well, we're going to continue
22  this.

Page 125

1        MS. ST. PETER-GRIFFITH:  We'll continue.
2        MR. ANDERSON:  Yeah.
3        MS. ST. PETER-GRIFFITH:  Yeah.
4        MR. ANDERSON:  But I'm just saying that, as a
5  general proposition, the witness is not here and in
6  his personal capacity as an attorney.
7        MS. ST. PETER-GRIFFITH:  As a lawyer.
8        MR. ANDERSON:  He's here as the corporate
9  representative, and merely because he has an attorney
10  background does not make any of his testimony on
11  behalf of an organization more or less privileged.
12        MS. CITERA:  I think you're conflating the two
13  because I mean here's the problem.  You guys are here
14  to testify -- you're here to talk to him about these
15  topics, okay?  And you are now asking about advice
16  that Legal would have gave.  It doesn't matter if he
17  was a lawyer or not.  That's privileged.  It's --
18        MS. ST. PETER-GRIFFITH:  And it's our
19  contention that it's not --
20        MS. CINTERA:  Well, I disagree.
21        MS. ST. PETER-GRIFFITH: -- because it bears on
22  the business practices.

32 (Pages 122 to 125)

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 130

1  had with Mr. Fischer, did you discuss anything else?
2      A.  No.
3      Q.  What were your discussions with Mr. Taylor
4  in preparation for today's deposition?
5      A.  My discussions with Mr. Taylor centered on
6  two separate matters.
7      Q.  Okay.
8      A.  First, the time frame '91 through '95
9  where I was not providing commercial --
10     Q.  Okay.
11     A.  -- legal advice and he was in -- and I
12 actually replaced him.  He went to Columbus.  So I
13 talked to him about what his recollections were about
14 compliance activities coming -- emanating from the
15 Legal Department.
16         And then separately, I talked -- not
17 separate -- the same conversation, but on a separate
18 subject matter would have talked -- talked with him
19 about conversations that he would have had with Matt
20 and Mike about AWP, whether the -- he had
21 conversations -- whether Mike -- whether he
22 specifically recalled Mike raising a particular

Page 131

1  concern about AWP.
2      Q.  Okay, did he recall having conversations
3  with Matt and Mike?
4      A.  He did not re -- he did not recall having
5  a conversation with Matt or with Mike where AWP was
6  raised in -- in a concerning manner.
7      Q.  Did he recall having any conversations
8  with Matt or Mike about AWP in general?
9      A.  He did not have specific recollection
10 about AWP.
11     Q.  About AWP in the conversation?
12     A.  In the conversation.
13     Q.  Okay.  What else did you discuss with
14 Mr. Taylor about the '91 through '95 commercial
15 advice?
16     A.  I confirmed with him that the practice
17 regarding training for the business divisions was
18 generally consistent with the practice that I was
19 familiar with post '95.
20     Q.  And was it?
21     A.  It was.
22     Q.  Anything else?

Page 132

1      A.  No.
2      Q.  Did you discuss any particular practice?
3      A.  No.
4      Q.  Did you discuss with Mr. Taylor at all the
5  Home Infusion Business Unit and whether that business
6  model complied with Medicare or Medicaid fraud and
7  abuse statutes?
8      A.  I did not talk to him about Home Infusion.
9      Q.  Did you talk to anybody about Home
10 Infusion?
11     A.  I talked with Mike Sellers and Ginny
12 Tobiason.
13     Q.  Ooh.  Okay, we didn't go over that when we
14 discussed Mr. Sellers and Ms. Tobiason.  What did you
15 discuss with Mr. Sellers about Home Infusion?
16     A.  We talked -- he described that there was a
17 separate sales force between HBS and Alternate Site in
18 which -- and that there was a separate Contract
19 Marketing organization within Home Infusion.
20     Q.  Okay, anything else?
21     A.  No.
22     Q.  Did you discuss at all concerns about the

Page 133

1  business model being violative of any federal or state
2  law?
3      A.  No.
4      MS. CITERA:  Objection to the form.
5
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  What did you discuss with Ms. Tobiason
8  about Home Infusion?
9      A.  We talked about the difference -- we
10 talked about the proportionality between HBS and Alt
11 Site as a -- -- as a structural piece of HPD and how the
12 Alternate Site and Home Infusion business was a
13 significantly small piece of the -- of the overall
14 business.  We talked about how the HBS business sales
15 force called on purchasing and pharmacy purchasing
16 elements within the hospital market and that the
17 billing aspect -- the billing procedures within
18 hospitals was a DRG-based process --
19     Q.  Okay.
20     A.  -- and that AWP would have had no --
21 played no role whatsoever in that.
22     Q.  Anything else that you recall about your

34 (Pages 130 to 133)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 142

1  evaluate whether or not the Home Infusion consignment
2  arrangements and revenue share contracts were in
3  compliance with federal and state Medicare and
4  Medicaid fraud and abuse statutes and regulations?
5      MS. CITERA:  Objection, asked and answered.
6      THE WITNESS:  Abbott would have -- Abbott, the
7  Legal Department, obtained, reviewed, read statutes
8  directly and regulations and would have consulted with
9  outside counsel on a case-by-case basis.  We would
10 have educated ourselves through periodicals and other
11 advisory documents that would have been presented from
12 external sources.
13     MS. ST. PETER-GRIFFITH:  Okay, we will pick up
14 on this after the break, but there's five minutes left
15 on the tape.
16     MS. CITERA:  Okay.
17     MS. ST. PETER-GRIFFITH:  So why don't we take a
18 break.
19     THE VIDEOGRAPHER:  Going off the record at 1:19
20 a.m. -- 11:19 a.m.
21          (Recess taken.)
22     THE VIDEOGRAPHER:  Beginning of Videotape No. 3

