# EXHIBIT 182

Page 285

```
        UNITED STATES DISTRICT COURT

     FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------X  MDL NO. 1456

IN RE:  PHARMACEUTICAL INDUSTRY   :  CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION : 01-CV-12257-PBS

----------------------------------X

THIS DOCUMENT RELATES TO:         :

U.S. ex rel. Ven-A-Care of the    :  CIVIL ACTION:

Florida Keys, Inc. v. Abbott      :  06-CV-11337-PBS

Laboratories, Inc.                :

----------------------------------X


          IN THE CIRCUIT COURT OF

        MONTGOMERY COUNTY, ALABAMA

----------------------------------X

STATE OF ALABAMA,                 :  CASE NO.

        Plaintiff,                :  CV-05-219

    v.                            :

ABBOTT LABORATORIES, INC.,        :  JUDGE

et al.,                           :  CHARLES PRICE

        Defendants.               :

----------------------------------X
```

320d321f-596a-4e1f-8444-2c4e6f42d4ae

Page 286

```
 1  STATE OF WISCONSIN   CIRCUIT COURT   DANE COUNTY
 2  ---------------------------------X
 3  STATE OF WISCONSIN,          : CASE NO.
 4       Plaintiff,              : 04-CV-1709
 5    v.                         :
 6  AMGEN INC., et al.,          :
 7       Defendants.             :
 8  ---------------------------------X
 9
10          IN THE COURT OF COMMON PLEAS
11              FIFTH JUDICIAL CIRCUIT
12  ---------------------------------X
13  STATE OF SOUTH CAROLINA, and    : STATE OF
14  HENRY D. McMASTER, in his official : SOUTH CAROLINA
15  capacity as Attorney General for   : COUNTY OF
16  the State of South Carolina,    : RICHLAND
17       Plaintiff,              :
18    v.                         : CIVIL ACTION:
19  MYLAN LABORATORIES, INC.     : 07-CP-40-0283
20       Defendant.              :
21  ---------------------------------X
22
```

Page 287

```
 1     IN THE COURT OF THE SECOND JUDICIAL CIRCUIT
 2          IN AND FOR LEON COUNTY, FLORIDA
 3  THE STATE OF FLORIDA
 4  ex rel.
 5  ------------------x
 6  VEN-A-CARE OF THE FLORIDA       :
 7  KEYS, INC., a Florida           :
 8  Corporation, by and through its :
 9  principal officers and directors, :
10  ZACHARY T. BENTLEY and          :
11  T. MARK JONES,                  :
12        Plaintiffs,               :
13     vs.                : Civil Action
14  MYLAN LABORATORIES, INC.; MYLAN    : No.: 98-3032G
15  PHARMACEUTICALS INC.; NOVOPHARM    : Judge:
16  LTD., SCHEIN PHARMACEUTICAL, INC.; : William L.
17  TEVA PHARMACEUTICAL INDUSTRIES     : Gary
18  LTD., TEVA PHARMACEUTICAL USA;     :
19  and WATSON PHARMACEUTICALS, INC.   :
20        Defendants.                :
21  ------------------x
22
```

Page 288

```
 1  IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
 2              STATE OF MISSOURI
 3  ------------------x
 4  STATE OF MISSOURI, ex rel.,      :
 5  JEREMIAH W. (JAY) NIXON,         :
 6  Attorney General,                :
 7  and                              :
 8  MISSOURI DEPARTMENT OF SOCIAL    :
 9  SERVICES, DIVISION OF MEDICAL    : Case No.:
10  SERVICES,              : 054-1216
11       Plaintiffs,      : Division
12                        : No. 31
13     vs.                :
14  DEY INC., DEY, L.P., MERCK KGaA, :
15  EMD, INC., WARRICK              :
16  PHARMACEUTICALS CORPORATION,    :
17  SCHERING-PLOUGH CORPORATION, and :
18  SCHERING CORPORATION,           :
19       Defendants.                :
20  ------------------x
21
22
```

