EXHIBIT 123

**DEPARTMENT OF HEALTH & HUMAN SERVICES**  Office of Inspector General

# Memorandum

**Date** NOV 21 1996

*Michael Mangano for* June Gibbs Brown

**From** Inspector General

**Subject** Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Virginia Department of Medical Assistance Services (A-06-95-00072)

**To** Bruce C. Vladeck
Administrator
Health Care Financing Administration

Attached for your information and use is our final report entitled, "Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Virginia Department of Medical Assistance Services." This review was conducted as part of a nationwide audit of pharmacy drug acquisition costs at the Health Care Financing Administration's request. Most States reimburse pharmacies for Medicaid prescriptions using a formula which generally discounts the average wholesale price (AWP) by 10.5 percent. The objective of our review was focused on developing an estimate of the discount below AWP at which pharmacies purchase brand name and generic drugs.

The Virginia Department of Medical Assistance Services (State Agency) was 1 of 11 States randomly selected as part of the nationwide review. Virginia reported drug expenditures of $203.1 million in Calendar Year 1994.

Through statistical sampling, we obtained pricing information from 24 Virginia pharmacies. We obtained 1,413 invoice prices for brand name drugs, and 686 invoice prices for generic drugs. The overall estimate of the extent that AWP exceeded pharmacy purchase invoice prices was 17.2 percent for brand name drugs and 45.1 percent for generic drugs. The national estimates are 18.3 percent and 42.5 percent, respectively. The estimates combine the results for four categories of pharmacies including rural-chain, rural-independent, urban-chain, and urban-independent pharmacies. The estimates exclude the results obtained from non-traditional pharmacies (nursing home pharmacies, hospital pharmacies, home IV, etc.) because such pharmacies purchase drugs at substantially greater discounts than retail pharmacies, and including them would have inappropriately inflated our percentages.

We are recommending that the State Agency consider the results of this review as a factor in any future changes to pharmacy reimbursement for Medicaid drugs.



EXHIBIT
Rox VA 5
11-3-08   truff

Page 2 - Bruce C. Vladeck

In response to our draft report, the Director of the State Agency was appreciative that the report stated that acquisition cost is just one factor involved in pharmacy reimbursement policy and that with any change to that policy, consideration should be given to other factors. The complete text of the Director's comments are included in Appendix 4.

We welcome any comments you have on this Virginia State report. If you have any questions, call me or have your staff contact George M. Reeb, Assistant Inspector General for Health Care Financing Audits, at (410) 786-7104.

To facilitate identification, please refer to Common Identification Number A-06-95-00072.

Attachment

# Department of Health and Human Services

## OFFICE OF INSPECTOR GENERAL

# REVIEW OF PHARMACY ACQUISITION COSTS FOR DRUGS REIMBURSED UNDER THE MEDICAID PRESCRIPTION DRUG PROGRAM OF THE VIRGINIA DEPARTMENT OF MEDICAL ASSISTANCE SERVICES



JUNE GIBBS BROWN
Inspector General

NOVEMBER 1996
A-06-95-00072

# SUMMARY

At the request of the Health Care Financing Administration (HCFA), the Office of Inspector General (OIG) conducted a nationwide review of pharmacy acquisition costs for drugs reimbursed under the Medicaid prescription drug program. Since most States reimburse pharmacies for Medicaid prescriptions using a formula which discounts the average wholesale price (AWP), the objective of our review was to develop an estimate of the discount below AWP at which pharmacies purchase brand name and generic drugs.

To accomplish our objective, we selected a random sample of 11 States from a universe of 48 States and the District of Columbia. Arizona was excluded from the universe of States because the Medicaid drug program is a demonstration project using prepaid capitation financing and Tennessee was excluded because of a waiver received to implement a statewide managed care program for Medicaid. Virginia was one of the sample States selected, as well as California, Delaware, District of Columbia, Florida, Maryland, Missouri, Montana, Nebraska, New Jersey, and North Carolina.

Additionally, we selected a sample of Medicaid pharmacy providers from each State and obtained invoices of their drug purchases. The pharmacies were selected from each of five categories--rural-chain, rural-independent, urban-chain, urban-independent and non-traditional pharmacies (nursing home pharmacies, hospital pharmacies, etc.). We included the non-traditional category so as to be able to exclude those pharmacies from our overall estimates. We believed such pharmacies purchase drugs at substantially greater discounts than retail pharmacies, and including them would have inflated our percentages.

