# EXHIBIT 124

Page 1

```
           UNITED STATES DISTRICT COURT

            DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x

In Re: PHARMACEUTICAL INDUSTRY   : MDL No. 1456

AVERAGE WHOLESALE PRICE          : Civil Action No.

LITIGATION                       : 01-12257-PBS

- - - - - - - - - - - - - - - -x

THIS DOCUMENT RELATES TO:        : VIDEOTAPED

United States of America, ex rel.: DEPOSITION OF

Ven-A-Care of the Florida Keys,  : THE VIRGINIA

Inc. v. Abbott Laboratories, Inc.: DEPARTMENT OF

Civil Action No. 06-11337-PBS;   : MEDICAL

and United States of America ex  : ASSISTANCE

rel. Ven-A-Care of the Florida   : SERVICES by

Keys, Inc., v. Dey, Inc., et al.,: HOWARD BRYAN

Civil Action No. 05-11084-PBS;   : TOMLINSON, II

and United States of America ex  :

rel. Ven-A-Care of the Florida   : NOVEMBER 3, 2008

Keys, Inc., v. Boehringer        :

Ingelheim Corp., et al., Civil   : RICHMOND,

Action No. 07-10248-PBS          : VIRGINIA

- - - - - - - - - - - - - - - -x
```

Page 30

1    A.  Yes.
2    Q.  How many people are on staff in the
3  pharmacy division?
4    A.  There are -- there are two pharmacists
5  from Tech, and another four, and a part time,
6  five.
7    Q.  Are there any other staff that are part
8  of the pharmaceutical division?
9    A.  Those are the direct staff.  There are
10  -- there are many other staff people involved in
11  providing pharmacy services, in terms of
12  information management individuals, systems
13  analysts.  And, of course, through the contract
14  with First Health Services, there are many other
15  types of individuals; clinical pharmacists,
16  rebate pharmacists, programmers, claims payers,
17  call center people.  So the five -- the five
18  people that are on the staff are the ones who are
19  directly involved in day-to-day administration in
20  the office.
21    Q.  Does DMAS have a program integrity
22  section?

Page 31

1    A.  Yes.
2    Q.  Are there any people in that section
3  who are specifically focussed on pharmacy
4  services?
5    A.  Not specifically focussed.
6    Q.  Do the program integrity people ever
7  conduct state-wide surveys of pharmaceutical
8  prices?
9    A.  Not in my experience.
10    Q.  I'd like to focus on the reimbursement
11  methodology that Virginia has used over the years
12  to pay for pharmaceuticals.
13        MS. OBEREMBT:  And I'm going to start
14  by marking an exhibit -- a page from the Federal
15  Register, dated July 31, 1987, Volume 52, Number
16  147, Pages 28657 to 58.  It's a two-sided page
17  from the Federal Register, and it announces
18  amendments to 42 CFR Part 413.  Would you,
19  please, mark that as Exhibit 3?
20          (The Federal Register document was
21  marked and received for identification as Exhibit
22  Tomlinson 003.)

Page 32

1  BY MS. OBEREMBT:
2    Q.  Mr. Tomlinson?
3    A.  Yes.
4    Q.  Does this appear to be the federal
5  regulation regarding payment for prescription
6  drugs in state Medicaid programs?
7    A.  Yes, it does appear to be.
8    Q.  If I could direct your attention to
9  Section 447.331b, other drugs.  Could you just
10  take a minute to read that paragraph?  Do you see
11  where -- where it refers to payment levels that
12  it focuses on applying the lower of either
13  estimated acquisition costs plus reasonable
14  dispensing fees established by the agency, or to
15  the providers usual and customary charges to the
16  general public?
17    A.  Yes.
18    Q.  Has DMAS established a reimbursement
19  methodology that applies to these elements?
20        MR. TORBORG:  Object to form.
21    A.  With respect to these elements or --
22  okay, could you rephrase that, please?

