# EXHIBIT 136

Gladden, Patricia                                             January 15, 2009
Austin, TX

1

CAUSE NO. D-1-GV-07-001259

| | |
|---|---|
| THE STATE OF TEXAS, ex rel. | ) IN THE DISTRICT |
| VEN-A-CARE OF THE FLORIDA | ) COURT |
| KEYS, INC., | ) |
|     Plaintiffs, | ) |
| vs. | ) TRAVIS COUNTY, |
| SANDOZ, INC. f/k/a GENEVA | ) TEXAS |
| PHARMACEUTICALS, INC., NOVARTIS | ) |
| PHARMACEUTICALS, INC., NOVARTIS | ) |
| AG, EON LABS, APOTHECON, INC., | ) 201ST JUDICIAL |
| MYLAN PHARMACEUTICALS, INC., | ) DISTRICT |
| MYLAN LABORATORIES, INC., UDL | ) |
| LABORATORIES, INC., TEVA | ) |
| PHARMACEUTICALS USA, INC., | ) |
| f/k/a LEMMON PHARMACEUTICALS, | ) ORAL VIDEOTAPED |
| INC., COPLEY PHARMACEUTICALS, | ) DEPOSITION OF |
| INC., IVAX PHARMACEUTICALS, | ) PATRICIA GLADDEN |
| INC., SICOR PHARMACEUTICALS, | ) VOLUME 1 |
| INC., TEVA NOVOPHARM, INC. and | ) |
| TEVA PHARMACEUTICAL | ) January 15, 2009 |
| INDUSTRIES, LTD., | ) |
|     Defendants. | ) Austin, Texas |

                                                              228

1    Q.    (By Mr. Merkl) Okay.
2          Now, earlier we were talking about some
3    of the rule changes, and we covered the one in
4    '85, and then in '97 you switched to what, AMP
5    minus -- I'm sorry, AWP minus 15?
6    A.    That rule actually happened in '97.
7    Q.    '97. Okay.
8    A.    Yes.
9    Q.    Okay. And that rule actually went into
10   the regulations, right?
11   A.    It did.
12   Q.    Okay. What was the next change on EAC
13   reimbursement amount that -- that you were
14   involved working on?
15   A.    Actually there hasn't been one.
16   Q.    Okay. Did there come a time when you
17   tried to change the EAC reimbursement amount after
18   1997?
19   A.    Yes.
20   Q.    Okay. Can you tell me what -- what
21   happened there?
22   A.    In 2002, based on two things that

229

1  happened, there were invoice audits that were
2  done, and there was an audit on the fee, on the
3  dispensing expense.  There were rules proposed
4  that would've changed the dispensing fee.
5      Q.   Uh-huh.  Do you remember the upshot of
6  what the EAC and the dispensing fee changes
7  would've been?
8      A.   Well, the EAC changes were not actually
9  part of the rule proposal because, again, they
10 weren't in the rules.  But the dispensing fee
11 proposal would have raised the dispensing fee --
12 raised the dispensing expense to, oh, gosh, over
13 $6.
14     Q.   Okay.  Did that become -- that become
15 accepted, or was that stopped?
16     A.   For 24 hours.
17     Q.   Okay.  Now, what happened to the EAC
18 piece of this?
19     A.   Well, the EAC piece was --
20     Q.   What were you going to change the EAC
21 to?
22     A.   We were going to -- we had proposed to

230

1    change the estimated acquisition cost to base it
2    on -- if I'm remembering, there were -- ultimately
3    what went in was AWP minus 16 or cost to the
4    wholesaler plus 1.
5        Q.   Okay.  Now, isn't it true that by that
6    time you'd seen some studies that indicated for
7    generics that they were available at a lot less
8    than WAC plus 1 on the order of, you know, WAC
9    minus 20 or 30, and that, in fact, the AWP
10   discounts were on the order of 40 to 60 to 80
11   percent for -- for some generics?
12            MR. CRAWFORD:  Objection; form.
13       Q.   (By Mr. Merkl) Isn't that the case?
14            MR. CRAWFORD:  Objection; form.
15       A.   If you were using the WAC as published
16   in First DataBank, that would've been true.
17       Q.   (By Mr. Merkl) All right.  Now, the WAC
18   that you used when you reimbursed the pharmacists,
19   was that the WAC that was published in First
20   DataBank?
21            MR. CRAWFORD:  Objection; form.
22       A.   We used price to wholesaler as reported

