# EXHIBIT 139

NO. GV401286

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| ex rel. | ) | |
|    VEN-A-CARE OF THE | ) | |
|    FLORIDA KEYS, INC. | ) | |
|       Plaintiffs, | ) | |
| | ) | |
| VS. | ) | TRAVIS COUNTY, TEXAS |
| | ) | |
| ABBOTT LABORATORIES INC., | ) | |
| et al. | ) | |
|       Defendants. | ) | 201ST JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF
BARBARA BENTON DEAN, AS CORPORATE
REPRESENTATIVE OF HHSC AND INDIVIDUAL CAPACITY
AUGUST 6, 2007
VOLUME 2

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

        ORAL AND VIDEOTAPED DEPOSITION OF BARBARA BENTON DEAN, produced as a witness at the instance of the Defendants, Abbott Laboratories, Inc., Abbott Laboratories, and Hospira, Inc., and duly sworn, was taken in the above-styled and numbered cause on the 6th day of August, 2007, from 9:05 a.m. to 5:05 p.m., before Cynthia Warren, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at the Office of the Attorney General, 300 West 15th Street, 12th Floor, Austin, Texas 78701, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

bffb319a-6b1f-4888-931b-ab233ed2f1ce

Page 185

1  Texas -- how did Texas Medicaid determine at what number
2  to set that?
3     A.  It's an add-on factor at the end of the
4  prescription.  The percentage has varied some over the
5  years.  It's not some -- just an objective number that
6  we arrived at.  There wasn't any specific study or
7  analysis.  It's about 2 percent, 3 percent, 5 percent,
8  7 percent.  It's currently 2 percent or 1.95 percent.
9     Q.  What are the policy considerations to
10 determining at what percent the inventory management
11 factor should be set?
12    A.  The policy consideration is always the same,
13 provide a reasonable dispensing fee.
14    Q.  How does Texas Medicaid determine whether the
15 dispensing fee is reasonable or not?
16    A.  We have tied -- in the past there were cost
17 surveys that pharmacists filled out, what does it
18 actually cost to dispense a prescription.  We did a
19 survey -- Myers and Stauffer did a survey to look at the
20 cost of dispensing.  We tried to tie the reasonable
21 dispensing fee to the cost of dispensing as the federal
22 regs require us to do.  These have to be approved by the
23 centers for Medicare and Medicaid services.
24    Q.  Well, in September 1992 how did you determine
25 that the inventory management factor should be 7 percent

Page 186

1  as opposed to 6 percent or 8 percent or some other
2  percent?
3          MS. JACOBS:  Objection, scope.  We're
4  beyond the time period for discovery as set by the
5  judge.
6     A.  I came to work in the program in June of 1991,
7  so I don't know exactly that there was any -- how that
8  figure was arrived at.  It's been a very long time.
9     Q.  (By Mr. Berlin)  Can you turn to the next page
10 of Exhibit 840.  And do you see under No. 29 it says,
11 "September 1, 1997 - New Fee effective $5.27, Inventory
12 management factor 0.98, Delivery 0.15," and so there it
13 shows the inventory management factor has been moved
14 from 7 percent down to 2 percent, right?
15    A.  Yes.
16    Q.  So what were -- how did the Texas Medicaid
17 determine that the inventory management factor should be
18 moved down to 2 percent?
19         MS. JACOBS:  Objection, form.
20    A.  We were specifically directed by our
21 legislature to reduce reimbursement.  This was our
22 effort at that.  The fee went up or the dispensing
23 expense portion of the fee went up from 4.55 to 5.27.
24 The inventory management factor was reduced from
25 7 percent to 2 percent.  And the wholesale costs and

Page 187

1  percent didn't change, but the percentage off of average
2  wholesale price was increased at that time.
3     Q.  (By Mr. Berlin)  Staying focused on the
4  2 percent for the inventory management factor -- by the
5  way, we're -- under No. 29 it says, "Inventory
6  management factor, 0.98 percent."  I just wanted to make
7  sure, that means 2 percent, right?
8     A.  Yes.
9     Q.  I misread it.  It says 0.98, and that means
10 2 percent, right?
11    A.  That means a 2 percent add-on.
12    Q.  So you were saying the legislature directed
13 Texas Medicaid to lower reimbursement so I want to
14 understand, why was that number, inventory management
15 factor, set at 2 percent as opposed to some other
16 percent?
17    A.  That number was determined to be the
18 appropriate number at that time to provide for what we
19 believed was adequate reimbursement and to, at the same
20 time, be a portion of the reimbursement that would
21 provide savings to the State.
22    Q.  Was there any analysis as to exactly what the
23 inventory management factor should be?
24    A.  Not that I recall.
25    Q.  Was anyone -- who were the people who were

