# EXHIBIT 141

Page 329

UNITED STATES DISTRICT COURT

OF THE DISTRICT OF MASSACHUSETTS

------------------------------x

IN RE:  PHARMACEUTICAL           :   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE       :   CIVIL ACTION

PRICE LITIGATION                 :   01-CV-12257-PBS

THIS DOCUMENT RELATES TO         :

U.S. ex rel. Ven-A-Care of       :   Judge Patti B.

The Florida Keys, Inc.,          :      Saris

           Plaintiff,            :

     vs.                         :

ABBOTT LABORATORIES, INC.,       :   Chief Magistrate

No. 06-CV-11337-PBS              :   Judge Marianne B.

           Defendants.           :      Bowler

------------------------------x

VOLUME II

Baltimore, Maryland

Thursday, September 27, 2007

Continued Videotape Deposition of:

LARRY REED,

the witness, was called for examination by counsel

for the Defendants, pursuant to notice, commencing

Page 350

1  BY MR. TORBORG:
2      Q.  Again, Mr. Reed, welcome back.  Before
3  I get started with the questioning, I wanted to
4  do two housecleaning matters with counsel.
5          The first relates to the assertion by
6  the government of a privilege under 6(c) of the
7  grand jury -- of the Federal Rules of Criminal
8  Procedure, and Mr. Reed was instructed not to
9  answer regarding his testimony before a grand
10 jury, and I -- prior to today's deposition, I
11 reviewed with counsel for the United States Rule
12 6(c), which provides that the secrecy of grand
13 jury testimony does not apply to witnesses.
14         In fact, the 1972 comment to that rule
15 specifically says the rule does not impose any
16 obligation of secrecy on witnesses.  The existing
17 practice on this point varies among the
18 districts. The seal of secrecy of witnesses seems
19 an unnecessary hardship and may lead to injustice
20 if a witness is not permitted to make a
21 disclosure to counsel or to associate.
22         So I understand, and I've discussed

Page 351

1  this with counsel, and we're not going to argue
2  about it here today, but I understand they're
3  still going to instruct the witness not to answer
4  any questions about that testimony, and then you
5  will review the issue and then have an answer for
6  us next time we come back.
7          MS. MARTINEZ:  Yes, we're going to
8  assert the investigatory files law enforcement
9  privilege.
10         MR. TORBORG:  Okay.  Thank you.
11         Secondly, the second housekeeping
12 matter I wanted to talk about with counsel was in
13 our meet and confers, we had discussed searching
14 Mr. Reed's e-mails for certain terms, and I had
15 sent you a list of those terms that we had asked
16 for you to review.
17         And I don't know if that's been done,
18 if a search of Mr. Reed's e-mails have been done
19 with those terms or any other terms, so I'd like
20 to get an understanding of if there will be more
21 documents from Mr. Reed being produced and if
22 those searches will be done.

Page 352

1          MS. MARTINEZ:  We're working on that,
2  and we'll be happy to discuss that with you more
3  off the record.
4          MR. TORBORG:  Okay.  So as we sit here
5  today, taking the second day of Mr. Reed's
6  deposition, there are still potential documents
7  out there from his files, correct?
8          MS. MARTINEZ:  Potentially.  I mean,
9  some of these may have already been produced, but
10 we are working on making sure that anything in
11 the electronic documents is produced.
12         MR. TORBORG:  Okay.  Thank you.
13 BY MR. TORBORG:
14     Q.  Mr. Reed, yesterday we talked a bit
15 about the confidentiality provisions of the AMP
16 data contained in the OBRA legislation of 1990.
17         Do you recall that discussion?
18     A.  Yes.
19     Q.  Okay.  And I stated yesterday, I
20 believe you agreed with me, that the legislation
21 itself limited the information -- the disclosure
22 of that information to CMS, the states, and

