# EXHIBIT 150

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X

```
IN RE: PHARMACEUTICAL INDUSTRY   ) MDL No. 1456
AVERAGE WHOLESALE PRICE          ) Civil Action No.
LITIGATION                       ) 01-12257-PBS
---------------------------------X
THIS DOCUMENT RELATES TO:        ) Hon. Patti B.
United States of America ex rel. ) Saris
Ven-A-Care of the Florida Keys,  )
Inc. v. Abbott Laboratories, Inc.)
Civil Action No. 06-11337-PBS;   ) TRANSCRIPT OF
United States of America ex rel. ) PROCEEDINGS
Ven-A-Care of the Florida Keys,  )
Inc. v. Dey, Inc., et al., Civil ) DEPOSITION OF
Action No. 05-11084-PBS; and     ) THE SOUTH DAKOTA
United States of America ex rel. ) DEPARTMENT OF
Ven-A-Care of the Florida Keys,  ) SOCIAL SERVICES
Inc. v. Boehringer Ingelheim     ) by LARRY IVERSEN
Corp., et al., Civil Action No.  )
07-10248-PBS                     ) DECEMBER 15, 2008
---------------------------------X
```

354e3b13-d775-406f-912c-c8856c7f542c

VIDEOTAPE DEPOSITION OF THE SOUTH DAKOTA DEPARTMENT OF SOCIAL SERVICES by LARRY IVERSEN

BEFORE: Carla A. Bachand, RMR, CRR
Court Reporter and Notary Public
Pierre, South Dakota

DATE: December 15, 2008, at 8:15 a.m.

PLACE: Kings Inn Convention Center
110 East Sioux Avenue
Pierre, South Dakota

A P P E A R A N C E S

Appearing on behalf of Dey:
LISA KHANDHAR, ESQ.
KELLEY DRYE & WARREN
101 Park Avenue
New York, New York 10178-0002

Appearing on behalf of Abbott:
HILARY A. RAMSEY, ESQ.
JONES DAY
51 Louisiana Ave. NW
Washington, D.C. 20001-2113,

Appearing on behalf of the United States:
JUNE C. ACTON, ESQ.
UNITED STATES ATTORNEY'S OFFICE
Assistant United States Attorney
99 NE Fourth Street, 3rd Floor
Miami, Florida 33132

(CONTINUED)

A P P E A R A N C E S (CONTINUED)

Appearing as Local Counsel for Ms. Khandhar and Ms. Ramsey:
MICHAEL J. SCHAFFER, ESQ.
SCHAFFER LAW OFFICE
412 West 9th St., #1
Sioux Falls, SD 57104

Appearing on behalf of the Department:
DANIEL J. TODD, ESQ.
SOUTH DAKOTA DEPARTMENT OF SOCIAL SERVICES
Legal Counsel, 700 Governor's Drive
Pierre, South Dakota 57501

Also Present: Videographer Torre Kavanaugh

I N D E X

WITNESS: LARRY IVERSEN PAGE
Examination by Ms. Khandhar.......... 011, 169
Examination by Ms. Ramsey............ 120, 170
Examination by Ms. Acton................. 148

D E Y E X H I B I T S

NUMBER DESCRIPTION PAGE
Exhibit Dey 904 - Notice of Deposition......... 016
Exhibit Dey 905 - South Dakota Medical Assistance Program Pharmacy Manual...................... 045
Exhibit Dey 906 - Form........................ 049
Exhibit Dey 907 - Affadavit and Certificate.... 064
Exhibit Dey 908 - HHC014-1560 - 1563........... 072
Exhibit Dey 909 - HHC014-1518 - 1526........... 076
Exhibit Dey 910 - HHD127-0418 - 0424........... 082
Exhibit Dey 911 - South Dakota Department of Social Services Consultant Contract.................... 085

Page 6

DEY EXHIBITS (CONTINUED)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit Dey 912 - AWP-IL-0010038 - 0042 | | 102 |

ABBOTT EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit Abbott-SD 001 - Cross-notice | | 129 |
| Exhibit Abbott-SD 002 - HHD006-0335 - 0340 | | 143 |

GOVERNMENT EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit Government 001 - Federal Register, Vol. 52, No. 147 | | 161 |
| Exhibit Government 002 - HHD038-0253 | | 153 |
| Exhibit Government 003 - HHD038-0422 | | 154 |
| Exhibit Government 004 - HHC014-1523 | | 155 |
| Exhibit Government 005 - HHC014-1555 | | 155 |

Page 7

MONDAY, DECEMBER 15, 2008

VIDEOGRAPHER: Today is the 15th of December 2008. The time is approximately 8:15 a.m. The location is the Kings Inn Hotel and Conference Center, 110 East Sioux Avenue, Pierre, South Dakota 57501. My name is Torre Kavanaugh, certified court video specialist, representing Henderson Legal Services. This is case number AWP-MDO entitled Ven-A-Care of the Florida Keys, Incorporated, et al., versus Dey, Incorporated, et al., and the deponent is Larry Iversen. Counsel and all present will please identify themselves for the record.

