# TAB 337

1

```
              IN THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS


    In re: PHARMACEUTICAL INDUSTRY      )

    AVERAGE WHOLESALE PRICE LITIGATION )

                                        )

    _____)

                                        )MASTER CASE NO

                                        )01-12257-PBS

    THIS DOCUMENT RELATES TO:           )

    United States of America ex rel.    )SUBCATEGORY NO

    Ven-A-Care of the Florida           )06-11337-PBS

    Keys, Inc., et al. v. Boehringer    )

    Ingelheim Corporation, et al.,      )

    Civil Action No. 07-10248-PBS.      )

    _____)



        30(b)(1) and 30(b)(6)

        VIDEOTAPED DEPOSITION OF:

        CAROLYN HELTON

        Taken on Behalf of Roxane Laboratories

        October 16, 2009
```

**Page 2**

```
 1   APPEARANCES:
 2
 3   For the U.S. Department of Justice:
 4       JAMES J. FAUCI, ESQ.
 5       Assistant United States Attorney
 6       John Joseph Moakley Federal Courthouse
 7       1 Courthouse Way, Suite 9200
 8       Boston, Massachusetts 02210
 9       617.748.3298
10       jeff.fauci@usdoj.gov
11
12   For Roxane Laboratories, Boehringer Ingelheim, and
13   Related Companies:
14       ERIC GORTNER, ESQ.
15       Kirkland & Ellis
16       300 North LaSalle Street
17       Chicago, Illinois 60654
18       312.862.2285
19       ERIC.GORTNER@KIRKLAND.COM
20
21
22
```

**Page 3**

```
 1   APPEARANCES (Continued):
 2
 3   For the Dey Defendants:
 4       MARISA A. LORENZO, ESQ.
 5       Kelley Drye & Warren
 6       101 Park Avenue
 7       New York, New York 10178
 8       212.808.7697
 9       mlorenzo@kelleydrye.com
10
11   Also Present:  Rudy Smith, Videographer
12
13
14
15
16
17
18
19
20
21
22
```

**Page 4**

```
 1                  I N D E X
 2   WITNESS: CAROLYN HELTON
 3            INDEX OF EXAMINATIONS
 4                     Page
 5   By Mr. Gortner                 7
 6   By Mr. Fauci                127
 7   By Mr. Gortner              134
 8            INDEX OF EXHIBITS
 9                     Page
10   Exhibit Roxane 260 Declaration          9
11   Exhibit Roxane 261 Red Book Excerpt        46
12   Exhibit Roxane 262 Documents - Drug Pricing Boxes 70
13   Exhibit Roxane 263 HCFA Transmittal     108
14   Exhibit Roxane 264 Doxorubicin Hydro. Array    110
15   Exhibit US 265     Search Database      130
16   Exhibit US 266     Ipratropium Array        131
17
18
19
20
21
22
```

**Page 5**

```
 1        The videotaped deposition of
 2   CAROLYN HELTON, taken on behalf of the Roxane
 3   Laboratories, on the 16th day of October, 2009, at
 4   9:02 a.m. in the offices of Walker, Tipps &
 5   Malone, 2300 One Nashville Place, 150 Fourth
 6   Avenue North, Nashville, Tennessee, for all
 7   purposes under the Federal Rules of Civil
 8   Procedure.
 9        The formalities as to notice,
10   caption, certificate, et cetera, are waived.  All
11   objections, except as to the form of the
12   questions, are reserved to the hearing.
13        It is agreed that Elisabeth A.
14   Miller, being a Notary Public and Court Reporter
15   for the State of Tennessee, may swear the witness,
16   and that the reading and signing of the completed
17   deposition by the witness are reserved.
18
19
20
21              * * *
22
```

Nashville, TN

6

1          P R O C E E D I N G S
2          THE VIDEOGRAPHER:  Here begins Volume
3   1, Videotape No. 1 in the deposition of Carolyn
4   Helton; In re: Pharmaceutical Industry Average
5   Wholesale Price Litigation; in the United States
6   District Court, District of Massachusetts.  Case
7   number is MDL1456.  Today's date is October the
8   15th [sic], 2009.  Time on the video monitor is
9   9:02 a.m.
10          The video operator today is Rudy Smith.
11   The video deposition is taking place at Walker,
12   Tipps & Malone, Nashville, Tennessee.
13          Counsel, please identify yourselves and
14   state whom you represent.
15          MR. GORTNER:  Eric Gortner from
16   Kirkland & Ellis representing Roxane Laboratories
17   and Boehringer Ingelheim and related companies.
18          MR. FAUCI:  This is Jeff Fauci from the
19   United States Attorney's Office, District of
20   Massachusetts, representing the United States.
21          THE VIDEOGRAPHER:  Court reporter,
22   would you please swear in the witness.

7

1          MR. FAUCI:  Marisa.
2          MS. LORENZO:  And Marisa Lorenzo from
3   Kelley, Drye & Warren representing the Dey
4   defendants.
5          THE VIDEOGRAPHER:  Reporter, would use
6   please swear in the witness.
7          CAROLYN HELTON, was called as a
8   witness, and after having been first duly sworn,
9   testified as follows:
10          MR. GORTNER:  Just for the record,
11   although this deposition was noticed as a
12   30(b)(1) deposition, counsel have agreed that the
13   testimony will also serve as 30(b)(6) deposition
14   testimony for the Cigna DMERC.
15          E X A M I N A T I O N
16   BY MR. GORTNER:
17     Q.  Good morning, Ms. Helton.
18     A.  Good morning.
19     Q.  As you know, my name is Eric Gortner,
20   and I represent Roxane Laboratories and certain
21   other defendants in this case which involves,
22   among other issues, claims related to Medicare,

8

1   some which may have been processed by the Cigna
2   DMERC that I know you have worked for.
3          I wanted to go over just a couple
4   rules, which I know will be familiar to you from
5   your prior deposition.
6          The first is to make sure that you give
7   verbal answers of either yes or no rather than
8   nodding your head so that the court reporter can
9   get a clear answer for you.  Is that okay?
10     A.  That is okay.
11     Q.  And I'll try to remind you. Sometimes
12   we all lapse into saying uh-huh or nodding our
13   head, so I'll try to remind you of that as best I
14   can.
15          The other rule is to make sure that we
16   try not to speak over each other.  Sometimes you
17   may think you know where my question is going or
18   how it will end.  But if possible, please wait
19   for the question to end so that we can have a
20   clear question and answer and not be talking over
21   each other.  Okay?
22     A.  Okay.

9

1     Q.  If you need a break at any time,
2   please let me know.  We're happy to take a break.
3     A.  Okay.
4     Q.  And if you don't understand a question
5   that I'm asking, feel free to ask me to clarify
6   it or repeat the question.  I'm happy to do so.
7     A.  Okay.
8          (Marked Exhibit Roxane 260.)
9   BY MR. GORTNER:
10     Q.  I'm going to hand you what we have
11   marked as Roxane Exhibit 260.  And this is the
12   declaration that you submitted in this case.  And
13   you recognize this document, don't you?
14     A.  Yes.
15     Q.  Could you explain generally how you
16   came to sign that document and how you were
17   approached about preparing such a document?
18     A.  The declaration, I was approached by
19   the U.S. Attorney's Office that additional
20   information was needed concerning certain
21   aspects, so I was asked to review certain data
22   and then try to put together my best recollection

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                                    October 16, 2009
Nashville, TN

4  (Pages 10 to 13)

10

1    and -- of what the events were.
2        Q.  Do you recall what aspects you were
3    asked to look into?
4        A.  The aspects for the declaration was
5    looking at how the prices change if you change
6    the average wholesale pricing within your arrays.
7        Q.  Were you asked to look into the issue
8    of how Cigna classified generic drugs versus
9    brand drugs?
10       A.  On this particular declaration, I do
11   not believe so.  Let me --
12       Q.  Let me try --
13       A.  Yes.
14       Q.  Excuse me?
15       A.  I'm sorry.
16       Q.  That's okay.
17       A.  Actually, yes.  There was a question
18   that came up as to how we did look at brand
19   names, so, yes, I did respond on that.
20       Q.  Okay.  And are you looking at Page 13
21   and 14 of your declaration?  Is that the section?
22       A.  Yes.

11

1        Q.  What documents -- well, let me take a
2    step back.  Were you provided any documents from
3    counsel to review?
4        A.  I was provided documents, one from the
5    CMS, which we had already provided based on --
6    from -- from CMS's instructions, so that's what
7    we went back and looked at just to make sure that
8    that was how we were basing it, which is what we
9    were.
10           We had already given that information
11   in the -- when we provided the details.
12       Q.  What documents are you referring to?
13       A.  CMS gives instructions to the carriers
14   on how to handle the drug pricing in determining
15   the average wholesale pricing, so there was
16   instructions there on how to make a determination
17   between a brand name and a generic name.
18       Q.  Okay.  Are you referring to -- to
19   what's sometimes called a CMS or HCFA program
20   memoranda?  Is that the type of document that
21   you're referring to?
22       A.  Yes.

12

1        Q.  And my question is, were you provided
2    a particular program memoranda or a citation to
3    that by counsel, or did you go back and find
4    program memoranda on your own?
5            MR. FAUCI:  Object to the form.
6    BY MR. GORTNER:
7        Q.  You can -- I'm sorry.  Let me clarify
8    one -- one issue that might come up in a
9    deposition is there will be times I will ask
10   questions that counsel for the Department of
11   Justice may object and will object to the form of
12   the question.  But unless counsel instructs you
13   not to answer the question, you'll still go ahead
14   and answer the question anyway.
15           This is one of those instances.
16       A.  Originally we were asked to explain
17   how we did the pricing and then if we had a basis
18   for it.  We -- I believe that I sent -- or Barbara
19   Douglas had provided that CMS transmittal in the
20   first information.  So then it was sent back to
21   me, Is this the one you're referring to.
22       Q.  Okay.  And when you say the first

13

1    information, just so we're on the same page, are
2    you referring to the -- the documents that Cigna
3    had produced at earlier time points in the
4    process of this litigation?
5        A.  Yes.
6        Q.  Okay.  So there was a program
7    memoranda in -- in that initial production that
8    you made reference to and then counsel asked you
9    whether that was, in fact, the particular one
10   that you were referring to; is that right?
11       A.  I believe that is the case.
12       Q.  And were there any other documents
13   that were provided to you in the course of
14   preparing your declaration with respect to this
15   issue of generic versus brand classification?
16       A.  I was asked to take a look at some
17   other spreadsheets that -- that were sent to me
18   to confirm if I could tell from that spreadsheet
19   how it was handled whether it was handled as a
20   brand or a generic.
21       Q.  When you say a spreadsheet, are you
22   referring to a spreadsheet with respect to how

14

1  Cigna classified drugs?  Sometimes we call them
2  arrays in this litigation.
3      **A.  It may have been Cigna but not Cigna**
4  **DMERC, so --**
5      Q.  Okay.  Maybe it was the Part B of
6  Cigna?
7      **A.  Yes.**
8      Q.  I see.  Okay.  And I think -- we'll
9  get to those -- I think we'll get to those
10  documents a little bit later on today.  And if we
11  do, let's make sure we're talking about the same
12  -- the same document.  Okay?
13      **A.  (Witness nodded head.)**
14      Q.  Now, in the course of preparing your
15  declaration with respect to the issue of
16  classifying generics versus brands, did you
17  review any other documents aside from these
18  arrays we're talking about and the program
19  memoranda that you referred to?
20      **A.  I don't quite understand that.**
21      Q.  My question is, are there any other
22  documents that you reviewed to refresh your

15

1  recollection or understand how it was that Cigna
2  classified brands versus generics, other than the
3  documents we've just talked about?
4      **A.  We looked at some of the Red Book.**
5      Q.  And when you mean Red Book, are you
6  referring to the Red Book CD-ROMs or the -- the
7  hard copy printed versions?
8      **A.  Both.**
9      Q.  Both?  Okay.
10      So tell -- just explain to me in more
11  detail what Red Books you looked at, which
12  versions and if you can recall the years as well.
13      MR. FAUCI:  I would just counsel the
14  witness not to reveal any communications that she
15  had with any DOJ attorneys or her own attorneys
16  at Cigna regarding the transmittal of any legal
17  advice.  It's fine to answer the question with
18  that in mind.
19      THE WITNESS:  I looked at the hard copy
20  old monthly Red Books and how they were
21  formatted, and then I looked at current version
22  Red Book CD.

16

1  BY MR. GORTNER:
2      Q.  By current version you mean this 2009?
3      **A.  I do.**
4      Q.  Okay.  Is Cigna currently using the --
5  the CD-ROM version of the Red Book, or is it
6  using an Internet based version of the Red Book?
7      **A.  We are using the CD.**
8      Q.  Okay.  Did you look at any annual Red
9  Books printed -- the printed annual Red Book?
10      **A.  I did not have the copy of the annual**
11  **specifically that -- when the conversation was**
12  **going on for that year, so I may have looked at**
13  **pages that were -- but I don't -- I didn't have**
14  **the actual physical annual when the conversation**
15  **-- for the year that we were discussing.**
16      Q.  Now, in terms of the monthly Red
17  Books, what time frame did you look at?  In other
18  words, what -- what years were these Red Books
19  from?
20      **A.  For this one, I just looked at a**
21  **couple of ones.  I went back to 1993 and '4 --**
22  **I'm sorry, I didn't have '3.  I went to '94,**

17

1  **which was the oldest one I had.**
2      Q.  In preparing your declaration, did you
3  have any conversations or any correspondence with
4  any other DMERC representatives?
5      **A.  No.**
6      Q.  Did you have any conversations or
7  correspondence with any individuals that worked
8  at Cigna relating to the classification of
9  generics versus brands?
10      **A.  I did, but not from a standpoint of**
11  **asking that person but more of a standpoint of**
12  **that person is my backup, and we have to train on**
13  **it just in the event that I couldn't come, if**
14  **something happened to me.**
15      Q.  I'm not sure I understand that answer.
16  Can you explain that a little bit more --
17      **A.  Okay.**
18      Q.  -- in terms of -- maybe it would be
19  helpful to know the nature of the conversation
20  that you had with this individual.
21      **A.  For Cigna, we try to make it where we**
22  **have dual backups so that some person can always**

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                    October 16, 2009

Nashville, TN

6  (Pages 18 to 21)

---

18

1   fill in for you in the event -- I'm sorry, if
2   something happens to you, you're deceased or
3   whatever.  So the information is -- this person
4   is being trained as my backup, so we discuss how
5   drugs were previously priced, how drugs are
6   currently priced. So it's in the context of the
7   old pricing versus the new pricing and training
8   her as a backup.
9       Q.  What is this person's name?
10      A.  Amber.
11      Q.  And how long has Amber been your
12  backup?
13      A.  She's been training as my backup for
14  about six months.  I think it's about six months.
15      Q.  Okay.  So Amber wasn't involved in the
16  actual classification of the drugs that we're
17  going to be talking about, and in particular
18  there's a drug called Ipratropium
19  Bromide-Novaplus that was in the Cigna arrays
20  roughly from 2001 up until 2004.
21      I take it Amber wasn't involved in that
22  process of classifying that drug in the Cigna

---

19

1   arrays; is that right?
2       A.  Correct, she was not with the company
3   at that time.
4       Q.  So she wasn't able to provide you any
5   information, was she, about how that particular
6   drug, the Novaplus drug, was categorized by
7   Cigna?
8       A.  No.  The conversation was strictly
9   from my end giving her information.
10      Q.  And what was the information you were
11  giving her just generally speaking?
12      A.  Just generally going over the old
13  pricing standards and the classifications, using
14  the CMS instructions; and under the new pricing,
15  how we handle those and the exceptions based on
16  CMS.
17      It's sort of like she's learning the
18  whole process.  She has to know the old process;
19  she has to know the current process.
20      Q.  Now, during the time period of 2001 to
21  2004, and in particular the time period when the
22  Novaplus Ipratropium Bromide was put into the

---

20

1   Cigna arrays, who would have been the person that
2   would have made the initial determination of
3   classifying the product as either a generic or a
4   brand?
5       A.  For the DME, that would be me.
6       Q.  So you were the actual person that was
7   looking at the -- the Red Book CD or the monthly
8   update or whatever medium of Red Book you were
9   looking at, looking at the name and how it was
10  listed and making that determination of how these
11  products should be classified in terms of
12  generics versus brands; is that right?
13      A.  That's right.
14      Q.  Now, when you were preparing your
15  declaration, did you have a specific recollection
16  of that particular Ipratropium Bromide-Novaplus
17  product?
18      A.  No, I did not.
19      Q.  Okay.  So at the time you were asked
20  to prepare your declaration, there was a
21  situation where you remembered, Oh, I recall
22  Ipratropium Bromide-Novaplus, and these are the

---

21

1   reasons specifically why I put this particular
2   product as a brand versus a generic?
3       A.  That is correct.
4       Q.  So is what happened in a general sense
5   that you then went back to the arrays and went to
6   the program memoranda and attempted to
7   reconstruct how it was that this product was
8   classified as a brand versus a generic?  Was that
9   generally the process that you did?
10      MR. FAUCI:  Object to the form.
11      THE WITNESS:  That is correct.
12  BY MR. GORTNER:
13      Q.  And at any point in the course of
14  reviewing documents or arrays, did you obtain a
15  specific recollection of -- of how you actually
16  were doing it or the decision process that you
17  engaged in for the Ipratropium Bromide-Novaplus
18  product?
19      A.  For me, the Novaplus still doesn't
20  stand out.  The process is in place for me and
21  applies across for, so I don't see a
22  differentiation between the Novaplus and the

---

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                    October 16, 2009

## Nashville, TN

7 (Pages 22 to 25)

22

1  process.
2      Q.  Okay.  So you -- you -- is it fair to
3  say that you recall the process and you're
4  assuming that the process was followed with
5  respect to Ipratropium Bromide-Novaplus?
6          MR. FAUCI:  Object to the form.
7          THE WITNESS:  Yes.
8  BY MR. GORTNER:
9      Q.  Aside from Amber, there was no one
10 else that you have spoken with with respect to
11 the classification of the Novaplus product?
12     **A.  That is correct.**
13     Q.  Were there different drafts of this
14 declaration, or was this the only single product
15 that you reviewed and signed?
16         MR. FAUCI:  Same instruction I gave
17 earlier, but answer the question to the best of
18 your ability.
19         THE WITNESS:  There were different
20 drafts.
21 BY MR. GORTNER:
22     Q.  Do you know what happened to those

23

1  drafts?
2      **A.  I quite honestly do not know.  I mean,**
3  **I think we combined them, but I can't say for**
4  **sure that everything in every draft is in this**
5  **one.**
6      Q.  How were they conveyed to you?  Was it
7  sent to you as a Word document in an e-mail, for
8  instance?
9      **A.  I'm not sure that it was a Word**
10 **document. It might have been a PDF document.**
11     Q.  Okay.  So sent as a PDF?
12     **A.  Right.**
13     Q.  And then what happened?  You would
14 open it up and print the document?
15     **A.  I didn't usually print the document. I**
16 **would read the document, make my changes, send**
17 **the document back.**
18     Q.  How would you make your changes on a
19 PDF document?
20     **A.  Save it as a PDF on my system, open it**
21 **with a form of PDF, save it as a different PDF.**
22     Q.  As a PDF that you can make changes to,

24

1  a writable one?
2      **A.  Yes.**
3      Q.  Did you keep the earlier versions of
4  the -- of the declaration as PDFs on your
5  computer?
6      **A.  I don't know for sure.  Some of them**
7  **may still be there, but I don't know.**
8          MR. GORTNER:  Jeff, I'll request that
9  those drafts get produced to us.
10         MR. FAUCI:  I'll just state for the
11 record that we will not be producing those.  I
12 feel I'm letting this go quite far afield.  We --
13 we'll think about it after, but my -- I'll be
14 surprised if we produce those.
15         MR. GORTNER:  Okay.  Well, we'll take
16 that up at a different juncture.
17         MR. FAUCI:  Sure.
18 BY MR. GORTNER:
19     Q.  Okay.  And so there were some
20 different versions.  Do you recall whether the
21 versions differed with respect to the -- the
22 issue of how you classified generics versus

25

1  brands?
2      **A.  No.**
3      Q.  So the changes would have been to
4  other -- other issues?
5      **A.  Yes.**
6      Q.  What issues do you recall changed in
7  the different drafts?
8          MR. FAUCI:  I'll caution the witness
9  again not to reveal any communications with DOJ
10 counsel or her own counsel that touch on legal
11 advice or other legal issues in the drafting of
12 the affidavit, but answer the question to the
13 best of your ability.
14 BY MR. GORTNER:
15     Q.  Ms. Helton, feel free to go through
16 the declaration and take a look to see what
17 sections you recall are different than this final
18 version of -- was it a single earlier draft, or
19 were there multiple drafts?
20     **A.  I believe that there were drafts for**
21 **two different possible cases or approaches.**
22     Q.  What one might be for -- for a case

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                    October 16, 2009

Nashville, TN

8  (Pages 26 to 29)

26

1  involving Roxane and one for Dey?  Do you know
2  that?
3       A.  I'm not exactly sure on that.
4       MR. FAUCI:  I'll also object that I
5  believe Ms. Helton testified that there were no
6  changes to do with the classification of Novaplus
7  areas dealing with Paragraphs 17 to 31 of her
8  declaration.  That's the -- other than the Zenith
9  Goldline issue, that is the limit of this
10  deposition.
11       So I'll just object to the extent the
12  question is asking about areas beyond those two
13  topics.
14       THE WITNESS:  Do I --
15       MR. FAUCI:  I don't know if there's a
16  question pending or not.
17  BY MR. GORTNER:
18       Q.  There is a question pending.  It was,
19  after reviewing the declaration whether you can
20  recall what issues received changes between the
21  final declaration and the earlier draft.
22       A.  Looking at it, I'm thinking that the

27

1  changes were for the albuterol, that there may
2  have been some charts.
3       Q.  What page in -- in particular are you
4  referring to?
5       A.  15.
6       Q.  Okay.  There may have been some charts
7  related to the albuterol sulfate heading on Page
8  15?
9       A.  But I quite honestly am not sure at
10  this point.  I was thinking that there were some
11  charts that we removed because they got too
12  involved.
13       Q.  Anything else?
14       A.  (Witness shook head.)
15       Q.  You have to say no?
16       A.  I do not think so, sorry.
17       Q.  That's okay.  I'll remind you of the
18  head nods.  We all forget from time to time.
19       In the course of preparing your
20  declaration, did you review any witnesses'
21  testimony?
22       A.  No.

28

1       Q.  You didn't look at what any other
2  DMERCs had -- representatives had testified about
3  the way they priced or classified drugs?
4       A.  No.
5       Q.  And have you ever spoken to any other
6  DMERC representative with respect to how they go
7  about classifying generics versus brand drugs?
8       MR. FAUCI:  In general or related to --
9       MR. GORTNER:  In general.
10       THE WITNESS:  In general, yes.
11  BY MR. GORTNER:
12       Q.  And do you have a specific
13  recollection of -- of a conversation with a
14  particular person?
15       A.  In the past, the DMERCs worked
16  together to do the drug pricing, so there were
17  quarterly calls between the DMERCs to go over the
18  arrays that they had, and we would work together
19  if we had any discrepancies to try to find those
20  out.  We also worked together to develop sort of
21  the same pricing.
22       Q.  When was the time frame those

29

1  quarterly calls occurred?
2       A.  I believe for this it would have been
3  from 1999 to 2003.  You're going through 2003,
4  correct?
5       Q.  Right.
6       And you mean through -- it would have
7  gone through 2003?
8       A.  Correct.
9       Q.  Did they continue after 2003?
10       A.  Yes.
11       Q.  Up until what point?
12       A.  Cigna transactioned out of the DMERC
13  in September of 2006, so up until that time, I
14  can say that they were still going on.
15       Q.  And these quarterly -- these quarterly
16  calls would have a representative from Cigna on
17  the call and someone from Palmetto if that was
18  the operative DMERC at the time and DMERC-A and
19  Administar; is that right?
20       MR. FAUCI:  Objection to form.
21       THE WITNESS:  Most of the calls would
22  have representatives from all four DMERCs.

