# EXHIBIT 10

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL | ) | |
| INDUSTRY AVERAGE | ) | MDL No. 1456 |
| WHOLESALE PRICE LITIGATION | ) | Master File No. |
| _____ | ) | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO: | ) | Subcategory No. |
| _____ | ) | 06-CV-11337-PBS |
| United States of America, | ) | |
| ex rel. Ven-A-Care of the | ) | |
| Florida Keys, Inc., v. | ) | |
| Abbott Laboratories, Inc., | ) | |
| CIVIL ACTION NO. | ) | |
| 06-11337-PBS | ) | |

VOLUME I of II

The video taped deposition of STEVEN J. YOUNG, called by the United States for examination, pursuant to subpoena and pursuant to the Federal Rules of Civil Procedure for the

1  were employed by Huron?
2     A.  There are economists that work for Huron,
3  at least I believe there are still economists that
4  work for Huron, that's correct.
5     Q.  And you're not a statistical expert;
6  right?
7     A.  No.  I apply statistics, as most CPAs do
8  in -- in the normal course of my work.
9     Q.  And although you disagree with the
10 extrapolation that was performed in this case for
11 various reasons, you didn't actually perform any
12 quantitative analysis to evaluate the scope of the
13 error you contend was caused thereby?
14    A.  I was asked to critique his analysis, and
15 his analysis did not take it to the stage that
16 there could be quantitative critiques made of --
17 since he didn't, he chose to ignore all of the
18 issues in his calculation, it was possible to do
19 quantitative -- it was not possible for me to do
20 quantitative calculations of the impact of those,
21 no.
22    Q.  Well, when you say that the variability of

1   the claims in the ten states is different than the
2   variability of the claims in the 38 states, you're
3   saying there's no way to quantify that variability
4   and why it's too different to extrapolate?
5       A.   The -- again, the normal approach in these
6   situations would be to get the full claims data
7   set, draw a statistically valid random sample,
8   come up with a point estimate and a range within
9   which that point estimate applied.
10           I did not have the claims data sets
11  necessary to perform that approach or to analyze
12  that claims data in relationship to the claims
13  data that he looked at to do any type of
14  quantification.
15           I wasn't asked to do that.  The Myers &
16  Stauffer summary combined with some of the
17  information that was included on your list from
18  yesterday demonstrates that there's not
19  homogeneity between the populations, and I believe
20  that that's adequate to reach the conclusion that
21  he hasn't properly -- given the fact that he's
22  deviated from the -- the normal way that I've ever

1 seen this calculation done supports my conclusion.
2     Q. Yeah. Because Abbott only hired you to do
3 the critique and not to actually quantify the
4 scope of the error, you didn't actually do
5 anything to quantify the scope of the error;
6 right?
7     MR. TORBORG: Object to form.
8     THE WITNESS: I was not asked to do that,
9 no.
10 BY MR. LAVINE:
11     Q. Okay. So what is the methodology that you
12 say that Dr. Duggan failed to follow when he based
13 his extrapolation on data related to ten states?
14     MR. TORBORG: Object to form.
15     THE WITNESS: Could you repeat that
16 question?
17 BY MR. LAVINE:
18     Q. What -- what is the principle or standard
19 that you say Dr. Duggan failed to meet when he
20 based his extrapolation on a sample of ten states?
21     A. Based on my past experience in performing
22 overcalculation and undercalculation -- or

1  been involved in.  So it's based on my past
2  experience over the last 25 years.
3     Q.   Am I right you're not necessarily saying
4  that it lacks the precision you would require, but
5  that that level of precision hasn't been
6  demonstrated by Dr. Duggan?
7     A.   Whether it lacks it or not, I can't tell
8  until he's demonstrated it, which he has not.
9     Q.   And you didn't go ahead and do that
10 yourself because that wasn't part of what you were
11 hired to do?
12    A.   That's correct.
13    Q.   And what is the objective standard that
14 Dr. Duggan would need to meet to overcome your
15 criticisms on this basis?
16    A.   Again, my -- it would be conjecture on my
17 part as to what that might be.  My -- I've been
18 asked to look at what Dr. Duggan has done and
19 critique the approach he's taken and not design a
20 new approach for him that would be acceptable, so
21 I haven't been asked to do that.
22    Q.   So you can't think of any particular

Page 286

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL        ) MDL No. 1456

INDUSTRY AVERAGE WHOLESALE)  Master 01-CV-12257-PBS

PRICE LITIGATION             ) Sub No. 06-CV-11337-PBS

_____  )

THIS DOCUMENT RELATES TO: )        VOLUME II

_____  )

United States of America, )

ex rel.                   )

Ven-A-Care of the Florida )

Keys, Inc., v. Abbott     )

Laboratories, Inc., CIVIL )

ACTION NO. 06-11337-PBS   )


    The continuation of the videotaped discovery

deposition of STEVEN J. YOUNG, taken in the

above-entitled cause, before DERALYN GORDON,

a notary public of Cook County, Illinois, on the

14th day of May, 2009, at 77 West Wacker Drive,

Suite 3500, Chicago, Illinois, beginning at

approximately 9:19 a.m., pursuant to Notice.

