## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456<br>Civil Action No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO CLASS 1 RESIDENTS OF THE COMMONWEALTH OF MASSACHUSETTS | Hon. Patti B. Saris |

## DECLARATION OF ANDREW D. SCHAU

ANDREW D. SCHAU declares as follows:

1.      I am a member of the law firm of Patterson Belknap Webb & Tyler LLP, attorneys for the J&J Defendants.  I submit this declaration in support of the J&J Defendants' Post-Remand Motion for Summary Judgment Against Class 1 Residents of the Commonwealth of Massachusetts.

2.      Attached hereto are true and correct copies of the following exhibits:

| Designation | Description |
|---|---|
| Exhibit 1 | Relevant excerpts from the transcript of the July 3, 2007 hearing in the above-captioned action. |
| Exhibit 2 | Findings and Order on Motion of Track 1 Defendants for the Entry of Judgment Pursuant to Federal Rule of Civil Procedure 54(b), dated November 20, 2007, in the above-captioned action. |
| Exhibit 3 | Notice of Appeal by Larry Young and Therese Shepley, dated December 19, 2007, in the above-captioned action. |
| Exhibit 4 | Order of Court, dated February 15, 2008, in *In re: Pharmaceutical Industry Average Wholesale Price Litigation*, No. 08-1002 (1st Cir.) |

| Designation | Description |
|---|---|
| Exhibit 5 | Relevant excerpts from the transcript of the October 8, 2009 hearing in the above-captioned action. |
| Exhibit 6 | Relevant excerpts from the Declaration of Raymond S. Hartman in Opposition to Defendants' Motions for Summary Judgment, dated April 6, 2006, in the above-captioned action. |
| Exhibit 7 | Relevant excerpts from the November 27, 2006 transcript of the Class 2 and Class 3 trial in the above-captioned action. |
| Exhibit 8 | Relevant excerpts from the November 21, 2006 transcript of the Class 2 and Class 3 trial in the above-captioned action. |
| Exhibit 9 | Relevant excerpts from the November 20, 2006 transcript of the Class 2 and Class 3 trial in the above-captioned action. |
| Exhibit 10 | Relevant excerpts from the transcript of the June 24, 2004 hearing in *United States v. MacKenzie*, CR-01-10350-DPW (D. Mass.). |
| Exhibit 11 | Relevant excerpts from the November 7, 2006 transcript of the Class 2 and Class 3 trial in the above-captioned action. |
| Exhibit 12 | Relevant excerpts from the November 9, 2005 deposition of Larry Young. |
| Exhibit 13 | Relevant excerpts from the November 11, 2005 deposition of James Shepley. |
| Exhibit 14 | Relevant excerpts from the December 11, 2006 transcript of the Class 2 and Class 3 trial in the above-captioned action. |
| Exhibit 15 | Relevant excerpts from the November 29, 2006 transcript of the Class 2 and Class 3 trial in the above-captioned action. |

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 23, 2009

/s/ Andrew D. Schau
Andrew D. Schau

## CERTIFICATE OF SERVICE

I certify that on November 23, 2009 a true and correct copy of the foregoing was delivered via electronic service to all counsel of record pursuant to Case Management Order No. 2.

/s/ Andrew D. Schau

Andrew D. Schau

# EXHIBIT 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

```
---------------------------------
IN RE:                        :      Civil Action
                              :      No. 01-12257-PBS
PHARMACEUTICAL INDUSTRY       :      Courtroom No. 19
AVERAGE WHOLESALE PRICE       :      1 Courthouse Way
LITIGATION                    :      Boston, MA 02210
                              :      10:00 a.m., Tuesday
_____ :      July 3, 2007
```

HEARING


Before:        THE HONORABLE PATTI B. SARIS,
               UNITED STATES DISTRICT JUDGE



APPEARANCES:

Hagens Berman Sobol Shapiro LLP, (by Steve W. Berman, Esq.)
  1301 5th Avenue, Seattle, WA 98101-1090,
  on behalf of the Plaintiffs.

Hagens Berman Sobol Shapiro LLP,
  (by Edward Notargiacomo, Esq.),
  One Main Street, Cambridge, MA 02142,
  on behalf of the Plaintiffs.

The Haviland Law Firm, LLC, (by Donald E. Haviland, Esq.)
  740 S. Third Street, Philadelphia, PA 91912,
  on behalf of the Plaintiffs.

Hogan & Hartson, (by Steven J. Edwards, Esq. and Lyndon M.
  Tretter, Esq.), 875 Third Ave., New York, NY 10022,
  on behalf of the Defendant Bristol-Myers Squibb.


                 Marie L. Cloonan
              Federal Court Reporter
           1 Courthouse Way - Room 7200
         Boston, MA  02210- 617-439-7086
      Mechanical Steno - Transcript by Computer

1    just had totally gone from my mind.   Although, Schering

2    quite quickly reminded me of it.

3              So, there will be no more trials with respect

4    to the first five defendants in Track 1 with respect to,

5    as I understand it, Class 1.  And, then, we've got the

6    two -- what I'll call -- bellweather trials on Classes 2

7    and 3.  And, I know you're eager to schedule a national

8    class, but I'm just as eager to start going into

9    Class -- Track 2.

10             So, I might schedule them for a hearing.  And,

11   I know -- I see Mr. DeMarco here.  We've got to move

12   that because it interferes with some people's vacation

13   plans to --

14             What date was it?

15             MR. DE MARCO:  July 17th, your Honor.

16             THE COURT:  July 17th.

17             THE CLERK:  2:30 p.m.

18             THE COURT:  But, as far as Track 1 goes --

19             MR. BERMAN:  There's one issue on Track 1,

20   your Honor.

21             THE COURT:  Yeah?

22             MR. BERMAN:  And, that is Johnson & Johnson.

23   I know that you said that their drugs didn't exceed the

24   30 percent rule for the purposes of Class 2 and 3.  But,

25   it's our position -- and we would like the opportunity

1    to present this or maybe you've already decided -- that

2    that 30 percent would not apply to Track 1.

3              THE COURT:  I thought I ruled that.  The 30

4    percent did apply to Track -- to Class 1.

5              MR. BERMAN:  Well, you have a footnote that

6    talks about -- implies that, but you did not rule in

7    that way.  That's your ruling, that we have no J & J

8    Class 1 trial.

9              THE COURT:  I thought it was not a footnote.

10   I thought I went on and on about it.  I think I went on

11   and on about everything.  So, maybe I ought to look at

12   it again.

13             MR. BERMAN:  I don't think you did --

14             THE COURT:  I think I said that I rejected

15   plaintiffs' position that the per se liability for Class

16   1 and that I thought that the 30 percent speed limit

17   should apply to Class 1 as well.  And, that would be, I

18   thought applicable to all of the defendants.

19             So, why is that not clear?

20             MR. BERMAN:  Well, I didn't see that in the

21   order, your Honor.

22             THE COURT:  They've got it.

23             MR. BERMAN:  At the time we negotiated the --

24   via that settlement, both sides thought that was a risk

25   that could go either way.  And, we discussed that with

1    the mediator.  The mediator didn't think it was clear

2    either.

3                THE COURT:  Well --

4                MR. BERMAN:  It's clear now.

5                THE COURT:  It's clear now.  And, I will look

6    at it again.  If it wasn't clear, it is clear.  The 30

7    percent speed limit applies to Class 1.

8                I rejected a per se position.  And, I have to

9    go look through it again, because I thought it was

10   clear.  That's why I essentially had the expert go back

11   and calculate the damages again.  Because, the way he

12   did it was he aggregated all the years when he did it

13   with the 30 percent speed limit.  He didn't back out

14   the -- it might have been statute of limitations and on

15   the specific NDCs.  That's why I needed a root

16   calculation.

