# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY ) AVERAGE WHOLESALE PRICE ) LITIGATION ) | MDL NO. 1456 Civil Action No. 01-12257-PBS |
| ) | Hon. Patti B. Saris |
| THIS DOCUMENT RELATES TO ) CLASS 1 RESIDENTS OF THE ) DISTRICT OF COLUMBIA AND ) STATES OTHER THAN THE ) COMMONWEALTH OF ) MASSACHUSETTS ) | |

## DECLARATION OF ANDREW D. SCHAU

ANDREW D. SCHAU declares as follows:

1.    I am a member of the law firm of Patterson Belknap Webb & Tyler LLP, attorneys for the J&J Defendants. I submit this declaration in support of the J&J Defendants' Post-Remand Motion for Summary Judgment Against Class 1 Residents of the District of Columbia and States Other Than the Commonwealth of Massachusetts.

2.    Attached hereto are true and correct copies of the following exhibits:

| Designation | Description |
|---|---|
| Exhibit 1 | Relevant excerpts from the Memorandum of Law in Support of Track 1 Defendants' Joint Motion for Summary Judgment, dated March 15, 2006, in the above-captioned action. |
| Exhibit 2 | Relevant excerpts from the transcript of the July 3, 2007 hearing in the above-captioned action. |
| Exhibit 3 | Relevant excerpts from the transcript of the October 8, 2009 hearing in the above-captioned action. |

| Designation | Description |
| --- | --- |
| Exhibit 4 | Relevant excerpts from the Declaration of Raymond S. Hartman in Opposition to Defendants' Motions for Summary Judgment, dated April 6, 2006, in the above-captioned action. |
| Exhibit 5 | Relevant excerpts from the November 27, 2006 transcript of the Class 2 and Class 3 trial in the above-captioned action. |
| Exhibit 6 | Relevant excerpts from the November 21, 2006 transcript of the Class 2 and Class 3 trial in the above-captioned action. |
| Exhibit 7 | Relevant excerpts from the November 20, 2006 transcript of the Class 2 and Class 3 trial in the above-captioned action. |
| Exhibit 8 | Relevant excerpts from the transcript of the June 24, 2004 hearing in *United States v. MacKenzie*, CR-01-10350-DPW (D. Mass.). |
| Exhibit 9 | Relevant excerpts from the November 7, 2006 transcript of the Class 2 and Class 3 trial in the above-captioned action. |
| Exhibit 10 | Relevant excerpts from the November 9, 2005 deposition of Larry Young. |
| Exhibit 11 | Relevant excerpts from the November 11, 2005 deposition of James Shepley. |
| Exhibit 12 | Relevant excerpts from the December 11, 2006 transcript of the Class 2 and Class 3 trial in the above-captioned action. |
| Exhibit 13 | Relevant excerpts from the November 29, 2006 transcript of the Class 2 and Class 3 trial in the above-captioned action. |
| Exhibit 14 | Relevant excerpts from the transcript of the May 23, 2006 hearing in the above-captioned action. |
| Exhibit 15 | Relevant excerpts of the Memorandum in Support of Plaintiffs' Proposed Jury Instructions, dated April 6, 2007, in the above-captioned action. |

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 23, 2009

/s/ Andrew D. Schau
Andrew D. Schau

## CERTIFICATE OF SERVICE

I certify that on November 23, 2009 a true and correct copy of the foregoing was delivered via electronic service to all counsel of record pursuant to Case Management Order No. 2.

/s/ Andrew D. Schau

Andrew D. Schau

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY ) AVERAGE WHOLESALE PRICE ) LITIGATION ) | MDL NO. 1456 Civil Action No. 01-12257-PBS |
| ) | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO ) 01-CV-12257-PBS ) | **FILED UNDER SEAL** |

## MEMORANDUM OF LAW IN SUPPORT OF
## TRACK 1 DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

As a result, Plaintiffs cannot prove causation – a necessary element under all of the state consumer fraud statutes.

> **A.    In order to prevail on their consumer fraud claims, Plaintiffs have to prove that the federal government was deceived by the published AWPs.**

Although some states do not require reliance, every state consumer fraud statute requires that a private plaintiff must prove causation.[47]  Establishing a causal nexus between the challenged statement and the plaintiff's injury is thus an essential element of a plaintiff's burden in order to prevail on a state consumer fraud claim.  *See, e.g., Hershenow v. Enterprise Rent-A-Car Co.*, 840 N.E.2d 526, 528 (Mass. 2006) ("[P]roving a causal connection between a deceptive act and a loss to the consumer is an essential predicate for recovery under our consumer protection statute").

Many states reject private consumer fraud claims when the consumer-plaintiff never saw, read or received the challenged statement.[48]  None of the Class 1 Plaintiffs alleges that he or she saw, read, heard or received any information about AWP, much less were deceived in any way by the AWPs published in the trade publications.  Relatedly, the Class 2 Plaintiffs assert that they

---

[47] *See* Track 1 Defendants Opposition to Class Certification, app. A.

[48] *See, e.g., Shannon v. Boise Cascade*, 805 N.E.2d 213, 215 (Ill. 2004) (noting the trial court's finding that plaintiffs "neither saw, heard, or otherwise were aware of the defendant's advertising"); *Weinberg v. Sun Co.*, 777 A.2d 442, 446 (Pa. 2001) (stating that "[t]here is no authority which would permit a private plaintiff to pursue an advertiser because an advertisement might deceive members of the audience and might influence a purchasing decision when the plaintiff himself was neither deceived nor influenced"); *Maine v. Weinschenk*, 868 A.2d 200, 207 (Me. 2005) (denying compensation to "indirect purchasers" who bought their homes from prior homeowners and who never received any representations directly from the homebuilder); *Fink v. Ricoh*, 839 A.2d 942, 958 (N.J. Super. Ct. 2003) (stating that plaintiffs must "demonstrate that each class member read one or more of the advertisements upon which plaintiffs rely and that one or more of the false advertising and material factual concealments which they allege were contained therein constituted a proximate cause of 'an ascertainable loss' of money or property"); *Scaffidi v. United Nissan*, No. CV-S-04-1366, 2005 WL 3737892, at *7 (D. Nev. Dec. 30, 2005) (summary judgment in favor of defendant on consumer fraud claim is proper where "[t]here is no evidence that at any time [defendant] made a false representation to, or for that matter communicated with, [plaintiff] in the course of its business."); *Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F. Supp. 2d 951, 961 (D. Minn. 2000) (granting summary judgment in favor of insurer on state consumer fraud claim where the plaintiff/policyholder never received the challenged representations).

