# Exhibit 191

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS
Exhibit to the November 23, 2009, Supplemental Declaration of James J. Fauci
In Support of Plaintiff's Response to Roxane Defendants'
Supplemental Local Rule 56.1 Statement of Material Facts

Dmerc, Palmetto - October 14, 2009 12:02:00 p.m.

```
1:1              UNITED STATES DISTRICT COURT
  2          FOR THE DISTRICT OF MASSACHUSETTS
  3    ----------------------------------x
  4    IN RE PHARMACEUTICAL INDUSTRY       : AVERAGE WHOLESALE PRICE            : MDL NO. 1456
  5    LITIGATION                          : MASTER FILE NO. 01-CV-12257-PBS --------------------
  6    THIS DOCUMENT RELATES TO:           : UNITED STATES OF AMERICA EX REL.   : JUDGE PATTI B. S
  7    VEN-A-CARE OF THE FLORIDA KEYS,     : JUDGE MARIANNE B. BOWLER INC., ET AL. V. BOEHRINGER
  8    INGELHEIM CORPORATION, ET AL.,      : CIVIL ACTION NO. 07-10248-PBS      :
  9         and                            : UNITED STATES OF AMERICA EX REL.   : OCTOBER 14, 2009
 10    VEN-A-CARE OF THE FLORIDA KEYS,     : 12:03 P.M. INC., ET AL. V. DEY LABORATORIES.  :
 11    ----------------------------------x
 12
 13                    VIDEOTAPE DEPOSITION OF:
 14             30(b)(1) and 30(b)(6) REPRESENTATIVE
 15              OF PALMETTO DMERC (ROBIN K. STONE)
 16                          TAKEN AT:
 17                Law Offices of Nelson, Mullins,
 18                     Riley & Scarborough
 19                 1320 Main Street, 17th Floor
 20                          Columbia, SC
 21
 22    REPORTED BY:   TERRI L. BRUSSEAU, RPR, CRR
```

Dmerc, Palmetto - October 14, 2009 12:02:00 p.m.

```
2:1   APPEARANCES OF COUNSEL:
  2       ATTORNEYS FOR THE PLAINTIFF
  3          UNITED STATES OF AMERICA:
  4          DEPARTMENT OF JUSTICE
  5          UNITED STATES ATTORNEY'S OFFICE
  6          BY:  JAMES J. FAUCI, AUSA
  7          John Joseph Moakley Federal Courthouse
  8          1 Courthouse Way, Suite 9200
  9          Boston, MA  02210
 10          (617) 748-3298
 11          jeff.fauci@usdoj.gov
 12       ATTORNEYS FOR THE DEFENDANTS BOEHRINGER
 13          INGELHEIM CORP., BOEHRINGER INGELHEIM
 14          PHARMACEUTICALS, INC., BOEHRINGER
 15          INGELHEIM ROXANE, INC. and ROXANE
 16          LABORATORIES, INC.:
 17          KIRKLAND & ELLIS, LLP
 18          BY:  ERIC GORTNER
 19          300 North LaSalle Street
 20          Chicago, IL  60654
 21          (312) 862-2285
 22          eric.gortner@kirkland.com
```

```
83:1    pharmaceutical industry understands a branded
   2    generic to be, right?
   3         A.   We were just basing it off if it was
   4    considered branded, it was a brand product.
   5         Q.   I understand that.  I just want to --
   6    it may be more helpful if we refer to the actual
   7    rule that you implement.  And the rule that you
   8    are telling me that you implemented at some point
   9    in time was if the product had the generic
  10    chemical name in its title and any additional
  11    name, it would be -- it should have been
  12    categorized as a brand according to Palmetto's
  13    procedures, is that right?
  14         A.   It would depend on the differentiation
  15    in the drug name.  There may have been some --
  16    some situation where it might have added
  17    something that might have been considered a
  18    diluent on the end which would differ from a
  19    company placing what we called a branded name on
  20    the end.  And if it was questionable, the staff
  21    would discuss it with our medical staff or
  22    whatever that might be -- there may have been
```

Dmerc, Palmetto - October 14, 2009 12:02:00 p.m.

```
84:1    cases they used the PDR, may have been cases
   2    where they contacted Redbook but I don't know
   3    every, you know, situation that that might have
   4    occurred in.
   5         Q.   You don't know that.  But there was a
   6    process where if there were questions by the
   7    front-line staff, if you will, the staff that was
   8    actually creating the arrays and making the
   9    initial determinations, if they had questions
  10    there was a chain of command they could go up
  11    within Palmetto or they could turn to outside
  12    resources?
  13         A.   True.
  14         Q.   Now, with respect to Ipratropium
  15    Bromide NovaPlus, do you have any specific
  16    recollection about the decision-making process
  17    that Palmetto went through to categorize that
  18    product as a brand or a generic?
  19         A.   Other than the fact that the NovaPlus
  20    -- I don't know if they specifically, you know,
  21    called or found out that it had a branded generic
  22    or not, you know, or if it was just taken off
```

