# Exhibit 192

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp. et al.*
Civil Action No. 07-10248-PBS
Exhibit to the November 23, 2009, Supplemental Declaration of James J. Fauci
In Support of Plaintiff's Response to Roxane Defendants'
Supplemental Local Rule 56.1 Statement of Material Facts

Page 1

```
             IN THE UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS



   In re: PHARMACEUTICAL INDUSTRY      )

   AVERAGE WHOLESALE PRICE LITIGATION  )

                                       )

   _____)

                                       )MASTER CASE NO

                                       )01-12257-PBS

   THIS DOCUMENT RELATES TO:           )

   United States of America ex rel.    )SUBCATEGORY NO

   Ven-A-Care of the Florida           )06-11337-PBS

   Keys, Inc., et al. v. Boehringer    )

   Ingelheim Corporation, et al.,      )

   Civil Action No. 07-10248-PBS.      )

   _____)



         30(b)(1) and 30(b)(6)

         VIDEOTAPED DEPOSITION OF:

         CAROLYN HELTON

         Taken on Behalf of Roxane Laboratories

         October 16, 2009
```

Page 2

 1  APPEARANCES:
 2
 3  For the U.S. Department of Justice:
 4      JAMES J. FAUCI, ESQ.
 5      Assistant United States Attorney
 6      John Joseph Moakley Federal Courthouse
 7      1 Courthouse Way, Suite 9200
 8      Boston, Massachusetts 02210
 9      617.748.3298
10      jeff.fauci@usdoj.gov
11
12  For Roxane Laboratories, Boehringer Ingelheim, and
13  Related Companies:
14      ERIC GORTNER, ESQ.
15      Kirkland & Ellis
16      300 North LaSalle Street
17      Chicago, Illinois 60654
18      312.862.2285
19      ERIC.GORTNER@KIRKLAND.COM
20
21
22

Page 3

 1  APPEARANCES (Continued):
 2
 3  For the Dey Defendants:
 4      MARISA A. LORENZO, ESQ.
 5      Kelley Drye & Warren
 6      101 Park Avenue
 7      New York, New York 10178
 8      212.808.7697
 9      mlorenzo@kelleydrye.com
10
11  Also Present:  Rudy Smith, Videographer
12
13
14
15
16
17
18
19
20
21
22

Page 4

 1              I N D E X
 2  WITNESS: CAROLYN HELTON
 3         INDEX OF EXAMINATIONS
 4                 Page
 5  By Mr. Gortner                          7
 6  By Mr. Fauci                          127
 7  By Mr. Gortner                        134
 8         INDEX OF EXHIBITS
 9                 Page
10  Exhibit Roxane 260 Declaration                 9
11  Exhibit Roxane 261 Red Book Excerpt           46
12  Exhibit Roxane 262 Documents - Drug Pricing Boxes  70
13  Exhibit Roxane 263 HCFA Transmittal          108
14  Exhibit Roxane 264 Doxorubicin Hydro. Array   110
15  Exhibit US 265     Search Database            130
16  Exhibit US 266     Ipratropium Array          131
17
18
19
20
21
22

Page 5

 1          The videotaped deposition of
 2  CAROLYN HELTON, taken on behalf of the Roxane
 3  Laboratories, on the 16th day of October, 2009, at
 4  9:02 a.m. in the offices of Walker, Tipps &
 5  Malone, 2300 One Nashville Place, 150 Fourth
 6  Avenue North, Nashville, Tennessee, for all
 7  purposes under the Federal Rules of Civil
 8  Procedure.
 9          The formalities as to notice,
10  caption, certificate, et cetera, are waived.  All
11  objections, except as to the form of the
12  questions, are reserved to the hearing.
13          It is agreed that Elisabeth A.
14  Miller, being a Notary Public and Court Reporter
15  for the State of Tennessee, may swear the witness,
16  and that the reading and signing of the completed
17  deposition by the witness are reserved.
18
19
20
21              * * *
22

                                2 (Pages 2 to 5)

