**EXHIBIT 49**

Page 1

NO. GV002327

| THE STATE OF TEXAS | ) IN THE DISTRICT COURT |
| ex rel. | ) |
|    VEN-A-CARE OF THE | ) |
|    FLORIDA KEYS, INC., | ) |
|       Plaintiff(s), | ) |
|  | ) |
| VS. | ) TRAVIS COUNTY, TEXAS |
|  | ) |
| DEY, INC.; ROXANE | ) |
| LABORATORIES, INC., WARRICK | ) |
| PHARMACEUTICALS CORPORATION, | ) |
| SCHERING CORPORATION, | ) |
| SCHERING-PLOUGH CORPORATION, | ) |
| LIPHA, S.A., MERCK-LIPHA, | ) |
| S.A., MERCK, KGAA, and EMD | ) |
| PHARMACEUTICALS, INC., | ) |
|       Defendant(s). | ) 53RD JUDICIAL DISTRICT |

*******************************************

ORAL AND VIDEOTAPED DEPOSITION OF
LUIS COBO
March 3rd, 2003

*******************************************

ORAL AND VIDEOTAPED DEPOSITION OF LUIS COBO, produced as a witness at the instance of the Defendant(s), and duly sworn, was taken in the above-styled and numbered cause on March 3rd, 2003, from 9:15 a.m. to 4:56 p.m., before Cynthia Vohlken, CSR in and for the State of Texas, reported by machine shorthand, at the Office of the Attorney General, 300 W. 15th Street, 9th Floor, Austin, Texas pursuant to the Texas Rules of Civil Procedure.

Page 2

APPEARANCES

FOR THE PLAINTIFF(S):
   MR. PATRICK J. O'CONNELL
   Office of the Attorney General
   State of Texas
   Post Office Box 12548
   Austin, Texas 78711-2548

FOR THE RELATOR:
   MR. JAMES JOSEPH BREEN
   The Breen Law Firm, P.A.
   P. O. Box 297470
   Pembroke Pines, Florida 33029-7470

FOR THE DEFENDANT(S) DEY, INC.:
   MR. STEVEN A. FLECKMAN
   Fleckman & McGlynn, P.L.L.C.
   515 Congress, Suite 1800
   Austin, Texas 78701-3503

FOR THE DEFENDANT ROXANE LABORATORIES, INC.:

Page 2 (cont.)

   MR. STEVEN S. WINGARD
   Scott, Douglass & McConnico, L.L.P.
   One American Center, Fifteenth Floor
   600 Congress Avenue
   Austin, Texas 78701

FOR THE DEFENDANTS WARRICK PHARMACEUTICALS CORPORATION, SCHERING-PLOUGH CORPORATION AND SCHERING CORPORATION:
   MR. JOHN P. MCDONALD
   Locke Liddell & Sapp, LLP
   2200 Ross Avenue, Suite 2200
   Dallas, Texas 75201-6776

ALSO PRESENT:
   Mr. Zachary Taylor Bentley, II

Page 3

INDEX

| | |
|---|---|
| Appearances................................... | 2 |
| LUIS COBO | |
|    Examination by Mr. McDonald............ | 5 |
| Signature and Changes........................ | 216 |
| Reporter's Certificate....................... | 218 |
| VIDEOTAPE NUMBER | |
|    1 .................................. | 5 |
|    2 .................................. | 55 |
|    3 .................................. | 108 |
|    4 .................................. | 164 |
|    5 .................................. | 213 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 515 | ........................................... | 37 |
| | 9/08/92 McKesson Invoice | |
| 516 | ........................................... | 45 |
| | 6/29/2000 Independent Pharmacy Coop Fax | |
| 517 | ........................................... | 149 |
| | Medicare B Update, A Newsletter for Florida Medicare Part B Providers, Inherent Reasonableness Notice for Radionuclide Materials | |
| 518 | ........................................... | 151 |
| | Drug Topics Medicaid Rx Reimbursement Report | |
| 519 | ........................................... | 154 |
| | Sign-in Sheet for Ven-A-Care Meeting | |
| 520 | ........................................... | 155 |
| | Credit Application for National Specialty Services, Inc. | |
| 521 | ........................................... | 158 |
| | 9-18-95 Fax From National Specialty | |

