UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) MDL No. 1456 <br> ) Master File No. 01-12257-PBS <br> ) Subcategory Case No. 06-11337 <br> ) <br> ) Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO: <br> *State of California, ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc., et al.* <br> Case No: 1:03-cv-11226-PBS | ) <br> ) Magistrate Judge <br> ) Marianne B. Bowler <br> ) <br> ) |

**PLAINTIFFS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AS TO DEFENDANTS MYLAN LABORATORIES INC. AND MYLAN PHARMACEUTICALS INC.**

**A.  Medi-Cal Pharmacy Providers Submitted Claims for the Relevant Mylan Drugs Which Were Paid By Medi-Cal With Government Funds Based on AWPs Reported by FDB.**

1. During the period from 1994 through 2004, pharmacies and other Medi-Cal providers routinely submitted pharmaceutical claims to Medi-Cal (through its fiscal intermediary, EDS) for reimbursement of the Mylan drugs at issue in this action (the "Subject Drugs") that those providers had dispensed to program beneficiaries. (Declaration of Nicholas N. Paul in Support of Motion for Partial Summary Judgment (hereinafter, "Paul") Ex. 1 (Gorospe Decl.), at ¶¶ 3, 4.)

2. Medi-Cal paid those claims (through EDS) with Government funds. (Paul Ex. 1 (Gorospe Decl.), at ¶¶ 3, 4.)

3. Pursuant to applicable statutory and regulatory requirements, the claims were adjudicated and paid *at the lesser of* the provider's usual and customary charge or at the Cost of the Drug Product plus a dispensing fee.  By statute, the total payment was then reduced by an

1

amount varying over time from $.10 to $.50 per claim. (Paul Ex. 1 (Gorospe Decl.), at ¶¶ 5a, 5b, 6.)

4.  The Cost of the Drug Product was set at *the lowest of* the drug's Estimated Acquisition Cost ("EAC"), the Federal Allowable Cost (FAC, a/k/a FUL), or (c) the Maximum Allowable Ingredient Cost (MAIC).[1] (Paul Ex. 1 (Gorospe Decl.), at ¶ 5a, 5b.)

5.  The Estimated Acquisition Cost for the Subject Drugs was determined at all relevant times at the AWPs reported by First Data Bank ("FDB") less a discount of either 5% (from 1994 through October 2002), 10% (from November 2002 through August 2004), or 17% (August 2004 through December 2004). (Paul Ex. 1 (Gorospe Decl.), at ¶¶ 5b, 7.)

**B.   Mylan Set and Reported AWPs For Its Products Without Regard to The Actual Prices Being Generally and Currently Paid By Providers.**

6.  Throughout the relevant time period, Mylan set AWPs for its products and reported those prices to pricing compendia, including FDB. (Paul Ex. 2 (11/21/08 Eric Belldina Dep.), at 49:5-22; Paul Ex. 3 (3/25/09 Hal Korman Dep.), at 38:22-39:16; Paul Ex. 4 (3/28/08 Steve Krinke Dep.), at 136:3-137:11.)

7.  Mylan set the AWPs for its product without even attempting to have those numbers reflect market prices. (Paul Ex. 3 (3/25/09 Hal Korman Dep.), at 38:22-39:16; Paul Ex. 4 (3/28/08 Steve Krinke Dep.), at 136:3-139:18; Paul Ex. 5 (8/2/07 Brian Roman Dep.), at 128:21-129:20.)

8.  When it was the first company to market a particular generic product, Mylan generally set and reported as AWPs for its products a price 10% below the AWP for the corresponding brand product. (Paul Ex. 3 (3/25/09 Hal Korman Dep.), at 38:19-39:16.)

9.  When Mylan launched a product and there was already a competitive generic product on the market, Mylan set its AWP by reference to the competitor's AWP. (Paul Ex. 4

---

[1] There are no claims paid at MAIC at issue in this case.

(3/28/08 Steve Krinke Dep.), at 137:5-11; Paul Ex. 6 (10/15/08 David Workman Dep.), at 182:22-183:14.)

