# Exhibit 4

*State of California ex. rel. Ven-A-Care of the Florida Keys, Inc. v.
Abbott Laboratories, Inc., et al.*

Exhibit to the Declaration of Nicholas N. Paul in Support of Plaintiffs' Motion for Summary Judgment as to Defendant Dey

```
                     CAUSE NO. GV002327

THE STATE OF TEXAS              )IN THE DISTRICT COURT
EX REL.                         )
    VEN-A-CARE OF THE           )
    FLORIDA KEYS, INC.,         )
        PLAINTIFFS,             )
                                )
VS.                             )TRAVIS COUNTY, TEXAS
                                )
DEY, INC.; ROXANE               )
LABORATORIES, INC.; WARRICK     )
PHARMACEUTICALS CORPORATION;    )
SCHERING-PLOUGH CORPORATION;    )
SCHERING CORPORATION;           )
LIPHA, S.A.; MERCK-LIPHA, S.A.;)
MERCK, KGAA; AND EMD            )
PHARMACEUTICALS, INC.,          )
        DEFENDANTS.             )53RD JUDICIAL DISTRICT
```

*********************************************

ORAL AND VIDEOTAPED DEPOSITION OF

ROBERT FRANCIS MOZAK
VOLUME IV

MARCH 13TH, 2003

*********************************************

ORAL AND VIDEOTAPED DEPOSITION OF

ROBERT FRANCIS MOZAK, PRODUCED AS A WITNESS AT THE

INSTANCE OF THE RELATOR AND DULY SWORN, WAS TAKEN IN

THE ABOVE-STYLED AND NUMBERED CAUSE ON THE 13TH OF

MARCH, 2003, FROM 9:37 A.M. TO 7:22 P.M., BEFORE

DEBRA L. SIETSMA, CSR IN AND FOR THE STATE OF TEXAS,

REPORTED BY MACHINE SHORTHAND, AT 300 WEST 15TH

STREET, 9TH FLOOR, AUSTIN, TEXAS, PURSUANT TO THE

TEXAS RULES OF CIVIL PROCEDURE AND THE PROVISIONS AS

PREVIOUSLY SET FORTH.

1  A.   YES.  HE WAS -- HE RECEIVED THIS MEMO AND --
2  AND I BELIEVE HE WAS PRESENT AT THE MEETING WHEN WE
3  TALKED ABOUT IT.
4  Q.   OKAY.  AND -- AND AFTER GOING TO LIPHA, DID
5  ANYBODY AT LIPHA EVER INSTRUCT YOU OR ANYBODY ELSE AT
6  DEY, TO YOUR KNOWLEDGE, THAT THEY SHOULD NOT FOLLOW
7  THE PRICING STRATEGY THAT IS STATED IN YOUR MEMO DATED
8  FEBRUARY 24TH, 1992?
9  MR. FLECKMAN:  OBJECTION, FORM.
10 THE WITNESS:  NO.  NOBODY INSTRUCTED ME.
11 Q.   (BY MR. BREEN)  NOW -- LET ME SEE CROMOLYN.
12 DID DEY CONTINUE TO FOLLOW THE PRICING
13 STRATEGY THAT WAS ANNOUNCED IN YOUR MEMO OF
14 FEBRUARY 24TH, 1992 ALL THE WAY UP UNTIL THE TIME YOU
15 LEFT THE COMPANY?
16 MR. GAYNOR:  OBJECTION, FORM.
17 THE WITNESS:  I BELIEVE IN ESTABLISHING
18 A -- A PRICE FOR A NEW GENERIC, WE FOLLOWED
19 ESSENTIALLY THE SAME GUIDELINES THAT WE WERE ADVISED
20 BY FIRST DATABANK, WHICH WAS TO SET THE AWP AT
21 APPROXIMATELY, YOU KNOW, THE AREA OF TEN PERCENT BELOW
22 THE BRANDED PRODUCT AND THE WAC PRICE AT SOMEWHERE
23 BETWEEN 15 AND 25 PERCENT BELOW THE AWP PRICE.  THIS
24 WAS THE ADVICE WE GOT FROM FIRST DATABANK.
25 AND WHENEVER WE WERE THE FIRST GENERIC

