# Exhibit 7

*State of California ex. rel. Ven-A-Care of the Florida Keys, Inc. v.*
*Abbott Laboratories, Inc., et al.*

Exhibit to the Declaration of Nicholas N. Paul in Support of Plaintiffs' Motion for Summary Judgment as to Defendant Dey

**Coudert Brothers LLP**
ROBERT A. CHRISTOPHER (SBN 89035)
ERIK HANSHEW (SBN 214292)
530 Lytton Avenue, Suite 300
Palo Alto, California 94301-1541
Telephone: (650) 470-2900
Telecopier: (650) 470-2901

**Dickenson Peatman & Fogarty PLC**
PAUL G. CAREY (SBN 105357)
809 Coombs Street
Napa, California 94559-2977
Telephone: (707) 252-7122
Telecopied: (707) 255-6876

Attorneys for Plaintiff
Dey, L.P.

FILED
APR 15 2003
Clerk of the Napa Superior Court
By: _____ Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF NAPA

Case No. 26-21019

DEY, L.P., a Delaware Limited Partnership,

Plaintiff,

vs.

FIRST DATABANK, INC., a Missouri corporation, d/b/a/ First DataBank and d/b/a PriceAlert; and
WOLTERS KLUWER HEALTH, INC., a Delaware corporation, d/b/a Medi-Span and d/b/a Facts and Comparisons,

Defendants.

DECLARATION OF RUSSELL JOHNSTON IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

Date: April 15, 2003
Time: 3:00 p.m
Dept.: B

Complaint Filed: _____, 2003
Trial Date: N/A

I, Russell Johnston, declare under penalty of perjury under the laws of the State of California as follows:

- 1 -
DECLARATION OF RUSSELL JOHNSTON IN SUPPORT OF PLAINTIFF'S APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

1. I am the Manager of Sales/Marketing Services at Dey, L.P. ("Dey"), the plaintiff in the above-referenced action. As to the following facts, I know them to be true of my own knowledge and, if required, could competently testify thereto. As to those matters stated on information and belief, I believe them to be true.

2. I have been employed, in various capacities, with Dey for 11 years.

3. Dey is a manufacturer and distributor of pharmaceutical products including several lines of generic (or "multi-source") pharmaceuticals. Dey's line of respiratory drug products includes inhalation therapies such as Albuterol Sulfate, Cromolyn Sodium and Ipratropium Bromide, which are used for the treatment of asthma and other chronic respiratory ailments.

4. When a branded (or "innovator") drug comes off statutory exclusivity, one or more generic manufacturers can enter the market. Generic pharmaceuticals are compositions that are identical or bioequivalent to branded drugs. The generic pharmaceutical market is highly competitive.

5. Dey has been innovative in this field even while dispensing products that are therapeutically identical to their competitors. In particular, Dey has developed certain value added features in the packaging of its products that enhance the benefits to dispensers of the products, patients and doctors who prescribe Dey's products.

6. For example, Dey has provided unit dose formulation of certain products so that the medication is pre-measured and can be administered in a single dose. This makes the actual use of the drug more convenient for the patient, and minimizes wastage. Clearer labeling and packaging have been implemented by Dey to reduce dispensing errors. These supplemental benefits of Dey products, along with competitive pricing, have helped Dey become a manufacturer of choice for many providers of these generic drugs.

- 2 -
DECLARATION OF RUSSELL JOHNSTON IN SUPPORT OF PLAINTIFF'S APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

7. These attributes contribute to the clinical efficacy and ease of use of Dey's generic pharmaceuticals. These advantages have also helped to make Dey a leader in this market despite the range of alternative suppliers.

8. The greater part of Dey's sales are to wholesalers, chain and independent retail pharmacies, hospitals, long term care facilities and managed care organizations. The distribution market is comprised predominately of national full line wholesalers and regional distributors who purchase multiple products or product lines from generic manufacturers. Similarly, many independent pharmacies, hospitals and long term care facilities affiliate with large national buying groups (or group purchasing organizations) in order to increase purchasing power in order to obtain pharmaceuticals for the lowest possible price. Thus, these national buying groups influence the purchasing decisions of a large segment of the generic marketplace.

9. The vast majority of patients who benefit from Dey pharmaceuticals receive some form of prescription drug coverage from private insurers or governmental programs such as Medicaid. These third party payors generally reimburse the cost of prescription drugs directly to providers, such as doctors and pharmacists.

10. The majority of these third party payor programs for decades have calculated their reimbursements using a bench-mark pricing figure (or reference price) reported as average wholesale price, or "AWP."

11. AWP is recognized throughout the industry, and in legislative history and regulatory interpretations, as a "sticker" price.

12. The AWP for Dey's products is reported to the pharmacies that purchase Dey's products, private insurers, government authorities and others by First DataBank and Medi-Span, whose business it is to sell access to AWP data for all pharmaceutical manufacturers.

