# Exhibit 24

*State of California ex. rel. Ven-A-Care of the Florida Keys, Inc. v.
Abbott Laboratories, Inc., et al.*

Exhibit to the Declaration of Nicholas N. Paul in Support of Plaintiffs' Motion for Summary Judgment as to Defendant Dey

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **In Re: PHARMACEUTICAL** ) | MDL No. 1456 |
| **INDUSTRY AVERAGE WHOLESALE** ) | |
| **PRICE LITIGATION** ) | Master File No. 01-CV-12257-PBS |
| _____ ) | Subcategory Case. No. 06-11337 |
| ) | |
| **THIS DOCUMENT RELATES TO**: ) | Hon. Patti B. Saris |
| *U.S. ex rel. Ven-A-Care of the Florida Keys,* ) | Magistrate Judge |
| *Inc. v. Dey Inc., et al.* ) | Marianne B. Bowler |
| ) | |
| Civil Action No. 05-11084-PBS ) | |
| ) | |

**CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF DEY, INC., DEY, L.P., AND DEY L.P., INC.'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Defendants Dey, Inc., Dey, L.P., and Dey L.P., Inc. (collectively, "Dey") submit this concise statement of the material facts of record as to which there is no genuine issue to be tried in support of its motion for partial summary judgment.

**I.   DEY'S BUSINESS**

    **A.   DEY'S HISTORY**

1.   Dey, Inc. is a Delaware corporation with its principal place of business at 2751 Napa Valley Corporate Drive in Napa, California.  Dey, Inc. is the general partner of Dey, L.P. which is engaged in the "development, manufacturing and marketing of prescription drugs used to treat selected respiratory diseases and allergies."  (Affidavit of Pamela R. Marrs, dated June 25, 2009 ("Marrs Aff."), ¶ 4.)

2.   Dey was founded in 1978 by four entrepreneurs as a small, start-up company selling generic respiratory medications.  (Marrs Aff. ¶ 5.)

3.   Dey's first products were unit-dose sodium chloride solution inhalation solutions ("saline solutions") which the company began to sell in 1978.  Dey continues to sell all

52. In an indirect sale with a contract, Dey negotiates a contract price with an indirect customer that will ultimately purchase Dey's product from a wholesaler. (Reid Decl., Ex. 5, at 90:11-91:1; 91:5-8; Reid Decl., Ex. 15, at 456:5-457:7.)

53. The contract price sets forth the price between Dey and the indirect customer, not the price between the indirect customer and the wholesaler. (Reid Decl., Ex. 5, at 99:18-100:5.)

54. Wholesalers also make indirect sales to customers with no contracts with Dey. In indirect sales where there is no contract with Dey, Dey has no visibility into the price paid by the wholesaler's customer. (Reid Decl., Ex. 16, at 104:10-12.)

## II.   COMPETITION IN THE GENERIC DRUG MARKET

55. In 1984, Congress enacted the Hatch-Waxman Act in an effort to encourage the use of generic drugs in the United States and to lower the cost of prescription drugs for American consumers through generic competition. (Reid Decl., Ex. 17; Declaration of W. David Bradford, dated June 25, 2009 ("Bradford Decl."), ¶¶ 3, 5, 6.).

56. Many states' Medicaid agencies have adopted drug formularies and mandatory generic substitution rules requiring the use of generics in the place of brands when available. (Bradford Decl. ¶ 12.)

57. As a generic drug manufacturer, Dey offers pharmaceutical products that are therapeutically equivalent to branded products. To be considered a generic equivalent to the brand drug and substitutable for the brand under generic substitution laws, a generic drug must have the same active ingredient, dosage strength and form, and route of administration as the equivalent brand drug. (*See, e.g.*, Reid Decl., Ex. 18, at vii-viii.)

64. If a payer wants the pharmacy to substitute a generic it will need to match the dollar margin on the brand. The same $13.50 reflects a 63% margin on the generic prescription. Furthermore, $13.50 reflects a 169% "spread" on the generic prescription. (Bradford Decl. ¶ 13.)

65. In the above example, switching to the generic drug results in a savings of $113 for Massachusetts Medicaid. To achieve that savings, Massachusetts must keep the pharmacy from losing revenue in the process. (Bradford Decl. ¶ 13.)

### III. PRICING OF THE SUBJECT DRUGS

#### A. DEY'S PRICES AT LAUNCH

66. At launch, pricing for a generic, like Dey's albuterol, is set in relationship to the brand AWP. (Reid Decl., Ex. 5, at 129:22-130:11.)

67. Dey's practice of establishing AWPs for the Subject Drugs at a percentage lower than the therapeutically equivalent brand AWPs was consistent with what Dey believed to be the industry practice. (Reid Decl., Ex. 22, at 460:2-8.)

68. Ed Edelstein of First Databank informed Dey that a generic AWP must be at least 10% lower than the corresponding brand AWP in order to be listed as such by First DataBank. (Reid Decl., Ex. 5, at 129:22-131:14; Reid Decl., Ex. 23, at 731:17-24.)

69. According to Patricia Kay Morgan, former Manager of Editorial Services at First DataBank, there was a "perception in the industry" that a generic drug had to be priced at least 10 percent less than the brand price. (Reid Decl., Ex. 24, at 21:4-18.)

70. Accordingly, Dey set its AWPs for its generic drugs at approximately 10% of the brand AWP and left that price unchanged. (Reid Decl., Ex. 5, at 131:8-132:12.)