**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re: **PHARMACEUTICAL INDUSTRY** **AVERAGE WHOLESALE PRICE LITIGATION** | ) **MDL No. 1456** <br> ) **Master File No. 01-12257-PBS** <br> ) **Subcategory Case No. 06-11337** <br> ) <br> ) **Hon. Patti B. Saris** <br> ) |
| **THIS DOCUMENT RELATES TO:** | ) <br> ) |
| *State of California ex rel. Ven-A-Care of the Florida* <br> *Keys, Inc. v. Abbott Labs, Inc. et al.*, <br> Civil Action No. 03-11226-PBS | ) <br> ) <br> ) <br> ) |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF**
**DEY, INC. AND DEY, L.P.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Defendants Dey, Inc. and Dey, L.P. (collectively, "Dey") submit this statement of the material facts of record as to which there is no genuine issue to be tried in support of its Motion for Partial Summary Judgment. Dey also refers the Court to Defendants' Joint Statement of Undisputed Material Facts (the "Joint Statement") and Joint Motion for Partial Summary Judgment.

**I.      DEY'S SUBJECT DRUGS**

1.      The First Amended Complaint in this action ("Am. Compl.") alleges claims against Dey arising from reimbursement by Medicaid and Medi-Cal to providers for dispensing varying dosages, concentrations, and sizes of drugs sold under 65 National Drug Codes (NDCs). (Reid Decl., Ex. 1; Robben Decl., Ex. 1.)

2.      The drugs listed in Exhibit C to the Amended Complaint are sold under a number of NDCs. NDCs are codes that uniquely identify the drug by manufacturer, active ingredient, and package size. (*See Id.*; Reid Decl., Ex. 2.)

3.     The following are the NDCs for the drugs listed in Exhibit C to the

Amended Complaint:

| Subject Drug | Strength/ Package Size | NDC |
|---|---|---|
| Acetylcysteine | 10% vial | 49502-0181-04 |
| Acetylcysteine | 10% vial | 49502-0181-10 |
| Acetylcysteine | 10% vial | 49502-0181-30 |
| Acetylcysteine | 20% vial | 49502-0182-04 |
| Acetylcysteine | 20% vial | 49502-0182-10 |
| Acetylcysteine | 20% vial | 49502-0182-30 |
| Albuterol Sulfate | .083%, 3ml, 25s | 49502-0697-03 |
| Albuterol Sulfate | .083%, 3 ml, 30s | 49502-0697-33 |
| Albuterol Sulfate | .083%, 3ml, 60s | 49502-0697-60 |
| Albuterol Sulfate | .083%, 3ml, 25s | 49502-0697-24 |
| Albuterol Sulfate | .083%, 3 ml, 30s | 49502-0697-29 |
| Albuterol Sulfate | .083%, 3ml, 60s | 49502-0697-61 |
| Albuterol Sulfate | .5%, 20 ml | 49502-0105-01 |
| Albuterol Sulfate | .5%, 20 ml | 49502-0196-20 |
| Albuterol Sulfate | 17g | 49502-0303-27 |
| Albuterol Sulfate | 17g | 49502-0303-17 |
| Albuterol Sulfate | 17g, 90 mcg | 49502-0333-17 |
| Albuterol Sulfate | 17g | 49502-0333-27 |
| Albuterol Sulfate | 2 mg, 5 ml | 49502-0795-16 |
| Alprazolam | 0.5 mg | 49502-0406-05 |
| Alprazolam | 1 mg | 49502-0407-01 |
| Atenolol | 50 mg | 49502-0400-01 |
| Atenolol | 100 mg | 49502-0401-01 |
| Cromolyn Sodium | 20 mg, 2 ml, 60s | 49502-0689-02 |
| Cromolyn Sodium | 20 mg, 2 ml, 120s | 49502-0689-12 |
| Cromolyn Sodium | 20 mg, 2 ml, 60s | 49502-0689-61 |
| Duoneb | 2.5-0.5 mg, 3 ml | 49502-0672-30 |
| Duoneb | 2.5-0.5 mg, 3 ml | 49502-0672-60 |
| Epipen | 0.3 mg | 49502-0500-01 |
| Epipen | 0.3 mg | 49502-0500-02 |
| Epipen | 0.15 mg | 49502-0501-01 |
| Epipen | 0.15 mg | 49502-0501-02 |
| Hydrocodone | 5/500 tab | 49502-0415-01 |
| Hydrocodone | 5/500 tab | 49502-0415-05 |
| Hydrocodone | 7.5/750 TB | 49502-0416-01 |
| Hydrocodone | 7.5/650 TB | 49502-0417-01 |
| Ipratropium Bromide | .02%, 2.5 ml, 25s | 49502-0685-03 |
| Ipratropium Bromide | .02%, 2.5 ml, 30s | 49502-0685-33 |
| Ipratropium Bromide | .02%, 2.5 ml, 60s | 49502-0685-60 |

| | | |
|---|---|---|
| Ipratropium Bromide | .02%, 2.5 ml, 25s | 49502-0685-24 |
| Ipratropium Bromide | .02%, 2.5 ml, 30s | 49502-0685-29 |
| Ipratropium Bromide | .02%, 2.5 ml, 60s | 49502-0685-61 |
| Ipratropium Bromide | 0.03% | 49502-0786-30 |
| Ipratropium Bromide | 0.06% | 49502-0786-15 |
| Metaproterenol Sulfate | 0.6% | 49502-0676-03 |
| Metaproterenol Sulfate | 0.6% | 49502-0676-24 |
| Metaproterenol Sulfate | 0.4% | 49502-0678-03 |
| Metaproterenol Sulfate | 0.4% | 49502-0678-24 |
| Piroxicam | 20 mg | 49502-0403-01 |
| Sodium Chloride | 3% vial | 49502-0640-15 |
| Sodium Chloride | 0.45% vial | 49502-0820-03 |
| Sodium Chloride | 0.45% vial | 49502-0820-05 |
| Sodium Chloride | 0.9% vial | 49502-0830-03 |
| Sodium Chloride | 0.9% vial | 49502-0830-05 |
| Sodium Chloride | 0.9% vial | 49502-0830-15 |
| Sodium Chloride | 0.9% vial | 49502-0830-50 |
| Theophylline | 100 mg | 49502-0431-01 |
| Theophylline | 200 mg | 49502-0432-01 |
| Theophylline | 200 mg | 49502-0432-05 |
| Theophylline | 300 mg | 49502-0433-01 |
| Theophylline | 300 mg | 49502-0433-05 |
| Triazolam | 0.125 mg | 49502-0412-01 |
| Triazolam | 0.25 mg | 49502-0413-01 |
| Water for Inhalation Vial | | 49502-0810-03 |
| Water for Inhalation Vial | | 49502-0810-05 |

(Reid Decl., Ex. 1.)

## II.  CALIFORNIA HAS NOT CALCULATED "OVERPAYMENTS" FOR ALL OF THE DRUGS LISTED IN THE COMPLAINT

4.      Although Exhibit C to the Amended Complaint lists 65 NDCs,

California's expert, Dr. Jeffrey J. Leitzinger, performs "overpayment" calculations for only 28 of

the Dey NDCs listed in the Amended Complaint.  (*See* Reid Decl., Ex. 3; Reid Decl., Ex. 1.)

5.      Dr. Leitzinger performs his calculations for the period from January 1,

1994 through December 31, 2004.  (*See* Reid Decl., Ex. 3, at ¶ 5(a).)

6.      The following are the 28 NDCs for the Subject Drugs analyzed by Dr.

Leitzinger:

| Subject Drug | Strength/Package Size | NDC |
|---|---|---|
| Acetylcysteine | 10% | 49502-0181-04 |
| Acetylcysteine | 10% | 49502-0181-10 |
| Acetylcysteine | 10% | 49502-0181-30 |
| Acetylcysteine | 20% | 49502-0182-04 |
| Acetylcysteine | 20% | 49502-0182-10 |
| Acetylcysteine | 20% | 49502-0182-30 |
| Albuterol Sulfate | .083%, 3ml, 25s | 49502-0697-03 |
| Albuterol Sulfate | .083%, 3 ml, 30s | 49502-0697-33 |
| Albuterol Sulfate | .083%, 3ml, 60s | 49502-0697-60 |
| Albuterol Sulfate | .083%, 3ml, 25s | 49502-0697-24 |
| Albuterol Sulfate | .083%, 3 ml, 30s | 49502-0697-29 |
| Albuterol Sulfate | .083%, 3ml, 60s | 49502-0697-61 |
| Albuterol Sulfate | .5%, 20 ml | 49502-0105-01 |
| Albuterol Sulfate | .5%, 20 ml | 49502-0196-20 |
| Albuterol Sulfate | 17g | 49502-0303-27 |
| Albuterol Sulfate | 17g | 49502-0303-17 |
| Albuterol Sulfate | 17g, 90 mcg | 49502-0333-17 |
| Cromolyn Sodium | 20 mg, 2 ml, 60s | 49502-0689-02 |
| Cromolyn Sodium | 20 mg, 2 ml, 120s | 49502-0689-12 |
| Cromolyn Sodium | 20 mg, 2 ml, 60s | 49502-0689-61 |
| Ipratropium Bromide | .02%, 2.5 ml, 25s | 49502-0685-03 |
| Ipratropium Bromide | .02%, 2.5 ml, 30s | 49502-0685-33 |
| Ipratropium Bromide | .02%, 2.5 ml, 60s | 49502-0685-60 |
| Ipratropium Bromide | .02%, 2.5 ml, 25s | 49502-0685-24 |
| Ipratropium Bromide | .02%, 2.5 ml, 30s | 49502-0685-29 |
| Ipratropium Bromide | .02%, 2.5 ml, 60s | 49502-0685-61 |
| Metaproterenol Sulfate | 0.6% | 49502-0676-03 |
| Metaproterenol Sulfate | 0.6% | 49502-0676-24 |

(Reid Decl., Ex. 3, at Exhibit 3.)

7.      Professor Matthew Perri, California's marketing expert as to Dey, testified that he had been informed by California's counsel that the Dey drugs "of primary interest" in the case were acetylcysteine, albuterol sulfate, cromolyn sodium, ipratropium bromide, metaproterenol, and EpiPen.  (Reid Decl., Ex. 4, at 66:17-20, 68:13-20 & Exhibit 20.) California's counsel subsequently informed him that EpiPen was not going to be at issue in this case.  (Reid Decl., Ex. 4, at 72:19 -74:6.)

### III.   PRICING OF THE SUBJECT DRUGS

#### A.   Dey's Prices at Launch

8.      At launch, pricing for a generic, like Dey's albuterol, is set in relationship to the brand AWP.  (Reid Decl., Ex. 5, at 129:22-130:11.)

9.      Dey's practice of establishing AWPs for the Subject Drugs at a percentage lower than the therapeutically equivalent brand AWPs was consistent with what Dey believed to be the industry practice.  (Reid Decl., Ex. 6, at 460:2-8.)

10.     Ed Edelstein of First Databank informed Dey that a generic AWP must be at least 10% lower than the corresponding brand AWP in order to be listed as such by First DataBank.  (Reid Decl., Ex. 5, at 129:22-131:14; Reid Decl., Ex. 7, at 731:17-24.)

11.     According to Patricia Kay Morgan, former Manager of Editorial Services at First DataBank, there was a "perception in the industry" that a generic drug had to be priced at least 10 percent less than the brand price.  (Reid Decl., Ex. 8, at 21:4-18.)

12.     Accordingly, Dey set its AWPs for its generic drugs at approximately 10% of the brand AWP and left that price unchanged.  (Reid Decl., Ex. 5, at 131:8-132:12; Reid Decl., Ex. 9.)

#### B.   Dey's WAC

13.     Dey then set its WAC price for its generics as a percentage off Dey's AWP.  (Reid Decl., Ex. 5, at 144:1-4; Reid Decl., Ex. 6, at 486:6-487:6.)

14.     Figures 2 through 29 of the declaration of Dr. W. David Bradford, Ph.D., show Dey's WACs relative to its AWPs for albuterol, cromolyn, ipratropium, and metaproterenol.  (Reid Decl., Ex. 9, at Figs. 2-29.)

15.     WAC is Dey's invoice price to wholesalers.  (Reid Decl., Ex. 5, at 75:22-76:3, 144:21-145:1; Reid Decl., Ex. 6, at 537:9-15; Reid Decl., Ex. 10, at 29:6-12, 31:14-16; Reid Decl., Ex. 11, at 501:2-17; Reid Decl., Ex. 12, at DL-0050108.)

16.     As prices for the Subject Drugs decline over time, Dey reduces the WAC for those drugs.  (Reid Decl., Ex. 13, at 662:6-12, 823:13-19; Reid Decl., Ex. 5, at 136:16-21; Reid Decl. Ex. 9, at Figs. 2-29.)

17.     Dey regularly updated its WACs in a manner that directly reflected underlying pricing activity.  (Reid Decl., Ex. 14, at 372:11-20; Reid Decl. Ex. 9, at Figs. 2-29.)

IV.     **FEDERAL INVESTIGATIONS INTO THE PRICING FOR DEY'S DRUGS**

A.     **HHS-OIG Investigations Into Dey's Albuterol**

18.     The OIG has published ten reports studying the acquisition cost of Albuterol:

- "Medicare Payments for Nebulizer Drugs" OEI-03-94-00390 (February 1996) (Reid Decl., Ex. 15);

- "A Comparison of Albuterol Sulfate Prices" OEI 03-94-00392 (June 1996) (Reid Decl., Ex. 16);

- "Suppliers' Acquisition Costs for Albuterol Sulfate" OEI-03-94-00393 (June 1996) (Reid Decl., Ex. 17);

- "Excessive Medicare Payments for Prescription Drugs" OEI-03-97-00290 (December 1997) (Reid Decl., Ex. 18);

- "Are Medicare Allowances for Albuterol Sulfate Reasonable?" OEI-03-97-00292 (August 1998) (Reid Decl., Ex. 19);

- "Comparing Drug Reimbursement:  Medicare and Department of Veterans Affairs" OEI-03-97-00293 (November 1998) (Reid Decl., Ex. 20);

- "Medicare Reimbursement of Albuterol" OEI-03-00-00311 (June 2000) (Reid Decl., Ex. 21);

- "Medicare Reimbursement of Prescription Drugs" OEI-03-00-00310 (January 2001) (Reid Decl., Ex. 22);

- "Excessive Reimbursement for Albuterol" OEI-03-01-00410 (March 2002) (Reid Decl., Ex. 23); and

- "Update: Excessive Medicare Reimbursement for Albuterol" OEI-03-03-00510 (January 2004) (Reid Decl., Ex. 24).

19.     In "A Comparison of Albuterol Sulfate Prices" OEI 03-94-00392 (June 1996), the OIG concluded that members of pharmaceutical buying groups could purchase albuterol sulfate for between 56 and 70 percent lower than the $0.43 per milliliter paid by Medicare at the time.  (Reid Decl., Ex. 16, at 5.)

20.     In "Suppliers' Acquisition Costs for Albuterol Sulfate" OEI-03-94-00393 (June 1996), the OIG concluded that Medicare suppliers could acquire albuterol sulfate as low as $0.12 per milliliter, while the price paid by Medicare was $0.43 per milliliter.  (Reid Decl., Ex. 17, at 6.)

21.     In December, 1997, the OIG reported that the actual average wholesale price for albuterol sulfate, J7620, in 1995 was $0.15, $0.27 lower than the $0.42 average Medicare reimbursement amount for that time.  (Reid Decl., Ex. 18, at B-2.)

22.     In August, 1998, the OIG reported that Medicare will pay between 56 and 550 percent more for albuterol than FSS prices available to the VA and up to 333 percent more than some pharmacies pay to acquire albuterol.  (Reid Decl., Ex. 19, at 7, 8.)

23.     In November, 1998, the OIG reported that the median price for the Department of Veterans Affairs (the "VA") to purchase albuterol sulfate unit dose was $0.12, while Medicare's median allowable price was $0.47, resulting in a 292 percent spread.  (Reid Decl., Ex. 20, at B-1.)

**B.      HHS-OIG Investigations Regarding Dey's Ipratropium**

24.      The Government has also specifically studied the actual acquisition cost of another of the Subject Drugs, ipratropium bromide, beginning at least as early as 1998, and the working files from the OIG indicate that the OIG also reviewed various prices for Dey's ipratropium.  (*See*, *e.g.*, Reid Decl., Ex. 20.)

25.      In "Comparing Drug Reimbursement: Medicare and Department of Veterans Affairs" OEI-03-97-00293, the OIG found that the VA's median price for ipratropium bromide was $1.31 per mg, while Medicare's median allowable price was $3.34 per mg, resulting in a 155% difference.  (Reid Decl., Ex. 20, at B-1.)

26.      In 2001, 2002 and again in 2004, the OIG continued to find and to report that there were large spreads for ipratropium:

- In "Medicare Reimbursement of Prescription Drugs"  OEI-03-00-00310 (January 2001), the OIG found that a median VA price was $0.84 per milligram, whereas the median Medicare allowable amount was $3.34, creating a spread of 297 percent.  The report also found that the median catalog price for ipratropium was $1.53, creating a spread of 118 percent. (Reid Decl., Ex. 22, at 16-17.)

- In "Excessive Medicare Reimbursement for Ipratropium Bromide"  OEI-03-01-00411 (March 2002), the OIG reported that the median Medicare allowable cost for ipratropium bromide was $3.34, while the median VA price for ipratropium bromide was $0.66, resulting in a "spread" of 406 percent.  The report also contained a chart, tracking the Medicare allowable amount against the VA prices between 1998 and 2001.  The report also found that the median price for ipratropium appearing in wholesale catalogs was $0.82 per milligram, creating a spread of 307 percent between the catalog price and the Medicare allowable amount.  (Reid Decl., Ex. 25, at 9-11.)

- In "Update: Excessive Medicare Reimbursement for Ipratropium Bromide"  OIG-03-03-00520 (January 2004), the OIG found that Medicaid set a FUL for ipratropium bromide at $1.17 per mg, 65% less than the $3.34 that Medicare pays for the same drug.  The median wholesaler price for that same drug was $0.57, and the median GPO price was $0.62. (Reid Decl., Ex. 26, at ii.)

27.      Kevin Gorospe testified that someone in the pharmaceutical unit at California DHS would have reviewed the HHS-OIG reports.  (Reid Decl., Ex. 27, at 409:5-15.)

8

## V.    DEY'S PRICE NOTIFICATION LETTERS

28.    Since 1999, Dey sent letters to state Medicaid administrators, including Medi-Cal administrators, in which Dey explicitly described the nature of its published AWPs and WACs when new products were introduced or when prices were changed.  (Reid Decl., Ex. 28; Reid Decl., Ex. 29; Reid Decl., Ex. 30; Reid Decl., Ex. 31; Reid Decl., Ex. 32; Reid Decl., Ex. 33; Reid Decl., Ex. 34; Reid Decl., Ex. 35; Reid Decl., Ex. 36; Reid Decl., Ex. 37; Reid Decl., Ex. 38; Reid Decl., Ex. 39.)

29.    For example, in one such letter dated August 10, 1999, Robert Mozak, Dey's Executive Vice President for Sales and Marketing, wrote to state Medicaid administrators as well as regional Medicare benefits administrators, apprising them of a new NDC number for Dey's Albuterol Sulfate Inhalation Solution 0.5%.  (Reid Decl., Ex. 30.)

30.    The letter describes Dey's WAC as follows:

As you know, WAC is referred to by data reporting services and government agencies as an "estimate," and Dey believes that WAC generally means the <u>invoice</u> price charged by a pharmaceutical manufacturer to drug wholesalers. As you also know, WAC does <u>not</u> include the net effect of discounts from invoice price (based on volume of purchases, speed of payment and other factors), rebates, chargebacks, administration fees and other such cost adjustments which are well-known and commonplace in the pharmaceutical industry and can affect, to a greater or lesser degree, the actual "final" cost to each purchaser. These discounts may not be determined until some months after the date of invoice. Therefore, we remind you that <u>WAC may well not be representative of actual market costs to those entities which you are reimbursing under Medicaid</u>.

(Reid Decl., Ex. 30 (emphasis in original).)

31.    The letter goes on to describe AWP as follows:

Further, as you also know, the Average Wholesale Price (or "AWP") per unit listed above does <u>not</u> represent actual wholesale prices which will be charged or paid for this product.  It is Dey's

practice to set an AWP before a product is first sold and not subsequently to change that figure.  We understand that this is consistent with industry practice and is understood by state and federal Medicaid regulators.

(Reid Decl., Ex. 30 (emphasis in original).)

32.     The letter closes with the following sentence:  "If you need additional information, please feel free to contact Todd Galles, Senior Product Manager, at 800-755-5560, ext. 7450."  (Reid Decl., Ex. 30.)

33.     Len Terra, Chief of the Medi-Cal Drug Program, was one of the recipients of this letter.  (Reid Decl., Ex. 30, at DEY-LABS-0415394.)

34.     Todd Galles, the Dey contact person listed on the August 1999 letter discussed above, testified that he had never been contacted by anyone regarding the letter.  (Reid Decl., Ex. 40, at 410:1-411:15.)

35.     In addition to the general letters, many letters were specifically addressed to Medi-Cal officials, including: (i) a March 16, 1999 letter to Kevin Gorospe, Senior Pharmacy Consultant for Medi-Cal Benefits Branch, introducing the EasiVent Mask; (ii) July 18, 2000 letter to Len Terra, Chief of the Medi-Cal Drug Program, introducing a new Albuterol Inhalation Aerosol, 17g Metered Dose Inhaler Kit and Refill; (iii) August 2, 2000 letter to Len Terra, Chief of the Medi-Cal Drug Program, introducing the private label Astech Peak Flow Meter; and (iv) January 2, 2001 letter to Len Terra, Chief of the Medi-Cal Drug Program, regarding price changes for certain Dey drugs.  (Reid Decl., Ex. 29, at DEY-MDL-0105075; Reid Decl., Ex. 32, at DEY-MDL-0105085, 090; Reid Decl., Ex. 34, DEY-LABS-0415539; Reid Decl., Ex. 35, at DEY-BO0018910, 912.)

36.     Kevin Gorospe testified that he recalled receiving letters with disclosures like the ones in Dey's price notification letters from manufacturers, but was unaware of any contact initiated by Medi-Cal to Dey after Dey sent such letters:

> Q.     Did it ever occur that when you passed on one of those letters to Mr. Terra he -- he asked you to subsequently investigate anything about the company that had sent it?
>
> A.     No, not that I can recall.
>
> Q.     Do you remember any -- any type of letter like this exhibit touching off some type of investigation, whether you did it or not?
>
> MR. PAUL:  Objection to form.
>
> THE WITNESS:  No.

(Reid Decl., Ex. 27, at 688:16-689:3.)

## VI.     THE DOJ AWPS

37.     In February of 2000, Patrick Lupinetti of the New York State Office of the Attorney General, Medicaid Fraud Control Unit, sent a letter to the Pharmacy Director of the Medi-Cal Benefits Branch of DHS describing the results of an investigation conducted by the United States Deparment of Justice and several state Medicaid Fraud Control Units.  (Reid Decl., Ex. 41.)  The letter stated that, as a result of the investigation, First DataBank would begin to report revised AWPs based on market prices, rather than prices reported by manufacturers.  (*Id.* at CAAG/DHS0072502-03.)  Included with the letter was a binder, comparing wholesaler and group purchasing organization prices to published AWPs for several infusion, injection, and inhalation drugs, on a NDC-specific level.  (*See id.* at CAAG/DHS0072506.)  The binder included pricing information for 14 of the 28 Dey NDCs that remain at issue in this action, as set forth below.

| Acetylcysteine | | | |
|---|---|---|---|
| **NDC** | **Wholesale** | **1999 AWP** | **Spread** |
| 49502-0181-04 | $25.80 | $67.80 | 162.79% |
| 49502-0181-10 | $15.27 | $40.26 | 163.65% |
| 49502-0181-30 | $41.97 | $110.48 | 163.24% |
| 49502-0182-04 | $31.08 | $81.36 | 161.78% |
| 49502-0182-10 | $18.57 | $48.66 | 162.04% |
| 49502-0182-30 | $50.64 | $133.43 | 163.49% |

| Albuterol Sulfate | | | |
|---|---|---|---|
| **NDC** | **GPO** | **1999 AWP** | **Spread** |
| 49502-0697-03 | $6.00 | $30.25 | 404.17% |
| 49502-0697-33 | $7.20 | $36.30 | 404.17% |
| 49502-0697-60 | $14.40 | $72.60 | 404.17% |
| 49502-0196-20 | $4.00 | $14.99 | 274.75% |

| Cromolyn Sodium | | | |
|---|---|---|---|
| **NDC** | **GPO** | **1999 AWP** | **Spread** |
| 49502-0689-02 | $18.15 | $42.00 | 131.40% |
| 49502-0689-12 | $36.30 | $84.00 | 131.40% |

| Metaproterenol | | | |
|---|---|---|---|
| **NDC** | **GPO** | **1999 AWP** | **Spread** |
| 49502-0678-03 | $6.25 | $30.75 | 392.00% |
| 49502-0676-03 | $6.25 | $30.75 | 392.00% |

(*Id.* at CAAG/DHS0072510, 512, 524, 553.)

38. Consistent with the letter referenced above, First DataBank began to

publish revised AWPs for these drugs. (Reid Decl., Ex. 42, at i.) NAMFCU strongly urged state

Medicaid programs to use these AWPs to calculate reimbursement. (*Id.*)

39.     California elected not to calculate Medi-Cal reimbursement by use of the

new DOJ AWPs, as they came to be known.  In a memo to the Governor's office, DHS advised

against implementing the new AWPs because of concerns that the decrease in reimbursement

may lead to access problems:

> The Department is concerned that providers affected by the new
> AWPs may discontinue serving [fee-for-service] Medi-Cal patients
> if the new prices are implemented.  If this occurs, patients would
> either not have access to these important drugs or patients would
> be directed to a hospital to obtain them.  The Department has
> already received correspondence from various advocacy groups
> such as hemophilia organizations and pharmacist organizations
> (see Attachment A) expressing their serious concerns over the new
> AWPs.

(Reid Decl., Ex. 43, at CAAG/DHS0076375.)

40.     In a January 2001 response to a survey conducted by HHS-OIG regarding

state Medicaid agencies' use of the DOJ AWPs, Kevin Gorospe confirmed that DHS chose not to

implement them for reimbursement purposes because of concerns that the lower payments would

cause providers to stop offering services to Medi-Cal beneficiaries.  (Reid Decl., Ex. 44, at

558:4-559:8, 571:9-574:6; Reid Decl., Ex. 45, at HHD006-0406-07.)

Dated: November 25, 2009

                                 KELLEY DRYE & WARREN LLP


                                 /s/ Sarah L. Reid
                                     Paul F. Doyle
                                     William A. Escobar (admitted *pro hac vice)*
                                     Sarah L. Reid (admitted *pro hac vice*)
                                     Neil Merkl (admitted *pro hac vice*)
                                     Christopher C. Palermo (admitted *pro hac vice*)
                                     Philip D. Robben (admitted *pro hac vice*)
                                 101 Park Avenue
                                 New York, NY 10178
                                 Telephone:  (212) 808-7800
                                 Facsimile:  (212) 808-7897

                                 *Counsel for Defendants Dey, Inc. and Dey, L.P.*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was delivered to all counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order No. 2, by causing to be sent, on November 25, 2009, a copy to LexisNexis File & Serve for posting and notification to all parties.


        /s/ Sarah L. Reid
           Sarah L. Reid