# EXHIBIT 20

*State of California ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Labs, Inc. et al.*, **Civil Action No. 03-11226-PBS**

**Exhibit to the November 25, 2009 Declaration of Sarah L. Reid
in Support of Dey's Motion for Partial Summary Judgment**

Department of Health and Human Services

# OFFICE OF
# INSPECTOR GENERAL

## Comparing Drug Reimbursement:
## Medicare and
## Department of Veterans Affairs



JUNE GIBBS BROWN
Inspector General

NOVEMBER 1998
OEI-03-97-00293



EXHIBIT

Abbott · 101
4.18.07 mkm

HHD014-0051    F

## OFFICE OF INSPECTOR GENERAL

The mission of the Office of Inspector General (OIG), as mandated by Public Law 95-452, is to protect the integrity of the Department of Health and Human Services programs as well as the health and welfare of beneficiaries served by them. This statutory mission is carried out through a nationwide program of audits, investigations, inspections, sanctions, and fraud alerts. The Inspector General informs the Secretary of program and management problems and recommends legislative, regulatory, and operational approaches to correct them.

### Office of Evaluation and Inspections

The Office of Evaluation and Inspections (OEI) is one of several components of the Office of Inspector General. It conducts short-term management and program evaluations (called inspections) that focus on issues of concern to the Department, the Congress, and the public. The inspection reports provide findings and recommendations on the efficiency, vulnerability, and effectiveness of departmental programs.

OEI's Philadelphia Regional Office prepared this report under the direction of Robert A. Vito, Regional Inspector General, and Linda M. Ragone, Deputy Regional Inspector General. Principal OEI staff included:

| **REGION** | **HEADQUARTERS** |
|---|---|
| David Tawes, *Lead Analyst* | Lisa A. Foley, *Program Specialist* |
| Nancy J. Molyneaux | |

To obtain copies of this report, please call the Philadelphia Regional Office at (800) 531-9562.
Reports are also available on the World Wide Web at our home page address:

http://www.dhhs.gov/progorg/oei

HHD014-0052

# EXECUTIVE SUMMARY

**PURPOSE**

To compare Medicare allowances for prescription drugs with drug acquisition prices currently available to the Department of Veterans Affairs.

**BACKGROUND**

Medicare allowances for prescription drugs totaled almost $2.3 billion in 1996. In 1997, allowances rose to approximately $2.75 billion.

Medicare does not pay for over-the-counter or most outpatient prescription drugs. However, under specific circumstances, Medicare Part B covers drugs used with durable medical equipment or infusion devices. Medicare also covers certain drugs used in association with organ transplantation, dialysis, chemotherapy, and pain management for cancer treatment. Additionally, the program covers certain vaccines, such as those for influenza and hepatitis B.

Physicians and suppliers usually bill Medicare directly for the prescription drugs they provide to beneficiaries. Medicare Part B reimburses covered drugs at 95 percent of the drugs' average wholesale prices (AWPs). The beneficiary is responsible for a 20 percent coinsurance payment.

Unlike Medicare, the Department of Veterans Affairs (VA) purchases drugs for its healthcare system directly from manufacturers or wholesalers. There are several purchase options available to the VA, including the Federal Supply Schedule, Blanket Purchase Agreements, and VA national contracts.

We focused our inspection on 34 drug codes, each with over $10 million in Medicare allowed charges for 1996. We then compared the amount Medicare reimbursed for these drugs to the VA's Federal Supply Schedule acquisition costs during the first quarter of 1998.

**FINDINGS**

*Medicare and its beneficiaries could save $1 billion in 1998 if the allowed amounts for 34 drugs were equal to prices obtained by the VA.*

After comparing the median Medicare allowance with the corresponding median VA acquisition cost for 34 drugs, we estimated that Medicare and its beneficiaries could save $1.03 billion in 1998 if the Medicare allowed amounts for 34 drugs were equal to prices obtained by the VA under the Federal Supply Schedule.

This savings represents almost half of the $2.07 billion in reimbursement that Medicare and its beneficiaries paid for these 34 drugs in 1997. The estimated savings for individual drugs ranged from a high of $276 million for J9217 (leuprolide acetate) to a low of $16,460 for K0523 (concentrated metaproterenol sulfate).

i

HHD014-0053

*Medicare allowed between 15 and 1600 percent more than the Department of Veterans Affairs paid for the 34 drugs reviewed.*

The Medicare allowance was greater than the VA acquisition cost for every drug reviewed. For 3 of the 34 drugs, Medicare allowed more than 16 times the VA acquisition cost. Eleven drugs had Medicare allowances that were between two and six times higher than the VA cost. For only two drugs was the difference between Medicare reimbursement and VA cost less than 25 percent.

## RECOMMENDATIONS

The Department of Veterans Affairs purchases drugs for its healthcare system directly from manufacturers or wholesalers. Conversely, Medicare reimburses doctors and suppliers for drugs which they administer or supply to beneficiaries. We recognize that the Health Care Financing Administration (HCFA) and the VA operate under different statutory constraints. Nevertheless, the fact remains that another Federal agency can get prescription drugs for a drastically lower price than Medicare.

Previous reports of the Office of Inspector General found that actual wholesale prices available to physicians and suppliers are often significantly lower than the Medicare allowed amounts. This report provides additional evidence that the published AWPs used in determining the Medicare allowed amounts for certain prescription drugs can be many times greater than the actual acquisition costs available in the marketplace.

We believe our current findings provide further support for recommendations made in earlier reports. We previously recommended that HCFA reexamine its Medicare drug reimbursement methodologies with the goal of reducing payments as appropriate. The HCFA concurred with this recommendation. We outlined a number of options for implementing this recommendation, including: (1) greater discounting of published average wholesale prices, (2) basing payment on acquisition costs, (3) establishing manufacturers' rebates similar to those used in the Medicaid program, and (4) using competitive bidding.

We continue to support the need for a comprehensive statutory reform of Medicare's prescription drug reimbursement methodology. A number of proposals addressing reform have been offered by both the Administration and members of Congress. However, until legislation can be enacted providing for such reform, we recommend that HCFA utilize the new inherent reasonableness or competitive bidding authorities provided in the Balanced Budget Act of 1997 to reduce Medicare's unreasonably high payments for certain drugs.

## AGENCY COMMENTS

The HCFA concurred with our recommendations, stating that it appreciates the OIG's continuous efforts to assist it in obtaining the lowest prices for covered drugs. The HCFA noted that it has made several efforts to reduce excessive reimbursement rates, including using an inherent reasonableness adjustment for albuterol sulfate. The OIG supports these efforts and we believe HCFA should continue to use its inherent reasonableness authority to lower inappropriate payments for other drugs with excessive reimbursement rates.

ii

HHD014-0054

# T A B L E   O F   C O N T E N T S

**PAGE**

EXECUTIVE SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FINDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   Potential savings of $1 billion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Medicare allowances are greater than VA cost . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

RECOMMENDATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**APPENDICES**

**A:** Description of 34 HCPCS Codes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

**B:** Estimated 1998 Savings by HCPCS Code  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-1

**C:** Health Care Financing Administration Comments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-1

HHD014-0055

# INTRODUCTION

**PURPOSE**

To compare Medicare allowances for prescription drugs with drug acquisition prices currently available to the Department of Veterans Affairs.

**BACKGROUND**

Medicare allowances for prescription drugs totaled almost $2.3 billion in 1996. In 1997, allowances rose to approximately $2.75 billion. Medicare allowances include both the Medicare payment and the 20 percent copayment made by the beneficiary.

*Medicare Coverage and Payment of Prescription Drugs*

Medicare does not pay for over-the-counter or most outpatient prescription drugs. However, under specific circumstances, Medicare Part B covers drugs used with durable medical equipment (DME) or infusion devices. Medicare also covers certain drugs used in association with organ transplantation, dialysis, chemotherapy, and pain management for cancer treatment. Additionally, the program covers certain vaccines, such as those for influenza and hepatitis B.

Physicians and suppliers usually bill Medicare directly for the prescription drugs they provide to beneficiaries. Medicare Part B reimburses covered drugs at 95 percent of the drugs' average wholesale prices (AWPs). The beneficiary is responsible for a 20 percent coinsurance payment.

The Health Care Financing Administration (HCFA) contracts with local carriers and four DME regional carriers (DMERCs) to process Part B claims and establish the Medicare allowed amounts for covered drugs. These carriers determine the allowed amount for a drug based on the AWPs as reported in the *Red Book* or similar pricing publications used by the pharmaceutical industry. If a drug has both brand and generic sources available, reimbursement is based on 95 percent of the median AWP for generic sources. However, if a brand name product's AWP is lower than the median generic price, a new median including the brand must be calculated. Beginning in 1999, Medicare will calculate the AWP for multiple-source drugs at the lower of the median generic AWP or the lowest brand-name AWP.

The HCFA and its carriers identify drug products using codes in HCFA's Common Procedure Coding System (HCPCS). The HCPCS codes define the type of drug, and in most cases, a dosage amount. The codes do not identify the specific drug product billed.

*Department of Veterans Affairs Payments for Prescription Drugs*

Unlike Medicare, the Department of Veterans Affairs (VA) purchases drugs for its healthcare system directly from manufacturers or wholesalers. The VA uses National Drug Codes (NDCs) rather than HCPCS codes to identify drugs products. Each drug manufactured or distributed in

---

1

HHD014-0056

the United States has a unique NDC. The NDCs identify the manufacturer of the drug, the product dosage form, and the package size.

There are several purchase options available to the VA, including the Federal Supply Schedule, Blanket Purchase Agreements, and VA national contracts. The Federal Supply Schedule provides agencies like the VA with a simple process for purchasing commonly-used products in various quantities while still obtaining the discounts associated with volume buying. Using competitive procedures, contracts are awarded to companies to provide services and supplies over a given period of time. Although the General Services Administration awards most Federal Supply Schedule contracts, the VA awards contracts for certain medical items. Agencies are not required to use the Federal Supply Schedule, however, and are able to negotiate prices lower than the Federal Supply Schedule price.

### New Authorities Provided by the Balanced Budget Act

A provision within the Balanced Budget Act of 1997 allows Medicare to diverge from a statutorily defined payment method if the application results in a payment amount that is not inherently reasonable. Additionally, the Act provides HCFA with the authority to conduct competitive bidding demonstrations. The legislation authorizes up to five of these demonstrations for health care items and services covered by the Medicare fee-for-service program. All demonstrations must be completed by December 31, 2002.

### Related Work by the Office of Inspector General

This report is one of several Office of Inspector General (OIG) reports concerning Medicare payments for prescription drugs. In 1997, we released *Excessive Medicare Payments for Prescription Drugs* (OEI 03-97-00290), which found that Medicare allowances for 22 drugs exceeded actual wholesale prices by $447 million in 1996. In 1996, we released a report entitled *Appropriateness of Medicare Prescription Drug Allowances* (OEI-03-96-00420) which compared Medicare drug reimbursement mechanisms with Medicaid mechanisms and found that Medicare could achieve significant savings by adopting reimbursement strategies similar to those used by Medicaid. The OIG has also released several reports focusing on the cost of inhalation drugs covered by Medicare. *Medicare Payments for Nebulizer Drugs (OEI-03-94-00390), A Comparison of Albuterol Sulfate Prices (OEI-03-94-00392),* and *Suppliers' Acquisition Costs for Albuterol Sulfate (OEI-03-94-00393)* all found Medicare allowances for inhalation drugs to be excessive.

## METHODOLOGY

We focused our inspection on the HCPCS codes with over $10 million in Medicare allowed charges for 1996. We then compared the amount Medicare reimburses for these drugs to the VA's acquisition costs during the first quarter of 1998.

We collected data from four sources. We accessed the HCFA National Claims History (NCH) File to get information concerning Medicare allowances and utilization for prescription drugs in 1996 and 1997. We gathered reimbursement rates for specific Medicare drug codes by contacting

2

several carriers. We obtained drug acquisition costs from the VA. We used the CD-ROM version of the *Red Book* to help us match HCPCS codes to their equivalent NDCs.

HHD014-0058

*Medicare Allowances for Prescription Drugs*

To determine total Medicare payments for prescription drugs, we compiled a list of HCPCS codes representing all drugs covered by Medicare in 1996. We selected 1996 because it was the most recent year with complete data in the NCH file. We then determined the Medicare allowance and utilization for each of the more than 400 HCPCS codes using HCFA's Part B Extract Summary System (BESS). Next, we aggregated the individual allowances and utilization to determine the total allowance and utilization for all prescription drugs covered by Medicare in 1996.

We arrayed the HCPCS codes by their allowances and found that 40 codes each had over $10 million in allowances for 1996. These 40 codes represented just over $2 billion in allowances for 1996, and comprised 88 percent of the total Medicare allowance for all prescription drugs.

We removed several HCPCS codes from our review. Codes J7699, J7999, and J3490 were removed because they are defined as either "not otherwise classified" or "unclassified" drugs. We also chose not to use code A4646, an iodine product. Two Factor VIII codes (J7190 and J7192) were removed because we knew from previous studies that they were difficult to match to NDCs. Finally, code J9010 (Doxorubicin, 50 mg) is no longer reimbursed by HCFA, and was therefore removed from review.

Several other HCFA coding changes in 1997 and 1998 affected the drugs in our review. Code J1625 was deleted, and replaced with J1626. Inhalation codes J7610 and J7645 were changed to K0503 and K0518 respectively. Finally, HCFA deleted inhalation codes J7620 and J7670 and replaced them with two codes each, one representing a concentrated dose and the other a unit dose form of the drug. Code J7620 was changed to codes K0504 and K0505, while code J7670 was changed to K0523 and K0524. After accounting for these changes, 35 HCPCS codes remained in our review.

*Carrier Reimbursement for Prescription Drugs*

Because Medicare does not have uniform national allowed amounts for prescription drugs, we had to collect reimbursement information from various carriers. We obtained first quarter 1998 Medicare allowed amounts for the 35 HCPCS codes from five large Medicare carriers: Xact Medicare Services, United Healthcare Insurance Company, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of Florida, and Blue Cross and Blue Shield of South Carolina. We also received Medicare allowed amounts from the four DMERCs. To determine a single Medicare allowed amount, we calculated median prices for each HCPCS code based on this information.

HHD014-0059

*Matching HCPCS Codes to NDCs*

Since the VA pays for drugs based on NDCs, we used the *1998 Red Book* CD-ROM update to determine the specific NDCs that would match the HCPCS code definition for each of the 35 drugs. Whenever possible, we selected NDCs that met the exact dosage delineated in the HCPCS code description. When this was not possible, we chose NDCs with doses for which a conversion factor to the HCPCS definition could be readily determined.

*VA Acquisition Costs for Prescription Drugs*

To determine the VA's first quarter 1998 acquisition costs for the selected NDCs, we obtained a file from the VA containing contract acquisition costs. We selected the Federal Supply Schedule price for comparison purposes. However, some drugs had lower prices available to the VA based on other contractual methods.

Eleven drugs had only one NDC match in the VA file, while six drugs had more than five matches. One HCPCS code (90724) and its corresponding NDCs did not have any matches in the VA file. This HCPCS code was therefore removed from the study, leaving 34 codes in our review. A list of the final 34 HCPCS codes and their corresponding descriptions is presented in Appendix A.

These 34 HCPCS codes represented 17 single-source, 11 multiple-source, and 6 multiple-brand drugs. A single-source drug has only one brand of drug available. A multiple-source drug has both brand and generic sources available. A multiple-brand drug has more than one brand but no generic versions available. Of the 11 drugs with a single NDC match in the VA file, 8 were single-source drugs.

*Comparing Medicare Allowance Amounts to VA Acquisition Costs*

Using the *Red Book* and the HCPCS code definitions, we compared product descriptions for the 34 drugs reviewed. For some NDCs, the corresponding HCPCS codes had an equivalent dosage, and therefore the VA cost could be easily compared to the Medicare allowed amount. If the two codes were not equal, we determined a conversion factor to match the NDC dosage and package size to the HCPCS dosage. We then took the Federal Supply Schedule contract price for the NDC and divided it by the conversion factor to determine the pricing of its HCPCS code equivalent.

To compare VA costs to Medicare allowed amounts, we needed to determine a single VA price for each drug. For the 11 drugs with a single NDC match in the VA file, we simply used the Federal Supply Schedule contract price of that NDC. For the 23 drugs with multiple NDC matches in the VA file, we took the median of the Federal Supply Schedule contract prices.

*Calculating Potential Medicare Savings*

To calculate potential Medicare savings, we used the utilization numbers contained in the 1997 BESS file. Although we used 1998 Medicare allowed amounts, we chose to use 1997 utilization

HHD014-0060

data for our calculations since the 1998 utilization data was incomplete at the time of our review. Because two HCPCS codes underwent dosage changes between 1997 and 1998, we needed to determine a conversion factor to estimate utilization for the new dosages. In 1998, code J1625 was changed to J1626, with the dosage changing from 1 milligram (mg) to 100 micrograms (mcg). Therefore, we estimated that utilization would increase by a factor of 10 (1 mg = 1000 mcg). Also in 1998, the dosage of J1562 was changed from 500 milligrams to 5 grams (g). Therefore, we estimated that overall utilization would decrease by a factor of 10 at the new dosage (5000 mg = 5 g).

Finally, for each drug, we compared the median Medicare allowed amount to the median VA acquisition cost for the first quarter of 1998. We multiplied the difference by the 1997 utilization of each drug to calculate the potential savings to Medicare if the program reimbursed drugs at VA cost rather than 95 percent of AWP.

HHD014-0061

# FINDINGS

**MEDICARE AND ITS BENEFICIARIES COULD SAVE $1 BILLION IN 1998 IF THE ALLOWED AMOUNTS FOR 34 DRUGS WERE EQUAL TO PRICES OBTAINED BY THE DEPARTMENT OF VETERANS AFFAIRS.**

After comparing the median Medicare allowance with the corresponding median VA acquisition cost for 34 drugs, we estimated that Medicare and its beneficiaries could save $1.03 billion in 1998 if the Medicare allowed amounts for 34 drugs were equal to prices obtained by the VA under the Federal Supply Schedule. The estimated savings represents almost half of the $2.07 billion in reimbursement that Medicare and its beneficiaries paid for these 34 drugs in 1997.

The estimated savings for individual drugs ranged from a high of $276 million for J9217 (leuprolide acetate) to a low of $16,460 for K0523 (concentrated metaproterenol sulfate). Drugs with estimated savings greater than $20 million are listed below. A complete list of the 34 drugs, Medicare and VA median costs, and potential savings is provided in Appendix B.

| DRUGS WITH 1998 ESTIMATED SAVINGS OVER $20 MILLION | | | | | |
|---|---|---|---|---|---|
| HCPCS CODE | GENERIC DRUG NAME | VA MEDIAN | MEDICARE MEDIAN | DIFFERENCE | NUMBER OF SERVICES | ESTIMATED SAVINGS |
| J9217 | Leuprolide acetate | $299.38 | $513.60 | $214.22 | 1,286,664 | $275,629,162.08 |
| K0505 | Albuterol sulfate (dose form) | $0.12 | $0.47 | $0.35 | 343,627,175 | $120,269,511.25 |
| J9202 | Goserelin acetate | $206.29 | $389.98 | $183.69 | 329,988 | $60,615,495.72 |
| K0518 | Ipratropium bromide | $1.31 | $3.34 | $2.03 | 29,505,931 | $59,897,039.93 |
| J9265 | Paclitaxel | $109.36 | $173.50 | $64.14 | 895,067 | $57,409,597.38 |
| Q0136 | Epoetin alpha | $6.74 | $12.00 | $5.26 | 10,466,953 | $55,056,172.78 |
| J0640 | Leucovorin calcium | $1.18 | $20.45 | $19.27 | 2,833,686 | $54,605,129.22 |
| J9045 | Carboplatin | $39.50 | $84.16 | $44.66 | 982,275 | $43,868,401.50 |
| J1626 | Granisetron hcl | $8.42 | $16.85 | $8.43 | 4,105,560 | $34,609,870.80 |
| J1562 | Immune globulin (5 g) | $110.83 | $439.38 | $328.55 | 92,994 | $30,553,178.70 |
| J9182 | Etoposide | $7.84 | $132.25 | $124.41 | 181,322 | $22,558,270.02 |
| J9000 | Doxorubicin | $7.46 | $43.23 | $35.77 | 629,236 | $22,507,771.72 |
| J1561 | Immune globulin (500 mg) | $27.71 | $48.65 | $20.94 | 1,039,526 | $21,767,674.44 |
| J2430 | Pamidronate disodium | $104.39 | $196.90 | $92.51 | 229,935 | $21,271,286.85 |

**MEDICARE ALLOWED BETWEEN 15 AND 1600 PERCENT MORE THAN THE DEPARTMENT OF VETERANS AFFAIRS PAID FOR THE 34 DRUGS REVIEWED.**

During the first quarter of 1998, Medicare allowed amounts were greater than the VA acquisition cost for every drug in our review. However, there was substantial variation in the difference between Medicare reimbursement and VA cost among the 34 drugs.

---

7

HHD014-0062

Fourteen of the drugs in our study (41 percent) had Medicare allowances that were more than double the VA cost. For 11 of these drugs, Medicare allowed between two and six times the VA acquisition cost. For three drugs in our review (J0640, J9181, J9182), Medicare allowed more than 16 times the VA acquisition cost. The chart below illustrates these drugs and their comparative cost to Medicare. Appendix B lists the difference between Medicare reimbursement and VA cost for all 34 drugs.



The remaining 20 drugs in our review also had Medicare reimbursements that were greater than VA acquisition cost. Eighteen of the 20 drugs had Medicare reimbursements between 44 and 93 percent higher than VA acquisition cost. For only two drugs was the difference between Medicare reimbursement and VA cost less than 25 percent.

8

HHD014-0063

# RECOMMENDATIONS

The Department of Veterans Affairs purchases drugs for its healthcare system directly from manufacturers or wholesalers. Conversely, Medicare reimburses doctors and suppliers for drugs which they administer or supply to beneficiaries. We recognize that HCFA and the VA operate under different statutory constraints. Nevertheless, the fact remains that another Federal agency can get prescription drugs for a drastically lower price than Medicare.

Previous reports of the Office of Inspector General found that actual wholesale prices available to physicians and suppliers are often significantly lower than the Medicare allowed amounts. This report provides additional evidence that the published AWPs used in determining the Medicare allowed amounts for certain prescription drugs can be many times greater than the actual acquisition costs available in the marketplace.

Our current findings provide further support for recommendations made in earlier reports. We previously recommended, and HCFA concurred, that HCFA reexamine its Medicare drug reimbursement methodologies with the goal of reducing payments as appropriate. We outlined a number of options for implementing this recommendation, including: (1) greater discounting of published average wholesale prices, (2) basing payment on acquisition costs, (3) establishing manufacturers' rebates similar to those used in the Medicaid program, and (4) using competitive bidding.

We continue to support the need for a comprehensive statutory reform of Medicare's prescription drug reimbursement methodology. A number of proposals addressing reform have been offered by both the Administration and members of Congress. However, until legislation can be enacted providing for such reform, we recommend that HCFA utilize the new inherent reasonableness or competitive bidding authorities provided in the Balanced Budget Act of 1997 to reduce Medicare's unreasonably high payments for certain drugs.

## AGENCY COMMENTS

The HCFA concurred with our recommendations, stating that it appreciates the OIG's continuous efforts to assist it in obtaining the lowest prices for covered drugs. The HCFA noted that it proposed in the President's fiscal year 1998 budget that drugs be reimbursed at the provider's actual acquisition cost. The Congress did not enact the recommendation, and therefore the proposal was again submitted with the fiscal year 1999 budget.

The HCFA further stated that DMERCs have issued inherent reasonableness notices to suppliers which proposed an 11 percent decrease in the reimbursement amount for albuterol sulfate. The HCFA indicated that other drugs may be reviewed for inherent reasonableness adjustments in the future. The full text of HCFA's comments is provided in Appendix C.

HHD014-0064

**OIG RESPONSE**

We fully support HCFA's and the Administration's continued efforts to reduce excessive payments for covered drugs.  Until comprehensive reforms are enacted, we believe HCFA should continue to use its inherent reasonableness authority to lower inappropriate payments for other drugs with excessive reimbursement rates.

HHD014-0065

# APPENDIX A

## DESCRIPTION OF 34 HCPCS CODES

| 1996 HCPCS CODE | 1997 HCPCS CODE | DESCRIPTION | CHANGES |
|---|---|---|---|
| | | Immunization, active; Pneumococcal vaccine | |
| | | Injection, Alglucerase, per 10 units | |
| | | Botulinum toxin type A, per unit | Changed 9/96 from per 100 units to per 1 unit |
| | | Injection, Leucovorin calcium, per 50 mg | |
| | | Injection, Ceftriaxone sodium, per 250 mg | |
| | | Injection, Dipyridamole, per 10 mg | |
| | | Injection, Filgrastim (G-CSF), 300 mcg | |
| | | Injection, Filgrastim (G-CSF), 480 mcg | |
| | | Injection, Immune globulin, Intravenous, 500 mg | |
| | | Injection, Immune globulin, Intravenous, 5 g | Changed 1/98 from per 500mg to per 5g |
| J1625 | J1626 | Injection, Granisetron hydrochloride, per 100 mcg | Changed 1/98 from per 1mg (J1625) to per 100mcg (J1626) |
| J2405 | J2405 | Injection, Ondansetron HCl, per 1 mg | |
| J2430 | J2430 | Injection, Pamidronate disodium, per 30 mg | |
| J7610 | K0503 | Acetylcysteine, unit dose form, per gram | Changed 4/97 from 10%, per ml (J7610) to per gram (K0503) |
| J7620 | K0504 | Albuterol sulfate, concentrated form, per mg | Changed 4/97 from .083%, per ml (J7620) to per mg, concentrated form (K0504) |
| J7620 | K0505 | Albuterol sulfate, unit dose form, per mg | Changed 4/97 from .083%, per ml (J7620) to per mg, unit dose form (K0505) |
| J7645 | K0518 | Ipratropium bromide, unit dose form, per mg | Changed 4/97 from .02%, per ml (J7645) to per mg, unit dose form (K0518) |
| J7670 | K0523 | Metaproterenol sulfate, concentrated form, per 10 mg | Changed 4/97 from .4%, per 2.5ml (J7670) to per 10mg, concentrated form (K0523) |
| J7670 | K0524 | Metaproterenol sulfate, unit dose form, per 10 mg | Changed 4/97 from .4%, per 2.5ml (J7670) to per 10mg, unit dose form (K0524) |
| J9000 | J9000 | Doxorubicin Hcl, 10 mg | |
| J9031 | J9031 | BCG, live (intravesical), per installation | |
| J9045 | J9045 | Injection, Carboplatin, 50 mg | |
| J9062 | J9062 | Injection, Cisplatin, 50 mg | |
| J9181 | J9181 | Injection, Etoposide, 10 mg | |
| J9182 | J9182 | Injection, Etoposide, 100 mg | |
| J9185 | J9185 | Injection, Fludarabine phosphate, 50 mg | |
| J9202 | J9202 | Goserelin acetate implant, per 3.6 mg | |
| J9214 | J9214 | Interferon alfa-2b, recombinant, 1 million units | |
| J9217 | J9217 | Leuprolide acetate (for depot suspension), 7.5 mg | |
| J9265 | J9265 | Injection, Paclitaxel, 30 mg | |
| J9293 | J9293 | Injection, Mitoxantrone HCl, per 5 mg | |
| J9390 | J9390 | Vinorelbine tartrate, per 10 mg | |
| K0121 | K0121 | Cyclosporine, oral, 25 mg | |
| Q0136 | Q0136 | Injection, Epoetin alpha, (non-ESRD), per 1000 units | |

A - 1

HHD014-0066

# APPENDIX B

| HCPCS CODE | GENERIC DRUG NAME | VA MEDIAN | HCFA MEDIAN | DIFFERENCE | PERCENTAGE DIFFERENCE | NUMBER OF SERVICES | ESTIMATED SAVINGS |
|---|---|---|---|---|---|---|---|
| | | | | ESTIMATED 1998 SAVINGS BY HCPCS CODE | | | |
| 90732 | Pneumococcal vaccine | $5.68 | $12.84 | $7.16 | 126% | 1,752,024 | $12,544,491.84 |
| J0205 | Alglucerase | $28.26 | $35.15 | $6.89 | 24% | 143,084 | $985,848.76 |
| J0585 | Botulinum | $2.41 | $3.98 | $1.57 | 65% | 2,843,251 | $4,463,904.07 |
| J0640 | Leucovorin calcium | $1.18 | $20.45 | $19.27 | 1633% | 2,833,686 | $54,605,129.22 |
| J0696 | Ceftriaxone sodium | $5.81 | $11.73 | $5.92 | 102% | 1,121,918 | $6,641,754.56 |
| J1245 | Dipyridamole | $9.65 | $28.21 | $18.56 | 192% | 518,207 | $9,617,921.92 |
| J1440 | Filgrastim (300 mcg) | $106.69 | $153.24 | $46.55 | 44% | 367,795 | $17,120,857.25 |
| J1441 | Filgrastim (480 mcg) | $169.55 | $244.06 | $74.51 | 44% | 196,969 | $14,676,160.19 |
| J1561 | Immune globulin (500 mg) | $27.71 | $48.65 | $20.94 | 76% | 1,039,526 | $21,767,674.44 |
| J1562 | Immune globulin (5 g) | $110.83 | $439.38 | $328.55 | 296% | 92,994 | $30,553,178.70 |
| J1626 | Granisetron hcl | $8.42 | $16.85 | $8.43 | 100% | 4,105,560 | $34,609,870.80 |
| J2405 | Ondansetron hcl | $5.03 | $5.80 | $0.77 | 15% | 8,730,024 | $6,722,118.48 |
| J2430 | Pamidronate disodium | $104.39 | $196.90 | $92.51 | 89% | 229,935 | $21,271,286.85 |
| J9000 | Doxorubicin* | $7.46 | $43.23 | $35.77 | 479% | 629,236 | $22,507,771.72 |
| J9031 | BCG Live | $78.22 | $150.91 | $72.69 | 93% | 115,438 | $8,391,188.22 |
| J9045 | Carboplatin | $39.50 | $84.16 | $44.66 | 113% | 982,275 | $43,868,401.50 |
| J9062 | Cisplatin | $100.09 | $182.01 | $81.92 | 82% | 61,788 | $5,061,672.96 |
| J9181 | Etoposide (10 mg) | $0.79 | $13.22 | $12.43 | 1573% | 879,440 | $10,931,439.20 |
| J9182 | Etopisde (100 mg) | $7.84 | $132.25 | $124.41 | 1587% | 181,322 | $22,558,270.02 |
| J9185 | Fludarbine phosphate | $110.70 | $186.68 | $75.98 | 69% | 102,444 | $7,783,895.12 |
| J9202 | Goserelin acetate | $206.29 | $389.98 | $183.69 | 89% | 329,988 | $60,615,495.72 |
| J9214 | Interferon, alfa-2b | $6.97 | $10.74 | $3.77 | 54% | 1,112,282 | $4,193,303.14 |
| J9217 | Leuprolide acetate | $299.36 | $513.60 | $214.22 | 72% | 1,286,664 | $275,629,162.08 |
| J9265 | Paclitaxel | $109.36 | $173.50 | $64.14 | 59% | 895,067 | $57,409,597.38 |
| J9293 | Mitoxantrone HCl | $101.56 | $179.56 | $78.00 | 77% | 121,358 | $9,465,924.00 |
| J9390 | Vinorelbine tartrate | $40.72 | $61.47 | $20.75 | 51% | 350,691 | $7,280,988.25 |
| K0121 | Cyclosporine | $.88 | $1.41 | $.53 | 60% | 15,326,735 | $8,123,169.55 |
| K0503 | Acetylcysteine** | $1.25 | $6.73 | $5.48 | 438% | 1,861,345 | $10,200,170.60 |
| K0504 | Albuterol sulfate (concentrated)** | $0.06 | $0.13 | $0.07 | 117% | 15,474,404 | $1,083,208.28 |
| K0505 | Albuterol sulfate (dose form)** | $0.12 | $0.47 | $0.35 | 292% | 343,627,175 | $120,269,511.25 |
| K0518 | Ipratropium bromide** | $1.31 | $3.34 | $2.03 | 155% | 29,505,931 | $59,897,039.93 |
| K0523 | Metaproterenol sulfate (concentrated)** | $0.18 | $0.26 | $0.08 | 44% | 205,745 | $16,459.60 |
| K0524 | Metaproterenol sulfate (dose form)** | $0.52 | $0.83 | $0.31 | 60% | 7,427,068 | $2,302,391.08 |
| Q0136 | Epoetin alpha | $6.74 | $12.00 | $5.26 | 78% | 10,466,953 | $55,056,172.78 |
| TOTAL | | | | | | | |

* Though code J9010 was deleted as of 12/31/96, there was still some billing of it in 1997. Currently, code J9000 is used for all Doxorubicin billing. The number of services listed does not reflect that all 1998 billing for J9010 will be subsumed under J9000. Therefore, potential savings are underestimated.

** Coding changes for inhalation drugs went into effect on April 1, 1997. The number of services listed reflects 1997 utilization for the K-codes only, and therefore does not represent services billed under previous codes from January 1997 through March 1997. Potential savings are therefore underestimated for these 6 codes.

HHD014-0067

# A P P E N D I X  C

**HEALTH CARE FINANCING ADMINISTRATION COMMENTS**

HHD014-0068



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Health Care Financing Administration

The Administrator
Washington, D.C.   20201

**DATE:**    OCT 2 8 1998

**TO:**    June Gibbs Brown
Inspector General

**FROM:**    Nancy-Ann Min DeParle    *Nancy-Ann DeParle*
Administrator

**SUBJECT:**    Office of Inspector General (OIG) Draft Report: "Comparing Drug
Reimbursement: Medicare and Department of Veterans Affairs,"
(OEI-03-97-00293)

We reviewed the above-referenced report that compares Medicare's drug reimbursement
prices to those of the Department of Veterans Affairs (VA). We appreciate the OIG's
continued efforts to assist us in obtaining the lowest prices for the limited prescription
drugs that are covered by the Medicare program. Your finding that Medicare and its
beneficiaries could save $1 billion in 1998 if Medicare could take advantage of a
purchasing system like that used by the VA is extremely disturbing.

The report recommends that, until there is a comprehensive statutory reform of
Medicare's prescription drug reimbursement methodology, the Health Care Financing
Administration (HCFA) should utilize the new inherent reasonableness or competitive
bidding authorities provided in the Balanced Budget Act of 1997 in order to reduce
Medicare's unreasonably high payments for certain drugs.

We concur with the report's recommendation. Our specific comments follow:

OIG Recommendation
HCFA should utilize the new inherent reasonableness or competitive bidding authorities
provided in the Balanced Budget Act of 1997 to reduce Medicare's unreasonably high
payments for certain drugs.

HCFA Response
We concur. In the President's FY 1998 budget, the Administration proposed a change
in the law to reduce Medicare's high payments for certain drugs. Under this proposal,
physicians and suppliers who bill Medicare for outpatient drugs (other than drugs paid
on a cost or prospective payment basis) would be paid their acquisition cost. This would
have removed the mark-up currently being paid above the true market price. While
Congress did not enact our recommendation, the Balanced Budget Act of 1997 provided
for program payment at the lower of the submitted charge or 95 percent of the average

---

C - 2

HHD014-0069

Page 2 – June Gibbs Brown

wholesale price. The President indicated in his radio message of December 13, 1997, that the Congress did not go far enough in the BBA, so we again submitted this proposal in the President's FY 1999 budget.

Our Durable Medical Equipment Regional Carriers (DMERCs) have issued inherent reasonableness notices to suppliers proposing decreases of approximately 11 percent in the payment amounts for albuterol sulfate. The comment periods on these proposed reductions end November 30, 1998. This proposed adjustment is based on a review of retail prices for albuterol sulfate. We plan to continue to review additional information, including information on what other payers are paying for albuterol sulfate, in order to determine if further adjustment to Medicare's payment amount for albuterol sulfate are warranted. In addition, after gaining experience, we may review Medicare's payments for other drugs in order to determine if inherent reasonableness adjustments are needed.

Additional Comments

The report needs to address that the VA does not have to work under the same statutory constraints as HCFA. We suggest the report include a discussion of the limitations and special circumstances of the payment allowances provided under the VA statute.

C - 3

HHD014-0070   L