# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

--o0o--

IN RE PHARMACEUTICAL INDUSTRY

AVERAGE WHOLESALE PRICE

LITIGATION

_____/MDL No. 1456

THIS DOCUMENT RELATES TO:    Civil Action: 01-12257-PBS

State of California, ex rel.

Ven-A-Care v. Abbott

Laboratories, Inc., et al.,

_____/


--o0o--

THURSDAY, APRIL 23, 2009

--o0o--

VIDEOTAPED DEPOSITION OF

MIKE NAMBA

--o0o--


Reported By:   CAROL NYGARD DROBNY, CSR No. 4018

               Registered Merit Reporter

Page 130

 1  next page of Exhibit 18 under "Additional Issues"
 2  on the first bullet point you see that the
 3  document states that Medi-Cal is moving from the
 4  current AWP model for determining drug ingredient
 5  costs to a much more accurate model known as
 6  Average Selling Price, or ASP, which factors in
 7  discounts and rebates when determining the price
 8  paid by a pharmacist.
 9       Do you see that?
10     A.  Yes.
11     Q.  Do you have an understanding of -- of
12  what "Average Selling Price" is, ASP?
13     A.  I can't remember the exact definition,
14  but I had seen the term.
15     Q.  Did you have anything to do with
16  examining or working on a proposal to move from
17  an AWP model to an ASP model?
18     A.  Not to the best of my recollection,
19  no.
20     Q.  Do you have an understanding of why a
21  reimbursement model for drug ingredient costs
22  based on Average Selling Price as opposed to AWP

Page 131

 1  would be desirable?
 2     A.  Well, as the document states, I guess
 3  it would be more accurate.
 4     Q.  Why would it be more accurate?
 5     A.  Simply because it's -- it's what's
 6  going to be the true cost of what's -- well, as
 7  they say it here, paid for by pharmacists.
 8     Q.  So ASP would factor in discounts and
 9  rebates?
10     A.  Correct.
11     Q.  And Medi-Cal understood that AWP did
12  not?
13         MR. FISHER:  Objection as to form.
14         THE WITNESS:  I think that it was
15  perceived to be less accurate than ASP.
16  BY MS. McDEVITT:
17     Q.  But do you have an understanding of --
18         Strike that.
19         You've got a document here that -- that
20  says that ASP -- Average Selling Price, as a
21  reimbursement model is -- would be more accurate
22  than -- than AWP because it factors in discounts

Page 132

 1  and rebates; right?
 2     A.  Yes.
 3     Q.  Is it fair to say then that this
 4  document produced from the files of Medi-Cal
 5  indicates that DHS knew that AWP did not factor
 6  in discounts and rebates?
 7         MR. FISHER:  Objection as to form.
 8         THE WITNESS:  I'm not sure.
 9  BY MS. McDEVITT:
10     Q.  You don't know?
11     A.  (Shaking head)
12         MS. McDEVITT:  Okay.
13         (Exhibit Namba 019 was marked for
14         Identification.)
15  BY MS. McDEVITT:
16     Q.  We've marked as Namba Exhibit 17 --
17         THE REPORTER:  19.
18         MS. McDEVITT:  18.  I can't do this
19  anymore. Remind me not to change time zones.
20  BY MS. McDEVITT:
21     Q.  Namba Exhibit 19 is an E-mail chain
22  that was produced from the files, electronic

Page 133

 1  files, of the Department of Health Services
 2  bearing Bates number E0039471, and it appears
 3  that you are the recipient of -- at the top of
 4  the E-mail chain, one of the recipients.
 5       Do you see that?
 6     A.  Yes.
 7     Q.  It's from Kevin Gorospe and was sent
 8  on October 25th, 2004.
 9       You see that?
10     A.  Yes.
11     Q.  Do you recall receiving this E-mail?
12     A.  No.
13     Q.  Have you had time to -- to look at the
14  second page?
15     A.  A little more time, please.
16     Q.  Sure.
17       Have you taken a look at it?
18     A.  Yes.
19     Q.  You see on the bottom, so-to-speak, of
20  the E-mail chain we have an E-mail from Kimberly
21  Belshe to Stan Rosenstein?
22     A.  Yes.

```
                    Page 150                                         Page 152
 1  regard to customary prompt pay discounts extended    1      A.  No, because certain drugs were
 2  to drug wholesalers.                                 2  required by federal statute to be covered,
 3      Do you see that?                                 3  examples, AIDS and cancer.
 4      A.  Yes.                                         4      Q.  So what would the benefit of
 5      Q.  Now, have -- would you agree that            5  participating in California's Rebate Program be
 6  Average Manufacturer Price more closely              6  to a manufacturer?
 7  approximates Average Acquisition Cost as compared    7      A.  Formulary placement.
 8  to AWP?                                              8      Q.  And what would that involve?
 9          MR. FISHER:  Objection as to form.           9          Would that mean it would be approved --
10          THE WITNESS:  I believe so.                 10  like there would be no preapproval required for
11  BY MS. McDEVITT:                                    11  the drug, or is there some other -- benefit to a
12      Q.  How -- you know, please describe the        12  manufacturer?
13  context in which you have worked with AMPs, you     13      A.  Generally speaking, it would mean that
14  know, to the extent you have.                       14  there's no prior approval required.
15      A.  AMPs were part of the requirements          15      Q.  Prior approval?
16  that we had to drug manufacturers as part of the    16          All right.
17  business proposal.                                  17          Did you work -- could you explain a bit
18          Again, that was a key component in the      18  sort of how the mechanics of your work on the --
19  calculation of cost.  So we require AMPs.           19  on the Supplemental Rebate Program were?
20      Q.  All right.  And in -- in what way was       20          I mean did you -- did you -- did
21  AMP a key component in the calculation of cost?     21  manufacturers contact you, or --
22      A.  When we did contracts, the discounts        22      A.  I'm sorry.

                    Page 151                                         Page 153
 1  were -- the business proposals were based off a      1      Q.  -- did you contact them?
 2  percentage of AMP.                                   2          I'm just trying to figure out a little
 3      Q.  Could you just explain --                    3  bit of context about how it all worked as a
 4          Just take a step back.                       4  matter of process.
 5          The contracts that you are referring to      5      A.  As a Pharmaceutical Consultant 2 or as
 6  are in connection with California's Supplemental     6  a Program Manager?
 7  Rebate Program; is that correct?                     7      Q.  Well, let's start -- I mean, let start
 8      A.  Yes, correct.                                8  --
 9      Q.  And was -- from what time frame during       9          You worked on the program as a
10  the course of your employment with DHS were you    10  Pharmaceutical Consultant 2?
11  working on the Supplemental Rebate Program?        11      A.  Yes.
12      A.  That would have been from the time I       12      Q.  And what -- what did you do when you
13  went to Sacramento as a Pharmaceutical Consultant  13  had that title?
14  2, so 2000 to 2006.                                14      A.  Primarily my job was to conduct the
15      Q.  Okay.  And during that time frame it       15  drug reviews going through the five criteria and
16  -- California's Supplemental Rebate Program was    16  establishing whether or not a drug was
17  -- was a voluntary one; is that correct?           17  appropriate for a placement on the formulary.
18      A.  What do you mean by "voluntary."           18      Q.  And we talked a bit about that
19      Q.  In order for a manufacturer to have        19  earlier.  That was the five factors.
20  its drug covered by Medi-Cal did it have to        20          Now, when you -- when you changed jobs,
21  participate in the California Supplemental Rebate  21  how did your responsibilities in respect to the
22  Program?                                           22  rebate program, California's rebate program,
```

Page 162

1    I don't remember the specific dealings
2  though.
3    Q.  Okay.  In -- in 2002 do you recall
4  whether California had a supplemental rebate
5  agreement with Geneva?
6    A.  Highly unlikely.
7    Q.  Why -- why do you believe it's highly
8  unlikely?
9    A.  Because I don't believe we had any
10 generic rebates of any kind.
11   Q.  During that time?
12   A.  Correct.
13   Q.  At one point in time Medi-Cal did have
14 generic supplemental rebates; did it not?
15   A.  In my tenure there?
16   Q.  Yes.
17   A.  There was a class of drugs that I
18 called "quasi-brand" because some of the generic
19 companies came out with a product that had a
20 proprietary brand name, but they deemed
21 themselves generic.
22   Q.  Uh-huh.

Page 163

1    A.  And I know we were working on
2  contracts with them, but -- I can't remember the
3  specifics.
4    Q.  You recall any supplemental rebate
5  agreements concerning Lorazepam?
6    A.  Yes.
7    Q.  Okay.  And that would be with -- those
8  would be with generic manufacturers; is that
9  right?
10   A.  We had what was called a "labeler
11 restriction," but I can't recall the labelers
12 that it was to, a manufacturer restriction, in
13 other words.
14   Q.  Getting back to the request for Mr.
15 Hartman's contact information, do you have any
16 recollection of -- of contacting him after
17 receiving this E-mail?
18   A.  No.  I just remember the name.
19   Q.  Okay.  So no other memory of -- of
20 interactions with him, I take it?
21   A.  No.
22   Q.  And, if I understand your testimony

Page 164

1  correctly then, you don't have a recollection of
2  -- either Geneva or Sandoz having a -- being
3  involved in the -- or being a contracting party
4  in California's Voluntary Supplemental Rebate
5  Program?
6    A.  Correct.
7    Q.  Okay.  Why weren't there voluntary
8  supplemental rebate contracts entered in to with
9  generics to your understanding?
10   A.  Yes.
11      I -- there are reasons.  I'm trying to
12 remember the whole structure of the rebate and
13 the math.
14      Oh, I recall it now.
15      It wasn't practical because based off
16 our reimbursement formula for generics to reach
17 that level of rebate, where they could be
18 possibly competitive, they would have to give an
19 extraordinary level of rebate.
20      So, therefore, there was no interest on
21 the part of the generic companies.
22   Q.  So, in other words, you -- based on

Page 165

1  your formula you saw that the --
2      Well, strike that.
3      What -- when you refer to your formula
4  and you were looking at the -- the comparison
5  that you've just described, what information from
6  generic manufacturers were you considering?
7    A.  Again, it was a four -- variable
8  formula, and so we had to have three other
9  components.  So it would have been the AWP minus
10 whatever percent.
11      We had to have the CMS Rebate, which
12 was given to us, and we had to have the
13 California supplemental offer, if any.
14   Q.  And what information did you have
15 about the -- in connection with the CMS rebate?
16      Is this -- did you have AMPs, or did
17 you have URAs?
18      Do you recall?
19   A.  Yes.
20      If the manufacturer had contacted us
21 and was interested in pursuing additional
22 formulary, they'd give us the AMP.  That was the

Page 166

1  requirement.
2       So we had it.
3       But we could also calculate from the
4  CMS information that we had, because our rebate
5  was set at 11 percent fixed.
6       Q.  Right.
7       So what you were receiving, what
8  California was receiving from CMS, were something
9  called "unit rebate amounts;" is that what you're
10 talking about?
11      A.  Correct, yes.
12      Q.  And what is a "unit."
13      Do you know what -- what that -- what
14 that represents, a unit rebate amount?
15      A.  I can't remember the exact definition.
16      Q.  Okay.  But -- but you just -- you just
17 noted that you could -- from that unit rebate
18 amount you could -- you could calculate the --
19 what the AMP would be?
20      A.  For generic drugs.
21      Q.  For generic drugs, right.
22      And so you saw, when you calculated AMP

Page 167

1  for the generic drug, that it -- that it was a
2  very low number; right?
3       A.  Correct.
4       Q.  Okay.  Much lower, would you agree
5  with me, than AWP-17 percent?
6       MR. FISHER:  Objection as to form.
7       THE WITNESS:  Again, I don't remember
8  the numbers, but probably.
9  BY MS. McDEVITT:
10      Q.  Okay.  Was California the first state
11 to implement a Supplemental Rebate Program?
12      Do you know?
13      A.  I'm not sure.
14      Q.  Okay.  It's -- do you know what
15 California's motivation was for launching a
16 Supplemental Rebate Program?
17      MR. FISHER:  Objection as to form.
18      THE WITNESS:  I don't recall ever
19 seeing a statement to that effect, but -- based
20 off the mathematics, to lower the costs --
21 program costs.
22 BY MS. McDEVITT:

Page 168

1       Q.  Fair to say it would -- a reason for
2  it would be to drive down net costs for -- for a
3  given drug; is that right?
4       A.  Correct.
5       Q.  And you were looking at -- at -- at
6  net cost, I believe you've testified --
7       A.  Correct.
8       Q.  -- earlier?
9       You looked at those four factors you
10 articulated, and you ultimately get to a -- to a
11 number; right?
12      A.  Correct.
13      MS. McDEVITT:  I'm trying to show you
14 documents that you might actually have seen, so
15 that's the reason for a little bit of the delay.
16      I apologize for it, but we're actually
17 trying to make it a bit more efficient than it
18 otherwise would be.
19      THE WITNESS:  Yes.  Thank you.
20      (Exhibit Namba 023 was marked for
21      Identification.)
22      MR. FISHER:  It's worth the wait.

Page 169

1       MS. McDEVITT:  You know, you try.  You
2  try.
3       What we've marked as Exhibit 23 is a
4  print-out of an E-mail that -- that you sent
5  produced from the Department of Health Services
6  Bates stamped E0039867.
7       It's a three page E-mail, and it's
8  dated the 17th of July, 2002 to someone named
9  Eric.Belldina@mylanlabs.com.
10      A.  (Nodding head)
11      Q.  Do you remember seeing this?
12      Or do you remember sending this?
13      A.  Not the E-mail itself, but I recognize
14 Eric's name.
15      Q.  And do you recall any of your
16 interactions with him?
17      A.  Again, from the document he must have
18 been asking us to explain the -- Medi-Cal
19 pricing, how we do our cost calculations.
20      Q.  Did you ever meet him?
21      A.  I'm not sure.
22      Q.  Okay.  Is -- is it fair to say that

43 (Pages 166 to 169)