# EXHIBIT E



**DEPARTMENT OF HEALTH & HUMAN SERVICES**     OFFICE OF INSPECTOR GENERAL

Region IX
Office of Audit Services
50 United Nations Plaza
San Francisco, CA 94102

December 23, 2003

Report Number A-09-03-00038

Diana M. Bonta, R.N., Dr. P.H.
Director
Department of Health Services
1501 Capitol Avenue, Suite 6001
MS 0000
Sacramento, California 95814

Dear Dr. Bonta:

Enclosed are two copies of the U.S. Department of Health and Human Services (HHS), Office of Inspector General Report entitled, "Audit of the Medicaid Drug Rebate Program in California."

Final determination as to actions taken on all matters reported will be made by the HHS action official named on page 2 of this transmittal letter. We request that you respond to the HHS action official within 30 days from the date of this letter. Your response should present any comments or additional information that you believe may have a bearing on the final determination.

In accordance with the principles of the Freedom of Information Act (5 U.S.C. 552, as amended by Public Law 104-231), OIG Reports issued to the Department's grantees and contractors are made available to members of the press and general public to the extent information contained therein is not subject to exemptions in the Act which the Department chooses to exercise. (See 45 CFR Part 5.) As such, within 10 business days after the final report is issued, it will be posted on the Internet at *http://oig.hhs.gov.*

To facilitate identification, please refer to report number A-09-03-00038 in all correspondence relating to this report. If you have any questions or need additional information, please contact Doug Preussler at (415) 437-8309.

Sincerely,

Lori A. Ahlstrand
Regional Inspector General
for Audit Services

CAAG/DHS-E0032592

Page 2 – Dr. Diana M. Bonta

**Direct Reply to HHS Action Official:**

Mr. H. Stephen Deering
Acting Regional Administrator
U.S. Department of Health and Human Services
Centers for Medicare & Medicaid Services – Region IX
75 Hawthorne Street, Room 408
San Francisco, California 94105

Enclosures – As stated

# Department of Health and Human Services

## OFFICE OF
## INSPECTOR GENERAL

# AUDIT OF THE
# MEDICAID DRUG REBATE PROGRAM
# IN CALIFORNIA



DECEMBER 2003
A-09-03-00038

CAAG/DHS-E0032594

# *Office of Inspector General*
### http://oig.hhs.gov

The mission of the Office of Inspector General (OIG), as mandated by Public Law 95-452, as amended, is to protect the integrity of the Department of Health and Human Services (HHS) programs, as well as the health and welfare of beneficiaries served by those programs. This statutory mission is carried out through a nationwide network of audits, investigations, and inspections conducted by the following operating components:

## *Office of Audit Services*

The OIG's Office of Audit Services (OAS) provides all auditing services for HHS, either by conducting audits with its own audit resources or by overseeing audit work done by others. Audits examine the performance of HHS programs and/or its grantees and contractors in carrying out their respective responsibilities and are intended to provide independent assessments of HHS programs and operations in order to reduce waste, abuse, and mismanagement and to promote economy and efficiency throughout the department.

## *Office of Evaluation and Inspections*

The OIG's Office of Evaluation and Inspections (OEI) conducts short-term management and program evaluations (called inspections) that focus on issues of concern to the department, the Congress, and the public. The findings and recommendations contained in the inspections reports generate rapid, accurate, and up-to-date information on the efficiency, vulnerability, and effectiveness of departmental programs.

## *Office of Investigations*

The OIG's Office of Investigations (OI) conducts criminal, civil, and administrative investigations of allegations of wrongdoing in HHS programs or to HHS beneficiaries and of unjust enrichment by providers. The investigative efforts of OI lead to criminal convictions, administrative sanctions, or civil monetary penalties. The OI also oversees state Medicaid fraud control units, which investigate and prosecute fraud and patient abuse in the Medicaid program.

## *Office of Counsel to the Inspector General*

The Office of Counsel to the Inspector General (OCIG) provides general legal services to OIG, rendering advice and opinions on HHS programs and operations and providing all legal support in OIG's internal operations. The OCIG imposes program exclusions and civil monetary penalties on health care providers and litigates those actions within the department. The OCIG also represents OIG in the global settlement of cases arising under the Civil False Claims Act, develops and monitors corporate integrity agreements, develops model compliance plans, renders advisory opinions on OIG sanctions to the health care community, and issues fraud alerts and other industry guidance.



**DEPARTMENT OF HEALTH & HUMAN SERVICES**          OFFICE OF INSPECTOR GENERAL

Region IX
Office of Audit Services
50 United Nations Plaza
Room 171
San Francisco, CA  94102

December 23, 2003

Report Number A-09-03-00038

Diana M. Bonta, R.N., Dr. P.H.
Director
Department of Health Services
1501 Capitol Avenue, Suite 6001
MS 0000
Sacramento, California  95814

Dear Dr. Bonta:

This report provides you with the results of our "Audit of the Medicaid Drug Rebate Program in California." The Medicaid drug rebate program was established to allow Medicaid to receive pricing benefits commensurate with its position as a high-volume purchaser of prescription drugs.

## EXECUTIVE SUMMARY

### OBJECTIVE

The objective of our review was to evaluate whether the State of California's Department of Health Services (State Agency) had established adequate accountability and internal controls over the Medicaid drug rebate program.

### SUMMARY OF FINDINGS

The State Agency had: (i) designed an adequate system to track receivables for drug rebate activity to the National Drug Code (NDC) level, and (ii) established formal policies and procedures over its Medicaid drug rebate program. However, we identified internal control and accountability weaknesses in the following areas:

- **Quarterly Reporting** – The State Agency was unable to provide documentation to support the $1.34 billion in uncollected rebates reported to the Centers for Medicare & Medicaid Services (CMS) as of June 30, 2002. In addition, the State Agency did not reconcile this balance to its subsidiary ledger system.

Page 2 – Dr. Diana M. Bonta

- **Accounts Receivable System** - The State Agency did not maintain a general ledger accounts receivable control account.

- **Dispute Resolution** - The State Agency did not actively work to resolve the backlog of manufacturer drug rebate disputes. In addition, the State Agency had not used the State hearing process to resolve long-standing disputes with manufacturers as suggested by CMS, and did not have polices on the use of the hearing process.

## RECOMMENDATIONS

We recommend that the State Agency establish internal controls to:

- implement a system capable of providing documentation to support numbers reported to CMS, and reconcile the ending balance of uncollected rebates to the receivable account;

- create a general ledger control account for drug rebate receivables; and

- actively work to resolve manufacturer disputes and, when appropriate, use the State hearing mechanism to resolve long-standing disputes.

## STATE AGENCY COMMENTS

In written comments to our draft report, the State Agency partially agreed with the findings and recommendations regarding quarterly reporting and dispute resolution. The State Agency disagreed with our recommendation regarding the accounts receivable system. The complete text of the State Agency's comments is included as an appendix to this report.

The State Agency agreed to reconcile the ending balance of uncollected rebates to its receivable account. However, the State Agency disagreed with the amount of uncollected rebates reported in our finding and indicated that we should have used the amount supported by the State's subsidiary ledger.

The State Agency did not agree to implement a general ledger control account. The State Agency believed that it would not be a proper accounting practice to treat invoiced amounts as accounts receivable in its general ledger, because drug manufacturers are allowed to increase or decrease retroactively the cost basis used to calculate the rebate.

The State Agency partially agreed with our dispute resolution finding and indicated that it would increase staffing for dispute resolution. However, the State Agency indicated that it did not need to use the State hearing mechanism, because it could achieve voluntary compliance without resorting to a hearing process.

Page 3 – Dr. Diana M. Bonta

**OFFICE OF INSPECTOR GENERAL (OIG) RESPONSE**

The balance reported as uncollected rebates was obtained from the State Agency certified CMS report submitted for the quarter ended June 30, 2002. If the balance was incorrectly reported, the State Agency should work with CMS to resolve the error. The implementation of a system to reconcile the ending balance of uncollected rebates to the receivable account quarterly should help ensure that future reports to CMS are accurate.

The establishment of a control account for drug rebate receivables would help the State Agency to ensure that its drug rebate receivables are accurate. In addition, a control account would provide increased awareness of the receivable and may result in increased audit coverage.

Although manufacturers may be willing to work with the State to resolve disputes, disagreements may still occur. In these instances, use of the State hearing mechanism would be appropriate.

# INTRODUCTION

## BACKGROUND

On November 5, 1990, Congress enacted the Omnibus Budget Reconciliation Act of 1990 legislation (OBRA '90), which established the Medicaid drug rebate program that became effective January 1, 1991. The Medicaid drug rebate program was established to allow Medicaid to receive pricing benefits commensurate with its position as a high-volume purchaser of prescription drugs. Responsibility for the rebate program was shared among the drug manufacturers, CMS, and participating States. Throughout the program, CMS issued memoranda to State agencies and manufacturers to provide guidance on numerous issues related to the Medicaid drug rebate program.

The OBRA '90 required a drug manufacturer to enter into, and have in effect, a rebate agreement with CMS in order to have its products covered under the Medicaid program. After a rebate agreement was signed, the manufacturer was required to submit to CMS a listing of all covered outpatient drugs, including the average manufacturer price and best price information for each drug. A covered outpatient drug is one of approximately 56,000 drugs listed in the NDC listing. Approximately 550 pharmaceutical companies participated in the program nationally.

Based on the information received from the manufacturers, CMS calculated and provided the unit rebate amount (URA) for each covered drug to States quarterly on a computer tape. However, the CMS tape may have contained a $0 URA if the pricing information was not provided timely by a manufacturer or if the computed URA had a 50 percent variance from the previous quarter. In instances of $0 URAs, States were instructed to invoice the units and the manufacturers were required to calculate the URAs and remit the appropriate amounts to the States. In addition, the manufacturers could change any URA based on updated pricing information, and submit this information to the States.

Page 4 – Dr. Diana M. Bonta

Each State was required to maintain, by manufacturer, the number of units dispensed for each covered drug. That number was applied to the URA to determine the actual rebate amount due from each manufacturer. States were required to provide drug utilization data to the manufacturers and CMS on a quarterly basis.

From the date an invoice was postmarked, each manufacturer had 38 days to remit the drug rebate amount owed to the State before interest started to accrue. The manufacturers were to provide the State with a Reconciliation of State Invoice detailing its rebate payment by NDC. A manufacturer could dispute utilization data it believed to be erroneous, but was required to pay the undisputed portion of the rebate by the due date. If the manufacturer and the State could not, in good faith, resolve the discrepancy, the manufacturer was required to provide written notification of the dispute to the State by the due date. The manufacturer was required to calculate and remit interest for disputed rebates when settlement was made in favor of the State. If the State and manufacturer were not able to resolve the discrepancy within 60 days, the State was required to make available a hearing mechanism under the State's Medicaid program for the manufacturer to resolve the dispute. In addition, States had the option to attend conferences, such as the Dispute Resolution Project sponsored by CMS, to resolve disputes with manufacturers.

States were required to report, on a quarterly basis, rebate collections on the CMS 64.9R report. Specifically, States were required to report rebates invoiced in the current quarter, adjustments and rebates received during the current quarter, and uncollected rebate balances for the current and prior quarters. The CMS 64.9R report was part of the CMS 64 report, which summarized actual Medicaid expenditures for each quarter and was used by CMS to reimburse the Federal share of these expenditures.

The State Agency reported (1) an average of $127 million[1] in billings and $227 million in collections per quarter during the 1-year period ending June 30, 2002, and (2) $1.34 billion as the outstanding receivable balance as of June 30, 2002. Based on the quarterly billings and outstanding balance reported on its June 30, 2002 CMS 64R report, the State Agency had an outstanding balance over 90 days of over $1.1 billion.

The California drug rebate program was established on January 1, 1991. From January 1991 through December 1996, the State Agency was responsible for all of the functions of the drug rebate program. Effective January 1997, the State Agency contracted with a private company to perform the operational activities of the rebate program, including generating and mailing invoices, and posting payments to and operating the State Agency's subsidiary ledger system. The State Agency continued to perform the quarterly reporting, cash receipt, general ledger posting, and dispute resolution functions.

---

[1] For the quarter ending September 30, 2001, the State Agency reported $0 in billings to CMS. As a result, the average quarterly billings reported above is understated.

CAAG/DHS-E0032599

Page 5 – Dr. Diana M. Bonta

## OBJECTIVE, SCOPE, AND METHODOLOGY

### Objective

The objective of our review was to evaluate whether the State Agency had established adequate accountability and internal controls over the Medicaid drug rebate program.

### Scope

We focused our audit on the current policies, procedures, and internal controls established by the State Agency and contractor for the Medicaid drug rebate program. We also reviewed accounts receivable information related to prior periods and interviewed State Agency and contractor employees to gain an understanding of how the Medicaid drug rebate program had operated since the State Agency began working with the contractor in January 1997.

### Methodology

Our audit was performed in accordance with generally accepted government auditing standards. To accomplish our objective, we interviewed State Agency and contractor officials to determine the policies, procedures, and internal controls that existed with regard to the Medicaid drug rebate program. We also interviewed State Agency and contractor employees who performed functions related to the drug rebate program, to understand their roles in the invoicing, collections, and dispute resolution processes. In addition, we reviewed the contractor's drug rebate activity summaries and compared the data on the summaries to the CMS 64.9R reports for the quarters ending June 30, 2001 through September 30, 2002.

Our field work was conducted during the period June through September 2003, and included site visits to State Agency and contractor offices in Sacramento, California.

## FINDINGS AND RECOMMENDATIONS

The State Agency had: (i) designed an adequate system to track receivables for drug rebate activity to the NDC level, and (ii) established formal policies and procedures over its Medicaid drug rebate program. However, we identified internal control and accountability weaknesses in the following areas:

- Quarterly Reporting
- Accounts Receivable System
- Dispute Resolution

### QUARTERLY REPORTING

The State Agency was unable to support the June 30, 2002 balance of uncollected rebates, totaling $1.34 billion, reported to CMS. State Agency officials indicated that the subsidiary

Page 6 – Dr. Diana M. Bonta

ledger system had never been programmed to generate a report based on historical data and, at the time of our review, the subsidiary ledger system was only capable of generating reports to provide supporting detail as of the time the report was generated. Because the State Agency could not generate reports based on historical data, it was not able to verify the accuracy of the uncollected rebate balance reported to CMS nor could it reconcile the ending balance of uncollected rebates to its supporting receivable account.

In addition, we noted that the State Agency had reported $0 in billings to CMS for the quarter ending September 30, 2001. Based on the State Agency's invoice summary, the billings for that quarter were $153 million. This occurred because the State Agency was not able to accurately determine total billings until after the CMS reporting date for that quarter. As of the time of our review, the State Agency had not revised its September 30, 2001 CMS 64.9R report to reflect actual billings for that quarter. The State Agency should ensure that the CMS 64.9R reports that it submits to CMS accurately reflect its Medicaid drug rebate program activity.

**ACCOUNTS RECEIVABLE SYSTEM**

The State Agency did not maintain a general ledger accounts receivable control account. The State Agency's general ledger system, California State Accounting and Reporting System, only maintained drug rebate collections in the aggregate.

Since the State Agency did not maintain a general ledger accounts receivable control account, the State Agency could not reconcile the amount of uncollected rebates reported to its general ledger.

**DISPUTE RESOLUTION**

The State Agency had not actively worked to resolve a portion of the long-standing disputes with manufacturers over drug rebate amounts. In addition, the State Agency did not have policies and procedures in place to utilize the State hearing mechanism to resolve long-standing disputes with manufacturers. As of June 20, 2003, the State Agency had $337 million in outstanding rebate receivables for the quarters ending March 31, 1991 through December 30, 2001.

During the period May 2000 through February 2002, the State Agency reviewed few drug rebate disputes because the analysts were involved in implementing the State Agency's current subsidiary ledger system. Following the implementation of the system, State Agency analysts still did not work to actively resolve all pending disputes due to the limited number of analysts available to invest the time needed to research and resolve disputes with manufacturers.

Prior to and during our audit, the State Agency had hired more analysts to review dispute resolution cases. However, we found that the State Agency analysts were not actively working to resolve all disputed cases and were primarily working those cases where the manufacturers had contacted the State Agency to resolve.

CAAG/DHS-E0032601

Page 7 – Dr. Diana M. Bonta

In addition, the State Agency did not have policies and procedures to utilize the State hearing mechanism to resolve long-standing disputes with manufacturers. The State Agency would benefit from establishing procedures for use of the State hearing mechanism to resolve future disputes in the event that it is unable to reach satisfactory resolution with drug manufacturers.

**RECOMMENDATIONS**

We recommend that the State Agency establish internal controls to:

- implement a system capable of providing documentation to support numbers reported to CMS, and reconcile the ending balance of uncollected rebates to the receivable account;

- create a general ledger control account for drug rebate receivables; and

- actively work to resolve manufacturer disputes and, when appropriate, use the State hearing mechanism to resolve long-standing disputes.

**STATE AGENCY COMMENTS**

In written comments to our draft report, the State Agency partially agreed with the findings and recommendations regarding quarterly reporting and dispute resolution. The State Agency disagreed with our recommendation regarding the accounts receivable system.

The State Agency partially agreed with our quarterly reporting finding and recommendation. The State Agency indicated that it had provided a more reliable figure for the uncollected rebate amount during the audit and the amount used in the finding was overstated. The State Agency also stated that it has a system capable of supporting the rebate numbers reported to CMS. The State Agency agreed to prospectively reconcile the ending balances of uncollected rebates reported to CMS to the receivable account.

The State Agency disagreed with our accounts receivable system recommendation to create a general ledger control account for drug rebate receivables. The State Agency indicated it would not be a proper accounting practice to treat invoiced amounts as accounts receivable in its general ledger due to the nature of the rebate program, which allows for unlimited retroactive rebate payment adjustments.

The Stage Agency partially agreed with our dispute resolution finding and recommendation to actively work to resolve manufacturer disputes and, when appropriate, use the State hearing mechanism to resolve long-standing disputes. The State Agency stated that, in the past, its staffing levels were not adequate to both resolve disputes and reduce the backlog. However, for State Fiscal Year 2004, the State Agency indicated that it added 11 staff positions to resolve the disputes. Further, the State Agency stated that it has not encountered a manufacturer unwilling to work cooperatively to resolve disputes. The State Agency believed its State statutes contain provisions to achieve voluntary compliance without resorting to a hearing process.

Page 8 – Dr. Diana M. Bonta

## OIG RESPONSE

The amount reported to CMS for uncollected rebates during the audit period was not adequately supported by the State Agency. We identified in this report the amount submitted and certified by the State Agency in its report to CMS for the quarter ended June 30, 2002, which contained the State Agency's cumulative balance of uncollected rebates. If the balance was incorrectly reported, the State Agency should work with CMS to resolve the error. The implementation of a system to reconcile the ending balance of uncollected rebates to the receivable account quarterly should help ensure that future reports to CMS are accurate.

A control account for drug rebate receivables would be appropriate and help the State Agency to ensure that its drug rebate receivables are accurate. Establishment of a general ledger control account would provide increased awareness of the receivable and may result in increased audit coverage by the State auditors when performing the State's annual financial review.

The indicated increase in dispute resolution staff should help to actively resolve long-standing disputes with manufacturers. However, there may be disputes that cannot be easily resolved and use of the State hearing mechanism would be appropriate in these instances.

\* \* \* \* \* \* \*

In accordance with the principles of the Freedom of Information Act (5 U.S.C. 552, as amended by Public Law 104-231), OIG reports issued to the Department's grantees and contractors are made available to members of the press and general public to the extent information contained therein is not subject to exemptions in the Act which the Department chooses to exercise. (See 45 CFR, part 5.)

To facilitate identification, please refer to report number A-09-03-00038 in all correspondence relating to this report.

Sincerely,

*[signature]*

Lori A. Ahlstrand
Regional Inspector General
 for Audit Services

Enclosure

# APPENDIX

CAAG/DHS-E0032604



State of California—Health and Human Services Agency
# Department of Health Services



DIANA M. BONTÁ, R.N., Dr. P.H.
Director

ARNOLD SCHWARZENEGGER
Governor

December 1, 2003

Ms. Lori A. Ahlstrand
Regional Inspector General
 for Audit Services
Office of Inspector General
Department of Health and Human Services
50 United Nations Plaza, Room 171
San Francisco, CA  94102

Dear Ms. Ahlstrand:

Thank you for your letter to Diana M. Bontá, R.N., Dr.P.H, Director of the Department of Health Services (DHS) regarding the Office of Inspector General's (OIG) draft report entitled, "Audit of the Medicaid Drug Rebate Program in California."

DHS notes that the objective of OIG's review of its drug rebate program "…**was to evaluate whether the State of California's Department of Health Services (State Agency) had established adequate accountability and internal controls over the Medicaid drug rebate program.**"

DHS is pleased that OIG found "**The State Agency had: (i) designed an adequate system to track receivables for drug rebate activity to the National Drug Code (NDC) level, and (ii) established formal policies and procedures over its Medicaid drug rebate program.**"

With federal financial assistance from the Department of Health and Human Services, DHS put much effort into designing and implementing its Rebate Accounting and Information System (RAIS). The RAIS system provides fiscal control and accountability at the NDC level. The system is now being adapted by other states to their drug rebate programs. DHS staff has provided technical assistance to these other states.

DHS notes that OIG found some internal control and accountability weaknesses and has made corresponding recommendations. As OIG has requested, DHS is submitting its actions taken or contemplated in response to the findings.

DHS is committed to the goal of building upon the successful Medi-Cal drug program to continue to lead the nation in obtaining vital drugs for Medi-Cal beneficiaries at the

1501 Capitol Avenue, Suite 71.6086, MS 4000, P.O. Box 942732
Sacramento, CA  94234-7320
(916) 440-7800   Fax: (916) 440-7805
www.dhs.ca.gov

CAAG/DHS-E0032605

Ms. Lori A. Ahlstrand
Page 2
December 1, 2003

lowest possible cost to the State. DHS is grateful for the objective review and assistance the OIG's report gives it in meeting that goal.

If you require further information concerning the Department's Medi-Cal drug program, please contact Mr. Roberto B. Martinez, Chief of the Medi-Cal Policy Division, at (916) 552-9400.

Sincerely,

Stan Rosenstein
Deputy Director
Medical Care Services

Enclosure

cc:  Mr. Roberto B. Martinez, Chief
     Medi-Cal Policy Division
     Department of Health Services
     1501 Capitol Avenue, Suite 4001
        MS 4600
     P.O. Box 942732
     Sacramento, CA 94234-7320

     Mr. Bud Lee, Chief
     Medi-Cal Contracting Section
     Department of Health Services
     1501 Capitol Avenue, Suite 3041
        MS 4600
     P.O. Box 942732
     Sacramento, CA 94234-7320

     Mr. Craig Miller, Chief
     Medi-Cal Rebate & Vision Section
     Department of Health Services
     1501 Capitol Avenue, Suite 3041
        MS 4600
     P.O. Box 942732
     Sacramento, CA 94234-7320

Response to Office of Inspector General's Draft Report Entitled

**"Audit of the Medicaid Drug Rebate Program in California"**

December 1, 2003

1. **OIG Finding:**

    Quarterly Reporting--The State Agency was unable to provide documentation to support the $1.34 billion in uncollected rebates reported to the Centers for Medicare & Medicaid Services (CMS) as of June 30, 2002. In addition, the State Agency did not reconcile this balance to its subsidiary ledger system.

    **OIG Recommendation:**

    Implement a system of providing documentation and reconcile the ending balance of uncollected rebates to the receivable account.

    **DHS Action Taken or Contemplated:**

    DHS contests the finding. DHS provided a more reliable figure for the uncollected rebate amount during the audit. DHS believes the OIG finding is overstated by more than one-half billion dollars. DHS' estimate of approximately $818 million is based on the more reliable and federally supported Rebate Accounting and Information System (RAIS). This constitutes the pool of "aged rebates" for which DHS received authority to hire additional staff to reconcile these outstanding claims. Additionally, DHS is investigating to determine why the federal CMS 64 report (status of drug rebate dollars reported quarterly to CMS from DHS) is incorrect. The RAIS was developed in part to account for changes in the Rebate Per Unit (RPU) amount which may have either overstated or understated the true RPU. This review and reconciliation, however, will not be completed within the 45 days the OIG has allowed for this response. DHS appreciates OIG's input and will inform the OIG of corrective actions taken.

    RAIS is the **"system capable of providing documentation to support numbers reported to CMS."** DHS agrees with and will implement OIG's recommendation to **"reconcile the ending balance of uncollected rebates to the receivable account."** From now on as part of its routine procedures, DHS will compare the CMS 64 report with the RAIS' (subsidiary ledger system) documentation to prevent a future CMS 64 reporting error.

2. **OIG Finding:**

    Accounts Receivable System--The State Agency did not maintain a general ledger accounts receivable control account.

1

CAAG/DHS-E0032607

**DHS Action Taken or Contemplated:**

DHS does not maintain an accounts receivable control account in its general ledger. This is due to the nature of the drug rebate program. Current federal rules permit drug manufacturers to increase or decrease retroactively, with no time limitation, the cost basis CMS uses to calculate the rebate due to the states and CMS. Therefore, the rebates owed by the manufacturer to the State of California and the federal goverment can be increased or decreased retroactively for many years previously.

As an example, OIG states in its introduction to its report:

**Based on the information received from the manufacturers, CMS calculated and provided the unit rebate amount (URA) for each covered drug to States quarterly on a computer tape. However, the CMS tape may have contained a $0 URA if the pricing information was not provided timely by a manufacturer or if the computed URA had a 50 percent variance from previous quarter. In instances of $0 URAs, States were instructed to invoice the units and the manufacturers were required to calculate URAs and remit the appropriate amounts to the States. In addition, the manufacturers could change any URA based on updated pricing information, and submit this information to the States.**

Due to the federally permitted, unlimited retroactive rebate payment adjustments, DHS believes it would not be proper accounting practice to treat invoiced amounts as accounts receivable in its general ledgers. Consequently, DHS built RAIS to serve the function of properly accounting for rebates monies. CMS confirmed this concern in its September 26, 2003, Federal Register publication (Volume 68, No. 187), which "establishes new record keeping requirements for drug manufacturers under the Medicaid drug rebate program. It also sets forth a 3-year time limitation during which manufacturers must report changes to average price and best price for purposes of reporting data to (CMS)" (p. 55527). California commented on this rule by requesting the 3-year time limitation be reduced to 2 years, thereby limiting the opportunity for drug manufacturers to retroactively adjust prices and reduce rebates owed the federal and state governments.

3. **OIG Finding:**

Dispute resolution--The State Agency did not actively work to resolve the backlog of manufacturer drug rebate disputes. In addition, the State agency had not used the State hearing process to resolve long-standing disputes with manufacturers as suggested by CMS and did not have policies on the use of the hearing process.

2

CAAG/DHS-E0032608

**DHS Action Taken or Contemplated:**

DHS agrees that, in the past, the staff time previously available to work on the backlog of manufacturer drug rebate disputes was not adequate to both resolve disputes added each calendar quarter, and to reduce the backlog. For California Fiscal Year 2003-04, DHS is adding 11 staff positions that will be devoted to resolving the aged disputes.

DHS has not encountered a manufacturer unwilling to work cooperatively to resolve disputes. Should a conflict occur that DHS cannot resolve informally, DHS believes it has sufficient authority in state statute and rebate contracts to ensure compliane. State statute [Welfare and Institutions Code 14105.33 (O)] provides: "If the department has not received a rebate payment, including interest, within 180 days of the date of mailing of the invoice, including supporting utilization data, the manufacturer's contract with the department shall be deemed to be in default and the contract may be terminated in accordance with the terms of the contract. For all other manufacturers, if the department has not received a rebate payment, including interest, within 180 days of the date of mailing of the invoice, including supporting utilization data, all of the drug products of those manufacturers shall be made available only through prior authorization effective 270 days after the date of mailing of the invoice, including utilization data sent to manufacturers.

Therefore, DHS believes that it can easily achieve voluntary compliance without resorting to a hearing process.

**DHS Response Summary:**

DHS appreciates the objective review that OIG has provided of its rebate program. It will work vigorously to address situations identified by the OIG as warranting attention.

3

# ACKNOWLEDGMENTS

This report was prepared under the direction of Lori A. Ahlstrand, Regional Inspector General for Audit Services. Other principal Office of Audit Services staff who contributed include:

Douglas Preussler, *Audit Manager*
Juliet Lo, *Senior Auditor*
Clarissa Yu, *Auditor*
Kimberly Kennedy, *Auditor*

For information or copies of this report, please contact the Office of Inspector General's Public Affairs office at (202) 619-1343.