# EXHIBIT H

Reed, Larry - Vol. V                    October 2, 2008
                    Washington, DC

Page 994

                UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - -x

IN RE:  PHARMACEUTICAL      :  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE  :  CIVIL ACTION

PRICE LITIGATION            :  01-CV-12257-PBS

THIS DOCUMENT RELATES TO:   :

U.S. ex rel. Ven-a-Care of  :  Hon.  Patti B. Saris

the Florida Keys, Inc.      :

     v.                     :

Dey, Inc., et al.           :

No. 05-11084-PBS            :

- - - - - - - - - - - - - -x

        (captions continue on following pages)



        Videotaped deposition of LARRY REED

                 Volume V


                 Washington, D.C.

                 Thursday, October 2, 2008

abc7abc9-82bf-4aa4-914c-080d29d14d56

Reed, Larry - Vol. V                                    October 2, 2008
Washington, DC

Page 1319

1    got it for 10 percent?
2        A.  Go back to page 2.
3        Q.  Right.
4        A.  I think it started in calendar year
5    '91.
6        Q.  Okay, so in '91, '92, '93, they are
7    getting URAs that are 10 percent of the AMP,
8    correct?
9        A.  Correct.
10       Q.  So the state Medicaid person who got
11   URAs during that time period could look at that
12   URA and pretty much know exactly what the AMP is
13   just by moving the decimal point one place,
14   correct?
15           MS. OBEREMBT:  Objection.
16           MS. THOMAS:  Object.
17   BY MR. MERKL:
18       Q.  True?
19       A.  There would be a way to figure --
20   probably a way -- 10 percent would be 10 percent
21   of AMP, so basically that's correct.
22       Q.  So really it's not much of a

Page 1320

1    calculation, you just move the decimal point,
2    right?
3            MS. OBEREMBT:  Objection.
4    BY MR. MERKL:
5        Q.  True?
6        A.  It would be 10 percent.
7        Q.  It would be a pretty easy calculation,
8    correct?
9            MS. OBEREMBT:  Objection.
10           THE WITNESS:  Again, if it's 10
11   percent, it would be 10 times that amount.
12   BY MR. MERKL:
13       Q.  Now, next year it went to 11 percent,
14   correct?
15       A.  In calendar year 1994.
16       Q.  And it's been at 11 percent ever since,
17   correct?
18       A.  Correct.
19       Q.  So again, anyone in the state Medicaid
20   office who gets the URA for -- the URAs for
21   generic drugs can, by doing a simple mathematical
22   computation based on 11 percent, pretty readily

Page 1321

1    determine what the AMP is, correct?
2            MS. OBEREMBT:  Objection.
3            THE WITNESS:  Correct.
4    BY MR. MERKL:
5        Q.  Is there anything in this agreement
6    that prevents state Medicaid officials from
7    reading and understanding the AMP or URA data
8    that they get?
9            MS. OBEREMBT:  Objection.
10           THE WITNESS:  And I'm not sure for -- I
11   mean, I'm not sure I understand your question.
12   Could you give it to me in a different manner?
13   BY MR. MERKL:
14       Q.  Well yeah.  Someone presumably at each
15   state agency gets the AMP data, right, in the
16   form of URAs, correct?
17       A.  Right.
18           MS. OBEREMBT:  Objection.
19   BY MR. MERKL:
20       Q.  Is there any rule that says they are
21   not allowed to read the URA information or
22   understand it?

Page 1322

1            MS. OBEREMBT:  Objection.
2    BY MR. MERKL:
3        Q.  They are allowed to look at it, right?
4        A.  For rebate purposes, they are allowed
5    to look at it.
6        Q.  And they sit down and they take that
7    and they send out a bill to each manufacturer,
8    correct?
9        A.  Correct.
10       Q.  And that bill will breakdown by NDC
11   number and URA what they are going to charge them
12   for each single drug, right?
13       A.  That's correct.
14       Q.  So the person computing the bills to
15   send to the manufacturer, at the time they are
16   doing the bill they send to the manufacturer has
17   a pretty good idea of the fully discounted price
18   sent to that manufacturer for each drug in the
19   bill, correct?
20           MS. OBEREMBT:  Objection.
21           THE WITNESS:  I'm not sure.  They would
22   know the URA, and they would know the number of

83 (Pages 1319 to 1322)

abc7abc9-82bf-4aa4-914c-080d29d14d56

# EXHIBIT I

Gorospe, James Kevin                                    March 19, 2008
                         Sacramento, CA

Page 1

                    UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------X

IN RE:  PHARMACEUTICAL        ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    ) CIVIL ACTION:

PRICE LITIGATION              ) 01-CV-12257-PBS

-----------------------------X

THIS DOCUMENT RELATES TO:     ) Judge Patti B. Saris

U.S. ex rel. Ven-A-Care of    )

the Florida Keys, Inc. v.     ) Magistrate Judge

Abbott Laboratories, Inc.,    ) Marianne B. Bowler

et al.                        )

Case No. 06-CV-11337-PBS      )

-----------------------------X

                         --oOo--

              WEDNESDAY, MARCH 19, 2008

                         --oOo--

               VIDEOTAPED DEPOSITION OF

                 JAMES KEVIN GOROSPE

Reported By:  JOANIE MURAKAMI, CSR No. 5199

              Registered Merit Reporter

              Certified Realtime Reporter

Gorospe, James Kevin                               March 19, 2008
                        Sacramento, CA

Page 74

1   contracts?
2       A.  I don't recall specifically when, what
3   year that was.
4       Q.  My understanding is that -- well, let
5   me ask you this.
6           There were supplemental rebate
7   contracts in place at the time that you started
8   working for the state in 1995; is that right?
9       A.  That's correct.
10      Q.  And in these contracts -- start over.
11          Do those AMP based rebate contracts
12  also require manufacturers to submit AMP to the
13  state?
14      A.  Some do.
15      Q.  Okay.  But some do not?
16      A.  That is correct.
17      Q.  So for those contracts that require the
18  submission of AMP, then the state obviously is
19  aware of the AMP for a particular product as soon
20  as the contract was entered into; is that fair?
21          MR. PAUL:  Object to the form.
22          MR. GOBENA:  Same objection.

Page 75

1           THE WITNESS:  That is correct.
2   BY MR. COLE:
3       Q.  And then for those contracts that don't
4   require the submission of AMP -- excuse me.
5           For those contracts that don't require
6   the submission of AMP, it is not difficult to
7   figure out what the AMP of the product is based
8   on the amount of the rebate that the state is
9   receiving, correct?
10          MR. PAUL:  Objection.  Form.
11          MR. GOBENA:  Same objection.
12          THE WITNESS:  It's incorrect.
13  BY MR. COLE:
14      Q.  It's incorrect?
15      A.  Incorrect.
16      Q.  All right.  Well, let's take an
17  example.  If, say, a supplemental rebate contract
18  provided that a manufacturer was to pay a
19  supplemental rebate of ten percent of AMP for a
20  particular product --
21      A.  Okay.
22      Q.  -- when the state would receive that

Page 76

1   rebate amount from the manufacturer, would it
2   receive something called a unit rebate amount?
3           MR. PAUL:  Objection.  Form.
4           MR. GOBENA:  Same objection.
5           THE WITNESS:  Yes.
6   BY MR. COLE:
7       Q.  Okay.  You're familiar with the term
8   "unit rebate amount"?
9       A.  Yes.
10      Q.  And what does it mean?
11      A.  Is the specific dollar amount that CMS
12  has indicated is payable to the state for each
13  defined unit per in National Drug Code.
14      Q.  Okay.  And if the supplemental rebate
15  contract provided for a rebate that is ten
16  percent of AMP and the state received a unit
17  rebate amount of, say, $1, would it not follow
18  that the AMP of that product must be $10?
19          MR. PAUL:  Objection.  Form.
20          MR. GOBENA:  Same objection.
21  BY MR. COLE:
22      Q.  What I'm trying to get at is that it

Page 77

1   would be -- you would just to have use simple
2   math or algebra to figure out what the AMP of a
3   product is if you had the unit rebate amount and
4   the formula for how the rebate was calculated?
5           MR. PAUL:  Objection.  Form.
6           MR. GOBENA:  Same objection.
7           THE WITNESS:  Correct.
8   BY MR. COLE:
9       Q.  So it if was ten percent -- if the
10  rebate was ten percent of AMP and you -- all you
11  would have to do is sort of, you know, use simple
12  division to figure out what the AMP was based on
13  the unit rebate amount?
14          MR. PAUL:  Objection.  Form.
15          MR. GOBENA:  Same objection.
16          THE WITNESS:  Correct.
17  BY MR. COLE:
18      Q.  Is it your understanding that
19  California has had the supplemental rebate
20  program in place since 1991?
21      A.  Yes.
22      Q.  And at least for those rebate contracts

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

7518707c-46aa-4bff-8eef-0c456891e081

Gorospe, James Kevin                                    March 19, 2008
                            Sacramento, CA

Page 106

1  at Medi-Cal that hospitals, HMOs and nursing
2  homes were contracting to receive discounts of up
3  to 99 percent off of AWP?
4         MR. PAUL: Objection. Form.
5         MR. GOBENA: Same objection.
6         THE WITNESS: No.
7  BY MR. COLE:
8     Q.   As I mentioned earlier, this document
9  was produced to us from the files of DHS in
10 connection with the State of California lawsuit.
11        Would you agree with me that anyone
12 within DHS who picked up this document, and read
13 this document, would have learned that hospitals,
14 HMOs and certain nursing homes were receiving
15 discounts of up to 99 percent off of AWP?
16        MR. PAUL: Objection. Form.
17        MR. GOBENA: Same objection.
18        THE WITNESS: Yes, from the time frame
19 of the report.
20 BY MR. COLE:
21    Q.   As well as the information listed above
22 about the Department of Veterans Affairs --

Page 107

1         MR. PAUL: Same objection.
2  BY MR. COLE:
3     Q.   -- correct?
4     A.   Yes.
5     Q.   Would you agree with me, Dr. Gorospe,
6  that a 41 percent discount off of average
7  wholesale price is significant?
8         MR. PAUL: Objection. Form.
9         MR. GOBENA: Same objection.
10        THE WITNESS: Yes.
11 BY MR. COLE:
12    Q.   And would you -- I take it you'd also
13 agree that a 67 percent and 99 percent discount
14 off of AWP, that you would consider those amounts
15 significant?
16        MR. PAUL: Objection. Form.
17        MR. GOBENA: Same objection.
18        THE WITNESS: Yes.
19 BY MR. COLE:
20    Q.   In your career as a pharmacist and
21 during your time with Medi-Cal, would you agree
22 with me that AWP is not an actual average of

Page 108

1  wholesale prices?
2         MR. PAUL: Objection. Form.
3         MR. GOBENA: Same objection.
4         THE WITNESS: Yes.
5  BY MR. COLE:
6     Q.   Have you ever referred to AWP as "ain't
7  what's paid"?
8     A.   Yes.
9     Q.   When was the first time that you either
10 said or learned that AWP had been -- has been
11 referred to as "ain't what's paid"?
12    A.   In the late '90s when my supervisor,
13 Len Terra, used the phrase.
14    Q.   So you and your colleagues at Medi-Cal
15 have used the phrase "ain't what's paid" at least
16 going back to the '90s?
17        MR. PAUL: Objection. Form.
18        MR. GOBENA: Same objection.
19        THE WITNESS: Yes.
20 BY MR. COLE:
21    Q.   Would you -- is it fair to say that it
22 was commonly known, in your unit, at DHS, that

Page 109

1  AWP stood for "ain't what's paid"?
2         MR. PAUL: Objection. Form.
3         MR. GOBENA: Same objection.
4         THE WITNESS: Yes.
5  BY MR. COLE:
6     Q.   We've mentioned the term "actual
7  acquisition cost" a couple of times today.  I
8  take it you're familiar with that term?
9     A.   Yes.
10    Q.   And what does that term mean to you?
11    A.   Actual acquisition cost refers to the
12 price that an entity actually pays for a
13 particular product.
14    Q.   And in your career as a pharmacist, did
15 you ever believe that AWP was equal to or
16 reflected providers' actual acquisition costs?
17        MR. PAUL: Objection. Form.
18        MR. GOBENA: Same objection.
19        THE WITNESS: Yes.
20 BY MR. COLE:
21    Q.   You did have that belief?
22    A.   Yes.

                                28 (Pages 106 to 109)

7518707c-46aa-4bff-8eef-0c456891e081

# EXHIBIT J

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

--oOo--

IN RE PHARMACEUTICAL INDUSTRY

AVERAGE WHOLESALE PRICE

LITIGATION

_____/

THIS DOCUMENT RELATES TO       MDL No. 1456

State of California, ex rel.   Civil Action:01-12258-

Ven-A-Care v. Abbott                        PBS

Laboratories, Inc., et al.

_____/


--oOo--

WEDNESDAY, SEPTEMBER 24, 2008

--oOo--

VIDEOTAPED DEPOSITION OF

CRAIG MILLER

--oOo--


Reported By:  CAROL NYGARD DROBNY, CSR No. 4018

Registered Merit Reporter

Miller, Craig                                    September 24, 2008

Page 82

1  rebates billed, the rebates paid, any interest
2  that's been charged.
3        Can you see if any changes have been made
4  over time to the unit rebate amount?
5    A.  Yes.
6    Q.  Okay.  Is there any field --
7        Strike that.
8        How does this information come up?
9        Is it all on one screen?
10   A.  No.  They're multiple screens.
11   Q.  Okay.  And you can navigate through
12  them?
13   A.  Yes.
14   Q.  I see.
15        So if -- let's sort of walk through it.
16        Let's say I typed in an NDC, and what
17  comes up first?
18   A.  You're on -- you're on multiple screens.
19        There's a formulary screen.  There's a --
20  you have -- you have a tool bar at the top.
21        You have detail -- first of all, you go
22  in to a -- a labeler, or a drug manufacturer, if

Page 83

1  you will, and there -- it's -- it's Windows.  It's
2  a tree.
3        You go down to whatever level you want to
4  the specific quarter, specific NDC, payment
5  information, et cetera.
6    Q.  Uh-huh.  Uh-huh.
7        Does -- is -- you said that the system
8  has the URA?
9    A.  Correct.
10   Q.  Is there anywhere that the system
11  reduces the URA to an AMP number?
12   A.  No.
13   Q.  Okay.
14   A.  We don't have access to AMP.
15   Q.  But that's something you could fairly --
16  at least for the noninnovator multiple source drugs
17  we talked about a few minutes ago, that's something
18  that if I -- if you wanted to you could figure that
19  AMP number relatively simply; couldn't you?
20        MR. PAUL:  Objection to form.
21  BY MR. ROBBEN:
22   Q.  You can -- you can answer.

Page 84

1    A.  Oh.  Yes.
2    Q.  I mean you just do the math?
3    A.  Right.
4    Q.  You reverse that division --
5    A.  Right.
6    Q.  -- with a calculator, and you've got the
7  AMP?
8    A.  Right.
9    Q.  Okay.  So even though you don't have it,
10  it's functionally available?
11        MR. PAUL:  Objection to form.
12        THE WITNESS:  Yeah.  It -- it is with the
13  exception of any best price, or CPI, or anything
14  that the Feds might have done to it.
15  BY MR. ROBBEN:
16   Q.  Okay.  So if it's not the noninnovator
17  multiple source 11 percent, or in earlier periods
18  10 percent of AMP, it's not so simple to reverse --
19   A.  Right.
20   Q.  -- to reverse calculate?
21   A.  Yeah, right.
22   Q.  But for those noninnovator multiple

Page 85

1  source 11 percent of AMP drugs it's simple to
2  calculate?
3    A.  Yes.
4        MR. ROBBEN:  Okay.
5        MR. PAUL:  Let me just caution the
6  witness, let me -- pause briefly if there should be
7  an objection from me, and then I won't step on it.
8  BY MR. ROBBEN:
9    Q.  Now, you had said before that outside of
10  your unit there are people in the Contracting
11  Section and the Policy Section that have access to
12  the RAIS system; correct?
13   A.  Correct.
14   Q.  Okay.  Do you have an understanding of
15  -- of why it is that they -- have access to that?
16   A.  They have access to payment history.
17        Then one of the -- they evaluate new
18  drugs or the renewal of drug contracts on the -- on
19  five statutory criteria, and one of which is cost.
20        So --
21   Q.  Do you have any involvement in the drug
22  -- the contracting process?

22  (Pages 82 to 85)

# EXHIBIT K

Hillblom, Douglas B.                    September 23, 2008
                    Sacramento, CA

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY

AVERAGE WHOLESALE PRICE

LITIGATION

_____/

THIS DOCUMENT RELATES TO        MDL No. 1456

State of California, ex rel.    Civil Action:

Ven-A-Care v. Abbott            01-12258-PBS

Laboratories, Inc., et al.

_____/


                    --oOo--

            TUESDAY, SEPTEMBER 23, 2008

                    --oOo--

            VIDEOTAPED DEPOSITION OF

              DOUGLAS B. HILLBLOM

                    --oOo--


Reported By:  CAROL NYGARD DROBNY, CSR No. 4018

              Registered Merit Reporter


Henderson Legal Services, Inc.

59a7f9f9-30c2-4b26-a88f-b90f6ae9a028

Hillblom, Douglas B.                                    September 23, 2008
                              Sacramento, CA

Page 262

1    A.  Correct.
2    Q.  And so California has URA information on
3 an NDC-by-NDC basis since -- 1991?
4         MR. PAUL:  Objection to form.
5 BY MR. BUEKER:
6    Q.  Medi-Cal has had URA information on an
7 NDC-by-NDC basis since 1991; correct?
8    A.  We would have had URA information
9 provided to us by HCVA, then CMS.
10        Some of those URAs are subject to
11 recalculation.
12        So -- when we talk about the URA amount,
13 it's important to note that the URA as initially
14 submitted may change with the supplemental addendum
15 to filing.
16    Q.  And if it did change, that URA
17 information would be updated with the State of
18 California; correct?
19    A.  Correct.
20    Q.  So ultimately California has, whether
21 initially filed or amended, URA information on an
22 NDC-by-NDC basis for all drugs reimbursed under the

Page 263

1 Medicaid program since 1991?
2    A.  The Medi-Cal program would have URA
3 information.
4    Q.  Okay.  And when I say "on an NDC-by-NDC
5 basis," what is an "NDC"?
6    A.  An "NDC" is a National Drug Code.
7    Q.  And there's a National Drug Code
8 assigned to each specific packet size, dose, and
9 strength of a particular product, right, a
10 particular drug?
11    A.  Okay.  But the URA amount does not go
12 down to the package size.
13    Q.  Right.
14    A.  The URA amount is on the Core 9, which
15 is a manufacturer and the product and strength.
16    Q.  And at that level of the granularity
17 Medi-Cal would have had URA information?
18    A.  At that level.
19    Q.  And because URAs are formulaically
20 derived from most generic products from AMP, you
21 could reverse engineer or calculate AMP from the
22 URA by simple math?

Page 264

1         MR. PAUL:  Objection to form.
2         THE WITNESS:  The URA represented a set
3 percentage of AMP.
4 BY MR. BUEKER:
5    Q.  At some point in time it was 10 percent
6 and later it was 11 percent; right?
7    A.  Yeah.  Most commonly it was 11 percent.
8    Q.  So for most -- most commonly if you
9 simply divided by that 11 percent, without a URA
10 without a hundred percent you'd get AMP?
11    A.  We don't divide by 11 percent.
12        There's -- there's division and
13 multiplication.
14    Q.  How would you derive?
15    A.  You are a --
16    Q.  How would you derive AMP from URA?
17    A.  You'd have to take the URA amount and
18 divide it by the appropriate percentage, and
19 multiply it by a hundred.
20    Q.  So if -- so in most cases 11 percent;
21 right?
22    A.  Right.

Page 265

1    Q.  As somebody working in the Pharmacy Unit
2 would you have access to URA information?
3    A.  Only in the process of negotiating the
4 contract.
5    Q.  You wouldn't have had access to URA
6 information in the context of making policy
7 determinations about reimbursement rates?
8    A.  That was not a common amount that we
9 utilize or information data source.
10    Q.  Okay.  Leaving aside whether it was
11 common, do you ever recall using URAs or
12 calculating AMPs as a check or as a part of the
13 consideration or data source that you would have
14 used in connection with making reimbursement rate
15 policy decisions?
16        MR. PAUL:  Objection to form.
17        THE WITNESS:  I would not have used it in
18 making reimbursement policy decisions or --
19 recommendations.
20 BY MR. BUEKER:
21    Q.  At all?
22    A.  Not at that time.

                                    67 (Pages 262 to 265)

# EXHIBIT L



2555 W. Midway Blvd. • P.O. Box 446 • Broomfield, CO 80038-0446

(303) 466-2400 • FAX (303) 466-3717

July 16, 1991

Michael Neff
Department of Health Services
Health Systems Financing Division
714 P Street, Room 1340
Sacramento, CA 95814

Dear Mr. Neff:

Enclosed please find the rebate check from Geneva Pharmaceuticals (labeler code #00781) to the California Department of Health Services. This is the rebate for drugs reimbursed from January 1, 1991 through March 31, 1991.

Also included is a printout identifying the AMP and calculated rebate for each product. Please note the NDC #'s on pages 27 and 28 which were invalid and therefore no rebate was calculated for these items.

Please call if you have any questions regarding this information.

Sincerely,

GENEVA PHARMACEUTICALS, INC.

Beth Brannan
Manager, Government Affairs

BB/bp



Subsidiary of CIBA-GEIGY Corporation

SANDOZ CALI 3000033

# EXHIBIT M

California

1996

SANDOZ CALI 3001109



SANDOZ CALI 3001110



pharmaceuticals, inc.

2655 W. Midway Blvd. • P.O. Box 446 • Broomfield, CO 80038-0446

(303) 466-2400 • FAX (303) 438-4600

March 21, 1997

State of California
Department of Health Services
Accounting Section
714 P Street, Room 1140
Sacramento, CA  95814
Attn: Drug Rebate Receivables

Dear Sir or Madam:

Enclosed please find the rebate check in the amount of $1,021,043.21 from Geneva
Pharmaceuticals (labeler code #00781) to the **State of California**, Department of Health
Services for the period January 1, 1996 through March 31, 1996.   Included are the following
adjustments:

              10% Supplemental Rebate:              $383,284.01

Also included is a printout identifying the AMP and calculated rebate for each product.
Please note the NDC #'s on pages 24 and 25  which were invalid or disputed and therefore,
no rebate was calculated for these items.

Please call if you have any questions regarding this information.

Sincerely,

**GENEVA PHARMACEUTICALS, INC.**

Ron Hartmann, R.Ph., MBA
Manager, Government Affairs

RH/jfo

Enclosures

*Ck# 304654*
*3/27/97*
*Sent Fed Ex 3/28/97*

*1 Q96*



◼ A Ciba Company ◼

SANDOZ CALI 3001111

299 4245 265

## FEDERAL EXPRESS FORM

DATE: _3-28-97_                    ORIGINATOR: _Amy Stephens_

DEPARTMENT: _Finance_              SHIP TO: _State of California_

PLEASE CHECK THE TYPE OF SERVICE:          _Dept. of Health Service_

___ PRIORITY ONE OVERNIGHT                 _714 'P' St. Room 1140_
     (DELIVERY BY NEXT BUSINESS A.M.)
_✓_ STANDARD OVERNIGHT                      _Sacramento, Ca. 95814_
     (DELIVERY BY NEXT BUSINESS P.M.)
___ ECONOMY SERVICE
     (GUARANTEED 2 DAY SERVICE)

IF VALUE EXCEEDS $100 AND EXTRA INSURANCE IS NEEDED, PLEASE INDICATE TH
AMOUNT HERE: _____

LIST ANY SPECIAL REFERENCE INFORMATION: _____

   ***SHIPMENTS MUST BE IN THE MAILROOM BY 3:00 PM FOR PROCESSING

SANDOZ CALI 3001112