# Exhibit 4

*State of California ex rel. Ven-A-Care of the Florida Keys, Inc. v.*
*Abbott Labs, Inc. et al., Civil Action No. 03-11226-PBS*

**Exhibit to the November 25, 2009 Declaration of Philip D. Robben**
**in Support of Defendants' Joint Motion for Partial Summary Judgment**

Vladeck, Ph.D., Bruce C. - Vol. II                    June 21, 2007
                    New York, NY

285

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------X  MDL NO. 1456

IN RE:  PHARMACEUTICAL INDUSTRY      :  CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION :  01-CV-12257-PBS

------------------------------------X

THIS DOCUMENT RELATES TO:            :

U.S. ex rel. Ven-A-Care of the       :  CIVIL ACTION:

Florida Keys, Inc. v. Abbott         :  06-CV-11337-PBS

Laboratories, Inc.                   :

------------------------------------X


IN THE CIRCUIT COURT OF

MONTGOMERY COUNTY, ALABAMA

------------------------------------X

STATE OF ALABAMA,                    :  CASE NO.

          Plaintiff,                 :  CV-05-219

     v.                              :

ABBOTT LABORATORIES, INC.,           :  JUDGE

et al.,                              :  CHARLES PRICE

          Defendants.                :

------------------------------------X

1              MS. BROOKER:  Objection.  Form.

2       A.      That is correct.

3       Q.      In fact, if the federal government

4 didn't approve the methodology, it couldn't be

5 used.  Right?

6              MS. BROOKER:  Objection.  Form.

7       A.      That's correct.

8       Q.      And the states had leeway to be

9 able to determine the specific ingredient

10 reimbursement basis that they wanted, as long as

11 it was acceptable to the federal government.

12              Right?

13              MS. BROOKER:  Objection.  Form.

14       A.      And consistent with the statute,

15 yes.

16       Q.      Okay.  Now -- so, it was possible,

17 for example, if you look at Delaware, you'll see

18 that the Delaware ingredient reimbursement basis

19 in place at the time of this document, 1995, was

20 AAC, actual acquisition cost?

21       A.      I do.

22       Q.      It was -- it was possible, and if

Page 434

1 Delaware wanted to reimburse on the basis of

2 actual acquisition cost, it could do that.

3              Right?

4      A.      That's correct.

5      Q.      And if you look, for example, at --

6 there are a number of states, but if you look, for

7 example, at New York, at the time, New York, the

8 reimbursement -- ingredient reimbursement basis is

9 indicated as AWP without any discount.  Right?

10     A.      That's correct.

11     Q.      Now, you would agree with me that

12 using those two examples, the State of Delaware

13 would be paying for a drug a lot less than New

14 York was paying for the same drug.  Right?

15             MR. BREEN:  Objection.  Form.

16     A.      I believe in general we would have

17 expected that, yes.

18     Q.      So, your understanding would be

19 that if Delaware was paying actual acquisition

20 costs that the provider had paid to acquire the

21 drug, that Delaware was paying less than New York,

22 which had decided to pay the average wholesale

1 price published.  Correct?

2               MS. BROOKER:  Objection.  Form.

3      A.      That's correct.

4      Q.      And as far as the federal

5 government was concerned, there wasn't any issue

6 or problem with New York deciding to pay more than

7 Delaware paid for the exact same drug.

8               MS. BROOKER:  Objection.

9      Q.      Isn't that right?

10              MS. BROOKER:  I'm sorry. Objection.

11 Form.

12     A.      Both systems, right, were

13 consistent with the -- with the statute and our

14 policies.

15     Q.      Did you know -- independent of

16 this, did you know that there was a point in time

17 in your tenure that Delaware used an actual

18 acquisition cost basis for drugs?

19     A.      I don't recall.  I may have known

20 it at some point, but I have no memory of having

21 known it.

22     Q.      And I take it that if -- if New

Page 436

1 York decided to pay, as it did in this period of

2 time, to reimburse for Medicaid using an

3 undiscounted AWP, the federal government did not

4 have a problem with its share being driven by that

5 number as opposed to the actual acquisition cost

6 that was being used in Delaware.

7                    MR. BREEN:  Objection.  Form.

8                    MS. BROOKER:  Objection.  Form.

9          Q.      Is that right?

10         A.      I'm not sure I would characterize

11 it as the federal government did not have a

12 problem.  The federal government permitted New

13 York to use the AWP methodology.

14         Q.      So, the federal government

15 permitted New York to pay an undiscounted AWP at

16 the very same time -- the federal government

17 permitted New York to reimburse for Medicaid on

18 AWP, without any discount, at the same time that

19 it was permitting Delaware to pay actual

20 acquisition cost, a lower amount for the same

21 drugs?

22                    MR. BREEN:  Objection.  Form.

1                  MS. BROOKER:  Objection.  Form.

2       A.       That's correct.

3       Q.       And from your agency's standpoint,

4  there was nothing wrong with that?

5                  MR. BREEN:  Objection.  Form.

6                  MS. BROOKER:  Objection.  Form.

7       A.       Again, I would -- I would disagree

8  with the characterization -- characterization.

9                  From our agency standpoint, that's

10  what the law and the structure of the program

11  permitted and called for.

12       Q.       So, the law and the structure of

13  the Medicaid program would permit one state to pay

14  at actual acquisition cost and another one to pay

15  an undiscounted AWP at the same time?

16                  MR. BREEN:  Objection.  Form.

17       A.       That was my understanding of the

18  law.  Yes, sir.

19       Q.       And, in fact, in the Medicaid

20  program, at the same time in 1995, during your

21  tenure, for the same drug that Delaware was

22  reimbursing on actual acquisition costs, if that

Page 438

1 drug was covered by Medicare, Medicare was paying

2 more.  Right?

3                    MS. BROOKER:  Objection.  Form.

4          A.       Yes, absolutely.

5          Q.       Because they were paying 100

6 percent of AWP.  Right?

7          A.       Yes.

8          Q.       And, again, as far as the federal

9 government was concerned, that was appropriate for

10 that time, given the statutes that existed?

11                   MS. BROOKER:  Objection.  Form.

12         A.       You know, to characterize the

13 federal government as sort of a fiction, I would

14 say that the statutes that existed at the time

15 permitted that.

16         Q.       And the statutes that we're talking

17 about, these were laws of the United States passed

18 by the U.S. Congress.  Right?

19         A.       That's correct.

20         Q.       So, Congress had decided that

21 that's the way it would work?

22                   MR. BREEN:  Objection.  Form.

Page 439

1      A.      Congress decided that it was

2 permissible.

3      Q.      So, to the extent that New York was

4 reimbursing Medicaid on AWP, without any discount,

5 while Delaware was reimbursing on actual

6 acquisition cost, New York wasn't improperly

7 overpaying; were they?

8              MS. BROOKER:  Objection.  Form.

9      A.      Again, their judgment was New York

10 was within its legal rights to do so.

11     Q.      And there are other states -- if

12 you look down the column, there are other states

13 where -- that were also using an undiscounted AWP

14 besides New York.

15             For example, if you look at Idaho,

16 that was -- the fact that Idaho decided to do it

17 that way, there was nothing wrong with that

18 either?

19     A.      It was permissible under the law,

20 yes.

21     Q.      Now, you would expect, wouldn't

22 you, Dr. Vladeck, that if the State of Delaware

1 Medicaid people could figure out how to reimburse

2 on actual acquisition cost, that other states

3 could do the same thing?  You would expect that.

4 Right?

5                 MS. BROOKER:  Objection.  Form.

6                 MR. BATES:  Object to form.

7        A.      Please restate your question.

8        Q.      Well, the people -- the Medicaid

9 people in Delaware didn't have some secret

10 knowledge that nobody else in the country had,

11 right, as far as you knew?

12                 MR. BATES:  Objection to form.

13                 MS. BROOKER:  Objection.  Form.

14        A.      That's -- I don't believe so, no.

15        Q.      Okay.  So, presumably, if the

16 people in Delaware that ran Medicaid could figure

17 out how to reimburse on actual acquisition cost,

18 so could the Medicaid people in every other state.

19                 Right?

20                 MS. BROOKER:  Objection.  Form.

21                 MR. BATES:  Object to form.

22        A.      They were legally permitted to

Page 441

1 choose to do so, yes.

2        Q.        And they were legally permitted to

3 choose not to do it that way.  Right?

4        A.        That's correct.

5                  MS. BROOKER:  Objection.  Form.

6        Q.        Well, since Mr. Bates in here,

7 let's -- let's look at Alabama, which is on the

8 first line.

9                  Alabama had ingredient

10 reimbursement basis of WAC plus 9.2 percent.

11                 Do you see that?

12       A.        Yes, I do.

13       Q.        And if Alabama decided that they

14 would use WAC, plus the 9.2 percent on top of WAC,

15 they were entitled to do that.  Right?

16                 MS. BROOKER:  Objection.  Form.

17       A.        Yes, they were.

18       Q.        And based on your understanding of

19 WAC, would you expect that a reimbursement basis

20 that was based on WAC would result in a lower

21 payment than one based on AWP?

22                 MR. BREEN:  Objection.  Form.

1              MS. BROOKER:  Objection to form.

2              MR. BATES:  Objection to form.

3       A.      My understanding is that WAC, plus

4  a percentage in the range of 9 percent, would be

5  roughly comparable to a state that chose to pay

6  AWP minus 10 percent.

7       Q.      You don't really know that that's

8  true for every single drug; do you?

9              MS. BROOKER:  Objection.  Form.

10      A.      I assume it's not true for every

11 single drug because I assume that the relationship

12 between given drugs and WAC and AWP varies from

13 state to state and from pharmacy to pharmacy.

14      Q.      And to the extent the state decided

15 that they would pay AWP minus 10 percent, for

16 example, just to pick one, Nevada, and another

17 state decided that they would pay AWP minus 10.5

18 percent. which is Oregon, or Oklahoma, rather, the

19 states could come up with those fine gradations if

20 that's what they wanted to do.  Right?

21             MR. BREEN:  Objection.  Form.

22             MS. BROOKER:  Objection.  Form.

1       A.      Yes.

2       Q.      Now, there were other states that

3 had entirely different reimbursement systems.

4 Isn't that right?  For example, Arizona.

5       A.      Well, no.  I would say that all the

6 states had either some version of AWP or some

7 version of acquisition costs, except the States of

8 Tennessee and Arizona, which did not directly pay

9 for retail prescription drugs but, rather, had all

10 of their beneficiaries enrolled in managed care

11 plans, which contracted for those drugs.

12      Q.      Well, and on that point then,

13 states were also entitled, if they wanted to go

14 that route, to do what Tennessee and Arizona had

15 done, which was to do it -- the reimbursement in

16 an entirely different way?

17              MS. BROOKER:  Objection.  Form.

18      A.      No, I wouldn't -- I wouldn't

19 characterize it that way.  I would say to provide

20 that Medicaid beneficiaries would receive service

21 through capitated claimants to a healthcare plan

22 rather than for reimbursements for individual

1 services.

2      Q.    And that was proper to do under the

3 structure -- the statutory structure?

4           MS. BROOKER:  Objection.  Form.

5      A.    Under a set of very specific and

6 limited circumstances, yes.

7.     Q.    So, would the HCFA have approved

8 Tennessee doing what it did?

9      A.    HCFA approved the TennCare plan,

10 yes.

11     Q.    And HCFA also approved the Arizona

12 healthcare cost containment program?

13         MS. BROOKER:  Objection.  Form.

14    A.    It did, although I believe, if I

15 remember correctly, that was under a statutory

16 mandate to approve it.

17     Q.    Do you know whether Arizona or

18 Tennessee paid more or less than other states

19 based on the different way they were doing it?

20        MS. BROOKER:  Objection.  Form.

21    A.    For prescription drugs?

22    Q.    Yes.

1    A.    I wouldn't have any information on

2 what they paid for prescription drugs.

3    Q.    Now, focusing, again, if you would,

4 Dr. Vladeck, on Delaware vs. New York, and the way

5 they were doing it as indicated on Exhibit Dey

6 022, New York was including in its reimbursement

7 whatever the spread was between AWP and actual

8 acquisition costs.  Right?

9          MR. BREEN:  Objection to form.

10    A.    To the extent there was a spread,

11 paying at average wholesale price would

12 incorporate that spread, yes.

13    Q.    Right.  So, to the extent that

14 there was a spread between AWP and actual

15 acquisition cost in New York, that spread was part

16 of the reimbursement that New York decided to pay.

17          Right?

18          MR. BREEN:  Objection.  Form.

19    A.    Yes.

20    Q.    And Delaware, using actual

21 acquisition cost, had -- had eliminated that

22 spread.  Right?

1              MS. BROOKER:  Objection.  Form.

2      A.      In principle, yes.

3      Q.      Okay.  So, in -- in the time period

4 that you were running HCFA, you had one state on a

5 Medicaid program where there was no spread,

6 Delaware, and one state that had the maximum

7 spread because they paid 100 percent of AWP.

8              Right?

9              MS. BROOKER:  Objection.  Form.

10             MR. BREEN:  Objection.  Form.

11     A.      Yes.

12     Q.      And, again, the fact that one state

13 had the full spread between AWP and actual

14 acquisition cost, New York, that was acceptable

15 within the structure of the program that you were

16 running.  Right?

17             MS. BROOKER:  Objection.  Form.

18     A.      That was -- that was what the law

19 permitted, yes.

20     Q.      And the fact that there was nothing

21 in the law that prohibited New York from deciding

22 to pay the full spread between acquisition cost

1 and AWP; was there?

2                MR. BREEN:  Objection.  Form.

3        A.        There was nothing in the law that

4 spoke directly to that.  The law permitted New

5 York to pay AWP.

6        Q.        So, there was nothing that made the

7 spread between AWP and actual acquisition cost

8 that New York was paying illegal?

9                MS. BROOKER:  Objection.  Form.

10       A.        Well, when you characterize the

11 spread, I think it, frankly, gets to -- my

12 layman's understanding of what this case is about

13 was what AWP means, and the size of the spread,

14 and I'm not competent to -- to speak to that.

15                I think it was legal for New York

16 State to pay what they thought AWP was.  Whether

17 AWP was a legally arrived at number I think is the

18 subject of litigation, on which I'm not competent

19 to comment.

20       Q.        And I don't want -- I'm not asking

21 you about the litigation or about anything in

22 terms of how the government views this now.

1              I'm just asking you, when you were

2 running HCFA in -- in the time period that you

3 were the head of that agency, there is nothing

4 that you know about that indicated that the

5 existence of a spread between AWP and actual

6 acquisition cost was illegal?

7              MR. BREEN:  Objection.  Form.

8              MS. BROOKER:  Objection.  Form.

9 Asked and answered.

10      Q.      You can answer.

11      A.      That the very existence of a spread

12 was illegal?  No.  We perceived that there

13 probably was a spread.

14      Q.      You perceived that there probably

15 was a spread?

16      A.      Yes.

17      Q.      And with that perception in mind,

18 HCFA approved state plans that had the spread

19 built into the reimbursement basis.  Correct?

20              MS. BROOKER:  Objection.  Form.

21      A.      HCFA approved state plans that paid

22 on some basis relative to AWP, because that's what

Page 449

1 the statute provided for.

2      Q.      And in doing that you were

3 approving plans that had the spread built into the

4 reimbursement methodology.   Right?

5                MS. BROOKER:  Objection.  Form.

6      A.      Again, I would say that had a

7 spread built into the reimbursement methodology.

8      Q.      Fine.  But you also had one state,

9 at least, that had no spread.  Right?

10               MS. BROOKER:  Objection.  Form.

11               MR. BREEN:  Objection.  Form.

12      A.      Yes, that's correct.

13      Q.      Now, at -- at -- at the same time

14 that we're focusing on with Exhibit Dey 022, which

15 is in the time period of 1995, which is the point

16 in time during your tenure as the head of HCFA --

17      A.      And if I may say, it refers to the

18 time period of '93/'94, but --

19      Q.      And, again, that was -- that was

20 the period of time that you were running HCFA, at

21 least part of that time?

22      A.      Part of that time, yes.

Vladeck, Ph.D., Bruce C. - Vol. II                    June 21, 2007
New York, NY

461

1    confidentiality restrictions as well, in terms of

2    what the states made -- did with the data.

3          Q.       Okay.  So, with respect to -- just

4    focusing on that, HCFA, under the statutory

5    scheme, was entitled to share AMP data with the

6    states.  Isn't that right?

7          A.       Of course, yes.

8                   MR. BREEN:  Objection.  Form.

9                   MS. BROOKER:  Objection.  Form.

10         Q.       And did HCFA do that?

11         A.       As far as I know.

12         Q.       So, as far as you know, people

13   within HCFA shared AMP data with state Medicaid

14   agencies?

15         A.       That was my understanding.

16         Q.       What was that based on?

17         A.       What was what based on?

18         Q.       Your understanding.  What was your

19   understanding based on?

20         A.       Of the process by which the HCFA

21   staff worked with the states in administering the

22   rebate program.

Henderson Legal Services
202-220-4158

463

1                          Right?

2                          MS. BROOKER:  Objection.  Form.

3          A.      Yes.

4          Q.      So, for example, looking back at

5     Exhibit Dey 022, the one-page sheet that we had

6     that had all the reimbursement basis, the

7     responsible directors of the Medicaid agencies of

8     these -- of each of these states would be able to

9     peruse AMP data and compare that to what they were

10    reimbursing on.  Right?

11                         MR. BREEN:  Objection.  Form.

12                         MS. BROOKER:  Objection.  Form.

13                         MR. BATES:  Objection to form.

14         A.      When you talk about "perusing,"

15    again, I don't -- I don't know if they'd even be

16    aware that their agencies had it.  But if they

17    were, depending on how their agencies were

18    organized, they might very well be.

19         Q.      So, it was entirely -- it was

20    entirely possible for the heads of a state

21    Medicaid agency to look at the AMP data on AMP

22    prices and at the same time look at data as to

Vladeck, Ph.D., Bruce C. - Vol. II                    June 21, 2007
                       New York, NY

                                                              464

1    what they were reimbursing for those drugs.  That

2    was entirely possible.  Right?

3                    MS. BROOKER:  Objection.  Form.

4                    MR. BREEN:  Objection.  Form.

5         A.      It's -- I don't know any reason why

6    it wouldn't be possible.

7         Q.      And within your agency, within

8    HCFA, certainly people within HCFA could sit down

9    and compare the AMP data, for example, for Dey's

10   Albuterol, and see what the AMP was and compare

11   what the AWP was.  Right?

12                   That was -- that was information

13   that they had in the agency?

14                   MS. BROOKER:  Objection.  Form.

15        A.      I believe the -- the way we

16   interpreted the confidentiality provisions of the

17   statute was that the people directly involved in

18   the administration of the Medicaid drug rebate

19   program could have chosen to do so, yes.

20        Q.      Right.  So, somebody in -- in HCFA

21   that was involved with the rebate program could

22   one day look at the AMP for Dey's Albuterol and

1 compare it to an AWP for Dey's Albuterol?

2                    MS. BROOKER:  Objection.  Form.

3        A.        Presumably, yes.

4        Q.        And based on your understanding of

5 AWP and AMP, as you've indicated in the course of

6 this deposition and your prior session, you would

7 expect that the AWP -- there was a spread between

8 the AMP and the AWP.  Right?

9                    MS. BROOKER:  Objection.  Form.

10       A.        Yes.

11       Q.        And that would be because the AMP

12 reported to HCFA would include a number of

13 specified discounts.  Isn't that right?

14                   MS. BROOKER:  Objection.  Form.

15       A.        I don't know what you mean by

16 "specified discounts," but it was my impression

17 that, again, on average, the AMPs would have been

18 for single-source drugs in the range of 15 to 20

19 percent below the AWP, on average, and, for

20 generic drugs, as I've learned in the course of

21 this proceeding, as much as 25 to 40 percent below

22 AWP, on average.