# Exhibit 8

*State of California ex rel. Ven-A-Care of the Florida Keys, Inc. v.*
*Abbott Labs, Inc. et al., Civil Action No. 03-11226-PBS*

**Exhibit to the November 25, 2009 Declaration of Philip D. Robben**
**in Support of Defendants' Joint Motion for Partial Summary Judgment**

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-------------------------------x

In re: PHARMACEUTICAL INDUSTRY   )

AVERAGE WHOLESALE PRICE          )

LITIGATION                       )

-------------------------------)

United States of America ex rel.) MDL No. 1456

Ven-A-Care of the Florida Keys, )

Inc. v. Abbott Laboratories,    ) Civil Action

Inc., Civil Action No. 06-      ) No. 01-12257-PBS

11337-PBS; and United States of )

America ex rel. Ven-A-Care of   ) Honorable

the Florida Keys, Inc., v. Dey, ) Patti B. Saris

Inc., et al., Civil Action No.  )

05-11084-PBS; and United States )

of America ex rel. Ven-A-Care   )

of the Florida Keys, Inc., v.   )

Boehringer Ingelheim Corp., et  )

al., Civil Action No. 07-10248- )

PBS                             )

-------------------------------x

30(b)(6) Arkansas Dept of HS - Vol. I          December 10, 2008
Little Rock, A

31

1    second column --

2        A.    Okay.

3        Q.    -- about three-quarters of the way

4    down. Actually, it's in the third column.   I'm

5    sorry.   Do you see where that second definition

6    says "estimated acquisition costs"?

7        A.    Yes, ma'am.

8        Q.    Are you familiar with that definition?

9        A.    Yes, ma'am.

10       Q.    Has the State tried to determine

11   estimated acquisition costs in accordance with

12   that definition?

13       A.    To our best estimate, yes, we do.

14             MS. OBEREMBT:   I'd like to mark as

15   Exhibit 3 a chart that tries to summarize

16   Arkansas' reimbursement formulas and dispensing

17   fees since 1990.

18             [Marked Exhibit Bridges 003]

19       A.    Thank you.

20       Q.    (By Ms. Oberembt) Would you take a

21   second to look over that chart, please?   Is this

22   chart familiar to you?

1     the chart.

2           MS. OBEREMBT:  I'm going to ask the

3     court reporter to mark this as Exhibit 4.  And

4     it's a document entitled "Official Notice of the

5     Arkansas Department of Human Services" dated July

6     6, 1990.

7           [Marked Exhibit Bridges 004]

8      Q.  (By Ms. Oberembt) Does this appear to

9     be a document issued by DHS?

10      A.  Yes, ma'am.

11      Q.  And does the reimbursement formula set

12     forth in Exhibit 4 correspond to the first entry

13     on the reimbursement chart marked as Exhibit 3?

14      A.  August 1st of '90, yes, ma'am.

15      Q.  And -- and what is the reimbursement

16     formula for the time period August 1, 1990

17     through June 30th, 1991?

18      A.  It's brand and generic AWP minus 10 and

19     a half percent, plus the 4.16 plus the .093 times

20     the EAC.  It's a sliding dispensing fee back

21     then.

22      Q.  And that formula is reflected on

Case 1:01-cv-12257-PBS   Document 6702-9   Filed 11/25/09   Page 4 of 23

51

1  remember that we specifically had a Myers &

2  Stauffer survey at this time.  I don't recall

3  that, if we did.

4       Q.  And what was the goal here of the State

5  in making this change to the reimbursement

6  formula?

7       A.  Well, in essence, we felt and Mr.

8  Hanley, from what I recall, felt fairly certain

9  that the chain reimbursement -- that the chains

10 could purchase at a much better price than the

11 independents, and so the purpose was to get up

12 closer to the actual -- what that pharmacy was

13 actually paying for the drug for a chain.  So

14 that was his intent.

15      Q.  And then I notice here that the -- this

16 reimbursement formula was only in effect for

17 approximately nine days?

18      A.  Uh-huh.

19      Q.  Nine or ten days.  What happened?

20      A.  A lot was going on at that time.  So

21 what I can recall is CMS approved it.  I have to

22 assume that the legislature approved it.  We

30(b)(6) Arkansas Dept of HS - Vol. I                December 10, 2008
Little Rock, A

52

1    implemented it, and then we knew that Wal-Mart
2    and Walgreens were going to file a lawsuit.  So I
3    don't know if there was an agreement to just pull
4    it back, but we -- we terminated it at that point
5    in time.  But I just -- I don't know every little
6    piece that transpired to -- to cause us to pull
7    it, but due to upcoming litigation, we withdrew.
8         Q.   And -- and did -- did Wal-Mart and
9    Walgreens actually sue the State over this?
10        A.   That's correct.  Now -- I don't know
11   that they sued.  They filed litigation.  I don't
12   know.  I don't know how to answer that.  I don't
13   know if it was law -- it was a lawsuit.
14        Q.   All right.  And do you know what the
15   end result of the litigation was?
16        A.   Well, we were not allowed to pursue the
17   AWP minus 17 percent on chains.  I -- yes, they
18   did file a lawsuit.  I guess my thought of
19   lawsuit, I was thinking of financial lawsuit, but
20   yes, they pursued a lawsuit, and we lost.  Sorry
21   about that.
22             MS. OBEREMBT:  I think this is a good

63

1    Multiple Source Drugs"?  Is that what you

2    understand to be the federal upper limit?

3         A.    Yes, ma'am.

4         Q.    And what is the "federal upper limit"?

5         A.    The federal upper limit is a maximum

6    allowable cost that's applied to generically

7    equivalent brands and generics.

8         Q.    Does the State set that amount?

9         A.    Not on the federal upper limits, no.

10        Q.    Who sets the federal upper limits?

11        A.    CMS.

12        Q.    We've looked at the State of Arkansas'

13   reimbursement formula since 1990.  Does -- has

14   the state consistently defined EAC with reference

15   to AWP?

16        A.    Yes.

17        Q.    Have you seen the State define AWP as

18   anything other than the -- the plain meaning of

19   the words, average wholesale price?

20        A.    No, ma'am.

21        Q.    What was the State's -- what is the

22   State's goal in using AWPs for reimbursement

30(b)(6) Arkansas Dept of HS - Vol. I                    December 10, 2008
Little Rock, A

65

1    amount per unit that we'll reimburse for -- for a

2    drug.

3        Q.    Can you tell me just generally how the

4    State sets a MAC?

5        A.    Generally when a -- generic equivalents

6    become available for a brand and we are made

7    aware of that, we'll -- we'll review the generic

8    products that are out there and try to obtain

9    from pharmacies what they say that they pay for

10   that product and then go from there to set the

11   MAC.

12       Q.    As part of the MAC process, does

13   Arkansas compared -- compare the EAC of a drug

14   that might be MAC'd with the proposed MAC?

15       A.    We will -- I -- we look at that, yes.

16   We'll look at what the brand EAC is versus the --

17   the different generic prices.

18       Q.    And what if when you do that

19   comparison, what if the brand EAC is lower than

20   the proposed MAC? What do you do then?

21       A.    There wouldn't be a reason to set the

22   MAC.

67

1    that -- that "My dispensing fee is too low, and

2    so you need to make it up for me on the

3    ingredient cost"?

4        A.   Oh, no.  I mean, no.  They wouldn't

5    have said -- no.  Our -- our dispensing fee has

6    generally been claimed to be some -- at one time

7    we were higher than most of the other states on

8    our dispensing fee, so we've never really had

9    pharmacists complain about our dispensing fee.

10       Q.   On the chart that's Exhibit 3, there's

11   a reflection that beginning in March of 2002, an

12   additional differential dispensing fee of $2

13   shall be given to pharmacy providers when a

14   generic that does not have a State or Federal

15   upper limit is dispensed, and I'm reading from

16   Footnote 8 on Exhibit 3, if you want to pull that

17   out.  What was the purpose of -- of that change

18   to the reimbursement formula?

19       A.   We had some generics that didn't have

20   upper limits on them, and so as an incentive for

21   the pharmacist to -- to dispense those, rather

22   than trying to dispense a

30(b)(6) Arkansas Dept of HS - Vol. I                    December 10, 2008
Little Rock, A

68

1    therapeutically-equivalent brand, we -- that was

2    an incentive for the pharmacist to dispense the

3    therapeutically-equivalent generic.

4         Q.    Say in fast ten times.

5         A.    No, thank you.  No, thank you.

6         Q.    Is it -- is it your understanding that

7    the State is supposed to make its dispensing fee

8    determination separate from its determination of

9    ingredient cost?

10        A.    We've always considered them a separate

11   entity, separate -- two separate things.

12        Q.    Has Arkansas ever had any practice or

13   policy of paying increasing ingredient costs to

14   make up for inadequate dispensing fees?

15        A.    No.

16        Q.    Does the State itself operate the MAC

17   Program?

18        A.    We do, yes, our state MAC Program.

19        Q.    And does the State have any assistance

20   from an outside contractor on that?

21        A.    We have a -- an individual that works

22   strictly for us through an outside contract, yes.

116

1        A.    Speculating any price could be put into

2    that billed amount by a pharmacy or a pharmacist,

3    but that's a speculation.

4        Q.    Let me clarify my question.  The -- the

5    regulations in place for Arkansas Medicaid

6    Program required a pharmacy to submit their

7    billed amount, the usual and customary charge; is

8    that correct?

9        A.    That's correct.

10       Q.    And if Arkansas Medicaid wanted to know

11   what the actual acquisition cost was for each

12   drug reimbursed under the Medicaid Program, it

13   could have asked pharmacies to submit that

14   information on each claim form, correct?

15            MS. MOSLEY-SIMS:  Objection, form.

16            MS. OBEREMBT:  Objection.

17       A.    I -- I -- could they have asked?

18   Speculating, they could have asked.  Would it

19   have been feasible or even physically possible to

20   -- to review the acquisition cost for each NDC,

21   that would be -- that would be absurd, and it

22   would defeat the purpose.  I mean --

140

1     provided more than just the cost of the drug?

2              MS. OBEREMBT:   Objection.

3        A.   I'd have to see a document.  I'm not

4     familiar with any document.  If you have a

5     document, I'd be happy to look at it.  Do you

6     have something you can provide me to look at, so

7     I can answer you better?

8        Q.   (By Mr. Reale) Now, are there any

9     factors in Arkansas that make --

10       A.   You didn't answer me.

11       Q.   We'll look at documents later, but --

12       A.   Okay.

13       Q.   -- for now, I just want to ask the

14    questions.  Are there any factors in Arkansas

15    that make access a particular concern?  In other

16    words, are there rural areas that you have to

17    focus on when you set your payment level that may

18    have difficulty for Medicaid patients getting

19    access?

20       A.   I think that's always a consideration,

21    is that you be aware of areas where there may not

22    be pharmacies in -- in all of the -- you know,

30(b)(6) Arkansas Dept of HS - Vol. I                    December 10, 2008
Little Rock, A

141

1    multiple pharmacies in a -- in a place.

2         Q.    And when Arkansas Medicaid sets its

3    payment rate for drug cost, it doesn't set a rate

4    based on what one pharmacy acquires their drugs

5    at?

6         A.    No, that's exactly correct.  We --

7    that's why we have to go on our best estimate, so

8    that when we reimburse -- we don't reimburse

9    separate -- different pharmacies different rates.

10   The reimbursement rate is -- is applied to all

11   pharmacies. We don't choose this pharmacy over

12   here and set a rate because they might be in this

13   area, and another pharmacy because they're in

14   that area.  We don't do that.

15        Q.    And -- and --

16        A.    Is that what you're asking?

17        Q.    Yes.  And Arkansas Medicaid is also

18   aware that some pharmacies acquire their drugs at

19   different costs than other pharmacies?

20        A.    That's what we are -- based on the

21   Myers & Stauffer survey from 2000 -- or 2000 -- I

22   don't remember the last survey, but it showed the

30(b)(6) Arkansas Dept of HS - Vol. I                    December 10, 2008
Little Rock, A

226

1    manufacturers?

2            MS. MOSLEY-SIMS:   Objection.

3        A.   I can only go by what this states.

4        Q.   (By Mr. Reale) Right.   And the rate

5    doesn't reflect what the average acquisition cost

6    was for pharmacies --

7        A.   Again, if we're going back to the

8    access issues, this is -- again, you're talking

9    about a set number of pharmacies.   Not every

10   pharmacy can purchase at the same price, so

11   you've got to make sure you maintain access, so

12   you've got to set an ingredient reimbursement

13   that will allow access to all the Medicaid

14   recipients of the entire state.

15       Q.   Right.

16       A.   So not every pharmacy can purchase at

17   the same rate as another pharmacy.

18       Q.   And --

19       A.   So again, the State, I would have to

20   think in consideration of that.

21       Q.   That's -- and so that's right.   And so

22   the Medicaid Program has to be mindful not just

244

1    trying our best to reimburse closer to the

2    acquisition cost on a generic drug.

3        Q.    (By Mr. Reale) How long has Arkansas'

4    Medicaid MAC Program been in place, the State

5    Upper Limit Program?

6        A.    When I came onboard, there were State

7    MACs in place at that point in time.

8        Q.    And you testified that the MAC prices

9    -- sorry.  You state -- you testified earlier

10   that the MAC prices set by Arkansas' Medicaid

11   Program were based on actual acquisition cost to

12   pharmacies?

13       A.    I never said that.

14       Q.    Well, how is the MAC Program set up?

15       A.    Again, the -- the MAC Program, we -- we

16   have an individual that currently does that for

17   us today. Basically, he will -- when we are aware

18   that there are some generics that have become

19   available for a brand, generic equivalents, he

20   will obtain -- he'll -- he'll find out from

21   different pharmacies.  He'll call pharmacies who

22   -- who are willing to work with us, give us their

30(b)(6) Arkansas Dept of HS - Vol. I                    December 10, 2008
Little Rock, A

245

1    invoice price, what they pay for the drug.

2          We don't -- their invoice price.  He'll

3    also get from them the different prices that they

4    pay for their generics and just kind of --

5    through some type of an analysis -- I don't know

6    the full detail of how he does it, but we'll

7    determine a MAC on -- on that generic -- on the

8    generic, on the GCN.  Are you familiar with the

9    GCN?

10         Q.   Yes.  But why don't, for the record,

11   you say what that is?

12         A.   The GCN is a single number that will

13   encompass multiple NDCs, so that rather than

14   having to apply something to each specific NDC,

15   it represents that specific drug, its dosage

16   form, its route of administration, so that you

17   don't have to be with a lot of numbers.

18         Q.   So is -- is it fair to say that a MAC

19   price that's set for a generic drug is not based

20   on AWP?

21         A.   It's not -- it doesn't reimburse off of

22   AWP. We might look at what the acquisition cost

30(b)(6) Arkansas Dept of HS - Vol. I                    December 10, 2008
Little Rock, A

246

1    of that brand is.

2         Q.    Okay.

3         A.    Okay.  We -- like if -- if you have a

4    -- the easiest way for me to explain it, if you

5    have a brand and you know that -- what we would

6    reimburse based on our reimbursement formula, AWP

7    minus 14 percent, then you -- he also finds out

8    from the pharmacy what that actual cost of that

9    brand is just as a comparison tool, so that when

10   he is setting the MAC, he can make that -- make a

11   comparable determination.

12        Q.    Is -- is the MAC based in part on the

13   invoice price of generic drugs within the GCN?

14        A.    The MAC looks at what the pharmacies

15   tell us are the invoice price for the different

16   NDCs within that GCN.  So he has a -- he'll

17   determine -- he'll put them -- I'm not good at

18   explaining how he does it.  He puts them all on a

19   spreadsheet.  He develops a spreadsheet of all of

20   the NDCs that he can obtain within that GCN and

21   gets the invoice prices from the -- from the

22   pharmacies.

248

1    saying we don't have a physical invoice to look

2    at.  We're calling them and we're -- we're

3    putting our trust in them that they're giving us

4    an honest number of what they pay for the drug.

5         Q.   (By Mr. Reale) And -- and the MAC price

6    is below the AWP, correct?

7         A.   Yes.

8         Q.   And it's actually below the estimated

9    acquisition cost, correct?

10        A.   Yeah.  That's correct.

11        Q.   So the MAC price is not based on AWP?

12        A.   That's correct.

13        Q.   It's based on actual invoices that --

14        A.   It's based on what pharmacies say they

15   have paid for the prescription.

16        Q.   How many drugs are subject to the MAC?

17        A.   I don't know.  I don't know.

18        Q.   More than 1,000?

19        A.   That's a -- when you say actual drugs

20   or GCNs, there's a big difference.

21        Q.   Well --

22        A.   And so I don't know how to answer that

249

1    question.   There would have been --

2        Q.    How many GCNs are subject to the State

3    MAC?

4        A.    I honestly -- I honestly do not know.

5    I'd have to pull the upper limit list online and

6    look to see which ones are Federal upper limits

7    and which ones are State.   I don't know.

8        Q.    Do you believe it's more than 500 that

9    are subject to a State MAC?

10       A.    I don't know.   I mean, there are --

11   there are several, but I honestly cannot tell you

12   how many. I've never just gone in to look to

13   count.   That's -- that's not part of what I do.

14   That's not --

15       Q.    And I believe you testified it's an

16   individual EDS that actually surveys the

17   pharmacies to determine their acquisition --

18       A.    He's contracted to do that for us.

19   That's just one of his job duties.   He has

20   several other job duties, but that's one of his.

21       Q.    But one of his job duties is dedicated

22   solely to determining a MAC price?

30(b)(6) Arkansas Dept of HS - Vol. I   December 10, 2008
Little Rock, A

250

1  A. One of his job duties is to assist us

2 with the MAC pricing.

3  Q. Okay.  We can take a break now.

4   VIDEOGRAPHER:  Going off record at 3:11

5 p.m., ending Tape 5.

6   (Whereupon, a break was taken.)

7   VIDEOGRAPHER:  Back on the record at

8 3:23 p.m.

9  Q. (By Mr. Reale) Hello again.  Before our

10 break, we were talking about Arkansas' State MAC

11 Program, and you testified that the State MAC

12 prices that were set for generic drugs were not

13 based on AWP; is that correct?

14  A. That's correct.

15  Q. And the State MAC prices that were set

16 were lower than the estimated acquisition cost as

17 that is defined by Arkansas Medicaid?

18  A. That's correct.

19  Q. And they're based, the MAC prices, on

20 actual invoice prices of drugs in Arkansas?

21  A. Well, again, they're based on what the

22 pharmacy says they have paid for the product.

30(b)(6) Arkansas Dept of HS - Vol. I      December 10, 2008
Little Rock, A

251

1     Q.   And you have no reason to doubt that

2  pharmacies are submitting you accurate and

3  truthful information?

4     A.   I have no reason to doubt.

5     Q.   Now, when we looked at the 1997 report,

6  which we marked as Roxane Exhibit 12, and in

7  particular, the finding that pharmacies, on

8  average, paid 42.5 percent less than AWP for

9  drugs sold to Medicaid beneficiaries, you

10  referenced the State's MAC Program in the context

11  that -- of our discussion.  Do you recall that?

12     A.   Yes.

13     Q.   Is it your testimony that the State's

14  MAC Program achieved savings of 42.5 percent less

15  than AWP on most drugs?

16     A.   I really can't answer that.  I don't --

17  I can't be definite on that.

18     Q.   Why wouldn't Arkansas' Medicaid Program

19  adopt a definition of estimated acquisition cost

20  for generic drugs of AWP minus 40 percent?

21     A.   If we knew that the AWPs that were

22  being provided to us were accurate, then we could

30(b)(6) Arkansas Dept of HS - Vol. I                December 10, 2008
Little Rock, A

307

1    products.  And they're telling you, Arkansas

2    Medicaid, that on average, drugs with FUL prices

3    are being acquired at discounts off of AWP of 82

4    percent.  And for drugs without FUL prices,

5    they're being acquired, on average, of discounts

6    approximating 46 percent.  And pharmacies are not

7    submitting you any evidence to challenge these

8    findings, and you're selecting AWP minus 20

9    percent.  Why is that?

10            MS. FORD:  Objection to form.

11        A.   This was not just -- this -- I can't

12    answer that question.

13        Q.   (By Mr. Reale) Do you think that it was

14    driven more out of a political compromise that

15    Arkansas selected AWP minus 20 percent than it

16    was a belief that drugs were actually acquired at

17    rates less than AWP minus 50 percent?

18            MS. MOSLEY-SIMS:  Objection.

19            MS. FORD:  Objection, form.

20        A.   I believe it was a provider relations

21    issue more than -- it was not necessarily a

22    political issue, but a provider relations issue,

30(b)(6) Arkansas Dept of HS - Vol. I                    December 10, 2008
                        Little Rock, A

308

1    that we wanted to make sure that we could --

2    again, that we wanted to make sure that all of

3    the Medicaid recipients in the State would be

4    able to obtain drugs.  So we didn't want to take

5    a chance of, or risk them losing access.

6        Q.   (By Mr. Reale) But -- but doing so, by

7    choosing AWP minus 20 percent out of an access

8    concern, you realized that you were paying, on

9    average, more than the estimated acquisition cost

10   for many pharmacies and many products?

11            MS. MOSLEY-SIMS:  Objection, asked and

12   answered.  Can we move on?

13       A.   And again, I will respond to that, that

14   we're not taking into consideration -- we're

15   focusing strictly on reimbursement off of AWP.

16   We're not -- there's no focus on what we have

17   State MACs on either. So -- and this is only

18   referring to FULs.  So to me that's -- that's

19   making an assumption that we didn't take action

20   and that we assumed something by that.

21       Q.   (By Mr. Reale) But you certainly knew

22   that AWP didn't represent anything close to the