# Exhibit 12

***State of California ex rel. Ven-A-Care of the Florida Keys, Inc. v.***
***Abbott Labs, Inc. et al., Civil Action No. 03-11226-PBS***

**Exhibit to the November 25, 2009 Declaration of Philip D. Robben**
**in Support of Defendants' Joint Motion for Partial Summary Judgment**

Page 287

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL         )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     )  CIVIL ACTION

PRICE LITIGATION               )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO       )

U.S. ex rel. Ven-a-Care of     )  Judge Patti B. Saris

the Florida Keys, Inc.         )

      v.                       )  Chief Magistrate

Abbott Laboratories, Inc.,     )  Judge Marianne B.

No. 06-CV-11337-PBS            )  Bowler

- - - - - - - - - - - - - - -

      (cross captions appear on following pages)


        Videotaped deposition of SUE GASTON


                  Volume II


                  Washington, D.C.

                  Wednesday, March 19, 2008

                  9:00 a.m.

Gaston, Sue - Vol. II                                    March 19, 2008
                        Washington, DC

|                                                        |                                                        |
|--------------------------------------------------------|--------------------------------------------------------|

Page 288

1           UNITED STATES DISTRICT COURT
2         FOR THE DISTRICT OF MASSACHUSETTS
3    ---------------
4    IN RE: PHARMACEUTICAL    ) MDL NO. 1456
5    INDUSTRY AVERAGE WHOLESALE ) CIVIL ACTION
6    PRICE LITIGATION       ) 01-CV-12257-PBS
7                         ) Judge Patti B. Saris
8    THIS DOCUMENT RELATES TO   ) Chief Magistrate
9    ALL CASES IN MDL NO. 1456  ) Judge Marianne B.
10   --------------- Bowler
11
12
13     IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
14       THIRD JUDICIAL DISTRICT AT ANCHORAGE
15   ---------------
16   STATE OF ALASKA,        )
17        Plaintiff,      )
18        vs.            ) Case No.
19   ALPHARMA BRANDED PRODUCTS   ) 3AN-06-12026 CI
20   DIVISION, INC., et al.    )
21        Defendants.      )
22   ---------------

Page 290

1    IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
2        COUNTY DEPARTMENT, CHANCERY DIVISION
3    ---------------
4    THE PEOPLE OF THE STATE OF  )
5    ILLINOIS,          )
6        Plaintiff,   ) Case No. 05 CH 02474
7        vs.          )
8    ABBOTT LABORATORIES, et al., )
9        Defendants.    )
10   ---------------
11
12
13        COMMONWEALTH OF KENTUCKY
14       FRANKLIN CIRCUIT COURT - DIV. I
15   ------------------
16   COMMONWEALTH OF KENTUCKY, ex rel. )
17   GREGORY D. STUMBO, ATTORNEY GENERAL)
18        Plaintiff,      ) Civil Action
19        vs.          ) NO. 04-CI-1487
20   ALPHARMA USPD, INC., et al.,    )
21        Defendants.      )
22   ------------------

Page 289

1      IN THE CIRCUIT COURT OF THE FIRST CIRCUIT
2             STATE OF HAWAII
3    ---------------
4    STATE OF HAWAII,        )
5        Plaintiff,     ) Case No.
6        vs.          ) 06-1-0720-04 EEH
7    ABBOTT LABORATORIES, INC., )
8    et al.,          ) JUDGE EDEN
9        Defendants.    ) ELIZABETH HIFO
10   ---------------
11
12
13     IN THE FOURTH JUDICIAL DISTRICT OF THE STATE OF
14      IDAHO, IN AND FOR THE COUNTY OF ADA
15   ---------------
16   STATE OF IDAHO,        )
17        Plaintiff,     )
18        vs.          ) Case No.
19   ALPHARMA USPD, INC., et al., ) CV OC 0701847
20        Defendant.      )
21   ---------------
22

Page 291

1        COMMONWEALTH OF KENTUCKY
2       FRANKLIN CIRCUIT COURT - DIV. II
3    ------------------
4    COMMONWEALTH OF KENTUCKY,      )
5        Plaintiff,   ) Civil Action
6        vs.          ) NO. 03-CI-1134
7    ABBOTT LABORATORIES, INC.,    )
8        Defendants.      )
9    ------------------
10
11        COMMONWEALTH OF KENTUCKY
12       FRANKLIN CIRCUIT COURT - DIV. II
13   ------------------
14   COMMONWEALTH OF KENTUCKY, ex rel. )
15   GREGORY D. STUMBO, ATTORNEY GENERAL)
16        Plaintiff,        ) Civil Action
17        vs.          ) NO. 03-CI-1135
18   WARRICK PHARMACEUTICALS CORP.,   )
19   et al.          )
20        Defendants.      )
21   ------------------
22

                                2 (Pages 288 to 291)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                    March 19, 2008
                 Washington, DC

Page 292

```
 1  STATE OF NEW YORK
 2  SUPREME COURT: COUNTY OF ERIE
 3  - - - - - - - - - - - - - - -
 4  COUNTY OF ERIE,            )
 5          Plaintiff,         )
 6      vs.              ) Index No. 05-2439
 7  ABBOTT LABORATORIES, INC.,   )
 8  et al.,                    )
 9          Defendants.        )
10  - - - - - - - - - - - - - - -
11
12
13        STATE OF WISCONSIN CIRCUIT COURT
14            DANE COUNTY  Branch 9
15  - - - - - - - - - - - - - - -
16  STATE OF WISCONSIN,        )
17          Plaintiff,         )
18      vs.              ) Case No. 04-CV-1709
19  AMGEN INC., et al.,        )
20          Defendants.        )
21  - - - - - - - - - - - - - - -
22
```

Page 293

```
 1        IN THE CIRCUIT COURT FOR
 2        MONTGOMERY COUNTY, ALABAMA
 3  - - - - - - - - - - - - - - -
 4  ITMO: ALABAMA MEDICAID      )
 5  PHARMACEUTICAL AVERAGE      ) MASTER DOCKET NO.
 6  WHOLESALE PRICE LITIGATION  ) CV-2005-219
 7  - - - - - - - - - - - - - -)
 8  THIS DOCUMENT RELATES TO:   )
 9  STATE OF ALABAMA  v.        )
10  ABBOTT LABORATORIES, INC.   )
11  - - - - - - - - - - - - - - -
12
13
14
15
16
17
18
19
20
21
22  (CONTINUED)
```

Page 294

```
 1        UNITED STATES DISTRICT COURT
 2        FOR THE DISTRICT OF MASSACHUSETTS
 3  - - - - - - - - - - - - - - -
 4  IN RE: PHARMACEUTICAL    ) MDL NO. 1456
 5  INDUSTRY AVERAGE WHOLESALE ) CIVIL ACTION
 6  PRICE LITIGATION       ) 01-CV-12257-PBS
 7  THIS DOCUMENT RELATES TO   )
 8  U.S. ex rel. Ven-a-Care of  ) Judge Patti B. Saris
 9  the Florida Keys, Inc., et al)
10      v.          ) Chief Magistrate
11  Boehringer Ingelheim   ) Judge Marianne B.
12  Corporation, et al.,   ) Bowler
13  No. 07-CV-10248-PBS    )
14  - - - - - - - - - - - - - - -
15
16      Continued videotaped deposition of SUE GASTON,
17  held at the law offices of Jones Day, 51 Louisiana
18  Avenue, N.W., Washington, D.C. 20001-2113, the
19  proceedings being recorded stenographically by
20  Jonathan Wonnell, a Registered Professional Court
21  Reporter and Notary Public of the District of
22  Columbia, and transcribed under his direction.
```

Page 295

```
 1    A P P E A R A N C E S   O F   C O U N S E L
 2
 3   On behalf of the United States of America:
 4
 5        ANA MARIA MARTINEZ, ESQ.
 6        United States Department of Justice
 7        99 N.E. 4th Street
 8        Miami, Florida 33132
 9        (305) 961-9431
10        ana.maria.martinez@usdoj.gov
11
12        -- and --
13
14        JAMES J. FAUCI, ESQ. (via phone)
15        United States Attorney's Office
16        John Joseph Moakley Building
17        1 Courthouse Way
18        Boston, Massachusetts 02210
19        (617) 748-3298
20
21
22
```

3 (Pages 292 to 295)

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

| Page 296 | | Page 298 | |
|---|---|---|---|

Page 296

1        A P P E A R A N C E S (Cont'd)
2
3    On behalf of the U.S. Department of Health and
4    Human Services:
5
6          LESLIE M. STAFFORD, ESQ.
7          U.S. Department of Health & Human Services
8          Office of General Counsel, CMS Division
9          7500 Security Boulevard
10         Mail Stop C2-05-23
11         Baltimore, Maryland 21244
12         (410) 786-9655
13
14   On behalf of the State of Alabama:
15
16         PAUL LYNN, ESQ. (via phone)
17         Beasley, Allen, Crow, Methvin, Portis &
18           Miles, P.C.
19         218 Commerce Street
20         Montgomery, Alabama 36104
21         (800) 898-2034
22         paul.lynn@beasleyallen.com

Page 298

1        A P P E A R A N C E S (Cont'd)
2
3    On behalf of Ven-A-Care of the Florida Keys, Inc.:
4
5          MARJORY P. ALBEE, ESQ.
6          Mager & Goldstein LLP
7          1818 Market Street, Suite 3710
8          Philadelphia, Pennsylvania 19103
9          (215) 640-3280
10         malbee@magergoldstein.com
11
12   On behalf of Abbott Laboratories, Inc.:
13
14         DAVID TORBORG, ESQ.
15         SEAN P. MALONE, ESQ.
16         Jones Day
17         51 Louisiana Avenue, N.W.
18         Washington, D.C. 20001-2113
19         (202) 879-3939
20         dstorborg@jonesday.com
21         spmalone@jonesday.com
22

Page 297

1        A P P E A R A N C E S (Cont'd)
2
3    On behalf of the State of Florida:
4
5          MARY S. MILLER, ESQ. (via phone)
6          Office of the Attorney General of Florida
7          PL-01, The Capitol
8          Tallahassee, Florida 32399-1050
9          (850) 414-3600
10         mary_miller@oag.state.fl.us
11
12   On behalf of the City of New York and all New York
13   Counties other than Nassau and Orange; and the
14   States of Alaska, Hawaii, Idaho, Illinois, Kentucky,
15   South Carolina and Wisconsin:
16
17         MICHAEL WINGET-HERNANDEZ, ESQ.
18         Winget-Hernandez, LLC
19         3112 Windsor Road, Suite 228
20         Austin, Texas 78703
21         (512) 858-4181
22         michael@winget-hernandez.com

Page 299

1        A P P E A R A N C E S (Cont'd)
2
3    On behalf of Aventis Pharmaceuticals and Sanofi
4    Synthelabo:
5
6          MICHAEL L. KOON, ESQ.
7          Shook, Hardy & Bacon, LLP
8          2555 Grand Boulevard
9          Kansas City, Missouri 64108-2613
10         (816) 474-6550
11         jkoon@shb.com
12
13   On behalf of Bristol-Myers Squibb:
14
15         DIANNE M. PETERSON, ESQ. (via phone)
16         Hogan & Hartson
17         875 Third Avenue
18         New York, New York 10022
19         (212) 918-3000
20         dmpeterson@hhlaw.com
21
22

4 (Pages 296 to 299)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                March 19, 2008
                        Washington, DC

| Page 300 | Page 302 |
|---|---|

**Page 300**

1       A P P E A R A N C E S (Cont'd)
2
3    On behalf of Dey, Inc., Dey, L.P. and Mylan:
4
5        SARAH L. REID, ESQ.
6        Kelley, Drye & Warren LLP
7        101 Park Avenue
8        New York, New York 10178
9        (212) 808-7720
10       sreid@kelleydrye.com
11
12   On behalf of Roxane Laboratories and Boehringer
13   Ingelheim:
14
15       JARED T. HECK, ESQ.
16       Kirkland & Ellis
17       200 East Randolph Drive
18       Chicago, Illinois 60601
19       (312) 469-7087
20       jheck@kirkland.com
21
22

**Page 302**

1       A P P E A R A N C E S (Cont'd)
2
3    On behalf of Ethex Corporation:
4
5        CLARA VONDRICH, ESQ.
6        Arnold & Porter
7        555 Twelfth Street, N.W.
8        Washington, D.C. 20004
9        (202) 942-5000
10
11
12   ALSO PRESENT:
13
14       CONWAY BARKER, Videographer
15
16
17
18
19
20
21
22

**Page 301**

1       A P P E A R A N C E S (Cont'd)
2
3    On behalf of Sandoz, Inc.:
4
5        MILANA SALZMAN, ESQ. (via phone)
6        White & Case LLP
7        1155 Avenue of the Americas
8        New York, New York 10036-2787
9        (212) 819-8711
10       msalzman@whitecase.com
11
12   On behalf of Schering-Plough Corporation,
13   Schering Corporation and Warrick
14   Pharmaceuticals Corporation:
15
16       JOHN P. BUEKER, ESQ.
17       Ropes & Gray
18       One International Place
19       Boston, Massachusetts 02110-2624
20       (617) 951-7050
21       john.bueker@ropesgray.com
22

**Page 303**

1                C O N T E N T S
2    WITNESS NAME: SUE GASTON              PAGE
3    Examination By Mr. Torborg................. 310
4    Examination By Mr. Bueker................... 402
5    Examination By Ms. Reid.................... 535
6    Examination By Mr. Heck.................... 545
7    Examination By Mr. Koon................... 548
8
9             E X H I B I T S
10   NUMBER          DESCRIPTION          PAGE
11   Exhibit Abbot 752, excerpt from rough
12           transcript of deposition of
13           Zachary Bentley............ 315
14   Exhibit Abbot 753, HHC004-0191 - 0192........ 385
15   Exhibit Abbot 754, HHD 180-0034 - 0039....... 391
16   Exhibit Abbot 755, KY_DMS_0000000125919 - 5921 398
17
18             E X H I B I T S
19   NUMBER          DESCRIPTION          PAGE
20   Exhibit NY Counties 001, excerpt from the CFR
21           Section 447.332....... 406
22   Exhibit NY Counties 002, HHD175-0849........... 412

5  (Pages 300 to 303)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Page 304

1          E X H I B I T S (CONTINUED)
2  NUMBER          DESCRIPTION          PAGE
3  Exhibit NY Counties 003, FUL Drug List
4          Transmittal No. 37
5          dated 11/20/01........ 416
6  Exhibit NY Counties 004, HHD175-0850 - 0852.... 431
7  Exhibit NY Counties 005, HHD175-1492........... 440
8  Exhibit NY Counties 006, HHD175-2110........... 445
9  Exhibit NY Counties 007, HHD175-0009........... 453
10 Exhibit NY Counties 008, HHD175-0276........... 459
11 Exhibit NY Counties 009, FUL Drug List
12         Transmittal No. 37
13         dated 6/27/04......... 466
14 Exhibit NY Counties 010, HHD170-1050 - 1053.... 469
15 Exhibit NY Counties 011, HHD175-1065 - 1071.... 473
16 Exhibit NY Counties 012, HHD175-0557 - 0559.... 491
17 Exhibit NY Counties 013, HHD175-1073 - 1077.... 499
18 Exhibit NY Counties 014, ALMED 304072 - 304141. 508
19 Exhibit NY Counties 015, Spreadsheet entitled
20         Albuterol .083%
21         Solution As of June
22         1997................. 511

Page 305

1          E X H I B I T S (CONTINUED)
2  NUMBER          DESCRIPTION          PAGE
3  Exhibit NY Counties 016, Excerpt from the FDA's
4          Orange Book, 1997..... 513
5  Exhibit NY Counties 017, Excerpt from the FDA's
6          Orange Book, 1998..... 515
7  Exhibit NY Counties 018, HHD175-1059 - 1063.... 519
8
9              E X H I B I T S
10 NUMBER          DESCRIPTION          PAGE
11 Exhibit Dey 136, Excerpt from the FDA's Orange
12         Book, 2000.................... 537
13 Exhibit Dey 137, HHC 0160123 - 0125........... 541
14
15             E X H I B I T S
16 NUMBER          DESCRIPTION          PAGE
17 Exhibit Aventis 001, Medicaid Drug Rebate
18         Program Release No. 18.... 554
19 Exhibit Aventis 002, Document entitled HCFA's
20         Medicaid Drug Rebate Staff 555
21 Exhibit Aventis 003, Medicaid Drug Rebate
22         Program Release No. 29.... 567

Page 306

1          E X H I B I T S (CONTINUED)
2  NUMBER          DESCRIPTION          PAGE
3  Exhibit Aventis 004, Chart entitled AMP/Best
4          Price Calculations........ 570
5  Exhibit Aventis 005, CMS carrier release number
6          47 dated 7/13/00.......... 580
7  Exhibit Aventis 006, Chart entitled Exclusions
8          from Rebate Program....... 582
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 307

1          P R O C E E D I N G S
2          (9:24 a.m.)
3      THE VIDEOGRAPHER:  In the United States
4  District Court for the District of Massachusetts
5  In Re: Pharmaceutical Industry Average Wholesale
6  Price Litigation, related to the United States of
7  America ex rel. Ven-A-Care of the Florida Keys
8  Incorporated versus Abbott Laboratories
9  Incorporated et al., Case Number 01-CV-12257 PBS,
10 this is the deposition of Sue E. Gaston, volume
11 2.
12     Today's date is March 19th 2008.  The
13 location of the deposition is Jones Day, 51
14 Louisiana Avenue, Northwest, Washington, D.C.
15 Will counsel please identify yourselves and state
16 whom you represent?
17     MR. TORBORG:  David Torborg from Jones
18 Day on behalf of Abbott Laboratories.
19     MR. BUEKER:  John Bueker from Ropes &
20 Gray on behalf of Schering Corporation, Schering-
21 Plough Corporation and Warrick Pharmaceuticals
22 Corporation.

                    6 (Pages 304 to 307)

Gaston, Sue - Vol. II                          March 19, 2008
                        Washington, DC

Page 308

1       MS. REID:  Sarah Reid from Kelley Drye
2   on behalf of the Dey defendants and also Mylan
3   Laboratories.
4       MR. HECK:  Jared Heck with Kirkland &
5   Ellis LLP on behalf of the Roxane defendants.
6       MS. MARTINEZ:  Ani Martinez on behalf
7   of the United States.
8       MS. STAFFORD:  Leslie Stafford on
9   behalf of the Centers for Medicare and Medicaid
10   Services.
11       MS. ALBEE:  Marjory Albee from Mager &
12   Goldstein on behalf of Ven-A-Care.
13       MR. WINGET-HERNANDEZ:  Michael Wingate-
14   Hernandez.  I'm here on behalf of the City of New
15   York and the New York Counties in MDL 1456 except
16   for Orange and Nassau.  Also on behalf of the
17   states of Wisconsin, Illinois, Kentucky, South
18   Carolina, Hawaii, Alaska, Idaho, to the extent
19   that they have been cross noticed.
20       THE VIDEOGRAPHER:  Those on the phone,
21   could you please identify yourselves, please?
22       MR. LYNN:  My name is Paul Lynn.  I

Page 309

1   represent the state of Alabama.
2       MS. MILLER:  Mary Miller on behalf of
3   the State of Florida office of the attorney
4   general, in the cross noticed matter by Dey and
5   Mylan.
6       MS. SALZMAN:  Milana Salzman from White
7   & Case representing Sandoz, Inc.
8       MS. VONDRICH:  Clara Vondrich from
9   Arnold & Porter representing Ethex.
10       MR. FAUCI:  Jeff Fauci with the United
11   States.
12       MS. PETERSON:  Dianne Peterson with
13   Hogan & Hartson representing Bristol-Myers
14   Squibb.
15       THE VIDEOGRAPHER:  Anyone else?
16       The court reporter is Jon Wonnell.  The
17   video camera operator is Conway Barker, both on
18   behalf of Henderson Legal Services.  That
19   deposition commences at 9:27.  Please swear in
20   the witness.
21
22   Whereupon,

Page 310

1       SUE GASTON,
2   called as a Witness, was duly sworn by Jonathan
3   Wonnell, a Notary Public in and for the District
4   of Columbia, and was examined and testified as
5   follows.
6
7       EXAMINATION BY COUNSEL FOR ABBOTT
8   LABORATORIES
9   BY MR. TORBORG:
10   Q.  Good morning, Ms. Gaston.
11   A.  Good morning.
12   Q.  And welcome back.  Okay.  My name is
13   David Torborg from Jones Day.  And we represent
14   Abbott Laboratories in this case.  Before we get
15   started continuing with the questioning I'd like
16   to go over a few ground rules that we talked
17   about last time just as a reminder to you.
18   First, you'll need to respond verbally to my
19   questions so that Jon, the court reporter, can
20   put down your response.
21       Most importantly, if you don't
22   understand any question that I ask please ask me

Page 311

1   to clarify.  My goal today is not to slip in any
2   trick questions or try to confuse you.  It's to
3   try to get your best recollection of the facts.
4   Okay?
5   A.  Fine.
6   Q.  From time to time Ms. Martinez or
7   others may say objection after I ask a question.
8   Often it's a good idea to allow a short pause
9   after I ask the question in case there are any
10   objections.  But unless you're instructed not to
11   answer the question you can go ahead and answer
12   my question.  Okay?
13   A.  Fine.
14   Q.  Similar to the last time that we went
15   through this process there are some binders to
16   your left that have orange covers on them.  Those
17   are documents that have been marked as Abbott
18   exhibits in depositions that came before you.  So
19   if I ask you to go to Abbott Exhibit 520 or
20   something of that nature, I'll ask that we find
21   the binder and Ms. Martinez has usually been
22   helpful in doing that.

                              7 (Pages 308 to 311)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                          Washington, DC

Page 312

1         I'll try to take a break after an hour
2    or so.  But let me know if you need to take a
3    break before that.  Okay?
4         A.  Okay.
5         Q.  Okay.  Since the last time that you
6    were deposed here in this case have you been
7    deposed in any other AWP-related litigation?
8         A.  No.
9         Q.  Have you met with counsel for the
10   United States or CMS since your last deposition?
11        A.  Yes.
12        Q.  Can you tell me about that?
13        A.  I met with Leslie and Jeff.  Is it
14   Fauci?  Last week, I think it was.
15        Q.  Was that an in-person meeting?
16        A.  What do you mean, in-person?
17        Q.  Was it in-person?
18        A.  Yes.
19        Q.  And how long was the meeting?
20        A.  Probably approximately two hours.
21        Q.  And did you review any documents at
22   that meeting?

Page 313

1         A.  Yes.
2         Q.  Did any of those documents refresh your
3    recollection at all about the subject matters
4    contained within those documents?
5         A.  Yes.
6         Q.  Tell me what documents refreshed your
7    recollection.
8         A.  They were sheets used when determining
9    federal upper limit prices.  They were copies of
10   -- copies from the application, the federal upper
11   limit application.
12        Q.  Was it your understanding that those
13   documents were being produced in AWP-related
14   litigation?
15        A.  Yes.
16        Q.  And that you would be asked about them?
17   That was your expectation?  That's why you were
18   reviewing them, I take it?
19        A.  Yes.
20        Q.  Any other conversations apart from this
21   morning that you've had with counsel?
22        A.  No.

Page 314

1         Q.  Have you had a chance to review your
2    deposition transcript from the first day of the
3    deposition?
4         A.  Yes.
5         Q.  Did you notice anything that needed
6    correcting?
7         A.  There were some typos, just minor
8    things that I annotated on the sheet.
9         Q.  But nothing substantive that you
10   recall?
11        A.  No.
12        Q.  Have you discussed anyone else's
13   testimony in AWP litigation?
14        A.  No.
15        Q.  Do you have on idea of who else from
16   your office, state Medicaid programs or
17   otherwise, has been deposed in the case?
18        A.  I understand that Larry and Deirdra and
19   Dennis Smith.
20        Q.  Anyone else?
21        A.  Not that I'm aware of, no.
22        Q.  I'd like to mark as the next exhibit,

Page 315

1    which I believe will be Abbott Exhibit 752 some
2    testimony that was provided in this case by an
3    individual by the name of Zachary Bentley.  This
4    is for the record a copy of the rough transcript
5    because that's what I had available to me at this
6    time.  It's pages 156 through 164 of that
7    transcript.
8             (Exhibit Abbott 752 was marked for
9    identification.)
10            MS. MARTINEZ:  Excuse me.  Did you say
11   156?
12            MR. TORBORG:  Page 256 through 264.
13            MS. MARTINEZ:  Okay.
14   BY MR. TORBORG:
15        Q.  Ms. Gaston, I'd like you to read to
16   yourself the line that starts from page 256 lines
17   17 through the remainder of the exhibit and then
18   I'll have some questions for you.
19        A.  (Reading.)
20            MS. MARTINEZ:  Just for the record, I
21   object to the use of these rough transcripts as
22   well as the attachment as an exhibit to the case,

                                    8 (Pages 312 to 315)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 316

1  or to the deposition.
2        MR. TORBORG:  What would you have me
3  do, Ms. Martinez?  Would you like me to question
4  about the testimony without providing her a copy
5  of it?  Would that be your preference?
6        MS. MARTINEZ:  No.  I'm going to object
7  to form either way.
8        MR. TORBORG:  Okay.  But would you ask
9  me to not show her that transcript because it's a
10  rough form?
11       MS. MARTINEZ:  No.  I'm just saying
12  both are improper.  So I'm going to object to
13  form.  The court can rule.  If you want to use
14  another approach just in case so you have the
15  opportunity to maintain whatever answers the
16  witness gives, you can use another approach.
17  It's your own judgment.
18       MR. TORBORG:  Is it your position that
19  -- would you have an objection if I showed her a
20  final copy of the transcript?
21       MS. MARTINEZ:  Yes.
22       MR. TORBORG:  Why?  I want to see if I

Page 317

1  can cure whatever the objection is.
2        MS. MARTINEZ:  I just don't think it's
3  a proper question.
4        MR. TORBORG:  It's not a proper
5  question to ask someone about a deposition
6  transcript?
7        MS. MARTINEZ:  I would object to the
8  form of your question when you ask one witness
9  about what another witness said.
10       MR. TORBORG:  You think that's
11  improper?
12       MS. MARTINEZ:  Yeah.  I would object to
13  it.
14       MR. TORBORG:  Okay.
15  BY MR. TORBORG:
16   Q.  You can go ahead and continue
17  reviewing.
18   A.  Do you want me to read the whole thing?
19   Q.  Yeah.  Through the end.
20   A.  Okay.  (Reading.)
21       Okay.  I'm finished.
22   Q.  Ms. Gaston, I believe we covered this

Page 318

1  last time, but you recall an individual by the
2  name of Zack Bentley, correct?
3    A.  Yes.
4    Q.  He's affiliated with the company called
5  Ven-A-Care?
6    A.  Yes.
7    Q.  And for the period 1991 through 2003
8  you were involved with the federal upper limit
9  program for Medicaid drugs; is that right?
10   A.  Correct.
11   Q.  And you recalled attending a meeting
12  with Ven-A-Care on or about -- you didn't
13  remember the exact date, but on or around the
14  date November 14th of 1995.  Is that fair to say?
15   A.  I don't remember the exact date.
16   Q.  You remember having a meeting with
17  representatives of Ven-A-Care in the mid-1990s;
18  is that fair to say?
19   A.  Yes.
20   Q.  That was a meeting in Baltimore that
21  was attended by a number of people, correct?
22   A.  Yes.

Page 319

1    Q.  Do you recall having conversations with
2  Mr. Bentley prior to that meeting?
3    A.  I know I had conversations with Zachary
4  Bentley.  I don't know if it was prior to the
5  meeting, after the meeting.  I don't know the
6  time period.
7    Q.  Do you recall what the substance of
8  those meetings was?
9    A.  The meetings or the calls?
10   Q.  I'm sorry.  The calls with Mr. Bentley.
11  Do you recall what was being discussed?
12   A.  I don't recall.
13   Q.  Do you recall Mr. Bentley advising you
14  of -- either in a meeting that you attended or in
15  a telephone call -- that there was a large
16  difference between acquisition costs and AWPs for
17  certain injectable and infusion drugs?
18       MS. MARTINEZ:  Objection, form.
19   A.  I don't remember Zachary Bentley
20  telling me that.
21   Q.  Do you recall becoming aware of that?
22   A.  Yes.

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                      March 19, 2008
                    Washington, DC

Page 320

1    Q.  How did you become aware of that?
2    A.  Because of the Ven-A-Care litigation.
3    Q.  And you recall becoming aware of the
4  Ven-A-Care litigation in the mid-1990s; is that
5  fair to say?
6    A.  Yes.
7    Q.  And you may have had conversations with
8  Mr. Bentley or others at Ven-A-Care prior to the
9  1995 meeting; is that fair to say?
10   A.  It's fair to say.
11   Q.  During the period in the mid-1990s --
12  or -- I'm sorry.  In the period from 1991 to,
13  say, 1997, did you have discretion on whether or
14  not to set a federal upper limit on drugs?
15       MS. MARTINEZ:  Objection, form.
16   A.  Yes.
17   Q.  So if you wanted to set a federal upper
18  limit on the injectable and infusion drugs that
19  Ven-A-Care advised you of a large difference
20  between acquisition cost and AWP, you were able
21  to do so; is that fair to say?
22       MS. ALBEE:  Objection, form.

Page 321

1    A.  No.
2    Q.  Why not?
3    A.  Because we didn't set federal upper
4  limit prices on injectable drugs or infusion
5  drugs.  We set them on drugs that were the most
6  commonly used such as tablets, capsules, creams.
7    Q.  But you're not aware of any written
8  statutory or regulatory guidance that prohibited
9  you from setting a FUL on infusion and injectable
10  drugs; is that right?
11   A.  That's right.
12   Q.  It was a policy of HCFA at the time you
13  started administering the FUL program not to set
14  FULs on those drugs; is that correct?
15       MS. MARTINEZ:  Objection, form.
16   A.  I think I would rather say that it was
17  the criteria that was established before I
18  started doing the federal upper limit program.
19   Q.  And when you say criteria, could you
20  explain what you mean by that?
21   A.  The criteria is how they determined
22  what federal upper limit prices would apply to

Page 322

1  what type of drugs and the criteria basically was
2  drugs that were considered outpatient drugs,
3  generally dispensed at the pharmacy level.
4    Q.  And we talked about this last time.
5  But you were aware that you specifically took
6  steps to exclude infusion and injectable drugs
7  from the mechanism by which the FULs were
8  calculated, correct?
9        MS. MARTINEZ:  Objection, form.
10   A.  Correct.
11   Q.  Do you recall any discussions about
12  perhaps changing the HCFA policy or criteria not
13  to establish FULs for injectable and infusion
14  drugs at any point in time?
15   A.  I know that the conversation was
16  probably discussed.  I don't know when.  But no
17  steps were taken to do that.
18   Q.  Can you tell me why not steps were
19  taken to do that?
20   A.  It's my understanding that the criteria
21  we were using is to set federal upper limit
22  prices on drugs that were most commonly used.

Page 323

1  When we stepped into the arena of injectable
2  drugs or other drugs that weren't most commonly
3  used, I think it was a little more difficult to
4  capture those drugs for various reasons.  So
5  that's why we stuck with the basic criteria that
6  we used.
7    Q.  But you believe that there were
8  discussions about possibly moving injectable
9  infusion drugs into the FUL program; is that fair
10  to say?
11   A.  I wouldn't say that specifically.
12  There could have been conversations.  I wouldn't
13  say that the conversations went as far as to say
14  let's move them into the FUL arena.  But the
15  conversations were there.  And I can only answer
16  that generally, because I only remember short
17  conversations maybe discussing the issue.
18   Q.  If there has been testimony from Mr.
19  Bentley that he -- his best recollection is that
20  he advised you of the large differences between
21  acquisition cost and AWPs for certain injectable
22  infusion drugs at least as early as 1990, could

10 (Pages 320 to 323)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                            Washington, DC

Page 324

1  you say that Mr. Bentley's recollection is
2  incorrect?
3          MS. ALBEE:  Objection, form.
4          MS. MARTINEZ:  Objection, form.
5      A.  I can't answer to his statements.
6      Q.  You just -- it's your testimony that
7  the conversations may have happened; you just
8  don't recall?
9      A.  I don't recall conversations like that
10 with Zachary Bentley.
11     Q.  But you recall conversations with Mr.
12 Bentley?
13     A.  Correct.
14     Q.  You just don't recall one way or the
15 other what the substance of the conversations
16 was, correct?
17     A.  Correct.
18     Q.  What other types of conversations would
19 you have had with Mr. Bentley apart from the
20 federal upper limit program?
21     A.  I don't remember the conversations that
22 I had with Zachary Bentley.  Specifically the

Page 325

1  conversations, I don't remember.
2      Q.  And my question is a touch different.
3      A.  Okay.
4      Q.  And it's based on what you were doing
5  at HCFA, what your responsibilities were and your
6  knowledge of how Mr. Bentley fit into the story.
7      A.  Okay.
8      Q.  Do you have a sense for -- apart from
9  the federal upper limit program, what other
10 topics you would have been discussing with Mr.
11 Bentley?
12         MS. ALBEE:  Objection, form.
13         MS. MARTINEZ:  Objection, form.
14     A.  I worked on state plan amendments.  If
15 he had an issue about something that was
16 occurring in Florida or another state, he could
17 have called me about that, what was in the state
18 plan amendment.  I don't even know if I was
19 handling Florida at the time.  Or whatever states
20 he might have questioned.  He could have asked
21 any kind of general questions about the Medicaid
22 drug rebate program or any kind of pharmacy

Page 326

1  reimbursement issues.
2      Q.  Do you recall Mr. Bentley ever raising
3  issues about the Medicaid drug rebate program?
4      A.  I can't remember specifically what I
5  discussed with Zachary Bentley.
6      Q.  Do you have any -- what is your best
7  guess about the substance of the conversations
8  that you had with Mr. Bentley and yourself?
9          MS. MARTINEZ:  Objection, form.
10     Q.  Do you believe it related to the FUL
11 program or something else?
12         MS. MARTINEZ:  Objection, form.
13     A.  My best guess would say it probably
14 related to the FUL program.
15     Q.  Ms. Gaston, is it your testimony that
16 even though you became aware of the large
17 differences between acquisition costs and AWPs
18 for certain injectable and infusion products, you
19 did not believe you had the authority or
20 discretion to place FULs on those drugs?
21         MS. MARTINEZ:  Objection, form.
22     Q.  Is that a fair summary of your

Page 327

1  testimony?
2          MS. MARTINEZ:  Objection, form.
3      A.  We did not set FUL prices on those
4  types of drugs.  Is it would be a matter of
5  changing the criteria.  And that wouldn't be
6  strictly my place to do that.
7      Q.  Okay.  Fair point.  Who had the
8  authority or whose place was it to change the
9  criteria?
10     A.  Specifically, I don't know.  I know I
11 would have to go to Larry.  I don't know whether
12 he would have to get authority from someone else
13 to do that.
14     Q.  And Mr. Reed was in attendance in at
15 least one of the meetings you had with Ven-A-Care
16 where they discussed the large difference between
17 acquisition cost and AWPs with Ven-A-Care,
18 correct?
19         MS. MARTINEZ:  Objection, form.
20     A.  He was present at the Ven-A-Care
21 meetings.
22     Q.  Do you recall any steps that were taken

11 (Pages 324 to 327)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 328

1  at all to attempt to get FULs established for
2  infusion or injectable drugs?
3      A.  No, I don't.
4      Q.  Do you recall, Ms. Gaston, yourself
5  thinking in the mid-1990s when you were becoming
6  aware of the large differences between
7  acquisition cost and AWP for infusion and
8  injectable drugs why aren't we establishing FULs
9  for these drugs?
10         MS. MARTINEZ:  Objection, form.
11     Q.  Do you recall having that thought in
12 your head?
13     A.  I had the thought in my head.  But the
14 thought in my head is just trying to capture more
15 drugs for savings to the states.  Whether it was
16 injectables or unit dose or anything outside of
17 the basic criteria, I thought about trying to
18 expand it to include additional drugs just for
19 cost saving purposes.
20     Q.  Do you recall becoming aware of any
21 other classes of drugs outside of infusion and
22 injectable drugs where you were becoming aware of

Page 329

1  the large differences between acquisition cost
2  and AWPs?
3          MS. MARTINEZ:  Objection, form.
4          MS. ALBEE:  Objection, form.
5      A.  Here again, when I'm working with the
6  FUL program I'm looking at it just to try to
7  include more drugs.  I'm not looking at it -- at
8  a class of drugs and where there might be a
9  difference in the pricing.
10     Q.  You testified a second ago that you
11 were concerned or you wanted to try to achieve
12 more cost savings for Medicaid, correct?
13     A.  Correct.
14     Q.  And the FUL program was a tool that CMS
15 could use to do that, correct?
16     A.  Correct.
17     Q.  And you understood the purpose of the
18 FUL program was to mitigate against certain
19 manufacturers having high AWPs, correct?
20         MS. MARTINEZ:  Objection, form.
21     A.  Can you repeat that?
22     Q.  You understood that the purpose of the

Page 330

1  FUL program was to mitigate against certain
2  manufacturers having high AWPs on their drugs?
3          MS. MARTINEZ:  Objection, form.
4      A.  The purpose of the FUL program was to
5  set a reasonable reimbursement rate for states.
6      Q.  And do you have an understanding about
7  -- as the person who was in charge of the FUL
8  program from the early '90s through I think 2003,
9  2004 -- is that about --
10     A.  2003.
11     Q.  2003.  Do you have an understanding of
12 why was this program created?  Why not just take
13 the AWPs for each manufacturer's drugs straight
14 from the compendia?
15     A.  It was in regulations.  The FUL program
16 was in regulations.
17     Q.  But did you have an understanding of
18 the purpose behind it?
19     A.  Yes, I did.
20     Q.  And your understanding was what?
21     A.  It's to set -- the federal government
22 sets a reimbursement rate for states and is

Page 331

1  trying to achieve savings.  We're trying to set
2  reasonable reimbursement rates for certain
3  generic drugs.
4      Q.  Do you recall taking any steps, whether
5  it be merely a conversation with Mr. Reed or
6  someone else in your office to establish federal
7  upper limits for infusion and injectable drugs?
8      A.  The conversation could have come up.  I
9  know it was discussed about including those in
10 FULs, but it was just a conversation.
11     Q.  And the conversation, was that with Mr.
12 Reed?
13     A.  I can't say.  It probably included Mr.
14 Reed, because he was my supervisor.
15     Q.  Who else would have been included in
16 that?
17     A.  I don't know.  It depends on who I was
18 mentoring at the time.
19     Q.  Did you have conversations with anyone
20 outside of CMS about setting federal upper limits
21 for infusion and injectable drugs?
22     A.  I don't recall that, no.

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                        Washington, DC

Page 332

1     Q.  For example, to see if it triggers your
2  memory, do you recall conversations with provider
3  advocacy groups about whether or not to set a FUL
4  on injectable or infusion drugs?
5        MS. MARTINEZ:  Objection, form.
6     A.  I don't remember that, no.
7     Q.  So what you recall is you believe there
8  were conversations that would have included Mr.
9  Reed about the possibility of putting a FUL on
10  injectable and infusion drugs, correct?
11    A.  Correct.
12    Q.  Where did it go from there?
13    A.  It didn't go any further.
14    Q.  Do you know why not?
15    A.  I think the way that from my
16  recollection to try to include those drugs was it
17  was -- it was more complicated because those
18  types of drugs aren't most commonly used
19  generally at the pharmacy level.  A lot of them
20  aren't identified by NDC numbers.  They would
21  have J codes or HCPCS codes.  So it made it much
22  more difficult to be able to identify.  And a lot

Page 333

1  of them, again, are not generic drugs.  A lot of
2  them are single-source drugs.
3        So it was, I think, an area that didn't
4  seem to work well for the federal upper limit
5  program.  And again, we go back to -- when we
6  decide not to include something in the FULs, we
7  still go back to the fact that the states can set
8  reimbursement rates that they feel are
9  reasonable.
10    Q.  Do you recall if Ven-A-Care actually
11  supplied you with NDC numbers for certain of the
12  injectable and infusion drugs for which they
13  informed you of a large difference between
14  acquisition cost and AWPs?
15        MS. ALBEE:  Objection, form.
16    A.  I can't remember that.  I know that
17  they brought materials when they met with us.
18  But I can't remember if NDC numbers were in the
19  materials they brought.
20    Q.  I'd like to ask you to take out Exhibit
21  453.
22        MS. MARTINEZ:  Do you know the binder?

Page 334

1        MS. ALBEE:  Could you give the Bates
2  numbers?
3        MR. TORBORG:  I do not.  VAC MDL 86162
4  through 175.
5  BY MR. TORBORG:
6     Q.  We looked at this document last time.
7  Do you recall that?  I asked you some questions
8  earlier.
9     A.  I can't remember.
10    Q.  Would you please go to the Bates page
11  ending 170?  This is a page titled "Generics more
12  expensive than brand."  Do you see that?
13    A.  Yes.
14    Q.  If you look down at the bottom of the
15  first column there's J 3370 Vancocin.  Do you see
16  that?
17        MR. WINGET-HERNANDEZ:  Could you repeat
18  the number, please?
19        MR. TORBORG:  Bates page ending 170.
20  BY MR. TORBORG:
21    Q.  I'm making you get out another pair of
22  glasses.

Page 335

1     A.  Yup.
2        MR. WINGET-HERNANDEZ:  Yeah.  That's
3  the part I was hoping you would tell us again.
4  Why don't you say exactly what's on the page
5  you're looking at.
6        MR. TORBORG:  The page I'm looking at?
7        MR. WINGET-HERNANDEZ:  Maybe I
8  misunderstood you.  I thought you were trying to
9  direct our attention to a particular part of this
10  page.
11        MR. TORBORG:  Yes.  Left column below J
12  3370.
13        MR. WINGET-HERNANDEZ:  I see.  Thank
14  you.
15  BY MR. TORBORG:
16    Q.  Do you recall that Lilly was the brand
17  name maker of Vancocin?
18    A.  I don't recall that.
19    Q.  And do you see that on the right-hand
20  side of the page there's a column for generic?
21  Do you see that?
22    A.  Correct.

13 (Pages 332 to 335)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                    March 19, 2008
                  Washington, DC

| Page 336 | Page 338 |
|---|---|

**Page 336**

1    Q.  And then below toward the bottom of the
2  page there's a section that says "vancomycin
3  hydrochloride."  Do you see that?
4    A.  Yes.
5    Q.  And here does it appear as though Ven-
6  A-Care has provided you with specific NDC numbers
7  for vancomycin hydrochloride that fall under the
8  heading of instances where generics are more
9  expensive than brands?
10       MS. MARTINEZ:  Objection, form.
11    A.  I mean, I see NDC numbers, yes.  Okay,
12  under -- yes.
13    Q.  So is it a fair summary of your
14  testimony -- and please tell me if it's not.  I'm
15  not trying to put words in your mouth -- that
16  when it came to infusion and injectable drugs you
17  knew that there was an issue with there being a
18  large difference between acquisition cost and
19  AWP, correct?
20       MS. MARTINEZ:  Objection, form.
21    Q.  You learned that from Ven-A-Care?
22       MS. MARTINEZ:  Objection, form.

**Page 337**

1       MS. ALBEE:  Objection, form.
2    A.  That's what they're stating, yes.
3    Q.  And you had conversation -- you believe
4  you had conversations about moving those classes
5  of drugs into the FUL list, correct?
6       MS. MARTINEZ:  Objection, form.
7    A.  There was conversation, yes.
8    Q.  And you didn't do so because you
9  thought it would be too difficult?
10       MS. MARTINEZ:  Objection, form.
11    A.  I'm sure there were other reasons too.
12    Q.  What other reasons do you believe there
13  may have been?
14    A.  I can't think of those at this time.
15  But I'm sure that it was more than just that it's
16  too difficult.  It might not be reasonable.
17    Q.  Now, when you say might not be
18  reasonable, can you tell me when you mean by
19  that?
20    A.  What I mean by that is many of these
21  drugs -- or not many, but some of these drugs
22  could be single-source drugs, might not have

**Page 338**

1  generic versions.
2    Q.  Let's take apart the --
3    A.  Some of them could have HCPCS codes or
4  J codes and they don't have NDC numbers when
5  they're submitted on the claim form.  So they're
6  -- that complicates matters.
7    Q.  But you understand that for every drug
8  there's an NDC number, correct?
9    A.  Correct.
10    Q.  And you knew that there were infusion
11  and injectable drugs that were being reimbursed
12  through Medicaid pharmacy programs, correct?
13       MS. MARTINEZ:  Objection, form.
14    A.  Correct.
15    Q.  And you knew based on your experience
16  that generally speaking Medicaid pharmacy
17  reimbursement was tied to NDC codes, correct?
18    A.  Correct.
19    Q.  Would it be fair to say -- strike that.
20  I'm done with that.
21       I'd like to hand you what we marked
22  previously in this case as Abbott Exhibit 582.

**Page 339**

1       MR. TORBORG:  Ani, this is one of those
2  I showed Mr. Reed yesterday.  So it should be in
3  your stack.
4       MS. MARTINEZ:  Could you describe it
5  for a second to see if -- I don't have a number
6  on this one.
7       MR. TORBORG:  It is a document bearing
8  the Bates number HHD 021-0121 through 22.
9       MS. MARTINEZ:  I found it.  What's the
10  exhibit number?
11       MR. TORBORG:  582.
12  BY MR. TORBORG:
13    Q.  Ms. Gaston, if you would take a look at
14  that document?
15       MR. WINGET-HERNANDEZ:  Dave, is that
16  the one you borrowed from us?
17       MR. TORBORG:  It is.  Thank you for
18  letting me borrow it.
19       MR. WINGET-HERNANDEZ:  No problem.
20  BY MR. TORBORG:
21    Q.  For the record, this is a record of
22  discussion dated September 27 through 28, 1995

14  (Pages 336 to 339)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
Washington, DC

Page 340

1  indicating the place was the Radisson Hotel in
2  Richmond, Virginia.
3      Ms. Gaston, have you had a chance to
4  look through this to the extent necessary to tell
5  me if you recall this particular document?
6      A.  I don't remember this document.
7      Q.  And my understanding from counsel for
8  the United States is this was a document that was
9  produced from OIG in connection with some of the
10 work they had done in that area.  Do you recall
11 that there was an effort by OIG in the mid-1990s
12 to do a survey of states to compare invoice cost
13 to AWP?  Do you recall that effort?
14     A.  I recall it, but I don't recall the
15 details.
16     Q.  Okay.  Do you recall attending a
17 meeting in Richmond, Virginia on or around
18 September 27th and 28th 1995 with members of OIG
19 and state pharmacy administrators to talk about
20 OIG's work in this area?
21     A.  Yes.
22     Q.  And your -- at least this document

Page 341

1  indicates that Mike Keough and Estelle Chisholm
2  from HCFA were also there; is that correct?
3      A.  That's correct.
4      Q.  And they were -- and I believe you
5  testified to this last time -- in the policy area
6  of the Medicaid Bureau; is that right?
7      A.  Correct.
8      Q.  Tell me what you recall about the
9  meeting in Virginia.
10     A.  I don't recall.  I recall the meeting,
11 but I don't recall the discussion.  I really
12 don't recall anything of the meeting.
13     Q.  You recall the meeting.  Do you recall
14 that it was attended by representatives from
15 state Medicaid programs?
16     A.  Correct.
17     Q.  And you recall that the meeting was to
18 discuss the difference between acquisition cost
19 and AWP?
20        MS. MARTINEZ:  Objection, form.
21     A.  I recall that the meeting was to
22 discuss some issues the OIG had.  But I can't

Page 342

1  remember specifically except for what this report
2  says.
3      Q.  Okay.  The last paragraph on the first
4  page -- actually, the second to the last
5  paragraph, the second sentence, states "The
6  states officials believed that the report should
7  include the following disclaimer:  Our review was
8  limited to ingredient acquisition costs and did
9  not address other areas such as:  The effect of
10 Medicaid business as a contribution to other
11 store sales."  And let me stop there.
12        Do you recall the state Medicaid
13 representatives raising concerns regarding the
14 impact of OIG's work in this area?
15     A.  No.
16     Q.  Do you have an understanding of what is
17 meant by "the effect of Medicaid business as a
18 contribution to other store sales"?  Do you know
19 what they're talking about there?
20     A.  Not really.  It's not clear to me.
21     Q.  Do you recall there being discussion at
22 any time at HCFA regarding the fact that medicate

Page 343

1  patients in general may not provide as much
2  ancillary business to a pharmacy than non-
3  Medicaid patients?  Is that an issue you recall
4  being discussed?
5         MS. MARTINEZ:  Objection, form.
6      A.  I don't remember that, no.
7      Q.  Have you thought about that issue ever
8  before, that consideration?
9      A.  I don't know.
10     Q.  The other -- the rest of the disclaimer
11 the states officials wanted to have in the report
12 continues "the cost to provide professional
13 services other than dispensing a prescription,
14 such as therapeutic interventions."  Do you have
15 an understanding of what's being talked about
16 there, Ms. Gaston?
17     A.  It appears that they're talking about
18 other services that the pharmacist -- other than
19 the dispensing of the drugs, if they have --
20 other than consulting, I think sometimes they
21 could offer other services.
22     Q.  What other kind of services are

15  (Pages 340 to 343)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 344

1  possible in this area?
2      A.  I'm not that familiar with it and it's
3  been a long time since I've been involved.  But
4  there's been some -- I think -- sort of like
5  management type services.  They might help
6  individuals with asthma.  So they might have some
7  other I guess maybe testing they might perform or
8  counseling or guidance that the pharmacist might
9  do above and beyond just the dispensing of the
10  drug.
11     Q.  And do you recall whether or not state
12  Medicaid pharmacy programs were providing
13  reimbursement for those types of services?
14     A.  It's my recollection that those types
15  of services if they were being paid for would
16  have to be under another type of service.  It
17  would have to be -- it wouldn't be included in
18  the dispensing fee.  It would be a separate
19  payment.
20     Q.  And do you recall if states were
21  providing that payment?
22     A.  I don't recall.  I know that some

Page 345

1  states have asked to have that in their state
2  plan amendment.  But again, I don't know what
3  other service -- what other service category that
4  would fall under.
5      Q.  Do you recall any conversations or
6  learning at all that those types of services, the
7  above and beyond the typical dispensing, were
8  being paid for by profits being made on the
9  ingredient side?  Do you recall those
10  discussions?
11         MS. MARTINEZ:  Objection, form.
12     A.  I don't recall that.
13     Q.  What interactions apart from obviously
14  this meeting did you have with state Medicaid
15  officials?
16     A.  Are you talking about this meeting, the
17  '95 meeting?
18     Q.  Just generally speaking.  Let me see if
19  I can move things along.  You did meet with them
20  in connection with state plan amendments,
21  correct?
22     A.  Correct.

Page 346

1      Q.  And those were typically over the phone
2  or through this written correspondence?
3      A.  Yes.
4      Q.  And then obviously you attended this
5  meeting?
6      A.  Yes.
7      Q.  Apart from those two categories of
8  discussions with state pharmacy administrators,
9  did you have any other interactions with them?
10     A.  Yes.
11     Q.  Okay.  Can you tell me about that?
12     A.  I attended other conferences.  I
13  mentioned those in the last deposition.  Some of
14  the pharmacy associations would have conferences
15  that I attended.  I received phone calls,
16  inquiries about the rebate program.  Any kind of
17  general work-related questions.
18     Q.  If I could ask you to go to the next
19  page of this document.  It states "The state
20  officials were concerned that without the above
21  disclaimer that uninformed state officials might
22  overreact to our report and adjust pharmacy

Page 347

1  reimbursement without considering the other
2  aspects of reimbursement."  Do you see that?
3      A.  Yes.
4          MS. MARTINEZ:  Objection, form.
5      Q.  Do you recall that sentiment being
6  expressed either at this meeting or at any other
7  time?
8      A.  No.
9      Q.  Do you have an understanding of what
10  they're talking about there?
11     A.  Yes.
12     Q.  What is your understanding?
13     A.  It's my understanding that they're
14  trying to say that they want to make sure that
15  state officials -- they want to make sure that
16  they're setting reimbursement rates that are what
17  they feel is, I guess, correct reimbursement
18  rates and they're not influenced by other
19  factors.
20     Q.  Is it fair to say that the state
21  officials were worried that other uninformed
22  state officials might cut ingredient cost

16  (Pages 344 to 347)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                          Washington, DC

Page 348

1  reimbursement?
2      MS. MARTINEZ:  Objection, form.
3      A.  It appears from this report the OIG
4  must have felt that way.
5      Q.  And do you recall conversations at any
6  time, Ms. Gaston, that state officials were
7  concerned that cutting back or decreasing
8  ingredient cost reimbursement might necessitate
9  increases to other aspects of reimbursement, such
10  as the dispensing fee?
11      MS. MARTINEZ:  Objection, form.
12      A.  I can't specifically remember
13  conversations like that.
14      Q.  Can you recall general conversations
15  along those lines?
16      A.  I don't.
17      Q.  I'd like to ask you to take out Exhibit
18  327.  Ms. Gaston, this is a cover letter that
19  attaches an OIG's study in the mid-'90s comparing
20  invoice cost to AWP.  And this one covers
21  Montana, I believe.  Let me ask you first, Ms.
22  Gaston, if you recall reviewing any of the OIG's

Page 349

1  reports that resulted from their work in the mid-
2  '90s?
3      A.  I don't remember.
4      Q.  Would it have been your pattern and
5  practice to review OIG reports that related to
6  Medicaid pharmacy issues?
7      A.  Correct.
8      Q.  Yes, it would have been?
9      A.  Yes.
10      Q.  And you would agree that this does
11  relate to Medicaid pharmacy issues?
12      A.  It does.  But it's a state-specific
13  report.  I don't know if we received every state-
14  specific report from the OIG.
15      Q.  If we go down to the third paragraph on
16  the first page, the third sentence, it states
17  "The overall estimate of the extent that AWP
18  exceeded pharmacy purchase invoice prices was
19  16.2 percent for brand name drugs and 48.5
20  percent for generic drugs.  The national
21  estimates are 18.3 percent and 42.5 percent
22  respectively."  Do you see that?

Page 350

1      A.  Yes.
2      MS. MARTINEZ:  Objection, form.
3      Q.  Do you recall learning of discounts of
4  AWP along those lines that came from OIG's work
5  in the mid-'90s?
6      A.  Can you explain your question?
7      Q.  Do you recall generally speaking that
8  OIG found differences between AWP and invoice
9  costs of approximately 18 percent for brand name
10  drugs and 42 and a half percent for generic
11  drugs?
12      A.  I can't remember percentages.
13      Q.  But you recall that they found a higher
14  difference for generic drugs; is that fair to
15  say?
16      MS. MARTINEZ:  Objection, form.
17      A.  I can't say.
18      Q.  But you would agree that a reader of
19  this report could see that OIG found that there
20  was an 18.3 percent discount off of AWP for brand
21  name drugs and 42.5 percent for generic drugs,
22  correct?

Page 351

1      A.  Yes.
2      Q.  And it would have been your pattern and
3  practice to review this type of report in your
4  position at HCFA?
5      MS. MARTINEZ:  Objection, form.
6      A.  As I said before, I don't know if we
7  got state-specific OIG reports.
8      Q.  Would you have reviewed the combined --
9  strike that.
10      Do you recall that OIG prepared a
11  combined set of reports that consolidated the
12  results from all the states?
13      MS. MARTINEZ:  Objection, form.
14      A.  I may have.  I'm not sure.  It sounds
15  familiar, but I can't remember it specifically.
16      Q.  You do recall attending the meeting in
17  Richmond in '95, correct?
18      A.  In Richmond?
19      Q.  Yes.
20      A.  Yes.
21      Q.  And do you recall that OIG at that
22  meeting presented the results of their review?

17 (Pages 348 to 351)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                              March 19, 2008
                        Washington, DC

Page 352

1     A.  I don't remember that.
2     Q.  You have no doubt or no reason to
3  disagree that as indicated in Abbott Exhibit 582
4  that OIG did the results of their AWP
5  review in that Richmond meeting in 1995?
6        MS. MARTINEZ:  Objection, form.
7     A.  That's what the report indicates.
8     Q.  And you have no reason to believe
9  that's not correct; is that fair to say?
10    A.  That's fair to say.
11    Q.  If I could ask you to go to the last
12  two pages of the Montana report, which is Abbott
13  Exhibit 327, I'd like to direct your attention to
14  the second paragraph of the Montana letter where
15  they state in part "It is important to note that
16  the study did not investigate the payment of
17  these services by Medicaid, only the confident of
18  acquisition of the drug by the providers."  Do
19  you see that?
20    A.  Yes.
21    Q.  Do you recall that sentiment ever being
22  expressed in any discussion of an OIG report

Page 353

1  ever?
2     A.   You're talking about services?
3     Q.   The fact that OIG is only looking at
4  the acquisition cost side of the equation.  Do
5  you recall that being discussed ever at any
6  meeting?
7     A.  I don't quite understand your question.
8  I mean, they do various reports.  So are you
9  saying -- I don't understand your question.  They
10  could look at that in one report.
11    Q.  Do you recall that OIG prepared a
12  number of reports throughout the 1990s where they
13  compared acquisition cost to AWP?
14    A.  Yes.
15    Q.  Do you recall ever having discussion
16  with anyone that in their reports they were
17  focusing just on that aspect of reimbursement and
18  not on any other aspects?
19        MS. ALBEE:  Objection, form.
20    A.  I don't recall that.
21    Q.  The conversations may have happened;
22  you just don't recall?

Page 354

1     A.  Correct.
2     Q.  It's been some time since those reports
3  were issued?
4     A.  Yes.
5     Q.  Your memory has faded?
6     A.  Excuse me?
7     Q.  Your memory has faded?
8     A.  Yes.
9     Q.  In the third paragraph, third sentence,
10  it starts with "in Montana," it states "In
11  Montana we currently believe that the dispensing
12  fee is below the cost to dispense because of the
13  cap on dispensing fees that is currently in place
14  and has been for many years."  Do you see that?
15        MS. MARTINEZ:  Objection, form.
16    A.  Yes.
17    Q.  Do you recall learning in the mid-1990s
18  or earlier that there were some concerns across
19  the state Medicaid programs that dispensing fees
20  might be inadequate?
21        MS. ALBEE:  Objection to form.
22    A.  I don't specifically recall it, but

Page 355

1  it's possible.
2     Q.  Do you recall general conversations
3  along those lines?
4     A.  I don't recall.
5     Q.  What work did CMS do to assess the
6  adequacy of state Medicaid programs' dispensing
7  fees?
8        MS. MARTINEZ:  Objection, form.
9     A.  Does it pertain to state plan
10  amendments? Is that what you're --
11    Q.  Generally speaking.
12    A.  I mean, generally --
13    Q.  At all.
14    A.  If states tried to adjust their
15  dispensing fees then we would work with them to
16  make sure that they can justify that their
17  dispensing fee is adequate.
18    Q.  And that was something you did in
19  connection with state plan amendments?
20    A.  Correct.
21    Q.  So as you sit here today you don't
22  recall any specific or even general conversations

18 (Pages 352 to 355)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 356

1  with anyone regarding the fact that dispensing
2  fees at state Medicaid programs might be
3  inadequate; is that a fair summary of your
4  testimony?
5       A.  What I'm saying is that I don't recall
6  specific conversations like that.  They could
7  have come up, but I don't recall that.
8       Q.  Would you agree as a general matter,
9  Ms. Gaston, that in reviewing the subject of
10 Medicaid payment for drugs and the adequacy of
11 that amount, one should look at more than just
12 the ingredient side of the equation?
13      MS. MARTINEZ:  Objection, form.
14      A.  Yes.
15      Q.  And so in this case when -- in this
16 litigation where we're looking at the question of
17 whether or not Medicaid programs overpaid
18 providers to dispense drugs to beneficiaries, it
19 wouldn't be appropriate to look just at the
20 ingredient side of the equation; would you agree
21 with that?
22      MS. MARTINEZ:  Objection, form.

Page 357

1       A.  I can't answer that.
2       Q.  Why not?
3       A.  Because it's not my place to answer
4  that.
5       Q.  Well, I'm asking for your view on that
6  question today.
7       A.  Can you repeat the question?
8       MR. TORBORG:  Would you mind reading it
9  back, Jon.
10      (Whereupon, the requested portion
11 was read by the reporter.)
12      MS. MARTINEZ:  Objection, form.
13      A.  I guess the way I want to answer that
14 is from my perspective, working with a state,
15 they want to set a reimbursement rate.  We want
16 them to justify that their reimbursement rate is
17 reasonable.  And they want to set dispensing
18 fees.  And we ask them to provide that those
19 dispensing fees are reasonable.  That's how I
20 look at it.  And the burden of proof is on the
21 state.
22      Q.  Could you answer my question yes or no

Page 358

1  that I asked you?  Do I need to read it back?
2       A.  Yup.
3       MR. TORBORG:  Jon, would you read it
4  back for her?
5       (Whereupon, the requested portion
6  was read by the reporter.)
7       A.  Yes.
8  BY MR. TORBORG:
9       Q.  If I could ask you to take out Abbott
10 Exhibit 84.  For the record, this is another one
11 of OIG's reports in the mid-1990s reviewing
12 invoice cost with AWPs.  This one is for the
13 State of Florida.  Ms. Gaston, my guess is that
14 you don't recall if you reviewed this particular
15 report.  Is that fair to say?
16      A.  That's correct.
17      Q.  Could you go to the last two pages of
18 the exhibit?  This is the letter from Florida.
19      MR. WINGET-HERNANDEZ:  Dave, could you
20 give us the date on that, please?
21      MR. TORBORG:  Sure.
22      MR. WINGET-HERNANDEZ:  The date of the

Page 359

1  report, that is.
2       MR. TORBORG:  August of 1996.
3       MR. WINGET-HERNANDEZ:  Thank you.
4  BY MR. TORBORG:
5       Q.  Ms. Gaston, do you remember this
6  letter?
7       A.  No, I don't.
8       Q.  Do you remember an individual by the
9  name of Jerry Wells?
10      A.  Yes, I do.
11      Q.  And how have you come to know Mr.
12 Wells?
13      A.  He worked in the pharmacy area for the
14 state.
15      Q.  Of Florida?
16      A.  Of Florida.
17      Q.  And you got to know him through
18 meetings that you attended of pharmacy
19 administrators?
20      A.  Yes.  And conversations.
21      Q.  What other conversations did you have
22 with --

                        19 (Pages 356 to 359)

Henderson Legal Services, Inc.

202-220-4158          www.hendersonlegalservices.com

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                March 19, 2008
                        Washington, DC

---

Page 360

1     A.  I don't know specifically.  I've known
2  him for years.
3     Q.  Did you have conversations with Mr.
4  Wells when Ven-A-Care was also in the room?
5     A.  I don't know.
6     Q.  If I could ask you to go to the third
7  paragraph of Mr. Cook's letter where he wrote in
8  part "Comparing acquisition costs for Florida
9  pharmacies to AWP as an academic exercise proves
10  that pharmacies, like almost all retail
11  businesses, purchase goods at some discount below
12  suggested list prices, but does not provide an
13  indication of need to change current
14  reimbursement policy."  Do you see that?
15        MS. MARTINEZ:  Objection, form.
16     A.  Yes.
17     Q.  Do you have an understanding as to sit
18  here today of what Mr. Cook was saying there?
19        MS. ALBEE:  Objection, form.
20        MS. MILLER:  Florida joins that
21  objection.
22     A.  No.

---

Page 361

1     Q.  If we go to the last paragraph on the
2  page, third sentence, Mr. Cook wrote "Restricting
3  reimbursement to actual costs" -- I'm sorry.  Let
4  me go one sentence before that.
5        "In most cases the products are multi-
6  source.  Restricting reimbursement to actual
7  costs might have the unintended effect of
8  discouraging purchase of promotional products and
9  eventually shifting the market to single-source
10  products, which are universally much more
11  costly."  Do you see that?
12        MS. MARTINEZ:  Objection, form.
13     A.  Yes.
14     Q.  Do you have an understanding of what
15  Mr. Cook is saying in those two sentences?
16        MS. ALBEE:  Objection, form.
17        MS. MILLER:  Florida.  Objection, form.
18     A.  I could just repeat what says.  That's
19  --
20     Q.  Could you paraphrase that?
21        MS. ALBEE:  Objection, form.
22        MS. MILLER:  Florida.  Objection, form.

---

Page 362

1     A.  They're just saying that restricting
2  the reimbursement to actual cost, which I guess
3  is what they pay -- I don't know -- might have an
4  unintended effect on discouraging purchases of
5  promotional products and eventually soliciting
6  the market to single-source products.
7        You know, I'd rather just read it.  I
8  don't -- in other words, you're asking me to
9  interpret something that somebody else wrote and
10  --
11     Q.  But you do understand what he's talking
12  about; is that fair to say?
13        MS. MARTINEZ:  Objection, form.
14     A.  Basically.  I'm not sure exactly, but,
15  you know, I could --
16     Q.  Fair enough.
17     A.  Yeah.
18     Q.  Do you recall the topic of not wanting
19  to restrict payment for generic drugs to
20  acquisition cost because it might encourage the
21  use of brand name drugs to be something that came
22  up?

---

Page 363

1     A.  No, I don't remember that.
2     Q.  Would you read Mr. Cook's letter today
3  as indicating that Florida did not want to pay
4  the actual acquisition cost for multi-source
5  products because it might discourage the use of
6  those products?
7        MS. ALBEE:  Objection, form.
8        MS. MARTINEZ:  Objection, form.
9        MS. MILLER:  Florida.  Objection, form.
10     A.  That's what it sounds like they're
11  saying in the letter.
12     Q.  In the next page Mr. Cook wrote
13  "injectable products and associated intravenous
14  fluids also continue to be problematic.
15  Manufacturers offer contracts to most vendors
16  providing very favorable pricing and terms, but
17  manufacturers continue to market small quantities
18  of these through conventional sources and report
19  single unit pricing through the national data
20  sources."  Do you see that?
21     A.  Yes.
22        MS. MARTINEZ:  Objection, form.

---

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 364

1    Q.  And by this point in time you had
2  already met with Ven-A-Care where they had
3  indicated to you that for injectable and
4  intravenous fluids there was a large difference
5  between acquisition cost and AWP; is that fair to
6  say?
7        MS. ALBEE:  Objection, form.
8        MS. MARTINEZ:  Objection, form.
9    A.  That's fair to say.
10   Q.  You know, I asked a pharmacy
11  administrator about this language last week and
12  asked him to give me his view on what Mr. Cook
13  was saying.  And he stated that it looked to him
14  as though Florida to put the federal
15  government to put a federal upper limit on these
16  drugs.  Do you read that the same way?
17       MS. ALBEE:  Objection, form.
18       MS. MARTINEZ:  Objection, form.
19       MS. MILLER:  Florida.  Objection, form.
20   A.  Like I said before, I don't -- I'm not
21  interpreting that -- I don't know what the
22  intention was meant here.  I can't take that read

Page 365

1  from it, no.
2    Q.  Do you recall having any discussions
3  with state Medicaid pharmacy personnel where they
4  requested HCFA to put a federal upper limit on
5  any injectable or infusion drug?
6        MS. MARTINEZ:  Objection, form.
7    A.  I don't recall that.
8    Q.  Those conversations may have happened;
9  you just may not recall them as you sit here
10  today?
11   A.  I don't recall.
12   Q.  So they may have happened; you don't
13  recall?
14   A.  They may have happened, but I don't
15  recall.
16   Q.  I'd like to ask you to go to Abbott
17  Exhibit 16?
18       MR. WINGET-HERNANDEZ:  While we're
19  doing that, will you tell us again what that last
20  exhibit number was, please?
21       MR. TORBORG:  84.
22       MR. WINGET-HERNANDEZ:  Thank you.

Page 366

1  BY MR. TORBORG:
2    Q.  We'll do one more document and then
3  we'll take a break.  Is that okay, Ms. Gaston?
4    A.  That's fine.
5    Q.  For the record, Abbott Exhibit 16 is a
6  June 25th 1996 fax cover sheet from Zack Bentley
7  to a Mr.  Keith Lynn of the Senate Finance
8  Committee attaching an article from Barron's
9  Magazine dated June 10, 1996 entitled "Hooked On
10  Drugs."
11       Ms. Gaston, if you would take a look at
12  that document to the extent necessary to tell me
13  whether or not you recall this particular
14  document?
15   A.  I don't remember seeing this.
16       MR. TORBORG:  Why don't we take our
17  first break here.
18       THE VIDEOGRAPHER:  This is the end of
19  tape 1.  Off the record at 10:35.
20       (Recess.)
21       THE VIDEOGRAPHER:  Thi is the beginning
22  of tape 2 in the deposition of Ms. Gaston.  On

Page 367

1  the record at 10:56.
2  BY MR. TORBORG:
3    Q.  Welcome back, Ms. Gaston.
4    A.  Thank you.
5    Q.  While we were on the break I showed you
6  Abbott Exhibit 381.  I put it in front of you.
7  This is an August 30th 2004 report prepared by
8  ABT Associates entitled "Medicaid and Medicare
9  drug pricing, strategy to determine market
10  prices, final report."  My question for you on
11  this one is very simple, and that is do you
12  recall this document?
13   A.  I was aware of it.  I've never read it
14  completely.
15   Q.  You've read portions of it?
16   A.  I may have.  It looks a little
17  familiar.  But this was after I left the policy
18  area.
19   Q.  Ms. Gaston, if I could ask you to take
20  out Abbott Exhibit 326.  Ms. Gaston, I don't
21  recall if I asked you about these last time,
22  quite frankly.  But this is a collection of pages

                                    21 (Pages 364 to 367)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                March 19, 2008
                          Washington, DC

|  | Page 368 |
|---|---|
| 1 | from National Pharmaceutical Council reports from |
| 2 | the time period 1990 through 2005, 2006.  Are you |
| 3 | familiar with the publication that's put out by |
| 4 | the National Pharmaceutical Council? |
| 5 | A.  Yes. |
| 6 | Q.  Are you familiar with the pages in this |
| 7 | exhibit? |
| 8 | A.  Yes. |
| 9 | Q.  Now, we saw earlier in one of the |
| 10 | exhibits that we looked at that OIG's mid-1990s |
| 11 | were comparing acquisition cost and AWP showed |
| 12 | discounts for generic drugs of on a nationwide |
| 13 | basis of AWP minus 42.5 percent.  Do you recall |
| 14 | that? |
| 15 | MS. MARTINEZ:  Objection, form. |
| 16 | A.  In their report? |
| 17 | Q.  Yes. |
| 18 | A.  Yes. |
| 19 | Q.  And those were findings that it appears |
| 20 | as though you were made aware of in September of |
| 21 | 1995; is that correct? |
| 22 | MS. MARTINEZ:  Objection, form. |

|  | Page 369 |
|---|---|
| 1 | MS. ALBEE:  Objection, form. |
| 2 | A.  You said that I was made aware of? |
| 3 | Q.  At the meeting in Richmond.  We looked |
| 4 | at the document earlier.  There was a record of |
| 5 | discussion from the Richmond meeting. |
| 6 | A.  Right.  But they didn't have those |
| 7 | percentages in that document. |
| 8 | Q.  But they indicated in the document it |
| 9 | presented the findings of their work.  Do you |
| 10 | recall that? |
| 11 | A.  Correct.  Yes. |
| 12 | Q.  And do you have any reason to believe |
| 13 | that they did not present their findings? |
| 14 | A.  No. |
| 15 | Q.  Now, if I could ask you to go to the |
| 16 | NPC report for 1996?  If you flip through they're |
| 17 | in chronological order.  Now, this page indicates |
| 18 | for each of the 50 states and the District of |
| 19 | Columbia the dispensing fee, the ingredient |
| 20 | reimbursement basis and the copayment for the |
| 21 | year 1996; is that right? |
| 22 | A.  Yes. |

|  | Page 370 |
|---|---|
| 1 | Q.  And if you look at the ingredient |
| 2 | reimbursement basis column, they either have a |
| 3 | WAC plus something or an AWP minus something. |
| 4 | And then in the case of Delaware it says AAC.  Do |
| 5 | you see that? |
| 6 | A.  Yes. |
| 7 | Q.  And you were familiar that most states |
| 8 | at this time were discounting off of AWP some |
| 9 | amount, correct? |
| 10 | A.  Correct. |
| 11 | Q.  And is it consistent with your general |
| 12 | recollection that that amount was around 5 to 10 |
| 13 | percent? |
| 14 | A.  That's what it appears to be. |
| 15 | Q.  And you knew that this reimbursement |
| 16 | basis would be applied to calculate the payment |
| 17 | amount for any generic drug for which a state had |
| 18 | not established a maximum allowable cost, HCFA |
| 19 | had not established a FUL, correct, potentially? |
| 20 | MS. ALBEE:  Objection, form. |
| 21 | A.  Potentially. |
| 22 | Q.  And you knew at the time that for |

|  | Page 371 |
|---|---|
| 1 | generic drugs OIG had told you the discount was |
| 2 | above 40 percent, right? |
| 3 | MS. MARTINEZ:  Objection, form. |
| 4 | Q.  For generic drugs. |
| 5 | A.  That was in that report that you showed |
| 6 | me. |
| 7 | Q.  And here we see that the states here |
| 8 | are not -- there's no reimbursement basis to |
| 9 | reduce -- for generic drugs of any of that kind |
| 10 | of discount; is that fair to say? |
| 11 | A.  This -- correct.  It doesn't show that. |
| 12 | Q.  Do you recall discussions regarding the |
| 13 | fact that the states reimbursement amounts for |
| 14 | generic drugs, the EAC formula -- let me strike |
| 15 | that and start again. |
| 16 | Do you recall discussions about the |
| 17 | fact that the EAC formula that the states were |
| 18 | using was reimbursing generic drugs at higher |
| 19 | than the amount that OIG had found providers |
| 20 | paid? |
| 21 | MS. MARTINEZ:  Objection, form. |
| 22 | MS. ALBEE:  Objection, form. |

22  (Pages 368 to 371)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                        Washington, DC

| Page 372 | Page 374 |

**Page 372**

1    A.  I can't say that I remember that
2  specifically.
3    Q.  Do you recall any efforts that HCFA
4  took to have states provide a separate
5  reimbursement basis for generic drugs?
6    A.  Outside of the FULs or the MAC?
7    Q.  Yes.
8    A.  Not specifically, no.
9    Q.  Do you recall anything generally.
10    A.  I do know that sometimes in a state
11  plan amendment a state may have a reimbursement
12  rate for a generic that might be different than a
13  branded drug and they might specify that in their
14  state plan amendment.
15    Q.  And is it your general recollection
16  that that's something that's happened more
17  recently?
18    A.  I can't say.
19    MS. ALBEE:  Objection, form.
20    Q.  Later on in your time in the policy
21  area?
22    A.  I can't say.

**Page 373**

1    Q.  I'd like to ask you to take out Abbott
2  Exhibit 329.  For the record, Abbott Exhibit 329
3  is a cover letter dated March 14th 2002 that
4  attaches a OIG report dated March 2002 titled
5  "Medicaid pharmacy actual acquisition cost of
6  generic prescription drug products."
7    Ms. Gaston, if you would take a look at
8  that to the extent necessary to tell me whether
9  or not you recall this document.
10    A.  (Reading.)  The report does look
11  familiar.
12    Q.  If you would go to the bottom of the
13  first page, the last sentence that carries over
14  on the next page.  OIG wrote "We estimated that
15  nationally actual drug acquisition cost was an
16  average of 65.93 percent below AWP.  Our previous
17  estimate based on calendar year 1994 pricing data
18  showed a discount of 42.45 percent below AWP for
19  generic drugs."  Do you see that?
20    A.  Yes.
21    Q.  Do you recall becoming aware of that
22  finding?

**Page 374**

1    A.  I can't specifically unless I read it
2  in this report.
3    Q.  Do you know why this particular report
4  stands out?
5    MS. MARTINEZ:  Objection, form.
6    A.  I would guess because it's in 2002,
7  which is a little more recent than reports in the
8  '90s.
9    Q.  If I could ask you to take out Abbott
10  Exhibit 370.  I'm sorry.  I may not have that
11  binder in front of you at this point, and I
12  apologize for that.  For the record, Abbott
13  Exhibit 370 is a page titled "Staff action, cover
14  sheet, August 24, 2001." Ms. Gaston, if you would
15  take a look at that and let me know if you recall
16  this document.
17    A.  Yes.
18    Q.  Can you tell us what this document is?
19    A.  It looks like a control sheet.  And it
20  looks like it was for the OIG report that came
21  in.  And it looks like it was forwarded to me.
22    Q.  Does it look like this is forwarding a

**Page 375**

1  draft copy of the report that we looked at as
2  Abbott Exhibit 329?
3    A.  Yes.
4    Q.  And is that your handwritten note in
5  the bottom right-hand corner?
6    A.  Yes.
7    Q.  And you're sending that to Kim, Larry
8  and Cindy?
9    A.  If that's Cindy.  It's kind of blurred.
10  Scratched out.
11    Q.  And there was a woman by the name of
12  Cindy Pelter who was working in your office?
13    A.  Correct.
14    Q.  Do you think that's who that is?  If
15  it's Cindy it's Cindy Pelter?
16    A.  Yes.
17    Q.  And Kim would be Kim Howell?
18    A.  Yes.
19    Q.  Larry would be Larry Reed?
20    A.  Yes.
21    Q.  Could you read the handwritten note
22  that you have at the bottom of the page into the

23 (Pages 372 to 375)

Gaston, Sue - Vol. II                                    March 19, 2008
                        Washington, DC

Page 376

1  record?
2     A.  It says "Please review and give me any
3  comments since this is a biggie I wanted to get
4  your input.  Please note page 6."
5     Q.  Do you no why you wrote that this
6  report was a biggie?
7     A.  No.  I don't recall.
8     Q.  Okay.  As you sit here today do you
9  have any understanding of what you would have
10 meant by that?
11    A.  It could have been something that was
12 overdue.  It could have been something that has
13 been an issue that in our division we needed to
14 comment on quickly.  I really don't know.
15    Q.  Is it fair to say that at the time you
16 wrote that note your comments suggests that you
17 thought this was an important report?
18       MS. MARTINEZ:  Objection, form.
19    A.  I can't say that.  It could be a matter
20 of timing on this too that could have made it a
21 biggie.  Sometimes when something is due they
22 want it right away.  You know, it's hard for me

Page 377

1  to say since it's been since 2001 on this one.
2     Q.  If I could ask you to go back to
3  Exhibit 326, which is the collection of National
4  Pharmaceutical Council reports --
5     A.  I'm sorry.  What was that number?
6     Q.  I'm sorry.  Did you need to be looking
7  through that?
8     A.  I was just looking at what page 6 was.
9     Q.  Why don't we do that.  A spot on page 6
10 of the final that states CMS -- well, that
11 wouldn't be in the draft anyway, would it?  CMS's
12 response?
13    A.  Correct.
14    Q.  As you look at this page range, is
15 there anything in particular you think you would
16 have been directing those individuals to?
17    A.  No.  Just the -- I guess maybe the
18 conclusion and recommendations, because if this
19 was something that was needed, a quick turnover,
20 or a quick turnaround, and you just want them to
21 review it you ask them to go right to the
22 conclusions to review it.

Page 378

1     Q.  Okay.  Let's look at page 6 of the
2  final report that you're at.  Under conclusions
3  and recommendations it says "Based on our review
4  we have determined that there is a significant
5  difference between pharmacy acquisition cost for
6  generic drugs and AWP."  Do you recall, Ms.
7  Gaston, that there was discussion of the
8  significant difference between AWP and
9  acquisition cost for generic drugs?
10    A.  I can't remember specific discussions.
11    Q.  Do you recall that becoming a general
12 topic of conversation in your office?
13    A.  I can't say specifically.  It may have.
14 But it's been so long I can't remember
15 specifically.
16    Q.  Then the report goes on "We have also
17 estimated that changing reimbursement policy
18 consistent with the findings of our report could
19 have resulted in savings of as much as $470
20 million for the 200 most reimbursed generic drugs
21 in calendar year 1999.  We recognize that these
22 calculations do not incorporate all of the

Page 379

1  complexities of pharmacy reimbursement and that
2  acquisition cost is just one factor in pharmacy
3  reimbursement policy.  However, we also believe
4  that the results of this report are significant
5  enough to warrant a review of pharmacy
6  reimbursement policy."  Do you see that?
7     A.  Yes.
8     Q.  Did you agree with OIG at the time that
9  the results of this review were significant
10 enough to warrant a review of pharmacy
11 reimbursement policy?
12    A.  I can't say specifically, but it looks
13 like CMS did because in their comments they make
14 a statement that they want to go out and notify
15 the states of this report.
16    Q.  And then CMS also says in the response
17 "The CMS also stated that it will strongly
18 encourage states to reevaluate their
19 reimbursement methodology for drugs and will
20 continue to encourage states to look for
21 alternative bases for reimbursement.  The CMS
22 plans to share our final report with the states,

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 380

1  strongly encourage states to review their
2  estimates of acquisition costs, and follow up to
3  ensure that their actions take our findings into
4  account." Do you see that?
5       A.  Yes.
6       Q.  Do you recall what efforts CMS took to
7  strongly encourage states to review their
8  estimates of acquisition cost for generic drugs?
9       A.  It's my recollection that they put a
10  statement in one of the state releases, program
11  releases, that identified this particular OIG
12  report.
13      Q.  Other than advising the states of the
14  report do you recall anything else that CMS did?
15      A.  No. I can't remember.
16          MR. WINGET-HERNANDEZ:  Objection, form.
17      Q.  Go back to the conclusions and
18  recommendations from OIG. It indicates, reading
19  further down in that paragraph from where I
20  stopped, "Per federal Medicaid regulations,
21  states are required to reimburse pharmacies'
22  ingredient drug portion of the reimbursement

Page 381

1  based on EAC. Therefore we recommend that CMS
2  require the states to bring pharmacy
3  reimbursement for generic drugs more in line with
4  the acquisition cost that we identified as being
5  65.93 percent below AWP." Do you see that?
6       A.  Yes, I do.
7       Q.  Do you recall that OIG was recommending
8  to CMS that they should required states to change
9  the reimbursement methodology to get closer to
10  the acquisition cost for generic drugs?
11      A.  I don't remember that. But I do from
12  this report.
13      Q.  What do you recall about that topic?
14      A.  I don't know what you're -- what do you
15  mean what do you recall?
16      Q.  Do you recall -- OIG is telling you in
17  this report that you want to go require the
18  states to reduce reimbursement on generic drugs;
19  is that fair to say?
20      A.  Correct.
21      Q.  And did CMS do that?
22      A.  It appears that CMS said that they were

Page 382

1  notifying the states. And from my recollection
2  they notified the states and encouraged the
3  states to look at their reimbursement methodology
4  by sending information out in a state program
5  release.
6       Q.  And that's not quite the same thing as
7  requiring states to change the amounts they're
8  paying; is that fair to say?
9           MS. ALBEE:  Objection, form.
10      A.  I can't say that.
11      Q.  Well, you see a difference between
12  encouraging someone to do something and requiring
13  them to do something, right?
14      A.  See, at my level I just reply to the
15  OIG reports. If anything is going to be required
16  it's going to be required from somebody above my
17  level.
18      Q.  Do you have children?
19          MS. MARTINEZ:  Objection, form.
20          THE WITNESS:  Do I have to answer that
21  question?
22          MS. MARTINEZ:  No. You don't have to

Page 383

1  answer that question. And that's just as a
2  courtesy.
3           MR. TORBORG:  Okay. Fine.
4  BY MR. TORBORG:
5       Q.  Have you ever been in a situation in
6  your job where you were encouraged to do
7  something?
8       A.  Yes.
9       Q.  And have you been in a situation where
10  you have been required to do something?
11      A.  Yes.
12      Q.  Two different things?
13      A.  Okay.
14      Q.  Right?
15      A.  Mm-hmm.
16      Q.  You agree?
17      A.  I said yes.
18      Q.  And is it the case that CMS did not
19  require the states to lower reimbursement on
20  generic drugs?
21      A.  I guess it all depends on what you mean
22  by require. I know that they notified them. It

25  (Pages 380 to 383)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 384

1  doesn't appear that a requirement was put in
2  place.
3      Q.  Do you know why not?
4      A.  No.
5      Q.  Who would know the answer to that?
6      A.  I don't know.  You could start with
7  Larry Reed.
8      Q.  If I could ask you to look at Abbott
9  Exhibit 328, which is the document -- it's on the
10 top of the binder there, the single page.  Ms.
11 Gaston, if you would take a look at that to the
12 extent necessary to let me know if you recall
13 that document.
14     MS. VONDRICH:  I'm sorry.  Which
15 exhibit are we looking at?
16     MR. TORBORG:  Exhibit 328.
17     A.  (Reading.)  It doesn't look familiar to
18 me.
19 BY MR. TORBORG:
20     Q.  Ms. Gaston, do you recall discussion in
21 or around 2002, 2003 -- strike that.  Let me back
22 up one step.

Page 385

1      Do you recall that in 2002 or
2  thereabouts that CMS changed the state approval
3  process -- approval of state plan amendment
4  process so that the approvals were being done by
5  the central office as opposed to the regional
6  offices?
7      A.  I remember that that happened.  I don't
8  know if I was still there at the time.
9      Q.  At some point you ceased having
10 involvement in approving state plan amendments;
11 is that fair to say?
12     A.  Correct.
13     Q.  And can you give me a time frame about
14 when that was?
15     A.  Well, I left the policy area in early
16 2003.
17     Q.  That's all I have on that document.
18     (Exhibit Abbott 753 was marked for
19 identification.)
20 BY MR. TORBORG:
21     Q.  I'd like to mark as Abbott Exhibit 753
22 a document that bears the Bates numbers HHC 004-

Page 386

1  0191 through 92.  At the top it says in
2  handwritten notes "GAO questions - call on
3  4/13/01."  And then it also says "Questions for
4  HCFA - Larry Reed/Sue Gaston."
5      Take a look at that document, Ms.
6  Gaston, and let me know if you're familiar with
7  it.
8      A.  (Reading.)  It doesn't look there are
9  to me even though my name is on it.
10     Q.  Whose handwriting is that at the top?
11     A.  It looks like Cindy Bergin's.
12     Q.  And her name was eventually changed to
13 Cindy Pelter or was it the other way?
14     A.  It was Cindy Pelter and now it's Cindy
15 Bergin.
16     Q.  And is it the other handwriting on the
17 document also hers, to your best guess?
18     A.  Yes.
19     Q.  In the -- why is it, Ms. Gaston, that
20 you would be fielding questions from GAO?
21     MR. WINGET-HERNANDEZ:  Objection, form.
22     Q.  Do you know?

Page 387

1      A.  We would field questions from GAO, OIG,
2  organizations like that.
3      Q.  And you were the person along with
4  Larry Reed that was asked to addressed those?
5      A.  It appears that way.
6      Q.  In paragraph 5 it states "In regard to
7  a recommendation in a May 8th 1998 audit report
8  entitled 'Need to establish connection between
9  the calculation of Medicaid drug rebates and
10 reimbursement for Medicaid drugs' (A-06-97-
11 00052), HCFA said that it agreed that changing
12 from average manufacturer price (AMP) to AWP
13 would reduce the administrative burdens involved
14 in the AMP recalculations.
15     "HCFA said that it was 'planning a
16 thoughtful, comprehensive study of issues such as
17 how AWP is defined; how to safeguard against
18 manipulation of AWPs to maximize reimbursement or
19 minimize rebates; how to verify the accuracy of
20 AWPs; the need for an indexing factor; and
21 differences in AWPs for brand name versus generic
22 drugs.

26  (Pages 384 to 387)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                        Washington, DC

Page 388

1        "What is the status of that study and,
2   if completed, can you provide us a copy?"  Do you
3   see that?
4        MS. MARTINEZ:  Objection, form.
5        A.  Yes.
6        Q.  Do you recall that the OIG had made a
7   recommendation to HCFA to attempt to seek
8   legislation that was tie Medicaid rebates to AWP
9   as opposed to AMP?
10       A.  I don't recall the legislation.
11       Q.  Well, do you recall that suggestion
12  from OIG?  Or that thought at all ever being
13  floated?
14       A.  I might have read that, but I don't
15  specifically remember where.
16       Q.  So there's not a whole lot more you can
17  tell me about that proposal; is that fair to say?
18       A.  Right.  Correct.
19       Q.  Do you recall HCFA planning a
20  thoughtful and comprehensive study of AWP,
21  including how AWP is defined?
22       A.  I don't recall that.

Page 389

1        Q.  Do you recall any efforts to seek
2   regulations or legislation on the subject of
3   defining AWP?
4        A.  I don't recall that.
5        Q.  And in your practice, in your
6   experience, AWP was an undefined measure; is that
7   correct?
8        MS. MARTINEZ:  Objection, form.
9        A.  It was defined in many ways.  So I
10  wouldn't say undefined.
11       Q.  How was it defined in many ways?
12       A.  It just depended on what source you
13  went to to look.  The compendia defined it one
14  way.  Just different literature, whatever you
15  would read, it would be defined in different
16  ways.
17       Q.  Have you ever seen it defined as
18  something else, as something apart from what was
19  contained in the compendia as it relates to
20  prescription drugs?
21       A.  I don't understand what you mean,
22  compendia.  The compendia --

Page 390

1        Q.  Drug compendia.
2        A.  Right.  The drug compendia would define
3   it.  But there's other pieces of literature that
4   you could read that would define AWP.  And I
5   think the OIG report at times tried to define AWP
6   in their terms.
7        Q.  In what terms did they define it?
8        A.  I don't know.  I'm just saying in
9   general.  I'm speaking in general.
10       Q.  As you sit here today are you aware of
11  any definition of AWP apart from drug prices that
12  were contained in the compendia?
13       MS. MARTINEZ:  Objection, form.
14       A.  Any other definition?
15       Q.  Yes.
16       A.  Other than the compendia?
17       Q.  Yes.
18       A.  Yes.  But I can't specifically say
19  where.
20       Q.  And you testified last time, if my
21  recollection serves, that when you used the term
22  AWP in your work you believed it referred -- or

Page 391

1   you understood it referred to prices in the
2   compendia?
3        A.  Correct.
4        And that -- I just wanted to clarify on
5   that one too.  And the reason I said that is
6   because in processing the FULs, that's what I
7   used.
8        Q.  But when you heard the term AWP in your
9   work, you believed it related to what was in the
10  compendia, correct?
11       MS. MARTINEZ:  Objection, form.
12       MS. ALBEE:  Objection, form.
13       A.  For FULs purposes, yes.
14       (Exhibit Abbott 754 was marked for
15  identification.)
16  BY MR. TORBORG:
17       Q.  For the record, what I've marked as
18  Abbott Exhibit 754 is a document bearing the
19  Bates numbers HHD 180-0034 through 39.  Ms.
20  Gaston, if you would take a look at that and let
21  me know if you recall this document.
22       A.  I recall the glossary.  I don't recall

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                        Washington, DC

Page 392

1  the e-mail.
2     Q.  And the glossary is the document ending
3  with Bates 36 through 39; is that right?
4     A.  Correct.
5     Q.  Do you recall getting a request from a
6  Sharman Leinwand for definitions of various
7  pricing acronyms that were used in Medicaid
8  pharmacy?
9     A.  I don't recall that, no.
10    Q.  In any event, it looks like on March
11  20th 2002 you sent Jessie Spillers -- maybe
12  it's Leinwand Sharman.  I'm in the sure which way
13  it is -- a glossary that contained definitions of
14  various terms that were used in the Medicaid
15  pharmacy area; is that right?
16    A.  Correct.
17    Q.  And you would not have sent them that
18  if you thought that any of the definitions in
19  there were incorrect; is that fair to say?
20       MR. WINGET-HERNANDEZ:  Objection, form.
21       MS. MARTINEZ:  Objection, form.
22    A.  I can't say that.  This document was

Page 393

1  prepared -- the glossary was prepared for
2  training purposes.  We did a training session for
3  our regional office folks and Jessie Spillers is
4  one of the regional office folks.  So the terms
5  are put together to just assist those folks with
6  the terminology that's used in the rebate
7  program.
8     Q.  If you would go to the Bates page
9  ending 37, do you see there listed as the term
10  "average wholesale price (AWP)."  Do you see
11  that?
12    A.  Yes.
13    Q.  Would you read that into the record,
14  please?
15    A.  It says --
16       MR. WINGET-HERNANDEZ:  Objection, form.
17    A.  "The published suggested wholesale
18  price of a drug as reported by the drug's
19  manufacturer.  This price, which is typically
20  significantly higher than the price actually paid
21  by purchasers of the drug, is used by state
22  Medicaid agencies as a basis for determining

Page 394

1  their estimated acquisition cost (EAC) for
2  pharmacy reimbursement purposes."
3     Q.  Do you know what is -- when the
4  definition refers to published suggested
5  wholesale price --
6     A.  I would assume that this is talking
7  about the compendia.
8     Q.  Well, do you know of any other source
9  where average wholesale prices are published
10  other than the compendia?
11    A.  They may be someplace else.  But I know
12  of the compendia.
13    Q.  You're not aware of any other as you
14  sit here today?
15    A.  No.
16    Q.  Ms. Gaston, do you recall having
17  conversations with the Alabama Medicaid agency
18  relating to prescription drugs?
19    A.  Not specifically.
20    Q.  Do you recall having conversations with
21  them relating to issues on dispensing fees?
22    A.  Not specifically.

Page 395

1     Q.  Do you recall -- just to see if it
2  refreshes your recollection -- that at some point
3  Alabama wanted to have a dispensing fee that had
4  different amounts for different drugs?
5       MR. WINGET-HERNANDEZ:  Objection, form.
6     A.  Did you --
7     Q.  Yeah.  Do you recall that?
8     A.  No, I don't.
9     Q.  If I threw out the name Mary Hayes-
10  Finch, would that refresh your recollection at
11  all about this?
12    A.  No.
13    Q.  I'd like to ask you to look at Abbott
14  Exhibit 578.
15       MR. TORBORG:  Ani, that's one that I
16  gave you a copy of yesterday.  It's the 1990
17  publication of the Medicaid Pharmacy Bulletin.
18  BY MR. TORBORG:
19    Q.  Ms. Gaston, do you recall a publication
20  known as the Medicaid Pharmacy Bulletin?
21    A.  It looks familiar.
22    Q.  This particular document or this volume

                              28  (Pages 392 to 395)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                        Washington, DC

---

Page 396

1   of the Medicaid Pharmacy Bulletin is titled
2   "Revisiting Medicaid reimbursement for home IV
3   drug therapy." Do you see that?
4       A.  Yes.
5       Q.  And the second paragraph on the first
6   page, the second sentence, indicates "Several
7   administrators indicate that the complex nature
8   of IV drug therapy, which involves the use of
9   multiple drugs, various supplies such as tubing
10  and needles and nursing services, has slowed the
11  development of a standardized payment system."
12  Do you see that?
13      A.  Yes.
14      Q.  Do you recall issues arising, Ms.
15  Gaston, with the fact that infusion and
16  injectable drugs had higher cost to dispense to
17  Medicaid beneficiaries?
18          MS. MARTINEZ:  Objection, form.
19      A.  I don't remember a conversation like
20  that.
21      Q.  Do you recall that -- apart from
22  conversations --

---

Page 397

1       A.  Okay.
2       Q.  -- just the issue arising ever?
3          MS. MARTINEZ:  Objection, form.
4       A.  It may have.  I can't remember.
5       Q.  It's been some time since these issues
6   have been raised?
7       A.  Yes.
8       Q.  Your memory has faded?
9       A.  Yes.
10      Q.  Ms. Gaston, I asked you briefly last
11  time about a project that the Department of
12  Justice in connection with the National
13  Association of Medicare Fraud Control Units had
14  worked on related to providing more accurate AWPs
15  for a set of drugs.  Do you recall that?
16      A.  Yes.
17      Q.  And you recall that effort, right?
18      A.  Yes.
19      Q.  Was that an effort that was spearheaded
20  by your office?
21          MS. MARTINEZ:  Objection, form.
22      A.  What do you mean by spearheaded?

---

Page 398

1       Q.  Whose idea was it?
2       A.  I thought it was a result of a
3   litigation suit.
4          (Exhibit Abbott 755 was marked for
5   identification.)
6   BY MR. TORBORG:
7       Q.  Ms. Gaston, when you said results from
8   a litigation suit, your understanding was it
9   resulted from a qui tam that had been filed by
10  Ven-A-Care; is that right?
11          MS. MARTINEZ:  Objection, form.
12      A.  I can't say that.  I don't have a
13  recollection.
14      Q.  For the record, what I've marked as
15  Abbott Exhibit 755 bears the Bates numbers KY-
16  DMS, dash, a whole bunch of zeros, 125918, 919
17  and 20.  I'd ask if you would go to Bates page
18  919.  There's an e-mail -- actually, why don't
19  you take a look at that and see if you recall the
20  e-mail.
21      A.  (Reading.)  I don't remember the e-
22  mail.

---

Page 399

1       Q.  But it appears you sent an e-mail to a
2   distribution on April 25th 2000, subject: First
3   Databank settlement?
4       A.  Correct.
5       Q.  And then on May 11th 2000 it appears as
6   though an individual named Joe Reeder, who
7   appears to be from HCFA, sent an e-mail to a
8   distribution.  Do you see that?
9       A.  Correct.  He's in the regional office.
10      Q.  And he said in his e-mail to the
11  distribution "Please see the attached which
12  provided background on the FDB agreement reached
13  between the Department of Justice and the states.
14  Before this agreement was finalized HCFA provided
15  the DOJ with information on how state
16  reimbursements are set, the state plan process
17  and how this proposal may affect states.  It
18  appears that the FDB agreement only provides
19  states with the 'true AWP' data provided by FDB
20  for the approximately 400 drugs, but does not
21  address the state reimbursement issue.
22          "HCFA was informed that states received

29 (Pages 396 to 399)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                        Washington, DC

Page 400

1  their FDB file the first week of May.  The file
2  contains an indicator which denotes the 'true AWP
3  prices' for those 400 drugs that were identified
4  on the price list states received from the
5  attorney general's office.  I will keep you
6  advised on this issue and share any additional
7  information received.  Please remember that any
8  changes in your reimbursement methodology must be
9  reflected in your state plan."
10       Do you see that?
11     A.  Yes.
12     Q.  And he was forwarding an e-mail that
13 you had written to individuals in the HCFA
14 regional offices, correct?
15     A.  This looks like it was to folks at the
16 state.  You're talking about the May 11th?
17     Q.  I'm talking about the e-mail that you
18 sent on April 25th, 2000.  Individuals in the
19 distribution line are individuals in the HCFA
20 regional offices, correct?
21     A.  Correct.  Oh, he copied.  Okay.
22 Correct.

Page 401

1      Q.  And you gave a brief summary in your e-
2  mail, correct?
3      A.  Yes.
4      Q.  Of the true AWP prices that were being
5  placed on 400 drugs, correct?
6          MS. MARTINEZ:  Objection, form.
7      A.  Correct.  The First Databank
8  settlement.
9      Q.  And you stated amongst other things,
10 "By way of background, there is a qui tam False
11 Claims Act lawsuit files against more than 20
12 drug manufacturers which is still partially under
13 seal."  Do you see that?
14     A.  Correct.
15     Q.  And that's consistent with your
16 recollection that the DOJ/NAMFCU AWP effort was
17 one that was coming out of litigation --
18     A.  Yes.
19     Q.  -- correct?
20         So that effort to provide more accurate
21 AWPs was something that was instigated by the
22 Department of Justice, correct?

Page 402

1      MS. MARTINEZ:  Objection, form.
2   A.  That's what it appears.
3      MR. TORBORG:  Ms. Gaston, that's all
4  the questions I have for you at this time.  I
5  reserve the right to ask some follow-up
6  questions.  But we're done.  I thank you for your
7  time.
8      THE WITNESS:  Okay.
9      THE VIDEOGRAPHER:  Off the record at
10 11:41.
11     (Recess.)
12     THE VIDEOGRAPHER:  On the record at
13 11:53.
14
15     EXAMINATION BY COUNSEL FOR WARRICK
16 PHARMACEUTICALS, SCHERING-PLOUGH CORPORATION AND
17 SCHERING CORPORATION
18 BY MR. BUEKER:
19   Q.  Good morning, Ms. Gaston.  My name is
20 John Bueker.  I'm here on behalf of Warrick
21 Pharmaceuticals, Schering-Plough Corporation and
22 Schering Corporation.  And we all are defendants

Page 403

1  in the New York counties case.  And I'm going to
2  focus my questioning on that case.  There have
3  been nine drugs for which FULs have been
4  established that have been singled out for kind
5  of focused discovery.
6          And a lot of what I want to do today is
7  use I think some of the printouts from the FUL
8  application that maybe you looked at to refresh
9  your recollection for the deposition and kind of
10 walk through the mechanics of how FULs are set to
11 kind of drill down and see if we can't better
12 understand that process, is a lot of what I want
13 to do today.
14     A.  Okay.
15     Q.  But I just want to before we delve into
16 that make sure that we have a common
17 understanding with regard to the chronology here
18 for a second.  As I understand it, from 1991 to
19 2003 you were one of the individuals at CMS who
20 was responsible for setting the FULs; is that
21 correct?
22     A.  Correct.

30 (Pages 400 to 403)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                            March 19, 2008
                     Washington, DC

|  | Page 404 |
|---|---|

1    Q.  And originally it was Peter Rodler who
2  trained you?
3    A.  Correct.
4    Q.  So starting in about 1991 Mr. Rodler
5  would have trained you to set FULs?
6    A.  Yes.
7    Q.  And I think you said last time that
8  when Mr. Rodler left CMS in the mid-1990s you
9  became solely responsible for setting the FULs at
10  that point, subject obviously to approval kind of
11  up the chain?
12    A.  Correct.
13    Q.  But you were the person day-to-day that
14  would get the printouts from the FUL application
15  and do the manual review and actually set the
16  FUL, correct?
17    A.  Correct.
18      MS. MARTINEZ:  Objection, form.
19    A.  But also in that period of time there
20  were other individuals that I trained.
21    Q.  In a period '91 to 2003?
22    A.  Correct.

|  | Page 405 |
|---|---|

1    Q.  Yeah.  Okay.  And let me -- let's see
2  if we can spell that out a little more clearly.
3  The other individual I know you trained was Cindy
4  Bergin?
5    A.  Correct.
6    Q.  And when did you begin training Ms.
7  Bergin on calculating or establishing FULs?
8    A.  When she started with the government in
9  '99.
10    Q.  So from 1999 until 2003 you and Ms.
11  Bergin would have worked on FULs setting FULs
12  together?
13    A.  Correct.
14    Q.  But you were involved in the process of
15  setting FULs through your departure from the
16  policy position in 2003, correct?
17    A.  Correct.
18    Q.  So as I understand it, there was a
19  period of time between, say, 1995 or the mid-
20  1990s when Mr. Rodler left and 1999 when Ms.
21  Bergin arrived where you were solely responsible
22  for setting the FULs?

|  | Page 406 |
|---|---|

1      MS. MARTINEZ:  Objection, form.
2    A.  Correct.
3      MR. BUEKER:  I ask the court reporter
4  to mark this as New York Counties Exhibit 1.
5      (Exhibit NY Counties 001 was
6  marked for identification.)
7  BY MR. BUEKER:
8    Q.  It's a document that's an excerpt from
9  the Code of Federal Regulations.  I just want to
10  make sure we have a common understanding.  This
11  section 447.332 is the FUL regulation, correct?
12    A.  Correct.
13    Q.  And it's a regulation with which you're
14  familiar, right?
15    A.  Yes.
16    Q.  In fact you set the FULs under this
17  regulation for the better part of 12 years,
18  right?
19      MS. MARTINEZ:  Objection, form.
20    A.  Yes.
21    Q.  To your knowledge did the regulation
22  change at all during the period 1991 to 2003?

|  | Page 407 |
|---|---|

1    A.  There was a period -- and I don't know
2  -- there was a period where we allowed the
3  federal upper limit drugs to be expanded to look
4  at at least three A-rated.
5    Q.  Let me see if I can help --
6    A.  As long -- and I can't remember the
7  dates.
8    Q.  Let me see if I can help you with the
9  dates, because I think we talked a little bit
10  about this the last time.  As I read this,
11  section (a)(1) talks about all formulations of
12  the drug needing to be therapeutically
13  equivalent, correct?
14    A.  Correct.
15    Q.  And at some point your recollection is
16  that CMS's approach to setting FULs expanded and
17  it wasn't that all drugs had to be A-rated, but
18  there had to be three A-rated equivalents,
19  correct?
20    A.  Correct.
21    Q.  And we looked at a document last time
22  that was a printout from the OBRA '90 statute.

31 (Pages 404 to 407)

Gaston, Sue - Vol. II                        March 19, 2008
                    Washington, DC

Page 408

1   Do you recall that?
2       A.  I don't recall.
3       Q.  Would it be consistent with your memory
4   that when OBRA -- when Congress passed OBRA '90
5   that Congress dictated that CMS set FULs when
6   there were three A-rated --
7       A.  Yes.  Yes.
8       Q.  So in the early period of time prior to
9   OBRA '90 coming into effect CMS would only have
10  set a FUL if all drugs were A-rated or
11  therapeutically equivalent as the regulation
12  says, but post OBRA '90 the definition was
13  expanded?
14      A.  Correct.
15      Q.  But to your knowledge the regulation
16  wasn't changed?
17      A.  Correct.
18      Q.  And I keep using a term and I want to
19  make sure the jury understands, which is A-rated.
20  What is A-rated?  Would you explain that?
21      A.  Here again, I've been out of it for
22  years.  But it's my understanding that they have

Page 409

1   to be therapeutically and pharmaceutically
2   equivalent.
3       Q.  And what does that mean?
4       A.  That's all the farther I can get.  I
5   don't get into the details of it.
6       Q.  Those are terms, though, that the FDA,
7   the Food and Drug Administration, defines?
8       A.  Correct.
9       Q.  And an A rating is a Food and Drug
10  Administration rating, is it not?
11      A.  That's my understanding.
12      Q.  And an A rating is the rating that the
13  Food and Drug Administration attaches to a drug
14  when it's deemed to be therapeutically and
15  pharmaceutically equivalent, correct?
16      A.  Correct.
17      Q.  Looking at Exhibit 1, and specifically
18  the FUL regulation, as I understand it there were
19  basically two criteria that had to be satisfied
20  before CMS would begin to look at establishing a
21  FUL.  The first was, as we've talked about, there
22  had to be for a while all therapeutically

Page 410

1   equivalent drugs or then three therapeutically
2   equivalent drugs, and the second criteria, as I
3   understand it, was there had to be at least three
4   suppliers listed in Red Book, Blue Book or Medi-
5   Span; is that correct?
6       A.  Yes.  We said in a national compendia.
7       Q.  And the national compendia are what?
8       A.  We considered that Red Book, Blue Book
9   and Medi-Span.
10      Q.  Were actually any other pricing sources
11  that CMS looked at or considered national
12  compendia?
13      A.  No.
14      Q.  Just so we have I think a common
15  understanding about how the process worked, once
16  those criteria were deemed to be satisfied then
17  the process became picking a price and
18  multiplying that price by 150 percent to set the
19  FUL, correct?
20      A.  The system did that.
21      Q.  The FUL system?
22      A.  The FUL system.

Page 411

1       Q.  So just mechanically -- I think you
2   described this the last time, but tell me if my
3   understanding is incorrect.  There was a program
4   called FULs that did some data crunching and then
5   there was manual review that went on after that;
6   is that correct?
7       A.  Correct.
8       Q.  So essentially you as the individual
9   responsible for setting FULs at particular points
10  in time would have gotten a printout from the
11  FULs system and then you would have embarked on a
12  manual review after that?
13      A.  Correct.
14      Q.  But basically the process was that
15  either the system or you picked a price and that
16  price was multiplied by 150 percent to set the
17  FUL, correct?
18      A.  Correct.
19          MR. BUEKER:  I ask the court reporter
20  to mark a document that bears the Bates number
21  HHD 175-0849 on the bottom right-hand corner as
22  New York Counties Exhibit 2 for identification,

32  (Pages 408 to 411)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                    Washington, DC

Page 412

1  please.
2       (Exhibit NY Counties 002 was
3  marked for identification.)
4  BY MR. BUEKER:
5     Q.  Ms. Gaston, do you have in front of you
6  what's been marked as New York Counties Exhibit 2
7  for identification?
8       MR. WINGET-HERNANDEZ:  Excuse me, John.
9  I apologize for not bringing this up with respect
10 to the first exhibit that you attached.  But
11 without at this point making an objection, I
12 would like to ask you if you would mind marking
13 these exhibits in some way that made it clear
14 that it was the defendant that was offering them
15 and attaching them to the deposition rather than
16 in a way that seems to suggest that they have
17 been attached by my clients.
18      MR. BUEKER:  I don't have an objection
19 to that.  In calling them New York county
20 exhibits I was simply trying to distinguish them
21 from the Abbott exhibits that are marked in this
22 deposition.

Page 413

1       MR. WINGET-HERNANDEZ:  Yeah.  I have no
2  truck with that.
3       MR. BUEKER:  How about we can mark them
4  New York Counties Defendants' Exhibit 1 for
5  identification, Defendants Exhibit 2 for
6  identification?  How is that?
7       MR. WINGET-HERNANDEZ:  That's perfectly
8  fine with me.
9       MR. BUEKER:  Great.
10 BY MR. BUEKER:
11    Q.  Do you have in front of you what's been
12 marked as New York Counties Defendants' Exhibit 2
13 for identification?
14    A.  Yes.
15    Q.  And this is a printout from the FUL
16 system of the kind you talked about refreshing
17 your recollection in connection with this case,
18 correct?
19    A.  Correct.
20    Q.  And this would have been -- this sheet
21 would have been the output that the FULs system
22 generated and would have been the basis for

Page 414

1  beginning kind of a manual review process, right?
2     A.  Correct.
3     Q.  And it's dated in the upper left-hand
4  corner, 8/21/2001, right?
5     A.  Correct.
6     Q.  And that's a period in time in which
7  you were responsible for setting the FULs?
8     A.  Yes.
9     Q.  And down in the lower right-hand corner
10 there's a -- I'll call it a calculation that
11 begins with what looks like a date at the top,
12 10/17/00.  Do you see that?
13    A.  Yes.
14    Q.  And down below it are a set of
15 initials.  SEG.  Dow see those?
16    A.  Yes.
17    Q.  Are those your initials?
18    A.  Yes.
19    Q.  And is that your handwriting at the
20 bottom of Exhibit 2?
21    A.  Yes.  On the right-hand side.
22    Q.  On the right-hand side.  I see.  What

Page 415

1  handwriting on Exhibit 2 is not yours?
2     A.  On the left-hand side dated 8/22 and
3  the handwriting that's been X'd out.
4     Q.  Okay.  And whose handwriting is that?
5     A.  That's Cindy Bergin's.
6     Q.  And then up above there's handwriting
7  that -- alongside the -- for example, Major
8  Pharmaceuticals.  Do you see that?
9     A.  At the top?
10    Q.  Yes.
11    A.  Yes.
12    Q.  Is that your handwriting?
13    A.  It looks like it.
14    Q.  And can you read into the record what
15 it says next to Major Pharmaceuticals?
16    A.  It says "not in stock."  Then it says
17 "soon."
18    Q.  And that you think is your handwriting?
19    A.  It appears to be.
20    Q.  And then next to Caraco Pharmaceuticals
21 Laboratory do you see that there's a written
22 "call" and then in parentheses "yes"?

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 416

1    A.  Yes.
2    Q.  Is that your handwriting?
3    A.  I can't say.
4    Q.  How about "discontinued (they no longer
5  manufacturer)," the printing?
6    A.  That's not my handwriting.
7    Q.  Okay.  But Exhibit 2 is a document with
8  which you're familiar?
9    A.  Correct.
10    Q.  And I take from your initials at the
11  bottom right-hand corner that you had some
12  involvement in the manual review process that
13  went on before a FUL was set for 100-milligram
14  metoprolol?
15    A.  Correct.
16    Q.  I'd like you to hang on to that.  I'm
17  going to flip back and forth between that and
18  another document that's labeled at the top
19  transmittal number 37, that I'd like to have
20  marked as New York Counties Defendants' Exhibit 3
21  for identification, please.
22       (Exhibit NY Counties 003 was

Page 417

1  marked for identification.)
2  BY MR. BUEKER:
3    Q.  Ms. Gaston, do you have in front of you
4  Exhibit 3 for identification?
5    A.  Yes.
6    Q.  And would you describe for the record
7  what Exhibit 3 is?
8    A.  This is transmittal number 37 of the
9  federal upper limit drug list dated November 20th
10  2001.
11    Q.  And what is a -- I take it it's a CMS
12  transmittal?
13    A.  Yes.
14    Q.  What is a CMS transmittal?  How is it
15  used in connection with the FUL program?
16    A.  The -- I don't know about in 2001.  But
17  previously the federal upper limit drug list was
18  published in the state Medicaid manual.  And then
19  we started publishing it on our webpage.  So we
20  would use the transmittal numbers because of the
21  state Medicaid manual issuance.
22    Q.  I see.  And if I take from that then

Page 418

1  the purpose of a CMS transmittal to the extent
2  these FULs were still being recorded in state
3  Medicaid manuals was to communicate to the states
4  that you were making changes to the FULs?
5    A.  Correct.
6    Q.  And you recognize transmittal 37 to be
7  one of those transmittals by which CMS was
8  transmitting to the state a new set of FULs?
9    A.  Correct.
10    Q.  And you can tell from the top that
11  transmittal number 37 was sent to the states on
12  November 20th 2001, right?
13    A.  Correct.
14    Q.  And there's a bold line about a third
15  of the way down Exhibit 3 which provides a date
16  when these FULs needed to be implemented by,
17  correct?
18    A.  Correct.
19    Q.  And what is that date?
20    A.  November 20th 2001.  And no later than
21  January 22nd -- I'm sorry.  "The November 20th
22  2001 FUL list should be implemented no later than

Page 419

1  January 22nd 2002."
2    Q.  So by January -- this transmittal was
3  essentially telling the states that by January
4  22nd 2002 these were the FULs that had to be in
5  place?
6    A.  Correct.
7    Q.  Would you turn with me to page 12,
8  please?  And do you see the third entry down on
9  page 12 on Exhibit 3 is for metoprolol?
10    A.  Yes.
11    Q.  And you see the second line there is
12  for the 100-milligram strength, right?
13    A.  Correct.
14    Q.  And that's the FUL that -- Exhibit 2
15  relates to setting a FUL for the 100-milligram
16  strength of metoprolol?
17    A.  Correct.
18    Q.  And you see that the -- you would agree
19  with me that Exhibit 2 reflects the calculation
20  that resulted in the FUL that's published in
21  transmittal 37, correct?
22    A.  Correct.

34 (Pages 416 to 419)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                          Washington, DC

Page 420

1    Q.  And just so it's clear for the record,
2  what is the B written next to the 0.0914 in
3  Exhibit 3?
4    A.  That's the compendia source that the
5  price was driven on, which is Blue Book.
6    Q.  So in other words the price that was
7  used to set that FUL was a price that was
8  published in Blue Book?
9    A.  Correct.
10   Q.  And if there was an R next to -- as
11 there is a now lines down -- what would an R
12 mean?
13   A.  Red Book.
14   Q.  And what if the price that was being
15 used had been published by Medi-Span?  What would
16 be there? Would you assume an M?
17   A.  I would assume an M.  I think there was
18 a period of time where First Databank and Medi-
19 Span were considered one.  And I can't remember
20 if we still picked up the M from Medi-Span.  I'm
21 not sure.  It's shown in the compendia source,
22 though.

Page 421

1    Q.  So during that period of time where
2  they were treated as one there would only have
3  been two sources that CMS looked at for pricing
4  information, right?
5    A.  No.  We still had a separate tape for
6  Medi-Span, even though they were both considered
7  -- I think however they worked.  Yeah.  But we
8  still had two separate compendias' tapes for each
9  one of those, and we used those in the pick.
10   Q.  I see.  So during that period of time
11 we just might not see an M --
12   A.  As much.
13   Q.  -- in the transmittal?
14   A.  Yeah.
15   Q.  And then just stick with the metaprolol
16 example for a minute.  Entry number 3 reads
17 across 100 mg, which is 100 milligrams, right?
18   A.  Correct.
19   Q.  And then tablet.  Tablet is the form of
20 the drug?
21   A.  It's the dosage.  That's what it's
22 considered on -- if you look at Exhibit 2.

Page 422

1    Q.  Okay.  And then what's oral?
2    A.  Is the route of administration.
3    Q.  And what's the 100?
4    A.  It's the strength.
5    Q.  Well --
6    A.  A bottle of 100.  So --
7    Q.  When you say a bottle of 100, in other
8  words, this FUL was set for a package size of a
9  bottle of 100 pills, correct?
10   A.  Correct.
11   Q.  If you look a little bit further down
12 the page to minocycline hydrochloride, do you see
13 that there's a 50?  Do you see that?
14   A.  Correct.
15   Q.  And that indicates that that FUL was
16 set on a basis of a package size of 50, correct?
17   A.  Correct.
18   Q.  Not to bounce around too much -- I
19 probably should have done this earlier, but if
20 you would just flip back to Exhibit 1 for a
21 second, package size plays a role in setting the
22 FUL, correct?

Page 423

1    A.  The most commonly used package size.
2    Q.  Right.  And in the regulation there's a
3  -- you select either the package size or 100 or
4  if there's another more commonly used package
5  size, you'd select that?
6    A.  Correct.
7    Q.  So in the case of metoprolol, as we see
8  in Exhibit 3, it's the 100 -- bottle of 100 is
9  the package size that's most commonly used,
10 whereas for minocycline it's 50 that CMS has
11 deemed to be the most commonly available package
12 size?
13   A.  Right.
14     MR. WINGET-HERNANDEZ:  Objection, form.
15     MS. MARTINEZ:  Objection, form.
16   A.  For the 100-milligram base.
17   Q.  Let me ask the question, for the 100-
18 milligram base for minocycline, CMS deemed 50 to
19 be the most commonly available package size,
20 correct?
21   A.  Correct.
22   Q.  Let's jump back now to Exhibit 2.  And

35  (Pages 420 to 423)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                      March 19, 2008
Washington, DC

Page 424

1  before I go any further, let me -- I may have
2  misspoke and I want to make sure the record is
3  clear.  Looking down at the bottom I think I said
4  -- we identified some text that began with 10/17.
5  And I think I said 2000.  But that actually may
6  be 2001.  Do you see that?
7      A.  Yes.  It's not very clear.
8      Q.  It's not very clear.  But whether it's
9  -- given the date up in the top left-hand corner
10 of 8/21/2001, it's more likely that you made your
11 note on October 17th of 2001, correct?
12     A.  Correct.
13     Q.  And that -- what follows the 10/17/2001
14 is in fact your note?
15     A.  Correct.
16     Q.  Now, to -- let's just understand a
17 little bit about what you wrote in the bottom
18 right-hand corner.  The .0609 is the price on
19 which this FUL is being set, correct?
20     A.  Correct.
21     Q.  And you're multiplying that by 150
22 percent to get the .0914 that we see appears in

Page 425

1  Exhibit 3, transmittal 37?
2      A.  Correct.
3      Q.  And so if I wanted to find out what
4  manufacturer's price set the FUL in this
5  instance, what I'd do is go up to the list of
6  prices above and I'd look for the .0609, right?
7      A.  Yes.
8      Q.  And so if I do that I go up and I see
9  that it actually was Mutual Pharmaceuticals' WAC
10 that set the FUL in this instance; is that
11 correct?
12     A.  It appears that way.
13     Q.  Well, the --
14     A.  Yes.  Yes.
15     Q.  Okay.  And what -- just so we're clear,
16 what Exhibit 2 is a list of published prices from
17 three national pricing compendia that CMS had in
18 front of it when it was establishing this FUL,
19 correct?
20     A.  Correct.
21     Q.  And there are lower published prices on
22 this list than the .0609 that was used to set the

Page 426

1  FUL, correct?
2      A.  Correct.
3      Q.  For example, if you look down almost to
4  the bottom, Geneva Pharmaceuticals, Inc., there's
5  a published pharmaceutical price of Geneva
6  Pharmaceuticals, Inc. of .0544 which was less
7  that was used to set the FUL?
8      A.  That one has a line through it and it
9  says "discontinued."
10     Q.  Right.  So that wasn't used to set the
11 FUL.  But that's something you would have had to
12 make a telephone call to find out?
13     A.  Probably.
14     Q.  What does the T over in the left-hand
15 column mean?  Do you recall?
16     A.  I think it means it's temporarily
17 unavailable.  It's a code that can be put into
18 the FULs application.
19     Q.  So if you or a colleague of yours calls
20 one of these manufacturers and learns that Geneva
21 Pharmaceuticals is temporarily out of stock of
22 metoprolol, you would put a T in the FULs system?

Page 427

1      A.  Correct.
2      Q.  And that would be to ensure that the
3  Geneva price didn't get used as the basis for the
4  FUL?
5      A.  Correct.
6      Q.  And why would you do that?
7      A.  Because if the product is in the
8  available you don't want to said a FUL price on a
9  product that is not available.
10     Q.  Why not?
11     A.  Because it might not be a realistic
12 price.  That product could be unavailable for
13 three years but they're still reporting it to the
14 compendia.  So if it's not a realistic price then
15 there's no sense in setting the FUL price based
16 on that.
17     Q.  And by realistic price you mean a price
18 that's high enough that providers could acquire
19 the product in the market place?
20     A.  Correct.
21     Q.  Caraco Pharmaceuticals also has a lower
22 reported price, right, of .0569?

36 (Pages 424 to 427)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 428

1    A.  Correct.
2    Q.  Do you know why that wasn't used to set
3  the FUL in this case?
4    A.  No.  I'm not real sure.
5    Q.  I mean, it does look to me from the
6  notation over on the right that somebody called
7  and that was a product that was deemed to be
8  available, right?
9    A.  Correct.
10    Q.  So you have a manufacturer, anyway,
11  who's got available product at a lower published
12  price, but it wasn't used for the FUL, correct?
13    A.  Correct.  Sometimes discretion was used
14  with this too.  You might look at that price and
15  if that price still appears to be too low that it
16  would make the product available out there, then
17  you would check to see if there's another
18  manufacturer that might be a step up that's
19  closer, but that could still allow you to set a
20  reasonable FUL price.
21    Q.  I see.  So sometimes discretion was
22  used to ensure that the FUL was reasonable?

Page 429

1    A.  And available.
2    Q.  And available?
3    A.  Yeah.
4    Q.  And the reason you used that discretion
5  was to make sure that providers -- you didn't set
6  a FUL that was so low that providers couldn't
7  acquire the product on the marketplace, correct?
8    A.  Correct.
9    Q.  And so you don't know for certain, but
10  it's possible that one of the reasons that the
11  Caraco price wasn't used here was discretion was
12  exercised and it was deemed maybe that this was
13  too low?
14    A.  It could be too low or Caraco only
15  distribute to maybe limited amount of states and
16  not all states.  That's something else to keep in
17  consideration.
18    Q.  Okay.  But there was in any event a
19  manual review process and discretion exercised
20  and a choice that CMS made not to use that price,
21  correct?
22    A.  Correct.

Page 430

1        MR. BUEKER:  Okay.  I have I think run
2  out of tape.  So perhaps we could set this to the
3  side, have some lunch and we'll come back this
4  afternoon.
5        THE WITNESS:  Okay.
6        THE VIDEOGRAPHER:  This is the end of
7  tape 2.  Off the record at 12:25.
8        (Whereupon, at 12:25 p.m. a lunch
9  recess was taken.)
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 431

1    AFTERNOON SESSION
2        (1:16 p.m.)
3
4  Whereupon,
5        SUE GASTON,
6  the witness testifying at the time of recess,
7  having been previously duly sworn, was further
8  examined and testified as follows.
9
10        EXAMINATION RESUMED BY COUNSEL FOR
11  THE WARRICK PHARMACEUTICALS, SCHERING-PLOUGH
12  CORPORATION AND SCHERING CORPORATION
13        THE VIDEOGRAPHER:  This is the
14  beginning of tape 3 in the deposition of Ms.
15  Gaston.  On the record at 1:16.
16        MR. BUEKER:  Can I ask the court
17  reporter to mark as three page exhibit that has
18  the Bates number HHD 175-0850 through 0852 as New
19  York Counties Defendants' Exhibit 4 for
20  identification, please.
21        (Exhibit NY Counties 004 was
22  marked for identification.)

37 (Pages 428 to 431)

Henderson Legal Services, Inc.

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                              March 19, 2008
                        Washington, DC

Page 432

1  BY MR. BUEKER:
2      Q.   Ms. Gaston, do you have in front of you
3  what's been marked as Exhibit 4 for
4  identification?
5      A.   Yes.
6      Q.   And would you agree with me that
7  Exhibit 4 is a three page exhibit consisting of
8  three separate e-mails?
9      A.   Correct.
10     Q.   And are you familiar with e-mails like
11 those reflected in Exhibit 4?
12     A.   It looks familiar.
13     Q.   What is it?
14     A.   From my recollection, there was a
15 period of time where we were soliciting comments
16 from states or I think some of the pharmacy
17 associations on a FUL list that was placed out
18 there without manual review.  And we established
19 a federal upper limit e-mail box where they could
20 send in their comments to give us some feedback
21 on this draft FUL list.
22     Q.   And that FUL list that you're referring

Page 433

1  to that was sent out without manual review, that
2  took place in 2000, right?
3      A.   I'm not sure.  It appears so because of
4  the date on the e-mail.
5      Q.   But in or about 2000?
6      A.   Correct.
7      Q.   And you said you set up an e-mail
8  mailbox to get complaints?
9      A.   Feedback.
10     Q.   Feedback?  Sorry.
11          And did you get a lot of feedback?  Did
12 CMS get a lot of feedback?
13     A.   I can't remember.
14     Q.   Okay.  Just looking at the e-mails that
15 are contained in Exhibit 4, it looks like you got
16 feedback here from Albertson's, Omni Care and it
17 looks like Eckerd or Brooks Pharmacy.  I take it
18 one source of feedback was the pharmacy
19 community, pharmacists?
20     A.   Correct.
21     Q.   And you also said associations and --
22     A.   Yeah.  State Medicaid agencies.

Page 434

1      Q.   Okay.  Do you recall the nature of the
2  feedback at all?
3      A.   Basically they were giving us feedback
4  whether they felt that the FUL prices or the
5  drugs were correctly on the FUL list or needed
6  adjust or shouldn't -- or weren't available.  I
7  think it was feedback about the whole list that
8  was put out at that time.
9      Q.   Okay.  Do you recall what if anything
10 CMS did in response to receiving feedback?
11     A.   I can't remember.  I don't know if we
12 just reverted back to the list that was still in
13 place.  I don't have a recollection of that.
14     Q.   Do you know whether CMS withdrew the
15 list that had been sent out without manual
16 review?
17     A.   I would assume that that's what
18 occurred.
19     Q.   Other than in this time period, the
20 2000 to 2001 time period, were there other ways
21 in which CMS received feedback on its FULs?
22     A.   Yes.

Page 435

1      Q.   How?
2      A.   We would get phone calls, e-mails,
3  sometimes letters or faxes.
4      Q.   And who would receive that feedback?
5      A.   I would.  Or Larry Reed.
6      Q.   And what kind of feedback would CMS
7  typically receive?
8      A.   It would be comments maybe from the
9  pharmacy saying that the product is not available
10 or that the pricing appears to be either too low
11 or too high.  Mostly availability issues.
12     Q.   And when you got feedback from some
13 source that a drug wasn't available, what if any
14 steps would CMS take?
15     A.   What we would do is call the
16 manufacturer or wholesaler and verify if that was
17 a fact.  Sometimes it might be just one state
18 that's having an availability problem.  But we
19 have to make sure that it's an availability
20 problem that would affect the FUL list for all
21 the states.
22     Q.   And what if you learn that, for

                        38 (Pages 432 to 435)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                            March 19, 2008
                       Washington, DC

Page 436

1   example, a manufacturer had discontinued a
2   particular drug that had been used to set the
3   FUL?  What would you do then?
4       A.  Then we would reevaluate whether the
5   FUL should be removed or if the FUL price should
6   be adjusted.
7       Q.  And in the case of a low price that had
8   been removed, the adjustment would have been one
9   that was upward?
10      A.  Well, we would look at the most recent
11  FUL application page for that particular drug and
12  look at the most current pricing that we have and
13  see if a new price should be established.
14      Q.  And if you say FUL application page you
15  mean something like Exhibit 2?
16      A.  Correct.
17      Q.  Let's parse the time periods a little
18  bit here.  Prior to 2000/2001 where you were
19  receiving feedback on your FULs, on CMS's FULs?
20      A.  We always receive feedback on the FULs.
21      Q.  So throughout the entire time period
22  '91 to 2003 you can recall receiving feedback on

Page 437

1   the FULs?
2       A.  Correct.  Just not by the FUL e-mail
3   address.  We established that for that one
4   particular situation.
5       Q.  Did CMS leave in place the mailbox, the
6   mail means of receiving feedback, post 2000/2001?
7       A.  I don't know.
8       Q.  So in terms of -- I'll refer to the e-
9   mail as a systematic way of receiving feedback.
10  Other than the e-mail systematic way of receiving
11  feedback, were there other systematic ways in
12  which CMS received feedback on its FULs?
13      A.  We would still receive faxes.  I think
14  in this particular situation we wanted the
15  feedback in writing.  So if we received phone
16  calls we would ask them to follow up in writing.
17      Q.  I see.  Do you recall receiving written
18  complaints in the 2000 period from the National
19  Association of Chain Drug Stores?
20      A.  Yes.
21      Q.  Tell me about that.  What do you
22  recall?

Page 438

1       A.  Just that they had complaints about the
2   -- some of the FUL prices or -- I can't remember
3   if availability was an issue for them.  And they
4   also wanted to receive a file with all the NDC
5   numbers of the FUL drugs.
6       Q.  Did they tell you why they wanted to
7   receive that?
8       A.  I can't recall.
9       Q.  When you say they had complaints about
10  the FUL prices what do you mean?  What kind of --
11  what was the nature of the complaint?
12      A.  I can only guess because it's been so
13  long.  But generally I would assume that they're
14  complaining that the FUL prices are probably set
15  too low.  They could have been complaining --
16  maybe the availability of the drugs too.
17      Q.  And when you say too low, in other
18  words, that the FUL was -- I'm sorry.  Go ahead.
19  What do you mean by too low?
20      A.  Okay.  In their -- I think because they
21  have a lot of pharmacies that they're
22  representing and if they feel that the prices are

Page 439

1   too low they feel the pharmacies can't purchase
2   them at the FUL prices.
3       Q.  And do you recall CMS doing anything in
4   response to the complaint from the National
5   Association of Chain Drug Stores?
6           MS. MARTINEZ:  Objection, form.
7       A.  I do want to clarify, that what I'm
8   talking about with the National Association of
9   Chain Drug Store complaints is during the period
10  of time when we sent out -- the one that I'm
11  addressing anyhow, is during this period of time.
12      Q.  I didn't mean to imply otherwise.
13      A.  I just wanted to make sure I'm clear.
14      Q.  And your counsel objected, to let me
15  see -- in the 2000/2001 time period you recall
16  CMS receiving a complaint from the National
17  Association of Chain Drug Stores.  What if any
18  action do you recall CMS taking in response to
19  that particular complaint?
20      A.  CMS took their complaints or
21  suggestions or issues, whatever they had, along
22  with all the other ones, and then whatever

39 (Pages 436 to 439)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                        March 19, 2008
                    Washington, DC

Page 440

1  happened with that draft that was put out at that
2  time I can't recall.
3      Q.  Other than the 2000/2001 draft list, do
4  you recall another instance in which CMS
5  circulated a FUL list without manual review and
6  got a series of complaints?
7      A.  I don't recall that.
8      Q.  So in your mind at least 2000/2001,
9  that instance is unique?
10     A.  Yes.
11     MR. BUEKER:  I ask the court reporter
12  to mark a one-page document with the Bates number
13  HHD 175-1492 as New York Counties Defendants'
14  Exhibit 5 for identification, please.
15         (Exhibit NY Counties 005 was
16  marked for identification.)
17  BY MR. BUEKER:
18     Q.  Ms. Gaston, the court reporter his
19  placed in front of you what has been marked as
20  New York Counties Defendants' Exhibit 5 for
21  identification.  And this I apologize is where
22  this might begin to get repetitive.  But Exhibit

Page 441

1  5 you would agree is a printout from the FULs
2  system from August of 2001, correct?
3      A.  Correct.
4      Q.  And it's a printout from the FUL's
5  system that relates to the 0.5-milligram strength
6  of clonazepam?
7      A.  Can I just back up?  You said August
8  2001.  I don't have a date on mine.
9      Q.  Okay.  Fair point.  The copy wasn't
10  well done.
11     MS. REID:  John, do you want to give me
12  her mine?
13     MR. BUEKER:  Sure.
14     MS. MARTINEZ:  Could I just look at it?
15     MR. BUEKER:  Sure.  Perhaps we could
16  substitute that as the one for the record,
17  please?
18         (Whereupon, Exhibit NY Counties
19  005 was replaced with a better photocopy of the
20  same document.)
21  BY MR. BUEKER:
22     Q.  Ms. Gaston, I apologize for you.  You

Page 442

1  now have in front of you what's been marked as
2  Exhibit 5 for identification.  And you would
3  agree with me that it's an August 2001 printout
4  from the FULs system?
5      A.  Yes.
6      Q.  And it relates to the 0.5-milligram
7  strength of clonazepam?
8      A.  Correct.
9      Q.  Which I'll represent to you is one of
10  the nine drugs that are at issue in the focused
11  discovery in the New York Counties.  Is that your
12  handwriting down at the bottom of the page?
13     A.  No.
14     Q.  That's Ms. Bergin's handwriting?
15     A.  Correct.
16     Q.  But nonetheless you recognize Exhibit 5
17  to be the printout from the FULs system that's
18  kind of the basis for the manual review that CMS
19  would have done in terms of setting this FUL?
20     A.  Correct.
21     Q.  And if you'd turn back with me to page
22  5 of Exhibit 3, can we agree that the 0.2455

Page 443

1  that's written at the bottom of page 5 is
2  actually what becomes the FUL in November of 2001
3  for the 5-milligram strength for clonazepam?
4      A.  Correct.
5      Q.  And looking at Exhibit 3, what you see
6  is that that's set on the basis of a Blue Book
7  price? That's the B?
8      A.  Correct.
9      Q.  And on the package size of 100?
10     A.  Correct.
11     Q.  Turning back to Exhibit 5, and there's
12  Ms. Bergin's writing down at the bottom.  This
13  FUL appears to have been set on the basis of
14  Purepac's WAC?
15     A.  Correct.
16     Q.  And if you go up and look, Purepac's
17  WAC at this time as reported by Blue Book was
18  0.16370, correct?
19     A.  Correct.
20     Q.  And you see in this FULs printout from
21  CMS again that there were lower published prices
22  that CMS was considering when setting this FUL,

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                            Washington, DC

Page 444

1  correct?
2      A.   Correct.
3      Q.   For example, Teva Pharmaceuticals,
4  Inc., a few up from the bottom, has a lower
5  published price?
6      A.   Correct.
7      Q.   But there's a T over in the left-hand
8  column which we established earlier I think meant
9  that one was maybe temporarily unavailable?
10     A.   Correct.
11     Q.   But if you look up at Major
12  Pharmaceuticals, as an example, up at the top,
13  Major has a lower published price in both Red
14  Book and Blue Book, correct?
15     A.   Correct.
16     Q.   Do you know why CMS chose not to set a
17  FUL on the basis of that lower published price?
18     A.   I could give you my opinion.
19     Q.   Sure.
20     A.   That here again what I think they were
21  trying to do was since there's such a difference
22  between the .07 and then the next price of

Page 445

1  .16370, that we wanted to make sure that the FUL
2  price that's set is a reasonable price and that
3  we'll be assured the availability of the drug.
4  So we went up to the next lowest price.
5      Q.   And when you say reasonable, what do
6  you mean in that context?
7      A.   That we feel that the pharmacies will
8  be able to purchase this drug at the FUL price.
9      Q.   So in other words, you thought it was
10  reasonable to ignore a published price that was
11  maybe too low in CMS's view so that you
12  established a reasonable FUL, correct?
13     A.   Correct.
14     Q.   I think we can set Exhibit 5 to the
15  side.  We'll do another one that looks exactly
16  like it.  If the court reporter could mark as
17  Exhibit 6 for identification New York Counties
18  Defendants' Exhibit 6 for identification HHD 175-
19  2110.  And I do confirm that this one has a date.
20          (Exhibit NY Counties 006 was
21  marked for identification.)
22  BY MR. BUEKER:

Page 446

1      Q.   Ms. Gaston, you recognize Exhibit 6 to
2  be again a printout from the FULs system?
3      A.   Correct.
4      Q.   And Exhibit 6 is dated August of 2001,
5  correct?
6      A.   Correct.
7      Q.   And this is the printout that relates
8  to establishing a FUL in this case for the 1
9  milligram strength of lorazepam?
10     A.   Correct.
11     Q.   Which I'll represent to you is another
12  one of the nine drugs that are the subject of
13  focused discovery in the New York Counties case.
14  I take it that's not your handwriting down at the
15  bottom of Exhibit 6?
16     A.   Correct.
17     Q.   That's again, Ms. Bergin's handwriting?
18     A.   Yes.
19     Q.   But you are familiar with Exhibit 6 and
20  recognize it to be a printout from the FULs
21  system that would have been the basis on which
22  CMS began its manual review of this FUL?

Page 447

1      A.   Yes.
2      Q.   I want to ask you about some text
3  that's written in the middle of the page in bold
4  and it's preceded by a couple of stars.  It says
5  "FULs price not greater than another supplier."
6  Do you see that?
7      A.   Yes.
8      Q.   Is that text that the FULs system in
9  your experience would have put on a page like
10  this?
11     A.   Correct.
12     Q.   Explain to me what that means.
13     A.   I think it was checking on the
14  supplier.  It has to make sure there's at least
15  three suppliers.  And here again, I haven't dealt
16  with this for a while, so I need to refresh my
17  memory.
18     Q.   Well, let me see if we can get at it
19  this way.  Just above that text do you see a low
20  price?
21     A.   Correct.
22     Q.   And you see that it's .1999?

41 (Pages 444 to 447)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 448

1    A.  Correct.
2         MR. WINGET-HERNANDEZ:  Objection, form.
3    I apologize.  I withdraw that objection.  I just
4    was confused about what number you were looking
5    at.
6    BY MR. BUEKER:
7         Q.  Okay.  And you see there's a number
8    that's crossed out that's .2999 over in the left-
9    hand side just before the bolded text we were
10   talking about?
11        A.  Correct.
12        Q.  And that -- because it's cut off,
13   perhaps it would help to refer to Exhibit 5.  But
14   that's the FUL price that the FULs system
15   calculated, correct --
16        A.  Correct.
17        Q.  -- the crossed out number .2999?
18        A.  Correct.
19        Q.  And that FUL number that's calculated
20   by the system would have been based on this low
21   price of .1999, correct?
22        A.  Correct.

Page 449

1         Q.  And if you go up and look at the list
2    of published prices above, you would agree with
3    me that there's no published price that's below
4    that .2999 number, right?
5         A.  Correct.
6         Q.  Except the one price in which the FUL
7    was based?
8         A.  Yes.
9         Q.  Or I shouldn't say based.  Was
10   calculated by the system.
11        So does that help to refresh your
12   recollection that indeed this warning, "FULs
13   price not greater than another supplier," was
14   essentially an occasion that the FULs system had
15   detected that by basing a FUL on the lowest
16   published price the FUL was being set at below
17   the next published price?
18        A.  Correct.
19        Q.  Is that a warning -- you talked the
20   last time in your last deposition about certain
21   flags that the system had to tell you and your
22   colleagues that you needed to conduct a manual

Page 450

1    review.  Is this one of those flags?
2         A.  Yes.
3         Q.  And why was it important that the FULs
4    system cautioned you to look at or manually
5    review a FUL that was set in this manner?
6         A.  Because if we allowed the FUL to be set
7    at this price then it would be an availability
8    issue.
9         Q.  In other words, that if you allowed a
10   FUL to be set at this price based on this lowest
11   published price, then you'd have an availability
12   issue and that's a problem, it's not a reasonable
13   FUL?
14        A.  Correct.
15        Q.  And so that number is crossed out and a
16   different number is written in that's .5718,
17   right?
18        A.  For the FUL price.
19        Q.  For the FUL price.
20        A.  Correct.
21        Q.  And that appears to be based on from
22   the note on the bottom a United Research Labs or

Page 451

1    URL's WAC?
2         A.  Correct.
3         Q.  And URL's WAC was not the lowest
4    published price in this instance, right?  Because
5    we've seen for example Major Pharmaceuticals had
6    a lower published price?
7         A.  Well, I thought you meant excluding
8    that published price.
9         Q.  No.  I didn't mean that.
10        A.  Yeah.  Major's was the next lowest.
11   The next lowest was URL.
12        Q.  So what we see in Exhibit 6 is another
13   situation in which, exercising its discretion,
14   CMS chose to set a FUL not based on the lowest
15   published price but based on the next lowest
16   published price because that's what was
17   reasonable to do in terms of ensuring access,
18   correct?
19        A.  Correct.
20        Q.  And for the record, why is it that CMS
21   would have chosen to ignore the lowest published
22   price?

42  (Pages 448 to 451)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 452

1        MS. MARTINEZ: Objection, form.
2        A.  Because setting the FUL on the lowest
3    published price here might not allow us to have a
4    reasonable FUL price for this drug.
5        Q.  Okay.  Let me see if I can cure Ani's
6    objection.  Why would CMS have chosen to have
7    ignored the lowest published price in setting a
8    FUL for the 1 milligram lorazepam in 2001?
9        MS. MARTINEZ: Objection, form.  Just
10   to let you know, one of my objections is to you
11   were stating that CMS is ignoring the price, the
12   characterization of ignoring.
13       MR. BUEKER:  Okay.  Didn't use?  Is
14   that better?
15       MS. MARTINEZ: Did not use.  Yeah.
16       MR. BUEKER:  Okay.
17   BY MR. BUEKER:
18       Q.  Just for the record, why is it that CMS
19   chose not to use the lowest published price in
20   setting the FUL for lorazepam in 2001?
21       A.  Because we wanted to assure that the
22   FUL price was a reasonable price.  So we chose to

Page 453

1    ignore Major's lowest price.
2        Q.  I think we can set Exhibit 6 to the
3    side.  I warned you this was going to get
4    repetitive.  May I ask the court reporter to mark
5    as New York Counties Defendants' Exhibit 7 for
6    identification a one-page document that's labeled
7    HHD 175-0009 in the bottom right-hand corner.  I
8    was looking for one that's got the best date.
9        (Exhibit NY Counties 007 was
10   marked for identification.)
11   BY MR. BUEKER:
12       Q.  Ms. Gaston, do you have in front of you
13   what's been marked as Exhibit 7 for
14   identification?
15       A.  Yes.
16       Q.  And this is, again, a printout from the
17   CMS's FUL system and it's dated in the upper
18   left-hand corner 7/24/2001?
19       A.  Correct.
20       Q.  And this is the same kind of printout
21   we've been looking at in other examples; it's
22   just that this one is now for the 500 milligrams

Page 454

1    strength of cefadroxil?
2        A.  Correct.
3        Q.  And I'll represent cefadroxil is
4    another one of the drugs at issue in the New York
5    Counties case.
6        Is that your handwriting at the bottom
7    of Exhibit 7?
8        A.  No.
9        Q.  Whose handwriting is that is that?
10       A.  It's Cindy Bergin's.
11       Q.  But nevertheless, you're familiar with
12   the form of Exhibit 7; it's a printout from the
13   FULs system?
14       A.  Correct.
15       Q.  Can you read into the record what Ms.
16   Bergin wrote in her handwriting at the bottom of
17   the page?
18       A.  She said on 7/25 "The FUL was too low
19   at 1.2749, but when I raised it it became equal
20   to Major's AWP.  That means delete for now."
21       Q.  Can you help me understand what she was
22   doing here?

Page 455

1        A.  It appears that the FUL price the
2    system generated needed to be evaluated --
3        Q.  We've got another one of those notes,
4    right?  The FUL price not greater than another
5    supplier?
6        A.  Correct.  And so we needed to do some
7    manual review.  It looks like the low price that
8    it was based on --
9        Q.  It looks like Major?
10       A.  -- was Major.  And it seemed extremely
11   low.  Not extremely.  But it seemed much lower
12   than all the other published prices.
13       Q.  And so the next, as I understand it,
14   the next highest published price after Major's
15   was Zenith Labs?
16       A.  Correct.
17       Q.  And when you used a Zenith Labs price
18   as I understand it you got something -- you
19   multiplied that by 150 percent to calculate what
20   a FUL might be, you get a number that was
21   equivalent to Major's AWP?
22       A.  That's what it appears.

43 (Pages 452 to 455)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 456

1    Q.  And Ms. Bergin's note indicates that in
2  this instance CMS did not set a FUL because the
3  FUL price would have been equal to Major's AWP;
4  is that correct?
5    A.  Correct.
6    Q.  Are you familiar with making that kind
7  of a decision not to set a FUL when it was equal
8  to an AWP?
9    A.  Yes.
10    Q.  Why would CMS decline to set a FUL when
11  the FUL was equal to an AWP?
12    A.  Because states have other methodologies
13  they can use for reimbursement.  And their
14  regular reimbursement methodology would be a
15  percentage off of AWP.  That would be a
16  reasonable reimbursement rate for other drugs.
17  So the purpose of setting the FUL price is to try
18  to set reasonable reimbursement.  And that would
19  kind of counter what the states were doing with
20  their other reimbursement methodology.
21    Q.  I see.  So just like we talked about
22  there morning, one of the objectives of the FUL

Page 457

1  program is cost savings?
2    A.  Correct.
3    Q.  And so if you set a FUL that was equal
4  to an AWP it wouldn't really result in any cost
5  savings to the state?
6    A.  Correct.
7    Q.  And so in this case, if I understand
8  what's going on here with cefadroxil in 2001,
9  basing a FUL on the lowest published price seemed
10  to result in a FUL that was too low, right?
11    A.  It appeared that way because of the
12  compendia information that we have.
13    Q.  And setting a FUL -- not using that
14  lowest published price but moving up to the next
15  seemed to result in a FUL that was too high?
16    A.  Correct.
17    Q.  And so CMS declined to set a FUL given
18  the published prices that were out there?
19    A.  Correct.
20    Q.  Let me just digress here for a second.
21  What role if any did AWP play in setting FULs?
22    A.  Generally, it did not.

Page 458

1    Q.  Can you think of any instance in which
2  CMS based a FUL on the published AWP price?
3    A.  I can't think of a situation where they
4  did.
5    Q.  In other words, other than being used
6  to check whether there was going to be cost
7  savings that resulted, FUL was basically -- or --
8  I'm sorry -- AWP was basically irrelevant for the
9  FUL calculation?
10        MS. MARTINEZ:  Objection, form.
11        MR. WINGET-HERNANDEZ:  Objection, form.
12    A.  It was used in the methodology just for
13  consideration, but I don't know of any times when
14  it would have been used to set a FUL price.
15    Q.  So in terms of a basis of calculation,
16  the price on which the FUL was based, AWP was
17  irrelevant?
18        MR. WINGET-HERNANDEZ:  Objection, form.
19        MS. MARTINEZ:  Objection, form.
20    A.  We wouldn't have used AWP.
21    Q.  Why would CMS not have used AWP?
22    A.  Because we know that states will be

Page 459

1  reimbursing for drugs at a percentage off of AWP.
2  That's one of the methodologies they could use.
3  And we will let states reimburse according to
4  that methodology.  Setting a FUL using the AWP
5  wouldn't achieve the cost savings where if they
6  did it with their own methodology, a percentage
7  off of AWP, they would be achieving savings.
8    Q.  You can set that aside.  But don't
9  worry, I have others that look like it.
10    A.  I'm sure.
11    Q.  Can I ask the court reporter to mark as
12  Exhibit 8 -- New York Counties Defendants'
13  Exhibit 8 for identification a one-page document
14  labeled HHD 175-0276.
15        (Exhibit NY Counties 008 was
16  marked for identification.)
17  BY MR. BUEKER:
18    Q.  Ms. Gaston, you have in front of you
19  Exhibit 8?
20    A.  Yes.
21    Q.  And Exhibit 8, again, looks to be to
22  you a printout from the FULs system for 500-

44  (Pages 456 to 459)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                     March 19, 2008
                    Washington, DC

---

Page 460

1   milligram strength of cefadroxil?
2       A.  Correct.
3       Q.  And Exhibit 8 is dated in the top left-
4   hand corner 3/27/02?
5       A.  Correct.
6       Q.  What I want to do is focus on the
7   writing at the bottom of Exhibit 8.  Is that your
8   handwriting?
9       A.  No.
10      Q.  Again, it's Ms. Bergin's handwriting?
11      A.  Correct.
12      Q.  Let me ask specifically, the
13  handwriting kind of above the chart that looks
14  like pound sign or number sign "100 looks like
15  the most commonly used size," is that your
16  handwriting?
17      A.  No.  That's Cindy's.
18      Q.  You would agree with me that it looks
19  like what Ms. Bergin was trying to do here was
20  determine what the most commonly available
21  package size was, right?
22      A.  Correct.

---

Page 461

1       Q.  And down the left-hand column it looks
2   like a list of six states, correct?
3       A.  Correct.
4       Q.  And those are Florida, California, New
5   York, North Carolina, Idaho and Missouri?
6       A.  Correct.
7       Q.  How did -- is Exhibit 8 representative
8   of how CMS determined the most commonly available
9   package size?
10      A.  We didn't have to do this a lot.
11  Generally it was easily identifiable.
12      Q.  Okay.
13      A.  There were some situations where if the
14  100 was the most commonly used package size at
15  one time and it appears that something has
16  changed and it looks like the 50 might now be the
17  most commonly used package size, we would have to
18  do some research because we would want to use the
19  most commonly used package size.  And that's what
20  this research involved.  It didn't occur a lot.
21      Q.  How did CMS know to do this kind of
22  research to determine whether something was no

---

Page 462

1   longer the most commonly used package size?
2       A.  I can't remember.  But I do know that
3   there was something with the feedback that we had
4   from the FULs program, whether it was maybe there
5   wasn't a lot of compendia information.  I'm
6   really not sure.  But something alerted us to
7   that.
8       Q.  So -- I don't see anything on this
9   particular page that might alert it.  But you
10  think there was something along the lines of the
11  bolded FULs not lower than the published price
12  kind of thing that the FULs system spit out to
13  alert you to go look at the package size?
14      A.  I don't know if it was an alert
15  statement or it was just -- if there was FUL data
16  also printed out that helped us to be alerted to
17  that.
18      Q.  But this is a fairly short list
19  relative to the others in terms of the number of
20  manufacturers?
21      A.  Correct.
22      Q.  Is that the kind of thing that would

---

Page 463

1   have alerted you it go look at the package size?
2       A.  I really can't remember.
3       Q.  When CMS determined that it needed to
4   look at the package size, what did it do to
5   determine what the most commonly used package
6   size was?
7       A.  Are you saying what did we do?
8       Q.  Yeah.  What did you do.
9       A.  Okay.  It appears from the work in the
10  bottom of this page that we probably looked at
11  the utilization of each of these NDC numbers in
12  the state utilization data that CMS has.
13      Q.  Mm-hmm.  Do you yourself recall ever
14  searching for a most commonly available package
15  size?
16      A.  I recall doing it.
17      Q.  And did you do the analysis as is shown
18  here, meaning by going out and looking at the
19  state utilization?
20      A.  Yes.
21      Q.  And it looks like here that not all of
22  the states were used.  It looks like six states,

---

45 (Pages 460 to 463)

Gaston, Sue - Vol. II                    March 19, 2008
                    Washington, DC

Page 464

1  right?
2      A.  Correct.
3      Q.  Was that CMS's practice, to use a
4  subset of the states?
5      A.  It wasn't a practice.  It was just
6  using our judgment.
7      Q.  I see.  So there wasn't a commonly
8  established -- there wasn't a practice or a
9  policy on how to determine the most commonly
10  available package size; that was something that
11  was left to your discretion?
12     A.  Correct.
13     Q.  Okay.  And just so I get the bounds of
14  the discretion, the overall objective obviously
15  was to find the most commonly available package
16  size and utilization tended to be a pretty good
17  measure of that, right?
18     A.  Correct.
19     Q.  So whether it was looking at some
20  subset of the states or all the states,
21  utilization was generally what CMS looked at?
22     A.  In these types of situations, yes.

Page 465

1      Q.  Is that written down anywhere to your
2  knowledge?
3      A.  Not that I'm aware of.
4      Q.  So it's not in the regulation or a
5  manual or something that, you know, outsiders
6  would know?
7      A.  No.  We always reference the most
8  commonly used package size.
9      Q.  Right.  But how that most commonly used
10  package size is determined is something that's
11  less to CMS's discretion?
12     A.  Correct.
13     Q.  And there aren't to your knowledge
14  written guidelines about how to exercise that
15  discretion?
16     A.  Correct.
17        MR. WINGET-HERNANDEZ:  John, I know
18  it's quick.  It's right after lunch.  So as soon
19  as you can find a chance for a break, that would
20  be great.
21        MR. BUEKER:  Okay.  Give me a couple
22  more minutes to do this and we'll take a break.

Page 466

1        MR. WINGET-HERNANDEZ:  Sure.
2  BY MR. BUEKER:
3      Q.  Would it surprise you to learn that the
4  package sizing in which CMS actually wound up
5  basing the FUL in this time period was actually
6  the 100?  I'm sorry.  Was actually the 50.
7        MS. MARTINEZ:  Objection, form.
8      A.  I can't explain that.
9      Q.  Okay?
10        MR. BUEKER:  We'll take a break here.
11        THE VIDEOGRAPHER:  Off the record at
12  1:57.
13        (Recess.)
14        THE VIDEOGRAPHER:  On the record at
15  2:11.
16        (Exhibit NY Counties 009 was
17  marked for identification.)
18  BY MR. BUEKER:
19      Q.  Back on the record.  Let me place in
20  front of you, Ms. Gaston, what's been marked as
21  New York Counties Defendants' Exhibit 9 for
22  identification.  And before the break we were

Page 467

1  talking about cefadroxil and I asked you whether
2  or not it surprised you that in this time period
3  actually the FUL was set on the 50 package size
4  of cefadroxil?
5      A.  Mm-hmm.
6      Q.  I just wanted to show you that in fact
7  the cefadroxil was based on 50.  If you look with
8  me at Exhibit 9 for a minute.  Exhibit 9 for the
9  record again is a transmittal from CMS?
10     A.  Yes.
11     Q.  Okay.  And it's a transmittal in the
12  June 7th 2004 time period, correct?
13     A.  Correct.
14     Q.  And if you just turn to page do you see
15  the second entry down is for cefadroxil?
16     A.  Correct.
17     Q.  And the 50 over at the end of that
18  line, the 500-milligram base, is the package size
19  in which the FUL was set?
20     A.  Correct.
21     Q.  Right?  And of course that doesn't line
22  up with Exhibit 8 because Exhibit 8 is calculated

46 (Pages 464 to 467)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                March 19, 2008
                        Washington, DC

Page 468

1  on package sizes of 100?
2       MS. MARTINEZ: Objection, form.
3     A.  Actually, Exhibit 8 is calculated on
4  the package size of 50, the FUL that's
5  established here on the printout.  But the work
6  that was done on the bottom was evaluating the
7  different package sizes.
8     Q.  We'll try it this way.  Exhibit 3 -- do
9  you have Exhibit 3?
10    A.  Mm-hmm.
11    Q.  If you turn to page 4 of Exhibit 3, the
12  third entry up from the bottom, that's the same
13  cefadroxil we've been talking about?
14    A.  Correct.
15    Q.  And that FUL is set on the basis of a
16  package size of 50?
17    A.  Correct.
18    Q.  And so if you lay the two transmittals,
19  the 2004 transmittal and the January 2002
20  transmittal, next to one another as kind of book-
21  ends -- I'll represent to you I'm not aware of
22  another transmittal between -- throughout this

Page 469

1  time period the cefadroxil FUL was set on the
2  basis of the 50 package size, correct?
3     A.  Yes.
4     Q.  And turning back to Exhibit 8 it says -
5  - Ms. Bergin wrote "100 looks like the most
6  commonly used package size," right?
7     A.  Correct.
8     Q.  Presumably as a result of her analysis
9  here?
10    A.  Correct.
11    Q.  You don't know why she reached that
12  conclusion that the FUL was set on the 50 package
13  size?
14    A.  Right.  I don't know.
15    Q.  Okay.  We're done with cefadroxil.
16       MR. BUEKER:  Let's mark as Exhibit 10
17  for identification a four-page document that's
18  Bates labeled HHD 170-1050 through 1053.
19          (Exhibit NY Counties 010 was
20  marked for identification.)
21  BY MR. BUEKER:
22    Q.  Do you have Exhibit 10 in front of you?

Page 470

1     A.  Yes, I do.
2     Q.  Do you recognize Exhibit 10?
3     A.  Yes.
4     Q.  What do you recognize it to be?
5     A.  It's a screen shot of the FUL
6  application.
7     Q.  And it's for the drug albuterol 90-
8  microgram inhaler, correct?
9     A.  Correct.
10    Q.  And is that your handwriting down at
11  the bottom of page 1 of Exhibit 10?
12    A.  Yes.
13    Q.  And would you read into the record the
14  first bit of handwriting that begins "temp"?
15    A.  "Temp delete due to raw material
16  shortage."
17    Q.  So "MTL" is material?
18    A.  Correct.
19    Q.  And what does that mean?
20    A.  Apparently we must have done some
21  research on this and we were told that there is a
22  raw material shortage, so we would temporarily

Page 471

1  delete it from the FULs and look at it the next
2  time we would reevaluate.
3     Q.  Okay.  And then there are three lines
4  that say -- that begin "delete" and a check mark
5  over to the right down in the right-hand corner.
6  That's also your handwriting?
7     A.  Yes.
8     Q.  And what does that mean?  What do those
9  lines tell you?
10    A.  I'm assuming that it was -- here again,
11  it's been a while -- but that we delete this drug
12  product from the FUL list, delete it from --
13  there's a memo that goes out with updates.  So
14  apparently this must have been on there.  So
15  delete it from the memo.  And delete the NDC
16  probably from the application at this point.
17    Q.  Okay.  And those checkmarks indicate
18  that that was done, right?
19    A.  That's my understanding, yes.
20    Q.  So the FUL was removed in or about
21  October of 2000, correct?  If it helps you,
22  there's a date at the bottom of the screen print

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                              March 19, 2008
                        Washington, DC

Page 472

1   on each of the pages that says -- I guess you can
2   confirm -- October 24th 2000.
3       A.  I know when this was done.  But I don't
4   know the date to see when it was removed from the
5   FULs.  But this was put into the application at
6   that time.
7       Q.  So in or about October of 2000 you were
8   removing the FUL -- CMS removed the FUL for the
9   albuterol inhaler?
10      A.  Correct.
11      Q.  And the reason -- why did CMS remove
12  the FUL from the inhaler at this point?
13      A.  Because it looks like from the note
14  here that we found out that it was temporarily
15  deleted because we found out there was a raw
16  material shortage.
17      Q.  And why would that cause CMS to want to
18  remove the FUL for the albuterol inhaler?
19      A.  Because if the product is not available
20  then it wouldn't make sense to put a FUL price on
21  it.
22      Q.  And in removing the FUL CMS understood

Page 473

1   that, I assume, that states would start
2   reimbursing for the inhaler at a higher price?
3           MS. MARTINEZ:  Objection, form.
4       A.  Well, they would reimburse at their
5   state methodology.  They also can MAC it if they
6   want to, put it subject to their state MAC.  So
7   whatever that price is, they determine that.
8       Q.  But because of an access issue CMS
9   thought it was appropriate to remove the FUL at
10  this time?
11      A.  Correct.
12          MR. BUEKER:  Can I ask the court
13  reporter to mark a seven page document that's
14  Bates labeled at the bottom HHD 175-1065 through
15  1071 as Exhibit 11, New York Counties Defendants'
16  Exhibit 11 for identification, please?
17          (Exhibit NY Counties 011 was
18  marked for identification.)
19  BY MR. BUEKER:
20      Q.  Let me know when you're ready.
21      A.  (Reading.)  Okay.  I'm ready.
22      Q.  Okay.  You would agree with me,

Page 474

1   wouldn't you, that the first page of Exhibit 11
2   is a printout from the FULs system like we've
3   been looking at before -- like we've been looking
4   at in several of the other exhibits that have
5   been marked today?
6       A.  Correct.
7       Q.  And it's a printout from the FULs
8   system for the 90-microgram albuterol inhaler and
9   it's dated 8/17/2001?
10      A.  Correct.
11      Q.  And this again is the printout from the
12  FULs system that would have been the basis for
13  the manual review that would have followed with
14  regard to setting a FUL for the 90-microgram
15  inhaler, correct?
16      A.  Correct.
17      Q.  And is that your handwriting down at
18  the bottom of Exhibit 11?
19      A.  On the right-hand side.
20      Q.  Just so we're clear about what you mean
21  by the right-hand side, would you read into the
22  record that which you wrote?

Page 475

1       A.  "Work up new FUL based on" -- it looks
2   like "$7."
3       Q.  Okay.  And whose handwriting is on the
4   left-hand side of the page, if you know?
5       A.  Cindy Bergin's.
6       Q.  Okay.  And there's -- down at the
7   bottom there's -- it looks to me written "FDB
8   prices?  OIB prices?"  Do you see that?
9       A.  I see that.
10      Q.  And is that your handwriting?
11      A.  That's my handwriting.
12      Q.  And there's an X crossing that
13  handwriting out, correct?
14      A.  Correct.
15      Q.  Do you know what that means, "FDB
16  prices?  OIB prices?"?
17      A.  No, I don't.
18      Q.  Do you know why you wrote that?
19      A.  No.  Unless we were just trying to
20  check current prices.
21      Q.  Is that something that CMS did in
22  setting FULs, check current prices?

                              48  (Pages 472 to 475)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                March 19, 2008
                      Washington, DC

|  | Page 476 |
|---|---|

1     A.  In the compendia.
2     Q.  Did CMS ever check prices other than
3  prices that are listed in the compendia?
4     A.  Other than calling.  We would call the
5  wholesale -- you know, to verify, we would call
6  wholesalers or the manufacturers.
7     Q.  Can you turn with me to the fifth page
8  of Exhibit 11?  It's a page that has a Moore
9  Medical up in the top left-hand column and a
10  Bates number HHD 175-0169 in the lower right-hand
11  corner.
12     A.  I see it.
13     Q.  Do you know what Moore Medical Supply
14  is?
15     A.  No.  Just -- I mean, I've heard of
16  them, but I don't know specifically what they
17  are.  They purchase, I guess, drugs and supplies.
18     Q.  You say they purchase drugs and
19  supplies.
20     A.  I'm assuming.  I don't know.
21     Q.  Purchase drugs and supplies from whom?
22     A.  I don't know.

|  | Page 477 |
|---|---|

1     Q.  Are they a wholesaler or a place that a
2  provider could purchase drugs?
3     A.  I don't know.
4     Q.  Do you know what you meant when you
5  wrote "Work up new FUL based on $7"?
6     A.  No.
7     Q.  Was it your practice to -- I mean, do
8  you ever recall trying to establish a FUL based
9  on a target that you would come up with like
10  this?
11     A.  No.
12        MS. MARTINEZ:  Objection, form.
13     Q.  Do you recall trying to work up with
14  FUL in the $7 range for the albuterol inhaler?
15     A.  No.
16     Q.  Turn with me to the last page.  Do you
17  recognize the last page of Exhibit 11?
18     A.  No, I don't.  Except for the writing at
19  the top.
20     Q.  And what's the writing at the top?
21     A.  It says Texas Medicaid.  So this might
22  be their -- a copy of their MAC listing.

|  | Page 478 |
|---|---|

1     Q.  Well, the next line down, right, where
2  there are a bunch of circles are MAC -- some of
3  the column headings are MAC?
4     A.  Right.
5     Q.  Does that help you identify this as the
6  Texas MAC list?
7     A.  Because it says Texas at the top, it
8  could be.
9     Q.  And that's your handwriting, right?
10     A.  It could be.
11     Q.  Do you ever remember in establishing
12  FULs going out and looking at various states' MAC
13  lists?
14     A.  Sometimes we would for -- not for
15  establishing, but just for analysis and
16  verification.
17     Q.  What kind of analysis and verification
18  would you do using a state MAC list?
19     A.  Make sure to verify that the FUL price
20  that we establish is in the ballpark, that it
21  looks realistic.  Sometimes we don't have a lot
22  of feedback from the compendia.

|  | Page 479 |
|---|---|

1     Q.  Mm-hmm.
2     A.  So we want to make sure that if we're
3  setting it it's something that looks realistic
4  for states.
5     Q.  And to look realistic for states to use
6  the term kind of in the ballpark, what do you
7  mean?
8     A.  So that it's available; that a price
9  isn't something that the state couldn't reach.
10     Q.  So if I kind of follow the analysis you
11  might have done, you would have been looking to
12  see that the FUL price that you were setting was
13  either right at or slightly above where the state
14  MAC prices were; is that correct?
15     A.  Not necessarily.
16     Q.  Okay.
17     A.  It would just be used in the analysis.
18     Q.  I'm just trying -- let me ask the
19  question again.  How would the state MACs have
20  been used in the analysis?  Maybe I'm missing
21  something.
22     A.  The FUL prices are set on what we have

49 (Pages 476 to 479)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                           March 19, 2008
                    Washington, DC

Page 480

1  in the compendia source.
2     Q.  Mm-hmm.
3     A.  Sometimes the compendia source isn't
4  real easily to be read.  There's sometimes
5  availability problems.  So we set a price and we
6  still want to make sure that we're being
7  realistic with the price, that it's going to be a
8  price that states will be able to use in the FUL
9  program.  So sometimes we would check.  I know
10 Texas had it on their webpage.  I don't know if
11 other states did.  Once in a while we would check
12 to see that we were being reasonable in our
13 analysis using the compendia source.
14    Q.  And how would the state MAC list tell
15 you if you were being reasonable?
16    A.  Because generally, especially Texas,
17 they were pretty up to date with setting their
18 MACs, which helped us because sometimes a
19 compendia source isn't as current.  Because the
20 manufacturers don't submit the pricing it isn't
21 current, the updated pricing.  So it helps us to
22 validate that we are using current prices and

Page 481

1  that they aren't outdated.  So it was just
2  something that we could do a comparison and see
3  that our prices were a realistic price.
4     Q.  Okay.  And what comparison would you
5  have had to observe between, say, the Texas MAC
6  list and the FUL to conclude that the FUL that
7  CMS was setting was reasonable?
8     A.  You mean --
9     Q.  How would the two had to have compared
10 for you to --
11    A.  Well, if Texas was -- even if they were
12 a little lower than us, then we know that they
13 were -- if they were extremely lower than us then
14 we might have to do more research and check the
15 compendia sources to dig a little built deeper to
16 make sure that we had real prices from them.  Or
17 if they were extremely high we would do the same
18 thing and say, well, let's check and make sure
19 that we're using realistic prices for
20 establishing the FUL.
21    Q.  What if Texas was only a little bit
22 higher?  Would that have been a signal of any kind

Page 482

1  to you?
2     A.  No.  Then I think we would feel like
3  we're in the ballpark.
4     Q.  It would have been okay to you --
5  strike that.
6        It would have been okay to CMS for the
7  FUL to be slightly lower than a state MAC?
8     A.  It depends on the supporting data that
9  we have from the compendia sources too.  It's not
10 just using that MAC.  But we can't just depend on
11 one state either.  If we feel that we can support
12 the FUL price that we set by the compendia source
13 and that we've checked the compendia sources,
14 then that would be fine.
15    Q.  What were some of the other state MAC
16 programs besides Texas that you recall looking
17 at?
18    A.  Maybe New York.  I can't remember any
19 other states.
20    Q.  Wisconsin?
21    A.  I can't remember.
22    Q.  Turning back with me to the first page

Page 483

1  of Exhibit 11, do you see a P in the far left
2  hand column?  It seems to correspond with the
3  cross-outs?
4     A.  Correct.
5     Q.  Do you know what P meant?
6     A.  I think it was permanently removed.
7     Q.  Okay.  That's consistent with my
8  recollection.  I just wanted to confirm that we
9  were on the same page there.
10       Just so we understand kind of what's
11 going on in Exhibit 11, the low price down there
12 at the bottom, that's a .26470.  Do you see that?
13    A.  Yes.
14    Q.  And that would have been the price that
15 the FULs system used to calculate a FUL, right?
16    A.  Correct.
17    Q.  And that would have been a price that
18 you were manually reviewing to see if it was
19 reasonable?
20    A.  Correct.
21    Q.  And it looks like that was based on
22 Martec Pharmaceuticals, Inc.'s Red Book or -- I'm

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                              Washington, DC

Page 484

1  sorry -- Blue Book price, right?
2         MR. WINGET-HERNANDEZ:  Objection, form.
3     A.  Oh, yes.  It does.
4     Q.  And you know that because you're
5  looking at the bottom line on the list of prices
6  below and there's the B and then .26470, right?
7     A.  Correct.
8     Q.  If you go up kind of to the middle of
9  the page there's a circle with handwriting in it
10  that looks like .7935.  Do you see that?
11     A.  Correct.
12     Q.  Is that your handwriting?
13     A.  No.
14     Q.  Do you know whose handwriting that is?
15     A.  That's Cindy Bergin's.
16     Q.  Looking at the writing down at the
17  bottom there are four companies' names written
18  there in the lower left-hand side.  Do you see
19  that?
20     A.  Yes.
21     Q.  And then there's what looks to me to be
22  a price, multiplication sign, and then a number,

Page 485

1  17, right?
2     A.  Correct.
3     Q.  And 17, if you look at the top of
4  Exhibit 11, is the package size.
5     A.  Correct.
6     Q.  And it appears that what Ms. Bergin was
7  doing here was calculating the cost of a package
8  of this good based on the WAC price from above,
9  right?
10     A.  Correct.
11     Q.  Just take the first line as an example.
12  She calculates for the Schering Warrick product
13  that the cost of the package based on the WAC
14  would be $16.06, correct?
15     A.  Yes.
16     Q.  And would you turn with me back to the
17  fifth page of Exhibit 11?  This is the Moore
18  Medical page.
19     A.  Mm-hmm.
20     Q.  And would you state for the record what
21  it appears Moore Medical's selling price was for
22  the Warrick albuterol inhaler?

Page 486

1     A.  For the 17 gram?
2     Q.  17 gram, right.
3     A.  52940?
4     Q.  Yes.
5     A.  It says 8.65.
6     Q.  You understood in or about this time
7  period that WAC was a list price, right?
8         MS. MARTINEZ:  Objection, form.
9     Q.  You understood in or about the August
10  2001 time period that WAC was a list price that
11  didn't reflected all the discounts available in
12  the market, correct?
13         MS. MARTINEZ:  Objection, form.
14     A.  I just -- I understood that it was a
15  published price that we used for this purpose.
16     Q.  And did you have an understanding of
17  how that published price related to the prices
18  actually available in the marketplace for a
19  particular drug?
20     A.  I mean -- I don't understand.  Like --
21  what do you mean?
22     Q.  It looks to me here that Ms. Bergin was

Page 487

1  comparing a price based on the WAC to, you know,
2  this Moore Medical price and it looks like from
3  that one might have concluded that the actual
4  price at which you could buy the albuterol
5  inhaler was less than the price derived using the
6  WAC.  Would you agree with that?
7         MS. MARTINEZ:  Objection, form.
8     A.  It looks like it was used to -- I mean,
9  this was used as a comparison, yes.
10     Q.  And it looks like the comparison showed
11  that the prices available in the market were less
12  than the price derived using the WAC?
13         MS. ALBEE:  Objection.
14     A.  At least with this catalog, or whatever
15  Moore Medical is.
16     Q.  And from the Moore Medical price do you
17  draw any connection with the $7 target that you
18  seem to indicate ought to be the target for this
19  FUL?
20         MS. MARTINEZ:  Objection, form.
21     A.  No.  I mean, just what's worded here.
22  Maybe that's why that was written there.  I don't

                                    51 (Pages 484 to 487)

Gaston, Sue - Vol. II                                    March 19, 2008
                        Washington, DC

Page 488

1  remember.
2      Q.  Okay.  I guess to get back to the
3  questions about WAC, I guess I'm trying to
4  understand whether you had any understanding of
5  the relationship between the published WAC price
6  and the actual price that one might buy in the
7  marketplace in this 2001 time period.
8      A.  Well, I guess the WAC, we used the WAC
9  for consideration for establishing the FUL.  But
10 we know that we need to increase it by 150
11 percent so that the product is out there and
12 available.  So it's an assumption that the WAC is
13 a lower price.  It's not -- this is -- my
14 understanding from the compendia source, it's a
15 lower price that needs to be raised in order for
16 the product to be available for states.
17     Q.  And that's why -- CMS adds the 150
18 percent to ensure availability, right?
19     A.  Correct.
20     Q.  And so in establishing the FUL CMS
21 recognized that the product would be available in
22 the marketplace at a price less than the FUL it

Page 489

1  was establishing, correct?
2      A.  Say that again.
3          MR. BUEKER:  Can you actually read that
4  back?
5          (Whereupon, the requested portion
6  was read by the reporter.)
7          MR. WINGET-HERNANDEZ:  Objection, form.
8      A.  I wouldn't have known that unless it
9  was brought to my attention.
10 BY MR. BUEKER:
11     Q.  And was it ever brought to your
12 attention?
13     A.  When we get feedback from pharmacies
14 after the FUL price is set, we may have.
15     Q.  Would you recall one way or the another
16 ever receiving that feedback?
17     A.  I can't, because we received feedback
18 every time we published a FUL price or even
19 during the year you would get feedback.
20     Q.  What's your understanding of the term
21 WAC?
22     A.  It's wholesale acquisition cost.  It's

Page 490

1  a price that a manufacturer uses just like AWP or
2  direct price and they submit these prices to the
3  compendia.
4      Q.  Were you aware that there are certain
5  manufacturers that don't submit WAC prices, like
6  my client Warrick?
7          MR. WINGET-HERNANDEZ:  Objection, form.
8      A.  I would notice it on the printout.
9      Q.  But other than noticing it on the
10 printout, you have no independent knowledge --
11     A.  No.
12     Q.  -- of whether or not a particular
13 manufacturer submits a WAC price?
14     A.  No.
15         Can I ask you a question?  There is a
16 WAC price on here from Warrick.
17     Q.  Yeah.  That's because FDB created a WAC
18 despite our telling them not to publish a WAC.
19 If you look actually at Medi-Span or Red Book,
20 you'll see that there's no WAC for Warrick.
21 That's the zero.  That's what -- that's what it
22 should have been.

Page 491

1          MR. WINGET-HERNANDEZ:  Objection, form.
2          MS. MARTINEZ:  Objection, form.
3          MS. ALBEE:  And I ask that be stricken
4  from the record as now being evidence.
5          MR. BUEKER:  I ask the court reporter
6  to mark a three page document that's Bates
7  labeled HHD 175-0557 to 0559 as Exhibit 12 for
8  identification, please.
9          (Exhibit NY Counties 012 was
10 marked for identification.)
11         MR. BUEKER:  And let's -- if you don't
12 mind, before I get started with this exhibit, the
13 videographer has told me we need to change the
14 tape.  So let's do that.  So off the record.
15         THE VIDEOGRAPHER:  This is the end of
16 tape 3.  Off the record at 2:43.
17         (Discussion off the record.)
18         THE VIDEOGRAPHER:  This is the
19 beginning of tape 4 in the deposition of Ms.
20 Gaston.  On the record at 2:45.
21 BY MR. BUEKER:
22     Q.  You have now in front of you what's

52 (Pages 488 to 491)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 492

1   been marked, Ms. Gaston, as New York Counties
2   Defendants' Exhibit 12 for identification?
3       A.  Yes.
4       Q.  And Exhibit 12, at least the first page
5   of Exhibit 12, looks to be a printout from the
6   FULs system, correct?
7       A.  Correct.
8       Q.  And again, this is the printout from
9   the FULs system that would have been the
10  beginning for the manual review process that CMS
11  engaged in before establishing a FUL?
12      A.  Correct.
13      Q.  And the next two pages of Exhibit 12
14  for identification are e-mails like we looked at
15  earlier that were sent to the e-mail mailbox that
16  CMS established to get feedback on the 2000/2001
17  FUL list, correct?
18      A.  Correct.
19      Q.  And these are feedback as it relates to
20  the albuterol 90-microgram inhaler, correct?
21      A.  Correct.
22      Q.  And the first page of Exhibit 1, that's

Page 493

1   a FUL printout that also relates to the 90-
2   microgram inhaler?
3       A.  Correct.
4       Q.  And --
5           MS. MARTINEZ:  Mr. Bueker, are you
6   saying 90 or 9?
7           MR. BUEKER:  90 microgram.  It's .09
8   milligram.  90 microgram.
9           MS. MARTINEZ:  Okay.  Got it.
10  BY MR. BUEKER:
11      Q.  Can you identify the handwriting on the
12  first page of Exhibit 12?  Is any of that your
13  handwriting?
14      A.  Yes.
15      Q.  What's your handwriting?  What portions
16  of the handwriting on Exhibit 12 are yours?
17      A.  At the top it says "Note: NDC number
18  includes inhaler and refills."
19      Q.  Mm-hmm.
20      A.  Some of the little notes on the right
21  that say "call."
22      Q.  Mm-hmm.

Page 494

1       A.  It looks like it says "10/30, remove
2   FUL, greater than most AWPs."  And I think that's
3   it.
4       Q.  Okay.  When you say call, who were you
5   going to call?
6           MR. WINGET-HERNANDEZ:  Objection, form.
7       A.  We call the manufacturer, Warrick, as
8   indicated here, Martec, Glaxo, Schering.
9       Q.  And what was the purpose of calling the
10  manufacturer?
11      A.  To check on availability and to try to
12  verify, if we can, a WAC price.
13      Q.  Do you recall Schering or Warrick ever
14  confirming a WAC price for you?
15      A.  I would only know if there were
16  notations.  I can't remember.
17      Q.  And I think you said "Remove FUL
18  greater than most AWPs."  And I think that's
19  "SEG" under that; is that right?
20      A.  That's me, right.
21      Q.  And those are your initials?
22      A.  Yes.

Page 495

1       Q.  In other words, you were concluding
2   that the FUL ought to be removed here, right?
3       A.  That's what it appears.
4       Q.  Well, if we go look at a transmittal
5   37, Exhibit 3, which was the transmittal that
6   came out --
7           MS. MARTINEZ:  Transmittal 37 is
8   Exhibit 9.
9           MR. BUEKER:  No.  That's an updated
10  version.
11          MS. MARTINEZ:  Oh, I see.
12          MR. BUEKER:  That's June 2004.  Exhibit
13  3 is the original transmittal 37.  It's the one
14  that came out kind of right after this time
15  period.  Let me see if I can establish a timeline
16  here, Ani.
17  BY MR. BUEKER:
18      Q.  Exhibit 12, Ms. Gaston, up in the top
19  left- hand corner bears a date October 12th 2001,
20  correct?
21      A.  Correct.
22      Q.  And this is the evaluation -- Exhibit

Henderson Legal Services, Inc.
202-220-4158              www.hendersonlegalservices.com

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                        Washington, DC

Page 496

1   12 reflects the manual evaluation that was being
2   done in the October 2001 time period as to
3   whether or not to establish or reestablish a FUL
4   for -- or revise the FUL for the 90-microgram
5   albuterol inhaler?
6       A.  Correct.
7       Q.  And Exhibit 3 is the CMS transmittal
8   that comes out November 20th 2001, so shortly
9   after the analysis we see in Exhibit 12?
10      A.  Correct.
11      Q.  And if you flip to the second page,
12  page 2, of Exhibit 3 you'll see that there's no
13  FUL established for the 90-microgram albuterol
14  inhaler? There's other albuterol FULs but not for
15  the inhaler, correct?
16      A.  Correct.
17      Q.  Which is consistent with the note you
18  wrote in Exhibit 12, remove FUL greater than most
19  AWPs, correct?
20      A.  Correct.
21      Q.  So in other words, CMS didn't establish
22  or reestablish a FUL -- or revise the FUL for the

Page 497

1   90-microgram inhaler in this 2001 time period; it
2   actually removed the FUL?
3       A.  Correct.
4       Q.  And it did so despite the fact there
5   are shown on this sheet a series of
6   manufacturers' reported published prices, right?
7       A.  Correct.
8       Q.  There's a published price for Warrick,
9   there's a published price for Schering, Martec,
10  Zenith and Glaxo-Wellcome, among others?
11      A.  I think Schering is discontinued.
12      Q.  Oh, I'm sorry.  You're right.  But the
13  note at the bottom -- Ms. Bergin's note at the
14  bottom would indicate that there were at least
15  reported published prices for Warrick, Martec and
16  Zenith?
17      A.  Correct.
18      Q.  In other words, there were three
19  manufacturers who were reported published prices
20  for the 90-microgram inhaler?
21      A.  Correct.
22      Q.  And so in other words the conditions

Page 498

1   necessary for CMS to establish a FUL were met at
2   this time?
3          MS. MARTINEZ:  Objection, form.
4       A.  The conditions were met, but the
5   pricing condition wasn't met.
6       Q.  What pricing condition was that?
7       A.  It was that if you would take the
8   prices that are remaining and multiply by 150
9   percent you're going to have a price that's, it
10  looks like, over what the AWPs are.  So you're
11  sort of defeating the purpose of the FUL program.
12      Q.  Which was, again, soft savings?
13      A.  Soft savings to the states.  The states
14  can set their own reimbursement level at that
15  point.
16      Q.  So as we've kind of seen throughout,
17  CMS is trying to establish a FUL that's not too
18  low and not too high to achieve a cost savings,
19  but also not set it too low to create an access
20  issue; that's the balance CMS is trying to
21  strike?
22      A.  Correct.

Page 499

1       Q.  And you did that -- the balance was
2   struck, sometimes the computer program worked as
3   it was supposed to and that balance was struck by
4   the computer program, but other times it was the
5   result of manual intervention?
6       A.  Correct.
7       Q.  And the manual intervention resulted in
8   CMS making a choice in its discretion, correct?
9       A.  Correct.
10         MR. BUEKER:  Anyone keeping track of
11  how many drugs we've covered?
12         MS. MARTINEZ:  No.
13         MR. BUEKER:  Well, we're going to do
14  another one.  Can I ask the court reporter to
15  mark as Exhibit 13 for identification a five page
16  document that's Bates labeled HHD 175-1073 to
17  1077.
18         (Exhibit NY Counties 013 was
19  marked for identification.)
20  BY MR. BUEKER:
21      Q.  Not a rush, but just let me know when
22  you're ready.

54  (Pages 496 to 499)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                        March 19, 2008
                    Washington, DC

Page 500

1    A.  I'm ready.
2    Q.  Ms. Gaston, you can identify page --
3  the first page of Exhibit 13 as a printout from
4  the FULs system, correct?
5    A.  Correct.
6    Q.  And is any of the handwriting on the
7  first page of the Exhibit 13 yours?
8    A.  Yes.
9    Q.  What handwriting is yours?
10   A.  It says "call - yes; inactive; call -
11 yes." And there's a little notation here.  I
12 think it says "available, Alpharma."
13   Q.  Okay.
14   A.  And the rest is Cindy Bergin's.
15   Q.  And the calls again were calls made to
16 the manufacturers to determine availability?
17   A.  Correct.
18   Q.  And as I understand the handwriting
19 down at the bottom of the page, both next to the
20 FUL price and in the very lower left-hand corner,
21 a new FUL of .1450 was established for in this
22 case the .083 albuterol solution, right?

Page 501

1    A.  Correct.
2    Q.  And if we go look at, if you still have
3  it in front of you, page 2 of Exhibit 3, the
4  transmittal 37, you'll see there you have the FUL
5  -- the .1450 FUL for that .083 solution?
6    A.  Correct.
7    Q.  And it has a B -- in transmittal 37 you
8  see there's a B next to the FUL for that .083
9  solution, correct?
10   A.  Correct.
11   Q.  And means it's based on a Blue Book
12 price?
13   A.  Correct.
14   Q.  And looking back at Exhibit 13 you see
15 that it's actually Alpharma's Blue Book WAC that
16 sets the FUL?
17   A.  Correct.
18   Q.  Just so we identify the rest of the
19 pages of Exhibit 13, the second and third and
20 fourth pages are, again, e-mails to CMS's e-mail
21 mailbox that was created for purposes of
22 receiving feedback on the 2001/2001 FUL list,

Page 502

1  correct?
2    A.  Correct.
3    Q.  And then the last page is a printout --
4  it looks like from a website ipcrx.com.  Do you
5  know what that is?
6    A.  No, I don't.
7    Q.  Just so I understand how the FUL was
8  mechanically set here, it looks like initially
9  the computer program picked up the Major
10 Pharmaceuticals price, the .12520 price, and
11 calculated a FUL on that basis, right?
12   A.  Correct.
13   Q.  And originally -- the Alpharma price is
14 actually lower than that price.  But originally
15 the computer program hadn't picked that up
16 because there was an indication in the computer
17 program that the Alpharma product was temporarily
18 unavailable?
19   A.  Correct.
20   Q.  But your handwritten note, "available,
21 Alpharma," indicates to you that indeed you
22 called Alpharma and learned that the product was

Page 503

1  in fact available?
2    A.  It appears that way, yes.
3    Q.  And -- well, you wouldn't have set a
4  FUL on the basis of an unavailable product,
5  right?
6    A.  Correct.
7    Q.  And this FUL is set on the basis of
8  Alpharma's published price?
9    A.  Correct.
10   Q.  So we can assume that you learned that
11 Alpharma's product was available and that became
12 the basis for setting the FUL?
13   A.  Yes.
14   Q.  Now, I want to ask you if you can read,
15 because I'm not sure I can read it entirely, Ms.
16 Bergin's handwritten note in the lower right-hand
17 corner that begins 11/8.  Can you read her
18 writing?
19   A.  I'll try.  "We only show one WAC less
20 than the new FUL price.  But IPREP" -- whatever
21 that says.
22   Q.  IPCRX.

55 (Pages 500 to 503)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                      March 19, 2008
Washington, DC

Page 504

1    A.  "But ipcrx.com" --
2    Q.  Is that "shows"?
3    A.  I can't read it.  "Two prices."
4  Something.
5    Q.  Less than?
6    A.  I can't read.  "Two prices."  Maybe
7  it's "less than."  You're doing better than me.
8  What's the next one?
9    Q.  That's why I'm asking.  I don't know.
10    A.  Yeah.  And then it sounds like
11  "McKesson."
12    Q.  And what's McKesson?
13    A.  I think McKesson is another company,
14  like a catalog company.  "Shows three."
15    Q.  Is McKesson one of the national drug
16  wholesalers?
17    A.  Yeah.  I think so.  I can't remember,
18  but I think they are.
19    Q.  It's one of the big three national drug
20  wholesalers.
21    A.  Okay.
22        "Shows three.  We're going to leave it

Page 505

1  as is for now.  See attached."
2    Q.  And the last word is "documentation"?
3    A.  Yeah.
4    Q.  So now that we've struggled through
5  that, as I understand it, this is a situation
6  where we see that warning that the system put on,
7  right, "FUL prices not greater than another
8  supplier"?
9    A.  Correct.
10    Q.  And that warning was on there when it
11  was being calculated on the basis of Major's
12  price, right?
13    A.  Correct.
14    Q.  And in the end CMS sets the FUL based
15  on an even lower price, correct?
16    A.  Correct.
17    Q.  And so this is a situation in which the
18  FUL is being set at a price lower than the next
19  greatest supplier, which I think we talked about
20  earlier was a flag or a concern in terms of
21  availability, right?
22    A.  Correct.

Page 506

1    Q.  And so as I understand Ms. Bergin's
2  note, what she's done is gone out to a national
3  wholesaler in this IPCRX and found out that they
4  at least are reporting price availability at a
5  price less than the FUL, correct?
6    A.  That's what it appears, yes.
7    Q.  Do you recall yourself doing that kind
8  of an analysis when you had a situation where the
9  FUL was being set at a price lower than the next
10  greatest published price?
11    A.  Not many times, but I think once in a
12  while.  And mostly just to help us with your
13  analysis and to validate the fact that -- here
14  again, in this situation the prices that were
15  actually going to be used, the system thought
16  they should be temporarily excluded.  So in this
17  situation we call, but we also want to validate
18  the fact that the prices are actually out there
19  and the product is actually out there.
20        So there have been situations, not that
21  often, because usually we don't have to go that
22  far --

Page 507

1    Q.  Mm-hmm.
2    A.  -- for that type of research.
3    Q.  But in those instances where you did
4  have to go that far and validate it, how did you
5  do that?  You went to like wholesalers or places
6  where you could actually acquire the drug?
7    A.  Just someplace where we could validate
8  a WAC price.
9    Q.  Sometimes it might be a state MAC list;
10  sometimes it might be McKesson, but --
11    A.  Correct.  Just to help with the
12  analysis.
13    Q.  Right.  And I don't mean to suggest
14  that you then -- that CMS turns around and bases
15  a FUL on what it learns from McKesson or
16  whatever.  But you don't recall instances in
17  which to confirm the FUL price you were setting
18  was reasonable you did go and look at kind of
19  other prices that were available in the
20  marketplace?
21    A.  Right.  But for me it was rare.  Cindy
22  might have done it a few more times than me, but

56 (Pages 504 to 507)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                         March 19, 2008
                    Washington, DC

Page 508

1  -- she was learning.  I was teaching.  So --
2      Q.  And when you say rare, was it five or
3  ten times?
4      A.  I couldn't put a number on it.  Just on
5  an as-needed basis.  Generally I wouldn't need to
6  do that.
7      Q.  Because you were confident based on
8  what you were seeing in the published prices?
9      A.  Or calling.
10     Q.  Or calling?
11     A.  Yeah.
12         MR. BUEKER:  Ani, would you mind if we
13 took a short break here?
14         MS. MARTINEZ:  No.  That would be good.
15 Let's go off the record.
16         THE VIDEOGRAPHER:  Off the record at
17 3:05.
18         (Recess.)
19         (Exhibit NY Counties 014 was
20 marked for identification.)
21         THE VIDEOGRAPHER:  On the record at
22 3:23.

Page 509

1  BY MR. BUEKER:
2      Q.  Now I want to shift gears a little bit
3  and place before you, Ms. Gaston, what's been
4  marked as New York Counties Defendants' Exhibit
5  14 for identification.  Do you recognize this to
6  be an addendum to the state plan manual, a
7  transmittal from CMS?
8      A.  Correct.
9      Q.  And you see midway down the first page
10 that there's an effective date of this CMS
11 transmittal of October 1, 1997?
12     A.  Correct.
13     Q.  And I just want to ask you to turn to
14 what is actually the third page of Exhibit 14,
15 and it's got a page number 6 down at the bottom,
16 and just state for the record, if you would, what
17 the FUL was effective October 1, 1997 for the
18 .083 percent base inhalation solution in the
19 albuterol sulfate?
20     A.  .083?
21     Q.  Yup.
22     A.  .1990.

Page 510

1      Q.  Okay.  And that's based on a Blue Book
2  price, right?
3      A.  Correct.
4      Q.  Now, I don't have one of your helpful
5  FUL system printouts from this time period, so
6  I've got to kind of back into this.  But if you
7  wanted to know the price on which the FUL was
8  based you'd essentially divide the number .1990
9  by 1.5, correct?
10     A.  Yes.
11     Q.  I'm going to hand you a calculator.
12 Would you do that for me?
13     A.  (Witness uses calculator.)  Okay.
14     Q.  And what number did you get?
15     A.  .006666.  Or did I do it wrong?
16     Q.  Maybe we could try that again.  .1990
17 divided by 1.5.
18     A.  (Witness uses calculator.) .132666.
19     Q.  So rounded off to the further decimal
20 point -- in other words, the price that the FUL
21 would have been based on was a price of .1327,
22 correct?

Page 511

1      A.  It appears that way, yes.
2      Q.  That's more than -- it's a matter of
3  mathematics, right?
4      A.  Yes.  Right.
5      Q.  Okay.  Now, I don't have, as I say,
6  helpful FULs printouts.  So let me ask the court
7  reporter to mark this as Exhibit 15.
8          (Exhibit NY Counties 015 was
9  marked for identification.)
10 BY MR. BUEKER:
11     Q.  I'm placing before you what's been
12 marked by the -- or the court reporter has placed
13 before you what's been marked as Exhibit 15 for
14 identification, which I'll represent to you is
15 the second page of the list of all of the
16 available prices as of June 1997 and the first
17 page kind of collects those in a way that's
18 readable.
19         So taking my representation as true, if
20 it is accurate that this is all the published
21 prices, can you identify the manufacturer whose
22 published price was .1327?

                              57 (Pages 508 to 511)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                        March 19, 2008
                    Washington, DC

Page 512

1       MR. WINGET-HERNANDEZ:  Excuse me.
2  Before you answer, are you representing, Counsel,
3  that this is a document that you yourself created
4  for this purpose?
5       MR. BUEKER:  Yes.
6       MR. WINGET-HERNANDEZ:  Thank you.
7    A.  The pricing is from the compendias?
8  Because you show the compendia sources.  So you
9  obtained these from the --
10   Q.  From the compendia.
11   A.  Okay.  And this is --
12   Q.  I'm sorry?
13   A.  This is this information blown up?
14   Q.  Condensed.  If you start with the
15  second page you see each of the three compendia,
16  FDB, Red Book and Medi-Span.  And those are all
17  of the published prices.  What I did to put
18  together the first page so we could all read it
19  is extract the lowest published price from each
20  of the compendia.
21   A.  Okay.
22       Okay.  It appears that the .1327 is

Page 513

1  Qualitest.  It's the first one.
2    Q.  Okay.  To assure that you're awash in
3  paper, I'll ask the court reporter to mark a
4  document that bears at the top the title
5  "Approved drug products with therapeutic
6  equivalence evaluations," 17th edition, and down
7  at the bottom U.S. Department of Health and Human
8  Services, as Exhibit 16 for identification,
9  please.
10       (Exhibit NY Counties 016 was
11  marked for identification.)
12  BY MR. BUEKER:
13   Q.  Do you recognize Exhibit 16, Ms.
14  Gaston, to be an excerpt from the FDA's Orange
15  Book?
16   A.  Yes.
17   Q.  And just for the record, what is the
18  Orange Book?
19   A.  The Orange Book is the FDA data that we
20  use for establishing the FULs.
21   Q.  In other words, that's how you
22  determine which drugs are therapeutically

Page 514

1  equivalent?
2    A.  Correct.
3    Q.  And we talked earlier today about the
4  fact or this morning about the fact that it's an
5  A rating in the Orange Book that deems something
6  to be therapeutically equivalent, correct?
7    A.  Correct.
8    Q.  And so if you turn with me to the third
9  page of Exhibit 16 you'll see the ratings for the
10  .083 albuterol solution on the left-hand side.
11  Do you see those?
12   A.  Yes.
13   Q.  And do you see listed there anywhere an
14  A-rated product for Qualitest?
15   A.  No.
16   Q.  If you would keep that in front of you,
17  I would, though, like to ask the court reporter
18  to mark a document that's entitled "Approved drug
19  products with therapeutic equivalence
20  evaluations," 18th edition, down at the bottom
21  U.S. Department of Health and Human Services, as
22  Exhibit 17 for identification, please.

Page 515

1       (Exhibit NY Counties 017 was
2  marked for identification.)
3  BY MR. BUEKER:
4    Q.  Ms. Gaston, you recognize Exhibit 17 to
5  be the 1998 version of the FDA's Orange Book, or
6  an extract from the 1998 version of the FDA's
7  Orange Book, correct?
8    A.  Correct.
9    Q.  And Exhibit 17 -- I'm sorry.  So the
10  record is clear, I've misspoken.
11       Exhibit 17 is the 1998 Orange Book and
12  Exhibit 16 is the 1997 Orange Book, correct?
13   A.  Correct.
14   Q.  And if you look in Exhibit 17, the 1998
15  version, the A-rated .083 solution products
16  appear on the second page; is that right?
17   A.  Correct.
18   Q.  And do you see Qualitest listed there?
19   A.  No.
20   Q.  The manufacturers you do see listed in
21  Exhibit 17 are Alpharma, Copley Pharma, Dey,
22  Nephron, Schering and Glaxo-Wellcome that all

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                    March 19, 2008
                Washington, DC

Page 516

1  have A-rated versions of the .083 solution,
2  correct?
3     A.  Correct.
4     Q.  And in the '97 version, Exhibit 16, you
5  see that the A-rated versions in FDA's assessment
6  of the .083 solution are Alpharma, Copley Pharma,
7  Dey, Schering and Glaxo-Wellcome, so the same
8  list of manufacturers, correct?
9     A.  Correct.
10    Q.  And taking as true my representation
11  that Exhibit 15 contains all of the published
12  prices, it can't be that Alpharma, Copley or Dey
13  or Schering or Glaxo set the FUL in June of 1997,
14  because their published prices were higher than
15  the price that was used to set the FUL, correct?
16       MR. WINGET-HERNANDEZ:  Objection, form.
17    A.  I'd have to look at each one of their
18  prices.
19    Q.  Okay.  We could do that.
20    A.  I mean, but we pointed out that
21  Qualitest is the lowest.
22    Q.  Right.

Page 517

1     A.  Go ahead.
2     Q.  Maybe I can short circuit it.  Does it
3  surprise you that you don't see the Qualitest in
4  the Orange Book?
5     A.  No.
6       MR. WINGET-HERNANDEZ:  Objection, form.
7     Q.  Why not?
8     A.  Because the compendia gives us their
9  manufacturers.  They could be wholesalers,
10  repackagers.  So --
11    Q.  Go ahead.  I'm sorry.
12    A.  So the compendia source is giving us
13  ones that sell the drugs.
14    Q.  I see.  So even though something might
15  not be A-rated in the Orange Book, if that
16  manufacturer or you said repackager or wholesaler
17  is listed in the compendia, that price can be
18  used to set the FUL?
19    A.  Yes.
20    Q.  Ah.
21    A.  Also, these companies may purchase and
22  very likely they purchase these A-rated drugs.

Page 518

1     Q.  I see.  So -- and that would be the
2  idea of repackaging, right?
3     A.  Correct.  Or a wholesaler.
4     Q.  A wholesaler.  So somebody who's listed
5  in one of the pricing compendia, manufacturers
6  listed in one of the pricing compendia, might not
7  have an A-rated version of the drug in the Orange
8  Book, but that manufacturer, that repackager's
9  price, still could be the basis for the FUL?
10    A.  Correct.
11    Q.  Okay.  Are you familiar with the FDB
12  rating ZA?  A ZA rating?
13    A.  First Databank's?
14    Q.  Yeah.
15    A.  No.
16    Q.  Okay.  In any event, it's your
17  testimony that the price in which the FUL was
18  based isn't necessarily the price for one of the
19  manufacturers who's actually listed in the Orange
20  Book?
21    A.  Correct.
22    Q.  We can set that bit of paper to the

Page 519

1  side.  And just so I'm clear, because this really
2  is helpful to me, the FUL can be based on any of
3  the published prices listed in any of the pricing
4  compendia regardless of the rating of the drug in
5  Orange Book?
6     A.  Correct.
7     Q.  I'm just trying to make sure --
8     A.  I'm just trying to think it out.
9     Q.  Yeah.  I'm just trying to make sure we
10  get it right.  So in other words, if a
11  manufacturer publishes a price for the .083
12  solution, that price is eligible to be considered
13  the basis for the FUL?
14    A.  Yes.
15    Q.  We'll do one more printout.  Can we
16  mark this as Exhibit 18, please?
17       (Exhibit NY Counties 018 was
18  marked for identification.)
19  BY MR. BUEKER:
20    Q.  Exhibit 18, Ms. Gaston, at least the
21  first page -- let's say the first page of Exhibit
22  18 -- is one of the federal upper limit system

59  (Pages 516 to 519)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 520

1  printouts that we've been looking at kind of
2  throughout the day, right?
3      A.  Correct.
4      Q.  And this one is dated up in the top
5  left-hand corner 2/15/2005, which is actually
6  after you had left your position in the policy
7  area at CMS?
8      A.  Correct.
9      Q.  Okay.  So you haven't seen Exhibit 18
10 before?
11     A.  No.
12     Q.  But you are familiar with the form of
13 Exhibit 18; it's a printout from the FUL system?
14     A.  Correct.
15     Q.  And can you identify the handwriting on
16 Exhibit 18?
17     A.  No, I can't.
18     Q.  That's not Ms. Bergin's handwriting?
19     A.  No.  I'm not a hundred percent sure.  I
20 don't think it is.
21     Q.  Can you read into the record what's
22 written on the right-hand side that begins "three

Page 521

1  can"?
2      A.  It says "Three can have three suppliers
3  as long as the A drives the FUL.  The other two B
4  can still serve as suppliers."
5      Q.  Okay.  And it looks like up above on
6  the right-hand side next to each of the three,
7  there are three manufacturers shown in Exhibit
8  18?
9      A.  Correct.
10     Q.  And it looks like there's a BN or an AB
11 rating -- those are Orange Book ratings?
12     A.  Correct.
13     Q.  -- written next to each of the
14 manufacturers?
15     A.  Correct.
16     Q.  And it looks like in this case the
17 Warrick and Schering albuterol inhalers are B-
18 rated and the Ivax inhaler is B-rated, correct?
19     A.  Correct.
20     Q.  And this is an instance in which CMS
21 set a FUL despite the fact that there was only
22 one A-rated product, correct?

Page 522

1      A.  I can't say that, because I don't know
2  what the Orange Book reflects.
3      Q.  I'm sorry.  I don't know -- what do you
4  mean?
5      A.  I mean, I don't know if the Orange Book
6  -- when the system pulls down the information
7  from the Orange Book, did it show more than the
8  information here?
9      Q.  Well, I think, if we turn -- maybe we
10 can answer your question.  If we turn to the next
11 several pages of Exhibit 18.
12     A.  Okay.
13     Q.  Do you recognize that to be the online
14 version of the FDA's Orange Book?  Right?
15     A.  I've never seen it like this.
16     Q.  Oh, okay.
17     A.  If this is the Orange Book, it looks
18 like there's more than -- this is the .09?
19     Q.  Yup.
20     A.  You're showing one, two, three, four A-
21 rated.  Five A-rated.
22     Q.  Oh, okay.

Page 523

1      A.  And one B-rated.
2      Q.  Even though the CMS system is only
3  picking up --
4      A.  Yeah.  And I don't understand -- unless
5  -- here again, these are the manufacturers.  They
6  might not -- I don't know.  Maybe they're not
7  selling it or giving the pricing to the
8  compendia.  Because they're not showing up.  So
9  maybe these guys are selling it for them.  I
10 don't know.
11     Q.  Okay.  But this is after your time, so
12 --
13     A.  Correct.  And I'm just addressing the
14 basic criteria.
15     Q.  All right.  We'll set Exhibit 18 to the
16 side.  Well, before I do, could a B-rated drug --
17 let's assume the ratings here are accurate.
18 Could Warrick or Schering, which are B-rated
19 drugs, actually have been the basis for the FUL -
20 - published prices be the basis for the FUL?
21     A.  I can speak to when I was doing the
22 FUL.

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                March 19, 2008
                        Washington, DC

Page 524

1    Q.  Yeah.
2        MR. WINGET-HERNANDEZ:  Objection, form.
3    A.  And as long as there were -- I can't
4  remember exactly.  I think it was as long as
5  there were three A-rated you could include the B-
6  rated drugs.
7    Q.  And if you included the B-rated drugs
8  then the B-rated drugs could be the basis for the
9  FUL?
10       MR. WINGET-HERNANDEZ:  Objection, form.
11   A.  From what I remember, yes.
12       MR. WINGET-HERNANDEZ:  In the interests
13  of time, John, are you interested -- I mean, I'd
14  like to offer you the basis of my objection so
15  that you can cure it.
16       MR. BUEKER:  Sure.
17       MR. WINGET-HERNANDEZ:  I think when you
18  use the term basis in that context that it's not
19  clear, that it's vague and that it would be much
20  clearer and preferable if you would use a term
21  like formed the price that the FUL was calculated
22  on or something like that.  Because it's clear --

Page 525

1  it seems based on the testimony that basis -- I
2  mean, they're basing the --
3        MR. BUEKER:  Okay.  I get your
4  objection.  Let me see if I can cure it.  I can't
5  promise to be able to do that.
6        MR. WINGET-HERNANDEZ:  Sure.
7  BY MR. BUEKER:
8    Q.  In your experience, setting a FUL from
9  1991 to 2003, it's your testimony that the
10  published price for a drug that was B-rated, that
11  published price could still be the basis for the
12  FUL that CMS set?
13   A.  From what I remember, yes.
14   Q.  I understand from your testimony back
15  in January that in addition to your job
16  responsibilities in terms of setting FULs you
17  also had some responsibilities for the Medicaid
18  rebate program?
19   A.  Correct.
20   Q.  For the record, what is the Medicaid
21  rebate program?
22   A.  The Medicaid rebate program was enacted

Page 526

1  in '90.  It began in '91.  It's a program that if
2  drug manufacturers wish to participate they sign
3  a rebate agreement with CMS.  And what will occur
4  is that the states will provide the
5  manufacturers' drugs to their Medicaid population
6  and in return the drug manufacturers pay rebate
7  dollars to the states and the federal government
8  gets their share.  That's kind of the short
9  version.
10   Q.  No.  It's a good version.  As I
11  understand it, for a manufacturer's drugs to be
12  reimbursable by Medicaid they had to sign a
13  rebate agreement, right?
14   A.  Correct.
15   Q.  And agree to pay rebates to the states?
16   A.  Correct.
17   Q.  And what were your responsibilities
18  when it came to the Medicaid rebate program?
19   A.  Any policy-related issues that would
20  come up pertaining to the rebate program.
21   Q.  Can you give me an example?
22   A.  Answering questions to explain the

Page 527

1  program.  Interpreting -- we didn't have a
2  regulation.  So trying to interpret parts of the
3  program, interpret the statute for states or for
4  drug manufacturers.
5    Q.  Did you have any administrative
6  responsibilities when it came to the Medicare
7  rebate program?
8    A.  What type of administrative
9  responsibilities?
10   Q.  Well, for example, I understand that
11  under the Medicaid rebate program manufacturers
12  had to submit AMPs and best price?  That's how
13  the rebate got calculated, right.
14   A.  Correct.
15   Q.  Did you have any responsibility for
16  collecting the AMP and best price information?
17   A.  No.  That's another staff that takes
18  care of that.
19   Q.  What staff takes care of that?
20   A.  They're called the operations staff.
21  Actually, they're in a separate group, in a
22  separate division within CMSO.

61 (Pages 524 to 527)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                   March 19, 2008
                        Washington, DC

---

Page 528

1    Q.   Would you have had access to that AMP
2  information?
3    A.   Yes.
4    Q.   Did you ever use that AMP information
5  in setting FULs?
6    A.   No.
7    Q.   Did you ever use that AMP information
8  in terms of evaluating and the approval of state
9  Medicaid plans?
10   A.   State Medicaid plans are for the
11 states.  So we really wouldn't use AMPs.
12   Q.   Well, as I understand it, one of your
13 responsibilities -- one of your other
14 responsibilities was approving state Medicaid
15 plans, right?
16   A.   Correct.
17   Q.   And to get approval, one of the things
18 a state had to demonstrate was the reasonableness
19 of its reimbursement rates?
20   A.   Correct.  Their methodology.
21   Q.   Their methodology.
22   A.   Correct.

---

Page 529

1    Q.   And I guess what I'm wondering is in
2  examining the reasonableness of the methodology,
3  the reasonableness of the reimbursement rates the
4  state was proposing to pay, if you ever looked at
5  AMP information.
6    A.   No.
7    Q.   Switching back to putting your FUL hat
8  back on, what if anything did CMS do to monitor
9  when drugs were coming off patents and therefore
10 going generic?
11   A.   Well, when I was doing the FUL program
12 basically I just waited to get notification if
13 somebody would let me know.  I really didn't do
14 anything proactively, because I just didn't have
15 the capability of doing it or the time.
16   Q.   Is it different today?  Do you know?
17   A.   I don't know.
18   Q.   And who typically will let you know
19 that something came off patent and therefore went
20 generic?
21   A.   Industry folks.  I can't say
22 specifically.  But sometimes pharmacies might

---

Page 530

1  have an idea.  So they would call and let us know
2  if something was occurring.
3    Q.   So how was it that you determined when
4  it was time to update or set a new FUL?
5    A.   It's been a while.  But from what I
6  remember, we were on a schedule.  I can't
7  remember if it was once a year.  And then
8  periodically we would update the FULs list with
9  memos.  And then we would come out and produce a
10 whole new FUL list.  I think we tried to do it
11 once a year.  I can't remember the schedule after
12 that.  I think we got to a point where it was on
13 an as-needed basis.
14   Q.   Okay.  So let me try and unpack that a
15 little bit, because it seems like there were a
16 couple of things going on.  It sounds like on
17 some periodic basis, and you think maybe
18 annually, CMS tried to update the entire FUL
19 list?
20   A.   Correct.  And that was probably earlier
21 in the program, like earlier when I was there.
22   Q.   So not towards the 2003 end of time,

---

Page 531

1  but rather towards the 1991 time period?
2    A.   Correct.  From what I remember.
3    Q.   Okay.  And from what you remember in
4  the interim between those kind of full -- excuse
5  the pun -- updates to the FUL list, there were
6  memos or smaller updates?
7    A.   Correct.
8    Q.   And those smaller updates obviously
9  didn't update the entire list; just particular
10 FULs?
11   A.   Correct.
12   Q.   As to those smaller interim -- can I
13 call them interim updates?
14   A.   Yes.
15   Q.   As to those smaller interim updates,
16 how would you decide which FULs got updated then?
17   A.   We would get current compendia
18 information.  Sometimes we would just do further
19 research when we received e-mails or calls about
20 certain drugs.
21   Q.   So there was no systematic way of doing
22 it; it was as you learned information that you

---

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                           March 19, 2008
                      Washington, DC

Page 532

1   thought was appropriate to incorporate into the
2   process of setting FULs you incorporated that
3   information?
4       A.   For the updates, yes.
5       Q.   And then annually or some other period
6   of time, at least you began annually at the
7   beginning, there were these systematic updates of
8   the entire list?
9       A.   Correct.
10      Q.   Separate and apart from that, what
11  triggered the decision to actually add a new drug
12  to the list?
13      A.   Most of the time it came out on a new
14  run that we would do.  So if we're looking at
15  updating the whole entire FUL list, that's when
16  the new drugs would show up.
17      Q.   Let me see if I understand.  So the FUL
18  system -- when you do the update of the entire
19  list, the FUL system would go back to Orange Book
20  and identify all the drugs that were eligible and
21  also pull in the published prices.  So at that
22  time if a drug had gone generic and was now --

Page 533

1   met the minimum criteria, it would get pulled in
2   and you would at least get one of the printouts
3   we've been looking at like Exhibit 18?
4       A.   Correct.
5       Q.   And then you begin a manual review
6   process at that point to decide whether or not to
7   set a FUL?
8       A.   If it was necessary.  It might have
9   enough information we wouldn't have to do a
10  manual review.
11      Q.   Okay.  And there may also have been
12  other instances in which you got the information
13  and decided even though the drug met the minimum
14  criteria in the regulation, for some other reason
15  it wouldn't result in a cost savings or the FUL
16  that would be derived on the basis of the
17  published prices would be too low, you might
18  decide not to set a FUL at that point even though
19  it was eligible?
20      A.   Yes, if there was a reason not to set
21  it.
22      Q.   Okay.  It sounds like in terms of

Page 534

1   setting brand-new FULs at the very least they
2   would have been picked up as a part of the
3   complete or the entire update process?
4       A.   Correct.
5       Q.   And at that point, just like with any
6   of the other FULs, CMS would have made a
7   determination as to whether it made sense to add
8   a FUL, whether it was reasonable to add a FUL at
9   that time?
10      A.   Correct.
11      Q.   Can you remember instances in which a
12  drug was new, came on -- a new drug was
13  identified as a result of the annual update
14  process and CMS decided not to set a FUL?
15      A.   I can't remember that.
16      Q.   You can't remember specific examples?
17      A.   Correct.
18      Q.   But don't doubt that it happened?
19      A.   It could have happened.
20          MS. MARTINEZ:  Objection, form.
21      Q.   Is there anything else other than
22  having the annual update or receiving information

Page 535

1   from industry sources that would have caused CMS
2   in your time period, '91 and 2003, to update the
3   FUL list?
4       A.   That's all I can think of.
5          MR. BUEKER:  Okay.  Well, that's all I
6   have.
7          THE WITNESS:  Okay.
8          MR. BUEKER:  I appreciate your time.
9          THE WITNESS:  You're welcome.
10         MR. BUEKER:  I think some of the others
11  here may still have questions.
12         THE VIDEOGRAPHER:  This is the end of
13  tape 4.  Off the record at 355.
14             (Recess.)
15         THE VIDEOGRAPHER:  This is the
16  beginning of tape 5 in the deposition of Ms.
17  Gaston.  On the record at 3:57.
18
19             EXAMINATION BY COUNSEL FOR DEY,
20  INC., DEY, L.P. AND MYLAN
21  BY MS. REID:
22      Q.   Good afternoon.  My name again is Sarah

Gaston, Sue - Vol. II                                    March 19, 2008
                            Washington, DC

Page 536

1   Reid and I am with Kelley Drye representing the
2   Dey, Inc., Dey L.P. and Dey L.P., Inc. defendants
3   in the case that the United States has brought
4   against my clients.  And if I refer to them here
5   as Dey, can we have an understanding that that's
6   the entities that I'm referring to?
7       A.  Yes.
8       Q.  I don't have very many questions.  My
9   first question is have you ever seen the
10  complaint that the government has brought against
11  the Dey defendants?
12      A.  I saw the information that Leslie sent
13  me by e-mail.  Is it different than the Abbott --
14      Q.  Yes.
15      A.  Okay.  I don't remember seeing that.
16      Q.  Okay.  And have you ever had any
17  discussions with anybody from the Dey companies
18  concerning any of the allegations in -- you know,
19  about the litigation or contained in the
20  complaint?
21      A.  No.
22      Q.  Do you recall having had any

Page 537

1   conversations with people from Dey in the period
2   from 1991 to 2003 which we've been talking about
3   today?
4       A.  I can't recall.  The possibility is
5   there because we called manufacturers at times to
6   verify pricing or availability.
7       Q.  Right.  But you have no specific
8   recollection of talking to anyone from Dey at
9   this point in time?
10      A.  No.
11      Q.  And are you aware where Dey is located?
12      A.  No.
13      Q.  Let me just turn to marking Dey Exhibit
14  136.
15          (Exhibit Dey 136 was marked for
16  identification.)
17          MS. REID:  And if we can I'd like to
18  mark this one with the yellow stickers.
19  BY MS. REID:
20      Q.  Ms. Gaston, do you recognize Dey
21  Exhibit 136 as an excerpt from the 2000 Orange
22  Book?

Page 538

1       A.  Yes.
2       Q.  And I'd like to direct your attention
3   to two entries.  The first sticky, which is I
4   believe the page which has Chromelin sodium
5   inhalation solution on it, do you see that?
6       A.  Yes.
7       Q.  And for the record, the bottom of that
8   particular page has what looks to be the number
9   NO -- oh, no.  Ignore that.  It's 3-94.
10          MR. WINGET-HERNANDEZ:  I'm sorry.  What
11  page, Sarah?
12          MS. REID:  3-94.
13          MR. WINGET-HERNANDEZ:  Thank you.
14  BY MS. REID:
15      Q.  And directing your attention to that,
16  do you see that there are five manufacturers
17  listed under the Chromelin sodium solution
18  inhalation drug?
19      A.  And this is under the 10-milligram --
20      Q.  Yes.
21      A.  -- slash ML?
22      Q.  Yes.

Page 539

1       A.  Correct.  There's five.
2       Q.  And are there five A codes next to
3   those five manufacturers?
4       A.  Correct.
5       Q.  Would it be correct to say that the
6   coding means that these five drug products were
7   considered therapeutic equivalents according to
8   the FDA?
9       A.  Yes.
10      Q.  And from this listing does it appear
11  that Chromelin sodium qualified to be considered
12  for inclusion on the FUL list as of 2000?
13          MR. WINGET-HERNANDEZ:  Objection, form.
14      A.  Based on the FDA data.
15      Q.  To your knowledge, do you know whether
16  a FUL was ever established for this Chromelin
17  sodium product?
18      A.  I don't know.
19      Q.  And then if we could turn to the next
20  yellow sticky and look at ipratropium bromide on
21  the right side under the solution inhalation.
22      A.  Yes.

64  (Pages 536 to 539)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                           March 19, 2008
                    Washington, DC

Page 540

1    Q.  And do you see there that there are
2  three manufacturer names listed under the
3  inhalation solution?
4    A.  Yes.
5    Q.  And that there are three A codes next
6  to those three manufacturers' names?
7    A.  Yes.
8    Q.  Is it therefore correct to say that
9  this coding also means that these three drug
10 products were considered therapeutic equivalents?
11   A.  Yes.
12   Q.  And is it correct to say that there are
13 three suppliers which have been listed for this
14 particular drug?
15   A.  I don't know about the suppliers.
16   Q.  Manufacturers.  Excuse me.
17   A.  Okay.  That's okay.  Yes, three
18 manufacturers.
19   Q.  And therefore does it appear that
20 ipratropium bromide inhalation solution was
21 qualified to be on the FUL list or to be
22 considered for inclusion on the FUL list as of

Page 541

1  2000?
2        MR. WINGET-HERNANDEZ:  Objection, form.
3    A.  Just based on the FDA data, yes.
4    Q.  Do you have any recollection of
5  actually working on looking at whether to create
6  a FUL for either ipratropium bromide or Chromelin
7  sodium during the time that you were working in
8  your position as FUL supervisor?
9    A.  No.  I don't remember that.
10   Q.  Let me mark as --
11   A.  Can I just correct?  I wasn't a
12 supervisor.  So I was just an analyst.  Make a
13 correction.  Yes.  Just an analyst.
14   Q.  Okay.
15   A.  Health insurance specialist.
16   Q.  Health insurance specialist and
17 analyst.
18       Let me mark as Dey Exhibit 137 a
19 document which bears Bates numbers HHC 0160123
20 through 0125.
21       (Exhibit Dey 137 was marked for
22 identification.)

Page 542

1  BY MS. REID:
2    Q.  Ms. Gaston, can you identify what has
3  been marked as Dey Exhibit 137?  What is it?
4    A.  That appears to be a memo to the state
5  Medicaid agencies.  And it has some FUL changes
6  through transmittal number 37.
7    Q.  And can I direct your attention to the
8  final page of the document and the last entry?
9  And can you explain what is being added to the
10 FUL list in the final entry?
11   A.  Ipratropium bromide, .02 percent
12 solution for inhalation, 2.500 ml, 25s.
13   Q.  And the price that is listed there is
14 based on the Blue Book; is that correct?
15   A.  Yes.
16   Q.  And to your knowledge is this the first
17 time that this particular -- excuse me.  We'll
18 withdraw that.
19       To your knowledge, is this the first
20 time that ipratropium bromide .02 percent
21 solution for inhalation was added to the FUL
22 list?

Page 543

1        MR. WINGET-HERNANDEZ:  Objection, form.
2    A.  I don't know.
3    Q.  If we could just quickly look at a
4  document --
5    A.  I'd like to clarify this memo, too.
6    Q.  Yes.
7    A.  This is -- this looks like it's from
8  the San Francisco regional office.  So this is
9  something that the regional office sends out to
10 the -- some of the states notifying them of these
11 changes.  So this wasn't initially from CMS
12 headquarters, central office.
13   Q.  But is there any reason to believe that
14 the San Francisco regional office is sending out
15 incorrect information?
16   A.  Oh, no.  They obtained this information
17 from CMS central office.
18   Q.  Oh, I see.  And then in turn generated
19 their own memo and sent it out?
20   A.  Correct.
21   Q.  If we could just quickly look at an
22 exhibit that you've already seen, which is Abbott

65  (Pages 540 to 543)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                         March 19, 2008
                     Washington, DC

Page 544

1    108, which is the omission of drugs from the
2    federal upper limit list.  Do you have it?
3        A.  Yes.
4        Q.  First of all, are you familiar having
5    seen that particular report from the Office of
6    Inspector General which is titled "Omission of
7    drugs from the federal upper limit list in 2001"?
8        A.  I was aware of this report.  I don't
9    know if I read it, because this was published
10   after I worked on the FULs.
11       Q.  Did you have any input into drafting
12   the comments from CMS which are attached at the
13   end of the report?
14       A.  I do not remember having any feedback
15   to the comments.
16       Q.  I only have a very limited question.
17   Let me direct your attention to page 7 of the
18   report.  And I'm directing your attention both to
19   footnote 2 and also to the paragraph under the
20   chart.  If you could just read those.
21       A.  Footnote 2?
22       Q.  Yeah.  To yourself.

Page 545

1        A.  Okay. (Reading.) Okay.
2        Q.  Does that refresh your recollection
3    that the first time ipratropium bromide solution
4    was added to the federal upper limit list was
5    indeed on August 24th 2003?
6        A.  I can't remember.  I can only take what
7    the report says.
8        Q.  And do you have any reason to believe
9    that the report is incorrect in this regard?
10       A.  I can't speak for the report.
11           MS. REID:  I have no further questions.
12           THE VIDEOGRAPHER:  Off the record at
13   4:11.
14           (Recess.)
15           THE VIDEOGRAPHER:  On the record at
16   4:12.
17
18           EXAMINATION BY COUNSEL FOR ROXANE
19   LABORATORIES AND BOEHRINGER INGELHEIM
20   BY MR. HECK:
21       Q.  Good afternoon, Ms. Gaston.  My name is
22   Jared Heck and I'm with a firm called Kirkland &

Page 546

1    Ellis and I represent a series of companies, one
2    of which is called Roxane Laboratories
3    Incorporated and the other companies are
4    affiliated with a company called Boehringer
5    Ingelheim Corporation.  And one of them is named
6    Boehringer Ingelheim Pharmaceuticals, Inc.  For
7    the purpose of my question I'm going to refer to
8    them as the Roxane defendants.  Is that okay?
9        A.  That's fine.
10       Q.  Have you ever had any communications
11   with any of these companies that I just
12   mentioned?
13       A.  I may have.
14       Q.  But sitting here today you don't recall
15   any specific communications with any of these
16   companies?
17       A.  Correct.
18       Q.  So if I understand correctly, you don't
19   have any personal knowledge about how the Roxane
20   defendants priced their drugs; is that correct?
21       A.  Correct.
22       Q.  And you don't have any personal

Page 547

1    knowledge about how the Roxane defendants
2    marketed their drugs; is that right?
3        A.  Correct.
4        Q.  And you don't have any personal
5    knowledge about how the Roxane defendants may or
6    may not have reported AWPs or WACs to third party
7    compendia like First Databank; is that right?
8        A.  Correct.
9        Q.  Are you aware that the federal
10   government has filed a federal qui tam action
11   against Roxane Laboratories?
12           MS. MARTINEZ:  Objection, form.
13       A.  I know that they're included in with
14   the Abbott, but that's all that I know.
15       Q.  Have you ever seen a complaint by the
16   government specifically against the Roxane
17   defendants?
18       A.  No.
19       Q.  And if I understand correctly, you were
20   never consulted for the facts contained in that
21   complaint; is that correct?
22       A.  No.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 548

1        MS. MARTINEZ: Objection, form.
2        THE REPORTER:  You asked "never" and
3   she said "no."  You might want to --
4        Q.  If I understand correctly, you were not
5   consulted for the complaint, for the facts that
6   were contained in that complaint; is that
7   correct?
8        A.  Correct.
9        MR. HECK:  I think that's all for
10  questions, but we would just generally reserve
11  our right to redepose Ms. Gaston in conjunction
12  with the Roxane case.  That's all I have.
13  Thanks.
14       THE VIDEOGRAPHER:  Off the record at
15  4:14.
16       (Recess.)
17       THE VIDEOGRAPHER:  On the record at
18  4:32.
19
20       EXAMINATION BY COUNSEL FOR AVENTIS
21  PHARMACEUTICALS
22  BY MR. KOON:

Page 549

1        Q.  Ms. Gaston, my name is Michael Koon.
2   I'm probably the 415th lawyer that's talked with
3   you today.  I represent Aventis Pharmaceuticals.
4   I'd like to focus on a period of time in your
5   career at CMS that John spoke a little bit about,
6   particularly that's the point from 1991 to about
7   2001.  And I want to focus on some of the
8   questions that he began asking you about your
9   responsibilities with regard to the Medicaid
10  rebate statute.  Are you with me so far?
11       A.  Yes.
12       Q.  Okay.  The Medicaid rebate statute I
13  think you would agree with me marked a fairly
14  significant change in CMS's responsibilities with
15  the pharmaceutical industry?
16       A.  Correct.
17       Q.  A lot more reporting by the
18  pharmaceutical companies by the states,
19  interaction with the agency in different parts of
20  pharmaceutical company operations?
21       A.  Correct.
22       Q.  Did you during 1991 to 2001 time

Page 550

1   period, did you ever have final regulations with
2   regard to the calculation of payment of rebates?
3        A.  No.
4        Q.  Those were all tentative or proposed
5   regulations?
6        A.  I guess you could call them proposed,
7   but they never actually were made formal.
8        Q.  How did you all get trained in how to
9   advise the industry with regard to their Medicaid
10  rebate reporting obligations?
11       A.  Just on-the-job training.  Larry Reed,
12  he was the branch chief or division director, as
13  the time changed.  And just learned among staff.
14  Just educated ourselves or went to meetings, you
15  know, learned that way.
16       Q.  Let me focus on interactions that you
17  might have had with either pharmaceutical
18  companies or the people representing
19  pharmaceutical companies.  Would they call you
20  with questions about obligations that the
21  companies had on Medicaid rebate reporting
22  obligations?

Page 551

1        A.  Yes.
2        Q.  Was that a daily occurrence in the '91
3   to, say, '95 time period?
4        A.  I can't say daily.  I can't put a time
5   limit on it.
6        Q.  Okay.  What responsibilities did you
7   have with regard to advising industry about
8   Medicaid rebate obligations during that time
9   period?
10       MS. MARTINEZ:  Objection, form.
11       A.  When I started with the program I was
12  training.  So generally when I would get phone
13  calls most of the time I would be given phone
14  calls by Larry Reed and then I would return the
15  phone calls and then go back to him to find out
16  what the person said to me and then try to
17  interpret his answer to go back to them.  It was
18  a trial by error.  But it was a lot of that type
19  of exchange until I became more familiar and
20  could return phone calls on my own, still
21  conferring whenever I needed to with Larry or
22  other staff.

67 (Pages 548 to 551)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                        Washington, DC

Page 552

1    Q.  Okay.  Was there a time when there was
2  a hotline set up at CMS where either people
3  representing the industry or the industry
4  themselves could call in and leave messages and
5  somebody would get back to them?
6    A.  The operations staff, the ones that ran
7  the data side of the program, they had a hotline.
8    Q.  Okay.  But this was not something that
9  policy did?
10   A.  No.
11   Q.  Would there be times when operations
12  would refer questions to policy that they
13  couldn't answer?
14   A.  Yes.
15   Q.  And when I say that, again, I'm
16  confining it to the Medicaid rebate obligations.
17  Would you get questions from operations about
18  questions that they had gotten from industry
19  about rebate obligations?
20   A.  Policy related rebate obligations.
21   Q.  And if you can do so, what sort of
22  questions would operations refer to policy with

Page 553

1  regard to rebate obligations?
2    A.  If they were policy related, if they
3  needed to understand the statute.  I guess
4  generally speaking if they were not data related,
5  that they would go to policy.
6    Q.  So questions about, you know, is this
7  class of trade to be included in AMP, that would
8  be a policy question, not a data question
9  probably, right?
10   A.  Correct.
11   Q.  And so if they couldn't answer that in
12  operations they'd refer it to your group?
13   A.  Correct.
14   Q.  Do you recall a time when the
15  operations hotline was discontinued?
16   A.  I don't know it happened, but I
17  know that it was discontinued.
18   Q.  And do you recall the -- at least --
19  let me rephrase that.
20      At the time they discontinued the
21  hotline did they then release information about
22  how to reach policy directly if they had

Page 554

1  questions about rebate obligations?
2    A.  I don't know.
3       (Exhibit Aventis 001 was marked
4  for identification.)
5  BY MR. KOON:
6    Q.  Let me show you what we've previously
7  marked for identification purposes as Aventis
8  Exhibit Number 1.  Take a look at that, if you
9  would.  And you're welcome to read the whole
10  thing if you want.  I'm most interested in the
11  first page.
12   A.  Thank you.  (Reading).
13   Q.  Have you taken a look at that?
14   A.  Yes.  You're just interested in the
15  first --
16   Q.  I'm interested in really the first
17  paragraph of the first page.
18   A.  Okay.
19   Q.  The document carries a date of August
20  16th 1995 and announces effective immediately the
21  drug rebate hotline is no longer operational.  Do
22  you see that?

Page 555

1    A.  Yes, I do.
2    Q.  Does that refresh your recollection
3  about when that hotline might have been shut down
4  by CMS?
5    A.  I don't remember what it was, but
6  because of the release that refreshes the memory.
7  I would assume that that's when it was shut down.
8    Q.  That first paragraph refers to
9  attachment A.  And it says "Attachment A lists
10  the members of the Medicaid rebate staff, their
11  general areas of responsibilities and their new
12  telephone numbers.  Please feel free to contact a
13  staff member with any questions you may have."
14       (Exhibit Aventis 002 was marked
15  for identification.)
16  BY MR. KOON:
17   Q.  And let me show you now what we've
18  marked previously as Aventis Exhibit Number 2 for
19  identification.  And I'll represent to you that I
20  think that's the attachment A that is referred to
21  in what we've marked previous as Exhibit number
22  1.

68  (Pages 552 to 555)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                     Washington, DC

Page 556

1      A.  Yes.
2      Q.  Does your name appear on that?
3      A.  Yes.
4      Q.  And what areas of responsibilities are
5   identified as being within your area of
6   expertise?
7      A.  "Coverage/policy issues, dispute
8   resolution, VHCA/formulary regulations, federal
9   upper limits."
10     Q.  And that first heading, coverage and --
11  what was it, policy?
12     A.  Policy issues.
13     Q.  Could you describe generally what that
14  would be with regard to rebate obligations that
15  manufacturers might have?
16     A.  Questions on Medicaid coverage, if a
17  drug is covered or not under the Medicaid
18  program, policy issues such as what we discussed,
19  helping to interpret the statute or the rebate
20  agreement.
21     Q.  And the next heading under your name?
22     A.  Dispute resolution.

Page 557

1      Q.  Is that as between manufacturers and
2   states for utilization issues?
3      A.  Correct.  Yes.
4      Q.  Was that your direct telephone line
5   that's listed there?
6      A.  Yes.
7      Q.  Did you have an increase in calls
8   directly from industry after release 18 came out?
9      A.  I can't remember.
10     Q.  But as I understand it, because Exhibit
11  1 says it went to all plating drug manufacturers,
12  essentially every drug manufacturer in America
13  had your phone number?
14     A.  The technical contacts for all the drug
15  manufacturers participating in the program.
16     Q.  Okay.  Do you recall a fellow by the
17  name of Mike Keough?
18     A.  Yes.
19     Q.  How were his responsibilities as they
20  related to manufacturer obligations under the
21  Medicaid rebate statute different than yours, if
22  they were?

Page 558

1      A.  I came on with the rebate program more
2   in a trainee position.  I was a lower grade.
3   Mike came on at a higher grade.  I think he had a
4   little more responsibilities.  And he worked in
5   different areas of the rebate program.
6      Q.  Can you be any more specific?
7      A.  He worked more on maybe pricing issues.
8   The example you gave earlier about something
9   being included in the pricing.
10     Q.  Included in AMP or BP?
11     A.  Best price rate.  Dispute resolutions,
12  he was the lead for dispute resolution.
13     Q.  So he -- at least in the early years he
14  have would have been more senior than you but
15  would have had some of the same responsibilities?
16     A.  Correct.
17     Q.  Do you recall when he left CMS?
18     A.  He retired about four years ago.
19     Q.  Have you spoken with him since he left
20  the government?
21     A.  Yes.
22     Q.  Have you had good relations with him?

Page 559

1      A.  Yes.
2      Q.  There's been some discussion about
3   repackagers earlier in your testimony.  Can you
4   just for the benefit of the jury describe what a
5   repackager is for purposes of classification
6   under the Medicaid rebate statutes?
7      A.  Repackagers are companies that will
8   repackage and relabel a drug product under their
9   own NDC.  And for that purpose we consider them a
10  manufacturer for drug rebate purposes.
11     Q.  The NDC is national drug code?
12     A.  Correct.
13     Q.  And a manufacturer who is a repackager
14  or relabeller, they would have to have their own
15  NDC for their product, correct?
16     A.  Correct.
17     Q.  Because they're responsible for
18  reporting to CMS any sales of that product for
19  rebate purposes, right?
20     A.  Correct.
21     Q.  And that's an eleven digit NDC number,
22  right?

69  (Pages 556 to 559)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                          Washington, DC

Page 560

1      A.  Correct.
2      Q.  And so whether you're buying someone
3  else's product and repackaging it or buying
4  someone else's package and relabeling it, if
5  you're using your NDC number you are responsible
6  for recording those sales to CMS?
7      A.  Correct.
8      Q.  Do you recall ever responding to
9  questions from manufacturers about the inclusion
10  or the exclusion of repackagers or relabellers
11  from rebate reporting requirements?
12      A.  I don't remember specifically, but I
13  know I have.
14      Q.  Do you recall testifying in your -- I
15  think the first day of your deposition, having
16  gone up to Boston and appearing in front of the
17  grand jury?
18      A.  Yes.
19      Q.  I think you appeared twice?
20      A.  Yes.
21      Q.  And both times, as I understand it,
22  related to the U.S. Attorney's Office there and

Page 561

1  their investigation into repackagers or
2  relabellers, right?
3      A.  Yes.
4      Q.  Did you ever meet with any
5  representative of industry in connection with the
6  repackager or relabeller investigation out of
7  Boston?
8      A.  No.
9      Q.  Did you ever -- were you ever
10  interviewed by anyone in connection with that
11  investigation?  I'm not talking about your grand
12  jury testimony now.
13      A.  Like the AG's office in Boston.  But
14  you're not talking about that, right?
15      Q.  I'm not talking about your grand jury
16  testimony.
17      A.  Oh, okay.
18      Q.  Did you go for an interview before
19  then?
20      A.  When you say interview -- I'm confused.
21  You're confusing me.
22      Q.  All right.  A meeting other than your

Page 562

1  grand jury testimony.
2      A.  A meeting in general?
3      Q.  Right.
4      A.  Concerning repackaging?
5      Q.  Repackaging or relabelling and the
6  investigation of repackagers or relabellers by
7  the Boston U.S. Attorney's Office.
8      A.  Pertaining to that?
9      Q.  Yes, ma'am.
10      A.  Not that I know of.  Not that I
11  remember.
12      Q.  Were you subpoenaed to go to the grand
13  jury?  Do you know?
14      A.  Yes.
15      Q.  And you don't recall being interviewed
16  by Susan Winkler prior to going to the grand
17  jury?
18      A.  Yes.  She was the AG's office.  When
19  you asked me that question -- okay.
20      Q.  That's the confusion we had?
21      A.  Yes.
22      Q.  Was anyone else in the room when Susan

Page 563

1  interviewed you?
2      A.  Yes.
3      Q.  Do you recall who else was there?
4      A.  Mary Salhus.  That's S-a-l-h-u-s.
5      Q.  And she would have been general counsel
6  for CMS?
7      A.  Yes, CMS.
8      Q.  Anyone else?
9      A.  There was another individual, but I
10  don't know who that person was.  I can't
11  remember.
12      Q.  And I assume this took place before
13  your grand jury testimony?
14      A.  Correct.
15      Q.  Do you recall how long before your
16  grand jury testimony?
17      A.  The one meeting I remember was the day
18  before.
19      Q.  Do you think there was more than one
20  meeting?
21      A.  I don't know if we had any conference
22  calls.

Henderson Legal Services, Inc.
202-220-4158                      www.hendersonlegalservices.com

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                        March 19, 2008
                    Washington, DC

Page 564

1     Q.  And I think you testified previously
2  that you did not recall the name of any of the
3  companies that were involved in that
4  investigation.  Is that right?
5     A.  The only name that I remember is
6  Kaiser.
7     Q.  And in what capacity was Kaiser
8  involved in that investigation, if you know?
9     A.  I don't know the specifics.  I just
10 know that that was one of the companies that was
11 involved in the investigation.
12    Q.  Did you at any time understand Kaiser
13 to be a manufacturer under CMS rules?
14    A.  I can't remember the details of Kaiser.
15 I know they had other roles other than -- if they
16 were a manufacturer they had other roles that
17 they played too.  Here again, it's sketchy
18 because it's been so long.
19    Q.  Sure.  And if the answer is you don't
20 know or you don't remember, that's fine.  Did you
21 understand Kaiser was buying from other
22 manufacturers?

Page 565

1     A.  I can't remember that.
2     Q.  Did you understand whether Kaiser had
3  its own NDCs for any of the products that it was
4  selling?
5     A.  I can't remember that.
6     Q.  Was there a time when you became aware
7  that some manufacturers were not including sales
8  to repackagers or relabellers in their AMP or
9  best price calculations?
10    A.  Yes.
11    Q.  Can you recall generally when that was?
12    A.  No.
13    Q.  In the general -- let's take a very
14 general concept.  A manufacturer sells to someone
15 that relabels or repackages and sells under their
16 own NDC.  Generally that's a transaction that
17 does not require recording by the original
18 selling manufacturer, right?
19       MR. WINGET-HERNANDEZ:  Objection, form.
20    A.  I can't answer that because I haven't
21 worked with that for years.  So just answer off
22 the top of my head, I can't do that.

Page 566

1     Q.  Okay.  That's fair.
2        Do you recall ever making a
3  presentation, either at a conference or in a
4  meeting, where you spoke on behalf of CMS about
5  the appropriateness of including or excluding
6  private label materials from a manufacturer's
7  rebate reporting?
8     A.  No.
9     Q.  Do you recall an Arnold & Porter
10 conference in 1997 here in Washington where you
11 appeared?
12    A.  Yes.
13    Q.  What do you recall about that
14 conference?
15    A.  I remember that Larry Reed and I were
16 present.  And it was more of a prepared questions
17 and we would answer.
18    Q.  And when you say prepared questions,
19 what does that mean?
20    A.  We met with someone from the company.
21 Larry decided what questions he felt were
22 appropriate for the discussion.  And then we sat

Page 567

1  there, they asked us questions and we answered
2  them.
3     Q.  Okay.  Do you recall whether any of
4  those questions dealt with repackaging or
5  relabeling?
6     A.  I can't remember.
7        (Exhibit Aventis 003 was marked
8  for identification.)
9  BY MR. KOON:
10    Q.  Let me show you what we've marked for
11 identification purposes as Aventis Exhibit Number
12 3.  And again, you're welcome to look through as
13 much of that as you want, but I'd like to make
14 sure that you've read the segment that begins on
15 page 2, additional guidance on average
16 manufacturer price.  And that continues onto page
17 3.
18    A.  (Reading.)  Okay.
19    Q.  Okay.  I understand this to be Medicaid
20 drug rebate program release number 29.  Have you
21 ever seen this document before?
22    A.  Yes.

71 (Pages 564 to 567)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                        Washington, DC

Page 568

1    Q.  Did you by any chance write any part of
2  this?
3    A.  Not that I remember.
4    Q.  When these releases would come out and
5  they would deal with policy type or coverage type
6  questions, would you draft them or review them or
7  be in any way involved in getting them completed
8  before they went out to the industry?
9    A.  Yes, depending on what the subject
10 matter was.
11   Q.  Okay.  And the subject matter of the
12 part of this release that I pointed out beginning
13 on page 2 and continuing on to page 3 is headed
14 "Additional guidance on average manufacturer
15 price calculations." Do you see that?
16   A.  Yes.
17   Q.  Is that something that you would have
18 had some expertise in the summer of 1997?
19   A.  I would have knowledge, but I don't
20 think I had the expertise to do this or put the
21 chart together.
22   Q.  Do you have any idea who would have

Page 569

1  been responsible for that?
2    A.  It might have been Mike Keough.
3    Q.  Okay.  Taking a look at page 2, the
4  segment there includes the following sentence,
5  and I'm reading about halfway down.  It begins
6  with the sentence "this additional information."
7    A.  Yes.
8    Q.  "This additional information does not
9  impose any new requirements on manufacturers and
10 no action is necessary by manufacturers that are
11 not revising or recalculating pricing data."
12 When would a manufacturer revise or recalculate
13 their pricing data?
14   A.  We had situations where manufacturers
15 might look back and reevaluate their methodology
16 and realize that they may not be including
17 something that they should have or maybe one of
18 the releases might remind them that they should
19 have been doing something.  So they would come to
20 CMS and sit down or submit their methodology to
21 make sure that they're submitting the correct
22 pricing.

Page 570

1    Q.  And the releases prompting them to do
2  that, that really was the concept here, right,
3  was guidance for the industry in a prospective
4  way so they could make sure they were reporting
5  what they needed to report?
6    A.  Correct.
7    Q.  That sentence or that paragraphs goes
8  on "Essentially the information on the chart is a
9  compilation of instructions previously provided
10 in earlier releases." Do you see that?
11   A.  Yes.
12   Q.  So is it your understanding that this
13 is essentially trying to draw together materials
14 from prior releases for the benefit of the
15 industry?
16   A.  I can't say that.  I just think that
17 it's -- the releases are used for purposes of
18 providing the guidance to the industry and to the
19 states.
20       (Exhibit Aventis 004 was marked
21 for identification.)
22 BY MR. KOON:

Page 571

1    Q.  Let me show you what we've previously
2  marked as Exhibit 4, Aventis 4.  And I'll
3  represent to you that this appears or at least
4  was advised to us to be the chart that was
5  attached to release number 29, which we've
6  previously marked.  Does this chart look familiar
7  to you?
8    A.  Yes.
9    Q.  Do you think I got it right, that that
10 was in fact the chart attached to release 29?
11   A.  Yes.
12   Q.  It's headed -- let me back up.
13       I think you indicated before you didn't
14 think that you had the expertise to write the
15 segment of the release or to create the chart;
16 you thought that Mike Keough might have done
17 that?
18   A.  Correct.
19   Q.  Would Mike Keough have been able to
20 send it out without approval by Larry Reed or
21 someone else in his group?
22   A.  No.

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                    March 19, 2008
                         Washington, DC

| Page 572 | Page 574 |
|---|---|

**Page 572**

1    Q.  So if it goes out it's supposed to be
2  the voice of CMS, right?
3    A.  Correct.
4    Q.  Now, this chart has categories of sales
5  along the left-hand side, does it not?
6    A.  Correct.
7    Q.  And then there's headings, whether
8  those sales should be first of all included in
9  AMP, included in best price and whether rebates
10  are due on those sales; is that right?
11    A.  Yes.
12    Q.  If you'll work down with me about --
13  let's see -- it's third from the bottom.  The
14  type of sales is described as sales to other
15  manufacturers who repackage or relabel under the
16  purchaser's NDC.  Do you see that?
17    A.  Yes.
18    Q.  And according to this chart, are those
19  sales to be included in AMP?
20    A.  No.
21    Q.  Are they to be included in best price?
22    A.  No.

**Page 573**

1    Q.  And are rebates due on those sales
2  according to this chart?
3    A.  No.
4    Q.  Now, below that the next industry is
5  "sales to manufacturers who act as wholesalers
6  and do not repackage or relabel under the
7  purchaser's NDC."  Am I correct in understanding
8  those are people that buy but don't necessarily
9  sell under their own NDC?  Is that right?
10    A.  Correct.
11    Q.  And there those sales, first of all,
12  are to be included in AMP, right?
13    A.  Yes.
14    Q.  And are to be included in best price?
15    A.  Correct.
16    Q.  And there are rebates owed on those
17  sales, right?
18    A.  Correct.
19    Q.  And so that were clear, I think this
20  was Exhibit 4?
21    A.  Correct.
22    Q.  And that's dated June of 1997; is that

**Page 574**

1  right?
2    A.  This is Exhibit 4.
3    Q.  Exhibit 3.  That is dated --
4    A.  Exhibit 3 is dated June 5th of 1997.
5    Q.  Now, would you have used a chart like
6  this to advise callers about whether sales to
7  repackagers or relabellers should be treated in a
8  given way, or would that have been something that
9  Mike Keough would have been responsible for
10  dealing with?
11    A.  No.  I would have replied to questions
12  pertaining to this chart.  Yes.
13    Q.  And because this was guidance that had
14  gone out to the industry by CMS, you would have
15  used this essentially to provide that advice,
16  right?
17    A.  Correct.
18    Q.  So if someone said should sales to
19  repackagers or relabellers that sell under their
20  own NDC be included in AMP, you would have said
21  no, right?
22    A.  Correct.  But also many times when

**Page 575**

1  questions like that would come up, because no
2  question is that clear-cut, what we would
3  generally do is ask them to submit their question
4  in writing and provide a scenario so that we
5  truly understand what their question is.
6    Q.  Right.  Let me ask about that a little
7  bit.  There's a fairly robust health care law
8  practice here in Washington, isn't there?  A lot
9  of lawyers do health care law, advise people what
10  to do to comply with CMS regs?
11        MS. MARTINEZ:  Objection.
12    A.  You're asking me a question?
13    Q.  Do you know that to be true?
14    A.  I don't know that to be true.
15    Q.  Are there any lawyers that you've dealt
16  with during your time at CMS that call a lot
17  about questions to make sure that they're
18  providing advice that's consistent and
19  appropriate to their clients?
20    A.  We have lawyers, consultants.  They
21  call.
22    Q.  Are there any folks that you've talked

73 (Pages 572 to 575)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                March 19, 2008
                        Washington, DC

Page 576

1  to a lot, more than once, people whose names you
2  recall?
3      A.  Not that I -- no.  Not that I recall.
4      Q.  There's nobody that you can think of
5  that that called frequently enough that you got
6  to be on a first name or even a last name basis
7  with them?
8      A.  Do you want to give me an example?
9      Q.  Sure.  Donna Boswell with Hogan &
10 Hartson.
11     A.  Sure.  I've dealt with Donna.
12     Q.  Did she strike you as a serious health
13 care lawyer?
14     A.  I don't have a lot of recollection.  I
15 remember the name.  I remember dealing with her.
16 I can't remember issues, so I can't answer that.
17     Q.  Your impression of her positive,
18 negative or nondescript?
19     A.  I can't really say because I don't have
20 a lot of memory.
21     Q.  But you can recall her calling more
22 than once to the CMS policy group?

Page 577

1      A.  I would say yes.
2      Q.  Did there come a time when the agency
3  was criticized for its handling of the relabeling
4  or repackaging exclusion from best price and AMP?
5      A.  Criticized by whom?
6      Q.  Well, let's start with Congressman
7  Waxman.
8      A.  May have.  I don't recall.
9      Q.  Do you recall any investigation at CMS
10 in late 1999 or early 2000 about concerns by
11 Congressman Waxman or others on Capitol Hill
12 about whether the agency was doing the right
13 thing in excluding sales to repackagers or
14 relabellers from best price or AMP calculations?
15     A.  I may recall a letter from Waxman.  But
16 -- just because you brought it up.  But my
17 recollection is not good.
18     Q.  Okay.  My recollection from your
19 testimony was that you went to Boston in late
20 1999 or 2000.  Is that right?
21     A.  Correct.
22     Q.  Do you recall any connection between

Page 578

1  going to Boston to talk about repackaging or
2  relabeling there with any inquiry that was going
3  on at CMS at the time about repackaging other
4  relabeling exclusion from is best price or AMP?
5      A.  I didn't relate the two.
6      Q.  Do you recall ever telling someone
7  inquiring of you in your capacity as a coverage
8  or policy expert that the agency didn't like the
9  situation but that that's what the regs required
10 and a statutory fix was needed?
11     MS. MARTINEZ:  Objection, form.
12     A.  I don't remember saying that.
13     Q.  Do you remember ever talking with Mike
14 Keough about repackaging or relabeling issues?
15     A.  As a staff member, we may have.
16     Q.  But you don't have any recollection as
17 you sit here today of any specific conversation?
18     A.  No.
19     Q.  Do you have any recollection of any
20 general conversation about the topic with Mike
21 Keough?
22     A.  I don't have any recollection, no.

Page 579

1      Q.  Let me ask the same question with
2  regard to Larry Reed.  Do you have any general
3  recollection about talking with Mr. Reed about
4  repackaging or relabeling?
5      A.  I'm sure that I spoke to Larry about
6  repackaging and relabeling.  But I don't remember
7  specifically the conversion.
8      Q.  Do you remember generally those
9  conversations?
10     A.  No.  But I know that they occurred.
11     Q.  So you wouldn't be able to tell me
12 whether there was a difference of opinion between
13 the two of you about what the regulations did or
14 didn't say?
15     A.  No.
16     Q.  You wouldn't be able to tell me
17 anything of substance about those conversations?
18     A.  No.  I don't remember.
19     Q.  Your testimony would be you know they
20 happened but you simply don't have a substantive
21 recollection of what was passed between you?
22     A.  Correct.

Henderson Legal Services, Inc.

202-220-4158                      www.hendersonlegalservices.com

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                           March 19, 2008
                        Washington, DC

| Page 580 | Page 582 |

**Page 580**

1          (Exhibit Aventis 005 was marked
2    for identification.)
3    BY MR. KOON:
4        Q.  Let me show you what we've previously
5    marked as Aventis Exhibit 5 for identification.
6    And again, this is something we pulled off the
7    website.  It purports to be a copy of a release
8    from CMS dated July 13th 2000, carrier release
9    number 47?
10       A.  Correct.
11       Q.  Have you ever seen this document
12   before?
13       A.  Yes.
14       Q.  Did you write any part of it?
15       A.  I may have been involved in it.
16       Q.  It indicates in the first sentence
17   there "We were recently alerted to a situation
18   where drug sales are being omitted from
19   a manufacturer's best price calculation on the
20   basis that the purchaser is a drug repackager."
21   Do you see that?
22       A.  Yes.

**Page 581**

1        Q.  Do you have any information about when
2    the agency was recently alerted to that issue?
3        A.  No, I don't.
4        Q.  Before these releases go out, are there
5    typically meetings or are there drafts that are
6    circulated?
7        A.  Generally whatever is prepared for
8    here, there is a draft and then Larry Reed
9    reviews it as the final, or it goes through our
10   general counsel.
11       Q.  So is it fair to say that either Mr.
12   Reed on his own or Mr. Reed with the assistance
13   of the general counsel would be the final say-so
14   on these releases?
15       A.  Correct.
16       Q.  Now, there's no reference to any
17   attachment to release 47 that I've been able to
18   see.  Do you see any?
19       A.  No I don't.
20       Q.  I'm going to show you now what was
21   marked earlier today as Abbott Exhibit 753.  I
22   apologize.  I don't have an extra copy of that.

**Page 582**

1    The first three questions on there all relate to
2    this repackaging and relabeling issue, correct?
3        A.  Yes.
4        Q.  I think you indicated that was not your
5    handwriting; that was -- tell me again whose
6    handwriting that was.
7        A.  Cindy Bergin's.
8        Q.  Was there a conference call or a
9    meeting with OIG about these issues or was that
10   just a draft that was handed back and forth?
11       A.  I don't know.  It says called on
12   4/13/01.  But I don't remember this.
13          (Exhibit Aventis 006 was marked
14   for identification.)
15   BY MR. KOON:
16       Q.  Let me show you now what we've
17   previously marked as Aventis Exhibit Number 6.
18   And this should look a little familiar, right?
19       A.  Yes.
20       Q.  Now, this document is headed
21   "exclusions from rebate program," correct?
22       A.  Correct.

**Page 583**

1        Q.  But it is largely the same as the chart
2    that was appended to release number 29; is it
3    not?
4        A.  Correct.
5        Q.  In fact there's only one change, isn't
6    there?
7           MS. MARTINEZ:  Objection, form.
8        Q.  Well, let me speed this along a little
9    bit.  Take a look at the line third from the
10   bottom, the same one we talked about before, the
11   sales category, the third from the bottom, "sales
12   to other manufacturers who repackage/relabel
13   under the purchaser's NDC."
14       A.  Okay.
15       Q.  And on what we previously marked as
16   Exhibit 4 it indicates it's not to be included in
17   AMP, right?
18       A.  Correct.
19       Q.  And it's not to be included in best
20   price, correct?  I'm talking about Exhibit 4 now.
21       A.  Correct.
22       Q.  And it's not to be something on which

75 (Pages 580 to 583)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 584

1  rebates are due, right?
2      A.  Correct.
3      Q.  And on Exhibit 6 -- is it 6?
4      A.  6.
5      Q.  It now says -- when you say is it
6  included in AMP, it still says no, right?
7      A.  Correct.
8      Q.  But now included in BP it doesn't say
9  no anymore, does it?
10     A.  Correct.
11     Q.  It says "Note 3," right?
12     A.  Correct.
13     Q.  And if you go to the right-hand side,
14 note 3 says "No, unless the manufacturer acts as
15 an HMO or other non-excluded entity."  Do you see
16 that?
17     A.  Yes, I do.
18     Q.  Are you aware of whether this was ever
19 broadcast to the industry, this chart?
20     A.  I'm not aware.
21     Q.  Are you aware of any releases that
22 carried this chart as an attachment to the

Page 585

1  industry?
2      A.  I don't recall.
3      Q.  Do you recall when this revised chart
4  was prepared?
5      A.  No.
6      Q.  Were you involved in preparing it?
7      A.  I don't remember.
8      Q.  Do you recall ever presenting the first
9  chart to any conference or meeting?
10     A.  Exhibit 4?
11     Q.  Yes.
12     A.  I may have.
13     Q.  Do you recall ever presenting Exhibit 6
14 to a conference or a meeting?
15     A.  I don't recall.
16     Q.  But you agree with me that Exhibit 6
17 represents a change from Exhibit 4 with regard to
18 the classification of those sales to repackagers
19 or relabellers being included in best price?
20     MS. ALBEE:  Objection to form.
21     A.  Yes.
22     MR. KOON:  That's all I have.  Thank

Page 586

1  you.
2      THE VIDEOGRAPHER:  Shall we go off the
3  record.
4      MS. MARTINEZ:  Yes.  Let's go off the
5  record for one second.
6      THE VIDEOGRAPHER:  Off the record at
7  5:08.
8      (Discussion off the record.)
9      THE VIDEOGRAPHER:  On the record at
10 5:09.
11     MS. MARTINEZ:  Mr. Winget-Hernandez and
12 Ms. Albee, right now I think it's a good time to
13 conclude because it's after 5:00.  It's about
14 5:10.  I understand that you may have additional
15 questions, especially Mr. Winget-Hernandez.  If
16 you want to make a statement --
17     MR. WINGET-HERNANDEZ:  Well, first I'd
18 like to find out whether all defense counsel have
19 had questions have asked their questions, because
20 I don't have the right to go at this point unless
21 the defense counsel have finished.
22     MR. BUEKER:  Is there anyone in the

Page 587

1  room who has questions for this witness on the
2  defendants' side?  Any defense counsel on the
3  telephone have questions for this witness?
4      MS. SALZMAN:  Not at this time.
5      MR. WINGET-HERNANDEZ:  Well, in that
6  case, first of all I'd like to restate my
7  previous objection to being invited as my clients
8  have been by Abbott, Johnson & Johnson, America,
9  Roxane, Schering and Warrick to the deposition
10 without being afforded an opportunity to ask
11 questions.  I'd also like to object to being
12 required to attend without the production of
13 salient materials that would have been responsive
14 to our outstanding discovery that have been
15 produced here and marked by defense counsel as
16 exhibits to this deposition.
17     I'd like to reserve my right to ask
18 questions of this witness at some point
19 subsequent to the production of responsive
20 materials, particularly materials responsive to
21 our second request for production in the New York
22 Counties case, which was served in November of

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                           March 19, 2008
                      Washington, DC

| Page 588 |
|---|

1   last year, and which pertains particularly to
2   materials that are -- that touch upon the issue
3   of the establishment or the use of FULs.  And I
4   would defer to the language of the request rather
5   than to try to reproduce it here on the record.
6        I think that that is essentially all
7   the objection that I have at this point.
8        MR. BUEKER:  On behalf of at least my
9   clients, the defendants in the New York Counties
10  case, I don't mean to have a debate or an
11  argument here.  As to your first objection, being
12  invited without the opportunity to question, I
13  don't understand the objection because I don't
14  understand you not to have or at least not to
15  have the right to reserve your opportunity to
16  question this witness.  So I don't understand the
17  objection there.
18       And with regard to the production of
19  documents, you know, all of the documents that
20  anyway I marked today were produced by the
21  Federal Government.
22       MR. WINGET-HERNANDEZ:  Are you taking

| Page 589 |
|---|

1   the position that because documents were produced
2   to you by the federal government that you have no
3   obligation to produce them to us in response to
4   our discovery?
5        MR. BUEKER:  I'm not taking a position
6   on that right now.
7        MR. WINGET-HERNANDEZ:  Okay.  I think
8   I'm done.
9        MS. MARTINEZ:  Okay.  Ms. Albee?
10       MS. ALBEE:  If this deposition is going
11  to be held open we'll reserve -- we have no
12  questions at this time on Ven-A-Care's behalf, no
13  questions at this time but reserve the right to
14  ask questions at a later date.
15       MR. WINGET-HERNANDEZ:  I think it
16  occurs to me in response to Mr. Bueker's
17  statement that my objection perhaps is not clear.
18  Assuming that we have the opportunity to come
19  back and question this witness, of course, I
20  don't object to that.  I would like to ask this
21  witness questions.  My objection is to the use of
22  this deposition in any case in which my clients

| Page 590 |
|---|

1   have been cross noticed in the event that I'm not
2   provided the opportunity to ask those questions.
3   Thank you.
4        MS. MARTINEZ:  On behalf of the United
5   States, the United States just reserves its right
6   in the United States versus Abbott, the United
7   States versus Dey and the United States versus
8   Roxane to ask questions of Ms. Gaston.
9        THE VIDEOGRAPHER:  This deposition
10  adjourns at 5:14 and consists of five tapes.
11       (Whereupon, at 5:14 p.m. the
12  deposition was adjourned.)
13
14
15       _____
16              SUE GASTON
17
18  Subscribed and sworn to and before me
19  this _____ day of _____, 20____.
20
21  _____
22       Notary Public

                              77 (Pages 588 to 590)

96c95944-eee1-42b5-b77a-388fc0daf3d5

# Federal Upper Limit System

*NY Counties*
*Defendants 2*
*3/19/08*  *fw*

Product Group : 1067
Strengths : 100MG
Routes : ORAL
Ingredients : METOPROLOL TARTRATE

Package Size : 100
Dosage : TABLET
Exclusion Code :

| Excl CD | Direct Price | AWP | WAC | SRCE CD | NDC Number | Company Name | MDRI Date |
|---|---|---|---|---|---|---|---|
| | 0.00000 | 0.65400 | 0.00000 | M | 00904/7947/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.65400 | 0.00000 | M | 00904/7773/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.65400 | 0.06180 | B | 00904/7947/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.65400 | 0.06180 | R | 00904/7947/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.65400 | 0.18450 | R | 00904/7773/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.65400 | 0.21110 | B | 00904/7773/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.67410 | 0.00000 | B | 55370/0821/07 | MOVA LABORATORIES INC. | |
| | 0.00000 | 0.67860 | 0.00000 | B | 00603/4628/21 | QUALITEST PRODUCTS, INC. | |
| | 0.00000 | 0.67860 | 0.00000 | M | 00603/4628/21 | QUALITEST PRODUCTS, INC. | |
| | 0.00000 | 0.67860 | 0.00000 | M | 00603/4628/21 | QUALITEST PRODUCTS, INC. | |
| | 0.00000 | 0.69750 | 0.00000 | R | 00093/0734/01 | TEVA PHARMACEUTICALS USA, INC. | |
| | 0.00000 | 0.69750 | 0.00000 | R | 00093/0734/01 | TEVA PHARMACEUTICALS USA, INC. | |
| | 0.00000 | 0.73850 | 0.00000 | B | 64376/0503/01 | BOCA PHARMACAL, INC. | |
| | 0.00000 | 0.73850 | 0.00000 | M | 57664/0167/08 | CARACO PHARMACEUTICAL LABORATO | |
| T | 0.00000 | 0.73850 | 0.00000 | M | 64376/0503/01 | BOCA PHARMACAL, INC. | |
| T | 0.00000 | 0.73850 | 0.05930 | B | 57664/0167/08 | CARACO PHARMACEUTICAL LABORATO | |
| | 0.00000 | 0.73000 | 0.05930 | R | 57664/0167/08 | CARACO PHARMACEUTICAL LABORATO | |
| T | 0.00000 | 0.73000 | 0.00000 | M | 00781/1228/01 | GENEVA PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.73000 | 0.08440 | R | 00781/1228/01 | GENEVA PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.76300 | 0.00000 | M | 00677/1483/01 | UNITED RESEARCH LABORATORIES | |
| T | 0.00000 | 0.76300 | 0.06090 | M | 53489/0367/01 | MUTUAL PHARMACEUTICAL COMPANY | |
| T | 0.00000 | 0.76300 | 0.00000 | R | 49884/0367/01 | MUTUAL PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.76300 | 0.06090 | B | 53489/0367/01 | UNITED RESEARCH LABORATORIES | |
| | 0.00000 | 0.76300 | 0.08000 | R | 00677/1483/01 | MUTUAL PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.76300 | 0.08500 | B | 00677/1483/01 | UNITED RESEARCH LABORATORIES | |
| | 0.00000 | 0.80100 | 0.00000 | B | 52544/0463/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.80100 | 0.00000 | M | 00378/0047/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.80100 | 0.00000 | M | 52544/0463/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.80100 | 0.00000 | R | 00378/0047/01 | MYLAN PHARMACEUTICALS, INC. | |
| T | 0.00000 | 0.80100 | 0.07250 | R | 52544/0463/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.80100 | 0.00000 | B | 00378/0047/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.94280 | 0.00000 | B | 00186/1092/05 | ASTRA PHARMACEUTICALS L.P. | |
| | 0.00000 | 0.94280 | 0.78570 | M | 00186/1092/05 | ASTRA PHARMACEUTICALS L.P. | |
| | 0.00000 | 0.94284 | 0.78570 | R | 00186/1092/05 | ASTRA PHARMACEUTICALS L.P. | |
| | 0.00000 | 1.15260 | 0.00000 | M | 00028/0071/01 | NOVARTIS PHARMACEUTICALS | |
| | 0.00000 | 1.15260 | 0.96050 | B | 00028/0071/01 | NOVARTIS PHARMACEUTICALS | |
| T | 0.00000 | 1.15260 | 0.96050 | R | 00028/0071/01 | NOVARTIS PHARMACEUTICALS | |
| | 0.06520 | 0.73990 | 0.05440 | B | 00781/1228/01 | GENEVA PHARMACEUTICALS, INC. | |
| | 0.10500 | 0.69750 | 0.09880 | B | 00093/0734/01 | TEVA PHARMACEUTICALS USA, INC. | |
| | 0.55070 | 0.65400 | 0.00000 | M | 59772/3693/02 | APOTHECON INC | |
| | 0.55070 | 0.65400 | 0.52320 | B | 59772/3693/02 | APOTHECON INC | |
| | 0.55070 | 0.65400 | 0.52320 | R | 59772/3693/02 | APOTHECON INC | |

FULs Price : .0816
Percent Difference : -36.74
High Price : 1.15260

Prior FULs Price : .1290
Source Code : R
Low Price : .05440

HHD175-0849    F

# Federal Upper Limit System

EXHIBIT
NY Counties
DeFendals 5
3/19/08
DW

Product Group : 349
Strengths : 0.5MG
Routes : ORAL
?ients : CLONAZEPAM

Package Size :. 100
Dosage : TABLET
Exclusion Code :

| Exc. CD | Direct Price | AWP | WAC | SRCE CD | NDC Number | Company Name | MDRI Date |
|---|---|---|---|---|---|---|---|
| | 0.00000 | 0.69230 | 0.00000 | M | 00904/5342/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.69230 | 0.07990 | B | 00904/5342/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.69230 | 0.07990 | R | 00904/5342/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.71370 | 0.00000 | B | 00185/0063/01 | EON LABS MANUFACTURING, INC. | |
| | 0.00000 | 0.71370 | 0.00000 | B | 62037/0952/01 | ANDRX PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.71370 | 0.00000 | M | 00185/0063/01 | EON LABS MANUFACTURING, INC. | |
| | 0.00000 | 0.71370 | 0.00000 | M | 62037/0952/01 | ANDRX PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.71370 | 0.00000 | R | 00185/0063/01 | EON LABS MANUFACTURING, INC. | |
| | 0.00000 | 0.71370 | 0.00000 | R | 62037/0952/01 | ANDRX PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.74900 | 0.00000 | B | 52544/0746/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.74900 | 0.00000 | B | 49884/0495/01 | PAR PHARMACEUTICAL INC | |
| | 0.00000 | 0.74900 | 0.00000 | M | 00093/0832/01 | TEVA PHARMACEUTICALS USA, INC. | |
| | 0.00000 | 0.74900 | 0.00000 | M | 49884/0495/01 | PAR PHARMACEUTICAL INC | |
| | 0.00000 | 0.74900 | 0.00000 | R | 52544/0746/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.74900 | 0.00000 | R | 00093/0832/01 | TEVA PHARMACEUTICALS USA, INC. | |
| | 0.00000 | 0.74900 | 0.00000 | R | 52544/0746/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.74910 | 0.00000 | R | 49884/0495/01 | PAR PHARMACEUTICAL INC | |
| | 0.00000 | 0.74910 | 0.00000 | B | 00228/3003/11 | PUREPAC PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.74910 | 0.16370 | R | 00228/3003/11 | PUREPAC PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.74950 | 0.00000 | M | 00228/3003/11 | PUREPAC PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.74950 | 0.00000 | R | 00378/1910/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.74950 | 0.18400 | B | 00378/1910/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.84768 | 0.70640 | B | 00378/1910/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.84770 | 0.00000 | B | 00004/0068/01 | HOFFMANN-LA ROCHE INC | |
| | 0.00000 | 0.84770 | 0.70640 | M | 00004/0068/01 | HOFFMANN-LA ROCHE INC | |
| T | 0.09890 | 0.74900 | 0.09310 | R | 00004/0068/01 | HOFFMANN-LA ROCHE INC | |
| | 0.59990 | 0.68390 | 0.56990 | B | 00093/0832/01 | TEVA PHARMACEUTICALS USA, INC. | |
| | 0.59990 | 0.71237 | 0.56990 | R | 62269/0353/24 | INVAMED, INC. | |
| | 0.59990 | 0.71240 | 0.00000 | B | 62269/0353/24 | INVAMED, INC. | |
| | | | | M | 62269/0353/24 | INVAMED, INC. | |

FULs Price : .4199 .2455
Percent Difference : -56.56
High Price : .84770

Prior FULs Price : .2760
Source Code : R
Low Price : .07990

8/15-4 WACs are les than NF FuL -1colb ok

.1637 (Purepac N?)R
X 150
──────
.2455) New FUL

nYCo Def
5

08/01/2001

# Federal Upper Limit System

**EXHIBIT**
NY Counties
Defendants 6
3/19/08

Product Group : 959
Strengths : 1MG
Routes : ORAL
Ingredients : LORAZEPAM

Package Size : 100
Dosage : TABLET
Exclusion Code :

| Excl CD | Direct Price | AWP | WAC | SRCE CD | NDC Number | Company Name | MDRI Date |
|---|---|---|---|---|---|---|---|
| | 0.00000 | 0.82950 | 0.00000 | M | 00904/1501/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 0.82950 | 0.19990 | B | 00904/1501/60 | MAJOR PHARMACEUTICALS | |
| P | 0.00000 | 0.82950 | 0.19990 | R | 00904/1501/60 | MAJOR PHARMACEUTICALS | |
| P | 0.00000 | 0.89770 | 0.00000 | B | 59911/5812/01 | ESI LEDERLE INC. | |
| | 0.00000 | 0.89770 | 0.00000 | B | 52544/0333/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.83770 | 0.00000 | M | 00781/1404/01 | GENEVA PHARMACEUTICALS, INC., | |
| P | 0.00000 | 0.83770 | 0.00000 | M | 59911/5812/01 | ESI LEDERLE INC. | |
| | 0.00000 | 0.83770 | 0.00000 | M | 52544/0333/01 | WATSON PHARMACEUTICALS | |
| P | 0.00000 | 0.83770 | 0.00000 | M | 00677/1057/01 | UNITED RESEARCH LABORATORIES | |
| | 0.00000 | 0.83770 | 0.00000 | R | 52544/0333/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.83770 | 0.00000 | R | 59911/5812/01 | ESI LEDERLE INC. | |
| | 0.00000 | 0.83770 | 0.38120 | B | 00677/1057/01 | UNITED RESEARCH LABORATORIES | |
| | 0.00000 | 0.83770 | 0.38120 | R | 00677/1057/01 | UNITED RESEARCH LABORATORIES | |
| | 0.00000 | 0.83770 | 0.38190 | R | 00781/1404/01 | GENEVA PHARMACEUTICALS, INC., | |
| | 0.00000 | 0.88000 | 0.00000 | B | 52544/0241/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.88000 | 0.00000 | M | 52544/0241/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.88000 | 0.00000 | R | 52544/0241/01 | WATSON PHARMACEUTICALS | |
| | 0.00000 | 0.88250 | -0.00000 | M | 00378/0457/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.88250 | 0.00000 | M | 00228/2059/10 | PUREPAC PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.88250 | 0.38190 | B | 00228/2059/10 | PUREPAC PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.88250 | 0.38190 | R | 00228/2059/10 | PUREPAC PHARMACEUTICAL COMPANY | |
| | 0.00000 | 0.88250 | 0.40200 | B | 00378/0457/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.00000 | 0.88750 | 0.00000 | R | 00378/0457/01 | MYLAN PHARMACEUTICALS, INC. | |
| | 0.45770 | 0.83770 | 0.38190 | B | 00781/1404/01 | GENEVA PHARMACEUTICALS, INC., | |
| | 0.86770 | 1.08460 | 0.00000 | M | 00008/0064/02 | WYETH LABORATORIES | |
| | 0.86770 | 1.08460 | 0.00000 | R | 00008/0064/02 | WYETH LABORATORIES | |
| | 0.86770 | 1.08462 | 0.86770 | B | 00008/0064/02 | WYETH LABORATORIES | |

Price : .2999  .5718
Amount Difference : -47.55
High Price : 1.08462

Prior FULs Price : .5718
Source Code : B
Low Price : .19990

***FULs Price not greater than another supplier***

8/1 → FUL 100tb ok - five suppliers are less than our price

.38120 (URL NDC)R
λ  150
(.5718)
↳ New FUL



07/24/2001

# Federal Upper Limit System

Product Group : 250
Strengths : 500MG
Routes : ORAL
Ingredients : CEFADROXIL/CEFADROXIL HEMIHYDRATE

Package Size : 100
Dosage : CAPSULE
Exclusion Code :

EXHIBIT
NY Counties
Defendants 7
DW     3/19/08

| Excl CD | Direct Price | AWP | WAC | SRCE CD | NDC Number | Company Name | MDRI Date |
|---|---|---|---|---|---|---|---|
| P | 0.00000 | 2.84650 | 0.00000 | M | 00904/7878/60 | MAJOR PHARMACEUTICALS | |
| P | 0.00000 | 2.84650 | 0.00000 | M | 00904/5450/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 2.84650 | 0.84990 | B | 00904/7878/60 | MAJOR PHARMACEUTICALS | |
| P | 0.00000 | 2.84650 | 0.84990 | B | 00904/5450/60 | MAJOR PHARMACEUTICALS | |
| P | 0.00000 | 2.84650 | 2.29050 | R | 00904/5450/60 | MAJOR PHARMACEUTICALS | |
| | 0.00000 | 3.19950 | -0.00000 | M | 00555/0582/02 | BARR LABORATORIES INC | |
| | 0.00000 | 3.19950 | 0.00000 | R | 00555/0582/02 | BARR LABORATORIES INC | |
| | 0.00000 | 3.19950 | 2.12330 | B | 00555/0582/02 | BARR LABORATORIES INC | |
| | 0.00000 | 3.27950 | -0.00000 | M | 00172/4058/60 | ZENITH LABORATORIES, INC | |
| | 0.00000 | 3.27950 | 0.00000 | M | 63304/0582/01 | RANBAXY PHARMACEUTICALS, INC. | |
| | 0.00000 | 3.27950 | 1.95300 | B | 00172/4058/60 | ZENITH LABORATORIES, INC | |
| | 0.00000 | 3.27950 | 1.95500 | R | 00172/4058/60 | ZENITH LABORATORIES, INC | |
| | 0.00000 | 3.27950 | 2.12900 | B | 63304/0582/01 | RANBAXY PHARMACEUTICALS, INC. | |
| | 0.00000 | 3.27950 | 2.12900 | R | 63304/0582/01 | RANBAXY PHARMACEUTICALS, INC. | |
| | 2.56840 | 3.05000 | 0.00000 | M | 59772/7271/04 | APOTHECON INC | |
| | 2.56840 | 3.05000 | 2.44000 | B | 59772/7271/04 | APOTHECON INC | |
| | 2.56840 | 3.05000 | 2.44000 | R | 59772/7271/04 | APOTHECON INC | |

FULs Price : ~~1.2749~~ 2.9000
Percent Difference : 0.00
High Price : 3.27950

Prior FULs Price : .0000
Source Code : B
Low Price : .84990

***FULs Price not greater than another supplier***

7/25 - FUL was too low at 1.2749, but when I raised it, it became = to Major's awp - delete for now

⑤

HHD175-0009