# Exhibit 14-1

*State of California ex rel. Ven-A-Care of the Florida Keys, Inc. v.*
*Abbott Labs, Inc. et al., Civil Action No. 03-11226-PBS*

**Exhibit to the November 25, 2009 Declaration of Philip D. Robben**
**in Support of Defendants' Joint Motion for Partial Summary Judgment**



# DEPARTMENT OF FINANCE

# MEDI-CAL DRUG PRICE CONTROLS

## A Staff Reference Report



DOCUMENTS DEPARTMENT

MAY 8 1978

UNIVERSITY OF CALIFORNIA

Report No. S78-4

November 1977

MEDI-CAL DRUG PRICE CONTROLS

This is a Staff Refernce Report, providing
information, analyses or techniques which
may contribute to the refinement of public
policies and programs.  It does not necessarily
reflect the official policies or views of the
California State Department of Finance.

PREPARED BY

STATE OF CALIFORNIA
DEPARTMENT OF FINANCE
PROGRAM EVALUATION UNIT

ROBERT L. HARRIS                          BERNARD P. DONNELLY
PROGRAM BUDGET MANAGER                     CHIEF, PROGRAM EVALUATION

NOVEMBER 1977

H D
9666
.7
C2
C36
1977
DOCS

## PREFACE

The Medi-Cal Division of the Department of Health purchases prescription drugs for its beneficiaries from retail pharmacies in California.  In order to minimize the prices it pays Medi-Cal has instituted a system of ceiling price controls.

The purpose of this study is to determine how effective these controls are, and to determine whether alternative methods of buying drugs might cost less, but serve the beneficiary as well.

A price survey established that prices vary widely among pharmacies, and that Medi-Cal's purchases are concentrated in pharmacies whose prices are relatively high.  Many pharmacies, chiefly chain stores, sell to the general public at prices substantially below Medi-Cal's ceilings.

This report recommends that the Medi-Cal Division take greater advantage of these low market prices than it now does.  In order to do so, the Department must improve its understanding of the market in which it buys.

Much of the information contained herein was obtained directly from the trade.  We wish to acknowledge the cooperation of the many retail firms, as well as the wholesalers, manufacturers, trade associations, and trade publications who discussed their business affairs with us.  Mr. Victor Boisseree of the Department of Health provided us with much of the background information that helped us to

fit the price control problem into the broader perspective of the entir
Medi-Cal drug program.  The assistance of Mr. Carlo Michelotti and the
staff of the Medi-Cal Benefits Section is also gratefully acknowledged,
well as the assistance of Messrs. Rod Palmieri, Dan McCarroll, and
Larry Lee of other Department of Health units, and Mr. Loren Lafferty,
Department of Finance.  Other units providing assistance, both within a
without State Government were the Board of Pharmacy, the California
Pharmaceutical Association and the California Health Facilities Commiss

   The primary recommendation of this report does not, in itself,
constitute a fully operable plan of action.  It is however an attainabl
goal, the obstacles to achievement of which are discussed in detail her

GROVER J. DALY
PROJECT MANAGER


CHARLES A. PILLSBURY
MARGARET H. GEROULD

PREPARED UNDER THE
GENERAL SUPERVISION OF:

P. RICHARD SEEVERS
PRINCIPAL PROGRAM REVIEW ANALYST

## TABLE OF CONTENTS

                                                                    Page

PREFACE  . . . . . . . . . . . . . . . . . . . . . . . . . .   iii

LIST OF TABLES . . . . . . . . . . . . . . . . . . . . . .   vii

LIST OF FIGURES  . . . . . . . . . . . . . . . . . . . . .   ix

FINDINGS AND RECOMMENDATIONS. . . . . . . . . . . . . . . .   xi

CHAPTER I.     THE PRESCRIPTION DRUG MARKET . . . . . . . .   1

               Distribution and Pricing  . . . . . . . . .   2
               Characteristics of Retail
                 Pharmacies . . . . . . . . . . . . . . . .   7

CHAPTER II.    CEILING PRICE CONTROLS . . . . . . . . . . .   13

               Origin of Medi-Cal Price
                 Control Programs . . . . . . . . . . . . .   14
               Calculation of Ingredient
                 and Fee Levels . . . . . . . . . . . . . .   20

CHAPTER III.   PROBLEMS AND ALTERNATIVES . . . . . . . . . .   27

               Problems Arising from
                 Controls Upon Ingredient
                 Prices. . . . . . . . . . . . . . . . . . .   27
               Problems in Determination of
                 the Dispensing Fee. . . . . . . . . . . . .   31
               Alternative Price Control
                 Policies. . . . . . . . . . . . . . . . . .   33

CHAPTER IV.    COMPARISON OF MEDI-CAL
               PAYMENTS TO MARKET PRICES . . . . . . . . . .   39

               Analysis of Price Differences . . . . . . .   40
               Estimate of Potential Savings . . . . . . .   49

CHAPTER V.     A MARKET PRICE PROGRAM  . . . . . . . . . . .   55

APPENDIX 1     DRUG SUBSTITUTION . . . . . . . . . . . . . .   65

APPENDIX 2     EXPLANATION OF DATA IN
               TABLE 1-3 . . . . . . . . . . . . . . . . . .   69

<u>Page</u>

APPENDIX 3    PRICE CONTROLS IN OTHER
              INDUSTRIES. . . . . . . . . . . . . . . .    71

APPENDIX 4    OTHER MEDICAID AND THIRD-
              PARTY DRUG PROGRAMS . . . . . . . . . . .    75

APPENDIX 5    PRICE CONTROLS APPLICABLE
              TO MEDI-CAL PROVIDERS
              OTHER THAN PHARMACIES . . . . . . . . . .    79

APPENDIX 6    MEDI-CAL CONTROLS UPON VOLUME
              OF DRUGS UTILIZED . . . . . . . . . . . .    83

APPENDIX 7    ALTERATIONS TO MAIC . . . . . . . . . . .    87

APPENDIX 8    MODIFIED VOLUME PURCHASE PLAN . . . . . .    91

APPENDIX 9    DRUG PRICE SURVEY METHODOLOGY . . . . . .    99

BIBLIOGRAPHY . . . . . . . . . . . . . . . . . . . . .   105

LIST OF TABLES

Table                                                                       Page

1-1.   ESTIMATE OF MEDI-CAL FEE-FOR-SERVICE
       PAYMENTS ON BEHALF OF BENEFICIARIES,
       OTHER THAN HOSPITAL INPATIENTS,
       1976-77 THROUGH 1978-79 . . . . . . . . . . . . . .      2

1-2.   LICENSED RETAIL PHARMACIES IN CALIFORNIA,
       1974 and 1976 . . . . . . . . . . . . . . . . . . .      8

1-3.   ESTIMATED RETAIL SALES OF PRESCRIPTION
       DRUGS IN CALIFORNIA, 1976 . . . . . . . . . . . . .      9

1-4.   SALES OF PRESCRIPTION DRUGS TO MEDI-CAL,
       ALL STORES AND LARGE MEDI-CAL STORES, 1976  . . . .     12

4-1.   ESTIMATED PRICE TO MEDI-CAL OF 27 DRUG/
       QUANTITY SAMPLE BY COUNTY AND BY PROVIDER
       TYPE  . . . . . . . . . . . . . . . . . . . . . . .     46

4-2.   AVERAGE POSTED PRICE AND INDEXED PRICE OF
       27 DRUG/QUANTITY SAMPLE BY PROVIDER TYPE  . . . . .     47

4-3.   ESTIMATE OF POTENTIAL SAVINGS, BASED ON
       POSTED PRICES FOR 27 DRUG/QUANTITY
       SAMPLE BY CUMULATIVE PRICE DECILE   . . . . . . . .     51

4-4.   ESTIMATE OF POTENTIAL SAVINGS, BASED ON
       POSTED PRICES FOR 27 DRUG/QUANTITY
       SAMPLE AND PAID CLAIMS FOR MAY, 1977,
       MONTH OF SERVICE, JUNE, 1977, MONTH OF
       PAYMENT, BY CUMULATIVE PRICE DECILE . . . . . . . .     52

5-1.   ESTIMATED SAVINGS OF MARKET PRICE PROGRAM,
       BASED ON 1976 DATA  . . . . . . . . . . . . . . . .     56

5-2.   COMPARISON OF FEATURES OF CEILING PRICE AND
       MARKET PRICE PROGRAMS . . . . . . . . . . . . . . .     57

A4-1.  CHARACTERISTICS OF PHARMACEUTICAL PAYMENT
       PLANS OF MEDICAID PROGRAMS, SELECTED STATES,
       1974-75 . . . . . . . . . . . . . . . . . . . . . .     76

| Table | | Page |
|-------|---|------|
| A5-1. | MAXIMUM PAYMENT ALLOWED SELECTED PROVIDERS 1976-77 . . . . . . . . . . . . . . . . . . . . . . | 80 |
| A7-1. | ESTIMATE OF SAVINGS ARISING FROM ADDITION OF DRUGS TO MAIC, AND REDUCTION IN PRICE OF EXISTING DRUGS, JAN. 1977 . . . . . . . . . . . . | 88 |
| A8-1. | MODIFIED VOLUME PURCHASE PLAN, ILLUSTRATION OF POTENTIAL SAVINGS, 1977-78 . . . . . . . . . . . . | 96 |
| A9-1. | MEDI-CAL COST AND USAGE OF DRUGS IN PRICE SURVEY, 1975-76 . . . . . . . . . . . . . . . . . . | 101 |

LIST OF FIGURES

<u>Figure</u>                                                            <u>Page</u>

1-1.    PRESCRIPTION DRUG PRICING PRACTICES . . . . . . . . . . . .    5

2-1.    SCHEMATIC EXPLANATION OF MEDI-CAL
        PRICE CONTROLS. . . . . . . . . . . . . . . . . . . . . .    22

4-1.    POSTED PRICES OF PRESCRIPTION DRUG
        SAMPLE BY PRICE DECILES . . . . . . . . . . . . . . . . .    42

4-2.    ESTIMATED PRICE TO MEDI-CAL FOR
        PRESCRIPTION DRUG SAMPLE BY
        PRICE DECILE. . . . . . . . . . . . . . . . . . . . . . .    43

4-3.    ESTIMATED PRICES OF DRUG SAMPLE TO
        MEDI-CAL AND TO NON-MEDI-CAL
        CONSUMERS, BY PROVIDER TYPE . . . . . . . . . . . . . . .    44

4-4.    INDEXED DRUG PRICES FOR THE 27 DRUG/
        QUANTITY SAMPLE BY PROVIDER TYPE. . . . . . . . . . . . .    48

A9-1.   DRUG SURVEY DOCUMENT  . . . . . . . . . . . . . . . . . .   102

FINDINGS AND RECOMMENDATIONS

Findings                                                          Page

1.  Medi-Cal's ceilings on the ingredient portion of its payments
    for drugs are well above the average price paid by pharmacies,
    but problems inherent in ceiling price controls prevent their
    being lowered.                                                  28

2.  The dispensing fee portion of Medi-Cal's payments for drugs
    cannot be measured accurately.                                  32

3.  Most alternative means of price control offer only incomplete
    or auxiliary solutions to Medi-Cal price control problems.      34

4.  There exist wide variations in pharmacies' drug prices to
    the general public.                                             40

5.  If Medi-Cal buys drugs at an average price equal to the
    average market price
    a)  of the lowest-price 40 percent of pharmacies, it can
        save $9.5 million,
    b)  of the lowest-price 20 percent of pharmacies, it can
        save $19.7 million (calculations made at 1976 program
        levels).                                                    55

Recommendation

        The Department of Health should develop a method, to submit with
the 1979-80 budget request, to buy prescription drugs for the Medi-Cal
program at prices at which lower-price pharmacies sell to the general public.

CHAPTER I

THE PRESCRIPTION DRUG MARKET

In 1976-77 the California State Department of Health (DOH) paid about $147 million for prescription drugs dispensed by pharmacies to Medi-Cal beneficiaries, other than hospital inpatients, on a fee-for-service basis (Table 1-1). In 1977-78 this amount is expected to be $171 million, and in 1978-79 $193 million.

Medi-Cal also pays for a substantial volume of drugs for hospital inpatients, including those in state hospitals, and to prepaid health plans. The price controls which are the subject of this study do not apply to drugs dispensed to hospital inpatients, which are reimbursed at actual cost, or to prepaid plans, which are compensated on a capitation basis. Drugs dispensed by hospital pharmacies to their outpatients are included in this study even though not all Medi-Cal beneficiaries have access to such pharmacies.

DOH controls prices of the drugs covered by this study by establishing the maximum amount payable to the pharmacist for the drugs he buys from manufacturers or wholesalers (the ingredient cost), to which is added a flat fee per prescription (currently $3.06).

The purpose of this study is to determine whether this system of ceiling price controls functions as effectively as other means that might be available. Since the purpose of price control is to minimize price to the State, an alternative statement of the study's purpose is to determine whether DOH can buy drugs at lower prices.

-1-

TABLE 1-1

ESTIMATE OF MEDI-CAL FEE-FOR-SERVICE PAYMENTS ON
BEHALF OF BENEFICIARIES, OTHER THAN HOSPITAL INPATIENTS
1976-77 through 1978-79

|  | Millions $ | | |
|---|---|---|---|
|  | Actual 1976-77 | Estimate 1977-78 | Budget 1978-79 |
| Prescription Drugs per Governor's Budget | 143.6 | $168.3 | $190.2 |
| County Hospitals, L.A. County[b/] | 3.0 | 3.0 | 3.0 |
| Total | $146.6 | $171.3 | $193.2 |
| State and County Share of Funding | $ 78.6[a/] | $ 91.8[c/] | $102.0[c/] |

SOURCE:  Governor's Budget, 1977-78, and 1978-79, except as noted.

[a/] DOH Budget Unit, August, 1977.
[b/] Los Angeles County waiver claims process does not permit separate
   identification of prescription drugs.  Estimate based on data obtained
   from L.A. County.
[c/] Same percentage of State and County funding assumed for 1977-78 and 1978-79
   as 1976-77 actual.


Distribution and Pricing

   Medi-Cal beneficiaries obtain drugs upon written prescription from

their physician as does any patient.  Drugs may be obtained from any

licensed pharmacy the beneficiary chooses, but the beneficiary does not

pay for the drugs.  The pharmacist enters a claim for payment from Medi-

Cal which is processed for payment, like claims from other Medi-Cal pro-

viders, through DOH's fiscal intermediary.

No direct restrictions exist upon the wholesale or manufacturing source from which the pharmacist buys or the quantities in which he buys, although Medi-Cal's substitution requirement, described later, and its price controls can impact the choice of product.

About half of retailers' purchases are made from wholesalers, and half direct from manufacturers.  Four wholesalers in California carry a full line of prescription drugs, as well as non-prescription (over-the-counter) drugs, and non-drug items.  All have warehouse locations in the major metropolitan areas and can readily serve retailers throughout the State the day after an order is placed, and often the same day an order is placed in metropolitan areas.  There are also a number of regional wholesalers, some of whom do not carry a full line.

Although most manufacturers sell through wholesalers, and some sell through wholesalers exclusively, many of the largest have regional distribution centers and sales staff.  This permits them to sell a high proportion of their product direct to retail pharmacies.

There is no pronounced trend either toward or away from direct sales from manufacturers to retailers.  Wholesalers' success lies in their capability to deliver quickly a full line of products of many manufacturers at reasonable prices.  The large wholesalers in California also offer computer ordering services and other computer-related management services.

The price list most used in the industry is the Red Book published by Medical Economics Co.  Other publications, including manufacturers' catalogs, list the few prices not shown in the Red Book.  For each drug, in each strength, and each quantity of tablets, capsules or liquid per retail container, each manufacturer's price is displayed.  The benchmark price, generally used for implementing price changes, and from which discounts are

-3-

calculated is usually the Average Wholesale Price (AWP). Manufacturers' list prices to wholesalers and retailers, based upon inspection of the Red Book, appear to range from 14 percent below AWP from some manufacturers to 22 percent for others (Figure 1-1).

Average Wholesale Price less these published discounts is the maximum price the pharmacist can expect to pay if he buys direct from the manufacturer. The range of discounts below AWP is in fact very wide and apt to change rapidly. Inspection of manufacturers' price lists for some items show discounts larger than those that appear in the Red Book by taking into account not only quantity per retail package, but number of packages per order. Other forms of discount include periodic rebates, extra goods given to the pharmacy by the manufacturer's representative, returned goods policy used to return slow-moving merchandise in addition to outdated goods, and extended dating of receivables. Special deals are offered intermittently and in certain areas but not others. Some such discounts reflect themselves in invoice prices; others do not. There is evidence of invoice differences on the same branded products in which the highest price billed a pharmacy is more than ten times the lowest price billed to another pharmacy at the same point in time. [1]/

Wholesalers' discounts to most pharmacies in California appear to range from 8 to 12 percent below AWP. Thus the pharmacist pays more for drugs purchased from wholesalers than from manufacturers. These discounts normally apply, not on an item-by-item basis, but to all purchases made during a month or other span of time. Since the discounts are tied to volume of purchases from a single wholesaler, pharmacies tend to align

---

[1]/"IMS Data Reveals Broad Manufacturer Rx Pricing Differences," Chain Store Age/Drug Edition, March 1977, p. 95.

FIGURE 1-1

PRESCRIPTION DRUG PRICING PRACTICES



Sources:  See Text.

themselves with one of the largest wholesalers as primary source of supply, and to use another wholesaler as backup. These discounts usually do not appear on invoices. The discount serves as both a volume and cash discount.

In 1975 HEW estimated that AWP "tends to overstate actual costs by about 15 to 18 percent."[2/] Documentation is lacking for this estimate, but it tends to agree with other estimates made in the California trade. The range of discounts among phamacies is unknown but probably is from 8 to 25 percent or more, and does not take into account the nonprice discoun and allowances mentioned above.

These manufacturer and wholesaler pricing practices have important implications for Medi-Cal's ceiling price controls of the type now in force. In general, price ceilings set at AWP are too high to achieve the savings that could be had if ceilings were set at actual acquisition cost. But actual acquisition costs are not known and, given the complexity of discounts, probably cannot be known. Even if they were known, reduction of ceilings to levels at which some pharmacies buy direct from manufacturers penalize those who cannot do so because of time or quantity constraints.

DOH regulations limit Medi-Cal's reimbursement to pharmacies to the drug-by-drug ingredient cost maximum, plus a flat fee per prescription applicable to all drugs. Method of calculation of both fee and ingredient cost are explained in Chapter II. Pharmacies' prices to other third parties are usually calculated in much the same way. Pharmacies' prices to their regular customers are to a degree competitively determined. But pharmacies whose location is good and who have contacts with physicians can overcome

---

2/"Present Status of Competition in the Pharmaceutical Industry," U.S. Senate, Select Committee on Small Business, Sub-Committee on Monopoly, Hearings of March 19, 20, 21 and April 24, 25 and May 16, 1975, p. 11649

the disadvantage of high price.  Only recently have laws that prescription prices be posted and that pharmacists be permitted to substitute one multi-source drug brand for another dispelled some of the mystery surrounding drug pricing, and intensified price competition.  (See Appendix 1 on Drug Substitution.)  Price differences among pharmacies are the key data upon which the conclusions of this report are based (see Chapter IV).

## Characteristics of Retail Pharmacies

In December, 1976, there were 4,909 retail pharmacies licensed in California, compared to 4,787 in December, 1974 (Table 1-2), exclusive of hospitals licensed to serve impatients only.  In 1976 Medi-Cal paid claims to almost all of the State's pharmacies.  Very few do not participate in the program.

Retail sales of prescription drugs in California in 1976 are estimated to total $792 million (Table 1-3).  Of that amount, 11.2 percent or $89 million were sales of the 485 hospital outpatient pharmacies. Hospital outpatient pharmacies are the only retail pharmacies whose clientele is restricted:  in general it is the policy of such pharmacies to limit their clientele to their own outpatients, although in emergencies and late at night other patients may be served by some hospitals, particularly county hospitals.  County hospitals constitute about 40 percent of total hospital retail (outpatient) pharmacy business, even though their share of the market for other hospital services is much lower than 40 percent.

-7-

The total number of pharmacies in the State increased only 2.5 percent in the two-year period from December, 1974 to December, 1976. Chains with five or more stores increased in number 8.9 percent in that period and professional prescription pharmacies increased 5.5 percent, while the number of community pharmacies declined 1.3 percent (Table 1-2). Professional prescription pharmacies carry few if any nondrug items, their floor space is limited, and they are often operated near or in conjunction with a medical clinic or medical building.  In Table 1-3 a distinction is made between chains with two to four stores and those with five or more.  The former tend to be local, closely-held operations with a mode of operation closely related to that of independent community pharmacies.  (For purposes of this report community pharmacies are those not otherwise identified.)

### TABLE 1-2

### LICENSED RETAIL PHARMACIES IN CALIFORNIA
1974 and 1976

|  | Dec. 1974 | Dec. 1976 |
|---|---|---|
| Chain Pharmacies (5 or more stores) a/ | 1,013 | 1,103 |
| Hospital Pharmacies | 467 | 465 |
| Professional Prescription Pharmacies | 829 | 875 |
| Community and other Pharmacies | 2,478 | 2,446 |
| Total | 4,787 | 4,909 |

SOURCE:  Board of Pharmacy

a/Exclusive of hospitals licensed to serve inpatients only:  174 in December, 1974 and 167 in December, 1976.

TABLE 1-3

ESTIMATED RETAIL SALES OF PRESCRIPTION DRUGS
IN CALIFORNIA, 1976

| | Number of Pharmacies | Sales | |
| --- | --- | --- | --- |
| | | To Medi-Cal | Total |
| Chains (2-4 stores) | 402 | $ 14.6 | $ 60 |
| (5 or more stores) | 1,103 | 18.3 | 249 |
| Total | 1,505 | $ 32.9 | $309 |
| Hospitals (outpatients only) | 485 | 11.2 | 89 |
| Professional, Community and Other | 2,919 | 95.5 | 394 |
| Total | 4,909 | $139.6 | $792 |

Sources and explanation of data:  See Appendix 2

Nationwide almost all of the growth in number of chain stores between 1972 and 1976 occurred in those having more than 10 stores per chain.[3/]

Three chains, Thrifty, Long's and Sav-On, have a total of about 600 stores in California, with another six chains (Fedmart, Gemco, Lucky, Payless, Pay-n-Save and Walgreen) accounting for another 200.  Thus nine chains account for about 16 percent of the retail pharmacies in California and about $200 million or more than 25 percent of prescription drug sales.

These large chains have the following characteristics in common:

1. Prescription drug sales usually constitute less than 10 percent of the store's business, compared to about 50 percent for community pharmacies and a much larger percentage for professional prescription pharmacies.

2. Total sales (all items including drugs) per store are 5 to 10 times as great as sales of independent community pharmacies.

3/Chain Store Age, May, 1977, p. 72.

3. Prices of prescription drugs average substantially less than thos
   community pharmacies and price competition among chains is intens
   This study focuses primarily upon documentation of those price
   differences (Chapter IV).

4. As a matter of policy, chain stores do not offer delivery service
   emergency service, or maintain patient profiles.  Some community
   pharmacies offer these services.  Others provide them in a limited
   way or not at all.

Lower pharmacy prices (and costs) are achieved by large chains
part by larger prescription drug volume per store (about 70 percent gr
than smaller chains or community pharmacies), which makes possible low
purchase prices and reduced gross margin.  Lower purchase prices are
achieved by buying often direct from the manufacturer, taking advantag
of periodic deals offered by manufacturers and by buying the largest
package size.  In general no deals are available to chains that are no
also available to other pharmacies.  Few California chains utilize cen
warehousing and some do not even buy centrally.  Rapid inventory turno
is emphasized, but not at the expense of inventory size and variety.
is no evidence that chains use pharmacies as loss leader departments.
general large chains' lower prices are a product of good management.

Chains do relatively little Medi-Cal business.  Their sales cor
tute 39 percent of the total $792 million of prescription sales in Cal
but chains' sales to Medi-Cal constitute only 24 percent of the $139.6
million of Medi-Cal business (Table 1-3).  Large chains (those with 5 o
more stores) make 31 percent of all sales in California, but only 13 pe
of sales to Medi-Cal.  Community and professional pharmacies have total
prescription sales of approximately $394 million in California, of whic
$95.5 million, or 24 percent are sales to Medi-Cal (Table 1-3).

Medi-Cal patients have no financial incentive to shop in chain stores. Their incentive to buy in community and professional pharmacies probably lies in convenience of location, in the fact that physicians direct patients to those pharmacies, and in the delivery and other services available.

Not all community and professional pharmacies share equally in Medi-Cal business. It is in fact heavily concentrated in very few pharmacies. Statewide 36 percent of Medi-Cal business in 1975-76 was done by only 272 pharmacies, or 5.5 percent of all pharmacies, each of which had sales to Medi-Cal of $100,000 or more. Only eight of those were large chain stores; 35 were hospitals, chiefly county hospitals (Table 1-4). The dollar volume of sales to Medi-Cal per store for these 272 stores ranged from $100,000 to $667,000 in 1976, exclusive of the USC-Los Angeles County Medical Center whose Medi-Cal billings for prescription drugs cannot be separately identified, but were estimated to be $3 million.

In almost every county sales concentration follows the same pattern. For purposes of this study the most important implication of concentration was found to be that large Medi-Cal stores priced their sales to Medi-Cal at Medi-Cal maxima, and their non-Medi-Cal business at the Medi-Cal maxima or above. For these stores price controls serve, not as price ceilings, but as price minima guaranteed, in effect, by the State.

The same factors that account for the large volume of Medi-Cal business done by pharmacies other than large chains probably also contribute to concentration in a few stores: the direction patients receive from physicians, convenient location, and the provision of delivery and other services. The complexity of the process of serving Medi-Cal patients is also a factor: some pharmacies have learned to live with the intricacies of the process.

-11-

TABLE 1-4

SALES OF PRESCRIPTION DRUGS TO MEDI-CAL,
ALL STORES AND LARGE MEDI-CAL STORES
1976

| | Large Medi-Cal Stores a/ | | All Stores | |
|---|---|---|---|---|
| | No. | $ | No. | $ |
| Chains (5 or more stores) | 8 | 1.0 | 1,103 | 18.3 |
| Hospitals | 35 | 8.5 | 485 | 11.2 |
| Other | 229 | 40.8 | 3,321 | 110.1 |
| Total | 272 | $50.3 | 4,909 | $139.6 |

SOURCE:  MIO Report HMDPECY-4, "Pharmacy Earnings Report-Year
Ending 12-31-76.

a/Stores with sales to Medi-Cal of $100,000 per year or more.
See text for explanation of data.

CHAPTER II

CEILING PRICE CONTROLS

The central feature of Medi-Cal's retail prescription drug price controls in the decades of the 1960s and 1970s has been the use of a concept of cost from which the cost-containing element of competition is absent.

In competitive industries cost and prices have a reciprocal relationship.  Price equals or exceeds economic cost if the firm is to survive.  But competition, in combination with advancing technology, forces real prices down, and firms must find ways to achieve cost reductions.  Consumers benefit and increased living standards result.

Government has instituted controls in many industries in order to insulate them from market forces for reasons intended to be in the public interest.  After controls are instituted, and have become endemic in an industry, the industry begins to react, not to market forces but to the controls themselves, and decontrol becomes difficult.

Subsequent price escalation is usually based upon estimates of raw material or labor cost changes.  Opportunity for competition to depress prices and costs is foreclosed.  Analysis of the ways in which market forces have been restrained by Medi-Cal ceiling price controls

in retail prescription drug sales is presented in Chapter III.  In this chapter the origins of drug price controls are traced, and current controls are explained in detail. [1]/

## Origin of Medi-Cal Price Control Programs

Ceiling price controls were in effect in California prior to Medi-Cal's inception in 1966.  Federal drug price controls applied to Medicaid programs are more recent, but their origin lies in Congressional inquiries initiated more than two decades ago.

Concern with the wide range and random pattern of pharmaceutical manufacturers' prices runs through a series of investigations which was begun by the U.S. Senate in the 1950s and continues to the present day. [2]/  The origin of modern Federal drug price controls lies in a study completed by a task force established by the U.S. Department of Health, Education, and Welfare (HEW) in 1969. [3]/  Some members of that Task Force direct the present Federal drug price control program.

The Task Force's recommendations ranged across the entire field of pharmacy, affecting drug manufacturers, distributors, users and prescribers.  The inability of the Senate committee, HEW or the industry

---

1/A **brief review of price controls in other industries** is provided in Appendix 3, of other Medicaid and third-party drug programs in Appendix 4, of price controls applicable to Medi-Cal providers other than pharmacies in Appendix 5, and of Medi-Cal controls upon volume of drugs utilized in Appendix 6.

2/The modern series are:  Hearings before the Subcommittee on Monopoly, Select Committee on Small Business, U.S. Senate, entitled "Present Status of Competition in the Pharmaceutical Industry."

3/Final Report, Task Force on Prescription Drugs, U.S. Department of Health, Education and Welfare, Washington, February 7, 1969.

itself in hearings before these bodies to develop a simple, rational explanation for manufacturers' drug pricing and marketing practices promoted the inference that publicly funded programs ought to control prices.

In December, 1973, HEW announced its Maximum Allowable Cost (MAC) program.  It contemplated limiting reimbursement for multi-source drugs (drugs made by more than one manufacturer) to the lowest price among generally available brands.

To Californians the plan was not new.  As early as 1961, under the Public Assistance Medical Care program, the forerunner of Medi-Cal, California had established "maximum allowable wholesale costs" (MAWC) for ten multi-source drugs.[4/]  This plan continued through the advent of the Medi-Cal program in 1966.  In 1972, as part of the Medi-Cal Reform Plan to contain runaway costs, the Reimbursable Cost List Price (RCLP) plan extended the MAWC ceiling price concept to a greater number of drugs. Ceiling prices were set for multi-source drugs, numbering 198 in total including strength and dosage form.[5/]  Accompanying the RCLP was a Volume Refund Plan (VRP).  Under the VRP a pharmaceutical manufacturer whose Average Wholesale Price (AWP) exceeded an RCLP ceiling was offered an opportunity to refund the difference to Medi-Cal in exchange for continued inclusion of his product in the program.  Such VRP items became, in effect, exceptions to the RCLP, for which the ceiling was set at the AWP of the VRP participant.  The concept is important because it is similar to a plan recently considered, the Modified Volume Purchase Plan.  -

---

4/"Present Status of Competition in the Pharmaceutical Industry,"
    Hearings before the Subcommittee on Monopoly, Select Committee on
    Small Business, U.S. Senate, 94th Congress, First Session, p. 12052.
5/Ibid., Testimony of Carlo Michelotti, p. 12017.

Few manufacturers volunteered to participate in the VRP plan, and both VRP and RCLP were short-lived.  In 1972 the Pharmaceutical Manufacturers' Association sued to prevent further implementation of the plans. [6/]  In 1973 the current Maximum Allowable Ingredient Cost (MAIC) plan was adopted.  It salvaged the ceiling price features of RCLP by following a strict court-dictated procedure for establishing them.  Those procedures are now set out in administrative regulations. [7/]

The Federal government drew upon the experience of California and other states in developing its MAC program.  Although the Department of Defense and the Veterans' Administration had long been buying drugs centrally at prices far below those available to the commercial drug trade, the Federal plan rejected that possibility for Medicaid because of the potential for interference in private business. [8/]  Although the VA was and is in the mail order drug business that possibility was thought not to fit Medicaid's needs.  Government ownership or operation of pharmacies or any other element of drug production or distribution was never seriously considered.  Dispensing fee (or percentage markup) and ingredient cost were traditionally viewed by pharmacists as separate elements of cost and the distinction between the two made it possible for the Federal government to control ingredient cost and permit states to control the fee.

---

6/Pharmaceutical Manufacturers' Association, et. al. vs. Brian., Superior
    Court of California, Sacramento, No. 221773.
7/California Administrative Code, Title 22, Section 51513.2.
8/"Present Status of Competition in the Pharmaceutical Industry," op. cit.,
    p. 11643.

Health, Education and Welfare's ceiling price control program announced in December, 1973, included both a Maximum Allowable Cost (MAC) and Estimated Acquisition Cost (EAC) feature.  The MAC program applies to multi-source drugs and is identical in concept to California's MAIC.  The EAC program limited the price paid for single-source drugs to each state's "closest estimate of the price generally and currently paid by providers." [9]/

Implementation of the Federal controls has proceeded slowly and hesitantly.  Promulgation of MAC and EAC regulations did not occur until August, 1975.  The Pharmaceutical Manufacturers' Association (PMA) and the American Medical Association (AMA) brought suit against HEW challenging the validity of its regulations, but the suit was dismissed in March, 1977.  The American Pharmaceutical Association (APhA) objected to the proposed EAC regulations because they promised to diminish pharmacists' margins.

By mid-1977 the only drugs identified for control under the MAC regulations were ampicillin capsules in 250 mg. and 500 mg. strengths. Unlike these MAC maxima EAC regulations called for interpretation by the states.  The Federal role was limited to gathering and publishing for the states' information lists of modal invoice prices for widely used drugs.  States were free to set their ceilings for single-source drugs at these prices as published or to modify them, as long as their imple-mentation conformed to the requirement that maximum prices be those

_____

9/Code of Federal Regulations #45, Section 250.30.

"generally and currently paid."[10]    A major source of contention was the
discovery that HEW's modal prices for some items concealed a very wide
price range.  Health, Education and Welfare "supplied Federal Trade
Commission antitrust officials with MAC pharmacy invoice data showing
manufacturer pricing differentials of as much as 700 percent to 1500
percent on two leading ampicillin brands."[11]    Clearly selection of a
single price, from such a range, on whatever basis it is selected, raises
serious questions about its usefulness for control purposes.

California implemented the EAC program in March, 1977.  Medi-Cal
staff discovered that HEW's invoice prices were in most instances the
AWP listed in an industry catalog, Medical Economics' Red Book.
California had for years limited payment for any manufacturer's drug to
AWP, in the lowest available quantity (reflecting the highest price).
A few modal prices on HEW's list, for drugs produced by certain manu-
facturers, were not at AWP, but at the lower manufacturer's direct price,
and a few reflected, not the lowest available quantity price, but the
lower prices reflecting higher quantities.  (The reader is reminded that
invoice prices typically do not reflect either wholesalers' discounts,
or non-price discounts.  See Chapter I.)  Medi-Cal staff decided to
comply with EAC regulations by retaining its AWP maxima for most drugs
and by altering its regulations to reflect direct manufacturers' prices
on all drugs produced by 11 specified manufacturers, and to set ceilings
at the 500 or 1000 tablet/capsule quantity price for 11 specified drugs.

--------

10/Ibid.
11/"IMS Data Reveals Broad Manufacturer Rx Pricing Differences," Chain
    Store Age/Drug Edition, March, 1977, p. 95.

The publication of California's EAC regulations was preceded by a public hearing at which evidence was presented supporting selection of these manufacturers and drug quantities. Most of the very limited number of pharmacies (48) surveyed statewide confirmed that they commonly bought direct from the selected manufacturers and that they commonly purchased the selected drugs in large bottle sizes. Neither HEW's modal price data nor DOH's price analysis deal with the fact that large numbers of pharmacies do not, cannot, and probably in the interest of efficiency ought not to buy in accordance with those patterns. 12/

Dispensing costs are also part of the total payments which the states are asked to contain. The upper limit for payment for prescribed drugs is required by Federal regulations to be the cost of the drug "...plus a dispensing fee established by the state...." 13/ In establishing the dispensing fee states are required to "...take into account the results of surveys of costs of pharmacy operation." 14/ California has periodically conducted such studies and completed one shortly before publication of this report. 15/ In Chapter III, the concept of a fee and its calculation are called in question.

In recent years ceiling price controls have been administered by a staff of five pharmacists in the Pharmaceutical Services Unit of the Medi-Cal Benefits Section of DOH's Division of Medical Assistance (Medi-Cal). Data is provided from claims payments processed by the fiscal

12/Hearings, Department of Health, State of California, Dec., 27, 1976, pp. 23-31.
13/CFR #45, op. cit., Section 250.30.
14/Ibid.
15/Touche Ross & Co., Survey of Pharmacy Dispensing Costs, Sept. 1977.

intermediary, Medi-Cal Intermediary Operations (MIO), who maintain a staff of four pharmacists plus price researchers and other staff who are responsible for updating the computer ceiling price controls. Periodic reports based upon paid claims data are processed either by MIO or DOH's Center for Health Statistics. The DOH Drug Utilization Review Unit (DURU) maintains a staff of nine pharmacists who examine records of pharmacies for the purpose of discovering improper claims.

## Calculation of Ingredient and Fee Levels

Medi-Cal's ceiling prices for ingredients emanate from an amalgam of rules derived from the MAC, EAC and MAIC programs touched upon above, but also incorporate rules not identifiable with any of these programs. Their collective objective is to cut as closely as possible to pharmacists' elusive purchase price. That task is difficult, and the rules are complex.

Ceiling prices are calculated in the following way. Medi-Cal will pay no more than the individual pharmacist's customary and usual charge to the general public. In addition payment to the pharmacist for Medi-Cal drugs can be no greater than the Estimated Acquisition Cost (EAC) of the drug. [16]/ Single source drugs--those produced by only one manufacturer, usually because they are under patent--are subject to these "customary and usual" (C+U) and EAC price controls only. Multi-source drugs are those produced by more than one manufacturer. Medi-Cal regulations require that the pharmacist dispense the lowest cost multi-source drug product that the pharmacy has in stock which meets the medical needs of the beneficiary. Multi-source drugs are also subject to the same EAC restrictions as are single-source. In addition

16/California Administrative Code, Title 22, Section 51513(b)(1).

-20-

approximately 100 of the largest volume multi-source drugs are included in the Maximum Allowable Ingredient Cost (MAIC) list.  In this instance Medi-Cal pays no more than the EAC of a selected drug product which Medi-Cal identifies as being of acceptable quality and generally available. [17]  A Federal Maximum Allowable Cost (MAC) program, functioning like MAIC, became operational in 1977, applying initially to only two drugs.

In Figure 2-1 Drug Product A illustrates the operation of Medi-Cal price controls applicable to single-source drugs.  Both pharmacies have the same EAC:  for each drug product EAC is the same for all pharmacies in the state.  Both have the same fee:  currently it is $3.06 per prescription for all prescriptions dispensed to Medi-Cal beneficiaries (with a few exceptions).  Pharmacy 1's customary and usual charge to the general public is greater than the sum of EAC and fee.  Medi-Cal will pay Pharmacy 1 EAC plus fee.  Pharmacy 2's customary and usual charge is less than EAC plus fee.  Medi-Cal will pay Pharmacy 2 its customary and usual charge.

If Drug Product A and Drug Product B both are of the same generic drug type both pharmacies are expected to dispense Drug Product B because it is less costly, provided that they carry it in stock and that it meets the medical needs of the beneficiary.  Pharmacy 1 will be paid EAC plus fee for Drug Product B.  Pharmacy 2 will be paid its customary and usual charge.  If the generic drug type to which Drug Product A and B belong is on the MAIC list, and if they are the only drug products of

_____
[17]/Ibid., Section 51513.2.

FIGURE 2-1

SCHEMATIC EXPLANATION OF MEDI-CAL PRICE CONTROLS



that generic type, Medi-Cal will pay EAC plus fee of Drug Product B no matter which of the two drug products the pharmacy dispenses, assuming that Drug Product B has been found to be widely available and of acceptable quality.  If only Drug Product A is widely available and of acceptable quality, the MAIC level will be that of Drug Product A.  In that case Medi-Cal will pay EAC plus fee of Drug Product A if it is

dispensed, but only EAC plus fee of Drug Product B if Drug Product B is dispensed.  In all cases Medi-Cal's payment to any pharmacist cannot exceed that pharmacist's customary and usual charge.

Estimated Acquisition Cost for most drugs means the Average Wholesale Price (AWP) quoted in certain industry publications.  For drugs made by 11 specified manufacturers it means the direct price from the manufacturer.  Quoted prices vary widely by package size, so regulations require that the State pay for "100's, pints or pounds" if available, because all pharmacies can afford to stock drugs in those small quantities.[18]  Regulations permit DOH, however, to set prices based upon larger package sizes if such size is that "most frequently purchased."[19] The option of establishing controls based upon manufacturers' direct prices, instead of wholesale, and larger package sizes (now applicable to 11 drugs) rather than 100's, pints and pounds, are of recent date. They stem from Federal regulations establishing the EAC program, the California version of which became effective March 6, 1977.[20]

The actual acquisition cost of individual pharmacies has no bearing upon the payment Medi-Cal makes.  Medi-Cal pays at the unit price for 100's even though the pharmacy may have purchased at a lower 1,000's price, and pays the wholesale cost even though the pharmacist may have purchased at lower prices direct from the manufacturer.

Prior to the new EAC controls of March 6, 1977 the margin between AWP and pharmacies' actual acquisition cost served to offset a fee level which many pharmacists believed to be inadequate.  In recognition of this

18/Ibid., Section 51513(a)(10).
19/Ibid., Sections 51513(a) and 51513.2.
20/Federal:  45 CFR 250.30 (b).
   State:   Medi-Cal Bulletin No. 65A (Professional).

view, DOH increased the fee on March 6, 1977 from $2.86 to $3.06 per prescription, an amount calculated to offset the loss to pharmacies arising from imposition of EAC controls on that date.  Simultaneously, DOH initiated a study to determine a proper fee, but recommendations arising from it had not been made at the time of completion of this study.

Explanation of the magnitude of the fee is difficult, because there is no consensus as to its definition, nor is there an accepted means of calculating it.  The effective dates of changes in the fee in recent years are shown below.

| | |
|---|---|
| March 6, 1977 | $3.06 |
| September 9, 1976 | 2.86 |
| July 1, 1975 | 2.70 |
| November 1, 1972 | 2.42 |
| July 1, 1972 | 2.30 |

The most recent fee increase was calculated, as noted above, as an offset to a reduction in Medi-Cal's costs estimated to result from the EAC program, thus effectively nullifying the savings of the latter.  This was not an admission by DOH that the EAC program unreasonably reduced pharmacies revenue, but an admission that it did not know what the effect was.  The current DOH fee study was designed to provide the information needed to determine whether the $3.06 fee ought to be retained.

The 1975 increase in fee from $2.42 to $2.70 was established by a study in which chain stores were underrepresented and the average fee was selected despite a very wide range. [21/]

_____

21/"Report on the Department of Health's Pharmacy Services Charge
    Survey." Report No. 25-75-1, Rates and Fees Section, DOH,
    January, 1975.

Objections to use of the fee as a cost or charge component separate from ingredient cost are summarized in Chapter III.  Ingredient cost ceilings can be determined from published prices, even though these prices are not the prices actually paid by pharmacies.  Neither DOH nor HEW provide a workable definition of the dispensing fee.