# Exhibit 14-3

*State of California ex rel. Ven-A-Care of the Florida Keys, Inc. v.*
*Abbott Labs, Inc. et al., Civil Action No. 03-11226-PBS*

**Exhibit to the November 25, 2009 Declaration of Philip D. Robben**
**in Support of Defendants' Joint Motion for Partial Summary Judgment**

1. Increased generic prescribing

2. Reduction in number of drugs under patent.

3. Promotion and advertising to the public of lower cost drugs, particularly by chain stores.

4. Promotion of generic lines by major pharmaceutical manufacturers.

5. Adoption of MAC, EAC and similar state and other third-party price control programs.

It is possible that in the next few years these factors will depress drug prices as well as the profit margins of pharmaceutical manufacturers.[2/] There is little evidence of such price reduction to da however. Factors working against significant price reductions arising from substitution are:

1. Drugs coming off patent become branded generics which tend to retai both their high price and very high market share.

2. Vigorous resistance to MAC and similar programs by the pharmaceutic manufacturing industry.

3. Very slow rate of increase in generic prescribing.

4. Failure of state substitution laws to promote substitution.

New state drug substitution laws are permissive, not mandatory. Substitution usually requires the consent of the customer and in some c the customer must initiate the request for substitution. Savings usual must be passed on to the customer (California law has this provision) a pharmacists have been unsure about the liability they incur by substi- tuting. In the last analysis it will be the pressure of competition that produces price reductions. Consumerist concern has helped bring about changes in the law that now make such competition possible.

---

[2/] "Multi-Source Drugs: An Acceleration in the Use of Lower-Costing Substitutes?" Reynolds Securities, 13 May, 1977.

The Medi-Cal drug formulary is usefully discussed within the context of substitution. It is the list of drugs which are benefits of the Medi-Cal program. Medi-Cal will pay for any of the 2,000 or so drugs on the formulary if prescribed by a physician or other person authorized to prescribe by state law. Drugs not on the formulary are also benefits of the program if the prescribing physician insists upon it, and if a Medi-Cal consultant in Medi-Cal's Field Services Section concurs. "Legend" drugs are those drugs which by Federal law cannot be dispensed without a prescription. The Medi-Cal formulary includes both legend and non-legend drugs. The latter are referred to as over-the-counter (OTC) drugs.

Additions to and deletions from the Medi-Cal formulary are made upon recommendation of the Medical Therapeutics and Drug Advisory Committee, an appointed panel composed primarily of physicians and pharmacists, and approved by the Director of DOH.

The formulary could be used to control the prices Medi-Cal pays for drugs by using price as an explicit criterion for addition of drugs to the formulary, or deletion from the formulary. Nothing in law, regulations or Committee practice suggests that the formulary is or ought to be so used. Drugs are deleted because they are found to be seldom used, to duplicate other drugs, are ineffective or, in some cases, have been found to be harmful. Drugs are added if found to be less toxic than existing drugs, to fill an unmet need, or to be more effective than alternatives.

The need for a formulary has been questioned, as well as the length of the formulary, its composition, and the effectiveness of the Committee in administering it.

It may be unwise to rely upon use of the formulary fo
control, since that objective may conflict with its primary f
Within the present system of price controls, the MAIC program
about 100 drugs, to force selection among multi-source drugs
basis of price.  If the recommendation made by this report we
implemented there would be no need for MAIC or for use of the
as a price control device.

APPENDIX 2

EXPLANATION OF DATA IN TABLE 1-3

The data in Table 1-3 is derived as follows:

<u>Sales to Medi-Cal</u>:  Medi-Cal Intermediary Operations (MIO) report
HMDPECY-4 entitled "Pharmacy Earning Report-Year Ending 12/31/76."
Data summed county-by-county.  Identification of chain, hospital
and other categories was made by DOF staff.

<u>Number of Stores</u>:  No distinction is made in this table between the
number of licensed stores and the number who actually billed
Medi-Cal in 1976 because the <u>total</u> number of the latter cannot
readily be determined precisely.  An actual count of stores in
the MIO report is 4,992, but this is known to include duplication.
A total of 485 hospitals are licensed to serve outpatients, but
562 are known to have billed Medi-Cal in 1974-75, based on a
special printout obtained from the California Health Facilities
Commission, and probably a larger number in 1976.  This is
believed to be due to the fact that some hospitals licensed to
serve inpatients only in fact provide some drugs to outpatients.
In 1976, by actual count of stores in MIO's Medi-Cal report,
only 1,063 chains with five or more stores billed Medi-Cal.
1,103 are licensed, however (see Table 1-2).  A total
of 402 chains with two to four stores per chain is the
actual count of stores that billed Medi-Cal in 1976.  The

-69-

professional, community, and other category is a residual: total licensed stores less all others.  In summary, all figures in this column are numbers of licensed stores, except for the number of chains with two to four stores which has been deducted from the total of professional, community, and other.

Total Sales:

1. Chains (2-4):  402 stores @ $150,000.

2. Chains (5 or more):  constructed from financial reports of four large chains with a total of 628 stores and sales of $166 million, plus 475 stores at $175,000 each.

3. Hospitals:  based upon a special report of the California Health Facilities Commission showing total costs of $54 million in 1974-75, increased by 10 percent to estimate 1976 costs, multiplied by 1.5 to convert costs to revenues.

4. Professional, Community, and other:  2,919 stores at $135,000.

Estimates made above of sales volume per store based on national averages estimated from three periodicals in the drug field.

APPENDIX 3

PRICE CONTROLS IN OTHER INDUSTRIES


Price controls have been used to meet emergencies in the economy at large and are endemic in certain industries.  In wartime price controls and rationing have accompanied diversion of a large segment of the economy to output for military uses.  Similar inflation controls upon prices were instituted for the first time in peacetime in 1971, initially as a wage-price freeze, and subsequently in the form of ceiling prices with a variety of mechanisms for calculating them and for permitting upward adjustments to reflect increased costs.  These inflation controls have in each instance been temporary.  The "incomes policy" of the 1970s was most effective in the months immediately following its imposition, and least destructive of the market system it was designed to control.  Subsequently it led to black markets, product shortages, failure of firms, and distortions in costs and prices as companies began to adapt, not to the myriad of normal market forces but to the control system itself. [1/]

Regulation of monopolies has long been an accepted practice. Thus utilities and firms in the transportation and communication industries serve designated markets at set rates and/or return on investment under the aegis of Federal regulatory bodies.  The potential for competition in industries heretofore viewed as "natural" monopolies is now attracting attention.  The waste inherent in control has been

[1/]Confessions of a Price Controller, C. Jackson Grayson, Jr., Homewood, Illinois:  Dow-Jones-Irwin, Inc., 1974, pp. 204-207.

estimated to be substantial.  Recent studies have addressed limitation upon the entry of new firms, the influence of industry upon the adminis- trative bodies that control it, lack of innovation, and the inherent limitations of regulatory bodies in dealing with the complexities of business. [2]

The power of government to control prices in peacetime has not been limited to inflation control and regulation of monopoly, but extends to the protection of selected industries, whenever government finds it necessary in the public interest to do so. [3]  Agriculture is the prime beneficiary of such regulation.  Price support is a cornerstone of Federal farm programs affecting a variety of agricultural commodities.

Resale price maintenance (R.P.M.) is another form of price control specific to certain products within certain industries.  "Fair trade" laws in various states permit manufacturers to set the prices of the retailers who ultimately market their products.  R.P.M. effectively restrains price competition among both manufacturers and retailers.  It has the effect of widening retailers gross margins and shifting emphasis to nonprice competition.  Secondary effects may include increase in the number and dispersion of retail outlets, as price competition subsides. [4] The earliest efforts on behalf of R.P.M. involved the National Association of Retail Druggists, and drugs, cosmetics and toiletries were the most important area of application of fair trade.  Because prescription items

[2] Promoting Competition in Regulated Markets, Editor, Almarin Philips, Washington:  The Brookings Institution, 1975, pp. 368-370.
[3] Nebbia vs. New York.  291 U.S. 502 (1934).
[4] Resale Price Maintenance, B.S. Yamey, Editor, Chicago:  Aldine Publishing Co., 1966, pp. 1-22.

were and still are "sold under conditions that are largely inimical to price shopping and favorable to price maintenance." R.P.M. efforts were limited to nonprescription drugs. [5/]   Adverse legislation in combination with discounting has since the 1950s reduced the effectiveness of R.P.M. "Almost thirty years' use of price maintenance, with varying degrees of enforcement, shows it to be little more than a futile and costly barrier to change and competition in marketing." [6/]

---

[5/] Ibid, p. 91.
[6/] Ibid, p. 100.

APPENDIX 4

OTHER MEDICAID AND THIRD-PARTY DRUG PROGRAMS


All states except Arizona have Medicaid programs.  All but Arizona and three other states purchase drugs from privately owned pharmacies for use by ambulatory beneficiaries.  In addition, numerous private group health care programs, chiefly those of large corporations, unions and other employee groups provide prescription drug benefits to their employees or members.  All such third-party plans are faced with the same financial problem:  the beneficiary has no direct interest in cost containment.  In most cases payments to providers are made and day-to-day transactions administered by a fiscal intermediary on behalf of the sponsoring group.

It is estimated that about 25 percent of all prescriptions in the United States are paid by such third-party plans.  Medicaid prescriptions are estimated to be about 15.5 percent of all prescriptions and other third party prescriptions about 9.5 percent. [1]/

The payment characteristics of Medicaid and other third party plans are similar.  In Table A4-1 Medicaid pharmaceutical payment plans of five large states are compared.  All maintain a distinction between fee and ingredient cost.  Four of the five states use AWP for ingredient cost, as reported in Medical Economics Red Book or, in some cases in the Blue Book or manufacturers' catalogs.  New York State, (exclusive of

---

[1]/American Druggist, June, 1976, p. 42.

TABLE A4-1

CHARACTERISTICS OF PHARMACEUTICAL PAYMENT PLANS
OF MEDICAID PROGRAMS, SELECTED STATES
1974-75

| | Pharm. Benefits Millions $ | Rx Charge Formula | Fee | Ingredient Cost Calculation |
|---|---|---|---|---|
| California | $ 103 | AWP & Fee, with exceptions | $ 2.70 (1977:$3.06) | Usually Red Book AWP |
| Illinois | 65 | AWP & Fee | $ 2.05 (1977:$2.35) | AWP |
| New York | 91 | Acquisition Cost & Fee | $ 2.00 (1977:$2.00) | Acquisition is invoice cost |
| Pennsylvania | 44 | AWP & Fee | $ 1.85 (1977:$2.00) | Red Book AWP |
| Texas | 38 | Acquisition Cost & Fee | Variable $1.94-$2.36 (1977:$2.25-$2.75) | Acquisition is Red Book AWP |

SOURCE:  National Pharmaceutical Council, Pharmaceutical Benefits
Under State Medical Assistance Plans, 1976.

New York City) uses acquisition cost as reflected in invoice price.  No

information is available on the extent to which invoice price is in fact

AWP, and the extent of auditing required, or provider subversion or evasion

of the "invoice cost" requirement.  California's fee of $3.06 is now and

has for at least seven years been the highest in the nation.  California's

fee is clearly more liberal than that of other states, but also reflects higher costs of operation in California.  Effective March 6, 1977, California had effected their version of the EAC plan, which effectively reduces pharmacies' compensation.  Four other states had complied with that Federal requirement by midyear, 1977.

Most third-party plans in California are administered by a few fiscal intermediaries, including PCS, Blue Shield and Paid Prescriptions. Payments to providers tend to follow the Medi-Cal formula closely: generally compensation is AWP plus a fee of about $3.00 per prescription.

Certain large organizations have achieved more favorable terms than those available in the standard plans administered by fiscal inter-mediaries by negotiating directly with pharmacies.  In New York City the United Federation of Teachers (UFT) has taken advantage of its buying power and negotiating capability to reduce prices below those available to the general public, or to other conventional third-party plans.[2]  In this instance pressure on the prices charged by the numerous small providers in this plan necessitates a claims review system to prevent providers' cheating, much like that of Medi-Cal's Drug Utilization Review Unit.

In California certain large organizations have negotiated plans directly with chain pharmacies, in which the bargaining power of the contracting parties is more nearly equal.  Some of these plans also provide prices below those available either to Medi-Cal or the general public.  The existence of such plans augurs well for the likelihood that similar favorable price terms could be made available to Medi-Cal.  It is understood that Tennessee has assumed ownership of pharmacies dispensing

---

[2]/"Use of Consumer Leverage to Reduce Prescription Costs...," American Druggist, November, 1976, p. 17.

drugs to Medicaid patients, but in general, other state Medicaid plans and conventional intermediary-administered third-party plans are not innovative and offer no significant cost-cutting features other than pressure upon dispensing fees.

APPENDIX 5

PRICE CONTROLS APPLICABLE TO MEDI-CAL
PROVIDERS OTHER THAN PHARMACIES


In the Medi-Cal program, or any third-party program in which the interests of the party who receives services do not necessarily coincide with those of the party who pays for them, rules governing allowable services and the prices to be paid for them must be established. Medi-Cal has established controls applicable to all categories of providers. Payments to hospitals and nursing homes are based upon an approximation of cost and payments to physicians and other providers of health services and supplies upon charges. (Table A5-1.)

Medi-Cal payments to hospitals are based upon "reasonable cost." [1] For each hospital reasonable cost in 1975-76 was equal to that hospital's average total cost per Medi-Cal patient day of service for 1974-75 plus a maximum of 10 percent, and 1976-77 cost was limited to 1975-76 cost plus 7 percent. Thus the problem of rapidly increasing hospital costs has been dealt with by limiting percentage increases from year to year. Cost exclusions and allocations are determined by reference to a Federal manual. Additional reimbursement is available to those hospitals which can demonstrate that their actual cost increases exceeded the allowable maxima, if their occupancy rate was at least 70 percent and if they

---

[1] State of California, California Administrative Code, Title 22, Section 51508.

TABLE A5-1

## MAXIMUM PAYMENT ALLOWED SELECTED PROVIDERS
## 1976-77

| Provider | Maximum Payment Allowed |
|---|---|
| Physicians, Podiatrists, Nurse Anesthetists | 1969 R.V.S. X Amt. per Unit |
| Hospitals (Inpatients Only) | 1976-77 reimbursement per patient day = 1975-76 average total cost per Medi-Cal patient day + 7%. 1975-76 reimbursement = 1974-75 + 10%. Higher % increases allowed if hospital submits actual cost data and meets other criteria including minimum 70% occupancy. Exception for hospitals with Medi-Cal occupancy greater than 9 1/2%. |
| Skilled Nursing Facilities | Schedule of maximum reimbursements per patient day. Includes special employee wage increase of $.10 per hour. |
| Prosthetics and Orthotics | Schedule of maximum reimbursements per appliance. |
| Prepaid Health Plans | Flat rate per capita. |
| General | No payment greater than charge made to non-Medi-Cal patients. |

either undertook a new and necessary service or experienced a change in patient mix.  In addition, if Medi-Cal occupancy exceeds 9.5 percent higher reimbursement may be allowed.  This constitutes recognition that payment at Medi-Cal rates may cause costs to be shifted to other patients. [2]

The complexity of the operations of acute hospitals has thus far made impossible establishment of a flat rate per patient day.  The existence of excess capacity and the penchant of hospitals to duplicate facilities and equipment available in neighboring institutions has given rise to the possibility of soliciting competitive bids among hospitals. The legality of selective issuance of provider agreements has been tested in other jurisdictions. [3]  The Department of Health is currently considering competitive bidding among hospitals as a device to reduce costs.

Nursing homes are paid by Medi-Cal a flat fee per patient day. The costs of nursing homes are less complex than those of acute hospitals. Medi-Cal beneficiaries' percentage of occupancy of nursing homes is much greater than that in acute hospitals, and Medi-Cal's specification of the skilled nursing and intermediate care services provided is extensive. In an attempt to improve nursing home quality of care Medi-Cal took the unusual step of specifying that part of a recent rate increase be used to increase employees' wages. [4]

For purposes of setting rates to the general public, physicians and other health professionals have long used Relative Value Studies

[2] Ibid., Section 51508 through 51508.9.
[3] See, for example, Memorandum of Regional Attorney, Region VIII, HEW to Acting Regional Commissioner, November 4, 1976.
[4] California Admin. Gode, Title 22, op. cit., Section 51511.

prepared by their peers and published by their local affiliate of the
American Medical Association.  For physicians every medical procedure is
identified and a relative value established for each.  Each physician
can then charge an amount equal to this relative value times a factor
that he himself establishes.  Medi-Cal currently sets its rate maxima
for physicians by establishing conversion factors to be applied to the
1969 California Relative Value Studies.[5]

No generally applicable rationale for Medi-Cal's rate-making
policies exists.  It is not helpful to say that they reflect "cost" or
"price" because the range of possible costs and prices is in each
instance very great.  In addition, the competition which exists among
pharmacies is largely absent among other health providers.  The level
of reimbursement then tends to be determined by availability of funds,
pressure from providers and estimation by administrators of the impact
of rates upon the quality and volume of services likely to be made
available.

---

[5] Op. cit., Section 51503.

APPENDIX 6

MEDI-CAL CONTROLS UPON VOLUME OF DRUGS UTILIZED

This study deals with price per unit, not the factors that impact number of units per time period, but DOH also has a variety of controls that affect volume:

1. By prior authorization, which is approval by a Medi-Cal consultant of Medi-Cal's Field Services Section in advance of the rendering of service.  Prior authorization for drugs is required only for drugs not on the formulary, which is the list of drugs which are benefits of the Medi-Cal program.[1]  The formulary could be used for price control as well as utilization control, but it has not been explicitly used for the purpose of excluding drugs which are more expensive than therapeutic equivalents.

2. By postservice-prepayment audits of claims by the fiscal intermediary.

3. By postservice-postpayment audits by the Medi-Cal Drug Utilization Review Unit.  Such audits restrict the volume for which Medi-Cal pays both by identifying payments made for which services were not rendered, as well as those made for unnecessary services rendered, such as the provision of an excessive number of refills.  This category of audit also includes the activities of peer review committees which are teams of local practicing pharmacists who

_____
[1] State of California, California Administrative Code, Title 22, Sections 51159 and 51313.

-83-

utilize paid claims data to identify patterns of prescribing and dispensing which result in provision of "unnecessary" pharmaceutical services.[2/]

4. By "limitation on number of services, which means certain services may be restricted as to number within a specified time frame."[3/] The only such current restriction is that "Prescriptions shall be furnished in quantities not to exceed a 100 calendar day supply."[4/] A requirement that beneficiaries except nursing home patients be limited to a maximum of two prescriptions per month was recently rescinded.

A recent study disclosed that most of the increases in Medi-Cal drug costs in the period 1972-73 through 1975-76 were attributable to quantity considerations, not price, as follows:[5/]

| | |
|---|---|
| Increased drug recipients | 9.9% |
| Increased Rx's per recipient | 35.2% |
| Increased units per Rx | 32.4% |
| Factors that produce increase in volume | 77.5% |
| Factors that produce increase in price | 22.5% |

Nonprice controls are not limited to control of the pharmacist. The formulary requires physicians to justify to Medi-Cal consultants the prescription of nonformulary drugs, or to alter their prescription to

2/Ibid., Section 51159.1.
3/Ibid., Section 51159.
4/Ibid., Section 51313.
5/"Analysis of Growth in Medi-Cal Drug Expenditures," 1972-73 vs. 1975-76, Eli Lilly and Co., unpublished report, 1977.

conform to the formulary.  The drug post-payment review system identifies for peer review those beneficiaries who utilize more than one physician. Physicians' prescribing practices clearly have greater impact upon patterns of drug utilization than do the practices of pharmacists or beneficiaries.

APPENDIX 7

ALTERATIONS TO MAIC

In Chapter III the first alternative presented is expansion of existing ceiling controls by adding drugs to the Maximum Allowable Ingredient Cost (MAIC) list.  MAIC is the list of Medi-Cal price maxima for about 100 large-volume multi-source drugs.  For a given drug product, DOH designates the ceiling price as that of a manufacturer whose product is of acceptable quality and widely available.

At the time this study was undertaken DOH had embarked upon a program of expanding the MAIC list.  In order to obtain an estimate of the savings likely to be achieved by such a program the Department of Finance study team consulted the California Pharmaceutical Association (CPhA).  From a list of Medi-Cal's 70 largest volume multi-source drugs plus those drugs on MAIC (the lists overlap and total about 135 drugs) the Technical Committee of CPhA suggested the addition of 29 drugs, and identified the manufacturers who in their view met MAIC's criteria of quality and availability.  They also recommended lower-priced brands for two drugs currently on the list.  The drugs, suggested manufacturers and savings estimates appear in Table A7-1.  Total savings are estimated to be $1.27 million per year.

TABLE A7-1

ESTIMATE OF SAVINGS ARISING FROM ADDITION OF DRUGS TO MAIC, AND REDUCTION IN PRICE OF EXISTING DRUGS, JANUARY, 1977

(A) Items Suggested for Addition to MAIC

| Code | Drug | Strength | Av. claim per Rx 1/77 | Suggested MAIC per Rx | Suggested Manufacturer | Est. Annual Savings | Comments |
|---|---|---|---|---|---|---|---|
| 0204D | Penicillin G Tabs | 400,000 units | $ 3.48 | $ 3.74 | McKesson | -0- | All mfrs. av. prices lower than suggested MAIC. |
| 0221F | Ampicillin Caps or Tabs | 500 mg. | 9.01 | 7.03 | Smith, Kline | $122000 | Suggested MAIC is Federal MAC. Deleted from MAIC 1/77. |
| 0221V | Ampicillin Oral Susp. or Sol. | 250 mg./Tsp. | 6.97 | 6.36 | Smith, Kline | 57000 | |
| 0244H | Tetracycline Caps | 250 mg. | 3.61 | 3.77 | Smith, Kline | 20000 | |
| 1608A | Trihexyphenidyl HCl Tabs | 2 mg. | 4.54 | 3.94 | Schering | 53000 | |
| 1717C | Propantheline Bromide Tabs | 15 mg. | 8.19 | 5.51 | Philips Roxane | 102000 | No Philips Roxane now dispensed. Available? |
| 2155H | Pentobarbital Sodium Caps | 100 mg. | 3.44 | 4.09 | Lilly | -0- | All mfrs. av. prices lower than sugg. MAIC. |
| 2505A | Diphenhydramine HCl Exp. | Liquid | 3.37 | 5.11 | Purepac | -0- | Drug evidently billed at customary & usual. |
| 2507A | Promethazine Expect w/Cod | Liquid | 4.13 | 7.36 | Towne, Paulsen | -0- | Drug evidently billed at customary & usual. |
| 2520A | Tripolidine HCl w/Cod Expect. | Liquid | 4.99 | 8.31 | Robinson | -0- | Drug evidently billed at customary & usual. |
| 2600E | Chlorpromazine HCl Tabs | 25 mg. | 5.71 | 4.99 | Philips Roxane | 43000 | No Philips Roxane now dispensed. |
| 2600F | Chlorpromazine HCl Tabs | 50 mg. | 6.22 | 5.38 | Philips Roxane | 34000 | No Philips Roxane now dispensed. |
| 26020 | Imipramine HCl Tabs | 50 mg. | 15.57 | 10.51 | Smith, Kline | 90000 | Possible greater saving if Towne, Paulsen available. Gregy now has 75% of Imipramine market. |
| 2602C | Imipramine HCl Tabs | 25 mg. | 9.69 | 7.28 | Smith, Kline | 81000 | |
| 2615E | Fluphenazine HCl Tabs | 5 mg. | 19.82 | 18.10 | Schering | 34000 | Only 2 Mfrs. 95% now Squibb. |
| 2644E | Reserpine Tabs | .25 mg. | 3.20 | 3.63 | Purepac | -0- | Most volume Towne, Paulsen. Mostly customary and usual. |
| 3007E | Digoxin Tabs | .125 mg. | 3.22 | 3.43 | Burroughs-Wellcome | -0- | BW has almost 100%. $3.22 av. probably customary and usual. |
| 3311A | Nitroglycerin Tabs | | 3.58 | 4.04 | Lilly | -0- | Lilly has 80% with av. billing of $3.41. |
| 3324A | Isosorbide Dinitrate Tabs | 5 mg. | 7.19 | 7.54 | Ives | -0- | Ives has more than 50% with av. billing of $7.29. |
| 3324B | Isosorbide Dinitrate Tabs | 10 mg. | 8.02 | 8.51 | Ives | -0- | Ives has av. billing of $8.27. |

| Code | Drug | Strength | Av. claim per Rx 1/77 | Suggested MAIC per Rx | Suggested Manufacturer | Est. Annual Savings | Comments |
|---|---|---|---|---|---|---|---|
| 7152B | Vitamins ADC w/Sod. Fl. Drops | | $ 5.37 | $ 5.54 | Mead Johnson | -0- | Mead Johnson has 80% with av. billing of $5.30. |
| 8005C | Chlorpheniramine Maleate Tabs | 4 mg. | 2.99 | 3.60 | ICN | -0- | All mfrs. av. prices lower than suggested MAIC. |
| 8005D | Chlorpheniramine Maleate | Liquid | 3.46 | 5.18 | Lederle | -0- | Drug evidently billed at customary and usual. |
| 8076A | Tripolidine & Pseudoephedrine Tabs | | 4.86 | 4.81 | Robinson | $ 50000 | BW has 75% of business. Robinson available? |
| 8076B | Tripolidine & Pseudoephedrine | Liquid | 4.01 | 6.35 | Robinson | -0- | Drug evidently billed at customary & usual. |
| 8103A | Meclizine HCl Tabs | 25 mg. | 9.07 | 4.37 | Towne, Paulsen | 356000 | Roerig has 75% of business. Towne, Paulsen available? |
| 8940J | Prednisolone Tabs | 5 mg. | 4.63 | 4.06 | Towne, Paulsen | 18000 | Towne, Paulsen largest supplier w/30% of business. |
| 9124J | HC w/Iodochlorhydroxyquin | 1% | 6.87 | 6.26 | Barnes-Hind | 36000 | Ciba now supplies 75%, Barnes-Hind none in 1/77. |
| 9507A | Sulfanilamide & Aminoacridine w/Appl. | | 6.63 | 6.31 | Syntex | 18000 | Syntex had no business in 1/77. |
| | TOTAL ITEMS SUGGESTED FOR ADDITION TO MAIC | | | | | $1114000 | |

(B) Items on MAIC, Lower Price Suggested

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 0221E | Ampicillin Caps or Tabs | 250 mg. | 6.38 | 5.18 | Smith, Kline | $ 134000 | Suggested MAIC is Federal MAIC. |
| 0221P | Ampicillin Liquid | 250 mg./5 cc | 5.24 | 4.91 | Smith, Kline | 18000 | |
| | TOTAL ITEMS ON MAIC, LOWER PRICE SUGGESTED | | | | | $ 152000 | |
| | TOTAL PRICE REDUCTIONS RECOMMENDED | | | | | $1266000 | |

SOURCE: Drugs and manufacturers identified by California Pharmaceutical Association. Savings calculations by Department of Finance.

APPENDIX 8

MODIFIED VOLUME PURCHASE PLAN


In February, 1975, DOH appointed a task force to examine the possibility of the State's purchasing drugs for the Medi-Cal program direct from drug manufacturers.  The task force found that the Department of Defense and the Veteran's Administration were buying at prices about one-half those of the Medi-Cal program, and the State Department of General Services and Los Angeles County at prices about one-third less than Medi-Cal prices.  In order to attempt to take advantage of such prices DOH designed the Volume Purchase Plan (VPP) which entailed purchase on a bid basis direct from manufacturers of certain large-volume drugs.  The Department of Health proposed that the State assume ownership of the drugs, but that they be shipped directly to wholesalers and then to retailers, both of whom would receive a fee for their services.  It was estimated that the plan would save the Medi-Cal program between $5.7 and $14.6 million on the purchase of 150 drug items with an ingredient cost to the state in 1973-74 of $60 million. [1]

It proved impossible to make the program operative, even on a pilot basis.  Voluntary participation of manufacturers, wholesalers, and pharmacies was necessary to its success.  By March, 1977, DOH had decided that the direct intervention in the market contemplated by the State was impractical, and announced the Modified Volume Purchase Plan. [2]

[1] Department of Health, Task Force on Volume Health Item Purchasing, "Feasibility of Reducing Net Cost of Prescription Drugs," p. 4, April 1, 1975.

[2] Department of Health, Medi-Cal Division, "Modified Volume Purchase Plan," March 28, 1977.

The Modified VPP is a rebate plan.  It was proposed initially as an 18-month pilot program applicable to 75 multi-source drugs to be dispensed through 300 volunteer pharmacies in 11 counties.  Manufacturers were to be invited to offer the State a refund on drugs sold by them to Medi-Cal through existing channels.  If a manufacturer were a successful bidder (only one would be selected for each drug) the State would so advise participating pharmacies.  An incentive of $.30 per prescription was intended to induce the pharmacy to dispense those drugs on which the State would receive a discount.  Periodically the State would present the manufacturer with an invoice claiming the rebate due on the volume dispensed.

On May 3, 1977, the Pharmaceutical Manufacturers Association filed suit in Sacramento Superior Court, claiming the plan would cause "irreparable harm" to its members because their products could be excluded from a major segment of the California market.  The suit required the Department of Health to indicate the source of its authority to conduct the pilot project.  An initial hearing was scheduled for September, 1977.  On August 24, 1977 the Joint Legislative Budget Committee disapproved the Department's request to start the pilot project.

The Modified VPP is similar in concept to the short-lived Volume Refund Plan (VRP) of 1972 which offered manufacturers exemption from the ceilings of the Reimbursable Cost List Price (RCLP) plan.  The Volume Refund Plan had to be abandoned following a PMA suit, but RCLP was reinstituted as MAIC.  Savings arising from VRP were limited to the difference between each brand's AWP and the established ceiling.  The Modified Volume Purchase Plan would seek a saving below the existing MAIC or EAC, or AWP if neither

-92-

an MAIC or EAC exist.  The pilot was to apply to the 75 multi-source drugs, most of which have MAIC ceilings and some of which are covered by EAC maxima.  The Volume Refund Plan prevented a manufacturer's exclusion from the Medi-Cal market at the cost of a rebate to Medi-Cal, but without the need for reduction in that manufacturer's price to all his customers. The Modified Volume Purchase Plan would guarantee to a single successful bidder the entire Medi-Cal market for each generic drug product.

The sole purpose of the VPP program is to reduce costs to Medi-Cal.  Its success rests upon the magnitude of four variables: (1) volume of Medi-Cal business affected, (2) manufacturers' refunds, (3) pharmacists' fees, and (4) administrative costs.

In the proposed VPP program, prior to its conversion to a rebate plan, the estimate of volume of drugs included single-source drugs as well as multi-source on the ground that the Veterans Administration and the Department of Defense in fact received discounts on them.  It is unlikely that the State will receive discounts on single-source drugs under the Modified VPP.  The original plan contemplated assumption of ownership by the State upon shipment by the manufacturer, but the Modified VPP requires the manufacturer to assume a level of responsibility for moving drugs through channels no different than he would have in the absence of the program.  Nor were the economics of large-volume shipments likely to be achieved even under the original VPP.  It also is apparent that PMA members - the industry's largest manufacturers who produce almost all the single-source drugs used by Medi-Cal - are firm in their opposition to volume purchase by Medicaid programs, notwithstanding their traditional discount to those large Federal, State and county buyers whose purchases

-93-

are viewed as less of a threat to the price structure of their products marketed through conventional channels. As time passes, however, the ratio of single-source drugs to multi-source is declining. In 1975-76 143 of the 200 largest-volume Medi-Cal drugs were multi-source, with an ingredient cost of about $36,000,000 that is expected to increase to $48,500,000 in 1977-78 (Table A8-1). Achieving the volume estimated in Table A8-1 also depends upon whether manufacturers bid on all 143 multi-source drugs, and whether all pharmacies participate in the full-scale plan.

Manufacturers' discounts of 20% are used for the purpose of calculating savings in Table A8-1. A 33% discount had been estimated for the original VPP, based upon analysis of actual discounts to the Department of Defense, Veterans Administration, Los Angeles County and the state hospitals and for the California State College and University system.) A 20% estimate is used in Table A8-1 in recognition of the fact that a rebate would not be as attractive to manufacturers as would outright purchase. By September, 1977, 40 manufacturers had shown interest in the pilot program but the number likely to participate in a full-scale program and the likely level of discounts is difficult to estimate, notwithstanding the comparison made above with the discounts granted to other government agencies.

The need for an incentive to induce pharmacists to participate is equally difficult to evaluate. More than the requisite 300 pharmacies volunteered for the pilot program. It is unlikely that this could have been accomplished without a financial incentive. If it had been discovered in the course of the pilot that the designated Medi-Cal VPP drugs were wide

available, and were acceptable to the pharmacist, physician and bene-
ficiary, Medi-Cal could have mandated their use and withdrawn the $.30
incentive.  This would entail substitution of the state's judgment for
that of the physician or pharmacist.

Based upon the data in Table A8-1 the breakeven level of manu-
facturers' discounts (the level of discount needed to cover the pharmacy
fee plus administrative and development cost) in the full-scale program
is about 11 percent.  Failure of manufacturers to bid, or to bid an
amount sufficient to warrant acceptance of their bid, and failure of
pharmacies to participate or to participate in full degree, will have
the effect of reducing the average manufacturer  scount.

The facts that were expected to be gained from the pilot are:

1. Volume discounts applicable to the full-scale project.  The manu-
   facturers' contracts were to be designed to commit them to the
   discount applicable to large volume as well as the pilot volume.

2. The shift in mix of business for each drug and each pharmacy.  This
   complex task was to be accomplished by comparing volume of VPP drugs
   before the pilot to volume after the pilot, and by comparing parti-
   cipating pharmacies to a control group.

The Modified Volume Purchase Plan is compatible with the compe-
titive bid procedure recommended in this report, provided that partici-
pation by pharmacies remains voluntary, because a major purpose of that
recommendation is to shift decision-making away from the State and to
the pharmacies.  Mandating the brand of multi-source drug to be used
by Medi-Cal is likely to eliminate from the bidding process many
pharmacies unwilling to use that brand for their non-Medi-Cal customers
or to carry duplicate inventories.

-95-



TABLE A8-1

MODIFIED VOLUME PURCHASE PLAN
ILLUSTRATION OF POTENTIAL SAVINGS, 1977-78

| | Full-Scale Project (143 Multi-Source Drugs All Stores) | Pilot Project (75 Multi-Source D 300 Stores) |
|---|---|---|
| Number of prescriptions | $ 13,700,000[b]/ | $ 600,000[d]/ |
| Payment for ingredients | $ 48,500,000[a]/ | $ 2,000,000[c]/ |
| Manufacturers' discounts (20%) | $ 9,700,000 | $ 400,000 |
| Less: Pharmacy fee ($.30/Rx) | $ 4,100,000 | $ 180,000 |
| Admin. & Develop. Cost | 1,000,000 | 330,000 |
| Total | $ 5,100,000 | $ 510,000 |
| Saving | $ 4,600,000 | $ (110,000) |

---

SOURCE:  DOF calculations based upon stated assumptions.  No DOH projection existed at time of completion of study.

a/1975-76 ingredient cost for top 143 multi-source drugs = $36.2 milli
   Growth in total budgeted drug outlay between 1975-76 and 1977-78 =
   34%.  $36.2 · 1.34 = $48.5.  Does not take into consideration like
   that multi-source volume will increase more rapidly than single-so
b/1975-76 number of Rx for top 143 multi-source drugs = 11.7 million.
   Assume one-half or 17% of growth will be in number of Rx.  11.7 ·
   1.17 = 13.7.
c/1975-76 ingredient cost for top 75 multi-source drugs = $30 million.
   Since 6.5% of stores participating, .065 · $30 = $2.0.
d/1975-76 number of Rx for top 75 multi-source drugs = 9 million.
   .065 · 9.0 = 600,000.

The probability is great that the full-scale Modified VPP will achieve no savings. A pilot is required primarily to establish the major unknown: the level of discounts offered by manufacturers. Conversion of a given manufacturer's discount into savings to the State requires consideration of the extent to which the State is already paying less than the maxima from which the discount is calculated, and tracking the shift in market share. The potential for savings exists, however, and the pilot project should eventually go forward, subject to:

1. Approval by the Legislature.

2. Resolution of the very complex reporting system needed to evaluate the pilot project.

3. Recognition that the Modified VPP rebate concept is not designed to replace ceiling cost controls but to supplement them. It could also supplement a competitive bid program.

APPENDIX 9

DRUG PRICE SURVEY METHODOLOGY


The purpose of this appendix is to explain the process of selection of the 27 drug/quantity items which made up the drug price survey and the selection of sample stores, and to estimate the validity of the results obtained.


Surveyed Drugs

Our selection of the sampled drugs was based on the following criteria:

1. Include only drugs on the Medi-Cal formulary.

2. Include both high and low priced drugs.

3. Include relatively high volume drugs in terms of Medi-Cal sales.

4. Include only drugs on the Board of Pharmacy price poster which every pharmacy is required by law to post.

5. Select drug strength and quantity per prescription based on those most often paid for by Medi-Cal.

6. Include both single and multi-source drugs.

The drugs in Table A9-1 were selected using the above criteria.  The table shows that the prices paid by Medi-Cal range from $2.84 per prescription for phenobarbital tablets to $12.89 for Diabenese tablets.  The 16 drugs included in the sample constituted 15.8 percent of Medi-Cal purchases in

1975-76.  The survey document itself appears as Figure A9-1, and includes the quantities selected per drug.  The document produces 27 prices in total, which were summed to produce the "market-basket" price used in the text.  The quantities shown in Table A9-1 provide the weights used for purposes of price calculations in the text.

Drugs on the Board of Pharmacy price poster were selected because the poster is the most reliable source of pharmacies' prices.  The view was advanced, however, that some pharmacies use the price poster for advertising purposes and that prices of poster drugs might therefore tend to be lower than others.  A sample of nonposter drugs, meeting all of the other selection criteria, was therefore compared to the survey sample.  Inspection of the Paid Claims records of the Department of Health showed that the ratio of Medi-Cal maximum prices to actual prices paid for the survey poster drugs was within 5 percent of the same ratio for nonposter drugs.

The prices required to be posted on the Board of Pharmacy poster are the usual and customary prices which are charged to the ambulatory private patient.  Prices actually paid by consumers are sometimes lower than the poster price, since some drug stores give up to 10 percent discounts to senior citizens, who purchase a higher than average number of drugs.

Selection of Sample Stores

Prices were obtained from stores in four large counties - Los Angeles, Alameda, Sacramento and San Diego - which accounted for 53.8 percent of Medi-Cal drug claims in the period July-December, 1976.  Analysis

TABLE A9-1

MEDI-CAL COST AND USAGE OF DRUGS
IN PRICE SURVEY
1975-76

| Code | Drug | Usage Thousands $ | Average Amount Paid Per Rx |
|------|------|-------------------|----------------------------|
| 3307B | Aldomet Tabs 250 mg* | $ 3,090 | $10.45 |
| 3549B | Lasix Furosemide 40 mg* | 3,014 | 7.64 |
| 0244H | Tetracycline Caps 250 mg | 2,125 | 3.50 |
| 2041A | Indocin Caps 25 mg* | 1,947 | 10.44 |
| 2603B | Mellaril Tabs 25 mg* | 1,656 | 10.71 |
| 6350B | Diabinese Tabs 250 mg* | 1,448 | 12.89 |
| 0265K | Erythromycin Tabs or Caps 250 mg | 1,365 | 5.39 |
| 0221E | Ampicillin Caps 250 mg | 1,066 | 6.14 |
| 3007B | Digoxin Tabs .25 mg | 986 | 3.13 |
| 0204D | Penicillin G Tabs 400,000 Units | 790 | 3.32 |
| 2613C | Valium Tabs 5 mg* | 760 | 8.83 |
| 6230A | Ovral Tabs* | 757 | 8.03 |
| 2156K | Phenobarbital Tabs 30 mg | 626 | 2.84 |
| 2313B | Percodan Full S* | 598 | 7.54 |
| 3802A | Zyloprim Allopurinol 100 mg* | 518 | 9.05 |
| 8945C | Prednisone Tabs 5 mg | 405 | 3.64 |
| | All Drugs in Survey | $ 20,551 | $ 6.27 |
| | All Medi-Cal Drugs | $130,322 | $ 6.31 |
| | % Survey Drugs to Medi-Cal Drugs | 15.8% | |

* Single-source drugs.  All others multi-source.

FIGURE A9-1

DRUG SURVEY DOCUMENT*

| Drug Name | Quantity | |
|---|---|---|
| ALDOMET TABLET 250 mg | 100/ | |
| AMPICILLIN TABLET/CAPSULE 250 mg | 20/ | 40/ |
| DIABINESE TABLET 250 mg | 50/ | 100/ |
| DIGOXIN TABLET 0.25 mg | 50/ | 100/ |
| ERYTHROMYCIN STEARATE TABLET 250 mg | 20/ | 40/ |
| INDOCIN CAPSULE 25 mg | 50/ | 100/ |
| LASIX TABLET 40 mg | 50/ | 100/ |
| MELLARIL TABLET 25 mg | 50/ | 100/ |
| OVRAL PILPAK TABLET | 3 mo/ | |
| PENICILLIN G TABLET 400 mg | 20/ | 40/ |
| PERCODAN TABLET | 30/ | |
| PHENOBARBITAL TABLET 30 mg | 100/ | |
| PREDNISONE TABLET 5 mg | 50/ | 100/ |
| TETRACYCLINE TABLET/CAPSULE 250 mg | 25/ | 50/ |
| VALIUM TABLET 5 mg | 50/ | 100/ |
| ZYLOPRIM TABLET 100 mg | 100/ | |

* Other data was obtained on additional pages.

of Medi-Cal's paid claims for May, 1977 indicated that the average price
charged Medi-Cal in those four counties was within .5 percent of the
statewide price level.

The formula used to determine sample size in each county was

$$\sigma_{\bar{x}} = \frac{\sigma}{\sqrt{n}}\sqrt{1-\frac{n}{N}},$$ in which     N = number of pharmacies in county

n = number of pharmacies in sample

$\sigma$ = \$.70 (based on observation of Medi-Cal claims and pretest of
35 stores in Los Angeles county, and

$\sigma_{\bar{x}} = \frac{.10}{1.96}$, based upon the DOF study team's requirement that the
selection of sample stores provide a 95 percent level of confidence that
the sample mean for each drug be within $\pm$ \$0.10 of the population mean
for each drug within each county.

In addition to the sample determined by the above formula
additional large Medi-Cal stores were added in each county, and 10 percent
was added to the resulting total to allow for stores from which data
could not be obtained.  The resulting sample size is summarized below.

| | Pharmacies in County N | Pharmacies in Sample n | Added Large Medi-Cal | Plus 10% | Total |
|---|---|---|---|---|---|
| Los Angeles | 1929 | 167 | 30 | 20 | 217 |
| Alameda | 210 | 100 | 10 | 11 | 121 |
| San Diego | 252 | 107 | 10 | 12 | 129 |
| Sacramento | 143 | 81 | 10 | 9 | 100 |
| Survey forms prepared - four counties | | | | | 567 |
| Survey forms returned and used | | | | | 530 |

The number of pharmacies per county provided the county weights
used for purpose of statewide price comparisons in the text.

<u>Validation</u> <u>of</u> <u>Sample</u>

In advance of determination of sample size, standard deviation (σ) of the population had to be estimated.  In order to determine whether the sample had in fact produced an acceptable result, the standard deviation of the population was reestimated by calculating the actual standard deviation of the sample.  At the time sample size was determined the acceptable deviation from the mean was expressed in terms of individual drugs ($0.10 per drug), because the market-basket had not been selected at that time.  The calculations below are expressed in market-basket terms.  Shown below for each county and for the four-counties as a whole are the average market-basket posted price, the standard deviation obtained from the sample and the size of the acceptable confidence interval stated both in dollar terms and as a percentage of the mean.

| | Average market basket price | Sample standard deviation | Confidence interval $ | % |
|---|---|---|---|---|
| Los Angeles | $212.71 | $37.88 | + $5.44 | 2.6% |
| Alameda | 214.13 | 33.21 | + 4.55 | 2.1 |
| San Diego | 173.08 | 27.63 | + 4.01 | 2.3 |
| Sacramento | 191.37 | 35.85 | + 4.46 | 2.3 |
| 4 Counties | 206.52 | 38.71 | + 3.16 | 1.5 |

Thus, in the four counties taken together, if we assume that the standard deviation of the sample is the same as that of the universe, the sample produced a 95 percent level of confidence that the $206.52 estimate of the average market-basket price was within 1.5 percent of the actual mean in that area.  A similar statement can be made about each of the four counties.

-104-

BIBLIOGRAPHY

American Druggist, All Prescriptions: Up 2%, Third Party Prescriptions:
        Up 7%, Medicaid Prescriptions: Up 11%, June, 1976, p. 42.

American Druggist, "Mail-Order Rx Field Girds for New Growth," November,
        1976, p. 58.

American Druggist, "Use of Consumer Leverage to Reduce Prescription Costs...,"
        November, 1976, p. 17.

Brooke, Paul A., Resistant Prices, A Study of Competitive Strains in the
        Antibiotic Markets, New York and San Francisco: Council on
        Economic Priorities, 1975.

California Health Facilities Commission, First Annual Inventory of Financial
        and Statistical Information for California Hospitals, 1977.
        Covers Fiscal Year 1975-76.

Chain Store Age/Drug Edition, "IMS Data Reveals Broad Manufacturer Rx
        Pricing Differences," March, 1977, p. 95.

Chain Store Age/Drug Edition, "Large Chains Increase Hold on Market,"
        May, 1977, p. 72.

Grayson, C. Jackson, Jr., Confessions of a Price Controller, Homewood,
        Illinois: Dow-Jones-Irwin, Inc., 1974.

The Hearst Corporation, American Druggist Blue Book, New York, N.Y.

Lilly, Eli, and Co., Analysis of Growth in Medi-Cal Drug Expenditures,
        1974-73 vs. 1975-76, unpublished report, 1977.

Medical Economics Co., Drug Topics Red Book, Oradell, N. J.

Medi-Cal Intermediary Operations, computer reports, store-by-store paid
        claims data.

Medi-Cal Intermediary Operations, Medi-Cal Bulletin, No. 65A (Professional),
        San Francisco, April, 1977.

Medi-Cal Intermediary Operations, Pharmacy Earning Report--Year Ending
        12/31/76, Computer Report # HMDPECY-4.

National Pharmaceutical Council, Pharmaceutical Benefits Under State Medical
        Assistance Plans, 1976.