# Exhibit 19-3

***State of California ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Labs, Inc. et al., Civil Action No. 03-11226-PBS***

**Exhibit to the November 25, 2009 Declaration of Philip D. Robben in Support of Defendants' Joint Motion for Partial Summary Judgment**

We conducted this review under the authority vested in the auditor general by Section 10500 et seq. of the California Government Code and according to generally accepted governmental auditing standards. We limited our review to those areas specified in the audit scope section of this report.

Respectfully submitted,

KURT R. SJOBERG
Auditor General (acting)

Date:       August 26, 1991

Staff:      Steven M. Hendrickson, Audit Manager
            Deborah L. D'Ewart
            Jean M. Iacino
            Joy H. Matsuo
            Cynthia L. Traxler
            Mark B. Campbell
            Risa H. Hernandez

CAAG/DHS0071203
CAAG/DHS0071203

# Appendix A Canadian Drug Pricing Policies and Utilization Controls

In its 1990 report entitled Strategies To Reduce Medicaid Drug Expenditures, the Office of the Inspector General of the federal Department of Health and Human Services reported that, for 48 brand name drugs, the United States' average wholesale price was 62 percent higher than the average of the prices in two Canadian provinces. To determine some of the strategies that the Canadian federal and provincial governments use to control drug prices, we contacted Canadian government officials at the federal and provincial levels.

The Patented Medicine Price Review Board (board) is a Canadian federal agency that reviews patented medicine prices to ensure that the prices are not excessive. The board reports its findings on drug prices, along with information about pharmaceutical price trends and pharmaceutical industry research and development, to the Canadian Parliament.

Drug patent holders, typically the manufacturers, submit to the board pricing information on all patented medicines. Along with the Canadian price, they must, when possible, submit price data from seven other nations. The board also considers the consumer price index and the prices of medicines in the same therapeutic class in Canada and in other countries. If necessary, the board also considers the manufacturing and marketing costs and other factors it considers relevant. Based on this information, the board decides if the price is excessive. If the board believes the price is excessive, it informs the manufacturer and requests a voluntary price reduction. If the manufacturer refuses to reduce the price, the board has the authority to hold public

CAAG/DHS0071204

hearings on the matter and can ultimately remove the drug's patent exclusivity. The price the patent holder submits is usually the "factory gate price" or the price at which the manufacturer sells the patented medicine to a wholesaler or directly to a hospital or pharmacy.

In addition to the board activity at the federal level, each Canadian province controls the price it reimburses pharmacies for drugs purchased by individuals receiving government drug benefits. In Ontario, the government provides free prescription drug benefits to all residents age 65 and older, to all persons receiving Family Benefits Assistance, General Welfare Assistance, Extended Health Care benefits, and to residents of Homes for Special Care.

Individuals who receive government drug benefits may fill their prescriptions at any retail pharmacy. The provincial government reimburses the pharmacy based on a formula of "best available price" plus 10 percent plus a professional fee, or the amount the pharmacy usually charges customers not receiving government drug benefits if the amount is lower. Ontario's government defines "best available price" as the lowest amount for which a listed drug product of a given dosage, form, and strength can be purchased in Canada for wholesale or retail sale in Ontario, less the value of any price reduction granted by the manufacturer or wholesaler or its representatives in the form of rebates, discounts, refunds, free goods, or any other benefits of a similar nature. The government adds a percentage to the best available price to account for the fact that every pharmacy may not be able to purchase drugs at that price.

The Ontario Ministry of Health issues a formulary developed with the advice of its Drug Quality and Therapeutics Committee. The purpose of the formulary is to assist in the provision of quality drug products at a reasonable cost. In considering drugs for inclusion on the formulary, the committee considers the proven medical value of the drug, potential harmful side effects, the availability of alternative drugs, and price. Higher priced drugs are included if they offer a therapeutic advantage. The formulary

CAAG/DHS0071205

designates certain drugs of the same chemical composition as interchangeable and provides a comparative pricing guide for them.

In addition to the formulary, the Ontario Ministry of Health produces a list of non-formulary benefits. Prescriptions for drugs on the non-formulary benefit list must be accompanied by a non-formulary benefit form.

Finally, for drugs that do not appear either in the formulary or on the non-formulary benefit list, the Ministry of Health may approve prescriptions on a case-by-case basis. Physicians requesting such approval must submit a request to the Ministry of Health, stating the clinical circumstances that necessitate the use of the unlisted drug.

CAAG/DHS0071206

## Appendix B The Effect of Open Versus Restricted Formularies on Medicaid Expenditures

By: Stephen W. Schondelmeyer, Pharm. D., Ph.D.
Professor and Director, PRIME Institute
College of Pharmacy, University of Minnesota

### Introduction

The concept of a formulary was originated by, and has been most thoroughly developed within, hospital settings. The American Society of Hospital Pharmacists (ASHP) defines a formulary as "a continually revised compilation of pharmaceuticals which reflects the current judgement of the medical staff (of a hospital)."[1] The ASHP goes on to describe that the "formulary system is a powerful tool for improving the quality and controlling the cost of drug therapy, and its use is strongly encouraged."[2]

In the outpatient setting, formularies have been adapted to meet the needs of health maintenance organizations, private insurance plans, and state Medicaid programs. Formularies in outpatient settings, just as in hospitals, are usually created by, and maintained through, a pharmacy and therapeutics committee composed of physicians, pharmacists, and others. Not only does the list of drugs and dosage forms represent those drug products which the purchaser considers to be most useful or cost-effective, but in these outpatient settings it also becomes a means of defining the drug products which will be covered and reimbursed by the managed care or third party program. In other words, a drug formulary is not a singular concept and, consequently, formularies may be quite different across different settings.

Formularies are often labeled as either "open" or "restrictive" in nature. Basically an open formulary is an oxymoron in that "open" implies that all drug products are covered, while "formulary" implies a selected list of drug products. An open formulary, as the term is used, is no more than a compilation of all drug products which are available for use in the target patient

CAAG/DHS0071207

population. A "restricted formulary" is a 'restricted' list of drug products based on one or more of the following criteria. Drugs may be left off of a formulary because: (1) they are considered less than effective; (2) they are available over-the-counter; (3) they are used for cosmetic purposes and are not considered essential to the patient's health; (4) they are subject to patient misuse and abuse (e.g., controlled substances); or (5) the program does not wish to cover them for administrative, cost, or other reasons.

Drug formularies may include drug products on their lists for a variety of reasons. Some formularies are lists of drug entities and dosage forms for which the products of a number of manufacturers are considered to be generically equivalent. Other formularies include drug products that are considered to be essential for proper patient care. Yet other drugs are listed on a formulary as being therapeutically equivalent or interchangeable for the same therapeutic purpose. One or more of the therapeutically equivalent drugs may be specified as the drug of choice or the first drug to be used within the therapeutic class before trying other therapies. Drug formulary systems which restrict the drugs that are covered and reimbursed almost always have a procedure by which the physician can get approval for a non-formulary drug that is medically necessary for a given patient. These provisions assure that even though access is restricted, it is not prohibited for patients who truly need a specific restricted therapy.

**Impact of Formularies on Prescription Drug Costs**

The Office of the Inspector General for the U.S. Department of Health and Human Services examined the Medicaid prescription drug costs per recipient for the the year 1988. The report Strategies to Reduce Medicaid Drug Expenditures[3] states that:

> "the five largest states which maintain restricted drug lists (California, New York, Ohio, Illinois, and Michigan) had Medicaid prescription drug costs per recipient of $203.05 for 1988. The drug cost of the five largest states without restricted drug lists Pennsylvania, Texas, Florida, Massachusetts, and Indiana) was $247.42 per recipient.

CAAG/DHS0071208

CAAG/DHS0071208

In addition, the report notes that eight of the 25 states with the highest total Medicaid drug payments annually averaged less than $200 per recipient. Seven of these eight states maintained a restricted drug list. The report concludes that "the Medicaid prescription drug costs per recipient, in 1988, were 22 percent lower in the five largest states with restricted drug lists" when compared with the five largest states with open drug lists.

A comprehensive review of studies on the economic impact of Medicaid drug formularies covering the period 1972 to 1985 was published in the Journal of Pharmaceutical Marketing and Management.[4] This article reviewed 11 studies known to have been published on various aspects of the economic impact of Medicaid formularies. Seven of these studies reported on the impact of a restrictive formulary on drug expenditures. Four studies[5,6,7,8] found that restrictive formularies had not decreased drug expenditures, while three studies[9,10,11] reported decreases in drug expenditures with restricted formularies. A 1988 study which examined the South Carolina Medicaid program found that upon opening up the drug formulary the average prescription expenditure per recipient increased.[12]

**Impact of Formularies on Total Program Costs**

Even though three of the studies prior to 1985 and the 1988 South Carolina study found that restrictive formularies resulted in lower drug expenditures, all four of these studies reported an increase in total Medicaid program expenditures when a restrictive formulary was used. One additional study recently examined the economic impact of restricted formularies on total Medicaid expenditures by using a regression model on Medicaid expenditure data from 47 states.[13] This study suggested, as had earlier studies, that there was no savings in total Medicaid expenditures from implementation of a restrictive formulary. One should note that all five of the studies reporting increased total Medicaid expenditures with restrictive formularies were sponsored by pharmaceutical companies or one of their trade associations.[9,10,11,12,13] In contrast to these studies, one study from 1985 reported directly opposing evidence which "associated restricted formularies with lower overall Medicaid program costs."[8]

CAAG/DHS0071209

All studies reporting on the relationship between type of formulary and total Medicaid expenditures acknowledged severe limitations in analyzing the relationship. First, the analyses reported represent measures of association and should not be construed as cause and effect relationships. Second, most of the studies admitted that there was an inability to account for other programmatic changes in the Medicaid program. In other words, other changes in Medicaid such as increased payment rates for hospitals or physicians may have occurred; expansion of services such as mental health, long term care, or other outpatient or inpatient services may have been implemented; and the eligibility criteria for certain target populations may have changed. Furthermore, it is not unusual for a Medicaid program to institute programmatic changes in one component of Medicaid, such as the drug program and then offset the savings expected from that component by expanding coverage of another component of the program such as outpatient mental health services or expanded patient eligibility criteria. If this trade off approach to program funding were used by a Medicaid program, it would not be surprising to find that a restrictive formulary is associated with higher total Medicaid expenditures. However, it would not be appropriate to conclude that the increase in program expenditures was due to the restrictive formulary. In fact, the savings from a restrictive drug formulary may have enabled an expansion of access through increased program benefits or expansion in the number of beneficiaries.

**Conclusions**

Based on a review of the literature regarding the use of formularies in Medicaid programs, two basic conclusions can be drawn. First, Medicaid programs with restricted formularies experience equal or lower drug costs per recipient when compared to Medicaid programs with open formularies. Second, total Medicaid program expenditures may increase or decrease with the implementation of a restrictive drug formulary. Drug formulary restrictions should be examined to determine which alternative health care products and services are likely to be used if a drug product restriction is adopted; and the cost of this alternative care should

CAAG/DHS0071210

be compared to the drug therapy cost to determine the impact that will result with respect to total Medicaid expenditures. Benefit and beneficiary changes in the broader Medicaid program must be accounted for before any increase in total Medicaid expenditures can be attributed to implementation of a restrictive drug formulary.

CAAG/DHS0071211

## References

1 American Society of Hospital Pharmacists, ASHP Statement of Guiding Principles on the Operation of the Hospital Formulary System, as found in Smith, M.C., and T.R. Brown, Handbook of Institutional Practice (Williams & Wilkins: Baltimore, 1982), pages 655-656.

2 American Society of Hospital Pharmacists, ASHP Guidelines for Hospital Formularies, as found in Smith, M.C., and T.R. Brown, Handbook of Institutional Practice, (Williams & Wilkins: Baltimore, 1982), pages 677-679.

3 U.S. Department of Health and Human Services, Office of the Inspector General, Strategies to Reduce Medicaid Drug Expenditures, publication number OEI-12-90-00800.

4 Jang, R., "Medicaid Formularies: A Critical Review of the Literature," Journal of Pharmaceutical Marketing and Management, Vol. 2 (3), Spring 1988, pages 39-61.

5 Hammel, R.W., "Insights into Public Assistance Medical Care Expenditures," Journal of the American Medical Association, 219:1740, March 27, 1972.

6 Taubman, A.H., "Examination of Economic and Administrative Costs of Drug Formularies," Northeastern University, Boston, MA (undated), as cited in Smith and Simmons (1982).

7 Smith, M.C. and S. Simmons, "A Study of the Effects of Formulary Limitations on Medicaid Drug Programs," in Proceedings, *The Effectiveness of Medicines in Containing Health Care Costs: Impact of Innovation, Regulation, and Quality* (National Pharmaceutical Council: Washington, DC, 1982), pages 117-141.

8 Schwietzer, S.O., H. Salehi, and N. Boling, "The Social Drug Lag: An Examination of Pharmaceutical Approval Delays in Medicaid Formularies," Social Science and Medicine, 21 (10):1077, 1985.

CAAG/DHS0071212

9 Hefner, D.L., *A Study to Determine the Cost-Effectiveness of a Restrictive Formulary: The Louisiana Experience* (National Pharmaceutical Council: Washington, DC; 1979).

10 Hefner, D.L., *Cost-Effectiveness of A Restrictive Formulary: Louisiana vs Texas* (National Pharmaceutical Council: Washington, DC, 1980).

11 Bloom, B.S. and J. Jacobs, "Cost Effects of Restricting Cost-Effective Therapy," Medical Care, 23:872, 1985.

12 Reeder, C.E. and E.W. Lingle, *An Evaluation of the South Carolina Medicaid Open Formulary System*, Final Report submitted to the National Pharmaceutical Council, Washington, DC, Dec. 29, 1988.

13 Moore, W.J. and R.J. Newman, *An Economic Analysis of State Medicaid Formularies: Implications for the Recent Changes in the Louisiana Formulary*, Final Report prepared for the Pharmaceutical Manufacturers Association, Washington, DC, December 1989.

CAAG/DHS0071213
CAAG/DHS0071213

## Appendix C Discussion of Selected Aspects of the Medi-Cal Drug Benefit Program

One of the objectives of this study was to review the operation of selected aspects of the California Medical Assistance Program (Medi-Cal). More specifically, we attempted to address questions about the effect of the department's prior authorization process on prescribers' willingness to prescribe drugs not on Medi-Cal's list of contract drugs and the effect of the process on Medi-Cal beneficiaries' access to drugs, especially breakthrough drugs, not on the list of contract drugs. We also address the effect of federal reimbursement limits on the inclusion of certain drugs on the Medi-Cal list of contract drugs.

### Effects of Prior Authorization on Beneficiaries and Prescribers

We collected evidence suggesting that Medi-Cal's prior authorization process may limit prescription drug treatment for Medi-Cal beneficiaries. We surveyed more than 400 physicians who treated Medi-Cal beneficiaries in fiscal year 1989-90 to determine whether prior authorization affects the selection of drugs, especially breakthrough drugs, prescribed to these beneficiaries. The physicians we surveyed were paid between $1,001 and $50,000 by Medi-Cal during the fiscal year. Approximately 64 percent of the physicians completed the survey.

The potential for Medi-Cal's prior authorization requirement to affect a beneficiary's access to breakthrough drugs appears minimal. Between 1988 and 1990, the Food and Drug Administration (FDA) approved the use of 15 new breakthrough drugs. We defined breakthrough drugs as drugs classified by the FDA as either a new molecular entity offering significant

CAAG/DHS0071214
CAAG/DHS0071214

therapeutic gain, known as "1A," or a high-priority AIDS drug, known as "1AA." As of July 1, 1991, 8 of 15 breakthrough drugs were on the list of contract drugs, so prior authorization would not be required for these drugs. According to the pharmaceutical program consultant for the department's drug discount program, the remaining 7 newly approved drugs are available to Medi-Cal beneficiaries through the department's prior authorization process. The department did not include these 7 drugs on the list of contract drugs because they either would be rarely or infrequently used by Medi-Cal beneficiaries, would not normally be prescribed to Medi-Cal beneficiaries who are not hospitalized, or the drug manufacturer did not petition the department to have them included on the list. In November 1990, the federal government enacted legislation that requires states to make new drugs approved by the FDA available six months after they are approved without prior authorization. Medi-Cal has adopted this requirement for drugs approved after the enactment of federal legislation. (See page 36 of this report for a description of how a drug manufacturer petitions the department to have a prescription drug included on the Medi-Cal list of contract drugs.)

Although we found the prior authorization process does not appear to limit a beneficiary's access to breakthrough drugs, our survey does indicate the process may inhibit physicians' willingness to prescribe certain drugs. More than 75 percent of the physicians who responded to the survey indicated that the prior authorization process at least sometimes prevents them from prescribing drugs not on the department's list of contract drugs. Some of these physicians said they experienced difficulty with the department's prior authorization process because of delays in getting through to the department for drug approval and said they also lacked information about what drugs are included on the list of contract drugs.

Two recent reports by the Office of the Auditor General discuss delays in receiving prior authorization for drugs prescribed to Medi-Cal beneficiaries. In the first two of four semi-annual reports to the Legislature (Report P-044 issued in January 1991

CAAG/DHS0071215

and Report P-117 issued in July 1991), we found selected providers experienced some delays in obtaining prior authorization for filling prescription drugs for Medi-Cal beneficiaries. In the January 1991 report, 6 of the 12 pharmacists we surveyed noted having had some difficulty getting through to the department to request prior authorization by telephone. Since that time, the department has attempted to expand its capability for receiving and processing requests for prior authorization by opening a new Medi-Cal drug unit in Stockton equipped with a new automated voice-response system.

Either the prescribing physician or the pharmacist filling the prescription may seek prior authorization on behalf of the Medi-Cal beneficiary, although, according to the chief of the department's field services branch, it is usually the pharmacist who seeks prior authorization. To mitigate some of the obstacles associated with prior authorization, the physicians in our survey said they take a variety of steps to ensure that Medi-Cal beneficiaries receive the prescribed drug when prior authorization is required. Physicians most frequently reported they make an extra effort to specify the medical necessity of the drug on the prescription to increase the likelihood the department will approve the drug. Also, 25 percent of these physicians or their staffs try to obtain prior authorization as soon as the drug is prescribed. Some physicians reported they seek prior authorization once the patient has been unsuccessful in getting the drug. Some physicians also refer Medi-Cal beneficiaries to particular community pharmacies that will try to obtain prior authorization. Instead of getting prior authorization for certain drugs, six physicians in the survey also give free samples of those drugs to Medi-Cal beneficiaries. In spite of these efforts, 69 percent of the survey respondents prescribed drugs not on the list of contract drugs, only to learn later that the beneficiaries never obtained them.

Similarly, the department's prior authorization process may limit Medi-Cal beneficiaries' access to certain drugs: 16 of the physicians who responded to our survey sometimes substitute the original, prescribed drug with an alternative one that does not require prior authorization. Some of the physicians stated that

CAAG/DHS0071216
CAAG/DHS0071216

in their opinion the substitute drug may or may not have the same therapeutic value as the one originally prescribed to the Medi-Cal beneficiary.

**Effect of Federal Allowable Costs on Medi-Cal's List of Contract Drugs**

One of the purposes of this study was to determine the effect of Federal Allowable Costs (FACs) on the inclusion of multiple-source drugs on the Medi-Cal list of contract drugs and the effect of FACs on the availability of those drugs to Medi-Cal beneficiaries.

According to the department's deputy director of medical care services, the cost of a drug is one of the five factors the department evaluates before adding a drug to the list of contract drugs. The other four factors are the drug's safety, effectiveness, essential need, and potential for misuse. The existence of a FAC for a drug the department is evaluating would be a point in favor of adding the drug to the department's list of contract drugs since the department is interested in controlling costs and a FAC is a cost control. If the department does add the drug, a FAC for the drug has certainly not hindered Medi-Cal beneficiaries' access to it.

CAAG/DHS0071217

# Appendix D Pharmaceutical Manufacturers' Costs

We reviewed the 1990 annual reports for a sample of pharmaceutical manufacturers to determine their research, development, manufacturing, and marketing costs as a percent of sales.

Many pharmaceutical manufacturers are involved in manufacturing numerous products in addition to pharmaceuticals. For our review, we selected four companies whose pharmaceutical sales represented at least 70 percent of total sales in 1990. Total sales for these companies ranged from $1.5 billion to $7.7 billion. In addition to pharmaceuticals, products manufactured by the four companies include animal health products, agricultural chemicals, over-the-counter health products, and medical instruments and diagnostic products.

The four companies we reviewed spent an average of 24 percent of sales for materials and production, 35 percent for marketing and administration, and 14 percent for research and development. These figures, as shown in the following table, represent expenditures for the entire company, not just the pharmaceutical division.

CAAG/DHS0071218
CAAG/DHS0071218

Table D-1 **Pharmaceutical Manufacturers' Expenditures as a Percent of Total Sales**

| Cost Category | Company 1 | Company 2 | Company 3 | Company 4 | Average |
|---|---|---|---|---|---|
| Materials and production | 23.18% | 24.12% | 19.51% | 29.34% | 24.04% |
| Marketing and administration | 31.13 | 42.70 | 36.92 | 27.47 | 34.56 |
| Research and development | 11.13 | 11.42 | 17.80 | 13.54 | 13.47 |

We were unable to determine separate cost components for the pharmaceutical divisions of these four companies. However, we identified three different companies that did report separate research and development costs for their pharmaceutical divisions. For these three companies, research and development amounted to an average of 17 percent of pharmaceutical sales. The Pharmaceutical Manufacturers Association reported an average cost for industry-wide research and development of 16 percent of pharmaceutical sales in 1988.

CAAG/DHS0071219
CAAG/DHS0071219

## Appendix E Percent of Health Maintenance Organizations (HMOs) Using Various Techniques To Control Pharmaceutical Costs

| Technique | Percent of HMOs Using Technique by Types of HMO[a] | | | | |
|---|---|---|---|---|---|
| | Group | IPA | Network | Staff | All Types of HMOs[b] |
| Formulary | 62% | 28% | 43% | 75% | 39% |
| Over-the-counter drugs excluded from benefit coverage | 94 | 92 | 74 | 61 | 86 |
| Required generic substitution | 79 | 60 | 61 | 71 | 64 |
| Therapeutic substitution allowed | 23 | 10 | 21 | 36 | 16 |
| Drug utilization review | 62 | 52 | 51 | 62 | 54 |
| Contract bids for drug purchasing | 78 | 86 | 91 | 87 | 84 |

Source: The Marion Managed Care Digest HMO Pharmacy Edition 1990 and the SMG Marketing Group, Inc., based on a random stratified sample of HMOs throughout the United States.

[a]Types of HMO (as defined in the Marion Managed Care Digest HMO Edition 1990):

Group HMOs contract with one or a few larger multiple-specialty group practices to serve patients.

Independent Practice Association (IPA) HMOs use independent physicians practicing alone or in medical groups to care for enrollees.

Network HMOs contract for medical services from many individual physicians and group practices.

Staff HMOs use salaried staff physicians.

[b]Weighted averages.

CAAG/DHS0071220

## Appendix F References Cited

Ernst & Young. Cost Effectiveness of the Medi-Cal Therapeutic Drug Utilization Review Program. Sacramento: Office of the Auditor General, May 1991.

Lavizzo-Mourey, Risa J. and Eisenberg, John M. "Prescription Drugs, Practicing Physicians, and the Elderly." Health Affairs 9(1990):20.

National Pharmaceutical Council. Pharmaceutical Benefits Under State Medical Assistance Programs. Reston, VA: National Pharmaceutical Council, 1990.

Nelson, Arthur A., Jr., et al. "The Effect of a Medicaid Drug Copayment Program on the Utilization and Cost of Prescription Services." Medical Care 22(1984):724.

Office of the Auditor General. The Department of Health Services' Information on Drug Treatment Authorization Requests. Sacramento: Office of the Auditor General, January 1991.

Office of the Auditor General. A Review of the Department of Health Services' Estimate of Savings Resulting From the Drug Discount Program. Sacramento: Office of the Auditor General, June 1991.

Office of the Auditor General. The Department of Health Services' Information on Drug Treatment Authorization Requests. Sacramento: Office of the Auditor General, July 1991.

CAAG/DHS0071221
CAAG/DHS0071221

Office of the Inspector General, Department of Health and Human Services. Uses of Average Wholesale Prices in Reimbursing Pharmacies Participating in Medicaid and the Medicare Prescription Drug Program. Washington, D.C.: U.S. Government Printing Office, October 1989.

Office of the Inspector General, Department of Health and Human Services. Strategies to Reduce Medicaid Drug Expenditures. Washington, D.C.: U.S. Government Printing Office, 1990.

Price Waterhouse. A Study of Health Care Cost Escalation in California. Sacramento: Office of the Auditor General, June 1991.

Public Sector Consultants, Inc. The Medicaid Prescription Drug Program - Cutting Costs & Improving Quality. Lansing: Michigan Pharmacists Association, January 1991.

Soumerai, Stephen B. and Avorn, Jerry, M.D. "Economic and Policy Analysis of University-based Drug 'Detailing.'" Medical Care 23(1986):313.

Soumerai, Stephen B. and Ross-Degnan, Dennis. "Experience of State Drug Benefit Programs." Health Affairs 9(1990):36.

Special Committee on Aging, United States Senate. Prescription Drug Prices: Are We Getting Our Money's Worth? Washington, D.C.: U.S. Government Printing Office, August 1989.

Special Committee on Aging, United States Senate. Skyrocketing Prescription Drug Prices: Turning a Bad Deal Into a Fair Deal. Washington, D.C.: U.S. Government Printing Office, January 1990.

SysteMetrics/McGraw-Hill, Inc. Pharmaceutical and Health Care Expenditures in Medi-Cal 1984-1989: Final Report. Washington, D.C.: Pharmaceutical Manufacturers Association, 1990.

CAAG/DHS0071222
CAAG/DHS0071222

STATE OF CALIFORNIA—HEALTH AND WELFARE AGENCY

PETE WILSON, Governor

DEPARTMENT OF HEALTH SERVICES
714/744 P STREET
P.O. BOX 942732
SACRAMENTO, CA 94234-7320
(916) 445-1248

August 22, 1991

Kurt R. Sjoberg
Auditor General (Acting)
Office of the Auditor General
660 J Street, Suite 300
Sacramento, CA 95814

Dear Mr. Sjoberg:

Secretary Gould has asked me to respond to your August, 1991, draft report on "How Medi-Cal and Other Health Care Providers Manage Their Pharmaceutical Expenditures".

We believe the report contains a fair and reasonable assessment of how third parties, including Medi-Cal, control pharmaceutical expenses while maintaining access to needed drug products.

It is acknowledged that prescription drug expenditures in the Medi-Cal outpatient program have increased substantially in the last few years. We expect this trend to continue, since many new and important drug therapies are becoming available in the health care community. However, with continued use of our price and utilization controls as well as our ability to maximize savings through our state drug rebate program, we believe that we can improve access to these much needed medications and attain the greatest possible benefit to Medi-Cal beneficiaries while controlling unnecessary expenditures.

For your interest, we have enclosed a copy of a recent publication by T. Donald Rucker, Ph.D., regarding drug formularies.* To paraphrase from Dr. Rucker's quote from the Task Force on Prescription Drugs, while the use of a drug formulary is no guarantee of attainment of such ideals as high quality medical care, rational prescribing, effective utilization review, and control of costs, we find that the achievement of these objectives in a drug program is difficult if not impossible without its use.

Thank you for the opportunity to review the draft report. If you have any questions, please contact Mr. Michael Neff, Acting Chief Negotiator, Medical Drug Discount Program, at (916) 322-8963.

Sincerely,

Molly Joel Coye, M.D., M.P.H.
Director

Enclosure

*This publication is available from the Office of the Auditor General.

CAAG/DHS0071223
CAAG/DHS0071223

cc: Members of the Legislature
Office of the Governor
Office of the Lieutenant Governor
State Controller
Legislative Analyst
Assembly Office of Research
Senate Office of Research
Assembly Majority/Minority Consultants
Senate Majority/Minority Consultants
Capitol Press Corps

CAAG/DHS0071224