# Exhibit 25

*State of California ex rel. Ven-A-Care of the Florida Keys, Inc. v.*
*Abbott Labs, Inc. et al., Civil Action No. 03-11226-PBS*

**Exhibit to the November 25, 2009 Declaration of Philip D. Robben
in Support of Defendants' Joint Motion for Partial Summary Judgment**

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY

AVERAGE WHOLESALE PRICE

LITIGATION

_____/

| THIS DOCUMENT RELATES TO | MDL No. 1456 |
| State of California, ex rel. | Civil Action: |
| Ven-A-Care v. Abbott | 01-12258-PBS |
| Laboratories, Inc., et al. | |

_____/

--oOo--

TUESDAY, SEPTEMBER 23, 2008

--oOo--

VIDEOTAPED DEPOSITION OF

DOUGLAS B. HILLBLOM

--oOo--

Reported By:  CAROL NYGARD DROBNY, CSR No. 4018
              Registered Merit Reporter

                                                                    39

1              You know, I can't remember.  I -- I can't
2     remember the time frame.
3              I -- I know we did it, but I can't
4     remember exact dates or year, per se, because it
5     kind of just blended.
6         Q.   Okay.  Let's see if I can try and help
7     you put together a little bit of a time line
8     anyway.
9              You thought that you held the pharmacy
10    position -- pharmacy --
11             Strike that.
12             You thought you held the Pharmacy
13    Consultant 2 position for approximately four to
14    five years, so from approximately April of '95 to
15    early 2000?
16        A.   I left the Department in --
17             Let's see.  This is -- 2008.
18             2004, I believe, which means --
19             Left that position --
20             So it would have been from right around
21    2000 or 2001 to 2003, and, again, I'd have to look
22    at a resume to -- you know, I just -- but I think

1   it was like 2000, or 2001 to 2003 that I was in the
2   Staff Manager position.
3       Q.   Okay.  And you said you left the
4   Department in 2004?
5       A.   Yeah, I think it was 2004.
6       Q.   And did you go from the Department to
7   Prescription Solutions?
8       A.   No.  I went from the Department to
9   Kaiser Permanente.
10      Q.   And what's Kaiser Permanente?
11      A.   Kaiser Permanente is a health
12  maintenance organization.
13      Q.   An HMO?
14      A.   An HMO.
15      Q.   And how long did you work for Kaiser?
16      A.   For two years.
17      Q.   And so you've been with Prescription
18  Solutions for a little over a year now?
19      A.   About 18 months.
20      Q.   I want to jump back to this -- the
21  period of time you served as a Pharmacy Consultant
22  2 in that contracting area.

143

1        And the objection that I'm stating is
2   that I believe this document should have been
3   withheld by the State and not produced to the
4   Defendants because it's protected under
5   deliberative process privilege.
6        We've now produced that.  I realize that,
7   and I'm not going to stop the line of questioning,
8   but we'll file a motion to, in essence, clawed
9   back, and we, obviously, we want this testimony
10  redacted if there is any testimony from Mr.
11  Hillblom in connection with this document.
12       Thank you, counsel.
13       THE WITNESS:  Yes.
14  BY MR. BUEKER:
15       Q.   Are you familiar with Exhibit 7?
16       A.   Yes.
17       Q.   How are you familiar with Exhibit 7?
18       A.   It was part of a budget change proposal.
19       Q.   In what time period?
20       A.   It would have been for fiscal year
21  '97/'98.
22       Q.   And what involvement would you have had

144

1   in, for example, the creation of Exhibit 7?
2       A.   Not in the creation, just in the
3   discussion of the -- the way it was written
4   potentially, if it was a -- if it reflected the
5   position of the unit, that a consensus driven unit
6   at that time.
7       Q.   What do you mean by that?
8       A.   There's like six pharmacy consultants.
9            They would have all read and said "Does
10  this look like -- have I misspelled anything?  Have
11  I misstated anything?"  You know, "Are there any
12  glaring errors in it?"  that type of thing.
13           We wouldn't have evaluated it based on
14  merit or anything else.  It would have been --
15      Q.   You would or wouldn't have evaluated it
16  on the basis of that?
17           I'm sorry.  Maybe I misunderstood.
18      A.   Because it's a budget change proposal it
19  really was more of an administrative proposal.
20           This type of proposal typically would
21  have been done when you talk about reimbursements
22  at the request of the Legislature or --

Hillblom, Douglas B.                                September 23, 2008
                    Sacramento, CA

                                                              145

1       Q.    So walk me through the steps as to how
2  that would have happened.
3       A.    The Legislature would be looking at the
4  budget.  They need a reduction.
5             They ask the Department for X, and they
6  would say what could -- you know, "We saw a report
7  on 'Headline News' or whatever and it says this is
8  too much, you know, so we're going to challenge you
9  to come up with a proposal to meet that."
10            They would bring that down.  They'd send
11 it down through -- through the various
12 organizations down to finally would reside in our
13 unit.
14            We would come up with a response, and if
15 that's what they wanted in the budget, then we'd
16 try to support the budget because the Legislature
17 is asking us to support the budget change proposal.
18      Q.    Do you recall whether this particular
19 budget proposal that's reflected in Exhibit 7 was
20 the result of the State Controller's audit in 1996
21 which found that Medicaid paid too much?
22      A.    Based on the time frames it would appear

1    that that's what the legislator -- legislation and
2    Legislature was asking us to do.
3         Q.   Was to respond to that --
4         A.   As a budget -- as a budget change
5    proposal as part of the budget process.
6         Q.   And the specific proposal that's being
7    discussed here is the move to a reimbursement rate
8    that's -- AWP minus 10 or WAC plus 7; correct?
9         A.   Right, and that appears to mirror what
10   you previously showed me.
11        Q.   And when you said this is a consensus,
12   the unit was consensus driven at the time, is this
13   a proposal that, given the budgetary constraints
14   that were communicated to you, that -- or to the
15   unit, that you personally as a member of the unit
16   would have agreed with?
17        A.   It wasn't a matter of whether I agreed
18   with it or not.
19             It was this is what the Legislature
20   wants, and we -- this is just simply saying, okay,
21   the Legislature has requested X. What are the pros
22   and what are the cons of that proposal?

1    Q. Okay. And would you have read and
2  agreed with the pros and cons?
3    A. I might have read and agreed with the
4  pros and cons.
5    Q. Even if you didn't have a choice about
6  what the proposal was going to be and you had to
7  hit a particular dollar rate the Legislature was
8  requiring?
9    A. Right.
10       I might be asked to say "Okay. What are
11 the pros of this proposal? What -- what are the
12 positives about this in meeting the budget goals?
13 What are the potential difficulties in
14 implementing?"
15       So those would be the cons.
16       If there's -- any type of issue with
17 systems, would there be a systems requirement
18 change.
19    Q. So in 1997 the Pharmacy Unit looked at
20 -- a proposal that reduced the reimbursement rate,
21 and one of the pros identified was that it would
22 reduce the ingredient cost expenditure for

157

1   had to take in to account was the input of the
2   California Pharmacists Association; right?
3       A.    Along with others.
4       Q.    Right.
5             Do you know what the inequities -- other
6   inequities in the reimbursement policy are that are
7   being referred to in the second bullet point under
8   the "Cons" in Exhibit 7?
9       A.    It could be looking at the cost of
10  dispensing.
11            Again, reimbursement is a
12  multi-component. It's not just drug ingredient.
13      Q.    So what are the components of
14  reimbursement?
15      A.    Primarily they are the drug ingredient
16  costs and the costs of dispensing.
17            The cost of dispensing is inclusive of a
18  number of different pieces and parts.
19      Q.    What would include -- what does it
20  include?
21      A.    Building cost, computer systems,
22  transaction costs, labor costs, water, power,

                                                                    158

1     sewer, I mean, all the things that go in to the
2     cost of dispensing a product.
3            I mean, something as simple as a label
4     has a cost.
5        Q.   Uh-huh.
6        A.   You know, how does that fit in to the
7     reimbursement in terms of the cost of dispensing.
8        Q.   And so the inequity, as I understand it
9     being referred to here, is this idea that the
10    dispensing fee that was being paid to cover those
11    costs was too low, didn't cover the costs?
12       A.   Potentially could have been too low.
13       Q.   Do you recall whether in 1997 --
14    1996/1997 you had reached the conclusion that the
15    Medi-Cal dispensing fee was too low?
16       A.   You mean personally?
17       Q.   Yes, you personally.
18       A.   It appeared to be not adequate.
19       Q.   And by that you mean it was too low?
20       A.   Well, again, you know, when I say it
21    "appeared not to be adequate" I'm talking about in
22    aggregate.