# Exhibit 33-1

*State of California ex rel. Ven-A-Care of the Florida Keys, Inc. v.*
*Abbott Labs, Inc. et al., Civil Action No. 03-11226-PBS*

**Exhibit to the November 25, 2009 Declaration of Philip D. Robben**
**in Support of Defendants' Joint Motion for Partial Summary Judgment**

DEPOSITION
EXHIBIT
26
11-06-08



# Study of Medi-Cal Pharmacy Reimbursement

Prepared for the

California Department of Health Services

June 2002



# Myers and Stauffer LC

### Certified Public Accountants

CAAG/DHS0068472

# Table of Contents

EXECUTIVE SUMMARY ................................................................................................ 3

    INTRODUCTION ........................................................................................................ 3
    SUMMARY OF FINDINGS ........................................................................................ 4
    CONCLUSIONS AND RECOMMENDATIONS ........................................................ 5

PROGRAM OVERVIEW .......................................................................................... 8

    MEDI-CAL PHARMACY PROGRAM OVERVIEW ................................................ 8
    DRUG UTILIZATION PROFILE ............................................................................... 9

DISPENSING COST SURVEY ................................................................................ 12

    METHODOLOGY OF THE SURVEY ...................................................................... 12
    FIELD EXAMINATION PROCEDURES .................................................................. 18
    COST FINDING PROCEDURES .............................................................................. 18
    ANALYSIS AND FINDINGS ................................................................................... 25
    SUMMARY ............................................................................................................. 38

PRESCRIPTION CHARGES SURVEY ................................................................. 39

    METHODOLOGY .................................................................................................... 39
    ANALYSIS AND FINDINGS ................................................................................... 40
    OTHER CONSIDERATIONS ................................................................................... 42
    CONCLUSIONS ...................................................................................................... 44

EVALUATION OF THE ADEQUACY OF MEDI-CAL PHARMACY REIMBURSEMENT
RATES ....................................................................................................................... 45

    ANALYSIS OF MEDI-CAL PHARMACY PARTICIPATION RATES ..................... 45
    ANALYSIS OF TYPICAL MARGINS ON MEDI-CAL PRESCRIPTIONS ............. 49
    CONCLUSIONS ...................................................................................................... 50

APPENDIX A. DEVELOPMENT OF THE DISPENSING COST SURVEY
METHODOLOGY ..................................................................................................... 52

APPENDIX B. COMPONENTS OF PHARMACY DISPENSING COST ................. 54

APPENDIX C. SUMMARY OF PHARMACY ATTRIBUTES ................................. 56

APPENDIX D. DISPENSING COST ISSUES FOR INSTITUTIONAL, INTRAVENOUS,
HOME INFUSION AND COMPOUNDING PHARMACIES ...................................... 58

**EXHIBITS**



CAAG/DHS0068473



**Chapter 1**

# Executive Summary

## Introduction

Under contract to the California Department of Health Services, Myers and Stauffer LC performed a study of the adequacy of Medi-Cal pharmacy reimbursement rates. This study was designed to meet the legislative requirements of Senate Bill No. 393, Section 1, Article 24. 4426:

> "The State Department of Health Services shall conduct a study of the adequacy of Medi-Cal pharmacy reimbursement rates including the cost of providing prescription drugs and services."

A major component of the study was a survey of pharmacy dispensing cost. However, as overall pharmacy Medi-Cal payments are significantly influenced by reimbursement for pharmaceutical ingredients, we have incorporated results of a study of pharmacy acquisition cost. Other factors, including payment rates by other payers of pharmaceutical services and an analysis of the accessibility of pharmacy services to Medi-Cal recipients, have also been included in a broad discussion of the adequacy of pharmacy reimbursement rates.

This report includes a narrative of the methodologies and findings relevant to the survey of dispensing costs and a general discussion of the adequacy of Medi-Cal pharmacy reimbursement rates. A separate report issued by Myers and Stauffer LC includes a detailed discussion of the methodology and findings of the study of pharmaceutical acquisition costs.

The dispensing and acquisition cost study followed the methodology and used a survey instrument similar to those used by Myers and Stauffer in Medicaid pharmacy engagements in 17 other states. A stratified random sample of California pharmacy providers enrolled in the Medi-Cal program were surveyed; 847 pharmacies filed dispensing cost surveys and 491 pharmacies provided a sample of pharmaceutical purchase invoices that could be included in the study. All data received including the dispensing cost surveys were subject to extensive desk review procedures. Additionally, 50 pharmacies were selected for on-site field examinations to validate reported costs.

Myers and Stauffer LC
Certified Public Accountants

CAAG/DHS0068474

## Summary of Findings

The significant findings of the study are as follows:

- **The statewide average (median) cost of dispensing, weighted by Medi-Cal volume, was $6.95.** The average cost of dispensing observed in California pharmacies is higher than has been observed in similar studies in other states. This higher dispensing cost is mainly due to higher pharmacist salaries in California than were observed in other state surveys.

Table 1.1 Dispensing Cost[A] for California Pharmacies

| Pharmacies Included in Analysis[B] | 798 |
|---|---|
| **Weighted Average (Median)**[C] | **$6.95** |
| Weighted Average (Mean)[C] | $7.21 |
| Unweighted Average (Mean) | $7.87 |

[A] Inflated to June 30, 2002.
[B] Excludes pharmacies that dispensed a significant amount of intravenous, home infusion or compounded prescriptions.
[C] Weighted by Medi-Cal volume.

- Average dispensing cost at certain pharmacy specialties was observed to be higher than dispensing cost at "typical" retail pharmacies. In particular we noted higher dispensing cost associated with pharmacies that provided services related to the dispensing of intravenous, home infusion and compounded prescriptions.

- A significant portion of pharmacy reimbursement is associated with payments for drug ingredient cost. A report of the findings and methodology of a pharmaceutical acquisition cost study was published separately. This study indicates that for a "typical" prescription, a pharmacy's margin on ingredient reimbursement is approximately $10.

- Considering both the dispensing and acquisition portions of cost and reimbursement, current levels of Medi-Cal pharmacy reimbursement provide margins, or profits, to pharmacies of approximately 11%. Study results indicate that this amount is significantly higher than margins associated with other third party payers of prescription drugs.

- Myers and Stauffer's examination of Medi-Cal pharmacy participation rates and other analyses related to the proximity of pharmaceutical services to Medi-Cal recipients did not indicate any significant impediments to access.

Myers and Stauffer lc
Certified Public Accountants

CAAG/DHS0068475

## Conclusions and Recommendations

Myers and Stauffer considered many factors to evaluate the overall adequacy of Medi-Cal pharmacy reimbursement rates. This included an analysis of pharmacy dispensing and acquisition cost compared to the current Medi-Cal pharmacy reimbursement rate formula. Additionally, Myers and Stauffer evaluated market rates for prescriptions filled for other third party payers and examined issues related to the accessibility of pharmaceutical services to Medi-Cal recipients.

We concluded that the current Medi-Cal pharmacy reimbursement rates are, in the aggregate, sufficient to cover the dispensing and acquisition costs of the vast majority of pharmacies. Medi-Cal pharmacy reimbursement rates are typically higher than those of other third party payers (such as commercial insurance plans) and we did not identify any systemic problems related to the accessibility of pharmaceutical services to Medi-Cal recipients. Participation in the Medi-Cal pharmacy program is almost universal among California pharmacies, and pharmacies are geographically located such that accessibility for Medi-Cal recipients is not curtailed.

We offer the following recommendations to the California Department of Health Services as suggestions for improving the Medi-Cal pharmacy reimbursement program.

### Ingredient Reimbursement Recommendations

There was sufficient evidence in the study of pharmacy acquisition cost to suggest that the Department's current ingredient cost allowance of the Average Wholesale Price (AWP) minus 5% provides for ingredient reimbursement in excess of a pharmacy's actual acquisition cost. Ten to fifteen years ago, when many states set their Medicaid ingredient reimbursement rates and the average brand name Medicaid prescription cost $12 - $15, the margin between the pharmacy's true acquisition cost and the cost assumed by an AWP less 5% formula was equivalent to $1 added to the dispensing fee. Now, with the average brand name Medicaid prescription in California costing more than $120, the margin on drug ingredient cost for a brand name prescription can be *more than $15 per prescription.*

In light of these findings, we recommend that the Department should consider increasing the discount from the Average Wholesale Price (AWP) for both single source and multi-source drugs. The acquisition cost study indicates that the Department could justify setting ingredient reimbursement for brand name drugs at a level between AWP minus 12% and AWP minus 15%. The study would also support a differential reimbursement rate for generic drugs such as one between AWP minus 20% and AWP minus 25%.

For drugs from a limited number of labelers, the Medi-Cal pharmacy program currently bases ingredient reimbursement on the Direct Price. The acquisition

Myers and Stauffer LC
Certified Public Accountants

5

cost study indicates that the relationship between pharmacy actual acquisition cost and the Direct Price is less predictable than the relationship between acquisition cost and discounted AWP. Additionally, the Direct Price system results in reimbursement for several products below pharmacy cost. Based on these observations, we recommend that the Department consider eliminating the use of Direct Prices and standardize ingredient reimbursement under an AWP system (for drugs without federal or state upper limits).

Some multi-source drugs are currently paid under one of two upper limit price systems: Federal Upper Limits (FUL) and California Maximum Allowable Ingredient Costs (MAIC). The use of FUL pricing is almost universal among state Medicaid pharmacy programs in order to assure compliance with aggregate upper limit policies required by federal regulations. Additionally, most Medicaid programs also use Maximum Allowable Cost (MAC) prices to set reimbursement limits on drugs not covered by the FUL system, or to set a rate lower than an existing FUL. FUL and MAC systems are appropriate for certain multi-source drugs where the relationship of acquisition cost to the AWP can be highly skewed (e.g. acquisition cost of AWP minus 90% or greater is not uncommon) and incentives to promote generic utilization are appropriate.

As compared to MAC systems observed in other states, Medi-Cal's MAIC prices have not been set for a broad range of multi-source drugs. An expansion of MAIC pricing to cover a more comprehensive set of multi-source drugs might be desirable. If an expansion of MAIC pricing expansion is considered, we would recommend that rates be based upon observations of pharmacies' actual acquisition cost incorporating appropriate margins to assure cost coverage.

**Dispensing Fee Recommendations**
The Department's current pharmacy dispensing fee is below the average cost of dispensing prescriptions. This finding alone does not indicate that the current pharmacy reimbursement rates are inadequate since both dispensing and ingredient reimbursement rates should be considered in tandem. Should the Department desire to more closely match the pharmacy dispensing fee with observed pharmacy dispensing cost, then an increase in the dispensing fee would be appropriate. Such an increase would be most appropriately considered in conjunction with an adjustment the Department may make in pharmaceutical ingredient reimbursement.

The dispensing cost study considered several pharmacy attributes to determine if dispensing costs were significantly different based on variables of pharmacy affiliation, location, and specialty. For many tested attributes, we did not observe statistically significant differentials in dispensing cost. We did, however, observe systemically higher dispensing cost associated with pharmacies that specialize in dispensing intravenous and compounded prescriptions. Several significant issues related to these pharmacy specialties are addressed in the study, and one possibility for the Department to consider is to set pharmacy dispensing fees

6

Myers and Stauffer lc
Certified Public Accountants

CAAG/DHS0068477

specific to certain specialties.  We note, however, that many pharmacy programs have successfully operated without a dispensing fee set specifically for these pharmacy types and to continue a single dispensing fee for all pharmacy types is also a valid option.

Myers and Stauffer
Certified Public Accountants

7



Chapter
2

## Program Overview

## Medi-Cal Pharmacy Program Overview

The Medi-Cal program includes a benefit for prescription drugs. This program allows recipients access to many commonly prescribed drugs through its formulary.

The current pharmacy dispensing fee is $4.05. Medi-Cal ingredient reimbursement is based on the following formulas:

- Average Wholesale Price minus 5% for single source products and multiple source products with no Federal Upper Limit (FUL) or California Maximum Allowable Ingredient Cost (MAIC). A physician may override the FUL or MAIC limits by indicating "brand medically necessary" on a prescription for multi-source drugs with FUL limits.

- For drugs from certain labelers, ingredient reimbursement is based on the Direct Price (DP) rather than the discounted AWP.

- Federal Upper Limit (FUL), as applicable for multi-source products.

- California Maximum Allowable Ingredient Cost (MAIC), as applicable for multi-source products.

Regardless of ingredient cost basis, the overall dispensing fee and ingredient reimbursement formula amount is limited to a maximum of the provider's usual and customary charge to the general public.

In addition to the above policies for dispensing and ingredient portions of reimbursement, the California Legislature has mandated certain adjustments to total prescription reimbursement.  A per prescription reduction of $0.50 is required by the 1994-95 Budget Act and additional legislation effective January 1, 2000 increases reimbursement by $0.25.  Beginning July 1, 2002, the provider reimbursement amount will be increased by an additional $0.15.

Reimbursement policies vary slightly for certain special classes of medications. For example, over-the-counter (OTC) products are reimbursed at 150% of the calculated ingredient amount (based on AWP, DP, FUL, or MAIC) with no additional dispensing fee.  For certain extemporaneously compounded

Myers and Staufferʟᴄ

CAAG/DHS0068479

medications, the Department has established a schedule of compounding fees that can be paid in addition to ingredient costs and the dispensing fee[1].

Approximately 5,900 pharmacy providers participate in the Medi-Cal drug program. Approximately 51% of the stores are chain-affiliated, and 49% are independently-owned stores. However, independent pharmacies fill approximately 65% of Medi-Cal prescriptions. Among Medi-Cal providers, the average annual Medi-Cal volume is approximately 8,100 prescriptions. This average is impacted by a small number of pharmacies filling over 100,000 Medi-Cal prescriptions per year. The median annual Medi-Cal volume is much less, roughly 3,100 prescriptions.

## Drug Utilization Profile

Myers and Stauffer obtained a claims summary file from the Department of Health Services. This file summarized pharmacy claims processed for calendar year 2000. Information from this file indicates that the Medi-Cal program reimbursed[2]:

- Approximately 27,000 drug products.
- 39.6 million prescriptions.
- $2.4 billion for prescription drug products.

Although approximately 86% of the 27,000 drug products and 64% of the 39.6 million prescriptions were multi-source drug products, these products account for only 27% ($655 million) of the expenditures. The majority of the program's expenditures, $1.7 billion, were for single source drug products. The proportion of drug expenditures that is for single source drugs has increased in recent years as new and more expensive pharmaceutical products continue to become available.

Reimbursement for many multi-source drug products is limited by FUL prices. For drugs on the FUL list, the Centers for Medicare and Medicaid Services (CMS, formerly HCFA) semiannually reviews and updates the FUL drug list. Each FUL equates to 150% of the lowest wholesale price listed in any of the various published compendia of cost information of drugs. Reimbursement for a limited number of multi-source products is limited by the MAIC prices that are set internally by the Department of Health Services.

The following table summarizes the makeup of the program's expenditures by single source and multi-source categories. The table also subdivides drug products based on whether the product has a Federal Upper Limit.

---

[1] As with other prescriptions, OTC and compounded prescriptions are subject to the same statutory adjustments (currently a $0.25 reduction, $0.10 after July 1, 2002).
[2] Medicaid recipients in some counties of California are integrated into managed care programs. Accordingly, these recipients receive some pharmaceutical benefits outside of the traditional fee-for-service program.

Myers and Stauffer lc
Certified Public Accountants

9

CAAG/DHS0068480

**Table 2.1 Summary of Medi-Cal Pharmacy Program Utilization**

| Product Type | | Number of Drug Products[1] | Percent of Total Number of Drug Products | Number of Rxs | Percent of Total Number of Rxs | Amount Reimbursed[2] | Percent of Program Expenditures |
|---|---|---|---|---|---|---|---|
| | Single Source Products | 3,500 | 13% | 14.3 | 36% | $ 1,710 | 71% |
| Multi-Source Products | Products with an FUL Price | 8,516 | 32% | 11.7 | 30% | $ 139 | 6% |
| | Products without an FUL Price | 14,533 | 54% | 13.5 | 34% | $ 516 | 22% |
| | Subtotal: Multi-Source Products | 23,049 | 86% | 25.2 | 64% | $ 655 | 28% |
| | Other Unclassified Products (e.g. compounded Rxs etc.) | 132 | 1% | 0.1 | 0% | $ 31 | 1% |
| | Total: All Products | 26,681 | 100% | 39.6 | 100% | $ 2,365 | 100% |

[1] Based on unique NDC.
[2] In millions
Note: Existence of FUL prices is based upon November 2000 prices. Utilization figures were obtained from the Department of Health Services and are for Calendar Year 2000.

Although a complete discussion of the many unique aspects of the Medi-Cal pharmacy program is outside the scope of this report, there are several aspects worth noting as they interact with reimbursement policies.

As with all state Medicaid programs, the Medi-Cal pharmacy program's level of expenditures are reflective of not only reimbursement policies, but also the size and acuity level of the underlying recipient base. Although it is noted that the average payment amount per prescription for the Medi-Cal pharmacy program (approximately $61 in calendar year 2000) is somewhat higher than Medicaid programs overall (about $48), this difference is reflective of a combination of payment rates, utilization policies, as well as the mix of pharmaceuticals utilized by the program. For example, one distinguishing factor of the Medi-Cal program

Myers and Stauffer LC
Certified Public Accountants

CAAG/DHS0068481

is payments for drugs for HIV patients at one and a half times the national average.

The Medi-Cal system includes a mixture of recipients enrolled in the traditional fee-for-service program as wells as various levels of managed care that varies from county to county.  In some instances, recipients are included in a hybrid form of capitated and non-capitated services.  Notably, some pharmaceuticals (specifically certain drugs for the treatment of mental health conditions and HIV) are excluded from some managed care plans and are covered by the fee-for-service pharmacy program.  Such carve-outs of pharmaceutical services are significant since many of the drugs placed within the context of fee-for-service Medi-Cal programs tend to be more expensive on a per-prescription basis.

The Medi-Cal pharmacy program has been authorized by statute to create a formulary[3], referred to as the Medi-Cal List of Contract Drugs[4].  The Medi-Cal Contact Drug Advisory Committee was established to evaluate drugs for inclusion in the formulary.  This committee is charged with evaluating drugs on the basis of safety, effectiveness, essential need, potential for misuse and the cost of the drug.  Drug reviews are done both by therapeutic category and individually (by petition).  Furthermore, the Medi-Cal pharmacy program negotiates for supplemental rebates, in addition to the federal rebate, with drug manufacturers.  One key aspect to the functionality of the Medi-Cal List of Contract Drugs and the supplemental rebates is that drugs not on the List of Contract Drugs can be subject to a Treatment Authorization Request (TAR), a form of prior authorization.

---

[3] Federal law allows a state Medicaid program to develop a formulary subject to certain restrictions at 42 USC 1396r-8(f)(4).
[4] California state statutes that authorize the Medi-Cal drug formulary and rebate program can be found in the California Welfare and Institutions (W&I) Code Section 14105.3 through 14105.45.

Myers and Stauffer LC
Certified Public Accountants

CAAG/DHS0068482



**Chapter 3**

## Dispensing Cost Survey

The two primary components for reimbursement of pharmaceuticals are drug ingredient cost and the dispensing fee. The dispensing, or professional, fee is paid to pharmacies to cover their overhead and labor costs. Federal regulations at 42 CFR 447.331-333 require states to establish a reasonable dispensing fee for their Medicaid pharmacy programs and to document their pharmacy reimbursement methodology in their state plan. The California Department of Health Services was required by Senate Bill 393 to perform a study of the adequacy of Medi-Cal pharmacy reimbursement rates "including the cost of providing prescription drugs and services."

Dispensing fees for Medicaid programs nationally have typically been based on an analysis of costs incurred by pharmacies within the state and tend to vary somewhat from state to state. In order to determine costs incurred to dispense pharmaceuticals to Medi-Cal recipients in California, Myers and Stauffer utilized a survey method consistent with the methodology of the previous surveys conducted by Myers and Stauffer in 17 states.

## Methodology of the Survey

### Development of Methodology

Survey methodologies used by the firm have been developed and refined since our first dispensing cost study engagements in the 1970's. The cost accounting principles used in the study are, however, standard to the health care industry and are similar to methods other experts have used to study pharmacy dispensing cost. Please refer to Appendix A for references to other pharmacy studies and the accounting principles that provide background to the methodologies used in this study.

### Pharmacy Sample Selection

Myers and Stauffer received a pharmacy provider file from the Department of Health Services that included the following information:

Myers and Stauffer llc
Certified Public Accountants

CAAG/DHS0068483

- Medi-Cal Provider Numbers
- Provider Names
- Provider Address and Phone Number Information
- Prescription Claim Count for Calendar Year 2000
- Prescription Claim Dollar Amount for Calendar Year 2000

Myers and Stauffer also received a sample of pharmacy claims for the months of May and November 2000.

Based on an analysis of predicted statistical variation, expected participation rates and other considerations, Myers and Stauffer developed a survey plan that involved soliciting participation in the dispensing cost survey from approximately 2,000 pharmacies. The selection criteria for the sample was primarily random, however certain stratification protocols were implemented to promote adequate representation of various pharmacy specialties. Myers and Stauffer determined that certain pharmacy traits were broadly distributed, and were therefore appropriately captured in adequate numbers in a random sample. There were also some attributes for which better representation was obtained via a stratification process.

After importing the pharmacy provider data into internal database formats, Myers and Stauffer performed a process of making preliminary identifications of pharmacy specialties. Various "flags" were created for the purpose of performing appropriate sample stratification. Pharmacy attributes that were flagged are as follows:

- **Chain versus Independent Affiliation**
  Myers and Stauffer made a preliminary determination of chain versus independent based on a preliminary visual inspection of the provider file. As applicable, Myers and Stauffer staff also utilized their experience with and exposure to various national chain organizations. For the purposes of this project, a chain was considered an entity with five or more stores nationally.

- **Urban versus Rural Location**
  Myers and Stauffer used zip code data to crosswalk the pharmacy location to individual California counties. A county was deemed to be "urban" based on its location in a "Metropolitan Statistical Area" (MSA) as used by the Bureau of the Census. Other counties were considered "rural." Pharmacies not physically located in the state of California were not classified as to urban or rural status.

- **Long-Term Care Pharmacy Provider Status**
  The pharmacy provider data included "place of service" codes. One code is used to identify claims dispensing in a nursing facility. Myers and Stauffer used these codes to determine the ratio of prescriptions dispensed to a long-term care setting. Pharmacies that dispensed 50% or more prescriptions in a

Myers and Stauffer LC
Certified Public Accountants

13

long-term care setting were identified. A few additional providers were also classified based on name recognition of the provider.

- **Provision of Intravenous Prescription Services**
  Myers and Stauffer used the sample of pharmacy claims data to identify certain pharmacies that dispensed a significant portion of intravenous medications.

- **Provision of Other Compounding Services**
  Myers and Stauffer received lists of pharmacies that provide compounding services from the Department of Health Services, a local pharmacist recommended by the Department, and from the Internet web site of the International Academy of Compounding Pharmacists (IACP)[5].

### Low Volume Exclusion from Pharmacy Sample

Prior to selecting any pharmacies into the random sample, Myers and Stauffer excluded all pharmacies that dispensed fewer than 250 prescriptions during calendar year 2000. Approximately 1,200 pharmacies were excluded based on this criteria. It has been our experience that these pharmacies with low volume of Medi-Cal prescriptions often are out-of-state, newly opened, or recently closed pharmacies. As such, these pharmacies do not represent the norm of Medi-Cal participating providers. Additionally, our experience has shown that due to their low Medi-Cal volume, many of these pharmacies would be reluctant to spend the time and effort required to participate in the survey. These pharmacies also have little impact on the overall cost structure of pharmacies in the Medi-Cal pharmacy program (and conversely are often only minimally impacted by the Medi-Cal program). Collectively, all of these low Medicaid volume pharmacies dispensed less than one-quarter of one percent of Medi-Cal prescriptions in calendar year 2000.

### Stratification Protocols based on Pharmacy Specialty

Based on our preliminary analysis, there were certain specialties that were not broadly distributed among the pharmacy population (exclusive of the low Medi-Cal volume pharmacies previously described). In particular we noted that there were 201 pharmacies that met the criteria for the long-term care pharmacy provider designation. Also, there were only 100 pharmacies identified that dispensed intravenous prescriptions as a significant portion of their volume. There were 63 pharmacies designated to be the compounding specialty. Myers and Stauffer believed that in order to ensure adequate representation of specialties represented by these flags, 100% of the pharmacies so identified should be included in the sample.

---

[5] "http://www.iacprx.org/"

Myers and Stauffer LC
Certified Public Accountants

CAAG/DHS0068485

**Stratification Protocols Based on Pharmacy Location**
It was noted that there were only 200 pharmacies located in counties designated as "rural." Due to this relatively small number of rural providers, Myers and Stauffer included 100% of these pharmacies in the sample. Additionally, Myers and Stauffer developed a computer algorithm to ensure that each California county was represented by at least five pharmacies in each county (or all eligible pharmacies in the case of a county with less than five pharmacies).

**Random Selection**
After including the stratification groups identified previously, a computer algorithm randomly selected from the remaining pharmacies for inclusion in the survey sample.

**Mailing Procedures**

Survey forms were mailed on October 2, 2002 to 2,010 pharmacy providers currently enrolled in the Medi-Cal program that were selected from the sampling methodology. Each pharmacy received a copy of the cost survey (Exhibit 1), a list of instructions (Exhibit 2), a letter of introduction from the California Department of Health Services (Exhibit 3), a letter of explanation from Myers and Stauffer (Exhibits 4 and 5), a letter from the California Pharmacists Association (Exhibit 6) and a business reply envelope.

The survey forms were accompanied by a flyer announcing a series of informational meetings that were held in six locations across California (see Exhibit 7). A presentation explaining the dispensing cost survey forms was included in the meetings. Pharmacy owners and managers had the opportunity to meet with Department and Myers and Stauffer representatives and ask questions about the survey process.

**Survey Participation**

Of the 2,010 surveyed pharmacies, 122 pharmacies were determined to be ineligible to participate. Providers were deemed ineligible if they had closed their pharmacy, had a change of ownership, or had less than six months of cost data available.

Concerted efforts to encourage maximum participation were made by various parties concerned with the success of the survey. An official letter explaining the purpose of the study was sent to the sampled pharmacy providers by the California Department of Health Services. The cost survey forms and instructions and a letter of explanation from Myers and Stauffer offered pharmacy owners the option of having Myers and Stauffer complete certain sections of the survey form if copies of financial statements and/or tax returns were supplied. A toll-free telephone number was listed on the survey form, and pharmacists were urged to

Myers and Stauffer LC
Certified Public Accountants

15

CAAG/DHS0068486

call to resolve any questions they had concerning completion of the survey form. Myers and Stauffer staff attended the California Pharmacists Association's Education Faire held in Reno, Nevada in October 2001. Brochures promoting the survey (see Exhibit 8) were passed out from a booth in the exhibit hall. Additionally, a reminder postcard was sent to pharmacies in the sample approximately two weeks before the survey due date to encourage participation (see Exhibit 9).

By the original filing deadline of November 30, 2001, 234 cost surveys had been received. In an effort to increase the response rate, surveys were accepted after the due date and Myers and Stauffer sent letters to non-responding pharmacies encouraging them to participate in the survey (Exhibit 10). Additionally, key staff at various chain pharmacy headquarters were contacted by telephone.

As is typical with these projects, many of the submitted cost surveys contained errors or were incomplete. For cost surveys with such errors or omissions, the pharmacy was contacted for clarification. There were some cases in which issues on the cost survey were not resolved in time for inclusion in the final analysis. Ultimately, 847 surveys were entered into a database and used in our analysis of dispensing costs.

The following table, 3.1, summarizes the cost survey response rate.

### Table 3.1  Dispensing Cost Survey Response Rate

| Type of Pharmacy / Pharmacy Attribute | Total Medi-Cal Participating Pharmacies | Pharmacies Receiving Cost Surveys | Pharmacies Exempt from Filing | Eligible Pharmacies | Usable Cost Surveys Received | Response Rate |
|---|---|---|---|---|---|---|
| Chain | 2,919 | 963 | 47 | 916 | 465 | 51% |
| Independent | 2,983 | 1,047 | 75 | 972 | 382 | 39% |
| Urban[1] | 5,646 | 1,803 | 108 | 1,695 | 768 | 45% |
| Rural[1] | 227 | 200 | 14 | 186 | 78 | 42% |
| Institutional[2] | 286 | 201 | 22 | 179 | 70 | 39% |
| Intravenous[3] | 102 | 100 | 3 | 97 | 25 | 26% |
| Compounding[4] | 63 | 61 | 2 | 59 | 45 | 76% |
| All Pharmacies[5] | 5,902 | 2,010 | 122 | 1,888 | 847 | 45% |

[1] Urban versus rural status determined for in-state pharmacies only.

[2] Initial determination of institutional pharmacy status was based on a review of Medi-Cal pharmacy claims. Review of submitted cost reports later indicated that some pharmacies originally considered to be "institutional" did not meet the criteria that is typically implied with the term. Analyses subsequent to the collection of cost report data modified classification criteria based on self-reported statistics.

[3] Initial determination of intravenous dispensing status was based on a review of a sample Medi-Cal pharmacy claims. Analyses subsequent to the collection of cost report data determined intravenous dispensing status based on self-reported sales statistics.

[4] Initial determination of the provision of compounding services was based on the pharmacy's inclusion on various marketing lists. Analyses subsequent to the collection of cost report data determined provision of compounding services based on self-reported prescription statistics.

[5] The pharmacy types in the table include some overlap, therefore the total for all pharmacies is not a sum of the above categories.

Myers and Stauffer llc
Certified Public Accountants

CAAG/DHS0068487

## Reporting Bias

For the traits listed in Table 3.1, the sample of 847 pharmacies was tested to determine if it was representative of the population of Medi-Cal provider pharmacies. Since the response rate of the sample pharmacies was less than 100 percent, the possibility of bias in the responding sample should be considered. To measure the likelihood of this possible bias, chi square ($\chi^2$) tests were performed.  Among other attributes, a chi square test was used to determine whether the final sample was independent with respect to traits that were assumed to be broadly distributed.

Of the 847 cost surveys, 382 were from independent pharmacies and 465, or 55%, were from chain pharmacies.  The slight over representation of chain pharmacies (compared to 51% of eligible Medi-Cal providers) was due to several reasons.  First, the decision of a chain organization to file typically meant filing for all, or at least the majority, of its pharmacies included in the pharmacy sample. There were eight large pharmacy chains in California that filed usable cost surveys for five or more stores, but these eight chain organizations collectively supplied approximately 450 usable surveys.  The decision for an independent pharmacy to file, however, typically only affected one, or on some occasions, two stores.  Chain organizations typically have corporate accounting offices or third party program managers in place to handle tasks such as completing cost surveys.  Owners of independent pharmacies, however, are often involved in many facets of their business operation, and consequently are in some cases less likely to have the time or resources available to complete a cost survey.  An additional reason for a greater number of chain pharmacy surveys being available was an increased difficulty of contacting independent pharmacists to resolve any issues involved with their cost report. Chain pharmacies, alternatively, could be contacted through their corporate offices where again, mechanisms were in place to deal with our inquiries.

Other characteristics of the final sample are represented in slightly different proportions than exist in the population of Medi-Cal provider pharmacies due to the stratification techniques used in the sample selection process.

Due to the use of these stratification protocols and the possibility of reporting bias, further analysis is indicated to determine whether there is a significant difference in dispensing costs of the various pharmacy specialties.  This issue is further addressed in the "Analysis and Findings" section of this chapter.

## Receipt and Review Procedures

For confidentiality purposes, each pharmacy was randomly assigned a four-digit identification number and each cost survey was carefully examined. This review identified cost surveys considered incomplete, and pharmacies submitting these

Myers and Stauffer LC
Certified Public Accountants

17

cost surveys were sent a "Request for Additional Information" letter specifying the information necessary for completion (Exhibit 11) or were contacted by telephone.

## Field Examination Procedures

A total of 50 pharmacies were selected for a field examination. The selection was primarily random, but geographic location was taken into consideration. A letter was sent to each selected pharmacy explaining the selection process, the time period during which the field examination would take place, and the necessary data to have available. Each pharmacy was then contacted by telephone for further explanation of the field examination and confirmation of the time and date. An examination file was prepared for each of the pharmacies containing a uniform field examination program, a copy of the completed reviewed cost survey, and other necessary work papers.

Following the actual visit to the pharmacy, work papers were completed by making a second examination of each file to ensure that all necessary information had been obtained. A follow-up letter was sent to each pharmacy visited, expressing appreciation for the time and cooperation of pharmacy personnel. Each work paper file was reviewed for quality assurance. Results of the field examinations showed no significant bias in overstating or understating costs reported on the cost survey (Exhibit 12).

## Cost Finding Procedures

Cost finding is the process of recasting cost data using rules or formulas in order to accomplish an objective. In this study, the objective is to estimate the cost of dispensing prescriptions to Medi-Cal recipients. To accomplish this objective, some pharmacy costs must be allocated between the prescription dispensing function and other business activities. This process identified the reasonable and allowable costs necessary for prescription dispensing to Medi-Cal recipients.

Most pharmacies are also engaged in lines of business other than the dispensing of prescription drugs. For example, many pharmacies have a retail business with sales of over-the-counter (OTC) drugs and other non-medical items. Some pharmacies are involved in the sale of durable medical equipment. The existence of these other lines of business necessitate that procedures be taken to isolate the costs involved in the prescription dispensing function of the pharmacy.

Dispensing cost consists of two components: overhead and labor. The cost finding rules employed to determine each of these components are described in the following sections.

Myers and Stauffer LC
Certified Public Accountants

18

CAAG/DHS0068489

## Overhead Costs

Overhead cost per prescription was calculated by summing the allocated overhead of each pharmacy and dividing this sum by the number of prescriptions dispensed. Overhead expenses originally reported for the entire pharmacy were allocated to the prescription department based on either:

- Sales ratio (prescription sales divided by total sales)
- Area ratio (prescription department floor space (in square feet) divided by total floor space)
- All (100%)
- None

Overhead costs that were considered *entirely prescription-related* include:

- Prescription department fees
- Prescription delivery expense
- Prescription computer expense
- Prescription containers and labels (For many pharmacies the costs associated with prescription containers is captured in their cost of goods. Subsequently, it was often the case that a pharmacy was unable to report expenses for prescription containers. In order to maintain consistency, a standardized allowance for prescription containers was determined after consultation with several pharmacists. See Exhibit 13.)
- Certain other expenses that were separately identified on lines 27-29[6] (see the cost survey in Exhibit 1)

Overhead costs that were *not allocated as a prescription expense* include:

- Income taxes[7]
- Bad debts[8]
- Advertising
- Contributions[9]

---

[6] Expenses that were considered entirely prescription-related were transferred to Line 28. One example is continuing professional education for a pharmacist.

[7] Income taxes are not considered an operational cost because they are based upon the profit of the pharmacy operation. Although a separate line was provided for the state income taxes of corporate filers, it was not allowed as a prescription cost in order to afford equal treatment to each pharmacy, regardless of the type of ownership.

[8] Bad debts were not considered a prescription-related expense since they are revenue offsets arising through an accrual recognition of revenues which are later found to be not collectible. Disallowing this expense also afforded equal treatment to providers, irrespective of their method of accounting.

Myers and Stauffer LC
Certified Public Accountants

CAAG/DHS0068490

Certain costs reported on Lines 27, 28, and 29 were occasionally excluded. An example is freight expense, which usually relates only to nonprescription purchases or cost of goods sold.

The remainder of the costs was assumed to be related to *both prescription and nonprescription sales*. Joint cost allocation is necessary to avoid understating or overstating the cost of filling a prescription.

Those overhead costs allocated on the ratio of the *floor space* (as previously defined) include:

- Depreciation
- Real estate taxes
- Rent
- Repairs
- Utilities

The costs in these categories were considered a function of floor space. For example, the larger the facility, the higher the rent, if other factors are considered equal. The floor space ratio was increased by 50 percent from that reported on the original cost survey to allow for waiting area for patients and prescription department office area. The resulting ratio was adjusted downward, when necessary, not to exceed the sales ratio (in order to avoid allocating 100% of these costs in the rare instance where the prescription department occupies the majority of the area of the store).

Overhead costs allocated using the *sales ratio* include:

- Personal property taxes
- Other taxes
- Insurance
- Interest
- Accounting and legal fees
- Telephone and supplies
- Dues and publications

---

[9] Individual proprietors and partners are not allowed to deduct contributions as a business expense for federal income tax purposes. Any contributions made by their business are deducted along with personal contributions as itemized deductions. However, corporations are allowed to deduct contributions as a business expense for federal income tax purposes. Thus, while Line 19 on the cost report recorded the business contributions of a corporation, none of these costs were allocated as a prescription expense. This, again, afforded equal treatment for each type of ownership.

Myers and Stauffer๙
Certified Public Accountants

CAAG/DHS0068491

## Labor Costs

Labor costs are calculated by allocating total salaries, payroll taxes, and benefits based on the percent of time spent in the prescription department. The allocations for each labor category were summed and then divided by the number of prescriptions dispensed to calculate labor cost per prescription. There are various classifications of salaries and wages requested on the cost survey (Lines 31-44) due to the different cost treatment given to each labor classification.

The total salaries, payroll taxes, and benefits of employee pharmacists (Lines 34-38) were multiplied by a factor based upon the percent of prescription time. Although some employee pharmacists spent a portion of their time performing nonprescription duties, it was assumed that their economic productivity when performing nonprescription functions was less than their productivity when performing prescription duties. Therefore, a higher percentage of salaries, payroll taxes, and benefits was allocated to prescription labor costs than would have been allocated if a simple percent of time allocation was utilized. Specifically, the percent of prescription time indicated was multiplied by two and divided by the percent of prescription time plus one.

> *An Example:*
>
> An employee pharmacist spends 90 percent of their time in the prescription department. The 90 percent factor would be modified to 95 percent:
>
> $$\frac{(2)(.9)}{(1+.9)}$$
>
> Thus, 95 percent of the reported salaries, payroll taxes, and benefits would be allocated to the prescription department. It should be noted that most employee pharmacists spent 100 percent of their time in the prescription department.

The allocation of salaries, payroll taxes, and benefits for all other prescription employees (Lines 39-43) was based directly upon the percentage of time spent in the prescription department as indicated on the individual cost survey. For example, if the reported percentage of prescription time was 75 percent and total salaries were $10,000, then the allocated prescription cost would be $7,500.



Myers and Stauffer
Certified Public Accountants

21

CAAG/DHS0068492

## Owner Compensation Issues

The allocation of salaries, payroll taxes, and benefits of the owner pharmacists (Lines 31-33) was based upon the same modified percentage as that used for employee pharmacists. However, limitations were placed upon the allocated salaries, payroll taxes, and benefits of owner pharmacists. Since amounts shown for owner pharmacists are not historical costs that have arisen from arm's length negotiations, they are not similar to other costs. A pharmacy owner has a different attitude toward other expenses than toward his/her own salary. In fact, owners often pay themselves above the market costs of securing the services of an employee pharmacist. This excess effectively represents a withdrawal of business profits, not a cost of dispensing. Some owners may underpay themselves for business reasons, which would also misrepresent the true dispensing cost.

A factor considered in determining the allocation of owner's salaries was the variability in productivity. For example, one owner pharmacist may dispense 5,000 prescriptions per year while another may dispense 30,000. Those owner pharmacists who dispensed a greater number of prescriptions were allowed a higher salary than were owner pharmacists who dispensed a smaller number of prescriptions. Since variance is not nearly as great with respect to employee pharmacists, the owner pharmacist's salary was subjected to limits based upon employee pharmacists' salaries per prescription.

## Determining Owner Compensation Allowances

To estimate the cost that would have been incurred had an employee been hired to perform the prescription-related functions actually performed by the owner, a statistical regression technique was used. A bivariate plot shows the correlation between an independent (predictor) variable and a dependent (predicted) variable. The upper and lower limits on owner pharmacist salary were determined from a bivariate regression (Chart 3.1)[19]. In order to accurately reflect the trend of decreasing marginal costs with increasing volume, a regression technique that fit the bivariate data to a logarithmic curve was used.  The resulting regression equation to predict pharmacist labor cost at varying amounts of work performed is:

*Labor cost* = 33,409 *X* ln *(number of prescriptions dispensed* [11]*)* – 255,623
(where ln represents the natural logarithm function)

---

[19] Employee pharmacist salary per prescription was used to set limitations on owner pharmacist salary estimates due to the "arm's length" nature and lack of variance in employee productivity compared with owner productivity.

[11] The number of prescriptions filled by the owner pharmacist was determined by multiplying the percent of owner-filled prescriptions (Lines 31-33 of the cost report) by the total number of prescriptions dispensed (Line a).

Myers and Stauffer
Certified Public Accountants

22

CAAG/DHS0068493

This equation was used to establish limits for allocating owner pharmacist costs. There was variation in actual employee salaries both above and below this regression line. This variation is measured by the equation's *standard error of the estimate*, $14,435. The standard error of the estimate was used to construct upper and lower limits of owner pharmacist labor cost:

*Upper Limit* = 33,409 $X$ *ln (number of prescriptions dispensed)* -- 213,770
*Lower Limit* = 33,409 $X$ *ln (number of prescriptions dispensed)* -- 255,623

Chart 3.1 Owner Pharmacist Limits Based on Employee Pharmacist Salaries



These two constraints effectively set upper and lower thresholds at approximately the 50th and 95th percentiles of volume adjusted employee salaries. An additional constraint is a $152,229 maximum annual salary and a $24,838 minimum salary. These amounts are set at the 30th and 95th percentile of volume adjusted employee salaries.

There is no reason to believe that managerial or clerical duties performed by the nonpharmacist owners were more valuable to the prescription dispensing function than for other functions. As with other owners, the amount shown for salaries, payroll taxes, and benefits was not a result of arm's length negotiations. Therefore, an upper limit of $45,000 and a lower limit of $19,000 were placed upon these prescription costs. These limits were chosen based on experience from this survey and prior surveys. No adjustment was made to the percentage of prescription time factor for owner nonpharmacists (Lines 31-33).



Myers and Stauffer.c
Certified Public Accountants

23

## Overall Labor Cost Constraints

An overall constraint was placed on the proportion of total reported labor that could be allocated as prescription labor. The constraint assumes that a functional relationship exists between the proportion of allocated prescription labor to total labor and the proportion of prescription sales to total sales. It is also assumed that a higher input of labor costs is necessary to generate prescription sales than nonprescription sales, within limits.

The parameters of the applied labor constraint are based upon an examination of data submitted by all pharmacies. These parameters are set in such a way that any resulting adjustment affects only those pharmacies with a percentage of prescription labor deemed unreasonable. For instance, the constraint would come into play for an operation that reported 75 percent pharmacy sales and 100 percent pharmacy labor (obviously, some labor must be devoted to generating the 25 percent nonprescription sales).

To determine the maximum percentage of total labor allowed, the following calculation was made:

$$\frac{0.3(Sales\ Ratio)}{0.1+(0.2)(Sales\ Ratio)}$$

## Inflation Factors

All allocated costs for overhead and labor were totaled and multiplied by an inflation factor. Inflation factors are intended to reflect cost changes from the middle of the reporting period of a particular pharmacy to a common fiscal period ending December 31, 2002 (specifically from the *midpoint* of the pharmacy's fiscal year to the *midpoint* of the common fiscal period, June 30, 2002). The midpoint and terminal month indices used were taken from the U. S. Government Consumer Price Index (CPI), Urban Consumer (see Exhibit 14). The use of inflation factors is preferable in order for pharmacy cost data from various fiscal years to be compared uniformly.

Recent experience with pharmacy cost studies has indicated that the CPI may tend to overstate increases in dispensing cost over an extended time. This appears to be the result of increased cost containment pressures exerted on retail pharmacies by reduced reimbursement from managed care entities. The impact of these cost containment pressures may have been mitigated during the period of the dispensing cost survey by apparent escalations in pharmacists salaries driven, in part, by a perceived pharmacist shortage.

Myers and Stauffer LC
Certified Public Accountants

CAAG/DHS0068495