# Exhibit 35-1

*State of California ex rel. Ven-A-Care of the Florida Keys, Inc. v.*
*Abbott Labs, Inc. et al., Civil Action No. 03-11226-PBS*

**Exhibit to the November 25, 2009 Declaration of Philip D. Robben**
**in Support of Defendants' Joint Motion for Partial Summary Judgment**



**DEPOSITION EXHIBIT** PM
28
11-06-08

*CONFIDENTIAL-Government Code §6254(I)*

| Department:/Board | Bill Number/Author: |
| --- | --- |
| Health Services | AB 442/Assembly Budget Committee |

| Sponsor: | Related Bills | Chaptering Order (if known) |
| --- | --- | --- |
| ☐ Admin Sponsored -- Proposal No. | AB 523, AB 925, AB 3006, SB 406 | ☒ Attachment |

| Subject: |
| --- |
| HEALTH AND WELFARE PROGRAMS |

**SUMMARY:**

AB 442 would implement the provisions of the State budget for fiscal year 2002-2003, as it pertains to programs administered by the Department of Health Services (DHS), Department of Mental Health (DMH), Department of Developmental Services (DDS), Department of Managed Health Care (DMHC), the Managed Risk Medical Insurance Board (MRMIB), and the Emergency Medical Services Authority (EMSA).

**PURPOSE OF THE BILL:**

AB 442 is intended to implement portions of the 2002-2003 State Budget, as passed by the Legislature to the Governor, that relate to health programs. Below is a section-by-section summary of the provisions of this bill, followed by an analysis of each section affecting DHS.

**RECOMMENDATION AND SUPPORTING ARGUMENTS: SIGN**

SEC. 1. This section would delete the reporting due date of the pharmacy reimbursement rate study being conducted by the DHS. Due to the time needed for DHS's contractor to complete the study, deletion of this due date was necessary. The pharmacy reimbursement rate study was released August 23, 2002. **DHS supports this proposal.**

SEC. 2. This section would delete the sunset provision of the Prescription Drug Discount Program for Medicare recipients. This program has been very successful, providing an average savings of 24 percent for Medicare beneficiaries on their prescription drugs. **DHS supports this proposal.**

| Departments That May Be Affected |
| --- |
| MRMIB, DSS, DDS, DMH, EMSA, CDE |

| ☒ New / Increased Fee | ☐ Governor's Appointment | ☐ Legislative Appointment | ☒ State Mandate | ☒ Urgency Clause |
| --- | --- | --- | --- | --- |

| Dept/Board Position | Agency Secretary Position |
| --- | --- |
| ☒ Sign | ☐ Sign |
| ☐ Veto | ☐ Veto |
| ☐ Defer to: | ☐ Defer to: |
| Director /Chair     Date | Agency Secretary     Date |
| _[signature]_  9/17/03 | |

SEC. 3.  This section, in combination with Section 43 of this bill would:

1. Allow for an express enrollment process into the Medi-Cal program for children who have been
   determined eligible for free meals through a federally funded program using the National School
   Lunch Program (NSLP) application;
2. Authorize school districts and county superintendents to share information provided on the NSLP
   application with the entity designated by DHS to make an express enrollment determination;
3. Change the effective date of these and related provisions from July 1, 2002, to July 1, 2003; and,
4. Make technical changes to clarify the original intent of the legislation and to ensure compliance
   with federal regulations.

Although the Governor's May Revision delayed implementation of this legislation to July 2005 due to
budget constraints, DHS is concerned that the 2003 implementation may not be feasible, due to the
projected budget situation for fiscal year 2003-2004.

Additionally, DHS sponsored the amendments to existing law in these sections that would allow for
implementation of the Express Lane Eligibility process as originally intended, in a manner in which
FFP is not jeopardized.  **DHS supports this proposal.**

SEC. 4.  Health Care Service Plans.  DEFER to DMHC.

SEC. 5.  Trauma Care Fund.  DEFER to EMSA.

SEC. 5.5.  This section would create a fund that could accept voluntary contributions to support DHS
activities in providing guidance and developing standards and guidelines regarding indoor mold
contamination.  Moneys donated to this fund would be available for all DHS indoor mold-related
actions, including, but not limited to those mandated in SB 732 (Ortiz, Chapter 18, Statutes of 2001),
the Toxic Mold Protection Act of 2001.  **DHS supports this proposal.**

SEC. 6.  Supportive Housing Multi-Year Contracting.  DEFER to DMH.

SEC. 7.  This section would require that formal administrative hearings requested by institutional
Medi-Cal providers and health facilities be held in Sacramento.  With the consent of the parties
hearings could also be conducted by telephone.  The number of administrative hearings that DHS
must hold has increased and the number of staff available to conduct or represent DHS at hearings
has not.  Limiting the location of formal hearings for institutional Medi-Cal providers and health
facilities would significantly improve the efficiency of the hearing office and DHS attorneys who
participate in hearings and reduce travel budgets.  There would be no significant hardship on the
institutions that request hearings because they would have the option of traveling to Sacramento or
having a hearing conducted by telephone.  Hearings would continue to be held at a location close to
individuals and small businesses that request hearings.  **DHS supports this proposal.**

SEC. 8.  This section would establish that federal funding received by DHS for local bioterrorism preparedness and response activities is subject to appropriation in the annual Budget Act.  This section would (1) govern the conditions under which local health jurisdictions in California are eligible to receive funding from DHS; (2) establish the allocation formula by which the administrative bodies of eligible local jurisdictions would receive funds pursuant to the federally approved collaborative state-local plan; and (3) define the allocation process for disbursing current and future federal funds.  DHS agreements with counties for allocation of the funds appropriated for the purposes of this section would be exempted from review by the Department of General Services.  These provisions are consistent with the federally approved collaborative state-local plan and DHS supports the provisions of this section.

SEC. 9. This section would cap the indirect cost rate (ICR) allowed to be charged on research grants funded by the Cancer Research Program (CRP) to 25 percent of the institutions' direct costs. DHS supports this proposal.

SEC. 10. This section would require manufacturers of drugs on the AIDS Drug Assistance Program (ADAP) formulary to negotiate with DHS for payment of additional rebates, beyond those rebates currently mandated by State and federal law.  The additional rebates collected would serve to offset the increasing cost of drugs and help ensure uninterrupted client access to life-sustaining drugs. DHS supports this proposal.

SEC. 11, 12, and 13 of the bill would establish the Child Health and Disability Program (CHDP) Gateway. This Gateway would be an internet-based system that would allow an application for CHDP to also serve as the pre-enrollment application for Healthy Families (HF) or Medi-Cal programs. This system would be used to pre-enroll eligible children into the HF or Medi-Cal programs for 60 days and start the application process for ongoing eligibility under these programs.  The CHDP Gateway program could potentially provide enhanced health care coverage to approximately 1 million children who are currently not enrolled in Medi-Cal or HF.  The CHDP Gateway would also allow the State to draw down federal matching funds to pay for CHDP services provided to children pre-enrolled in Medi-Cal or Healthy Families, instead of using State funds only.  DHS supports this proposal.

SEC. 14. This section would make the requirement to conduct a community outreach and awareness campaign pertaining to the California Newborn Hearing Screening Program (NHSP) permissive, rather than mandatory.  By eliminating this mandatory requirement, DHS would have the discretion to decide if, when and where outreach activities are to be provided.  This proposal would not impact the delivery of services under the NHSP.  DHS supports this proposal as a mechanism to reduce expenditures during the current budget crisis.

SEC. 15. This section of the budget trailer bill would extend the sunset date for the Domestic Violence Advisory Council (DVAC) from January 1, 2003 to January 1, 2006.  The DVAC assists DHS by providing input and advice from stakeholders, consequently ensuring that DHS best meets clients' needs by obtaining community input.  This proposal would allow the opportunity for members to serve an extended amount of time, thereby allowing continuity in the review of old and new issues presented to the DVAC committee.  DHS supports this proposal.

SEC. 15.5.  This section would repeal existing statute, which prohibits collection of Newborn Screening (NBS) test fees from the hospital of birth effective July 1, 2002.  Existing statute would be followed for all services provided prior to that date.  This language would resolve a fee collection problem for NBS experienced under the current statute.  **DHS supports this proposal.**

SEC. 16.  This section would authorize DHS to receive manufacturer discounts, rebates or refunds, based on the quantities of blood factor purchased under the Genetically Handicapped Person's Program (GHPP).  This proposal could result in a significant reduction in the GHPP's expenditures for blood factor products prescribed for persons with hemophilia.  **DHS supports this proposal.**

SEC. 17.  This section identifies an alternative funding source to provide support for the Perinatal Profiles Reports (PPR).  Current funding for the PPR has been redirected by the Legislature to support DHS's Birth Defects Monitoring Program in the 2002-03 fiscal year.  This section identifies a health facility fee administered by Office of Statewide Health Planning and Development (OSHPD) to provide funds to support the PPR.  Providing a funding source for the PPR will allow for continued provision of facility-specific data to California maternity hospitals and facilities to reduce the incidence of maternal and infant deaths and improve the overall quality of care at these facilities.  **DHS supports this proposal.**

SEC. 18.  This section would amend Section 12693.17 of the Insurance Code governing the Healthy Families Program (HFP) to clarify the definition of "family contribution sponsor", and to make the timeframes consistent with the CHDP Gateway concept.  See sections 11-13, 19-24, 45 and 46 of this bill.  **DHS supports this proposal.**

SEC. 19.  This section would make Insurance Code 12693.41 inoperative on April 1, 2003, and repeal it January 1, 2004.  The current language provides for payment of CHDP providers for services rendered to children who are found to be eligible for HFP.  This language is not necessary once the CHDP Gateway program is implemented.  **DHS supports this proposal.**

SEC. 20.  This section would add a new Insurance Code Section 12693.41 to replace that section which would become inoperative on April 1, 2003 and would be repealed on January 1, 2004 by Section 19.  This new section would require the Managed Risk Medical Insurance Board (MRMIB) to coordinate with DHS on implementing the CHDP Gateway program, the pre-enrollment program into Medi-Cal and HFP.  This section would define the requirements and conditions under which HFP will implement the new program.  It also would specify an effective date of April 1, 2003.  **DHS supports this proposal.**

SEC 21.  This section would amend Insurance Code Section 14693.43 to permit applicants (not family contribution sponsors) who pay the family HFP premium by an approved electronic funds transfer (EFT) means to receive a 25 percent discount.  This proposal is unrelated to the CHDP Gateway proposal, and is intended to clarify that the discount is available for EFT transactions.  **DHS supports this proposal.**

SEC. 22.  This section would amend Insurance Code Section 14693.45 to clarify the conditions under which HFP applicants/participants may be disenrolled for failure to make premium payments.  This proposal is intended to be consistent with the CHDP Gateway program timeframes.  **DHS supports this proposal.**

SEC 23.  This section would amend Insurance Code Section 14693.70. The existing language defines the requirements for applicants to the HFP.  This section would add another requirement that the applicant must pay in full any family contributions owed in arrears for any health coverage provided by the program within the previous 12 months.  This proposal is intended to ensure that a child reapplying for HFP through the CHDP Gateway pays any family contributions owed to HFP from a previous enrollment before enrolling again.  DHS supports this proposal.

SEC 24.  This section concerns the Healthy Families to Medi-Cal Bridging program.  This amendment to Insurance Code Section 14693.981 would delete paragraph (e), which limits implementation of the section only upon approval and implementation of the Title XXI SCHIP waiver.  **DHS supports this proposal.**

SEC. 25.  Community Treatment Facilities.  DEFER to DMH.

SEC. 26.  Early Mental Health. DEFER to DMH.

SEC. 27.  Primary Intervention Program.  DEFER to DDS.

SEC. 28.  Community Placement Plan.  DEFER to DDS.

SEC. 29.  Community Placement Plan.  DEFER to DDS.

SEC. 30.  Primary Intervention Program.  DEFER to DDS.

SEC. 30.5.  Unallocated Reduction for Regional Centers.  DEFER to DDS.

SEC. 31.  Regional Center Employment Contracts.  DEFER to DDS.

SEC. 32.  Intake and Assessment.  DEFER to DDS.

SEC. 33.  Individual Program Plans.  DEFER to DDS.

SEC. 34.  Community Placement Plans.  DEFER to DDS.

SEC. 34.5.  Repeal of Meeting Requirements.  DEFER to DDS.

SEC. 35.  Children's System of Care.  DEFER to DMH.

SEC. 36.  EPSDT Language.  DEFER to DMH.

SEC. 37.  Children's System of Care.  DEFER to DMH.

SEC. 38.  Children's System of Care.  DEFER to DMH.

SEC. 39.  Children's System of Care.  DEFER to DMH.

SEC. 40.  Children's System of Care.  DEFER to DMH.

SEC. 41.  This section would eliminate the existing requirements that interagency agreements pertaining to the Medi-Cal program be amended when additional funds are required, as long as: 1) there is no change to the scope of work of the agreement; and 2) the additional funds are newly appropriated and budgeted.  This language would support efficiency in state government by streamlining the processing of interagency agreements.  This language would result in reducing the amount of time needed to amend interagency agreements between DHS and other state agencies. Further, it would speed up payments of FFP to other departments, reducing the use of state General Funds and increasing state interest income.  DHS supports this proposal.

SEC. 42.  This section would make possible the establishment of an Office of the Ombudsman to implement outreach, community education, and training regarding health care consumer rights and responsibilities.  This section would authorize the Director of DHS to enter into contracts on a regional pilot project basis, with one or more non-profit organizations, which would include the production and distribution of related materials, individual consumer assistance and the development and maintenance of a database of inquiries and requests for assistance. No funds are appropriated for an Office of the Ombudsman. Establishing an Office of the Ombudsman would provide DHS with an on-going communication mechanism with any person receiving or eligible to receive Medi-Cal benefits, regarding health care consumer issues for the State of California.  DHS supports this proposal.

SEC. 43.  This section, in combination with Section 3 of this bill would:

1. Allow an express enrollment process into the Medi-Cal program for children who have been determined eligible for free meals through a federally funded program using the National School Lunch Program (NSLP) application,
2. Authorize school districts and county superintendents to share information provided on the NSLP application with the entity designated by DHS to make an express enrollment determination.
3. Change the effective date of these and related provisions from July 1, 2002, to July 1, 2003, and;
4. Make technical changes to clarify the original intent of the legislation and to ensure compliance with federal regulations.

Although the Governor's May Revision delayed implementation of this legislation to July 2005 due to budget constraints, DHS supports the 2003 implementation, subject to availability of funds.

Additionally, DHS sponsored the amendments to existing law in these sections that would allow for implementation of the Express Lane Eligibility process as originally intended, in a manner in which FFP is not jeopardized. **DHS supports this proposal.**

SEC. 44. This section would clarify the implementation date for the accelerated enrollment (AE) program of children. It would also instruct counties how to treat the receipt of an application for a child who is receiving accelerated coverage. This proposal would facilitate implementation of the AE program, which will ensure that more uninsured children have access to health care under Medi-Cal and that the providers treating these children will be reimbursed for their services. **DHS supports this proposal.**

SEC. 45. This section describes the CHDP Gateway pre-enrollment process, would require DHS to develop an electronic application, and would require DHS and the Managed Risk Medical Insurance Board (MRMIB) to seek all state plan amendments and approval required under Title XIX and XXI of the Social Security Act in order to secure federal financial participation for the CHDP Gateway program. DHS proposed this section, but is concerned that the July 1, 2003 date may not provide adequate time for development of the electronic application. DHS would prefer language requiring development of the electronic application 90 days after the effective date and implementation of the new program. This section would result in more children applying for and enrolling in the Medi-Cal and Healthy Families programs, thus improving access to comprehensive health care while maximizing federal funding. **Overall, DHS supports this proposal.**

SEC. 46. This section would provide that the services provided during the pre-enrollment eligibility period would end on the last day of the month following the month in which the determination was made under the CHDP Gateway program, unless an application for Healthy Families or Medi-Cal is filed before that date. If an application were filed before that date, preliminary benefits would continue until the regular eligibility determination is completed. The application in all other respects would be treated as other initial applications for eligibility. This section would result in more children applying for and enrolling in the Medi-Cal and Healthy Families programs, thus improving access to comprehensive health care while maximizing federal funding. **DHS supports this proposal.**

SEC. 47. This section would require DHS to issue instructions to counties to establish an automated system for tracking the status of applications received from the Single Point of Entry (SPE). The Governor's May Revision included funding for counties to manually track the status of all applications sent to the County Welfare Departments (CWDs) by the SPE, which includes applications granted accelerated eligibility (AE). This Section would require the CWDs to report only the denial of applications that had previously been granted AE, and it restricts DHS's ability to require status reporting of all applications until an interface between the county's automated system and the Medi-Cal Eligibility Data System (MEDS) is developed. Due to the concerns raised by the CWDs about additional workload, DHS agrees that this language would provide some tracking of Medi-Cal applications, with further tracking elements required as county automated systems are upgraded. **DHS supports this proposal.**

SEC. 47.5. This section would waive the requirement that pharmacy providers refund money to DHS for drugs returned to stock from a nursing facility upon discontinuation of the drug therapy for, or upon the death of, the Medi-Cal beneficiary. This proposal would provide needed financial relief to nursing home pharmacy providers, without affecting proposed savings in the budget. **DHS supports this proposal.**

SEC. 48. This section would eliminate the sunset date for the provision of Medi-Cal benefits to children receiving adoption assistance from another state. This proposal would continue this program so that Medi-Cal coverage is not taken away from the eligible children who have special health care needs. **DHS supports this proposal.**

SEC. 49 & 50. These sections would extend the sunset dates of the *Medi-Cal Medical Education Supplemental Payment Fund*, and the *Large Teaching Emphasis and Children's Hospital Medi-Cal Medical Education Supplemental Payment Fund*, from July 1, 2002, to July 1, 2004. These funds subsidize teaching costs by utilizing voluntarily transferred funds matched with federal funds through Medi-Cal's Selective Provider Contracting Program. Payments from these funds are negotiated between the California Medical Assistance Commission (CMAC) and Medi-Cal contracting hospitals that meet the definition of either: a University of California (UC) teaching hospital; a major (non-university) teaching hospital; a large teaching-emphasis hospital that is a disproportionate share hospital; or a children's hospital that is a disproportionate share hospital. **DHS supports this proposal.**

SEC. 51 & 52. These sections would provide DHS the authority to contract, either directly or through DHS's fiscal intermediary, for staff to accomplish Treatment Authorization Request (TAR) reviews, including appeals, and medical case management. **DHS supports this proposal.**

SEC. 53. This section would require provider rates of payment for services in the following programs be identical to rates of payment for the same service performed by the same provider type, pursuant to the Medi-Cal program: the California Children's Services Program, the Genetically Handicapped Person's Program, the Breast and Cervical Cancer Early Detection Program, the State-Only Family Planning Program, and the Family Planning, Access, Care, and Treatment (Family PACT) Waiver Program. Reimbursement rates for any procedures in these five programs will be tied to similar reimbursement rates for corresponding procedures in the Medi-Cal program. This proposal would provide consistency by allowing one single procedure code with a single payment methodology to be adopted for all similar procedures performed by the same provider type, delivered under Medi-Cal and any of the other five programs. **DHS supports this proposal.**

SEC. 53.5. This section would reduce the reimbursement for medical supplies under the Medi-Cal program from a 25 percent markup to a 23 percent markup. This section would also change the reimbursement of diabetic testing supplies from a 25 percent markup to a dispensing fee equal to the dispensing fee for prescription drugs. This alternative to significantly reducing reimbursement on incontinence supplies was suggested by providers of medical supplies, as they believe they are better able to absorb broad-based reductions than reductions focused on one product category. **DHS supports this proposal.**

SEC. 54. This section would restrict DHS contracting with clinical laboratories to only those laboratories that operate under specific provisions of state and federal law. Such contracting is expected to reduce expenditures for clinical laboratory services, while assuring access to high quality laboratory testing services for Medi-Cal beneficiaries. Additionally, this section would allow DHS to contract with its Fiscal Intermediary (FI) for consultant pharmacist staff needed for drug rebate contracting. Additional staff is needed to realize the projected savings, and this proposal would give DHS a "hiring option" that could facilitate the acquisition of the necessary personnel. **DHS supports this proposal.**

SEC. 55 & 56. These two sections would delete sunset provisions related to the Medi-Cal drug rebate program. Eliminating the sunset date for the Medi-Cal drug rebate program would enable DHS to retain authority to contract for $280 million in state supplemental rebates and prevent a return to the lengthy and burdensome regulatory process for making changes to the Medi-Cal formulary. These sections also include "clean-up" language to change the title of the Health Care Financing Administration to its new title of Centers for Medicare and Medicaid Services. **DHS supports this proposal.**

SEC. 57. This section would protect state and federal drug rebates owed to the Medi-Cal program when drug manufacturers report changes in Best Price or Average Manufacturers Price. Since these changes occur retroactively, they currently result in Medi-Cal refunding money or giving rebate credit to the manufacturers. This proposal would preclude such repayment. **DHS supports this proposal.**

SEC. 58. Section 58 would change state law to reduce the per-prescription reimbursement by DHS to Medi-Cal enrolled pharmacists and would exempt claims submitted by pharmacists for beneficiaries in a nursing facility, effective the date this section is enacted and with a sunset of July 1, 2004. This proposal would repeal the 25-cent increase effective on January 1, 2000, and the 15-cent increase effective July 1, 2002. The result of this section would be an estimated $21.5 million Total Fund (TF) savings to the Medi-Cal program. **DHS supports this proposal** as part of its efforts to address the current budget crisis.

SEC. 59. & 60. These sections would delete sunset provisions related to the Medi-Cal drug rebate program. Also includes "clean-up" language to change the title of the Health Care Financing Administration to its new title of Centers for Medicare and Medicaid Services. (See Sections 55 & 56). **DHS supports this proposal.**

SEC. 61. This section would allow DHS to suspend or delete drugs from the Medi-Cal List of Contract Drugs (List) in the absence of a contract. The proposal would provide DHS authority to deal with drugs on the Contract Drug List that have never had a contract in the same way as those drugs with a contract. This section also deletes sunset provisions related to the Medi-Cal drug rebate program. **DHS supports this proposal.**

SEC. 62. This section would delete sunset provisions related to the Medi-Cal drug rebate program. **DHS supports this proposal.**

SEC. 63. This section would delete obsolete language pertaining to new drugs designated as having an important therapeutic gain by the federal Food and Drug Administration. The presence of this language has caused confusion among drug manufacturers about the DHS process for adding new drugs to the List. This section would also create a new subset of the List containing preferred prior authorization drugs and would allow DHS to contract for drug rebates on products contained in this new List subset. The creation of a List of preferred prior authorization drugs should generate additional rebates of approximately $10 million Total Funds (TF) ($5 million General Fund (GF)). This section would also delete sunset provisions related to the Medi-Cal drug rebate program. DHS supports this proposal.

SEC. 64. This section would delete language that would have become operative upon the sunset of the drug rebate program. With the elimination of the sunset provisions, this section of law is no longer required. DHS supports this proposal.

SEC. 65 & 66. These two sections would delete sunset provisions related to the Medi-Cal drug rebate program. DHS supports this proposal.

SEC. 67. This section would delete language that would have become operative upon the sunset of the drug rebate program. With the elimination of the sunset provisions, this section of law is no longer required. DHS supports this proposal.

SEC. 68 & 69. These two sections would delete sunset provisions related to the Medi-Cal drug rebate program. DHS supports this proposal.

SEC. 70. This section would change the title of the Health Care Financing Administration to its new title of Centers for Medicare and Medicaid Services. DHS supports this proposal.

SEC. 71. This section would require manufacturers to contract with DHS for drug rebates for their AIDS and cancer drugs. The rebate period would retroactively begin on July 1, 2002 and end July 1, 2005. It would also allow DHS to take administrative actions if drug rebate contracts were not in place by February 1, 2003. DHS estimates it will be able to save $14.094 million TF ($7.047 million GF) by contracting for drug rebates for AIDS and cancer drugs. DHS supports this proposal.

SEC. 72. This section would change the reference price used to establish Maximum Allowable Ingredient Cost (MAIC) prices for generic drugs from the current Average Wholesale Price (AWP) minus five percent to a Wholesale Selling Price (WSP). The MAIC would be based on the average price paid by pharmacies to a wholesale drug distributor, the WSP for generically equivalent drugs available in California. This change would save $10 million TF ($5 million GF). This section would also require DHS to update these prices at least every 2 months. DHS supports this proposal.

SEC. 73. This section would change the Estimated Acquisition Cost (EAC) of drugs from AWP minus five percent to AWP minus ten percent and would eliminate the use of Direct Price (DP) in the calculation of EAC. The change to AWP minus 10 percent will enable DHS to save $20 million TF ($10 million GF) through reduced provider reimbursement. Additionally, this section would change

the reimbursement of over-the-counter drugs from EAC plus a 50 percent markup to EAC plus a professional fee. **DHS supports this proposal.**

SEC. 74. This section would remove the list of medical supplies covered by Medi-Cal from regulation, enabling DHS to respond quickly to abuses by providers. It would establish that DHS may place utilization controls on medical supplies and must notify providers at least 30 days before the effective date of the utilization control. This section would also remove the Maximum Allowable Product Cost (MAPC) process from regulation and establish the general process DHS will use in creating MAPC prices for medical supplies to ensure beneficiary access to medically necessary medical supply products. Removing the medical supply list from regulations is expected to reduce expenditures by $4 million TF ($2 million GF) and revising the MAPC methodology is expected to generate savings of $6 million TF ($3 million GF). **DHS supports this proposal.**

SEC. 75. This section would delete language that would have become operative upon the sunset of the drug rebate program. With the elimination of the sunset provisions, this section of law is no longer required. **DHS supports this proposal.**

SEC. 76. This section would establish the Medi-Cal list of enteral formulae. DHS would be able to designate enteral formulae that are without a contract as non-benefits of the program. This section would also establish the types of enteral formulae that would be considered for inclusion on the list, beneficiary access to continuing care, and notification requirements when enteral formulae are deleted from the list. Additionally, this section would establish the general accounts receivable and interest penalty process to be used for rebates owed by manufacturers of the enteral formulae on the list. DHS intends to continue to cover medically necessary products. The contracting authority provided by this proposal is expected to result in $18.138 million TF ($9.069 million GF) savings to the Medi-Cal program. **DHS supports this proposal.**

SEC. 77. This section would change the reimbursement rate on enteral formulae from estimated acquisition cost (different than drug EAC) plus a 50 percent markup to the estimated acquisition cost plus a percentage markup to be determined in consultation with the provider community. After analyzing cost data, it is clear that a 50 percent mark-up is excessive. In order to set an appropriate mark-up, DHS staff will need to work with providers in a rate setting process. DHS expects this proposal to result in $21.262 million TF ($10.631 GF) savings to the Medi-Cal program. **DHS supports this proposal.**

SEC. 78, 79, & 80. These sections would delete language that would have become operative upon the sunset of the drug rebate program. With the elimination of the sunset provisions, these sections of law are no longer required. **DHS supports this proposal.**

SEC. 81. This section would reduce the reimbursement for incontinence medical supplies in Medi-Cal from a 40 percent markup to a 38 percent markup. Medical supply providers recommended this reduction in combination with the reductions in Section 53.5 as an alternative to significantly reducing reimbursement for incontinence supplies. This reduction in the mark-ups is expected to provide $1.3 million TF in savings ($.650 million GF). **DHS supports this proposal.**

SEC. 82. No section 82 in this bill.

SEC. 83. This section would establish enteral formulae as a benefit of the Medi-Cal program subject to utilization controls.  This language is clarification only, as these products are currently benefits of the Medi-Cal program.  This section would also establish diabetic testing supplies as a benefit only when dispensed by a pharmacy provider. This language should not impact beneficiary access to diabetic testing supplies, as most testing supplies are currently dispensed through pharmacies.  This section would also include "clean-up" language to change the title of the Health Care Financing Administration to its new title of Centers for Medicare and Medicaid Services.  **DHS supports this proposal.**

SEC. 84.  This section would provide technical clean up to requirements for DHS's implementation of an Assisted Living waiver benefit under the Medi-Cal program.  The purpose of this section is to delete the stricter standard for cost neutrality to the State General Fund and to replace it with the requirement for cost neutrality to the Medi-Cal program.  This language is consistent with federal cost neutrality requirements for implementing Home and Community Based Services (HCBS) waivers under Section 1915 (c) of the Social Security Act.  The proposed language further enables implementation of the Assisted Living pilot project only if funding is available.  **DHS supports this proposal.**

SEC 85.  This section would require DHS to allow psychiatrists to receive fee-for-service (FFS) Medi-Cal reimbursement for services provided through telemedicine until June 30, 2004, or until DMH and the local mental health plans, in collaboration with stakeholders, develop a method for reimbursing psychiatric services provided through telemedicine that is administratively feasible for the local mental health plans, primary care providers and psychiatrists, whichever occurs later. While DHS has concerns regarding county utilization controls and duplicate payments, this provision provides an interim solution to reimburse telemedicine providers that provide services to beneficiaries in primarily rural areas.  DMH would be required to carve out these telemedicine mental health services out of their contracts with local mental health plans (MHPs) to avoid duplication of services.  Although DHS has concerns with operational aspects of this proposal, **DHS is supportive** of this short-term solution to a legitimate problem.

SEC. 85.5.  This section would reduce the number of dental examinations and prophylaxis (cleanings) covered under Medi-Cal for eligible adults 21 years of age and older.  The proposal would reduce the number of examinations and cleanings covered to the number that were covered prior to August 2000.  Medi-Cal eligible adults could receive one initial dental examination by a dentist, and one prophylaxis (cleaning) per year.  Dental benefits for Medi-Cal eligible children would not change.  This change would result in a General Fund savings of $3,978,500.  **DHS supports this proposal.**

SEC. 86.  This section would eliminate the sunset date for the Personal Care Services Program (PCSP), which is due to become inoperative on June 1, 2002, and, absent further enactment of statute, would be repealed as of January 1, 2003.  The PCSP provides services such as bathing, oral hygiene, and grooming to enable Medi-Cal beneficiaries to remain in their own homes.  This sunset date was established due to concern that Medi-Cal coverage of the personal care component of the

In-Home Supportive Services (IHSS) program would lead to litigation and significant program expansion. The ability to continue PCSP and draw additional federal dollars is a benefit to the State as it reduces the fiscal impact of the IHSS program on the state General Fund and prevents premature institutionalization by providing recipients with assistance in activities of daily living. Without this program, many of the current PCSP recipients would be institutionalized prematurely at a potentially higher cost, unless additional state and local funding were dedicated to the IHSS program to make up for the loss of federal funding. **DHS supports this proposal.**

SEC. 87. This section would require DHS to notify the chairpersons of the fiscal committee of each house of the Legislature, the Chairperson and the Vice Chairperson of the Joint Legislative Budget Committee and county representatives, within 60 days after the chaptering of the annual Budget Act, if it intends to withhold any of the funds included in the base county allocation for county Medi-Cal eligibility activities approved in the Budget Act. While DHS has no intention to withhold and not allocate any of the funding provided by the Budget Act for the purposes of Medi-Cal eligibility activities provided by the counties, it is not opposed to the provisions outlined in this section to inform the members of the Legislature, the Joint Legislative Budget Committee and the county representatives, should this situation arise. **DHS supports this proposal.**

SEC. 88. This section would increase administrative fee funding transfers from participating public entities to the Disproportionate Share Hospital (DSH) program by $55.2 million, for Fiscal Year (FY) 2002-03 and each subsequent year. The funding level for FY 2001-02 was $29.8 million, making a total of $85 million that would be transferred for FY 2002-03 and subsequent years. These additional funds would be applied to the Medi-Cal program budget item, providing needed funding during the current budget crisis. **DHS supports this proposal.**

SEC. 89. This section would extend the sunset date for the Intermediate Care Facility for Persons with Developmental Disabilities, Continuous Nursing (ICF/DD-CN) pilot program to January 1, 2006 (from January 1, 2003). **DHS supports this provision**, as it would allow time for full evaluation of this pilot program. DHS is concerned, however, as this legislation does not include staffing required for program oversight beyond the current sunset of January 1, 2003. Redirection of staff is not possible and DHS will have to address this issue through the Budget Change Proposal process.

SEC. 90, 91, 91.5. These sections would extend the sunset date for the County Medical Services Program (CMSP) Governing Board until January 1, 2008. Sections 90 and 91 would defer for an additional year, the State's liability of up to $20.2 million for cost increases of CMSP not funding through other sources. This proposal is consistent with the language in the 2001 trailer bill (AB 430 Chapter 171, Statutes of 2001), which also deferred the State's liability for a single year. Section 90 requires the CMSP Governing Board to reimburse $3.5 million to the State for the cost of providing administrative support to CMSP and allows the Board to use the funds in the CMSP account to make this payment. In addition, sections 90 and 91 would provide for the CMSP account to be continuously appropriated, without regard to fiscal years. Finally, Section 91.5 would allow the Board to establish alternate methods of payment for the delivery of care and negotiate alternate methods of payment that are compatible with DHS's requirements, but may be different from those methods and rates used by DHS. These provisions were modified from the Administration's proposal for budget year

2002-03, and DHS is concerned that $3.5 million may not cover its costs for providing administrative support to the CMSP program. Overall, however, **DHS is supportive of this proposal.**

SEC. 92. This section would amend the existing statute, which requires DHS to implement a simplified eligibility process to expedite Medi-Cal and HFP enrollment for uninsured children and parents receiving food stamps. This proposal would provide for program implementation on or after July 1, 2003, and only to the extent federal financial participation (FFP) is available. Although the Governor's May Revision proposed delaying implementation of this legislation to 2005 due to budget constraints, the Administration **fully supports** streamlining application and enrollment processes for Medi-Cal and the HFP as a critical strategy for increasing enrollment of uninsured and eligible children and their parents into these programs. A July 2003 implementation date means that DHS will have to begin implementation efforts for this program in Fall 2002 for a July 1, 2003 implementation.

SEC. 93. This section would provide emergency regulatory authority to DHS to implement the applicable sections of the budget trailer bill, in accordance with the Administrative Procedures Act. This proposal is standard language and will be adequate to enable DHS to promulgate regulations as needed. **DHS supports this proposal.**

SEC. 94. This section would restrict DHS from collecting Medi-Cal overpayments from providers of ambulance transport services to dual eligible beneficiaries of Medicare and Medi-Cal (crossover claims) before October 1, 2002, if the overpayment is not due to the fault of the provider. DHS has a fiscal responsibility and accountability regarding the expenditure of public funds for health care, and, to the extent that an overpayment to providers exists, is constrained by federal and state laws to collect such overpayments. However, DHS does not believe that ambulance providers have been overpaid on crossover claims, and therefore **does not object to this proposal.**

SEC. 95. This section would require the Children's Medical Services Network (CMS Net) Enhancement 47 (E47) Project be completely implemented and operational by August 1, 2004. This section would require the completion of all the systems work necessary to enable California Children's Services (CCS) providers to submit electronic claims for reimbursement for services provided to CCS eligible children directly to the State's fiscal intermediary (Electronic Data Systems) and Delta Dental Plan of California, for CCS claims processing. The E47 changes to CMS Net would allow CCS providers the ability to submit electronic claims for services provided to CCS clients. The system would be more efficient and provide cost savings than the current existing paper system. E47 would also eliminate delays that are inherent in to the current manual process of claims review and processing. Institution of on-line authorizations and electronic billing will also help CCS retain existing providers and possibly enlist new providers. **DHS supports this proposal.**

SEC. 96. This section would require the California Health and Human Services Agency (CHHSA) to develop a comprehensive plan describing the actions that the State may take to improve its long term care system so that its residents have an array of community care options that allow them to avoid unnecessary institutionalization. Developing an "Olmstead Plan" would provide a blue print of the

State's long-term care system. This would greatly enhance the coordination of the State's long-term care programs and provision of services to over 100,000 Medi-Cal recipients currently institutionalized in State facilities. Simultaneously, if a Plan were developed and implemented, it would provide an augmented defense to Americans with Disabilities Act (ADA) based discrimination claims against the State for failure to integrate disabled persons into the community. Finally, development and implementation of an "Olmstead Plan" is consistent with the plurality opinion in *Olmstead* and the Center for Medicare and Medicaid Services' recommendation. **DHS supports this proposal.**

SEC. 97. Future Federal Funds. DEFER to DDS.

SEC. 98. Regional Centers. DEFER to DDS.

SEC. 99. Regional Centers. DEFER to DDS.

SEC. 100. Local Grants. DEFER to DDS.

SEC. 101. This section would continue the use of Proposition 99 (Tobacco Tax) funds by directing the use of $24,803,000 of Prop 99 funds for emergency services. Continuing the use of $24.8 million for emergency services is in accordance with the Governor's 2002-03 Budget to provide emergency physicians with needed additional reimbursement for emergency medical services. **DHS supports this proposal.**

SEC. 102. This section would re-appropriate the unencumbered balances, as of June 30, 2002, of the amounts appropriated to the Cancer Research Fund (CRF) for FY 1999-2000, 2000-2001, and 2001-2002, and make these monies available for encumbrance and expenditure until July 30, 2005. This proposal is consistent with the intent of existing statute that provides for multi-year expenditure authority for the Cancer Research Program's (CRP) research projects. **DHS supports this proposal.**

SEC. 103. This section would eliminate most rate increases provided in the funding for Medi-Cal services that were effective August 1, 2000. Based on the language of the section, the only Medi-Cal services that would be exempt from the elimination of the rate increase would be the supplemental rate for the California Children Services, home health services, shift nursing, non-emergency medical transportation, and family planning services. This section directly impacts DHS and would save the State of California an estimated $183,600,000 TF ($91,800,000 GF). This section is consistent with the Governor's Veto Message for AB 425, the 2002 Budget Act. **DHS supports this proposal** as part of the overall budget crisis solution.

SEC. 104. This section contains uncodified language that directs the DHS to negotiate as aggressively as is necessary to achieve budgeted savings through the Medi-Cal pharmaceutical contracting process.

Enrolled Bill Report                    Page 16                    Bill Number: AB 442
                                                                   Author: Committee on Budget

SEC. 105. State Mandate Clause.

SEC. 106. Urgency Clause

*LISTED SECTION BY SECTION BELOW IS AN ANALYSIS OF ONLY THOSE SECTIONS OF
AB 442 THAT IMPACT DHS.*

## SECTION 1

**ANALYSIS:**
Existing law requires DHS to conduct a study of the adequacy of Medi-Cal pharmacy reimbursement
rates. The law also requires DHS to submit the results of the study to the Legislature by July 1, 2002.
DHS contracted with the accounting firm of Myers and Stauffer, LLP., to conduct the study. Based on
the time needed by Myers and Stauffer to gather and analyze the data and then issue a final report to
DHS, deletion of the due date was necessary. This study was released on August 23, 2002.

**LEGISLATIVE HISTORY:**
SB 393 (Chapter 946, Statutes of 1999) required DHS to conduct the study. SB 696 [Chapter 693,
Statutes of 2001 (SEC. 1)] added the July 1, 2002 reporting date. SEC. 73 of this bill would change
the EAC for drugs to AWP minus 10 percent and would eliminate the use of DP in establishing EAC.
These changes could significantly impact pharmacy reimbursement rates.

**PROGRAM BACKGROUND:**
The Medi-Cal drug program in DHS maintains the Medi-Cal List of Contract Drugs (List). This
outpatient drug List is used by physicians when prescribing medications for fee-for-service (FFS)
Medi-Cal patients. Drugs not specifically listed remain a Medi-Cal benefit subject to prior
authorization from a Medi-Cal consultant. State legislation was enacted in 1990 that enabled DHS to
contract with drug manufacturers to obtain rebates for drugs dispensed to FFS outpatient Medi-Cal
beneficiaries. This rebate program complements, rather than conflicts with, the federal Medicaid
rebate law. As a result of negotiating state supplemental rebates, DHS often secures rebates in
addition to those required under federal law. Rebates over and above those required to be paid to
the State under federal law have been possible due to leverage DHS has with manufacturers
regarding drug contracting in exchange for adding their drugs to the List. DHS has also implemented
a drug discount program for Medicare recipients and has contracted with Myers and Stauffer, LLP.,
for the Medi-Cal pharmacy reimbursement rate study. Pharmacy reimbursement uses an EAC plus a
professional fee of $4.05 for prescription drugs and EAC plus a 50 percent markup for over-the-
counter drugs. Currently EAC is equal to the AWP minus 5 percent or the DP, whichever is lower.
SEC. 73 of this bill would change the EAC for drugs to AWP minus 10 percent and would eliminate
the use of DP in establishing EAC.

**OTHER STATES' INFORMATION:**
Myers and Stauffer conducted a pharmacy rate study in 2001 for Arkansas Medicaid resulting in a
decrease in the EAC used and an increase in the professional fee.

**FISCAL IMPACT:**
SEC 1 would have no fiscal impact on DHS in the 2002-03 budget year.

**ECONOMIC IMPACT:** None.

**LEGAL IMPACT:** None.

**APPOINTMENTS:** None.

**SUPPORT/OPPOSITION:**

Support: None known.

Opposition: California Pharmacist Association is opposed to eliminating the due date.

**ARGUMENTS:**

Pros: Makes DHS compliant with statute.

Cons: None

## SECTION 2

**ANALYSIS**
This section would eliminate the January 1, 2003, sunset provision of California's Prescription Drug Discount Program for Medicare Beneficiaries, making this program permanent. SB 393 (Speier, Chapter 946, Statutes of 1999) established the Prescription Drug Discount Program for Medicare Beneficiaries. This program requires pharmacies, as a condition of becoming or remaining a California Medi-Cal provider, to charge Medicare recipients an amount for their prescriptions not to exceed the Medi-Cal reimbursement rate, plus an amount to cover the electronic transmission fee for obtaining the Medi-Cal reimbursement rate. This legislation sunsets on January 1, 2003.

This program has been very successful. Medicare beneficiaries have saved, on average, 24 percent on their prescription drug purchases.

**LEGISLATIVE HISTORY**
SB 393 addressed the high cost of prescription drugs for Medicare beneficiaries. SB 1278 (Speier, 2002) also proposes to eliminate the sunset provision, and would clarify that Medicare recipients can only access the program for prescriptions not covered by other insurance.

**PROGRAM BACKGROUND**
SB 393 established a new outpatient drug discount program for Medicare beneficiaries, effective February 1, 2000. SB 393 requires pharmacies, as a condition of becoming or remaining a Medi-Cal provider, to charge Medicare beneficiaries an amount for their prescriptions not to exceed the Medi-Cal reimbursement rate, plus an amount to cover electronic transmission fee for obtaining the

Medi-Cal reimbursement rate (which is 15 cents per prescribed drug). Medicare beneficiaries are not allowed to use the Medi-Cal reimbursement rate for over-the-counter medications or compounded prescriptions.

DHS currently maintains an electronic listing of the Medi-Cal reimbursement rates for prescription drugs through a contract with its FI. Each pricing inquiry transmitted by a pharmacy costs DHS approximately four cents. DHS is monitoring the program and has some statistics regarding the number of price inquiries submitted to date. Since the beginning of 2001, DHS has received over 8.4 million price inquiries. The amount of savings being realized is difficult to derive. However, DHS has compared the usual and customary charge submitted by pharmacies on pricing inquiries with the Medi-Cal reimbursement rate (which includes the 15 cents transmission fee) returned to the pharmacy. The range in estimated savings is from 0 to 70 percent. The overall average in this comparison is approximately 24 percent.

DHS developed and maintains on a monthly basis, a web site that users may access to find pricing information on the 200 most commonly prescribed trade name drugs for Medicare beneficiaries.

**OTHER STATES' INFORMATION:** None available.

**FISCAL IMPACT**
The May 2002 Budget Estimate contains $340,000 GF in FY 2001/02 and $380,000 GF in FY 2002/03 for the drug price inquiry system costs. Elimination of the sunset would continue these costs on an ongoing basis.

**ECONOMIC IMPACT**

If the sunset date is not eliminated or extended, many Medicare beneficiaries would incur increased prescription drug costs that could adversely affect their health and standard of living (if they cannot afford to purchase the prescriptions).

**LEGAL IMPACT:** Unknown.

**APPOINTMENTS:** None.

**SUPPORT/OPPOSITION**

Support:    Area 4 Agency on Aging
            California Commission on Aging
            California Dialysis Council
            California Medical Association
            California Optometric Association
            California Senior Legislature
            Congress of California Seniors

Gray Panthers of California
JERICHO
San Francisco Commission on Aging
San Joaquin County Commission on Aging
Older Women's League of California

Opposition: Independent Pharmacist Coalition

## ARGUMENTS

Pros: Eliminating the sunset date would continue this program which assists Medicare beneficiaries
in purchasing their prescription drugs at discounted prices, thereby allowing more monies to be
available for purchase of other items of necessity.

Cons: Continuation of this program, in combination with reimbursement reductions for Medi-Cal
pharmacists in this bill, may result in some pharmacies leaving the Medi-Cal program.

## SECTION 3

ANALYSIS:
Last year, AB 59 (Chapter 894, Statutes of 2001) added Section 49557.2 and amended Section
49558 to the Education Code allowing the California Department of Education (CDE) to collaborate
with DHS in sharing information for enrolling low-income children into the Medi-Cal program. The
sharing of information is strictly through use of the school lunch program application. The intent of
Section 49557.2 and 49558 is for children enrolled in free school meals to be quickly enrolled in no
cost Medi Cal so that children can obtain immediate medical care. Section 43 of this bill includes
provisions for accelerated enrollment of children into Medi-Cal. In order to accomplish this task, an
entity must be designated by DHS to determine express enrollment eligibility into Medi-Cal. The
entity could be the schools or a separate organization. Section 3 of this bill would provide the
authority for schools to share the information provided by the families on the school lunch application
with the determining entity, should that entity be other than the school itself. Prior to this amendment,
schools were only allowed to share information from the NSLP form with the local county social
services offices.

The intent of the original legislation was to provide for the streamlined and expedited enrollment of
children enrolled in the NSLP and receiving free meals, into the Medi-Cal program. The program was
to take effect July 1, 2002. These two sections of the Health Trailer Bill would change the effective
date of this new program, established by AB 59, from July 1, 2002 to July 1, 2003, and would provide
language to ensure the expedited enrollment of children receiving free meals into Medi-Cal without
jeopardizing federal financial participation (FFP). While the latter was intended in the original
legislation, these amendments provide language that would ensure compliance with existing federal

laws. Section 3 provides necessary language for CDE to authorize the sharing of information with the entity designated by DHS to grant express enrollment into the Medi-Cal program. Section 43 authorizes DHS to exercise a specified federal option for express enrollment and to designate the entity conducting the express enrollment determinations.

There is however, one minor technical drafting error in this proposal in Section 3, subdivision (b). The following redundant language should have been deleted, but was not: *"entity designated by the State Department of Health Services to make an accelerated determination and the"* should appear only after *"the school Lunch program application with the"*. This error does not have a material affect but does cause confusion.

This amendment is intended to reduce the school workload associated with making the express enrollment determination for those schools without the adequate resources, while allowing DHS the authority to designate an entity to perform this task.

LEGISLATIVE HISTORY:
AB 59 (Chapter 894, Statutes of 2001) authored by Assemblymember Gilbert Cedillo and signed into law October 14, 2001, added Section 49557.2 and amended Section 49558 to the Education Code with an implementation date of July 1, 2002.

In the May Revise, Governor Davis proposed changing the implementation date to July 1, 2005. Section 3 of AB 442 seeks implementation on July 1, 2003.

PROGRAM BACKGROUND:
The United States Department of Agriculture's NSLP provides reimbursement to non-profit sponsors who serve meals to children in kindergarten through grade twelve. In California, CDE administers the NSLP.

The federal income guidelines for free meals through the NSLP closely parallel those of Medi-Cal. Children with household income up to 130% of the federal poverty level (FPL) are eligible for free meals. However, the NSLP counts all household income whereas Medi-Cal counts only the immediate family income.

At the beginning of each school year, schools distribute welcome packets that include a school meal application. Some school districts and schools, at their option, currently distribute Medi-Cal for Children/Healthy Families Program (MCC/HFP) information, a referral form, and/or applications within these welcome packets.

42 United States Code 1758(b)(2)(C)(iii)(IV) provides that information from an application for a free or reduced price meal or from the "school food authority" can be disclosed to "a person directly connected with the administration of the State Medicaid program…or the State children's health insurance program…solely for the purpose of identifying children eligible for benefits under, and enrolling in, such programs." Despite these federal guidelines, the California Education Code

Sections 49557 and 49558 required changes so that the benefit provided under federal law could be enacted in California. These changes were provided through AB 59.

AB 59 added Section 49557.2 and amended Section 49558 to the Education Code, setting guidelines for the sharing of information between schools and the local county Medi-Cal office, and for enrolling children into the Medi-Cal program.

However, changes in legislation did not provide funding to schools for the additional workload involved in undertaking this sharing of information. According to CDE, school meal regulations restrict the use of cafeteria funds to activities that directly support school meal programs and cafeteria funds must not bear any costs associated with express enrollment functions. Express enrollment participation by schools is optional and the lack of funding for the additional workload has been a topic of concern among school administrators.

## OTHER STATES' INFORMATION:

Washington State conducted a pilot program that attempted to cross-match NSLP data files with Medicaid eligibility files to identify children who are not Medicaid enrolled. This process did not expedite health coverage and required the parent/caretaker to complete additional forms. Effective 6/30/02, this pilot ended due to a State budget cut.

New York City provides a list of names of students receiving free or reduced price school meals to the Health Department. The Health Department then contacts the parent/guardian inquiring about the child's health insurance status. This process does not expedite health coverage and requires the parent/caretaker to complete additional forms. The New York Health Department provides a financial incentive for school participation depending on the percentage of new enrollees and provides training and staff to facilitate enrollment.

## FISCAL IMPACT:

There would be no fiscal impact to the Medi-Cal program during budget year 2002-03, as this section would not be effective until July 1, 2003. The initial DHS May Estimate included $10,386,000 ($5,193,000 GF) for benefits and $1,609,000 ($804,500 GF) for county administration for the implementation of Express Enrollment.

DHS may incur additional costs depending on the entity designated for express enrollment determinations.

Fiscal impact to CDE is unknown.

## ECONOMIC IMPACT:

The provision to expedite health coverage to children presumed Medi-Cal eligible would benefit the State by preventing child health risks and decreasing costs associated with expensive medical care provided through emergency room visits.

**LEGAL IMPACT:** Unknown.

**APPOINTMENTS:** None.

**SUPPORT/OPPOSITION:**

Support: None known.
Opposition: None known.

**ARGUMENTS:**

Pro:
- These amendments to the express enrollment statutory authority would allow this program to be implemented in accordance with federal law.

Con:
- County administrative funding has been cut by 20%, thus creating further hardship on the counties with this workload increase.
- The July 1, 2003, implementation date may not be feasible, depending upon the budget situation for fiscal year 2003-04.


## SECTION 5.5


**ANALYSIS:**

This section of the budget trailer bill seeks to fund additional DHS indoor mold activities by creating a mechanism that would allow DHS to accept monetary donations.

The provisions of Section 5.5 would increase resources available to DHS to address developing health issues associated with indoor mold contamination. Current resources have been inadequate to respond to the tasks mandated in SB 732 (Ortiz, Chapter 18, Statutes of 2001), the Toxic Mold Protection Act of 2001, and to engage in other activities to decrease health effects of indoor mold exposure.

This section would create within the State Treasury the Public Health Protection from Indoor Mold Hazards Fund. Moneys would be continuously appropriated to DHS without regard to fiscal years to support DHS's actions to provide guidance, develop standards and guidelines and permissible exposure limits (PELs) and adopt regulations relating to indoor mold hazards.

This section would set up a private funding mechanism for policy development that may have significant benefit to special interests (trial lawyers, insurance companies, construction companies, etc.) that may have large amounts of money to spend and may expect to have a bigger voice in the process than those without the ability to donate (low income tenants, homeowners).

Moneys donated to this fund may only be allocated to deal with indoor mold issues. This could lead to an imbalance in the effort devoted to this issue compared to other important public health priorities.

Using the Legislature and some segments of the public to set funding priorities for health-related research could undermine DHS's priorities and impact other programs that may have a greater opportunity to reduce adverse health effects, but are also under funded.

LEGISLATIVE HISTORY:

SB 732 (Ortiz, Chapter 18, Statutes of 2001), directs DHS to assess the feasibility of developing PELs for molds and, if feasible, to develop the PELs through a regulatory process. The statute requires DHS develop "standards to assess the health threat posed by the presence of mold" and guidelines for identification of mold water damage and volatile "microbial organic compounds" and remediation of mold. The statute requires DHS to convene a Task Force of representatives of at least 25 interest groups to advise on the development of the standards and guidelines. The statute sets requirements for the disclosure of the presence of mold in certain real estate and leasing transactions. The bill would require local officials to enforce the disclosure requirements based on standards and penalties set by DHS. The bill also requires DHS to develop and disseminate culturally appropriate educational materials, including making materials available on an Internet site.

Related Legislation (Current Session):
SB 2098 (Committee on Health and Human Services) would amend the Toxic Mold Protection Act of 2001 to require landlords, sellers and transferors of real property to disclose specified information regarding the presence of mold or conditions likely to result in mold growth. Drafting errors left some questions about whether owners of certain types of property were currently required to disclose the presence of mold. SB 2098 would make technical changes to clarify that disclosure requirements imposed on commercial landlords would be effective after DHS develops mold standards.

SB 1763 (Ortiz) addresses coverage of mold-damage repairs through requiring property or liability insurance policies to cover such damages if they are caused by covered perils.

PROGRAM BACKGROUND:
DHS staff in the Environmental Health Investigations Branch (EHIB) and Environmental Health Laboratory Branch (EHLB) has been involved in both indoor mold-related research and public outreach activities for many years. DHS staff includes nationally known microbiologists, mechanical engineers, physicians, epidemiologists and research scientists working in this field. Each year, DHS responds to numerous calls for information, technical advice or other assistance. Several major themes have emerged in these contacts: 1) tenants with extensive mold growth who are having difficulty getting the problem corrected; 2) officials requesting advice about mold problems in public

buildings; 3) homeowners with mold and moisture problems who are having difficulty working with insurance companies or contractors; 4) individuals or officials asking for information about standards for testing or remediation of mold contamination; and 5) employees with unabated workplace mold problems.

DHS has conducted a needs assessment of local agencies (primarily county and city health departments), some of which respond to indoor mold complaints and inquiries from the public. Local jurisdictions have the authority to inspect and recommend appropriate remediation of buildings (although specific authority relating to molds is lacking), so DHS's primary role is to provide city and county officials with training and technical assistance to allow them to keep up with this new and rapidly developing field. DHS also maintains Internet web sites that provide information to the public on indoor environmental hazards including molds.

DHS's Occupational Health Branch (OHB) receives numerous reports of molds in indoor workplaces, associated with a variety of employee health problems. Employee mold exposures have resulted in Workers Compensation claims. Mold exposures, particularly in public agency buildings, are a frequent source of complaints from workers resulting in California Occupational Safety and Health Administration (Cal/OSHA) compliance inspections. The Hazard Evaluation System and Information Service, within OHB, recently recommended that Cal/OSHA develop a workplace standard to address mold issues. In response, Cal/OSHA has proposed an addition to the Sanitation regulation (General Industry Safety Order 3362) that would require employers to prevent accumulation of water in the workplace to avoid the growth of mold. The Sanitation regulation requires that workplaces be kept in a sanitary condition insofar as the nature of the work permits. OHB recommends treating mold as other sanitation hazards, such as rats and garbage, are treated.

## OTHER STATES' INFORMATION:
New York S5799-A (Marcellino) is similar to California SB 732 in that it directs the New York Department of Health to convene a task force to advise the department on the development of standards with regard to toxic mold, directs the task force to consider the feasibility of adopting permissible exposure limits to mold in indoor environments, and requires the New York Health Department to make a report to the legislature.

## FISCAL IMPACT:
Could result in an unknown amount of funding that would be specifically designated for DHS programs related to indoor mold contamination.

**ECONOMIC IMPACT:** Unknown

**LEGAL IMPACT:** None.

**APPOINTMENTS:** None.

## SUPPORT/OPPOSITION:

Support:      None known.

Opposition: None known.

## ARGUMENTS:

Pro:

- Would provide DHS with additional funding to pursue new and extended activities in training local health and building agency staff about prevention of mold-related health effects.
- Would allow DHS staff to begin the complex set of tasks mandated under SB 732.

Con:

- This bill sets up a private funding mechanism for policy development that may have significant benefit to special interests (trial lawyers, insurance companies, construction companies, etc.) that may have large amounts of money to spend and may expect to have a bigger voice in the process than those without the ability to donate (low income tenants, homeowners).
- Moneys donated to this fund may only be allocated to deal with indoor mold issues. This may lead to an imbalance in the effort devoted to this issue compared to other important public health priorities.
- Using the Legislature and some segments of the public to set funding priorities for health-related research may undermine DHS's priorities and impact other programs that may have a greater opportunity to reduce adverse health effects, but are also under funded.

## SECTION 7

### ANALYSIS:

This proposal would affect about one half of the formal administrative hearings conducted by DHS. Under current law and regulations, hearings are generally held in Sacramento, Los Angeles, San Diego or Berkeley, depending on which city is closest to the physical location of the requestor. Section 7 would change the rules for hearings requested by institutional Medi-Cal providers and health facilities. Formal hearings for these providers and facilities would be held in Sacramento, the headquarters of all DHS Administrative Law Judges and attorneys, or by telephone. This means that Judges and DHS counsel would spend less time and money traveling. There could be some increase in travel costs for DHS witnesses. In addition, there would be a negligible increase in Medi-Cal reimbursement to some providers for travel costs related to appeals.

### LEGISLATIVE HISTORY:

The language in Section 7 was proposed by DHS to improve the efficiency of the administrative hearing process and reduce the DHS travel budget.

Enrolled Bill Report                              Page 26                    Bill Number: AB 442
                                                                            Author: Committee on Budget

## PROGRAM BACKGROUND:
DHS's Office of Administrative Hearings and Appeals (OAHA) conducts hearings on audit disputes and DHS actions against providers and licensees that arise out of license suspensions and revocations or fraud and abuse enforcement activities. Currently hearings are held at various locations throughout the state. Section 7 would require most institutions that request formal hearings to travel to Sacramento for hearing. The language would not affect the place of hearings requested by individuals, small businesses and non-institutional providers (including medical groups, laboratories and pharmacies).

## OTHER STATES' INFORMATION: Unknown.

## FISCAL IMPACT:
This proposal would result in $135,300 savings ($67,650 GF), due to reducing the travel budgets for 14 staff counsel and 9 administrative law judges. This proposal would not reduce the number of staff in OAHA.

## ECONOMIC IMPACT: None.

## LEGAL IMPACT:
This proposal complies with constitutional requirements, including due process.

## APPOINTMENTS: None.

## SUPPORT/OPPOSITION:

Support: None known.
Opposition: None known.

## ARGUMENTS:
Pros: This proposal would result in general fund savings by improving the efficiency of the administrative hearing process.

Cons: None.