# Exhibit 35-2

*State of California ex rel. Ven-A-Care of the Florida Keys, Inc. v.*
*Abbott Labs, Inc. et al., Civil Action No. 03-11226-PBS*

**Exhibit to the November 25, 2009 Declaration of Philip D. Robben**
**in Support of Defendants' Joint Motion for Partial Summary Judgment**

## SECTION 8

**ANALYSIS:**

Beginning in February 2002, the federal Centers for Disease Control (CDC) made supplemental bioterrorism preparedness funding available to all 50 state health agencies, the District of Columbia, and three city health agencies. Approximately $60.8 million was made available to DHS for the period of February 19, 2002 to August 30, 2003 to improve the state and local public health capacity to rapidly and appropriately respond to bioterrorism. In planning its application for the supplemental award, DHS undertook an extensive planning process in collaboration with the local health officers and the county health executives. This collaborative planning process was able to reach agreement on nearly all aspects of DHS's CDC supplemental award application.

Twenty percent of this $60.8 million award, or approximately $12.1 million, was made immediately available to states for urgent needs, planning and post-September 11, 2001 cost recovery -- $3.0 million of which went to State General Fund backfill to address the State's recovery costs, $1.5 million for DHS's urgent equipment needs, and $7.5 million went to eligible local health jurisdictions using a formula via contracts to initiate local planning. Ten percent of each jurisdiction's contract could be used to cover the jurisdiction's post September 11, 2001 recovery costs. The language proposed in Section 8 of this bill addresses how the remaining 80 percent (or $48.6 million) of the supplemental award will be spent. The bulk of the remaining CDC funds, nearly $30 million, as described in DHS's approved application to CDC, are dedicated to local health jurisdictions. CDC has requested additional information concerning the exact amount being allocated to each jurisdiction, and has stressed that DHS will be held fiscally and programmatically accountable for the use of these supplemental funds by CDC pre-identified focus area at the county level.

The language in Section 8 is intended to guarantee an equitable and timely distribution of federal funds to local health jurisdictions for local bioterrorism preparedness and response activities, as proposed by DHS and approved by CDC.  It would allow DHS to distribute funds to local health jurisdictions without formal contracts.

The language in this section is consistent with the Administration's plan for distribution of this federal funding. The local health jurisdictions' use of these funds is contingent upon purposes identified by DHS in its federal application to CDC. DHS has minor concerns with the language in that funds for a jurisdiction that is non-compliant or that elects to not accept funding would revert to the eligible jurisdictions. However, the language is appropriately permissive and would allow DHS to retain the ability and resources to either directly provide services, undertake a regional approach, or take appropriate developmental steps to provide technical assistance to such jurisdictions.

The proposed language in Section 101315 of the Health and Safety Code (H&S Code) would provide that federal funds received by DHS for bioterrorism preparedness and emergency response are subject to appropriation in the annual Budget Act, clarifies that allocation and expenditure by local health jurisdictions shall be pursuant to the federally approved collaborative state-local plan, prohibits supplanting of existing levels of services, and specifies conditions of eligibility for funding to local health jurisdictions.

- While the latter three conditions are generally in accordance with provisions contained in the federal guidance to states, trailer bill language is not necessary to budget or expend federal funds. The Administration and the Legislature could continue to appropriate funds through the budget process or by using the Federal Special Projects line item.

Proposed Section 101317 lays out the funding formula by which allotments to each local health jurisdiction will be calculated. The process closely mirrors the formula used by the DHS State Public Health Subvention program and is a process that the local jurisdictions are used to. This section would allow funds in six CDC-specified funding areas to be disbursed to the local health jurisdiction under a single agreement that addresses all six areas, and expended according to a DHS-approved application, with reimbursement in quarterly payments.

- Reimbursement in quarterly payments may adversely affect DHS's ability to track and have prior approval of local expenditures.

- Section 101317 contains pertinent restrictions on eligibility for those jurisdictions receiving funds for bioterrorism directly from CDC or from another jurisdiction (i.e., Los Angeles County, which receives funds directly from CDC, will in turn provide funds directly to the health departments in Long Beach and Pasadena).

- Section 101317 (c) would allow special project funds, if included in DHS's plan and approved by CDC, to be disbursed directly to specific counties, with exemptions from Part 2 of the Public Contract Code. This mechanism streamlines the contracting process.  DHS managers have advocated this mechanism of funding counties for communicable disease control activities in the past.

- Section 101317 (d) (3) would permit DHS to redistribute any formula-based county funding to other counties if a health jurisdiction does not apply or is non-compliant.  Since DHS is responsible for assuming functions in those non-applicant/non-compliant counties and since CDC has not approved a set allotment to all counties, this provision is questionable.  Unused county funding should revert to DHS for other purposes that benefit the statewide preparedness or assist counties in developing and implementing their bioterrorism preparedness plans.

- Section 101317 (g) and (i) contain significant departures from the provisions of the State Public Health Subvention program in that they require reports of cost data and progress and would allow DHS to recoup funds not spent or expended in violation of the article.  However, the provisions requiring DHS to consult with local health jurisdictions to develop report content and to meet and discuss the status of unspent or disputed funds are unnecessary as these provision duplicate standard business practices, fiscal monitoring, and agreement language in place and used by DHS.  Moreover, the language would require DHS to consult with local jurisdictions to "develop" the required content for the reports.  CDC has informed DHS, in a letter dated June 6, 2002, that it will develop reporting requirements and distribute these to state health agencies in mid-summer 2002, with initial progress reports due to CDC on October 1, 2002.  CDC's directives may limit DHS's ability to develop reporting parameters in consultation with the local health jurisdictions.

- Section 101317 (j) would allow local jurisdictions to have statutory rollover authority for unspent/unencumbered funds for one year following the budgeted fiscal year. The new federal CDC ruling (CDC Guidance Letter #202, effective October 1, 2002) specifies that unobligated funds can be carried over only one year, which must be requested in writing and approved by CDC. This statutory rollover authority applies to DHS's process for drawing down federal funding for this purpose, and may have no relation to how the agreements between DHS and the local health jurisdictions actually award funding and the periods of funding availability.

Section 101319 exempts all agreements between DHS and local health jurisdictions for the purposes of the article from Part 2, commencing with Section 10100, of the Public Contract Code.

- This provision will expedite the contracting process.
- The agreements will be exempt from the Department of General Services review.
- The agreements will be exempt from competitive bidding and DVBE requirements (usually not an issue with government contracts).
- DHS can be more relaxed in applying other contract requirements and will have more flexibility in applying rules (e.g., DHS Contract Management Unit can allow a longer contract term of up to five years without Department of General Services approval).

**LEGISLATIVE HISTORY:**
There have been two bills introduced this session that address DHS expenditure of federal bioterrorism funds to local health jurisdictions. SB 406 (Ortiz, Chapter 393, Statutes of 2002) contains language similar to Section 8 of this bill and would establish procedures and requirements to govern the allocation to, and expenditure by, local health jurisdictions of federal funding received by DHS for the prevention of and response to bioterrorism. SB 406 includes an appropriation for the federal funding, so these funds can be distributed to the local jurisdictions in a timely manner. The Health Officers' Association of California supported earlier versions of SB 406. The Governor signed SB 406 on September 6, 2002.

SB 1298 (also by Ortiz) would appropriate federal bioterrorism funds to local health jurisdictions, using a slightly different formula and would allow the funds to be used for other types of terrorism (e.g., chemical, radiological -- not allowed in the current CDC cooperative agreement). SB 406 and SB 1298, both sponsored by the Health Officers Association of California, would codify federal funding allocations to local health jurisdictions. Both bills were introduced to ensure that the large infusion of federal funding is used responsibly and to guarantee that a substantial portion be allotted to local health jurisdictions to improve communicable disease control, health surveillance, emerging diseases and terrorism preparedness.

With regard to state funding of local health jurisdictions, SB 269 (Ortiz and Leslie, Chapter 279, Statutes of 2000) enacted the "Public Health Improvement Act of 1999." The bill appropriated $1 million from the General Fund to local public health jurisdictions for local communicable disease control and public health surveillance activities. The 2001-2002 budget augmented this amount by an additional $5 million. The DHS State Public Health Subvention program administers these funds.

## PROGRAM BACKGROUND:

DHS is the official recipient of federal funding for bioterrorism preparedness and response. Federal grant funds for this purpose have been received since August 1999. Ultimate responsibility for public health in the state, including communicable disease control, rests with the State. The first federal bioterrorism cooperative agreement received in 1999 included funding for local health jurisdiction preparedness planning. Approximately $400,000 in local assistance funding per annum has been provided in each of the last three years to 18 local health jurisdictions to enhance and strengthen their critical capacities related to planning, coordination, communication, training, and emergency response system improvement. The federal funds appropriated by this bill would be in addition to the federal CDC bioterrorism funds currently being administered by DHS.

DHS currently provides $6 million of State Public Health Subvention funds to 58 counties and 3 cities for public health administration and infectious and communicable disease prevention and control. Eleven counties currently contract with DHS to administer public health nursing and environmental health programs on their behalf. DHS also distributes other state and federal funding to local health jurisdictions via contracts and memoranda of understanding for communicable disease control-related activities. Subvention funds do not allow for State recovery of unspent or misspent funds; they do allow for maximum flexibility of expenditure by local health jurisdictions. Communicable disease control program funds have more stringent fiscal accountability and contract deliverable/performance requirements, and typically require close federal-state-local health jurisdiction collaboration in developing standards and protocols for disease control.

## OTHER STATES' INFORMATION:

The state health agencies of all 50 states, three municipalities (Chicago, Los Angeles, and New York City) and Washington, D.C., were eligible to apply for bioterrorism preparedness funds made available by CDC. Three of these state health agencies received extensions and the application from Washington, D.C., is pending further clarification. Nearly all states made funding available to their local health jurisdictions. A brief survey of other state health agencies completed by staff of the Emergency Preparedness Office found the proportion to range from 30 percent to 80 percent, with most in the 50 percent range. California's percentage of total funds going locally is 61 percent, with an additional proportion of the state share -- especially funds for the health alert network and laboratory capacity -- also going to support local efforts. Many states proposed regionally (as opposed to county-based) planning/preparedness approaches, which included development of a centralized bioterrorism incident command structure.

CDC has expressed written concerns to two states -- California and Ohio -- regarding their funding of local health jurisdictions. Similar to California, Ohio has identified a large portion of funding in each focus area to be distributed to its counties as a block. CDC has asked for additional information concerning Ohio's experience and success with this model. CDC has asked California for additional information concerning the amount of funds directed to each California health jurisdiction and the type of guidance/oversight DHS will be providing on the use of these funds. CDC has also informed all states that it will be making reporting requirements available in mid-Summer 2002 and that the first progress report will be due on October 1, 2002.

## FISCAL IMPACT:

Since this bill governs local appropriations from a federal funding source, CDC, there is no fiscal cost to the State.  The FY 2001-02 Budget Act provides $6.0 million (including the extra $5.0 million authorized by the Governor for post-September 11, 2002 costs) to local health jurisdictions via the State Public Health Subvention program.  This bill would authorize up to an additional $30 million (or as approved by CDC) in federal funds to be expended locally on local public health bioterrorism preparedness and response functions.

## ECONOMIC IMPACT:

This large infusion of federal funds will assist local public health agencies in attaining their established goal of protecting the public.   Since the purpose of this funding from CDC is to address key public health infrastructure needs and CDC has encouraged both state and local health agencies to address public health workforce needs, this stimulus of funds may result in increased numbers of full, part-time, and limited-term positions within local health jurisdiction focused on dual core public health disease control and bioterrorism preparedness functions.

DHS's costs to administer the collaborative state-local agreement, including the cost of administering the local health jurisdiction agreements, will be paid out of the State portion of the federal funding.

## LEGAL IMPACT:

By codifying the process for disbursing the federal funding, the language in this section may limit DHS's flexibility to change this process as local needs or federal requirements change in the future. Using federal funding for purposes other than those to which CDC and DHS have agreed -- such as greater than allowable expenditures to each local jurisdiction or lack of statewide coverage for bioterrorism preparedness -- will place DHS at risk of noncompliance with the current and anticipated cooperative agreement.  CDC has indicated that it has contracted with an independent organization for a fiscal and program audit of State's use of the federal bioterrorism funds.

## APPOINTMENTS:

Not applicable.  The planning provisions of the CDC cooperative agreement are utilizing the existing Strategic State Committee on Terrorism planning structure managed by the Governor's Office of Emergency Services.

## SUPPORT/OPPOSITION

Support: None known.
Opposition: None known.

## ARGUMENTS:

Pro:
- The language in Section 8 should ensure the provision of additional funds for local communicable disease and terrorism preparedness and response.
- The provisions in this section would be implemented with non-state funding.

Con:
- This language is not needed for DHS to budget or expend federal bioterrorism preparedness funds.
- It is unclear as to whether there is a need for the legislation given DHS's collaborative agreements with the local health jurisdictions regarding federal funding being made available to them.
- Trailer bill language intent does not ensure that the State, as the federal funding recipient and legally accountable entity, retains its ability to establish statewide priorities, flexibly respond to the public's health and safety needs, and meet the terms of its cooperative agreements with federal funding sources.

## SECTION 9

**ANALYSIS:**
Indirect costs are charged by institutions in order to recoup administrative and facility overhead expenses related to their cancer research grant. Currently, the Cancer Research Program's (CRP) enabling legislation allows institutions to charge their federally negotiated indirect cost rate (ICR), which in the case of some California institutions is over 95 percent. This section would cap the allowable ICR for cancer research projects funded through CRP at 25 percent of direct costs, and thereby would result in more monies being available for the actual cancer research being conducted, which is consistent with the mission of the program.

- Capping the allowable ICR that institutions can charge for their cancer research projects at 25 percent will result in additional funding for actual cancer research.
- Other national cancer research institutions cap their ICR at 25 percent (e.g. American Cancer Society).
- If the ICR is capped, some institutions that charge more than 25 percent ICR may not apply to CRP for funding, thereby possibly reducing the number and quality of applications submitted. Currently, the University of California, Stanford University, the University of Southern California, and Burnham Institute have federally-negotiated ICRs greater than 25 percent of their direct costs.

**LEGISLATIVE HISTORY:**
AB 1554 (Chapter 755, Statutes of 1997) and SB 273 (Chapter 756, Statutes of 1997) established CRP, allocating $2 million to the Cancer Research Fund (CRF) in fiscal year (FY) 1997-98, and stating the Legislature's intent to allocate $25 million for FY 1998-99, subject to the availability of funds. The Governor's Budget allocated $25 million to CRF in FY 1998-99 through FY 2001-02, and the proposed budget for FY 2002-03 is $12.5 million for CRF.

**PROGRAM BACKGROUND:**
CRP's enabling legislation relative to indirect costs (Health and Safety Code, Section 104185 (b) (6)) has been interpreted to allow institutions to charge their federally negotiated ICR for research grants funded by CRP. These ICRs range from 0 percent to over 95 percent. It has always been CRP's

intent, with support from the Cancer Research Council (CRC), CRP's advisory group, to maximize the resources directed toward actual research being conducted. One of the ways this could be done by the institutions applying for funds is to lower the ICR they charge CRP. However, since the enabling legislation allows institutions to charge their federally negotiated rate, most do. Therefore, in those situations where an institution charges that rate, more CRP funds are spent on indirect costs. Capping the ICR to 25 percent will result in more money being available for actual research.

**OTHER STATES' INFORMATION:** None known.

**FISCAL IMPACT**
This section would not result in additional administrative costs to DHS. Additional General Fund monies appropriated to CRF would be available for actual research.

**ECONOMIC IMPACT:** None.

**LEGAL IMPACT:** None.

**APPOINTMENTS:** None.

**SUPPORT/OPPOSITION:**

Support: None known.

Opposition: None known

**ARGUMENTS:**
Pro:
- More General Fund monies appropriated to CRF will be available for direct research activities.

Con:
- Some institutions whose ICR is over 25 percent may not apply to CRP for funding, thereby possibly reducing the number and quality of applications submitted.

## SECTION 10

**ANALYSIS:**
This section would require manufacturers of drugs on the AIDS Drug Assistance Program (ADAP) formulary to negotiate with DHS for payment of additional rebates, beyond that which is currently mandated by state and federal law. The additional rebates collected would serve to offset the cost to the General Fund of escalating drug prices and help ensure uninterrupted client access to life-sustaining drugs.

Existing state and federal law (Health and Safety Code, Section 120955(d) and federal Social Security Act (42 U.S.C. Sec. 1396r-8[c], respectively)) require manufacturers of drugs on the ADAP formulary to pay mandatory rebates. Drug manufacturers generally pay a minimum of 15.1 percent of

Enrolled Bill Report                    Page 34                    Bill Number: AB 442
                                                                  Author: Committee on Budget

average manufacturer price (AMP), as the term is defined under the federal drug rebate mandate, for brand name products. Currently, a small number of drug manufacturers pay additional voluntary rebates beyond that which is required by federal law.

Mandatory rebates are an integral part of the annual ADAP budget. This section could serve to minimize increased fiscal impact to the General Fund portion of the ADAP budget through the collection of rebates above and beyond what is currently required. However, the potential increase in rebate collection is unknown. Though it is anticipated that the major AIDS drug manufacturers may comply with the rebate negotiation requirement, this section does not address implementation concerns, including the additional rebate amount to be negotiated/paid, the timeframe in which manufacturers are to comply with the additional rebate negotiations mandate, and non-compliance issues. ADAP invoices approximately 100 drug manufacturers for rebate. Negotiations with each of these manufacturers must be conducted without additional program staff.

## LEGISLATIVE HISTORY:
AB 2744 (Chan) was introduced on February 22, 2002 and was sponsored by DHS. This bill would have required the manufacturers of drugs on the ADAP formulary to pay an additional rebate of 10 percent of the AMP. Thus, AB 2744 would have increased the minimum mandatory rebate obligation to a total of 25.2 percent of AMP. AB 2744 was amended April 9, 2002, to delete the 10 percent rebate requirement and require negotiation of the rebate amount, and was held in the Assembly Health Committee when the author decided not to go forward with it at that time, due to a lack of votes for the bill.

## PROGRAM BACKGROUND:
ADAP was legislatively established to provide AIDS drugs to eligible individuals who could otherwise not afford them. The formulary consists of 147 drugs, including all federal Food and Drug Administration approved antiretroviral drugs and those drugs necessary to treat in accordance with the federal HIV/AIDS treatment guidelines. ADAP served approximately 25,000 clients in fiscal year (FY) 2001-02. The annual ADAP budget is comprised of state, federal and drug rebate dollars. In FY 2001-02, the projected drug manufacturer rebate for ADAP drug purchases is $15.7 million. Approximately 100 drug manufacturers are invoiced on a quarterly basis for drug rebate.

ADAP's budget has consistently grown in response to increased need and increasing drug prices. Federal allocations have not kept pace with the national increase in program demand, resulting in program restrictions (e.g., client waiting lists, drug benefit limits, etc.) in several other state ADAPs across the country. However, in California the General Fund has continued to "make up the difference" between need and available resources.

## OTHER STATES' INFORMATION:
All state ADAPs are eligible for drug rebate in accordance with the federal drug rebate requirement.

## FISCAL IMPACT:
Section 10 could serve to minimize increased impact to the General Fund portion of the ADAP budget through increased rebate collection. However, the actual fiscal impact is unknown. Though the

outcome of negotiations with the drug manufacturers for payment of additional rebates cannot be anticipated; some increased benefit to the program is expected. If rebate collection increased by only one to five percent in the current fiscal year, ADAP could have collected an additional $157,000 to $785,000.

**ECONOMIC IMPACT:** None.

**LEGAL IMPACT:** None.

**APPOINTMENTS:** None.

**SUPPORT/OPPOSITION:**

Support: Unknown.

Opposition: Unknown.

**ARGUMENTS:**

Pro:
- Could offset the cost of escalating drug prices and ensure uninterrupted client access to life-sustaining drugs.
- Could serve to minimize increased fiscal impact on the General Fund portion of the ADAP budget.

Con:
- Section 10 does not address implementation concerns, including the amount of additional rebate to be negotiated/paid, the timeframe in which drug manufacturers are to comply with the additional rebate mandate, and manufacturer non-compliance issues.
- ADAP invoices approximately 100 drug manufacturers for rebate. Negotiations with each of these manufacturers must be conducted without additional program staff.

## SECTIONS 11 – 13

**ANALYSIS:**

Currently the Child Health and Disability program (CHDP) provides services to approximately 1.2 million children. Of this number, approximately 770,000 of these children are believed to be eligible for ongoing full scope coverage in the Healthy Families (HF) or Medi-Cal program. While the physical examinations and immunizations provided by the CHDP program are vital to these children, the limited scope of coverage of the CHDP program means that many children go without necessary and comprehensive preventive and treatment services. To illustrate, CHDP does not cover dental or vision care but more than forty percent of the children who receive a CHDP screen are diagnosed to have dental problems needing treatment services for which CHDP provides no coverage.

Since CHDP currently provides health care screens to this population of uninsured children, the CHDP Gateway would take advantage of the existing health care network by allowing the CHDP encounter to serve as an entry point for these children to enroll in health care coverage under the HF or Medi-Cal program. In doing so, CHDP would be able to take advantage of available federal money to augment the state funds already used to fund the screens and provide these children with a larger scope of benefits than is currently available to them.

The major barrier to enrolling CHDP children in HF or Medi-Cal programs has been the manual systems that treat each program independently and cannot communicate with each other. Families applying for CHDP services must also separately apply to HF or Medi-Cal programs for coverage. Using an Internet system would allow families to use the CHDP application as a pre-enrollment application for HF or Medi-Cal program and thus avoids duplicating the application process.

LEGISLATIVE HISTORY:
The Governor's January Budget proposed to eliminate the CHDP program and augment the funding for primary care clinics (Expanded Access to Primary Care) to ensure that children had access to health screenings and immunizations. In response to widespread concern over this proposal, DHS conducted meetings with concerned parties, gathered their suggestions and drafted the proposal contained in Sections 11, 12, 13, 18, 19, 20, 22, 23, 24, 45 and 46 of this bill.

PROGRAM BACKGROUND:
The CHDP program provides health assessments and immunizations for all Medi-Cal children under the age of twenty-one and for children, not enrolled in Medi-Cal, under the age of nineteen and who are from families with income at or below 200 percent of the federal poverty level. Health assessments for non-Medi-Cal children are funded from State General Fund and Tobacco Settlement Fund (TSF). If a condition is found during a health assessment, the child is referred for diagnosis and treatment to an appropriate provider.

Existing HF statute allows MRMIB to fund well child assessments, immunizations and initial treatment services if they are provided by CHDP providers up to ninety days prior to the effective date of the child's coverage in a HF contracted plan. This process was instituted when the HF program was established, as CHDP providers were expected to be used as an entry point into HF for eligible uninsured children. However, this process has not proven successful in having providers directly link families with HF. CHDP providers have, however, given families information and applications for HF.

OTHER STATES' INFORMATION:  Not applicable.

FISCAL IMPACT:
Restoration of funding for the CHDP program during the transition period to the Gateway and the implementation of the CHDP Gateway for preenrollment into either Medi-Cal and HF by April 1, 2003, will result in FY 2002-03 local assistance funding requirements for CHDP of $101,600,000 GF/TSF and for Medi-Cal/HF of $6,981,000 ($3,139,000 GF).

CHDP FY 2002-03 support costs resulting from the reinstatement of the program are $436,000 (6.0 positions reinstated, 4.0 redirected positions restored). Additional new support costs for staff (5.5 positions) and systems changes costs for CHDP, Medi-Cal Policy Division, Payment Systems Division, and Information Technology Systems Division associated with the Gateway are $2,758,000 TF ($836,000 GF).

Annual local assistance costs are estimated to be $20,169,000 for CHDP and between $474,858,000 ($226,244,000 GF) and $677,271,000 ($323,026,000 GF) for Medi-Cal/HF.

ECONOMIC IMPACT: Not applicable.

LEGAL IMPACT: Not applicable.

APPOINTMENTS: None.

SUPPORT/OPPOSITION:

Support: Children's Advocacy Groups
Opposition: None known.

ARGUMENTS:
Pros:
- The CHDP Gateway program could potentially provide enhanced health coverage to approximately 1 million children who are currently not enrolled in Medi-Cal or HF.
- The CHDP Gateway program would allow the state to draw down federal funding for all CHDP services.

Cons:
- Enrollment of additional children in HF and Medi-Cal would result in increased costs to the State.
- The CHDP Gateway would require additional staff to administer.

SECTION 14

ANALYSIS:
Health and Safety Code, Section 124120, currently requires DHS to conduct a community outreach and awareness campaign to inform medical providers, pregnant women, and the families of newborns and infants on the availability of the Newborn Health Screening Program (NHSP). These outreach activities are required to be provided by an independent contractor. Section 14 of this bill would make the outreach activities discretionary rather than mandatory. By eliminating this requirement, DHS can use available data to decide if, when, and where, outreach activities are to be provided. State fund savings could be realized to the extent DHS decides that outreach activities are necessary in selected situations, rather than statewide.

**LEGISLATIVE HISTORY:**
AB 2780 (Chapter 310, Statutes of 1998) authorized DHS to establish a system to screen all newborns and infants for hearing loss and to create and maintain a system of assessment and follow-up services for newborns and infants identified by the screening in approved Neonatal Intensive Care Units participating in the California Children's Services program.

**PROGRAM BACKGROUND:**
The NHSP is a statewide comprehensive system of care, administered by DHS's Children's Medical Services Branch, which is designed to identify hearing loss in newborns and infants before three months of age and assist these children and their families in accessing intervention services by six months of age. It is estimated that the program, once fully operational, will screen approximately 400,000 newborns and infants every year. Of that number, approximately 1,200 newborns and infants with a hearing loss will be identified. The NHSP includes Hearing Coordination Centers that serve as a critical component in assuring that infants with hearing loss are identified and receive intervention services as early as possible. In addition, NHSP provides an outreach and awareness campaign to inform medical providers, pregnant women, and the families of newborns and infants on the availability of this program and services

**OTHER STATES' INFORMATION:** None.

**FISCAL IMPACT:**
The proposed language in this section provides DHS the ability to reduce funding to the outreach and awareness component of the NHSP when deemed necessary. The Governor's May Revise contains a reduction of $290,000 (GF) for this item.

**ECONOMIC IMPACT:** Not applicable.

**LEGAL IMPACT:** Not applicable.

**APPOINTMENTS:** None.

**SUPPORT/OPPOSITION:**

Support: None known.
Opposition: None known.

**ARGUMENTS:**
Pros:  This General Fund reduction would help reduce expenditures without reducing services to
       Californians.

Cons:  A reduction in outreach expenditures could result in fewer parents and providers being
       informed about this program.

## SECTION 15

**ANALYSIS:**
The initial enabling legislation for the Battered Women Shelter Program (BWSP) requires that DHS shall collaborate closely with the Domestic Violence Advisory Council (DVAC) in the development of funding priorities, the framing of the Request for Proposals, and the solicitation of proposals." The DVAC has been of significant assistance in providing a stakeholder's voice to the policies and activities of the BWSP. DVAC meetings serve as an opportunity to share research data and information regarding domestic violence issues in California; activities and performance of the statewide BWSP; and other DHS-funded domestic violence projects. Input and advice from DVAC permit the BWSP to develop and provide services that meet the needs of the community. Existing statute requires the BWSP to fund:

- Shelters,
- Prevention projects,
- Unserved/underserved populations,
- At least one technical assistance and training contract, and
- Statewide evaluation.

These public health approaches distinguish BWSP from other government-funded domestic violence programs in California that have a criminal justice approach.

AB 801 (Chapter 599, Statutes of 1994) established the DVAC to advise on issues related to the statewide BWSP; specifically, development of funding priorities, framing of Requests for Proposals, and solicitation of proposals. As required in AB 801, and subsequent legislation, DVAC members represent a cross-section of the DV community:

- Domestic violence advocates;
- Battered women service providers;
- Representatives of women's organizations, law enforcement, and other groups involved with DV;
- Representatives should reflect the ethnic, racial, cultural, and geographic diversity of the State of California.

In addition to ongoing advice to the BWSP, the DVAC developed a landmark document entitled "Preventing Domestic Violence: A Blueprint for the 21st Century.

An additional example of the importance of the DVAC occurred in 1997. The BWSP had received an augmentation and went to the DVAC to get their input regarding priority issues. Workgroups were formed and out of this process it was identified that teens were an underserved group, both from the perspective of direct services and prevention. Some pilot projects were developed and ultimately this served as the basis for 10 projects for unserved teen populations and 15 projects for underserved teen populations.

The DVAC consists of no more than 13 voting members and two non-voting legislative members. DVAC appointments are as follows:

- Seven (7) appointed by the Governor

- Three (3) appointed by the Speaker of the Assembly
- Three (3) appointed by the Senate Committee on Rules, and
- Two (2) nonvoting ex-officio members appointed by the Speaker of the Assembly and the Senate Committee on Rules, respectively.

Currently, there is one Governor's appointee pending. The term for all members is 2001-2003. There are currently no limits to the amount of time a DVAC member may serve. Therefore, with an extension to the sunset date, it is expected that current members will continue to serve.

LEGISLATIVE HISTORY:
The BWSP was established by the Battered Women Protection Act of 1994 (AB 1667, Chapter 140, Statutes of 1994), as amended by AB 801 (Chapter 599, Statutes of 1994). AB 801 authorized the DVAC until 1996. AB 3483 (Chapter 197, Statutes of 1996) extended the sunset date to January 1, 1998, and AB 1107 (Chapter 146, Statutes of 1999) extended the sunset date to January 1, 2003.

PROGRAM BACKGROUND:
As legislatively mandated by AB 1667 and AB 801, BWSP began primarily as a shelter-based program that expanded existing services, established 17 new shelters statewide, and funded creative and innovative service approaches, such as community response teams. The Budget Act of 1996 specified that a portion of the augmentation funds be spent on prevention efforts; a fiscal year 1998-99 augmentation required that those funds provide outreach and services to unserved or underserved populations.

OTHER STATES' INFORMATION: Not applicable.

FISCAL IMPACT:
There are no new costs associated with extending the sunset date of the DVAC.

ECONOMIC IMPACT: Not applicable.

LEGAL IMPACT: Not applicable.

APPOINTMENTS: None.

SUPPORT/OPPOSITION:

Support: None known.
Opposition: None known.

ARGUMENTS:

Pros:
- The BWSP is a dynamic program that is constantly addressing new issues; this requires the input from the greater DV community via the DVAC.

- The DVAC ensures both public and government awareness of domestic violence as a public health issue.

Cons: None.

## SECTION 15.5

**ANALYSIS:**
Prior to July 1, 2001, DHS collected the Newborn Screening (NBS) testing fee from the hospital of birth. The hospitals included these costs in their Medi-Cal and private insurance billings. This practice was prohibited by AB 2427 (Chapter 803, Statutes of 2000) and DHS was required to bill families, insurance, and Medi-Cal directly. This is an expensive process and collections are down approximately 30 percent. The special fund, Genetic Disease Testing Fund (GDTF), incurred a deficit. This language restores the old system, which had a 98 percent collection rate.

**LEGISLATIVE HISTORY:**
AB 2427 changed the NBS billing system to require NBS fees to be paid directly to the GDTF by the third party payor of the person receiving the services, including the Medi-Cal program, health care service plan or insurance. Under AB 2427, hospitals could not be charged for these services.

**PROGRAM BACKGROUND:**
DHS conducts a mandatory screening of 535,000 newborns annually for treatable inherited metabolic disorders. The program is supported by fees charged for testing.

**OTHER STATES' INFORMATION:**
Forty states charge a NBS fee. Provisions for collection vary.

**FISCAL IMPACT:**
The Department of Finance has determined that a reduction of 5 PY used for the collection process could be eliminated in FY 2002-2003 at a savings of $209,000. Revenues are estimated to increase in FY 2002-2003 by approximately $13 million.

**ECONOMIC IMPACT:** Not applicable.

**LEGAL IMPACT:** Not applicable.

**APPOINTMENTS:** None.

**SUPPORT/OPPOSITION:**

Support: None known.
Opposition: None known.

Page 42                         Bill Number: AB 442
                                                                          Author: Committee on Budget

## ARGUMENTS:

Pros:
- Would help restore fiscal solvency to the NBS program.
- Would provide a stable basis for fiscal planning and estimates.
- Would give insurance companies and families a more satisfactory way to pay.

Cons:
- Could result in hospitals not being fully reimbursed for NBS services.

### SECTION 16

**ANALYSIS:**
The Genetically Handicapped Persons Program (GHPP) client population is primarily comprised of adults with hemophilia. The GHPP authorizes and pays a significant amount of monies annually to provide these individuals with medically necessary blood factor products. It is anticipated that providing the program with the authority to receive manufacturer discounts, rebates and refunds for blood factor products would result in significant General Fund savings. There is, however, no requirement in the proposed language in this section that manufacturers provide any discount, rebate or refund to the GHPP for blood factor products purchased.

DHS currently negotiates contracts for blood factor products prescribed to children eligible for Medi-Cal benefits, at a significant savings to the Medi-Cal program. The Medi-Cal program has separate statutory authority to contract for these rebates, but GHPP does not have authority to receive rebates.

**LEGISLATIVE HISTORY:**
During the discussions of the budget trailer bill language, a representative from Baxter Healthcare Corporation expressed concerns about the language originally drafted by DHS, which would have authorized GHPP to negotiate contracts with manufacturers for blood factor products and prescription drugs. Baxter was opposed to any language that would indicate to other states that they had entered into a contract for specified rebates under the GHPP program, as this would set a precedent for other states to request similar contracts. Compromise language was developed with input from Baxter's representative and was placed in this section.

**PROGRAM BACKGROUND:**
GHPP provides medical case management and pays the medical and dental costs of persons primarily age 21 and over, who have a confirmed genetic condition. Such conditions include, but are not limited to, Hemophilia, Cystic Fibrosis, and Sickle Cell Disease. These persons receive the care for their medical condition under the supervision of a GHPP special care center.

GHPP case management staff is responsible for authorizing medically necessary services and coordinating the patient's care with the primary care physician, the GHPP special care center, and other service providers in the community. GHPP clients with hemophilia represent a significant percentage of the caseload and authorization and payment of blood factor products continues to represent the largest annual program expenditures.

**OTHER STATES' INFORMATION:** None known.

**FISCAL IMPACT:**
The voluntary rebates received for GHPP state-only clients would result in a General Fund savings for GHPP of approximately $6,426,000, assuming continuation of the current level of rebates.

**ECONOMIC IMPACT:** Not applicable.

**LEGAL IMPACT:** Not applicable.

**APPOINTMENTS:** None.

**SUPPORT/OPPOSITION:**

Support: None known.
Opposition: None known.

**ARGUMENTS:**

Pros:
• This proposal will provide the GHPP program with statutory authority to receive manufacturer discounts, rebates and refunds, resulting in reduced expenditures for blood factor products and savings to the GHPP program.

Cons:
• There is no requirement in this proposal that manufacturers provide any rebate or discount to the GHPP program.

## SECTION 17

**ANALYSIS:**
Health and Safety Code 127280 requires that all health facilities, except those owned and operated by the State, be charged each year a designated fee established, in accordance with certain requirements, by the Office of Statewide Health Planning and Development (OSHPD), to pay for certain functions. This bill would authorize DHS to expend $200,000 of those fees for FY 2002-2003 PPR; including data collection, analysis, and reporting, of maternal and perinatal outcomes. This funding would allow the PPR to continue to be provided to the birthing facilities for quality assurance purposes. The primary objective of the PPR is to provide facility-specific data to California maternity

hospitals and facilities to reduce the incidence of maternal and infant deaths and improve the overall quality of care at these facilities. Hospitals are provided with data on their facility's outcomes, as well as comparison data as the basis for identifying problems for planning and implementing improvements.

## LEGISLATIVE HISTORY:

The Governor's January Budget for 2002-03 proposed to reduce the Birth Defects Monitoring Program by $1,571,000. The Legislature wanted to restore this funding, to the extent possible under the current budgetary situation, and found that Title V funding could be used for this purpose. The resulting legislative action redirected Title V funding from the PPR to the Birth Defects Monitoring program and specified that $200,000 in OSHPD health facility fees be redirected to support the PPR.

## PROGRAM BACKGROUND:

Since the 1980's, DHS has provided facility-specific perinatal data upon request to interested staff of California maternity hospitals and facilities for improving perinatal outcomes at these facilities. Currently, over 300 hospitals and over 1,000 staff at these hospitals have participated in this program. Data for a particular maternity hospital is shared only with the staff of that hospital and DHS. DHS offers consultation to the facility on how to use this data to improve its perinatal outcomes. DHS also uses the data to facilitate improvements in health delivery systems within and between geographic areas that would aid in improving maternal and perinatal health outcomes. From its inception, this activity has been funded with Title V funds that are no longer available for this purpose. Using OSHPD funding through this bill would enable DHS to continue providing this valuable information to maternity facilities and perinatal regions.

**OTHER STATES' INFORMATION:** Not applicable.

## FISCAL IMPACT:

No fiscal impact. There is no change in the cost of funding the PPR, however, the funding will be from a different fund source.

**ECONOMIC IMPACT:** Not applicable.

**LEGAL IMPACT:** Not applicable.

**APPOINTMENTS:** None.

## SUPPORT/OPPOSITION:

Support: None known.  Opposition: None known.

## ARGUMENTS:

Pros: Using OSHPD funding would allow continued provision of maternal and perinatal outcome data to hospitals for quality assurance purposes.

Cons: None.

Page 45                    Bill Number: AB 442
                                                                              Author: Committee on Budget

## SECTIONS 18 – 24

**ANALYSIS:**

**Sec. 18.** This provision in the Healthy Families statute would clarify existing language by changing the definition of "family contribution sponsor" to mean a person or entity paying the family contribution for <u>any</u> 12 consecutive months. It also would specify that if the sponsor is paying for the initial 12 months of eligibility, the payment be made with the application.

**Sec. 19.** This amendment would establish a repeal date of January 1, 2004 for this statute because Section 20 of this bill would add a new provision (Section 12693.41). The existing statute provides that CHDP providers will be paid by the Healthy Families program (HFP) for any services provided to a child up to 90 days prior to the effective date of the child's enrollment in the program. This section's repeal would be needed to authorize the CHDP Gateway program, which will require some restructuring of CHDP, HFP and Medi-Cal.

**Sec. 20.** This amendment would establish a new Insurance Code Section 12693.41 to replace the section that becomes inoperative on April 1, 2003 and is repealed January 1, 2004 by Section 19 of this bill. This new section would authorize MRMIB to coordinate with DHS in the pre-enrollment into Medi-Cal or HFP by the CHDP providers and would define some of the requirements for implementation. Medi-Cal would provide full-scope benefits during the pre-enrollment period and if a follow-up application were submitted on behalf of the child, HFP would accept it as a HFP application.

This new provision would become operative on the same day (April 1, 2003) existing language would become inoperative.

**Sec. 21.** This section would amend Insurance Code Section 14693.43 to permit a 25 percent discount to HFP applicants who use an approved electronic funds transfer to pay the family HFP premium. This amendment is sponsored by the Administration to make it more convenient for families to pay the premium and thus encourage higher rates of program participation.

**Sec. 22.** This section would amend Insurance Code Section 14693.45 to specify that applicants or participants of HFP may be disenrolled after two consecutive months (rather than 60 days) of premium non-payment. This provision would delete the existing six-month lock out from the program for failure to pay family contributions. It also would specify that disenrollments be subject to requirements of federal law and would delete the authority of the MRMIB to waive the exclusion for good cause. These amendments would make HFP law consistent with federal requirements that may be imposed by approvals for the CHDP Gateway program.

**Sec. 23.** This section would amend Insurance Code Section 14693.70. This provision currently defines the requirements to be an applicant of the HFP. This section would add another requirement that the applicant must pay in full any family contributions owed in arrears for any health coverage provided by the program within the previous 12 months.

**Sec. 24.** This section was originally adopted in 2001 to authorize a two-month bridging program between HFP and Medi-Cal. The bridging program allows clients losing eligibility for HFP services, who might now be eligible for Medi-Cal, to continue two months of HFP services while the Medi-Cal application is being processed. This amendment to Insurance Code Section 14693.981 would delete paragraph (e), which limits implementation of the section until after federal waiver approval for expansion of the HFP and at the time of waiver implementation. Although the waiver was approved in December 2001, this amendment would now authorize the two-month bridging program regardless of whether the waiver is approved and implemented.

**LEGISLATIVE HISTORY:**
The HFP was implemented by AB 1126 (Chapter 623, Statutes of 1997).

**PROGRAM BACKGROUND:**
The HFP is authorized by Title XXI of the federal Social Security Act and was implemented in California in 1998. HFP provides comprehensive medical, dental and vision services to uninsured children of working families with incomes less than 250% of the federal poverty level. Approximately two-thirds of the cost of HFP is contributed by federal Title XXI funds. Children who are eligible for Medi-Cal without a share of cost are not eligible for HFP.

**OTHER STATES' INFORMATION:** Unknown.

**FISCAL IMPACT:**
It is unknown whether there is any fiscal impact on DHS from this section. MRMIB may experience some increased costs.

**ECONOMIC IMPACT:** Unknown.

**LEGAL IMPACT:** Not applicable.

**APPOINTMENTS:** None.

**SUPPORT/OPPOSITION:**

Support:  None known.
Opposition:  None known.

**ARGUMENTS:**
Sec. 18.
Pros:  Clarifies the definition of a family contribution sponsor to be any person/entity paying for 12 consecutive months, resulting in less confusion among enrollees and sponsors.

Cons: None

Enrolled Bill Report                    Page 47              Bill Number: AB 442
                                                             Author: Committee on Budget

**Sec. 19.**
Pros:  Repeals a section of HFP statutes that will not be needed when the new CHDP Gateway
       program is implemented.

Cons: None

**Sec. 20.**
Pros:
  - Replaces the Insurance Code section repealed in the previous section with new authority for
    MRMIB to participate in the pre-enrollment system for children who visit CHDP providers for a
    health assessment.

Cons: None

**Sec. 21.**
Pros:  Encourages increased participation in HFP.

Cons: None

**Sec. 22.**
Pros:  Will make HFP laws consistent with federal Medicaid requirements.

Cons: None

**Sec. 23.**
Pros:  Clarifies existing law with regard to requirements for HFP applicants.

Cons: None

**Sec. 24.**
Pros:
  - Allowing the HFP to Medi-Cal Bridging program to be implemented regardless of whether the
    HF Parental Expansion waiver is implemented permits a person transferring from HF to Medi-
    Cal to receive full health coverage while Medi-Cal eligibility is being determined.

Cons: None

Page 48

## SECTION 41

**ANALYSIS:**
This section is added to the Welfare and Institutions Code to maximize the amount of federal and state funds continually available under agreements identified in Section 1396a(a)(11)(A) of Title 42 of the United States Code and entered into by the State Department of Health Services, by making later-appropriated and budgeted funds immediately encumbered and available for expenditure under agreements by operation of law. This will obviate the need for completing a new interagency agreement process each time new funding is required, as long as no change to the scope of work is needed, and the new funding is newly appropriated and budgeted.

**LEGISLATIVE HISTORY:**
This language was proposed by the Administration. There have been no other known legislative initiatives during the current session to accomplish the intent of this proposed change.

**PROGRAM BACKGROUND:**
DHS currently processes numerous interagency agreements and amendments that require significant time and investment of staff resources   There is a two-year federal claiming limit which currently requires interagency agreements be amended to increase or decrease funds when needed. Interagency agreement amendments are currently needed before claims can be paid, if the claim exceeds the amounts available under the current terms of the interagency agreement. The State loses federal funds when the claims cannot be paid prior to expiration of the two-year claiming period. The change in this proposal would eliminate the existing requirements that interagency agreements be amended when additional funds are required as long as:  1) there is no change to the scope of work, and 2) the additional funds are newly appropriated and budgeted. This change would streamline the processing of interagency agreement amendments and would keep the agreement in effect indefinitely without amending, unless changes to the scope of work under a particular interagency agreement is needed, or additional funding is needed that is not newly appropriated and budgeted.

**OTHER STATES' INFORMATION:** Not applicable.

**FISCAL IMPACT:**
Section 41 would have no direct fiscal impact on DHS. To the extent that this provision would allow the State to draw down federal funds faster than it is possible to under current contracting provisions, the state would earn more interest on the statewide General Fund than otherwise, or, in the case of this year where money is being borrowed, pay less interest.

**ECONOMIC IMPACT:** Not applicable.

**LEGAL IMPACT:** Not applicable.

**APPOINTMENTS:** None.

## SUPPORT/OPPOSITION:

Support:  None known.
Opposition:  None known.

## ARGUMENTS:

Pros:

- This proposal would reduce the processing and staff time needed to implement interagency agreements and amendments with State entities.
- This proposal would allow interagency agreement funds to be continually available for encumbrances and avoid delay in processing due to insufficient funds.

Cons:  None.

## SECTION 42

## ANALYSIS:

Section 42 provides authority to contract with non-profit organizations to perform ombudsman services, but no funds were appropriated.  The following elements would need to be put into place to establish an Office of the Ombudsman:

- DHS would need to design and distribute a competitive request for applications (RFA), outlining the specific duties to be performed by the nonprofit organizations.

- DHS would need to enlist nonprofit contractors, on a regional pilot project basis, to assist Medi-Cal eligible persons on behalf of DHS.  Assistance would include outreach, education, and training about health care consumer rights and responsibilities.

- With direction from DHS, the nonprofit contractors would develop project work plans and budgets supporting their efforts to address the following tasks: 1) Production and distribution of consumer-related material, 2) Provision of individual consumer assistance (including counseling, advice, assistance, education, advocacy, and referral, as appropriate), 3) Establishment and operation of a data base to analyze the nature of the inquiries and requests for assistance, and 4) Training of DHS and/or county staff.

Relying on a regional pilot project format that works with nonprofit organizations, as local contractors would allow DHS to work with entities that are familiar to consumers in their local communities, thereby making the nonprofit organizations more approachable to members of the general public who wish to access the services of the Office of the Ombudsman. Without funding, contracting for these activities cannot take place.

Enrolled Bill Report                     Page 50                     Bill Number: AB 442
                                                                     Author: Committee on Budget

## LEGISLATIVE HISTORY:

In 1999, AB 138 (Health Care Ombudsman Program) proposed that funds be allocated for an independent health care ombudsman program under which projects throughout the state would receive funding to provide health care consumers with counseling, assistance, and advocacy services. This bill died in committee. In 2001, SB 1168 (Health Care Program: Consumer Assistance Program) proposed that the Department of Health Services would establish a process to allocate grant funding for independent health care consumer assistance projects that meet certain criteria. The bill would have also required the Department to contract with an independent expert entity to evaluate the grant programs and report to relevant committees of the Legislature. This bill died in committee.

## PROGRAM BACKGROUND:

The Education and Outreach Section is located in the Medi-Cal Eligibility Branch of the Medi-Cal Policy Division. One of its primary functions is the oversight and management of Healthy Families Program/Medi-Cal for Families (HFP/MCF) outreach contracts to community-based organizations, schools and county offices of education, clinics, and local health departments. Other major functions include oversight of the work of subcontractors Runyon, Saltzman, and Einhorn, Richard Heath and Associates, and Electronic Data Systems as related to the statewide HFP/MCF Outreach Campaign. The focus of this work is to develop and conduct community outreach and education activities that create public awareness about, and encourage and assist families to apply for HFP/MCF. It has included: outreach and application assistance (administration of community based and school outreach contracts and processing/payment of application assistance fees); outreach support (development and distribution of collateral marketing materials such as posters, pens, and flyers, support to Enrollment Entities (EEs) and CAAs, and toll-free application information services); education (implementation of advertising, public relations, activities); and a focus on immigrant populations.

## OTHER STATES' INFORMATION: Unknown.

## FISCAL IMPACT:

Section 42 provides that funds appropriated in the annual Budget Act for the support of the Office of the Ombudsman may be allocated to establish contracts with nonprofit organizations on a regional basis. No funds are appropriated for the Office of the Ombudsman, so DHS would not be able to contract with nonprofit organizations for the ombudsman activities in the budget year. State staff would also need to process the RFA for the nonprofit organizations and to administer the resulting contracts.

## ECONOMIC IMPACT: Unknown.

## LEGAL IMPACT: None.

## APPOINTMENTS: None.

## SUPPORT/OPPOSITION:

Support: None known.
Opposition: None known.

## ARGUMENTS:

Pros:
- Establishing an Office of the Ombudsman would provide DHS with an on-going communication mechanism with any person receiving or eligible to receive Medi-Cal benefits, regarding health care consumer issues for the State of California.

Cons:
- Establishing an Office of the Ombudsman would require GF support to fund the design and release of an RFA and the contractor selection process, as well as to fund DHS positions for administration purposes. No funds have been appropriated.


## SECTION 43

## ANALYSIS:

Last year, AB 59 added Section 14005.41 of the W&I Code allowing DHS to collaborate with the California Department of Education (CDE) for the sharing of information for enrolling low-income children into the Medi-Cal program. The sharing of information is through use of the National School Lunch program (NSLP) application. This program was originally scheduled for implementation by July 1, 2002.

The intent of Section 14005.41 is for children enrolled in NSLP to be quickly enrolled in no cost Medi-Cal; however, federal law requires that immigration/citizenship status be verified prior to enrollment into Medi-Cal. Immigration/citizenship status is not required for the receipt of school meals and seeking such questions on the school lunch application could deter families from applying. Without meeting the federal requirement for a declaration of immigration/citizenship on the school lunch application, a child cannot be permanently enrolled into Medi-Cal. Federal law allows for presumptive enrollment of a child subject to verification of immigration/citizenship status. This is accomplished by establishing a presumptive eligibility process pursuant to Section 1396r-1a of Title 42 of the United States Code:

Federal law for presumptive eligibility does not require verification of citizenship/immigration status prior to enrollment. The presumptive eligibility process allows low-income children to quickly access health coverage on a temporary basis until all other requirements are met and a Medi-Cal determination can be made. Section 43 of AB 442 would provide the necessary changes to the original legislation authorizing DHS to implement Section 14005.41 as intended, while maintaining program integrity and not jeopardizing federal financial participation. Program integrity and federal

financial participation is protected, however, state plan amendment approval is necessary. The State must designate an entity to authorize presumptive eligibility into Medi-Cal, for children meeting the income requirements for the program.

In addition to the above amendments, Section 43 changes the implementation date for this program from July 2002 to July 2003. The Governor's May Revision delayed implementation until 2005 due to budget constraints.

## LEGISLATIVE HISTORY:

AB 59 (Chapter 894, Statutes of 2001) authored by Assemblymember Gil Cedillo and signed into law October 14, 2001, added Section 14005.41 to the W&I code with an implementation date of July 1, 2002.

In the May revise, Governor Davis proposed changing the implementation date to July 1, 2005. Section 43 of AB 442 seeks implementation on July 1, 2003.

## PROGRAM BACKGROUND:

The Medi-Cal program currently provides health coverage to approximately 6 million Californians. To be eligible, individuals must meet certain restrictive income and resource criteria. Eligibility requires applicants to meet at minimum, one of several linking categories: pregnancy, under the age of 21, 65 or older, eligible for receipt of CalWORKs, blind or disabled.

Children under age six with family income under 133% of the FPL and children age 6 through age 18 with family income up to 100% of the FPL are eligible for no cost Medi-Cal.

The Medi-Cal funding share is approximately 50/50 (state/federal). DHS is the single state agency charged under federal law with the administration of the program; however, the counties serve as agents of the State in determining the eligibility of the participants.

The Balanced Budget Act of 1997 created the State Children's Health Insurance Program (SCHIP) by which participating states were provided the opportunity to design comprehensive coverage and health insurance for uninsured children. In California, the SCHIP program is called the Healthy Families program.

California sought federal approval of the proposed Healthy Families parental expansion SCHIP waiver for implementation of accelerated enrollment under Section 1396r-1a of Title 42 of the United States Code. To obtain federal approval, statutes were placed into the W&I Code. Accelerated enrollment was implemented July 1, 2002 and is available to anyone applying through Single Point of Entry (SPE), the designated accelerated enrollment determining entity.

Applicants eligible for Medi-Cal and enrolled through the accelerated enrollment process have their application and verifying documents forwarded to their county Medi-Cal office for a complete Medi-Cal determination. Accelerated enrollment is only available through the SPE venue and requires documentation of facts.

## OTHER STATES' INFORMATION:

Washington State conducted a pilot program that attempted to cross-match NSLP data files with Medicaid eligibility files to identify children who are not Medicaid enrolled. This process did not expedite health coverage and required the parent/caretaker to complete additional forms. Effective 6/30/02, this pilot ended due to State budget cuts.

New York City provides a list of names of students receiving free or reduced price school meals to the Health Department. The Health Department then contacts the parent/guardian inquiring about the child's health insurance status. This process does not expedite health coverage and requires the parent/caretaker to complete additional forms. The New York Health Department provides a financial incentive for school participation depending on the percentage of new enrollees and provides training and staff facilitating enrollment.

## FISCAL IMPACT:

There would be no fiscal impact to the Medi-Cal program during Budget Year 2002-03, as this section would not become effective until July 1, 2003. DHS may incur additional costs depending on the entity designated for express enrollment determinations. The Governor's final May Estimate assumed delaying implementation until July 1, 2005 and did not include any funding for the 2002-03 fiscal year. The Budget Conference Committee added funding for this program effective October 1, 2002 ($11,995,000 TF, $5,997,000 GF), however, the language in Section 43 does not match the funding. The funding appears to assume an October 1, 2002, implementation date, but the language specifies July 1, 2003.

## ECONOMIC IMPACT

The provision to expedite health coverage to children presumed Medi-Cal eligible would benefit the State by preventing child health risks and decreasing costs associated with expensive medical care provided through emergency room visits.

## LEGAL IMPACT: Unknown.

## APPOINTMENTS: None

## SUPPORT/OPPOSITION

Support: None known.
Opposition: None known.