# Exhibit 35-4

*State of California ex rel. Ven-A-Care of the Florida Keys, Inc. v.*
*Abbott Labs, Inc. et al., Civil Action No. 03-11226-PBS*

**Exhibit to the November 25, 2009 Declaration of Philip D. Robben**
**in Support of Defendants' Joint Motion for Partial Summary Judgment**

Enrolled Bill Report

Bill Number: AB 442

Author: Committee on Budget

## PROGRAM BACKGROUND:

The Medi-Cal drug program in DHS maintains the outpatient drug List. This List is used by physicians when prescribing medications for FFS Medi-Cal patients. Drugs not specifically listed remain a Medi-Cal benefit subject to prior authorization from a Medi-Cal consultant. State legislation was enacted in 1990, that enabled DHS to contract with drug manufacturers to obtain rebates for drugs dispensed to FFS outpatient Medi-Cal beneficiaries. This rebate program complements, rather than conflicts with the federal Medicaid rebate law. Because of negotiating state supplemental rebates, DHS often secures rebates in addition to those required under federal law. Rebates over and above those required to be paid to the State under federal law have been possible due to leverage DHS has with manufacturers regarding drug contracting in exchange for adding their drugs to the List.

## OTHER STATES' INFORMATION:

Florida Medicaid is the only other state Medicaid program with a broad supplemental rebate program.

## FISCAL IMPACT:
There is no fiscal impact.

## ECONOMIC IMPACT:  None known.

## LEGAL IMPACT:  Unknown.

## APPOINTMENTS:  None.

## SUPPORT/OPPOSITION:

Support: None known.
Opposition: None known.

## ARGUMENTS:

Pros:  Closes a technical gap in the law, allowing DHS to suspend or delete a drug that has never had a contract from the List.

Cons: None

## SECTION 62

**ANALYSIS:**

These sections would eliminate the January 1, 2003, sunset provisions of the Medi-Cal drug rebate program (SEC. 55,56,59,60,62,63,65,66,68,69) and would delete sections of law that become operative due to the January 1, 2003, sunset (SEC. 64,67,75,78,79,80). Several sections contain clean-up language changing Health Care Financing Administration to its new title, Centers for Medicare and Medicaid Services (SEC. 56,59,70).

Budget Trailer Bill language established the Medi-Cal drug rebate program in 1990. Since that time several extensions to the sunset date have been enacted. The most recent extension of the Medi-Cal drug rebate program was enacted in AB 2877 (Chapter 93, Statutes of 2000) for two additional years and is now due to sunset January 1, 2003.

Eliminating the sunset date and related sections would enable DHS to continue to operate the drug rebate program as it has since 1990. The sunset of the Medi-Cal drug rebate program would cause the:

- DHS to lose authority to collect $280 million in rebates greater than the federally-mandated amount;
- Program to revert to a lengthy and burdensome regulatory process for making changes to the Medi-Cal drug formulary.

The elimination of the sunset is consistent with the following provisions of DHS's Strategic Plan: 1) Ensuring fiscal accountability of programs and services; 2) Reforming DHS's administration and program management, including external contracting, into a rational, business-like, and outcome oriented approach.

The Medi-Cal drug rebate program currently generates significant fiscal savings per year in rebates over-and-above the rebates paid to the State under the federal Medicaid drug rebate program. Without Reauthorization of this program would avoid the loss of these additional drug rebate savings. Without reauthorization, beginning January 1, 2003, current law requires DHS to return to the system in place prior to 1990 in which there was no drug contracting for additional rebates and each addition to the drug formulary required a change in regulations. Neither DHS nor drug manufacturers would like to reinstate the regulatory process as a requirement for drug additions to the Medi-Cal drug formulary. Drug additions through this regulatory process were much slower compared to the current contract negotiation process (18 months average compared to 6 to 9 months). This now obsolete process also resulted in fewer new drug additions (4 to 5 new drug additions per year in 1988 and 1989 compared to 20 to 30 new additions per year from 1996 to 1998), presumably due to cost concerns that are often mitigated through drug rebate contracting.

**LEGISLATIVE HISTORY:**

Prior to 1990, DHS did not contract for supplemental drug rebates and each addition to the Medi-Cal drug formulary required a change in regulations. Budget Trailer Bill language established the original contracting authority in 1990. Chapter 716, Statutes of 1992 (SB 1063) extended a January 1, 1993, sunset date to January 1, 1999; Chapter 722, Statutes of 1992 (SB 485) revised the sunset date back

to January 1, 1997. Chapter 197, Statutes of 1996 (AB 3483) extended the sunset date to January 1, 1999. Chapter 310, Statutes of 1998 (AB 2780) extended the sunset date to January 1, 2000. Chapter 146, Statutes of 1999 (AB 1107) extended the sunset date to January 1, 2001. Chapter 93, Statutes of 2000 (AB 2877) extended the sunset date to January 1, 2003.

## PROGRAM BACKGROUND:

The Medi-Cal drug program in DHS maintains the Medi-Cal List of Contract Drugs (List). This outpatient drug List is used by physicians when prescribing medications for FFS Medi-Cal patients. Drugs not specifically listed remain a Medi-Cal benefit subject to prior authorization from a Medi-Cal consultant. State legislation was enacted in 1990, that enabled DHS to contract with drug manufacturers to obtain rebates for drugs dispensed to FFS outpatient Medi-Cal beneficiaries. This rebate program complements, rather than conflicts with the federal Medicaid rebate law. Because of negotiating state supplemental drug rebates, DHS often secures rebates in addition to those required under federal law. Rebates over and above those required to be paid to the State under federal law have been possible due to leverage DHS has with manufacturers regarding drug contracting in exchange for adding their drugs to the List.

## OTHER STATES' INFORMATION:

Florida Medicaid is the only other state Medicaid program with a broad supplemental rebate program.

## FISCAL IMPACT:

There is no fiscal impact if the Medi-Cal drug rebate program sunset date is eliminated. There would, however, be a significant fiscal impact if the drug rebate program were allowed to sunset and DHS could no longer negotiate and collect rebates.

## ECONOMIC IMPACT:

There is no economic impact if the Medi-Cal drug rebate program sunset date is eliminated.

**LEGAL IMPACT:** Unknown.

**APPOINTMENTS:** None.

## SUPPORT/OPPOSITION:

Support: None known.
Opposition: None known.

## ARGUMENTS:

Pro:   Elimination of the drug rebate sunset date avoids the necessity of repeatedly seeking reauthorization every year or two while maintaining the fiscal integrity of this cost-saving program.

Con:  None

## SECTION 63

### ANALYSIS:

This section would delete obsolete language pertaining to new drugs designated as having an important therapeutic gain by the federal Food and Drug Administration (FDA). This section would create a new subset of the List containing preferred prior authorization drugs and would allow DHS to contract for drug rebates on products contained in this new List subset. This section also deletes sunset provisions related to the Medi-Cal drug rebate program (see analysis on the deletion of sunset provisions, Sec. 62).

California State statute contains obsolete language that provides for the immediate inclusion on the Medi-Cal drug formulary of any new drug designated by the FDA as having an "important therapeutic gain." The FDA stopped designating new drugs as having "an important therapeutic gain" in 1992, when the requirements changed to a priority review process. The presence of this language has caused confusion among drug manufacturers about the DHS process for adding new drugs to the List.

This issue received attention last year when Secretary Grantland Johnson received a letter from Senator Bruce McPherson regarding Pharmacia Corporation's new antibiotic Zyvox. In that letter, Senator McPherson questioned why the Legislature has not been notified if DHS believes this section of statute has been "inoperable" since 1992, particularly when the immediate adoption of FDA designated "Priority Review" drugs appears to meet the "intent" of the State law. Therefore, it is likely that if DHS continues to try to maintain the status quo by not proposing a legislative change to §14105.39(c), some remedy will be proposed in the near future that may not be in the best interest of the State or Medi-Cal beneficiaries.

Pharmaceutical manufacturer representatives agree with DHS that Priority Review designated drugs do not necessarily have "important therapeutic gain" or are "break-through" drug therapies. Pharmaceutical manufacturer representatives have agreed to the deletion of this obsolete language, although some manufacturers would still like to see some provision for automatic addition of "break-through" drugs to the List. Additionally, DHS, by policy, completes the analysis of Priority Review drugs within 120 calendar days from the date of drug petition submission.

The creation of a sublist of preferred prior authorization drugs would allow DHS to reduce costs by directing utilization to less costly drugs. There are drugs available only through prior authorization because they have failed to meet one or more of the five review criteria (efficacy, safety, essential need, misuse potential or cost). Many drugs are in the same therapeutic category as other prior authorization drugs and with equivalent therapeutic profiles. In these situations, directing utilization toward the lowest cost item, even under prior authorization, is a fiscally sound decision. Products to be added to this sublist will be compared based on the five criteria to determine if it is appropriate to add one or more to the sublist. In addition, DHS would enter into negotiated contracts with drug manufacturers to increase the rebate for the drug on the sublist.

### LEGISLATIVE HISTORY:

State legislation enacted in 1990 enabled DHS to contract with drug manufacturers to obtain rebates for drugs dispensed to FFS outpatient Medi-Cal beneficiaries. W & I Code §14105.39 (c) was

adopted at this time, but became obsolete in January 1992, when the FDA stopped designating drugs according to their therapeutic potential (e.g., "important therapeutic gain"). Only one drug was ever added to the formulary pursuant to §14105.39(c) and that was on January 1, 1992.

The last revision to the statutes governing the Medi-Cal FFS drug program was the 2001 budget trailer bill, AB 430, which deleted some obsolete sections in the W&I Code. Before that, the 2000 budget trailer bill, AB 2877, extended the sunset provisions authorizing the Medi-Cal drug rebate program until January 2003.

## PROGRAM BACKGROUND:
The Medi-Cal FFS drug program covers all drugs once they become approved for marketing by the FDA either with or without prior authorization. DHS maintains a formulary (List) of drugs that do not require prior authorization. This List is used by physicians when prescribing medications for FFS Medi-Cal beneficiaries. Exclusion of a drug from the List does not preclude its use for Medi-Cal beneficiaries. However, it does mean that the beneficiary's physician or pharmacist must obtain prior authorization from a Medi-Cal field office consultant. Authorization is given if there is adequate medical justification for the drug requested instead of drugs on the List. This prior authorization process is part of DHS's utilization control program that helps keep drug costs in check for the Medi-Cal program. State and federal law require prior authorization requests for drugs to be adjudicated within one business day of receipt from the beneficiary's provider. Medi-Cal consistently meets this mandate.

DHS reviews drugs newly approved by the FDA for inclusion on the Medi-Cal drug formulary. The current process begins when a drug manufacturer requests that DHS review the new drug. Within 60 to 90 days of that request, DHS meets with the drug manufacturer and within 120 to 240 days after the initial request is made, a decision is made on whether to add the new drug to the List or leave it on prior authorization status. New drugs approved by the FDA, which are designated as "priority review", are evaluated by DHS within 120 days of receipt of a manufacturer petition. These time limits have been self-imposed on DHS and are not mandated by any state or federal requirement.

## OTHER STATES' INFORMATION:
Florida Medicaid is the only other state Medicaid program with a broad supplemental rebate program.

## FISCAL IMPACT:
There is no direct fiscal impact associated with the deletion of §14105.39(c). There could, however, be some cost avoidance in the future if litigation is avoided as a result of deleting this language.

The creation of a list of preferred prior authorization drugs would generate additional rebates of approximately $10 million TF ($5 million GF). One additional Pharmaceutical Consultant II Specialist would be required for this new workload.

**ECONOMIC IMPACT:** None known.

**LEGAL IMPACT:** Unknown.

**APPOINTMENTS:** None.

**SUPPORT/OPPOSITION:**

Support: None known.
Opposition: None known.

**ARGUMENTS:**

Pro:
- The proposed change would delete obsolete and confusing State statute and would prevent potential litigation regarding the non-addition of a "priority" reviewed drug.

- The creation of a list of preferred prior authorization drugs would generate additional rebates, thus helping to address the current budget crisis.

Con:
- One additional pharmacy consultant would be needed to implement the preferred prior authorization drug list.

SECTIONS 64,65,66,67,68,69 & 70

**ANALYSIS:**

These sections would eliminate the January 1, 2003, sunset provisions of the Medi-Cal drug rebate program (SEC. 55,56,59,60,62,63,65,66,68,69) and would delete sections of law that become operative due to the January 1, 2003, sunset (SEC. 64,67,75,78,79,80). Several sections contain clean-up language changing Health Care Financing Administration to its new title, Centers for Medicare and Medicaid Services (SEC. 56,59,70).

Budget Trailer Bill language established the Medi-Cal drug rebate program in 1990. Since that time several extensions to the sunset date have been enacted. The most recent extension of the Medi-Cal drug rebate program was enacted in AB 2877 (Chapter 93, Statutes of 2000) for two additional years and is now due to sunset January 1, 2003.

Eliminating the sunset date and related sections would enable DHS to continue to operate the drug rebate program as it has since 1990. The sunset of the Medi-Cal drug rebate program would cause the:
- DHS to lose authority to collect $280 million in rebates greater than the federally-mandated amount;
- Program to revert to a lengthy and burdensome regulatory process for making changes to the Medi-Cal drug formulary.

The elimination of the sunset is consistent with the following provisions of DHS's Strategic Plan: 1) Ensuring fiscal accountability of programs and services; 2) Reforming DHS's administration and program management, including external contracting, into a rational, business-like, and outcome oriented approach.

The Medi-Cal drug rebate program currently generates significant fiscal savings per year in rebates over-and-above the rebates paid to the State under the federal Medicaid drug rebate program. Reauthorization of this program would avoid the loss of these additional drug rebate savings. Without reauthorization, beginning January 1, 2003, current law requires DHS to return to the system in place prior to 1990 in which there was no drug contracting for additional rebates and each addition to the drug formulary required a change in regulations. Neither DHS nor drug manufacturers would like to reinstate the regulatory process as a requirement for drug additions to the Medi-Cal drug formulary. Drug additions through this regulatory process were much slower compared to the current contract negotiation process (18 months average compared to 6 to 9 months). This now obsolete process also resulted in fewer new drug additions (4 to 5 new drug additions per year in 1988 and 1989 compared to 20 to 30 new additions per year from 1996 to 1998), presumably due to cost concerns that are often mitigated through drug rebate contracting.

## LEGISLATIVE HISTORY:

Prior to 1990, DHS did not contract for supplemental drug rebates and each addition to the Medi-Cal drug formulary required a change in regulations. Budget Trailer Bill language established the original contracting authority in 1990. Chapter 716, Statutes of 1992 (SB 1063) extended a January 1, 1993, sunset date to January 1, 1999; Chapter 722, Statutes of 1992 (SB 485) revised the sunset date back to January 1, 1997. Chapter 197, Statutes of 1996 (AB 3483) extended the sunset date to January 1, 1999. Chapter 310, Statutes of 1998 (AB 2780) extended the sunset date to January 1, 2000. Chapter 146, Statutes of 1999 (AB 1107) extended the sunset date to January 1, 2001. Chapter 93, Statutes of 2000 (AB 2877) extended the sunset date to January 1, 2003.

## PROGRAM BACKGROUND:

The Medi-Cal drug program in DHS maintains the Medi-Cal List of Contract Drugs (List). This outpatient drug List is used by physicians when prescribing medications for FFS Medi-Cal patients. Drugs not specifically listed remain a Medi-Cal benefit subject to prior authorization from a Medi-Cal consultant. State legislation was enacted in 1990, that enabled DHS to contract with drug manufacturers to obtain rebates for drugs dispensed to FFS outpatient Medi-Cal beneficiaries. This rebate program complements, rather than conflicts with the federal Medicaid rebate law. Because of negotiating state supplemental rebates, DHS often secures rebates in addition to those required under federal law. Rebates over and above those required to be paid to the State under federal law have been possible due to leverage DHS has with manufacturers regarding drug contracting in exchange for adding their drugs to the List.

## OTHER STATES' INFORMATION:
Florida Medicaid is the only other state Medicaid program with a broad supplemental drug rebate program.

**FISCAL IMPACT:**

There is no fiscal impact if the Medi-Cal drug rebate program sunset date is eliminated.  There would, however, be a significant fiscal impact if the drug rebate program were allowed to sunset and DHS could no longer negotiate and collect rebates.

**ECONOMIC IMPACT:**

There is no economic impact if the Medi-Cal drug rebate program sunset date is eliminated.

**LEGAL IMPACT:**  Unknown.

**APPOINTMENTS:**  None.

**SUPPORT/OPPOSITION:**

Support: None known.
Opposition: None known.

**ARGUMENTS:**

Pro:  Elimination of the drug rebate sunset date avoids the necessity of repeatedly seeking reauthorization every year or two while maintaining the fiscal integrity of this cost-saving program.

Con:  None

## SECTION 71

**ANALYSIS:**

This section would require manufacturers to contract with DHS for drug rebates for their AIDS and cancer drugs.  The rebate period would retroactively begin on July 1, 2002, and end June 30, 2005. It would also allow DHS to take administrative actions if drug rebate contracts were not in place by February 1, 2003.

When AIDS and cancer drugs are added to the List automatically, they bypass the evaluation of the cost criterion used for other drugs evaluated for addition to the List.  AIDS and cancer drugs are some of the most expensive (per prescription) drugs reimbursed in the Medi-Cal program.  Annual expenditures in the drug program for AIDS drugs equal approximately $127 million TF and for cancer drugs approximately $34 million TF.  As a budget reduction measure, this section would require that the manufacturers of AIDS and cancer drugs added to the List pay a rebate to the Medi-Cal program.

DHS will negotiate the level of rebate with each manufacturer and execute a contract requiring the rebate be paid for the period beginning July 1, 2002, and ending June 30, 2005.  DHS anticipates having all of the necessary contracts in place by February 1, 2003.  Pharmacist consultants obtained for other drug contracting functions will be used for these negotiations.

Enrolled Bill Report

**LEGISLATIVE HISTORY:**
Prior to 1990, DHS did not contract for supplemental rebates and each addition to the Medi-Cal drug formulary required a change in regulations. Budget Trailer language established the original contracting authority in 1990. Chapter 716, Statutes of 1992 (SB 1063) extended a January 1, 1993, sunset date to January 1, 1999; Chapter 722, Statutes of 1992 (SB 485) revised the sunset date back to January 1, 1997. Chapter 197, Statutes of 1996 (AB 3483) extended the sunset date to January 1, 1999. Chapter 310, Statutes of 1998 (AB 2780) extended the sunset date to January 1, 2000. Chapter 146, Statutes of 1999 (AB 1107) extended the sunset date to January 1, 2001. Chapter 93, Statutes of 2000 (AB 2877) extended the sunset date to January 1, 2003.

**PROGRAM BACKGROUND:**
The Medi-Cal drug program in DHS maintains the outpatient drug List. This List is used by physicians when prescribing medications for FFS Medi-Cal patients. Drugs not specifically listed remain a Medi-Cal benefit subject to prior authorization from a Medi-Cal consultant. State legislation was enacted in 1990, that enabled DHS to contract with drug manufacturers to obtain rebates for drugs dispensed to FFS outpatient Medi-Cal beneficiaries. This rebate program complements, rather than conflicts with the federal Medicaid rebate law. Because of negotiating state supplemental rebates, DHS often secures rebates in addition to those required under federal law. Rebates over and above those required to be paid to the State under federal law have been possible due to leverage DHS has with manufacturers regarding drug contracting in exchange for adding their drugs to the List.

Prior to 1990, legislation was enacted that required DHS to add to the List those all drugs approved by the FDA for the treatment of cancer and AIDS. At that time, legislation was also enacted that specifically exempted the cancer and AIDS drugs from the mandated requirement of contracting with manufacturers prior to the addition of new drugs to the List. As a result, DHS does not contract for or otherwise obtain any State supplemental rebates for drugs added to the List pursuant to the cancer or AIDS drug statutes.

**OTHER STATES' INFORMATION:** None.

**FISCAL IMPACT:**
DHS estimates that it will be able to save $14.094 million TF ($7.047 million GF) by contracting for drug rebates on AIDS and cancer drugs.

**ECONOMIC IMPACT:** None.

**LEGAL IMPACT:** Unknown.

**APPOINTMENTS:** None.

**SUPPORT/OPPOSITION:**

Support: None known.
Opposition: None known.

## ARGUMENTS:

Pros:
- DHS would be able to save additional GF dollars by contracting for supplemental drug rebates on AIDS and cancer drugs, thus contributing to the solution for the current budget crisis.

Cons: None.


## SECTION 72

### ANALYSIS:

This section would change the reference price used to establish Maximum Allowable Ingredient Cost (MAIC) prices for generic drugs from the current AWP minus five percent to a Wholesale Selling Price (WSP). This section would also require DHS to update these prices at least every 2 months.

Medi-Cal reimbursement to pharmacies is comprised of two components, drug ingredient cost and a professional fee, often called the dispensing fee. Current reimbursement of ingredient cost is estimated using the lowest of: 1) AWP minus 5% (AWP-5%), 2) the direct price (DP) (for 11 specific manufacturers), 3) federal acquisition cost (price is set by the Centers for Medicare and Medicaid Services) or 4) the MAIC (price set by Medi-Cal). The overall effective rate for drug ingredient cost reimbursement is currently AWP-14%. The professional fee is $4.05.

The MAIC is the maximum drug ingredient cost, set by Medi-Cal, which pharmacies are reimbursed for various generic drugs. The federal government authorizes states to use MAIC programs to address the wide variation in the price of generic drugs. For example, there could be 5 different manufacturers of the same generic drug and price might vary considerably between the manufacturers.

In the Medi-Cal program, based on existing state statute, MAIC is set using the AWP-5% price of a reference generic drug that is generically equivalent to the innovator brand. A company must manufacture the reference drug with production capability to meet the statewide needs of the Medi-Cal Program for that particular drug. For example, Acetaminophen with Codeine #3 is generically equivalent to the brand name Tylenol with Codeine #3. Medi-Cal has determined that the product made by Purepac Pharmaceutical is the reference drug based on its AWP-5% price (34-cents per tablet) and production availability. This sets Medi-Cal's maximum ingredient cost reimbursement for all drugs generically equivalent to Purepac's product (including brand name Tylenol with Codeine) at 34-cents.

This section would change the existing methodology for establishing MAIC from AWP-5% to a new methodology that is based on the WSP. The proposed statute defines WSP as the price, including discounts and rebates, paid by a pharmacy to a wholesale drug distributor for a drug. DHS would base a MAIC on the average of the WSP of generically equivalent drugs that are available in

California from major wholesale drug distributors.  This section would also require DHS to review and update a MAIC at least every two months if necessary.

## LEGISLATIVE HISTORY:

Prior to 1990, DHS did not contract for supplemental rebates and each addition to the Medi-Cal drug formulary required a change in regulations.  Budget Trailer language established the original contracting authority in 1990.  Chapter 716, Statutes of 1992 (SB 1063) extended a January 1, 1993, sunset date to January 1, 1999; Chapter 722, Statutes of 1992 (SB 485) revised the sunset date back to January 1, 1997.  Chapter 197, Statutes of 1996 (AB 3483) extended the sunset date to January 1, 1999.  Chapter 310, Statutes of 1998 (AB 2780) extended the sunset date to January 1, 2000.  Chapter 146, Statutes of 1999 (AB 1107) extended the sunset date to January 1, 2001.  Chapter 93, Statutes of 2000 (AB 2877) extended the sunset date to January 1, 2003.

MAIC rate setting was removed from regulation by the Budget Trailer Bill language that established the original contracting authority in 1990.

## PROGRAM BACKGROUND:

The Medi-Cal drug program in DHS maintains the outpatient drug List.  This List is used by physicians when prescribing medications for FFS Medi-Cal patients.  Drugs not specifically listed remain a Medi-Cal benefit subject to prior authorization from a Medi-Cal consultant.  State legislation was enacted in 1990, that enabled DHS to contract with drug manufacturers to obtain rebates for drugs dispensed to FFS outpatient Medi-Cal beneficiaries.  This rebate program complements, rather than conflicts with the federal Medicaid rebate law.  Because of negotiating state supplemental rebates, DHS often secures rebates in addition to those required under federal law.  Rebates over and above those required to be paid to the State under federal law have been possible due to leverage DHS has with manufacturers regarding drug contracting in exchange for adding their drugs to the List.

## OTHER STATES' INFORMATION:
Most state Medicaid programs use an MAIC program.  None of these programs use the proposed WSP mechanism.

## FISCAL IMPACT:
The change to WSP would enable DHS to save $10 million TF ($5 million GF) through reduced provider reimbursement.

## ECONOMIC IMPACT:

There would be a negative economic impact on pharmacy providers through reduced reimbursement.  The extent of the impact is unknown.

## LEGAL IMPACT:  Unknown.

## APPOINTMENTS:  None.

## SUPPORT/OPPOSITION

Support: None known.
Opposition: None known.

## ARGUMENTS:

Pros:    Would help reach projected budget reductions.

Cons:    Some providers may opt out of the Medi-Cal program due to the reduction in reimbursement, regardless of the extent of the economic impact.

## SECTION 73

ANALYSIS:

This section would change the Estimated Acquisition Cost (EAC) of drugs from AWP minus five percent to AWP minus ten percent and would eliminate the use of direct price (DP) in the calculation of EAC. In addition, for drugs that have a federal acquisition cost (FAC) and/or an MAIC, that FAC/MAIC would be applied to both generic drugs and the brand name drug. Thus, DHS would use the lower of the EAC, FAC or MAIC to calculate the reimbursement for each drug. Finally, this section would change the reimbursement of over-the-counter (OTC) drugs from EAC plus a 50 percent markup to EAC plus a professional fee.

Medi-Cal reimbursement to pharmacies is comprised of two components, drug ingredient cost and a professional fee, often called the dispensing fee. Current reimbursement of ingredient cost is estimated using the lowest of: 1) the EAC, AWP minus 5% (AWP-5%), 2) the DP (for 11 specific manufacturers), 3) FAC (price is set by the Centers for Medicare and Medicaid Services) or 4) the MAIC (price set by Medi-Cal). The overall effective rate for drug ingredient cost reimbursement is currently AWP-14%. The professional fee is $4.05.

The DP component has been a long-standing issue with pharmacy providers. Most providers are unable to purchase drugs directly from the specified manufacturer due to the purchasing volume requirements imposed by the manufacturer. Providers must buy from drug wholesalers at a price that is often above the DP, thus taking a loss when filling a Medi-Cal prescription. Medi-Cal is the only third-party payer that uses the DP for reimbursement. DP is an outdated reimbursement concept and should be eliminated from the ingredient cost calculation.

It is often noted that Medi-Cal's rate of AWP-5% is higher than other third-party payers, both in the private and public sectors. Various reviews of pharmacy purchasing indicate that brand name drugs are purchased at approximately AWP-15% to 17% and generic drugs can be purchased at AWP-40% to 50%. With this in mind, the original May Revision proposed deep cuts in the ingredient cost rate to AWP-10% for brand drugs and AWP-40% for generic drugs. This type of change, however, does not take into account the overall reimbursement (professional fee) rate. The pharmacy industry has indicated that the average cost of dispensing a prescription, in California, ranges from $6 to $10. Arkansas Medicaid's rate study concluded that the cost of dispensing a prescription in Arkansas is

$5.08.  Considering the significantly higher cost of doing business in California, a $6 to $10 per prescription estimate is very realistic.  These costs are significantly higher than Medi-Cal's current professional fee of $4.05.

Pharmacy providers have relied on the margin between acquisition cost and the Medi-Cal ingredient cost reimbursement rate to account for the difference in the actual cost of dispensing a prescription and the Medi-Cal rate of $4.05.

The California Pharmacists Association (CPhA) contends that pharmacy providers will be unable to provide prescription services Medi-Cal beneficiaries of the rate proposed in the original May Revision; in some cases, forcing independent pharmacies (non-chain) in areas of high Medi-Cal enrollment out of business.  This reduction in pharmacy providers would create access problems for the Medi-Cal beneficiary.  CPhA believes that this proposal coupled with the implementation of a broader MAIC program and a reinstatement of the 50-cent claim reduction are cuts that the pharmacy provider community will be unable to bear.  In recognition of CPhA's contentions, the DHS modified the original May revision proposal to AWP-10% for all drugs.

Additionally this section would change the reimbursement of OTC drugs from a 50 percent markup to a dispensing fee of $4.05 per prescription.  In Medi-Cal, OTC drugs are handled the same as prescription drugs in that they require a prescription from a licensed prescriber.

DHS conducted, through a contractor, a pharmacy reimbursement rate study (see SEC. 1 analysis).  Due on July 1, 2002, this study was released on August 23, 2002.

## LEGISLATIVE HISTORY:

Prior to 1990, DHS did not contract for supplemental drug rebates and each addition to the Medi-Cal drug formulary required a change in regulations.  Budget Trailer language established the original contracting authority in 1990.  Chapter 716, Statutes of 1992 (SB 1063) extended a January 1, 1993, sunset date to January 1, 1999; Chapter 722, Statutes of 1992 (SB 485) revised the sunset date back to January 1, 1997.  Chapter 197, Statutes of 1996 (AB 3483) extended the sunset date to January 1, 1999.  Chapter 310, Statutes of 1998 (AB 2780) extended the sunset date to January 1, 2000.  Chapter 146, Statutes of 1999 (AB 1107) extended the sunset date to January 1, 2001.   Chapter 93, Statutes of 2000 (AB 2877) extended the sunset date to January 1, 2003.

EAC is currently defined in California Code of Regulations §51513.

SB 393, Chapter 946, Statutes of 1999, required the DHS to conduct the pharmacy reimbursement rate study.  SB 696, Chapter 693, Statutes of 2001 (SEC. 1) added the July 1, 2002 reporting date.

## PROGRAM BACKGROUND:

The Medi-Cal drug program in DHS maintains the outpatient drug List.  This List is used by physicians when prescribing medications for FFS Medi-Cal patients.  Drugs not specifically listed remain a Medi-Cal benefit subject to prior authorization from a Medi-Cal consultant.  State legislation was enacted in 1990, which enabled DHS to contract with drug manufacturers to obtain rebates for

drugs dispensed to FFS outpatient Medi-Cal beneficiaries.  This rebate program complements, rather than conflicts with the federal Medicaid rebate law.  Because of negotiating state supplemental rebates, DHS often secures rebates in addition to those required under federal law.  Rebates over and above those required to be paid to the State under federal law have been possible due to leverage DHS has with manufacturers regarding drug contracting in exchange for adding their drugs to the List.

## OTHER STATES' INFORMATION:

According to the Senate Office of Research, only one other state reimburses at AWP minus five, Alaska.  About 22 states reimburse pharmacies between AWP minus 11 percent to minus 15 percent for brand name drugs and substantially lower than that for generic drugs.

## FISCAL IMPACT:

The change to AWP minus 10 will enable DHS to save $ 20 million TF ($ 10 million GF) through reduced provider reimbursement.

## ECONOMIC IMPACT:

There would be a negative economic impact on pharmacy providers through reduced reimbursement. The extent of the impact is unknown.

**LEGAL IMPACT:**  Unknown.

**APPOINTMENTS:**  None.

## SUPPORT/OPPOSITION:

Support:  None known.
Opposition:   California Pharmacist Association
California Retailers Association
National Association of Chain Drug Stores

## ARGUMENTS:

Pros:     Would help reach projected budget reductions.

Cons:     Some providers may opt out of the Medi-Cal program due to the reduction in reimbursement, regardless of the extent of the economic impact.


## SECTION 74

## ANALYSIS:

This section would remove the list of medical supplies covered by Medi-Cal from regulation.  It would establish that DHS may place utilization controls on medical supplies and must notify providers at least 30 days before the effective date of the utilization control.  This section would also remove the Maximum Allowable Product Cost (MAPC) process from regulation and would establish the general

process DHS would use in creating MAPC prices for medical supplies to ensure beneficiary access to medically necessary medical supply products.

Maintenance of the medical supply list through the regulatory process is cumbersome and unresponsive to a rapidly changing medical treatment environment. DHS has to be able to react to these changes in order to provide beneficiaries with medically needed supplies. Additionally, when abuses of the system occur, DHS needs to be able to react swiftly with utilization controls. This section would remove the medical supply list from the regulatory process, thus giving DHS the ability to make changes as quickly as possible.

In addition, this section would remove the MAPC rate setting from the regulatory process. The costs of drugs and medical supplies are very dynamic and DHS needs the ability to quickly change reimbursement in order to keep expenditures in check while maintaining beneficiary access to needed medical supplies. This section would base the MAPC on the wholesale selling price (WSP). The proposed statute defines WSP as the price, including discounts and rebates, paid by a provider to a wholesaler, manufacturer or distributor for a medical supply product. DHS would base a MAPC on the average of the WSP of related medical supply products that are available in California from major wholesale medical supply distributors. This section would require DHS to consult with providers when reviewing products for addition or removal from the list and when setting a MAPC. DHS would also be required to notify providers 30-day in advance of any change.

## LEGISLATIVE HISTORY:

Medical supplies were added as a benefit of the program in 1976. Federal Medicaid law classifies medical supplies as an optional benefit. California Code of Regulations, Title 22, §51320 lists medical supplies as a benefit when prescribed by a physician. California law lists medical supplies as a benefit in the W&I Codes §14132(m).

## PROGRAM BACKGROUND:

The Medi-Cal drug program in DHS maintains the list of medical supplies. This outpatient medical supply list is used by physicians when prescribing medical supplies for FFS Medi-Cal patients. Medical supply providers include pharmacies and licensed medical supply dealers.

## OTHER STATES' INFORMATION: None.

## FISCAL IMPACT:

Removing the medical supply list from regulations will reduce expenditures by $4 million TF ($ 2 million GF). Revised MAPC methodology will generate savings of $9 million TF ($4.5 million GF).

## ECONOMIC IMPACT:

There would be a negative economic impact on providers through reduced reimbursement (MAPC); however, DHS believes that it will not affect provider participation in the Medi-Cal program.

LEGAL IMPACT: Unknown.

APPOINTMENTS: None.

SUPPORT/OPPOSITION:

Support: None known.

Opposition:  None known.

ARGUMENTS:

Pros:  Would help reach projected budget reductions.

Cons: None


SECTION 75

ANALYSIS:

These sections would eliminate the January 1, 2003, sunset provisions of the Medi-Cal drug rebate program (SEC. 55,56,59,60,62,63,65,66,68,69) and would delete sections of law that become operative due to the January 1, 2003, sunset (SEC. 64,67,75,78,79,80). Several sections contain clean-up language changing Health Care Financing Administration to its new title, Centers for Medicare and Medicaid Services (SEC. 56,59,70).

Budget Trailer Bill language established the Medi-Cal drug rebate program in 1990.  Since that time several extensions to the sunset date have been enacted.  The most recent extension of the Medi-Cal drug rebate program was enacted in AB 2877 (Chapter 93, Statutes of 2000) for two additional years and is now due to sunset January 1, 2003.

Eliminating the sunset date and related sections would enable DHS to continue to operate the drug rebate program as it has since 1990.  The sunset of the Medi-Cal drug rebate program would cause the:

- DHS to lose authority to collect $280 million in rebates greater than the federally-mandated amount;
- Program to revert to a lengthy and burdensome regulatory process for making changes to the Medi-Cal drug formulary.

The elimination of the sunset is consistent with the following provisions of DHS's Strategic Plan: 1) Ensuring fiscal accountability of programs and services; 2) Reforming DHS's administration and program management, including external contracting, into a rational, business-like, and outcome oriented approach.

The Medi Cal drug rebate program currently generates significant fiscal savings per year in rebates over-and-above the rebates paid to the State under the federal Medicaid drug rebate program. Reauthorization of this program would avoid the loss of these additional drug rebate savings. Without reauthorization, beginning January 1, 2003, current law requires DHS to return to the system in place prior to 1990 in which there was no drug contracting for additional rebates and each addition to the drug formulary required a change in regulations. Neither DHS nor drug manufacturers would like to reinstate the regulatory process as a requirement for drug additions to the Medi-Cal drug formulary. Drug additions through this regulatory process were much slower compared to the current contract negotiation process (18 months average compared to 6 to 9 months). This now obsolete process also resulted in fewer new drug additions (4 to 5 new drug additions per year in 1988 and 1989 compared to 20 to 30 new additions per year from 1996 to 1998), presumably due to cost concerns that are often mitigated through drug rebate contracting.

## LEGISLATIVE HISTORY:

Prior to 1990, DHS did not contract for supplemental rebates and each addition to the Medi-Cal drug formulary required a change in regulations. Budget Trailer Bill language established the original contracting authority in 1990. Chapter 716, Statutes of 1992 (SB 1063) extended a January 1, 1993, sunset date to January 1, 1999; Chapter 722, Statutes of 1992 (SB 485) revised the sunset date back to January 1, 1997. Chapter 197, Statutes of 1996 (AB 3483) extended the sunset date to January 1, 1999. Chapter 310, Statutes of 1998 (AB 2780) extended the sunset date to January 1, 2000. Chapter 146, Statutes of 1999 (AB 1107) extended the sunset date to January 1, 2001. Chapter 93, Statutes of 2000 (AB 2877) extended the sunset date to January 1, 2003.

## PROGRAM BACKGROUND:

The Medi-Cal drug program in DHS maintains the Medi-Cal List of Contract Drugs (List). This outpatient drug List is used by physicians when prescribing medications for FFS Medi-Cal patients. Drugs not specifically listed remain a Medi-Cal benefit subject to prior authorization from a Medi-Cal consultant. State legislation was enacted in 1990, that enabled DHS to contract with drug manufacturers to obtain rebates for drugs dispensed to FFS outpatient Medi-Cal beneficiaries. This rebate program complements, rather than conflicts with the federal Medicaid rebate law. Because of negotiating state supplemental rebates, DHS often secures rebates in addition to those required under federal law. Rebates over and above those required to be paid to the State under federal law have been possible due to leverage DHS has with manufacturers regarding drug contracting in exchange for adding their drugs to the List.

## OTHER STATES' INFORMATION:

Florida Medicaid is the only other state Medicaid program with a broad supplemental rebate program.

## FISCAL IMPACT:

There is no fiscal impact if the Medi-Cal drug rebate program sunset date is eliminated. There would, however, be a significant fiscal impact if the drug rebate program were allowed to sunset and DHS could no longer negotiate and collect rebates.

## ECONOMIC IMPACT:

There is no economic impact if the Medi-Cal drug rebate program sunset date is eliminated.

## LEGAL IMPACT: Unknown.

## APPOINTMENTS: None.

## SUPPORT/OPPOSITION:

Support: None known.
Opposition: None known.

## ARGUMENTS:

Pro:   Elimination of the drug rebate sunset date avoids the necessity of repeatedly seeking
       reauthorization every year or two while maintaining the fiscal integrity of this cost-saving
       program.

Con: None

## SECTIONS 76 and 77

## ANALYSIS:

SEC. 76 would establish the Medi-Cal list of enteral formulae, available through prior authorization.
DHS would be able to designate enteral formulae that are without a contract as non-benefits of the
program. This section would also establish the types of enteral formulae that would be considered for
inclusion on the list, beneficiary access to continuing care, and notification requirements when enteral
formulae are deleted from the list. Additionally, this section establishes the general account
receivable and interest penalty process to be used for rebates owed by manufacturers of the enteral
formulae on the list.

The Medi-Cal program, for decades, has covered enteral nutritional products as part of a therapeutic
regimen to prevent serious disability or death in patients with medically diagnosed conditions that
preclude the full use of regular food. This benefit has never clearly been defined in law and therefore
confusion over the type of enteral formulae covered can occur. The creation of a list of enteral
formulae would help end the confusion, by clearly listing those products that DHS has determined are
benefits of the program through prior authorization.

The intent of DHS is to continue covering medically necessary products. Beneficiary protections such
as continuing care and notification prior to deletion of a product are in this section. Additionally, this
section would give DHS the authority to contract with manufacturers of enteral formulae for rebates
as a mechanism to reduce spending.

SEC. 77 would change the reimbursement rate on enteral formulae from estimated acquisition cost (different from drug EAC) plus a 50 percent markup to a percentage markup to be determined in consultation with the provider community. When analyzing the data, it is clear that a 50 percent markup is excessive (the average markup is over $100 per claim) and a reduction in the rate is needed. In order to set the rate at the most appropriate level, SEC. 77 requires DHS to work with providers in the rate setting process.

**LEGISLATIVE HISTORY:**  None.

**PROGRAM BACKGROUND:**

The Medi-Cal drug program in DHS is responsible for the policies on enteral nutrition. Currently, there are no laws or regulations regarding, the structure of this benefit. Enteral formulae are approved through the prior authorization process. Individual consultants currently make the decision of whether or not an enteral formulae is a benefit and meets the medical need of the beneficiary.

**OTHER STATES' INFORMATION:**  None known.

**FISCAL IMPACT:**
SEC 76 contracting for enteral formulae manufacturer rebates would save $18.138 million TF ($9.069 million GF).

SEC 77 change in reimbursement rates for enteral formulae would save $21.262 million TF ($10.631 million GF) in reduced provider reimbursement.

**ECONOMIC IMPACT:**

There could be a negative economic impact on providers through reduced reimbursement; however, DHS believes that it will not affect provider participation.

**LEGAL IMPACT:**  Unknown.

**APPOINTMENTS:**  None.

**SUPPORT/OPPOSITION:**

Support: None known.
Opposition:  None known.

**ARGUMENTS:**

Pros:  Would help reach projected budget reductions, while maintaining beneficiary access to medically necessary enteral formula products.

Cons:  None

## SECTIONS 78, 79 & 80

### ANALYSIS:

These sections would eliminate the January 1, 2003, sunset provisions of the Medi-Cal drug rebate program (SEC. 55,56,59,60,62,63,65,66,68,69) and would delete sections of law that become operative due to the January 1, 2003, sunset (SEC. 64,67,75,78,79,80). Several sections contain clean-up language changing Health Care Financing Administration to its new title, Centers for Medicare and Medicaid Services (SEC. 56,59,70).

Budget Trailer Bill language established the Medi-Cal drug rebate program in 1990. Since that time several extensions to the sunset date have been enacted. The most recent extension of the Medi-Cal drug rebate program was enacted in AB 2877 (Chapter 93, Statutes of 2000) for two additional years and is now due to sunset January 1, 2003.

Eliminating the sunset date and related sections would enable DHS to continue to operate the drug rebate program as it has since 1990. The sunset of the Medi-Cal drug rebate program would cause the:

- DHS to lose authority to collect $280 million in rebates greater than the federally-mandated amount;
- Program to revert to a lengthy and burdensome regulatory process for making changes to the Medi-Cal drug formulary.

The elimination of the sunset is consistent with the following provisions of DHS's Strategic Plan: 1) Ensuring fiscal accountability of programs and services; 2) Reforming DHS's administration and program management, including external contracting, into a rational, business-like, and outcome oriented approach.

The Medi-Cal drug rebate program currently generates significant fiscal savings per year in rebates over-and-above the rebates paid to the State under the federal Medicaid drug rebate program. Reauthorization of this program would avoid the loss of these additional drug rebate savings. Without reauthorization, beginning January 1, 2003, current law requires DHS to return to the system in place prior to 1990 in which there was no drug contracting for additional rebates and each addition to the drug formulary required a change in regulations. Neither DHS nor drug manufacturers would like to reinstate the regulatory process as a requirement for drug additions to the Medi-Cal drug formulary. Drug additions through this regulatory process were much slower compared to the current contract negotiation process (18 months average compared to 6 to 9 months). This now obsolete process also resulted in fewer new drug additions (4 to 5 new drug additions per year in 1988 and 1989 compared to 20 to 30 new additions per year from 1996 to 1998), presumably due to cost concerns that are often mitigated through drug rebate contracting.

### LEGISLATIVE HISTORY:

Prior to 1990, DHS did not contract for supplemental drug rebates and each addition to the Medi-Cal drug formulary required a change in regulations. Budget Trailer Bill language established the original contracting authority in 1990. Chapter 716, Statutes of 1992 (SB 1063) extended a January 1, 1993,

sunset date to January 1, 1999; Chapter 722, Statutes of 1992 (SB 485) revised the sunset date back to January 1, 1997. Chapter 197, Statutes of 1996 (AB 3483) extended the sunset date to January 1, 1999. Chapter 310, Statutes of 1998 (AB 2780) extended the sunset date to January 1, 2000. Chapter 146, Statutes of 1999 (AB 1107) extended the sunset date to January 1, 2001. Chapter 93, Statutes of 2000 (AB 2877) extended the sunset date to January 1, 2003.

**PROGRAM BACKGROUND:**
The Medi-Cal drug program in DHS maintains the Medi-Cal List of Contract Drugs (List). This outpatient drug List is used by physicians when prescribing medications for FFS Medi-Cal patients. Drugs not specifically listed remain a Medi-Cal benefit subject to prior authorization from a Medi-Cal consultant. State legislation was enacted in 1990, that enabled DHS to contract with drug manufacturers to obtain rebates for drugs dispensed to FFS outpatient Medi-Cal beneficiaries. This rebate program complements, rather than conflicts with the federal Medicaid rebate law. Because of negotiating state supplemental rebates, DHS often secures rebates in addition to those required under federal law. Rebates over and above those required to be paid to the State under federal law have been possible due to leverage DHS has with manufacturers regarding drug contracting in exchange for adding their drugs to the List.

**OTHER STATES' INFORMATION:**
Florida Medicaid is the only other state Medicaid program with a broad supplemental rebate program.

**FISCAL IMPACT:**
There is no fiscal impact if the Medi-Cal drug rebate program sunset date is eliminated. There would, however, be a significant fiscal impact if the drug rebate program were allowed to sunset and DHS could no longer negotiate and collect rebates.

**ECONOMIC IMPACT:**
There is no economic impact if the Medi-Cal drug rebate program sunset date is eliminated.

**LEGAL IMPACT:** Unknown.

**APPOINTMENTS:** None.

**SUPPORT/OPPOSITION:**

Support: None known.
Opposition: None known.

**ARGUMENTS:**

Pro:  Elimination of the drug rebate sunset date avoids the necessity of repeatedly seeking reauthorization every year or two while maintaining the fiscal integrity of this cost-saving program.

Con:  None

Enrolled Bill Report

Author: Committee on Budget

## SECTION 81

**ANALYSIS:**

This section reduces the reimbursement for incontinence medical supplies in Medi-Cal from a 40 percent markup to a 38 percent markup. This markup occurs on a reference price established through contracting between DHS and incontinence medical supply manufacturers.

Providers of medical supplies recommended this reduction in combination with a reduction in general medical supply reimbursement and a change in diabetic testing supplies reimbursement as an alternative to significantly reducing reimbursement on incontinence medical supplies. Providers contend that they are better able absorb broad-based reductions than reductions focused on one product category. Annual expenditures for incontinence medical supplies equal $90 million TF.

**LEGISLATIVE HISTORY:**

Medical supplies were added as a benefit of the program in 1976. Federal Medicaid law classifies medical supplies as an optional benefit.  SB 718 (Chapter 813, Statutes 1994) established the reimbursement of incontinence medical supplies at cost plus a 40 percent markup.

**PROGRAM BACKGROUND:**

The Medi-Cal drug program in DHS maintains the list of incontinence medical supplies.  This list is used by physicians when prescribing incontinence medical supplies for FFS Medi-Cal patients. Incontinence supply providers include pharmacies and licensed medical supply dealers.  Incontinence supplies include adult diapers and pads, creams and washes.

**OTHER STATES' INFORMATION:** None.

**FISCAL IMPACT:**

Expenditures on incontinence medical supplies equal approximately $90 million TF.  A two percent reduction in the markup from 40 percent to 38 percent would save $1.3 million TF ($0.650 million GF).

**ECONOMIC IMPACT:**

There could be a negative economic impact on providers through reduced reimbursement; however, DHS believes that it will not affect provider participation.

**LEGAL IMPACT:**  Unknown.

**APPOINTMENTS:**  None.

**SUPPORT/OPPOSITION:**

Support: None known.
Opposition:   None known.

Enrolled Bill Report                                              Author: Committee on Budget

## ARGUMENTS:

Pros: Would help reach projected budget reductions, while maintaining beneficiary access to incontinence supplies.

Cons: None

### SECTION 83

## ANALYSIS:

This section would establish enteral formulae as a benefit of the Medi-Cal program subject to utilization controls. This was a general oversight in the law. Enteral formulae have been a benefit of Medi-Cal for decades. This language codifies current policy.

This section also establishes diabetic testing supplies as a benefit only when dispensed by a pharmacy provider. As part of the compromise with providers on medical and incontinence supply reimbursement changes, providers offered this change as an alternative. Most diabetic testing supplies are dispensed through pharmacies; therefore this change will not have an effect on beneficiary access.

Finally, the section also includes "clean-up" language to change the title of the Health Care Financing Administration to its new title of Centers for Medicare and Medicaid Services.

## LEGISLATIVE HISTORY: None.

## PROGRAM BACKGROUND:

The Medi-Cal drug program in DHS is responsible for the policies on enteral nutrition. Currently, there are no laws or regulations regarding, the structure of this benefit. Enteral formulae are approved through the prior authorization process. Individual consultants currently make the decision of whether or not an enteral formulae is a benefit and meets the medical need of the beneficiary.

The Medi-Cal drug program in DHS maintains the list of medical supplies, which include diabetic testing supplies. This outpatient medical supply list is used by physicians when prescribing medical supplies for FFS Medi-Cal patients. Medical supply providers include pharmacies and licensed medical supply dealers.

## OTHER STATES' INFORMATION: None.

## FISCAL IMPACT: None.

## ECONOMIC IMPACT: None.

## LEGAL IMPACT: Unknown.

APPOINTMENTS: None.

SUPPORT/OPPOSITION:

Support: None known.
Opposition: None known.

ARGUMENTS:

Pros: By requiring all diabetic testing supplies to be dispensed through pharmacies, DHS would be able to maximize the savings projected by changing the reimbursement to pharmacies and including a flat dispensing fee (see analysis of SEC. 53.5).

Cons: None

## SECTION 84

ANALYSIS:

Assisted Living is defined loosely as an array of medical, social and supportive services which enable an individual to remain in the community when, without additional services, the individual would require in-patient nursing facility services. No federal definition of Assisted Living exists, other than an optional list of services, which may or may not be chosen by States to be included in a federal waiver application. California has no statutory or regulatory definition of Assisted Living. Currently, providers who advertise as Assisted Living facilities in California are licensed by the Department of Social Services/Community Care Licensing (CCL) as Residential Care for the Elderly (RCFE). RCFEs are non-medical, board and care facilities, which range from small home-like settings to large multi-floor, apartment complexes. All are required by CCL regulations to provide care and supervision to residents. Medical services are not included in the required care and supervision. Payments to providers are made directly by the residents and can range from $1,000 to over $3,000 per month, depending on amenities. Currently, low-income residents who are Medi-Cal eligible and who have medical needs beyond the capability of the RCFE to provide must consider in-patient nursing facility care.

AB 499 (Aroner), Statutes of 2000, added Welfare and Institutions Code Section 14132.26, which requires DHS to develop a pilot project to test the efficacy of providing an Assisted Living benefit under the Medi-Cal program. Section 1915 (c) of the Social Security Act requires that HCBS waiver benefits be cost neutral as compared to the cost of providing the same individual with inpatient nursing facility services. The original bill language prohibited DHS from implementing the pilot project if it would result in additional costs to the State General Fund, which is a stricter standard than federal requirements for cost neutrality.

Proposed amendments to W&I Code Section 14132.26(i) and (j) bring requirements for cost neutrality for a Medi-Cal Assisted Living waiver benefit into conformity with federal requirements. Amendments further require implementation of the Assisted Living pilot project only if there is funding for that purpose.

## LEGISLATIVE HISTORY:

AB 499 (Aroner, Chapter 557, Statutes of 2000) established the requirement for DHS to develop a pilot project to test the efficacy of Assisted Living as a Medi-Cal benefit.

## PROGRAM BACKGROUND:

Subsequent to the enrollment of AB 499 and the chaptering of W&I section 14132.26, DHS convened a series of large stakeholder meetings to gather public input on the development of Assisted Living as a Medi-Cal benefit. Fiscal analysis revealed that implementation of the pilot project would require additional costs to the State General fund for oversight and quality assurance.

Proposed amendments to W&I section 14132.26 will bring cost neutrality requirements for the Assisted Living pilot project into conformance with federal standards for other HCBS waivers implemented by DHS.

## OTHER STATES' INFORMATION:

Thirty-seven other States have implemented some form of Assisted Living under their Medicaid programs. Other States use State Plan services and/or waivers of choice and/or comparability under Sections 1915 (c) and/or (b) of the Social Security Act.

## FISCAL IMPACT:

No money or staff was put in the budget for this section of the Trailer Bill. There is no change from the way AB 499 will be implemented. The language in SEC. 84 would allow this bill to be cost neutral to Medi-Cal, not the state, so that it could be implemented, to the extent that funds are appropriated or otherwise available for this purpose. There is still the potential for GF costs for development and oversight of the waiver.

## ECONOMIC IMPACT:

The amendments to AB 499 in this section would facilitate implementation of a Medi-Cal Assisted Living waiver, which would create a new funding stream for licensed RCFE providers and would create additional funding for low-income aged, blind and disabled to remain in the community with long-term care services instead of residing in a nursing facility.

## LEGAL IMPACT:

Could impact litigation surrounding Americans with Disabilities Act. Would enable a new option for community-based, long-term health care services.

## APPOINTMENTS: None

## SUPPORT/OPPOSITION:

Support:     California Association of Homes and Services for the Elderly (CAHSA), California Assisted Living Facilities Association (CALFA), and California Center for Assisted Living (CCAL)

Opposition:   None known.

Case 1:01-cv-12257-PBS   Document 6702-50   Filed 11/25/09   Page 27 of 28

## ARGUMENTS:

Pro:

- Enables implementation of a new option for community-based long-term care services.
- Enables eligible aged, blind and disabled individuals to age in place as intended under the Governor's "Aging with Dignity" initiative.
- Reduces exposure under litigation under the Americans with Disability Act.

Con:

- Requires staff and administrative costs for oversight of federal and state standards.

## SECTION 85

## ANALYSIS:

Mental Health Plans (MHPs) are responsible for providing, coordinating and approving specialty mental health care services for Medi-Cal beneficiaries with "included diagnoses". These plans have been either unable or unwilling to pay for telemedicine services, which has frustrated providers, advocates, and the Legislature. As managed care entities, MHPs limit services to those provided by MHP contractors and authorized by the MHPs. When providers refer Medi-Cal beneficiaries for telemedicine services directly, without obtaining MHP approval, MHPs lose data and the ability to maintain utilization controls and to provide and coordinate services. Since the county MHPs are ultimately responsible for providing services to beneficiaries, they must coordinate with primary care providers and telemedicine providers for beneficiaries requiring telemedicine services. Third party providers must work through the MHPs to ensure proper coordination of care for Medi-Cal beneficiaries. To implement reimbursement operationally, providers could be directed to include a modifier when submitting claims or a new code could be created specific to telemedicine to track this type of service. Additionally, the DHS payment system, through its fiscal intermediary, is designed to reject fee-for-service claims for services covered by MHPs to avoid duplication of services and maintain fiscal control. Removal of this edit in order to implement this section would subject the Medi-Cal claims processing system to duplicate services and/or payments.

Proposed language in this section would require DHS to allow psychiatric reimbursement to be made through Medi-Cal FFS through June 30, 2004 or until DMH and stakeholders develop an administratively feasible telemedicine reimbursement procedure, "whichever occurs later". This last phrase does not provide incentive for any of those parties to develop a methodology to ensure coordination of services prior to June 30, 2004. If an alternate reimbursement method is developed prior to June 30, 2004, this language does not provide the flexibility to use that method.

## LEGISLATIVE HISTORY:

SB 1665 (Chapter 864, Statutes of 1996), the "Telemedicine Development Act of 1996", set standards for the provision of telemedicine services, subject to Medi-Cal reimbursement policies. SB 922 (Chapter 199, Statutes of 1997) excluded telephone conversations and electronic mail messages

between providers and patients from the definition of telemedicine and provided other refinements to the act. AB 2877 (Chapter 93, Statutes of 2000) eliminated the 2001 sunset date for Medi-Cal telemedicine.

## PROGRAM BACKGROUND:
DHS is the "single state agency" in California responsible for Medicaid. Through two federally approved Medicaid waivers, which receive federal funding, DHS contracts with DMH for comprehensive Medi-Cal specialty mental health services. Services for Medi-Cal beneficiaries with specified (e.g., "included") diagnoses were carved out of Medi-Cal primary care health plans in 1993 and are now provided by county administered MHPs. Any mental health services for Medi-Cal beneficiaries with "excluded" diagnoses are not covered by the MHPs and remains available in the FFS Medi-Cal program. A single MHP in each county serves as the sole source for both Short-Doyle Medi-Cal and Medi-Cal FFS. DHS has an interagency agreement with Department of Mental Health (DMH) for the administration, billing and payment of county MHPs. The MHPs are responsible for coordinating, providing and approving services for plan beneficiaries with included diagnoses.

## OTHER STATES' INFORMATION:
In 1999, it was estimated that over 74,000 telemedicine (medical and psychiatric) visits occurred in the United States. Nationally, Arkansas, Georgia, Illinois, Iowa, Kansas, Louisiana, Minnesota, Montana, Nebraska, North Carolina, North Dakota, Oklahoma, South Dakota, Texas, Utah, Virginia, and West Virginia have established telemedicine sites, some of which provide both medical and mental health services.

## FISCAL IMPACT:
Allowing providers to bill directly for Medi-Cal reimbursement may result in duplicate services and/or claims unless DMH carves these telemedicine services out of the contracts. The State's entire telemedicine program is very small and thus, the number of telemedicine mental health services will likely be small.

## ECONOMIC IMPACT: Not applicable.

## LEGAL IMPACT: Not applicable.

## APPOINTMENTS: None.

## SUPPORT/OPPOSITION:
Potential supporters based on their previous support for prior telemedicine legislation:
California Health Information Association
California Healthcare Association
California Academy of Family Physicians
Association of California Healthcare Districts
County Health Executives Association of California
California Association for health Services at Home