# Exhibit 35-5

*State of California ex rel. Ven-A-Care of the Florida Keys, Inc. v.*
*Abbott Labs, Inc. et al., Civil Action No. 03-11226-PBS*

**Exhibit to the November 25, 2009 Declaration of Philip D. Robben**
**in Support of Defendants' Joint Motion for Partial Summary Judgment**

Pacific Bell
California Medical Association
California Association of Health Facilities
California Rural Health Association
Northern California Rural Roundtable
North Coast Clinics Network
Northern Sierra Rural Health Network
California State Hospice Association
Redwood Community Health Coalition
Stanford University
University of California
University of Southern California
County Medical Services Program Governing Board
Area 1 Agency on Aging
California Association of Area Agencies on Aging
California Children's Hospital Association
California Primary Care Association
Valley Children's Hospital, Fresno
Mark Twain St. Joseph's Hospital, San Andreas
California Nurses Association
Lytton Gardens (skilled nursing facility, Palo Alto)
Counties of Lake, Humboldt, Tulare, Santa Cruz, Glenn,
  Trinity, Riverside, and Del Norte
Integrated Telemedical Resources
Unified Medical Group Association

Opposition:  No known opposition based on prior legislation.

## ARGUMENTS:

Pros:
- Would increase access to specialty mental health services in geographic areas with limited provider availability.

Cons:
- May result in duplicate payments unless DMH carves out telemedicine mental health services from DMH contracts.

SECTION 85.5

**ANALYSIS:**

Currently, Medi-Cal eligibles are allowed one initial dental examination per dentist and semi-annual examinations thereafter and two prophylaxes (cleanings) per year. Prior to August 2000, the Medi-Cal dental program covered one initial dental examination by a dentist and one prophylaxis (cleaning) per year. This section would reduce current benefits for adults to pre-August 2000 benefits related to examinations and cleanings. Children would continue to receive two examinations and two prophylaxes (cleanings) per year.

**LEGISLATIVE HISTORY:**

AB 2877 (Chapter 93, Statutes of 2000) added Welfare and Institutions Code Section 14132.88, which increased dental examination and cleaning benefits from one to two of each per year. Section 85.5 of AB 442 would eliminate the semi-annual dental examinations and one prophylaxis (cleaning) per year for Medi-Cal eligible adults. Adults would be allowed one initial dental examination and one cleaning per year as it was prior to AB 2877.

**PROGRAM BACKGROUND:**

The Payment Systems Division administers the Medi-Cal dental programs through the Medi-Cal Dental Services Branch. The predominant program is the Medi-Cal fee-for-service dental program, which provides claims payment and prior authorization services for approximately 5 million beneficiaries. Dental managed care programs comprise the remainder, including the Sacramento Geographic Managed Care (GMC) program and the Dental Prepaid Health Plan (PHP) program. Dental managed care programs provide dental services to approximately 350,000 beneficiaries.

Currently, the Medi-Cal program covers, for all Medi-Cal eligibles, one initial dental examination per dentist and semi-annual examinations thereafter, and two prophylaxes (cleanings) per year. Prior to August 2000, the program covered one initial dental examination by a dentist and one prophylaxis (cleaning) per year, for all Medi-Cal eligibles.

**OTHER STATES' INFORMATION:**  Not applicable.

**FISCAL IMPACT:**

Total Savings:      $7,957,000*
GF Savings:         $3,978,500*

*These figures were provided from Fiscal Forecasting and are different from the original figures submitted with the original proposed Trailer Bill Language. The action taken by Conference Committee assumed a savings of $7,933,000 ($3,967,000 GF). This savings amount will be corrected in the November 2002 Medi-Cal Estimate to $7,957,000 ($3,979,000 GF).

**ECONOMIC IMPACT:**  None.

Enrolled Bill Report                                        Page 110                    Bill Number: AB 442
                                                                                       Author: Committee on Budget

**LEGAL IMPACT:** None.

**APPOINTMENTS:** None.

**SUPPORT/OPPOSITION:**

Support:      None known

Opposition:   None known.

**ARGUMENTS:**

Pro:   The State would save $3,978,500 in General Funds, thus helping to reach projected budget
       reductions.

Con:   The Medi-Cal dental program would not cover the same number of examinations and
       cleanings provided by commercial dental plans for adults.

## SECTION 86

**ANALYSIS:**

This proposal would delete the sunset provision in Welfare and Institutions (W&I) Code Section
14132.95, subdivision (q) which states: "This section will become inoperative on July 1, 2002, and as
of January 1, 2003, is repealed unless a later enacted statute, which becomes effective on or before
July 1, 2003, deletes or extends the date on which it becomes inoperative and is repealed."

Prior to April 1993, aged, blind or disabled persons, who were unable to remain safely in their homes
without certain described assistance, could apply for In-Home Supportive Services (IHSS). IHSS is a
social services program administered by the Department of Social Services (DSS), and includes a
personal care services component. Effective April 1, 1993, the Personal Care Services program
(PCSP) was implemented to provide, under Medi-Cal, essentially the same services as the personal
care services component of the IHSS program. The IHSS program has existed in California since
1973, and is supported through a combination of state and county funding. The creation of PCSP
provides federal Medicaid matching funds, in accordance with an approved state plan, for 70% of the
IHSS population in California. PCSP services are defined in Welfare and Institutions Code Section
14132.95 subdivisions (a) and (p)(1), and Title 22, Sections 51183 and 51350. As defined, the PCSP
includes (a) personal care services and (b) ancillary services prescribed in accordance with a plan of
treatment. Personal care services consist of assistance with ambulation, bathing, oral hygiene and
grooming, dressing, care and assistance with prosthetic devices, bowel, bladder and menstrual care,
skin care, repositioning, range of motion exercises, and transfers, feeding and assurance of adequate
fluid intake, respiration, paramedical services, and assistance with self administration of medications.
Ancillary services include meal preparation and cleanup, routine laundry, shopping for food and other
necessities, and domestic services as long as these ancillary services are subordinate to personal
care services. DSS, through an interagency agreement with DHS, also administers the PCSP.

Categorically needy and medically needy individuals eligible for services under the PCSP are not eligible for the same services under IHSS. If both PCSP and IHSS cover a particular service, a PCSP-eligible recipient must receive the service pursuant to the PCSP. This allows for recovery of FFP for personal care services rendered to Medi-Cal beneficiaries.

"Categorically needy person" means a person whose Medicaid coverage is mandatory under federal law, including persons receiving cash assistance, such as the Supplemental Security Income Program and the Temporary Aid to Needy Families. "Medically needy person" means a person who meets the federal definition for aged, blind or disabled persons and whose income and resources are insufficient to provide for the costs of health care.

The average monthly number of recipients in both the IHSS and PCSP is approximately 250,000. Federal Medicaid funds are provided to DSS for the provision of PCSP under the Interagency Agreement, with DSS providing the state match with state and county funds. The existing 3-year agreement is for $1.6 billion, or $6 million annually.

Eliminating the sunset date would enable personal care services to continue to be rendered under the PCSP and California would continue to collect related FFP. Allowing the provision to sunset would necessitate rendering of similar services to individuals under the IHSS program, which is funded by a combination of state and local funding, and for which FFP is not available, or placing these individuals in out-of-home care.

## LEGISLATIVE HISTORY:

Prior to April 1, 1993, individuals who were unable to remain safely in their homes without certain assistance could apply for IHSS. AB 1773 (Chapter 939, Statutes of 1992) authorized the creation of a PCSP in California for categorically needy individuals. AB 2779 (Chapter 329, Statutes of 1998) extended PCSP eligibility to medically needy individuals and IHSS income-eligible individuals. AB 524 (Aroner, 2001), which would have provided advance payments to PCSP providers, was vetoed by the Governor due to the lack of a rigorous evaluation of the costs and benefits of the bill and current budget concerns. AB 925 (Aroner, 2001) also addresses the PCSP and IHSS programs and would extend the sunset date for the PCSP program. AB 925 was enrolled and has gone to the Governor for action.

## PROGRAM BACKGROUND:

IHSS includes supportive services such as personal care services, paramedical services, and housekeeping services, which make it possible for the recipient to enjoy an independent living arrangement. Effective April 1, 1993, the PCSP was established as a Medi-Cal State Plan benefit to provide personal care services such as bathing, oral hygiene, and grooming, to categorically needy and medically needy persons. This program allows for federal financial participation.

## OTHER STATES' INFORMATION:

31 other states provide personal care services under their Medicaid programs. All 31 other states provide these services for categorically needy individuals, as defined in federal regulations, some of them also cover medically needy individuals.

**FISCAL IMPACT:**
This proposal would not result in new program costs, but a continuation of an existing Medi-Cal benefit. The existing Interagency Agreement for PCSP is funded for $1.6B for a three-year contract period. The Medi-Cal estimate includes $929,364,000 in FFP, for a total budgeted amount of $1.8B.

**ECONOMIC IMPACT:** Not applicable.

**LEGAL IMPACT:** None.

**APPOINTMENTS:** None.

**SUPPORT/OPPOSITION:**

Support: Patient advocacy groups broadly support PCSP services as an alternative to inpatient care for severely disabled Medi-Cal patients.
Opposition: None known.

**ARGUMENTS:**
Pros:
- Would decrease likelihood of premature institutionalization of individuals.
- Would continue provision of personal care services to qualified individuals.
- Would avoid loss of FFP in provision of personal care services.
- Would prevent possible limitation of benefits under the IHSS program.
- Would avoid the expenditure of Medi-Cal resources needed to maintain patients in inpatient settings, thus reducing overall Medi-Cal costs.

Con: None.


**SECTION 87**

**ANALYSIS:**
The California Welfare Directors Association (CWDA) is the sponsor of this section of the Health Trailer Bill. The CWDA is concerned that, given the severity of the current budget crisis, the Administration may direct DHS to not allocate all the funds available for administrative costs associated with the Medi-Cal eligibility determination process. These funds would then be available for redirection to other areas. In FY 2001-02, the Legislature passed and the Governor signed the budget with funds for a Medi-Cal cost of living adjustment (COLA) for county administration, but without a COLA for CalWORKs or Food Stamps. By law, Medi-Cal must apply the same cost standards as the two other programs and DHS could not legally provide these COLAs. At the direction of the Department of Finance, DHS did not allocate COLA money to the counties and did not provide legislative notice that it was not allocating these budgeted funds until the November 2001 Estimate. This language requires in the future that such notice be provided within 60 days.

LEGISLATIVE HISTORY:  None known.

PROGRAM BACKGROUND:  Not applicable.

OTHER STATES' INFORMATION:  None known.

FISCAL IMPACT:  None.

ECONOMIC IMPACT:  Not applicable.

LEGAL IMPACT:  Not applicable.

APPOINTMENTS:  None.

SUPPORT/OPPOSITION:

Support:  CWDA
Opposition:  None known.

ARGUMENTS:

Pros:  This change codifies existing policy, and could assist counties' financial management.

Cons:  None.


## SECTION 88

ANALYSIS:
This section would increase, by $55.2 million, the amount of monies transferred as an administrative
fee, by the participating public entities (city, county, city-county, district or University of California
Regents) to the Medi-Cal Inpatient Payment Adjustment (MIPA) Fund.  The administrative fees would
then be deposited into the Health Care Deposit Fund (HCDF).  This language would not affect the
amount of federal funding provided to the DSH program, but would impact the distribution of that
funding to the DSH-eligible public and private hospitals.  Hospital-specific funding is impacted by
changes in the administrative fee, pursuant to existing statutory mechanisms that specify the
calculations for division of the funding between public and private hospitals.  The existing statute
governing the DSH program includes language that automatically adjusts the funding distribution to
ensure an equitable division of the impact of an increased (or reduced) administrative fee transfer
between the private and public hospitals.

LEGISLATIVE HISTORY:
AB 2780 (Chapter 310, Statutes of 1998) enacted a $40 million reduction in funds transferred for the
administration fee. AB 1209 (Chapter 44, Statutes of 1999) was enacted before the distribution of

funds, to ensure that the benefit of the $40 million reduction was allocated equitably between public and nonpublic hospitals.  AB 1107 (Chapter 146, Statutes of 1999) reduced the administrative fee by an additional $30 million.  Section 96 of AB 2877 (Chapter 93, Statutes of 2000) again reduced the administrative fee, this time by an additional $55 million.  The administrative fee funding level targeted for the FY 2000-01 ($29.8 million), as a result of AB 2877, remained the same for FY 2001-02.

PROGRAM BACKGROUND:
The DSH program began in August 1991.  The DSH program currently provides more than $2 billion annually in supplemental Medi-Cal payment adjustments to California public and private inpatient acute care hospitals.  The State's portion of the DSH payments is funded through inter-governmental transfers from the participating public entities, which are then matched by the federal contribution. The monies in the HCDF must be used for the Medi-Cal program.  There is a separate DSH administrative fee, not the administrative fee addressed in this section of the trailer bill, which pays for DHS's administrative costs for the DSH program and the State Controller's costs for administering the MIPA Fund.  This fee is obtained from the interest earned on the MIPA fund account.

OTHER STATES' INFORMATION:  Unknown.

FISCAL IMPACT:
Fiscal Forecasting included $85 million in the Governor's January 2002 proposed budget, which was increased to $116 million in the 2002 May Revise budget.  The conference committee rejected the May Revise increase.  This increase in the administrative fee would not affect DSH eligibility or funding distribution and therefore would not increase costs to the Medi-Cal program for administration of the DSH program.

ECONOMIC IMPACT:
The increased administrative fee would require an increase in intergovernmental transfers from the transferor entities (city, county, city-county, district or University of California Regents).  In order to ensure that the public hospitals do not bear the entire burden of the increased administrative fee, the existing statute governing the DSH program includes a section that adjusts the distribution of the DSH funding to public and private hospitals to create an equitable split in the impact of the administrative fee changes.  The result would be a net loss of funding to all DSH eligible hospitals.

LEGAL IMPACT:  Unknown.

APPOINTMENTS:  None.

SUPPORT/OPPOSITION:

Support:  None known.
Opposition:  None known.

## ARGUMENTS:

Pros:
- These additional funds would be applied to the Medi-Cal program budget item, providing needed funding during the current budget crisis.

Cons:
- The increased administrative fee would require an increase in intergovernmental transfers from the transferor entities, resulting in a net loss of funding to all DSH eligible hospitals.

## SECTION 89

## ANALYSIS:

Section 89 would allow for the extension of the sunset date for the ICF/DD-CN pilot program to January 1, 2006. The extension of the pilot sunset is desirable to comply with the original intent of AB 359 (Chapter 845, Statutes of 1999) to evaluate the effect of the pilot program on the health, safety and quality of life of the participating beneficiaries and the cost-effectiveness of this care. The longer period would provide DHS the time to provide necessary oversight required by these fragile beneficiaries while this new model of care is under evaluation. If the pilot is successful, it will allow DHS to develop a State Plan service and develop regulations for this type of healthcare facility. If this level of care is not continued beyond a second waiver period, it will provide for adequate time for the relocation of these fragile beneficiaries and for staff to complete final deliverables.

If the sunset date is not extended, the full intent of AB 359 will not be met because neither this new licensing model of care nor the health, safety and quality of life of these individuals will be evaluated thoroughly. The MCPD, MCOD and L&C will be unable to effectively relocate beneficiaries to a safe and appropriate alternate placement, provide oversight and administration of the pilot, perform waiver renewal activities, perform onsite TAR adjudication, and conduct quarterly facility reviews/inspections without jeopardizing the workload of other existing programs. Beneficiaries participating in the pilot will be placed in jeopardy due to the stressful effects of relocation twice in less than one year.

Section 89 does not include staffing required for program oversight beyond the current sunset date of January 1, 2003. Redirection of existing staff is not possible because it would undermine other critical projects, compromise program integrity, increase DHS exposure to litigation, require the suspension of other vital health care activities, and prevent the effective administration of current and newly implemented Medi-Cal programs. A BCP is required to extend to January 1, 2006, six limited-term positions in Medi-Cal Policy Division (MCPD), Medi-Cal Operations Division (MCOD), and Licensing and Certification Division (L&C) to ensure appropriate oversight and an appropriation of $250,000 for FY 2003-04 and $250,000 for FY 2004-05 for the second independent assessment of the pilot program required by the Centers for Medicare and Medicaid Services (CMS).

## LEGISLATIVE HISTORY:

AB 2183 (Aroner), introduced in 1998, proposed to create a new licensing category and was vetoed by Governor Wilson. Chapter 845, Statutes of 1999 (Aroner, AB 359) provided authority to implement the ICF/DD-CN pilot project. On April 29, 2002, Assembly Budget Subcommittee #1 agreed to adopt trailer bill language to extend the sunset to January 1, 2006.

## PROGRAM BACKGROUND:

In 1971, the Intermediate Care Facility for Persons with Mental Retardation (ICF/MR) program was established. In California, the ICF/MR program has been further classified into subgroups. Two of these subgroups, Intermediate Care Facility for the Developmentally Disabled-Habilitative (ICF/DD-H) and Intermediate Care Facility for the Developmentally Disabled-Nursing (ICF/DD-N), provide beneficiaries with community placement in a 4 to 15-bed facility. These facilities allow the beneficiary to be more involved in the residential community and give the beneficiaries the opportunity to gain daily living skills to the highest degree possible.

Welfare and Institutions Code, Section 14495.10 (Chapter 845, Statues of 1999, AB 359), required DHS to establish a waiver program to pilot a third ICF/DD category that would provide continuous (24-hour) skilled nursing care to medically fragile, developmentally disabled infants, children, and adults (ICF/DD-CN) in a residential community setting. The purpose of the pilot is to explore more flexible and effective models of health facility licensure to provide continuous skilled nursing care to developmentally disabled individuals in the least restrictive health facility setting. For those beneficiaries without the option of home placement, an ICF/DD-CN placement may be a more preferred choice and provide better treatment and rehabilitation opportunities than a large institutional setting, such as a skilled nursing facility. The qualifying beneficiaries are so medically fragile that they previously would have had to live in a sub-acute hospital, skilled nursing facility, or a developmental center. A federal waiver was required because this new model is being tested on a limited basis with a select number of beneficiaries. Once evaluated as an appropriate category of healthcare facility, ICF/DD-CN facility services may be implemented statewide as a Medicaid State Plan service (precluding the necessity of a waiver). It is hoped that a successful pilot program will facilitate support for enabling legislation to add this level of care to the Medicaid State Plan.

The ICF/DD-CN pilot program began enrolling beneficiaries on April 3, 2002; however, not all participating providers are operational. This allows less than six months for the pilot because the enabling legislation (AB 359) designated January 1, 2003 as the sunset date for the pilot. This timeframe is insufficient to evaluate the effect of the pilot program on the health, safety and quality of life of the individuals and cost effectiveness of this new category of care as required by AB 359.

## OTHER STATES' INFORMATION:  None known.

## FISCAL IMPACT:

A BCP is required to extend, and fund, to January 1, 2006, six positions in Medi-Cal Policy Division (MCPD), Medi-Cal Operations Division (MCOD), and Licensing and Certification Division (L&C) to ensure appropriate oversight. The estimated annual cost for the six positions is $500,000. In

addition, an appropriation of $250,000 for FY 2003-04 and $250,000 for FY 2004-05 is needed for the second independent assessment of the pilot program required by CMS.

**ECONOMIC IMPACT:** None.

**LEGAL IMPACT:** None.

**APPOINTMENTS:** None.

**SUPPORT/OPPOSITION:**
The Association of Regional Center Agencies sponsored AB 359 to test new categories of care for persons currently residing in acute care hospitals, pediatric sub-acute facilities, skilled nursing facilities, state developmental centers, existing ICF/DD-CN facilities and at home.

It is not known who specific supporters of this section but it is expected that those in support of the previous version of the bill would continue to be in support of the extension. The following groups supported prior versions of AB 359:

Allen-Spees Family Homes
Alta California Regional Center
Area Boards of Developmental Disabilities
California Association of Health Facilities (CAHF)
California Coalition of United Cerebral Palsy Associations
Community Advocacy Services Association, Inc.
Central Valley Regional Center, Inc.
Community Advocacy Services Association (CASA)
Frank D. Lanterman Regional Center
North Bay Regional Center
Protection and Advocacy, Inc.
Residential Care Society
San Gabriel/Pomona Regional Center

Opposition: None known.

**ARGUMENTS:**

Pros:
- Allows time to evaluate the effect of the pilot program on the health, safety and quality of life of the clients and cost effectiveness of care as required by AB 359.

- Provides time for DHS to meet the federal waiver requirement of securing a second independent assessment, ensures the safe transition of beneficiaries to other placements, and/or the development of regulations for a permanent category of care.

Cons:
- Requires extension of six limited-term positions from January 1, 2003, to January 1, 2006.

## SECTIONS 90, 91 & 91.5

**ANALYSIS:**
Section 90 would amend Version 1 of Section 16809 of the Welfare and Institutions (W&I) Code (see Legislative History) as follows: 1) extends the operative date for the currently operative Section 16809 of the W&I Code to January 1, 2008; 2) requires the County Medical Services Program (CMSP) Board to reimburse the State $3.5 million for the state costs of providing administrative support to the CMSP; 3) continuously appropriates the CMSP Account in the County Health Services Fund; 4) authorizes funds in the CMSP Account to be used to reimburse DHS for its CMSP administrative support costs; and 5) exempts the State from paying the statutorily mandated $20.2 million (maximum) GF appropriation to the CMSP for FY 2002-03 and instead would make the CMSP counties liable for the full costs of the program.

The Administration's proposal in the January Budget would have required the counties to reimburse the State $5 million for administrative costs and would not have extended the sunset for the CMSP Board. The Legislature drafted the final language. DHS does not object to continuation of the CMSP Board, but is concerned that $3.5 million will not cover all DHS's costs for administrative support of this program.

Section 91 would amend Version 2 of Section 16809 of the Welfare and Institutions Code (see Legislative History) to conform to the amendments made to Version 1 of Section 16809 by Section 90 of the bill. The amendments in Section 91 are tailored to the current statutory language in Version 2 of Section 16809 but are nearly identical to those in Section 90 and accomplish the same intended purposes as those in Section 90.

Section 91.5 would extend the operative date of Section 16809.4, which establishes the Board and its governing authority over the program, to January 1, 2008. It would also authorize the CMSP Board, as part of its cost containment and case management powers, to establish alternative methods and rates for the delivery of care subject to DHS authorization and would require that methods of payment adopted by the CMSP Board for the CMSP be compatible with the administrative requirements of DHS's fiscal intermediary.

**LEGISLATIVE HISTORY:**
AB 1288 (Chapter 89 of the Statutes of 1991, which enacted realignment, enacted two Section 16809's of the W&I Code. Version 1 of Section 16809 re-constituted the CMSP pursuant to Realignment (See Program Background). Version 2 of Section 16809 retained the pre-Realignment statutes establishing the CMSP. Version 1 was made operable through June 30, 1994 and Version 2 was made inoperable through that date but was to become operable on July 1, 1994 if Version 1

"sunsetted". Subsequent legislation has extended the sunset and re-operative dates of the two sections to January 1, 2003.

Budget Trailer Bills enacted for FYs 1999-00 and 2000-01 exempted the State for successive one-year periods from its statutory requirement to provide up to $20.2 million of funding from the GF to the CMSP. The Governor's FY 2001-02 Budget proposed permanent elimination of the annual $20.2 million GF appropriation to CMSP; however legislative language in the FY 2001-02 Health Trailer Bill extended the exemption for only one additional year.

PROGRAM BACKGROUND:
CMSP provides reimbursement to participating providers for medical and dental services to non-Medi-Cal eligible indigents and working poor in 34 small counties (with populations of 300,000 or less). Provider reimbursements are made through a risk pool funded with monies derived principally from sales tax, vehicle license fees and county general-purpose revenues which participating counties are required to contribute to the program.

DHS, through a contract with the CMSP Board, provides administrative support services to CMSP. These services are provided primarily by the Office of County Health Services (OCHS), the Medi-Cal program and its fiscal intermediaries, and the Administration and Information Technology Services Divisions. Since the enactment of Realignment in 1991 (see below), the State has been statutorily obligated to provide up to $20.2 million of GF to meet some of the program's costs not met by Sales Tax (ST) and Vehicle License Fee (VLF) revenues. However, for the past two fiscal years the State has been statutorily exempt from this obligation.

_Realignment_: In 1991, pursuant to enacted legislation initiated by Governor Wilson, the State transferred much of its fiscal responsibility for the AB 8 (Green, Chapter 282, Statutes of 1979) and the Medically Indigent Services Program (MISP), as well as other health, mental health, and social services programs, to the counties as part of a "realignment" of State and local programs (Realignment). The AB 8 and MISP programs were established in the early 1980's in the wake of Propositions 13 and 4 to provide counties with funding for inpatient/outpatient and public health, and indigent adult health care services which they are mandated to provide under Section 17000 of the W&I Code. AB 8 and MISP began as separate programs with separate funding but were integrated over the years and administered in conjunction with each other. Along with the transfer of fiscal responsibility, Realignment also shifted a large amount of administrative authority, control, and decision making over these programs and services from DHS to the counties. It did not, however, relieve counties of their Section 17000 health service mandate. Pursuant to Realignment, most GF for the AB 8 Program and MISP was eliminated and replaced with special fund revenues derived from an increase in the ST and the VLF.

OTHER STATES' INFORMATION: Not applicable.

Enrolled Bill Report                                          Bill Number: AB 442
                          Page 120                          Author: Committee on Budget

**FISCAL IMPACT:**
Would result in a savings of up to $23.7 million to the GF in FY 2002-03 and at least a $3.5 million annual GF savings over the next five years. Continuously appropriating funds to the CMSP Account would enable funds to be expended beyond the current three-year limit.

**ECONOMIC IMPACT:** None.

**LEGAL IMPACT:** None known.

**APPOINTMENTS:** None.

**SUPPORT/OPPOSITION:**

Support: CMSP Board
Potential: CMSP County Boards of Supervisors

Opposition: None known.

**ARGUMENTS:**

Pros:

- Reduces GF costs by $23.7 million in FY 2002-03 and unknown amounts in future fiscal years, which will help mitigate the State's current and future fiscal problems.
- Enables the CMSP Board to continue operating for an additional five years.
- Allows funds in the CMSP Account to be expended without regard to fiscal year, which will facilitate the efficient administration of the Account.
- Conforms CMSP payment methods to those of the DHS fiscal intermediary to facilitate the provider cost reimbursement process.
- Allows the State to contract with the Board in a highly expedient and efficient manner.
- Increases the CMSP Board's power and flexibility to develop cost containment and case management programs and procedures.

Cons:

- The $3.5 million annual reimbursement from the CMSP Board to the State may not fully cover the State's administrative costs for the CMSP.

- Does not permanently relieve the State of its $20.2 million (maximum) financial obligation to CMSP, which could expose the State to future financial liabilities and GF costs.

## SECTION 92

**ANALYSIS:**
SB 493 (Chapter 897, Statues of 2001) requires DHS and CDSS to implement a simplified eligibility process to expedite Medi-Cal and HFP enrollment for uninsured children and their parents receiving Food Stamps. The bill requires CWDs to complete a data extract identifying children and their family members who receive Food Stamps but are not enrolled in Medi-Cal or HFP. The original legislation specified no implementation date, making it statutorily effective January 2002, and did not subject implementation to availability of FFP.

The Governor's May Revision proposed delaying implementation of this legislation to July 2005, due to budget constraints. It was anticipated that the State would save approximately $7 million General Fund in 2002-03. Section 92 of the Health Trailer Bill provides for implementation of this legislation on or after July 2003, giving the State the flexibility to have to the new program in place two years earlier than the proposed July 2005 date, if funds are available.

**LEGISLATIVE HISTORY:**
SB 493 requires DHS to develop a process to notify Food Stamp participants who are due for their annual re-certification of their potential eligibility for Medi-Cal or HFP. AB 59 (Chapter 894, Statutes of 2001) has a similar process for persons applying for Food Stamp benefits, allowing that applicants will be notified, at the time of application, of their potential eligibility for Medi-Cal or HFP.

**PROGRAM BACKGROUND:**
At least 50 percent of uninsured children who are eligible for the Medi-Cal program or the Healthy Families Program are already enrolled in public programs with similar income eligibility guidelines, including the Food Stamp program. Based on these similarities, SB 493 intends to streamline access to Medi-Cal and the Healthy Families Program by identifying those individuals currently receiving Food Stamp benefits but not enrolled in Medi-Cal or the Healthy Families Program, and notifying them at their annual Food Stamp re-certification of their potential eligibility for these programs. DHS estimates that 15 percent of current Food Stamp participants will request Medi-Cal at re-certification, resulting in health coverage for approximately 62,000 previously uninsured Californians.

**OTHER STATES' INFORMATION:**
DHS is not aware of any other states that have implemented a health coverage outreach and enrollment plan through their Food Stamp Program.

**FISCAL IMPACT:**
DHS estimates an $11,026,000 ($5,513,000 GF) impact during the first year of implementation. Annual ongoing costs are estimated at $12,902,000 ($6,451,00 GF). DHS would require additional resources to prepare for implementation on July 1, 2003.

**ECONOMIC IMPACT:**  Not applicable.

**LEGAL IMPACT:**  Not applicable.

APPOINTMENTS: None.

SUPPORT/OPPOSITION:

Support: None known.
Opposition: None known.

ARGUMENTS:

Pro: An estimated 800 individuals could enroll in the Medi-Cal or Healthy Families program in fiscal
year 2003-04, who otherwise would not.

Con: There is no funding in the 2002-03 budget to implement the SB 493 program effective July 1,
2003.


SECTION 93

ANALYSIS:
Section 93 provides emergency regulatory authority to DHS to implement the applicable sections of
the budget trailer bill, in accordance with the Administrative Procedures Act. This is standard
language, which provides the initial adoption of emergency regulations and one re-adoption of those
regulations will be deemed to be an emergency and exempt from review by the Office of
Administrative Law. Under this provision, the initial emergency regulations and the first re-adoption of
those regulations would each remain in effect no longer than 180 days. This provision is necessary
to enable DHS to meet the statutory implementation timeframes in the trailer bill.

DHS has reviewed this language and finds it to be adequate to allow promulgation of emergency
regulations for the implementation of the provisions contained in the budget trailer bill.

LEGISLATIVE HISTORY:

The standard emergency regulation language contained in Section 93 is consistent with the language
used in numerous other pieces of legislation, including the 2001-2002 budget trailer bill, AB 430
(Chapter 171, Statutes of 2001).

PROGRAM BACKGROUND:

Due to the lengthy review process for state regulations, DHS is often compelled to use the
emergency regulation process provided for in the Administrative Procedure Act to promulgate
regulations quickly enough to implement programs related to the public health. The emergency
regulatory process streamlines the process, enabling programs to become operational in a timely
manner. DHS has used this process in the past, most notably for the Medi-Cal Managed Care
program, where DHS was required to implement many new program policies that needed to be
contained in State regulations.

OTHER STATES' INFORMATION: None available.

FISCAL IMPACT:
Section 93 could result in a cost savings to DHS by enabling use of emergency regulations to implement the provisions of the budget trailer bill.

ECONOMIC IMPACT: None known.

LEGAL IMPACT: None.

APPOINTMENTS: None.

SUPPORT/OPPOSITION

Support: None known.
Opposition: None known.

ARGUMENTS:

Pros: The standard language in Section 93 would facilitate DHS's implementation of the provision of the budget trailer bill.

Cons: None.


SECTION 94


ANALYSIS:
Sec. 94 would provide that ambulance providers billing crossover claims be exempt from collection of overpayments that are not their fault. This language conflicts with current federal and State laws regarding collection of overpayments made to any Medi-Cal provider and puts DHS at financial and legal risk if such an overpayment is discovered. A summary analysis of paid ambulance crossover claims from January 2000 through December 2001 shows an increase in payments to providers in calendar year 2001; however, there is no indication of an overpayment. The increase in payments is the result of the 2001 Annual HCPCS (HCFA Common Procedure Coding System) update that was done according to policy and is not classified by DHS as an overpayment. The effect was to turn previously zero paid claims into full cost sharing claims as new codes were implemented and old codes were eliminated. If a federal or State audit should find this increase to be an overpayment, this language would prevent DHS from collecting back these funds and the State could have to pay the federal government their share of these payments. The ambulance association sought this language, as they were concerned that at some date, the state could re-define its policy changes to an overpayment and seek collection of these payments.

**LEGISLATIVE HISTORY:**
This issue has not been addressed legislatively before this language was proposed.

**PROGRAM BACKGROUND:**
The federal Center for Medicare and Medicaid Services (CMS) oversees the Medicare and Medicaid programs. Every state Medicaid program must protect against unnecessary or inappropriate use of services or excessive payments. Medi-Cal, (California's Medicaid program) is a jointly funded federal-State program that pays for medical costs for certain groups of low-income individuals. Federal Law (Sec. 1903(d)(2)(c) [42 U.S.C. 1396b]) specifies that overpayments made by a State shall be recovered and an adjustment in the federal payment made at the end of 60 days, whether or not the recovery was made. An "overpayment" is an amount that is paid by a state Medicaid agency to a provider in excess of the amount that is proper and that is required to be refunded to CMS. Per California Welfare & Institutions Code, Chapter 7, Article 5.3, Section 14170 (a) (1), DHS must ensure responsibility and accountability for federal and State fund expenditures. Sections 14176 and 14177 state how overpayments may be recovered, and the California Code of Regulations Title 22, Division 3, Section 51458.1 states DHS shall recover overpayments and under what conditions.

Each year, in accordance with Welfare and Institutions Code section 14105(d) DHS prepares an update of Medi-Cal billing codes after reviewing materials issued by the CMS, formerly known as the Health Care Financing Administration (HCFA). New HCPCS codes for ambulance services were implemented by CMS on January 1, 2001. Rates for new codes or crosswalks to other Medi-Cal codes may or may not be established for Medi-Cal as determined by DHS's Medi-Cal Benefits Branch, however, the maximum rate of reimbursement shall not exceed the lowest maximum allowance established by the federal Medicare program for that service in any area of the state per section 14105.25. In 2001 only two of the 12 new codes were given specific Medi-Cal rates. All other codes defaulted to the Medicare rate and are paid the full deductible and coinsurance billed on crossover claims. In the past, ambulance providers were paid less by Medi-Cal for similar services. No overpayment exists as these claims were accurately paid the rates established for this period. Unless new rates are established in the future, claims for these services will continue to pay at the Medicare rate.

**OTHER STATES' INFORMATION:** None known.

**FISCAL IMPACT:**
DHS expects there would be no fiscal impact resulting from this section, since there is no evidence of overpayment in this area. However, if an overpayment is discovered, DHS would not only lose income from State funds, but the federal share would have to be reimbursed even though no collection was made.

**ECONOMIC IMPACT:** None.

Case 1:01-cv-12257-PBS   Document 6702-51   Filed 11/25/09   Page 19 of 28

**LEGAL IMPACT:**
May create conflicts between federal and State laws regarding collection of overpayments that impact audit resolution, and may become the basis of or set precedents for lawsuits regarding future erroneous payment corrections for other provider types.

**APPOINTMENTS:** None.

**SUPPORT/OPPOSITION:**

Support: None known.
Opposition: None known.

**ARGUMENTS:**
Pro:
- If an overpayment is discovered that is not the fault of the ambulance providers, then Sec. 94 may exempt DHS from collecting the overpayment and the providers will not incur the hardship of repaying funds.

Con:
- Sec. 94 conflicts with current federal and State laws regarding overpayments by providing special treatment for ambulance providers.

## SECTION 95

**ANALYSIS:**
The objective of CMS Net E47 is to link the CMS Net system to the State's fiscal intermediaries, Electronic Data Systems (EDS) and Delta Dental Plan of California (DDPC), for claims processing. This connectivity between databases allows the authorization number issued for services to be linked to an individual claim and eliminates the manual approval process that is currently necessary at each local CCS program.

Providing CCS providers with the ability to submit electronic claims is more efficient and should eliminate delays that are inherent in a manual process. This enhancement would also serve to help CCS retain existing providers and possibly enlist new providers. The deadline for implementation of the CMS Net E-47 may accelerate the conversion process, but this language is not necessary to implement the new system. DHS intends to pursue conversion as rapidly as is feasible, but would not choose to impose an August 1, 2004, deadline, for completion of the conversion process.

**LEGISLATIVE HISTORY:** None.

Case 1:01-cv-12257-PBS   Document 6702-51   Filed 11/25/09   Page 20 of 28
Page 126

## PROGRAM BACKGROUND:

CMS Net is an automated case management system for CCS currently used by 49 county CCS programs and three CMS Branch regional offices. Nine other counties currently use other automated case management systems. Most of these counties, including Los Angeles, which has over one third of the State CCS caseload, intend to convert to the State's CMS Net system in the near future. When claims for most services authorized by CCS are billed they must be approved using a hand-stamp by the local program prior to submission to EDS. The CMS Net system operates and is located at the Health and Human Services Agency Data Center.

## OTHER STATES' INFORMATION: Not applicable.

## FISCAL IMPACT:

The CMS E-47 project is currently budgeted for implementation in Spring 2004. Full participation of County CCS programs in CMS Net is currently being scheduled. Implementation of a fully operational CMS Net automated case management system for all county CCS programs would require the conversion of five large counties to the system. This would double the number of users, runtime licenses, file size, helpdesk calls and the required level of application support activities. Costs associated with this conversion are $661,000 in FY 2003-04 with ongoing support costs of $288,000 per year.

## ECONOMIC IMPACT: Not applicable.

## LEGAL IMPACT: Not applicable.

## APPOINTMENTS: None.

## SUPPORT/OPPOSITION:
Support: None known.
Opposition: None known.

## ARGUMENTS:
Pros:
- This proposal could facilitate the completion of the CMS Net E-47 project, by statutorily specifying a completion date.

Cons:
- This proposal is not necessary, as the CMS Net E-47 project is currently scheduled for implementation in Spring 2004.

Case 1:01-cv-12257-PBS   Document 6702-51   Filed 11/25/09   Page 21 of 28

## SECTION 96

**ANALYSIS:**

Section 96 would require the California Health and Human Services Agency (CHHSA) to develop a comprehensive plan describing the actions that the State may take to improve its long-term care system so that its residents have available an array of community care options that allow them to avoid unnecessary institutionalization. Section 96 does not mandate the adoption of the plan; it does not mandate funding for the plan; and it does not mandate implementation deadlines for the plan. Section 96 would require only that a comprehensive, effectively working plan be developed and submitted to the Legislature on or before April 1, 2003. The decisions regarding adoption, funding, and implementation timelines are not set forth in this bill.

The purpose of section 96 is to ensure that California develops a comprehensive long-term care, community service integration plan that responds to the United States Supreme Court decision in *Olmstead v. L.C.* (1999) 527 U.S. 581.

In *Olmstead*, the Court clarified Title II of the Americans with Disabilities Act (ADA). Title II and its implementing regulations provide that a person with a disability has a right to services in the most integrated appropriate setting. The Court ruled that an individual receiving mental health services has a right to live in a community setting so long as three conditions were met:

1) The state's treatment professionals determine that such placement is appropriate;
2) The affected person does not oppose such treatment; and
3) The placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

Additionally, the Court in the plurality opinion, indicated that a state could establish compliance with Title II of the ADA if it demonstrates that it has:

1) A comprehensive, effectively working plan for placing qualified persons with disabilities in less restrictive settings; and
2) A waiting list (for home and community based waivers) that moves at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated.

Following the *Olmstead* decision, the federal Department of Health and Human Services (DHHS) sent letters to each Governor urging states to create *Olmstead* implementation plans. Additionally, the Health Care Financing Administration (now the Center for Medicaid and Medicare Services (CMS)) and the Office of Civil Rights sent a joint letter to the state Medicaid Directors providing guidance in the creation of such a plan. The Medicaid Directors' letter sets forth that "states are required to provide community-based services for persons with disabilities who would otherwise be entitled to institutional services" under the three conditions articulated in the *Olmstead* decision.

Case 1:01-cv-12257-PBS   Document 6702-51   Filed 11/25/09   Page 22 of 28
Bill Number: AB 442

AB 442, section 96 provides that the State's "Olmstead Plan" shall embody the six principles CMS articulated in the State Medicaid Directors' letter. These principles include: (1) A comprehensive, effectively working plan; (2) A plan development and implementation process that provides for the involvement of consumers and other stakeholders; (3) The development of assessment procedures and practices that prevent or correct current and future unjustified institutionalization of persons with disabilities; (4) An assessment of the current availability of community-integrated services, identification of gaps in service availability, and evaluation of changes that could be made to enable consumers to be served in the most integrated setting possible; (5) The inclusion in the plan of practices by which consumers are afforded the opportunity to make informed choices among the services available to them; and (6) Elements in the plan that ensure that services are provided in the most integrated setting appropriate and that the quality of services meets the needs of the consumers.

DHS is the single state agency charged with administering the Medi-Cal program. Accordingly, under CHHSA's leadership, DHS will have a major role in the development and implementation of the State's "Olmstead Plan".

## LEGISLATIVE HISTORY:
AB 442 in its initial form was introduced by Assemblymembers Cardenas (Chair), Aroner, Cardoza, Cedillo, Dutra, Firebaugh, Horton, Keeley, Nakano, Oropeza, Pavley, Simitian, Steinberg, Vargas, and Wright. Many sections have been added to this bill since its initial introduction. In its current form, AB 442, section 96 mandates the CHHSA to develop a comprehensive long term care, community service integration plan that responds to the decision of the Untied States Supreme Court in *Olmstead v. L.C.* (1999) 527 U.S. 581.

## PROGRAM BACKGROUND:
California has a broad array of public long-term care programs available to its citizens. Many state departments, including DHS and the Departments of Aging, Developmental Services, Mental Health, Rehabilitation, Social Services, and Veterans Affairs administer these programs. In particular, DHS is a leader in providing long-term care programs to California citizens through a variety of services available through the Medi-Cal program. Because of its designation as the single state agency in charge of administering the Medi-Cal program, DHS would almost certainly be the primary department under CHHSA to assist in developing the State's "Olmstead Plan."

Additionally, pursuant to Government Code section 12803.2, the CHHSA established the Long-Term Care Council. Its mission statement: "[To] provide state-level leadership in developing a coordinated long-term care system that includes a full array of services, that promotes personal choice and independence while also assuring fiscal responsibility and equitable access to all long-term care consumers." The Long-Term Care Council has been assigned the central role in *Olmstead* planning and implementation in California. The Council's Mission and Vision Statement includes an Action Statement that explicitly addresses the steps the State plans to take to modify the existing processes to assist individuals who wish to transition into more independent living settings. The CHHSA Secretary chairs the Long-Term Care Council, which includes the Directors of DHS and the Departments of Aging, Developmental Services, Mental Health, Rehabilitation, Social Services,

Veterans Affairs, Alcohol and Drug Programs, Housing and Community Development, Transportation, and the Office of Statewide Health Planning and Development.

Given the existing charge of the Long-Term Care Council, the development of California's "Olmstead Plan" should be coordinated through the Council.

## OTHER STATES' INFORMATION:
More than 40 states have appointed study commissions to develop long-term care options, but many states, including California, are facing budget deficits that may limit the expansion of community services needed for independent living. Currently, at least 10 states have completed "Olmstead Plans" and are being reviewed by DHS. It is believed that many states are in various stages of developing "Olmstead Plans."

## FISCAL IMPACT:
Undetermined, but significant cost. No fiscal impact has been prepared to date. However, it should be emphasized that the fiscal impact of developing an Olmstead Plan (Plan) and implementing it once developed, are two entirely different issues.

Developing the Plan would require CHHSA and various departmental resources. Program staff would need to be dedicated to complete the work, and some costs would be incurred. Given the designation as the single state agency charged with administering the Medi-Cal program, DHS would be a primary contributor to Plan development.

More importantly, the fiscal impact of implementing such a Plan cannot be determined at this time, but it could certainly be massive. The impact of Plan implementation is entirely dependent upon the size and scope of the plan. Based upon rough estimates CHHSA provided, the impact could be billions of dollars annually due to the scope of services necessary to de-institutionalize the State's nursing homes, centers for the developmentally disabled and other institutions in the State. CHHSA has estimated this Medi-Cal population at approximately 100,000 persons.

## ECONOMIC IMPACT:
Undetermined, but significant cost. The economic impact could be massive depending again upon the size and scope of the Plan. For example: the system infrastructure necessary to support the expanded community placements would need to be created and/or augmented in order to accommodate the expected demand for community placements.

## LEGAL IMPACT:
Currently, CHHSA and DHS (as well as several other state departments) are involved in multiple lawsuits that this legislation will impact. The lawsuits allege violations of federal and State law due to the failure to provide services that would keep persons in the community and/or provide services that would enable persons to transition from long-term care facilities into community placements. The plurality opinion in *Olmstead* indicated (and CMS has advised) that the State can show compliance with the ADA's integration mandate by demonstrating it has (1) a comprehensive, effectively working plan for placing qualified persons with disabilities in less restrictive settings; and (2) a waiting list that

moves at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated. The development of an "Olmstead Plan" balanced with sound fiscal policy and consistent with the *Olmstead* ruling would serve to provide the State with an augmented legal defense against claims of ADA violations based upon disability discrimination.

**APPOINTMENTS:** None.

**SUPPORT/OPPOSITION:**

Support: None known.
Opposition: None known.

**ARGUMENTS:**
Pros (if implemented):
1. Would provide a blue print of the State's long-term care system;
2. Would enhance coordination of the State's long-term care programs;
3. Would provide an augmented defense to ADA based discrimination claims against the State for failure to integrate disabled persons into the community;
4. Would be consistent with CMS recommendations.

Cons (if implemented):
1. Would cause substantial increases in total fiscal costs of the State's long term care system;
2. May be perceived as a listing of guaranteed services when in fact services may be contingent upon factors not listed or only upon available funding/resources.

## SECTION 101

**ANALYSIS:**

Section 101 would require that $24,803,000 of Proposition 99 funds from the Hospital Services, Physician Services and Unallocated accounts in the Cigarette and Tobacco Products Surtax Fund be allocated to the appropriations for the California Healthcare for Indigents Program (CHIP) and the Rural Health Services (RHS) program for the reimbursement of emergency room physician and hospital emergency services. This would provide emergency physicians with needed additional reimbursement for emergency medical services to help reduce the amount of uncompensated care that these providers must absorb, and accomplishes the Administration's intent to target additional funding to emergency room physicians. Section 101 contains language that allows the Office of County Health Services (OCHS) to distribute the proposed funding through its current administrative mechanisms.

**LEGISLATIVE HISTORY:**
SB 2132 (Chapter 826, Statutes of 2000) authorized use of $24.8 million of Prop 99 (Tobacco Tax) funds for emergency physician services. AB 430 (Chapter 171, Statutes of 2001), the 2001 health trailer bill, continued this funding at the same level.

**PROGRAM BACKGROUND:**
OCHS administers the CHIP and the RHS program. Counties participating in these programs receive funding from Prop 99 for services to indigents for whom payment will not be made through State or private health insurance coverage or by any program funded in whole or in part by the federal government. Current Proposition 99 (tobacco surtaxes) statutes require that specified percentages be appropriated to the Hospital Services Account (HSA), the Physician Services Account (PSA) and the Unallocated Account within the Cigarette and Tobacco Products Surtax Fund to the CHIP and RHS program. The funds are then allocated in accordance with prescribed percentages to the counties. These funds are to be used for specified purposes related to each of the accounts.

**OTHER STATES' INFORMATION:**
Several other states have imposed tobacco surtaxes on the sale of cigarettes and tobacco products. Allocation and use of the funds varies from state to state. In some states the funds are administered exclusively by one or more state agencies; in other states a portion is retained by the state for direct programming and state administration and overhead, and a portion is allocated to the counties for either prescribed purposes or at the discretion of the local jurisdiction.

**FISCAL IMPACT:**
The provisions of Section 101 do not adversely impact the GF, since it pertains to special tobacco tax (Prop 99) funds.

**ECONOMIC IMPACT:** Not applicable.

**LEGAL IMPACT:** Not applicable.

**APPOINTMENTS:** None.

**SUPPORT/OPPOSITION:**

Support: None known.
Opposition: None known.

**ARGUMENTS:**

Pros:
- Provides emergency physicians with needed additional reimbursement for uncompensated emergency medical services as proposed by the Administration in the Governor's FY 2002-03 Budget.

- Would reduce costs for uncompensated care that emergency room physicians and hospitals must absorb or subsidize through other sources of revenue.

Cons:
- Restricts the flexibility of counties receiving CHIP and RHS funds from determining if funds are used for hospital services other than emergency services.

## SECTION 102

### ANALYSIS:
The purpose of this section is to give the Cancer Research Program (CRP) multi-year encumbrance and expenditure authority for previous fiscal year (FY 1999/2000, 2000/01, and 2002/02) appropriations to the Cancer Research Fund (CRF). The language was originally drafted to ensure that the existing research projects funded in the previous three years would continue to be funded until completion. The Governor's proposed budget in January 2002 would have eliminated all funding for the CRP, and there would have been no mechanism to continue to fund the existing programs, even though the monies had already been appropriated.

This section would provide multi-year encumbrance and expenditure authority to monies appropriated to the CRF in Item 4260-001-0589 of Chapter 50 of the Statutes of 1999, Chapter 52 of the Statutes of 2000, and Chapter 106 of the Statutes of 2001.

- This language would implement the intent of Health and Safety Code Section 104187 (f), which provides CRP with multi-year encumbrance and expenditure authority for its research projects.
- Because research often takes many years to complete, multi-year expenditure authority is necessary to ensure that research monies are available to the researchers throughout the entire course of their projects.
- Other research programs in California have multi-year encumbrance and expenditure authority (UC's Breast Cancer Research Program and Tobacco-Related Disease Research Program).

### LEGISLATIVE HISTORY:
AB 1554 (Chapter 755, Statutes of 1997) and SB 273 (Chapter 756, Statutes of 1997) established the CRP, allocating $2 million to CRF in FY 1997-98, and stating the Legislature's intent to allocate $25 million for FY 1998-99, subject to the availability of funds. The Governor's Budget allocated $25 million to CRF in FY 1998-99 through FY 2001-02, and the proposed budget for FY 2002-03 is $12.5 million for CRF. SB 1009 (Chapter 751, Statutes of 1999) provided expenditure authority for CRP grant moneys for a period of three years beginning with funds appropriated in the 1998-99 FY.

**PROGRAM BACKGROUND:**
Section 104187 (f) of the Health and Safety Code provides expenditure authority of CRP grants for a period of three years beginning with funds appropriated in FY1998/99. This bill would provide encumbrance and expenditure authority for monies appropriated in FY 1999-2000, 2000-01, and 2001-02 until July 30, 2005. Because research projects of this nature require several years to complete, this additional expenditure authority would allow researchers to complete their projects.

**OTHER STATES' INFORMATION:** None known.

**FISCAL IMPACT:**

This language will not result in any additional administrative cost to DHS.

**ECONOMIC IMPACT**
Monies appropriated to CRF will be available and used for cancer research over several years, as was the original intent of the Fund, thus contributing to the economy of the research community.

**LEGAL IMPACT:** None.

**APPOINTMENTS:** None.

**SUPPORT/OPPOSITION**

Support: None known.
Opposition: None known

**ARGUMENTS**

Pros:
- Multi-year encumbrance and expenditure authority is necessary for research projects.
- This language is consistent with the intent of Health and Safety Code Section 104187 (f).

Cons: None

**SECTION 103**

**ANALYSIS:**
The State of California is experiencing one of its most severe budget crises. DHS, like all other state agencies, has been asked to reduce some of its services and programs to help minimize the impact of the anticipated budget deficit for FY 2002-03. Section 103 is an effort in that direction. By eliminating major portions of the August 1, 2000, rate increase, DHS would save an estimated $183,600,000 TF ($91,800,000 GF). At the same time, DHS would protect the California Children Services supplemental rate increase, services for home health,

shift nursing, non-emergency medical transportation, and family planning by not reducing their reimbursement rates to pre-August 2000 levels.

This provider rate cut could have a significant impact on the access to care by Medi-Cal patients. This could force Medi-Cal patients to seek care more often in the emergency room. Further, rates for emergency room doctors are being cut 40% and this could create a crisis in emergency room care.

It is likely the State will be litigated on this rate reduction due to access to care issues. The last time the State reduced physician rates, it was quickly restrained from implementing those cuts through a temporary restraining order and the State lost that case.

## LEGISLATIVE HISTORY:
The language in this section was proposed, in part, by the Administration in the 2002 May Revision Budget proposal, and amended by the Legislature. The language is not consistent with the action taken by the Senate on June 29, 2002.

The budget actions that have been taken related to the provider rate increase are as follows (in millions):

| | | |
|---|---|---|
| Governor's January Budget: | -$155.1 (-$77.6 GF) | ½ 2000 rate increase (protect children) |
| Preliminary May Estimate: | -$142.2 (-$71.1 GF) | January proposal adjusted for 8/1 impl. |
| Final May Estimate: | -$236.2 (-$118.1 GF) | eliminate 2000 rate increase |
| Legislature (6/11) | -$253.0 (-$126.5 GF) | add $51 for additional managed care savings, less $15.6 for CCS, $3.2 for home health, $10.1 for nonemergency transportation, $5.3 for family planning |
| Senate (6/29) | -$142.2 (-$71.1 GF) | unclear which services protected |

AB 3006 (Committee on Budget, 2002) would repeal Section 103 of this bill. The Governor's Veto Message for AB 425 (Chapter 379, Statutes of 2002), the 2002 Budget Bill, directs DHS to implement the rate reduction pursuant to Section 103, sustaining the exemptions contained in this language, and then to restore the reduction to the levels proposed in the Governor's January 10, 2002 budget, using DHS' existing statutory authority.

## PROGRAM BACKGROUND:
The Medi-Cal program provides comprehensive health care to low-income families, children, and the aged, blind and disabled. Provider rates were increased on August 1, 2000, because of the 2000-2001 State Budget Act.

## OTHER STATES' INFORMATION:  Unknown.

## FISCAL IMPACT:
SEC 103, if passed, would exempt the supplemental rate for California Children's Services $15.6 million ($7.8 million GF), services for home health $3.2 million ($1.6 million GF), shift