# Exhibit 42-1

*State of California ex rel. Ven-A-Care of the Florida Keys, Inc. v.*
*Abbott Labs, Inc. et al., Civil Action No. 03-11226-PBS*

**Exhibit to the November 25, 2009 Declaration of Philip D. Robben**
**in Support of Defendants' Joint Motion for Partial Summary Judgment**





**Bureau of Medi-Cal Fraud & Elder Abuse**
State of California Department of Justice

Office of Attorney General
Bill Lockyer

Bureau of
Medi-Cal Fraud
and Elder Abuse

March 20, 2006

110 West A Street
San Diego, CA
92101-3702

Telephone: (619) 688-6099
Facsimile: (619) 688-4200

*Via UPS*
Jonathan D. Cohen
Greenberg Traurig LLP
One International Place
Boston, MA 02110

RE:   Relator's First Amended Complaint (redacted)

Dear Jon,

Pursuant to Judge Saris' electronic order of February 2, 2006 (granting ex parte motion by California), and with Relator's concurrence, please find attached a redacted copy of Relator's First Amended Complaint, which has been redacted to eliminate allegations pertaining to other Defendants.

Sincerely,

NICHOLAS N. PAUL
Deputy Attorney General
Bureau of Medi-Cal Fraud and Elder Abuse

For   BILL LOCKYER
Attorney General

Enclosure:  Relator's First Amended Complaint, redacted, in pdf form.

1  David B. Zlotnick, SBN 195607
   THE LAW FIRM OFFICES OF DAVID ZLOTNICK
2  1010 Second Avenue, Suite 1750
   San Diego, CA 92101
3  (619) 232-0331

4  James J. Breen, Esq., Florida Bar No. 297178
   Alison W. Simon, Esq., Florida Bar No. 0109568
5  THE BREEN LAW FIRM
   The Crossroad Building
6  8201 Peters Road, Suite 1000
   Plantation, Florida 33324
7  (954) 916-2713

8  Sherrie R. Savett, Esq.
   Susan S. Thomas, Esq.
9  Jeanne A. Markey, Esq.
   Joy Clairmont, Esq.
10 BERGER & MONTAGUE, P.C.
   1622 Locust Street
11 Philadelphia, PA 19103
   (215) 875-3000
12
   John E. Clark, Esq.
13 GOODE, CASSEB, JONES,
    RIKLIN, CHOATE & WATSON
14 2122 North Main Avenue
   San Antonio, Texas 78212-9680
15 (210) 733-6030

16 Attorneys for the Plaintiff,
   THE STATE OF CALIFORNIA
17 The Qui Tam Plaintiff

18         IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

19             FOR THE CITY AND COUNTY OF SAN DIEGO

20 THE STATE OF CALIFORNIA, ex rel.          )   Case No. 722855
                                             )
21 VEN-A-CARE OF THE FLORIDA KEYS, INC.,     )   FILED IN CAMERA UNDER SEAL
   a Florida Corporation, by and through its principal  )   FIRST AMENDED COMPLAINT
22 officers and directors,      ZACHARY T. BENTLEY  )       FOR MONEY DAMAGES
                                             )            AND
23 and  T. MARK JONES,                       )   CIVIL PENALTIES UNDER THE
                                             )   CALIFORNIA FALSE CLAIMS
24            Plaintiff,                      )   ACT, GOV. CODE §§ 12651(a) AND
                                             )   12652(c)(1), et seq.
25    vs.                                    )
26 
27
28

First Amended Complaint                                          Case No. 722855



MYLAN PHARMACEUTICALS, INC.;

Defendants.

1    COMES NOW, the STATE OF CALIFORNIA ("GOVERNMENT" or "STATE"), by and

2  through and in their own persons VEN-A-CARE OF THE FLORIDA KEYS, INC., a Florida

3  corporation, by and through its principal officers and directors, ZACHARY T. BENTLEY and

4  T. MARK JONES ("VEN-A-CARE" or "VAC"), as the "Qui Tam Plaintiff" and by the undersigned

5  attorneys on behalf of the STATE OF CALIFORNIA and on the Qui Tam Plaintiff's own behalf and

6  bring this action against ████████████████████████████████

7  ████████████████████████████████████████████████

8  ████████████████████████████████████████████████

9  ████████████████████████████████████████████████

10  ████████████████████████████████████████████████

11  ████████████████████████████████████████████████

12  ████████████████████████████████████████████████

13  ████████████████████████████████████████████████

14  ████████████████████████████████████████████████

15  ████████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ████████████████MYLAN PHARMACEUTICALS, INC.;████████████

18  ████████████████████████████████████████████████

19  ████████████████████████████████████████████████

20  ████████████████████████████████████████████████

21  ████████████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ████████████████████████████████████████████████

24  ████████████████████████████████████████████████

25  ████████████████████████ (sometimes referred to collectively as, "DEFENDANT

26  DRUG MANUFACTURERS" or "DEFENDANTS"), for money damages, civil penalties and

27  equitable relief arising out of the DEFENDANT DRUG MANUFACTURERS' violations of the

28

1 | California False Claims Act, Cal. Gov. Code §§12651(a) and 12652(c)(1) from on or before January

2 | 1, 1988 to the present date.

3 | <center>**SECTION NO. 1**</center>

4 | <center>**SUMMARY OF THE ACTION**</center>

5 | **A.   OVERALL NATURE OF THE CLAIM - DEFENDANTS CAUSED THE CALIFORNIA MEDICAID PHARMACY PROGRAM TO REIMBURSE**
6 | **PRESCRIPTION DRUG PROVIDERS AT GROSSLY EXCESSIVE AMOUNTS**

7 |     1.      This is an action for damages, treble damages, restitution, pre-judgment interest, civil

8 | penalties of up to $10,000 for each false claim, equitable relief and for costs and attorneys' fees and

9 | expenses of the Attorney General of the State of California and of Ven-A-Care against the

10 | DEFENDANTS for violation of the California False Claims Act. The violations arise from

11 | DEFENDANTS' actions which caused California Medicaid ("Medi-Cal") to pay grossly inflated

12 | prices for DEFENDANTS' prescription drugs.  This First Amended Complaint encompasses all

13 | those pharmaceuticals with respect to which DEFENDANTS violated the California False Claims

14 | Act during the relevant time period by any of the means described herein.

15 |     2.      Medi-Cal pays reimbursement claims for the prescription drugs at issue herein only

16 | if three distinct requirements are met.  First, the drug manufacturer must make price and cost

17 | information about the drug publicly available.  Second, Medi-Cal must elect to cover the drug when

18 | medically necessary.  Third, the physician, pharmacy or other health care provider who seeks

19 | reimbursement for the cost of purchasing the drug must confirm that it was administered or

20 | dispensed to an eligible person covered by Medi-Cal.

21 |     3.      This false claims action reveals an intentional scheme by DEFENDANTS to arrange

22 | financial inducements aimed at pharmacies, specialized physicians (oncologists, infectious disease

23 | physicians, etc.) and clinics to increase sales of DEFENDANTS' prescription drugs which are

24 | reimbursed by Medi-Cal. The particular drugs and biologicals at issue here are hereinafter referred

25 | to as the "specified drugs". The DEFENDANTS, engineering what amounts to a kickback scheme,

26 | create financial inducements by falsely inflating their reports of the price and cost of the specified

27 | drugs, offering inducements such as free goods, direct monetary payments, rebates, and in the case

28 |

1   of blood factors, issuing or causing to be issued invoices that did not reflect the providers' true cost,

2   thus causing Medi-Cal to pay inflated reimbursement to the pharmacy, specialized physician or

3   clinic (collectively "the Providers") providing the covered drug to the drug recipient.  The financial

4   inducements arranged by the DEFENDANTS are intentionally concealed so that Medi-Cal will not

5   benefit from the true prices in the marketplace.  The DEFENDANTS were fully aware that Medi-Cal

6   was required by its reimbursement policies to use the  DEFENDANTS' reported drug prices and

7   costs in establishing reimbursement amounts.  Each DEFENDANT, had it so chosen, could have

8   reported prices and costs for the specified drugs that were consistent with the prices actually being

9   charged and paid in the marketplace.  The DEFENDANTS  were also  free to elect not to report

10  prices and thus not have their drugs covered by Medi-Cal.  Rather than choose either of these paths,

11  each of the DEFENDANTS has knowingly opted to report inflated prices and costs for the express

12  purpose of creating a "Spread" between the resulting Medi-Cal reimbursement amounts and the

13  prices actually being charged to the Providers.

14          4.



5.

6.

7.        As a result of the fraudulent and illegal acts alleged herein, DEFENDANTS have

reaped millions of dollars in illegal profits at the expense of the State of California and directly

contributed to Medi-Cal's soaring cost of providing prescription drugs for the State's needy. The

following chart reflects the fact that during the period from 1997 through 2001 California succeeded

in reducing the number of Medi-Cal recipients by almost 15%. Despite this decrease, Medi-Cal

prescription drug costs doubled over that period, from $1.55 billion in 1997 to $3.11 billion in 2001,

due in material part to the DEFENDANTS' false statements, which inflated the prices paid by Medi-Cal for such drugs.

| Year | Total Prescription Drug Cost to Medi-Cal | Number of Medi-Cal Recipients | Average Annual Prescription Cost Per Recipient |
|------|------|------|------|
| 2001 | $3,110,003,138.75 | 11,200,055 | $277.67 |
| 2000 | $2,399,891,464.95 | 10,708,028 | $224.12 |
| 1999 | $2,129,665,292.40 | 10,945,838 | $194.56 |
| 1998 | $1,809,364,948.40 | 11,748,817 | $154.00 |
| 1997 | $1,553,151,142.74 | 13,115,974 | $118.41 |

**B.   DRUG MANUFACTURERS' FALSE PRICE REPRESENTATIONS INVOLVE DRUGS PROVIDED BY RETAIL PHARMACIES AND DRUGS PROVIDED BY SPECIALIZED PHYSICIANS AND PHARMACIES**

8.     As have all other states, California has chosen to provide pharmaceutical reimbursement coverage pursuant to Medicaid, the federal medical assistance program for the poor which both the federal and state government fund and which the state administers pursuant to federal statutes, regulations and guidelines.

9.     In order to comply with federal regulations regarding establishing a reasonable estimate of Providers' drug acquisition costs for reimbursement purposes, Medicaid prescription drug programs such as Medi-Cal acquire and receive drug price and cost information from drug manufacturers directly and indirectly from companies which gather and publish such data. It is this price and cost information, which Medi-Cal used to establish reimbursement amounts for drugs to Providers, that DEFENDANTS falsely inflated in order to cause Medi-Cal to pay reimbursement claims in excessive amounts. The specified drugs include both those provided by retail pharmacies and those provided by specialized physicians and pharmacies.

10.     With respect to retail pharmacy drugs, the DEFENDANTS falsely represented their reports of Average Wholesale Price or "AWP" and/or DEFENDANTS' Direct Prices to Providers for certain of their prescription drugs (hereinafter sometimes referred to as the "specified retail pharmacy drugs") in order to cause Medi-Cal to pay claims in excessive amounts. By causing Medi-Cal to set reimbursement well above the Provider's actual costs for the specified retail pharmacy

1  drugs, the DEFENDANTS induced Medi-Cal retail pharmacy providers to choose the specified retail

2  pharmacy drugs over competing brand and generic versions.

3        11.    Likewise, the DEFENDANTS also inflated the AWP, and/or the direct price, of

4  various other drugs and biologicals which cannot be taken by mouth or self-administered (sometimes

5  herein referred to as "specified physician drugs"). These specified physician drugs are ordinarily

6  prescribed by specialized physicians for the treatment of various diseases, including respiratory

7  diseases, severe infections, cancer, AIDS, hemophilia and HIV diseases. They are generally

8  available only through a hospital, specialized physician or a specialized pharmacy. The physicians

9  prescribing these specified physician drugs are in a unique relationship with the DEFENDANTS

10  because they not only prescribe the pharmaceuticals, they also directly provide and administer or

11  arrange for the provision and administration of the specified drugs. They then apply for

12  reimbursement from Medi-Cal for the drug.

13        12.    The DEFENDANTS' false price representations were made through First Data Bank,

14  the company that assembles drug price data for Medi-Cal. Throughout the relevant time period

15  MediCal's fiscal agent had contracted with First Data Bank to assemble and provide Medi-Cal,

16  through the fiscal agent, with drug price information based upon which Medi-Cal would pay claims.

17        13.    The DEFENDANTS chose to report truthful AWP and Direct Prices for many drugs

18  and Medi-Cal was thus able to accurately estimate acquisition costs when paying claims for those

19  drugs.

20        14.    By reporting falsely inflated costs and prices, the DEFENDANTS created a "Spread"

21  between the acquisition cost that they caused the State to calculate and use for reimbursement

22  purposes and the actual cost of the drug to the retail pharmacies or specialized physician. This

23  "Spread", which constituted an unlawful financial inducement arranged by the DEFENDANTS,

24  directly benefitted the DEFENDANTS because it caused Providers to order the DEFENDANTS'

25  specified drugs instead of their competitors' drugs. The DEFENDANTS' reported AWP and Direct

26  Prices, containing as they did large, often enormous Spreads, (over 1000% in numerous instances),

27  became mere marketing tools employed to increase sales while bearing no relation whatsoever to

28

1   the actual prices providers were paying for the specified drugs.  DEFENDANTS thus duped the

2   Medi-Cal Program into paying claims for the specified drugs at inflated amounts in order to increase

3   the DEFENDANTS' sales and market share.  In short, the DEFENDANTS falsely reported the price

4   and cost of their specified drugs in order to cause the State to expend Medi-Cal dollars to

5   unwittingly fund  unlawful kickbacks to Providers.

6          15.     The DEFENDANTS' wrongful exploitation of the State's Medicaid Program caused

7   Medi-Cal to incur single damages in excess of Ten Million Dollars for which the State of California

8   is entitled to recover treble damages plus up to Ten Thousand Dollars per false claim, interest, costs

9   and attorneys' fees pursuant to Cal. Gov. Code §§ 12651(a)(1) and (2) and 12652 (c)(I) et seq.

10         16.     The   DEFENDANT   DRUG   MANUFACTURERS   knew   that   their   false

11  representations of prices and costs would cause the Medi-Cal Program to pay grossly excessive and

12  unreasonable amounts of money for claims for their drug products.

13  **C.     CERTAIN DEFENDANTS FALSELY IDENTIFIED THEIR DRUGS TO THE
       FEDERAL GOVERNMENT AS NON-INNOVATOR DRUGS IN ORDER TO PAY
14     A   SMALLER   REBATE   AMOUNT   TO   MEDI-CAL   PURSUANT   TO   THE
       MEDICAID REBATE PROGRAM**

15

16         17.     In addition to the fraud arising from DEFENDANTS' reporting of inflated prices and

17  costs for Medi-Cal reimbursement purposes, many of the DEFENDANTS, specifically ███████

18  ██████████████████████████████████████████████████████████████

19  ██████████████████████████████████████████████████████████████

20  █████████████████████████████████████████████████       MYLAN

21  PHARMACEUTICALS, INC., ██████████████████████████████████████

22  ██████████████████████████████████████████████████████████████

23  ██████████████████████████████████████████████████████████████

24  ██████████████████████████████████████████████████████████████

25  ████████████████   ██████████████████████████████████████████

26  ████████████████████████████

27  / / /

28         18.     The  Rebate Program requires all drug manufacturers whose drugs are paid for by

1  Medicaid to enter into an agreement with the Secretary of the Department of Health and Human

2  Services, under which the manufacturer agrees to pay each state a quarterly rebate as to each drug.

3  As part of the rebate calculation, drug manufacturers supply to the federal government what is called

4  their average manufacturer's price ("AMP").   The  smaller the AMP, the smaller the rebate.

5  Moreover, the amount of the rebate also depends upon which of two classifications a given drug falls

6  under. One category consists of single source drugs and innovator multiple source drugs (hereinafter

7  collectively referred to as "innovator drugs") and includes all drugs being sold under a New Drug

8  Application ("NDA").  The remaining category consists of non-innovator multiple source drugs

9  (hereinafter referred to as "non-innovator drugs") and includes all those drugs sold under an

10  Abbreviated New Drug Application ("ANDA").

11        19.     At all times relevant herein, the rebate that drug manufacturers paid for an innovator

12  drug was larger than what would be paid if that same drug were classified as a non-innovator.

13  Accordingly, the REBATE DEFENDANTS falsely reported that certain of their prescription drugs

14  were non-innovators when, in truth, they were innovators.  These false reports permitted the

15  REBATE DEFENDANTS to pay smaller rebate amounts, all to the direct detriment of California

16  and its Medi-Cal Program.

17        20.     The REBATE DEFENDANTS were also able to increase their potential to benefit

18  financially from their reporting of inflated prices and costs for reimbursement purposes by also

19  falsely reporting their drugs under the Rebate Program as being non-innovators as opposed to

20  innovators. As explained further herein, this arises from the different formulas used to calculate the

21  rebate amount for an innovator drug versus an non-innovator drug.  This added benefit of a non-

22  innovator drug classification provided a further motive for REBATE DEFENDANTS to falsely

23  report their drugs as non-innovators separate and apart from the motive of minimizing the amount

24  paid back to Medi-Cal pursuant to the Rebate Program. Likewise, DEFENDANTS were motivated

25  to, and did in fact, falsely report their drugs as generics to State Medicaid programs, including Medi-

26  Cal, because State Medicaid programs, in assembling and monitoring their state formulary of drugs

27  covered by the State Medicaid programs, scrutinized generics, and their pricing, less closely than

28

1   brand drugs and their pricing.

<div align="center">

**SECTION NO. 2**

**THE PARTIES**

</div>

4   21.    The Plaintiff in this action is the State of California by and through the Attorney

5   General.  At all times material to this civil action, the California Department of Health and Human

6   Services, the Department of Health Services and Medi-Cal were agencies and instrumentalities of

7   the State and their activities, operations and contracts in administering the Medicaid program were

8   paid from State and federal funds.  The State and its subcontractors performing on behalf of the State

9   provided Medicaid benefits to qualified recipients which included payment of claims for the drugs

10  specified herein manufactured by the DEFENDANT DRUG MANUFACTURERS and which were

11  based upon the false   price and cost representations made by the DEFENDANT DRUG

12  MANUFACTURERS.

13  22.    The Qui Tam Plaintiff, VEN-A-CARE, is a corporation organized under the laws of

14  the State of Florida, with its principal offices in Key West, Florida.  The Qui Tam Plaintiff's

15  principal officers and directors include Zachary T. Bentley and T. Mark Jones, who are each citizens

16  of the United States and reside in Key West, Florida.  The Qui Tam Plaintiff is a pharmacy and

17  provides pharmaceuticals, including intravenous, injectable or inhalation drugs and biologicals

18  specified in this First Amended Complaint, and has been, during the relevant period of this

19  Complaint, a Florida Medicaid provider and a Medicaid Part B supplier. The Qui Tam Plaintiff has

20  direct and independent knowledge of the information and is the "original source" of the information

21  on which these allegations are based within the meaning of Cal. Gov. Code §12652(d)(3)(A) and

22  (B) .  The Qui Tam Plaintiff has standing to bring this action pursuant to Cal. Gov. Code

23  §12652(c)(1). The information upon which these allegations are based was voluntarily provided by

24  the Qui Tam Plaintiff to the State and has been frequently supplemented by the Qui Tam Plaintiff.

25  A portion of the original source information provided by the Qui Tam Plaintiff consists of truthful

26  price and cost information for the specified drugs which is available to the Qui Tam Plaintiff as an

27  industry insider,  albeit a very small one.

28

First Amended Complaint                             9                             Case No. 722855



23. ███████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
███████████████████████

24. ████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
███████████████████████████

25. ████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
███████████████████████████████████████

26. ████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
███████████████████████████

27. ████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████

First Amended Complaint                    10                    Case No. 722855

1 ██████████████████████████████████████████████

2 ██████████████████████████████████████████████

3 ██████████████████████████████████████████████

4 ██████████████████████████████████████████████

5 ██████████████████████████████████████████████

6 ██████████████████████████████████████████████

7 ██████████████████████████████████████████████

8 ████████████████████

9    28.   ████████████████████████████████████

10 ██████████████████████████████████████████████

11 ██████████████████████████████████████████████

12 ██████████████████████████████████████████████

13 ██████████████████████████████████████████████

14 ██████████████████████████████████████████████

15 █████████████████████████████

16    29.   ████████████████████████████████████

17 ██████████████████████████████████████████████

18 ██████████████████████████████████████████████

19 ██████████████████████████████████████████████

20 ██████████████████

21    30.   ████████████████████████████████████

22 ██████████████████████████████████████████████

23 ██████████████████████████████████████████████

24 ██████████████████████████████████████████████

25 ██████████████████████████████████████████████

26 ██

27    31.   ████████████████████████████████████

28 ██████████████████████████████████████████████

First Amended Complaint                    11                    Case No. 722855



1

2

3

4

5    32.

6

7

8

9

10

11

12    33.

13

14

15

16

17

18    34.

19

20

21

22

23    35.

24

25

26

27

28    ///

First Amended Complaint

Case No. 722855

36. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████

37. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████

38. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████

First Amended Complaint                    13                    Case No. 722855

39. 

40.

41.



42.

43.

44.

45.



46. ████████████████████████████████████████

47.     The DEFENDANT, MYLAN PHARMACEUTICALS, INC. ("MYLAN"), is a corporation organized under the laws of West Virginia with its principal offices in Morgantown, West Virginia.  At all times material to this civil action, MYLAN has transacted business in the State of California by, including but not limited to, selling directly or through wholesalers its specified drugs in the State of California including San Diego County.

48. ████████████████████████████████████████

49. ████████████████████████████████████████

1

2    50. 

3

4

5

6

7    51.

8

9

10

11

12

13    52.

14

15

16

17

18

19    53.

20

21

22

23

24

25

26

27

28



54.

55.

56.

57.



58.

59.

///

60. 

61.     Any and all acts alleged herein to have been committed by any or all of the DEFENDANT DRUG MANUFACTURERS were committed by said DEFENDANT's officers, directors, employees, or agents who at all times acted on behalf of their respective DEFENDANT DRUG MANUFACTURER.

## SECTION NO. 3

### JURISDICTION & VENUE

62.     Jurisdiction is founded upon the State of California False Claims Act, (the "Act") Cal. Gov. Code §§12651(a) and 12652(c)(1) et seq.

63.     Venue in the Superior Court of San Diego County, California is appropriate and sufficient contacts for jurisdiction exist in that each of the DEFENDANTS transacted business in the State of California by selling directly or through others their specified drugs in the State of California, including San Diego County, which the respective DEFENDANTS knew would be supplied to Medi-Cal recipients including those residing in San Diego County and for which the DEFENDANTS knew that grossly excessive and unreasonable reimbursements for claims would be made to the providers/suppliers by Medi-Cal.

64.     A copy of pleadings and written disclosure of substantially all material evidence and

1    information VEN-A-CARE possesses was served on the State pursuant to Cal. Gov't. Code

2    §12652(c)(3) by mail, return receipt requested, on the Attorney General in Sacramento, California.

3                                    **SECTION NO. 4**

4                        **SYNOPSIS OF THE FALSE CLAIM SCHEME**

5           65.     The DEFENDANTS are each liable under the California False Claims Act because

6    they caused Medi-Cal to pay claims for certain of their prescription drugs in exorbitant amounts, far

7    in excess of the reasonable reimbursement contemplated under the applicable statutes and

8    regulations. The DEFENDANTS manufactured and/or distributed the specified drugs in this action

9    and sold the specified drugs either directly to pharmacies, physicians, clinics and others or indirectly

10   through such intermediaries as wholesalers and group purchasing organizations.     The

11   DEFENDANTS caused false claims for excessive reimbursement to be submitted to Medi-Cal by

12   reporting falsely inflated AWP and direct price representations which bore no relation to the actual

13   prices Providers had paid for the drug.   Pursuant to the kickback scheme DEFENDANTS

14   engineered, the Providers received a windfall financial benefit in the amount by which the

15   Government's approved "reimbursement" amount exceeded a reasonable estimate of the Provider's

16   true acquisition cost.

17          66.     The DEFENDANTS also caused the submission of false claims by actively marketing

18   the Spread on their specified drugs to Providers.  This financial inducement was in many cases

19   enhanced by additional inducements such as free goods, discounts, rebates, direct money payments,

20   off invoice pricing and deceptive invoicing, all of which increased the Spread by lowering the true

21   price for the specified drugs.

22          67.     The DEFENDANTS knew that Medi-Cal would not pay or approve claims for the

23   specified drugs if it were disclosed to the State's Medicaid Program that said claims were for

24   amounts that included kickbacks.

25          68.     The DEFENDANTS also knew that the Providers, in presenting claims for the

26   specified drugs to Medi-Cal , would not and did not disclose that the claim amounts included

27   kickbacks.

28          69.     The DEFENDANTS each carried out their scheme to defraud Medi-Cal by

First Amended Complaint                        21                          Case No. 722855

knowingly providing false and misleading price information directly or indirectly to Medi-Cal so that the Providers would be reimbursed in excessive amounts and thus be financially induced to prescribe and purchase the DEFENDANTS' specified drugs. The DEFENDANTS thus each participated in a fraudulent scheme to cause Medi-Cal to pay and approve false claims in excessive amounts.

70. The claims in question are each false claims under the California False Claims Act, in part, because they were each supported by, and the payment amount determined from, the false and misleading price information provided by the DEFENDANTS in connection with their respective specified drugs. The DEFENDANTS provided false price information to the price reporting services used by Medi-Cal to cause the State to pay amounts based on that information which is, in fact, what the State did. They thus caused false claims to be submitted to the State. Each DEFENDANT acted knowingly, as defined in the California False Claims Act, in providing the false and misleading price information that caused the State to pay claims for the DEFENDANTS' drugs in excessive amounts.

71. The false claims at issue in this action were each submitted to Medi-Cal by or on behalf of Providers that sought and received payment in excessive amounts because of false and misleading price and cost representations made by the DEFENDANTS directly or indirectly to Medi-Cal . The specific false claims at issue are thus each and every claim submitted to Medi-Cal for which the payment amount was determined by use, in whole or to any degree, of the false and misleading price representations of the DEFENDANTS. The false claims at issue number in the tens of thousands and each claim is in the possession of Medi-Cal . For many of the specified drugs, the Qui Tam Plaintiff has identified the false claims to the State by: providing the truthful prices concealed from the State by the DEFENDANTS for each drug; providing information about the DEFENDANTS' exploitation of financial inducements to induce utilization of these drugs and specific identification information about these drugs and providing the specific false price representations in question from which the Qui Tam Plaintiff and the State identified the specific false claims.

72. The damages sought herein include, but are not limited to, those arising from the false

1    claims for the specified drugs set out in Sections 9 through 38 and elsewhere throughout this First

2    Amended Complaint. The damages sought herein encompass all damages and penalties recoverable

3    due to the false claim scheme of the DEFENDANTS alleged herein relating to all drugs of all sizes

4    about which false price representations or records were used in connection with, considered or made

5    available in, caused, aided or otherwise affected the presentment, payment or approval of false

6    claims.  These claims also encompass recovery of the funds paid for false claims due to the

7    DEFENDANTS' false drug price representations, regardless of the State program that actually

8    expended the funds, the person or entity that ultimately received the funds or the person or entity

9    from which California ultimately recovers the funds.

10          73.    Some of the information supporting the Qui Tam Plaintiff's allegations is in the

11   exclusive control of the DEFENDANTS, in particular, certain information relating to the actual

12   prices of certain drugs taking into account the impact of rebates, chargebacks, discounts, bonuses,

13   free goods and/or any other mechanism which lowers the ultimate cost of a drug to Providers.

14          74.    The grossly inflated payments unwittingly made by Medi-Cal not only served as an

15   inducement to providers to purchase a particular manufacturer's product but also served to drive

16   over-utilization. The Qui Tam Plaintiff, prior to filing the initial Complaint in this action, surveyed

17   three national pharmacy providers of Albuterol to determine their business practices for their sales

18   of Albuterol to the Medicare and States' Medicaid Programs.  The Qui Tam Plaintiff's principals

19   used positions in an affiliated home health care company to pose as an interested customer. The Qui

20   Tam Plaintiff determined that the payment of kickbacks and/or split fees were commonplace

21   between the pharmacies and home health care companies who could provide the pharmacies with

22   patient referrals.  One marketing scheme offered by one of the pharmacies was the automatic

23   shipping of refills of Albuterol every month without verifying continuing need with the patient or

24   physician in order to maximize the sales of Albuterol and reimbursement.

25          75.    For many of the specified drugs, the DEFENDANT DRUG MANUFACTURERS'

26   false and fraudulent representations of price and cost caused the Medicare Program to pay and

27   approve claims at such excessive amounts that the 20% co-payment exceeded the true price of the

28   pharmaceuticals. In the cases of Medicare beneficiaries who are additionally eligible for Medicaid

1  benefits as the secondary payor, the States' Medicaid Programs, including Medi-Cal, paid the

2  excessive, inflated Medicare 20% co-payment.  The chart below lists some of those specified drugs,

3  the amount approved in 1996 by California Medicare, the 20% co-payment and the true price paid

4  by the Qui Tam Plaintiff.

76.     Through the above described scheme of concealing their true prices and representing falsely inflated prices and costs, the DEFENDANT DRUG MANUFACTURERS caused Medi-Cal to pay kickbacks (illegal remuneration) from Federal and State funds to the DEFENDANT DRUG MANUFACTURERS' customers.

<div align="center">

**SECTION NO. 5**

**BACKGROUND OF HOW
PHARMACEUTICAL CLAIMS ARE PAID FOR
UNDER MEDI-CAL**

</div>

77.     The United States Government partially funds state sponsored medical assistance programs for the poor pursuant to Title XIX of the Social Security Act, 42 U.S.C. §1396 et seq.

78.     Benefits for pharmaceuticals are optional but all states have opted to provide Medicaid pharmaceutical reimbursement coverage.

79.     The federal portion of state Medicaid payments, Federal Medical Assistance Percentage ("FMAP") is based on a state's per capita income compared to the national average. The federal portion consists of a minimum of 50% up to a maximum of 83%.   California's FMAP contributed by the United States in 1995 was 50.00%.

80.     The States, United States Territories and the District of Columbia are required to implement a State Health Plan containing certain specified minimum criteria for coverage and payment of claims in order to qualify for federal funds for Medicaid expenditures.  42 U.S.C. §1396a(a)(30)(A).

81.     State Health Plans must, in part, provide for payment of claims for prescription pharmaceuticals pursuant to a formula approved by the Secretary of the Department of Health and Human Services which determines maximum allowable claim amount for each pharmaceutical manufactured by each manufacturer whose prescription pharmaceuticals qualify for Medicaid reimbursement based upon an estimation of the provider's acquisition cost plus a reasonable dispensing fee.  42 CFR §447.331.

82.     In order to comply with the requirements of 42 CFR §447.331 to estimate a provider's costs for specific pharmaceuticals, the States' Medicaid programs acquire and receive price and cost information from the DEFENDANT DRUG MANUFACTURERS directly and indirectly from entities equipped to do specialized data collection.

83.     Medical Economics, Inc. and the Hearst Corporation are nationally recognized companies that specialize in gathering pharmaceutical pricing and cost information including Average Wholesale Price ("AWP"), Wholesale Acquisition Cost ("WAC"), Direct Price ("DP"), Actual Acquisition Cost ("AAC") and Estimated Acquisition Cost ("EAC"). Medical Economics publishes pharmaceutical pricing information in "The Red Book". The Hearst Corporation publishes pharmaceutical pricing information through its First Data Bank Division, which is an automated data base service.

84.     During the time covered by this First Amended Complaint :

        a.      Medi-Cal awarded cost-reimbursement contracts to private companies to evaluate and process claims for payment.  The State refers to these contractors as fiscal agents.

        b.      Medi-Cal's fiscal agent contracted with First Data Bank to provide the requisite drug pricing information to establish provider reimbursement.

        c.      Medi-Cal pays for drugs under two programs:

                i.      Pharmacy (which would apply to all the specified retail pharmacy drugs) and;

                ii.     Incident to a physician's service (which would apply to all the specified physician's drugs)

85.     Medi-Cal's reimbursement formula under the pharmacy program involves a

1  determination of Estimated Acquisition Cost ("EAC") to the Provider for the drug.  Pursuant to

2  California Administrative Code, Cal. Code, Title 22, § 51513 (hereinafter Section 51513), the EAC

3  for a drug product means: "[Medi-Cal's] best estimate of the price generally and currently paid by

4  providers for a drug product sold by a particular manufacturer or principal labeler in a standard

5  package."  The EAC is either the drug's reported Average Wholesale Price ("AWP") minus 5% or

6  the drug's reported direct price (in the case of certain enumerated drug manufacturers).

7          a.       Under Section 51513, Medi-Cal determines AWP as follows: Average

8  Wholesale Price (AWP), excepting temporary updates provided in subdivision (a)(13), is the price

9  for a drug product or medical supply product listed for a standard package in the Department's

10  primary price reference source, or for products not listed in the Department's primary price reference

11  source, the price listed for a standard package in the secondary price reference source; and, if not

12  listed in the secondary price source, the principal labeler's catalog.

13          b.       The primary price reference source is the price reference source that, in the

14  judgment of the Director, best meets several criteria including accuracy and currentness of data.  The

15  EAC is updated no less than every 30 days.

16          c.       The EAC that is the Direct Price (applicable in this action only to

17  DEFENDANTS ███████████████████████████████ is determined

18  pursuant to California Administrative Code, Cal. Code Title 22, § 51513.5 which provides:   The

19  estimated acquisition cost for all of the drug products manufactured or distributed by a

20  pharmaceutical company listed below shall be the direct price listed for a standard package in the

21  Department's primary reference source; or for products not listed in the Department's primary price

22  reference source, the direct price listed for a standard package in the secondary price reference

23  source; or, if not listed in the secondary price source, the principal labeler's catalog.

24          86.      The State of California's reimbursement for pharmaceuticals incident to a physician's

25  services is based on a Level 3 HCPCS Code from the Physician's Handbook which is unique to

26  California Medicaid.  California physicians are reimbursed based upon the quantity of drug they

27  dispense.  Additionally, when more than one manufacturer of a given drug exists, Providers are

28  reimbursed in the amount of the lowest reported AWP for that drug minus 5%.

87.     Medi-Cal has utilized First Data Bank as its primary reference source and has utilized data about Direct Price and AWP supplied by First Data Bank in setting reimbursement amounts for the specified drugs.

88.     First Data Bank established or reported the AWP and Direct Price for the specified drugs based solely on the pricing information supplied to it by the DEFENDANTS.

89.     With respect to anti-hemophilia factors, Medi-Cal provides that claims for reimbursement must be made "By Report".  Pursuant to this reimbursement procedure, a valid invoice ("AHF invoice") for each AHF product must be submitted by the provider which includes, inter alia, the manufacturer's name, product brand name, units per vial, total number of units or vials administered and the total cost for each product.  Reimbursement is then provided based on the per unit acquisition cost (as calculated by the Provider based upon the AHF invoice price minus "off-invoice discounts and rebates") plus one percent of this cost.

90.     Congress has attempted to assist the States' Medicaid programs, including Medi-Cal, in limiting reimbursement amounts for certain generic prescription drugs to a reasonable estimate of acquisition cost by empowering the Centers for Medicare and Medicaid Services ("CMS") to set a Federal Upper Limit ("FUL") for drugs paid for by the Medicaid Programs.  Under the plan, CMS may impose a FUL on any generic drug if:

       a.      All formulations of the drug have been evaluated as therapeutically equivalent by the FDA;

       b.      At least three (3) companies list their drugs in current published compendia with their cost; and

       c.      If the above criteria are met, the drugs are available for sale nationally.

91.     CMS then finds the least costly generic as listed in all available national compendia that can be purchased by pharmacies and multiplies its cost by 150% to arrive at the FUL amount.  This becomes the FUL amount for all manufacturers' generic form of the drug or the maximum amount a State Medicaid Program can pay.

92.     With respect to drugs in the Medi-Cal pharmacy program, reimbursement amounts are determined by taking the lesser of:

a.      the State's CMS approved plan (i.e. California's AWP - 5%);

b.      the pharmacies usual and customary charges to the general public;  or,

c.      the Federal Upper Limit ("FUL") plus a reasonable professional or dispensing fee.

93.     The claims that are the subject of the False Claims Act are the claims for reimbursement of pharmacy and incident-to-physicians services drugs submitted to Medi-Cal to obtain reimbursement for prescription drugs provided to Medi-Cal recipients.

94.     Pharmacy claims are submitted in one of two ways. The first is by submitting to the fiscal agent or state agency a completed (hard copy 30-1) pharmacy claim form.  The second is through an electronic claims filing procedure whereby the same information required to be included on the hard copy is transmitted electronically to the Medicaid fiscal agent or state agency.

95.     Pharmacies must bill Medicaid by utilizing National Drug Codes ("NDC") numbers. The Food and Drug Administration ("FDA") assigns NDC numbers to identify each individual manufacturer and their pharmaceuticals' strength and size.  NDC numbers are eleven digits, with the first five digits identifying the manufacturer or labeler, the next four digits identifying the product and the last two digits identifying the package size.

96.     Claims for pharmaceuticals incident to a physician service are submitted in one of two ways.  The first is by submitting to the fiscal agent or state agency a completed (hard copy) HCFA 1500 claim form.  The second is through an electronic claims filing procedure whereby the same information required to be included on the hard copy is transmitted electronically to the Medicaid fiscal agent or State Agency.

97.     Physicians must bill Medi-Cal  for pharmaceuticals by utilizing a 5-digit alpha numeric system created by the State of California and referred to as a HCPCS Level 3.  In addition to being reimbursed for the cost of the pharmaceutical, physicians receive a payment of $3.93 to cover the cost of the needle, syringe and alcohol swab.

98.     The State of California awards cost-reimbursement contracts to private companies to evaluate and process Providers' claims for payment. The State refers to these contractors as fiscal agents.

1   / / /

2   / / //

3                               **SECTION 6**

4                      **THE ROLE OF THE WHOLESALER**

5        99.    The majority of the DEFENDANTS' drugs, including the majority of the specified

6   drugs at issue in this action, are distributed through drug wholesalers who resell and distribute the

7   drugs to hospitals, pharmacies, physicians and clinics.

8        100.    Four companies, McKesson Drug, Cardinal, Bergen Brunswig and Ameri-Source,

9   comprise approximately eighty (80%) of the 53 billion dollar annual wholesale drug market.

10  Wholesalers generally sell to any person or entity (i.e. pharmacies, physicians and hospitals) who

11  can lawfully purchase prescription drugs.

12       101.    Wholesalers purchase the specified drugs at prices that are unilaterally set and

13  controlled by the DEFENDANTS. The wholesalers in turn add a percentage (commonly referred

14  to as an "up-charge") to the price to cover the wholesaler's expenses such as warehousing, delivery,

15  billing and collections and to provide a profit. The percentage of up-charge is negotiated between

16  the pharmacy and the wholesaler and is usually based on the pharmacy's purchasing volume. By

17  way of example, the Qui Tam Plaintiff's up-charge from ███████████

18       102.    The DEFENDANTS also sell directly and indirectly to hospitals and retail

19  pharmacies through group purchasing organizations (" GPO's") and buying groups. GPO's and

20  buying groups represent smaller providers and provide members with lower costs by negotiating

21  prices for specific drugs from the manufacturers. The GPO or buying group member is able to

22  purchase the drugs at the GPO's or buying group's negotiated price either directly from the

23  manufacturer or from a wholesaler that has a "charge-back" agreement with the specific

24  manufacturer.

25       103.    The DEFENDANTS have employed the charge back arrangements with wholesalers

26  to conceal the true costs of acquiring the specified drugs to the wholesalers and to report fictitiously

27  inflated drug costs. When a wholesaler sells a drug, the price of which has been negotiated with a

28  GPO or buying group, the wholesaler is credited by the DEFENDANT for the difference between

1  the false price and the true price to the DEFENDANTS' customer plus the agreed "up-charge" for

2  the wholesaler.   The DEFENDANTS' exploitation of the "charge-back" scheme allows the

3  DEFENDANTS to control prices charged by wholesalers while fictitiously reporting inflated

4  wholesaler cost.

5  104.

6

7

8  a.

9

10  b.

11

12

13  c.

14

15

16

17

18  d.

19

20

21

22  105.   In order to monitor the wholesalers' compliance, the DEFENDANTS required all

23  drug wholesalers to periodically (generally quarterly) report back to the DEFENDANTS all

24  prescription drug sales by NDC number, provider name and sales price.

25  106.   A representative example of this practice was demonstrated when Ven-A-Care was

26  informed by a ▮▮▮ sales representative that ▮▮▮ and other drug manufacturers considered this

27  information vital in determining how and where to market their prescription drugs.  The ▮▮▮

28  representative informed VAC that ▮▮▮ prepared reports for every sales representative based on

the information compiled from all wholesalers' reports and that the ▮▮▮ report was broken down by postal zip code, provider, NDC number, quantity and sales prices.

///

## SECTION NO. 7

### THE DEFENDANT DRUG MANUFACTURERS' KNOWLEDGE OF THE FALSE CLAIMS SCHEME

107.  At all times material to this action, each of the DEFENDANT DRUG MANUFACTURERS acted "knowingly" as that term is defined in Cal. Gov. Code §§12650(b)(2) by:

    a.    Causing the presentation of false claims for payment or approval by Medi-Cal; and

    b.    Causing the making and using of false statements and/or records for the purpose of getting false claims approved or paid by Medi-Cal.

108.  The DEFENDANT DRUG MANUFACTURERS knew or recklessly disregarded or acted in deliberate ignorance of the fact that their conduct would cause Medi-Cal to pay claims for the specified drugs in amounts exceeding that contemplated by applicable law, in part, because:

    a.    Each of the DEFENDANT DRUG MANUFACTURERS knew or recklessly disregarded or acted in elaborate ignorance of the fact that Medi-Cal was required to pay claims based upon the drugs' Estimated Acquisition Cost ("EAC") to the Provider submitting the claim. 42 CFR §447.331.

    b.    Each DEFENDANT DRUG MANUFACTURER knew or recklessly disregarded or acted in deliberate ignorance of the fact that Medi-Cal contracted through its fiscal agent with First Data Bank to obtain the DEFENDANT's reported AWPs or Direct Prices and used the prices from First Data Bank to establish the estimated acquisition cost for the specified drugs for reimbursement purposes.

    c.    Each of the DEFENDANTS knew or recklessly disregarded or acted in deliberate ignorance of the fact that, Medi-Cal utilized their reported AWP minus 5% or reported Direct Price as the Estimated Acquisition Cost.

1           d.      Each of the DEFENDANT DRUG MANUFACTURERS knew or recklessly

2  disregarded or acted in deliberate ignorance of the fact that they were supplying to First Data Bank

3  the AWPs and Direct Prices which First Data Bank reported to Medi-Cal and that First Data Bank

4  relied solely on DEFENDANTS to obtain its prices.

5           e.      The DEFENDANTS knew or recklessly disregarded or acted in deliberate

6  ignorance of the fact that they required wholesalers to report back to DEFENDANTS, and that

7  wholesalers did in fact routinely report back to the DEFENDANTS, all prescription drug sales by

8  NDC number, provider name and the actual price the Provider had paid.

9           f.      Each of the DEFENDANTS knew and in fact closely monitored the prices,

10  with and without discounts, that Providers were paying for DEFENDANTS' specified drugs.

11           g.      The DEFENDANTS knew or recklessly disregarded or acted in deliberate

12  ignorance of the fact that the AWP and Direct Prices they reported to First Data Bank were vastly

13  higher than, and bore no relation whatsoever to, the actual prices which Providers were paying for

14  their specified drugs.

15           h.      The DEFENDANTS knew or recklessly disregarded or acted in deliberate

16  ignorance of the fact that, all other factors being equal, the greater the "Spread" on a drug, the

17  greater the likelihood a provider would purchase that drug versus a competing brand or generic drug.

18           i.      Each of the DEFENDANT DRUG MANUFACTURERS knew or recklessly

19  disregarded or acted in deliberate ignorance of the fact that federal statutes and regulations limited

20  payment of Medi-Cal claims for the specified drugs to a reasonable estimation of the acquisition

21  cost.

22           j.      Each of the DEFENDANT DRUG MANUFACTURERS knew or recklessly

23  disregarded or acted in deliberate ignorance of the fact that Medi-Cal was not authorized or

24  permitted by applicable law to pay claims for the specified drugs in excessive amounts.

25           k.      Each of the DEFENDANTS systematically concealed or otherwise failed to

26  report decreases in the actual prices to the Providers of the specified drugs.

27      109.    Each of the DEFENDANT DRUG MANUFACTURERS knew or recklessly

28  disregarded or acted in deliberate ignorance of the fact that federal and California statutes and

regulations prohibited them from making misleading representations about the specified drugs, including misleading price or cost representations:

        a.      Each of the DEFENDANT DRUG MANUFACTURERS was required to comply with the Federal Food, Drug and Cosmetic Act 21 U.S.C. §321 et seq., and the regulations promulgated pursuant thereto.

        b.      The price and cost representations about the specified drugs constituted advertising that was included in the "labeling" provisions of the Federal Food and Drug Act and related regulations. 21 U.S.C. §§201(m); 202.1(k)(2).

        c.      Each of the DEFENDANT DRUG MANUFACTURERS is prohibited from disseminating any information about their prices or costs of the specified drugs that was "false or misleading in any particular . . ." 21 U.S.C. §§5.02; 302(b).

        d.      Each of the DEFENDANT DRUG MANUFACTURERS possessed a duty to assure that their representations about prices and costs of the specified drugs were not misleading, taking into account:

> " . . . not only representations made or suggested by statement, word, design, device, or any combination thereof, but also to the extent to which the labeling or advertising fails to reveal facts material in light of such representations"

21 U.S.C. §201(n).

110.    The DEFENDANT DRUG MANUFACTURERS regularly made direct representations of false price and cost information to Medi-Cal that were utilized in approving and paying claims. By way of example, attached hereto and incorporated herein by reference as Exhibit 1 is a copy of a written representation of false price and cost information provided to all state Medicaid, including Medi-Cal, agencies by DEFENDANT ▮▮▮▮▮▮▮ regarding its drug ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

111.    The DEFENDANT DRUG MANUFACTURERS were each fully capable of making truthful representations about prices and costs of the specified drugs and did so when it is economically beneficial to them, a fact which further indicates that they acted with knowledge and one demonstrated by the DEFENDANTS' drug price reports supplied to the federal government in

1    connection with the Rebate Program.

2        112.    The DEFENDANT DRUG MANUFACTURERS each participated in the Rebate

3    Program mandated by the Federal Omnibus Budget Reconciliation Act of 1990 ("OBRA '90") and

4    thus were required to pay rebates to Medi-Cal.  In calculating rebates it was in the economic

5    interests of the DEFENDANT DRUG MANUFACTURERS to report the lowest AMPs possible

6    based upon the data available to them.  The following examples demonstrate that the DEFENDANT

7    DRUG MANUFACTURERS were able to report accurate prices when they chose to:

8        a.

9

10

11

12

13

14

15

16

17

18

19

20        b.

21

22

23

24

25

26

27

28

First Amended Complaint                      35                      Case No. 722855

1

2

3

4      113.    When reporting prices to First Data Bank and directly to Medi-Cal for the drugs at

5  issue in this case, the DEFENDANT DRUG MANUFACTURERS falsely reported amounts far in

6  excess of those reported for federal Medicaid rebate purposes.  Therefore, when it benefitted the

7  DEFENDANT DRUG MANUFACTURERS to report high prices in order to maximize the

8  reimbursement amount for Providers, they used the false and grossly inflated prices and, when it

9  benefitted the DEFENDANT DRUG MANUFACTURERS to report their true prices, which were

10  much lower, to minimize the rebates they were required to pay the Rebate Program, they used the

11  true prices.

12      114.    The knowledge or gross recklessness of DEFENDANTS is further demonstrated by

13  the Rebate Program because the vast difference between the AMP's being reported for federal rebate

14  purposes and the AWP's and direct prices being reported for reimbursement purposes made it

15  obvious that the reported reimbursement costs and prices were grossly inflated yet they were never

16  corrected.

17      115.    Each DEFENDANT DRUG MANUFACTURER was on notice that it was

18  prohibited by federal statute from paying, or causing the payment of, directly or indirectly,  money

19  or other financial benefit to induce its customers to order the specified drugs when Medi-Cal would

20  be paying claims. 42 U.S.C. §1320a-7b(b)(2).

21      116.

22

23

24

25

26

27

28

1 /// 

2 /// 

3 /// 



**SECTION NO. 8**

**THE MAGNITUDE OF THE FINANCIAL INDUCEMENT**

117.    The magnitude of the kickback, or financial inducement which Providers could receive through utilization of drugs with large Spreads is illustrated by the following examples of common drug therapies for certain of the specified drugs:

        a.

1  ///

2  ///

3  ///

4

5



118.    As a result of DEFENDANT's falsely inflated price representations which Medi-Cal used to set reimbursement rates, the Provider would be reimbursed $2,983.02 for a cycle of drugs which cost no more than $194.29, a profit from Medi-Cal of over 1600%.  For the full ten cycle therapy, the Provider would be reimbursed almost $28,000 more than its cost, under a system that is designed to pay only the reasonable acquisition cost of drugs.

119.    The above example is of a chemotherapy regimen obtained from Handbook of Commonly Used Chemotherapy Regimens, F. Anthony Greco, M.D., Precept Press, 1996.  It does not include any professional or dispensing fees, supportive drugs or intravenous fluids prescribed which are all separately reimbursable by Medicare and the State's Medicaid Program.

a.



| COMPARISONS OF QUI TAM PLAINTIFF'S COST VS. MEDI-CAL REIMBURSEMENT FOR ONE (1) CYCLE: | | |
|---|---|---|
| **QUI TAM PLAINTIFF'S COST** | **vs** | **MEDI-CAL REIMBURSEMENT** |
| $52.05 | | $1,090.71 |

| COMPARISONS OF QUI TAM PLAINTIFF'S COST VS. MEDI-CAL REIMBURSEMENT FOR SIX (6) CYCLES (6 WEEKS): | | |
|---|---|---|
| **QUI TAM PLAINTIFF'S COST** | **vs** | **MEDI-CAL REIMBURSEMENT** |
| $312.30 | | $6,544.46 |

120.    The above example is of a chemotherapy regimen obtained from <u>Journal of Clinical</u>

1    Oncology, 5: 1559-1565, 1987.  It does not include any professional or dispensing fees, supportive

2    drugs or intravenous fluids prescribed which are all separately reimbursable by Medicare and

3    State's Medicaid Program.

4            a.



27            **COMPARISONS OF QUI TAM PLAINTIFF'S COST VS. MEDI-CAL
           REIMBURSEMENT FOR ONE (1) CYCLE:**

| QUI TAM PLAINTIFF'S COST | vs | MEDI-CAL REIMBURSEMENT |
|---|---|---|
| $680.68 | | $1,670.12 |

| COMPARISONS OF QUI TAM PLAINTIFF'S COST VS. MEDI-CAL REIMBURSEMENT FOR FOUR (4) CYCLES: | | |
|---|---|---|
| QUI TAM PLAINTIFF'S COST | vs | MEDI-CAL REIMBURSEMENT |
| $2,722.72 | | $6,680.48 |

121.    The above example is of a chemotherapy regimen obtained from <u>Handbook of Commonly Used Chemotherapy Regimens,</u> F. Anthony Greco, M.D., Precept Press, 1996. It does not include any professional or dispensing fees, supportive drugs or intravenous fluids prescribed which are all separately reimbursable by Medicare and State's Medicaid Program.

122.    The knowledge of the DEFENDANT DRUG MANUFACTURERS is further demonstrated by their systematic and ongoing, written and verbal communications with customers whereby they encouraged and induced them to submit claims to Medicare and Medicaid to receive the excessive payments resulting from the DEFENDANTS' false price and cost representations.

each maintained an "800" number, staffed with personnel trained to assist customers in securing payment of claims in the excessive amounts at issue in this action.

**SECTION NO. 9**



124.

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| ███ | | | | | |
| ███ | ██ | ████ | ███ | ██████ | ███████ |
| | | ████ | ██ | ██████ | █████ |
| ███████ | █████ | ██ | ███ | ███ | ██ |
| ███ | ██████ | ██ | ██ | ██ | ██ |
| ███ | ██████ | ███ | ██ | ██ | ██ |
| ███ | ██████ | ██ | ██ | ██ | ██ |
| ██ | ██████ | ██ | ██ | ██ | ██ |
| █████ | █████ | ██ | ██ | ██ | ██ |
| █████ | █████ | █ | ██ | ██ | ███ |
| █████ | █████ | ██ | ██ | ██ | ███ |
| ██ | █████ | ███ | ██ | ██ | ███ |
| ███ | █████ | █ | ██ | ██ | ██ |
| █████ | █████ | ██ | ██ | ██ | ███ |
| █████ | █████ | ██ | ██ | ██ | ███ |
| █████ | ████ | ██ | ███ | ██ | ██ |

125.   The acts of ████████████ in knowingly providing false and misleading price information to Medi-Cal:

    a.   Were committed knowingly in order to cause Medi-Cal to pay amounts for claims for drugs that substantially exceeded the amounts that would otherwise have been paid according to law.

b.      Were committed knowingly in order to cause Medi-Cal to pay unwittingly excessive amounts for the DEFENDANT's drugs.

c.      Were committed knowingly in order to financially induce the DEFENDANT's customers, and those acting in concert with them, to cause the DEFENDANT's drugs to be utilized for the treatment of Medicaid recipients.

d.      Were committed knowingly in order to financially induce the DEFENDANT's customers and those acting in concert with them to select the DEFENDANT's drugs for Medicaid recipients rather than select similar drugs of competitors, or prescribe alternative therapies.

e.      Did in fact cause the DEFENDANT's customers, and those acting in concert with them, to utilize the DEFENDANT's drugs for treatment of Medicaid recipients rather than competing drugs or alternative therapies.

126.    As a direct and proximate result of the actions of the DEFENDANT ▋▋▋ alleged herein, the State of California has sustained damages recoverable under the California False Claims Act together with treble damages, penalties, attorneys' fees and costs.

### SECTION NO. 10

▋▋▋▋▋▋▋▋▋▋

127. ▋▋▋▋▋▋▋▋▋▋▋▋▋▋

▋▋▋▋▋▋▋▋▋▋▋▋▋▋

▋▋▋▋▋▋▋▋▋▋▋▋▋▋

▋▋▋▋▋▋▋▋▋▋▋▋▋▋

▋▋▋▋▋▋▋▋▋▋▋▋▋▋

▋▋▋▋▋▋▋▋▋▋▋▋▋▋

▋▋▋▋▋▋▋▋▋▋▋▋▋▋

▋▋▋▋▋▋▋▋▋▋▋▋▋▋

▋▋▋▋▋▋▋▋▋▋▋▋▋▋



128.

129. ████████████████████████████████████

█████████████████████████████████████████████

█████████████████████

///

130.   The acts of DEFENDANT ██████ in knowingly providing false and misleading price information to Medi-Cal:

        a.   Were committed knowingly in order to cause Medi-Cal to pay amounts for claims for drugs that substantially exceeded the amounts that would otherwise have been paid according to law.

        b.   Were committed knowingly in order to cause Medi-Cal to pay unwittingly excessive amounts for the DEFENDANT's drugs.

        c.   Were committed knowingly in order to financially induce the DEFENDANT's customers, and those acting in concert with them, to cause the DEFENDANT's drugs to be utilized for the treatment of Medicaid recipients.

        d.   Were committed knowingly in order to financially induce the DEFENDANT's customers and those acting in concert with them to select the DEFENDANT's drug products for Medicaid recipients rather than select similar drugs of competitors, or prescribe alternative therapies.

        e.   Did in fact cause the DEFENDANT's customers, and those acting in concert with them, to utilize the DEFENDANT's drugs for treatment of Medicaid recipients rather than competing drugs or alternative therapies.

**SECTION NO. 11**

████████████████████████████

131. ████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████



1

2

3

4

5

6

7

8

9

10

11    132.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 ///

2 ///

3 //

4 ///

5 ///