# Exhibit 45

*State of California ex rel. Ven-A-Care of the Florida Keys, Inc. v.*
*Abbott Labs, Inc. et al., Civil Action No. 03-11226-PBS*

**Exhibit to the November 25, 2009 Declaration of Philip D. Robben**
**in Support of Defendants' Joint Motion for Partial Summary Judgment**

1   EDMUND G. BROWN JR.
    Attorney General of the State of California
2   RICHARD T. WALDOW
    Supervising Deputy Attorney General
3   JENNIFER M. KIM
    Supervising Deputy Attorney General
4   MICHELE WONG
    Deputy Attorney General
5   State Bar No. 167176
    ERIC D. BATES
6   Deputy Attorney General
    State Bar No. 170444
7      300 South Spring Street, Suite 1702
       Los Angeles, CA  90013
8      Telephone: (213) 897-2449
       Fax: (213) 897-2805
9      Email: Michele.Wong@doj.ca.gov

10  Attorneys for Defendant

11                IN THE UNITED STATES DISTRICT COURT

12             FOR THE CENTRAL DISTRICT OF CALIFORNIA

13                        WESTERN DIVISION

14

15  | MANAGED PHARMACY CARE, a | CV09-0382-CAS (MANx) |
    | California corporation; INDEPENDENT | |
16  | LIVING CENTER OF SOUTHERN | PAGES 000234-00289 |
    | CALIFORNIA, INC., a California | |
17  | corporation; GERALD SHAPIRO, | DECLARATIONS OF T. ALLAN |
    | Pharm.D., doing business as Uptown | HANSEN, KEVIN GOROSPE |
18  | Pharmacy & Gift Shoppe; SHARON | AND SUSAN FLORES IN |
    | STEEN, doing business as Central | SUPPORT OF **DEFENDANT'S** |
19  | Pharmacy; and TRAN PHARMACY, | **OPPOSITION TO** |
    | INC., a California corporation,**,** | **PLAINTIFFS' MOTION FOR** |
20  | | **PRELIMINARY INJUNCTION** |
    |                            Plaintiffs, | |
21  | | Date: |
    |         **v.** | Time: |
22  | | Courtroom: |
    | DAVID MAXWELL-JOLLY, Director of | Judge:        The Honorable |
23  | Department of Health Care Services of the | Christina A. Snyder |
    | State of California,**,** | Trail Date: TBA |
24  | | Action Filed: 1/16/2009 |
    |                            Defendant. | |
25

26

27

28

# DECLARATION OF T. ALLAN HANSEN

# EXHIBIT B

1                               <u>DECLARATION OF T. ALLAN HANSEN</u>

2                 I, T. ALLAN HANSEN, declare and state as follows:

3                 1. I have personal knowledge of the facts set forth in this declaration and, if

4 called as a witness at the trial in this matter, could and would testify competently to the

5 contents thereof.

6                 2. I am a manager with the Accounting Firm of Myers and

7 Stauffer LC. I received a B.S. in Mathematics (Actuarial Science) from Northern Arizona

8 University in 1993. I have been employed by Myers and Stauffer LC since February

9 1997. Myers and Stauffer LC, a Certified Public Accounting firm, has worked almost

10 exclusively in the public health care sector since 1977. The practice is intentionally

11 restricted to providing Medicaid rate setting, financial/statistical analysis, data

12 management, cost report review and audit and other specialized consulting services to

13 state and federal agencies managing government-sponsored health care programs.

14 Myers and Stauffer has more than 29 years experience conducting more than 40

15 pharmacy cost surveys in more than 15 states.

16                 3. In June 2002, Myers and Stauffer completed a study of dispensing

17 costs and drug acquisition costs for pharmacies on behalf of the California Department of

18 Health Services. I served as manager for the California study and supervised the

19 collection and review of dispensing cost surveys and pharmaceutical purchase invoices.

20 I was actively involved in all stages of the project including data analysis and report

21 writing. In December 2007, Myers and Stauffer completed another study of dispensing

22 costs and drug acquisition costs for pharmacies on behalf of the California Department of

23 Health Care Services (DHCS). I again served as manager for this latest study.

24                 4. On page 8 of the December 2007 study is a table containing the average

25 Medi-Cal reimbursement, including $7.25 dispensing fee, and the average pharmacy

26 acquisition cost for three categories of prescription drugs: single source, multi-source

27 without a federal upper limit (FUL) and multi-source with an FUL. This table was based

1

000235

1 | on summaries of Medi-Cal pharmacy claims and the results of the pharmacy acquisition

2 | cost study.  Not specifically reported in the study itself was the aggregate average

3 | reimbursement and average acquisition cost for all categories of drugs included in the

4 | table.   Based on the same summaries of Medi-Cal pharmacy claims and the results of

5 | the pharmacy acquisition cost study that was the basis for the averages reported on page

6 | 8 of the study, Myers and Stauffer determined that the average Medi-Cal reimbursement

7 | for all categories of prescription drugs was $84.62 (including the $7.25 dispensing fee)

8 | and the average acquisition cost for all categories of prescription drugs was $66.22.  On

9 | March 27, 2008, I provided this information concerning average Medi-Cal reimbursement

10 | and average acquisition cost to Kevin Gorospe, Chief of the Medi-Cal Pharmacy Policy

11 | Branch of DHCS.

12 |          5.   In early January 2009, DHCS staff contacted me for suggestions for

13 | inflating the $10.81 average dispensing cost determined in the December 2007 study to

14 | March 1, 2009 to take into account cost increases since the earlier study.   I informed

15 | DHCS staff that if I applied the same methodology that Myers and Stauffer used in the

16 | December 2007 study to inflate cost data for a prior period to a later point, I would use

17 | the employment cost index of the Bureau of Labor Statistics.  Applying this methodology

18 | and using the Bureau's employment cost index for 2001-2008, I calculated a 1.0725

19 | inflation factor.  I informed the DHCS staff that this would be a reasonable factor for

20 | inflating the $10.81 average dispensing cost determined in our study from the common

21 | point of December 31, 2006 to March 1, 2009.  Attached hereto as Exhibit A is a true and

22 | correct copy of my calculation of the 1.0725 inflation index factor.  By multiplying the

23 | / / /

24 | / / /

25 | / / /

26 | / / /

27 | / / /

2

DECLARATION OF T. ALLAN HANSEN IN OPPOSITION TO PRELIMINARY INJUNCTION

000236

1    1.0725 factor by the $10.81 average dispensing cost determined in our study, the result

2    is an average dispensing cost per prescription of $11.59 as of March 1, 2009.

3         I declare under penalty of perjury, under the laws of the State of California

4    and the laws of the State of Kansas that the foregoing is true and correct.    Executed at

5    Leawood, Kansas, this 6th day of February 2009.

6

7

8                  T. ALLAN HANSEN

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

3

DECLARATION OF T. ALLAN HANSEN IN OPPOSITION TO PRELIMINARY INJUNCTION

# DECLARATION OF KEVIN GOROSPE

# EXHIBIT C

000238

1     <u>DECLARATION OF KEVIN GOROSPE</u>

2         I, KEVIN GOROSPE, declare as follows:

3         1. I have personal knowledge of the facts set forth in this declaration and, if

4 called as a witness at the trial in this matter, could and would testify competently to the

5 contents thereof.

6         2. I am employed as the Chief of Medi-Cal Pharmacy Policy Branch

7 of the California Department of Health Care Services (DHCS). In this capacity, I am

8 responsible for providing professional advice and guidance to the Department's executive

9 staff and other agencies on matters relating to the scope and quality of pharmaceutical

10 and medical supply benefits under the Medi-Cal program, interpreting and evaluating

11 federal and state legislation relating to the scope of pharmaceutical and medical supply

12 benefits under the Medi-Cal program, and serving as the supervising pharmacist for the

13 Pharmaceutical Consultants, in the Pharmacy Policy Branch. I have been employed in

14 my current position since November 2000. I am a licensed pharmacist, who has been

15 employed by DHCS to deal with issues concerning Medi-Cal coverage and

16 reimbursement of drugs since April 1995. Except as otherwise specified, the facts stated

17 in this declaration are based upon my personal knowledge, and if called upon to testify I

18 would competently do so as follows.

19         3. For each drug dispensed by a pharmacy to a Medi-Cal recipient, the

20 Medi-Cal program pays an amount for the drug itself and a dispensing fee. The

21 reimbursement rate for the drug itself is the lesser of average wholesale price (AWP)

22 minus 17 percent, any applicable federal upper limit (FUL), or the maximum allowable

23 ingredient cost (MAIC). The FUL and MAIC apply only to multi-source drugs. A multi-

24 source drug is a drug for which there is more than one generically equivalent drug

25 available. The FUL for a drug is a federal allowable cost that the United States

26 Department of Health and Human Services has adopted for some multi-source drugs.

27 Pharmacies are able to purchase drugs at a cost well below AWP. The MAIC is similar to

1

000239

1   the FUL in that it creates a maximum reimbursement for generically equivalent drugs,

2   which is an amount that represents the average purchase prices paid by retail

3   pharmacies for generically equivalent drugs.  In addition to the rate for the drug itself,

4   Medi-Cal also pays pharmacies a dispensing fee for each drug that a pharmacy

5   dispenses to a Medi-Cal recipient.  The basic Medi-Cal dispensing fee is $7.25 per drug,

6   except that the dispensing fee paid is $8 for each drug provided to a Medi-Cal recipient

7   who is a patient in a nursing facility.

8           4.  Assembly Bill (AB) 1183 mandates that the Medi-Cal program reduce by

9   5% the reimbursement that would otherwise be paid to pharmacies for dates of service

10  on or after March 1, 2009.  In October 2008, the former Chief Deputy Director of DHCS

11  directed that DHCS conduct analyses on the impact of payment reductions mandated by

12  AB 1183 to assure that the reduced reimbursement will comply with applicable federal

13  requirements.  I was among the DHCS staff that participated in the DHCS analysis of the

14  5% reduction in pharmacy payments.

15          5.  During the first week of February 2009, DHCS completed the analysis of

16  reduced Medi-Cal reimbursement for pharmacies.  It is my understanding that the

17  analysis was approved by the Chief Deputy Director for DHCS on February 8, 2009. The

18  DHCS Analysis relied significantly on data contained in a study of drug acquisition costs

19  and dispensing costs that the accounting firm of Myers and Stauffer issued in December

20  2007.  Myers and Stauffer conducted this study for DHCS under a contract with DHCS.

21          6.  We contacted the California Pharmacy Board during the first week of

22  February and verified that there are currently 6,078 pharmacies in California with an

23  active license.  This data is contained on page 10 of the DHCS Analysis under the

24  subheading "The Access Provision."

25          7.  DHCS decided to evaluate the impact of the 10% reduction in

26  reimbursement to pharmacies that was in effect during the period July 1, 2008 through

27  August 17, 2008.  The 10% reduction was halted because of a court injunction.   In

2

DECLARATION OF KEVIN GOROSPE IN OPPOSITION TO PRELIMINARY INJUNCTION

1    addition to evaluating the impact of the 10% reduction on all prescription drug claims and

2    all pharmacy service claims, we thought it would be a good idea to evaluate the impact of

3    the 10% reduction on selected brand name drugs.   We compiled a list of 108 brand

4    name drugs to be reviewed.  Of those drugs, 100 were selected because they were the

5    top 100 paid brand name drugs by Medi-Cal (based on amount paid and total claims

6    paid) for the first six months of 2008.  The other 8 drugs were listed in Exhibit A to the

7    declaration of Pharmacist Gerald Shapiro in a declaration he filed in 2008 in support of a

8    preliminary injunction against the 10% reduction.  DHCS asked Electronic Data Systems

9    (the Medi-Cal fiscal intermediary) to provide information as to paid claims and the number

10    of pharmacies with at least one paid claim for all prescription drugs, for the 108 selected

11    brand drugs, and for all pharmacy claims for dates of service July 1, 2008 through August

12    17, 2008 when the 10% payment reduction was in effect and for the same period in 2007.

13    The data that EDS produced is contained in Attachments D, E, F, and G to the DHCS

14    Analysis.

15         8.  The Medi-Cal program currently pays pharmacies approximately $2.9

16    billion annually for drugs (prior to any payment reduction).  Thus, when a 5% reduction is

17    imposed, the Medi-Cal program will pay pharmacies approximately $2.75 billion annually

18    for drugs.  Pages 3-4 of the DHCS Analysis explain that reduced reimbursement will

19    comply with applicable federal upper spending limits enacted pursuant to the "efficiency,

20    economy, and quality of care" provision of the federal Medicaid statute.  Pages 4-5 of the

21    DHCS Analysis explain that reduced reimbursement for pharmacies is consistent with the

22    efficient and economic administration of the Medi-Cal program and quality of care is

23    assured by licensing and other standards of practice enforced by both the California

24    Pharmacy Board and by DHCS.   As discussed in paragraph 9, DHCS determined that

25    this reduced reimbursement would in the aggregate compensate a very high percentage

26    of costs that should be sufficient to comply with the federal court's interpretation of the

27    / / /

DECLARATION OF KEVIN GOROSPE IN OPPOSITION TO PRELIMINARY INJUNCTION

000241

1   "efficiency, economy, and quality of care" requirement in the *Orthopaedic* (DHCS

2   Analysis, pages 5-10.)

3           9.  Pages 5-10 of the DHCS Analysis contains a discussion of DHCS's

4   evaluation of reimbursement relative to pharmacy costs.  Reduced reimbursement in the

5   aggregate for all prescription drugs is estimated to compensate 103% of pharmacy costs

6   (DHCS Analysis, page 8.)  Reduced reimbursement in the aggregate for single source

7   drugs is estimated to compensate 98-99 percent of pharmacy costs (DHCS Analysis,

8   pages 8-9.)  Reduced reimbursement in the aggregate for multi-source drugs not subject

9   to an FUL is estimated to compensate 107% of pharmacy costs and reduced

10  reimbursement in the aggregate for multi-source drugs subject to an FUL is estimated to

11  compensate 137% of pharmacy costs (DHCS Analysis, page 9.)  As further explained on

12  pages 9-10 of the DHCS Analysis, pharmacies that achieve efficiencies with dispensing

13  costs below the average or that are able to purchase various drugs at a cost below the

14  average acquisition cost should be reimbursed well above their costs and above the

15  aggregate percentages listed above.

16          10.  Pages 10-12 of the DHCS Analysis summarize the DHCS findings

17  concerning the Access issue.  Based on this data, DHCS concludes that the 10%

18  reduction in effect for dates of service July 1, 2008 through August 17, 2008 had no

19  negative impact on pharmacy participation in Medi-Cal.  Pharmacy participation in the

20  Medi-Cal program remains very high with approximately 95% of all actively licensed

21  pharmacies remaining actively enrolled in Medi-Cal.  After a 5% reduction is imposed,

22  Medi-Cal reimbursement will continue to compensate pharmacy costs at levels that

23  greatly exceed the "range of reasonableness," which according to the DHCS Analysis,

24  was acceptable under a repealed federal statute known as the Boren Amendment.  Thus,

25  DHCS determined that Medi-Cal recipients should continue to have sufficient access to

26  Medi-Cal covered drugs and other pharmacy services as required by federal law, when

27  the 5% reduction goes into effect on March 1, 2009 (DHCS Analysis, page 12.)

4

DECLARATION OF KEVIN GOROSPE IN OPPOSITION TO PRELIMINARY INJUNCTION

000242

1      11. I have reviewed the declarations that the plaintiffs submitted from

2   various pharmacists. Because Medi-Cal reimbursement makes up only a small

3   percentage of the business for many of the pharmacists, the reduction in over-all revenue

4   based on a 5% reduction will be between 1 and 2% for most of these pharmacies. For

5   example, David Medina states that prescription items make up 99% of his total revenue

6   and that about 25% of that is from the Medi-Cal fee-for-service program. Thus, the 5%

7   reduction will cause a reduction in over-all revenues for Mr. Medina of 1.24%.

8      12.  Attached to this declaration as Exhibit A are my findings with respect

9   to pharmacists George Davis, Nancy Dunkel, Frank Fornasero, Lisa Faast, David Jeha,

10   Odette Leonelli, David Medina, and Gerald Shapiro, who submitted declarations. Column

11   1 identifies the individual pharmacists. Column 2 identifies what each pharmacist said

12   was the percentage that prescription items make up of total revenues. Column 3

13   identifies what each pharmacist stated was the percentage that the Medi-Cal fee-for-

14   service program makes up of total prescription revenue. Column 4 identifies the

15   percentage reduction in prescription revenue for each pharmacy based on a 5%

16   reduction in Medi-Cal reimbursement. Column 5 identifies the percentage reduction in

17   total revenue for each pharmacy based on a 5% reduction in Medi-Cal reimbursement.

18   In summary, I calculated that with one exception, the total reduction in revenue for

19   pharmacists Davis, Dunkel, Fornasero, Faast, Jeha, Leonelli, Medina, and Shapiro will be

20   less than 2%. For pharmacists Leonelli I calculated a 2% reduction in overall revenue.

21      13. It should also be noted that the pharmacists submitting declarations are

22   independent retail pharmacies, which according to the Myers and Stauffer study have a

23   lower mean dispensing fee cost of $10.27 per prescription, instead of the $10.81 average

24   for all pharmacies. Furthermore, for six of these pharmacists, only between 9% and 30%

25   of total prescription business was devoted to providing drugs subject to the 5% reduction.

26   That is significant because pharmacies have certain fixed costs of operation they will

27   incur whether they provide services to Medicaid recipients or not. For example,

5

DECLARATION OF KEVIN GOROSPE IN OPPOSITION TO PRELIMINARY INJUNCTION

1   according to the Myers and Stauffer study, only about 94% of the mean average
2   dispensing fee cost of $10.81 was for the marginal cost incurred by a pharmacy of
3   dispensing one drug (DHCS Analysis, Attachment A, page 33.)  Many of the other costs
4   that go into the average dispensing fee costs are costs of operation that a pharmacy will
5   incur regardless of whether it provides a drug to a Medi-Cal recipient (e.g., building,
6   equipment, labor, and other overhead).  Yet the average dispensing fee cost per
7   prescription determined in the Myers and Stauffer study included all of those costs.  In
8   summary, continued participation in Medi-Cal by these pharmacies brings in additional
9   reimbursement that will help to pay for many of the costs of operating a pharmacy that
10  the pharmacy would incur even if didn't participate in Medi-Cal.

11          14.  I reviewed the declaration of Martin Kim who states that he is the
12  President of the Californian Korean Pharmacists Association (CKPA).  He discusses a
13  survey of his members that was done in 2003.  In light of how old the information is, it
14  provides nothing relevant to what impact of a 5% reduction in Medi-Cal reimbursement
15  will have on members of the CKPA.  Mr. Kim alleges that he sent copies of the filled in
16  survey responses to his counsel for DHCS but I have yet to see those responses.

17          15.  I reviewed the declaration of Sharon Steen who operates Central
18  Pharmacy in Santa Monica.  She alleges that her pharmacy will lose money on mental
19  health drugs based on a 5% reduction.  However, her declaration provides insufficient
20  detail to evaluate her claim.  Moreover, she didn't provide any information as to what
21  portion of her over-all revenues is from the Medi-Cal fee-for-service system.  Therefore, it
22  is not possible to evaluate what impact a 5% reduction in Medi-Cal reimbursement will
23  have on her over-all revenues.

24          16.  I reviewed the declaration of Thu-Hang Tran, Pharm D., who states that
25  he is president of the Vietnamese American Pharmacy Association (VAPA) and that he
26  operates a pharmacy in Orange County.  First, his declaration doesn't discuss what
27  percentage of his revenue is from the Medi-Cal fee-for-service program because his

6

DECLARATION OF KEVIN GOROSPE IN OPPOSITION TO PRELIMINARY INJUNCTION

1   pharmacy is in Orange County which has mandatory Medi-Cal enrollment in the Cal

2   Optima Medi-Cal managed care plan. Therefore, the 5% reduction in reimbursement to

3   pharmacies in the Medi-Cal fee-for-service system should have very little impact on Dr.

4   Tran's pharmacy. He does mention that certain drugs are carved out of the Cal Optima

5   plan and paid for by either the Medi-Cal fee-for-service system or Medi-Cal part D for

6   persons eligible to both Medi-Cal and Medicare. But his reference to Medicare Part D

7   carved out drugs is incorrect. Those drugs are paid for by Cal Optima and not impacted

8   by the 5% reduction. He further alleges that of 25 carved out drugs (though his

9   declaration lists only 24 drugs) for which the Medi-Cal fee-for-service system pays his

10  pharmacy, he receives a loss on 11 of those drugs based on Medi-Cal reimbursement.

11          17. As can be seen from the Exhibit attached to Dr. Tran's declaration,

12  Medi-Cal reimbursement for most of these drugs is above the acquisition cost allegedly

13  incurred by Mr. Tran, and in several instances significantly above his acquisition cost.

14  His estimated loss on 11 of the 24 drugs would have to be primarily a result of his own

15  dispensing costs. According to the DHCS Analysis, the average dispensing fee cost per

16  prescription as of March 1, 2009, is $11.59. The median dispensing fee cost for all

17  pharmacies, inflated to March 1, 2009, is $11.01. (DHCS Analysis, at pages 9-10.) The

18  more efficient a pharmacy can be in terms of its drug acquisition costs and costs of

19  operation, the more likely it will be able to obtain a substantial profit from providing

20  services under the Medi-Cal program. I am not aware of any Medicaid law that requires

21  state Medicaid agencies to assure that pharmacies earn a profit from Medicaid

22  reimbursement or that requires that all of a pharmacy's costs must be reimbursed.

23          18. The exhibit to Dr. Tran's declaration illustrates that depending on a

24  pharmacy's acquisition cost for a particular drug, the pharmacy may obtain a huge profit

25  on a drug even after a 5% reduction. For example, the exhibit to Dr. Tran's declaration

26  indicates that his acquisition cost for Loxapine Succinate is $46.02 for 60 units. His

27  Exhibit indicates that Medi-Cal currently pays $95.84 and will pay $91.05 after a 5%

7

DECLARATION OF KEVIN GOROSPE IN OPPOSITION TO PRELIMINARY INJUNCTION

1   reduction. Thus, Dr. Tran's exhibit indicates that even after a 5% reduction and taking
2   into account his dispensing costs, he would still earn a $40 profit when he provides this
3   particular drug to a Medi-Cal recipient under the Medi-Cal fee-for-service system. Dr.
4   Tran's own exhibit shows that for 10 of the 24 drugs on his list, he would earn a profit of
5   at least $4.77 per drug after a 5% reduction under the Medi-Cal fee-for-service system.
6   There are thousands of drugs that the Medi-Cal program pays for. Dr. Tran's exhibit
7   illustrates that whether a pharmacy earns a profit or has a loss on a particular drug, even
8   after a 5% reduction will depend on the efficiency of each provider with respect to
9   acquisition cost for the drug and the pharmacy's costs of operation. Finally, Medi-Cal
10  paid claims records for July 1, 2008 through December 31, 2008 indicate that Dr. Tran's
11  pharmacy was paid under the Medi-Cal fee-for-service system for only 5 of the 24 drugs
12  in his exhibit. In summary, the 5% reduction in reimbursement for pharmacies would
13  appear to have an extremely small impact on Dr. Tran's revenues.

14          19. Some of the pharmacists who submitted declarations alleged that they
15  incur costs in delivering drugs to elderly or disabled persons who are home-bound. I am
16  not aware of any studies on the extent that pharmacies normally deliver drugs to elderly
17  or disabled persons in the general population. It is my understanding and belief that the
18  relatives (i.e., spouse, children, siblings etc.) or friends of many elderly or disabled
19  persons go to the pharmacy and pick up prescription drugs for their loved ones or friends.
20  It is my understanding and belief that assisted living facilities may include pick-up or
21  delivery of drugs as part of the services they provide to their residents. I know that the
22  Medi-Cal program pays a higher dispensing fee of $8 per prescription for each drug
23  provided to Medi-Cal patients in nursing facilities. Persons that might need delivery
24  services would mainly be elderly and disabled persons. Most recipients who are at least
25  65 years of age and approximately one-third of disabled recipients receive drug coverage
26  under Medicare Part D. Reimbursement under the Medicare Part D program is not
27  impacted by AB 1183. Finally, delivery costs that pharmacies incur has been taken into

DECLARATION OF KEVIN GOROSPE IN OPPOSITION TO PRELIMINARY INJUNCTION

000246

1  account in the $11.59 average dispensing cost per prescription incurred by Medi-Cal
2  pharmacies (DHCS Analysis, page 7, fn. 5.)

3       20. I reviewed the declaration of Richard Wilson, who states that he is a
4  Certified Public Accountant. The first 17 paragraphs of his declaration simply explain
5  who he is and discuss the current Medi-Cal reimbursement methodology and some of the
6  information contained in the Myers and Stauffer study of December 2007. In paragraphs
7  19-22 of his declaration he makes a couple points. First, he alleges that with inflation, the
8  average pharmacy dispensing costs have increased to $11.49 since the Myers and
9  Stauffer study was issued. Inflation was taken into account in the DHCS Analysis. As
10  indicated on page 7 of the DHCS Analysis, DHCS applied an inflation factor, developed
11  by Myers and Stauffer, to increase the average dispensing fee cost to $11.59 as of March
12  1, 2009. That figure was used in the DHCS Analysis to determine what the impact would
13  be on aggregate reimbursement of pharmacy costs based on a 5% reduction. (DHCS
14  Analysis, pages 8-10.)

15       21. Mr. Wilson next alleges that there is a difference between the Medi-Cal
16  dispensing fee and the average Medi-Cal dispensing cost of $4.61 per prescription.
17  Actually the difference between the inflated average dispensing cost per prescription of
18  $11.59 and the 5% reduced Medi-Cal dispensing fee is $4.71. But as explained in at
19  pages 9-10 of the DHCS Analysis, the median dispensing fee cost is $11.01. That
20  means half the pharmacies have a dispensing fee cost below that amount. Obviously
21  then more efficient pharmacies will not have as great a spread between their dispensing
22  cost per prescription and Medi-Cal dispensing fee. More importantly, for each drug
23  dispensed, Medi-Cal pays not only the dispensing fee but also an amount for the drug
24  itself. And it is because the Medi-Cal reimbursement for the drug itself frequently is well
25  above pharmacy acquisition cost, that any loss on the dispensing fee portion of
26  reimbursement is made up for by a significant profit on Medi-Cal reimbursement for the
27  drug itself. Dr. Tran's declaration illustrated the extent to which Medi-Cal reimbursement

9
DECLARATION OF KEVIN GOROSPE IN OPPOSITION TO PRELIMINARY INJUNCTION

000247

1  for some drugs may greatly exceed a pharmacy's acquisition cost. Medi-Cal

2  reimbursement in the aggregate will compensate approximately 103% of pharmacy costs,

3  after the 5% reduction is implemented. (DHCS Analysis, page 8.)

4       22. The remaining paragraphs of Mr. Wilson's declaration contain various

5  allegations concerning Medi-Cal reimbursement relative to acquisition costs, purportedly

6  using data from the Myers and Stauffer study. However, there were problems with some

7  of the data that was the basis for his findings. For example, he attached an Exhibit F to

8  show the data that he was discussing in paragraph 25, which concerned single source

9  drugs. However, the data in Exhibit F is not the top 200 single source drugs from the

10  Myers and Stauffer study, but rather the top 200 multi-source drugs without an FUL.

11  Moreover, the information from his Exhibit F is not in sequence and may not be entered

12  correctly. Because of this flaw, I am unable to validate Mr. Wilson's calculations.

13  Moreover, I saw nothing in Mr. Wilson's declaration that refutes the findings contained in

14  the DHCS Analysis that Medi-Cal reimbursement in the aggregate will compensate 103%

15  of pharmacy costs for providing all prescription drugs, 98-99% of pharmacy costs for

16  providing single source drugs, 107% of pharmacy costs for providing multi-source drugs

17  not subject to an FUL, and 137% of pharmacy costs for providing multi-source drugs

18  subject to an FUL.

19       I declare under penalty of perjury under the laws of the State of California

20  that the foregoing is true and correct. Executed at Sacramento, California, this 11th day

21  of February 2009.

22

23  KEVIN GOROSPE

24

25

26

27

DECLARATION OF KEVIN GOROSPE IN OPPOSITION TO PRELIMINARY INJUNCTION

000248

# EXHIBIT C-A

000249

**EXHIBIT A**
**DECLARATION OF KEVIN GOROSPE**

| Declarant | Prescription Items % of Total Revenue | Medi-Cal FFS % of Prescription Items | % change in Prescription Revenue after 5% reduction | % change in total Total Revenue after 5% cut |
|---|---|---|---|---|
| George R. Davis, R.Ph. | 95% | 20% | 1.0% | 0.95% |
| Nancy Dunkel, R.Ph. | 99% | 30% | 1.5% | 1.49% |
| Frank Fornasero, Pharm.D. | 90% | 43% | 2.2% | 1.94% |
| Lisa Faast, Pharm.D. | 10% | 9% | 0.5% | 0.05% |
| David J. Jeha, R.Ph. | 80% | 10% | 0.5% | 0.40% |
| Odette Leonelli, Pharm.D. | 80% | 50% | 2.5% | 2.00% |
| David W. Medina, R.Ph. | 99% | 25% | 1.3% | 1.24% |
| Gerald Shapiro, Pharm.D. | 98% | 29% | 1.5% | 1.42% |

**NOTE:**  Five of the pharmacists submitting declarations state that more than 90% of their revenue is from prescription item sales.  The declaration of Lisa Faast may be in error since she indicates that only 10% of her sales are from prescription items.  Assuming 90% of her sales were devoted to prescriptions, then the 5% reduction in Medi-Cal fee-for-service reimbursement would reduce her over-all revenues by less than .40%.

000250

# ANALYSIS OF IMPACT OF CHANGES IN MEDI-CAL REIMBURSEMENT TO PHARMACIES FOR DRUGS PURSUANT TO WELFARE AND INSTITUTIONS CODE SECTIONS 14105.19, 14105.336, 14105.337, AND 14105.45, AMENDED BY SB 1103

**California Department of Health Services**
**August 2004**

## ANALYSIS OF IMPACT OF CHANGES IN MEDI-CAL REIMBURSEMENT TO PHARMACIES FOR DRUGS PURSUANT TO WELFARE AND INSTITUTIONS CODE SECTIONS 14105.19, 14105.336, 14105.337, AND 14105.45, AMENDED BY SB 1103

### A. INTRODUCTION

During the 2003/2004 legislative session, the California Legislature enacted Senate Bill (SB) 1103 (Stats. 2004, Ch. 228), which is a trailer bill that modifies numerous statutory provisions contained in the Corporations Code, Government Code, Health and Safety Code, and Welfare and Institutions Code. Included within the statutory changes of SB 1103 are amendments to Welfare and Institutions Code sections 14105.19, 14105.336, 14105.337, and 14105.45 concerning Medi-Cal reimbursement for drugs that pharmacies provide to Medi-Cal beneficiaries. The Governor signed SB 1103 on August 16, 2004. This analysis concerns only those changes to reimbursement for drugs that will take effect on September 1, 2004, in accordance with sections 14105.19, 14105.336, 14105.337, and 14105.45. These reimbursement changes are discussed in more detail in Part D of this analysis.

### B. LITIGATION CONCERNING PREVIOUS STATUTORY REQUIREMENT TO REDUCE DRUG RATES BY FIVE (5) PERCENT

In 2003, the Legislature enacted Welfare and Institutions Code section 14105.19, which provided for a 5% reduction in Medi-Cal reimbursement on or after January 1, 2004, for various services, including drugs provided by pharmacies. However, on December 23, 2003, the 5% reduction in Medi-Cal rates was enjoined by the federal court in *Clayworth, et al.* V. *Bonta* 295 F.Supp.2d 1110 (E.D. Calif. 2003). The basis for the federal court's decision to issue a preliminary injunction as to the 5% reduction was that the administrative record before the court at the time it issued its ruling lacked any evidence that the Department of Health Services (DHS) had conducted a reasoned analysis as to whether the rates resulting from a 5% percent reduction would meet applicable federal Medicaid criteria.

### C. JANUARY 2004 ANALYSIS (ADDENDUM TO THIS ANALYSIS)

In January 2004, DHS issued an analysis in which it concluded that a 5% reduction in Medi-Cal rates for drugs would meet all applicable federal criteria, including both the "access" and "efficiency, economy, and quality of care" provisions of 42 United States Code section 1396a(a)(30)(A). Based in part on the January 2004 analysis, DHS filed a motion for reconsideration concerning the preliminary injunction in *Clayworth*. The federal court denied that motion, stating that the January 2004 analysis was not an appropriate basis for reconsidering the preliminary injunction because, according to the court, (1) it was "not newly discovered evidence" and (2) there was no reason that DHS could not have conducted the analysis before the court issued the preliminary injunction. A copy of the January 2004 analysis is contained in an Addendum to this analysis (attached).

This analysis on the drug rate changes scheduled to take effect September 1, 2004 relies on much of the information contained in the January 2004 analysis concerning the enjoined 5% rate reduction. The January 2004 analysis is divided into the following

1

parts. Part A on pages 1-3 of the earlier analysis contains a discussion of the applicable federal criteria. Part B.1 on page 3 addresses the "access" provision of the federal statute. Part B.2 on pages 3-4 addresses the federal upper payment limits that were enacted to implement the "efficiency, economy, and quality of care" provision of the federal statute. Part B.3 on pages 4-5 discusses the existing reimbursement formula and notes that the existing Medi-Cal dispensing fee rate of $4.05 is higher than the dispensing fee rate typically paid by private health insurance plans. Part B.4 on pages 5-9 addresses whether drug rates after a 5% reduction would comply with the payment standard set forth in *Orthopaedic Hospital* v. *Belshe* 103 F.3d 1491 (9th Cir. 1997) that payments "should bear a reasonable relationship to efficient and economical … costs in providing quality care." Page 10 of the January 2004 analysis contains DHS' conclusion that "reimbursement after the 5% reduction bears a reasonable relationship to costs of efficient and economic pharmacies to provide quality services."

## D. CHANGE IN MEDI-CAL REIMBURSEMENT FOR DRUGS PROVIDED BY PHARMACIES THAT ARE SCHEDULED TO TAKE EFFECT SEPTEMBER 1, 2004

Part B.3 on pages 4-5 of the January 2004 analysis contains a summary of the current Medi-Cal reimbursement rates for drugs provided by pharmacies. As explained on those pages, Medi-Cal currently pays a dispensing fee rate of $4.05 on each drug provided. Additionally, it pays a rate for the cost of a drug. That rate is the lesser of estimated acquisition cost (EAC), a federal upper limit (FUL), or a maximum allowable ingredient cost (MAIC). As explained in the earlier analysis, an FUL or MAIC applies to some, but not all, multiple source drugs. The federal government establishes FULs and federal regulations require that rates not exceed any applicable FUL. MAICs have been in existence for many years, and Medi-Cal policy on MAICs is not changing under the rate changes taking effect on September 1, 2004. The EAC is currently average wholesale price minus 10 percent (AWP-10%) as it was when DHS did the January 2004 analysis. As explained on page 5 of the earlier analysis, the total reimbursement payable for a drug based on the above formula was reduced by 50 cents (10 cents for nursing facility patients) up until July 1, 2004, when the reduction was changed to 10 cents for all drug claims. In summary, the existing reimbursement policy is to pay for each drug an amount equal to the sum of (1) $4.05 for dispensing fee and (2) the lesser of EAC (AWP-10%), FUL, or MAIC and then subtract 10 cents from that sum.

There will be three changes to the Medi-Cal reimbursement policy for drugs beginning on September 1, 2004.

First, SB 1103 amends Welfare and Institutions Code section 14105.19 at subparagraph (c)(11) to provide that beginning September 1, 2004, the 5% reduction in payments shall not apply to drugs dispensed by pharmacy providers and paid under Welfare and Institutions Code section 14105.45.

Second, SB 1103 amends Welfare and Institutions Code 14105.45, subparagraph (b)(1) to increase the Medi-Cal dispensing fee rate from $4.05 to $7.25 per drug ($8 per drug for beneficiaries in a long-term care facility).

Third, SB 1103 amends Welfare and Institutions Code sections 14105.336 and 14105.337 to provide that beginning September 1, 2004, claims for drugs will no longer be reduced by 10 cents.

2

SB 1103 also amends section 14105.45 to provide for eventual use of "selling price" as part of the reimbursement formula. "Selling price" as defined in the statute at subparagraph (a)(12) is the "average sales price" that drug manufacturers will be required to report to DHS pursuant to subparagraph (c) of amended section 14105.45. "Average sales price" is defined in subparagraph (a)(1) of amended section 14105.45. The important point for purpose of this analysis is that DHS will not implement "selling price" as part of the Medi-Cal reimbursement formula beginning September 1, 2004. This will take some time to implement and DHS does not anticipate implementing this before June 2005. DHS will provide appropriate public notice prior to implementing "selling price" as part of the Medi-Cal reimbursement formula.

In summary, the current Medi-Cal reimbursement policy for drugs will be changed beginning September 1, 2004, by (1) increasing the dispensing fee rate from $4.05 to $7.25 ($8 for nursing facility patients), (2) changing EAC from AWP-10% to AWP-17%, and (3) ceasing to reduce claims by 10 cents. Following is a summary of the current policy and the policy that will be in effect beginning September 1, 2004.

1.   Current Policy: Payment is the sum of (a) a dispensing fee rate of $4.05 and (b) the lesser of AWP-10%, FUL, or MAIC. That sum is then reduced by 10 cents.

2. Policy Effective September 1, 2004: Payment will be the sum of (a) dispensing fee rate of $7.25 ($8 for nursing facility patients) and (b) the lesser of AWP-17%, FUL, or MAIC.

## E. BACKGROUND INFORMATION RELATED TO REIMBURSEMENT CHANGES

A goal of the State of California is to achieve cost savings in the Medi-Cal program consistent with applicable federal and state laws. This was an obvious factor in the enactment of the changes in drug reimbursement scheduled to take effect on September 1, 2004. In meetings with Medi-Cal stakeholders (e.g., groups representing beneficiaries, groups representing providers, etc.) on alternatives for achieving savings in the program, stakeholders often mention that rates paid to pharmacies for drugs are too high. For years, the State Attorney General's Office has been investigating and litigating overpricing and fraud by drug manufacturers. In that regard, there have been concerns expressed that many manufacturers inflate reporting of AWP.

The 2002 Myers and Stauffer study demonstrated that what pharmacies actually pay for a drug is typically well below AWP. During recent discussions with representatives of major pharmacy groups, they provided data to DHS staff indicating that pharmacies typically purchase brand name drugs at anywhere from AWP-17% to AWP-25%. This recent information is consistent with what Myers and Stauffer found in its 2002 study that the average cost for brand name drugs was 81.7% of AWP (i.e., AWP-18.3%). Moreover, the average acquisition cost for multi-source drugs was approximately 56% of AWP (AWP-44%) according to the Myers and Stauffer study. Based on more recent data DHS has reviewed on multi-source drugs, AWP-44% is still accurate for multi-source drugs.

3

## F. ALTERNATIVES CONSIDERED DURING THE ENACTMENT OF SB 1103, INCLUDING THOSE PROPOSED BY PROVIDER GROUPS

The California Welfare and Institutions Code contains hundreds of statutes that govern the Medi-Cal program, including many that govern reimbursement rates such as sections 14105.19, 14105.336,14105.337, and 14105.45. The enactment of statutes governing a program as complicated as Medi-Cal often involves input from interested members of the public as well as DHS. Representatives of providers and beneficiaries actively sponsored and lobbied for many of the statutes that govern the Medi-Cal program. For example, the California Pharmacists Association (CPHA) and the California Retailers Association (CRA) were actively involved in presenting proposals on modification of the drug rates during the legislative process that led to the enactment of changes in drug reimbursement contained in SB 1103. CPHA is a statewide trade group representing most California pharmacists. CRA represents large chain stores such as Longs, RiteAid, Walgreens, and Raleys, which make up about 70 to 80 percent of all licensed pharmacies.

Based on DHS recommendations, the May revisions to the Governor's proposed budget for the 2004/2005 Budget Year initially contained a proposal to modify the current reimbursement policy to pay a dispensing fee rate of $8.30 but a much lower EAC of AWP-20%. This proposal would have reduced Medi-Cal reimbursement for drugs annually by an amount that was approximately the reduction that would have occurred if DHS had implemented the 5% rate reduction enjoined in *Clayworth*. Based on data that pharmacists provided to DHS staff, a concern developed that AWP-20% could be too large a reduction in reimbursement with respect to some brand name drugs, with a possible reduction in provider participation that might have negatively impacted beneficiary access. As indicated earlier, representatives of major provider groups presented data to DHS staff showing that pharmacies were typically purchasing brand name drugs at a range of AWP-17% to AWP-25%. From the provider reported range of AWP-17%-25%, an EAC of AWP-17% would provide the highest rate and most cost coverage for brand name drugs. As noted previously, providers purchase multi-source drugs at an average AWP-44%.

DHS recommended AWP-17% instead of the original proposal of AWP-20% for the cost of a drug and recommended that the dispensing fee be set at a level that was closer to the weighted median dispensing cost determined by the Myers and Stauffer study. Myers and Stauffer determined that "the measurement that is the most ideally suited for determining the typical cost of dispensing prescriptions to Medicaid recipients is the median weighted by Medi-Cal volume." (Part 1 of Myers and Stauffer study, page 25). The median weighted by Medi-Cal volume according to the Myers and Stauffer study was $6.95. (Part 1 of Myers and Stauffer study, page 4.) DHS felt that there should be a higher dispensing fee of approximately $8 for drugs provided to long term care patients in recognition of the fact that long term care facility cost data indicated that these facilities have a higher cost of doing business than a regular retail pharmacy. During the legislative process, CPHA and CRA proposed that the dispensing fee rate be increased to $5.80 and that EAC be decreased to AWP-15%. That proposal by these two provider groups would have reduced Medi-Cal reimbursement for drugs by approximately $123 million annually (federal and state dollars). As noted earlier, the changes that SB 1103 finally enacted increased the dispensing fee to $7.25 ($8 for nursing facility patients) and change the EAC to AWP-17%. Thus, the dispensing fee

4

000255

rate will be higher than the $5.80 proposed by the two large provider groups and the EAC will be lower than the AWP-15% proposed by those two groups.

The Department estimates that Medi-Cal reimbursement will be reduced annually by approximately $131.7 million (federal and state dollars) based on the changes being implemented on September 1, 2004. In the context of a program that spends well over $4 billion annually for drugs, the difference between the reduction in reimbursement in the CPHA/CRA proposal and the reduction in reimbursement that will occur beginning September 1, 2004 is small. The enjoined 5% rate reduction would have reduced Medi-Cal reimbursement for drugs by approximately $220 million annually (federal and state dollars). Therefore, the annual reduction in reimbursement of $131.7 million that will result from the changes being implemented September 1, 2004 is approximately 60 percent of the amount by which reimbursement would have been reduced by the enjoined 5% rate reduction.

## G. PAYMENTS WILL BE SUFFICIENT TO ASSURE ACCESS

As noted on page 3 of the January 2004 analysis, approximately 96% of pharmacies in the State participate in the Medi-Cal program and are available in all geographic areas of the State. DHS indicated on page 4 of the earlier analysis that after a 5% rate reduction, Medi-Cal payments for drugs would be in line with what private health insurance pays for drugs. This was corroborated during the *Clayworth* litigation concerning the 5% rate reduction by one of the plaintiffs' experts, Paul Lofholm. He stated in a declaration that a 5% reduction would reduce Medi-Cal reimbursement to what private health insurance plans pay for drugs. As previously noted, the reduction in Medi-Cal reimbursement beginning on September 1, 2004, will be approximately 60% of what would have occurred under the 5% rate reduction. Thus, Medi-Cal reimbursement should be somewhat higher than what private health insurance pays. The rates paid for many drugs will not be reduced at all beginning September 1, 2004, but pharmacies will be paid the higher dispensing fees of $7.25 or $8 for all these drugs. Specifically, some multi-source drugs are currently paid an FUL or a MAIC that is lower than AWP-10 percent and the FUL or MAIC currently paid will also be below AWP-17% in most cases. Pharmacies providing those particular drugs will continue to be paid at the applicable FUL or MAIC, but would be paid the higher dispensing fee rate scheduled to take effect September 1, 2004.

Because the Medi-Cal reimbursement changes will (1) be relatively moderate (estimated reduction in reimbursement of $131 million in a program that spends well over $4 billion annually on drugs), (2) result in payments comparable to what private health insurance pays, and (3) reduce Medi-Cal reimbursement by an amount that is very close to the reduction that would have occurred under the CPHA/CRA proposal, DHS does not believe the changes will have a negative impact on provider participation. Even if a few pharmacies cease participation, DHS has concluded that based on a current 96% participation rate, Medi-Cal beneficiaries will continue to have access to Medi-Cal covered drugs at a level comparable to the general population in accordance with 42 United States Code section 1396a(a)(30)(A).

5

## H. PAYMENTS WILL COMPLY WITH THE EEQ UPPER PAYMENT LIMITS

On pages 3-4 of the January 2004 analysis, DHS determined that the rates after a 5% drug payments would not exceed the upper payment limits contained in federal regulations that implement the "efficiency, economy, and quality of care" provision. DHS has considered the matter and determined that payments under the current reimbursement do not exceed the federal upper payment limits. Because aggregate Medi-Cal reimbursement is being reduced beginning September 1, 2004, payments will continue to be below the federal upper payment limits.

## I. PAYMENTS WILL BEAR A REASONABLE RELATIONSHIP TO THE COSTS OF EFFICIENT AND ECONOMICAL PHARMACIES TO PROVIDE QUALITY CARE

In Part B.4 on pages 5-9 of the January 2004 analysis, DHS evaluated whether reducing rates by 5% from current reimbursement levels would result in payments for drugs that complied with the payment standard that the United States Court of Appeals for the Ninth Circuit established in its 1997 *Orthopaedic* decision. Specifically, the Ninth Circuit held that in establishing rates for hospital outpatient services, DHS was required "consider the costs of providing hospital outpatient services" and then establish rates that "bear a reasonable relationship to an efficient and economical hospital's costs in providing quality care." *Orthopaedic Hospital* v. *Belshe, supra,* 103 F.3d at 1500.

In the January 2004 analysis, DHS estimated that if rates were reduced by 5%, aggregate payment to cost coverage for all drugs would be approximately 103%. DHS also assessed what the payment to cost coverage would be for various examples of single source and multi-source drugs based on a 5% reduction. Based on this analysis, DHS determined that after a 5% reduction, the payment to cost coverage would be high and well above the 85% to 95% payment to cost coverage that the courts found to be within the "range of reasonableness" of the now repealed federal statute commonly known as the Boren Amendment. (See fn. 3 on page 2 of January 2004 analysis). The Ninth Circuit in *Orthopaedic* said the "requirements of § 1396a(a)(30)(A) are **more flexible** than the Boren Amendment." *Orthopaedic Hospital* v. *Belshe, supra,* 103 F.3d, at 1499. Thus, if 85% to 95% reimbursement of costs was sufficiently within the "range of reasonableness" under the Boren Amendment, DHS reasoned that the aggregate payment to cost coverage of 103% that would result after a 5% rate reduction would be more than reasonable under the "more flexible" requirements of section 1396a(a)(30)(A).

As previously noted, the aggregate reduction in Medi-Cal reimbursement that will result from the changes taking effect on September 1, 2004 is approximately 60% of the reduction in reimbursement that would have occurred under the enjoined 5% rate cut. Thus, DHS has concluded that the payment to cost coverage should be even higher than the payment to cost coverage that would have occurred under the 5% rate cut. Thus, the payments under the changes occurring September 1, 2004, will clearly be above what was acceptable under the Boren Amendment and within the "range of reasonableness" of the more flexible 42 United States Code section 1396a(a)(30)(A).

With respect to the "quality of care" component of the "efficiency, economy, and quality of care" provision of section 1396a(a)(30)(A), DHS adopts the reasoning contained on the last paragraph of page 8 through page 9 of the January 2004 analysis concerning

6

the enjoined 5% reduction.   Based on that reasoning, DHS concludes that the payments resulting from an even smaller payment reduction beginning September 1, 2004, will be consistent with "quality of care."

<u>CONCLUSION</u>

DHS has determined that Medi-Cal reimbursement for drugs after the changes scheduled to take effect on September 1, 2004, will (1) be sufficient to assure adequate access to drugs for beneficiaries and (2) bear a reasonable relationship to the costs of efficient and economic pharmacies to provide quality services.

Based upon the above analysis, the Department of Health Services has determined that Medi-Cal reimbursement to pharmacies for drugs will comply with all applicable federal Medicaid standards after the implementation of changes in drug reimbursement that are effective on September 1, 2004.  As Deputy Director for Medical Care Services, I am the Chief of the Medi-Cal program.  In that capacity, I have the authority to adopt the above analysis and determination on the Department's behalf, and hereby do so.

August 27, 2004

Stan Rosenstein
Deputy Director
Medical Care Services

7

000258

# ADDENDUM

# TO

## "Analysis of Impact of Changes in Medi-Cal Reimbursement to Pharmacies for Drugs Pursuant to Welfare and Institutions Code Sections 14105.19, 14105.336, 14105.337, and 14105.45, Amended by SB 1103," August 2004.

000259

# ANALYSIS OF THE IMPACT OF WELFARE AND INSTITUTIONS CODE SECTION 14105.19 ON MEDI-CAL REIMBURSEMENT TO PHARMACIES FOR DRUGS

California Department of Health Services
January 2004

000260

## ANALYSIS OF IMPACT OF WELFARE AND INSTITUTIONS CODE SECTION 14105.19 ON MEDI-CAL REIMBURSEMENT TO PHARMACIES FOR DRUGS

Welfare and Institutions Code section 14105.19 provides for a 5% reduction in Medi-Cal reimbursement to pharmacies for drugs provided on or after January 1, 2004. This report evaluates whether the resulting Medi-Cal payments comply with applicable federal Medicaid standards. The report is divided into two parts. Part "A" evaluates the federal legal standards. Part "B" evaluates Medi-Cal payments, based on the 5% reduction, to determine whether the payments comply with the applicable federal standards. Part "B" relies heavily on cost data contained in a Reimbursement Study on Medi-Cal pharmacy reimbursement completed in June 2002. The accounting firm of Myers and Stauffer prepared the Reimbursement Study on behalf of the California Department of Health Services (Department). There were two parts to the Reimbursement Study. Part 1 focused on pharmacy dispensing costs and Part 2 focused on acquisition cost of drugs. Throughout this report, references will be made to either Part 1 or Part 2 of the Reimbursement Study.

## A. FEDERAL STANDARDS FOR EVALUATING PAYMENTS FOR DRUGS

Title 42, United States Code, section 1396a(a)(30)(A) requires state Medicaid agencies to make payments for Medicaid covered services that are "consistent with efficiency, economy, and quality of care" (the "EEQ" provision) and "sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population" (the "Access" provision). The only guidance the federal government has ever provided with respect to payments under the EEQ provision has been to adopt federal regulations that impose upper limits on payment. (e.g., 42 C.F.R. §§ 447.272 and 447.300-447.334.)

In January 1997, the United States Court of Appeals for the Ninth Circuit interpreted the EEQ provision in *Orthopaedic Hospital* v. *Belshe* 103 F.3d 1491 (9th Cir. 1997), holding that the Department was required to "consider the costs of providing hospital outpatient services." (*Id.* at p. 1500.) The Court said that "the Department must rely on responsible cost studies, its own or others,' that provide reliable data as a basis for its rate setting." (*Id.* at p. 1496.) The Court further required that, after considering the providers' costs, hospital outpatient rates "should bear a reasonable relationship to an efficient and economical hospital's costs in providing quality care." (*Id.* at p. 1500.)[1]

Importantly, the Medi-Cal program covers approximately 27,000 different drugs (Part 1 of Reimbursement Study, page 10.), and almost 6,000 pharmacies participating in the

---

[1] To the Department's knowledge, this is the first and only federal court decision to interpret the EEQ provision as imposing a minimum standard of reimbursement tied to provider costs or any other criterion.

000261

Medi-Cal program. While the basic reimbursement formula is the same, the rate that the Department actually pays for each drug may differ from drug to drug. Because there are thousands of different drugs, the Department has concluded that it would be impossible to evaluate each of the thousands of drugs one by one under the *Orthopaedic* standard. Such a process would involve: (1) trying to determine the cost thousands of different pharmacies incur in providing each drug; (2) then attempting to determine what an efficient and economic cost is for the drug (without any guidance in the law as to how that would be determined); and (3) setting a rate that "bears a reasonable relationship" to the "efficient and economic" cost of providing a particular drug in a quality manner. There is no guidance as to how the phrase "bears a reasonable relationship" would be interpreted in relationship to each of thousands of drugs or how the word "quality" would be interpreted with respect to each of thousands of drugs. An attempt to decide whether the rate that the Department is paying for each of thousands of different drugs bears a reasonable relationship to an efficient and economic pharmacy's cost of providing a particular drug in a quality manner might never be completed.[2] If the Department must attempt to apply the *Orthopaedic* payment standard to drugs, then it must rely on available cost estimates.

It is the Department's position that the "range of reasonableness" standard other courts have applied in deciding whether rates complied with the now-repealed Boren Amendment provides some guidance in attempting to apply the *Orthopaedic* standard to the payments it makes for thousands of different drugs.[3] It seems reasonable that a

---

[2] To the Department's knowledge, no other state in the history of the EEQ provision has ever attempted to evaluate the rates paid for each of thousands of different rates under such a standard.

[3] For example, the court in *Folden v. Washington State Department of Social and Health Services*, 744 F.Supp. 1507, affirmed, 981 F.2d 1054 (9th Cir. 1992) stated:

"Medicaid payment rates are 'reasonable and adequate' within the meaning of the Boren Amendment if they fall within a zone or range of reasonableness.' ... The doctrine recognizes that rate-setting is an inexact science and that rate-making agencies must be allowed a 'substantial spread between what is unreasonable because too low and what is unreasonable because too high." *Folden, supra*, 744 F.Supp. 1507, 1529. See also *Colorado Health Care Ass'n v. Colorado Dep't of Social Services* 842 F.2d 1158, 1167 (10th Cir. 1988); *Wisconsin Hosp. Ass'n v. Reivitz*, 733 F.2d 1226, 1233 (7th Cir. 1984).

In applying the "range of reasonableness" concept under the Boren Amendment, courts have often found that rates were reasonable and adequate if they were compensating in the aggregate anywhere from 85% to 95% of aggregate provider costs. (See, *Folden, supra*, at 1524; *New Jersey Association of Health Care Facilities v. Gibbs*, 838 F.Supp. 881, 900; *Memorial Hosp., Inc. v. Childers* 896 F.Supp. 1427, 1440 (W.D.Ky. 1995).)

The Boren Amendment actually required rates to "meet" the costs that efficiently and economically operated facilities incur to provide quality care. Yet, the Boren Amendment did not require all provider costs to be compensated, only a "range of reasonableness." The *Orthopaedic* Court said the "requirements of § 1396a(a)(30)(A) are more flexible than the Boren Amendment." (Emphasis added.) *Orthopaedic Hosp. v. Belshe, supra*, 103 F.3d at p. 1499. That is reflected in the fact that rates do not have to literally "meet" the costs that must be incurred by an efficient and economic provider. Instead the Court said the rates must "bear a reasonable relationship" to such costs.

2

000262

requirement that rates "bear a reasonable relationship to" rather than "meet" an efficient and economic provider's costs would allow for an even lower range of reimbursement relative to provider costs. That is, drug rates compensating between 70% and 80% percent of aggregate provider costs for a drug could fit within a "range of reasonableness" applied to the Orthopaedic payment standard. As will be explained below, Medi-Cal payments after a 5% reduction, will continue to be well above the 85% to 95% percent payment to cost coverage the courts found acceptable under the Boren Amendment.

## B. PAYMENTS AFTER THE 5 PERCENT REDUCTION WILL COMPLY WITH THE APPLICABLE FEDERAL STANDARDS

### 1) ACCESS PROVISION

The 2002 Reimbursement Study found that Medi-Cal reimbursement for drugs was sufficient to comply with the federal law's "Access" provision. Specifically, it found that 96% of the pharmacies in the State participated in the Medi-Cal program and that participation existed in all geographic area of the State. (Part 1 of Reimbursement Study, pages 45-49.)

Current records indicate that 96% of pharmacies in the State continue to participate in the Medi-Cal program. Even if some pharmacies cease participating in the Medi-Cal program as a result of a 5% reduction in Medi-Cal payment, the Department believes that there will continue to be sufficient pharmacies participating so that Medi-Cal beneficiaries will have adequate access to Medi-Cal covered drugs in accordance with the Access provision.

### 2) EEQ UPPER PAYMENT LIMITS

The amount of reimbursement paid for each drug is different, but the basic formula is the same. It is the lesser of estimated acquisition cost (EAC), federal upper limit (FUL), or maximum allowable ingredient cost (MAIC) for the acquisition cost of the drug plus a $4.05 dispensing fee minus 50 cents. This reimbursement formula is based on federal upper payment limit regulations that were enacted to implement the EEQ provision. These upper payment limits are set forth at 42 Code of Federal Regulations sections 447.331-447.333.[4] The upper limits are generally defined as "estimated acquisition costs" or specific federal limits established for some drugs plus a reasonable dispensing fee. The Department has determined that Medi-Cal payments made to pharmacies for

---

[4] The Third Circuit Court of Appeals observed with respect to the federal regulatory upper limits:

> "These regulations do not assist the plaintiffs here for the obvious reason that they merely set a ceiling, but no floor, on what providers must be paid. Any payments below the ceiling, no matter how low, would satisfy the regulation. Accordingly, the regulations do not show that the Secretary has interpreted Section 30(A) as intended to benefit providers; nor can they be viewed as themselves intended to benefit providers." (*Pennsylvania Pharmacists Association* v. *Houstoun* 283 F.3d 531, 541.)

000263

drugs will continue to be below the EEQ upper payment limits contained in federal regulations.

3) REIMBURSEMENT FORMULA

The Reimbursement Study determined that the Department's definition of EAC was excessive and made specific recommendations. For many years, the Department defined EAC as average wholesale price (AWP) minus 5% or the Direct Price (DP). The DP applied to certain brand name drugs and was the reference price some manufacturers issued to represent the manufacturer's direct selling price to the pharmacy. The Reimbursement Study recommended that the Department eliminate DP. The Department eliminated DP after the study was issued, which resulted in an estimated $40 million to $50 million in annual additional payments for those drugs that had previously been subject to DP. The Reimbursement Study recommended that the Department redefine its EAC as AWP minus between 12% and 15% for brand name drugs and AWP minus between 20% and 25% for generic drugs. The Department did not reduce EAC by that much. Instead, EAC is now defined as AWP-10% for all drugs. Conversely, EAC is equal to 90% of the AWP for a drug. This is important to understand in evaluating how Medi-Cal reimbursement compares to available estimates on actual costs pharmacies incurred.

It would likely take several years to determine what it costs each of almost 6,000 pharmacies in the State to acquire each of approximately 27,000 different drugs. That is why the Department must use the available EAC and dispensing costs contained in the 2002 Reimbursement Study to evaluate the adequacy of payments under the *Orthopaedic* payment standard.

After the 5% reduction, the Department believes that Medi-Cal payments to pharmacies will be more in line with what they are paid by commercial health insurance.

There are two components to the reimbursement formula for drugs: (1) payment for acquisition cost and (2) dispensing fee. The payment for the acquisition cost is the lesser of EAC, FUL, or MAIC. As noted above, EAC is now AWP-10%.

The FUL for a drug is a federal allowable cost (FAC) that USDHHS has adopted for some multi-source drugs. Medi-Cal regulations define the FAC or FUL for a drug as "the price established for a generic drug type by the United States Department of Health and Human Services" in accordance with federal regulations. (Cal. Code Regs., tit 22, § 51513 (a)(10).) The FULs established by USDHHS are based upon 150% of the wholesale acquisition cost (WAC) of the least costly specific multi-source drug. (42 C.F.R. 447.332.) WAC is a rate published by the pharmaceutical manufacturer. While WAC is intended to represent the wholesale cost of a specific drug, the real wholesale cost can be significantly lower.

MAIC is the maximum reimbursable cost that the Department has established for a generic drug type. These are multi-source drugs. Historically, MAICs were established

4

based on a reference drug brand which was generically equivalent to the innovator brand which is manufactured by a company with production capability to meet the statewide needs of the Medi-Cal program for the drug (commonly referred to as the generic drug). The MAIC for the reference drug then is the MAIC for the generically equivalent drugs of the same generic type.[5] In 2002, the Legislature amended Welfare and Institutions Code section 14105.45 to modify how the Department determines MAICs for a multi-source drug. The amendment required that MAICs should be determined based on the "mean of the wholesale selling prices of drugs generically equivalent to the innovator brand that are available in California from selected wholesale drug distributors." (Welf. & Inst. Code, § 14105.45, subd. (b).) This change is consistent with a recommendation in the 2002 Reimbursement Study. The Department has not yet modified any MAICs in accordance with section 14105.45(b). It is conducting a survey of wholesale selling prices of generically equivalent drugs as provided for by the statute. Historically, the MAICs have had relatively insignificant impact on Medi-Cal reimbursement for drugs. Because, most generically equivalent drugs subject to a MAIC are subject to an even lower FUL, the lower FUL would be paid.

In addition to what it pays for the cost of acquiring a drug, the Medi-Cal program also pays a dispensing fee for each drug provided. It is currently $4.05. However, the total Medi-Cal payment for each drug is currently reduced by 50 cents (10 cents for nursing facility patients). Therefore, for the purpose of this Medi-Cal reimbursement analysis, the Department will treat the dispensing fee as $3.55. According to the 2002 Reimbursement Study, the Medi-Cal fee was higher than the dispensing fee commercial health insurance plans typically paid. Specifically, the Study found that the estimated dispensing fee commercial health insurance plans paid was $2.47 for single source drug products and between $2.01 and $2.36 for multi-source drug products. (Part 1 of Reimbursement Study, Pages 41-42.)

## 4. EVALUATION OF PAYMENTS BASED ON ORTHOPAEDIC PAYMENT STANDARD

The Reimbursement Study found that the weighted median dispensing cost for California Pharmacies was $6.95, while the weighted average was $7.21. (Part 1 of Reimbursement Study, page 4.) Thus, while the Department's dispensing fee is above what commercial health plans typically pay, it is lower than the average dispensing cost pharmacies incurred. However, the Reimbursement Study noted that "this finding alone does not indicate that the current pharmacy reimbursement rates are inadequate since both dispensing and ingredient reimbursement rates should be considered in tandem." (Part 1 of Reimbursement Study, page 6.) Therefore, in evaluating current Medi-Cal payments and the impact of a 5% reduction, the Department has considered the cost of

---

[5] For example, Tylenol with Codeine #3, manufactured by McNeil Pharmaceutical, is an innovator drug product. There are ten non-innovator products other drug companies manufacture that are generically equivalent to the McNeil product. Purepac Pharmaceutical Company's product was selected as the reference drug brand that is generically equivalent to the McNeil Pharmaceutical innovator brand. AWP minus 5% for the Purepac product became the MAIC for Tylenol with Codeine #3 by McNeil (the innovator drug) as well as the other generically equivalent non-innovative drugs.

000265

acquisition and the cost of dispensing in tandem in comparison to the over-all reimbursement paid for each drug.

The 2002 Reimbursement Study found that 86% of the 27,000 drugs were multi-source drug products. (Part 1 of Reimbursement Study, page 9.) Multi-source drug products tend to have lower acquisition cost. Specifically, the 2002 Reimbursement Study found that in 2000, the average Medi-Cal payment for each drug was $61.00. However, based on $1.7 billion in payments for single source drug products for 14.3 million drugs, it appears that Medi-Cal payments for single source drugs in 2000 averaged closer to $118 per drug. This is important in evaluating Medi-Cal rate to cost coverage for multi-source drugs and single source drugs.

For the purpose of evaluating the adequacy of Medi-Cal payments based on a 5% reduction, the Department is using the higher weighted mean average cost of $7.21 instead of the weighted median cost of $6.95. (Part 1 of Reimbursement Study, page 4.) Those were estimated dispensing costs as of June 30, 2002. The Department has applied an inflation factor of 1.041 to bring that figure up to the current year. The inflation factor of 1.041 was applied to update costs for two years in the 2002 Reimbursement Study (Reimbursement Study, Part 1, Exhibit 14.) There has been no significant change in inflation since that observed during the two-year period prior to June 30, 2002. It is the Department's position that using the two-year inflation factor of 1.041 from the Reimbursement Study is a reasonable way to factor in inflation since June 30, 2002. Also, because the Department has chosen to use the higher mean average of $7.21 instead of the $6.95 median average, the result is appropriate. Applying a 1.041 inflation factor to $7.21 results in an estimated dispensing cost of $7.50 for the purpose of this evaluation of payments.[6]

### SINGLE SOURCE DRUGS

The actual acquisition cost for single source drugs was estimated at 79% to 84% of AWP and an average of 81.7% of AWP. (Part 2 of Reimbursement Study, page 4.) For purpose of evaluating how Medi-Cal payments compare to single source drug costs, the Department will use the estimated average actual acquisition cost of 81.7% of AWP. There are different AWPs for each of the thousands of drugs. The Department has evaluated Medi-Cal payments based on three examples. That of a drug with a $150 AWP, $100 AWP, and a $50 AWP. As noted, for single source drugs, the AWP is usually going to be closer to the $150 figure than the $50 figure.

---

[6] Myers and Stauffer (which conducted the 2002 Reimbursement Study) has advised the Department that, if the average dispensing cost as of June 30, 2002 were inflated to June 2004, the $7.21 weighted mean would be updated to $7.54 as of June 30, 2004. This is only four cents more than the $7.50 updated dispensing cost resulting from applying a 1.41 inflation factor. Myers and Stauffer's calculation is based upon the Bureau of Labor Statistics' most recent Consumer Price Index data and the future inflation projections in McGraw Hill DRI's Health Care Cost Review.

000266

|  | $150 AWP | $100 AWP | $50 AWP |
|---|---|---|---|
| Cost (81.7% of AWP plus $7.50 dispensing) | $130.05 | $89.20 | $48.35 |
| Current Payment (90% of AWP plus $3.55). | $138.55 | $93.55 | $48.55 |
| Payment Reduced 5 percent | $131.62 | $88.87 | $46.12 |
| Payment to Cost Ratio 5 percent reduction | 101 percent | 99 percent | 95 percent |

The above examples illustrate that payment to cost coverage will continue to be high for single source drugs after a 5% payment reduction. These examples illustrate that Medi-Cal payments for single source drugs, after a 5% payment reduction, should continue to be above or close to 100% of aggregate costs. Obviously, the more efficient and economic costs could achieve a significant profit. However, even under the Boren Amendment, states were not required to assure that any providers obtained a profit. The payment to cost ratios set forth above are in excess of the 85% to 95% aggregate cost coverage that courts found adequate under the Boren Amendment. Based on the above data, the Department has determined that after a 5% reduction in payments, Medi-Cal payments for single source drugs will easily meet what is expected under the more flexible *Orthopaedic* payment standard. But evaluation of the over-all impact of Medi-Cal payments relative to provider costs must consider that for multi-source drugs the payment to cost coverage is even higher.

## MULTI-SOURCE DRUGS

The average acquisition cost for multi-source drugs was 56.6% of AWP. (Part 2 of Reimbursement Study, page 4.) Following is an analysis of Medi-Cal payments for multi-source drugs, using the example of a drug with a $150 AWP, $100 AWP, and a $50 AWP.

|  | $150 AWP | $100 AWP | $50 AWP |
|---|---|---|---|
| Cost (56.6% of AWP plus $7.50 dispensing) | $92.40 | $64.10 | $35.80 |

7

| | | | |
|---|---|---|---|
| Current Payment (90% of AWP plus $3.55). | $138.55 | $93.55 | $48.55 |
| Payment Reduced 5 percent | $131.62 | $88.87 | $46.12 |
| Payment to Cost Ratio 5 percent reduction | 142 percent | 138 percent | 128 percent |

The above examples demonstrate that Medi-Cal payments for multi-source drugs when the drug is paid at the EAC rate (90% of AWP). As can be seen, Medi-Cal payments after the 5% reduction should continue to be well above provider costs. Payments for some multi-source drugs are limited by FULs that USDHHS have adopted and some by a MAIC. The actual acquisition cost for multi-source drugs subject to FULs was 44.2% of the FUL. (Part 2 of Reimbursement Study, page 23.) Following is an example of the impact of the 5% reduction as applied to drugs paid at a $50 FUL, using 44.2% of FUL as the estimated acquisition cost. The overall cost to the pharmacy would be $29.50 based on 44.2% of FUL plus $7.50 for dispensing cost. The current Medi-Cal payment would be $53.55 based on FUL plus $3.55. A 5% reduction would result in a Medi-Cal payment of $50.87. That is 171% the provider's cost.

MAICs currently have little impact on Medi-Cal reimbursement. Most generically equivalent drugs that are subject to a MAIC are multi-source drugs that are subject to an even lower FUL established by USDHHS. Thus the lower FUL would be paid. As indicated above, drugs paid at the FUL minus 5% will generally have a very high percentage of cost covered.

Pharmacies generally provide a mix of single source drugs and multi-source drugs. The above data indicates that payment relative to cost may tend to be somewhat lower for single source drugs, but is still extremely high. Cost coverage of 95% to 101% for single-source drugs is well above what the courts required under the stricter Boren Amendment payment standard. As indicated above, the payment to cost coverage will be much higher for multi-source drugs. Based on a 5% reduction in payments, the Department estimates that Medi-Cal payments for all drugs will compensate almost 103% of aggregate pharmacy costs.

With respect to the "quality care of care" component of the EEQ provision, the Court in *Orthopaedic* provided no guidance as to how the Department or the courts would evaluate that in the context of rate setting. USDHHS has not issued any guidelines that states or courts could use to evaluate that concept in rate setting. The now repealed Boren Amendment also incorporated the concept of quality care, requiring that rates be reasonable and adequate to "meet" the costs incurred by efficiently and economically operated facilities "in order to provide care and services in conformity with applicable State and Federal laws, regulations, and **quality** and safety standards." As previously

8

000268

noted, the courts would typically find that rates complied with the Boren Amendment if aggregate payments were compensating between 85% and 95% of aggregate provider costs. The State Pharmacy Board licenses pharmacies and pharmacies are subject to the Board's quality standards. Absent any other guidelines for evaluating whether payments will "bear a reasonable relationship" to the efficient and economic costs of providing a drug in a quality manner, the Department must conclude that Medi-Cal payments that compensate almost 103% of aggregate pharmacy costs should meet that standard. Even if the stricter Boren Amendment applied, it would appear that the Department could reduce Medi-Cal payments for drugs by another 10% and meet that standard.

In pending federal court litigation challenging the 5% reduction, the plaintiffs in one case submitted a survey conducted by Lee Strandberg. The survey only shows the percentage of pharmacies that will have reduced profits based on the new rates. There is nothing in the survey to indicate that these pharmacies will not continue to earn a profit from Medi-Cal reimbursement. In fact, the survey finds that for a significant percentage of pharmacies, the reduction in profits will be either, none, slight, or moderate.

The Strandberg survey indicates that some pharmacies will reduce their deliveries. The Department is not aware of any established standards indicating that home delivery of drugs is something that the general population expects. The survey suggests that deliveries to nursing homes may have to be reduced. However, Title 42 United States Code section 1396r(b)(4)(A)(iii) requires nursing homes to make sure that all necessary drugs are acquired and provided to patients. The daily rates that Medi-Cal pays nursing facilities are intended to compensate them for performing their duty under section 1396r(b)(4)(A)(iii). The Department pays the pharmacy for the acquisition cost and a dispensing fee. If the nursing facility must incur additional costs to get the drug from the pharmacy to the nursing facility (e.g., nursing facility staff driving to the pharmacy to pick up the drugs), that is among the functions that the Department reimburses through the daily rates it pays to nursing facilities.

The Strandberg survey indicates that some pharmacies may reduce hours, staff, or salaries. The extent to which that will actually occur is speculative. Moreover, the Department is not aware of any guidelines that indicate that reduced hours, reduced staff, or reduced salaries equate to less quality care. If a pharmacy reduces its hours of operation or salaries for some employees, the pharmacies must continue to meet all of the State Pharmacy Board's applicable quality standards. Furthermore, the Strandberg survey indicates that with respect to reduced hours, reduced salaries, and overall impact on operations, there does not appear to be any significant difference between pharmacies with a low percentage of Medi-Cal business compared to pharmacies with a high percentage of Medi-Cal business. Any impact that the 5% reduction in Medi-Cal reimbursement has on pharmacy staffing or salaries would appear to be felt by the Medi-Cal population in a manner comparable to the general population.

000269

## CONCLUSION

The Department believes that reimbursement after the 5% reduction bears a reasonable relationship to costs of efficient and economic pharmacies to provide quality services.

Based upon the above-referenced analysis, the Department of Health Services has determined that Medi-Cal reimbursement to pharmacies for drugs will comply with all applicable federal legal standards after a 5% reduction in payments. As Deputy Director for Medical Care Services, I am in charge of the Medi-Cal program. In that capacity, I have the authority to adopt the above-referenced analysis on the Department's behalf, and hereby do so.

January 8, 2004

Stan Rosenstein
Deputy Director
Medical Care Services

10

# DECLARATION OF SUSAN FLORES

# EXHIBIT D

000271

## DECLARATION OF SUSAN FLORES

I, SUSAN FLORES, declare and state as follows:

1. I have personal knowledge of the facts set forth in this declaration and, if called as a witness at the trial in this matter, could and would testify competently to the contents thereof.

2. I am currently employed as the Information Associate of the Ad Hoc Team within the Program Integrity Organization of Electronic Data Systems (EDS), an HP company. As an Information Associate, I am responsible for coordinating ad hoc requests, pulling or extracting warrant information, and responding to special projects related to claims payment review as they arise. I have been employed by EDS, an HP company in my current position since January 2, 2008. Except as otherwise specified, the facts stated in this declaration are based on my own personal knowledge, and if called upon to testify I would competently do so as follows.

2. EDS, an HP company, is a private company. It is the Medi-Cal fiscal intermediary for the Medi-Cal claims processing system, except for dental services, pursuant to a contract with the California Department of Health Care Services (DHCS). As the Medi-Cal fiscal intermediary, EDS, an HP company, is responsible for administering the claims processing system for paying all providers (except dentists) under the Medi-Cal fee-for-service system. This includes responsibility for making necessary system changes to the claims processing system and maintaining records on previously processed claims. EDS, an HP company, will frequently respond to DHCS requests for information contained in the claims records.

3. As an example, in December 2008, DHCS informed EDS, an HP company, that it would need information in paid claims records regarding different services that were subject to payment reductions that the Legislature had imposed, including pharmacy services. I was assigned to oversee EDS, an HP Company's, response to this request.

1

DECLARATION OF SUSAN FLORES IN OPPOSITION TO PRELIMINARY INJUNCTION

1        4.  In accordance with DHCS's request, I produced Exhibit A to this

2    declaration, which contains information obtained from Medi-Cal paid claim records

3    concerning prescription drug claims for three different periods.  It first shows the paid

4    prescription drug claims and the number of pharmacies with at least one paid drug claim

5    for dates of service (DOS) in state fiscal year 2007/2008 (July 1, 2007 through June 30,

6    2008).  The next column shows the number of paid prescription drug claims and the

7    number of pharmacies with at least one paid drug claim for DOS July 1, 2007 through

8    August 17, 2007.  The final column shows the number of paid prescription drug claims

9    and the number of pharmacies with at least one paid drug claim for DOS July 1, 2008

10   through August 17, 2008.

11       5.  In accordance with DHCS's request, I produced Exhibit B to this

12   declaration, which contains information obtained from Medi-Cal paid claims records

13   concerning 108 brand name drugs that DHCS identified.  The drugs listed in lines 5, 37,

14   67, 68, and 93 on this list of 108 drugs are over the counter drugs according to claim

15   records.  Exhibit B first shows the number of paid claims and the number of pharmacies

16   with at least one paid drug claim for each of the 108 drugs for DOS in state fiscal year

17   2007/2008 (July 1, 2007 through June 30, 2008.)  The next column shows the number of

18   paid claims and the number of pharmacies with at least one paid drug claim for each of

19   the 108 drugs for DOS July 1, 2007 through August 17, 2007.  The final column shows

20   the number of paid claims and the number of pharmacies with at least one paid drug

21   claim for each of the 108 drugs for DOS July 1, 2008 through August 17, 2008.

22       6.  In accordance with DHCS's request, I produced Exhibit C to this

23   declaration, which is the same as Exhibit B, except it only contains data for the 103

24   prescription drugs on the list of 108 drugs that DHCS had identified.  Exhibit C first shows

25   the number of paid claims and the number of pharmacies with at least one paid claim for

26   each of the 103 prescription drugs for DOS in state fiscal year 2007/2008 (July 1, 2007

27   through June 30, 2008).  The next column shows the number of paid claims and the

2

DECLARATION OF SUSAN FLORES IN OPPOSITION TO PRELIMINARY INJUNCTION

1   number of pharmacies with at least one paid claim for each of the 103 prescription drugs

2   for DOS July 1, 2007 through August 17, 2007.  The final column shows the number of

3   paid claims and the number of pharmacies with at least one paid claim for each of the

4   103 prescription drugs for DOS July 1, 2008 through August 17, 2008.

5           7.  In accordance with DHCS's request, I produced Exhibit D to this

6   declaration, which contains information obtained from Medi-Cal paid claims records on

7   claims for all pharmacy services, including prescription drugs, over the counter drugs,

8   medical supplies, and durable medical equipment, for three different periods.   Exhibit D

9   first shows the number of paid claims and number of pharmacies with at least one paid

10  claim for all pharmacy services for DOS in state fiscal year 2007/2008 (July 1, 2007

11  through June 30, 2008).  The next column shows the number of paid claims and the

12  number of pharmacies with at least one paid claim for all pharmacy services for DOS July

13  1, 2007 through August 17, 2007.  The final column shows the number of paid claims and

14  the number of pharmacies with at least one paid claim for all pharmacy services for DOS

15  July 1, 2008 through August 17, 2008.

16          I declare under penalty of perjury, under the laws of the State of California

17  that the foregoing is true and correct.  Executed at Sacramento, California, this _10th_ day

18  of February 2009.

19                                          _Susan Flores_

20                                          SUSAN FLORES

21

22

23

24

25

26

27

---

3

DECLARATION OF SUSAN FLORES IN OPPOSITION TO PRELIMINARY INJUNCTION



| AB 1183 ANALYSIS | | | | | | |
|---|---|---|---|---|---|---|
| Pharmacy - Prescription Drugs Only | | | | | | |
| | | | | | | |
| | | | | | | |
| | | DOS Fiscal Year 07/08 | | DOS 07/01/07-08/17/07 | | DOS 07/01/08-08/17/08 | |
| | | CLAIM COUNT | PHARMACIES WITH CLAIM ACTIVITY | CLAIM COUNT | PHARMACIES WITH CLAIM ACTIVITY | CLAIM COUNT | PHARMACIES WITH CLAIM ACTIVITY |
| **Pharmacy Prescription Drugs** | 23,864,626 | 5,343 | 3,050,368 | 4,863 | 3,018,892 | 5,171 |

000276



000277

## AB 1183 ANALYSIS
### Pharmacy - 108 Specific NDC Codes

| NDC ORDER | NDC | DOS Fiscal Year 07/08 | | DOS 07/01/07-08/17/07 | | DOS 07/01/08-08/17/08 | |
|---|---|---|---|---|---|---|---|
| | | CLAIM COUNT | PHARMACIES WITH CLAIM ACTIVITY | CLAIM COUNT | PHARMACIES WITH CLAIM ACTIVITY | CLAIM COUNT | PHARMACIES WITH CLAIM ACTIVITY |
| 1 | 63402051001 | 338,084 | 4329 | 34,387 | 3,036 | 38,837 | 3,373 |
| 2 | 00300304613 | 302,578 | 4214 | 40,982 | 3,248 | 37,109 | 3,340 |
| 3 | 00186504031 | 208,037 | 3624 | 27,151 | 2,666 | 27,186 | 2,876 |
| 4 | 00071015623 | 146,605 | 3904 | 20,273 | 2,903 | 17,766 | 2,969 |
| 5 | 00074374113 | 137,336 | 1286 | 18,609 | 798 | 16,927 | 866 |
| 6 | 00071015523 | 125,756 | 3838 | 17,745 | 2,825 | 15,049 | 2,857 |
| 7 | 00069306075 | 95,737 | 3798 | 6,196 | 1,861 | 7,174 | 2,102 |
| 8 | 00024542131 | 106,682 | 3487 | 13,945 | 2,366 | 14,330 | 2,538 |
| 9 | 00456201001 | 108,533 | 3638 | 14,404 | 2,395 | 13,694 | 2,434 |
| 10 | 00088222033 | 98,987 | 3622 | 12,563 | 2,383 | 13,933 | 2,629 |
| 11 | 00310027110 | 105,134 | 3710 | 13,958 | 2,468 | 13,357 | 2,607 |
| 12 | 00069154068 | 101,657 | 3658 | 12,990 | 2,526 | 13,703 | 2,713 |
| 13 | 00310027210 | 101,952 | 3444 | 14,301 | 2,305 | 12,332 | 2,370 |
| 14 | 00085128801 | 91,466 | 3902 | 9,855 | 2,336 | 8,806 | 2,343 |
| 15 | 00006011731 | 85,197 | 3138 | 10,806 | 2,064 | 10,263 | 2,180 |
| 16 | 00173069600 | 75,988 | 3679 | 9,526 | 2,274 | 9,495 | 2,440 |
| 17 | 00456202001 | 76,882 | 3131 | 9,809 | 2,023 | 10,089 | 2,168 |
| 18 | 00049491030 | 74,281 | 3024 | 9,425 | 2,010 | 9,895 | 2,177 |
| 19 | 00310027460 | 73,202 | 2932 | 9,514 | 1,792 | 9,480 | 1,956 |
| 20 | 00310027510 | 73,545 | 3629 | 9,762 | 2,233 | 9,091 | 2,333 |
| 21 | 00069153068 | 67,313 | 3306 | 8,378 | 2,149 | 9,246 | 2,355 |
| 22 | 00006003144 | 68,837 | 3349 | 9,551 | 2,245 | 8,769 | 2,251 |
| 23 | 00071015723 | 65,607 | 3150 | 8,803 | 2,084 | 8,574 | 2,176 |
| 24 | 00045152550 | 60,984 | 3842 | 7,264 | 2,019 | 6,782 | 2,104 |
| 25 | 50458030006 | 63,581 | 3449 | 8,486 | 2,226 | 7,578 | 2,273 |
| 26 | 50458032006 | 63,511 | 3171 | 8,663 | 2,007 | 7,493 | 2,001 |
| 27 | 00049490030 | 59,199 | 3226 | 7,418 | 1,911 | 7,856 | 2,122 |
| 28 | 00173045301 | 55,165 | 3588 | 6,124 | 1,973 | 6,397 | 2,079 |
| 29 | 00002411730 | 56,523 | 2799 | 7,835 | 1,756 | 6,906 | 1,751 |
| 30 | 00074712613 | 54,306 | 2524 | 7,292 | 1,485 | 6,679 | 1,635 |
| 31 | 59148000813 | 49,748 | 3048 | 6,341 | 1,714 | 6,628 | 1,906 |
| 32 | 50458033006 | 50,571 | 2664 | 7,046 | 1,698 | 6,015 | 1,677 |
| 33 | 00597005801 | 48,793 | 3077 | 6,260 | 1,769 | 6,815 | 1,996 |
| 34 | 00300304619 | 48,710 | 325 | 6,652 | 220 | 6,325 | 225 |
| 35 | 59148000913 | 46,476 | 2793 | 6,171 | 1,608 | 6,119 | 1,771 |
| 36 | 00049399060 | 46,104 | 2446 | 6,263 | 1,443 | 6,047 | 1,589 |
| 37 | 50580048810 | 67,353 | 195 | 11,822 | 129 | 115 | 19 |
| 38 | 00002323730 | 43,670 | 2548 | 5,499 | 1,408 | 6,213 | 1,637 |
| 39 | 59148000713 | 42,439 | 2940 | 5,004 | 1,499 | 6,146 | 1,887 |
| 40 | 00024552131 | 42,604 | 2466 | 5,408 | 1,403 | 5,809 | 1,470 |
| 41 | 00065027105 | 41,984 | 3210 | 6,172 | 1,750 | 4,968 | 1,664 |
| 42 | 00186504054 | 41,748 | 783 | 5,603 | 519 | 5,081 | 507 |
| 43 | 00078035934 | 40,685 | 2789 | 5,157 | 1,647 | 5,982 | 1,802 |
| 44 | 00597010314 | 41,177 | 2875 | 5,414 | 1,581 | 4,990 | 1,595 |
| 45 | 00002751001 | 36,918 | 2607 | 4,734 | 1,410 | 5,210 | 1,574 |
| 46 | 00310075190 | 40,817 | 2468 | 5,472 | 1,486 | 5,329 | 1,547 |
| 47 | 00597007541 | 37,218 | 2768 | 3,797 | 1,303 | 5,417 | 1,768 |
| 48 | 59148001113 | 37,831 | 2230 | 4,842 | 1,240 | 5,034 | 1,387 |
| 49 | 00074612390 | 37,475 | 2524 | 4,630 | 1,436 | 5,561 | 1,734 |
| 50 | 00045063965 | 38,129 | 2638 | 5,127 | 1,538 | 4,822 | 1,573 |
| 51 | 00045064165 | 37,755 | 2374 | 5,181 | 1,500 | 4,744 | 1,524 |

000278

## AB 1183 ANALYSIS
### Pharmacy - 108 Specific NDC Codes

| | | | DOS Fiscal Year 07/08 | | DOS 07/01/07-08/17/07 | | DOS 07/01/08-08/17/08 | |
|---|---|---|---|---|---|---|---|---|
| NDC ORDER | NDC | CLAIM COUNT | PHARMACIES WITH CLAIM ACTIVITY | CLAIM COUNT | PHARMACIES WITH CLAIM ACTIVITY | CLAIM COUNT | PHARMACIES WITH CLAIM ACTIVITY | |
| 52 | 00149047201 | 37,087 | 2408 | 4,871 | 1,369 | 4,985 | 1,447 |
| 53 | 50458035006 | 37,809 | 2033 | 5,051 | 1,248 | 4,303 | 1,243 |
| 54 | 00006011754 | 36,986 | 1101 | 4,876 | 727 | 4,360 | 676 |
| 55 | 00062190315 | 54,852 | 3156 | 7,702 | 1,872 | 6,360 | 1,784 |
| 56 | 50474059540 | 35,414 | 2476 | 4,392 | 1,411 | 5,027 | 1,663 |
| 57 | 50458030206 | 36,654 | 2951 | 4,856 | 1,734 | 4,309 | 1,727 |
| 58 | 00173064255 | 36,060 | 2523 | 4,745 | 1,499 | 4,661 | 1,597 |
| 59 | 00006074031 | 33,622 | 2356 | 3,914 | 1,335 | 5,253 | 1,645 |
| 60 | 00074621513 | 37,427 | 2471 | 5,386 | 1,507 | 4,544 | 1,477 |
| 61 | 00173013555 | 36,977 | 2505 | 5,091 | 1,501 | 4,621 | 1,524 |
| 62 | 00002442030 | 35,863 | 1925 | 4,804 | 1,107 | 4,522 | 1,192 |
| 63 | 64764030114 | 36,230 | 2533 | 4,958 | 1,518 | 4,686 | 1,629 |
| 64 | 00002411530 | 36,006 | 2605 | 4,977 | 1,468 | 4,421 | 1,518 |
| 65 | 00186109005 | 33,095 | 2575 | 5,477 | 1,588 | 4,863 | 1,620 |
| 66 | 63653117106 | 34,205 | 1945 | 4,344 | 1,260 | 4,786 | 1,382 |
| 67 | 50580044909 | 47,527 | 395 | 7,711 | 250 | 84 | 19 |
| 68 | 00002831501 | 31,724 | 2452 | 4,539 | 1,383 | 4,014 | 1,322 |
| 69 | 64764045124 | 32,421 | 2277 | 4,412 | 1,342 | 4,270 | 1,452 |
| 70 | 00078035834 | 32,318 | 2593 | 4,377 | 1,463 | 4,480 | 1,534 |
| 71 | 00065401303 | 28,603 | 2942 | 3,529 | 1,238 | 2,713 | 1,182 |
| 72 | 00074621553 | 32,892 | 497 | 4,569 | 321 | 4,129 | 320 |
| 73 | 61958070101 | 30,560 | 950 | 3,914 | 509 | 4,088 | 556 |
| 74 | 00024540131 | 30,540 | 2709 | 4,069 | 1,401 | 4,129 | 1,432 |
| 75 | 59148001013 | 29,483 | 2224 | 3,639 | 1,117 | 4,112 | 1,371 |
| 76 | 00173069500 | 30,358 | 2885 | 3,815 | 1,494 | 3,309 | 1,418 |
| 77 | 00173073001 | 31,514 | 2449 | 4,365 | 1,400 | 3,715 | 1,349 |
| 78 | 00006027531 | 29,089 | 2166 | 3,141 | 1,089 | 2,961 | 1,113 |
| 79 | 00169750111 | 25,978 | 2031 | 3,044 | 926 | 3,840 | 1,140 |
| 80 | 00173073101 | 30,421 | 2154 | 4,229 | 1,270 | 3,809 | 1,317 |
| 81 | 00069153072 | 31,083 | 946 | 4,487 | 624 | 3,759 | 575 |
| 82 | 00006074931 | 26,400 | 2190 | 3,064 | 1,172 | 4,082 | 1,450 |
| 83 | 00029608612 | 25,587 | 2846 | 2,568 | 1,120 | 2,503 | 1,115 |
| 84 | 00069312019 | 23,134 | 2173 | 1,314 | 571 | 1,341 | 625 |
| 85 | 00006074054 | 25,478 | 1446 | 2,994 | 751 | 3,840 | 862 |
| 86 | 00002441530 | 27,947 | 1882 | 3,806 | 1,100 | 3,598 | 1,166 |
| 87 | 00074663330 | 25,707 | 684 | 3,137 | 358 | 3,566 | 431 |
| 88 | 00002324030 | 26,378 | 2325 | 3,347 | 1,126 | 3,712 | 1,302 |
| 89 | 00078031534 | 27,253 | 1962 | 3,675 | 1,120 | 3,768 | 1,178 |
| 90 | 00069311019 | 21,952 | 2044 | 1,311 | 597 | 1,455 | 655 |
| 91 | 00173069700 | 25,400 | 2548 | 3,210 | 1,301 | 3,217 | 1,401 |
| 92 | 00069306030 | 23,960 | 2593 | 2,030 | 898 | 1,953 | 885 |
| 93 | 00045048810 | 15,107 | 109 | 580 | 25 | 5,605 | 77 |
| 94 | 63653117101 | 25,895 | 1396 | 3,604 | 855 | 3,240 | 814 |
| 95 | 00310027910 | 22,853 | 1612 | 2,526 | 669 | 3,589 | 1,002 |
| 96 | 58468002101 | 23,911 | 1705 | 3,220 | 885 | 3,011 | 898 |
| 97 | 00186108805 | 21,277 | 2178 | 1,995 | 741 | 3,382 | 1,257 |
| 98 | 00074621413 | 24,279 | 2195 | 3,431 | 1,280 | 2,914 | 1,218 |
| 99 | 00008083321 | 23,468 | 1896 | 3,064 | 1,085 | 3,021 | 1,114 |
| 100 | 00009519101 | 23,482 | 2126 | 3,171 | 1,189 | 2,954 | 1,194 |
| 101 | 50242006301 | 233 | 87 | 27 | 21 | 28 | 21 |
| 102 | 00173044704 | 2,563 | 525 | 268 | 146 | 326 | 177 |

000279

Case 1:01-cv-12257-PBS Document 4702-64 Filed 10/25/08 Page 49 of 58

## AB 1183 ANALYSIS
### Pharmacy - 108 Specific NDC Codes

| NDC ORDER | NDC | DOS Fiscal Year 07/08 | | DOS 07/01/07-08/17/07 | | DOS 07/01/08-08/17/08 | |
|---|---|---|---|---|---|---|---|
| | | CLAIM COUNT | PHARMACIES WITH CLAIM ACTIVITY | CLAIM COUNT | PHARMACIES WITH CLAIM ACTIVITY | CLAIM COUNT | PHARMACIES WITH CLAIM ACTIVITY |
| 103 | 00004110150 | 3,151 | 503 | 410 | 166 | 460 | 172 |
| 104 | 59572020594 | 159 | 21 | 36 | 14 | 9 | 5 |
| 105 | 00006022761 | 2,217 | 199 | 0 | 0 | 695 | 148 |
| 106 | 00075062300 | 1,451 | 416 | 200 | 109 | 218 | 112 |
| 107 | 59676030401 | 430 | 111 | 55 | 32 | 56 | 40 |
| 108 | 59676056001 | 3,846 | 231 | 351 | 89 | 574 | 138 |
| | | 5,567,186 | 5,157 | 711,288 | 4,636 | 686,396 | 4,964 |

000280



## AB 1183 ANALYSIS
### Pharmacy - 108 Specific Codes (Prescription Drugs Only)

| NDC and DER | NDC | DOS Fiscal Year 07/08 | | DOS 07/01/07-08/17/07 | | DOS 07/01/08-08/17/08 | |
|---|---|---|---|---|---|---|---|
| | | CLAIM COUNT | PHARMACIES WITH CLAIM ACTIVITY | CLAIM COUNT | PHARMACIES WITH CLAIM ACTIVITY | CLAIM COUNT | PHARMACIES WITH CLAIM ACTIVITY |
| 1 | 63402051001 | 338,084 | 4329 | 34,387 | 3036 | 38,837 | 3,373 |
| 2 | 00300304613 | 302,578 | 4214 | 40,982 | 3248 | 37,109 | 3,340 |
| 3 | 00186504031 | 208,037 | 3624 | 27,151 | 2666 | 27,186 | 2,876 |
| 4 | 00071015623 | 146,605 | 3904 | 20,273 | 2903 | 17,766 | 2,969 |
| 5 | 00074374113 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6 | 00071015523 | 125,756 | 3838 | 17,745 | 2825 | 15,049 | 2,857 |
| 7 | 00069306075 | 95,737 | 3798 | 6,196 | 1861 | 7,174 | 2,102 |
| 8 | 00024542131 | 106,682 | 3487 | 13,945 | 2366 | 14,330 | 2,538 |
| 9 | 00456201001 | 108,533 | 3638 | 14,404 | 2395 | 13,694 | 2,434 |
| 10 | 00088222033 | 98,987 | 3622 | 12,563 | 2383 | 13,933 | 2,629 |
| 11 | 00310027110 | 105,134 | 3710 | 13,958 | 2468 | 13,357 | 2,607 |
| 12 | 00069154068 | 101,657 | 3658 | 12,990 | 2526 | 13,703 | 2,713 |
| 13 | 00310027210 | 101,952 | 3444 | 14,301 | 2305 | 12,332 | 2,370 |
| 14 | 00085128801 | 91,466 | 3902 | 9,855 | 2336 | 8,806 | 2,343 |
| 15 | 00006011731 | 85,197 | 3138 | 10,806 | 2064 | 10,263 | 2,180 |
| 16 | 00173069600 | 75,988 | 3679 | 9,526 | 2274 | 9,495 | 2,440 |
| 17 | 00456202001 | 76,882 | 3131 | 9,809 | 2023 | 10,089 | 2,168 |
| 18 | 00049491030 | 74,281 | 3024 | 9,425 | 2010 | 9,895 | 2,177 |
| 19 | 00310027640 | 73,202 | 2932 | 9,514 | 1792 | 9,480 | 1,956 |
| 20 | 00310027510 | 73,545 | 3629 | 9,762 | 2233 | 9,091 | 2,333 |
| 21 | 00069153068 | 67,313 | 3306 | 8,378 | 2149 | 9,246 | 2,355 |
| 22 | 00006003144 | 68,837 | 3349 | 9,551 | 2245 | 8,769 | 2,251 |
| 23 | 00071015723 | 65,607 | 3150 | 8,803 | 2084 | 8,574 | 2,176 |
| 24 | 00045152550 | 60,984 | 3842 | 7,264 | 2019 | 6,782 | 2,104 |
| 25 | 50458030006 | 63,581 | 3449 | 8,486 | 2226 | 7,578 | 2,273 |
| 26 | 50458032006 | 63,511 | 3171 | 8,663 | 2007 | 7,493 | 2,001 |
| 27 | 00049490030 | 59,199 | 3226 | 7,418 | 1911 | 7,856 | 2,122 |
| 28 | 00173045301 | 55,165 | 3588 | 6,124 | 1973 | 6,397 | 2,079 |
| 29 | 00002411730 | 56,523 | 2799 | 7,835 | 1756 | 6,906 | 1,751 |
| 30 | 00074712613 | 54,306 | 2524 | 7,292 | 1485 | 6,679 | 1,635 |
| 31 | 59148000813 | 49,748 | 3048 | 6,341 | 1714 | 6,628 | 1,906 |
| 32 | 50458033006 | 50,571 | 2664 | 7,046 | 1698 | 6,015 | 1,677 |
| 33 | 00597005801 | 48,793 | 3077 | 6,260 | 1769 | 6,815 | 1,996 |
| 34 | 00300304619 | 48,710 | 325 | 6,652 | 220 | 6,325 | 225 |
| 35 | 59148000913 | 46,476 | 2793 | 6,171 | 1608 | 6,119 | 1,771 |
| 36 | 00049399060 | 46,104 | 2446 | 6,263 | 1443 | 6,047 | 1,589 |
| 37 | 50580048810 | 0 | 0 | 0 | 0 | 0 | 0 |
| 38 | 00002323730 | 43,670 | 2548 | 5,499 | 1408 | 6,213 | 1,637 |
| 39 | 59148000713 | 42,439 | 2940 | 5,004 | 1499 | 6,146 | 1,887 |
| 40 | 00024552131 | 42,604 | 2466 | 5,408 | 1403 | 5,809 | 1,470 |
| 41 | 00065027105 | 41,984 | 3210 | 6,172 | 1750 | 4,968 | 1,664 |
| 42 | 00186504054 | 41,748 | 783 | 5,603 | 519 | 5,081 | 507 |
| 43 | 00078035934 | 40,685 | 2789 | 5,157 | 1647 | 5,982 | 1,802 |
| 44 | 00597001314 | 41,177 | 2875 | 5,414 | 1581 | 4,990 | 1,595 |
| 45 | 00002751001 | 36,918 | 2607 | 4,734 | 1410 | 5,210 | 1,574 |
| 46 | 00310075190 | 40,817 | 2468 | 5,472 | 1486 | 5,329 | 1,547 |
| 47 | 00597007541 | 37,218 | 2768 | 3,797 | 1303 | 5,417 | 1,768 |
| 48 | 59148001113 | 37,831 | 2230 | 4,842 | 1240 | 5,034 | 1,387 |
| 49 | 00074612390 | 37,475 | 2524 | 4,630 | 1436 | 5,561 | 1,734 |
| 50 | 00045063965 | 38,129 | 2638 | 5,127 | 1538 | 4,822 | 1,573 |
| 51 | 00045064165 | 37,755 | 2374 | 5,181 | 1500 | 4,744 | 1,524 |

REQ 20081069 AB1183 PHARMACY          Page 1 of 3          108 SPECIFIC RX Only

000282

## AB 1183 ANALYSIS
### Pharmacy - 108 Specific Codes (Prescription Drugs Only)

| NDC and DER | NDC | DOS Fiscal Year 07/08 CLAIM COUNT | PHARMACIES WITH CLAIM ACTIVITY | DOS 07/01/07-08/17/07 CLAIM COUNT | PHARMACIES WITH CLAIM ACTIVITY | DOS 07/01/08-08/17/08 CLAIM COUNT | PHARMACIES WITH CLAIM ACTIVITY |
|---|---|---|---|---|---|---|---|
| 52 | 00149047201 | 37,087 | 2408 | 4,871 | 1369 | 4,985 | 1,447 |
| 53 | 50458035006 | 37,809 | 2033 | 5,051 | 1248 | 4,303 | 1,243 |
| 54 | 00006011754 | 36,986 | 1101 | 4,876 | 727 | 4,360 | 676 |
| 55 | 00062190315 | 54,852 | 3156 | 7,702 | 1872 | 6,360 | 1,784 |
| 56 | 50474059540 | 35,414 | 2476 | 4,392 | 1411 | 5,027 | 1,663 |
| 57 | 50458030206 | 36,654 | 2951 | 4,856 | 1734 | 4,309 | 1,727 |
| 58 | 00173064255 | 36,060 | 2523 | 4,745 | 1499 | 4,661 | 1,597 |
| 59 | 00006074031 | 33,622 | 2356 | 3,914 | 1335 | 5,253 | 1,645 |
| 60 | 00074621513 | 37,427 | 2471 | 5,386 | 1507 | 4,544 | 1,477 |
| 61 | 00173013555 | 36,977 | 2505 | 5,091 | 1501 | 4,621 | 1,524 |
| 62 | 00002442030 | 35,863 | 1925 | 4,804 | 1107 | 4,522 | 1,192 |
| 63 | 64764030114 | 36,230 | 2533 | 4,958 | 1518 | 4,686 | 1,629 |
| 64 | 00002411530 | 36,006 | 2605 | 4,977 | 1468 | 4,421 | 1,518 |
| 65 | 00186109005 | 33,095 | 2575 | 5,477 | 1588 | 4,863 | 1,620 |
| 66 | 63653117106 | 34,205 | 1945 | 4,344 | 1260 | 4,786 | 1,382 |
| 67 | 50580044909 | 0 | 0 | 0 | 0 | 0 | 0 |
| 68 | 00002831501 | 0 | 0 | 0 | 0 | 0 | 0 |
| 69 | 64764045124 | 32,421 | 2277 | 4,412 | 1342 | 4,270 | 1,452 |
| 70 | 00078035834 | 32,318 | 2593 | 4,377 | 1463 | 4,480 | 1,534 |
| 71 | 00065401303 | 28,603 | 2942 | 3,529 | 1238 | 2,713 | 1,182 |
| 72 | 00074621553 | 32,892 | 497 | 4,569 | 321 | 4,129 | 320 |
| 73 | 61958070101 | 30,560 | 950 | 3,914 | 509 | 4,088 | 556 |
| 74 | 00024540131 | 30,540 | 2709 | 4,069 | 1401 | 4,129 | 1,432 |
| 75 | 59148001013 | 29,483 | 2224 | 3,639 | 1117 | 4,112 | 1,371 |
| 76 | 00173069500 | 30,358 | 2885 | 3,815 | 1494 | 3,309 | 1,418 |
| 77 | 00173073001 | 31,514 | 2449 | 4,365 | 1400 | 3,715 | 1,349 |
| 78 | 00006027531 | 29,089 | 2166 | 3,141 | 1089 | 2,961 | 1,113 |
| 79 | 00169750111 | 25,978 | 2031 | 3,044 | 926 | 3,840 | 1,140 |
| 80 | 00173073101 | 30,421 | 2154 | 4,229 | 1270 | 3,809 | 1,317 |
| 81 | 00069153072 | 31,083 | 946 | 4,487 | 624 | 3,759 | 575 |
| 82 | 00006074931 | 26,400 | 2190 | 3,064 | 1172 | 4,082 | 1,450 |
| 83 | 00029608612 | 25,587 | 2846 | 2,568 | 1120 | 2,503 | 1,115 |
| 84 | 00069312019 | 23,134 | 2173 | 1,314 | 571 | 1,341 | 625 |
| 85 | 00006074054 | 25,478 | 1446 | 2,994 | 751 | 3,840 | 862 |
| 86 | 00002441530 | 27,947 | 1882 | 3,806 | 1100 | 3,598 | 1,166 |
| 87 | 00074663330 | 25,707 | 684 | 3,137 | 358 | 3,566 | 431 |
| 88 | 00002324030 | 26,378 | 2325 | 3,347 | 1126 | 3,712 | 1,302 |
| 89 | 00078031534 | 27,253 | 1962 | 3,675 | 1120 | 3,768 | 1,178 |
| 90 | 00069311019 | 21,952 | 2044 | 1,311 | 597 | 1,455 | 655 |
| 91 | 00173069700 | 25,400 | 2548 | 3,210 | 1301 | 3,217 | 1,401 |
| 92 | 00069306030 | 23,960 | 2593 | 2,030 | 898 | 1,953 | 885 |
| 93 | 00045048810 | 0 | 0 | 0 | 0 | 0 | 0 |
| 94 | 63653117101 | 25,895 | 1396 | 3,604 | 855 | 3,240 | 814 |
| 95 | 00310027910 | 22,853 | 1612 | 2,526 | 669 | 3,589 | 1,002 |
| 96 | 58468002101 | 23,911 | 1705 | 3,220 | 885 | 3,011 | 898 |
| 97 | 00186108805 | 21,277 | 2178 | 1,995 | 741 | 3,382 | 1,257 |
| 98 | 00074621413 | 24,279 | 2195 | 3,431 | 1280 | 2,914 | 1,218 |
| 99 | 00008083321 | 23,468 | 1896 | 3,064 | 1085 | 3,021 | 1,114 |
| 100 | 00009519101 | 23,482 | 2126 | 3,171 | 1189 | 2,954 | 1,194 |
| 101 | 50242006301 | 233 | 87 | 27 | 21 | 28 | 21 |
| 102 | 00173044704 | 2,563 | 525 | 268 | 146 | 326 | 177 |

000283

## AB 1183 ANALYSIS
### Pharmacy - 108 Specific Codes (Prescription Drugs Only)

| NDC and DER | NDC | DOS Fiscal Year 07/08 | | DOS 07/01/07-08/17/07 | | DOS 07/01/08-08/17/08 | |
|---|---|---|---|---|---|---|---|
| | | CLAIM COUNT | PHARMACIES WITH CLAIM ACTIVITY | CLAIM COUNT | PHARMACIES WITH CLAIM ACTIVITY | CLAIM COUNT | PHARMACIES WITH CLAIM ACTIVITY |
| 103 | 00004110150 | 3,151 | 503 | 410 | 166 | 460 | 172 |
| 104 | 59572020594 | 159 | 21 | 36 | 14 | 9 | 5 |
| 105 | 00006022761 | 2,217 | 199 | 0 | 0 | 695 | 148 |
| 106 | 00075062300 | 1,451 | 416 | 200 | 109 | 218 | 112 |
| 107 | 59676030401 | 430 | 111 | 55 | 32 | 56 | 40 |
| 108 | 59676056001 | 3,846 | 231 | 351 | 89 | 574 | 138 |
| | | 5,268,139 | 5,154 | 668,027 | 4,630 | 659,651 | 4,961 |

000284



000285

| **AB 1183 ANALYSIS** | | | | | | |
|---|---|---|---|---|---|---|
| **Pharmacy - All Paid Claims** | | | | | | |
| | | | | | | |
| | | DOS Fiscal Year 07/08 | | DOS 07/01/07-08/17/07 | | DOS 07/01/08-08/17/08 | |
| | | CLAIM COUNT | PHARMACIES WITH CLAIM ACTIVITY | CLAIM COUNT | PHARMACIES WITH CLAIM ACTIVITY | CLAIM COUNT | PHARMACIES WITH CLAIM ACTIVITY |
| **Pharmacy All Paid Claims** | | 34,687,790 | 5,427 | 4,426,774 | 4,957 | 4,368,195 | 5,227 |

000286

# DECLARATION OF JUDITH K. PHELPS

# EXHIBIT E

### DECLARATION OF JUDITH K. PHELPS

I, JUDITH K. PHELPS, declare as follows:

1. I have personal knowledge of the facts set forth in this declaration and, if called as a witness at the trial in this matter, could and would testify competently to the contents thereof.

2. I am currently employed as the Chief of the Facilities, Pharmacy, and Provider Master File Branch within the Provider Enrollment Division of the California Department of Health Care Services (DHCS). In that capacity, my responsibilities include oversight of enrollment of twenty-six (26) different provider types and updates to and maintenance of the Medi-Cal Provider Master File. I have been employed by DHCS in my current position since May 1, 2006, and I have worked at DHCS since January 4, 1999. Except as otherwise specified, the facts stated in this declaration are based upon my personal knowledge, and if called upon to testify I would competently do so as follows.

3. It is my understanding that DHCS conducted an analysis of a reduction in Medi-Cal payments for pharmacies, scheduled to take effect on March 1, 2009. As part of this analysis, DHCS wanted to find out the number of pharmacies that are actively enrolled in the Medi-Cal program. According to the Provider Master file, there are currently 5,772 California pharmacies actively enrolled in the Medi-Cal program to provide pharmacy services.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at Sacramento, California, this 10th day of February 2009.

*Judith K. Phelps*

JUDITH K. PHELPS

1

DECLARATION OF JUDITH K. PHELPS IN OPPOSITION TO PRELIMINARY INJUNCTION

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:   **Managed Pharmacy Care, et al. v. Maxwell-Jolly, D., et al.**

No.:   **2:09-cv-00382-CAS-MAN**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter; my business address is 300 South Spring Street, Suite 1702, Los Angeles, CA  90013.

On <u>February 11, 2009</u>, I served the attached **DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States Mail at Los Angeles, California, addressed as follows:

Lynn S. Carman                              Stanley L. Friedman
Medicaid Defense Fund                    445 S. Figueroa St. 27th Floor
28 Newport Landing Dr.                  Los Angeles, Ca 90071-1631
Novato, Ca 94949-8214

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on February 11, 2009, at Los Angeles, California.

|  |  |
|---|---|
| Norma L. Herrera-Orr | |
| Declarant | Signature |

60379646.wpd

000289