# Exhibit 47

*State of California ex rel. Ven-A-Care of the Florida Keys, Inc. v.*
*Abbott Labs, Inc. et al., Civil Action No. 03-11226-PBS*

**Exhibit to the November 25, 2009 Declaration of Philip D. Robben**
**in Support of Defendants' Joint Motion for Partial Summary Judgment**

Gaston, Sue                                    January 24, 2008
                    Washington, DC

                    UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL        )   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    )   CIVIL ACTION

PRICE LITIGATION              )   01-CV-12257-PBS

THIS DOCUMENT RELATES TO      )

U.S. ex rel. Ven-a-Care of    )   Judge Patti B. Saris

the Florida Keys, Inc.        )

      v.                      )   Chief Magistrate

Abbott Laboratories, Inc.,    )   Judge Marianne B.

No. 06-CV-11337-PBS           )   Bowler

- - - - - - - - - - - - - - -

        (cross captions appear on following pages)




        Videotaped deposition of SUE GASTON

                      Volume I



                    Washington, D.C.

                    Thursday, January 24, 2008

                    9:00 a.m.

Gaston, Sue                                          January 24, 2008
                        Washington, DC

| Page 2 |
|---|
| 1      UNITED STATES DISTRICT COURT |
| 2      FOR THE DISTRICT OF MASSACHUSETTS |
| 3   --------------- |
| 4   IN RE: PHARMACEUTICAL    ) MDL NO. 1456 |
| 5   INDUSTRY AVERAGE WHOLESALE ) CIVIL ACTION |
| 6   PRICE LITIGATION        ) 01-CV-12257-PBS |
| 7                ) Judge Patti B. Saris |
| 8   THIS DOCUMENT RELATES TO   ) Chief Magistrate |
| 9   ALL CASES IN MDL NO. 1456  ) Judge Marianne B. |
| 10  --------------- Bowler |
| 11 |
| 12 |
| 13    IN THE SUPERIOR COURT FOR THE STATE OF ALASKA |
| 14      THIRD JUDICIAL DISTRICT AT ANCHORAGE |
| 15   --------------- |
| 16  STATE OF ALASKA,        ) |
| 17      Plaintiff,     ) |
| 18      vs.          ) Case No. |
| 19  ALPHARMA BRANDED PRODUCTS   ) 3AN-06-12026 CI |
| 20  DIVISION, INC., et al.   ) |
| 21      Defendants.       ) |
| 22   --------------- |

| Page 3 |
|---|
| 1      IN THE CIRCUIT COURT OF THE FIRST CIRCUIT |
| 2          STATE OF HAWAII |
| 3   --------------- |
| 4   STATE OF HAWAII,        ) |
| 5      Plaintiff,     ) Case No. |
| 6      vs.          ) 06-1-0720-04 EEH |
| 7   ABBOTT LABORATORIES, INC.,  ) |
| 8   et al.,          ) JUDGE EDEN |
| 9      Defendants.   ) ELIZABETH HIFO |
| 10   --------------- |
| 11 |
| 12 |
| 13    IN THE FOURTH JUDICIAL DISTRICT OF THE STATE OF |
| 14      IDAHO, IN AND FOR THE COUNTY OF ADA |
| 15   --------------- |
| 16  STATE OF IDAHO,        ) |
| 17      Plaintiff,     ) |
| 18      vs.          ) Case No. |
| 19  ALPHARMA USPD, INC., et al., ) CV 0C 0701847 |
| 20      Defendant.       ) |
| 21   --------------- |
| 22 |

| Page 4 |
|---|
| 1      IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS |
| 2        COUNTY DEPARTMENT, CHANCERY DIVISION |
| 3   --------------- |
| 4   THE PEOPLE OF THE STATE OF  ) |
| 5   ILLINOIS,            ) |
| 6      Plaintiff,     ) Case No. 05 CH 02474 |
| 7      vs.          ) |
| 8   ABBOTT LABORATORIES, et al., ) |
| 9      Defendants.   ) |
| 10   --------------- |
| 11 |
| 12 |
| 13      COMMONWEALTH OF KENTUCKY |
| 14      FRANKLIN CIRCUIT COURT - DIV. I |
| 15   ------------------ |
| 16  COMMONWEALTH OF KENTUCKY, ex rel. ) |
| 17  GREGORY D. STUMBO, ATTORNEY GENERAL) |
| 18      Plaintiff,     ) Civil Action |
| 19      vs.          ) NO. 04-CI-1487 |
| 20  ALPHARMA USPD, INC., et al.,   ) |
| 21      Defendants.       ) |
| 22   ------------------ |

| Page 5 |
|---|
| 1      COMMONWEALTH OF KENTUCKY |
| 2      FRANKLIN CIRCUIT COURT - DIV. II |
| 3   ------------------ |
| 4   COMMONWEALTH OF KENTUCKY,     ) |
| 5      Plaintiff,     ) Civil Action |
| 6      vs.          ) NO. 03-CI-1134 |
| 7   ABBOTT LABORATORIES, INC.,     ) |
| 8      Defendants.       ) |
| 9   ------------------ |
| 10 |
| 11      COMMONWEALTH OF KENTUCKY |
| 12      FRANKLIN CIRCUIT COURT - DIV. II |
| 13   ------------------ |
| 14  COMMONWEALTH OF KENTUCKY, ex rel. ) |
| 15  GREGORY D. STUMBO, ATTORNEY GENERAL) |
| 16      Plaintiff,      ) Civil Action |
| 17      vs.          ) NO. 03-CI-1135 |
| 18  WARRICK PHARMACEUTICALS CORP.,   ) |
| 19  et al.            ) |
| 20      Defendants.       ) |
| 21   ------------------ |
| 22 |

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                        Washington, DC

1  STATE OF NEW YORK
2  SUPREME COURT: COUNTY OF ERIE
3  - - - - - - - - - - - - - - -
4  COUNTY OF ERIE,            )
5         Plaintiff,          )
6     vs.                     ) Index No. 05-2439
7  ABBOTT LABORATORIES, INC.,  )
8  et al.,                    )
9         Defendants.         )
10 - - - - - - - - - - - - - - -
11
12
13       STATE OF WISCONSIN CIRCUIT COURT
14          DANE COUNTY  Branch 9
15 - - - - - - - - - - - - - - -
16 STATE OF WISCONSIN,         )
17       Plaintiff,           )
18    vs.                     ) Case No. 04-CV-1709
19 AMGEN INC., et al.,        )
20       Defendants.          )
21 - - - - - - - - - - - - - - -
22

1        UNITED STATES DISTRICT COURT
2      FOR THE DISTRICT OF MASSACHUSETTS
3  - - - - - - - - - - - - - - -
4  IN RE: PHARMACEUTICAL        ) MDL NO. 1456
5  INDUSTRY AVERAGE WHOLESALE  ) CIVIL ACTION
6  PRICE LITIGATION            ) 01-CV-12257-PBS
7  THIS DOCUMENT RELATES TO    )
8  U.S. ex rel. Ven-a-Care of  ) Judge Patti B. Saris
9  the Florida Keys, Inc., et al)
10    v.                      ) Chief Magistrate
11 Boehringer Ingelheim        ) Judge Marianne B.
12 Corporation, et al.,        ) Bowler
13 No. 07-CV-10248-PBS         )
14 - - - - - - - - - - - - - - -
15
16     Videotaped deposition of SUE GASTON, held at
17 the law offices of Jones Day, 51 Louisiana Avenue,
18 N.W., Washington, D.C. 20001-2113, the proceedings
19 being recorded stenographically by Jonathan Wonnell,
20 a Registered Professional Court Reporter and Notary
21 Public of the District of Columbia, and transcribed
22 under his direction.

1     A P P E A R A N C E S   O F   C O U N S E L
2
3  On behalf of the United States of America:
4
5        ANA MARIA MARTINEZ, ESQ.
6        United States Department of Justice
7        99 N.E. 4th Street
8        Miami, Florida 33132
9        (305) 961-9431
10       ana.maria.martinez@usdoj.gov
11
12 On behalf of the U.S. Department of Health and
13 Human Services:
14
15       LESLIE M. STAFFORD, ESQ.
16       U.S. Department of Health & Human
17        Services
18       Office of General Counsel, CMS Division
19       7500 Security Boulevard
20       Mail Stop C2-05-23
21       Baltimore, Maryland 21244
22       (410) 786-9655

1     A P P E A R A N C E S   (Cont'd)
2
3  On behalf of the State of Alabama:
4
5        SCARLETTE M. TULEY, ESQ. (via phone)
6        Beasley, Allen, Crow, Methvin, Portis &
7         Miles, P.C.
8        218 Commerce Street
9        Montgomery, Alabama 36104
10       (800) 898-2034
11       scarlette.tuley@beasleyallen.com
12
13 On behalf of the State of Florida:
14
15       MARY S. MILLER, ESQ. (via phone)
16       Office of the Attorney General of Florida
17       PL-01, The Capitol
18       Tallahassee, Florida 32399-1050
19       (850) 414-3600
20       mary_miller@oag.state.fl.us
21
22 (Cont'd)

3 (Pages 6 to 9)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 10

1        A P P E A R A N C E S (Cont'd)
2
3    On behalf of the City of New York and all New
4    York Counties other than Nassau and
5    Orange; the States of Wisconsin,
6    Illinois, Kentucky, Idaho, Alaska and
7    Hawaii:
8
9        MICHAEL WINGET-HERNANDEZ, ESQ.
10       Winget-Hernandez, LLC
11       3112 Windsor Road, Suite 228
12       Austin, Texas 78703
13       michael@winget-hernandez.com
14
15   On behalf of Ven-A-Care of the Florida Keys, Inc.:
16
17       MARJORY P. ALBEE, ESQ.
18       Mager & Goldstein LLP
19       1818 Market Street, Suite 3710
20       Philadelphia, Pennsylvania 19103
21       (215) 640-3280
22       malbee@magergoldstein.com

Page 11

1        A P P E A R A N C E S (Cont'd)
2    On behalf of Abbott Laboratories, Inc.:
3
4        DAVID TORBORG, ESQ.
5        SEAN P. MALONE, ESQ.
6        Jones Day
7        51 Louisiana Avenue, N.W.
8        Washington, D.C. 20001-2113
9        (202) 879-3939
10       dstorborg@jonesday.com
11       spmalone@jonesday.com
12
13   On behalf of Aventis Pharmaceuticals and
14   Sanofi Synthelabo:
15
16       JENNIFER H. MCGEE, ESQ.
17       Shook, Hardy & Bacon, LLP
18       600 Fourteenth Street, N.W.
19       Suite 800
20       Washington, D.C. 20005-2004
21       (202) 783-8400
22       jmcgee@shb.com

Page 12

1        A P P E A R A N C E S (Cont'd)
2
3    On behalf of Bristol-Myers Squibb:
4
5        DIANNE M. PETERSON, ESQ. (via phone)
6        Hogan & Hartson
7        875 Third Avenue
8        New York, New York 10022
9        (212) 918-3000
10       dmpeterson@hhlaw.com
11
12   On behalf of Dey, Inc., Dey, L.P. and Mylan:
13
14       SARAH L. REID, ESQ.
15       Kelley, Drye & Warren LLP
16       101 Park Avenue
17       New York, New York 10178
18       (212) 808-7720
19       sreid@kelleydrye.com
20
21
22   (Cont'd)

Page 13

1        A P P E A R A N C E S (Cont'd)
2
3    On behalf of Roxane Laboratories and
4    Boehringer Ingelheim:
5
6        ERIC GORTNER, ESQ.
7        Kirkland & Ellis
8        200 East Randolph Drive
9        Chicago, Illinois 60601
10       (312) 861-2285
11       egortner@kirkland.com
12
13   On behalf of Sandoz, Inc.:
14
15       DAVID L. KLEINMAN, ESQ. (via phone)
16       White & Case LLP
17       1155 Avenue of the Americas
18       New York, New York 10036-2787
19       (212) 819-2567
20       dkleinman@whitecase.com
21
22

4  (Pages 10 to 13)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 14

```
 1        A P P E A R A N C E S (Cont'd)
 2
 3   On behalf of Schering-Plough Corporation,
 4   Schering Corporation and Warrick
 5   Pharmaceuticals Corporation:
 6
 7        JOHN P. BUEKER, ESQ.
 8        Ropes & Gray
 9        One International Place
10        Boston, Massachusetts 02110-2624
11        (617) 951-7050
12        john.bueker@ropesgray.com
13
14        -- and --
15
16        GINGER APPLEBERRY, ESQ. (via phone)
17        Locke, Lord, Bissell & Liddell
18        2200 Ross Avenue, Suite 2200
19        Dallas, Texas 75201
20        (214) 740-8459
21        gappleberry@lockeliddell.com
22
```

Page 15

```
 1        A P P E A R A N C E S (Cont'd)
 2
 3   On behalf of Endo Pharmaceuticals:
 4
 5        VICTOR RORTVEDT, ESQ.
 6        Arnold & Porter
 7        555 Twelfth Street, N.W.
 8        Washington, D.C. 20004
 9        (202) 942-5000
10
11   On behalf of Ethex Corporation:
12
13        CLARA VONDRICH, ESQ.
14        Arnold & Porter
15        555 Twelfth Street, N.W.
16        Washington, D.C. 20004
17        (202) 942-5000
18
19
20   ALSO PRESENT:
21        EMILY WATSON, legal assistant
22        CONWAY BARKER, videographer
```

Page 16

```
 1             C O N T E N T S
 2   WITNESS NAME                    PAGE
 3   SUE GASTON
 4       Examination By Mr. Torborg................. 022
 5
 6
 7             E X H I B I T S
 8   NUMBER         DESCRIPTION          PAGE
 9   Exhibit Abbott 453, VAC MDL 86162 THROUGH 86175 097
10   Exhibit Abbott 454, VAC MDL 64417 through 64427 139
11   Exhibit Abbott 455, HHD 101-1266 through 1285.. 146
12   Exhibit Abbott 456, HHD 042-0164.............. 151
13   Exhibit Abbott 457, HHC 008-0083.............. 167
14   Exhibit Abbott 458, OIG report entitled Cost of
15            Dialysis Related Drugs
16            (no Bates refs)........... 187
17   Exhibit Abbott 459, VAC MDL 45005 through 31... 206
18   Exhibit Abbott 460, HCFA Review article
19            entitled "State Medicaid
20            Pharmacy Payments and Their
21            Relation to Estimated Costs"
22            (no Bates refs)........... 206
```

Page 17

```
 1        I N D E X   O F   E X H I B I T S (Cont'd)
 2   NUMBER         DESCRIPTION          PAGE
 3   Exhibit Abbott 461, HHC 992-0856 through 0858.. 222
 4   Exhibit Abbott 462, HHC 902-0446.............. 231
 5   Exhibit Abbott 463, Section 4401 of the Omnibus
 6            Budget Reconciliation Act
 7            of 1990 (no Bates refs).... 263
 8   Exhibit Abbott 464, NYSHD-FOIL 01682 through
 9            01683...................... 271
10   Exhibit Abbott 465, HHC 004-0054.............. 276
11   Exhibit Abbott 466, HHD 006-0103 through 0108.. 279
12   Exhibit Abbott 467, US' Second Supplemental
13            Response to Defendant
14            Abbott's Fourth Set of
15            Interrogatories
16            (no Bates refs)........... 284
17
18
19
20
21
22
```

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                                    January 24, 2008
                          Washington, DC

Page 18

1        P R O C E E D I N G S
2            (9:35 a.m.)
3        THE VIDEOGRAPHER:  In the United States
4    District Court for the District of Massachusetts, In
5    Re: Pharmaceutical Industry Average Wholesale Price
6    Litigation, related to U.S. ex rel. Ven-A-Care of
7    the Florida Keys, Incorporated versus Abbott
8    Laboratories Incorporated et al., Case Number 01 CV
9    12257 PBS, and other cases cross noticed.  This is
10   the deposition of Sue Gaston.
11       Today's date is January 24th 2008.  The
12   location of the deposition is Jones Day, 51
13   Louisiana Avenue, Northwest, Washington, D.C. Will
14   counsel please identify yourselves and state whom
15   you represent?
16       MR. TORBORG:  David Torborg from Jones
17   Day representing Abbott Laboratories.
18       MR. GORTNER:  Good morning.  Eric Gortner
19   from Kirkland & Ellis representing Roxane
20   Laboratories, Inc. and entities affiliated with
21   Boehringer Ingelheim Corporation.
22       MR. RORTVEDT:  Victor Rortvedt, Endo

Page 19

1    Pharmaceuticals.
2        MS. REID:  Sarah Reid from Kelley, Drye &
3    Warren representing Dey and on the cross-noticed
4    deposition also representing Mylan Laboratories.
5        MS. McGEE:  Jennifer McGee from Shook,
6    Hardy & Bacon representing Aventis Pharmaceuticals
7    and Sanofi Synthelabo.
8        MR. BUEKER:  John Bueker from Ropes &
9    Gray on behalf of Schering-Plough Corporation,
10   Schering Corporation and Warrick Pharmaceuticals
11   Corporation.
12       MS. VONDRICH:  Clara Vondrich on behalf
13   of Ethex Corporation.
14       MR. WINGET-HERNANDEZ:  Michael Winget-
15   Hernandez.  I'm here on behalf of the City of New
16   York and the New York Counties in the MDL 1456
17   except for Orange and Nassau.  Also on behalf of the
18   states of Wisconsin, Illinois, Kentucky, Alaska,
19   Idaho and Hawaii.
20       MS. ALBEE:  Marjory Albee from the law
21   firm of Mager & Goldstein on behalf of Ven-A-Care of
22   the Florida Keys, Inc.

Page 20

1        MS. STAFFORD:  Leslie Stafford on behalf
2    of the Centers for Medicare and Medicaid Services.
3        MS. MARTINEZ:  Ani Martinez on behalf of
4    the United States.  And I just like to ask, David,
5    at a particular point I'd like to make a comment
6    before you begin regarding cross notices.
7        MR. TORBORG:  Perhaps it makes sense to
8    have the people on the phone identify themselves
9    before we go into the preliminary matters.
10       Would those on the phone please state
11   your name and who you represent?
12       MS. MILLER:  Yes, this is Mary Miller for
13   the attorney general on behalf of the State of
14   Florida on the cross noticed matter filed by Mylan.
15       MS. APPLEBERRY:  Ginger Appleberry from
16   Locke, Lord, Bissell & Liddell representing
17   Schering, Schering-Plough and Warrick
18   Pharmaceuticals.
19       MS. MILLER:  Joining Mary Miller for the
20   State of Florida is Kirk Rogers.
21       MS. TULEY:  This is Scarlette Tuley from
22   the law firm of Beasley Allen for the state of

Page 21

1    Alabama.
2        MR. KLEINMAN:  This is David Kleinman
3    from White & Case for Sandoz, Inc.
4        MS. PETERSON:  Diane Peterson from the
5    firm of Hogan & Hartson on behalf of Bristol-Myers
6    Squibb.
7        THE VIDEOGRAPHER:  Is there anyone else
8    on the phone?  Okay.
9        The court reporter is Jon Wonnell.  The
10   video camera operator is Conway Barker, both on
11   behalf of Henderson Legal Services.  This deposition
12   commences at 9:37.  Please swear in the witness.
13            * * * * *
14       Whereupon,
15            SUE GASTON,
16       called as a Witness, was duly sworn by
17   Jonathan Wonnell, a Notary Public in and
18   for the District of Columbia , and was
19   examined and testified as follows.
20            * * * * *.
21       THE VIDEOGRAPHER:  Your may proceed.
22       MR. TORBORG:  Ani, you had some

                                    6  (Pages 18 to 21)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                      January 24, 2008
                    Washington, DC

Page 22

1  preliminary comments?
2       MS. MARTINEZ: Yes. This is Ani
3  Martinez. My comment is with respect to any state
4  cross notices of this deposition. And it's just to
5  say that the United States is agreeable to you all
6  cross noticing this and being here. However, only
7  subject to the way that it was contemplated by the
8  MDL judge, Judge Saris. And what she contemplated
9  is that if you all participate in these depositions
10 any issues that may arise regarding it would be
11 resolved by her.
12      And so I just wanted to say that the
13 United States is in no way offering Ms. Gaston as a
14 witness in response to those notices in any way that
15 would lead to the United States having to go to
16 state court on any issue or having state
17 jurisdiction over this particular deposition.
18 That's all.
19 EXAMINATION BY COUNSEL FOR THE ABBOTT LABORATORIES
20      BY MR. TORBORG:
21 Q.   Good morning, Ms. Gaston.
22 A.   Good morning.

Page 23

1  Q.   Could you please state your full name for
2  the record?
3  A.   It's see Susan E. Gaston.
4  Q.   Thank you. My name is David Torborg and
5  I'm an attorney from the law firm of Jones Day. And
6  we represent Abbott Laboratories in this case. And
7  we've never spoken before today; is that right?
8  A.   Correct.
9  Q.   What is your current address?
10 A.   Home address?
11 Q.   Yes, please.
12 A.   9011 Thrugmorton Road, Baltimore,
13 Maryland, 21234.
14 Q.   And what is your current business
15 address?
16 A.   7500 Security Boulevard.
17 Q.   And is that the offices of CMS?
18 A.   The Center for Medicare and Medicaid
19 Services.
20 Q.   Thank you. Do you have any plans to move
21 your personal residence in the near future?
22 A.   No.

Page 24

1  Q.   Do you have any plans to take a different
2  job?
3  A.   No.
4  Q.   Have you ever been deposed before?
5  A.   Yes.
6  Q.   How many times have you been deposed?
7  A.   Once.
8  Q.   Can you give me just a general background
9  or what the nature of the deposition was and the
10 case? I'm sorry. The nature of the case.
11 A.   It was -- from my recollection it was the
12 Federal Trade Commission and Mylan Labs.
13 Q.   Do you recall what the nature of that
14 litigation was?
15 A.   Yes. It was my understanding that the
16 Federal Trade Commission was looking into Mylan Labs
17 because they -- there was an indication that they
18 have purchased some of the bulk material for some of
19 their generic drugs so the other competitor
20 companies that also made that same product, they
21 were unable to obtain the bulk materials in order to
22 make the competitive product. So sort of cornering

Page 25

1  the market kind of --
2  Q.   Antitrust type matter?
3  A.   Correct.
4  Q.   Have you ever testified at a trial or
5  hearing?
6  A.   Yes.
7  Q.   Can you tell me about that?
8  A.   It was testifying to the grand jury in
9  Boston.
10 Q.   And when was that?
11 A.   When?
12 Q.   Yes.
13 A.   I can't recall.
14 Q.   Was it within the last two years?
15 A.   It was prior to that.
16 Q.   What's your best guess of when it was? I
17 don't need an exact date, but your best guess at
18 when it was?
19 A.   Early 2000. Maybe the end of 1999. I'm
20 really not sure.
21 Q.   And did that relate in any way to
22 prescription drugs?

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
Washington, DC

Page 26

1    A.  Yes.
2    Q.  How did you come to testify before the
3  grand jury in Boston in early 2000 relating to
4  prescription drugs?
5    A.  Did you want to know what the issue was?
6    Q.  Yes.
7    A.  It was concerning repackagers,
8  manufacturers that were considered repackagers.
9    Q.  And what is a repackager?
10    A.  A repackager is a company that repackages
11  a drug under their own NDC number.
12    Q.  Do you recall which manufacturers were
13  involved?
14    A.  No, I don't.
15    Q.  Do you recall any of the ones that were
16  involved?
17    A.  I know Kaiser was an issue.
18    Q.  And how long did you testify before the
19  grand jury?
20    A.  I appeared twice.
21    Q.  For how long were you on the stand?
22    A.  I don't remember.

Page 27

1    Q.  Did this testimony have anything to do
2  with issues regarding average wholesale price?
3    A.  No, not that I'm aware of.
4    Q.  Did it have anything to do with the
5  pricing of drugs?
6    A.  Not that I'm aware of.
7    Q.  Have you given any other testimony
8  besides what you told me already?
9    A.  No.
10    Q.  Have you ever testified before
11  Congress --
12    A.  No.
13    Q.  -- or any congressional committee?
14    A.  No.
15    Q.  Have you ever met with any congressional
16  committees?
17    A.  Not that I remember.
18    Q.  Were you aware of any others in your
19  office meeting with congressional committees
20  regarding issues on drug pricing?
21    A.  I can't specifically remember if they
22  did.

Page 28

1    Q.  Do you have any general recollection at
2  all about whether those types of meetings took
3  place?
4    A.  They could have occurred.
5    Q.  And why do you see that they could have
6  occurred?  Do you have a general recollection about
7  that or --
8    A.  No.  Just the nature of the program.
9    Q.  Okay.  Before we get too far along I'd
10  like to go over some guidelines about how I'd like
11  to proceed today.  First -- and you've done a great
12  job of this so far -- you'll need to respond
13  verbally to my questions so the court reporter can
14  pick it up.  And the most important guideline is
15  this.  Please tell me if you don't understand any
16  question that I ask.  Otherwise I'll assume that you
17  understand the question and are able to provide a
18  response.
19      If it helps us get on the same
20  wavelength, feel free to ask me a question.  You've
21  already done that once today.  That's fine.  I'm
22  just trying to get your -- I just want us to be on

Page 29

1  the same wavelength so you understand what I'm
2  asking.  Okay?
3    A.  Okay.
4    Q.  From time to time Ms. Martinez may say
5  objection after I ask a question.  The objections
6  are being made for purposes of the record.  Unless
7  Ms. Martinez specifically tells you not to answer my
8  question you are to answer my question.  Okay?
9    A.  Okay.
10    Q.  And we've had an agreement with counsel
11  in previous depositions that one objection for that
12  side of the table will suffice for all cases so we
13  don't have a chorus of objections.  Is that
14  agreement acceptable to everyone here today?
15      MR. WINGET-HERNANDEZ:  Actually, I think
16  the agreement applies so both sides of the table.
17      MR. TORBORG:  That's fine.
18      MS. ALBEE:  Is there also an agreement
19  that objection form suffices as an objection to the
20  form without further articulation?
21      MR. TORBORG:  Yes.  That would be
22  preferred under the rules.

8  (Pages 26 to 29)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                          January 24, 2008
                        Washington, DC

Page 30

1        MS. MARTINEZ:  I just want to state for
2   the record I think it's possible that there's some
3   people on this side that are not sort of plaintiff.
4   So I just wanted to -- I defendants.  So we'll just
5   end that are representing defendants.  So we'll just
6   say that objections either by Mr. Winget, Ms. Albee
7   or myself -- I don't expect Ms. Stafford -- Ms.
8   Stafford will probably rely on me to make the
9   objections -- will count for the plaintiff's side,
10  shall we said.
11       MR. TORBORG:  But I thought Ms. Hernandez
12  says it doesn't matter.
13       MS. MARTINEZ:  Excuse me?
14       MR. TORBORG:  I think Mr. Hernandez said
15  it doesn't matter if you're plaintiff or defendant.
16       MR. WINGET-HERNANDEZ:  I hate that we're
17  having to go down this rabbit trail, but my
18  understanding of the agreement is that if one of the
19  defendants' counsel raises an objection that
20  objection is good for all of defense counsel.  The
21  same is true on the plaintiff's side.  If one of
22  plaintiff's counsel raises an objection then the

Page 31

1   objection is good for all the plaintiffs' counsel.
2   That's my understanding of it.  Do you agree?
3        MR. TORBORG:  I agree for Abbott Labs.
4   That's all I can agree for.  If anyone has an
5   objection, please raise it.
6        BY MR. TORBORG:
7        Q.   Ms. Gaston, you may have wondered what's
8   next to you and Ms. Martinez.  There's a couple
9   boxes of binders that have orange covers.  What
10  those are are copies of documents that have been
11  marked as exhibits in previous depositions that have
12  come before you.
13       I will ask you -- fortunately I will not
14  be asking you questions about all of those, but I
15  will be asking you questions about some of them.
16  And I will tell you the exhibit number.  And on the
17  front of each binder is a sticker that will tell you
18  which exhibits are in that binder.  It will be say
19  Abbott Exhibit 25 through whatever, 50, and I'm
20  going to ask you to pull that out when I get those.
21       But that's what those are and Ms.
22  Martinez has been kind enough in the past to help us

Page 32

1   do that.  She has copies as well.  We're trying to
2   save some trees here, but of course not all trees.
3        MR. WINGET-HERNANDEZ:  You should be
4   struck by lightning for saying that.
5        BY MR. TORBORG:
6        Q.   Finally, I will try to take a break about
7   every hour or what otherwise makes sense.  Let me
8   know if you need to take a break at any time.
9        A.   Okay.
10       Q.   Do you have any questions before we get
11  started?
12       A.   No.
13       Q.   First I'd like to walk through your
14  professional career starting with college.  And did
15  you attend college?
16       A.   No.
17       Q.   Have you taken any post high school
18  educational courses?
19       A.   Yes.
20       Q.   Can you tell me about those?
21       A.   Specifically, no.  I'm not -- I can't
22  remember.  I know there was an English course.  But

Page 33

1   other than that, unless they were job-related
2   courses, which I really can't remember exactly which
3   courses I took.  Are you talking specifically
4   college or are you talking --
5        Q.   Any educational courses after high
6   school.  That's what I'm asking about.  And what you
7   recall is taking some English-related courses?
8        (Telephone objection.)
9        MR. TORBORG:  Excuse me a second.
10  There's something odd going on on the phone.
11       MR. WINGET-HERNANDEZ:  We're going to go
12  off the record and see if we can't fix this.
13       THE VIDEOGRAPHER:  Off the record at
14  9:49.
15       (Recess.)
16       THE VIDEOGRAPHER:  On the record at 9:15.
17       BY MR. TORBORG:
18       Q.   I'm sorry about that, Ms. Gaston.  Where
19  was I?  We were talking about courses you've taken
20  after high school.  And you indicated that you've
21  taken some English-related courses; is that right?
22       A.   Yes, but I can't remember any other

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                                January 24, 2008
                         Washington, DC

Page 34

1  specific courses.
2      Q.   And where did you take those courses?
3      A.   The location was at Social Security.  But
4  it was through one of the local colleges.
5      Q.   Have you taken any educational courses in
6  the area of pharmacy?
7      A.   No.
8      Q.   Have you taken any educational courses
9  relating to health care in general?
10     A.   Not that I can remember.
11     Q.   Have you ever worked at a pharmacy?
12     A.   No.
13     Q.   Is it fair to say that what you know
14 about the world of pharmacy is what you've learned
15 on the job at HCFA?
16     A.   Correct.
17     Q.   What was your -- did you graduate from
18 high school?
19     A.   Yes.
20     Q.   What was your first job after graduating
21 from high school?
22     A.   I worked for a moving and storage

Page 35

1  company.
2      Q.   What year did you graduate from high
3  school?
4      A.   '73.
5      Q.   And how long did you work for the moving
6  company?
7      A.   Until '79.
8      Q.   And then what did you do after that?
9  What was your next job?
10     A.   I started with the Social Security
11 Administration.
12     Q.   When did you start with the Social
13 Security Administration?
14     A.   In a typing pool.
15     Q.   Excuse me?
16     A.   A typing pool.
17     Q.   A typing pool.  And when did you start
18 that job?
19     A.   In '79.
20     Q.   How long did you serve in that job?
21     A.   Can I ask you a question?
22     Q.   Sure.

Page 36

1      A.   The paper that Ani gave you, on the top
2  it says EOD date.
3      Q.   Yes.
4      A.   What does that say?
5      Q.   1/30/1974?
6      A.   Okay.  I want to correct myself.  It's
7  '74, not '79.
8      Q.   That's when you started with Social
9  Security in the typing pool?
10     A.   Yes.
11     Q.   Thank you.  So you worked in the moving
12 company until 1974; is that right?
13     A.   Correct.
14     Q.   And how long did you work in the typing
15 pool at the Social Security Administration?
16     A.   I really don't know how long that was.
17     Q.   Ten years, more than ten years?
18     A.   No.  It wasn't that long.
19     Q.   What was your next job?
20     A.   I worked for Office of the General
21 Counsel.  It was a clerical job.
22     Q.   Was that within the Social Security

Page 37

1  Administration?
2      A.   Correct.
3      Q.   Who did you work with?  Who was your
4  boss?
5      A.   I don't recall.
6      Q.   How long did you work in that position?
7      A.   I don't recall.
8      Q.   More than ten years?
9      A.   No.  Less.
10     Q.   After that what was your next job?
11     A.   I worked for Office of the Actuary.
12     Q.   And was that still within the SSA?
13     A.   Correct.
14     Q.   What did you do in that job?
15     A.   Clerical.
16     Q.   Do you know how long you had that job?
17     A.   No, I don't.
18     Q.   What was your next job after that?
19     A.   Division of classification.
20     Q.   That's still within the SSA?
21     A.   Correct.
22     Q.   What was the nature of your job in that

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                                January 24, 2008
                              Washington, DC

Page 38

1   division?
2       A.   Clerical.
3       Q.   After that what did you do?
4       A.   Disability operations in Social Security.
5       Q.   What was the nature of your job in that?
6       A.   Processing foreign claims.  Social
7   Security claims.
8       Q.   Was that a clerical or a --
9       A.   I was a benefit authorizer.
10      Q.   Okay.  So that's more than clerical?
11      A.   Correct.
12      Q.   So you were to look at the forms and
13  decide whether or not to -- or make recommendations
14  on whether or not to authorize benefits?
15      A.   No.  We just -- we did more of -- we
16  didn't determine or authorize claims.  But we
17  processed the claims after the authorization
18  occurred.
19      Q.   What was the next job you had after that?
20      A.   With HCFA.
21      Q.   Okay.  Was this your first job with HCFA?
22      A.   Yes.

Page 39

1       Q.   And what was your position there?
2       A.   I don't recall the job title at that
3   time.
4       Q.   On the resume that you created for
5   purposes of this deposition -- I appreciate that --
6   the last one I have on the page runs the dates May
7   1988 to April 1991, post entitlement technical
8   expert, Social Security Administration, Office of
9   Disability and International Operations.  Have we
10  talked about that one yet?
11      A.   Well, I went in there as a benefit
12  authorizer and then I was promoted to the post
13  entitlement technical expert.  But it was still
14  foreign claims and it was -- from benefit authorizer
15  to the post entitlement job, it was all within those
16  years.
17      Q.   And you worked at the Social Security
18  Administration until April of 1991; is that right?
19      A.   Correct.
20      Q.   During your time at the SSA did you
21  confront issues relating to pharmacy?
22      A.   No.

Page 40

1       Q.   From 1991 to February of 2003 you were
2   health insurance specialist at HCFA; is that right?
3       A.   Yes.  Our actual title when I first
4   started was different than health insurance
5   specialist.  But it was all basically the same job.
6   They changed the name of the job.
7       Q.   But your duties and responsibility in
8   this job were the same from April of 1991 through
9   February of '03; is that right?
10      A.   Correct.
11      Q.   And tell me about your job at that time.
12  What were you doing?
13      A.   I was working with the Medicaid drug
14  rebate program pharmacy reimbursement and coverage
15  issues.
16      Q.   When you say pharmacy reimbursement, what
17  do you mean by that?
18      A.   It's drug reimbursement with the -- we
19  did state plan amendments and covered issues that
20  came up for drug coverage under Medicaid.
21      Q.   And when you say drug coverage under
22  Medicaid, you mean what drugs would be covered under

Page 41

1   Medicaid, correct?
2       A.   Right.
3       Q.   Not necessarily, in that category at
4   least, the level of payment to be paid; is that
5   right?
6       A.   Both.  Whether a drug was covered under
7   Medicaid and also any of the payment issues that
8   would come up, what states would pay by the state
9   planned amendments.
10      Q.   You also referenced the Medicaid drug
11  rebate program; is that right?
12      A.   Correct.
13      Q.   What was the nature of your involvement
14  in that during this time?
15      A.   The Medicaid drug rebate program
16  determines if drugs are covered under Medicaid.
17      Q.   What was the nature of your job with
18  respect to the Medicaid drug rebate program?  What
19  did you do?
20      A.   Overseeing the policy.
21      Q.   When you say overseeing policy, what do
22  you mean by that?

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                        January 24, 2008
                        Washington, DC

---

Page 42

1      A.   Working on any policy-related issues
2  concerning the Medicaid drug rebate program.
3      Q.   With respect to state plan amendments and
4  drug reimbursement, what was the nature of your work
5  in that area?
6      A.   Working with the regional office and
7  reviewing the state plan amendments that are
8  submitted by the states.
9      Q.   We'll talk about that a little bit more
10 today.  Who was your boss during this time from
11 April 1991 through February of 2003?
12     A.   Larry Reed.
13     Q.   What was Mr. Reed's title?  Do you know?
14     A.   In the beginning he was a branch chief.
15 At times he was a technical director.  Other times
16 he was a director.
17     Q.   Was there anyone sort of in the chain of
18 command between Mr. Reed and yourself or did you
19 report directly to Mr. Reed?
20     A.   I don't quite understand your question.
21     Q.   Have you seen an organizational chart
22 before that has little boxes and lines?

Page 43

1      A.   Yes.
2      Q.   Would there be a box between you and Mr.
3  Reed?
4      A.   A box between us?  No.
5      Q.   Or did you report directly to Mr. Reed?
6      A.   To Larry Reed.
7      Q.   Okay.  Who else did you work with --
8  well, let me strike that and back up.
9           On your resume you indicate that you
10 worked for CMS/CMSO.
11     A.   Correct.
12     Q.   Can you tell us what that means?
13     A.   Center for Medicaid and State Operations.
14     Q.   So as I understand it there are two broad
15 divisions within CMS, one for Medicare and one for
16 Medicaid; is that right?
17     A.   Correct.
18     Q.   And you worked in the Medicaid side?
19     A.   Correct.
20     Q.   Was that previously referred to as the
21 Medicaid Bureau, do you know?
22     A.   At one time.

Page 44

1      Q.   And CMSO is the predecessor name for the
2  Medicaid Bureau; is that right?
3      A.   Correct.
4           MS. MARTINEZ:  Objection, form.  I think
5  you said it backwards.
6           MR. TORBORG:  Yes.  Successor name.
7  You're right.
8           MS. MARTINEZ:  Okay.
9           BY MR. TORBORG:
10     Q.   Just so we're clear, CMSO is the
11 successor name to the Medicaid Bureau?
12     A.   Right.
13     Q.   And in February of 2003 you switched
14 jobs; is that right?
15     A.   Correct.
16     Q.   And that's your current job, right?
17     A.   Yes.
18     Q.   And what is the nature of your job there?
19     A.   I'm the team lead for dispute resolution
20 of the Medicaid drug rebate program.
21     Q.   Do you work on state plan amendments
22 anymore?

Page 45

1      A.   No.
2      Q.   I wanted to ask one other thing.  From
3  1991 to 2003, the previous job, did you work on
4  federal upper limits?
5      A.   Yes.
6      Q.   And can you tell us what those are?
7      A.   The federal government sets an upper
8  limit reimbursement amount on certain drugs.
9      Q.   What was the nature of your involvement
10 with the federal upper limit program?
11     A.   I took care of setting the upper limit
12 reimbursement amount on the drugs.
13     Q.   For all drugs?
14     A.   No.  There were just -- the regulations
15 indicate that they're set on -- there are certain
16 criteria, and they're the drugs that we would set an
17 upper limit reimbursement amount on.
18     Q.   I asked the wrong question.  What I meant
19 to ask was for drugs that HCFA did establish a
20 federal upper limit, you would have been involved in
21 that?
22     A.   Correct.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 46

1    Q.   And did you work with anyone else in that
2  area at HCFA?
3    A.   Yes.
4    Q.   Who else was involved in that?
5    A.   When I first started, Pete Rodler.
6         MR. WINGET-HERNANDEZ:  Could you spell it
7  for us?
8         THE WITNESS:  Rodler, R-o-d-l-e-r.
9    Q.   Anyone else?
10   A.   Cindy Bergin.  I mentored her later.
11   Q.   Her last name is spelled out?
12   A.   B-e-r-g-i-n.
13   Q.   Is she still with HCFA?
14   A.   Yes.
15   Q.   Is her name still Cindy Bergin?
16   A.   Yes.
17   Q.   Who else?
18   A.   That was it.
19   Q.   Can you recall anyone else during your
20  time from 1991 to February of 2003 who was involved
21  in the federal upper limit program?
22        MS. MARTINEZ:  Objection, form.

Page 47

1         Oh, you can answer.  I make these little
2  form objections.  Don't worry.
3         THE WITNESS:  Okay.
4    A.   Not that I can remember.
5    Q.   What was the nature of Mr. Reed, your
6  boss', involvement with the FULs, as we'll call
7  them?  Federal upper limits, FULs, is that correct?
8    A.   Correct.
9    Q.   What was the nature of his involvement in
10  the FULs?
11   A.   Well, he had last say on anything that
12  was sent out or published.
13   Q.   So did you discuss issues related to the
14  FUL program with Mr. Reed?
15   A.   Yes.
16   Q.   Anyone else besides Mr. Reed you recall
17  having discussions about the FUL program with?
18   A.   Can you be more specific with your
19  question?
20   Q.   Is there anyone else within HCFA that you
21  discussed issues relating to the federal upper limit
22  program with?

Page 48

1    A.   Relating to the work that I did on FULs?
2    Q.   Yes.
3         MS. MARTINEZ:  Objection, form.
4    A.   Only the people that I worked with, Pete
5  Rodler or Cindy Bergin.
6         MR.COOK:  What is the nature of the form
7  objection?  Maybe I'm missing something.
8         MS. MARTINEZ:  Time period.  Just for the
9  record, I think you're only addressing during the
10  1991 to 2003.
11        MR. TORBORG:  Correct.
12        MS. MARTINEZ:  And I just -- if that's
13  the period of time that you're referring to I have
14  no objection.
15        MR. WINGET-HERNANDEZ:  My objection was
16  lack of foundation.  I don't think you've
17  established that there was anything called a FUL
18  program.
19        BY MR. TORBORG:
20   Q.   In your job today are you still working
21  on issues relating to the FUL program?
22   A.   No.

Page 49

1    Q.   Do you know who's handling those issues
2  today?
3    A.   Gail Sexton.
4    Q.   Anyone else?
5    A.   Not that I'm aware of.
6    Q.   Did you talk with anyone else about the
7  federal upper limit program from April 1991 through
8  February 2003 besides those within HCFA?
9    A.   When you say talk to anyone else --
10   Q.   About issues relating to the FUL program
11  besides those within HCFA.
12        MS. MARTINEZ:  Objection, form.
13   A.   Do you mean for establishing the price --
14  for doing --
15   Q.   Anything.
16   A.   For anything.
17   Q.   I'm starting broad and hope to narrow it
18  down.
19        MR. WINGET-HERNANDEZ:  Objection, form.
20        MS. MARTINEZ:  My objection is to the
21  breadth, so you know.  Difficult to answer.
22   A.   Yeah.  I find it difficult to answer.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                       January 24, 2008
                    Washington, DC

Page 50

1   There's times when I would call various states to go
2   ahead some feedback from them on availability of
3   drugs or various questions like that.
4       Q.   Do you recall discussing issues relating
5   to the federal upper limit program with anyone else
6   besides those within HCFA and states,
7   representatives of states?
8            MS. MARTINEZ:  Objection, form.
9       A.   Here again, I'm not sure what you mean by
10  discussing.  But I would call drug manufacturers to
11  verify pricing that's published in compendia.
12      Q.   All right.  Tell me about those
13  conversations.
14           MS. MARTINEZ:  Objection, form.
15      Q.   Who were they with and what you recall
16  being discussed?
17           MS. MARTINEZ:  Objection, form.
18      A.   I don't recall who it would be with.  I
19  can just answer in general terms that if something
20  was questionable in the pricing compendia then we
21  would try to call the manufacturer to verify
22  availability.

Page 51

1       Q.   Did you discuss with drug manufacturers
2   anything other than availability of the drugs?
3       A.   Sometimes we would try to verify the
4   price that's published in the compendia if it was
5   still current.
6       Q.   And by price, are we talking about
7   average wholesale price or something more than that?
8       A.   Average wholesale price, direct price or
9   wholesale acquisition cost.
10      Q.   Do you recall any discussions with anyone
11  from Abbott Laboratories concerning pricing?
12      A.   I don't recall.
13      Q.   Why would you be making those contacts
14  with drug manufacturers?
15      A.   To verify that the information in the
16  drug compendia was accurate in order to be able to
17  set an accurate federal upper limit amount.
18      Q.   And when you say accurate, what do you
19  mean by that?
20      A.   Following federal guidelines on setting
21  the upper limit reimbursement amount, we used the
22  compendia.  So we wanted to make sure the

Page 52

1   information was current.
2       Q.   Did you believe that the average
3   wholesale prices in the compendia represented the
4   average amount at which people could buy drugs from
5   wholesalers?
6            MS. MARTINEZ:  Objection, form.
7       A.   I couldn't make that statement.
8       Q.   You weren't -- when you were having
9   conversations with drug manufacturers, you weren't
10  asking them something like is this the average price
11  at which you sell drugs to wholesalers?
12      A.   No.
13      Q.   Okay.  As you probably have guessed
14  already, given the nature of this suit and where you
15  worked at CMS, my questions will largely focus on
16  the topic of state Medicaid programs payment to
17  providers for dispensing drugs to Medicaid
18  beneficiaries.  Do you understand that topic?
19      A.   Yes.
20      Q.   As well as issues relating to the federal
21  upper limit program.  In your experience at CMS what
22  was CMS's role when it came to the amounts that

Page 53

1   state Medicaid programs reimburse for drugs?
2            MS. MARTINEZ:  Objection, form.
3       A.   Could you explain your question?
4       Q.   Yeah.  What I'm trying to get is you
5   worked on what state Medicaid programs paid
6   providers for dispensing drugs.  Is that right?
7       A.   We looked at their state plan amendments.
8   That would have that information in there.
9       Q.   Okay.  Besides reviewing state plan
10  amendments what else did HCFA, now CMS, do when it
11  came to the topic of state Medicaid programs payment
12  for drugs?
13           MS. ALBEE:  Objection.
14           MS. MARTINEZ:  Objection, form.
15      A.   Could you give me some more detail?
16      Q.   I'm just trying to figure out what CMS's
17  role was when it came to what state Medicaid
18  programs paid for drugs, apart from approval of the
19  state plan amendments.
20      A.   We would encourage the states to set
21  reimbursement amounts that follow federal guidelines
22  and that were reasonable and supportable.

                              14  (Pages 50 to 53)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                           January 24, 2008
                        Washington, DC

Page 54

1    Q.   And how did you encourage states to do
2  that?
3         MS. MARTINEZ:  Objection, form.
4    Q.   What was the nature of your acts in
5  encouraging the states to set reimbursement amounts
6  consistent with federal guidelines?
7    A.   We would provide that information in the
8  program releases.  It's general guidance.
9    Q.   Were you involved in any conversations,
10  in-face meetings or phone calls with states to
11  encourage them to set reimbursement amounts
12  consistent with federal guidelines?
13        MS. MARTINEZ:  Objection, form.
14   A.   I can't specifically remember particular
15  conversations.  I would assume that a conversation
16  like that would occur if you're discussing a state
17  plan amendment with a state.
18   Q.   And you recall having discussions with
19  representatives from states concerning state plan
20  amendments; is that right?
21   A.   Correct.
22   Q.   Were those conversations typically over

Page 55

1  the phone or were they in person?
2    A.   Generally over the phone.
3    Q.   And did you have a set territory of the
4  country or a certain number of states that you were
5  involved with with state plan amendments?
6    A.   I don't recall exactly.  I think at one
7  time we had particular states that we serviced.  But
8  I don't recall what states they were or what period
9  of time that occurred.
10   Q.   Did you have primary authority for a
11  certain number of states and then backup
12  responsibility for other states?  Is that how it
13  worked?
14        MS. MARTINEZ:  Objection, form.
15   A.   From what I remember, during a period of
16  time that's how we processed the state plan
17  amendments.
18   Q.   And you referred to federal guidelines.
19  What did you mean by that?
20   A.   Federal regulations.
21   Q.   Which regulations did you have in mind?
22   A.   The regulations in the C.F.R.

Page 56

1    Q.   Code of federal --
2    A.   Yes.
3    Q.   This is a broad question.  I'm sure we'll
4  get into it more today.  But did you find it
5  difficult to get states to reimburse at amounts
6  consistent with federal regulations?
7         MS. ALBEE:  Objection.
8         MS. MARTINEZ:  Objection, form.
9    A.   Generally, no.
10   Q.   And there are -- as I understand it,
11  there is a regulation for federal upper limits,
12  correct?
13   A.   Correct.
14   Q.   As well as a regulation that governs the
15  payments for all other drugs?
16   A.   Correct.
17   Q.   And those to your understanding would be
18  drugs that are not covered by the federal upper
19  limit program; is that right?
20   A.   That's my understanding.
21   Q.   It could be sole source drugs or multiple
22  source drugs; is that right?

Page 57

1    A.   Yes.
2    Q.   Did you find it difficult to -- let me
3  strike that.
4         And the regulation governing all other
5  drugs not covered by a FUL required the states to
6  reimburse drugs such that in the aggregate they were
7  reimbursing at their best estimate of what providers
8  could generally and currently purchase those drugs
9  in the marketplace; is that right?
10        MS. MARTINEZ:  Objection, form.
11   A.   Are you saying that's not for federal
12  upper limit?
13   Q.   Yes.  There's a regulation that covers
14  drugs that are within the federal upper limit,
15  correct?
16   A.   Correct.
17   Q.   And there's a regulation that covers
18  drugs that are not covered by the federal upper
19  limit?
20   A.   Correct.
21        MR. WINGET-HERNANDEZ:  Objection to form.
22   Q.   Correct?

15  (Pages 54 to 57)

Gaston, Sue                                                    January 24, 2008
                              Washington, DC

Page 58

1    A.   Correct.
2    Q.   And what is the regulation covering drugs
3  not covered by the upper limit program?
4        MS. MARTINEZ:  Objection, form.
5    Q.   Do you know that?
6    A.   You mean the methodology in the
7  regulation?
8    Q.   Yes.
9    A.   You're asking me to repeat that?
10   Q.   Your understanding of what it is.
11   A.   Generally it's the lower of the estimated
12 acquisition cost or what is generally paid -- here
13 again, I'm not going to remember the exact words,
14 and I haven't been working in that area for a while.
15 But it's either the estimated acquisition cost or
16 the cost that's to the general public.  I can't
17 remember exactly what it is.  But it's in the
18 regulation.
19        What you were talking about before in the
20 aggregate sounded more like what's in the federal
21 upper limit regulation.
22   Q.   Okay.  We'll look at the regulations in

Page 59

1  particular later.  Do you recall having difficulty
2  getting states to abide by the federal regulations
3  covering drugs not covered by the federal upper
4  limit program?
5        MS. MARTINEZ:  Objection, form.
6    A.   No.  Generally not.
7    Q.   You don't recall any difficulties with
8  that at all?
9    A.   I can't recall specifically.
10   Q.   You don't recall that being a discussion
11 within your office?
12       MS. MARTINEZ:  Objection, form.
13   A.   Can you explain --
14   Q.   The difficulty getting states to set a
15 reimbursement methodology for drugs not covered by
16 the federal upper limit program so that it met
17 federal regulations?
18       MS. MARTINEZ:  Objection, form.
19   A.   I'm sure that it was discussed.  I don't
20 remember the specifics, when, or exactly what was
21 discussed.
22   Q.   And some of these events took place some

Page 60

1  time ago; is that fair to say?
2    A.   Correct.
3    Q.   And your recollection has -- you've
4  forgotten some things; is that fair to say?
5    A.   Very -- yes.
6    Q.   You were going to say something about
7  "very"?
8    A.   My recollection, yes.  No.  I'm agreeing
9  with you.
10   Q.   It's very much diminished; is that fair
11 to say?
12       MS. MARTINEZ:  Objection, form.
13   A.   I can't remember everything.
14   Q.   Do you think there are a lot of things, a
15 lot of detail, that you don't remember?
16   A.   Maybe.
17       MS. MARTINEZ:  Objection.
18       MR. WINGET-HERNANDEZ:  Objection, form.
19   Q.   Ms. Gaston, do you belong to any
20 professional organizations?
21   A.   No.
22   Q.   Have you attended in the past meetings or

Page 61

1  seminars relating to state Medicaid pharmacy issues?
2        MS. MARTINEZ:  Objection, form.
3    A.   Can you be more specific?  Do you have
4  any examples?
5    Q.   I've heard meetings held of the PTAG,
6  Pharmacy Technical Advice Commission, or whatever it
7  is.  I can't remember what it is.  Group.
8    A.   It's been a long time since I've been to
9  a PTAG meeting.
10   Q.   But you've attended PTAG meetings in the
11 past?
12   A.   Yes.
13   Q.   Have you attended any other meetings
14 where the issue of state pharmacy payment was
15 discussed?
16       MR. WINGET-HERNANDEZ:  Objection, form.
17   A.   And are you saying any period of time or
18 a specific period of time?
19   Q.   1991 through 2001.
20   A.   Yes.
21   Q.   What other meetings do you recall
22 attending?

16  (Pages 58 to 61)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                      January 24, 2008
                    Washington, DC

Page 62

1     A.   Some of the pharmacy associations have
2  meetings.  I attended one in Boston.  They're more
3  or less conferences.  I think one was in Raleigh,
4  North Carolina.
5     Q.   When you say pharmacy association, what
6  is that?  Is that a group of pharmacists or a group
7  of state people, state administrators, who work in
8  the pharmacy area?
9     A.   It's my recollection they were state
10 pharmacy folks and then some manufacturers would
11 also attend.
12    Q.   Was the topic of average wholesale price
13 discussed at those meetings?
14    A.   I can't recall.
15    Q.   Did you receive any materials at those
16 meetings?
17    A.   I may have.
18    Q.   Did you keep those?
19    A.   No.
20    Q.   Do you recall what type of topics were
21 discussed at the meetings of the state pharmacy
22 personnel?

Page 63

1        MS. MARTINEZ:  Objection, form.
2     A.   I do remember that some of the states
3  that are present, they would go around the table
4  just talking about what's happening in their states
5  relating to their Medicaid programs.  I presented at
6  those conferences discussing various issues
7  concerning the rebate program.
8     Q.   Did you keep any materials relating to
9  that, to your presentations?
10    A.   No.
11    Q.   Did you prepare any materials for these
12 presentations?
13    A.   Yes.
14    Q.   Do you recall any other meetings that
15 you've had apart from meetings with state pharmacy
16 personnel and the PTAG group at which the issue of
17 state pharmacy payment for drugs was discussed?
18       MS. MARTINEZ:  Objection, form.
19    A.   I can't specifically remember any
20 particular meetings.
21    Q.   But you believe that there may have been
22 others?

Page 64

1     A.   There may have been.
2     Q.   You just can't recall those given the
3  passage of time; is that fair to say?
4        MS. MARTINEZ:  Objection, form.
5     A.   Correct.
6     Q.   At the meetings that you recall, was the
7  issue of adequacy of dispensing fees ever discussed?
8        MS. MARTINEZ:  Objection, form.
9     A.   I can't recall.
10    Q.   And do you know what I'm asking you about
11 there with the adequacy of dispensing fee?
12    A.   Do I know --
13    Q.   Yeah.  You know what I'm talking about?
14    A.   Yes, I do.
15    Q.   The dispensing fee is what?
16    A.   That it's reasonable.
17    Q.   Is that a topic that you recall coming up
18 quite a bit during your time at CMS?
19       MR. WINGET-HERNANDEZ:  Objection, form.
20       MS. ALBEE:  Objection, form.
21       MS. MARTINEZ:  Objection, form.
22    A.   The issue comes up in the discussion of

Page 65

1  state plan amendments, but other than that I don't
2  recall it being a big issue.
3     Q.   And how does it come up in the context of
4  state plan amendments?
5     A.   Because in the state plan amendment
6  generally states will have something in there about
7  their dispensing fee.  And then they have to provide
8  sufficient documentation or justification for their
9  dispensing fee.
10    Q.   Do you recall there being discussion that
11 the dispensing fee as set by the states was not
12 adequate to cover a pharmacy's cost?
13       MS. MARTINEZ:  Objection, form.
14    A.   Can you repeat that?
15       MR. TORBORG:  Would you mind reading it
16 back, Jon?
17       (Whereupon, the requested portion was
18 read by the reporter.)
19    A.   I don't recall specific conversations.
20    Q.   And is that because of the passage of
21 time?
22       MR. WINGET-HERNANDEZ:  Objection, form.

17 (Pages 62 to 65)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                        January 24, 2008
                        Washington, DC

Page 66

1    A.   Correct.
2    Q.   Did you attend meetings with the Office
3  of Inspector General relating to state pharmacy
4  issues?
5    A.   Yes.
6    Q.   Can you approximate how many such
7  meetings you've attended?
8    A.   No, I could not.
9    Q.   More than five?
10   A.   I really can't recall.
11   Q.   Do you recall who you met with at OIG?
12   A.   Ben Jackson.  From Little Rock I think
13 there were two individuals from Little Rock, but I
14 can't remember their names at this time.
15   Q.   Paul Chesser?  Is that --
16   A.   Correct.
17   Q.   Was he from Little Rock?
18   A.   Correct.  It's my understanding.
19   Q.   Gordon Sato.  Does that sound familiar?
20   A.   That name does not sound familiar.
21   Q.   No?
22   A.   No.

Page 67

1    Q.   How about William Shrigley?
2    A.   Yes.
3       MS. MARTINEZ:  I'm sorry.  Was your
4  question does she recall that name or does she
5  recall meeting with Mr. Shrigley?
6    Q.   Do you recall meeting with Mr. Shrigley?
7    A.   Yes.
8    Q.   Anyone else?
9    A.   I can't recall any other names at this
10 time.
11   Q.   Did you ever meet with a Mr. Robert Vito?
12   A.   Yes.
13   Q.   Do you recall the nature of that meeting
14 at all?
15   A.   No, I don't recall.
16   Q.   How about David Tawes?  Do you remember
17 meeting with him?
18   A.   Yes.
19   Q.   Do you recall the nature of your
20 discussions with him?
21   A.   It might have been for a federal upper
22 limit OIG report or study they were doing.

Page 68

1    Q.   Do you remember meeting with a woman by
2  the name of Linda Ragone?
3    A.   That name doesn't sound familiar.
4    Q.   Did you review any professional
5  literature in connection with your job, Ms. Gaston?
6    A.   Can you be more specific?
7    Q.   Magazine articles, things of that nature.
8    A.   Generally no.
9    Q.   Is it fair to say that from April 1991
10 through February of 2003 your job was focused on
11 pharmacy-related issues?  Is that right?
12   A.   Correct.
13   Q.   And did you review any publications
14 relating to pharmacy issues?
15   A.   Yes.
16   Q.   Which ones do you recall reviewing?
17   A.   The Pink Sheets -- and you're talking
18 about that specific time?
19   Q.   Yes.  Did your office have a subscription
20 to Pink Sheets?
21   A.   Yes.
22   Q.   Did other people in the office read it?

Page 69

1    A.   Yes.
2       MS. MARTINEZ:  Objection, form.
3    Q.   Did you circulate interesting articles
4  from Pink Sheets around the office?
5       MS. MARTINEZ:  Objection, form.
6    A.   The Pink Sheet was circulated around the
7  office.
8    Q.   Any other publications you recall
9  reviewing?
10   A.   I can't recall other publications.
11   Q.   How about Drug Topics?  Did you ever
12 review that one?
13   A.   It sounds familiar, but I don't remember.
14   Q.   How about Eli's Home Week?  Do you recall
15 that publication?
16   A.   I don't recall that.
17   Q.   How about Modern Health Care?
18   A.   I don't recall that.
19   Q.   How about something called the Medicaid
20 Pharmacy Bulletin?
21   A.   That sounds familiar, but I don't recall
22 the bulletin.

18  (Pages 66 to 69)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                     January 24, 2008
                    Washington, DC

Page 70

1    Q.   Do you recall if your office had a
2  subscription to that publication?
3    A.   I don't know.
4        MR. TORBORG:  Why don't we take a ten
5  minute break here.
6        THE VIDEOGRAPHER:  This is the end of
7  tape 1.  Off the record at 10:32.
8        (Recess.)
9        THE VIDEOGRAPHER:  This is the beginning
10 of tape 2 in the deposition of Ms. Gaston.  On the
11 record at 10:47.
12        BY MR. TORBORG:
13    Q.   Welcome back, Ms. Gaston.  Did you do
14 anything to prepare for today's deposition?
15    A.   Yes.
16    Q.   Did you meet with counsel?
17    A.   Yes.
18    Q.   Did you do anything else to prepare for
19 today's deposition other than meet with counsel?
20    A.   Could you explain what you mean?
21    Q.   Did you review any documents, anything
22 else that you did to get ready for today?

Page 71

1    A.   No.
2    Q.   Who did you meet with?
3    A.   I met with Ani and Leslie.
4    Q.   And when was that meeting or meetings?
5    A.   Last Friday.  I don't have the date.  And
6  one other time.  I don't know which date that was.
7    Q.   Was it before last Friday or after last
8  Friday?
9    A.   Before last Friday.
10    Q.   And do you recall how long the initial
11 meeting was approximately?
12    A.   I'm just thinking about last Friday.  I
13 could be wrong.  It was a Friday.  I think it was
14 last Friday.  But I could ask Ani what date it was.
15    Q.   Okay.
16    A.   Do you want me to do that?
17    Q.   No.  It's not necessary.  How long did
18 you meet last Friday?
19    A.   About three hours.
20    Q.   Did you review any documents in that
21 meeting?
22    A.   No.

Page 72

1    Q.   Either in that session, the other session
2  or otherwise, have you reviewed any documents to
3  refresh your recollection to prepare for this
4  deposition?
5    A.   No.
6    Q.   You indicated you met with counsel
7  another time, correct?  How long was the other
8  meeting?
9    A.   A couple hours.
10    Q.   That was in person?
11    A.   Yes.
12    Q.   Have you discussed the fact that you're
13 being deposed with anyone else besides counsel?
14    A.   Yes.
15    Q.   Who?
16    A.   My division director.
17    Q.   Who is that?
18    A.   Rick Friedman.
19    Q.   Do you know that others at CMS have been
20 deposed in this litigation?
21    A.   Yes.
22    Q.   Who are you aware of who's been deposed?

Page 73

1    A.   Larry Reed, Deirdra Duzor.
2    Q.   Anyone else?
3    A.   No.
4    Q.   Have you discussed those depositions with
5  either of those people?
6    A.   No.
7    Q.   Have you discussed the substance of their
8  testimony in anywhere way with counsel?
9        MS. MARTINEZ:  Objection.
10    Q.   For example, did counsel indicate, well,
11 Mr. Reed said this or anything of that nature?
12    A.   No.
13        MS. MARTINEZ:  Counsel, asking
14 specifically about discussions with counsel is
15 privileged.
16        MR. TORBORG:  I'm not asking for the
17 contents of the discussion.
18        MS. MARTINEZ:  Yes, you are.
19        MR. TORBORG:  No.  I didn't ask about the
20 content.  Listen to the question carefully.
21        MR. WINGET-HERNANDEZ:  Objection to the
22 form.

19  (Pages 70 to 73)

Gaston, Sue                                              January 24, 2008
                        Washington, DC

Page 74

1        MS. MARTINEZ:  Object to the form.  She
2   answered the question.  I'm just saying if you put
3   the content in your question and then ask did you
4   talk about this then you are asking about the
5   content of a discussion with counsel.
6        BY MR. TORBORG:
7        Q.   Prior to the meetings you've had with
8   counsel, Ms. Gaston, have you had any other
9   discussions with any lawyers on the subject of AWP
10  or Medicaid payment for drugs?
11       A.   Could you give me more detail?
12       Q.   I'm just asking if you've had any --
13  apart from these meetings preparing for this
14  deposition, have you had any other meetings with
15  attorneys concerning the subject of average
16  wholesale price or Medicaid reimbursement of drugs?
17       MS. MARTINEZ:  Objection, form.
18       A.   Do you have like a specific period of
19  time?  Anytime?
20       Q.   Not at this point.  I'm just asking if
21  there are any.  It sounds like there may be.
22       A.   There may have been.  But I don't know

Page 75

1   specifically.
2        Q.   Why do you believe there may have been?
3        A.   Because that would be a subject when I
4   worked in policy that was something that could have
5   been discussed with our general counsel.
6        Q.   Who is your general counsel?
7        A.   Mary Salhus.
8        Q.   Have you provided -- do you recall in any
9   of those discussions have you provided any factual
10  information to counsel?
11       MR. WINGET-HERNANDEZ:  Objection, form.
12       A.   I don't remember those specific
13  discussions.
14       Q.   Do you recall providing -- it sounds like
15  you recall there may have been some general
16  discussions in the course of your work.  Is that
17  right?
18       MS. MARTINEZ:  Objection, form.
19       A.   The reason I'm saying that is because of
20  the nature of the work in policy, that those
21  discussions could have occurred.  But I don't
22  remember any of those specific discussions.

Page 76

1        Q.   Do you have any recollection regarding
2   the general nature of those conversations?
3        MR. WINGET-HERNANDEZ:  Objection, form.
4        MS. MARTINEZ:  Objection, form.
5        A.   I can't say.
6        Q.   You can't say at all what you may have
7   talked about with attorneys; is that right?
8        MS. MARTINEZ:  Objection, form.
9        A.   Your question is too broad.  I'd have to
10  know specifically what an issue would have been.
11  And here again, I don't recall those specific
12  conversations.  So it's hard for me to give you an
13  answer on that.
14       Q.   And my question is more general than
15  that.  And that is, do you recall the general
16  subject matter of any conversations that you've had
17  with counsel?
18       MS. MARTINEZ:  Objection, form.
19       A.   I don't know how to answer that.  I need
20  something more from you.  I don't know where you're
21  going with it.  If you could explain what you're
22  saying.

Page 77

1        Q.   I'm trying to figure out just if you've
2   had discussions with counsel what the nature of the
3   discussions was.  That's all I'm trying to figure
4   out.
5        MS. MARTINEZ:   Objection to form.
6        A.   It could have been anything.  We discuss
7   a lot of things with counsel in policy.  It could
8   have been concerning a state plan amendment.  It
9   could -- it's -- I don't know specifically, so I
10  can't be that specific in my response.
11       Q.   Have you ever discussed litigation
12  related to average wholesale price with the
13  Department of Justice?
14       MS. MARTINEZ:  Objection, form.
15       A.   I don't recall.  If they were involved
16  in -- if they were involved in the other deposition,
17  which I don't think they were, or if they were
18  involved with the grand jury, I'm not sure.  So I
19  really can't say that it occurred.
20       Q.   Ms. Gaston, do you understand that you're
21  here today in connection with lawsuit that the
22  United States Government has brought against Abbott

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                     January 24, 2008
                    Washington, DC

| Page 78 | Page 80 |
|---|---|

**Page 78**

1  Laboratories?
2      A.   Yes.
3      Q.   Do you have an understanding of what the
4  United States alleges that Abbott did wrong?
5      A.   I have a basic understanding.
6      Q.   What is your basic understanding?
7      A.   My basic understanding is there's
8  concerns that there were certain drugs that the
9  prices of those particular drugs may be higher than
10 what they should be for purposes of reimbursement.
11     Q.   Do you have an understanding of what
12 prices in particular are at issue?
13     A.   What do you mean by what prices?
14     Q.   Average wholesale price, things like
15 that.
16     A.   Average wholesale price I think is one of
17 the issues.
18     Q.   Do you have an understanding of -- when
19 you say that the prices for certain drugs were
20 higher than they should be, do you have an
21 understanding of what it is the government contends
22 they should have been?

**Page 79**

1      A.   No.
2      Q.   Do you have an understanding of the
3  nature of the drugs at issue in this case?
4      A.   You mean what type of drugs?
5      Q.   Yes.  The type of drugs.
6      A.   In the Abbott case?
7      Q.   Yes.
8      A.   I think they're just injectables.
9      Q.   And when you say injectables, what do you
10 mean by that?
11     A.   Drugs that are injectables.  They're not
12 tablets or capsules.
13     Q.   Do you know which specific injectables
14 are at issue?
15     A.   No, I don't.
16     Q.   I'd like to ask you to take out Exhibit
17 19 in those binders there, Ms. Gaston.  Were you
18 able to find it, Ms. Gaston?
19     A.   Yes.
20     Q.   For the record, Exhibit 19 is a copy of
21 the initial complaint filed by the United States
22 against Abbott Labs.  After you've had a chance to

**Page 80**

1  peruse that, Ms. Gaston, my question will be whether
2  or not you have ever seen this document before.
3      A.   I don't recall seeing this.  I don't
4  recall seeing this document.
5      Q.   Let me ask you to go to page 10 of the
6  complaint.  Specifically paragraph 31.  There's --
7  after the first paragraph there's a couple columns
8  titled drug and NDC.  Do you see that?
9      A.   Yes.
10     Q.   And there are some various NDC numbers
11 listed.  Do you see that?
12     A.   Yes.
13     Q.   Included within here are NDCs for sodium
14 chloride, water for injection, vancomycin and then
15 some dextrose-type solutions.  Do you see that?
16     A.   Yes.
17     Q.   Does that refresh your recollection at
18 all regarding what types of drugs are at issue in
19 this case?
20     A.   I guess I don't -- it's not that I don't
21 remember what drugs were included in this case --
22     Q.   You've never known?

**Page 81**

1      A.   -- I really don't -- I'm not aware of --
2  I may have read it, but I don't remember which drugs
3  were included in this case.  So this doesn't really
4  refresh my memory.  I just don't remember
5  specifically which drugs are included in this case.
6          MS. MARTINEZ:   And just for the record,
7  I mean, there is an amended complaint that the
8  United States filed that includes an additional
9  drug, acyclovir.
10         MR. TORBORG:  An additional NDC?
11         MS. MARTINEZ:  An additional drug and
12 NDC, yeah.  Right.  An injectable version of
13 acyclovir.
14         MR. TORBORG:  Well, that complaint is
15 still pending before Judge Saris whether or not you
16 can file that, but --
17         MS. MARTINEZ:  You mean your motion to
18 dismiss is pending.  The complaint has been filed.
19         MR. TORBORG:  The motion for lead is also
20 pending.
21         BY MR. TORBORG:
22     Q.   Ms. Gaston, regardless of whether or not

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                              January 24, 2008
                        Washington, DC

Page 82

1   you are familiar with these particular -- or that
2   you knew these NDCs were at issue in the case, have
3   you run across these drugs in your work at all?
4       A.   I may have.  I don't specifically
5   remember.
6       Q.   You don't recall any specific issues
7   arising with any of these drugs?
8       A.   Specifically, I can't remember.
9       Q.   Do you know how these drugs are dispensed
10  to Medicaid beneficiaries?
11      A.   You mean how -- can you explain yourself?
12      Q.   Do you know how these drugs are dispensed
13  by providers to Medicaid beneficiaries such that the
14  Medicaid program would reimburse them?
15          MR. WINGET-HERNANDEZ:  Objection, form.
16      A.   Are you asking are they provided in a
17  pharmacy or a physician's office or --
18      Q.   Correct.  That's what I'm getting at.
19  Yes.
20      A.   Okay.  I wouldn't know specifically how
21  they're dispensed.
22      Q.   Do you know what types of providers would

Page 83

1   have submitted claims to seek reimbursement for
2   these NDCs?
3       A.   No.  I would not know.
4       Q.   Do you know why the government decided to
5   bring suit regarding these particular drugs?
6       A.   It's my understanding that the suit is
7   because the federal government is concerned about
8   the prices that -- the prices that the
9   manufacturer -- they felt that the prices were
10  higher on some of the drugs for reimbursement
11  purposes.
12      Q.   Higher than what?
13      A.   Than what I guess they felt was
14  reasonable.
15      Q.   Do you have a view on what price would be
16  reasonable, Ms. Gaston?
17      A.   You mean a specific price?
18      Q.   Generally.
19          MR. WINGET-HERNANDEZ:  Objection, form.
20      Q.   Across drugs.
21      A.   Are you saying a money amount?
22      Q.   A money amount, yeah.

Page 84

1       A.   No.  I would not know.
2       Q.   I'm going to ask you to go to paragraph
3   38 of the initial complaint.  Do you see there it
4   says "No governmental payor knew of or sanctioned
5   Abbott's conduct as set forth in this complaint;
6   i.e., its deliberate manipulation of its published
7   prices for certain of its products to induce the
8   customers to purchase those products."
9          Ms. Gaston, were you asked whether or not
10  you personally were aware of whether or not
11  published prices were consistent with acquisition
12  cost?
13          MS. MARTINEZ:  Objection, form.
14      Q.   Have you ever been asked that question?
15      A.   Can you repeat that?
16      Q.   Have you ever done asked during your time
17  at CMS whether or not you knew that published prices
18  did not equal acquisition costs?
19          MS. MARTINEZ:  Objection, form.
20      Q.   Is that a topic that has come up in
21  conversations?
22          MS. MARTINEZ:  Objection, form.

Page 85

1       A.   When you say the estimated acquisition
2   cost, do you mean -- okay.  What do you mean by
3   that?  Do you mean what the states are paying?
4       Q.   No.  I'm asking what providers are paying
5   for the drugs.
6          MS. MARTINEZ:  Objection, form.
7       A.   So that's what the state --
8       Q.   Let me back up and try this a different
9   way.
10      A.   Okay.
11      Q.   Do you understand what damages the
12  government is seeking in this case?
13      A.   What do you mean damages?
14      Q.   You know in civil litigation someone is
15  suing for an amount of money.
16      A.   Okay.
17      Q.   Do you know generally speaking -- not
18  numbers -- what types of damages the government is
19  seeking in this case?
20      A.   No, I don't.
21      Q.   Are you familiar with the term "spread"
22  as used in the context of pharmacy issues.

                                        22  (Pages 82 to 85)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                          January 24, 2008
                        Washington, DC

Page 86

1    A.   I've heard the term.  I'm not really
2  familiar with it.
3    Q.   When have you used the term?
4    A.   It just sounds familiar to me.  I don't
5  know when.
6    Q.   You don't know what the term the spread
7  means in connection with prescription drugs?
8    A.   It's really not a term that I use.
9    Q.   We sent you a subpoena for your
10 appearance here today.  Did you see that?
11   A.   Yes.
12   Q.   It called for certain types of documents
13 in your personal possession?
14   A.   Yes.
15   Q.   Did you make a search of your personal
16 files for any such documents?
17   A.   Yes.
18   Q.   Did you have any?
19   A.   Whatever I had was previously obtained by
20 counsel.  I have no other further documents.
21   Q.   Did you have documents at your home or --
22   A.   No.

Page 87

1    Q.   -- in your car?
2    A.   No.
3    Q.   Did you have documents in your office
4  relating to -- that would have been responsive to
5  the subpoena?
6    A.   To the subpoena?
7    Q.   Yes.
8    A.   No.
9    Q.   Did you have your own office at HCFA from
10 1991 through 2001?
11   A.   I had a cube.
12   Q.   And what types of -- did you have files
13 that related to the FUL program?
14   A.   Yes.
15   Q.   What types of files did you have?  Can
16 you describe them for me?
17   A.   You mean the paper that -- I mean, they
18 were just files.  They were paperwork.  They might
19 have been correspondence, copies of the old FUL
20 publications.  It could have been any kind of
21 general information, correspondence.
22   Q.   Can you give me an idea for the magnitude

Page 88

1  of those paper files?
2    A.   I really can't remember.
3    Q.   Was it one box, five boxes, a file
4  cabinet?  Do you have any idea?
5    A.   It wouldn't be a file cabinet.  It would
6  be less than a file cabinet.  Yeah.  A couple
7  folders, from my recollection.
8    Q.   And were those documents turned over to
9  counsel in response to discovery taken in this or
10 another case?
11   A.   Those documents -- the ones that I'm
12 referencing are the ones for the period of time when
13 I worked in policy.  And they stayed in the policy
14 area when I moved in 2003.
15   Q.   So you had possession of the files prior
16 to 2003 in your cube?
17   A.   Correct.
18   Q.   And then after you moved over to the new
19 office you left those behind?
20   A.   Correct.
21   Q.   Did you switch offices in your new job?
22   A.   Yes.

Page 89

1    Q.   You referred to something called the
2  policy area.  What is that?
3    A.   That was where I worked from '91 through
4  2003.
5    Q.   And do you know specifically where your
6  files relating to the federal upper limit program
7  went?
8    A.   No.
9    Q.   Did you have files at your previous job,
10 the policy job, relating to approval of state plans,
11 state plan amendments?
12   A.   Yes.
13   Q.   And did you take those with you when you
14 switched jobs?
15   A.   No.
16   Q.   So those are back somewhere in the policy
17 area?
18       MS. MARTINEZ:  Objection, form.
19   A.   Yeah.  As far as I know.  I don't know
20 where they are now.
21   Q.   When you switched office did you have to
22 sign out your files or put them someplace like in an

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                   Washington, DC

Page 90

1   archives or something like that?
2       A.   No.
3       Q.   Or just leave them behind in your office
4   and move on?
5       A.   I left them behind.
6       Q.   You don't know who they went to?
7       A.   No.
8       Q.   Can you give me a sense for the volume of
9   documents you had relating to approval of state plan
10  amendments?
11      A.   I really wouldn't have any idea.
12      Q.   Would it be a file cabinet?
13      A.   If -- probably less than that.
14      Q.   Compared to the volume of the federal
15  upper limit documents, more or less?
16      A.   That's really hard to say.
17      Q.   Did you have any documents -- when you
18  switched jobs, did you keep the same computer or did
19  you switch? Files that were on your hard drive
20  originally, did they stay there?
21      A.   Correct.
22      Q.   So you still had access to all the same

Page 91

1   documents when you moved jobs; is that right?
2          MS. MARTINEZ:  Objection, form.
3       A.   I didn't keep all of those documents.  I
4   got rid of a lot of those documents when I moved.
5       Q.   And when you say you got rid of, what do
6   you mean by that?
7       A.   I mean, just deleted them off my hard
8   drive because I didn't need the information, didn't
9   need the information any longer.
10      Q.   Are you familiar with something called a
11  document hold notice?
12         MS. MARTINEZ:  Objection to form.
13      A.   Can you explain that?
14      Q.   A notice for you to retain any files you
15  may have related to a specific subject.
16      A.   Yes.
17      Q.   Have you ever received a document hold
18  notice during your work at CMS?
19      A.   Yes.
20      Q.   Tell me about that.  When did you get it
21  and what did it cover?
22      A.   I can't remember the date on it, but it

Page 92

1   was probably -- I can't remember the date on the
2   document.  But we received it and it was asking us
3   to not destroy any documents.
4       Q.   Related to what subject?
5       A.   I can't remember.
6       Q.   Did you get this notice while you were
7   working in the new position?
8       A.   Yes.
9       Q.   Was it a notice you received within the
10  last year or prior to that?
11      A.   Prior to that.
12      Q.   Prior to getting that document hold
13  notice did you make any efforts to keep documents
14  that might relate to Medicaid payment for drugs?
15      A.   Can you I guess explain -- can you
16  restate that?
17      Q.   I don't think I can.
18      A.   Can you repeat that?  Yeah.  Prior to
19  getting the notice to not destroy documents, did you
20  take any evidence to consciously maintain documents
21  that related to Medicaid payment for drugs.
22         MS. MARTINEZ:  Objection, form.

Page 93

1       A.   Medicaid payment for drugs is kind of
2   broad.  So are you saying state plan amendments? I
3   mean --
4       Q.   In your view what all would fall in the
5   category of Medicaid payment for drugs, other than
6   state plan amendments obviously that you indicated.
7       A.   You're asking me that?
8       Q.   Yes.
9       A.   Okay.  I don't know.  We have -- any kind
10  of correspondence that maybe I replied to.  So --
11      Q.   Did you make any efforts to retain any
12  documents relating to state plan amendments prior to
13  getting the hold notice?
14      A.   Well, the notice that -- I was in my new
15  area so I didn't have the state plan amendment
16  information with me.
17      Q.   Okay.  Prior to getting the litigation
18  hold notice and back during the time you were
19  working on state plan amendment stuff --
20      A.   Okay.
21      Q.   -- did you make any conscious efforts to
22  retain any of those documents?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 94

1        MS. MARTINEZ:  Objection, form.
2     A.   I retained the documents.
3     Q.   All of them?
4     A.   I can't say all of them.  What was
5  pertinent to what I was working on at that time.
6     Q.   But if it didn't relate to what you were
7  working on at the time, you didn't make an effort to
8  keep them; is that right?
9        MS. MARTINEZ:  Objection, form.
10    A.   I can't answer that.
11    Q.   Did you use e-mail?
12    A.   Yes.
13    Q.   When did you start using e-mail?
14    A.   I can't remember.
15    Q.   Was it during the time that you were
16  working on state plan amendments and federal upper
17  limits?
18    A.   Yes.
19    Q.   Did you have e-mail correspondence on
20  those subjects with anyone?
21    A.   Yes.
22    Q.   Was that something that you did

Page 95

1  regularly?
2     A.   Yes.
3     Q.   And where are those e-mails today?
4        MS. MARTINEZ:  Objection, form.
5     A.   I don't know.
6     Q.   Did you take any efforts to keep any
7  e-mails?
8        MS. MARTINEZ:  Objection, form.
9     A.   From that period?
10    Q.   Yes.
11    A.   I really -- I'm not sure.
12    Q.   Do you have a sense on your computer --
13  what is the approximate date of the oldest e-mail
14  that you have access to on your computer?
15    A.   I have no idea.
16    Q.   Did you correspond by e-mail with people
17  who administered the state Medicaid programs?
18    A.   Yes.
19    Q.   Relating to the way in which they paid
20  for drugs?  Is that a topic you e-mailed them about?
21    A.   Are you saying relating to state plan
22  amendments?

Page 96

1     Q.   That and anything else dealing with
2  payment of drugs.
3        MS. MARTINEZ:  Objection, form.
4     A.   Yes.
5     Q.   Is that something that you did regularly?
6     A.   When it was necessary.
7     Q.   Do you recall being asked to search for
8  documents relating to drug pricing litigation on or
9  around 2003?
10    A.   I wouldn't -- I can't remember
11  specifically that time frame.
12    Q.   But you recall an effort being made to
13  search for documents relating to drug pricing
14  litigation; is that fair to say?
15    A.   Correct.
16    Q.   And what involvement did you have in that
17  search?
18    A.   I just searched my folders to see if I
19  had any information that was relevant to the
20  request.  And generally the request would come
21  through Larry's division, through policy, and they
22  would copy me to see if we had any documents.  And

Page 97

1  if I did I would share them back with the policy
2  folks and they would submit the document request.
3     Q.   Did you have any documents?
4     A.   I may have.
5     Q.   You don't recall?
6     A.   I don't recall.
7     Q.   Did you search your hard drive in your
8  computer for documents that may have been responsive
9  to the document requests?
10    A.   I may have.
11       MR. TORBORG:  Okay.  We'll mark this as
12  our next exhibit.  I think I have ten copies of
13  these, of the newly marked exhibits.  I'll let you
14  all fight about who gets the copies and who has to
15  share.
16            (Exhibit Abbott 453 was
17             marked for
18             identification.)
19       MS. MARTINEZ:  There's only four on the
20  plaintiff's side.  Could we have one more on the
21  plaintiff's side?  Thanks.
22       MR. TORBORG:  Now, when you say

                              25  (Pages 94 to 97)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                      January 24, 2008
                        Washington, DC

Page 98

1  plaintiff's side, what do you mean?
2        MS. MARTINEZ:  What I mean --
3        MR. TORBORG:  That was a joke.
4        MR. WINGET-HERNANDEZ:  What are we
5  calling this?
6        MR. TORBORG:  Abbott Exhibit 453.  For
7  the record, what I've marked as Abbott Exhibit 453
8  bears the Bates numbers VAC MDL 86162 through 75.
9        BY MR. TORBORG:
10    Q.   And Ms. Gaston, for purposes of my
11  questioning here today if I ask you to flip to a
12  Bates number or a reference number or some number,
13  I'll be referring to the number that's printed on
14  the bottom right corner of the document.
15    A.   Okay.
16    Q.   Do you see that?
17    A.   Yes.
18    Q.   Okay?  First I'd like you to review the
19  entirety of this document and tell me whether or not
20  you recall it.
21    A.   Did you say do I recall it?
22    Q.   Yes.

Page 99

1    A.   (Reading.)  I don't specifically recall
2  it.  It may look familiar, but -- because of the
3  names on the front it shows that there was a meeting
4  and I attended the meeting.  So there could be a
5  recollection, but I don't have much of a
6  recollection at all.
7    Q.   You don't have much of a recollection of
8  the meeting or the document?
9    A.   Either.
10    Q.   Okay.  If I could ask you to go to the
11  second page of the document, Bates ending 163, this
12  appears to be an an sign-in sheet titled Ven-A-Care
13  meeting, dated 9/14/95.  Do you see that?
14    A.   Yes, I do.
15    Q.   And is your name listed on this document?
16    A.   Yes.
17    Q.   And you're listed next to number 16,
18  right?
19    A.   Correct.
20    Q.   Is that your handwriting?
21    A.   Yes, it is.
22    Q.   And then under affiliation you wrote

Page 100

1  HCFA/MB?
2    A.   Yes.
3    Q.   Does that mean HCFA Medicaid Bureau?
4    A.   Correct.
5    Q.   And was there anyone else from the HCFA
6  Medicaid Bureau in attendance?
7    A.   Larry Reed.
8        MS. MARTINEZ:  Objection, form.  Is your
9  question whether she recalls or is your question for
10  her to read the document?
11        MR. TORBORG:  Read the document.
12    A.   Yeah.  I'm reading the document.  And
13  from what I can see here, Larry Reed.
14    Q.   Are there any other names on this list
15  that were on the Medicaid side of CMS?
16    A.   I can't say because I don't know what OBI
17  or -- you know, but for my purposes I recognize
18  Medicaid Bureau.  I don't know what the WBB is.
19    Q.   If we go through the document a bit, on
20  the next page, 164, it says "the false AWP
21  multibillion dollar machine."  Do you see that?
22    A.   Yes.

Page 101

1    Q.   The next page is titled "manufacturer's
2  false AWPs versus provider's true cost," do you see
3  that?
4    A.   Yes.
5    Q.   And the next page, "manufacturers are
6  also wholesalers - use false AWPs to promote drug
7  sales to providers," do you see that?
8    A.   Yes.
9    Q.   The next page, "HCFA defrauded into
10  directing DMERCs to pay higher reimbursement based
11  on false AWP," do you see that?
12    A.   Yes.
13    Q.   We'll skip a couple pages to the Bates
14  page ending 171.  It says "Medicaid defrauded."  Do
15  you see that?
16    A.   Yes.
17    Q.   The first column is "AWP drives Medicaid
18  reimbursement $8 billion in 1993."  "Medicaid
19  victimized by false AWPs."  "Medicaid victimized by
20  Medicare paying false AWPs."  Do you see that?
21    A.   Yes.
22    Q.   Do you recall this meeting, Ms. Gaston?

                              26 (Pages 98 to 101)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                           January 24, 2008
                        Washington, DC

Page 102

1    A.   No, I don't.
2    Q.   Do you recall anything at all about this
3  meeting?
4    A.   No, I don't.
5    Q.   Do you recall at some point meeting with
6  representatives from Ven-A-Care?
7    A.   Yes.
8    Q.   Tell me what you remember about those
9  meetings.
10       MS. MARTINEZ:  Objection, form.
11   A.   I remember -- I remember them coming to
12 CMS and discussing their issues.  But I don't
13 remember specifically anything more than that.
14   Q.   When you say to discuss their issues,
15 what do you mean by that?
16   A.   From what I remember, they were concerned
17 about pricing on certain drugs and Medicaid and
18 Medicare reimbursing at higher levels than they felt
19 were right.
20   Q.   And do you recall approximately when this
21 meeting was?
22   A.   I don't recall, but it says on the paper

Page 103

1  '95.
2    Q.   So you do recall a little bit about the
3  '95 meeting?
4        MS. MARTINEZ:  Objection to form.
5    A.   No.  I don't remember this meeting.
6    Q.   But you recall Ven-A-Care coming to you
7  in Baltimore to discuss their issues and concerns
8  about pricing of certain drugs; is that right?
9        MS. ALBEE:  Objection, form.
10   A.   Coming to CMS.
11   Q.   Mm-hmm.  And when I asked you when the
12 meeting was you referred to this document, correct?
13   A.   No.  I can't -- there could have been
14 several meetings.  I don't know if this is when they
15 came to Baltimore.
16   Q.   You said there could have been several
17 meetings.  Do you recall more than one meeting with
18 Ven-A-Care?
19   A.   There was another meeting in D.C.
20   Q.   Was that before or after the meeting in
21 Baltimore?
22   A.   I don't know.

Page 104

1    Q.   Who was in attendance at that meeting, to
2  your recollection?
3    A.   I don't know all the parties involved.
4  Larry Reed was there.  I don't know if Mary Salhus
5  was there.  And it may have been the administrator
6  at that time.  Other than that I don't remember
7  anybody else.
8    Q.   Do you recall what was the nature of that
9  meeting, what was discussed?
10   A.   I don't recall.
11   Q.   Do you recall where it was in D.C.?
12   A.   Specifically, no.
13   Q.   Do you recall the number of attendees
14 generally?
15   A.   No.
16   Q.   Was it you and Mr. Reed and people from
17 Ven-A-Care or was it larger than that?
18   A.   I don't recall.
19   Q.   Do you recall anything about the meeting
20 at all?
21   A.   No.
22   Q.   That's because it's been some time; is

Page 105

1  that correct?
2        MS. MARTINEZ:  Objection, form.
3    A.   Correct.
4    Q.   You memory would have been better had I
5  been able to ask you about this meeting five years
6  ago; is that fair to say?
7        MS. MARTINEZ:  Objection, form.
8    A.   I can't say.
9    Q.   Do you recall any other meetings with
10 Ven-A-Care?
11   A.   No.
12   Q.   Do you recall any other conversations
13 with Ven-A-Care on the phone?
14   A.   There may have been.  I don't recall.
15   Q.   You say that there may have been.  Is
16 that because you think that there were?
17       MS. MARTINEZ:  Objection, form.
18   Q.   You just don't recall the details of it?
19       MS. MARTINEZ:  Objection, form.
20   A.   Correct.
21   Q.   And who was in attendance on these phone
22 calls?

27 (Pages 102 to 105)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                              January 24, 2008
                    Washington, DC

Page 106

1           MS. ALBEE:  Objection, form.
2           MS. MARTINEZ:  Objection, form.
3       A.  I don't remember the phone calls.  There
4   may have been, but I don't -- I don't know because I
5   don't remember.
6       Q.  Did you take notes of the meetings with
7   Ven-A-Care, either of the meetings with Ven-A-Care?
8       A.  I don't remember.
9       Q.  Would it have been your pattern and
10  practice to take notes?
11          MS. MARTINEZ:  Objection, form.
12      A.  It just depends.
13      Q.  Depends on what?
14      A.  What meeting I was attending.
15      Q.  Would it have been your pattern and
16  practice to take notes of a meeting of the type with
17  Ven-A-Care?
18          MS. ALBEE:  Objection, form.
19          MS. MARTINEZ:  Objection, form.
20      A.  I can't say.
21      Q.  I'm going to ask you to go back to the
22  Bates page ending 171.  This is the slide for a page

Page 107

1   titled Medicaid defrauded.  Do you see that?
2       A.   Yes.
3       Q.   And in the middle column there, if you
4   would look at that for a second and let me know if
5   you have an understanding of what that chart is
6   portraying.
7       A.   I can't see it.  Do you have bigger
8   print?
9       Q.   Not at this time.
10      A.   Okay.
11      Q.   Do you see that -- can you read the top?
12  Medicaid drug cost?  Can you read that?
13      A.   That's it.  Yup.
14      Q.   Can you read the next column?  NDC
15  number?
16      A.   Barely.  This is like an eye exam.
17      Q.   How about drug?  Do you see that?
18      A.   Okay.
19      Q.   And then AWP, the next column?
20      A.   Okay.
21      Q.   I won't ask you to read the next
22  column --

Page 108

1       A.   Please.
2       Q.   -- because I can't either.  Then the next
3   column, VAC cost and then percentage difference?  I
4   think that's what it says, but I won't swear to say.
5           MS. MARTINEZ:  That's not legible.
6       Q.   Do you recall reviewing charts that
7   compared AWP with Ven-A-Care's cost?
8       A.   No, I don't.
9           MS. MARTINEZ:  Objection, form.
10      Q.   But it appears as though these were
11  presented in a meeting; is that fair to say?
12          MS. MARTINEZ:  Objection, form.
13      A.   I don't know.
14      Q.   Do you recall when you met with
15  Ven-A-Care being surprised at what they were telling
16  you?
17      A.   I don't really recall the meetings.
18      Q.   Did you have an understanding of why you
19  would have been asked to attend a meeting with
20  Ven-A-Care to discuss their concerns with drug
21  pricing?
22          MR. WINGET-HERNANDEZ:  Objection, form.

Page 109

1           MS. MARTINEZ:  Objection, form.
2       A.   As part of the division we would attend
3   meetings just for educational purposes.
4       Q.   And what do you mean when you say
5   educational purposes?  What does that mean?
6       A.   Just to learn what's going on.  And
7   basically I think that's what my attendance here as
8   part of the division -- just to, I guess, educate
9   ourselves on what's happening.
10      Q.   And why would you need to be educated
11  about what was happening?
12      A.   Because that's part of the job.
13      Q.   And was the idea to do something about
14  the facts as presented by Ven-A-Care?
15          MS. MARTINEZ:  Objection, form.
16      A.   For me?
17      Q.   Yes.
18      A.   No.
19      Q.   Why would you need to know this
20  information if you wouldn't use it?
21          MR. WINGET-HERNANDEZ:  Objection, form.
22      Q.   Was it just to sort of know about it or

                                    28  (Pages 106 to 109)

Gaston, Sue                                              January 24, 2008
                        Washington, DC

---

Page 110

1  was there a plan that you would do something about
2  it?
3          MR. WINGET-HERNANDEZ:  Same objection.
4          MS. MARTINEZ:  Objection to form.
5  A.   I can't say.  Just to educate myself.
6  Q.   Education just for education's sake?
7          MS. MARTINEZ:  Objection, form.
8  Q.   I'm trying to figure out why you were at
9  the meeting, why you're educating yourself about
10 these issues.  Was it just to satisfy your --
11 A.   Because my supervisor probably asked me
12 to go to meeting.
13 Q.   And do you have an understanding of why
14 you would be asked to go to meeting?
15         MR. WINGET-HERNANDEZ:  Objection, form.
16 A.   To learn more about the program.
17 Q.   And then to do something about what you
18 learned; is that right?
19         MR. WINGET-HERNANDEZ:  Objection to form
20 23450 objection, form.
21         MS. MARTINEZ:  Objection, form.
22 A.   No.

---

Page 111

1  Q.   So it was just to learn, it wasn't to
2  give you any knowledge base to do something; is that
3  your testimony?
4          MR. WINGET-HERNANDEZ:  Objection, form.
5          MS. MARTINEZ:  Objection, form.
6  A.   To do something on this case?
7  Q.   To do something about this situation as
8  presented by Ven-A-Care?
9          MS. MARTINEZ:  Objection, form.
10 A.   No.
11 Q.   So what was the answer no to?  My
12 question of was it just for curiosity's sake?  Is
13 that what the answer no was to?
14 A.   It wasn't for curiosity.
15 Q.   It was to learn information so that you
16 would do something with the information you learned;
17 is that correct?
18         MS. MARTINEZ:  Objection, form.
19 A.   It was to educate myself.
20 Q.   Do you recall taking any action in
21 response to the information presented by Ven-A-Care?
22         MS. MARTINEZ:  Objection, form.

---

Page 112

1          MS. ALBEE:  Objection to form.
2  A.   No.
3  Q.   Do you recall any discussion or
4  consideration of doing anything about the facts as
5  presented by Ven-A-Care?
6          MS. MARTINEZ:  Objection, form.
7  A.   No.
8  Q.   Did you make any efforts to inform your
9  colleagues in the state Medicaid programs about the
10 information presented by Ven-A-Care?
11         MS. MARTINEZ:  Objection, form.
12 A.   No.
13 Q.   Why not?
14 A.   Why not?  Can you explain?
15 Q.   Well, isn't one of HCFA's rules to help
16 educate states regarding pharmacy issues?
17         MS. MARTINEZ:  Objection, form.
18 A.   This was a litigation case.
19 Q.   So is it your understanding that you were
20 in attendance at these meetings with Ven-A-Care in
21 connection with a litigation case?
22         MS. MARTINEZ:  Objection, form.

---

Page 113

1  A.   A potential litigation case, yes.
2  Q.   Did you ever discuss with Mr. Reed or
3  anyone else what the Medicaid Bureau might do with
4  this information to save money for the government?
5  A.   I can't say that.  I don't know.
6  Q.   Do you recall ever contacting
7  manufacturers to discuss the concerns raised by
8  Ven-A-Care on drug pricing issues?
9          MS. MARTINEZ:  Objection, form.
10 A.   No.
11 Q.   Do you recall any discussion or
12 consideration within the Medicaid Bureau to contact
13 manufacturers about those issues?
14         MS. MARTINEZ:  Objection, form.
15 A.   No.
16 Q.   Were you given any instructions not to
17 contact manufacturers about those issues?
18         MS. MARTINEZ:  Objection, form.
19 A.   I don't recall.
20 Q.   If I can ask you to take out Exhibit 24
21 from the binders.  For the record, this is a
22 document dated October 2nd 1996 addressed to Mr.

---

29  (Pages 110 to 113)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 114

1  Vladek from Zack Bentley and Mark Jones.  I ask you
2  to take a look at that first, Ms. Gaston, and then
3  I'll have some questions for you.
4      A.   (Reading.) I'm sorry.  I'm looking at
5  the wrong thing.
6      Q.   Exhibit 24.
7      A.   Oh, I'm looking at -- yeah.  Okay.
8          MS. MARTINEZ:  It's upside-down.  Here.
9  Do you want to use my book?  Because my book is not
10 upside-down.  There's a problem with that exhibit.
11         MR. TORBORG:  There's what?
12         MS. MARTINEZ:  There's a problem.  It's
13 upside-down in my book so I'm giving her mine.  Let
14 me see if I can follow this one that's backwards.  I
15 can follow it backwards.
16         BY MR. TORBORG:
17     Q.   Again, my first question, Ms. Gaston, is
18 whether or not you recall this document.
19     A.   No, I don't.
20     Q.   At the top of the first page there's a
21 handwritten notation.  Do you see that?
22     A.   Yes.

Page 115

1      Q.   It appears to say BO something backslash
2  MB.  Do you know whose handwriting that is?
3      A.   No, I don't.
4      Q.   Do you know what MB stands for within
5  HCFA?
6          MR. WINGET-HERNANDEZ:  Objection, form.
7      Q.   What is your understanding of the term?
8  When you see MB there what does it mean to you?
9      A.   I could guess that it's Medicaid Bureau.
10     Q.   Let me direct you to the first paragraph
11 of the letter.  It says "Ven-A-Care of the Florida
12 Keys Inc. has attempted for more than seven years to
13 assist the Health Care Financing Administration and
14 the state Medicaid programs in limiting infusion and
15 inhalation pharmaceutical reimbursements to the
16 reasonable levels contemplated by the enabling
17 legislation."  And this is dated October 2nd 1996.
18         Do you recall any efforts, any contacts,
19 with Ven-A-Care starting in the early 1990s or late
20 1980s, regarding the subject matter that I just
21 read?
22         MS. MARTINEZ:  Objection, form.

Page 116

1      A.   No, I don't recall.
2      Q.   Is that because it's been some time that
3  you may have had those contacts?
4          MS. MARTINEZ:  Objection, form.
5      A.   It could be.
6      Q.   The second paragraph refers to two
7  volumes of exhibits that "substantiate and support
8  the fact that Medicare and Medicaid programs are
9  continuing to make excessive reimbursements to
10 providers for infusion and inhalation
11 pharmaceuticals.  These reimbursements are many
12 multiples over and above the amount that the
13 programs ever intended to pay."
14         Do you recall having a set of two volumes
15 of exhibits that had been prepared by Ven-A-Care?
16         MS. MARTINEZ:  Objection, form.
17     A.   I don't recall.
18     Q.   Do you recall ever getting pricing
19 catalogs, pricing information from Ven-A-Care in the
20 form of pricing catalogs?
21     A.   I don't recall.
22     Q.   I'd like to ask you to go to the next

Page 117

1  page.  I'm going to read in a paragraph that starts
2  after the indentation there.  "Over a year ago."
3  Are you with me?
4      A.   Yes.
5      Q.   Ven-A-Care wrote "Over a year ago we
6  traveled to the HCFA in Baltimore and met with
7  various representatives of your agency and made a
8  detailed presentation regarding these excessive
9  reimbursements and their impact on the health care
10 delivery system.  Unfortunately for the Medicare and
11 Medicaid programs as well as the American public to
12 date, no meaningful action has been either proposed
13 or implemented by your agency to deal with these
14 issues.  We find this fact not only disconcerting
15 but potentially the source of a major embarrassment
16 to both your agency and to the administration."  Do
17 you see that?
18     A.   Yes, I do.
19         MS. MARTINEZ:  Objection, form.
20     Q.   Do you recall any action that CMS,
21 including the Medicaid Bureau, took to respond to
22 information that Ven-A-Care presented at the

30  (Pages 114 to 117)

Gaston, Sue                                          January 24, 2008
                        Washington, DC

Page 118

1   Baltimore meeting in 1995?
2        MS. ALBEE:  Objection, form.
3    A.  No.
4    Q.  So as far as you know, Ven-A-Care was
5   correct that no meaningful action had been either
6   proposed or implemented by your agency to deal with
7   these issues?
8        MS. MARTINEZ:  Objection, form.
9    A.  I can't say that.
10   Q.  But you as you sit here today don't know
11  of any meaningful action that had been taken?
12   A.  I personally don't know, but that doesn't
13  mean that it didn't occur.
14   Q.  Sure.  And I'm just asking for your
15  personal knowledge as one of the two Medicaid
16  officials that was at the meeting?
17       MS. MARTINEZ:  Objection, form.
18   Q.  Do you recall discussing the possibility
19  of establishing federal upper limits for specific
20  drugs that Ven-A-Care had identified there being a
21  large difference between AWP and their cost?
22       MS. MARTINEZ:  Objection, form.

Page 119

1    A.  No, not on those specific drugs.  No.
2    Q.  Do you know why not?
3        MS. MARTINEZ:  Objection, form.
4    A.  I don't recall that being discussed.
5    Q.  Regarding Ven-A-Care's comment that "We
6   find this fact" -- the fact that no meaningful
7   action had been taken -- "not only disconcerting,
8   but potentially the source of a major embarrassment
9   to both your agency and to the administration," do
10  you recall that being a discussion within HCFA that
11  the Medicare and Medicaid programs paying above
12  acquisition cost could be a major source of
13  impairment for HCFA?
14       MS. MARTINEZ:  Objection, form.
15   A.  Do I recall a specific comment or -- is
16  that what you're saying?
17   Q.  Generally speaking do you recall that
18  sentiment being expressed ever?
19   A.  No, I don't.
20   Q.  I'd like to ask you to go to 483.  The
21  first full paragraph in the middle of the page
22  states "The drug manufacturers are further

Page 120

1   exploiting their ability" --
2    A.  I'm sorry.  Where are you.
3    Q.  I'm at page 483?
4        MS. MARTINEZ:  It's page 5 of the letter
5   and he's referring to the Bates label at the bottom
6   that says 483.
7        THE WITNESS:  Thank you.  Okay.
8    Q.  The first full paragraph starts with "the
9   drug manufacturers."  Are you with me?
10   A.  Uh-huh.
11   Q.  Ven-A-Care wrote "The drug manufacturers
12  are further exploiting their ability to falsify
13  pricing information by using their falsifications of
14  AWP as a marketing tool."  Do you have an
15  understanding of what Ven-A-Care is saying there?
16       MS. MARTINEZ:  Objection to form.
17       MS. ALBEE:  Objection to the form.
18   A.  You're asking me to interpret this?
19   Q.  I'm asking if you have any understanding
20  of what they're getting at there?
21       MS. MARTINEZ:  Objection, form.
22   A.  No.

Page 121

1    Q.  You have no understanding of what they're
2   saying about --
3    A.  Are you asking me what I feel this is
4   saying?
5    Q.  Yes.  Your understanding as someone who
6   might read this letter.
7        MS. MARTINEZ:  Objection, form.
8    A.  It's saying that they're falsifying their
9   AWP, their pricing, as a marketing tool.  So, I
10  mean, I don't know what more --
11   Q.  Do you have an understanding of how
12  pricing information could be used as a marketing
13  tool?
14       MS. MARTINEZ:  Objection, form.
15   Q.  Do you understand that concept?
16       MS. MARTINEZ:  Objection, form.
17   A.  Are you saying for just general sales or
18  are you talking about for Medicare and Medicaid for
19  reimbursement?
20   Q.  Do you think I'm talking about general
21  sales or do you think I'm talking about pharmacy
22  issues?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                        January 24, 2008
                        Washington, DC

Page 122

1    A.   That's what I'm asking you for
2  clarification.
3    Q.   The latter.  My questions are focused
4  on --
5    A.   Medicaid.
6    Q.   Medicaid pharmacy issues.  Yes.
7    A.   You want me to interpret what this
8  statement says --
9    Q.   I'm asking -- I'm trying to get your
10 understanding of what that sentence is.
11        MS. MARTINEZ:  Objection, form.
12   A.   I mean, I'm just interpreting this and it
13 could be completely wrong.  But it sounds like
14 they're falsifying the AWP.  If marketing -- if
15 they're talking about for Medicaid and Medicare,
16 it's for the reimbursement that's going to occur to
17 Medicare and Medicaid and that it's going to be a
18 higher reimbursement rate.
19   Q.   And are you familiar with the phrase
20 "marketing the spread"?
21   A.   I've heard of it.
22   Q.   And how have you heard of it?

Page 123

1    A.   We hear of it on the news.
2    Q.   In connection with Medicaid pharmacy
3  issues?
4    A.   I don't really get involved with that, so
5  it doesn't really mean much to me.
6    Q.   Are you familiar with the concept of
7  allegations that a drug manufacturer would market
8  the difference between AWP and acquisition price to
9  their customers to induce them to purchase their
10 drugs?  Is that a concept that you're familiar with?
11   A.   Yes.
12   Q.   When did you first learn about that
13 potential -- that that potentially was going on?
14   A.   Oh.  I don't know.  You asked me if I was
15 familiar with the term, which I am.  But --
16   Q.   But you're familiar with the concept,
17 correct?
18   A.   Yes.
19   Q.   And you don't recall when you first
20 learned about that potentially was going on; is that
21 right?
22   A.   I'm talking about the term, though.  I'm

Page 124

1  familiar with the term.  I don't know when I learned
2  the term.  I don't -- I don't have any dates for
3  that.  I don't know when I learned that.
4    Q.   Are you familiar with the concept?
5    A.   I'm familiar with the concept.
6    Q.   And do you know when you first learned of
7  the concept?
8    A.   No.
9    Q.   And is that because it's been some time
10 ago since you first learned about the concept?
11   A.   I can't say.
12   Q.   Because it's been so long ago; is that
13 right?
14        MS. MARTINEZ:  Objection, form.
15   A.   I guess.
16   Q.   To put a fine point on it, you can't tell
17 me when you first learned of the concept that drug
18 manufacturers are marketing spread because it's been
19 so long ago you can't remember; is that right?
20        MS. MARTINEZ:  Objection, form.
21        MS. ALBEE:  Objection, form.
22   A.   It could be, but it could also be that

Page 125

1  it's so vague.  It's not one particular thing that
2  occurred to put a date to.  It's a concept that's
3  used.  So it's hard to put a date on when you first
4  heard of the concept.
5        MR. TORBORG:  I'm going to do a couple
6  more and then -- do you guys want to take lunch at
7  12:00 or 1:00?  What do you guys want to do?  What's
8  your preference.
9        MS. MARTINEZ:  Let's ask the witness.  Do
10 you prefer lunch at 12:00 or 1:00?  Do you feel like
11 the boss for a moment?
12        MR. WINGET-HERNANDEZ:  It really is
13 entirely up to you.  You should do what you feel
14 comfortable doing.
15        THE WITNESS:  So you have enough to go to
16 1:00?
17        MR. TORBORG:  Oh, yes.  I have enough to
18 go all day.
19        THE WITNESS:  I mean, but is this a good
20 break time?
21        MR. WINGET-HERNANDEZ:  Yes.  If you want
22 to take a break it's a good time.

                                    32  (Pages 122 to 125)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                                January 24, 2008
                        Washington, DC

Page 126

1        MS. MARTINEZ:  If you need a break you
2   tell us and if you want to take lunch at 12:00 you
3   tell us and if you want to take it at 1:00 you tell
4   us.
5        MR. TORBORG:  We can take a break now and
6   then talk about it if you'd like.  Let's take a
7   little break and then I'll make a decision.
8        THE VIDEOGRAPHER:  This is the end of
9   tape 2.  Off the record at 11:50.
10       (Recess.)
11       THE VIDEOGRAPHER:  This is the beginning
12  of tape 3 in the deposition of Ms. Gaston.  On the
13  record at 12:06.
14       BY MR. TORBORG:
15       Q.   Welcome back, Ms. Gaston.  I've asked you
16  to get out Abbott Exhibit 163.
17       MS. MARTINEZ:   And your servant, Ani
18  Martinez, is getting it for you.
19       MR. TORBORG:  Thank you, Ani.
20       Q.   For the record, Abbott 163 is a July 10th
21  1997 letter addressed to Mr. Vladek from Zachary
22  Bentley, T. Mark Jones and John Lockwood.

Page 127

1        Ms. Gaston, if you would take a look at
2   that document and let me know if you've seen it
3   before.
4        A.   I don't recall.
5        Q.   Do you recall receiving any letters from
6   Ven-A-Care or being copied on or receiving a copy
7   of?
8        A.   I don't recall.
9        Q.   I take it you didn't have a file for
10  correspondence from Ven-A-Care?
11       A.   I may have.  I don't recall.
12       Q.   You just don't recall because it's been
13  so long ago?
14       MS. MARTINEZ:  Objection, form.
15       A.   Yes.
16       Q.   I'd like to ask you to go to the second
17  paragraph of Ven-A-Care's July 10th 1997 letter to
18  Mr. Vladek.  They wrote "We have been closely
19  monitoring your agency's recommended legislation.
20  No markup on drugs directed at remedying these
21  abuses in the Medicare program.  We have recently
22  been advised by Congressman Stark's office that this

Page 128

1   proposal did not survive the House Ways and Means
2   markup session.
3        "Additionally you should be aware that
4   the Health Care Financing Administration failed to
5   offer or propose any recommendations that would have
6   addressed these abuses in the states' Medicaid
7   programs."  Do you see that?
8        A.   Yes.
9        Q.   And in the Medicaid Bureau of CMS,
10  correct?
11       A.   Correct.
12       Q.   Then known as HCFA, correct?
13       A.   Correct.
14       Q.   And were you aware of any recommendations
15  to address the issues raised by Ven-A-Care
16  concerning drug pricing that would affect the state
17  Medicaid programs?
18       MS. MARTINEZ:  Objection, form.
19       A.   I don't recall.
20       Q.   Do you recall any discussion of proposing
21  any recommendations?
22       A.   I don't recall.

Page 129

1        Q.   Did you have individuals within the
2   Medicaid Bureau who worked on proposed regulations
3   or legislation?
4        A.   Yes.
5        Q.   Who were those people?  Do you recall?
6        A.   Estelle Chisholm and Mike Keough.
7        Q.   Anyone else?
8        A.   That's all I remember.
9        Q.   Do you recall ever CMS proposing any
10  legislation concerning how much state Medicaid
11  programs would pay for drugs?
12       MS. MARTINEZ:  Objection, form.
13       A.   I don't recall.
14       Q.   I'd like to ask you to flip to the next
15  page.  Ven-A-Care wrote "It would appear that HCFA's
16  vested attempt at a partial remedy has failed.
17  Nevertheless, HCFA has a duty and an obligation to
18  protect the integrity of the Medicare and states'
19  Medicaid programs to ensure that these programs are
20  'prudent purchasers' of health care goods and
21  services."
22       Do you agree with that, Ms. Gaston?

                                    33  (Pages 126 to 129)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                          January 24, 2008
                        Washington, DC

Page 130

1        MS. MARTINEZ: Objection, form.
2     A.   What are you asking me to believe to?
3     Q.   Do you believe that HCFA had a duty and
4  obligation to protect the integrity of the Medicare
5  and states' Medicaid programs?
6        MS. MARTINEZ: Objection, form.
7     A.   Are you just asking me my opinion?
8     Q.   Yes.
9     A.   I would say yes.
10    Q.   And is it your understanding that Mr.
11 Reed shared that view?
12    A.   I can't speak for him.
13    Q.   Ms. Gaston, what is your view on what
14 HCFA's duty was when it came to the amount that
15 state Medicaid programs should be paying for
16 providers to dispense drugs to Medicaid
17 beneficiaries?
18       MS. ALBEE: Objection, form.
19       MS. MARTINEZ: Objection to form.
20    A.   Can you repeat the question?
21       MR. TORBORG: Would you repeat it?
22       (Whereupon, the requested portion was

Page 131

1  read by the reporter.)
2     A.   Are you asking me what HCFA's duty -- I
3  mean, what we did, we had state plan amendments that
4  we reviewed and we worked with the states.
5     Q.   Anything else?
6     A.   Like what?
7     Q.   I mean, was it HCFA's obligation to
8  enforce the federal regulations governing how much
9  states could pay for drugs?
10    A.   HCFA had the federal regulations.  And we
11 worked with the states to assure this they were
12 adhering to the federal regulations.
13    Q.   Was it HCFA's obligation to ensure that
14 that was done?
15       MS. MARTINEZ: Objection, form.
16    A.   I can't answer that.
17    Q.   I'm going to ask you to go to Abbott
18 Exhibit 56.  It would be a different orange binder.
19       MS. MARTINEZ:  In the future you know
20 what would be awesome is that when you had an
21 exhibit if you actually knew the volume -- because
22 you've got almost like 20 volumes.

Page 132

1        MR. TORBORG:  Yeah.  I had actually asked
2  that that be done this morning, so we're working on
3  it.
4        MS. MARTINEZ:  Okay.
5     Q.   For the record, Abbott Exhibit 56 is a
6  January 5th 1998 letter from Ven-A-Care addressed to
7  Janet Reno, June Gibbs-Brown and Donna Shalala.  Ms.
8  Gaston, I'd ask that you take a look at that
9  document.
10    A.   (Reading.)
11    Q.   And let me know if you have ever seen
12 that document before.
13    A.   I don't recall seeing this.
14    Q.   I'd like to ask you to go to page 4 of
15 the letter has the Bates page ending 048.
16    A.   Okay.
17    Q.   The last paragraph -- let me read it into
18 the record and then ask you some questions about it.
19 Ven-A-Care wrote "Be advised that we continue to be
20 appalled and shocked by recent and past public
21 statements made by members of the executive branch
22 that the grossly excessive payments made by the

Page 133

1  Medicare and states' Medicaid programs for the
2  pharmaceuticals at issue are somehow legal waste and
3  are the result of some kind of 'loophole'."  Do you
4  see that?
5     A.   Yes.
6     Q.   Do you recall that sentiment being
7  expressed in connection with Medicaid reimbursement
8  of drugs?
9        MS. MARTINEZ: Objection, drugs.
10    A.   I don't recall.
11    Q.   Do you recall the term "loophole" being
12 used in connection state Medicaid reimbursement of
13 drugs?
14       MS. MARTINEZ: Objection, form.
15    A.   I can't say.
16    Q.   You can't say because it's been some
17 time?
18    A.   I can't say because it's a word.  A word
19 can be used.  I can't say.
20    Q.   Do you recall the terms legal waste or
21 waste being used in connection with Medicare or
22 Medicaid payment for drugs?

34  (Pages 130 to 133)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                          January 24, 2008
                        Washington, DC

Page 134

1       MR. WINGET-HERNANDEZ:  Objection, form.
2       MS. MARTINEZ:  Objection, form.
3    A.  I can't say.
4    Q.  You can't say because it's been some time
5  since the events on these issues transpired?
6       MS. MARTINEZ:  Objection.
7    A.  No.  I can't say just because of the
8  words.  They're very general in nature and I can't
9  say.
10   Q.  I'd like to ask you to flip one back, to
11 Abbott Exhibit 55.  This is a document entitled
12 "remarks by the President in radio address to the
13 nation."  It appears to be from the White House
14 Office of the Press Secretary.  I'd ask you to take
15 a look at that and let me know if you're familiar
16 with these remarks.
17   A.  (Reading.)  I'm not familiar with this.
18   Q.  If I can direct you to the fourth
19 paragraph, it starts with "but we must do more."  Do
20 you see that?
21   A.  Yes, I do.
22   Q.  Mr. Clinton stated "But we must do more.

Page 135

1  Sometimes the waste and abuses aren't even illegal;
2  they're just embedded in the practices of the
3  system.  Last week the Department of Health and
4  Human Services confirmed that our Medicare program
5  has been systemically overpaying doctors and clinics
6  for prescription drugs, overpayments that cost
7  taxpayers hundreds of millions of dollars.
8            "Such waste is simply unacceptable.  Now,
9  these overpayments occur because Medicare reimburses
10 doctors according to the public average wholesale
11 price, the so-called sticker price for drugs.  Few
12 doctors, however, actually pay the full sticker
13 price.  In fact some just pay one-tenth of the
14 published price."  Do you see that?
15   A.  Yes, I do.
16   Q.  Does that refresh your recollection at
17 all about whether or not you've seen --
18   A.  No.  It doesn't look familiar to me.
19   Q.  Do you recall any discussions at HCFA or
20 with state representatives that basing payment on
21 average wholesale price was something that was not
22 illegal; it was just embedded in the practice of the

Page 136

1  system?
2       MS. MARTINEZ:  Objection, form.
3    A.  Are you asking if I've heard that term
4  or --
5    Q.  Have you heard that sentiment expressed?
6    A.  No.  I can't say.
7    Q.  With respect to the last sentence, "In
8  fact some pay just one-tenth of the published
9  price" -- do you see that?
10   A.  Yes, I see it.
11   Q.  Did you become aware of the fact that
12 there were times that the average wholesale price
13 could be ten times or more higher than what
14 providers were paying to acquire drugs?
15       MS. MARTINEZ:  Objection, form.
16   A.  Are you asking me specifically if I'm
17 aware of that?
18   Q.  Yeah.  Did you become aware of that?
19       MS. MARTINEZ:  Objection, form.
20   A.  I couldn't say.  It would depend on the
21 situation.
22   Q.  And what do you mean by that, depend on

Page 137

1  the situation?
2    A.  I mean, I wouldn't -- unless it was
3  brought to my attention, I'm not aware of it.
4    Q.  But if there are documents that you
5  reviewed -- you may have reviewed documents that
6  would have expressed that information; is that
7  right?
8    A.  No, not that I'm aware of.
9    Q.  You don't recall?
10   A.  No, I don't recall.
11   Q.  Okay.  But you may have.  You just don't
12 recall because it's been some time.  Is that fair to
13 say?
14       MS. MARTINEZ:  Objection, form.
15   A.  I don't know.
16   Q.  Why don't you know?
17   A.  Because I don't know if that even
18 occurred.
19   Q.  Because it's been some time; is that
20 correct?
21   A.  Yes.
22   Q.  If you became aware of fraud in the

Henderson Legal Services, Inc.

202-220-4158                     www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                              January 24, 2008
                            Washington, DC

Page 138

1   Medicaid system are there steps that you're supposed
2   to take, Ms. Gaston?
3            MS. MARTINEZ:  Objection, form.
4       A.   Can you give me an example?
5       Q.   Have you received training or any
6   guidance about what someone in your position is
7   supposed to do if they learn of fraud in the
8   Medicaid system?
9       A.   I haven't received training.  I know that
10  the regional office have offices that deal with
11  fraud and CMS has an office that deals with fraud.
12      Q.   But are you aware of any guidance to you
13  about what you're supposed to do if you learn about
14  fraud in the Medicaid system?
15      A.   No.
16      Q.   Do you recall ever raising an issue
17  during your time at CMS about drug pricing being
18  fraudulent?
19      A.   Can you be more specific?
20      Q.   I'm asking a very broad question.
21      A.   Just general?
22      Q.   Yeah.

Page 139

1       A.   I don't recall specifically.
2       Q.   Do you recall anything generally?
3       A.   No.
4            MR. TORBORG:  Okay.  I'd like to mark
5   this as our next exhibit.
6                (Exhibit Abbott 454 was
7                 marked for
8                 identification.)
9            BY MR. TORBORG:
10      Q.   For the record, what I've marked as
11  Abbott Exhibit 454 bears the Bates numbers VAC MDL
12  64417 through 27.  Ms. Gaston, I ask you to take a
13  look at that document and tell me whether or not you
14  recall it.
15      A.   (Reading.)
16      Q.   For the record, this is a fax cover sheet
17  dated January 22nd 1998 from Zack Bentley and Mark
18  Jones to Congressman Pete Stark attaching a letter
19  of the same date from Ven-A-Care to Congressman
20  Stark.
21           MR. WINGET-HERNANDEZ:  David, do you
22  contend that this is all one document?

Page 140

1            MR. TORBORG:  I contend it's been
2   produced in the same Bates range.  I'm not here to
3   make contentions about documents.  I'm here to ask
4   questions of witnesses about documents.
5            MR. WINGET-HERNANDEZ:  Well, okay.  But
6   you have --
7            MR. TORBORG:  You can reserve your
8   objection if this gets made at trial.  Otherwise
9   don't interrupt my questioning.
10           MR. WINGET-HERNANDEZ:  You've marked a
11  document which you have attached the pages together
12  as though it's a single document when on its face it
13  shows that it's an eight page fax.  The document has
14  eleven pages in it.  I'm just asking you to clarify
15  that apparent mistake or confusion if you can.  If
16  you can't then that's fine.
17           MR. TORBORG:  I can't.  I didn't produce
18  them.
19           MR. WINGET-HERNANDEZ:  But did you attach
20  them?  Apparently you did.
21           MS. MARTINEZ:  Right.  Are you saying
22  these --

Page 141

1            MR. TORBORG:  I'm not making contentions
2   about documents.  I'm asking the witness about
3   documents.  You can reserve your objections on this
4   stuff.  It's wasting time.
5            MR. WINGET-HERNANDEZ:  Well, I object to
6   the attachment of this document to the deposition in
7   the form that it's been provided based upon the fact
8   that on the its face it shows it's supposed to be an
9   eight page document and it has more than eight pages
10  in it.  That's my objection.
11           MS. MARTINEZ:  Obviously the objection is
12  good for everybody on the plaintiff's side and the
13  United States has the same objection.
14           BY MR. TORBORG:
15      Q.   Ms. Gaston, are you familiar with this
16  document?
17      A.   No, I'm not.
18      Q.   If I can ask you to go to the Bates page
19  ending 419, there's a re: line titled "Suggested
20  Course of Action for You to Encourage HCFA to Take
21  Concerning the 22 Drugs Identified in the OIG Report
22  Entitled 'Excessive Medicare Payments for

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                                    January 24, 2008
Washington, DC

---

Page 142

1  Prescription Drugs.'"  And it gives a number and a
2  date.
3            In the first paragraph, Ven-A-Care wrote
4  "As you may be aware, in September 1995 we met with
5  representatives from the OIG and HCFA in Baltimore
6  to discuss and present evidence of the fact that the
7  Medicare and states' Medicaid programs were
8  unwittingly making excessive reimbursements for
9  certain infusion, injectable and inhalation drugs."
10           That's the meeting we saw earlier that
11  looked like you attended; is that right?
12           MS. MARTINEZ:  Object to form.
13      A.   That meeting was in '95.
14      Q.   It goes on, "During that meeting we were
15  shocked by certain statements made by certain HCFA
16  officials concerning their understanding that the
17  term 'AWP' had never been legislatively or
18  administratively defined by the federal government."
19           Ms. Gaston, does that refresh your
20  recollection at all regarding any conversation about
21  that subject that occurred in the Baltimore meeting
22  with Ven-A-Care in 1995?

---

Page 143

1      A.   No.
2      Q.   Do you recall that subject ever being
3  discussed within HCFA, the fact that AWP, that term,
4  had never been legislatively or administratively
5  defined?
6      A.   I don't recall.
7      Q.   You don't recall any discussions about
8  that issue?
9      A.   I don't recall.
10      Q.   And is that because it's been some time
11  since both the September 1995 meeting as well as
12  your time dealing with these issues?
13           MS. MARTINEZ:  Objection, form.
14      A.   It could be.
15      Q.   If I could ask you to go to the next
16  page. Ven-A-Care wrote "We contacted an official at
17  the Bureau of Labor Statistics, Department of
18  Commerce, whose branch of government also uses the
19  words average wholesale price and the term AWP.
20  When we asked if the Commence Department had ever
21  defined the words 'average wholesale price' or the
22  term 'AWP,' the official stated 'Mr. Bentley, I

---

Page 144

1  don't mean to be rude, but what is it exactly that
2  you don't understand about the words average,
3  wholesale, and price and/or the words average
4  wholesale price put together as AWP?'"  Do you see
5  that?
6      A.   Yes, I do.
7           MS. MARTINEZ:  Objection, form.
8      Q.   Do you recall there ever being any
9  discussion of any issue within HCFA about what the
10  term AWP meant?
11           MS. MARTINEZ:  Objection, form.
12      A.   Can you be more specific?  Just what it
13  means?
14      Q.   Yeah.
15      A.   There may have been discussions.  I don't
16  remember any specific discussions.
17      Q.   Do you remember -- when you used the word
18  or the phrase "average wholesale price," what did
19  you understand it to mean?
20           MS. ALBEE:  Objection, form.
21      A.   Average wholesale price was a price that
22  we used along with the direct price or the WAC price

---

Page 145

1  for determining the FULs.  It really wasn't our
2  place -- for me when I'm working on the FULs -- to
3  get into defining it.  I'm looking at it for FULs
4  purposes.
5      Q.   And where did you look to get average
6  wholesale prices?
7           MS. MARTINEZ:  Objection, form.
8      A.   The three prices the average wholesale
9  price, direct price and the wholesale acquisition
10  cost, was provided to us by the compendia sources.
11      Q.   That would be Blue Book, Red Book and
12  Medi-Span?
13      A.   Correct.
14      Q.   And when you use the term average
15  wholesale price and when you saw it used by others
16  such as in state plans, that's what you understood
17  the term to meant; is that right?
18           MS. MARTINEZ:  Objection, form.
19      A.   You mean to mean -- not defining it, but
20  how I use it?
21      Q.   Yeah.  It meant what was in Blue Book,
22  Red Book and other compendia?

---

37 (Pages 142 to 145)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                          January 24, 2008
                        Washington, DC

Page 146

1    A.   It's a price that's provided in the
2 compendia.
3    Q.   And that's what you understood the term
4 to mean; is that right?
5        MS. MARTINEZ:  Objection, form.
6    A.   I wasn't defining it.  It's a price.
7    Q.   I'm not asking you to define it.  I'm
8 asking you to tell me what was your understanding of
9 what AWP meant.
10       MS. MARTINEZ:  Objection, form.
11   A.   It was a price that was submitted by the
12 manufacturers and -- just like direct price and
13 wholesale acquisition cost.
14   Q.   And it was something that you found in
15 the compendia?
16   A.   Correct.
17       MR. TORBORG:  We'll mark this as our next
18 exhibit.
19              (Exhibit Abbott 455 was
20              marked for
21              identification.)
22       BY MR. TORBORG:

Page 147

1    Q.   Ms. Gaston, what I've marked as Abbott
2 Exhibit 455 bears the Bates numbers HHD 101-1266
3 through 85.  It appears to be a letter dated
4 September 27th 2001 from Janet Rehnquist, Inspector
5 General, to Thomas Scully, subject: OIG final
6 report, "Medicaid's use of revised average wholesale
7 prices."  And then it attaches a copy of that
8 report, as well as some other documents I'll be
9 asking you about.
10       I ask you to take a look at that and let
11 me know if you're familiar with this document.
12   A.   (Reading.)  Okay.
13   Q.   Ms. Gaston, do you recall this particular
14 OIG report?
15   A.   It looks familiar.
16   Q.   Do you recall an effort that the
17 Department of Justice made in connection with NAMFCU
18 to develop revised average wholesale pricing for
19 certain prescription drugs that occurred in the time
20 period of the late '90s and early 2000, 2001?
21       MS. MARTINEZ:  Objection, form.
22   A.   Yes.

Page 148

1    Q.   Do you have a name you use for that
2 project that you and I can understand each other if
3 we talk about it later?
4    A.   No.
5    Q.   If I call it the DOJ AWP project will you
6 understand what I'm talking about?
7    A.   You can call it that.  That would be
8 fine.
9    Q.   That's not a term you used, but it's a
10 term if I use it today you'll understand what I
11 mean?
12   A.   That's fine.
13   Q.   I'd ask you if you would to go to the
14 second-to-last page in the document, Bates page
15 ending 284.  It's a page titled "action item number
16 6."  Then it also says "record of sign-offs."  And I
17 see your name there.
18   A.   Correct.
19   Q.   Can you tell me what this document is and
20 what it's signifying?
21   A.   My recollection, this is probably a cover
22 sheet to a control.  And you sign off if -- I

Page 149

1 guess -- to the response, I'm guessing.  It could be
2 to the response to the OIG report.
3    Q.   And does the fact that your name is
4 listed there under cleared by, or next to cleared
5 by -- what does that mean?
6    A.   It means that I probably had some input
7 into the response.
8    Q.   Into the response to the OIG report?
9    A.   Correct.
10   Q.   And other people are -- is the next one
11 Reed?
12   A.   Correct.
13   Q.   Any idea what the other ones are, based
14 on either your ability to read handwriting better
15 than me and your knowledge of who the people would
16 be?
17   A.   I'm not sure of the next one.  The other
18 one says PCPG, which is -- generally they do more
19 the administrative work.  And OCD would be I would
20 say the center director's office.  But I don't know
21 whose names they were.
22   Q.   What is the center -- what does OCD --

Henderson Legal Services, Inc.
202-220-4158                    www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                       January 24, 2008
                        Washington, DC

Page 150

1    A.   I would say OCD. I'm guessing. But I
2  would say that it would be the center director. So
3  it could be maybe up to the Medicaid directors.
4    Q.   Medicaid directors within HCFA?
5    A.   Within CMSO. And here again, I'm not
6  sure. Office center director.
7    Q.   So that could be someone like Dennis
8  Smith maybe?
9    A.   It could be.
10   Q.   Do you know what the CMSO/FCHPG would be?
11   A.   Family and Children's Health Programs
12 Group.
13   Q.   Any idea --
14   A.   That's the group that Larry was under.
15 The policy area was under that group.
16   Q.   Any idea who that name might be next to
17 it?
18   A.   No.
19   Q.   Do you recall attending the -- do you
20 recall that there were exit and entrance conferences
21 for various OIG reports?
22   A.   Yes.

Page 151

1    Q.   Do you recall ever attending those?
2    A.   Yes.
3            (Exhibit Abbott 456 was
4            marked for
5            identification.)
6        BY MR. TORBORG:
7    Q.   For the record, what I've marked as
8  Abbott Exhibit 456 bears the Bates number HHD
9  042-0164. Do you have an understanding of what this
10 document is, Ms. Gaston?
11   A.   It looks like a meeting participant list.
12   Q.   And you're familiar with these type of --
13 this type of document in your work?
14   A.   Yes.
15   Q.   And is your name listed there third from
16 the bottom?
17   A.   Yes.
18   Q.   Is that your handwriting?
19   A.   Yes, it is.
20   Q.   Do you recall attending the exit
21 conference for the OIG project Medicaid's use of
22 revised AWP?

Page 152

1    A.   I don't recall.
2    Q.   You indicated earlier that you believe
3  that the Bates page ending 1284 on Abbott Exhibit
4  455 may indicate you had some input into the
5  comments to the report; is that right?
6    A.   Correct.
7    Q.   Tell me about how that process works, how
8  comments are made, what review they undergo, that
9  practice.
10   A.   The process?
11   Q.   Yes.
12   A.   If we receive an OIG report and we have
13 to review it and make comments on it, whoever it's
14 assigned to, we would do whatever research needed to
15 be performed and do a draft of our comments and then
16 give it to Larry Reed for him to review. And then a
17 final will be prepared and forwarded up through the
18 channels up to -- generally up to the center
19 director's office.
20   Q.   And the center director's office would
21 be --
22   A.   Like a Dennis Smith.

Page 153

1    Q.   -- a Dennis Smith type?
2        When did Dennis Smith start at the
3  Medicaid Bureau or at CMSO?
4    A.   I don't recall.
5    Q.   But you recall the comments would
6  initially be drafted by someone at your level and
7  then they would be forwarded up to Mr. Reed?
8    A.   Correct.
9    Q.   You don't recall Mr. Reed doing a first
10 draft of any comments; is that fair to say?
11       MS. MARTINEZ:  Objection to form.
12   Q.   That wasn't the practice?
13       MS. MARTINEZ:  Objection to form.
14   A.   That wasn't the practice.
15   Q.   Then Mr. Reed would review it and approve
16 it; is that right? And then he would send it on to
17 the center director's office?
18   A.   I think there were other offices that we
19 had to -- the group. And sometimes I guess it
20 would -- I'm not sure because my recollection isn't
21 that clear. But generally if something filters up
22 to the center director's office, it has to go to the

                                  39 (Pages 150 to 153)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                           January 24, 2008
                        Washington, DC

---

Page 154

1   next channel, which would be the group director.
2   And then from the group director up to the center
3   director's office.
4       Q.   So is it fair to say a lot of steps go
5   into the process of the comments that CMS provides
6   to an OIG report?
7       A.   Correct.
8       Q.   A lot of review is done for the accuracy
9   and appropriateness of the comments; is that fair to
10  say?
11           MR. WINGET-HERNANDEZ:  Objection, form.
12           MS. MARTINEZ:  Objection, form.
13      A.   I couldn't say.
14      Q.   But in your view it was something that
15  CMS took pretty seriously?
16           MR. WINGET-HERNANDEZ:  Objection, form.
17           MS. MARTINEZ:  Objection, form.
18      A.   I can only speak for myself.
19      Q.   Okay.
20      A.   I take it seriously.
21      Q.   Now, if we look at the comments -- and
22  let me make sure I get this straight.  The process

---

Page 155

1   that you were talking about, that relates to the
2   comments that were given to a draft report?  That's
3   when you first get the opportunity to do comments,
4   right?  You get a copy of OIG's draft report, you
5   make comments and OIG may modify its report based on
6   your comments?
7       A.   Correct.
8       Q.   Right?  If we go to Bates page 1281 of
9   Abbott Exhibit 455, can you tell us what this
10  document is?  This and the next page.
11      A.   It looks like a letter to the OIG from
12  our -- is it deputy administrator? -- with the draft
13  comments.
14      Q.   When you say draft comments, what do you
15  mean by that?  You mean comments on a draft report?
16      A.   Correct.
17      Q.   And do you remember a man by the name of
18  Reuben King-Shaw Jr.?
19      A.   Yes.
20      Q.   He was a deputy administrator?
21      A.   Correct.
22      Q.   Chief operating officer?

---

Page 156

1       A.   Yes.
2       Q.   So did he work underneath Dennis Smith?
3       A.   No.  He was the deputy to the
4   administrator.
5       Q.   So he was above Dennis Smith?
6       A.   Correct.
7       Q.   Did you ever meet with Mr. King-Shaw?
8       A.   No.
9       Q.   And here he's providing CMS's comments to
10  this report; is that right?
11      A.   That's what it appears to be.
12      Q.   And you're -- let me ask you this.  Do
13  you recall drafting comments, at least a draft
14  version of comments, to this particular OIG report?
15      A.   I don't remember.
16      Q.   But you believe that you may have had
17  input into it?
18      A.   I may have.
19      Q.   Okay.  Why don't with you look at this a
20  second.  Mr. King-Shaw's memo states "Thank you for
21  the opportunity to review and comment on the
22  above-referenced draft report regarding state

---

Page 157

1   Medicaid's use of revised average wholesale prices
2   (AWPs) for certain prescription drugs.
3   Investigative findings by the Department of Justice
4   and the National Association of Medicaid Fraud
5   Control Units (NAMFCU) reveal that some drug
6   manufacturers were reporting inflated average
7   manufacturer prices for certain drug products.
8           "As a result, actual wholesale pricing
9   data were collected for approximately 400 national
10  drug codes representing 51 drugs."  And you recall
11  that project, right?
12          MS. MARTINEZ:  Objection, form.
13      A.   It looks familiar, but I don't recall --
14  I don't recall the details.
15      Q.   The second paragraph states "While there
16  were no recommendations noted in this report, the
17  Centers for Medicare and Medicaid Services agreed
18  with OIG's conclusion that reliance on the reported
19  AWPs by drug manufacturers as a basis for drug
20  reimbursement is problematic."  Do you see that?
21      A.   Yes, I do.
22      Q.   And that something that you agreed with

---

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                        January 24, 2008
                        Washington, DC

Page 158

1  at the time?
2      A.   I can't remember.
3      Q.   The next sentence says "Additionally, we
4  acknowledge OIG's comments and earlier reports
5  regarding the shortcomings of using AWPs as a basis
6  for reimbursement and will continue to look for
7  administrative and legislative solutions to this
8  problem."  Do you recall efforts that the Medicaid
9  Bureau or CMSO took in looking for administrative
10 and legislative solutions to this problem?
11     A.   I don't remember.
12     Q.   Let's go to the next page, if you would.
13 The paragraph states "The OIG concludes that because
14 most states base their reimbursement for drugs on
15 AWPs, inflated AWPs have 'caused Medicaid to overpay
16 for these products.'"  And it says, paren, "See
17 pages little I conclusion and 9 first paragraph."
18 You understand that's referring to language
19 that was in a draft report?
20     A.   If you say so.
21     Q.   Well, I'm just asking your interpretation
22 of that.  That's what it looks like to you?  This

Page 159

1  memo --
2      A.   Yeah.  It appears that's what it's
3  referencing.
4      Q.   And let's go back to the first paragraph
5  of the letter.  It says "Thank you for the
6  opportunity to review and comment on the above-
7  referenced draft."  Do you see that?
8      A.   Okay.
9      Q.   Does that suggest to you the language
10 here that we just talked about was contained in a
11 draft OIG report?
12     A.   Yes.
13     Q.   And then it continues on "Since the
14 regulations and relevant state plans authorize
15 payment for drugs based on AWPs, regardless of
16 whether those prices are inflated, we have concerns
17 with the statement that states and Medicaid have
18 'overpaid for drugs.  We therefore recommend that
19 the sentence on pages little I, penultimate
20 paragraph, second sentence, and 9, first paragraph,
21 second sentence, be deleted."  Do you see that?
22     A.   I do.

Page 160

1      Q.   Did I read it correctly?
2      A.   Yes.
3      Q.   Do you recall being involved in drafting
4  this language?
5      A.   I don't recall.
6      Q.   Do you have an understanding of what it's
7  saying?
8      A.   Yes.
9      Q.   Can you tell me in your words what you
10 understand it to be saying?
11     A.   That the comments are saying they have a
12 concern over the statement saying overpaid and they
13 wanted it deleted from the comments, from that part
14 of the OIG report.
15     Q.   And why did CMS have a concern with use
16 of the term overpayment or overpay?
17          MS. ALBEE:  Objection, form.
18     A.   Yeah.  I can't speak for them.  I don't
19 know if this was language I prepared or who
20 prepared.  So I can't speak to it.
21     Q.   As you read it here today what do you
22 take it to mean?

Page 161

1      A.   That they have an objection to the word
2  overpaid and they don't want that in the report.
3      Q.   Because the regulations in the relevant
4  state plans authorize payment for drugs based upon
5  published average wholesale prices, correct?
6          MS. ALBEE:  Objection, form.
7          MS. MARTINEZ:  Objection, form.
8      Q.   That's when it says, right?  I'm not
9  making that up.
10         MS. MARTINEZ:  No.  That's not what it
11 says.
12     A.   Yeah.  The state plans say --
13         MS. MARTINEZ:  I just want to say for the
14 record --
15         MR. TORBORG:  No.
16         MS. MARTINEZ:  You misread it.  The word
17 "published" is not in there.  The word "published"
18 is not in there.  And you read it into it.
19         MR. TORBORG:  Okay.
20         BY MR. TORBORG:
21     Q.   When you saw the words AWPs there, you
22 thought it referred to published AWPs, did you not?

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                             January 24, 2008
                        Washington, DC

Page 162

1    A.   Yes.
2    Q.   And it says that "The regulations and
3  relevant state plans authorize payment for drugs
4  based on AWPs regardless of whether those prices are
5  inflated."  Do you see that?
6    A.   Yes.
7    Q.   And what did you understand the term
8  "inflated" to mean?
9    A.   Inflated?  Higher than what they should
10 be.
11   Q.   And this particular inflation -- this
12 particular project relates to some 400 national drug
13 codes that were part of the DOJ AWP effort, correct?
14       MS. MARTINEZ:  Objection, form.
15   A.   Yes.
16   Q.   And this is saying, is it not, that even
17 though prices for these NDCs may be inflated, state
18 Medicaid programs are not "overpaying" for these
19 drugs because the regulations and state plans
20 authorize payment for these drugs based upon the
21 inflated AWPs for those drugs, is it not?
22       MS. MARTINEZ:  Objection, form.

Page 163

1        MS. ALBEE:  Objection, form.
2    A.   Are you waiting for me?
3    Q.   Yes.
4    A.   I'm sorry.  Can you repeat that?
5    Q.   And this is saying, is it not, that even
6  though prices for these NDCs may be inflated, state
7  Medicaid programs are not "overpaying" for these
8  drugs because the regulations and state plans
9  authorize payment for these drugs based upon the
10 inflated AWPs for those drugs, is it not?
11   A.   And you're saying that's what this is
12 saying?
13   Q.   Yes.  Is that how you interpret it?
14       MS. MARTINEZ:  Objection, form.
15       MS. MILLER:  Objection, form.
16   A.   I'd prefer not to answer that because
17 you're asking me to interpret this.
18   Q.   I'm asking for your interpretation as
19 someone who appears to have been involved in the
20 drafting of the document.
21       MS. MARTINEZ:  Objection, form.
22   A.   Right.  But you're asking me -- this has

Page 164

1  been so long ago that --
2    Q.   I'm asking for your interpretation today.
3        MR. WINGET-HERNANDEZ:  Objection, form.
4    A.   I have to ask you to read your question
5  again.
6    Q.   This is saying, is it not, that even
7  though prices for these NDCs may be inflated, state
8  Medicaid programs are not "overpaying" for these
9  drugs because the regulations and state plans
10 authorize payments for these drugs based upon the
11 inflated AWPs for those drugs, is it not?
12       MS. MARTINEZ:  Objection, form.
13       MS. ALBEE:  Objection, form.
14   A.   I don't think they were saying they were
15 overpaying.  I think they want that word "overpaid"
16 in there to imply that.  But I don't think it's
17 coming out and saying that they weren't overpaying.
18   Q.   Why is your objection to the word
19 "overpaid"?
20   A.   I don't know.  They're saying it in here
21 they want it removed.  So I'm just repeating what's
22 said in the document.

Page 165

1    Q.   What do you understand the term
2  "overpaid" to mean?
3    A.   Paying too much.
4    Q.   Paying too much based upon the relevant
5  law at the time?
6        MS. MARTINEZ:  Objection, form.
7    A.   You want to say law.  Maybe.  I don't
8  know.  I can guess.  Paying -- I can't say
9  specifically.  I can't interpret this.  But
10 overpaying --
11   Q.   I'm asking for your interpretation here
12 today.
13   A.   Paying more than what they should be
14 paying.
15   Q.   And this comment is saying that in
16 essence OIG's report should not say that paying for
17 these drugs based on inflated AWPs was paying more
18 than they should be paying, is it not?
19       MS. MARTINEZ:  Objection, form.
20       MS. ALBEE:  Objection to form.
21   A.   It may be saying that, but it sounds like
22 they just want the word "overpaid" removed from

                                42  (Pages 162 to 165)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                  Washington, DC

Page 166

1  there because the comments have more in there than
2  just that one sentence.
3      Q.   You indicated earlier -- you can put that
4  away.
5          You indicated earlier that in your work
6  at CMS you understood the term average wholesale
7  price to mean prices published in Blue Book, Red
8  Book or other compendia, correct?
9          MS. MARTINEZ:  Objection, form.
10     A.   Correct.
11     Q.   And that is in fact how many state plans
12 specifically defined the term average wholesale
13 price; am I right?
14         MS. MARTINEZ:  Objection, form.
15     A.   I don't know what you mean by defined it.
16 They use AWP in their pricing.
17     Q.   And when you saw states using AWP in
18 their pricing you understood them to be referring to
19 prices in Blue Book, Red Book or other compendia,
20 correct?
21         MS. MARTINEZ:  Objection, form.
22     A.   I don't know whether they get their AWPs

Page 167

1  from.  I know where I get the AWPs, direct price and
2  wholesale acquisition cost, from those three
3  compendia sources.  But I don't know specifically if
4  the states use those sources also.
5      Q.   You're familiar with -- let me mark a
6  document.
7          (Exhibit Abbott 457 was
8          marked for
9          identification.)
10         BY MR. TORBORG:
11     Q.   Ms. Gaston, I've handed you a copy of
12 what's been marked HHC 008-0083.  It's titled "state
13 plan under title 19 of the Social Security Act."
14 The state is indicated as Tennessee.  And there's
15 language in the upper right-hand corner that says
16 attachment 4.19B.
17         My question to you, Ms. Gaston, is
18 whether or not you're familiar with this type of
19 document.
20     A.   Yes.
21     Q.   And what is this type of document?
22     A.   It's a page from a state's state plan

Page 168

1  amendment.
2      Q.   And what is a state plan amendment?
3      A.   A state plan amendment is sort of a
4  snapshot of the state's Medicaid program.  And they
5  submit this to CMS.
6      Q.   If we look at section 12 under prescribed
7  drugs there's a paragraph B there.  Do you see that?
8      A.   Yes.
9      Q.   It says "EAC is defined as Blue Book
10 published average wholesale price (AWP) minus 8
11 percent for legend drugs except for DEA schedule II
12 drugs which shall be Blue Book published AWP."  Do
13 you see that?
14     A.   Yes.
15     Q.   So in this state plan they specifically
16 defined AWP in reference to the Blue Book, correct?
17     A.   Right.
18     Q.   And when you reviewed state plans at
19 HCFA, when you saw the term AWP you believed they
20 were referring to what was in Blue Book or other
21 compendia, correct?
22         MS. ALBEE:  Objection, form.

Page 169

1          MS. MARTINEZ:  Objection, form.
2      A.   Like I said, I don't know where they get
3  their AWP from.  It doesn't -- it wouldn't concern
4  me if they detail it in a state plan
5  amendment, that's fine.  But what we're looking at
6  is their methodology they're submitting to CMS.
7      Q.   Okay.  You can put that to the side.
8          When you started working in the pharmacy
9  area, Ms. Gaston, of CMS starting in 1991, had you
10 had any prior experience with Medicaid's payment for
11 drugs?
12     A.   No.
13     Q.   Did you receive any reports or other
14 information to educate yourself about the issues
15 that you would be confronting in your new job?
16     A.   No.
17     Q.   You can say for certain that you did not
18 review any background material at all?
19     A.   When I was interviewed by Larry he gave
20 me a copy of -- it was like the law, but it
21 wasn't -- it was the new legislation, so it was
22 something pertaining to the law.  That was it.

43  (Pages 166 to 169)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 170

1    Q.   Do you recall reviewing any reports from
2  the Office of Inspector General?
3    A.   No, I don't.
4    Q.   Can you say for certain that you did not
5  review them?
6    A.   Is this before I was hired?
7    Q.   After you were hired and started working
8  in your job.
9    A.   Oh.  Then what was your question?
10    Q.   Did you review reports from the Office of
11  Inspector General relating to reimbursement of
12  drugs?
13    A.   Yes.
14        MS. MARTINEZ:  Objection, form.  Are you
15  asking about the entire '91 to 2003 period, or
16  specifically right in '91 when she started?  Because
17  you were going to that early period and then you
18  seemed to open it up.
19    Q.   I'd like to ask you to go to Exhibit 307
20  in your book.
21        MS. MARTINEZ:  Counsel, you're planning
22  on breaking maybe within the next 10 or 15 minutes

Page 171

1  or something?
2        MR. TORBORG:  Why don't we just go ahead
3  and take our lunch break now.  Would you like to do
4  that, Ms. Gaston?
5        THE WITNESS:  Sure.
6        MR. TORBORG:  Why don't we take our lunch
7  break now.
8        THE VIDEOGRAPHER:  This is the end of
9  tape 3.  Off the record at 1:02.
10        (Whereupon, at 1:02 p.m. a lunch recess
11  was taken.)
12
13
14
15
16
17
18
19
20
21
22

Page 172

1        A F T E R N O O N   S E S S I O N
2            (2:04 p.m.)
3            * * * * *
4    Whereupon,
5            SUE GASTON,
6    the witness testifying at the time of
7  recess, having been previously duly sworn,
8  was further examined and testified as
9  follows.
10            * * * * *
11        THE VIDEOGRAPHER:  This is the beginning
12  of tape 4 in the deposition of Ms. Gaston.  On the
13  record at 2:04.
14    EXAMINATION RESUMED BY COUNSEL FOR THE
15        ABBOTT LABORATORIES
16    BY MR. TORBORG:
17    Q.   Welcome back, Ms. Gaston.
18    A.   Thank you.
19    Q.   At the time we broke I had asked you to
20  flip to Abbott Exhibit 307 in the orange binders.
21  And this appears to me to be an action transmittal
22  that contains a report from the HHS Office of

Page 173

1  Inspector General.  And have you had a chance to
2  look at this document to tell me whether or not you
3  have seen this before?
4    A.   I've glanced at it, and it doesn't look
5  familiar.
6    Q.   If I could ask you to go then to Abbott
7  Exhibit 81 in the orange binders.  Ms. Gaston, I ask
8  that you take a look at that document.  It's titled
9  "Prescription Drug Prices: Are We Getting Our
10  Money's Worth?  A Majority Staff report of the
11  Special Committee On Aging in the United States
12  Senate," dated in 1989.
13    A.   (Reading.)  This doesn't look familiar.
14    Q.   I'd like to ask you to go to page 10 of
15  the study.  There's no Bates numbers on it but I
16  think you'll see the page number is on the actual
17  document if you go in a few pages.  Were you able to
18  find it?
19    A.   Yes.
20    Q.   Specifically I draw your attention to
21  finding 7.  Do you see that at the bottom of the
22  page?

Henderson Legal Services, Inc.
202-220-4158              www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                          January 24, 2008
                        Washington, DC

Page 174

1    A.   Yes.
2    Q.   Where it states "There are two markets in
3  the United States for most big-selling prescription
4  drugs: a price competitive market characterized by
5  deep discounts off the published list price, and a
6  high-priced market where retail customers, Medicare
7  and Medicaid purchase those prescription drugs." Do
8  you have an understanding of what that finding is
9  saying, Ms. Gaston?
10   A.   No.
11   Q.   If we go, please, to page 11, under the
12 first bullet there is a bullet that's discussing the
13 Department of Veterans Affairs.  Do you see that?
14   A.   Yes, I do.
15   Q.   The first paragraph under that bullet, I
16 guess subparagraph, states "DVA" -- which is defined
17 above as the Department of Veterans Affairs --
18 "achieves an average discount of 41 percent off the
19 manufacturer's published 'average wholesale price'
20 for single source drugs (those still under patent),
21 and an average of 67 percent off the published AWP
22 for multiple source drugs."  Do you see that?

Page 175

1    A.   Yes.
2    Q.   Do you recall becoming aware of that
3  finding during the course of your work at CMS?
4    A.   No, I don't.
5    Q.   Did your office receive copies of reports
6  prepared by the General Accounting Office or other
7  congressional committees?
8         MS. MARTINEZ:  Objection, form.
9    Q.   Or congressional committees?
10        MS. MARTINEZ:  Objection, form.
11   A.   We received GAO reports.
12   Q.   And was it your practice to review those
13 reports?
14        MS. MARTINEZ:  Objection, form.
15   A.   At times.  Not every report.
16   Q.   If it related to Medicaid payment for
17 prescription drugs, would that be something that in
18 your practice you would have reviewed?
19   A.   It's possible.
20   Q.   Finally in the last paragraph, page 11,
21 the last bullet states "Hospitals, health
22 maintenance organizations and nursing homes that

Page 176

1  contract with wholesalers to purchase prescription
2  drugs from a predetermined list are able to achieve
3  discounts of up to 99 percent off manufacturer's
4  published 'average wholesale price' even for brand
5  name drugs."  Do you see that?
6    A.   Yes, I do.
7    Q.   Did you become aware of that during your
8  work at CMS?
9    A.   No.
10   Q.   How do you know that you did not become
11 aware of it, as opposed to just you may have known
12 about it but forgot about it?
13        MS. MARTINEZ:  Objection, form.
14   A.   It doesn't sound familiar to me.
15   Q.   But you may have become aware of it, you
16 just don't remember today?
17        MR. WINGET-HERNANDEZ:  Objection, form.
18        MS. MARTINEZ:  Objection, form.
19   A.   It doesn't sound familiar to me.
20   Q.   Did you at some point learn that
21 hospitals, health maintenance organizations and
22 nursing homes received deeper discounts in

Page 177

1  purchasing drugs?
2    A.   I'm not aware of that.
3    Q.   That's not something you recall being
4  discussed in any OIG reports?
5    A.   I don't recall.
6    Q.   I'd like to ask you to go to Abbott
7  Exhibit 129.  Abbott Exhibit 129 is an OIG report
8  titled "Comparison of Reimbursement Prices for
9  Multiple Source Prescription Drugs in the United
10 States and Canada" bearing the report number
11 OEI-03-91-00470.  Do you have an understanding of
12 what that number signifies, Ms. Gaston?
13   A.   The report number?
14   Q.   Yes.
15   A.   No.
16   Q.   If you would go to the last page of this
17 document, the second-to-last page, there's a comment
18 there, a memo from Richard Kusserow dated March 12th
19 1991.  Do you see that?
20   A.   Yes.
21   Q.   I just wanted to put a time frame in mind
22 regarding this report.  Would you take a look at

45 (Pages 174 to 177)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 178

1  this report and let me know if it's something that
2  you recall reviewing?
3      A.   You said to Kusserow? Okay. And you're
4  talking about the one from Kusserow?
5      Q.   I'm sorry. I'm asking you to take a look
6  at the actual OIG report that starts at the
7  beginning of the document. Does the front page of
8  your document say "comparison of reimbursement
9  prices"?
10     A.   Yes.
11     Q.   If you would take a look at this OIG
12  report and let me know if you recall reviewing it
13  before, the actual report, not just the memo.
14     A.   (Reading.) No. I don't remember this
15  report.
16     Q.   From your glance does the document appear
17  to compare government reimbursement prices for
18  multiple source drugs in the United States and
19  Ontario, Canada?
20     A.   That's what it appears to be doing.
21     Q.   And does it appear to relate to the
22  Medicaid program?

Page 179

1      A.   Yes.
2      Q.   That is not something that you recall at
3  all; is that right?
4      A.   Correct.
5      Q.   Do you recall in your work at CMS any
6  discussion of drug pricing information available in
7  Canada?
8      A.   Yes.
9      Q.   Tell me what you recall about that.
10     A.   I just remember that we had someone, a
11  visitor, come in and talk about how Canada -- the
12  drug pricing in Canada.
13     Q.   Do you recall who that visitor was?
14     A.   No.
15     Q.   Do you recall when that visit happened?
16     A.   No.
17     Q.   Do you recall who else was at the
18  meeting?
19     A.   Larry Reed.
20     Q.   Anyone else?
21     A.   I don't recall.
22     Q.   So at least yourself and Larry Reed,

Page 180

1  correct?
2      A.   Correct.
3      Q.   This is something that happened before
4  2003, correct, when you were working --
5      A.   Correct.
6      Q.   -- not in the current job?
7      A.   Correct.
8      Q.   And can you give me any estimate of
9  whether that visit happened at the beginning of your
10  tenure in that job, middle or end?
11     A.   No.
12     Q.   It's been too long ago for you to
13  remember those details?
14     A.   Correct.
15     Q.   And do you recall where the visitor was
16  from? Was he affiliated with any organization in
17  particular?
18     A.   I can't remember.
19     Q.   Was he from Canada?
20     A.   I can't remember.
21     Q.   Did he supply you with any information,
22  like any actual written information?

Page 181

1      A.   I can't remember.
2      Q.   Do you recall what the purpose of the
3  meeting was? Why was he coming to visit you?
4      A.   From my recollection, we would have
5  visitors come in sometimes just to discuss how
6  they -- I guess how they handled their health care
7  and what they do in their countries. Just an
8  overview.
9      Q.   Do you recall in this particular visit
10  was something that HCFA had requested or was just
11  someone approached you about a possible visit?
12     A.   My recollection is they contacted us for
13  a visit.
14     Q.   And was it an in-person meeting, you
15  said?
16     A.   Excuse me?
17     Q.   Was it an in-person meeting?
18     A.   Correct.
19     Q.   And how long was the meeting?
20     A.   I can't say. I can't recall.
21     Q.   And do you recall anything you did as a
22  result of this meeting? Any steps you took or

46 (Pages 178 to 181)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                         January 24, 2008
                        Washington, DC

Page 182

1    anything else you did?
2        A.   No.  Don't recall.
3        Q.   Was it an informational type meeting?
4        A.   From what I remember, it was an
5    information sharing meeting.
6        Q.   Do you recall sharing any information or
7    advising state and Medicaid programs of this visit?
8        A.   You're saying advising any --
9        Q.   Advising any state Medicaid officials of
10   this visit?
11       A.   No.  In the that I remember.
12       Q.   Okay.  Could I ask you to go to Abbott
13   Exhibit 79?  For the record, this starts with a
14   letter dated November 6th 1992 from Bryan Mitchell
15   to William Toby, subject: physician's cost for
16   chemotherapy drugs.  And attached is a copy of the
17   report.  Ms. Gaston, if you would take a look at
18   that document and let me know if this is a document
19   you recall getting.
20       A.   (Reading.)  This report does not look
21   familiar.
22       Q.   If I could ask you to go to the Bates

Page 183

1    page ending 324.  Is there a page on there or no?
2    Is there a Bates page on that copy?  There may not
3    be.
4        MS. MARTINEZ:  No.
5        Q.   Why don't I ask you to go to -- if you go
6    to the actual fifth page in to the document, it'll
7    say "Page 2 - William Toby Jr." at the top.
8        A.   Okay.
9        Q.   The first paragraph there OIG wrote "Our
10   results indicate that for the physicians surveyed
11   the 13 chemotherapy drugs can be purchased at
12   amounts below AWP and that AWP is not a reliable
13   indicator of the cost of a drug to physicians."  Do
14   you see that?
15       A.   Yes.
16       Q.   And was that something that you came to
17   know at some point during your time at CMS that AWP
18   was not a reliable indicator of a cost of a drug to
19   a physician or a pharmacy?
20       MS. MARTINEZ:  Objection, form.
21       A.   I can't answer that.
22       Q.   Why not?

Page 184

1        A.   Because, I mean, you're asking --
2    generally -- well, this focuses on Medicare.  But I
3    don't know what physicians pay for drugs and I don't
4    get involved in that.
5        Q.   You were focused on pharmacies in
6    Medicaid; is that right?
7        A.   Well, and setting prices for the state
8    Medicaid agencies for Medicaid purposes.
9        Q.   Okay.  And Medicaid purposes you were
10   focused on pharmacies; is that right?
11       A.   Well, yeah, basically.
12       Q.   And physicians as well?
13       A.   For the retail class of trade, I think
14   it's a general term that we used.  But prices that
15   we set I don't know what pharmacies are going to be
16   paying or what physicians are going to be paying.
17       Q.   Did you come to learn at some point that
18   AWP was not a reliable indicator of what pharmacies
19   paid to acquire drugs?
20       MS. MARTINEZ:  Objection, form.
21       A.   It was my understanding that AWP is one
22   of the higher of the prices that are in the

Page 185

1    compendia.
2        Q.   Did you believe it was a reliable
3    indicator of what a pharmacy would pay for a drug?
4        MS. MARTINEZ:  Objection, form.
5        A.   I used the compendia source and that's
6    what I used for making my judgment for setting FUL
7    prices.
8        Q.   And the FUL prices -- your understanding
9    of the regulations with the FUL is that you're
10   required to use the prices contained in the
11   compendia, correct?
12       A.   Correct.
13       Q.   My question is a little bit different.
14   And that is, did you believe that the AWP prices
15   listed in the compendia were a reliable indicator of
16   the cost to providers to purchase drugs?
17       MS. MARTINEZ:  Objection, form.
18       A.   When you say a reliable indicator -- so
19   are you saying -- can you explain that to me?
20       Q.   Do you know what the term "reliable"
21   means?
22       A.   Yeah.

47  (Pages 182 to 185)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                          January 24, 2008
                         Washington, DC

Page 186

1    Q.   What is your understanding of what the
2  term reliable means?
3    A.   That it would be something that somebody
4  could rely on.
5    Q.   And "indicator." Do you have an
6  understanding of what indicator means?
7    A.   Yes.
8    Q.   What is your understanding of what that
9  means?
10   A.   That it's something that somebody could
11 use I guess to judge, to base a judgment on.
12   Q.   Okay. So my question I guess restated
13 would be did you believe AWPs in the compendia were
14 something that could be relied upon to provide an
15 indication of what a pharmacy paid for a drug?
16       MS. MARTINEZ: Objection, form.
17   A.   I couldn't say that, because I don't
18 know -- I don't know what pharmacies pay for drugs
19 and every pharmacy pays something different for
20 drugs. So I couldn't make that statement.
21   Q.   And because every -- well, did you learn
22 that pharmacies paid different amounts for the same

Page 187

1  drug? Is that something that you learned?
2    A.   It was my understanding depending on the
3  state, depending on the pharmacy, depending if it's
4  a big pharmacy or a small pharmacy, that they
5  probably purchased things in different ways and pay
6  different prices.
7    Q.   Did you have any expectation at all, Ms.
8  Gaston, of whether or not the AWP prices published
9  in the compendia would be a reliable indication of
10 what a pharmacy paid for that drug?
11       MS. MARTINEZ: Objection, form.
12   A.   I wouldn't know that.
13   Q.   Let me ask you to go to Exhibit 82.
14 Exhibit 82 contains an OIG report titled Cost of
15 Dialysis Related Drugs. I'll ask if you could take
16 a look at that document, Ms. Gaston, and let me know
17 if you're familiar with that one.
18   A.   (Reading.) I'm not familiar with this
19 report.
20          (Exhibit Abbott 458 was
21          marked for
22          identification.)

Page 188

1        BY MR. TORBORG:
2    Q.   All right, Ms. Gaston. I've handed you
3  as what has been marked Abbott Exhibit 458 a March
4  1993 GAO report titled Outpatient Drug Costs and
5  Reimbursements for Selected Pharmacies in Illinois
6  and Maryland. And it also says at the top Medicaid.
7        MS. MARTINEZ: I'm sorry. Aren't we on
8  Exhibit 458?
9        MR. TORBORG: Correct. You can put that
10 aside. I'm done with that.
11       THE WITNESS: You didn't ask me any
12 questions about this.
13       MR. TORBORG: I just wanted to know if
14 you saw it and you didn't. If you want I could go
15 back and --
16       THE WITNESS: No. That's all right.
17       BY MR. TORBORG:
18   Q.   And before you tell me you don't
19 recognize it, I'm going to ask you questions about
20 it anyway. So you might as well fess up on this
21 one.
22   A.   I have been fessing up. Okay? Don't do

Page 189

1  that. You'll have me in jail.
2          (Reading.) This report does not look
3  familiar to me.
4    Q.   Do you recall and was it your practice to
5  review at least some GAO reports; is that right?
6    A.   Correct.
7    Q.   And how would your office get copies of
8  these reports? GAO reports, how would your office
9  get copies of them?
10   A.   I really don't know. If they get them
11 directly from GAO I really don't know, unless they
12 come down as a control.
13   Q.   When you say as a control --
14   A.   It could come down from maybe the center
15 director's office if they receive it and it filters
16 down to our level.
17   Q.   Let me ask you to turn toward the end of
18 the document. Specifically page 17, which is the
19 third to the last page.
20   A.   In the document?
21   Q.   In the document, yes. The title of the
22 page is "major contributors to this fact sheet"?

                              48  (Pages 186 to 189)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                      January 24, 2008
                    Washington, DC

Page 190

1    A.   Okay.
2    Q.   On the right it says "Human resources
3  division" in Washington, D.C., and it lists two
4  names there.  John Hansen and Joel Hamilton.  Do you
5  know who those two individuals are?
6    A.   No.
7    Q.   And have you ever spoken with or met any
8  of the people listed below from the Chicago regional
9  office, Karyn Bell, Patricia Barry, Joseph Klauke or
10  Susan Thillman?
11    A.   Not that I remember.
12    Q.   How about a woman by the name of Janet
13  Skiles?  Do you remember that name?
14    A.   No.
15    Q.   Okay.  If I could ask you to page 1 of
16  the report, the first paragraph discusses the
17  Omnibus Budget Reconciliation Act of 1990.  Then
18  skipping on a couple sentences this refers to a
19  provision that required GAO to "conduct a study of
20  drug purchasing and billing practices of hospitals,
21  other institutional facilities, health maintenance
22  organizations and retail pharmacies."

Page 191

1        Do you recall there being a provision in
2  OBRA requiring the GAO to do some studies of what
3  these kind of organizations were paying for drugs?
4    A.   I'd have to see the statute that was out
5  there at that time.  There were some provisions in
6  the back of statute, but I can't remember what they
7  required.
8    Q.   Let's go to the next sentence.  The next
9  paragraph indicates that they are comparing -- I'm
10  paraphrasing here.  That they are comparing drug
11  purchase cost and Medicaid reimbursements in two
12  states, Illinois and Maryland, and that also -- the
13  last sentence of that paragraph states "We also
14  compared the prices that pharmacies paid to the
15  drugs' average wholesale prices (AWP).  AWP
16  represents the price pharmacies would pay if they
17  did not receive discounts from manufacturers."
18        I'd ask you to take a look at, to see if
19  it refreshes your recollection at all, some
20  attachments at the end of the document, appendix 2
21  on page 12 of the report.  And there's a paragraph
22  that precedes a table that goes from this page to

Page 192

1  the next page.  And that paragraph indicates "The
2  following table shows the prices that each of the
3  five pharmacies, two hospital outpatient pharmacies
4  and three nursing home pharmacies, paid per unit for
5  those drugs on the state Medicaid program's top 50
6  list of outpatient drugs for the year ending October
7  31, '91.  And then it goes on.
8        And the last sentence says it compares
9  each drug's average -- it also shows each drug's
10  average wholesale price.  Do you see that?
11    A.   Correct.
12    Q.   Do you recall seeing tables like this in
13  reports that would compare what somebody paid for a
14  drug versus its AWP?
15    A.   I don't recall.
16    Q.   Is it possible you would have reviewed
17  such material, you just don't recall it here today?
18    MR. WINGET-HERNANDEZ:  Objection, form.
19    A.   It's possible, but I just don't recall.
20    Q.   And do you have an understanding of what
21  this table is showing?
22    A.   I mean, a basic understanding, but --

Page 193

1    Q.   What is your understanding of what it's
2  showing?
3    A.   It's showing what it says up in the
4  wording, but it has AWP on the right-hand side.  And
5  it's doing comparisons of two hospital outpatient
6  pharmacies and three nursing home pharmacies and
7  what they paid per unit for drugs that are listed on
8  the left-hand side.
9    Q.   So if you look at number 3, for
10  example -- do you know how to pronounce that?
11    A.   No.  You can do a good job of that.
12    Q.   Diphenhydramine shows a 1.03 per unit.
13  Is that how you're reading it?
14    A.   If that's what they're saying, yeah.
15    Q.   And then it says one outpatient pharmacy
16  purchased that drug at 46 cents and one in-home
17  nursing home purchased it for 30 cents per unit; is
18  that right?
19    A.   That's what it's saying.
20    Q.   Compared to an AWP price of $1.03 per
21  unit?
22    A.   That's what it's saying.

49 (Pages 190 to 193)

Gaston, Sue                                      January 24, 2008
                        Washington, DC

Page 194

1     Q.   So this is telling the reader of this
2  report that for this drug one nursing home is paying
3  less than one-third of the price of the AWP; is that
4  right?  Am I reading that right?
5     A.   I'm just reading the numbers here, so
6  whatever the numbers reflect, that's what it's
7  saying.
8     Q.   But as it appears, one nursing home paid
9  less than one-third of the AWP for this drug?
10    A.   I'm just going by the numbers.  I'm not
11 putting percentages on it.
12    Q.   Okay.  30 cents versus $1.03?
13    A.   That's what the chart is saying.
14    Q.   And you don't recall charts like this?
15    A.   It doesn't look familiar to me.
16    Q.   I'm going to ask you, if you would, to go
17 to page 6 of this document?
18    A.   To this last part of it?
19    Q.   To the actual report.
20       MS. MARTINEZ:   Counsel, I just want to
21 state this objection.  If you have a clarification,
22 that's fine.  But it just seems like you have

Page 195

1  attached a separate document to this.  At the back
2  there's some other document called state Medicaid --
3       MR. TORBORG:  That's a copy error.
4       MS. MARTINEZ:  It's a copy error?
5       MR. TORBORG:  Yeah.  You can remove that.
6  I did not want this as part of this exhibit.  I'll
7  mark it later.  I don't know what's going on there.
8  If you all would take off that document.
9       MS. MARTINEZ:   I think it begins here?
10      MR. TORBORG:  Yeah.
11      MS. MARTINEZ:   It begins at the page
12 that said "state Medicaid pharmacy payments and
13 their relation to estimated costs." So that's a
14 separate document that seems to be from the Health
15 Care Financing Review.
16      MR. TORBORG:  Yes.
17      BY MR. TORBORG:
18    Q.   Okay.  Sorry about that.  I'll ask you to
19 go to page 6 of the actual report.
20       The first full paragraph, the GAO wrote
21 "Although total Medicaid reimbursements exceeded the
22 pharmacies' total drug purchase costs for the drugs

Page 196

1  we reviewed, whether this represents unreasonable
2  benefits for the pharmacies is not clear.  Neither
3  HCFA nor the states have determined what would be an
4  appropriate margin between reimbursements and
5  costs."
6       Do you recall there being discussion at
7  HCFA or at the states of when an appropriate margin
8  would be between reimbursements and costs?
9       MS. MARTINEZ:  Objection, form.
10    A.   I don't remember, no.
11    Q.   Now, you were from 1991 to 2003 you were
12 the Medicaid Bureau?
13    A.   Correct.
14    Q.   In the policy side, right?
15    A.   Correct.
16    Q.   And the policy side was involved in
17 determining how much states should be paying for
18 drugs; is that right?
19    A.   Correct.
20    Q.   And you don't recall any conversations in
21 your position about what an appropriate margin would
22 be between reimbursements and cost?

Page 197

1     A.   No, I don't.
2     Q.   Do you think any of those conversations
3  may have happened and you just don't recall them
4  here today?
5       MS. MARTINEZ:  Objection, form.
6       MR. WINGET-HERNANDEZ:  Objection, form.
7     A.   They may have happened.
8     Q.   Let's go to the next sentence.  GAO wrote
9  "Further, representatives of all nine pharmacies
10 contended that because of insufficient dispensing
11 fees they used the excess reimbursements to cover
12 the drugs' dispensing costs." Do you see that?
13    A.   Yes, I do.
14    Q.   Do you have an understanding of what that
15 is saying?
16    A.   My understanding, yeah.
17    Q.   And what is your understanding?
18    A.   It sounds like they're trying to say that
19 because the dispensing fees were not high enough,
20 that they were using the ingredient cost of the drug
21 to compensate for the dispensing fee.
22    Q.   And is that issue something that you

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 198

1  recall discussing within HCFA and with state
2  Medicaid programs?
3       MS. MARTINEZ:  Objection, form.
4       A.   Yes, when it concerns state plan
5  amendments.
6       Q.   Tell me what you recall about that topic.
7       A.   Well, the state plan amendment, states
8  are required to set prices on the ingredient cost of
9  the drug and the dispensing fee should be kept
10 separate.  So that was one of the issues that we had
11 to make sure that states were keeping those two
12 separate.
13      Q.   And you recall there being issues with
14 states not necessarily keeping them separate; is
15 that fair to say?
16      A.   I can't say that.
17      Q.   But you recall discussions about using
18 the excess on the ingredient reimbursement to make
19 up for alleged insufficiencies on the dispensing
20 side; is that right?
21           MR. WINGET-HERNANDEZ:  Objection, form.
22      A.   The conversations that I recall are

Page 199

1  concerning the state plan amendments.  And when we
2  review state plan amendments we need to be assured
3  that the methodology they're using is keeping the
4  ingredient cost and the dispensing fee separate.
5       Q.   But do you recall states responding that
6  one reason they were not lowering reimbursement on
7  the ingredient cost was because of a belief that
8  dispensing fees were not adequately?
9            MS. ALBEE:  Objection, form.
10           MS. MARTINEZ:  Objection, form.
11      A.   I can't say is that.
12      Q.   Do you recall any --
13      A.   I don't recall any states saying that.
14      Q.   Do you recall any written correspondence
15 about that issue with your colleagues at state
16 Medicaid programs?
17      A.   I don't recall, no.
18      Q.   Was that an issue that came up quite a
19 bit in connection with your work on state plan
20 amendments?
21           MS. ALBEE:  Objection to form.
22           MS. MARTINEZ:  Objection, form.

Page 200

1       A.   That question -- that would be something
2  routine that you would look at when you were
3  reviewing a state plan amendment.
4       Q.   We'll look at some documents later today.
5  Perhaps it will refresh your recollection on that
6  topic.
7            MR. WINGET-HERNANDEZ:  Objection to the
8  side-bar remark.
9       Q.   If you would look at the next paragraph,
10 it states "From 1976 to 1987 HCFA required states to
11 periodically conduct surveys to gather data on
12 pharmacies' dispensing costs so that they could be
13 used by the states to set dispensing fees.  However,
14 in 1987 HCFA rescinded this requirement when it
15 became clear that most states were not conducting
16 the surveys.  Because of the fiscal constraints and
17 competing budget priorities, HCFA officials noted
18 that states considered the surveys too expensive.
19           "HCFA officials also noted that because
20 states focused on reducing Medicaid costs, most
21 state programs were not willing to increase
22 dispensing fees regardless of survey results."  Do

Page 201

1  you see that?
2       A.   Yes, I do.
3       Q.   Okay.  Do you recall anyone making that
4  observation?
5       A.   I'm not familiar with that, no.
6       Q.   Do you know what HCFA officials would
7  have made this note that I just read?
8       A.   I'm not aware.
9       Q.   Do you have any idea who it would have
10 been?
11      A.   No.
12      Q.   Would it have likely been someone who
13 worked with Larry Reed, in that department?
14           MS. MARTINEZ:  Objection, form.
15      A.   Don't know.
16      Q.   Is there any other place in the HCFA
17 hierarchy where one could expect to find someone who
18 was commenting to GAO on these issues?
19           MS. MARTINEZ:  Objection, form.
20      A.   This is before my time.  They're saying
21 from '76 to '87.  And I don't know what was
22 occurring in HCFA at that time.

51 (Pages 198 to 201)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                      January 24, 2008
                    Washington, DC

Page 202

1    Q.   Well, the report is dated 1993, correct?
2    A.   But they're talking about the surveys and
3  all of this going on during this period of time.  So
4  isn't that what you're asking me?
5    Q.   Well, let me ask you this.  Is there
6  anyone else within the HCFA hierarchy who would have
7  been making comments to GAO employees regarding
8  issues like adequacy of dispensing fees, and
9  adequacy of reimbursement?
10   A.   I don't know.  I just know what we did in
11  our area.
12   Q.   Would it be appropriate for states not to
13  increase dispensing fees regardless of survey
14  results?
15       MS. MARTINEZ:  Objection, form.
16   A.   I don't know.
17   Q.   Who would be able to answer that
18  question?
19       MS. MARTINEZ:  Objection, form.
20   A.   I don't know.  You could ask Larry.
21   Q.   Well, you were in the policy department
22  for 12, 13 years, correct?

Page 203

1    A.   Correct.
2    Q.   And part of your job was to review what
3  states were paying for dispensing fees; is that
4  right?
5    A.   That's part of it, yes.
6    Q.   And what was your understanding of what
7  the federal guidelines were with respect it
8  dispensing fees?
9    A.   That it needs to be reasonable and it's
10  up to the states to prove whether their dispensing
11  fees are reasonable.
12   Q.   And if the survey indicated that
13  dispensing fee was below cost, would that be
14  reasonable?
15       MR. WINGET-HERNANDEZ:  Objection, form.
16       MS. MARTINEZ:  Objection, form.
17   A.   I can't answer that.
18   Q.   Would you need more information to answer
19  that?
20   A.   No, because I don't know -- I know from
21  my recollection -- when we did state plan
22  amendments, we would address situations where the

Page 204

1  dispensing fees were higher.  But generally from my
2  recollection I don't remember responding to an issue
3  of a dispensing fee being too low.
4    Q.   The next paragraph states "HCFA and state
5  Medicaid officials agreed that pharmacies must often
6  use excess Medicaid reimbursements to cover their
7  dispensing costs."  Do you see that?
8        MS. MARTINEZ:  Objection, form.
9    A.   Yes.
10   Q.   Do you recall that sentiment being
11  expressed during your time at CMS?
12       MS. MARTINEZ:  Objection, form.
13   A.   No.
14   Q.   And do you know who at HCFA would have
15  made this comment?
16   A.   No, I don't.
17   Q.   Do you have any guess who it would be?
18       MS. MARTINEZ:  Objection, form.
19   A.   No.
20   Q.   Do you know anyone outside of the
21  department you worked at from 1991 to 2003 who would
22  have been making these comments?

Page 205

1        MS. MARTINEZ:  Objection to form.
2    A.   Outside of the policy area?
3    Q.   Yes.
4    A.   I don't know.
5    Q.   Do you recall if CMS commissioned any
6  studies to determine the adequacy of dispensing
7  fees?
8    A.   Like an official study?
9    Q.   Any study at all, then we'll talk about
10  official versus unofficial.
11   A.   There may have been unofficial canvassing
12  of the states for dispensing fees.
13   Q.   When you say canvassing of the states, do
14  you remember to remember to looking to what other
15  states are --
16   A.   Soliciting states to get a feel for what
17  their dispensing fees are.
18   Q.   What do you recall about that?
19   A.   That's all I recall.
20   Q.   I'm going to hand you two documents at
21  the same time here.  They're two different forms of
22  the same document.

52 (Pages 202 to 205)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                      January 24, 2008
                      Washington, DC

<table>
<tr><td>

Page 206

1            (Exhibit Abbott 459 and
2            Exhibit Abbott 460 were
3            marked for identification.)
4        BY MR. TORBORG:
5        Q.   What I've marked as Abbott Exhibit 459
6    bears the Bates numbers VAC MDL 45005 through 31.
7    What I've marked as Abbott Exhibit 460 does not have
8    Bates numbers.
9            Ms. Gaston, Abbott Exhibit 459 starts out
10   with a cover page from Dr. John and Zack on
11   Ven-A-Care letterhead to T. Reed Stephens, trial
12   attorney with the Department of Justice.  And it
13   attaches a document called -- starting at Bates page
14   ending 007 Health Care Financing Review, spring of
15   '94, which appears to be an article attached at the
16   next page titled State Medicaid Pharmacy Payments
17   and Their Relation to Estimated Costs.
18           And the second document I've handed you,
19   Abbott Exhibit 460, is a I think better copy of the
20   actual survey document in that it's not cut off at
21   the side.  I'd like to tell me whether or not you've
22   seen -- ever reviewed the actual survey.  And while

</td><td>

Page 208

1        MR. TORBORG:  Which I'm sure we will,
2    particularly since the document apparently has been
3    in DOJ's possession for ten years.
4        MS. MARTINEZ:  I'm going to object to
5    that.  And I'm also objecting to your discussion
6    being part of the record of Ms. Gaston's deposition.
7        MR. TORBORG:  Okay.
8        A.   So this is what's here?
9        BY MR. TORBORG:
10       Q.   It's a subset, yes.  It doesn't have the
11   cover pages on it.
12       A.   What was the date of this?
13       Q.   If you look at the bottom of Exhibit
14   460 --
15       A.   Okay.
16       Q.   -- it says Health Care Financing Review,
17   spring of 1994.
18       A.   This looks a little familiar, but that's
19   all I can really say about it.
20       Q.   If we work off -- well, first, let me ask
21   you are you familiar with something called the
22   Health Care Financing Review?

</td></tr>
<tr><td>

Page 207

1    you're taking a look at that, these are some
2    comments for counsel.
3        MR. TORBORG:  It's disserving to me that
4    this document was not produced by the United States
5    Government.  It did not come up in HCFA's document
6    collection.  The best I can tell doing due diligence
7    on our side it appears as though the document was
8    housed at some point at the Office of Research and
9    Demonstrations at HCFA, something that -- I was not
10   aware of that office before, nor do I know whose
11   this is.
12           But I would request you search that
13   particular location for any other documents.  I
14   think if you would review the document you would see
15   it is quite relevant to the issues at play in this
16   case.  So either it didn't come up in your search or
17   it was -- just didn't exist anymore for whatever
18   reason.  And as well as any other documents that may
19   pertain to this time.  I'll follow up with a letter.
20       MS. MARTINEZ:  I'm sure we could have
21   just talked about that outside Ms. Gaston's
22   testimony.

</td><td>

Page 209

1        A.   I'd have to see it to know.  Is it a
2    publication?
3        Q.   It appears to me as though it is.
4        A.   Excuse me?
5        Q.   It appears to me as though it is, but
6    that's why I'm asking a little bit more about it to
7    you.
8        A.   If I could visually see it it might look
9    familiar.
10       Q.   I don't have a copy of one.
11       A.   Okay.  I'm not familiar with it then.
12       Q.   Okay.  Do you know a Kathleen Gondeck?
13       A.   Yes.
14       Q.   Okay.  Who is she?
15       A.   She used to work in ORD, Office of
16   Research and Development.  I don't think they're
17   call ORD any longer.
18       Q.   Do you know what they're called now?
19       A.   No.
20       Q.   Is it Office of Research and
21   Demonstrations?
22       A.   Demonstrations, yeah.  See?  You know.

</td></tr>
</table>

                                    53 (Pages 206 to 209)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                        Washington, DC

Page 210

1    Q.   I know what this document tells me.
2    A.   Okay.
3    Q.   Nothing more.  What was Ms. Gondeck's
4  role at HCFA?
5    A.   I just know that she worked in ORD.  I
6  think she might have worked on some research in the
7  drug area.  That's all I know.
8    Q.   Was it something that she worked on more
9  than one report on, to your knowledge?
10   A.   I don't know.
11   Q.   And is she still with HCFA today?
12   A.   It's my understanding she's not.
13   Q.   Do you know what she's doing today?
14   A.   Years ago she left.  I think she's
15  working for a pharmaceutical company.
16   Q.   Do you know which one?
17   A.   No.
18   Q.   If you would take a quick look at this
19  document and just see if it helps refresh your
20  recollection at all on its contents.  The document
21  is titled "State Medicaid Pharmacy Payments and the
22  Relation to Estimated Costs."  Do you have an

Page 211

1  understanding as you review this what this study is
2  attempting to do?
3    A.   No, unless I read through the study.  I
4  don't recall that.
5    Q.   If you go to the third sentence of the
6  introductory section of the article, it states
7  "Congress mandated a study of the adequacy of
8  Medicaid payments to pharmacies.  In this study
9  several data sources were reviewed to develop 1991
10  estimates of average pharmacy ingredient and
11  dispensing costs.  A simulation was used to estimate
12  the amounts states pay.  Nationally simulated
13  payments averaged 96 percent of estimated costs
14  overall, but were lower for dispensing cost (79
15  percent) and higher for ingredient costs (102
16  percent)."
17        Do you recall a study that sought to look
18  at the reimbursement paid to providers on a more
19  combined basis, both on the ingredient cost side and
20  on the dispensing cost side?
21        MS. MARTINEZ:  Objection, form.
22   A.   No.

Page 212

1    Q.   But do you agree that's what this study
2  appears to be showing?
3        MS. ALBEE:  Objection, form.
4        MS. MARTINEZ:  Objection, form.
5    A.   Without reading the whole study, it
6  appears that what they're saying here in the
7  introduction is what they're trying to address.
8    Q.   Do you recall how this study was used at
9  all in HCFA's administration of the Medicaid
10  program?
11        MS. MARTINEZ:  Objection, form.
12        MS. ALBEE:  Objection, form.
13   A.   No.
14   Q.   I'm going to ask you to go to page 28 of
15  the study.  The little page number.  It starts on
16  page 25 of the total publication, but specifically
17  page 28 of the publication.
18   A.   It says data?
19   Q.   Yeah, data.
20        This refers to the fact that a
21  significant amount of information was drawn from
22  databases available through IMS America.  Do you see

Page 213

1  that?
2    A.   Yes.
3    Q.   Do you know what that is, what IMS is?
4    A.   I've heard of them.  I can't say
5  specifically what they do.
6    Q.   Have you ever discussed the availability
7  of IMS data with anyone else in HCFA?
8    A.   Not that I recall.
9    Q.   Do you know if this data was available
10  for purchase?
11   A.   I'm not that familiar with IMS.
12   Q.   Are you familiar with a publication
13  called the Lily Digest?
14   A.   No.
15   Q.   Okay.  I'd like to ask you -- you can put
16  that aside.  I'm going to be asking you next about
17  Abbott Exhibit 284.
18        Okay.  Ms. Gaston, after you've had a
19  chance to take a look at this document which is some
20  pages from the Federal Register dated July 31, 1987,
21  in particular it is a final rule titled Medicare and
22  Medicaid Programs Limits on payments for Drugs.  And

                              54 (Pages 210 to 213)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                          January 24, 2008
                    Washington, DC

Page 214

1   as you might guess from this document, I'm now
2   moving to the subject of federal upper limits for
3   the series of questions for you on this exhibit.
4          My first question will be if you're
5   familiar with this regulation.
6      A.   I've seen it before.  I'm not that
7   familiar with it at this point.
8      Q.   But it's something that you would have
9   reviewed in connection with your role in the federal
10  upper limit program; is that fair to say?
11         MS. MARTINEZ:  Objection, form.  I just
12  want to clarify.  The document, the Federal Register
13  has the regulation at the end and the beginning part
14  is the preamble and the issuance of it.  The
15  regulation is towards the end.
16     A.   I would be more familiar with the reg.
17  I'm sure that I probably had the preamble available
18  to me.  But working on the federal upper limit we
19  would actually use the reg.
20     Q.   Okay.  So if I could ask you to go to
21  page 687 --
22     A.   What?

Page 215

1      Q.   687.  The Bates page 687 in the bottom
2   right-hand corner.
3      A.   Okay.
4      Q.   The second column there is a section
5   called part 447, payments for services?
6      A.   Correct.
7      Q.   And there's the rest of that page and
8   then the next page, is that the actual federal upper
9   limit regulation --
10     A.   Yes.
11     Q.   -- amongst other things?
12     A.   Right.
13     Q.   I take it you had no involvement in the
14  drafting of this regulation prior to its issuance.
15  Is that fair to say?
16     A.   Correct.
17     Q.   The summary, if you go back to the first
18  page of Abbott Exhibit 284, there's a section in the
19  first column that says "background of the existing
20  system."  Do you see that?
21     A.   Yes.
22     Q.   The second paragraph there says "The

Page 216

1   department rules are intended to ensure that the
2   federal government acts as a prudent buyer for drugs
3   under certain federal health programs."  Do you see
4   that?
5      A.   Yes, I do.
6      Q.   And is it your understanding that federal
7   upper limits applied to certain multiple source
8   drugs that satisfy criteria; is that right?
9      A.   Correct.
10     Q.   And why would you need to establish an
11  upper limit for multiple source drugs?
12         MR. WINGET-HERNANDEZ:  Objection, form.
13         MS. MARTINEZ:  Objection, form.
14     Q.   Do you have an understanding of what the
15  purpose of the FUL program was?
16     A.   Yes.
17     Q.   What was your understanding?
18     A.   To set a reimbursement amount for states
19  to achieve savings for states and Medicaid.
20     Q.   Why not just use the average wholesale
21  price of these multiple source drugs to set the
22  reimbursement amount?

Page 217

1          MS. MARTINEZ:  Objection, form.
2      A.   Because the regulations say to use the
3   lowest price in the published compendia.
4      Q.   Do you have an understanding of why this
5   regulation existed, why you didn't just use the
6   average wholesale price as published in the
7   compendia?
8          MR. WINGET-HERNANDEZ:  Objection to form.
9          MS. MARTINEZ:  Objection, form.
10     A.   I don't understand the rationale.  I had
11  nothing to do with the development of the
12  regulation.
13     Q.   So in your work on federal upper limits
14  you had no idea of what the purpose of the program
15  was?
16     A.   The purpose of the program is to achieve
17  savings.  I don't know the purpose of the statement
18  you made before, of the pricing, you know, what was
19  involved in the methodology.  I understand the
20  purpose of the program.
21     Q.   And it was to achieve savings on payment
22  for multiple source drugs, correct?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                          January 24, 2008
                          Washington, DC

Page 218

1    A.   Yes.
2    Q.   And did you understand that the average
3    wholesale price for multiple source drugs in
4    particular was not a reliable indicator of the cost
5    at which pharmacies and physicians purchased drugs?
6          MS. MARTINEZ:  Objection to form.
7          MS. ALBEE:  Objection to the form.
8          MR. WINGET-HERNANDEZ:  Objection, form.
9    A.   As I stated before, my understanding is
10   that I looked at average wholesale price, direct
11   price, wholesale acquisition costs, the prices that
12   were available in the compendia, and generally
13   speaking the average wholesale price was a higher
14   price at that point others.
15   Q.   Did you have an understanding that the
16   difference between average wholesale price published
17   in the compendia and what people were buying the
18   drugs for was particularly variable when it came to
19   multiple source drugs as opposed to sole source
20   drugs?
21         MR. WINGET-HERNANDEZ:  Objection, form.
22         MS. ALBEE:  Objection, form.

Page 219

1          MS. MARTINEZ:  Objection, form.
2    A.   I can't say that.
3    Q.   Is that something that you were made
4    aware of in multiple OIG reports?
5          MS. MARTINEZ:  Objection, form.
6    A.   It's mentioned in the OIG reports, yes.
7    Q.   Let me ask you to look at page 685 of
8    this document, the Bates page ending in 685.  The
9    last column, the first full paragraph starts with
10   "stage agencies."  Do you see that?
11   A.   Yes.
12   Q.   It says "State agencies should determine
13   independent of the 150 percent formula appropriate
14   payment levels for the listed multiple source drugs.
15   We would not expect a state agency to adopt directly
16   the upper limit methodology as a payment method
17   because it does not gear payments to markups
18   appropriate to the actual costs of acquiring and
19   dispensing these drugs."  Do you see that?
20   A.   Yes, I do.
21   Q.   Do you have an understanding of what that
22   means?

Page 220

1    A.   Just what they're saying.
2    Q.   What are they saying?
3    A.   So independently I guess states on their
4    own shouldn't apply the 150 percent markup.
5    Q.   If you go to the next paragraph, the
6    second full sentence starts with "since."  Do you
7    see that?
8    A.   No.
9    Q.   "Since we are not placing" --
10   A.   Where are you?
11   Q.   The next paragraph down about eight lines
12   down.
13   A.   The next paragraph down?
14   Q.   Yeah.
15   A.   Okay.  "Since we are not"?  Okay.
16   Q.   "Since we are not placing maximum payment
17   limits on individual drugs, drugs with high
18   compendia prices could generate extremely high
19   payment levels.  Unless an agency's payment
20   methodology ensured otherwise, a Medicaid agency
21   could end up paying inappropriately high rates for
22   some drugs while still being in compliance with the

Page 221

1    aggregate upper limit.
2          "Nevertheless, we believe states may
3    establish maximum payment limits in order to offset
4    the minimum payment levels necessary to ensure
5    reasonable compensation for very low priced drugs."
6    Do you see that?
7    A.   Yes.
8    Q.   Do you have an understanding of what that
9    last sentence means, establishing minimum payment
10   levels necessary to ensure reasonable compensation
11   for very low priced drugs?
12   A.   Well, my understanding of what they're
13   trying to say is that states have the flexibility to
14   set a MAC on drugs that they feel are not priced
15   appropriately.
16   Q.   Do you know what they're talking about or
17   how do you interpret the comment reasonable
18   compensation for very low priced drugs?
19   A.   That if they feel that the drug cannot be
20   obtained in their state because the price is low,
21   that they have the flexibility to set a MAC on a
22   drug so that it will be obtainable within their

                  Henderson Legal Services, Inc.
202-220-4158                      www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 222

1  state.
2          (Exhibit Abbott 461 was
3          marked for
4          identification.)
5          MR. TORBORG:  I'm told that we have five
6  minutes left on the tape and it's within about an
7  hour.  So let's go ahead and take a break here.
8          THE VIDEOGRAPHER:  This is the end of
9  tape 4.  Off the record at 3:17.
10         (Recess.)
11         THE VIDEOGRAPHER:  This is the beginning
12 of tape 5 in the deposition of Ms. Gaston.  On the
13 record at 3:43.
14         MR. TORBORG:  Welcome back, Ms. Gaston.
15         THE WITNESS:  Thank you.
16         MR. TORBORG:  I wanted to cover
17 something, some housekeeping matters on the record
18 very quickly.  I understand from Ms. Martinez that
19 there are some additional documents from Ms.
20 Gaston's files or legacy files that are yet to be
21 produced.  Is that right?
22         MS. MARTINEZ:  Yes.

Page 223

1          MR. TORBORG:  And those are ones that
2  you're working on currently and we intend to
3  schedule a second day with Ms. Gaston so that we can
4  go over those documents.
5          MS. MARTINEZ:  I believe what you told me
6  is that you'd look at them and see if you need an
7  additional day.
8          MR. TORBORG:  That's true.
9          MS. MARTINEZ:  But naturally --
10         MR. TORBORG:  I will need an additional
11 day anyway.
12         MS. MARTINEZ:  Okay.  That's what I
13 thought.
14         MR. TORBORG:  Okay.
15 BY MR. TORBORG:
16   Q.   Okay.  Going back to the subject of
17 federal upper limits, Ms. Gaston, I want to ask just
18 a few very general background questions about how
19 the process worked at HCFA, who was involved in what
20 aspects and things of that nature.  Earlier you
21 testified or you identified three people at CMS who
22 were involved in establishing the FULs.  I believe

Page 224

1  you said from 1991 through 2003 when you were doing
2  that, correct?
3    A.   Correct.
4    Q.   And those three people were -- three
5  additional people were Peter Rodler, Cindy Bergin
6  and Gail Sexton?
7    A.   Gail Sexton worked on the FULs after
8  2003.
9    Q.   Did she have any involvement with FULs
10 prior to 2003?
11   A.   No.
12   Q.   What was she doing prior to 2003?
13   A.   I'm not sure.  She was employed by CMS
14 around that time, but I don't know exactly when she
15 started.
16   Q.   And Mr. Rodler I understand was somebody
17 who had been at HCFA and the Medicaid Bureau prior
18 to you being there?
19   A.   Correct.
20   Q.   And then at some point he retired or
21 moved on?
22   A.   Correct.

Page 225

1    Q.   Do you know when he retired or moved on?
2    A.   No.
3    Q.   Can you give me a sense?  Was it early
4  '90s, late '80s?
5    A.   I'm guessing it was in the '90s.  Not in
6  the late '90s, but I'm not sure.
7    Q.   And Cindy Bergin, when did she work at
8  CMS on the FUL issues?
9    A.   She was hired -- I'm not sure exactly the
10 date -- probably eight or nine years ago.  And I
11 mentored here on the FULs until I left in 2003.
12   Q.   So she would have been someone that was
13 working on FUL issues starting in the mid to late
14 '90s; is that fair to say?
15   A.   That's fair to say.
16   Q.   And did you work with Mr. Rodler on the
17 federal upper limit issues or did you sort of
18 succeed his duties?
19   A.   He taught me how to handle the federal
20 upper limit program.  And then when he left I took
21 it over.
22   Q.   And did Cindy Bergin take it over from

57 (Pages 222 to 225)

Gaston, Sue                                                January 24, 2008
                          Washington, DC

Page 226

1  you --
2      A.   Yes.
3      Q.   And then at some point is it your
4  understanding that Gail Sexton took it over from
5  Cindy Bergin or were they both working on it?
6      A.   She -- Cindy trained Gail and then Gail
7  took it over when Cindy left the area.
8      Q.   So it sounds to me -- and please tell me
9  if I'm mischaracterizing this or misunderstanding
10 this -- that the mechanics of the FUL program were
11 handled primarily by one person, but there was some
12 overlap in training.  Is that right?
13         MS. MARTINEZ:  Objection, form.
14     A.   Generally speaking.  There were periods
15 when it was just one person.  And then when there
16 were two, even though one was training they were
17 both working on it.
18     Q.   And did you first get involved -- is it
19 your recollection that a transition between yourself
20 and Mr. Rodler happened in the early '90s; is that
21 fair to say?
22     A.   When Pete retired then I took it over.

Page 227

1      Q.   And was there anyone else working on the
2  FUL issues besides yourself from that point until
3  Cindy Bergin came on in the mid to late '90s?
4      A.   There was a period of time where I
5  trained Altamease Arnold, but --
6      Q.   Was she in your office?
7      A.   She was in our office.  But she was
8  never -- she never really worked on the program per
9  se.
10     Q.   When you say per se, what do you mean by
11 that?  Officially or what does that mean?
12     A.   She never really learned the program to
13 work on it.
14     Q.   What does it mean to learn the program?
15     A.   When you try to teach someone the program
16 but they choose not to absorb what you're teaching.
17     Q.   Got it.  Is she still working at CMS?
18     A.   No.
19     Q.   When did she leave CMS?
20     A.   She retired last year.
21     Q.   What was her position at CMS?
22     A.   Health insurance specialist.

Page 228

1      Q.   Was that the same position that you had?
2      A.   Yes.
3      Q.   So you were equals, so to speak?
4      A.   Most of the analysts in our area are all
5  health insurance specialists.
6      Q.   Okay.  And you indicated that Mr. Reed
7  would have some input into the FULs and I think you
8  used the word even the final say.
9      A.   Correct.
10     Q.   What does that mean?
11     A.   He's the division director.
12     Q.   So what would the extent of his
13 involvement be with FULs?  When would he get
14 involved?
15     A.   Throughout -- whenever necessary he was
16 there to discuss issues that might need to be
17 discussed.  The final publication he was aware of
18 and would have to give his okay in order to send it
19 through or any letters that would go through
20 generally were from an authority higher than me.
21     Q.   Can you tell me what kind of issues would
22 come up in the FUL program that would necessitate

Page 229

1  his involvement?
2      A.   Maybe just general discussion.
3  Especially when I was the only one working on the
4  FUL program, just a general discussion of maybe
5  particular drugs, the pricing just somebody to have
6  an open discussion about how we're setting the
7  prices, because there's manual review involved.
8      Q.   What do you mean when you say there's
9  manual review involved?  And we'll get into a little
10 bit more the mechanics, but generally speaking what
11 do you mean by that?
12     A.   Generally you have paper that you work
13 from.  You have the compendia with all the drug
14 numbers on it and the pricing.  And sometimes you
15 have to make determinations if it looks like a drug
16 is truly available or not, whether you should follow
17 up and see if it's available.  Sometimes it's better
18 to discuss it with someone to see that you're
19 looking at it the same way that they might be
20 looking at it.
21     Q.   When you say truly available, do you
22 remember is the product available from a particular

58 (Pages 226 to 229)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                      January 24, 2008
                    Washington, DC

---

Page 230

1  manufacturer, whether it be because they quit making
2  the drug or they have a shortage of the drug?  Is
3  that what you're talking about?
4      A.   I think what I'm talking about, at least
5  preliminarily, is we have printouts from the
6  compendia.  And just looking at the printouts,
7  sometimes there might be pricing that looks like
8  it's not updated in the compendia source.  So you
9  might want to discuss and say does this look like
10  it's maybe old pricing, maybe we should follow up
11  and see if it's still available.  Has the pricing
12  been updated, is the drug still out there, because a
13  lot of times the compendia might not be totally up
14  to date.
15      Q.   How much of your time, if you could
16  estimate, in your position as a health insurance
17  specialist from '91 to 2003, roughly, did you spend
18  on the FUL program?
19      A.   I really can't say.  There was a period
20  of time when we were trying to get a publication out
21  where I could spend the majority of my time working
22  on it.  I had other duties, so the FULs couldn't

---

Page 231

1  take up all of my time every day.  It just depended
2  on what activity occurred.  You would stop.  You
3  would work on the FULs.  Then I would go back to my
4  other areas.
5      Q.   Did you work -- are you a five-day
6  employee every week or did you work part time during
7  this time?
8      A.   During the 2003 --
9      Q.   During the '91 through 2003 time period?
10      A.   I was an eight hour a day, five day --
11      Q.   Five day a week employee?
12      A.   Correct.
13      Q.   All right.  Could you walk me through
14  the -- let me see if it helps facilitate the
15  discussion to find a document here that might help
16  us talk about this a bit.
17              (Exhibit Abbott 462 was
18               marked for
19               identification.)
20      BY MR. TORBORG:
21      Q.   For the record, what I've marked as
22  Abbott Exhibit 462 bears the Bates numbers HHC

---

Page 232

1  902-0446.  Ms. Gaston, if you would take a look at
2  that document and let me know if that's a document
3  that you're familiar with.
4      A.   Yes.  I am familiar with it.
5      Q.   Could you tell us what this document is?
6      A.   It looks like it's just an overview of
7  the federal upper limit program.
8      Q.   Did you play a part in drafting this
9  document?
10      A.   I may have.  I'm not sure.
11      Q.   Ms. Gaston, can you walk me through
12  basically what you did to establish federal upper
13  limits for drugs?  Can you just walk me through the
14  process?
15      A.   Do you want me to use this exhibit?
16      Q.   If it helps --
17      A.   Okay.
18      Q.   -- that would be fine.  I'm just trying
19  to have you -- put me back in your office back in
20  the mid-'90s or whenever you were working on this
21  and tell me what you did.
22      A.   Well, first of all we have an

---

Page 233

1  application.  I'm going to talk about it in
2  reference to the application that's used that houses
3  this information.  But our systems folks when it's
4  time to set a FUL or put out a new list of FUL
5  drugs, the system folks will obtain FDA Orange
6  Book data and they'll pull that into their system.
7  And there are some standards within that program
8  that look for the criteria that's sort of detailed
9  in this handout here.
10          Once that criteria is met then the system
11  will pull in the latest compendia data and then
12  they'll merge the two.  And the compendia data,
13  there's some criteria in there too.  But they try to
14  match the compendia data to the drugs pulled from
15  the FDA.  And they match them together and then the
16  application -- and I'm simplifying this -- but the
17  application will have in there FUL groups, which
18  include all NDC numbers, and it will have the
19  FUL group, the drug names, the NDC number and then
20  the compendia and the compendia pricing in there.
21          So it will have the source, if it's Red
22  Book, Blue Book, Medi-Span, and then it will have

---

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                          January 24, 2008
                    Washington, DC

Page 234

1   the prices.  It will have an AWP price, a direct
2   price or WAC price.  If there's not a price it'll
3   just be blank in any of those categories.  And then
4   the system, the application itself -- from my
5   recollection -- it's been a while since I've used
6   it.  But it will determine a FUL price where it can.
7          Then we apply some manual review just to
8   assure we have -- there's some edits and I can't
9   remember all of those.  But we want to make sure
10  that it's using -- because it's supposed to use the
11  lowest price in published compendia, and we want to
12  make sure that that lowest price is a true price,
13  that it's using a true price to establish a FUL.
14         So there's a manual review that's applied
15  to some of the drugs where the pricing might not
16  look right in there or there's missing pricing.  But
17  basically there's a lot of manual review that's
18  included before the final FUL listing will come out.
19     Q.   Okay.  I appreciate that.  I'm going to
20  try to follow up on each of those steps as best I
21  can.  You indicated that there was a system
22  involved.

Page 235

1      A.   It's an application.
2      Q.   I think I've seen some documents that
3   indicate the FUL process was computerized?
4      A.   Correct.
5      Q.   Right?  Is that what you're talking about
6   when you talk about the system?
7      A.   Yeah.  It's an application that they use.
8      Q.   And what kind of application is it?
9      A.   I'm not a techie person.  I don't know.
10  It's on the computer.  It's an application.  I don't
11  know what more -- how to describe it.
12     Q.   Was the application set up before you
13  started working on it or did you --
14     A.   No.
15     Q.   -- take part in setting it up?
16     A.   When I first started working on FULs it
17  was in our mainframe.  The activity would occur in
18  our mainframe.  They took it from the mainframe and
19  put it into an application that they can use on the
20  computer, if that helps.
21     Q.   And do you recall -- was there someone --
22  you mentioned systems folks.  Was there somebody at

Page 236

1   CMS in the systems department that was involved in
2   this?
3      A.   In the switch to the new application?
4      Q.   Yeah.  And basically the FUL program in
5   general.  Who was involved in loading data --
6      A.   The systems support was Dona Kaufman.
7   D-o-n-a.
8      Q.   Was there anyone else you recall or was
9   she the primary person?
10     A.   There was someone before her, but he no
11  longer works for CMS and I can't remember his name.
12  But she was the main one for the new application.
13     Q.   Do you know if she's still there today?
14     A.   Yes.
15     Q.   Do you recall when the new application --
16  when you moved from the mainframe to the new
17  application?
18     A.   Time?
19     Q.   Yes.  When that happened.
20     A.   After '95.
21     Q.   Prior to 1995 was the process still
22  computerized bringing in information from the

Page 237

1   compendia and that kind of information?
2      A.   It was brought into the mainframe.
3      Q.   Just brought into a different computer in
4   other words?  I'm not a techie either.
5      A.   I'm just saying mainframe because that's
6   what I know.
7      Q.   And do you know what the application is
8   called?
9      A.   FULs.
10     Q.   FULs.  Now, the Orange Book has a place
11  in this process, correct?
12     A.   Right.
13     Q.   And could you tell us what the Orange
14  Book is and what impact it had?
15     A.   The FDA Orange Book.  It lists the drugs
16  that are grouped by the FDA.  If you have an Orange
17  Book available, I think they have on the front
18  page -- yeah -- the Orange Book can explain it much
19  better than I can.  But -- yeah.
20     Q.   I'm handing you our only copy of the
21  Orange Book.
22     A.   But they get this electronically and it

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                              January 24, 2008
                          Washington, DC

Page 238

1  just has drugs by ingredient names.  And they don't
2  have NDC numbers or anything in here.  But they pull
3  data from the Orange Book where the criteria that's
4  in the regulation -- so it meets that criteria.  And
5  they just pull what they can from there.  There's
6  other type of system criteria in there that picks
7  the drugs that are selected for the FULs.  But it
8  pulls it from the Orange Book first.
9      Q.    So they have an electronic version of the
10  Orange Book?
11     A.    They -- it's my understanding they do
12  now.
13     Q.    Do you know when they first started using
14  an electronic version of the Orange Book versus some
15  other method of getting the Orange Book data into
16  this computer?
17     A.    I really don't know.
18     Q.    Do you recall at some point somebody had
19  to go through the manual copy of the Orange Book --
20     A.    Oh, no.  They wouldn't go through the
21  manual.  They would just request the data from FDA.
22  I think the data now is available and they could go

Page 239

1  on the Web or someplace in FDA's website and obtain
2  the data now.
3      Q.    But it was all done to your knowledge --
4  as far as you can recall it was done electronically
5  in some way?
6      A.    Correct.
7      Q.    Somebody would set up a program that
8  would, say, identify the drugs that meet the FUL
9  criteria and then down those into a file, something
10  called Orange Book or something like that?  Is that
11  how it worked?
12     A.    You would have to talk to our systems
13  folks.  I just know that they would get -- they had
14  the criteria set in there and however it works, you
15  know.  I mean, we're simplifying it, but I'm not a
16  data person.  We just tell them what we need from
17  the Orange Book and they set up their criteria on
18  how they're going to get it and how it's selected.
19     Q.    And do you recall what the criteria was
20  for a drug to qualify for the FUL program?
21     A.    I'm going to read it from here.  But it
22  says -- well, all the formulations of the drug

Page 240

1  products approved by the FDA are A-rated which are
2  therapeutically equivalent and then there must be
3  two rated A in the Orange Book.  And then there's
4  another criteria where they can also allow a B-rated
5  drug when the A-rated drug products -- when there's
6  three A-rated drug products in the Orange Book.
7      Q.    Okay.  So if not all the drugs within a
8  drug product group are rated A, then you have to
9  have three that are rated A?
10     A.    Correct, to allow a B-rated product.
11     Q.    Now, would the B-rated product or a
12  product that's not rated A, would that still be
13  governed by the FUL?
14     A.    If it's included in this, yes.
15     Q.    What involvement would you have in the
16  review of the Orange Book data and what gets on the
17  Orange Book lists in the computer?
18     A.    I have nothing to do with that.
19     Q.    Who was involved in that?
20     A.    If you're saying reviewing it --
21     Q.    Just who was involved in deciding which
22  drugs from the Orange Book, whether it be manual or

Page 241

1  electronic, get put into your FUL computer?
2      A.    The system folks would download the drugs
3  from the Orange Book.  If further review is needed,
4  if some of the drugs are questionable, if they met
5  the criteria and maybe weren't on there before, then
6  we would look at those drugs to verify that they did
7  meet the criteria.
8      Q.    Let me ask you a specific question here.
9  And I'll give you my copy of this.
10         MR. TORBORG:  And Ms. Martinez, you can
11  look on with her if you'd like.
12         MS. MARTINEZ:  I'm going to try to stay
13  away from that videotape.
14         THE WITNESS:  Thanks.
15         BY MR. TORBORG:
16     Q.    Specifically, on this top page, the right
17  column is a drug under the prescription drug product
18  list by the name vancomycin hydrochloride.
19         MS. MARTINEZ:  Give me one second just to
20  glance at what it is.
21         Counsel, would you like to lay out a
22  little bit of foundation, like maybe the date of the

                  Henderson Legal Services, Inc.

202-220-4158                        www.hendersonlegalservices.com

Gaston, Sue                                                    January 24, 2008
                              Washington, DC

Page 242

1  book or something?
2        MR. TORBORG:  I think it's dated on the
3  side 1996.
4        MS. MARTINEZ:  Right.  I'm just saying
5  for the record, we're not going to have an exhibit,
6  so --
7        MR. TORBORG:  Sure.  That's a good idea.
8  I'll do that.
9        BY MR. TORBORG:
10   Q.   Ms. Gaston, do you recognize that book?
11   A.   Yes.
12   Q.   Okay.  Could you tell us what it is?
13   A.   It's the FDA Orange Book.
14   Q.   It's a hard copy version dated 1996?
15   A.   Correct.
16   Q.   And the FDA publishes its Orange Book
17  once every year; is that right?
18   A.   I'm not sure.
19   Q.   Okay.  In any event, this one at the side
20  says it's 1996?
21   A.   Correct.
22   Q.   And is it your understanding that the

Page 243

1  Orange Book has different sections, one of which is
2  titled Product Drug Cost Listing or something like
3  that?  If you look at the top page there.
4    A.   Are you talking about in here?  It's been
5  years since we've I've looked at one of these books,
6  so --
7    Q.   If you look at the spot that I showed
8  you, where your finger is, what does the top of that
9  say?  I can't remember exactly.
10   A.   "Prescription drug product list."
11   Q.   Do you know what that means?
12   A.   Prescription drug product list.
13   Q.   So that's a list of prescription products
14  in the Orange Book --
15   A.   Okay.
16   Q.   -- by alphabetical order?  Is that what
17  it looks like?
18   A.   That's what it looks like.
19   Q.   And looking at vancomycin hydrochloride
20  there, there are a number of different manufacturers
21  listed; is that right?
22   A.   Correct.

Page 244

1    Q.   Which manufacturers are there?
2        MS. MARTINEZ:  Excuse me.  Just for the
3  record, could we have -- again, since we have no
4  exhibit, could we have the page that she's looking
5  at, page number for the record?
6        THE WITNESS:  3-302.
7    A.   Fujisawa, Lilly and I think that's it.
8    Q.   Can I take a look at that real quick?
9    A.   Mm-hmm.
10   Q.   Did you see one for Abbott?
11   A.   Oh, okay.  You're over here too.  It's
12  also on page 3-303.  Is this a continuation over
13  here of this?
14   Q.   That's the way that I read it, but --
15       MS. MARTINEZ:  Since we can't see what --
16   A.   Okay.  Ledderle, it looks like they're in
17  here too.  Abbott, Elkins.  Okay.  That's it.
18   Q.   Now, based on your understanding, are
19  there any of those vancomycin products that are not
20  rated A?
21   A.   It doesn't appear that way.
22   Q.   So under the regulatory and statutory

Page 245

1  criteria vancomycin hydrochloride would qualify as a
2  drug product that would satisfy the FUL criteria; is
3  that right?
4        MR. WINGET-HERNANDEZ:  Objection, form.
5        MS. MARTINEZ:  Objection, form.
6    A.   I would say no, because -- just because
7  it's A-rated.  This is an injection.
8    Q.   Okay.
9    A.   So I don't know if this product -- if
10  this is an injectable, then there are certain
11  products that are in the included on the FUL.
12   Q.   And we'll talk about that in a bit.  Why
13  don't we talk about it now.  Why are not injectable
14  products included on the FUL?
15       MR. WINGET-HERNANDEZ:  Objection, form.
16   A.   When I started to work on the FULs
17  injectable products were not included.  And it's my
18  understanding that the purpose of the FUL program is
19  to set reimbursement rates on drugs that are
20  generally used by the Medicaid population in an
21  outpatient-type, like a pharmacy-type setting, most
22  commonly used products.  And it's my understanding

                    Henderson Legal Services, Inc.
202-220-4158                        www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                                    January 24, 2008
                          Washington, DC

Page 246

1  that injectables and other products many times are
2  provided in a physician's office and other type of
3  settings where they might not be claimed separately.
4  They might be included in a payment, like a
5  physician payment.
6          Also, injectables, many times when
7  they're billed on the claim form they're not --
8  they're billed with codes rather than NDC numbers,
9  which means that the states may not be paying for
10 them through their pharmacy benefit but through
11 another means, such as a physician's visit or a
12 hospital or something like that.
13         So many times what we're trying to do
14 with the FULs is use most commonly used drugs and
15 covered outpatient drug type, so like tablets and
16 capsules.
17    Q.   Is there anything in the regulations or
18 statutes that limit the FUL program to tablets or
19 capsules or other drugs that are commonly
20 administered in the outpatient setting?
21    A.   Not that I know of.
22    Q.   That was just the -- when you started

Page 247

1  working on the FULs that was just the way that HCFA
2  approached it, you did not establish FULs on the
3  injectables?
4    A.   Correct.
5    Q.   And did you ever receive any explanation
6  about why that was?
7    A.   I can't say specifically there was an
8  explanation.  I think you learn this as you work
9  with the program.
10    Q.   But you would agree with me that the
11 Orange Book page that I showed you does show that in
12 1996 there were at least two versions of vancomycin
13 that were rated A in the Orange Book?
14    A.   Correct.
15         MS. MARTINEZ:  Objection, form.
16    Q.   And so -- I want to get back to this
17 computer business.  Was the computer program
18 specifically designed to not include injectables or
19 how did that work?
20    A.   You'd have to talk to the data folks.  We
21 were not including injectables.  I don't know what
22 criteria they put in there.

Page 248

1    Q.   Because if the initial identification of
2  drugs that satisfied the criteria was just two or
3  more A-rated drugs or three or more A-rated drugs if
4  one of them was not A-rated, and that was done by
5  computer presumably that would bring in injectable
6  drugs like vancomycin, right?
7         MS. ALBEE:  Objection.
8    A.   No.  There are still more criteria.  You
9  still have the Orange Book criteria, but there are
10 still criteria that the systems folks put in to look
11 for the type of drugs that the FUL prices are set
12 on.
13    Q.   So is it your understanding that HCFA
14 specifically set up the computer program to identify
15 and exclude injectable drugs?
16         MS. MARTINEZ:  Objection, form.
17    A.   In one part of the process, yes.
18    Q.   And do you know in what part of the
19 process that was done?
20    A.   No, I don't.
21    Q.   Did you have any part in that process of
22 either manually excluding the injectables drugs or

Page 249

1  setting up a computer program such that those drugs
2  would be moved aside?
3    A.   The basic criteria for the system was
4  developed before I got there.
5    Q.   Who would be the best person to ask about
6  why it was that injectables were specifically
7  excluded from the FUL program?
8         MR. WINGET-HERNANDEZ:  Objection, form.
9         MS. MARTINEZ:  Objection, form.
10    A.   I don't know.  Pete Rodler was the first
11 one I know that worked on FULs.  That's the only
12 person I could think of.
13    Q.   Are these other -- now, we've talked a
14 little bit about Exhibit 462 that talks about the
15 Orange Book data.  And we talked about the criteria
16 already, correct?  And now you've identified I think
17 another criteria, which is to exclude injectable
18 drugs, right?
19         MS. MARTINEZ:  Objection, form.
20    A.   Correct.
21    Q.   Is that criteria written down anywhere?
22         MR. WINGET-HERNANDEZ:  Objection, form.

63  (Pages 246 to 249)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                      January 24, 2008
                    Washington, DC

Page 250

1    A.   I don't know.
2    Q.   Have you ever seen a policy memorandum or
3  any other memorandum that discusses why injectables
4  are specifically excluded from the FUL program?
5        MS. MARTINEZ:  Objection, form.
6    A.   I'm not aware of that.
7    Q.   Are you aware of any other criteria that
8  HCFA has used to eliminate drugs that might
9  otherwise satisfy the regulatory or statutory
10  criteria?
11   A.   I think unit dose.
12   Q.   Can you explain a little bit -- that unit
13  stuff always makes my head spin.
14   A.   Just the little individual unit dose
15  packets, like little individual blister tablets that
16  might be in the little blister pack that are
17  generally distributed within a hospital setting.
18   Q.   And why are those -- do you understand
19  why those are excluded?
20   A.   Here again, what I think they're trying
21  to focus on is what's the drugs that are commonly
22  used and dispensed by the pharmacies.

Page 251

1    Q.   Any other exclusion criteria that you're
2  aware of?
3    A.   They may not want to capture the infusion
4  bags because here again that's generally used in an
5  impatient setting and not dispensed at the pharmacy.
6    Q.   Do you know if that's the fact that the
7  FUL program does not cover infusion bags?  Is that
8  something that you're aware of?
9    A.   As far as I know they don't.
10   Q.   And infusion bags would be what type of
11  products?
12   A.   I really can't say at this point.
13   Q.   Saline solution?
14   A.   Okay, fine.
15   Q.   Is that one?
16   A.   Yeah.
17   Q.   Dextrose-type solutions?
18   A.   That's my understanding.
19   Q.   And the rationale for exclusion of those
20  is the same as the rationale for excluding the
21  injectable drugs?
22   A.   Correct.

Page 252

1    Q.   Any other criteria you're aware of?
2    A.   That's all I can think of.
3    Q.   And do you know if the blister pack or
4  the infusion bag exclusions are written down
5  anywhere?
6    A.   I'm not aware of that.
7    Q.   Are -- I'm sorry.
8    A.   The systems folks, they might have
9  written criteria.  I really don't know and I can't
10  speak for them.  But I'm not aware of any.
11   Q.   Do you recall any discussions about --
12  apart here today in the deposition, of course --
13  about why infusion bags, blister packs and
14  injectable drugs are not included in the FUL list?
15   A.   You mean specific discussions?
16   Q.   Or general discussions.  Anything you
17  recall.
18   A.   I'm sure that it was discussed over the
19  years just within the process of working on the
20  FULs.
21   Q.   Do you know if HCFA has since changed the
22  way that it does FULs so that any of those three

Page 253

1  categories' exclusions are no longer excluded?
2    A.   I have no idea.
3    Q.   Okay.  I think that the next step you
4  discussed was the pulling in of the compendia
5  data --
6    A.   Correct.
7    Q.   -- into the mainframe or later the
8  application, correct?
9    A.   Correct.
10   Q.   And was that done with electronic copies
11  of the compendia data?
12   A.   I don't know.  I don't know how they
13  obtained that data.  I would assume it's electronic,
14  but I don't know.
15   Q.   But you did not sit down with a copy of
16  the Red Book or the Blue Book, a manual copy, and
17  input things into a computer?
18   A.   No.
19   Q.   Right?  What you know is that by the time
20  you got involved somebody had already loaded the
21  data into the system?
22   A.   Correct.

64  (Pages 250 to 253)

Gaston, Sue                                         January 24, 2008
                         Washington, DC

Page 254

1    Q.   Is that fair to say?
2    A.   Yup.
3    Q.   Do you know which compendia they used?
4    A.   Red Book, Blue Book and Medi-Span.
5    Q.   They Would use all three?
6    A.   Correct.
7    Q.   Do you know if they used all three from
8    1991 when you got involved through 2003?
9    A.   I can't remember.  I know there was a
10   time when I think Medi-Span and First Databank might
11   have merged.  But I would still -- from my
12   recollection I think there was still separate
13   pricing under both of them.  So from my recollection
14   it was always three.
15   Q.   Did you have a hard copy of the Red Book
16   or the Blue Book on your desk or in your cubicle?
17   A.   Red Book I would have a copy.  Just
18   their -- I think it's a monthly publication.
19   Q.   Did you have a copy of the Orange Book?
20   A.   At times.
21   Q.   And then -- so you've got the Orange Book
22   data loaded.  Is it fair to say that that's in one

Page 255

1    file or one spot on the computer but then you've got
2    the compendia data loaded in another spot?
3    A.   I can't speak for the systems aspect of
4    it.  We just -- we see it -- in the application we
5    see the end result of the Orange Book and the
6    compendia merged together.
7    Q.   Okay.  So there's a program that merges
8    the two together and automatically identifies drugs
9    that meet the Orange Book criteria, any other
10   criteria we've discussed and also have available
11   information in the compendia data; is that right?
12   A.   Correct.
13   Q.   And that's when you get involved; is that
14   fair to say?
15   A.   Correct.
16   Q.   You don't get involved before that?
17   A.   Correct.
18   Q.   Can you take me from that point in time
19   through the publication of the FUL list to the
20   public?
21   A.   From what I remember what we would do is
22   just go through the various groups.  I think there

Page 256

1    were -- I can't remember exactly, but there were
2    certain drug groups that might show up that need to
3    be manually looked at because there might not be
4    enough suppliers or there might not be enough
5    pricing.  And I can't remember what else might be
6    said in there.
7        But we would go through.  And then when
8    instances like that would occur that what we would
9    do is sometimes print off that information and then
10   research to see if the information in the compendia
11   was incorrect or if it is correct then we can sort
12   of go in there and work with what -- you know, try
13   to make a decision whether it should be included or
14   not.
15   Q.   How did you become aware of potential
16   issues that may arise?  Did people contact you and
17   you looked at things in response to their concerns
18   or was there a methodology that you followed to spot
19   issues?
20       MS. MARTINEZ:  Objection, form.
21   A.   Are you asking me -- when you say
22   potential issues, you mean raised by individuals

Page 257

1    or -- I don't know when you mean by potential
2    issues.
3    Q.   Well, we talked about there was a manual
4    review of this.  You wouldn't just take whatever the
5    computer spat out and make that FUL list.
6    A.   Correct.
7    Q.   There was a manual review involved to
8    identify some issues.  I think you've talked about
9    some of them here today.  Availability of the drug,
10   whether the pricing information was still correct.
11   Any other issues that you recall?
12   A.   They are the two main ones, yeah.
13   Q.   How would you go about identifying those
14   issues?  Like how do you -- there's a lot of drugs
15   on the FUL list.  How would you go about figuring
16   that stuff out?
17   A.   I can't remember exactly, because I
18   haven't dealt with the application for years.  But
19   there was something in the application that would
20   alert us to certain drugs that needed the manual
21   review.  Maybe it was the fact that the system
22   couldn't come up with a price because something

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                          January 24, 2008
                        Washington, DC

Page 258

1    wasn't right in the application itself, something
2    didn't look right, so then we would have to go
3    through and verify the information that we had in
4    our system.
5        Q.   The computer system that did this was all
6    housed within HCFA?
7        A.   CMS.
8        Q.   It's CMS.
9        A.   Yes.
10       Q.   And then the computer program would
11   select the lowest price of the reported prices in
12   there and then would it multiply it by 150 percent
13   and spit out a price?
14       A.   Correct.
15       Q.   And which prices in the compendia would
16   be included in that analysis that the computer did?
17       A.   Are you saying from the compendia
18   sources?
19       Q.   Yes.  Average wholesale price?
20       A.   Average wholesale price, direct price,
21   wholesale acquisition cost.
22       Q.   Are there any other prices that you're

Page 259

1    aware of?
2        A.   Not that I remember.
3        Q.   But the computer did all that and then
4    you came in and looked at some issues afterwards,
5    correct?
6        A.   Correct.
7            MR. WINGET-HERNANDEZ:  Objection, form.
8        Q.   Okay.  I handed you before Abbott
9    exhibit -- I forget the number of it.  It was a
10   document that has a handwritten notation at the top,
11   September 15, 1993.  Do you see that?
12       A.   461?
13       Q.   461, yes.
14           And I note that your name is listed at
15   the bottom of the document in a chart as well as at
16   the end of the document.  There's something that
17   says at Bates page 858, FME 32, Sue Gaston, 60488.
18       A.   Right.
19       Q.   Let me ask you first if you remember this
20   document?
21       A.   It looks familiar.
22       Q.   And what does that information on the

Page 260

1    last page mean?
2        A.   That was the document where it was
3    saved -- well, that I prepared it.  The FME was our
4    identification.  And then it has the typist and the
5    disk that the typist placed it on.
6        Q.   What does FME 32 mean?
7        A.   I'm not sure.
8        Q.   What does the 60488 number mean?
9        A.   My extension.
10       Q.   Your phone number?
11       A.   Yes.
12       Q.   So this indicates that you were the one
13   that prepared this memorandum?
14       A.   Correct.
15       Q.   The second paragraph -- let me ask you
16   also, if I could, the chart at the bottom of the
17   first page of this document, that little box next to
18   file copy, what does this mean?
19       A.   It's a sign-off for correspondence.
20       Q.   So your name is first.  That means I
21   guess you were the first one involved?  Is that what
22   that means?

Page 261

1        A.   Well, I was the one -- I prepared this,
2    the document.  Larry Reed approved it.
3        Q.   And then there's another name after that
4    which I can't read.
5        A.   Yeah.  I don't know who that is.
6        Q.   And the last one is Abato.
7        A.   Okay.
8        Q.   Rozanne Abato; is that correct?
9        A.   Correct.
10       Q.   What was her position?
11       A.   I don't know if we were Medicaid Bureau
12   then.  But I think she was the director.  And I'm
13   guessing at the title.
14       Q.   The second paragraph of this document you
15   wrote "Section 1927(e)(1) and (4) of the act as
16   amended by OBRA '93 mandates that HCFA establish a
17   federal upper limit for multiple source drugs that
18   meet specific criteria."  Do you see that?
19       A.   Yes.
20       Q.   What is the reference to the act?  Is
21   that the Social Security Act?
22       A.   Yes.

66  (Pages 258 to 261)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                          January 24, 2008
                    Washington, DC

---

Page 262

1    Q.   And OBRA '93, that would be referencing
2    what?
3    A.   It's the Social Security Act.  It amended
4    the Social Security Act, just like OBRA '90
5    established section 1927, OBRA '93 made amendments
6    to section 1927.
7    Q.   OBRA was a statute passed by Congress?
8    A.   Yes.
9    Q.   Omnibus Reconciliation Act?
10   A.   Correct.
11       MS. MARTINEZ:  Maybe Omnibus Budget
12   Reconciliation Act?
13       MR. TORBORG:  Did I not say that?
14       MS. MARTINEZ:  It has OMB.
15       MR. TORBORG:  Oh.  I'm sorry.  Omnibus
16   Budget Reconciliation Act.
17       BY MR. TORBORG:
18   Q.   And was it your understanding that
19   Congress had mandated HCFA to establish federal
20   upper limits for any multiple source drugs that met
21   specific criteria?
22       MS. MARTINEZ:  Objection, form.

---

Page 263

1    Q.   Right?
2    A.   Correct.
3    Q.   Congress had told HCFA you must do this?
4        MS. MARTINEZ:  Objection, form.
5    Q.   Is that right?
6    A.   Congress amended the law to include this.
7    Q.   But the mandates means that HCFA was
8    mandated by law to establish federal upper limits
9    for multiple source drugs that met specified
10   criteria, correct?
11       MS. MARTINEZ:  Objection to form.
12   A.   If that's what the legislation does, yes.
13   Q.   Have you ever reviewed the legislation?
14   A.   What do you mean reviewed?
15   Q.   Have you looked at it?
16   A.   Yes.
17   Q.   The actual statute itself?
18   A.   Yes.
19           (Exhibit Abbott 463 was
20           marked for
21           identification.)
22       BY MR. TORBORG:

---

Page 264

1    Q.   Let me explain what this document is.
2    This is a section of the Omnibus Budget
3    Reconciliation Act of 1990.  And I've included a
4    cover page which has the title as well as a section
5    4401 titled Reimbursement of Prescribed Drugs.
6    That's what this is.  I have not given you the
7    entire OBRA 1990.
8        I'd like you, if you would, to go eight
9    more pages from the page you're at now.  I'm sorry
10   it doesn't have page numbers on this.  But it would
11   be a section F, pharmacy reimbursement.  Were you
12   able to find it?
13   A.   Yes.
14   Q.   And under section 2 it says establishment
15   of upper payment limits.  Do you see that?
16   A.   Yes.
17   Q.   And then it says "HCFA shall establish a
18   federal upper reimbursement limit for each multiple
19   source drug for which the FDA has rated three or
20   more products therapeutically equivalent and
21   pharmaceutically equivalent, regardless of whether
22   all such additional formulations are rated as such

---

Page 265

1    and shall use only such formulations when
2    determining any such upper limit."  Do you recall
3    reviewing this language before?
4    A.   Yes.
5    Q.   Now, this statutory criteria does not
6    discuss any criteria relating to injection drugs or
7    infusion drugs; is that right?
8    A.   It doesn't specify any drugs in
9    particular.
10   Q.   It just says "all multiple source drugs
11   for which the FDA has rated three or more products
12   therapeutically and pharmaceutically equivalent,"
13   correct?
14       MR. WINGET-HERNANDEZ:  Objection to form.
15   You've misread it, Counsel.
16       MR. TORBORG:  I'm sorry.  I'll read it
17   again.
18       BY MR. TORBORG:
19   Q.   "HCFA shall establish a federal upper
20   reimbursement limit for each multiple source drug
21   for which the FDA has rated three or more products
22   therapeutically and pharmaceutically equivalent."

67 (Pages 262 to 265)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                          January 24, 2008
                        Washington, DC

Page 266

1   Did I read that right?
2       A.   Yes, you did.
3       Q.   Now, this indicates that HCFA shall
4   establish it for each multiple source drug.  And I
5   think we saw earlier in looking at a copy of the
6   1996 Orange Book that for vancomycin there were
7   three or more drugs that were therapeutically and
8   pharmaceutically equivalent, correct?
9            MS. MARTINEZ:  Objection to form.
10      A.   Correct.
11      Q.   And you indicated that if that was an
12  injection drug it would not have met the -- it would
13  have been knocked out of the FUL process by the
14  computer; is that right?
15      A.   Correct.
16      Q.   And is that consistent with the statutory
17  language here?
18           MR. WINGET-HERNANDEZ:  Objection, form.
19           MS. MARTINEZ:  Objection, form.
20      A.   The language doesn't go into that type of
21  detail in the statute.
22      Q.   It doesn't talk about excluding injection

Page 267

1   or infusion drugs, does it?
2       A.   No, it doesn't.
3       Q.   Do you recall any discussions about that
4   issue while you were at HCFA, whether or not the
5   statutory or regulations governing the federal upper
6   limit allowed HCFA to exclude injectable or infusion
7   drugs?
8       A.   I don't -- no.  I don't remember specific
9   discussions like that.
10      Q.   You just know that for as long as you've
11  been working on it it's just been something that's
12  been excluded at the outset?
13      A.   Exactly.  Yes.
14      Q.   And you have some understanding of why
15  that is, but you weren't there originally when the
16  decision was made?
17      A.   Correct.
18      Q.   You've just been told about this
19  rationale over time?
20      A.   Right.  I understand the rationale.  It's
21  been explained to me.
22           MR. TORBORG:  What time do people want to

Page 268

1   end today?  We've been going for I think an hour or
2   more.  I could continue to go until 5:00 if people
3   want to stop at 5:00.  And that's what I would
4   recommend that we do, go another 25 minutes.  Or
5   since we started a little bit late, if people want
6   to go past 5:00 I could take a break now.
7            MR. WINGET-HERNANDEZ:  I would prefer to
8   go to 5:00 for what it's worth.
9            MR. TORBORG:  I think that probably makes
10  more sense.
11           MS. MARTINEZ:  Yeah.  I vote for going to
12  5:00 and stopping, cutting out the break if
13  everybody can take it.
14           THE WITNESS:  That's fine.
15           MR. TORBORG:  Is that okay?
16           THE WITNESS:  Mm-hmm.
17           MR. TORBORG:  Okay.
18           THE VIDEOGRAPHER:  I have 25 minutes
19  remaining.
20           MR. WINGET-HERNANDEZ:  That's enough.
21  That takes us to 5:00.
22           MR. TORBORG:  That will be perfect.  All

Page 269

1   things are coalescing into a decision to go.
2            MS. MARTINEZ:  Counsel, could I just
3   request that at some point you make a copy of the
4   pages that the witness looked at in the FDA drug
5   book and we can just --
6            MR. TORBORG:  Mark it as an exhibit
7   maybe?
8            MS. MARTINEZ:  Well --
9            MR. TORBORG:  Let's talk about it and
10  deal with it at the end of the deposition.
11           MS. MARTINEZ:  Yeah.  But if you could
12  PDF that or something.
13           MR. TORBORG:  Yes.
14           BY MR. TORBORG:
15      Q.   Now, is it your understanding that the
16  federal regulations for FULs had an aggregate test?
17  Do you understand what I mean by that?
18      A.   I do.  The test confuses me.
19      Q.   The states' compliance with federal upper
20  limits was measured in the aggregate, correct?
21      A.   Yes.  Correct.
22      Q.   Could you explain to us as best you can

                          68 (Pages 266 to 269)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                                        January 24, 2008
                           Washington, DC

Page 270

1  in plain English what that means?
2      A.   The federal government sets prices on the
3  federal upper limit drugs.  And we release those
4  prices to the states.  The states have the
5  flexibility to adjust those prices so that in the
6  aggregate the same savings is achieved.  So they can
7  raise one price and lower another price.  But they
8  have to be able to validate doing that.
9      Q.   And what types of auditing does HCFA do
10 on the states' compliance with federal upper limits?
11         MS. MARTINEZ:  Objection, form.
12     A.   I'm not familiar with CMS's auditing.
13     Q.   You don't recall yourself doing any work
14 to see if states were actually complying with the
15 FUL regulations; is that fair to say?
16     A.   Correct.
17     Q.   Your involvement with the FULs was to
18 take the primary lead in getting the list published
19 in the first instance, but not necessarily -- or not
20 at all with dealing with whether or not the states
21 complied with the limits?
22         MS. MARTINEZ:  Objection to form.

Page 271

1      A.   Correct.
2      Q.   Do you know anyone that was involved in
3  doing that?
4      A.   No.
5          MR. TORBORG:  Okay.  I'd like to mark
6  this as our next exhibit, if we could.
7                 (Exhibit Abbott 464 was
8                  marked for
9                  identification.)
10         BY MR. TORBORG:
11     Q.   For the record, what I've marked as
12 Abbott Exhibit 464 bears the Bates numbers
13 NYSHD-FOIL 01682 through 83, a document dated
14 October 2nd 1990.  I ask if you'd take a look at
15 that, Ms. Gaston, and tell me whether or not you
16 recall it.
17     A.   No.  I've never seen this before.
18     Q.   Let me ask you some questions about some
19 language in the document to see if you can help me
20 understand some things.  The second paragraph states
21 "Over the past year, several state operations
22 letters have been sent to you removing upper limits.

Page 272

1  This has been done for a variety of reasons.  The
2  most prevalent reason, however, is the discovery by
3  the FDA that a specific manufacturer of a generic
4  drug has not been totally accurate in its
5  formulation of the drug.
6          "When one of these inaccurately
7  formulated generics is discovered, HCFA is required
8  to remove all formulations of the generic from the
9  upper limits listing, primarily due to problems in
10 identifying the manufacturer of any particular
11 generic item."
12         Do you recall this issue at all?
13     A.   No, not at all.
14     Q.   Do you recall HCFA taking steps to
15 affirmatively remove items from the federal upper
16 limit list?
17     A.   During the period of time that I --
18     Q.   Yes.
19     A.   We would remove drugs if they didn't meet
20 the criteria.
21     Q.   Apart from not meeting that statutory
22 criteria, were there other reasons why drugs were

Page 273

1  removed?
2      A.   No.  I'm not aware of other reasons to
3  remove them.
4      Q.   One other -- well, were there instances
5  where you learned that there was an availability
6  problem with the drug?
7      A.   Correct.
8      Q.   And in those instances would a FUL be
9  removed?
10     A.   Yes.  So that maybe I should clarify.
11 When you said statutory, also regulatory and
12 statutory.  So --
13     Q.   Another background question I had was how
14 were drugs -- was there a code that was used to
15 group all generic drugs of the same type and dose
16 into one category so those can be put together for
17 establishing a FUL?
18     A.   We had FULs -- FUL groups.
19     Q.   FUL groups?
20     A.   Yeah.  That's in the application.  It
21 would be a FUL group.  But I can't go into exactly
22 what my recollection of establishing those FUL

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                              January 24, 2008
                        Washington, DC

Page 274

1  groups.  But that's what we would work with on the
2  application, the FUL group, and then it would have
3  all the NDC numbers and the compendia information.
4      Q.   Who established the FUL groups?
5      A.   It's in the system.  The system
6  establishes it.
7      Q.   Is it done electronically by a computer
8  without any manual review?
9      A.   The information that's pulled down from
10 the Orange Book in the compendia, once it's joined
11 together it has to be placed into a FUL group in
12 order to be into the application.  Once it's in the
13 application there may be some manual review
14 required.
15     Q.   But the FUL groups were set up in the
16 system and then drugs were taken from the Orange
17 Book list and the compendia list and put together
18 this FUL group list, right?
19     A.   Yeah.
20     Q.   And any FUL that was established for any
21 FUL group would then limit the reimbursement that
22 could be paid for any drug in that group; is that

Page 275

1  right?
2          MS. MARTINEZ:  Objection, form.
3      Q.   The FUL --
4      A.   It applies to a FUL group.
5      Q.   Yeah.
6      A.   Yes.
7      Q.   Okay.
8      A.   That's my recollection.
9      Q.   And it may be that the FUL would apply
10 even if a particular drug was not rated A in Orange
11 Book?
12     A.   As long as it met the basic criteria then
13 that FUL price would apply to all of the drugs in
14 that group.
15     Q.   And the drugs in the group, would those
16 include drugs that were not rated A in Orange Book,
17 do you know?
18     A.   Correct.
19     Q.   It would?
20     A.   It would be my understanding.  As long as
21 it meets the basic criteria, then all the other
22 drugs would still be subject to the FUL.  That's my

Page 276

1  recollection.
2      Q.   And what is the basic criteria?
3      A.   The criteria in the Orange Book that we
4  discussed earlier and the criteria in the compendia
5  for the suppliers.
6              (Exhibit Abbott 465 was
7               marked for
8               identification.)
9          BY MR. TORBORG:
10     Q.   Ms. Gaston, we've marked as Abbott
11 Exhibit 465 a document bearing the Bates number HHC
12 004-0054.  It appears to be an e-mail from Cindy
13 Pelter to a distribution that includes "C. Thompso,"
14 which I believe is Cheryl Thompson, an
15 organization called the American Society of Health
16 Systems Pharmacists.  Do you see that?
17     A.   Yes.
18     Q.   If you could take a quick glance at that
19 document and tell me whether or not you recall it.
20     A.   I don't recall it.
21     Q.   Who was Cindy Pelter?
22     A.   That's Cindy Bergin.

Page 277

1      Q.   That's Cindy Bergin?
2      A.   Yes.
3      Q.   That's what I suspected.  That why I
4  asked you earlier if she was still named -- what's
5  her current name?
6      A.   You didn't ask me if she was still --
7      Q.   It's Cindy Pelter now?
8      A.   No.  It's Cindy Bergin now.  It's Bergin
9  now.  It was Pelter when she was hired.  You're
10 confusing me.  This is the hardest question.
11     Q.   It's been a long day.  Cindy Pelter is
12 now Cindy Bergin?
13     A.   Correct.
14     Q.   And her name is spelled B-e-r-g-i-n?
15     A.   Correct.
16     Q.   I had that suspicion.  And who is Cheryl
17 Thompson?  Do you know her?
18     A.   No.
19     Q.   Do you know what the American Society of
20 Health Systems Pharmacists is?
21     A.   I'm really not familiar with them, no.
22     Q.   In any event, Cheryl Thompson asked

70 (Pages 274 to 277)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                              January 24, 2008
                        Washington, DC

Page 278

1  Ms. Pelter a question on June 19th that was "Do the
2  prices listed in" -- this release which I won't read
3  into the record -- "reflected information recently
4  provided by First Databank."  Do you see that?
5      A.   Right.
6      Q.   And then she responds saying "No.  The
7  new federal upper limit prices do not reflect the
8  new AWP prices recently published by First Databank.
9  Those new AWP prices pertain mostly to injectable
10 drugs that are not subject to FUL prices at this
11 time.  Therefore we do not need to consider the new
12 AWPs while we were compiling the new FUL list.  If
13 you have any more questions please feel free to
14 e-mail me."
15      Does this refresh your recollection at
16 all about any conversations that arose within HCFA
17 or elsewhere about the fact that there were no FUL
18 prices on injectable drugs?
19      MS. MARTINEZ:  Objection, form.
20      A.   I could be wrong.  And here again, this
21 isn't my e-mail.  But what was the period of time
22 when that MFCU thing occurred?

Page 279

1      Q.   I believe around 2000.
2      A.   This inquiry might have come about
3  because of the MFCU issue and they were probably
4  asking this question because of that.
5      Q.   And the MFCUs would have new -- they were
6  having First Databank publish new AWPs for certain
7  drugs?  Is that your recollection?
8      A.   Right.
9      MS. MARTINEZ:  Objection, form.
10      Q.   Which might impact the FULs that you were
11 setting at HCFA?
12      A.   I think that's what they were asking.
13      Q.   And Ms. Pelter was saying that is not
14 going to be an issue because these new AWP prices
15 pertain mostly to injectable drugs, correct?
16      A.   That's what she's saying.
17      Q.   Do you recall any other discussion about
18 this issue?
19      A.   There may have been.  I don't remember
20 any further discussion.
21           (Exhibit Abbott 466 was
22                marked for

Page 280

1             identification.)
2      BY MR. TORBORG:
3      Q.   For the record, what I've marked as
4  Abbott Exhibit 466 bears the Bates numbers HHD
5  006-0103 through 108.  And I can represent to you,
6  Ms. Gaston, that this was a document that was pulled
7  from the OIG working paper files for their work on
8  the DOJ AWP effort, the report we looked at earlier.
9      I would ask you just to look at the first
10 page and just let me know if you've seen this.  I
11 doubt you have.
12      A.   (Reading.)  And what was this pertaining
13 to again?
14      Q.   This was a document that we found in the
15 working paper files for the OIG report concerning
16 the DOJ AWP effort?
17      MS. MARTINEZ:  Objection, form.
18      A.   Is this the MFCU?
19      Q.   Yes.
20      A.   Okay.  I changed that term on you.
21      Q.   That's fine.  And my understanding,
22 deposing the individual who sent forth this

Page 281

1  document, this contains some comments that states
2  had made to OIG concerning those NAMFCU AWPs.
3      MS. MARTINEZ:  Objection, form.  Or
4  objection to your comment.  Let me ask you, this
5  hasn't been marked as an exhibit before, then, in
6  another deposition?
7      MR. TORBORG:  I think it may have been.
8  If it has, I don't have that.
9      BY MR. TORBORG:
10      Q.   In any event, I want to ask you about a
11 comment that's contained in the first page, the
12 third one down, the state NC.  I'm assuming it's
13 North Carolina.  The second line says "At a meeting
14 about the new prices, asked Larry Reed why not put
15 these prices on a FUL.  HCFA responded that they
16 couldn't do that."  Do you see that?
17      A.   Yes.
18      Q.   Do you recall attending any meetings
19 concerning the NAMFCU AWPs?
20      MR. WINGET-HERNANDEZ:  Objection, form.
21      Q.   In particular between the states and
22 HCFA.

                        71 (Pages 278 to 281)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                                January 24, 2008
                        Washington, DC

Page 282

1      MR. WINGET-HERNANDEZ:  I have to object,
2  Counsel, to your manner of taking.  You are using
3  this document to imply that it is notes of a meeting
4  that occurred at which this witness might have
5  attended when you know full well exactly where this
6  document came from, who produced it and the fact
7  that this witness would not have had anything to do
8  with it.  It's improper for you to use the document
9  in this way.
10     MR. TORBORG:  How do you know that she
11 wasn't at the meeting?
12     MR. WINGET-HERNANDEZ:  You've already
13 received sworn testimony about how this information
14 was obtained from David Tawes, from the Office of
15 the Investigator General with which she has
16 absolutely no connection.
17     MR. TORBORG:  Well, we established that
18 she was at the exit conference for this report.  So
19 clearly she has a connection.
20     MR. WINGET-HERNANDEZ:  And you
21 established in sworn testimony that this information
22 was the result of a telephone survey that was

Page 283

1  conducted by Mr. Tawes in which he was on the line
2  with a state person from North Carolina.
3      MR. TORBORG:  That doesn't mean that was
4  the only meeting that discussed this issue.  It's
5  clear this document suggests otherwise.
6      MR. WINGET-HERNANDEZ:  I'm not objecting
7  to your question in the abstract.  I'm objecting to
8  the manner in which you've used this document in
9  this instance.  I think it's outrageous.
10     MR. TORBORG:  Okay.
11     BY MR. TORBORG:
12     Q.   Do you recall attending any meetings with
13 states concerning the NAMFCU AWPs?
14     A.   I don't remember attending a meeting with
15 states on the NAMFCU.
16     Q.   Do you recall any discussion of HCFA
17 stating that they could not put injectable drugs or
18 other drugs on the NAMFCU list on a FUL?
19     MS. MARTINEZ:  Objection to form.
20     Q.   Do you recall that being an issue of
21 discussion at any time?
22     A.   No.  I don't remember that being a

Page 284

1  discussion at that time.
2      Q.   We'll do one more document quickly.  This
3  will be Abbott Exhibit 467.
4             (Exhibit Abbott 467 was
5             marked for
6             identification.)
7      BY MR. TORBORG:
8      Q.   For the record, what I've marked as
9  Abbott Exhibit 467 is a interrogatory response that
10 was provided by the United States in response to an
11 interrogatory issued by Abbott Laboratories.  And I
12 ask you to take a look at that and let me know if
13 you are familiar with this document.
14     A.   Yes, I am.
15     Q.   Have you reviewed this before today?
16     A.   Yes.
17     Q.   Now, this document has been signed or
18 what we call in legal terminology verified by
19 someone named William Lasowski?
20     A.   Yes.
21     Q.   Do you know who that is?
22     A.   He worked with Dennis Smith.

Page 285

1      Q.   How long has he been with HCFA?  Do you
2  know?
3      A.   I have no idea.
4      Q.   Has he been there since you started?
5      A.   I'm not sure.
6      Q.   Do you know what his involvement has been
7  with the federal upper limit program?
8      A.   I would say no involvement.  Unless it
9  was prior to my time.
10     MR. TORBORG:  We have one minute left on
11 the tape so why don't we go ahead and take a break
12 here and we'll adjourn at a time and place to be
13 decided later.  Thank you for your time.
14     THE WITNESS:  Okay.  You're welcome.
15     THE VIDEOGRAPHER:  This deposition
16 adjourns at 5:01 and consists of five tapes.
17         (Whereupon, at 5:01 p.m. the statement of
18 counsel was concluded.)
19             * * * * *
20
21
22

72  (Pages 282 to 285)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                     Washington, DC

Page 286

1       SIGNATURE OF WITNESS
2
3
4
5
6
7
8       _____
9           SUE GASTON
10
11  Subscribed and sworn to and before me
12  this _____ day of _____, 20_____.
13
14
15  _____
16       Notary Public
17
18
19
20
21
22

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf