# Exhibit 48

*State of California ex rel. Ven-A-Care of the Florida Keys, Inc. v.*
*Abbott Labs, Inc. et al., Civil Action No. 03-11226-PBS*

**Exhibit to the November 25, 2009 Declaration of Philip D. Robben**
**in Support of Defendants' Joint Motion for Partial Summary Judgment**

Sexton, Gail                                        May 20, 2008
                    Washington, DC

                    UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -

IN RE: PHARMACEUTICAL            ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE       ) CIVIL ACTION NO.

PRICE LITIGATION                 ) 01-CV-12257-PBS

- - - - - - - - - - - - - - - - - - - - - - - -

THIS DOCUMENT RELATES TO:                        )

The City of New York v. Abbott Labs., et al.     )

(S.D.N.Y. No. 04-CV-06054)                       )

County of Suffolk v. Abbott Labs., et al.        )

(E.D.N.Y. No. 03-CV-229)                         )

County of Westchester v. Abbott Labs., et al.    )

(S.D.N.Y. No. 03-CV-6178)                        )

County of Rockland v. Abbott Labs., et al.       )

(S.D.N.Y. No. 03-CV-7055)                        )

[Caption continues on Next Page]                 )


                       Washington, D.C.

                       Monday, May 20, 2008

                       9:30 a.m.

           VIDEOTAPED DEPOSITION OF GAIL SEXTON

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                              May 20, 2008
                          Washington, DC

```
                                    Page 2 |                                       Page 4
 1   County of Dutchess v. Abbott Labs., et al.  ) | 1   County of St. Lawrence v. Abbott Labs., et al.  )
 2   (S.D.N.Y. No. 05-CV-06458)               ) | 2   (N.D.N.Y. No. 05-CV-00479)               )
 3   County of Putnam v. Abbott Labs., et al.  ) | 3   County of Jefferson v. Abbott Labs., et al.  )
 4   (S.D.N.Y. No. 05-CV-04740)               ) | 4   (N.D.N.Y. No. 05-CV-00715)               )
 5   County of Washington v. Abbott Labs., et al.  ) | 5   County of Lewis v. Abbott Labs., et al.  )
 6   (N.D.N.Y. No. 05-CV-00408)               ) | 6   (N.D.N.Y. No. 05-CV-00839)               )
 7   County of Rensselaer v. Abbott Labs., et al.  ) | 7   County of Chautauqua v. Abbott Labs., et al.  )
 8   (N.D.N.Y. No. 05-CV-00422)               ) | 8   (W.D.N.Y. No. 05-CV-06204)               )
 9   County of Albany v. Abbott Labs., et al.  ) | 9   County of Allegany v. Abbott Labs., et al.  )
10   (N.D.N.Y. No. 05-CV-00425)               ) |10   (W.D.N.Y. No. 05-CV-06231)               )
11   County of Warren v. Abbott Labs., et al.  ) |11   County of Cattaraugus v. Abbott Labs., et al.  )
12   (N.D.N.Y. No. 05-CV-00468)               ) |12   (W.D.N.Y. No. 05-CV-06242)               )
13   County of Greene v. Abbott Labs., et al.  ) |13   County of Genesee v. Abbott Labs., et al.  )
14   (N.D.N.Y. No. 05-CV-00474)               ) |14   (W.D.N.Y. No. 05-CV-06206)               )
15   County of Saratoga v. Abbott Labs., et al.  ) |15   County of Wayne v. Abbott Labs., et al.  )
16   (N.D.N.Y. No. 05-CV-00478)               ) |16   (W.D.N.Y. No. 05-CV-06138)               )
17   County of Columbia v. Abbott Labs., et al.  ) |17   County of Monroe v. Abbott Labs., et al.  )
18   (N.D.N.Y. No. 05-CV-00867)               ) |18   (W.D.N.Y. No. 05-CV-06148)               )
19   Essex County v. Abbott Labs., et al.      ) |19   County of Yates v. Abbott Labs., et al.  )
20   (N.D.N.Y. No. 05-CV-00878)               ) |20   (W.D.N.Y. No. 05-CV-06172)               )
21   [Caption continues on Next Page]          ) |21   [Caption continues on Next Page]          )
22                                               |22
```

```
                                    Page 3 |                                       Page 5
 1   County of Chenango v. Abbott Labs., et al.  ) | 1   County of Niagara v. Abbott Labs., et al.  )
 2   (N.D.N.Y. No. 05-CV-00354)               ) | 2   (W.D.N.Y. No. 05-CV-06296)               )
 3   County of Broome v. Abbott Labs., et al.  ) | 3   County of Seneca v. Abbott Labs., et al.  )
 4   (N.D.N.Y. No. 05-CV-00456)               ) | 4   (W.D.N.Y. No. 05-CV-06370)               )
 5   County of Onondaga v. Abbott Labs., et al.  ) | 5   County of Orleans v. Abbott Labs., et al.  )
 6   (N.D.N.Y. No. 05-CV-00088)               ) | 6   (W.D.N.Y. No. 05-CV-06371)               )
 7   County of Tompkins v. Abbott Labs., et al.  ) | 7   County of Schuyler v. Abbott Labs., et al.  )
 8   (N.D.N.Y. No. 05-CV-00397)               ) | 8   (W.D.N.Y. No. 05-CV-06387)               )
 9   County of Cayuga v. Abbott Labs., et al.  ) | 9   County of Steuben v. Abbott Labs., et al.  )
10   (N.D.N.Y. No. 05-CV-00423)               ) |10   (W.D.N.Y. No. 05-CV-06223)               )
11   County of Madison v. Abbott Labs., et al.  ) |11   County of Chemung v. Abbott Labs., et al.  )
12   (N.D.N.Y. No. 05-CV-00714)               ) |12   (W.D.N.Y. No. 05-CV-06744)               )
13   County of Courtland v. Abbott Labs., et al.  ) |13   and,                                       )
14   (N.D.N.Y. No. 05-CV-00881)               ) |14   County of Nassau v. Abbott Labs., et al.  )
15   County of Herkimer v. Abbott Labs., et al.  ) |15   (E.D.N.Y. No. 04-CV-5126)               )
16   (N.D.N.Y. No. 05-CV-00415)               ) |16   - - - - - - - - - - - - - - - - - - - - - - - - -
17   County of Oneida v. Abbott Labs., et al.  ) |17
18   (N.D.N.Y. No. 05-CV-00489)               ) |18
19   County of Fulton v. Abbott Labs., et al.  ) |19
20   (N.D.N.Y. No. 05-CV-00519)               ) |20
21   [Caption continues on Next Page]          ) |21
22                                               |22          (CAPTIONS CONTINUED)
```

Henderson Legal Services, Inc.
202-220-4158                          www.hendersonlegalservices.com

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                           May 20, 2008
                        Washington, DC

---

Page 6

1        UNITED STATES DISTRICT COURT
2      FOR THE DISTRICT OF MASSACHUSETTS
3   - - - - - - - - - - - - - - -
4   IN RE: PHARMACEUTICAL        ) MDL NO. 1456
5   INDUSTRY AVERAGE WHOLESALE   ) CIVIL ACTION
6   PRICE LITIGATION             ) 01-CV-12257-PBS
7   - - - - - - - - - - - - - - -
8   THIS DOCUMENT RELATES TO     )
9   U.S. ex rel. Ven-a-Care of   ) Judge Patti B. Saris
10  the Florida Keys, Inc.       )
11       v.                      ) Chief Magistrate
12  Abbott Laboratories, Inc.,   ) Judge Marianne B.
13  No. 06-CV-11337-PBS          ) Bowler
14  - - - - - - - - - - - - - - -
15
16
17
18
19
20
21
22              (CAPTIONS CONTINUED)

---

Page 8

1        UNITED STATES DISTRICT COURT
2      FOR THE DISTRICT OF MASSACHUSETTS
3   - - - - - - - - - - - - - - -
4   IN RE: PHARMACEUTICAL        ) MDL NO. 1456
5   INDUSTRY AVERAGE WHOLESALE   ) CIVIL ACTION NO.
6   PRICE LITIGATION             ) 01-CV-12257-PBS
7   - - - - - - - - - - - - - - -
8   THIS DOCUMENT RELATES TO     ) Judge Patti B. Saris
9   State of California, ex rel. )
10  Ven-a-Care v. Abbott         )
11  Laboratories, Inc., et al.   ) Magistrate Judge
12  Case No. 1:03-CV-11226-PBS   ) Marianne Bowler
13  - - - - - - - - - - - - - - -
14
15
16
17
18
19
20
21
22              (CAPTIONS CONTINUED)

---

Page 7

1    IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
2      THIRD JUDICIAL DISTRICT AT ANCHORAGE
3   - - - - - - - - - - - - - - -
4   STATE OF ALASKA,            )
5        Plaintiff,             )
6     vs.                       ) Case No.
7   ALPHARMA BRANDED PRODUCTS    ) 3AN-06-12026 CI
8   DIVISION, INC., et al.       )
9        Defendants.            )
10  - - - - - - - - - - - - - - -
11   IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
12      IN AND FOR THE COUNTY OF MARICOPA
13  - - - - - - - - - - - - - - -
14  ROBERT J. SWANSON, individually )
15  and on behalf of himself and    )
16  all others similarly situated,  )
17        Plaintiff,              )
18     vs.                        ) No. CV-2002-04988
19  TAP PHARMACEUTICAL PRODUCTS,    ) Judge Janet Barton
20  INC., et al.,                 )
21        Defendants.            )
22  - - - - - - - - - - - - - - -

---

Page 9

1        COMMONWEALTH OF KENTUCKY
2      FRANKLIN CIRCUIT COURT - DIV. II
3   - - - - - - - - - - - - - - - -
4   COMMONWEALTH OF KENTUCKY, ex rel.   )
5   JACK CONWAY, Attorney General       )
6        Plaintiff,              ) Civil Action
7     vs.                        ) No. 03-CI-1135
8   WARRICK PHARMACEUTICALS CORP., et al.,)
9        Defendants.            )
10  - - - - - - - - - - - - - - - -
11
12       IN THE COURT OF COMMON PLEAS
13        FIFTH JUDICIAL CIRCUIT
14  - - - - - - - - - - - - - - -
15  In re: South Carolina           )
16  Pharmaceutical Pricing Litigation )   STATE OF
17                          ) SOUTH CAROLINA
18  This document relates to:     )   COUNTY OF
19  Civil Action No. 2006-CP-40-4390 )   RICHLAND
20  Civil Action No. 2006-CP-40-4399 )
21  - - - - - - - - - - - - - - -
22

              Henderson Legal Services, Inc.
202-220-4158              www.hendersonlegalservices.com

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                                    May 20, 2008
                              Washington, DC

Page 10

1        IN THE CIRCUIT COURT OF THE FIRST CIRCUIT
2                   STATE OF HAWAII
3        - - - - - - - - - - - - - -
4    STATE OF HAWAII,        ) Civil Nos.
5        Plaintiff,   ) 06-1-0720-04 EEH
6    vs.                 ) 07-1-1639-09 EEH
7    ABBOTT LABORATORIES, INC.,   )
8    et al.,           ) JUDGE EDEN
9        Defendants.   ) ELIZABETH HIFO
10       - - - - - - - - - - - - - -
11   STATE OF HAWAII,        )
12       Plaintiff,   )
13   vs.                 )
14   SCHERING CORPORATION; DOE   )
15   CORPORATIONS 1-100; DOE    )
16   ENTITIES 1-100,        )
17       Defendants.   )
18       - - - - - - - - - - - - - -
19
20
21
22

Page 11

1        Videotaped deposition of GAIL SEXTON, held at
2    the law offices of Ropes & Gray, 700 12th Street,
3    N.W., Washington, D.C. 20005, the proceedings being
4    recorded stenographically by Jonathan Wonnell, a
5    Registered Professional Court Reporter and Notary
6    Public of the District of Columbia, and transcribed
7    under his direction.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 12

1    A P P E A R A N C E S   O F   C O U N S E L
2
3    On behalf of the United States of America:
4
5        JAMES FAUCI, ESQ.
6        U.S. Attorney's Office
7        1 Courthouse Way
8        Boston, Massachusetts 02210
9        (617) 748-3298
10
11       -- and --
12
13       LAURIE A. OBEREMBT, ESQ.
14       U.S. Department of Justice
15       Civil Division
16       P.O. Box 261, Ben Franklin Station
17       Washington, D.C. 20044
18       (202) 305-1088
19
20
21
22

Page 13

1    A P P E A R A N C E S   (Cont'd)
2
3    On behalf of the U.S. Department of Health and
4    Human Services:
5
6        LESLIE M. STAFFORD, ESQ.
7        U.S. Department of Health & Human Services
8        Office of General Counsel, CMS Division
9        7500 Security Boulevard
10       Mail Stop C2-05-23
11       Baltimore, Maryland 21244
12       (410) 786-9655
13
14   On behalf of the State of California:
15
16       RITA HANSCOM, ESQ. (via phone)
17       Supervising Deputy Attorney General
18       Civil Prosecutions Unit
19       P.O. Box 85266
20       110 West A Street, #1100
21       San Diego, California 82186
22       (619)-688-6099

                                    4  (Pages 10 to 13)

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                              May 20, 2008
                        Washington, DC

Page 14

```
1        A P P E A R A N C E S  (Cont'd)
2
3   On behalf of the City of New York and all New York
4   Counties other than Nassau and Orange; and the
5   States of Alaska, Hawaii, Idaho, Illinois, Kentucky,
6   South Carolina and Wisconsin:
7
8        MICHAEL WINGET-HERNANDEZ, ESQ.
9        Winget-Hernandez, LLC
10       3112 Windsor Road, Suite 228
11       Austin, Texas 78703
12       (512) 858-4181
13       michael@winget-hernandez.com
14
15  On behalf of Ven-A-Care of the Florida Keys, Inc.:
16
17       MARJORY P. ALBEE, ESQ. (via phone)
18       Mager & Goldstein LLP
19       1818 Market Street, Suite 3710
20       Philadelphia, Pennsylvania 19103
21       (215) 640-3280
22       malbee@magergoldstein.com
```

Page 15

```
1        A P P E A R A N C E S  (Cont'd)
2
3   On behalf of Abbott Laboratories:
4
5        ANDREA L. CARON, ESQ. (via phone)
6        Jones Day
7        77 West Wacker
8        Chicago, Illinois 60601-1692
9        (312) 782-3939
10       acaron@jonesday.com
11
12  On behalf of Dey, Inc., Dey, L.P. and Mylan:
13
14       SARAH REID, ESQ.
15       Kelley, Drye & Warren LLP
16       101 Park Avenue
17       New York, New York 10178
18       (212) 808-7811
19       sreid@kelleydrye.com
20
21
22
```

Page 16

```
1        A P P E A R A N C E S  (Cont'd)
2
3   On behalf of Ethex Corporation:
4
5        MARK A. FLESSNER, ESQ.
6        Sonnenschein, Nath & Rosenthal
7        8000 Sears Tower
8        233 South Wacker Drive
9        Chicago, Illinois 60606
10       (312) 876-7934
11       mflessner@sonnenschein.com
12
13  On behalf of Merck & Company, Inc.:
14
15       KATHLEEN M. FONES, ESQ.
16       Hughes & Hubbard
17       1775 Eye Street, N.W.
18       Washington, D.C. 20006-2401
19       (202) 721-4671
20       fones@hugheshubbard.com
21
22
```

Page 17

```
1        A P P E A R A N C E S  (Cont'd)
2
3   On behalf of Par Pharmaceuticals:
4
5        PAUL K. DUEFFERT, ESQ.
6        Williams & Connolly, L.L.P.
7        725 Twelfth Street, N.W.
8        Washington, D.C. 20005
9        (202) 434-5000
10       pdueffert@wc.com
11
12  On behalf of Pharmacea and Pfizer:
13
14       EZRA DODD CHURCH, ESQ. (via phone)
15       Morgan Lewis
16       1701 Market Street
17       Philadelphia, Pennsylvania 19103-2921
18       (215) 963-5010
19       echurch@morganlewis.com
20
21
22
```

                                          5  (Pages 14 to 17)

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                          May 20, 2008
                          Washington, DC

Page 18

APPEARANCES (Cont'd)

On behalf of Roxane Laboratories and Boehringer
Ingelheim:

        SETH A. GASTWIRTH, ESQ.
        Kirkland & Ellis
        200 East Randolph Drive
        Chicago, Illinois 60601
        (312) 861-2464
        sgastwirth@kirkland.com

On behalf of Sandoz, Inc.:

        MILANA SALZMAN, ESQ. (via phone)
        White & Case LLP
        1155 Avenue of the Americas
        New York, New York 10036-2787
        (212) 819-8711
        msalzman@whitecase.com

Page 19

APPEARANCES (Cont'd)

On behalf of Schering-Plough Corporation, Schering
Corporation and Warrick Pharmaceuticals Corporation:

        JOHN P. BUEKER, ESQ.
        Ropes & Gray
        One International Place
        Boston, Massachusetts 02110-2624
        (617) 951-7050
        john.bueker@ropesgray.com

On behalf of Teva Pharmaceuticals USA, Inc., IVAX
Corporation, IVAX Pharmaceuticals, Inc. and
Sicor, Inc.:

        BRYAN M. STEPHANY, ESQ.
        Kirkland & Ellis
        655 Fifteenth Street, N.W., Suite 1200
        Washington, D.C. 20005
        (202) 879-5000
        bstephany@kirkland.com

Page 20

APPEARANCES (Cont'd)

ALSO PRESENT:
        CONWAY BARKER, videographer

Page 21

CONTENTS

WITNESS NAME                              PAGE
GAIL SEXTON
        Examination By Mr. Bueker................. 028
        Examination By Mr. Winget-Hernandez....... 146
        Examination By Mr. Fauci................. 157

EXHIBITS
NUMBER          DESCRIPTION          PAGE
Exhibit Sexton 001, List of nine GCNs at issue
        in New York Counties
        expedited discovery
        (1 pg, no Bates)........... 030
Exhibit Sexton 002, HHD 175-1787 - 1793........ 037
Exhibit Sexton 003, HHD 170-0245.............. 040
Exhibit Sexton 004, HHD 175-1456.............. 050
Exhibit Sexton 005, HHD 175-1455.............. 051
Exhibit Sexton 006, HHD 175-1448.............. 063
Exhibit Sexton 007, HHD 175-1072.............. 068
Exhibit Sexton 008, HHD 175-1059 - 175-1063.... 078
Exhibit Sexton 009, HHD 175-1058.............. 088

                                        6  (Pages 18 to 21)

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                                    May 20, 2008
                           Washington, DC

Page 22

1        E X H I B I T S  (CONTINUED)
2  NUMBER          DESCRIPTION          PAGE
3  Exhibit Sexton 010, Document entitled "Approved
4            drug products with
5            therapeutic equivalence
6            evaluations, 25th edition"
7            (5 pgs, no Bates).......... 100
8  Exhibit Sexton 011, HHD 175-1057............... 105
9  Exhibit Sexton 012, HHD 175-2024............... 113
10 Exhibit Sexton 013, HHD 175-2109............... 118
11 Exhibit Sexton 014, Document entitled
12           Transmittal Number 37 -
13           Federal Upper Limit Drug
14           List dated 11/20/01
15           (16 pgs, no Bates)......... 119
16 Exhibit Sexton 015, Document entitled "Federal
17           Upper Limit (FUL) Changes
18           to Transmittal Number 37"
19           (34 pgs, no Bates)......... 120
20 Exhibit Sexton 016, HHD 175-2110............... 123
21
22 (CONTINUED)

Page 23

1        E X H I B I T S  (CONTINUED)
2  NUMBER          DESCRIPTION          PAGE
3  Exhibit Sexton 017, OIG report entitled
4            "Addition of Qualified
5            Drugs to the Medicaid
6            Federal Upper Limit List"
7            (29 pgs, no Bates)......... 128
8  Exhibit Sexton 018, HHD 175-1807............... 130
9  Exhibit Sexton 019, NASMD-0001304 - 0001306.... 140
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 24

1           P R O C E E D I N G S
2              (9:31 a.m.)
3        THE VIDEOGRAPHER:  In the United States
4  District Court for the District of Massachusetts,
5  In Re: Pharmaceutical Industry Average Wholesale
6  Price Litigation, Consolidated New York Counties,
7  Case Number 01-CV-12257 PBS, this is the
8  deposition of Gail Sexton.
9        Today's date is May 20th 2008.  The
10 location of the deposition is Ropes & Gray, 700
11 12th Street, N.W., Washington, D.C.
12        Will counsel please identify yourselves
13 and state whom you represent?
14        MR. BUEKER:  Good morning, Ms. Sexton.
15 My name is John Bueker.  I'm here at Ropes &
16 Gray.  I'm appearing on behalf of Schering-Plough
17 Corporation, Schering Corporation and Warrick
18 Pharmaceuticals Corporation.
19        MR. FLESSNER:  Good morning, Ms.
20 Sexton.  My name is Mark Flessner.  I'm with
21 Sonnenschein, Nath & Rosenthal in Chicago and I
22 represent Ethex.

Page 25

1        MR. GASTWIRTH:  Good morning, Ms.
2  Sexton.  My name is Seth Gastwirth.  I'm from
3  Kirkland & Ellis in Chicago and I represent the
4  Boehringer and Roxane Defendants.
5        MS. FONES:  Good morning.  My name is
6  Kathleen Fones, I'm with Hughes, Hubbard & Reed
7  LLP here in D.C. and I represent Merck & Company,
8  Inc.
9        MR. STEPHANY:  Bryan Stephany from
10 Kirkland & Ellis, also here in D.C.  I represent
11 --
12        MS. CARON:  Good morning.  This is
13 Andrea Caron from Jones Day.  I represent Abbott
14 Laboratories.
15        THE VIDEOGRAPHER:  Could the others on
16 the phone please identify yourselves then?
17        MS. HANSCOM:  This is Rita Hanscom from
18 the State of California Office of the Attorney
19 General.
20        MR. CHURCH:  Good morning.  Ezra Dodd
21 Church from Morgan, Lewis & Bockius representing
22 Pharmacea and Pfizer.

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                             May 20, 2008
                       Washington, DC

Page 26

1        MS. ALBEE:  Marjory Albee from Mager &
2   Goldstein representing Ven-A-Care.
3        MS. SALZMAN:  Milana Salzman with White
4   & Case representing Sandoz, Inc.
5        THE VIDEOGRAPHER:  Anyone else on the
6   phone?  Okay.  Go ahead.
7        MR. STEPHANY:  I'm sorry.  Again, Bryan
8   Stephany from Kirkland & Ellis here in D.C.  I
9   represent Teva Pharmaceuticals USA, IVAX
10  Corporation, IVAX Pharmaceuticals Inc. and Sicor
11  Inc.
12       MS. REID:  Good morning.  My name is
13  Sarah Reid from the law firm of Kelley, Drye &
14  Warren in New York and I represent Mylan
15  Laboratories and the Dey companies in connection
16  with this deposition.
17       MR. FAUCI:  I'm Jeff Fauci and I
18  represent the United States.
19       MS. STAFFORD:  Leslie Stafford on
20  behalf of the Centers for Medicare and Medicaid
21  Services.
22       MS. OBEREMBT:  Laurie Oberembt and I

Page 27

1   represent the United States.
2        MR. WINGET-HERNANDEZ:  Michael Winget-
3   Hernandez.  I am here on behalf of the City of
4   New York and the New York Counties in MDL 1456
5   except for Nassau and Orange; Illinois,
6   Wisconsin, Kentucky, South Carolina, Idaho,
7   Alaska and Hawaii to the extent that they have
8   been cross noticed here, which I'm afraid I'm not
9   sure exactly what all the cross notices are at
10  this time.
11       THE VIDEOGRAPHER:  The court reporter
12  is Jon Wonnell.  The video camera operator is
13  Conway Barker both on behalf of Henderson Legal
14  Services.  This deposition begins at 9:33.
15  Please swear in the witness.
16
17  Whereupon,
18            GAIL SEXTON,
19  called as a Witness, was duly sworn by Jonathan
20  Wonnell, a Notary Public in and for the District
21  of Columbia, and was examined and testified as
22  follows.

Page 28

1        EXAMINATION BY COUNSEL FOR
2   SCHERING-PLOUGH CORPORATION, SCHERING CORPORATION
3   AND WARRICK PHARMACEUTICALS CORPORATION
4   BY MR. BUEKER:
5        Q.  Good morning, again, Ms. Sexton.  Would
6   you just state and spell your name for the
7   record, please?
8        A.  Yes.  Gail, G-a-i-l, Sexton, S-e-x-t-o-
9   n.
10       Q.  And how are you presently employed?
11       A.  I'm employed as a health insurance
12  specialist with the Centers for Medicare and
13  Medicaid Services in Baltimore, Maryland.
14       MS. HANSCOM:  Excuse me.  I cannot hear
15  the witness.
16       MS. SALZMAN:  Nor can I.
17         (Discussion off the record.)
18  BY MR. BUEKER:
19       Q.  Perhaps we could started again.  Could
20  you state and spell your name for the record,
21  please?
22       A.  Yes.  My name is Gail Sexton, G-a-i-l

Page 29

1   S-e-x-t-o-n.
2        Q.  And Ms. Sexton, how are you currently
3   employed?
4        A.  I'm employed as a health insurance
5   specialist with the Centers for Medicare and
6   Medicaid Services in Baltimore, Maryland.
7        Q.  This deposition is being taken in a New
8   York Counties matter and there are nine generic
9   drugs or generic drug codes, GCNs that have been
10  selected by the parties in the case for expedited
11  discovery on issues related to how FULs are set.
12  That's going to be the focus of my examination.
13  Before I start, let me ask, are you aware of
14  which nine GCNs have been selected in the New
15  York Counties matter for expedited discovery?
16       A.  I believe I am aware of the drug
17  ingredients.  Not offhand, but I believe I have
18  gathered some information on the drug
19  ingredients.
20       Q.  Perhaps it might help to just mark as
21  Exhibit 1 a list of the nine GCNs that are at
22  issue.

8 (Pages 26 to 29)

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                          May 20, 2008
                    Washington, DC

Page 30

1        (Exhibit Sexton 001 was marked for
2  identification.)
3  BY MR. BUEKER:
4     Q.  When you have a chance, just take a
5  look at Exhibit 1 and make sure that's consistent
6  with your understanding of the nine GCNs that are
7  at issue in the New York Counties expedited
8  discovery period.
9     A.  Okay.  I'm actually not familiar from
10 memory if these are the GCNs.  But --
11    Q.  Okay.  Just take a look at the GCNs.
12       MR. CHURCH:  Excuse me.  I'm still
13 feeling it's very hard to hear the witness.
14       MS. HANSCOM:  No.  It's true.  After
15 each word the microphone cuts out.  So it is
16 difficult to hear.
17       MS. OBEREMBT:  Can we take a short
18 break?
19       MR. BUEKER:  Let's take a short break.
20       THE VIDEOGRAPHER:  Off the record at
21 .
22       (Recess.)

Page 31

1        THE VIDEOGRAPHER:  On the record at
2  .
3  BY MR. BUEKER:
4     Q.  Ms. Sexton, before we took a break to
5  address our technical issues, I was asking you to
6  take a look at Exhibit 1.  Would you just do
7  that?  And I guess my question is whether looking
8  at those GCNs there's anything you recognize that
9  are unique about them in terms of the process you
10 would have used to set the FUL or the information
11 that you would have used.  I want to make sure
12 that they're representative of the process you
13 used to set FULs.
14       MR. FAUCI:  Objection, form.
15    A.  I don't see anything that would stand
16 out from these GCNs that would be unique to my
17 setting a FUL.
18    Q.  So you think these would be
19 representative of the process you used to set
20 FULs?
21       MR. FAUCI:  Objection, form.
22    A.  Yes.

Page 32

1        MS. HANSCOM:  Excuse me.  Are we going
2  by the understanding that an objection by one
3  plaintiff speaks for all?
4        MR. BUEKER:  Sure.
5     A.  One of the drugs on here, the second
6  one, the albuterol 0.38 milligrams per mill
7  solution, I don't know if that's an inhalation
8  solution or an injectable solution.  That could
9  be different than -- it appears to be different
10 than the others in the list.
11    Q.  If I were to represent to you that it's
12 an inhalation solution, does that -- as opposed
13 to an injectable solution -- does that in any way
14 affect your answer?
15       MR. FAUCI:  Objection, form.
16    A.  Generally we do have some inhalation
17 solutions on the federal upper limit list as
18 opposed to injectable solutions which we
19 generally do not look at for a federal upper
20 limit.  I do not know if this drug has previously
21 had a federal upper limit or currently has a
22 federal upper limit.

Page 33

1     Q.  Okay.  So setting aside the 0.83
2  solution generally speaking the other drugs on
3  this list would be representative of the process
4  used to establish FULs during your tenure?
5        MR. FAUCI:  Objection, form.
6     A.  Yes.  They appear to be according to
7  ingredient, route, strength and dose, with
8  products that we would generally look at to set a
9  federal upper limit.
10       MR. FAUCI:  John, I hate to interrupt
11 you for a second.  But on the albuterol is that a
12 typo on the second one down that it says .38?
13       MR. BUEKER:  Yes, it is.  It should say
14 .83.
15 BY MR. BUEKER:
16    Q.  Ms. Sexton, how long have you worked
17 for CMS?
18    A.  Since -- the date that I started
19 working at CMS was October 31st 2004.
20    Q.  Where did you work before CMS?
21    A.  I worked for the State of Maryland
22 Disability Determination Services.

9  (Pages 30 to 33)

Sexton, Gail                                                  May 20, 2008
                          Washington, DC

Page 34

1      Q.   What positions have you held at CMS
2  since October 31, 2004?
3      A.   The same position I'm in now, the
4  health insurance specialist.  I've been in the
5  same position in the same division since I
6  started with CMS.
7      Q.   Would you describe generally your job
8  responsibilities as they relate to -- as a health
9  insurance specialist at CMS?
10     A.   Well, I've been the lead since I
11  started at CMS or shortly thereafter I became the
12  lead on federal upper limit program for CMS where
13  I would look at drugs that have been classified
14  at multiple-source drugs for whether they met the
15  criteria per the federal statute and statute
16  for a federal upper limit.  And then increasing,
17  decreasing, adding or taking off the drugs from
18  the federal upper limit list.
19         I also have had other responsibilities
20  as adjudicating state plan amendments for the
21  states for changes in policy or regulation for
22  the states' Medicaid programs, responding to

Page 35

1  Office of Inspector General reports.  Basically
2  just developing policy and regulation for
3  Medicaid pharmacy for the Medicaid drug rebate
4  program.
5      Q.   When you say adjudicating state plans
6  do you mean approving state plan amendments?
7      A.   Reviewing them for approval or
8  disapproval.
9      Q.   What states have you been primarily
10  responsible for reviewing state plan amendments?
11     A.   Vermont, Texas, Wyoming, New Mexico and
12  Oregon.
13     Q.   And have those states for which you've
14  been responsible changed over time or have they
15  been consistent since you started in October of
16  2004?
17        MR. FAUCI:  Objection, form.
18     A.   They have been consistent.  However,
19  there were some changes with the states.  But
20  basically as far as I remember when I was given
21  the responsibility of looking at state plan
22  amendments, they have been my states, although

Page 36

1  there have been changes within the division as
2  far as state assignments.
3      Q.   But those changes haven't affected the
4  states for which you've been responsible,
5  correct?
6      A.   I don't think so.  I don't know.  I
7  don't remember for sure.  But those five states
8  have -- the ones I remember as being my
9  responsibility.
10     Q.   Can you recall any particular OIG
11  reports for which you were responsible for
12  helping CMS to draft a response?
13     A.   The reports -- there was a report for
14  the Deficit Reduction Act and the affect on the
15  federal upper limit.  But I've also attended
16  entrance conferences, exit conferences and
17  contributed to the response on a number of
18  reports.  I don't know the exact reports and --
19  but quite a few of the reports.
20     Q.   So the one you remember -- I'm sorry.
21  I'll let you finish your answer.  Are you done?
22     A.   Yes.

Page 37

1      Q.   Okay.  So the one you remember in
2  particular is the one with regard to the Deficit
3  Reduction Act or DRA?
4      A.   Yes.  Although I have been involved in
5  other reports for the federal upper limit list
6  and drugs the federal upper limit list did.
7         MS. HANSCOM:  Could the witness keep
8  other voice up, or at least try to?
9         THE WITNESS:  Yes.
10        MR. BUEKER:  I'll ask the court
11  reporter to mark a document that begins at Bates
12  number HHD 175-1787 as Sexton Exhibit 2 for
13  identification, please.
14            (Exhibit Sexton 002 was marked for
15  identification.)
16            (Mr. Dueffert entered the
17  conference room.)
18  BY MR. BUEKER:
19     Q.   Ms. Sexton, the court reporter has
20  placed before you Exhibit 2 for identification.
21  I'm actually going to ask you please take your
22  time to take a look at it.  But I'm going to ask

Henderson Legal Services, Inc.

202-220-4158                      www.hendersonlegalservices.com

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                          May 20, 2008
                        Washington, DC

Page 38

1  you questions as they relate to pages 4 and 5.
2  I'm just trying to establish a time period as to
3  when you became the lead on the FUL program.
4       A.  (Reading.)  Okay.
5       Q.  Ready?
6       A.  Mm-hmm.
7       Q.  First of all, Ms. Sexton, do you
8  recognize Exhibit 2 to be an e-mail exchange
9  between you and Rojan Sevilla?
10      A.  Yes.
11      Q.  Did I say that correctly?
12      A.  I don't know if that's how you
13 pronounce the name.
14      Q.  Who is Mr. Sevilla?
15      A.  He is a contact, a person whose name I
16 was given when I started with the agency.  He is
17 with First Databank, one of the compendia that
18 question use at CMS to establish drug pricing.
19 And he is a contact who I was given to verify
20 prices on occasion if we could not locate a
21 wholesale acquisition cost or a direct price when
22 establishing a FUL.

Page 39

1       Q.  And turn with me, if you would, to
2  pages 4 and 5.  At the beginning of the bottom of
3  page 4 and carrying over to page 5, would you
4  agree that that's an e-mail that you sent to Mr.
5  Sevilla introducing yourself as the person who
6  would become a contact person for CMS on the FUL
7  program?
8       A.  Yes.
9       Q.  And the e-mail is dated December 16th
10 2004, correct?
11      A.  Yes.
12      Q.  Is that consistent with your memory in
13 terms of the time period in which you became the
14 person, the lead, on the FUL program?
15      A.  Yes.  Probably prior to that I became
16 the lead.  But I think this was the point that I
17 would have first contacted Rojan for any
18 information.  It looks --
19      MR. BUEKER:  I ask the court reporter
20 to mark a one page exhibit that has the Bates
21 number HHD 170-0245 as Sexton Exhibit 3 for
22 identification, please.

Page 40

1       (Exhibit Sexton 003 was marked for
2  identification.)
3  BY MR. BUEKER:
4       Q.  If you'd look at Exhibit 3 and tell me
5  when you've had a chance to do that.
6       A.  (Reading.)  Okay.
7       Q.  Ms. Sexton, would you agree with me
8  that Exhibit 3 appears to be an e-mail exchange
9  that you had with Renee McDonald?
10      A.  Yes.
11      Q.  And you had that e-mail exchange in
12 mid-December of 2004, correct?
13      A.  Yes.
14      Q.  And who is Renee McDonald?
15      A.  She worked in the IT area for the
16 federal upper limit system.  She was one of the
17 primary analysts or health insurance specialists
18 who had responsibility for the federal upper
19 limit software program.
20      Q.  And just for the record, what is the
21 federal upper limit software program?
22      A.  It's a software program that we use at

Page 41

1  CMS.  It's -- I would call it more of a database
2  system -- where the compendia prices and the FDA
3  information was input into the system and prices
4  were stored there.  The system actually computed
5  the federal upper limit price.  And it housed the
6  information for the drug manufacturers, the NDCs,
7  prices, calculation of federal upper limit.  And
8  that's our primary system that we use for the
9  federal upper limit system.
10      Q.  So it's involved in helping you to set
11 -- or helping CMS rather to set federal upper
12 limits?
13      A.  Yes.
14      MR. FAUCI:  Objection, form.
15      Q.  And in December of 2004 what
16 responsibility if any did Ms. McDonald have for
17 the federal upper limit system or program?
18      A.  She was involved in the IT end of the
19 federal upper limit of this software system.  She
20 worked in that end of it to -- basically.
21      Q.  Would you agree with me that Exhibit 3
22 is an e-mail exchange between you and Ms.

11 (Pages 38 to 41)

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Sexton, Gail                                                    May 20, 2008
                        Washington, DC

---

Page 42

1  McDonald, the purpose of which was to give you a
2  password so that you could use the CMS federal
3  upper limit system?
4      MR. FAUCI:  Objection, form.
5      A.  I do not remember.  I'm not familiar
6  with where it says the service number is 8136.  I
7  really don't remember whether that was
8  specifically for the federal upper limit system,
9  although Renee McDonald was my contact person for
10 that system.
11     Q.  Do you recall having access to the
12 federal upper limit system before mid-December of
13 2004?
14     A.  I don't recall for sure the exact date
15 that I had access to the system.
16     Q.  Sometime obviously after October 31 of
17 2004 --
18     A.  Correct.
19     Q.  -- but likely before the end of 2004;
20 is that fair?
21     MR. WINGET-HERNANDEZ:  Objection, form.
22     A.  I would say that -- I don't know the

---

Page 43

1  exact date, but I would -- probably before that
2  point.
3      Q.  But not before October 31 of 2004?
4      A.  No.
5      Q.  Did you have any responsibility for
6  setting federal upper limits prior to October 31,
7  2004?
8      A.  No, I did not.
9      Q.  Who is -- there's a reference in
10 Exhibit 2 to Cindy, in parentheses, Pelter
11 Bergin.  Who is Cindy -- and I understand it's
12 now Bergin?
13     A.  Yes.  She was the health insurance
14 specialist who to my knowledge had the lead on
15 the FULs program before I was hired.  And she
16 worked in the division of pharmacy for a matter
17 of weeks, I would say, maybe up to a month from
18 the time I was hired and started until when she
19 took over with her new position in CMS.  And she
20 actually was the primary person who trained me on
21 the software system and the federal upper limit
22 program.

---

Page 44

1      Q.  Do you know if she still works for CMS?
2      A.  She does as far as I know.  But not
3  within the division of pharmacy.
4      Q.  Do you know in what capacity?
5      A.  As far as I know, she works more with
6  the operations staff for the Medicaid drug rebate
7  program and the state -- and the Center for
8  Medicaid and State Operations.
9      Q.  And what if any involvement does she
10 continue to have in the FUL program?
11     A.  I don't know of any involvement she has
12 at this point with the federal upper limit
13 program.  But with the drug rebate program she's
14 involved.  Just kind of part of the bigger
15 system, the bigger program, the drug rebate
16 program.
17     Q.  Do you know an individual by the name
18 of Sue Gaston?
19     A.  Yes, I do.
20     Q.  What involvement if any are you aware
21 of Sue Gaston having in the FUL program?
22     A.  At a point previous to Cindy Bergin

---

Page 45

1  having the lead on the FULs program, Sue Gaston
2  was involved with the federal upper limit
3  program.  I don't know the exact years, months or
4  years, that she was actually involved with the
5  program.
6      Q.  Have you ever had any conversations
7  with Ms. Gaston about the FUL program?
8      MR. FAUCI:  Objection, form.
9      A.  Yes.  I would say on a -- yes.  I would
10 say that I have.
11     Q.  Have you ever had any conversations
12 with Ms. Gaston specifically about how the
13 mechanics of establishing FULs for a particular
14 drugs?
15     A.  No.  I would say that was primarily
16 with Cindy Bergin.
17     Q.  What conversations can you recall
18 having with Ms. Gaston about the FUL program?
19     A.  Any conversations were probably just on
20 a very general note because she was not working
21 with the division of pharmacy when I started
22 working there.  And I don't recall any specific

---

Henderson Legal Services, Inc.

202-220-4158                        www.hendersonlegalservices.com

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                           May 20, 2008
                       Washington, DC

Page 46

1  topics of conversation.  And there were probably
2  very few, but I'm sure there were times when I
3  did speak with her about the program in general.
4      Q.   But is it fair to say you wouldn't be
5  knowledgeable about the process, for example,
6  that Ms. Gaston used to establish FULs during
7  the period of time where she was the lead?
8          MR. FAUCI:  Objection, form.
9      A.   No.
10     Q.   Or the information on which she chose
11 to rely while she was the lead for setting FULs?
12         MR. FAUCI:  Objection, form.
13     A.   No.
14     Q.   Or the objectives that she sought to
15 achieve when she was setting FULs?  You wouldn't
16 have any knowledge of that?
17         MR. FAUCI:  Objection, form.
18     A.   No, I would not.
19     Q.   Just so we set out a clear time period
20 here, it's my understanding that CMS hasn't
21 updated its FUL list since December of 2006.  Is
22 that consistent with your understanding?

Page 47

1      A.   That's correct.
2      Q.   And the reason that CMS hasn't updated
3  a FUL list since 2006 is because of the advent of
4  the DRA?
5      A.   Correct.
6      Q.   And what do you understand me to mean
7  by the DRA, just so the term is clear on the
8  record?
9      A.   The DRA is the Deficit Reduction Act of
10 2005.  And there were several provisions passed
11 in the Deficit Reduction Act that changed the
12 federal upper limit program, changed the
13 definition of a multiple source drug, changed the
14 methodology by which the federal upper limit is
15 calculated.
16     Q.   What methodology for calculating the
17 federal upper limit was proposed in the DRA?
18         MR. FAUCI:  Objection, form.
19     A.   The DRA establishes the federal upper
20 limit to be 250 percent of the lowest average
21 manufacturer price for the lowest therapeutically
22 and pharmaceutically equivalent average

Page 48

1  manufacturer price within a drug group.
2      Q.   Sounds like you've stated that before.
3  What is an average manufacturer's price?
4          MR. FAUCI:  Objection, form.
5      A.   The average manufacturer price, my
6  understanding of that is the price that the
7  wholesaler obtains the drug from the
8  manufacturer.
9      Q.   Is it otherwise known as AMP?
10     A.   Yes.
11     Q.   And there's a statutory definition of
12 AMP or average manufacturer's price, correct?
13         MR. FAUCI:  Objection, form.
14     A.   In our drug rebate rule, our major rule
15 that we published in July of 2007, even though I
16 did not have the lead on the AMP definition or
17 the entities that were included or excluded from
18 AMP, that is discussed in that regulation.
19     Q.   But there's a definition of AMP that
20 exists to your knowledge?
21         MR. FAUCI:  Objection, form.
22     A.   I believe that there is in the drug

Page 49

1  rebate agreement.
2      Q.   Okay.  And in your role as the program
3  lead on FULs you say that the FUL list hasn't
4  been updated since December of 2006, correct?
5      A.   Correct.
6      Q.   So it fair then to assume that the DRA
7  methodology, the 250 percent of AMP, hasn't been
8  implemented as of today?
9          MR. FAUCI:  Objection, form.
10     A.   Correct.  We have not published any
11 federal upper limit prices under that
12 methodology.
13     Q.   So then is it fair to assume that the
14 period of time for which you've reviewed and
15 updated the FUL list really is December of 2004
16 to December of 2006, so it's the 2005-2006
17 period?
18         MR. FAUCI:  Objection, form.
19     A.   At some point after October 31st 2004
20 until December 2006 as far as the updates on the
21 FUL.
22     Q.   I'm from here on out going to try and

13 (Pages 46 to 49)

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                              May 20, 2008
                        Washington, DC

---

Page 50

1   concentrate my questions on that, that period of
2   October 31, 2005 to December of 2006.  So if you
3   would just kind of keep that in mind in your
4   answers things will go smoothly.
5        MS. OBEREMBT:  John, did you mean to
6   say October of 2004?
7        MR. BUEKER:  I did.  What did I say?
8        MS. OBEREMBT:  2005.
9        MR. BUEKER:  Oh.  Sorry.
10  BY MR. BUEKER:
11       Q.   Just so the record is clear, I'm going
12  to try and confine my questions to October 2004
13  to December 2006.  If you'd keep that in mind it
14  would be appreciated.
15       A.   Sure.
16       MR. BUEKER:  I ask the court reporter
17  to mark at this time two exhibits, Sexton Exhibit
18  4 for identification is a one page document that
19  bears the Bates number HHD 175-1456.
20          (Exhibit Sexton 004 was marked for
21  identification.)
22       MR. BUEKER:  And at the same time,

---

Page 51

1   because I think they're related, let's mark HHD
2   175-1455 as Exhibit 5 for identification, please.
3          (Exhibit Sexton 005 was marked for
4   identification.)
5        THE WITNESS:  (Reading.)
6   BY MR. BUEKER:
7        Q.   Ms. Gaston, please let me know when
8   you've had a chance to look at Exhibit 4 and
9   Exhibit 5.
10       A.   I'm Ms. Sexton.
11       MR. FLESSNER:  You said Gaston.
12       MR. BUEKER:  Gosh I'm having a rough
13  morning.
14       MS. OBEREMBT:  Do you want some coffee?
15       MR. BUEKER:  I do.
16       THE WITNESS:  Okay.
17  BY MR. BUEKER:
18       Q.   Just for the record, would you identify
19  and explain what Exhibit 4 is?
20       A.   Exhibit 4, this would be a printout
21  sheet from the federal upper limit software
22  system.  This is what the sheets look like when

---

Page 52

1   they're printed off.
2        Q.   Okay.  And what is Exhibit 5?
3        A.   Exhibit 5, this is my handwriting, and
4   this is -- appears to be the information from the
5   federal upper limit system.  However, I do not
6   know why I would have -- usually if I was
7   obtaining information myself through one of the
8   compendia I would handwrite in information.  So I
9   don't know if I put this together before the
10  information was downloaded into the compendia or
11  -- I don't know the exact reason why.  But I
12  wrote this, I guess.
13       Q.   I just will note for the record that
14  this is not a drug that's at issue in the New
15  York Counties.  I just thought this might be an
16  easy way to illustrate kind of your process.  By
17  why don't you just walk us through what you
18  typically do in terms of setting a federal upper
19  limit.
20       A.   Okay.  When it's determined that a drug
21  is available as a multiple source drug and we
22  have several sources to use for that, the FDA --

---

Page 53

1   there's an FDA website.  We use a resource from
2   the Food and Drug Law Institute.  The different
3   sources that we would use to identify when a drug
4   is available as a multiple source drug; then we
5   would look at the drug to determine whether it
6   met the criteria under the federal regulations
7   statute whereby we would have two As in the FDA's
8   Orange Book.
9          If there was a B-rated drug or a
10  formulation other than an A-rated drug in the FDA
11  Orange Book then we would have needed three As as
12  our first criteria.  And then we would have to
13  have three suppliers from our compendia.
14  Generally we would get that information from one
15  of the three compendia that we use.
16       Q.   And those are the criteria you'd apply
17  in establishing a federal upper limit?
18       MR. FAUCI:  Objection, form.
19       A.   Yes.
20       Q.   Those are the criteria that CMS would
21  apply in establishing a federal upper limit?
22       A.   Yes.

14  (Pages 50 to 53)

Sexton, Gail

May 20, 2008

Washington, DC

Page 54

1    Q.   And you used the term As.  What does
2  that mean?
3    A.   An A-rated drug would be a
4  therapeutically equivalent drug rated as A in the
5  FDA's Orange Book.  It's a therapeutic
6  equivalency rating.
7    Q.   And what is therapeutic equivalence, at
8  least as you understand it?
9    A.   It's that a multiple source drug
10  product is equivalent to the brand product or the
11  reference listed drug in the Orange Book.
12    Q.   And the Orange Book is a publication
13  that the FDA, Food and Drug Administration, puts
14  out?
15    A.   Yes.
16    Q.   And as I understand it, the Orange Book
17  rates the equivalence of drugs?
18    MR. FAUCI:  Objection, form.
19    A.   They list the therapeutic equivalency
20  ratings.  Mm-hmm.
21    Q.   And you said if there are Bs we need
22  three As.  What's a B?

Page 55

1    A.   A B-rated drug would be a drug that is
2  not therapeutically equivalent to the reference
3  listed drug, and it would be basically a
4  different -- a drug that is not therapeutically
5  equivalent.
6    Q.   You made reference to a resource from
7  the food and drug institute that sounded like it
8  was different from the Orange Book.  Did I hear
9  that correctly?
10    A.   Yes.  The Food and Drug Law Institute.
11  They publish a resource called The Orange Book
12  Companion that gives us patent expiration dates.
13  And it's a source that I would use for checking
14  patent expirations to determine if a drug was
15  available as a multiple source drug.
16    Q.   Explain to me why it's important to
17  check patent expiration dates to determine
18  whether a drug is available as a multiple source
19  drug.
20    A.   Well, that would be our first criteria
21  to evaluate whether a drug was available as a
22  multiple source drug.  And if we saw that there

Page 56

1  was a patent expiration we would then look into
2  the compendia or we would then look into the
3  Orange Book to see then if we had the A-rated
4  drugs.  But that would be one of our starting
5  points to even determine whether a drug was
6  basically available as a multiple source drug.
7    Q.   Would you use the Orange Book companion
8  for any other purposes?
9    A.   No.  Just to determine multiple-source
10  drugs.
11    Q.   And you said -- once you determined if
12  there were two As or if there was a B, three As,
13  then you needed to determine whether there were
14  three suppliers from the compendia.  Is that
15  correct?
16    A.   Correct.
17    MR. FAUCI:  Objection, form.
18    Q.   And you used the word "generally" with
19  reference to the compendia.  Do you always look
20  at the compendia or is there some other place
21  that you might look for prices?
22    A.   We would look at the compendia.  That's

Page 57

1  where we would obtain our pricing information
2  from.  We have a software system that -- as this
3  system (indicating) -- where the compendia
4  information is downloaded into.  We also receive
5  a monthly paper supplement from the compendia
6  from Red Book and from Medi-Span.
7    Q.   You just made reference to a system and
8  a piece of paper.  I take it that the first step
9  in the process of setting FULs is that the FULs
10  program that we talked about a little bit ago
11  downloads pricing data from the compendia?
12    MR. FAUCI:  Objection, form.
13    A.   Did you say that would be our first?
14  Well, the first criteria actually that we would
15  look at after we determined that a drug is
16  available as a multiple source would be the
17  Orange Book, the FDA Orange Book, for the A
18  rating to make sure that regulation was met.
19    Q.   And do you do that or is that done by
20  the FULs program?
21    A.   I did that.  I do that.
22    Q.   When is a printout from the FULs system

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                              May 20, 2008
                        Washington, DC

Page 58

1   like Exhibit 4 generated?
2       A.   It can be generated at any point.
3   Generally I would print out a pricing sheet when
4   I was evaluating a drug and I would keep a hard
5   copy as this for any drugs that there were
6   changes made in the federal upper limit system.
7       Q.   How about drugs for which you evaluated
8   and decided not to make a change?  Would you keep
9   copies of those?
10      A.   My process was that if I did not make a
11  change to the federal upper limit list, if I did
12  not increase or decrease or add or delete a drug,
13  I would make a notation onto the system which we
14  had the capability to do.
15          And I also had a follow-up book that I
16  compiled where if a drug did not meet the
17  criteria, if it was -- we did not have the A-
18  rated drugs, if we did not have a sufficient
19  amount of A ratings, if we did not have a
20  sufficient amount of suppliers, or in the case
21  where if the federal upper limit, once it was
22  calculated, was higher than the AWP price or the

Page 59

1   majority of the AWP prices, then we would
2   generally not set a FUL on those drug
3   ingredients, because the AWP -- well, a couple
4   years ago the average AWP on a national basis was
5   I think AWP minus 12 percent for drug
6   reimbursement, estimated acquisition costs for
7   drug reimbursement for a drug that did not have a
8   federal upper limit.
9           And if a drug did not -- if the FUL was
10  calculated to be higher than an AWP price then
11  generally we did not put a federal upper limit on
12  it because we would be setting a higher limit
13  than what was already established in regulation
14  because EAC reimbursement or estimated
15  acquisition costs were AWP minus a percentage.
16      Q.   In other words, if the FUL that would
17  have been set would have been higher than AWP it
18  wouldn't have resulted in a cost savings for the
19  Medicaid program and so you didn't set a FUL?
20          MR. FAUCI:  Objection, form.
21      A.   Correct.  That was generally the
22  thinking, why a FUL would not be set.

Page 60

1       Q.   Mechanically, once you got a printout
2   from the FULs system like Exhibit 4, what if
3   anything would you do before CMS established a
4   federal upper limit for a particular drug?
5       A.   What would I do with this sheet?
6       Q.   What additional steps if any would you
7   take?
8       A.   Well, generally I would make a notation
9   on the sheet what drug the federal upper limit
10  was set on and show the calculation of the 150
11  percent times the lowest priced drug, the lowest
12  priced available drug, because there could be
13  situations where the lowest priced drug was not
14  available.  So I may put that calculation on the
15  sheet and perhaps that the FUL was not higher
16  than AWP.  Just general notations for my own
17  knowledge.
18      Q.   Anything else that you would do before
19  -- any other steps or additional information you
20  would seek before CMS established a FUL?
21          MR. FAUCI:  Objection, form.
22      A.   There were times when we would call or

Page 61

1   I would call the manufacturers or the suppliers
2   to determine if a drug was available.  If -- and
3   some of these drugs were looked at, most of them,
4   on a case-by-case basis because there were times
5   when we would have three or more suppliers but
6   perhaps we were missing a wholesale acquisition
7   cost, for instance.
8           And I would try to get the wholesale
9   acquisition cost from maybe First Databank like
10  the e-mail to Rojan, because if you could obtain
11  every wholesale acquisition cost you would be --
12  in other words, if you just looked at the prices
13  that were on the pricing sheet and there was a
14  wholesale acquisition cost that was missing, that
15  could have had a lower wholesale acquisition cost
16  than the prices that were shown and perhaps you
17  were falsely setting a higher federal upper limit
18  than you would have to.  However, we were not
19  always successful at getting that information
20  from the suppliers.
21      Q.   When you say wholesale acquisition
22  cost, do you mean WAC?

                                    16 (Pages 58 to 61)

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                                    May 20, 2008
                    Washington, DC

Page 62

1      A.   The WAC, mm-hmm.
2      Q.   And who would you call to get WACs
3   typically?
4      A.   The suppliers we would call.  Sometimes
5   I would try to contact Rojan from First Databank.
6   Or we would call the suppliers to see if a drug -
7   - an NDC was available, and if it was, was it
8   available -- at what price or the currently
9   listed price.
10     Q.   And when you say suppliers, do you mean
11  wholesalers?
12     A.   No.  The suppliers that would be listed
13  on the pricing sheets or in the software system.
14  In Exhibit 4, Dr. Reddy's, Sandoz, IVAX.
15     Q.   So companies selling pharmaceutical
16  products?
17          MR. WINGET-HERNANDEZ:  Objection, form.
18     A.   Correct.  The companies listed under a
19  specific drug.
20          MR. BUEKER:  Let's mark a one page e-
21  mail that's got the Bates number HHD 175-1448 as
22  Exhibit 6 for identification, please.

Page 63

1          (Exhibit Sexton 006 was marked for
2   identification.)
3          THE WITNESS:  (Reading.)
4   BY MR. BUEKER:
5      Q.   Ms. Sexton, the court reporter has
6   placed before you Exhibit 6.  Tell me whether
7   you've had a chance to take a look.
8      A.   Yes.
9      Q.   And again, this is not a drug that's at
10  issue in the New York Counties.  I just want to
11  ask a couple more questions and we'll move to the
12  New York Counties' drugs.
13     A.   Okay.
14     Q.   This e-mail makes reference to the most
15  common package size.  Do you see that?
16     A.   Yes.
17     Q.   What is the most common package size?
18          MR. FAUCI:  Objection, form.
19     A.   Well, I don't know how that's exactly
20  defined commonly.  In the regulation in 447.332,
21  I believe, the FULs was set on package size of
22  100 or the most commonly prescribed package size

Page 64

1   for tablets or capsules; if it was a liquid, in
2   the most commonly prescribed package size.  And
3   there were occasions where we could not always
4   determine what the most commonly prescribed
5   package size was for a drug.
6          We may not have a package size 100.
7   And sometimes we did or we didn't.  But we would
8   try to -- I would try to determine before I set a
9   federal upper limit if I was using the most
10  commonly prescribed package size according to the
11  regulation.  I generally had two ways of doing
12  that, either asking the pharmacist, which
13  Christie Cahee was a pharmacist at the time who
14  had previously worked in the division of
15  pharmacy.  At the time she was not in the
16  division of pharmacy, but still employed at CMS.
17  Or we could look at the Medicaid drug rebate
18  system, which was a database system to determine
19  utilization.
20          MS. SALZMAN:  I am so sorry.  I hate to
21  interrupt.  But the witness is continually fading
22  in and out.  I don't know if anybody else on the

Page 65

1   phone is having this problem.
2          MR. CHURCH:  No, no.  I strongly agree.
3          MS. HANSCOM:  Yes.
4          THE WITNESS:  Am I not talking loud?
5          MR. WINGET-HERNANDEZ:  I think you'll
6   holding the paper between yourself and the
7   microphone.
8          THE WITNESS:  Is this better?
9          MS. SALZMAN:  Is there any way we can
10  repeat what she just said before?
11          MR. BUEKER:  No.  We'll keep moving and
12  the witness will do the best she can as she's
13  been doing to keep her voice up.
14          MR. CHURCH:  It's almost not a problem
15  with her keeping her voice up.  It's like there's
16  something distorting it when she speaks.  So a
17  word drops in and out.  It's chops off the end of
18  the word.
19          MR. FAUCI:  It's pretty clearly audible
20  in the room.
21          MR. BUEKER:  Yeah.  I don't know what
22  to say.  I mean, we can turn the phone hookup off

17 (Pages 62 to 65)

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                                              May 20, 2008
                              Washington, DC

Page 66

1    if people want to do that.  I don't know how
2    better to address the issue.
3            MR. CHURCH:  I don't think it's a
4    problem with her speaking in the phone.
5            MR. BUEKER:  Okay.  Well, we'll keep
6    going.
7    BY MR. BUEKER:
8        Q.  Let me just ask generally, what
9    criteria did you use in trying to determine the
10   most commonly available package size?
11           MR. FAUCI:  Objection, form.
12       A.  If it was not determined that a drug
13   was available in a package size of 100 or it did
14   not appear that the package size of 100 had ample
15   suppliers, which could have meant it was not the
16   most commonly prescribed package size, I would
17   ask a pharmacist, at that time Christie Cahee was
18   a pharmacist who had previously worked in the
19   division of pharmacy.  I believe in the FULs
20   program she had previously worked.  Or we would
21   check the Medicaid drug rebate system for
22   utilization amounts of the NDC.  They were two

Page 67

1    pretty reliable ways to determine that we were
2    fairly setting a FUL.
3        Q.  And how did you decide between those
4    two ways which you'd use in a particular case?
5        A.  I think there was really no specific
6    guidelines as far as which one I would use.
7        Q.  When you looked at Medicaid utilization
8    data did you look at it nation-wide?  Did you
9    look at particular states?  What data did you
10   look at specifically?
11           MR. FAUCI:  Objection, form.
12       A.  I don't recall, except that I would
13   look at each package size.  But I don't recall if
14   I looked at the state or national amounts.
15       Q.  And you said if a package was -- if a
16   drug was available in a package size of 100 you
17   might still go look at the commonly available
18   package size if there weren't ample suppliers.
19   What criteria did you use to determine whether
20   there were sufficient or ample suppliers?
21       A.  Well, if we did not have three
22   suppliers but we may have had a number of

Page 68

1    suppliers in other package sizes, that may have
2    been a clue that there was a most commonly
3    prescribed package size other than the 100.
4        Q.  Are there criteria written down any
5    place that you're aware of for determining the
6    most commonly available package size?
7        A.  No.
8            MR. BUEKER:  We'll mark a one-page
9    document that bears the Bates number HHD 175-1072
10   as Sexton Exhibit 7 for identification, please.
11           (Exhibit Sexton 007 was marked for
12   identification.)
13           THE WITNESS:  (Reading.)
14           MR. BUEKER:  Okay.
15   BY MR. BUEKER:
16       Q.  Ready?
17       A.  Yes.
18       Q.  Ms. Sexton, do you recognize Exhibit 7?
19       A.  Yes.
20       Q.  What is it?
21       A.  It is a pricing sheet printed off of
22   the federal upper limit software system.

Page 69

1        Q.  And whose handwriting is that at the
2    bottom of Exhibit 7?
3        A.  My handwriting.
4        Q.  For what drug was this printout
5    generated?
6        A.  Albuterol sulfate, 0.083 percent
7    inhalation, package size 3.
8        Q.  And this is the solution we were
9    talking about earlier?
10           MR. FAUCI:  Objection, form.
11       A.  In the New York list?  Well, except for
12   the typo, it looks like it.
13       Q.  Yeah.  Please excuse my typo.
14       A.  However, that does not have a package
15   size listed in this first exhibit.
16       Q.  Okay.  Turn back to Exhibit 7 for a
17   minute.  The handwriting at the bottom, that's
18   your handwriting, you say?
19       A.  Yes.
20       Q.  And it reflects that following
21   generating this printout from the federal upper
22   limit system you did some manual review or

                                            18  (Pages 66 to 69)

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                      May 20, 2008
                    Washington, DC

Page 70

1   calculations, correct?
2       A.   Yes.
3       Q.   Describe for me the manual review or
4   calculations that you did.
5       A.   Well, the system actually calculates
6   the federal upper limit.  But just as a general
7   notation the way I was taught I would document
8   the price, the source of the lowest price and
9   what the source code, which is the compendia
10  code, and just for my own purposes put the
11  calculation, spell out the calculation.
12      Q.   In other words, you were confirming the
13  calculation that the system had done?
14      A.   Yes.  Mm-hmm.
15      Q.   And you say you identified the source.
16  And by that you mean the lowest published price
17  on which the FUL was based?
18          MR. FAUCI:  Objection, form.
19      A.   Yes.
20      Q.   And in this instance what is that
21  source?
22      A.   Hi-Tech Pharmacal Company.

Page 71

1       Q.   Okay.  So for the -- in the March of
2   2005 time period the FUL for the .083 albuterol
3   sulfate solution would have been based on Hi-
4   Tech's WAC?
5       A.   Correct.
6       Q.   And what's the significance of the B
7   written in quotations next to the word Hi-Tech on
8   Exhibit 7?
9       A.   B is the source code and B stands for
10  Blue Book, which is First Databank's compendia.
11      Q.   And what are the other source codes?  I
12  see an R.
13      A.   R is for Red Book and M is for Medi-
14  Span.
15      Q.   And are those the three sources of
16  published prices that CMS used while you were the
17  FUL program lead?
18      A.   Yes.
19      Q.   Were there any other pricing sources
20  during the October of 2004 to December 2006 time
21  period that CMS used for pricing information?
22          MR. FAUCI:  Objection, form.

Page 72

1       A.   Not that I'm aware of.  Are you
2   referring to if we would call a supplier as well?
3   Are you counting that as a source?
4       Q.   No.  I hadn't thought of that.  So in
5   terms of publications there were I guess three
6   publications?
7       A.   Yes.  To my knowledge.
8       Q.   And in addition to publications what if
9   any other sources of information did you use in
10  establishing federal upper limits?
11      A.   Any other pricing, sources of pricing?
12      Q.   Yes.
13      A.   Well, if we would call a supplier and
14  obtain pricing information directly from a
15  supplier, if we were trying to verify or obtain
16  pricing, that would be another source, I guess.
17  But as far as the publications, the compendia,
18  these were the three that I knew of that were
19  used.  I was not aware of any other pricing
20  compendia.
21      Q.   Okay.  There's a handwritten note at
22  the bottom of Exhibit 7 that reads to me three

Page 73

1   WACs then a less than sign, FUL, dash, FUL, less
2   than sign, AWP, minus.  Do you see that?
3       A.   Yes.
4       Q.   Is that note that you made?
5       A.   Yes.
6       Q.   What does that note mean?
7       A.   Three WACs less than the FUL meant that
8   we saw that there were three wholesale
9   acquisition costs or three prices that would be
10  available to the providers that were less than
11  the federal upper limit.  In other words, there
12  were -- we could see that there were NDCs
13  available within the federal upper limit.
14      Q.   Why did you look at that?
15      A.   Basically because when I was taught the
16  program that is one of the criteria that they had
17  looked at as far as in setting a federal upper
18  limit.  And so that was just something I
19  documented on every sheet.  However, that's not -
20  - there were no set amount of wholesale
21  acquisition costs that would be looked at as far
22  as when I did the FULs that would have to be less

19  (Pages 70 to 73)

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                                    May 20, 2008
                          Washington, DC

Page 74

1  than the FUL.
2      Q.   And who taught you to do this kind of
3  analysis?
4          MR. FAUCI:  Objection, form.
5      A.   Cindy Bergin taught me the FULs
6  program.
7      Q.   Did she explain to you why this kind of
8  analysis was done?
9          MR. FAUCI:  Objection, form.
10     A.   Over the course of time the pharmacy
11 community had -- they raised a lot of concern and
12 in fact on an ongoing basis whether NDCs were
13 available at the federal upper limit
14 reimbursement amount.  And to my knowledge it was
15 used kind of as a checkpoint system to say, well,
16 we can see where there are prices that are less
17 than the federal upper limit where drugs could be
18 obtained within the reimbursement amount.
19     Q.   So is that a check on availability?
20         MR. FAUCI:  Objection, form.
21     A.   A check on -- well, availability and
22 cost.

Page 75

1      Q.   Let me make sure I got it.  So the
2  reason you'd look to see whether there were WACs
3  less than the federal upper limit is to determine
4  whether there was drugs available on the
5  marketplace at that federal upper limit price?
6          MR. FAUCI:  Objection, form.
7      A.   That's why I documented, because that
8  was just how I learned -- that's how I was
9  taught.  That's one thing that was looked at.
10 However, I did not set a FUL based on that
11 criteria.  It was just something that I guess at
12 some point was looked at.
13     Q.   But it was a check that you continued
14 to do during the period of time October 2004 to
15 December 2006, correct?
16         MR. FAUCI:  Objection, form.
17     A.   Yes.
18     Q.   And the second part of that statement
19 says "FUL less than AWP minus"; is that correct?
20     A.   That's not a minus.  That's just a
21 marking.  It's just "FUL less than AWP."
22     Q.   Okay.  I think you explained it,

Page 76

1  certainly.  But why would you look at that?  Why
2  would you make that comparison?
3      A.   Because EAC or estimated acquisition
4  cost for drugs that did not have a federal upper
5  limit or even for drugs that had a federal upper
6  limit were AWP minus a percent and that varied by
7  state.  And if a FUL was calculated to be higher
8  than the majority of the AWPs, then it did not --
9  it would not yield cost savings to set a federal
10 upper limit that was higher than an EAC already
11 established by a state.
12     Q.   Do you recall in your time where you
13 were the program lead on FULs ever establishing a
14 FUL based on a published AWP?
15         MR. FAUCI:  Objection, form.
16     A.   I don't recall there -- I remember rare
17 occasions when an AWP would be calculated in the
18 system to be the lowest price.  Very rare
19 occasions.
20     Q.   On those occasions do you ever recall
21 establishing a FUL or was that a situation where
22 the drug wasn't -- a FUL wasn't established for

Page 77

1  the drug because it wouldn't have resulted in a
2  cost savings?
3          MR. FAUCI:  Objection, form.
4      A.   I would not have not set a FUL based on
5  that if that was the lowest published price.  But
6  I don't recall if that was ever the case where a
7  federal upper limit was set on a drug with the
8  AWP.
9      Q.   Just so I'm clear, you don't ever
10 recall setting a FUL based on an AWP?
11         MR. FAUCI:  Objection, form.
12     A.   I'm not saying that I haven't.  I just
13 don't -- I don't recollect ever doing that.
14     Q.   But if you ever did, it would be a rare
15 occasion?
16         MR. FAUCI:  Objection, form.
17     A.   I would say that it was rare that the
18 AWP price was ever the lowest price.
19         MR. BUEKER:  We've been going for about
20 an hour.  Do you want to take a break here and
21 we'll come back in five or ten minutes?  What's
22 good for you?

                 Henderson Legal Services, Inc.
202-220-4158                      www.hendersonlegalservices.com

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                            May 20, 2008
                        Washington, DC

Page 78

1      THE WITNESS: Sure. That's fine.
2      THE VIDEOGRAPHER: This is the end of
3  tape 1. Off the record at 10:44.
4      (Recess.)
5      THE VIDEOGRAPHER: This is the
6  beginning of tape 2 in the deposition of Ms.
7  Sexton. On the record at 10:58.
8      MR. BUEKER: I'll ask the court
9  reporter to mark as Sexton Exhibit 8 for
10 identification a five page document, the first
11 page of which bears the Bates number HHD 175-
12 1059.
13     (Exhibit Sexton 008 was marked for
14 identification.)
15 BY MR. BUEKER:
16   Q.  Ms. Sexton, the court reporter has
17 handed you Exhibit 8. Once you've had a chance
18 to take a look, let me know.
19   A.  Okay. (Reading.) Okay.
20   Q.  Okay? And for the record, would you
21 explain what the first page of Exhibit 8 is?
22   A.  The first page is a pricing sheet

Page 79

1  printed from the federal upper limit software
2  system.
3    Q.  And there's handwriting on the first
4  page of Exhibit 8. Whose handwriting is that?
5    A.  That's my handwriting.
6    Q.  Okay. The balance, the four pages
7  behind the first, so the second through the fifth
8  pages, what are those?
9    A.  These are printouts from the FDA Orange
10 Book where we would look at therapeutic
11 equivalency ratings. This is a printout from the
12 Orange Book on a drug group.
13   Q.  And who would have printed out pages 2
14 to 5?
15   A.  I probably would have printed them out.
16   Q.  Just so we -- turn back to the first
17 page, if you would. Just so I make sure I
18 understand what's going on, the notation at the
19 bottom that begins with 3/05, that's your
20 recalculating the federal upper limit as
21 generated by the FULs system, correct?
22   A.  Yes.

Page 80

1    Q.  And do I correctly understand that in
2  this case for the -- and now we're talking about
3  the 90 microgram albuterol inhaler, correct?
4    A.  Yes. The 0.09 milligram inhalation
5  aerosol metered inhalant, yes.
6    Q.  So the albuterol inhaler?
7    A.  Yes.
8    Q.  And at this time in March of 2005 the
9  FUL for the albuterol inhaler was being based on,
10 as I understand your notation at the bottom of
11 the page, IVAX's WAC in Red Book; is that
12 correct?
13   A.  Yes.
14   Q.  We see a notation at the bottom that
15 you've checked to see that the FUL is less than
16 AWP?
17   A.  Yes.
18   Q.  Can you read into the record what's
19 written on the right-hand side of the page?
20   A.  "Three can have three suppliers as this
21 as long as the A" -- meaning the A-rated drug --
22 "drives the FUL. The other two B can still serve

Page 81

1  as suppliers."
2    Q.  Okay. And up above there are the
3  letters "BN" and "AB" written. Do you see those?
4    A.  Yes.
5    Q.  And BN is written next to the three
6  lines that end with a company name of Warrick
7  Pharmaceuticals.
8    A.  Yes.
9    Q.  And AB is written next to IVAX
10 Pharmaceuticals, Inc., correct?
11   A.  Yes.
12   Q.  And BN is written next to Schering
13 Corporation?
14   A.  Yes.
15   Q.  And so I understand it in March of --
16 or in February of 2005 there were three
17 manufacturers who were supplying the albuterol
18 inhaler referenced in Exhibit 8; is that correct?
19   A.  According to the pricing sheet, yes.
20   Q.  And this was the pricing sheet on which
21 you would have set the federal upper limit in
22 March of 2005, correct?

                                21  (Pages 78 to 81)

Sexton, Gail                                          May 20, 2008
                       Washington, DC

Page 82

1        MR. FAUCI:  Objection, form.
2        A.   Yes, but I always did a secondary check
3   in the paper compendium, which would be the same
4   compendia sources.  But there were times when the
5   paper compendia would list another source or the
6   system would have another source.  They were
7   generally the same but not always.  And I would
8   also look at those paper monthly compendia.
9        Q.   In this instance it looks like there
10  are two manufacturers whose drugs are B-rated,
11  correct?
12       A.   Correct.
13       Q.   And one whose drug is A-rated?
14       A.   Correct.
15       Q.   And nevertheless, it looks like you
16  established a federal upper limit; is that
17  correct?
18       A.   Correct.
19       Q.   Now, you said earlier that the criteria
20  where there needed to be two A or if there were B
21  there had to be three A-rated.  How is it that in
22  this situation CMS established a federal upper

Page 83

1   limit?
2        MR. FAUCI:  Objection, form.
3        A.   There has been to be two As or a third
4   A with the B-rated in the Orange Book.  And this
5   is not the Orange Book.  This is the compendia.
6   And it appears we have the A ratings in the
7   compendia.  I mean -- I'm sorry -- in the Orange
8   Book.  And that's where the therapeutic
9   equivalency ratings are derived from.
10       Q.   So as I understand it you went and
11  looked at the Orange Book, which are the pages 2
12  to 5, and determined that there were at least
13  either two A-rated or -- well, it must have been
14  in this case because there were B.  There were
15  three A-rated equivalents of the 90 microgram
16  inhaler; is that correct?
17       A.   Correct.
18       Q.   And then as I understood it, your
19  testimony earlier, the second kind of hurdle or
20  criteria that had to be met is there had to be at
21  least three suppliers in the compendia, correct?
22       MR. FAUCI:  Objection to form.

Page 84

1        A.   Correct.  Or three suppliers available
2   that we could determine.
3        Q.   In this case which were the three
4   suppliers?
5        A.   Warrick, IVAX and Schering.
6        Q.   And so let me try and come at it this
7   way.  What did you mean by your note?
8        A.   I would interpret the note to mean that
9   we had the A-rated criteria, we had three
10  suppliers, and as long as we set the FUL --
11  because in statute the FUL must be set on an A-
12  rated drug or a therapeutically equivalent drug,
13  and we did calculate the FUL on an A-rated drug.
14  But the B-rated drugs are still suppliers in the
15  market.  They still -- B-rated drugs are still --
16  they are still considered suppliers of the drug.
17       Q.   Let me see if I understand it.  You
18  wouldn't have set the FUL based on a Schering or
19  Warrick product in this example because it was B-
20  rated; is that correct?
21       MR. FAUCI:  Objection, form.
22       A.   Correct.  But also -- that would have

Page 85

1   been for any drug.  But in this particular case
2   the A-rated happened to be the lowest published
3   price.
4        Q.   Okay.
5        A.   But if it was not the lowest published
6   price, if a B-rated was the lowest published
7   price, then it would not have been used to set
8   the FUL.
9        Q.   Because during your time in
10  establishing federal upper limits at CMS you
11  didn't use B-rated drugs as the published price
12  on which the FUL was based, correct?
13       MR. FAUCI:  Objection, form.
14       A.   Not that I can remember, unless we
15  clarified that another source listed an NDC as A-
16  rated.
17       Q.   I'm sorry.  I didn't understand that.
18       A.   I was referring earlier to the paper
19  compendia.  If we had -- the system also -- this
20  federal upper limit system also gave us
21  therapeutic equivalency ratings.  They don't show
22  up on here.  But they do.  And they're also

Henderson Legal Services, Inc.

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                           May 20, 2008
                    Washington, DC

Page 86

1  listed in the paper compendia.  So I would always
2  look at all resources to make sure that a drug
3  that was an A was an A across the board or a B
4  across the board or if it was not listed in one
5  with any therapeutic equivalency rating that I
6  would find it from another source.
7       Q.  Let me see if I understand the last
8  part of the statement and then we'll go back.  If
9  something wasn't listed as therapeutically
10 equivalent, as A-rated in the hard copy
11 publication of the Orange Book, you might go look
12 someplace else to see --
13      A.  Well, not to initially establish if the
14 drug would meet the criteria for a FUL.
15      Q.  The process for establishing whether a
16 drug met the FUL criteria, you only looked at the
17 Orange Book for that part of the process?
18      A.  Correct.
19      Q.  And by the Orange Book the hard copy
20 Orange book that FDA publishes; is that correct?
21      A.  Well, I always used the electronic
22 copy.  In fact, I don't know that it was

Page 87

1  published in a hard copy.  I don't know that.  I
2  always used -- this is a printout of the online -
3  - off of the website, the Orange Book.  That's
4  the only source basically that I have used.
5       Q.  But unless that online source -- this
6  online source from the FDA is the only place you
7  would have looked in determining whether a drug
8  was eligible for a FUL?
9       A.  Correct.
10      MR. FAUCI:  Objection, form.
11      Q.  And then let me make sure I have the
12 basic premise.  To your recollection there's no
13 instance in which you, during the period of time
14 you were the program lead on FULs, established a
15 federal upper limit based on the published price
16 of a B-rated drug; is that correct?
17      A.  Not to my knowledge.  I don't recollect
18 setting a FUL on a B-rated drug.
19      Q.  Okay.  But in the process of trying to
20 determine whether the drug with the lowest price
21 was A-rated or B-rated you might look at sources
22 beyond just the online Orange Book?

Page 88

1       A.  As a cross-check we did have those
2  ratings in our software system.
3       Q.  Okay.  Other than the online Orange
4  Book and your software system, was there anywhere
5  else you would have gone to look to see if
6  something was therapeutically equivalent?
7       A.  Not no, not to my knowledge.  Just the
8  compendia or the FDA sources.
9       MR. BUEKER:  Can I ask the court
10 reporter to mark as Sexton Exhibit 9 for
11 identification a one-page document Bates labeled
12 HHD 175-1058?
13      (Exhibit Sexton 009 was marked for
14 identification.)
15 BY MR. BUEKER:
16      Q.  Ms. Sexton, let me know when you've had
17 a chance to look at Sexton Exhibit 9.
18      A.  Okay.  (Reading.)  Okay.
19      Q.  Exhibit 9, first of all, appears to me
20 to be a printout from the federal upper limited
21 system with your handwriting on it.  Is that
22 true?

Page 89

1       A.  Yes.
2       Q.  And Exhibit 9 pertains to the 0.09
3  microgram albuterol inhaler, the same drug we
4  were talking about in Exhibit 8, correct?
5       A.  Correct.
6       Q.  And just so we understand what's going
7  on at the top of Exhibit 8, it looks like the WAC
8  for IVAX's albuterol inhaler has been crossed
9  out; is that correct?
10      A.  Yes.
11      Q.  And written to the right of that it
12 says "new WAC" and then "0.2911."  Do you see
13 that?
14      A.  Yes.
15      Q.  What significance, if any, does that
16 notation have to you?
17      A.  Well, the new WAC would be used to set
18 the FUL.  It would change from the original WAC
19 to increase the FUL.  And from memory we had a
20 lot of concern raised from the pharmacy community
21 on the availability of this drug.  And so further
22 evaluation was done to determine the exact

23 (Pages 86 to 89)

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                    May 20, 2008
                    Washington, DC

---

Page 90

1  availability in the market, prices and
2  availability.
3      Q.  And it looks like from Exhibit 9 that
4  one of the things that you did to determine
5  availability in the marketplace was to call IVAX
6  and ask IVAX about its WAC; is that correct?
7          MR. FAUCI:  Objection, form.
8      A.  I cannot recall, but that would have
9  been -- either that or contacting First Databank,
10 Rojan or someone.  But more than likely I called
11 IVAX.  But it was determined that there was a
12 different WAC for that drug.
13     Q.  Down in the bottom of the page there's
14 a column labeled "contact."  Do you see that?
15     A.  Okay.  Yes.  Then I did contact them.
16 Mm-hmm.
17     Q.  So you contacted IVAX and learned that
18 their --
19     A.  Correct.
20     Q.  -- WAC price had been increased; is
21 that correct?
22     A.  Correct.

---

Page 91

1      Q.  The FUL system itself had calculated a
2  federal upper limit on the basis of the old IVAX
3  WAC, correct?
4      A.  Correct.
5      Q.  And so what you did was make some
6  telephone calls to confirm the FUL calculation
7  and revise the FUL based on what you had learned?
8      A.  Correct.
9      Q.  And we see a notation that's the same
10 as -- over on the right-hand side of the page
11 there's a notation that starts "03/2006."  Do you
12 see that?
13     A.  Zero?
14     Q.  Referring to --
15     A.  Yes.  Yes.
16     Q.  And would you read into the record what
17 it says next to 03/2006?
18     A.  "FULs set on IVAX WAC.  Three WACs less
19 than FUL.  FUL less than AWP."
20     Q.  And what did you mean when you wrote
21 that?
22     A.  Meaning the FUL, the federal upper

---

Page 92

1  limit, was set on the IVAX NDC.  And we had three
2  WACs of the available suppliers there that --
3  three WACs that were less than the calculated
4  FUL.  And the calculated FUL was less than the
5  AWP.
6      Q.  And again, why did you make those
7  comparisons?
8      A.  Well, that was just the notation that
9  we -- a documentation that was done as far as the
10 WACs being -- how many WACs less than the FUL.
11 FUL less than AWP because it would not have been
12 -- it would not have rendered savings for the
13 Medicaid program to set a FUL that was higher
14 than the AWP, according -- per our prior
15 conversation on that.
16     Q.  And the notation about WACs, why was
17 that?
18     A.  To note that there were at least three
19 NDCs that were available less than the calculated
20 FUL.
21     Q.  Okay.  There's a -- under the chart in
22 bold there's a typed notation which I haven't

---

Page 93

1  seen before which starts with three stars and
2  then says "FULs price not greater than another
3  supplier."  Do you see that?
4      A.  Yes.
5      Q.  Is that generated by the FULs system?
6      A.  Yes.
7      Q.  In what circumstances is that notation
8  generated?
9      A.  I'm interpreting that to mean that the
10 calculated FULs price was not higher than the
11 NDCs listed, the WAC prices.
12     Q.  So in other words, there's not another
13 WAC price -- other than the WAC price that's used
14 to set the federal upper limit as calculated by
15 the system, there's not another WAC price that's
16 lower than that FUL calculated by the system; is
17 that correct?
18         MR. FAUCI:  Objection, form.
19     A.  Right.  In the system, but as you can
20 see there was further manual interventions done
21 on this drug from other suppliers that the FULs
22 system would not take into account when they

---

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                          May 20, 2008
                        Washington, DC

Page 94

1  would -- when the FULs system would show that
2  message.
3      Q.  Okay.  And why do that further manual
4  intervention?
5      A.  Well, I learned -- and it could have
6  been from the paper compendia that I did the
7  second checks on I learned of other suppliers
8  that were marketing this drug.  So I tried to
9  determine if they were still marketing and at
10 what price to see exactly what the availability
11 was in the market, because there was a lot of
12 concern raised by the pharmacy community about
13 this drug and that it was not available.
14     Q.  At the federal upper limit price?
15     A.  Or that it was even not available,
16 adequate supply.
17     Q.  Is the notation "FULs price not greater
18 than another supplier" something that in your
19 experience is automatically generated by the
20 system?
21     A.  I really don't think I ever noticed
22 those messages or the messages that would come

Page 95

1  out.  They come out kind of in a different color
2  or small at the bottom of the system when you're
3  looking at the screen.  And that's not something
4  I would generally look at or look for.
5      Q.  Okay.  So it wasn't a flag that caused
6  you to do anything differently than would have
7  been done with other drugs for which you were
8  establishing a federal upper limit?
9      A.  No, it would not have.
10     Q.  But is it fair to say then that there's
11 a manual review process that you undertake with
12 regard to each federal upper limit that you
13 established?
14         MR. FAUCI:  Objection, form.
15     A.  I wouldn't say each.  I would say in
16 cases where I saw that manual intervention could
17 have changed the price, changed the federal upper
18 limit, or where it appeared that perhaps the
19 criteria was not met and that further
20 intervention should have been taken.
21     Q.  How would you identify those situations
22 in which manual intervention might change the FUL

Page 96

1  price?
2      A.  Could you repeat that?
3      Q.  Sure.  How would you identify -- what
4  criteria would you use to identify situations in
5  which your manual intervention might change the
6  FUL price that was set?
7      A.  Well, for instance, if I saw a price
8  that was -- that looked to be an outlier price,
9  maybe far lower than the other prices, I may call
10 that supplier to determine was the NDC available
11 at that price, so as not to set an unfairly low
12 price on an outlier that was not available.  If I
13 saw -- comparing to the paper compendia, if I saw
14 that there were other suppliers other than what
15 was noted in the system then I would call those
16 suppliers.
17         Is that what you mean?
18     Q.  Yeah.  I'm just trying to understand
19 the criteria that you used to decide when you'd
20 want to manually intervene in the process.
21     A.  Right.  If the paper compendia maybe
22 showed a different amount of suppliers and there

Page 97

1  was a possibility that you did have three
2  suppliers, just that the system was not showing
3  three suppliers, or in the case of an outlier
4  drug, or in the case where a drug supplier was
5  shown, an NDC was shown, but there was no price
6  at all, you would try to determine the price.
7      Q.  You used the term outlier price and you
8  said I didn't want to set a FUL that was unfair.
9  What did you mean by that?
10         MR. FAUCI:  Objection, form.
11     A.  Well, in cases -- if I saw -- maybe
12 there was a WAC for two cents and then maybe all
13 the other WACs were 80 cents and above, or
14 something to that effect, that would be a case
15 where you may want to call to verify, if you
16 could, if you would -- the suppliers did not
17 always provide you with the information
18 requested.  You were not an account holder.  But
19 that would be a case perhaps.
20         We didn't have to verify, but that
21 would just be a good practice to make the attempt
22 if you could.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                           May 20, 2008
                        Washington, DC

| Page 98 | Page 100 |
|---|---|

**Page 98**

1    Q.   What if you learned the drug was
2  available at the 2 cent price?  Then what would
3  you do?
4    A.   Well, then that would set the federal
5  upper limit.
6    Q.   Looking back at Exhibit 9 there's a
7  package size notes.  Do you see that?
8    A.   Yes.
9    Q.   And could you read into the record
10  what's written under that?
11    A.   "FDA ratings are adequate.  Three
12  suppliers 02/2005."
13    Q.   Is that a note that you would have put
14  into the FUL system?
15    A.   I -- probably, because I was the lead
16  on the FULs at that time, although I had just
17  started.  So I would say that I probably made
18  that notation in the system.
19    Q.   What did you mean by that notation?
20    MR. FAUCI:  Objection, form.
21    A.   It would mean that in the FDA Orange
22  Book there were two As or three As if there were

**Page 99**

1  a B.  And we had three suppliers of the drug as
2  of February of 2005.
3    Q.   Written in the left-hand margin there's
4  a note that I'm not sure I can read.  Would you
5  try and read -- next to the table.
6    A.   "FUL must be set on A."
7    Q.   What did that mean?
8    A.   That we needed to set a FUL on an A-
9  rated drug.
10    Q.   In other words, that a FUL couldn't be
11  set on a B-rated drug?
12    MR. FAUCI:  Objection, form.
13    A.   Yes.  Mm-hmm.
14    Q.   And that's, I take it, the significance
15  of the As and Bs written in the third column
16  there; you were trying to determine which of
17  those drugs could form the basis for the federal
18  upper limit?
19    MR. FAUCI:  Objection, form.
20    A.   Correct.
21    MR. BUEKER:  I ask the court reporter
22  to mark as Sexton Exhibit 10 for identification a

**Page 100**

1  document that has on the front cover "Approved
2  drug products with therapeutic equivalence
3  evaluations, 25th edition."
4    (Exhibit Sexton 010 was marked for
5  identification.)
6  BY MR. BUEKER:
7    Q.   Take a look at Exhibit 10, Ms. Sexton,
8  and just tell me when you've had a chance to do
9  so.
10    A.   (Reading.)  Okay.
11    Q.   You may have answered this question
12  indirectly already, but do you recognize Exhibit
13  10?
14    A.   Yes.
15    Q.   What is Exhibit 10?
16    A.   This would be the Orange Book, the FDA
17  publication.  It appears to be the hard copy
18  edition.
19    Q.   Okay.
20    A.   I have seen a hard copy edition.  But I
21  don't know that they still produce it in hard
22  copy.

**Page 101**

1    Q.   Would you agree with me, though, that
2  this appears to be the 2005 edition of the FDA's
3  Orange Book?
4    A.   Yes.
5    Q.   And the pages that are excerpted, the
6  second to last and the last page of the exhibit
7  pertain to albuterol, correct?
8    A.   Correct.  And albuterol sulfate.
9    Q.   And if you go to look at the middle of
10  the page that the second to last, it's got 3-12
11  of 351 at the top?
12    A.   Yes.
13    Q.   Do you see there the equivalence
14  ratings for the albuterol inhaler right under the
15  broad heading albuterol, right?
16    A.   Correct.
17    Q.   I don't see on that list Andrx.  Do
18  you?
19    A.   No.
20    Q.   Flipping back with me to Exhibit 9
21  you've written in your chart that Andrx albuterol
22  inhaler was A rated.  Do you see that?

Henderson Legal Services, Inc.
202-220-4158                        www.hendersonlegalservices.com

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                          May 20, 2008
                     Washington, DC

Page 102

1    A.  Yes.
2    Q.  Do you know where you would have gotten
3  that rating?
4    A.  From the compendia.  The only other
5  source would have been the compendia, the paper
6  compendia.  Because it appears that there were
7  several other suppliers that were not listed in
8  the system.
9    Q.  Okay.  And so when you say the paper
10  compendia, by that you mean Red Book, Blue Book
11  or Medi-Span?
12    A.  Correct.
13    Q.  And in Blue Book, anyway, a
14  therapeutically equivalent rating is ZA rated,
15  right?
16      MR. FAUCI:  Objection, form.
17    A.  No.  An A-rated would be
18  therapeutically equivalent in Blue Book.
19    Q.  Do you know in Blue Book how Blue Book
20  indicates that something is A-rated or
21  therapeutically equivalent?
22    A.  It should be an A.  A should be used by

Page 103

1  all the compendia as a therapeutic equivalency
2  rating.
3    Q.  But you would sometimes rely on the
4  compendia for determining the therapeutic
5  equivalence of a product for at least the second
6  step in the process?
7      MR. FAUCI:  Objection, form.
8    A.  I would use the FDA Orange Book.  But
9  in -- as you looked through individual drugs and
10  you did further evaluations you would see that
11  there were other sources that would give you a
12  therapeutic equivalency rating.
13    Q.  And so when something didn't appear in
14  the Orange Book you'd go look at those other
15  sources like you did in Exhibit 9?
16    A.  You could look at other sources, but
17  not to establish whether a drug met the criteria.
18  If a drug did not have the three A ratings or the
19  two, depending on whether there was another
20  formulation, I don't know that you would have
21  then gone to the compendia to try to get that
22  information.  But only a drug already met the

Page 104

1  criteria but then other suppliers appear to be
2  there and then you would gather the information
3  on those suppliers.
4    Q.  Okay.  So let me just make sure -- I
5  know I've spent a lot of time on this.  Let me
6  make sure I get the point.  So using the Andrx
7  example, because Andrx isn't in the Orange Book
8  that A rating wouldn't have been considered in
9  terms of whether or not the inhaler was eligible
10  for a FUL, correct?
11    A.  Correct.
12      MR. FAUCI:  Objection, form.
13    Q.  But then in terms of whether or not
14  Andrx's published price could set the FUL,
15  because it was A-rated in someplace other than
16  Orange Book, that is a price that you would have
17  used?
18    A.  Correct.
19    Q.  I think I get it.
20      MR. BUEKER:  I ask the court reporter
21  to mark for identification as Sexton Exhibit 11 a
22  one-page document that bears the Bates number HHD

Page 105

1  175-1057.
2      (Exhibit Sexton 011 was marked for
3  identification.)
4  BY MR. BUEKER:
5    Q.  Ms. Sexton, please take a look at
6  Exhibit 11 and let me know when you've had a
7  chance to do so.
8    A.  (Reading.)  Okay.
9    Q.  Would you state for the record what
10  Exhibit 11 is?
11    A.  It's a pricing sheet generated from the
12  FULs software system.
13    Q.  And there's handwriting on Exhibit 11,
14  right?
15    A.  Yes.
16    Q.  Whose handwriting is that?
17    A.  Mine.
18    Q.  And would you read for the record what
19  your handwriting says?
20    A.  "3/06 per Deirdra in meeting with
21  NACDS, albuterol will be deleted due to PTAG
22  feedback, limited supply issue and costs."  PTAG

                              27 (Pages 102 to 105)

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                              May 20, 2008
                        Washington, DC

Page 106

1   being the Pharmacy Technical Advisory Group.
2       Q.   Explain to me what the Pharmacy
3   Technical Advisory Group is.
4           MR. FAUCI:  Objection, form.
5       A.   It's a group of state representatives
6   where the pharmacy division at CMS has conference
7   calls with the PTAG on a sometimes monthly,
8   sometimes quarterly basis, to discuss pharmacy
9   issues within the state Medicaid program.
10      Q.   Who's on a PTAG or who's a part of that
11  group?
12      A.   It could be state Medicaid pharmacy
13  directors or state representatives who were
14  involved in the Medicaid pharmacy drug program
15  and then the pharmacy division, the members of
16  the pharmacy division at CMS.  And I actually
17  coordinated the PTAG the first year or two that I
18  was at CMS.  And we would also invite members of
19  the Medicaid drug rebate team to the PTAG calls.
20      Q.   Did the PTAG group include practicing
21  pharmacists?
22      A.   I believe that some people were

Page 107

1   practicing pharmacists, yes.
2       Q.   Did this include representatives of
3   drug wholesalers and manufacturers?
4       A.   No.  No.  They were I believe just
5   state representatives.
6       Q.   How about representatives of private
7   Medicaid providers, say an independent pharmacist
8   or a representative of chain drug stores?
9       A.   I don't think so.  No.  I think they
10  were just state representatives.
11      Q.   And you used the acronym NACDS.  What's
12  that?
13      A.   National Association of Chain Drug
14  Stores.
15      Q.   What's that group in your
16  understanding?
17      A.   They're an association that represent
18  the chain drug stores on pharmacy issues
19  throughout the country.
20      Q.   And you also make reference to Deirdra.
21  Do you know who Deirdra --
22      A.   Deirdra Duzor.  She would be me

Page 108

1   division director for the pharmacy division at
2   that time and still is at this point.
3       Q.   What role if any would Deirdra Duzor
4   have had in establishing federal upper limits at
5   this time?
6           MR. FAUCI:  Objection.
7       A.   Well, even though I would establish the
8   actual federal upper limit, in this case there
9   was a lot of controversy about the drug -- again,
10  supply, availability issues, pricing.  And we had
11  had a meeting with NACDS and that was one of the
12  topics of the meeting.  I don't think that was
13  the reason for the meeting, but as I recall it
14  was brought up in the meeting.  There was concern
15  from the industry that this drug was not
16  available.
17          And that's why -- I believe there was a
18  lot of manual intervention here to determine the
19  exact availability in the market as close as we
20  could determine.  And then we deleted the
21  albuterol in I guess 2006 due to limited supply
22  issues, because we did have more than three

Page 109

1   suppliers.  But as I noted some suppliers were --
2   it was very limited supply or they were on back
3   order and that type of thing.
4       Q.   So in other words, the criteria were
5   met to establish a FUL, but CMS made a decision
6   not to establish a FUL based on feedback it was
7   receiving from providers and others in the
8   marketplace about whether or not it was
9   available?
10          MR. FAUCI:  Objection, form.
11      A.   Well, I wouldn't -- it was kind of a
12  gray area whether it met the criteria.  I think
13  that was the point, that if a manufacturer or a
14  drug supplier had it in limited supply or it was
15  not available at all, they still marketed the
16  drug but there was not going to be any available
17  for maybe a number of weeks or months.  I think a
18  decision had to be made on whether they could be
19  considered suppliers.
20      Q.   But the reason CMS decided to remove
21  the FUL from the .09 microgram inhaler in March
22  of 2006 was a supply issue?

Sexton, Gail                                          May 20, 2008
                    Washington, DC

Page 110

1     MR. FAUCI:  Objection, form.
2     A.  It appears that it was a supply issue.
3     Q.  And that decision was made in part
4  based on feedback that Deirdra Duzor, your
5  superior, received from the National Association
6  of Chain Drug Stores?
7     A.  And feedback that I received as well.
8  And like I said, this was a gray area.  And
9  that's why I took it to Deirdra Duzor to make the
10  decision.
11     Q.  But a judgment was made to remove the
12  FUL?
13     A.  Correct.
14     Q.  Apart from through the PTAG and through
15  the National Association of Chain Drug Stores,
16  how else did you receive feedback on issues like
17  availability in the marketplace?
18     A.  It was from pharmacy providers or
19  states.  I would receive e-mails about -- and
20  other drugs as well on supply issues or cost
21  issues.
22     Q.  Was there a formalized process

Page 111

1  established or how did you receive that feedback?
2     A.  No.  There was no formalized process
3  established.  But the providers would contact me
4  generally by e-mail, sometimes by written letter,
5  that a drug was not available or a drug was not
6  available at cost or within the federal upper
7  limit reimbursement amount.
8     Q.  How frequently did you get that kind of
9  feedback from providers in the marketplace?
10     A.  I would say fairly often.  Not so much
11  just about this drug, but all drugs.
12     Q.  And what if anything did you do in
13  reaction to the feedback you were receiving about
14  a market availability?
15     A.  I would look at the availability in the
16  compendia or I may call suppliers or check -- you
17  know, verify price availability per the criteria.
18     Q.  And can you think of instances in which
19  you made a decision to change the federal upper
20  limit based on the feedback you were receiving?
21     MR. FAUCI:  Objection, form.
22     A.  I can't remember individual drugs or

Page 112

1  ingredient, route, strength, dose, product
2  groups.  But yes, changes were made to the
3  federal upper limit based on a pharmacy provider
4  giving us feedback.  Not because they gave us
5  feedback, but it would be the impetus for me to
6  further evaluate the drug.
7     Q.  I know in 2001, which I know was before
8  your time, CMS established a mailbox, an e-mail
9  mailbox for feedback, at least on a particular
10  federal upper limit list.  I'm wondering if that
11  in your tenure still existed.
12     A.  Not that I know of.
13     Q.  So to the extent that you got feedback
14  by e-mail it would come to your e-mail address
15  personally?
16     A.  Correct.
17     Q.  Would you talk to wholesalers in an
18  effort to determine market availability?
19     A.  No.  I would only talk to the companies
20  listed on in the compendia to determine
21  availability or price, or try to determine.
22     Q.  I think we're finally done with

Page 113

1  albuterol.
2     MS. OBEREMBT:  Not all of us.
3     MR. BUEKER:  I ask the court reporter
4  to mark as Sexton Exhibit 12 for identification a
5  one-page document that's Bates labeled HHD 175-
6  2024.
7     (Exhibit Sexton 012 was marked for
8  identification.)
9  BY MR. BUEKER:
10     Q.  Please tell me when you've had a chance
11  to take a look at Exhibit 12, Ms. Sexton.
12     A.  (Reading.) Okay.
13     Q.  Would you state for the record what
14  Exhibit 12 is?
15     A.  It's a pricing sheet generated from the
16  federal upper limit software system.
17     Q.  And there's handwriting on Exhibit 12.
18  Whose handwriting is that?
19     A.  That would be my handwriting.
20     Q.  What drug does Exhibit 12 pertain to?
21     A.  Isosorbide mononitrate.
22     Q.  Can we refer to it as ISMN?

29 (Pages 110 to 113)

Sexton, Gail                                                    May 20, 2008
                           Washington, DC

| Page 114 |
| --- |

1    A.  I've never referred to it as that.
2    Q.  Okay.  I'll try and say that isosorbide
3  --
4    A.  Oh.  Can we refer to it?
5    Q.  Yes.
6    A.  Oh.  Sure.
7    Q.  Would that be okay?
8    A.  I thought "did I refer to it" --
9    Q.  No.  Can we, because I can't say the
10 name.
11         MR. FLESSNER:  That's mononitrate.
12    Q.  So Exhibit 12 pertains to the 60-
13 milligram tablet form of ISMN?
14    A.  Extended release tablet.
15    Q.  Extended release tablet.  Okay.  And we
16 see the note that we saw on one of the albuterol
17 slides that says "FUL price not greater than
18 another supplier."  Do you see that?
19    A.  Yes.
20    Q.  And that's a note that's generated by
21 the FUL system, but again, not one that you would
22 have paid any attention to?

| Page 115 |
| --- |

1         MR. FAUCI:  Objection, form.
2    A.  I'm not saying I wouldn't pay attention
3  to it.  It's generally not something I would have
4  used to determine whether a FUL was -- whether
5  the criteria was met to place a FUL on a drug.
6    Q.  Is it a flag that would have caused you
7  to do further follow-up?
8    A.  No.
9    Q.  In what instances would you have paid
10 attention to it?
11    A.  I don't know that I would have, really,
12 at all.
13    Q.  Okay.  There's a note under -- well,
14 before we go there, from your handwritten note I
15 take it that it's Ethex' Blue Book price that was
16 the basis for the federal upper limit being
17 established for this drug?
18    A.  Correct.
19    Q.  And we see a notation down in the lower
20 left-hand corner, some dates and then it looks
21 like "called."  Is that "called" down there?
22    A.  Yes.

| Page 116 |
| --- |

1    Q.  What if anything does that notation
2  indicate to you?
3    A.  That I called those two suppliers --
4  the Ethex, there was no WAC, so I see why I would
5  have called them.  The Purepac, I don't know why,
6  just looking at this pricing sheet, why I would
7  have called them.  Well, it looks like they were
8  the lowest published price, but we did not have a
9  WAC on the Warrick or the Ethex.  That's what it
10 looks like to me.
11    Q.  Okay.
12    A.  So to determine whether there was a
13 lower WAC out there, that looks like that was the
14 impetus for the calls.
15    Q.  And so let me just -- there's a T in
16 the far left-hand column of the chart up at the
17 top.  Do you see -- next to the Purepac?
18    A.  Yes.
19    Q.  What if anything does that T mean?
20    A.  It means it's temporarily unavailable.
21 And per my product group note that Purepac was
22 discontinued at this time, therefore we could

| Page 117 |
| --- |

1  input a T in the system, meaning temporarily
2  unavailable, whereby the FUL would be calculated
3  based on another WAC price or another lowest
4  published price, to take it out of the
5  calculation.
6    Q.  To make sure I understand this, you
7  would have called Purepac and I guess learned
8  that it had been -- their NDC for this drug had
9  been discontinued?
10         MR. FAUCI:  Objection, form.
11    A.  Correct.  That's what it appears.
12    Q.  And so you would have taken it out of
13 the calculation and been looking for the next
14 lowest --
15    A.  Correct.
16    Q.  -- published price?
17    A.  Yes.
18    Q.  And it looks like you settled on Ethex
19 as the lowest published price?
20    A.  Yes.
21    Q.  But that you got that price not from
22 the pricing compendia; it was not one that was

30  (Pages 114 to 117)

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                                    May 20, 2008
                          Washington, DC

| Page 118 | Page 120 |
|---|---|

Page 118

1  published in the pricing compendia; you got it
2  from some other source?
3      A.  Yes.  By calling the supplier.
4      MR. BUEKER:  I'd like to ask the court
5  reporter to mark as Sexton Exhibit 13 for
6  identification a one-page document that's labeled
7  HHD 175-2109.
8          (Exhibit Sexton 013 was marked for
9  identification.)
10 BY MR. BUEKER:
11     Q.  When you've had a chance to look at
12 Exhibit 13, Ms. Sexton, please let me know.
13     A.  (Reading.)  Okay.
14     Q.  Would you state for the record what
15 Exhibit 13 is?
16     A.  It's a pricing sheet generated from the
17 federal upper limit software system.
18     Q.  Okay.  And for what drug?
19     A.  Lorazepam, one milligram tablet.
20     Q.  And again, there's handwriting on
21 Exhibit 13.  Whose handwriting is that?
22     A.  Mine.

Page 119

1      Q.  And would you read for me what that
2  handwriting says?
3      A.  "2/05, only one WAC under FUL, no
4  changes made."
5      Q.  So is it fair to say that Exhibit 13
6  reflects your consideration of whether to change
7  the FUL for lorazepam and a decision not to
8  change it at this time?
9      A.  Correct.
10     MR. BUEKER:  I ask the court reporter
11 to mark as Sexton Exhibit 14 a document that
12 states at the top, "Transmittal number 37 -
13 federal upper limit drug list, and has the date
14 underneath November 20th 2001.
15         (Exhibit Sexton 014 was marked for
16 identification.)
17 BY MR. BUEKER:
18     Q.  Ms. Sexton, just generally what is a
19 CMS transmittal?
20     A.  Well, transmittal number 37 actually
21 was the last -- what I would call the last
22 complete update of the FUL list.  And on our

Page 120

1  website we have the transmittal number 37 lists
2  all the drugs that were on the federal upper
3  limit list at that time, November 2001.  And then
4  a subsequent document called changes made to
5  transmittal number 37, which also appears on our
6  website, contains additions, deletions, price
7  increases and decreases, from this complete list.
8      Q.  So just so I understand it, Exhibit 14,
9  transmittal number 37, would have been a complete
10 list of the federal upper limits as they had been
11 established -- well, in November of 2001?
12     A.  Correct.
13     Q.  It just so happens I have the update.
14     MR. BUEKER:  Let's ask the court
15 reporter to mark as Exhibit 15 the -- what is a
16 document that's labeled at the top "Federal Upper
17 Limit (FUL) changes to transmittal number 37."
18         (Exhibit Sexton 015 was marked for
19 identification.)
20 BY MR. BUEKER:
21     Q.  Ms. Sexton, is Exhibit Number 15 the
22 update from the CMS website that you were talking

Page 121

1  about just a minute ago?
2      A.  Correct.
3      Q.  And it says up at the top "current as
4  of 12/19/2006."  You and I talked earlier about
5  the fact that that's the last time CMS has
6  updated its FUL prices, correct?
7      A.  Correct.
8      Q.  So Exhibit 15 reflects any changes that
9  CMS has made to federal upper limits since
10 November 20th 2001?
11     A.  Correct.
12     Q.  So if there's been no change reflected
13 in Exhibit 15 then the FUL price that remains in
14 effect today is the price shown in transmittal
15 number 37, Exhibit 14?
16     A.  It should be.
17     Q.  Would you turn with me to page 11 of
18 Exhibit 14?  And would you state for the record -
19 would you tell me with reference to Exhibit 14
20 what federal upper limit CMS had established for
21 the 1 milligram tablet of lorazepam in 2001?
22     A.  0.5718.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                          May 20, 2008
                        Washington, DC

Page 122

1    Q.  Okay.  And there's a B on the right-
2  hand column.  What does that B mean?
3    A.  That means the source from -- for the
4  price was Blue Book compendia, or First Databank.
5    Q.  So if I understand the federal upper
6  limit rules correctly, whatever published price
7  set the FUL in November of 2001 would be .5718
8  divided by 1.5, the 150 percent?
9    A.  Right.  I don't usually calculate it
10  that way, but it would be 150 percent of the
11  lowest published price would equal the .5718.
12    Q.  And then that price, which I will
13  represent is .3812 -- does that sound correct?
14    A.  Point what?  I'm sorry.
15    Q.  .3812?
16      MR. FAUCI:  Objection.
17    A.  It would be approximately.  I don't
18  know --
19    Q.  I tell you what.  I have a calculator.
20  Let's make sure we get it correct.  Would you
21  divide the --
22    A.  .3812 times 1.5.  (Witness uses

Page 123

1  calculator.)
2      Yes.  That's correct.
3    Q.  So the price in which the federal upper
4  limit for the 1 milligram lorazepam was based in
5  November of 2001 was .3812, correct?
6    A.  That's what it appears, the price that
7  it would have been set on.
8    Q.  Let me see if I can help you out.
9      MR. BUEKER:  I ask the court reporter
10  to mark as Exhibit 16 a one page document that's
11  Bates labeled HHD 175-2110.
12        (Exhibit Sexton 016 was marked for
13  identification.)
14  BY MR. BUEKER:
15    Q.  Once you've had a chance to review
16  Exhibit 16, let me know.
17    A.  (Reading.)  Yes.
18    Q.  Exhibit 16 is -- I know it's before you
19  -- it's dated up in the right-hand corner August
20  1, 2001.  Do you see that?
21    A.  Yes.
22    Q.  So that's before you were at CMS?

Page 124

1    A.  Correct.
2    Q.  But Exhibit 16 looks to be or appears
3  to be a printout from the federal upper limit
4  system?
5    A.  Yes.
6    Q.  And consistent with your training, the
7  notation down at the bottom, although not yours,
8  appears to be a notation about what published
9  price was used to set the federal upper limit?
10    A.  Correct.
11    Q.  And it appears that in this instance it
12  was URL's NDC .38120 that set the federal upper
13  limit for the 1 milligram lorazepam, correct?
14    A.  Yes.
15    Q.  And that's consistent with the division
16  we had just done on Exhibit 15, right?  I'm
17  sorry.  Exhibit 14.
18    A.  Yes.
19    Q.  And can we agree that URL stands for
20  United Research Laboratories?
21    A.  I would believe so from looking at the
22  sheet, mm-hmm.

Page 125

1    Q.  Do you know whether subsequent to
2  November of 2001 the federal upper limit for the
3  1 milligram lorazepam was ever updated?
4    A.  I do not know.
5    Q.  I thought you might not.  But would you
6  take as true -- I take it as true if it doesn't
7  appear in the update transmittal number 37,
8  Exhibit 15, then you'd accept as true that it
9  hadn't been updated, the FUL hadn't been updated?
10    A.  Prior to 2001?  Is that --
11    Q.  Strike that.  Obviously a confusing
12  question.  Let me try again.
13      If there's no reference to the 1
14  milligram lorazepam in Exhibit 15, the update to
15  transmittal number 37, then it's fair to assume
16  that it hadn't been updated post or after
17  November of 2001, correct?
18    A.  Correct.
19    Q.  So would you accept as true my
20  representation that as of today the federal upper
21  limit for the 1 milligram lorazepam remains
22  .5718?

                          32  (Pages 122 to 125)

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                           May 20, 2008
                        Washington, DC

---

Page 126

1   A.  Well, I haven't looked through this
2  entire Exhibit 15.
3   Q.  Okay.  Take a minute and do that.
4   A.  Okay.  (Witness complies.)
5     MR. FAUCI:  John, are you representing
6  that lorazepam does not appear?
7     MR. BUEKER:  Yeah.  I'm pretty
8  confident she won't find it.  I didn't, but --
9     MR. FAUCI:  And we're just talking
10 about the 1 milligram?
11    MR. BUEKER:  We're just talking about
12 the 1 milligram.
13   A.  Okay.  I only saw the 2-milligram.
14   Q.  Right.  So would you agree with me that
15 as of, say, February of 2005, the federal upper
16 limit for the 1 milligram lorazepam tablet
17 remained .5718?
18   A.  It appears that it did, yes.
19   Q.  Turning back to Exhibit 13 for a
20 moment, Exhibit 13 shows that the federal upper
21 limit system calculated a lower federal upper
22 limit for the 1 milligram of lorazepam in

---

Page 127

1  February of 2005.  Right?
2   A.  Mm-hmm.
3   Q.  And CMS chose not to implement that
4  lower federal upper limit in February 2005,
5  correct?
6   A.  That's what it looks like here.
7   Q.  And the lower federal upper limit that
8  the CMS FULs system calculated was based on the
9  Major Pharmaceuticals' WAC price of .077?
10   A.  Correct.
11   Q.  And we see that the United Research
12 Laboratories WAC of .3812 still remains?
13   A.  URL looks like that was unavailable.
14   Q.  Well, your package note indicates that
15 it was unavailable until April of 2003, correct?
16   A.  Oh, okay.
17   Q.  In any event, the FUL system was
18 picking up a lower published price that CMS
19 decided not to use in setting the federal upper
20 limit, correct?
21   A.  Mm-hmm.
22    MR. FAUCI:  Objection, form.

---

Page 128

1   Q.  I'm sorry.  Did you --
2   A.  That's what it appears.  I don't know
3  if there were any other pricing sheets or
4  documentation on this.
5   Q.  But at least on Exhibit 13, one pricing
6  sheet CMS -- you in particular -- had before you
7  a lower published price that was not used to set
8  the federal upper limit?
9   A.  Mm-hmm.
10   Q.  That's correct?
11   A.  Yes.
12    MR. BUEKER:  I ask the court reporter
13 to mark as Sexton Exhibit 17 an OIG report that's
14 titled "Addition of qualified drugs to the
15 Medicaid federal upper limit list."
16      (Exhibit Sexton 017 was marked for
17 identification.)
18 BY MR. BUEKER:
19   Q.  Take your time with Exhibit 17 and then
20 I'll have some questions.
21   A.  (Reading.)  Okay.
22   Q.  Are you familiar with Exhibit 17, Ms.

---

Page 129

1  Sexton?
2   A.  Yes.  I have seen this report.
3   Q.  You testified earlier that one of your
4  responsibilities as the program lead on FULs was
5  to help CMS comment on OIG reports.  Is this one
6  of the reports you recall helping CMS to comment
7  on?
8   A.  This report was evolving right at the
9  time that I was hired by CMS.  I don't know at
10 what stage, but I remember maybe putting together
11 a draft response to this.  And I don't know if
12 that was in response to the OIG's draft or their
13 final report or what.  I know this was all
14 evolving at the time.
15   Q.  You're aware that one of the kind of
16 major conclusions of this OIG report was that CMS
17 wasn't adding qualified drugs, meaning drugs
18 eligible for the federal upper limit, to the
19 federal upper limit list fast enough and that was
20 costing Medicaid significant dollars, right?
21    MR. FAUCI:  Objection.
22   A.  Yes.

---

                                33 (Pages 126 to 129)

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                                    May 20, 2008
                          Washington, DC

Page 130

1    Q.   Page 9 of the report, in the only full
2  paragraph on page 9, would you agree with me that
3  OIG is warning of three additional drugs that
4  would soon be coming off patent that might result
5  in a significant loss if Medicaid didn't act
6  quickly to establish a FUL for those drugs?
7    A.   Correct.
8    Q.   And one of the drugs mentioned
9  specifically by name is gabapentin or the brand
10 name Neurotin?
11   A.   Yes.
12       MR. BUEKER:  I ask the court reporter
13 to mark as Sexton Exhibit 18 for identification a
14 one-page document that's Bates labeled HHD 175-
15 1807 at the bottom.
16       (Exhibit Sexton 018 was marked for
17 identification.)
18       THE WITNESS:  (Reading.)
19 BY MR. BUEKER:
20   Q.   Ms. Sexton, do you recognize Exhibit
21 18?
22   A.   Yes.

Page 131

1    Q.   Is it fair to say that it's an e-mail
2  exchange between you and Larry Reed occurring in
3  late December 2004 and early January 2005?
4    A.   Yes.
5    Q.   And is it also fair to say that the
6  subject matter of this exchange is it setting a
7  federal upper limit or the possibility of setting
8  a federal upper limit on Neurotin?
9    A.   Yes.
10   Q.   Which is one of the drugs that we saw
11 OIG was suggesting should be subject to a federal
12 upper limit pretty quickly in its December 2004
13 report, right?
14   A.   Correct.
15   Q.   As an initial matter, who is Larry
16 Reed?
17   A.   He is the technical director in the
18 pharmacy division at CMSO, CMS.
19   Q.   In the late 2004 early 2005 period of
20 time what if any responsibilities did he have
21 with regard to the federal upper limit program,
22 as far as you're aware?

Page 132

1    A.   Basically, if I would have a question
2  or a clarification needed, he would serve in that
3  purpose.  He would not actually do calculations
4  or add the drugs himself or --
5    Q.   That was your responsibility?
6    A.   Correct.
7    Q.   And I take it in the first sentence you
8  write -- of your e-mail, which appears at the
9  bottom, correct?
10   A.   Correct.
11   Q.   You write "I e-mailed our contact with
12 First Databank for current pricing on Neurotin,
13 one of the OIG report's 'high volume not on FUL
14 list drugs,'" right?
15   A.   Correct.
16   Q.   That's a reference again to the OIG
17 report?
18   A.   Yes.
19   Q.   And what you're doing is trying to
20 determine whether Neurotin will be eligible for a
21 federal upper limit?
22   A.   Correct.

Page 133

1    Q.   And you reach the conclusion, it looks
2  like, in the second sentence that "We cannot add
3  Neurotin at this time"?
4    A.   Yes.
5    Q.   And you go on to explain that this is a
6  prime example of "manual verification which has
7  made a drug ineligible."  Do you see that?
8    A.   Correct.
9    Q.   In other words, as a result of some of
10 the manual review process we've talked about
11 today, this was not going to be a drug that was
12 ultimately going to be eligible for a federal
13 upper limit?
14   A.   And I'm not sure which dosage or
15 strengths of this drug that this e-mail is
16 referring to.
17       MR. FAUCI:  I'm just going to object
18 insofar as there's relevant language in the
19 exhibit which wasn't read into the record as part
20 of your question.
21       MR. BUEKER:  Okay.
22 BY MR. BUEKER:

                              34  (Pages 130 to 133)

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                      May 20, 2008
                    Washington, DC

Page 134

1      Q.  Ms. Sexton, at the top of Exhibit 18
2  there's a response from Mr. Reed.  Do you see
3  that?
4      A.  Yes.  To Kim.
5      Q.  And who might Kim be?
6      A.  The only person I would know would be
7  Kim Howell who's on the pharmacy division.  I
8  can't verify that's the Kim.  But that's --
9      Q.  Okay.  Mr. Reed says "Could you try
10 MDR?"  Do you know what MDR stands for?
11     A.  Medicaid drug rebate system.  Our
12 database system for MDR.
13     Q.  What kind of information is on the MDR
14 system?
15     A.  Labeler information, NDCs, prices,
16 average manufacturer prices, best prices.
17     Q.  So the AMPs and best prices that
18 manufacturers report quarterly to CMS are
19 contained on the MDR system?
20         MR. FAUCI:  Objection to form.
21     A.  I believe so.
22     Q.  Are AMPs information that you've ever

Page 135

1  used in terms of setting federal upper limits?
2      A.  At this point in time?
3      Q.  At this point in time.
4      A.  In 2004 -- no.
5      Q.  Have you ever set a federal upper limit
6  based on an AMP?
7      A.  No.  Not during this time.  I mean,
8  with the DRA changes where AMPs come into play
9  with the federal upper limit we have looked at
10 AMPs in regard to multiple-source drugs.  But not
11 during this time frame, I have not.
12     Q.  Did you ever use AMPs as a reference
13 point when you were setting federal upper limits
14 based on the published prices?
15     A.  Not that I recall.  No.
16     Q.  Turn with me back to Exhibit 17,
17 please, and specifically to pages 20 and 21.
18 Pages 20 and 21 are the response that CMS sent to
19 OIG in response to the December 2004 report on
20 federal upper limits, correct?
21     A.  Correct.
22     Q.  And the response is sent out under the

Page 136

1  signature of Mark McClellan?
2      A.  Yes.
3      Q.  What role did Mr. McClellan have at the
4  time, December of 2004, at CMS?
5      A.  He would have been the administrator of
6  CMS, the agency.
7      Q.  Does that mean that he's the highest
8  ranking official at CMS?
9      A.  Yes.  I believe so.
10     Q.  Turn with me to page 21, the paragraph
11 that begins while.
12     A.  Mm-hmm.
13     Q.  Mr. McClellan writes in the second
14 sentence "Before a drug is placed on the FUL list
15 it is important to be certain that the products
16 listed are actually available in the
17 marketplace."  Did I read that correctly?
18     A.  Correct.
19     Q.  Would you agree with Mr. McClellan that
20 it was important to make that determination
21 before a federal upper limit was added?
22     A.  I would agree that it's -- that it

Page 137

1  would be important to make sure they are
2  available, if possible.  If we could possibly
3  determine that.
4      Q.  And if you could possibly determine
5  it's important to make sure they're available at
6  the federal upper limit price, correct?
7          MR. FAUCI:  Objection, form.
8      A.  Not at the federal upper limit price,
9  but at the published price.  That would be -- the
10 price that we would verify if we called a
11 supplier would be their published price, not the
12 federal upper limit price, or that drugs were
13 available at the federal upper limit price.
14     Q.  Would you agree with Mr. McClellan in
15 the next sentence that "New drugs may be in
16 limited supply or unavailable nationwide"?
17     A.  Would I agree with that statement?
18     Q.  Yes.  In your experience.
19     A.  I couldn't answer that in my
20 experience.
21     Q.  Would you agree with Mr. McClellan in
22 the next sentence that "CMS manually verifies

35 (Pages 134 to 137)

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                        May 20, 2008
                        Washington, DC

Page 138

1  that the FUL drugs continue to be available for
2  manufacturers and suppliers to assure current
3  market availability"?
4      MR. WINGET-HERNANDEZ:  Objection, form.
5  You need to read that again.
6      A.  When possible we would manually verify
7  that drugs were available.
8      Q.  That was one of the reasons you
9  undertook the manual verification process that
10 we've been talking about this morning?
11     A.  Yes, correct.
12     Q.  One of the other things that you've
13 tried to do through the manual verification
14 process is, as Mr. McClellan states in the second
15 sentence, to make sure that they're actually
16 available in the marketplace before establishing
17 a federal upper limit, correct?
18     MR. FAUCI:  Objection to form.
19     A.  It says before a drug is placed on the
20 FUL list, right, it is important to make certain
21 that the products are actually available in the
22 marketplace, yes.  And that would be the reason

Page 139

1  that we would attempt manual verifications on the
2  drugs.
3      Q.  Okay.  You mentioned earlier
4  maintaining a FUL follow-up book?
5      A.  Mm-hmm.
6      Q.  In what form?  Hard copy, electronic?
7      A.  It's a hard copy separated into the
8  reason that the FUL could not be applied at the
9  time:  We didn't have the proper amount of A-
10 rated drugs, if we did not have three suppliers
11 or if the FUL was higher than AWP.
12     Q.  Are any of the documents we've looked
13 at today from that book?
14     A.  No.  This was a handwritten book that I
15 compiled just so that each month when -- or each
16 quarter when I would go WAC to publish a new
17 federal upper limit update I could re-check
18 multiple-source drugs that didn't previously
19 qualify for a FUL but may qualify for a FUL at a
20 future date.
21     Q.  Were you asked to provide a copy of
22 that book to the lawyers from CMS or DOJ in

Page 140

1  connection with this case?
2      A.  I don't remember.
3      Q.  Do you recall producing a copy of that
4  book to any of the lawyers involved in this case?
5      A.  I really don't remember if I did or
6  not.  Or if I was asked to or --
7      MR. BUEKER:  Laurie, I'll represent
8  that I haven't seen it in our production.  I
9  don't know if you've seen it or you think it's
10 been produced.  But if it hasn't I would ask that
11 it be produced.
12     MS. OBEREMBT:  We'll check on that for
13 you.
14     MR. BUEKER:  I think I'm about done.
15 If I might have five minutes.  I don't know what
16 people's schedules are and what the witness'
17 preference is with regard to lunch.  Maybe we'll
18 go off the record and we'll see from there.
19     THE VIDEOGRAPHER:  Off the record at
20 12:27.
21     (Recess.)
22     (Exhibit Sexton 019 was marked for

Page 141

1  identification.)
2      THE VIDEOGRAPHER:  On the record at
3  12:39.
4  BY MR. BUEKER:
5      Q.  Welcome back, Ms. Sexton.  I've had
6  during the break the court reporter mark as
7  Sexton Exhibit 19 for identification a three-page
8  document that bears in the lower right-hand
9  corner the Bates label on the first page NASMD-
10 0001304.  Do you have Exhibit 19 in front of you?
11     A.  Yes.
12     Q.  Exhibit 19 -- what is Exhibit 19?
13     A.  The minutes from a Pharmacy Technical
14 Advisory Group conference call from March 16th
15 2006.
16     Q.  At the top of page 1 of Exhibit 19
17 there's a list of people who participated in that
18 meeting, correct?
19     A.  Correct.
20     Q.  And you see that you are one of the
21 individuals who participated in that particular
22 PTAG meeting?

36 (Pages 138 to 141)

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                            May 20, 2008
                        Washington, DC

Page 142

1    A.  Yes.
2    Q.  Are you a member of the Pharmacy
3  Technical Advisory Group?
4    A.  I am a member of the pharmacy division.
5  And we coordinate with the TAG members.  But I
6  believe that only the state members are actually
7  considered the TAG members.  I don't know how
8  they clarify the TAG members.  I mean, I'm a
9  member just because I'm a part of the pharmacy
10  division.  I don't know that we're actually
11  considered members.
12    Q.  Okay.  But you routinely attend these
13  meetings?
14    A.  Yes.
15    Q.  And does that continue up until the
16  present?
17    A.  Yes.
18    Q.  Would you turn to page 3 of Exhibit19?
19  Do you see in the middle of the page number 5
20  albuterol inhalers?
21    A.  Yes.
22    Q.  Do you recall earlier we were talking

Page 143

1  about the context of looking at some of the
2  federal upper limits system printouts for the
3  albuterol inhaler a note that you made based on a
4  conversation you had with Deirdra Duzor?
5    A.  Yes.
6    Q.  Would you just read to yourself the
7  three paragraphs that follow the number 5?  And
8  the question at the end I want you to answer is
9  whether what's reflected in these PTAG minutes is
10  consistent with the discussion at the PTAG
11  meeting as you recall it.
12    A.  (Reading.)  These minutes are not
13  prepared by the pharmacy division.  I did not
14  prepare the minutes.  So I could not state
15  whether exactly what is stated here is what was
16  stated in the meeting.
17    Q.  Okay.  Who prepares the minutes?
18    A.  The APHSA coordinator, who in this case
19  was Ashley Trantham, it looks like.
20    Q.  And is that --
21    A.  I think it's Public Health Service, I
22  believe.

Page 144

1    Q.  Is that a CMS employee?
2    A.  No.  No.  And I don't remember the
3  exact point in time when I no longer was the
4  coordinator for the PTAG for the pharmacy
5  division.  I don't know if it included this time
6  frame or not.  However, I don't recall ever CMS
7  when I was a part of it doing the minutes.
8    Q.  Okay.
9    A.  It was just --
10    Q.  Leaving aside who prepared the minutes,
11  is the description of what was discussed on page
12  3 under the heading "five albuterol inhalers"
13  consistent with your recollection of the March
14  16th 2006 PTAG meeting?
15    A.  I don't recollect what was said
16  specifically at the meeting.
17    Q.  Is what is reflected on page 3 of the
18  Exhibit 19 consistent with the discussion you
19  recall having with Deirdra Duzor that led to
20  CMS's deciding to remove the FUL for the
21  albuterol inhaler?
22    A.  This appears to be one source that we

Page 145

1  considered, was the feedback from the PTAG group.
2    Q.  And what's recorded here is consistent
3  with the feedback you remember hearing that led
4  to the FUL being removed for the albuterol
5  inhaler, correct?
6    A.  And other inquiries and concerns
7  expressed from other pharmacy providers and it
8  could have been e-mail correspondence or letters
9  or verbally in meetings.
10    MR. BUEKER:  Okay.  Thank you, Ms.
11  Sexton.  I have no further questions for you at
12  this time.
13    THE VIDEOGRAPHER:  Does anyone on the
14  telephone have any questions?
15    MS. HANSCOM:  I just have one question.
16  What was the button you pushed so that we could
17  all hear?  That was fantastic.
18    MR. BUEKER:  You don't want to know.
19    THE VIDEOGRAPHER:  This deposition
20  concludes --
21    MR. BUEKER:  Wait a minute.  Does
22  anybody in the room have any questions?  Mr.

37 (Pages 142 to 145)

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                          May 20, 2008
                    Washington, DC

Page 146

1  Winget-Hernandez?
2        MR. WINGET-HERNANDEZ:  Well, yeah.  I
3  do have a couple of follow-up questions.
4
5        EXAMINATION BY COUNSEL FOR THE
6  CITY OF NEW YORK AND ALL NEW YORK COUNTIES OTHER
7  THAN NASSAU AND ORANGE; AND THE STATES OF ALASKA,
8  HAWAII, IDAHO, ILLINOIS, KENTUCKY, SOUTH CAROLINA
9  AND WISCONSIN
10  BY MR. WINGET-HERNANDEZ:
11     Q.  It wasn't entirely clear to me, Ms.
12  Sexton, why it was that you made the notations on
13  the pricing sheets of the number of WACs that
14  were below the FUL that were setting.  Could
15  you describe the reason for that again?  And the
16  confusion for me was what it had to do with the
17  feedback you were getting from the pharmacy
18  industry.
19     MR. BUEKER:  Objection as to form.
20     Q.  Can you explain what impact the
21  pharmacy industry had on those notations, if any?
22     A.  Well, it was documented only because

Page 147

1  that was -- I was taught to do -- that was the
2  documentation to make on the pricing sheets.  And
3  it was my understanding that if a certain amount
4  of WACs were underneath the FUL then it provided
5  insight to us, to CMS, that a drug was obtainable
6  or how many drugs were obtainable at the federal
7  upper limit reimbursement amount, at or below.
8        For me personally, I would look at if -
9  - again, looking at an outlier situation, if the
10  FUL was calculated and it was calculated on a
11  drug that had a WAC of, say, 2 cents and
12  everything else was, you know, 80 cents, a
13  dollar, 1.50, that may be a reason to do some
14  manual verifications on whether that NDC was
15  available and available at that price.
16     Q.  Okay.  I'm going to ask you a little
17  bit about your verifications.
18     A.  Okay.
19     Q.  When you use the word suppliers to whom
20  are you referring?
21     A.  The companies listed in the compendia.
22     Q.  Do you have an understanding of whether

Page 148

1  the companies that are listed in the compendia
2  are the manufacturers or the wholesalers?  Are
3  they pharmacies?  Who are these people that are
4  listed in the compendia?
5     A.  Generally they are the -- I understand
6  them to be the manufacturers or even -- well, the
7  manufacturers, I would say.
8     Q.  Okay.
9     A.  I don't recall seeing some of the major
10  wholesaler names.  I can't say they were never in
11  there.  I don't recall seeing some of the major
12  wholesalers listed under the company names.
13     Q.  I'd like to turn your attention for a
14  moment to Exhibit Sexton Number 12.  Let me know
15  when you have it.
16     A.  Yes.  Mm-hmm.
17     Q.  Among your handwritten notes at the
18  bottom of the page I notice that there's a
19  character there that follows the word Ethex in
20  parentheses.  What is that character?
21     A.  Ethex in -- oh.  That's a B for Blue
22  Book or for First Databank pricing compendia.

Page 149

1     Q.  What does that mean?
2     A.  That means that the price from Ethex is
3  noted or could be found in First Databank
4  compendium or obtained from First Databank.
5     Q.  Okay.  And was there some reason as you
6  look at this document that you added the last
7  part of your answer there, "or could be obtained
8  from First Databank"?
9        MR. BUEKER:  Objection as to form.
10     Q.  What was the reason why you qualified
11  your answer a moment ago that that price could be
12  obtained from First Databank?
13     A.  I would say because that's the only
14  pricing compendium that lists Ethex as a supplier
15  in this list.
16     Q.  Okay.  There was a little bit of
17  confusion, at least for me, in listening to your
18  testimony before about this exhibit.  In looking
19  at the exhibit, if you look at the prices that
20  are shown for Ethex Corporation for this drug, it
21  lists zeros for WAC, doesn't it?
22     A.  Yes, for WAC.  Mm-hmm.

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                                    May 20, 2008
                          Washington, DC

Page 150

1    Q.  And yet it also shows that the source
2  code up above in the printed material is B also
3  for First Databank?
4    A.  Where it's listed in the -- on the
5  pricing sheet?
6    Q.  Yes, ma'am.
7    A.  Yes.  Yes.  Mm-hmm.  That price would
8  have been from First Databank, Blue Book.
9    Q.  Okay.  So if the pricing sheet or if
10 the computer generated portion of the pricing
11 sheet shows that the price listed for Ethex's
12 isosorbide mononitrate is zero, then how did you
13 go about getting the price of 13 and a half cents
14 for Ethex from First Databank as shown in your
15 notes below?
16   A.  Well, it looks like I called Ethex to
17 obtain the price.  And the source -- I cannot
18 recall, but an assumption I would make is that
19 because, again, First Databank is the only
20 compendium that listed any pricing for Ethex for
21 this drug.
22   Q.  Okay.  When you note -- or for that

Page 151

1  matter, even if you don't write it down, when you
2  called the companies that were listed on the
3  pricing sheet, what did you say to them in order
4  to get the information that you were seeking?
5        MR. FLESSNER:  Objection to form.
6        MR. BUEKER:  I join in the objection.
7        MR. WINGET-HERNANDEZ:  What's the
8  objection?
9        MR. FLESSNER:  It's not what she said.
10       MR. BUEKER:  It's also overly broad and
11 vague.
12       MR. WINGET-HERNANDEZ:  Okay.
13 BY MR. WINGET-HERNANDEZ:
14   Q.  Let me ask you a different question.
15 I'm going to try to meet the objections if I can.
16 Did you testify earlier that you sometimes called
17 the companies that are listed on the pricing
18 sheets for some purpose?
19   A.  Yes.
20   Q.  And what purpose did you call them for?
21   A.  To determine if that supplier was still
22 -- still had the NDC available and if it was

Page 152

1  available at that price.  We would try to -- we
2  would attempt to get both pieces of that
3  information.
4    Q.  And when you say that price, what price
5  are you referring to?
6    A.  The price that is listed or if there
7  was a zero we would try to obtain what the WAC
8  price is.
9    Q.  In order to determine whether the drug
10 was available at the price that was listed on the
11 pricing sheet, what would you have asked the
12 company?
13       MR. FLESSNER:  Objection.
14   A.  I would ask them -- I would give them
15 the NDC number and ask if that product was
16 available and could they supply -- like in the
17 case of Warrick Pharmaceuticals where there's a
18 zero, just using that as an example, I would ask
19 if they had a current WAC price available if the
20 drug was available.
21   Q.  And can you say whether they typically
22 had a response to that question for you?

Page 153

1        MR. BUEKER:  Objection.
2        MS. REID:  Objection.
3        MR. FLESSNER:  Objection.
4    A.  Sometimes they would.  Sometimes if I
5  would call a supplier they would only give the
6  information to account holders.  They would ask
7  if I was an account holder.  And of course I was
8  not an account holder.  So I would say the
9  majority of the time they did give the
10 information, but there were numerous times where
11 they did not, they would not give the
12 information.
13   Q.  If the information that was printed on
14 the pricing sheet showed a WAC of zero, what
15 would you ask the supplier in order to determine
16 what was the WAC?
17   A.  If the product was available and could
18 they give me a current WAC price.
19   Q.  Can you estimate as you sit here today
20 over the course of your experience as the lead
21 person for the FUL program about what proportion
22 of the time you made these calls where there was

                                    39 (Pages 150 to 153)

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                              May 20, 2008
                        Washington, DC

Page 154

1  no WAC listed on the pricing sheet and you were
2  actually provided with a current WAC?
3       MR. BUEKER:  Objection as to form.
4       MR. FLESSNER:  Same objection.
5       MR. GASTWIRTH:  I join the objection.
6       MS. OBEREMBT:  Could we have the same
7  agreement on the defendants side that where one
8  objects it counts for all of you?
9       MR. BUEKER:  Fine with me.
10      MS. OBEREMBT:  Thank you.
11      A.  I could not give you a definite
12  percentage.  Very broadly I could state that
13  probably more than half the time I was provided
14  with the information.
15      Q.  Could you look at Sexton Number 13 for
16  me, please?  Do you see it?
17      A.  Yes.
18      Q.  When you look at the printed portion of
19  the pricing sheet down at the bottom or almost at
20  the bottom where it lists the prior FUL price and
21  the source code and the low price -- do you see
22  that part?

Page 155

1       A.  Yes.
2       Q.  Can you tell me what this sheet means
3  when it shows the letter R for low price?
4       A.  I don't recall ever seeing that in the
5  system.
6       Q.  Can you tell me what it means when it
7  says source code zero?
8       A.  I have never seen that in the system as
9  well.  I've never -- I'd say I've never noticed
10  it in the system, either one of those two codes.
11      Q.  Please flip back to the one -- I'm
12  sorry.  I don't have a copy of the last one that
13  was used.  Could somebody lend me one?  I'd like
14  you to look at the very last one, please.
15      MR. BUEKER:  You're referring, Mr.
16  Hernandez, to Exhibit 19?
17      MR. WINGET-HERNANDEZ:  Yes.  Thank you.
18  BY MR. WINGET-HERNANDEZ:
19      Q.  As we look at the front page of Exhibit
20  Number 19, were you familiar with these
21  individuals that are referred to here as states?
22      MR. BUEKER:  Objection as to form.

Page 156

1       A.  I was familiar with the names, yes.
2       MR. WINGET-HERNANDEZ:  I'm sorry.  I
3  just have to ask what the objection is.
4       MR. BUEKER:  The form of the question
5  was are you familiar with these people as states.
6  I don't know what that means.
7       MR. WINGET-HERNANDEZ:  Oh.  I don't
8  think that's what I asked.  But that's okay.
9  I'll move on.
10  BY MR. WINGET-HERNANDEZ:
11      Q.  When on the last page under topic
12  number 5 in the second sentence under albuterol
13  inhalers it says "States have heard of some
14  shortages," does that refer to the individuals
15  that are listed under the heading "states" on the
16  front page?
17      A.  That could be representative of other
18  states besides the states listed.  That would
19  just be a compiled statement from the writer of
20  the minutes as these state representatives from
21  reported on the call or as they have discussed on
22  the call.

Page 157

1       Q.  So are you guessing that that's what
2  they might have meant?
3       A.  Well, I don't think they necessarily
4  were speaking for their own states because the
5  PTAG is actually made up of consortia areas.  And
6  I cannot say that they were speaking just of
7  their own states.
8       Q.  You also can't really say that they
9  were speaking on behalf of other states, can you?
10      A.  I guess I can't make that statement,
11  although that's supposed to be the function of
12  the PTAG, to be representative of the states in
13  their consortium.
14      MR. WINGET-HERNANDEZ:  I think that's
15  all the questions I have now.
16      MR. FAUCI:  I just have one question.
17      MR. BUEKER:  Sure.  Go ahead.
18      MR. FAUCI:  If you'd like to follow up,
19  that's fine.
20      MR. BUEKER:  No, no.
21
22      EXAMINATION BY COUNSEL FOR THE

40 (Pages 154 to 157)

97df9962-63cb-4bf4-b0e6-7ddde994d826

Sexton, Gail                                            May 20, 2008
                        Washington, DC

Page 158

1    UNITED STATES OF AMERICA
2    BY MR. FAUCI:
3        Q.  Ms. Sexton, if you saw a price
4    published in the compendia which appeared to you
5    to be an outlier in that it was significantly
6    lower than other prices, I believe you testified
7    that you might call the supplier to verify that
8    the price was actually available; is that
9    correct?
10       A.  Yes.
11       Q.  And if the answer to that question is
12   yes, if you verified that the drug was available
13   at that price, would you use that price to set
14   the FUL?
15       A.  Yes.
16           MR. FAUCI:  That's all.
17           MR. BUEKER:  I have nothing further.
18   Does anyone on the phone have any further
19   questions for this witness?
20           THE VIDEOGRAPHER:  This deposition
21   concludes at 1:05 and consists of two tapes.
22           (Whereupon, at 1:05 p.m. the

Page 159

1    videotaped deposition was adjourned.)
2
3
4
5
6
7        _____
8            GAIL SEXTON
9
10   Subscribed and sworn to and before me
11   this _____ day of _____, 20_____.
12
13
14   _____
15       Notary Public
16
17
18
19
20
21
22

Page 160

1    UNITED STATES OF AMERICA   )
2
3    DISTRICT OF COLUMBIA        )
4        I, JONATHAN WONNELL, a Notary Public in and
5    for the District of Columbia, do hereby certify that
6    the within transcript is a true and accurate record of
7    the testimony under oath and other proceedings in the
8    above-entitled matter.
9        I further certify that I am not a relative,
10   employee, attorney or counsel of any of the parties to
11   this action and that I am in no way interested in the
12   outcome of this matter.
13       IN WITNESS WHEREOF, I have hereunto set my
14   hand this _____ day of _____, 2008.
15
16
17
18       _____
19           JONATHAN WONNELL
20
21   My Commission expires:
22   October 1, 2012

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

97df9962-63cb-4bf4-b0e6-7ddde994d826