longer making either of these products. Even if Mylan had legitimate concerns about the supply of these APIs, like other generic pharmaceutical manufacturers, Mylan could have entered into a less restrictive requirements contract which would have assured Mylan a source of supply, but not denied Mylan's competitors access to the same source. Moreover, its attempt to obtain an exclusive agreement with FIS would provide no assurances of supply, given that Mylan could not use any FIS lorazepam API for at least a year, due to FDA regulations.

## XI.
## EFFECTS

51. The acts and practices of the Defendants as herein alleged have had the purpose or effect, or the tendency or capacity, to restrain competition unreasonably and to injure competition within each State and throughout the United States in the following ways, among others:

52. Restraining competition in the markets for lorazepam and clorazepate APIs and tablets;

53. Fixing, raising, stabilizing, or otherwise tampering with the prices of lorazepam API;

54. Raising the cost that pharmacies, hospitals, insurers, managed care organizations, wholesalers, government agencies, consumers, and others pay for lorazepam and clorazepate tablets;

55. Depriving consumers of access to needed pharmaceuticals and thereby injuring their health; and

56. Depriving consumers of the benefits of competition among generic pharmaceutical manufacturers and entry from new competitors.

## XII.

INJURY

57. As a direct and proximate result of the unlawful conduct alleged above, the States were not and are not able to purchase, or pay reimbursements for purchases of, lorazepam and clorazepate at prices determined by free and open competition, and consequently have been injured in their business and property in that, *inter alia,* they have paid more and continue to pay more for lorazepam and clorazepate than they would have paid in a free and open competitive market. The States cannot quantify at this time the precise amount of monetary harm which they have sustained, but allege that such harm is substantial. A determination and explication of this amount will require the testimony of economic experts following extensive review of the books and records of the Defendants and third parties.

58. As a direct and proximate result of the unlawful conduct alleged above, consumers in the Plaintiff States were not and are not able to purchase lorazepam and clorazepate at prices determined by free and open competition, and consequently have been injured in their business or property in that, *inter alia*, they have paid more and continue to pay more for lorazepam and clorazepate than they would have paid in a free and open competitive market. The States cannot quantify at this time the precise amount of monetary harm which their consumers have sustained, but allege that such harm is substantial. A determination and explication of this amount will require the testimony of economic experts following extensive review of the books and records of the Defendants and third parties.

59. As a direct and proximate result of the unlawful conduct alleged above, the general economies of the States have sustained injury, and are threatened with further injury to their business and property unless the Defendants are enjoined from their unlawful conduct.

60. As a direct and proximate result of the unlawful conduct alleged above, the Defendants have unjustly profited through inflated profit margins and have thus far retained the illegally obtained profits.

61. Defendants' unlawful conduct is continuing and will continue unless the injunctive and equitable relief request is granted. The States do not have an adequate remedy at law.

XIII.

FIRST CLAIM FOR RELIEF -- CONSPIRACY TO

MONOPOLIZE GENERIC LORAZEPAM TABLETS MARKET

62. The States reallege and incorporate by reference paragraphs 1 through 61.

63. Mylan, Cambrex, Profarmaco, and Gyma conspired to act together to obtain monopoly power for Mylan in the generic lorazepam tablets market in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

64. Mylan acted with a specific intent to monopolize, and to destroy competition in, the generic lorazepam tablets market. Mylan devised and implemented a calculated campaign to raise the price and profitability of lorazepam by locking up the supply of lorazepam API, the most essential ingredient in manufacturing lorazepam tablets. Each of the co-conspirators acted with the specific intent that Mylan obtain monopoly power in the generic lorazepam tablets market, and through their profit sharing arrangement and the resulting higher prices, the co-conspirators each have profited significantly from their conspiracy to the detriment of consumers.

65. In furtherance of this conspiracy, these Defendants entered into agreements and profit sharing arrangements whereby Mylan obtained the exclusive license to Profarmaco's lorazepam API. This license had the purpose and effect of denying, to Mylan's competitors in the generic lorazepam tablets market, the supply of an essential raw material. Also in furtherance of this conspiracy, Mylan



 

-- with the full knowledge and approval of Cambrex, Profarmaco, and Gyma -- sought to obtain the exclusive right to the only other active supplier of lorazepam API to generic manufacturers.

XIV.

SECOND CLAIM FOR RELIEF -- CONSPIRACY TO MONOPOLIZE GENERIC CLORAZEPATE TABLETS MARKET

66. The States reallege and incorporate by reference paragraphs 1 through 61.

67. Mylan, Cambrex, Profarmaco, and Gyma conspired to act together to obtain monopoly power for Mylan in the generic clorazepate tablets market in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

68. Mylan acted with a specific intent to monopolize, and to restrain and destroy competition in, the generic clorazepate tablets market. Mylan devised and implemented a calculated campaign to raise the price and profitability of clorazepate by locking up the supply of clorazepate API, the most essential ingredient in manufacturing clorazepate tablets. Each of the co-conspirators acted with the specific intent that Mylan obtain monopoly power in the generic clorazepate tablets market, and through their profit sharing arrangement and the resulting higher prices, the co-conspirators each have profited significantly from their conspiracy to the detriment of consumers.

69. In furtherance of this conspiracy, these Defendants entered into agreements and profit sharing arrangements whereby Mylan obtained the exclusive license to Profarmaco's clorazepate API. This license had the purpose and effect of denying, to Mylan's competitors in the generic clorazepate tablets market, the supply of an essential raw material. Also in the furtherance

of this conspiracy, Mylan approached Abbott Laboratories -- which manufactured clorazepate API for use in Abbott's branded clorazepate -- to inquire about purchasing clorazepate API, even though FDA regulations effectively precluded Mylan from using, for at least a year, any Abbott clorazepate API.

XV.

THIRD CLAIM FOR RELIEF

AGREEMENT IN RESTRAINT OF TRADE ON LORAZEPAM

70. The States reallege and incorporate by reference paragraphs 1 through 61.

71. Mylan's exclusive licensing agreement with Cambrex and Profarmaco, pursuant to which Mylan obtained the exclusive right to Profarmaco's supply of lorazepam API, and Gyma's compliance with it, unreasonably restricts competition and constitutes an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

72. Under this licensing agreement, Mylan licensed, on a ten-year exclusive basis, Profarmaco's lorazepam API. The purpose or effect of this agreement is to foreclose substantially the supply of lorazepam API to Mylan's competitors, thereby restraining trade and competition in the generic lorazepam tablets market and enabling Mylan to raise prices significantly.

73. This agreement is not reasonably necessary to accomplish any procompetitive objective. Moreover, any justification that may exist does not outweigh the substantial anticompetitive effect of Defendants' conduct.

XVI.

FOURTH CLAIM FOR RELIEF

AGREEMENT IN RESTRAINT OF TRADE ON CLORAZEPATE

74. The States reallege and incorporate by reference paragraphs 1 through 61.

75. Mylan's exclusive licensing agreement with Cambrex and Profarmaco, pursuant to which Mylan obtained the exclusive right to Profarmaco's supply of clorazepate API, and Gyma's compliance with it, unreasonably restricts competition and constitutes an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

76. Under this licensing agreement, Mylan licensed, on a ten-year exclusive basis, Profarmaco's clorazepate API. The purpose or effect of this agreement is to foreclose substantially the supply of clorazepate API to Mylan's competitors, thereby restraining trade and competition in the generic clorazepate tablets market and enabling Mylan to raise prices significantly.

77. This agreement is not reasonably necessary to accomplish any procompetitive objective. Moreover, any justification that may exist does not outweigh the substantial anticompetitive effect of Defendants' conduct.

XVII.

FIFTH CLAIM FOR RELIEF

MONOPOLIZATION OF GENERIC LORAZEPAM TABLETS MARKET

78. The States reallege and incorporate by reference paragraphs 1 through 61.

79. Mylan obtained monopoly power in the generic lorazepam tablets market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Using this monopoly power, Mylan raised the price

of generic lorazepam tablets by amounts ranging from 1,900 percent to over 2,600 percent, depending on the bottle size and tablet strength.

80. Mylan willfully acquired its monopoly power by entering into an exclusive licensing agreement for Profarmaco's lorazepam API. This exclusive license provided Mylan complete control over Profarmaco's supply of lorazepam API in the United States market, which enabled Mylan to deny its actual or potential competitors access to this essential ingredient in manufacturing generic lorazepam tablets and significantly raise prices.

## XVIII.

## SIXTH CLAIM FOR RELIEF -- ATTEMPTED MONOPOLIZATION OF GENERIC LORAZEPAM TABLETS MARKET

81. The States reallege and incorporate by reference paragraphs 1 through 61.

82. Mylan acted with a specific intent to monopolize, and to destroy competition in, the generic lorazepam tablets market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Mylan devised and implemented a calculated campaign to raise the price and profitability of lorazepam by locking up the supply of lorazepam API, the most essential ingredient in manufacturing generic lorazepam tablets.

83. Mylan has willfully engaged in a course of exclusionary conduct in order to obtain a monopoly in the generic lorazepam tablets market, including, *inter alia:* (1) entering into an exclusive licensing agreement for Profarmaco's lorazepam API; and (2) approaching SST -- the only other active distributor of lorazepam API to generic manufacturers in the United States -- proposing

a similar licensing arrangement for FIS's lorazepam API, even though Mylan could not even use any of FIS's lorazepam API because of FDA regulations.

84. At the time Mylan engaged in these acts, it had a dangerous probability of succeeding in controlling the supply of lorazepam API and excluding its competitors. Mylan, by obtaining the exclusive licensing agreement with Cambrex, Profarmaco, and Gyma, prevented certain competitors from obtaining lorazepam API, enabling Mylan to significantly raise prices. Had SST agreed to Mylan's proposal, it would have denied lorazepam API to other competitors and potential competitors, allowing Mylan to acquire or maintain monopoly power in the generic lorazepam tablets market.

XIX.

SEVENTH CLAIM FOR RELIEF

MONOPOLIZATION OF GENERIC CLORAZEPATE TABLETS MARKET

85. The States reallege and incorporate by reference paragraphs 1 through 61.

86. Mylan possessed monopoly power in the generic clorazepate tablets market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Using this monopoly power, Mylan raised the price of generic lorazepam tablets by amounts ranging from 1,900 percent to over 3,200 percent, depending on the bottle size and strength.

87. Mylan willfully acquired its monopoly power by entering into an exclusive licensing agreement for Profarmaco's clorazepate API. This exclusive license provided Mylan with complete control over Profarmaco's supply of clorazepate API in the United States market, which enabled



 

Mylan to deny its actual or potential competitors access to this essential ingredient in manufacturing generic clorazepate tablets and significantly raise prices.

XX.

EIGHTH CLAIM FOR RELIEF

ATTEMPTED MONOPOLIZATION OF GENERIC CLORAZEPATE TABLETS MARKET

88. The States reallege and incorporate by reference paragraphs 1 through 61.

89. Mylan acted with a specific intent to monopolize, and to destroy competition in, the generic clorazepate tablets market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Mylan devised and implemented a calculated campaign to raise the price and profitability of clorazepate by locking up the supply of clorazepate API, the most essential ingredient in manufacturing clorazepate tablets.

90. Mylan has willfully engaged in a course of exclusionary conduct in order to obtain a monopoly in the generic lorazepam tablets market, including, *inter alia*, entering into an exclusive licensing agreement for Profarmaco's clorazepate API.

91. At the time Mylan engaged in these acts, it had a dangerous probability of succeeding in controlling the supply of clorazepate API and excluding its competitors. Mylan, by obtaining the exclusive licensing agreement with Cambrex, Profarmaco and Gyma, prevented certain competitors from obtaining clorazepate API, enabling Mylan to significantly raise prices.

XXI.

NINTH CLAIM FOR RELIEF

PRICE FIXING AGREEMENT ON LORAZEPAM API

92. The States reallege and incorporate by reference paragraphs 1 through 61.

93. Mylan, Cambrex, Profarmaco, Gyma, and SST conspired to fix, raise, or stabilize the prices of lorazepam API, a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

94. In furtherance of this conspiracy, Mylan met with SST in Pittsburgh, Pennsylvania on or around November 20, 1997. At this meeting, or otherwise in the course of their exchanges of information before and after it, Mylan and SST conspired and reached an agreement to fix, raise, or stabilize the price of lorazepam API. Among other things, SST agreed to raise the price of lorazepam API to its customers.

95. In accordance with this agreement, Mylan substantially raised the price of its lorazepam tablets, and by virtue of its profit sharing arrangement with Cambrex, Profarmaco, and Gyma, substantially raised the effective price of Profarmaco's lorazepam API. Also in accordance with this agreement, SST substantially raised the price of its lorazepam API. By raising the price of its lorazepam API, SST ensured that its customers would follow Mylan's pricing for generic lorazepam tablets. This agreement further ensured Mylan's ability to promote the success of its unlawful scheme and maintain supra-competitive prices for lorazepam.

XXII.

SUPPLEMENTAL STATE LAW CLAIMS

96. Plaintiff State of Alabama repeats and realleges each and every allegation contained in paragraphs 1 through 95 with the same force and effect as if here set forth in full.

97. The aforementioned practices by Defendants were in violation of the Code of Alabama, §§ 8-10-1 *et seq.* (1975). The State of Alabama represents consumers' claims pursuant to the Attorney General's *parens patriae* authority.

98. Plaintiff State of Alaska repeats and realleges each and every allegation contained in paragraphs 1 through 95 with the same force and effect as if here set forth in full.

99. The aforementioned practices by Defendants were in violation of the Alaska Monopolies and Restraint of Trade Act, AS 45.50.562 et seq., and the Alaska Unfair Trade Practices and Consumer Protection Act, AS 45.50.471 et seq. The State of Alaska represents consumers' claims pursuant to the Attorney General's *parens patriae* authority and authority under Rule 23 of the Federal Rules of Civil Procedure.

100. Plaintiff State of Arizona repeats and realleges each and every allegation contained in paragraphs 1 through 95 with the same force and effect as if here set forth in full.

101. The aforementioned practices by Defendants were in violation of Arizona Uniform State Antitrust Act, A.R.S. §§ 44-1401 *et seq*. The State of Arizona represents consumers' claims pursuant to the Attorney General's *parens patriae* authority.

102. Plaintiff State of Arkansas repeats and realleges each and every allegation contained in paragraphs 1 through 95 with the same force and effect as if here set forth in full.

103. The aforementioned practices by Defendants were in violation of Arkansas law concerning prohibited practices in restraint of trade and monopolies generally, found at Ark. Code Ann. sec. 4-75-301 et seq. and the Arkansas Deceptive Trade Practices Act found at Ark. Code Ann. sec. 4-88-101 et seq. The State of Arkansas represents consumers' claims pursuant to the Attorney General's authority under Rule 23 of the Federal Rules of Civil Procedure.

104. Plaintiff State of California repeats and realleges each and every allegation contained in paragraphs 1 through 95 with the same force and effect as if here set forth in full.

105. The aforementioned practices by Defendants were in violation of the Cartwright Act, California Business and Professions Code Sections 16700 *et seq*., and the California Unfair Competition Act, California Business and Professions Code Sections 17200 *et seq*. The State of

California represents consumers' claims pursuant to the Attorney General's *parens patriae* authority and authority under Rule 23 of the Federal Rules of Civil Procedure.

106. Plaintiff State of Colorado repeats and realleges each and every allegation contained in paragraphs 1 through 95 with the same force and effect as if here set forth in full.

107. The aforementioned practices of Defendants were in violation of the Colorado Antitrust Act of 1992, §§ 6-4-104 and 6-4-105, C.R.S. (1998). The State of Colorado represents consumers' claims pursuant to the Attorney General's *parens patriae* authority and equitable authority under §6-4-111,C.R.S. (2000) .

108. Plaintiff State of Connecticut repeats and realleges each and every allegation contained in paragraphs 1 through 95 with the same force and effect as if here set forth in full.

109. The aforementioned practices of Defendants were in violation of the Connecticut Antitrust Act, Conn. Gen. Stat. Sections 35-24 *et seq.*, and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. Sections 42-110a, *et seq.* The State of Connecticut is entitled to redress pursuant to §§ 35-32, 35-34, 35-38, 42-110m and 42-110o of the Connecticut General Statutes. The State of Connecticut represents consumers' claims pursuant to the Attorney General's authority under Rule 23 of the Federal Rules of Civil Procedure.

110. Plaintiff State of Delaware repeats and realleges each and every allegation contained in paragraphs 1 through 95 with the same force and effect as if here set forth in full.

111. The aforementioned practices by Defendants were in violation of the Delaware Antitrust Act, 6 Delaware Code Chapter 21, and Delaware's Uniform Deceptive Trade Practices Act, 6 Delaware Code, Subchapter 111, Sec. 2532. The State of Delaware represents consumers' claims pursuant to the Attorney General's *parens patriae* authority.

112. Plaintiff District of Columbia repeats and realleges each and every allegation contained in paragraphs 1 through 95 with the same force and effect as if here set forth in full.

113. The aforementioned practices by Defendants were in violation of the District of Columbia Antitrust Act of 1980, D.C. Code §§ 28-4501 *et seq.* The District of Columbia represents consumers' claims pursuant to the Corporation Counsel's *parens patriae* authority.

114. Plaintiff State of Florida repeats and realleges each and every allegation contained in paragraphs 1 through 95 with the same force and effect as if here set forth in full.

115. The aforementioned practices by Defendants were in violation of Chapter 542, Florida Statutes (the Florida Antitrust Act of 1980), and Chapter 501, Part II, Florida Statutes (the Florida Deceptive and Unfair Trade Practices Act). Florida Attorney General Robert A. Butterworth brings this action in part as an "enforcing authority" designated under the Florida Deceptive and Unfair Trade Practices Act (Chapter 501, Part II, Florida Statutes, and particularly sections 501.207 and 501.203(2)) on behalf of all "consumers" (as defined in section 501.203(7), Florida Statutes) who purchase or purchased lorazepam or clorazepate at supra-competitive prices either directly from Defendants or indirectly through others in the chain of distribution. The violations of section 501.204, Florida Statutes, herein alleged have occurred in or affected, and are occurring in or affecting, more than one judicial circuit of the State of Florida. The State of Florida represents consumers' claims pursuant to the Attorney General's enforcement authority and authority under Rule 23 of the Federal Rules of Civil Procedure.

116. Plaintiff State of Georgia repeats and realleges each and every allegation contained in paragraphs 1 through 95 with the same force and effect as if set forth in full.

117. The aforementioned practices by Defendants were in violation of Official Code of Georgia Annotated (O.C.G.A.) § 13-8-2, and Ga. Const. Art. 111, § VI, para. 5 (1983). The State of Georgia represents consumers' claims pursuant to the Attorney General's authority under Rule 23 of the Federal Rules of Civil Procedure.

118. Plaintiff State of Hawaii repeats and realleges each and every allegation contained in paragraphs 1 through 95 with the same force and effect as if here set forth in full.

119. The aforementioned practiced by Defendants were in violation of Hawaii Revised Statutes §§ 480-4, 480-9, 480-2. The State of Hawaii represents consumers' claims pursuant to the Attorney General's *parens patriae* authority.

120. Plaintiff State of Idaho repeats and realleges each and every allegation contained in paragraphs 1 through 95 with the same force and effect as if here set forth in full.

121. The aforementioned practices by Defendants were in violation of the Idaho Competition Act, Idaho Code Sections 48-101 *et seq.*, and were unconscionable acts or practices in violation of Idaho Code Section 48-603(18) of the Idaho Consumer Protection Act. The State of Idaho is entitled to redress pursuant to Idaho Code Sections 48-108, 48-606, and 48-607, Idaho Code. The Attorney General finds that the purposes of title 48, chapter 6, Idaho Code, will be substantially and materially impaired by delay in instituting this action. The State of Idaho represents consumers' claims pursuant to the Attorney General's *parens patriae* authority.

122. Plaintiff State of Illinois repeats and realleges each and every allegation contained in paragraphs 1 through 95 with the same force and effect as if here set forth in full.

123. The aforementioned practices by the Defendants were in violation of the Illinois Antitrust Act, 740 ILCS 10/3. The State of Illinois represents consumers' claims pursuant to the Attorney General's *parens patriae* authority and authority under Rule 23 of the Federal Rules of Civil Procedure.

124. Plaintiff State of Indiana repeats and realleges each and every allegation contained in paragraphs 1 through 95 with the same force and effect as if here set forth in full.

125. The aforementioned practices by the Defendants were in violation of Indiana Code §§ 24-1-1-1 *et seq.* The State of Indiana represents consumers' claims pursuant to the Attorney General's authority under Rule 23 of the Federal Rules of Civil Procedure.

126. Plaintiff State of Iowa repeats and realleges each and every allegation contained in paragraphs 1 through 95 with the same force and effect as if here set forth in full.

127. The aforementioned practices by the Defendants were in violation of the Iowa Competition Law, Iowa Code sections 553.4 and 553.5 and the Iowa consumer frauds and unfair practices act, Iowa Code §714.16, *et seq*. The State of Iowa represents consumers' claims pursuant to the Attorney General's authority under Rule 23 of the Federal Rules of Civil Procedure.

128. Plaintiff State of Kansas repeats and realleges each and every allegation contained in paragraphs 1 through 95 with the same force and effect as if here set forth in full.

129. The aforementioned practices by the Defendants were in violation of Kansas Statutes Annotated §§ 50-101 *et seq*. The State of Kansas represents consumers' claims pursuant to the Attorney General's *parens patriae* authority and authority under Rule 23 of the Federal Rules of Civil Procedure.

130. Plaintiff Commonwealth of Kentucky repeats and realleges each and every allegation contained in paragraphs 1 through 95 with the same force and effect as if here set forth in full.

131. The aforementioned practices by the Defendants were in violation of Kentucky Revised Statutes (KRS) 367.175, and the Kentucky Consumer Protection Act, KRS 367.110 *et seq*.

132. Pursuant to KRS 367.110 *et seq*., the Commonwealth of Kentucky brings this action for damages sustained by the Commonwealth of Kentucky and its natural person citizens, together with costs and attorneys fees, civil penalties and all available equitable relief, including injunctive relief and restitution and disgorgement. The Commonwealth of Kentucky represents consumers' claims pursuant to the Attorney General's *parens patriae* authority and authority under Rule 23 of the Federal Rules of Civil Procedure.

133. Plaintiff State of Louisiana repeats and realleges each and every allegation contained in paragraphs 1 through 95 with the same force and effect as if here set forth in full.

134. The aforementioned practices of Defendants were in violation of the Louisiana Monopolies Act, Louisiana Revised Statutes (La. R.S.) 51:121, et seq. and the Louisiana Unfair