**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY | ) | MDL NO. 1456 |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | CIVIL ACTION: 01-CV-12257-PBS |
| | ) | Subcategory Docket: 06-CV-11337-PBS |
| | ) | |
| THIS DOCUMENT RELATES TO | ) | Judge Patti B. Saris |
| | ) | |
| *U.S. ex rel. Ven-A-Care of the Florida Keys,* | ) | Magistrate Judge Marianne B. Bowler |
| *Inc. v. Abbott Laboratories, Inc.,* | ) | |
| No. 07-CV-11618-PBS | ) | |
| | ) | |

**ABBOTT LABORATORIES INC.'S REPLY TO VEN-A-CARE'S RESPONSE
TO ABBOTT'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL
FACTS SUPPORTING ABBOTT'S MOTION FOR SUMMARY JUDGMENT**

Dated:  December 4, 2009

James R. Daly
Eric P. Berlin
Tara A. Fumerton
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, Illinois  60601
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585

*Counsel for Defendant Abbott Laboratories Inc.*

Pursuant to the Federal Rule of Civil Procedure 56 and Local Rule 56.1, Defendant Abbott Laboratories Inc. ("Abbott") submits this reply to Ven-A-Care's Response to Abbott's Local Rule 56.1 Statement of Undisputed Material Facts in Support of Abbott's Motion for Partial Summary Judgment ("VAC SOF Resp.").

Abbott objects to the format used by Ven-A-Care ("VAC") because it does not state whether VAC is contesting or agreeing to each of the paragraphs in Abbott's original Rule 56.1 statement.  VAC's paragraph numbers do not match the paragraph numbers in Abbott's original Rule 56.1 statement, and one cannot discern whether VAC is even attempting to respond to many of Abbott's statements.  Abbott requests that the Court strike VAC's response document and deem all of Abbott's statements of fact admitted pursuant to Local Rule 56.1.

In the alternative, Abbott has tried to correlate VAC's responses to Abbott's original numbered paragraphs, and has replied accordingly.

## I.     THE PARTIES

1.      The parties to this litigation are Ven-A-Care of the Florida Keys, Inc. ("Ven-A-Care") and Defendant Abbott Laboratories Inc. ("Abbott").  (Case No. 07-CV-11618, the Complaint "Complaint," ¶¶ 12, 16, Ex. 1.)

**REPLY:**      Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 1).  Abbott disputes VAC's additional statement of fact because Zachary Bentley is not a principal officer or director. (3/5/08 Bentley Dep. at 33:15-36:14; 387:2-389:9 (Mr. Bentley resigned as President in July 2003) attached hereto as Berlin II, Ex 3.)

## II.    VEN-A-CARE'S UNDER SEAL-COMPLAINTS AND CURRENT COMPLAINT REGARDING ERY DRUGS

2.      In 1995, Ven-A-Care filed a suit under seal against various pharmaceutical manufacturers, including Abbott, alleging that defendants' "price spreads" (differences between

AWPs and actual sales prices) amounted to fraud against the Medicaid and Medicare programs (the "DOJ case").  (1995 Complaint, Case No. 95-CV-1354 (S.D. Fla.), Ex. 2.)

**REPLY:**      Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 2), and Abbott does not dispute the facts that VAC added to its paragraph 2.

3.      This under-seal complaint in the DOJ case alleged that Abbott's Hospital Products Division ("HPD") violated the False Claims Act ("FCA") by reporting inflated prices for nineteen NDCs of infusion and injectable pharmaceutical products.  (*Id.* ¶ 50.)

**REPLY:**      Uncontroverted by VAC.

4.      In 1997, Ven-A-Care added an allegation that Abbott marketed the spread to increase its market share of the drugs at issue.  (Second Amended Complaint filed August 13, 1997, ¶¶ 48-50, Ex. 3.)

**REPLY:**      Uncontroverted by VAC.

5.      In 2002, Ven-A-Care amended its under-seal complaint in the DOJ case to add several Abbott oral erythromycin ("Ery") drugs produced by Abbott's Pharmaceutical Products Division ("PPD").  (Ex. 6 to Fourth Amended Complaint, filed December 11, 2002, Ex. 4.)

**REPLY:**      Uncontroverted by VAC.

6.      The Department of Justice intervened in Ven-A-Care's complaint in March 2006 with respect to four Abbott products:  Vancomycin, sodium choloride, sterile water and dextrose. (2006 DOJ Complaint, Ex. 5.)  Ven-A-Care amended its complaint to drop the Ery drugs and all but the four HPD products.  (*U.S. ex rel. Ven-A-Care of the Florida Keys, Inc v. Abbott Laboratories Inc.,* Case No. 95-CV-1354, Plaintiff Ven-A-Care's Motion for Leave to Amend Complaint by Adopting United States' Complaint in Intervention (March 17, 2006), Ex. 6.)

**REPLY:**      Uncontroverted by VAC.

7.      On April 10, 2000, Ven-A-Care filed a complaint under-seal in the United States District Court for the District of Massachusetts against several drug manufacturers (Case No. 00-CV-10698, the "Massachusetts Case.").  Abbott was not named in that complaint.  (2000 Complaint, Ex. 7.)

**REPLY:**      Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 3).

8.      On February 15, 2001, Ven-A-Care filed an amended complaint adding Abbott to the Massachusetts case.  (First Amended Complaint, Ex. 8.)

**REPLY:**      Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 3).  Abbott does not dispute that the Ery drugs were oral drugs that were the responsibility of Abbott's PPD.

9.      The First Amended Complaint named six Ery drugs (thirteen National Drug Code ("NDCs")) and alleged that Abbott and the other drug manufacturers "falsely represented the prices that they charged wholesalers for certain of their generic prescription products."  (*Id.* at ¶ 1.)

**REPLY:**      Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 4).  Abbott does not dispute that VAC accurately quotes from and cites to its complaint in its paragraph 4.

10.      The First Amended Complaint alleged that this "wholesaler information" was "used to determine the Wholesaler Acquisition Cost (WAC) for the specified drugs to which a percentage was added to estimate the acquisition cost of a pharmacy purchasing from a wholesaler."  (*Id.* at ¶ 3.)  The First Amended Complaint identified eight states (Alabama, Colorado, Florida, Maryland, Massachusetts, Ohio, Rhode Island, and Texas) as "WAC STATES" that utilized Abbott's allegedly false WAC information.  (*Id.* at ¶ 2.)

**REPLY:**      Uncontroverted by VAC (*see* VAC SOF Resp. ¶¶ 5-6).

11.     The First Amended Complaint further alleged that the Defendants "knew that the WAC STATES' Medicaid Programs relied on the DEFENDANTS' representations of the prices that the DEFENDANTS charged wholesalers in setting the amount to be reimbursed to a pharmacy.  (*Id.* at ¶ 3.)

**REPLY:**     Uncontroverted by VAC.

12.     The First Amended Complaint made no allegations with respect to published Average Wholesale Prices ("AWPs") or the other forty-one State Medicaid Programs.  (*Id.*)

**REPLY:**     Uncontroverted by VAC.  VAC notes that its First Amended Complaint explained how AWP was used by some Medicaid programs to calculate payments (*see* VAC SOF Resp. ¶ 4), but VAC does not controvert that its complaint contained no alleged wrongdoing by Abbott with respect to the Erys' AWPs.

13.     On February 1, 2002, Ven-A-Care filed a Second Amended Complaint, adding an allegation that, "[t]hrough its direct prices," Abbott also knowingly defrauded California Medicaid.  (Second Amended Complaint ¶ 141, Ex. 9.)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 6).

14.     The Second Amended Complaint made no allegations directed to Abbott with respect to published AWPs or the remaining forty State Medicaid programs, although Ven-A-Care did add AWP-based allegations directed to the other defendants.  (Second Amended Complaint ¶¶ 155, 178, Ex. 9.)

**REPLY:**     Uncontroverted by VAC.

15.     On February 15, 2005, Ven-A-Care filed its Third Amended Complaint under seal.  In this amended complaint Ven-A-Care alleged for the first time that Abbott caused the

publication of false AWPs for the Ery drugs in addition to false WACs and direct prices.  (Third

Amended Complaint ¶ 194, Ex. 10.)

**REPLY:** Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 7).  With respect to the

VAC's additional statements in its paragraph 9, Abbott does not contest VAC's statement that

the AWPs in Exhibits 1 and 9 to the Third Amended Complaint appear to be 25% greater than

the WACs.  Abbott disputes that it published AWP to the compendia.  (30(b)(6) Fiske Dep. at

143:23-144:1, 175:16-23, Ex. 33; 1/22/09 Pavlik Dep. at 61:23-62:1 (Abbott sets WAC and List

Price, but not AWP), attached as Berlin II Ex. 4.)

16.     The Third Amended Complaint expanded Ven-A-Care's claims from nine States

to all state Medicaid programs nationwide.  (*Id.* at ¶ 171, Ex. 10.)

**REPLY:** Uncontroverted by VAC.  VAC does not address this statement at all.

17.     The Third Amended Complaint also named five additional Ery formulations (13

NDCs).  (Ex. 1 to Third Amended Complaint, Ex. 10.)

**REPLY:** Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 8).

18.     Because these complaints were filed under seal, Abbott had no knowledge of

them.  *See* 31 U.S.C § 3730(b)(2).

**REPLY:** Uncontroverted by VAC.  VAC does not address this statement at all.

19.     On August 30, 2007, Ven-A-Care severed its claims against Abbott and filed the

current complaint (Case No. 07-CV-11618, the "Complaint," Ex. 1.)  The United States declined

intervention.  (*Id.* at ¶ 15.)

**REPLY:** Uncontroverted by VAC.  VAC does not address this statement at all.

20.     The Complaint named six additional Ery formulations (17 NDCs), bringing the

total to seventeen Ery formulations (43 NDCs).  (Complaint ¶ 33, Ex. 1.)

**REPLY:**     Uncontroverted by VAC.  VAC does not address this statement at all.

21.     The Complaint alleges that Abbott violated the FCA by "report[ing] inflated pharmaceutical prices that it knew Medicaid relied upon to set reimbursement rates for Abbott's pharmaceutical products" when its "actual sales prices . . . were far less than the prices reported." (Complaint at Intro, Ex. 1.)  The Complaint also alleges that Abbott "used the public fisc as a marketing tool, actively promoting government-funded 'spreads' between (1) its fraudulently inflated prices and (2) its actual sales prices as an inducement to its customers.  These efforts allowed Abbott to increase its profits by boosting sales for its drugs."  (*Id.*)

**REPLY:**     Uncontroverted by VAC.  VAC does not address this statement at all.

22.     The Complaint alleges two causes of action under the FCA.  Count I alleges that "Abbott knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States" by "knowingly using the spread [between reported prices and providers' actual acquisition costs] as an unlawful inducement in violation of the federal anti-kickback statute" and that Abbott violated 31 U.S.C. § 3729(a)(1).  (*Id.* at ¶ 72.)  Count II alleges that "Abbott knowingly made, used, or caused to be made or used, false records or statements to cause false or fraudulent claims to be paid or approved by the United States" and that Abbott violated 31 U.S.C. § 3729(a)(2).  (*Id.* at ¶ 75.)

**REPLY:**     Uncontroverted by VAC.  VAC does not address this statement at all.

23.     Ven-A-Care seeks damages from January 1, 1994 through the present.  (*Id.* at ¶ 49.)

**REPLY:**     Uncontroverted by VAC.

24.     Dr. John Lockwood, the designated corporate representative for the Rule 30(b)(6)

deposition of Ven-A-Care in this case, provided the following testimony regarding Ven-A-Care's

various amendments to the Complaints:

> Q.  And the complaint that you filed in February '01 -- well, let me
> back up -- go forward, rather.  In February 2005 you added
> additional Abbott Ery NDCs to complaint, right?
>
> A.  Yes, sir.
>
> Q.  Why were you adding additional NDCs four years later?
>
> A.  I think our original thought process was to call the attention of
> the government to drugs where the FUL potentially was affected
> by I guess the WAC fraud that we saw and by -- of a later date we,
> I guess, felt that the WAC fraud would stand on its own, to the
> extent that we could show it and prove it.  And I think we were
> trying to show the government the impact on the FUL in 2001 and
> that the impacts were far-ranging.  I think that was our goal at that
> time.
>
> Q.  And then you added additional Abbott Ery NDCs to the
> complaint in August of 2007, so over two years after the previous
> amendment and I guess six years after originally filing this
> complaint.  Why was Ven-A-Care adding those NDCs at that time?
>
> A.  I think my recollection is that we felt that those drugs would
> also be properly included in the allegations that we made in the
> complaint.
>
> Q.  Well, when -- those NDCs -- and I won't list all of them, the
> ones added in 2007, but they are, for example, the EES 400 film
> tab; the Ery tab tablet, 250 milligrams; EES granules, 250 – 200
> milligrams.  I'm just giving some examples.  When did you -- for
> the drugs that you added in August 2007, when did you discover
> the alleged fraud that you were stating in the complaint with
> respect to those NDCs?
>
> A.  Well, I'd have to go back and look, but I believe all of those
> NDCs are actually included in the Econolink database and shows
> some pricing discrepancies.  Along the way we were, I think,
> trying to point out what we thought were the bad actor drugs, the
> most -- the most -- the significant problem drugs, and along the
> way we included more drugs that may or may not have quite as big
> a spread or for one reason were ignored or not focused on.

Q.  Was this a situation where -- and I just want to understand the process for adding these along the way, where you discovered the price discrepancies back in 2000 for all of these NDCs and then added them for different reasons over time?

A.  That would be my general answer that, yes, it was -- we had pricing information over a period of time and I think our reasons for adding them changed over time in our discussions with the attorneys.

Q.  So you explained the reason for adding -- for the second addition where those weren't necessarily affecting the FUL and you were more focused on the FUL.  Can you explain the addition of the third time?

A.  I probably went over the -- I know I went over the list again and made basically final decisions with the attorneys about which drug should be in and which drug should be out and discussed that and proceeded from there.

(04/24/09 30(b)(6) Lockwood Dep. ("30(b)(6) Ven-A-Care Dep.") at 434:18-437:18, Ex. 11.)

      **REPLY:**      Uncontroverted by VAC.  VAC does not address this statement at all.

## III.   PUBLIC DISCLOSURE REGARDING ERY DRUGS

      **GENERAL REPLY:**  VAC does not controvert the Abbott's statements in this section. Instead, VAC raises several irrelevant or legally incorrect boilerplate arguments in response to certain paragraphs.  Abbott incorporates the following replies to VAC's arguments into the replies below where applicable.

      a.      VAC's argument about whether or not certain documents "indicate[s] approval by the United States" relies upon a mistatement of the law (the law clearly establishes that the government need not issue "a hall pass" for information to pass as acquiescence), and the assertion misses Abbott's purpose for citing the report.

      b.      Whether or not Abbott relied upon or used a report is irrelevant because the statement is made with respect to Abbott's causation and damages argument in its motion, not Abbott's scienter.

- 8 -

c.      Although VAC argues in some of its responses that the document is hearsay or "contains inadmissible hearsay," Abbott is not using the documents for the truth of the matters asserted.

d.      That some of the documents do not mention Abbott or the Ery drugs by name is irrelevant because the Court must consider the knowledge gained from the documents as a whole.  *See United States v. Catholic Healthcare W.*, 445 F.3d 1147, 1152 (9th Cir. 2006) ("elements of the fraud allegation need not be made public in a single document"); *Dingle v. Bioport Corp.*, 388 F.3d 209, 214 (6th Cir. 2004) ("The fact that the information comes from different disclosures is irrelevant."); *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 174 n.8 (5th Cir. 2004) (multiple sources "considered as a whole").

e.      Whether or not a report counts as a public disclosure under the FCA's public disclosure bar (and these documents do), the document is still relevant to the causation and damages issues raised in Abbott's motion for summary judgment.

25.     In September 1984, the HHS-OIG issued a report titled "Medicaid – Limitation on Payments for Drugs."  (Ex 12.)  According to the report:  "Within the pharmaceutical industry, AWP means non-discounted list price.  Pharmacies purchase drugs at prices that are discounted significantly below AWP or list price."  (*Id*. at 10.193.)  Included in this report was a comparison of the Bluebook AWP and the 70th Percentile Price based on data collected from an audit of pharmacy invoices for EES 400$^{®}$ tabs.  According to the report, the AWP for EES 400$^{®}$ was $21.95 and the 70th Percentile Price per Audit was $16.49, resulting in a spread of 33%.  (*Id*. at 10.203.)  The report also listed prices generally paid by pharmacies in different states.  (*Id*. at

Schedule V.)  According to the report, the median price paid by pharmacies in Massachusetts for EES 400® tabs was $14.06, resulting in a spread of 56%.[1]  (*Id.*)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 16).  VAC merely argues that this disclosure was too early – that it may not have reflected pricing " or late 1990s – which is contrary to VAC's theory that manufacturers generally increased the spreads over time and otherwise speculative and unsupported.  The portion of the OIG report that VAC quotes is immaterial (and merely suggests that the spreads were larger than those enumerated in the report).  VAC's additional argument is just wrong – EES is by definition and trade name Abbott's Ery.  (Ex. 11 United States Patent and Trademark Office Search Results, Trademark for EES.)

26.     On September 17, 1986, the State of Colorado Department of Social Services wrote to HCFA, the federal agency responsible for Medicaid regarding proposed regulatory changes concerning maximum limits for generic drugs, and warned that pharmaceutical manufacturers were using spreads on drug prices as a "marketing tool": "Published data in Red Book or Blue Book should be used with caution.  Market surveys of various brands of generics should be used to verify accuracy of the data. . . . Submission of artificially high AWP prices has been used as a marketing tool by the generic companies to sell their products."  (Ex. 13 at 4.)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 17).  Abbott agrees that the letter is the best evidence of its content; that is why Abbott quoted from the document.

---

[1] The spreads represented in Ven-A-Care's Complaint are in effect exaggerated by 100%.  For example, based on Ven-A-Care's method of calculating spread in the Complaint's Exhibit A, even if a drug's AWP is only 5% more than the "relator's cost," Ven-A-Care would claim that drug has a 105% spread.  For consistency and to enable valid comparisons, this brief will utilize a proper calculation of spread ((AWP-AAC)/AAC or (AWP/AAC)-1.0).

27.     On July 5, 1987, the *Lexington Herald-Leader* published an article titled "Drug Industry Overcharging Medicaid Prescriptions Cost Taxpayers Millions of Extra Dollars."  (Ex. 14.)  The article stated that "Medicaid programs across the country are making millions of dollars in overpayments because of flaws and abuses in the way they buy prescription drugs for the poor."  (*Id.* at 1.)  The article stated that "[t]he system is distorted even further by drug companies that publish prices that are dramatically higher than the prices they actually charge pharmacies."  (*Id.*)  In one example, the article stated that, as a result of a 1985 survey, Texas Medicaid officials learned that "one brand of penicillin . . . had a Red Book price of $100 'but pharmacists were buying it all day long for $30.'"  (*Id.* at 7.)  In another example, the article stated that Kentucky Medicaid officials "discovered that [an arthritic medication] was being sold to pharmacies for only 8.88 cents a tablet—47% below the published Average Wholesale Price."  (*Id.* at 4.)  The article also discussed a "sales technique called 'playing the spread,'" noting that a large "spread, or difference, between the [AWP] and the actual price" meant that "a pharmacist buying that drug could make a larger profit."  (*Id.* at 4-5.)  The article stated that some "companies actually advertised that they had a better spread," and "many companies routinely list Average Wholesale Prices and 'your price' in their catalogs to show the spread."  (*Id.* at 5.)  The article indicated that previous attempts to change the system had "met bitter resistance from the National Association of Retail Druggists" and other groups, who "led the fight to force the federal Health Care Financing Administration . . . to retreat from proposed changes in 1985 that came up after the inspector general's audit discovered the overpayments."  (*Id.* at 8-9.)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 18).  That one pharmacy representative stated that "we haven't seen any laws broken" does not diminish the articles value as a public disclosure on the topics discussed (and quoted above).  VAC argues that spreads and

"'playing the spread" are per se illegal; the law does not require that the article label them as such (and indeed the article does refer to them as "abuse").  Finally, VAC's argument that the article predates the period alleged in VAC's complaint is immaterial and is contrary to VAC's theory that manufacturers generally increased the spreads over time.

28.     In March 1991, the HHS-OIG issued a report entitled "Comparison of Reimbursement Prices for Multiple-Source Prescription Drugs In the United State and Canada." (Ex. 15)  This report focused on the "most commonly used drugs" and found:  "over half of the commonly used drugs had lower prices in Ontario."  (*Id.* at ii.)  According to the report, the Ontario price for Erythromycin Tab 250 mg was 55.3% lower than the HFCA FUL.  (*Id.* at B-2.)

**REPLY:**      Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 19).  VAC merely disputes the report's materiality even though the report specifically compares so-called transaction prices to reported prices.  In addition, VAC presents no evidence that anyone in the government would have thought that prices in the Canada market would have been so significantly lower than in the U.S. market.

29.     On July 31, 1992, the Energy Commerce Committee of the U.S. House of Representatives held a hearing to discuss "Bills to Amend the Public Health Service Act and the Social Security Act to Establish Limits on Certain Drug Prices."  (Ex. 16.)  John M. Rector, Vice President of Government Affairs and General Counsel for the National Association of Retail Druggists ("NARD"), submitted a statement at the hearing.  (*Id.* at 280.)  NARD also submitted a comparison of the contract prices (available to members of its organization) and published AWPs.  (*Id.* at 302-310.)

**REPLY:**      Partially undisputed by VAC.  VAC argues only that the prices submitted by NARD were not available to the NARD pharmacies.  VAC claims incorrectly that the

contract prices were available only to hospitals (*see* VAC SOF Resp. ¶ 20), even though Mr.

Rector from NARD testified that the prices were available to "purchasers, *including* hospitals"

and referred to "pharmacies."  (*See* Anderson Ex. 26(S) at 295-96.)  VAC even cites a portion of

the record where Mr. Rector states that the prices were available to "many other for-profit

pharmacies."  (Upon more careful reading, Abbott agrees that Mr. Rector indicated that the

contract prices were not available to the NARD members; clearly, however, the prices were

available to other pharmacies in the market, and VAC's vituperative accusations of Abbott

hiding a page and lying to the Court are misplaced and inappropriate.  Abbott used a complete

copy Mr. Rector's testimony before Congress in many depositions including the Rule 30(b)(6)

deposition of Ven-A-Care in this case.  (Lockwood 4/24/09 30(b)(6) Dep. Ex. 16, attached hereto

as Berlin II Ex. 5.))  Finally, VAC's assertions about Prucare (VAC SOF Resp. ¶ 21) are

unsupported and immaterial.  VAC cites no evidence with respect to Prucare's operations in the

early 1990s (and VAC attaches none of the cited evidence, in violation of Local Rule 56.1

("Copies of all referenced documentation shall be filed as exhibits to the motion or opposition.")).

30.     Several versions of Abbott's Erys at issue in this case were on NARD's list

presented to the U.S. Congress, including EES 400® TABs, EES® 200 liquid, EES 400® liquid,

Ery-TAB® 250 mg tabs, Ery-TAB® 333 mg, and Ery-TAB® 500 mg.  (*Id*.)  The price lists show

discounts for these drugs ranging from AWP-56% to AWP-86% (spreads of 127% to 614%).

(*Id*.)  These spreads, publicly disclosed in 1992, equal or exceed the spreads alleged by Ven-A-

Care on the same drugs a decade later.  The following table compares the spreads shown in this

1992 Congressional Report and the spreads alleged in Ven-A-Care's Complaint.

| Drug | 1992 Congressional Report AWP | 1992 Congressional Report Contract Cost | Spread Disclosed in 1992 | Ven-A-Care Alleged Spread |
|------|------|------|------|------|

| | | | |
|---|---|---|---|
| E.E.S.® 400 tabs | $104.12 | $46.25 | 125% | 58% |
| E.E.S.® 200 liquid | $19.59 | $8.00 | 145% | 64% |
| E.E.S.® 400 liquid | $36.49 | $15.45 | 136% | 79% |
| Ery-Tab® 250 mg tabs (100) | $23.75 | $3.51 | 577% | 178%/249% |
| Ery-Tab® 250 mg tabs (500) | $112.81 | $17.43 | 547% | 242% |
| Ery-Tab® 333 mg tabs (100) | $34.97 | $4.78 | 632% | 147%/218% |
| Ery-Tab® 333 mg tabs (500) | $166.12 | $23.78 | 599% | 211% |
| Ery-Tab® 500 mg tabs (100) | $40.10 | $12.78 | 214% | 132%/154% |
| Erythrocin® 250 mg (500) | $65.31 | $24.75 | 164% | 109% |
| Erythrocin® 500 mg (100) | $24.86 | $11.89 | 109% | 98% |
| Pediazole® suspension (100 ml) | $13.99 | $4.23 | 231% | 69% |
| Pediazole® suspension (200 ml) | $27.29 | $8.37 | 226% | 69% |
| Pediazole® suspension (250 ml) | $33.61 | $10.50 | 220% | 70% |

**REPLY:**      Uncontroverted by VAC.

31.    In August 1994, at HCFA's request, the Office of Inspector General (the "OIG")

commenced an audit surveying drug prices.  (6/24/08 Chesser Dep. at 66:1-9; 89:2-4, Ex. 17.)

The results of this study were published in a 1997 OIG report titled Medicaid Pharmacy – Actual

Acquisition Cost of Generic Prescription Drug Products.  (*Id.* at 87:19-88:11; Ex. 17.)  The

objective "was to develop a nationwide estimate of the discount below AWP at which

pharmacies purchase generic drugs."  (*Id.*)  As part of its study, the OIG collected over 9000

invoice prices for generic drugs.  (*Id.*)  Based on the audit, the OIG "estimated that, on average,

actual acquisition cost of generic drugs was 42.5 percent below AWP [a 74% spread]."  (*Id.*)  In

its comments to the report, HCFA concurred with the OIG's findings and stated that "[t]he

- 14 -

findings shown in the report confirm the belief shared by many states that the pharmacy's actual generic drug acquisition costs are much less than the prices paid by many states to the pharmacies." (*Id.* at App. 3, Pg. 2.) The OIG Working Files reflect audits of actual invoices containing Ery-Tab prices. (Working Files, Ex. 22.)

**REPLY:** Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 23). VAC's arguments about this paragraph's materiality fail. In addition to the points addressed in the General Reply, above, Ery-Tab is a trade name referring specifically to an Abbott Ery drug.

32. On June 10, 1996, *Barron's* published an article entitled "Hooked on Drugs," which detailed not only an alleged spread between Abbott's reported AWP and its prices for certain of its generic drugs, but also stated that drug manufacturers, including Abbott, employed "drug salespeople . . .[that] let[] the doctor know that his product has a bigger spread between AWP and the real price than any other generic firm." (Ex. 18 at 3.)

**REPLY:** Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 24).

33. In March 1997, various representatives of state Medicaid programs and an HHS-OIG investigator, Paul Chesser, attended a Medicaid Pharmacy Administrators Symposium in Asheville, North Carolina. (Ex. 19.) At least one meeting was held to obtain input from state Medicaid administrators about basing rebates on AWP rather than AMP. (*Id.* at 1.) The record of discussion notes that one reason offered in support of basing rebates on AWP was "that those drug manufacturers that play games with AWP (overstate AWP for marketing purposes) would immediately lower their AWPs to a more realistic level."

**REPLY:** Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 25). Although VAC does not dispute the paragraph, VAC argues that the document is mainly about rebates, but the

document clearly contains relevant information about AWP and manufacturers' marketing practices.

34.     In May 1998, an OIG report titled "Need to Establish Connection Between the Calculation of Medicaid Drug Rebates and Reimbursement for Medicaid Drugs" reiterated that "[b]ecause AWP is usually used as a basis for reimbursement at the pharmacy level, manufacturers can use it as a marketing tool to gain market share." (Ex. 20 at 5.) This report goes on to acknowledge that "[t]he drug industry currently treats AWP as a published list price rather than a true wholesale price." (*Id.*)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 26).

35.     On November 29, 2001, the HHS-OIG published "Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Texas Health and Human Services Commission." (Ex. 21.) This report stated that the average pharmacy acquisition cost for generic drugs was AWP-62.84% and WAC-26.13%. (*Id.*.)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 27).

36.     On March 14, 2002, the HHS-OIG published "Medicaid Pharmacy – Actual Acquisition Cost of Generic Prescription Drug Products." (Ex. 23.) This report found that "there is a significant difference between pharmacy acquisition cost for generic drugs and AWP." The estimated actual acquisition cost was 65.93% below AWP.

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 28).

37.     In 1998, under contract from the State of Idaho, Myers and Stauffer prepared a report analyzing the acquisition cost of prescription drugs in the state of Idaho. (Ex 24 at 4.) Myers and Stauffer utilized invoices collected from studies of Arkansas and Kentucky and weighed the data to Idaho Medicaid utilization. (*Id.*) This report found that the "average

discount from AWP for multi-source drugs was 65%. (*Id.* at 5.) The report also included a table of "Idaho Weighted EAC Discounts." This table included Ery-TAB (NDC 00074632013) and listed its AAC and the AWP. (*Id.* at 18.) According to this report, the invoices collected from pharmacies indicated that the average price paid for Ery-TAB was AWP-65.5%, or 33.50% of AWP. (*Id.*)

> **REPLY:** Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 29).

38. In 1998, under contract from the Kentucky Department for Medicaid Services, Myers and Stauffer prepared a report on the cost of dispensing prescription medications to Kentucky Medicaid recipients. ("A Survey of Dispensing Prescriptions and Estimated Acquisition Cost in the State of Kentucky" Ex 25 at 1.) This report found that pharmacies were able to obtain discounts from multi-source drugs that had a MAC price at a discount of AWP-72.6%. (*Id.* at 22.)

> **REPLY:** Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 30).

39. In March 1999, under contract from the Wyoming Division of Health Care Financing, Myers and Stauffer prepared a report titled "A Survey of Dispensing and Estimated Acquisition Costs of Pharmaceuticals in the State of Wyoming." (Ex. 26.) According to this report, the actual acquisition cost of multi-source drugs that had a MAC price, had an average discount of AWP- 73.7%. (*Id.* at 23.) Ery-Tab ® (NDC 00074632013) was included in this study. (*Id.* at 21.)

> **REPLY:** Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 31).

40. In 1999, under contract from the Louisiana Department of Health and Hospitals, Myers and Stauffer prepared a report, titled "A Survey of Dispensing and Acquisition Costs of Pharmaceuticals in the State of Louisiana" analyzing the pharmacy dispensing costs and drug

acquisition costs for providers serving Louisiana Medicaid beneficiaries. (Ex. 27)  This report

found that pharmacies were obtaining a discount of AWP-45.5% through AWP-62.8% for multi-

source drugs.  (*Id*. at 42.)

> **REPLY:**      Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 32).

41.      In 2002, under contract from the California Department of Health Services, Myers

and Stauffer prepared a report titled "A Survey of Acquisition Costs of Pharmaceuticals in the

State of California."  (Ex. 28 at 3 .)  This Report found:

> Findings from the study indicate that the current pharmacy
> ingredient reimbursement rate of AWP less 5% provides payments
> in excess of the costs actually incurred by California pharmacies in
> acquiring pharmaceutical products for Medi-Cal recipients.  In
> fact, the acquisition cost study findings indicate that for a "typical"
> prescription, a pharmacy's margin on ingredient reimbursement is
> approximately $10.  These margins on ingredient cost must be
> considered in tandem with an analysis of pharmacy dispensing cost
> and dispensing fee reimbursement in order to fully evaluate the
> issue of the adequacy of Medi-Cal pharmacy reimbursement.

(*Id*. at 4-5.)

> **REPLY:**      Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 33).

## IV.    VEN-A-CARE'S "DISCOVERY" OF ITS ERY CLAIMS

42.      Ven-A-Care has not seen a patient or submitted a claim for payment from any

health care program since approximately 1998.  (12/6/07 Lockwood Dep. at 198:16-22, Ex. 29.)

> **REPLY:**      Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 10).  Abbott objects to

VAC's additional statement (that VAC had "direct and independent insider access") in its

paragraph 10 because it is a legal conclusion.  Abbott otherwise disputes the statement.  (*See*

Abbott's Mem. in Support of Mot. for Summary Judgment at 1; *see also* Abbott's Mem. in

Support of Mot. to Dismiss at 6-7 .)  *See In re National Gas Royalties Qui Tam Litig*., 562 F.3d

1032, 1045 (10th Cir. 2009) ("the fact that a relator has background information or unique

expertise allowing him to understand the significance of publicly disclosed allegations and transactions is also insufficient").

43.     Ven-A-Care did not have a specific conversation with an Abbott employee who marketed the spread to them on Erythromycin oral drugs.  (30(b)(6) Ven-A-Care Dep. at 106:4-7, Ex. 11.)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 11).  VAC specifically admits, again, that it "did not have a specific conversation or incident with an Abbott employee who marketed the spread to Ven-a-Care on the Ery products."  It is immaterial whether VAC "is aware of the mechanisms by which reimbursement pricing information is marketed to pharmacies," other than for the fact that the absence of any marketing the spread of Erys to VAC further shows that Abbott did not market the spread of the Erys.

44.     Ven-A-Care never witnessed an Abbott employee marketing the spread on any Ery drug.  (*Id*. at 183:15-184:6, Ex. 11.)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 11).  (*See also* Reply 43, above.)

45.     Ven-A-Care does not have any evidence that Abbott knew that any wholesaler was marketing the spread on any Ery drug or that Abbott ever directed its customers to the spread information published by any wholesaler.  (*Id*. at 177:22-178:11, 280:4-22, 287:11-14, Ex. 11.)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 12).  VAC's additional statement in its Response paragraph 12 (that VAC has market knowledge about how drug manufacturers cause prices to be published) in no way controverts Abbott's paragraph 45 and is

immaterial because, even if true, it would not require denial of Abbott's motion for summary judgment.

46.     Ven-A-Care has no record that it ever purchased any of the Erythromycin products.  (Ven-A-Care's Second Amended Answers to Interrogatories, Response No. 1, Ex. 30.)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 13).  VAC agrees that it cannot prove that it ever purchased the Erys at issue in this case and that its allegations are not based on any purchase of Erys.  VAC's speculation that it may have purchased Ery drugs is inadmissible, unsupported (Anderson Exs. 22 and 23 do not state anything about Ery invoices), and immaterial.  (Moreover, if in fact VAC lost an invoice during Hurricane Georges in 1999, only VAC is responsible because VAC, a professional FCA relator, took no precautions to safeguard that purported evidence.  (4/23/09 Lockwood Dep. at 50:1-15; 53:4-19, Ex. 11.)

47.     Ven-A-Care began investigating the alleged spreads on Ery drugs in 2000:

> Q.  What led you to look at the Abbott drugs at that point in 2000 as opposed to sometime in 1999 or 1998?
>
> A.  Well, this isn't the only thing I was doing at Ven-A-Care.  We had a wide variety of projects going on.  I certainly had a wide variety of projects going on at any one time and it was just a matter of, I guess, what we had time to look at in terms of investigating and looking at these issues.  And I looked at -- happen to look at Abbott in more detail in 2000, and in many ways, this complaint describes what I found.

(30(b)(6) Ven-A-Care Dep. at 21:4-15, Ex. 11; *see also id.* at 40:8-40:22, Ex. 11.)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 14).  Abbott objects to and disputes VAC's allegation about "pricing manipulation" and that VAC's "analysis required access to industry insider pricing information" as unsupported and untrue.  (SOF ¶ 55-60; SOAF ¶¶ 1-17; Abt. Brief at 6)

48.     Ven-A-Care claims that, although it might have been able to piece together information from documents earlier, it did not "discover" Abbott's alleged fraud with respect to the Erys until 2000.  (*Id*. at 22:10-23:9, Ex. 11.)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 15).

49.     Ven-A-Care primarily used a copy of McKesson's Econolink software program to "discover" the claims.  (*Id.; see also id* at 48:15-49:4.)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 15).

50.     Ven-A-Care acquired its copy of Econolink in March 2000.  (*Id*. at 222:12-22:3-15, Ex. 11.)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 15).

51.     Ven-A-Care shared a copy of Econolink with the DOJ in January 2001 (without McKesson's permission or knowledge).  (30(b)(6) Ven-A-Care Dep. at 227:12-228:9, Ex. 11.)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 15).

## V.     THE ERY DRUGS

52.     Abbott's different Ery formulations consist of different drugs that use the same antibiotic salt compounds.  (Meditz Affidavit ¶ 5, Ex. 31.)  Each formulation is prescribed for different purposes and to different types of patients.  (*Id.* at ¶ 6.)  Each formulation faces competition from different drugs.  (*Id.*¶.)  For example, Pediazole Suspension is prescribed for, and used by, only pediatric patients.  (*Id.* at ¶ 7.)  By contrast, Ery-TAB® is prescribed for and used by adult patients.  (*Id.*.)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 34).  Although VAC does not dispute this statement, VAC states "that the Ery drugs were priced similarly and uniquely by Abbott PPD."  (*Id.*)  Abbott cannot discern what VAC is trying to say – how prices can be unique and similar at the same time – and the cited testimony does not seem to support VAC's

statement.  Abbott does not interpret this statement as contesting Abbott's well supported statement.

53.     Abbott PPD reported the product's WAC and list price to the pricing compendia at the product's launch.  (2/19/09 Parker Dep. at 55:20-56:7, Ex. 32.)  Abbott also reported to the pricing compendia whenever Abbott took a price change to the WAC or list price of a product. (2/17/09 Fiske Dep. at 158:5-16, Ex. 33.)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 35).  Abbott disputes VAC's additional statements listed in its paragraph 35, and incorporates its responses to VAC's motion for partial summary judgment SOF ¶¶ 6-8 and 17-18 that VAC referenced.  Even in the portions of Ms. Parker's and Mr. Fiske's depositions that VAC cites, Ms. Parker and Mr. Fiske testified that Abbott did not set AWPs and only occasional estimated AWPs.  (Anderson Ex. 15 at 85:1; Anderson Ex. 11 at 137:25-138:9.)  VAC's additional statements about AWPs are immaterial.

54.     During the fifteen-year time period relevant to Ven-A-Care's claims, Abbott changed and reported WACs and list prices for the Ery drugs to the compendia on only five occasions.  (2/19/09 Parker Dep. at 105:3-11, Ex. 32.)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 35).  *See* reply to ¶ 53, *supra*.

55.     Abbott calculated and reported WAC as the price charged to wholesalers and other customers that purchased a case quantity or more of a product, prior to taking into account any possible chargebacks or discounts to which the wholesaler or customer would be entitled. (12/17/08 Senger Dep. at 34:17-35:3; 162:24-163:7, Ex. 34; 2/17/09 Fiske Dep. at 198:12-19, Ex. 33.)

**REPLY:** Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 35). *See* reply to ¶ 53, *supra*.

56.    Abbott's list price was the price charged to any non-contract customer that purchased less than a case quantity of product. (12/17/08 Senger Dep. at 145:24-146:5, Ex. 34.)

**REPLY:** Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 35). *See* reply to ¶ 53, *supra*.

57.    Mr. Fiske described the factors Abbott used in setting the prices for Erythromycin products: "We evaluated a number of things in terms of the pricing of the erythromycins, we evaluated the competitive circumstances in the marketplace, we evaluated our own market share for the products and determined if we felt we could take price actions. (2/17/09 Fiske Dep. at 41:8-12, Ex. 33.)

> Q.  Prior to July of 2003 for the erythromycin products, how were the WAC prices that were published by Abbott to the compendia such as First DataBank and Red Book set?
>
> A.  I -- I think I testified to this already today.  I think that I explained that we evaluate competitive circumstances in the marketplace.  It's no different for WAC pricing than it is for contract pricing, because, remember, we always have customers that are purchasing at WAC and list price and we want to maximize our margins.  We evaluated the -- we evaluate the competitive situation, what kind of market share do we have for our products, what has inflation been over time.  In -- in this case, we al- -- we also look at the WAC pricing for our competitors.  It's hard to discern contract pricing for competitors.  That information is not readily available.  But after we have done that, we determine if there's an opportunity to take a price increase.  I told you that we took a total of five price increases from 1994 to present.

(*Id*. at 80:2-24, Ex. 33.)

**REPLY:** Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 35). *See* reply to ¶ 53, *supra*.

58.    "List price" is defined by Merriam-Webster's Dictionary as "a basic price of an item as published in a catalog, price list, or advertisement before any discounts are taken." (Merriam-Webster's online dictionary at http://www.merriam-webster.com/dictionary/list%20price (last visited on July 25, 2009).)

**REPLY:**    Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 36).  VAC's additional statements do not require responses.  The first inappropriately suggests that Abbott's use of "List price" is unclear, and the second (about WAC prices) is unsupported and in fact has been controverted by Abbott.  (*See, e.g.*, Abbott SOF ¶¶ 55, 57.)

59.    A variety of sources defined WAC as an undiscounted list price:

(a)    The September 2001 GAO Report "Medicare, Payments for Covered Outpatient Drugs Exceed Providers Cost" defined WAC as "the list price a wholesaler pays to a manufacturer, but it does not include discounts that may affect the net price."  (Ex. 35.)

(b)    Redbook defined WAC as the "manufacturer quoted list price to wholesale distributors, and does not with any deal terms or specialized contract pricing."  (Minne Ex. 82, Ex. 36.)  Kristin Minne, Rule 30(b)(6) representative for Redbook, defined WAC as a price that "does not reflect rebates and contract pricing and, you know, discounts for early payment, [etc.]" (11/19/08 Minne Dep. at 396:9-19, Ex. 37.)

(c)    The U.S. Congress defined WAC in the Medicare Modernization Act of 2003:

> The term 'wholesale acquisition cost' means, with respect to a drug or biological, the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price  . . ..

(42 U.S.C. § 1395w-3a(c)(6)(B), Ex. 38)

**REPLY:**       Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 37).  Abbott disputes VAC's additional statements in its paragraph 37.  While VAC inaccurately represents the use of WAC in the MMA, ironically VAC acknowledges the distinction of how WAC was used for brands versus generics such as the Erys.  That distinction also applies to the Court's findings in the *Mylan* case.  VAC cites to Anderson Ex. 29 for another definition of WAC, by the author of that report, Prof. David Kreling from the University of Wisconsin School of Pharmacy later specifically disclaimed his earlier definition of WAC, and Ex. 30 merely duplicates the table from Ex. 29 containing the faulty definition.  (12/04/2008 Deposition of David Kreling at 70:12-21; 305:17-306:88, attached as Berlin II Ex. 6.)

Q.   Is there anything in this report that you remember as being inaccurate or inconsistent with what your view was at the time?

MR. EVERETT:  Objection to form.

THE WITNESS:  Yes.  There's – In retrospect, I've learned that there's something that has become very interesting to some people, that there is a definition of wholesale acquisition cost, WAC, that is misstated in this document.

* * *

Q.   And I believe you testified earlier that you do not agree with the definitions of WAC that appear in Exhibits 3 and 4, is that true?

A.   Yes.

Q.   Could you explain again how those definitions that you disagreed with made their way into Exhibits 3 and 4?

A.   That's -- That's a good question.  Kathleen was the primary researcher, project director.  I was a consultant on this project.  That -- Those definitions may have come from a discussion that we had and she took it from there.  It's possible that I provided those to her, but I'm -- I would be a bit surprised if they were a table that I prepared because it's not consistent with what -- my definition of WAC and what I learned WAC was.

Q.   What is your definition of WAC?

A.  My definition of WAC is it's a -- it's the list price, it's the catalog price for manufacturers to wholesalers.

Q.  Does WAC include discounts, rebates and the like, in your view?

A.  No.

(Anderson Ex. 29 is useful for other issues in this case because it showed that Medicaid ingredient cost overpayments were necessary to maintain access and states that AWP is not "a direct measure of true acquisition cost."  (*See* Anderson Ex. 29 at 3, 4.))  Abbott has earlier explained how it set its WACs based on legitimate business reasons having nothing to do with Medicaid payments.  (Abbott SOF ¶ 57.)

60.    Abbott had sales of Ery drugs at both its published WACs and list prices. (12/17/08 Senger Dep. at 52:11-23; 171:5-172:2, Ex. 34; 1/15/09 Lehn Dep. at 214:23-215:10, Ex. 39; 2/17/09 Fiske Dep. at 48:4-25; 63:21: 64:1; 238:5-10, Ex. 33.)

**REPLY:**      Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 38).  VAC does not dispute the statement.  Instead, it merely adds an allegation that sales of the Erys at the WACs were "rare."  The record, however, contradicts VAC's allegation.  (*See* Young Affidavit at ¶ 3, attached as Berlin II Ex. 7 (34% of customers purchased Ery at or above the published prices for at least 25% of the time).)

61.    Since 1991, Abbott has reported its average manufacturer price ("AMP") directly to CMS (f/k/a HCFA) for all of its products, including Ery products, on a quarterly basis as required by the Medicaid Rebate Act.  42 U.S.C. 1396r-8.  (2/18/09 Fiske Dep. 351:14-15, Ex. 33.)

**REPLY:**      Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 39).  VAC does not dispute the statement.  VAC's additional comments are immaterial.  The U.S. government had Abbott's AMPs.  The U.S. government alone chose not to share the AMPs with the states, even

though the states were statutorily entitled to them.  42 U.S.C. § 1396r-

8(b)(3)(D)(1993)("notwithstanding any other provision of law, information disclosed by

manufacturers or wholesalers under this paragraph …is confidential and shall not be disclosed by

the Secretary or the Secretary of Veterans Affairs or a State agency (or contractor therewith) in a

form which discloses the identity of a specific manufacturer or wholesaler, prices charged for

drugs by such manufacturer or wholesaler…"); 42 U.S.C. § 1396r-8(3)(A)(iii) (beginning July 1,

2006 the Secretary will provide AMP information to states.)

62.     While Abbott PPD submitted WACs and list prices for the Ery drugs, the

compendia actually calculated the AWPs for them.  (2/17/09 Fiske Dep. at 143:23-144:1,

175:16-23, Ex. 33.)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 40).  VAC does not

dispute that PPD submitted WACs and list prices and that the compendia actually calculated the

AWPs.  Instead, VAC asserts that Abbott "report[ed]" AWPs to compendia.  Even in the

portions of Ms. Parker's and Mr. Fiske's depositions that VAC cites, Ms. Parker and Mr. Fiske

testified that Abbott did *not* set AWPs and only occasional *estimated* AWPs.  (Anderson Ex. 15

at 85:1; Anderson Ex. 11 at 137:25-138:9; *see also* Anderson Ex. 11 at 139:11-:18 (re:

conversation with compendia "that despite the fact that manufacturers may have been providing

estimated AWPs, that the data vendors, especially First DataBank, was actually verifying or

confirming what a correct AWP should be with the wholesalers themselves.").)  Abbott has *not*

reported estimated AWPs since 2001; that simply is not supported by VAC's cite or by the

record.  (Fiske Dep. at 141:5-7, Ex. 33).

63.     Abbott informed Redbook on many occasions that it never intended to control the

AWP published by the pricing compendia.  (*See* Gerzel Ex. 10 ("Abbott does not control how

Red Book does its business nor does Abbott provide AWP or a calculated markup to establish an AWP.  Consequently, Abbott concluded that there was no need to respond to Ms. Voeck's April 2003 letter.  Abbott trusts that Red Book will continue to conduct its business as it sees fit.")  *See also*, 10/20/09 Gerzel Dep. at 127:5-129:14, Ex. 41; 02/17/09 Fiske Dep. at 142:18-144:12, Ex. 33.)

**REPLY:**      Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 41).  VAC does not dispute Abbott's statement, but instead responds only by arguing whether Abbott in fact controlled "the pricing published by the compendia," which does not controvert Abbott's statement.  To the extent that VAC is making an additional statement of fact, Abbott disputes VAC's statement.  (*See* Abbott's Resp. to VAC's SOF ¶¶ 6, 14.)

64.      Abbott's PPD employees testified that they believed that they reported the prices that the pricing compendia wanted and in accordance with Abbott's use of the terms:

(a)      Joseph Fiske, Director of Pricing and Planning, testified:

A.  The information that we reported to the data agencies was our WAC and our list price.  Any changes to our WAC and list price, we did so in good faith with the expectation that that was the information we should be providing.  Nobody told us to do anything differently than that, including Kay Morgan who certainly had the opportunity because she knew what our practices were.

(2/17/09 Fiske Dep. at 166:24-167:7, Ex. 33.)

* * * * *

A.  The pricing that we reported to the pricing compendia were the WAC and the list price -- the published WAC and list price, the -- the WAC price before any discounts to any of our customers, including the wholesalers.  That was our practice.  We always acted in good faith by doing that.  Nobody ever told us that we should do anything differently than that.

(2/17/09 Fiske Dep. at 195:7-14, Ex. 33.)

\* \* \* \* \*

The WAC price and the list price that we reported to the data agencies was a price that customers paid for our products. It was a price that was generally available in the marketplace. There was no intent to misrepresent anything.

(2/17/09 Fiske Dep. at 197:2-6, Ex. 33.)

\* \* \* \* \*

(b)      April Gerzel, a PPD Pricing Analyst testified:

Q. Do you have any idea at all why Abbott was reporting prices to the compendia?

A. I believe that's what our obligation was that they wanted us to report to them.

Q. (BY MR. ANDERSON):  How did you gain that understanding?

A. Through my training, when I came to the position.

Q. What was the obligation?

A. To inform the pricing compendia of new product launches, price changes to list or WAC, or any discontinued products that we were no longer going to manufacture and sell.

(2/20/09 Gerzel Dep. at 44:24-45:13, Ex. 41.)

**REPLY:**      Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 42).  VAC does not dispute Abbott's statement.  To the extent that VAC intends that its argument that Abbott knew that the published pricing was inflated beyond "usual market pricing" serve as an addition statement, Abbott disputes VAC's statement.  (*See* Abbott's Resp. to VAC's SOF ¶¶ 8-9, 14-16.)

65.      Kay Morgan worked at Abbott from 1975 to 1999.  (8/27/07 Morgan Dep. at 27:17-20, Ex. 42.)  She then went to First DataBank and served as Manager of Editorial Services.  (*Id*. at 28:19-22, Ex. 42.)  Ms. Morgan was responsible for the pricing information published by First DataBank until she left in 2005.  (*Id*. at 28:23-29:11, Ex. 42.)

**REPLY:**         Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 43).  VAC does not

dispute Abbott's statement.  Instead, VAC provides the complete non sequitur that Ms. Morgan

did not have price-reporting responsibilities for Abbott prior to working for First DataBank.

That statement is non-responsive and immaterial; in addition, Anderson Ex. 15 does not include

the cited deposition testimony as required by Local Rule 56.1, but even the cited pages do not

support the statement.

66.     Abbott denies marketing any price spreads on the Ery drugs.  For example Mr.

Fiske, Russ Lehn and Ms. Parker testified as follows:

> Q.  (BY MR. ANDERSON):  Did Abbott provide spreads by
> reporting high inflated estimated AWPs or AWPs to the pricing
> compendia?
>
> MR. BERLIN:  Objection, form.
>
> A.  No.
>
> Q.  (BY MR. ANDERSON):  With respect to the erythromycins
> that were selling for much less than the AWPs, will you agree that
> Abbott was enabling chains to achieve more reimbursement spread
> on those drugs?
>
> MR. BERLIN:  I'm sorry.  Could I have the question back?
>
> (Requested testimony read back.)
>
> MR. BERLIN:  Objection, form.
>
> A.  No.
>
> Q.  (BY MR. ANDERSON):  Why not?
>
> MR. BERLIN:  Objection, form.
>
> A.  Numerous reasons.  As I've indicated, we reported the WAC
> and the list price that we were actually selling product for in the
> marketplace.  Some of those purchasers were, in fact, retailers.  In
> addition, the actual reimbursement for the products in question
> were not a- -- not always even based on AWPs.  There are, as we
> discussed previously, numerous formulas for determining what a

maximum allowable cost will be for a product, and some of those have no relationship to AWP whatsoever.  So the answer is "no".

(2/18/09 Fiske Dep. at 304:5-305:7, Ex. 33.)

\*\*\*

Q.  Based on your experience, what factors did Abbott consider when setting prices for the erythromycin drugs?

A.  Competition, having a full line of product, quality of the product, dependable distribution, reliable distribution, distribution cost, cost of the product.

Q.  Did you ever observe anyone at Abbott consider the reimbursement spread when setting prices for erythromycin?

A.  No.

Q.  Did you ever observe that Abbott increased the list price, or the WAC, for any of the erythromycin drugs in order to increase the reimbursement spread?

A.  No.

Q.  To your knowledge, was that ever a consideration in price setting at Abbott?

A.  Not to my knowledge.

Q.  And I asked you about factors considered for setting price. What factors about Ery did Abbott market to its customers in the 1993 through '96 period?

A.  Those that I mentioned earlier, other than the cost of the product.

Q.  To your knowledge, did any Abbott employee market the spread between erythromycin's cost to the provider and the reimbursement amount?

A.  Not to my knowledge.

Q.  And did you ever learn that wholesalers were marketing the spread on the erythromycins?  Did you have any specific knowledge of that?

A. No.

(1/15/09 Lehn Dep. at 217:18-218:23, Ex. 39.)

      ***

> Q.  (BY MR. ANDERSON):  Have you ever heard AWP spread referred to as a potential talking point with customers?
>
> A.  No.
>
> Q.  Would that type of activity be condoned by Abbott?
>
> A.  No, it would not.
>
> Q.  Why not?
>
> A.  It's not our business how they profit.  We have to sell our product based on the merits of our product, which have to do with its clinical effectiveness, its availability, its, you know, reliability, and that's the methods that we use to sell our products.

(2/19/09 Parker Dep. at 97:23-98:11, Ex. 32.)

**REPLY:**      Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 44).  VAC does not dispute the statement.  Instead, VAC asserts only that Abbott was "aware[] that its customers were interested in such reimbursement on such generics drugs."  Certainly, that point cannot stand for marketing the spread.  To the extent that VAC is suggesting that Abbott set prices to impact Medicaid payments, Abbott disputes the statement.  (*See* Abbott's Resp. to VAC SOF ¶ 8-9, 14-16.)

## VI.  MEDICAID PAYMENTS FOR ERY DRUG CLAIMS

### A.  FULs

67.  On January 15, 1969, new regulations were enacted providing for federal financial participation in state medical assistance programs.  (31 Fed. Reg. 1243, Ex. 44.)  According to these regulations, payments for prescription drugs could be made under this program at a rate "defined by the State agency."  (*Id.* at 1244.)

**REPLY:**      Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 45).

68.     The Federal Upper Limit ("FUL") program was established by the Secretary of Health and Human Services in 1987.  (*See* 52 Fed. Reg. 28648, 28653 (July 31, 1987), Ex. 43.) The Secretary established the FUL program to allow "the Federal and State governments to take advantage of savings that are currently available in the marketplace for multiple source drugs . . . [while] maintain[ing] State flexibility in the administration of the Medicaid program."  (Ex. 43.)

**REPLY:**      Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 45).

69.     According to federal regulation, A FUL is established for a drug if:

> (1)  All of the formulations of the drug approved by the [FDA] have been evaluated as therapeutically equivalent in the most current edition of their publication, *Approved Drug Products with Therapeutic Equivalence Evaluations*;
>
> (2)  At least three suppliers list the drug [in the FDA publication] based on all listings contained in current editions [or updates] of published compendia of cost information for drugs available for sale nationally.

(52 Fed. Reg. at 28658, Ex. 43.)

**REPLY:**      Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 45).

70.     The FUL represents an amount set by CMS that is pertinent to what an agency may reimburse pharmacies, not including the dispensing fee, for a drug on the FUL.  (52 Fed. Reg. at 28653, Ex. 43.)  FULs are set by CMS.  Regulation instructed CMS to set FULs by computing a price "equal to 150 percent of the published price for the least costly therapeutic equivalent (using all available national compendia) that can be purchased by pharmacists in quantities of 100 tablets or capsules (or, if the drug is not commonly available in quantities of 100, the package size commonly listed) or in the case of liquids, the commonly listed size."  (*Id.*)

**REPLY:**      Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 45).  To the extent that VAC's assertions in its paragraph 45 are additional statements of fact, Abbott admits that FULs and MACs cap Medicaid ingredient cost payments, denies that Medicaid programs "almost

universal[ly] use" "lower of" payment methodologies, denies that Abbott did not report prices that "reflected market prices paid by pharmacies" (Young Affidavit at ¶ 3, Berlin II Ex. 7), denies that other prices would have resulted in "EACs lower than an applicable FUL or MAC" given how FULs and MACs were set and that Dr. Duggan should have recalculated FULs and MACs based on VAC's allegations of the but-for world with respect to other manufacturers, and incorporates its responses to VAC SOF ¶¶ 62-124.

71.     FULs were in place for Medicaid payments to pharmacies for dispensing multisource, oral erythromycins.  (Reisetter Report ¶ 48 Ex. 45; Redbook listing 1998, 2000 and 2001 (noting the FUL price (as "HCFA") for Erys, Ex. 46; Ven-A-Care 30(b)(6) Dep. at 221:3-19, Ex. 11.)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 46).  (VAC says "some Erys," but it is unclear if they are attempting to refute some part of the statement.  VAC provides no evidence, so the statement should be deemed admitted any way.)

72.     A FUL for an erythromycin drug prevented a pharmacy from increasing its Medicaid payment by submitting a claim for an erythromycin with a higher AWP than another generically equivalent erythromycin had.  (5/1/09 Perri Dep. at 109:3-20, Ex. 47; *see also* 2/17/09 Fiske Dep. at 164:1-6 ("You have to keep in mind that the erythromycin products were multisource pharmaceuticals and often third-party payors, whether it be government agencies or others, don't reimburse based off of an AWP.  They actually reimburse based on some MAC formula.") Ex. 33.)

**REPLY:**     VAC states that it disputes the statement "as stated" (*see* VAC SOF Resp. ¶ 47), but in fact VAC's argument is not responsive.  Therefore Abbott's statement should be deemed admitted.  With a FUL (or MAC) in place, a manufacturer raising an AWP would not

get a customer to purchase that manufacturer's product because the FUL (or MAC) would prevent the customer from getting a higher Medicaid payment.  (5/1/09 Perri Dep. at 103:17-104:1.)  VAC also improperly assumes that the FUL (or MAC) would remain the same in its but-for world.  VAC appears to cite to its expert's declaration (the use of "*id.*" is unclear), but Dr. Duggan most certainly has not shown that Abbott's reporting in any way impacted the amount that Medicaid paid.  (Duggan Rpt. at 27, n.19 "It is worth noting that I have not evaluated the effect of Abbott's published prices on the calculation of FUL or MAC prices."), Ex. 95.)

**B.**     **CMS Exercised Discretion and Disregarded Published Prices in Setting FULs**

73.     Sue Gaston was the CMS employee responsible for setting FULs from April 1991 through February of 2003.  (1/24/08 Gaston Dep. at 40:7-40:10, Ex. 48.)  Gail Sexton was the CMS employee responsible for setting FULs beginning in 2004.  (05/20/08 Sexton Dep. at 49:13-50:21, Ex. 49.)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 48).  VAC challenges only the materiality of Abbott's statements about CMS setting FULs.  The statements are material, however, because they demonstrate that CMS, at times, knowingly and purposefully set higher FULs to compensate pharmacies.  There was a policy not to pay lower amounts.  In addition, Dr. Duggan has not determined which FULs CMS increased, and it is not be proper to calculate damages as the entire amount between a FUL and a recalculated EAC without taking into account CMS's intent in increasing the FULs and providing larger margins to pharmacies.

74.     According to Ms. Gaston, CMS utilized a computer program and then a manual review to establish the FULs.  (1/24/08 Gaston Dep. at 232:22-234:6, Ex. 48.)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 48).  (For discussion about materiality, *see* reply to SOF ¶ 73, *supra*.)

75.     Ms. Gaston further testified that the manual review process was used to determine whether the price was "truly available or not" and whether or not "you should follow up and see if it's available."  (*Id.* at 229:8-230:14, Ex. 48.)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 48).  (For discussion about materiality, *see* reply to SOF ¶ 73, *supra*.)

76.     According to Ms. Gaston, CMS did not always set the FUL based on the lowest reported price of the drug for which the FUL capped payment.  For example, CMS would exercise discretion to set a higher FUL to ensure Medicaid patients access to pharmaceuticals. (3/19/08 Gaston Dep. at 451:12-451:19, 498:16-499:9, Ex. 48.)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 48).  (For discussion about materiality, *see* reply to SOF ¶ 73, *supra*.)

77.     CMS officials received feedback from members of the pharmacy community and from State Medicaid agencies about:  "whether they felt that the FUL prices or the drugs were correctly on the FUL list or needed [to be] adjust[ed]"; whether the product was "available"; and whether "the pricing appears to be either too low or too high."  (*Id.* at 433:14-434:8, 435:8-435:11, Ex. 48; 5/20/08 Sexton Dep. at 110:14-110:21, Ex. 49.)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 48).  (For discussion about materiality, *see* reply to SOF ¶ 73, *supra*.)

78.     The process CMS utilized in establishing FUL prices was recently the subject of a tutorial hearing before Judge Saris in the New York Counties Consolidated Cases.  During that hearing, the Court acknowledged that CMS violated the regulation establishing the process for CMS to set FULs.  (July 28, 2009 Tutorial and Motion Hearing at 32:24-33:5, Ex. 50.)

**REPLY:**     Uncontroverted by VAC.  VAC does not address this paragraph at all.

79.     CMS had access to AMP information that manufacturers, including Abbott reported to CMS.  (3/19/08 Gaston Dep. at 528:1-528:3, Ex. 48.)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 39).  VAC does not dispute the statement.  VAC's additional comments are immaterial.  The U.S. government had Abbott's AMPs.  The U.S. government alone chose not to share the AMPs with the states, even though the states were statutorily entitled to them.  42 U.S.C. § 1396r 8(b)(3)(D)(1993) ("notwithstanding any other provision of law, information disclosed by manufacturers or wholesalers under this paragraph . . . is confidential and shall not be disclosed by the Secretary or the Secretary of Veterans Affairs *or a State agency* (or contractor therewith) in a form which discloses the identity of a specific manufacturer or wholesaler, prices charged for drugs by such manufacturer or wholesaler.") (emphasis added).

### C.     DRA 2006 Litigation

80.     In 2006, Congress passed the Deficit Reduction Act ("DRA"), which amended the FUL statute, 42 U.S.C. § 1396r-8.  This amendment required CMS to "substitute 250 percent of the average manufacturer price (as computed without regard to customary prompt pay discounts extended to wholesalers) for 150 percent of the published price."  Pub. L. No. 109-171 § 6001, 120 Stat. 4, 54-55 (2006).

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 49).

81.     As part of the implementation of the new FULs, states were directed to assure that dispensing fees paid by Medicaid programs to pharmacies were reasonable.  (72 Fed. Reg. 39,142 (July 17, 2007), Ex. 51.)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 49).

82.     The Congressional Budget Office estimated that calculating FULs at 250% of AMP would "reduce Medicaid spending by $3.6 billion over the 2006-2010 period and $11.18

billion over the 2006-2015 period.  (Congressional Budget Office, *Cost Estimate:  S. 1932: Deficit Reduction Act of 2005,* Ex. 52.)

**REPLY:**       Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 49).

83.     On July 17, 2007, CMS published a final rule implementing the FUL formula established by the DRA.  (72 Fed. Reg. 39,142 (July 17, 2007), Ex. 51.)

**REPLY:**       Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 49).

84.     On November 7, 2007, the National Association of Chain Drug Stores ("NACDS") and the National Community Pharmacists Association ("NCPA") filed a complaint against the Department of Heath and Human Services, the Secretary of the Department of Health and Human Services, CMS, and the Acting Administrator of CMS asking for (among other things) an injunction to stop CMS from implementing the new FUL rule.  (Complaint, *Nat'l Ass'n of Chain Drug Stores v. U.S. Dep't of Health & Human Servs.*, No. 07-cv-02017-RCL (D.D.C. Nov. 7, 2007, Ex. 53.)

**REPLY:**       Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 49).

85.     Dr. Stephen Schondelmeyer, one of Ven-A-Care's experts in this case, issued a statement in support of NCPA's request for an injunction.  Dr. Schondelmeyer opined that the "AMP-based FULs, as described in the final rule, will result in payments to pharmacies that are below the pharmacy's actual costs for many generic prescriptions."  Dr. Schondelmeyer stated the AMP-based FUL regulations would lower payments to pharmacies, result in "substantial losses" and endanger access to care.  (Schondelmeyer Report ¶ 226, Ex. 54.)

**REPLY:**       Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 49).

86.     On December 19, 2007, the court granted NACDS and NCPA's motion for a preliminary injunction and enjoined CMS from implementing the regulation effectuating the

FUL formula established by the DRA.  (Order of December 19, 2007, *Nat'l Ass'n of Chain Drug Stores v. U.S. Dep't of Health & Human Servs.*, No. 07-cv-02017-RCL, Ex. 55.)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 49).  VAC adds the non-responsive statement that pharmacies supported the injunction because the AMPs are flawed, but cites only a letter from the Food Marketing Institute, not the extensive trial record including statements from VAC's own expert.  Abbott disputes that VAC has accurately described pharmacies' reasons for seeking the injunction.  (*See* Memorandum of the National Association of Chain Drug Stores and National Community Pharmacists Association In Support of Their Motion For Preliminary Injunction and Request For Expedited Hearing, *Nat'l Ass'n of Chain Drug Stores v. U.S. Dep't of Health & Human Servs.*, No. 07-cv-02017-RCL, at 39 (quoting expert Steven Schondelmeyer, "the AMP Rule will result in substantial loss, and even closures, for a number of pharmacies.") attached as Berlin II Ex. 8.)  Abbott disputes that AMPs "are and were not available or useable for reimbursement purposes."  42 U.S.C. § 1396r-8(b)(3)(D)(1993) requires confidentiality, but does not prohibit the use of AMPs, which certainly could be used in setting MACs without divulging the underlying AMPs, and of course the DRA requires the use of AMPs.

### D.     MAC

87.     State Maximum Allowable Costs ("MACs") similarly capped Medicaid payments to pharmacies.  (Steven Young, Ph.D. Report at 26 ("[A]t least twenty states performed their own determination of a MAC price to be paid for pharmacies for erythromycin."), Ex. 56.)

**REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 50).  VAC challenges only the materiality of Abbott's statements about the MACs.  The statements are material, however, because they demonstrate that the states often knowingly and purposefully looked beyond reported prices to set MAC.  The MACs and the payments, therefore, were not based in

any way on the reported prices for Abbott's Erys.  Moreover, VAC's failure to recalculate any MAC according to its theory of fraud is fatal to VAC's claim.

**REPLY:**      Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 50).  (For discussion about materiality, *see* reply to SOF ¶ 87.)

88.      In this case and the DOJ case, discovery was conducted with respect to approximately half the State Medicaid agencies.  Erythromycin products were found on the following 22 state MAC lists:  Alabama, Arkansas, California, Delaware, Florida, Georgia, Idaho, Illinois, Kentucky, Maryland, Michigan, Missouri, Nebraska , North Dakota, Ohio, Oklahoma, Oregon, South Carolina, Vermont, Virginia, Washington, Wyoming.  (*See* Collection of MAC lists, Ex. 57; *see also* testimony from State Representatives: 12/2/08 Roxane Homar Dep. at 340:15-342:20 (Wyoming), Ex. 58; 12/11/08 Frank Tetkoski Dep. at 126:2-6 (Maryland), Ex. 59; Ex. 60 (Maryland 14); 12/2/08 Gary Cheloha Dep. at 308:3-8 (Nebraska), Ex. 61.)

**REPLY:**      Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 50).  (For discussion about materiality, *see* reply to SOF ¶ 87.)

89.      State Medicaid programs used pricing information beyond manufacturers' prices reported in the pricing compendia to establish the MACs, such as:

(a)      Invoice prices provided by pharmacies.  (*See* Ohio: 12/15/08 Reid Dep. at 160:19-161:20, Ex. 62; Arkansas: 12/10/08 Bridges Dep. at 65:3-11, 244:14-245:9, Ex. 63; Maine: 3/26/2008 Walsh Dep. 97:20-98:14, Ex. 64.)

(b)      Direct surveys of pharmacies and wholesalers.  (*See* Nebraska: 12/02/08 G. Cheloha Dep. at 130:10-132:17, Ex. 59; Washington: 11/24/08 Hautea-Wimpee Dep. at

212:7-213:1 230:20-21, Ex. 65; North Dakota: 12/12/08 Joyce Dep. at 128:21-129:20, Ex. 66;

Wyoming: 12/2/08 Homar Dep. at 214:6-12, Ex. 58.)

        (c)      Review of wholesaler catalogs and price lists: (*See* Tennessee:  3/12/08

Sullivan Dep. at 106:18-107:22, Ex. 67; Maryland: 12/09/08 J. Fine Dep. at 203:8-204:19, Ex.

68.)

      **REPLY:**      Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 50).  (For discussion

about materiality, *see* reply to SOF ¶ 87.)

      90.      Many State Medicaid officials confirmed that AWPs were not used to set MAC

prices.  (*See* Arkansas: 12/10/08 Bridges Dep. at 248:5-15, Ex. 63; Tennessee: 3/12/08 Sullivan

Dep. at 115:20-116:10, Ex. 67; Maryland: 12/9/08 Fine Dep. at 320:2-10, 321:10-14, Ex. 68;

12/11/08 Tetkoski Dep. at 129:17-21, Ex. 59; Washington: 11/24/08 Wimpee Dep. at 226:16-

227:9, Ex. 65; North Dakota:  12/12/08 Joyce Dep. at 109:20-110:10, 128-21-129:20, Ex. 66.)

      **REPLY:**      Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 50).  (For discussion

about materiality, *see* reply to SOF ¶ 87.)

      91.      For many states, MAC pricing (and pricing in general) was influenced by policy

determinations and a give-and-take with providers to come up with levels that were fair under

the circumstances.  (*See, e.g.* Colorado: 12-15-08 Chapman Dep. at 46:1-17, 334-35, Ex. 59;

Georgia: 12/15/08 Dubberly Dep. at 75:7-75:19, Ex. 70; Hawaii: 4/29/08 Donovan Dep. at

188:2-21, Ex. 69; Nebraska: 12/2/08 Cheloha Dep. at 125:20-126:12, Ex. 61; Wisconsin:

10/30/07 Collins Dep. at 82:8-83:7, 85:22-86:4, Ex. 71; *see also*  Hughes Report ¶ 75, Ex. 72.)

      **REPLY:**      Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 50).  (For discussion

about materiality, *see* reply to SOF ¶ 87.)

92.     Many State Medicaid agencies allowed for a profit margin in their MAC prices. (*See* Indiana: 12/3/08 Shirley Dep. at 410:10-18 (Indiana Medicaid established its MAC prices at 20% above the actual acquisition cost), Ex. 73; Massachusetts: 6/14/07 Jeffrey Dep. at 96:5-13 (Massachusetts Medicaid included profit margin in its MAC prices "in order to induce" pharmacy participation), Ex. 74 ; Wyoming: 12/2/08 Homar Dep. at 231:17-232:10 (Wyoming Medicaid set MAC prices 40% above the average actual acquisition cost in order to include a "profit" and to cover the "cost of running business"), Ex. 58; North Carolina: 10/21/08 Weeks Dep. at 263:15-264:6 (North Carolina set MAC prices at 20% above actual acquisition cost.), Ex. 75; Minnesota: Myers & Stauffer Analysis ("SMACs are based on an informal survey of a few retail pharmacies that have agreed to share their costs. *The State tries to include an average profit of about $7.00 for each prescription using SMAC*. This $7 includes the $3.65 dispensing fee. . . ."), Ex. 76.; South Dakota: Dey Ex. 911 (South Dakota structured its MAC program "to insure that the profit to the pharmacist to dispense the generic product is higher than that associated with dispensing the brand product."), Ex. 77.)

    **REPLY:**     Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 50).  (For discussion about materiality, *see* reply to SOF ¶ 87.)

## VII.    FEDERAL AND STATE TESTIMONY CONCERNING COMPENDIA PRICES

93.     HCFA administrators from the relevant time period understood that AWP as reported in the compendia did not constitute an average of transaction prices.  (*See* 7/13/07 Thomas Scully Dep. at 900:16-901:06, Ex. 78; 12/07/07 Elizabeth Richter Dep. at 152:9-13 (former Acting Director of the Center for Medicare), Ex. 79; 12/18/07 Robert Berenson Dep. at 72:19-73:03 (Former HCFA Deputy Administrator: "there was a common understanding within the agency that AWP referred to the prices in these compendia and that they deviated from actual acquisition prices and that's how we sort of viewed AWP."), Ex. 80; 10/29/07 Charles Booth

Dep. at 310:9-15, 518:10-519:8 (Former Director of Office of Payment Policy: "I did not believe that there was a relationship to any great extent between acquisition costs and AWP."), Ex. 81.)

**REPLY:**     VAC does not dispute the veracity or the accuracy of the quoted testimony.  VAC attempts to dispute and refers to its own SOF ¶¶ 57-61, but those paragraphs refer only to state Medicaid programs and are, accordingly, unresponsive.  The paragraph should be deemed uncontested.

94.     Federal officials involved in Medicare Part B and Medicaid drug payment policy, as well as OIG officials, knew well before 1994 that there were spreads between providers' acquisition costs and published AWPs.  (*See e.g*., 9/27/07 Larry Reed Dep. at 258:20-261:5 (Technical Director, CMS Medicaid Division of Pharmacy:  "The saying that average wholesale price means 'ain't what's paid' has been around for a long long time."), Ex. 82; 4/23/07 Booth Dep. at 236:17-237:1 (CMS position was that AWP was inflated and overstated the price that providers actually paid for the drug.), Ex. 80 9/13/07 Kathleen Buto Dep. at 433:4-18 (Former Director of CMS's Bureau of Policy Development:  HCFA knew in 1991 that there was no predictable relationship between AWP and acquisition cost.), Ex. 83; 6/20/07 Robert Vito Dep. at 490:9-491:18 (Regional Inspector General:  OIG reported to CMS that generic drugs sold at prices 60 to 90 percent below AWPs.), Ex. 84 ; 12/12/08 Ben Jackson Dep. at 394:6-395:10 (Acting Director, Operational and Program Reviews, Health Care Financing Audit Division, Office of Inspector General), Ex. 85.)

**REPLY:**     VAC does not dispute the veracity or the accuracy of the quoted testimony.  VAC attempts to dispute and refers to its own SOF ¶¶ 57-61, but those paragraphs

refer only to state Medicaid programs and are, accordingly, unresponsive.  The paragraph should be deemed uncontested.

95.     State officials understood that AWP was significantly higher than average transaction prices.  *See* Tennessee: 3/12/08 Sullivan Dep. at 100:13-101:18 ("you could pay AWP minus 80 percent and still the pharmacist [would] make money for some"), Ex. 86; Alaska: 8/19/08 Campana Dep. at 93:15-95:16, 98:8-99:7 (Prior to 1990, Mr. Campana was aware "[t]hat the net cost to the pharmacy for generics that have been out for a long time was very low compared to the benchmark."), Ex. 86; California: 3/19/08 Gorospe Dep. at 212:16 – 213:17 (By August 1991, California knew that certain providers received discounts anywhere from 41 to 99 percent off of the published AWP.), Ex. 86 ; 9/22/08 Gorospe Dep. at 594:7-595:5 (By the late nineties California was aware that AWP minus 20 percent is significantly higher than the pharmacy acquisition costs for generic drugs.), Ex. 87; Florida: 12/15/09 Wells Dep. at 122:6-123:6, 206:2-206:15, 223:17-225:09, 339:20-341:02 (Providers able to receive discounts for innovator multisource drugs of 41.42 percent off of AWP; by 1990 AWP was no longer a reasonable predictor of the price for generic drugs.), Ex. 88; Illinois: 11/18/08 Parker Dep. at 182:1-5 (Change in reimbursement methodology prompted "due to Illinois Medicaid's realization that AWP had become virtually meaningless."), Ex. 108; Louisiana: 11/7/08 Terrebonne Dep. at 48:02-49:09 (It was a common statement within Louisiana Medicaid, and other State Medicaid programs that "AWP equals ain't what's paid"), Ex. 89; Michigan: 3/25/08 Kramer Dep. at 93:5-94:2 (By 1992 Michigan Medicaid realized that some AWPs were upwards of 500 percent above acquisition costs.), Ex. 90.)

**REPLY:**     VAC does not dispute the veracity or accuracy of the quoted testimony. VAC attempts to dispute and refers to its own SOF ¶¶ 57-61.  VAC SOF ¶¶ 57, 59-61 are not

responsive.  In VAC SOF ¶ 58, VAC correctly cites testimony from Arkansas and New Jersey state Medicaid for the proposition that though that AWP to be defined as the "average of wholesale prices for a particular product" but fails to mention that both officials testify, almost immediately thereafter, that pharmacists are reimbursed <u>below</u> AWP.  *See* Vaccaro Dep at 73:17-4, Ex. USAbt-Q; Bridges Dep. at 64:2-8, Ex. USAbt-C ("Well, the AWP is the benchmark that we use for the reimbursement. . . that's why we have to use the AWP minus a percent to - - as our best estimate for what the AWP reimbursement would be.")  *See also* Abbott Resp. to VAC SOF ¶ 58.  Paragraph 95 should be deemed admitted.

96.    Some state Medicaid programs also designed their pharmacy payment methodologies to allow margin on ingredient costs in order to compensate for low dispensing fees.  (*See e.g.* Delaware:  12/09/08 Denemark Dep. at 180:11-181:22 (Dispensing fees that were too low to cover the providers costs were not a problem due to a margin allowed on the ingredient cost), Ex. 91; Missouri:  11/07/07 McCann Dep. at 479:6-16 (same), Ex. 92.; New Jersey:  DHS Inter-office Communication, Analysis and Evolution of New Jersey's Drug Reimbursement Program, 1/23/86, at 4, ("[Our program] compensated pharmacies for inadequate dispensing fees by allowing some 'fat' to exist in the pricing structure."), Ex. 93; Illinois: Illinois Dept. of Public Aid Memo, Briefing--Average Wholesale Prices (AWP) Pricing Changes, 5/30/00, at 2 ("We also expect arguments that dispensing fees should be increased to compensate for some of the revenue lost because of reductions in AWP."), Ex. 94. )

    **REPLY:**    VAC does not dispute the veracity or accuracy of the quoted evidence.  VAC attempts to dispute and refers to its own SOF ¶¶ 57-61, but none of those paragraphs address dispensing fees, or the recognized industry practice of cross-subsidizing inadequate dispensing fees.  This paragraph should be deemed uncontested.

## VIII.   PROFFERED TESTIMONY OF MARK G. DUGGAN, PH.D.

### A.   Duggan's Opinions

97.     On March 27, 2009, Ven-A-Care served the expert report of Mark G. Duggan,

Ph.D.  (Report of Mark G. Duggan, Ph.D, March 27, 2009 ("Duggan Rpt."), Ex. 95.)  Duggan is

a Professor of Economics at the University of Maryland.  (*Id.* at 3.)

**REPLY:**  Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 52).  Abbott does not dispute

VAC's additional statements in its paragraph 52.

98.     Prior to proffering expert opinion in the AWP litigation brought by the state of

Texas, Duggan had never been retained to provide expert testimony in a court of law.  (7/14/08

M. Duggan Dep. at 37:5-39:18, Ex. 96.)  Apart from AWP litigation, Duggan has never been

engaged to assess damages in civil litigation.  (*Id.* at 41:6-13.)  Duggan has never had a damage

calculation accepted by a court of law or jury.  (*Id.* at 376:3-7.)

**REPLY:**  Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 53).

99.     In his March 27, 2009 report, Duggan summarized his expert opinion as follows:

> This Report calculates a **$15.559 million difference** between (1)
> what the federal government reimbursed for certain pharmaceutical
> products dispensed to Medicaid recipients during 1994Q1 to
> 2008Q1 period and (2) what the federal government would have
> reimbursed for the same products during the same time period if
> prices reflective of the actual prices at which Abbott was
> transacting business had been used for the AWP, WAC, and Direct
> Price of Abbott products.

(*Id.* at 2.)

**REPLY:**  Uncontroverted by VAC.  (*see* VAC SOF Resp. ¶ 54).

100.    Table 1 of Duggan's report listed his computation, using Abbott's direct

transaction data, of the average price paid for each of the 43 Complaint NDCs.  (Duggan Rpt. at

Table 1, Ex. 95.)  On average, the dollar difference between the AWP and the average price

calculated by Duggan per prescription is about $3.  (4/17/09 Duggan Ery Dep. 155:6-9, Ex. 97.)

   **REPLY:**  Uncontroverted by VAC.

   101.   Duggan has not proffered an opinion on what prices Abbott should have reported.

(Duggan Rpt., Ex. 95.)  Duggan merely reported a "difference."  (7/14/08 M. Duggan Dep. at

44:8-45:6, Ex. 96)

   **REPLY:**  Uncontroverted by VAC.

### B.      Duggan's Calculations

   102.   For each quarter during the Q1-1994 to Q1-2008 time period, and for each of the

43 National Drug Codes at issue ("Complaint NDCs"), Duggan calculated the revised AWPs,

WACs, and Direct Prices ("Direct Prices") that are used in his "difference" calculations.

(Duggan Rpt. at 8, Ex. 95.)  Duggan calculated the revised AWPs, WACs, and DPs by

considering certain Direct and Indirect transaction data produced by Abbott.  (*Id*.)

   **REPLY:**  Uncontroverted by VAC.

   103.   Duggan's report stated that he calculated the revised AWPs used in his

"difference" calculation by "replacing AWP with 125 percent of the average pharmacy indirect

price for each NDC in each quarter."  (Duggan Rpt. at 9, Ex. 95.)  For WAC, Duggan calculated

the average price paid by customers who purchased through a wholesaler.  (Duggan Rpt. at 8,

Ex. 95.)  For Direct Price, Duggan calculated the average price paid by pharmacies who

purchased directly from Abbott.  (Duggan Rpt. at 9, Ex. 95.)

   **REPLY:**  Uncontroverted by VAC.

### C.      States and Periods With Some Data

   104.   In his report, Duggan performed separate Medicaid "difference" calculations for

fifteen states:  California, Texas, New York, Illinois, Florida, Kentucky, Georgia, Pennsylvania,

North Carolina, Massachusetts, Louisiana, Michigan, Virginia, Wisconsin, and New Jersey. Duggan chose these states for which he performed separate "difference" calculations because they had high amount of expenditures of the 43 Complaint NDCs.  (4/17/09 Duggan Ery Dep. at 101:21-102:2, Ex. 97.)

**REPLY:**  Partially disputed by VAC (*see* VAC SOF Resp. ¶ 55).  VAC disputes Abbott's contention that Duggan chose to focus on those states due to "high amount of expenditures." Abbott does not VAC's contention that Duggan chose to analyze state claims data for the states with the largest number of claims.  The remainder of VAC's response does not contain material facts.  Abbott does not dispute that Duggan was satisfied with the reliability of the data set, but, for the reasons set forth in its motion to exclude Dr. Duggan's extrapolations, Dkt. 6443, Abbott disputes the contention that the data set was in fact reliable.

105.    Table 28 of Duggan's report illustrates for which states and for which time periods Duggan used claims data.  (Duggan Rpt. at Table 28, Ex. 95.)  Duggan used claims data for only fifteen states:  California, Texas, New York, Illinois, Florida, Kentucky, Georgia, Pennsylvania, North Carolina, Massachusetts, Louisiana, Michigan, Virginia, Wisconsin and New Jersey.  (*Id.*)  For none of the fifteen states did he have claims data for the entire period for which he calculated his "differences."  (*Id.*)  Instead of using claims data for the other thirty-four states and periods, Duggan calculated extrapolations.  (4/17/09 Duggan Ery Dep. at 100:13-20, Ex. 97.)

**REPLY:**  Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 56).

106.    Duggan's report separately explained the methodology that he used to calculate "differences" for the states of California, Texas, New York, Illinois, Florida, Kentucky, Georgia, Pennsylvania, North Carolina, Massachusetts, Louisiana, Michigan, Virginia, Wisconsin and

New Jersey, for those time periods for which he had claims data.  First, using the claims data, he identified the total number of claims for one of the 43 Complaint NDCs and then removed those claims with apparent data errors.  (*E.g.*, Duggan Rpt. at 36, Ex. 95.)  Second, Duggan developed a computer algorithm that purports to reflect the states' adjudication methodologies, using the information contained in the Myers and Stauffer reimbursement schedules.  (*Id.* at 36-37.)  Third, he linked each of the states' claims for one of the 43 Complaint NDCs with a NDC-quarter-specific prices that he calculated.  He utilized the prices he calculated from the three pharmacy classes of trade in Abbott's transaction data.  (*Id.* at 39.)  Fourth, Duggan then used his computer algorithm re-adjudicate those claims using his revised prices.  (*Id.* at 39-40.)  Anytime there was a difference between what the state paid on a claim and what it allegedly would have paid had Duggan's revised prices been used, Duggan computed a "difference" on that claim.  (*Id.*)  For example, Duggan even calculated a "difference" for claims reimbursed on the basis of a provider usual and customary charge ("U&C") or state MAC if his revised estimated acquisition cost price results in a price lower than the U&C or MAC.  (Ex. 95.)

> **REPLY:**  Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 57).

107.    Duggan's report described the methodology that he employed to calculate "differences" for the quarters for which he did not have claims data for the fifteen states. (Duggan Rpt. at 31-35, Ex. 95.)  Duggan computed a "ratio of DIFFERENCE" for the earliest quarter where he has claims data produced by the state.  (*Id.* at 32)  The "ratio of DIFFERENCE" or "difference ratio" purportedly reflects the percentage by which a states' spending for a specific NDC-quarter allegedly would have changed had Duggan's revised prices been used in a states' adjudication methodology.  (*Id.*)  Duggan then scaled down this ratio of DIFFERENCE to account for the possibility that the spread between reported prices and marketplace prices would

have been less in earlier periods.  (*Id.*)  On an NDC-quarter basis, he applies this scaled ratio of DIFFERENCE to a state's putative spending for the 43 Complaint NDCs.  (*Id.*)  He utilizes aggregate data maintained by CMS, State Drug Utilization Data ("SDUD") and SMRF/MAX, to determine a state's putative spending for the 43 Complaint NDCs.  (*Id.*)

**REPLY:**  Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 58).  Abbott disputes the statement that the claims level data analyzed by Duggan was "very complete" as vague and contradicted by the record.  For the reasons set forth in its motion to exclude Dr. Duggan's extrapolations, Dkt. 6443, Abbott also disputes the contention that Duggan's extrapolations were in fact reliable.

### D.    States and Periods With No Data

108.    Pages 89 through 92 of Duggan's report explain Duggan's methodology for extrapolating "differences" for the states for which Duggan had no claims data.  (Duggan Rpt. at 89-92.)  On an NDC-quarter basis, Duggan computed an average ratio of DIFFERENCE from his fifteen-state analysis.  (Duggan Rpt. at 90, Ex. 95.)  Duggan also referred to this value as a "DIFF-FRAC."  (*Id.*)  The "DIFF-FRAC" is a composite ratio of DIFFERENCE which represents the average ratio of the change in Medicaid spending that allegedly would have occurred if his revised prices had been used in the fifteen states' reimbursement calculations. (*Id.*)  Each of the fifteen states which produced detailed claims data for an NDC-quarter was given equal weight in calculating the "DIFF-FRAC."  States which did not produce any claims data for an NDC-quarter were given a weight of zero for that NDC-quarter.  (*Id.*)  Duggan then multiplied the composite "DIF-FRAC" by the total dollar expenditures for the Subject NDCs in each of the 34 no-data states to arrive at a dollar value "difference" totaling more than $5.2 million.  (*Id*. at 89-92.)

**REPLY:**  Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 59).

E.      Duggan's Medicaid "Difference"

109.    Duggan did not analyze what impact, if any, the AWPs, WAC, or List prices for the Abbott Ery drugs reported in the compendia had on any FUL or state MAC.  (Duggan Rpt. at 27 n.19 ("It is worth noting that I have not evaluated the effect of Abbott's published prices on the calculation of FUL or MAC prices."), Ex. 95.)

**REPLY:**  Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 60).  VAC admits that Duggan did not recalculate the FULs or MACs, which were universally the basis of reimbursement for the Erys.  VAC's additional statements regarding Duggan's "difference" calculation's use of the lower-of formula are immaterial.

110.    Duggan's "difference" calculations for Medicaid claims include a "differences" for claims that were, in fact, based on MACs.  (4/17/09 Duggan Ery Dep. at 119:5-120:2, 120:22-121:10, 123:6-124:8 ("as I outline in my report, I do not account for the effect of a transaction-based AWP on the MACs or FUL prices.  And [] it was not the focus of my analysis to determine the method that each state used in determining MAC prices."), Ex. 97.)

**REPLY:**  Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 60).  *See* Reply to ¶109, *supra*.

111.    For those time periods for which Dr. Duggan had claims data for the 15 states for which he separately calculates a "difference," Dr. Duggan determined the percentage of claims that were reimbursed on the basis of provider charges.  Duggan's analysis shows considerable variability within a given state over time in the percentage of claims reimbursed at U&C, and a general decline across the states in the percentage of claims reimbursed on that basis.  For example, in Illinois, which produced a relatively full set of data, Duggan found that the percentage of U&C-based payments declined from 30% in 1994 to 2.06% in Q1 2006.  (3/27/09 Duggan Electronic Production, pricesandunits.dta.)

**REPLY:**  Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 60).  *See* Reply to ¶ 109, *supra*.

112.     Similarly, Duggan found that U&C-based payments in New York decreased from 44% in 1995 to 1.4% in Q1 2006.  (3/27/09 Duggan Electronic Production, pricesandunits.dta.)

**REPLY:**  Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 60).  *See* Reply to ¶ 109, *supra*.

113.     Although Ven-A-Care claims that Abbott's reported prices were "two or three times the cost of the drugs" and alleges "spreads" exceeding 100% (*see* Compl. ¶ 14, Ex. A, Ex. 1.),  Duggan's aggregate "difference ratio" – the percentage Medicaid spending allegedly would have declined with Duggan's "corrected" compendia prices – is only approximately 25%. (Duggan Rpt. at 92, Ex. 95.)

**REPLY:**  Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 61).  VAC's additional statements are immaterial to the damages issues raised in Abbott's motion.  To the extent that VAC's response contains additional statements, these statements are disputed.  Abbott specifically disputes VAC's contention that it was "well known to Abbott" that there was a 25% mark-up from WAC to AWP.  (2/17/09 Fiske Dep. at 120:12-25, Berlin II Ex. 1)  VAC's additional comments, regarding the calculations voluntarily implemented by its own expert, are confusing, and immaterial.

## F.     Examples of Evidence Duggan Did Not Consider

114.     Duggan relied upon the accounting firm of Myers and Stauffer to acquire information about the adjudication formulas used by state Medicaid programs to provide payments to providers for dispensing pharmaceuticals to Medicaid patients.  (4/17/09 Duggan Ery Dep. at 121:16-122:10, Ex. 97.)  To assist Duggan, Myers and Stauffer prepared schedules

for each state Medicaid program titled "Medicaid Pharmacy Reimbursement Methodology" (*E.g.* California Medicaid Pharmacy Reimbursement Methodology, Ex. 98.)

**REPLY:**  Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 62).  Abbott objects to VAC's additional statements in its ¶ 62 as argumentative and immaterial.

115.    Duggan did not consider evidence that some states, like Minnesota, intended to provide a profit for drugs on their MAC list or a profit to providers generally.  (4/17/09 Duggan Ery Dep. at 179:9-180:7 at 173:17-174:13, 182:13-184:2 ("Medicaid agencies are complicated things.  There are many people and they're governed by their state legislatures and so forth.  It's a complicated thing."), Ex. 97.)

**REPLY:**  Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 62).  Abbott objects to VAC's additional statements in its ¶ 62 as argumentative and immaterial.

116.    Duggan did not evaluate whether state Medicaid programs intended to set MACs above the average transaction prices.  (4/17/09 Duggan Ery Dep. at 174:4-13, Ex. 97.)

**REPLY:**  Uncontroverted by VAC.

117.    Duggan did not evaluate states' individual definitions of "usual and customary charge."  (4/17/09 Duggan Ery Dep. at 124:9-125:1, Ex. 97.)  The Myers and Stauffer reimbursement summary for the state of Massachusetts prepared for Duggan for this litigation states the following regarding the definition Massachusetts utilized for "usual and customary":

> Effective February 1st 1995 the definition of usual and customary was changed to be defined as the lowest price charged or accepted as payment for any given volume of drug (legend or non-legend) by an eligible pharmacy provider to any purchaser or reimburser.

(Myers and Stauffer Medicaid Pharmacy Reimbursement Methodology for Massachusetts, Ex. 99.)  When asked if he was aware of this definition, Duggan testified that he did not "drill down" to determine whether the reporting of usual and customary by the pharmacies was "complete"

and if that would have effected his "DIFFERENCE" calculation.  (4/17/09 Duggan Ery Dep. at 132:3-21, 134:9-135:15, Ex. 97.)

**REPLY:**  Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 63).  VAC's additional comments are argument and immaterial.  VAC does not dispute the statement.

118.    Duggan did not analyze whether or not the dispensing fee that was paid by the Medicaid agency covered the cost of dispensing the 43 Complaint NDCs.  (4/17/09 Duggan Ery Dep. at 165:19-166:10, Ex. 97.)

**REPLY:**  Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 63).

119.    Duggan did not make any comparisons between the spreads for the 43 Complaint products and the spreads for similar drugs in the marketplace at similar time periods.  (4/17/09 Duggan Ery Dep. at 184:3-11, Ex. 97.)

**REPLY:**  Uncontroverted by VAC.

**G.    Improper Extrapolation**

120.    In its detailed protocols for Medicare Carriers, CMS instructs the Carriers to use "statistical sampling in their reviews to calculate and project [i.e., extrapolate] overpayment amounts to be recovered by recoupment, offset or otherwise."  (CMS Manual System, Pub. 100-08, Medicare Program Integrity, Transmittal 114, *Change in Statistical Sampling Instructions* at 3.10.1.1, Ex. 100; *see also* Program Memorandum (Carriers), Transmittal B-03-022, *Use of Statistical Sampling for Overpayment Estimation When Performing Administrative Reviews of Part B Claims*, Ex. 101.)

**REPLY:**  Uncontroverted by VAC.

121.    Duggan did not use any of the sampling techniques – simple random sampling, systematic sampling, stratified sampling, or cluster sampling – recognized by CMS.  (*Id* at 4.)

**REPLY:**  Uncontroverted by VAC.  To the extent that VAC's response includes additional statement of facts, those statements are disputed.  Abbott has yet to discover any report or case which has accepted the sampling methods employed by Duggan in this case.  *See* Motion in Limine Dkt. 6443.

122.    Two experts retained by Abbott, Dr. James W. Hughes (a Professor of Economics at Bates College) and  Mr. Steven J. Young (an accountant with considerable healthcare consulting experience), have provided reports and deposition testimony detailing criticism of Duggan's extrapolated "differences."  Those criticisms are summarized on pages 30-33 of Dr. Hughes's report and pages 24-27 of Mr. Young's report.  (*See* Ex. 72, Expert Report of Dr. James Hughes); Ex. 56, Expert Report of Steven J. Young.)

**REPLY:**  Uncontroverted by VAC (*see* VAC SOF Resp. ¶ 65).  VAC objects to the paragraph, but does not states a basis for its objection.  VAC merely states that it disagrees with Abbott's experts' underlying opinions, which is immaterial to this paragraph.

123.    Duggan's extrapolation assumes that the impact of his revised "but for" prices on Medicaid spending would be the same for claims paid by the 34 no-data states as they were for the 15 states in his non-random sample.  Yet Duggan did not determine which states established MACs for the Subject NDCs or compare the relative prevalence (or numerical values) of state MACs among the 15 and 34 state groups, respectively.  (*Id.* at 27, n.1.)  Duggan ignored these details and instead simply reviewed the basic adjudication formulas (*e.g.*, whether states used AWP, WAC, or DP) to establish comparability among the states.  (Duggan Ery Dep. at 79:5-80:9, Ex. 97.)

**REPLY:**  VAC "disputes Abbott's characterization," but does not dispute the substantive points raised in this paragraph and provides no factual basis to dispute this paragraph (*see* VAC

SOF Resp. ¶ 66).  To the extent that VAC's response includes additional statements of fact, those statements are argument, immaterial to this paragraph, and disputed for the reasons stated in Abbott's Motion in Limine, Dkt. 6443.

124.    In 2004, the OIG issued its report titled "Wide Variation in Medicaid Drug Prices." (Ex. 102.)  Using 2001 data, OIG found that states' payment per unit for the same drugs varied widely:  "On average the highest paying State paid 477 percent more per drug than the lowest paying State for each of the 28 drugs in our sample."  (*Id.*)  The OIG found much greater variation in reimbursements for generic drugs, with the median and average variations of 374% and 1230%, respectively, between the highest and lowest paying states.  (*Id.*)  Even the "average difference between the State at the 25th percentile and the State the 75th percentile (*i.e.*, the interquartile range) was 63 percent for the 10 non-innovator multisource drugs."  (*Id.*)

**REPLY:**  Uncontroverted by VAC.

125.    The OIG reported that this variability was due to differences in state MAC pricing, as well as differences in states' definitions of "usual and customary charge" and the frequency with which drugs were reimbursed at U&C.  (*Id.*)  Specifically, the OIG stated:  "*Even States with the same formula* for estimating pharmacy acquisition demonstrated variation in their average annual reimbursement prices," thus undercutting the "widespread assumption . . . that states with the same estimated acquisition cost formula pay similar prices."  (*Id.* emphasis added).)

**REPLY:**  Uncontroverted by VAC.

126.    The suggested payments from Duggan's extrapolated difference calculation for the 34 no-data states often fall below actual acquisition costs:

(a)      Maryland:  for the second quarter of 2004, Maryland imposed a MAC of $9.57 for NDC 00074632613 (250 MG Erythromycin tablets).  (Ex. 103 Maryland MAC List, DE_00019044-45.)  Duggan ignored this MAC, as he does all MACs, and simply applied a composite "difference ratio" derived from his 15-state sample to the total expenditures made by Maryland to arrive at a dollar value "difference."  (Duggan Rpt. at 90.)  For the NDC-quarter (00074632613, Q2, 2004), Duggan applies a difference ratio of 19.918%.  (3/27/09 Duggan Electronic Production, scbc.dta.)  In other words, Duggan reduces the payment on claims for this NDC- quarter by nearly 20%.  Applying this difference ratio to Maryland's MAC-based payment for this product ($9.57) would lead to a per-unit payment of just $7.66 – below Duggan's estimate of what providers actually paid ($8.15) for this product.  The calculation is $9.57 minus Duggan's payment reduction of $1.91 ($9.57 times .19918) = $7.66.

(b)      Nebraska:  For the first quarter of 1997, Nebraska imposed a MAC of $32.50 for NDC 00074632653 (250 MG Erythromycin tablets) (Ex. 104, Nebraska MAC list at 11.)  Duggan applied his composite "difference ratio" derived from his 15-state sample to the total expenditures made by Nebraska to arrive at a dollar value "difference."  For the NDC-quarter (00074632653, Q1, 1997), Duggan applies a difference ratio of 20.727%.  (3/27/09 Duggan Electronic Production, scbc.dta.)  Applying this difference ratio to Nebraska's MAC-based payment for this product ($32.50) would lead to a per-unit payment of just $25.76 – well below Duggan's estimate of what providers actually paid ($27.80) for this product.  (3/27/09 Duggan Electronic Production, pricesandunits.dta.)   The calculation is $32.50 minus Duggan's payment reduction of $2.04 ($32.50 times .20727) = $25.76.  Duggan and Plaintiff thus seem to suggest that, if payment levels were properly set, providers in Nebraska should have taken a 7.3% loss on each prescription of this product to a Medicaid patient.

**REPLY:**  VAC does not in fact dispute the facts raised in this paragraph (*see* VAC SOF Resp. ¶ 67).  Instead, VAC argues that Duggan otherwise addresses the "bias" and that the "Nebraska example," while evidence of a flawed analysis, actually results "in an underestimation of damages."  The paragraph should be deemed uncontroverted.  To the extent that Ven-A-Care's argument can be construed as additional statements of fact, Abbott denies them for the reasons stated in Motion in Limine, Dkt. 6443.¶

127.     Eleven of the Complaint NDCs were also included in Ven-A-Care's California *qui tam* against Abbott.  (*State of California, ex rel. Ven-A-Care v. Abbott Laboratories, Inc., et al*, MDL No. 1456, Original Case No. 03-CV-2238, D. Mass.) (First Complaint in Intervention, Ex. A, Ex. 105.)  Because California had a MAIC for many of those NDCs, those claims were dismissed by the Court's March 22, 2007 decision.  *See* 478 F. Supp. 2d at 180.

**REPLY:**  Uncontroverted by VAC.

128.     On December 9, 2008, a settlement agreement was reached between the State of California, Ven-A-Care and Abbott (as well as other co-defendants) in the case *State of California, ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories Inc., et al.*, MDL No. 01-12257-PBS (original Case No. 03-CV-2238).  (Ex. 106.)  The agreement to settle and dismiss claims that Abbott's pricing fraud harmed Medi-Cal even provides that Ven-A-Care "covenant[s] not to sue or take any other civil or administrative action against Abbott based on the Covered Conduct."  (*Id*. at ¶  3.)

**REPLY:**  Partially disputed by VAC (*see* VAC SOF Resp. ¶ 68).  VAC correctly identifies a slight, insignificant, discrepancy in the quoted Settlement Agreement but does not dispute the substance of the release.  In response to VAC SOF Resp. ¶ 69, Abbott states that the California Settlement Agreement (Ex. 106), signed by Ven-A-Care on 11/17/08, most certainly

settled and dismissed VAC's claims in the present case with respect to alleged injury to California Medicaid due to Abbott's alleged mis-reporting of Ery drugs' prices.  (Ex. 106 § II.B. ("To the extent that Plaintiffs may have civil claims against the Settling Defendants under . . . other statutory or common law provisions, whether sealed or unsealed, for conduct alleged in the Litigation pertaining to drug price reporting and to the reimbursement price paid by the State for drugs . . ., this Agreement applies to any and all such claims."); *see also* § II.C.).)  The present case brought by Ven-A-Care was not included in the "Limitations on Release" in § III.15.  Ven-A-Care and California collected a settlement payment for claims paid by California Medicaid, including the United States' share.  Pursuant to statute, the United States was paid its FMAP share of this settlement.

129.   On September 8, 2008, Abbott reached a settlement with the State of Texas and Ven-A-Care in the case *State of Texas ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories Inc.*, Case No. D-1-GV-04-01286 (Travis Cty Texas).  (Ex. 107.)  The Texas settlement agreement provides an identical release.  (*Id.* at ¶ 3.)

**REPLY:**  Uncontested in part (*see* VAC SOF Resp. ¶ 70).  VAC disputes only that the Texas agreement provided an identical release.  Abbott agrees with VAC's statement, but states that the differences in the release are immaterial to the issue in the present case.  Abbott disputes VAC's additional statement that the Texas Settlement Agreement's covenant not to sue covered only future suits, as completely unsupported.  (*See* Ex. 107 § 3.3 ("The STATE and the Relator Releasors covenant not to sue or take any other civil or administrative action against Abbott based on the Covered Conduct.").)

130.    Duggan did not remove claims from California or Texas from his analysis.

(4/17/09 Duggan Ery Dep. at 199:22-200:20 ("So if those claims were dropped, if we just whited

out the California section, the total difference, I'm sure it would fall.") Ex. 95.)

**REPLY:**  Undisputed by VAC (*see* VAC SOF Resp. ¶ 72).


Dated:  December 4, 2009                              Respectfully submitted,

                                                     /s/ Tara A. Fumerton
                                                     James R. Daly
                                                     Eric P. Berlin
                                                     Tara A. Fumerton
                                                     JONES DAY
                                                     77 West Wacker Drive, Suite 3500
                                                     Chicago, Illinois  60601
                                                     Telephone:  (312) 782-3939
                                                     Facsimile:   (312) 782-8585

                                                     *Counsel for Defendant Abbott Laboratories Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Tara A Fumerton, an attorney, hereby certify that I caused a true and correct copy of

the foregoing ABBOTT LABORATORIES INC.'S REPLY TO VEN-A-CARE'S RESPONSE

TO ABBOTT'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

SUPPORTING ABBOTT'S MOTION FOR SUMMARY JUDGMENT to be served on all

counsel of record electronically by causing same to be posted via LexisNexis, this 4th day of

December, 2009.

/s Tara A. Fumerton
Tara A. Fumerton