# EXHIBIT 3

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Case No. MDL No. 1456

Civil Action No. 01-12257-PBS


In Re:  PHARMACEUTICAL INDUSTRY

AVERAGE WHOLESALE PRICE LITIGATION

------------------------------------------------

IN THE DISTRICT COURT OF

TRAVIS COUNTY, TEXAS

Cause No. GV401286


THE STATE OF TEXAS

Ex rel.

VEN-A-CARE OF THE FLORIDA KEYS,

INC.,

    Plaintiffs

v.

ABBOTT LABORATORIES, INC., et al.,

    Defendants.                                    Volume 1

------------------------------------------------

(Captions continue on next pages.)

Page 30

1  transcript.
2  BY MR. COOK:
3      Q.  Mr. Bentley, if you could, please, take a
4  look at the transcript over the break.  I
5  understand you're not going to read every page of a
6  multi-hundred page document, but if there's
7  anything that strikes you, that suggests that we
8  may have gotten the wrong transcript or the wrong
9  case or the wrong witness, or anything else, would
10 you please tell me when you come back from the
11 break?
12     MR. SCAROLA:  I'm going to object to the form
13 of the question.  Your "or anything else" makes the
14 question vague and ambiguous, and I will tell you
15 again that we are not going to undertake to conduct
16 that review off the record.
17     MR. COOK:  Counsel, "objection" would be
18 sufficient.  And it's been the practice, and I
19 think the rule, at least in Texas and the federal
20 courts, on form objections if we want a more
21 detailed objection, the practice has been for the
22 counsel asking the deposition to ask for the more

Page 31

1  detailed instruction.
2      MR. SCAROLA:  Thank you.  I appreciate that.
3  And I will certainly limit my objection to legal
4  form.  I think I've done that.
5  BY MR. COOK:
6      Q.  But, Mr. Bentley, if there's any
7  indication from your review, and, again, I
8  understand you can't read every word of the
9  transcript, but if there's something that indicates
10 to you that I've gotten the wrong transcript,
11 please let me know.  Can you do that for me?
12     A.  Yes.
13     Q.  Within the bounds of human possibility.
14     MR. SCAROLA:  Object to form.
15     MR. COOK:  Jim, I would ask you also if I have
16 the wrong transcript, please let me know, but I
17 think there can be clear agreement between the
18 parties that I've got the right transcript.
19 BY MR. COOK:
20     Q.  Mr. Bentley, do you recall giving the
21 deposition in the state of Texas versus Dey and
22 Warrick?

Page 32

1      A.  Yes.
2      Q.  To the best of your ability at that
3  deposition, did you give truthful and complete
4  answers to the questions that were asked?
5      A.  Yes.
6      Q.  Have you ever testified on any other
7  occasions other than the depositions, the
8  transcripts for which we've marked as Exhibit 549?
9      A.  Have I ever testified --
10     Q.  On other occasions.
11     A.  Just any testimony whatsoever?
12     Q.  Yes, sir.
13     A.  Yes.
14     Q.  Approximately how many times have you
15 testified on other occasions?
16     A.  To the best of my knowledge, two.
17     Q.  Could you describe those for me, please.
18     A.  The last one was I think in November of
19 2007.  There was a criminal case in Key West where
20 someone was caught selling illegal narcotics, and
21 it was done within a thousand feet of our school,
22 and so the State of Florida asked me to come and

Page 33

1  testify that, in fact, we were a school and, you
2  know, all the --
3      Q.  What was the other occasion?
4      A.  The other occasion was I testified before
5  Congress.
6      Q.  When did you testify before Congress?
7      A.  That would have been October of 2000 --
8  I'm sorry, September of 2000.  It was, I believe,
9  two weeks after the September 11th, thereabouts.
10     Q.  Do you recall giving testimony in April
11 2001 also to another committee of Congress?  I may
12 have that wrong.
13     A.  I only gave testimony before Congress one
14 time.
15     Q.  What's your current relationship to the
16 relator, Ven-A-Care of the Florida Keys?
17     A.  I am a paid consultant.
18     Q.  Is that pursuant to a contract?
19     A.  Yes, it is.
20     Q.  What are the terms of that contract as you
21 could describe it very generally?
22     A.  To the best of my knowledge, it was for

9 (Pages 30 to 33)

Page 34

1  five years. It started in January 1st of 2007 for
2  five years, whatever that takes that up to. I
3  receive compensation, I receive health insurance.
4  That's about all. And also I am participating in a
5  bonus pool.
6      Q. Could you describe the bonus pool for me?
7      A. Sure. A number of years ago Ven-A-Care
8  created a bonus pool from the income that was being
9  derived by Ven-A-Care. In the first case, National
10 Medical Care, the bonus pool consisted of 40
11 percent of the proceeds that Ven-A-Care received
12 after attorneys' fees. And then it was divided up
13 according to a -- actually, we just had a board
14 meeting and we discussed how to divide it up. That
15 was amended at some time, and the bonus pool was
16 taken up to 60 percent, and the methodology of how
17 one shared in the bonus pool was changed twice
18 after that.
19     Q. So if I understand you correctly, under
20 the bonus pool concept, if there's any recovery
21 after attorneys' fees, 60 percent goes into the
22 bonus pool, the other 40 percent is distributed

Page 35

1  among the shareholders of the corporation? Do I
2  have that correct?
3      A. Well, it would be going into the working
4  capital of Ven-A-Care, and assuming that the board
5  of directors opted for a shareholder dividend, then
6  yes.
7      Q. What is your interest in the current bonus
8  pool?
9      A. The -- well, mine, I guess, it's a little
10 different, because mine was changed, and I receive
11 15 percent of Ven-A-Care's awards after attorneys'
12 fees, and before taxes, obviously.
13     Q. What duties do you perform as a consultant
14 for Ven-A-Care?
15     A. I'm here today testifying.
16     Q. Is that the only duty that you perform for
17 Ven-A-Care?
18     A. I've been contacted in the past. Mr.
19 Jones contacted me, I think, one time when he was
20 being deposed, or he was speaking possibly with
21 attorneys from the Department of Justice, and he
22 had -- they had some questions for me.

Page 36

1      Q. Do you go to work regularly at
2  Ven-A-Care's business location?
3      A. I do not.
4      Q. How long has it been since you went to
5  work regularly at Ven-A-Care's business location?
6      A. I went for -- let's see. In January and
7  February of 2004 was probably the last time, and
8  prior to that it would have been the end of June,
9  the first week in July of 2003.
10     Q. Are there any other duties that you
11 perform as a consultant to Ven-A-Care currently?
12     A. Other than being available to answer
13 questions that come up periodically, and to testify
14 when needed.
15     Q. What are you paid as -- I think you
16 indicate you are paid to be a consultant for
17 Ven-A-Care. Correct?
18     A. Yes.
19     Q. What are you paid?
20     A. $150,000 per year plus health insurance
21 benefits for myself and my wife.
22     Q. When were you first -- let me start over

Page 37

1  again. When did you first begin a business
2  relationship with Ven-A-Care?
3      A. That would have been the summer of 1989.
4      Q. How was it that you came to be -- I'm
5  sorry. Were you employed by Ven-A-Care in the
6  summer of 1989?
7      A. Yes.
8      Q. In what position?
9      A. I didn't really have a title. I guess you
10 could say I was the comptroller or business
11 manager.
12     Q. How did you come to be employed by
13 Ven-A-Care in the summer of 1989?
14     A. My brother-in-law, Luis Cobo, was the
15 cofounder of Ven-A-Care and part owner, and a good
16 friend of mine, Mark Jones, was a minority owner,
17 and was really the vehicle that ran Ven-A-Care on a
18 day-to-day basis. And they invited me to join
19 Ven-A-Care, because Ven-A-Care was growing very
20 rapidly.
21     Q. How long had Ven-A-Care been in business
22 in the summer of 1989?

10 (Pages 34 to 37)

Page 349

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

In Re:  PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE

PRICE LITIGATION

-------------------------------------------

IN THE DISTRICT COURT OF

TRAVIS COUNTY, TEXAS     Case No.

Cause No. GV401286       MDL No. 1456

THE STATE OF TEXAS Ex rel.      Civil Action No.

VEN-A-CARE OF THE FLORIDA KEYS, INC.,  01-12257-PBS

Plaintiffs

v.

ABBOTT LABORATORIES, INC., et al.,

Defendants.    Volume II

-------------------------------------------

CONTINUED VIDEOTAPE DEPOSITION OF ZACHARY TAYLOR

BENTLEY II, Thursday, March 6, 2008

9:05 a.m. - 12:25 p.m. 1:20 p.m. - to 5:25 p.m.

21st Floor 2 South Biscayne Boulevard Miami, Florida 33131

by:  Sherilynn McKay, RMR, CRR Notary Public,

State of Florida

Page 386

1  computerized record of various prices for various
2  drugs?
3      MR. BREEN:  Objection.  Form.
4      THE WITNESS:  No.  Other than the -- just
5   so we're clear, we had access to the McKesson
6   -- I forget what they called it.  I think it
7   was Economost or something like that, their
8   nomenclature for their database.
9  BY MR. COOK:
10     Q  And so the charts that I see in various
11 Complaints and in presentations that show Ven-A-
12 Care's cost, AWP percentage spread, those aren't the
13 output from some database that Ven-A-Care was
14 maintaining.  Correct?
15     MR. BREEN:  Excuse me.  Objection.  Form.
16     THE WITNESS:  Yeah, correct.  In other
17  words, when we -- when we quoted a price, we
18  pulled it out of one of our wholesale catalogs,
19  or the McKesson database.
20 BY MR. COOK:
21     Q  At the very beginning of yesterday's
22 deposition I got sidetracked in going through the

Page 387

1  series of positions that you held with Ven-A-Care.
2  You started out as the sales manager for Ven-A-Care
3  or a manager for Ven-A-Care, I guess -- a business
4  manager was the word, for Ven-A-Care, in about 1989.
5   Correct?
6     A  Yes.
7     Q  Could you go through with me what positions
8  you held with Ven-A-Care after that?
9     A  Basically it never changed, up until
10 probably 1995 when Luis resigned as president, and
11 so I took over as president.  In the meantime, from
12 1989, I had become a minority shareholder.  Sometime
13 in I think 1990, and then I think in '91 or '92 we
14 bought out Mark Parness, and Mark and Luis and I
15 went through some function of transferring shares,
16 buying shares so that Mr. Jones, Mr. Cobo and myself
17 had an equal number of shares.
18     Q  And then you became president in 1995?
19     A  The latter part of 1995, that's my best
20 recollection.
21     Q  How long did you remain president of Ven-
22 A-Care?

Page 388

1     A  From there until July of 2003.
2     Q  Between 1995 and 2003, were you the primary
3  decision maker for Ven-A-Care when it came to
4  decisions relating to this litigation?
5     A  I think they were joint decisions between
6  Mr. Jones and myself, and certainly Mr. Cobo would
7  weigh in.  If there was some major decision,
8  usually, the three of us talked about what was going
9  on, what we should do.
10     Q  After July 2003, what position did you have
11 with Ven-A-Care?
12     A  I took a leave of absence from July of 2003
13 until January 1st of 2004.  I resigned as president
14 in July of 2003.  So I just took a leave of absence.
15     Q  Why did you resign as president of Ven-A-
16 Care?
17     A  Oh, there were a myriad of reasons, most of
18 them are personal.
19     Q  But did any of them relate to your
20 relationship with others within the company or your
21 performance as president of Ven-A-Care?
22     A  Probably both.

Page 389

1              * * *
2      (Portion designated highly confidential
3   excerpted to a separate transcript.)
4              * * *
5  BY MR. COOK:
6     Q  And your current position, as I understand
7  from yesterday, is you are a paid consultant for
8  Ven-A-Care.  Correct?
9     A  Yes, sir.
10     Q  There's a web log titled Pharma Fraud.  Are
11 you familiar with that web log?
12     A  No.
13     Q  There are postings made on that web log by
14 someone with the screen name fraudpi, F-R-A-U-D-P-I.
15 Did you make those postings, Mr. Bentley?
16     A  No.
17     Q  Do you know who did?
18     A  Never heard of it until you just now
19 mentioned it.
20     MR. COOK:  If we can go off the record for
21  one second, while I arrange some exhibits for
22  Mr. Bentley.