# EXHIBIT 6

Kreling, Ph.D., David H.                                December 4, 2008
                              Madison, WI

Page 1

STATE OF WISCONSIN : CIRCUIT COURT : DANE COUNTY
- - - - - - - - - - - - - - - - - - - - - - - - - -
STATE OF WISCONSIN,

        Plaintiff,

    v.                    Case No. 04-CV-1709

AMGEN INC., et al.,

        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - -

     VIDEO DEPOSITION of DAVID H. KRELING, Ph.D., taken at the instance of the Defendants, under and pursuant to the provisions of Chapter 804.05 of the Wisconsin Statutes, and the acts amendatory thereof and supplementary thereto, before me, KIM M. PETERSON, CM, Registered Professional Reporter and Notary Public in and for the State of Wisconsin, at the law offices of Stafford Rosenbaum, LLP, 222 West Washington Avenue, Suite 900, Madison, Wisconsin, on the 4th day of December, 2008, commencing at 9:23 o'clock in the forenoon.

Page 70

1  broadbrush?
2      A.  I helped them with methods, helped them
3  answer questions they might have understanding
4  pharmacy operations, pharmacy costs, building on
5  my expertise up to that time in my work and my
6  research.
7      Q.  And I take it at the end you reviewed
8  this report?
9      A.  I did.
10     Q.  All right.
11     A.  Briefly, I'm sure.
12     Q.  Is there anything in this report that
13 you remember as being inaccurate or inconsistent
14 with what your view was at the time?
15         MR. EVERETT:  Objection to form.
16         THE WITNESS:  Yes.  There's -- In
17 retrospect, I've learned that there's something
18 that has become very interesting to some people,
19 that there is a definition of wholesale
20 acquisition cost, WAC, that is misstated in this
21 document.
22 BY MR. BARNHILL:

Page 71

1      Q.  Well, we'll get to that in a minute.
2  Anything else you can think of?
3      A.  That's the one that I've become most
4  sensitive to.  I'm sure there probably are other
5  typos and possibly some other --
6      Q.  Did you become most sensitive to it
7  because the -- one or more drug manufacturers
8  told you that they didn't agree with that
9  particular definition?
10         MR. EVERETT:  Objection to form.
11         THE WITNESS:  No.
12 BY MR. BARNHILL:
13     Q.  Did you -- By the way -- Well, let's
14 take this sort of in a more organized way.  Take
15 a look at the executive summary of this report.
16     A.  Okay.
17     Q.  It starts off by saying "Growth in
18 Medicaid expenditures has recently become a major
19 policy concern.  Medicaid expenditures are
20 growing faster than any other state budgetary
21 expense."  Was that true at the time you wrote
22 this report?

Page 72

1      A.  I -- I didn't write this.  This was
2  authored by Kathleen Adams.  I was secondary on
3  this.  I reviewed this.
4      Q.  Was that consistent with what your
5  understanding was?
6      A.  I didn't disagree with that statement.
7      Q.  You -- You talk in the second
8  paragraph, I think the third sentence it says "In
9  1987, under new Federal regulations (52 FR 28648)
10 states were given more flexibility in
11 establishing their own payment methodologies.
12 State reimbursement policy now varies for the two
13 major drug manufacturers -- excuse me, two major
14 drug classifications.  For multi-source drugs
15 there can be state MACs in place that differ from
16 federal maximums, although state payments --
17 states' payments must stay within the federal
18 aggregate expenditure limits."  What do you mean
19 by that?
20         MR. EVERETT:  Objection to form.
21         THE WITNESS:  I'm trying to think how -
22 - This is a -- This is complex and it's difficult

Page 73

1  to say it in a few words like this sentence is,
2  but the notion is is that there was a shift in
3  1987 from -- this is my recollection, from
4  maximum allowable cost being established by the
5  fed and HCFA to allow states to establish their
6  own maximum allowable costs, and there was a
7  shift in the thinking about estimated acquisition
8  costs that moved towards thinking more in the
9  aggregate.  That there could be estimated
10 acquisition cost, states could pay higher than
11 estimated acquisition cost or MACs if in the
12 aggregate their payments sort of across their
13 whole book of business on average were lower than
14 the aggregate of what EACs or MACs would be.
15 That's my understanding.
16 BY MR. BARNHILL:
17     Q.  Can you just give me an example of what
18 you just said?
19     A.  Say, for example, a state or the
20 federal upper guidelines at that time, they
21 changed it to have a different definition than
22 MAC.  They started to begin to use federal upper

Kreling, Ph.D., David H.                                    December 4, 2008
                              Madison, WI

Page 302

1        THE WITNESS: I don't remember the
2   individual's name, but I seem to recall talking
3   with individuals about how pharmacy prices worked
4   at Hogan & Hartson. I don't --
5   BY MR. BARNHILL:
6        Q. Steve Barley? Jenny Walker? Hank
7   Young? Lyndon Tretter?
8        A. I don't recall.
9        Q. But somebody at Hogan & Hartson you
10  think?
11       A. Yeah. I think one time I had some
12  conversations with them.
13       Q. Anybody else that you can think of?
14       A. Not that I can think of. There may be.
15       Q. Have you sent invoices or bills to any
16  of these firms?
17       A. Yes, I have.
18       Q. All right. And so you have bills that
19  would reflect either -- the job that you've done
20  for them; is that correct?
21       A. I believe I still have records, yes.
22       Q. And do you recall, in general, what the

Page 303

1   total amount of money is that you've billed these
2   various law firms or their clients?
3        A. I believe that I have, oh, since the
4   time I've been involved with Shook, Hardy, I've
5   billed and been paid slightly over $10,000. And
6   they've been the -- they've had -- they've been
7   the biggest payments.
8        Q. All right. And during this same time
9   that you were accepting payments from Shook,
10  Hardy in connection with this case were you also
11  getting paid by the State of Wisconsin?
12       A. I'm employed by the University of
13  Wisconsin.
14       Q. And that means --
15       A. Yes.
16       Q. -- the State of Wisconsin?
17       A. Yes.
18       Q. Okay. Is the Pharmaceutical School
19  supported by drug manufacturers?
20          MR. EVERETT: Objection to form.
21          THE WITNESS: I'm sorry?
22  BY MR. BARNHILL:

Page 304

1        Q. Is the Pharmaceutical School supported
2   by drug manufacturers in any way?
3           MR. EVERETT: Same objection.
4           THE WITNESS: I don't believe so. I
5   don't know of that.
6   BY MR. BARNHILL:
7        Q. There are no grants from major drug
8   manufacturers to the Pharmaceutical School for
9   endowed rooms or chairs or anything like that, as
10  far as you know?
11       A. There may be. I'm -- I don't know
12  specifics of that.
13       Q. Have you published any -- any surveys,
14  studies or other papers in connection with the
15  acquisition costs or the dispensing fee cost,
16  dispensing cost of drugs, that we have not seen
17  or reviewed today?
18       A. Not that I know of.
19          MR. BARNHILL: I have no further
20  questions. Thanks for coming.
21          MR. EVERETT: Okay. Yeah, I'm going to
22  ask a few questions.

Page 305

2            EXAMINATION
3   BY MR. EVERETT:
4        Q. All right. Good afternoon, Dr.
5   Kreling. I'll try to be brief, as brief as
6   possible, because I know it's been a long day.
7        A. Thank you.
8        Q. You recall earlier testimony relating
9   to Exhibits 3 and 4, which you may want to have
10  in front of you, about the definition of WAC that
11  appeared in -- in those exhibits?
12       A. I have 3 and 4. Okay.
13       Q. Okay. You recall questions earlier
14  about the definition of WAC that appear in those
15  exhibits?
16       A. Yes.
17       Q. And I believe you testified earlier
18  that you do not agree with the definitions of WAC
19  that appear in Exhibits 3 and 4, is that true?
20       A. Yes.
21       Q. Could you explain again how those
22  definitions that you disagreed with made their

77 (Pages 302 to 305)

Page 306

1  way into Exhibits 3 and 4?
2     A.  That's -- That's a good question.
3  Kathleen was the primary researcher, project
4  director.  I was a consultant on this project.
5  That -- Those definitions may have come from a
6  discussion that we had and she took it from
7  there.  It's possible that I provided those to
8  her, but I'm -- I would be a bit surprised if
9  they were a table that I prepared because it's
10 not consistent with what -- my definition of WAC
11 and what I learned WAC was.
12    Q.  What is your definition of WAC?
13    A.  My definition of WAC is it's a -- it's
14 the list price, it's the catalog price for
15 manufacturers to wholesalers.
16    Q.  Does WAC include discounts, rebates and
17 the like, in your view?
18    A.  No.
19    Q.  How long have you believed that to be
20 the definition of WAC?
21    A.  I learned that definition when I was --
22 when I had available to me some of the pricing

Page 307

1  publications that manufacturers had submitted to
2  the Texas Department of Human Resources, Health
3  and Human Services, in doing my dissertation
4  work.
5     Q.  When was that?
6     A.  That would have been in '83.
7  Approximately late '82.  Probably during '83.
8     Q.  And does that definition of WAC appear
9  in any of your other publications?
10    A.  Yes.
11    Q.  Let's -- Let's talk a little bit about
12 Exhibit 3.  Do you recall questions earlier about
13 a conclusion of the study in Exhibit 3 that
14 pharmacies would be expected to participate in
15 Medicaid programs even if reimbursement were
16 below their average costs?
17    A.  That was written in this report, yes.
18 We had a discussion.
19    Q.  With that conclusion in mind, I'd like
20 you to turn, and it's a page without a number,
21 but it's in Appendix C, which is towards the back
22 of the report, and the -- it's the one, two,

Page 308

1  three, fourth page of the exhibit in Appendix C.
2        MR. BARNHILL:  What appendix?  I'm
3  sorry, Clay.
4        MR. EVERETT:  Appendix C.
5        MR. BARNHILL:  C?  Yes.  What does it
6  say?  What's the top of the page look like?
7        MR. EVERETT:  It is -- There's a
8  carryover sentence on the top of the page.  The
9  first word in the top left corner is payment.
10 Payment exceeds marginal cost.
11       MR. BARNHILL:  Got it.
12 BY MR. EVERETT:
13    Q.  Okay.  Okay.  And does this appendix,
14 to your understanding, deal with the analysis of
15 the likelihood that pharmacies will continue to
16 participate in Medicaid programs even if they're
17 reimbursed at less than their average cost?
18    A.  Would you repeat that question?
19       MR. EVERETT:  Could you read that back?
20       (Record read.)
21       THE WITNESS:  My quick review of the
22 text here would lead me to say yes.

Page 309

1  BY MR. EVERETT:
2     Q.  Okay.  So returning to the page we were
3  talking about before, if you look at the third
4  full paragraph on that page it reads the
5  situation is complicated somewhat if private
6  customers also have some market power.  HMOs, for
7  example, may have the market power to negotiate
8  discounts from pharmacies in exchange for
9  guaranteed customer volume.  If such health plans
10 represent a significant share of the market,
11 Medicaid's ability to pay below average cost may
12 be affected, as it is the ability of the pharmacy
13 to more than cover average costs (i.e., earn more
14 than normal profit) from other payers that allows
15 it to remain viable while receiving payments
16 below average costs for Medicaid.  Do you see
17 that?
18    A.  Yes.
19    Q.  And do you agree with that statement?
20    A.  Yes.
21    Q.  Dr. Kreling, do you know if Wisconsin
22 Medicaid in general pays more or less than third-