# EXHIBIT 3

```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                              )  CA No. 01-12257-PBS
                                    )  CA No. 05-11084-PBS
PHARMACEUTICAL INDUSTRY AVERAGE     )  CA No. 06-11337-PBS
WHOLESALE PRICE LITIGATION          )  CA No. 07-10248-PBS
                                    )  Pages 1 - 66




                        STATUS HEARING

            BEFORE THE HONORABLE PATTI B. SARIS
               UNITED STATES DISTRICT JUDGE







                        United States District Court
                        1 Courthouse Way, Courtroom 19
                        Boston, Massachusetts
                        May 28, 2009, 2:15 p.m.













                    LEE A. MARZILLI
                  OFFICIAL COURT REPORTER
               United States District Court
               1 Courthouse Way, Room 3205
                    Boston, MA  02210
                      (617)345-6787
```

72fe4b07-ff68-4ab0-9daf-1849027a1147

Page 2

1  APPEARANCES:
2
      EDWARD NOTARGIACOMO, ESQ., Hagens Berman Sobol Shapiro,
3  LLP, One Main Street, Cambridge, Massachusetts, 02142,
   for the Class Plaintiffs.
4
      JOHN A. MACORETTA, ESQ., Spector Roseman Kodroff &
5  Wills, 1818 Market Street, Suite 2500, Philadelphia,
   Pennsylvania, 19103, for the Class Plaintiffs.
6
      JOHN T. MONTGOMERY, ESQ. and JOHN P. BUEKER, ESQ.,
7  Ropes & Gray, LLP, One International Place, Boston,
   Massachusetts, 02110, for Schering and Warrick.
8
      FREDERICK G. HEROLD, ESQ., Dechert, LLP,
9  2440 W. El Camino Real, Suite 700, Mountain View,
   California, 94040-1499, for Glaxosmithkline.
10
      PAUL K. DUEFFERT, ESQ., Williams & Connolly, LLP,
11 725 Twelfth Street, N.W., Washington, D.C., 20005,
   for Par Pharmaceutical Companies, Inc.
12
13 ALSO PARTICIPATING:
14     NICHOLAS N. PAUL, ESQ., State of California.
       DONALD E. HAVILAND, ESQ., for Plaintiff.
15     D. SCOTT WISE, ESQ., AstraZeneca Pharmaceuticalls LP.
       LYNDON M. TRETTER, ESQ., Bristol-Myers Squibb Company.
16     STEVEN F. BARLEY, ESQ., Amgen, Inc.
       ANDREW D. SHAU, ESQ., Johnson & Johnson.
17     GEORGE B. HENDERSON, AUSA, United States of America.
       JOANNE M. CICALA, ESQ., New York City, New York Counties.
18     SUSAN SCHNEIDER THOMAS, ESQ., Ven-A-Care.
       WILLIAM A. ESCOBAR, ESQ., Dey and Mylan.
19     PETER A. MULLIN, ESQ., Commonwealth of Massachusetts.
       MERLE M. DELANCEY, JR., ESQ., Baxter Healthcare.
20     CLINTON C. CARTER, ESQ., South Carolina and Utah.
       JAMES W. MATTHEWS, ESQ., Watson Pharmaceuticals.
21
22
23
24
25

Page 3

1           PROCEEDINGS
2           THE CLERK: In Re: Pharmaceutical Industry
3  Average Wholesale Price Litigation, Civil Action 01-12257,
4  will now be heard before this Court. Will counsel please
5  identify themselves for the record.
6           MR. MACORETTA: Good afternoon, your Honor. John
7  Macoretta from Spector Roseman Kodroff & Wills for the class
8  plaintiffs.
9           MR. NOTARGIACOMO: Ed Notargiacomo from Hagens
10 Berman Sobol Shapiro for the class plaintiffs as well as for
11 the states of Arizona, Montana, and Nevada.
12          MR. MONTGOMERY: John Montgomery from Ropes & Gray
13 for Schering and Warrick, your Honor.
14          MR. BUEKER: Good afternoon, your Honor. John
15 Bueker, also from Ropes & Gray, for Schering and Warrick.
16          MR. HEROLD: Good afternoon, your Honor. Fred
17 Herold, Dechert, for GSK.
18          MR. DUEFFERT: Good afternoon, your Honor. Paul
19 Dueffert, Williams & Connolly, for Par Pharmaceutical, Inc.
20          THE COURT: I recognize a lot of people sitting
21 back there. I'm not sure it's necessary for everyone to
22 introduce themselves, although I will encourage
23 participation. My goal in doing this is twofold: One is
24 just to get a handle on all the different cases that have
25 made up the AWP MDL. It's now been eight years, going on

Page 4

1  nine years since I got the first case, and I want to
2  understand where each case is going and what the end point
3  is.
4           The second is -- many of you know this -- I had
5  breakfast with Eric Green, the mediator who's helped many
6  people mediate this case, maybe two weeks ago. He had a
7  proposal for a universal mediation process, which would
8  involve not just the various companies involved but also the
9  federal and state governments, and, of course, plaintiffs'
10 class counsel and the various Attorney Generals offices, to
11 essentially take what we've learned over the last eight
12 years and try and create certain general guidelines on how
13 to deal with the federal-state issue, how to deal with
14 damage methodologies, how to deal with generics, basically
15 trying to figure out if there's a way of having a universal
16 settlement of this.
17          I don't know which order we should go on. Perhaps
18 I could start with where each case is going, and then
19 hear -- I see some folks whom I think are representing --
20 which Attorney Generals are represented here? First of all,
21 where's the federal government? There you are standing up
22 there. All right, great. Now. Who's here from -- could
23 you stand -- from the various state Attorney Generals?
24 You're representing --
25          MR. NOTARGIACOMO: Montana, Nevada, and Arizona.

Page 5

1           THE COURT: You're with New York counties, right?
2           MS. CICALA: And also Iowa.
3           THE COURT: Iowa.
4           MR. PAUL: California, your Honor.
5           THE COURT: Okay.
6           MR. CARTER: South Carolina and Utah.
7           THE COURT: Okay, thank you very much. And I know
8  we have a lot of the -- we have the plaintiffs' class
9  lawyers. And I'm reluctant to have us go through every
10 single corporate defendant, but I do want to make sure that
11 I hear your views about especially the universal, the
12 proposal.
13          I just got off the phone, I called him, and I
14 said, "Well, actually, how soon were you thinking of this,
15 Professor Green?" who was in heated mediation on something
16 completely different, and he was actually thinking as soon
17 as the end of June. It's a lot of people to pull in. He
18 already has told me that his availability is June 26 or
19 June 27. I am sure he could make available other dates. I
20 could try and make available downstairs the jury lounge
21 area. If that's too public, maybe someone has a law firm
22 that could actually house a fair number of people with
23 breakout rooms.
24          He says he's done one of these before, and there
25 are certain prototypes for doing this. I myself, I have to

Page 6

1  admit, am not really sure what it would involve. He said
2  many of you would, and many of you have expressed privately
3  support to him for doing it.
4      The one last thing I wanted to mention is, he's
5  asked me to get involved in the mediation. It's something I
6  have not done so far in this case. I've done it in other
7  cases. I haven't. I've got a lot of outstanding motions on
8  important legal issues, not the least of which is FULs and
9  what to do with them and the like. So I don't know if you
10 want me involved, and I want you all to be thinking about
11 that. I'm going to start off just by getting a blow-by-blow
12 about where each case is and when do you think it will be
13 over; and then if there are any next events that I should be
14 scheduling, am I missing something? I saw one whole case I
15 didn't even know I had, nothing's happened in, when we were
16 trying to get prepared for this.
17     So maybe we can just start with the plaintiffs'
18 attorneys. I'm hoping you're somewhat prepared to do this
19 on the class cases. I know some are on appeal, and there's
20 nothing we can or should do about those, but there are other
21 cases where, for example, GSK which aren't even complete
22 yet. So is somebody here from GSK?
23     MR. HEROLD: Yes, your Honor.
24     THE COURT: Yes, you are, right. Okay, so I know
25 you're here in another capacity somewhat, but with the

Page 7

1  settled class, maybe we can just go down each one and where
2  we are on it.
3      MR. MACORETTA: Sure. We submitted a filing the
4  other day on this, your Honor.
5      THE COURT: The status reports, yes, I've got the
6  pile of them here.
7      MR. MACORETTA: So the good news to start with is
8  that checks to consumers in the GSK settlement should go out
9  this week.
10     THE COURT: And so what percentage -- I want to
11 learn from GSK. It's amazing to me that a check hasn't gone
12 out yet because it was the first one in the door settled.
13 So the checks are going out this week. How much is going
14 out the door to consumers?
15     MR. MACORETTA: About $1.6 million.
16     THE COURT: And what percentage of the class do we
17 think has put in for it, the consumer class?
18     MR. MACORETTA: I don't have an overall
19 percentage, Judge. This was our earliest process when we
20 didn't have as good CMS data and we can't track. I can get
21 you a percentage, but --
22     THE COURT: I'd love a report at the end of the
23 day because I'd like to learn from it. Did people have
24 to -- I don't remember, what kind of claims did they have to
25 put in in GSK?

Page 8

1      MR. MACORETTA: They got the -- if you'll
2  remember, there were the two chemotherapy drugs, Kytril and
3  Zofran, which were Medicaid paid, and then there were a
4  bunch of other drug that were paid at a much lower level.
5  So people got a claim form with blocks for those seven or
6  eight drugs, "Tell us how much you paid for each one," and
7  then you got a different percentage. You got 100 percent,
8  50 percent --
9      THE COURT: So we didn't have CMS telling us what
10 they paid. They actually had to go out, do research, file
11 an affidavit. And how many consumers do we know who even
12 put in a claim? Do we know?
13     MR. NOTARGIACOMO: There are a total of just under
14 14,000 claims filed.
15     THE COURT: 14,000? And you don't know what we
16 were expecting?
17     MR. NOTARGIACOMO: I can tell you that by way of
18 number of letters that went out. There were almost two
19 million letters that went out using the CMS data.
20     THE COURT: And were those overinclusive?
21 Remember, there was some criticism that they may have been
22 overinclusive? Or do we think that was who took it?
23     MR. NOTARGIACOMO: Those were overinclusive
24 because we don't know from the CMS data whether or not the
25 consumer actually paid out of pocket, so many of the people

Page 9

1  may not have been class members because they had
2  supplemental insurance.
3      THE COURT: I see. All right, so, now, what's
4  going on with the third-party payors?
5      MR. MACORETTA: The claims are being processed.
6  They're still auditing data and going through that to make a
7  determination, make their final determination of what the
8  pro rata percentage --
9      THE COURT: When is the projected date?
10     MR. NOTARGIACOMO: That's a few months, at least,
11 Judge, is the answer we've gotten from the claims
12 administrator.
13     THE COURT: So the checks will go out --
14     MR. MACORETTA: At least no sooner than a few
15 months from now is the answer we have from the claims
16 agency. We just don't have a more definitive answer than
17 that. That is way overallocated. I think there's well over
18 a billion dollars in claims from the TPPs, so that will
19 be --
20     THE COURT: And how much, what's the pot again, do
21 you remember?
22     MR. MACORETTA: The TPP pot will be about 50,
23 40 something million dollars, Judge, before you take out
24 attorneys' fees, so it's less than that.
25     THE COURT: Have you been paid any attorneys' fees

Page 10

1  from the settlement yet?
2      MR. MACORETTA: Yes.
3      THE COURT: How much have you all been paid in
4  attorneys' fees for this settlement?
5      MR. MACORETTA: You gave us 25 percent of
6  $65 million, I think, so it was about -- what's that?
7  25 percent of $67.5 million, so that's about $16 million.
8      THE COURT: All right, and you've pocketed that.
9  In other words, you have that in --
10     MR. NOTARGIACOMO: You gave us 30 percent, your
11 Honor.
12     MR. MACORETTA: I'm sorry. That included
13 expenses, but, yes, we have that. We've pocketed that, yes.
14     THE COURT: All right. So on the cy pres fund,
15 that only comes out of the consumers, we think. Is that
16 right?
17     MR. MACORETTA: Here's the issue with the cy pres.
18 Yes, yes, the TPPs will use up all their money, so there
19 will be no money left over from them, for sure. The
20 consumer cy pres is scheduled for mediation with Eric Green
21 June 22. Under the settlement agreement, the leftover
22 consumer money is subject to a mediation between consumers,
23 Attorney Generals, and the TPPs. All of us will get down
24 and meet and try to come up with some allocation that Eric
25 Green will mediate or determine, I think, ultimately and

Page 11

1  then get your approval.
2      THE COURT: How much money are we talking about?
3      MR. MACORETTA: We're talking about $12 million?
4  It's a little less than $12 million.
5      THE COURT: So it's huge, it's huge.
6      MR. MACORETTA: Yes, it is. I will tell you,
7  Judge, that part of our suggestion is going to be that some
8  of that money --
9      THE COURT: Could we just plow it back in to these
10 people who have put in claims?
11     MR. MACORETTA: Well, that's going to be some of
12 our suggestion, Judge, Yes. Part of it, we're going to
13 suggest paying these consumers more. Part of it is going to
14 be an attempt to find some of the consumers who for whatever
15 reason didn't respond to the first notice. There's
16 deficient claims, there's a lot of deficient claims, and we
17 may suggest spending some money --
18     THE COURT: Deficient because we think they might
19 be fraudulent, or the people couldn't come up with the
20 documentation?
21     MR. MACORETTA: They couldn't come up with
22 anything. And all of these people got letters from the
23 administrator, "Your claim is deficient, you didn't give us
24 any proof, you didn't give us an affidavit," so they just
25 ignored it. So we want to use some of the money to reach

Page 12

1  out to those people and --
2      THE COURT: Did we pay these people -- see, I
3  don't remember, there are so many classes -- were we paying
4  the consumers treble?
5      MR. MACORETTA: No. Under the terms of the
6  settlement, consumers who took Kytril and Zofran were
7  getting 50 percent of their claimed amount, 50 percent of
8  what they paid. Consumers who claimed for all of the other
9  drugs were getting 5 percent of what they paid for those
10 drugs with a $100 minimum.
11     THE COURT: So one thing I'd like you -- cy pres
12 funds, you know, for me --
13     MR. MACORETTA: We know.
14     THE COURT: -- where usually there's a few
15 thousand left are over, just it wasn't worth the dime. So
16 to the extent, are you going to be part of the negotiation
17 process for this?
18     MR. HEROLD: We're not, your Honor. We agreed to
19 stay out of the mediation. From GSK's perspective, the
20 money is spent, and it has it divided up between the
21 consumers, third-party payors, and Attorneys General who had
22 filed claims under parens patriae here --
23     THE COURT: So you're saying, are some of the
24 Attorney Generals wanting part of it? Is that it?
25     MR. MACORETTA: At the time the settlement was

Page 13

1  reached, that was the terms of the settlement, the Attorney
2  Generals could be involved in this mediation to discuss it.
3  Now, will they want some of it? I don't know. I assume
4  they will, but we haven't talked to them about it yet.
5      THE COURT: All right. So my strong preference,
6  because I've already rejected one $12 million cy pres fund,
7  is whether it's finding new people who weren't able to put
8  in a claim or just paying more to the people who are class
9  members up to the trebling. After that, you couldn't
10 justify it.
11     MR. MACORETTA: And I should point out, Judge,
12 some of those people probably, to the extent people got a
13 $100 minimum, some of those people may have hit their
14 treble. They may have had a $20 claim that we were paid up
15 to that minimum.
16     THE COURT: Sure. When there's something left
17 that's a true cy pres, you know, everybody's gotten the
18 maximum of what you could possibly argue in good faith,
19 then -- all right, so that's GSK. What I'd love at the end
20 of it is a report.
21     MR. MACORETTA: But you're going to have to sign
22 off on whatever we do, so, yes.
23     THE COURT: So but in particular what I'm worried
24 about is -- this is the first of them. I was very
25 appreciative that GSK came in the door and settled right

Page 14

1  away.  Just what have we learned about what works in claims
2  handling, what percentage returns are we getting, did the
3  media work?  We went on the Internet, right?
4       MR. MACORETTA:  We have a Website, yes.  This is
5  the earliest one, so I don't know how aggressive we were on
6  the Internet beyond having a Website.
7       THE COURT:  It was one of the first in the
8  country, right, where we've tried to do Internet noticing?
9       MR. MACORETTA:  Yes.
10      THE COURT:  I want to know how it's worked, is it
11 worth it?  So just what's worked here.  Yes?
12      MR. HEROLD:  Your Honor, one other comment I make
13 is, we did do the very best we could to get notice out to
14 the entire class, especially the consumers.  And I don't
15 know if you recall, but we hired and split the cost for
16 Professor McGovern from Duke Law School --
17      THE COURT:  I remember that vividly, yes.
18      MR. HEROLD:  -- to come in and advise us, and he
19 suggested some improvements on the notice plan and the way
20 the settlement was administered.  So we've tried very hard
21 with the assistance of a law professor to design a program
22 that would get as much money as possible out of this
23 agreed-upon amount to the consumers.
24      THE COURT:  I agree with that, and so I think all
25 good faith and due diligence was performed her.  And yet it

Page 15

1  was our earliest, and there's many that are flowing from it,
2  and we can learn.
3       MR. MACORETTA:  And before the mediation, we'll
4  submit to you the statistics we have and exactly what claims
5  so you can get a better handle.  That's GSK.
6       THE COURT:  Okay, good.  So basically when do you
7  anticipate you'll be able to give me a final wrap-up?
8       MR. MACORETTA:  The mediation is scheduled with
9  Professor Green on June 22.  Under the order, we mediate and
10 he rules.  It's more of an arbitration.
11      THE COURT:  No, but I'm talking the whole kit and
12 caboodle with the third-party payors, at least have one
13 piece of this done.  Do you think you could give me
14 something by September 1?
15      MR. MACORETTA:  We won't be in a position to tell
16 you, I don't think, by September 1 the checks can go out to
17 the TPP, quite candidly.
18      THE COURT:  Why don't you do this:  Why don't you
19 give me a status report on September 1.  And if the checks
20 haven't been paid by then, then at least you can tell me by
21 then when they will go out.  But at least the consumers will
22 go out by then, right?
23      MR. MACORETTA:  The consumers better go out this
24 week, yes.  It's what we understood from the administrator,
25 yes.

Page 16

1       THE COURT:  Anybody else want to say anything else
2  about the GSK settlement?  Okay.
3       MR. MACORETTA:  Next on our list, Judge, is
4  AstraZeneca.
5       THE COURT:  All right.
6       MR. MACORETTA:  So AstraZeneca, the Class 1, which
7  is the Medicare Part B consumers, as your Honor knows, we
8  went around -- we think we finally have that resolved.  That
9  was the one that started out with this $12 million cy pres,
10 which you encouraged us to pare down, and we did.  So that
11 claim is being processed, and I don't think we have a date
12 from the administrator yet as to when those checks are going
13 to go out.
14      THE COURT:  It's on appeal, isn't it?
15      MR. MACORETTA:  I'm sorry, it's just out there and
16 there's an appeal of that, that's right.  That's right,
17 that's right.
18      THE COURT:  So where are you on that appeal
19 process?
20      MR. MACORETTA:  That has not yet -- I don't even
21 think there's a briefing schedule on that appeal yet.
22 Mr. Haviland is here.  I don't --
23      THE COURT:  Mr. Haviland, do you know when that
24 briefing is scheduled?
25      MR. HAVILAND:  We haven't got a briefing schedule,

Page 17

1  Judge.  We've been told one will be coming from the First
2  Circuit, but it hasn't been issued yet.
3       THE COURT:  Well, given the fact that I keep
4  reiterating this is a dying class, is there a way of filing
5  a motion for expedited review?
6       MR. MACORETTA:  We can do that, Judge.  We haven't
7  had success with that in the First Circuit in the past, but
8  we'll do it.  We can ask them for it and highlight that
9  fact.  This was an issue -- there was an appeal of the GSK
10 settlement where we raised this issue, and --
11      THE COURT:  Yes, but the GSK settlement you worked
12 out somehow, right?
13      MR. MACORETTA:  Yes, but I think we asked for
14 expedited review there, and nothing happened.  But we'll
15 file a motion for an expedited review.
16      THE COURT:  Mr. Haviland, do you agree that that
17 should be the case?
18      MR. HAVILAND:  Certainly, your Honor.
19      THE COURT:  So maybe if you did a joint motion.
20 Regardless of whether you prevail on your issues or he does
21 on his, it's a dying class of people who need the money.
22 They're sick and dying, so --
23      MR. HAVILAND:  From the voices of my clients,
24 they'd like it as well, Judge, so I'm happy to do that.
25      THE COURT:  Okay.  So there's nothing more for me

Page 18

1  to do there, right?
2         MR. MACORETTA:  No.
3         THE COURT:  Okay.  Next one?
4         MR. MACORETTA:  The rest of AstraZeneca, Classes 2
5  and 3, are in the First Circuit as well, at least as to the
6  case you tried here in Massachusetts.  That's been fully
7  briefed and argued --
8         THE COURT:  And that's stayed.  There's nothing we
9  can do with that.  Have you argued that one yet?
10        MR. MACORETTA:  We have argued it, yes, several
11 months ago.
12        THE COURT:  For the class, not -- the Classes 2
13 and 3 you've argued?  Or you've just argued the big case?
14        MR. MACORETTA:  We've just argued what you ruled
15 on here, Judge, the trial, the results of the trial.
16        THE COURT:  Right, but what about the class cert?
17 That's on appeal too, right, that I granted cert?  It must
18 be.  I can't believe you missed an opportunity.
19        MR. WISE:  Your Honor, the cert issues bound up in
20 the Massachusetts trial are on appeal.
21        THE COURT:  Right.
22        MR. WISE:  The remaining cert issues you stayed
23 pending resolution of the First Circuit.
24        MR. MACORETTA:  There's no 23(f) because you never
25 gave a final ruling.

Page 19

1         THE COURT:  Because I didn't even do it and stay
2  it, all right.
3         MR. WISE:  You decided to wait and see what the
4  Circuit did.
5         THE COURT:  Okay.  So that will be a huge thing
6  for me to do after the --
7         MR. MACORETTA:  First Circuit rules.
8         THE COURT:  -- the First Circuit rules, if it
9  doesn't sort of wipe out the core ruling.
10        MR. MACORETTA:  Yes.
11        THE COURT:  Okay.  So AstraZeneca, there's nothing
12 for me to do.
13        MR. MACORETTA:  No.
14        THE COURT:  That's a lovely thought, all right.
15        MR. MACORETTA:  BMS, there is also nothing for you
16 to do because, as we referenced, we have reached a global
17 settlement with BMS.
18        THE COURT:  All right, so, now, we've had a bad
19 experience in Track 2 because it's taken so long to get some
20 of the data to even be able to send out the notice.  So the
21 reason I wanted to find out is, where are we on the BMS
22 notice?
23        MR. NOTARGIACOMO:  What we did, anticipating there
24 might be a settlement with BMS, when we put in the request
25 for the Track 2 data, we also threw in the BMS drugs, so

Page 20

1  that when we get that data, we will also get the BMS data
2  and won't have to wait for that.
3         THE COURT:  When do you want to schedule a
4  preliminary approval hearing?
5         MR. NOTARGIACOMO:  We're going to be filing
6  something on the Track 2 -- on BMS?
7         THE COURT:  Yes.
8         MR. NOTARGIACOMO:  There's an allocation meeting
9  between the consumers and the TPPs in BMS on June 22, and we
10 expect to file motions for preliminary approval in early
11 July.
12        THE COURT:  So shall we get that date on the
13 calendar?  Are there likely to be -- do you have class reps?
14        MR. MACORETTA:  We do, we do.
15        THE COURT:  And are you expecting -- I mean, the
16 number of objections, really, in both the McKesson and the
17 Track 2 started flowing in at the preliminary approval
18 stage, I believe, and --
19        MR. MACORETTA:  That's right.
20        THE COURT:  So are we expecting that you know of a
21 full-blown preliminary approval hearing that will take a lot
22 of time?
23        MR. MACORETTA:  It would be unusual if we didn't
24 have one in this case right, Judge?
25        THE COURT:  Well, I always have a preliminary

Page 21

1  approval hearing.
2         MR. MACORETTA:  There's been objections to the
3  preliminary approval in AstraZeneca and GSK as well, I
4  think, so --
5         THE COURT:  For the last two.  So now that
6  everyone's here, let's set a date.  Robert, do we have an
7  afternoon?  Maybe the third week in July, does that sound
8  right?
9         MR. MACORETTA:  Judge, I believe there's something
10 July 23.
11        THE COURT:  Well, beautiful.
12        MR. MACORETTA:  But I don't know what that is.  Is
13 that the --
14        THE CLERK:  That's McKesson final approval.
15        THE COURT:  That's McKesson final approval.  I
16 think that's too much.  But if we did them back to back
17 maybe, then people who would be in town otherwise --
18        THE CLERK:  The 24th.  It's a Friday.
19        THE COURT:  The 24th?
20        MR. MACORETTA:  That's fine for us, I think, your
21 Honor.
22        THE COURT:  For a preliminary approval hearing.
23 Who's from Bristol Myers?  There you are.
24        MR. TRETTER:  Hi, your Honor.
25        THE COURT:  You're so far back, you're trying to

Page 22

1  stay out of the courtroom. So is that a day acceptable to
2  you?
3      MR. TRETTER: I'm furiously going through the
4  little calendar on my Blackberry, but I'll say "yes" to the
5  24th of July. Unless you hear from me otherwise, yes.
6      MR. NOTARGIACOMO: The same for plaintiffs, your
7  Honor, we'll have to check with other counsel to see if that
8  works, but assuming it does --
9      THE COURT: My theory was to do it back to back
10 with McKesson on the theory that some of the players were
11 overlapping, and I know Mr. Berman tends to come in from
12 across the country, and I think other people are coming up
13 from other locations. What's the 24th, is it a Friday?
14     THE CLERK: Yes.
15     THE COURT: And then they can do Cape Cod the next
16 day.
17     (Laughter.)
18     MR. MACORETTA: I'll point that out to Mr. Berman.
19 And, of course, you know, we have a settlement in principle
20 with BMS. We --
21     THE COURT: I understand. If it falls apart, it
22 does. Maybe we'll just use that date as a status to figure
23 out what I do next.
24     MR. TRETTER: So what time, your Honor?
25     THE COURT: Do you want to do it at 2:00 o'clock?

Page 23

1  And then you can --
2      MR. MACORETTA: We can do it in the morning,
3  Judge.
4      THE COURT: You know what my problem is? I know
5  no one wants to be doing this Friday afternoon. I just
6  never know what my trial schedule looks like. What does the
7  24th look like in the afternoon? Anything else?
8      THE CLERK: No. It's open.
9      THE COURT: Why don't I put it on at 2:00 o'clock.
10 Now, here's the thing: Keep in touch with Mr. Alba because
11 if I'm not on trial, I'm happy to move it into the morning.
12 I have a solid block for you on the Friday in the afternoon,
13 okay? All right. So that's BMS.
14     MR. MACORETTA: That's BMS. And that leaves us
15 with the Track 2 global settlement, Judge.
16     THE COURT: And where are we on that?
17     MR. MACORETTA: All the notice has not yet gone
18 out because we still haven't gotten the right data from CMS.
19     THE COURT: When are you going to get that data?
20     MR. NOTARGIACOMO: We're working with them. We're
21 trying to get it in so that we can request another final,
22 final approval hearing in late July or early August, and it
23 looks like --
24     THE COURT: But help me with this. So when do you
25 think that the notice can go out?

Page 24

1      MR. NOTARGIACOMO: By the end of this month, the
2  end of June.
3      THE COURT: The end of June, notice?
4      MR. NOTARGIACOMO: And then we want to give
5  consumers 30 days to respond. All they have to do is send
6  back a postcard that's pre --
7      THE COURT: All right, so let's just play this
8  out, though. Maybe we should do a little longer because a
9  lot of people vacation. I mean, I don't know if this group
10 necessarily. Actually, this is a huge group. This isn't
11 necessarily my -- most people, a lot of people won't even
12 focus on it till -- maybe give maybe 40 days or something,
13 give that extra ten days for the July 4 period of time. And
14 then when would the approval -- people vacation in August,
15 this is my concern, so I want to give people advanced --
16 when do you think would make sense to do a hearing, the
17 second week in August, before the tail end?
18     MR. NOTARGIACOMO: If you're going to give them
19 40 days, I might push it out a little bit, your Honor,
20 either -- I know you're reluctant to do it in the last two
21 weeks of August because that's prime vacation schedule.
22     THE COURT: Yes, for lawyers as well as judges and
23 consumers, so I'm thinking of the second --
24     MR. NOTARGIACOMO: Week in August?
25     THE COURT: Yes. And we can always cancel it if

Page 25

1  it turns out not to be right.
2      So when can we do it, Robert? Do we have an
3  afternoon in there somewhere?
4      THE CLERK: August 11 at 2:00 p.m.
5      THE COURT: So that would be the final approval
6  hearing, is that right?
7      MR. NOTARGIACOMO: That's correct.
8      MR. MACORETTA: Part two. Your Honor had a
9  hearing.
10     THE COURT: Well, I'm curious as to whether -- I
11 think I do need another hearing, but there are also a series
12 of objections I haven't ruled on and are being briefed,
13 right?
14     MR. MACORETTA: Yes, and we want to submit further
15 briefing on a lot of these issues, yes, which we will do
16 well in advance of this.
17     THE COURT: Well in advance because there were a
18 number of objections, some of which I responded to through
19 this supplemental notice requirement. Okay.
20     MR. MACORETTA: Was that 2:00 o'clock as well?
21     THE COURT: Yes.
22     THE CLERK: That's correct.
23     MR. NOTARGIACOMO: Yes, there is one piece of
24 this, your Honor, that I don't know the answer to that might
25 affect that date, and that is the supplemental notice that

Page 26

1  you just mentioned to cash payors, and we're working on a
2  publication schedule.  I assume we can work with that date,
3  but if not --
4      THE COURT:  If not, we'll push it into September.
5      MR. NOTARGIACOMO:  Okay.
6      THE COURT:  There are so many people here from the
7  Track 2 settlement.  Is there any reason anyone knows of
8  that August 11 would be an impossible date for any of the
9  key players who have been very active in negotiating that
10 settlement?  There are what, how many defendants, how many
11 companies?
12     MR. NOTARGIACOMO:  I think, depending on how you
13 count them, eleven or thirteen defendants.
14     THE COURT:  All right.  Has there been one
15 particular spokesperson who's been involved in the
16 settlement?
17     MR. MACORETTA:  There's been a few.  I wouldn't
18 want to put it on just one person, Judge.  I don't see
19 anybody here.
20     MR. BARLEY:  I've spoken for the defendants at a
21 number of hearings, your Honor.  Steve Barley for AmGen.  Is
22 there a particular issue?
23     THE COURT:  I just want to make sure you're
24 available on that date.
25     MR. BARLEY:  I'm available.

Page 27

1      THE COURT:  Okay.  And so is there someone who's
2  been sending out e-mails on behalf of the defendants?
3      MR. BARLEY:  I'm happy to do that.
4      THE COURT:  Would you, if we have to change it
5  because the noticing doesn't go right, you'd be the point
6  person to just make sure you touch base with Mr. Alba?
7      MR. BARLEY:  Yes, your Honor.
8      THE COURT:  Perfect, thank you.  Okay.
9      MR. MACORETTA:  And then the only thing we have
10 left --
11     THE COURT:  Did you get his name?  He knows who
12 everyone is.  He talks to you all?  All right.
13     THE CLERK:  Most, not all.
14     MR. MACORETTA:  The only thing we have left is
15 Johnson & Johnson.  If you'll remember, you granted them
16 summary judgment.  That's on appeal as well.
17     THE COURT:  But that's on appeal.
18     MR. MACORETTA:  That's on appeal, so that's --
19     THE COURT:  Okay, so now you're done.
20     MR. MACORETTA:  Now we're done.
21     THE COURT:  So essentially there are no more
22 dispositive motions that you have outstanding with me that
23 need to be resolved?
24     MR. MACORETTA:  Not before the First Circuit.
25     THE COURT:  You're almost done with me, depending

Page 28

1  on what happens with the First Circuit?
2      MR. MACORETTA:  Yes.
3      THE COURT:  So in terms of a global mediation -- I
4  have no idea, it's such a huge suit, how long the First
5  Circuit would take to rule -- should these issues pending on
6  appeal be part of the universal mediation, assuming
7  Mr. Green can do it before the First Circuit rules?  What's
8  your point of view?
9      MR. MACORETTA:  I guess this goes more to -- the
10 only defendants we have left is Johnson & Johnson and
11 AstraZeneca, Judge.  This goes more to them, I mean,
12 although these --
13     THE COURT:  Are you willing to mediate on those
14 two?
15     MR. MACORETTA:  We are.
16     THE COURT:  Okay, so who's here with Johnson &
17 Johnson?  There you are.  For the record, you are?
18     MR. SHAU:  Andrew Shau from Patterson Belknap for
19 Johnson & Johnson.
20     THE COURT:  What do you want to do if there's a
21 mediation?  I'd encourage a try.
22     MR. SHAU:  Yes, the mediation will affect more
23 than just the class case.  It will affect the county cases
24 and the Iowa case, so we would expect to be there anyway.
25     THE COURT:  All right, so I'm going to tell -- and

Page 29

1  how about from AstraZeneca?
2      MR. WISE:  Scott Wise, your Honor.  We'll be in
3  the same position.  I mean, I think we'll be there for these
4  other cases as well, so there's no reason not to include the
5  class case too.
6      THE COURT:  Okay, thank you.  So I'm going to
7  suggest to him that that's on the table because you'll be
8  there anyway, and we just don't know yet when the First
9  Circuit will rule.  Okay?
10     MR. MACORETTA:  Okay.
11     THE COURT:  Perfect.  So you're done.
12     MR. MACORETTA:  Yes.
13     THE COURT:  You can leave, except to the extent
14 you're representing other clients.
15     MR. NOTARGIACOMO:  I do represent some state
16 clients, your Honor.
17     THE COURT:  Okay.  So maybe at this point I can
18 get the state Attorney Generals up here.  California.
19 Massachusetts is here, I assume?  No.  Maybe not because
20 Mylan is not technically part of this.
21     Well, let me ask you, Mr. Mullen, why don't you
22 come up too because even though -- I don't know you're --
23 you're here, although you're not technically part of this.
24 And I want Uncle Sam here.  Who wants to come up for the
25 federal government?  Mr. Henderson, all right.  Because as I

Page 30

1  understand it from Mr. Green, one of the big holdups in
2  settling this end of the case is making sure that the state
3  and the federal government are on the same page in
4  settlement. Have any of you been directly involved with
5  that issue?
6        MR. HENDERSON: No, not really, your Honor. We
7  did have a communication with Mr. Green in which he
8  suggested that we attend a meeting with some of the state
9  parties to see if some issues could be discussed, and we
10 said we were willing, but there was no follow-through on
11 that.
12       THE COURT: So as I understand, part of the issue
13 is, of course, that Medicaid has a federal and a state
14 component, right?
15       MR. HENDERSON: Yes.
16       THE COURT: And so the feds are suing on their
17 own, at least through the Ven-A-Care cases, but, in
18 addition, the states are suing both for their share, and in
19 at least one situation, for parens patriae penalties.
20       MR. HENDERSON: That's correct, your Honor, and --
21       THE COURT: What do I have to do, if I want a
22 universal mediation, to get the states to be able to settle
23 and have the federal government not be a roadblock, or at
24 least be part of the discussion?
25       MR. HENDERSON: Preliminarily I don't think the

Page 31

1  federal government has been a roadblock, in that there have
2  been a number of state settlements that have occurred.
3        THE COURT: And what happens in them? Do they
4  release with respect to your half or your portion?
5        MR. HENDERSON: No. There is no release unless
6  the federal government gives a release, and usually we
7  require some money to be paid.
8        THE COURT: Sure.
9        MR. HENDERSON: Nonetheless, CMS, the position of
10 the Center for Medicare and Medicaid Services is that when a
11 state settles with a defendant for Medicaid overpayments,
12 those overpayments must credit the Medicaid program as a
13 whole, including the federal share. So that effectively,
14 say, in a state like California where it's 50/50
15 state-federal contribution to Medicaid expenditures, half of
16 the settlement will be credited to the federal share of
17 that. And that has been somewhat of a problem.
18       THE COURT: Roadblock?
19       MR. HENDERSON: Well, except that recently we've
20 seen a bunch of state settlements.
21       THE COURT: And then what's happening? Are you
22 getting half of it? Is that what's happening, depending on
23 the share that the state --
24       MR. HENDERSON: Yes, half of -- well, it depends
25 who you talk to, but certainly the CMS position is that half

Page 32

1  of that must get credited to the Medicaid program.
2        THE COURT: And then what happens to you? Do you
3  then continue to sue the company?
4        MR. HENDERSON: Yes, we have that ability, and in
5  our three cases against Abbott, Dey, and Roxane, we are
6  doing that. I would say, I would note that the State of
7  Alabama has actually sued CMS over that policy.
8        THE COURT: I don't have it, right?
9        MR. HENDERSON: No.
10       THE COURT: All right.
11       (Laughter.)
12       MR. HENDERSON: I'm sure we could arrange to
13 transfer it to you.
14       THE COURT: No. I did want to ask you just on a
15 totally different subject, I read the United States just
16 sued Wyeth. Is that somewhere else? Is that over this set
17 of issues?
18       MR. HENDERSON: I'm not familiar with that.
19       MR. HEROLD: It's different issues.
20       THE COURT: It's completely different?
21       MS. CICALA: It's different issues, your Honor.
22       THE COURT: All right, good. Yes, go ahead.
23 Maybe you can be helpful here.
24       MR. MONTGOMERY: There is another twist, your
25 Honor, on the DOJ issue. This is not the place to resolve

Page 33

1  it, but there is another Ven-A-Care case against Warrick in
2  which DOJ decided not to intervene. We have an agreement in
3  principle with Ven-A-Care acting on behalf of the United
4  States. That settlement also includes the state AG claims
5  by California, which were brought by the Ven-A-Care
6  relators, and then also Florida, which is not before you,
7  but it is part of the settlement. That settlement has
8  features to it which implicate DOJ or CMS, and I would say
9  that DOJ has definitely been an impediment to finalizing
10 that settlement. And we may well be submitting that
11 settlement to your Honor without DOJ's imprimatur, and
12 you --
13       THE COURT: And that's where I would have to make
14 some legal rulings. Yes?
15       MS. THOMAS: Representing Ven-A-Care, your Honor,
16 Susan Thomas. The implications for DOJ are really ones that
17 Schering and Warrick have raised. They're not an issue from
18 Ven-A-Care's perspective. It's issues that Schering and
19 Warrick won't address. We would be prepared to consummate
20 these settlements, but there's issues that the defendants
21 have raised.
22       THE COURT: Well, because they still have some
23 exposure, is that it?
24       MR. MONTGOMERY: Yes, your Honor, and this would
25 require more time than you have today, and certainly --

Page 34

1   THE COURT:  Right.  Well, would this be
2 appropriate for being part of this universal mediation?
3   MR. MONTGOMERY:  We think so, your Honor.
4   THE COURT:  All right, so you're California?
5   MR. PAUL:  Yes, your Honor, and there's one other
6 issue that --
7   THE COURT:  I've been reading a lot about you in
8 the papers, the financial situation in California.  So
9 you --
10   MR. PAUL:  I walked here.
11   THE COURT:  Yes, I thought.  I worried.
12   (Laughter.)
13   THE COURT:  You didn't take the California
14 corporate jet?
15   MR. PAUL:  No.  I got rid of that.  Corporate
16 Model T at this point.  But, your Honor, with respect to
17 your earlier question about issues that tie in with CMS,
18 some of which Mr. Henderson just spoke about, there is one
19 other issue that does complicate the effort to reach
20 settlement, and it's a policy that CMS issued in October
21 that requires the relator's share to come out of the state's
22 recovery entirely, as opposed to the prior practice, which
23 was to take it out of, in a whistleblower case, which was to
24 take it out of the overall recovery.  I.e., in a 50/50 state
25 like California, we would pay half the relator's share, and

Page 35

1 the U.S. would pay half the relator's share.  And that is a
2 problem.
3   THE COURT:  Is that so?  Is that the way you
4 understand it, Mr. Henderson?
5   MR. HENDERSON:  I'd have to look back at that
6 policy, your Honor.  I can't comment on that.
7   MR. ESCOBAR:  Your Honor, William Escobar on
8 behalf of Dey and Mylan.  Both of my clients are involved in
9 federal cases, Ven-A-Care cases, and a variety of state
10 cases, and this issue of the federal and state shares is a
11 significant obstacle when we're having discussions.  In
12 fact, in the Alabama lawsuit against CMS, the Alabama
13 complaint says that the CMS position that has been described
14 here is an obstacle to settlements because the state is not
15 able to agree on the settlement without risking some portion
16 of that settlement being claimed in advance by CMS.  And
17 from our perspective, we're not able to get releases.  So
18 you have a real obstacle here and an issue that really has
19 to be addressed.  If we can separate out -- you know, we
20 would fight the federal share in the federal cases, and if
21 the states are able to talk and deal on the state share
22 issue, I think it would facilitate settlement at both ends.
23   THE COURT:  Well, let me just ask the federal
24 government, as I look at you:  You're willing to be part of
25 this universal mediation?

Page 36

1   MR. HENDERSON:  We're willing to meet with parties
2 to discuss these issues.
3   THE COURT:  No, but universally so we can have
4 some guidelines, so when the states come in -- I don't know
5 anything about it, okay, so I'm talking off the top of my
6 head, but it does sound reasonable that if it's a 50/50
7 split, then it's 50/50 goes to the relator, I mean, on that
8 really minor narrow issue.  You know, especially if the
9 state has been spending the legal bills to garner the
10 settlement, I don't know why the federal government gets to
11 be a free rider, but maybe there's something I don't know.
12 I'm just simply saying, at the very least, it should be
13 negotiable.
14   MR. HENDERSON:  Perhaps so, your Honor.
15   THE COURT:  So do you have authority now to say
16 you'll be part of this mediation?
17   MR. HENDERSON:  Not really, but I think it likely
18 that we would be able to with a caveat, your Honor.  On this
19 issue, we would participate.  We would have somebody come
20 and participate.  I will say that as to the cases that we're
21 litigating, we have a summary judgment schedule that is
22 going to keep all our resources --
23   THE COURT:  Do you know how many people need a
24 job?  They'd love to work.
25   MR. HENDERSON:  I need a vacation.

Page 37

1   THE COURT:  They'd love to let you go on vacation
2 and work on this brief.  But I think I don't want to hold up
3 these discussions for a summary judgment briefing schedule.
4 You know, Professor Green cared enough to call me up and
5 want a breakfast saying that there are some things that are
6 just going to -- use "roadblock," use "impediment," use
7 whatever -- that are just going to have to be worked out
8 systemically, for want of a better word, institutionally to
9 see if there are -- and I trust him.  I mean, he's been so
10 good in this case.  If he's telling me this is one of his --
11 he just outlined it for me -- this is one of the big issues,
12 I'd like at least people to be willing to talk through --
13   MR. HENDERSON:  And we have previously indicated
14 to Professor Green that we would be willing to do that, have
15 a CMS person attend and a DOJ person attend.
16   THE COURT:  Who at DOJ is calling the shots?  Is
17 there a new chief of the Civil Division?
18   MR. HENDERSON:  There's Joyce Branda there but
19 also Dan Anderson.
20   THE COURT:  Are these new kids on the block?
21   MR. HENDERSON:  No.  No, they're career people.
22   THE COURT:  So they've been involved all along?
23   MR. HENDERSON:  Yes.
24   THE COURT:  All right, so maybe have some of those
25 folks come on up.

Page 38

1     MR. HENDERSON:  Yes, and somebody from CMS who
2  would be very familiar with the policy issues involved.
3  That would be fine.  I think it would probably not be
4  somebody on the litigating team because we're going to be
5  busy.
6     THE COURT:  All right, that's fair enough.
7     Now, I'm going to just ask each of the -- and I'll
8  get to you in a minute -- just on where the status of each
9  of your cases is.  So why don't we start with California.
10     MR. PAUL:  Yes, your Honor.  For California, our
11  case is about at the end of discovery.  The cutoff date is
12  June 15.  Our expert reports for the plaintiffs are due
13  June 30, and the defendants' are due July 30, and our
14  summary judgment briefing is due October 30.
15     THE COURT:  So do we have a hearing date yet for?
16     MR. PAUL:  We have a hearing on, I think it's
17  January 20, your Honor.
18     THE COURT:  Of 2010?
19     MR. PAUL:  Yes.
20     THE COURT:  All right, so would California be
21  willing to participate in this mediation?  Do you have any
22  state policies that would prevent it?
23     MR. PAUL:  No, your Honor.  We'll be there.
24     THE COURT:  Okay.  All right, so is there anything
25  else you want to tell me about your case?

Page 39

1     MR. PAUL:  No, your Honor.  We did have a
2  mediation at the end of April with Eric Green.
3     THE COURT:  And I know you probably can't say
4  publicly, you know, is it likely to settle, but were there
5  any systemic issues that you thought might be addressed?
6     MR. PAUL:  Well, it was complicated a little bit,
7  I think, by the issue I spoke about in terms of the state
8  recovery.  If the state has to pay the entire relator's
9  share, that affects our position, obviously, and I think
10  Mr. Escobar just spoke about it from another angle, so --
11     THE COURT:  Which is the release.
12     MR. PAUL:  Yes.
13     THE COURT:  What is the exposure at the end of the
14  day with respect to the federal and state government all
15  together?
16     All right, so when you settle something, let's say
17  you take a drug and you settle it, you're settling it just
18  for what the Medicaid loss is?
19     MR. PAUL:  Well, for both the federal component
20  and the state component, your Honor.  That's always been our
21  practice is to get a recovery and --
22     THE COURT:  So if 50 cents is paid by the federal
23  government and 50 cents by you, you're looking for a hundred
24  percent recovery, and then you give back the 50 percent?
25     MR. PAUL:  Yes, your Honor.

Page 40

1     THE COURT:  So are all the states taking that
2  point of view?  So you're essentially suing on behalf of the
3  federal government.
4     Now, do you take a different view, Mr. Henderson?
5     MR. HENDERSON:  No.  We agree that when the state
6  sues, the state should recover the full amount and credit
7  whatever the federal share is back to the Medicaid program.
8  That does not extinguish our claims.  We are entitled to
9  treble damages and typically in these cases where we have
10  oftentimes different drugs.  So our claims are not
11  extinguished, but at the end of the day, there would be some
12  offset.  If, for example, the defendant can show how much
13  was paid to California for a particular drug and we get a
14  judgment at the end of the day, there would be an offset for
15  the amount that was credited back to the federal share of
16  the program.
17     THE COURT:  But from a defendant's point of
18  view -- just let's assume, you know, there's one drug --
19  does the settlement come as specific as it's for this drug,
20  this amount of money for this time period?  Is it that
21  specific, or is it a lump sum with respect to every
22  manufacturer?
23     MR. PAUL:  In the settlements California has
24  reached to date in the AWP litigation, your Honor, it's been
25  for a specific time period and specific drugs.

Page 41

1     THE COURT:  So you'd be able to know which drug it
2  was and which NDC number and that sort of thing?
3     MR. PAUL:  Yes.  Yes, your Honor.
4     THE COURT:  And so then you would then come along
5  and say, "Well, 50 percent of that is mine."  And then do
6  you then second-guess the amount and then want to treble it?
7     MR. HENDERSON:  We --
8     THE COURT:  So let's say 50 cents.  Do you say,
9  "Oh, no, no, really, it should have been $2.50"?
10     MR. HENDERSON:  Correct, yes, we may, if we wish
11  to.
12     THE COURT:  And then you'll want to treble it.  So
13  a defendant almost has --
14     MR. HENDERSON:  They'd have some extra exposure
15  if, for example, the settlement is 50 cents on the dollar or
16  a small portion of the damages.
17     THE COURT:  So what would it take to get you in to
18  settle it so a manufacturer could just wrap it up?
19     MR. HENDERSON:  Money.
20     THE COURT:  But are you in these discussions?
21     MR. HENDERSON:  No, we have not been part of these
22  discussions.  We've --
23     THE COURT:  So from a manufacturer's point of
24  view, you would like them to be part of this?
25     MR. ESCOBAR:  No, your Honor.  I think what we

11 (Pages 38 to 41)

72fe4b07-ff68-4ab0-9daf-1849027a1147

Page 42

1 want to be able to do, and this is something --
2         THE COURT:  All right, so maybe I'm wrong, all
3 right.
4         MR. ESCOBAR:  But what you just heard sets out the
5 problem for us.  Mr. Henderson's case against us is suing us
6 on the federal share of all states across the country,
7 including California.  California is suing us in the state
8 case for both the federal and the state share.  Now, we're
9 happy to have --
10        THE COURT:  You're just suing for the federal
11 share, right?
12        MR. HENDERSON:  Yes.
13        THE COURT:  All right.
14        MR. ESCOBAR:  Right.  So, now, we want to be able
15 to -- one possibility, which, frankly, would be one that
16 makes the most sense, I think, is that we would be able to
17 talk directly to California about the California state case,
18 about its settlement with California that is only for the
19 state portion that they're claiming, and therefore leave the
20 rest, the federal share, in the federal case where we're
21 litigating not only in California but in other cases.
22        THE COURT:  So that for you would be an acceptable
23 settlement approach.  In other words, California would get
24 the 50 cents, and you would just leave me and the two of you
25 to resolve the federal piece.

Page 43

1         MR. ESCOBAR:  Well, they would get less than that,
2 your Honor, but we won't go into --
3         THE COURT:  No, no, right, but --
4         MR. ESCOBAR:  But that's correct, your Honor.
5         THE COURT:  Is that an acceptable -- I think this
6 is what Professor Green wants to try and actually work out
7 is a method of going forward because right now I think he
8 feels it's stuck.
9         MR. HENDERSON:  Well, right now, as I said, your
10 Honor, we've indicated to Professor Green we're willing to
11 talk about these issues.  There is a clear policy statement
12 issued by CMS that says that a state must credit the federal
13 share.
14        THE COURT:  Right, that's why we need CMS.  This
15 is stuck.  I mean, I was only half teasing when I was
16 referring to California's dire financial straits, but you
17 have the largest Medicaid system in the world, right, or in
18 the country certainly, right?
19        MR. PAUL:  It is, your Honor, in terms of amount
20 of money and drugs.
21        THE COURT:  And I don't know, you don't believe
22 everything you read in the paper, but it sounds pretty dire.
23 I'm just saying that these states need the money, and so if
24 there's a way of -- not that the federal government doesn't,
25 for sure, but I'm just simply saying, I'd hate to hold this

Page 44

1 all up because I can't get the releases.  There's got to be
2 a set of guiding principles that we can work off of, so that
3 if you're not happy with what they're doing, it leaves you
4 free to fight on, but doesn't hold up their side.  And
5 that's what I'm hoping will be accomplished by the
6 mediation.
7         New York stands.  How many counties?
8         MS. CICALA:  Forty-three and the city, your Honor.
9         THE COURT:  Okay.
10        MS. CICALA:  If I may, just a couple of points.
11 Setting aside the CMS letter of October of '08 for a moment,
12 the federal government is only prosecuting three cases.  So
13 there's only three cases where this issue may be most
14 pronounced, and perhaps a mediation could focus just on
15 those three, Abbott, Dey, and Roxane, setting aside the
16 Schering Warrick issue that was mentioned earlier where you
17 have the case that the DOJ didn't intervene into.  So that's
18 my first comment.  Yes, you have an overlap of prosecution,
19 but it's confined to only three defendants.
20        Secondly --
21        THE COURT:  So is there anything holding -- with
22 respect to the others, do you think we can get the
23 releases -- that's a really excellent point --
24 Mr. Henderson, with respect to the others that you're not
25 suing?

Page 45

1         MS. CICALA:  I certainly can't speak to that.  If
2 I can just make one other --
3         THE COURT:  Yes, I'm sorry, yes.
4         MS. CICALA:  My understanding of the state law in
5 New York and Iowa is, this notion of sending money back to
6 the feds apart from CMS, there's no choice involved here.
7 If the New York counties recover a dollar, they're sending
8 25 cents to the state and 50 cents to the feds, assuming old
9 percentages apply, no matter what they call that dollar.  So
10 it's not an election on anyone's part; it's a requirement
11 that the money has to be allocated this way.
12        In the settlements that we've reached thus far
13 with defendants, and we have quite a few in New York and
14 Iowa, we have --
15        THE COURT:  Where are you on -- I know we've got
16 an opinion we owe you, right?  There's a pending issue, and
17 you're supplementing with rebate information.
18        MS. CICALA:  Yes, that's on the GSK partial
19 summary judgment motion, your Honor, that's right.
20        THE COURT:  Right, and that's what I owe you,
21 but --
22        MS. CICALA:  We first are going to submit
23 supplemental papers to your Honor pursuant to a schedule
24 that we submitted about a week ago, which your Honor
25 endorsed.

Page 46

1    THE COURT: Right.
2    MS. CICALA: And then the summary judgment
3  briefing is taking place with regard to the claims, the FUL
4  claims, where both plaintiffs and defendants filed their
5  briefs, and we have a hearing scheduled for July 8 on that.
6  So we have summary judgment briefing taking place on what we
7  think are the two of the three areas of reimbursement at
8  issue in the case, the brand reimbursement, the generic FUL
9  reimbursement. Separately, of course, there's the generic
10 non-FUL reimbursement where there's no summary judgment
11 activity at the moment, though we expect there to be that
12 activity in the short term.
13   THE COURT: What is your position on settlement?
14   MS. CICALA: Well, with regard to settlement,
15 without naming any names, New York has reached handshake
16 agreements, at least, or is in the process of negotiating --
17   THE COURT: I've got a whole lawsuit this morning
18 on handshakes, so just get it in writing, but, I mean --
19   MS. CICALA: Yes, we're working on the writings,
20 but nine, possibly ten defendants for New York and ten
21 defendants for Iowa, your Honor.
22   THE COURT: Are settled or settling possibly?
23   MS. CICALA: Yes. We're drafting --
24   THE COURT: Preliminarily. So will that still
25 leave something for me to do in the New York cases?

Page 47

1    MS. CICALA: Absolutely, your Honor.
2    THE COURT: I thought so.
3    MS. CICALA: These tend to be, with a few minor
4  exceptions, these tend to be our smaller defendants, but --
5    THE COURT: So you've settled, let's say on a
6  handshake, with these smaller cases. Have there been any
7  impediments from the federal side?
8    MS. CICALA: None.
9    THE COURT: Are you getting releases from the
10 federal government?
11   MS. CICALA: No, nor have defendants pressed for
12 them in any way, your Honor.
13   THE COURT: So it hasn't been a problem in those
14 cases?
15   MS. CICALA: That's correct. And that's my
16 understanding of how things have typically worked when there
17 are state settlements at issue; the defendants do not press
18 for the federal release. Of course, they press for the
19 state release, although even in some of our county
20 settlements, there hasn't even been a press for a state
21 release.
22   THE COURT: So have you been finding it in
23 California an impediment to settlement?
24   MR. PAUL: No, your Honor. Quite frankly, I think
25 we look at the more serious impediment is this issue of the

Page 48

1  relator's share.
2    THE COURT: The relator's share is the -- yes, go
3  ahead.
4    MR. MONTGOMERY: Although our settlement, your
5  Honor, that I described to you a moment ago does include
6  California. Now, I don't think our problem is necessarily
7  with the California aspect of the case. But I do think,
8  just as a structural matter, DOJ is essentially sitting on
9  the sidelines with respect to every case that it's not
10 directly involved in. So the notion of subdividing the DOJ
11 participation and the CMS participation in any broader
12 conversation that you might or we might be having in
13 mediation I think is probably a mistake.
14   THE COURT: But it's interesting to find out that
15 at least with respect to the smaller cases, it's not such an
16 impediment that settlement can happen.
17   MR. MULLIN: Your Honor --
18   THE COURT: I'll get to you. Hold on.
19   MR. MULLIN: Your Honor, Peter Mullen on behalf of
20 the Commonwealth of Massachusetts. We've settled with seven
21 out of thirteen defendants, including two of the defendants
22 that the federal government has cases pending against;
23 namely, Dey and Roxane. The Commonwealth of Massachusetts
24 gave Dey and Roxane releases consistent with the scope of
25 our complaint, and there was no impediment, no concerns

Page 49

1  expressed with regard to the pending federal cases. So
2  that, you know, the federal government only has active cases
3  in its own name as to three defendants. So that for the
4  vast majority of defendants, I don't think the likelihood of
5  a federal suit is an issue, merely because the statute of
6  limitations is well beyond at this point. You know, it has
7  not been a problem for us in our case.
8    THE COURT: Okay, thank you.
9    You're with Ven-A-Care, right?
10   MS. THOMAS: Ven-A-Care, yes. Just in response to
11 the New York and Massachusetts points, although the federal
12 government has only intervened as to three defendants, we as
13 the relator have brought an un- or nonintervening case that
14 involves seven additional defendants on a federal basis. So
15 I just don't want that to not be clear.
16   THE COURT: And where is that case?
17   MS. THOMAS: That case is in its infancy, your
18 Honor. There's a motion to dismiss pending, and although
19 that motion to dismiss involves public disclosure issues and
20 other issues, your Honor has ordered that original-source
21 discovery proceed, which somewhat under protest we are
22 doing.
23   THE COURT: All right. So do we have a hearing
24 date to supplement? Do we have a next date in your case?
25   MS. THOMAS: We have a date when the original

13 (Pages 46 to 49)

72fe4b07-ff68-4ab0-9daf-1849027a1147

Page 50

1  source discovery ends, July or August, but we're waiting on
2  your Honor's ruling on the motion to dismiss, I think.
3  Although the case is in its infancy, many of these
4  defendants are in fact being sued elsewhere, including the
5  Ven-A-Care state cases.  So there's a lot of the discovery
6  which we think will be done by the time we get there.  And,
7  of course, the CMS and state Medicaid discovery that's
8  already taken place should be applicable.  So although
9  there's not actual discovery taking place on these
10  defendants in the nonintervening case, we think when your
11  Honor rules on the motion to dismiss, there will in fact be
12  a fair bit of progress that's already happened.
13        THE COURT:  All right.  So do you want to be part
14  of this universal mediation?
15        MS. THOMAS:  Yes.
16        THE COURT:  All right, so that includes -- what's
17  the sub-number of your case?
18        MS. THOMAS:  I do not know offhand.  The first
19  named defendant is Actvis, and the other -- we also have a
20  nonintervening case as to certain of Abbott's drugs, the
21  case that we refer to as Abbott-Ery for the erythromycin
22  drugs.
23        THE COURT:  All right.
24        MS. THOMAS:  And that is on the same schedule as
25  the three federal cases, but the federal government did not

Page 51

1  intervene as to those drugs.
2        THE COURT:  Are any of the state Attorney Generals
3  objecting to being part of a universal mediation?
4        MR. PAUL:  California is willing, your Honor.
5        MR. MULLIN:  Massachusetts is willing, your Honor.
6        MR. CARTER:  And I think South Carolina and Utah
7  would be willing as well.
8        MR. NOTARGIACOMO:  Montana and Nevada have been --
9        THE COURT:  They're gone.
10        MR. NOTARGIACOMO:  And they're almost settled in
11  their own states, so that is not an issue.  The only other
12  state is Arizona, and the procedure that's a little
13  different, as I understand it, although I haven't been close
14  to it, that case is brought solely on behalf of the state
15  itself for civil penalties under the Arizona Consumer
16  Protection Act.
17        THE COURT:  I had problems with that because --
18        MR. NOTARGIACOMO:  Understood, your Honor, and
19  actually it's been stayed pending -- you encouraged the
20  parties, and I believe the parties agreed, to stay that
21  litigation pending the First Circuit decision.
22        THE COURT:  But even on top of that, I don't
23  see -- it creates a level of exposure for people if they
24  settle the state -- I'm trying to remember, but, in any
25  event, assuming for a minute Arizona stays in the case from

Page 52

1  a class action point of view, I think that would make it
2  difficult to settle the class action, if they thought they
3  had exposure for penalties in addition.  So would you be
4  willing to be part of that settlement discussion for
5  Arizona?
6        MR. NOTARGIACOMO:  For those defendants that
7  haven't already been settled.  But the next thing I was
8  going to say is that there are a number of defendants that
9  we already have settlement -- either we've reached a
10  settlement in principle and we're working on an agreement,
11  or we have an agreement that has yet to be presented for
12  settlement.
13        THE COURT:  On a penalty case.
14        MR. NOTARGIACOMO:  On the penalty case.
15        THE COURT:  So there's really a big question in my
16  mind what I do if there was a national -- I think you need
17  to be there because how do I count that?
18        MR. NOTARGIACOMO:  I'm sure we'd be willing to be
19  there, your Honor.  I'm not prepared today to say, you know,
20  if we already have a settlement with a defendant, what we
21  would be able to offer by way of those defendants if we've
22  already made an agreement.
23        THE COURT:  Well, with respect to those
24  defendants, what happens to those penalties?  Does it go
25  back to the citizens, I mean, the injured parties?

Page 53

1        MR. NOTARGIACOMO:  I'm not sure.  I don't know
2  whether it goes to the state coffers or whether there's an
3  attempt to distribute back to the consumers.
4        THE COURT:  I'd really want to know that because
5  it does strike me that that would be another impediment to
6  settlement if it's a back-end kick after you've -- why would
7  you settle with the class if you thought the money was going
8  back to some of these people?  I don't know what Arizona
9  plans on doing with it, so I would very much want Arizona to
10  be part of it.
11        Yes, go ahead.
12        MS. CICALA:  The New York counties and the City of
13  New York and Iowa would certainly participate in the
14  settlement.  I do want to propose that some thought be given
15  to breaking out brand versus generics.  I think, in terms of
16  productivity of any universal settlement, there may be
17  something to be said for separating out the groups.  That's
18  our experience, at least to date, that when we have both in
19  the same room, it's very difficult to have constructive
20  dialogue.
21        MR. MONTGOMERY:  Your Honor, many of the
22  defendants had a preliminary discussion before coming over
23  here today, and I think many defendants are interested in
24  participating in mediation.  Counsel needs to talk to the
25  clients.  But we are all going to be interested in the

Page 54

1  structure of the mediation, and that may affect how some
2  defendants react to the prospect. And so I really do think
3  as one structural point that we would agree with Ms. Cicala,
4  that there really needs to be generics and brands
5  separately.
6      THE COURT: I don't know how -- is it possible to
7  have a spokesperson from each of the key defendants, a few
8  defendants, one maybe brand, one generic, one from the
9  relator, one from the federal government, one from the state
10 governments, just to meet with Professor Green to come up
11 with a structure so you can then present it to your general
12 counsel?
13     MR. MONTGOMERY: We discussed just that
14 possibility. We think that that's an excellent idea. We're
15 sure that Professor Green will have some suggestions
16 himself, and we could come up with a structure and involve
17 your Honor to the extent that Professor Green thought
18 appropriate, and hopefully come to an agreement on how to
19 proceed.
20     THE COURT: I think that does make the most sense.
21 Does anyone disagree with that? And then I'll at that
22 point -- all right, so listen and see if this is right --
23 order everyone to mediation on the agreed-upon structure.
24 I'll have Professor Green come up with a final one. And if
25 people decide at the end of the day they don't want to

Page 55

1  participate, that's your right. It's not binding in the
2  sense of, if you go in and you don't want to be part of this
3  process, I suppose I don't think I have the authority to
4  require people to mediate it. But I think to the extent we
5  can -- I see this just going on endlessly unless some of
6  these structural things are resolved.
7      In the meantime, I'm not going to let up on the
8  motions. I mean, I've hired up for next year. I've got
9  plenty of people ready to go. And so I'm planning on
10 chugging through the motions, but I do want to be ready to
11 just settle out what can be settled out and then just
12 address what's left.
13     Mr. Henderson, yes?
14     MR. HENDERSON: I just want it to be clear, your
15 Honor. The United States is willing/amenable to have a
16 participant at these mediations. With regard to the
17 intervened cases that we are now litigating, I think our
18 view is twofold: One, we've been very unsuccessful in
19 mediations thus far, and are not amenable to further
20 mediation absent some movement from the defendants.
21     THE COURT: Well, it may be that you decide to opt
22 out on a dollar figure, but what I would require you to
23 attend, actually, is to at least try and mediate some of
24 these issues with respect to how to allocate relators'
25 shares and how to deal with the release issues.

Page 56

1      MR. HENDERSON: And that we are willing to do.
2      THE COURT: That makes some sense to me. And then
3  you may just decide you can't, and I will, you know,
4  obviously respect that. You're a little newer in the whole
5  process. But it makes no sense for me to be holding up all
6  these state settlements. Is there any -- there was one case
7  that I'd never heard of before, so let me just -- I worried
8  that I would -- oh, yes, United States, ex rel Linnette Sun
9  and Greg Hamilton V. Baxter Hemoglobin, does this ring a
10 bell to anybody? Dickstein Shapiro?
11     MR. DELANCEY: Merle Delancey for Baxter, your
12 Honor.
13     THE COURT: Apparently nothing has happened about
14 that case, and I didn't even know I had it when we were
15 trying to just get prepared for this. So what's happenings?
16     MR. DELANCEY: We've been talking to plaintiffs'
17 counsel trying to get something resolved, and it doesn't
18 look like we're going to be able to. I don't know if
19 plaintiffs' counsel is here, at least one of them. There's
20 two relators in the case.
21     THE COURT: Should I just set that up for a
22 scheduling conference?
23     MR. DELANCEY: We're ready for a CMO. Let's go.
24     THE COURT: Let's go? How long is that -- I'm
25 backwards to ask -- is that --

Page 57

1      MR. DELANCEY: It originally came as a qui tam out
2  of Colorado. It hasn't been here -- maybe December of last
3  year.
4      THE COURT: Oh, all right, so I'll not feel too
5  bad about it.
6      Is there any other matter that I should be
7  addressing here that has slipped through the cracks, you
8  think why haven't you ruled? Oh, God, I was hoping no one
9  would stand up. Okay, so --
10     MR. HENDERSON: Well, we just have some issues
11 that don't involve the whole group, just in our three
12 intervened cases about summary judgment proceedings, some
13 mechanical issues that I think we'd like to address.
14     THE COURT: All right. And what would you like to
15 address?
16     MR. CARTER: Your Honor, Clint Carter. You
17 noticed this hearing for the State of Utah, and I represent
18 the State of Utah. There are three Utah cases, and we
19 believe all three have been remanded.
20     THE COURT: All right, so Utah is gone.
21     MR. CARTER: It should be.
22     THE COURT: The great state of Utah.
23     MR. CARTER: That's right.
24     THE COURT: All right, so all I've got left is the
25 South Carolina, but you're on track?

15 (Pages 54 to 57)

72fe4b07-ff68-4ab0-9daf-1849027a1147

Page 58

1  MR. CARTER: We are. There are, I think, fourteen
2  AWP cases that are actually filed in state court in South
3  Carolina, and then there are two in this court. But
4  discovery is ongoing, and we're on track, and we'll
5  participate in the mediation.
6  THE COURT: You've actually just raised a fabulous
7  issue that I meant to bring up, which is I know that I
8  remanded -- in the beginning, much of what I did was -- what
9  I kept here and what I remanded was a triaging. Should the
10 state cases be part of it, or does it make it too huge? In
11 other words, the ones I remanded, is there anything left on
12 the ones I remanded? Are they still going on?
13 MR. CARTER: I know that we represent other states
14 that have been here where the Court has remanded those, and
15 we're seeking trial dates and actively moving those cases
16 forward. We've settled them in some states.
17 THE COURT: Let me ask, from the defense point of
18 view, which may be really what's left, is there anyone here
19 who is actively involved in a state case where it might be
20 appropriate to bring them into a universal mediation, if the
21 state court judge was willing? Well, would you talk about
22 that when you do it and see because --
23 MR. MONTGOMERY: It may make sense if Eric Green
24 is already engaged in those cases. If it's brand-new to
25 Eric Green, then I think I can imagine some real

Page 59

1  impediments, but those involved will have to talk.
2  THE COURT: Maybe this is something you raise on
3  the mediation on mediation?
4  MR. MONTGOMERY: Very good idea.
5  THE COURT: All right. I feel like I'm dealing
6  with the Mideast or something. So fine. So we're going
7  to -- how at this point -- and I don't want to have everyone
8  sit here, Mr. Henderson, through this summary judgment just
9  on your cases. So I'm thinking I can let everyone go, we
10 can take a break, and then whoever is left who needs to deal
11 with this, your unique case, we can go.
12 How are we going to decide right now who wants to
13 go to Eric Green and be part of the mediation and what this
14 looks like? Do you want me to just -- you can come in, and
15 the defense can organize itself, and then I'll let the
16 plaintiffs organize?
17 MR. MONTGOMERY: We'll organize ourselves, your
18 Honor.
19 THE COURT: Okay, so you'll organize yourselves.
20 MR. PAUL: Your Honor, I think, I talked to
21 Joanne, and we'll organize ourselves, the states.
22 THE COURT: So the states will come up with a
23 representative. Mr. Henderson, either you or, as you say,
24 you might be briefing summary judgment, the CMS and
25 higher-ups in Washington will show up. Ven-A-Care will come

Page 60

1  up with somebody.
2  MS. THOMAS: Yes, your Honor.
3  THE COURT: And of course the class plaintiffs.
4  MR. NOTARGIACOMO: Yes, your Honor.
5  THE COURT: Any other entity that should be part
6  of that? I think that's about it.
7  He said he has free time on June 26 or 27. I
8  think that might not be a terrible -- oh, God, you have a
9  vacation with your kids or something, right?
10 MS. CICALA: No. The vacation is later, but, you
11 know, we have that FUL summary judgment briefing which wraps
12 up on June 30 and the supplemental submissions for the GSK
13 summary judgment at the end of June, so we've got a
14 tremendous amount of litigation activity between now and
15 June 30 happening in the New York cases. And we don't have
16 the luxury of --
17 THE COURT: What if we just moved all that off by
18 a week and gave -- I think all this is going to be is not
19 that substantive as much as it is going -- I mean, what is
20 this going to look like so that everyone can see if they
21 want to buy into it?
22 MS. CICALA: If we could -- pushing off the
23 mediation even by a week, your Honor, is that what you mean?
24 THE COURT: No, no, no. This is what he gave me,
25 so I think this is the soonest you can get in the front door

Page 61

1  to see him.
2  MS. CICALA: Okay, then we'll make it work, your
3  Honor.
4  THE COURT: And then if you want by stipulation --
5  I'm not here to destroy your July 4 weekend, so if you want
6  to put this off by a week or two, put it off by a week or
7  two.
8  MS. CICALA: Thank you, your Honor.
9  MR. MONTGOMERY: But, your Honor, we do have an
10 argument date.
11 THE COURT: What date is it?
12 MR. BUEKER: I think it's July 8, your Honor.
13 MS. CICALA: We'll be in touch with counsel.
14 We'll work it through.
15 MR. MONTGOMERY: It implicates your Honor's
16 schedule.
17 THE COURT: I'm not sure you -- I know you're
18 critical to all this, but I'm just sort of thinking maybe
19 California and Massachusetts could at least, and you could
20 be in telephone contact. I'm not requiring every state AG
21 to come in. I think we only need one representative from
22 the states.
23 MS. CICALA: Thank you, I understand, and my
24 partner, Dan Hume who's here, can certainly participate in
25 the mediation on behalf of my client.

16 (Pages 58 to 61)

72fe4b07-ff68-4ab0-9daf-1849027a1147

Page 62

1       THE COURT:  Okay, all right.  So I'm going to
2  encourage all of you -- I'm going call him up right
3  afterwards, and, ideally speaking, I'm going to tell him
4  that you're all going to try and be available on the 26th.
5  And do you have a mechanism of being in touch with him as to
6  who's going to come?
7       MR. MONTGOMERY:  Yes, we can certainly talk to
8  Eric by telephone.  I think we're going to have to make an
9  assessment and he will have to make an assessment as to
10 whether we can actually have a real mediation process on the
11 26th and 27th, or whether the organizational issues are more
12 complicated than any of us are acknowledging.  But Eric can
13 help us with that.  But I think those two dates are fine,
14 but what they might turn out to be I think remains to be
15 seen.
16      THE COURT:  Right.  Just I think what I wanted to
17 do was to say we've been at this for eight years.  It's a
18 huge -- I think class counsel has only recently just been
19 paid, has put a huge amount of resources into this thing,
20 and it's worth an effort.  If it doesn't work, it doesn't
21 work.
22      You rise from the midst?
23      MR. MATTHEWS:  James Matthews of Sherin and Lodgen
24 on behalf of Watson.  Like Mylan and Dey, Watson is in many
25 of the cases before your Honor and in many cases around the

Page 63

1  country in state AG actions.  We have participated in the
2  mediations, and in particular the New York county mediation
3  to date.  We are certainly interested in participating in
4  the mediation that you schedule after this hearing.  I would
5  be remiss, however, not to inform you that Watson is
6  scheduled to go to trial on an AWP case against Alabama
7  starting on June 22.  So if the 26th and 27th is merely an
8  organizational meeting --
9       THE COURT:  It's just merely organizational.
10      MR. MATTHEWS:  If it's going to be that, that
11 would probably be okay, but I just wanted to mention that we
12 could not --
13      THE COURT:  I take it it's not going to settle?
14      MR. MATTHEWS:  Well, you never know until you try
15 the case, but it doesn't look that way right now, your
16 Honor.
17      THE COURT:  So enjoy Alabama, so you're going to
18 be --
19      MR. MATTHEWS:  Montgomery is a very nice town, as
20 Mr. Carter, who will be there as well, knows.
21      THE COURT:  You're going to be there?
22      MR. CARTER:  I'm going to be there, yes, your
23 Honor.
24      THE COURT:  You're the trial counsel?
25      MR. CARTER:  Absolutely.

Page 64

1       THE COURT:  How many of these have actually gone
2  to trial?
3       MR. CARTER:  This will be the fourth trial in
4  Alabama, I believe.
5       THE COURT:  Wow.  And what's happened in the other
6  three?
7       MR. CARTER:  Let's see, the first trial was
8  against AstraZeneca.  It was a verdict for the plaintiff.  I
9  apologize, it was a hundred something million, $175 million.
10 The second trial was against GSK and Novartis, a verdict for
11 the plaintiff, I think 30 something versus Novartis and
12 80 something against GSK, million.  The last trial was
13 against Sandoz, also a verdict for the State of Alabama, I
14 think 70 plus million.
15      THE COURT:  So let me just ask you this:  Since we
16 like to think about bellwether trials, is there something
17 unique to Alabama's law that would make us think that it's
18 not --
19      MR. HEROLD:  Your Honor, I'd be happy to speak --
20      (Laughter.)
21      MR. WISE:  There are many things unique about
22 Alabama, your Honor.
23      THE COURT:  I mean, that's a pretty good winning
24 streak.  What's the story?
25      MR. WISE:  But to complete the story there, all

Page 65

1  those cases are now pending on appeal in the Alabama Supreme
2  Court.
3       THE COURT:  On questions of law or class cert or
4  all of the above?
5       MR. WISE:  They're not class cases, but --
6       THE COURT:  Oh, I see, because they're all AG --
7       MR. WISE:  Correct.
8       MR. HEROLD:  They're fully briefed in the Alabama
9  Supreme Court, your Honor.
10      THE COURT:  But putting aside for a minute -- I'm
11 sure you always do raise excellent legal issues -- on a
12 sense of it is worth -- is there any other state that's been
13 trying these cases?
14      MS. CICALA:  Yes.  Wisconsin and Missouri have had
15 trials recently, your Honor, Missouri against Schering and
16 Warrick, a victory -- well, it was settled ultimately after
17 a jury verdict initially for the state.  And then Pharmacia
18 was tried by the Wisconsin AG, again a jury verdict for the
19 state, your Honor.
20      MR. MONTGOMERY:  And you'll recall that West
21 Virginia --
22      (Laughter.)
23      MR. MONTGOMERY:  -- went to trial against Warrick,
24 and that was a verdict for Warrick.
25      THE COURT:  All right.  But this is worth just

Page 66

1  saying publicly, so it creates some impetus to settlement.
2  And I'm sure there are great legal issues because these
3  statutes are very difficult sometimes to follow in this
4  context, but, still, it gives a sense of the exposure.
5        So I want to take a break now.  Lee has been going
6  all morning on a trial, and we're going to take a
7  fifteen-minute break.  And then I'm hoping, Mr. Henderson,
8  who else should be here on these issues?
9        MR. MERKL:  Both sides are here, your Honor.
10       THE COURT:  Everybody's here?  Why don't you try
11 and work it all out in the next fifteen or twenty minutes,
12 and if not, I'm here.  Okay?  Thank you very much.
13       (Adjourned, 3:25 p.m.)

Page 67

1              C E R T I F I C A T E

3  UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )

7        I, Lee A. Marzilli, Official Federal Court
8  Reporter, do hereby certify that the foregoing transcript,
9  Pages 1 through 66 inclusive, was recorded by me
10 stenographically at the time and place aforesaid in Civil
11 Action No. 01-12257-PBS, In Re:  Pharmaceutical Industry
12 Average Wholesale Price Litigation, and thereafter by me
13 reduced to typewriting and is a true and accurate record of
14 the proceedings.
15       In witness whereof I have hereunto set my hand
16 this 4th day of June, 2009.

21       /s/ Lee A. Marzilli
         _____
22       LEE A. MARZILLI, CRR
         OFFICIAL FEDERAL COURT REPORTER