UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | ) ) | CIVIL ACTION: 01-CV-12257-PBS |
| ALL CLASS ACTIONS RELATING TO TRACK TWO DEFENDANTS | ) ) ) ) | Hon. Patti B. Saris |

## CLASS MEMBER PATRICIA WEATHERLY'S SECOND REVISED OBJECTION TO CLASS ACTION SETTLEMENT AND NOTICE OF INTENT TO APPEAR

Class 3 Percentage Co-pay Consumer class member Patricia Weatherly

("Weatherly") of San Antonio, Texas hereby submits a Second Revised Objection to the

proposed class action settlement.

## MEMBERSHIP IN CLASS

Weatherly is part of this action because between January 1, 1991 and March 1,

2008 she made percentage co-payments for certain drugs identified in the class

membership drug list appended to the proposed settlement. Specifically on June 17, 2004

Weatherly underwent a procedure at Baptist Hospital in San Antonio, Texas during which

she was administered Acetylcysteine and Lorazepam at a total cost of $410.25 of which

she was responsible to pay ten (10%) percent and the balance of which was paid by her health insurer, United Healthcare Insurance.

## NOTICE OF INTENT TO APPEAR

Patricia Weatherly gives notice of her intent to appear through local counsel (Richard F. Landrigan) at the Fairness Hearing previously scheduled for February 3, 2010, a date that Class Counsel has recently requested be postponed and which the Court has today ordered be postponed indefinitely.[1]

## BACKGROUND

Weatherly's Revised Objection[2] raised six issues with respect to the adequacy of the proposed settlement for Class 3 Percentage Co-pay Consumers such as herself. These issues, reiterated below, were each raised at the Fairness Hearing held on April 27, 2009.

First, the failure of Class Counsel to inform the Court about the size of the Percentage Co-pay Consumer class and the likelihood that class members will be able to submit documented claims prevents the Court from determining how much the settlement agreement will be worth to the class. Without some sense of the size of the class and the average class member's out-of-pocket expense, the Court cannot fairly assess the value of the settlement to the Class 3 Percentage Co-pay Consumers. To determine whether the

---

[1] See, Class Plaintiff's Motion Regarding Dates Related to Final Approval of the Track Two Settlement, (Doc. No. 6736, December 4, 2009). See also, Order Regarding Class Plaintiffs' Motion Regarding Dates Related to Final Approval of the Track Two Settlement, (Doc. No. 6760, December 15, 2009).
[2] See, Revised Objection to Class Action Settlement and Notice of Intent to Appear of Class Member Patricia Weatherly, (Doc. No. 5291, February 23, 2009).

settlement is fair, this Court must assess the value of the settlement to the class based on the class's size and the strength of the Plaintiffs' case on the merits.[3]

Second, that the requirements set forth in the Class 3 Co-Payment Consumer settlement notice[4] create arbitrary and unnecessary barriers to recovery. Specifically, the requirement for records of out-of-pocket expenses to substantiate a claim pursuant to the so-called "Full Estimation Refund Option" "partial refund" is extremely burdensome. The proposed settlement agreement does not outline meaningful or practical ways for members to recover required claims documentation records for the period January 1, 1991 to March 1, 2008 short of each claimant attempting to recover his or her expenditure records, physician records, EOBs, or pharmacy records. Because of the difficulty some class members will have in obtaining proof of their out-of-pocket expenses, and mindful of the historic low take-up rate for claims-based class action settlements,[5] it is reasonable to expect that a substantial number of Percentage Co-pay Consumer class members will not be able to recover full "partial refund" of out-of-pocket expenses. Take-up rates in pharmaceutical cases are generally much lower than with other consumer products cases because of consumers' poor recollection of their pharmaceutical purchases, spread over multiple dates and covering an extended period. Given the added difficulty that many Percentage Co-pay Consumer class members will have recovering documentation of their out-of pocket expenses it is reasonable to expect that take-up rates of Percentage Co-pay

---

[3] Roberts v. Bausch & Lomb, No. CV-94-C-1144-W (N.D. Ala. 1996).

[4] Revised Objection to Class Action Settlement and Notice of Intent to Appear of Class Member Patricia Weatherly, (Doc. No. 5291, February 23, 2009), Exhibit 1.

[5] See, eg. Strong v. Bellsouth Telecomm., Inc., 173 F.R.D. 167, 169 (W.D. La. 1997), aff'd, 137 F.3d 844 (5th Cir. 1998) where 4.3% of class members participated in claims process offering payments of $12 to $20. Even when class members are offered significantly higher minimum payments than those in the settlement agreement here, participation remains low. See, Sylvester v. Cigna Corp., 369 F. Supp. 2d 34, 44 (D. Me. 2005).

Consumer class members in this case will be very low. As presented in the Class 3 Co-Payment Consumer settlement notice, recovery for class members who are unable or unwilling to locate the necessary documentation will be limited to "up to $35" (per the Percentage Co-pay Consumer Class Notice). The small amount of money allocated for those claimants unable or unwilling to obtain sufficient documentation renders the settlement inadequate and unfair.

Third, the proposed settlement fails to inform with any specificity what Percentage Co-pay Consumer class members can expect to receive from the settlement. The proposed Notice only states that some class members will get "up to $35.00" and that, alternatively, claimants "can estimate what (they) paid and show that (they) made percentage co-payments through receipts or bills" and "receive a partial refund of the total amount spent." (Emphasis supplied). Such opaque guidance does not provide the Percentage Co-pay Consumer class members sufficient information to decide whether to invest in the acquisition of billing records and whether the "partial refund" that may result could be more than the cost of those records.

Fourth, if retrieval of records for the extensive span of years encompassed in the proposed settlement is determined to be impractical, a fall back approach may be needed to adequately compensate Percentage Co-pay Consumer class members with a flat fee, albeit higher than the $35 proposed. If the average cost of medical/billing records retrieval may be estimated at around $100 to $150 per claimant, perhaps an award of $100 to $150 per claimant without documentation provides a more equitable result under such a structure. Members of the class would have a stronger incentive to respond to settlement notices.

4

The Court mentioned a higher amount, a $300 flat award figure award, during the colloquy on Weatherly's initial Objection on December 16, 2008 and, although that amount would certainly serve to more fairly, reasonably, and adequately compensate Percentage Co-pay Consumer class members who elect not to submit documentation of their claims it may be beyond the range of an acceptable compromise settlement amount. There is, however, room for an appropriate figure between $35 and $300. Such adjustment is not without precedent. For example, in the settlement of a class action case in state court in Illinois in 2007,[6] where considerations very similar to those in this case were in issue, the award to consumer class members without documentation of their Paxil purchases was increased from the originally proposed $15 to $100 per claimant. Also in that case a cap of $300,000 on consumer claims was removed in the final settlement making available more payments to a larger portion of potential claimants.

Fifth, to ensure that Percentage Co-pay Consumer class members in this case actually benefit in a significant number from the settlement fund, any settlement agreement should provide for **direct payment** to Percentage Co-pay Consumer class members based on billing records subpoenaed from their individual health insurers ("ISHPs") and on records subpoenaed from pharmacies . The ISHPs have already been tasked with supplying the names and addresses of Percentage Co-pay Consumer class members that they have in their data. It seems notably more efficient and effective that a significant percentage of potential Percentage Co-pay Consumer class members, along with their billing/records histories, can be identified and obtained directly from the files of the ISHPs.  In addition,

---

[6] Hoormann, et al. v. SmithKline Beecham, Third Judicial Circuit, Madison County, Illinois, Case No. 04-L-715.

any settlement agreement should provide for direct payment to Percentage Co-pay

Consumer class members based on billing records subpoenaed from several of the leading

pharmacies. Proper HIPPA protection can be addressed. A similar approach to class claims

identification has been used with great success in another class action settlement in this

District, specifically the In Re: Relafen Antitrust Litigation, 01-CV-12239-WGY (D.

Mass.). In Relafen, the plaintiffs were represented by Plaintiff counsel in the instant case

and in Relafen the entire amount of the consumer portion of the settlement funds was able

to be distributed in full. If a sufficiently large number of Percentage Co-pay Consumer

class members' records could be obtained from the ISHPs and from pharmacies, the issue

of records cost reimbursement is less of a factor. If fairness, reasonableness and adequacy

are the mandate of FRCP 23(e)(2), any methodology with a demonstrable impact of

increasing the number of Percentage Co-pay Consumer class members who can participate

in this settlement should be given serious consideration.

Sixth, the allocation of funds in the proposed settlement of Percentage Co-pay

Consumer class claims is inadequate.  At the Fairness Hearing on December 16, 2008

Plaintiff counsel stated to the Court that he did not know the potential size of Percentage

Co-pay Consumer class. Based on conversations with Plaintiff counsel since that Hearing

it is clear that the identification of potential Percentage Co-pay Consumer class members is

a work in progress. The proposed Track Two Settlement Agreement and Release allocates

$21,875,000, or about 17.5 (17.5%) percent of the total $125 million settlement, to the

"Consumer Settlement Pool".  If, as Plaintiff Counsel has admitted, the size of Class 3

Percentage Co-pay Consumer class in the present case has not been quantified, then the

Court has not been provided sufficient information to determine the adequacy of the compensation to potential class members' claims. In her Revised Objection Weatherly presented some statistics estimating the potential pool of Percentage Co-pay Consumer class members. Weatherly indicated that if a significant number of the Percentage Co-pay Consumer class members are eventually identified, the proposed settlement amount allocated in the Consumer Settlement Pool will be insufficient to fairly compensate the potential size of the class.[7]

## RECENT DEVELOPMENTS

In late October 2009 Class Plaintiffs filed a motion to approve the form of notice to cash paying consumers in Class 3 and to reschedule the date for final approval of the settlement.[8] The motion addressed notice to cash payor members of Class 3 without reference to Class 3 Percentage Co-pay Consumers. The Court granted the Motion and reset the schedule of dates leading up to final approval of the settlement.[9] In early December 2009 Class Plaintiffs filed a motion to indefinitely suspend the schedule set in October on the basis that data related to Class 1 and Class 3 cash payor consumers had not yet been received and reviewed.[10] As with its October 2009 motion the latest Class Plaintiffs' motion is wholly lacking any reference to settlement of Class 3 Percentage Co-pay Consumers claims. The Court just acted today on Class Plaintiffs' December motion

---

[7] See, Revised Objection to Class Action Settlement and Notice of Intent to Appear of Class Member Patricia Weatherly, (Doc. No. 5291, February 23, 2009), at pages 13, 14.

[8] Class Plaintiffs' Motion for Approval of Form of Notice to Cash Paying Consumers in Class 3, Approval of Consumer Claims Schedule, and th Reschedule Date for Final Approval of the Track Two Settlement. (Doc. No. 6581, October 27, 2009).

[9] See, Court Order, Doc. No. 6591, October 13, 2009.

[10] Class Plaintiffs' Motion Regarding Dates Related to Final Approval of the Track Two Settlement, (Doc. No. 6736, December 4, 2009).

and ordered an indefinite suspension of events related to the settlement of this matter. Consistent with Class Plaintiffs' December motion, the Order does not reference issues related to Class 3 Percentage Co-pay Consumers claims.[11]

This Court was involved in 2007 in the settlement of GlaxoSmithKline ("GSK") portion of these cases.[12] In April 2009 Class Counsel, who was Class Counsel in GSK, reported to the Court that "(t)he Claims Administrator received 6,311 eligible consumer claims with a total Recognized Claim Amount of $1,596,959.08."[13] Counsel went on to say that "(a)fter distribution to consumers with approved claims there will still be a substantial amount of money remaining in the Net Consumer Settlement Pool."[14] (emphasis added). Counsel then solicitously mentioned that it is "…well aware of this Court's oft-expressed desire to get as much of the settlement funds as possible directly into the hands of consumers." [15]

The portion of the $70 million GSK settlement apportioned to consumers was approximately $19.65m, before attorney fees and expenses.[16] (The consumer allocation was 30% of the total $70m settlement after $4.5m of state payments.) The attorneys' fees were 33.33%[17], or $6.55m of the consumer portion of the settlement, leaving $13.10m exclusive of expenses. If a very conservative $100k amount of expenses were allocated to the consumer portion of the settlement, the net consumer settlement after fees and expenses

---

[11] Order Regarding Class Plaintiffs' Motion Regarding Dates Related to Final Approval of the Track Two Settlement, (Doc. No. 6760, December 15, 2009).
[12] *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, 1:01-CV-12257-PBS.
[13] Plaintiffs' Motion for Disbursement of Funds to Consumer Claimants in the GSK Settlement (Doc. No. 6011), page 2.
[14] Id, page 3.
[15] Id.
[16] See, GSK Settlement Consumer Notice, page 6
[17] Id, page 10.

8

was $13m. On June 22, 2009 Mediator Eric Green determined that $11.6m remained of the amount originally allocated to the consumer class in the GSK settlement after distribution to eligible consumers.[18] The claims disbursed amount of just under $1.6m is a paltry 8% of the $19.65m gross consumer allocation of the GSK settlement and was only 13% of the net amount of $13m allocated to the consumer class. In June 2009 Mediator Green set about reallocating the GSK consumer funds, including supplemental payment to five states that participated in the settlement.[19] It is clearly evident that after the reallocation of consumer funds the value of the GSK settlement to the consumer class was nowhere near the value of the settlement as originally approved by this Court.

The very recent settlement of New England Carpenters Health Benefits Fund, et al. v. First Data Bank, Inc. and McKesson Corporation ("McKesson") was approved by this Court.[20] There Class Counsel, who was Class Counsel in McKesson, agreed to subpoena records for cash payor class members from the ten largest pharmacies. But in McKesson Class Counsel was permitted by the Court to subpoena pharmacy records only after the case settlement was approved by the Court[21], as opposed to Relafen where Class Counsel had been required by Judge Young to subpoena consumer records prior to approval of the settlement.[22]

---

[18] Class Plaintiffs' Notice of Filing Decision of MDL Mediator Regarding Disposition of Unclaimed Consumer Funds in the GSK Settlement (Doc. No. 6171), Exhibit A, page 1.

[19] Id., at page 3.

[20] New England Carpenters Health benefits Fund, et al. v. First Data Bank, Inc. and McKesson Corporation, 1:05cv1148-PBS.

[21] Class Plaintiffs' Unopposed Motion for a Supplemental Order on Preliminary Approval of the McKesson Settlement, (Doc. No. 785).

[22] In Re Relafen Antitrust Litigation, 01-CV-12239-WGY (D. Mass.), Memorandum of Judge Young, (Doc. No 457, September 28, 2005), page 19.

Interestingly, in <u>McKesson</u> this Court ordered Third Party Payors (TTPs) to provide the Claims Administrator with certain information about the Consumer Co-Pay class to assist in the identification of Consumer Co-Payment class members. In its March 5, 2009 Order Granting Preliminary Approval of the McKesson Settlement,[23] this Court provided direction to facilitate the delivery of information to the Claims Administrator with regard to some Co-Pay (but not Cash Payor) consumer claims.  On page 9 of the Order the Court states:

> "To increase the proportion of the consumer class members who obtain
> financial recovery from the settlement, the Court hereby orders members
> of the TPP Class, to provide certain information about their percentage
> Co-Payor members to the Claims Administrator, as set forth in the TPP
> claims form (Exhibit K)."

The Order goes on to say that the information will be provided to the Claims Administrator, who will be subject to the Court's October 11, 2006 Protective Order governing the use of confidential health information, and that the Claims Administrator:

> "...shall use the data for the sole purpose of calculating the checks and sending
> them to members of the Co-Pay consumer class."

On page 10 the Court further orders that the TPPs fall within a safe harbor of the HIPPA Act and therefore shall have no liability for supplying the information.[24]

On pages 4 and 5 of the <u>McKesson</u> TPP Claim Form[25] there are data fields defined for identifying percentage Co-Pay Class members and listing payments made by percentage Co-Pay Class members.

---

[23] <u>See</u>, Order Granting Preliminary Approval of the McKesson Settlement, Certifying the U&C Class for settlement Purposes only, Directing Notice to the Class and Scheduling Final Approval Hearing, at page 9
[24] Id., at page 10.
[25] Id., at Exhibit K.

In the Plan of Allocation in McKesson Class Counsel took responsibility to work with Third Party Payor (TPP) counsel to determine the feasibility of identifying Co-Pay class members and to explore the possibility of sending class members checks without the need to file a claim, but only to do so at an unspecified time after the execution of the Settlement Agreement.[26] Arguably, this Court should have, as Judge Young did in Relafen, withheld approval of the McKesson settlement until after the TPP information had been received and processed and until after the members of the consumer co-payment class in McKesson were identified. When Judge Young insisted on that process being completed before approving settlement in Relafen, the small number of class members that submitted claims in response to a traditional notice plan (2,761) was increased 92 times to 250,905 class members who were identified through the court authorized subpoenas to pharmacies. Using that information the claims administrator in Relafen made direct payment to consumer class members.[27]

## ARGUMENT

As the guardian of the absent class members' interests, this Court has an independent obligation, pursuant to Fed. R. Civ. P. 23 (e) (2), to determine whether the settlement agreement is "fair, reasonable, and adequate." See, Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997). The proposed settlement is unfair and inadequate since without knowing prior to approval of the settlement the size of the Consumer

---

[26] See, Plan of Allocation, at page 2, attached as Exhibit J to the Amended Settlement Agreement and Release.
[27] In Re Relafen Antitrust Litigation, supra, Affidavit of Thomas R. Glenn, Allocation and Distribution of the Net Settlement Funds, (Doc. No. 512).

Percentage Co-Payment Class the Court has not fairly determined the value of this

settlement to the Consumer Percentage Co-Payment Class. As presented the settlement is

unfair and inadequate because it fails to provide consistent and effective mechanisms to

identify and make payment, including direct payment without need of filing a documented

claim, to members of the Consumer Percentage Co-Payment Class. And, the proposed

settlement is unfair and inadequate because it fails to allocate sufficient funds to the

Consumer Percentage Co-Payment Class.

Class action settlements, such as this one, historically have extremely low take-up

rates.[28] Given that asking consumers to document their pharmaceutical purchases over a

long period of years often acts as a deterrent to consumer recovery, the proposed

settlement should focus on specification of consistent methodologies for identification of

Consumer Percentage Co-Payment Class members and should provide to the greatest

extent possible for direct payment of settlement funds to consumer class members.  The

settlement should minimize the requirement for consumer class members to provide

documentation of their purchase of listed drugs.

In his very detailed Memorandum describing the Relafen settlement, issued before

the Final Order and Judgment granting final approval of the settlement in that case, Judge

Young comments:

> "One of the challenges for a court in a class action is to ensure that consumers
> actually receive compensation for the damages they have suffered, and not just
> the attorneys or the institutional plaintiffs."[29]

---

[28] See, Strong v. Bellsouth Telecomm., Inc., supra.
[29] In Re Relafen Antitrust Litigation, supra, Memorandum of Judge Young, (Doc. No. 457, September 28, 2005), page 20.

Arguably, the value of the settlement to consumer class members in this case depends entirely on how many consumers are able to take advantage of the settlement and in what amounts. One clear example of the devaluation of a class action settlement is Roberts v. Bausch & Lomb, supra, where the defendant set aside $67 million into a fund for consumer class members. The dollars that were actually received by the consumer class amounted to only $9.2 million, or 14% percent of the gross settlement amount,[30] versus an even poorer 8% distribution of the gross settlement amount in GSK. Without some sense of the size of the class and the average class member's claim, this Court simply cannot determine how much the settlement agreement will be worth to the consumer class. See, Duhaime v. John Hancock Mutual Life Ins., 989 F. Supp. 375, 378 (D. Mass. 1997); Bowling v. Pfizer, Inc., 922 F. Supp. 1261, 1284 (S.D. Ohio 1996). Without knowing how valuable the settlement agreement is to the consumer class there is no way to determine whether the proposed settlement is fair, reasonable, and adequate, or in the consumer class's best interests. The Court should insist that Class Counsel provide the information on the value of this settlement to the consumer class before the settlement is approved.

The inconsistent manner Class Counsel has proposed in this and in various other similar settlements in this Court to identify and make claim payment to members of the Percentage Co-Payment Class and the Cash Payor Classes may very well reduce the value of this settlement to the consumer class in this case. Weatherly argues for identification of Percentage Co-pay Consumer class members through subpoenas of ISHP records and

---

[30] Deborah Hensler & Thomas Rowe, Jr., *Beyond "It Just Ain't Worth It": Alternative Strategies for Damage Class Action Reform*, 64 L. & Contemp. Probs. 137, 149 (Summer 2001).

through subpoena of retail and mail order pharmacy records <u>before settlement</u> so that under Court supervision direct payment can be made to as many class members as possible.

## CONCLUSION

Weatherly is cognizant of the fact the foregoing proposals add a significant alternative direction to the settlement of Percentage Co-payment Consumer class claims. However, given the lack of specificity in the identification of potential Class 3 Percentage Co-pay Consumer class members, given the extended time frame encompassed in this settlement, given the challenges co-payment consumers face in retrieving records for that long time period, given the award of treble damages to a fair percentage of possible claims, and given the very low flat fee proposed for settlement of what could reasonably be a far higher average claim, the Percentage Co-payment Consumer Class 3 settlement as proposed is inadequate. A reasonable alternative is to award, based on a notarized statement, a flat amount of $100 to $150 per claimant who elect not to submit documentation. Concomitantly, the pool of potential Percentage Co-Payment Consumer class members can be increased significantly through subpoenas of records for ISHPs and from pharmacies and mail order pharmacies, to include billing records that will substantiate claims and which will obviate the need for an additional award of billing records costs. Should such a mechanism be implemented, funds allocated to the Consumer Settlement Pool are inadequate to compensate an expected significant increase in the number of Percentage Co-pay Consumer class, and cash payor claimants, and it is Weatherly's position that the Consumer Settlement Pool should be reasonably increased to

14

between $83,250,000 and $166,500,000 to sufficiently compensate Class 3 flat fee awards of $100 to $150 per claimant. Parenthetically, there is no adequate mechanism spelled out in the proposed settlement for disposition of funds that may not be distributed through the claims process such as return of unclaimed funds to the Consumer Settlement Pool to be used to increase flat fee awards or the award of a *cy pres* distribution. The experience in the GSK settlement of having to reallocate consumer funds after the fact can be avoided here by specification in the settlement of a comprehensive plan for disposition of any remaining funds.

For each of the reasons stated above, the Court should reject the proposed class action settlement in its entirety as not being fair, reasonable, and adequate. Weatherly reserves the rights to withdraw, revise, add to, and expand upon her objections and call witnesses and experts in support thereof.

Dated: December 15, 2009

Respectfully submitted
Patricia Weatherly,

By: /s/ **Richard F. Landrigan**
Richard F. Landrigan (BBO# 284960)
COSTELLO & LANDRIGAN
421 Highland Avenue
Somerville, MA 02144
Telephone: 617-625-4322
Facsimile: 617-625-5911

## CERTIFICATE OF SERVICE

I, Richard F. Landrigan, certify that a true copy of the foregoing document was served upon the attorney of record for each other party through the Court's electronic filing service on December 15, 2009.

/s/ **Richard F. Landrigan**
Richard F. Landrigan