# EXHIBIT D

705

```
 1              UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF MASSACHUSETTS

 3    - - - - - - - - - - - - - - -x

 4    IN RE:  PHARMACEUTICAL          :   MDL NO. 1456

 5    INDUSTRY AVERAGE WHOLESALE      :   CIVIL ACTION

 6    PRICE LITIGATION                :   01-CV-12257-PBS

 7    - - - - - - - - - - - - - - -x

 8    THIS DOCUMENT RELATES TO:       :

 9    U.S. ex rel. Ven-a-Care of      :   Hon.  Patti B. Saris

10    the Florida Keys, Inc.          :

11         v.                         :

12    Dey, Inc., et al.               :

13    No. 05-11084-PBS                :

14    - - - - - - - - - - - - - - -x

15

16         (CROSS NOTICED CAPTIONS ON FOLLOWING PAGES)

17

18         CONTINUED DEPOSITION OF T. MARK JONES

19                   Washington, D.C.

20                Monday, December 8, 2008

21                      VOLUME III

22
```

800

1  acquisition costs, is it your contention that
2  this was new information being provided to the
3  OIG?
4        MR. BREEN:  Objection.  Form.
5        THE WITNESS:  Well, when we first
6  contacted the OIG, it was back in the earlier
7  '90s, and it was with Miss Penniston and Kitty
8  Ahern.  And I think she was out of the D.C. or
9  Baltimore office.  I can't be for sure.
10       But most of what our conversations were
11 about, were about TPN, you know, the price
12 discrepancies in IDPN and TPN.  And subsequently,
13 the difference between acquisition cost and the
14 reimbursement amounts in the marketplace.
15       So it started out with them and then it
16 made its transition into Rob Vitto.  And I think
17 we started discussing this issue with Rob Vitto
18 back, I want to say as early as late '95.  And a
19 lot of -- we spent a lot of time with Rob in the
20 early 1996 period, giving him information on the
21 Albuterol drugs or the inhalants, because he was
22 developing a report for the inhalant drugs.

801

1  BY MR. KATZ:
2      Q.   I'm not sure that you answered my
3  question, so let me ask it a different way.
4      A.   Okay.
5      Q.   When you first started -- when Ven-A-
6  Care first started communicating with the OIG,
7  the concept that AWP exceeded the actual
8  acquisition cost of pharmacies, is it Ven-A-
9  Care's contention that that was new information
10 being provided to the OIG?
11         MR. BREEN:  Objection.  Form.
12         THE WITNESS:  What Ven-A-Care provided
13 to the OIG was something the OIG hadn't seen
14 before.  The OIG didn't realize that -- I mean, I
15 looked at some reports that they did, and we
16 discussed it with them.  They did differences
17 between WAC and AWP, acquisition cost, you know,
18 the difference between the WAC and the AWP being
19 the difference between acquisition cost.
20         I don't know that the OIG -- I didn't
21 feel like the OIG knew that there were 300
22 percent differences, thousand percent

802

1  differences.  That was all new information to the
2  OIG, in my mind, and in Ven-A-Care's mind.
3  BY MR. KATZ:
4      Q.   Okay.  So it's Ven-A-Care's contention
5  that the new information being provided with
6  respect to the comparison between AWP and actual
7  acquisition costs were these very large spreads,
8  in the hundreds and maybe thousands of percents?
9          MR. BREEN:  Objection.  Form.
10         THE WITNESS:  I don't want to get
11 nailed down to the large spreads, because a 50
12 percent spread on a big drug can be as
13 significant as a thousand percent on a small
14 drug.  The way we approached it, we had had
15 experience with Immune Care, and the Immune Care
16 venture was about splitting the fees on the
17 profits from drugs.
18         So we had been looking at drugs with
19 spreads that allowed pharmacies and physicians to
20 split fees with.  So that -- that was our
21 approach to the OIG.  So when we came in, what we
22 came in with was, here are spreads on drugs,

1    here's pharmaceutical companies using those
2    spreads to market it, to secure market share, to
3    get physicians to prescribe it. And we were a
4    prime example of having suffered that problem in
5    the marketplace.
6    BY MR. KATZ:
7        Q.    Okay. But sticking with the large
8    spreads, would that be something that was
9    communicated by Ven-A-Care to the federal
10   government with respect to Dey's drugs starting
11   in 1995?
12       A.    We communicated -- we gave them the
13   pricing that we had for Dey Labs inhalant drugs
14   in 1995. Yes.
15       Q.    Did Ven-A-Care tell anyone from the
16   federal government, and you can specify who, that
17   there were spreads in excess of 100 percent for
18   Dey's drugs starting in 1995?
19           MR. BREEN:  Objection. Form.
20           THE WITNESS:  I don't exactly recall
21   the spreads for Dey's drugs in 1995. I'd have to
22   look at it to testify accurately. I'm sure Ven-

804

1   A-Care told the OIG especially, and probably Mark
2   Lavine at the U.S. Attorney's Office, that Dey
3   had spreads on drugs.  Whether they were 100
4   percent or 300 percent, I don't recall.
5   BY MR. KATZ:
6       Q.   So whatever the spreads were at the
7   time, that's what Ven-A-Care would have told to
8   the OIG and the DOJ, is that right?
9            MR. BREEN:  Objection.  Form.
10           THE WITNESS:  Whatever spreads that
11  were available to Ven-A-Care would have been --
12  we gave them our pricing.  We gave them copies of
13  it.
14  BY MR. KATZ:
15      Q.   Okay.  We'll look at some more
16  documents.
17      A.   Okay.
18      Q.   I mean, we'll look at documents.
19      A.   I don't exactly recall what the spreads
20  were.
21      Q.   Now, Ven-A-Care also, just sticking
22  with the federal government for now, Ven-A-Care