# Exhibit 14

*State of California ex. rel. Ven-A-Care of the Florida Keys, Inc. v.*
*Abbott Laboratories, Inc., et al.*

Exhibit to the Declaration of Rita Hanscom in Support of
Plaintiffs' Opposition to Dey, Inc. and Dey, L.P.'s Motion for Partial Summary Judgment

CA Dept of Health Care Services (J. Kevin Gorospe, PharmD)-Vol II                             May 6, 2009

Sacramento, CA

Page 304

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-------------------------------X

IN RE PHARMACEUTICAL INDUSTRY    )

AVERAGE WHOLESALE PRICE          )   MDL No. 1456

LITIGATION                       )

-------------------------------X

THIS DOCUMENT RELATES TO         )   Civil Action:

State of California, ex rel.    )   01-12258-PBS

Ven-A-Care v. Abbott             )

Laboratories, Inc., et al.       )

-------------------------------X

--oOo--

WEDNESDAY, MAY 6, 2009

--oOo--

VIDEOTAPED DEPOSITION OF

THE CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES

by J. KEVIN GOROSPE, Pharm.D.

VOLUME II

--oOo--

Reported By:  CAROL NYGARD DROBNY, CSR No. 4018

Registered Merit Reporter

Page 325

1   time; correct?"

2          "Answer:  That's correct."

3          "Question:  And is it your understanding
4   based on your experience at Medi-Cal that if a
5   draft report by the Auditor General was sent to a
6   particular department such as DHS, that people in
7   DHS would read it and learn the information
8   contained in it?

9          "MR. PAUL:  Objection, form.  No
10  foundation."

11         "MR. GOBANA:  Same objections."

12         "THE WITNESS:" which is you, "That is
13  correct."

14         Okay.  And that's page 212, lines 16,
15  through page 214, line 5.

16         If I asked you those same exact
17  questions today, would your answers be the same?

18         MR. GLASER:  I'm going to object as to
19  form, the same as Mr. Paul did during that
20  deposition.

21         MR. ROBBEN:  (Nodding head)

22         THE WITNESS:  The answers relative to

CA Dept of Health Care Services (J. Kevin Gorospe, PharmD)-Vol II                                May 6, 2009
Sacramento, CA

Page 326

1    what the paragraph says would be the same,
2    however, in context, if you read the rest of the
3    report, as I just briefly scanned it, since I
4    hadn't read this full report previously, as
5    discussed in -- in some of the apparent
6    conclusions of the report that, you know, it
7    referenced that, for example, the Veterans Affair
8    and hospitals are actually purchasing drugs,
9    whereas the Department of Health Services
10   reimburse providers, so it's a different health
11   care delivery system completely.
12            How HMOs at the time were negotiating
13   prices directly is -- you know, relative to what
14   Medi-Cal would do also, and does and has been
15   doing so since this report apparently was
16   published in -- in 1991.
17   BY MR. ROBBEN:
18       Q.   Okay.  But I'm asking a very narrow
19   question, which is, Mr. Cole asked you certain
20   questions, and you gave certain answers in March
21   of 2008, and the only question I'm asking, which I
22   think you can answer "yes" or "no" is, does the

CA Dept of Health Care Services (J. Kevin Gorospe, PharmD)-Vol II                                May 6, 2009
Sacramento, CA

Page 610

1     A.    Uh-huh.

2     Q.    -- they would lose money; is that right?

3     A.    That's correct.

4     Q.    Okay.  And, conversely, do you recall
5  previously testifying in this case that if the
6  reimbursement had hypothetically been set at AWP-
7  56.6 percent --

8     A.    Uh-huh.

9     Q.    -- pharmacies receiving reimbursement
10  for dispensing those drugs represented on the left
11  side of the mean or the left side of the graph
12  would make money?

13     A.    That's correct.

14     Q.    Is that right?
15          And do you remember that testimony?

16     A.    Yes.

17     Q.    Is that your testimony today though?

18     A.    Yes.

19     Q.    Okay.  Now, Dr. Gorospe, do you -- to
20  your knowledge has DHCS ever had a policy of
21  purposefully over-reimbursing Medi-Cal providers
22  for their drug ingredient costs?

Henderson Legal Services, Inc.
202-220-4158                                    www.hendersonlegalservices.com

9b29f823-b020-452b-93fc-c1870c416af7

CA Dept of Health Care Services (J. Kevin Gorospe, PharmD)-Vol II                May 6, 2009
Sacramento, CA

Page 611

1  A. No.
2  Q. And to your knowledge has DHCS ever had
3  a policy of purposefully under-reimbursing Medi-
4  Cal providers for their drug costs?
5  A. No.
6  Q. And do you recall testifying that it's
7  DHCS's policy to reimburse Medi-Cal providers in a
8  fair and consistent manner?
9  A. Yes.
10 Q. And, as far as you know, has that always
11 been the case?
12 A. Yes.
13 Q. And, more particularly, for the purposes
14 of this case, was that the case between the period
15 of January 1st of 1994 and December 31st of 2004?
16 A. Yes.
17 Q. Now, looking at the graph again, does it
18 appear that the AWPs for the drugs sampled in the
19 study closely tracked the average acquisition
20 costs of those drugs?
21         MR. ROBBEN: Object to the form.
22         THE WITNESS: No.

CA Dept of Health Care Services (J. Kevin Gorospe, PharmD)-Vol II                    May 6, 2009
Sacramento, CA

Page 619

1    program?

2            MR. ROBBEN:  Object to the form.

3            THE WITNESS:  That's what this would

4    indicate.

5            MR. GLASER:  Okay.  I think I have no

6    further questions.

7            MR. ROBBEN:  I've just got a few --

8            MR. GLASER:  David, do you have any?

9            MR. ZLOTNICK:  Yeah, I would like to ask

10   just three or four questions.

11           MR. GLASER:  Okay.

12

13                   EXAMINATION

14   BY MR. ZLOTNICK:

15       Q.   Dr. Gorospe, this is David Zlotnick,

16   counsel for Vena-A-Care of the Florida Keys.

17           Would it be practical for the Department

18   to monitor actual acquisition prices and establish

19   different reimbursement amounts for each of the

20   26,000 drugs that it covers?

21       A.   No, that wouldn't -- it would be

22   exceedingly difficult to do that, because it would

1   be 20 to -- 26,000 national drug codes from over
2   5,000 pharmacies.
3        Q.   Why does the Department use Average
4   Wholesale Prices as a reimbursement benchmark
5   rather than actual acquisition costs?
6        A.   Because it is the -- currently the only
7   price that's readily available to the Department
8   outside of Wholesaler Acquisition Costs.
9        Q.   Now, would it be correct to summarize
10  the dialogue between yourselves and Mr. Glaser
11  regarding Exhibit 21 as demonstrating that there's
12  a substantial degree of variability in the
13  relationship between AWP and actual acquisition
14  costs with respect to the multi-source drugs
15  depicted on that chart?
16           MR. ROBBEN:  Object to the form.
17           THE WITNESS:  Yes.
18  BY MR. ZLOTNICK:
19       Q.   Does that variability create any
20  difficulties for the program in establishing an
21  equitable reimbursement rate?
22       A.   Yes.  There -- whenever you have wide