# Exhibit 16

*State of California ex. rel. Ven-A-Care of the Florida Keys, Inc. v.*
*Abbott Laboratories, Inc., et al.*

Exhibit to the Declaration of Rita Hanscom in Support of
Plaintiffs' Opposition to Dey, Inc. and Dey, L.P.'s Motion for Partial Summary Judgment

```
NO. GV002327
THE STATE OF TEXAS          ) IN THE DISTRICT COURT
EX REL.                     )
    VEN-A-CARE OF THE       )
    FLORIDA KEYS, INC.,     )
        PLAINTIFF(S),       )
                            )
VS.                         ) TRAVIS COUNTY, TEXAS
                            )
DEY, INC.; ROXANE           )
LABORATORIES, INC., WARRICK )
PHARMACEUTICALS CORPORATION,)
SCHERING-PLOUGH CORPORATION,)
AND SCHERING CORPORATION,   )
        DEFENDANT(S).       ) 53RD JUDICIAL DISTRICT
```

*******************************************

ORAL AND VIDEOTAPED DEPOSITION OF

CHARLES A. RICE

NOVEMBER 7TH, 2002

VOLUME 2

*******************************************

ORAL AND VIDEOTAPED DEPOSITION OF CHARLES A. RICE, PRODUCED AS A WITNESS AT THE INSTANCE OF THE PLAINTIFF(S), AND DULY SWORN, WAS TAKEN IN THE ABOVE-STYLED AND NUMBERED CAUSE ON NOVEMBER 7TH, 2002, FROM 9:12 A.M. TO 5:34 P.M., BEFORE CYNTHIA VOHLKEN, CSR IN AND FOR THE STATE OF TEXAS, REPORTED BY MACHINE SHORTHAND, AT THE OFFICES OF COUDERT BROTHERS, 600 BEACH STREET, SAN FRANCISCO, CALIFORNIA PURSUANT TO THE TEXAS RULES OF CIVIL PROCEDURE.

1  WOULD HAVE BEEN EARLY ON IN THE START OF THAT
2  BUSINESS.  BUT IN TERMS OF OUR OTHER -- OTHER PRODUCTS
3  MARKETED BY DEY, AGAIN, I'D HAVE TO CONSULT THE
4  RECORDS TO SEE WHAT THE HISTORY WAS BECAUSE I -- I
5  DON'T HAVE ANY RECOLLECTION OF THAT.
6  Q.   THE OCCASION THAT YOU'RE REFERRING TO
7  INVOLVING E PHARMA (SIC), WAS THAT AN OCCASION WHERE
8  THERE WAS A REDUCTION OF THE AWP BECAUSE OF
9  COMPETITIVE FORCES?
10 A.   NO.  AND IT'S EM PHARMA THAT I MENTIONED AND
11 IT WAS AN INCREASE TO THE AWP DUE TO MARKET FORCES.
12 Q.   OKAY.  SO WOULD I BE CORRECT IN SAYING THAT
13 YOU CAN RECALL NO OCCASION WHEN THERE WAS A CHANGE
14 DOWNWARD OF THE AWP FROM THE TIME YOU FIRST BECAME CEO
15 UP UNTIL THE PRESENT DAY?
16 A.   I'M NOT AWARE OF ONE.  AGAIN, I'M NOT CLOSE
17 TO THAT INFORMATION.  SO THERE MAY HAVE BEEN, BUT I'M
18 NOT AWARE OF IT.
19 Q.   ON THE OCCASION WHEN YOU -- WHEN YOU RAISED
20 THE AM -- AWP FOR EM PHARMA, WAS THAT BECAUSE MARKET
21 FORCES REQUIRED YOU TO INCREASE YOUR SELLING PRICE?
22 A.   NO.
23 Q.   DID THAT HAVE THE EFFECT OF RAISING THE
24 SPREAD TO THOSE CUSTOMERS WHO BOUGHT THE DRUG?
25 A.   IT HAD THE EFFECT OF NORMALIZING THE SPREAD

1  TO THOSE CUSTOMERS WHO WOULD NOT BUY THE DRUG UNDER
2  THE PREVIOUSLY PUBLISHED AWPS.
3  Q.   YOU USED THE TERM "NORMALIZING THE SPREAD."
4  PLEASE TELL ME WHAT YOU MEANT BY THAT TERM
5  "NORMALIZING."
6  A.   MAKING -- MAKING THE PROFIT MARGIN ON OUR
7  PRODUCTS COMPETITIVE WITH THE COMPETITORS IN THE
8  MARKETPLACE.
9  Q.   WAS THAT --
10 A.   ONE OF OUR PRODUCT MANAGERS ERRONEOUSLY
11 PUBLISHED AN AWP THAT WAS COMPLETELY OUT OF LINE WITH
12 THE COMPETITIVE MARKETPLACE AND UNFORTUNATELY WE
13 DIDN'T CATCH IT UNTIL CUSTOMERS CALLED AND SAID, "NOT
14 ONLY AM I NOT GOING TO BUY YOUR PRODUCT, THE
15 WHOLESALERS AREN'T GOING TO BUY IT EITHER."  SO WE HAD
16 TWO CHOICES.  WE COULD CLOSE THE PRODUCT LINE OR
17 INCREASE OUR AWP.
18 Q.   WAS MERCK ADVISED OF THAT?
19 A.   MERCK WAS ADVISED OF THAT.
20 Q.   AND WHY DID YOU ADVISE MERCK ON THAT
21 OCCASION?
22 A.   JUST IN THE NORMAL COURSE OF LETTING THEM
23 KNOW WHAT WAS HAPPENING WITH THE BUSINESS.
24 Q.   WAS IT YOUR CUSTOM AND PRACTICE AT THAT TIME
25 TO ADVISE MERCK REGARDING DEY'S AWP OR WAC PRICES?