# Exhibit 21

*State of California ex. rel. Ven-A-Care of the Florida Keys, Inc. v.*
*Abbott Laboratories, Inc., et al.*

Exhibit to the Declaration of Rita Hanscom in Support of
Plaintiffs' Opposition to Dey, Inc. and Dey, L.P.'s Motion for Partial Summary Judgment

CA Dept of Health Care Services (Stanley L Rosenstein)                                November 6, 2008
Sacramento, CA

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--oOo--

STATE OF CALIFORNIA, ex rel

VEN-A-CARE OF THE FLORIDA KEYS, INC.,

A Florida Corporation,

       Plaintiffs,

    vs.               MDL No. 1456

                   Master File No.

                   01-12257-PBS

ABBOTT LABORATORIES, INC.,   Civil Action No.

Et al.,               03-11226-PBS

       Defendants.

_____/

--oOo--

THURSDAY, NOVEMBER 6, 2008

--oOo--

VIDEOTAPE DEPOSITION OF THE CALIFORNIA DEPARTMENT

OF HEALTH CARE SERVICES BY STANLEY L. ROSENSTEIN

--oOo--

Reported By:  PATRICIA MCCARTHY, CSR No. 12888

          Registered Professional Reporter

Henderson Legal Services, Inc.
202-220-4158                                                  www.hendersonlegalservices.com

34173f81-e12f-4a58-81cc-406caeb7ab66

Page 303

1   happen, but none of the drug manufacturers have
2   come to me and made that disclosure.
3       Q.   I think you were showed earlier in the
4   day an exhibit.  I think it was Exhibit 5, a 1996
5   report by the OIG concerning its examination of
6   the discrepancy between AWPs and acquisition
7   costs for generic and branded drugs.
8            Do you recall that?
9       A.   Yes.
10      Q.   To your knowledge, did any manufacturer
11  come to the Medi-Cal program after the OIG issued
12  that report to offer help in reforming its
13  reporting of AWPs?
14      A.   No.
15      Q.   Did any manufacturer come to the
16  program expressing any concern about the
17  implications of that report to your knowledge?
18      A.   Not to my knowledge, and never to me.
19      Q.   If manufacturers AWPs had been reported
20  by the manufacturers owning those AWPs as actual
21  and accurate measures of their -- of the average
22  wholesale prices of those drugs, would that have

34173f81-e12f-4a58-81cc-406caeb7ab66

1   affected Medi-Cal's efforts to contain its drug
2   reimbursement costs?
3           MR. BUEKER:  Objection as to form.
4           THE WITNESS:  Yes.  We have been
5   spending -- we spent all day talking about the
6   effort we've had to get accurate pricing.  Had we
7   started with accurate pricing, we wouldn't have
8   had to go through all of these changes, and we
9   would have had an accurate reimbursement system
10  in the Medi-Cal program.  That would have saved
11  the taxpayers hundreds of millions of dollars.
12  BY MR. PAUL:
13      Q.   If manufacturers had reported their
14  AWPs truthfully to the state, and by truthfully,
15  I mean, as an accurate measure of actual average
16  wholesale prices, would that have negated the
17  need for a MAC program?
18          MR. BUEKER:  Objection as to form.
19          THE WITNESS:  Yes.  We would pay, have
20  the ability to pay pharmacies accurately.  We
21  wouldn't have to come up with a secondary method
22  to get to honest data.

CA Dept of Health Care Services (Stanley L Rosenstein)                November 6, 2008
Sacramento, CA

Page 308

1   BY MR. PAUL:

2       Q.   So to your knowledge, no drug
3   manufacturer, and in particular, no generic drug
4   manufacturer made any effort to come to the
5   California Legislature and explain that actual
6   provider cost are value A and our AWPs are value
7   B, and here is the difference between them?

8       A.   I am not aware of it.  Generally, we
9   hear a lot of activity from the legislative
10  staff, have contacts.  I am not aware of anybody
11  ever having that contact.

12      Q.   Did you ever hear of any staffer or
13  legislator in either the Senate or the Assembly
14  state an acceptance of inflated AWPs or
15  acceptance of reimbursement from the Medi-Cal
16  program of pharmacy drugs based on inflated or
17  untruthful AWPs?

18           MR. BUEKER:  Objection as to form.
19           MR. CYR:  Objection.
20           THE WITNESS:  No, I do not.  In fact, I
21  have heard it quite the opposite of strong
22  objection to the government getting false

Page 309

1  information.

2  BY MR. PAUL:

3      Q.   In your years as chief deputy director
4  for the Medi-Cal program and your 13 years as
5  deputy director or chief deputy director and your
6  30-some years experience with the Medi-Cal
7  program in general, do you believe that drug
8  manufacturers have an obligation to be truthful
9  in all due respects when they report any kind of
10 information to the Medi-Cal program on which the
11 program relies for reimbursement?

12          MR. BUEKER:  Objection as to form and
13 beyond the scope.

14          THE WITNESS:  Very much so.  You know,
15 it is an underlying law and assumption that
16 people, when they interact with the government,
17 are going to tell the truth and provide accurate
18 information.  The entire Medi-Cal program relies
19 upon the honesty of people who participate in
20 that program.

21 BY MR. PAUL:

22      Q.   Has any representative of any generic

1              MR. BUEKER:  Objection as to form.
2     Beyond the scope.
3              THE WITNESS:  I believe each study was
4     in the neighborhood of 200- to $250,000.
5     BY MR. PAUL:
6         Q.   And those monies came from public fund,
7     from the Medi-Cal program?
8         A.   They came from the state and federal
9     government.
10        Q.   Just to be clear, I want to confirm
11    with you whether or not, has it ever been the
12    policy of the Medi-Cal program to deliberately
13    accept inflated and inaccurate AWPs simply
14    because the program knew it would offset them by
15    shorting or minimizing the amount of the filling
16    fee for pharmacists?
17             MR. BUEKER:  Objection as to form.
18             MR. CYR:  Objection.
19             THE WITNESS:  No.  It has always been
20    our policy to have accurate information and to
21    use that information to establish what the
22    accurate price should be, should be on both ends

Page 314

1    of the equation.  We do believe they need to be
2    both looked at, but they have got to come from
3    accurate data sources.
4         BY MR. PAUL:
5              Q.   And are you aware, based on your
6    experience, that actually under federal law, it
7    is unlawful to offset ingredient cost payments
8    with a filling fee?
9                   MR. BUEKER:  Objection as to form and
10   lack of foundation.  Calls for a legal
11   conclusion.
12                  MR. CYR:  Objection.
13                  THE WITNESS:  No, I am not aware of
14   that provision.
15        BY MR. PAUL:
16             Q.   Based on your 13 years as deputy
17   director and chief deputy director and your 30
18   years in the program, can you state whether it
19   was or was not ever the policy of the Medi-Cal
20   program to deliberately accept the reporting by
21   drug manufacturers of inflated AWPs simply
22   because the program knew it would offset that

1    with the receipt of rebates?
2              MR. BUEKER:  Objection as to form.
3              THE WITNESS:  It was never the policy
4    of the department to ever accept false
5    information.  And we always looked at the
6    transaction, financial transaction, between the
7    department and the pharmacists as a totally
8    severable and different transaction between us
9    and the drug manufacturer.
10             MR. PAUL:  That's all I have.  Thanks.
11             MR. BUEKER:  I have some further
12   questions.
13                  (Break Taken)
14             VIDEOGRAPHER:  We are now going back on
15   the record.  The time is approximately 6:25.
16
17                  FURTHER EXAMINATION
18   BY MR. BUEKER:
19       Q.   Mr. Rosenstein, during Mr. Paul's
20   examination, he showed you Exhibit 38, do you
21   still have that in front of you?
22       A.   Yes.