# Exhibit 1

*State of California ex. rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc., et al.*

Exhibit to the Declaration of Matthew C. Kilman in Support of Plaintiffs' Opposition to Mylan's Motion for Partial Summary Judgment

SECURITIES AND EXCHANGE COMMISSION
Washington, DC 20549

FORM 10-K Annual Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 For the Fiscal Year Ended March 31, 2001 Commission File No. 1-9114

MYLAN LABORATORIES INC. (Exact name of registrant as specified in its charter)

Pennsylvania                                25-1211621
(State of Incorporation)           (IRS Employer Identification No.)

1030 Century Building
130 Seventh Street
Pittsburgh, Pennsylvania 15222 (412) 232-0100

(Address, including zip code, and telephone number,
including area code, of principal executive offices)
Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class: | Name of Each Exchange on Which Registered: |
|---|---|
| Common Stock, par value $.50 per share | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by checkmark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes...X....    No.......

Indicate by checkmark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

The aggregate market value of voting stock held by non-affiliates of the registrant as of June 20, 2001, was $3,411,923,773 (computed by reference to the closing price of such stock).

The number of shares of Common Stock of the registrant outstanding as of June 20, 2001, was 130,854,713.

DOCUMENTS INCORPORATED BY REFERENCE

Incorporated by reference into this Report is the Proxy Statement for the 2001 Annual Meeting of Shareholders, Part III, Items 10-13.

1

<PAGE>

MYLAN LABORATORIES INC.

INDEX TO FORM 10-K
For the Fiscal Year Ended March 31, 2001

PART I

| | | Page |
|---|---|---|
| Item 1. | Business | 3 |
| | Overview of Our Business | 3 |
| | Generic Segment | 4 |
| | Brand Segment | 5 |
| | Joint Venture | 7 |
| | Product Development | 7 |
| | Generic Product Development | 9 |
| | Brand Product Development | 10 |
| | Patents, Trademarks and Licenses | 13 |
| | Customers and Marketing | 13 |
| | Competition | 13 |
| | Product Liability | 16 |
| | Raw Materials | 16 |
| | Government Regulation | 17 |
| | Seasonality | 18 |
| | Environment | 18 |
| | Employees | 18 |
| | Backlog | 18 |
| Item 2. | Properties | 19 |
| Item 3. | Legal Proceedings | 20 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 23 |

PART II

Item 5.  Market for Registrant's Common Equity and Related Stockholder
         Matters ---------------------------------------------------- 23
Item 6.  Selected Financial Data ------------------------------------ 24
Item 7.  Management's Discussion and Analysis of
         Financial Condition and Results of Operations -------------- 25
Item 7A. Quantitative and Qualitative Disclosures About Market Risk - 35
Item 8.  Financial Statements and Supplementary Data ---------------- 36
Item 9.  Changes in and Disagreements with Accountants on Accounting
         and Financial Disclosure ----------------------------------- 61

                                PART III

Item 10. Directors and Executive Officers of the Registrant --------- 61
Item 11. Executive Compensation ------------------------------------- 61
Item 12. Security Ownership of Certain Beneficial Owners and Management 61
Item 13. Certain Relationships and Related Transactions ------------- 61

                                PART IV

Item 14. Exhibits, Financial Statement Schedules, and Reports on Form 8-K  61


Signatures ---------------------------------------------------------- 64

                                     2
<PAGE>

                                   PART I

Item 1. Business

     Mylan Laboratories Inc. is engaged in developing, licensing, manufacturing, marketing and distributing generic and brand pharmaceutical products. We were incorporated in Pennsylvania in 1970. References herein to fiscal 2001, 2000 and 1999 shall mean the fiscal years ended March 31, 2001, 2000 and 1999, respectively.


Overview of Our Business

     We conduct business through our generic (Generic Segment) and brand (Brand Segment) pharmaceutical operating segments. For fiscal 2001, the Generic Segment represented approximately 83% of net revenues and the Brand Segment represented approximately 17% of net revenues. The Generic Segment represented 85% and 88% of net revenues in fiscal 2000 and 1999, respectively, while the Brand Segment reported 15% and 12% of net revenues for those fiscal years. The financial information for our operating segments required by this Item is provided in Note 16 in the Notes to Consolidated Financial Statements under Part II, Item 8, of this Report.

     Pharmaceutical products in the United States are generally marketed as either brand or generic drugs. Brand products are marketed under brand names and through programs that are designed to generate physician and consumer loyalty. Brand products generally are patent protected or benefit from other non-patent market exclusivities that exist at the time of their market introduction. This market exclusivity generally provides brand products with the ability to maintain their profitability for relatively long periods of time. Brand products generally continue to have a significant role in the market after the end of patent protection or market exclusivities due to physician and customer loyalties.

     Generic pharmaceutical products are the chemical and therapeutic equivalent of a reference brand drug. The Drug Price Competition and Patent Term Restoration Act of 1984 (Waxman-Hatch Act) provides that generic drugs may enter the market after (1) U.S. Food and Drug Administration (FDA) approval of an Abbreviated New Drug Application (ANDA) and (2) the expiration, invalidation or circumvention of any patents on the corresponding brand drug and the end of any other market exclusivity periods related to the brand drug. Generic drugs are bioequivalent to their brand name counterparts. Accordingly, generics provide a safe, effective and cost efficient alternative to users of these brand products. Growth in the generic pharmaceutical industry has been driven by the increased acceptance of generic drugs as bioequivalent substitutes for brand name products, as well as the number of brand drugs for which patent terms and/or FDA market exclusivities have expired.

                                     3
<PAGE>

Generic Segment

     We are recognized as a leader in the generic pharmaceutical industry. Our Generic Segment consists of two principal business units, Mylan Pharmaceuticals Inc.(Mylan Pharm) and UDL Laboratories Inc.(UDL), both wholly owned

subsidiaries. Mylan Pharm is our primary generic pharmaceutical development, manufacturing, marketing and distribution arm. Mylan Pharm's net revenues are derived primarily from solid oral dosage products. We acquired UDL in fiscal 1996. UDL packages and markets generic products, either obtained through Mylan Pharm or purchased through third parties, in unit dose formats for use primarily in hospitals and institutions. Our Generic Segment is augmented by transdermal patch products developed and manufactured by our wholly owned subsidiary, Mylan Technologies, Inc. (Mylan Tech).

We obtain new products primarily through new product development and FDA approval, as well as from licensing or co-development arrangements with other companies. New FDA approved generic products are generally introduced to the marketplace at the expiration of patent protection for the brand product. The FDA may extend the period of brand product marketing exclusivity under certain circumstances, primarily through pediatric exclusivity. New generic product approvals are obtained from the FDA through the ANDA process. The ANDA process requires us to demonstrate bioequivalence to a reference brand product. In addition, we must develop formulations of the reference product that will result in demonstrating bioequivalence under a variety of clinical conditions. Even with the uncertainties related to formulation development, the ANDA process often results in the FDA granting a number of ANDA approvals for a given product by the time of brand product patent and pediatric exclusivity expiration. Consequently, we often face a number of competitors when a new generic product enters the market. Additional ANDA approvals often continue to be granted for a given product subsequent to the initial launch of the generic product. These circumstances generally result in significantly lower prices for generic products and lower margins compared to brand products. New generic market entrants generally result in continued price and margin erosion over the generic product life cycle. Our continued success is dependent upon our ability to successfully develop or acquire and profitably market new generic pharmaceuticals.

The Waxman-Hatch Act provides for a period of 180 days of generic marketing exclusivity for those ANDA applicants that are first to file an ANDA containing a certification of invalidity, non-infringement or unenforceability with respect to the listed patent(s), referred to as Paragraph IV certifications. This period of generic market exclusivity generally yields a higher market share, net revenues and gross margin until the entry of other competitors at the conclusion of the 180 days. Generic manufacturers may also enjoy longer periods of relatively high, stable margins through the introduction of difficult to develop generic pharmaceuticals. Significant market opportunities also result in the event that we are able to demonstrate that a brand pharmaceutical product's limiting patent(s) is invalid.

4

<PAGE>

We manufacture and market approximately 115 generic pharmaceuticals in capsule or tablet forms in an aggregate of approximately 261 dosage strengths. We also manufacture and distribute two transdermal patch generic pharmaceutical products in six dosage strengths. In addition, we are marketing 72 generic products in 128 dosage strengths under supply and distribution agreements with other pharmaceutical companies. We have been successful in developing a number of extended release products with approximately eight extended release products in 15 dosage strengths in our portfolio. In fiscal 2001, we held the first or second market position on 90 out of the 129 generic pharmaceutical products we marketed, excluding unit-dose.

Our most significant generic product in terms of net revenues in fiscal 2001 was nifedipine ER (Procardia XL(R)), for the treatment of hypertension and angina, with net revenues of $151.3 million. We obtained this product through an agreement with Pfizer, Inc. As a result, our gross margins on this product are relatively lower than our overall Generic Segment gross margins. Net revenues and gross margins on this product are expected to decrease in fiscal 2002. Our anti-anxiety drug group represented $27.8 million, $106.8 million and $153.8 million in net revenues in fiscal 2001, 2000 and 1999, respectively.

We sold certain ANDAs related to our UDL liquid unit dose business in fiscal 2001 for $12.8 million. The sale of these ANDAs will not significantly impact future profitability.

We have attained a leadership position in the generic industry through our ability to obtain ANDA approvals, our uncompromising quality control and our devotion to customer service. We have bolstered our traditional solid oral dose products with unit dose, transdermal and extended release products. We have entered into strategic alliances with several pharmaceutical companies through product development, distribution and licensing agreements that provide us with additional products to broaden our product line.

We expect that our future growth will come from our ability to expand substitution rates for existing products. We intend to emphasize the development or acquisition of new products that may attain FDA first to file status; that are difficult to formulate; that involve overcoming regulatory adversities; and that have difficult to source active pharmaceutical ingredients. In addition, we plan on pursuing complementary, accretive or strategic acquisitions.