# Exhibit 1

*State of California ex. rel. Ven-A-Care of the Florida Keys, Inc. v.*
*Abbott Laboratories, Inc., et al.*

Exhibit to the Declaration of Steven U. Ross in Support of
Plaintiffs' Opposition to Sandoz, Inc.'s Motion for Summary Judgment

Hillblom, Douglas B.                               September 23, 2008
                         Sacramento, CA

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY

AVERAGE WHOLESALE PRICE

LITIGATION

_____/

THIS DOCUMENT RELATES TO        MDL No. 1456

State of California, ex rel.    Civil Action:

Ven-A-Care v. Abbott            01-12258-PBS

Laboratories, Inc., et al.

_____/


--oOo--

TUESDAY, SEPTEMBER 23, 2008

--oOo--

VIDEOTAPED DEPOSITION OF

DOUGLAS B. HILLBLOM

--oOo--


Reported By:   CAROL NYGARD DROBNY, CSR No. 4018

               Registered Merit Reporter

1  Q.  As somebody working in the Pharmacy Unit
2  would you have access to URA information?
3  A.  Only in the process of negotiating the
4  contract.
5  Q.  You wouldn't have had access to URA
6  information in the context of making policy
7  determinations about reimbursement rates?
8  A.  That was not a common amount that we
9  utilize or information data source.
10 Q.  Okay.  Leaving aside whether it was
11 common, do you ever recall using URAs or
12 calculating AMPs as a check or as a part of the
13 consideration or data source that you would have
14 used in connection with making reimbursement rate
15 policy decisions?
16      MR. PAUL:  Objection to form.
17      THE WITNESS:  I would not have used it in
18 making reimbursement policy decisions or --
19 recommendations.
20 BY MR. BUEKER:
21 Q.  At all?
22 A.  Not at that time.

Page 266

1       Q.   At any time?

2       A.   I can't think of a time that we utilized

3  the URA as a basis of a reimbursement discussion.

4       Q.   How about AMP?

5       A.   No, not as the basis of a reimbursement

6  discussion.

7       Q.   Do you -- did you discuss it in

8  connection with setting reimbursement rates at all?

9       A.   I had it suggested to me by a

10  multi-source manufacturer at one point in time.

11           The difficulty is that -- that were

12  required the legislative change.

13      Q.   Do you recall which multi-source

14  manufacturer suggested it to you?

15      A.   I believe it was Barr.

16      Q.   And what did they suggest do you?

17           What did Barr suggest to you?

18      A.   Use AMP as the basis of pharmacy

19  reimbursement.

20      Q.   You said it would have required a

21  legislative change.

22           Did you do anything with the suggestion?

Hillblom, Douglas B.                                September 23, 2008
                         Sacramento, CA

Page 351

1     Q.   Okay.  Mr. Bueker asked you some
2  questions about AMPs, and he used the term "URAs,"
3  which I think stands for Unit Rebate Amount.
4          Do you recall that testimony?
5     A.   Yes.
6     Q.   How many URAs come to California?
7     A.   They're supplied by what was previously
8  HCVA now CMS in a rebate tape.
9     Q.   And they're used to -- as Mr. Bueker, I
10 think discussed with you, compute rebate amounts by
11 multiplying the URA by utilization numbers?
12    A.   The invoice -- rebate invoice amount.
13    Q.   And the invoice is submitted to the
14 manufacturer?
15    A.   Correct.
16    Q.   To your knowledge were URAs ever
17 subsequently changed after first received by
18 California?
19    A.   Yes.
20    Q.   And what causes them to be changed?
21    A.   A change --
22         MR. BUEKER:  Objection.  Lack of

Hillblom, Douglas B.                               September 23, 2008
                          Sacramento, CA

Page 352

1    foundation.
2    BY MR. PAUL:
3        Q.   To your knowledge what causes them to be
4    changed?
5        A.   A change in the average manufacturer's
6    price, a change in best price.
7        Q.   In other words, when the manufacturer
8    restates its average manufacturer price or its best
9    price?
10       A.   Correct.
11       Q.   And to your knowledge was it uncommon
12   for URAs to be -- to be changed?
13            MR. BUEKER:  Objection as to form.
14   BY MR. PAUL:
15       Q.   By "changed" I mean changed subsequently
16   to having been originally received from HCVA or
17   CMS.
18            MR. BUEKER:  Same objection.
19            THE WITNESS:  That was not at all
20   uncommon.
21   BY MR. PAUL:
22       Q.   And, therefore, would you agree that if

Hillblom, Douglas B.                                September 23, 2008
                       Sacramento, CA

Page 353

1   the State of California was disposed to spend the
2   manpower on calculating using reverse engineering
3   AMPs, it would be a fruitless exercise because of
4   the fact the URAs are undependable?
5            MR. BUEKER:  Objection as to form.
6            MS. BERWANGER:  Objection.
7            MR. ROBBEN:  Objection.
8            THE WITNESS:  Making the assumption that
9   you can reverse engineer the AMP price is dependent
10  upon the information supplied to CMS initially.
11           Manufacturers had the ability to change
12  the data supplied from multiple quarters.
13           So -- if a manufacturer, whether branded
14  or generic, changed their AMP calculation, it could
15  be applied back five quarters.
16  BY MR. PAUL:
17       Q.   During your approximately 11 years at
18  DHS do you believe that you had a -- a good
19  understanding of the statutes and regulations
20  applicable to the Medi-Cal program?
21       A.   Yes.
22       Q.   Given your understanding of those