# Exhibit 5

*State of California ex. rel. Ven-A-Care of the Florida Keys, Inc. v.
Abbott Laboratories, Inc., et al.*

Exhibit to the Declaration of Steven U. Ross in Support of
Plaintiffs' Opposition to Sandoz, Inc.'s Motion for Summary Judgment

Case 1:01-cv-12257-PBS   Document 6788-6   Filed 12/21/09   Page 2 of 10

Gorospe, Pharm. D., J. Kevin - Vol. II                    September 22, 2008
                              Sacramento, CA

Page 394

```
                UNITED STATES DISTRICT COURT

                 DISTRICT OF MASSACHUSETTS

   -----------------------------x

   IN RE PHARMACEUTICAL INDUSTRY)

   AVERAGE WHOLESALE PRICE      )

   LITIGATION                   )

   _____)

   THIS DOCUMENT RELATES TO     ) MDL No. 1456

   State of California, ex rel. ) Civil Action:

   Ven-A-Care v. Abbott         ) 01-12258-PBS

   Laboratories, Inc., et al.   )

   -----------------------------x

                            VOL. II

                           --oOo--

                MONDAY, SEPTEMBER 22, 2008

                           --oOo--

                  VIDEOTAPED DEPOSITION OF

                 J. KEVIN GOROSPE, Pharm.D.

                           --oOo--



   Reported By:  CAROL NYGARD DROBNY, CSR No. 4018

                 Registered Merit Reporter
```

Case 1:01-cv-12257-PBS   Document 6788-6   Filed 12/21/09   Page 3 of 10

Gorospe, Pharm. D., J. Kevin - Vol. II                    September 22, 2008
                              Sacramento, CA

Page 654

1    variety of products including inhalation therapy
2    products.
3         Q.   Do you understand it to be a primarily
4    generics manufacturer?
5         A.   Yes, I guess so.
6         Q.   Have you ever heard of Mylan?
7         A.   Yes.
8         Q.   What's your understanding of what Mylan
9    is?
10        A.   Very similar to Dey.
11        Q.   Okay.  Have you ever had any discussion
12   with a person at Dey?
13        A.   Not that I can recall.
14        Q.   Okay.  Same question for Mylan, have you
15   ever had any discussions with somebody from Mylan?
16        A.   Yes.
17        Q.   Who did you --
18             Well, let me ask you what -- how many
19   discussions have you had?
20        A.   One that I can recall.
21        Q.   Okay.  Do you remember when it was?
22        A.   May of 2007.

Case 1:01-cv-12257-PBS   Document 6788-6   Filed 12/21/09   Page 4 of 10

Gorospe, Pharm. D., J. Kevin - Vol. II                    September 22, 2008
                              Sacramento, CA

Page 655

1    Q.   May of 2007?

2    A.   Yes.

3    Q.   Okay.  Do you remember who you spoke to?

4    A.   No, I do not.

5    Q.   Do you remember what the -- do you

6 remember if it was a man or a woman?

7    A.   I don't recall.

8    Q.   Do you remember what the subject matter

9 of the conversation was?

10   A.   Yes.

11   Q.   What was it?

12   A.   At the time the -- in front of the

13 Legislature -- or the Legislature had on --

14        Excuse me.

15        The Governor had proposed a change in

16 reimbursement related to the pharmacy program to

17 move to AMP based reimbursement both for brand name

18 products and multi-source products by setting MAIC

19 based on AMP.

20   Q.   And do you remember -- did the person

21 from Mylan initiate the call with you or did you

22 call them?

Case 1:01-cv-12257-PBS   Document 6788-6   Filed 12/21/09   Page 5 of 10

Gorospe, Pharm. D., J. Kevin - Vol. II                    September 22, 2008
                         Sacramento, CA

Page 656

1    A.    They initiated the call.
2    Q.    Okay.  Was this a telephone call?
3    A.    Face-to-face meeting.
4    Q.    Face-to-face meeting.
5          Where was it?
6    A.    At the Department of Health Services
7    offices.
8    Q.    So it was here in Sacramento?
9    A.    Yes.
10   Q.    Okay.  Was it a Mylan -- do you know if
11   it was a Mylan employee?
12   A.    Yes.
13   Q.    Okay.  What did they say to you?
14   A.    In general they presented to me a
15   discussion about the use of AMP as reported to CMS
16   as not necessarily being the most appropriate
17   vehicle to reimburse pharmacies at.
18   Q.    Do you remember what -- why they said it
19   wasn't the most appropriate?
20   A.    I can't remember the specific language.
21         It had to do with a document that -- or a
22   -- I don't know if it was a document, but a

Case 1:01-cv-12257-PBS   Document 6788-6   Filed 12/21/09   Page 6 of 10

Gorospe, Pharm. D., J. Kevin - Vol. II                    September 22, 2008
                              Sacramento, CA

Page 657

1   discussion related to the Generic Pharmaceutical
2   Manufacturers Association, I think that's what
3   they're called, that had put some language or some
4   -- a report out that said that AMP as reported to
5   CMS wouldn't be appropriate for use for
6   reimbursement because of a variety of reasons, one
7   of which was confidentiality.
8        Q.   Did they give you a copy of that -- of
9   that report, of that document?
10       A.   Yes, I believe they did.  Yes.
11       Q.   Do you keep -- did you keep it?
12            Do you still have it?
13       A.   Yes.
14       Q.   Okay.  What did you say to the -- to the
15  Mylan person?
16       A.   I thanked them for bringing their
17  technical information forward and that we would
18  pass it along to the Legislature with our analysis
19  of it.
20       Q.   And did you do that?
21       A.   Yes.
22       Q.   How long did the conversation last?

Case 1:01-cv-12257-PBS   Document 6788-6   Filed 12/21/09   Page 7 of 10

Gorospe, Pharm. D., J. Kevin - Vol. II                September 22, 2008
                              Sacramento, CA

Page 671

1   asked you some questions about AMP, and I believe
2   you said in sum or substance that AMP would have
3   been of interest to you in your role with the
4   Medi-Cal agency.
5           I'm paraphrasing, but do you remember
6   that testimony?
7       A.   Yes.
8       Q.   Okay.  Why would it have been of
9   interest to you?
10      A.   Well, I asked clarification.
11           During the time of the nineties or when
12  she said any time, and subsequent, as I previously
13  described, the statutes changed for reimbursement
14  to be based on AMP, and, therefore, I would be
15  interested in those numbers based on that statutory
16  change.
17      Q.   Okay.  Would you have been interested in
18  it prior to that statutory change?
19      A.   Only in the context of rebates.
20      Q.   Okay.  Now, I think you testified that
21  AMP is a number that because of the definition is
22  closer, in fact, significantly closer, to actual

Case 1:01-cv-12257-PBS   Document 6788-6   Filed 12/21/09   Page 8 of 10

Gorospe, Pharm. D., J. Kevin - Vol. II                September 22, 2008
                           Sacramento, CA

Page 693

1   BY MR. PAUL:

2       Q.   For the record I'm Nicholas Paul with

3   the California Department of Justice representing

4   the Medi-Cal program here in California in this

5   case and representing Mr. Gorospe in this

6   deposition.

7            Mr. Gorospe, counsel for Mylan and Dey,

8   Mr. Robben, asked you some questions at the

9   beginning of his time with you regarding a meeting

10  -- a discussion that you had with Mylan, his

11  client, in May 2007, I believe.

12           Do you recall the testimony?

13      A.   Yes.

14      Q.   And you provided responses to his

15  questions?

16      A.   Yes.

17      Q.   And if I recollect correctly, the

18  discussion with the Mylan representative included

19  discussion of AMPs; is that correct?

20      A.   Yes.

21      Q.   And the Mylan representative described

22  AMPs to you as a poor basis for reimbursement

Case 1:01-cv-12257-PBS   Document 6788-6   Filed 12/21/09   Page 9 of 10

Gorospe, Pharm. D., J. Kevin - Vol. II                September 22, 2008
                            Sacramento, CA

Page 694

1  because they were unreliable; is that correct?
2          MR. ROBBEN:  Objection.
3  BY MR. PAUL:
4      Q.   Is that correct?
5      A.   Yes.
6      Q.   Do you recall -- did the Mylan
7  representative explain to you why he or she
8  believed that Mylan's AMP were unreliable?
9      A.   Yes, but I don't recall the content.
10     Q.   So you don't remember the reason for
11 their unreliability?
12     A.   Just -- I don't recall the specifics of
13 the conversation.
14     Q.   And I believe the representative also
15 expressed concern about using AMPs for
16 reimbursement because of the confidentiality of
17 AMP; is that correct?
18     A.   Yes.
19     Q.   Do you recall what the representative
20 stated to you regarding the confidentiality of
21 Mylan AMPs, any details?
22     A.   No, I don't recall the details.

Gorospe, Pharm. D., J. Kevin - Vol. II                     September 22, 2008
                              Sacramento, CA

Page 698

1    Q.   Do you have an understanding of the
2    magnitude -- difference between actual acquisition
3    costs and AWPs for the drugs that are in the
4    California Complaint?
5         MR. BENNETT:  Objection to form.
6         THE WITNESS:  No, I don't.
7    BY MR. PAUL:
8    Q.   At any time in your career at DHCS have
9    you ever received any communication of any sort
10   from Mylan explaining the differences between the
11   AWPs it reports and providers' actual acquisition
12   costs?
13   A.   Not that I can recall.
14   Q.   At any time in your career at DHCS have
15   you ever received any communication of any sort
16   from Sandoz explaining the differences between the
17   actual acquisition costs for its drugs and Sandoz's
18   reported AWPs?
19   A.   Not that I can recall.
20   Q.   I won't restate the question each time,
21   but the same question regarding Dey
22   Pharmaceuticals?