# Exhibit 8

*State of California ex. rel. Ven-A-Care of the Florida Keys, Inc. v.*
*Abbott Laboratories, Inc., et al.*

Exhibit to the Declaration of Steven U. Ross in Support of
Plaintiffs' Opposition to Sandoz, Inc.'s Motion for Summary Judgment

Hartmann, R.Ph., Ronald H. - 30(b)(6)                    May 6, 2009
New York, New York

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

MDL NO. 1456

Master File No. 01-12257-PBS

Subcategory Case No. 06-11337

---------------------------------------x

In re:  PHARMACEUTICAL INDUSTRY

AVERAGE WHOLESALE PRICE LITIGATION

---------------------------------------x

THIS DOCUMENT RELATED TO:

State of California, ex rel. Ven-A-Care v.

Abbott Laboratories Inc. et al.

Case No. 03-cv-11226-PBS

---------------------------------------x

         (Cross Notices Appear on Following Pages)

    VIDEOTAPED TELECONFERENCED 30(B)(6) DEPOSITION OF:

                RONALD H. HARTMANN, R.Ph.

                 Wednesday, May 6, 2009

                  New York, New York


Reported in stenotype by:  RICH GERMOSEN,

                      CCR, CRCR, RPR, CRR, CLR

03dece24-0798-428f-abda-15ed00785a77

Hartmann, R.Ph., Ronald H. - 30(b)(6)                    May 6, 2009
                    New York, New York

Page 330

1      would be.

2            Q.      Right, but if you went to the CMS

3      website, for example, or if you used the National

4      Pharmaceutical Council's publication and you

5      looked up the reimbursement formula used by

6      California, it would show you AWP minus some

7      percent, isn't that correct?

8            A.      That is correct.  That's a formula

9      California would choose to use.

10           Q.      Correct.  Okay.

11                   Do you know when you first became

12     aware of that, that California used an AWP minus

13     some percentage formula?

14           A.      I'm not sure exactly what year,

15     but it almost seems like the majority of states

16     do use an AWP minus formula --

17           Q.      Okay.

18           A.      -- among other tools that they

19     choose to use.

20           Q.      Right.  Okay.

21                   So would it be a fair statement to

22     say that probably for at least the majority of

03dece24-0798-428f-abda-15ed00785a77

Hartmann, R.Ph., Ronald H. - 30(b)(6)                                    May 6, 2009
New York, New York

Page 331

1    that period of time, that is 1994 through 2004,

2    you were aware that California used that AWP

3    minus formula to reimburse pharmacies under its

4    Medicaid system?

5           A.     Among other --

6                  MR. CARBERRY:  Objection as to

7    form.

8           A.     Among other tools they, they, in

9    fact, could have used the AWP minus formula, yes.

10          Q.     Okay.

11                 But I'm just talking about that

12   period of time.

13          A.     Okay.

14          Q.     Your knowledge during that period

15   of time.  Is that an accurate statement, that

16   during that period of time you were aware of what

17   California used to reimburse pharmacies under the

18   Medicaid system?

19          A.     Right.  They used that as one of

20   their tools that I don't believe exclusively they

21   used AWP minus formula.  They used other tools

22   to, for instance, like Federal Upper Limits

03dece24-0798-428f-abda-15ed00785a77

Hartmann, R.Ph., Ronald H. - 30(b)(6)                    May 6, 2009
                     New York, New York

Page 332

1    and --

2              Q.      Okay.

3              A.       -- and federal -- state MACs and

4    usual and customary.

5              Q.      Okay.

6                      Now, isn't it true that most

7    states that used an AWP as at least a basis for

8    reimbursement obtained that AWP price from First

9    DataBank?

10                     MR. CARBERRY:   Objection as to

11   form.

12             A.      It's my understanding that First

13   DataBank was one of the main sources of that

14   information.

15             Q.      Okay.

16                     And, in fact, California or its

17   agents obtained their AWPs or the AWPs that

18   California used for its reimbursement from First

19   DataBank?

20                     MR. CARBERRY:   Objection as to

21   form.

22             Q.      Are you aware of that?

Henderson

Henderson Legal Services, Inc.

202-220-4158

202-220-4158                    www.hendersonlegalservices.com

03dece24-0798-428f-abda-15ed00785a77

03dece24-0798-428f-abda-15ed00785a77

Hartmann, R.Ph., Ronald H. - 30(b)(6)                    May 6, 2009
New York, New York

Page 370

1          Q.     Well, what if an F-U-L was

2     eliminated on a particular Sandoz product,

3     product, do you believe that the sales and

4     marketing department would have been interested

5     in that as well?

6          A.     They very well possibly could have

7     been.

8          Q.     Are you aware, Mr. Hartmann --

9                 Strike that.

10                Let me direct your attention or

11    redirect your attention for a little while to

12    GPhA.

13         A.     Okay.

14         Q.     Okay.

15                I know you've given a substantial

16    amount of testimony about it.  I'm going to try

17    not to repeat any of the questions that

18    Mr. Riklin asked you earlier.

19                I know you testified that GPhA has

20    a Board of Directors which you've never been on,

21    but somebody from Sandoz has always sat on,

22    correct?

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

03dece24-0798-428f-abda-15ed00785a77

Hartmann, R.Ph., Ronald H. - 30(b)(6)                          May 6, 2009
                        New York, New York

Page 371

1           A.      I believe that is correct, yes.

2           Q.      Okay.

3                   Does GPhA have or has it ever had

4      an executive committee?

5           A.      I believe they do, yes.

6           Q.      Is that a part of the Board of

7      Directors?

8           A.      I believe it is.

9           Q.      Okay.

10                  Have you ever been on that

11     committee?

12          A.      No.

13          Q.      Has anyone from Sandoz ever been

14     on that committee?

15          A.      Yes, I believe our CEO

16     traditionally is a member of the, of the

17     executive committee.

18          Q.      Okay.

19                  Has the CEO of Sandoz, whoever

20     that person is or was, been on that executive

21     committee since the inception of GPhA?

22          A.      I don't know for sure.  I assume

03dece24-0798-428f-abda-15ed00785a77

Hartmann, R.Ph., Ronald H. - 30(b)(6)                    May 6, 2009
                    New York, New York

Page 372

1    that may be correct, but I don't know for sure.

2              Q.     Okay.

3              A.     There's been some periods of time

4    where we hadn't had a CEO and that type of thing

5    so perhaps.

6              Q.     Okay.

7                     Now, you're familiar with GPhA's

8    Medicaid task force, correct?

9              A.     Yes.

10             Q.     Okay.

11                    In fact, you were a member of that

12   task force, correct?

13             A.     That is correct.

14             Q.     Okay.

15                    Is the Medicaid task force still

16   in existence?

17             A.     I don't believe it is or if it is

18   we don't meet very often.

19             Q.     Well, okay.  When was the last

20   time you recall the GPhA Medicaid task force

21   meeting?

22             A.     I don't know if we -- we may have

03dece24-0798-428f-abda-15ed00785a77

Hartmann, R.Ph., Ronald H. - 30(b)(6)                    May 6, 2009
New York, New York

Page 398

1              And then she goes on to say:  On

2    the contrary, AMP represents only a snapshot in

3    time, then in parens it says, as discussed more

4    fully below, of a complex set of sales records.

5    In fact, given the spectrum of variables

6    impacting AMP, there will be a different AMP for

7    the same sale depending on the timing of the AMP

8    calculation.

9              You understood what Ms. Jaeger was

10   saying there, correct, Mr. Hartmann?

11        A.     That is correct.

12        Q.     Okay.

13             Then if you look with me to the

14   next page you see the heading limitations on the

15   usefulness of AMP?

16        A.     Correct.

17        Q.     And the sentence right below that

18   says AMP is mistakenly perceived as an indicator

19   of market prices, however, it bears little

20   relevance to market price.

21             You understood, Mr. Hartmann, what

22   Ms. Jaeger was stating when you read this letter?

03dece24-0798-428f-abda-15ed00785a77

Hartmann, R.Ph., Ronald H. - 30(b)(6)                      May 6, 2009
New York, New York

Page 399

1   You understood what she was stating in that, in

2   those sentences when you read this letter?

3          A.     Right.  Potentially there can be

4   problems with AMP and what is actually paid in

5   the marketplace.

6          Q.     Okay.

7                 And Sandoz had no disagreement

8   with the positions or the statements made by

9   Ms. Jaeger in those sentences, correct?

10         A.     That is correct.  I don't recall

11  any specific.

12         Q.     Okay.

13                And I'm sorry you needed to read

14  this entire letter, but that's all the questions

15  I have on this document.

16         A.     Okay.

17                MR. DOUGLAS:  Are you going to be a

18  minute?  We need to substitute an exhibit in.

19                Go ahead.  Never mind.  We can

20  wait.

21                MR. ROSS:  Okay.

22                MR. DOUGLAS:  You were sorting

03dece24-0798-428f-abda-15ed00785a77