# Exhibit 1

*State of California ex. rel. Ven-A-Care of the Florida Keys, Inc. v.*
*Abbott Laboratories, Inc., et al.*

Exhibit to the Declaration of Nicholas N. Paul in Support of
Plaintiffs' Opposition to Defendants' Joint Motion for Partial Summary Judgment

## Sacramento, CA

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-----------------------------X

IN RE PHARMACEUTICAL INDUSTRY  )

AVERAGE WHOLESALE PRICE        )  MDL No. 1456

LITIGATION                     )

-----------------------------X

THIS DOCUMENT RELATES TO       )  Civil Action:

State of California, ex rel.   )  01-12258-PBS

Ven-A-Care v. Abbott           )

Laboratories, Inc., et al.     )

-----------------------------X

--oOo--

WEDNESDAY, DECEMBER 3, 2008

--oOo--

VIDEOTAPED DEPOSITION OF

THE CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES

by J. KEVIN GOROSPE, Pharm.D.

--oOo--


Reported By:  CAROL NYGARD DROBNY, CSR No. 4018

Registered Merit Reporter

CA Dept of Health Care Services (Gorospe, PharmD, J. Kevin)                                    December 3, 2008

Sacramento, CA

Page 201

1    Kevin Gorospe.

2           We are on the record at 2:35 p.m.

3    BY MR. HENDERSON:

4           Q.   Mr. -- Dr. Gorospe, referring back to

5    Exhibit 12, if you -- I'd like to direct your

6    attention to Section 447.301 in the upper

7    righthand corner of the first page,

8    "Definitions."

9           A.   Okay.

10          Q.   Do you see that?

11               And you see there's a definition of

12   "estimated acquisition cost," and it says

13   "'Estimated acquisition cost' means the agency's

14   best estimate of the price generally and

15   currently paid by providers for a drug marketed

16   or sold by a particular manufacturer or labeler

17   in a package size of drug most frequently

18   purchased by providers."

19               Do you see that?

20          A.   Yes, I do.

21          Q.   From time-to-time has Medi-Cal used the

22   term "estimated acquisition cost"?

Sacramento, CA

Page 202

1      A.   Yes.

2           MR. COLE:  Object to the form.

3           THE WITNESS:  Yes, we have.

4   BY MR. HENDERSON:

5      Q.   And in your experience has Medi-Cal's

6   use of the term "estimated acquisition cost" been

7   consistent or inconsistent with the definition

8   that's shown here in this Exhibit 12?

9      A.   Consistent.

10     Q.   Now, we've handed you some additional

11  exhibits that have been marked, and what I'd like

12  to do is to -- for probably the next hour, maybe

13  two, ask you questions about the methodology

14  employed by Medi-Cal for determining the amount

15  of reimbursements to pharmacy providers for drugs

16  covered under the Medi-Cal fee-for-service

17  program and how that methodology has evolved and

18  changed over time.

19          These first few exhibits, I recognize

20  that they're dated before you were at the

21  Department, but I'd like to ask you to look at

22  what's been marked as Exhibit 13, which is a

CA Dept of Health Care Services (Gorospe, PharmD, J. Kevin)                December 3, 2008

Sacramento, CA

Page 237

1    sorts of discrepancies?

2             MR. BUEKER:  Objection to form.

3             MR. COLE:  Objection to form.

4             MS. DANNA:  Objection to form.

5             THE WITNESS:  No.

6    BY MR. HENDERSON:

7        Q.   Do you recall the Department making any

8    statement approving of drug manufacturers

9    reporting false pricing information about their

10   drugs to price reporting publishers?

11            MR. COLE:  Object to form.

12            MS. DANNA:  Objection the form.

13            MR. BUEKER:  We do have the

14   stipulation; right?

15            MR. HENDERSON:  Yes, one -- an

16   objection by one defense counsel is an objection

17   by all.

18            THE WITNESS:  The answer to your

19   question is no.

20   BY MR. HENDERSON:

21       Q.   Okay.  In 1999 did the California

22   Legislature instruct the Department to prepare a

da64dc31-37ca-4ff0-8b1b-f1748d285c39

CA Dept of Health Care Services (Gorospe, PharmD, J. Kevin)                    December 3, 2008

Sacramento, CA

Page 238

1    study on the -- the adequacy of reimbursements to

2    pharmacies?

3              MR. BUEKER:   Objection as to form.

4              THE WITNESS:   Pursuant to Senate Bill

5    393 the Legislature directed the Department to do

6    a study.

7    BY MR. HENDERSON:

8         Q.    Okay.  And was that in 1999?

9         A.    That was in 1999.

10         Q.    Okay.  Did -- did the Department take

11    any action within the next year on that?

12         A.    No.

13         Q.    Did the Legislature subsequently

14    establish a deadline for a study -- such a study

15    -- if you recall?

16         A.    Not that I can recall --

17         Q.    Okay.

18         A.    -- specifically.

19         Q.    In any event, did the Department then

20    take some action to have such a study prepared?

21         A.    Yes.

22              In 2001 the Department issued an RFP,

CA Dept of Health Care Services (Gorospe, PharmD, J. Kevin)                    December 3, 2008

Sacramento, CA

Page 239

1    Request for Proposal, to find a -- company to do

2    such a study.

3         Q.   All right.  And that -- that request

4    for proposal ultimately resulted in an

5    arrangement with Myers and Stauffer, and they

6    produced two reports that have been discussed in

7    your testimony previously; is that right?

8         A.   That's correct.

9              They -- they produced essentially two

10   reports.  They were -- one on dispensing costs

11   and one on acquisition costs.

12        Q.   So about how long did it take between

13   when the Department first started the process of

14   preparing a request for proposal and when the

15   Myers and Stauffer studies were actually issued?

16        A.   Roughly 18 months.

17        Q.   Do you recall approximately how much it

18   cost to have those studies done?

19        A.   Approximately $250,000.

20        Q.   The Myers and Stauffer study that was

21   done --

22             MR. HENDERSON:  Let's have this next

Sacramento, CA

Page 243

1          THE WITNESS:  Correct.

2     BY MR. HENDERSON:

3          Q.    Well, what else would Average Wholesale

4     Price relate to other than acquisition cost?

5          A.    That was responding to your --

6          Q.    Okay.

7          A.    -- your question.

8          Q.    All right.  I believe the chart

9     indicates that the weighted mean shown in terms

10    of average acquisition cost as a percentage of

11    AWP is 56.6 percent; is that right?

12          That's what this says anyway?

13          A.    That's what the chart says, yes.

14          Q.    And if reimbursement were set at AWP

15    minus 56.6 percent, what would that mean for

16    those drugs that are at the right side of the

17    mean?

18          MS. DANNA:  Object to form.

19          THE WITNESS:  For products whose

20    average acquisition cost is above 56.6 percent

21    that would mean the pharmacy would -- would

22    essentially lose money on the ingredient cost.

CA Dept of Health Care Services (Gorospe, PharmD, J. Kevin)                December 3, 2008

Sacramento, CA

Page 244

1    BY MR. HENDERSON:

2         Q.   Okay.  And for drugs to the left of the

3    mean what would it mean for pharmacies who are

4    reimbursed for those drugs?

5         A.   That they would make money based on the

6    percentages.

7         Q.   All right.  So if -- would it be fair

8    to say that if -- if reimbursement were based on

9    AWP minus 56.6 percent of AWP, there would be

10   very significant inaccuracies in the amounts of

11   reimbursements because of this wide variation in

12   the relationship between AWP and actual

13   acquisition costs?

14        MR. BUEKER:  Objection as to form.

15   BY MR. HENDERSON:

16        Q.   Is that fair to conclude?

17        MR. BUEKER:  Same objection.

18        THE WITNESS:  Based on the -- the chart

19   presented, that's correct.

20   BY MR. HENDERSON:

21        Q.   Are you aware of any rational policy

22   reason for paying inflated reimbursements for

CA Dept of Health Care Services (Gorospe, PharmD, J. Kevin)                    December 3, 2008

Sacramento, CA

Page 245

1    those drugs that just happened to fall on the

2    left side of the mean?

3              MR. BUEKER:  Objection as to form.

4              THE WITNESS:  No, I don't.

5    BY MR. HENDERSON:

6         Q.   And are you aware of any rational

7    policy reason for paying an inadequate ingredient

8    cost for those drugs that happen to be on the

9    right side of that midpoint?

10             MR. BUEKER:  Same objection.

11             THE WITNESS:  No, I don't.

12   BY MR. HENDERSON:

13        Q.   Is it the Department's policy to be

14   fair and consistent in its methodology for

15   reimbursing drugs?

16        A.   Yes.

17        Q.   Have the -- the discrepancies in the

18   relationship between Average Wholesale Price and

19   actual acquisition costs that's shown in this --

20   in this chart -- have they hindered that

21   objective of -- of that policy objective for fair

22   and consistent and --

CA Dept of Health Care Services (Gorospe, PharmD, J. Kevin)                          December 3, 2008

Sacramento, CA

Page 246

1            MR. BUEKER:  Objection as to form.

2            THE WITNESS:  Not to my knowledge.

3    BY MR. HENDERSON:

4        Q.   Well, let me ask you this.

5            If -- well, let me --

6            Let me withdraw that question and move

7    on.

8            After this report was -- was issued by

9    Myers and Stauffer did the California Legislature

10   enact changes to the reimbursement methodologies

11   by California?

12       A.   There were changes in the methodology

13   in 2002, but the report -- this report was issued

14   too late in the budget cycle process for it to be

15   used in those decisions by the Legislature.  They

16   had already moved forward a proposal.

17       Q.   I see.

18            So the -- the proposal was in the works

19   already by the time the Myers and Stauffer report

20   was issued?

21       A.   That is correct.

22            This report was -- was used to some

CA Dept of Health Care Services (Gorospe, PharmD, J. Kevin)                                    December 3, 2008

Sacramento, CA

Page 253

1      information about drugs for reimbursement

2      purposes?

3              MR. BUEKER:  Objection as to form.

4              THE WITNESS:  Yes.

5      BY MR. HENDERSON:

6          Q.   As compared to AWPs?

7              MR. BUEKER:  Objection as to form.

8              THE WITNESS:  Yes.

9      BY MR. HENDERSON:

10         Q.   In your opinion, Dr. Gorospe, if

11     manufacturers had reported AWPs truthfully as --

12     as accurate measures of actual wholesale prices,

13     would this legislation and the efforts made to

14     implement it have -- have been necessary?

15             MR. BUEKER:  Objection as to form.

16             THE WITNESS:  If you mean by "truthful"

17     the description as stated here, what wholesale

18     selling price represents?

19             MR. HENDERSON:  Yes.

20             THE WITNESS:  Yes, this legislation

21     would not have been necessary.

22     BY MR. HENDERSON:

da64dc31-37ca-4ff0-8b1b-f1748d285c39

Sacramento, CA

Page 294

1    wanted to increase the -- the reimbursement for

2    providers who purchased its drugs?

3              MR. COLE:  Object to the form.

4              THE WITNESS:  No.

5    BY MR. HENDERSON:

6         Q.   Did the -- did the Department ever

7    delegate to drug manufacturers the authority to

8    determine how much dispensing fees should be paid

9    to providers?

10        A.   No.

11        Q.   Did the Department ever take a position

12   that drug manufacturers should be permitted to

13   report false AWP pricing information so that --

14   in order to compensate for inadequate dispensing

15   fees?

16             MR. BUEKER:  Objection as to form.

17             THE WITNESS:  No.

18   BY MR. HENDERSON:

19        Q.   In your opinion, Dr. Gorospe, would it

20   be a reasonable government policy to give drug

21   manufacturers the -- the power to increase

22   reimbursements in order to make up for what they

CA Dept of Health Care Services (Gorospe, PharmD, J. Kevin)                    December 3, 2008

Sacramento, CA

Page 295

1    perceive to be inadequate dispensing fees?

2              MR. BUEKER:  Objection as to form.

3              THE WITNESS:  No.

4    BY MR. HENDERSON:

5         Q.   Why not?

6              MR. BUEKER:  Same objection.

7              THE WITNESS:  Why not what?

8    BY MR. HENDERRSON:

9         Q.   Well, why wouldn't that be a reasonable

10   policy to pursue?

11             MR. BUEKER:  Same objection.

12             THE WITNESS:  The management of the --

13   the program is -- with the State of California

14   and with -- and the federal government, and to

15   allow a -- what is considered in California a

16   provider type, which a manufacturer is, to set

17   rates for providers would -- would not make

18   sense.

19   BY MR. HENDERSON:

20        Q.   It would give the manufacturer control

21   over how much money is -- of the State's money is

22   spent; is that fair to say?

CA Dept of Health Care Services (Gorospe, PharmD, J. Kevin)                    December 3, 2008

Sacramento, CA

Page 296

1          A.     Potentially.

2          Q.     To your knowledge has --

3                 Let me withdraw that and ask a

4      different question.

5                 If Abbott Laboratories reported grossly

6      inflated Average Wholesale Prices to First

7      DataBank knowing and intending that those prices

8      would be used by state Medicaid agencies,

9      including Medi-Cal, to pay inflated

10     reimbursements to customers, people who bought

11     Abbott drugs, would you consider that to be

12     deceptive?

13                MR. COLE:  Objection.  Form.

14                THE WITNESS:  Yes.

15     BY MR. HENDERSON:

16         Q.    Did Dey ever to your knowledge come to

17     the California Department of Health Care Services

18     and tell the Department that it was reporting

19     grossly inflated Average Wholesale Prices on its

20     drugs?

21                MR. ROBBEN:  Objection as to form.

22                THE WITNESS:  No.

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

CA Dept of Health Care Services (Gorospe, PharmD, J. Kevin)                    December 3, 2008

Sacramento, CA

Page 299

1              THE WITNESS:  Yes.

2         BY MR. HENDERSON:

3              Q.    Has the Department ever had a -- any

4         policy or practice of paying inflated acquisition

5         costs in order to compensate for perceived

6         inadequate dispensing fees?

7              MR. BUEKER:  Objection as to form.

8              THE WITNESS:  Was it a policy?

9              MR. HENDERSON:  Yes.

10             THE WITNESS:  No.

11             MR. HENDERSON:  Okay.

12        BY MR. HENDERSON:

13             Q.    Dr. Gorospe, if AWPs had -- as a

14        general rule had no relationship whatsoever to

15        actual market prices but were simply set by

16        manufacturers according to whatever their

17        marketing strategy might be, would it make any

18        sense to use AWPs at all for determining

19        reimbursement?

20             MR. BUEKER:  Objection as to form.

21             THE WITNESS:  If that was the only or

22        the most available information, you would use AWP