# Exhibit 4

*State of California ex. rel. Ven-A-Care of the Florida Keys, Inc. v.*
*Abbott Laboratories, Inc., et al.*

Exhibit to the Declaration of Nicholas N. Paul in Support of
Plaintiffs' Opposition to Defendants' Joint Motion for Partial Summary Judgment

Sacramento, CA

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--oOo--

STATE OF CALIFORNIA, ex rel

VEN-A-CARE OF THE FLORIDA KEYS, INC.,

A Florida Corporation,

        Plaintiffs,

     vs.              MDL No. 1456

                    Master File No.

                    01-12257-PBS

ABBOTT LABORATORIES,INC.,   Civil Action No.

Et al.,               03-11226-PBS

        Defendants.

_____/

--oOo--

THURSDAY, NOVEMBER 6, 2008

--oOo--

VIDEOTAPE DEPOSITION OF THE CALIFORNIA DEPARTMENT

OF HEALTH CARE SERVICES BY STANLEY L. ROSENSTEIN

--oOo--

Reported By:  PATRICIA MCCARTHY, CSR No. 12888

           Registered Professional Reporter

Page 98

1   worked to write size the program, we eliminated
2   the 50 cents, we eliminated those other things
3   and we sent, yeah, a different dispensing fee,
4   and a different ingredient cost.  So it is a
5   fairly complicated transaction when you really
6   get down to solving the issue.
7        Q.   Okay.  And I appreciate, there are a
8   lot of, like dispensing fee, right, there are a
9   lot of moving parts that have to be balanced.
10  But I guess -- but what I am trying to get at is,
11  did -- did DHS communicate in 1996 to the
12  California Legislature an effort to reduce
13  reimbursement rates that AWP minus 5 didn't
14  reflect actual purchasing activity by California
15  pharmacists?
16           MR. PAUL:  Objection to form.
17           THE WITNESS:  I am not sure in 1996
18  where we did.  We proposed additional
19  reimbursement reductions in pharmacies, coming
20  off of an AWP minus greater amount.
21  BY MR. BUEKER:
22       Q.   And as a part of -- as a part of

Page 99

1  justifying that reduction, one of the things that
2  DHS would have communicated to the California
3  Legislature was that the AWP minus 5 didn't
4  reflect actual purchasing activity by California
5  pharmacists, correct?
6      A.   Typically, my testimony when I did it
7  was, that we were trying to get to honest
8  pricing, that we accurately represented the cost
9  of purchasing, and the cost of dispensing.  The
10 key was to have accurate pricing that had
11 transparency, that everybody could see and agree
12 to.  So when I did the testimony on this, it
13 really came from the perspective of we need to
14 have a good honest price.
15     Q.   Okay. And I am trying to -- I
16 understand that.  What I am trying to understand
17 is, whether it was ever communicated to the
18 California Legislature that AWP minus 5 didn't
19 reflect the price at which pharmacists in
20 California were actually purchasing
21 pharmaceutical product?
22           MR. PAUL:  Objection.  Form.

Page 100

1            THE WITNESS:  I believe the
2   communication was that that was an excessive
3   reimbursement, so that we could pay at a higher -
4   - or lower price, higher AWP.
5   BY MR. BUEKER:
6        Q.   Higher discount of AWP?
7        A.   Higher discount and maintain access to
8   care.
9        Q.   Let us mark an audit report, California
10  Medi-Cal program dated March 19, 1996 as
11  Rosenstein 30(b)(6) Exhibit Number 6, please.
12            (Exhibit Rosenstein 006 Was Marked
13  For Identification.)
14  BY MR. BUEKER:
15       Q.   You can, Mr. Rosenstein, take whatever
16  time you need to familiarize yourself with
17  Exhibit 6, but I will tell you that I'm going to
18  keep my questions fairly general.
19       A.   You will focus on the pharmacy part of
20  the audit?
21       Q.   Well, no, I'm actually going to just --
22  I have some process questions.

1  price, which we have yet to be able to get to on
2  these drugs.  And that, you know, ought not to be
3  this difficult to get to an accurate price.
4           MR. BANK:  One second.  I think I am
5  done with the questioning.
6           MR. PAUL:  Can I trade seats with you.
7           MR. BANK:  Sure.
8           MR. PAUL:  Please mark this as 38.
9           (Exhibit Rosenstein 038 Was Marked
10 For Identification.)
11
12                    EXAMINATION
13 BY MR. PAUL:
14      Q.   Mr. Rosenstein, I have marked as
15 Rosenstein Exhibit 38 a document that reads --
16 it's a West's version of California Welfare and
17 Institutions Code, Section 14105.45, 2004 to
18 2007.
19           I will represent to you that this is
20 taken from the online West Law Database, printing
21 out or reporting the statute.  That statute, as I
22 just read it, which was in effect from September

1    2004, I believe, until August 2007.
2               MR. BUEKER:  Objection as to form.
3    BY MR. PAUL:
4         Q.   I would like to direct your attention
5    to a couple of provisions of this statute.  If
6    you turn to the third page by the number 12 in
7    brackets, if you follow along with me, "Selling
8    price means the price used in the establishment
9    of the estimated acquisition cost.  The
10   department shall base the selling price on the
11   average sales price reported by manufacturers
12   pursuant to subdivision C.  Selling price shall
13   not be considered confidential and shall be
14   subject to disclosure under the California Public
15   Records Act."
16             Did I read that correctly?
17        A.   Yes.
18        Q.   And below that in parens, capital
19   letter A, this would be the second paragraph up
20   in the bottom, "For single source and innovator
21   multiple source drugs, the estimated acquisition
22   cost shall be equal to the lowest of the average

Page 298

1   wholesale price minus 17 percent, the selling
2   price, the federal upper limit, or the MAIC."
3            Did I read that correctly?
4       A.   That's correct.
5       Q.   And if you turn to the next page, third
6   paragraph up from the bottom, enumerated
7   paragraph small C1, "Manufacturers and principal
8   labelers of legend and nonlegend drugs no later
9   than 30 days after the end of each calendar
10  quarter, and in a format determined by the
11  department, provide to the department the average
12  sales price of each of the manufacturer's legend
13  and nonlegend drug."
14           Did I read that correctly?
15           MR. BUEKER:  Objection as to form.
16           THE WITNESS:  That's correct.
17  BY MR. PAUL:
18      Q.   To your knowledge, did the department
19  receive any cooperation from manufacturers with
20  respect to the statutory provision I just read?
21           MR. BUEKER:  Objection to form and
22  beyond the scope.

Page 299

1         THE WITNESS:  We did not.  We sought to
2    create an average sale price to address our
3    concerns to get an accurate price for generic
4    drugs that would be used in conjunction with
5    other pricing and we were unable to get the
6    information from the drug manufacturers to
7    implement the statute.
8    BY MR. PAUL:
9         Q.   And none of the four manufacturers who
10   are represented by counsel at this table ever
11   cooperated with that; is that correct?
12        A.   We had, to my understanding,
13   cooperation from no drug manufacturers in the
14   implementation of this statute.
15        Q.   Now, you know what, AWP stands for
16   average wholesale price; is that correct?
17        A.   That's correct.
18        Q.   And to your knowledge, there is AWP in
19   effect for each drug in the Medi-Cal program?
20        A.   Yes, there is.
21        Q.   And who determines what the value of
22   AWP is?

1  is First Data Bank get AWP information?
2             MR. BUEKER:  Objection.  Lack of
3  foundation.
4             THE WITNESS:  From the manufacturers'
5  report at First Data Bank.
6  BY MR. PAUL:
7      Q.  And does California have the means to
8  police the accuracy of those AWPs?
9             MR. BUEKER:  Objection.  Lack of
10 foundation and form.
11            THE WITNESS:  We do not.  It would take
12 an enormous amount of staff and those change
13 every month.
14 BY MR. PAUL:
15     Q.  And to your knowledge, is it the intent
16 of the Medi-Cal program that manufacturers report
17 AWPs as an accurate measure of average wholesale
18 prices?
19            MR. BUEKER:  Objection.  Form.
20            THE WITNESS:  Absolutely.  We depend
21 upon the accuracy and the integrity of everybody
22 who participates in the program.  It is a

1   humongous revised program with a relatively small
2   staff.
3           In all aspects of it, it depends upon
4   the people who provide the government, the state,
5   the federal government with data they do
6   accurately.
7   BY MR. PAUL:
8       Q.   With regard to generic manufacturers,
9   has any generic manufacturer, to your knowledge,
10  ever come to the Medi-Cal program and provided
11  information to explain to the program the
12  difference between actual provider costs and its
13  reported AWPs for any of its drugs?
14      A.   Not in the 13 years that I have been a
15  part of running the Medi-Cal program.
16      Q.   So that statement would apply to the
17  four defendants who are represented by counsel at
18  this table?
19      A.   That's right.  No one has come to my
20  office and told us that.  And we have other
21  providers who have come to us and disclosed, you
22  know, inaccurate claiming over the past.  It does

Page 303

1  happen, but none of the drug manufacturers have
2  come to me and made that disclosure.
3       Q.   I think you were showed earlier in the
4  day an exhibit.  I think it was Exhibit 5, a 1996
5  report by the OIG concerning its examination of
6  the discrepancy between AWPs and acquisition
7  costs for generic and branded drugs.
8            Do you recall that?
9       A.   Yes.
10      Q.   To your knowledge, did any manufacturer
11 come to the Medi-Cal program after the OIG issued
12 that report to offer help in reforming its
13 reporting of AWPs?
14      A.   No.
15      Q.   Did any manufacturer come to the
16 program expressing any concern about the
17 implications of that report to your knowledge?
18      A.   Not to my knowledge, and never to me.
19      Q.   If manufacturers AWPs had been reported
20 by the manufacturers owning those AWPs as actual
21 and accurate measures of their -- of the average
22 wholesale prices of those drugs, would that have

Page 304

1   affected Medi-Cal's efforts to contain its drug
2   reimbursement costs?
3           MR. BUEKER:  Objection as to form.
4           THE WITNESS:  Yes.  We have been
5   spending -- we spent all day talking about the
6   effort we've had to get accurate pricing.  Had we
7   started with accurate pricing, we wouldn't have
8   had to go through all of these changes, and we
9   would have had an accurate reimbursement system
10  in the Medi-Cal program.  That would have saved
11  the taxpayers hundreds of millions of dollars.
12  BY MR. PAUL:
13      Q.   If manufacturers had reported their
14  AWPs truthfully to the state, and by truthfully,
15  I mean, as an accurate measure of actual average
16  wholesale prices, would that have negated the
17  need for a MAC program?
18          MR. BUEKER:  Objection as to form.
19          THE WITNESS:  Yes.  We would pay, have
20  the ability to pay pharmacies accurately.  We
21  wouldn't have to come up with a secondary method
22  to get to honest data.

1  BY MR. PAUL:
2      Q.   So to your knowledge, no drug
3  manufacturer, and in particular, no generic drug
4  manufacturer made any effort to come to the
5  California Legislature and explain that actual
6  provider cost are value A and our AWPs are value
7  B, and here is the difference between them?
8      A.   I am not aware of it.  Generally, we
9  hear a lot of activity from the legislative
10 staff, have contacts.  I am not aware of anybody
11 ever having that contact.
12     Q.   Did you ever hear of any staffer or
13 legislator in either the Senate or the Assembly
14 state an acceptance of inflated AWPs or
15 acceptance of reimbursement from the Medi-Cal
16 program of pharmacy drugs based on inflated or
17 untruthful AWPs?
18           MR. BUEKER:  Objection as to form.
19           MR. CYR:  Objection.
20           THE WITNESS:  No, I do not.  In fact, I
21 have heard it quite the opposite of strong
22 objection to the government getting false

34173f81-e12f-4a58-81cc-406caeb7ab66

1  information.

2  BY MR. PAUL:

3      Q.  In your years as chief deputy director
4  for the Medi-Cal program and your 13 years as
5  deputy director or chief deputy director and your
6  30-some years experience with the Medi-Cal
7  program in general, do you believe that drug
8  manufacturers have an obligation to be truthful
9  in all due respects when they report any kind of
10 information to the Medi-Cal program on which the
11 program relies for reimbursement?

12         MR. BUEKER:  Objection as to form and
13 beyond the scope.

14         THE WITNESS:  Very much so.  You know,
15 it is an underlying law and assumption that
16 people, when they interact with the government,
17 are going to tell the truth and provide accurate
18 information.  The entire Medi-Cal program relies
19 upon the honesty of people who participate in
20 that program.

21 BY MR. PAUL:

22     Q.  Has any representative of any generic

Page 310

1   drug manufacturer ever told you that they believe
2   they do not have an obligation to be truthful in
3   the information that they report to the program?
4        A.   No.
5        Q.   Or accurate?
6        A.   Nobody has ever told me that.  And had
7   they, I would have taken very strong swift action
8   in telling them that that was unacceptable.  They
9   did have the obligation, but nobody ever
10  approached me and said that.
11       Q.   Do you believe that the Medi-Cal
12  program has been defrauded by manufacturers who
13  have reported inflated AWPs knowingly to the
14  program?
15            MR. BUEKER:  Objection as to form.
16  Calls for a legal conclusion.
17  BY MR. PAUL:
18       Q.   Do you believe the program has been
19  cheated?
20            MR. BUEKER:  Objection as to form.
21            THE WITNESS:  Yeah, I believe we have
22  been.  I believe the taxpayers have had to pay

1  excessive amounts of money because of incorrectly
2  reported and incorrectly reported AWPs.
3       BY MR. PAUL:
4            Q.   Earlier in your testimony in response
5  to questions from counsel for Warrick, I think
6  you mentioned at one point that Dr. Grossby
7  conducted some interviews or participated in
8  interviews with the participating pharmacies
9  sometimes around 2004.
10                And I think you used the phrase, "This
11 was a resource intensive effort on the part of
12 Dr. Grossby and his pharmacists"; is that
13 correct?
14           A.   That's correct.
15           Q.   And would you agree that had the
16 generic drug manufacturers accurately reported
17 their AWPs as actual average wholesale prices
18 that that resource intensive effort would not
19 have had to take place?
20                MR. BUEKER:  Objection as to form.
21                THE WITNESS:  We would have saved
22 hundreds of hours of our pharmacist's time that

1   both that effort which took weeks and throughout
2   this whole process, time that he could have
3   better been spent on other ways to improve the
4   Medi-Cal program.
5   BY MR. PAUL:
6       Q.   Do you believe that if generic drug
7   manufacturers had reported truthful average
8   wholesale prices, by truthful, I mean, accurate
9   measures of average wholesale prices to Medi-Cal
10  that there wouldn't have been a need for the
11  Myers & Stauffer studies?
12           MR. BUEKER:  Objection as to form.
13           THE WITNESS:  It would have been a
14  necessary study, but it would have more focused
15  on what was the appropriate cost of dispensing.
16  We wouldn't have spent as much time on what the
17  ingredient cost was, but we needed the study to
18  understand what the appropriate cost of pharmacy
19  dispensing was.
20  BY MR PAUL:
21      Q.   Do you happen to have an understanding
22  of the cost of the Myers & Stauffer cost study?

1        MR. BUEKER:  Objection as to form.
2   Beyond the scope.
3        THE WITNESS:  I believe each study was
4   in the neighborhood of 200- to $250,000.
5   BY MR. PAUL:
6      Q.   And those monies came from public fund,
7   from the Medi-Cal program?
8      A.   They came from the state and federal
9   government.
10     Q.   Just to be clear, I want to confirm
11  with you whether or not, has it ever been the
12  policy of the Medi-Cal program to deliberately
13  accept inflated and inaccurate AWPs simply
14  because the program knew it would offset them by
15  shorting or minimizing the amount of the filling
16  fee for pharmacists?
17          MR. BUEKER:  Objection as to form.
18          MR. CYR:  Objection.
19          THE WITNESS:  No.  It has always been
20  our policy to have accurate information and to
21  use that information to establish what the
22  accurate price should be, should be on both ends

Page 314

1   of the equation.  We do believe they need to be
2   both looked at, but they have got to come from
3   accurate data sources.
4   BY MR. PAUL:
5       Q.  And are you aware, based on your
6   experience, that actually under federal law, it
7   is unlawful to offset ingredient cost payments
8   with a filling fee?
9           MR. BUEKER:  Objection as to form and
10  lack of foundation.  Calls for a legal
11  conclusion.
12          MR. CYR:  Objection.
13          THE WITNESS:  No, I am not aware of
14  that provision.
15  BY MR. PAUL:
16      Q.  Based on your 13 years as deputy
17  director and chief deputy director and your 30
18  years in the program, can you state whether it
19  was or was not ever the policy of the Medi-Cal
20  program to deliberately accept the reporting by
21  drug manufacturers of inflated AWPs simply
22  because the program knew it would offset that