# Exhibit 14

*State of California ex. rel. Ven-A-Care of the Florida Keys, Inc. v.*
*Abbott Laboratories, Inc., et al.*

Exhibit to the Declaration of Nicholas N. Paul in Support of
Plaintiffs' Opposition to Defendants' Joint Motion for Partial Summary Judgment

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ——————————————————— ) | **MDL No. 1456** |
| **IN RE PHARMACEUTICAL INDUSTRY** ) | **Master File No. 01-12257-PBS** |
| **AVERAGE WHOLESALE PRICE LITIGATION** ) | **Subcategory Case No. 06-11337** |
| ——————————————————— ) | |
| ) | **Judge Patti B. Saris** |
| **THIS DOCUMENT RELATES TO:** ) | |
| *State of California, ex rel. Ven-A-Care* ) | **Magistrate Judge** |
| *of the Florida Keys, Inc. v.* ) | **Marianne B. Bowler** |
| *Abbott Laboratories, Inc., et al.* ) | |
| Case No:  1:03-cv-11226-PBS ) | |
| ——————————————————— ) | |

**DECLARATION OF JEFFREY J. LEITZINGER, PH.D.,**
**REGARDING DEFENDANT SANDOZ**

I, Jeffrey J. Leitzinger, do hereby declare as follows:

1.     I am an economist and President of Econ One Research, Inc., an economic research and consulting firm.  I have master's and doctoral degrees in economics from the University of California at Los Angeles.  I have worked as a consultant on economic issues over the past 30 years, a significant portion of which has involved the analysis and calculation of damages.  I have personal knowledge of the matters stated in this declaration, and, if called upon to do so, could competently testify thereto.

2.     I have been retained by the California Department of Justice to provide consulting services in connection with the State of California's ("the State's") claims against, among others, Sandoz, Inc. ("Sandoz"), in the above captioned action, *State of California, ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc., et al*. Attached hereto as Exhibit A is a true and correct copy of the June 30, 2009 report that I

1

prepared for this matter with respect to Sandoz ("my report"). My report accurately details the analysis and calculations that I performed in this engagement.

3.      As stated in paragraph 5 of my report, I was asked by the California Department of Justice to do, among other things, the following:

a.      Determine the amounts (total ingredient costs only) that Medi-Cal actually reimbursed on claims by providers for Sandoz's 149 identified NDCs[1] during the period from January 1, 1994 through December 31, 2004.

b.      Determine the amounts (total ingredient costs only) that Medi-Cal would have reimbursed if the reported average wholesale prices ("AWPs") reasonably approximated the actual prices currently paid by the wholesalers' customers for those NDCs over that same time period, insofar as such prices can be determined from Sandoz's business records. In making that determination, I was asked to assume that, if the reported AWPs had been reasonable approximations of the actual prices paid by the wholesalers' customers, then Medi-Cal would not have required any offsets from the reported AWPs (i.e., AWP less 5 percent, AWP less 10 percent, AWP less 17 percent).

c.      Calculate the State's aggregate overpayment (the difference between using (a) and (b) as the basis for payment), excluding overpayments that arise from any and all claims where the reimbursement amount paid by Medi-Cal (total ingredient cost only) was less than 25 percent above the average net price paid by wholesalers to Sandoz for the relevant NDC.

---

[1] In my report, I use the terms "product," "drug product," or "pharmaceutical product" synonymously with the term "NDC" (National Drug Code). For the purposes of this declaration, the term NDC is used at all times in a manner consistent with the terms "product," "drug product," or "pharmaceutical product" as used in my report.

4.      As explained in paragraphs 12-20 of my report, I use data provided by Sandoz to estimate average prices paid by wholesalers' customers for each of the 149 relevant Sandoz NDCs.  I begin with the average net prices that wholesalers paid to Sandoz each quarter for each NDC and then apply a wholesaler markup to those prices to estimate the average net quarterly price that was paid to wholesalers by their customers.

5.      Exhibit 4 to my report shows, in column (6), the "spread" (the difference between the average net quarterly prices described above and the reported AWP) for each of the 149 relevant Sandoz NDCs on a quarter-by-quarter basis from the first quarter of 1994 through the fourth quarter of 2004.

6.      For over 95 percent of the Sandoz NDC/quarter combinations for which I have complete data, the AWP reported by Sandoz exceeded the average net quarterly prices paid by wholesalers' customers by at least 100 percent.  For most of these NDC/quarter combinations (82 percent), the spread exceeded 300 percent, with some even greater than 2,000 percent.

7.      In calculating the overpayments made by the State for the 149 relevant Sandoz NDCs, I exclude claims for which the actual reimbursement did not exceed the average net price paid by wholesalers to Sandoz by at least 25 percent.  For each remaining claim, I calculate the overpayment as the difference between the actual ingredient cost reimbursed by the State and an amount that is 25 percent above the average net price paid by wholesalers to Sandoz.

8.      As stated in paragraph 24 of my report, I believe, based on my training and experience, that the methodology I use in my report is economically appropriate for

determining losses incurred by Medi-Cal as a direct and proximate result of Sandoz reporting AWPs that exceeded  a reasonable approximation of the actual prices paid by the wholesalers' customers for Sandoz's 149 identified NDCs during the time frame at issue, based on information contained in Sandoz's contemporaneous business records.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 19th day of November 2009 in Los Angeles, California.

_____

Jeffrey J. Leitzinger, Ph.D.