# Exhibit 21

*State of California ex. rel. Ven-A-Care of the Florida Keys, Inc. v.*
*Abbott Laboratories, Inc., et al.*

Exhibit to the Declaration of Nicholas N. Paul in Support of
Plaintiffs' Opposition to Defendants' Joint Motion for Partial Summary Judgment

State Capitol
P.O. Box 942849
Sacramento, CA 94249-0099
(916) 319-2097
(916) 319-2197 (fax)
e-mail
assemblymember.frommer@assembly.ca.gov

DEPOSITION EXHIBIT
37
11-06-08

# Assembly
## California Legislature



## Committee on Health
**DARIO FROMMER**
CHAIRMAN

PRESCRIPTION DRUGS: WHY ARE THEY SO EXPENSIVE ?
WHAT CAN WE DO TO CONTROL COSTS?
Assembly Committee on Health
March 11, 2003
1:30 p.m.
Room 4202

**Introduction**
In the fall of 2002, the Assembly Health Committee held two informational hearings that examined how health care costs are once again rising rapidly. Double-digit percentage increases in health insurance premiums are placing new strains on employers, workers and publicly funded health programs. At these hearings, health care analysts identified steep increases in hospital care costs and drug prices as two of the primary factors in this latest round of premium inflation.

Last month, this committee looked at issues related to hospital billing in terms of systemic problems and the greed of some participants in the system. As a result, a number of legislative proposals addressing hospital billing issues have been introduced.

Prescription drug costs have been steadily rising for the past decade. In California the impact of these cost increases has been felt in a variety of ways. Prescription drug costs for the taxpayer financed Medi-Cal program reached $2.4 billion in 2001-02 and are projected to rise to $3.3 billion in 2003-04. That is just for the Medi-Cal fee-for-service program. Medi-Cal managed care spends hundreds of millions of dollars more each year. Private health plans and the state employees health program, CalPERS, report annual double-digit increases in prescription drug spending, ameliorated only by benefit changes that increase the burden on subscribers. Such burdens include increased copayment amounts and multi-tiered copayment schedules. Individuals without drug coverage, especially seniors who require more medications on average than younger Californians, have been especially hard hit. Even seniors with drug coverage, especially through Medicare HMOs and Medicare Supplement policies, find the cost of prescription drugs often far exceeds their coverage limits. Some seniors must choose between food, rent, and needed medications. It is no wonder that many Californians who are looking for sources of affordable drugs are turning to Canada and Mexico to buy prescription drugs for less than they pay here in the United States.



This hearing will examine the high price of pharmaceuticals in California, how those costs impact consumers, private health plans and state-funded programs, and whether the state can or should intervene to protect patients.

**Why Costs Are Rising**
According to IMS Health, a pharmaceutical information and consulting company, prescription drug sales reached $192 billion last year in the U.S. and an estimated $24 billion alone in California. According to the California Healthcare Foundation (CHCF), national spending for drugs has tripled in the last decade and is expected to more than double again between 2000 and 2008. The channels of distribution from drug manufacturers to consumers are varied, as illustrated in Chart 1.

Spending on drugs increased in 2001 for three reasons, according to the National Institute for Health Care Management Research and Educational Foundation (NIHCM), a non-profit organization funded by the federal government and insurers such as Blue Cross and Blue Shield.
- More prescriptions were written (accounting for 39% of the increase).
- Prices increased by 10.1%, more than six times the rate of inflation (accounting for 37% of the increase). and
- Shifting prescriptions to newer, more costly drugs (accounting for 24% of the increase).

**A Complex Array of Factors**
Underlying the basic reasons for increasing prescription drug prices are a complex array of factors:

• Newly approved medicines that are more expensive are being more heavily marketed to both doctors and consumers..

• Many brand name drug companies extend the "franchise" of their important blockbuster drugs by spinning off new formulations or versions of them. In some instances the new version may be almost identical to the old version and essentially equivalent. They also aggressively seek to extend patent protection for their branded drugs, sometimes illegally, that can delay generic competition, and affordable prices, for years.

• The incidence and prevalence of many chronic conditions has increased in recent years, in part because the population is aging, and doctors are diagnosing and treating these chronic illnesses at a higher rate than in the past.

• Managed care health plans cover more of the costs for prescription drugs than traditional health insurers did a decade ago. This has lowered the financial barrier to patients for the purchase of drugs.

The rise in pharmaceutical expenditures is led by the increased use of a relatively small number of expensive drugs. In 2001, the increase in sales for just 50 drugs amounted to $9.9 billion, compared to $10.9 billion for all of the other 9,850 prescription drugs

CAAG/DHS0077543

combined. Of note is the fact that the year before, in 2000, 95% of direct-to-consumer advertising focused on those same 50 drugs.

**Pricing of Drugs: Follow the Money--If You Can**
Prescription drug pricing has moved center stage in a health care industry that is becoming more and more complex. With the inclusion of new groups of stakeholders, more varied incentive systems, greater competition, and more complicated benefit structures, the "true" cost of prescription drugs has grown increasingly elusive. According to a National Health Policy Forum Issue Brief published in 2002, drug prices are subject to various types of discounts and rebates, seen and unseen, on both the public and private side. Each drug sold by a manufacturer is subject to multiple prices, and little is known publicly about this pricing information.

Table 1 lists ten commonly used pricing methodologies and the relative cost of an "average" prescription drug under each methodology. For any individual drug, only three of the ten prices are published, and only the Average Wholesale Price (AWP) is widely available and includes all drugs. Table 2 defines the pharmaceutical pricing terms in Table 1.

**Average Wholesale Price (AWP)**
The AWP of prescription drugs was intended to represent the average price at which wholesalers sell drugs to physicians, pharmacies, and other customers. The AWP has often been equated with a "sticker price" or "list price." It has become an important prescription drug pricing benchmark for payers throughout the health care industry. Payments are typically based on AWP minus some percentage. Despite its name, however, the AWP is not an accurate reflection of actual market prices for drugs.

According to the U.S. General Accounting Office (GAO), the AWP may be neither "average" nor "wholesale." In addition, a recent investigation by the U.S. Department of Justice (DOJ) and the National Association of Medicaid Fraud Control Units, which involved the collection of actual wholesale pricing information, indicated that some drug manufacturers report inflated average wholesale pricing information. Because the AWP is part of the reimbursement formula used by many state Medicaid programs including Medi-Cal, any increase in the published AWP can increase the billions of dollars that federal and state governments pay for prescription drugs.

**Accusations of False Drug Pricing Reports**
In fact, on January 7, 2003, California Attorney General Bill Lockyer accused two major pharmaceutical companies, Abbott Laboratories and Wyeth, of cheating California taxpayers out of millions of dollars by reporting false drug pricing data which was relied upon by the state's Medi-Cal program to set reimbursement rates. The state also filed suit against the same companies under the California False Claims Act. The state's complaint was prompted by a whistleblower lawsuit filed by a small pharmacy that gathered data on the vast discrepancies between actual prices paid to manufacturers versus the over-inflated prices reported to Medi-Cal. The complaint notes that in 1996, Abbott reported that a one-gram dose of its antibiotic Vancomycin was priced at $55.59. Relying upon

CAAG/DHS0077544

this information, the Medi-Cal program set its reimbursement rate at $55.59. However, the actual cost to the pharmacy was $6.29. Medi-Cal was defrauded into paying a 752 percent mark-up.

Another suit based on false price information was filed earlier this year by New York's Attorney General against two other companies, Pharmacia and GlaxoSmithKline.

**Manufacturing of Drugs**
Prescription drugs are manufactured by "brand name" companies and "generic" companies. Brand name manufacturers bring new drugs to market. New drugs go through a process of research and development followed by clinical trials that must demonstrate that the drug is safe and effective for its designated purpose. If the drug is shown to be safe and effective, the FDA allows it to be marketed. Basic and clinical research required in the development of a drug is often carried out by publicly funded institutions as well as by the manufacturers themselves. In determining the efficacy of a drug, the FDA looks to see whether the drug performed better than a placebo, not whether the drug performed better than existing brand name or generic medications already on the market. Brand name drugs are patent-protected from the time of their first discovery, well before they are marketed. Brand-name drugs are generally given patent protection for 20 years from the date of submission of the patent It takes years from that submission to marketing of a drug. Still, the effective patent life of a new drug is estimated to be between 13.9 and 15.4 years. By filing various different patents on a single drug over time, or patenting a slightly different version of the same drug and then marketing it heavily, brand name drug companies can often continue to dominate the market of a given class of drugs

**The Cost of Pharmaceutical R&D**
In response to questions concerning the rising costs of prescription drugs and record profits, the pharmaceutical industry commonly points to the growing expense of conducting research and development (R&D) necessary to produce new drugs. According to a Kaiser Family Foundation (KFF) report published in 2002, <u>Federal Policies affecting the Cost and Availability of New Pharmaceuticals</u>, industry investment in R&D has increased steadily over the last generation. Estimates completed in 2001 by the Center for the Study of Drug Development at Tufts University and based on data supplied by the drug industry indicate that, on average, it costs $802 million (in 2000 dollars) to bring a new drug to market The Tufts researchers also estimated in 1991 that the cost of bringing a new drug to market at that time averaged $470 million (1991 dollars). These estimates include the cost of potential drugs that prove ineffective or unsafe and never make it to market as well as the "time value" (i.e., the interest cost) of money invested over the entire R&D process.

These estimates have been criticized by many groups including a detailed 2001 report by the consumer-oriented advocacy group Public Citizen that claims that the actual after tax cash outlay for each drug in the Tufts study is closer to $240 million. Public Citizen claims there are two major flaws in the study:

4

CAAG/DHS0077545

- The $802 million estimate includes both significant expenses for which tax credits are available and theoretical costs that drug companies don't actually incur. For example, roughly half of the $802 million estimate ($399 million) is the "opportunity cost of capital" -- a theoretical calculation of what R&D expenditures might be worth if they were invested elsewhere. Tufts calculated actual out-of-pocket R&D costs for drugs in the study at $403 million per new drug according to Public Citizen

- The Tufts study was not representative of real drug industry R&D because none of the 68 drugs used in the Tufts study received any government support. Yet, many if not most, drugs brought to market receive financial support from the government at some stage in their discovery and development. Therefore, the Tufts study focuses on a skewed sample of drugs and inflates the actual cost of R&D for the average drug.

Critics also point to two other major concerns:

- The pharmaceutical industry considers data reported to Tufts about its investments in specific drug projects to be proprietary. Hence, other researchers cannot verify it. One industry critic has recently questioned the drug industry's claims about the cost of conducting clinical trials. In particular, he found the industry's estimates to be higher than those based on publicly available data from the National Institutes of Health. This raises the question of whether public policy decisions concerning pharmaceuticals should be based on information for which the industry is not publicly accountable.

- While critics acknowledge that some post-marketing research is of value and intended to assure patient safety, they claim many such studies and similar types of expenditures are primarily intended to promote the product to physicians and should be considered marketing expenses rather than R&D.

The Pharmaceutical Research and Manufacturers Association (PhRMA) hired Ernst and Young, LLP To analyze Public Citizen's critique. Ernst and Young concluded: "Many of the arguments made by the Public Citizen report do not stand up to close scrutiny. In several key aspects, the Public Citizen approach deviates from standard methodologies adopted by previous research and the financial and accounting communities. On many issues, the report presents selective evidence and ignores strong evidence to the contrary. These methodological shortcomings cause Public Citizen to underestimate the cost of pharmaceutical R&D."

**Public Monies Support Drug Research and Development**
Of the $56.4 billion spent on health R&D in the United States in FY 1999, NIH expenditures constituted 28 percent, with the industry responsible for another 60 percent. Spending by public universities also contributed to the national total. Public spending is important to the success of the drug industry, both for its contribution to training and research.

CAAG/DHS0077546

### Training Support

The most valuable asset of the pharmaceutical industry is its intellectual property and the scientists who create it. PhRMA reported that in 1999 its member companies employed 14,703 doctorate-level scientists and 3,056 medical doctors in its domestic R&D operations. The federal government pays for the training of scientists by funding National Research Service Awards (NRSA). In FY 2000, NIH provided NRSAs to 16,164 pre-doctoral and post-doctoral trainees at a cost of $592 million (3 percent of the total NIH budget).

### Research Support

Publicly funded research also directly or indirectly results in new pharmaceuticals. According to <u>Federal Policies Affecting the Cost and Availability of New Pharmaceuticals,</u> a number of recent reports document the intimate role that federally-funded research plays in the development of new drug therapies.

### Protecting the Public's Research Investment

The significant federal investment in research that directly or indirectly contributes to new pharmaceuticals has raised concern about the reasonableness of prices charged for such products. Consumer advocates argue that American taxpayers help fund the research that develops new drugs that those same taxpayers cannot afford to buy.

### Ethics in Research

An article in the New York Times on November 22, 2002 discussed questionable activities in the conduct of drug research by private research firms owned by advertising companies. According to the article, the three largest advertising companies have spent tens of millions of dollars to buy or invest in companies that perform clinical trials of experimental drugs. The article highlights practices such as ghost writing research papers and designing research studies to publicize new uses of existing drugs to circumvent the FDA approval process. Stories in the New York Times and on National Public Radio document such activities by Parke-Davis in the marketing of the drug Neurontin. A May 2000 article in the New England Journal of Medicine reports how pharmaceutical companies manipulate results of clinical trials by controlling a study's design or choosing to make public only positive data. In the Journal of the American Medical Association (JAMA) in January 2003, researchers from Yale University concluded that financial relationships among industry, scientific investigators, and academic institutions are widespread and that conflicts of interest arising from these ties can influence biomedical research in important ways.

Another major criticism of pharmaceutical research is that companies spend far too much time and money developing "me-too" drugs and not enough on truly new, innovative therapies. According to the NICHM, half of the drugs approved in the 1990s were for "new formulations" or "new combinations" of already approved compounds.

### Pharmaceutical Company Profits

CAAG/DHS0077547

While the overall profits of Fortune 500 companies declined by 53 percent in 2001– the second deepest dive in profits the Fortune 500 has taken in its 48 years – the top ten U.S. drug makers topped all three of *Fortune* magazine's measures of profitability in 2001, according to the magazine's annual analysis of America's largest companies. These companies had the greatest return on revenues, reporting a profit of 18.5 cents for every $1 of sales, which was eight times higher than the median for all Fortune 500 industries and one-third higher than the next most profitable industry, commercial banking (13.5 percent return on revenue). The drug industry realized a return on assets of 16.5 percent– almost six times the median (2.5 percent) posted by all industries. Finally, pharmaceutical companies posted the highest return on shareholders' equity (33.2 percent) that was more than three times the median of all Fortune 500 industries (9.8 percent).

Together the ten Fortune 500 drug companies earned $37.2 billion in profits in 2001, up from the $27.8 billion they reported in 2000. Are these profits excessive? The industry claims that it needs those profits as an incentive to invest in research and development of new drugs. Critics argue that the pursuit of higher profits makes drugs unaffordable for many Americans, and that profit margins comparable to other industries would not hinder R&D of new drugs.

**The Marketing of Drugs**
In 1997, the FDA relaxed its rules on mass media advertising for prescription drugs, making it easier for pharmaceutical companies to promote their products in 30-second or 60-second TV ads without giving detailed medical information on the indications, potential side effects, or proper use. Since then, spending on mass media advertising for prescription drugs has risen steadily and sharply – from $791 million in 1996 to $2.7 billion in 2001. The growth in mass media drug ads during that time has coincided with a rapid rise in spending on prescription drugs in the U.S. Such spending increased between 13% and 20% each year during that period, making prescription drugs the fastest growing health care expense.

Not surprisingly, prescription drug advertising tends to be focused on patent-protected blockbuster drugs, those drugs expected to be big profit makers for their companies. In 2000, 95% of direct-to-consumer (DTC) advertising focused on just 50 drugs. The advertising paid off. Prescriptions for those drugs rose 24.6% in one year, compared with a 4.3% rise for all other drugs. According to NIHCM, the increase in sales over the prior year for those fifty drugs amounted to $9.9 billion, compared to $10.9 billion for all of the other 9,850 prescription drugs combined.

**Prescription Drug Advertising in Context**
The $2.7 billion the pharmaceutical spends on DTC advertising represents a small portion of overall advertising spending--about 2.5%. But the amount spent on specific drugs, in comparison to other products is remarkable. For example, in 2000, more dollars were spent on advertising Vioxx ($160 million) than on either Budweiser beer ($146 million) or Pepsi ($125 million). That same year, each of the top 15 individual drugs had DTC spending that exceeded the $58 million that Campbell's spent advertising soup. (NIHCM)

CAAG/DHS0077548

**Oversight of DTC Advertising**
The FDA is responsible for implementing regulations governing DTC advertising. In a report issued in October 2002, the GAO reported gaps in FDA's oversight, especially those created by a new policy of letter review by DHHS that results in some regulatory letters not being issued until after the offending advertising campaign has run its course.

**Critiques of DTC Advertising**
As reported in JAMA on February 19, 2003, reviews of DTC advertising are mixed. Proponents have claimed DTC advertising educates the public to make more informed medical choices, while critics charge that aggressive marketing campaigns encourage patients to demand newer, more expensive, and sometimes inappropriate medications. Preliminary findings released last month from a new FDA survey of 500 physicians appeared unlikely to lessen the controversy.

An FDA *Talk Paper*, summarizing the survey's findings, reported that DTC advertising, when done correctly, can serve positive public health functions such as increasing patient awareness of diseases that can be treated, and prompting thoughtful discussions with physicians that result in needed treatments being prescribed. According to the JAMA article, the positive findings cited by the FDA are at odds with the historically negative view that physicians held on DTC advertising. Critics of the study say the FDA is overly optimistic in its interpretation of the results, and question whether the study design permits drawing definitive conclusions.

JAMA does note that the FDA's numbers imply that DTC advertising is having the effect desired by drug manufacturers. In the survey, 211 of 359 physicians (59%) said a patient had asked them to prescribe a specific brand name drug. And of those 211 physicians, 57% prescribed the brand name drug requested. The U.S. General Accounting Office in a report published in October 2002, noted that in data from consumer surveys, 5% of consumers (or 8.5 million consumers annually) have both requested and received from their physician a prescription for a particular drug in response to seeing a DTC advertisement.

**Marketing to Doctors**
While not as dramatic as the rise in DTC advertising, overall growth in promotional spending by the drug industry has been steady, more than doubling from $9.2 billion in 1996 to $19.1 billion in 2001. Most of that money was spent promoting drugs to doctors and giving away free drug samples. Included in that year 2000 total was $4.8 billion on one-to-one promotion by some 83,000 drug reps or detailers making hundreds of thousands of visits to doctors' offices. (NIHCM and JAMA 2/19/2003) Providing free samples is a double-edged sword. On the one hand it provides some medicines free to some patients who would otherwise not be able to afford them; on the other hand it encourages physicians to write prescriptions for that same drug, which may often be more expensive than other drugs that would be just as appropriate for the patient's condition.

CAAG/DHS0077549

Concerns have been raised for years about inappropriate pharmaceutical industry spending to market drugs to physicians. Such marketing has included lavish dinners, tickets to high priced sporting events, and expensive vacations for doctors, their families and office staffs. In response to those concerns, in June 2001, the federal Department of Health and Human Services began soliciting input on developing a compliance program guidance for the pharmaceutical industry. A draft guidance was published on October 3, 2002. A year after the federal government announced its intent to develop guidelines for the industry, PhRMA adopted a voluntary code on interactions with healthcare professionals.

### How Much Industry Spends on Advertising and Marketing vs. Research

According to industry estimates, pharmaceutical companies spend more on R&D ($30.3 billion in 2001) than on marketing (19.1 billion). As previously noted, critics argue that actual amounts spent on R&D are far less. In July 2002, Families USA published an analysis, based on SEC filings, of the nine pharmaceutical companies that sell the 50 most prescribed drugs to seniors. The analysis concluded that those companies spent $45.4 billion on marketing, advertising, and administration and only $19.1 billion on R&D. In response, PhRMA claimed that Families USA is using "WorldCom accounting," that the facts are straightforward, and that the industry figures noted above are correct.

Even based on figures from the industry, pharmaceutical company profits in 2001 significantly exceeded research spending. Indeed the profits of just the ten Fortune 500 pharmaceutical companies, $37.2 billion, exceed by over 20% the R&D spending claimed for the entire industry.

### Generic Drugs

When patents or other periods of exclusivity on brand name drugs expire, multiple manufacturers can apply to the FDA to sell generic versions. A generic drug is chemically identical to a brand name drug in dosage form, safety, strength, route of administration, quality, performance characteristics and intended use. Although generic drugs are chemically identical to their branded counterparts, they are typically sold at substantial discounts from the branded price. The first generic on the market is typically priced 20 to 30 percent below the comparable brand-name drug, but as more generics enter the market, consumers have more choices, and generic prices drop further. The average price paid per prescription for brand-name drugs is approximately three times the per prescription price of generics.

Generic drugs accounted for approximately 42 percent of all prescriptions dispensed in 2000. According to the Congressional Budget Office, generic drugs save consumers an estimated $8 to $10 billion a year at retail pharmacies. Even more billions are saved when hospitals use generics. The generic approval process at the FDA was designed to be relatively simple, however disputes over patent validity can delay generic approvals up to 30 months. Cases have been reported where a brand name company has paid a generic manufacturer to keep its product off the market, allowing the brand name company to keep its high priced product unopposed in the market.

CAAG/DHS0077550

**Over-the-Counter Drugs**
Americans buy about 5 billion over-the-counter (OTC) drugs each year, according to government estimates, to treat their headaches, heartburn, coughs and colds, and other routine health problems. According to the Consumer Healthcare Products Association, a trade group that represents nonprescription drug makers, more than 600 OTC drugs contain ingredients and dosages that 20 years ago were available only by prescription. Drug sold over the counter are more accessible to consumers, since no prescription is required, and often, but not always, lower in price than the comparable prescription drug. Consumers may wind up paying more out-of-pocket because prescription drug insurance usually does not cover OTC products.

**How Well are Californians Covered for Prescription Drugs?**
While over 75% of Californians have some form of prescription drug coverage, an estimated 7-7.5 million residents do not. Most individuals under the age of 65 have coverage through job-based insurance. The vast majority of non-seniors without prescription drug coverage (close to 7 million) are individuals and families who have no health insurance at all. An estimated 700,000 seniors lack any prescription drug coverage.

**California Employer Health Benefits Survey 2002**
The California Employer Health Benefits Survey 2002, published in February 2003 by KFF and the Health Research and Educational California Trust, included analysis of employer-sponsored prescription drug coverage. Highlights of this survey were:
- 100% of firms that offer health coverage provide prescription drug coverage.
- 55% of large firms and 15% of small firms increased the amount employees paid for prescription drugs in 2002.
- The number of firms with three-tier cost sharing for prescription drugs in 2002 was 39% compared to 11% in 2001. Average drug copayments increased from 2001 to 2002. The increase for non-preferred drugs was 33% (from $15 to $20/prescription).
- 47% of large firms that offer health insurance said that it was very likely or somewhat likely that they would increase the amount that employees pay for prescription drugs in 2003.
- Only 28% of large firms and 4% of small firms offer retiree health benefits. Of these, in the last 2 years, 16% introduced 3-tiered cost sharing for drugs and 34% increased the amount that retirees pay for prescription drugs.

**Prescription Drug Coverage for Seniors**
Seniors are particularly vulnerable to the high cost of prescription drugs for two reasons: they need more medications and they lack good coverage. In 2002, more than 80 percent of Medicare's nearly 40 million beneficiaries use prescription drugs and each beneficiary fills an average of almost 20 prescriptions annually. A 1997 study describes how the elderly comprise about 13 percent of the population but account for more than one-third of the nation's total drug spending. In 1999, 91% of California seniors reported that they were taking at least one prescription drug.

Although Medicare covers virtually all seniors, the Medicare program does not generally cover outpatient drugs. Nearly 700,000 California seniors (almost one out of five) have

CAAG/DHS0077551

no prescription drug coverage. (See Figure 1) Even those with coverage often find that their limited benefits leave them liable for significant out of pocket costs. Medicare + Choice plan (Medicare HMOs), which provide prescription drug coverage to 30% of California seniors, generally have formularies, copayments of $10-60, and annual limits as low as $1000-$2000. Medicare Supplement policies, which provide drug coverage for 7% of California seniors, have a $250 deductible, 50% copay, and annual limits of either $1,250 or $3,000. Typical premiums for these policies, depending on age and county of residence, range from $1,920 to $4,680 per year.

**The Limited Availability of Discounts In California**

As recently reported by CHCF, there are a number of discount programs available for seniors in California. However, these discounts are generally limited to 10-20% off list price and seniors report that even with these discounts prescription drugs remain unaffordable.

### California Drug Discount Program

The California Drug Discount Program, SB 393 (Speier), Chapter 946, Statutes of 1999, was enacted by the state to help reduce Medicare beneficiaries' out-of-pocket drug costs. Under this program, beneficiaries who show their Medicare card to the pharmacy are entitled to receive a discount when they fill their prescriptions so that their cost is not greater than the Medi-Cal reimbursement rate. Generally, that discount amounts to 10-20% off of the "list price" (AWP). There is no cost for this program.

### Golden Bear Pharmacy Assistance Program

The Golden Bear Pharmacy Assistance Program, SB 696 (Speier) Chapter 693, Statutes of 2001, created a voluntary rebate program involving Medicare beneficiaries, pharmacies, and drug manufacturers. Thus far, no rebate contracts have been entered into.

### California's Drug Distribution Project

The Drug Distribution Project (DDP) arose from drug pricing lawsuits brought against brand-name drug companies. As part of the settlement of those suits, $170 million worth of brand-name drugs have been provided over a three-year period to uninsured patients who would otherwise have had difficulty accessing medication. That program ends on March 31, 2003. The Public Health Institute, which administered DDP and community clinics have asked the industry to continue at least the same level of medication assistance as has been provided over the past three years.

### Other Discount Programs

According to CHCF, there are nine other "discount" prescription drug programs in the California. Six of the plans are "open" to any seniors, provide access to virtually any drug, and cost beneficiaries a membership fee ranging from nothing to $84 per year. Prices quoted by CHCF for 12 commonly prescribed drugs using

CAAG/DHS0077552

any of the six programs are on average the same, an estimated 15-20% off "list price" (AWP).

The pharmaceutical industry also offers three limited discount programs. They are limited because seniors must meet certain income criteria to qualify and because they cover only certain brands. The Together Rx Card is offered by a consortium of six manufacturers and gives access to their products at a reported "minimum of 15% off" list price (AWP). The other two industry programs offer higher discounts but are limited to single brands. Some manufacturers will make available free prescriptions in cases of hardship when requested by the patient's physician.

### Consequences of Inadequate Drug Coverage

Lack of adequate drug coverage has many consequences. In a KFF survey 700,000 California seniors reported either not filling a prescription due to cost or skipping doses to make their medicine last longer. This was especially true of seniors with chronic conditions such as heart failure, hypertension, and diabetes. Failure to take needed medications worsens health and leads to unnecessary hospitalizations and emergency room visits. When prescriptions are unaffordable here in California, seniors look elsewhere. An increasing number of Californians with inadequate or no prescription drug coverage are turning to Canada and Mexico where many of the same medications can be purchased for far less money.

### Why Californians Are Turning to Canada for Their Prescription Drugs

An increasing number of Americans are turning to Canada to purchase prescription drugs for 40-75% less than in this country. Prices in Canada, as in many countries, are controlled by the government and pharmaceutical companies are willing to sell their products to these countries for far less than the prices charged to U.S. wholesalers. For a number of years, seniors in northern tier states have taken bus trips across the Canadian border to buy drugs for personal use. (Similar trips take place to Mexico from California and other southwestern states) Members of Congress, and candidates for office, have frequently accompanied the Canadian trips to highlight the cost disparity. More recently Americans have been buying from Canada via the Internet and the mail. Full page advertisements for Canadian pharmacies have appeared in California newspapers. Senior organizations have links to Canadian pharmacies on their web sites, and in some cases have entered into agreements guaranteeing access to Canadian prices to their members.

Technically, the federal Prescription Drug Marketing Act allows only the manufacturer to import, or reimport, prescription drugs into the U.S. However, the FDA and U.S. Customs, because of their enforcement discretion and finite resources, have not enforced the importation ban on individuals bringing limited supplies of drugs for personal use across the border. Mail order prescriptions appear to be enjoying the benefit of this enforcement discretion also.

Not surprisingly, the pharmaceutical industry takes a dim view of importation of drugs from other countries by anyone other than the industry. PhRMA has opposed efforts by

CAAG/DHS0077553

Congress to change the law, citing concerns for patient safety. Critics argue that the industry's real concerns are profits, not safety. One drug company has cut off drug sales to Canadian firms that resell drugs to Americans. In response, senior groups from California and other states have launched a boycott of the company's products. The Los Angeles Times reports that a group of Web pharmacies is preparing a lawsuit against the company, accusing it of anticompetitive practices. On February 27, Senator Russ Feingold (D-Wis.) introduced a bill that would deny tax breaks to pharmaceutical companies that block U.S. consumers' access to prescription drugs from Canada.

CAAG/DHS0077554



Chart 1. Channels of Distribution for Prescription Drugs: 1999

Stephen Schondelmeyer, PRIME Institute, University of Minnesota (2001).

CAAG/DHS0077555

Table 1

# Background on U.S. Pharmaceutical Market: Comparison of Prices



Source: Data derived from Prescription Drugs: Expanding Access to Federal Prices Could Cause Other Price Changes, U.S. General Accounting Office, GAO/HEHS-00-118, August 2000 and How the Medicaid Rebate on Prescription Drugs Affects Pricing in the Pharmaceutical Market, Congressional Budget Office Papers, January 1996.

CAAG/DHS0077556

## Table 2. Pharmaceutical Pricing Terms

| Price | Definition |
|---|---|
| AWP | The average list price that a manufacturer suggests wholesalers charge pharmacies. AWP is typically less than the retail price, which will include the pharmacy's own price markup. AWP is referred to as a sticker price because it is not the actual price that large purchasers normally pay. For example, in a study of prices paid by retail pharmacies in 11 states, the average acquisition price was 18.3 percent below AWP.[a] Discounts for HMOs and other large purchasers can be even greater. AWP information is publicly available. |
| AMP | The average price paid to a manufacturer by wholesalers for drugs distributed to retail pharmacies. FSS prices and prices associated with direct sales to HMOs and hospitals are excluded. AMP was a benchmark created by OBRA[b] in 1990 to use in determining Medicaid rebates and is not publicly available. The Congressional Budget Office estimated AMP to be about 20 percent less than AWP for more than 200 drug products frequently purchased by Medicaid beneficiaries.[c] |
| Non-FAMP | The average price paid to a manufacturer by wholesalers for drugs distributed to nonfederal purchasers. Non-FAMP is not publicly available. |
| Medicaid Rebate Net Price and "Best Price" | The effective outpatient drug price after manufacturer rebates to state Medicaid programs. The basic rebate for brand name drugs is the greater of 15.1 percent of the AMP, or the difference between AMP and the lowest price the manufacturer charges any purchaser other than Medicaid, known as "best price." Rebates for generic drugs are 11 percent of the AMP. Rebates are larger for brand name drugs whose AMP increases exceed inflation in the consumer price index. Information on rebate amounts is publicly available; AMP and best price are not. |
| FSS | The price available to all federal purchasers for drugs listed on the FSS. FSS prices are intended to equal or better the prices manufacturers charge their "most-favored" nonfederal customers under comparable terms and conditions. Because terms and conditions can vary by drug, the most-favored customer price may not be the lowest price in the market. FSS prices are publicly available. |
| 340B | The maximum price that manufacturers can charge "covered entities," which include disproportionate share hospitals owned by or under contract with state or local governments and eleven categories of facilities or programs funded by the Health Resource & Services Administration, including federally qualified health centers, AIDS drug assistance programs, etc. The 340B discount is calculated using the Medicaid rebate formula and is deducted from the manufacturer's selling price rather than paid as a rebate. |
| FCP | The maximum price manufacturers can charge for FSS-listed brand name drugs to VA, DOD, PHS, and the Coast Guard, even if the FSS price is higher. FCP must be at least 24 percent off non-FAMP. FCP is not publicly available. |
| VA National Contract Price | The price VA has obtained through competitive bids from manufacturers for select drugs in exchange for their inclusion on the VA formulary. Contract prices are publicly available. |

a. See footnote 28.   b. Omnibus Budget Reconciliation Act of 1990.   c. See footnote 28.

[28]Table 2 subnotes: (a) U.S. Department of Health and Human Services, Office of the Inspector General, "Medicaid Pharmacy-Actual Acquisition Cost of Prescription Products for Brand Name Drugs" (Apr. 1997) and (c) "Congressional Budget Office Papers: How the Medicaid Rebate on Prescription Drugs Affects Pricing In the Pharmaceutical Industry" 20 (Jan. 1996). This table is a modified version of a chart prepared by GAO. See GAO, Report to Congressional Requesters, "Prescription Drugs: Expanding Access to Federal Prices Could Cause Other Price Changes" 9 (August 2000) [hereinafter "GAO Federal Pricing Report"]. The references to 340B prices have been added.

Reprinted from <u>Pharmaceutical Discounts Under Federal Law: State Program Opportunities</u> by William H. von Oehsen, III, Public Health Institute/Pharmaceuticals and Indigent Care Program, May 2001

CAAG/DHS0077557



Figure 1
**Sources of Prescription Drug Coverage Among California Seniors**

Note: Analysis includes seniors in sample with classifiable drug coverage (n=2380). "Other" includes those with drug coverage through VA/DOD. Medi-Cal is California's Medicaid program.
SOURCE: Kaiser/Commonwealth/Tufts-New England Medical Center 2001 Survey of Seniors in Eight States.

CAAG/DHS0077558