# Exhibit 3

*State of California ex. rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc., et al.*

Exhibit to Plaintiffs' Request for Judicial Notice in Support of Plaintiffs' Opposition to Defendants' Joint Motion for Partial Summary Judgment

## Assembly Bill No. 442

### CHAPTER 1161

An act to amend Section 4426 of, and to repeal Section 4427 of, the Business and Professions Code, to amend Section 49557.2 of the Education Code, to amend Sections 1356, 1797.199, 53300, 100171, 120955, 124030, 124040, 124120, and 124250 of, to add Sections 26157, 104188, 124033, 124977, 125190, and 127280.1 to, and to add Article 6 (commencing with Section 101315) to Chapter 3 of Part 3 of Division 101 of, the Health and Safety Code, to amend Sections 12693.17, 12693.43, 12693.45, 12693.70, and 12693.981 of, and to amend, repeal, and add Section 12693.41 of, the Insurance Code, and to amend Sections 4094.2, 4380, 4418.3, 4418.7, 4640.6, 4643, 4646.5, 5600.8, 5869, 5881, 5882, 5883, 14005.41, 14011.6, 14019.3, 14051, 14085.7, 14085.8, 14103.6, 14105.2, 14105.3, 14105.31, 14105.33, 14105.337, 14105.34, 14105.35, 14105.37, 14105.38, 14105.39, 14105.405, 14105.42, 14105.43, 14105.45, 14125, 14132, 14132.26, 14132.88, 14132.95, 14163, 14495.10, 16809, 16809.4, and 18925 of, to add Sections 4418.2, 4418.25, 4781.5, 5767, 14000.03, 14000.5, 14011.7, 14011.8, 14011.9, 14105.18, 14105.332, 14105.46, 14105.47, 14105.8, 14105.85, 14132.73, and 14150 to, to add and repeal Sections 4631.5 and 14105.436 of, to repeal Sections 4847, 14105.65, 14105.91, 14105.915, and 14105.916 of, and to repeal and amend Sections 14105.4 and 14105.41 of, the Welfare and Institutions Code, relating to health, making an appropriation therefor, and declaring the urgency thereof, to take effect immediately.

[Approved by Governor September 30, 2002. Filed
with Secretary of State September 30, 2002.]

LEGISLATIVE COUNSEL'S DIGEST

AB 442, Committee on Budget.   Health: budget trailer.

Existing law provides for the Medi-Cal program, administered by the State Department of Health Services, under which qualified low-income persons are provided with health care services.

Existing law requires, as a condition of a pharmacy's participation in the Medi-Cal program, the pharmacy to charge a price that does not exceed the Medi-Cal reimbursement rate for prescription medicines and an amount to cover electronic transmission charges by Medicare beneficiaries. Existing law requires the department to monitor pharmacy participation under these provisions, conduct a study of the adequacy of the Medi-Cal pharmacy reimbursement rates, and report the results of

95

the study to the Legislature by July 1, 2002. Under existing law, these provisions are repealed as of January 1, 2003.

This bill would delete the repeal of these provisions, thereby extending the operation of these provisions indefinitely. The bill would delete the requirement of the department to report the results of the study by July 1, 2002.

Existing law provides for a school lunch program under which eligible pupils receive free or reduced price meals. Existing law, effective July 1, 2002, authorizes the incorporation into the school lunch program application packet, or notification of eligibility, various notifications to parents and guardians, including those with regard to the confidentiality of school lunch application information and its use for purposes of the Medi-Cal program.

This bill would change the effective date of the above notification provisions from July 1, 2002, to July 1, 2003. It would also revise the notifications that may be incorporated under this provision regarding the confidentiality of the school lunch application information and its use for purposes of the Medi-Cal program and would make related and technical changes.

Existing law provides for the regulation and licensure of health care service plans, administered by the Department of Managed Health Care. Existing law requires a health care service plan to reimburse the director for the actual cost of processing an application for licensure as a health care service plan and for a health care service plan's share of all costs and expenses reasonably incurred in the administration of these regulatory provisions. In addition, existing law authorizes the director, by notice on or before September 15, 2000, to require a health care service plan to pay an additional assessment to provide the department with sufficient revenues to support various costs and expenses for the 2000–01, 2001–02, and 2002–03 fiscal years.

This bill would require that notice for the additional assessment be provided each year, rather than on or before September 15, 2000. The bill would expressly require, if a health care plan fails to pay the additional assessment for the 2001–02 fiscal year, the assessment of the amount due for the 2001–02 fiscal year in the 2002–03 fiscal year, in addition to the amount due in the 2002–03 fiscal year.

Existing law establishes the Trauma Care Fund, effective August 10, 2001, which is continuously appropriated to the Emergency Medical Services Authority for purposes of allocating funds to local emergency medical services (EMS) agencies for certain trauma centers. Existing law requires the authority, within 30 days of the effective date of the establishment of the fund and related provisions, to request all local

— 3 —                          Ch. 1161

EMS agencies with an approved trauma plan to submit specified information.

This bill, instead, would require the authority to request all local EMS agencies to submit this information within 30 days of the effective date of the enactment of an appropriation for purposes of implementing provisions relating to the Trauma Care Fund.

Existing law establishes the Toxic Mold Protection Act of 2002, which requires the State Department of Health Services to take specified steps related to reducing toxic mold exposure. The act declares that it shall be implemented only to the extent that the department determines that funds are available for its purposes.

This bill would authorize the department to receive voluntary contributions to support the department's activities pursuant to the act. It would establish the Public Health Protection from Indoor Mold Hazards Fund, a continuously appropriated fund, into which those contributions would be deposited for use by the department in implementing the act, thereby making an appropriation.

The existing California Statewide Supportive Housing Initiative Act requires the State Department of Mental Health to award grants to local government or private nonprofit agencies for services to a target population. The act requires the department to make all grant awards from funds allocated in the Budget Act of 2000 for the supportive housing initiative no later than June 30, 2002, and to expend the funds allocated for those grants no later than June 30, 2004.

This bill would revise this provision to require, instead, the department to make all grant awards from funds allocated in the Budget Act of 2001 for the supportive housing initiative no later than June 30, 2002, and to expend the funds allocated for those grants no later than June 30, 2005.

Existing law vests the State Department of Health Services with various powers, functions, and duties with respect to the administration and oversight of various health programs and facilities. Existing law requires that any adjudicative hearing that the department is authorized or required to conduct be conducted pursuant to the Administrative Procedure Act. The staff assigned to the hearing office of the State Department of Health Services is authorized to determine the time and place of an administrative adjudication hearing conducted pursuant to these procedures.

This bill would require that formal hearings requested by institutional Medi-Cal providers and health facilities be held in Sacramento and would authorize informal conferences concerning appeals by those entities to be held in Sacramento or Los Angeles.

Existing law provides for the allocation of state aid to the administrative bodies of qualifying local health departments according to a specified formula.

This bill would establish procedures and requirements to govern the allocation to, and expenditure by, local health jurisdictions of federal funding received for the prevention of, and response to, bioterrorist attacks and other public health emergencies.

The bill would provide that federal funding received by the State Department of Health Services for bioterrorism preparedness and emergency response is subject to appropriation in the annual Budget Act.

Existing law requires the State Department of Health Services to establish and administer the Cancer Research Program and authorizes the department to award grants under the program.

This bill would establish a maximum indirect cost rate that may be charged on any cancer research program grant awarded to any institution under these provisions.

Existing law requires the Director of Health Services to develop a list of drugs to be provided under a program for the treatment of persons infected with the human immunodeficiency virus (HIV) and requires manufacturers of drugs on the list to pay the department a rebate that is equal to the rebate that would apply to the drug under certain provisions of federal law.

This bill would require these manufacturers to pay an additional rebate to be negotiated by each manufacturer with the department.

Under existing law, the governing body of each county is required to establish a community child health and disability prevention program for the purpose of providing early and periodic assessments of the health status of children in the county.

This bill would require, commencing July 1, 2003, that all applications for services under the child health and disability prevention program be filed electronically as provided under the bill. The bill would define "child health and disability prevention provider" for purposes of the provisions concerning child health and disability prevention programs, and would make related changes.

Existing law requires the State Department of Health Services to conduct a community outreach and awareness campaign relative to a specified newborn hearing screening program and the value of early hearing testing.

This bill, instead, would authorize the department to conduct this outreach and awareness campaign.

Existing law requires the Maternal and Child Health Branch of the department to administer a comprehensive shelter-based services grant

95

program to battered women's shelters. In implementing the program, the department is required to consult with a designated advisory council that shall remain in existence until January 1, 2003.

This bill would provide that the advisory council shall remain in existence until January 1, 2006.

Existing law requires the department to charge a fee to all payers for any tests or activities performed pursuant to provisions relating to genetic disorder prevention services, including the Hereditary Disorders Act. Existing law requires that any fee charged for screening and followup services provided to Medi-Cal eligible persons, health care service plan enrollees, or persons covered by disability insurance policies be paid directly to the Genetic Disease Testing Fund, a continuously appropriated fund, to be used for purposes of the Hereditary Disorders Act.

This bill, commencing July 1, 2002, would recast these provisions to require, instead, the department to charge a fee to the hospital of birth or to families of a newborn, for births not occurring in a hospital, for newborn screening and followup services. The bill would require that payments pursuant to this provision be made to the Genetic Disease Testing Fund. The bill would prohibit the department from charging or billing Medi-Cal beneficiaries for services provided under these provisions relating to genetic disorder prevention services.

Existing law requires the State Department of Health Services to establish and administer a program for the medical care of persons with genetically handicapping conditions.

This bill would provide that the department is considered to be the purchaser, but not the dispenser or distributor, of blood factor products, under the Genetically Handicapped Person's Program.

Existing law requires that all health facilities, except those owned and operated by the state, be charged each year a designated fee established, in accordance with certain requirements, by the Office of Statewide Health Planning and Development to pay for certain functions required to be performed by the office.

This bill would authorize the State Department of Health Services to expend $200,000 of the fees collected pursuant to this provision for use in the 2002–03 fiscal year for data collection on, analysis of, and reporting on, maternal and perinatal outcomes, if funds are appropriated in the Budget Act of 2002 for that purpose.

Existing law establishes the Healthy Families Program, administered by the Managed Risk Medical Insurance Board, to arrange for the provision of health services to eligible children, and defines "family contribution sponsor" for purposes of these provisions.

This bill would revise the definition of family contribution sponsor.

95

Existing law provides for reimbursement to providers participating in the Healthy Families Program for certain services provided up to 90 days prior to the effective date of coverage under the program.

This bill would repeal these reimbursement provisions and would require instead, effective April 1, 2003, the board, in consultation with the State Department of Health Services, to implement a preenrollment program into the Healthy Families Program or the Medi-Cal program. The bill would authorize the board to adopt emergency regulations to implement this preenrollment program. The bill would make various other changes in program requirements related to family contributions, disenrollment, and eligibility to participate in the program.

Existing law establishes the Healthy Families-to-Medi-Cal Bridge Benefits Program to provide any person enrolled for coverage under the Healthy Families Program who meets certain criteria with a two calendar-month period of health care benefits in order to provide the person with the opportunity to apply for Medi-Cal. Existing law authorizes the implementation of this program only if a specified State Children's Health Insurance Program waiver is approved, and at the time the waiver is implemented.

This bill would delete this waiver restriction on implementation of the Healthy Families-to-Medi-Cal Bridge Benefits Program.

Existing law requires the State Department of Social Services to establish a foster care rate for each community treatment facility program, and requires for the 2001–02 fiscal year that a community treatment facility program be paid a community treatment facility supplemental rate. Subject to the availability of funds, this payment is required to be shared by the state and the counties.

This bill would extend to the 2002–03 fiscal year the requirement that the supplemental rate be paid.

Existing law requires the Director of Mental Health to award matching grants to local educational agencies to pay the state share of the costs of providing programs that provide school-based early mental health intervention and prevention services to eligible pupils at schoolsites of eligible pupils, based on certain priorities and specifications.

This bill would revise these priorities and specifications.

Existing law states the intent of the Legislature relating to the transition process of persons with developmental disabilities from a developmental center to a community living arrangement through the development of an individual program plan process.

This bill would require the State Department of Developmental Services to establish policies and procedures for the development by regional centers of an annual community placement plan, would require the department to review the plans, and would authorize the department

to make allocations to regional centers to develop the plans. It would also require, until July 1, 2004, a regional center to take specified actions upon the department's determination of the amount of unallocated reduction in the regional center's purchase of service budget.

The bill also would specify additional requirements for the State Department of Developmental Services, developmental centers, and regional resource development projects pertaining to the coordination of efforts among those entities, the provision of services to consumers, and the collection and availability of data.

Existing law provides for the provision of services to persons with developmental disabilities by regional centers, pursuant to contracts with the State Department of Developmental Services. Existing law imposes various requirements on the department and the regional centers with respect to these contracts.

The bill would provide that any contract between the department and a regional center entered into on and after January 1, 2003, shall require that all employment contracts entered into with regional center staff or contractors be available to the public for review, except with respect to the social security number of the contracting party. It would also prohibit any employment contract, or portion thereof, from being deemed confidential or unavailable for public review.

Existing law requires that a regional center perform initial intake, including deciding whether to provide assessment, within 15 days following a request for assistance. Existing law requires that if assessment is needed, the assessment shall be performed within 60 days following the initial intake.

This bill, instead, would require, before July 1, 2003, that the assessment be performed within 120 days following initial intake, and on or after July 1, 2003, that the time limit for performing the assessment be within 60 days following initial intake.

Existing law requires the development of an individual program plan for an individual with developmental disabilities eligible for regional center services. Existing law requires the State Department of Developmental Services to annually review a random sample of individual program plans at each regional center.

This bill, instead, would require a biennial review by the department pursuant to this provision.

The bill, with certain exceptions, would prohibit, for the 2002–03 fiscal year only, a regional center from expending any purchase of service funds for the startup of any new program unless certain conditions exist.

Existing law requires the State Department of Developmental Services to coordinate, or require each regional center to coordinate, a

95

meeting within each regional center catchment area between the regional center, the local health facility providers, the State Department of Health Services representatives from the local district office, and the State Department of Developmental Services center staff for purposes of better coordinating services and supports provided to regional center consumers in licensed health facilities.

This bill would repeal this requirement.

Existing law authorizes the State Department of Developmental Services to allocate funds appropriated in a specified item of the Budget Act of 2000 to county mental health programs that meet programmatic goals and model adult system of care programs to the satisfaction of the department or for Children's System of Care programming.

This bill, instead, would authorize the department to allocate funds appropriated in a specified item of the annual Budget Act for these purposes.

Under the Children's Mental Health Services Act, the State Department of Mental Health is authorized to enter into annual performance contracts with participating counties, known as system of care counties, for the delivery of mental health services to seriously emotionally disturbed children. Existing law requires the department to provide participating counties with a contract with an independent evaluator to measure performance outcomes and provide technical assistance to the state and counties and provide training, consultation, and technical assistance for county applicants and participants.

This bill would eliminate the requirement that the department provide the above-described independent evaluator and the training, consultation, and technical assistance, and would require instead that the department provide technical assistance related to system evaluation. The bill would make related changes.

Existing federal law requires that California's state plan for medical assistance under the medicaid program, known as the Medi-Cal program, provide for entering into cooperative arrangements with the state agencies responsible for the administration of health services and vocational rehabilitation services in the state looking toward maximum utilization of these services in the provision of medical assistance under the plan.

This bill would provide, notwithstanding any other provision of law, upon additional funds being appropriated and budgeted for the support of the services identified within the scope of work of an agreement of the type specified under federal law and previously entered into by the State Department of Health Services, the amount of the encumbrance in such an agreement shall be amended, by operation of law, to reflect the newly appropriated and budgeted funds. It would also provide that once an

95

agreement is entered into by the department, the agreement shall continue in effect indefinitely and need not be amended unless the department changes the scope of work to be provided under the agreement.

Under existing law, the Medi-Cal program is administered by the State Department of Health Services.

This bill would authorize the Director of Health Services, on a regional pilot project basis, to enter into contracts with one or more nonprofit organizations to perform the functions of the department's Office of the Ombudsman, with services provided by the ombudsman to be made available to any person who may be eligible for, or who is receiving, benefits under the Medi-Cal program.

Existing law provides that any child who is less than 6 years of age and who has been determined to be eligible for free meals under the National School Lunch Program has met the income eligibility requirements for participation in the Medi-Cal program, without a share of cost.

This bill would revise this provision to replace the reference to income eligibility requirements with income documentation requirements and would make conforming changes.

Existing law, effective July 1, 2002, requires each county to participate in a statewide pilot project to grant Medi-Cal program eligibility to, and enroll in the Medi-Cal program, any child under 6 years of age enrolled in school and eligible for free meals under the National School Lunch Program.

This bill would change the effective date of this and related provisions from July 1, 2002, to July 1, 2003. It would also revise this provision to require each county, instead, to determine Medi-Cal program eligibility for any child described above, and would authorize the department to exercise a specified federal option for eligibility determinations.

Existing law requires the State Department of Health Services to exercise certain options provided under federal law to implement a program for accelerated enrollment of children in the Medi-Cal program.

This bill would require a county, upon receipt of an application for a child who has accelerated enrollment coverage under this program, to determine whether the child is eligible for Medi-Cal benefits and to report this finding to the medical eligibility data system. The bill would provide that this provision shall become operative on July 1, 2002, or the date that the program of accelerated enrollment coverage for children takes effect, whichever is later.

This bill would require the State Department of Health Services and the Managed Risk Medical Insurance Board to exercise certain options provided under federal law to implement a program for preenrollment of children into the Medi-Cal program and the Healthy Families

Program. The bill would require the department to develop an electronic application before July 1, 2003, to serve as the application for preenrollment into the Medi-Cal program or the Healthy Families Program and to also serve as an application for the Child Health and Disability Prevention program. The bill would specify requirements for the processing of the electronic application.

The bill would provide for the termination within a designated time of benefits provided to an individual pursuant to a preliminary determination under Medi-Cal as described under federal law, unless an application for medical assistance under the state plan is filed.

The bill would require the State Department of Health Services, on or before October 1, 2002, to issue instructions to all counties to establish an automated system for tracking the status of applications received by county welfare departments from the centralized processing entity, which screens applications for eligibility benefits under the Medi-Cal program and forwards the applications to the appropriate county.

Existing law provides that a beneficiary or any person on behalf of the beneficiary who has paid for health care services otherwise covered by the Medi-Cal program received by the beneficiary shall be entitled to a return from the provider of any part of the payment that meets specified requirements. Existing law also provides for the Medi-Cal reimbursement of a provider upon submission of proof of eligibility.

This bill would require the State Department of Health Services, to the extent permitted by federal law, to waive overpayments made to a pharmacy provider that would otherwise be reimbursable to the department for prescription drugs returned to the pharmacy provider from a nursing facility upon discontinuation of the drug therapy or death of the beneficiary.

Under existing law, for purposes of the Medi-Cal program, "medically needy person" is defined to include, among other described persons, until October 1, 2002, a child who is eligible to receive Medi-Cal benefits under an interstate agreement for adoption assistance and related services and benefits to the extent federal financial participation is available.

This bill would delete reference to October 1, 2002, and thereby include the above-described child within the definition of a medically needy person indefinitely.

Existing law requires the county in which a person resides to determine a person's eligibility for Medi-Cal benefits and continued eligibility.

To the extent this bill would increase the counties' responsibilities for eligibility determination, it would impose a state-mandated local program.

95

Existing law creates the Medi-Cal Medical Education Supplemental Payment Fund, and the Large Teaching Emphasis Hospital and Children's Hospital Medi-Cal Medical Education Supplemental Payment Fund, in the State Treasury as continuously appropriated funds, which consist of various moneys for use by public agencies for health care programs or purposes. Under existing law, these provisions become inoperative on July 1, 2002, and as of January 1, 2003, are repealed.

This bill would extend the inoperative dates to July 1, 2004, and the repeal dates to January 1, 2005. By extending the operation of continuously appropriated funds, this bill would result in an appropriation.

Existing law authorizes the State Department of Health Services to require that a provider receive prior authorization before providing Medi-Cal services when it is determined that the provider has been rendering unnecessary services.

This bill would authorize the department to contract for staff to accomplish treatment authorization request reviews and to carry out contracting activity with manufacturers of single-source drugs.

Existing law requires the State Department of Health Services to administer various health programs, including the California Children's Services Program, Genetically Handicapped Person's Program, Breast and Cervical Cancer Early Detection Program, State-Only Family Planning Program, and Family Planning, Access, Care, and Treatment (Family PACT) Waiver Program.

This bill would require that provider rates of payment for services rendered in all of these programs be identical to the rates of payment for the same service performed by the same provider type pursuant to the Medi-Cal program, would authorize the director to identify, by regulation, other programs that would be subject to this requirement, and would authorize reimbursement at rates greater than the Medi-Cal rate if provided by regulation of the director.

Existing law under the Medi-Cal program prohibits the allowable markup payable for the dispensing of medical supplies by assistive device and sickroom supply dealers and pharmacies from exceeding 25% of the cost of the item dispensed, as defined by the department.

This bill would prohibit the allowable markup payable for these supplies from exceeding 23% of the cost of the item dispensed. It would also prohibit payment for diabetic testing supplies from exceeding the cost of the item dispensed, as defined by the department, plus a fee equal to the maximum professional fee component used in the payment for legend generic drug types.

Existing law provides that certain contracts entered into by the department on a bid or negotiated basis for drugs, product-type health

95

services, and clinical laboratory services under the Medi-Cal program have no force and effect unless approved by the Department of Finance. Existing law exempts these contracts from certain requirements under the Public Contract Code, including a requirement of approval by the Department of General Services.

This bill would delete the requirement that these contracts be approved by the Department of Finance, would provide for additional exemptions from various requirements under the Public Contract Code and the Government Code, and would make related changes.

Existing law authorizes the State Department of Health Services to contract with less than all manufacturers or clinical laboratories including only one manufacturer or clinical laboratory, on a bid or nonbid basis.

This bill would delete this authorization and would require the department to take specified actions for purposes of implementing certain contracting provisions.

Existing law authorizes the State Department of Health Services to enter into contracts with manufacturers of single-source and multiple-source drugs on a bid or nonbid basis pursuant to specified procedures and to maintain a list of contract drugs. Under existing law, these provisions are repealed as of January 1, 2003, and replaced with alternative provisions implementing the Medi-Cal drug formulary program.

This bill would delete the repeal of these provisions, thereby extending the authority of the department to enter into the above-described contracts indefinitely. The bill would repeal the alternative provisions related to the implementation of the Medi-Cal drug formulary program.

Existing law provides for various increases to the reimbursement to pharmacists for all drug prescription claims reimbursed through the Medi-Cal program.

This bill, until July 1, 2004, would require the department to reduce reimbursement to pharmacists in the amount reimbursement was increased pursuant to these provisions with respect to pharmacy services rendered on and after the date that this bill is enacted, and would exempt claims submitted by pharmacists for beneficiaries in a nursing facility.

Existing law provides that if certain conditions are met, a new drug designated as having an important therapeutic gain and approved for marketing by the federal Food and Drug Administration shall be immediately included on the list of contract drugs for 3 years.

This bill would delete this provision.

Existing law permits any drug suspended from the list of contract drugs for at least 12 months to be deleted from the list of contract drugs.

This bill would remove the 12-month time period as a condition prior to deletion of a drug from the list of contract drugs. It would also establish a list of preferred prior authorization drugs as a subset of the list of contract drugs and would permit a manufacturer of a drug deleted from, or not added to, the list of contract drugs to request inclusion on that list.

Existing law specifies conditions under which certain drugs for use in the treatment of acquired immune deficiency syndrome (AIDS) or an AIDS-related condition or cancer are deemed approved for addition to the Medi-Cal list of contract drugs or considered a Medi-Cal benefit.

This bill would require, commencing July 1, 2002, all pharmaceutical manufacturers to provide to the State Department of Health Services a state rebate in addition to rebates pursuant to other provisions of state or federal laws for any drug products that have been added to the Medi-Cal list of contract drugs pursuant to the above described provisions related to drugs used to treat AIDS and cancer. This provision would become inoperative on July 1, 2005, and would be repealed on January 1, 2006.

Existing law requires the State Department of Health Services to establish a list of Maximum Allowable Ingredient Costs (MAIC) for drugs based on reference to certain drug brands.

This bill would revise the basis for establishing the list of MAIC for drugs. The bill would require the department to update MAICs at least every 2 months and to establish the estimated acquisition cost, as defined, of legend and nonlegend drugs, as defined. The bill would also require the department to establish a list of medical supplies, including utilization controls applied to each medical supply product, and a list of Maximum Allowable Product Costs (MAPC) for medical supplies. The bill would require the department to repeal certain regulations related to medical supplies.

This bill would authorize the State Department of Health Services to enter into contracts with manufacturers of enteral formulae that can be used as a therapeutic regimen to prevent serious disability or death in patients with medically diagnosed conditions that preclude the full use of regular food. The bill would require the department to maintain a list of those products for which contracts have been executed.

Existing law provides for the establishment of provider reimbursement rates for incontinence medical supplies covered by the Medi-Cal program.

This bill would revise the method for determining the reimbursement rate.

Under the Medi-Cal program, specified medical benefits are provided to public assistance recipients and certain other low-income persons.

95

This bill would include the purchase of prescribed enteral formulae and diabetic testing supplies as a covered benefit subject to utilization controls. It would also revise the covered benefits related to dental care.

Existing law requires the State Department of Health Services to develop a federal waiver program to test the efficacy of providing an assisted living benefit to beneficiaries under the Medi-Cal program. Existing law prohibits the department from implementing the waiver program developed under this provision if the program will result in additional costs to the state.

This bill, instead, would prohibit the department from implementing the waiver program if the benefits provided pursuant to the program will result in additional costs to the Medi-Cal program.

Under existing law, certain telemedicine services are reimbursable under the Medi-Cal program.

This bill would require the State Department of Health Services to allow psychiatrists to receive fee-for-service Medi-Cal reimbursement for services provided through telemedicine until June 30, 2004, or until a method for reimbursement is developed, as provided.

Existing law specifies procedures under which personal care services meeting certain conditions, when provided to a categorically needy person, as defined, are a covered Medi-Cal benefit to the extent federal financial participation is available. Under existing law, these provisions become inoperative on July 1, 2002, and as of January 1, 2003, are repealed.

This bill would delete the inoperative and repeal dates, thereby extending these Medi-Cal benefit coverage provisions indefinitely.

Existing law specifies procedures for the monthly advancement of state funds to counties for costs of administration of the Medi-Cal program.

This bill would require, within 60 calendar days of the date that the annual Budget Act is chaptered, the State Department of Health Services to notify the chairpersons of the fiscal committees of each house of the Legislature, the Chairperson and the Vice Chairperson of the Joint Legislative Budget Committee, and appropriate county representatives if the department plans to withhold and not allocate any of the baseline allocation for county Medi-Cal eligibility activities that are appropriated for Medi-Cal administration.

Under existing law, the Medi-Cal program provides for a special methodology of reimbursement of disproportionate share hospitals for the provision of inpatient hospital services. Existing law establishes the Medi-Cal Inpatient Payment Adjustment Fund in the State Treasury, as a continuously appropriated fund, to be used as the source for the nonfederal share of payments to disproportionate share hospitals.

Ch. 1161

Existing law transfers $29,757,690 from the fund to the Health Care Deposit Fund for the 2000–01 fiscal year and each fiscal year thereafter.

This bill would transfer $85,000,000 to the Health Care Deposit Fund for the 2002–03 fiscal year and each fiscal year thereafter. Because the Health Care Deposit Fund is continuously appropriated, this bill would make an appropriation.

Existing law requires the State Department of Health Services to establish a pilot program to provide continuous skilled nursing care as a benefit of the Medi-Cal program when those services are provided in accordance with an approved federal waiver meeting certain requirements. Existing law repeals this provision as of January 1, 2003.

This bill would extend the repeal date of the provision from January 1, 2003, to January 1, 2006.

Existing law authorizes the board of supervisors of a county that contracted with the State Department of Health Services pursuant to a specified provision of law during the 1990–91 fiscal year and any county with a population under 300,000, as determined in accordance with the 1990 decennial census, to elect to participate in the County Medical Services Program (CMSP) for the state administration of health care services to eligible persons in the county. Existing law specifies a formula under which counties and the state share the risk for cost increases of the CMSP not funded through other sources.

This bill would revise this formula.

Existing law authorizes, until January 1, 2003, a county to establish a County Medical Services Program Governing Board, with a specified membership, to administer the CMSP.

This bill would extend the operation of these provisions until January 1, 2008.

Existing law requires that the contract between the State Department of Health Services and the County Medical Services Program Governing Board require that the state provide a designated minimum level of administrative support to the CMSP.

This bill would require, instead, that the County Medical Services Program Governing Board reimburse up to $3,500,000 for the state costs of providing administrative support to the CMSP.

Existing law establishes the County Medical Services Program Account in the County Health Services Fund, which is continuously appropriated, and specifies the purposes for which moneys in the account may be used.

This bill would provide that moneys in the account also may be used to reimburse the State Department of Health Services for state costs of providing administrative support to the CMSP, thereby making an appropriation.

Existing law requires the State Department of Health Services, in conjunction with the State Department of Social Services, to implement a simplified eligibility process as part of the Food Stamp program to expedite Medi-Cal program and Healthy Families Program enrollment.

This bill, instead, would provide that these provisions shall be implemented on and after July 1, 2003, but only if and to the extent that federal financial participation is available.

This bill would authorize the State Department of Health Services to adopt emergency regulations to implement the applicable provisions of this bill in accordance with the rulemaking provisions of the Administrative Procedure Act.

The bill would prohibit the State Department of Health Services from recouping any overpayment made to a provider before October 1, 2002, under a specified provision of the Medi-Cal Act for ambulance transport services, if the overpayment is not due to the fault of the provider. It would also add to the requirements of the State Department of Health Services with regard to completing the design and implementation of the Children's Medical Services Network (CMS Net).

The bill would require the California Health and Human Services Agency to develop a comprehensive plan that responds to the decision of the United States Supreme Court in Olmstead v. L.C. and that describes the actions that California may take to improve its long-term care system so that its residents have available an array of community care options that allow them to avoid unnecessary institutionalization.

This bill would specify requirements of the State Department of Developmental Services related to the use of funds appropriated in Item 4300-101-0001 of the Budget Act of 2002 pertaining to regional centers.

The bill would provide that of the amounts appropriated in Item 4260-111-0001 of the Budget Act of 2002 from the Hospital Services Account, the Physician Services Account, and the Unallocated Account in the Cigarette and Tobacco Products Surtax Fund, $24,803,000 shall be administered and allocated for the 2002–03 fiscal year, as provided in the bill, for distribution through the California Healthcare for Indigents Program and the rural health services program.

The bill would provide that the unencumbered balances of the amounts appropriated in Item 4260-001-0589 of Chapter 50 of the Statutes of 1999, Item 4260-001-0589 of Chapter 52 of the Statutes of 2000, and Item 4260-001-0589 of Chapter 106 of the Statutes of 2001 are reappropriated and shall be available for encumbrance and expenditure until July 30, 2005, thereby making an appropriation.

This bill, in order to implement changes in the level of funding for Medi-Cal services in the Budget Act of 2002, would require the Director of Health Services to eliminate, with specified exceptions, all provider

rate increases that were provided, effective August 1, 2000, for services rendered in the Medi-Cal program. The bill would define "provider" for purposes of this requirement.

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement, including the creation of a State Mandates Claims Fund to pay the costs of mandates that do not exceed $1,000,000 statewide and other procedures for claims whose statewide costs exceed $1,000,000.

This bill would provide that, if the Commission on State Mandates determines that the bill contains costs mandated by the state, reimbursement for those costs shall be made pursuant to these statutory provisions.

This bill would declare that it is to take effect immediately as an urgency statute.

Appropriation: yes.

*The people of the State of California do enact as follows:*

SECTION 1.    Section 4426 of the Business and Professions Code is amended to read:

4426.    The State Department of Health Services shall conduct a study of the adequacy of Medi-Cal pharmacy reimbursement rates including the cost of providing prescription drugs and services.

SEC. 2.    Section 4427 of the Business and Professions Code is repealed.

SEC. 3.    Section 49557.2 of the Education Code is amended to read:

49557.2.    (a) (1)  Effective July 1, 2003, at the option of the school district or county superintendent, and to the extent necessary to implement Section 14005.41 of the Welfare and Institutions Code, the following information may be incorporated into the School Lunch Program application packet or notification of eligibility for the School Lunch Program using simple and culturally appropriate language:

(A)  A notification that if a child qualifies for free school lunches, then the child may qualify for free or reduced-cost health coverage.

(B)  A request for the applicant's consent for the child to participate in the Medi-Cal program, if eligible for free school lunches, and to have the information on the school lunch application shared with the entity designated by the State Department of Health Services to make an accelerated determination and the local agency that determines eligibility under the Medi-Cal program.

(C)  A notification that the school district will not forward the school lunch application to the entity designated by the State Department of

Health Services to make an accelerated determination and the local agency that determines eligibility under the Medi-Cal program, without the consent of the child's parent or guardian.

(D) A notification that the school lunch application is confidential and, with the exception of forwarding the information for use in health program enrollment upon the consent of the child's parent or guardian, the school district will not share the information with any other governmental agency, including the federal Immigration and Naturalization Service and the Social Security Administration.

(E) A notification that the school lunch application information will only be used by the entity designated by the State Department of Health Services to make an accelerated determination and the state and local agencies that administer the Medi-Cal program for purposes directly related to the administration of the program and will not be shared with other government agencies, including the Immigration and Naturalization Service and the Social Security Administration for any purpose other than the administration of the Medi-Cal program.

(F) Information regarding the Medi-Cal program, including available services, program requirements, rights and responsibilities, and privacy and confidentiality requirements.

(2) The State Department of Education, in consultation with school districts, county superintendents of schools, consumer advocates, counties, the State Department of Health Services, and other stakeholders, shall make recommendations regarding the School Lunch Program application, on or before February 1, 2003. The recommendations shall include specific changes to the School Lunch Program application materials as necessary to implement Section 14005.41 of the Welfare and Institutions Code, information for staff as to how to implement the changes, and a description of the process by which information on the School Lunch Program application will be shared with the county, as the local agency that determines eligibility under the Medi-Cal program.

(b) (1) Effective July 1, 2003, school districts and county superintendents of schools may implement a process to share information provided on the entity designated by the State Department of Health Services to make an accelerated determination and the School Lunch Program application with the entity designated by the State Department of Health Services to make an accelerated determination and the local agency that determines eligibility under the Medi-Cal program, and shall share this information with those entities, if the applicant consents to that sharing of information. This information may be shared electronically, physically, or through whatever method is determined appropriate.

95

(2) Each school district or county superintendent that chooses to share information pursuant to this subdivision shall enter into a memorandum of understanding with the local agency that determines eligibility under the Medi-Cal program, that sets forth the roles and responsibilities of each agency and the process to be used in sharing the information.

(3) The local agency that determines eligibility under the Medi-Cal program shall only use information provided by applicants on the school lunch application for purposes directly related to the administration of the Medi-Cal program.

(4) After school districts share information regarding the school lunch application with the entity designated by the State Department of Health Services to make an accelerated determination and the local agency that determines eligibility under the Medi-Cal program, for the purpose of determining Medi-Cal program eligibility, the local agency and the school district shall not share information about school lunch participation or the Medi-Cal program eligibility information with each other unless specifically authorized under other provisions of law.

SEC. 4.    Section 1356 of the Health and Safety Code is amended to read:

1356.    (a) Each plan applying for licensure under this chapter shall reimburse the director for the actual cost of processing the application, including overhead, up to an amount not to exceed twenty-five thousand dollars ($25,000). The cost shall be billed not more frequently than monthly and shall be remitted by the applicant to the director within 30 days of the date of billing. The director shall not issue a license to any applicant prior to receiving payment in full for all amounts charged pursuant to this subdivision.

(b) In addition to other fees and reimbursements required to be paid under this chapter, each licensed plan shall pay to the director an amount as estimated by the director for the ensuing fiscal year, as a reimbursement of its share of all costs and expenses, including, but not limited to, costs and expenses associated with routine financial examinations, grievances and complaints including maintaining a toll-free number for consumer grievances and complaints, investigation and enforcement, medical surveys and reports, and overhead, reasonably incurred in the administration of this chapter and not otherwise recovered by the director under this chapter or from the Managed Care Fund. The amount may be paid in two equal installments. The first installment shall be paid on or before August 1 of each year, and the second installment shall be paid on or before December 15 of each year. The amount paid by each plan, except a plan offering only specialized health care service plan contracts, shall be twelve thousand five hundred

Ch. 1161                    — **20** —

dollars ($12,500), plus an amount up to, but not exceeding, an amount computed in accordance with the following schedule:

| Plan Enrollment | Amount of Assessment |
| --- | --- |
| 0 to 25,000 | $0 + 65 cents for each enrollee |
| 25,001 to 75,000 | $16,250 + 53 cents for each enrollee in excess of 25,000 |
| 75,001 to 150,000 | $42,750 + 50 cents for each enrollee in excess of 75,000 |
| 150,001 to 300,000 | $80,250 + 47 cents for each enrollee in excess of 150,000 |
| over 300,000 | $150,750 + 45 cents for each enrollee in excess of 300,000 |

Plans offering only specialized health care service plan contracts shall pay seven thousand five hundred dollars ($7,500), plus an amount up to, but not exceeding, an amount computed in accordance with the following schedule:

| Plan Enrollment | Amount of Assessment |
| --- | --- |
| 0 to 25,000 | $0 + 48 cents for each enrollee |
| 25,001 to 75,000 | $12,000 + 36 cents for each enrollee in excess of 25,000 |
| 75,001 to 150,000 | $30,000 + 30 cents for each enrollee in excess of 75,000 |
| 150,001 to 300,000 | $52,500 + 26 cents for each enrollee in excess of 150,000 |
| over 300,000 | $91,500 + 24 cents for each enrollee in excess of 300,000 |

The amount paid by each plan shall be for each enrollee enrolled in its plan in this state as of the preceding March 31, and shall be fixed by the director by notice to all licensed plans on or before June 15 of each year. A plan that is unable to report the number of enrollees enrolled in the plan because it does not collect that data, shall provide the director with an estimate of the number of enrollees enrolled in the plan and the method used for determining the estimate. The director may, upon giving written notice to the plan, revise the estimate if the commissioner determines that the method used for determining the estimate was not reasonable.

In determining the amount assessed, the director shall consider all appropriations from the Managed Care Fund for the support of this chapter and all reimbursements provided for in this chapter.

95

Ch. 1161

(c)  Each licensed plan shall also pay two thousand dollars ($2,000), plus an amount up to, but not exceeding, forty-eight hundredths of one cent ($0.0048) for each enrollee for the purpose of reimbursing its share of all costs and expenses, including overhead, reasonably anticipated to be incurred by the department in administering Sections 1394.7 and 1394.8 during the current fiscal year. The amount charged shall be remitted within 30 days of the date of billing.

(d)  In no case shall the reimbursement, payment, or other fee authorized by this section exceed the cost, including overhead, reasonably incurred in the administration of this chapter.

(e)  The director by notice to all licensed plans on or before September 15 of each year, may require health care service plans to pay an additional assessment to provide the department with sufficient revenues to support costs and expenses as set forth in this section and subdivision (b) of Section 1341.4 for the 2000–01, 2001–02, and 2002–03 fiscal years. Any plan that did not pay its assessment as required under this subdivision for the 2001–02 fiscal year shall be assessed the amount due for the 2001–02 fiscal year in the 2002–03 fiscal year, in addition to the amount due in the 2002–03 fiscal year. The assessment pursuant to this subdivision is separate and independent of the assessment in subdivision (b), and may not be aggregated for the purposes of limitation or otherwise with the assessment in subdivision (b). The assessment pursuant to this subdivision is not subject to the limitations imposed on assessments pursuant to Section 1356.1. In imposing an assessment pursuant to this subdivision the director shall levy on each plan an amount determined by the director using the categories of plans in the schedules set forth in subdivision (b). The assessment shall be paid in full or in two equal installments, as determined by the department. On July 1, 2003, and thereafter, the director may raise the assessment limit pursuant to subdivision (b) to incorporate annual expenditure levels set forth in this subdivision.

(f)  For the purpose of calculating the assessment under this section, an enrollee who is enrolled in one plan and who receives health care services under arrangements made by another plan or plans, whether pursuant to a contract, agreement, or otherwise, shall be considered to be enrolled in each of the plans.

SEC. 5.   Section 1797.199 of the Health and Safety Code is amended to read:

1797.199.   (a)  There is hereby created in the State Treasury, the Trauma Care Fund, which, notwithstanding Section 13340 of the Government Code, is hereby continuously appropriated without regard to fiscal years to the authority for the purposes specified in subdivision (c).

(b)  The fund shall contain any moneys deposited in the fund pursuant to appropriation by the Legislature or from any other source, as well as, notwithstanding Section 16305.7 of the Government Code, any interest and dividends earned on moneys in the fund.

(c)  Moneys in the fund shall be expended by the authority to provide for allocations to local EMS agencies, for distribution to local EMS agency-designated trauma centers provided for by this chapter.

(d)  Within 30 days of the effective date of the enactment of an appropriation for purposes of implementing this chapter, the authority shall request all local EMS agencies with an approved trauma plan, that includes at least one designated trauma center, to submit within 45 days of the request the total number of trauma patients and the number of trauma patients at each facility that were reported to the local trauma registry for the most recent fiscal year for which data are available, pursuant to Section 100257 of Title 22 of the California Code of Regulations. However, the local EMS agency's report shall not include any registry entry that is in reference to a patient who is discharged from the trauma center's emergency department without being admitted to the hospital unless the nonadmission is due to the patient's death or transfer to another facility. Any local EMS agency that fails to provide these data shall not receive funding pursuant to this section.

(e)  Except as provided in subdivisions (j) and (o), the authority shall distribute all funds to local EMS agencies with an approved trauma plan that includes at least one designated trauma center in the local EMS agency's jurisdiction as of July 1 of the fiscal year in which funds are to be distributed.

(1)  The amount provided to each local EMS agency shall be in the same proportion as the total number of trauma patients reported to the local trauma registry for each local EMS agency's area of jurisdiction compared to the total number of all trauma patients statewide as reported under subdivision (d).

(2)  The authority shall send a contract to each local EMS agency that is to receive funds within 30 days of receiving the required data and shall distribute the funds to a local EMS agency within 30 days of receiving a signed contract and invoice from the agency.

(f)  Local EMS agencies that receive funding under this chapter shall distribute all those funds to eligible trauma centers, except that an agency may expend 1 percent for administration. It is the intent of the Legislature that the funds distributed to eligible trauma centers be spent on trauma services. The local EMS agency may utilize a grant-based system, a reimbursement-based system, or other appropriate methodology to comply with this section. Local EMS agencies shall take

95

the following factors into consideration when determining the distribution amounts for each trauma center:

(1) The volume of uninsured trauma patients treated at the trauma center.

(2) The existence of a high percentage of uninsured trauma patients relative to the total number of trauma patients treated at the trauma center.

(3) The acuity mix of uninsured trauma patients treated at the trauma center.

(g) A trauma center shall be eligible for funding under this section if it is designated as a trauma center by a local EMS agency pursuant to Section 1798.165 and complies with the requirements of this section. Both public and private hospitals designated as trauma centers shall be eligible for funding.

(h) A trauma center that receives funding under this section shall agree to remain a trauma center through June 30 of the fiscal year in which it receives funding. If the trauma center ceases functioning as a trauma center, it shall pay back to the local EMS agency a pro rata portion of the funding that has been received. If there are one or more trauma centers remaining in the local EMS agency's service area, the local EMS agency shall distribute the funds among the other trauma centers. If there is no other trauma center within the local EMS agency's service area, the local EMS agency shall return the moneys to the authority. The authority shall deposit any such funds into the reserve described in subdivision (j). In the case of a local EMS agency that distributes funds using a reimbursement or fee-for-service system, a trauma center that ceases functioning as a trauma center shall only be required to pay back a pro rata portion of the minimum distributed as described in subdivision (i).

(i) Notwithstanding subdivision (f), the local EMS agency shall provide from the funds that the local EMS agency receives from the authority a minimum amount of one hundred fifty thousand dollars ($150,000) to each Level I or Level II trauma center to assist those centers in ensuring trauma center viability. The local EMS agency shall provide a Level III trauma center a minimum amount of fifty thousand dollars ($50,000) for this purpose. If a local EMS agency's distribution pursuant to subdivision (e) is less than the amount necessary for each trauma center within the local EMS agency's jurisdiction to receive the minimum amount provided by this subdivision, the authority shall include in its distribution to the agency an additional amount of funds necessary to make up the minimum amount pursuant to paragraph (1) of subdivision (j) plus 1 percent of the added amount for local EMS agency administrative costs. Based upon qualifying patient volume figures and the distribution factors established in subdivision (f), a trauma center

designated as a Level IV may receive funding as determined appropriate by the local EMS agency.

(j) Notwithstanding subdivision (e), the authority shall reserve 6 percent of any funds appropriated to the Trauma Care Fund for distribution during the same fiscal year. The authority may spend these funds for the purposes specified in paragraphs (1) to (3), inclusive.

(1) To provide to a local EMS agency, the amount that the agency needs to make up the full minimum amount specified in subdivision (i).

(2) To provide a minimum amount to a trauma center that was not designated on July 1 of the fiscal year as specified in subdivision (e) but which becomes designated by January 1 of any fiscal year in which funds are being distributed pursuant to this section. In the case of such a newly designated center, the minimum distribution shall equal one-half of the minimum distribution described in subdivision (i), provided the local EMS agency makes an application to the authority for this purpose by February 1 of the same fiscal year.

(3) To the extent that there are funds in the reserve after the distributions provided by paragraphs (1) and (2) of this subdivision, to provide additional amounts to a local EMS agency where the distribution under subdivision (f) does not provide an accurate reflection of its total trauma volume. Any local EMS agency that believes the distribution under subdivision (f) does not provide an accurate accounting of its total trauma patient volume may make application to the authority for an adjustment.

(A) The application shall state the reason for the request and shall include supporting data.

(B) The authority shall consider all applications submitted pursuant to this paragraph and received by February 1 of the fiscal year.

(C) Based on the application and its supporting information, the authority shall determine the amount, if any, that the local agency should receive in addition to the amounts specified in subdivision (e) and shall allocate an appropriate amount of the reserve in accordance with its determination.

(k) In order to receive funds pursuant to this section, an eligible trauma center shall submit, pursuant to a contract between the trauma center and the local EMS agency, relevant and pertinent data requested by the local EMS agency. A trauma center shall demonstrate that it is appropriately submitting data to the local EMS agency's trauma registry and a local EMS agency shall audit the data annually within two years of a distribution from the local EMS agency to a trauma center. Any trauma center receiving funding pursuant to this section shall report to the local EMS agency how the funds were used to support trauma services.

(*l*) It is the intent of the Legislature that all moneys appropriated to the fund be distributed to local EMS agencies during the same year the moneys are appropriated. To the extent that any moneys are not distributed by the authority during the fiscal year in which the moneys are appropriated, the moneys shall remain in the fund and be eligible for distribution pursuant to this section during subsequent fiscal years, except that the minimum distribution specified in subdivision (i) shall be provided to the extent that moneys are available in the fund.

(m) By October 31, 2002, the authority shall develop criteria for the standardized reporting of trauma patients to local trauma registries. The authority shall seek input from local EMS agencies to develop the criteria. All local EMS agencies shall utilize the trauma patient criteria for reporting trauma patients to local trauma registries by July 1, 2003.

(n) By December 31 of the fiscal year following any fiscal year in which funds are distributed pursuant to this section, a local EMS agency that has received funds from the authority pursuant to this chapter shall provide a report to the authority that details the amount of funds distributed to each trauma center, the amount of any balance remaining, and the amount of any claims pending, if any, and describes how the respective centers used the funds to support trauma services. The report shall also describe the local EMS agency's mechanism for distributing the funds to trauma centers, a description of their audit process and criteria, and a summary of the most recent audit results.

(o) The authority may retain from any appropriation to the fund an amount sufficient to implement this section, up to two hundred eighty thousand dollars ($280,000). This amount may be adjusted to reflect any increases provided for wages or operating expenses as part of the authority's budget process.

SEC. 5.5.   Section 26157 is added to the Health and Safety Code, to read:

26157.   (a) The department may receive voluntary contributions to support the department's activities in providing guidance, developing standards and guidelines and permissible exposure limits, and adopting regulations relating to indoor mold hazards, including, but not limited to, duties included under this chapter.

(b) The contributions shall be deposited in the Public Health Protection from Indoor Mold Hazards Fund, which is hereby created in the State Treasury. Notwithstanding Section 13340 of the Government Code, moneys in the fund shall be continuously appropriated to the department without regard to fiscal years and shall be used to support the department's activities in providing guidance, developing standards and guidelines and permissible exposure limits, and adopting regulations

95

relating to indoor mold hazards, including, but not limited to, duties included under this chapter to the extent that funding is available.

SEC. 6.   Section 53300 of the Health and Safety Code is amended to read:

53300.   (a)  No more than 10 percent of the amount appropriated in a fiscal year for the purposes of this chapter may be used for state administration of this chapter, including evaluation and technical assistance. Technical assistance shall include, but is not limited to, assisting with collaborations, providing information, and convening training workshops. The Legislature shall be notified of the administrative costs of this program pursuant to Section 28 of the Budget Act.

(b)  Notwithstanding the allocation of funds in the Budget Act of 2000 for the supportive housing initiative to the local assistance Item 4440-101-0001, up to 10 percent of the funds may be spent for administrative costs, as defined in subdivision (a).

(c)  Notwithstanding any other provision of law, the lead agency shall make all grant awards from funds allocated in the Budget Act of 2001 for the supportive housing initiative no later than June 30, 2002, and shall expend the funds allocated for those grants no later than June 30, 2005, except for grants awarded for housing costs, as specified in paragraph (1) of subdivision (b) of Section 53275.

SEC. 7.   Section 100171 of the Health and Safety Code is amended to read:

100171.   Notwithstanding any other provision of law, whenever the department is authorized or required by statute, regulation, due process (14th amendment, United States Constitution; subdivision (a) of Section 7 of Article I, California Constitution), or a contract, to conduct an adjudicative hearing leading to a final decision of the director or the department, the following shall apply:

(a)  The proceeding shall be conducted pursuant to the administrative adjudication provisions of Chapter 4.5 (commencing with Section 11400) and Chapter 5 (commencing with Section 11500) of Part 1 of Division 3 of Title 2 of the Government Code, except as specified in this section.

(b)  Notwithstanding Section 11502 of the Government Code, whenever the department conducts a hearing under Chapter 4.5 (commencing with Section 11400) or Chapter 5 (commencing with Section 11500) of Part 1 of Division 3 of Title 2 of the Government Code, the hearing shall be conducted before an administrative law judge selected by the department and assigned to a hearing office that complies with the procedural requirements of Chapter 4.5 (commencing with Section 11400) of Part 1 of Division 3 of Title 2 of the Government Code.

(c) (1) Notwithstanding Section 11508 of the Government Code, whenever the department conducts a hearing under Chapter 4.5 (commencing with Section 11400) or Chapter 5 (commencing with Section 11500) of Part 1 of Division 3 of Title 2 of the Government Code, the time and place of the hearing shall be determined by the staff assigned to the hearing office of the department, except as provided in paragraph (2) or unless the department by regulation specifies otherwise.

(2) Formal hearings requested by institutional Medi-Cal providers and health facilities shall be held in Sacramento.

(d) (1) Unless otherwise specified in this section, the following sections of the Government Code shall apply to any adjudicative hearing conducted by the department only if the department has not, by regulation, specified an alternative procedure for the particular type of hearing at issue: Section 11503 (relating to accusations), Section 11504 (relating to statements of issues), Section 11505 (relating to the contents of the statement to respondent), Section 11506 (relating to the notice of defense), Section 11507.6 (relating to discovery rights and procedures), Section 11508 (relating to the time and place of hearings), and Section 11516 (relating to amendment of accusations).

(2) Any alternative procedure specified by the department in accordance with this subdivision shall conform to the purpose of the Government Code provision it replaces insofar as it is possible to do so consistent with the specific procedural requirements applicable to the type of hearing at issue.

(3) Any alternative procedures adopted by the department under this subdivision shall not diminish the amount of notice given of the issues to be heard by the department or deprive appellants of the right to discovery suitable to the particular proceedings. Except as specified in paragraph (2) of subdivision (c), modifications of timeframes or of the place of hearing made by regulation may not lengthen timeframes within which the department is required to act nor require hearings to be held at a greater distance from the appellant's place of residence or business than is the case under the otherwise applicable Government Code provision.

(e) The specific timelines specified in Section 11517 of the Government Code shall not apply to any adjudicative hearing conducted by the department to the extent that the department has, by regulation, specified different timelines for the particular type of hearing at issue.

(f) In the case of any adjudicative hearing conducted by the department, "transcript," as used in subdivision (c) of Section 11517 of the Government Code, shall be deemed to include any alternative form of recordation of the oral proceedings, including, but not limited to, an audiotape.

95

(g) Pursuant to Section 11415.50 of the Government Code, the department may, by regulation, provide for any appropriate informal procedure to be used for an informal level of review that does not itself lead to a final decision of the department or the director. The procedures specified in Article 10 (commencing with Section 11445.10) of Chapter 4.5 of Part 1 of Division 3 of Title 2 of the Government Code shall not apply to any such an informal level of review. Informal conferences concerning appeals by institutional Medi-Cal providers and health facilities may be held in Sacramento or Los Angeles.

(h) Notwithstanding any other provision of law, any adjudicative hearing conducted by the department that is conducted pursuant to a federal statutory or regulatory requirement that contains specific procedures may be conducted pursuant to those procedures to the extent they are inconsistent with the procedures specified in this section.

(i) Nothing in this section shall apply to a fair hearing involving a Medi-Cal beneficiary insofar as the hearing is, by agreement or otherwise, heard before an administrative law judge employed by the State Department of Social Services, or insofar as the hearing is being held pursuant to Division 4.5 (commencing with Section 4500) of the Welfare and Institutions Code in connection with services provided by the State Department of Developmental Services under applicable federal medicaid waivers. Nothing in this subdivision shall be interpreted as abrogating the authority of the State Department of Health Services as the single state agency under the state medicaid plan.

(j) Nothing in this provision shall supersede express provisions of law that apply to any hearing that is not adjudicative in nature or that does not involve due process rights specific to an individual or specific individuals, as opposed to the general public or a segment of the general public.

SEC. 8.    Article 6 (commencing with Section 101315) is added to Chapter 3 of Part 3 of Division 101 of the Health and Safety Code, to read:

Article 6.    Federal Funding for Bioterrorism Preparedness and other
Public Health Threats

101315.    (a) Federal funding received by the State Department of Health Services for bioterrorism preparedness and emergency response is subject to appropriation in the annual Budget Act.

(b) This article shall govern the purposes for which federal funding may be allocated and expended by local health jurisdictions for the prevention of, and response to, bioterrorist attacks and other public

health emergencies pursuant to the federally approved collaborative state-local plan.

(c) A local health jurisdiction shall be ineligible to receive funding from appropriations made for purposes of this article when that local health jurisdiction receives directly or through another local jurisdiction federal funding for the same purposes. Moneys appropriated in the annual Budget Act for purposes of this article that would have been allocated to a local health jurisdiction that is ineligible, pursuant to this subdivision, to receive funding shall be allocated, as provided in Section 101317, among the remaining local health jurisdictions that are eligible.

(d) Funds appropriated for the purposes of this article shall not be used to supplant funding for existing levels of service and shall only be used for purposes specified in Section 101317.

101317.   (a) For purposes of this article, allocations shall be made to the administrative bodies of qualifying local health jurisdictions described as public health administrative organizations in Section 101185, and pursuant to Section 101315, in the following manner:

(1) (A) For the 2003–04 fiscal year and subsequent fiscal years, to the administrative bodies of each local health jurisdiction, a basic allotment of one hundred thousand dollars ($100,000), subject to the availability of funds appropriated in the annual Budget Act or some other act.

(B) For the 2002–03 fiscal year, the basic allotment of one hundred thousand dollars ($100,000) shall be reduced by the amount of federal funding allocated as part of a basic allotment for the purposes of this article to local health jurisdictions in the 2001–02 fiscal year.

(2) (A) Except as provided in subdivision (c), after determining the amount allowed for the basic allotment as provided in paragraph (1), the balance of the annual Budget Act appropriation for purposes of this article, if any, shall be allotted on a per capita basis to the administrative bodies of each local health jurisdiction in the proportion that the population of that local health jurisdiction bears to the population of all eligible local health jurisdictions of the state.

(B) The population estimates used for the calculation of the per capita allotment pursuant to subparagraph (A) shall be based on the Department of Finance's E-1 Report, "City/County Populations Estimates with Annual Percentage Changes" as of January 1 of the previous year. However, if within a local health jurisdiction there are one or more city health jurisdictions, the local health jurisdiction shall subtract the population of the city or cites from the local health jurisdiction total population for purposes of calculating the per capita total.

(b) If the amounts appropriated in the annual Budget Act are insufficient to fully fund the allocations specified in subdivision (a), the department shall prorate and adjust each local health jurisdiction's allocation so that the total amount allocated equals the amount appropriated.

(c) For the 2002–03 fiscal year and subsequent fiscal years, where the federally approved collaborative state-local plan identifies an allocation method, other than the basic allotment and per capita method described in subdivision (a), for specific funding to a local public health jurisdiction, including, but not limited to, funding laboratory training, chemical and nuclear terrorism preparedness, and information technology approaches, that funding shall be paid to the administrative bodies of those local health jurisdictions in accordance with the federally approved collaborative state-local plan for bioterrorism preparedness and other public health threats in the state.

(d) Funds appropriated pursuant to the annual Budget Act for allocation to local health jurisdictions pursuant to this article shall be disbursed quarterly to local health jurisdictions beginning July 1, 2002, using the following process:

(1) Each fiscal year, upon the submission of an application for funding by the administrative body of a local health jurisdiction, the department shall make the first quarterly payment to each eligible local health jurisdiction. That application shall include a plan and budget for the local program that is in accordance with the department's plans and priorities for bioterrorism preparedness and response, and other public health threats and emergencies, and a certification by the chairperson of the board of supervisors or the mayor of a city with a local health department that the funds received pursuant to this article will not be used to supplant other funding sources in violation of subdivision (d) of Section 101315.

(2) The department shall establish procedures and a format for the submission of the local health jurisdiction's plan and budget. The local health jurisdiction's plan shall be consistent with the department's plans and priorities for bioterrorism preparedness and response, and other public health threats and emergencies, in accordance with requirements specified in the department's federal grant award. Payments to local health jurisdictions beyond the first quarter shall be contingent upon the approval of the department of the local health jurisdiction's plan and the local health jurisdiction's progress in implementing the provisions of the local health jurisdiction's plan, as determined by the department.

(3) If a local health jurisdiction does not apply or submits a noncompliant application for its allocation, those funds provided under

this article may be redistributed according to subdivision (a) to the remaining local health jurisdictions.

(e) Funds shall be used for activities to improve and enhance local health jurisdictions' preparedness for and response to bioterrorism and other public health threats and emergencies, including laboratory training and information technology, and for any other purposes, as determined by the department, that are consistent with the purposes for which the funds were appropriated.

(f) Any local health jurisdiction that receives funds pursuant to this article shall deposit them in a special Local Public Health Preparedness Trust Fund established solely for this purpose before transferring or expending the funds for any of the uses allowed pursuant to this article. The interest earned on moneys in the fund shall accrue to the benefit of the fund and shall be expended for the same purposes as other moneys in the fund.

(g) (1) A local health jurisdiction that receives funding pursuant to this article shall submit reports that display cost data and the activities funded by moneys deposited in its Local Public Health Preparedness Trust Fund to the department on a regular basis in a form and according to procedures prescribed by the department.

(2) The department, in consultation with local health jurisdictions, shall develop required content for the reports required under paragraph (1), which shall include, but shall not be limited to, data and information needed to implement this article and to satisfy federal reporting requirements. The chairperson of the board of supervisors or the mayor of a city with a local health department shall certify the accuracy of the reports and that the moneys appropriated for the purposes of this article have not been used to supplant other funding sources.

(h) The administrative body of a local health jurisdiction may enter into a contract with the department and the department may enter into a contract with that local health jurisdiction for the department to administer all or a portion of the moneys allocated to the local health jurisdiction pursuant to this article.

(i) The department may recoup from a local health jurisdiction any moneys allocated pursuant to this article that are unspent or that are not expended for purposes specified in subdivision (d). The department may also recoup funds expended by a local health jurisdiction in violation of subdivision (d) of Section 101315. The department may withhold quarterly payments of moneys to a local health jurisdiction if the local health jurisdiction is not in compliance with this article or the terms of that local health jurisdiction's plan as approved by the department. Before any funds are recouped or withheld from a local health jurisdiction, the department shall meet with local health officials to

discuss the status of the unspent moneys or the disputed use of the funds or both.

(j) Moneys made available for bioterrorism preparedness pursuant to this article in the 2001–02 fiscal year shall be available for expenditure and encumbrance until June 30, 2003. Moneys made available for bioterrorism preparedness pursuant to this article from July 1, 2002, to August 30, 2003, inclusive, shall be available for expenditure and encumbrance until August 30, 2004, subject to extension of the federal grant authority.

101319.   Due to the need to rapidly implement, and to provide local health jurisdictions with timely funding for the purposes of, this article, funds appropriated in the annual Budget Act for purposes of this article for the 2002–03 fiscal year and subsequent fiscal years shall be allocated through the use of agreements, which shall not be subject to Part 2 (commencing with Section 10100) of the Public Contract Code.

SEC. 9.   Section 104188 is added to the Health and Safety Code, to read:

104188.   The maximum indirect cost rate that may be charged on any cancer research program grant awarded to any institution under this article shall not be more than 25 percent of the institution's direct costs.

SEC. 10.   Section 120955 of the Health and Safety Code is amended to read:

120955.   (a) To the extent that state and federal funds are appropriated in the annual Budget Act for these purposes, the director shall establish and may administer a program to provide drug treatments to persons infected with human immunodeficiency virus (HIV), the etiologic agent of acquired immune deficiency syndrome (AIDS). The director shall develop, maintain, and update as necessary a list of drugs to be provided under this program. Drugs on the list shall include, but not be limited to, the drugs zidovudine (AZT) and aerosolized pentamidine.

(b) The director may grant funds to a county public health department through standard agreements to administer this program in that county. To maximize the recipients' access to drugs covered by this program, the director shall urge the county health department in counties granted these funds to decentralize distribution of the drugs to the recipients.

(c) The director shall establish a rate structure for reimbursement for the cost of each drug included in the program. Rates shall not be less than the actual cost of the drug. However, the director may purchase a listed drug directly from the manufacturer and negotiate the most favorable bulk price for that drug.

(d) Manufacturers of the drugs on the list shall pay the department a rebate equal to the rebate that would be applicable to the drug under

95

Section 1927(c) of the federal Social Security Act (42 U.S.C. Sec. 1396r-8(c)) plus an additional rebate to be negotiated by each manufacturer with the department, except that no rebates shall be paid to the department under this section on drugs for which the department has received a rebate under Section 1927(c) of the federal Social Security Act (42 U.S.C. Sec. 1396r-8(c)) or that have been purchased on behalf of county health departments or other eligible entities at discount prices made available under Section 256b of Title 42 of the United States Code.

(e) The department shall submit an invoice, not less than two times per year, to each manufacturer for the amount of the rebate required by subdivision (d).

(f) Drugs may be removed from the list for failure to pay the rebate required by subdivision (d), unless the department determines that removal of the drug from the list would cause substantial medical hardship to beneficiaries.

(g) The department may adopt emergency regulations to implement amendments to this chapter made during the 1997–98 Regular Session, in accordance with the Administrative Procedure Act, Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code. The initial adoption of emergency regulations shall be deemed to be an emergency and considered by the Office of Administrative Law as necessary for the immediate preservation of the public peace, health and safety, or general welfare. Emergency regulations adopted pursuant to this section shall remain in effect for no more than 180 days.

(h) Reimbursement under this chapter shall not be made for any drugs that are available to the recipient under any other private, state, or federal programs, or under any other contractual or legal entitlements, except that the director may authorize an exemption from this subdivision where exemption would represent a cost savings to the state.

SEC. 11.   Section 124030 of the Health and Safety Code is amended to read:

124030.   As used in this article and Section 120475:

(a) "State board" means the State Maternal, Child, and Adolescent Health Board.

(b) "Department" means the department.

(c) "Director" means the director.

(d) "Governing body" means the county board of supervisors or boards of supervisors in the case of counties acting jointly.

(e) "Local board" means local maternal, child, and adolescent health board.

(f) "Local health jurisdiction" means county health department or combined health department in the case of counties acting jointly or city health department within the meaning of Section 101185.

(g)   "Child Health and Disability Prevention provider" or "CHDP provider" means any of the following, if approved for participation in the Child Health and Disability Prevention program by the community Child Health and Disability program director in accordance with program standards and as certified by the department:

(1) A physician licensed to practice medicine in California.

(2) A family nurse practitioner certified pursuant to Sections 2834 and 2836 of the Business and Professions Code.

(3) A pediatric nurse practitioner certified pursuant to Sections 2834 and 2836 of the Business and Professions Code.

(4) A primary care center, clinic, or other public or private agency or organization that provides outpatient health care services.

(5) A physicians' group.

(6) A licensed clinical laboratory.

SEC. 12.   Section 124033 is added to the Health and Safety Code, to read:

124033.   (a)  Commencing July 1, 2003, all applications for services under the Child Health and Disability Prevention program shall be filed electronically in accordance with subdivision (b) of Section 14011.7 of the Welfare and Institutions Code.

(b)  To implement the program described in subdivisions (b) to (e), inclusive, of Section 14011.7 of the Welfare and Institutions Code for the use of an electronic application for the Child Health and Disability Prevention program and for preenrollment into the Medi-Cal program or the Healthy Families Program, the following shall apply:

(1)  The department may contract with public or private entities, or utilize existing health care service provider enrollment and payment mechanisms, including the Medi-Cal program's fiscal intermediary, only if services provided under the program are specifically identified and reimbursed in a manner that appropriately claims federal financial reimbursement.

(2)  Contracts, including the Medi-Cal program fiscal intermediary contract for the Child Health and Disability Prevention Program, including any contract amendment, any system change pursuant to a change order, and any project or systems development notice shall be exempt from Part 2 (commencing with Section 10100) of Division 2 of the Public Contract Code, Chapter 7 (commencing with Section 11700) of Part 1 of Division 3 of Title 2 of the Government Code, Section 19130 of the Government Code, and any policies, procedures, or regulations authorized by these laws.

Ch. 1161

SEC. 13.   Section 124040 of the Health and Safety Code is amended to read:

124040.   (a) The governing body of each county or counties shall establish a community child health and disability prevention program for the purpose of providing early and periodic assessments of the health status of children in the county or counties by July 1, 1974. However, this shall be the responsibility of the department for all counties that contract with the state for health services. Contract counties, at the option of the board of supervisors, may provide services pursuant to this article in the same manner as other county programs, provided the option is exercised prior to the beginning of each fiscal year. Each plan shall include, but is not limited to, the following requirements:

(1)  Outreach and educational services.

(2)  Agreements with public and private facilities and practitioners to carry out the programs.

(3)  Health screening and evaluation services for all children including a physical examination, immunizations appropriate for the child's age and health history, and laboratory procedures appropriate for the child's age and population group performed by, or under the supervision or responsibility of, a physician licensed to practice medicine in California or by a certified family nurse practitioner or a certified pediatric nurse practitioner.

(4)  Referral for diagnosis or treatment when needed, including, for all children eligible for Medi-Cal, referral for treatment by a provider participating in the Medi-Cal program of the conditions detected, and methods for assuring referral is carried out.

(5)  Recordkeeping and program evaluations.

(6)  The health screening and evaluation part of each community child health and disability prevention program plan shall include, but is not limited to, the following for each child:

(A)  A health and development history.

(B)  An assessment of physical growth.

(C)  An examination for obvious physical defects.

(D)  Ear, nose, mouth, and throat inspection, including inspection of teeth and gums, and for all children three years of age and older who are eligible for Medi-Cal, referral to a dentist participating in the Medi-Cal program.

(E)  Screening tests for vision, hearing, anemia, tuberculosis, diabetes, and urinary tract conditions.

(7)  An assessment of nutritional status.

(8)  An assessment of immunization status.

95

(9) Where appropriate, testing for sickle-cell trait, lead poisoning, and other tests that may be necessary to the identification of children with potential disabilities requiring diagnosis and possibly treatment.

(10) For all children eligible for Medi-Cal, necessary assistance with scheduling appointments for services and with transportation.

(b) Dentists receiving referrals of children eligible for Medi-Cal under this section shall employ procedures to advise the child's parent or parents of the need for and scheduling of annual appointments.

(c) Standards for procedures to carry out health screening and evaluation services and to establish the age at which particular tests should be carried out shall be established by the director. At the discretion of the department, these health screening and evaluation services may be provided at the frequency provided under the Healthy Families Program and permitted in managed care plans providing services under the Medi-Cal program, and shall be contingent upon appropriation in the annual Budget Act. Immunizations may be provided at the frequency recommended by the Committee on Infectious Disease of the American Academy of Pediatrics and the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention.

(d) Each community child health and disability prevention program shall, pursuant to standards set by the director, establish a record system that contains a health case history for each child so that costly and unnecessary repetition of screening, immunization and referral will not occur and appropriate health treatment will be facilitated as specified in Section 124085.

SEC. 14.　Section 124120 of the Health and Safety Code is amended to read:

124120.　The department may conduct a community outreach and awareness campaign to inform medical providers, pregnant women, and the families of newborns and infants on the availability of the newborn hearing screening program and the value of early hearing testing. The outreach and awareness campaign shall be conducted by an independent contractor.

SEC. 15.　Section 124250 of the Health and Safety Code is amended to read:

124250.　(a) The following definitions shall apply for purposes of this section:

(1) "Domestic violence" means the infliction or threat of physical harm against past or present adult or adolescent female intimate partners, and shall include physical, sexual, and psychological abuse against the woman, and is a part of a pattern of assaultive, coercive, and controlling

behaviors directed at achieving compliance from or control over, that woman.

(2) "Shelter-based" means an established system of services where battered women and their children may be provided safe or confidential emergency housing on a 24-hour basis, including, but not limited to, hotel or motel arrangements, haven, and safe houses.

(3) "Emergency shelter" means a confidential or safe location that provides emergency housing on a 24-hour basis for battered women and their children.

(b) The Maternal and Child Health Branch of the State Department of Health Services shall administer a comprehensive shelter-based services grant program to battered women's shelters pursuant to this section.

(c) The Maternal and Child Health Branch shall administer grants, awarded as the result of a request for application process, to battered women's shelters that propose to maintain shelters or services previously granted funding pursuant to this section, to expand existing services or create new services, and to establish new battered women's shelters to provide services, in any of the following four areas:

(1) Emergency shelter to women and their children escaping violent family situations.

(2) Transitional housing programs to help women and their children find housing and jobs so that they are not forced to choose between returning to a violent relationship or becoming homeless. The programs may offer up to 18 months of housing, case management, job training and placement, counseling, support groups, and classes in parenting and family budgeting.

(3) Legal and other types of advocacy and representation to help women and their children pursue the appropriate legal options.

(4) Other support services for battered women and their children.

(d) (1) The Maternal and Child Health Branch of the State Department of Health Services shall conduct a minimum of one site visit per grant term to each agency funded to provide shelter-based services to battered women and their children. The purpose of the site visit shall be a performance assessment of, and technical assistance for, each agency visited. The performance assessment shall include, but need not be limited to, a review of all of the following:

(A) Progress in meeting program goals and objectives.

(B) Agency organization and facilities.

(C) Personnel policies, files, and training.

(D) Recordkeeping, budgeting, and expenditures.

(E) Documentation, data collection, and client confidentiality.

(2) Subsequent to each site visit conducted under paragraph (1), the Maternal and Child Health Branch shall provide a written report to the agency summarizing the agency's performance, any deficiencies noted, and any corrective action needed.

(3) Where an agency receives funding from both the Maternal and Child Health Branch of the State Department of Health Services and the Domestic Violence Branch of the Office of Criminal Justice Planning during any grant cycle, the Maternal and Child Health Branch and the Domestic Violence Branch shall, to the extent feasible, coordinate agency site visits and share performance assessment data with the goal of improving efficiency, eliminating duplication, and reducing administrative costs.

(e) In implementing the grant program pursuant to this section, the State Department of Health Services shall consult with an advisory council that shall remain in existence until January 1, 2006. The council shall be composed of not to exceed 13 voting members and two nonvoting members appointed as follows:

(1) Seven members appointed by the Governor.

(2) Three members appointed by the Speaker of the Assembly.

(3) Three members appointed by the Senate Committee on Rules.

(4) Two nonvoting ex officio members who shall be Members of the Legislature, one appointed by the Speaker of the Assembly and one appointed by the Senate Committee on Rules. Any Member of the Legislature appointed to the council shall meet with, and participate in the activities of, the council to the extent that participation is not incompatible with his or her position as a Member of the Legislature.

The membership of the council shall consist of domestic violence advocates, battered women service providers, and representatives of women's organizations, law enforcement, and other groups involved with domestic violence. At least one-half of the council membership shall consist of domestic violence advocates or battered women service providers from organizations such as the California Alliance Against Domestic Violence.

It is the intent of the Legislature that the council membership reflect the ethnic, racial, cultural, and geographic diversity of the state.

(f) The department shall collaborate closely with the council in the development of funding priorities, the framing of the Request for Proposals, and the solicitation of proposals.

(g) (1) The Maternal and Child Health Branch of the State Department of Health Services shall administer grants, awarded as the result of a request for application process, to agencies to conduct demonstration projects to serve battered women, including, but not limited to, creative and innovative service approaches, such as

95

community response teams and pilot projects to develop new interventions emphasizing prevention and education, and other support projects identified by the advisory council.

(2) For purposes of this subdivision, "agency" means a state agency, a local government, a community-based organization, or a nonprofit organization.

(h) It is the intent of the Legislature that services funded by this program include services in underserved and ethnic and racial communities. Therefore, the Maternal and Child Health Branch of the State Department of Health Services shall do all of the following:

(1) Fund shelters pursuant to this section that reflect the ethnic, racial, economic, cultural, and geographic diversity of the state.

(2) Target geographic areas and ethnic and racial communities of the state whereby, based on a needs assessment, it is determined that no shelter-based services exist or that additional resources are necessary.

(i) The director may award additional grants to shelter-based agencies when it is determined that there exists a critical need for shelter or shelter-based services.

(j) As a condition of receiving funding pursuant to this section, battered women's shelters shall do all of the following:

(1) Provide matching funds or in-kind contributions equivalent to not less than 20 percent of the grant they would receive. The matching funds or in-kind contributions may come from other governmental or private sources.

(2) Ensure that appropriate staff and volunteers having client contact meet the definition of "domestic violence counselor" as specified in subdivision (a) of Section 1037.1 of the Evidence Code. The minimum training specified in paragraph (2) of subdivision (a) of Section 1037.1 of the Evidence Code shall be provided to those staff and volunteers who do not meet the requirements of paragraph (1) of subdivision (a) of Section 1037.1 of the Evidence Code.

SEC. 15.5.  Section 124977 of the Health and Safety Code is amended to read:

124977.  (a) It is the intent of the Legislature that, unless otherwise specified, the program carried out pursuant to this chapter be fully supported from fees collected for services provided by the program.

(b) (1) The department shall charge a fee to all payers for any tests or activities performed pursuant to this chapter. The amount of the fee shall be established by regulation and periodically adjusted by the director in order to meet the costs of this chapter. Notwithstanding any other provision of law, any fees charged for screening and followup services provided to Medi-Cal eligible persons, health care service plan enrollees, or persons covered by disability insurance policies, shall be

paid in full directly to the Genetic Disease Testing Fund, subject to all terms and conditions of each enrollee's or insured's health care service plan or insurance coverage, whichever is applicable, including, but not limited to, copayments and deductibles applicable to these services, and only if these copayments, deductions, or limitations are disclosed to the subscriber or enrollee pursuant to the disclosure provisions of Section 1363.

(2)  The department shall expeditiously undertake all steps necessary to implement the fee collection process, including personnel, contracts, and data processing, so as to initiate the fee collection process at the earliest opportunity. In no event shall a hospital be charged a fee for any test performed pursuant to this chapter on or after July 1, 2001.

(3)  Paragraphs (1) and (2) shall be inoperative for services provided after June 30, 2002.

(4)  Effective for services provided on and after July 1, 2002, the department shall charge a fee to the hospital of birth, or, for births not occurring in a hospital, to families of the newborn, for newborn screening and followup services. The hospital of birth and families of newborns born outside the hospital shall make payment in full to the Genetic Disease Testing Fund. The amount of the fee shall be established by regulation and periodically adjusted by the director in order to meet the costs of providing services under this chapter. The department shall not charge or bill Medi-Cal beneficiaries for services provided under this chapter.

(c)  (1)  The Legislature finds that timely implementation of changes in genetic screening programs and continuous maintenance of quality statewide services requires expeditious regulatory and administrative procedures, including policies and procedures developed pursuant to Sections 12101 and 12102 of the Public Contract Code or Division 25.2 (commencing with Section 38070) of the Health and Safety Code, to obtain the most cost-effective electronic data processing, hardware, software services, testing equipment, testing services, and followup contracts.

(2)  The expenditure of funds from the Genetic Disease Testing Fund for these purposes shall not be subject to Section 12113.5 of, and Chapter 2 (commencing with Section 10290) of Part 2 of Division 2 of, the Public Contract Code. The department shall provide the Department of Finance with documentation that equipment and services have been obtained at the lowest cost consistent with technical requirements for a comprehensive high-quality program.

(d)  Nothing in this section shall be construed to impose a new mandated benefit on health care service plans and health insurers.

95

SEC. 16.    Section 125190 is added to the Health and Safety Code, to read:

125190.    Notwithstanding any other provision of law, the department is considered to be the purchaser, but not the dispenser or distributor, of blood factor products under the Genetically Handicapped Person's Program. The department may receive manufacturers' discounts, rebates, or refunds based on the quantities purchased under the Genetically Handicapped Person's Program. The discounts, rebates, or refunds received pursuant to this section shall be separate from any agreements for discounts, rebates, or refunds negotiated pursuant to Section 14105.3 of the Welfare and Institutions Code or any other program.

SEC. 17.    Section 127280.1 is added to the Health and Safety Code, to read:

127280.1.    Notwithstanding any other provision of law, up to two hundred thousand dollars ($200,000) of the moneys collected pursuant to Section 127280 may be used in the 2002–03 fiscal year by the State Department of Health Services for data collection on, analysis of, and reporting on, maternal and perinatal outcomes, if funds are appropriated in the Budget Act.

SEC. 18.    Section 12693.17 of the Insurance Code is amended to read:

12693.17.    "Family contribution sponsor" means a person or entity that pays the family contribution on behalf of an applicant for any period of 12 consecutive months and, notwithstanding Section 12693.70, if the sponsor is paying for the initial 12 months of eligibility, the payment for 12 months is made with the application.

SEC. 19.    Section 12693.41 of the Insurance Code is amended to read:

12693.41.    (a)  Upon the effective date of coverage of a child eligible for the program, the board shall arrange for payment of providers who participate in the Child Health and Disability Prevention Program pursuant to Article 6 (commencing with Section 124025) of Chapter 3 of Part 2 of Division 106 of the Health and Safety Code, for well-child health assessments, immunizations, and initial treatment provided up to 90 days prior to the effective date of coverage.

(b)  The board shall pay only for those services that are eligible for federal financial participation under Section 2105 of Title XXI of the Social Security Act and that are approved in the required state plan under that title, except as specified in Section 12693.76.

(c)  (1)  Child Health and Disability Prevention Program providers shall submit charges for the services under subdivision (a) on the form or in the format specified by the department for the Child Health and

Disability Prevention Program. Those providers shall be reimbursed at the rates established for these services by the Child Health and Disability Prevention Program once coverage under the program is established.

(2) Those providers shall submit charges for services reimbursable under Medi-Cal on the form or in the format specified by the department for Medi-Cal. Those providers shall be reimbursed at the rates established for these services by Medi-Cal once coverage under Medi-Cal is established.

(d) (1) The board may use the state fiscal intermediary for medicaid to process the payments authorized in subdivision (a).

(2) The board shall be exempt from the requirements of Chapter 7 (commencing with Section 11700) of Division 3 of Title 2 of the Government Code and Chapter 3 (commencing with Section 12100) of Part 2 of Division 2 of the Public Contract Code as those requirements apply to the use of contractual claims processing services by the state fiscal intermediary.

(e) This section shall become inoperative on April 1, 2003, and, as of January 1, 2004, is repealed, unless a later enacted statute, that becomes operative on or before January 1, 2004, deletes or extends the dates on which it becomes inoperative and is repealed.

SEC. 20.    Section 12693.41 is added to the Insurance Code, to read:

12693.41.    (a) The board shall consult and coordinate with the State Department of Health Services in implementing a preenrollment program into the Healthy Families Program or the Medi-Cal program pursuant to subdivision (b) of Section 14011.7 of the Welfare and Institutions Code. The board shall accept the followup application provided for in Section 14011.7 of the Welfare and Institutions Code as an application for the Healthy Families Program. Preenrollment shall be administered by the State Department of Health Services to provide full-scope benefits pursuant to Medi-Cal program requirements, at no cost to the applicant.

(b) The board may use the state fiscal intermediary for medicaid to process the eligibility determinations and payments required pursuant to Section 14011.7 of the Welfare and Institutions Code.

(c) The board shall be exempt from the requirements of Chapter 7 (commencing with Section 11700) of Division 3 of Title 2 of the Government Code and Chapter 3 (commencing with Section 12100) of Part 2 of Division 2 of the Public Contract Code as those requirements apply to the use of processing services by the state fiscal intermediary.

(d) The board may adopt emergency regulations to implement preenrollment into the Healthy Families Program or the Medi-Cal program pursuant to Section 14011.7 of the Welfare and Institutions Code. The emergency regulations shall include, but not be limited to,

regulations that implement any changes in rules relating to eligibility, enrollment, and disenrollment in the programs pursuant to Sections 12693.45 and 12693.70. The initial adoption of emergency regulations and one readoption of the initial regulations shall be deemed to be an emergency and necessary for the immediate preservation of the public peace, health and safety, and general welfare. Initial emergency regulations and the first readoption of those regulations shall be exempt from review by the Office of Administrative Law. The initial emergency regulations and one readoption of those regulations authorized by this section shall be submitted to the Office of Administrative Law for filing with the Secretary of State and publication in the California Code of Regulations and each shall remain in effect for no more than 180 days.

(e) This section shall become operative on April 1, 2003.

SEC. 21.   Section 12693.43 of the Insurance Code is amended to read:

12693.43.   (a) Applicants applying to the purchasing pool shall agree to pay family contributions, unless the applicant has a family contribution sponsor. Family contribution amounts consist of the following two components:

(1) The flat fees described in subdivision (b) or (d).

(2) Any amounts that are charged to the program by participating health, dental, and vision plans selected by the applicant that exceed the cost to the program of the highest cost Family Value Package in a given geographic area.

(b) In each geographic area, the board shall designate one or more Family Value Packages for which the required total family contribution is:

(1) Seven dollars ($7) per child with a maximum required contribution of fourteen dollars ($14) per month per family for applicants with annual household incomes up to and including 150 percent of the federal poverty level.

(2) Nine dollars ($9) per child with a maximum required contribution of twenty-seven dollars ($27) per month per family for applicants with annual household incomes greater than 150 percent and up to and including 200 percent of the federal poverty level.

(c) Combinations of health, dental, and vision plans that are more expensive to the program than the highest cost Family Value Package may be offered to and selected by applicants. However, the cost to the program of those combinations that exceeds the price to the program of the highest cost Family Value Package shall be paid by the applicant as part of the family contribution.

(d) The board shall provide a family contribution discount to those applicants who select the health plan in a geographic area that has been

designated as the Community Provider Plan. The discount shall reduce the portion of the family contribution described in subdivision (b) to the following:

(1) A family contribution of four dollars ($4) per child with a maximum required contribution of eight dollars ($8) per month per family for applicants with annual household incomes up to and including 150 percent of the federal poverty level.

(2) Six dollars ($6) per child with a maximum required contribution of eighteen dollars ($18) per month per family for applicants with annual household incomes greater than 150 percent and up to and including 200 percent of the federal poverty level.

(e) Applicants, but not family contribution sponsors, who pay three months of required family contributions in advance shall receive the fourth consecutive month of coverage with no family contribution required.

(f) Applicants, but not family contribution sponsors, who pay the required family contributions by an approved means of electronic fund transfer shall receive a 25-percent discount from the required family contributions.

(g) It is the intent of the Legislature that the family contribution amounts described in this section comply with the premium cost sharing limits contained in Section 2103 of Title XXI of the Social Security Act. If the amounts described in subdivision (a) are not approved by the federal government, the board may adjust these amounts to the extent required to achieve approval of the state plan.

SEC. 22.   Section 12693.45 of the Insurance Code is amended to read:

12693.45.   (a) After two consecutive months of nonpayment of family contributions by an applicant, and a reasonable written notice period of no less than 30 days is provided to the applicant, subscribers or purchasing credit members may be disenrolled for an applicant's failure to pay family contributions. The board may impose or contract for collection actions to collect unpaid family contributions.

(b) Subject to any additional requirements of federal law, disenrollments shall be effective at the end of the second consecutive month of nonpayment.

SEC. 23.   Section 12693.70 of the Insurance Code is amended to read:

12693.70.   To be eligible to participate in the program, an applicant shall meet all of the following requirements:

(a) Be an applicant applying on behalf of an eligible child, which means a child who is all of the following:

95

(1) Less than 19 years of age. An application may be made on behalf of a child not yet born up to three months prior to the expected date of delivery. Coverage shall begin as soon as administratively feasible, as determined by the board, after the board receives notification of the birth. However, no child less than 12 months of age shall be eligible for coverage until 90 days after the enactment of the Budget Act of 1999.

(2) Not eligible for no-cost full-scope Medi-Cal or Medicare coverage at the time of application.

(3) In compliance with Sections 12693.71 and 12693.72.

(4) A child who meets citizenship and immigration status requirements that are applicable to persons participating in the program established by Title XXI of the Social Security Act, except as specified in Section 12693.76.

(5) A resident of the State of California pursuant to Section 244 of the Government Code; or, if not a resident pursuant to Section 244 of the Government Code, is physically present in California and entered the state with a job commitment or to seek employment, whether or not employed at the time of application to or after acceptance in, the program.

(6) (A) In a family with an annual or monthly household income equal to or less than 200 percent of the federal poverty level.

(B) All income over 200 percent of the federal poverty level but less than or equal to 250 percent of the federal poverty level shall be disregarded in calculating annual or monthly household income.

(C) In a family with an annual or monthly household income greater than 250 percent of the federal poverty level, any income deduction that is applicable to a child under Medi-Cal shall be applied in determining the annual or monthly household income. If the income deductions reduce the annual or monthly household income to 250 percent or less of the federal poverty level, subparagraph (B) shall be applied.

(b) If the applicant is applying for the purchasing pool, and does not have a family contribution sponsor the applicant shall pay the first month's family contribution and agree to remain in the program for six months, unless other coverage is obtained and proof of the coverage is provided to the program.

(c) An applicant shall enroll all of the applicant's eligible children in the program.

(d) In filing documentation to meet program eligibility requirements, if the applicant's income documentation cannot be provided, as defined in regulations promulgated by the board, the applicant's signed statement as to the value or amount of income shall be deemed to constitute verification.

(e) An applicant shall pay in full any family contributions owed in arrears for any health, dental, or vision coverage provided by the program within the prior 12 months.

SEC. 24.    Section 12693.981 of the Insurance Code is amended to read:

12693.981.    (a) (1) The Healthy Families-to-Medi-Cal Bridge Benefits Program is hereby established to provide any person enrolled for coverage under this part who meets the criteria set forth in subdivision (b) with a two calendar-month period of health care benefits in order to provide the person with an opportunity to apply for Medi-Cal.

(2) The Healthy Families-to-Medi-Cal Bridge Benefits Program shall be administered by the board.

(b) (1) Any person who meets all of the following requirements shall be eligible for two additional calendar months of Healthy Families benefits:

(A) He or she has been receiving, but is no longer eligible for, benefits under the program.

(B) He or she appears to be income eligible for full-scope Medi-Cal benefits without a share of cost.

(2) The two additional calendar months of benefits under this chapter shall begin on the first day of the month following the last day of the person's eligibility for benefits under the program.

(c) The two-calendar-month period of Healthy Families benefits provided under this chapter shall be identical to the scope of benefits that the person was receiving under the program.

(d) Nothing in this section shall be construed to provide Healthy Families benefits for more than a two calendar-month period under any circumstances, including the failure to apply for benefits under the Medi-Cal program or the failure to be made aware of the availability of the Medi-Cal program unless the circumstances described in subdivision (b) reoccur.

(e) This section shall become inoperative if an unappealable court decision or judgment determines that any of the following apply:

(1) The provisions of this section are unconstitutional under the United States Constitution or the California Constitution.

(2) The provisions of this section do not comply with the State Children's Health Insurance Program, as set forth in Title XXI of the federal Social Security Act.

(3) The provisions of this section require that the health care benefits provided pursuant to this section are required to be furnished for more than two calendar months.

SEC. 25.    Section 4094.2 of the Welfare and Institutions Code is amended to read:

4094.2.  (a) For the purpose of establishing payment rates for community treatment facility programs, the private nonprofit agencies selected to operate these programs shall prepare a budget that covers the total costs of providing residential care and supervision and mental health services for their proposed programs. These costs shall include categories that are allowable under California's Foster Care program and existing programs for mental health services. They shall not include educational, nonmental health medical, and dental costs.

(b)  Each agency operating a community treatment facility program shall negotiate a final budget with the local mental health department in the county in which its facility is located (the host county) and other local agencies as appropriate. This budget agreement shall specify the types and level of care and services to be provided by the community treatment facility program and a payment rate that fully covers the costs included in the negotiated budget. All counties that place children in a community treatment facility program shall make payments using the budget agreement negotiated by the community treatment facility provider and the host county.

(c)  A foster care rate shall be established for each community treatment facility program by the State Department of Social Services. These rates shall be established using the existing foster care ratesetting system for group homes, with modifications designed as necessary. It is anticipated that all community treatment facility programs will offer the level of care and services required to receive the highest foster care rate provided for under the current group home ratesetting system.

(d)  For the 2001–02 fiscal year and the 2002–03 fiscal year, community treatment facility programs shall also be paid a community treatment facility supplemental rate of up to two thousand five hundred dollars ($2,500) per child per month on behalf of children eligible under the foster care program and children placed out of home pursuant to an individualized education program developed under Section 7572.5 of the Government Code. Subject to the availability of funds, the supplemental rate shall be shared by the state and the counties. Counties shall be responsible for paying a county share of cost equal to 60 percent of the community treatment rate for children placed by counties in community treatment facilities and the state shall be responsible for 40 percent of the community treatment facility supplemental rate. The community treatment facility supplemental rate is intended to supplement, and not to supplant, the payments for which children placed in community treatment facilities are eligible to receive under the foster care program and the existing programs for mental health services.

(e)  For initial ratesetting purposes for community treatment facility funding, the cost of mental health services shall be determined by

deducting the foster care rate and the community treatment facility supplemental rate from the total allowable cost of the community treatment facility program. Payments to certified providers for mental health services shall be based on eligible services provided to children who are Medi-Cal beneficiaries, up to the statewide maximum allowances for these services.

(f)  Although there is statutory authorization for up to 400 community treatment facility beds statewide, it is anticipated that there will be a phased-in implementation of community treatment facilities, and that the average monthly community treatment facility caseload during the 2001–02 fiscal year will be approximately 100 and during the 2002–03 fiscal year will be approximately 140.

(g)  The department shall provide the community treatment facility supplemental rates to the counties for advanced payment to the community treatment facility providers in the same manner as the regular foster care payment and within the same required payment time limits.

(h)  In order to facilitate a study of the costs of community treatment facilities, licensed community treatment facilities shall provide all documents regarding facility operations, treatment, and placements requested by the department.

(i)  It is the intent of the Legislature that the department and the State Department of Social Services work to maximize federal financial participation in funding for children placed in community treatment facilities through funds available pursuant to Titles IV-E and XIX of the federal Social Security Act (Title 42 U.S.C. Sec. 670 and following and Sec. 1396 and following) and other appropriate federal programs.

(j)  The department and the State Department of Social Services may adopt emergency regulations necessary to implement joint protocols for the oversight of community treatment facilities, to modify existing licensing regulations governing reporting requirements and other procedural and administrative mandates to take into account the seriousness and frequency of behaviors that are likely to be exhibited by the seriously emotionally disturbed children placed in community treatment facility programs, to modify the existing foster care ratesetting regulations, and to pay the community treatment facility supplemental rate. The adoption of these regulations shall be deemed to be an emergency and necessary for the immediate preservation of the public peace, health and safety, and general welfare. The regulations shall become effective immediately upon filing with the Secretary of State. The regulations shall not remain in effect more than 180 days unless the adopting agency complies with all the provisions of Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of

the Government Code, as required by subdivision (e) of Section 11346.1 of the Government Code.

SEC. 26.   Section 4380 of the Welfare and Institutions Code is amended to read:

4380.   The Legislature authorizes the director, in consultation with the Secretary of Child Development and Education and the Superintendent of Public Instruction, to award matching grants to local educational agencies to pay the state share of the costs of providing programs that provide school-based early mental health intervention and prevention services to eligible pupils at schoolsites of eligible pupils, as follows:

(a)  The director shall award matching grants pursuant to this chapter to local educational agencies throughout the state.

(b)  Matching grants awarded under this part shall be awarded for a period of not more than three years and no single schoolsite shall be awarded more than one grant, except for a schoolsite that received a grant prior to July 1, 1992.

(c)  The director shall pay to each local educational agency having an application approved pursuant to requirements in this part the state share of the cost of the activities described in the application.

(d)  Commencing July 1, 1993, the state share of matching grants shall be a maximum of 50 percent in each of the three years.

(e)  Commencing July 1, 1993, the local share of matching grants shall be at least 50 percent, from a combination of school district and cooperating entity funds.

(f)  The local share of the matching grant may be in cash or payment in-kind.

(g)  Priority shall be given to those applicants that demonstrate the following:

(1)  The local educational agency will serve the greatest number of eligible pupils from low-income families.

(2)  The local educational agency will provide a strong parental involvement component.

(3)  The local educational agency will provide supportive services with one or more cooperating entities.

(4)  The local educational agency will provide services at a low cost per child served in the project.

(5)  The local educational agency will provide programs and services that are based on adoption or modification, or both, of existing programs that have been shown to be effective. No more than 20 percent of the grants awarded by the director may be utilized for new models.

(6) The local educational agency will provide services to children who are in out-of-home placement or who are at risk of being in out-of-home placement.

(h) Eligible supportive services may include the following:

(1) Individual and group intervention and prevention services.

(2) Parent involvement through conferences or training, or both.

(3) Teacher and staff conferences and training related to meeting project goals.

(4) Referral to outside resources when eligible pupils require additional services.

(5) Use of paraprofessional staff, who are trained and supervised by credentialed school psychologists, school counselors, or school social workers, to meet with pupils on a short-term weekly basis, in a one-on-one setting as in the Primary Intervention Program established pursuant to Chapter 4 (commencing with Section 4343) of Part 3. A minimum of 80 percent of the grants awarded by the director shall include the basic components of the Primary Intervention Program.

(6) Any other service or activity that will improve the mental health of eligible pupils.

Prior to participation by an eligible pupil in either individual or group services, consent of a parent or guardian shall be obtained.

(i) Each local educational agency seeking a grant under this chapter shall submit an application to the director at the time, in a manner, and accompanied by any information the director may reasonably require.

(j) Each matching grant application submitted shall include all of the following:

(1) Documentation of need for the school-based early mental health intervention and prevention services.

(2) A description of the school-based early mental health intervention and prevention services expected to be provided at the schoolsite.

(3) A statement of program goals.

(4) A list of cooperating entities that will participate in the provision of services. A letter from each cooperating entity confirming its participation in the provision of services shall be included with the list. At least one letter shall be from a cooperating entity confirming that it will agree to screen referrals of low-income children the program has determined may be in need of mental health treatment services and that, if the cooperating entity determines that the child is in need of those services and if the cooperating entity determines that according to its priority process the child is eligible to be served by it, the cooperating entity will agree to provide those mental health treatment services.

(5) A detailed budget and budget narrative.

95

(6) A description of the proposed plan for parent involvement in the program.

(7) A description of the population anticipated to be served, including number of pupils to be served and socioeconomic indicators of sites to receive funds.

(8) A description of the matching funds from a combination of local education agencies and cooperating entities.

(9) A plan describing how the proposed school-based early mental health intervention and prevention services program will be continued after the matching grant has expired.

(10) Assurance that grants would supplement and not supplant existing local resources provided for early mental health intervention and prevention services.

(11) A description of an evaluation plan that includes quantitative and qualitative measures of school and pupil characteristics, and a comparison of children's adjustment to school.

(k) Matching grants awarded pursuant to this article may be used for salaries of staff responsible for implementing the school-based early mental health intervention and prevention services program, equipment and supplies, training, and insurance.

(l) Salaries of administrative staff and other administrative costs associated with providing services shall be limited to 5 percent of the state share of assistance provided under this section.

(m) No more than 10 percent of each matching grant awarded pursuant to this article may be used for matching grant evaluation.

(n) No more than 10 percent of the moneys allocated to the director pursuant to this chapter may be utilized for program administration and evaluation.

Program administration shall include both state staff and field staff who are familiar with and have successfully implemented school-based early mental health intervention and prevention services. Field staff may be contracted with by local school districts or community mental health programs. Field staff shall provide support in the timely and effective implementation of school-based early mental health intervention and prevention services. Reviews of each project shall be conducted at least once during the first year of funding.

(o) Subject to the approval of the director, at the end of the fiscal year, a school district may apply unexpended funds to the budget for the subsequent funding year.

(p) Contracts for the program and administration, or ancillary services in support of the program, shall be exempt from the requirements of the Public Contract Code and the State Administrative Manual, and from approval by the Department of General Services.

SEC. 27.   Section 4418.2 is added to the Welfare and Institutions Code, to read:

4418.2.   The department shall support, utilizing regional resource development projects, the activities specified in Sections 4418.25, 4418.3, and 4418.7.

SEC. 28.   Section 4418.25 is added to the Welfare and Institutions Code, to read:

4418.25.   (a) The department shall establish policies and procedures for the development of an annual community placement plan by regional centers. The community placement plan shall be based upon an individual program plan process as referred to in subdivision (a) of Section 4418.3 and shall be linked to the development of the annual state budget. The department's policies shall address statewide priorities, plan requirements, and the statutory roles of regional centers, developmental centers, and regional resource development projects in the process of assessing consumers for community living and in the development of community resources.

(b) The community placement plan shall provide for dedicated funding for comprehensive assessments of selected developmental center residents, for identified costs of moving selected individuals from developmental centers to the community, and for deflection of selected individuals from developmental center admission. The plans shall, where appropriate, include budget requests for regional center operations, assessments, resource development, and ongoing placement costs. These budget requests are intended to provide supplemental funding to regional centers. The plan is not intended to limit the department's or regional centers' responsibility to otherwise conduct assessments and individualized program planning, and to provide needed services and supports in the least restrictive, most integrated setting in accord with the Lanterman Developmental Disabilities Services Act (Division 4.5 (commencing with Section 4500)).

(c) The department shall review, negotiate, and approve regional center community placement plans for feasibility and reasonableness, including recognition of each regional centers' current developmental center population and their corresponding placement level, as well as each regional centers' need to develop new and innovative service models. The department shall hold regional centers accountable for the development and implementation of their approved plans. The regional centers shall report, as required by the department, on the outcomes of their plans. The department shall make aggregate performance data for each regional center available, upon request, as well as data on admissions to, and placements from, each developmental center.

(d) Funds allocated by the department to a regional center for a community placement plan developed under this section shall be controlled through the regional center contract to ensure that the funds are expended for the purposes allocated. Funds allocated for community placement plans that are not used for that purpose may be transferred to Item 4300-003-0001 for expenditure in the state developmental centers if their population exceeds the budgeted level. Any unspent funds shall revert to the General Fund.

SEC. 29.   Section 4418.3 of the Welfare and Institutions Code is amended to read:

4418.3.   (a) It is the intent of the Legislature to ensure that the transition process from a developmental center to a community living arrangement is based upon the individual's needs, developed through the individual program plan process, and ensures that needed services and supports will be in place at the time the individual moves. It is further the intent of the Legislature that regional centers, developmental centers, and regional resource development projects coordinate with each other for the benefit of their activities in assessment, in the development of individual program plans, and in planning, transition, and deflection, and for the benefit of consumers.

(b) As individuals are identified for possible movement to the community, an individual planning meeting shall be initiated by the developmental center, which shall notify the planning team, pursuant to subdivision (j) of Section 4512, and the regional resource development project of the meeting. The regional resource development project shall make services available to the developmental center and the regional center, including, but not limited to, consultations with the planning teams and the identification of services and supports necessary for the consumer to succeed in community living.

(c) The development of the individual program plan shall be consistent with Sections 4646 and 4646.5. For the purpose of this section, the planning team shall include developmental center staff knowledgeable about the service and support needs of the consumer.

(d) Regional resource development project services may include providing information in an understandable form to consumers and, where appropriate, their families, conservators, legal guardians, or authorized representatives, that will assist them in making decisions about community living and services and supports. This information may include affording the consumer the opportunity to visit a variety of community living arrangements that could meet his or her needs. If the visits are not feasible, as determined by the planning team, a family member or other representative of the consumer may conduct the visits. Regional resource development projects may be requested to facilitate

95

these visits. The availability of this service shall be made known by the planning team to consumers and, where appropriate, their families, conservators, legal guardians, or authorized representative.

(e) Once the individual program plan is completed and providers of services and supports are identified and agreed to, pursuant to subdivision (b) of Section 4646.5, and no less than 15 days prior to the move, unless otherwise ordered by a court, a transition conference, which may be facilitated by a regional resource development project, shall be held. Participants in the transition conference shall include, but not be limited to, the consumer, where appropriate the consumer's parents, legal guardian, conservator, or authorized representative, a regional center representative, a developmental center representative, and a representative of each provider of primary services and supports identified in the individual program plan. This meeting may take place in the catchment area to which the consumer is moving. If necessary, conferees may participate by telephone or video conference. The purpose of this conference shall be to ensure a smooth transition from the developmental center to the community.

(f) The department, through the appropriate regional resource development project, shall provide, in cooperation with regional centers and developmental centers, followup services to help ensure a smooth transition to the community. Followup services shall include, but shall not limited to, all of the following:

(1) Regularly scheduled as well as on an as-needed basis, contacts and visits with consumers and service providers during the 12 months following the consumers movement date.

(2) Participation in the development of an individual program plan in accordance with Sections 4646 and 4646.5.

(3) Identification of issues that need resolution.

(4) Arrangement for the provision of developmental center services, including, but not limited to, medication review, crisis services, and behavioral consultation.

(g) To ascertain that the individual program plan is being implemented, that planned services are being provided, and that the consumer and, where appropriate the consumer's parents, legal guardian, or conservator, are satisfied with the community living arrangement, the regional center shall schedule face-to-face reviews no less than once every 30 days for the first 90 days. Following the first 90 days, and following notification to the department, the regional center may conduct these reviews less often as specified in the individual program plan.

(h) The regional center and the regional resource development project shall coordinate their followup reviews required pursuant to

subdivisions (f) and (g) and shall share with each other information obtained during the course of the followup visits.

SEC. 30.   Section 4418.7 of the Welfare and Institutions Code is amended to read:

4418.7.   (a)  If the regional center determines, or is informed by the consumer's parents, legal guardian, conservator, or authorized representative that the community placement of a consumer is at risk of failing, and that admittance to a state developmental center is a likelihood, the regional center shall immediately notify the appropriate regional resource development project, the consumer, and the consumer's parents, legal guardian, or conservator.

(b)  In these cases, the regional resource development project shall immediately arrange for an assessment of the situation, including, visiting the consumer, if appropriate, determining barriers to successful integration, and recommending the most appropriate means necessary to assist the consumer to remain in the community. If, based on the assessment, the regional resource development project determines that additional or different services and supports are necessary, the department shall ensure that the regional center provides those services and supports on an emergency basis. An individual program plan meeting, including the regional resource development project's representative, shall be convened as soon as possible to review the emergency services and supports and determine the consumer's ongoing needs for services and supports. The regional resource development project shall follow up with the regional center as to the success of the recommended interventions until the consumer's living arrangement is stable.

(c)  If the regional resource development project, in consultation with the regional center, the consumer, and the consumer's parents, legal guardian, or conservator, when appropriate, determines that admittance to a state developmental center is necessary to prevent a substantial risk to the individual's health and safety, the regional resource development project shall immediately facilitate that admission.

(d)  The department shall collect data on the outcomes of efforts to assist at-risk consumers to remain in the community. The department shall make aggregate data on the implementation of the requirements of this section available, upon request.

SEC. 30.5.   Section 4631.5 is added to the Welfare and Institutions Code, to read:

4631.5.   (a)  The Legislature finds and declares both of the following:

(1) The state is facing an unprecedented fiscal crisis that will require an unallocated reduction in the 2002–03 fiscal year for regional centers' purchase of service budgets of fifty-two million dollars ($52,000,000).

(2) Even when the state faces an unprecedented fiscal crisis, the services and supports set forth in the Lanterman Developmental Disabilities Services Act (Division 4.5 (commencing with Section 4500)) shall continue to be provided to individuals with developmental disabilities in accordance with state and federal statutes, regulations, and case law, including Association for Retarded Citizens v. Department of Developmental Services (1985) 38 Cal.3d 384.

(b) It is the intent of the Legislature that actions taken pursuant to this section shall not eliminate an individual's eligibility, adversely affect an individual's health and safety, or interfere with an individual's rights as described in Section 4502.

(c) In order to ensure that services to eligible consumers are available throughout the fiscal year, regional centers shall administer their contracts within the level of funding appropriated by the annual Budget Act.

(d) Within 30 days of the enactment of the annual Budget Act, and after consultation with stakeholder organizations, the department shall determine the amount of unallocated reduction that each regional center shall make in its purchase-of-service budget and shall provide each regional center with guidelines, technical assistance, and a variety of options for reducing operations and purchase of service costs.

(e) Within 60 days of the enactment of the annual Budget Act, each regional center shall develop and submit a plan to the department describing in detail how it intends to absorb the unallocated reduction and achieve savings necessary to provide services to eligible consumers throughout the fiscal year within the limitations of the funds allocated. Prior to adopting the plan, each regional center shall hold a public hearing in order to receive comment on the plan. The regional center shall provide notice to the community at least 10 days in advance of the public hearing. The regional center shall summarize and respond to the public testimony in its plan.

(f) A regional center shall implement components of its plans upon approval of the department. Within 30 days of receipt of the plan, the department shall review and approve, or require modification of, portions of the regional center's plan.

(g) This section shall become inoperative on July, 1, 2004, and, as of January 1, 2005, is repealed, unless a later enacted statute, that becomes operative on or before January 1, 2005, deletes or extends the dates on which it becomes inoperative and is repealed.

95

SEC. 31.   Section 4640.6 of the Welfare and Institutions Code is amended to read:

4640.6.   (a)  In approving regional center contracts, the department shall ensure that regional center staffing patterns demonstrate that direct service coordination are the highest priority.

(b)  Contracts between the department and regional centers shall require that regional centers implement an emergency response system that ensures that a regional center staff person will respond to a consumer, or individual acting on behalf of a consumer, within two hours of the time an emergency call is placed. This emergency response system shall be operational 24 hours per day, 365 days per year.

(c)  Contracts between the department and regional centers shall require regional centers to have service coordinator-to-consumer ratios, as follows:

(1)  An average service coordinator-to-consumer ratio of 1 to 62 for all consumers who have not moved from the developmental centers to the community since April 14, 1993. In no case shall a service coordinator for these consumers have an assigned caseload in excess of 79 consumers for more than 60 days.

(2)  An average service coordinator-to-consumer ratio of 1 to 45 for all consumers who have moved from a developmental center to the community since April 14, 1993. In no case shall a service coordinator for these consumers have an assigned caseload in excess of 59 consumers for more than 60 days.

(d)  For purposes of this section, "service coordinator" means a regional center employee whose primary responsibility includes preparing, implementing, and monitoring consumers' individual program plans, securing and coordinating consumer services and supports, and providing placement and monitoring activities.

(e)  In order to ensure that caseload ratios are maintained pursuant to this section, each regional center shall provide service coordinator caseload data to the department in September and March of each fiscal year, commencing in the 1999–2000 fiscal year. The data shall be submitted in a format prescribed by the department. Within 30 days of receipt of data submitted pursuant to this subdivision, the department shall make a summary of the data available to the public upon request. The department shall verify the accuracy of the data when conducting regional center fiscal audits. Data submitted by regional centers pursuant to this subdivision shall:

(1)  Only include data on service coordinator positions as defined in subdivision (d). Regional centers shall identify the number of positions that perform service coordinator duties on less than a full-time basis.

Staffing ratios reported pursuant to this subdivision shall reflect the appropriate proportionality of these staff to consumers served.

(2) Be reported separately for service coordinators whose caseload primarily includes any of the following:

(A) Consumers who are three years of age and older and who have not moved from the developmental center to the community since April 14, 1993.

(B) Consumers who have moved from a developmental center to the community since April 14, 1993.

(C) Consumers who are younger than three years of age.

(3) Not include positions that are vacant for more than 60 days.

(f) The department shall provide technical assistance and require a plan of correction for any regional center that, for two consecutive reporting periods, fails to maintain service coordinator caseload ratios required by this section or otherwise demonstrates an inability to maintain appropriate staffing patterns pursuant to this section. Plans of correction shall be developed following input from the local area board, local organizations representing consumers, family members, regional center employees, including recognized labor organizations, and service providers, and other interested parties.

(g) Contracts between the department and regional center shall require the regional center to have, or contract for, all of the following areas:

(1) Criminal justice expertise to assist the regional center in providing services and support to consumers involved in the criminal justice system as a victim, defendant, inmate, or parolee.

(2) Special education expertise to assist the regional center in providing advocacy and support to families seeking appropriate educational services from a school district.

(3) Family support expertise to assist the regional center in maximizing the effectiveness of support and services provided to families.

(4) Housing expertise to assist the regional center in accessing affordable housing for consumers in independent or supportive living arrangements.

(5) Community integration expertise to assist consumers and families in accessing integrated services and supports and improved opportunities to participate in community life.

(6) Quality assurance expertise, to assist the regional center to provide the necessary coordination and cooperation with the area board in conducting quality-of-life assessments and coordinating the regional center quality assurance efforts.

(7) Each regional center shall employ at least one consumer advocate who is a person with developmental disabilities.

(8) Other staffing arrangements related to the delivery of services that the department determines are necessary to ensure maximum cost-effectiveness and to ensure that the service needs of consumers and families are met.

(h) Any regional center proposing a staffing arrangement that substantially deviates from the requirements of this section shall request a waiver from the department. Prior to granting a waiver, the department shall require a detailed staffing proposal, including, but not limited to, how the proposed staffing arrangement will benefit consumers and families served, and shall demonstrate clear and convincing support for the proposed staffing arrangement from constituencies served and impacted, that include, but are not limited to, consumers, families, providers, advocates, and recognized labor organizations. In addition, the regional center shall submit to the department any written opposition to the proposal from organizations or individuals, including, but not limited to, consumers, families, providers, and advocates, including recognized labor organizations. The department may grant waivers to regional centers that sufficiently demonstrate that the proposed staffing arrangement is in the best interest of consumers and families served, complies with the requirements of this chapter, and does not violate any contractual requirements. A waiver shall be approved by the department for up to 12 months, at which time a regional center may submit a new request pursuant to this subdivision.

(i) The requirements of subdivisions (c), (f), and (h) shall not apply when a regional center is required to develop an expenditure plan pursuant to Section 4791, and when the expenditure plan addresses the specific impact of the budget reduction on staffing requirements and the expenditure plan is approved by the department.

(j) (1) Any contract between the department and a regional center entered into on and after January 1, 2003, shall require that all employment contracts entered into with regional center staff or contractors be available to the public for review, upon request. For purposes of this subdivision, an employment contract or portion thereof may not be deemed confidential nor unavailable for public review.

(2) Notwithstanding paragraph (1), the social security number of the contracting party may not be disclosed.

(3) The term of the employment contract between the regional center and an employee or contractor shall not exceed the term of the state's contract with the regional center.

SEC. 32.   Section 4643 of the Welfare and Institutions Code is amended to read:

95

4643.  (a) If assessment is needed, prior to July 1, 2003, the assessment shall be performed within 120 days following initial intake. Assessment shall be performed as soon as possible and in no event more than 60 days following initial intake where any delay would expose the client to unnecessary risk to his or her health and safety or to significant further delay in mental or physical development, or the client would be at imminent risk of placement in a more restrictive environment. Assessment may include collection and review of available historical diagnostic data, provision or procurement of necessary tests and evaluations, and summarization of developmental levels and service needs and is conditional upon receipt of the release of information specified in subdivision (b). On and after July 1, 2003, the assessment shall be performed within 60 days following intake and if unusual circumstances prevent the completion of assessment within 60 days following intake, this assessment period may be extended by one 30-day period with the advance written approval of the department.

(b) In determining if an individual meets the definition of developmental disability contained in subdivision (a) of Section 4512, the regional center may consider evaluations and tests, including, but not limited to, intelligence tests, adaptive functioning tests, neurological and neuropsychological tests, diagnostic tests performed by a physician, psychiatric tests, and other tests or evaluations that have been performed by, and are available from, other sources.

SEC. 33.   Section 4646.5 of the Welfare and Institutions Code is amended to read:

4646.5.   (a) The planning process for the individual program plan described in Section 4646 shall include all of the following:

(1) Gathering information and conducting assessments to determine the life goals, capabilities and strengths, preferences, barriers, and concerns or problems of the person with developmental disabilities. For children with developmental disabilities, this process should include a review of the strengths, preferences, and needs of the child and the family unit as a whole. Assessments shall be conducted by qualified individuals and performed in natural environments whenever possible. Information shall be taken from the consumer, his or her parents and other family members, his or her friends, advocates, providers of services and supports, and other agencies. The assessment process shall reflect awareness of, and sensitivity to, the lifestyle and cultural background of the consumer and the family.

(2) A statement of goals, based on the needs, preferences, and life choices of the individual with developmental disabilities, and a statement of specific, time-limited objectives for implementing the person's goals and addressing his or her needs. These objectives shall be

95

stated in terms that allow measurement of progress or monitoring of service delivery. These goals and objectives should maximize opportunities for the consumer to develop relationships, be part of community life in the areas of community participation, housing, work, school, and leisure, increase control over his or her life, acquire increasingly positive roles in community life, and develop competencies to help accomplish these goals.

(3)  When developing individual program plans for children, regional centers shall be guided by the principles, process, and services and support parameters set forth in Section 4685.

(4)  A schedule of the type and amount of services and supports to be purchased by the regional center or obtained from generic agencies or other resources in order to achieve the individual program plan goals and objectives, and identification of the provider or providers of service responsible for attaining each objective, including, but not limited to, vendors, contracted providers, generic service agencies, and natural supports. The plan shall specify the approximate scheduled start date for services and supports and shall contain timelines for actions necessary to begin services and supports, including generic services.

(5)  When agreed to by the consumer, the parents or legally appointed guardian of a minor consumer, or the legally appointed conservator of an adult consumer or the authorized representative, including those appointed pursuant to Section 4590 and subdivision (e) of Section 4705, a review of the general health status of the adult or child including a medical, dental, and mental health needs shall be conducted. This review shall include a discussion of current medications, any observed side effects, and the date of last review of the medication. Service providers shall cooperate with the planning team to provide any information necessary to complete the health status review. If any concerns are noted during the review, referrals shall be made to regional center clinicians or to the consumer's physician, as appropriate. Documentation of health status and referrals shall be made in the consumer's record by the service coordinator.

(6)  A schedule of regular periodic review and reevaluation to ascertain that planned services have been provided, that objectives have been fulfilled within the times specified, and that consumers and families are satisfied with the individual program plan and its implementation.

(b)  For all active cases, individual program plans shall be reviewed and modified by the planning team, through the process described in Section 4646, as necessary, in response to the person's achievement or changing needs, and no less often than once every three years. If the consumer or, where appropriate, the consumer's parents, legal guardian,

or conservator requests an individual program plan review, the individual program shall be reviewed within 30 days after the request is submitted.

(c) (1) The department, with the participation of representatives of a statewide consumer organization, the Association of Regional Center Agencies, an organized labor organization representing service coordination staff, and the Organization of Area Boards shall prepare training material and a standard format and instructions for the preparation of individual program plans, which embodies an approach centered on the person and family.

(2) Each regional center shall use the training materials and format prepared by the department pursuant to paragraph (1).

(3) The department shall biennially review a random sample of individual program plans at each regional center to assure that these plans are being developed and modified in compliance with Section 4646 and this section.

SEC. 34.    Section 4781.5 is added to the Welfare and Institutions Code, to read:

4781.5.    For the 2002–03 fiscal year only, a regional center may not expend any purchase of service funds for the startup of any new program unless the expenditure is necessary to protect the consumer's health or safety or because of other extraordinary circumstances, and the department has granted prior written authorization for the expenditure. This provision shall not apply to any of the following:

(a) The purchase of services funds allocated as part of the department's community placement plan process.

(b) Expenditures for the startup of new programs made pursuant to a contract entered into before July 1, 2002.

SEC. 34.5.    Section 4847 of the Welfare and Institutions Code is repealed.

SEC. 35.    Section 5600.8 of the Welfare and Institutions Code is amended to read:

5600.8.    (a) The department may allocate the funds appropriated in Schedule (2) of Item 4440-101-0001 of the annual Budget Act, to county mental health programs that meet programmatic goals and model adult system of care programs to the satisfaction of the department. The department shall audit and monitor the use of these funds to ensure they are used solely in support of Adult System of Care programming. If county programs receiving adult system of care funding do not comply with program and audit requirements determined by the department, funding shall be redistributed to other counties to implement, expand, or model adult systems of care.

(b)  The department may allocate the funds appropriated in Schedule (3) of Item 4440-101-0001 of the annual Budget Act, to county mental health programs for Children's System of Care programming. These funds shall be utilized by counties only in support of a mental health system serving seriously emotionally disturbed children, in accordance with the principles and program requirements associated with the system of care model, as set forth in Part 4 (commencing with Section 5850). The department shall audit and monitor the use of these funds to ensure they are used solely in support of the Children's System of Care program. If county programs receiving children's system of care funding do not comply with program and audit requirements determined by the department, funds shall be redistributed to other counties to implement, expand, or model children's system of care programming.

SEC. 36.   Section 5767 is added to the Welfare and Institutions Code, to read:

5767.   The department, in consultation with a statewide organization representing county mental health services, shall strengthen and ensure statewide application of managed care principles, building on existing county systems, to manage the Early Periodic Screening Diagnosis and Treatment Program benefit while ensuring access to eligible Medi-Cal recipients.

SEC. 37.   Section 5869 of the Welfare and Institutions Code is amended to read:

5869.   The department shall provide participating counties with all of the following:

(a)  Applications for funding guidelines and format, and coordination and oversight of the selection process as described in Article 4 (commencing with Section 5857).

(b)  Contracts with each state funded county specifying the approved budget, performance outcomes, and a scope of work plan for each year of participation in the children's system of care program.

(c)  Technical assistance related to system evaluation.

SEC. 38.   Section 5881 of the Welfare and Institutions Code is amended to read:

5881.   (a) Evaluation shall be conducted by both participating county evaluation staff and, subject to the availability of funds, by the department.

(b)  Evaluation at both levels shall do all of the following:

(1)  Ensure that county level systems of care are serving the targeted population.

(2)  Ensure that the timely performance data related to client outcome and cost avoidance is collected, analyzed, and reported.

95

(3) Ensure that system of care components are implemented as intended.

(4) Provide information documenting needs for future planning.

SEC. 39.   Section 5882 of the Welfare and Institutions Code is amended to read:

5882.   (a) Participating counties shall assign sufficient resources to performance evaluation to enable the county to fulfill all evaluation responsibilities specified in the contract with the department.

(b) Counties shall cooperate with the department regarding the development of uniform measures of performance.

SEC. 40.   Section 5883 of the Welfare and Institutions Code is amended to read:

5883.   (a) The department shall facilitate improved access to relevant client and financial data from all state agencies, including, but not limited to, the State Department of Social Services, the State Department of Education, the State Department of Health Services, the State Department of Mental Health, the Department of the Youth Authority, and the Department of Finance.

(b) The State Department of Mental Health shall expand the funding allocated to the contract for independent evaluation, as necessary to accommodate the increase in workload created by the addition of new sites.

(c) Subject to the availability of funds, the department shall do all of the following:

(1) Develop uniform data collection and reporting measures applicable to all participating counties.

(2) Collect, analyze, and report performance outcome data for participating counties as a group in comparison to state averages.

(3) Offer technical assistance to participating counties related to data collection, analysis, and reporting.

SEC. 41.   Section 14000.03 is added to the Welfare and Institutions Code, to read:

14000.03.   (a) The Legislature finds and declares that Section 1396a(a)(11)(A) of Title 42 of the United States Code provides that California's state plan for medical assistance under the Medicaid program must "provide for entering into cooperative arrangements with the State agencies responsible for administering or supervising the administration of health services and vocational rehabilitation services in the State looking toward maximum utilization of such services in the provision of medical assistance under the plan."

(b) In furtherance of Section 1396a(a)(11)(A) of Title 42 of the United States Code and Section 7560 of the Government Code, it is the intent of the Legislature to maximize the amount of federal and state funds

continually available under agreements identified in Section 1396a(a)(11)(A) of Title 42 of the United States Code and entered into by the State Department of Health Services by making later-appropriated and budgeted funds immediately encumbered and available for expenditure under agreements by operation of law.

(c) Notwithstanding any other provision of law, upon additional funds being appropriated and budgeted for the support of the services identified within the scope of work of an agreement of the type identified in Section 1396a (a)(11)(A) of Title 42 of the United States Code and previously entered into by the State Department of Health Services, the amount of the encumbrance in such an agreement shall be amended, by operation of law, to reflect the newly appropriated and budgeted funds.

(d) Notwithstanding any other provision of law, once an agreement of the type identified in Section 1396a (a)(11)(A) of Title 42 of the United States Code is entered into by the State Department of Health Services, the agreement shall continue in effect indefinitely and need not be amended unless the State Department of Health Services changes the scope of work to be provided under the agreement.

SEC. 42.   Section 14000.5 is added to the Welfare and Institutions Code, to read:

14000.5.   On a regional pilot project basis, to the extent authorized by law, the director may enter into contracts with one or more nonprofit organizations to perform the functions of the department's Office of the Ombudsman. These activities may include outreach, community education and training about health care consumer rights and responsibilities, including the production and distribution of consumer-oriented material, individual consumer assistance, including counseling, advice, assistance, education, advocacy, and referral as appropriate, establishing and operating a database to analyze the nature of the inquiries and requests for assistance, and training of department or county staff. These services may be made available to any person who may be eligible for or is receiving benefits under this chapter. Funds appropriated in the annual Budget Act for the support of the Office of the Ombudsman may be allocated for this purpose.

SEC. 43.   Section 14005.41 of the Welfare and Institutions Code is amended to read:

14005.41.   (a) Notwithstanding any other provision of law, the department shall deem to have met the income documentation requirements for participation in the Medi-Cal program, without a share of cost, any child who is less than six years of age and who has been determined to be eligible for free meals through a federally funded program using the National School Lunch application provided for

pursuant to Chapter 13 (commencing with Section 1751) of Title 42 of the United States Code.

(b) Notwithstanding any other provision of law, with regard to any child who is enrolled in and attending public school in the State of California, the department shall accept documentation of enrollment for free meals under the National School Lunch Program as sufficient documentation of California residency for that child for the purposes of the Medi-Cal program.

(c) (1) (A) Effective July 1, 2003, notwithstanding any other provision of law, each county shall participate in a statewide pilot project to determine Medi-Cal program eligibility for any child under six years of age and currently enrolled in school in the State of California who is eligible for free meals under the National School Lunch Program upon receipt of proof of participation in the National School Lunch Program and a signed Medi-Cal application, which may be the supplemented application, described in subdivision (i). Counties shall notify the parent or guardian of the results of the eligibility determination.

(B) Effective July 1, 2003, notwithstanding any other provision of law, each county shall participate in a statewide pilot project to use the procedure described in this subdivision to determine Medi-Cal eligibility without a share of cost, and, if eligible, shall enroll in the Medi-Cal program, any child six years of age or older currently enrolled in school in the State of California who is eligible for free meals under the National School Lunch Program, upon receipt of proof of participation in the National School Lunch Program and a signed Medi-Cal application, which may be the supplemented application, described in subdivision (i). If the county determines from the supplemented application described in subdivision (i) that the child meets the eligibility requirements for participation in the Medi-Cal program, the county shall notify the parent or guardian that the child has been found eligible for the Medi-Cal program. If the county is unable to determine from the information on the application as described in subdivision (i) whether the child is eligible, the county shall contact the family to seek any additional information regarding income, household composition, or deductions that the department, in consultation with the county welfare departments, may determine to be necessary to complete the Medi-Cal application. If the county determines that the child does not meet the eligibility requirements for participation in the Medi-Cal program, the county shall notify the parent or guardian of the determination and shall send the parent or guardian an application for the Healthy Families Program.

(2) Each county shall ask the parent or guardian of each child identified in subparagraph (A) of paragraph (1) and the parent or

95

guardian of each child whom the county determines to meet the income eligibility requirements for participation in the Medi-Cal program under subparagraph (B) of paragraph (1) to provide additional documentation as required by current law necessary for retention of eligibility in the Medi-Cal program. If a parent or guardian does not provide the documentation required for retention of full-scope Medi-Cal program eligibility, the county shall continue the child's enrollment in the Medi-Cal program, but only for the limited scope of Medi-Cal program benefits as described in Section 14007.5.

(d) Nothing in this section shall be construed as preventing the department from verifying eligibility through the Income Eligibility Verification System match mandated by Section 1137 of the federal Social Security Act (42 U.S.C. Sec. 1320b-7) or from requesting additional information or documentation required by federal law.

(e) Each county shall include its cost of implementing this section in its annual Medi-Cal administrative budget requests submitted to the department.

(f) For purposes of this section, the Medi-Cal program application date shall be the date on which the school lunch application information is received by the local agency determining eligibility under the Medi-Cal program.

(g) (1) This section shall be implemented on July 1, 2003, only if, and to the extent that, federal financial participation is available for the services provided and only for the period of time the free National School Lunch Program utilizes a gross income standard at or below 133 percent of the federal poverty level. This section shall be implemented in a manner consistent with any federal approval.

(2) Notwithstanding paragraph (1), if the department determines that one or more state plan amendments are necessary to ensure full federal financial participation in the provisions of this section, the department shall prepare and submit requests for the state plan amendments to the federal government, after which this section shall not be implemented until the later of the date the department receives approval of all necessary state plan amendments, or July 1, 2003.

(h) (1) Notwithstanding subdivision (g), not later than March 1, 2003, the department, in consultation with the State Department of Education and representatives of the school districts, county superintendents of schools, local agencies that administer the Medi-Cal program, consumer advocates, and other stakeholders, shall develop and distribute the policies and procedures, including any all-county letters, necessary to implement Section 49557.2 of the Education Code and this section.

(2) The policies and procedures required to be developed and distributed pursuant to subdivision (a) shall include, at a minimum, both of the following:

(A) Processes for the school districts, county superintendents of schools, and local agencies that administer the Medi-Cal program to use in forwarding and processing free school lunch application information pursuant to Section 49557.2 of the Education Code, and in following up with the applicants to obtain any necessary documentation required by federal law.

(B) Instructions for implementing the eligibility provisions of this chapter.

(3) The policies and procedures required to be developed pursuant to subdivision (a) shall specify all of the following:

(A) The information on the school lunch application may be used to initiate a Medi-Cal program application only when the applicant has provided his or her consent pursuant to Section 49557.2 of the Education Code.

(B) The date of the Medi-Cal program application shall be the date on which the school lunch application was received by the local agency that determines eligibility under the Medi-Cal program.

(C) The county, in determining eligibility for the Medi-Cal program, shall request additional documentation only as required by federal law, and shall enroll any child whose parent or guardian does not provide the necessary documentation for full-scope benefits under the Medi-Cal program in the Medi-Cal program with limited scope benefits, as described in Section 14007.5.

(i) To the extent federal financial participation is available, and to the extent administratively feasible, the department shall utilize the free National School Lunch Application developed under Section 49557.2 of the Education Code, if supplemented as needed by simplified forms and disclosures, including Medi-Cal rights and responsibility notices and privacy notices, as a Medi-Cal application for children described in this section.

(j) Notwithstanding Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code, the department shall implement this section by means of all-county letters or similar instructions without taking regulatory action. Thereafter, the department shall adopt regulations in accordance with the requirements of Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code.

(k) The department shall review the effectiveness of the statewide pilot project and make recommendations regarding appropriate ways to expand the use of the approaches contained in this section.

95

(*l*)  In order to expedite health coverage for children who have been determined eligible for free meals under the National School Lunch Program, the department, at its discretion, may choose to implement this section in whole or in part by exercising the option described in Section 1396r-1a of Title 42 of the United States Code to allow information provided on the National School Lunch Program application referred to, and supplemented as described, in paragraph (1) of subdivision (a) of Section 49557.2 of the Education Code to serve as a basis for a preliminary eligibility determination by a qualified entity designated by the department.

SEC. 44.   Section 14011.6 of the Welfare and Institutions Code is amended to read:

14011.6.   (a)  To the extent federal financial participation is available, the department shall exercise the option provided in Section 1920a of the federal Social Security Act (42 U.S.C. Sec. 1396r-1a) to implement a program for accelerated enrollment of children.

(b)  The department shall designate the single point of entry, as defined in subdivision (c), as the qualified entity for determining eligibility under this section.

(c)  For purposes of this section, "single point of entry" means the centralized processing entity that accepts and screens applications for benefits under the Medi-Cal Program for the purpose of forwarding them to the appropriate counties.

(d)  The department shall implement this section only if, and to the extent that, federal financial participation is available.

(e)  The department shall seek federal approval of any state plan amendments necessary to implement this section. When federal approval of the state plan amendment or amendments is received, the department shall commence implementation of this section on the first day of the second month following the month in which federal approval of the state plan amendment or amendments is received, or on July 1, 2002, whichever is later.

(f)  Notwithstanding any other provision of law, the department shall implement this section only if, and to the extent that, the federal State Children's Health Insurance Program waiver described in Section 12693.755 of the Insurance Code is approved by the federal government.

(g)  Notwithstanding Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code, the department shall, without taking any regulatory action, implement this section by means of all-county letters. Thereafter, the department shall adopt regulations in accordance with the requirements of Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code.

95

(h) Upon the receipt of an application for a child who has coverage pursuant to the accelerated enrollment program, a county shall determine whether the child is eligible for Medi-Cal benefits. If the county determines that the child does not meet the eligibility requirements for participation in the Medi-Cal program, the county shall report this finding to the Medical Eligibility Data System so that accelerated enrollment coverage benefits are discontinued. The information to be reported shall consist of the minimum data elements necessary to discontinue that coverage for the child. This subdivision shall become operative on July 1, 2002, or the date that the program for accelerated enrollment coverage for children takes effect, whichever is later.

SEC. 45.   Section 14011.7 is added to the Welfare and Institutions Code, to read:

14011.7.   (a) To the extent allowed under federal law and only if federal financial participation is available, the department shall exercise the option provided in Section 1396r-1a of Title 42 of the United States Code and the Managed Risk Medical Insurance Board shall exercise the option provided in Section 1397gg(e)(1)(D) of Title 42 of the United States Code to implement a program for preenrollment of children into the Medi-Cal program or the Healthy Families Program. Upon the exercise of both of the federal options described in this subdivision, the department shall implement and administer a program of preenrollment of children into the Medi-Cal program or the Healthy Families Program.

(b) Before July 1, 2003, the department shall develop an electronic application to serve as the application for preenrollment into the Medi-Cal program or the Healthy Families Program and to also serve as an application for the Child Health and Disability Prevention (CHDP) program, to the extent allowed under federal law.

(c) (1) The department may designate, as necessary, those CHDP program providers described in paragraphs (1) to (5), inclusive, of subdivision (g) of Section 124030 of the Health and Safety Code as qualified entities who are authorized to determine eligibility for the CHDP program and for preenrollment into either the Medi-Cal program or the Healthy Families Program as authorized under this section.

(2) The CHDP provider shall assist the parent or guardian of the child seeking eligibility for the CHDP program and for preenrollment into the Medi-Cal program or the Healthy Families Program in completing the electronic application.

(d) The electronic application developed pursuant to subdivision (b) may only be filed through the CHDP program when the child is in need of CHDP program services in accordance with the periodicity schedule used by the CHDP program.

95

Ch. 1161

(e) (1) The electronic application developed pursuant to subdivision (b) shall request all information necessary for a CHDP provider to make an immediate determination as to whether a child meets the eligibility requirements for CHDP and for preenrollment into either the Medi-Cal program or the Healthy Families Program pursuant to the federal options described in Section 1396r-1a or 1397gg(e)(1)(D) of Title 42 of the United States Code.

(2) (A) If the electronic application indicates that the child is seeking eligibility for either no cost full-scope Medi-Cal benefits or enrollment in the Healthy Families Program, the department shall mail to the child's parent or guardian a followup application for Medi-Cal program eligibility or enrollment in the Healthy Families Program. The parent or guardian of the child shall be advised to complete and submit to the appropriate entity the followup application.

(B) The followup application, at a minimum, shall include all notices and forms necessary for both a Medi-Cal program and a Healthy Families Program eligibility determination under state and federal law, including, but not limited to, any information and documentation that is required for the joint application package described in Section 14011.1.

(C) The date of application for the Medi-Cal program or the Healthy Families Program is the date the completed followup application is submitted with the appropriate entity by the parent or guardian.

(3) Upon making a determination pursuant to paragraph (1) that a child is eligible, the CHDP provider shall inform the child's parent or guardian of both of the following:

(A) That the child has been determined to be eligible for services under the CHDP program and, if applicable, eligible for preenrollment into either the Medi-Cal program or the Healthy Families Program.

(B) That if the child has been determined to be eligible for preenrollment into either the Medi-Cal program or the Healthy Families Program, the period of preenrollment eligibility will end on the last day of the month following the month in which the determination of preenrollment eligibility is made, unless the parent or guardian completes and returns to the appropriate entity the followup application described in paragraph (2) on or before that date.

(4) If the followup application described in paragraph (2) is submitted on or before the last day of the month following the month in which a determination is made that the child is eligible for preenrollment into either the Medi-Cal program or the Healthy Families Program, the period of preenrollment eligibility shall continue until the completion of the determination process for the applicable program or programs.

(f) The scope and delivery of benefits provided to a child who is preenrolled for the Healthy Families Program pursuant to this section

shall be identical to the scope and delivery of benefits received by a child who is preenrolled in the Medi-Cal program pursuant to this section.

(g)  The department and the Managed Risk Medical Insurance Board shall seek approval of any amendments to the state plan, necessary to implement this section, for purposes of funding under Title XIX (42 U.S.C. 1396 et seq.) and Title XXI (42 U.S.C. 1397aa et seq.) of the Social Security Act. Notwithstanding any other provision of law and only when all necessary federal approvals have been obtained, this section shall be implemented only to the extent federal financial participation is available.

(h)  Upon the implementation of this section, this section shall control in the event of a conflict with any provision of Article 6 (commencing with Section 124025) of Chapter 3 of Part 2 of Division 106 of the Health and Safety Code governing the Child Health and Disability Prevention program.

(i)  To implement this section, the department may contract with public or private entities, or utilize existing health care service provider enrollment and payment mechanisms, including the Medi-Cal program's fiscal intermediary, only if services provided under the program are specifically identified and reimbursed in a manner that appropriately claims federal financial reimbursement. Contracts, including the Medi-Cal fiscal intermediary contract for the Child Health and Disability Prevention Program, including any contract amendment, any system change pursuant to a change order, and any project or systems development notice shall be exempt from Part 2 (commencing with Section 10100) of Division 2 of the Public Contract Code, Chapter 7 (commencing with Section 11700) of Part 1 of Division 3 of Title 2 of the Government Code, Section 19130 of the Government Code, and any policies, procedures, or regulations authorized by these laws.

(j)  Notwithstanding Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code, the department shall implement this section by means of all-county letters or similar instructions, without taking any further regulatory action. Thereafter, the department shall adopt regulations, as necessary, to implement this section in accordance with the requirements of Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code.

(k)  Notwithstanding subdivision (g), in no event shall this section be implemented before April 1, 2003.

SEC. 46.   Section 14011.8 is added to the Welfare and Institutions Code, to read:

14011.8.   (a)  Benefits provided to an individual pursuant to a preliminary determination as described in Section 1396r-1, 1396r-1a, or

1396r-1b of Title 42 of the United States Code shall end, without the necessity for any further review or determination by the department, on or before the last day of the month following the month in which the preliminary determination was made, unless an application for medical assistance under the state plan is filed on or before that date.

(b)  If an application for medical assistance is filed on or before the last day of the month following the month in which the preliminary determination was made, preliminary benefits shall continue until the regular eligibility determination based on the application has been completed. The application shall be treated in all respects as an initial application for benefits and the following shall apply:

(1)  In the case of an applicant who is found eligible for medical assistance, benefits shall be granted in an amount and under those conditions, including imposition of a share of cost, as have been found applicable pursuant to the regular eligibility determination.

(2)  In the case of all other applicants, provision of preliminary benefits shall end on the day that the regular eligibility determination is made.

(c)  Notwithstanding any other provision of law, medical assistance pursuant to a preliminary determination as described in Section 1396r-1, 1396r-1a, or 1396r-1b of Title 42 of the United States Code shall be provided only if and to the extent federal financial participation is available.

SEC. 47.   Section 14011.9 is added to the Welfare and Institutions Code, to read:

14011.9.   (a)  On or before October 1, 2002, the department shall issue instructions to counties via an all-county letter or similar instructions to establish an automated system for tracking the status of applications received by county welfare departments from the centralized processing entity that accepts and screens applications for benefits under the Medi-Cal program for the purpose of forwarding these applications to the appropriate counties. Except for reporting denials of applications on behalf of children enrolled in accelerated Medi-Cal coverage pursuant to subdivision (g) of Section 14011.6, the department shall not institute a process to require county welfare departments to routinely manually report to the Medi-Cal Eligibility Data System (MEDS) regarding the status of applications for Medi-Cal coverage prior to the development of an interface between that county's automated eligibility determination system and the MEDS system for the purposes of implementing this section. It is the intent of the Legislature that the Health Human Services Data Center and the counties complete the automation changes necessary to implement the automated tracking system on or before July 1, 2003.

(b) This section shall be implemented only to the extent that federal financial participation is not jeopardized.

(c) Nothing in this section shall be construed as prohibiting the department from requiring a county to report on the status of an individual application or to manually generate a report on a statistically valid sampling of applications pursuant to federally required monitoring activities.

SEC. 47.5.   Section 14019.3 of the Welfare and Institutions Code is amended to read:

14019.3.   (a) A beneficiary or any person on behalf of the beneficiary who has paid for health care services otherwise covered by the Medi-Cal program received by the beneficiary shall be entitled to a return from the provider of any part of the payment that meets all of the following:

(1) Was rendered during any period prior to the receipt of his or her Medi-Cal card, for which the card authorizes payment under Section 14018 or 14019.

(2) Was reimbursed to the provider by the Medi-Cal program, following all audits and appeals to which the provider is entitled.

(3) Is not payable by a third party under contractual or other legal entitlement.

(4) Was not used to satisfy his or her paid or obligated liability for health care services or to establish eligibility.

(b) To the extent permitted by federal law, whether or not a facility actually evicts a beneficiary, a beneficiary who may validly be evicted pursuant to Section 1439.7 of the Health and Safety Code, and who has received and paid for health care services otherwise covered by the Medi-Cal program shall not be entitled to the return from the provider of any part of the payment for which service was rendered during any period prior to the date upon which knowledge is acquired by the licensee of the application of the beneficiary for Medi-Cal or the date of application for Medi-Cal, whichever is later.

(c) Upon presentation of the Medi-Cal card or other proof of eligibility, the provider shall submit a Medi-Cal claim for reimbursement, subject to the rules and regulations of the Medi-Cal program.

(d) Notwithstanding subdivision (c), payment received from the state in accordance with Medi-Cal fee structures shall constitute payment in full, except that a provider, after making a full refund to the department of any Medi-Cal payments received for services, may recover all provider fees to the extent that any other contractual entitlement, including, but not limited to, a private group or indemnification