# Exhibit 3

*State of California ex. rel. Ven-A-Care of the Florida Keys, Inc. v.*
*Abbott Laboratories, Inc., et al.*

Exhibit to Plaintiffs' Request for Judicial Notice in Support of Plaintiffs'
Opposition to Defendants' Joint Motion for Partial Summary Judgment

insurance program, is obligated to pay the charges for the care provided the beneficiary.

(e) The provider shall return any and all payments made by the beneficiary, or any person on behalf of the beneficiary, other than a third party obligated to pay charges by reason of the beneficiary's other contractual or legal entitlement for Medi-Cal program covered services upon receipt of Medi-Cal payment.

(f) To the extent permitted by federal law, the department shall waive overpayments made to a pharmacy provider that would otherwise be reimbursable to the department for prescription drugs returned to the pharmacy provider from a nursing facility upon discontinuation of the drug therapy or death of the beneficiary.

SEC. 48.   Section 14051 of the Welfare and Institutions Code is amended to read:

14051.   (a) "Medically needy person" means any of the following:

(1) An aged, blind, or disabled person who meets the definition of aged, blind, or disabled under the Supplemental Security Income Program and whose income and resources are insufficient to provide for the costs of health care or coverage.

(2) A child in foster care for whom public agencies are assuming financial responsibility, in whole or in part, or a person receiving aid under Chapter 2.1 (commencing with Section 16115) of Part 4.

(3) A child who is eligible to receive Medi-Cal benefits pursuant to interstate agreements for adoption assistance and related services and benefits entered into under Chapter 2.6 (commencing with Section 16170) of Part 4, to the extent federal financial participation is available.

(b) "Medically needy family person" means a parent or caretaker relative of a child who meets the deprivation requirements of Aid to Families with Dependent Children or a child under 21 years of age or a pregnant woman of any age with a confirmed pregnancy, exclusive of those persons specified in subdivision (a), whose income and resources are insufficient to provide for the costs of health care or coverage.

SEC. 49.   Section 14085.7 of the Welfare and Institutions Code is amended to read:

14085.7.   (a) The Medi-Cal Medical Education Supplemental Payment Fund is hereby created in the State Treasury. Notwithstanding Section 13340 of the Government Code, the fund shall be continuously appropriated to, and under the administrative control of, the department for the purposes specified in this section. Except as otherwise limited by this section, the fund shall consist of all of the following:

(1) All public moneys transferred by public agencies to the department for deposit into the fund, as permitted under Section 433.51

of Title 42 of the Code of Federal Regulations or any other applicable federal medicaid laws.

(2)  All private moneys donated by private individuals or entities to the department for deposit in the fund as permitted under applicable federal medicaid laws.

(3)  Any amounts appropriated to the fund by the Legislature.

(4)  Any interest that accrues on amounts in the fund.

(b)  Any public agency transferring moneys to the fund may, for that purpose, utilize any revenues, grants, or allocations received from the state for health care programs or purposes, unless otherwise prohibited by law. A public agency may also utilize its general funds or any other public moneys or revenues for purposes of transfers to the fund, unless otherwise prohibited by law.

(c)  The department shall have the discretion to accept or not accept moneys offered to the department for deposit in the fund. If the department accepts moneys pursuant to this section, the department shall obtain federal matching funds to the full extent permitted by law. The department shall accept only those funds that are certified by the transferring or donating entity as qualifying for federal financial participation under the terms of the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991 (P.L. 102-234) or Section 433.51 of Title 42 of the Code of Federal Regulations, as applicable, and may return any funds transferred or donated in error.

(d)  Moneys in the fund shall be used as the source for the nonfederal share of payments to hospitals under this section. Moneys shall be allocated from the fund by the department and matched by federal funds in accordance with customary Medi-Cal accounting procedures for purposes of payments under subdivision (e). Distributions from the fund shall be supplemental to any other amounts that hospitals receive under the contracting program.

(e)  For purposes of recognizing medical education costs incurred for services rendered to Medi-Cal beneficiaries, payments from this fund shall be negotiated between the California Medical Assistance Commission and hospitals contracting under this article that meet the definition of university teaching hospitals or major (nonuniversity) teaching hospitals as set forth on page 51 and as listed on page 57 of the department's report dated May 1991, entitled "Hospital Peer Grouping." Payments from the fund shall be used solely for the purposes identified in the contract between the hospital and the state.

(f)  The state shall be held harmless from any federal disallowance resulting from this section. A hospital receiving supplemental reimbursement pursuant to this section shall be liable for any reduced federal financial participation resulting from the implementation of this

95

section with respect to that hospital. The state may recoup any federal disallowance from the hospital.

(g) This section shall become inoperative on July 1, 2004, and, as of January 1, 2005, is repealed, unless a later enacted statute, that becomes effective on or before January 1, 2005, deletes or extends the dates on which it becomes inoperative and is repealed.

SEC. 50.   Section 14085.8 of the Welfare and Institutions Code is amended to read:

14085.8.   (a) The Large Teaching Emphasis Hospital and Children's Hospital Medi-Cal Medical Education Supplemental Payment Fund is hereby created in the State Treasury.

(b) Notwithstanding Section 13340 of the Government Code, the fund shall be continuously appropriated to, and under the administrative control of, the department for the purposes specified in this section.

(c) Except as otherwise limited by this section, the fund shall consist of all of the following:

(1) All public moneys transferred by public agencies to the department for deposit into the fund, as permitted under Section 433.51 of Title 42 of the Code of Federal Regulations or any other applicable federal medicaid laws.

(2) All private moneys donated by private individuals or entities to the department for deposit in the fund as permitted under applicable federal medicaid laws.

(3) Any amounts appropriated to the fund by the Legislature.

(4) Any interest that accrues on amounts in the fund.

(d) Any public agency transferring moneys to the fund may, for that purpose, utilize any revenues, grants, or allocations received from the state for health care programs or purposes, unless otherwise prohibited by law. A public agency may also utilize its general funds or any other public moneys or revenues for purposes of transfers to the fund, unless otherwise prohibited by law.

(e) The department may accept or not accept moneys offered to the department for deposit in the fund. If the department accepts moneys pursuant to this section, the department shall obtain federal matching funds to the full extent permitted by law. The department shall accept only those funds that are certified by the transferring or donating entity as qualifying for federal financial participation under the terms of the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991 (P.L. 102-234) or Section 433.51 of Title 42 of the Code of Federal Regulations, as applicable, and may return any funds transferred or donated in error.

(f) Moneys in the fund shall be used as the source for the nonfederal share of payments to hospitals under this section. Moneys shall be

95

allocated from the fund by the department and matched by federal funds in accordance with customary Medi-Cal accounting procedures for purposes of payments under subdivision (g). Distributions from the fund shall be supplemental to any other amounts that hospitals receive under the contracting program.

(g) (1) For purposes of recognizing medical education costs incurred for services rendered to Medi-Cal beneficiaries, contracts for payments from the fund may, at the discretion of the California Medical Assistance Commission, be negotiated between the commission and hospitals contracting under this article that are defined as either of the following:

(A) A large teaching emphasis hospital, as set forth on page 51 and listed on page 57 of the department's report dated May 1991, entitled "Hospital Peer Grouping," and meets the definition of eligible hospital as defined in paragraph (3) of subdivision (a) of Section 14105.98.

(B) A children's hospital pursuant to Section 10727 and meets the definition of eligible hospital as defined in paragraph (3) of subdivision (a) of Section 14105.98.

(2) Payments from the fund shall be used solely for the purposes identified in the contract between the hospital and the state.

(h) The state shall be held harmless from any federal disallowance resulting from this section. A hospital receiving supplemental reimbursement pursuant to this section shall be liable for any reduced federal financial participation resulting from the implementation of this section with respect to that hospital. The state may recoup any federal disallowance from the hospital.

(i) This section shall become inoperative on July 1, 2004, and, as of January 1, 2005, is repealed, unless a later enacted statute, that becomes effective on or before January 1, 2005, deletes or extends the dates on which it becomes inoperative and is repealed.

SEC. 51. Section 14103.6 of the Welfare and Institutions Code, as amended by Section 1 of Chapter 1005 of the Statutes of 1975, is amended to read:

14103.6. The director, or a carrier acting under regulations adopted by the director, may require that any individual provider shall receive prior authorization before providing services when the director or carrier determines that the provider has been rendering unnecessary services.

At any time the director determines that it is necessary to postpone elective services pursuant to Section 14120, he or she shall require prior authorization for those services determined to be generally elective under the provisions of Section 14103.4, except a service which costs less than one hundred dollars ($100) or a lower amount determined by the director. This lower amount may be applied generally or for specific services. The director may terminate the requirement for prior

95

authorization when he or she determines that it is no longer necessary to postpone elective services.

Prior authorization for services provided by persons licensed under the provisions of Chapter 4 (commencing with Section 1600) and Chapter 7 (commencing with Section 3000) of Division 2 of the Business and Professions Code shall be determined by consultants licensed under Chapter 4 or Chapter 7 respectively. Prior authorization for all other elective services shall be determined by consultants licensed under the provisions of Chapter 5 (commencing with Section 2000) of Division 2 of the Business and Professions Code, provided, however, that prior authorization for pharmaceutical services may be determined by persons licensed under the provisions of Chapter 9 (commencing with Section 4000) of Division 2 of the Business and Professions Code, and prior authorization for services provided in an inpatient setting may be reviewed and approved, but not denied, by a person licensed under the provisions of Chapter 6 (commencing with Section 2700) of Division 2 of the Business and Professions Code, working under the supervision of a consultant licensed under the provisions of Chapter 5 (commencing with Section 2000) of Division 2 of the Business and Professions Code.

In no event shall prior authorization be required when there is a bona fide emergency requiring immediate treatment.

In carrying out this section, notwithstanding Section 19130 of the Government Code, the department may contract, either directly or through the fiscal intermediary, for staff to accomplish the treatment authorization request reviews and medical case management, including appeals. The fiscal intermediary contract, including any contract amendment, system change pursuant to a change order, and project or systems development notice shall be exempt from Part 2 (commencing with Section 10100) of Division 2 of the Public Contract Code, Chapter 7 (commencing with Section 11700) of Part 1 of Division 3 of Title 2 of the Government Code, and any policies, procedures, or regulations authorized by those laws.

SEC. 52.    Section 14103.6 of the Welfare and Institutions Code, as amended by Section 1 of Chapter 682 of the Statutes of 1985, is amended to read:

14103.6.    The director, or a carrier acting under regulations adopted by the director, may require that any individual provider shall receive prior authorization before providing services when the director or carrier determines that the provider has been rendering unnecessary services.

At any time the director determines that it is necessary to postpone elective services pursuant to Section 14120, he or she shall require prior authorization for those services determined to be generally elective

95

under the provisions of Section 14103.4, except a service which costs
less than one hundred dollars ($100) or a lower amount determined by
the director. This lower amount may be applied generally or for specific
services. The director may terminate the requirement for prior
authorization when he or she determines that it is no longer necessary to
postpone elective services.

Prior authorization for services provided by persons licensed under
the provisions of Chapter 4 (commencing with Section 1600) and
Chapter 7 (commencing with Section 3000) of Division 2 of the
Business and Professions Code shall be determined by consultants
licensed under Chapter 4 or Chapter 7 respectively. Prior authorization
for all other elective services shall be determined by consultants licensed
under the provisions of Chapter 5 (commencing with Section 2000) of
Division 2 of the Business and Professions Code, provided, however,
that prior authorization for pharmaceutical services may be determined
by persons licensed under the provisions of Chapter 9 (commencing
with Section 4000) of Division 2 of the Business and Professions Code,
and prior authorization for services provided in an inpatient setting may
be reviewed and approved, but not denied, by a person licensed under
the provisions of Chapter 6 (commencing with Section 2700) of
Division 2 of the Business and Professions Code, working under the
supervision of a consultant licensed under the provisions of Chapter 5
(commencing with Section 2000) of Division 2 of the Business and
Professions Code.

The consultants shall render decisions on prior authorization requests
in a timely manner. A timely manner shall be deemed to be an average
of five working days after the prior authorization request is received by
the department. A decision shall be an approval, denial, modification,
or request for additional information. A supplemental authorization
request submitted with additional information requested by a consultant
shall be processed in a timely manner as if it were an original
authorization request. If no decision on a prior authorization request is
rendered by the consultant within 30 days of receipt by the department,
the request shall be deemed to be approved. Final decisions of the
department on all requests for prior authorization shall be reviewable
under the department's provider appeal and fair hearing procedures. If
the request is denied, the department shall send notice to the provider and
beneficiary of the right to appeal the decision.

In no event shall prior authorization be required when there is a bona
fide emergency requiring immediate treatment.

In carrying out this section, notwithstanding Section 19130 of the
Government Code, the department may contract, either directly or
through the fiscal intermediary, for staff to accomplish the treatment

95

authorization request reviews and medical case management, including appeals. The fiscal intermediary contract, including any contract amendment, system change pursuant to a change order, and project or systems development notice shall be exempt from Part 2 (commencing with Section 10100) of Division 2 of the Public Contract Code, Chapter 7 (commencing with Section 11700) of Part 1 of Division 3 of Title 2 of the Government Code, and any policies, procedures, or regulations authorized by those laws.

SEC. 53.   Section 14105.18 is added to the Welfare and Institutions Code, to read:

14105.18.   (a)  Notwithstanding any other provision of law, provider rates of payment for services rendered in all of the following programs shall be identical to the rates of payment for the same service performed by the same provider type pursuant to the Medi-Cal program.

(1)  The California Children's Services Program established pursuant to Article 5 (commencing with Section 123800) of Chapter 3 of Part 2 of Division 106 of the Health and Safety Code.

(2)  The Genetically Handicapped Person's Program established pursuant to Article 1 (commencing with Section 125125) of Chapter 2 of Part 5 of Division 106 of the Health and Safety Code.

(3)  The Breast and Cervical Cancer Early Detection Program established pursuant to Article 1.5 (commencing with Section 104150) of Chapter 2 of Part 1 of Division 103 of the Health and Safety Code and the breast cancer programs specified in Section 30461.6 of the Revenue and Taxation Code.

(4)  The State-Only Family Planning Program established pursuant to Division 24 (commencing with Section 24000).

(5)  The Family Planning, Access, Care, and Treatment (Family PACT) Waiver Program established pursuant to subdivision (aa) of Section 14132.

(b)  The director may identify in regulations other programs not listed in subdivision (a) in which providers shall be paid rates of payment that are identical to the rates of payments in the Medi-Cal program pursuant to subdivision (a).

(c)  Notwithstanding subdivision (a), services provided under any of the programs described in subdivisions (a) and (b) may be reimbursed at rates greater than the Medi-Cal rate that would otherwise be applicable if those rates are adopted by the director in regulations.

SEC. 53.5.   Section 14105.2 of the Welfare and Institutions Code is amended to read:

14105.2.   (a)  The allowable markup payable for the dispensing of medical supplies by assistive device and sickroom supply dealers and

pharmacies shall not exceed 23 percent of the cost of the item dispensed, as defined by the department.

(b) Payment for diabetic testing supplies shall not exceed the cost of the item dispensed, as defined by the department, plus a fee equal to the maximum professional fee component used in the payment for legend generic drug types.

SEC. 54.   Section 14105.3 of the Welfare and Institutions Code is amended to read:

14105.3.   (a)  The department is considered to be the purchaser, but not the dispenser or distributor, of prescribed drugs under the Medi-Cal program for the purpose of enabling the department to obtain from manufacturers of prescribed drugs the most favorable price for those drugs furnished by one or more manufacturers, based upon the large quantity of the drugs purchased under the Medi-Cal program, and to enable the department, notwithstanding any other provision of state law, to obtain from the manufacturers discounts, rebates, or refunds based on the quantities purchased under the program, insofar as may be permissible under federal law. Nothing in this section shall interfere with usual and customary distribution practices in the drug industry.

(b) The department may enter into exclusive or nonexclusive contracts on a bid or negotiated basis with manufacturers, distributors, dispensers, or suppliers of appliances, durable medical equipment, medical supplies, and other product-type health care services and with laboratories for clinical laboratory services for the purpose of obtaining the most favorable prices to the state and to assure adequate quality of the product or service. This subdivision shall not apply to pharmacies licensed pursuant to Section 4080 of the Business and Professions Code.

(c) Notwithstanding subdivision (b), the department may not enter into a contract with a clinical laboratory unless the clinical laboratory operates in conformity with Chapter 3 (commencing with Section 1200) of Division 2 of the Business and Professions Code and the regulations adopted thereunder, and Section 263a of Title 42 of the United States Code and the regulations adopted thereunder.

(d) The department shall contract with manufacturers of single-source drugs on a negotiated basis, and with manufacturers of multisource drugs on a bid or negotiated basis.

(e) In carrying out contracting activity for this or any section associated with the Medi-Cal list of contract drugs, notwithstanding Section 19130 of the Government Code, the department may contract, either directly or through the fiscal intermediary, for pharmacy consultant staff necessary to accomplish the contracting process or treatment authorization request reviews. The fiscal intermediary contract, including any contract amendment, system change pursuant to

95

a change order, and project or systems development notice shall be exempt from Part 2 (commencing with Section 10100) of Division 2 of the Public Contract Code, Chapter 7 (commencing with Section 11700) of Part 1 of Division 3 of Title 2 of the Government Code, and any policies, procedures, or regulations authorized by these provisions.

(f)  In order to achieve maximum cost savings the Legislature hereby determines that an expedited contract process for contracts under this section is necessary. Therefore contracts under this section shall be exempt from Chapter 2 (commencing with Section 10290) of Part 2 of Division 2 of the Public Contract Code.

(g)  For purposes of implementing the contracting provisions specified in this section, the department shall do all of the following:

(1)  Ensure adequate access for Medi-Cal patients to quality laboratory testing services in the geographic regions of the state where contracting occurs.

(2)  Consult with the statewide association of clinical laboratories and other appropriate stakeholders on the implementation of the contracting provisions specified in this section to ensure maximum access for Medi-Cal patients consistent with the savings targets projected by the 2002–03 Budget Conference Committee for clinical laboratory services provided under the Medi-Cal program.

(3)  Consider which types of laboratories are appropriate for implementing the contracting provisions specified in this section, including independent laboratories, outreach laboratory programs of hospital based laboratories, clinic laboratories, physician office laboratories, and group practice laboratories.

SEC. 55.   Section 14105.31 of the Welfare and Institutions Code is amended to read:

14105.31.   For purposes of the Medi-Cal contract drug list, the following definitions shall apply:

(a)  "Single-source drug" means a drug that is produced and distributed under an original New Drug Application approved by the federal Food and Drug Administration. This shall include a drug marketed by the innovator manufacturer and any cross-licensed producers or distributors operating under the New Drug Application, and shall also include a biological product, except for vaccines, marketed by the innovator manufacturer and any cross-licensed producers or distributors licensed by the federal Food and Drug Administration pursuant to Section 262 of Title 42 of the United States Code. A drug ceases to be a single-source drug when the same drug in the same dosage form and strength manufactured by another manufacturer is approved by the federal Food and Drug Administration under the provisions for an Abbreviated New Drug Application.

95

(b) "Best price" means the negotiated price, or the manufacturer's lowest price available to any class of trade organization or entity, including, but not limited to, wholesalers, retailers, hospitals, repackagers, providers, or governmental entities within the United States, that contracts with a manufacturer for a specified price for drugs, inclusive of cash discounts, free goods, volume discounts, rebates, and on- or off-invoice discounts or credits, shall be based upon the manufacturer's commonly used retail package sizes for the drug sold by wholesalers to retail pharmacies.

(c) "Equalization payment amount" means the amount negotiated between the manufacturer and the department for reimbursement by the manufacturer, as specified in the contract. The equalization payment amount shall be based on the difference between the manufacturer's direct catalog price charged to wholesalers and the manufacturer's best price, as defined in subdivision (b).

(d) "Manufacturer" means any person, partnership, corporation, or other institution or entity that is engaged in the production, preparation, propagation, compounding, conversion, or processing of drugs, either directly or indirectly by extraction from substances of natural origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis, or in the packaging, repackaging, labeling, relabeling, and distribution of drugs.

(e) "Price escalator" means a mutually agreed upon price specified in the contract, to cover anticipated cost increases over the life of the contract.

(f) "Medi-Cal pharmacy costs" or "Medi-Cal drug costs" means all reimbursements to pharmacy providers for services or merchandise, including single-source or multiple-source prescription drugs, over-the-counter medications, and medical supplies, or any other costs billed by pharmacy providers under the Medi-Cal program.

(g) "Medicaid rebate" means the rebate payment made by drug manufacturers pursuant to Section 1927 of the federal Social Security Act (42 U.S.C. Sec. 1396r-8).

(h) "State rebate" means any negotiated rebate under the Drug Discount Program in addition to the medicaid rebate.

(i) "Date of mailing" means the date that is evidenced by the postmark date by the United States Postal Service or other common mail carrier on the envelope.

SEC. 56.   Section 14105.33 of the Welfare and Institutions Code is amended to read:

14105.33.   (a) The department may enter into contracts with manufacturers of single-source and multiple-source drugs, on a bid or

95

nonbid basis, for drugs from each major therapeutic category, and shall maintain a list of those drugs for which contracts have been executed.

(b) (1) Contracts executed pursuant to this section shall be for the manufacturer's best price, as defined in Section 14105.31, which shall be specified in the contract, and subject to agreed-upon price escalators, as defined in that section. The contracts shall provide for an equalization payment amount, as defined in Section 14105.31, to be remitted to the department quarterly. The department shall submit an invoice to each manufacturer for the equalization payment amount, including supporting utilization data from the department's prescription drug paid claims tapes within 30 days of receipt of the Centers for Medicare and Medicaid Services' file of manufacturer rebate information. In lieu of paying the entire invoiced amount, a manufacturer may contest the invoiced amount pursuant to procedures established by the federal Centers for Medicare and Medicaid Services' Medicaid Drug Rebate Program Releases or regulations by mailing a notice, that shall set forth its grounds for contesting the invoiced amount, to the department within 38 days of the department's mailing of the state invoice and supporting utilization data. For purposes of state accounting practices only, the contested balance shall not be considered an accounts receivable amount until final resolution of the dispute pursuant to procedures established by the federal Centers for Medicare and Medicaid Services' Medicaid Drug Rebate Program Releases or regulations that results in a finding of an underpayment by the manufacturer. Manufacturers may request, and the department shall timely provide, at cost, Medi-Cal provider level drug utilization data, and other Medi-Cal utilization data necessary to resolve a contested department-invoiced rebate amount.

(2) The department shall provide for an annual audit of utilization data used to calculate the equalization amount to verify the accuracy of that data. The findings of the audit shall be documented in a written audit report to be made available to manufacturers within 90 days of receipt of the report from the auditor. Any manufacturer may receive a copy of the audit report upon written request. Contracts between the department and manufacturers shall provide for any equalization payment adjustments determined necessary pursuant to an audit.

(3) Utilization data used to determine an equalization payment amount shall exclude data from both of the following:

(A) Health maintenance organizations, as defined in Section 300e(a) of Title 42 of the United States Code, including those organizations that contract under Section 1396b(m) of Title 42 of the United States Code.

(B) Capitated plans that include a prescription drug benefit in the capitated rate, and that have negotiated contracts for rebates or discounts with manufacturers.

95

(c) In order that Medi-Cal beneficiaries may have access to a comprehensive range of therapeutic agents, the department shall ensure that there is representation on the list of contract drugs in all major therapeutic categories. Except as provided in subdivision (a) of Section 14105.35, the department shall not be required to contract with all manufacturers who negotiate for a contract in a particular category. The department shall ensure that there is sufficient representation of single-source and multiple-source drugs, as appropriate, in each major therapeutic category.

(d) The department shall select the therapeutic categories to be included on the list of contract drugs, and the order in which it seeks contracts for those categories. The department may establish different contracting schedules for single-source and multiple-source drugs within a given therapeutic category.

(e) (1) In order to fully implement subdivision (d), the department shall, to the extent necessary, negotiate or renegotiate contracts to ensure there are as many single-source drugs within each therapeutic category or subcategory as the department determines necessary to meet the health needs of the Medi-Cal population. The department may determine in selected therapeutic categories or subcategories that no single-source drugs are necessary because there are currently sufficient multiple-source drugs in the therapeutic category or subcategory on the list of contract drugs to meet the health needs of the Medi-Cal population. However, in no event shall a beneficiary be denied continued use of a drug which is part of a prescribed therapy in effect as of September 2, 1992, until the prescribed therapy is no longer prescribed.

(2) In the development of decisions by the department on the required number of single-source drugs in a therapeutic category or subcategory, and the relative therapeutic merits of each drug in a therapeutic category or subcategory, the department shall consult with the Medi-Cal Contract Drug Advisory Committee. The committee members shall communicate their comments and recommendations to the department within 30 business days of a request for consultation, and shall disclose any associations with pharmaceutical manufacturers or any remuneration from pharmaceutical manufacturers.

(f) In order to achieve maximum cost savings, the Legislature declares that an expedited process for contracts under this section is necessary. Therefore, contracts entered into on a nonbid basis shall be exempt from Chapter 2 (commencing with Section 10290) of Part 2 of Division 2 of the Public Contract Code.

(g) In no event shall a beneficiary be denied continued use of a drug that is part of a prescribed therapy in effect as of September 2, 1992, until the prescribed therapy is no longer prescribed.

95

(h)  Contracts executed pursuant to this section shall be confidential and shall be exempt from disclosure under the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1 of the Government Code).

(i)  The department shall provide individual notice to Medi-Cal beneficiaries at least 60 calendar days prior to the effective date of the deletion or suspension of any drug from the list of contract drugs. The notice shall include a description of the beneficiary's right to a fair hearing and shall encourage the beneficiary to consult a physician to determine if an appropriate substitute medication is available from Medi-Cal.

(j)  In carrying out the provisions of this section, the department may contract either directly, or through the fiscal intermediary, for pharmacy consultant staff necessary to initially accomplish the treatment authorization request reviews.

(k)  (1)  Manufacturers shall calculate and pay interest on late or unpaid rebates.  The interest shall not apply to any prior period adjustments of unit rebate amounts or department utilization adjustments.

(2)  For state rebate payments, manufacturers shall calculate and pay interest on late or unpaid rebates for quarters that begin on or after the effective date of the act that added this subdivision.

(3)  Following final resolution of any dispute pursuant to procedures established by the federal Centers for Medicare and Medicaid Services' Medicaid Drug Rebate Program Releases or regulations regarding the amount of a rebate, any underpayment by a manufacturer shall be paid with interest calculated pursuant to subdivisions (m) and (n), and any overpayment, together with interest at the rate calculated pursuant to subdivisions (m) and (n), shall be credited by the department against future rebates due.

(l)  Interest pursuant to subdivision (k) shall begin accruing 38 calendar days from the date of mailing of the invoice, including supporting utilization data sent to the manufacturer.  Interest shall continue to accrue until the date of mailing of the manufacturer's payment.

(m)  Except as specified in subdivision (n), interest rates and calculations pursuant to subdivision (k) for medicaid rebates and state rebates shall be identical and shall be determined by the federal Centers for Medicare and Medicaid Services' Medicaid Drug Rebate Program Releases or regulations.

(n)  If the date of mailing of a state rebate payment is 69 days or more from the date of mailing of the invoice, including supporting utilization data sent to the manufacturer, the interest rate and calculations pursuant

95

to subdivision (k) shall be as specified in subdivision (m), however the interest rate shall be increased by 10 percentage points. This subdivision shall apply to payments for amounts invoiced for any quarters that begin on or after the effective date of the act that added this subdivision.

(o) If the rebate payment is not received, the department shall send overdue notices to the manufacturer at 38, 68, and 98 days after the date of mailing of the invoice, and supporting utilization data. If the department has not received a rebate payment, including interest, within 180 days of the date of mailing of the invoice, including supporting utilization data, the manufacturer's contract with the department shall be deemed to be in default and the contract may be terminated in accordance with the terms of the contract. For all other manufacturers, if the department has not received a rebate payment, including interest, within 180 days of the date of mailing of the invoice, including supporting utilization data, all of the drug products of those manufacturers shall be made available only through prior authorization effective 270 days after the date of mailing of the invoice, including utilization data sent to manufacturers.

(p) If the manufacturer provides payment or evidence of payment to the department at least 40 days prior to the proposed date the drug is to be made available only through prior authorization pursuant to subdivision (o), the department shall terminate its actions to place the manufacturers' drug products on prior authorization.

(q) The department shall direct the state's fiscal intermediary to remove prior authorization requirements imposed pursuant to subdivision (o) and notify providers within 60 days after payment by the manufacturer of the rebate, including interest. If a contract was in place at the time the manufacturers' drugs were placed on prior authorization, removal of prior authorization requirements shall be contingent upon good faith negotiations and a signed contract with the department.

(r) A beneficiary may obtain drugs placed on prior authorization pursuant to subdivision (o) if the beneficiary qualifies for continuing care status. To be eligible for continuing care status, a beneficiary must be taking the drug when its manufacturer is placed on prior authorization status. Additionally, the department shall have received a claim for the drug with a date of service that is within 100 days prior to the date the manufacturer was placed on prior authorization.

(s) A beneficiary may remain eligible for continuing care status, provided that a claim is submitted for the drug in question at least every 100 days and the date of service of the claim is within 100 days of the date of service of the last claim submitted for the same drug.

(t) Drugs covered pursuant to Sections 14105.43 and 14133.2 shall not be subject to prior authorization pursuant to subdivision (o), and any

95

other drug may be exempted from prior authorization by the department if the director determines that an essential need exists for that drug, and there are no other drugs currently available without prior authorization that meet that need.

(u)  It is the intent of the Legislature in enacting subdivisions (k) to (t), inclusive, that the department and manufacturers shall cooperate and make every effort to resolve rebate payment disputes within 90 days of notification by the manufacturer to the department of a dispute in the calculation of rebate payments.

SEC. 57.   Section 14105.332 is added to the Welfare and Institutions Code, to read:

14105.332.   State and federal rebates that are owed to the state for drugs dispensed to fee-for-service Medi-Cal beneficiaries shall not be reduced to the state if a manufacturer reports, to the Centers for Medicare and Medicaid Services or the department, a revised drug product's average manufacturer price or best price as these terms are defined pursuant to Section 1927 of the federal Social Security Act (42 U.S.C. Sec. 1396r-8) for any calendar quarter in which the rebate was due.

SEC. 58.   Section 14105.337 of the Welfare and Institutions Code is amended to read:

14105.337.   (a) Effective January 1, 2000, the department shall increase reimbursement to pharmacists by twenty-five cents ($0.25) per prescription for all drug prescription claims reimbursed through the Medi-Cal program.

(b) Effective July 1, 2002, the department shall increase reimbursement to pharmacists by an additional fifteen cents ($0.15) per prescription for all drug prescription claims reimbursed through the Medi-Cal program.

(c) (1) The department shall reduce reimbursement to pharmacists in the amount reimbursement was increased pursuant to subdivisions (a) and (b) with respect to pharmacy services rendered on and after the date that this subdivision is enacted. Claims submitted by pharmacists for beneficiaries residing in a nursing facility shall be exempt from this subdivision.

(2) This subdivision shall become inoperative on July 1, 2004.

SEC. 59.   Section 14105.34 of the Welfare and Institutions Code is amended to read:

14105.34.   (a) The department shall provide for an annual written report of Medi-Cal pharmacy costs or Medi-Cal drug costs, as defined in subdivision (f) of Section 14105.31.

(b) The annual report shall be consistent with the relevant sections of the Quarterly Report of Expenditures for the Medi-Cal Assistance Program, known as the HCFA-64 Report, provided to the Centers for

95

Medicare and Medicaid Services. The report shall include the following expenditure and receipt information:

(1) The total annual equalization payment amounts received by the department pursuant to agreements with the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services.

(2) The total annual equalization payment amounts received pursuant to state contracts with drug manufacturers.

(3) Total drug cost amounts upon which equalization payments were made.

SEC. 60.   Section 14105.35 of the Welfare and Institutions Code is amended to read:

14105.35.   (a) (1) On and after July 1, 1990, drugs included on the Medi-Cal drug formulary shall be included on the list of contract drugs until the department and the manufacturer have concluded contract negotiations or the department suspends the drug from the list of contract drugs pursuant to the provisions of this subdivision.

The department shall, in writing, invite any manufacturer with single-source drug products on the formulary as of July 1, 1990, to enter into negotiations relative to the retention of its drug or drugs. As to the issue of cost, the department shall accept the manufacturer's best price as sufficient for purposes of entering into a contract to retain the drug or drugs on the list of contract drugs.

If the department and a manufacturer enter into a contract for retention of a drug or drugs on the list of contract drugs, the drug or drugs shall be retained on the list of contract drugs for the effective term of the contract.

If a manufacturer refuses to enter into negotiations with the department pursuant to this subdivision, or if after 30 days of negotiation, the manufacturer has not agreed to execute a contract for a drug at the manufacturer's best price, the department may suspend from the list of contract drugs the manufacturer's single-source drug in question for a period of at least 180 days. The department shall lift the suspension upon execution of a contract for that drug. Consistent with the provisions of this section, the department shall delete the Medi-Cal drug formulary specified in paragraphs (b), (c), (d), and (e) of Section 59999 of Title 22 of the California Code of Regulations.

(2) On and after July 1, 1990, the director may retain a drug on the Medi-Cal list of contract drugs even if no contract is executed with a manufacturer, if the director determines that an essential need exists for that drug, and there are no other drugs currently on the formulary that meet that need.

95

(3) The director may delete a drug from the list of contract drugs if the director determines that the drug presents problems of safety or misuse. The director's decision as to safety shall be based upon published medical literature, and the director's decision as to misuse shall be based on published medical literature and claims data supplied by the fiscal intermediary.

(b) Any reference to the Medi-Cal drug formulary by statute or regulation shall be construed as referring to the list of contract drugs.

(c) (1) Any drug in the process of being added to the formulary by contract agreement pursuant to Section 14105.3, executed prior to the effective date of this section, shall be added to the list of contract drugs.

(2) Contracts pursuant to Section 14105.3 executed prior to January 1, 1991, shall be considered to be contracts executed pursuant to Section 14105.33, and the department shall exempt the drugs included in these contracts from the initial therapeutic category review in which they would normally be considered.

(3) Nothing in this section shall be construed to require the department to discontinue negotiations into which it has entered with any manufacturer as of the effective date of this section. Contracts entered into as a result of these negotiations shall be exempt from the initial therapeutic category review in which they would normally be considered.

SEC. 61.   Section 14105.37 of the Welfare and Institutions Code is amended to read:

14105.37.   (a) The department shall notify each manufacturer of drugs in therapeutic categories selected pursuant to Section 14105.33 of the provisions of Sections 14105.31 to 14105.42, inclusive.

(b) If, within 45 days of notification, a manufacturer does not enter into negotiations for a contract pursuant to those sections, the department may suspend or delete from the list of contract drugs, or refuse to consider for addition, drugs of that manufacturer in the selected therapeutic categories.

(c) If, after 150 days from the initial notification, a contract is not executed for a drug currently on the list of contract drugs, the department may suspend or delete the drug from the list of contract drugs.

(d) If, within 150 days from the initial notification, a contract is executed for a drug currently on the list of contract drugs, the department shall retain the drug on the list of contract drugs.

(e) If, within 150 days from the date of the initial notification, a contract is executed for a drug not currently on the list of contract drugs, the department shall add the drug to the list of contract drugs.

(f) The department shall terminate all negotiations 150 days after the initial notification.

95

(g) The department may suspend or delete any drug from the list of contract drugs at the expiration of the contract term or when the contract between the department and the manufacturer of that drug is terminated.

(h) In the absence of a contract, the department may suspend or delete any drug from the list of contract drugs.

(i) Any drug suspended from the list of contract drugs pursuant to this section or Section 14105.35 shall be subject to prior authorization, as if that drug were not on the list of contract drugs.

(j) Any drug suspended from the list of contract drugs pursuant to this section or Section 14105.35 may be deleted from the list of contract drugs in accordance with Section 14105.38.

SEC. 62.   Section 14105.38 of the Welfare and Institutions Code is amended to read:

14105.38.   (a) (1) In the event the department determines a drug should be deleted from the list of contract drugs, the department shall conduct a public hearing, as provided in this section, to receive comment on the impact of removing the drug.

(2) (A) The department shall provide written notice 30 days prior to the hearing.

(B) The department shall send the notice required by this subdivision to the manufacturer of the drug proposed to be deleted and to organizations representing Medi-Cal beneficiaries.

(b) (1) The hearing panel shall consist of the Chief, Medi-Cal Drug Discount Program, who shall serve as chair, and the Medi-Cal Contract Drug Advisory Committee.

(2) The hearing shall be recorded and transcribed, and the transcript available for public review.

(3) Subsequent to hearing all public comment, and within 30 days of the hearing, each panel member shall submit a recommendation regarding deletion of the drug and the reason for the recommendation to the director.

(c) The director shall consider public comments provided at the hearing and the recommendations of each panel member in determining whether to delete the drug.

SEC. 63.   Section 14105.39 of the Welfare and Institutions Code is amended to read:

14105.39.   (a) (1) A manufacturer of a new single-source drug may request inclusion of its drug on the list of contract drugs pursuant to Section 14105.33 provided all of the following conditions are met:

(A) The request is made within 12 months of approval for marketing by the federal Food and Drug Administration.

(B) The manufacturer agrees to negotiate a contract with the department to provide the drug at the manufacturer's best price.

Ch. 1161

(C) (i) The manufacturer provides the department with necessary information, as specified by the department, in the request.

(ii) Notwithstanding clause (i), either of the following may be submitted by the manufacturer in lieu of the Summary Basis of Approval prepared by the federal Food and Drug Administration for that drug:

(I) The federal Food and Drug Administration's approval or approvable letter for the drug and federal Food and Drug Administration's approved labeling.

(II) The federal Food and Drug Administration's medical officers' and pharmacologists' reviews and the federal Food and Drug Administration's approved labeling.

(D) The department had concluded contracting for the therapeutic category in which the drug is included prior to approval of the drug by the federal Food and Drug Administration.

(2) Within 90 days from receipt of the request, the department shall evaluate the request using the criteria identified in subdivision (d), and shall submit the drug to the Medi-Cal Contract Drug Advisory Committee.

(b) Any petition for the addition to or deletion of a drug to the Medi-Cal drug formulary submitted prior to July 31, 1990, shall be deemed to be denied. A manufacturer who has submitted a petition deemed denied may request inclusion of that drug on the list of contract drugs provided all of the following conditions are met:

(1) The manufacturer agrees to negotiate for a contract with the department to provide the drug at the manufacturer's best price.

(2) The manufacturer provides the department with necessary information, as specified by the department, in the request.

(3) The manufacturer submits the request to the department prior to October 1, 1990.

(c) (1) To ensure that the health needs of Medi-Cal beneficiaries are met consistent with the intent of this chapter, the department shall, when evaluating a decision to execute a contract, and when evaluating drugs for retention on, addition to, or deletion from, the list of contract drugs, use all of the following criteria:

(A) The safety of the drug.

(B) The effectiveness of the drug.

(C) The essential need for the drug.

(D) The potential for misuse of the drug.

(E) The cost of the drug.

(2) The deficiency of a drug when measured by one of these criteria may be sufficient to support a decision that the drug should not be added or retained, or should be deleted from the list. However, the superiority of a drug under one criterion may be sufficient to warrant the addition

95

or retention of the drug, notwithstanding a deficiency in another criterion.

(d) (1) A manufacturer of single-source drugs denied a contract pursuant to this section or Section 14105.33 or 14105.37, may file an appeal of that decision with the director within 30 calendar days of the department's written decision.

(2) Within 30 calendar days of the manufacturer's appeal, the director shall request a recommendation regarding the appeal from the Medi-Cal Contract Drug Advisory Committee. The committee shall provide its recommendation in writing, within 30 calendar days of the director's request.

(3) The director shall issue a final decision on the appeal within 30 calendar days of the recommendation.

(e) Deletions made to the list of contract drugs, including those made pursuant to Section 14105.37, shall become effective no sooner than 30 days after publication of the changes in provider bulletins.

(f) A manufacturer of a drug deleted from, or not added to, the list of contract drugs may request inclusion of the drug on the list of preferred prior authorization drugs that is hereby established as a subset of the list of contract drugs. To ensure that the health needs of Medi-Cal beneficiaries are met, the department shall evaluate the request pursuant to subdivision (c). The department shall give preference for prior authorization drugs based on the medical need or continuing care of the beneficiary. The department may contract with manufacturers of drugs on the list of preferred prior authorization drugs. Contracts executed pursuant to this subdivision are subject to Section 14105.33.

(g) Changes made to the list of contract drugs under this or any other section are exempt from the requirements of the Administrative Procedure Act (Chapter 3.5 (commencing with Section 11340), Chapter 4 (commencing with Section 11370), and Chapter 5 (commencing with Section 11500) of Part 1 of Division 3 of Title 2 of the Government Code), and shall not be subject to the review and approval of the Office of Administrative Law.

SEC. 64.   Section 14105.4 of the Welfare and Institutions Code, as amended by Section 78 of Chapter 93 of the Statutes of 2000, is repealed.

SEC. 65.   Section 14105.4 of the Welfare and Institutions Code, as amended by Section 77 of Chapter 93 of the Statutes of 2000, is amended to read:

14105.4.   (a) The director shall appoint a Medi-Cal Contract Drug Advisory Committee for the purpose of providing scientific and medical analysis on drugs contained on the list of contract drugs. The duties of the committee shall be as follows:

(1)  To review drugs in the Medi-Cal list of contract drugs and make written recommendations to the director as to the addition of any drug or the deletion of any drug from the list. These recommendations shall be in accordance with subdivision (c) of Section 14105.39.

(2)  To review and report in writing to the director as to the comparative therapeutic effect of drugs in accordance with Section 14053.5.

(3)  To prepare a fair, impartial, and independent recommendation in writing, regarding appeals from manufacturers made pursuant to subdivision (d) of Section 14105.39.

(b)  The committee shall consist of at least one representative from each of the following groups:

(1)  Physicians.

(2)  Pharmacists.

(3)  Schools of pharmacy or pharmacologists.

(4)  Medi-Cal beneficiaries.

(c)  Members of the committee shall be reimbursed for necessary travel and other expenses incurred in the performance of official committee duties.

(d)  In order to provide sufficient scientific information and analysis in the therapeutic categories under review, the director may replace a representative if required for specific expertise.

(e)  The director shall notify the committee of the decisions made on the recommendations.

SEC. 66.   Section 14105.405 of the Welfare and Institutions Code is amended to read:

14105.405.   (a)  A Medi-Cal beneficiary, within 90 days of receipt of the director's notice to beneficiaries pursuant to subdivision (i) of Section 14105.33, informing them of the decision to delete or suspend a drug from the list of contract drugs, may request a fair hearing pursuant to Chapter 7 (commencing with Section 10950) of Part 2.

(b)  Any beneficiary filing a fair hearing request regarding the deletion or suspension of a drug from the list of contract drugs shall be granted a treatment authorization request for that drug until a final decision is adopted by the director. Should the beneficiary seek judicial review of the director's decision, a treatment authorization request shall be granted for that drug until a final decision is issued by the court.

(c)  (1)  Any Medi-Cal beneficiary, within one year of the director's decision pursuant to Section 10959, may file a petition with the superior court, under the provisions of Section 1094.5 of the Code of Civil Procedure, praying for a review of both the legal and factual basis for the director's decision.

(2)  The director shall be the sole respondent in these proceedings.

(d) Any Medi-Cal beneficiary injured as a result of being denied a drug which is determined to be medically necessary may sue for injunctive or declaratory relief to review the director's decision to delete or suspend a drug from the list of contract drugs.

SEC. 67.    Section 14105.41 of the Welfare and Institutions Code, as amended by Section 81 of Chapter 93 of the Statutes of 2000, is repealed.

SEC. 68.    Section 14105.41 of the Welfare and Institutions Code, as amended by Section 80 of Chapter 93 of the Statutes of 2000, is amended to read:

14105.41.    Moneys accruing to the department from contracts executed pursuant to Section 14105.33 shall be deposited in the Health Care Deposit Fund, and shall be subject to appropriation by the Legislature.

SEC. 69.    Section 14105.42 of the Welfare and Institutions Code is amended to read:

14105.42.    (a) The department shall report to the Legislature after the first three major therapeutic categories have been reviewed and contracts executed. The report shall include the estimated savings, number of manufacturers entering negotiations, number of contracts executed, number of drugs added and deleted, and impact on Medi-Cal beneficiaries and providers.

(b) The department shall report to the Legislature, through the annual budget process, on the cost-effectiveness of contracts executed pursuant to Section 14105.33.

SEC. 70.    Section 14105.43 of the Welfare and Institutions Code is amended to read:

14105.43.    (a) (1) Notwithstanding other provisions of this chapter, any drug which is approved by the federal Food and Drug Administration for use in the treatment of acquired immune deficiency syndrome (AIDS) or an AIDS-related condition shall be deemed to be approved for addition to the Medi-Cal list of contract drugs only for the purpose of treating AIDS or an AIDS-related condition, for the period prior to the completion of the procedures established pursuant to Section 14105.33.

(2) (A) In addition to any drug that is deemed to be approved pursuant to paragraph (1), any drug that meets any of the following criteria shall be a Medi-Cal benefit, subject to utilization controls:

(i) Any vaccine to protect against human immunodeficiency virus (HIV) infection.

(ii) Any antiviral agent, immune modulator, or other agent to be administered to persons who have been infected with human immunodeficiency virus to counteract the effects of that infection.

(iii) Any drug or biologic used to treat opportunistic infections associated with acquired immune deficiency syndrome, that have been found to be medically accepted indications and that has either been approved by the federal Food and Drug Administration or recognized for that use in one of the following:

(I) The American Medical Association Drug Evaluations.

(II) The United States Pharmacopoeia Dispensing Information.

(III) Two articles from peer reviewed medical journals that present data supporting the proposed use or uses as generally safe and effective.

(iv) Any drug or biologic used to treat the chemotherapy-induced suppression of the human immune system resulting from the treatment of acquired immune deficiency syndrome.

(3) The department shall add any drug deemed to be approved pursuant to paragraph (1) to the Medi-Cal list of contract drugs or allow the provision of the drug as a Medi-Cal benefit, subject to utilization controls, pursuant to paragraph (2), only if the manufacturer of the drug has executed a contract with the Centers for Medicare and Medicaid Services which provides for rebates in accordance with Section 1396r-8 of Title 42 of the United States Code.

(b) Any drug deemed to be approved pursuant to paragraph (1) of subdivision (a) shall be immediately added to the Medi-Cal list of contract drugs, and shall be exempt from the contract requirements of Section 14105.33.

(c) If it is determined pursuant to subdivision (c) of Section 14105.39 that a drug to which subdivision (a) applies should not be placed on the Medi-Cal list of contract drugs, that drug shall no longer be deemed to be approved for addition to the list of contract drugs pursuant to subdivision (a).

SEC. 71.   Section 14105.436 is added to the Welfare and Institutions Code, to read:

14105.436.   (a) Effective July 1, 2002, all pharmaceutical manufacturers shall provide to the department a state rebate, in addition to rebates pursuant to other provisions of state or federal law, for any drug products that have been added to the Medi-Cal list of contract drugs pursuant to Section 14105.43 or 14133.2 and reimbursed through the Medi-Cal outpatient fee-for-service drug program. The state rebate shall be negotiated as necessary between the department and the pharmaceutical manufacturer. The negotiations shall take into account offers such as rebates, discounts, disease management programs, and other cost savings offerings and shall be retroactive to July 1, 2002.

(b) The department may use existing administrative mechanisms for any drug for which the department does not obtain a rebate pursuant to subdivision (a). The department may only use those mechanisms in the

event that, by February 1, 2003, the manufacturer refuses to provide the additional rebate.

(c) In no event shall a beneficiary be denied continued use of a drug that is part of a prescribed therapy and that is the subject of an administrative mechanism pursuant to subdivision (b) until the prescribed therapy is no longer prescribed.

(d) This section shall become inoperative on July 1, 2005, and, as of January 1, 2006, is repealed, unless a later enacted statute, that becomes operative on or before January 1, 2006, deletes or extends the dates on which it becomes inoperative and is repealed.

SEC. 72.   Section 14105.45 of the Welfare and Institutions Code is amended to read:

14105.45.   (a) The department shall establish a list of Maximum Allowable Ingredient Costs (MAIC) for drugs, which shall be published in provider bulletins. On the effective date of this section, MAICS listed in Title 22 of the California Code of Regulations shall be included in the list of MAICS. MAICS shall no longer be listed in regulations. The department shall repeal Section 51513.3 of Title 22 of the California Code of Regulations.

(b) The department shall update existing MAICS and establish additional MAICS in accordance with all of the following:

(1) The department shall base an MAIC on the mean of the wholesale selling prices of drugs generically equivalent to the innovator brand that are available in California from selected major wholesale drug distributors. For the purposes of this section, "wholesale selling price" means the price, including discounts and rebates, paid by a pharmacy to a wholesale drug distributor for a drug.

(2) The decision regarding therapeutic equivalency shall be based on the federal Food and Drug Administration determinations. For antacid drugs, therapeutic equivalency shall be determined by the department based on review of in vitro scientific data.

(3) The department shall request information from drug manufacturers regarding the availability of their products throughout the state to outpatient pharmacies through the usual and customary distribution channels in sufficient quantities to meet the needs of the Medi-Cal program.

(4) The department shall update MAICS at least every two months and notify Medi-Cal providers at least 30 days prior to the effective date of an MAIC.

(c) Notwithstanding the provisions of Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code, actions under this section shall not be subject to the Administrative

95

Ch. 1161

Procedure Act, or to the review and approval of the Office of Administrative Law.

SEC. 73.   Section 14105.46 is added to the Welfare and Institutions Code, to read:

14105.46.   (a) For purposes of this section, the following definitions apply:

(1) "Estimated acquisition cost" means the department's best estimate of the price generally and currently paid by providers for a drug product sold by a particular manufacturer or principal labeler in a standard package.

(2) "Legend" means any drug whose labeling states "Caution: Federal law prohibits dispensing without prescription" or words of similar import.

(3) "Nonlegend" means any drug whose labeling does not contain the statement referenced in paragraph (2).

(4) "Single-source," "innovator multiple source," and "noninnovator multiple source" drugs have the same meaning as those terms are defined in Section 1396r-8(k)(7) of Title 42 of the United States.

(5) "Average sales price" means the price reported to the department as required by agreements between the State of California and the manufacturer.

(6) "Average wholesale price" means the price for a drug product listed in the department's price reference source.

(7) "Direct price" means the price for a drug product purchased directly from a drug manufacturer listed in the department's price reference source.

(b) The department shall establish the estimated acquisition cost of legend and nonlegend drugs as follows:

(1) For single-source and innovator multiple source drugs, the estimated acquisition cost shall be equal to the lower of the average sales price, as reported to the department by a drug manufacturer, and the average wholesale price minus 10 percent.

(2) For noninnovator multiple source drugs, the estimated acquisition cost shall be equal to the lower of the average sales price, as reported to the department by a drug manufacturer, and the average wholesale price minus 10 percent.

(c) Direct price shall not be used by the department to establish estimated acquisition cost.

(d) The reimbursement for legend and nonlegend drugs shall consist of the cost of the drug plus a professional fee for services.

SEC. 74.   Section 14105.47 is added to the Welfare and Institutions Code, to read:

14105.47.   (a) (1) The department shall establish a list of medical supplies. The list shall specify utilization controls to be applied to each medical supply product.

(2) The utilization controls specified shall include, but not be limited to, those provided by regulation of the department. The department shall repeal Section 59998 of Title 22 of the California Code of Regulations, which establishes requirements for medical supplies.

(3) The department shall notify providers at least 30 days prior to the effective date of a change in utilization controls.

(b) (1) The department shall establish a list of maximum allowable product costs (MAPCS) for medical supplies, which shall be published in provider bulletins.

(2) The department shall repeal the provisions of Section 51520.1 of Title 22 of the California Code of Regulations.

(3) The department shall update existing MAPCS and establish additional MAPCS in accordance with all of the following:

(A) In establishing the MAPCS, the director shall assure that eligible persons shall receive medical supply products that are available to the public generally, without discrimination or segregation based purely on economic disability.

(B) All related medical supply products within each particular medical supply type available for retail distribution shall be reviewed by the department in consultation with representatives from the California Association of Medical Product Suppliers and the California Pharmacists Association.

(C) The department shall base MAPCS on the mean of the wholesale selling price of related medical supply products that are available in California. For purposes of this section, "wholesale selling price" means the price, including discounts and rebates, paid by a provider to a wholesaler, distributor, or manufacturer for a medical supply product.

(D) The department shall notify Medi-Cal providers at least 30 days prior to the effective date of MAPCS.

(c) Notwithstanding the provisions of Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of the Government Code, actions under this section shall not be subject to the Administrative Procedure Act or to the review and approval of the Office of Administrative Law.

SEC. 75.   Section 14105.65 of the Welfare and Institutions Code is repealed.

SEC. 76.   Section 14105.8 is added to the Welfare and Institutions Code, to read:

14105.8.   (a) The department may enter into contracts with manufacturers of enteral formulae that can be used as a therapeutic regimen to prevent serious disability or death in patients with medically

diagnosed conditions that preclude the full use of regular food, on a bid or nonbid basis. The department shall maintain a list of those products for which contracts have been executed. Rebates created by these contracts shall be managed through the department's drug rebate accounting system.

(b) For the purpose of this benefit, enteral formulae is defined as those products that have been classified by the Statistical Analysis Durable Medical Equipment Regional Carrier (SADMERC) into one of the product classifications used for reimbursement in the Medicare program. SADMERC classified enteral formulae, Category V: modular components do not meet the test as a replacement for regular food pursuant to subdivision (a) and shall not be a benefit of the Medi-Cal program, except that the Medi-Cal program may deem a SADMERC Category V classified enteral formulae as a benefit when the department determines that the use of the product is neither investigational nor experimental when used as a therapeutic regimen to prevent serious disability or death in patients with medically diagnosed conditions. Infant formulas and enteral formulae covered by the Woman, Infant and Children (WIC) program for individuals enrolled in WIC shall not be a benefit of the Medi-Cal program.

(c) In order that Medi-Cal beneficiaries may have access to a comprehensive range of enteral formulae pursuant to subdivision (a), the department shall ensure that there is representation on the list of both general use and specialized use enteral formulae. The Medi-Cal program may deem an enteral formulae not classified by SADMERC as a benefit if it meets the medical need of patients with medically diagnosed conditions that preclude the full use of regular food.

(d) In order to achieve maximum cost savings, the Legislature declares that an expedited process for contracts under this section is necessary. Therefore, contracts entered into on a nonbid basis shall be exempt from Chapter 2 (commencing with Section 10290) of Part 2 of Division 2 of the Public Contract Code.

(e) (1) A manufacturer of an enteral formulae denied a contract pursuant to this section may file an appeal of that decision with the director within 30 calendar days of the department's written decision.

(2) The director shall issue a final decision on the appeal within 60 calendar days of the postmark date of the appeal.

(f) Deletions made to the list of enteral formulae shall become effective no sooner than 30 days after publication of the changes in provider bulletins.

(g) Changes made to the list of enteral formulae under this or any other section are exempt from the requirements of the Administrative Procedure Act (Chapter 3.5 (commencing with Section 11340), Chapter

4 (commencing with Section 11370), and Chapter 5 (commencing with Section 11500) of Part 1 of Division 3 of Title 2 of the Government Code), and shall not be subject to the review and approval of the Office of Administrative Law.

(h) In no event shall a beneficiary be denied continued use of an enteral formulae, pursuant to subdivisions (b) and (j), that has been deleted from the list of enteral formulae. To be eligible for continuing care status under this subdivision, a beneficiary must be taking the enteral formulae product when the product is deleted. Additionally, the department shall have received a claim for the enteral formulae product with a date of service that is within 100 days prior to the date the product was deleted. A beneficiary shall remain eligible for continuing care status provided that a claim is submitted for the enteral formulae product in question at least every 100 days and the date of service of the claim is within 100 days of the date of service of the last claim submitted for the same enteral formulae product.

(i) The department shall provide individual notice to Medi-Cal beneficiaries at least 60 calendar days prior to the effective date of the deletion of any enteral formulae from the list of enteral formulae. The notice shall include a description of the beneficiary's right to a fair hearing and shall encourage the beneficiary to consult a physician to determine if an appropriate substitute enteral formulae is available from Medi-Cal.

(j) Enteral formulae authorized pursuant to subdivision (a) shall be available only through prior authorization. The department may designate those enteral formulae that are without a contract as not being a benefit of the Medi-Cal program, except in the case of continuing care as described in subdivision (h) of this section.

(k) Contracts executed pursuant to this section shall be confidential and shall be exempt from disclosure under the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1 of the Government Code).

(*l*) (1) Manufacturers shall calculate and pay interest on late or unpaid rebates.

(2) Interest pursuant to paragraph (1) shall begin accruing 38 calendar days from the date of mailing of the quarterly invoice, including supporting utilization data sent to the manufacturer. Interest shall continue to accrue until the date of mailing of the manufacturer's payment.

(3) Interest rates and calculations pursuant to paragraph (1) shall be identical and shall be equal to the drug rebate interest rates as determined by the federal Centers for Medicare and Medicaid Services' Medicaid Drug Rebate Program Releases or regulations.

95

(4)  If the date of mailing of a state rebate payment is 69 days of more from the date of mailing of the invoice, including supporting utilization data sent to the manufacturer, the interest rate shall be as specified in paragraph (3), however the interest rate shall be increased by 10 percentage points.

(m)  The department may adopt emergency regulations to implement this section in accordance with the rulemaking provisions of the Administrative Procedure Act (Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code).

SEC. 77.   Section 14105.85 is added to the Welfare and Institutions Code, to read:

14105.85.   Effective July 1, 2002, payment for enteral formulae dispensed by a pharmacy provider shall be based on the estimated acquisition cost for that product plus a percentage markup to be determined by the department in consultation with provider representatives from the California Association of Medical Product Suppliers and the California Pharmacists Association. The percentage markup shall consider the costs of handling, storage, delivery, and billing for those products. Any changes to the percentage markup may be implemented with 30-day notice to the provider community via a provider bulletin or other specific notification to providers.

SEC. 78.   Section 14105.91 of the Welfare and Institutions Code is repealed.

SEC. 79.   Section 14105.915 of the Welfare and Institutions Code is repealed.

SEC. 80.   Section 14105.916 of the Welfare and Institutions Code is repealed.

SEC. 81.   Section 14125 of the Welfare and Institutions Code is amended to read:

14125.   The purpose of this article is to establish provider reimbursement rates for incontinence medical supplies covered by the Medi-Cal program. Reimbursement for incontinence medical supplies shall consist of the weighted average of the negotiated contract prices within each product category, plus a markup fee equal to 38 percent of the resulting adjusted contract price.

SEC. 83.   Section 14132 of the Welfare and Institutions Code is amended to read:

14132.   The following is the schedule of benefits under this chapter:

(a)  Outpatient services are covered as follows:

Physician, hospital or clinic outpatient, surgical center, respiratory care, optometric, chiropractic, psychology, podiatric, occupational therapy, physical therapy, speech therapy, audiology, acupuncture to the extent federal matching funds are provided for acupuncture, and services

of persons rendering treatment by prayer or healing by spiritual means in the practice of any church or religious denomination insofar as these can be encompassed by federal participation under an approved plan, subject to utilization controls.

(b) Inpatient hospital services, including, but not limited to, physician and podiatric services, physical therapy and occupational therapy, are covered subject to utilization controls.

(c) Nursing facility services, subacute care services, and services provided by any category of intermediate care facility for the developmentally disabled, including podiatry, physician, nurse practitioner services, and prescribed drugs, as described in subdivision (d), are covered subject to utilization controls. Respiratory care, physical therapy, occupational therapy, speech therapy, and audiology services for patients in nursing facilities and any category of intermediate care facility for the developmentally disabled are covered subject to utilization controls.

(d) Purchase of prescribed drugs is covered subject to the Medi-Cal List of Contract Drugs and utilization controls.

(e) Outpatient dialysis services and home hemodialysis services, including physician services, medical supplies, drugs and equipment required for dialysis, are covered, subject to utilization controls.

(f) Anesthesiologist services when provided as part of an outpatient medical procedure, nurse anesthetist services when rendered in an inpatient or outpatient setting under conditions set forth by the director, outpatient laboratory services, and X-ray services are covered, subject to utilization controls. Nothing in this subdivision shall be construed to require prior authorization for anesthesiologist services provided as part of an outpatient medical procedure or for portable X-ray services in a nursing facility or any category of intermediate care facility for the developmentally disabled.

(g) Blood and blood derivatives are covered.

(h) (1) Emergency and essential diagnostic and restorative dental services, except for orthodontic, fixed bridgework, and partial dentures that are not necessary for balance of a complete artificial denture, are covered, subject to utilization controls. The utilization controls shall allow emergency and essential diagnostic and restorative dental services and prostheses that are necessary to prevent a significant disability or to replace previously furnished prostheses which are lost or destroyed due to circumstances beyond the beneficiary's control. The department's utilization controls shall not require X-rays as a condition of reimbursement for fillings for children under 18 years of age. Notwithstanding the foregoing, the director may by regulation provide for certain fixed artificial dentures necessary for obtaining employment

or for medical conditions which preclude the use of removable dental prostheses, and for orthodontic services in cleft palate deformities administered by the department's California Children Services Program.

(2) For persons 21 years of age or older, the services specified in paragraph (1) shall be provided subject to the following conditions:

(A) Periodontal treatment is not a benefit.

(B) Endodontic therapy is not a benefit except for vital pulpotomy.

(C) Laboratory processed crowns are not a benefit.

(D) Removable prosthetics shall be a benefit only for patients as a requirement for employment.

(E) The director may, by regulation, provide for the provision of fixed artificial dentures that are necessary for medical conditions that preclude the use of removable dental prostheses.

(F) Notwithstanding the conditions specified in subparagraphs (A) to (E), inclusive, the department may approve services for persons with special medical disorders subject to utilization review.

(3) Paragraph (2) shall become inoperative July 1, 1995.

(i) Medical transportation is covered, subject to utilization controls.

(j) Home health care services are covered, subject to utilization controls.

(k) Prosthetic and orthotic devices and eyeglasses are covered, subject to utilization controls. Utilization controls shall allow replacement of prosthetic and orthotic devices and eyeglasses necessary because of loss or destruction due to circumstances beyond the beneficiary's control. Frame styles for eyeglasses replaced pursuant to this subdivision shall not change more than once every two years, unless the department so directs.

Orthopedic and conventional shoes are covered when provided by a prosthetic and orthotic supplier on the prescription of a physician and when at least one of the shoes will be attached to a prosthesis or brace, subject to utilization controls. Modification of stock conventional or orthopedic shoes when medically indicated, is covered subject to utilization controls. When there is a clearly established medical need that cannot be satisfied by the modification of stock conventional or orthopedic shoes, custom-made orthopedic shoes are covered, subject to utilization controls.

(*l*) Hearing aids are covered, subject to utilization controls. Utilization controls shall allow replacement of hearing aids necessary because of loss or destruction due to circumstances beyond the beneficiary's control.

(m) Durable medical equipment and medical supplies are covered, subject to utilization controls. The utilization controls shall allow the replacement of durable medical equipment and medical supplies when

95

necessary because of loss or destruction due to circumstances beyond the beneficiary's control. The utilization controls shall allow authorization of durable medical equipment needed to assist a disabled beneficiary in caring for a child for whom the disabled beneficiary is a parent, stepparent, foster parent, or legal guardian, subject to the availability of federal financial participation. The department shall adopt emergency regulations to define and establish criteria for assistive durable medical equipment in accordance with the rulemaking provisions of the Administrative Procedure Act (Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code).

(n) Family planning services are covered, subject to utilization controls.

(o) Inpatient intensive rehabilitation hospital services, including respiratory rehabilitation services, in a general acute care hospital are covered, subject to utilization controls, when either of the following criteria are met:

(1) A patient with a permanent disability or severe impairment requires an inpatient intensive rehabilitation hospital program as described in Section 14064 to develop function beyond the limited amount that would occur in the normal course of recovery.

(2) A patient with a chronic or progressive disease requires an inpatient intensive rehabilitation hospital program as described in Section 14064 to maintain the patient's present functional level as long as possible.

(p) Adult day health care is covered in accordance with Chapter 8.7 (commencing with Section 14520).

(q) (1) Application of fluoride, or other appropriate fluoride treatment as defined by the department, other prophylaxis treatment for children 17 years of age and under, are covered.

(2) All dental hygiene services provided by a registered dental hygienist in alternative practice pursuant to Sections 1768 and 1770 of the Business and Professions Code may be covered as long as they are within the scope of Denti-Cal benefits and they are necessary services provided by a registered dental hygienist in alternative practice.

(r) (1) Paramedic services performed by a city, county, or special district, or pursuant to a contract with a city, county, or special district, and pursuant to a program established under Article 3 (commencing with Section 1480) of Chapter 2.5 of Division 2 of the Health and Safety Code by a paramedic certified pursuant to that article, and consisting of defibrillation and those services specified in subdivision (3) of Section 1482 of the article.

(2) All providers enrolled under this subdivision shall satisfy all applicable statutory and regulatory requirements for becoming a Medi-Cal provider.

(3) This subdivision shall be implemented only to the extent funding is available under Section 14106.6.

(s) In-home medical care services are covered when medically appropriate and subject to utilization controls, for beneficiaries who would otherwise require care for an extended period of time in an acute care hospital at a cost higher than in-home medical care services. The director shall have the authority under this section to contract with organizations qualified to provide in-home medical care services to those persons. These services may be provided to patients placed in shared or congregate living arrangements, if a home setting is not medically appropriate or available to the beneficiary. As used in this section, "in-home medical care service" includes utility bills directly attributable to continuous, 24-hour operation of life-sustaining medical equipment, to the extent that federal financial participation is available.

As used in this subdivision, in-home medical care services, include, but are not limited to:

(1) Level of care and cost of care evaluations.

(2) Expenses, directly attributable to home care activities, for materials.

(3) Physician fees for home visits.

(4) Expenses directly attributable to home care activities for shelter and modification to shelter.

(5) Expenses directly attributable to additional costs of special diets, including tube feeding.

(6) Medically related personal services.

(7) Home nursing education.

(8) Emergency maintenance repair.

(9) Home health agency personnel benefits which permit coverage of care during periods when regular personnel are on vacation or using sick leave.

(10) All services needed to maintain antiseptic conditions at stoma or shunt sites on the body.

(11) Emergency and nonemergency medical transportation.

(12) Medical supplies.

(13) Medical equipment, including, but not limited to, scales, gurneys, and equipment racks suitable for paralyzed patients.

(14) Utility use directly attributable to the requirements of home care activities which are in addition to normal utility use.

(15) Special drugs and medications.

95

(16) Home health agency supervision of visiting staff which is medically necessary, but not included in the home health agency rate.

(17) Therapy services.

(18) Household appliances and household utensil costs directly attributable to home care activities.

(19) Modification of medical equipment for home use.

(20) Training and orientation for use of life-support systems, including, but not limited to, support of respiratory functions.

(21) Respiratory care practitioner services as defined in Sections 3702 and 3703 of the Business and Professions Code, subject to prescription by a physician and surgeon.

Beneficiaries receiving in-home medical care services are entitled to the full range of services within the Medi-Cal scope of benefits as defined by this section, subject to medical necessity and applicable utilization control. Services provided pursuant to this subdivision, which are not otherwise included in the Medi-Cal schedule of benefits, shall be available only to the extent that federal financial participation for these services is available in accordance with a home- and community-based services waiver.

(t) Home- and community-based services approved by the United States Department of Health and Human Services may be covered to the extent that federal financial participation is available for those services under waivers granted in accordance with Section 1396n of Title 42 of the United States Code. The director may seek waivers for any or all home- and community-based services approvable under Section 1396n of Title 42 of the United States Code. Coverage for those services shall be limited by the terms, conditions, and duration of the federal waivers.

(u) Comprehensive perinatal services, as provided through an agreement with a health care provider designated in Section 14134.5 and meeting the standards developed by the department pursuant to Section 14134.5, subject to utilization controls.

The department shall seek any federal waivers necessary to implement the provisions of this subdivision. The provisions for which appropriate federal waivers cannot be obtained shall not be implemented. Provisions for which waivers are obtained or for which waivers are not required shall be implemented notwithstanding any inability to obtain federal waivers for the other provisions. No provision of this subdivision shall be implemented unless matching funds from Subchapter XIX (commencing with Section 1396) of Chapter 7 of Title 42 of the United States Code are available.

(v) Early and periodic screening, diagnosis, and treatment for any individual under 21 years of age is covered, consistent with the

95

requirements of Subchapter XIX (commencing with Section 1396) of Chapter 7 of Title 42 of the United States Code.

(w)  Hospice service which is Medicare-certified hospice service is covered, subject to utilization controls. Coverage shall be available only to the extent that no additional net program costs are incurred.

(x)  When a claim for treatment provided to a beneficiary includes both services which are authorized and reimbursable under this chapter, and services which are not reimbursable under this chapter, that portion of the claim for the treatment and services authorized and reimbursable under this chapter shall be payable.

(y)  Home- and community-based services approved by the United States Department of Health and Human Services for beneficiaries with a diagnosis of AIDS or ARC, who require intermediate care or a higher level of care.

Services provided pursuant to a waiver obtained from the Secretary of the United States Department of Health and Human Services pursuant to this subdivision, and which are not otherwise included in the Medi-Cal schedule of benefits, shall be available only to the extent that federal financial participation for these services is available in accordance with the waiver, and subject to the terms, conditions, and duration of the waiver. These services shall be provided to individual beneficiaries in accordance with the client's needs as identified in the plan of care, and subject to medical necessity and applicable utilization control.

The director may under this section contract with organizations qualified to provide, directly or by subcontract, services provided for in this subdivision to eligible beneficiaries. Contracts or agreements entered into pursuant to this division shall not be subject to the Public Contract Code.

(z)  Respiratory care when provided in organized health care systems as defined in Section 3701 of the Business and Professions Code, and as an in-home medical service as outlined in subdivision (s).

(aa)  (1)  There is hereby established in the department, a program to provide comprehensive clinical family planning services to any person who has a family income at or below 200 percent of the federal poverty level, as revised annually, and who is eligible to receive these services pursuant to the waiver identified in paragraph (2). This program shall be known as the Family Planning, Access, Care, and Treatment (Family PACT) Waiver Program.

(2)  The department shall seek a waiver for a program to provide comprehensive clinical family planning services as described in paragraph (8). The program shall be operated only in accordance with the waiver and the statutes and regulations in paragraph (4) and subject

to the terms, conditions, and duration of the waiver. The services shall be provided under the program only if the waiver is approved by the federal Centers for Medicare and Medicaid Services in accordance with Section 1396n of Title 42 of the United States Code and only to the extent that federal financial participation is available for the services.

(3) Solely for the purposes of the waiver and notwithstanding any other provision of law, the collection and use of an individual's social security number shall be necessary only to the extent required by federal law.

(4) Sections 14105.3 to 14105.39, inclusive, 14107.11, 24005, and 24013, and any regulations adopted under these statutes shall apply to the program provided for under this subdivision. No other provision of law under the Medi-Cal program or the State-Only Family Planning Program shall apply to the program provided for under this subdivision.

(5) Notwithstanding Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code, the department may implement, without taking regulatory action, the provisions of the waiver after its approval by the federal Health Care Financing Administration and the provisions of this section by means of an all-county letter or similar instruction to providers. Thereafter, the department shall adopt regulations to implement this section and the approved waiver in accordance with the requirements of Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code. Beginning six months after the effective date of the act adding this subdivision, the department shall provide a status report to the Legislature on a semiannual basis until regulations have been adopted.

(6) In the event that the Department of Finance determines that the program operated under the authority of the waiver described in paragraph (2) is no longer cost-effective, this subdivision shall become inoperative on the first day of the first month following the issuance of a 30-day notification of that determination in writing by the Department of Finance to the chairperson in each house that considers appropriations, the chairpersons of the committees, and the appropriate subcommittees in each house that considers the State Budget, and the Chairperson of the Joint Legislative Budget Committee.

(7) If this subdivision ceases to be operative, all persons who have received or are eligible to receive comprehensive clinical family planning services pursuant to the waiver described in paragraph (2) shall receive family planning services under the Medi-Cal program pursuant to subdivision (n) if they are otherwise eligible for Medi-Cal with no share of cost, or shall receive comprehensive clinical family planning services under the program established in Division 24 (commencing

95

with Section 24000) either if they are eligible for Medi-Cal with a share of cost or if they are otherwise eligible under Section 24003.

(8) For purposes of this subdivision, "comprehensive clinical family planning services" means the process of establishing objectives for the number and spacing of children, and selecting the means by which those objectives may be achieved. These means include a broad range of acceptable and effective methods and services to limit or enhance fertility, including contraceptive methods, federal Food and Drug Administration approved contraceptive drugs, devices, and supplies, natural family planning, abstinence methods, and basic, limited fertility management. Comprehensive clinical family planning services include, but are not limited to, preconception counseling, maternal and fetal health counseling, general reproductive health care, including diagnosis and treatment of infections and conditions, including cancer, that threaten reproductive capability, medical family planning treatment and procedures, including supplies and followup, and informational, counseling, and educational services. Comprehensive clinical family planning services shall not include abortion, pregnancy testing solely for the purposes of referral for abortion or services ancillary to abortions, or pregnancy care that is not incident to the diagnosis of pregnancy. Comprehensive clinical family planning services shall be subject to utilization control and include all of the following:

(A) Family planning related services and male and female sterilization. Family planning services for men and women shall include emergency services and services for complications directly related to the contraceptive method, federal Food and Drug Administration approved contraceptive drugs, devices, and supplies, and followup, consultation, and referral services, as indicated, which may require treatment authorization requests.

(B) All United States Department of Agriculture, federal Food and Drug Administration approved contraceptive drugs, devices, and supplies that are in keeping with current standards of practice and from which the individual may choose.

(C) Culturally and linguistically appropriate health education and counseling services, including informed consent, that include all of the following:

(i) Psychosocial and medical aspects of contraception.

(ii) Sexuality.

(iii) Fertility.

(iv) Pregnancy.

(v) Parenthood.

(vi) Infertility.

(vii) Reproductive health care.

95

(viii)  Preconception and nutrition counseling.

(ix)  Prevention and treatment of sexually transmitted infection.

(x)  Use of contraceptive methods, federal Food and Drug Administration approved contraceptive drugs, devices, and supplies.

(xi)  Possible contraceptive consequences and followup.

(xii)  Interpersonal communication and negotiation of relationships to assist individuals and couples in effective contraceptive method use and planning families.

(D)  A comprehensive health history, updated at next periodic visit (between 11 and 24 months after initial examination) that includes a complete obstetrical history, gynecological history, contraceptive history, personal medical history, health risk factors, and family health history, including genetic or hereditary conditions.

(E)  A complete physical examination on initial and subsequent periodic visits.

(ab)  Purchase of prescribed enteral formulae is covered, subject to the Medi-Cal list of enteral formulae and utilization controls.

(ac)  Diabetic testing supplies are covered when provided by a pharmacy, subject to utilization controls.

SEC. 84.    Section 14132.26 of the Welfare and Institutions Code is amended to read:

14132.26.    (a)  The department shall develop a program that requires a waiver of federal law to test the efficacy of providing an assisted living benefit to beneficiaries under the Medi-Cal program. Assisted living benefits shall include, but are not limited to, the care and supervision activities specified in Section 1569.2 of the Health and Safety Code and Section 87101 of Title 22 of the California Code of Regulations, and other health-related services. The program developed pursuant to this section shall be known as the waiver program for purposes of this section. The department shall submit any necessary waiver applications or modifications to the medicaid state plan to the Health Care Financing Administration to implement the waiver program, and shall implement the waiver program only to the extent federal financial participation is available.

(b)  The department shall develop the waiver program in conjunction with other state departments, consumers, consumer advocates, housing and service providers, and experts in the fields of gerontology, geriatric health, nursing services, and independent living.

(c)  The assisted living benefit shall be designed to provide eligible individuals with a range of services that enable them to remain in the least restrictive and most homelike environment while receiving the medical and personal care necessary to protect their health and well-being. Benefits provided pursuant to this waiver program shall

95

Ch. 1161

include only those not otherwise available under the state plan, and may include, but are not limited to, medicine management, coordination with a primary health care provider, and case management.

(d) (1) Eligible individuals shall be those who are eligible for the Medi-Cal program and are determined by the department to be eligible for placement in a nursing facility, as defined under subdivisions (c) and (d) of Section 1250 of the Health and Safety Code. Eligibility shall be based on an assessment of an individual's ability to perform functional and instrumental activities of daily living, as well as the individual's medical diagnosis and prognosis, and other criteria, including other Medi-Cal services that the beneficiary is receiving, as specified in the waiver.

(2) An eligible individual shall participate in the waiver program only if he or she is fully informed of the program and the nature of the assisted living benefit and indicates in writing his or her choice to participate.

(e) (1) The waiver program shall test the effectiveness of providing a Medi-Cal assisted living benefit through two service delivery approaches, as specified in paragraphs (2) and (3).

(2) Under the first model, an assisted living benefit shall be provided to residents of licensed residential care facilities. Facility participation in the program shall be determined by the department in conjunction with the State Department of Social Services and in accordance with the criteria for participation specified in the waiver. Under this model the facility operator shall be responsible for the provision of services allowed under the benefit, either directly or through contracts with other provider agencies, as permitted and specified in the waiver. During participation in the waiver program, residential care facilities shall comply with all terms and conditions of the waiver. The department and the State Department of Social Services, may, as determined necessary and appropriate, waive provisions contained in Division 2 (commencing with Section 1200) of the Health and Safety Code, subdivision (h) of Section 14132.95, and Title 22 of the California Code of Regulations for facilities providing services to waiver program participants.

(3) Under the second model, an assisted living benefit shall be provided to residents in publicly funded senior and disabled housing projects. Under this model an independent agency, pursuant to a contract with the department, shall be responsible for the provision of case management and other services to eligible individuals, as specified in the waiver.

(f) The department shall evaluate the effectiveness of the waiver program.

(1) The evaluation shall include, but not be limited to, participant satisfaction, health, and safety, the quality of life of the participant

95

receiving the assisted living benefit, and demonstration of the cost neutrality of the waiver program as specified in federal guidelines.

(2) The evaluation shall estimate the projected savings, if any, in the budgets of state and local governments if the program was expanded statewide.

(3) The evaluation shall be submitted to the appropriate policy and fiscal committees of the Legislature on or before January 1, 2003.

(g) The department shall limit the number of participants in the waiver program during the initial three years of its operation to a number that will be statistically significant for purposes of the program evaluation and that meets any requirements of the federal Health Care Financing Administration, including a request to waive statewide implementation requirements for the waiver program during the initial years of evaluation.

(h) In implementing this section, the department may enter into contracts for the provision of essential administrative and other services. Contracts entered into under this section may be on a noncompetitive bid basis, and shall be exempt from the requirements of Chapter 2 (commencing with Section 10290) of Part 2 of Division 2 of the Public Contract Code.

(i) The department shall not implement the waiver program specified in subdivision (a) if the benefits provided pursuant to the waiver program will result in additional costs to the Medi-Cal program.

(j) The waiver program shall be developed and implemented only to the extent that funds are appropriated or otherwise available for that purpose.

SEC. 85.    Section 14132.73 is added to the Welfare and Institutions Code, to read:

14132.73.   The State Department of Health Services shall allow psychiatrists to receive fee-for-service Medi-Cal reimbursement for services provided through telemedicine until June 30, 2004, or until the State Department of Mental Health and mental health plans, in collaboration with stakeholders, develop a method for reimbursing psychiatric services provided through telemedicine that is administratively feasible for the mental health plans, primary care providers, and psychiatrists providing the services, whichever occurs later.

SEC. 85.5.   Section 14132.88 of the Welfare and Institutions Code is amended to read:

14132.88.   (a) Notwithstanding subdivision (h) of Section 14132 and to the extent funds are made available in the annual Budget Act for this purpose, the following are covered benefits for beneficiaries 21 years of age or older under this chapter:

95

(1) One dental prophylaxis cleaning per year.

(2) One initial dental examination by a dentist.

(b) The following are covered benefits for beneficiaries under 21 years of age under this chapter:

(1) Two dental prophylaxis cleanings per year.

(2) Two periodic dental examinations per year.

SEC. 86.   Section 14132.95 of the Welfare and Institutions Code is amended to read:

14132.95.   (a) Personal care services, when provided to a categorically needy person as defined in Section 14050.1 is a covered benefit to the extent federal financial participation is available if these services are:

(1) Provided in the beneficiary's home and other locations as may be authorized by the director subject to federal approval.

(2) Authorized by county social services staff in accordance with a plan of treatment.

(3) Provided by a qualified person.

(4) Provided to a beneficiary who has a chronic, disabling condition that causes functional impairment that is expected to last at least 12 consecutive months or that is expected to result in death within 12 months and who is unable to remain safely at home without the services described in this section.

(b) The department shall seek federal approval of a state plan amendment necessary to include personal care as a medicaid service pursuant to subdivision (f) of Section 440.170 of Title 42 of the Code of Federal Regulations. For any persons who meet the criteria specified in subdivision (a) or (p), but for whom federal financial participation is not available, eligibility shall be available pursuant to Article 7 (commencing with Section 12300) of Chapter 3, if otherwise eligible.

(c) Subdivision (a) shall not be implemented unless the department has obtained federal approval of the state plan amendment described in subdivision (b), and the Department of Finance has determined, and has informed the department in writing, that the implementation of this section will not result in additional costs to the state relative to state appropriation for in-home supportive services under Article 7 (commencing with Section 12300) of Chapter 3, in the 1992–93 fiscal year.

(d) (1) For purposes of this section, personal care services shall mean all of the following:

(A) Assistance with ambulation.

(B) Bathing, oral hygiene and grooming.

(C) Dressing.

(D) Care and assistance with prosthetic devices.

95

(E)  Bowel, bladder, and menstrual care.

(F)  Skin care.

(G)  Repositioning, range of motion exercises, and transfers.

(H)  Feeding and assurance of adequate fluid intake.

(I)  Respiration.

(J)  Paramedical services.

(K)  Assistance with self-administration of medications.

(2)  Ancillary services including meal preparation and cleanup, routine laundry, shopping for food and other necessities, and domestic services may also be provided as long as these ancillary services are subordinate to personal care services. Ancillary services may not be provided separately from the basic personal care services.

(e) (1) (A)  After consulting with the State Department of Social Services, the department shall adopt emergency regulations to establish the amount, scope, and duration of personal care services available to persons described in subdivision (a) in the fiscal year whenever the department determines that General Fund expenditures for personal care services provided under this section and expenditures of both General Fund moneys and federal funds received under Title XX of the federal Social Security Act for services pursuant to Article 7 (commencing with Section 12300) of Chapter 3, are expected to exceed the General Fund appropriation and the federal appropriation under Title XX of the federal Social Security Act provided for the 1992–93 fiscal year pursuant to Article 7 (commencing with Section 12300) of Chapter 3, as it read on June 30, 1992, as adjusted for caseload growth or as increased in the Budget Act or appropriated by statute. At least 30 days prior to filing these regulations with the Secretary of State, the department shall give notice of the expected content of these regulations to the fiscal committees of both houses of the Legislature.

(B)  In establishing the amount, scope, and duration of personal care services, the department shall ensure that General Fund expenditures for personal care services provided for under this section and expenditures of both General Fund moneys and federal funds received under Title XX of the federal Social Security Act for services pursuant to Article 7 (commencing with Section 12300) of Chapter 3, do not exceed the General Fund appropriation and the federal appropriation under Title XX of the federal Social Security Act provided for the 1992–93 fiscal year pursuant to Article 7 (commencing with Section 12300) of Chapter 3, as it read on June 30, 1992, as adjusted for caseload growth or as increased in the Budget Act or appropriated by statute.

(C)  For purposes of this subdivision, "caseload growth" means an adjustment factor determined by the department based on (1) growth in the number of persons eligible for benefits under Chapter 3

95

(commencing with Section 12000) on the basis of their disability, (2) the average increase in the number of hours in the program established pursuant to Article 7 (commencing with Section 12300) of Chapter 3 in the 1988–89 to 1992–93 fiscal years, inclusive, due to the level of impairment, and (3) any increase in program costs that is required by an increase in the mandatory minimum wage.

(2) In establishing the amount, scope, and duration of personal care services pursuant to this subdivision, the department may define and take into account, among other things:

(A) The extent to which the particular personal care services are essential or nonessential.

(B) Standards establishing the medical necessity of the services to be provided.

(C) Utilization controls.

(D) A minimum number of hours of personal care services that must first be assessed as needed as a condition of receiving personal care services pursuant to this section.

The level of personal care services shall be established so as to avoid, to the extent feasible within budgetary constraints, medical out-of-home placements.

(3) To the extent that General Fund expenditures for services provided under this section and expenditures of both General Fund moneys and federal funds received under Title XX of the federal Social Security Act for services pursuant to Article 7 (commencing with Section 12300) of Chapter 3 in the 1992–93 fiscal year, adjusted for caseload growth, exceed General Fund expenditures for services provided under this section and expenditures of both General Fund moneys and federal funds received under Title XX of the federal Social Security Act for services pursuant to Article 7 (commencing with Section 12300) of Chapter 3 in any fiscal year, the excess of these funds shall be expended for any purpose as directed in the Budget Act or as otherwise statutorily disbursed by the Legislature.

(f) Services pursuant to this section shall be rendered, under the administrative direction of the State Department of Social Services, in the manner authorized in Article 7 (commencing with Section 12300) of Chapter 3, for the In-Home Supportive Services program. A provider of personal care services shall be qualified to provide the service and shall be a person other than a member of the family. For purposes of this section, a family member means a parent of a minor child or a spouse.

(g) A beneficiary who is eligible for assistance under this section shall receive services that do not exceed 283 hours per month of personal care services.

95

(h) Personal care services shall not be provided to residents of facilities licensed by the department, and shall not be provided to residents of a community care facility or a residential care facility for the elderly licensed by the Community Care Licensing Division of the State Department of Social Services.

(i) Subject to any limitations that may be imposed pursuant to subdivision (e), determination of need and authorization for services shall be performed in accordance with Article 7 (commencing with Section 12300) of Chapter 3.

(j) (1) To the extent permitted by federal law, reimbursement rates for personal care services shall be equal to the rates in each county for the same mode of services in the In-Home Supportive Services program pursuant to Article 7 (commencing with Section 12300) of Chapter 3, plus any increase provided in the annual Budget Act for personal care services rates or included in a county budget pursuant to paragraph (2).

(2) (A) The department shall establish a provider reimbursement rate methodology to determine payment rates for the individual provider mode of service that does all of the following:

(i) Is consistent with the functions and duties of entities created pursuant to Section 12301.6.

(ii) Makes any additional expenditure of state general funds subject to appropriation in the annual Budget Act.

(iii) Permits county-only funds to draw down federal financial participation consistent with federal law.

(B) This ratesetting method shall be in effect in time for any rate increases to be included in the annual Budget Act.

(C) The department may, in establishing the ratesetting method required by subparagraph (A), do both of the following:

(i) Deem the market rate for like work in each county, as determined by the Employment Development Department, to be the cap for increases in payment rates for individual practitioner services.

(ii) Provide for consideration of county input concerning the rate necessary to ensure access to services in that county.

(D) If an increase in individual practitioner rates is included in the annual Budget Act, the state-county sharing ratio shall be as established in Section 12306. If the annual Budget Act does not include an increase in individual practitioner rates, a county may use county-only funds to meet federal financial participation requirements consistent with federal law.

(3) (A) By November 1, 1993, the department shall submit a state plan amendment to the federal Health Care Financing Administration to implement this subdivision. To the extent that any element or requirement of this subdivision is not approved, the department shall

95

Ch. 1161

submit a request to the federal Health Care Financing Administration for any waivers as would be necessary to implement this subdivision.

(B)  The provider reimbursement ratesetting methodology authorized by the amendments to this subdivision in the 1993–94 Regular Session of the Legislature shall not be operative until all necessary federal approvals have been obtained.

(k) (1)  The State Department of Social Services shall, by September 1, 1993, notify the following persons that they are eligible to participate in the personal care services program:

(A)  Persons eligible for services pursuant to the Pickle Amendment, as adopted October 28, 1976.

(B)  Persons eligible for services pursuant to subsection (c) of Section 1383c of Title 42 of the United States Code.

(2)  The State Department of Social Services shall, by September 1, 1993, notify persons to whom paragraph (1) applies and who receive advance payment for in-home supportive services that they will qualify for services under this section without a share of cost if they elect to accept payment for services on an arrears rather than an advance payment basis.

(*l*)  An individual who is eligible for services subject to the maximum amount specified in subdivision (b) of Section 12303.4 shall be given the option of hiring his or her own provider.

(m)  The county welfare department shall inform in writing any individual who is potentially eligible for services under this section of his or her right to the services.

(n)  It is the intent of the Legislature that this entire section be an inseparable whole and that no part of it be severable. If any portion of this section is found to be invalid, as determined by a final judgment of a court of competent jurisdiction, this section shall become inoperative.

(o)  Paragraphs (2) and (3) of subdivision (a) shall be implemented so as to conform to federal law authorizing their implementation.

(p) (1)  Personal care services shall be provided as a covered benefit to a medically needy aged, blind, or disabled person, as defined in subdivision (a) of Section 14051, to the same extent and under the same requirements as they are provided under subdivision (a) of this section to a categorically needy, aged, blind, or disabled person, as defined in subdivision (a) of Section 14050.1, and to the extent that federal financial participation is available.

(2)  The department shall seek federal approval of a state plan amendment necessary to include personal care services described in paragraph (1) as a medicaid service pursuant to subdivision (f) of Section 440.170 of Title 42 of the Code of Federal Regulations.

95

(3) In the event that the Department of Finance determines that expenditures of both General Fund moneys for personal care services provided under this subdivision to medically needy aged, blind, or disabled persons together with expenditures of both General Fund moneys and federal funds received under Title XX of the federal Social Security Act for all aged, blind, and disabled persons receiving in-home supportive services pursuant to Article 7 (commencing with Section 12300) of Chapter 3, in the 2000–01 fiscal year or in any subsequent fiscal year, are expected to exceed the General Fund appropriation and the federal appropriation received under Title XX of the federal Social Security Act for expenditures for all aged, blind, and disabled persons receiving in-home supportive services provided in the 1999–2000 fiscal year pursuant to Article 7 (commencing with Section 12300) of Chapter 3, as it read on June 30, 1998, as adjusted for caseload growth or as changed in the Budget Act or by statute or regulation, then this subdivision shall cease to be operative on the first day of the month that begins after the expiration of a period of 30 days subsequent to a notification in writing by the Director of the Department of Finance to the chairperson of the committee in each house that considers appropriations, the chairpersons of the committees and the appropriate subcommittees in each house that consider the State Budget, and the Chairperson of the Joint Legislative Budget Committee.

(4) Solely for purposes of paragraph (3), caseload growth means an adjustment factor determined by the department based on:

(A) Growth in the number of persons eligible for benefits under Chapter 3 (commencing with Section 12000) on the basis of their disability.

(B) The average increase in the number of hours in the program established pursuant to Article 7 (commencing with Section 12300) of Chapter 3 in the 1994–95 to 1998–99 fiscal years, inclusive, due to the level of impairment.

(C) Any increase in program cost that is required by an increase in hourly costs pursuant to the Budget Act or statute.

(5) In the event of a final judicial determination by any court of appellate jurisdiction or a final determination by the Administrator of the federal Centers for Medicare and Medicaid Services that personal care services must be provided to any medically needy person who is not aged, blind, or disabled, then this subdivision shall cease to be operative on the first day of the first month that begins after the expiration of a period of 30 days subsequent to a notification in writing by the Director of Finance to the chairperson of the committee in each house that considers appropriations, the chairpersons of the committees and the

95

appropriate subcommittees in each house that consider the State Budget, and the Chairperson of the Joint Legislative Budget Committee.

(6) If this subdivision ceases to be operative, all aged, blind, and disabled persons who would have received or been eligible to receive in-home supportive services pursuant to Article 7 (commencing with Section 12300) of Chapter 3, but for receiving services under this subdivision, shall be eligible immediately upon this section becoming inoperative for services pursuant to Article 7 (commencing with Section 12300) of Chapter 3.

(7) The department shall implement this subdivision on April 1, 1999, but only if the department has obtained federal approval of the state plan amendments described in paragraph (2) of this subdivision.

SEC. 87.   Section 14150 is added to the Welfare and Institutions Code, to read:

14150.   Within 60 calendar days of the date that the annual Budget Act is chaptered, the department shall notify the chairpersons of the fiscal committees of each house of the Legislature, the Chairperson and the Vice Chairperson of the Joint Legislative Budget Committee, and appropriate county representatives if the department plans to withhold and not allocate any of the baseline allocation for county Medi-Cal eligibility activities that are appropriated for Medi-Cal administration.

SEC. 88.   Section 14163 of the Welfare and Institutions Code is amended to read:

14163.   (a) For purposes of this section, the following definitions shall apply:

(1) "Public entity" means a county, a city, a city and county, the State of California, the University of California, a local health care district, a local health authority, or any other political subdivision of the state.

(2) "Hospital" means a health facility that is licensed pursuant to Chapter 2 (commencing with Section 1250) of Division 2 of the Health and Safety Code to provide acute inpatient hospital services, and includes all components of the facility.

(3) "Disproportionate share hospital" means a hospital providing acute inpatient services to Medi-Cal beneficiaries that meets the criteria for disproportionate share status relating to acute inpatient services set forth in Section 14105.98.

(4) "Disproportionate share list" means the annual list of disproportionate share hospitals for acute inpatient services issued by the department pursuant to Section 14105.98.

(5) "Fund" means the Medi-Cal Inpatient Payment Adjustment Fund.

(6) "Eligible hospital" means, for a particular state fiscal year, a hospital on the disproportionate share list that is eligible to receive

payment adjustment amounts under Section 14105.98 with respect to that state fiscal year.

(7) "Transfer year" means the particular state fiscal year during which, or with respect to which, public entities are required by this section to make an intergovernmental transfer of funds to the Controller.

(8) "Transferor entity" means a public entity that, with respect to a particular transfer year, is required by this section to make an intergovernmental transfer of funds to the Controller.

(9) "Transfer amount" means an amount of intergovernmental transfer of funds that this section requires for a particular transferor entity with respect to a particular transfer year.

(10) "Intergovernmental transfer" means a transfer of funds from a public entity to the state, that is local government financial participation in Medi-Cal pursuant to the terms of this section.

(11) "Licensee" means an entity that has been issued a license to operate a hospital by the department.

(12) "Annualized Medi-Cal inpatient paid days" means the total number of Medi-Cal acute inpatient hospital days, regardless of dates of service, for which payment was made by or on behalf of the department to a hospital, under present or previous ownership, during the most recent calendar year ending prior to the beginning of a particular transfer year, including all Medi-Cal acute inpatient covered days of care for hospitals that are paid on a different basis than per diem payments.

(13) "Medi-Cal acute inpatient hospital day" means any acute inpatient day of service attributable to patients who, for those days, were eligible for medical assistance under the California state plan, including any day of service that is reimbursed on a basis other than per diem payments.

(14) "OBRA 1993 payment limitation" means the hospital-specific limitation on the total annual amount of payment adjustments to each eligible hospital under the payment adjustment program that can be made with federal financial participation under Section 1396r-4(g) of Title 42 of the United States Code as implemented pursuant to the Medi-Cal State Plan.

(b) The Medi-Cal Inpatient Payment Adjustment Fund is hereby created in the State Treasury. Notwithstanding Section 13340 of the Government Code, the fund shall be continuously appropriated to, and under the administrative control of, the department for the purposes specified in subdivision (d). The fund shall consist of the following:

(1) Transfer amounts collected by the Controller under this section, whether submitted by transferor entities pursuant to applicable provisions of this section or obtained by offset pursuant to subdivision (j).

95

Ch. 1161

(2) Any other intergovernmental transfers deposited in the fund, as permitted by Section 14164.

(3) Any interest that accrues with respect to amounts in the fund.

(c) Moneys in the fund, which shall not consist of any state general funds, shall be used as the source for the nonfederal share of payments to hospitals pursuant to Section 14105.98. Moneys shall be allocated from the fund by the department and matched by federal funds in accordance with customary Medi-Cal accounting procedures, and used to make payments pursuant to Section 14105.98.

(d) Except as otherwise provided in Section 14105.98 or in any provision of law appropriating a specified sum of money to the department for administering this section and Section 14105.98, moneys in the fund shall be used only for the following:

(1) Payments to hospitals pursuant to Section 14105.98.

(2) Transfers to the Health Care Deposit Fund as follows:

(A) In the amount of two hundred thirty-nine million seven hundred fifty-seven thousand six hundred ninety dollars ($239,757,690) for the 1994–95 and 1995–96 fiscal years.

(B) In the amount of two hundred twenty-nine million seven hundred fifty-seven thousand six hundred ninety dollars ($229,757,690) for the 1996–97 fiscal year.

(C) In the amount of one hundred fifty-four million seven hundred fifty-seven thousand six hundred ninety dollars ($154,757,690) for the 1997–98 fiscal year.

(D) In the amount of one hundred fourteen million seven hundred fifty-seven thousand six hundred ninety dollars ($114,757,690) for the 1998–99 fiscal year.

(E) (i) In the amount of eighty-four million seven hundred fifty-seven thousand six hundred ninety dollars ($84,757,690) for the 1999–2000 fiscal year.

(ii) It is the intent of the Legislature that the economic benefit of any reduction in the amount transferred, or to be transferred, to the Health Care Deposit Fund pursuant to this subdivision for the 1999–2000 fiscal year, as compared to the amount so transferred for the 1998–99 fiscal year, be allocated equally between public and nonpublic disproportionate share hospitals. To implement the reduction in clause (i) the department shall, by June 30, 2000, adjust the calculations in Section 14105.98 in order to allocate the funds in accordance with this clause.

(F) In the amount of twenty-nine million seven hundred fifty-seven thousand six hundred ninety dollars ($29,757,690) for the 2000–01 fiscal year and the 2001–02 fiscal year.

95

(G)  In the amount of eighty-five million dollars ($85,000,000) for the 2002–03 fiscal year and each fiscal year thereafter.

(H)  The transfers from the fund shall be made in six equal monthly installments to the Medi-Cal local assistance appropriation item (Item 4260-101-0001 of the annual Budget Act) in support of Medi-Cal expenditures. The first installment shall accrue in October of each transfer year, and all other installments shall accrue monthly thereafter from November through March.

(e)  For the 1991–92 state fiscal year, the department shall determine, no later than 70 days after the enactment of this section, the transferor entities for the 1991–92 transfer year. To make this determination, the department shall utilize the disproportionate share list for the 1991–92 fiscal year issued by the department pursuant to paragraph (1) of subdivision (f) of Section 14105.98. The department shall identify each eligible hospital on the list for which a public entity is the licensee as of July 1, 1991. The public entity that is the licensee of each identified eligible hospital shall be a transferor entity for the 1991–92 transfer year.

(f)  The department shall determine, no later than 70 days after the enactment of this section, the transfer amounts for the 1991–92 transfer year.

The transfer amounts shall be determined as follows:

(1)  The eligible hospitals for 1991–92 shall be identified. For each hospital, the applicable total per diem payment adjustment amount under Section 14105.98 for the 1991–92 transfer year shall be computed. This amount shall be multiplied by 80 percent of the eligible hospital's annualized Medi-Cal inpatient paid days as determined from all Medi-Cal paid claims records available through April 1, 1991. The products of these calculations for all eligible hospitals shall be added together to determine an aggregate sum for the 1991–92 transfer year.

(2)  The eligible hospitals for 1991–92 involving transferor entities as licensees shall be identified. For each hospital, the applicable total per diem payment adjustment amount under Section 14105.98 for the 1991–92 transfer year shall be computed. This amount shall be multiplied by 80 percent of the eligible hospital's annualized Medi-Cal inpatient paid days as determined from all Medi-Cal paid claims records available through April 1, 1991. The products of these calculations for all eligible hospitals with transferor entities as licensees shall be added together to determine an aggregate sum for the 1991–92 transfer year.

(3)  The aggregate sum determined under paragraph (1) shall be divided by the aggregate sum determined under paragraph (2), yielding a factor to be utilized in paragraph (4).

(4)  The factor determined in paragraph (3) shall be multiplied by the amount determined for each hospital under paragraph (2). The product

of this calculation for each hospital in paragraph (2) shall be divided by 1.771, yielding a transfer amount for the particular transferor entity for the transfer year.

(g) For the 1991–92 transfer year, the department shall notify each transferor entity in writing of its applicable transfer amount or amounts.

(h) For the 1992–93 transfer year and subsequent transfer years, transfer amounts shall be determined in the same procedural manner as set forth in subdivision (f), except:

(1) The department shall use all of the following:

(A) The disproportionate share list applicable to the particular transfer year to determine the eligible hospitals.

(B) The payment adjustment amounts calculated under Section 14105.98 for the particular transfer year. These amounts shall take into account any projected or actual increases or decreases in the size of the payment adjustment program as are required under Section 14105.98 for the particular year in question, including any decreases resulting from the application of the OBRA 1993 payment limitation. The department may issue interim, revised, and supplemental transfer requests as necessary and appropriate to address changes in payment adjustment levels that occur under Section 14105.98. All transfer requests, or adjustments thereto, issued to transferor entities by the department shall meet the requirements set forth in subdivision (i).

(C) Data regarding annualized Medi-Cal inpatient paid days for the most recent calendar year ending prior to the beginning of the particular transfer year, as determined from all Medi-Cal paid claims records available through April 1 preceding the particular transfer year.

(D) The status of public entities as licensees of eligible hospitals as of July 1 of the particular transfer year.

(E) For the 1993–94 transfer year and subsequent transfer years, the divisor to be used for purposes of the calculation referred to in paragraph (4) of subdivision (f) shall be determined by the department. The divisor shall be calculated to ensure that the appropriate amount of transfers from transferor entities are received into the fund to satisfy the requirements of Section 14105.98, exclusive of the amounts described in paragraph (2) of this subdivision, and to satisfy the requirements of paragraph (2) of subdivision (d), for the particular transfer year. For the 1993–94 transfer year, the divisor shall be 1.742.

(F) The following provisions shall apply for certain transfer amounts relating to nonsupplemental payments under Section 14105.98:

(i) For the 1998–99 transfer year, transfer amounts shall be determined as though the payment adjustment amounts arising pursuant to subdivision (ag) of Section 14105.98 were increased by the amounts paid or payable pursuant to subdivision (af) of Section 14105.98.

95

(ii) Any transfer amounts paid by a transferor entity pursuant to subparagraph (C) of paragraph (2) shall serve as credit for the particular transferor entity against an equal amount of its transfer obligation for the 1998–99 transfer year.

(iii) For the 1999–2000 transfer year, transfer amounts shall be determined as though the amount to be transferred to the Health Care Deposit Fund, as referred to in paragraph (2) of subdivision (d), were reduced by 28 percent.

(2) (A) Except as provided in subparagraphs (B), (C), and (D), for the 1993–94 transfer year and subsequent transfer years, transfer amounts shall be increased for the particular transfer year in the amounts necessary to fund the nonfederal share of the total supplemental payment adjustment amounts of all types that arise under Section 14105.98. These increases shall be paid only by those transferor entities that are licensees of hospitals that are projected to receive some or all of the particular supplemental payments, and the increases shall be paid by the transferor entities on a pro rata basis in connection with the particular supplemental payments. For purposes of this paragraph, supplemental payment adjustment amounts shall be deemed to arise for the particular transfer year as of the date specified in Section 14105.98. Transfer amounts to fund the nonfederal share of the payments shall be paid for the particular transfer year within 20 days after the department notifies the transferor entity in writing of the additional transfer amount to be paid.

(B) For the 1995–96 transfer year, the nonfederal share of the secondary supplemental payment adjustments described in paragraph (9) of subdivision (y) of Section 14105.96 shall be funded as follows:

(i) Ninety-nine percent of the nonfederal share shall be funded by a transfer from the University of California.

(ii) One percent of the nonfederal share shall be funded by transfers from those public entities that are the licensees of the hospitals included in the "other public hospitals" group referred to in clauses (ii) and (iii) of subparagraph (B) of paragraph (9) of subdivision (y) of Section 14105.98. The transfer responsibilities for this 1 percent shall be allocated to the particular public entities on a pro rata basis, based on a formula or formulae customarily used by the department for allocating transfer amounts under this section. The formula or formulae shall take into account, through reallocation of transfer amounts as appropriate, the situation of hospitals whose secondary supplemental payment adjustments are restricted due to the application of the limitation set forth in clause (v) of subparagraph (B) of paragraph (9) of subdivision (y) of Section 14105.98.

95

(iii)  All transfer amounts under this subparagraph shall be paid by the particular transferor entities within 30 days after the department notifies the transferor entity in writing of the transfer amount to be paid.

(C)  For the 1997–98 transfer year, transfer amounts to fund the nonfederal share of the supplemental payment adjustments described in subdivision (af) of Section 14105.98 shall be funded by a transfer from the County of Los Angeles.

(D) (i)  For the 1998–99 transfer year, transfer amounts to fund the nonfederal share of the supplemental payment adjustment amounts arising under subdivision (ah) of Section 14105.98 shall be increased as set forth in clause (ii).

(ii)  The transfer amounts otherwise calculated to fund the supplemental payment adjustments referred to in clause (i) shall be increased on a pro rata basis by an amount equal to 28 percent of the amount to be transferred to the Health Care Deposit Fund for the 1999–2000 fiscal year, as referred to in paragraph (2) of subdivision (d).

(3)  The department shall prepare preliminary analyses and calculations regarding potential transfer amounts, and potential transferor entities shall be notified by the department of estimated transfer amounts as soon as reasonably feasible regarding any particular transfer year. Written notices of transfer amounts shall be issued by the department as soon as possible with respect to each transfer year. All state agencies shall take all necessary steps in order to supply applicable data to the department to accomplish these tasks. The Office of Statewide Health Planning and Development shall provide to the department quarterly access to the edited and unedited confidential patient discharge data files for all Medi-Cal eligible patients. The department shall maintain the confidentiality of that data to the same extent as is required of the Office of Statewide Health Planning and Development. In addition, the Office of Statewide Health Planning and Development shall provide to the department, not later than March 1 of each year, the data specified by the department, as the data existed on the statewide database file as of February 1 of each year, from all of the following:

(A)  Hospital annual disclosure reports, filed with the Office of Statewide Health Planning and Development pursuant to Section 443.31 or 128735 of the Health and Safety Code, for hospital fiscal years that ended during the calendar year ending 13 months prior to the applicable February 1.

(B)  Annual reports of hospitals, filed with the Office of Statewide Health Planning and Development pursuant to Section 439.2 or 127285 of the Health and Safety Code, for the calendar year ending 13 months prior to the applicable February 1.

95

(C) Hospital patient discharge data reports, filed with the Office of Statewide Health Planning and Development pursuant to subdivision (g) of Section 443.31 or 128735 of the Health and Safety Code, for the calendar year ending 13 months prior to the applicable February 1.

(D) Any other materials on file with the Office of Statewide Health Planning and Development.

(4) Transfer amounts calculated by the department may be increased or decreased by a percentage amount consistent with the Medi-Cal state plan.

(5) For the 1993–94 fiscal year, the transfer amount that would otherwise be required from the University of California shall be increased by fifteen million dollars ($15,000,000).

(6) Notwithstanding any other provision of law, except for subparagraph (D) of paragraph (2), the total amount of transfers required from the transferor entities for any particular transfer year shall not exceed the sum of the following:

(A) The amount needed to fund the nonfederal share of all payment adjustment amounts applicable to the particular payment adjustment year as calculated under Section 14105.98. Included in the calculations for this purpose shall be any decreases in the program as a whole, and for individual hospitals, that arise due to the provisions of Section 1396r-4(f) or (g) of Title 42 of the United States Code.

(B) The amount needed to fund the transfers to the Health Care Deposit Fund, as referred to in subdivision (d).

(7) (A) Except as provided in subparagraphs (B) and (C) and in paragraph (2) of subdivision (j), and except for a prudent reserve not to exceed two million dollars ($2,000,000) in the Medi-Cal Inpatient Payment Adjustment Fund, any amounts in the fund, including interest that accrues with respect to the amounts in the fund, that are not expended, or estimated to be required for expenditure, under Section 14105.98 with respect to a particular transfer year shall be returned on a pro rata basis to the transferor entities for the particular transfer year within 120 days after the department determines that the funds are not needed for an expenditure in connection with the particular transfer year.

(B) The department shall determine the interest amounts that have accrued in the fund from its inception through June 30, 1995, and, no later than January 1, 1996, shall distribute these interest amounts to transferor entities.

(C) With respect to those particular amounts in the fund resulting solely from the provisions of subparagraph (D) of paragraph (2), the department shall determine by September 30, 1999, whether these particular amounts exceed 28 percent of the amount to be transferred to the Health Care Deposit Fund for the 1999–2000 fiscal year, as referred

to in paragraph (2) of subdivision (d). Any excess amount so determined shall be returned to the particular transferor entities on a pro rata basis no later than October 31, 1999.

(D) Regarding any funds returned to a transferor entity under subparagraph (A) or (C), or interest amounts distributed to a transferor entity under subparagraph (B), the department shall provide to the transferor entity a written statement that explains the basis for the particular return or distribution of funds and contains the general calculations used by the department in determining the amount of the particular return or distribution of funds.

(i) (1) For the 1991–92 transfer year, each transferor entity shall pay its transfer amount or amounts to the Controller, for deposit in the fund, in eight equal installments.

(2) (A) Except as provided in subparagraphs (B) and (C), for the 1992–93 transfer year and subsequent transfer years, each transferor entity shall pay its transfer amount or amounts to the Controller, for deposit in the fund, in eight equal installments. However, for the 1997–98 and subsequent transfer years, each transferor entity shall pay its transfer amount or amounts to the Controller, for deposit in the fund, in the form of periodic installments according to a timetable established by the department. The timetable shall be structured to effectuate, on a reasonable basis, the prompt distribution of all nonsupplemental payment adjustments under Section 14105.98, and transfers to the Health Care Deposit Fund under subdivision (d).

(B) For the 1994–95 transfer year, each transferor entity shall pay its transfer amount or amounts to the Controller, for deposit in the fund, in five equal installments.

(C) For the 1995–96 transfer year, each transferor entity shall pay its transfer amount or amounts to the Controller, for deposit in the fund, in five equal installments.

(D) Except as otherwise specifically provided, subparagraphs (A) to (C), inclusive, shall not apply to increases in transfer amounts described in paragraph (2) of subdivision (h) or to additional transfer amounts described in subdivision (o).

(E) All requests for transfer payments, or adjustments thereto, issued by the department shall be in writing and shall include (i) an explanation of the basis for the particular transfer request or transfer activity, (ii) a summary description of program funding status for the particular transfer year, and (iii) the general calculations used by the department in connection with the particular transfer request or transfer activity.

(3) A transferor entity may use any of the following funds for purposes of meeting its transfer obligations under this section:

(A) General funds of the transferor entity.

(B) Any other funds permitted by law to be used for these purposes, except that a transfer entity shall not submit to the Controller any federal funds unless those federal funds are authorized by federal law to be used to match other federal funds. In addition, no private donated funds from any health care provider, or from any person or organization affiliated with the health care provider, shall be channeled through a transferor entity or any other public entity to the fund, unless the donated funds will qualify under federal rules as a valid component of the nonfederal share of the Medi-Cal program and will be matched by federal funds. The transferor entity shall be responsible for determining that funds transferred meet the requirements of this subparagraph.

(j) (1) If a transferor entity does not submit any transfer amount within the time period specified in this section, the Controller shall offset immediately the amount owed against any funds which otherwise would be payable by the state to the transferor entity. The Controller, however, shall not impose an offset against any particular funds payable to the transferor entity where the offset would violate state or federal law.

(2) Where a withhold or a recoupment occurs pursuant to the provisions of paragraph (2) of subdivision (r) of Section 14105.98, the nonfederal portion of the amount in question shall remain in the fund, or shall be redeposited in the fund by the department, as applicable. The department shall then proceed as follows:

(A) If the withhold or recoupment was imposed with respect to a hospital whose licensee was a transferor entity for the particular state fiscal year to which the withhold or recoupment related, the nonfederal portion of the amount withheld or recouped shall serve as a credit for the particular transferor entity against an equal amount of transfer obligations under this section, to be applied whenever the transfer obligations next arise. Should no such transfer obligation arise within 180 days, the department shall return the funds in question to the particular transferor entity within 30 days thereafter.

(B) For other situations, the withheld or recouped nonfederal portion shall be subject to paragraph (7) of subdivision (h).

(k) All transfer amounts received by the Controller or amounts offset by the Controller shall immediately be deposited in the fund.

(l) For purposes of this section, the disproportionate share list utilized by the department for a particular transfer year shall be identical to the disproportionate share list utilized by the department for the same state fiscal year for purposes of Section 14105.98. Nothing on a disproportionate share list, once issued by the department, shall be modified for any reason other than mathematical or typographical errors or omissions on the part of the department or the Office of Statewide Health Planning and Development in preparation of the list.

95

Case 1:01-cv-12257-PBS   Document 6792-5   Filed 12/21/09   Page 58 of 83

(m) Neither the intergovernmental transfers required by this section, nor any elective transfer made pursuant to Section 14164, shall create, lead to, or expand the health care funding or service obligations for current or future years for any transferor entity, except as required of the state by this section or as may be required by federal law, in which case the state shall be held harmless by the transferor entities on a pro rata basis.

(n) Except as otherwise permitted by state and federal law, no transfer amount submitted to the Controller under this section, and no offset by the Controller pursuant to subdivision (j), shall be claimed or recognized as an allowable element of cost in Medi-Cal cost reports submitted to the department.

(o) Whenever additional transfer amounts are required to fund the nonfederal share of payment adjustment amounts under Section 14105.98 that are distributed after the close of the particular payment adjustment year to which the payment adjustment amounts apply, the additional transfer amounts shall be paid by the parties who were the transferor entities for the particular transfer year that was concurrent with the particular payment adjustment year. The additional transfer amounts shall be calculated under the formula that was in effect during the particular transfer year. For transfer years prior to the 1993–94 transfer year, the percentage of the additional transfer amounts available for transfer to the Health Care Deposit Fund under subdivision (d) shall be the percentage that was in effect during the particular transfer year. These additional transfer amounts shall be paid by transferor entities within 20 days after the department notifies the transferor entity in writing of the additional transfer amount to be paid.

(p) (1) Ten million dollars ($10,000,000) of the amount transferred from the Medi-Cal Inpatient Payment Adjustment Fund to the Health Care Deposit Fund due to amounts transferred attributable to years prior to the 1993–94 fiscal year is hereby appropriated without regard to fiscal years to the State Department of Health Services to be used to support the development of managed care programs under the department's plan to expand Medi-Cal managed care.

(2) These funds shall be used by the department for both of the following purposes: (A) distributions to counties or other local entities that contract with the department to receive those funds to offset a portion of the costs of forming the local initiative entity, and (B) distributions to local initiative entities that contract with the department to receive those funds to offset a portion of the costs of developing the local initiative health delivery system in accordance with the department's plan to expand Medi-Cal managed care.

95

(3) Entities contracting with the department for any portion of the ten million dollars ($10,000,000) shall meet the objectives of the department's plan to expand Medi-Cal managed care with regard to traditional and safety net providers.

(4) Entities contracting with the department for any portion of the ten million dollars ($10,000,000) may be authorized under those contracts to utilize their funds to provide for reimbursement of the costs of local organizations and entities incurred in participating in the development and operation of a local initiative.

(5) To the full extent permitted by state and federal law, these funds shall be distributed by the department for expenditure at the local level in a manner that qualifies for federal financial participation under the medicaid program.

(q) (1) Any local initiative entity that has performed unanticipated additional work for the purposes identified in subparagraph (B) of paragraph (2) of subdivision (p) resulting in additional costs attributable to the development of its local initiative health delivery system, may file a claim for reimbursement with the department for the additional costs incurred due to delays in start dates through the 1996–97 fiscal year. The claim shall be filed by the local initiative entity not later than 90 days after the effective date of the act adding this subdivision, and shall not seek extra compensation for any sum that is or could have been asserted pursuant to the contract disputes and appeals resolution provisions of the local initiative entity's respective two-plan model contract. All claims for unanticipated additional incurred costs shall be submitted with adequate supporting documentation including, but not limited to, all of the following:

(A) Invoices, receipts, job descriptions, payroll records, work plans, and other materials that identify the unanticipated additional claimed and incurred costs.

(B) Documents reflecting mitigation of costs.

(C) To the extent lost profits are included in the claim, documentation identifying those profits and the manner of calculation.

(D) Documents reflecting the anticipated start date, the actual start date, and reasons for the delay between the dates, if any.

(2) In determining any amount to be paid, the department shall do all of the following:

(A) Conduct a fiscal analysis of the local initiative entity's claimed costs.

(B) Determine the appropriate amount of payment, after taking into consideration the supporting documentation and the results of any audit.

(C) Provide funding for any such payment, as approved by the Department of Finance through the deficiency process.

95

(D)  Complete the determination required in subparagraph (B) within six months after receipt of a local initiative entity's completed claim and supporting documentation. Prior to final determination, there shall be a review and comment period for that local initiative entity.

(E)  Make reasonable efforts to obtain federal financial participation. In the event federal financial participation is not allowed for this payment, the state's payment shall be 50 percent of the total amount determined to be payable.

SEC. 89.   Section 14495.10 of the Welfare and Institutions Code is amended to read:

14495.10.   (a)  The department shall establish a pilot program to provide continuous skilled nursing care as a benefit of the Medi-Cal program, when those services are provided in accordance with an approved federal waiver meeting the requirements of subdivision (b). "Continuous skilled nursing care" means medically necessary care provided by, or under the supervision of, a registered nurse within his or her scope of practice, seven days a week, 24 hours per day, in a health facility participating in the pilot program. This care shall include a minimum of eight hours per day provided by or under the direct supervision of a registered nurse. Each health facility providing continuous skilled nursing care in the pilot program shall have a minimum of one registered nurse or one licensed vocational nurse awake and in the facility at all times.

(b)  The department shall submit to the federal Health Care Financing Administration, no later than April 1, 2000, a federal waiver request developed in consultation with the State Department of Developmental Services and the Association of Regional Center Agencies, pursuant to Section 1915(b) of the federal Social Security Act to provide continuous skilled nursing care services under the pilot program.

(c)  (1)  The pilot program shall be conducted to explore more flexible models of health facility licensure to provide continuous skilled nursing care to developmentally disabled individuals in the least restrictive health facility setting, and to evaluate the effect of the pilot program on the health, safety, and quality of life of individuals, and the cost-effectiveness of this care. The evaluation shall include a review of the pilot program by an independent agency.

(2)  Participation in the pilot program shall include 10 health facilities provided that the facilities meet all eligibility requirements. The facilities shall be approved by the department, in consultation with the State Department of Developmental Services and the appropriate regional center agencies, and shall meet the requirements of subdivision (e). Priority shall be given to facilities with four to six beds, to the extent those facilities meet all other eligibility requirements.

95

(d) Under the pilot program established in this section, a developmentally disabled individual is eligible to receive continuous skilled nursing care if all of the following conditions are met:

(1) The developmentally disabled individual meets the criteria as specified in the federal waiver.

(2) The developmentally disabled individual resides in a health facility that meets the provider participation criteria as specified in the federal waiver.

(3) The continuous skilled nursing care services are provided in accordance with the federal waiver.

(4) The continuous skilled nursing care services provided to the developmentally disabled individual do not result in costs that exceed the fiscal limit established in the federal waiver.

(e) A health facility seeking to participate in the pilot program shall provide care for developmentally disabled individuals who require the availability of continuous skilled nursing care, in accordance with the terms of the pilot program. During participation in the pilot program, the health facility shall comply with all the terms and conditions of the federal waiver described in subdivision (b), and shall not be subject to licensure or inspection under Chapter 2 (commencing with Section 1250) of Division 2 of the Health and Safety Code. Upon termination of the pilot program and verification of compliance with Section 1265 of the Health and Safety Code, the department shall immediately reinstate the participating health facility's previous license for the balance of time remaining on the license when the health facility began participation in the pilot program.

(f) The department shall implement this pilot program only to the extent it can demonstrate fiscal neutrality, as required under the terms of the federal waiver, and only if the department has obtained the necessary approvals to implement the pilot program and receives federal financial participation from the federal Health Care Financing Administration.

(g) In implementing this article, the department may enter into contracts for the provision of essential administration and other services. Contracts entered into under this section may be on a noncompetitive bid basis and shall be exempt from the requirements of Chapter 2 (commencing with Section 10290) of Part 2 of Division 2 of the Public Contract Code.

(h) This section shall remain in effect only until January 1, 2006, and as of that date is repealed, unless a later enacted statute that becomes effective on or before January 1, 2006, deletes or extends that date.

SEC. 90.   Section 16809 of the Welfare and Institutions Code, as amended by Section 45 of Chapter 171 of the Statutes of 2001, is amended to read:

95

16809.    (a) (1)  The board of supervisors of a county that contracted with the department pursuant to Section 16709 during the 1990–91 fiscal year and any county with a population under 300,000, as determined in accordance with the 1990 decennial census, by adopting a resolution to that effect, may elect to participate in the County Medical Services Program.  The County Medical Services Program shall have responsibilities for specified health services to county residents certified eligible for those services by the county.

(2) If the County Medical Services Program Governing Board contracts with the department to administer the County Medical Services Program, that contract shall include, but need not be limited to, all of the following:

(A)  Provisions for the payment to participating counties for making eligibility determinations based on the formula used by the County Medical Services Program for the 1993–94 fiscal year.

(B)  Provisions for payment of expenses of the County Medical Services Program Governing Board.

(C)  Provisions relating to the flow of funds from counties' vehicle license fees, sales taxes, and participation fees and the procedures to be followed if a county does not pay those funds to the program.

(D)  Those provisions, as applicable, contained in the 1993–94 fiscal year contract with counties under the County Medical Services Program.

(3)  The contract between the department and the County Medical Services Program Governing Board shall require that the County Medical Services Program Governing Board shall reimburse three million five hundred thousand dollars ($3,500,000) for the state costs of providing administrative support to the County Medical Services Program. The department may decline to implement decisions made by the governing board that would require a greater level of administrative support than that for the 1993–94 fiscal year. The department may implement decisions upon compensation by the governing board to cover that increased level of support.

(4)  The contract between the department and the County Medical Services Program Governing Board may include provisions for the administration of a pharmacy benefit program and, pursuant to these provisions, the department may negotiate, on behalf of the County Medical Services Program, rebates from manufacturers that agree to participate. The governing board shall reimburse the department for staff costs associated with this paragraph.

(5)  The department shall administer the County Medical Services Program pursuant to the provisions of the 1993–94 fiscal year contract with the counties and regulations relating to the administration of the program until the County Medical Services Program Governing Board

95

executes a contract for the administration of the County Medical Services Program and adopts regulations for that purpose.

(6) The department shall not be liable for any costs related to decisions of the County Medical Services Program Governing Board that are in excess of those set forth in the contract between the department and the County Medical Services Program Governing Board.

(b) Each county intending to participate in the County Medical Services Program pursuant to this section shall submit to the Governing Board of the County Medical Services Program a notice of intent to contract adopted by the board of supervisors no later than April 1 of the fiscal year preceding the fiscal year in which the county will participate in the County Medical Services Program.

(c) A county participating in the County Medical Services Program pursuant to this section shall not be relieved of its indigent health care obligation under Section 17000.

(d) (1) The County Medical Services Program Account is established in the County Health Services Fund. The County Medical Services Program Account is continuously appropriated, notwithstanding Section 13340 of the Government Code, without regard to fiscal years. The following amounts may be deposited in the account:

(A) Any interest earned upon money deposited in the account.

(B) Moneys provided by participating counties or appropriated by the Legislature to the account.

(C) Moneys loaned pursuant to subdivision (q).

(2) The methods and procedures used to deposit funds into the account shall be consistent with the methods used by the program during the 1993–94 fiscal year.

(e) Moneys in the program account shall be used by the department, pursuant to its contract with the County Medical Services Program Governing Board, to pay for health care services provided to the persons meeting the eligibility criteria established pursuant to subdivision (j) and to pay for the expense of the governing board as set forth in the contract between the board and the department. In addition, moneys in this account may be used to reimburse the department for state costs pursuant to paragraph (3) of subdivision (a).

(f) (1) Moneys in this account shall be administered on an accrual basis and notwithstanding any other provision of law, except as provided in this section, shall not be transferred to any other fund or account in the State Treasury except for purposes of investment as provided in Article 4 (commencing with Section 16470) of Chapter 3 of Part 2 of Division 4 of Title 2 of the Government Code.

(2) (A) All interest or other increment resulting from the investment shall be deposited in the program account, at the end of the 1982–83

95

fiscal year and every six months thereafter, notwithstanding Section 16305.7 of the Government Code.

(B) All interest deposited pursuant to subparagraph (A) shall be available to reimburse program-covered services, County Medical Services Program Governing Board expenses, or for expenditures to augment the program's rates, benefits, or eligibility criteria pursuant to subdivision (j).

(g) A separate County Medical Services Program Reserve Account is established in the County Health Services Fund. Six months after the end of each fiscal year, any projected savings in the program account shall be transferred to the reserve account, with final settlement occurring no more than 12 months later. Moneys in this account shall be utilized when expenditures for health services made pursuant to subdivision (j) for a fiscal year exceed the amount of funds available in the program account for that fiscal year. When funds in the reserve account are estimated to exceed 10 percent of the budget for health services for all counties electing to participate in the County Medical Services Program under this section for the fiscal year, the additional funds shall be available for expenditure to augment the rates, benefits, or eligibility criteria pursuant to subdivision (j) or for reducing the participation fees as determined by the County Medical Services Program Governing Board pursuant to subdivision (i). Nothing in this section shall preclude the CMSP Governing Board from establishing other reserves.

(h) Moneys in the program account and the reserve account, except for moneys provided by the state in excess of the amount required to fund the state risk specified in subdivision (j), and any funds loaned pursuant to subdivision (q) shall not be transferred to any other fund or account in the State Treasury except for purposes of investment as provided in Article 4 (commencing with Section 16470) of Chapter 3 of Part 2 of Division 4 of Title 2 of the Government Code. All interest or other increment resulting from investment shall be deposited in the program account, notwithstanding Section 16705.7 of the Government Code.

(i) (1) Counties shall pay participation fees as established by the County Medical Services Program Governing Board and their jurisdictional risk amount in a method that is consistent with that established in the 1993–94 fiscal year.

(2) A county may request, due to financial hardship, the payments under paragraph (1) be delayed. The request shall be subject to approval by the CMSP Governing Board.

(3) Payments made pursuant to this subdivision shall be deposited in the program account.

(4) Payments may be made as part of the deposits authorized by the county pursuant to Sections 17603.05 and 17604.05.

(j) (1) (A) For the 1991–92 fiscal year and all preceding fiscal years, the state shall be at risk for any costs in excess of the amounts deposited in the reserve fund.

(B) (i) Beginning in the 1992–93 fiscal year and for each fiscal year thereafter, counties and the state shall share the risk for cost increases of the County Medical Services Program not funded through other sources. The state shall be at risk for any cost that exceeds the cumulative annual growth in dedicated sales tax and vehicle license fee revenue, up to the amount of twenty million two hundred thirty-seven thousand four hundred sixty dollars ($20,237,460) per fiscal year, except for the 1999–2000, 2000–01, 2001–02, and 2002–03 fiscal years. Counties shall be at risk up to the cumulative annual growth in the Local Revenue Fund created by Section 17600, according to the table specified in paragraph (2), to the County Medical Services Program, plus the additional cost increases in excess of twenty million two hundred thirty-seven thousand four hundred sixty dollars ($20,237,460) per fiscal year, except for the 1999–2000, 2000–01, 2001–02, and 2002–03 fiscal years. In the 1994–95 fiscal year, the amount of the state risk shall be twenty million two hundred thirty-seven thousand four hundred sixty dollars ($20,237,460) per fiscal year, in addition to the cost of administrative support pursuant to paragraph (3) of subdivision (a).

(ii) For the 1999–2000, 2000–01, 2001–02, and 2002–03 fiscal years, the state shall not be at risk for any cost that exceeds the cumulative annual growth in dedicated sales tax and vehicle license fee revenue. Counties shall be at risk up to the cumulative annual growth in the Local Revenue Fund created by Section 17600, according to the table specified in paragraph (2), to the County Medical Services Program, plus any additional cost increases for the 1999–2000, 2000–01, 2001–02, and 2002–03 fiscal years.

(C) The CMSP Governing Board, after consultation with the department, shall establish uniform eligibility criteria and benefits for the County Medical Services Program.

(2) For the 1991–92 fiscal year, jurisdictional risk limitations shall be as follows:

| Jurisdiction | Amount |
|---|---|
| Alpine | $ 13,150 |
| Amador | 620,264 |
| Butte | 5,950,593 |
| Calaveras | 913,959 |
| Colusa | 799,988 |

95

Ch. 1161

| | |
|---|---:|
| Del Norte | 781,358 |
| El Dorado | 3,535,288 |
| Glenn | 787,933 |
| Humboldt | 6,883,182 |
| Imperial | 6,394,422 |
| Inyo | 1,100,257 |
| Kings | 2,832,833 |
| Lassen | 687,113 |
| Madera | 2,882,147 |
| Marin | 7,725,909 |
| Mariposa | 435,062 |
| Modoc | 469,034 |
| Mono | 369,309 |
| Napa | 3,062,967 |
| Nevada | 1,860,793 |
| Plumas | 905,192 |
| San Benito | 1,086,011 |
| Shasta | 5,361,013 |
| Sierra | 135,888 |
| Siskiyou | 1,372,034 |
| Solano | 6,871,127 |
| Sonoma | 13,183,359 |
| Sutter | 2,996,118 |
| Tehama | 1,912,299 |
| Trinity | 611,497 |
| Tuolumne | 1,455,320 |
| Yuba | 2,395,580 |

(3) Beginning in the 1991–92 fiscal year and in subsequent fiscal years, the jurisdictional risk limitation for the counties that did not contract with the department pursuant to Section 16709 during the 1990–91 fiscal year shall be the amount specified in paragraph (A) plus the amount determined pursuant to paragraph (B), minus the amount specified by the County Medical Services Program Governing Board as participation fees.

(A)

| Jurisdiction | Amount |
|---|---:|
| Lake | $1,022,963 |
| Mendocino | 1,654,999 |

| | |
|---|---|
| Merced | 2,033,729 |
| Placer | 1,338,330 |
| San Luis Obispo | 2,000,491 |
| Santa Cruz | 3,037,783 |
| Yolo | 1,475,620 |

(B)  The amount of funds necessary to fully fund the anticipated costs for the county shall be determined by the CMSP Governing Board before a county is permitted to participate in the County Medical Services Program.

(4)  For the 1994–95 and 1995–96 fiscal years, the specific amounts and method of apportioning risk to each participating county may be adjusted by the CMSP Governing Board.

(k)  The Legislature hereby determines that an expedited contract process for contracts under this section is necessary. Contracts under this section shall be exempt from Part 2 (commencing with Section 10100) of Division 2 of the Public Contract Code. Contracts of the department pursuant to this section shall have no force or effect unless they are approved by the Department of Finance.

(*l*)  The state shall not incur any liability except as specified in this section.

(m)  Third-party recoveries for services provided under this section pursuant to Article 3.5 (commencing with Section 14124.70) of Chapter 7 of Part 3 may be pursued.

(n)  Under the program provided for in this section, the department may reimburse hospitals for inpatient services at the rates negotiated for the Medi-Cal program by the California Medical Assistance Commission, pursuant to Article 2.6 (commencing with Section 14081) of Chapter 7 of Part 3, if the California Medical Assistance Commission determines that reimbursement to the hospital at the contracted rate will not have a detrimental fiscal impact on either the Medi-Cal program or the program provided for in this section. In negotiating and renegotiating contracts with hospitals, the commission may seek terms which allow reimbursement for patients receiving services under this section at contracted Medi-Cal rates.

(o)  Any hospital which has a contract with the state for inpatient services under the Medi-Cal program and which has been approved by the commission to be reimbursed for patients receiving services under this section shall not deny services to these patients.

(p)  Participating counties may conduct an independent program review to identify ways through which program savings may be generated. The counties and the department may collectively pursue identified options for the realization of program savings.

95

(q) The Department of Finance may authorize a loan of up to thirty million dollars ($30,000,000) for deposit into the program account to ensure that there are sufficient funds available to reimburse providers and counties pursuant to this section.

(r) Regulations adopted by the department pursuant to this section shall remain operative and shall be used to operate the County Medical Services Program until a contract with the County Medical Services Program Governing Board is executed and regulations, as appropriate, are adopted by the County Medical Services Program Governing Board. Notwithstanding Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code, those regulations adopted under the County Medical Services Program shall become inoperative until January 1, 1998, except those regulations that the department, in consultation with the County Medical Services Program Governing Board, determines are needed to continue to administer the County Medical Services Program. The department shall notify the Office of Administrative Law as to those regulations the department will continue to use in the implementation of the County Medical Services Program.

(s) Moneys appropriated from the General Fund to meet the state risk as set forth in subparagraph (B) of paragraph (1) of subdivision (j) shall not be available for those counties electing to disenroll from the County Medical Services Program.

(t) This section shall remain in effect only until January 1, 2008, and as of that date is repealed, unless a later enacted statute, that is enacted on or before January 1, 2008, deletes or extends that date.

SEC. 91.   Section 16809 of the Welfare and Institutions Code, as amended by Section 2 of Chapter 669 of the Statutes of 1997, is amended to read:

16809.   (a) The board of supervisors of a county that contracted with the department pursuant to Section 16709 during the 1990–91 fiscal year and any county with a population under 300,000, as determined in accordance with the 1990 decennial census, may enter into a contract with the department and the department may enter into a contract with that county under which the department agrees to administer the program responsibilities for specified health services to county residents certified eligible for those services by the county.

(b) Each county intending to contract with the department pursuant to this section shall submit to the department a notice of intent to contract adopted by the board of supervisors no later than April 1 of the fiscal year preceding the fiscal year for which the agreement will be in effect in accordance with procedures established by the department.

95

(c) A county contracting with the department pursuant to this section shall not be relieved of its indigent health care obligation under Section 17000.

(d) The department shall establish the County Medical Services Program Account in the County Health Services Fund. The County Medical Services Program Account is continuously appropriated, notwithstanding Section 13340 of the Government Code, without regard to fiscal years. The following amounts may be deposited in the account:

(1) Any interest earned upon money deposited in the account.

(2) Moneys provided by participating counties or appropriated by the Legislature to the account.

(3) Moneys loaned pursuant to subdivision (q).

(e) Moneys in the program account shall be used by the department to pay for health care services provided to the persons meeting the eligibility criteria established pursuant to subdivision (j).

(f) (1) Moneys in this account shall be administered on an accrual basis and notwithstanding any other provision of law, except as provided in this section, shall not be transferred to any other fund or account in the State Treasury except for purposes of investment as provided in Article 4 (commencing with Section 16470) of Chapter 3 of Part 2 of Division 4 of Title 2 of the Government Code.

(2) (A) All interest or other increment resulting from the investment shall be deposited in the program account, at the end of the 1982–83 fiscal year and every six months thereafter, notwithstanding Section 16305.7 of the Government Code.

(B) All interest deposited pursuant to subparagraph (A) shall be available to reimburse program-covered services, or for expenditures to augment the program's rates, benefits, or eligibility criteria pursuant to subdivision (j).

(g) The department shall establish a separate County Medical Services Program Reserve Account in the County Health Services Fund. Six months after the end of each fiscal year, any projected savings in the program account shall be transferred to the reserve account, with final settlement occurring no more than 12 months later. Moneys in this account shall be utilized when expenditures for health services made pursuant to subdivision (j) for a fiscal year exceed the amount of funds available in the program account for that fiscal year. When funds in the reserve account are estimated to exceed 10 percent of the budget for health services for all counties electing to contract with the department under this section for the fiscal year, the additional funds shall be available for expenditure to augment the rates, benefits, or eligibility criteria pursuant to subdivision (j) or for reducing the participation fees required by Section 16809.3.

95

Ch. 1161

(h) Moneys in the program account and the reserve account, except for moneys provided by the state in excess of the amount required to fund the state risk specified in subdivision (j), and any funds loaned pursuant to subdivision (q), shall not be transferred to any other fund or account in the State Treasury except for purposes of investment as provided in Article 4 (commencing with Section 16470) of Chapter 3 of Part 2 of Division 4 of Title 2 of the Government Code. All interest or other increment resulting from investment shall be deposited in the program account, notwithstanding Section 16705.7 of the Government Code.

(i) (1) Counties shall pay by the 15th of each month the agreed-upon contract amount. In the event a county does not make the agreed-upon monthly payment, the department may terminate the county's participation in the program.

(2) A county may request, due to financial hardship, the payments under paragraph (1) be delayed. The request shall be subject to approval by the Small County Advisory Committee.

(3) Payments made pursuant to this subdivision shall be deposited in the program account.

(4) Payments may be made as part of the deposits authorized by the county pursuant to Sections 17603.05 and 17604.05.

(j) (1) (A) For the 1991–92 fiscal year and all preceding fiscal years, the state shall be at risk for any costs in excess of the amounts deposited in the reserve fund.

(B) Beginning in the 1992–93 fiscal year and for each fiscal year thereafter, counties and the state shall share the risk for cost increases of the County Medical Services Program not funded through other sources. The state shall be at risk for any cost that exceeds the cumulative annual growth in dedicated sales tax and vehicle license fee revenue, up to the amount of twenty million two hundred thirty-seven thousand four hundred sixty dollars ($20,237,460) per fiscal year, except for the 2002–03 fiscal year. Counties shall be at risk up to the cumulative annual growth in the Local Revenue Fund created by Section 17600 according to the table specified in paragraph (2) to the County Medical Services Program, plus additional cost increases in excess of twenty million two hundred thirty-seven thousand four hundred sixty dollars ($20,237,460) per fiscal year.

(C) As a condition of the state assuming this risk, the department may require uniform eligibility criteria and benefits to be provided which shall be mutually established by participating counties in conjunction with the department. The County Medical Services Program Governing Board may revise these eligibility criteria and benefits or alter rates of payment in order to assure that expenditures do not exceed the funds available in the program account.

Ch. 1161 — 144 —

(2) For the 1991–92 fiscal year, jurisdictional risk limitations shall be as follows:

| Jurisdiction | Amount |
|---|---|
| Alpine | $ 13,150 |
| Amador | 620,264 |
| Butte | 5,950,593 |
| Calaveras | 913,959 |
| Colusa | 799,988 |
| Del Norte | 781,358 |
| El Dorado | 3,535,288 |
| Glenn | 787,933 |
| Humboldt | 6,883,182 |
| Imperial | 6,394,422 |
| Inyo | 1,100,257 |
| Kings | 2,832,833 |
| Lassen | 687,113 |
| Madera | 2,882,147 |
| Marin | 7,725,909 |
| Mariposa | 435,062 |
| Modoc | 469,034 |
| Mono | 369,309 |
| Napa | 3,062,967 |
| Nevada | 1,860,793 |
| Plumas | 905,192 |
| San Benito | 1,086,011 |
| Shasta | 5,361,013 |
| Sierra | 135,888 |
| Siskiyou | 1,372,034 |
| Solano | 6,871,127 |
| Sonoma | 13,183,359 |
| Sutter | 2,996,118 |
| Tehama | 1,912,299 |
| Trinity | 611,497 |
| Tuolumne | 1,455,320 |
| Yuba | 2,395,580 |

(3) Beginning in the 1991–92 fiscal year and in subsequent fiscal years, the jurisdictional risk limitation for the counties that did not contract with the department pursuant to Section 16709 during the

95

1990–91 fiscal year shall be the amount specified in paragraph (A) plus the amount determined pursuant to paragraph (B), minus the amount specified in Section 16809.3.

(A)

| Jurisdiction | Amount |
| --- | --- |
| Lake | 1,022,963 |
| Mendocino | 1,654,999 |
| Merced | 2,033,729 |
| Placer | 1,338,330 |
| San Luis Obispo | 2,000,491 |
| Santa Cruz | 3,037,783 |
| Yolo | 1,475,620 |

(B) The amount of funds necessary to fully fund the anticipated costs for the county shall be determined by the department. This amount shall be subject to the approval of both the Department of Finance and the Small County Advisory Committee before a county is permitted to contract back with the department.

(4) For the 1992–93 fiscal year and fiscal years thereafter, the amounts of the jurisdictional risk limitations shall be adjusted according to the provisions of paragraph (2).

(k) The Legislature hereby determines that an expedited contract process for contracts under this section is necessary. Contracts under this section shall be exempt from the provisions of Chapter 2 (commencing with Section 10290) of Part 2 of Division 2 of the Public Contract Code. Contracts shall have no force and effect unless approved by the Department of Finance.

(*l*) The state shall not incur any liability except as specified in this section.

(m) The department may pursue third-party recoveries for services provided under this section pursuant to Article 3.5 (commencing with Section 14124.70) of Chapter 7 of Part 3.

(n) Under the program provided for in this section, the department shall reimburse hospitals for inpatient services at the rates negotiated for the Medi-Cal program by the California Medical Assistance Commission, pursuant to Article 2.6 (commencing with Section 14081) of Chapter 7 of Part 3, if the California Medical Assistance Commission determines that reimbursement to the hospital at the contracted rate will not have a detrimental fiscal impact on either the Medi-Cal program or the program provided for in this section. In negotiating and renegotiating contracts with hospitals, the commission may seek terms which allow

reimbursement for patients receiving services under this section at contracted Medi-Cal rates.

(o) Any hospital which has a contract with the state for inpatient services under the Medi-Cal program and which has been approved by the commission to be reimbursed for patients receiving services under this section shall not deny services to these patients.

(p) Participating counties may conduct an independent program review to identify ways through which program savings may be generated. The counties and the department shall collectively pursue identified options for the realization of program savings.

(q) The Department of Finance may authorize a loan of up to thirty million dollars ($30,000,000) for deposit into the program account to ensure that there are sufficient funds available to reimburse providers and counties pursuant to this section.

(r) This section shall become operative January 1, 2008.

SEC. 91.5.    Section 16809.4 of the Welfare and Institutions Code is amended to read:

16809.4.    (a) Counties voluntarily participating in the County Medical Services Program pursuant to Section 16809 may establish the County Medical Services Program Governing Board pursuant to procedures contained in this section. The board shall govern the CMSP program.

(b) The membership of the board shall be comprised of all of the following:

(1) Three members who shall each be a member of a county board of supervisors.

(2) Three members who shall be county administrative officers.

(3) Two members who shall be county welfare directors.

(4) Two members who shall be county health officials.

(5) One member who shall be the Secretary of the Health and Welfare Agency, or his or her designee, and who shall serve as an ex officio, nonvoting member.

(c) The board may establish its own bylaws and operating procedures.

(d) The voting membership of the board shall meet all of the following requirements:

(1) All of the members hold office or employment in counties that participate in the CMSP program.

(2) The initial CMSP Governing Board shall be composed of the incumbent members of the Small County Advisory Committee holding office on the effective date of this section. Those members shall choose one additional county supervisor and one additional county administrative officer. The initial CMSP Governing Board shall hold office until April 1, 1995.

(3) The initial CMSP Governing Board shall be succeeded on April 1, 1995, by a board chosen in the following order so as to ensure that no two representatives shall be from the same county.

Following the effective date of this section:

(A) The three county supervisor members shall be elected by the CMSP counties acting prior to February 1, 1995, with each county having one vote and convened at the call of the Chair of the CMSP Governing Board.

(B) The three county administrative officers shall be elected by the administrative officers of the CMSP counties convened at the call of the Chair of the CMSP Governing Board prior to February 15, 1995.

(C) The two county health officials shall be selected by the health officials of the CMSP counties convened at the call of the Chair of the CMSP Governing Board prior to March 1, 1995.

(D) The two county welfare directors shall be elected by the welfare directors of the CMSP counties convened at the call of the Chair of the CMSP Governing Board prior to March 15, 1995.

(4) Board members shall serve three-year terms.

(5) No two persons from the same county may serve as members of the board at the same time.

(e) (1) The board shall convene its first meeting at the call of the Chair of the Small County Advisory Committee, who shall serve as interim chairperson of the board.

(2) The board may elect a permanent chair.

(f) (1) The CMSP Governing Board is hereby established with the following powers:

(A) Determine program eligibility and benefit levels.

(B) Establish reserves and participation fees.

(C) Establish procedures for the entry into, and disenrollment of counties from the County Medical Services Program. Disenrollment procedures shall be fair and equitable.

(D) Establish cost containment and case management procedures, including, but not limited to, alternative methods for delivery of care and alternative methods and rates for those authorized by the department.

(E) Sue and be sued in the name of the CMSP Governing Board.

(F) Apportion jurisdictional risk to each county.

(G) Utilize procurement policies and procedures of any of the participating counties as selected by the governing board.

(H) Make rules and regulations.

(I) Make and enter into contracts or stipulations of any nature with a public agency or person for the purposes of governing or administering the CMSP.

(J) Purchase supplies, equipment, materials, property, or services.

(K)  Appoint and employ staff to assist the CMSP Governing Board.

(L)  Establish rules for its proceedings.

(M)  Accept gifts, contributions, grants, or loans from any public agency or person for the purposes of this program.

(N)  Negotiate and set rates, charges, or fees with service providers, including alternative methods of payment to those used by the department.

(O)  Establish methods of payment that are compatible with the administrative requirements of the department's fiscal intermediary during the term of any contract with the department for the administration of the CMSP.

(P)  Use generally accepted accounting procedures.

(2)  The Legislature finds and declares that the amendment of subparagraph (N) of paragraph (1) in 1995 is declaratory of existing law.

(g)  (1)  The CMSP Governing Board shall be considered a "public entity" for purposes of Division 3.6 (commencing with Section 810) of Title 1 of the Government Code, and a "local public entity" for purposes of Part 3 (commencing with Section 900) of Division 3.6 of Title 1 of the Government Code, but shall not be considered a "state agency" for purposes of Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code and shall be exempt from that chapter. No participating county shall have any liability for civil judgments awarded against the County Medical Services Program or the board. Nothing in this paragraph shall be construed to expand the liability of the state with respect to the County Medical Services Program beyond that set forth in Section 16809. Nothing in this paragraph shall be construed to relieve any county of the obligation to provide health care to indigent persons pursuant to Section 17000.

(2)  Before initiating any proceeding to challenge rates of payment, charges, or fees set by the board, to seek reimbursement or release of any funds from the County Medical Services Program, or to challenge any other action by the board, any prospective claimant shall first notify the board, in writing, of the nature and basis of the challenge and the amount claimed. The board shall consider the matter within 60 days after receiving the notice and shall promptly thereafter provide written notice of the board's decision. This paragraph shall have no application to provider audit appeals conducted pursuant to Article 1.5 (commencing with Section 51016) of Chapter 3 of Division 3 of Title 22 of the California Code of Regulations and shall apply to all claims not reviewed pursuant to Sections 51003 or 51015 of Title 22 of the California Code of Regulations.

(3) All regulations adopted by the CMSP Governing Board shall clearly specify by reference the statute, court decision, or other provision

95

of law that the governing board is seeking to implement, interpret, or make specific by adopting, amending, or repealing the regulation.

(4) No regulation adopted by the governing board is valid and effective unless the regulation meets the standards of necessity, authority, clarity, consistency, and nonduplication, as defined in paragraph (4).

(5) The following definitions govern the interpretation of this subdivision:

(A) "Necessity" means the record of the regulatory proceeding that demonstrates by substantial evidence the need for the regulation. For purposes of this standard, evidence includes, but is not limited to, facts, studies, and expert opinion.

(B) "Authority" means the provision of law that permits or obligates the CMSP Governing Board to adopt, amend, or repeal a regulation.

(C) "Clarity" means that the regulation is written or displayed so that the meaning of the regulation can be easily understood by those persons directly affected by it.

(D) "Consistency" means being in harmony with, and not in conflict with, or contradictory to, existing statutes, court decisions, or other provisions of law.

(E) "Nonduplication" means that a regulation does not serve the same purpose as a state or federal statute or another regulation. This standard requires that the governing board identify any state or federal statute or regulation that is overlapped or duplicated by the proposed regulation and justify any overlap or duplication. This standard is not intended to prohibit the governing board from printing relevant portions of enabling legislation in regulations when the duplication is necessary to satisfy the clarity standard in subparagraph (C). This standard is intended to prevent the indiscriminate incorporation of statutory language in a regulation.

(h) The requirements of the Ralph M. Brown Act (Chapter 9 (commencing with Section 54950) of Part 1 of Division 2 of Title 5 of the Government Code) shall apply to the meetings of the CMSP Governing Board, except as otherwise provided in this subdivision. The board may meet in closed session to consider and take action on matters pertaining to contracts and contract negotiations with providers of health care services. The governing board shall comply with the following procedures for public meetings held to eliminate or reduce the level of services, restrict eligibility for services, or adopt regulations:

(1) Provide prior public notice of those meetings.

(2) Provide that notice not less than 30 days prior to those meetings.

(3) Publish that notice in a newspaper of general circulation in each participating CMSP county.

(4) Include in the notice, at a minimum, the amount and type of each proposed change, the expected savings, and the number of persons affected.

(5) Hold those meetings in the county seats of at least four regionally distributed CMSP participating counties.

(6) Locate those meetings so as to provide that each hearing will be within a four-hour one-way drive of one quarter of the target population so that the four meetings shall be held at locations in the state that will ensure that each member of the target population may reach at least one of the meetings by a one-way drive that does not exceed four hours.

(i) Records of the County Medical Services Program and of the CMSP Governing Board that relate to rates of payment or to the board's negotiations with providers of health care services or to the board's deliberative processes regarding either shall not be subject to disclosure pursuant to the Public Records Act (Chapter 5 (commencing with Section 6250) of Division 7 of Title 1 of the Government Code).

(j) The following definitions shall govern the construction of this part, unless the context requires otherwise:

(1) "CMSP Governing Board" means the County Medical Services Program Governing Board established pursuant to this section.

(2) "Board" means the County Medical Services Program Governing Board established pursuant to this section.

(3) "CMSP" means the program by which health care services are provided to eligible persons in those counties electing to participate in the CMSP pursuant to Section 16809.

(4) "CMSP county" means a county that has elected to participate pursuant to Section 16809 in the CMSP.

(k) Any references to the "County Medical Services Program" or "CMSP county" in this code shall be defined as set forth in this section.

(l) This section shall remain in effect only until January 1, 2008, and as of that date is repealed, unless a later enacted statute, that is enacted on or before January 1, 2008, deletes or extends that date.

SEC. 92.   Section 18925 of the Welfare and Institutions Code is amended to read:

18925.   (a) The State Department of Health Services, in conjunction with the State Department of Social Services, shall implement a simplified eligibility process as part of the Food Stamp Program to expedite Medi-Cal program and Healthy Families Program enrollment for Food Stamp Program recipients, including children and their eligible parents or caretaker relatives who are not enrolled in those programs.

(b) Each county welfare department shall develop a data list of family members residing in eligible food stamp households who are not enrolled in the Medi-Cal program or the Healthy Families Program.

(c)  The county welfare department shall develop a notice informing individuals identified pursuant to subdivision (b) that they may be entitled to receive benefits under the Medi-Cal program or the Healthy Families Program.

(d)  At the time of the food stamp household's annual recertification, the county welfare department shall send the notice specified in subdivision (c) to the individuals identified in subdivision (b). The notice shall include a request for permission to use the information in the food stamp recipient's case file to make a determination of eligibility for the Medi-Cal program and the Healthy Families Program.

(e)  The notice shall be written in culturally and linguistically appropriate language and at an appropriate literacy level. The notice shall include information on the Medi-Cal program and the Healthy Families Program, and a telephone number that food stamp recipients may call for additional information.

(f)  To apply for medical assistance under the Medi-Cal program, the food stamp recipient shall sign, date, and return the notice requesting that an eligibility determination be made. Upon receipt of the notice, the county welfare department shall make an eligibility determination by utilizing the information in the food stamp recipient's case file or paper application. The Medi-Cal application date shall be the date the notice is received by the county welfare department. If the food stamp case file does not include sufficient information to establish Medi-Cal program eligibility, the county welfare department shall request, either orally or in writing, additional information from the food stamp recipient.

(g)  If the food stamp recipient is determined to be eligible to participate in the Medi-Cal program with a share of cost, or is determined to be ineligible for Medi-Cal, information pertinent to the food stamp recipient's eligibility for the Healthy Families Program shall be forwarded by the county welfare department to the Healthy Families Program statewide administrator for immediate processing. If there is insufficient information to establish Healthy Families Program eligibility, the administrator shall request, either orally or in writing, additional information from the food stamp recipient.

(h)  Counties shall include the cost of implementing this section in their annual administrative budget requests to the State Department of Health Services.

(i)  This section shall be implemented on or after July 1, 2003, but only to the extent federal financial participation is available.

SEC. 93.  The State Department of Health Services may adopt emergency regulations to implement the applicable provisions of this act in accordance with the rulemaking provisions of the Administrative Procedure Act (Chapter 3.5 (commencing with Section 11340) of Part

95

1 of Division 3 of Title 2 of the Government Code). The initial adoption of emergency regulations and one readoption of the initial regulations shall be deemed to be an emergency and necessary for the immediate preservation of the public peace, health, or general welfare. Initial emergency regulations and the first readoption of those regulations shall be exempt from review by the Office of Administrative Law. The initial emergency regulations and the first readoption of those regulations authorized by this section shall be submitted to the Office of Administrative Law for filing with the Secretary of State and publication in the California Code of Regulations and each shall remain in effect for no more than 180 days.

SEC. 94.   The department may not recoup any overpayment made to a provider before October 1, 2002, pursuant to Section 14109 of the Welfare and Institutions Code for ambulance transport services, if the overpayment is not due to the fault of the provider.

SEC. 95.   (a) The State Department of Health Services shall complete the design and implementation of the Children's Medical Services Network (CMS Net) Enhancement 47 project to ensure that all system enhancements for CMS Net, the California Medicaid Management Information System (CA-MMIS), and the California Dental Management Information System (CD-MMIS) that are required to enable providers in the California Children's Services (CCS) provider network to submit electronic claims for reimbursement for services provided to CCS eligible children are operational by August 1, 2004.

(b) The department shall work in cooperation with county CCS programs that are not yet participating in CMS Net to take all necessary action within available resources to expedite the transition of these county programs to CMS Net for the provision of automated case management and service authorization for all CCS eligible children in their county caseload.

SEC. 96.   (a) The California Health and Human Services Agency shall develop a comprehensive plan describing the actions that California may take to improve its long-term care system so that its residents have available an array of community care options that allow them to avoid unnecessary institutionalization. The plan shall respond to the decision of the United States Supreme Court in Olmstead v. L.C. (1999) 527 U.S. 581 and shall embody the six principles for an "Olmstead Plan" as articulated by the federal Center for Medicaid and Medicare Services. These principles include:

(1) A comprehensive, effectively working plan.

(2) A plan development and implementation process that provides for the involvement of consumers and other stakeholders.

(3) The development of assessment procedures and practices that prevent or correct current and future unjustified institutionalization of persons with disabilities.

(4) An assessment of the current availability of community-integrated services, identification of gaps in service availability, and evaluation of changes that could be made to enable consumers to be served in the most integrated setting possible.

(5) The inclusion in the plan of practices by which consumers are afforded the opportunity to make informed choices among the services available to them.

(6) Elements in the plan that ensure that services are provided in the most integrated setting appropriate and that the quality of services meets the needs of the consumers.

(b) The plan required under subdivision (a) shall be submitted to the Legislature on or before April 1, 2003.

SEC. 97.   It is the intent of the Legislature that a significant portion of funds received in the 2003–04 fiscal year and subsequent fiscal years, due to increased federal financial participation attributable to the medicaid home- and community-based waiver program under Section 1396n of Title 42 of the United States Code or other similar initiatives, shall be used to increase the rates for community-based providers serving individuals with developmental disabilities and other actions related to expanding and improving services and supports. The purpose of these fund adjustments shall be to increase community living options, provide expanded consumer choice, provide for increased health and physical safety, and improve the overall stability of community-based services and supports.

SEC. 98.   The State Department of Developmental Services shall ensure that funds appropriated in Item 4300-101-0001 of the Budget Act of 2002 to address concerns regarding the potential underfunding of regional center operations shall be used by each regional center toward achieving and maintaining service coordinator caseloads, as contained in subdivision (c) of Section 4640.6 of the Welfare and Institutions Code. In addition, these funds may be used to provide for increased clinical staff as necessary to meet requirements under the federal home- and community-based waiver program (42 U.S.C. Sec. 1396n).

SEC. 99.   The State Department of Developmental Services shall ensure that funds appropriated in Item 4300-101-0001 of the Budget Act of 2002 for the purpose of funding a federal program coordinator position at each regional center will be used only for that purpose. This position shall address issues pertaining to federally funded programs serving individuals with developmental disabilities as appropriate, including the home- and community-based waiver program (42 U.S.C.

95

Sec. 1396n), as well as seeking increased federal financial participation when practicable.

SEC. 100.   (a)  Of the amount appropriated in Item 4300-101-0001 of the Budget Act of 2002, up to five million six hundred thousand dollars ($5,600,000) may be used to provide one-time only grant awards to community-based service providers to conduct resource development activities for hard-to-serve populations, including dual diagnosis, and medically and behaviorally challenged individuals who have been identified through the community placement plan process as being appropriate for community placement and whose needs cannot otherwise be met within the existing array of service options in the community.

(b)  The grant awards shall be allocated pursuant to subdivision (a) by the State Department of Developmental Services with the intent to improve the quality of local services and to stabilize service systems. Regional centers may serve as the fiscal agent for these one-time grants.

SEC. 101.   (a)  Of the amount appropriated in Item 4260-111-0001 of the Budget Act of 2002 from the Cigarette and Tobacco Products Surtax Fund, twenty-four million eight hundred three thousand dollars ($24,803,000) shall be allocated in accordance with subdivision (b) for the 2002–03 fiscal year from the following accounts:

(1)  Nine million fifteen thousand dollars ($9,015,000) from the Hospital Services Account.

(2)  Two million three hundred twenty-eight thousand dollars ($2,328,000) from the Physician Services Account.

(3)  Thirteen million four hundred sixty thousand dollars ($13,460,000) from the Unallocated Account.

(b)  The funds specified in subdivision (a) shall be allocated proportionately as follows:

(1)  Twenty-two million three hundred twenty-four thousand dollars ($22,324,000) shall be administered and allocated for distribution through the California Healthcare for Indigents Program (CHIP), Chapter 5 (commencing with Section 16940) of Part 4.7 of Division 9 of the Welfare and Institutions Code.

(2)  Two million four hundred seventy-nine thousand dollars ($2,479,000) shall be administered and allocated through the rural health services program, Chapter 4 (commencing with Section 16930) of Part 4.7 of Division 9 of the Welfare and Institutions Code.

(c)  Funds allocated by this section from the Physician Services Account and the Unallocated Account in the Cigarette and Tobacco Products Surtax Fund shall be used only for the reimbursement of uncompensated emergency services, as defined in Section 16953 of the Welfare and Institutions Code. Funds shall be transferred to the

95

Physician Services Account in the county Emergency Medical Services Fund established pursuant to Sections 16951 and 16952 of the Welfare and Institutions Code.

(d) Funds allocated by this section from the Hospital Services Account in the Cigarette and Tobacco Products Surtax Fund shall be used only for reimbursement of uncompensated emergency services, as defined in Section 16953 of the Welfare and Institutions Code, provided in general acute care hospitals providing basic, comprehensive, or standby emergency services. Reimbursement for emergency services shall be consistent with Section 16952 of the Welfare and Institutions Code.

SEC. 102.   Notwithstanding any other provision of law, the unencumbered balances, as of June 30, 2002, of the amounts appropriated in Item 4260-001-0589 of Chapter 50 of the Statutes of 1999, Item 4260-001-0589 of Chapter 52 of the Statutes of 2000, and Item 4260-001-0589 of Chapter 106 of the Statutes of 2001 are hereby reappropriated for the purposes specified in those items, and shall be available for encumbrance and expenditure until July 30, 2005.

SEC. 103.   (a)   In order to implement changes in the level of funding for Medi-Cal services in the Budget Act of 2002, effective August 1, 2002, the Director of Health Services shall eliminate all provider rate increases that were provided, effective August 1, 2000, for services rendered in the Medi-Cal program, except for the supplemental rate for the California Children's Services Program, home health services, shift nursing, nonemergency medical transportation, and family planning physician services. The director shall take this action pursuant to the rate-setting authority provided under subdivision (a) of Section 14105 of the Welfare and Institutions Code. The director shall also conform the rates for the same services rendered by the same provider types in non-Medi-Cal programs pursuant to Section 14105.18 of the Welfare and Institutions Code to those paid in the Medi-Cal program, absent regulations adopted pursuant to subdivision (c) of Section 14105.18 of the Welfare and Institutions Code. The rates for managed health care plans shall be reduced by the actuarial equivalent amount of the provider rate reductions made by this section at the time of the plan's next rate determination.

(b) For purposes of this section, "provider" means any provider participating in the Medi-Cal program that received a rate increase, effective August 1, 2000, but does not include the following:

(1) A general acute care hospital as defined in subdivision (a) of Section 1250 of the Health and Safety Code.

(2) A skilled nursing facility as defined in subdivision (c) of Section 1250 of the Health and Safety Code.

95

(3)  An intermediate care facility/developmentally disabled as defined in subdivision (g) of Section 1250 of the Health and Safety Code.

(4)  An intermediate care facility/developmentally disabled habilitative as defined in subdivision (e) of Section 1250 of the Health and Safety Code.

(5)  An intermediate care facility/developmentally disabled-nursing as defined in subdivision (h) of Section 1250 of the Health and Safety Code.

(6)  An adult day health care center as defined in subdivision (b) of Section 1570.7 of the Health and Safety Code.

SEC. 104.   It is the intent of the Legislature that, in implementing Section 14105.33 of the Welfare and Institutions Code during the 2002–03 fiscal year, the Director of Health Services shall direct the department to negotiate as aggressively as necessary to achieve savings levels related to pharmaceutical contracting identified in the Budget Act of 2002.

SEC. 105.   Notwithstanding Section 17610 of the Government Code, if the Commission on State Mandates determines that this act contains costs mandated by the state, reimbursement to local agencies and school districts for those costs shall be made pursuant to Part 7 (commencing with Section 17500) of Division 4 of Title 2 of the Government Code. If the statewide cost of the claim for reimbursement does not exceed one million dollars ($1,000,000), reimbursement shall be made from the State Mandates Claims Fund.

SEC. 106.   This act is an urgency statute necessary for the immediate preservation of the public peace, health, or safety within the meaning of Article IV of the Constitution and shall go into immediate effect. The facts constituting the necessity are:

In order to make necessary statutory changes to implement the Budget Act of 2002 at the earliest possible time, it is necessary that this act go into immediate effect.

O