# Exhibit 2

*State of California ex rel. Ven-A-Care of the Florida Keys, Inc.*
*v. Abbott Laboratories, Inc., et al.*, **Master Civil Action No. 01-12257-PBS,**
**Subcategory Case No. 06-11337**

**Exhibit to the December 21, 2009 Declaration of Sarah L. Reid in Support of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment**

Page 1

```
 1                 UNITED STATES DISTRICT COURT

 2                   DISTRICT OF MASSACHUSETTS

 3      ---------------------------------X

 4      IN RE PHARMACEUTICAL INDUSTRY    )

 5      AVERAGE WHOLESALE PRICE LITIGATION)

 6      ---------------------------------X Volume 1

 7      THIS DOCUMENT RELATES TO:        ) MDL NO. 1456

 8      The City of New York, et al.,    ) Civil Action

 9         V.                            ) No. 01-12257-PBS

10      Abbott Laboratories, et al.      )

11      ---------------------------------X

12      THIS DOCUMENT RELATES TO:        )

13      State of California, ex rel.     )

14      Ven-A-Care v. Abbott Laboratories,)

15      Inc., et al., Case No.           )

16      03-cv-11226-PBS                  )

17      ---------------------------------X

18                  THURSDAY, MAY 15, 2008

19          DEPOSITION OF DEY, L.P. AND DEY, INC.

20                    BY PAMELA MARRS

21      Reported By:  CAROL NYGARD DROBNY, CSR No. 4018

22               Registered Merit Reporter
```

Page 78

```
 1                MR. AZORSKY:  Okay.
 2                THE WITNESS:  What the complexities of
 3    that are I don't know, because we don't,
 4    obviously, have access to the wholesaler data.
 5    BY MR. AZORSKY:
 6        Q.   Well, you -- in fact, Dey does have
 7    access to certain information about the price at
 8    which its drugs are sold by wholesalers, and that
 9    involves perhaps the distinction between direct
10    sales and indirect sales; is that correct?
11                MR. DOYLE:  Objection as to form.
12                THE WITNESS:  No.  Actually, we don't -
13    - we don't have visibility as to what price the
14    wholesaler sells our product to what you're
15    referring to as indirect sales or our contract
16    customers.
17                What we know is that we get a
18    chargeback from the wholesaler, but it's my
19    understanding that the wholesaler then takes that
20    contract price -- let's say we have a contract
21    with a hospital at $10.
22                We get a chargeback for the difference
```

 1   between the contract price and the price on the
 2   invoice that the wholesaler paid.  So that's what
 3   we know.
 4            What we don't know is when the
 5   wholesaler then sells that product out to the
 6   hospital what kind of mark-up they add, because,
 7   obviously, they have to add some type of mark-up
 8   or they wouldn't stay in business.  We don't have
 9   visibility as to what they ultimately sell it to
10   the customer for.
11   BY MR. AZORSKY:
12      Q.   So the one aspect of the wholesaler's
13   price to the provider that you're not -- you,
14   Dey, is not privy to is the mark-up by the
15   wholesaler?
16            MR. DOYLE:  Objection as to form.
17   BY MR. AZORSKY:
18      Q.   Is that what you're saying?
19      A.   Well, we don't -- we don't know what
20   happens to the transaction after it leaves the
21   wholesaler.
22            We know that we get a -- a report or

Dey, L.P. and Dey, Inc. (Pamela Marrs)      Napa, CA      May 15, 2008

Page 129

```
 1    different customer categories, there were
 2    individual price sheets.
 3              So there would be a price sheet for
 4    wholesale, a price sheet for retail.
 5              Like I said, it became meaningless
 6    because, you know, it became a negotiation point,
 7    but this was really the summarization of those
 8    list price sheets so that one -- they appeared
 9    all in one place.
10              It was an internal document that just
11    summarized that information.
12        Q.    Were prices to wholesalers uniform
13    across -- different wholesalers so that WAC was
14    the same regardless of which wholesaler a drug
15    was being sold to?
16              MR. DOYLE:  Objection as to form.
17              THE WITNESS:  Generally speaking, as
18    far as I know, we've -- the wholesale price has
19    always been the same for different wholesalers,
20    McKesson, Cardinal, et cetera, et cetera.
21    BY MR. AZORSKY:
22        Q.    And when setting an AWP for a drug to
```

Dey, L.P. and Dey, Inc. (Pamela Marrs)                                May 15, 2008

Napa, CA

Page 130

1   be reported to the pricing compendia at the time

2   a generic product was launched, it was Dey's

3   practice to set AWP at or near 10 percent below

4   the brand AWP; is that correct?

5        A.   It's my understanding that that was the

6   guidance that was given to us by First DataBank.

7   Ed Edelstein had a conversation or maybe it was a

8   memo, I don't recall which, with Bob Mozak, and

9   that was the guidance that was given in terms of

10  how to establish an AWP for a generic product at

11  launch.

12       Q.   Do you know exactly what Mr. Edelstein

13  said to anyone at Dey in that regard?

14            MR. DOYLE:  Objection as to form.

15            THE WITNESS:  I don't know exactly.

16            I've seen it -- I've heard it referred

17  to with Bob when he was at Dey.

18            I've seen it referred to in a

19  deposition, but -- I didn't personally have the

20  conversation or see the document, if there was

21  one, issued by First DataBank.

22  BY MR. AZORSKY:

Dey, L.P. and Dey, Inc. (Pamela Marrs)  
Napa, CA  
May 15, 2008

Page 132

```
 1   throughout my time in preparing for various
 2   depositions that's what I've always been told by
 3   -- Bob specifically, but, you know, I've heard it
 4   from other people as well.
 5        Q.   And has it historically been typically
 6   the case that Dey does not change the AWP once
 7   it's been set at the time of launch of a new
 8   product?
 9        A.   For generic products, that's correct.
10             It's, again, my understanding that
11   that's an industry practice, that AWP is not
12   changed.
13             For the brands the AWP does change over
14   time as price increases are implemented for the
15   brand products, because with brand products
16   prices tend to go up, not down.
17             The AWP is raised a corresponding
18   amount.
19        Q.   And when you say "it's industry
20   practice," what -- what source are you drawing
21   upon to understand the industry practice with
22   respect to setting or changing AWP?
```

Dey, L.P. and Dey, Inc. (Pamela Marrs)                                May 15, 2008

Napa, CA

Page 135

```
 1              We do not -- we do not now -- and I'm
 2   not sure if we even did then, other than this
 3   piece of paper we got from them actually
 4   physically look in the published document to see
 5   if our prices were input correctly.
 6   BY MR. AZORSKY:
 7       Q.   But Dey does know that the prices that
 8   are reported in First DataBank, Medispan, and
 9   Redbook are the prices that were reported to it
10   by Dey; correct?
11              MR. DOYLE:  Objection as to form.
12              THE WITNESS:  No.  That's what I was
13   trying to explain.
14              In the early years they would send us a
15   piece of paper back, not the -- not the published
16   document, but a confirmation form, where we would
17   look at it, it appears from the documentations
18   I've looked at, and validate that that was, in
19   fact, what we sent them.
20              That doesn't happen any longer.
21              What we do now is we send them a letter
22   notifying them of a price change, and we ask them
```

```
 1    to sign off and send back to us a confirmation
 2    that they received the information.
 3                We do not then go and -- and verify
 4    that they've posted the correct amount, which
 5    became obvious when this whole issue happened
 6    with the generic products in 2003, where they
 7    lowered our AWP.
 8                We didn't actually know anything about
 9    it until customers started calling and
10    complaining.
11    BY MR. AZORSKY:
12        Q.    So in addition to reporting an AWP Dey
13    reports a WAC price; correct?
14        A.    That's correct.  We send them
15    information on WAC as it changes.
16        Q.    And, in fact, historically Dey has
17    reduced its WAC prices on their generic drugs
18    from time-to-time; correct?
19        A.    Correct.
20                As the price of the marketplace has
21    come down we've also reduced our reported WAC.
22        Q.    Now, Dey does that on a -- on a
```

Page 137

```
 1   periodic basis; correct?
 2        A.   It -- it was done on a periodic basis
 3   in the past.  Lately the price hasn't changed
 4   that much in the market, so there hasn't been a
 5   WAC decrease for -- for quite a while now.
 6        Q.   But when there was a decrease in WAC
 7   prices in the marketplace, did Dey report the
 8   change in WAC on a regular basis such as
 9   annually?
10        A.   No.  The notification was made when the
11   change actually happened.
12             So that there would be no need to
13   notify them if nothing changed.  They would --
14   the Contracts Department more recently, at one
15   point it was the Marketing Department, would
16   notify the reporting agencies when the actual WAC
17   decrease occurred.
18        Q.   So every time Dey lowered its prices to
19   wholesalers it reported the change in WAC?
20        A.   Well, I would probably have to --
21             MR. DOYLE:  Objection as to form.
22             THE WITNESS:  -- check the documents to
```

```
 1    BY MR. AZORSKY:
 2       Q.   So is that something that you could
 3    look at and be prepared to answer the next
 4    session of this deposition?
 5       A.   Sure.
 6       Q.   Are you familiar with the phrase "AMP"?
 7       A.   Yes, I am.
 8       Q.   What is that?
 9       A.   Average Manufacturer's Price.
10       Q.   And from 1997 to 2005 Dey has reported
11    AMPs as required by the Federal Rebate Statute;
12    is that correct?
13       A.   We have submitted the prices quarterly
14    using our best efforts to comply with the law,
15    yes.
16       Q.   And those best efforts to comply with
17    the law were efforts to calculate an AMP in
18    accordance with law and report that AMP; correct?
19       A.   Yes, and the reason I hedge a little is
20    the law is not always clear on these
21    calculations, so we've through outside counsel,
22    and consultants, and a variety of other sources
```

```
 1   that was sometimes given to the Sales Reps.
 2             What I don't know and what I'm not
 3   aware of is if it was updated on a structured,
 4   regimented basis every, you know, "X" days or
 5   months.
 6             MR. AZORSKY:  Okay.
 7             THE WITNESS:  I know that there are
 8   documents I have seen that have AWP on it that
 9   were provided to the Sales Reps in case customers
10   asked them questions about it.
11             Well, that was AWP, though, not the
12   reimbursement rate that I'm remembering.
13             So -- I mean, the documents that I've
14   seen from the company at this point don't show
15   evidence that there was a monthly report or any
16   regular report that was distributed to people
17   that had this kind of information on it.
18             I'm not saying that people weren't
19   generally aware that that was the reimbursement
20   formula in some way.
21             I -- I haven't seen documents that
22   would suggest it was tracked in a regimented and
```

Dey, L.P. and Dey, Inc. (Pamela Marrs)                                    May 15, 2008

Napa, CA

Page 186

```
 1    structured way.
 2         Q.   Fair enough.
 3              And I did not mean to suggest in my
 4    question that Dey kept track of it on a -- in a
 5    regimented manner.
 6              Rather, my question was whether Dey
 7    kept track of changes to the Medicare or Medicaid
 8    programs.
 9              MR. DOYLE:  Objection as to form.
10              THE WITNESS:  Program --
11    BY MR. AZORSKY:
12         Q.   Not necessarily on a weekly or monthly
13    regimented basis, but periodically the sales
14    force and the Marketing Department were aware of
15    how their drugs were being reimbursed by the
16    different Medicaid agencies around the country.
17              MR. DOYLE:  Objection as to form.
18              THE WITNESS:  What I have seen that was
19    provided to the Sales Reps from corporate was an
20    AWP price list.
21              I don't know if it was called "price
22    list," but a list of AWPs that was -- that was
```

```
 1   given to the Sales Rep just for their information
 2   in case customers asked.
 3              What I'm not aware of, other than
 4   having seen the Carrie Jackson memo -- I don't
 5   recall seeing documents that talked about
 6   reimbursement in terms of the formula by state.
 7              It was more just a general AWP
 8   worksheet for reference.
 9   BY MR. AZORSKY:
10        Q.    Well --
11        A.    Which is -- I mean, it's -- granted,
12   AWP was part of it, but I don't recall seeing on
13   that spread sheet the specific formula by state.
14        Q.    Okay.  But Dey was aware that -- that
15   many states reimbursed for -- drugs dispensed to
16   Medicaid recipients based upon AWP and WAC, as
17   you've previously testified; correct?
18        A.    Based on the documents I've seen it's -
19   - it appears some people were aware of that, yes.
20              I don't think it was a -- perhaps maybe
21   in the Sales organization it was broader.  I
22   don't think it was a corporate -- something that
```