# Exhibit 4

*State of California ex rel. Ven-A-Care of the Florida Keys, Inc.*
*v. Abbott Laboratories, Inc., et al.*, **Master Civil Action No. 01-12257-PBS,**
**Subcategory Case No. 06-11337**

**Exhibit to the December 21, 2009 Declaration of Sarah L. Reid in Support of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment**

Dey, L.P. and Dey, Inc. (Pamela Marrs) - Vol. II                                         July 10, 2008
Napa, CA

Page 300

```
 1                UNITED STATES DISTRICT COURT

 2                   DISTRICT OF MASSACHUSETTS

 3    -------------------------------------X

 4    IN RE PHARMACEUTICAL INDUSTRY       )

 5    AVERAGE WHOLESALE PRICE LITIGATION)

 6    -------------------------------------X Volume 1

 7    THIS DOCUMENT RELATES TO:           ) MDL NO. 1456

 8    The City of New York, et al.,       ) Civil Action

 9        V.                              ) No. 01-12257-PBS

10    Abbott Laboratories, et al.         )

11    -------------------------------------X

12    THIS DOCUMENT RELATES TO:           )

13    State of California, ex rel.        )

14    Ven-A-Care v. Abbott Laboratories,)

15    Inc., et al., Case No.              )

16    03-cv-11226-PBS                     )

17    -------------------------------------X

18                    JULY 10, 2008

19        DEPOSITION OF DEY, L.P. AND DEY, INC.

20            BY PAMELA MARRS - VOLUME II

21

22    Reported By: WENDY L. VAN MEERBEKE, CSR No. 3676
```

Dey, L.P. and Dey, Inc. (Pamela Marrs) - Vol. II                                    July 10, 2008
                                    Napa, CA

Page 368

1           MS. GIULIANA: Objection to form.
2           THE WITNESS: Dey would not have had
3    any sales if it had lowered its AWPs
4    substantially below the competitors' AWPs.
5           MR. AZORSKY:
6       Q.  So in order to maintain sales, Dey kept
7    its AWPs at or about where it was initially set
8    and did not lower them as prices decreased;
9    correct?
10          MS. GIULIANA: Objection to form.
11          THE WITNESS: It's really not an issue
12   of maintaining. It's an issue of whether or not
13   you'd have any sales. And just to add to that --
14   and this is in my previous testimony, too. We
15   did have a product that we tried to launch and it
16   was in the middle of when people were trying to
17   figure out what all this litigation was about.
18   It was a nasal spray product. We launched. We
19   set a very low WAC and AWP, much lower than our
20   competitors, and we had to discontinue the
21   product. No one would buy it.
22          So it pretty much put us out of

```
 1   business on that product.
 2              MR. AZORSKY:
 3        Q.   In that situation, did Dey consider
 4   raising its AWP and WAC in order to get more
 5   sales for that product?
 6        A.   No, because we were under the
 7   impression that that was inappropriate at that
 8   time based on the information obtained throughout
 9   the litigation process.
10        Q.   Well, at that time, did Dey then lower
11   its AWPs and WACs for all of its generic
12   products?
13              MS. GIULIANA:  Objection to the form.
14              THE WITNESS:  As I said, it's
15   impractical to expect one manufacturer to lower
16   its AWPs significantly below other similar
17   products because there would be no sales and the
18   company would go out of business.
19              MR. AZORSKY:
20        Q.   Well, Mr. Upp, the national accounts
21   manager in Dey's sales department, said that when
22   these situations arose when a customer would
```

Dey, L.P. and Dey, Inc. (Pamela Marrs) - Vol. II  
Napa, CA  
July 10, 2008

Page 460

```
1              MS. GIULIANA:  Same objection.
2              THE WITNESS:  I think what I said was
3    that it -- it was my understanding it was
4    industry practice to set AWPs for generics at a
5    percentage off of the brand and that that
6    information was generally obtained from Ed
7    Edelstein at First DataBank when his advice was
8    sought by Bob Mozak.
9              MR. HENDERSON:
10       Q.   Okay.  So I -- to prepare for this
11   particular topic, what did you do?
12       A.   This week, nothing.  Before, I do
13   recall reading a transcript of a deposition where
14   the contact with Ed Edelstein was referenced.
15   It's something that I have just generally heard
16   from the attorneys as well as Mr. Mozak in the
17   course of providing documents for this
18   litigation.
19              Other than the reference to Mr.
20   Edelstein, I don't recall a specific document
21   right now that talked about industry practice.
22   It was more just what he indicated to me.
```

Dey, L.P. and Dey, Inc. (Pamela Marrs) - Vol. II  
Napa, CA  
July 10, 2008

Page 461

```
 1       Q.   Okay.  So based on -- Dey's view that
 2   it was industry practice to set AWP at
 3   approximately -- well, let me back up.
 4            Do I understand correctly that Dey
 5   believes and has believed that the industry
 6   practice with respect to setting AWPs for generic
 7   drugs is to set the AWP at approximately ten
 8   percent below the AWP of the brand product?
 9       A.   I don't recall if it was ten percent or
10   15 percent, but it was in that -- it was in that
11   range.
12       Q.   Okay.  And am I correct in
13   understanding that the basis for that belief is
14   that the phone conversation that Mr. Mozak had
15   with Ed Edelstein -- I can't remember the date --
16   sometime in the early 1990s, I believe --
17       A.   I think it was before albuterol was
18   launched in '92 sometime.
19       Q.   Okay.  So am I correct in understanding
20   that that's the basis for Dey's belief about the
21   industry practice?
22            MS. GIULIANA:  Objection.  Form.
```

Dey, L.P. and Dey, Inc. (Pamela Marrs) - Vol. II                                  July 10, 2008
                                        Napa, CA

Page 462

```
 1              THE WITNESS:  That's the specific --
 2              MR. HENDERSON:
 3       Q.   Which right now --
 4       A.   -- third party that I recall being
 5   mentioned.  Bob and other people would, of
 6   course, had knowledge of what was going on in the
 7   industry just from virtue of being in sales and
 8   marketing, which, you know, again, I was -- I was
 9   relying on Bob to relay industry practice type of
10   information to me.
11       Q.   Okay.  In preparation for this topic,
12   did you talk to Bob Mozak about Dey's belief
13   regarding the industry practice?
14              MS. GIULIANA:  Objection.  Form.
15              THE WITNESS:  I didn't speak with him
16   in preparing for this recent deposition.  When he
17   was still with Dey and the litigation was
18   ongoing, we spoke about it then.
19              MR. HENDERSON:
20       Q.   Okay.  What -- what did he tell you?
21       A.   Just that that was the -- that that's
22   how AWPs were set, from a mechanical standpoint
```

Dey, L.P. and Dey, Inc. (Pamela Marrs) - Vol. II                                July 10, 2008
                                    Napa, CA

Page 469

1           MS. GIULIANA:  Objection to form.
2           THE WITNESS:  We took action after our
3    customers reported to us that the numbers had
4    been changed in a manner in which was
5    inconsistent with everyone else in the industry.
6           MR. HENDERSON:
7       Q.   When Dey learned that First DataBank
8    had not published the AWP that Dey reported to
9    them, Dey sued First DataBank to correct that?
10          MS. GIULIANA:  Objection.  Form.  It's
11   asked and answered.
12          THE WITNESS:  We sued First DataBank,
13   and our intention was we didn't care if our AWP
14   changed, but everyone else's needed to change and
15   there needed to be a level playing field.
16          MR. HENDERSON:
17      Q.   You sued First Data -- you didn't ask
18   First DataBank to publish everybody -- to publish
19   a different AWP for everybody else.  You sued
20   First DataBank to force them to publish the AWP
21   that you reported to First DataBank; isn't that
22   correct?

Dey, L.P. and Dey, Inc. (Pamela Marrs) - Vol. II  Napa, CA  July 10, 2008

Page 502

1   launch.  And I'd like to ask a few questions
2   about the -- Dey's belief regarding any industry
3   practice concerning changing or not changing the
4   AWP after launch.
5       A.   It's my understanding --
6           MS. GIULIANA:  Objection to the form.
7           THE WITNESS:  It's my understanding
8   that for generics, the price is set at launch and
9   it does not change subsequently.  But for brands,
10  it is set at launch and it is subsequently
11  changed, and it moves in the same direction as
12  the actual price changes in the marketplace.
13          MR. HENDERSON:
14      Q.   And tell me who at Dey has had that
15  belief --
16          MS. GIULIANA:  Objection to the form.
17          MR. HENDERSON:
18      Q.   -- about this being an industry
19  standard.
20          MS. GIULIANA:  Same objection.
21          THE WITNESS:  Same answer as before, I
22  guess.  You know, it's something that we've

Dey, L.P. and Dey, Inc. (Pamela Marrs) - Vol. II                July 10, 2008
Napa, CA

Page 503

```
 1   consistently done.  It's something that it's our
 2   understanding -- and that would be a little
 3   broader because it's actually the contracts
 4   people who implement the price changes.  So, for
 5   example, if there's a WAC change on a generic,
 6   they do the revised pricing and -- and reporting
 7   of that, and over the years they would change the
 8   WAC and not change the AWP.
 9              On the same hand, if they were
10   processing a price change for a brand which would
11   traditionally be an increase to the price, then
12   they would publish both a new WAC and a new AWP.
13   And the AWP and the WAC would go up by the same
14   percentage point.
15              So the people who process those
16   transactions would be aware of them.
17              MR. HENDERSON:
18        Q.    I appreciate that, Ms. Marrs.  My
19   question was, who at Dey -- and if you could,
20   please identify them by name -- had this belief?
21        A.    It would be primarily Russ Johnston.
22   He's the one who has been in charge of those
```