# Exhibit 6

*State of California ex rel. Ven-A-Care of the Florida Keys, Inc.*
*v. Abbott Laboratories, Inc., et al.*, **Master Civil Action No. 01-12257-PBS,**
**Subcategory Case No. 06-11337**

**Exhibit to the December 21, 2009 Declaration of Sarah L. Reid in Support of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment**

Page 223

CAUSE NO. GV002327

THE STATE OF TEXAS ) IN THE DISTRICT COURT
ex rel. )
   VEN-A-CARE OF THE )
   FLORIDA KEYS, INC. )
)
     Plaintiffs, )
)
VS. ) TRAVIS COUNTY, TEXAS
)
DEY, INC.; ROXANE )
LABORATORIES, INC. and )
WARRICK PHARMACEUTICALS )
CORPORATION, )
)
     Defendants. ) 53rd JUDICIAL DISTRICT

**********************************************

ORAL AND VIDEOTAPED DEPOSITION OF
ROBERT FRANCIS MOZAK
VOLUME II
April 30th, 2002

**********************************************

ORAL AND VIDEOTAPED DEPOSITION OF ROBERT FRANCIS MOZAK, produced as a witness at the instance of the State of Texas and duly sworn, was taken in the above-styled and numbered cause on the 30th of April, 2002, from 9:09 a.m. to 5:02 p.m., before Debra L. Sietsma, CSR in and for the State of Texas, reported by machine shorthand, at Coudert Brothers, 600 Beach Street, San Francisco, California, pursuant to the Texas Rules of Civil Procedure and the provisions as previously set forth.

Page 224

A P P E A R A N C E S

FOR THE PLAINTIFF:
   MR. PATRICK J. O'CONNELL,
   MR. RAYMOND C. WINTER
   Office of the Attorney General
   State of Texas
   Post Office Box 12548
   Austin, Texas   78711-2548

FOR THE RELATOR:
   MR. JAMES JOSEPH BREEN
   The Breen Law Firm, P.A.
   8201 Peters Road, Suite 1000
   Plantation, Florida   33324
     - and -
   MR. JOHN E. CLARK (Of Counsel)
   Goode Casseb Jones Riklin
     Choate & Watson, P.C.
   2122 North Main Avenue

Page 224 (cont.)

   P.O. Box 120480
   San Antonio, Texas   78212-9680
     - and -
   MS. JOY P. CLAIRMONT
   Berger & Montague, PC
   1622 Locust Street
   Philadelphia, Pennsylvania   19103

FOR DEFENDANT DEY, INC.:
   MR. STEPHEN M. HUDSPETH
   Coudert Brothers
   1114 Avenue of the Americas
   New York, New York   10036-7703
     - and -
   MR. STEVEN A. FLECKMAN
   Fleckman & McGlynn, PLLC
   515 Congress Avenue, Suite 1800
   Austin, Texas   78701-3503

Page 225

FOR DEFENDANT ROXANE LABORATORIES, INC.:
   MR. R. ERIC HAGENSWOLD
   Scott, Douglass & McConnico, L.L.P.
   One American Center, Fifteenth Floor
   600 Congress Avenue
   Austin, Texas   78701

FOR DEFENDANT WARRICK PHARMACEUTICALS CORPORATION:
   MR. C. MICHAEL MOORE
   Locke Liddell & Sapp, LLP
   2200 Ross Avenue, Suite 2200
   Dallas, Texas   75201-6776

ALSO PRESENT:
   Mr. Richard Rienstra, Videographer
   Mr. Zachary Ventley

Page 226

I N D E X

WITNESS: ROBERT FRANCIS MOZAK

| EXAMINATION | PAGE NO. |
|---|---|
| By Mr. Winter. . . . . . . . . . . | 228 |
| By Mr. Breen . . . . . . . . . . . | 290 |
| By Mr. Winter. . . . . . . . . . . | 350 |
| By Mr. Breen . . . . . . . . . . . | 381 |

VIDEOTAPE NUMBER

| | |
|---|---|
| 1 . . . . . . . . . . . . . | 227 |
| 2 . . . . . . . . . . . . . | 279 |
| 3 . . . . . . . . . . . . . | 336 |
| 4 . . . . . . . . . . . . . | 381 |
| 5 . . . . . . . . . . . . . | 434 |

| EXHIBIT NO. | PAGE NUMBER REFERRED TO: |
|---|---|
| 229 . . . . . . . . . . . . | 249 |
| 230 . . . . . . . . . . . . | 310 |
| 231 . . . . . . . . . . . . | 310 |

Page 310

1  But please read it back.
2  (The requested portion was read).
3  THE WITNESS: To the best of my
4  knowledge, we did that.
5  MR. BREEN: Let me see exhibit -- no,
6  I'm sorry.
7  (Discussion off the record).
8  MR. BREEN: I'm now going to ask the
9  court reporter to mark the following exhibit as
10  Exhibit 230. It's got Dey Bates stamps 0050001
11  through 50027. It's a composite exhibit. The front
12  page is a Dey Laboratories memo dated August 12, 1993,
13  and then I'll ask that you'll hand that to the witness
14  after you mark it.
15  (Discussion off the record).
16  (Exhibit 230 marked).
17  MR. BREEN: And while you're looking at
18  it, let's mark the next one, which is going to be
19  Exhibit 231. It picks up at 50028 all the way up to
20  50101. I believe they're sequential, and it's a --
21  the same kind of memo, but this one's dated 2 February
22  1994.
23  (Exhibit 231 marked).
24  (Discussion off the record).
25  THE WITNESS: The second one is the same

Page 311

1  as the first except a different date.
2  Q. (BY MR. BREEN) They're about -- what, about
3  six months apart?
4  MR. HUDSPETH: One's in February of '94.
5  The other one is in August of --
6  Q. (BY MR. BREEN) All right. Why don't you put
7  them down side by side there, 220 -- 230 and 231. It
8  might speed things up if you can refer to -- to both
9  of them.
10  A. Okay.
11  Q. Have you ever seen either one of those
12  documents before?
13  A. I believe I have seen them many years ago,
14  yes.
15  Q. And this Carrie Jackson is the same lady that
16  you were testifying about earlier?
17  A. Yes.
18  Q. She worked for you?
19  A. She -- she did work for us. She's no longer
20  with us.
21  Q. Did she work in your department?
22  A. She worked in my department, yes.
23  Q. So this -- these were -- this -- these
24  memoranda and reports that are now Exhibits 230 and
25  231 to your deposition, were they prepared by your

Page 312

1  department under your supervisory responsibility and
2  control?
3  A. Yes, they were -- they were prepared by my
4  department.
5  Q. And I notice a -- kind of a report attached
6  to each one of them, each one of these memos, rather
7  lengthy report.
8  Do you know what those reports are?
9  A. Yes, I believe I know what they are.
10  Q. What are they?
11  A. I believe -- it's my understanding that
12  Carrie Jackson called the state -- individuals within
13  each state to find out what the reimbursement codes
14  were for these various items, and this was
15  information -- information directly communicated to
16  her from the state and compiled by her in this form.
17  Q. Okay. Now, if you'll look at these forms,
18  they -- for each state they seem to have both Medicare
19  information and Medicaid information.
20  Do you see that?
21  A. Yes, I see that.
22  Q. Does that refresh your recollection as to
23  whether or not you got any information in your
24  department as to Medicare reimbursement?
25  A. I -- I -- I don't believe -- could you

Page 313

1  rephrase that question for me?
2  Q. Do these Exhibits 230 and 231 refresh your
3  recollection as to whether or not there's any
4  information within your department relating to
5  Medicare reimbursement?
6  A. Well, obviously these are related to Medicare
7  reimbursement.
8  Q. Okay. And you indicated these reports -- you
9  recall seeing them many years ago, correct?
10  A. Yes.
11  Q. Exhibit 231 is dated 2 February 1994.
12  Do you see that?
13  A. Yes.
14  Q. When was the last time you actually saw a
15  report similar to the ones that appear here in front
16  of you here now?
17  A. I believe that was the last report, the one
18  in 1994.
19  Q. Did -- who ordered the discontinuance of the
20  preparation of these reports?
21  A. I don't know who ordered the discontinuation.
22  I think it was done by Carrie Jackson either on her
23  own volition or through somebody else's request in the
24  department, and it was compiled these two times. I
25  don't believe there are any other additional reports,

Page 314

1  at least to the best of my knowledge, beyond that date
2  of 1994.
3  Q. Well, if you'll go with me to Page 50026.
4  That's the -- the Bates stamp number on the bottom
5  right-hand corner, which is a page of the first
6  exhibit, Exhibit 230 -- I'm sorry.
7  A. 230?
8  Q. Yeah.
9      MR. HUDSPETH: 26, second-to-the-last
10  page?
11     MR. BREEN: Yes, sir.
12     THE WITNESS: Right.
13     MR. BREEN: And 27, which is --
14     THE WITNESS: Uh-huh.
15     MR. BREEN: -- the next page.
16     THE WITNESS: Yes.
17 Q. (BY MR. BREEN) There's a whole slew of
18  people on there.
19     Do you see that?
20 A. Yes, I do.
21 Q. Why did this report go to -- go to all these
22  folks?
23 A. It went to them because they were members of
24  the sales organization and -- I don't know whether
25  they specifically requested it or it was sent to them

Page 315

1  as information.
2 Q. Information about Medicare and Medicaid
3  reimbursement?
4 A. Yes. Obviously the -- the codes for each of
5  the products.
6 Q. Why did they need to know that?
7 A. Because on a number of occasions a customer
8  could -- customer would ask the question whether --
9  whether it is reimbursed or what is the code. Many
10  times we didn't know what that was, and so I think
11  this was compiled for the -- for that reason.
12 Q. So it was compiled to let a customer know
13  whether it was reimbursed and what the proper billing
14  codes were?
15 A. Yes.
16 Q. It wasn't prepared in order to let the
17  customer know how much they would be reimbursed for?
18 A. No, it was not.
19 Q. And to your knowledge, is there -- was there
20  any information included in -- in -- in Exhibits
21  220 -- 230 or 231 that was designed to educate your
22  sales force about how much would be reimbursed by the
23  state Medicaid programs for Dey's pharmaceutical
24  products?
25     MR. HUDSPETH: You better look through

Page 316

1  them all because the question asks about all of them.
2      THE WITNESS: I'd have to -- I'd have to
3  look, but I don't believe that was the --
4      MR. HUDSPETH: Take a look before you
5  answer.
6      THE WITNESS: Okay. Well, it does say
7  on -- on -- I don't know what page this is. It's not
8  numbered but --
9      MR. BREEN: Bottom right-hand corner.
10 Just call out the Bates-stamp number.
11     THE WITNESS: 00008.
12     MR. BREEN: Okay. We'll go to 08.
13     THE WITNESS: And 09.
14     MR. BREEN: 09.
15     THE WITNESS: It does have an allowable
16  for the State of Illinois and -- and Indiana. Many of
17  the other states have nothing. Some -- there was --
18  also on 006 it does have an allowable for the State of
19  Florida.
20 Q. (BY MR. BREEN) You're talking about the
21  Medicare allowables, correct?
22 A. Yes. Now --
23 Q. Now, let's go -- if you would, go to -- well,
24  you picked Florida and you picked Illinois. Those --
25  those are two good examples.

Page 317

1      MR. HUDSPETH: So you're -- you're no
2  longer talking about 231, is that right, Jim? Your
3  original question, I thought, asked about both, and
4  we've just looked at 230.
5      MR. BREEN: Right. Since --
6      MR. HUDSPETH: Do you want him to look
7  at 231 now or not?
8      MR. BREEN: Not yet.
9      MR. HUDSPETH: Okay.
10     MR. BREEN: Since the witness is now
11  focused on 230, we'll go to Illinois and we'll go to
12  Florida, since those are the two --
13 Q. (BY MR. BREEN) I assume you picked those two
14  states just by thumbing through at random?
15 A. Yes, I did.
16 Q. Okay. We'll start with Florida, and I assume
17  you were talking about -- on Page 000 -- 50006 all the
18  allowable amounts in the right-hand column for --
19  under the Florida Medicare?
20 A. Yes. That would have been information given
21  to us by the -- by the state.
22 Q. And then the -- in the middle there you've
23  got the codes. I guess -- so those are the billing
24  codes you were talking about?
25 A. I believe those are the billing codes, yeah.

Page 370

1  have the date before us when that took place, and then
2  again down to $12.50?
3  A. Yes, that's correct.
4  Q. And it wouldn't surprise you that during this
5  same time Dey is reporting a price to wholesaler
6  and/or distributor to the State of Texas at greater
7  than either $16.50 or $12.50?
8      MR. HUDSPETH:  Objection, form.
9      THE WITNESS:  That would not surprise
10 me.
11 Q. (BY MR. WINTER)  Okay.  And, in fact, it --
12 it would be your expectation that the prices that were
13 being reported to the State of Texas during any time
14 relevant to this inquiry would be, in fact, greater
15 than the contract prices at which Dey's actually
16 selling these products to its customers?
17     MR. HUDSPETH:  Objection, form.
18     THE WITNESS:  Yes, in most cases.  But
19 we continually lower the WAC on a regular basis to
20 bring it closer to the contract price.
21 Q. (BY MR. WINTER)  So even though you're
22 continuing to lower the WAC, it is your expectation
23 that, if we looked at each drug that has been
24 identified as a relevant drug in this lawsuit, that in
25 each case the WAC that you're reporting is always

Page 371

1  going to be higher than the actual contract prices
2  that Dey has agreed to with its customers?
3  A. Yes, to -- to -- to whatever degree that is.
4      MR. WINTER:  Let me take a real quick
5  minute off the record so we can get some exhibits
6  lined up.
7      THE VIDEOGRAPHER:  We're off the record
8  at 2:21 p.m.
9      (Discussion off the record).
10     (Exhibits 236, 237, 238, 239, 240,
11 241, 242 and 243 marked).
12     THE VIDEOGRAPHER:  We're back on the
13 record at 2:23 p.m.
14 Q. (BY MR. WINTER)  Mr. Mozak, going back to the
15 question that I asked you right before we took a
16 break, you said that it would be your expectation that
17 the WAC that you had reported to the State of Texas
18 over this time period would in all cases be greater
19 than the contract price; but you also stated that over
20 time Dey had lowered its WAC to bring the WAC closer
21 to the contract price.
22 A. That's correct.
23 Q. Why did Dey lower the WAC to bring the WAC
24 closer to the contract price?
25 A. We lowered the WAC to -- well, for, number

Page 372

1  one, to bring it closer to the contract prices.
2  That's the first reason.  You stated it yourself.
3      And secondly, it -- it reduced the cash
4  discount we might be paying to a wholesaler on a lower
5  WAC versus a higher WAC, and those were the -- the
6  principal reasons we would lower our WAC.
7  Q. Let's take those two in order.
8      You said that the first answer was just
9  to bring it closer to the contract price?
10 A. That's correct.
11 Q. Why would you have any desire to bring the
12 WAC closer to the contract price?
13 A. Because it reduced the -- the spread between
14 the contract price and the WAC, which, in turn,
15 reduced our chargebacks or reduced the chargebacks
16 that the wholesaler would claim from Dey Laboratories.
17 So instead of a larger -- as the contract price came
18 down, the amount of the chargeback grew, so we lowered
19 the -- the WAC price so that the chargeback would also
20 be reduced.
21 Q. So it's a cost-saving measure for Dey to
22 lessen the amount that it has to pay back to the
23 wholesaler in the form of a chargeback?
24 A. Well, it also lessens the -- the
25 out-of-pocket to the wholesaler as well.

Page 373

1  Q. And you've identified the difference between
2  the WAC and the contract price as the spread.
3      Is that what you -- first thing that
4  comes to your mind when you think of the term spread?
5  A. I wouldn't call it a spread.  I would call it
6  the difference between the contract price and -- and
7  the WAC.
8  Q. Well, you just identified it as spread in
9  your answer to my previous question.
10     So when you think of the term "spread,"
11 in your mind, do you immediately think of the
12 difference between the WAC and the contract price?
13 A. No.  I don't -- I don't use the word "spread"
14 that often.  I don't use it.  It's -- it's anything --
15 any difference -- you can characterize it anything you
16 want, whether it is the difference between or whether
17 it's the spread between.  It's -- it's the difference
18 between the contract price and the -- and the WAC
19 price.
20 Q. Okay.  Let's look at the next two documents
21 that I've handed to you marked as Exhibits 236 and
22 237.
23     Are these also excerpts from Dey's
24 contract files with a different customer, though, CFI?
25 A. Yes, I believe so, yes.  They're signed by