# Exhibit 15

*State of California ex rel. Ven-A-Care of the Florida Keys, Inc.
v. Abbott Laboratories, Inc., et al.*, **Master Civil Action No. 01-12257-PBS,
Subcategory Case No. 06-11337**

**Exhibit to the December 21, 2009 Declaration of Sarah L. Reid in Support
of Dey's Opposition to Plaintiffs' Motion for Partial Summary Judgment**

## Page 1

NO. GV002327

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| ex rel. | ) | |
|   VEN-A-CARE OF THE | ) | |
|   FLORIDA KEYS, INC., | ) | |
|     Plaintiff(s), | ) | |
| | ) | |
| VS. | ) | TRAVIS COUNTY, TEXAS |
| | ) | |
| DEY, INC.; ROXANE | ) | |
| LABORATORIES, INC., WARRICK | ) | |
| PHARMACEUTICALS CORPORATION, | ) | |
| SCHERING CORPORATION, | ) | |
| SCHERING-PLOUGH CORPORATION, | ) | |
| LIPHA, S.A., MERCK-LIPHA, | ) | |
| S.A., MERCK, KGAA, and EMD | ) | |
| PHARMACEUTICALS, INC., | ) | |
|     Defendant(s). | ) | 53RD JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF
CARRIE-JEAN JACKSON
April 18th, 2003

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF CARRIE-JEAN JACKSON, produced as a witness at the instance of the Defendant(s), and duly sworn, was taken in the above-styled and numbered cause on April 18th, 2003, from 9:08 a.m. to 1:03 p.m., before Cynthia Vohlken, CSR in and for the State of Texas, reported by machine shorthand, at the Sacramento Marriott Rancho Cordova, 11211 Point East Drive, Rancho Cordova, California pursuant to the Texas Rules of Civil Procedure.

## Page 2

A P P E A R A N C E S

FOR THE PLAINTIFF(S):
    MR. RAYMOND C. WINTER
    Office of the Attorney General
    State of Texas
    Post Office Box 12548
    Austin, Texas 78711-2548

FOR THE RELATOR:
    MR. FRANK M. PITRE
    Cotchett, Pitre, Simon & McCarthy
    840 Malcolm Road, Suite 200
    Burlingame, California     94010

FOR THE DEFENDANT(S) DEY, INC.:
    MR. DARRELL PRESCOTT
    Coudert Brothers, LLP
    1114 Avenue of the Americas
    New York, New York 10036-7703

FOR THE DEFENDANT ROXANE LABORATORIES, INC.:

## Page 2 (cont.)

    MR. STEVEN S. WINGARD
    Scott, Douglass & McConnico, L.L.P.
    One American Center, Fifteenth Floor
    600 Congress Avenue
    Austin, Texas 78701

## Page 3

FOR THE DEFENDANTS WARRICK PHARMACEUTICALS CORPORATION, SCHERING-PLOUGH CORPORATION AND SCHERING CORPORATION:
    MR. JOHN P. MCDONALD
    Locke Liddell & Sapp, LLP
    2200 Ross Avenue, Suite 2200
    Dallas, Texas 75201-6776

ALSO PRESENT:
    Ms. Adelina O. Berumen,
        California Office of the
        Attorney General
    Mr. Brian Bobbitt, Videographer

## Page 4

INDEX

| | |
|---|---|
| Appearances.................................. | 2 |
| CARRIE-JEAN JACKSON | |
|     Examination by Mr. Prescott............ | 5 |
|     Examination by Mr. Winter.............. | 56 |
|     Examination by Mr. Pitre............... | 108 |
|     Examination by Mr. McDonald............ | 164 |
| Signature and Changes........................ | 166 |
| Reporter's Certificate....................... | 168 |

VIDEOTAPE NUMBER

| | |
|---|---|
|     1 .................................. | 5 |
|     2 .................................. | 53 |
|     3 .................................. | 108 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 880 | ............................................ | 18 |
| | August 31, 1993 Letter from Ms. Jackson to Ms. McNeill, Re: Medicaid Reimbursement | |
| 881 | ............................................ | 27 |
| | Handwritten Notes, Vacation/Sick Leave Request | |
| 882 | ............................................ | 48 |
| | February 24, 1995 Memorandum From Ms. Jackson to Mr. Mozak, Re: Office Incident; 2/24/95; 9:20 a.m. | |
| 883 | ............................................ | 61 |
| | Resume | |
| 884 | ............................................ | 95 |
| | 1/18/95 Fax from Ms. Jackson to Ms. Burnham | |
| 885 | ............................................ | 146 |
| | 11/30/94 Performance Review | |

Page 9

1  Q. So you've come here pursuant to agreement and
2     notice; is that right?
3  A. Yes.
4  Q. You've agreed --
5  A. Yes.
6  Q. -- to come in and talk to us?
7  A. Yes.
8  Q. Have you also brought with you any documents
9     from your period of employment with Dey?
10 A. I do have notes. I have a copy of my resume
11    that I had when I was there, copies of notes that I
12    had taken in a previous meeting with Helen Burnham,
13    copies of my job description pertinent to that.
14 Q. And if you would leave those on the table.
15    During a break we will take a look at them and we may
16    want to discuss them later.
17 A. (Witness complies).
18 Q. Later this morning. Now, you said that you
19    have spoken before with Mr. Winter?
20 A. Uh-huh.
21 Q. Was that in person or over the phone?
22 A. It was in person.
23 Q. Was anyone else with him?
24 A. There was four or five other individuals. I
25    left their cards on my desk at work. My dad was also

Page 10

1     present.
2  Q. Do you remember who the other four or five
3     individuals were?
4  A. I did not bring the business cards with me,
5     you know. I'm sorry.
6  Q. Did they tell you who they represented?
7  A. Yes. Very quickly they did. Mr. Winter did
8     most of the questioning.
9  Q. How long did you meet with these individuals?
10 A. Maybe an hour and a half, two hours.
11 Q. Where did that meeting take place?
12 A. The -- I want to say the attorney general
13    office over by Cal Expo, over there.
14 Q. Have you ever been -- other than that
15    occasion have you -- have you had any communications
16    with any representative of the State of Texas or of
17    the Relator Ven-A-Care about this matter?
18 A. No. I had had a phone call and some e-mails
19    with Mr. Winter prior to our meeting, but it was to
20    arrange the meeting and to -- you know, why was I
21    there and that type of thing. Other than that, no.
22 Q. Have you ever been employed by Dey LP or Dey
23    Laboratories?
24 A. Yes.
25 Q. And when were you employed by Dey?

Page 11

1  A. From October of '89 to March of '95. Yes.
2  Q. And what -- excuse me.
3  A. Yes.
4  Q. Have you finished your answer?
5  A. I'm finished.
6  Q. If I interrupt you at any point --
7  A. That's okay.
8  Q. -- just say so and --
9  A. That's okay.
10 Q. What positions did you hold while you were
11    with Dey?
12 A. From October of '89 to November of '93 I was
13    the contract department coordinator. And from
14    November of '93 to March of '95 I was a marketing
15    services coordinator.
16 Q. And what were your job responsibilities in
17    your position as contract department coordinator?
18 A. I worked in the contract negotiation side
19    with major group purchasing organizations. I did
20    sales administration support to Mark Pope. I did RFPs
21    or proposal preparation and administration of the
22    contracts that we had with Dey.
23 Q. And to whom did you report in that position?
24 A. A variety of people. Originally it was Cindy
25    Daulong and then it was to Mark Pope, for a short time

Page 12

1     to Bob Mozak.
2  Q. Anyone else?
3  A. From what I recall that was who I direct
4     reported during -- in that position.
5  Q. And in your position as marketing services
6     coordinator to whom did you report?
7  A. Helen Burnham specifically.
8  Q. Anyone else?
9  A. Not that I recall.
10 Q. And what were your duties in that position?
11 A. Administration of their conventions, you
12    know, coordinate all of that, assist Helen, which was
13    the marketing manager at the time, with literature
14    publication. I also assisted her or worked for her
15    for Medicare and Medicaid state programs and
16    administrative support to the marketing manager,
17    product managers and market research analyst,
18    receptionist and switchboard operator.
19 Q. I'm going to show you a document that has
20    been previously marked in this proceeding as McNeill
21    Deposition 27.
22       MR. PRESCOTT: And there are copies here
23    I'll pass around to everyone.
24       MR. WINTER: Thank you.
25 Q. (BY MR. WINTER) There we go. Is that your

Page 21

1  was just relaying to Alberto, Ross, Helen and Bob my
2  discussion with Jerry.
3  Q. And the memorandum was an accurate recitation
4     of what Mr. Wells had told you to the best of your
5     ability?
6  A. To the best of my knowledge. Of course, I
7     wouldn't have my hand notes, but that looks to be the
8     best.
9  Q. Apart from what is set forth in this
10    memorandum do you have any recollection of that
11    conversation with Mr. Wells?
12 A. I honestly cannot say.
13 Q. Do you recall discussing this memorandum with
14    any of the people listed on it?
15 A. No. When things like this would happen I
16    would pass the memo over to -- to distribution and
17    look for them to return the call to Jerry to discuss
18    further.
19 Q. Did anyone ever report back to you that he or
20    she had talked with Jerry Wells about the subject
21    matter of this?
22 A. I don't recollect.
23 Q. I'm going to show you a document we've
24    previously marked Deposition Exhibit 342.
25        MR. PRESCOTT: And again, I'm sorry, I

Page 22

1  only have one copy, so I will pass this around. It
2  does have my highlighted yellow on the first page.
3  Q. (BY MR. PRESCOTT) Ms. Jackson, I'm going to
4     ask you to look through Deposition Exhibit 342 and
5     tell me if you recognize it or any part of it. Please
6     take your time. It's multipage. Take your time and
7     look through it.
8  A. (Witness reviewing document). I don't
9     remember seeing this, but this was after I left the
10    company dated 12/4 of '95.
11 Q. So this handwriting on the first page that
12    says done 12/14/1995 (sic), that is certainly not
13    yours?
14 A. Huh-uh. No.
15 Q. That was my question. Thank you. I'm going
16    to show you a document that's been previously marked
17    Deposition Exhibit 230. It's a number of pages long,
18    so take your time and look through it.
19 A. (Witness reviewing document). I remember
20    doing this document.
21 Q. Did you prepare this document on or about the
22    date it bears, which is August 12, 1993?
23 A. It's familiar, yes.
24 Q. And those are your handwritten initials on
25    this page?

Page 23

1  A. Yes, those are my initials.
2  Q. How did you gather the information -- well,
3     let me step back. What is the document?
4  A. It's a report to distribution, which is on
5     the back, giving the status of Medicare and/or
6     Medicaid for each individual state. How I compiled
7     the individual information I don't remember, but I was
8     tasked with providing this report on a periodic basis,
9     updating it as required showing the different states
10    and their requirements and that type of thing.
11 Q. And who asked you -- did someone ask you to
12    do this at Dey?
13 A. Since it's cc'd to Helen, I would cc my --
14    the requester, although I was more than likely
15    reporting to -- August of '93, I don't recall
16    reporting to Helen, but I cc'd her, so that would mean
17    she was the requester.
18 Q. Okay. Did you have any understanding as to
19    why you were being asked to do this?
20 A. I don't remember now how much in-depth
21    knowledge I had back then, to be honest. I'm sure I
22    had a general sense of what the request was. I don't
23    recall how much in-depth I knew back then.
24 Q. I'm going to ask you similar questions about
25    a document previously marked Deposition Exhibit 231.

Page 24

1  Is this a document you prepared on or about February
2  2, 1994?
3  A. Yes.
4  Q. Those are your initials on it?
5  A. Yes.
6  Q. And does this -- does looking at this
7     document help you to remember how you gathered the
8     information?
9  A. What it does bring to mind, as I remember,
10    there was a period of months there from August '93 to
11    February of '94 where they had wanted this report
12    periodically, more frequent than six months here, and
13    the focus -- I was put on other things, you know, with
14    conventions and that type of thing, so I was unable to
15    get to it and I remember there was a length of time
16    where Helen had asked me, "Okay. Carrie, can you
17    update this?" How I gathered the information, there
18    again, I don't remember.
19 Q. Okay.
20 A. So... I remember it was a lot of work and
21    she said, "Well, we are going to do it on an as-needed
22    basis from now on."
23 Q. As you sit here today do you have any
24    understanding as to why you were being asked to do
25    this?

Page 49

1  A. Yes, I did.
2  **Q. Did Mr. Mozak respond?**
3  A. He did. He called me in. We talked about
4     what had happened again and he said he would speak
5     with Helen about it.
6  **Q. Did he respond that same day?**
7  A. I don't remember if it was that day or
8     exactly when he responded, but he did respond back.
9     We did have a meeting in his office.
10 **Q. Did he respond promptly --**
11 A. Yes.
12 **Q. -- either on that day or shortly thereafter?**
13 A. Yes. He was very proactive, yes.
14 **Q. And what did you and Mr. Mozak discuss on**
15 **this subject when you met with him in his office?**
16 A. He asked me again why I was called in and I
17    briefed him why I was called in. He said -- he did
18    want to say, "Are you sure she said this?" And I
19    said, "Yes, I'm sure she said this." He's reading the
20    notes and I told him that I felt, you know, my job was
21    being taken away, obviously, and that she was giving
22    some type of retribution or something to me for the
23    whole workers' comp and I expressed my concern and
24    wanted to know what was going to happen.
25 **Q. And did Mr. Mozak undertake to do anything**

Page 50

1     **following this meeting with you?**
2  A. Yes. He did call Helen in. He did -- I
3     don't know exactly when, but he did call her in.
4  **Q. You heard then sometime after your meeting**
5  **with Mr. Mozak that he had in fact called Helen in?**
6  A. Yes.
7  **Q. From whom did you hear that?**
8  A. I believe I heard that directly from Helen
9     herself because she was coming back to the office one
10    day because he -- Bob was over at HQ 1, or whatever
11    you want to call it, and we were over on Camino
12    Dorado, that little satellite building. And she had
13    come back in and she was very upset and said, "I've
14    just had another meeting with Bob because of you," or
15    something of that nature. And that was after -- her
16    first meeting, obviously, was because she didn't
17    report my workers' comp and this was the second
18    meeting she had had.
19 **Q. So there were two meetings that she had with**
20 **Bob --**
21 A. Well, she was --
22 **Q. -- about your workers' comp issue?**
23 A. Yeah. Well, she had told me that she was
24    written up by Bob the first time for inaccurately
25    reporting my workers' comp in the first place. And so

Page 51

1     in the notes you'll read where she says, "I'm not
2     taking another letter in my file because of you."
3     That letter was referring to the first letter she got
4     in her file because she did not report the workers'
5     comp in time.
6  **Q. And that letter that was put in her file was**
7  **done sometime prior to the February 24, 1995 --**
8  A. Exactly.
9  **Q. -- meeting with you?**
10 A. Exactly. Yeah. And I don't know when, but
11    she did get a letter in her file because of it.
12 **Q. Sometime prior to the February 24, 1995 --**
13 A. Prior to.
14 **Q. -- meeting?**
15 A. Yes, yes. Prior to.
16       MR. PITRE: Objection.
17 **Q. (BY MR. PRESCOTT) Prior to the meeting you**
18 **had with Ms. Burnham?**
19       MR. PITRE: Objection, form.
20 **Q. (BY MR. PRESCOTT) To the best of your**
21 **knowledge and understanding was it your understanding**
22 **that the letter that was put in Ms. Burnham's file by**
23 **Mr. Mozak relating to your workman's comp issue was**
24 **put in her file prior to February 24, 1995?**
25 A. That is correct.

Page 52

1  **Q. Now, when you saw Ms. Burnham following her**
2  **second meeting with Mr. Mozak, that is, following the**
3  **meeting that occurred after your February 24, 1995**
4  **memo, did Ms. Burnham say anything to you?**
5  A. She said she had just been spoken to Bob
6     again or Bob had just spoken to her again about this
7     incident. But she seemed -- she had a different
8     attitude. It was more -- it wasn't retribution, it
9     was more, okay, Carrie, we are just going to do our
10    work, you know. Okay. You know, let's get the heat
11    off type of thing. I don't know exactly how that all
12    transpired, but...
13 **Q. And that would have been sometime after**
14 **February 24, 1995?**
15 A. Right. And prior to March 30th when I left.
16 **Q. Why did you leave the employ of Dey?**
17 A. It was at that point I found out they didn't
18    have a position for me and in one of my meetings with
19    Bob he said, "You know, Carrie, you don't have a
20    degree. We have no other positions open here for
21    you." And he said, "Right now you're a receptionist.
22    We are not going to continue to pay you your 30 grand
23    a year, whatever it is, to be a receptionist. I can
24    give you a severance package, let me look into it with
25    HR, or I will give you time to start looking for