Page 143

1  in the deposition of Mr. Fishman.  We're back on the
2  record at 11:30 a.m.
3
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  Mr. Fishman, I'm going to get back on task
6  here a little bit.  I've got a couple of follow-up
7  questions though.
8          Prior to the break, we were
9  discussing what Abbott did to confirm that its Home
10 Infusion Business Unit basically business model of
11 consignment or risk sharing agreements complied with
12 state and federal Medicare and Medicaid laws.
13         Other than work done within the Legal
14 Department, did Abbott's Home Infusion Business Unit
15 do anything else to verify whether or not its Home
16 Infusion business model of consignment arrangements or
17 risk share contracts complied with or violated state
18 and federal Medicare/Medicaid fraud and abuse
19 statutes?
20     MS. CITERA:  Objection to the form.
21     THE WITNESS:  I'm not sure that was the same
22 question you asked before, but -- or a follow-up to

Page 144

1  the same question, but the business unit would not
2  have -- should not have made -- reached legal
3  conclusions about any of its practices.
4          As a general rule, again, Abbott had
5  business -- a Code of Business Conduct.  All Abbott
6  employees were obligated to adhere and comply with all
7  laws including federal healthcare laws, so they had an
8  overriding standard to adhere to.
9          What they would have done to ensure
10 compliance, is that the question?
11
12 BY MS. ST. PETER-GRIFFITH:
13     Q.  Yes.
14     A.  As managers, managers had responsibility
15 to supervise its employees.  So they would have been
16 working with employees, making sure they adhered --
17 they adhered to -- to the laws.
18     Q.  Okay, but my question is particular to the
19 Home Infusion Business Unit model of consignment
20 arrangements.
21     A.  Yes, my answer would have to be I'm not
22 aware of -- what I described would be applicable to

Page 145

1  all business units.
2      Q.  Okay.
3      A.  And I'm not aware that the Home
4  Business -- Home Infusion would have done anything
5  over and above that.
6      Q.  Okay, so ultimately then, the -- the
7  compliance check, if you will, on whether or not this
8  particular business model was in compliance with
9  federal and state Medicare/Medicaid fraud and abuse
10 statutes, that would rest with the in-house counsel?
11     MS. CITERA:  Objection to form.
12     THE WITNESS:  The determination of compliance,
13 the legal evaluation of facts as applied against
14 regulations and laws would have been a legal
15 determination.  Again, once the legal determination,
16 when given and communicated to the business,
17 compliance with that determination would be everyone's
18 obligation.
19
20 BY MS. ST. PETER-GRIFFITH:
21     Q.  Okay.  But in terms of doing that initial
22 evaluation, that would be done within the Legal Unit?

37 (Pages 142 to 145)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 146

1    A.   It should have been.
2    Q.   Okay.  And is that -- that's true for all
3   of HPD?
4    A.   That's true for all of Abbott.
5    Q.   Okay.  Another clean-up matter that I want
6   to get to --
7    A.   Okay.
8    Q.   -- is, sir, you referred earlier to an OEC
9   policy with Charles Brock's name on it.  I'd like to
10  mark this as Exhibit 2 and ask you, sir, if this is
11  the policy you were talking about?
12       MS. CITERA:  Do you have my copy?  I mean --
13  oh, I gave you four copies, right.
14       MS. ST. PETER-GRIFFITH:  Here you go.
15       MS. CITERA:  Thank you.
16       THE WITNESS:  This is the policy I was
17  referring to, yes.
18       MS. ST. PETER-GRIFFITH:  Okay, can we mark that
19  as Exhibit 2?
20       THE WITNESS:  Yeah.
21       MS. ST. PETER-GRIFFITH:  Could you just give
22  that to --

Page 147

1        THE WITNESS:  Oh, I'm sorry.  (Tendering
2   document).
3              (Exhibit Fishman 002 was
4              marked for ID)
5
6   BY MS. ST. PETER-GRIFFITH::
7    Q.   Okay, sir, going back to your
8   communications with Mr. Taylor, did you have any other
9   communications with Mr. Taylor?
10   A.   Can you re --
11   Q.   Sure.
12   A.   -- restate what you have so far that I've
13  said I said?
14   Q.   Sure.  You discussed two things with
15  Mr. Taylor, the communications with Mr. Fischer and
16  Mr. Tootell --
17   A.   Right.
18   Q.   -- and the operations or commercial advice
19  for the H -- for HPD when he held the position before
20  you did from '91 through '95?
21   A.   Right.  And then I would add a third
22  thing, which was the operating guidelines.  We worked

Page 148

1   in tandem from the Legal organization to issue the
2   operating guidelines, that each division had its own.
3   We were working to maintain consistency and
4   uniformity, where appropriate.  And he was supporting
5   Ross.  I was tasked with supporting and -- Lynn
6   Boehringer and I were tasked with supporting HPD.  So
7   we worked -- we talked about having worked together to
8   do -- to issue those guidelines back in '99.
9    Q.   Okay, in '99?
10   A.   Correct, August.
11   Q.   And did -- what specifically did Mr.
12  Taylor discuss with you about that?
13   A.   Mostly confirming it, and we joked how we
14  had a deadline and we were up 'til 3 in the morning
15  finishing it.
16   Q.   I see.  Anything else about that you can
17  recall of your conversation with Mr. Taylor?
18   A.   No.
19   Q.   What con -- what conversation did you
20  have -- is it Miss Pence-Leav, Miss Pence-Levy?
21   A.   Miss -- Ms. Pence-Levy, P-E-N-C-E -
22  L-E-V-Y, Melissa.

Page 149

1    Q.   Okay, and what did you --
2    A.   You can tell I've dictated documents
3   before.
4    Q.   What do you recall about your conversation
5   with Ms. Pence-Levy?
6    A.   My conversation with Ms. Pence-Levy
7   pertained to the questions -- the issues that Mike
8   Tootell apparently raised in deposition testimony
9   regarding concerns, specific concerns he had about
10  AWP.
11   Q.   And what did you dis -- what did Miss
12  Pence-Levy discuss with you about that?
13   A.   She reminded me that she came onboard in
14  May time frame of 2003.
15   Q.   Oh.
16   A.   So any conversations that would have been
17  prior to that, she can't talk to at all, but she had
18  no recollection of Mike coming to her regarding that
19  subject -- regarding AWP subject matter in any
20  concerned way.
21   Q.   Do you recall any -- did you discuss
22  anything else with Miss Pence-Levy?

38 (Pages 146 to 149)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 222

1   information to customers.
2       Q.  If HPD employees provided AWP information
3   or AWP spread information to customers, would that
4   have violated any Abbott policy that was in place from
5   1991 to 2000?
6       MS. CITERA:  Objection to the form, outside the
7   scope.
8       MS. ST. PETER-GRIFFITH:  It's not outside the
9   scope.  It's directly on point.
10      THE WITNESS:  '91 to 2000?  What time frame did
11  you --
12
13  BY MS. ST. PETER-GRIFFITH:
14      Q.  '91 to 2000.
15      MS. CITERA:  Same objections.
16      THE WITNESS:  There -- to my knowledge, there
17  was not a formal policy pertaining to AWP.  There was
18  a practice.  And whether or not they violated it, it
19  sounds to me violation is a conclusion of reviewing
20  facts in relation to -- in relation to legal analysis.
21
22  BY MS. ST. PETER-GRIFFITH:

Page 223

1       Q.  Well, if some -- if someone within HPD
2   during the time frame from 1991 to 2000 provided
3   spread marketing information, AWP information, AWP
4   spread information to customers, would that violate
5   Medicare and Medicaid fraud and abuse statutes?
6       MS. CITERA:  Objection.
7       THE WITNESS:  You're asking me for a legal
8   conclusion.
9       MS. CITERA:  He's not here to talk -- he's not
10  here to give legal conclusions.
11  BY MS. ST. PETER-GRIFFITH:
12      Q.  I want to know, from Abbott's viewpoint,
13  was that -- was that a violation of any statute?
14      A.  That's a legal conclusion --
15      MS. CITERA:  Objection to form, outside the
16  scope.
17      THE WITNESS:  -- that I'm not prepared to
18  answer today.
19
20  BY MS. ST. PETER-GRIFFITH:
21      Q.  Okay.  Did Abbott have a concern that it
22  might have violated --

Page 224

1       MS. CITERA:  Objection.  Are you done?
2
3   BY MS. ST. PETER-GRIFFITH::
4       Q.  -- that it might have violated
5   Medicare/Medicaid fraud and abuse abuse statutes?
6       MS. CITERA:  Objection to the form, outside the
7   scope.
8       THE WITNESS:  Abbott had -- took compliance
9   very seriously and evaluated its -- its activities
10  regularly, and conduct that may have raised concerns
11  or questions about their legality would have caused
12  Abbott to be concerned.
13
14  BY MS. ST. PETER-GRIFFITH:
15      Q.  Okay, was Abbott concerned?
16      MS. CITERA:  Objection to the form, outside the
17  scope.
18      MS. ST. PETER-GRIFFITH:  It's not outside the
19  scope, but go ahead.
20      MS. CITERA:  You're asking him to give
21  opinions.
22      MS. ST. PETER-GRIFFITH:  I am not asking him --

Page 225

1   I am asking him about Abbott's concerns.  He is here
2   to testify today on behalf of Abbott.
3       MS. CITERA:  Not as to this area.
4       THE WITNESS:  Abbott was generally con -- was
5   generally concerned and took very -- and worked very
6   hard at addressing fraud and abuse issues.
7
8   BY MS. ST. PETER-GRIFFITH:
9       Q.  Okay, what did Abbott do -- let's start
10  there.  You said that Abbott took compliance
11  seriously.
12      A.  (Witness nodding).
13      Q.  What did Abbott do for the time period
14  from 1991 to 2001 to ensure that Medicaid and Medicare
15  statute -- fraud and abuse statutes were not violated
16  and regulations?
17      MS. CITERA:  Objection to, form.
18      THE WITNESS:  Multiple -- what time frame
19  again, '91 to when?
20
21  BY MS. ST. PETER-GRIFFITH:
22      Q.  2001.

57 (Pages 222 to 225)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 230

1    A.  To my knowledge, and we spent time trying
2  to investigate this without a satsfactory answer, a
3  certainty, it's almost proving -- again, proving the
4  negative whether there was an interim Code of Business
5  Conduct that was issued between '93 and '99.  To --
6  through a series of inquiries, none exists.  So it
7  would have been added for the October '99 version.
8    Q.  Okay, because the '93 version didn't have
9  one?
10   A.  Correct.
11   Q.  And that's the one signed by Dwayne
12  Burnham?
13   A.  If it was signed by the CEO, then that
14  would be correct.
15   Q.  Okay.  And it's -- I'm trying to get you a
16  copy, but it's substantially shorter than -- probably
17  about half as long; is that fair?
18   A.  Ah --
19   Q.  We'll look at it.
20   A.  -- I can't make that determination.
21   Q.  That's okay, we'll look at it.  Sir, what
22  prompted Abbott to include this section in its Code of

Page 231

1  Business Conduct?
2    A.  I believe that --
3    MS. CITERA:  Objection to form.
4    THE WITNESS:  This is speculation in some
5  regards because I don't have it.  No one told me
6  specifically why it was added.  What appears obvious
7  to me is the difference between 1993 and 1999 was the
8  environment which the subject matter existed.
9
10 BY MS. ST. PETER-GRIFFITH:
11   Q.  When you say the -- what do you mean by
12 that?
13   A.  I mean the enforcement environment, the
14 '93 I think the safe harbors would have just come out,
15 and I think they were even revised, provided a little
16 bit more information.  So there was relatively little
17 formal pronunciation and guidance regarding the
18 statute in '9 -- in 1993, and it became a
19 particularly -- again, in attempting to address
20 compliance matters, as the external environment
21 changes around you, you, you know, address the
22 external environment.

Page 232

1    Q.  Okay, when you say "the external
2  environment," do you mean that there was more
3  enforcement of Medicare?
4    A.  There's more enforcement, there's more
5  attention, there was more resources, there was --
6  again, there was some more settlements, so there was
7  more understanding of what -- how these laws and
8  regulations were being applied and what the concerns
9  of the enforcement agencies were.  I think in '93,
10 there was a lot less known about it than in '99.
11   Q.  Okay, well, could Abbott have done
12 something to clarify -- well, let me ask you -- strike
13 that.
14         Was Abbott confused about how
15 Medicare or Medicaid fraud and abuse statutes applied
16 with regard to AWP pricing, spread and spread
17 marketing?
18   MS. CITERA:  Objection to form, outside the
19 scope.
20   MS. ST. PETER-GRIFFITH:  It's not outside the
21 scope.
22   THE WITNESS:  When?  What time frame are you

Page 233

1  talking about?
2
3  BY MS. ST. PETER-GRIFFITH:
4    Q.  Pre-1999.  Fair question.
5    MS. CITERA:  Same objections.
6    THE WITNESS:  Were we confused?  Abbott --
7  Abbott had a -- an understanding of the law as written
8  and continued to gain insight into the interpretation
9  of the laws and the regulations and the safe -- the
10 safe harbor regulations in particular as more
11 attention was placed on it and more information
12 became -- became available.
13
14 BY MS. ST. PETER-GRIFFITH:
15   Q.  Became available from who?
16   A.  Publicly.
17   Q.  Okay.  Well, at any time did Abbott go to
18 either HHS OIG or HCFA and ask for clarification about
19 whether or not it was permissible to maintain
20 excessively high spreads -- when I say "high spreads,"
21 I mean a hundred percent or more to a thousand percent
22 to two thousand percent -- on its drug products or to

59 (Pages 230 to 233)

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 234

1  market the spread and provide spread information to
2  its customers?
3        MS. CITERA:  Objection to the form, outside the
4  scope.
5        MS. ST. PETER-GRIFFITH:  It's not outside the
6  scope.
7        THE WITNESS:  You've asked a lot of questions
8  there.
9
10 BY MS. ST. PETER-GRIFFITH:
11       Q.  Okay, well, I can break it down for you,
12 okay?
13       A.  (Witness nodding).
14       Q.  Okay, let's do this.  At any time did
15 Abbott go to HCFA or HHS OIG to ask about its pricing
16 activities and whether or not it was in compliance
17 with health -- Medicaid and Medicare fraud and abuse
18 statutes?
19       MS. CITERA:  Same objections.
20       THE WITNESS:  No, not to my knowledge.
21
22 BY MS. ST. PETER-GRIFFITH:

Page 235

1        Q.  Okay, why not?
2        MS. CITERA:  Same objections.
3        THE WITNESS:  You're asking me to speculate as
4  to why they didn't do something?
5
6  BY MS. ST. PETER-GRIFFITH:
7        Q.  I'm asking -- it's not "they."  You --
8  you're sitting here today as Abbott.  I'm asking why
9  Abbott didn't go to HHS OIG or to HCFA to ask about
10 its compliance in its pricing and its AWP activities?
11       MS. CITERA:  Same objections.
12       THE WITNESS:  I don't -- the premise of this
13 was whether there was any confusion, and I'm not
14 certain it's fair to assume that there was confusion.
15 Perhaps the premise of your question was why was
16 Abbott -- was Abbott confused?
17
18 BY MS. ST. PETER-GRIFFITH:
19       Q.  I'm on a different question now, sir.
20       A.  But it's -- I know, but these questions
21 are -- appeared to me to be following one another.
22       Q.  Well, sir, I just want you to -- trust me,

Page 236

1  if you try to follow me from one question to another,
2  we could all get real confused --
3        A.  Okay.
4        Q.  -- okay?  So don't necessarily believe
5  that it flows.  I just want you to answer the
6  question --
7        A.  Okay.
8        Q.  -- that's pending before you.
9        A.  Okay.  What -- which is?
10       MS. CITERA:  Do you need the question read
11 back?
12       THE WITNESS:  Yeah.  The question is?
13       MS. ST. PETER-GRIFFITH:  Can you read it back,
14 please?
15       THE REPORTER:  Okay.
16             (Record read.)
17       MS. CITERA:  Same objections.
18       THE WITNESS:  Hum?
19       MS. CITERA:  No --
20       THE WITNESS:  Same objections?  Okay.
21       MS. CITERA:  -- I was just saying, "Same
22 objections."

Page 237

1        THE WITNESS:  I hear that question as assuming
2  that we needed clarification.
3  BY MS. ST. PETER-GRIFFITH:
4        Q.  Well, did you need clarifications?
5        A.  Not to my knowledge.
6        MS. CITERA:  Same objections.
7
8  BY MS. ST. PETER-GRIFFITH:
9        Q.  Okay, did you have an understanding as to
10 whether the maintenance of spreads on certain Abbott
11 HPD products of a hundred percent or more to a
12 thousand percent, sometimes two thousand percent was
13 permissible under the federal, state and -- federal
14 and state Medicaid and Medicare fraud and abuse
15 statutes?
16       A.  That -- that clearly --
17       MS. CITERA:  Wait, can I --
18       THE WITNESS:  Oh, sorry.
19       MS. CITERA:  Objection to form, outside the
20 scope.  He's not here to say what's legal or illegal.
21       MS. ST. PETER-GRIFFITH:  I'm not asking him
22 what's legal.

Henderson Legal Services, Inc.

202-220-4158                        www.hendersonlegalservices.com

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 238

1     THE WITNESS: You said "permissible."
2     MS. ST. PETER-GRIFFITH: I'm asking him what
3  Abbott's understanding is.
4     THE WITNESS: But that's a legal conclusion.
5  Whether something is permissible under statute is a
6  legal conclusion.
7
8  BY MS. ST. PETER-GRIFFITH:
9     Q.  Did Abbott believe it?  I'm asking what
10 Abbott understood.
11    MS. CITERA: Same objections.
12    THE WITNESS: But it's a legal conclusion.
13
14 BY MS. ST. PETER-GRIFFITH:
15    Q.  I want -- I want to tell me whether or
16 not Abbott understood that its maintenance of
17 spreads -- whether its maintenance of spreads was
18 violative of the Medicare and Medicaid fraud and abuse
19 statutes?
20    MS. CITERA: Same objections.
21    THE WITNESS: I'm not prepared to respond to
22 that question.  I'm not prepared for that question.  I

Page 239

1  believe it's a -- calling for a legal conclusion.
2     MS. ST. PETER-GRIFFITH: Sir, you need to
3  answer the question.
4     MS. CITERA: He's answered the question.
5     THE WITNESS: I believe you're calling --
6     MS. ST. PETER-GRIFFITH: He -- he hasn't
7  answered the question.
8     MS. CITERA: He cannot -- I mean he's not here
9  to testify about what's legal or illegal.
10    MS. ST. PETER-GRIFFITH: I'm not asking about
11 what --
12    MS. CITERA: I think you are.
13    MS. ST. PETER-GRIFFITH: I'm asking his
14 under -- Abbott's understanding.
15    MS. CITERA: But that -- the premise of the
16 understanding is whether or not it violated the law,
17 and that's a legal conclusion.  He's not here to
18 testify about what's legal or illegal.
19
20 BY MS. ST. PETER-GRIFFITH:
21    Q.  Did Abbott undertake any initiative to
22 ascertain whether or not its practices in maintaining

Page 240

1  spreads of a hundred to a thousand percent or more or
2  any excessive spread was permissible?
3     MS. CITERA: Objection to the form, outside the
4  scope.
5     THE WITNESS: To my knowledge, Abbott did not
6  make any inquiry regarding any spread regardless of
7  what the percent was.
8
9  BY MS. ST. PETER-GRIFFITH:
10    Q.  Did Abbott make any inquiry concerning
11 whether it was permissible to provide customers with
12 spread information or AWP information?
13    A.  Inquiry of whom?
14    MS. CITERA: Objection.
15
16 BY MS. ST. PETER-GRIFFITH:
17    Q.  Inquiry of any state or federal Medicaid
18 or Medicare official.
19    MS. CITERA: Objection to form, outside the
20 scope.
21    THE WITNESS:  Not to my knowledge, but I would
22 reiterate it was the practice not to do that.

Page 241

1
2  BY MS. ST. PETER-GRIFFITH:
3     Q.  Why was it the practice not to do that?
4     A.  Because that was -- that was the business
5  operating procedure that Abbott elected to adhere to.
6     Q.  And you say it was the practice not to do
7  what?
8     A.  Not to provide AWP information to
9  customers, which is what the nature of the question
10 was.
11    Q.  Okay, but, sir, are you aware that
12 Abbott -- we have testimony from a whole slew of
13 witnesses that they did undertake that activity?
14    MS. CITERA: I Object to that commentary.
15    THE WITNESS: I only know that you've told me
16 that.
17    MS. ST. PETER-GRIFFITH: Okay.
18    THE WITNESS:  I have not seen that testimony.
19 So I can't say that, yes, I'm aware of that.
20
21 BY MS. ST. PETER-GRIFFITH:
22    Q.  So you didn't take -- undertake any

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 286

1  less, but I don't have to document them.
2       MS. ST. PETER-GRIFFITH: Oh, I -- I don't doubt
3  that.
4
5  BY MS. ST. PETER-GRIFFITH:
6       Q.  Sir, did Abbott -- for purposes of
7  evaluating its HPD Medicaid/Medicare fraud and abuse
8  compliance obligations, did Abbott ever consider
9  whether it's pricing and its decision to report prices
10 that created spreads of fifty, a hundred, a thousand
11 percent or more implicated Medicaid or Medicare fraud
12 and abuse?
13      MS. CITERA:  Objection to the form.
14      THE WITNESS:  In the presen -- in the training
15 environment that I op -- that I operated in and other
16 Commercial Attorneys operated in, AWP and pricing was
17 not something that we addressed.
18           Again, back to -- I think I said
19 earlier, to the extent questions may have come in to
20 me about AWP, we would have referred them to
21 Litigation.
22

Page 287

1  BY MS. ST. PETER-GRIFFITH:
2       Q.  Did Litigation give any presentations
3  concerning pricing or AWP?
4       A.  Not to my knowledge.
5       Q.  Why not?
6       A.  I mean I can't answer why they didn't.
7       Q.  Did anyone within Abbott ever evaluate
8  whether or not its maintenance of spreads between what
9  it was actually selling to customers and its AWPs were
10 violative of Medicare or Medicaid fraud and abuse
11 laws?
12      MS. CITERA:  Objection to the form, outside the
13 scope.
14      THE WITNESS:  Any analysis that would or
15 wouldn't have occurred would be a legal privilege.
16      MS. CITERA:  Also privileged.
17
18 BY MS. ST. PETER-GRIFFITH:
19      Q.  Why would it be a legal privilege?  I'm
20 asking whether Abbott ever undertook that evaluation.
21      A.  I don't know whether they undertook that
22 evaluation.

Page 288

1       Q.  Who would undertake that evaluation on
2  behalf of Abbott?
3       A.  The Legal Department.
4       Q.  Anyone else?
5       A.  They -- no one else should.
6       Q.  Did Abbott's Legal Department ever
7  undertake that evaluation?
8       MS. CITERA:  Objection to form, also objection
9  to the extent it seeks privileged communications,
10 outside the scope.
11      THE WITNESS:  To my knowledge -- to my
12 knowledge, the Commercial -- the Commercial lawyers
13 did not.  I don't know whether the Litigation
14 attorneys did.
15
16 BY MS. ST. PETER-GRIFFITH:
17      Q.  Who would know that?
18      A.  Whoever was the head of Litigation.
19      Q.  Did you do anything to ascertain what
20 steps may have been taken to confirm Abbott's pricing
21 practice -- that confirmed that Abbott's pricing
22 practices were in conformity with Medicare and

Page 289

1  Medicaid fraud and abuse statutes within the
2  Litigation Department?
3       MS. CITERA:  Objection to form.
4       THE WITNESS:  I did not have a conversation
5  with Litigation.
6
7  BY MS. ST. PETER-GRIFFITH:
8       Q.  In 2001, did Abbott reduce its list prices
9  on certain HPD products for any reason pertaining to
10 Medicare or Medicaid fraud and abuse laws?
11      MS. CITERA:  Objection to the form, outside the
12 scope.
13      THE WITNESS:  Not to my knowledge.
14
15 BY MS. ST. PETER-GRIFFITH:
16      Q.  Okay, sir, we left off with you learned
17 laws through -- is there anything else -- other than
18 the presentations that you've described when you said
19 that we do not have all of them in front of us --
20      A.  I have to assume that these are not all of
21 them because most -- many of the -- I don't know if
22 things dated -- things that were given in 1994 would

73 (Pages 286 to 289)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 294

1      Q.  I see, okay.  So 36 then is the Hospital
2  Products Division operating guide?
3      A.  I have 34.
4      Q.  34?
5      A.  I mean that's the one I pulled out.
6      MS. CITERA:  34 and 36 is what he said.
7      MS. ST. PETER-GRIFFITH:  Okay.
8      THE WITNESS:  I can -- and I'm looking at both
9  34 and 36, which --
10     MS. CITERA:  There's also 37.
11     THE WITNESS:  I have 34, 36 and 37 out.
12
13 BY MS. ST. PETER-GRIFFITH:
14     Q.  Okay.  And let me ask you were -- after
15 they were drafted in '99, were they subsequently
16 revised at any time?
17     A.  They were never -- they were not
18 revised -- they were not revised.
19     Q.  Okay.  I'd like you just to take document
20 No. 34 --
21     A.  Yes.
22     Q.  -- and turn to Page 14.

Page 295

1      A.  Okay.
2      Q.  Prior to the implementation of this
3  particular operating guideline for HPD, at any place
4  was there a resource that HPD employees could go to
5  for a discussion of the Federal False Claims Act
6  compliance other than the '99 Code of Business Conduct
7  and this document?
8      A.  An internal document?
9      Q.  Yes.
10     A.  No.  They always were welcome to contact
11 Legal directly and they were encouraged to do so, and
12 there was the -- from the Code of Business Conduct, a
13 central number to call if there was something that
14 they felt was worthy of going that route.
15     Q.  Did anyone ever call the Legal Department
16 with questions concerning the Federal False Claims
17 Act's compliance?
18     MS. CITERA:  Objection to the form, and I would
19 also instruct you not to reveal any privileged
20 conversations.
21     THE WITNESS:  Oh, God, it's such a broad
22 question.

Page 296

1      MS. CITERA:  I'm also going to object to it's
2  outside the scope.
3      MS. ST. PETER-GRIFFITH:  How is it outside the
4  scope, Toni?  It pertains directly to Topic 8 -- I'm
5  sorry, Topic 7, Section II.
6      MS. CITERA:  Whether or not there were calls I
7  see as outside the scope.  The fact that there was a
8  call line is something else.
9      THE WITNESS:  Did -- I'm sorry, was your
10 question did they call the General Counsel's office or
11 did they call Legal?  I heard, Did you call Legal
12 about False Claims Act questions?
13
14 BY MS. ST. PETER-GRIFFITH:
15     Q.  Is there a difference between the General
16 Counsel's Office and Legal?
17     A.  The published number in the Code of
18 Business Conduct was for any concerns you had about
19 any of the matters, and it went to the General
20 Counsel's Office.  It was a corporate-wide
21 opportunity.
22          The -- what I heard and what I was

Page 297

1  contemplating was did any of my clients, any of the
2  people I worked with in HPD ever call me or call Legal
3  to ask Federal False Claims Act questions.
4      Q.  That's my question, sir.
5      MS. CITERA:  Same objections and instruction.
6      THE WITNESS:  The -- given the breadth of the
7  question, I'd say yes.
8
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  Okay, what particular areas did they
11 inquire about?
12     MS. CITERA:  Again, same objections, same
13 instruction.
14     THE WITNESS:  I believe the content of the
15 inquiry would be privileged conversation.
16     MS. ST. PETER-GRIFFITH:  Well, Toni, do you
17 intend to rely upon an advice of counsel defense in
18 this case?
19     MS. CITERA:  I'm not going to answer that.  I'm
20 instructing him not to answer to the extent that it
21 would reveal privileged conversations.
22

75 (Pages 294 to 297)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 330

1       MS. CITERA:  Objection to the form.
2       THE WITNESS:  All people were required to
3   follow Medicare and Medicaid fraud and abuse laws.
4
5   BY MS. ST. PETER-GRIFFITH:
6       Q.   And that's true for those individuals that
7   worked with Abbott's AWPs?
8       A.   That would be --
9       MS. CITERA:  Objection to form.
10      THE WITNESS:  That would be true of all
11  employees.
12
13  BY MS. ST. PETER-GRIFFITH:
14      Q.   Okay.  And from any time including from
15  1991 to the 2000?
16      MS. CITERA:  Objection to form.
17      THE WITNESS:  It would be as long as the law
18  was in effect, which even predated '91, but yes.
19
20  BY MS. ST. PETER-GRIFFITH:
21      Q.   Okay.  If that's the case, how did Abbott
22  as a matter of policy permit its list or catalog

Page 331

1   prices to receive annual price increases on drugs when
2   the market prices decreased?
3       MS. CITERA:  Objection to the form, outside the
4   scope.
5       MS. ST. PETER-GRIFFITH:  It's not outside the
6   scope.
7       THE WITNESS:  That's -- that would be a
8   business decision, and I couldn't address pricing that
9   I'm aware of was tied to CPI.
10
11  BY MS. ST. PETER-GRIFFITH:
12      Q.   Okay, pricing -- what pricing?
13      A.   Pricing generally.
14      Q.   List pricing, catalog pricing?
15      A.   Well, price -- the business practice was
16  looking at pricing and considering CPI is what I
17  understand.
18      Q.   Okay, were there any implications
19  concerning Abbott policy and Abbott's policy that
20  employees comply with Medicare and Medicaid fraud and
21  abuse statutes implicated through that business
22  practice of pricing?

Page 332

1       A.   I --
2       MS. CITERA:  Objection to form, outside the
3   scope to the extent you're asking him to give a legal
4   opinion.
5       THE WITNESS:  I believe when you talk about
6   whether a particular activity is implicated by a
7   statute, you're asking me to reach a legal conclusion.
8
9   BY MS. ST. PETER-GRIFFITH:
10      Q.   Well, did Abbott consider Medicaid and
11  Medicare compliance in its decision making concerning
12  the business practice of setting its annual catalog
13  and list prices and decreasing its market product
14  prices?
15      MS. CITERA:  Same objections.
16      THE WITNESS:  Abbott considered compliance with
17  all laws in -- in each of its activities that it would
18  have conducted.
19
20  BY MS. ST. PETER-GRIFFITH:
21      Q.   Okay, what did it do to evaluate
22  compliance with Medicaid and Medicare laws in the

Page 333

1   context of its decision to increase annually its
2   listing catalog prices, while at the same time it was
3   decreasing its prices to its customers?
4       MS. CITERA:  The same objections, and also I
5   would caution you not to reveal any privileged
6   discussions.
7       THE WITNESS:  Could you -- I'm not -- what's
8   the -- what the kind of predicate of the question?  I
9   understand -- would you repeat the question?
10      THE REPORTER:  Sure.
11          (Record read.)
12      THE WITNESS:  I believe an evaluation of
13  compliance with laws is what lawyers do, and I think
14  that's privileged, a privileged conclusion.
15
16  BY MS. ST. PETER-GRIFFITH:
17      Q.   I want to know what Abbott did.
18      MS. CITERA:  Same objections, same instruction.
19      THE WITNESS:  Abbott through the conduct of its
20  Legal Department would have been making legal
21  determination of compliance with law, and that
22  conclusion is privileged.

84 (Pages 330 to 333)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 334

1
2   BY MS. ST. PETER-GRIFFITH:
3       Q.   Why is that conclusion privileged?
4       A.   Because it's a legal conclusion.
5       MS. CITERA:  Objection to form.
6       THE WITNESS:  And I --
7
8   BY MS. ST. PETER-GRIFFITH:
9       Q.   Okay, it's not a privileged communication,
10  right?
11      MS. CITERA:  Objection to the form.  He --
12  you're asking him legal questions as to --
13      MS. ST. PETER-GRIFFITH:  I'm not asking him
14  legal questions.  I'm asking him what's the predicate
15  for Abbott's -- its continuing this policy.
16      MS. CITERA:  I don't think that's the question
17  you just asked.
18      THE WITNESS:  That's not the question.
19      MS. ST. PETER-GRIFFITH:  Yes, it is the
20  question.
21      THE WITNESS:  You asked me what evaluation did
22  we do to -- to assure compliance with the laws.

Page 335

1       MS. ST. PETER-GRIFFITH:  Right.
2       THE WITNESS:  And that's a legal conclusion.
3
4   BY MS. ST. PETER-GRIFFITH:
5       Q.   No, I'm asking you what did you -- what
6   did Abbott do to evaluate whether its pricing
7   practices complied with Medicaid and Medicare fraud
8   and abuse laws?  That's not a legal question.
9       MS. CITERA:  Any evaluation would be
10  privileged.
11      MS. ST. PETER-GRIFFITH:  I want to know what
12  you did.
13      MS. CITERA:  Any evaluation would be privileged
14  that was done by the Legal Department.
15      MS. ST. PETER-GRIFFITH:  All right, the witness
16  can answer for himself, Toni.
17      THE WITNESS:  That -- I thought that's what I
18  said, which is to the extent, we -- there was an -- an
19  evaluation was done, it would have -- it would have
20  been --
21
22  BY MS. ST. PETER-GRIFFITH:

Page 336

1       Q.   Was one done?
2       A.   Whether -- whether Legal -- whether an
3   analysis and evaluation was was done is a legal con --
4   is also legal -- privileged.
5       Q.   No, I want to know, yes or no, was an
6   evaluation done?
7       A.   When, in '91 to 2001?
8       Q.   Yes.
9       MS. CITERA:  Objection to the form and outside
10  the scope.
11      THE WITNESS:  And just so I -- I would
12  appreciate the scope of what we're talking about.
13  What aspect of fraud -- Medicaid fraud and abuse are
14  we talking about?
15
16  BY MS. ST. PETER-GRIFFITH:
17      Q.   Any.
18      A.   Any aspect of Medicare fraud and abuse?
19  Yes, there was evaluations done.
20      Q.   Okay, what evaluations were done with
21  regard to Abbott's compliance with Medicare or
22  Medicaid fraud and abuse statutes in the context of

Page 337

1   its decision to raise on an annual basis its list and
2   catalog prices, while at the same time, it was
3   decreasing its prices to customers?
4       MS. CITERA:  Objection to the form, outside the
5   scope, and also the same caution about not revealing
6   privileged discussions.
7       THE WITNESS:  I've answered the question
8   whether we did an evaluation.  To what extent we did
9   an evaluation, I think is privileged.  You asked me
10  what was the evaluation.
11
12  BY MS. ST. PETER-GRIFFITH:
13      Q.   I'm asking you what was the eval -- I'm
14  asking what Abbott's evaluation was.
15      A.   That, I think is a privileged conclusion.
16      MS. ST. PETER-GRIFFITH:  Do you intend to rely
17  upon an advice of counsel defense?  Do you?  Do you,
18  Toni?
19      MS. CITERA:  I told you that I'm not going to
20  answer that.
21      MS. ST. PETER-GRIFFITH:  Because we're entitled
22  to discover this information.

85 (Pages 334 to 337)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3

30(b)(6) Abbott (Fishman, David S.)                     March 12, 2008

---

Page 342

1       MS. CITERA:  Same objections.
2       THE WITNESS:  -- a legal con -- a -- privileged
3  information.
4
5  MS. ST. PETER-GRIFFITH:
6       Q.  How is that asking for privileged
7  information?  I'm asking what Abbot did.
8       A.  Whether Legal of -- did a legal evaluation
9  of a particular business practice?
10      Q.  Right.
11      MS. CITERA:  It's privileged.
12      THE WITNESS:  It's privileged.
13
14 BY MS. ST. PETER-GRIFFITH:
15      Q.  Did anyone outside of the Legal Department
16 do that -- make that evaluation?
17      A.  To the extent anybody -- as I stated
18 before, to the extent anybody outside of Legal
19 attempted to make a legal analysis, one, that was
20 outside of their job description and shouldn't be
21 doing it, and I have no reason to believe that anybody
22 would rely on a non-legal -- a non-lawyer's evaluation

---

Page 343

1  of a legal analysis.
2       Q.  How did Abbott know that in raising its
3  prices, its list and catalog prices on an annual basis
4  it was in compliance with federal and state Medicare
5  and Medicaid fraud and abuse statutes?
6       MS. CITERA:  Same objections and instructions.
7       THE WITNESS:  You're asking me for a legal
8  conclusion.
9       MS. ST. PETER-GRIFFITH:  Do you intend to
10 assert an advice of counsel defense?
11      MS. CITERA:  I'm not going to answer that.
12      MR. ANDERSON:  Well, you know, I've got to
13 interject something.  Are you instructing the witness
14 not to answer because he -- he's not answering the
15 question by just stating that it's a legal conclusion,
16 but I don't hear an instruction not to answer.  Yet
17 he's not --
18      MS. CITERA:  I said, Same objection and same
19 caution.
20      MR. ANDERSON:  Yeah, you're cautioning him not
21 disclose a privilege.  He's not saying it's
22 privileged.  He saying it calls for a legal

---

Page 344

1  conclusion.  He doesn't get to make that decision.
2       MS. CITERA:  Reveal the -- reveal the -- I mean
3  reveal.  Please reread the question.
4            (Record read.)
5       MS. CITERA:  And -- okay, so how did it know
6  that it was in compliance.  And your question is?
7       MR. ANDERSON:  I don't have a question.  He's
8  repeatedly saying it calls for a legal conclusion and
9  refusing to answer.  There's no bases in the rules for
10 such a --
11      MS. ST. PETER-GRIFFITH:  Are you -- are you
12 instructing him not to answer?
13      MS. CITERA:  Well, A, he's not required to give
14 a legal conclusion.
15      MR. ANDERSON:  We're not asking for a legal
16 conclusion.
17      MS. ST. PETER-GRIFFITH:  We're not asking for a
18 legal conclusion.
19      MS. CITERA:  But I'm just saying, let's get
20 that straight.  Second, to the extent that it's
21 calling for any privileged conversations, he is saying
22 that he's not going to answer that.

---

Page 345

1       MS. ST. PETER-GRIFFITH:  Okay, I'm not -- what
2  I'm asking is are you instructing him not to answer
3  the question?
4       MS. CITERA:  I am instructing him not to reveal
5  any privileged discussions.
6            If there's any -- any part of that
7  question that you could answer that doesn't deal with
8  privileged communications and discussions, then you
9  can answer it.
10      THE WITNESS:  How we knew whether we were
11 complying with the law is a legal analysis.  How does
12 anyone know that they're complying with the law?  They
13 have to make an illegal analysis and compare facts and
14 law and conclude whether or not the facts fit within
15 the law.
16
17 BY MS. ST. PETER-GRIFFITH:
18      Q.  And what did Abbott do?
19      MS. CITERA:  Same objections, form and outside
20 the scope, same caution.
21      THE WITNESS:  I think I have the same answer.
22 It's the same answer as I --

---

87 (Pages 342 to 345)

cdd3ff2a-b72b-4c68-8c9a-7da0ab93bbf3