Page 289

```
 1              New York, New York
 2              Thursday, June 21, 2007
 3
 4         CONTINUED Videotaped Deposition of
 5  BRUCE C. VLADECK, Ph.D., a witness herein, called
 6  for examination by counsel for Abbott Laboratories
 7  in the above-entitled matter, pursuant to
 8  Subpoena, the witness being duly sworn by JOMANNA
 9  DEROSA, a Notary Public in and for New York, taken
10  at the offices of Jones Day, 222 East 41st Street,
11  New York, New York, at 8:54 a.m. on Thursday, June
12  21, 2007, and the proceedings being taken down by
13  Stenotype by JOMANNA DEROSA, and transcribed under
14  her direction.
```

320d321f-596a-4e1f-8444-2c4e6f42d4ae

Vladeck, Ph.D., Bruce C. - Vol. II                                    June 21, 2007
                              New York, NY

Page 290

```
 1  APPEARANCES:
 2
 3  On Behalf of Abbott Laboratories, Inc.
 4       R. CHRISTOPHER COOK, ESQ.
 5       TONI-ANN CITERA, ESQ.
 6       Jones Day
 7       51 Louisiana Avenue, Northwest
 8       Washington, D.C. 20001
 9       christophercook@jonesday.com
10       tcitera@jonesday.com
11       (202) 879-3939
12
13  On Behalf of Roxane Laboratories and
14  Boehringer Ingelheim:
15       ERIC GORTNER, ESQ.
16       Kirkland & Ellis, LLP
17       200 East Randolph Drive
18       Chicago, Illinois 60601
19       egortner@kirkland.com
20       (312) 861-2285
21
22  (Continued)
```

Page 291

```
 1  APPEARANCES (continued):
 2
 3  On Behalf of Dey, Inc., Dey, L.P., Mylan
 4  Laboratories, Inc., and Mylan Pharmaceuticals, Inc.:
 5       WILLIAM A. ESCOBAR, ESQ.
 6       CLIFFORD KATZ, ESQ.
 7       Kelley Drye & Warren, LLP
 8       101 Park Avenue
 9       New York, New York 10178
10       wescobar@kelleydrye.com
11       ckatz@kelleydrye.com
12       (212) 808-7771
13
14  On Behalf of B. Braun Medical, Inc.,
15  Schering-Plough Corporation, Schering Corporation,
16  and Warrick Pharmaceuticals Corporation:
17       JOHN P. MCDONALD, ESQ.
18       Locke Liddell & Sapp, LLP
19       2200 Ross Avenue, Suite 2200
20       Dallas, Texas 75201
21       jpmcdonald@lockeliddell.com
22       (214) 740-8758
```

Page 292

```
 1  APPEARANCES (Continued):
 2
 3  On Behalf of Novartis Pharmaceuticals Corporation:
 4       NATHAN COHEN, ESQ.
 5       Kaye Scholer, LLP
 6       425 Park Avenue
 7       New York, New York 10022-3598
 8       ncohen@kayescholer.com
 9       (212) 836-7568
10
11  On Behalf of the State of Florida:
12       JAIME DOYLE LIANG, ESQ.
13       Office of the Attorney General
14       State of Florida
15       PL-01 The Capitol
16       Tallahassee, Florida 32399-1050
17       Jaime_Liang@oag.state.fl.us
18       (850) 414-3600
19
20
21
22  (Continued)
```

Page 293

```
 1  APPEARANCES (Continued):
 2
 3  On Behalf of Bristol-Myers Squibb:
 4       STEVEN M. EDWARDS, ESQ.
 5       DENNIS QUINIO, ESQ.
 6       HOA T. T. HOANG, ESQ.
 7       Hogan & Hartson, LLP
 8       875 Third Avenue
 9       New York, New York 10022
10       smedwards@hhlaw.com
11       dquinio@hhlaw.com
12       htthoang@hhlaw.com
13       (212) 918-3000
14
15  On Behalf of the MDL Plaintiffs:
16       JENNIFER FOUNTAIN CONNOLLY, ESQ.
17       Wexler Toriseva Wallace
18       One North LaSalle Street, Suite 2000
19       Chicago, Illinois 60602
20       jfc@wtwlaw.us
21       lpgabel@jonesday.com
22       (312) 261-6195
```

3 (Pages 290 to 293)

320d321f-596a-4e1f-8444-2c4e6f42d4ae

Page 294

```
 1   APPEARANCES (Continued):
 2
 3   On Behalf of Ven-A-Care of the Florida Keys, Inc.:
 4        JAMES JOSEPH BREEN, ESQ.
 5        The Breen Law Firm
 6        5755 North Point Parkway, Suite 39
 7        Alpharetta, Georgia 30022
 8        jbreen@breenlaw.com
 9        (770) 740-0008
10
11   On Behalf of the United States of America and The
12   Witness, Bruce C. Vladeck, Ph.D.:
13        RENEE BROOKER, ESQ.
14        U.S. Department of Justice
15        Civil Division
16        601 D Street, Northwest
17        Room 9918
18        Washington, D.C. 20004
19        renee.brooker@usdoj.gov
20        (202) 616-3797
21
22   (Continued)
```

Page 295

```
 1   APPEARANCES (Continued):
 2
 3   On Behalf of the Commonwealth of Pennsylvania:
 4        MICHAEL J. LORUSSO, ESQ.
 5        The Haviland Law Firm, LLC
 6        740 S. Third Street, Third Floor
 7        Philadelphia, Pennsylvania 19147
 8        lorusso@havilandlaw.com
 9        (215) 609-4661
10
11   On Behalf of the State of California:
12        NICHOLAS N. PAUL, ESQ.
13        BMFEA
14        Supervising Deputy Attorney General
15        Civil Prosecutions Unit
16        P.O. Box 85266
17        110 West A Street, #1100
18        San Diego, California 92186
19        nicholas.paul@doj.ca.gov
20        (619) 688-6099
21
22   (Continued)
```

Page 296

```
 1   APPEARANCES (Continued):
 2
 3   On Behalf of the Centers for Medicare and
 4   Medicaid Services:
 5        (by telephone)
 6        LESLIE M. STAFFORD, OGC
 7        Centers For Medicare &
 8        Medicaid Services
 9        7500 Security Boulevard
10        Baltimore, Maryland 21244
11        (410) 786-9655
12
13   On Behalf of the KMS New York Counties, The City
14   of New York, and the States of Hawaii, Wisconsin,
15   and Kentucky:
16        (by telephone)
17        MICHAEL WINGET-HERNANDEZ, ESQ.
18        Winget-Hernandez, LLC
19        3112 Windsor Road, #228
20        Austin, Texas 78703
21        michael@winget-hernandez.com
22        (512) 474-4095
```

Page 297

```
 1   APPEARANCES (Continued):
 2
 3   On Behalf of Amgen, Inc.:
 4        (by telephone)
 5        STEVEN F. BARLEY, ESQ.
 6        Hogan & Hartson, LLP
 7        111 South Calvert Street, Suite 1600
 8        Baltimore, Maryland 21202
 9        jawalker@hhlaw.com
10        (410) 659-2724
11
12   On Behalf of Baxter Healthcare Corporation:
13        (by telephone)
14        TINA REYNOLDS, ESQ.
15        Dickstein Shapiro, LLP
16        1825 Eye Street, Northwest
17        Washington, D.C. 20006
18        delanceym@dicksteinshapiro.com
19        (202) 420-2282
20
21
22   (Continued)
```

Vladeck, Ph.D., Bruce C. - Vol. II                                June 21, 2007
New York, NY

Page 298

1  APPEARANCES (Continued):
2
3  On behalf of the State of Alabama:
4      (by telephone)
5      ROGER L. BATES, ESQ.
6      Hand Arendall, L.L.C.
7      1200 Park Place Tower
8      2001 Park Place North
9      Birmingham, Alabama  35203
10     Rbates@handarendall.com
11     (205) 502-0105
12
13 On Behalf of Ven-A-Care:
14     GARY L. AZORSKY, ESQ.
15     Berger & Montague, P.C.
16     1622 Locust Street
17     Philadelphia, Pennsylvania 19103-6305
18     gazorsky@bm.net
19     (215) 875-3090
20
21 Also Present:
22     MICHAEL HUNTERTON, Videographer

Page 299

1            C O N T E N T S
2  THE WITNESS: BRUCE C. VLADECK, Ph.D.    PAGE
3  Examination By Mr. Cook.................... 307
4  Examination By Mr. Escobar................. 391
5  Examination By Mr. Edwards................. 495
6  Examination By Ms. Connolly................ 564
7  Examination By Mr. Breen................... 582
8
9
10           E X H I B I T S
11 ABBOTT EXHIBIT NO.                       PAGE
12 Exhibit Abbott 258-Memorandum and Attachment
13         HHC 903, 0723-0730........ 342
14 Exhibit Abbott 259-Executive Summary for
15         Medicare Home Infusion
16         Therapy................... 342
17 Exhibit Abbott 260-Excerpts from House
18         Resolution 3600........... 342
19 Exhibit Abbott 261-Rules and Regulations, 42
20         CFR Parts 405, 413, 415... 364
21 Exhibit Abbott 262-Chicago Tribune Article
22         HHC 003-0246-0253......... 377

Page 300

1         E X H I B I T S (CONTINUED)
2  DEY EXHIBIT NO.                          PAGE
3  Exhibit Dey 022-Medicaid Rx Reimbursement
4          Report HHD013-1304........... 431
5  Exhibit Dey 023-Rebate Agreement, with
6          Attachment................... 452
7
8
9  BMS EXHIBIT NO.                          PAGE
10 Exhibit BMS 001-Letter dated 9/8/00
11         AS 00058-60.................. 507
12 Exhibit BMS 002-(WITHDRAWN)
13 Exhibit BMS 003-Excerpt of Report on Balanced
14         Budget Act of 1997........... 541
15 Exhibit BMS 004-Fax dated 7/2/97 BMS/AWP
16         000256524-27................. 544
17 Exhibit BMS 005-Excerpt of Federal Register,
18         Vol 52, No. 147.............. 548
19 Exhibit BMS 006-Pharmacy Reimbursement Rates
20         Report to Congress 1994...... 551
21 Exhibit BMS 007-Memorandum dated 4/16/97
22         With Attachment.............. 557

Page 301

1            P R O C E E D I N G S
2
3        THE VIDEOGRAPHER:  Good morning.
4  Here starts Videotape No. 6 in Volume II of the
5  continued videotaped deposition of Dr. Bruce
6  Vladeck, taken by the defendant party, in the
7  matter of In re Pharmaceutical Industry Average
8  Wholesale Price Litigation, MDL No. 1456, Civil
9  Action No. 01-CV-12257-PBS, before the United
10 States District Court for the District of
11 Massachusetts.
12       The date is June 21st, 2007, and
13 this deposition is being held at Jones Day Reavis
14 & Pogue, 222 East 41st Street, New York, New York.
15 The time on the monitor is 8:54 a.m.  My name is
16 Michael Hunterton, and I am the certified
17 videographer associated with the firm of Henderson
18 Legal Services, located at 1015 15th Street,
19 Northwest, in Washington, D.C.  The court reporter
20 today is Jo DeRosa, associated with the same firm.
21       Will counsel first at the table
22 please introduce themselves for the record.

5 (Pages 298 to 301)

Page 454

1      Now, under the rebate agreement,
2  you understood that Dey had an obligation to
3  report certain pricing information to the federal
4  government.  Right?
5      A.    That's correct.
6            MS. BROOKER:  Objection.  Form.  I'm
7  sorry.
8      Q.    What they had to report to the
9  federal government was something called average
10 manufacturer price.  Right?
11           MS. BROOKER:  Objection.  Form.
12     A.    Yes.
13     Q.    And if you look at Page 1 of the
14 rebate agreement, there is a lengthy definition of
15 the average manufacturer price that they had to
16 report.  Right?
17     A.    Right.
18     Q.    And the rebate agreement spells out
19 how Dey is supposed to calculate and report the
20 AMP.  Right?
21     A.    Yes.
22     Q.    And as far as you know, Dey, in

Page 455

1  fact, reported AMPs and paid rebates.  Right?
2      A.    I assume so, yes.
3      Q.    You have no reason to believe, as
4  you sit here today, that they didn't pay rebates
5  or report AMP.  Right?
6      A.    No.
7      Q.    And, in fact, if Dey had not
8  reported AMP and had not paid rebates, at some
9  point their drugs wouldn't be covered by Medicaid.
10 Right?
11     A.    That's correct.
12     Q.    So, to the extent the federal
13 government is claiming, in this case, damages that
14 relate to the federal government reimbursing on
15 Dey drugs, you would expect that there was a
16 rebate agreement and Dey was paying rebates.
17        Right?
18           MS. BROOKER:  Objection.  Form.
19     A.    In the context of the question, it
20 was my understanding that under this agreement Dey
21 would have been paying rebates.
22     Q.    Okay.  And was it your

Page 456

1  understanding that during the time that you ran
2  HCFA, that within HCFA, the AMPs, average
3  manufacturer prices reported by Dey were somewhere
4  within HCFA?
5           MS. BROOKER:  Objection.  Form.
6      A.    Yes.
7      Q.    And was it your understanding that
8  there were people who were responsible for
9  reviewing the information on AMP that they
10 submitted to HCFA?
11           MS. BROOKER:  Objection.  Form.
12     A.    Yes.
13     Q.    And was it your understanding that
14 there were people at HCFA whose responsibility it
15 was to make sure that Dey was reporting AMPs and
16 paying rebates?
17           MS. BROOKER:  Objection.  Form.
18     A.    Yes.
19     Q.    And the information that Dey
20 submitted to -- to HCFA, when you were the head,
21 reporting every quarter the AMPs as required by
22 the agreement, that was information that was

Page 457

1  available to you.  Right?
2      A.    No.
3           MS. BROOKER:  Objection.  Form.
4      Q.    I'm sorry?
5      A.    No.
6      Q.    You -- you, as the head of HCFA,
7  could not see the AMP data?
8      A.    I -- I believe the statutory
9  requirements relative to the data and the use of
10 the data limited its distribution application only
11 for people involved in the direct administration
12 of the rebate program.
13           Had I chosen to be more directly
14 involved in the rebate program I could have been,
15 and, therefore, had access to the data, but it was
16 not routinely made available to anyone in the
17 agency other than those directly involved in
18 administering the rebates.
19     Q.    Well, you were entitled to, Dr.
20 Vladeck, as the person running HCFA, to go into
21 your office one day and say to somebody, Give me
22 the AMPs that Dey is reporting.

44 (Pages 454 to 457)

Vladeck, Ph.D., Bruce C. - Vol. II                                        June 21, 2007
New York, NY

Page 458

```
 1        Isn't that right?
 2            MR. BREEN:  Objection.  Form.
 3            MS. BROOKER:  Objection.  Form.
 4    Q.    You had the power to do that;
 5  didn't you?
 6            MR. BREEN:  Objection.  Form.
 7            MS. BROOKER:  Objection.  Form.
 8    A.    As I understood the statute, only
 9  to the extent that I was interested in -- in
10  reviewing the administration of the rebate
11  program.
12    Q.    Well, for whatever reason, you were
13  entitled to get that information and look at it
14  yourself; weren't you?
15            MR. BREEN:  Objection.  Form.  Asked
16  and answered.
17            MS. BROOKER:  Objection.  Form.
18    A.    I would guess as a -- as a formal
19  legal matter, yes.
20    Q.    Okay.  Now, you're -- when you talk
21  about who can see the AMP data, you're referring
22  to the fact that there were confidentiality
```

Page 459

```
 1  provisions that explained who could get that
 2  information.  Right?
 3            MS. BROOKER:  Objection.  Form.
 4    A.    Yes.
 5    Q.    Are you aware -- are you saying
 6  that were statutory provisions that stated that
 7  people running Medicaid at HCFA were prohibited
 8  from looking at AMP data?
 9            MS. BROOKER:  Objection.  Form.
10    A.    My understanding of the statutory
11  provision was that people at HCFA who were not
12  involved in running the drug reimbursement program
13  were not supposed to have access to the AMP data.
14    Q.    What is that understanding based
15  on?
16    A.    That's what I was advised by -- by
17  counsel's office.
18    Q.    Which counsel's office?
19    A.    HHF's counsel's office.
20    Q.    Who was the person that advised you
21  of that?
22    A.    I don't recall.
```

Page 460

```
 1    Q.    Who was the head of the counsel's
 2  office while you were there?
 3    A.    Well, the head of the counsel's
 4  office would have been Harriet Ram, who was
 5  general counsel to the agency, but it probably
 6  would have been somebody in the branch of the
 7  counsel's office that served primarily on HCFA
 8  issues.
 9    Q.    Who were the people that -- as you
10  understood it, who were the people within HCFA who
11  could look at AMP data?
12            MS. BROOKER:  Objection.  Form.
13    A.    My understanding was that the staff
14  directly involved in administration of the rebate
15  program had access to the AMP data.
16    Q.    Well, it was -- it was actually the
17  understanding of your agency, and your own
18  understanding at the time you were running the
19  agency, that HCFA was not precluded from releasing
20  AMP data to the states.  Isn't that right?
21            MS. BROOKER:  Objection.  Form.
22    A.    Of course not, yes, but under
```

Page 461

```
 1  confidentiality restrictions as well, in terms of
 2  what the states made -- did with the data.
 3    Q.    Okay.  So, with respect to -- just
 4  focusing on that, HCFA, under the statutory
 5  scheme, was entitled to share AMP data with the
 6  states.  Isn't that right?
 7    A.    Of course, yes.
 8            MR. BREEN:  Objection.  Form.
 9            MS. BROOKER:  Objection.  Form.
10    Q.    And did HCFA do that?
11    A.    As far as I know.
12    Q.    So, as far as you know, people
13  within HCFA shared AMP data with state Medicaid
14  agencies?
15    A.    That was my understanding.
16    Q.    What was that based on?
17    A.    What was what based on?
18    Q.    Your understanding.  What was your
19  understanding based on?
20    A.    Of the process by which the HCFA
21  staff worked with the states in administering the
22  rebate program.
```

45 (Pages 458 to 461)

Page 462

1   Q.   So, based on your understanding
2  when you were running HCFA, Dr. Vladeck, the state
3  Medicaid people who were designing and
4  administering the reimbursement methodology of the
5  states would have, through HCFA, access to AMP,
6  average manufacturer price, data.  Right?
7       MS. BROOKER:  Objection.  Form.
8       MR. BREEN:  Objection.  Form.
9   A.   In the generic sense that the
10  agencies -- the state agencies that administered
11  Medicaid would have access to it.  Whether it was
12  the same people in those agencies who administered
13  the rebate program and made policy about
14  reimbursement policy, I wouldn't know.
15   Q.   Okay.  But in terms of -- let's --
16  let's talk in terms of agency, since people might
17  change over time.
18       But the agencies that ran Medicaid
19  in each of the states, which were the agencies
20  responsible for implementing the reimbursement
21  methodologies, those agencies would have access,
22  through HCFA, to AMP data from the states.

Page 463

1       Right?
2       MS. BROOKER:  Objection.  Form.
3   A.   Yes.
4   Q.   So, for example, looking back at
5  Exhibit Dey 022, the one-page sheet that we had
6  that had all the reimbursement basis, the
7  responsible directors of the Medicaid agencies of
8  these -- of each of these states would be able to
9  peruse AMP data and compare that to what they were
10  reimbursing on.  Right?
11       MR. BREEN:  Objection.  Form.
12       MS. BROOKER:  Objection.  Form.
13       MR. BATES:  Objection to form.
14   A.   When you talk about "perusing,"
15  again, I don't -- I don't know if they'd even be
16  aware that their agencies had it.  But if they
17  were, depending on how their agencies were
18  organized, they might very well be.
19   Q.   So, it was entirely -- it was
20  entirely possible for the heads of a state
21  Medicaid agency to look at the AMP data on AMP
22  prices and at the same time look at data as to

Page 464

1  what they were reimbursing for those drugs.  That
2  was entirely possible.  Right?
3       MS. BROOKER:  Objection.  Form.
4       MR. BREEN:  Objection.  Form.
5   A.   It's -- I don't know any reason why
6  it wouldn't be possible.
7   Q.   And within your agency, within
8  HCFA, certainly people within HCFA could sit down
9  and compare the AMP data, for example, for Dey's
10  Albuterol, and see what the AMP was and compare
11  what the AWP was.  Right?
12       That was -- that was information
13  that they had in the agency?
14       MS. BROOKER:  Objection.  Form.
15   A.   I believe the -- the way we
16  interpreted the confidentiality provisions of the
17  statute was that the people directly involved in
18  the administration of the Medicaid drug rebate
19  program could have chosen to do so, yes.
20   Q.   Right.  So, somebody in -- in HCFA
21  that was involved with the rebate program could
22  one day look at the AMP for Dey's Albuterol and

Page 465

1  compare it to an AWP for Dey's Albuterol?
2       MS. BROOKER:  Objection.  Form.
3   A.   Presumably, yes.
4   Q.   And based on your understanding of
5  AWP and AMP, as you've indicated in the course of
6  this deposition and your prior session, you would
7  expect that the AWP -- there was a spread between
8  the AMP and the AWP.  Right?
9       MS. BROOKER:  Objection.  Form.
10   A.   Yes.
11   Q.   And that would be because the AMP
12  reported to HCFA would include a number of
13  specified discounts.  Isn't that right?
14       MS. BROOKER:  Objection.  Form.
15   A.   I don't know what you mean by
16  "specified discounts," but it was my impression
17  that, again, on average, the AMPs would have been
18  for single-source drugs in the range of 15 to 20
19  percent below the AWP, on average, and, for
20  generic drugs, as I've learned in the course of
21  this proceeding, as much as 25 to 40 percent below
22  AWP, on average.

Page 582

1  The reason why I don't have -- the reason why I
2  cannot ask the particular questions that I would
3  like to ask Dr. Vladeck is based on restrictions
4  that have been put on us by TAP. So, with respect
5  to those particular questions I believe the
6  record's clear.
7          MR. COOK: Since I don't know what
8  those questions are I don't know how clear it is,
9  but it is what it is.
10         MR. BREEN: All right. Roll.
11         MS. BROOKER: Let me just say in
12 response to all of that, the Government of the
13 United States reserves its right to respond to any
14 of those comments or objections, or whatever they
15 just were, at an appropriate time.
16         MR. BREEN: Now can we roll?
17
18     EXAMINATION BY COUNSEL FOR
19     VEN-A-CARE
20 BY MR. BREEN:
21     Q.   I just have a few questions, I
22 believe, Dr. Vladeck.

Page 583

1      A.   Yes.
2      Q.   And you know I'm Jim Breen. I
3  represent Ven-A-Care of the Florida Keys.
4      A.   I'm aware, yes.
5      Q.   The relator in a whole bunch of
6  these cases, including the one you're probably
7  noticed on.
8          You've spent a lot of time
9  testifying about average manufacturers' price in
10 response to both Mr. Cook's and Mr. Escobar's
11 questions earlier.
12         Do you recall that?
13     A.   Yes.
14     Q.   Now, they asked you about average
15 manufacturers' price, but do you also recall a
16 term "best price"?
17     A.   Yes.
18     Q.   As used in the Medicaid rebate
19 statute?
20     A.   That's correct. Yes.
21     Q.   And that would be OBRA '90.
22         Correct?

Page 584

1      A.   That's -- Yes.
2      Q.   All right. Now, when you were
3  testifying about confidentiality of pricing
4  information provided by the drug companies with
5  respect to the Medicaid rebate obligations, what
6  specific pricing information were you talking
7  about?
8          MR. ESCOBAR: Objection to the
9  form.
10     A.   Well, I would include all the
11 pricing information that was provided by the
12 manufacturers to HCFA, which would include both
13 average manufacturing price and best price.
14     Q.   Okay.
15         MR. BREEN: And what's wrong with
16 that question, counselor? I want to clean it up
17 if there's a problem.
18         MR. ESCOBAR: I didn't understand
19 it.
20         MR. BREEN: Okay.
21     Q.   What pricing information were you
22 aware that drug companies provided under their

Page 585

1  obligations under the Medicaid rebate program and
2  under their Medicaid rebate agreements --
3          MR. ESCOBAR: Objection to the
4  form.
5      Q.   -- with HHS?
6      A.   Again, it was my understanding that
7  manufacturers provided average manufacturer's
8  price and best price.
9      Q.   And best price, okay. Now, and was
10 it also your understanding that that information
11 had to be maintained as confidential by -- with
12 the Health Care Financing Administration?
13         Correct?
14     A.   By the unit in the Health Care
15 Financing Administration that administered the
16 rebate program.
17     Q.   Other than specific patient
18 information, can you think of any information that
19 was held to a higher degree of confidentiality by
20 HCFA during your term there?
21         MR. ESCOBAR: Objection to the
22 form.

76 (Pages 582 to 585)