We compared each invoice drug price to AWP for that drug and calculated the percentage, if any, by which the invoice price was discounted below AWP. We then projected those differences to the universe of pharmacies in each category for each State and calculated an overall estimate for each State. Additionally, we projected the results from each State to estimate the nationwide difference between invoice price and AWP.

In Virginia, we obtained pricing information from 24 pharmacies. Specifically, we obtained 1,413 invoice prices for brand name drugs, and 686 invoice prices for generic drugs. For Virginia, the overall estimate of the extent that invoice prices were discounted below AWP was 17.2 percent for brand name drugs and 45.1 percent for generic drugs. The national estimates are 18.3 percent and 42.5 percent, respectively. The estimates combine the results for four categories of pharmacies including rural-chain, rural-independent, urban-chain and urban-independent and exclude the results obtained from non-traditional pharmacies.

Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Virginia Department of Medical Assistance Services

i

We are recommending that the Virginia Department of Medical Assistance Services (State Agency) consider the results of this review as a factor in any future changes to pharmacy reimbursement for Medicaid drugs. We will share the information with HCFA from all 11 States in a consolidation report for their use in evaluating the overall Medicaid drug program.

The Director of the State Agency responded to our draft report in a letter dated, October 17, 1996. The Director was appreciative that the report stated that acquisition cost is just one factor involved in pharmacy reimbursement policy and that with any change to that policy, consideration should be given to the other factors. The complete text of the Director's comments are included in Appendix 4.

# TABLE OF CONTENTS

|  | PAGE |
|---|---|
| **INTRODUCTION** | 1 |
| **BACKGROUND** | 1 |
| **SCOPE** | 2 |
| **FINDINGS AND RECOMMENDATIONS** | 4 |
| **CONCLUSIONS AND RECOMMENDATION** | 6 |

**APPENDICES**

    APPENDIX 1 - SAMPLE DESCRIPTION

    APPENDIX 2 - VIRGINIA SAMPLE RESULTS

    APPENDIX 3 - NATIONWIDE SAMPLE RESULTS

    APPENDIX 4 - STATE AGENCY COMMENTS

# INTRODUCTION

At the request of HCFA, OIG, Office of Audit Services (OAS) conducted a review of pharmacy acquisition costs for drugs reimbursed under the Medicaid prescription drug program of the Virginia Department of Medical Assistance Services (State Agency). The objective of our review was to develop an estimate of the difference between the actual acquisition costs of drugs and AWP. This review was conducted as a part of a nationwide review of pharmacy acquisition costs. Virginia was 1 of 11 States randomly selected as part of the nationwide review.

## *BACKGROUND*

Medicaid regulations provide for the reimbursement of drugs using two methods. If a drug is a multiple source (generic) drug, then reimbursement is based on the lower of the pharmacist's usual and customary charge to the general public or an upper limit amount plus a dispensing fee. The Federal upper limit amounts are established by HCFA. If a drug is a single source (brand name) drug, or a generic drug for which an upper limit amount has not been established, then the reimbursement is the lower of the pharmacist's usual and customary charge to the general public or the estimated acquisition cost (EAC) plus a reasonable dispensing fee. The State agencies are responsible for determining the EAC and the dispensing fee.

The EAC for most States is calculated by using AWP for a drug less some percentage. The AWP is the price assigned to the drug by its manufacturer and is listed in either the *Red Book*, *Medispan* or the *Blue Book*--publications universally used in the pharmaceutical industry. Prior to 1984, most States used 100 percent of AWP for reimbursement of acquisition costs. However, OIG issued a report in 1984 which stated that, on average, pharmacies purchased drugs for 15.9 percent below AWP. In 1989, OIG issued a follow-up report which concluded that pharmacies were purchasing drugs at discounts of 15.5 percent below AWP. Both the 1984 and 1989 reports combined brand name and generic drugs in calculating the percentage discounts and included a comparison of 3,469 and 4,723 purchases, respectively.

In 1989, HCFA issued a revision to the State Medicaid Manual which pointed out that a preponderance of evidence demonstrated that AWP overstated prices that pharmacies actually paid for drugs by as much as 10 to 20 percent. The Manual further provided that, absent valid documentation to the contrary, it would not be acceptable for a State to make reimbursements using AWP without a significant discount.

In November 1990, the Omnibus Budget Reconciliation Act of 1990 was passed which placed a 4-year moratorium on changes to States' reimbursement policies. The moratorium expired on December 31, 1994 and HCFA requested that we, once again, determine the difference between AWP and actual pharmacy acquisition cost.

---

Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Virginia Department of Medical Assistance Services

1

The State Agency reported drug expenditures of $203.1 million in Calendar Year (CY) 1994.

## *SCOPE*

Our review was performed in accordance with generally accepted government auditing standards. The objective of our review was to develop an estimate of the difference between AWP and the actual invoice prices of both brand name and generic prescription drugs to Medicaid pharmacy providers. Our objective did not require that we identify or review any internal control systems.

Our review was limited to ingredient acquisition costs and did not address other areas such as: the effect of Medicaid business as a contribution to other store sales; the cost to provide professional services other than dispensing a prescription such as therapeutic interventions, patient education, and physician consultation; and the cost of dispensing which includes costs for computers, multi-part labels, containers, technical staff, transaction fees, Medicaid specific administrative costs, and general overhead. We also did not take into consideration the effect of Federal upper limit amounts on generic drug reimbursements or usual and customary charge limitations. We plan to evaluate the effect of the Federal upper limit amounts on generic drug reimbursements in a subsequent review.

We obtained a listing of all Medicaid pharmacy providers from the State Agency. The State Agency was responsible for classifying each pharmacy as chain, independent or non-traditional. For purposes of this review, a chain was defined as four or more pharmacies with common ownership. We determined whether each pharmacy was rural or urban by comparing the county location for each pharmacy to a December 31, 1992 listing of metropolitan areas and their components. We selected a stratified random sample of 60 pharmacies with 12 pharmacies selected from each of 5 strata--rural-chain, rural-independent, urban-chain, urban-independent, and non-traditional (nursing home pharmacies, hospital pharmacies, home IV, etc.). We included the non-traditional category so as to be able to exclude those pharmacies from our estimates. We believed that such pharmacies are able to purchase drugs at substantially greater discounts than a retail pharmacy and would inflate our estimate.

We requested, from each pharmacy selected, the largest invoice from each different source of supply for a specified month in CY 1994. We identified the sources of supply as wholesalers, chain warehouse distribution centers, generic distributors, and direct manufacturer purchases. Each pharmacy was initially assigned a month from January through September in order to provide a cross-section of this 9-month time period. However, we permitted one pharmacy to provide invoices from December as invoices were not available from the earlier period.

We reviewed every line item on the invoices supplied by the sample pharmacies to ensure that the invoices contained the information necessary for our review. We eliminated over-the-counter items. Some invoices did not include National Drug Codes (NDC), which were needed to obtain

AWP for the drug. We attempted to obtain NDCs in those instances. We used the 1994 *Red Book*, a nationally recognized reference for drug product and pricing information, to obtain NDCs or identify over-the-counter items. One prominent wholesaler, whose invoices contained that wholesaler's item number rather than NDCs, provided us with a listing that converted their item number to an NDC. If we were unable to identify the NDC for a drug, we eliminated the drug. This was a common occurrence for generic drugs where there was no indication on the invoice as to the manufacturer of the drug.

We obtained a listing from HCFA that indicated whether a drug is a brand name or generic drug. We used that listing to classify each drug on the invoices as brand or generic. If a drug was not on the HCFA listing, we used the *Red Book* to determine whether the drug was brand or generic. Additionally, we obtained drug expenditure information from HCFA-64 Reports.

The State of Missouri provided us with a pricing file for the purpose of obtaining the AWP for each drug. We compared the invoice drug price to AWP for each drug and calculated the percentage, if any, by which the invoice price was discounted below AWP. If a drug from an invoice was not on the pricing file we eliminated that drug.

An initial meeting was held in Richmond, Virginia on August 30 - 31, 1994, with Medicaid pharmacy representatives from the sample States. At this meeting, we presented a methodology for performing the review and the methodology was refined with input from the State representatives. At a follow-up meeting held in Richmond, Virginia, on September 27 - 28, 1995, we presented the results of our review with the sample States.

We used OAS statistical computer software to calculate all estimates as well as to generate all random numbers. We did not independently verify any information obtained from third party sources. Our review was conducted by our Little Rock, Arkansas OAS field office with assistance from our OAS field offices in Baton Rouge, Louisiana, and Austin, Texas from September 1994 to September 1995.

# FINDINGS AND RECOMMENDATIONS

## *BRAND NAME DRUGS*

We estimate that invoice prices for *brand name drugs* were discounted 17.2 percent below AWP. The estimate combined all pharmacy categories except non-traditional pharmacies and was based on the comparison to AWP of 1,413 invoice prices received from 24 pharmacies. The standard deviation for this estimate was 1.31 percent (see Appendix 2).

The estimates that invoice prices for *brand name drugs* were discounted below AWP are summarized in the following chart:



**Estimated Difference**

| Category | Percent |
|---|---|
| Rural Chain | 18.6 |
| Rural Independent | 18.4 |
| Urban Chain | 16.4 |
| Urban Independent | 18.8 |
| Non-Traditional (NonT) | 31.1 |
| Overall (Excluding NonT) | 17.2 |

The following chart shows the number of pharmacies sampled and the number of prices reviewed by individual category for *brand name drugs.*



| Category | Number of Sample Pharmacies | Prices from Sample Pharmacies |
|---|---|---|
| Rural-Chain | 5 | 587 |
| Rural-Independent | 8 | 273 |
| Urban-Chain | 5 | 393 |
| Urban-Independent | 6 | 180 |
| Non-Traditional | 8 | 177 |
| Overall (Exc. NonT) | 24 | 1413 |

---

Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program
of the Virginia Department of Medical Assistance Services

4

## *GENERIC DRUGS*

We estimate that invoice prices for *generic drugs* were discounted below AWP by 45.1 percent. Once again the estimate combined all pharmacy categories except non-traditional pharmacies. The estimate was based on the comparison to AWP of 686 invoice prices received from 24 pharmacies. The standard deviation for this estimate was 2.67 percent (see Appendix 2).

The estimates that invoice prices for *generic drugs* were discounted below AWP are summarized by individual categories in the following chart:



The following chart shows the number of pharmacies sampled and the number of prices reviewed by individual category for the *generic drugs*.



---

Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program
of the Virginia Department of Medical Assistance Services

5

## CONCLUSIONS AND RECOMMENDATION

Based on our review, we have determined that there is a significant difference between AWP and pharmacy acquisition costs. The difference between AWP and pharmacy acquisition costs is significantly greater for generic drugs than for brand name drugs. In general, State representatives believed that the review supported current State practices to establish pharmacy reimbursement for ingredient cost at levels below AWP.

We recognize that acquisition cost is just one factor in pharmacy reimbursement policy and that any change to that policy should also consider the other factors discussed in the Scope section of our report. Additionally, the effect of Federal upper limit amounts on generic drug reimbursements or usual and customary charge limitations should be taken into consideration. However, a change in any of the factors affecting pharmacy reimbursement could have a significant impact on expenditures because of the size of the program ($203.1 million) in Virginia. We believe that the difference between AWP and pharmacy acquisition costs as determined by our review is significant enough to warrant consideration by the State in any evaluation of the drug program. Therefore, we recommend that the State Agency consider the results of this review in determining any future changes to pharmacy reimbursement for Medicaid drugs.

### *STATE AGENCY COMMENTS*

The Director of the State Agency responded to our draft report in a letter dated, October 17, 1996. The Director was appreciative that the report stated that acquisition cost is just one factor involved in pharmacy reimbursement policy and that with any change to that policy, consideration should be given to the other factors. The complete text of the Director's comments are included in Appendix 4.

# APPENDICES

*APPENDIX 1*
*PAGE 1 OF 2*

## SAMPLE DESCRIPTION

**Sample Objectives:**

Develop an estimate of the discount below Average Wholesale Prices (AWP) of actual invoice prices to Medicaid pharmacies in Virginia for brand name drugs and for generic drugs.

**Population:**

The sampling population was pharmacy providers participating in the Medicaid prescription drug program of the State Agency.

**Sampling Frame:**

The sampling frame was a listing of all pharmacy providers participating in the Medicaid prescription drug program.

**Sample Design:**

A sample of 12 pharmacies was randomly selected from each of 5 strata. The five strata of pharmacies were rural-chain, rural-independent, urban-chain, urban-independent, and non-traditional (nursing home pharmacies, hospital pharmacies, home IV, etc.). Each pharmacy was assigned a month from 1994 for which to provide invoices. All pharmacies were initially assigned a month from January through September in a method designed to provide a cross-section of the 9-month period. However, one pharmacy was permitted to submit invoices from December as invoices were not available for the month originally assigned. The largest invoice from each of four different sources of supply was requested. The sources of supply were identified as wholesalers, chain warehouse distribution centers, generic distributors, and direct manufacturer purchases. All invoice prices were compared to AWP.

**Sample Size:**

Twelve pharmacies were selected from each stratum for a total of 60 pharmacies.

**Source of Random Numbers:**

OAS statistical sampling software was used to generate the random numbers.

*APPENDIX 1*<br>*PAGE 2 OF 2*

**Characteristics to be Measured:**

From our review of the pharmacy invoices, we calculated the percentage of the discount below AWP of actual invoice prices for all drugs on the invoices submitted.

**Treatment of Missing Sample Items:**

No spare was substituted for a pharmacy that did not provide information. If a pharmacy did not send an invoice for a particular type of supplier, we assumed that the pharmacy did not purchase drugs from that type of supplier during the month assigned to the pharmacy.

**Estimation Methodology:**

We used OAS Statistical Software to project the percentage difference between AWP and actual invoice prices for each stratum, as well as an overall percentage difference. The overall percentage difference excluded the non-traditional pharmacies. The projections were done separately for brand name drugs and generics.

**Other Evidence:**

We obtained AWP from First DataBank.

*APPENDIX 2*

## VIRGINIA SAMPLE RESULTS
## BRAND NAME AND GENERIC DRUGS

| | CATEGORY | SAMPLE UNIVERSE | SAMPLE SIZE | DRUG PRICES REVIEWED | MEAN ESTIMATE | STANDARD DEVIATION | 95 PERCENT CONFIDENCE INTERVAL LOWER LIMIT | UPPER LIMIT |
|---|---|---|---|---|---|---|---|---|
| **BRAND** | RURAL-CHAIN | 171 | 5 | 567 | 18.64 | 0.93 | 17.97 | 19.31 |
| | RURAL-INDEPENDENT | 204 | 8 | 273 | 16.43 | 4.34 | 13.95 | 18.90 |
| | URBAN-CHAIN | 622 | 5 | 393 | 16.36 | 5.68 | 12.20 | 20.52 |
| | URBAN-INDEPENDENT | 293 | 6 | 180 | 18.83 | 4.49 | 15.85 | 21.82 |
| | NON-TRADITIONAL | 66 | 8 | 177 | 31.11 | 7.15 | 27.22 | 35.01 |
| | OVERALL (EXCL. NON-TRAD) | 1,290 | 24 | 1,413 | 17.23 | 1.31 | 15.08 | 19.39 |
| **GENERIC** | RURAL-CHAIN | 171 | 5 | 206 | 44.90 | 13.35 | 35.22 | 54.58 |
| | RURAL-INDEPENDENT | 204 | 8 | 147 | 47.41 | 5.42 | 44.32 | 50.50 |
| | URBAN-CHAIN | 622 | 5 | 191 | 43.10 | 9.98 | 35.79 | 50.41 |
| | URBAN-INDEPENDENT | 293 | 6 | 142 | 48.03 | 14.85 | 38.16 | 57.90 |
| | NON-TRADITIONAL | 66 | 8 | 141 | 56.35 | 22.70 | 43.97 | 68.73 |
| | OVERALL (EXCL. NON-TRAD) | 1,290 | 24 | 686 | 45.14 | 2.67 | 40.74 | 49.54 |

*APPENDIX 3*

# NATIONWIDE SAMPLE RESULTS
# BRAND NAME AND GENERIC DRUGS

| | CATEGORY | SAMPLE UNIVERSE | SAMPLE SIZE | DRUG PRICES REVIEWED | POINT ESTIMATE | STANDARD ERROR | 95 PERCENT CONFIDENCE LEVEL LOWER LIMIT | 95 PERCENT CONFIDENCE LEVEL UPPER LIMIT |
|---|---|---|---|---|---|---|---|---|
| **BRAND** | RURAL-CHAIN | 1,095 | 73 | 5,723 | 17.40 | 1.05 | 15.67 | 19.13 |
| | RURAL-INDEPENDENT | 1,499 | 78 | 3,043 | 16.39 | 1.07 | 14.63 | 18.15 |
| | URBAN-CHAIN | 8,194 | 73 | 7,198 | 18.45 | 0.52 | 17.60 | 19.31 |
| | URBAN-INDEPENDENT | 6,242 | 91 | 3,009 | 18.71 | 0.90 | 17.22 | 20.19 |
| | NON-TRADITIONAL | 2,026 | 66 | 1,762 | 27.52 | 2.28 | 23.76 | 31.27 |
| | OVERALL (EXCL. NON-TRAD) | 17,030 | 315 | 18,973 | 18.30 | 0.66 | 17.21 | 19.38 |
| **GENERIC** | RURAL-CHAIN | 1,095 | 73 | 2,963 | 47.51 | 1.63 | 44.82 | 50.20 |
| | RURAL-INDEPENDENT | 1,499 | 78 | 1,798 | 47.38 | 0.93 | 45.85 | 48.92 |
| | URBAN-CHAIN | 8,194 | 72 | 2,634 | 37.61 | 2.82 | 32.97 | 42.26 |
| | URBAN-INDEPENDENT | 6,242 | 91 | 1,680 | 46.72 | 2.44 | 42.70 | 50.73 |
| | NON-TRADITIONAL | 2,026 | 59 | 1,262 | 57.70 | 1.98 | 54.43 | 60.96 |
| | OVERALL (EXCL. NON-TRAD) | 17,030 | 314 | 9,075 | 42.45 | 0.90 | 40.97 | 43.93 |



# COMMONWEALTH of VIRGINIA

*Department of Medical Assistance Services*

JOSEPH M. TEEFEY
DIRECTOR

October 17, 1996

SUITE 1300
600 EAST BROAD STREET
RICHMOND, VA 23219
804/786-7933
804/225-4512 (Fax)
800/343-0634 (TDD)

Mr. M. Ben Jackson, Jr.
Acting Director, Operational
  and Program Reviews
Health Care Financing Audit Division
Department of Health and Human Services
Office of Inspector General
Washington, D.C. 20201

Dear Mr. Jackson:

This letter is to convey the Virginia Department of Medical Assistance Services' (DMAS) comments on the draft report of the results of the Department of Health and Human Services Office of Inspector General's review of pharmacy acquisition cost for drugs reimbursed under the prescription drug program.

As a result of this nationwide review of eleven states chosen at random, Virginia was selected for sampling and participation in the capacity of not only requesting randomly selected providers to submit purchase invoices for analysis, but also hosting two conferences for representatives of HCFA, OIG, and states involved in the study.

DMAS appreciates the recommendation that Virginia Medicaid consider the results of this review as a factor in any future changes to pharmacy reimbursement for Medicaid specific drugs in the state program. As stated Medicaid reimbursement rates to pharmacy providers for covered outpatient prescription drugs consists of two components which are ( 1) an amount representing the drug ingredient cost (the acquisition cost) and, (2) an amount representing the professional or dispensing fee. Normally the reimbursement cost is based on the lower of EAC (estimated acquisition cost), usual and customary, or FUL (Federal Upper Limit) and Maximum Allowable Costs. As stated in the draft of these reviews, the acquisition cost is just one factor involved in pharmacy reimbursement policy or methodology, and with any change, consideration should be given to other factors such as the following:

- Impact on recipient access to service.
- Present rebate allowances from pharmaceutical manufacturers to both federal and state programs.
- Provider specialty care or level of care such as Home Health providers.
- Coordination of monitoring for recipients with compliance needs.
- Overhead costs for dispensing functions and record keeping.

Mr. M. Ben Jackson, Jr.
October 17, 1996
Page Two

This does not necessarily cover inclusively the factors that are involved in assuring that the Medicaid recipient receives the most efficient and cost-effective health care available, but does emphasize that when one aspect of the equation is affected, all possible consequences should be considered.

I would like to take this opportunity to express Virginia Medicaid's appreciation for the cooperative effort in which this review was undertaken.

Sincerely,

Joseph M. Teefey
Director

JMT:dbs

cc: June Gibbs Brown, Inspector General