Page 33

1    Q.  Sure.  Let me just ask it more
2  generally.  Does DMAS have a reimbursement
3  methodology that's consistent with what you're
4  reading in this regulation?
5        MR. TORBORG:  Object to form.
6    A.  DMAS -- DMAS has a policy which
7  reflects these -- these components, yes.
8    Q.  Okay.  And how has that policy been
9  developed?
10    A.  How has it been developed?
11    Q.  Yes.
12    A.  With respect to?  Could you clarify,
13  please?
14    Q.  Sure.  Sure.  Well, first of all, what
15  -- what is the state's current reimbursement
16  methodology for pharmaceuticals?
17    A.  With respect to the -- well, we have --
18  well, let me -- could you clarify that?  We have
19  a pretty complex program, so with respect to what
20  aspect?
21    Q.  Okay.  Well, for example, this
22  regulation references estimated acquisition cost?

Page 250

1  try to use a tiered approach to reimbursement,
2  correct?
3       MS. OBEREMBT:  Objection.
4       MS. GOBBLE:  Objection.
5     A.  The -- they chose only to go with AWP
6  minus 10.25 and above.
7     Q.  Well, hold on.  They didn't use that
8  rate until 2003, correct?
9     A.  Ultimately, in -- that was when the
10 change occurred.
11    Q.  In 1996 and 1997, when this report and
12 the subsequent national report came out, DMAS's
13 response to the OIG findings was to do nothing to
14 its reimbursement methodology, correct?
15      MS. OBEREMBT:  Objection.
16      MS. GOBBLE:  Objection.
17    A.  There was no change in the -- the
18 change in AWP minus 9 within that period until
19 2000.
20    Q.  So --
21    A.  Three.  There was no change.
22    Q.  Now, OIG's suggestion and

Page 251

1  recommendation to Virginia was, quote:
2       "We believe that the difference between
3  AWP and pharmacy acquisition costs, as determined
4  by our review, is significant enough to warrant
5  consideration by the state and any evaluation of
6  the drug program."
7       MS. OBEREMBT:  Where are you reading
8  from?
9       MR. REALE:  On Page 6, conclusions and
10 recommendations, same page we were discussing
11 earlier.
12      THE DEPONENT:  Okay.
13      MR. REALE:  Let me start again.
14      THE DEPONENT:  Yeah.
15 BY MR. REALE:
16    Q.  In the conclusions and recommendations
17 of the OIG, in this report, covered the
18 acquisition costs to pharmacies in Virginia, it
19 is recommending the following:
20      "We believe that the difference between
21 AWP and pharmacy acquisition costs, as determined
22 by our review, is significant enough to warrant

Page 252

1  consideration by the state in any evaluation of
2  the drug program.  Therefore, we recommend that
3  the state agency consider the results of this
4  review in determining any future changes to
5  pharmacy reimbursement for Medicaid drugs."
6       Correct.
7     A.  Yes.
8     Q.  And you understand that the OIG is
9  recommending to DMAS that it should take under
10 advisement the findings of this report?
11    A.  Yes.
12    Q.  And those findings were that branded
13 drugs were typically acquired at discounts of AWP
14 minus 17.2 percent in Virginia, and that generic
15 drugs were acquired, on average, at 45 percent
16 discounts off of AWP, correct?
17    A.  That was their findings, yes.
18    Q.  And DMAS's response to these findings
19 was not to change its reimbursement methodology,
20 it's determination of estimated acquisition cost,
21 correct?
22    A.  There was no change during that time

Page 253

1  period.
2       MS. OBEREMBT:  Are you done with this
3  document?
4       MR. REALE:  Not yet.
5       MS. OBEREMBT:  Okay.
6  BY MR. REALE:
7     Q.  Now, based on the findings as reported
8  by the OIG in this report, DMAS was aware that it
9  -- on average, pharmacies were acquiring profits
10 or a margin on reimbursement for generic drugs?
11      MS. OBEREMBT:  Objection.
12      MS. GOBBLE:  Objection.
13    A.  I can't -- I don't know that to be the
14 case.
15    Q.  I want to ask you a hypothetical
16 question:  If on average you acquire a product
17 for $40; are you with me?
18    A.  Yes.
19    Q.  And you are reimbursed at $100; you
20 still with me?
21    A.  Still with you.
22    Q.  What is the difference between 100 and