1   by the manufacturer.
2       Q.   (By Mr. Merkl) I guess what I'm asking -
3   - well, how does the reimbursement work
4   mechanically?  I mean, does -- when a -- when a
5   new drug comes in, do you sit down and figure out
6   what you're going to allow for that drug as WEAC
7   and calculate AWP minus this and WAC plus that and
8   actually put a number in for each and every drug,
9   or is there a formula in your system that
10  automatically assigns prices to the drugs as they
11  come in?
12           MR. CRAWFORD:  Objection --
13      Q.   (By Mr. Merkl) Do you know how that
14  works?
15           MR. CRAWFORD:  Objection; form.
16      A.   To the best of my knowledge, what
17  actually went into the computer was the reported
18  AWP and the reported price to the wholesaler, the
19  reported direct price, if there was one, and the
20  computer did the calculation.
21      Q.   (By Mr. Merkl) Okay.  Now -- okay.
22           So to come back to the change, then, so

232

1  the change was going to be your -- your WAC
2  wholesaler price was going to be dropped from
3  what, plus --
4  　　　　　What had it been?
5  　　A.　　12.
6  　　Q.　　-- to plus 1?
7  　　A.　　Correct.
8  　　Q.　　And how were you mechanically going to
9  go through that?  Was there a hearing, or what
10 were you going to do?
11 　　A.　　There was a hearing.
12 　　Q.　　Uh-huh.
13 　　A.　　And --
14 　　Q.　　What happened at the hearing?
15 　　A.　　I don't believe I was at that hearing.
16 I don't really know.
17 　　Q.　　Did Joe handle the hearing for you?
18 　　A.　　I'm not sure who handled the hearing.
19 　　Q.　　Will anyone admit to being there?
20 　　A.　　Huh?
21 　　Q.　　Will anyone admit to being there?
22 　　A.　　I don't know.

Gladden, Patricia

Austin, TX

January 15, 2009

233

1     Q.    All right.

2     MR. CRAWFORD:    Objection; form.

3     Q.    (By Mr. Merkl) So you don't know who was
4  at the hearing?

5     A.    (Witness shakes head.)

6     Q.    Who was in charge of this whole show?

7     A.    I -- I really am having trouble
8  remembering this. I believe that would've been
9  the rate analysis people who actually worked on
10  the audits -- the invoice audits.

11     Q.    And who was that person so I could ask
12  him and not you, or her?

13     A.    Probably Merle Moden.

14     Q.    So they go in and they actually change
15  the EAC? Do they actually -- do they actually make
16  that change at some point in the system to
17  wholesaler plus 1 as opposed to wholesaler plus 5?

18     A.    It was in effect for one day.

19     Q.    And what happened?

20     A.    And the pharmacist got a -- they
21  enjoined us from proceeding with the dispensing
22  expense.

Gladden, Patricia

January 15, 2009

Austin, TX

234

```
1      Q.    I guess that's a shorthand way of saying
2   they went to court; true?
3      A.    That's true.
4      Q.    And they asked a judge to stop the
5   change?
6      A.    That's true.
7      Q.    And then the judge ordered that the
8   change not go through and you go back to the old
9   day -- old way of doing things?
10     A.    As I recall, it was a restraining order,
11  and we chose to go back to the old way.
12     Q.    What were you restrained from doing?
13     A.    We were restrained from proceeding with
14  the dispensing expense change.
15     Q.    Okay.  So then you went back to the old
16  way, right?
17     A.    We restored the old dispensing expense
18  setup.
19     Q.    And you restored the old --
20     A.    And we restored the estimated
21  acquisition cost as well.
22     Q.    So you went back to the old wholesaler
```