Page 188

1  responsible at looking at the inventory management
2  factor?
3          MR. ANDERSON:  Objection, beyond the
4  scope.
5     A.  That was done with program staff.  Bob Harriss
6  at that time was the director of the program.  Certainly
7  Patsy Napier was involved, Curtis, Martha, as well as
8  the rate-setting staff.  It's a joint effort on the part
9  of the program as a whole.  This was the result
10 following the lawsuit for the rates that we had
11 previously tried to implement.
12    Q.  (By Mr. Berlin)  Let's go back in time for a
13 moment.  In March of 1996 Texas Medicaid lowered the
14 dispensing fee down to $3.00 for urban pharmacies and
15 $4.00 for rural pharmacies, right?
16    A.  Yes.
17    Q.  And what were the policy considerations for
18 lowering the dispensing fee at that time?
19    A.  That was primarily determined by the
20 rate-setting area as a reimbursement that would meet the
21 fiscal needs of the state.
22    Q.  What do you mean, meet the fiscal needs of the
23 state?
24    A.  There was a direction to reduce reimbursement,
25 to move toward a more market-based reimbursement that

Page 189

1  was consistent with what was going on in the marketplace
2  supposedly.
3  Q. Why do you say supposedly?
4  A. Well, that is sort of in opposition to the
5  federal directives for the Medicaid program.
6  Q. I'm sorry, what was your answer?
7  A. It doesn't particularly matter to the Medicaid
8  program what Blue Cross or ERS or TRS, how they're
9  reimbursing. There are federal regulations about
10 Medicaid which says pay a reasonable dispensing fee and
11 pay as close as you can to the actual acquisition costs
12 of the pharmacist.
13 Q. And prior to lowering the dispensing fee to
14 $3.00 or $4.00, the dispensing fee was what?
15 A. I believe it was 4.55.
16 Q. And did Texas Medicaid believe that that was a
17 reasonable dispensing fee?
18 A. I believe so, yes.
19 Q. Did it believe that it was over-reimbursing
20 pharmacists for dispensing costs?
21 A. It's never been our intent to over-reimburse
22 pharmacists.
23 Q. But did you -- did Texas Medicaid believe at
24 that time, in 1996 or prior to then, that it was
25 over-reimbursing pharmacists for their dispensing costs?

Page 190

1       MS. JACOBS: Objection, form.
2  A. I don't believe so.
3  Q. (By Mr. Berlin) What's your answer?
4  A. I don't believe so.
5  Q. So if it didn't believe that it was
6  over-reimbursing and it believed that it was paying a
7  reasonable dispensing fee, why did it lower the
8  dispensing fee at that time?
9  A. Because we were directed by our legislature to
10 do so.
11 Q. Were you directed to lower it specifically to
12 that amount?
13 A. I don't believe so.
14 Q. What was the legislative direction?
15 A. Typically there's a number that's removed from
16 our budget, a dollar number.
17 Q. In other words, you had a certain budget which
18 meant you could only pay out so much for Medicaid
19 reimbursement; is that correct?
20 A. We have a budget, absolutely.
21 Q. So was the dispensing fee lowered at this time
22 because of budgetary limitations?
23 A. That was the primary driver and it was the
24 overall dispensing fee. As you see, the dispensing
25 expense, 5.27 was actually an increase from the 4.55.

Page 191

1  Q. But I'm referring back to where it was dropped
2  down to $3.00 and $4.00, and you had testified that --
3  A. I'm sorry, I didn't realize you were talking
4  about that -- that drop.
5  Q. Yeah, the policy considerations were a
6  reasonable dispensing fee, and I was trying to
7  understand, Ms. Dean, the drop in the dispensing fee
8  wasn't because Texas Medicaid thought $3.00 and $4.00
9  would be a more reasonable dispensing fee; it was
10 because there were budgetary limitations, right?
11       MS. JACOBS: Objection, form.
12      MR. ANDERSON: Objection, scope.
13 A. There were budgetary limitations and there was
14 a sense in our legislature and our comptroller's office,
15 a number of places, that Medicaid reimbursement should
16 closer resemble other reimbursements in the marketplace
17 that are not driven by cost, actual costs.
18 Q. (By Mr. Berlin) What are they driven by?
19 A. Whatever they determine they want them to be
20 and whether or not they can contract with pharmacies at
21 that level.
22 Q. And did the folks in the Texas Medicaid agree
23 with that legislative assessment?
24       MR. ANDERSON: Objection, scope.
25 A. I'm not sure. Texas Medicaid is a big agency.

Page 192

1  There's lots of folks in Texas Medicaid. I think that
2  probably within the Vendor Drug Program there was some
3  skepticism and some concerns that it didn't necessarily
4  coincide with the federal requirements or wasn't
5  consistent with the federal requirements for cost-based
6  reimbursement. I don't know what the rate-setting area
7  might have thought.
8  Q. (By Mr. Berlin) Because the folks -- you knew
9  the folks in the Vendor Drug Program were concerned that
10 lowering the dispensing fee like that would result in
11 under-reimbursing pharmacists for their dispensing
12 costs?
13      MS. JACOBS: Objection, form.
14 A. I think there were concerns that that was a
15 significant reduction and that in fact there might be
16 some issues with pharmacies dropping out of the program.
17 Q. (By Mr. Berlin) For determining a fair
18 Medicaid reimbursement, a reasonable -- a reasonable
19 Medicaid dispensing fee, was there a recognition that
20 dispensing Medicaid drugs or dispensing to Medicaid
21 patients could be more expensive than dispensing to the
22 general population?
23      MS. JACOBS: Objection, form.
24 A. That's been an issue, a concern, that's out
25 there. I don't recall, I think Myers and Stauffer

10 (Pages 189 to 192)

bffb319a-6b1f-4888-931b-ab233ed2f1ce

Page 221

1  Q. (By Mr. Berlin) I want to just make sure I
2  have all your reasons. If it's that we've been busy,
3  that's fine. I want to make sure that at this juncture
4  I'm getting your entire explanation.
5       MS. JACOBS: Objection, form.
6       MR. ANDERSON: Objection, scope.
7  A. And I don't think it's a specific reason to do
8  it or to not do it. It just hasn't been done to this
9  time.
10 Q. (By Mr. Berlin) Have there been -- you say
11 there wasn't a specific -- a proposal to move forward
12 with a specific rule change. Have there been
13 considerations of doing that?
14 A. There have been considerations of
15 reimbursement. Again, I can't give you specific dates
16 or meeting times or people in attendance, but -- other
17 than the discussions that went on with the pharmacy
18 association.
19 Q. Back in 2002 and 2003?
20 A. No, those were -- those started probably fall
21 '03 and went through '04.
22 Q. You're referring to the pharmacy work group
23 that was formed at that time?
24 A. Yes.
25 Q. As part of that pharmacy work group, did Texas

Page 222

1  Medicaid bring any specific proposals to the
2  pharmacists?
3       MS. JACOBS: Objection, form.
4       MR. ANDERSON: Objection, scope.
5  A. There were some proposals that Merle did
6  present to his leadership I guess, Tom Suehs. TPA, I
7  guess, saw them. I don't know that we specifically
8  presented them to TPA.
9  Q. (By Mr. Berlin) Who did you say Tom -- excuse
10 me. To whom did you say Merle Moden presented them
11 internally?
12      MS. JACOBS: Objection, form.
13 A. Tom Suehs.
14 Q. (By Mr. Berlin) And what were those proposals
15 that were presented?
16 A. I don't remember all of the -- there were
17 several options. One was -- I know had something to do
18 with different payments based on the percent of a
19 pharmacy's business that was Medicaid, although that's
20 difficult to determine.
21 Q. What other proposals were there in addition to
22 that?
23 A. There were two or three others that I think
24 might have been different. I don't remember the
25 specifics of them. Probably two or three different

Page 223

1  scenarios.
2  Q. But Texas Medicaid never tried to get them
3  implemented?
4  A. No.
5  Q. And then we were discussing the ingredient
6  costs. What different dispensing fee reimbursements
7  were considered between December 2002 and the present?
8  A. Other than the 6.04, I'm not --
9  Q. After the 6.04. The 6.04, that whole
10 reimbursement formula was blocked so it returned to the
11 old dispensing fee, right?
12 A. Yes.
13 Q. So after the -- it returned to the old
14 dispensing fee, did Texas Medicaid consider making any
15 adjustments to the reimbursement for dispensing fee or
16 inventory management factor?
17 A. The 6.04 number was still there and viewed as a
18 reasonable number.
19 Q. Well, after the TRO, did the dispensing fee
20 return to $5.27?
21 A. Yes.
22 Q. And from the TRO until, let's just take 2003,
23 did the dispensing fee change in 2003?
24 A. The dispensing fee was reduced 2-1/2 percent in
25 I believe October -- October or November '03.

Page 224

1  Q. Could you look back at Exhibit 840. That's the
2  time line. And can you look at No. 45 on page 3.
3  A. Yes.
4  Q. It says, "October 5, '03 - Fee $5.14, Inventory
5  Management Factor" -- it does say "$0.9805, Delivery
6  $0.15, WAC plus 12 percent, AWP minus 15 percent." Does
7  that accurately reflect the formula at that time?
8  A. That was the fee after the 2-1/2 percent
9  reduction.
10 Q. And why was there a 2-1/2 percent reduction?
11 A. Because the legislature said reduce it 2-1/2
12 percent during the '03 legislative session.
13 Q. And then the inventory management factor, that
14 was lowered as well?
15 A. It was reduced 2-1/2 percent.
16 Q. Actually this dollar sign 0.9805, is it
17 actually -- I mean, that should be expressed as a
18 percentage?
19      MS. JACOBS: Objection, form.
20 A. That .9805 is what you divide by at the -- the
21 last step in the equation, and that number represents a
22 2-1/2 percent reduction from the .98.
23 Q. (By Mr. Berlin) It's a 2-1/2 percent reduction
24 of 2 percent?
25 A. Yes.

18 (Pages 221 to 224)

ACUSCRIBE COURT REPORTERS
(800) 497-0277