Page 353

1  certain contractors; is that right?
2      A.  Contractors for the states, that's
3  correct.
4      Q.  Correct.  And after a consultation that
5  CMS had with representatives of the states, some
6  manufacturers and some pharmacy provider advocacy
7  groups, a decision was made that the AMP
8  information would not be shared with the states.
9          Is that a fair summary of your
10 testimony?
11     A.  Yeah, that's correct.
12     Q.  Okay.  And did you have an
13 understanding of why it was that the information
14 was made confidential in the legislation to begin
15 with?
16         You were involved in drafting that
17 legislation, correct?
18     A.  I was involved in providing comments
19 back to managers within CMS on that legislation,
20 correct.
21     Q.  Okay.  Do you have an understanding of
22 why it is that the information was to be kept

Reed, Larry - Vol. II                                     September 27, 2007
Baltimore, MD

Page 570

1   a state -- what a state might do to reflect that.
2       Q.  And what goes into a reasonable
3   dispensing fee?
4       A.  In accordance with what's in the final
5   regulation?
6       Q.  Yes.
7       A.  I don't know.  I don't have that
8   document here.
9       Q.  If we can go to Exhibit Abbott 284
10  again, in particular, Bates page ending 681,
11  there's a section on the far left column titled,
12  "Dispensing Fees, Section F."
13          Do you see that?
14      A.  I do, Section F.
15      Q.  There's a comment that says, "Several
16  commenters suggested that we either delete the
17  requirement in current regulations for state
18  surveys of dispensing fee costs or require state
19  agencies to update their fees in a periodic
20  manner," and HCFA provided a response.
21          The last sentence on that page states,
22  "We expect that most states will continue their

Page 571

1   present activities to establish a reasonable
2   dispensing fee level and will document these and
3   any new activities in their state plan.  Such
4   activities could include, (1), audits and surveys
5   of pharmacy operational costs; (2), compilation
6   of data regarding professional salaries and fees;
7   and (3), analysis of compiled data regarding
8   pharmacy overhead costs, profits, et cetera."
9           Do you recall, Mr. Reed, if it was
10  HCFA's understanding of the regulations that a
11  dispensing fee could include a component for
12  profit for the pharmacy?
13      A.  Are you referring to these 1987
14  regulations --
15      Q.  Yes.
16      A.  -- the part that you just read?
17      Q.  Yes.
18      A.  I -- this was before I was working in
19  this area, so I don't have any information on
20  that.
21      Q.  Okay.  How about in your time from 19,
22  roughly, 90 throughout the 1990s as the branch

Page 572

1   chief in charge of the division that was looking
2   at these Medicaid issues?  What was your
3   understanding about whether or not a state's
4   reasonable dispensing fee could include a profit
5   component?
6       A.  I don't think that we addressed that in
7   any program instructions.  I don't think that we
8   put anything else out on that.
9       Q.  Did you believe that a dispensing fee
10  that did not include a component of profit would
11  be reasonable?
12      A.  A dispensing fee that would cover the
13  cost of dispensing a drug would cover -- again,
14  it would cover the cost of dispensing a drug and,
15  by its nature, would have a profit piece in it.
16      Q.  And what -- I don't think I understand
17  that.
18      A.  That's okay.  I think -- should I go
19  ahead?
20      Q.  Does the -- I'm not sure I understood
21  your comment that a dispensing fee that includes
22  overhead and covers cost would include profit.

Page 573

1           Would you explain that to me a little
2   bit?
3       A.  I -- in the Medicaid program in
4   general, I don't know that we have separate line
5   items that would say profit and then have a
6   number that would be put in by the state, and I
7   don't think we had that here.
8       Q.  But you recall discussing with states
9   in approving state plans or disapproving state
10  plans the issue of whether or not a profit could
11  be included in the dispensing fee, right?
12      A.  The issue would be whether or not the
13  dispensing fee would be reasonable.  I don't
14  recall if we discussed if that reasonable -- if
15  we discussed profit within that term
16  "reasonable."
17      Q.  You would agree with me that a pharmacy
18  needs to make a return on its investment when
19  serving Medicaid beneficiaries, would you not?
20          MR. HERNANDEZ:  Objection, form.
21          MS. MARTINEZ:  Objection, form.
22          THE WITNESS:  And, again, I would say

62 (Pages 570 to 573)

Henderson Legal Services
202-220-4158

79c10215-cdc8-4745-9a2e-f995562fa54f

Page 574

1  that under Medicaid federal regulations that the
2  state must determine a reasonable dispensing fee.
3  BY MR. TORBORG:
4      Q.  Did HCFA have a position on whether or
5  not a dispensing fee that did not include a
6  profit component was a reasonable dispensing fee?
7          MS. MARTINEZ:  Objection, form.
8          THE WITNESS:  Is your question did we
9  put out a policy on whether or not a reasonable
10 dispensing fee needed to include profit?
11 BY MR. TORBORG:
12     Q.  I think my question was a little
13 broader than that, and that was whether or not
14 HCFA had a view on the matter.
15         MS. MARTINEZ:  Objection, form.
16         THE WITNESS:  I don't know that I can
17 speak for all of HCFA here.
18 BY MR. TORBORG:
19     Q.  Can you speak for your office?
20         MS. MARTINEZ:  Objection, form.
21         THE WITNESS:  I don't recall a view on
22 whether or not profit was viewed as part of -- if

Page 575

1  we put any -- if we discussed profit as part of a
2  reasonable dispensing fee.
3  BY MR. TORBORG:
4      Q.  Mr. Reed, did you believe that a
5  dispensing fee that did not include a component
6  of profit would be a reasonable dispensing fee?
7          MS. MARTINEZ:  Objection, form.
8          THE WITNESS:  A dispensing fee, again,
9  that would cover the cost to the pharmacy, all
10 the costs of dispensing the drug, the overhead
11 costs, the costs of the pharmacist, could by
12 itself be a reasonable dispensing fee.
13 BY MR. TORBORG:
14     Q.  Do you understand my question?
15     A.  I understand your question.  I just
16 can't answer it better than that.
17     Q.  You can't answer it yes or no?
18         MR. HERNANDEZ:  Objection, form.
19 BY MR. TORBORG:
20     Q.  Is that right?
21     A.  Give me your question again.
22     Q.  Did you have a view about whether or

Page 576

1  not a reason -- whether or not a dispensing fee
2  that did not include some level of profit would
3  be reasonable?
4          MR. HERNANDEZ:  Objection, form.
5          THE WITNESS:  And, again, a dispensing
6  fee that covered the cost of dispensing that
7  drug, including the overhead, including some of
8  the things that you mentioned here, would be one
9  that would be reasonable, what -- would be one
10 that would keep the pharmacy in business so that
11 it could keep dispensing drugs.
12 BY MR. TORBORG:
13     Q.  If we could go back to --
14         Actually, I think I need to take a
15 break for a tape change.
16         THE VIDEOGRAPHER:  This marks the end
17 of Tape 4 of Volume II of the deposition of Larry
18 Reed.
19         Going off the record.  The time is
20 15:51:26.
21         (A break was taken.)
22         THE VIDEOGRAPHER:  This marks the

Page 577

1  beginning of Tape 5 of Volume II of the
2  deposition of Larry Reed.
3          Going back on the record.  The time is
4  16:05:29.
5  BY MR. TORBORG:
6      Q.  Welcome back, Mr. Reed.
7      A.  Thank you.
8      Q.  We were talking about dispensing fees
9  and state Medicaid programs when we broke, and we
10 were talking specifically about the issue of
11 profit.
12         If a profit component was, in fact,
13 necessary to keep pharmacies in a particular
14 state Medicaid program, then profits would be
15 required in a reasonable dispensing fee, correct?
16         MS. MARTINEZ:  Objection to form.
17         MR. HERNANDEZ:  Objection to form.
18         THE WITNESS:  The profit would have
19 been built into the other costs that went into --
20 or could have been built into the other costs
21 that went into the components of the dispensing
22 fee, and if that -- if those profits then were

63 (Pages 574 to 577)

Page 578

1   what kept that pharmacy in business, if that
2   profit -- if those profits within those
3   components were what the state used to determine
4   a reasonable dispensing fee, I think that -- I
5   think that probably would have been acceptable.
6   BY MR. TORBORG:
7       Q.  You're familiar with the regulation
8   from Medicaid that requires states to develop
9   reimbursement formulas that ensure equal access
10  to care for Medicaid beneficiaries, correct?
11          MS. MARTINEZ:  Objection, form.
12          THE WITNESS:  I would have to say that
13  I'm not very familiar with them.  I have some
14  general understanding, but not a lot.
15  BY MR. TORBORG:
16      Q.  And do you recall there being times
17  when that regulation sort of bumped up against
18  other regulations, such as the need to reimburse
19  ingredient cost in accordance with estimated
20  acquisition cost?
21          MS. MARTINEZ:  Objection, form.
22          THE WITNESS:  And unfortunately, I

Page 579

1   would need to know what that regulation said.  My
2   knowledge is limited, so I don't even know what
3   that says.
4   BY MR. TORBORG:
5       Q.  Okay.  We can revisit that next time.
6           And we talked earlier about the
7   approval of state plans during your time at HCFA,
8   now CMS, and you knew from OIG's work that the
9   AWP -- the difference between AWP and acquisition
10  costs for generic drugs could be significant,
11  right?
12          MS. MARTINEZ:  Objection, form.
13          THE WITNESS:  Can you further clarify
14  your question?  By "significant," what do you
15  mean by "significant"?
16  BY MR. TORBORG:
17      Q.  Well, in the OIG's 1996 work, they
18  determined on a national level that the
19  difference was about 42.5 percent; is that right?
20      A.  I do know that they did report the
21  numbers we talked about previously, 42 point
22  whatever percent that was, correct.

Page 580

1       Q.  And do you recall that that difference
2   -- well, let me back up, lay a foundation.
3           You recall that OIG repeated this
4   project with different states about 5 years
5   later, correct?
6       A.  After 1996?
7       Q.  Yes.
8       A.  I don't recall that, no.
9       Q.  All right.  Let me then show you a
10  document, see if it refreshes your recollection
11  on that.
12          Mark this as our next exhibit, please.
13          (Deposition Exhibit Abbott 329 was
14  marked for identification.)
15          MR. TORBORG:  For the record, what I've
16  marked as Exhibit Abbott 329 bears the Bates
17  numbers HHD014-0764 through 82, appears to be a
18  cover letter from Janet Rehnquist, Inspector
19  General, to Thomas Scully, with the subject
20  "Medicaid Pharmacy - Actual Acquisition Cost of
21  Generic Prescription Drug Products."
22          If you would take a look at that, Mr.

Page 581

1   Reed, that and the study.
2           THE WITNESS:  Okay.
3   BY MR. TORBORG:
4       Q.  Okay.  After having a chance to review
5   that, Mr. Reed, do you recall the work that OIG
6   did in the 2000-2001 time frame that was sort of
7   a repeat of the work they had done in 1995-1996
8   to compare AWP and actual acquisition cost for a
9   number of state Medicaid programs?
10      A.  I do recall the report that reflects
11  that work, this report.
12      Q.  Okay.  And the bottom of the first page
13  of the report, the OIG -- well, let me -- strike
14  that.
15          Is it your understanding that this
16  particular document that I've shown you
17  summarizes the results of the 8-state survey?
18      A.  Reading from the bottom paragraph, I do
19  understand that they looked at pharmacies in 8
20  states that they identify in that paragraph.
21      Q.  And at the end of the paragraph, OIG
22  wrote, "We estimated that, nationally, actual

79c10215-cdc8-4745-9a2e-f995562fa54f