MS. KHANDHAR: This is Lisa Khandhar from Kelley, Drye and Warren and I'm representing the Dey defendants.

MS. ACTON: This is June Acton and I'm representing the United States.

MR. TODD: I'm Dan Todd, I am representing the State of South Dakota Department of Social Services.

Page 8

MS. KHANDHAR: Just for the record, before we begin, I'd like to --

MS. RAMSEY: Lisa, we need to get our appearance on the record, please. This is Hilary Ramsey from Jones Day, I represent Abbott Labs.

MR. SCHAFFER: This is Mike Schaffer from the Schaffer Law Office in Sioux Falls, South Dakota, and I'm appearing as local counsel for Ms. Ramsey and Ms. Khandhar in this case.

MS. KHANDHAR: Sorry about that. Just for the record, before we begin, this deposition was scheduled to begin on Friday, December 12th, 2008, and everyone here, except for Mike Schaffer, local counsel, who is appearing by phone today, was present and ready for the deposition to begin at 3:30 in the afternoon on Friday. And at that time Assistant Attorney General Dan Todd objected to the deposition proceeding and stated that according to his understanding of the South Dakota local rules, the deposition would not be able to go forward without one of the examining attorneys being

Page 9

admitted in the state of South Dakota or with local counsel being present.

For the record, Dey believes that the Assistant Attorney General's position is meritless and I am just going to hand back to him the local rules that he had given me on Friday stating his position. Also, after closer examination, these local rules are for the state of South Carolina, but even if these rules had been the parallel rules for South Dakota, this would have been a meritless position. And the fact that this deposition should have been started on Friday and is now going forward on Monday is costing our clients unnecessary expenses, including local counsel's charges for the day and my travel costs.

According to Rule 45 of the Federal Rules of Civil Procedure, it stands for the proposition that local counsel is not required as long as an examining attorney is admitted where the case is pending. This case is pending in the District of Massachusetts, where I am admitted

Q. What's your understanding of what "actual cost" means here?
A. I would assume that is the actual cost to the pharmacy.
Q. Can you please turn to page three. And if you could look at the paragraph under the heading "frequency of MAC updates," in the middle of the paragraph it states, "SXC completes a review of the acquisition cost and the MAC price for every product on the MAC list," correct?
A. Yes.
Q. Do you know if South Dakota Medicaid has access to this review of actual acquisition cost?
A. No, we do not have access to that.
Q. Would South Dakota Medicaid be able to have access to this list if it requested access?
A. I don't know that.
Q. If you turn to page two, if you turn back one page to the section with the heading "methodology," are you familiar at all with the methodology used by SXC to determine MAC pricing?

A. No.
Q. If you look at the first bullet point, it states, "First, the final selection of drug products is made. Acquisition prices are obtained from wholesalers, retailers, and the Medispan drug file." Do you know if these acquisition prices are prices that South Dakota Medicaid also has access to?
A. I would believe that we do not have access to those prices.
Q. And why do you believe that?
A. Because I'm not aware of any file or any sort of list that we have that includes acquisition prices.
Q. If you look at the second bullet point at the third sentence, it states, "The MAC price is then applied across all package sizes available, but is structured to insure that the profit to the pharmacist to dispense the generic product is higher than that associated with dispensing the brand product. This strategy provides pharmacists with an incentive to

dispense generic products as well as to make recommendations to prescribers that they substitute brand products with generic therapy alternatives." As we established earlier, providing the provider with a profit was an important concern to South Dakota Medicaid, correct?
A. Yes.
Q. And in fact this concern directly informed the reimbursement level on MAC prices, according to this sentence that I just read out loud, correct?
A. Yes.
Q. Would you agree that SXC has a lot of leeway here in determining what the MAC prices are?
A. I don't -- I guess that would be an opinion that I haven't necessarily thought about, no.
Q. What would be your opinion, thinking about it now?
A. You know, I don't know enough about

their pricing methodology, other than what's described here, to really formulate an opinion.
Q. And do providers still receive a dispensing fee if reimbursement is made based on MACs in South Dakota?
A. Yes.
Q. If we look again at the last sentence I read, it states, "This strategy provides pharmacists with an incentive to dispense generic products as well as to make recommendations to prescribers that they substitute brand products with generic therapy alternatives," and as you testified earlier, it was important to South Dakota Medicaid to incentivize providers to use generic drugs, correct?
A. It's important for providers to dispense generic drugs.
Q. And this was because it would result in greater savings for South Dakota Medicaid, correct?
A. Correct.
Q. In your -- strike that. Would you

Page 122

Q. Can you describe for me the documents that she did show you?
A. Boy, I just don't recall exactly what they were. There may have been some state plan documents.
Q. What else?
A. That's all I recall.
Q. Did she show you any legal documents such as deposition transcripts?
A. No.
Q. Did she show you any other type of legal documents?
A. No.
Q. Did the United States Attorney provide an overview on the legal theories of the case?
A. No.
Q. Did the United States Attorney provide any indication of the United States's claims in this action?
A. No.
Q. Besides this meeting that you referred to last Thursday, have you had any other

Page 123

discussions with attorneys from the United States Department of Justice or CMS regarding drug pricing litigation?
A. No.
Q. Is there anything else which you recall the United States Attorney telling you that I have not asked about?
A. No.
Q. Approximately how long did you meet?
A. Oh, somewhere between an hour and hour and a half.
Q. Have you ever reviewed any complaints related to the matter for which we are here today?
A. No.
Q. Do you have an understanding about the nature of the lawsuit?
A. A very basic understanding.
Q. And how did you come to that understanding?
A. Simply by reading the subpoena that we had received.

Page 124

Q. Any other way?
A. No.
Q. When did you first become aware of the United States lawsuit against Abbott, Dey, and Roxane?
A. When we received the subpoena.
Q. Did South Dakota ever receive notification from CMS or the Department of Justice indicating that it should retain documents relating to AWP or drug pricing?
A. To the best of my knowledge, no.
Q. Have you ever personally been advised to retain documents relating to South Dakota's Medicaid reimbursement system or its knowledge about published AWPs?
A. No.
Q. When South Dakota established its definition of estimated acquisition cost as AWP minus 10.5 percent, how was the figure of 10.5 percent determined?
A. I don't know that, that was before my time with the department.

Page 125

Q. In preparation for your deposition today, were you educated as to how this figure was set?
A. No.
Q. Do you have any insight as to how that figure was determined?
A. I don't.
Q. Do you know when the 10.5 percent discount was first applied in the South Dakota Medicaid reimbursement formula?
A. I don't know specifically, but it's been 10 and a half percent for as long as I can recall.
Q. And you began work with the department around 1995; is that correct?
A. Approximately 13 years.
Q. I'm sorry, I didn't hear your answer, sir.
A. Yes, approximately 13 years.
Q. And similarly, I believe you previously testified that the dispensing fee has remained at the $4.25 level since you began with the

Page 126

department around 1995.

A. I think it's 4.75.

Q. I'm sorry, I misspoke. 4.75 --

A. Yes.

Q. -- has remained the dispensing fee level since at least as early as 1995; is that correct?

A. There may have been a change in there at some point, I don't recall. I can recall it's been 4.75 for a number of years.

Q. How was the $4.75 level selected for the South Dakota dispensing fee?

A. I don't know that.

Q. As part of your preparation for today's deposition, were you educated at all regarding South Dakota's knowledge about the adequacy or inadequacy of its dispensing fee rate?

A. No.

Q. Are you familiar with the term nontraditional pharmacies?

A. No.

Q. Have you ever heard of home IV

Page 127

pharmacies?

A. Could you repeat that?

Q. Yes. Have you ever heard of home IV pharmacies?

A. No.

Q. We discussed earlier some references to closed pharmacies; do you recall that?

A. Yes.

Q. What is your understanding of a closed pharmacy?

A. My understanding of a closed pharmacy is it's a pharmacy that provides prescription drugs to individuals in nursing facilities. They don't necessarily have a store front where they dispense drugs to someone walking in through the door.

Q. Are you aware of any other types of examples besides nursing home pharmacies for closed pharmacies?

A. No.

Q. Is it fair to say that you have no reason to disbelieve that these exist, you just

Page 128

may not be aware of them?

A. Other examples other than nursing facilities?

Q. Yes.

A. That's the limit of my experience and knowledge with them.

Q. If South Dakota -- if South Dakota's Medicaid office was going to make a change to its reimbursement methodology, does the agency have authority to do so or must any change to the reimbursement formula go through the legislature?

A. Changes in administrative rule are required to go through an interim rules committee that is made up of legislative members.

Q. I'll give an example and maybe you can walk me through this. If South Dakota wanted to increase its dispensing fee, how would it go about doing so?

A. If we wanted to increase our dispensing fee, first we would look to see if a state plan amendment needed to be made and then we would go through the process that I previously described.

Page 129

If a rules change were to be required, then I would also then say we would have to go through the process that I previously described, that includes meeting in front of the legislative interim rules committee.

Q. From 1991 through 2003, did South Dakota take any efforts to increase its dispensing fee?

A. I don't immediately recall any actions to change the dispensing fee.

MS. RAMSEY: Lisa, if I could please ask you to hand the court reporter the cross-notice.

MS. KHANDHAR: Sure.

MS. RAMSEY: I ask this please be marked as Abbott South Dakota 1.

(Deposition Exhibit Abbott-SD 001 marked for identification.)

Q. (BY MS. RAMSEY) Mr. Iversen, do you have that document in front of you?

A. Yes, I do.

Q. If you could please turn to Schedule A,