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                    October 16, 2009

Nashville, TN

9  (Pages 30 to 33)

30

1  BY MR. GORTNER:
2      Q.  Were you the Cigna representative that
3  was on most of these calls?
4      **A.  Most of the calls, yes.**
5      Q.  And the purpose of these calls, as you
6  stated, were -- was to coordinate your pricing
7  arrays; is that right?
8      **A.  To coordinate the fees that we**
9  **developed.**
10     Q.  Was this part of what's been called
11 the Uniform Drug Pricing Project?  Is that a name
12 you're familiar with?
13     **A.  I have heard the name.  I would not**
14 **think that this came in under that, but I'm not**
15 **really sure.  It was CMS instructions that the**
16 **DMERCs work together.  I don't know if that was**
17 **based on Uniform or not.**
18     Q.  Did you have an understanding as to
19 why CMS was instructing the DMERCs to work
20 together?
21     **A.  So that we would all have similar**
22 **pricing.**

31

1      Q.  And what you mean by similar pricing
2  is to make sure that the -- the fee payment that
3  was established by each DMERC for, say,
4  ipratropium bromide or a particular J-code would
5  be uniform, all four DMERCs would be paying the
6  same amount for each of those claims under that
7  J-code?
8      **A.  Correct.**
9      Q.  And what was the nature of the
10 discussions?  Can you -- can you give me a flavor
11 in terms of how you would have these phone calls
12 to coordinate your arrays?
13     MR. FAUCI:  Objection to the form.
14     THE WITNESS:  Generally when we
15 received -- each quarter we would have to do the
16 pricing.  So before each quarter, the DMERCs
17 would set up a conference call between each other
18 to discuss it.  We had previously established
19 which drug codes were routinely processed under
20 the DMERCs, which had a coverage benefit.
21         Each of the carriers would develop the
22 fees using the regulations and bring those to the

32

1  calls.  We would go through the codes and
2  indicate what we had -- the fee.  Anywhere we had
3  differences, we would discuss the differences.
4  BY MR. GORTNER:
5      Q.  With respect to ipratropium bromide,
6  for example, would the call basically encompass
7  all four DMERCs saying, We have established
8  $3.34, for instance, per milligram for
9  ipratropium bromide, and if all of you had
10 established that same amount, you'd move on to
11 another J-code?  Is that how that worked?
12     **A.  That is correct.**
13     Q.  So it wasn't a circumstance where you
14 were actually reading to each other the
15 particular drugs that you had in the array or the
16 classifications of whether they were generics or
17 brands; is that right?
18     **A.  That's right.**
19     Q.  And the reason you wouldn't do that is
20 because as long as you had established the same
21 fee there was uniformity among the DMERCs?
22     **A.  Correct.**

33

1      MR. FAUCI:  Object to the form.
2  BY MR. GORTNER:
3      Q.  At any point, was there a discussion
4  about the particular drugs that were listed in
5  the arrays for payments on ipratropium bromide?
6      **A.  I do not recall one for . . .**
7      Q.  Based on your recollection of the
8  nature of these quarterly teleconferences, would
9  you expect that conversation to have occurred
10 between the DMERCs if you were all setting the
11 same fee payment for ipratropium bromide during
12 this time?
13     **A.  I would not.**
14     Q.  At any point during your -- your work
15 at Cigna from 2001 through 2004, did you examine
16 the ipratropium arrays for the other DMERCs?
17     **A.  Actually look at their arrays?**
18     Q.  That's correct.
19     **A.  I don't recall doing it.  I don't see**
20 **a need where they would send it to me. However,**
21 **as new people come in, they sometimes ask for**
22 **help. So I can't say that I didn't absolutely,**

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                          October 16, 2009

## Nashville, TN

10  (Pages 34 to 37)

---

34

1    but I do not recall it.
2        Q.   And was there an attempt during the
3    time of 2001 to 2004 to try to get coordination
4    between the four DMERCs to make sure that they
5    were classifying drugs consistently as either
6    generic or a brand across the DMERCs?
7        A.   My assumption is that we were all
8    classifying them based on instructions, so, no. I
9    mean --
10       Q.   Well, is the answer to the question,
11   no, there wasn't a -- an attempt to coordinate
12   among the four DMERCs to make sure they were
13   classifying the drugs consistently as generics or
14   brands?
15       A.   I don't believe that there was
16   anything about generics and brands.
17       Q.   The focus was on making sure that the
18   actual fee payment came out the same for the four
19   DMERCs?
20       A.   Yes.
21       Q.   Now, as a Cigna representative, did
22   you have any concerns whether the DMERCs were

---

35

1    classifying drugs as generics or brands
2    differently as long as they came out on the same
3    fee payment schedule?
4        A.   I never considered the generic and the
5    brands.  I thought we all were using the same
6    instructions, looking that -- all the same, so I
7    would not have even questioned it.  If the fees
8    came out the same, I wouldn't have gone any
9    further.
10       Q.   Now, when you say the same
11   instructions, what are you specifically referring
12   to?
13       A.   The transmittals that I said earlier
14   from CMS.
15       Q.   Now, are you familiar with -- with
16   what has been referred to as Medicare
17   Professional Drug Pricing Procedure, documents
18   that have that title?  Is that something you're
19   familiar with?
20       A.   No.
21       Q.   I'm going to hand you what has been
22   marked as -- previously marked as Roxane Exhibit

---

36

1    100, Ms. Helton, and it's a document entitled
2    Medicare Pricing, Drug Pricing Procedure.  Would
3    you take a quick look at the document and tell me
4    if you recognize it?
5        A.   I have seen the document.
6        Q.   I'm going to hand you what's been
7    previously marked as Roxane Exhibit 41, and this
8    is a document entitled Medicare Professional
9    Reimbursement, Best Procedure -- Drug Pricing
10   Procedure.
11           Do you recognize this document as well?
12       A.   Yes.
13       Q.   And are these different formats for
14   basically the same kind of document?  I recognize
15   they have different content in them.  But I'm
16   just trying to understand this idea of a drug
17   pricing procedure.  Is that a general type -- a
18   type of document that you're familiar with?
19       A.   This -- I'm not sure about the first
20   one that you gave me.
21       Q.   Meaning Roxane 100?  Okay.
22       A.   Yes.

---

37

1        Q.   All right.
2        A.   Roxane 41 was when the DMERCs were
3    trying to work together to establish that all of
4    them had the same procedures, so there was input
5    from all of the different DMERCs of how the
6    pricing was done.
7        Q.   And this was a document, then, that
8    all four DMERCs in some fashion would review and
9    -- and provide input to?
10       A.   Yes, they worked on it together.
11       Q.   And is it a document that was revised
12   and evolved over time?
13       A.   I believe that the information from
14   this actually went into the Internet only
15   manuals, Publication 100-04, Chapter 17, which is
16   where our instructions are for drug pricing.
17       Q.   Can you repeat that publication number
18   again?
19       A.   Publication 100-04, which is the
20   Medicare claims processing manual.
21       Q.   And when you say Internet only
22   manuals, what do you mean by that?

---

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                                October 16, 2009

## Nashville, TN

11  (Pages 38 to 41)

---

38

1    **A.  CMS guidance to the Medicare carriers**
2    **manuals went from a Medicare carriers manual,**
3    **which was a paper hard copy, to Internet only**
4    **manuals that are on the CMS website.**
5        Q.  Do you know when that transition to
6    the website occurred?
7        **A.  I do not.**
8        Q.  What would be your best estimate?
9            MR. FAUCI:  Object to the form.
10           THE WITNESS:  I would say between 2000
11   and 2002, but I'm -- that is just a guess.
12   BY MR. GORTNER:
13       Q.  And would these manuals have been
14   available to the public, what I mean by that is
15   available to people that weren't Medicare carrier
16   personnel?
17       **A.  I believe that they're on the CMS**
18   **website, which is public, but I can't confirm**
19   **that anyone can look at them.**
20       Q.  What was the process by which these
21   drug pricing procedure documents would be
22   integrated into the -- the Medicare carriers

---

39

1    manual? How would that happen, if you know?
2        **A.  I do not.  We provided the information**
3    **to CMS.**
4        Q.  And in terms of getting feedback from
5    the different DMERCs, do you recall whether there
6    were meetings or conference calls or some other
7    procedure by which comments or ideas could be
8    exchanged on this drug pricing procedure?
9        **A.  I believe it was e-mail and possibly**
10   **conference calls.**
11       Q.  What's your understanding of the -- of
12   the purpose of a drug pricing procedure document?
13       **A.  To try to get all four DMERCs using**
14   **the same process.**
15       Q.  Is it fair to say that, then, the
16   procedures in the drug pricing procedure document
17   were intended to be followed by all four DMERCs?
18       **A.  Yes.**
19       Q.  So these drug pricing procedure
20   documents outlined a process by which all four
21   DMERCs should have been pricing their drugs and
22   classifying their drugs, right?

---

40

1            MR. FAUCI:  Object to the form.
2            THE WITNESS:  I believe that the actual
3    document that you have here is what the DMERCs
4    sent as what they were doing.  I don't think
5    these were the actual instructions, so we would
6    have actually followed the instructions that came
7    out based on this.
8    BY MR. GORTNER:
9        Q.  And by the instructions, you're
10   referring to the Medicare carriers manual?
11       **A.  The carriers manual, the IOM.**
12       Q.  Let me stop you there.  Just explain
13   what that acronym is.
14       **A.  Internet only manual.**
15       Q.  Okay.  Anything else?
16       **A.  The CMS transmittals.**
17       Q.  Well, take a look at Roxane 100 real
18   quick, if you would.  And on the first page, you
19   can see that it is exerting a section of the code
20   of federal regulations that establishes the
21   payment for Part B drugs.  Do you see that in
22   italics?

---

41

1        **A.  I do.**
2        Q.  And you can see that in the last
3    sentence of that excerpt from the code of federal
4    regulations it describes the payment for multiple
5    source drugs, which is basically that the average
6    wholesale price is defined as the lesser of the
7    median average price for all sources of generics;
8    or if the brand AWP is lower, that sets the
9    payment basis, right?
10       **A.  Yes.**
11       Q.  In a nutshell, what this -- what this
12   regulation is telling the DMERCs is that you pay
13   for generic drugs under Part B on either the
14   median of the generic AWPs or the brand AWP if
15   that's lower; is that an accurate statement of
16   your understanding of the regulation?
17       **A.  You -- you set the fee -- or pay for**
18   **the -- the fee.  I don't think it just says**
19   **generics.  It would be any drugs that fall under**
20   **that code is going to be based on the lesser of**
21   **the median of the generics or the lowest brand.**
22       Q.  And then the -- the next section under

---

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                    October 16, 2009

Nashville, TN

12  (Pages 42 to 45)

42

1    Scope, it says, "This procedure outlines the
2    criteria used to calculate the quarterly
3    reimbursement updates for Part A, Part B, DMERC,
4    and SAD or SADMERC drugs."  Do you see that?
5        **A.  Yes.**
6        Q.  Now, could this document be an excerpt
7    from -- from a manual, a carriers manual?  Does it
8    look like it's in that format?
9        **A.  It does not look like it's in that**
10   **format.**
11       Q.  And you can see a little bit further
12   down on that -- on that first page, there's a
13   reference to a form number or a document number,
14   and you see that it mentions a Transmittal AB
15   9963.  Do you see that?
16       **A.  I do.**
17       Q.  And that was some 1999 transmittal
18   from HCFA; is that right?
19       **A.  I would assume so.**
20       Q.  Now, on the next page, which is Bates
21   labeled AWP 034-0463, there's a heading at the
22   top that says, "Step 2, identify drug sources."

43

1    And if you go to the second from the bottom
2    bullet point on that same page, there's a
3    paragraph that begins with, "If no generic forms
4    of the drug exist, use all brands that exist for
5    a specified dosage."  Do you see that sentence?
6        **A.  Yes.**
7        Q.  And then the last sentence of that
8    paragraph says, "During 1998, if a brand name
9    source was lower than the median of generics, the
10   lower brands were included in the median AWP
11   calculation."  Do you see that?
12       **A.  Yes.**
13       Q.  And that was a different methodology
14   for that one year; is that correct?
15       **A.  That is correct.**
16       Q.  And then in 1999, it became, pay at
17   the lower of the median of the generic AWPs or
18   the brand AWP if it's lower?
19       **A.  That is correct.**
20       Q.  And that's how you set payment rates
21   up to 2004 at Cigna, that you would compare the
22   median of the generic AWPs and the brand AWP, and

44

1    you would set the fee payment based on whichever
2    one was lower?
3        **A.  Based on -- with others**
4    **considerations.**
5        Q.  What does that mean?
6        **A.  There is a piece missing here about**
7    **the reduction.  Once you determine the AWP, then**
8    **you -- what you're going to use is the AWP,**
9    **whether it's the median of the generics of the**
10   **lowest brand, then during part of that time, it**
11   **would get a 95 percent.**
12       Q.  That's right.  It paid 95 percent, not
13   100 percent AWP in this time frame?
14       **A.  Yes.**
15       Q.  Now, the next bullet point down, which
16   carries over to the next page, it states, "To
17   determine if a drug is a generic or brand, look
18   at the boldface uppercase name of the drug.  If
19   there's another name for the drug immediately
20   below it in lower case letters (the generic
21   name), the entries following are generally
22   brands.  If there is no lower case drug name

45

1    immediately below the boldface uppercase name,
2    the boldface uppercase name is the generic name,
3    and all entries below are generics."
4        Let me stop you there.  You're familiar
5    during your work with Cigna with that methodology
6    of determining generics versus brands?
7        **A.  Yes.**
8        Q.  And you had seen that before in other
9    drug pricing procedure guides as well?
10       **A.  I don't think we actually had a guide,**
11   **but, yes, I was trained on --**
12       Q.  You were -- you were trained on this
13   -- on this methodology?
14       **A.  Yes.**
15       Q.  Okay.  And this was a methodology that
16   was in place at least as of 1999, right?
17       **A.  It was in 1999.  I think that this is**
18   **based on hard copy Red Book.**
19       Q.  That's my next question is, can you
20   explain to me how this criteria -- criteria was
21   implemented at Cigna?
22       **A.  I don't have a Red -- on the --**

Nashville, TN

46

1    Q.  Would it help you if you had a Red
2  Book?
3    A.  Please.
4    Q.  Why don't -- why don't we get it?
5        MR. GORTNER:  Why don't we take a quick
6  break.  We've gone about an hour.  Let's take a
7  quick break.  And then we can kind of walk
8  through a hard copy Red Book in reference to that
9  criteria.  Okay?
10       THE WITNESS:  Okay.
11       THE VIDEOGRAPHER:  Going off the
12  record, time is 9:54.
13       (Brief recess observed.)
14       THE VIDEOGRAPHER:  Back on the record,
15  time is 10:01.
16       (Marked Exhibit Roxane 261.)
17  BY MR. GORTNER:
18    Q.  Ms. Helton, I've handed you what we've
19  marked as Roxane Exhibit 261.  This is an excerpt
20  from the 2001 annual Red Book, the printed
21  version, and I wanted to draw your attention to
22  what's Page 368 in the upper left-hand corner of

47

1  this document.  And if you look on the left-hand
2  column about halfway down, there is an entry for
3  ipratropium bromide.  Do you see that in bold?
4    A.  Yes.
5    Q.  And it continues listing a variety of
6  ipratropium bromides from different manufacturers
7  on that left-hand column and over it about
8  halfway on the middle column of Page 368.  Do you
9  see that?
10    A.  Yes.
11    Q.  And now I wanted to discuss this --
12  this criteria for classifying generics versus
13  brand drugs that we just looked at in the drug
14  pricing procedure document.  Okay?  And let me
15  know if I'm understanding how that criteria
16  worked.
17       But in essence, if you look at the
18  entry for Ipratropium Bromide Hydrous, which is
19  in the middle of that second column, do you see
20  that?
21    A.  Yes.
22    Q.  And what you see there is that that

48

1  entire entry is in bold and capitals, correct?
2    A.  Correct.
3    Q.  And then underneath it, it has an
4  entry in lowercase for the generic chemical name
5  ipratropium bromide, right?
6    A.  Yes.
7    Q.  And is it fair to say that if you were
8  looking at this document and applying the
9  criteria that we just discussed on the drug
10  pricing procedure document, that would meet the
11  criteria for a brand drug because it has a
12  heading all in capital bold up top with the
13  generic name in lowercase underneath it?
14    A.  Yes, it has a -- the bold cap is a
15  different name, and then the generic name is in
16  lowercase.  So the cap is different from the
17  generic, so, yes, it is a brand name.
18    Q.  And that's the way that you would
19  apply that criteria at Cigna if you were looking
20  at a printed Red Book; is that correct?
21    A.  Yes.
22    Q.  And looking over similar to the -- to

49

1  the next page, in the thirdhand column over on
2  the -- on the page marked 362, there's an entry
3  there for Inderal, can you see that?  And
4  underneath it, it has an entry in lowercase for
5  propanolol hydrochloride.  That would also be
6  considered a brand under this criteria?
7    A.  Yes.
8    Q.  Okay.  Now, I wanted you to go back to
9  Page 368 and look at the entry for the Roxane
10  ipratropium bromides above.  If you look right
11  above the -- the entry for Zenith Goldline, you
12  can see that Roxane is in parens in that middle
13  column on Page 368?
14    A.  Yes.
15    Q.  And you see that there's six NDCs that
16  are listed there.  Three of them up top have the
17  middle designation of 8402, and then three at the
18  bottom have the middle designation of NDC 8404.
19  Do you see those?
20    A.  Yes.
21    Q.  And using the criteria that we just
22  talked about in that drug pricing procedure,

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                    October 16, 2009

Nashville, TN

14 (Pages 50 to 53)

50

1  Cigna would classify all six of these NDCs as
2  generics, wouldn't it?
3      **A.  Using the hard copy, yes.**
4      Q.  Okay.  And that criteria would be in
5  effect all the way up to 2004 when the Medicare
6  policy changed, or would it continue up until
7  today?
8          MR. FAUCI:  Object to the form.
9          THE WITNESS:  If we were using the hard
10 copy, yes.  But we switched to the CD, so the CD
11 is different format.
12 BY MR. GORTNER:
13     Q.  Okay.  And we'll talk about the CDs in
14 just a moment.  But just so I understand how it
15 worked at Cigna, it -- you would apply the rule
16 regarding capitalization of the product to
17 determine whether it was a generic or brand when
18 you were relying on the hard copy Red Book; is
19 that correct?
20         MR. FAUCI:  Objection to the form.
21         THE WITNESS:  The capitalization of the
22 product helps you determine.  You would apply the

51

1  rules that are in the CMS guidelines.
2  BY MR. GORTNER:
3      Q.  Well, how would those two work
4  together?  I'm trying to understand.  You have a
5  -- the drug pricing procedure rule there
6  regarding limited capitalization and whether it
7  had a lowercase generic name underneath it,
8  correct?  How would that rule work in conjunction
9  with the CMS rule?
10     **A.  You have to compare the two and see. I**
11 **don't see any conflict with it here, but I would**
12 **have to evaluate each one individually and see if**
13 **there was.**
14     Q.  Okay.  And how would you do that? Can
15 you explain that?
16     **A.  I'm looking at what I see here, and I**
17 **don't see anything here that would tell me that**
18 **it's different, so -- based on this, I don't see**
19 **any different names added to, so I would say it's**
20 **the same.**
21     **Like the Ipratropium Bromide Hydrous**
22 **and then the generic name underneath it is**

52

1  ipratropium bromide.
2      Q.  Right.
3      **A.  Okay.  I have to consider that the**
4  **Ipratropium Bromide Hydrous, based on statutes,**
5  **is different than the generic name.  So if it's**
6  **different than the generic name, it's a brand.**
7      Q.  Let me stop you there.  Were there any
8  exceptions to that rule that Cigna applied?
9      **A.  I can't think of any for -- for DME.**
10     Q.  We deposed Ms. Stone from the Palmetto
11 DMERC a couple days ago, and she mentioned that
12 there may be situations where the name of the
13 drug has something more than just the generic
14 name in it.  In other words, it might be a drug
15 that has ipratropium bromide hydrochloride, for
16 instance.
17         And there would be instances where the
18 additional term that was in the name of the drug
19 was related to being a dilutant, for instance.
20 They might classify that drug as a -- as a
21 generic or at least have a discussion about
22 whether it should be a generic or a brand.

53

1          Was there anything akin to that at
2  Cigna?
3      **A.  I don't think that that was considered**
4  **brand -- a brand conversation.  I'm thinking that**
5  **those are still considered generics.  But**
6  **sometimes when you're doing arrays for drugs, the**
7  **medical directors would make determinations as**
8  **to, if you don't have a drug that meets the**
9  **code's description specifically, that you may**
10 **have to -- there's -- like a chloride may have to**
11 **be used for that drug.**
12     Q.  I'm not sure I understand that
13 exactly. Can you --
14     **A.  I don't have any codes here to**
15 **explain. Some of the drugs, especially for the**
16 **inhalation drugs, didn't have inhalation formats**
17 **that were -- the name of the drug was just**
18 **strictly the generic as in the HCPCS description.**
19 **You could not find any products that met that**
20 **description.**
21         **So the medical directors would say that**
22 **a different type of drug, like a hydrochloride,**

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                    October 16, 2009

Nashville, TN

15 (Pages 54 to 57)

54

1  was actually what was being used for that
2  inhalation.
3          And so we would pull in the products
4  for that -- that drug into the array because we
5  couldn't find the other.
6      Q.  Well, can you give me an example of a
7  drug that would have -- because I'm just trying
8  to understand, are you referring to the fact that
9  you would add a term to the drug name so that it
10 would match the -- the HCFA description or
11 whether you would give it an entirely different
12 name? I'm just trying to understand what you're
13 referring to.
14     A.  I don't actually have any description
15 -- anything with me here to give you examples of
16 it. The -- when you're talking about like sulfide
17 and hydrochloride and things like that that are
18 added but they -- they're part -- they're a
19 generic name, but they're a little bit different
20 than the generic name of the drug, if you don't
21 have any products that fall under that generic
22 name, then we would have to ask for assistance

55

1  from the medical directors, and they would
2  determine which products actually were being used
3  under those codes.
4      Q.  Okay.  I think I understand what
5  you're saying now.
6          Would the medical directors ever be
7  involved in the process of helping you determine
8  whether a drug was a generic or a brand drug?
9      A.  No.
10     Q.  Would anyone other than, in this
11 instance, you who was involved with grading the
12 arrays, be involved in the process of determining
13 whether a drug was a generic or a brand?
14     A.  For Cigna? No.  We -- I mean, we
15 might have discussed some on the conference
16 calls.
17     Q.  Do you have any recollection of that?
18     A.  No.
19     Q.  Do you know whether any of the other
20 DMERCs had a process by which a medical director
21 or some other staff would be consulted with to
22 determine whether a drug was a generic or a

56

1  brand?
2      A.  I do not.
3      Q.  Now, with respect to the -- the HCFA
4  transmittal that you're referring to in
5  classifying a generic or a brand, what was your
6  understanding of what that criteria was for
7  determining --
8      A.  If --
9      Q.  -- let me finish the question --
10 determining whether a drug was a generic or a
11 brand?
12     A.  When you're looking at the description
13 of the drug, if the drug is other than -- or the
14 name is other than the generic name of the drug,
15 if it has something added to it, then it would be
16 considered a brand.
17     Q.  Okay.  So let's take the simplest
18 example. If a drug is called Atrovent and the
19 generic chemical name is ipratropium bromide,
20 Atrovent is clearly a name other than the generic
21 chemical name, and you would classify that as a
22 brand?

57

1      A.  Yes.
2      Q.  And you're familiar with that drug,
3  aren't you?
4      A.  Yes.
5      Q.  And you routinely classify Atrovent as
6  a brand at all pertinent times in the Cigna
7  arrays?
8      A.  Yes.
9      Q.  Now, in situations where you have the
10 generic chemical name, like ipratropium bromide,
11 in the drug title and something additional, is it
12 your testimony that you considered that to be
13 other than the generic chemical name?
14     A.  Yes.
15     Q.  And that was the criteria you were
16 looking at.  If it was different in any way from
17 simply the words ipratropium bromide, you
18 categorized it as a brand in your arrays?
19     A.  Yes.
20     Q.  Now, looking at this 2001 annual Red
21 Book printout for the Roxane NDCs, I'll represent
22 to you that the NDCs that have the 8404 in the

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                          October 16, 2009

Nashville, TN

16 (Pages 58 to 61)

58

1    middle, the three lower NDCs on that Page 368 of
2    the Red Book, those represent the NDCs with the
3    Novaplus label ipratropium bromide.  Okay?
4        A.  Okay.
5        Q.  And you'd agree with me that using the
6    HCFA criteria that you're referring to, which is
7    if the product name is something other than the
8    generic chemical name, you would classify those
9    three Novaplus NDCs as a generic, wouldn't you?
10       MR. FAUCI:  Object to the form.
11       THE WITNESS:  Based on using this
12   information in Red Book, it is listed as
13   ipratropium bromide with just the manufacturer.
14   So based on this, it only is ipratropium bromide.
15   So I would -- based on just that it is the
16   generic name, I would have classified these as a
17   generic.
18   BY MR. GORTNER:
19       Q.  To be clear, you would have classified
20   the Novaplus label ipratropium bromide NDCs as a
21   generic under either one of the two criteria
22   we're talking about.  Either based upon the

59

1    capitalization format in the Red Book or on the
2    HCFA criteria with regard to the generic name,
3    they would be classified as generics based upon
4    this 2001 annual Red Book printout?
5        MR. FAUCI:  Object to the form.
6        THE WITNESS:  Based on this where it's
7    strictly listed as ipratropium bromide only, yes,
8    I would have classified it as a generic.
9    BY MR. GORTNER:
10       Q.  You spoke a moment ago that -- that
11   Cigna transitioned to different formats of the
12   Red Book over time; is that right?
13       A.  Yes.
14       Q.  Can you explain for me generally what
15   materials Red -- or Red Book Cigna was using over
16   time where we can, you know, begin with the late
17   1990s up to 2004 if it's easier for you to
18   recollect that.
19       A.  The late 1990s we were using the
20   annual and the monthly hard copies.
21       Q.  Okay.
22       A.  2000 we started using the quarterly

60

1    CDs.
2        Q.  Can you explain for me the reasons why
3    you switched to the quarterly CDs from the
4    printed versions?
5        A.  It was determined by the four DMERCs
6    together that the quarterly CDs were easier and
7    faster than the hard copies, so all four agreed
8    to go with the quarterly CDs.
9        Q.  That's because on a quarterly CD you
10   can do searches and get right to the product and
11   don't have to be flipping through a book?
12       A.  That is correct.
13       Q.  There's a real convenience factor to
14   those CDs versus the annual hard copies, right?
15       A.  The CDs also had the ability to search
16   by NDC number.
17       Q.  Do you recall at what point in 2000
18   the switch was made?  Was it later 2000?  Mid?
19       A.  I actually think -- I think it was
20   first or second quarter of 2000.  I think the
21   first CD we had was October in '99, which would
22   have come into play with the January 2000.

61

1        Q.  You're not sure one way or the other?
2        A.  I'm not really sure.
3        Q.  So up until some point in 2000, you
4    were using the annual Red Book like the excerpt
5    that we have right here marked as Roxane Exhibit
6    261, right?
7        A.  Yes.
8        Q.  So you're familiar with this entry for
9    ipratropium bromide, right?
10       A.  Yes.
11       Q.  And the decision to change to
12   different Red Book formats was a decision the
13   four DMERCs collectively made?
14       A.  Yes.
15       Q.  The Red Book CDs required a
16   subscription, didn't they?
17       A.  Yes.
18       Q.  You'd have to pay, what, a quarterly
19   or an annual fee?
20       A.  I think it was annual.
21       Q.  So the Red Book CDs weren't something
22   that -- that the general public would just have

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                    October 16, 2009

## Nashville, TN

17 (Pages 62 to 65)

---

62

1    access to?  You would have to actually sign up
2    and pay Red Book to be able to look at these CDs;
3    is that correct?
4            MR. FAUCI:  Object to the form.
5            THE WITNESS:  From my standpoint, yes,
6    but I didn't look anywhere else, so I don't know.
7    BY MR. GORTNER:
8        Q.  Now, during your time constructing the
9    DMERC pricing arrays for Cigna, did Cigna always
10   look to the Red Book publishing compendium?
11       A.  Yes.
12       Q.  Do you have any understanding as to
13   why Cigna relied exclusively on the Red Book
14   compendium?
15       A.  I do not know initially why Cigna. It
16   was selected prior to my coming in.  Going
17   forward when the DMERCs started working together,
18   that was the source that all four DMERCs selected
19   as the one that they all four had, so it was
20   determined that that was the one we would use.
21       Q.  Do you think it was based on -- on the
22   historical use of the Red Book?  Is that the

---

63

1    reason you think?
2        A.  I would think that.  Like I said, I
3    don't know exactly why we started with the Red
4    Book.  It was one of the compendia in the CMS
5    regulations that we could use.  I don't know
6    specifically why that one was chosen.
7            For the DMERCs going forward where we
8    wanted to all be on the same page, the same
9    coordination, we all agreed to use Red Book.  It
10   was the -- the one that all four DMERCs already
11   had.
12       Q.  So as far -- as far as you knew, there
13   wasn't anything special about Red Book in the
14   sense that it had more accurate pricing or better
15   pricing than other compendia as far as you knew?
16       A.  I don't know.
17       Q.  Now, you -- you said a moment ago that
18   Red Book was one of the sources that HCFA allowed
19   DMERCs to look to for -- for drug pricing.  What
20   were the other sources?
21       A.  I believe that it changed through the
22   years, so I can't say for sure.  I think Medispan

---

64

1    and Blue Book were some -- a couple of them, but
2    I don't remember all of them.
3        Q.  Now, you're familiar with
4    FirstDataBank Blue Book?
5        A.  I have not actually ever worked with
6    it.
7        Q.  You know it's out there, though,
8    right?
9        A.  Yes.
10       Q.  Do you know if Medicaid programs use
11   it?
12       A.  I do not know.
13       Q.  And how about the -- the Medispan
14   publishing compendia?
15       A.  I have never used it.
16       Q.  But you're aware that there are these
17   other compendia that are out there, right?
18       A.  Yes.
19       Q.  And you're aware during your time
20   constructing the arrays for Cigna that you were
21   authorized to look at other compendia should you
22   choose to, right?

---

65

1        A.  Yes.
2        Q.  And did the internal DMERC decision to
3    rely on Red Book require you to only look at Red
4    Book, or was that simply an agreement that was
5    adhered to but that you still had discretion to
6    look at other things?
7        A.  I don't really know.  At the time,
8    Barbara Douglas was the one who worked out, so --
9    for Cigna, we only looked at Red Book.  I can't
10   say whether the other ones looked at other
11   things.
12       Q.  Okay.  But from what you just told me
13   a moment ago, it sounds like you -- you never
14   looked to the FirstDataBank Blue Book or Medispan
15   book to help determine whether drugs were generic
16   or brands, for instance?
17       A.  I did not.
18           MR. GORTNER:  Let's take a quick break
19   to change tapes.  Okay?
20           THE WITNESS:  Okay.
21           THE VIDEOGRAPHER:  Here marks the end
22   of Tape No. 1.  Going off the record, time is

---

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                              October 16, 2009

Nashville, TN

18  (Pages 66 to 69)

---

66

1    10:24.
2         (Brief recess observed.)
3         THE VIDEOGRAPHER:  Back on the record.
4    Here marks the beginning of Tape No. 2. Time is
5    10:29.
6    BY MR. GORTNER:
7         Q.  Ms. Helton, going back to the Medicare
8    drug pricing procedure document, which is Roxane
9    100 that we looked at a moment ago, if you could
10   turn to Page 3 of that document, just following
11   up on the -- the criteria for distinguishing
12   between brand and generics, if you look at the
13   last sentence of that paragraph on the top of
14   Page 3, it reads, "If there is a question as to
15   whether a drug is brand or generic, consult the
16   PDR," which I think means Physicians' Desk
17   Reference, "generics book, telephone the drug
18   company, or Red Book," and it gives an 800 number
19   for Red Book.
20        At any point during your classification
21   of drugs as brand or generics, did you, in fact,
22   consult the PDR generics?

---

67

1         A.  I did not.
2         Q.  Did anyone on your staff do so, as far
3    as you know?
4         A.  Not that I'm aware of.
5         Q.  How about ever telephone a drug
6    company to understand whether a drug was a
7    generic or a brand?
8         A.  No.
9         Q.  Or call Red Book itself?
10        A.  No.
11        Q.  But -- but during the time you were
12   creating these arrays, you knew that this option
13   was available to you, that you could consult a
14   PDR generics or call a drug company or the Red
15   Book?
16        A.  I knew that there were options if we
17   needed help. I would not say that this procedure
18   is mine, so -- but, yes, I am aware of different
19   options.
20        Q.  When you say I'm not -- this procedure
21   is not mine, what do you mean by that?
22        A.  As before, the Roxane 100, I've seen

---

68

1    the document.  I don't know who created the
2    document. I can't say that this is the document
3    that is in Cigna's book of what instructions we
4    have.
5         Q.  But does this -- does this description
6    of -- of the criteria of a generic and brand and
7    that option to contact Red Book or the drug
8    company, are those terms generally familiar to
9    you within Cigna's manual even if the precise
10   words might be different?
11        MR. FAUCI:  Object to the form.
12        THE WITNESS:  I would think that -- I
13   don't have a precise manual, so if I had a
14   question between generic and brand, I am aware
15   that there are options to try to find out.
16   BY MR. GORTNER:
17        Q.  Okay.  So let's set aside the
18   specifics of the document.
19        In terms of your procedure when you
20   were constructing the Cigna arrays, during that
21   time period of constructing the arrays, you were
22   aware that you had options to contact Red Book or

---

69

1    the drug company if you -- if you so chose,
2    right?
3         A.  Yes.
4         Q.  And you could call them up to clarify
5    if -- if any of their drugs was a generic or a
6    brand, right?
7         A.  Yes.
8         Q.  Now, at some point in 2000, you
9    transitioned to using the Red Book CD-ROMs for
10   helping you determine the prices for drugs; is
11   that right?
12        A.  That's right.
13        Q.  Did you use any other Red Book in
14   addition to the CD-ROMs?  For instance, did you
15   rely -- still rely on the monthly updates?
16        A.  We did still use the monthly updates.
17        Q.  So you did still have hard copies that
18   you used in addition to the CD-ROMs; is that
19   right?
20        A.  That is correct.
21        Q.  And with respect to the hard copies,
22   this criteria we're talking about in the drug

---

Henderson Legal Services, Inc.

202-220-4158                              www.hendersonlegalservices.com

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                                October 16, 2009

Nashville, TN

19 (Pages 70 to 73)

---

70

1  pricing procedure of the capitalization
2  conventions of Red Book would still be one of the
3  criteria you would look to to classify drugs as
4  generic or brands?
5        MR. FAUCI:  Object to the form.
6        THE WITNESS:  Yes.
7  BY MR. GORTNER:
8     Q.  Let's take a look at the -- the Red
9  Book CD-ROMs.  I'm going to hand you what we will
10 mark as Roxane Exhibit 262.
11       (Marked Exhibit Roxane 262.)
12       MR. GORTNER:  For the record, we've
13 previously also marked this as Roxane Exhibit
14 255.
15 BY MR. GORTNER:
16    Q.  This, I'll represent to you, are a
17 series of documents that we received from you or
18 from DOJ counsel just last week.  I'll ask you
19 just to quickly flip through and see if you
20 recognize these documents.
21       I'll point you to a specific page, and
22 I'll represent that those are a complete version

---

71

1  of the documents that we received.  But
2  generally, do they appear to be the documents
3  that you provided to counsel?
4     **A.  Yes.**
5     Q.  Can you explain for me how you located
6  these documents?
7     **A.  I have some boxes of drug pricing**
8  **information, and I pulled this out of those**
9  **boxes.**
10    Q.  Where were those boxes located?
11    **A.  They're currently located in my**
12 **building in front of my desk.  We had pulled them**
13 **back from the warehouse.**
14    Q.  Before -- before they were in your
15 office, then, they had been in a warehouse where
16 Cigna stores documents?
17    **A.  Yes.**
18    Q.  And where is that warehouse located?
19    **A.  I don't know.**
20    Q.  Now, how did -- how did you come about
21 retrieving those documents from the warehouse?
22    **A.  In 2006 when Cigna transitioned out of**

---

72

1  **the old DMERC, we still had the hold order for**
2  **documentation for drug pricing, and we pulled**
3  **boxes back from the warehouse that we thought**
4  **would be pertinent to that hold document.**
5     Q.  This was in 2006?
6     **A.  Yes.**
7     Q.  And this is one of the boxes that had
8  been pulled in 2006?
9     **A.  Yes.**
10    Q.  And it had been pulled to where?
11    **A.  To that cabinet in front of my desk.**
12    Q.  Okay.  So from -- since 2006, it was
13 in that cabinet in front of your desk?
14    **A.  Yes.**
15    Q.  Now, you may recall that we spoke
16 earlier today about the initial series of
17 documents that Cigna had produced in this
18 litigation, which included that HCFA transmittal
19 you referred to.  Do you remember that?
20    **A.  Yes.**
21    Q.  Why was it that these documents
22 weren't included in that production?

---

73

1        MR. FAUCI:  Object to the form.
2        THE WITNESS:  The way that we
3  interpreted the documentation was that you wanted
4  the spreadsheets and how we used AWP.
5        We provided the spreadsheets -- the
6  spreadsheet itself was already provided
7  electronically.  We did not interpret that to
8  mean that you wanted all of our resources, which
9  are copyrighted, such as Red Book, so we did not
10 provide.
11 BY MR. GORTNER:
12    Q.  Now, how about the Red Book CDs?  Those
13 -- as you may recall, a subset of those was
14 produced a little bit earlier this summer.  Is it
15 the same situation with Red Book CDs?  Were they
16 kept in a similar location?
17    **A.  The CDs were not kept in a similar**
18 **location.  The CDs are loaded to our mainframes;**
19 **therefore, they are maintained and secured by the**
20 **people who maintain the mainframe.  I don't know**
21 **exactly what the designation is for that person.**
22       **And when we first started Red Book,**

---

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                    October 16, 2009

## Nashville, TN

20  (Pages 74 to 77)

74

1  they were diskettes loaded to an individual user
2  machine.  Those were not maintained because as
3  each Red Book comes out, subsequent one, it --
4  you get rid of the previous one.
5      Q.  Okay.
6      A.  You only maintain the current.  So the
7  ones that we produced were the ones that were the
8  multiuser license that had been at one time
9  loaded to our mainframes while the subscriptions
10 were valid.  They had been maintained in the
11 cabinet, but the subscriptions had expired, so we
12 cannot access them.  They're no longer on our
13 system.
14     Q.  So there's some subset of CDs where
15 that -- that information is no longer retrievable
16 on your end; is that right?
17     A.  I would think that -- some of the CDs
18 it's no longer retrievable on our end, yes.  And
19 then some of the earlier versions we don't have
20 at all.
21     Q.  Okay.
22     A.  They've already been destroyed.

75

1      Q.  So at some point during the summer,
2  you -- you contacted someone at your IT
3  department to try to locate off your server the
4  Red Book CD information that was still available?
5      A.  Not off the server because they're no
6  longer maintained there.  Only the current
7  version is maintained.  We had to contact someone
8  in the IT area to see if they had the older
9  versions anywhere in storage.
10     Q.  Okay.  Are there other documents,
11 either electronic or hard copy, that -- that
12 relate to your pricing arrays that have not been
13 produced in this litigation?
14     A.  Other than the actual Red Book?
15     Q.  Right.
16     A.  No.
17     Q.  Now let's take a look at Roxane
18 Exhibit 262.  This appears to be a printout of --
19 of Cigna arrays from 1999 through 2004.  And
20 behind each Cigna array, it appears that you have
21 printed out in -- and attached Red Book CD-ROM
22 information with respect to ipratropium bromide;

76

1  is that correct?
2      A.  Yes.
3      Q.  Then let's take a look at the page
4  that begins CIGNA-0109.  It's the lower right
5  Bates label.  That -- that page appears to be an
6  array for ipratropium bromide constructed by
7  Cigna, and it has a date on the lower right of
8  December 12, 2000.  Do you see that?
9      A.  Yes.
10     Q.  Then at the very bottom center,
11 there's a phrase that says, "Confidential,
12 unpublished property of Cigna.  Do not duplicate
13 or distribute.  Use and distribution limited
14 solely to authorized personnel, 2000, Cigna."
15        Do you see that?
16     A.  Yes.
17     Q.  And I take it that then these arrays
18 were arrays that were kept internally at Cigna
19 only?
20     A.  Yes.
21     Q.  So you didn't publish these up on a
22 website or distribute them out to providers, for

77

1  instance?
2      A.  No.
3      Q.  Is it fair to say that the -- that the
4  only information that would be publicly available
5  from the Cigna arrays would be the actual fee
6  payment that you set for ipratropium bromide?
7      A.  Yes.
8        MR. FAUCI:  Object to the form.
9  BY MR. GORTNER:
10     Q.  And individuals who were not part of
11 the -- the Cigna DMERC or individuals connected
12 with other DMERCs wouldn't know the specific
13 drugs that you placed in each particular portion
14 of the array; is that right?
15     A.  If I had a dispute with one of the
16 other -- or in the fee that I came up with with
17 one of the other DMERCs, if we had a discrepancy
18 then they could know how I put on those
19 conference calls.
20        They also would have the information
21 that's in the lower -- with the KO and KPs, that
22 lower left-hand corner, all four DMERCs would

## Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

Nashville, TN

21  (Pages 78 to 81)

| | 78 |
|---|---|

1  have had that calculation.
2      Q.  But how about anyone else outside of
3  the DMERCs?
4      A.  No.
5      Q.  They wouldn't have access to that
6  information of how you put a particular drug in a
7  particular generic versus brand array, for
8  instance?
9      A.  I would say on a routine basis, no. I
10  don't know if someone like you subpoenaed the
11  documents.
12      Q.  Okay.  So through a formal subpoena,
13  those documents might be produced?
14      A.  Yes.
15      Q.  I'm just trying to establish, in the
16  normal course, a manufacturer like Roxane, for
17  instance, as far as you know, wouldn't have a
18  publicly available source to be able to look and
19  see, Oh, you put our Roxane ipratropium bromide
20  in the generic array of Cigna, and you put the
21  Novaplus Ipratropium Bromide in the brand array?
22      A.  Correct.

| | 79 |
|---|---|

1      Q.  They wouldn't know that, right?
2      A.  That is correct.
3      Q.  Correct?
4      A.  Correct, would not.
5      Q.  If you could look at the next page,
6  which is Bates labeled 01110, and this appears to
7  be a printout from the October 2000 Red Book for
8  Windows CD that lists all the products associated
9  with ipratropium bromide; is that right?
10      A.  Yes.  The products that I selected.
11      Q.  Okay.  In -- in this particular sheet
12  that we're looking at, what would you have
13  selected to get this particular printout from the
14  Red Book CD?
15      A.  I would have selected solution .02
16  percent.
17      Q.  That -- does that refer -- that refers
18  to a specific J-code or HCPCS?
19      A.  Yes.
20      Q.  Okay.  So for that particular
21  solution, this is -- these are all the -- the
22  listings in the Red Books CD that you can see,

| | 80 |
|---|---|

1  right?
2      A.  Yes.
3      Q.  And then it looks like in the -- in
4  the pages that follow it that begin with Bates
5  label CIGNA 01111 through CIGNA 01119, those are
6  printouts from the Red Book CD-ROM of what's
7  called detailed product information for each one
8  of those ipratropium bromide NDCs; is that right?
9      A.  Yes.
10      Q.  And that was just another -- a tab you
11  could click on the Red Book CD, for instance?
12      A.  Yes.
13      Q.  And with respect to this information,
14  the information that was on the product
15  information list and all the detailed product
16  information, that was all available to you as you
17  were constructing the Cigna arrays from
18  ipratropium bromide, correct?
19      A.  Yes.
20      Q.  And you're familiar with the
21  information contained on -- on this Red Book
22  CD-ROM as you've printed it out here, right?

| | 81 |
|---|---|

1      A.  Yes.
2      Q.  Okay.  Now, taking a look at CIGNA
3  0111, the detailed product information screens, I
4  just want to talk to you a little bit about these
5  screens.  The first entry there has the product
6  name for Atrovent, right?
7      A.  Yes.
8      Q.  And then underneath it, it has a
9  generic name for ipratropium bromide, correct?
10      A.  Yes.
11      Q.  And you knew, didn't you, that the
12  generic name for these products was ipratropium
13  bromide at all pertinent times?
14      A.  Yes.
15      Q.  Okay.  And Atrovent obviously is a
16  different kind of name than ipratropium bromide?
17      A.  Yes.
18      Q.  And that's why based upon the Red Book
19  CD-ROM you would classify it as a brand, correct?
20      A.  Yes, based on this and CMS
21  instructions.
22      Q.  Now, you see a -- that there's also a

Nashville, TN

22  (Pages 82 to 85)

82

1    field that Red Book provided to you throughout
2    this time that is labeled Generic and has a Y/N.
3    Did you understand that to be yes or no generic
4    field?
5        **A.  Yes.**
6        Q.  And it tells you here that it -- that
7    Red Book is classifying Atrovent as a brand drug,
8    right, because it has an N or a no next to the
9    generic field?
10       **A.  Yes.**
11       Q.  And you understood that at the time,
12   right?
13       **A.  I quite honestly didn't go that far.**
14       Q.  Okay.  Well, let's talk -- let's talk
15   a little bit more about that in a second.
16       Going through CIGNA 0111, you can see
17   there's -- there's another listing of ipratropium
18   bromide from Allscripts manufacturer, and that
19   has a generic yes in that field indicator.  Do
20   you see that?
21       **A.  Yes.**
22       Q.  So it's -- Red Book is telling you

83

1    that it considers the Allscripts ipratropium
2    bromide to be a generic drug, correct?
3        **A.  Yes.**
4        Q.  Then if you continue to flip through
5    these next few pages, there's listings you'll see
6    for Alpharma ipratropium bromide, which is also
7    called ipratropium bromide, and Dey's on Page 3
8    of the Red Book printout.
9        And if you continue on where there are
10   some other NDCs and you get to Roxane's
11   ipratropium bromide at the bottom of Page 5 of
12   this October 2000 Red Book CD, do you see that?
13       **A.  Yes.**
14       Q.  And there the product name is
15   ipratropium bromide, the manufacturer is Roxane,
16   and on the top of Page 6, Red Book, again, is
17   telling you that this is a generic product,
18   right?
19       **A.  Yes.**
20       Q.  Okay.  And it's the same for the other
21   Roxane label ipratropium bromides, which are
22   listed on Page 6.  They're both in different

84

1    package sizes, but, again, the generic field is
2    telling you that that's a generic product,
3    correct?
4        **A.  Yes.**
5        Q.  Then if you turn to Page 8 and 9 of
6    this October 2000 printout, which is CIGNA 0118
7    and CIGNA 0119, you can see that the three
8    Novaplus products are listed on the Red Book CD,
9    correct?
10       **A.  Yes.**
11       Q.  Okay.  And -- and the way these are
12   listed by product name, it has the generic
13   chemical name, ipratropium bromide, it then has a
14   dash, and the word Novaplus, correct?
15       **A.  Yes.**
16       Q.  All right.  And there are three
17   different NDC entries on Pages 8 and 9, and they
18   refer to different package sizes, correct?
19       **A.  Yes.**
20       Q.  And for all three of these NDCs, the
21   Red Book CD-ROM is telling you that these are
22   also generic products, correct?

85

1        **A.  Yes.**
2        Q.  And it's telling you that because in
3    the specific generic field it has a Y for yes for
4    all three NDCs; isn't that right?
5        **A.  Yes.**
6        Q.  Now, did you take that information
7    into account when you were classifying a Novaplus
8    product in the Cigna arrays?
9        **A.  No.**
10       Q.  Can you explain why you didn't take
11   that information into account?
12       **A.  I was looking specifically at the name**
13   **of the drug, the name of the drug being different**
14   **than the generic name, so I considered it a brand**
15   **name.**
16       Q.  Okay.  So the presence of the term
17   Novaplus preceded by a dash would lead you to
18   believe that it was a brand name versus a generic
19   name?
20       **A.  Yes.**
21       Q.  And -- and just to be clear about the
22   testimony we talked about earlier, you're

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                    October 16, 2009

## Nashville, TN

23  (Pages 86 to 89)

86

1   assuming that that was the decision that you made
2   with respect to these drugs based upon the policy
3   that Cigna had at the time; is that fair to say?
4        MR. FAUCI:  Object to form.
5        THE WITNESS:  Yes.
6   BY MR. GORTNER:
7        Q.  And as -- as you sit here today, you
8   don't have a specific recollection of exactly why
9   you classified these particular Novaplus products
10  here on Pages 8 and 9 as brands in the array?
11       MR. FAUCI:  Object to the form.
12       THE WITNESS:  I still recollect that I
13  classified them as brand because the name is
14  different.  So my instruction is still if the
15  name of the product is different than the generic
16  name of the drug, then I consider it a brand.
17  BY MR. GORTNER:
18       Q.  Yeah.  And I -- I understand that that
19  was your policy, correct?  That was the policy
20  that you understood that you implemented during
21  this time, right?
22       **A.  Yes.**

87

1        Q.  My question is a little bit different.
2   My question is, do you have a specific
3   recollection about the actual decision that you
4   made with respect to this particular drug at the
5   time it first was put into a Cigna array?
6        **A.  On here, I circled the Novaplus, so**
7   **that's where I was thinking I needed to consider**
8   **it -- or check on it.**
9        Q.  Okay.
10       **A.  But other than that, no, I'm -- I'm**
11  **still thinking it's -- it's a brand name.**
12       Q.  Now, looking at Pages 8 and 9 of this
13  printout, what you're referring to are some
14  underlinings under the word Novaplus and some
15  circles around the term on this particular
16  printout; is that right?
17       **A.  Yes.**
18       Q.  Can you identify those markings?  Are
19  they your pen marks?
20       **A.  I believe that they are, yes.**
21       Q.  You're not sure one way or the other?
22       **A.  I -- because the array is mine, I**

88

1   would say, yes, they're mine.
2        Q.  And -- and you would have circled them
3   at the time that you had printed this out; is
4   that correct?
5        **A.  Yes.**
6        Q.  Explain to me what the procedure was
7   in terms of how these printouts were generated.
8        **A.  There really wasn't a procedure.  I**
9   **printed them for my own reference in the event**
10  **that I had to go back and look at the array.  I**
11  **would have the documentation since the CD**
12  **wouldn't be available.**
13       Q.  All right.  So is it fair to say that
14  all the printouts that we have that are attach --
15  from the Red Book CD-ROM that are attached to the
16  back of these arrays were printed on or about the
17  time you were constructing the array that's --
18  precedes the printout?
19       **A.  Yes.**
20       Q.  And then you kept these in your files
21  over all these years?
22       **A.  Yes.**

89

1        Q.  Now, why did you circle the single
2   dose vial, which is the acronym SDV, five-by-five
3   protecta-pack?  Why would you circle that?
4        **A.  I honestly don't know at this**
5   **particular time.  I had a question on it at that**
6   **time.  And I can't tell whether I was circling**
7   **the single dose vial, protecta-pack, or the --**
8   **whether it was the single dose vial or the fact**
9   **that it was protecta-pack.**
10       **I didn't know if the protecta-pack was**
11  **like the Carpujects or something like that, I**
12  **think is what I was looking at to go back and**
13  **check, but I honestly don't know.**
14       Q.  Okay.  But there's no doubt that you
15  were looking specifically at these detailed
16  product information printouts from the Red Book
17  CD-ROM because you actually circled certain
18  segments of the hard copy on this, right?
19       **A.  Yes.**
20       Q.  Okay.  And, therefore, you would have
21  -- you would have definitely seen that Red Book
22  had classified it as a generic drug, right?

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                    October 16, 2009

Nashville, TN

24  (Pages 90 to 93)

90

1       A.  I didn't look at that field.
2       Q.  So you would print this out, but you
3   would stop reading at a point earlier on this
4   printout?
5       A.  I would only look at the fields that I
6   needed.
7       Q.  And what were those fields?
8       A.  I would be looking at the product
9   name, the Orange Book description, additional
10  description, generic name.
11      Q.  Well, what about the Orange Book code,
12  what would you look at for that?
13      A.  There are certain Orange Book codes
14  that we had to exclude from the array.
15      Q.  Which ones were those?
16      A.  I do not remember.
17      Q.  Do you know what the Orange Book code
18  AN stands for?
19      A.  I do not.  The Red Book has a listing.
20      Q.  It has a listing in -- in the cover --
21  in the front cover of the Red Book?
22      A.  The hard copy, I believe so.  And on

91

1   the CD, there is a drop-down box where you can
2   find it.
3       Q.  And what would you do?  You would look
4   at the -- the Orange Book code and then refer
5   over to the CD or to a hard copy to figure out
6   what that Orange Book code was?
7       A.  No.  There are certain Orange Book
8   codes in some of the earlier instructions from
9   CMS that were be -- to be excluded from the
10  arrays, so I needed to check to see which.
11      Q.  Okay.  Well, would it surprise you to
12  know that the AN designation from the Orange Book
13  code is in reference to a therapeutically
14  equivalent solution, a generic drug?  Would that
15  surprise you?
16      A.  I honestly don't know what they are,
17  so I wouldn't have looked.  I mean, I don't -- it
18  wouldn't surprise me because I don't know exactly
19  what they are.
20      Q.  Okay.  But you looked at the Orange
21  Book code, but you -- you wouldn't look at the
22  line that was seven lines down, in that generic

92

1   field yes-or-no field, that's something you
2   wouldn't pay attention to?
3       A.  I didn't go that far.
4       Q.  Just disregard that information
5   entirely?
6       A.  Yes.
7       Q.  Okay.  If at the time you were
8   classifying this drug as a brand you had seen
9   that the Red Book, in fact, was telling you that
10  it was a generic drug, would that have changed
11  your classification decision?
12      A.  No.
13      Q.  And the reason for that is?
14      A.  Because the name of the drug has
15  Novaplus in it.  And per the CMS instructions, if
16  the name of the drug is different than the
17  generic name, I consider it to be a brand name.
18      Q.  It wouldn't matter what the Red Book
19  compendia told you about the classification of
20  the drug as a generic or brand, that information
21  wouldn't be something you would consider?
22      A.  I wouldn't consider it.

93

1       Q.  How about another compendia,
2   FirstDataBank, for instance, if it told you it
3   was a generic drug?
4       A.  I don't use FirstDataBank, so I would
5   not have gone there.
6       Q.  I'm saying hypothetically speaking if
7   you had known at the time you were classifying
8   this drug as a brand that the Red Book compendia
9   and FirstDataBank classified it as a generic
10  drug, and it had a code from the Orange Book that
11  indicated it was a generic drug, would that have
12  made you consider whether it was a generic drug
13  and not a brand?
14      A.  No.
15          MR. FAUCI:  Object to the form.
16
17
18
19  BY MR. GORTNER:
20      Q.  And you relied on the other
21  information from the Red Book, right?  You relied
22  on the AWPs, correct?

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                    October 16, 2009

# Nashville, TN

25  (Pages 94 to 97)

94

1    **A.  Yes.**
2    Q.  And you relied -- you relied on the
3    product name being described accurately in the
4    Red Book, right?
5    **A.  Yes.**
6    Q.  And you relied on its description of
7    the route of administration, for instance?
8    **A.  Yes.**
9    Q.  So you relied on information about
10   package size?
11   **A.  Yes.**
12   Q.  Okay.  So you consider it to be a
13   reliable source of -- of information pertinent to
14   your classification of this drug in the arrays,
15   right?
16   **A.  Yes.**
17   Q.  Why -- why wouldn't you rely upon the
18   generic indicator?
19   **A.  I didn't ever go that far.  I -- if**
20   **the name was different, I followed the CMS**
21   **instructions and considered it a brand.**
22   Q.  Now, we -- we talked a moment earlier

95

1    that looking at the annual hard copy Red Book
2    printout, this same rule that you're referring to
3    as the HCFA rule would have led you to classify
4    the product as a generic, correct?
5    **A.  Yes.**
6    Q.  All right.  So the classification of
7    the product as a generic or a brand in your
8    arrays depended on whether you were looking at
9    the Red Book CD-ROM versus the Red Book hard copy
10   version; is that correct?
11   MR. FAUCI:  Object to the form.
12   THE WITNESS:  I would say yes because
13   it's listed differently in both.  The hard copy
14   did not say Novaplus.  It only said ipratropium
15   bromide.  The CD says Ipratropium
16   Bromide-Novaplus.  The names are different, so I
17   classified it based on how the name was listed.
18   BY MR. GORTNER:
19   Q.  Right.  But the reason you classified
20   it as a brand drug was because you were looking
21   at the Red Book CD-ROM, correct?
22   MR. FAUCI:  Object to the form.

96

1    THE WITNESS:  That was -- yes, I looked
2    at the CD-ROM.
3
4
5
6    BY MR. GORTNER:
7    Q.  So the answer is, that's correct, that
8    it was based upon how the product was described
9    in the Red Book CD-ROM, correct?
10   MR. FAUCI:  Object to the form.
11   THE WITNESS:  Yes, I based it on how it
12   was listed in the CD-ROM.
13   BY MR. GORTNER:
14   Q.  Did you at any point compare how
15   things were listed in the CD-ROM to how they were
16   listed in the printed Red Book?
17   **A.  No.**
18   Q.  Did you do so for this particular
19   product?  The answer would be no, I assume, since
20   you didn't do it for any product, right?
21   **A.  Right.**
22   Q.  Probably withdraw that question.

97

1    Now, how about if the product was
2    listed ipratropium bromide-Roxane instead of
3    Novaplus?
4    MR. FAUCI:  Object to the form.
5    BY MR. GORTNER:
6    Q.  How would you have classified that
7    drug?
8    **A.  I would have classified it as a brand**
9    **name.**
10   Q.  And if the product were listed as
11   ipratropium bromide-CVS?
12   **A.  I would have classified it as a brand**
13   **name.**
14   Q.  And what are some other large retail
15   pharmacy chains in the Nashville area?  Do you
16   have Walgreens down here?
17   **A.  We do.**
18   Q.  And you're familiar that Walgreens has
19   a series of drugs that it -- it lists under a
20   Walgreens name?  For instance, have you seen
21   Walgreens ibuprofen, for instance?
22   **A.  I don't use Walgreens.  I don't -- I'm**

Nashville, TN

26  (Pages 98 to 101)

---

98

1    not familiar with it.
2        Q.  What pharmacy do you use?
3        A.  Actually I go through Cigna Tel-Drug.
4        Q.  That would make sense given a Cigna
5    employee.
6            Well, let's say that -- that the drug
7    was listed as ipratropium bromide-Walgreens, for
8    instance.  How would you have classified the drug
9    like that?
10       A.  If the drug -- if we're talking about
11   it listed in the Red Book as, then I would
12   classify it as a brand name.
13       Q.  It doesn't matter what comes after the
14   dash, anything that's different than the words
15   ipratropium bromide would lead you to classify
16   the drug as a brand?
17       A.  Yes.
18           MR. FAUCI:  Objection to the form.
19   BY MR. GORTNER:
20       Q.  So even if the title said Ipratropium
21   Bromide-Novaplus and had a follow-up dash that
22   said this is a generic drug in the full title,

---

99

1    you would still classify it as a brand, wouldn't
2    you?
3            MR. FAUCI:  Object to the form.
4            THE WITNESS:  I have never seen one
5    that way, so I might at this particular point ask
6    for classification from CMS.
7    BY MR. GORTNER:
8        Q.  Okay.  So there's some point where you
9    would seek some information from somebody else to
10   try to clarify whether that drug should be a
11   generic or brand, right?
12       A.  Yes.
13       Q.  But you'd agree with me that even
14   under that hypothetical scenario, technically
15   that -- under your -- meets your understanding of
16   the HCFA rules of being a brand, right?
17       A.  Yes.
18       Q.  Because that title, even if it says
19   this is a generic drug, those are words that are
20   different than exclusively the generic name of
21   the drug, right?
22       A.  Yes.

---

100

1        Q.  Now, what's your understanding of what
2    a proprietary name is?
3            MR. FAUCI:  Object to the form.
4            THE WITNESS:  I quite honestly don't
5    have an understanding of proprietary.
6    BY MR. GORTNER:
7        Q.  Okay.  And do you have an
8    understanding of what a trade name is?
9        A.  My understanding is that it's specific
10   to one entity.  I mean, it's -- I don't really
11   know the difference between -- I mean, I think
12   it's specific to one company only, and no one
13   else can use that.
14       Q.  Do you have any understanding whether
15   Novaplus is a trade name?
16           MR. FAUCI:  Object to the form.
17           THE WITNESS:  I -- I don't.
18   BY MR. GORTNER:
19       Q.  You don't know one way or the other,
20   right?
21       A.  Right.
22       Q.  Do you have any understanding whether

---

101

1    Novaplus is a proprietary name?
2        A.  No, I don't.
3        Q.  You don't know one way or the other?
4            Now, with respect to the Novaplus
5    drugs, were you familiar with that Novaplus
6    designation?
7        A.  I have seen it in the array.  But
8    familiar with it, no.  I just put it into the
9    arrays.
10       Q.  So you didn't know what the Novaplus
11   meant?
12       A.  Correct.
13       Q.  You didn't know that these were drugs
14   that were being sold exclusively to Novation's
15   GPO members?
16       A.  No.
17       Q.  But you knew that it was the same
18   manufacturer, Roxane, as -- as the other
19   ipratropium bromide that was listed on Pages 5
20   and 6 of this Red Book CD, right?
21       A.  Same manufacturer, yes.
22       Q.  And you can see that the same -- the

---

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                     October 16, 2009

Nashville, TN

102

1 same manufacturer had named both products with
2 the terms ipratropium bromide in the title,
3 right?
4 **A. Yes.**
5 Q. And with respect to the Roxane label
6 ipratropium bromide, there was no doubt in your
7 mind that that was a generic product at all
8 times, correct?
9 **A. Correct.**
10 Q. And you never stopped to think about
11 the fact that Roxane had a generic product with
12 the title ipratropium bromide in it and another
13 product with the addition of Novaplus and that
14 those two products were likely to be generics?
15 MR. FAUCI: Object to the form.
16 THE WITNESS: No.
17 BY MR. GORTNER:
18 Q. How about the fact that the AWPs were
19 identical for the respective package sizes
20 between the Roxane label and the Novaplus label
21 ipratropium bromide?
22 **A. No.**

103

1 Q. You didn't pay attention to that?
2 **A. No.**
3 Q. Can you think of any instance where
4 you were unsure whether a product should be
5 classified as a generic or a brand?
6 **A. I cannot.**
7 Q. Do you think there was any such
8 instance where there was confusion in your mind
9 about whether a product should be a generic or a
10 brand?
11 MR. FAUCI: Object to the form.
12 THE WITNESS: I honestly can't remember
13 specifics. I can't say that during that entire
14 time that there might have been some
15 conversations for -- on the different calls with
16 the DMERCs, whether we classify, you know, in the
17 brand or the generics when we were discussing the
18 arrays and we came out with different amounts.
19 BY MR. GORTNER:
20 Q. Are you aware that DMERC-A classified
21 these same Ipratropium Bromide-Novaplus products
22 as generic products in their arrays the entire

104

1 three-year plus period that they were in the
2 arrays?
3 **A. No.**
4 Q. And were you aware that the Palmetto
5 DMERC for one quarter isn't sure whether they
6 classified that product as a generic or a brand
7 in its array?
8 **A. No.**
9 Q. And had you known that DMERC-A was
10 classifying this product as a generic about that
11 time would that have caused you to reconsider
12 your classification of it as a brand?
13 **A. We might have discussed it on the
14 call. We would have still said we thought it
15 should have been brand because of the name, but
16 there could have been discussion.**
17 Q. Now, are you familiar with -- with the
18 process by which the Cigna Part B carrier
19 constructs arrays for non-DMERC drugs?
20 **A. No.**
21 Q. Where -- where is -- where is the
22 Cigna Part B?

105

1 **A. Cigna Part B is in the same building.
2 They're on different floors than I am.**
3 Q. So they're located in the same
4 building as you?
5 **A. Yes.**
6 Q. Do you ever interact with the staff
7 that construct arrays for Cigna Part B?
8 **A. As far as developing the arrays?**
9 Q. Yes.
10 **A. The only interaction I've had is
11 helping them -- or they looked at some of our
12 spreadsheets initially when they were going from
13 hard copy to spreadsheets.**
14 Q. Okay.
15 **A. And then, of course, with the CD when
16 we went to multiuser, we have to -- the -- the CD
17 is shared between the two contracts, so we
18 interact with getting the CD tested and loaded.**
19 Q. But you never interact with them in
20 terms of how they classify products as generics
21 or brands, for instance?
22 **A. No.**

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                                    October 16, 2009

## Nashville, TN

28  (Pages 106 to 109)

106

1      Q.  Now, as far as you know, isn't Part B
2  operating under the same criteria for classifying
3  generics and brands as the DMERCs are?
4      **A.  I don't know.**
5      Q.  But do you see any reason based on
6  your awareness of the HCFA transmittal and the
7  Medicare drug pricing procedure documents why
8  Cigna's Medicare Part B carrier should be
9  classifying drugs differently than you as the
10  DMERC should?
11      **A.  I don't have their instructions, so I
12  can't say.  We had different regional contracts.
13  We look at drugs differently because we have
14  different coverage criteria.  So I cannot say how
15  they actually classify and if they have the same
16  instructions.**
17      Q.  So it's possible that they're using
18  different criteria for classifying drugs than you
19  are?
20      **A.  Yes.**
21      Q.  So maybe they're not looking to the --
22  to the product name to see whether it's a gen- --

107

1  whether it's a generic chemical name or something
2  other than generic chemical name to determine
3  whether it's a brand; is that right?
4      **A.  I don't have their instructions, so I
5  -- I would say that they could have different
6  instructions.  I just don't know.**
7      Q.  But you know, don't you, that they
8  have classified other drugs that have the label
9  Novaplus in it as a generic and not a brand,
10  right?
11      **A.  I did get some of their -- or looked
12  at some of their arrays for this case.  Those
13  were some that were sent to me, and, yes, I did
14  see that they arrayed them as generics.**
15      Q.  Okay.  So even within Cigna, there
16  wasn't consistency between the DMERC
17  classification of a drug with a Novaplus in its
18  title and the Part B classification of the drug
19  with Novaplus in its title, right?
20      **A.  Yes, but they're different contracts
21  with different -- possibly different
22  instructions.  For example, single drug pricer**

108

1  **applied to the Part B but did not apply to the
2  DMERCs.**
3      Q.  Let's take a look at this HCFA
4  transmittal that you've been referring to.  Maybe
5  that will help clarify this issue.  I'm going to
6  hand you what's been previously marked as Abbott
7  529.  We're going to go ahead and mark it as
8  Roxane 263.
9          (Marked Exhibit Roxane 263.)
10  BY MR. GORTNER:
11      Q.  Here you go, Ms. Helton.  And this is
12  Transmittal No. AB-98-76 dated December 1998, and
13  it's a program memorandum to intermediaries and
14  carriers.  Do you see this?
15      **A.  Yes.**
16      Q.  And I'll draw your attention to the
17  middle of the page under calculation of the AWP
18  No. 2, HCFA writes in the second sentence, "A
19  brand name product is defined as a product that
20  is marketed under a label name that is other than
21  the generic chemical name for the drug or
22  biological."

109

1          Do you see that?
2      **A.  Yes.**
3      Q.  And that's the -- the criteria that
4  you've been referring to that you apply to
5  classifying drugs as generics or brands, right?
6      **A.  Yes.**
7      Q.  And this program memorandum was sent
8  to all Medicare carriers, right?
9      **A.  I cannot say whether it was or.  It --
10  I mean, it appears at the top.  All I know is
11  that I received it.**
12      Q.  Do you have any reason to believe that
13  -- that this program memorandum and the statement
14  within it here with respect to brand name
15  products wouldn't apply to Cigna's Part B
16  carrier?
17      **A.  I don't know if they get separate
18  instructions or not.**
19      Q.  Well, in terms of establishing the
20  payment methodology for Part B drugs, is it your
21  understanding that Cigna's Part B drugs would be
22  paid under a different methodology than the

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                                    October 16, 2009

## Nashville, TN

29 (Pages 110 to 113)

|  | 110 |
|---|---|
| 1 | median AWP of generics or the brand AWP if it |
| 2 | were lower? |
| 3 | **A.  I don't know what methodology they** |
| 4 | **used. I -- I wasn't -- when these instructions** |
| 5 | **came out, I wasn't in the loop of who they were** |
| 6 | **sent to.  I only got them after the fact, so I** |
| 7 | **can only say that I saw the instruction.** |
| 8 | Q.  But you've been using that -- that |
| 9 | instruction throughout the time period 2001 to |
| 10 | 2004, right? |
| 11 | **A.  Yes.** |
| 12 | Q.  Let's take a look at what I'll mark as |
| 13 | Roxane Exhibit 264. |
| 14 | (Marked Exhibit Roxane 264.) |
| 15 | BY MR. GORTNER: |
| 16 | Q.  And I believe this is a document you |
| 17 | may have seen before.  It is a -- an array from |
| 18 | the Cigna Medicare Part B carrier with respect to |
| 19 | a drug called doxorubicin hydrochloride.  Have |
| 20 | you seen this document before, Ms. Helton? |
| 21 | **A.  I'm not sure if this is one that was** |
| 22 | **sent to me to look at or not.** |

|  | 111 |
|---|---|
| 1 | Q.  Okay.  I'll represent to you that -- |
| 2 | the document as I described it a moment ago.  And |
| 3 | as you can see at the top in the pricing sheet, |
| 4 | it says, "Doxorubicin hydrochloride HCL," and |
| 5 | then it has a reference specifically to Novaplus |
| 6 | in the title.  Do you see that? |
| 7 | **A.  Yes.** |
| 8 | Q.  And the document is dated May 13th, |
| 9 | 2002, right? |
| 10 | **A.  Yes.** |
| 11 | Q.  And it looks like it's the 2002 |
| 12 | pricing for the third quarter, correct? |
| 13 | **A.  Yes.** |
| 14 | Q.  And if you look at the bottom of the |
| 15 | -- of the array, you can see that there's a |
| 16 | series of entries for what says brand Rx, and |
| 17 | those appear to be entries for products that are |
| 18 | in the brand portion of the array.  Do you see |
| 19 | that? |
| 20 | **A.  Yes.** |
| 21 | Q.  It begins with the term Adriamycin.  Do |
| 22 | you see that? |

|  | 112 |
|---|---|
| 1 | **A.  Yes.** |
| 2 | Q.  Okay.  And then above, there's a |
| 3 | listing of products that appear to be in the |
| 4 | generic portion of the array, correct? |
| 5 | **A.  Yes.** |
| 6 | Q.  And included in that generic portion |
| 7 | are doxorubicin Novaplus with a parens for |
| 8 | Bedford, right? |
| 9 | **A.  Yes.** |
| 10 | Q.  And -- and that would indicate to you |
| 11 | that the Part B carrier had classified it -- the |
| 12 | drug name doxorubicin Novaplus as a generic? |
| 13 | **A.  Yes.** |
| 14 | Q.  And had you been looking at that same |
| 15 | drug with that same name, you would have |
| 16 | classified it as a brand; isn't that right? |
| 17 | **A.  That is correct.** |
| 18 | Q.  And you don't know of any reason, |
| 19 | though, do you, why one drug should be classified |
| 20 | as a brand in a DMERC scenario versus a generic |
| 21 | in a Part B scenario, do you? |
| 22 | **A.  I don't have Part B's instructions,** |

|  | 113 |
|---|---|
| 1 | so, no, I'm not aware. |
| 2 | Q.  But depending upon the classification |
| 3 | of the drug as a generic or a brand, I mean, that |
| 4 | could significantly change the fee payment amount |
| 5 | that you set, right? |
| 6 | **A.  Yes.** |
| 7 | Q.  If it turned out that the brand AWP |
| 8 | was significantly lower than the median generic, |
| 9 | then that could have an impact theoretically, |
| 10 | right? |
| 11 | **A.  Okay.  Could you repeat that?** |
| 12 | MR. GORTNER:  That's all right.  I'll |
| 13 | withdraw the question.  That's fine. |
| 14 | Why don't we take a quick break, and I |
| 15 | can see how much more time, if any, I need. Okay? |
| 16 | Thanks. |
| 17 | THE VIDEOGRAPHER:  Going off the |
| 18 | record, time is 11:21. |
| 19 | (Brief recess observed.) |
| 20 | THE VIDEOGRAPHER:  Back on the record. |
| 21 | Time is 11:30. |
| 22 | |

Nashville, TN

**30 (Pages 114 to 117)**

---

114

BY MR. GORTNER:

 2    Q.  Ms. Helton, going back to your
 3  classification of Novaplus Ipratropium Bromide as
 4  a brand, was it the case that when you made your
 5  initial classification it remained the same at
 6  each period where you updated the array?  In
 7  other words, you wouldn't go back and reconsider
 8  the classification of the product each quarter?

 9    **A.  Correct.  If the name didn't change --**
10  **remained the same, I wouldn't have reclassified**
11  **it.**

12    Q.  Okay.  So what probably happened here
13  was the first time that the product showed up in
14  the Red Book and you determined that it should be
15  put into the array as a brand, that -- that
16  decision wasn't evaluate -- reevaluated each --
17  each quarter, right?

18    **A.  As long as nothing changed on the --**
19  **on the name, correct.**

20    Q.  Well, was the process such that the --
21  that the -- the actual arrays would be resaved or
22  reused from quarter to quarter?  In other words,

---

115

 1  what I mean to say is that the first time that
 2  Novaplus showed up as a brand in the array you
 3  constructed, would the next quarter of arrays
 4  simply you opening up that file again and
 5  importing any new drugs that came in but
 6  otherwise leaving the drugs that were in there
 7  unaltered?

 8    **A.  Yes, we -- we would verify the old**
 9  **drugs, that there were no changes in AWP,**
10  **packaging.  And if they remained the same, then**
11  **we didn't make changes to them; we added the new**
12  **ones that came in.**

13    Q.  Okay.  But as long as that name was
14  the same, it remained a brand in your arrays
15  across time?

16    **A.  Yes.**

17    Q.  Now, with respect to Cigna's decision
18  in concert with other DMERCs to look principally
19  to Red Book's CD-ROMs for pricing information,
20  would anyone outside of the DMERCs have a way of
21  knowing which particular Red Book you were
22  looking at to make your pricing arrays, printed

---

116

 1  versus CD-ROM, for instance?

 2    **A.  No.**

 3    Q.  So a manufacturer like Roxane, for
 4  instance, wouldn't know that you were looking to
 5  the Red Book CD-ROM versus the annual printed Red
 6  Book, for instance, to set up your pricing
 7  arrays?

 8    **A.  No.**

 9    MR. FAUCI:  Object to the form.

10  BY MR. GORTNER:

11    Q.  And Roxane wouldn't know, therefore,
12  that you were classifying Ipratropium
13  Bromide-Novaplus as a brand based upon the Red
14  Book CD-ROM, correct?

15    **A.  Correct.**

16    MR. FAUCI:  Object to the form.

17  BY MR. GORTNER:

18    Q.  And Roxane wouldn't know that you had
19  put the Ipratropium Bromide-Novaplus product into
20  your brand versus generic array, correct?

21    **A.  Correct.**

22    Q.  If you had called Roxane and asked

---

117

 1  them whether they considered Ipratropium
 2  Bromide-Novaplus product to be a generic or brand
 3  and they had told you that they always believed
 4  it was a generic, would that have affected your
 5  classification decision?

 6    **A.  I wouldn't have the need to call them.**
 7  **I'm going by my instructions, so I wouldn't have**
 8  **contacted them for that information.**

 9    Q.  My question is a little different. I'm
10  not asking you just to assume that you did, in
11  fact, contact Roxane about Ipratropium
12  Bromide-Novaplus and a Roxane representative
13  informed you that they always considered this to
14  be a generic and not a brand product.  Would that
15  have affected your classification decision?

16    MR. FAUCI:  Object to the form.

17    THE WITNESS:  I would say no, because
18  based on the instructions, the name being
19  different makes it a brand.

20  BY MR. GORTNER:

21    Q.  Now, with respect to the name being
22  different, I mean, the actual phrase that you've

---

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                                October 16, 2009

# Nashville, TN

31  (Pages 118 to 121)

---

118

1  been referring to is if it's a -- a product name
2  that is other than a generic chemical name; is
3  that correct?
4      **A.  Let's see.  "Brand name product is**
5  **defined as a product that is marketed under a**
6  **label name that is other than the generic**
7  **chemical name for the drug or biological."**
8      Q.  And that's the -- that's the rule that
9  you testify you were using for classifying the
10  Novaplus product?
11      **A.  Yes.**
12      Q.  Would you agree with me that the name
13  Ipratropium Bromide-Novaplus doesn't fall clearly
14  within that particular rule?
15          MR. FAUCI:  Object to the form.
16          THE WITNESS:  No, I actually think it
17  does.
18  BY MR. GORTNER:
19      Q.  Were you familiar during the course of
20  your work with Cigna about normal industry naming
21  conventions for generic versus brand drugs?
22          MR. FAUCI:  Object to the form.

---

119

1          THE WITNESS:  Not naming conventions,
2  no.
3  BY MR. GORTNER:
4      Q.  During the course of preparing the
5  arrays, you weren't aware that brand drugs are
6  typically given a -- a name that doesn't refer to
7  the generic chemical name like Atrovent, for
8  instance, or Valium?
9      **A.  No, I only follow the instructions**
10  **that I have.**
11      Q.  Okay.  So during the process of
12  implementing the instructions, you weren't
13  informed by any understanding as to how the
14  pharmaceutical industry typically names brand
15  versus generic drugs?
16          MR. FAUCI:  Object to the form.
17          THE WITNESS:  I don't have any input
18  with the pharmaceutical industry, so I'm only
19  looking at it from the standpoint of what my
20  instructions are and what's in the source that
21  I'm looking at.  And I can see that certain
22  products, you know, that had different names are

---

120

1  brands.  So that's how I consider them brands.
2          But as far as how the pharmaceutical
3  companies do the naming, no, I'm not familiar
4  with it.
5  BY MR. GORTNER:
6      Q.  And -- and the concept that every
7  single generic drug for ipratropium bromide that
8  you placed into your generic array had the
9  generic chemical name ipratropium bromide in its
10  title, that wasn't a factor that you considered
11  in determining whether a drug that had
12  ipratropium bromide in its title plus the term
13  Novaplus might be at least in an ambiguous
14  position with respect to that rule?
15          MR. FAUCI:  Object to the form.
16          THE WITNESS:  I don't really understand
17  the complete question.  I mean --
18  BY MR. GORTNER:
19      Q.  Let's see if I can simplify it.  I
20  mean, we have a situation here where every single
21  drug that you classified as a generic in your
22  array was called ipratropium bromide, which was

---

121

1  the generic chemical name, correct?
2      **A.  Yes.**
3      Q.  Right.  And you have a situation where
4  here comes another drug that's called Atrovent,
5  something completely different, and you put that
6  in a brand, right?
7      **A.  Yes.**
8      Q.  Then there's a third situation where
9  you have a drug that has the term ipratropium
10  bromide in its title, which is the generic
11  chemical name, right?
12      **A.  Yes.**
13      Q.  Which is the basis by which you
14  classified the other drugs with those two words,
15  ipratropium bromide, as generics, correct?
16      **A.  Yes.**
17      Q.  And then -- that has the addition of a
18  dash and the term Novaplus, correct?
19      **A.  Yes.**
20      Q.  My question is, under that third
21  scenario where you have both the generic chemical
22  name and an additional name, wouldn't you agree

---

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                                October 16, 2009

## Nashville, TN

32  (Pages 122 to 125)

122

1  with me that there's a reasonable interpretation
2  that a drug that's named like that falls
3  somewhere in between?
4    **A.  No.**
5      MR. FAUCI:  Object to the form.
6  BY MR. GORTNER:
7    Q.  And the reason is because any term in
8  addition to the generic chemical name in your
9  view automatically makes it a brand; is that
10  right?
11    **A.  Yes.**
12    Q.  Now, did you assume throughout this
13  time that the other DMERCs were applying the same
14  type of rule that you were with respect to
15  classifying drugs such as Ipratropium
16  Bromide-Novaplus as a brand or a generic?
17    **A.  Yes.**
18    Q.  Now, what's your explanation if the
19  rule was clear as you contend how DMERC-A
20  classified the exact same drug with the exact
21  same name as a generic for over three years?
22    **A.  I don't have an explanation.**

123

1    Q.  But wouldn't that suggest to you that,
2  therefore, the rule, if, in fact, DMERC-A was
3  applying it, is not as clear as you would suggest
4  --
5      MR. FAUCI:  Object.
6  BY MR. GORTNER:
7    Q.  -- with respect to this product?
8      MR. FAUCI:  Object to the form.
9      THE WITNESS:  To me, the rule seems
10  clear, so I can't speculate on what A did.
11  BY MR. GORTNER:
12    Q.  Have you had sufficient interactions
13  with DMERC-A representatives during this time
14  period 2001 and 2004 to -- to determine whether
15  you think they can perform their job duties
16  competently?
17    **A.  No.**
18      MR. FAUCI:  Object to the form.
19  BY MR. GORTNER:
20    Q.  It's the same for all the other
21  DMERCs, you don't know whether they were doing
22  their job competently or not?

124

1    **A.  Correct.**
2    Q.  Did you know that the Administar DMERC
3  classified the Roxane labeled ipratropium bromide
4  product as a generic for over a year?
5    **A.  No.**
6    Q.  You weren't aware of that either?
7    **A.  No.**
8    Q.  And that was a product that you
9  classified as a generic the entire time it was in
10  the Cigna arrays; isn't that correct?  I'll
11  represent to you that you did.
12    **A.  Okay.**
13    Q.  Okay.  And that decision whether to
14  put Roxane labeled ipratropium bromide in a
15  generic array for Cigna at least was based on
16  this same HCFA rule that we've been talking about
17  about whether it's a generic chemical name or
18  not, right?
19    **A.  Yes.**
20    Q.  And you believe that Administar was
21  applying that -- that rule as well?
22    **A.  I assumed they were.**

125

1    Q.  And their application of that rule led
2  them to misclassify the Roxane labeled product as
3  a brand for over a year?
4      MR. FAUCI:  Object to the form.
5  BY MR. GORTNER:
6    Q.  Do you know that?
7    **A.  I don't have actually how they**
8  **classified it, so I don't know.**
9    Q.  Does that additional piece of
10  information, assuming it to be true, lead you to
11  reconsider whether you believe that HCFA rule is
12  clear with respect to Ipratropium
13  Bromide-Novaplus?
14      MR. FAUCI:  Object to the form.
15      THE WITNESS:  To me, the rule seems
16  clear.
17  BY MR. GORTNER:
18    Q.  I wanted to go back quickly to your
19  declaration which we marked earlier today as
20  Roxane 260, I believe.  If you could turn to Page
21  13 in particular of your declaration.
22      In Paragraph 31 of the declaration, you

## Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                    October 16, 2009

Nashville, TN

33 (Pages 126 to 129)

126

1    mentioned, "During the period 2001, quarter 2, to
2    2003, quarter 4, when Roxane's Novaplus were in
3    the arrays, Cigna generally used the quarterly
4    CD-ROM as a source of information."
5         Do you see that in Paragraph 31?
6         **A. Yes.**
7         Q. Now, you don't mention the use of the
8    -- the monthly Red Book updates during this time
9    period. But you were using those as well,
10   weren't you?
11        **A. We were checking those to see if there**
12   **were any additions that weren't copied in the CD.**
13        Q. Okay. So you were using both the
14   CD-ROM and the paper versions of the Red Book
15   during this time as well, correct?
16        **A. The monthly, yes.**
17        Q. The answer is yes?
18        **A. Yes.**
19        MR. GORTNER: I don't have any further
20   questions. Thank you so much for your time.
21        MR. FAUCI: Marisa, do you have any
22   questions?

127

1         MS. LORENZO: No, I do not. Thank you.
2         MR. FAUCI: How much time do we have?
3         THE VIDEOGRAPHER: It looks like about
4    14 minutes.
5         MR. FAUCI: Let's try.
6         E X A M I N A T I O N
7    BY MR. FAUCI:
8         Q. Ms. Helton, I just have a very few
9    quick follow-up questions.
10        First, just in response to testimony
11   you just gave, you said that you were -- at the
12   time you were using the Red Book for Windows
13   program you were also using the monthly updates;
14   is that correct?
15        **A. Yes.**
16        Q. Can you explain how you used the
17   monthly updates for what purpose?
18        **A. The quarterly Windows was a month**
19   **behind when we would be developing the fees. For**
20   **example, we would be using the October 2009 to**
21   **establish the -- or October 1999 to establish the**
22   **January 2000 fees.**

128

1         So we would look at any Red Books that
2    we would get in between that time, such as
3    November or December, to see if we could pick up
4    any additional changes that we needed to.
5         Generally we would refer to those, and
6    Red Book had changes in red print, so we would
7    only be looking at the ones that were in red
8    print.
9         Q. Do you know if you ever looked to the
10   monthly updates to the Red Book in deciding how
11   to classify Ipratropium Bromide-Novaplus as a
12   brand or a generic?
13        **A. No.**
14        Q. No, you do not know; or, no, you
15   didn't?
16        **A. No, we didn't. Sorry.**
17        Q. Thank you. That was my fault.
18        Can you look back at Exhibit 263? I
19   believe this was the program memoranda. We've
20   talked at length about the language contained in
21   Paragraph 2 under the calculation of the AWP. Do
22   you see that?

129

1         **A. Yes.**
2         Q. Can you read the last sentence of that
3    paragraph?
4         **A. "A brand name product is defined as a**
5    **product that is marketed under a label name that**
6    **is other than the generic chemical name for the**
7    **drug or biological."**
8         Q. Did you rely on this language in
9    making classification decisions?
10        **A. Yes.**
11        Q. Can you go to Exhibit 261, and I'll
12   direct your attention to the Page 368. Is this a
13   -- is this pages excerpted from the 2001 hard
14   copy version of the annual Red Book?
15        **A. Yes.**
16        Q. And you see that there's a section
17   related to ipratropium bromide?
18        **A. Yes.**
19        Q. Do you recall talking to Mr. Gortner
20   earlier about the Roxane products that are listed
21   in the second column?
22        **A. Yes.**

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                                October 16, 2009

Nashville, TN

34  (Pages 130 to 133)

130

1    Q.  And you gave some testimony that those
2  products -- based on what you see here you would
3  have classified those products -- all six of
4  those products as generics; is that correct?
5    **A.  Yes, that's --**
6    Q.  Can you explain why you would have
7  done so?
8    **A.  Because they only list the name of the**
9  **drug as ipratropium bromide.**
10    Q.  If for the 8404 NDCs the product was
11  listed as Ipratropium Bromide-Novaplus, how would
12  you have classified them?
13    **A.  A brand name.**
14    Q.  Just going to very quickly -- we've
15  been talking about the Red Book for Windows
16  program, and I'd just like to ask a quick few
17  questions.
18      (Marked Exhibit US 265.)
19  BY MR. FAUCI:
20    Q.  Do you recognize this, Ms. Helton?
21    **A.  Yes.**
22    Q.  What is it?

131

1    **A.  It's the search database that comes up**
2  **when you open -- enter Red Book.**
3    Q.  Just for the record, I'll represent
4  that I did a print screen from the -- a version
5  of the Red Books for Windows.  And you've
6  identified this as the search database?
7    **A.  Yes.**
8    Q.  Is this the first screen that popped
9  up when you looked at the Red Book for Windows?
10    **A.  Yes.**
11    Q.  You can put that aside.
12      (Marked Exhibit US 266.)
13  BY MR. FAUCI:
14    Q.  Do you recognize Exhibit 266, Ms.
15  Helton?
16    **A.  Yes.**
17    Q.  What is this -- what does this appear
18  to be?
19    **A.  Once you type in the brand into the**
20  **selection field, this is the array that you get**
21  **that comes up with the word ipratropium.  And it**
22  **has an N capitalized in lowercase.**

132

1    Q.  Is this -- is -- how you would have
2  used this program is by typing in the drug you
3  were looking to get information on into the
4  search screen?
5    **A.  Yes.**
6    Q.  And if you had typed in ipratropium,
7  is this what would have come up on the screen?
8    **A.  Yes.**
9    Q.  What would have happened if you
10  clicked ipratropium, if you had hit enter or
11  okay?
12    **A.  On this particular one?**
13    Q.  On this particular screen -- no, which
14  of these would you have selected?
15    **A.  I would have selected the lower case,**
16  **the ipratropium bromide, because it would have**
17  **pulled all of the ipratropium bromides into that**
18  **and then hit okay.**
19    Q.  And what would have happened then?
20    **A.  Then it would have brought up a list**
21  **of manufacturers for the different drugs.**
22    Q.  And you would have used that list of

133

1  manufacturers to -- how would you have used that
2  list of manufacturers?
3    **A.  I would have said select all, because**
4  **I wanted to pull all manufacturers in, and then**
5  **hit okay.**
6    Q.  And can you explain what that would
7  have done?
8    **A.  It then brings up the detailed screen,**
9  **which are some of these that we looked at the**
10  **prints.**
11    Q.  On Exhibit 262?
12    **A.  Yes -- well, actually, it brings up**
13  **another screen before the ones on 262 where it**
14  **lists all of the -- it has -- it's the -- the**
15  **product information screen comes up, and it lists**
16  **all of the manufacturers and the products that**
17  **meet that ipratropium bromide generic**
18  **description.**
19    **And then I go in and make my selections**
20  **for the code that I'm trying to process as to**
21  **what actually I'm going to pull into the array**
22  **based on the strength and the type of the drug.**

## Nashville, TN

35  (Pages 134 to 136)

---

134

1      Q.   And then at some point in that
2   process, you would generate a list of the
3   products that fit the code; is that true?
4      A.   Yes.
5      Q.   And if you turn to Exhibit 262 on Page
6   CIGNA 0102, is that a representation of what such
7   a printout would look like?
8      A.   Yes.
9        MR. FAUCI:  I have no further
10  questions.
11          E X A M I N A T I O N
12  BY MR. GORTNER:
13     Q.   Just a quick follow-up since we're on
14  this exhibit.  If you go to CIGNA 0110, is that
15  similar to the page that Mr. Fauci was just
16  asking you about, that same page would be
17  generated when you enter ipratropium bromide and
18  go through those steps?
19     A.   Yes.
20     Q.   Okay.  So by entering ipratropium into
21  the search screen on Red Book CD-ROM, it would
22  include this list of ipratropium bromide products

---

135

1   at that particular point in time?
2      A.   Yes.
3        MR. GORTNER:  No further questions on
4   my end.
5        MR. FAUCI:  Thank you very much for
6   your time, Ms. Helton.
7        THE VIDEOGRAPHER:  This concludes the
8   deposition of Carolyn Helton, Volume 1.  Number
9   of tapes used was two.  Going off the record,
10  time is 11:52.
11       (Proceedings adjourned at 11:52 a.m.)
12       FURTHER DEPONENT SAITH NOT.
13
14   _____
15       SIGNATURE OF THE WITNESS
16
17  Subscribed and sworn to and before me
18  this _____ day of _____, 20____.
19
20
21  _____
22       Notary Public

---

136

1          REPORTER'S CERTIFICATE
2        I certify that the witness in the
3   foregoing deposition, CAROLYN HELTON, was by me
4   duly sworn to testify in the within entitled
5   cause; that the said deposition was taken at the
6   time and place therein named; that the testimony
7   of said witness was reported by me, a Shorthand
8   Reporter and Notary Public of the State of
9   Tennessee authorized to administer oaths and
10  affirmations, and said testimony, pages 1 through
11  117 was thereafter transcribed to typewriting.
12       I further certify that I am not of
13  counsel or attorney for either or any of the
14  parties to said deposition, nor in any way
15  interested in the outcome of the cause named in
16  said deposition.
17       IN WITNESS WHEREOF, I have hereunto
18  set my hand the 19th day of October, 2009.
19
20   _____
21       Elisabeth A. Miller, RPR, RMR, CRR
22       My commission expires:  3/11/2011

---

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                    October 16, 2009

## Nashville, TN

1

---

**A**

**AB** 42:14
**Abbott** 108:6
**ability** 22:18
  25:13 60:15
**able** 19:4 62:2
  78:18
**absolutely** 33:22
**AB-98-76**
  108:12
**access** 62:1
  74:12 78:5
**account** 85:7,11
**accurate** 41:15
  63:14
**accurately** 94:3
**acronym** 40:13
  89:2
**Action** 1:15
**actual** 16:14
  18:16 20:6
  34:18 40:2,5
  75:14 77:5
  87:3 114:21
  117:22
**add** 54:9
**added** 51:19
  54:18 56:15
  115:11
**addition** 69:14
  69:18 102:13
  121:17 122:8
**additional** 9:19
  52:18 57:11
  90:9 121:22
  125:9 128:4
**additions**
  126:12
**adhered** 65:5
**adjourned**
  135:11
**Administar**
  29:19 124:2,20

**administer**
  136:9
**administration**
  94:7
**Adriamycin**
  111:21
**advice** 15:17
  25:11
**affidavit** 25:12
**affirmations**
  136:10
**afield** 24:12
**ago** 52:11 59:10
  63:17 65:13
  66:9 111:2
**agree** 58:5 99:13
  118:12 121:22
**agreed** 5:13
  7:12 60:7 63:9
**agreement** 65:4
**ahead** 12:13
  108:7
**akin** 53:1
**al** 1:13,14
**albuterol** 27:1,7
**allowed** 63:18
**Allscripts** 82:18
  83:1
**Alpharma** 83:6
**Amber** 18:10,11
  18:15,21 22:9
**ambiguous**
  120:13
**America** 1:11
**amount** 31:6
  32:10 113:4
**amounts** 103:18
**annual** 16:8,9
  16:10,14 46:20
  57:20 59:4,20
  60:14 61:4,19
  61:20 95:1
  116:5 129:14
**answer** 8:9,20

  12:13,14 15:17
  17:15 22:17
  25:12 34:10
  96:7,19 126:17
**answers** 8:7
**anyway** 12:14
**appear** 71:2
  111:17 112:3
  131:17
**APPEARAN...**
  2:1 3:1
**appears** 75:18
  75:20 76:5
  79:6 109:10
**application**
  125:1
**applied** 52:8
  108:1
**applies** 21:21
**apply** 48:19
  50:15,22 108:1
  109:4,15
**applying** 48:8
  122:13 123:3
  124:21
**approached**
  9:17,18
**approaches**
  25:21
**area** 75:8 97:15
**areas** 26:7,12
**array** 4:14,16
  32:15 54:4
  75:20 76:6
  77:14 78:7,20
  78:21 86:10
  87:5,22 88:10
  88:17 90:14
  101:7 104:7
  110:17 111:15
  111:18 112:4
  114:6,15 115:2
  116:20 120:8
  120:22 124:15

  131:20 133:21
**arrayed** 107:14
**arrays** 10:6 14:2
  14:18 18:19
  19:1 20:1 21:5
  21:14 28:18
  30:7 31:12
  33:5,16,17
  53:6 55:12
  57:7,18 62:9
  64:20 67:12
  68:20,21 75:12
  75:19 76:17,18
  77:5 80:17
  85:8 88:16
  91:10 94:14
  95:8 101:9
  103:18,22
  104:2,19 105:7
  105:8 107:12
  114:21 115:3
  115:14,22
  116:7 119:5
  124:10 126:3
**aside** 14:17 22:9
  68:17 131:11
**asked** 9:21 10:3
  10:7 12:16
  13:8,16 20:19
  116:22
**asking** 9:5 17:11
  26:12 117:10
  134:16
**aspects** 9:21
  10:2,4
**assistance** 54:22
**Assistant** 2:5
**associated** 79:8
**assume** 42:19
  96:19 117:10
  122:12
**assumed** 124:22
**assuming** 22:4
  86:1 125:10

**assumption**
  34:7
**Atrovent** 56:18
  56:20 57:5
  81:6,15 82:7
  119:7 121:4
**attach** 88:14
**attached** 75:21
  88:15
**attempt** 34:2,11
**attempted** 21:6
**attention** 46:21
  92:2 103:1
  108:16 129:12
**attorney** 2:5
  136:13
**attorneys** 15:15
  15:15
**Attorney's** 6:19
  9:19
**authorized**
  64:21 76:14
  136:9
**automatically**
  122:9
**available** 38:14
  38:15 67:13
  75:4 77:4
  78:18 80:16
  88:12
**Avenue** 3:6 5:6
**average** 1:5 6:4
  10:6 11:15
  41:5,7
**aware** 64:16,19
  67:4,18 68:14
  68:22 103:20
  104:4 113:1
  119:5 124:6
**awareness**
  106:6
**AWP** 41:8,14
  42:21 43:10,18
  43:22 44:7,8

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                    October 16, 2009

# Nashville, TN

2

44:13 73:4
108:17 110:1,1
113:7 115:9
128:21
**AWPs** 41:14
43:17,22 93:22
102:18
**a.m** 5:4 6:9
135:11

**B**

**B** 14:5 40:21
41:13 42:3
104:18,22
105:1,7 106:1
106:8 107:18
108:1 109:15
109:20,21
110:18 112:11
112:21
**back** 11:2,7 12:3
12:20 16:21
21:5 23:17
46:14 49:8
66:3,7 71:13
72:3 88:10,16
89:12 113:20
114:2,7 125:18
128:18
**backup** 17:12
18:4,8,12,13
**backups** 17:22
**Barbara** 12:18
65:8
**based** 11:5 16:6
19:15 30:17
33:7 34:8 40:7
41:20 44:1,3
45:18 51:18
52:4 58:11,14
58:15,22 59:3
59:6 62:21
81:18,20 86:2
95:17 96:8,11

106:5 116:13
117:18 124:15
130:2 133:22
**basically** 32:6
36:14 41:5
**basing** 11:8
**basis** 12:17 41:9
78:9 121:13
**Bates** 42:20 76:5
79:6 80:4
**Bedford** 112:8
**beginning** 66:4
**begins** 6:2 43:3
76:4 111:21
**behalf** 1:21 5:2
**believe** 10:11
12:18 13:11
25:20 26:5
29:2 34:15
37:13 38:17
39:9 40:2
63:21 85:18
87:20 90:22
109:12 110:16
124:20 125:11
125:20 128:19
**believed** 117:3
**benefit** 31:20
**best** 8:13 9:22
22:17 25:13
36:9 38:8
**better** 63:14
**beyond** 26:12
**biological**
108:22 118:7
129:7
**bit** 14:10 17:16
42:11 54:19
73:14 81:4
82:15 87:1
**Blue** 64:1,4
65:14
**Boehringer** 1:13
2:12 6:17

**bold** 47:3 48:1
48:12,14
**boldface** 44:18
45:1,2
**book** 4:11 15:4
15:5,6,22 16:5
16:6,9 20:7,8
45:18 46:2,8
46:20 48:20
50:18 57:21
58:2,12 59:1,4
59:12,15 60:11
61:4,12,15,21
62:2,10,13,22
63:4,9,13,18
64:1,4 65:3,4,9
65:14,15 66:17
66:18,19 67:9
67:15 68:3,7
68:22 69:9,13
70:2,9 73:9,12
73:15,22 74:3
75:4,14,21
79:7,14 80:6
80:11,21 81:18
82:1,7,22 83:8
83:12,16 84:8
84:21 88:15
89:16,21 90:9
90:11,13,17,19
90:21 91:4,6,7
91:12,21 92:9
92:18 93:8,10
93:21 94:4
95:1,9,9,21
96:9,16 98:11
101:20 114:14
115:21 116:5,6
116:14 126:8
126:14 127:12
128:6,10
129:14 130:15
131:2,9 134:21
**Books** 15:11,20

16:9,17,18
79:22 128:1
131:5
**Book's** 115:19
**Boston** 2:8
**bottom** 43:1
49:18 76:10
83:11 111:14
**box** 91:1
**boxes** 4:12 71:7
71:9,10 72:3,7
**brand** 10:9,18
11:17 13:15,20
20:4 21:2,8
28:7 34:6 41:8
41:14,21 43:8
43:18,22 44:10
44:17 47:13
48:11,17 49:6
50:17 52:6,22
53:4,4 55:8,13
56:1,5,11,16
56:22 57:6,18
66:12,15,21
67:7 68:6,14
69:6 78:7,21
81:19 82:7
85:14,18 86:13
86:16 87:11
92:8,17,20
93:8,13 94:21
95:7,20 97:8
97:12 98:12,16
99:1,11,16
103:5,10,17
104:6,12,15
107:3,9 108:19
109:14 110:1
111:16,20
112:16,20
113:3,7 114:4
114:15 115:2
115:14 116:13
116:20 117:2

117:14,19
118:4,21 119:5
119:14 121:6
122:9,16 125:3
128:12 129:4
130:13 131:19
**brands** 14:16
15:2 17:9
20:12 25:1
32:17 34:14,16
35:1,5 43:4,10
44:22 45:6
65:16 70:4
86:10 105:21
106:3 109:5
120:1,1
**break** 9:1,2 46:6
46:7 65:18
113:14
**Brief** 46:13 66:2
113:19
**bring** 31:22
**brings** 133:8,12
**bromide** 19:22
31:4 32:5,9
33:5,11 47:3
47:18 48:5
51:21 52:1,4
52:15 56:19
57:10,17 58:3
58:13,14,20
59:7 61:9
75:22 76:6
77:6 78:19,21
79:9 80:8,18
81:9,13,16
82:18 83:2,6,7
83:11,15 84:13
95:15 98:15
101:19 102:2,6
102:12,21
114:3 120:7,9
120:12,22
121:10,15

Nashville, TN

3

124:3,14
129:17 130:9
132:16 133:17
134:17,22
**bromides** 47:6
49:10 83:21
132:17
**bromide-CVS**
97:11
**Bromide-Nov...**
18:19 20:16,22
21:17 22:5
95:16 98:21
103:21 116:13
116:19 117:2
117:12 118:13
122:16 125:13
128:11 130:11
**bromide-Rox...**
97:2
**bromide-Wal...**
98:7
**brought** 132:20
**building** 71:12
105:1,4
**bullet** 43:2
44:15
**B's** 112:22

— C —

**C** 6:1
**cabinet** 72:11,13
74:11
**calculate** 42:2
**calculation**
43:11 78:1
108:17 128:21
**call** 14:1 29:17
31:17 32:6
67:9,14 69:4
104:14 117:6
**called** 7:7 11:19
18:18 30:10
56:18 80:7

83:7 110:19
116:22 120:22
121:4
**calls** 28:17 29:1
29:16,21 30:3
30:4,5 31:11
32:1 39:6,10
55:16 77:19
103:15
**cap** 48:14,16
**capital** 48:12
**capitalization**
50:16,21 51:6
59:1 70:1
**capitalized**
131:22
**capitals** 48:1
**caption** 5:10
**Carolyn** 1:20
4:2 5:2 6:3 7:7
135:8 136:3
**Carpujects**
89:11
**carrier** 38:15
104:18 106:8
109:16 110:18
112:11
**carriers** 11:13
31:21 38:1,2
38:22 40:10,11
42:7 108:14
109:8
**carries** 44:16
**case** 1:8 6:6 7:21
9:12 13:11
25:22 44:20,22
107:12 114:4
132:15
**cases** 25:21
**categorized**
19:6 57:18
**cause** 136:5,15
**caused** 104:11
**caution** 25:8

**CD** 15:22 16:7
20:7 50:10,10
60:9,21 75:4
79:8,14,22
80:11 83:12
84:8 88:11
91:1,5 95:15
101:20 105:15
105:16,18
126:12
**CDs** 50:13 60:1
60:3,6,8,14,15
61:15,21 62:2
73:12,15,17,18
74:14,17
**CD-ROM** 16:5
75:21 80:6,22
81:19 84:21
88:15 89:17
95:9,21 96:2,9
96:12,15 116:1
116:5,14 126:4
126:14 134:21
**CD-ROMs** 15:6
69:9,14,18
70:9 115:19
**center** 76:10
**certain** 7:20
9:20,21 89:17
90:13 91:7
119:21
**certificate** 5:10
136:1
**certify** 136:2,12
**cetera** 5:10
**chains** 97:15
**change** 10:5,5
61:11 65:19
113:4 114:9
**changed** 25:6
50:6 63:21
92:10 114:18
**changes** 23:16
23:18,22 25:3

26:6,20 27:1
115:9,11 128:4
128:6
**Chapter** 37:15
**charts** 27:2,6,11
**check** 87:8
89:13 91:10
**checking** 126:11
**chemical** 48:4
56:19,21 57:10
57:13 58:8
84:13 107:1,2
108:21 118:2,7
119:7 120:9
121:1,11,21
122:8 124:17
129:6
**Chicago** 2:17
**chloride** 53:10
**choose** 64:22
**chose** 69:1
**chosen** 63:6
**Cigna** 7:14 8:1
10:8 13:2 14:1
14:3,3,6 15:1
15:16 16:4
17:8,21 18:19
18:22 19:7
20:1 29:12,16
30:2 33:15
34:21 43:21
45:5,21 48:19
50:1,15 52:8
53:2 55:14
57:6 59:11,15
62:9,9,13,15
64:20 65:9
68:20 71:16,22
72:17 75:19,20
76:7,12,14,18
77:5,11 78:20
80:5,5,17 81:2
82:16 84:6,7
85:8 86:3 87:5

98:3,4 104:18
104:22 105:1,7
107:15 110:18
118:20 124:10
124:15 126:3
134:6,14
**Cigna's** 68:3,9
106:8 109:15
109:21 115:17
**CIGNA-0109**
76:4
**circle** 89:1,3
**circled** 87:6
88:2 89:17
**circles** 87:15
**circling** 89:6
**circumstance**
32:13
**citation** 12:2
**Civil** 1:15 5:7
**claims** 7:22 31:6
37:20
**clarify** 9:5 12:7
69:4 99:10
108:5
**classification**
13:15 17:8
18:16 22:11
26:6 66:20
92:11,19 94:14
95:6 99:6
104:12 107:17
107:18 113:2
114:3,5,8
117:5,15 129:9
**classifications**
19:13 32:16
**classified** 10:8
14:1 15:2
20:11 21:8
24:22 28:3
58:16,19 59:3
59:8 86:9,13
89:22 93:9

95:17,19 97:6
97:8,12 98:8
103:5,20 104:6
107:8 112:11
112:16,19
120:21 121:14
122:20 124:3,9
125:8 130:3,12
**classify** 50:1
52:20 56:21
57:5 58:8 70:3
81:19 95:3
98:12,15 99:1
103:16 105:20
106:15 128:11
**classifying**
14:16 18:22
20:3 28:7 34:5
34:8,13 35:1
39:22 47:12
56:5 82:7 85:7
92:8 93:7
104:10 106:2,9
106:18 109:5
116:12 118:9
122:15
**clear** 8:9,20
58:19 85:21
122:19 123:3
123:10 125:12
125:16
**clearly** 56:20
118:13
**click** 80:11
**clicked** 132:10
**CMS** 11:5,13,19
12:19 19:14,16
30:15,19 35:14
38:1,4,17 39:3
40:16 51:1,9
63:4 81:20
91:9 92:15
94:20 99:6
**CMS's** 11:6

**code** 40:19 41:3
41:20 90:11,17
91:4,6,13,21
93:10 133:20
134:3
**codes** 31:19 32:1
53:14 55:3
90:13 91:8
**code's** 53:9
**collectively**
61:13
**column** 47:2,7,8
47:19 49:1,13
129:21
**combined** 23:3
**come** 12:8 17:13
33:21 60:22
71:20 132:7
**comes** 74:3
98:13 121:4
131:1,21
133:15
**coming** 62:16
**comments** 39:7
**commission**
136:22
**communicatio...**
15:14 25:9
**companies** 2:13
6:17 120:3
**company** 19:2
66:18 67:6,14
68:8 69:1
100:12
**compare** 43:21
51:10 96:14
**compendia** 63:4
63:15 64:14,17
64:21 92:19
93:1,8
**compendium**
62:10,14
**competently**
123:16,22

**complete** 70:22
120:17
**completed** 5:16
**completely**
121:5
**computer** 24:5
**concept** 120:6
**concerning** 9:20
**concerns** 34:22
**concert** 115:18
**concludes** 135:7
**conference**
31:17 39:6,10
55:15 77:19
**Confidential**
76:11
**confirm** 13:18
38:18
**conflict** 51:11
**confusion** 103:8
**conjunction**
51:8
**connected** 77:11
**consider** 52:3
86:16 87:7
92:17,21,22
93:12 94:12
120:1
**considerations**
44:4
**considered** 35:4
49:6 53:3,5
56:16 57:12
85:14 94:21
117:1,13
120:10
**considers** 83:1
**consistency**
107:16
**consistently**
34:5,13
**construct** 105:7
**constructed**
76:6 115:3

**constructing**
62:8 64:20
68:20,21 80:17
88:17
**constructs**
104:19
**consult** 66:15,22
67:13
**consulted** 55:21
**contact** 68:7,22
75:7 117:11
**contacted** 75:2
117:8
**contained** 80:21
128:20
**contend** 122:19
**content** 36:15
**context** 18:6
**continue** 29:9
50:6 83:4,9
**Continued** 3:1
**continues** 47:5
**contracts**
105:17 106:12
107:20
**convenience**
60:13
**conventions**
70:2 118:21
119:1
**conversation**
16:11,14 17:19
19:8 28:13
33:9 53:4
**conversations**
17:3,6 103:15
23:6
**conveyed** 23:6
**coordinate** 30:6
30:8 31:12
34:11
**coordination**
34:3 63:9
**copied** 126:12
**copies** 59:20

60:7,14 69:17
69:21
**copy** 15:7,19
16:10 38:3
45:18 46:8
50:3,10,18
75:11 89:18
90:22 91:5
95:1,9,13
105:13 129:14
**copyrighted**
73:9
**corner** 46:22
77:22
**Corporation**
1:14
**correct** 19:2
21:3,11 22:12
29:4,8 31:8
32:12,22 33:18
43:14,15,19
48:1,2,20
50:19 51:8
60:12 62:3
69:20 76:1
78:22 79:2,3,4
80:18 81:9,19
83:2 84:3,9,14
84:18,22 86:19
88:4 93:22
95:4,10,21
96:7,9 101:12
102:8,9 111:12
112:4,17 114:9
114:19 116:14
116:15,20,21
118:3 121:1,15
121:18 124:1
124:10 126:15
127:14 130:4
**correspondence**
17:3,7
**counsel** 6:13
7:12 11:3 12:3

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                    October 16, 2009

## Nashville, TN

5

12:10,12 13:8
15:13 25:10,10
70:18 71:3
136:13
**couple** 8:3 16:21
52:11 64:1
**course** 13:13
14:14 21:13
27:19 78:16
105:15 118:19
119:4
**court** 1:1 5:14
6:6,21 8:8
**Courthouse** 2:6
2:7
**cover** 90:20,21
**coverage** 31:20
106:14
**created** 68:1
**creating** 67:12
**criteria** 42:2
45:20,20 46:9
47:12,15 48:9
48:11,19 49:6
49:21 50:4
56:6 57:15
58:6,21 59:2
66:11 68:6
69:22 70:3
106:2,14,18
109:3
**CRR** 136:21
**current** 15:21
16:2 19:19
74:6 75:6
**currently** 16:4
18:6 71:11

### D

**D** 4:1 6:1
**dash** 84:14
85:17 98:14,21
121:18
**data** 9:21

**database** 4:15
131:1,6
**date** 6:7 76:7
**dated** 108:12
111:8
**day** 5:3 135:18
136:18
**days** 52:11
**dealing** 26:7
**deceased** 18:2
**December** 76:8
108:12 128:3
**deciding** 128:10
**decision** 21:16
61:11,12 65:2
86:1 87:3
92:11 114:16
115:17 117:5
117:15 124:13
**decisions** 129:9
**declaration** 4:10
9:12,18 10:4
10:10,21 13:14
14:15 17:2
20:15,20 22:14
24:4 25:16
26:8,19,21
27:20 125:19
125:21,22
**defendants** 3:3
7:4,21
**defined** 41:6
108:19 118:5
129:4
**definitely** 89:21
**department** 2:3
12:10 75:3
**depended** 95:8
**depending**
113:2
**DEPONENT**
135:12
**deposed** 52:10
**deposition** 1:19

5:1,17 6:3,11
7:11,12,13 8:5
12:9 26:10
135:8 136:3,5
136:14,16
**described** 94:3
96:8 111:2
**describes** 41:4
**description** 53:9
53:18,20 54:10
54:14 56:12
68:5 90:9,10
94:6 133:18
**designation**
49:17,18 73:21
91:12 101:6
**desk** 66:16
71:12 72:11,13
**destroyed** 74:22
**detail** 15:11
**detailed** 80:7,15
81:3 89:15
133:8
**details** 11:11
**determination**
11:16 20:2,10
**determinations**
53:7
**determine** 44:7
44:17 50:17,22
55:2,7,22
65:15 69:10
107:2 123:14
**determined**
60:5 62:20
114:14
**determining**
11:14 45:6
55:12 56:7,10
120:11
**develop** 28:20
31:21
**developed** 30:9
**developing**

105:8 127:19
**Dey** 3:3 7:3 26:1
**Dey's** 83:7
**differed** 24:21
**difference**
100:11
**differences** 32:3
32:3
**different** 22:13
22:19 23:21
24:16,20 25:7
25:17,21 36:13
36:15 37:5
39:5 43:13
47:6 48:15,16
50:11 51:18,19
52:5,6 53:22
54:11,19 57:16
59:11 61:12
67:18 68:10
81:16 83:22
84:17,18 85:13
86:14,15 87:1
92:16 94:20
95:16 98:14
99:20 103:15
103:18 105:2
106:12,14,18
107:5,20,21,21
109:22 117:9
117:19,22
119:22 121:5
132:21
**differentiation**
21:22
**differently** 35:2
95:13 106:9,13
**dilutant** 52:19
**direct** 129:12
**director** 55:20
**directors** 53:7
53:21 55:1,6
**discrepancies**
28:19

**discrepancy**
77:17
**discretion** 65:5
**discuss** 18:4
31:18 32:3
47:11
**discussed** 48:9
55:15 104:13
**discussing** 16:15
103:17
**discussion** 33:3
52:21 104:16
**discussions**
31:10
**diskettes** 74:1
**dispute** 77:15
**disregard** 92:4
**distinguishing**
66:11
**distribute** 76:13
76:22
**distribution**
76:13
**District** 1:1,2
6:6,6,19
**DME** 20:5 52:9
**DMERC** 7:14
8:2 14:4 17:4
28:6 29:12,18
31:3 42:3
52:11 62:9
65:2 72:1
77:11 104:5
106:10 107:16
112:20 124:2
**DMERCs** 28:2
28:15,17 29:22
30:16,19 31:5
31:16,20 32:7
32:21 33:10,16
34:4,6,12,19
34:22 37:2,5,8
39:5,13,17,21
40:3 41:12

55:20 60:5
61:13 62:17,18
63:7,10,19
77:12,17,22
78:3 103:16
106:3 108:2
115:18,20
122:13 123:21
**DMERC-A**
29:18 103:20
104:9 122:19
123:2,13
**document** 1:10
9:13,16,17
11:20 14:12
23:7,10,10,14
23:15,16,17,19
36:1,3,5,8,11
36:14,18 37:7
37:11 39:12,16
40:3 42:6,13
47:1,14 48:8
48:10 66:8,10
68:1,2,2,18
72:4 110:16,20
111:2,8
**documentation**
72:2 73:3
88:11
**documents** 4:12
11:1,2,4,12
13:2,12 14:10
14:17,22 15:3
21:14 35:17
38:21 39:20
70:17,20 71:1
71:2,6,16,21
72:17,21 75:10
78:11,13 106:7
**doing** 21:16
33:19 40:4
53:6 123:21
**DOJ** 15:15 25:9
70:18

**dosage** 43:5
**dose** 89:2,7,8
**doubt** 89:14
102:6
**Douglas** 12:19
65:8
**doxorubicin**
4:14 110:19
111:4 112:7,12
**draft** 23:4 25:18
26:21
**drafting** 25:11
**drafts** 22:13,20
23:1 24:9 25:7
25:19,20
**draw** 46:21
108:16
**drop-down** 91:1
**drug** 4:12 11:14
18:18,22 19:6
19:6 28:16
30:11 31:19
35:17 36:2,9
36:16 37:16
38:21 39:8,12
39:16,19 42:22
43:4 44:17,18
44:19,22 45:9
47:13 48:9,11
49:22 51:5
52:13,14,18,20
53:8,11,17,22
54:4,7,9,20
55:8,8,13,22
56:10,13,13,14
56:18 57:2,11
63:19 66:8,15
66:17 67:5,6
67:14 68:7
69:1,22 71:7
72:2 78:6 82:7
83:2 85:13,13
86:16 87:4
89:22 91:14

92:8,10,14,16
92:20 93:3,8
93:10,11,12
94:14 95:20
97:7 98:6,8,10
98:16,22 99:10
99:19,21 106:7
107:17,18,22
108:21 110:19
112:12,15,19
113:3 118:7
120:7,11,21
121:4,9 122:2
122:20 129:7
130:9 132:2
133:22
**drugs** 10:8,9
14:1 18:5,5,16
28:3,7 32:15
33:4 34:5,13
35:1 39:21,22
40:21 41:5,13
41:19 42:4
47:13 53:6,15
53:16 65:15
66:21 69:5,10
70:3 77:13
86:2 97:19
101:5,13
104:19 106:9
106:13,18
107:8 109:5,20
109:21 115:5,6
115:9 118:21
119:5,15
121:14 122:15
132:21
**Drye** 3:5 7:3
**dual** 17:22
**duly** 7:8 136:4
**duplicate** 76:12
**duties** 123:15

_____
**E**
_____

**E** 4:1 6:1,1 7:15
127:6 134:11
**earlier** 13:3
22:17 24:3
25:18 26:21
35:13 72:16
73:14 74:19
85:22 90:3
91:8 94:22
125:19 129:20
**easier** 59:17
60:6
**effect** 50:5
**either** 8:7 20:3
34:5 41:13
58:21,22 75:11
124:6 136:13
**electronic** 75:11
**electronically**
73:7
**Elisabeth** 5:13
136:21
**Ellis** 2:15 6:16
**employee** 98:5
**encompass** 32:6
**engaged** 21:17
**enter** 131:2
132:10 134:17
**entering** 134:20
**entire** 48:1
103:13,22
124:9
**entirely** 54:11
92:5
**entitled** 36:1,8
136:4
**entity** 100:10
**entries** 44:21
45:3 84:17
111:16,17
**entry** 47:2,18
48:1,4 49:2,4,9
49:11 61:8
81:5

**equivalent**
91:14
**Eric** 2:14 6:15
7:19
**ERIC.GORT...**
2:19
**especially** 53:15
**ESQ** 2:4,14 3:4
**essence** 47:17
**establish** 37:3
78:15 127:21
127:21
**established** 31:3
31:18 32:7,10
32:20
**establishes**
40:20
**establishing**
109:19
**estimate** 38:8
**et** 1:13,14 5:10
**evaluate** 51:12
114:16
**event** 17:13 18:1
88:9
**events** 10:1
**evolved** 37:12
**ex** 1:11
**exact** 122:20,20
**exactly** 26:3
53:13 63:3
73:21 86:8
91:18
**EXAMINATI...**
4:3
**examine** 33:15
**example** 32:6
54:6 56:18
107:22 127:20
**examples** 54:15
**exceptions**
19:15 52:8
**excerpt** 4:11
41:3 42:6

30(b)1 and 30(b)6 Deposition of Helton, Carolyn

October 16, 2009

Nashville, TN

7

46:19 61:4
**excerpted**
129:13
**exchanged** 39:8
**exclude** 90:14
**excluded** 91:9
**exclusively**
62:13 99:20
101:14
**Excuse** 10:14
**exerting** 40:19
**exhibit** 4:10,11
4:12,13,14,15
4:16 9:8,11
35:22 36:7
46:16,19 61:5
70:10,11,13
75:18 108:9
110:13,14
128:18 129:11
130:18 131:12
131:14 133:11
134:5,14
**EXHIBITS** 4:8
**exist** 43:4,4
**expect** 33:9
**expired** 74:11
**expires** 136:22
**explain** 9:15
12:16 15:10
17:16 40:12
45:20 51:15
53:15 59:14
60:2 71:5
85:10 88:6
127:16 130:6
133:6
**explanation**
122:18,22
**extent** 26:11
**e-mail** 23:7 39:9

———————
F
———————
**fact** 13:9 54:8

66:21 89:8
92:9 102:11,18
110:6 117:11
123:2
**factor** 60:13
120:10
**fair** 22:2 39:15
48:7 77:3 86:3
88:13
**fall** 41:19 54:21
118:13
**falls** 122:2
**familiar** 8:4
30:12 35:15,19
36:18 45:4
57:2 61:8 64:3
68:8 80:20
97:18 98:1
101:5,8 104:17
118:19 120:3
**far** 24:12 63:12
63:12,15 67:2
78:17 82:13
92:3 94:19
105:8 106:1
120:2
**fashion** 37:8
**faster** 60:7
**Fauci** 2:4 4:6
6:18,18 7:1
12:5 15:13
21:10 22:6,16
24:10,17 25:8
26:4,15 28:8
29:20 31:13
33:1 38:9 40:1
50:8,20 58:10
59:5 62:4
68:11 70:5
73:1 77:8 86:4
86:11 93:15
95:11,22 96:10
97:4 98:18
99:3 100:3,16

102:15 103:11
116:9,16
117:16 118:15
118:22 119:16
120:15 122:5
123:5,8,18
125:4,14
126:21 127:2,5
127:7 130:19
131:13 134:9
134:15 135:5
**fault** 128:17
**federal** 2:6 5:7
40:20 41:3
**fee** 31:2 32:2,21
33:11 34:18
35:3 41:17,18
44:1 61:19
77:5,16 113:4
**feedback** 39:4
**feel** 9:5 24:12
25:15
**fees** 30:8 31:22
35:7 127:19,22
**field** 82:1,4,9,19
84:1 85:3 90:1
92:1,1 131:20
**fields** 90:5,7
**figure** 91:5
**file** 115:4
**files** 88:20
**fill** 18:1
**final** 25:17
26:21
**find** 12:3 28:19
53:19 54:5
68:15 91:2
**fine** 15:17
113:13
**finish** 56:9
**first** 7:8 8:6
12:20,22 36:19
40:18 42:12
60:20,21 73:22

81:5 87:5
114:13 115:1
127:10 131:8
**FirstDataBank**
64:4 65:14
93:2,4,9
**fit** 134:3
**five-by-five** 89:2
**flavor** 31:10
**flip** 70:19 83:4
**flipping** 60:11
**floors** 105:2
**Florida** 1:12
**focus** 34:17
**follow** 80:4
119:9
**followed** 22:4
39:17 40:6
94:20
**following** 44:21
66:10
**follows** 7:9
**follow-up** 98:21
127:9 134:13
**foregoing** 136:3
**forget** 27:18
**form** 5:11 12:5
12:11 21:10
22:6 23:21
29:20 31:13
33:1 38:9 40:1
42:13 50:8,20
58:10 59:5
62:4 68:11
70:5 73:1 77:8
86:4,11 93:15
95:11,22 96:10
97:4 98:18
99:3 100:3,16
102:15 103:11
116:9,16
117:16 118:15
118:22 119:16
120:15 122:5

123:8,18 125:4
125:14
**formal** 78:12
**formalities** 5:9
**format** 42:8,10
50:11 59:1
**formats** 36:13
53:16 59:11
61:12
**formatted** 15:21
**forms** 43:3
**forward** 62:17
63:7
**four** 29:22 31:5
32:7 34:4,12
34:18 37:8
39:13,17,20
60:5,7 61:13
62:18,19 63:10
77:22
**Fourth** 5:5
**frame** 16:17
28:22 44:13
**free** 9:5 25:15
**front** 71:12
72:11,13 90:21
**full** 98:22
**further** 35:9
42:11 126:19
134:9 135:3,12
136:12

———————
G
———————
**G** 6:1
**gen** 106:22
**general** 21:4
28:8,9,10
36:17 61:22
**generally** 9:15
19:11,12 21:9
31:14 44:21
59:14 68:8
71:2 126:3
128:5

Henderson Legal Services, Inc.

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                    October 16, 2009
Nashville, TN

8

| | | | | |
|---|---|---|---|---|
| **generate** 134:2 | 121:1,10,21 | 41:20 44:8 | **GPO** 101:15 | **head** 8:8,13 |
| **generated** 88:7 | 122:8,16,21 | 46:11 62:16 | **grading** 55:11 | 14:13 27:14,18 |
| 134:17 | 124:4,9,15,17 | 63:7 65:22 | **guess** 38:11 | **heading** 27:7 |
| **generic** 10:8 | 128:12 129:6 | 66:7 70:9 | **guidance** 38:1 | 42:21 48:12 |
| 11:17 13:15,20 | 133:17 | 82:16 105:12 | **guide** 45:10 | **heard** 30:13 |
| 20:3 21:2,8 | **generics** 14:16 | 108:5,7 113:17 | **guidelines** 51:1 | **hearing** 5:12 |
| 34:6 35:4 | 15:2 17:9 | 114:2 117:7 | **guides** 45:9 | **help** 33:22 46:1 |
| 41:13,14 43:3 | 20:12 24:22 | 130:14 133:21 | | 65:15 67:17 |
| 43:17,22 44:17 | 28:7 32:16 | 135:9 | **H** | 108:5 |
| 44:20 45:2 | 34:13,16 35:1 | **Goldline** 26:9 | **halfway** 47:2,8 | **helpful** 17:19 |
| 48:4,13,15,17 | 41:7,19,21 | 49:11 | **hand** 9:10 35:21 | **helping** 55:7 |
| 50:17 51:7,22 | 43:9 44:9 45:3 | **Good** 7:17,18 | 36:6 70:9 | 69:10 105:11 |
| 52:5,6,13,21 | 45:6 47:12 | **Gortner** 2:14 | 108:6 136:18 | **helps** 50:22 |
| 52:22 53:18 | 50:2 53:5 59:3 | 4:5,7 6:15,15 | **handed** 46:18 | **Helton** 1:20 4:2 |
| 54:19,20,21 | 66:12,17,21,22 | 7:10,16,19 9:9 | **handle** 11:14 | 5:2 6:4 7:7,17 |
| 55:8,13,22 | 67:14 102:14 | 12:6 16:1 | 19:15 | 25:15 26:5 |
| 56:5,10,14,19 | 103:17 105:20 | 21:12 22:8,21 | **handled** 13:19 | 36:1 46:18 |
| 56:20 57:10,13 | 106:3 107:14 | 24:8,15,18 | 13:19 | 66:7 108:11 |
| 58:8,9,16,17 | 109:5 110:1 | 25:14 26:17 | **happen** 39:1 | 110:20 114:2 |
| 58:21 59:2,8 | 121:15 130:4 | 28:9,11 30:1 | **happened** 17:14 | 127:8 130:20 |
| 65:15 66:15 | **getting** 39:4 | 32:4 33:2 | 21:4 22:22 | 131:15 135:6,8 |
| 67:7 68:6,14 | 105:18 | 38:12 40:8 | 23:13 114:12 | 136:3 |
| 69:5 70:4 78:7 | **give** 8:6 31:10 | 46:5,17 50:12 | 132:9,19 | **hereunto** 136:17 |
| 78:20 81:9,12 | 54:6,11,15 | 51:2 58:18 | **happens** 18:2 | **historical** 62:22 |
| 82:2,3,9,19 | **given** 11:10 98:4 | 59:9 62:7 | **happy** 9:2,6 | **hit** 132:10,18 |
| 83:2,17 84:1,2 | 119:6 | 65:18 66:6 | **hard** 15:7,19 | 133:5 |
| 84:12,22 85:3 | **gives** 11:13 | 68:16 70:7,12 | 38:3 45:18 | **hold** 72:1,4 |
| 85:14,18 86:15 | 66:18 | 70:15 73:11 | 46:8 50:3,9,18 | **honestly** 23:2 |
| 89:22 90:10 | **giving** 19:9,11 | 77:9 86:6,17 | 59:20 60:7,14 | 27:9 82:13 |
| 91:14,22 92:10 | **go** 8:3 12:3,13 | 93:19 95:18 | 69:17,21 75:11 | 89:4,13 91:16 |
| 92:17,20 93:3 | 24:12 25:15 | 96:6,13 97:5 | 89:18 90:22 | 100:4 103:12 |
| 93:9,11,12 | 28:6,17 32:1 | 98:19 99:7 | 91:5 95:1,9,13 | **hour** 46:6 |
| 94:18 95:4,7 | 43:1 49:8 60:8 | 100:6,18 | 105:13 129:13 | **Hydro** 4:14 |
| 98:22 99:11,19 | 82:13 88:10 | 102:17 103:19 | **HCFA** 4:13 | **hydrochloride** |
| 99:20 102:7,11 | 89:12 92:3 | 108:10 110:15 | 11:19 42:18 | 49:5 52:15 |
| 103:5,9,22 | 94:19 98:3 | 113:12 114:1 | 54:10 56:3 | 53:22 54:17 |
| 104:6,10 107:1 | 108:7,11 114:7 | 116:10,17 | 58:6 59:2 | 110:19 111:4 |
| 107:2,9 108:21 | 125:18 129:11 | 117:20 118:18 | 63:18 72:18 | **Hydrous** 47:18 |
| 112:4,6,12,20 | 133:19 134:14 | 119:3 120:5,18 | 95:3 99:16 | 51:21 52:4 |
| 113:3,8 116:20 | 134:18 | 122:6 123:6,11 | 106:6 108:3,18 | **hypothetical** |
| 117:2,4,14 | **going** 8:17 9:10 | 123:19 125:5 | 124:16 125:11 | 99:14 |
| 118:2,6,21 | 16:12 18:17 | 125:17 126:19 | **HCL** 111:4 | **hypothetically** |
| 119:7,15 120:7 | 19:12 29:3,14 | 129:19 134:12 | **HCPCS** 53:18 | 93:6 |
| 120:8,9,21 | 35:21 36:6 | 135:3 | 79:18 | |

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                                  October 16, 2009

# Nashville, TN

9

**I**

**ibuprofen** 97:21
**idea** 36:16
**ideas** 39:7
**identical** 102:19
**identified** 131:6
**identify** 6:13
42:22 87:18
**Illinois** 2:17
**immediately**
44:19 45:1
**impact** 113:9
**implemented**
45:21 86:20
**implementing**
119:12
**importing** 115:5
**include** 134:22
**included** 43:10
72:18,22 112:6
**Inderal** 49:3
**INDEX** 4:3,8
**indicate** 32:2
112:10
**indicated** 93:11
**indicator** 82:19
94:18
**individual** 17:20
74:1
**individually**
51:12
**individuals** 17:7
77:10,11
**industry** 1:4 6:4
118:20 119:14
119:18
**information**
9:20 11:10
12:20 13:1
18:3 19:5,9,10
37:13 39:2
58:12 71:8
74:15 75:4,22

77:4,20 78:6
80:7,13,14,15
80:16,21 81:3
85:6,11 89:16
92:4,20 93:21
94:9,13 99:9
115:19 117:8
125:10 126:4
132:3 133:15
**informed**
117:13 119:13
**Ingelheim** 1:14
2:12 6:17
**inhalation** 53:16
53:16 54:2
**initial** 13:7 20:2
72:16 114:5
**initially** 62:15
105:12
**input** 37:4,9
119:17
**instance** 23:8
32:8 52:16,19
55:11 65:16
69:14 77:1
78:8,17 80:11
93:2 94:7
97:20,21 98:8
103:3,8 105:21
116:1,4,6
119:8
**instances** 12:15
52:17
**instructing**
30:19
**instruction**
22:16 86:14
110:7,9
**instructions**
11:6,13,16
19:14 30:15
34:8 35:6,11
37:16 40:5,6,9
68:3 81:21

91:8 92:15
94:21 106:11
106:16 107:4,6
107:22 109:18
110:4 112:22
117:7,18 119:9
119:12,20
**instructs** 12:12
**integrated**
38:22
**intended** 39:17
**interact** 105:6
105:18,19
**interaction**
105:10
**interactions**
123:12
**interested**
136:15
**intermediaries**
108:13
**internal** 65:2
**internally** 76:18
**Internet** 16:6
37:14,21 38:3
40:14
**interpret** 73:7
**interpretation**
122:1
**interpreted** 73:3
**involved** 18:15
18:21 27:12
55:7,11,12
**involves** 7:21
**involving** 26:1
**IOM** 40:11
**ipratropium**
4:16 18:18
19:22 20:16,22
21:17 22:5
31:4 32:5,9
33:5,11,16
47:3,6,18 48:5
49:10 51:21

52:1,4,15
56:19 57:10,17
58:3,13,14,20
59:7 61:9
75:22 76:6
77:6 78:19,21
79:9 80:8,18
81:9,12,16
82:17 83:1,6,7
83:11,15,21
84:13 95:14,15
97:2,11 98:7
98:15,20
101:19 102:2,6
102:12,21
103:21 114:3
116:12,19
117:1,11
118:13 120:7,9
120:12,22
121:9,15
122:15 124:3
124:14 125:12
128:11 129:17
130:9,11
131:21 132:6
132:10,16,17
133:17 134:17
134:20,22
**issue** 10:7 12:8
13:15 14:15
24:22 26:9
108:5
**issues** 7:22 25:4
25:6,11 26:20
**italics** 40:22

**J**

**J** 2:4
**JAMES** 2:4
**January** 60:22
127:22
**Jeff** 6:18 24:8
**jeff.fauci@us...**

2:10
**job** 123:15,22
**John** 2:6
**Joseph** 2:6
**juncture** 24:16
**Justice** 2:3
12:11
**J-code** 31:4,7
32:11 79:18

**K**

**keep** 24:3
**Kelley** 3:5 7:3
**kept** 73:16,17
76:18 88:20
**Keys** 1:13
**kind** 36:14 46:7
81:16
**Kirkland** 2:15
6:16
**knew** 63:12,15
67:12,16 81:11
101:17
**know** 7:19 8:2,4
8:17 9:2 17:19
19:18,19 22:22
23:2 24:6,7
26:1,15 30:16
38:5 39:1
47:15 55:19
59:16 62:6,15
63:3,5,16 64:7
64:10,12 65:7
67:3 68:1
71:19 73:20
77:12,18 78:10
78:17 79:1
89:4,10,13
90:17 91:12,16
91:18 100:11
100:19 101:3
101:10,13
103:16 106:1,4
107:6,7 109:10

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                                October 16, 2009

Nashville, TN

10

109:17 110:3
112:18 116:4
116:11,18
119:22 123:21
124:2 125:6,7
125:8 128:9,14
**knowing** 115:21
**known** 93:7
104:9
**KO** 77:21
**KPs** 77:21

**L**
**label** 58:3,20
76:5 80:5
83:21 102:5,20
102:20 107:8
108:20 118:6
129:5
**labeled** 42:21
79:6 82:2
124:3,14 125:2
**Laboratories**
1:21 2:12 5:3
6:16 7:20
**language** 128:20
129:8
**lapse** 8:12
**large** 97:14
**LaSalle** 2:16
**late** 59:16,19
**lead** 85:17 98:15
125:10
**learning** 19:17
**leaving** 115:6
**led** 95:3 125:1
**left-hand** 46:22
47:1,7 77:22
**legal** 15:16
25:10,11
**length** 128:20
**lesser** 41:6,20
**letters** 44:20
**letting** 24:12

**let's** 14:11 46:6
56:17 65:18
68:17 70:8
75:17 76:3
82:14,14 98:6
108:3 110:12
118:4 120:19
127:5
**license** 74:8
**limit** 26:9
**limited** 51:6
76:13
**line** 91:22
**lines** 91:22
**list** 80:15 130:8
132:20,22
133:2 134:2,22
**listed** 20:10 33:4
49:16 58:12
59:7 83:22
84:8,12 95:13
95:17 96:12,15
96:16 97:2,10
98:7,11 101:19
129:20 130:11
**listing** 47:5
82:17 90:19,20
112:3
**listings** 79:22
83:5
**lists** 79:8 97:19
133:14,15
**litigation** 1:5 6:5
13:4 14:2
72:18 75:13
**little** 14:10
17:16 42:11
54:19 73:14
81:4 82:15
87:1 117:9
**loaded** 73:18
74:1,9 105:18
**locate** 75:3
**located** 71:5,10

71:11,18 105:3
**location** 73:16
73:18
**long** 18:11 32:20
35:2 114:18
115:13
**longer** 74:12,15
74:18 75:6
**look** 10:3,7,18
13:16 16:8,17
25:16 28:1
33:17 36:3
38:19 40:17
42:8,9 44:17
47:1,17 49:9
49:10 62:2,6
62:10 63:19
64:21 65:3,6
66:12 70:3,8
75:17 76:3
78:18 79:5
81:2 88:10
90:1,5,12 91:3
91:21 106:13
108:3 110:12
110:22 111:14
115:18 128:1
128:18 134:7
**looked** 11:7 15:4
15:11,19,21
16:12,20 47:13
65:9,10,14
66:9 91:17,20
96:1 105:11
107:11 128:9
131:9 133:9
**looking** 10:5,20
20:7,9,9 26:22
35:6 48:8,19
48:22 51:16
56:12 57:16,20
79:12 85:12
87:12 89:12,15
90:8 95:1,8,20

106:21 112:14
115:22 116:4
119:19,21
128:7 132:3
**looks** 80:3
111:11 127:3
**loop** 110:5
**Lorenzo** 3:4 7:2
7:2 127:1
**lower** 41:8,15
43:9,10,17,18
44:2,20,22
58:1 76:4,7
77:21,22 110:2
113:8 132:15
**lowercase** 48:4
48:13,16 49:4
51:7 131:22
**lowest** 41:21
44:10

**M**
**M** 7:15 127:6
134:11
**machine** 74:2
**mainframe**
73:20
**mainframes**
73:18 74:9
**maintain** 73:20
74:6
**maintained**
73:19 74:2,10
75:6,7
**making** 20:10
34:17 129:9
**Malone** 5:5 6:12
**manual** 37:20
38:2 39:1
40:10,11,14
42:7,7 68:9,13
**manuals** 37:15
37:22 38:2,4
38:13

**manufacturer**
58:13 78:16
82:18 83:15
101:18,21
102:1 116:3
**manufacturers**
47:6 132:21
133:1,2,4,16
**Marisa** 3:4 7:1,2
126:21
**mark** 70:10
108:7 110:12
**marked** 9:8,11
35:22,22 36:7
46:16,19 49:2
61:5 70:11,13
108:6,9 110:14
125:19 130:18
131:12
**marketed**
108:20 118:5
129:5
**markings** 87:18
**marks** 65:21
66:4 87:19
**Massachusetts**
1:2 2:8 6:6,20
**MASTER** 1:8
**match** 54:10
**materials** 59:15
**matter** 92:18
98:13
**MDL1456** 6:7
**mean** 15:5 16:2
23:2 29:6 31:1
34:9 37:22
38:14 44:5
55:14 67:21
73:8 91:17
100:10,11
109:10 113:3
115:1 117:22
120:17,20
**Meaning** 36:21

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                    October 16, 2009

Nashville, TN

11

means 66:16
meant 101:11
median 41:7,14
  41:21 43:9,10
  43:17,22 44:9
  110:1 113:8
Medicaid 64:10
medical 53:7,21
  55:1,6,20
Medicare 7:22
  35:16 36:2,8
  37:20 38:1,2
  38:15,22 40:10
  50:5 66:7
  106:7,8 109:8
  110:18
Medispan 63:22
  64:13 65:14
medium 20:8
meet 48:10
  133:17
meetings 39:6
meets 53:8
  99:15
members
  101:15
memoranda
  11:20 12:2,4
  13:7 14:19
  21:6 128:19
memorandum
  108:13 109:7
  109:13
mention 126:7
mentioned
  52:11 126:1
mentions 42:14
met 53:19
methodology
  43:13 45:5,13
  45:15 109:20
  109:22 110:3
Mid 60:18
middle 47:8,19

49:12,17,18
58:1 108:17
Miller 5:14
  136:21
milligram 32:8
mind 15:18
  102:7 103:8
mine 67:18,21
  87:22 88:1
minutes 127:4
misclassify
  125:2
missing 44:6
mlorenzo@ke...
  3:9
Moakley 2:6
moment 50:14
  59:10 63:17
  65:13 66:9
  94:22 111:2
monitor 6:8
month 127:18
monthly 15:20
  16:16 20:7
  59:20 69:15,16
  126:8,16
  127:13,17
  128:10
months 18:14
  18:14
morning 7:17
  7:18
move 32:10
multiple 25:19
  41:4
multiuser 74:8
  105:16

N

N 4:1 6:1 7:15
  7:15 82:8
  127:6,6 131:22
  134:11,11
name 7:19 11:17

11:17 18:9
20:9 30:11,13
43:8 44:18,19
44:21,22 45:1
45:2,2 48:4,13
48:15,15,17
51:7,22 52:5,6
52:12,14,18
53:17 54:9,12
54:19,20,22
56:14,14,19,20
56:21 57:10,13
58:7,8,16 59:2
81:6,9,12,16
83:14 84:12,13
85:12,13,14,15
85:18,19 86:13
86:15,16 87:11
90:9,10 92:14
92:16,17,17
94:3,20 95:17
97:9,13,20
98:12 99:20
100:2,8,15
101:1 104:15
106:22 107:1,2
108:19,20,21
109:14 112:12
112:15 114:9
114:19 115:13
117:18,21
118:1,2,4,6,7
118:12 119:6,7
120:9 121:1,11
121:22,22
122:8,21
124:17 129:4,5
129:6 130:8,13
named 102:1
122:2 136:6,15
names 10:19
51:19 95:16
119:14,22
naming 118:20

119:1 120:3
Nashville 5:5,6
  6:12 97:15
nature 17:19
  31:9 33:8
NDC 49:18
  60:16 84:17
NDCs 49:15
  50:1 57:21,22
  58:1,2,9,20
  80:8 83:10
  84:20 85:4
  130:10
need 9:1 33:20
  113:15 117:6
needed 9:20
  67:17 87:7
  90:6 91:10
  128:4
never 35:4
  64:15 65:13
  99:4 102:10
  105:19
new 3:7,7 18:7
  19:14 33:21
  115:5,11
nodded 14:13
nodding 8:8,12
nods 27:18
non-DMERC
  104:19
normal 78:16
  118:20
North 2:16 5:6
Notary 5:14
  135:22 136:8
notice 5:9
noticed 7:11
Novaplus 19:6
  19:22 21:19,22
  22:11 26:6
  58:3,9,20
  78:21 84:8,14
  85:7,17 86:9

87:6,14 92:15
95:14 97:3
100:15 101:1,4
101:5,10
102:13,20
107:9,17,19
111:5 112:7,12
114:3 115:2
118:10 120:13
121:18 126:2
Novation's
  101:14
November
  128:3
number 6:7
  37:17 42:13,13
  60:16 66:18
  135:8
nutshell 41:11

O

O 6:1 7:15 127:6
  134:11
oaths 136:9
object 12:5,11
  12:11 21:10
  22:6 26:4,11
  33:1 38:9 40:1
  50:8 58:10
  59:5 62:4
  68:11 70:5
  73:1 77:8 86:4
  86:11 93:15
  95:11,22 96:10
  97:4 99:3
  100:3,16
  102:15 103:11
  116:9,16
  117:16 118:15
  118:22 119:16
  120:15 122:5
  123:5,8,18
  125:4,14
Objection 29:20

31:13 50:20
98:18
**objections** 5:11
**observed** 46:13
66:2 113:19
**obtain** 21:14
**obviously** 81:15
**occurred** 29:1
33:9 38:6
**October** 1:22
5:3 6:7 60:21
79:7 83:12
84:6 127:20,21
136:18
**office** 6:19 9:19
71:15
**offices** 5:4
**Oh** 20:21 78:19
**okay** 8:9,10,21
8:22 9:3,7
10:16,20 11:18
12:22 13:6
14:5,8,12 15:9
16:4,8 17:17
18:15 20:19
22:2 23:11
24:15,19 27:6
27:17 36:21
40:15 45:15
46:9,10 47:14
49:8 50:4,13
51:14 52:3
55:4 56:17
58:3,4 59:21
65:12,19,20
68:17 72:12
74:5,21 75:10
78:12 79:11,20
81:2,15 82:14
83:20 84:11
85:16 87:9
89:14,20 91:11
91:20 92:7
94:12 99:8

100:7 105:14
107:15 111:1
112:2 113:11
113:15 114:12
115:13 119:11
124:12,13
126:13 132:11
132:18 133:5
134:20
**old** 15:20 18:7
19:12,18 72:1
115:8
**older** 75:8
**oldest** 17:1
**Once** 44:7
131:19
**ones** 16:21
65:10 74:7,7
90:15 115:12
128:7 133:13
**open** 23:14,20
131:2
**opening** 115:4
**operating** 106:2
**operative** 29:18
**operator** 6:10
**option** 67:12
68:7
**options** 67:16,19
68:15,22
**Orange** 90:9,11
90:13,17 91:4
91:6,7,12,20
93:10
**order** 72:1
**Originally**
12:16
**outcome** 136:15
**outlined** 39:20
**outlines** 42:1
**outside** 78:2
115:20

———————
**P**

**P** 6:1
**package** 84:1,18
94:10 102:19
**packaging**
115:10
**page** 4:4,9 10:20
13:1 27:3,7
40:18 42:12,20
43:2 44:16
46:22 47:8
49:1,2,9,13
58:1 63:8
66:10,14 70:21
76:3,5 79:5
83:7,11,16,22
84:5 108:17
125:20 129:12
134:5,15,16
**pages** 16:13
80:4 83:5
84:17 86:10
87:12 101:19
129:13 136:10
**paid** 44:12
109:22
**Palmetto** 29:17
52:10 104:4
**paper** 38:3
126:14
**paragraph** 43:3
43:8 66:13
125:22 126:5
128:21 129:3
**Paragraphs**
26:7
**parens** 49:12
112:7
**Park** 3:6
**part** 14:5 30:10
40:21 41:13
42:3,3 44:10
54:18 77:10
104:18,22
105:1,7 106:1

106:8 107:18
108:1 109:15
109:20,21
110:18 112:11
112:21,22
**particular** 10:10
12:2 13:9
18:17 19:5,21
20:16 21:1
27:3 28:14
31:4 32:15
33:4 77:13
78:6,7 79:11
79:13,20 86:9
87:4,15 89:5
96:18 99:5
115:21 118:14
125:21 132:12
132:13 135:1
**parties** 136:14
**pay** 41:12,17
43:16 61:18
62:2 92:2
103:1
**paying** 31:5
**payment** 31:2
33:11 34:18
35:3 40:21
41:4,9 43:20
44:1 77:6
109:20 113:4
**payments** 33:5
**PDF** 23:10,11
23:19,20,21,21
23:22
**PDFs** 24:4
**PDR** 66:16,22
67:14
**pen** 87:19
**pending** 26:16
26:18
**people** 33:21
38:15 73:20
**percent** 44:11

44:12,13 79:16
**perform** 123:15
**period** 19:20,21
68:21 104:1
110:9 114:6
123:14 126:1,9
**person** 17:11,12
17:22 18:3
20:1,6 28:14
73:21
**personnel** 38:16
76:14
**person's** 18:9
**pertinent** 57:6
72:4 81:13
94:13
**pharmaceutical**
1:4 6:4 119:14
119:18 120:2
**pharmacy** 97:15
98:2
**phone** 31:11
**phrase** 76:11
117:22
**physical** 16:14
**Physicians**
66:16
**pick** 128:3
**piece** 44:6 125:9
**place** 5:5 6:11
21:20 45:16
136:6
**placed** 77:13
120:8
**play** 60:22
**please** 6:13,22
7:6 8:18 9:2
46:3
**plus** 104:1
120:12
**point** 21:13
27:10 29:11
33:3,14 43:2
44:15 60:17

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                    October 16, 2009

## Nashville, TN

13

61:3 66:20
69:8 70:21
75:1 90:3
96:14 99:5,8
134:1 135:1
**points** 13:3
**policy** 50:6 86:2
86:19,19
**popped** 131:8
**portion** 77:13
111:18 112:4,6
**position** 120:14
**possible** 8:18
25:21 106:17
**possibly** 39:9
107:21
**preceded** 85:17
**precedes** 88:18
**precise** 68:9,13
**prepare** 20:20
**preparing** 9:17
13:14 14:14
17:2 20:14
27:19 119:4
**presence** 85:16
**Present** 3:11
**previous** 74:4
**previously** 18:5
31:18 35:22
36:7 70:13
108:6
**price** 1:5 6:5
41:6,7
**priced** 18:5,6
28:3
**pricer** 107:22
**prices** 10:5
69:10
**pricing** 4:12
10:6 11:14,15
12:17 18:7,7
19:13,14 28:16
28:21 30:6,11
30:22 31:1,16

35:17 36:2,2,9
36:17 37:6,16
38:21 39:8,12
39:16,19,21
45:9 47:14
48:10 49:22
51:5 62:9
63:14,15,19
66:8 70:1 71:7
72:2 75:12
106:7 111:3,12
115:19,22
116:6
**principally**
115:18
**print** 23:14,15
90:2 128:6,8
131:4
**printed** 15:7
16:9,9 46:20
48:20 60:4
75:21 80:22
88:3,9,16
96:16 115:22
116:5
**printout** 57:21
59:4 75:18
79:7,13 83:8
84:6 87:13,16
88:18 90:4
95:2 134:7
**printouts** 80:6
88:7,14 89:16
**prints** 133:10
**prior** 8:5 62:16
**probably** 96:22
114:12
**procedure** 5:8
35:17 36:2,9
36:10,17 38:21
39:7,8,12,16
39:19 42:1
45:9 47:14
48:10 49:22

51:5 66:8
67:17,20 68:19
70:1 88:6,8
106:7
**procedures** 37:4
39:16
**Proceedings**
135:11
**process** 13:4
18:22 19:18,18
19:19 21:9,16
21:20 22:1,3,4
38:20 39:14,20
55:7,12,20
104:18 114:20
119:11 133:20
134:2
**processed** 8:1
31:19
**processing**
37:20
**produce** 24:14
**produced** 13:3
24:9 72:17
73:14 74:7
75:13 78:13
**producing**
24:11
**product** 20:3,17
21:2,7,18
22:11,14 50:16
50:22 58:7
60:10 80:7,14
80:15 81:3,5
83:14,17 84:2
84:12 85:8
86:15 89:16
90:8 94:3 95:4
95:7 96:8,19
96:20 97:1,10
102:7,11,13
103:4,9 104:6
104:10 106:22
108:19,19

114:8,13
116:19 117:2
117:14 118:1,4
118:5,10 123:7
124:4,8 125:2
129:4,5 130:10
133:15
**production** 13:7
72:22
**products** 20:11
53:19 54:3,21
55:2 79:8,10
81:12 84:8,22
86:9 102:1,14
103:21,22
105:20 109:15
111:17 112:3
119:22 129:20
130:2,3,4
133:16 134:3
134:22
**Professional**
35:17 36:8
**program** 11:19
12:2,4 13:6
14:18 21:6
108:13 109:7
109:13 127:13
128:19 130:16
132:2
**programs** 64:10
**Project** 30:11
**propanolol** 49:5
**property** 76:12
**proprietary**
100:2,5 101:1
**protecta-pack**
89:3,7,9,10
**provide** 19:4
37:9 73:10
**provided** 11:2,4
11:5,11 12:1
12:19 13:13
39:2 71:3 73:5

73:6 82:1
**providers** 76:22
**public** 5:14
38:14,18 61:22
135:22 136:8
**publication**
37:15,17,19
**publicly** 77:4
78:18
**publish** 76:21
**publishing**
62:10 64:14
**pull** 54:3 133:4
133:21
**pulled** 71:8,12
72:2,8,10
132:17
**purpose** 30:5
39:12 127:17
**purposes** 5:7
**put** 9:22 19:22
21:1 77:18
78:6,19,20
87:5 101:8
114:15 116:19
121:5 124:14
131:11

_____
**Q**
_____
**quarter** 31:15
31:16 60:20
104:5 111:12
114:8,17,22,22
115:3 126:1,2
**quarterly** 28:17
29:1,15,15
33:8 42:2
59:22 60:3,6,8
60:9 61:18
126:3 127:18
**question** 8:17,19
8:20 9:4,6
10:17 12:1,12
12:13,14 14:21

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                    October 16, 2009

## Nashville, TN

14

15:17 22:17
25:12 26:12,16
26:18 34:10
45:19 56:9
66:14 68:14
87:1,2 89:5
96:22 113:13
117:9 120:17
121:20
**questioned** 35:7
**questions** 5:12
12:10 126:20
126:22 127:9
130:17 134:10
135:3
**quick** 36:3
40:18 46:5,7
65:18 113:14
127:9 130:16
134:13
**quickly** 70:19
125:18 130:14
**quite** 14:20 23:2
24:12 27:9
82:13 100:4

### R

**R** 6:1
**rates** 43:20
**read** 23:16
129:2
**reading** 5:16
32:14 90:3
**reads** 66:14
**real** 40:17 60:13
**really** 30:15
61:2 65:7 88:8
100:10 120:16
**reason** 32:19
63:1 92:13
95:19 106:5
109:12 112:18
122:7
**reasonable**

122:1
**reasons** 21:1
60:2
**recall** 10:2
15:12 20:21
22:3 24:20
25:6,17 26:20
33:6,19 34:1
39:5 60:17
72:15 73:13
129:19
**received** 26:20
31:15 70:17
71:1 109:11
**recess** 46:13
66:2 113:19
**reclassified**
114:10
**recognize** 9:13
36:4,11,14
70:20 130:20
131:14
**recollect** 59:18
86:12
**recollection**
9:22 15:1
20:15 21:15
28:13 33:7
55:17 86:8
87:3
**reconsider**
104:11 114:7
125:11
**reconstruct**
21:7
**record** 7:10
24:11 46:12,14
65:22 66:3
70:12 113:18
113:20 131:3
135:9
**red** 4:11 15:4,5
15:6,11,20,22
16:5,6,8,9,16

16:18 20:7,8
45:18,22 46:1
46:8,20 48:20
50:18 57:20
58:2,12 59:1,4
59:12,15,15
61:4,12,15,21
62:2,10,13,22
63:3,9,13,18
65:3,3,9 66:18
66:19 67:9,14
68:7,22 69:9
69:13 70:2,8
73:9,12,15,22
74:3 75:4,14
75:21 79:7,14
79:22 80:6,11
80:21 81:18
82:1,7,22 83:8
83:12,16 84:8
84:21 88:15
89:16,21 90:19
90:21 92:9,18
93:8,21 94:4
95:1,9,9,21
96:9,16 98:11
101:20 114:14
115:19,21
116:5,5,13
126:8,14
127:12 128:1,6
128:6,7,10
129:14 130:15
131:2,5,9
134:21
**reduction** 44:7
**reevaluated**
114:16
**refer** 79:17
84:18 91:4
119:6 128:5
**reference** 13:8
42:13 46:8
66:17 88:9

91:13 111:5
**referred** 14:19
35:16 72:19
**referring** 11:12
11:18,21 12:21
13:2,10,22
15:6 27:4
35:11 40:10
54:8,13 56:4
58:6 87:13
95:2 108:4
109:4 118:1
**refers** 79:17
**refresh** 14:22
**regard** 59:2
**regarding** 15:16
50:16 51:6
**regional** 106:12
**regulation**
41:12,16
**regulations**
31:22 40:20
41:4 63:5
**reimbursement**
36:9 42:3
**rel** 1:11
**relate** 75:12
**related** 2:13
6:17 7:22 27:7
28:8 52:19
129:17
**RELATES** 1:10
**relating** 17:8
**reliable** 94:13
**relied** 62:13
93:20,21 94:2
94:2,6,9
**rely** 65:3 69:15
69:15 94:17
129:8
**relying** 50:18
**remained** 114:5
114:10 115:10
115:14

**remember** 64:2
72:19 90:16
103:12
**remembered**
20:21
**remind** 8:11,13
27:17
**removed** 27:11
**repeat** 9:6 37:17
113:11
**reported** 136:7
**reporter** 5:14
6:21 7:5 8:8
136:8
**REPORTER'S**
136:1
**represent** 6:14
7:20 57:21
58:2 70:16,22
111:1 124:11
131:3
**representation**
134:6
**representative**
28:6 29:16
30:2 34:21
117:12
**representatives**
17:4 28:2
29:22 123:13
**representing**
6:16,20 7:3
**request** 24:8
**require** 65:3
**required** 61:15
**resaved** 114:21
**reserved** 5:12
5:17
**resources** 73:8
**respect** 13:14,22
14:15 22:5,10
24:21 28:6
32:5 56:3
69:21 75:22

30(b)1 and 30(b)6 Deposition of Helton, Carolyn

October 16, 2009

## Nashville, TN

15

80:13 86:2
87:4 101:4
102:5 109:14
110:18 115:17
117:21 120:14
122:14 123:7
125:12
**respective**
102:19
**respond** 10:19
**response** 127:10
**retail** 97:14
**retrievable**
74:15,18
**retrieving** 71:21
**reused** 114:22
**reveal** 15:14
25:9
**review** 9:21 11:3
14:17 27:20
37:8
**reviewed** 14:22
22:15
**reviewing** 21:14
26:19
**revised** 37:11
**rid** 74:4
**right** 13:10 19:1
20:12,13 23:12
29:5,19 30:7
32:17,18 37:1
39:22 41:9
42:18 44:12
45:16 48:5
49:10 52:2
59:12 60:10,14
61:5,6,9 64:8
64:17,22 69:2
69:6,11,12,19
74:16 75:15
76:4,7 77:14
79:1,9 80:1,8
80:22 81:6
82:8,12 83:18

84:16 85:4
86:21 87:16
88:13 89:18,22
93:21 94:4,15
95:6,19 96:20
96:21 99:11,16
99:21 100:20
100:21 101:20
102:3 107:3,10
107:19 109:5,8
110:10 111:9
112:8,16 113:5
113:10,12
114:17 121:3,6
121:11 122:10
124:18
**RMR** 136:21
**roughly** 18:20
**route** 94:7
**routine** 78:9
**routinely** 31:19
57:5
**Roxane** 1:21
2:12 4:10,11
4:12,13,14 5:2
6:16 7:20 9:8
9:11 26:1
35:22 36:7,21
37:2 40:17
46:16,19 49:9
49:12 57:21
61:5 66:8
67:22 70:10,11
70:13 75:17
78:16,19 83:15
83:21 101:18
102:5,11,20
108:8,9 110:13
110:14 116:3
116:11,18,22
117:11,12
124:3,14 125:2
125:20 129:20
**Roxane's** 83:10

126:2
**RPR** 136:21
**Rudy** 3:11 6:10
**rule** 8:15 50:15
51:5,8,9 52:8
95:2,3 118:8
118:14 120:14
122:14,19
123:2,9 124:16
124:21 125:1
125:11,15
**rules** 5:7 8:4
51:1 99:16
**Rx** 111:16

---

## S

**S** 6:1
**SAD** 42:4
**SADMERC**
42:4
**SAITH** 135:12
**save** 23:20,21
**saw** 110:7
**saying** 8:12 32:7
55:5 93:6
**says** 41:18 42:1
42:22 43:8
76:11 95:15
99:18 111:4,16
**scenario** 99:14
112:20,21
121:21
**schedule** 35:3
**Scope** 42:1
**screen** 131:4,8
132:4,7,13
133:8,13,15
134:21
**screens** 81:3,5
**SDV** 89:2
**search** 4:15
60:15 131:1,6
132:4 134:21
**searches** 60:10

**second** 43:1
47:19 60:20
82:15 108:18
129:21
**section** 10:21
40:19 41:22
129:16
**sections** 25:17
**secured** 73:19
**see** 14:8 21:21
25:16 33:19
40:19,21 41:2
42:4,11,14,15
43:5,11 47:3,9
47:19,22 49:3
49:12,15,19
51:10,11,12,16
51:17,18 70:19
75:8 76:8,15
78:19 79:22
81:22 82:16,20
83:5,12 84:7
91:10 101:22
106:5,22
107:14 108:14
109:1 111:3,6
111:15,18,22
113:15 118:4
119:21 120:19
126:5,11 128:3
128:22 129:16
130:2
**seek** 99:9
**seen** 36:5 45:8
67:22 89:21
92:8 97:20
99:4 101:7
110:17,20
**segments** 89:18
**select** 133:3
**selected** 62:16
62:18 79:10,13
79:15 132:14
132:15

**selection** 131:20
**selections**
133:19
**send** 23:16
33:20
**sense** 21:4 63:14
98:4
**sent** 12:18,20
13:17 23:7,11
40:4 107:13
109:7 110:6,22
**sentence** 41:3
43:5,7 66:13
108:18 129:2
**separate** 109:17
**September**
29:13
**series** 70:17
72:16 97:19
111:16
**serve** 7:13
**server** 75:3,5
**set** 31:17 41:17
43:20 44:1
68:17 77:6
113:5 116:6
136:18
**sets** 41:8
**setting** 33:10
**seven** 91:22
**shared** 105:17
**sheet** 79:11
111:3
**shook** 27:14
**Shorthand**
136:7
**showed** 114:13
115:2
**sic** 6:8
**sign** 9:16 62:1
**SIGNATURE**
135:15
**signed** 22:15
**significantly**

113:4,8
**signing** 5:16
**similar** 30:21
  31:1 48:22
  73:16,17
  134:15
**simplest** 56:17
**simplify** 120:19
**simply** 57:17
  65:4 115:4
**single** 22:14
  25:18 89:1,7,8
  107:22 120:7
  120:20
**sit** 86:7
**situation** 20:21
  73:15 120:20
  121:3,8
**situations** 52:12
  57:9
**six** 18:14,14
  49:15 50:1
  130:3
**size** 94:10
**sizes** 84:1,18
  102:19
**Smith** 3:11 6:10
**sold** 101:14
**solely** 76:14
**solution** 79:15
  79:21 91:14
**somebody** 99:9
**sorry** 10:15 12:7
  16:22 18:1
  27:16 128:16
**sort** 19:17 28:20
**sounds** 65:13
**source** 41:5 43:9
  62:18 78:18
  94:13 119:20
  126:4
**sources** 41:7
  42:22 63:18,20
**speak** 8:16

**speaking** 19:11
  93:6
**special** 63:13
**specific** 20:15
  21:15 28:12
  70:21 77:12
  79:18 85:3
  86:8 87:2
  100:9,12
**specifically**
  16:11 21:1
  35:11 53:9
  63:6 85:12
  89:15 111:5
**specifics** 68:18
  103:13
**specified** 43:5
**speculate**
  123:10
**spoke** 59:10
  72:15
**spoken** 22:10
  28:5
**spreadsheet**
  13:18,21,22
  73:6
**spreadsheets**
  13:17 73:4,5
  105:12,13
**staff** 55:21 67:2
  105:6
**stand** 21:20
**standards** 19:13
**standpoint**
  17:10,11 62:5
  119:19
**stands** 90:18
**started** 59:22
  62:17 63:3
  73:22
**state** 5:15 6:14
  24:10 136:8
**stated** 30:6
**statement** 41:15

109:13
**states** 1:1,11 2:5
  6:5,19,20
  44:16
**statutes** 52:4
**step** 11:2 42:22
**steps** 134:18
**Stone** 52:10
**stop** 40:12 45:4
  52:7 90:3
**stopped** 102:10
**storage** 75:9
**stores** 71:16
**Street** 2:16
**strength** 133:22
**strictly** 19:8
  53:18 59:7
**SUBCATEG...**
  1:11
**submitted** 9:12
**subpoena** 78:12
**subpoenaed**
  78:10
**Subscribed**
  135:17
**subscription**
  61:16
**subscriptions**
  74:9,11
**subsequent** 74:3
**subset** 73:13
  74:14
**sufficient**
  123:12
**suggest** 123:1,3
**Suite** 2:7
**sulfate** 27:7
**sulfide** 54:16
**summer** 73:14
  75:1
**sure** 8:6,15 11:7
  14:11 17:15
  23:4,9 24:6,17
  26:3 27:9

30:15 31:2
  34:4,12,17
  36:19 53:12
  61:1,2 63:22
  87:21 104:5
  110:21
**surprise** 91:11
  91:15,18
**surprised** 24:14
**swear** 5:15 6:22
  7:6
**switch** 60:18
**switched** 50:10
  60:3
**sworn** 7:8
  135:17 136:4
**system** 23:20
  74:13

---

**T**

**T** 7:15 127:6
  134:11
**tab** 80:10
**take** 9:2 11:1
  13:16 18:21
  24:15 25:16
  36:3 40:17
  46:5,6 56:17
  65:18 70:8
  75:17 76:3,17
  85:6,10 108:3
  110:12 113:14
**taken** 1:21 5:2
  136:5
**talk** 50:13 81:4
  82:14,14
**talked** 15:3
  49:22 85:22
  94:22 128:20
**talking** 8:20
  14:11,18 18:17
  54:16 58:22
  69:22 98:10
  124:16 129:19

130:15
**Tape** 65:22 66:4
**tapes** 65:19
  135:9
**technically**
  99:14
**teleconferences**
  33:8
**telephone** 66:17
  67:5
**tell** 13:18 15:10
  36:3 51:17
  89:6
**telling** 41:12
  82:22 83:17
  84:2,21 85:2
  92:9
**tells** 82:6
**Tel-Drug** 98:3
**Tennessee** 5:6
  5:15 6:12
  136:9
**term** 52:18 54:9
  85:16 87:15
  111:21 120:12
  121:9,18 122:7
**terms** 16:16
  17:18 20:11
  31:11 39:4
  68:8,19 88:7
  102:2 105:20
  109:19
**tested** 105:18
**testified** 7:9
  26:5 28:2
**testify** 118:9
  136:4
**testimony** 7:13
  7:14 27:21
  57:12 85:22
  127:10 130:1
  136:6,10
**Thank** 126:20
  127:1 128:17

| | | | | |
|---|---|---|---|---|
| 135:5 | 46:12,15 59:12 | 45:11,12 | 119:14 | 45:1,2 |
| **Thanks** 113:16 | 59:16 62:8 | **training** 18:7,13 | **typing** 132:2 | **use** 7:5 43:4 |
| **theoretically** | 64:19 65:7,22 | **transactioned** | ———— | 44:8 62:20,22 |
| 113:9 | 66:4 67:11 | 29:12 | **U** | 63:5,9 64:10 |
| **therapeutically** | 68:21 74:8 | **transcribed** | **uh-huh** 8:12 | 69:13,16 76:13 |
| 91:13 | 82:2,11 86:3 | 136:11 | **unaltered** 115:7 | 93:4 97:22 |
| **things** 54:17 | 86:21 87:5 | **transition** 38:5 | **underlinings** | 98:2 100:13 |
| 65:6,11 96:15 | 88:3,17 89:5,6 | **transitioned** | 87:14 | 126:7 |
| **think** 8:17 14:8 | 92:7 93:7 | 59:11 69:9 | **underneath** | **user** 74:1 |
| 14:9 18:14 | 103:14 104:11 | 71:22 | 48:3,13 49:4 | **usually** 23:15 |
| 23:3 24:13 | 110:9 113:15 | **transmittal** 4:13 | 51:7,22 81:8 | **U.S** 2:3 9:19 |
| 27:16 30:14 | 113:18,21 | 12:19 15:16 | **understand** 9:4 | ———— |
| 40:4 41:18 | 114:13 115:1 | 42:14,17 56:4 | 14:20 15:1 | **V** |
| 45:10,17 52:9 | 115:15 122:13 | 72:18 106:6 | 17:15 36:16 | **v** 1:13 |
| 53:3 55:4 | 123:13 124:9 | 108:4,12 | 50:14 51:4 | **valid** 74:10 |
| 60:19,19,20 | 126:8,15,20 | **transmittals** | 53:12 54:8,12 | **Valium** 119:8 |
| 61:20 62:21 | 127:2,12 128:2 | 35:13 40:16 | 55:4 67:6 82:3 | **variety** 47:5 |
| 63:1,2,22 | 135:1,6,10 | **true** 125:10 | 86:18 120:16 | **Ven-A-Care** |
| 66:16 68:12 | 136:6 | 134:3 | **understanding** | 1:12 |
| 74:17 89:12 | **times** 12:9 57:6 | **try** 8:11,13,16 | 30:18 39:11 | **verbal** 8:7 |
| 100:11 102:10 | 81:13 102:8 | 9:22 10:12 | 41:16 47:15 | **verify** 115:8 |
| 103:3,7 118:16 | **Tipps** 5:4 6:12 | 17:21 28:19 | 56:6 62:12 | **version** 15:21 |
| 123:15 | **title** 35:18 57:11 | 34:3 39:13 | 99:15 100:1,5 | 16:2,5,6 25:18 |
| **thinking** 26:22 | 98:20,22 99:18 | 68:15 75:3 | 100:8,9,14,22 | 46:21 70:22 |
| 27:10 53:4 | 102:2,12 | 99:10 127:5 | 109:21 119:13 | 75:7 95:10 |
| 87:7,11 | 107:18,19 | **trying** 36:16 | **understood** | 129:14 131:4 |
| **third** 111:12 | 111:6 120:10 | 37:3 51:4 54:7 | 82:11 86:20 | **versions** 15:7,12 |
| 121:8,20 | 120:12 121:10 | 54:12 78:15 | **uniform** 30:11 | 24:3,20,21 |
| **thirdhand** 49:1 | **today** 6:10 | 133:20 | 30:17 31:5 | 60:4 74:19 |
| **thought** 35:5 | 14:10 50:7 | **turn** 66:10 84:5 | **uniformity** | 75:9 126:14 |
| 72:3 104:14 | 72:16 86:7 | 125:20 134:5 | 32:21 | **versus** 10:8 |
| **three** 49:16,17 | 125:19 | **turned** 113:7 | **United** 1:1,11 | 13:15 14:16 |
| 58:1,9 84:7,16 | **Today's** 6:7 | **two** 25:21 26:12 | 2:5 6:5,19,20 | 15:2 17:9 18:7 |
| 84:20 85:4 | **told** 65:12 92:19 | 51:3,10 58:21 | **unpublished** | 20:12 21:2,8 |
| 122:21 | 93:2 117:3 | 102:14 105:17 | 76:12 | 24:22 28:7 |
| **three-year** | **top** 42:22 48:12 | 121:14 135:9 | **unsure** 103:4 | 45:6 47:12 |
| 104:1 | 49:16 66:13 | **type** 11:20 36:17 | **update** 20:8 | 60:14 78:7 |
| **time** 6:8 9:1 | 83:16 109:10 | 36:18 53:22 | **updated** 114:6 | 85:18 95:9 |
| 13:3 16:17 | 111:3 | 122:14 131:19 | **updates** 42:3 | 112:20 116:1,5 |
| 19:3,20,21 | **topics** 26:13 | 133:22 | 69:15,16 126:8 | 116:20 118:21 |
| 20:19 27:18,18 | **touch** 25:10 | **typed** 132:6 | 127:13,17 | 119:15 |
| 28:22 29:13,18 | **trade** 100:8,15 | **typewriting** | 128:10 | **vial** 89:2,7,8 |
| 33:12 34:3 | **train** 17:12 | 136:11 | **upper** 46:22 | **video** 6:8,10,11 |
| 37:12 44:10,13 | **trained** 18:4 | **typically** 119:6 | **uppercase** 44:18 | **Videographer** |

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                    October 16, 2009

Nashville, TN

18

3:11 6:2,21 7:5
46:11,14 65:21
66:3 113:17,20
127:3 135:7
**Videotape** 6:3
**videotaped** 1:19
5:1
**view** 122:9
**Volume** 6:2
135:8

___

**W**
**wait** 8:18
**waived** 5:10
**Walgreens**
97:16,18,20,21
97:22
**walk** 46:7
**Walker** 5:4 6:11
**want** 81:4
**wanted** 8:3
46:21 47:11
49:8 63:8 73:3
73:8 125:18
133:4
**warehouse**
71:13,15,18,21
72:3
**Warren** 3:5 7:3
**wasn't** 18:15,21
19:4 32:13
34:11 63:13
88:8 107:16
110:4,5 114:16
120:10
**way** 2:7 28:3
48:18 50:5
57:16 61:1
73:2 84:11
87:21 99:5
100:19 101:3
115:20 136:14
**website** 38:4,6
38:18 76:22

**week** 70:18
**went** 11:7 16:21
16:22 21:5,5
37:14 38:2
105:16
**weren't** 38:15
61:21 72:22
119:5,12 124:6
126:10,12
**we'll** 14:8,9
24:13,15 50:13
**we're** 9:2 13:1
14:11,18 18:16
58:22 69:22
79:12 98:10
108:7 134:13
**we've** 15:3 46:6
46:18 70:12
124:16 128:19
130:14
**WHEREOF**
136:17
**whichever** 44:1
**wholesale** 1:5
6:5 10:6 11:15
41:6
**Windows** 79:8
127:12,18
130:15 131:5,9
**withdraw** 96:22
113:13
**witness** 4:2 5:15
5:17 6:22 7:6,8
14:13 15:14,19
21:11 22:7,19
25:8 26:14
27:14 28:10
29:21 31:14
38:10 40:2
46:10 50:9,21
58:11 59:6
62:5 65:20
68:12 70:6
73:2 86:5,12

95:12 96:1,11
99:4 100:4,17
102:16 103:12
117:17 118:16
119:1,17
120:16 123:9
125:15 135:15
136:2,7,17
**witnesses** 27:20
**word** 23:7,9
84:14 87:14
131:21
**words** 16:18
52:14 57:17
68:10 98:14
99:19 114:7,22
121:14
**work** 28:18
30:16,19 33:14
37:3 45:5 51:3
51:8 118:20
**worked** 8:2 17:7
28:15,20 32:11
37:10 47:16
50:15 64:5
65:8
**working** 62:17
**wouldn't** 32:19
35:8 50:2 58:9
77:12 78:5,17
79:1 88:12
91:17,18,21
92:2,18,21,22
94:17 99:1
109:15 114:7
114:10 116:4
116:11,18
117:6,7 121:22
123:1
**writable** 24:1
**writes** 108:18

___

**X**
**X** 4:1 7:15 127:6

134:11

___

**Y**
**Y** 85:3
**Yeah** 86:18
**year** 16:12,15
43:14 124:4
125:3
**years** 15:12
16:18 63:22
88:21 122:21
**yes-or-no** 92:1
**York** 3:7,7
**Y/N** 82:2

___

**Z**
**Zenith** 26:8
49:11

___

**$**
**$3.34** 32:8

___

**0**
**01-12257-PBS**
1:9
**0102** 134:6
**0110** 134:14
**0111** 81:3 82:16
**01110** 79:6
**01111** 80:5
**01119** 80:5
**0118** 84:6
**0119** 84:7
**02** 79:15
**02210** 2:8
**034-0463** 42:21
**06-11337-PBS**
1:12
**07-10248-PBS**
1:15

___

**1**
**1** 2:7 6:3,3 65:22
135:8 136:10

**10:01** 46:15
**10:24** 66:1
**10:29** 66:5
**100** 36:1,21
40:17 44:15
66:9 67:22
**100-04** 37:15,19
**101** 3:6
**10178** 3:7
**108** 4:13
**11:21** 113:18
**11:30** 113:21
**11:52** 135:10,11
**110** 4:14
**117** 136:11
**12** 76:8
**127** 4:6
**13** 10:20 125:21
**13th** 111:8
**130** 4:15
**131** 4:16
**134** 4:7
**14** 10:21 127:4
**15** 27:5,8
**15th** 6:8
**150** 5:5
**16** 1:22
**16th** 5:3
**17** 26:7 37:15
**19th** 136:18
**1990s** 59:17,19
**1993** 16:21
**1998** 43:8
108:12
**1999** 29:3 42:17
43:16 45:16,17
75:19 127:21

___

**2**
**2** 42:22 66:4
108:18 126:1
128:21
**20** 135:18
**2000** 38:10

30(b)1 and 30(b)6 Deposition of Helton, Carolyn                    October 16, 2009

# Nashville, TN

59:22 60:17,18
60:20,22 61:3
69:8 76:8,14
79:7 83:12
84:6 127:22
**2001** 18:20
19:20 33:15
34:3 46:20
57:20 59:4
110:9 123:14
126:1 129:13
**2002** 38:11
111:9,11
**2003** 29:3,3,7,9
126:2
**2004** 18:20
19:21 33:15
34:3 43:21
50:5 59:17
75:19 110:10
123:14
**2006** 29:13
71:22 72:5,8
72:12
**2009** 1:22 5:3
6:8 16:2
127:20 136:18
**212.808.7697**
3:8
**2300** 5:5
**255** 70:14
**260** 4:10 9:8,11
125:20
**261** 4:11 46:16
46:19 61:6
129:11
**262** 4:12 70:10
70:11 75:18
133:11,13
134:5
**263** 4:13 108:8,9
128:18
**264** 4:14 110:13
110:14

**265** 4:15 130:18
**266** 4:16 131:12
131:14

---
**3**

**3** 16:22 66:10,14
83:7
**3/11/2011**
136:22
**30(b)(1)** 1:18
7:12
**30(b)(6)** 1:18
7:13
**300** 2:16
**31** 26:7 125:22
126:5
**312.862.2285**
2:18
**362** 49:2
**368** 46:22 47:8
49:9,13 58:1
129:12

---
**4**

**4** 16:21 126:2
**41** 36:7 37:2
**46** 4:11

---
**5**

**5** 83:11 101:19
**529** 108:7

---
**6**

**6** 83:16,22
101:20
**60654** 2:17
**617.748.3298**
2:9

---
**7**

**7** 4:5
**70** 4:12

---
**8**

**8** 84:5,17 86:10

87:12
**800** 66:18
**8402** 49:17
**8404** 49:18
57:22 130:10

---
**9**

**9** 4:10 84:5,17
86:10 87:12
**9:02** 5:4 6:9
**9:54** 46:12
**9200** 2:7
**94** 16:22
**95** 44:11,12
**99** 60:21
**9963** 42:15

Henderson Legal Services, Inc.