1  if you have a lot of high calculated reduction
2  states applying to the rest of the population,
3  you can have overstatements relating to that.
4  Again, it's something that's showing that
5  something needs to be investigated.
6      Q.   All right.  So now does that cover all
7  of the points in your opinion related to Texas
8  and Ohio that you were addressing?
9      A.   Yes, sir.
10     Q.   And am I correct we're in the same
11 position as before, these were things where
12 Dr. Duggan should have addressed these and
13 explained why they were not material or if
14 they were material somehow accounted for that
15 and explained it?
16     A.   Yes, that's my opinion.
17     Q.   Okay.  But you haven't taken the extra
18 step of actually testing the magnitude or scope
19 of what the impact might have been, right?
20     A.   No, that was not included in the scope of
21 my work.
22     Q.   And you haven't identified any actual

1  populations. And, in fact, is a specific issue
2  that's cited by the OIG when they comment on the
3  homogeneity of reimbursement levels between states
4  in their 2004 analysis.
5       So I did not specifically quantify it,
6  because, again, I believe it's an issue that
7  should have been addressed by Dr. Duggan, and
8  he didn't. And it's not my job to do his job.
9       But I do believe that there's support out
10 there that it's a material issue that warrants
11 investigation.
12    Q.   But tell me how it is material. How would
13 it have changed the calculation to Dr. Duggan?
14    A.   Let me try to explain this. And I'll put
15 it within the context of the OIG report.
16      The OIG report did an analysis of states
17 that on the surface appeared to have similar or
18 almost identical reimbursement structures --
19    Q.   Could I just interrupt and ask what about
20 your reporting are you talking about, the one that
21 you got for the first time yesterday?
22      MR. TORBORG: Object to form.

1  Q.  You could have contacted them to asked
2  them for information?
3      MR. TORBORG:  Object to form.
4  A.  Again, Dr. Duggan indicated that he was
5  performing a calculation of the average selling
6  price to retail customers.  It was not my job to
7  go out and identify information to assist him in
8  that process.
9      My task by my client was to identify
10 deficiencies in the process that he went through.
11 So I did not go out and try to do the effort that
12 you just described on behalf of Dr. Duggan or
13 otherwise.
14 BY MR. LAVINE:
15 Q.  And you never had any discussion, never
16 evaluated the question of whether or not you
17 should actually try to do a better job than you
18 say Dr. Duggan did and actually come to a more
19 precise figure?
20 A.  My job was not to recalculate or
21 attempt to fix Dr. Duggan's analysis.  It was
22 merely to critique Dr. Duggan's analysis.  That

1  any of these products, but apparently you expected
2  Dr. Duggan should have done some type of
3  comprehensive collection of data related to all
4  of those sales to satisfy your critique?
5       MR. TORBORG:  Objection, asked and
6  answered, argumentative.
7       A.   No.  Dr. Duggan prepared a differences
8  calculation.  I believe this was necessary for a
9  differences calculation.
10      I was not tasked with performing a
11 differences calculation; therefore, I did not
12 do that work.
13 BY MR. LAVINE:
14      Q.   All right.  So I think we're on the
15 same page on the overall but-for reimbursement
16 issue covered in Section 8, that you have
17 identified issues that Dr. Duggan should have
18 considered and/or addressed, but you haven't done
19 the quantitative analysis yourself or identified
20 any particular quantitative analysis that should
21 have been done?
22      A.   I've identified the areas that he should

1  have considered, but it was not within the scope
2  of my work to perform the calculation for him
3  or to do the quantification that you referred to.
4          MR. LAVINE:  Can we mark this as 015 and
5  016.
6                  (Deposition Exhibit Young 015
7                  and Deposition Exhibit Young 016
8                  marked for identification.)
9  BY MR. LAVINE:
10     Q.   Does your opinion --
11          MR. TORBORG:  Do you have copies of those?
12          MR. LAVINE:  Oh, I'm sorry.
13  BY MR. LAVINE:
14     Q.   Does your opinion refer to or rely upon
15  any of the opinions of Judge Saris in the AWP
16  litigation?
17          MR. TORBORG:  Object to form.  Which one
18  is 015 and which one is 016?  The shorter one is
19  015.
20     A.   The opinions that I reach I do not believe
21  are dependent on Judge Saris' findings.
22          There is some information that I provide