17               Otherwise, I could have done it.  Right?  On

18   the per se.  Because, he did it year by year.

19               MR. BERMAN:  Correct, you could have, yeah.

20               THE COURT:  I could have done that.  I mean

21   ...

22               MR. BERMAN:  But, we felt it was a different

23   issue with the consumers, because there's no evidence

24   that they had any knowledge of the so-called industry

25   norm of 20, 25 percent.

1          THE COURT:  Well, I ruled to the contrary and

2    I don't accept that position.  And, I thought it was

3    clear.  If not, I'm making it clear now.

4          Now, I want to know what -- I'm ready, at this

5    point, to deal with Montana and Nevada and move them

6    back to their home states.  I've waited because I

7    thought I would give someone the template so that

8    someone else wouldn't have to relive this entire piece

9    of it.  And, the question only is, from my point of

10   view, whether or not you all want to talk to them about

11   -- before I ship it off -- whether it's worth using

12   Eric Green's expertise to try and settle it before I do

13   that or whether I should just send it.

14          MR. BERMAN:  From our perspective, your Honor,

15   we are already in discussion with some of the

16   defendants.  So, if you want to get Mr. Green involved,

17   the plaintiffs would not -- we think that's a good

18   idea.

19          THE COURT:  I know I've only got one of you

20   here and not everybody.  But, what do you think?

21          I mean, once I've got a template, does this

22   make sense?  I know I've got this Medicaid and it's not

23   -- the TPPs and the Medicare statute.  But, Mr. Green

24   knows so much about it right now that I'd hate to ship

25   it back to the MDL and have them ship it up to the

# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY<br>AVERAGE WHOLESALE PRICE<br>LITIGATION | ) <br> ) MDL NO. 1456<br> ) <br> ) <br> ) <br> ) CIVIL ACTION NO. 01-12257-PBS |
| THIS DOCUMENT RELATES TO<br>01-CV-12257 | ) <br> ) <br> ) |

**FINDINGS AND ORDER ON MOTION OF
TRACK 1 DEFENDANTS FOR THE ENTRY OF JUDGMENT
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 54(b)**

November 20, 2007

Saris, U.S.D.J.

Defendants AstraZeneca Pharmaceuticals LP ("AstraZeneca");

Bristol-Myers Squibb Company and Oncology Therapeutics Network

Corporation ("BMS"); Johnson & Johnson, Centocor, Inc. and Ortho

Biotech Products, L.P. (together "the J&J Defendants"); and

Schering-Plough Corporation, Schering Corporation and Warrick

Pharmaceuticals Corporation (together "Schering/Warrick") have

moved for the entry of judgment pursuant to Fed. R. Civ. P. 54(b)

(Docket No. 4880).  Upon consideration of the motion and the

submissions of the parties, the Court **ALLOWS** the motion.  In

accordance with Rule 54(b), the Court makes the following

findings.  See Spiegel v. Trs. of Tufts Coll., 843 F.2d 38, 42-43

(1st Cir. 1988).

**FINDINGS**

1.  This is a multi-district litigation ("MDL")

consolidating a number of class actions that were brought against

16 pharmaceutical manufacturers beginning in 2001.  The actions,

as originally pleaded, included federal claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and various state consumer protection statutes.

2.   The essence of the claims was that Defendants caused various industry publications – such as the Red Book, First DataBank and MediSpan – to publish fictitious average wholesale prices ("AWPs"). These AWPs were used by Medicare and third party payors ("TPPs"), such as insurance companies, to reimburse doctors for physician-administered drugs, such as chemotherapy agents.   Plaintiffs claimed that the AWPs were fictitious because they grossly exceeded the true average prices. Plaintiffs also claimed that each Defendant unlawfully marketed the 'spread' or difference between the AWP, the benchmark for reimbursement, and the actual acquisition price of the drugs paid by providers such as doctors and pharmacies.

3.   In March 2004, the Court created a "fast track" consisting of five defendants or defendant groups: AstraZeneca, BMS, GlaxoSmithKline ("GSK"), the J&J Defendants and Schering/Warrick. The remaining defendants were placed in a "regular track" for discovery and trial.[1] The fast track defendants became known as the "Track 1" defendants, and the remaining defendants became known as the "Track 2" defendants.

4.   In January 2006, the Court certified three classes for trial against the Track 1 Defendants: (a) Class 1 -- consumers in

---

[1] The remaining defendants are Abbott, Amgen, the Aventis Group, Baxter, Bayer, Dey, the Fujisawa Group, Immunex, Pfizer/Pharmacia, Sicor and Watson.

2

40 states who made co-payments for drugs under Medicare Part B;
(b) Class 2 -- TPPs in Massachusetts who made co-payments for
drugs under Medicare Part B; and (c) Class 3 -- consumers and
TPPs in Massachusetts who paid for drugs in non-Medicare
transactions based on contracts expressly using AWP. Class 1 was
not certified as to Schering/Warrick, because there was no class
representative who had made a co-payment for a Schering or
Warrick product under Medicare Part B. In re Pharm. Indus.
Average Wholesale Price Litig., 233 F.R.D. 229 (D. Mass. 2006)
(class certification order).

5. By order dated November 2, 2006, the Court denied
Plaintiffs' motion for partial summary judgment as to the Class 1
and Class 2 claims, and also denied the Track 1 Defendants'
motions for summary judgment as to the Class 1 and Class 2
claims, except with respect to Medicare Part B drugs furnished in
2004. In re Pharm. Indus. Average Wholesale Price Litig., 460 F.
Supp. 2d 277, 288 (D. Mass. 2006). The Court also denied the
Track 1 Defendants' motions for summary judgment on the Class 3
claims.

6. GSK has settled the claims of all three classes.

7. A settlement of the Class 1 claims against AstraZeneca
and BMS has been reached and awaits final approval of the Court.

8. The Class 2 and 3 claims against AstraZeneca, BMS, the
J&J Defendants, and Schering/Warrick, alleging violations of
Mass. Gen. Laws ch. 93A, proceeded to a bench trial before the
Court in November of 2006. On June 21, 2007, the Court issued

3

Findings of Fact and Conclusions of Law holding AstraZeneca, BMS and Warrick liable with respect to certain drugs for certain time periods as set forth in the Court's opinion. _In re Pharm. Indus. Average Wholesale Price Litig._, 491 F. Supp. 2d 20, 109 (D. Mass. 2007). The Court hereby incorporates that opinion as if set forth fully herein.

9.   In the same opinion, the Court dismissed all Class 2 and 3 claims against Schering. _Id._ at 108 - 09. The Court found no damages in Class 3 for Warrick.  _Id._ at 109.  The Court also dismissed the claims against the J&J Defendants. _Id._ at 109.

10.  On August 27, 2007, the Court held an additional hearing on damages.

11. On November 1, 2007, the Court issued a Memorandum and Order on damages. _In re Pharm. Indus. Average Wholesale Price Litig._, No. 01-12257, 2007 WL 3225922 (D. Mass. Nov. 1, 2007). The Court found that AstraZeneca's conduct was knowing and willful as to Class 2 and awarded double damages as to AstraZeneca for Class 2. _Id._ at *3.  The Court also found that BMS' conduct was knowing and willful as to Class 2 when "less than ten percent of its sales were made within 5% of the list price, and the spreads were huge," and thus awarded double damages as to Taxol for 2002, Cytoxan in 1999 and 2001, and Rubex in 1998 and 2002. _Id._ at *3-4.  The Court found that neither BMS's nor AstraZeneca's conduct was knowing and willful as to Class 3 and accordingly did not award multiple damages as to Class 3.  _Id._ at *4.  The Court issued a final award of

4

damages and interest against AstraZeneca and BMS as follows:

| | Class 2 | | Class 3 | Overall |
|---|---|---|---|---|
| | Single Damages with Prejudgment Interest | Total Damages with Doubling | Single Damages with Prejudgment Interest | Total Award for Classes 2 and 3 |
| AstraZeneca | $3,467,267 | $5,557,370 | $7,384,499 | $12,941,869 |
| BMS | $309,267 | $388,557 | $307,037 | $695,594 |

Id. at *4 - 5.

12.  As to Warrick, after considering further expert testimony, the Court found in its November 1, 2007 Order, that "Warrick has produced undisputed evidence that its unfair and deceptive conduct in inflating the AWP for albuterol did not cause Class 2 any damages because of the methodology for calculating Medicare reimbursement for multi-source drugs based on a median." Id. at *4.  Thus, the Court ordered entry of judgment in favor of Warrick. Id. at *4.

13.  As to the J&J Defendants, the Court ruled, among other things, that although J&J's conduct was troubling, it did not violate Mass. Gen. Laws ch. 93A, in part because the spreads on the J&J Defendants' subject drugs (Procrit® and Remicade®) never substantially exceeded the range of spreads generally expected by the industry and government.  491 F. Supp. 2d at 104.  As a result, the Court ruled that the claims of Class 2 and Class 3 should be dismissed.  Id. at 109.  The claims by members of Class 1 are dismissed for the same reason.

DJA 200

14.   Rule 54(b) provides, in pertinent part:

> When more than one claim for relief is
> presented in an action . . . or when multiple
> parties are involved, the court may direct
> the entry of a final judgment as to one or
> more but fewer than all of the claims or
> parties only upon an express determination
> that there is no just reason for delay and
> upon an express direction for the entry of
> judgment.

Fed R. Civ. P. 54(b).

15.   Here, there are no other claims between Plaintiffs and the J&J Defendants and Schering/Warrick.  Accordingly, with respect to these parties, the judgments would have the requisite degree of finality.

16.   Plaintiffs will be moving to certify nationwide classes for Classes 2 and 3 against BMS and AstraZeneca.  However, there are no further claims against these companies under Massachusetts law.

17.   For the reasons set forth below, the Court finds that there is no just reason to delay the entry of judgments with respect to the Track 1 Defendants.

18.   There are no subsequent proceedings between the parties that threaten to moot the need for ultimate resolution of these issues in the Court of Appeals.  Nor are there any issues with respect to the Track 2 defendants that will affect my decision with respect to the Track 1 Defendants.

19.   Plaintiffs will not be prejudiced by the immediate entry of judgments against AstraZeneca and BMS pursuant to Rule 54(b); rather, if this Court's decision were to be affirmed, Plaintiffs

will benefit from having judgments capable of enforcement and
distribution to class members prior to resolution of the Track 2
claims.   There is no just reason to delay entry of judgments
against Plaintiffs with respect to the claims against the J&J
Defendants, and Schering/Warrick.

### ORDER

IT IS THEREFORE ORDERED THAT:

Pursuant to Fed. R. Civ. P. 54(b), the Clerk shall enter
judgments in the form of Appendices A through D as follows: in
favor of Class 2 and Class 3 and against AstraZeneca in the
amounts stated; in favor of Class 2 and Class 3 and against BMS
in the amounts stated; in favor of Schering/Warrick and against
Class 2 and Class 3; and in favor of the J&J Defendants and
against Class 1, Class 2 and Class 3.


Dated: 11/20/07                    **S/PATTI B. SARIS**
                                   United States District Judge

7

DJA 202

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) | MDL No. 1456 |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 | ) ) ) ) ) | Civil Action No. 01-CV-12257 PBS<br><br>Judge Patti B. Saris |

## <u>Judgment</u>

IT IS ADJUDGED AND DECREED THAT:

Judgment is entered in favor of Class 2 against Bristol-Myers Squibb Company in the amount $388,557, including pre-judgment interest, and in favor of Class 3 against Bristol-Myers Squibb Company in the amount $307,037, including pre-judgment interest, for a total of $ 695,594.

Dated:  November 2⁵, 2007

_____

10

DJA 203

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) | MDL No. 1456 |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 | ) ) ) ) ) | Civil Action No. 01-CV-12257 PBS  Judge Patti B. Saris |

### Judgment

IT IS ADJUDGED AND DECREED THAT:

Judgment is entered in favor of Schering-Plough Corporation, Schering Corporation, and Warrick Pharmaceuticals Corporation and against Class 2 and Class 3.

Dated: November 2‑, 2007

11

DJA 204

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) | MDL No. 1456 |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 | ) ) ) ) ) | Civil Action No. 01-CV-12257 PBS  Judge Patti B. Saris |

### Judgment

IT IS ADJUDGED AND DECREED THAT:

Judgment is entered in favor of Johnson & Johnson, Centocor, Inc. and Ortho

Biotech Products, L.P. and against Class 1, Class 2 and Class 3.

Dated: November 20, 2007

12

DJA 205

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) | MDL No. 1456 |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 | ) ) ) ) ) | Civil Action No. 01-CV-12257 PBS Judge Patti B. Saris |

### Judgment

IT IS ADJUDGED AND DECREED THAT:

Judgment is entered in favor of Class 2 against AstraZeneca Pharmaceuticals LP in the amount $5,557,370, including pre-judgment interest, and in favor of Class 3 against AstraZeneca Pharmaceuticals LP in the amount $7,384,499, including pre-judgment interest, for a total of $ 12,941,869.

Dated: November 2, 2007

Patti B. Saris

9

DJA 206

# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br>C.A. No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Judge Patti B. Saris |

### NOTICE OF APPEAL

Notice is hereby given that Larry Young and Therese Shepley, named representative plaintiffs in the above class action, appeal to the United States Court of Appeals for the First Circuit from the judgment entered against them on November 20, 2007, pursuant to Fed.R.Civ.P. 54(b), and from any and all orders antecedent and ancillary thereto, including, but not limited to, any and all interlocutory decrees, rulings, or opinions that merged into and became part of the judgment, that shaped the judgment, or upon which the judgment is based.

Respectfully submitted,

Dated: December 19, 2007

/s/ Donald E. Haviland, Jr.
Donald E. Haviland, Jr., Esquire
Adam S. Levy, Esquire, Of Counsel
Michael J. Lorusso, Esquire
THE HAVILAND LAW FIRM, LLC
740 S. Third Street, Third Floor
Philadelphia, PA 19147
Telephone: (215) 609-4661
Facsimile: (215) 392-4400

COUNSEL FOR NAMED REPRESENTATIVE
PLAINTIFFS, LARRY YOUNG AND THERESE SHEPLEY

## CERTIFICATE OF SERVICE

I, Donald E. Haviland, Jr., hereby certify that on December 19, 2007, a true and correct copy of the foregoing Notice of Appeal was filed via ECF electronic filing and notice was sent to all counsel of record.

/s/ Donald E. Haviland, Jr.
Donald E. Haviland, Jr., Esquire
THE HAVILAND LAW FIRM, LLC
740 S. Third Street, Third Floor
Philadelphia, PA 19147
Telephone: (215) 609-4661
Facsimile: (215) 392-4400
haviland@havilandlaw.com

COUNSEL FOR NAMED REPRESENTATIVE
PLAINTIFFS, LARRY YOUNG AND THERESE SHEPLEY

# EXHIBIT 4

# United States Court of Appeals
## For the First Circuit

---

No. 08-1002

IN RE: PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE LITIGATION.

---

ORDER OF COURT

Entered: February 15, 2008

This appeal is brought by two named plaintiffs, Larry Young and Therese Shepley, in their capacity as class representatives, from a judgment in favor of certain defendants ("the Johnson & Johnson defendants") in this massive antitrust class action.  The Johnson & Johnson defendants have moved to dismiss the appeal because it is being prosecuted by The Haviland Law Firm ("Haviland"), which was recently disqualified as class counsel by the district court.

Plaintiffs, represented by Haviland, opposed the motion to dismiss, arguing that the appeal was filed prior to the disqualification order and that dismissing the appeal would deprive them of their right to appeal the allegedly erroneous judgment against them.  Alternatively, plaintiffs asked that this appeal be consolidated with their appeal from the disqualification order.

Class counsel responded to the motion to dismiss by agreeing that Haviland can no longer prosecute this appeal but moving that the court permit class counsel to be substituted for Haviland rather than dismiss the appeal.  In response to class counsel's motion, the Johnson & Johnson defendants acknowledged that class counsel are authorized to prosecute this appeal and that allowing class counsel's motion to substitute themselves for Haviland would make dismissal of the appeal unnecessary.

Although the disqualification order predated the notice of appeal, now that Haviland has been disqualified from serving as class counsel, it can no longer represent the class in this appeal.  Further, although the disqualification order itself has been appealed,[1] that order

---

[1]Neither our jurisdiction to review that order nor the merits of that order are presently before us.  Accordingly, we intimate no view on

presently remains in effect.   Finally, although class counsel did not initially file an appeal on plaintiffs' behalf from the judgment in favor of the Johnson & Johnson defendants, now that class counsel have offered to take over prosecution of the appeal filed by Haviland, plaintiffs' right to pursue their appeal is no longer at stake.   We therefore allow class counsel's motion to substitute themselves for Haviland in this appeal, thereby mooting the Johnson & Johnson defendants' motion to dismiss.  Since allowing the motion to substitute makes the merits of the disqualification order irrelevant to this appeal, we deny plaintiffs' motion to consolidate this appeal with their appeal from the disqualification order.

Class counsel's motion to substitute is <u>granted</u>.   Johnson & Johnson's motion to dismiss and plaintiffs' motion to consolidate are <u>denied</u>.

By the Court:

Richard Cushing Donovan, Clerk.

By: _____
        Chief Deputy Clerk.

[cc: Steve Berman Esq., Rita Hanscom esq., Donald Haviland Esq., Steven Edwards Esq., Andrew Schau Esq., D. Scott Wise Esq., Jill Brenner Meixel Esq., Scott Kinsel Esq.]

_____

either issue.

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE:                              )
                                    )  CA No. 01-12257-PBS
PHARMACEUTICAL INDUSTRY AVERAGE     )
WHOLESALE PRICE LITIGATION          )  Pages 1 - 25
                                    )


STATUS HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
October 8, 2009, 4:10 p.m.


LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1          MR. SCHAU:  You had certified a national class for

2   Class 1.

3          MR. BERMAN:  For Class 1 you had a national class

4   without --

5          THE COURT:  Well, I had no intent to dismiss it

6   other than for Massachusetts.  Let's put it this way:  No

7   one was more surprised than I.  Maybe the language went in

8   too fast or whatever.  But I did intend for Massachusetts.

9   I couldn't have possibly thought through the country because

10  at that point I hadn't gone through all the national laws.

11  So I did it under 93A was my intent.  And if I was negligent

12  in how I phrased it, I think I just took your wording, and I

13  just didn't intend that, I didn't write on it.  But I did

14  intend it for 93A.  So where does that leave us?

15         MR. BERMAN:  Well, I think, as I interpret the

16  First Circuit opinion, because Class 1 was not -- there was

17  no Class 1 93A trial, and they have a right to a jury, I'm

18  not sure that your decision is binding.  I mean, we never

19  presented Class 1 --

20         THE COURT:  I thought 93A you don't get a right to

21  a jury.

22         MR. BERMAN:  You don't get a jury, okay.

23         THE COURT:  So let's just back up a little.  So it

24  came up in about ten minutes at the tail end of the case.

25  My intent was that under 93A, that it wouldn't fly.  If I

# EXHIBIT 6

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL No. 1456 |
| | ) | CIVIL ACTION:  01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 | ) ) ) ) | Judge Patti B. Saris |
| | ) | Chief Magistrate Judge Marianne B. Bowler |
| | ) ) | **[FILED UNDER SEAL PURSUANT TO COURT ORDER]** |
| | ) | |

## DECLARATION OF RAYMOND S. HARTMAN IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

motions, if those specific issues involve matters of economic theory and fact that have not been developed in the related supporting expert declarations.

3.      This Declaration proceeds as follows.  In Section II, I identify the issues raised and arguments made by Defendants' motions and Defendants' experts.  I discuss the reasons why these issues are irrelevant and why the Defendants' arguments fail.  In Section III, I present additional detail for selected issues discussed in Section II.  I also address selected data concerns raised by Defendants' experts in Section III.  My conclusions are summarized in the Executive Summary above.  Attachment A identifies materials cited in this Declaration.

## II.   Incorrect Assertions Made by Defendants and the Incorrect Analytic Results Put Forward by Defendants' Experts to Support those Assertions

4.      In this Section, I introduce the assertions made and issues raised by Defendants through the three venues they have used:  their Joint Motion for Summary Judgment; the specific individual motions for summary judgment filed by each of the Track 1 Defendants and the declarations put forward by their experts.  I focus upon those assertions with economic content.[4]

### A.   Defendants Incorrectly Argue that Plaintiffs Argue that AWP should Equal ASP

5.      Track 1 Defendants erroneously assert that Plaintiffs believe that "AWP should equal ASP."[5]  This is a serious mischaracterization of my testimony at this stage of the litigation.  In all analyses put forward in my Affirmative and Rebuttal Declarations in

---

for Summary Judgment As to Class 1 and Class 2 (*Dukes Declaration*); Merits Report and Declaration of Gregory K. Bell, Ph.D., for the Bristol-Myers Squibb Group (*Bell Declaration*); the Declaration of Sumanth Addanki, Ph.D., for the Schering-Plough Group (*Addanki Declaration*); all *In re: Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257, March 15, 2006.

[4]  My expertise as an economist does not allow me to address assertions regarding questions of law, such as the prevailing statute of limitations, whether the named Plaintiffs are adequate representatives of the relevant Classes and whether the federal government was deceived, as a matter of law.

[5]  See Section I heading, *Joint Motion*, page 9.  In making this assertion, Defendants apparently draw upon the confused and frequently incorrect Declaration of Dr. Addanki.  Dr. Addanki certainly does not comprehend the allegations in this matter.  For example, he states at ¶ 17 of his Declaration, "The Complaint alleges a scheme in which the measure of the average *wholesale* price has been manipulated, i.e., that the AWP does not, in fact, represent what *wholesalers* obtain from providers and other intermediaries. The price received by the *manufacturers* has no bearing on this alleged manipulation."

It is unclear what Dr. Addanki is talking about.  That is not the alleged AWP inflation scheme.  The allegations are laid out clearly in my September 3, 2004 Declaration in Support of Class Certification, as cited below in footnote 6.  Also, see Section IV of the Third Amended Master Consolidated Class Action Complaint, *In re: Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257, October 17, 2005, beginning at page 42.

---

Support of Class Certification and in my December 15, 2005 Declaration on Liability and Calculation of Damages, **I have never taken the position** that Defendants should have **set the "AWP equal to the ASP."** At all places in my Declarations, I have made explicit the following industry practice and knowledge: AWP has been a "sticker price" or "list price" for all drugs (by NDC); other list prices, most importantly WAC, are related formulaically to and are less than the AWP (AWP > WAC); transactions prices (including AMP and ASP) are negotiated off AWP and are less than AWP and WAC.[6] I have articulated this same position in my most recent deposition.[7]

6.     My formulaic methodology is straightforward.

- The AWP has been taken by the industry, including the public and private sectors, to be *a signal* for transactions prices (EAC and ASP), particularly the acquisition costs of providers of Part B drugs.[8]

- It is understood that the signal is not perfect, but it has been taken to be sufficiently accurate for reimbursement, despite its imperfection. Defendants' Expert Mr. Young has made this clear.[9]

- While imperfect, prior to the AWP inflation scheme, the signal provided the expectation that the AWP of single-source physician-administered drugs exceeded the provider acquisition cost (EAC or ASP) by 15-25%.

- Using the threshold of 30%, the formulaic methodology put forward in my December 15, 2005 Declaration finds AWP inflation subject to liability when the revealed spread ((AWP-ASP)/ASP) exceeds 30%.

- Once actual spreads are found to exceed 30%, the related AWP is found to have been inflated to an extent not fully understood by public and private sector payers. Hence, those public and private payers could not and did not adequately respond to adjust their reimbursement practices to the AWP inflation scheme.

- If I find liability (a spread in excess of 30%), I calculate damages. The Medicare damages are set forth by statute explicitly and without ambiguity.

---

[6] See, for example, the September 3, 2004 Declaration of Raymond S. Hartman in Support of Class Certification, *In re: Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257, ¶ 30. It has been understood that providers acquire such drugs at somewhat less than WAC. See also, my September 3, 2004 Declaration, Attachment D, ¶ 2, and my December 16, 2004 Rebuttal Declaration, ¶ 15, Section D.

[7] Deposition of Raymond S. Hartman, *In re: Pharmaceutical Industry Average Wholesale Price Litigation*, February 27, 2006, pp. 670 – 686.

[8] See pp. 9-10 of my September 3, 2004 Declaration in Support of Plaintiffs' Motion for Class Certification. See also Chapter 9, "Medicare payments for outpatient drugs under Part B" of Medicare Payment Advisory Commission (MedPAC), *Report to the Congress: Variation and Innovation in Medicare*, June 2003, which notes: "Most private payers are still using AWP-based payment methods similar to the Medicare model" (p. 164).

[9] See ¶ 33 and Attachment K of my December 15, 2005 Declaration on Liability and the Calculation of Damages in this matter.

Reimbursement is to be at "the lower of the EAC[10] or the AWP" (or 95% of AWP over 1998-2003 or 85% of AWP over 2004; see footnote 13 of my December 15, 2005 Declaration).

- Under Medicare Part B reimbursement, Plaintiffs do not assert that the AWP should = ASP. It is clear by the liability threshold and by an understanding of the markets in question, that such an equality does not (nor are Plaintiffs suggesting that it should) occur. However, under Medicare Part B, reimbursement should be set at the lower of the AWP (or a percentage thereof) and the EAC = ASP, so that if liability is demonstrated and reimbursement is paid at x%*AWP, calculation of damages is determined directly by Statute.

7.      Furthermore,, Defendants erroneously argue that "a finding that AWP was intended to mean ASP would impose liability on virtually every Medicare Part B eligible drug."[11]

Since I never assumed that AWP "means" or "equals" ASP, my December 15, 2005 Declaration on Liability and Calculation of Damages finds and imposes no liability for any Medicare Part B drug whose spread of AWP relative to its ASP is not inflated, that is, did not exceed the liability threshold of 30%.[12]

If, however, the spread is excessive (> 30%), I do find liability. At that point I assess damages according to the Medicare Statutes; that is, I measure damages as the amount by which the AWP (or the relevant percentage thereof) exceeds EAC = ASP. The assumption underlying this method is that had HCFA and Medicare understood sufficiently[13] the general extent to which the actual spreads on physician administered drugs were *mega-spreads*, they would have more aggressively undertaken the surveys to calculate EACs and impose the lesser of AWP (or a percent thereof) and the EAC practice for reimbursement.

8.      Defendants continue their distorted characterization of Plaintiffs' position, stating, "Plaintiffs' proposed construction of the regulation [i.e., AWP = ASP] is entirely inconsistent with HCFA's interpretation of the regulation. Between 1992 and 1997, HCFA did not implement reimbursement on the basis of EAC, but rather reimbursed providers for physician-administered drugs at 100% of AWP."[14]

---

[10] Attempts to assert that the "actual charge" differ from the EAC (for 1998-2003) fail for reasons discussed in my December 15, 2005 Declaration on Liability and the Calculation of Damages, footnote 14.

[11] *Joint Motion*, pp. 1-2.

[12] See my December 15, 2005 Declaration on Liability and Calculation of Damages, ¶¶ 56-60. In my February 3, 2006 Supplemental Declaration on Liability and Calculation of Damages, I was asked to calculate damages under Medicare Part B reimbursement, if as a matter of law, it was determined that reimbursement rates for all Part B drugs should have been the lower of the AWP (or 95%AWP or 85% AWP) and the EAC (= ASP), regardless of whether the AWP exceeded the yardstick spread of 30%.

[13] I discuss how much HCFA and Medicare knew in Section II.C below.

[14] *Joint Motion*, p. 10.

Plaintiffs' construction of the relevant Medicare statute as implemented in my damage analysis for that period of time (indeed for all periods during the Damage Period in which the Statute was revised) is based upon Statute, as cited in footnote 13 of my December 15, 2005 Liability Declaration. This construction is not "inconsistent with HCFA's interpretation;" **it implements it explicitly**. The Statute reads:

> "Payment for a drug ... *is based on the lower of the estimated acquisition cost (EAC) or the national average wholesale price [i.e., AWP][15] of the drug.* ... For multiple-source drugs, payment is based on the lower of the estimated acquisition cost ... or the wholesale price that, for this purpose, is defined as the median price for all sources of the generic form of the drug." (Source: 42 CFR 405.517, Revised October 1, 1996; emphasis added)

**Contrary to Defendants' assertion,**[16] Plaintiffs do understand the fact that "HCFA has always interpreted AWP to mean something different than ASP." Indeed, my formulaic methodology explicitly incorporates into the calculation of damages the fact that AWPs exceed ASPs, hence EACs. Liability is alleged not because AWP exceeds the ASP; rather liability is alleged because it exceeded ASP by the unreasonably and unexpectedly substantial amounts reflected in the "mega-spreads" recognized by Judge Saris and Dr. Berndt. Once liability is determined, damages occur precisely because reimbursement occurred at the higher of the artificially inflated AWP rather than "the lower of the EAC and or the national average wholesale price [AWP] of the drug." The Judge has agreed with this interpretation of the economic implications of the Statute.[17]

9.  Indeed, individual Defendants recognize that my formulaic methodology admits to the fact that AWP exceeds ASP and that it implements damage calculations only when

---

[15] Note that the average wholesale price (AWP) does appear in the 1991 statutory revision, as is recognized in Defendants' *Joint Motion* (pp. 4, 9). The fact that the *Joint Motion* states that "AWP appeared in the Medicare statute for the first time in 1997" on page 12 is contradictory and must be a typographical error. Note further that Defendants feebly attempt (at p. 12 of their *Joint Motion*) to imply that "the statute did not include an express definition of the term [AWP]." This innuendo does not work. Regardless of the "express definition," the industry has had a very definite understanding of AWP throughout the Damage Period; indeed, Defendants quote (*Joint Motion* at p. 13): "A House Report ... stated 'The AWPs are reported by drug manufacturers to organizations that publish the data in compendia.'"

Neither I nor the Plaintiffs disagree with this characterization.

[16] *Joint Motion*, pp. 11-12.

[17] At pp. 58-59 of the *Memorandum and Order*, Judge Saris states for Sub-Class 1: "The Court is satisfied that as to the Medicare Part B beneficiary class, a class action is a superior method to resolve the dispute. Defendants have not identified any plausible individual issues that will arise with regard to these class members other than their proofs of damages, which may entail reviewing documents to determine whether each patient was required to pay a percentage-based co-pay and whether each has supplemental insurance. **These damages calculations will be largely formulaic.** Even if some corroboration and individualized attention is necessary, it is unrealistic to expect millions of beneficiaries across the nation to repeatedly prove these claims. The number of drugs at issue in the Medicare Part B context is limited to about seventeen, so even if deciding spreads by individual NDCs is necessary, it would not be unmanageable" (emphasis added). For Sub-Class 2, she states: "**Again, the common factual issues (as outlined in the previous section) predominate,** in that the TPPs are required by contract to supplement Medicare drug co-payments" (emphases added).

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

In Re:                          )
PHARMACEUTICAL INDUSTRY         ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE         ) MDL No. 1456
LITIGATION                      ) Pages 10-1 - 10-149


BENCH TRIAL - DAY TEN

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
November 27, 2006, 9:10 a.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1  Q.  So, in your view, there's nothing inherently wrong with

2  a published AWP that is different from the actual selling

3  price of the drug, right?

4  A.  Well, again, I'm not an expert on right and wrong, but

5  the general issue is that they should track but not certainly

6  equal.

7  Q.  Your problem with it is when the spread becomes too big,

8  right?

9  A.  Yes.

10  Q.  But you don't have a specific opinion as to whether

11  Dr. Hartman's 30 percent spread is the right yardstick,

12  correct?

13  A.  That's correct.

14        THE COURT:  Do you believe that all the third-party

15  payors throughout the class period knew about the formulaic

16  20 to 25 percent markup between WAC and AWP?

17        THE WITNESS:  I believe the relationship between

18  those list prices, I believe that that was generally known.

19  I'm sure that not universally known, but I believe that that

20  information --

21        THE COURT:  I'm not talking about the consumers.

22        THE WITNESS:  Right, right, no, no, of course.

23        THE COURT:  But the third-party payors, was that

24  just universally known throughout the class period?

25        THE WITNESS:  I believe, for those that worked in

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


In Re:                        )
PHARMACEUTICAL INDUSTRY        ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE        ) MDL No. 1456
LITIGATION                     ) Pages 9-1 - 9-144


BENCH TRIAL - DAY NINE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
November 21, 2006, 9:10 a.m.


LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1    United States, and so if that's what you mean by it works.

2    Q.   No, she said it works, it works because for 99 percent

3    of the drugs, there's a predictable relationship between AWP

4    and ASP.  You agree with that, don't you?

5    A.   I haven't analyzed that to come up with a number.

6    Q.   Okay, you believe AWP works for drugs where there's a

7    spread between AWP and ASP that's 30 percent or less, right?

8    A.   I agree that the AWP system as it's evolved has led to

9    certain understandings about spread, and it's been working,

10   but it's clearly been in need of some change that we've seen

11   in the MMA.

12   Q.   But your theory is that you were looking for drugs where

13   there was a predictable relationship between AWP and ASP,

14   correct?

15   A.   Are we talking about the comparator drugs?  Are you

16   saying --

17   Q.   No, your analysis here, your expectation analysis, what

18   you were looking for is, was there a predictable

19   relationship?  And your yardstick is 30 percent, right?

20   A.   I'm saying, given that I find a predictable relationship

21   for classes of drugs and reflected in expectations, that's

22   what I -- I'm finding payors either understood or just

23   basically took as for granted.

24   Q.   All right.  So let's talk about Procrit.  Now, for

25   Procrit, early on in the case you thought 16 of the 114 NDCs

# EXHIBIT 9

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

In Re:                         )
PHARMACEUTICAL INDUSTRY         ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE         ) MDL No. 1456
LITIGATION                      ) Pages 8-1 - 8-175

BENCH TRIAL - DAY EIGHT

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
November 20, 2006, 9:15 a.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1      THE COURT:  If you wanted to look at the

2  deposition.

3      THE WITNESS:  Oh, I see, I do have it in front of

4  me.  The amending to my response made it a bit broader.

5  Counsel said because the "entire" industry knows that it

6  doesn't.  I think my response was that "Because the industry

7  knows that it doesn't."

8      Now, by the industry here, I'm certainly referring

9  to the manufacturers.  It's certainly clear that I've

10  testified that some payors did not know that fact.  So the

11  industry generally knows that.  I wouldn't -- this is not the

12  law of gravity or the speed of light.

13  Q.  Well, take a look at Page 672, the testimony that begins

14  at Line 7:  "Question:  Well, you keep referring to a market

15  understanding.  Do you have any reason to believe that the

16  government doesn't have the same understanding?  Answer:  The

17  government has -- you need to be more -- well, let me answer

18  this briefly.

19      "The government has set reimbursement rates that

20  reflect an understanding that is comparable to what I would

21  say is the -- in my yardsticks."

22      Was that testimony true when you gave it?

23  A.  That testimony, what I'm saying there is that the

24  government -- there are studies that I've cited in my direct

25  testimony here and that I've reviewed earlier before this

1   deposition that showed relationships between AWP and ASP that

2   were reflected in Medicare's movement toward 95 percent and

3   85 percent that showed some -- that showed some understanding

4   of the relationship of AWP to ASP, but that's as far as I

5   take it.

6   Q.   You say the understanding of the government was

7   comparable to what you said in your yardsticks, and your

8   yardstick was a 30 percent expectation yardstick, correct?

9   A.   I set a threshold yardstick of 30 percent.  I looked for

10  reimbursement yardsticks, measures of what were negotiated,

11  and all of those -- those included the manufacturers that I

12  looked at, they included the studies that I reviewed, and

13  they included the contracts that I reviewed.  And so that's

14  the body of yardsticks or the sample of yardsticks.  Finally,

15  I set a threshold that was conservative for all the

16  yardsticks I saw.

17  Q.   And you applied that 30 percent yardstick to Medicare in

18  your December 15, 2005 expert report; isn't that true?

19  A.   That's correct.

20       THE COURT:  And why did you do it then?  Put aside

21  the legal question for a minute.  Did you think it was fairly

22  applicable to them?

23       THE WITNESS:  Actually I didn't know.  I mean, I

24  was asked to do it as a -- I was told, look, there's legal

25  arguments going on both sides.  That's why there was a

1    supplemental to the original declaration.  And so I set that

2    as a conservative threshold --

3             THE COURT:  Well, would it be one reasonable way to

4    consider damages if I said there was no strict liability?

5             THE WITNESS:  Well, there are many ways that one

6    could come at it.  Is that one way?  It could be one of a

7    variety of ways.  I guess I'd want to --

8             THE COURT:  So, in other words, if I don't go with

9    the strict liability -- and I understand some case law I

10   think they're referring to -- but if I went more along the

11   standard of what's unfair or deceitful, I need to understand

12   what was understood in the market.  So would the 30 percent

13   yardstick be one fair way of thinking about what Medicare

14   knew in the market?

15            THE WITNESS:  Well, it's a very conservative

16   threshold for what was a range of reimbursement rates that I

17   find in the market.

18            THE COURT:  Just as it is with the other one, the

19   Class 3?

20            THE WITNESS:  That's right.

21   Q.   And you base that 30 percent threshold for Medicare in

22   your initial report on an economic analysis, correct?

23   A.   My entire expert report was the implementation of

24   economic formulations and economic analysis at the direction

25   of certain assumptions regarding legal issues.

# EXHIBIT 10

DAY 39

```
 1            UNITED STATES DISTRICT COURT
 2            DISTRICT OF MASSACHUSETTS
 3   * * * * * * * * * * * * * * *
                               *
 4   UNITED STATES            *
              Plaintiff       *
 5                            *
        VERSUS                *   CR-01-10350-DPW
 6                            *
 7   ALAN MACKENZIE, JANICE   *
        SWIRSKI, HENRY VAN MOURIK, *
        DONNA TOM, DONALD PATTON, *
 8      DONALD MEEK, ERIC OTTERBEIN *
        RITA JOKIAHO, CAREY SMITH, *
 9   MARK SMITH               *
              Defendants      *
10                            *
     * * * * * * * * * * * * * * *
11
             BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
12
             UNITED STATES DISTRICT COURT JUDGE
13
                 JURY TRIAL - DAY 39
14
                   JUNE 24, 2004
15
16
17             Courtroom No.  1 - 3rd Floor
               1 Courthouse Way
18             Boston, Massachusetts 02210
               9:00 A.M. - 12:00 P.M.
19
20
21
             Pamela R. Owens -- Lee A. Marzilli
22             Official Court Reporters
         John Joseph Moakley District Courthouse
23         1 Courthouse Way - Suite 3200
             Boston, Massachusetts  02210
24
25   Method of Reporting:  Computer-Aided Transcription
```

2

```
 1   APPEARANCES:
 2      MICHAEL K. LOUCKS, ESQ. Chief, Health Care
        Fraud Unit, GEORGE W. VIEN, ESQ., and SUSAN G.
 3      WINKLER, ESQ., Assistant United States Attorneys,
        U.S. Attorney's Office, 1 Courthouse Way, Suite
 4      9200, Boston, Massachusetts 02210, on behalf of
        the United States
```

66

1   designed to induce higher volume purchases.  And the
2   marketing of that, there was extensive testimony about
3   that.
4           THE COURT:  All right.  No. it's not a
5   question of the marketing.  It's the question of -- from
6   my perspective -- what do I tell the jury about this?
7           MR. MONICO:  Your Honor, may I just say
8   something?
9           THE COURT:  Sure.
10          MR. MONICO:  It just strikes me as amazing
11  that the Government, everytime they talk about there's a
12  discount, if the discount was intended to induce a sale.
13  How could a discount ever not be intended to induce a
14  sale?
15          THE COURT:  Of course.
16          MR. MONICO:  It strikes me so absurd, that
17  they keep saying that if that happens, then these other
18  things apply.  So, I mean it sounds like -- that strikes
19  me --
20          THE COURT:  That's precisely the argument the
21  Government is making.  I understand.  All right.
22          MR. LOUCKS:  That's precisely the argument
23  we are making, Your Honor.  And the reason why the
24  reporting obligation and informing the buyer is
25  important is because the Medicare program was set up as

67

1   the lesser of cost or charges.  And where there are
2   discounts, the cost is lower.  And the Medicare program
3   didn't require when there's a safe harbor --
4           THE COURT:  That's true of acquisition price
5   as well, regular acquisition price.
6           MR. LOUCKS:  It is.  But if the Medicare
7   program gets regular reports of discounts from
8   physicians, you can take a look at what it's paying and
9   say "we're paying way too much."
10          THE COURT:  I don't disagree with that.
11          MR. LOUCKS:  And that's the reason for the
12  safe harbors.
13          THE COURT:  And that's why I keep asking this
14  question about what's the duty to disclose.  That's why
15  I want to -- the principal reason why I want to focus on
16  that.  But it's the odd situation that it's only if you
17  do a discount.  If by contrast, you have the same price
18  for whatever quantity you have, there is no obligation
19  to report that to the Government.
20          MR. LOUCKS:  If I have a list price and you
21  make no discounts, right.
22          THE COURT:  Right.
23          MR. LOUCKS:  As a matter of fact, Your Honor,

24    a historical fact here, not proven to this jury, but
25    everybody got the spread between AWP and list price, the

68

1    same 25 percent, whether it was Zoladex or Lupron or
2    some other oncology drug, until, we think, this group
3    came up with the Return to Practice inducements.   The
4    extra volume discount.   And the 25 percent, everyone
5    gets that.   That's there.   That's what Congress expected
6    with AWP.
7            THE COURT:   Well, I understand that.
8            So, now with specificity and maybe
9    duplication, you're going to focus me on precisely the
10   language of the obligation.
11           Account reviews.   Any question that if offered
12   as a quid pro quo, that constitutes a kickback?
13           MR. KETTLEWELL:   Well, I think there is a
14   question there, Your Honor.   I don't think there is any
15   independent substantial value in an account review with
16   a customer.   And interestingly, the OIG observed just
17   that.   It's a legitimate sales support.   We will offer
18   up a jury instruction along that line.   But we believe
19   it's completely legitimate sales support that a company
20   can give to its product.   If you listen to Elaine
21   Morgan, who was the only witness who testified about the
22   limited account reviews done in the mid-Atlantic region,
23   she testified that the accounts she went into were
24   accounts that were having trouble paying TAP.   And the
25   reason she went in was so that the doctors can get

69

1    reimbursed so they could pay their bills.   And that more
2   or less proves, I think, what we are saying, that the
3   account reviews were offered and the value of them
4   primarily was to TAP and not to the customer.
5           THE COURT:   All right.
6           MS. WINKLER:   The answer to that was Phil
7   Beard's testimony who said that he, as an independent
8   consultant, went out and provided such services at
9   whatever his rate was.
10         THE COURT:   Well, but independent consultant
11   is a little different.   What we're talking about here is
12   account review.
13         MS. WINKLER:   Is a business value -- if we're
14   talking about those accounts where they went in and they
15   did the reimbursement review, there is an independent
16   financial value of that.   It's a business part of
17   running your medical practice.   And if it's a quid pro
18   quo for business, if it's to keep the Lupron business,
19   then it's a kickback.
20         THE COURT:   Well, let me just focus this a bit

# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

In Re:                          )
PHARMACEUTICAL INDUSTRY          ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE          ) MDL No. 1456
LITIGATION                       ) Pages 2-1 - 2-204

BENCH TRIAL - DAY TWO

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
November 7, 2006, 9:15 a.m.

LEE A. MARZILLI and TIMOTHY J. WILLETTE
OFFICIAL COURT REPORTERS
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

Page 74

1    names of any of them?

2         THE WITNESS:  The Zofran, that one I remembered.  I

3    remembered seeing that on my papers.  That's the only one

4    that I really remembered offhand.

5         THE COURT:  Thank you.

6         THE WITNESS:  You're welcome.

7    Q.   And you likewise don't know who manufactured the drugs

8    that you were administered, correct?

9    A.   I'm sorry?

10   Q.   You likewise don't know who manufactured the drugs that

11   you were administered; is that right?

12   A.   No, I don't.

13   Q.   Prior to becoming involved in this litigation, did you

14   have any knowledge regarding what AWP meant?

15   A.   No.

16   Q.   When you got involved in this case, you were provided a

17   copy of plaintiff's complaint; isn't that correct?

18   A.   Yes, ma'am.

19   Q.   And prior to becoming involved in this litigation, were

20   you aware of any of the facts that were alleged in that

21   complaint?

22   A.   No, I wasn't.

23   Q.   In connection with executing your trial affidavit in

24   this case, you were provided with some documents from your

25   lawyers as well, weren't you?

Page 107

1    deductible obligation at that point in time?

2    A.   No.

3              MR. HAVILAND:   Your Honor, our proffer was very

4    narrow, but we're happy to submit supplemental exhibits that

5    clear up some of the factual issues that I think are probably

6    troubling the Court at this point in time given the witness's

7    unavailability to talk about specific issues, but I'd like to

8    just conclude.

9    BY MR. HAVILAND:

10   Q.   Now, Mrs. Hopkins, the two times that you treated with

11   these drugs for your cancer, yesterday counsel for BMS said

12   that everybody in the world knew certain things about their

13   conduct, and I'd like to know from you:

14             At the time you treated and paid these bills, did

15   you know that the AWPs were inflated for the drugs you were

16   taking?

17   A.   No, I did not.

18   Q.   Did you know --

19             MR. SWEENEY:   Objection, your Honor.   There's no

20   evidence in the record that the AWP was charged for any of

21   these drugs.   The witness hasn't testified to that.   She's

22   not competent to testify --

23             THE COURT:   Overruled.   Did you know anything about

24   AWP at all?

25             THE WITNESS:   No, I did not.

# EXHIBIT 12

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

* * * * *

IN RE:  PHARMACEUTICAL INDUSTRY          )

AVERAGE WHOLESALE PRICE                  )

LITIGATION                               ) MDL DOCKET NO.

                                         ) CIVIL ACTION

                                         )) 01CV12257-PBS

D                                        ))

THIS DOCUMENT RELATES TO:                )

ALL ACTIONS                              )

                                         )

D                                        ))

* * * * *


HIGHLY CONFIDENTIAL

DEPOSITION OF LARRY YOUNG

TAKEN ON BEHALF OF THE DEFENDANTS

ON NOVEMBER 9, 2005, BEGINNING AT 10:06 A.M.

IN OKLAHOMA CITY, OKLAHOMA

* * * * *

REPORTED BY:  JANE McCONNELL, CSR, RPR, RMR, CRR

Young, Larry (2005-11-9) HIGHLY CONFIDENTIAL                November 9, 2005
Oklahoma City, OK

Page 61

1    whether plaintiffs in this action are claiming that

2    the pharmaceutical manufacturers committed

3    fraud?

4         A    No.

5         Q    Do you think the pharmaceutical

6    manufacturers committed fraud, committed fraud

7    in connection with the pricing of their drugs?

8              MR. WILLIAMS:   Objection, lack of

9    foundation, calls for speculation.

10        A    I don't know.

11        Q    (BY MR. YOUNG)   Prior to reading the

12   Complaint, had you ever heard of the term average

13   wholesale price or AWP before?

14        A    No.

15        Q    Have you done any additional research on

16   what average wholesale price or AWP is aside from

17   any communication with your attorneys?

18        A    No.

19        Q    Do you know how AWP is calculated?

20        A    No.

21        Q    Do you know who calculates AWP?

22        A    No.

# EXHIBIT 13

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-oOo-


IN RE PHARMACEUTICAL      MDL No. 1456

INDUSTRY AVERAGE PRICE

LITIGATION                CIVIL ACTION: 01-CV-12257-PBS

                          Judge Patti B. Saris

_____


DEPOSITION OF


JAMES E. SHEPLEY


Friday, November 11, 2005


Reno, Nevada


Reported by:  Lesley A. Clarkson, CCR #182

Shepley, James E. (2005-11-11)                     November 11, 2005
                              Reno, NV

1      sorry, we were talking.

2                    MR. HAVILAND:  Yes.

3                    MS. LAWSON:  Let's take a two-minute break

4      while they bring in coffee.

5                            (Off the record.)

6                    MS. LAWSON:  Back on the record.

7      BY MS. LAWSON:

8          Q     Are you familiar with the term "average

9      wholesale price"?

10         A     No.

11         Q     Just to make that clear, you said you are

12     not familiar with the term "average wholesale

13     price"; is that correct?

14         A     Yes.

15         Q     Are you familiar with the term "wholesale

16     acquisition cost"?

17         A     No.

18         Q     Are there other drugs that, other than

19     Lupron, that a doctor has given to you?

20         A     Prescribed?

21         Q     No, let's, we will clarify here.  I'm not

22     asking just about, I'm not asking about someone

# EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


In Re:                         )
PHARMACEUTICAL INDUSTRY        ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE        ) MDL No. 1456
LITIGATION                     ) Pages 17-1 - 17-132


BENCH TRIAL - DAY SEVENTEEN

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
December 11, 2006, 9:15 a.m.




TIMOTHY J. WILLETTE, RDR, CRR
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617) 345-6787

1    Q.    And do you see for the two Johnson & Johnson products,

2    Procrit and Remicade, am I correct, Dr. Hartman, that if the

3    Court for Class 2 were to apply a 30 percent liability

4    threshold, there would be zero damages for Procrit and

5    Remicade?

6    A.    That's correct.

7    Q.    And am I also correct that you use the same ASPs and

8    AWPs for all three classes which the Court has certified?

9    A.    I think that's correct.

10   Q.    So the same spreads apply to all three classes, correct?

11   A.    The spreads from the AWP to the ASPs apply to all the

12   classes.   The one -- there's a distinction in Class 2 damages

13   here in that over portions of the period, the reimbursement

14   rate was at a percentage below AWP, so that would be a reason

15   why even though the spread may be above, say, 30 percent for

16   Class 3, for Class 2, when you're looking at reimbursement at

17   95 percent of AWP, you've got to take that into account in

18   whatever comparison you're making.

19   Q.    All right.   If we could turn to 4007, please, and if you

20   would turn to the Procrit page.

21   A.    I'm sorry.   I'm just getting it.

22         I'm there.

23   Q.    Now, you state here -- well, did you actually prepare

24   this chart?

25   A.    I had my staff prepare this chart.

# EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

In Re:                              )
PHARMACEUTICAL INDUSTRY             ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE             ) MDL No. 1456
LITIGATION                          ) Pages 12-1 - 12-144

BENCH TRIAL - DAY TWELVE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
November 29, 2006, 9:10 a.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1   Q.   Or Blue Cross-Blue Shield, right?

2   A.   I agree, and I think, again, that's not the relevant

3   question.  These individual Medicare beneficiaries are in

4   some sense protected by Medicare.  I mean, they don't go in

5   and choose the amount of their reimbursement.  It's set by

6   Medicare, and in the same way the Taft-Hartley funds are

7   under the umbrella of Blue Cross-Blue Shield and other big

8   payors.

9   Q.   Well, the information might also, as you pointed out,

10  change over time.  You might have more information about one

11  drug rather than another; you might have more information at

12  one point in time than another, correct?

13  A.   Yes.

14  Q.   Okay.  Indeed, isn't it fair to say that the information

15  that you've looked at that shows some spreads isn't the only

16  information that was available to people in the marketplace?

17  You haven't canvassed in your direct examination, or even all

18  your prior reports, all the information that was available to

19  people one way or another?

20  A.   I don't know how I would know that I've got it all.

21  I've got a substantial amount canvassed.

22  Q.   Well, in your direct testimony, did you, for instance,

23  provide to us what First Databank said AWP meant during the

24  class period?  Yes or no, did you provide it?

25  A.   I didn't provide that.