# EXHIBIT 2

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

```
--------------------------------
IN RE:                        :      Civil Action
                              :      No. 01-12257-PBS
PHARMACEUTICAL INDUSTRY        :      Courtroom No. 19
AVERAGE WHOLESALE PRICE        :      1 Courthouse Way
LITIGATION                    :      Boston, MA 02210
                              :      10:00 a.m., Tuesday
_____:      July 3, 2007
```

HEARING

Before:       THE HONORABLE PATTI B. SARIS,
              UNITED STATES DISTRICT JUDGE

APPEARANCES:

Hagens Berman Sobol Shapiro LLP, (by Steve W. Berman, Esq.)
  1301 5th Avenue, Seattle, WA 98101-1090,
  on behalf of the Plaintiffs.

Hagens Berman Sobol Shapiro LLP,
  (by Edward Notargiacomo, Esq.),
  One Main Street, Cambridge, MA 02142,
  on behalf of the Plaintiffs.

The Haviland Law Firm, LLC, (by Donald E. Haviland, Esq.)
  740 S. Third Street, Philadelphia, PA 91912,
  on behalf of the Plaintiffs.

Hogan & Hartson, (by Steven J. Edwards, Esq. and Lyndon M.
  Tretter, Esq.), 875 Third Ave., New York, NY 10022,
  on behalf of the Defendant Bristol-Myers Squibb.

Marie L. Cloonan
Federal Court Reporter
1 Courthouse Way - Room 7200
Boston, MA  02210- 617-439-7086
Mechanical Steno - Transcript by Computer

1    just had totally gone from my mind.   Although, Schering

2    quite quickly reminded me of it.

3              So, there will be no more trials with respect

4    to the first five defendants in Track 1 with respect to,

5    as I understand it, Class 1.   And, then, we've got the

6    two -- what I'll call -- bellweather trials on Classes 2

7    and 3.   And, I know you're eager to schedule a national

8    class, but I'm just as eager to start going into

9    Class -- Track 2.

10             So, I might schedule them for a hearing.   And,

11   I know -- I see Mr. DeMarco here.   We've got to move

12   that because it interferes with some people's vacation

13   plans to --

14             What date was it?

15             MR. DE MARCO:   July 17th, your Honor.

16             THE COURT:   July 17th.

17             THE CLERK:   2:30 p.m.

18             THE COURT:   But, as far as Track 1 goes --

19             MR. BERMAN:   There's one issue on Track 1,

20   your Honor.

21             THE COURT:   Yeah?

22             MR. BERMAN:   And, that is Johnson & Johnson.

23   I know that you said that their drugs didn't exceed the

24   30 percent rule for the purposes of Class 2 and 3.   But,

25   it's our position -- and we would like the opportunity

1   to present this or maybe you've already decided -- that

2   that 30 percent would not apply to Track 1.

3            THE COURT:  I thought I ruled that.  The 30

4   percent did apply to Track -- to Class 1.

5            MR. BERMAN:  Well, you have a footnote that

6   talks about -- implies that, but you did not rule in

7   that way.  That's your ruling, that we have no J & J

8   Class 1 trial.

9            THE COURT:  I thought it was not a footnote.

10  I thought I went on and on about it.  I think I went on

11  and on about everything.  So, maybe I ought to look at

12  it again.

13           MR. BERMAN:  I don't think you did --

14           THE COURT:  I think I said that I rejected

15  plaintiffs' position that the per se liability for Class

16  1 and that I thought that the 30 percent speed limit

17  should apply to Class 1 as well.  And, that would be, I

18  thought applicable to all of the defendants.

19           So, why is that not clear?

20           MR. BERMAN:  Well, I didn't see that in the

21  order, your Honor.

22           THE COURT:  They've got it.

23           MR. BERMAN:  At the time we negotiated the --

24  via that settlement, both sides thought that was a risk

25  that could go either way.  And, we discussed that with

1    the mediator.  The mediator didn't think it was clear

2    either.

3                    THE COURT:  Well --

4                    MR. BERMAN:  It's clear now.

5                    THE COURT:  It's clear now.  And, I will look

6    at it again.  If it wasn't clear, it is clear.  The 30

7    percent speed limit applies to Class 1.

8                    I rejected a per se position.  And, I have to

9    go look through it again, because I thought it was

10   clear.  That's why I essentially had the expert go back

11   and calculate the damages again.  Because, the way he

12   did it was he aggregated all the years when he did it

13   with the 30 percent speed limit.  He didn't back out

14   the -- it might have been statute of limitations and on

15   the specific NDCs.  That's why I needed a root

16   calculation.

17                   Otherwise, I could have done it.  Right?  On

18   the per se.  Because, he did it year by year.

19                   MR. BERMAN:  Correct, you could have, yeah.

20                   THE COURT:  I could have done that.  I mean

21   ...

22                   MR. BERMAN:  But, we felt it was a different

23   issue with the consumers, because there's no evidence

24   that they had any knowledge of the so-called industry

25   norm of 20, 25 percent.

1          THE COURT:  Well, I ruled to the contrary and

2     I don't accept that position.  And, I thought it was

3     clear.  If not, I'm making it clear now.

4          Now, I want to know what -- I'm ready, at this

5     point, to deal with Montana and Nevada and move them

6     back to their home states.  I've waited because I

7     thought I would give someone the template so that

8     someone else wouldn't have to relive this entire piece

9     of it.  And, the question only is, from my point of

10    view, whether or not you all want to talk to them about

11    -- before I ship it off -- whether it's worth using

12    Eric Green's expertise to try and settle it before I do

13    that or whether I should just send it.

14          MR. BERMAN:  From our perspective, your Honor,

15    we are already in discussion with some of the

16    defendants.  So, if you want to get Mr. Green involved,

17    the plaintiffs would not -- we think that's a good

18    idea.

19          THE COURT:  I know I've only got one of you

20    here and not everybody.  But, what do you think?

21          I mean, once I've got a template, does this

22    make sense?  I know I've got this Medicaid and it's not

23    -- the TPPs and the Medicare statute.  But, Mr. Green

24    knows so much about it right now that I'd hate to ship

25    it back to the MDL and have them ship it up to the

# EXHIBIT 3

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE:                              )
                                    )  CA No. 01-12257-PBS
PHARMACEUTICAL INDUSTRY AVERAGE     )
WHOLESALE PRICE LITIGATION          )  Pages 1 - 25
                                    )

STATUS HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
October 8, 2009, 4:10 p.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

```
 1            MR. BERMAN:  I think we're fairly close because

 2    the petition for hearing is denied, which they usually act

 3    fairly quickly.  Then I think we're back here because

 4    there's no stay while they're filing a cert petition.

 5            THE COURT:  No, but then they have a right to

 6    appeal me, right, under 23(f) on the class cert, which I'd

 7    be surprised if they didn't.  So it's premature to set a

 8    trial date on that, right, or not?  Maybe I should have a

 9    status on that as well once we're --

10            MR. BERMAN:  I think I would like that, yes.

11            THE COURT:  So now we're at Johnson & Johnson, and

12    one of the things that confused me about this -- I barely

13    remember it.  Let's start with that basic fact.  It was at

14    the tail end of the trial.  I think what I thought I was

15    doing was resolving Class 1 under 93A, not under every state

16    statute.  Now, was that not true?

17            MR. BERMAN:  Well, we thought that you had, and

18    the judgment reflects that you had done it nationwide.

19            MR. SCHAU:  That's correct.  I can't tell you what

20    you anticipated you were doing.

21            THE COURT:  Well, all we talked about in court was

22    93A.  So, truthfully, that wasn't my intent at all to

23    resolve it nationally.  Does it say "nationally," or does it

24    just say "93A"?  I only had 93A.  I hadn't certified a

25    national class.  How could I possibly have --
```

1            MR. SCHAU:  You had certified a national class for

2    Class 1.

3            MR. BERMAN:  For Class 1 you had a national class

4    without --

5            THE COURT:  Well, I had no intent to dismiss it

6    other than for Massachusetts.  Let's put it this way:  No

7    one was more surprised than I.  Maybe the language went in

8    too fast or whatever.  But I did intend for Massachusetts.

9    I couldn't have possibly thought through the country because

10   at that point I hadn't gone through all the national laws.

11   So I did it under 93A was my intent.  And if I was negligent

12   in how I phrased it, I think I just took your wording, and I

13   just didn't intend that, I didn't write on it.  But I did

14   intend it for 93A.  So where does that leave us?

15           MR. BERMAN:  Well, I think, as I interpret the

16   First Circuit opinion, because Class 1 was not -- there was

17   no Class 1 93A trial, and they have a right to a jury, I'm

18   not sure that your decision is binding.  I mean, we never

19   presented Class 1 --

20           THE COURT:  I thought 93A you don't get a right to

21   a jury.

22           MR. BERMAN:  You don't get a jury, okay.

23           THE COURT:  So let's just back up a little.  So it

24   came up in about ten minutes at the tail end of the case.

25   My intent was that under 93A, that it wouldn't fly.  If I

# EXHIBIT 4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY ) 
AVERAGE WHOLESALE PRICE ) 
LITIGATION ) 
  ) 
_____ ) 
  ) 
THIS DOCUMENT RELATES TO ) 
01-CV-12257-PBS AND 01-CV-339 ) 
  ) 
  ) 
  ) 
  ) 
_____ ) 

MDL No. 1456

CIVIL ACTION:  01-CV-12257-PBS

Judge Patti B. Saris

Chief Magistrate Judge Marianne B. Bowler

**[FILED UNDER SEAL PURSUANT TO COURT ORDER]**

<u>**DECLARATION OF RAYMOND S. HARTMAN
IN OPPOSITION TO
DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT**</u>

motions, if those specific issues involve matters of economic theory and fact that have not been developed in the related supporting expert declarations.

3.      This Declaration proceeds as follows.  In Section II, I identify the issues raised and arguments made by Defendants' motions and Defendants' experts.  I discuss the reasons why these issues are irrelevant and why the Defendants' arguments fail.  In Section III, I present additional detail for selected issues discussed in Section II.  I also address selected data concerns raised by Defendants' experts in Section III.  My conclusions are summarized in the Executive Summary above.  Attachment A identifies materials cited in this Declaration.

## II.      Incorrect Assertions Made by Defendants and the Incorrect Analytic Results Put Forward by Defendants' Experts to Support those Assertions

4.      In this Section, I introduce the assertions made and issues raised by Defendants through the three venues they have used: their Joint Motion for Summary Judgment; the specific individual motions for summary judgment filed by each of the Track 1 Defendants and the declarations put forward by their experts.  I focus upon those assertions with economic content.[4]

### A.      Defendants Incorrectly Argue that Plaintiffs Argue that AWP should Equal ASP

5.      Track 1 Defendants erroneously assert that Plaintiffs believe that "AWP should equal ASP."[5]  This is a serious mischaracterization of my testimony at this stage of the litigation.  In all analyses put forward in my Affirmative and Rebuttal Declarations in

---

for Summary Judgment As to Class 1 and Class 2 (*Dukes Declaration*); Merits Report and Declaration of Gregory K. Bell, Ph.D., for the Bristol-Myers Squibb Group (*Bell Declaration*); the Declaration of Sumanth Addanki, Ph.D., for the Schering-Plough Group (*Addanki Declaration*); all *In re: Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257, March 15, 2006.

[4]  My expertise as an economist does not allow me to address assertions regarding questions of law, such as the prevailing statute of limitations, whether the named Plaintiffs are adequate representatives of the relevant Classes and whether the federal government was deceived, as a matter of law.

[5]  See Section I heading, *Joint Motion*, page 9.  In making this assertion, Defendants apparently draw upon the confused and frequently incorrect Declaration of Dr. Addanki.  Dr. Addanki certainly does not comprehend the allegations in this matter.  For example, he states at ¶ 17 of his Declaration, "The Complaint alleges a scheme in which the measure of the average *wholesale* price has been manipulated, i.e., that the AWP does not, in fact, represent what *wholesalers* obtain from providers and other intermediaries. The price received by the *manufacturers* has no bearing on this alleged manipulation."

It is unclear what Dr. Addanki is talking about.  That is not the alleged AWP inflation scheme.  The allegations are laid out clearly in my September 3, 2004 Declaration in Support of Class Certification, as cited below in footnote 6.  Also, see Section IV of the Third Amended Master Consolidated Class Action Complaint, *In re: Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257, October 17, 2005, beginning at page 42.

---

Support of Class Certification and in my December 15, 2005 Declaration on Liability and Calculation of Damages, **I have never taken the position** that Defendants should have **set the "AWP equal to the ASP."** At all places in my Declarations, I have made explicit the following industry practice and knowledge: AWP has been a "sticker price" or "list price" for all drugs (by NDC); other list prices, most importantly WAC, are related formulaically to and are less than the AWP (AWP > WAC); transactions prices (including AMP and ASP) are negotiated off AWP and are less than AWP and WAC.[6] I have articulated this same position in my most recent deposition.[7]

6.　　My formulaic methodology is straightforward.

- The AWP has been taken by the industry, including the public and private sectors, to be *a signal* for transactions prices (EAC and ASP), particularly the acquisition costs of providers of Part B drugs.[8]

- It is understood that the signal is not perfect, but it has been taken to be sufficiently accurate for reimbursement, despite its imperfection. Defendants' Expert Mr. Young has made this clear.[9]

- While imperfect, prior to the AWP inflation scheme, the signal provided the expectation that the AWP of single-source physician-administered drugs exceeded the provider acquisition cost (EAC or ASP) by 15-25%.

- Using the threshold of 30%, the formulaic methodology put forward in my December 15, 2005 Declaration finds AWP inflation subject to liability when the revealed spread ((AWP-ASP)/ASP) exceeds 30%.

- Once actual spreads are found to exceed 30%, the related AWP is found to have been inflated to an extent not fully understood by public and private sector payers. Hence, those public and private payers could not and did not adequately respond to adjust their reimbursement practices to the AWP inflation scheme.

- If I find liability (a spread in excess of 30%), I calculate damages. The Medicare damages are set forth by statute explicitly and without ambiguity.

---

[6] See, for example, the September 3, 2004 Declaration of Raymond S. Hartman in Support of Class Certification, *In re: Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257, ¶ 30. It has been understood that providers acquire such drugs at somewhat less than WAC. See also, my September 3, 2004 Declaration, Attachment D, ¶ 2, and my December 16, 2004 Rebuttal Declaration, ¶ 15, Section D.

[7] Deposition of Raymond S. Hartman, *In re: Pharmaceutical Industry Average Wholesale Price Litigation*, February 27, 2006, pp. 670 – 686.

[8] See pp. 9-10 of my September 3, 2004 Declaration in Support of Plaintiffs' Motion for Class Certification. See also Chapter 9, "Medicare payments for outpatient drugs under Part B" of Medicare Payment Advisory Commission (MedPAC), *Report to the Congress: Variation and Innovation in Medicare*, June 2003, which notes: "Most private payers are still using AWP-based payment methods similar to the Medicare model" (p. 164).

[9] See ¶ 33 and Attachment K of my December 15, 2005 Declaration on Liability and the Calculation of Damages in this matter.

---

Reimbursement is to be at "the lower of the EAC[10] or the AWP" (or 95% of AWP over 1998-2003 or 85% of AWP over 2004; see footnote 13 of my December 15, 2005 Declaration).

- Under Medicare Part B reimbursement, Plaintiffs do not assert that the AWP should = ASP. It is clear by the liability threshold and by an understanding of the markets in question, that such an equality does not (nor are Plaintiffs suggesting that it should) occur. However, under Medicare Part B, reimbursement should be set at the lower of the AWP (or a percentage thereof) and the EAC = ASP, so that if liability is demonstrated and reimbursement is paid at x%*AWP, calculation of damages is determined directly by Statute.

7.      Furthermore,, Defendants erroneously argue that "a finding that AWP was intended to mean ASP would impose liability on virtually every Medicare Part B eligible drug."[11]

Since I never assumed that AWP "means" or "equals" ASP, my December 15, 2005 Declaration on Liability and Calculation of Damages finds and imposes no liability for any Medicare Part B drug whose spread of AWP relative to its ASP is not inflated, that is, did not exceed the liability threshold of 30%.[12]

If, however, the spread is excessive (> 30%), I do find liability. At that point I assess damages according to the Medicare Statutes; that is, I measure damages as the amount by which the AWP (or the relevant percentage thereof) exceeds EAC = ASP. The assumption underlying this method is that had HCFA and Medicare understood sufficiently[13] the general extent to which the actual spreads on physician administered drugs were *mega-spreads*, they would have more aggressively undertaken the surveys to calculate EACs and impose the lesser of AWP (or a percent thereof) and the EAC practice for reimbursement.

8.      Defendants continue their distorted characterization of Plaintiffs' position, stating, "Plaintiffs' proposed construction of the regulation [i.e., AWP = ASP] is entirely inconsistent with HCFA's interpretation of the regulation. Between 1992 and 1997, HCFA did not implement reimbursement on the basis of EAC, but rather reimbursed providers for physician-administered drugs at 100% of AWP."[14]

---

[10] Attempts to assert that the "actual charge" differ from the EAC (for 1998-2003) fail for reasons discussed in my December 15, 2005 Declaration on Liability and the Calculation of Damages, footnote 14.

[11] *Joint Motion*, pp. 1-2.

[12] See my December 15, 2005 Declaration on Liability and Calculation of Damages, ¶¶ 56-60. In my February 3, 2006 Supplemental Declaration on Liability and Calculation of Damages, I was asked to calculate damages under Medicare Part B reimbursement, if as a matter of law, it was determined that reimbursement rates for all Part B drugs should have been the lower of the AWP (or 95%AWP or 85% AWP) and the EAC (= ASP), regardless of whether the AWP exceeded the yardstick spread of 30%.

[13] I discuss how much HCFA and Medicare knew in Section II.C below.

[14] *Joint Motion*, p. 10.

Plaintiffs' construction of the relevant Medicare statute as implemented in my damage analysis for that period of time (indeed for all periods during the Damage Period in which the Statute was revised) is based upon Statute, as cited in footnote 13 of my December 15, 2005 Liability Declaration. This construction is not "inconsistent with HCFA's interpretation;" **it implements it explicitly**. The Statute reads:

> "Payment for a drug ... *is based on the lower of the estimated acquisition cost (EAC) or the national average wholesale price [i.e., AWP][15] of the drug.* ... For multiple-source drugs, payment is based on the lower of the estimated acquisition cost ... or the wholesale price that, for this purpose, is defined as the median price for all sources of the generic form of the drug." (Source: 42 CFR 405.517, Revised October 1, 1996; emphasis added)

**Contrary to Defendants' assertion,**[16] Plaintiffs do understand the fact that "HCFA has always interpreted AWP to mean something different than ASP." Indeed, my formulaic methodology explicitly incorporates into the calculation of damages the fact that AWPs exceed EACs, hence ASP. Liability is alleged not because AWP exceeds the ASP; rather liability is alleged because it exceeded ASP by the unreasonably and unexpectedly substantial amounts reflected in the "mega-spreads" recognized by Judge Saris and Dr. Berndt. Once liability is determined, damages occur precisely because reimbursement occurred at the higher of the artificially inflated AWP rather than "the lower of the EAC and or the national average wholesale price [AWP] of the drug." The Judge has agreed with this interpretation of the economic implications of the Statute.[17]

9.      Indeed, individual Defendants recognize that my formulaic methodology admits to the fact that AWP exceeds ASP and that it implements damage calculations only when

---

[15]  Note that the average wholesale price (AWP) does appear in the 1991 statutory revision, as is recognized in Defendants' *Joint Motion* (pp. 4, 9).  The fact that the *Joint Motion* states that "AWP appeared in the Medicare statute for the first time in 1997" on page 12 is contradictory and must be a typographical error. Note further that Defendants feebly attempt (at p. 12 of their *Joint Motion*) to imply that "the statute did not include an express definition of the term [AWP]." This innuendo does not work.  Regardless of the "express definition," the industry has had a very definite understanding of AWP throughout the Damage Period; indeed, Defendants quote (*Joint Motion* at p. 13): "A House Report ... stated 'The AWPs are reported by drug manufacturers to organizations that publish the data in compendia.'"

Neither I nor the Plaintiffs disagree with this characterization.

[16]  *Joint Motion*, pp. 11-12.

[17]  At pp. 58-59 of the *Memorandum and Order*, Judge Saris states for Sub-Class 1: "The Court is satisfied that as to the Medicare Part B beneficiary class, a class action is a superior method to resolve the dispute. Defendants have not identified any plausible individual issues that will arise with regard to these class members other than their proofs of damages, which may entail reviewing documents to determine whether each patient was required to pay a percentage-based co-pay and whether each has supplemental insurance. **These damages calculations will be largely formulaic.** Even if some corroboration and individualized attention is necessary, it is unrealistic to expect millions of beneficiaries across the nation to repeatedly prove these claims. The number of drugs at issue in the Medicare Part B context is limited to about seventeen, so even if deciding spreads by individual NDCs is necessary, it would not be unmanageable" (emphasis added). For Sub-Class 2, she states: "**Again, the common factual issues (as outlined in the previous section) predominate,** in that the TPPs are required by contract to supplement Medicare drug co-payments" (emphases added).

---

# EXHIBIT 5

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

In Re:                        )
PHARMACEUTICAL INDUSTRY        ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE        ) MDL No. 1456
LITIGATION                     ) Pages 10-1 - 10-149

BENCH TRIAL - DAY TEN

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
November 27, 2006, 9:10 a.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1   Q.   So, in your view, there's nothing inherently wrong with

2   a published AWP that is different from the actual selling

3   price of the drug, right?

4   A.   Well, again, I'm not an expert on right and wrong, but

5   the general issue is that they should track but not certainly

6   · equal.

7   Q.   Your problem with it is when the spread becomes too big,

8   right?

9   A.   Yes.

10   Q.   But you don't have a specific opinion as to whether

11   Dr. Hartman's 30 percent spread is the right yardstick,

12   correct?

13   A.   That's correct.

14           THE COURT:  Do you believe that all the third-party

15   payors throughout the class period knew about the formulaic

16   20 to 25 percent markup between WAC and AWP?

17           THE WITNESS:  I believe the relationship between

18   those list prices, I believe that that was generally known.

19   I'm sure that not universally known, but I believe that that

20   information --

21           THE COURT:  I'm not talking about the consumers.

22           THE WITNESS:  Right, right, no, no, of course.

23           THE COURT:  But the third-party payors, was that

24   just universally known throughout the class period?

25           THE WITNESS:  I believe, for those that worked in

# EXHIBIT 6

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


In Re:                          )
PHARMACEUTICAL INDUSTRY         ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE         ) MDL No. 1456
LITIGATION                      ) Pages 9-1 - 9-144



BENCH TRIAL - DAY NINE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
November 21, 2006, 9:10 a.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1    United States, and so if that's what you mean by it works.

2    Q.   No, she said it works, it works because for 99 percent

3    of the drugs, there's a predictable relationship between AWP

4    and ASP.  You agree with that, don't you?

5    A.   I haven't analyzed that to come up with a number.

6    Q.   Okay, you believe AWP works for drugs where there's a

7    spread between AWP and ASP that's 30 percent or less, right?

8    A.   I agree that the AWP system as it's evolved has led to

9    certain understandings about spread, and it's been working,

10   but it's clearly been in need of some change that we've seen

11   in the MMA.

12   Q.   But your theory is that you were looking for drugs where

13   there was a predictable relationship between AWP and ASP,

14   correct?

15   A.   Are we talking about the comparator drugs?  Are you

16   saying --

17   Q.   No, your analysis here, your expectation analysis, what

18   you were looking for is, was there a predictable

19   relationship?  And your yardstick is 30 percent, right?

20   A.   I'm saying, given that I find a predictable relationship

21   for classes of drugs and reflected in expectations, that's

22   what I -- I'm finding payors either understood or just

23   basically took as for granted.

24   Q.   All right.  So let's talk about Procrit.  Now, for

25   Procrit, early on in the case you thought 16 of the 114 NDCs

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


In Re:                          )
PHARMACEUTICAL INDUSTRY          ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE          ) MDL No. 1456
LITIGATION                       ) Pages 8-1 - 8-175



BENCH TRIAL - DAY EIGHT

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
November 20, 2006, 9:15 a.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1          THE COURT:  If you wanted to look at the

2     deposition.

3          THE WITNESS:  Oh, I see, I do have it in front of

4     me.  The amending to my response made it a bit broader.

5     Counsel said because the "entire" industry knows that it

6     doesn't.  I think my response was that "Because the industry

7     knows that it doesn't."

8          Now, by the industry here, I'm certainly referring

9     to the manufacturers.  It's certainly clear that I've

10    testified that some payors did not know that fact.  So the

11    industry generally knows that.  I wouldn't -- this is not the

12    law of gravity or the speed of light.

13    Q.  Well, take a look at Page 672, the testimony that begins

14    at Line 7:  "Question:  Well, you keep referring to a market

15    understanding.  Do you have any reason to believe that the

16    government doesn't have the same understanding?  Answer:  The

17    government has -- you need to be more -- well, let me answer

18    this briefly.

19          "The government has set reimbursement rates that

20    reflect an understanding that is comparable to what I would

21    say is the -- in my yardsticks."

22          Was that testimony true when you gave it?

23    A.  That testimony, what I'm saying there is that the

24    government -- there are studies that I've cited in my direct

25    testimony here and that I've reviewed earlier before this

1    deposition that showed relationships between AWP and ASP that

2    were reflected in Medicare's movement toward 95 percent and

3    85 percent that showed some -- that showed some understanding

4    of the relationship of AWP to ASP, but that's as far as I

5    take it.

6    Q.   You say the understanding of the government was

7    comparable to what you said in your yardsticks, and your

8    yardstick was a 30 percent expectation yardstick, correct?

9    A.   I set a threshold yardstick of 30 percent.  I looked for

10   reimbursement yardsticks, measures of what were negotiated,

11   and all of those -- those included the manufacturers that I

12   looked at, they included the studies that I reviewed, and

13   they included the contracts that I reviewed.  And so that's

14   the body of yardsticks or the sample of yardsticks.  Finally,

15   I set a threshold that was conservative for all the

16   yardsticks I saw.

17   Q.   And you applied that 30 percent yardstick to Medicare in

18   your December 15, 2005 expert report; isn't that true?

19   A.   That's correct.

20           THE COURT:  And why did you do it then?  Put aside

21   the legal question for a minute.  Did you think it was fairly

22   applicable to them?

23           THE WITNESS:  Actually I didn't know.  I mean, I

24   was asked to do it as a -- I was told, look, there's legal

25   arguments going on both sides.  That's why there was a

Page 120

1      supplemental to the original declaration.  And so I set that

2      as a conservative threshold --

3               THE COURT:  Well, would it be one reasonable way to

4      consider damages if I said there was no strict liability?

5               THE WITNESS:  Well, there are many ways that one

6      could come at it.  Is that one way?  It could be one of a

7      variety of ways.  I guess I'd want to --

8               THE COURT:  So, in other words, if I don't go with

9      the strict liability -- and I understand some case law I

10     think they're referring to -- but if I went more along the

11     standard of what's unfair or deceitful, I need to understand

12     what was understood in the market.  So would the 30 percent

13     yardstick be one fair way of thinking about what Medicare

14     knew in the market?

15               THE WITNESS:  Well, it's a very conservative

16     threshold for what was a range of reimbursement rates that I

17     find in the market.

18               THE COURT:  Just as it is with the other one, the

19     Class 3?

20               THE WITNESS:  That's right.

21     Q.   And you base that 30 percent threshold for Medicare in

22     your initial report on an economic analysis, correct?

23     A.   My entire expert report was the implementation of

24     economic formulations and economic analysis at the direction

25     of certain assumptions regarding legal issues.

# EXHIBIT 8

DAY 39

```
 1                UNITED STATES DISTRICT COURT
 2                 DISTRICT OF MASSACHUSETTS
 3     * * * * * * * * * * * * * * *
                                     *
 4     UNITED STATES               *
                   Plaintiff       *
 5                                  *
           VERSUS                   *   CR-01-10350-DPW
 6                                  *
       ALAN MACKENZIE, JANICE       *
 7       SWIRSKI, HENRY VAN MOURIK, *
         DONNA TOM, DONALD PATTON,  *
 8       DONALD MEEK, ERIC OTTERBEIN *
         RITA JOKIAHO, CAREY SMITH, *
 9       MARK SMITH                 *
                   Defendants       *
10                                  *
       * * * * * * * * * * * * * * *

11          BEFORE THE HONORABLE DOUGLAS P. WOODLOCK

12            UNITED STATES DISTRICT COURT JUDGE

13                 JURY TRIAL - DAY 39

14                   JUNE 24, 2004

15
16
17                   Courtroom No.  1 - 3rd Floor
                     1 Courthouse Way
18                   Boston, Massachusetts 02210
                     9:00 A.M. - 12:00 P.M.

19
20
21
           Pamela R. Owens -- Lee A. Marzilli
22               Official Court Reporters
           John Joseph Moakley District Courthouse
23             1 Courthouse Way - Suite 3200
               Boston, Massachusetts  02210
24
25     Method of Reporting:  Computer-Aided Transcription
```

                                                              2

```
 1     APPEARANCES:
 2          MICHAEL K. LOUCKS, ESQ. Chief, Health Care
            Fraud Unit, GEORGE W. VIEN, ESQ., and SUSAN G.
 3          WINKLER, ESQ., Assistant United States Attorneys,
            U.S. Attorney's Office, 1 Courthouse Way, Suite
 4          9200, Boston, Massachusetts 02210, on behalf of
            the United States
```

66

1    designed to induce higher volume purchases.  And the
2    marketing of that, there was extensive testimony about
3    that.
4            THE COURT:  All right.  No. it's not a
5    question of the marketing.  It's the question of -- from
6    my perspective -- what do I tell the jury about this?
7            MR. MONICO:  Your Honor, may I just say
8    something?
9            THE COURT:  Sure.
10          MR. MONICO:  It just strikes me as amazing
11    that the Government, everytime they talk about there's a
12    discount, if the discount was intended to induce a sale.
13    How could a discount ever not be intended to induce a
14    sale?
15          THE COURT:  Of course.
16          MR. MONICO:  It strikes me so absurd, that
17    they keep saying that if that happens, then these other
18    things apply.  So, I mean it sounds like -- that strikes
19    me --
20          THE COURT:  That's precisely the argument the
21    Government is making.  I understand.  All right.
22          MR. LOUCKS:  That's precisely the argument
23    we are making, Your Honor.  And the reason why the
24    reporting obligation and informing the buyer is
25    important is because the Medicare program was set up as

67

1    the lesser of cost or charges.  And where there are
2    discounts, the cost is lower.  And the Medicare program
3    didn't require when there's a safe harbor --
4          THE COURT:  That's true of acquisition price
5    as well, regular acquisition price.
6          MR. LOUCKS:  It is.  But if the Medicare
7    program gets regular reports of discounts from
8    physicians, you can take a look at what it's paying and
9    say "we're paying way too much."
10          THE COURT:  I don't disagree with that.
11          MR. LOUCKS:  And that's the reason for the
12    safe harbors.
13          THE COURT:  And that's why I keep asking this
14    question about what's the duty to disclose.  That's why
15    I want to -- the principal reason why I want to focus on
16    that.  But it's the odd situation that it's only if you
17    do a discount.  If by contrast, you have the same price
18    for whatever quantity you have, there is no obligation
19    to report that to the Government.
20          MR. LOUCKS:  If I have a list price and you
21    make no discounts, right.
22          THE COURT:  Right.
23          MR. LOUCKS:  As a matter of fact, Your Honor,

```
24    a historical fact here, not proven to this jury, but
25    everybody got the spread between AWP and list price, the
```

68

```
1     same 25 percent, whether it was Zoladex or Lupron or
2     some other oncology drug, until, we think, this group
3     came up with the Return to Practice inducements.   The
4     extra volume discount.  And the 25 percent, everyone
5     gets that.  That's there.  That's what Congress expected
6     with AWP.
7               THE COURT:  Well, I understand that.
8               So, now with specificity and maybe
9     duplication, you're going to focus me on precisely the
10    language of the obligation.
11              Account reviews.  Any question that if offered
12    as a quid pro quo, that constitutes a kickback?
13              MR. KETTLEWELL:  Well, I think there is a
14    question there, Your Honor.  I don't think there is any
15    independent substantial value in an account review with
16    a customer.  And interestingly, the OIG observed just
17    that.  It's a legitimate sales support.  We will offer
18    up a jury instruction along that line.  But we believe
19    it's completely legitimate sales support that a company
20    can give to its product.  If you listen to Elaine
21    Morgan, who was the only witness who testified about the
22    limited account reviews done in the mid-Atlantic region,
23    she testified that the accounts she went into were
24    accounts that were having trouble paying TAP.  And the
25    reason she went in was so that the doctors can get
```

69

```
1     reimbursed so they could pay their bills.  And that more
2     or less proves, I think, what we are saying, that the
3     account reviews were offered and the value of them
4     primarily was to TAP and not to the customer.
5               THE COURT:  All right.
6               MS. WINKLER:  The answer to that was Phil
7     Beard's testimony who said that he, as an independent
8     consultant, went out and provided such services at
9     whatever his rate was.
10              THE COURT:  Well, but independent consultant
11    is a little different.  What we're talking about here is
12    account review.
13              MS. WINKLER:  Is a business value -- if we're
14    talking about those accounts where they went in and they
15    did the reimbursement review, there is an independent
16    financial value of that.  It's a business part of
17    running your medical practice.  And if it's a quid pro
18    quo for business, if it's to keep the Lupron business,
19    then it's a kickback.
20              THE COURT:  Well, let me just focus this a bit
```

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


In Re:                          )
PHARMACEUTICAL INDUSTRY         ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE         ) MDL No. 1456
LITIGATION                      ) Pages 2-1 - 2-204



BENCH TRIAL - DAY TWO

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
November 7, 2006, 9:15 a.m.




LEE A. MARZILLI and TIMOTHY J. WILLETTE
OFFICIAL COURT REPORTERS
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1   names of any of them?

2           THE WITNESS:  The Zofran, that one I remembered.  I

3   remembered seeing that on my papers.  That's the only one

4   that I really remembered offhand.

5           THE COURT:  Thank you.

6           THE WITNESS:  You're welcome.

7   Q.   And you likewise don't know who manufactured the drugs

8   that you were administered, correct?

9   A.   I'm sorry?

10  Q.   You likewise don't know who manufactured the drugs that

11  you were administered; is that right?

12  A.   No, I don't.

13  Q.   Prior to becoming involved in this litigation, did you

14  have any knowledge regarding what AWP meant?

15  A.   No.

16  Q.   When you got involved in this case, you were provided a

17  copy of plaintiff's complaint; isn't that correct?

18  A.   Yes, ma'am.

19  Q.   And prior to becoming involved in this litigation, were

20  you aware of any of the facts that were alleged in that

21  complaint?

22  A.   No, I wasn't.

23  Q.   In connection with executing your trial affidavit in

24  this case, you were provided with some documents from your

25  lawyers as well, weren't you?

Page 107

1    deductible obligation at that point in time?

2    A.   No.

3              MR. HAVILAND:  Your Honor, our proffer was very

4    narrow, but we're happy to submit supplemental exhibits that

5    clear up some of the factual issues that I think are probably

6    troubling the Court at this point in time given the witness's

7    unavailability to talk about specific issues, but I'd like to

8    just conclude.

9    BY MR. HAVILAND:

10   Q.   Now, Mrs. Hopkins, the two times that you treated with

11   these drugs for your cancer, yesterday counsel for BMS said

12   that everybody in the world knew certain things about their

13   conduct, and I'd like to know from you:

14             At the time you treated and paid these bills, did

15   you know that the AWPs were inflated for the drugs you were

16   taking?

17   A.   No, I did not.

18   Q.   Did you know --

19             MR. SWEENEY:  Objection, your Honor.  There's no

20   evidence in the record that the AWP was charged for any of

21   these drugs.  The witness hasn't testified to that.  She's

22   not competent to testify --

23             THE COURT:  Overruled.  Did you know anything about

24   AWP at all?

25             THE WITNESS:  No, I did not.

# EXHIBIT 10

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

* * * * *

IN RE:  PHARMACEUTICAL INDUSTRY        )

AVERAGE WHOLESALE PRICE                )

LITIGATION                            ) MDL DOCKET NO.

                                      ) CIVIL ACTION

                                      )) 01CV12257-PBS

D                                     ))

THIS DOCUMENT RELATES TO:             )

ALL ACTIONS                           )

                                      )

D                                     ))

* * * * *


HIGHLY CONFIDENTIAL

DEPOSITION OF LARRY YOUNG

TAKEN ON BEHALF OF THE DEFENDANTS

ON NOVEMBER 9, 2005, BEGINNING AT 10:06 A.M.

IN OKLAHOMA CITY, OKLAHOMA

* * * * *

REPORTED BY:  JANE McCONNELL, CSR, RPR, RMR, CRR

Young, Larry (2005-11-9) HIGHLY CONFIDENTIAL                November 9, 2005
Oklahoma City, OK

Page 61

1   whether plaintiffs in this action are claiming that

2   the pharmaceutical manufacturers committed

3   fraud?

4        A    No.

5        Q    Do you think the pharmaceutical

6   manufacturers committed fraud, committed fraud

7   in connection with the pricing of their drugs?

8             MR. WILLIAMS:  Objection, lack of

9   foundation, calls for speculation.

10       A    I don't know.

11       Q    (BY MR. YOUNG)  Prior to reading the

12  Complaint, had you ever heard of the term average

13  wholesale price or AWP before?

14       A    No.

15       Q    Have you done any additional research on

16  what average wholesale price or AWP is aside from

17  any communication with your attorneys?

18       A    No.

19       Q    Do you know how AWP is calculated?

20       A    No.

21       Q    Do you know who calculates AWP?

22       A    No.

# EXHIBIT 11

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-o0o-

IN RE PHARMACEUTICAL      MDL No. 1456

INDUSTRY AVERAGE PRICE

LITIGATION                CIVIL ACTION: 01-CV-12257-PBS

                          Judge Patti B. Saris

_____

DEPOSITION OF

JAMES E. SHEPLEY

Friday, November 11, 2005

Reno, Nevada

Reported by:  Lesley A. Clarkson, CCR #182

Shepley, James E. (2005-11-11)                    November 11, 2005
Reno, NV

Page 29

1    sorry, we were talking.

2              MR. HAVILAND:  Yes.

3              MS. LAWSON:  Let's take a two-minute break

4    while they bring in coffee.

5                    (Off the record.)

6              MS. LAWSON:  Back on the record.

7    BY MS. LAWSON:

8         Q    Are you familiar with the term "average

9    wholesale price"?

10        A    No.

11        Q    Just to make that clear, you said you are

12   not familiar with the term "average wholesale

13   price"; is that correct?

14        A    Yes.

15        Q    Are you familiar with the term "wholesale

16   acquisition cost"?

17        A    No.

18        Q    Are there other drugs that, other than

19   Lupron, that a doctor has given to you?

20        A    Prescribed?

21        Q    No, let's, we will clarify here.  I'm not

22   asking just about, I'm not asking about someone

# EXHIBIT 12

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


In Re:                          )
PHARMACEUTICAL INDUSTRY         ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE         ) MDL No. 1456
LITIGATION                      ) Pages 17-1 - 17-132



BENCH TRIAL - DAY SEVENTEEN

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
December 11, 2006, 9:15 a.m.








TIMOTHY J. WILLETTE, RDR, CRR
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617) 345-6787

1   Q.   And do you see for the two Johnson & Johnson products,

2   Procrit and Remicade, am I correct, Dr. Hartman, that if the

3   Court for Class 2 were to apply a 30 percent liability

4   threshold, there would be zero damages for Procrit and

5   Remicade?

6   A.   That's correct.

7   Q.   And am I also correct that you use the same ASPs and

8   AWPs for all three classes which the Court has certified?

9   A.   I think that's correct.

10  Q.   So the same spreads apply to all three classes, correct?

11  A.   The spreads from the AWP to the ASPs apply to all the

12  classes.   The one -- there's a distinction in Class 2 damages

13  here in that over portions of the period, the reimbursement

14  rate was at a percentage below AWP, so that would be a reason

15  why even though the spread may be above, say, 30 percent for

16  Class 3, for Class 2, when you're looking at reimbursement at

17  95 percent of AWP, you've got to take that into account in

18  whatever comparison you're making.

19  Q.   All right.   If we could turn to 4007, please, and if you

20  would turn to the Procrit page.

21  A.   I'm sorry.   I'm just getting it.

22       I'm there.

23  Q.   Now, you state here -- well, did you actually prepare

24  this chart?

25  A.   I had my staff prepare this chart.

# EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


In Re:                         )
PHARMACEUTICAL INDUSTRY        ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE        ) MDL No. 1456
LITIGATION                     ) Pages 12-1 - 12-144



BENCH TRIAL - DAY TWELVE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
November 29, 2006, 9:10 a.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1  Q.   Or Blue Cross-Blue Shield, right?

2  A.   I agree, and I think, again, that's not the relevant

3  question.   These individual Medicare beneficiaries are in

4  some sense protected by Medicare.   I mean, they don't go in

5  and choose the amount of their reimbursement.   It's set by

6  Medicare, and in the same way the Taft-Hartley funds are

7  under the umbrella of Blue Cross-Blue Shield and other big

8  payors.

9  Q.   Well, the information might also, as you pointed out,

10  change over time.   You might have more information about one

11  drug rather than another; you might have more information at

12  one point in time than another, correct?

13  A.   Yes.

14  Q.   Okay.   Indeed, isn't it fair to say that the information

15  that you've looked at that shows some spreads isn't the only

16  information that was available to people in the marketplace?

17  You haven't canvassed in your direct examination, or even all

18  your prior reports, all the information that was available to

19  people one way or another?

20  A.   I don't know how I would know that I've got it all.

21  I've got a substantial amount canvassed.

22  Q.   Well, in your direct testimony, did you, for instance,

23  provide to us what First Databank said AWP meant during the

24  class period?   Yes or no, did you provide it?

25  A.   I didn't provide that.

# EXHIBIT 14

1                 IN THE UNITED STATES DISTRICT COURT

                  FOR THE DISTRICT OF MASSACHUSETTS

2

3

         In re:                        )

4        PHARMACEUTICAL INDUSTRY       ) CA No. 01-12257-PBS

         AVERAGE WHOLESALE PRICE       ) MDL No. 1456

5        LITIGATION                    )

6

7

8                         MOTION HEARING

9               BEFORE THE HONORABLE PATTI B. SARIS

                   UNITED STATES DISTRICT JUDGE

10

11

12

13

                              United States District Court

14                            1 Courthouse Way, Courtroom 19

                              Boston, Massachusetts

15                            May 23, 2006, 3:05 p.m.

16

17

18

19

20

21

22

                         LEE A. MARZILLI

23                  CERTIFIED REALTIME REPORTER

                  United States District Court

24                1 Courthouse Way, Room 3205

                      Boston, MA  02210

25                       (617)345-6787

```
1    have to go back and find your class representatives.  Is that
2    the practical effect of all of this?
3              MR. WEXLER:  Well, I wouldn't say that you would
4    carve off Oregon yet, but, yes, if you granted summary
5    judgments on the claims of these individual class members,
6    yes, we would like the opportunity to find substitute class
7    members.
8              THE COURT:  What would you say -- and maybe it's
9    unfair to turn to you, since you have a whole team here --
10   would be the broadest state consumer protection statute?
11             MR. BERMAN:  Massachusetts, your Honor.
12             THE COURT:  More than California?
13             MR. SOBOL:  Yes.
14             MR. BERMAN:  We may disagree, since I'm on the West
15   Coast, but they're pretty close.  I'd have to analyze it, but
16   they're almost identical.
17             THE COURT:  All right, because what I'm going to
18   have to do, which I'm dreading but I will have to do, is, if
19   this goes forward to trial in September, I need to find out
20   what the -- apart from whether individual class
21   representatives exist, I'm going to have to find out what are
22   the common questions that I'm going to give to a jury.  I
23   mean, it is time now to put your teams of summer law clerks
24   on figuring out what states are left.  And the reliance
25   question, if we get there, I mean, in other words, actual
```