Dmerc, Palmetto - October 14, 2009 12:02:00 p.m.

```
160:1   Helton about her declaration in this case?
   2         A.   No.
   3              MR. GORTNER:  Okay.  And I'm going to
   4   request that counsel not discuss your testimony
   5   with Miss Helton prior to her deposition this
   6   Friday and I'll make the same request of you.
   7   We'll be speaking with her on Friday and would
   8   like to keep this testimony private until that
   9   time.  No more questions, thanks.
  10                    EXAMINATION
  11              BY MR. FAUCI:
  12         Q.   Mrs. Stone, I just have a couple quick
  13   questions just following up on a few matters.
  14   I'm going to show you what I'll mark as US Stone
  15   Exhibit 1.
  16              (Exhibit US Stone 001, Document
  17   entitled Tab 171, with attachments, was marked
  18   for identification.)
  19              BY MR. FAUCI:
  20         Q.   Take a moment to familiarize yourself
  21   with that document and just tell me if you
  22   recognize it.
```

Dmerc, Palmetto - October 14, 2009 12:02:00 p.m.

```
161:1        A.   Yes, I do.
    2        Q.   What is this document?
    3        A.   It is a CMS and/or HCFA, at that time,
    4   transmittal which gives the contractors
    5   guidelines and guidance for handling drug
    6   payments.
    7        Q.   What's the date of the document?
    8        A.   December 1998.
    9        Q.   Do you believe that Palmetto, excuse
   10   me, received this document?
   11        A.   Yes.
   12        Q.   Can you -- can I direct your attention
   13   to the heading calculation of the AWP?  Do you
   14   see that about midway down?
   15        A.   Oh, yes.
   16        Q.   Can you read the language after the
   17   Number 2?
   18        A.   Okay.  For a multisource drug or
   19   biological, the AWP is equal to the lesser of the
   20   median AWP of all of the generic forms of the
   21   drug or biological or the lowest brand name
   22   product AWP. A brand name product is defined as a
```

```
162:1    product that is marketed under a labeled name

   2     that is other than the generic chemical name for

   3     the drug or biological.

   4         Q.   Are you familiar with this language?

   5         A.   Yes.

   6         Q.   Did you rely on this language in

   7     deciding whether to classify products as brand or

   8     generics?

   9              MR. GORTNER:  Objection, form.

  10              THE WITNESS:  I'm sure we would have

  11     used this in that determination.

  12              BY MR. FAUCI:

  13         Q.   Earlier you testified that at some

  14     point in time you came to understand that there

  15     were some products that were what you called

  16     branded generics.  Do you recall that testimony?

  17         A.   Yes.

  18         Q.   Did you rely on the language in this --

  19     the language you just read in determining whether

  20     products you regarded as branded generics were

  21     brands or generics for purposes of Medicare

  22     reimbursement?
```

```
164:1   believe sometime in 2001 or 2002 maybe.  I can't
   2    remember dates exactly.
   3         Q.   Is that the Redbook for Windows?
   4         A.   No.
   5         Q.   I'm sorry, I misspoke then.
   6         A.   Okay.
   7         Q.   I wasn't clear.  Can you tell me the
   8    time that you came to use the Redbook for Windows
   9    program?
  10         A.   The Redbook for Windows, I want to
  11    think -- because I say that in my thing.  I can't
  12    remember dates very well.  I know at least 1999
  13    and I think I have something that showed me that
  14    we were using it possibly before that but I'm not
  15    sure.  Hang on.  This was dated '99.
  16         Q.   Yeah, if I can -- I believe you're
  17    looking at what's been marked as Abbott Exhibit
  18    42 -- Roxane Exhibit 42, is that correct?
  19         A.   Yes.
  20         Q.   And I direct your attention to a page
  21    on that beginning drug pricing procedure.
  22         A.   Okay.
```

Dmerc, Palmetto - October 14, 2009 12:02:00 p.m.

```
165:1        Q.   Does this suggest to you that you were
    2   using the Redbook CD/ROM by 1999?
    3        A.   Yes.
    4        Q.   In the printed Redbook, were these
    5   conventions that Redbook used to distinguish
    6   between brand name and generic products?
    7        A.   In the?
    8        Q.   In the annual printed Redbook.
    9        A.   In the annual printed Redbook, yes.
   10        Q.   What were those conventions?
   11        A.   I'd have to look at a visual.  The
   12   brand name -- can I refer to --
   13        Q.   Do they refer to the type face and
   14   capitalization?
   15        A.   Well, yes.
   16        Q.   And were there any such conventions in
   17   the Redbook for Windows program?
   18        A.   In the Redbook for Windows?  Say the
   19   question again, I'm sorry.
   20        Q.   Can you just -- when you looked at
   21   pricing information on the Redbook for Windows
   22   programs, did it make any -- did it distinguish
```