Page 46

1    Q.   Would it help you if you had a Red
2  Book?
3    A.   Please.
4    Q.   Why don't -- why don't we get it?
5       MR. GORTNER:  Why don't we take a quick
6  break.  We've gone about an hour.  Let's take a
7  quick break.  And then we can kind of walk
8  through a hard copy Red Book in reference to that
9  criteria.  Okay?
10       THE WITNESS:  Okay.
11       THE VIDEOGRAPHER:  Going off the
12 record, time is 9:54.
13       (Brief recess observed.)
14       THE VIDEOGRAPHER:  Back on the record,
15 time is 10:01.
16       (Marked Exhibit Roxane 261.)
17 BY MR. GORTNER:
18   Q.   Ms. Helton, I've handed you what we've
19 marked as Roxane Exhibit 261.  This is an excerpt
20 from the 2001 annual Red Book, the printed
21 version, and I wanted to draw your attention to
22 what's Page 368 in the upper left-hand corner of

Page 47

1  this document.  And if you look on the left-hand
2  column about halfway down, there is an entry for
3  ipratropium bromide.  Do you see that in bold?
4    A.   Yes.
5    Q.   And it continues listing a variety of
6  ipratropium bromides from different manufacturers
7  on that left-hand column and over it about
8  halfway on the middle column of Page 368.  Do you
9  see that?
10   A.   Yes.
11   Q.   And now I wanted to discuss this --
12 this criteria for classifying generics versus
13 brand drugs that we just looked at in the drug
14 pricing procedure document.  Okay?  And let me
15 know if I'm understanding how that criteria
16 worked.
17       But in essence, if you look at the
18 entry for Ipratropium Bromide Hydrous, which is
19 in the middle of that second column, do you see
20 that?
21   A.   Yes.
22   Q.   And what you see there is that that

Page 48

1  entire entry is in bold and capitals, correct?
2    A.   Correct.
3    Q.   And then underneath it, it has an
4  entry in lowercase for the generic chemical name
5  ipratropium bromide, right?
6    A.   Yes.
7    Q.   And is it fair to say that if you were
8  looking at this document and applying the
9  criteria that we just discussed on the drug
10 pricing procedure document, that would meet the
11 criteria for a brand drug because it has a
12 heading all in capital bold up top with the
13 generic name in lowercase underneath it?
14   A.   Yes, it has a -- the bold cap is a
15 different name, and then the generic name is in
16 lowercase.  So the cap is different from the
17 generic, so, yes, it is a brand name.
18   Q.   And that's the way that you would
19 apply that criteria at Cigna if you were looking
20 at a printed Red Book; is that correct?
21   A.   Yes.
22   Q.   And looking over similar to the -- to

Page 49

1  the next page, in the thirdhand column over on
2  the -- on the page marked 362, there's an entry
3  there for Inderal, can you see that?  And
4  underneath it, it has an entry in lowercase for
5  propanolol hydrochloride.  That would also be
6  considered a brand under this criteria?
7    A.   Yes.
8    Q.   Okay.  Now, I wanted you to go back to
9  Page 368 and look at the entry for the Roxane
10 ipratropium bromides above.  If you look right
11 above the -- the entry for Zenith Goldline, you
12 can see that Roxane is in parens in that middle
13 column on Page 368?
14   A.   Yes.
15   Q.   And you see that there's six NDCs that
16 are listed there.  Three of them up top have the
17 middle designation of 8402, and then three at the
18 bottom have the middle designation of NDC 8404.
19 Do you see those?
20   A.   Yes.
21   Q.   And using the criteria that we just
22 talked about in that drug pricing procedure,

Page 50

1   Cigna would classify all six of these NDCs as
2   generics, wouldn't it?
3       A.  Using the hard copy, yes.
4       Q.  Okay.  And that criteria would be in
5   effect all the way up to 2004 when the Medicare
6   policy changed, or would it continue up until
7   today?
8           MR. FAUCI:  Object to the form.
9           THE WITNESS:  If we were using the hard
10  copy, yes.  But we switched to the CD, so the CD
11  is different format.
12  BY MR. GORTNER:
13      Q.  Okay.  And we'll talk about the CDs in
14  just a moment.  But just so I understand how it
15  worked at Cigna, it -- you would apply the rule
16  regarding capitalization of the product to
17  determine whether it was a generic or brand when
18  you were relying on the hard copy Red Book; is
19  that correct?
20          MR. FAUCI:  Objection to the form.
21          THE WITNESS:  The capitalization of the
22  product helps you determine.  You would apply the

Page 51

1   rules that are in the CMS guidelines.
2   BY MR. GORTNER:
3       Q.  Well, how would those two work
4   together? I'm trying to understand.  You have a
5   -- the drug pricing procedure rule there
6   regarding limited capitalization and whether it
7   had a lowercase generic name underneath it,
8   correct?  How would that rule work in conjunction
9   with the CMS rule?
10      A.  You have to compare the two and see.  I
11  don't see any conflict with it here, but I would
12  have to evaluate each one individually and see if
13  there was.
14      Q.  Okay.  And how would you do that?  Can
15  you explain that?
16      A.  I'm looking at what I see here, and I
17  don't see anything here that would tell me that
18  it's different, so -- based on this, I don't see
19  any different names added to, so I would say it's
20  the same.
21          Like the Ipratropium Bromide Hydrous
22  and then the generic name underneath it is

Page 52

1   ipratropium bromide.
2       Q.  Right.
3       A.  Okay.  I have to consider that the
4   Ipratropium Bromide Hydrous, based on statutes,
5   is different than the generic name.  So if it's
6   different than the generic name, it's a brand.
7       Q.  Let me stop you there.  Were there any
8   exceptions to that rule that Cigna applied?
9       A.  I can't think of any for -- for DME.
10      Q.  We deposed Ms. Stone from the Palmetto
11  DMERC a couple days ago, and she mentioned that
12  there may be situations where the name of the
13  drug has something more than just the generic
14  name in it.  In other words, it might be a drug
15  that has ipratropium bromide hydrochloride, for
16  instance.
17          And there would be instances where the
18  additional term that was in the name of the drug
19  was related to being a dilutant, for instance.
20  They might classify that drug as a -- as a
21  generic or at least have a discussion about
22  whether it should be a generic or a brand.

Page 53

1           Was there anything akin to that at
2   Cigna?
3       A.  I don't think that that was considered
4   brand -- a brand conversation.  I'm thinking that
5   those are still considered generics.  But
6   sometimes when you're doing arrays for drugs, the
7   medical directors would make determinations as
8   to, if you don't have a drug that meets the
9   code's description specifically, that you may
10  have to -- there's -- like a chloride may have to
11  be used for that drug.
12      Q.  I'm not sure I understand that
13  exactly.  Can you --
14      A.  I don't have any codes here to
15  explain. Some of the drugs, especially for the
16  inhalation drugs, didn't have inhalation formats
17  that were -- the name of the drug was just
18  strictly the generic as in the HCPCS description.
19  You could not find any products that met that
20  description.
21          So the medical directors would say that
22  a different type of drug, like a hydrochloride,

Page 54

 1  was actually what was being used for that
 2  inhalation.
 3       And so we would pull in the products
 4  for that -- that drug into the array because we
 5  couldn't find the other.
 6       Q.  Well, can you give me an example of a
 7  drug that would have -- because I'm just trying
 8  to understand, are you referring to the fact that
 9  you would add a term to the drug name so that it
10  would match the -- the HCFA description or
11  whether you would give it an entirely different
12  name?  I'm just trying to understand what you're
13  referring to.
14       A.  I don't actually have any description
15  -- anything with me here to give you examples of
16  it.  The -- when you're talking about like sulfide
17  and hydrochloride and things like that that are
18  added but they -- they're part -- they're a
19  generic name, but they're a little bit different
20  than the generic name of the drug, if you don't
21  have any products that fall under that generic
22  name, then we would have to ask for assistance

Page 55

 1  from the medical directors, and they would
 2  determine which products actually were being used
 3  under those codes.
 4       Q.  Okay.  I think I understand what
 5  you're saying now.
 6       Would the medical directors ever be
 7  involved in the process of helping you determine
 8  whether a drug was a generic or a brand drug?
 9       A.  No.
10       Q.  Would anyone other than, in this
11  instance, you who was involved with grading the
12  arrays, be involved in the process of determining
13  whether a drug was a generic or a brand?
14       A.  For Cigna?  No.  We -- I mean, we
15  might have discussed some on the conference
16  calls.
17       Q.  Do you have any recollection of that?
18       A.  No.
19       Q.  Do you know whether any of the other
20  DMERCs had a process by which a medical director
21  or some other staff would be consulted with to
22  determine whether a drug was a generic or a

Page 56

 1  brand?
 2       A.  I do not.
 3       Q.  Now, with respect to the -- the HCFA
 4  transmittal that you're referring to in
 5  classifying a generic or a brand, what was your
 6  understanding of what that criteria was for
 7  determining --
 8       A.  If --
 9       Q.  -- let me finish the question --
10  determining whether a drug was a generic or a
11  brand?
12       A.  When you're looking at the description
13  of the drug, if the drug is other than -- or the
14  name is other than the generic name of the drug,
15  if it has something added to it, then it would be
16  considered a brand.
17       Q.  Okay.  So let's take the simplest
18  example.  If a drug is called Atrovent and the
19  generic chemical name is ipratropium bromide,
20  Atrovent is clearly a name other than the generic
21  chemical name, and you would classify that as a
22  brand?

Page 57

 1       A.  Yes.
 2       Q.  And you're familiar with that drug,
 3  aren't you?
 4       A.  Yes.
 5       Q.  And you routinely classify Atrovent as
 6  a brand at all pertinent times in the Cigna
 7  arrays?
 8       A.  Yes.
 9       Q.  Now, in situations where you have the
10  generic chemical name, like ipratropium bromide,
11  in the drug title and something additional, is it
12  your testimony that you considered that to be
13  other than the generic chemical name?
14       A.  Yes.
15       Q.  And that was the criteria you were
16  looking at.  If it was different in any way from
17  simply the words ipratropium bromide, you
18  categorized it as a brand in your arrays?
19       A.  Yes.
20       Q.  Now, looking at this 2001 annual Red
21  Book printout for the Roxane NDCs, I'll represent
22  to you that the NDCs that have the 8404 in the

15 (Pages 54 to 57)

Page 58

1  middle, the three lower NDCs on that Page 368 of
2  the Red Book, those represent the NDCs with the
3  Novaplus label ipratropium bromide.  Okay?
4      A.  Okay.
5      Q.  And you'd agree with me that using the
6  HCFA criteria that you're referring to, which is
7  if the product name is something other than the
8  generic chemical name, you would classify those
9  three Novaplus NDCs as a generic, wouldn't you?
10         MR. FAUCI:  Object to the form.
11         THE WITNESS:  Based on using this
12 information in Red Book, it is listed as
13 ipratropium bromide with just the manufacturer.
14 So based on this, it only is ipratropium bromide.
15 So I would -- based on just that it is the
16 generic name, I would have classified these as a
17 generic.
18 BY MR. GORTNER:
19      Q.  To be clear, you would have classified
20 the Novaplus label ipratropium bromide NDCs as a
21 generic under either one of the two criteria
22 we're talking about.  Either based upon the

Page 59

1  capitalization format in the Red Book or on the
2  HCFA criteria with regard to the generic name,
3  they would be classified as generics based upon
4  this 2001 annual Red Book printout?
5          MR. FAUCI:  Object to the form.
6          THE WITNESS:  Based on this where it's
7  strictly listed as ipratropium bromide only, yes,
8  I would have classified it as a generic.
9  BY MR. GORTNER:
10     Q.  You spoke a moment ago that -- that
11 Cigna transitioned to different formats of the
12 Red Book over time; is that right?
13     A.  Yes.
14     Q.  Can you explain for me generally what
15 materials Red -- of Red Book Cigna was using over
16 time where we can, you know, begin with the late
17 1990s up to 2004 if it's easier for you to
18 recollect that.
19     A.  The late 1990s we were using the
20 annual and the monthly hard copies.
21     Q.  Okay.
22     A.  2000 we started using the quarterly

Page 60

1  CDs.
2      Q.  Can you explain for me the reasons why
3  you switched to the quarterly CDs from the
4  printed versions?
5      A.  It was determined by the four DMERCs
6  together that the quarterly CDs were easier and
7  faster than the hard copies, so all four agreed
8  to go with the quarterly CDs.
9      Q.  That's because on a quarterly CD you
10 can do searches and get right to the product and
11 don't have to be flipping through a book?
12     A.  That is correct.
13     Q.  There's a real convenience factor to
14 those CDs versus the annual hard copies, right?
15     A.  The CDs also had the ability to search
16 by NDC number.
17     Q.  Do you recall at what point in 2000
18 the switch was made?  Was it later 2000?  Mid?
19     A.  I actually think -- I think it was the
20 first or second quarter of 2000.  I think the
21 first CD we had was October in '99, which would
22 have come into play with the January 2000.

Page 61

1      Q.  You're not sure one way or the other?
2      A.  I'm not really sure.
3      Q.  So up until some point in 2000, you
4  were using the annual Red Book like the excerpt
5  that we have right here marked as Roxane Exhibit
6  261, right?
7      A.  Yes.
8      Q.  So you're familiar with this entry for
9  ipratropium bromide, right?
10     A.  Yes.
11     Q.  And the decision to change to
12 different Red Book formats was a decision the
13 four DMERCs collectively made?
14     A.  Yes.
15     Q.  The Red Book CDs required a
16 subscription, didn't they?
17     A.  Yes.
18     Q.  You'd have to pay, what, a quarterly
19 or an annual fee?
20     A.  I think it was annual.
21     Q.  So the Red Book CDs weren't something
22 that -- that the general public would just have

16 (Pages 58 to 61)

Page 82

1  field that Red Book provided to you throughout
2  this time that is labeled Generic and has a Y/N.
3  Did you understand that to be yes or no generic
4  field?
5      A.  Yes.
6      Q.  And it tells you here that it -- that
7  Red Book is classifying Atrovent as a brand drug,
8  right, because it has an N or a no next to the
9  generic field?
10     A.  Yes.
11     Q.  And you understood that at the time,
12 right?
13     A.  I quite honestly didn't go that far.
14     Q.  Okay.  Well, let's talk -- let's talk
15 a little bit more about that in a second.
16         Going through CIGNA 0111, you can see
17 there's -- there's another listing of ipratropium
18 bromide from Allscripts manufacturer, and that
19 has a generic yes in that field indicator.  Do
20 you see that?
21     A.  Yes.
22     Q.  So it's -- Red Book is telling you

Page 83

1  that it considers the Allscripts ipratropium
2  bromide to be a generic drug, correct?
3      A.  Yes.
4      Q.  Then if you continue to flip through
5  these next few pages, there's listings you'll see
6  for Alpharma ipratropium bromide, which is also
7  called ipratropium bromide, and Dey's on Page 3
8  of the Red Book printout.
9          And if you continue on where there are
10 some other NDCs and you get to Roxane's
11 ipratropium bromide at the bottom of Page 5 of
12 this October 2000 Red Book CD, do you see that?
13     A.  Yes.
14     Q.  And there the product name is
15 ipratropium bromide, the manufacturer is Roxane,
16 and on the top of Page 6, Red Book, again, is
17 telling you that this is a generic product,
18 right?
19     A.  Yes.
20     Q.  Okay.  And it's the same for the other
21 Roxane label ipratropium bromides, which are
22 listed on Page 6.  They're both in different

Page 84

1  package sizes, but, again, the generic field is
2  telling you that that's a generic product,
3  correct?
4      A.  Yes.
5      Q.  Then if you turn to Page 8 and 9 of
6  this October 2000 printout, which is CIGNA 0118
7  and CIGNA 0119, you can see that the three
8  Novaplus products are listed on the Red Book CD,
9  correct?
10     A.  Yes.
11     Q.  Okay.  And -- and the way these are
12 listed by product name, it has the generic
13 chemical name, ipratropium bromide, it then has a
14 dash, and the word Novaplus, correct?
15     A.  Yes.
16     Q.  All right.  And there are three
17 different NDC entries on Pages 8 and 9, and they
18 refer to different package sizes, correct?
19     A.  Yes.
20     Q.  And for all three of these NDCs, the
21 Red Book CD-ROM is telling you that these are
22 also generic products, correct?

Page 85

1      A.  Yes.
2      Q.  And it's telling you that because in
3  the specific generic field it has a Y for yes for
4  all three NDCs; isn't that right?
5      A.  Yes.
6      Q.  Now, did you take that information
7  into account when you were classifying a Novaplus
8  product in the Cigna arrays?
9      A.  No.
10     Q.  Can you explain why you didn't take
11 that information into account?
12     A.  I was looking specifically at the name
13 of the drug, the name of the drug being different
14 than the generic name, so I considered it a brand
15 name.
16     Q.  Okay.  So the presence of the term
17 Novaplus preceded by a dash would lead you to
18 believe that it was a brand name versus a generic
19 name?
20     A.  Yes.
21     Q.  And -- and just to be clear about the
22 testimony we talked about earlier, you're

22 (Pages 82 to 85)

Page 98

```
 1  not familiar with it.
 2      Q.  What pharmacy do you use?
 3      A.  Actually I go through Cigna Tel-Drug.
 4      Q.  That would make sense given a Cigna
 5  employee.
 6          Well, let's say that -- that the drug
 7  was listed as ipratropium bromide-Walgreens, for
 8  instance.  How would you have classified the drug
 9  like that?
10      A.  If the drug -- if we're talking about
11  it listed in the Red Book as, then I would
12  classify it as a brand name.
13      Q.  It doesn't matter what comes after the
14  dash, anything that's different than the words
15  ipratropium bromide would lead you to classify
16  the drug as a brand?
17      A.  Yes.
18          MR. FAUCI:  Objection to the form.
19  BY MR. GORTNER:
20      Q.  So even if the title said Ipratropium
21  Bromide-Novaplus and had a follow-up dash that
22  said this is a generic drug in the full title,
```

Page 99

```
 1  you would still classify it as a brand, wouldn't
 2  you?
 3          MR. FAUCI:  Object to the form.
 4          THE WITNESS:  I have never seen one
 5  that way, so I might at this particular point ask
 6  for classification from CMS.
 7  BY MR. GORTNER:
 8      Q.  Okay.  So there's some point where you
 9  would seek some information from somebody else to
10  try to clarify whether that drug should be a
11  generic or brand, right?
12      A.  Yes.
13      Q.  But you'd agree with me that even
14  under that hypothetical scenario, technically
15  that -- under your -- meets your understanding of
16  the HCFA rules of being a brand, right?
17      A.  Yes.
18      Q.  Because that title, even if it says
19  this is a generic drug, those are words that are
20  different than exclusively the generic name of
21  the drug, right?
22      A.  Yes.
```

Page 100

```
 1      Q.  Now, what's your understanding of what
 2  a proprietary name is?
 3          MR. FAUCI:  Object to the form.
 4          THE WITNESS:  I quite honestly don't
 5  have an understanding of proprietary.
 6  BY MR. GORTNER:
 7      Q.  Okay.  And do you have an
 8  understanding of what a trade name is?
 9      A.  My understanding is that it's specific
10  to one entity.  I mean, it's -- I don't really
11  know the difference between -- I mean, I think
12  it's specific to one company only, and no one
13  else can use that.
14      Q.  Do you have any understanding whether
15  Novaplus is a trade name?
16          MR. FAUCI:  Object to the form.
17          THE WITNESS:  I -- I don't.
18  BY MR. GORTNER:
19      Q.  You don't know one way or the other,
20  right?
21      A.  Right.
22      Q.  Do you have any understanding whether
```

Page 101

```
 1  Novaplus is a proprietary name?
 2      A.  No, I don't.
 3      Q.  You don't know one way or the other?
 4          Now, with respect to the Novaplus
 5  drugs, were you familiar with that Novaplus
 6  designation?
 7      A.  I have seen it in the array.  But
 8  familiar with it, no.  I just put it into the
 9  arrays.
10      Q.  So you didn't know what the Novaplus
11  meant?
12      A.  Correct.
13      Q.  You didn't know that these were drugs
14  that were being sold exclusively to Novation's
15  GPO members?
16      A.  No.
17      Q.  But you knew that it was the same
18  manufacturer, Roxane, as -- as the other
19  ipratropium bromide that was listed on Pages 5
20  and 6 of this Red Book CD, right?
21      A.  Same manufacturer, yes.
22      Q.  And you can see that the same -- the
```

Page 126

1  mentioned, "During the period 2001, quarter 2, to
2  2003, quarter 4, when Roxane's Novaplus were in
3  the arrays, Cigna generally used the quarterly
4  CD-ROM as a source of information."
5       Do you see that in Paragraph 31?
6    A.  Yes.
7    Q.  Now, you don't mention the use of the
8  -- the monthly Red Book updates during this time
9  period.  But you were using those as well,
10 weren't you?
11   A.  We were checking those to see if there
12 were any additions that weren't copied in the CD.
13   Q.  Okay.  So you were using both the
14 CD-ROM and the paper versions of the Red Book
15 during this time as well, correct?
16   A.  The monthly, yes.
17   Q.  The answer is yes?
18   A.  Yes.
19       MR. GORTNER:  I don't have any further
20 questions.  Thank you so much for your time.
21       MR. FAUCI:  Marisa, do you have any
22 questions?

Page 127

1        MS. LORENZO:  No, I do not.  Thank you.
2        MR. FAUCI:  How much time do we have?
3        THE VIDEOGRAPHER:  It looks like about
4  14 minutes.
5        MR. FAUCI:  Let's try.
6           E X A M I N A T I O N
7  BY MR. FAUCI:
8    Q.  Ms. Helton, I just have a very few
9  quick follow-up questions.
10       First, just in response to testimony
11 you just gave, you said that you were -- at the
12 time you were using the Red Book for Windows
13 program you were also using the monthly updates;
14 is that correct?
15   A.  Yes.
16   Q.  Can you explain how you used the
17 monthly updates for what purpose?
18   A.  The quarterly Windows was a month
19 behind when we would be developing the fees.  For
20 example, we would be using the October 2009 to
21 establish the -- or October 1999 to establish the
22 January 2000 fees.

Page 128

1        So we would look at any Red Books that
2  we would get in between that time, such as
3  November or December, to see if we could pick up
4  any additional changes that we needed to.
5        Generally we would refer to those, and
6  Red Book had changes in red print, so we would
7  only be looking at the ones that were in red
8  print.
9    Q.  Do you know if you ever looked to the
10 monthly updates to the Red Book in deciding how
11 to classify Ipratropium Bromide-Novaplus as a
12 brand or a generic?
13   A.  No.
14   Q.  No, you do not know; or, no, you
15 didn't?
16   A.  No, we didn't.  Sorry.
17   Q.  Thank you.  That was my fault.
18       Can you look back at Exhibit 263?  I
19 believe this was the program memoranda.  We've
20 talked at length about the language contained in
21 Paragraph 2 under the calculation of the AWP.  Do
22 you see that?

Page 129

1    A.  Yes.
2    Q.  Can you read the last sentence of that
3  paragraph?
4    A.  "A brand name product is defined as a
5  product that is marketed under a label name that
6  is other than the generic chemical name for the
7  drug or biological."
8    Q.  Did you rely on this language in
9  making classification decisions?
10   A.  Yes.
11   Q.  Can you go to Exhibit 261, and I'll
12 direct your attention to the Page 368.  Is this a
13 -- is this pages excerpted from the 2001 hard
14 copy version of the annual Red Book?
15   A.  Yes.
16   Q.  And you see that there's a section
17 related to ipratropium bromide?
18   A.  Yes.
19   Q.  Do you recall talking to Mr. Gortner
20 earlier about the Roxane products that are listed
21 in the second column?
22   A.  Yes.

Page 130

1   Q.  And you gave some testimony that those
2  products -- based on what you see here you would
3  have classified those products -- all six of
4  those products as generics; is that correct?
5   A.  Yes, that's --
6   Q.  Can you explain why you would have
7  done so?
8   A.  Because they only list the name of the
9  drug as ipratropium bromide.
10  Q.  If for the 8404 NDCs the product was
11 listed as Ipratropium Bromide-Novaplus, how would
12 you have classified them?
13  A.  A brand name.
14  Q.  Just going to very quickly -- we've
15 been talking about the Red Book for Windows
16 program, and I'd just like to ask a quick few
17 questions.
18      (Marked Exhibit US 265.)
19 BY MR. FAUCI:
20  Q.  Do you recognize this, Ms. Helton?
21  A.  Yes.
22  Q.  What is it?

Page 131

1   A.  It's the search database that comes up
2  when you open -- enter Red Book.
3   Q.  Just for the record, I'll represent
4  that I did a print screen from the -- a version
5  of the Red Books for Windows.  And you've
6  identified this as the search database?
7   A.  Yes.
8   Q.  Is this the first screen that popped
9  up when you looked at the Red Book for Windows?
10  A.  Yes.
11  Q.  You can put that aside.
12      (Marked Exhibit US 266.)
13 BY MR. FAUCI:
14  Q.  Do you recognize Exhibit 266, Ms.
15 Helton?
16  A.  Yes.
17  Q.  What is this -- what does this appear
18 to be?
19  A.  Once you type in the brand into the
20 selection field, this is the array that you get
21 that comes up with the word ipratropium.  And it
22 has an N capitalized in lowercase.

Page 132

1   Q.  Is this -- is -- how you would have
2  used this program is by typing in the drug you
3  were looking to get information on into the
4  search screen?
5   A.  Yes.
6   Q.  And if you had typed in ipratropium,
7  is this what would have come up on the screen?
8   A.  Yes.
9   Q.  What would have happened if you
10 clicked ipratropium, if you had hit enter or
11 okay?
12  A.  On this particular one?
13  Q.  On this particular screen -- no, which
14 of these would you have selected?
15  A.  I would have selected the lower case,
16 the ipratropium bromide, because it would have
17 pulled all of the ipratropium bromides into that
18 and then hit okay.
19  Q.  And what would have happened then?
20  A.  Then it would have brought up a list
21 of manufacturers for the different drugs.
22  Q.  And you would have used that list of

Page 133

1  manufacturers to -- how would you have used that
2  list of manufacturers?
3   A.  I would have said select all, because
4  I wanted to pull all manufacturers in, and then
5  hit okay.
6   Q.  And can you explain what that would
7  have done?
8   A.  It then brings up the detailed screen,
9  which are some of these that we looked at the
10 prints.
11  Q.  On Exhibit 262?
12  A.  Yes -- well, actually, it brings up
13 another screen before the ones on 262 where it
14 lists all of the -- it has -- it's the -- the
15 product information screen comes up, and it lists
16 all of the manufacturers and the products that
17 meet that ipratropium bromide generic
18 description.
19      And then I go in and make my selections
20 for the code that I'm trying to process as to
21 what actually I'm going to pull into the array
22 based on the strength and the type of the drug.

34 (Pages 130 to 133)