Scrunch® www.scrunch.cc GC Software, Seattle, Washington

Page 203

1 it had received to Florida Medicaid?
2     MR. O'CONNELL: Objection, form.
3     MR. BREEN: Objection, form.
4 A. I have always participated in the Florida
5 Medicaid program and I assumed that that in fact was
6 happening and I never would have anticipated that I
7 would have had to perform an audit to account for the
8 behavior that -- that Florida Medicaid was seeing
9 because of the excessive reimbursement due to
10 fraudulent price representations made by
11 manufacturers.
12     MR. FLECKMAN: Objection.
13 A. So I -- I -- I have always operated under the
14 assumption, you know, that what I was doing was in
15 fact correct. And it wasn't until after Cobo Pharmacy
16 closed that, you know, I sort of felt the need to go
17 back and -- and re-evaluate that.
18 Q. (BY MR. McDONALD) Well --
19     MR. FLECKMAN: Objection, nonresponsive.
20     MR. McDONALD: Objection, nonresponsive.
21 Q. (BY MR. McDONALD) What I was trying to
22 circle back here, the language we looked at in Exhibit
23 529 about the requirements to report discounts and
24 rebates.
25 A. Uh-huh.

Page 204

1 Q. And I'm wanting to know if while Cobo
2 Pharmacy was an operating pharmacy, not after the
3 fact, after it closed its doors, while it was
4 operating did it ever report the rebates and discounts
5 it had received to Florida Medicaid?
6     MR. BREEN: Objection, form.
7     MR. O'CONNELL: Objection, form.
8     MR. BREEN: And I'm going to instruct
9 the witness it's been asked and answered over and over
10 again.
11     MR. McDONALD: Well, I'll agree with you
12 it's been asked, but it hasn't been answered.
13     MR. BREEN: Also, Counsel, I believe
14 there's a misleading predicate on this question I'll
15 be happy to disclose to you outside the presence of
16 the witness.
17 Q. (BY MR. McDONALD) That's fine. You can
18 answer the question.
19 A. I think it might clarify things if maybe you
20 understand that this type of terminology is not
21 uncommon among any manufacturer be it drugs, durable
22 medical equipment, anybody selling to a provider that
23 is involved in the Medicare/Medicaid program because
24 the different manufacturers of various items feel the
25 need to insert this language into their invoices or

Page 205

1 contracts or whatever it is for whatever purpose they
2 do. So this is not something that is uniquely
3 specific to this GPO by any means. This happens all
4 across the industry with anybody selling products.
5 Q. (BY MR. McDONALD) I appreciate that.
6     MR. FLECKMAN: Objection, nonresponsive.
7 Q. (BY MR. McDONALD) What I'm -- what I'm
8 trying to figure out is did you ever do it?
9     MR. BREEN: Objection, form.
10     MR. O'CONNELL: Objection, form.
11 A. I answered that I believe I did do it by the
12 way that I participated in the program. To me that
13 was fulfilling my obligation of making any type of
14 reporting known to the Florida Medicaid. Their
15 interest was not -- has not been -- and I think you
16 will find this if you speak to Mr. Wells and receive
17 an itemized list of all the discounts, their interest
18 is in obtaining truthful pricing. I don't think that
19 they have the manpower to sit there and, you know,
20 gather all these various lists and evaluate them.
21 They're assuming that the program is being handled
22 properly.
23     MR. FLECKMAN: Objection, nonresponsive.
24     MR. McDONALD: Objection, nonresponsive.
25 Q. (BY MR. McDONALD) Let me hand you what I've

Page 206

1 marked as Deposition Exhibit Number 530. Have you
2 ever seen this before?
3 A. The cover sheet is not familiar and the
4 specific contract award, again, I mean, I -- I can't
5 tell you if I have seen this particular page.
6 Q. What, if anything, was the relationship
7 between Ven-A-Care and Automated Health Technologies?
8 A. Again, this is -- this is addressed to me.
9 What time frame is this? '96. I mean, here again,
10 there were communications going back and forth and
11 usually the pharmacy -- the pharmacist was the one
12 where these things were directed. The specific
13 relationship I could not tell you.
14 Q. Well, you say that the pharmacist was where
15 these things were directed. Was there any pharmacist
16 at Ven-A-Care in 1996 other than yourself?
17 A. No. And again, let me qualify that. There
18 may have been occasion where I might have had -- and I
19 don't know if it was specifically in this time frame,
20 but there were instances from time to time where I
21 would have a pharmacist that perhaps was working at
22 Cobo Pharmacy that would always also do some, you
23 know, some duty at Ven-A-Care as well.
24 Q. Sitting here today you don't know what
25 Exhibit 530 is; is that correct?

Page 207

1  A. That's correct, other than what the face
2     value represents.
3  Q. Let me show you what I've marked as Exhibit
4     531. This appears to be a check to Cobo Pharmacy in
5     the sum of $4.52 from Warrick. Do you see that?
6  A. I do.
7  Q. Do you know what this is for?
8  A. I do not. I know Warrick from time to time
9     would -- would offer rebates. This surprises me
10    because my recollection has always been that Warrick
11    would process these rebates directly through the
12    wholesaler that I was purchasing. In other words,
13    they would call me and say we got a -- we got a
14    special going on and I'd order, I don't know, a
15    dozen -- a dozen units of whatever it is that they
16    were promoting and then they would process the rebate
17    through the manufacturer. So the adjustment was made
18    through the manufacturer. This appears to be a check
19    that may have been sent to Cobo Pharmacy.
20 Q. When you say they would call you, the
21    wholesaler would call you?
22 A. Usually it was a representative from Warrick
23    that was promoting a rebate from Warrick.
24 Q. And who was the representative of Warrick
25    that you talked to?

Page 208

1  A. I did not know anybody. You know, it wasn't
2     that regular of a relationship and I never knew -- I
3     don't necessarily know that it was the same person
4     calling every time.
5  Q. Are you sure it was somebody that was working
6     for Warrick as opposed to somebody that was working
7     for a distributor?
8  A. I would have -- I would have someone calling
9     me representing that they were calling from Warrick
10    Pharmaceuticals.
11 Q. Saying that they were with Warrick?
12 A. I don't know whether with, at, by, whatever,
13    but they were calling saying that they were
14    representing Warrick Pharmaceuticals and they had a --
15    a rebate going on one of their products.
16 Q. When was the last time you ever had one of
17    those conversations?
18 A. I would have to say perhaps as late as in the
19    year 2000.
20 Q. And can you tell us the names of any of the
21    people that you had such conversations with?
22 A. No.
23     MR. BREEN: When you get to a breaking
24    point why don't we take a break so can take a few
25    minutes and figure out how long we are going to stay.

Page 209

1  Q. (BY MR. McDONALD) Show you what I've marked
2     as Exhibit 532. Is this a fax you received from
3     Richie pharmaceutical company in December of 1997?
4  A. It appears to be a fax that came to
5     Ven-A-Care.
6  Q. Came to Ven-A-Care as opposed to Cobo
7     Pharmacy?
8  A. Oh, I'm sorry. I didn't even see that. Let
9     me see. I saw that V on Judy Vance and I thought that
10    said Ven-A-Care. I'm sorry.
11 Q. That's okay.
12 A. It's addressed to Cobo Pharmacy. I don't --
13    I couldn't honestly tell you if it came to Cobo
14    Pharmacy or came to Ven-A-Care. Many of these
15    different wholesalers knew that I had a relationship
16    in both of these entities and it was not uncommon for,
17    you know, faxes to get crossed from one to the other.
18    But it does say Luis Cobo, Cobo Pharmacy on the -- on
19    the fax.
20 Q. Did Ven-A-Care have a relationship with
21    Richey pharmaceutical company?
22 A. Yes.
23 Q. And what was Richie -- actually, I think it's
24    Pharmacal Company.
25 A. Richie. Again, this is one of those

Page 210

1     companies, I don't know if Ven-A-Care ever had a
2     contract with them or were just on some sort of a
3     solicitation list. I do know that there is a, you
4     know, a file that has Richie Pharmacal or Richie faxes
5     and, you know, pricing information that's come across
6     from time to time. I don't know specifically what the
7     legal relationship was.
8  Q. Does Ven-A-Care still receive pricing
9     information from Richie Pharmacal?
10 A. I am not sure. If anything comes across it's
11    not with very much regularity, but I just can't
12    definitely tell you. Once in a while you just get a
13    fax that comes across from some past company that
14    you've dealt with. I can't tell you for sure.
15        MR. McDONALD: Okay. Let's take a
16    break.
17        THE VIDEOGRAPHER: Stand by. The time
18    is 4:36 p.m. We are off the record. This concludes
19    Tape Number 4.
20        (Recess from 4:36 to 4:47)
21        MR. FLECKMAN: Jim, we've got -- as I
22    understand Mr. McDonald, he's got about an another
23    hour or so of questions for Mr. Cobo and then I've got
24    an hour and a half of questions for Mr. Cobo by a
25    rough estimate.