10.     Mylan knew that the generic market was very competitive and that market prices for generic drugs tended to decline significantly after additional participants entered the market. (Paul Ex. 3 (3/25/09 Hal Korman Dep.), at 153:19-154:21.)

11.     Mylan generally did not change its reported AWPs in response to changes in transaction prices for its complaint products. (Paul Ex. 7 (9/25/07 Steve Krinke Dep.), at 143:16-146:5; Paul Ex. 5 (8/2/07 Brian Roman Dep.), at 128:21-129:20.)

12.     On occasion, Mylan raised the AWP for a product. (Paul Ex. 4 (3/28/08 Steve Krinke Dep.), at 135:16-137:4; Paul Ex. 7 (9/25/07 Steve Krinke Dep.), at 143:16-146:5; Paul Ex. 8 (11/25/08 Robert Potter Dep.), at 91:9-92:5.) However, Mylan did not actually sell its product at AWP. (Paul Ex. 5 (8/2/07 Brian Roman Dep.), at 128:21-129:20.)

13.     Mylan was aware that it was necessary to report AWPs to the pricing compendia in order for its products to be reimbursed by third party payers, such as Medi-Cal. (Paul Ex. 9 (10/30/08 Robert Cunard Dep.), at 196:20-197:6; Paul Ex. 2 (11/21/08 Eric Belldina Dep.), at 161:15-23; Paul Ex. 7 (9/25/07 Steve Krinke Dep.), at 87:11-88:1; Paul Ex. 8 (11/25/08 Robert Potter Dep.), at 89:1-7, 241:3-15.)

14.     FDB published the suggested AWPs reported by Mylan as the AWPs for Mylan's products. (Paul Ex. 10 (6/26/08 David Workman Dep.), at 35:12-18.)

C.      **Mylan Was Aware of the Prices Providers Paid For Its Products.**

15.     Mylan maintained databases through which it regularly tracked the prices at which its products were being sold. (Paul Ex. 5 (8/2/07 Brian Roman Dep.), at 224:8-225:8, 226:3-15, 227:7-11, 229:2-16; Paul Ex. 11 (11/20/08 David Workman Dep.), at 100:19-101:20, 128:2-19, 130:11-131:3, 157:6-23, 158:2-159:10.)

16. For internal business purposes, Mylan calculated accurate estimates of sales prices for its products on a regular basis. (Paul Ex. 11 (11/20/08 David Workman Dep.), at 157:6-23, 158:2-159:10.)

17. Mylan contracted with large retail pharmacy chains for the sale of its products. (Paul Ex. 11 (11/20/08 David Workman Dep.), at 168:12-169:6; Paul Ex. 5 (8/2/07 Brian Roman Dep.), at 83:19-84:15.)

18. Mylan did not report its transactional prices, nor any average or compilation of these prices, to the pricing compendia or to Medi-Cal as its products' AWPs or otherwise. (Paul Ex. 3 (3/25/09 Hal Korman Dep.), at 37:6-39:16; Paul Ex. 4 (3/28/08 Steve Krinke Dep.), at 136:3-139:18.)

19. There was no fixed or predictable relationship between the AWPs that Mylan reported to FDB and the prices at which its products were sold to the retail class of trade. (Paul Ex. 5 (8/2/07 Brian Roman Dep.), at 128:21-129:20; Paul Ex. 3 (3/25/09 Hal Korman Dep.), at 37:6-39:16; Paul Ex. 4 (3/28/08 Steve Krinke Dep.), at 136:3-139:18.)

**D.    Mylan's Knowledge of Medicaid and Medi-Cal Policies**

20. Mylan was aware of or on notice of Medicaid and Medi-Cal reimbursement policies in general.  (Paul Ex. 12 (6/10/09 Brian Roman Dep.), at 133:22-135:11; Paul Ex. 8 (11/25/08 Robert Potter Dep.), at 63:16-65:12, 240:9-242:3, Ex. 12, Ex. 42; Paul Ex. 4 (3/28/08 Steve Krinke Dep.), at 120:1-121:19, Ex. 10.)

21. Mylan was aware of or on notice that Medi-Cal reimbursed providers for pharmaceutical products based, in part, on the reported AWPs of the products.  (Paul Ex. 9 (10/30/08 Robert Cunard Dep.), at 196:20-197:6; Paul Ex. 8 (11/25/08 Robert Potter Dep.), at 241:3-15; Paul Ex. 5 (8/2/07 Brian Roman Dep.), at 153:22-155:16; Paul Ex. 12 (6/10/09 Brian Roman Dep.), at 141:19-143:11.)

### E. Claims Submitted For All of Mylan's Subject Drugs Were Materially False.

22. Plaintiffs' expert, Dr. Leitzinger, used data provided by Mylan to estimate the average prices paid by pharmaceutical wholesaler's customers [i.e., providers] for each of the 217 relevant Mylan NDCs. Dr. Leitzinger did that by calculating the prices that wholesalers paid to Mylan for each NDC and then applying a wholesaler markup to those prices to estimate the total amount that customers paid to wholesalers for each such NDC. (Paul Ex. 14 (Leitzinger Decl.), at ¶ 4.) His methodology is explained more fully at paragraphs 12-20 of his Report, which is attached as Ex. A to his Declaration. The wholesaler markup that Dr. Leitzinger used was based on data contained in the "Industry Profile and Healthcare Factbook," published by the Healthcare Distribution Management Association. That markup ranged over time between 3.7 percent and 5.4 percent. (Paul Ex. 14 (Leitzinger Decl.), Ex. A at ¶ 20, n.20.)

23. Ex. 4 to Dr. Leitzinger's Report shows in column (6) the "spread" (the difference between the average net quarterly prices that he calculated and the reported AWP) for each of the 217 relevant Mylan NDCs on a quarter-by-quarter basis from the first quarter of 1994 through the fourth quarter of 2004. (Paul Ex. 14 (Leitzinger Decl.), at ¶ 5.)

24. For over 93 percent of the Mylan NDC/quarter combinations for which he had complete data, the AWP reported by Mylan exceeded the average net quarterly prices paid by wholesalers' customers by at least 100 percent. For 80 percent of those NDC/quarter combinations, the spread exceeded 300 percent, with some greater than 2,000 percent. (Paul Ex. 14 (Leitzinger Decl.), at ¶ 6.)

25. For purposes of calculating the overpayments made by the State for the 217 relevant Mylan NDCs, Dr. Leitzinger excluded claims for which the actual reimbursement did not exceed the average net price paid by wholesalers to Mylan by at least 25 percent. For each

remaining claim, he calculated the difference between the actual ingredient cost reimbursed by the State and an amount 25 percent above the average net price paid by wholesalers to Mylan. That difference was the overpayment he found.  (Paul Ex. 14 (Leitzinger Decl.), at ¶ 7.)

**F.     Mylan Acted Knowingly in Making the Above False Statements.**

26.     Mylan has contended that its reported AWPs did not reasonably reflect providers' acquisition costs.  (Paul Ex. 13 (Mylan's Objections and Responses to Plaintiff's First Set of Interrogatories), at Interrogatory Number 12, p. 25, ". . . AWP does not reflect providers' acquisition costs;" Paul Ex. 5 (8/2/07 Brian Roman Dep.), at 128:21-129:20.)

Dated:  November 24, 2009              Respectfully submitted,

                                       EDMUND G. BROWN JR.
                                       Attorney General for the State of California

                                       By:   */s/ Nicholas N. Paul*
                                             NICHOLAS N. PAUL
                                             CA State Bar No. 190605
                                             Supervising Deputy Attorney General
                                             Bureau of Medi-Cal Fraud and Elder Abuse
                                             Office of the Attorney General
                                             1455 Frazee Road, Suite 315
                                             San Diego, CA  92108
                                             Telephone:  (619) 688-6099
                                             Fax:  (619) 688-4200

                                       **Attorneys for Plaintiff,
                                       STATE OF CALIFORNIA**

**CERTIFICATE OF SERVICE**

    I certify that a true and correct copy of the foregoing was delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on November 24, 2009, a copy to Lexis-Nexis for posting and notification to all parties.

                                              */s/ Nicholas N. Paul*_____
                                              NICHOLAS N. PAUL