1  ON THE MARKET, THAT WAS THE BASIC STRATEGY THAT WE
2  FOLLOWED.  IF WE WERE NOT THE FIRST GENERIC ON THE
3  MARKET, WE USUALLY LOOKED AT THE COMPETITIVE GENERIC
4  AND EITHER -- USUALLY MATCHED THEIR AWP OR -- AND --
5  AND/OR WAC.  IT WOULD HAVE BEEN AT BASICALLY WHAT THE
6  COMPETITION WAS DOING.  SO IF WE WERE FIRST, WE
7  FOLLOWED THAT FORMAT ADVISED TO US BY FIRST DATABANK;
8  AND IF WE WERE SECOND, WE USUALLY LOOKED AT THE
9  COMPETITIVE SITUATION.
10     Q.   (BY MR. BREEN)  SO IF YOU WERE SECOND, WAS
11  IT YOUR -- WAS IT STILL YOUR STRATEGY TO PROVIDE
12  INCENTIVES TO RETAIL AND CHAIN PROVIDERS BY INCREASING
13  THE SPREAD ON MEDICARE AND MEDICAID REIMBURSEMENTS?
14     A.   SIR, THE INCENTIVE YOU'RE -- YOU'RE REFERRING
15  TO IS THAT IT'S A LOWER-PRICE GENERIC.
16     Q.   MY QUESTION -- OKAY.
17     MR. WINTER:  OBJECTION, RESPONSIVE.
18     MR. BREEN:  OBJECTION, NONRESPONSIVE.
19     PLEASE READ THE QUESTION BACK.
20     (THE REPORTER READ THE LAST ANSWER).
21     THE WITNESS:  YES, IT IS A LOWER-PRICE
22  GENERIC.
23     THE REPORTER:  I'M SORRY.  THAT'S THE
24  ANSWER.
25     (THE REQUESTED PORTION WAS READ).

1  WEREN'T SOME CONTRACTS THAT WERE LOWER THAN WAC, BUT
2  THERE'S -- THERE WERE MANY PRICES THAT WERE ABOVE WAC,
3  PARTICULARLY IN A NEWER PRODUCT.
4  SO IF ANYTHING, YOU'RE -- I'M NOT SURE
5  THERE REALLY IS AN "INCREASED SPREAD," QUOTE, UNQUOTE,
6  IN -- IN REIMBURSING FOR MEDICARE IN THAT PARTICULAR
7  SCENARIO WHEN YOU FIRST LAUNCH.  I THINK THE -- THE
8  INCENTIVE TO THE PHARMACIST IS THE FACT THAT HE'S NOW
9  BUYING THE PRODUCT FOR A LOWER PRICE BECAUSE HE'S
10 PAYING A LOWER WAC, AND HE ALSO KNOWS THAT OVER TIME,
11 AS SOON AS COMPETITION COMES OUT, THAT WAC AND THAT
12 CONTRACT PRICE IS GOING TO DROP AND HE, THEN, USUALLY
13 MAKES MORE MONEY ON A GENERIC THAN HE DOES ON A BRAND
14 DUE TO THE COMPETITION, WHEREAS BRANDS ARE ALWAYS
15 INCREASING THEIR PRICES, USUALLY ANNUALLY.  THE
16 COMPETITION FORCES PRICES DOWN ON THE GENERIC PRODUCT,
17 AND HE KNOWS THAT OVER TIME HE WILL MAKE MORE MONEY ON
18 A GENERIC THAN HE WILL ON A BRAND.
19 Q.   SO --
20 A.   AND SO WE'RE TRYING TO BALANCE -- WHEN WE
21 FIRST COME OUT WITH A PRICE, WE ARE TRYING TO BALANCE,
22 NUMBER ONE, THE OBJECTIVE OF SWITCHING THE -- THE --
23 THE -- THE ACCOUNT FROM A BRAND TO A -- WITH THE FACT
24 THAT CERTAINLY WE WANT TO MAKE PROFIT WHEN WE FIRST
25 COME OUT.  WE'VE JUST HAD ALL THIS INVESTMENT ON THIS