13. Private insurance companies reimburse providers for generic products at rates that can discount as much as 50-60% from AWP.

- 3 -
DECLARATION OF RUSSELL JOHNSTON IN SUPPORT OF PLAINTIFF'S APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

14. When a generic drug first enters the market, the manufacturer will generally suggest an AWP price that is at least 10% below the AWP for the brand name drug in order to be designated by First DataBank as a generic rather than a branded drug.

15. Because of the prominence of AWP in the reimbursement formulas throughout the country, a disproportionately low AWP will jeopardize the sales of a generic manufacturer's product because that manufacturer's products will be reimbursed at a lower rate than competitors' products that have a higher AWP.

16. It is common within the industry that the reported AWP for a generic drug, once set, will tend to remain constant and not change during the life of the product (with the exception of inadvertent errors on the part of First DataBank). Discounts applied to AWP by third party payors, however, often change over time due to changing market conditions. This has been the case through the years that I have worked in the pharmaceutical industry.

17. Because the AWP for a generic drug is almost uniformly lower than that of the branded product, the availability of generics saves money for state Medicaid programs, the federal government and other third party payors.

First DataBank and Medi-Span

18. Public and private third party payor programs typically obtain AWP figures by purchasing the information from price reporting services such as First DataBank and Medi-Span. First DataBank is the most widely used electronic reporting service.

19. In order to ensure reimbursement by third party payors, Dey has reported both its AWP and wholesale acquisition cost ("WAC") to First DataBank since the early 1990's. WAC is the published invoice price to the wholesale class of trade that is used by a few states and insurers as an alternative basis for reimbursement.

20. While Dey periodically reduces the WAC as the market prices on its generic products decline, Dey characteristically only reports an AWP figure at launch of the product.

- 4 -
DECLARATION OF RUSSELL JOHNSTON IN SUPPORT OF PLAINTIFF'S APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

Historically, Dey has informed price reporting services of its suggested AWP for each new product.

21.  Historically, Dey determines its suggested AWPs before launch of a product, see e.g. Exhibits A and B, and these suggested AWPs have been selected to be reported as the published AWPs by each of the reporting services, including First DataBank.

22.  Historically, Dey has reduced its WAC prices on their generic drugs from time to time. Since the early 1990's, Dey has reported declines in its reported WAC to First DataBank and despite the fact that Dey typically reduces the WAC prices in their products, the AWP as reported by First DataBank and Medi-Span has typically remained constant throughout the life of the product.

23.  To the best of my knowledge, never before last week has First DataBank or Medi-Span unilaterally altered Dey's AWPs based upon a change in Dey's reported WAC pricing.

24.  As recently as February 2002, Dey has lowered its WAC for Albuterol Sulfate, Cromolyn Sodium and Ipratropium Bromide, transmitted such information to First DataBank and the AWP for those products remained unchanged. A copy of this transmission is attached as Exhibit C.

The Events of April, 2003

25.  March 26, 2003, as in the past, Dey reported to First DataBank a decrease in its WAC prices on its Albuterol Sulfate, Ipratropium Bromide and Cromolyn Sodium inhalation products. As with prior WAC price decreases, Dey issued a letter to price reporting services, including First DataBank, informing them of the change. See Exhibit D. This letter is in the standard type form by which Dey has reported price changes to price reporting services for the past decade. See, e.g. Exhibits E, F, G and H.

26.  Dey did not notify First DataBank or Medi-Span on April 1, 2003 or any time thereafter of any suggested change in its AWP.

- 5 -
DECLARATION OF RUSSELL JOHNSTON IN SUPPORT OF PLAINTIFF'S APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

27. On April 10, I received a voice mail message from Steve Strom, Manager of Marketing Services, forwarding a voice mail message he had received from a pharmacist working at a Medicine Shoppe pharmacy in Texas. The pharmacist stated that he believed First DataBank had "bad information" and that his pharmacy was "not getting reimbursed properly" for Dey's albuterol products. A true and accurate transcription of this voice mail message is attached hereto as Exhibit I.

28. Medicine Shoppe is a large national retail pharmacy chain.

29. I phoned the Medicine Shoppe and informed the pharmacist that I was not aware of any changes to Dey's AWP price, and assured him that I would look into the matter.

30. Shortly thereafter I received a voice mail message from Hema Chandranatha, a Senior Contract Analyst from Dey whom I supervise. Ms. Chandranatha informed me that she had phoned First DataBank to inquire about the AWP reported for Dey's products because of numerous customer inquiries regarding an apparent change. She reported that First DataBank had informed her that they had implemented a change in the methodology that they were using to calculate AWP prices reported for Dey's products

31. Based on Ms. Chanadranatha's conversation with First DataBank, she informed me that First DataBank now sets Dey's reported AWP by applying a 125% markup to the WAC price reported by manufacturers and reportedly were only putting this new calculation into effect when a manufacturer submitted a change in its WAC for a drug. Thus, although they claimed that this methodology had been in place since September of 2002, First DataBank had not applied it to any Dey products until Dey reported a decline in its WAC price in late March of 2003. Further, First DataBank never informed Dey that it would be implementing this new methodology. My conversation with Ms. Chanadranatha was the first I had heard of a change in First DataBank's methodology.

32. I have also viewed a fax sent to Dey on April 10th from Kinney Drugs, a regional chain pharmacy. Attached to this fax was a printout from Medi-Span's database that reflected a

- 6 -

DECLARATION OF RUSSELL JOHNSTON IN SUPPORT OF PLAINTIFF'S APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

dramatic decrease to Dey's AWP pricing which was identical to the prices reported by First DataBank. A true and correct copy of the fax and attachment, are attached hereto as Exhibit J.

33. Most recently, on April 10, 2003, I received a voicemail message from Mark Boudreau, the Areas Sales Manager in the trade area, indicating that a Dey salesperson had received a message from an employee of American Respiratory Services ("ARS") voicing their concern about the recent decrease in published AWP for Dey's products and the resulting effects on their reimbursement rate.

34. Upon information and belief, Dey's most significant competitors have apparently not reported new WAC prices for their drugs since First DataBank adopted its new policy in September of 2002. Upon information and belief based on reports received from pharmacies that purchase Dey's products, neither First DataBank nor Medi-Span have reduced the reported AWPs for any products of any of Dey's competitors. See Exhibit K.

Impact of First DataBank's Pricing Changes

35. As stated above, the generic pharmaceutical market is highly competitive and there are often many generic versions of any given drug on the market.

36. Since third party reimbursement now accounts for approximately 85 % of the total payments made for pharmaceuticals nationally, as a result of the reporting of a low AWP by First DataBank and Medi-Span, pharmacies will simply refuse to buy Dey's products because they cannot be adequately reimbursed for Dey's products as compared to Dey's competitors' products.

37. In fact, Medi-Rx, a customer of Dey, has already expressly stated that, because of the low reimbursement rate resulting from the new low AWP reported by First DataBank and Medi-Span for Dey's products, it will no longer purchase Dey pharmaceuticals. Medi-Rx has stated that instead it will purchase from Dey's competitors who have not been subject to a decrease in their First DataBank AWP prices.

- 7 -
DECLARATION OF RUSSELL JOHNSTON IN SUPPORT OF PLAINTIFF'S APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

38.   In the few business days that have elapsed since First DataBank abruptly (and without notice) changed Dey's AWPs, at least 9 of Dey's customers have complained that because of the low AWP reported by First Data Bank, they are not receiving adequate reimbursement for Dey's products. A number of these customers have also threatened to switch their entire purchase of pharmaceuticals to Dey's competitors.

39.   Since the pharmacies that purchase Dey's products tend to purchase entire product lines from a manufacturer, the effects of First DataBank's actions which discourage the purchase Dey's Albuterol Sulfate, Cromolyn Sodium and Ipratropium Bromide are likely to significantly impact sales for Dey's entire product line of generic pharmaceuticals.

40.   The growth of group purchasing organizations and pharmaceutical benefits managers have significantly increased the intensity of competition in the generic industry. Many such programs enter into agreements with a particular manufacturer whereby that manufacturer's products are subject to pricing concessions and given a preferred status on the organization's drug formulary. If the members of these collectives cannot receive adequate compensation for dispensing Dey pharmaceuticals, there is little doubt that they will drop Dey's preferred status, thereby significantly decreasing the sale of Dey products.

41.   Moreover, it is likely that pharmacies and other customers in Napa County will also refuse to buy Dey products should First DataBank continue to report AWP prices for Dey's products that are substantially lower than AWPs reported by First DataBank for its competitors' products. Attached hereto as Exhibit L is a true and correct list of indirect sales to Dey's customers in Napa county.

42.   Pharmacies that purchase generic products tend to be loyal to a particular manufacturer over time unless something occurs to disrupt the relationship. Thus, the customers that Dey will now lose because of the lowering of AWP by First DataBank will likely remain customers of Dey's competitors for years to come.

- 8 -

DECLARATION OF RUSSELL JOHNSTON IN SUPPORT OF PLAINTIFF'S APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed this 14 day of April, 2003 at Napa, California.

_____
Russell Johnston

Coudert Brothers llp
TEL: (650) 470-2900
FAX: (650) 470-2901

- 9 -
DECLARATION OF RUSSELL JOHNSTON IN SUPPORT OF PLAINTIFF'S APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION