# EXHIBIT 1

Page 394

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

----------------------------x

IN RE PHARMACEUTICAL INDUSTRY)

AVERAGE WHOLESALE PRICE        )

LITIGATION                     )

_____)

THIS DOCUMENT RELATES TO       ) MDL No. 1456

State of California, ex rel. ) Civil Action:

Ven-A-Care v. Abbott           ) 01-12258-PBS

Laboratories, Inc., et al.    )

----------------------------x

VOL. II

--oOo--

MONDAY, SEPTEMBER 22, 2008

--oOo--

VIDEOTAPED DEPOSITION OF

J. KEVIN GOROSPE, Pharm.D.

--oOo--


Reported By:  CAROL NYGARD DROBNY, CSR No. 4018

Registered Merit Reporter

Gorospe, Pharm. D., J. Kevin - Vol. II                    September 22, 2008

Sacramento, CA

Page 687

1      Q.   Okay.  So this -- this type of a
2  statement about AWP you wouldn't have viewed as
3  being particularly important?
4          MR. PAUL:  Objection to form.
5          THE WITNESS:  Not at the time, no.
6  BY MR. ROBBEN:
7      Q.   Okay.  Now, the beginning part of that
8  paragraph, the part I didn't read, deals with WAC.
9          Now, WAC has no bearing on the -- on the
10  California Medicaid reimbursement; does it?
11      A.   No, it does not.
12      Q.   And it plays no part in your work with
13  Medicaid program?
14      A.   No, it does not.
15      Q.   And it didn't at the time of this
16  letter?
17      A.   No, it did not.
18      Q.   Okay.  So whatever Dey said about WAC
19  wouldn't have affected you -- you or your job in
20  Medi-Cal one way or the other; would it?
21      A.   No, it would not.
22          MR. ROBBEN:  I think we have to change

Page 688

1  the tape.
2          VIDEOGRAPHER:  This is the end of tape
3  three, volume two, of the deposition of Kevin
4  Gorospe.
5          We are off the record at 4:36 p.m.
6          (Discussion off the record)
7          VIDEOGRAPHER:  This is the beginning of
8  tape four, volume two, of the deposition of Kevin
9  Gorospe.
10          We are on the record at 4:40 p.m.
11  BY MR. ROBBEN:
12      Q.   A few minutes ago you said that you had
13  received letters such as Exhibit 63 from other
14  manufacturers and that you passed those on to Mr.
15  Terra.
16          Did it ever occur that when you passed on
17  one of those letters to Mr. Terra he -- he asked
18  you to subsequently investigate anything about the
19  company that had sent it?
20      A.   No, not that I can recall.
21      Q.   Do you remember any -- any type of
22  letter like this exhibit touching off some type of

Page 689

1  investigation, whether you did it or not?
2          MR. PAUL:  Objection to form.
3          THE WITNESS:  No.
4  BY MR. ROBBEN:
5      Q.   At the previous day of your deposition
6  you testified that you were familiar with something
7  called "usual and customary charge."
8          Do you remember that testimony?
9      A.   Yes.
10      Q.   And do I have it right that usual and
11  customary charge is an amount reported by a
12  pharmacy provider to Medi-Cal?
13      A.   Yes.
14      Q.   Okay.  And that that number is a
15  representation by the provider to Medi-Cal that
16  that's their usual and customary charge to the
17  public?
18          Is that correct?
19      A.   Yes.
20      Q.   Okay.  When a provider submits a claim
21  for a Medi-Cal -- for a drug submitted to a
22  Medi-Cal beneficiary, do they submit along with

Page 690

1  that any type of certification as to the accuracy
2  of the components in the claim?
3      A.   Not that I know of.
4      Q.   Okay.  Even if it doesn't come along
5  with the actual claim itself are pharmaceutical
6  providers like pharmacies expected to submit true
7  and accurate claims?
8      A.   Yes.
9      Q.   Okay.  So if a pharmacy says it
10  dispensed 30 antibiotic pills to Medicaid
11  beneficiary X, you expect that that's true and that
12  that actually happened; right?
13      A.   Yes.
14      Q.   Okay.  When they put the usual and
15  customary charge on their claim, you expect that
16  that usual and customary charge is a true number,
17  that's their usual and customary charge; correct?
18      A.   Yes.
19      Q.   Okay.  Now, as I understand how
20  reimbursement is worked under Medi-Cal, the program
21  is paid the lesser of a certain of number of -- of
22  factors; is that fair?

Gorospe, Pharm. D., J. Kevin - Vol. II                    September 22, 2008

Sacramento, CA

Page 691

1    A.  Yes.
2    Q.  Okay.  So for a time it was AWP minus 5,
3  or FAC, or MAIC, and then the program would pay the
4  lower of each of those -- of those components;
5  correct?
6    A.  After comparing it to the usual and
7  customary.
8    Q.  Okay.  So if the usual and customary was
9  10 and the others were less than 10, one of those
10  other ones would be picked as the basis for the
11  reimbursement; right?
12    A.  That is correct.
13    Q.  Okay.  So now, is it fair to say based
14  on that that whenever some basis of payment was
15  selected other than the usual and customary charge
16  the Medi-Cal program obtained the prescription at a
17  discount?
18    MR. PAUL:  Objection to form.
19    THE WITNESS:  Yes.
20  BY MR. ROBBEN:
21    Q.  Okay.  Does it -- it obtained the
22  product for less than that pharmacy would have sold

Page 692

1  it to the general public; correct?
2    A.  Yes.
3    Q.  Okay.  So even if the basis of payment
4  was AWP, AWP minus 5 percent, let's say, if that
5  was less than usual and customary charge the
6  Medi-Cal program obtained that drug for less than
7  the pharmacy would have charged somebody else for
8  that product; correct?
9    MR. PAUL:  Objection to form.
10    THE WITNESS:  Yes.
11    MR. ROBBEN:  I have nothing else.
12    MR. PAUL:  You guys done with him for the
13  day?
14    MR. BUEKER:  (Nodding head)
15    MR. PAUL:  I had a couple of questions.
16    MR. ROBBEN:  Why don't you go ahead.
17    MR. PAUL:  Sure.
18    Mr. Gorospe --
19    MR. ROBBEN:  You want to trade places?
20    MR. BENNETT:  Yeah, why don't we.
21    MR. BUEKER:  I'll move out.
22       EXAMINATION

Page 693

1  BY MR. PAUL:
2    Q.  For the record I'm Nicholas Paul with
3  the California Department of Justice representing
4  the Medi-Cal program here in California in this
5  case and representing Mr. Gorospe in this
6  deposition.
7       Mr. Gorospe, counsel for Mylan and Dey,
8  Mr. Robben, asked you some questions at the
9  beginning of his time with you regarding a meeting
10  -- a discussion that you had with Mylan, his
11  client, in May 2007, I believe.
12       Do you recall the testimony?
13    A.  Yes.
14    Q.  And you provided responses to his
15  questions?
16    A.  Yes.
17    Q.  And if I recollect correctly, the
18  discussion with the Mylan representative included
19  discussion of AMPs; is that correct?
20    A.  Yes.
21    Q.  And the Mylan representative described
22  AMPs to you as a poor basis for reimbursement

Page 694

1  because they were unreliable; is that correct?
2    MR. ROBBEN:  Objection.
3  BY MR. PAUL:
4    Q.  Is that correct?
5    A.  Yes.
6    Q.  Do you recall -- did the Mylan
7  representative explain to you why he or she
8  believed that Mylan's AMP were unreliable?
9    A.  Yes, but I don't recall the content.
10    Q.  So you don't remember the reason for
11  their unreliability?
12    A.  Just -- I don't recall the specifics of
13  the conversation.
14    Q.  And I believe the representative also
15  expressed concern about using AMPs for
16  reimbursement because of the confidentiality of
17  AMP; is that correct?
18    A.  Yes.
19    Q.  Do you recall what the representative
20  stated to you regarding the confidentiality of
21  Mylan AMPs, any details?
22    A.  No, I don't recall the details.

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

8caa644f-42e5-4e8a-b51e-b64e1e0d762a

# EXHIBIT 2



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Health Care Financing Administration

The Administrator
Washington, D.C.   20201



EXHIBIT
Abbott 762
3/20/08

`John F. Schlegel, Pharm. D.
President
American Pharmaceutical Association
2215 Constitution Avenue, NW
Washington, DC 20037

Dear Dr. Schlegel:

    Thank you for your letter in which you express concern that
the final Medicaid rule governing aggregate upper limits for
prescription drugs does not assure adequate reimbursement to
pharmacists.  You also indicated your view that the final rules
are flawed because they differ significantly from the proposed
rules published August 19, 1986.  Further, you state that an
opportunity to issue a uniform rule or single national policy on
Medicaid drug reimbursement was missed and as a result, State
agencies may continue to offer inadequate reimbursement to
participating pharmacies.  I regret that my response has been
delayed.

    In the notice of Proposed Rulemaking (NPRM) published on
August 19, 1986, the Department of Health and Human Services
outlined three different alternatives to change the Medicaid
reimbursement regulations that determine upper limits on
payments for prescription drugs.  The notice of rulemaking
proposed to replace the existing regulations with one of the
following methodologies:  (1) a revised Maximum Allowable Cost
(MAC) Program; (2) the Pharmacist Incentive Program (PhIP); and
(3) the Competitive Incentive Program (CIP).

    In evaluating the public response to the three alternatives,
we considered all the comments received as well as the
availability of resources to implement the proposed
alternatives.  Although your association supported the
Competitive Incentive Program, implementation of this
methodology would have been problematic in terms of
administrative costs, program benefit costs and delays in
implementation.  The reformed MAC Program was not selected
because even with the reforms we were proposing, the program
would still be too cumbersome to enable us to respond to the
rapidly changing drug market.  Thus, by a process of

prepared by:HCFA:BERC:ORP:DARS:RODLER 09/01/87:48060
Disc: Debbie #2
Computer: schlegel
Typist: Debbie T.:76336

HHC002-0564

2

elimination, we found that the policy goals of State flexibility and straight forward calculation of aggregate Federal upper limits for selected therapeutically equivalent multiple source drugs are best served by the adoption of the proposed formula approach. The upper limit for all other drugs is an aggregate upper limit that must not exceed the limit as calculated by the State Medicaid Agency under the estimated acquisition cost principles set forth in the notice of proposed rulemaking.

Since both of the approaches are embodied in the notice of proposed rulemaking, we are quite surprised to learn that you believe that the final rule differs significantly from the original and is, therefore, flawed. Further, we cannot agree with your concerns that the new rules do not assure adequate reimbursement to pharmacists because we did not issue a single uniform national payment policy for Medicaid drug payments. Please note that it was never our intent to set forth a particular payment system that must be followed by the individual State Medicaid agencies. Rather, it has always been our intent to permit and encourage the States to exercise maximum flexibility in designing a variety of payment systems that would be subject to maximum payment levels established by Federal regulations. Moreover, these maximum payment levels include sufficient margins in both the mark-up factor for generic substitutes and the reasonable dispensing fees that would enable pharmacists to realize profits through prudent purchasing and efficient business operations.

As with any new significant rules there is bound to be a "settling in" process during which time States and affected associations work closely together to assure mutual goals. Let us begin that process together by working with the individual State agencies and assisting them in the implementation of these new rules. I am confident that these new rules, once implemented, will result in both fair and equitable payments for pharmacists as well as enhanced savings to both the Federal and State governments through the greater usage of therapeutically equivalent but less costly, generic drugs.

We appreciate your taking time to share with us you views on this very important issue.

Sincerely,

William L. Roper, M.D.
Administrator

# EXHIBIT 3

```
1                UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MASSACHUSETTS

3      - - - - - - - - - - - - - - - -

4    IN RE:  PHARMACEUTICAL        )  MDL NO. 1456

5    INDUSTRY AVERAGE WHOLESALE    )  CIVIL ACTION

6    PRICE LITIGATION              )  01-CV-12257-PBS

7    THIS DOCUMENT RELATES TO      )

8    U.S. ex rel. Ven-a-Care of    )  Judge Patti B. Saris

9    the Florida Keys, Inc.        )

10        v.                       )  Chief Magistrate

11   Abbott Laboratories, Inc.,    )  Judge Marianne B.

12   No. 06-CV-11337-PBS           )  Bowler

13     - - - - - - - - - - - - - - - -

14        (captions continue on following pages)

15

16          .

17    Videotaped deposition of NANCY-ANN MIN DEPARLE

18                    Volume 2

19

20

21

22
```

1   rebates under that act and that there was a

2   linkage between the rebates and coverage of the

3   drugs.

4        Q.   And I think that you've testified that

5   the states had flexibility in determining how

6   they would run their Medicaid programs as long as

7   they complied with the federal statutes, rules

8   and regulations?

9        A.   That sounds right.

10       Q.   Now, HCFA had the ultimate

11  responsibility of overseeing whether each state

12  Medicaid program was in compliance with federal

13  statutes and rules and regulations?

14            MS. YAVELBERG:   Objection, form.

15       A.   Well, I don't know ultimate

16  responsibility.   I mean, HCFA was the agency of

17  the federal government that related to the state

18  Medicaid offices.

19       Q.   But each state was required to submit

20  its state plan describing its program to HCFA for

21  approval; isn't that correct?

22       A.   Yes.   And that's generally done once

Henderson Legal Services, Inc.

# EXHIBIT 4



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Health Care Financing Administration

The Administrator
Washington, D.C.   20201



·John F. Schlegel, Pharm. D.
President
American Pharmaceutical Association
2215 Constitution Avenue, NW
Washington, DC 20037

Dear Dr. Schlegel:

Thank you for your letter in which you express concern that
the final Medicaid rule governing aggregate upper limits for
prescription drugs does not assure adequate reimbursement to
pharmacists. You also indicated your view that the final rules
are flawed because they differ significantly from the proposed
rules published August 19, 1986. Further, you state that an
opportunity to issue a uniform rule or single national policy on
Medicaid drug reimbursement was missed and as a result, State
agencies may continue to offer inadequate reimbursement to
participating pharmacies. I regret that my response has been
delayed.

In the notice of Proposed Rulemaking (NPRM) published on
August 19, 1986, the Department of Health and Human Services
outlined three different alternatives to change the Medicaid
reimbursement regulations that determine upper limits on
payments for prescription drugs. The notice of rulemaking
proposed to replace the existing regulations with one of the
following methodologies: (1) a revised Maximum Allowable Cost
(MAC) Program; (2) the Pharmacist Incentive Program (PhIP); and
(3) the Competitive Incentive Program (CIP).

In evaluating the public response to the three alternatives,
we considered all the comments received as well as the
availability of resources to implement the proposed
alternatives. Although your association supported the
Competitive Incentive Program, implementation of this
methodology would have been problematic in terms of
administrative costs, program benefit costs and delays in
implementation. The reformed MAC Program was not selected
because even with the reforms we were proposing, the program
would still be too cumbersome to enable us to respond to the
rapidly changing drug market. Thus, by a process of

Prepared by:HCFA:BERC:ORP:DARS:RODLER 09/01/87:48060
Disc: Debbie #2
Computer: schlegel
Typist: Debbie T.:76336

elimination, we found that the policy goals of State flexibility and straight forward calculation of aggregate Federal upper limits for selected therapeutically equivalent multiple source drugs are best served by the adoption of the proposed formula approach. The upper limit for all other drugs is an aggregate upper limit that must not exceed the limit as calculated by the State Medicaid Agency under the estimated acquisition cost principles set forth in the notice of proposed rulemaking.

Since both of the approaches are embodied in the notice of proposed rulemaking, we are quite surprised to learn that you believe that the final rule differs significantly from the original and is, therefore, flawed. Further, we cannot agree with your concerns that the new rules do not assure adequate reimbursement to pharmacists because we did not issue a single uniform national payment policy for Medicaid drug payments. Please note that it was never our intent to set forth a particular payment system that must be followed by the individual State Medicaid agencies. Rather, it has always been our intent to permit and encourage the States to exercise maximum flexibility in designing a variety of payment systems that would be subject to maximum payment levels established by Federal regulations. Moreover, these maximum payment levels include sufficient margins in both the mark-up factor for generic substitutes and the reasonable dispensing fees that would enable pharmacists to realize profits through prudent purchasing and efficient business operations.

As with any new significant rules there is bound to be a "settling in" process during which time States and affected associations work closely together to assure mutual goals. Let us begin that process together by working with the individual State agencies and assisting them in the implementation of these new rules. I am confident that these new rules, once implemented, will result in both fair and equitable payments for pharmacists as well as enhanced savings to both the Federal and State governments through the greater usage of therapeutically equivalent but less costly, generic drugs.

We appreciate your taking time to share with us you views on this very important issue.

Sincerely,

William L. Roper, M.D.
Administrator

# EXHIBIT 5

285

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------------X  MDL NO. 1456

IN RE:  PHARMACEUTICAL INDUSTRY   :  CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION :  01-CV-12257-PBS

-----------------------------------X

THIS DOCUMENT RELATES TO:            :

U.S. ex rel. Ven-A-Care of the     :  CIVIL ACTION:

Florida Keys, Inc. v. Abbott       :  06-CV-11337-PBS

Laboratories, Inc.                 :

-----------------------------------X


IN THE CIRCUIT COURT OF

MONTGOMERY COUNTY, ALABAMA

-----------------------------------X

STATE OF ALABAMA,                    :  CASE NO.

        Plaintiff,                   :  CV-05-219

     v.                              :

ABBOTT LABORATORIES, INC.,           :  JUDGE

et al.,                              :  CHARLES PRICE

        Defendants.                  :

-----------------------------------X

1                    MS. BROOKER: Objection.  Form.

2         A.    That is correct.

3         Q.    In fact, if the federal government

4 didn't approve the methodology, it couldn't be

5 used.  Right?

6                    MS. BROOKER: Objection.  Form.

7         A.    That's correct.

8         Q.    And the states had leeway to be

9 able to determine the specific ingredient

10 reimbursement basis that they wanted, as long as

11 it was acceptable to the federal government.

12              Right?

13                   MS. BROOKER: Objection.  Form.

14        A.    And consistent with the statute,

15 yes.

16        Q.    Okay.  Now -- so, it was possible,

17 for example, if you look at Delaware, you'll see

18 that the Delaware ingredient reimbursement basis

19 in place at the time of this document, 1995, was

20 AAC, actual acquisition cost?

21        A.    I do.

22        Q.    It was -- it was possible, and if

1 Delaware wanted to reimburse on the basis of

2 actual acquisition cost, it could do that.

3              Right?

4        A.      That's correct.

5        Q.      And if you look, for example, at --

6 there are a number of states, but if you look, for

7 example, at New York, at the time, New York, the

8 reimbursement -- ingredient reimbursement basis is

9 indicated as AWP without any discount.  Right?

10       A.      That's correct.

11       Q.      Now, you would agree with me that

12 using those two examples, the State of Delaware

13 would be paying for a drug a lot less than New

14 York was paying for the same drug.  Right?

15              MR. BREEN:  Objection.  Form.

16       A.      I believe in general we would have

17 expected that, yes.

18       Q.      So, your understanding would be

19 that if Delaware was paying actual acquisition

20 costs that the provider had paid to acquire the

21 drug, that Delaware was paying less than New York,

22 which had decided to pay the average wholesale

1 price published. Correct?

2            MS. BROOKER: Objection. Form.

3      A.      That's correct.

4      Q.      And as far as the federal

5 government was concerned, there wasn't any issue

6 or problem with New York deciding to pay more than

7 Delaware paid for the exact same drug.

8            MS. BROOKER: Objection.

9      Q.      Isn't that right?

10            MS. BROOKER: I'm sorry. Objection.

11 Form.

12     A.      Both systems, right, were

13 consistent with the -- with the statute and our

14 policies.

15     Q.      Did you know -- independent of

16 this, did you know that there was a point in time

17 in your tenure that Delaware used an actual

18 acquisition cost basis for drugs?

19     A.      I don't recall. I may have known

20 it at some point, but I have no memory of having

21 known it.

22     Q.      And I take it that if -- if New

1 York decided to pay, as it did in this period of

2 time, to reimburse for Medicaid using an

3 undiscounted AWP, the federal government did not

4 have a problem with its share being driven by that

5 number as opposed to the actual acquisition cost

6 that was being used in Delaware.

7          MR. BREEN: Objection. Form.

8          MS. BROOKER: Objection. Form.

9     Q.    Is that right?

10    A.    I'm not sure I would characterize

11 it as the federal government did not have a

12 problem. The federal government permitted New

13 York to use the AWP methodology.

14    Q.    So, the federal government

15 permitted New York to pay an undiscounted AWP at

16 the very same time -- the federal government

17 permitted New York to reimburse for Medicaid on

18 AWP, without any discount, at the same time that

19 it was permitting Delaware to pay actual

20 acquisition cost, a lower amount for the same

21 drugs?

22          MR. BREEN: Objection. Form.

1                    MS. BROOKER:  Objection.  Form.

2         A.       That's correct.

3         Q.       And from your agency's standpoint,

4 there was nothing wrong with that?

5                    MR. BREEN:  Objection.  Form.

6                    MS. BROOKER:  Objection.  Form.

7         A.       Again, I would -- I would disagree

8 with the characterization -- characterization.

9                    From our agency standpoint, that's

10 what the law and the structure of the program

11 permitted and called for.

12        Q.       So, the law and the structure of

13 the Medicaid program would permit one state to pay

14 at actual acquisition cost and another one to pay

15 an undiscounted AWP at the same time?

16                   MR. BREEN:  Objection.  Form.

17        A.       That was my understanding of the

18 law.  Yes, sir.

19        Q.       And, in fact, in the Medicaid

20 program, at the same time in 1995, during your

21 tenure, for the same drug that Delaware was

22 reimbursing on actual acquisition costs, if that

1 drug was covered by Medicare, Medicare was paying

2 more. Right?

3              MS. BROOKER: Objection. Form.

4      A.     Yes, absolutely.

5      Q.     Because they were paying 100

6 percent of AWP. Right?

7      A.     Yes.

8      Q.     And, again, as far as the federal

9 government was concerned, that was appropriate for

10 that time, given the statutes that existed?

11             MS. BROOKER: Objection. Form.

12     A.     You know, to characterize the

13 federal government as sort of a fiction, I would

14 say that the statutes that existed at the time

15 permitted that.

16     Q.     And the statutes that we're talking

17 about, these were laws of the United States passed

18 by the U.S. Congress. Right?

19     A.     That's correct.

20     Q.     So, Congress had decided that

21 that's the way it would work?

22             MR. BREEN: Objection. Form.

1      A.      Congress decided that it was

2 permissible.

3      Q.      So, to the extent that New York was

4 reimbursing Medicaid on AWP, without any discount,

5 while Delaware was reimbursing on actual

6 acquisition cost, New York wasn't improperly

7 overpaying; were they?

8              MS. BROOKER: Objection.  Form.

9      A.      Again, their judgment was New York

10 was within its legal rights to do so.

11      Q.      And there are other states -- if

12 you look down the column, there are other states

13 where -- that were also using an undiscounted AWP

14 besides New York.

15              For example, if you look at Idaho,

16 that was -- the fact that Idaho decided to do it

17 that way, there was nothing wrong with that

18 either?

19      A.      It was permissible under the law,

20 yes.

21      Q.      Now, you would expect, wouldn't

22 you, Dr. Vladeck, that if the State of Delaware

 1 Medicaid people could figure out how to reimburse

 2 on actual acquisition cost, that other states

 3 could do the same thing?  You would expect that.

 4 Right?

 5                 MS. BROOKER:  Objection.  Form.

 6                 MR. BATES:  Object to form.

 7        A.      Please restate your question.

 8        Q.      Well, the people -- the Medicaid

 9 people in Delaware didn't have some secret

10 knowledge that nobody else in the country had,

11 right, as far as you knew?

12                 MR. BATES:  Objection to form.

13                 MS. BROOKER:  Objection.  Form.

14        A.      That's -- I don't believe so, no.

15        Q.      Okay.  So, presumably, if the

16 people in Delaware that ran Medicaid could figure

17 out how to reimburse on actual acquisition cost,

18 so could the Medicaid people in every other state.

19                 Right?

20                 MS. BROOKER:  Objection.  Form.

21                 MR. BATES:  Object to form.

22        A.      They were legally permitted to

1 choose to do so, yes.

2      Q.      And they were legally permitted to

3 choose not to do it that way.  Right?

4      A.      That's correct.

5              MS. BROOKER:  Objection.  Form.

6      Q.      Well, since Mr. Bates in here,

7 let's -- let's look at Alabama, which is on the

8 first line.

9              Alabama had ingredient

10 reimbursement basis of WAC plus 9.2 percent.

11             Do you see that?

12     A.      Yes, I do.

13     Q.      And if Alabama decided that they

14 would use WAC, plus the 9.2 percent on top of WAC,

15 they were entitled to do that.  Right?

16             MS. BROOKER:  Objection.  Form.

17     A.      Yes, they were.

18     Q.      And based on your understanding of

19 WAC, would you expect that a reimbursement basis

20 that was based on WAC would result in a lower

21 payment than one based on AWP?

22             MR. BREEN:  Objection.  Form.

1                  MS. BROOKER: Objection to form.

2                  MR. BATES: Objection to form.

3          A.      My understanding is that WAC, plus

4  a percentage in the range of 9 percent, would be

5  roughly comparable to a state that chose to pay

6  AWP minus 10 percent.

7          Q.      You don't really know that that's

8  true for every single drug; do you?

9                  MS. BROOKER: Objection. Form.

10         A.      I assume it's not true for every

11  single drug because I assume that the relationship

12  between given drugs and WAC and AWP varies from

13  state to state and from pharmacy to pharmacy.

14         Q.      And to the extent the state decided

15  that they would pay AWP minus 10 percent, for

16  example, just to pick one, Nevada, and another

17  state decided that they would pay AWP minus 10.5

18  percent. which is Oregon, or Oklahoma, rather, the

19  states could come up with those fine gradations if

20  that's what they wanted to do. Right?

21                 MR. BREEN: Objection. Form.

22                 MS. BROOKER: Objection. Form.

1        A.      Yes.

2        Q.      Now, there were other states that

3 had entirely different reimbursement systems.

4 Isn't that right? For example, Arizona.

5        A.      Well, no. I would say that all the

6 states had either some version of AWP or some

7 version of acquisition costs, except the States of

8 Tennessee and Arizona, which did not directly pay

9 for retail prescription drugs but, rather, had all

10 of their beneficiaries enrolled in managed care

11 plans, which contracted for those drugs.

12       Q.      Well, and on that point then,

13 states were also entitled, if they wanted to go

14 that route, to do what Tennessee and Arizona had

15 done, which was to do it -- the reimbursement in

16 an entirely different way?

17               MS. BROOKER: Objection. Form.

18       A.      No, I wouldn't -- I wouldn't

19 characterize it that way. I would say to provide

20 that Medicaid beneficiaries would receive service

21 through capitated claimants to a healthcare plan

22 rather than for reimbursements for individual

1 services.

2       Q.      And that was proper to do under the
3 structure -- the statutory structure?

4               MS. BROOKER:  Objection.  Form.

5       A.      Under a set of very specific and
6 limited circumstances, yes.

7.      Q.      So, would the HCFA have approved
8 Tennessee doing what it did?

9       A.      HCFA approved the TennCare plan,
10 yes.

11      Q.      And HCFA also approved the Arizona
12 healthcare cost containment program?

13              MS. BROOKER:  Objection.  Form.

14      A.      It did, although I believe, if I
15 remember correctly, that was under a statutory
16 mandate to approve it.

17      Q.      Do you know whether Arizona or
18 Tennessee paid more or less than other states
19 based on the different way they were doing it?

20              MS. BROOKER:  Objection.  Form.

21      A.      For prescription drugs?

22      Q.      Yes.

1     A.     I wouldn't have any information on

2 what they paid for prescription drugs.

3     Q.     Now, focusing, again, if you would,

4 Dr. Vladeck, on Delaware vs. New York, and the way

5 they were doing it as indicated on Exhibit Dey

6 022, New York was including in its reimbursement

7 whatever the spread was between AWP and actual

8 acquisition costs.  Right?

9            MR. BREEN:  Objection to form.

10     A.     To the extent there was a spread,

11 paying at average wholesale price would

12 incorporate that spread, yes.

13     Q.     Right.  So, to the extent that

14 there was a spread between AWP and actual

15 acquisition cost in New York, that spread was part

16 of the reimbursement that New York decided to pay.

17            Right?

18            MR. BREEN:  Objection.  Form.

19     A.     Yes.

20     Q.     And Delaware, using actual

21 acquisition cost, had -- had eliminated that

22 spread.  Right?

1           MS. BROOKER: Objection. Form.

2      A.    In principle, yes.

3      Q.    Okay. So, in -- in the time period

4 that you were running HCFA, you had one state on a

5 Medicaid program where there was no spread,

6 Delaware, and one state that had the maximum

7 spread because they paid 100 percent of AWP.

8           Right?

9           MS. BROOKER: Objection. Form.

10          MR. BREEN: Objection. Form.

11     A.    Yes.

12     Q.    And, again, the fact that one state

13 had the full spread between AWP and actual

14 acquisition cost, New York, that was acceptable

15 within the structure of the program that you were

16 running. Right?

17          MS. BROOKER: Objection. Form.

18     A.    That was -- that was what the law

19 permitted, yes.

20     Q.    And the fact that there was nothing

21 in the law that prohibited New York from deciding

22 to pay the full spread between acquisition cost

1 and AWP; was there?

2              MR. BREEN:  Objection.  Form.

3      A.     There was nothing in the law that

4 spoke directly to that.  The law permitted New

5 York to pay AWP.

6      Q.     So, there was nothing that made the

7 spread between AWP and actual acquisition cost

8 that New York was paying illegal?

9              MS. BROOKER:  Objection.  Form.

10     A.     Well, when you characterize the

11 spread, I think it, frankly, gets to -- my

12 layman's understanding of what this case is about

13 was what AWP means, and the size of the spread,

14 and I'm not competent to -- to speak to that.

15              I think it was legal for New York

16 State to pay what they thought AWP was.  Whether

17 AWP was a legally arrived at number I think is the

18 subject of litigation, on which I'm not competent

19 to comment.

20     Q.     And I don't want -- I'm not asking

21 you about the litigation or about anything in

22 terms of how the government views this now.

Page 448

1                    I'm just asking you, when you were

2 running HCFA in -- in the time period that you

3 were the head of that agency, there is nothing

4 that you know about that indicated that the

5 existence of a spread between AWP and actual

6 acquisition cost was illegal?

7                    MR. BREEN:  Objection.  Form.

8                    MS. BROOKER:  Objection.  Form.

9 Asked and answered.

10      Q.     You can answer.

11      A.     That the very existence of a spread

12 was illegal?  No.  We perceived that there

13 probably was a spread.

14      Q.     You perceived that there probably

15 was a spread?

16      A.     Yes.

17      Q.     And with that perception in mind,

18 HCFA approved state plans that had the spread

19 built into the reimbursement basis.  Correct?

20                    MS. BROOKER:  Objection.  Form.

21      A.     HCFA approved state plans that paid

22 on some basis relative to AWP, because that's what

1 the statute provided for.

2        Q.      And in doing that you were
3 approving plans that had the spread built into the
4 reimbursement methodology.  Right?

5                MS. BROOKER:  Objection.  Form.

6        A.      Again, I would say that had a
7 spread built into the reimbursement methodology.

8        Q.      Fine.  But you also had one state,
9 at least, that had no spread.  Right?

10               MS. BROOKER:  Objection.  Form.

11               MR. BREEN:  Objection.  Form.

12       A.      Yes, that's correct.

13       Q.      Now, at -- at -- at the same time
14 that we're focusing on with Exhibit Dey 022, which
15 is in the time period of 1995, which is the point
16 in time during your tenure as the head of HCFA --

17       A.      And if I may say, it refers to the
18 time period of '93/'94, but --

19       Q.      And, again, that was -- that was
20 the period of time that you were running HCFA, at
21 least part of that time?

22       A.      Part of that time, yes.

461

1    **confidentiality restrictions as well, in terms of**
2    **what the states made -- did with the data.**
3            Q.      Okay.  So, with respect to -- just
4    focusing on that, HCFA, under the statutory
5    scheme, was entitled to share AMP data with the
6    states.  Isn't that right?
7            A.      **Of course, yes.**
8                    MR. BREEN:  Objection.  Form.
9                    MS. BROOKER:  Objection.  Form.
10           Q.      And did HCFA do that?
11           A.      **As far as I know.**
12           Q.      So, as far as you know, people
13   within HCFA shared AMP data with state Medicaid
14   agencies?
15           A.      **That was my understanding.**
16           Q.      What was that based on?
17           A.      **What was what based on?**
18           Q.      Your understanding.  What was your
19   understanding based on?
20           A.      **Of the process by which the HCFA**
21   **staff worked with the states in administering the**
22   **rebate program.**

Case 1:01-cv-12257-PBS Document 6797-2 Filed 12/21/09 Page 34 of 139

463

1              Right?

2              MS. BROOKER: Objection. Form.

3         A.    Yes.

4         Q.    So, for example, looking back at

5    Exhibit Dey 022, the one-page sheet that we had

6    that had all the reimbursement basis, the

7    responsible directors of the Medicaid agencies of

8    these -- of each of these states would be able to

9    peruse AMP data and compare that to what they were

10   reimbursing on. Right?

11             MR. BREEN: Objection. Form.

12             MS. BROOKER: Objection. Form.

13             MR. BATES: Objection to form.

14        A.    When you talk about "perusing,"

15   again, I don't -- I don't know if they'd even be

16   aware that their agencies had it. But if they

17   were, depending on how their agencies were

18   organized, they might very well be.

19        Q.    So, it was entirely -- it was

20   entirely possible for the heads of a state

21   Medicaid agency to look at the AMP data on AMP

22   prices and at the same time look at data as to

464

1   what they were reimbursing for those drugs.  That

2   was entirely possible.  Right?

3                   MS. BROOKER:  Objection.  Form.

4                   MR. BREEN:  Objection.  Form.

5          A.       It's -- I don't know any reason why

6   it wouldn't be possible.

7          Q.       And within your agency, within

8   HCFA, certainly people within HCFA could sit down

9   and compare the AMP data, for example, for Dey's

10  Albuterol, and see what the AMP was and compare

11  what the AWP was.  Right?

12                  That was -- that was information

13  that they had in the agency?

14                  MS. BROOKER:  Objection.  Form.

15         A.       I believe the -- the way we

16  interpreted the confidentiality provisions of the

17  statute was that the people directly involved in

18  the administration of the Medicaid drug rebate

19  program could have chosen to do so, yes.

20         Q.       Right.  So, somebody in -- in HCFA

21  that was involved with the rebate program could

22  one day look at the AMP for Dey's Albuterol and

1 compare it to an AWP for Dey's Albuterol?

2                    MS. BROOKER: Objection. Form.

3         A.       Presumably, yes.

4         Q.       And based on your understanding of

5 AWP and AMP, as you've indicated in the course of

6 this deposition and your prior session, you would

7 expect that the AWP -- there was a spread between

8 the AMP and the AWP. Right?

9                    MS. BROOKER: Objection. Form.

10        A.       Yes.

11        Q.       And that would be because the AMP

12 reported to HCFA would include a number of

13 specified discounts. Isn't that right?

14                   MS. BROOKER: Objection. Form.

15        A.       I don't know what you mean by

16 "specified discounts," but it was my impression

17 that, again, on average, the AMPs would have been

18 for single-source drugs in the range of 15 to 20

19 percent below the AWP, on average, and, for

20 generic drugs, as I've learned in the course of

21 this proceeding, as much as 25 to 40 percent below

22 AWP, on average.

# EXHIBIT 6

Scully, Thomas A.

May 15, 2007

Washington, DC

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -x

IN RE:  PHARMACEUTICAL          :  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     :  CIVIL ACTION

PRICE LITIGATION               :  01-CV-12257-PBS

THIS DOCUMENT RELATES TO       :

U.S. ex rel. Ven-a-Care of     :  Judge Patti B. Saris

the Florida Keys, Inc.         :

        v.                     :

Abbott Laboratories, Inc.,     :  Chief Magistrate

No. 06-CV-11337-PBS            :  Judge Marianne B.

- - - - - - - - - - - - - - -x    Bowler

1    them that they weren't paying providers unless -- and
2    this is another complicated issue -- in some cases,
3    they were artificially paying providers huge amounts
4    so that they could churn the money back through and
5    not actually put up state money. That happened with
6    drug reimbursement as well. So the only time I
7    remember questioning drug reimbursement or rebate
8    strategies, for example, in Florida, was when they
9    used it for a scam to not put up state money. Which
10   I did in Florida on a regular basis.

11        Q.    And so it was CMS's policy to let the --
12   let the states make their own determination of what,
13   what levels to reimburse their providers at?

14        A.    For all providers.

15        Q.    For all providers.

16        A.    Yes.

17        Q.    And from CMS's perspective, it would be
18   okay if states used AWP minus 10 percent as a
19   reimbursement level, even though CMS and the state
20   knew that the actual acquisition cost was more like
21   AWP minus 40 percent?

22              MR. GOBENA:    Object to the form.

Scully, Thomas A.                                    May 15, 2007

Washington, DC

                                                            210

1              MR. BREEN:  Object to the form.

2              MS. MILLER:  Object to the form.

3              BY MR. DALY:

4         Q.   Go ahead.

5         A.   **I'm certain that we tried to educate them**

6    **state by state as to reference documents as to what**

7    **reasonable prices were.  But the pricing policy**

8    **whether it's nursing homes, hospitals, providers was**

9    **as long as it wasn't unreasonable and as long as it**

10   **wasn't part of a refinancing money churning scam to**

11   **avoid putting up state dollars, it was up to the**

12   **discretion of the state what they negotiate with**

13   **providers in the Medicaid program, including drugs,**

14   **unless Congress told us otherwise, which they never**

15   **did that I'm aware of.**

16        Q.   And the state -- the federal government

17   would pay, what, a national average of 50 percent of

18   all Medicaid dollars, is that how it worked out?

19        A.   **No.  It's all state by state, based on**

20   **poverty.  So Connecticut and New York, which are**

21   **wealthier states have 50 percent match.  Mississippi**

22   **was 78 percent, I believe.**

# EXHIBIT 7

```
 1              COMMONWEALTH OF KENTUCKY

 2           FRANKLIN CIRCUIT COURT - DIVISION I

 3              CIVIL ACTION NO. 04-CI-1487

 4

 5      ----------------------------X

 6   COMMONWEALTH OF KENTUCKY       )

 7   ex rel. GREGORY D. STUMBO,     )

 8   ATTORNEY GENERAL,              )

 9        Plaintiff                 )

10   v.                            )

11   ALPHARMA USPD, INC., et al., )

12        Defendants               )

13      ----------------------------X

14

15

16        Deposition of Mike Robinson, taken at Stites

17   & Harbison, 421 West Main Street, Frankfort,

18   Kentucky, commencing at 9:01 a.m., Thursday,

19   February 7, 2008, before Kimberley Ann Keene, RPR

20   No. 041331.

21

22
```

Page 108

1    but every single service that we provided had a

2    provider network that we wanted to ensure.

3         Q.    So -- so, DMS has to balance the

4    considerations of efficiently providing Medicaid

5    services and ensuring access to Medicaid services

6    for recipients in every one of the areas that

7    Medicaid provides, correct?

8         A.    That's correct.

9         Q.    And the considerations apply to the

10   pharmacy area as well?

11        A.    That's correct.

12        Q.    And you were also mentioning fairness

13   and reasonableness.

14             And just elaborate more on what you

15   meant by that.

16        A.    Well, I think what I meant by that is,

17   we -- we were confronted with a very difficult

18   financial situation, and our approach was, was

19   not to favor one provider network over another

20   provider network.

21             And the changes that we wanted to make,

22   or we -- we did make, we thought were reasonable

Case 1:01-cv-12257-PBS   Document 6797-2   Filed 12/21/09   Page 44 of 139

1    under the financial conditions that we found

2    ourselves in, trying to kind of make our budget

3    and also protecting the provider networks that

4    were established.

5        Q.    And in the pharmacy area, the fairness

6    and reasonableness had to -- I mean, wasn't that

7    basically balancing the need to reimburse

8    pharmacists enough to incentivize them to

9    participate in the program with the budget

10   considerations that you were talking about

11   before?

12       A.    It -- it was a very fine balance in

13   trying to accomplish both goals.

14       Q.    Yeah.

15             Now, how important was the report,

16   Exhibit 3, in making the decision about what

17   reimbursement levels would be?

18       A.    In -- in my opinion, it was just one

19   piece of information to be considered.

20       Q.    And who all was receiving Exhibit 3, or

21   considering Exhibit 3, in terms of deciding what

22   the reimbursement levels would -- would be?

# EXHIBIT 8

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-------------------------------x

In re: PHARMACEUTICAL INDUSTRY  )

AVERAGE WHOLESALE PRICE          )

LITIGATION                       )

-------------------------------)

United States of America ex rel.) MDL No. 1456

Ven-A-Care of the Florida Keys, )

Inc. v. Abbott Laboratories,    ) Civil Action

Inc., Civil Action No. 06-       ) No. 01-12257-PBS

11337-PBS; and United States of )

America ex rel. Ven-A-Care of    ) Honorable

the Florida Keys, Inc., v. Dey, ) Patti B. Saris

Inc., et al., Civil Action No.   )

05-11084-PBS; and United States )

of America ex rel. Ven-A-Care    )

of the Florida Keys, Inc., v.    )

Boehringer Ingelheim Corp., et   )

al., Civil Action No. 07-10248- )

PBS                              )

-------------------------------x

307

1    products.  And they're telling you, Arkansas

2    Medicaid, that on average, drugs with FUL prices

3    are being acquired at discounts off of AWP of 82

4    percent.  And for drugs without FUL prices,

5    they're being acquired, on average, of discounts

6    approximating 46 percent.  And pharmacies are not

7    submitting you any evidence to challenge these

8    findings, and you're selecting AWP minus 20

9    percent.  Why is that?

10              MS. FORD:  Objection to form.

11        A.    This was not just -- this -- I can't

12   answer that question.

13        Q.    (By Mr. Reale) Do you think that it was

14   driven more out of a political compromise that

15   Arkansas selected AWP minus 20 percent than it

16   was a belief that drugs were actually acquired at

17   rates less than AWP minus 50 percent?

18              MS. MOSLEY-SIMS:  Objection.

19              MS. FORD:  Objection, form.

20        A.    I believe it was a provider relations

21   issue more than -- it was not necessarily a

22   political issue, but a provider relations issue,

308

1     that we wanted to make sure that we could --

2     again, that we wanted to make sure that all of

3     the Medicaid recipients in the State would be

4     able to obtain drugs.  So we didn't want to take

5     a chance of, or risk them losing access.

6          Q.   (By Mr. Reale) But -- but doing so, by

7     choosing AWP minus 20 percent out of an access

8     concern, you realized that you were paying, on

9     average, more than the estimated acquisition cost

10    for many pharmacies and many products?

11              MS. MOSLEY-SIMS:  Objection, asked and

12    answered.  Can we move on?

13         A.   And again, I will respond to that, that

14    we're not taking into consideration -- we're

15    focusing strictly on reimbursement off of AWP.

16    We're not -- there's no focus on what we have

17    State MACs on either.  So -- and this is only

18    referring to FULs.  So to me that's -- that's

19    making an assumption that we didn't take action

20    and that we assumed something by that.

21         Q.   (By Mr. Reale) But you certainly knew

22    that AWP didn't represent anything close to the

# EXHIBIT 9

336

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-------------------------------x

In re: PHARMACEUTICAL INDUSTRY  )

AVERAGE WHOLESALE PRICE          )

LITIGATION                       )

-------------------------------)

United States of America ex rel.) MDL No. 1456

Ven-A-Care of the Florida Keys, )

Inc. v. Abbott Laboratories,    ) Civil Action

Inc., Civil Action No. 06-      ) No. 01-12257-PBS

11337-PBS; and United States of )

America ex rel. Ven-A-Care of   ) Honorable

the Florida Keys, Inc., v. Dey, ) Patti B. Saris

Inc., et al., Civil Action No.  )

05-11084-PBS; and United States )

of America ex rel. Ven-A-Care   )

of the Florida Keys, Inc., v.   )

Boehringer Ingelheim Corp., et  )

al., Civil Action No. 07-10248- )

PBS                              )

-------------------------------x

464

1    **access would be an issue.**

2        Q.    (By Mr. Reale) So it's fair to say that

3    the State's determination of estimated

4    acquisition cost is a balance of all the factors

5    that we talked about today, not solely the cost

6    of the drug to some pharmacies?

7        **A.    Well, again, and I know I've said this**

8    **and repeated it a lot of times, but there is**

9    **always that variance off of the AWP. So we know**

10   **that AWP is discounted. We don't want to -- so**

11   **we're going to set something that's a balance**

12   **that will allow access to be maintained by the**

13   **providers.**

14       Q.    And it's a balance, on the one hand,

15   between Arkansas' own budget pressures and the

16   need to try to ensure the efficiency and economy

17   in its Medicaid program, and on the other hand,

18   we have pressures from providers who voluntarily

19   participate in the program and the need to ensure

20   that there's access for Medicaid patients. Would

21   you say that's a fair representation?

22                MS. MOSLEY-SIMS:  Objection.

465

1        A.    I would say it's a fair statement.  I

2   don't know if it's complete, but it's fair.

3        Q.    (By Mr. Reale) And there may be other

4   factors that play in the cost, determination of

5   estimated acquisition cost.  Yes?

6        A.    There could be.  Right off the top of

7   my head, I don't have any answer for you.

8             MR. REALE:  Okay.  I have no questions

9   further at this time.  I don't know if Eric or

10  Anne want to go next, but I know you both have

11  documents, so give me a minute to pull those out

12  for you.

13            MR. BERLIN:  We do, and actually, we

14  hadn't spoken as to which of us should go first.

15  Anne, do you have a preference?

16            MS. MANGIARDI:  I don't.  Either way.

17            (Whereupon an off-the-record was held.)

18            [Marked Exhibit Abbott-ARK 001]

19

20            EXAMINATION QUESTIONS BY MR. BERLIN:

21       Q.    First, actually, I've already forgot.

22  You prefer Suzette, but if I have to call you by

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

# EXHIBIT 10

Case 1:01-cv-12257-PBS   Document 6797-2   Filed 12/21/09   Page 54 of 139

Page 1

```
1                 UNITED STATES DISTRICT COURT

2                 DISTRICT OF MASSACHUSETTS

3      Civil Action No. 03-CV-11865-PBS

4      - - - - - - - - - - - - - - - - - - - - - - - - x

5      THE COMMONWEALTH OF MASSACHUSETTS,

6                       Plaintiff,

7           v.

8      MYLAN LABORATORIES, INC.; BARR LABORATORIES, INC.;

9      DURAMED PHARMACEUTICALS, INC.; IVAX CORPORATION;

10     WARRICK PHARMACEUTICALS CORPORATION; WATSON

11     PHARMACEUTICALS, INC.; SCHEIN PHARMACEUTICAL; INC.;

12     TEVA PHARMACEUTICALS USA, INC.; PAR PHARMACEUTICAL,

13     INC.; DEY, INC.; ETHEX CORPORATION; PUREPAC

14     PHARMACEUTICAL CO.; and ROXANE LABORATORIES, INC.,

15                       Defendants.

16     - - - - - - - - - - - - - - - - - - - - - - - - x

17

18     VIDEOTAPED DEPOSITION OF PAUL L. JEFFREY, Pharm.D.

19        Thursday, June 14, 2007   9:50 a.m. to 4:26 p.m.

20                       Ropes & Gray,

21        One International Place, Boston, Massachusetts

22             Reporter:  Lisa A. Moreira, RDR/CRR
```

Jeffrey, Pharm.D., Paul L.

Boston, MA

June 14, 2007

Page 49

1    qualitative nature to that, so --

2            Q.    Right.

3            A.    -- at first I believed it to be, you

4    know, competent.  I think that my perspective on

5    the reimbursement for brands and generics changed

6    over time.

7            Q.    And as it changed, did it affect your

8    view of the competence of your predecessors?

9            A.    No.

10           Q.    Dr. Jeffrey, what are the goals of the

11   Massachusetts Medicaid program for

12   pharmaceuticals?

13           A.    To provide medically necessary drug

14   therapy to the members of the MassHealth program.

15           Q.    And in order to do that, am I correct

16   that one goal of the program is to ensure that

17   Medicare- eligible individuals have access to

18   pharmaceuticals?

19           A.    Medicaid-eligible.

20           Q.    Excuse me.

21           A.    Yes.

22                 MR. MONTGOMERY:  Strike that.  Don't

1    let that appear in the transcript.

2             THE WITNESS:  I do it myself.

3        A.   So yes, that would be an accurate

4    statement. That's a requirement of my position.

5    It is expected of my position to do that.

6        Q.   And in order to assure access, you have

7    to induce pharmacies to voluntarily participate

8    in the program, correct?

9        A.   Yes.

10       Q.   And am I correct that another goal of

11   the program is to make prudent use of taxpayer

12   dollars in providing this benefit?

13       A.   Yes.

14       Q.   And during the course of your tenure at

15   MassHealth have you been concerned from time to

16   time about your ability to maintain adequate

17   access to pharmaceuticals for Medicaid-eligible

18   individuals?

19       A.   Yes.

20       Q.   And can you tell me, just generally,

21   about the nature of the concern that you have

22   had.

Jeffrey, Pharm.D., Paul L.

June 14, 2007

Boston, MA

1        A.     I know it to be a responsibility of the

2    program management, so it's one of the things I

3    have to keep my eye on continuously, so it's

4    always one of the parameters I would evaluate

5    when making a decision that would affect our

6    policies, would it affect access.

7        Q.     And in making that evaluation, what do

8    you look at?

9        A.     Well, you know, specifically it is, are

10   there enough pharmacies to provide the services

11   required of the citizens of the Commonwealth who

12   are Medicaid beneficiaries?

13       Q.     And has it been your view that in order

14   to maintain an adequate stable of pharmacies,

15   that they need to make a reasonable profit on the

16   service that they provide to the Medicaid

17   program?

18       A.     Yes.

19       Q.     And how do you stay on top of the

20   reasonableness of the profit?

21       A.     The indicator that's of -- the most

22   important indicator is, do we have pharmacies to

# EXHIBIT 11



17771862

Dec 21 2007
5:49PM

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) MDL No. 1456 ) Master File No. 01-12257-PBS ) ) Judge Patti B. Saris ) |
| THIS DOCUMENT RELATES TO: State of California, *ex rel.* Ven-A-Care v. Abbott Laboratories, *et al.* 03-CV-11226-PBS | ) ) ) ) ) |

**STATE OF CALIFORNIA'S OBJECTIONS AND RESPONSES**
**TO DEFENDANT ABBOTT'S FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, the State of

California ("Plaintiff") provides these objections and responses to the combined Defendants First

Set of Interrogatories ("Interrogatories").

**Introductory Statement and General Objections**

1.      These Interrogatories are unclear, vague, and ambiguous to the extent they are

directed jointly toward Plaintiff's "agents," reasonably construed to refer to the Relator, Ven-A-

Care of the Florida Keys, Inc. ("Relator").  Plaintiff further objects to the extent it is unclear as to

whether Defendants seek responses to particular Interrogatories from either Plaintiff or the

Relator, or both.  Plaintiff objects to each Interrogatory directed, in whole or in part, to the

Relator.  Plaintiff is not obligated to respond to any Interrogatory that is directed to the Relator.

Accordingly, Plaintiff responds only to those Interrogatories, in whole or in part that appear to be

directed toward Plaintiff.

2.      These Interrogatories are unclear and confusing to the extent the Defendants'

Definitions and Instructions in Defendants' First Set of Requests for Production are incorporated

by reference in these Interrogatories.  Notwithstanding this, Plaintiff incorporates, herein, the

and therefore were not implemented by the Department.

INTERROGATORY NO. 13

Describe the methods and corresponding reasons and rationale for determining or calculating reimbursements for each Subject Drug that You based on FUL, FAC, MAC or MAIC, including, but not limited to providing the specific calculations used to determine the initial MAC or MAIC price applicable to each NDC and specific calculations used to determine every change in the applicable MAC or MAIC thereafter, explaining how and why Medi-Cal set the formula for calculating MAC or MAIC ("MAC Formula") and identifying all information and documents reviewed, considered, or relied upon, in setting the MAC Formula, including but not limited to all alternatives considered and reasons for rejecting them. This Interrogatory is addressed to Plaintiff whether it currently has such information or whether it must obtain such information from any of its agents, including, but not limited to Electronic Data Systems Corporation and/or First DataBank, Inc.

RESPONSE:

Plaintiff objects to the extent the Interrogatory seeks information regarding MAICs, which is not relevant to any claim in the complaint, or to any defense stated by Defendants. Plaintiff objects to the extent the Interrogatory is vague and ambiguous as to the terms "reasons" and "rationale." Further, the Interrogatory is overbroad, beyond the scope of discovery and beyond the control of Plaintiff to the extent it seeks information from First DataBank. Plaintiff objects to the extent the Interrogatory seeks information subject to the deliberative process privilege. The process of developing policies, regulations and rules regarding reimbursement of drug purchases is an inherently pre-decisional and policy-based process that includes requests for legal advice. The identities of all individuals who were involved or consulted in that process, as well as any documents generated, are also subject to the deliberative process privilege, as well as the attorney-client privilege and work product doctrine. Subject to and without waiving its specific and general objections and its objections to Defendants' definitions and instructions,

25

Plaintiff responds:

The Department does not calculate the FUL and relies on the FUL prices provided in Addendum A change transmittals from the Centers for Medicare and Medicaid Services (CMS). The Federal Upper Limit (FUL) prices provided by the Centers for Medicare and Medicaid Services (CMS) as listed in the State Medicaid Manual, Part 6, Payment for Services, Addendum A and subsequent changes made by CMS to Addendum A, on the implementation dates provided by CMS.

On January 1, 1994, calculations used to determine the initial MAC or MAIC price applicable to each NDC and specific calculations used to determine every change in the applicable MAC or MAIC thereafter were specified in California Welfare and Institutions Code section 14105.45.  The reimbursement methodology used for determining or calculating reimbursements based on FUL, FAC, MAC or MAIC was based on regulations set forth in section 51513,of Title 22 of the CCR.  Currently available documents do not indicate how this methodology was determined.  Changes after January 1, 1994, to the reimbursement methodology used for pharmacy claims were determined by changes in the Welfare and Institutions Code.  The amount reimbursed to providers is based on the lowest amount billed by the provider or the maximum rate of reimbursement as determined by the Department, minus any adjustments required by law.  The Estimated Acquisition Cost (EAC) and dispensing fee used to calculate the maximum reimbursement rate and adjustments to reimbursement from January 1, 1994, through December 31, 2003, occurred as follows:

| Date | Estimated Acquisition Cost | Dispensing Fee** | Other Adjustment |
|------|---------------------------|------------------|------------------|
| 1/1/1994 | Lowest of : AWP-5% or FUL or MAIC or Direct Price* (Cal. Code Regs. tit. 22, § 51513) | $4.05 (Cal. Code Regs. tit. 22, § 51513) | |
| 1/1/1995 | Lowest of : AWP-5% or FUL or MAIC or Direct Price* (Cal. Code Regs. tit. 22, § 51513) | $4.05 (Cal. Code Regs. tit. 22, § 51513) | 50-cents deducted calculated reimbursement amount (Cal. Welf. & Inst. Code § 14105.336) |

| 1/1/2000 | Lowest of : AWP-5% or FUL or MAIC or Direct Price* (Cal. Code Regs. tit. 22, § 51513) | $4.05 (Cal. Code Regs. tit. 22, § 51513) | 25-cents deducted from calculated reimbursement amount (Cal. Welf. & Inst. Code § 14105.337) |
|---|---|---|---|
| 1/1/2002 | Lowest of : AWP-5% or FUL or MAIC or Direct Price* (Cal. Code Regs. tit. 22, § 51513 | $4.05 (Cal. Code Regs. tit. 22, § 51513) | 10-cents deducted from calculated reimbursement amount (Cal. Welf. & Inst. Code § 14105.337) |
| 12/1/2002 | Lowest of : AWP-10% or FUL or MAIC or ASP (Cal. Code Regs. tit. 22, § 51513 and Cal. Welf. & Inst. Code § 14105.46) | $4.05 (Cal. Code Regs. tit. 22, § 51513) | 50-cents deducted from calculated reimbursement amount (Cal. Welf. & Inst. Code § 14105.337) |
| 7/1/2004 | Lowest of : AWP-10% or FUL or MAIC or ASP (Cal. Code Regs. tit. 22, § 51513 and Cal. Welf. & Inst. Code § 14105.46) | $4.05 (Cal. Code Regs. tit. 22, § 51513) | |
| 9/1/2004 | Lowest of : AWP-17% or FUL or MAIC or Selling Price (Cal. Welf. & Inst. Code § 14105.45) | $7.25 $8.00 for beneficiaries in nursing facilities (Cal. Welf. & Inst. Code § 14105.45) | |

* Direct Price used only for Abbott Laboratories, Ayerst Laboratories, Lederle Laboratories, Merck, Sharpe and Dohme, Parke Davis and Company, Pfizer Laboratories, Roerig, J. B. and Company, Ross Laboratories, Squibb, E. R. and Sons, The Upjohn Company, and Wyeth Laboratories pursuant to Section 51513.5 of the California Code of Regulations.

**Pursuant to section 51513.5(e) of the California Code of Regulations, additional charges for extemporaneously compounded prescriptions are allowed according to the following schedule:

    Capsules and Papers
        6-36............................................$1.98
        37-100........................................$3.95
    Ointments
        up to 180 Gm.............................$1.64
        180 Gm and over........................$3.29
    Suppositories
        up to 24.......................................$3.29
        24 and over..................................$5.76
    Sterile Eye Preparations

```
    All...............................................$2.04
Nose and Ear Preparations
    All...............................................$ 0.81
Emulsions
    Up to 240cc..............................$ 0.81
    240cc and over..........................$1.64
Liquids other than simple pouring or reconstituting
    All...............................................$ 0.99
```

INTERROGATORY NO. 14

Identify Your method for ensuring that pharmacist reimbursement rates established for

the prescription drugs under the Medi-Cal program estimate the price generally and currently

paid by Providers as required by 42 C.F.R. § 447.331, including but not limited to the method

You currently use, and/or have used historically, for calculating the EAC for each type of

pharmaceutical product or aggregate EAC; the date of any change to the method for calculating

EAC; the date of any proposed change, whether or not implemented, for calculating EAC; the

reasons for implementing or not implementing each proposed change in the method of

calculating EAC; the identity of each Person who proposed, recommended, or authorized the

changes in the method for calculating EAC; and the identity of the Persons most knowledgeable

about Your methods for calculating EAC and the changes to those methods.  Additionally,

Identify Your method for ensuring that pharmacist reimbursement rates established for the

prescription drugs under the Medi-Cal program do not exceed in the aggregate, payment levels

determined by applying for each drug entity a reasonable dispensing fee established by the

agency plus an amount established by CMS that is equal to 150 percent of the published price for

the least costly therapeutic equivalent, as required by 42 C.F.R. § 447.332, including but not

limited to the method You currently use, and/or have used historically, for calculating the FUL

for each type of pharmaceutical product or aggregate FUL; the date of any change to the method

for calculating FUL; the date of any proposed change, whether or not implemented, for

# EXHIBIT 12

Galownia, Kevin      HIGHLY CONFIDENTIAL      June 11, 2007
Philadelphia, PA

Page 1

STATE OF WISCONSIN

CIRCUIT COURT

DANE COUNTY, Branch 7

- - -

STATE OF WISCONSIN,        : Case No.

       Plaintiff    : 04-CV-1709

              :

      vs.          : Unclassified

              : Civil:30703

AMGEN INC., et al,        :

      Defendants.   :

- - -

   **** HIGHLY CONFIDENTIAL ****

      Video Tape Deposition of KEVIN

GALOWNIA, was taken pursuant to notice at the

Law Offices of Berger & Montague, 1622 Locust

Street, Philadelphia, Pennsylvania, on Monday,

June 11, 2007, beginning at 9:00 a.m.,

before Jeanne Christian, Court Reporter-Notary

Public and Richard Kanzinger, Jr., Video Tape

Operator, there being present.

- - -

219f2904-4b58-4844-ad64-7f143cba19e5

Galownia, Kevin     HIGHLY CONFIDENTIAL     June 11, 2007
Philadelphia, PA

Page 66

1          THE WITNESS:  Yes, I
2    understand that the Medicaid program is a joint
3    effort between the state and federal
4    governments.
5    BY MR. LIBMAN:
6    Q.   Do you have the understanding that the
7    population that's served by Medicaid are among
8    the neediest in society, meaning persons who are
9    poor, elderly, blind and disabled?
10          MR. GALLAGHER:  Objection to
11   the form of the question.
12          THE WITNESS:  I understand
13   that elderly people buy off of Medicaid.
14   BY MR. LIBMAN:
15   Q.   Do you understand that's also a program
16   designed to help persons below a certain income
17   level?
18   A.   I did not know that.
19   Q.   Have you ever understood that drug
20   manufacturers, such as Geneva or Sandoz, are not
21   actually required to participate in the Medicaid
22   program, but rather, have to elect voluntarily

Page 67

1    to participate in it?
2          MR. GALLAGHER:  Objection to
3    the form of the question.
4          THE WITNESS:  Yes, I do.
5    BY MR. LIBMAN:
6    Q.   And was it your understanding that Geneva
7    or Sandoz, during the time that you were working
8    for the company, had, in fact, elected
9    voluntarily to participate in the Medicaid
10   program?
11          MR. GALLAGHER:  Objection to
12   the form of the question.
13          THE WITNESS:  I understood
14   that Geneva products were reimbursable under
15   Medicaid.
16   BY MR. LIBMAN:
17   Q.   Did you understand that in order to have
18   its drugs be reimbursed under state Medicaid
19   programs that Geneva or Sandoz had to enter into
20   a contract with the federal government called a
21   Medicaid rebate agreement?
22          MR. GALLAGHER:  Objection,

Page 68

1    form.
2          THE WITNESS:  I did not know
3    that at that time.
4    BY MR. LIBMAN:
5    Q.   At some point, did you learn that fact?
6    A.   Subsequently.
7    Q.   After you left the company?
8    A.   Yes.
9    Q.   How did you learn about that after you
10   left the company?
11   A.   Based on some issues my current company
12   had with their Medicaid agreement.
13   Q.   Do you have any responsibility at your
14   current company for any aspect of the federal
15   rebate agreements governing Medicaid?
16   A.   Yes, I do.
17   Q.   What is your responsibility with respect
18   to those rebate agreements?
19   A.   I oversee the third-party distribution
20   company that administers that for us.
21   Q.   You mean it administers the payment of
22   rebates to the states?

Page 69

1    A.   Yes, it does.
2    Q.   Did you have any responsibilities while at
3    Geneva or Sandoz in connection with the Medicaid
4    rebate contract, either the computation of
5    average manufacturer price or best price or
6    payments or rebates to the states, anything of
7    that nature?
8          MR. GALLAGHER:  Objection to
9    the form.
10          THE WITNESS:  No, I did not.
11   BY MR. LIBMAN:
12   Q.   I wanted to ask you about any -- your
13   understanding or knowledge of any policy,
14   corporate policy, that is, of Sandoz or Geneva
15   governing a code of conduct for employees.
16          Was there such a code of
17   conduct while you were employed by Geneva or
18   Sandoz?
19          MR. GALLAGHER:  Objection to
20   the form.
21          THE WITNESS:  Yes, there
22   was.

18 (Pages 66 to 69)

219f2904-4b58-4844-ad64-7f143cba19e5

Galownia, Kevin     HIGHLY CONFIDENTIAL     June 11, 2007
Philadelphia, PA

Page 98

1   largest of the three.
2   BY MR. LIBMAN:
3   Q.   Are you aware of any better and larger
4   source of electronic pricing information for
5   pharmaceutical products other than First
6   Databank?
7            MR. GALLAGHER:  Objection to
8   the form of the question.
9            THE WITNESS:  I do not know.
10  BY MR. LIBMAN:
11  Q.   And as I understand it, during the time
12  that you worked for Sandoz, you provided certain
13  pricing information to each of these entities,
14  that is, First Databank, Redbook and Medispan;
15  is that correct?
16  A.   That is correct.
17  Q.   To make it easier during today's
18  deposition, when I refer to the price reporting
19  and services or the pricing compendia, I am
20  referring to all three of these, that is,
21  Redbook, First Databank and Medispan, unless my
22  question specifically instructs you otherwise.

Page 99

1            Is that okay?
2   A.   That is okay.
3   Q.   And among the pricing information you sent
4   to these pricing compendia are a WAC, which
5   stands for wholesale acquisition cost; is that
6   correct?
7   A.   That is correct.
8   Q.   And AWP, which stands for average
9   wholesale price; is that correct?
10  A.   That is correct.
11  Q.   And what is the -- in order to send this
12  pricing information to the pricing compendia,
13  are you required to get authorization from
14  someone above you in the chain of command?
15  A.   No, I'm not.
16  Q.   So you have -- well, so once the company
17  determines what the AWP or WAC is for a product,
18  you, at that point, have the authority to
19  communicate that to First Databank, Redbook and
20  Medispan; is that correct?
21  A.   I have authority to communicate any
22  pricing to the pricing services that is in

Page 100

1   accordance and matches the pricing that has been
2   entered into our system.
3   Q.   And what system are you referring to when
4   you say your system?
5   A.   The Sandoz system for housing all pricing
6   information, which is SAP.
7   Q.   During the time that you worked for
8   Sandoz, was the AS-400 system utilized by Sandoz
9   to maintain pricing information?
10  A.   Yes.
11  Q.   Would you include that as both the AS-400
12  and SAP as the system, so to speak, in which
13  pricing information is maintained at Sandoz?
14  A.   I would use those terms interchangeably.
15  I'm talking about the same thing.
16  Q.   And who has the authority to enter pricing
17  information, such as AWP or WAC, into the
18  system, as you have defined it?
19  A.   Only the pricing manager.
20  Q.   And during the time you worked at Sandoz,
21  are you aware of the process by which the
22  pricing manager obtained authorization from

Page 101

1   anyone above he or she in the chain of command
2   in order to enter an AWP or WAC into the
3   system?
4   A.   Prior to entering any AWP or WAC for a new
5   product or a change, there was a process
6   internally to get buy-in.  Without that buy-in,
7   no price would be entered into the system.
8   Q.   And did the pricing manager have the
9   ultimate authority to determine what WAC or AWP
10  was established by the company and entered into
11  the system or did it require approval of someone
12  higher in the chain of command than the pricing
13  manager?
14  A.   The pricing manager had the ability to
15  enter any price into the system that the pricing
16  manager determined; however, the corporate
17  policy was for the pricing manager to receive
18  appropriate buy-in for any price entered into
19  the system prior to entering that price within
20  corporate -- within corporate strategies.
21  Q.   Was there actually a written corporate
22  policy about this?

26 (Pages 98 to 101)

219f2904-4b58-4844-ad64-7f143cba19e5

Galownia, Kevin      HIGHLY CONFIDENTIAL           June 11, 2007
                    Philadelphia, PA

Page 110

1   A.   I do not recall specifically and
2   consistently sending AWP to them, but I would
3   assume for purposes of loading our products in
4   their system, that that was a requirement.
5   Q.   During the time you worked at Sandoz, did
6   you ever send AWPs or WACs to any of the 50
7   states or their state Medicaid programs?
8   A.   I didn't specifically.
9   Q.   Did you ever hear from any source within
10  Sandoz that someone within Sandoz had sent AWPs
11  or WACs to any state Medicaid program?
12          MR. GALLAGHER:  Objection to
13  the form of the question.
14          THE WITNESS:  I had never
15  heard that.
16  BY MR. LIBMAN:
17  Q.   What was your understanding during the
18  time you were employed at Sandoz of the meaning
19  of the term WAC or wholesale acquisition cost?
20  A.   Would you repeat the question?
21  Q.   Yes.
22          During the time that you were

Page 111

1   employed at Sandoz, what was your understanding
2   of the definition of WAC or wholesale
3   acquisition cost?
4   A.   My understanding of the definition of WAC
5   during my time at Sandoz was that that was the
6   price point at which wholesalers purchased
7   product from Sandoz and the price point at which
8   their inventory was valued and the basis for
9   determining a charge-back.
10  Q.   That definition, would you agree with me,
11  does not mean -- strike that.
12          Your understanding,
13  therefore, was that the term wholesale
14  acquisition cost was not the net price paid by a
15  wholesaler to acquire a Sandoz product directly
16  from Sandoz; is that correct?
17          MR. GALLAGHER:  Objection to
18  the form of the question.
19          THE WITNESS:  My
20  understanding was that WAC was the price basis
21  for which a wholesaler purchased directly from
22  Sandoz.  It may or may not be the ultimate net

Page 112

1   price paid for that product.
2   BY MR. LIBMAN:
3   Q.   If there were discounts or rebates or
4   charge-backs for a particular Sandoz product,
5   those would not be included within the WAC that
6   Sandoz reported to First Databank and the other
7   pricing compendia; is that correct?
8   A.   That is correct.
9   Q.   The WAC was essentially the invoice price
10  or the price that would appear on an invoice
11  from Sandoz to the wholesaler; is that correct?
12  A.   That is correct.
13  Q.   And what is your understanding of the --
14  strike that.
15          During the time that you were
16  employed at Sandoz, what was your understanding
17  of the definition of AWP or average wholesale
18  price?
19  A.   During my time at Sandoz, my understanding
20  of AWP and the use of AWP for our products was
21  to make a determination on if our product was to
22  be classified as a brand or a generic drug.

Page 113

1   Q.   So the AWPs or average wholesale prices
2   that Sandoz reported to First Databank and the
3   other pricing compendia were not the true
4   average prices charged by wholesalers for Sandoz
5   products; is that correct?
6   A.   The AWP, as an industry construct, is a
7   benchmark price that is used to determine
8   whether a product is classified as a brand or a
9   generic drug.
10  Q.   Okay, but back to my question, though,
11  would you agree with me that the AWPs that
12  Sandoz reported to First Databank were not the
13   -- intended to be the true average prices
14  charged by wholesalers for Sandoz products; is
15  that correct?
16  A.   Again, the average wholesale price
17  communicated by Sandoz was purely intended on
18  Sandoz part to be used to determine the generic
19  or brand classification of the drug.
20  Q.   But does that mean the answer to my
21  question is yes?  I can repeat it again.  If you
22  can answer it yes or no, I would appreciate it.

29  (Pages 110 to 113)

219f2904-4b58-4844-ad64-7f143cba19e5

Galownia, Kevin     HIGHLY CONFIDENTIAL       June 11, 2007
                    Philadelphia, PA

Page 114

1   That is, the AWPs that Sandoz reported to First
2   Databank and the other pricing compendia were
3   not intended to represent the true average
4   prices charged by wholesalers for Sandoz
5   product; is that correct?
6   A.   I would say, as commonly understood in the
7   industry, that is not the intention of that
8   price point.  It is not intended to be what you
9   are describing it to be.
10  Q.   Are you aware of First Databank ever
11  publishing any document that defined the term
12  average wholesale price at all?
13  A.   I vaguely recall some communications
14  around the different price points published by
15  First Databank.
16  Q.   Let me show you a couple of documents and
17  ask if you have seen these before.
18            ---
19           (Whereupon the court reporter
20  marked document as Exhibit Galownia 004 for
21  identification.)
22            ---

Page 115

1   BY MR. LIBMAN:
2   Q.   This is Exhibit Galownia 004.  Mr. Galownia,
3   you have been handed what's marked as Exhibit
4   Galownia 004.
5            For the record, it is a
6   three-page document, titled First Databank
7   Monthly Interest.  At the top right, it says
8   September, 1991.  Please take your time.  You
9   are welcome to review the entire document.  And
10  I was going to call your attention to a portion
11  of it that appears in the first column on the
12  left there.
13           THE VIDEO TAPE OPERATOR:
14  This completes Video Tape Number 1.  The time is
15  11:15.  We are now off the record.
16           THE VIDEO TAPE OPERATOR:  We
17  are on the record.  This is the beginning of
18  Video Tape Number 2.  The time is 11:17.  You
19  may begin the questioning.
20  BY MR. LIBMAN:
21  Q.   Mr. Galownia we were looking at Exhibit
22  Galownia 004.

Page 116

1            Let me ask you first, have
2   you ever seen this document before?
3   A.   I have never seen this document before.
4   Q.   So let me just direct your attention to
5   the first column of this document, under the
6   heading Understanding AWP.  If you could take a
7   look at the second paragraph there, and it
8   begins, AWP represents.
9            Do you see that?
10  A.   Yes.
11  Q.   So it reads, and I'm quoting:  AWP
12  represents an average price which a wholesaler
13  would charge a pharmacy for a particular
14  product.
15           Do you see that?
16  A.   Yes.
17  Q.   Would you agree with me that that
18  definition here or that explanation suggests
19  that AWP actually represents a real price that
20  reflects actual prices in the marketplace, as
21  opposed to being simply a benchmark, as you
22  described it?

Page 117

1            MR. GALLAGHER:  Objection to
2   the form of the question.
3            THE WITNESS:  I think the
4   determination needs to be made between a brand
5   and a generic product.  The AWP price is
6   something very different for both, my assumption
7   would be.  I would also say that this document
8   was written in 1991, which was a long time ago,
9   and the generic industry has evolved
10  significantly from 1991.
11  BY MR. LIBMAN:
12  Q.   Do you believe that based on your
13  knowledge of the generic industry, that that
14  statement was accurate with regard to the
15  generic drugs in September of 1991?
16  A.   I could not say.
17  Q.   Do you believe it is accurate with regard
18  to brand name drugs for any period of time since
19  1991?
20           MR. GALLAGHER:  Objection to
21  the form, no foundation.
22           THE WITNESS:  I have no basis

30 (Pages 114 to 117)

219f2904-4b58-4844-ad64-7f143cba19e5

Galownia, Kevin      HIGHLY CONFIDENTIAL      June 11, 2007
Philadelphia, PA

Page 158

1  chronology, at the time that Sandoz launches a
2   -- or introduces a new product into the
3  marketplace, it does set or establish a WAC, an
4  AWP for that product; is that correct?
5  A.   Yes, it does.
6  Q.   And how does it -- how does Sandoz -- how
7  did Sandoz do that during the time you were
8  there?  That is, how did it set its WAC and its
9  AWP?
10          MR. GALLAGHER:  Objection to
11 the form.
12          THE WITNESS:  Every product
13 is different.  It depends on what kind of market
14 situation you are walking into.  If you are
15 entering as a first entrant or if you are
16 entering a product that already has generic
17 manufacturers, it really depends.  I mean, there
18 is no set formula on how you do it.
19 BY MR. LIBMAN:
20 Q.   And who ultimately is responsible for
21 determining the WAC and AWP that is set for a
22 product at time of launch during the time you

Page 159

1  were at Sandoz?
2  A.   During my time at Sandoz, I was
3  responsible for developing an initial estimate
4  on -- or an initial recommendation on what I
5  believe the AWP and WAC should be based on the
6  market situation.
7  Q.   And you identified, I think, some of the
8  factors that you utilized.
9          Are there any other factors
10 you utilized in making a recommendation for an
11 initial WAC or AWP for a product at time of
12 launch?
13 A.   The main determinants would be what the
14 market currently looks like, if there is already
15 generics there.  As I said, AWP was used as a
16 benchmark to determine your brand or generic
17 status.  So if there is already generics listed,
18 you would want to be coded as the generic
19 yourself, so you would look to the market to
20 tell you where your AWP needs to be to be coded
21 as a generic.
22 Q.   And this coding as generic you are

Page 160

1  referring to, can you explain what you mean by
2  that?  Is that -- do you mean the pricing
3  publication, such as First Databank, would
4  classify your product as brand or generic or are
5  you referring to something else?
6  A.   When I refer to coding as generic, I'm
7  specifically referring to the pricing services
8  designating our product as a brand or generic.
9  Q.   Let's focus, if we could, then, on First
10 Databank.
11          What was your understanding,
12 during the time you were at Sandoz, as to how
13 First Databank went about determining whether to
14 indicate the Sandoz product as a generic or a
15 brand?
16 A.   My understanding during my time at Sandoz
17 on how First Databank designated us as a generic
18 or a brand was based off of the AWPs for a
19 particular pharmaceutical product that were
20 listed in their database.
21          Typically, a product would
22 have a brand listed, at least, but not always,

Page 161

1  so what -- my understanding on how First
2  Databank designated them was, it was looking for
3  a low price alternative to call as a generic.
4  So it was looking for the lower AWP to code it
5  as a generic.  However, that does not mean -- my
6  understanding was that that did not mean for a
7  particular product that there had to be a
8  generic.  Just by being a penny lower doesn't
9  necessarily make you a generic.  There was
10 certain statistical algorithms they used based
11 on certain standard deviations that made that
12 designation.
13          In general, the general
14 understanding in the industry was, if you were
15 entering a market with a brand, and you were ten
16 percent lower than the brand AWP, you would be
17 coded as a generic.  That was a general
18 understanding; however, that was not always
19 true, so in setting your AWP, you looked to the
20 brand AWP as your starting point, and then you
21 look at the market to see where everybody else
22 was priced to determine where you needed to be

41 (Pages 158 to 161)

219f2904-4b58-4844-ad64-7f143cba19e5

Galownia, Kevin      HIGHLY CONFIDENTIAL      June 11, 2007
Philadelphia, PA

Page 162

1  to be a brand or generic.
2  Q.   How did you obtain this understanding
3  about obtaining a generic indication from First
4  Databank?  Was it from First Databank itself or
5  some other source?
6  A.   It was from First Databank itself.
7  Q.   Did you ever receive anything in writing
8  from First Databank that explained either this
9  algorithm that they used or this ten percent
10 rule of thumb that you testified about a minute
11 ago?
12 A.   I never received anything official from
13 First Databank.
14 Q.   So am I correct, if there were no other
15 generics in the marketplace equivalent to the
16 brand drug for which Sandoz is launching its own
17 generic, that a rule of thumb that you used
18 would be to set the AWP at ten percent below the
19 AWP of the equivalent brand?
20 A.   That was the general practice.
21 Q.   Did you actually communicate back and
22 forth with First Databank before you sent them

Page 163

1  the AWP; for example, saying, we want a generic
2  indicator for our product, we are going to
3  propose an AWP of X, will this insure us getting
4  a generic indicator, or would you just send it,
5  knowing that the ten percent rule of thumb would
6  work?
7  A.   We did not communicate with First Databank
8  to determine what our status would be.  AWP
9  designations were completed depending on one,
10 like I said, if you were entering an existing
11 market, in which case you made your estimate on
12 what you needed to price your AWP to be
13 designated as a generic.  Entering a new market,
14 I'm not saying that all the time, it was AWP
15 less ten.  I can't say that there wouldn't be a
16 situation where we wouldn't have chosen to do
17 something different, but as a general rule, that
18 was our starting point.
19 Q.   Was it the intention to set the AWP as
20 high as possible while still retaining the
21 generic indicator from First Databank?
22 A.   The intention was purely to receive a

Page 164

1  generic indicator.
2  Q.   So you could have set the AWP, for
3  example, at 50 percent below the AWP of a brand;
4  correct?
5  A.   You could have set it at anything you
6  wanted to, but there were different implications
7  on other price points by doing that.
8  Q.   Can you explain what you mean by that?
9  A.   If you set your AWP at 50 percent less
10 than brand, and the market was selling for a
11 generic at 40 percent less than AWP, all of a
12 sudden, you are pushing your price down.  So you
13 are trying to price in the end, so that your
14 market price is as profitable to the company as
15 possible.
16 Q.   What is the relationship between AWP and
17 profitability for the company?
18 A.   Because your AWP determines what level --
19 it determines maximum levels for your WAC,
20 which, in turn, determines maximum levels for
21 your contract pricing.
22 Q.   And how does AWP determine the maximum

Page 165

1  levels for a WAC of a Sandoz product?
2  A.   In the system, a WAC could never be higher
3  than an AWP.
4  Q.   And in fact, WACs were always less than
5  AWPs for Sandoz products; is that correct?
6  A.   Yes, that is correct.
7  Q.   But if Sandoz -- well, anything else that
8  -- any other way in which AWP would affect the
9  profitability for a Sandoz product?
10 A.   AWP, in and of itself, doesn't affect the
11 profitability.  The AWP being set indirectly
12 affects the profitability by placing limits on
13 your other prices.
14       So in other words, in general
15 practice, AWP is the highest price, WACs under
16 AWP, contract prices are under WAC.  So in as
17 much as you chose to give your AWP a discount
18 that takes it lower and lower, you are just
19 pushing all the other prices lower and lower.
20 Q.   So is it accurate to say, then, that the
21 intention in setting an AWP initially at the
22 time of launch was to give maximum flexibility

42 (Pages 162 to 165)

219f2904-4b58-4844-ad64-7f143cba19e5

Galownia, Kevin        HIGHLY CONFIDENTIAL        June 11, 2007
                        Philadelphia, PA

Page 218

1  of the marketplace, and there is a temporary
2  supply problem that you are going to be taking
3  new customer business eventually.  You may be
4  planning a price increase down the road, because
5  there is going to be less competition, and you
6  chose -- for some reason, you were making these
7  other AWP and WAC changes.  You just chose to
8  make it at the same time and to manage contract
9  price after the fact.  It could be for that
10  reason.
11  BY MR. LIBMAN:
12  Q.   By the way, this drug has a labeler code
13  of 59772; is that correct?
14  A.   Yes, that is correct.
15  Q.   How did Sandoz come to sell this product
16  with that labeler code?
17          MR. GALLAGHER:  Objection, no
18  foundation.  Objection --
19  BY MR. LIBMAN:
20  Q.   Strike that.
21          Do you know who this labeler
22  code 59772 was originally assigned to?

Page 219

1          MR. GALLAGHER:  Same
2  objections.
3          THE WITNESS:  I do not recall
4  off the top of my head.
5  BY MR. LIBMAN:
6  Q.   It also has on this chart on Page 2 some
7  drugs with a labeler code 00015.
8          Do you see that?
9  A.   Yes, I do.
10  Q.   Do you know what labeler code that is or
11  where it came from?
12  A.   I do know not know who that belonged to.
13  I do know that some of the products that they
14  acquired from other companies, some of -- those
15  companies would have multiple labeler codes at
16  times.  They just kind of fell into our system.
17  It didn't really matter for purposes of what I
18  was doing.
19  Q.   We were talking earlier about the term
20  average wholesale price.  I was asking about
21  your understanding of the definition.
22          I'm not sure if you are aware

Page 220

1  that in another AWP litigation that's pending in
2  the court, in the federal court in Boston, that
3  a federal judge there, named Patti Saris, stated
4  the following in a published opinion in 2006.
5  I'm just going to quote from it.  It says:  The
6  Court construes the statutory term according to
7  its plain meaning and holds that AWP means the
8  average price at which wholesalers sell products
9  to their customers, end quote.
10          I'm correct that Sandoz AWPs
11  that you reported to First Databank and that
12  they published are not the same as that
13  definition of AWP; is that correct?
14          MR. GALLAGHER:  Objection to
15  the form of the question.
16          THE WITNESS:  The AWPs that
17  we provided were within the guidelines of the
18  general constructs that had evolved in the
19  industry over time, in which case, the AWP was
20  meant solely as a designation of a brand or
21  generic status.  So to take the word AWP at its
22  literal meaning is not representative of what

Page 221

1  was widely known within the industry in
2  general.
3  BY MR. LIBMAN:
4  Q.   My question is a little different, which
5  is whether the AWPs that you, on behalf of
6  Sandoz, reported to First Databank, and that
7  First Databank published, would you agree with
8  me, were not the, quote, average price at which
9  wholesalers sold those drugs to their customers?
10          MR. GALLAGHER:  Objection.
11  He answered your question.  You are asking him
12  in the context of a legal opinion.  You are
13  misleading him into thinking that that applies
14  to what Sandoz was doing.  And that question is
15  very objectionable for that reason.  You are
16  trying to mislead this witness.
17          MR. LIBMAN:  No, I have to
18  disagree.  I'm asking whether, given the
19  definition of AWP, at least as defined by one
20  court, whether Sandoz's use of AWP meets that
21  definition or not.
22          So let me just ask the

56 (Pages 218 to 221)

219f2904-4b58-4844-ad64-7f143cba19e5

Galownia, Kevin      HIGHLY CONFIDENTIAL      June 11, 2007
Philadelphia, PA

Page 234

1   BY MR. LIBMAN:
2   Q.   And then is it possible that -- strike
3   that.
4          Did Sandoz also make sales to
5   retail pharmacies through wholesalers, but they
6   were not pursuant to a contract between Sandoz
7   and the retail pharmacy?
8   A.   Yes.
9   Q.   How did the pricing for that work?
10  A.   I would be speculating on how wholesalers
11  sell products off contract.
12  Q.   Okay, but you knew, for example, that the
13  most that a wholesaler paid to Sandoz to acquire
14  the product would be WAC; is that correct?
15  A.   That is correct.
16  Q.   And that the wholesaler may have been
17  offered a prompt pay discount, and perhaps,
18  other discounts or rebates to lower its true net
19  price being paid to Sandoz; is that correct?
20         MR. GALLAGHER:  Objection to
21  the form of the question, misstates prior
22  testimony.

Page 235

1          THE WITNESS:  The amount of
2   discounts for non-contract sales to a wholesaler
3   are much less, but there would have been at
4   least the prompt pay discount.
5   BY MR. LIBMAN:
6   Q.   Would you agree with me that the -- let's
7   do it this way.  If a wholesaler purchased a
8   product from Sandoz, and then sells it, as you
9   said, off contract to a retail pharmacy, am I
10  correct that the wholesaler would perhaps add
11  some small markup or margin to the net price it
12  is paying that it then adds to the price it is
13  going to charge the retail pharmacy?
14         MR. GALLAGHER:  Objection, no
15  foundation.
16         THE WITNESS:  My assumption
17  would be that there would be some markup over
18  their acquisition cost to the buying pharmacy.
19  BY MR. LIBMAN:
20  Q.   And you know, don't you, from both your
21  time at Sandoz, as well as the time that you
22  were at Cardinal a wholesaler that that markup

Page 236

1   or margin is probably no larger than two or
2   three percent; isn't that correct?
3          MR. GALLAGHER:  Objection, no
4   foundation.
5          THE WITNESS:  I would
6   actually believe that it would be more than two
7   or three percent.
8   BY MR. LIBMAN:
9   Q.   How much more, do you think?
10         MR. GALLAGHER:  Same
11  objection.
12         THE WITNESS:  Again, I would
13  be speculating, but based on my understanding
14  for generic pharmaceuticals and wholesaler
15  margin requirements, it could be up to 20
16  percent.
17  BY MR. LIBMAN:
18  Q.   20 percent above what exactly?  Above the
19  wholesaler's net acquisition cost?
20         MR. GALLAGHER:  Objection to
21  the form of the question.
22         THE WITNESS:  Above WAC.

Page 237

1   BY MR. LIBMAN:
2   Q.   I'm sorry?
3   A.   Above WAC.
4   Q.   So you are aware of specific instances in
5   which a wholesaler like Cardinal acquired a
6   generic product from Sandoz for, for example,
7   $100 and sold it off contract to a retail
8   pharmacy for $120?
9          MR. GALLAGHER:  Objection to
10  the form of the question.
11         THE WITNESS:  I am not aware
12  of specific situations, but based on my
13  understanding, I don't think it would be
14  impossible.
15  BY MR. LIBMAN:
16  Q.   How frequently do you think it occurs that
17  that's the size of the markup, 20 percent?
18         MR. GALLAGHER:  Same
19  objection.
20         THE WITNESS:  I would have no
21  basis for determining a frequency of that
22  happening.

60 (Pages 234 to 237)

219f2904-4b58-4844-ad64-7f143cba19e5

Galownia, Kevin        HIGHLY CONFIDENTIAL        June 11, 2007
                        Philadelphia, PA

Page 238

1   BY MR. LIBMAN:
2   Q.   As a percentage of all the sales that
3   Sandoz makes that eventually winds up in the
4   hands of retail pharmacies, what percentage of
5   those sales are through wholesalers that are off
6   contract?
7            MR. GALLAGHER: Objection to
8   the form of the question.
9            THE WITNESS: I would be
10  speculating again, but my hunch, on average, as
11  this differs with every product, some products
12  could be significantly more based on market
13  conditions, but in general, I would assume
14  approximately ten percent of wholesaler sales
15  would end up as off contract.
16  BY MR. LIBMAN:
17  Q.   Since you said earlier that about 60
18  percent of the sales to retail pharmacies are
19  direct, would that mean that about four percent,
20  ten percent of the retaining 40 percent, so
21  about four percent of the sales that Sandoz
22  makes that end up in the hands of retail

Page 239

1   pharmacies are through wholesalers and off
2   contract?
3            MR. GALLAGHER: Objection to
4   the form of the question.
5            THE WITNESS: Based on those
6   assumptions, that would be correct.
7   BY MR. LIBMAN:
8   Q.   Even in those cases which a wholesaler
9   sells a Sandoz product to a retail pharmacy off
10  contract and applies a 20 percent markup,
11  would you agree with me that even in those
12  circumstances, the retail pharmacy is still
13  paying less than the AWP for the product?
14           MR. GALLAGHER: Objection to
15  the form of the question.
16           THE WITNESS: I would assume
17  so.
18  BY MR. LIBMAN:
19  Q.   That's because the AWP is always more than
20  20 percent above the WAC for Sandoz products, at
21  least for the time that you were employed at
22  Sandoz; is that correct?

Page 240

1            MR. GALLAGHER: Objection to
2   the form of the question.
3            THE WITNESS: That would be
4   correct.
5   BY MR. LIBMAN:
6   Q.   So just to summarize, we went through the
7   direct sales to retail pharmacies pursuant to
8   contract, the indirect sales from wholesalers
9   and pursuant to contracts and the indirect sales
10  through wholesalers that were off contract, and
11  in each of those instances, you know that the
12  retail pharmacy is paying less than the
13  published AWP for the Sandoz product; is that
14  correct?
15           MR. GALLAGHER: Objection to
16  the form, no foundation.
17           THE WITNESS: That is
18  correct.
19  BY MR. LIBMAN:
20  Q.   So earlier, when you said you really
21  wouldn't know one way or the other what retail
22  pharmacies are paying with respect to AWP, that

Page 241

1   wasn't correct, was it?
2            MR. GALLAGHER: Objection,
3   misstates prior testimony.
4            THE WITNESS: Again, all of
5   this is speculation on my part. I have no idea
6   what retail pharmacies are actually paying.
7   BY MR. LIBMAN:
8   Q.   Well, we just established that they -- in
9   two of the scenarios we just discussed, that
10  they are paying no more than WAC, which is
11  always less than AWP; correct?
12  A.   That's correct.
13  Q.   And the third, with the markup of 20
14  percent for the off-contract sales, that's still
15  less than the AWP, because the difference
16  between WAC and AWP for a Sandoz product is more
17  than 20 percent; is that correct?
18           MR. GALLAGHER: Objection to
19  the form of the question.
20           THE WITNESS: And the 20
21  percent is a guess on my part. I have no idea
22  what the wholesalers are marking up those

Henderson Legal Services
202-220-4158

219f2904-4b58-4844-ad64-7f143cba19e5

Galownia, Kevin      HIGHLY CONFIDENTIAL      June 11, 2007
Philadelphia, PA

---

Page 246

1   Q.   And then there is a column entitled
2   3-month average price.
3            Do you see that?
4   A.   Yes, I do.
5   Q.   What does that column represent, and how
6   is it calculated?
7            MR. GALLAGHER:  Objection to
8   the form of the question.
9            THE WITNESS:  As I recall, it
10  is a waited average contract price for a
11  three-month period.
12  BY MR. LIBMAN:
13  Q.   To what class of trade or what purchasers?
14  A.   To all classes of trade, all purchasers.
15  Q.   And can you identify the various classes
16  of trade to which Sandoz or Geneva sold its
17  products that were included in this calculation
18  of the three-month average price?
19  A.   It would be direct buying chains, mail
20  order, wholesaler auto sub programs,
21  distributors, GPOs, long-term care facilities
22  and buying groups.

---

Page 247

1   Q.   Buying groups for what sorts of entities?
2   A.   Retail buying groups.
3   Q.   Would it include any sales to hospitals?
4   A.   Hospitals would be included within the
5   GPOs.
6   Q.   Would it include any sales to the federal
7   government?
8   A.   Yes, that would include -- it would
9   include federal government sales.
10  Q.   Do you know approximately what percentages
11  of Sandoz sales for its products were made to
12  the federal government?
13  A.   I do not know.
14  Q.   Do you know what percentage of Sandoz
15  sales of its products were to hospitals?
16  A.   I don't know.
17  Q.   And then there is a column entitled
18  Average Contract Price Percent Discount to WAC,
19  do you see that?
20  A.   Yes.
21  Q.   How is that calculated?
22  A.   I would assume that it is the difference

---

Page 248

1   between WAC and average -- three-month average
2   price divided by WAC.
3   Q.   So, for example, if you follow one of the
4   drugs I have been using, Atenolol, the last
5   Atenolol listed there, which has got an item
6   number of 150710, it has an AWP of $1,188.93, a
7   WAC of $154.57; is that correct?
8   A.   That is correct.
9   Q.   And a three-month average price of $56.75;
10  correct?
11  A.   That is correct.
12  Q.   And then the average contract price
13  percent discount to WAC would be 63 percent; is
14  that correct?
15  A.   That is correct.
16  Q.   So that would have been the WAC, the 154
17  minus the three-month average price of the 56 as
18  a percentage of the WAC; is that right?
19  A.   That is correct.
20  Q.   What was the purpose for preparing this
21  document?
22  A.   To determine WAC decrease opportunities.

---

Page 249

1   Q.   What do you mean by that?
2   A.   As I discussed earlier, what we would do
3   periodically is, we would review the entire
4   portfolio products for situations where the
5   contract pricing was becoming significantly
6   lower than WAC to determine if we should reduce
7   the WAC price.
8   Q.   And so looking at the average contract
9   price percent discount to WAC assisted you in
10  determining whether a WAC decrease opportunity
11  existed; is that correct?
12  A.   Yes, it did.
13  Q.   Is there a particular size of that percent
14  discount that -- above which you or below which
15  you determined the company should consider a WAC
16  decrease?
17  A.   I don't know what particular parameter
18  would have been used.  I would have probably
19  looked at low to high and just started with the
20  ones with the biggest discount percent and
21  worked from there.
22  Q.   To whom did you provide this report or was

---

63  (Pages 246 to 249)

219f2904-4b58-4844-ad64-7f143cba19e5

Galownia, Kevin      HIGHLY CONFIDENTIAL        June 11, 2007
                        Philadelphia, PA

Page 250

1  it just done for your own purposes?
2  A.    This would have been done for my own
3  purposes.  I would have provided a list of
4  potential WAC decrease products.
5  Q.    And how frequently did you do a
6  calculation like this?
7  A.    There was no regular rhyme or reason to
8  it.  It would be whenever I thought about it or
9  had the time to do it.
10 Q.    Do you recall, during the time you were
11 there, about how frequently you did this?  Was
12 it an annual event or more frequently than that?
13 A.    I would probably say once -- I would
14 probably say twice a year.
15        THE VIDEO TAPE OPERATOR:  Off
16 the video, 2:39.
17        - - -
18        (Whereupon a short break was
19 taken at this time.)
20        - - -
21        THE VIDEO TAPE OPERATOR:
22 Back on the record, 2:45.

Page 251

1        - - -
2        (Whereupon the court reporter
3  marked document as Exhibit Galownia 019 for
4  identification.)
5        - - -
6  BY MR. LIBMAN:
7  Q.    You have before you what's been marked as
8  Exhibit Galownia 019.  It is a document Bates stamped
9  SANDOZWISC 0024146 through 24161 entitled Geneva
10 Pharmaceuticals Price List As Of 03-15-02.
11        Are you familiar with this
12 document or documents like this that are price
13 lists for Geneva or Sandoz?
14        MR. GALLAGHER:  Objection to
15 the form of the question.
16        THE WITNESS:  I am familiar
17 with documents like this; however, this document
18 was created prior to my employment at Sandoz.
19 BY MR. LIBMAN:
20 Q.    I see, because it is March 15th of '02?
21 A.    Correct.
22 Q.    You started shortly thereafter?

Page 252

1  A.    That is correct.
2  Q.    Let me ask you, since you say you have
3  seen documents that are similar to this, to
4  thumb through a few pages, but the first page,
5  of course, has a number of columns, including
6  the NDC for the product.  You notice there that
7  the labeler codes for each of those NDCs include
8  00781.  I don't know if you see, it has 62269,
9  00015, there may be others, but -- and then it
10 also has, among other things, a column entitled
11 AWP and a column entitled WAC.
12        Do you see that?
13 A.    Yes, I do.
14 Q.    Then if you thumb through a little
15 further, about halfway through, starting on
16 Bates Number 24154, headings that include the
17 word retail, why don't you flip to that page?
18 A.    I am there.
19 Q.    And a number of other things.  Can you
20 tell me what that -- what the column retail
21 refers to in this document?
22        MR. GALLAGHER:  Objection to

Page 253

1  the form of the question.
2        THE WITNESS:  In this
3  document, the column retail refers to the retail
4  strategy price, which was the strategy price
5  established for retail buying groups.
6  BY MR. LIBMAN:
7  Q.    Retail buying groups are who?
8  A.    Buying groups that negotiate on behalf of
9  independent pharmacies to consolidate purchasing
10 power.
11 Q.    And can you identify by name some of those
12 retail buying groups?
13 A.    I don't know any off the top of my head.
14 Q.    When you say the contract strategy price,
15 does that mean this was the actual price charged
16 to those retail buying groups?
17 A.    Not necessarily.
18 Q.    What does that mean, the strategy price?
19 A.    Just like we would establish AWP and WAC
20 pricing in our system, we also developed price
21 points which were general benchmarks by class of
22 trade, which are these classifications you see

Henderson Legal Services
202-220-4158

219f2904-4b58-4844-ad64-7f143cba19e5

Galownia, Kevin      HIGHLY CONFIDENTIAL      June 11, 2007
                    Philadelphia, PA

Page 374

1  form.
2          THE WITNESS:  That is
3  correct.
4  BY MR. GALLAGHER:
5  Q.   And that's a separate transaction than the
6  initial purchase by Amerisource Bergen when it
7  purchased the product and brought it into
8  general inventory; is that right?
9  A.   Yes, it is a separate transaction.
10  Q.   And when a retailer purchases a Sandoz
11  product that's in the Progenerics program, the
12  actual price the retailer pays is based on the
13  price set by the Progenerics program and not a
14  price set by Sandoz; is that right?
15          MR. LIBMAN:  Objection to
16  form.
17          THE WITNESS:  That is
18  correct.
19  BY MR. GALLAGHER:
20  Q.   So to the extent the ABC Progenerics
21  program marked up the Sandoz product above what
22  the contract price was, Sandoz would have no

Page 375

1  knowledge of that?
2          MR. LIBMAN:  Objection to
3  form.
4          THE WITNESS:  That is
5  correct.
6  BY MR. GALLAGHER:
7  Q.   And is that true as a general matter that
8  when customers of wholesalers purchased
9  products, Sandoz products, from the wholesalers,
10  that those transactions are governed by the
11  negotiations between those parties and Sandoz is
12  not involved in those transactions?
13          MR. LIBMAN:  Objection to
14  form.
15          THE WITNESS:  That is
16  correct.
17  BY MR. GALLAGHER:
18  Q.   And so whatever terms and conditions the
19  wholesaler has negotiated with its customers,
20  Sandoz does not have any input into that in
21  terms of any wholesaler markup or fee or service
22  charge or anything of that nature?

Page 376

1          MR. LIBMAN:  Objection to
2  form.
3          THE WITNESS:  That is
4  correct.
5  BY MR. GALLAGHER:
6  Q.   Does Sandoz get information -- when you
7  were at Sandoz, did Sandoz get information from
8  wholesalers as to what markups or margins it was
9  charging or earning on its sales to retail
10  pharmacies, for example?
11  A.   Sandoz, through the course of a price
12  challenge, may glean very general broad
13  requirements that the wholesalers may have, but
14  as far as officially being communicated margin
15  requirements, things like that, no, Sandoz would
16  not have known that.
17  Q.   Or actually markups that the wholesaler
18  was charging if it was actually charging
19  somebody on a cost plus type basis?
20  A.   We would not have been aware of that.
21  Q.   Would you take a look at Plaintiff's
22  Exhibit Galownia 030?

Page 377

1  A.   Okay.
2  Q.   You offered some testimony describing some
3  of the rebate percentages described in this
4  document for this Progenerics RFP offering.
5          Do you remember that
6  testimony generally?
7  A.   Yes, I do.
8  Q.   Are you aware whether Amerisource Bergen
9  and its Progenerics program actually earned any
10  of the rebates set forth in this RFP?
11  A.   I am aware of them receiving the first
12  rebate, which is the total administrative and
13  marketing fee.  That was part of their general
14  agreement.  Outside of that, I am not aware of
15  them having earned any of the additional
16  rebates.
17  Q.   And just to clarify something, you offered
18  some testimony about your time at Cardinal
19  Health.
20          Do you remember that
21  generally, that you offered some testimony about
22  that?

95 (Pages 374 to 377)

219f2904-4b58-4844-ad64-7f143cba19e5

Galownia, Kevin      HIGHLY CONFIDENTIAL        June 11, 2007
Philadelphia, PA

Page 378

1   A.   Yes, I do.
2   Q.   And I believe your responsibilities and
3   duties there related to the pricing of the auto
4   sub program to mainly retail customers, but
5   certain other classes of trade?
6   A.   That is correct.
7   Q.   But you did not have direct responsibility
8   for negotiating which products actually went
9   into those programs; is that right?
10  A.   I did not have that responsibility,
11  correct.
12  Q.   But I think you offered some testimony
13  that you have a general understanding that on
14  the bid side, in terms of determining what
15  products, generic products would be in the
16  retailer auto sub program, that the important
17  metric for the Cardinal program was net
18  acquisition cost; is that right?
19  A.   That is correct.
20  Q.   You offered some testimony at various
21  points in time regarding GPOs.
22          Do you remember generally

Page 379

1   talking about GPOs?
2   A.   Yes, I do.
3   Q.   Do GPOs actually purchase and take
4   possession of product?
5   A.   No, they do not.
6   Q.   So they function as a negotiating entity
7   on behalf of their members?
8   A.   That is correct.  They are contract
9   negotiators.
10  Q.   And then their members would use that
11  contract right, essentially, to actually
12  purchase product pursuant to that contract?
13  A.   Yes, their members would purchase their
14  product through the authorized wholesalers.
15  Q.   Mr. Libman asked you some questions
16  regarding state Medicaid program reimbursements
17  and a phrase estimated acquisition cost, and I
18  wanted to ask you -- wanted to confirm your
19  understanding that you had not heard of that
20  before, estimated acquisition cost, in terms of
21  use by that concept in state Medicaid programs?
22  A.   That is correct.

Page 380

1   Q.   So to the extent states were undertaking
2   some efforts to comply with something called
3   estimated acquisition cost, you would have no
4   knowledge of what that is?
5   A.   I had no knowledge of that.
6   Q.   And more generally, in terms of state
7   Medicaid programs, understanding their
8   reimbursement systems and requirements and their
9   obligations under state and federal law, that's
10  not something you ever had responsibility for;
11  is that correct?
12  A.   That is correct.
13  Q.   And that's not something you ever
14  investigated; is that correct?
15  A.   That is also correct.
16  Q.   With respect to First Databank, you
17  offered some testimony regarding your
18  understanding of what Sandoz needed to do to
19  have its products coded as a generic, and I
20  wanted to make sure I understand your basis for
21  acquiring that knowledge.
22          Was that from communications

Page 381

1   with someone at First Databank?
2   A.   I acquired that knowledge through e-mail
3   and telephone communications with Kay Morgan at
4   First Databank.
5   Q.   And was that on one occasion or across
6   multiple occasions that you acquired that
7   knowledge and information?
8   A.   It was across multiple occasions.
9   Q.   Aside from what you have testified about
10  concerning your understanding of how First
11  Databank determines whether something will be a
12  generic versus a brand, which I believe you said
13  related to the differences between the AWPs of
14  the certain products, are there other measures
15  that First Databank uses to indicate whether
16  something is a brand or a generic?
17  A.   I was aware of First Databank publishing
18  multiple codes as it refers brand and generic.
19  My understanding was that the most utilized code
20  was the generic price indicator, which is the
21  one that I focused my efforts on as far as
22  insuring that we were coded as a generic.

Henderson Legal Services
202-220-4158

219f2904-4b58-4844-ad64-7f143cba19e5

Galownia, Kevin      HIGHLY CONFIDENTIAL      June 11, 2007
Philadelphia, PA

Page 386

1   A.   I have not.
2   Q.   Have you seen any studies of that?
3   A.   No, I have not.
4   Q.   You offered some testimony regarding
5   Sandoz price changes in considering federal
6   upper limits, and my question is, can you think
7   of any instance in which Sandoz understood that
8   its lowering of its WAC might, indeed, be used
9   to set a lower federal upper limit, but went
10  ahead and lowered its WAC, anyway?
11  A.   Yes, I am.
12  Q.   And what product are you referring to
13  there?
14  A.   That product would be Terazocin.
15  Q.   Do you know in what time period that
16  occurred?
17  A.   If I recall correctly, it would have been
18  the summer of 2005.
19  Q.   And was that a significant product for
20  Sandoz at the time?
21  A.   Yes, it was.
22  Q.   And in terms of -- strike that.

Page 387

1               You talked a fair bit about
2   -- you testified a fair bit about Sandoz
3   wholesale acquisition cost or WAC prices and
4   AWPs, and I just wanted to ask a question in
5   terms of relationship with the relevant brand
6   AWP and the brand WAC.
7               Could there be instances in
8   which the wholesale of the WAC for the branded
9   product was higher than all of the Sandoz
10  prices, AWP, WAC, contract price?
11  A.   Yes, that's very possible.
12  Q.   You were shown some documents that
13  purported to be materials from First Databank
14  regarding AWP.
15              When you had your discussions
16  with Kay Morgan and you were providing her AWPs
17  and you talked to her about generic
18  classifications and related issues, did she ever
19  tell you that First Databank intended the AWPs
20  that it published for Sandoz products to be
21  actual averages of wholesaler prices?
22  A.   No, she did not.

Page 388

1   Q.   Did she ever tell you that that's what
2   First Databank was telling its customers?
3   A.   No, she did not.
4   Q.   Did anyone from First Databank ever tell
5   you that?
6   A.   Nobody did.
7   Q.   Did Ms. Morgan ever tell you that First
8   Databank surveyed wholesalers for understanding
9   the markups applied by wholesalers to Sandoz's
10  prices to determine AWPs?
11  A.   No, she did not.
12  Q.   You provided some testimony regarding a
13  confidentiality provisions as a general matter
14  in certain Sandoz's contracts, and what I wanted
15  to ask you is whether Sandoz had an
16  understanding of the risk of potential
17  disclosure of pricing it was giving the
18  wholesalers for use in terms of charge-backs
19  when the wholesaler was reselling the product to
20  a customer with the contract with Sandoz, that
21  is to say, was there some understanding
22  internally at Sandoz that those prices tended to

Page 389

1   leak into the marketplace over time?
2               MR. LIBMAN:  Objection to the
3   form.
4               THE WITNESS:  Yes, that's
5   always the expectation for that type of
6   customer, that pricing information may leak into
7   the marketplace.
8               MR. GALLAGHER:  I don't have
9   any further questions, Mr. Galownia, but I want
10  to make -- I want to put two statements on the
11  record, but I just want to ask for our friend on
12  the phone here if he has got any questions
13  before I do that.
14              MR. COHEN:  No, I don't have
15  any questions.
16              MR. GALLAGHER:  Let me just
17  make two statements, and I guess may have
18  follow-up.
19              MR. LIBMAN:  Just so you
20  know, I do not have further follow-up questions.
21              MR. GALLAGHER:  I just feel
22  constrained to make two statements for the

98 (Pages 386 to 389)

219f2904-4b58-4844-ad64-7f143cba19e5

# EXHIBIT 13

Worrell, Christopher   CONFIDENTIAL          August 23, 2007
New York, NY

**CONFIDENTIAL TRANSCRIPT**

IN THE CIRCUIT COURT OF

MONTGOMERY COUNTY, ALABAMA

---------------------------------------------x

STATE OF ALABAMA,

                    Plaintiff,

          -against-          Case No. CV-05-219

ABBOTT LABORATORIES, INC, et al.,

                    Defendants.

---------------------------------------------x


UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

---------------------------------------------x

IN RE: PHARMACEUTICAL INDUSTRY     MDL NO. 1456

AVERAGE WHOLESALE PRICE LITIGATION

---------------------------------------------x


CHRISTOPHER WORRELL DEPOSITION, AUGUST 23, 2007

96be8b31-9ca9-47dc-b58d-0c8dc2817c65

Worrell, Christopher   CONFIDENTIAL              August 23, 2007
New York, NY

---

Page 58

1  to utilize generic versus brand classifications.
2      Q.  When you say "fields," you're talking
3  about fields on a data sheet, on a spreadsheet of
4  data?
5      A.  Fields in electronic or printed
6  database, absolutely.  They have multiple fields.
7  The first field that they created years ago was
8  called the GPI or generic price indicator.  There
9  are other fields that I believe, from -- that
10  they have added to the database over the years
11  but, in the infancy of electronic reimbursement
12  systems in the '80s, GPI was -- the first generic
13  price indicator -- was the first field that they
14  entered to sort of deal with this issue about, is
15  the product a generic or is it a brand.
16      So that field was created many years ago.
17  In selling the database to clients, including the
18  companies I worked for, they gave a full booklet
19  of all the fields and described what each one is
20  supposed to do.  They may not have described the
21  methodology, per se, but they described what the
22  definition of each field was, and of course,
23  clients could use that field as they chose to.

Page 59

1      Q.  And what kind of indication appeared,
2  for example, in the GPI field?
3      A.  I -- I believe there was, it's a
4  numerical field and I believe it was numbers 1
5  through 3. There may have been more numbers added
6  over time. But 1 through 3 indicated whether your
7  product was a single-source brand, because
8  there's many products out there with no generics.
9  So they had to put something in that field, and
10  it happens to be a 1.  If you're a generic form
11  as they've identified your product as a generic,
12  they would give you another number, I believe it
13  was a 2.  And if you were another category, which
14  means you are now a branded product but generics
15  are available for your product, your product
16  changed from 1 to a 3.
17      So prior to generic introduction, your
18  branded product is a 1.  After introduction, you
19  now get reclassified as a 3, and the generic
20  would be put in the category of a 2.
21      Q.  And I take it from your prior testimony
22  that what you're interested in is having a 2 in
23  that field.

Page 60

1      A.  Yes.  If a generic manufacturer had a 1
2  or a 3, then we would be viewed in the database
3  as a brand and that had all sorts of implications
4  for customers that bought the product in this
5  co-pay situation and reimbursement situations.
6      Q.  And how did AWP play a role in
7  achieving a 2 in that field?
8      A.  I should be clear that First DataBank,
9  from my experience, never fully explained or
10  clearly explained how a GPI indicates or actually
11  gets set.  Meaning, how does your product get to
12  be a 2 versus a 1.
13      They were clear in that the definition, the
14  title itself says "Generic Price Indicator."  So
15  it had nothing to do with whether you're an
16  FDA-approved generic versus a brand. It had
17  nothing to do with anything on the regulatory
18  approval side of your product. It had to do with
19  how you were priced.  And of course it was
20  somewhat clear that if you were priced at the
21  same as a brand or higher, you were not going to
22  get a generic designation.
23      The question is, what price did you need to

Page 61

1  be to get a generic designation.  And over years
2  of experience with launching generic products and
3  buying generic products, it became apparent to
4  me, although First DataBank never confirms this,
5  that you needed to have about a ten or 15 percent
6  discount to the branded AWP to get this generic
7  classification.
8      Q.  And when you say ten to 15 percent
9  discount to the brand AWP, is that an AWP that
10  Sandoz or Geneva created?
11      A.  Yes.
12      Q.  And did you communicate that to First
13  DataBank?
14      A.  Yes, we did.
15      Q.  What was the purpose of communicating
16  that to First DataBank?
17      A.  The purpose was to make sure that our
18  product was -- well, let me back up a little bit.
19      You need to communicate to First DataBank
20  about your product because, if you don't tell
21  them you have a product in the marketplace, then
22  it's not in their database, which means then
23  nobody knows it really existed, all the clients

16  (Pages 58 to 61)

96be8b31-9ca9-47dc-b58d-0c8dc2817c65

Worrell, Christopher   CONFIDENTIAL                  August 23, 2007
                    New York, NY

Page 66

1   ten years.  We were losing money on particular
2   products.  And part of my responsibility was to
3   either discontinue products that were losing
4   money, or raise the prices to levels that were
5   acceptable.
6        Q.   And I think you said a couple of
7   answers ago that, when you raise prices, you
8   raise all prices.  To your recollection, was that
9   true at Geneva/Sandoz, that if you raised a
10  contract price or WAC or AWP, it was because all
11  three of them being raised?
12       MR. LIBMAN:  Objection to form.
13       A.   Yes.  Yes, that would generally be the
14  reason we would do that.
15       Q.   Were there occasions when you had
16  occasion to consider lowering AWPs?
17       A.   Yes.
18       Q.   Can you describe the circumstances
19  where you might consider lowering an AWP?
20       A.   Again, it would be a rare situation.
21  There wouldn't be a need to even look at AWP very
22  often after a product launch.  But in -- in
23  situation, if the market was dramatically

Page 67

1   dropping to large degrees, hundreds and hundreds
2   of percent and things were changing very
3   dramatically, we may look at the whole pricing
4   structure.
5        Another scenario, although again rare, if
6   the brand company elects to compete and lower
7   their AWP, then I need to look at mine also
8   because, I mean, that situation with my generic
9   price indicator, that I need to make sure that
10  continues to stay as a generic product.  But in
11  general, it's a pretty rare situation that we
12  would have any reason to lower it.
13       Q.   In general, was Geneva's pricing of its
14  products to its customers affected by the
15  reported AWP?
16       MR. LIBMAN:  Objection to form.
17       A.   Can you describe that further?
18       Q.   Well, I'm just asking, you said that
19  you submitted an AWP to First DataBank in order
20  to obtain a generic designation.
21       Did that reported AWP play any other role in
22  setting prices to customers?
23       A.   No.  That was the primary purpose of an

Page 68

1   AWP for Sandoz.
2        Q.   Well, I'll ask this broadly.  Did
3   reimbursement formulas play any role in setting
4   or changing AWP at Geneva?
5        MR. LIBMAN:  Objection to form.
6        A.   No, not for Geneva.
7        Q.   Did, in specific, did Medicaid
8   reimbursement formulas play any role in what AWP
9   was set, or whether you changed AWP up or down?
10       A.   No, not at all.
11       Q.   Did you ever consider Medicaid
12  reimbursement in setting an AWP or changing an
13  AWP?
14       A.   No.
15       Q.   Are you generally familiar with
16  Medicaid reimbursement formulas?
17       A.   In general, yes.
18       Q.   Are you familiar with the Medicaid
19  reimbursement formula of any particular state?
20       A.   No, I would not have knowledge or do
21  any research on that level of detail.
22       Q.   For example, do you know how Alabama
23  reimburses for generic drugs in the Medicaid

Page 69

1   system?
2        A.   I have no idea.
3        Q.   What about Wisconsin?
4        A.   I have no idea.
5        Q.   What about Illinois?
6        A.   No states.
7        Q.   No states?  Can you describe in general
8   your understanding of what kinds of formulas were
9   used?
10       A.   Most of my experience and understanding
11  of reimbursement formulas goes back to some of my
12  prior experience with CVS Pharmacy and Bindley
13  Western Drug Company, mostly on the CVS side.  As
14  a provider of services, we were acutely aware of
15  what our reimbursement rates were and such in
16  terms of setting retail pricing, which was part
17  of my responsibility.
18       So I was acutely aware at that point about
19  probably different states' levels and
20  reimbursement and how they impacted our business.
21  So most of my knowledge comes from what I knew
22  from years ago in terms of that.  So I am aware
23  that all these different -- different price

                              18 (Pages 66 to 69)

96be8b31-9ca9-47dc-b58d-0c8dc2817c65

Worrell, Christopher   CONFIDENTIAL               August 23, 2007
                        New York, NY

Page 82

1  that you would learn this over time through
2  experience.
3      Q.  Did it work mostly?
4      A.  I would say it worked every time.
5      Q.  Are you familiar with the phrase,
6  "Wholesale Acquisition Cost," or WAC?
7      A.  Yes, I am.
8      Q.  Can you describe for the jury what your
9  understanding of that phrase is.
10     A.  The way a wholesale acquisition cost
11 worked for Sandoz was, this was the price that we
12 would sell our product to the wholesale class of
13 trade.  So when a wholesaler would buy a product
14 from Sandoz, we would sell them at the wholesale
15 acquisition price, and the product would transact
16 at that price, and the wholesaler would pay us
17 that price.
18     Q.  Was the wholesale acquisition cost, or
19 WAC, a price that you reported to First DataBank?
20     A.  Yes, it was.
21     Q.  And did that price, let's start at
22 launch, at the launch of a product, did the WAC
23 bear some formulaic relationship to the reported

Page 83

1  AWP?
2      MR. LIBMAN:  Objection, form.
3      A.  Yes, there was a relationship between
4  the AWP that we reported and the WAC that we
5  reported.
6      Q.  And do you know, do you recall what
7  that relationship was?
8      A.  That relationship, if we go back to my
9  earlier statement about trying to price in the
10 marketplace prior to launch, we would have a
11 model that we would put together as to what WAC
12 discount we would provide to our AWP versus where
13 the AWP was initially being set because of where
14 the brand company was.
15     So that would change dramatically depending
16 on launch conditions, and many times we would --
17 we would have a WAC that we were thinking about
18 in terms of what we would -- what we would be
19 providing and then launch would come and we might
20 have to change at the last minute.
21     Because the WAC is a price that our
22 wholesalers paid, we had to be competitive on
23 that price.  So again, not knowing how the market

Page 84

1  is going to form, we would set it initially high,
2  and then if the market dramatically changed at
3  launch, then we would have to make some very
4  quick adjustments and lower that price.
5      Q.  How would the market change at launch?
6      A.  Well, again, because we don't know how
7  many competitors are coming, we start with the
8  theory that prices are going to -- that prices
9  are going to be high and, as competitors come in
10 and customers start to demand lower prices, we
11 have to make adjustments to all our prices in
12 terms of the WAC and in terms of a contract price
13 with a direct customer.
14     Q.  Assuming for the moment that -- are you
15 familiar with paragraph 4 certification to an
16 ANDA?
17     A.  Yes.
18     Q.  Assuming that you know, to eliminate
19 the imperfection in the market, assuming that you
20 know that you have 180-day Hatch-Wax exclusivity,
21 is there a relationship between your reported AWP
22 at launch and the WAC at launch?
23     A.  Yes, if we -- if we modelled a product

Page 85

1  that we felt we would be exclusive, for whatever
2  reason, and Hatch-Wax 180-day exclusivity, that
3  would be one reason, just first-to-market
4  exclusivity, that could happen from time to time,
5  for whatever the reason, if we felt we had
6  exclusivity, and we being the only generic in the
7  marketplace, we had a set formula up to what
8  discount our WAC would be to our AWP.
9      Q.  And what was that?
10     A.  It was generally 25 percent.
11     Q.  So the WAC would be 25 percent lower
12 than AWP?
13     A.  Correct.
14     Q.  So that if AWP was a hundred dollars,
15 WAC would be 75?
16     A.  That's right.
17     Q.  And if there were multiple possible
18 entrants, would WAC be different from that at
19 launch?
20     A.  Yes.  The scenario I described would
21 be, the highest possible price that we would
22 have, because we'd be the only generic in the
23 marketplace.  When a market forms, if other

Henderson Legal Services
202-220-4158

96be8b31-9ca9-47dc-b58d-0c8dc2817c65

Worrell, Christopher   CONFIDENTIAL          August 23, 2007
                       New York, NY

Page 106

1  the net contract price is dropping because of
2  these factors I described, and ended up at, let's
3  say, two dollars, in the very extreme case, if I
4  have a WAC of a hundred dollars, I'm already
5  offering a two-dollar prompt pay discount,
6  because that's two percent. So now I've sold the
7  product for basically free. I've sold it to the
8  wholesaler for a hundred dollars. My contract
9  price is two, so my net sell price is two. I
10 have to provide a $98 chargeback to the
11 wholesaler, and now I've made zero. I have no
12 sales dollar amount.
13     So the reason I explained that is because we
14 would reduce WACs because that prompt-pay
15 discount was a factor in the cost of doing
16 business with the wholesaler. So if my WAC was a
17 hundred, and let say the rest of the market was
18 dramatically lower and I would lower it, I would
19 lower my exposure to that prompt-pay discount.
20     Q.  When you say "exposure," you lower the
21 amount of the prompt pay discount you'd have to
22 pay?
23     A.  No, I wouldn't lower the two percent. I

Page 107

1  would lower my invoice price, so therefore, the
2  amount of the two-percent discount would be lower
3  on a dollar basis.
4      Q.  The dollar amount.
5      A.  Yes. So if I lowered that one from a
6  hundred dollars two twenty dollars, I have now
7  saved myself $1.60 in prompt-pay discount. And
8  just as a course of business practices, all
9  wholesalers paid within terms so they always
10 received the two-percent prompt-pay discount.
11     Q.  Under what circumstances would you
12 consider raising a WAC?
13     A.  A WAC would be increased if we were
14 going to take a price increase on an item, for
15 the same reason we would raise a contract price.
16 The price, for whatever reason, we're making the
17 decision to raise the price on a product and
18 therefore, all prices to customers go up.
19     Q.  When you say raise the price to the
20 customer, you're talking about raising contract
21 prices?
22     A.  Contract prices and WAC prices.
23     Q.  And WAC. Can you think of situations

Page 108

1  where you raised a WAC while you were at Geneva
2  or Sandoz, where you did not raise the contract
3  price?
4      A.  I can't think of a reason why we would
5  do that. It wouldn't sound logical to me why we
6  would need to do that. I mean, we should be
7  clear that the mechanics of pricing were done by
8  the people. I set the general rules about how
9  pricing was done and how we operated. So I can't
10 recall any situation where we would have a
11 discussion over why we would do that.
12     Q.  Now, you said that you raised WAC in
13 response to a rise in contract price. Would you
14 lower WAC in response to a reduction in contract
15 price?
16     A.  Yes. If the contract price was
17 reducing to such a large degree, then we may or
18 may not reduce our WAC to that customer segment,
19 because there is a customer segment that's buying
20 the product at WAC. So I have to look at, if I
21 feel I'm uncompetitive in that marketplace, then
22 I need to make that adjustment.
23     So it may or may not adjust at the same time

Page 109

1  a contract price.
2      Q.  Well, described the circumstances where
3  you would see contract prices dropping on a drug
4  but you would not reduce WAC.
5      A.  Okay. Let's take an example of one
6  particular large direct customer. I'll use, just
7  to pick a name, I'll use Wal-Mart as an example,
8  and Wal-Mart comes and demands a lower price on a
9  product. But no one else in the marketplace has
10 demanded any lower pricing from me. I would just
11 probably change Wal-Mart's price and I wouldn't
12 change any of my other prices. Meaning that
13 Wal-Mart's price went down but all my other drug
14 customers' prices stayed the same, my WACs stayed
15 the same, because I felt that was an isolated
16 incident.
17     If I had new competitors coming in the
18 market, and everybody is asking for price
19 reductions to a dramatic nature, all at the same
20 time, yes, I would probably adjust my WAC and all
21 the contract prices at the same time.
22     Q.  Can you think of situations where you
23 did not change WAC where you changed, where

28 (Pages 106 to 109)

96be8b31-9ca9-47dc-b58d-0c8dc2817c65

Worrell, Christopher   CONFIDENTIAL          August 23, 2007
New York, NY

Page 122

1    Q.  Let me go broader.  Have you ever
2 spoken to anybody in any state Medicaid agency
3 about anything?
4    A.  No.
5    Q.  Have you ever communicated directly or
6 indirectly with anybody at any state Medicaid
7 agency?
8    A.  No.
9    Q.  Are you aware of anybody, you know,
10 under your supervision -- I'm leaving aside
11 lobbying activities, but in the marketing sales
12 force -- aware of anybody communicating with
13 Medicaid agencies?
14    A.  Not knowingly.  If an e-mail came
15 across from a state agency to somebody in our
16 group, there could have been a correspondence.
17 But I can't imagine why that would happen.
18    Q.  Did you or anybody under your
19 supervision, to your knowledge, ever represent
20 that AWP was an average of wholesale price to
21 retailers by wholesalers?
22    A.  No.
23    Q.  That was not your understanding of what

Page 123

1 you reported to First DataBank?
2    MR. LIBMAN:  Objection, leading.
3    A.  Not at all.
4    Q.  What was your understanding of what was
5 reported to First DataBank?
6    MR. LIBMAN:  Objection, asked and answered.
7    A.  What we reported to First DataBank in
8 terms of AWP was our benchmark pricing to have a
9 generic designation for our products.
10    Q.  Did you ever represent, you or anybody
11 under your supervision, to your knowledge, ever
12 represent to any state Medicaid official what WAC
13 was?
14    A.  If someone -- I do not know.  If
15 someone had asked us what WAC was, we would tell
16 them what I've told you today, that it was the
17 list price at which we would sell to our
18 wholesalers.
19    Q.  Did anybody ever represent, to your
20 knowledge, to a state Medicaid official that WAC
21 was a net price to wholesalers?
22    A.  Absolutely not.
23    Q.  I believe I asked you this, but I'll

Page 124

1 make sure.  Did you ever raise or lower an AWP or
2 a WAC as reported to First DataBank in order to
3 affect Medicaid reimbursement one way or the
4 other?
5    A.  No.
6    MR. LIBMAN:  Object, just for the record,
7 objection.
8    MR. CROSS:  I think I may be close to done.
9 If we took a five-minute break, I may be there.
10    VIDEOGRAPHER:  Going off the record.  The
11 time is 11:48.
12    (Recess taken.)
13    VIDEOGRAPHER:  We're back on the record.
14 The time is 12:12.  This is tape 3.
15    MR. CROSS:  I do not have any further
16 questions for Mr. Worrell.  I reserve the right
17 to ask redirect.  I do have a few documents that
18 I'd like to authenticate unless you're willing to
19 stipulate that they are authentic.
20    MR. LIBMAN:  I think you should just go
21 through them --
22    MR. CROSS:  I am.  I'm going to go through
23 them.  Are we running sequential exhibit numbers?

Page 125

1    (A pause in the proceedings.)
2    MR. CROSS:  We don't have Worrell or
3 anything like that on them.  What have we been
4 doing?
5    MR. LIBMAN:  I think for the ones that I've
6 taken, we've done the witnesses' name.  For
7 these, they are dep notices, they will speak for
8 themselves as to when they were marked, but maybe
9 we want to do Worrell for the remainder.  Why
10 don't you just do Exhibit Worrell 009, and go on
11 from there.
12    MR. CROSS:  I'm marking as Exhibit Worrell
13 009 an e-mail with an attached presentation which
14 starts with Sandoz Wisconsin 0292400 and runs
15 through 0292427.
16    (Deposition Exhibit Worrell 009, e-mail with
17 attached presentation Bates numbered SANDOZ WISC
18 0292400 through 0292427, marked for
19 identification, as of this date.)
20 DIRECT EXAMINATION (Cont'd.)
21 BY MR. CROSS:
22    Q.  My question, Mr. Worrell, is, can you
23 identify that document?

32 (Pages 122 to 125)

96be8b31-9ca9-47dc-b58d-0c8dc2817c65

Worrell, Christopher   CONFIDENTIAL            August 23, 2007
                       New York, NY

Page 182

1  in First DataBank's database?
2      A.  Well, that was critical.  Because if a
3  pharmacy system is being populated with
4  information from First DataBank, and my drug
5  doesn't come up in a listing, they can't dispense
6  the product and it can't be checked against drug
7  interactions, it can't be checked for toxicity.
8  It's critical that that would be in a database
9  that the customer would use.
10     Q.  It was critical that Sandoz report
11  prices to First DataBank because Sandoz knew that
12  payors relied on those prices, correct?
13     A.  No.  I would say that it was something
14  that we did voluntarily, provide information to
15  First DataBank, but it wasn't, to my
16  recollection, ever mandatory that we did that.
17     Q.  Well, I was using your word.  I thought
18  you said it was critical.
19     A.  What I said was, it's critical that
20  with we provide our drug information for the
21  database so that, when a pharmacist goes to
22  dispense that drug that's populating the
23  database, I'm not referring to pricing, I'm

Page 183

1  referring to the international drug code, the
2  drug interaction information, the type of drugs.
3      Q.  But Sandoz also provided prices,
4  correct?
5      A.  Yes, we did provide ADP and WAC
6  information to First DataBank.
7      Q.  When Sandoz would launch a new drug,
8  would they provide new product information to
9  First DataBank?
10     A.  Yes, we would.
11     Q.  Like you just explained?
12     A.  Yes, it was fairly comprehensive, but
13  we would provide them.
14     Q.  And it would include the pricing, AWP
15  and the WAC, correct?
16     A.  That was part of our standard process.
17     Q.  Well, why would you provide the pricing
18  information if it was not mandatory?
19     A.  Because we felt it was important to
20  have a generic drug classification on our product
21  in their database that, if we did not provide the
22  information, we may not have a generic
23  classification.

Page 184

1      MR. CROSS:  Excuse me, I'm sitting here
2  watching the court reporter.  Can you slow down a
3  little bit?
4      THE WITNESS:  Okay, sure.
5      Q.  Tell me what you mean by "generic
6  classification."
7      MR. CROSS:  I'm going to object.  This was
8  the subject of probably half an hour of testimony
9  this morning.  I understand, Mr. Carter, you want
10  your own, but you're just basically rehashing
11  what we've already done.
12     A.  The drug, the Generic Pricing Indicator
13  is a field that First DataBank populates which
14  helps clients that buy the data determine if the
15  drug is a generic or a brand based on First
16  DataBank's criteria of that.
17     It is not related to FDA approval, status,
18  or how FDA might designate a branded or generics
19  on a regulatory approval.  They base it on a
20  pricing module that they have or pricing
21  calculation that they use.  So it was important
22  for us to have a generic drug classification on
23  our products.

Page 185

1      Q.  Is that the only reason you submitted
2  AWPs and WACs to First DataBank?
3      A.  Yes.
4      Q.  You didn't know that payors were
5  relying on those prices to reimburse health
6  providers and others when the drugs were
7  purchased?
8      A.  Like I said before, I'm not sure where
9  they got their information from.  I provided it
10  for a specific purpose.
11     Q.  The information that Sandoz would give
12  to First DataBank, was it transmitted
13  electronically?
14     A.  No. -- well, if you consider e-mail
15  electronic, an e-mail to them, that's how it was
16  transmitted.
17     Q.  The prices, the AWPs and the WACs were
18  transmitted electronically?
19     A.  Via e-mail, via a document that we
20  would send them about a new product.
21     Q.  Was there a sort of a person or persons
22  that you dealt with at First DataBank when you
23  were at Sandoz?

47 (Pages 182 to 185)

96be8b31-9ca9-47dc-b58d-0c8dc2817c65

Worrell, Christopher   CONFIDENTIAL          August 23, 2007
New York, NY

Page 218

1  guess would be post-launch, you would do -- do
2  you call it modeling post-launch?  What do you
3  call it after launch?  Surveying?
4      A.  No.  There was not much surveying after
5  launch.  After launch, we are now into a
6  competitive generic environment and we're
7  constantly dealing with price pressures and
8  prices dropping and such.  And WAC is one of the
9  prices that we set our wholesalers, so we have to
10  consider, is it a competitive price in the
11  marketplace.
12      There's an additional complication which I
13  explained this morning about providing prompt-pay
14  discounts to wholesalers.  So we've got to
15  consider the cost of that versus what the market
16  price is.
17      Q.  So it's possible that you could have,
18  prelaunch, an AWP and a WAC that is 25 percent
19  off of that AWP, do some modeling prelaunch,
20  reduce the WAC more than 25 percent, launch the
21  drug; after the drug is launched, survey the
22  market and reduce the WAC further, correct?
23      A.  It's not surveying the market.  It's

Page 219

1  getting competitor information, true actual
2  prices that your customers are telling you is in
3  the marketplace, and making price changes based
4  on that.
5      So, I just wanted to have a distinction, we
6  don't survey the market, survey databases or
7  things like that.  We look at what's actually
8  happening in the marketplace.  We get real
9  information from our customers.
10      Q.  So your customers are basically saying,
11  "I can purchase a competitor drug at a lower
12  WAC."
13      A.  They would say either that, or they
14  would say, "I have a contract price with you, but
15  I can buy your competitor's drug at a lower price
16  than you."  So yes, one of those two situations.
17      Q.  And that would provide Sandoz incentive
18  to further lower the WAC, correct?
19      A.  Yes.  The WAC relationship is a little
20  more complicated in that we do have sales to
21  customers at WAC.  So to the extent that I'm
22  lowering that, I am giving up profit margin.  So
23  it's a decision we have to make against, will we

Page 220

1  get more market share if we lower this price or
2  do we keep it at a higher price, less market
3  share but higher sell price.  And that's just a
4  marketing decision we have to make on a regular
5  basis.
6      Q.  You try to balance between market share
7  and the first one that you used that I just
8  forgot.
9      A.  Price?
10      MS. CICALA:  Can we read back -- could you
11  read back the witness' last answer, please?
12      (Record read.)
13      (A pause in the proceedings.)
14      MR. CROSS:  Can we go off the record?  Well,
15  I guess it won't be off the video record.
16      (Discussion off the stenographic record.)
17      VIDEOGRAPHER:  Want to go off the record?
18      MR. CROSS:  No:
19      MR. GALLAGHER:  Brian will make it stop.  I
20  have the utmost confidence in him.
21      MR. CROSS:  We may never see him again.
22      Q.  Okay.  Let's pick back up.  So you're
23  talking about balancing the difference between

Page 221

1  profit margin and market share; correct?
2      A.  Correct.
3      Q.  Tell me what you mean by that.
4      A.  Well, it's a very simple relationship.
5  To the extent that I lower my price, I've lost
6  dollar profit on that product, but I may gain
7  enough back in more sales to make up for that.
8  Conversely, it works the same way if I raise my
9  price.
10      Q.  So you may lose profit on the sale of
11  that particular drug but if you gain market
12  share, then it just makes up for it with that
13  particular customer, I guess.
14      A.  No, not with that customer.  With all
15  customers.  I'm looking at the entire universe.
16  If I can gain five percent more of the U.S.
17  market share on a product by lowering my price
18  twenty percent, that may be the right economic
19  decision for us.  Conversely, I may raise my
20  price and lose 20 percent market share, depending
21  on how the numbers come, that may be a good
22  decision.
23      Q.  So you either want a lot of market

56 (Pages 218 to 221)

96be8b31-9ca9-47dc-b58d-0c8dc2817c65

# EXHIBIT 14

Kellum, Hector Armando HIGHLY CONFIDENTIAL          January 25, 2007
                    New York, NY

Page 1

STATE OF WISCONSIN

CIRCUIT COURT DANE COUNTY

Branch 7

Case No. 04-CV-1709

Unclassified - Civil:30703

---------------------------------------------x

STATE OF WISCONSIN,

            Plaintiff,

        v.

AMGEN INC., et al.,

            Defendants.

---------------------------------------------x

                        830 Third Avenue

                        New York, New York 10022

                        January 25th, 2007

                        11:42 a.m.

HIGHLY CONFIDENTIAL Videotaped Deposition of

Defendant SANDOZ, INC., by: HECTOR ARMANDO KELLUM,

Thursday, January 25th, 2007, 11:42 a.m. at the

offices of Kirby, McInerney and Squire, held

before a Notary Public of the State of New York

at the above time and place.

3624e879-87bd-474a-a9b8-8bf531ae1d49

Kellum, Hector Armando HIGHLY CONFIDENTIAL          January 25, 2007
                        New York, NY

---

Page 34

1  the two you said you believe they have, who would
2  you ask or how would you find that out?
3      A.  I believe that I would be able to query
4  our system and determine whether that had been the
5  case.
6      Q.  I know one of the subjects you have been
7  designated to testify about are communications
8  with the reporting services like First Data Bank.
9  I wanted to ask you a few background questions
10 about your knowledge of the Medicaid program and
11 as it relates to the prices that are reported to
12 First Data Bank.  Do you know what the Medicaid
13 program is generally?
14     A.  I have a general understanding of it,
15 yes.
16     Q.  What is your understanding?
17         MR. GALLAGHER:  Well, I'm going to
18 object beyond the scope to notice.  But go ahead.
19     A.  Okay, my understanding of it is that we
20 participate in a rebate program with states
21 whereby we pay states rebates for their Medicaid
22 prescriptions.

---

Page 35

1      Q.  And do you understand how Medicaid
2  works, I'll say it sort of the front end, before
3  the rebates are paid; that is, how a patient gets
4  a prescription filled and how a state Medicaid
5  program will pay for those drugs?
6      A.  I have I would say, a very limited
7  understanding of it.
8      Q.  Can you tell me what your understanding
9  is?
10         MR. GALLAGHER:  Again objection.  Beyond
11 the scope of the notice.
12     A.  And again, I'm really speaking sort of
13 personally here.
14     Q.  That's fine.
15     A.  I'm venturing out beyond my realm of
16 expertise --
17         MR. GALLAGHER:  Just tell him what you
18 know.
19     A.  -- a patient that is on a Medicaid, on a
20 state Medicaid program would go into a pharmacy
21 and then receive drugs from the pharmacy obviously
22 with a prescription, at some sort of price that I

---

Page 36

1  guess the state has set or something like -- that
2  would be my understanding.
3      Q.  Do you have any understanding of the
4  relationship between prices that -- like AWP or
5  WAC that Sandoz reports to First Data Bank and its
6  effect on the amount that a state Medicaid program
7  pays for a particular drug?
8         MR. GALLAGHER:  Objection to the form
9  and objection to beyond the scope of the notice.
10     Q.  You can answer?
11     A.  Can you repeat that question?
12     Q.  Sure.  Do you have an understanding as
13 to the relationship between the prices that Sandoz
14 reports to pricing compendia like First Data Bank
15 and the amount that a state Medicaid program will
16 pay, for example, to a retail pharmacy for a drug?
17         MR. GALLAGHER:  Same objection.
18     A.  All right. I have a very limited
19 understanding of that.
20     Q.  Can you tell me what your understanding
21 is?
22         MR. GALLAGHER:  Same objection.

---

Page 37

1      A.  My understanding of it and I'm not very
2  well prepared to talk about it, is they are paid
3  some rate that may or may not be determined, based
4  on sort of this benchmark pricing that exists.
5      Q.  Well, tell me about what it is within
6  your job duties and responsibilities pertaining to
7  communications with First Data Bank, or Redbook or
8  Medispan?
9      A.  Okay.  My primary role in communicating
10 with First Data Bank or Medispan or Redbook would
11 be to send them AWP and WAC pricing.  This usually
12 occurs  when we are introducing a product to the
13 market.
14     Q.  And what is your understanding of well -
15 -
16         MR. LIBMAN:  Strike that.
17     Q.  -- has that been true since 1993?  That
18 is, that Sandoz has reported to -- I'll refer to
19 them as these pricing services.  By that I mean
20 First Data Bank, Redbook and Medispan, Sandoz has
21 reported both AWP and WAC to these pricing
22 publications or Sandoz drugs?

---

10 (Pages 34 to 37)

3624e879-87bd-474a-a9b8-8bf531ae1d49

Kellum, Hector Armando HIGHLY CONFIDENTIAL          January 25, 2007
                    New York, NY

Page 46

1    Q.  Sure. Is one of the reasons that Sandoz
2  has  chosen to report AWP's and WAC's to the
3  pricing publications like First Data Bank, because
4  it knows that third-party payers, such as private
5  insurance companies, as well as state Medicaid
6  programs are going to look at and perhaps rely on
7  the AWP's and WAC's in determining how much to pay
8  pay for the drugs?
9        MR. GALLAGHER:  Objection to the form of
10  the question.
11    A.  Okay.  In my experience, in submitting
12  those prices to that pricing compendia, that was
13  never discussed as a reason.  You know, it has
14  been a practice that I followed when I started in
15  this pricing position.  And you know, the main
16  reason for me that has come up as an issue is just
17  the customer issues that we discussed earlier.
18    Q.  So, back to that, one of the reasons
19  that Sandoz has chosen to report AWP's and WAC's,
20  to the pricing publications like First Data Bank
21  is because Sandoz's customers expect and want
22  Sandoz to do that; is that correct?

Page 47

1    A.  That is correct.
2    Q.  And that is because those prices affect
3  the reimbursement of those customers; is that
4  correct?
5    A.  I believe that's correct, yes.
6    Q.  And the reimbursement -- these customers
7  by the way are reimbursed by among other entities,
8  state Medicaid programs; is that correct?
9    A.  That's my understanding, that some of
10  our customers are reimbursed by state Medicaid
11  programs, yes.
12        MR. LIBMAN:  Let me mark an exhibit
13  here.
14        (Whereupon Exhibit Kellum 172 -
15  Geneva document was marked for identification.)
16    Q.  I have handed you what has been marked
17  as Exhibit Kellum 172.
18        MR. LIBMAN:  For the record it has Bates
19  number at the bottom with Sandoz Cal4148 and 4149.
20    Q.  Do you recognize this as a job
21  description? It says Geneve Pharmaceuticals, Inc.,
22  for the position of Director of Pricing and

Page 48

1  Financial Analysis?
2    A.  It appears to be that.
3    Q.  Is this -- does this job description
4  accurately describe your current duties and
5  responsibilities in -- remind me what your current
6  title is?
7    A.  Manager of Trade Pricing and Analysis.
8    Q.  Yes.  Should I repeat the question?  Let
9  me repeat it.
10        Does this document accurately describe
11  your current job duties and responsibilities?
12    A.  Can I have a moment to review at it?
13    Q.  Sure, absolutely.
14        MR. GALLAGHER:  Let me take this
15  opportunity to note, I think I forgot to do this
16  for Mr. Hartmann's deposition.  But I suspect there
17  will be other documents like this and testimony
18  regarding pricing, et cetera, that we'll designate
19  this transcript highly confidential pursuant to
20  the protective orders in place in the relevant
21  states and declassify or dedesignate as required
22  by those rules.  And we'll send a letter as to

Page 49

1  other depositions as we forgot to do it on the
2  record.
3        MR. CARTER: She's not used to two quiet
4  lawyers.
5        MR. LIBMAN: Or two fast talkers.
6    A.  Okay.  Could you repeat the question one
7  more time?
8    Q.  Sure.  Does this document Exhibit Kellum
9  172, accurately describe any or all of your
10  current job duties?
11    A.  It describes some of my current job
12  duties. It also has some items on here that are
13  not my job responsibility.
14    Q.  Is there a job description for your
15  current job, that is, a written job description?
16    A.  I don't know.
17    Q.  Have you ever seen one?
18    A.  No.
19    Q.  And this document Exhibit Kellum 172,
20  has the name of Geneva Pharmaceuticals, Inc.
21  Given your knowledge of when the name change took
22  place from Geneva to Sandoz, what is the latest

13  (Pages 46 to 49)

Henderson Legal Services, Inc.
(202) 220-4158

3624e879-87bd-474a-a9b8-8bf531ae1d49

Kellum, Hector Armando HIGHLY CONFIDENTIAL          January 25, 2007
                    New York, NY

Page 54

1  besides WAC or AWP?
2        MR. GALLAGHER: Objection to the form of
3  the question.
4     A.  In my experience, as pricing manager and
5  based on what I know, the only information we
6  regularly communicate to First Data Bank and the
7  pricing compendia is our AWP, and our WAC's.
8        However, I can't speak to everything
9  that would have been done over the entire time
10 frame that we have looked at.
11    Q.  How does First Data Bank communicate --
12       MR. LIBMAN: I'm sorry.  Strike that.
13    Q.  -- how does Sandoz communicate AWP's and
14 WAC's to First Data Bank and the other pricing
15 services?
16    A.  The practice today is we send them an
17 email with the description of the product, the
18 NDC, and those list prices.  If it's a new product
19 we also will attach some additional information,
20 like package inserts, labels, and approval letter.
21    Q.  To your knowledge has Sandoz ever sent
22 AWP's and WAC's to any of the state Medicaid

Page 55

1  programs in the country?
2     A.  To my knowledge, we have not.
3     Q.  Now during the time --
4        MR. LIBMAN:  Strike that.
5     Q.  -- when Sandoz reports AWP's and WAC's,
6  to the pricing publications, including First Data
7  Bank, Sandoz intends for First Data Bank to
8  publish those identical AWP's and WAC's; is that
9  correct?
10       MR. GALLAGHER:  Objection to the form of
11 the question.
12    A.  That is our expectation, yes.
13    Q.  And more than just your expectation
14 Sandoz in fact, knows that First Data Bank takes
15 the AWP's and WAC's that Sandoz reports to it and
16 publishes those identical AWP's and WAC's; isn't
17 that correct?
18       MR. GALLAGHER:  Objection to the form of
19 the question.
20    A.  You know, I can't speak for every
21 instance and every product that we have ever
22 submitted pricing to them for.  But typically in

Page 56

1  my experience, that has been the case.  They have
2  published the AWP and WAC, that we submitted to
3  them.
4     Q.  And sitting here today, can you identify
5  any specific instance in which First Data Bank
6  published an AWP or a WAC, for a Sandoz drug that
7  was different than the AWP or WAC, that Sandoz
8  reported to First Data Bank?
9     A.  I can't cite a specific instance.
10 However, I do or I am aware that from time to time
11 there have been discrepancies between what we have
12 submitted to them and what they have published.
13    Q.  Can you describe those instances?
14    A.  I can't describe them in a lot of detail
15 other than, you know, for whatever reason, we have
16 gotten inquiries, sometimes from a customer or
17 from First Data Bank themselves, asking us to
18 verify something.  And when we have done that,
19 have determined that they did not have the AWP,
20 and/or WAC, that we had you know, originally
21 submitted to them.
22    Q.  What was the resolution of those

Page 57

1  discussions? That is, did First Data Bank wind up
2  publishing the AWP's and WAC's that you had
3  originally sent to it?
4     A.  I believe after we have confirmed what
5  the correct AWP and WAC was, then they published
6  those prices.  That's my belief.
7     Q.  Does Sandoz also send WAC's and AWP's to
8  the Redbook for Sandoz products?
9        MR. GALLAGHER:  Objection to the form of
10 the question.
11    A.  Yes, they receive that pricing.
12    Q.  And are those the same WAC's and AWP's,
13 that Sandoz sends to First Data Bank?
14    A.  Yes.
15       MR. GALLAGHER: Objection to the form of
16 the question.
17    A.  Yes, they are the same.
18    Q.  Has Sandoz ever been asked by First Data
19 Bank, Redbook or Medispan, to verify the WAC's and
20 AWP's, that those companies publish for Sandoz
21 drugs?
22    A.  In my experience, yes, they have from

                Henderson Legal Services, Inc.
                      (202) 220-4158

3624e879-87bd-474a-a9b8-8bf531ae1d49

Kellum, Hector Armando HIGHLY CONFIDENTIAL          January 25, 2007
                         New York, NY

Page 62

1  that correct?
2      A.  Yes, correct.
3      Q.  So that field would tell Sandoz whether
4  its products should be classified as generic; is
5  that correct?
6      A.  Yes.  I think it is that field.  And I
7  don't know if that is the exact name.  But that is
8  sort of what the purpose of the field is.
9      Q.  But there is a field apart from any
10 field that contains an AWP or a WAC, that Sandoz
11 would look at to determine if First Data Bank has
12 classified its product as a generic; is that
13 correct?
14     A.  Yes, that's correct.
15     Q.  So why then does Sandoz purchase AWP,
16 and WAC information from First Data Bank for its
17 drugs and drugs of other companies?
18         MR. GALLAGHER:  Objection to the form of
19 the question.
20     A.  Obviously, I can't say all of the
21 reasons that we do it.  But, I can go through some
22 reasons.  One would be to ascertain that our

Page 63

1  products were being classified as generic
2  products.
3      Q.  I'm sorry.  If I can interrupt you right
4  there.  How would looking at AWP, or WAC, help
5  Sandoz verify that its products are being
6  classified as generic or something else?
7      A.  I don't know that looking at AWP and WAC
8  would.  But looking at this generic indicator
9  would do that.
10     Q.  Let me try to rephrase the question
11 then.  We talked about the generic indicator field
12 whatever name it has.
13     A.  Right.
14     Q.  Now I'm talking about the AWP's and the
15 WAC's, that Sandoz purchases from First Data Bank
16 and I would like to know, any or all the reasons
17 that is Sandoz purchases that specific pricing
18 information?
19     A.  Okay.
20         MR. GALLAGHER:  Objection to the form of
21 the question.  You seem to be indicating it's
22 pieces of information.  I don't think that's what

Page 64

1  he has testified about.  That's my objection.
2      Q.  Do you understand my question?
3      A.  I think so.  When we launch generic
4  products.  I'm going through a hypothetical
5  example.  If we're the first generic in the
6  market, my understanding since I have been in this
7  pricing role, is that one of the things that goes
8  into First Data Bank's assessment of whether we're
9  a generic or not is whether we're priced at a --
10 if our AWP is priced at a discount to the
11 reference brand that we have been approved for.
12         So  that helps us ascertain where we
13 should list put this benchmark AWP pricing so that
14 we could be categorized as a generic so that
15 consumers can buy our product as a generic and pay
16 a little co-pay, those kind of things.
17     Q.  Can you also determine that generic
18 indicator based on the WAC, that's listed by First
19 Data Bank?
20         MR. GALLAGHER:  Objection to the form of
21 the question.
22     A.  I don't know that I can answer that.  I

Page 65

1  don't know the specific formula that First Data
2  Bank uses to determine that.  Our rule of thumb is
3  that the AWP is the benchmark that they use in
4  order to try to at least make their designation of
5  a generic versus a brand drug.
6      Q.  Have you heard that directly from anyone
7  at First Data Bank?
8      A.  No.
9      Q.  Where did you get that understanding
10 from?
11     A.  I got the understanding during the -- I
12 guess my transition to taking you know, that
13 position, the position that I currently have.
14     Q.  And who provided you were you with that
15 information?
16     A.  I believe it was it would have been
17 Christy Ronko and possibly Tom Sammler, S-A-M-M-L-
18 E-R.
19     Q.  What was his position at the time?
20     A.  He is Director of Trade Contracting.
21     Q.  By the way, does Ms. Ronko still work
22 for Sandoz?

17 (Pages 62 to 65)

3624e879-87bd-474a-a9b8-8bf531ae1d49

Kellum, Hector Armando HIGHLY CONFIDENTIAL          January 25, 2007
                      New York, NY

---

Page 78

1  consistent.
2          But the rule of thumb would be a twenty
3  percent discount.  Our AWP, our generic AWP, would
4  then have a twenty percent discount and that would
5  be our generic WAC.
6      Q.  I'm sorry.  You may have misspoken.  The
7  AWP is ten percent of the brand AWP?
8      A.  Correct, yes.
9      Q.  And the WAC is what?
10     A.  Would be a twenty percent discount to
11  that generic AWP.
12     Q.  Oh, I see.  Is that consistent over
13  time? Does that change at all?
14          MR. GALLAGHER:  Objection to the form of
15  the question.
16     A.  I don't know if it changes over time for
17  the entire time frame that we have looked at.
18  With respect to AWP, that is what we have
19  consistently done since I have been in the role, I
20  believe.  WAC is not consistent.  That really is a
21  rule of thumb.  But it may vary from that, based
22  on market conditions.

---

Page 79

1      Q.  So, it's your testimony that the AWP,
2  for a Sandoz generic drug is always ten percent of
3  the AWP, for the corresponding brand name drug?
4          MR. GALLAGHER:  Objection.  Misstates
5  prior testimony.
6      A.  No, I can't say that.  I haven't looked
7  at every AWP, for all of the products that you
8  have requested.  So, it's quite possible that
9  there is some that are not a ten present discount.
10  I can just say that in today's practice, of what
11  I'm doing, that would be our typical methodology
12  would be to, if we were launching a generic drug,
13  is to price our generic AWP, at a ten percent
14  discount to the brand AWP.
15     Q.  Is that regardless of what the actual
16  prices in the marketplace are for Sandoz drugs?
17          MR. GALLAGHER:  Objection to the form of
18  the question.
19     A.  Can you repeat that question?
20     Q.  Sure.  Is that true that Sandoz will set
21  the AWP, for its generic, at the time of launch,
22  at ten percent of the brand AWP, regardless of

---

Page 80

1  what the actual market prices are for Sandoz
2  drugs?
3          MR. GALLAGHER:  Objection to the form of
4  the question.
5          MR. LIBMAN:  What is the objection to
6  form?
7          MR. GALLAGHER:  Well, I don't know how
8  you have a market price when you haven't launched
9  the product.  I think it's vague and ambiguous for
10  that reason.
11     Q.  Does Sandoz set a price for its generic
12  product at the time of launch?
13     A.  The -- typically when we launch, one of
14  the first steps is to set an AWP and a WAC.
15     Q.  What about a price, a contract price, or
16  a price at which you'll sell to a wholesaler or
17  retailer?
18     A.  Yeah, generic drugs and generic pricing
19  is really sort of market based.  So it depends I
20  guess sort of on the competition in the market.
21  In some cases it's possible that there would be no
22  contract pricing offered.  And we would just sell

---

Page 81

1  at WAC.  And in other cases, there may be in a
2  number of cases where there are discounts to our
3  WAC.
4      Q.  So you talked about at time of launch.
5  What about over time after launch?  That is, how
6  does Sandoz determine when to change it's AWP or
7  its WAC?
8      A.  Okay, with respect to AWP, and again I
9  can't speak for all of the AWP price changes that
10  may or may have taken place over this entire time
11  frame because it goes beyond my time at Geneva
12  Sandoz.
13          However, my experience has been that
14  typically we wouldn't adjust generic AWP pricing
15  as long as our product was being classified as a
16  generic product, that if it wasn't classified as a
17  generic that might give us a reason to look at why
18  that could be.  And if it was because of First
19  Data Bank's assessment of the AWP, then that might
20  cause a change. But to my -- but my experience is
21  that we haven't done that in my time as a pricing
22  manager.

---

21  (Pages 78 to 81)

3624e879-87bd-474a-a9b8-8bf531ae1d49

Kellum, Hector Armando HIGHLY CONFIDENTIAL          January 25, 2007
                        New York, NY

Page 162

1     Q.  Can you tell me where you're looking?
2     A.  Sure.  I'm looking on, I believe what is
3   Sandoz WISC 0094848.  And in that, there is a
4   comment field within the Excel spread sheet I
5   believe that was used to prepare this that gives a
6   description of the what the six month rolling
7   average price is supposed to be.  And it says,
8   "the rolling six month average price is based on
9   charge-back data.  It is supplied as a reference
10  point only.  A true average price should consist
11  of weighted, direct and indirect contract
12  business."
13    Q.  Thank you.  And apart from that comment
14  field, anything else about this document that
15  helps you understand what the rolling six month
16  average price refers to?
17    A.  No, I think that's it.
18    Q.  Does this help explain in any way, what
19  purchasers or class of trade is included in the
20  calculation of the six month rolling average
21  price?
22    A.  Yes, somewhat.  It would appear to me

Page 163

1   based on you know that comment, that the six month
2   rolling average price is for products purchased
3   via wholesaler or contracted item purchase via
4   wholesaler.
5     Q.  And on to who is the ultimate purchaser?
6     A.  That is sort of the thing that is
7   unclear.  That could probably span the spectrum of
8   all our customers an it doesn't define a class of
9   trade.
10    Q.  Your conclusion about it resulting from
11  indirect purches is because of the the reference
12  to a charge-back?
13    A.  Yes.
14    Q.  Can you explain what a charge-back is?
15    A.  Sure.  Going through our sale to the
16  wholesaler we sell to a wholesaler at WAC.  At
17  that point in time we don't know exactly where
18  that product will eventually be distributed to.
19  So he could sell it at WAC.  He could sell it at a
20  contracted price to or at a price to his source
21  program or he could sell it to one of our
22  customers at our contracted price with the

Page 164

1   customer.  When he does that, that contracted
2   price is typically below WAC.
3           So, he is actually selling it to them at
4   below his original acquisition costs.  And that
5   charge back is an accounting mechanism to make him
6   whole for selling it at that price.
7     Q.  And these charge backs or rather the
8   contract price that is honored that results in the
9   charge-back, those are not reflected in the WAC's
10  that Sandoz reports to First Data Bank; is that
11  correct?
12    A.  No, they are not.
13    Q.  If you could take a look at the next
14  Exhibit Kellum 179.
15        MR. LIBMAN:  For the record it's Bates
16  numbers Sandoz WISC 24013 and 24014.
17    Q.  It's another one of the documents that
18  you were designated to testify about today.
19    A.  Okay.
20    Q.  The following Exhibit Kellum 180, is
21  also a document you have been designated to
22  testify about today.  It's Bates Sandoz Wisc 24052

Page 165

1   through 24080.  Do you recognize either of these
2   documents?
3     A.  I do.
4     Q.  What do you recognize them to be?
5         MR. GALLAGHER:  Objection to the form of
6   the question.  You want to take one at a time?
7         MR. LIBMAN:  Sure.
8     Q.  Let's start with Exhibit Kellum 179.
9   What is Exhibit Kellum 179?
10    A.  Document Exhibit Kellum 179, I
11  understand this document to be a listing of the
12  products sold by Sandoz that were formally sold by
13  Lek, or under Lek, L-E-K Pharmaceuticals and it's
14  a listing of year to date sales by product, the
15  quantity sold, some sort of billed amount, a
16  column called net sales, an ASP, which I
17  understand, which I understand to be an average
18  sales price or selling price, and then a discount
19  percentage, which I believe is the percentage
20  discount from the billed column to the net sales
21  column.
22    Q.  And for which purchasers or which sales

Henderson Legal Services, Inc.
(202) 220-4158

3624e879-87bd-474a-a9b8-8bf531ae1d49

**EXHIBIT 15**

Page 1

                    UNITED STATES DISTRICT COURT

                    DISTRICT OF MASSACHUSETTS

                        MDL NO. 1456

                Master File No. 01-12257-PBS

                Subcategory Case No. 06-11337

-----------------------------------------x

In re:  PHARMACEUTICAL INDUSTRY

AVERAGE WHOLESALE PRICE LITIGATION

-----------------------------------------x

THIS DOCUMENT RELATED TO:

State of California, ex rel. Ven-A-Care v.

Abbott Laboratories Inc. et al.

Case No. 03-cv-11226-PBS

-----------------------------------------x

        (Cross Notices Appear on Following Pages)

    VIDEOTAPED TELECONFERENCED 30(B)(6) DEPOSITION OF:

                RONALD H. HARTMANN, R.Ph.

                Wednesday, May 6, 2009

                 New York, New York


Reported in stenotype by:  RICH GERMOSEN,

                    CCR, CRCR, RPR, CRR, CLR

Hartmann, R.Ph., Ronald H. - 30(b)(6)                      May 6, 2009
                      New York, New York

Page 334

1  form.
2       A.   I'm not sure if not real prices is
3  the way to characterize it.  It's a reference
4  price or a benchmark price that's generally a
5  certain percentage of the brand AWP and as most
6  Medicaid agencies and pharmacists realize that
7  AWP is, in fact, a reference price and not the
8  actual price a pharmacy can obtain the drug for.
9       Q.   Okay.
10           MR. DOUGLAS:  Objection.
11           Non-responsive.
12           MR. CARBERRY:  I'll oppose.
13
14  BY MR. ROSS:
15      Q.   Well, didn't you state in your
16  prior deposition in this case that AWP was not a
17  real price?
18           MR. CARBERRY:  Objection as to
19  form.
20           Mr. Hartmann is being offered as a
21  30(b)(6) witness.  Whatever testimony he may have
22  given as an individual fact witness is not

Page 335

1  relevant to his testimony as a Sandoz witness.
2           MR. ROSS:  Okay.  Well, we don't
3  need to argue that point right now unless you're
4  instructing him not to answer.
5           MR. CARBERRY:  I'm not instructing
6  him not to answer.
7           MR. ROSS:  Okay.
8       A.   If I characterized it as not a
9  real price, I perhaps misspoke.  I believe it's a
10  reference price that it's referenced off the
11  brand AWP and once again I mentioned that as most
12  pharmacists and Medicaid agencies realize it is
13  not the actual price that pharmacies can obtain a
14  drug product for.
15           MR. DOUGLAS:  Objection.
16           Non-responsive.
17           MR. CARBERRY:  I'll oppose.
18
19  BY MR. ROSS:
20      Q.   Mr. Hartmann, I don't recall
21  asking you what most pharmacists or Medicaid
22  agencies think about AWP.

Page 336

1           All I asked you was how you termed
2  AWP in your last deposition.
3       A.   Okay.
4       Q.   Okay?
5       A.   I might have characterized it as a
6  reference price.  I'm not sure.
7       Q.   Sorry.
8           Well, certainly you would agree
9  with me that the AWPs that Sandoz submitted to
10  First DataBank were not an average of the prices
11  of the sales of Sandoz drugs by wholesalers to
12  retailers.
13           You would agree with that,
14  wouldn't you?
15      A.   I would agree as most of the
16  pharmaceutical industry would agree that that is
17  only a reference price.
18      Q.   Okay.
19           And again, sir, I'm not asking you
20  what the pharmaceutical industry would agree
21  with.  I'm asking what Sandoz, how Sandoz looks
22  at its AWPs.

Page 337

1       A.   I think they look at AWP as a
2  reference price that is connected to the brand
3  AWP, yes.
4       Q.   Okay.
5           Let me ask the question again
6  then.
7           You would agree with me that
8  Sandoz does not believe that its AWPs that it
9  provides to First DataBank for publication are
10  the average of prices of sales of its drugs by
11  wholesalers to retailers.
12           You would agree with that, right?
13      A.   I believe Sandoz believes that AWP
14  is a reference price, yes.
15      Q.   Okay.
16           Did Sandoz ever have any direct
17  communications either orally or in writing with
18  California or the MediCal agency, the Medicaid
19  agency in California where Sandoz acknowledged
20  that its AWPs were not real prices?
21           MR. CARBERRY:  Objection as to
22  form.

                              85 (Pages 334 to 337)

03dece24-0798-428f-abda-15ed00785a77

Hartmann, R.Ph., Ronald H. - 30(b)(6)                    May 6, 2009
                    New York, New York

Page 338

1      A.    I -- just thinking back in history
2  I remember conversations with Michael Neff back
3  in the nineties that he was thinking of having a
4  bidding process with generic drugs because he
5  realized that AWP was not, was not the actual
6  price.  So I would say yes, I've had oral
7  conversation with, with California officials.
8            I believe Kevin Gorospe brought up
9  in '07 about the possibility of using AMP as a
10 reimbursement formula and with the understanding
11 that he realized that AWP was not the actual
12 price that pharmacies could obtain the drug for.
13 So they did, in fact, have alternatives that they
14 were thinking of, yes.
15     Q.    Okay.
16           Kevin Gorospe, you said the
17 conversation occurred in 2007?
18     A.    I believe that's correct.
19     Q.    Okay.
20           And for Michael Neff, by the way,
21 what was Michael Neff's position at the time?
22     A.    He's the same as Kevin Gorospe.

Page 339

1      Q.    Which is what?
2      A.    I believe he was the director of
3  the Medicaid drug program.  MediCal.  Excuse me.
4      Q.    And what were the circumstances of
5  those discussions that you had with him?
6      A.    We just had an opportunity to have
7  a face-to-face meeting with him and he brought up
8  the possibility of having a bidding process with,
9  with generic drugs.
10     Q.    Do you recall what the occasion of
11 that opportunity for a face-to-face meeting was?
12     A.    I'm not sure.  It was just a meet
13 and greet opportunity, but that's when he --
14     Q.    Okay.
15           And he told you that he was
16 thinking about having a bidding war?
17     A.    Well, I don't know if war is --
18           MR. CARBERRY:  Hold on.  Hold on.
19           THE WITNESS:  Excuse me.
20           MR. CARBERRY:  Let him finish the
21 question.
22           THE WITNESS:  Okay.

Page 340

1            MR. CARBERRY:  I know it's been a
2  long day so.
3            MR. ROSS:  Yeah.
4            MR. CARBERRY:  Go ahead, Mr. Ross.
5            MR. ROSS:  Okay.
6
7  BY MR. ROSS:
8      Q.    He brought up the possibility of
9  having a bidding process for generic drugs, is
10 that correct?
11     A.    That is correct.
12     Q.    Okay.
13           And do you recall the
14 circumstances surrounding that particular portion
15 of your discussion with him?  In other words, why
16 did he bring that subject up?
17     A.    As I recall, it was he realized
18 that the AWP price was, was not the actual price
19 that pharmacies could obtain drugs for and he
20 thought perhaps if you had a bidding process,
21 that may bring the price down to more, a level
22 that was more in line with the actual acquisition

Page 341

1  cost.
2      Q.    Okay.
3            And do you recall what you said in
4  response to that?
5      A.    I don't recall specifically.  I
6  don't think we encouraged the program.
7      Q.    And can you give me a better
8  approximate than the nineties as to when that
9  discussion took place?
10     A.    Oh, I certainly cannot.  I could
11 perhaps check my files and see, but I'm not
12 specifically sure when it was.
13     Q.    Okay.
14           Do you recall other than that
15 discussion or those discussions -- by the way,
16 how many of those discussions with Mr. Neff were
17 there?
18     A.    Just one.
19     Q.    Just one.  Okay.
20           Had you or anybody else at Sandoz
21 that you know of ever had the opportunity to
22 discuss whether AWP's real prices with anybody

                                    86 (Pages 338 to 341)

Henderson Legal Services, Inc.
202-220-4158                      www.hendersonlegalservices.com

03dece24-0798-428f-abda-15ed00785a77

# EXHIBIT 16

State of Hawaii (Lynn Donovan) - Vol. II                    July 20, 2009
## Honolulu, HI

Page 279

          IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

                     STATE OF HAWAII

-------------------------X

STATE OF HAWAII,              :

               Plaintiff,  :

       vs.                    :  CIVIL NO.

ABBOTT LABORATORIES           :  06-1-0720-04 EEH

INC., et al.,                 :  (Complex litigation)

                              :

Defendants.                   :

------------------------ :

STATE OF HAWAII,              :  CIVIL NO.

               Plaintiff,  :  07-1-1639-09 EEH

             vs.              :  (Other Civil Action)

SCHERING CORPORATION;         :

DOE CORPORATIONS 1-100;       :

DOE ENTITIES 1-100,           :

Defendants.                   :

-------------------------:

     (CROSS-CAPTIONS CONTINUED ON FOLLOWING PAGES)

     VIDEOTAPED DEPOSITION OF THE STATE OF HAWAII

             BY LYNN DONOVAN - VOLUME 2

## Henderson Legal Services, Inc.

State of Hawaii (Lynn Donovan) - Vol. II                      July 20, 2009
Honolulu, HI

Page 352

1    Q.  (BY MR. MOORE)  True?
2    A.  It is supposed to be.
3    Q.  Okay.  And you could certainly easily
4  compare those actual acquisition prices with the
5  pharmacy -- the retail pharmacy reimbursements,
6  couldn't you?
7        MR. WINGET-HERNANDEZ:  Objection, form.
8    A.  Yes.
9    Q.  (BY MR. MOORE)  Okay.  Turn to page
10  2742.  Again, this page is your handwritten notes
11  from these -- these presentations, correct?
12   A.  Correct.
13   Q.  And I just wanted to focus on the one
14  that says Roma, Wisconsin.  That's Roma Rowlands -
15  - we already saw her name -- or Rowlands, correct?
16   A.  Correct.
17   Q.  Turn to page 2744 of Exhibit 26.  You
18  have notes from the presentation or discussions
19  you had with Caroline Sojourner in South Carolina,
20  true?
21   A.  True.
22   Q.  Okay.  Would it be -- if -- at any of

Page 353

1  these meetings that you told me about, either the
2  WMPAA or the AMPAA meetings, if I'm pronouncing
3  that correctly, you would have had similar types
4  of interactions with Medicare -- Medicaid
5  administrators from other states; is that true?
6        MR. WINGET-HERNANDEZ:  Objection, form.
7    A.  True.
8    Q.  (BY MR. MOORE)  All right.  Let's look
9  now at the Kay Morgan First DataBank slides, the
10  ones that you received in 2002 at the San
11  Francisco meeting.  And actually, this is already
12  marked as an exhibit, which is Donovan 15.
13       First, I'd like for you just to look
14  through this and identify this for me, Ms.
15  Donovan, as the slides that we referred to earlier
16  that were the slides from the Kay Morgan
17  presentation that you attended on August the 3rd,
18  2002; it's in San Francisco.
19       MR. WINGET-HERNANDEZ:  Objection, form.
20   A.  Could you repeat the question, please.
21   Q.  (BY MR. MOORE)  Yes, ma'am.  Can you
22  identify Donovan Exhibit 15 for us as the Kay

Page 354

1  Morgan slides that you recall receiving when you
2  attended her presentation at the San Francisco
3  meeting in August of 2002?
4    A.  Yes, these are the notes that I took
5  from her presentation.
6    Q.  All right.  And -- and I was going to
7  ask you that next.  The handwriting on the right-
8  hand side of the slides, that's your handwriting;
9  is that true?
10   A.  True.
11   Q.  Did you attend any other First DataBank
12  meetings -- well, let me strike that and ask it
13  this way.
14       It's my understanding that First
15  DataBank sponsored and held meetings itself that
16  were different from these WMPAA and AMPAA
17  meetings.  Did you attend any First DataBank
18  conferences?
19   A.  No.
20   Q.  Did you ever attend a presentation from
21  anyone with -- associated with First DataBank,
22  other than this Kay Morgan presentation in August

Page 355

1  of 2002?
2    A.  I don't recall.  I may have.
3    Q.  You don't recall any?
4    A.  No.
5    Q.  All right.  Let's look at some of the
6  slides in Exhibit 15.  Turn to page 2693.  Do you
7  see the slide that's -- the Kay Morgan slide
8  that's AWP?  Do you see that slide?
9    A.  Yes, I do.
10   Q.  It says, average wholesale price, it
11  says, published price from wholesaler to retailer
12  and then there's a notion that said, ain't what's
13  paid.  Do you see that?
14   A.  Yes.
15   Q.  Did Ms. -- did Kay Morgan refer to AWP
16  as ain't what's paid in this presentation?
17   A.  I don't recall.  It's here in the slide.
18   Q.  And when you -- you saw the slides,
19  didn't you, because you've made notes on some of
20  them; you saw the slides at the time?
21   A.  Yes.
22   Q.  When you saw those words ain't -- those

# EXHIBIT 17

# KAY MORGAN

## Manager, Product Knowledge Base Services
## First DataBank

Kay Morgan joined First DataBank as the Manager of Product Knowledge Base Services in April of 1999. In her present position, Kay is responsible for the acquisition and maintenance of product and pricing information for the NDDF, MDDB, and PIF databases. She is also responsible for the databases editorial policies for defining package size, billing unit, generic status and many other fields of interest to the NCPDP membership.

Prior to joining First DataBank, Kay was employed by Abbott Laboratories for more than 20 years in various positions. These included Research & Development, Product Information, Third Party Reimbursement, Marketing, Trade Relations, Managed Care, and Customer Service Operations. Kay was instrumental in increasing Abbott support for NCPDP and manufacturer awareness of the standards set by NCPDP.

Kay has a B.S. in Pharmacy from the University of Missouri in Kansas City and serves on the Dean's Advisory Panel. She has also been named one of the Outstanding Women in Pharmacy.



DEFENDANT'S
EXHIBIT

Donovan   015

HI_HI 000002686

**Pricing Methodologies: Sources and Definition**

---

## Objectives

- NCPDP Standard for Formatting NDCs

- NCPDP Billing Units and Exceptions

- NDDF Pricing Data Elements

- NDDF Generic Indicators

---

## National Drug Code (NDC)

- Title XIX – Required Tracking System for Drugs
- NDC Consists of 10 Digits
  - 4-4-2
  - 5-3-2
  - 5-4-1
- 1st - 4 or 5 is Labeler Code – FDA Assigned
- 2nd -3 or 4 is Product Identifier
- 3rd - 1 or 2 is Package Size

---

Copyright 1994 - First DataBank, The Hearst Corporation

HI_HI 000002687

**NDC Continued**

• NCPDP Set NDC # at 11 Digits

• Add 0 to 10 for Standardization

• Set Methodology for Adding 0

---

**NDC Continued**

| | |
|---|---|
| 4-4-2  0 is in First Position | 04-4-2 |
| 5-3-2  0 is in the Sixth Position | 5-03-2 |
| 5-4-1  0 is in the Tenth Position | 5-4-01 |

Applies to NDC's ONLY

---

**Non- NDCs**

• UPC – Universal Code Council
 – 5-5 Format
 – 0 in 0ᵗʰ Position: 5-05
• HRI – FDA Assigned Labeler Code
 – 4-6 Format
 – 0 in 1ˢᵗ Position: 04-4-2
• PIN Number – Supplier Created
 – 0 May Not Exist

---

Copyright 1994 - First DataBank, The Hearst Corporation

*2*

HI_HI 000002688

## File Has All NDCs?
- Field Name is "NDC"

- NDC Format Indicator (NDCFI)
  - Indicates Format for Number in NDC Field
  - 7 Values

*There is an Indicator on the file to show if UPC, NDC*
*Format Indicator - 4,5,6 = UPC*
*1,2,3 = NDC*
*OTCs may have UPC - FDA does not require they have NDCs*

## Billing Units
- NCPDP Standard Requires:
  - Each
  - Milliliter (mL)
  - Gram (Gm)
- NCPDP Rounding:
  - Ounces
    - 1 ounce = 30 mL or 30 gm unless stated on label

## What Is a 1?
- 1 Tablet or 1 Bottle of 100 Tablet
  - NCPDP – 1 Tablet
  - CMS – Either 1 Tablet or 1 Bottle

- RESULT – 100 Fold Difference In Rebate Claim

Copyright 1994 - First DataBank, The Hearst Corporation

*3*

HI_HI 000002689

### What Is an ML?

- Majority of Liquids Labeled in Ounces
  - Determine mL by multiplying by 30 unless on specific mL on label
  - Manufacturer reports exact conversion (29.57)

- RESULT – 0.5 mL discrepancy for each ounce


### Powders For Reconstitution

- Injectable
  - 1 each - not number of mLs after reconstitution
- Oral
  - Number of mLs after reconstitution
  - Further Dilution with another diluent irrelevant


### Issues With Package Size

- Some have reported bottle size
  - 100 mL bottle - after reconstitution 75 mL
  - 3 mL bottle - contained 2.5 mL
  - Result
    - Under payment to pharmacy
    - Discrepancies in rebate claims
- Patches
  - 1 patch not 1 box


Copyright 1994 - First DataBank, The Hearst Corporation

4

## Issues With Package Size

- Birth Control Pills
  - # of Tablets not 1 package
  - Result is 21 or 28 fold discrepancy
- Ointments
  - # of grams not one tube

- Never in terms of Dose

*Antihemophilie - variable potency*
*- billing per unit*
*✳ Prolastin - mg*
*✳ Novo Seven - mcg*

## Determining Package Size

- Think in terms of Dispensable Units
- Not Saleable Units
  - 10 bottles is not an NCPDP Billing Unit

- Use of NCPDP Billing Unit Standard for Package Sizes Minimizes:
  - Under/Overpayment on claims
  - Rebate Discrepancies

## NDDF™ Pricing Information

- Average Wholesale Price (AWP)
- BaseLine Price (BLP)
- Customized Pricing
- Direct Price
- HCFA Federal Upper Limits Price
- Historical Pricing
- Medicaid Billing Data



Copyright 1994 - First DataBank, The Hearst Corporation

5

**GCN/GCNSEQNO**

- Groups Products by
  - Active Ingredient
  - Dosage Form
  - Route of Administration
  - Strength
- Candidates for Substitution

---

**It's Not the Money**

- Most Dynamic Fields on Date On Databases

- Most Excitement as It Affects Payment
  Patient
  Pharmacist
  Physician
  Payer

---

Direct ≠ WAC
Abbott only left

**Pricing Information Sources**
- WHN (WAC) - Manufacturer/Supplier - *from manufacturer*
- Direct – Manufacturer/Supplier
- AWP – Wholesaler Survey
- SWP – Manufacturer/Supplier - *suggested wholesale price - from manufacturer*
- Medicaid AWPs – DoJ
- HCFA Upper Limit – CMS
- Baseline Price – FDB Formula

*no wholesalers are responding*

---

Copyright 1994 - First DataBank, The Hearst Corporation

6

HI_HI 000002692

**Price Update Frequency**
- Daily for Master File -
- Customers Chose
  - Daily
  - Weekly
  - Monthly
  - Semi-Monthly
  - Bi-Monthly
  - Quarterly

**AWP**
- Average Wholesale Price
- Published Price from Wholesaler to Retail
- Ain't What's Paid
- Benchmark for Reimbursement
- National/Standard AWP Does Not Exist

only national wholesalers

**BBAWP/AWP**
- AWP Unit
  - Survey Wholesalers for Mark-up
  - Confirm Mark-ups Periodically
  - Update When notified by Labeler
  - Most Commonly Used

across product line –
labeler code



Forward buying - wholesaler buy sup before price ↑
Markup applied to WAC/WHN Price
Mck, Bergen, Cardinal

20% Markup
25% Markup
Suggested WP

80% of the WACS populated on whole database

Copyright 1994 - First DataBank, The Hearst Corporation

7

HI_HI 000002693

*multisource*

$$AWP - \% \atop WAC + \% \Big\} \; whichever \; us \; lower$$

**WHN/WAC Price**
- Wholesale Acquisition Cost
- Provided by Manufacturer
- Published Price from Manufacturer to Wholesaler
- Used by Some Payers
- > 80% Populated on Commercially Available Drugs

Brand. S. Source products -
pretty close
Severies - vary
Volume buying discounts

legitimate
* WAC pricing for multisource -
Major

**HCFA FUL Price**
- HCFA (Health Care Financing Administration) FFP (Federal Financial Participation)
- FUL (Federal Upper Limit) AKA MAC
- Updated When Notified By CMS (HCFA)

3 suppliers - use lowest WAC
× 150%

**Medicaid AWP**
- New Data Element
- Can Be Used by Medicaid for Reimbursing on Select Products
- Prices Given to FDB by DoJ
- FDB Surveys List of Wholesalers Provided by DoJ Every 6 Months for Price Updates
- No Wholesaler Has Responded

Copyright 1994 - First DataBank, The Hearst Corporation

8

HI_HI 000002694

**DIR/DP**
- Direct Price
- Provided by Manufacturer
- Price from Manufacturer to Non-wholesale Customers
- Least Populated of All Pricing Fields

**Suggested Wholesale Price (SWP)**

- Suggested Wholesale Price
- Provided by Manufacturer
- May or May Not Agree with Surveyed AWP
- May Be Higher or Lower than Surveyed AWP

*manufactures*
*- a lot don't provide this any more.*

**BaseLine Price (BLP)**
- Statistical Analysis Applied to Calculate a Mean Average Price for Multi-source Products
- Must Be at Least 3 Active Generic Sources
- Based on Most Common Package Size
- Updated Monthly

Copyright 1994 - First DataBank, The Hearst Corporation

9

HI_HI 000002695

## Customized Pricing Fields
- FDB Will Work with Customers to Develop Custom Pricing Fields
- Algorithms
- MACs
- Additional Fees for Customized Fields

## Orange Book Code
- Used in Conjunction with Formulary Development
- Reports FDA Orange Book Rating
- No Orange Book Rating, the Value is "Z" on NDDF
- Includes AB1, AB2 and AB3

*to show did not forget to populate field*

## Generic Classification Indicators
- Six Different Indicators
- Customized to Customer's Specifications
- Define Brand/Generic

Copyright 1994 – First DataBank, The Hearst Corporation

10

HI_HI 000002696

**Generic Indicator (GI)**
- Differentiates Single-source from Multiple-source Drugs
- Based on GCN/GCNSEQNO
- Two Values Only
  - Single-source
  - Multiple-source

**Generic Price Indicator (GPI)**
- Distinguishes Products Based on Price
- Most Common Package Size is the Standard
- Products with Highest AWPs = Brand
- Products with Lower AWPs = Generic

_Branded generic - standard durations_

_Haloperidol - 2 suppliers - generic_
_* 1 supplier of 10mg tablets left → single_
_source_
_now_

_Vistide - 2 suppliers left_
_- both same price (very low)_

**Generic Price Indicator (GPI)**
- Excludes Non-drug Items
- Excludes Patent Protected/Cross-licensed Products
- Independent of:
  - Name
  - Innovator Status
  - Labeler

_FDB can do algorithm to determine "generics"_

Copyright 1994 - First DataBank, The Hearst Corporation

11

HI_HI 000002697

**Generic Price Indicator (GPI)**

· Evaluated when AWPs change
· Very Dynamic
· Constant Review Necessary to Maintain Proper Values
· 4 Values

**Generic Manufacturer Indicator (GMI)**

Specifies Product by Manufacturer Strategy:
· Brand Manufacturer
· Generic Manufacturer
· Niche (Alternative) Manufacturer

**Generic Therapeutic Drug Indicator (GTI)**

Specifies product as:
· Innovator
· Orange Book "A" rated
· Orange Book "B" rated
· Product not listed in Orange Book

_Orange Book codes_

Copyright 1994 - First DataBank, The Hearst Corporation

*12*

## Generic Named Drug Indicator GNI)

Specifies Product as:
- Brand-named Product
- Generic Name Only
- Alternative Product

*FDB*
*Generic*
*Indicator*

## Generic Spread Indicator (GSI)

Specifies Product Based on Spread:
- Brand (< 25%)
- Generic (= or > 25%)
- Alternative (Generic Manufacturer and < 25%)
- Spread Not Provided

*Can use to flag generics*

## Innovator Indicator  (INNOV)

- Identifies the Original Product for a Particular Generic Code Number (GCN)
- Customer May Elect to Use in Conjunction with Formulary Development
- Many Plans Pay for Innovator

*brands*
*Morris taized now → all dropping*
*out of the market*

Copyright 1994 - First DataBank, The Hearst Corporation

*13*

HI_HI 000002699

## Summary

- Data – Each File Customized for Each Customer
- Many Options for Pricing
- Many Options for Brand/Generic
- Why Our Customers Have Questions

## Brand/Generic Indicators



Copyright 1994 - First DataBank, The Hearst Corporation

14

## NOTES

AMP - CMS chose this figure - not to be released to the States

Can request special file from FDB to see what fields available - not currently getting

FULs - based on WAC (150% x WAC) - from FDB

Markup going to 25% → 90% now - waiting to finish - then ↑ discount from AWP

HI_HI 000002701

# NOTES

# NOTES

HI_HI 000002703

## NOTES

HI_HI 000002704

# EXHIBIT 18

Morgan, Patricia Kay                          August 27, 2007
                        Tampa, FL

                    IN THE CIRCUIT COURT OF

                  MONTGOMERY COUNTY, ALABAMA

- - - - - - - - - - - - - - -x

STATE OF ALABAMA,              :

      Plaintiff,               :

      vs.                      :   Case No.: CV-05-219

ABBOTT LABORATORIES, INC.,     :   Judge Charles Price

 et al.                        :

      Defendants.              :

- - - - - - - - - - - - - - -x

        UNITED STATES DISTRICT COURT

         DISTRICT OF MASSACHUSETTS

----------------------------X

In re: PHARMACEUTICAL          :

INDUSTRY AVERAGE WHOLESALE     : MDL No. 1456

PRICE LITIGATION               : Civil Action No.

                               : 01-12257-PBS

THIS DOCUMENT RELATES TO:      :

                               :

ALL ACTIONS                    :

----------------------------X

            DEPOSITION OF PATRICIA KAY MORGAN

                  August 27, 2007

Morgan, Patricia Kay                                    August 27, 2007

Tampa, FL

Page 38

1    Q.  Is it correct that according to the First
2  DataBank definition of AWP, AWP is not set by the
3  manufacturer?
4    A.  That's correct.
5    Q.  It's the wholesalers that assign the AWP;
6  correct?
7    MR. KERN:  Objection; misstates prior
8  testimony, vague and ambiguous, assumes facts. Go
9  ahead.
10    A.  Incorrect, because we surveyed the
11  markups to be applied to the manufacturer, not for
12  the AWP.
13    Q.  I understand that.  But what I was
14  referring to is your testimony at Page 15, Lines 10
15  and 11, where you said, quote, "In our definition
16  it's the wholesalers that assign the AWP."
17  Correct?
18    A.  Correct.  In the whole context it was
19  completely understood.
20    Q.  Right.  Basically what happens is First
21  DataBank surveyed the wholesalers up through 2005
22  periodically to determine a markup factor that
23  would be applied to wholesale acquisition costs to

Page 39

1  arrive at AWP; correct?
2    A.  It might have been 2004 instead of 2005,
3  but I'll agree with the rest of the statement.
4    MR. CARTER:  Steve, I'm just going to object
5  to --
6  BY MR. EDWARDS:
7    Q.  And you didn't survey for the particular
8  price that was the AWP; you surveyed to determine
9  the markup?
10    A.  Yes.
11    MR. CARTER:  Excuse me.  I'm going to object
12  to this line of questioning, because it is
13  completely within the scope of the prior
14  depositions.
15    It was my understanding, Steve, that you
16  represented to the judge that you needed this
17  deposition to plow new ground, not to rehash
18  testimony that this witness has already given.  I
19  think there is a transcript of that hearing where
20  you told the judge that the purpose of this
21  deposition was to ask new questions and to ask her
22  about things that have yet to be brought up in her
23  former testimony.

Page 40

1    Everything that you have asked her so far is
2  simply a rehashing of testimony that she's already
3  given.
4    MR. EDWARDS:  The court's order permits me to
5  ask the witness to verify particular parts of her
6  prior testimony, which is what I'm trying to do
7  right now; and I'm really trying to do this as a
8  favor to you so that you know the areas that I'm
9  going to be relying on at trial in case you want to
10  cross-examine on those areas.
11    MR. KERN:  I'll join the State's objection and
12  just note that I think that Mr. Edwards has gone
13  beyond the scope of laying foundation or verifying
14  deposition passages in his rehashing of prior
15  testimony.
16    MR. CARTER:  I understand what the court's
17  order said about the verification, but I also
18  thought that all of the parties agreed that her
19  prior deposition testimony was authenticated and
20  admissible for the purposes of the Alabama trial
21  and that is why we didn't have to do all this
22  again.
23    MR. EDWARDS:  Well, let me ask this question.

Page 41

1  Are all of the other states who are present at this
2  deposition willing to agree that all of Ms.
3  Morgan's prior testimony is admissible in their
4  actions?
5    MR. CARTER:  Well, it wouldn't matter because,
6  again, the judge in Hillsborough County said to us
7  that he only had authority or jurisdiction over Kay
8  Morgan's deposition for today with respect to
9  Alabama only, because she was only subpoenaed in
10  the Alabama case; and he said at the hearing that
11  he only had authority over the parties in the
12  Alabama case and not the other states, and he
13  reiterated that -- the judge reiterated that in the
14  telephonic hearing dealing with the State of
15  Florida trying to intervene.
16    MR. KERN:  I agree --
17    MR. EDWARDS:  Well, I appreciate your efforts
18  to protect the interests of the other states here,
19  Mr. Carter, but I asked a question of the other
20  states that are present at this deposition, and
21  they have an opportunity to speak up.  They can
22  speak up.
23    MR. MULLIN:  Massachusetts is not agreeable.

11  (Pages 38 to 41)

62b3fedf-4c61-45f1-a4f9-afec50e235f9

Morgan, Patricia Kay                    August 27, 2007

Tampa, FL

Page 42

1    MR. BARNHILL:  I'm not taking a position on
2  this. My position is the deposition isn't long
3  enough for us to ask the questions that we want,
4  and we're not bound by the protective order.
5    MS. TORGERSON:  There is an answer pending
6  still.
7    MR. EDWARDS:  Can you read the question back.
8    (The question was read by the reporter.)
9    A.  That's correct.
10    Q.  And is it also correct that First
11  DataBank did not let the manufacturer control the
12  AWP field?
13    A.  That's correct.
14    Q.  And the manufacturers did not control the
15  markups that First DataBank used to determine AWPs?
16    MR. KERN:  Objection; vague and ambiguous,
17  lacks foundation. Go ahead.
18    A.  The markups were based on our wholesaler
19  survey. They didn't have direct influence over
20  those markups.
21    Q.  And I just want to direct your attention
22  to your prior testimony at Page 309, Line 4, where
23  you were asked a question -- this is the prior

Page 43

1  testimony of November 13, 2002, that's been marked
2  as Exhibit Morgan 002.
3    You were asked the question "And manufacturers
4  do not control the markup," and your answer was
5  "Correct." Can you verify that that answer is true
6  and accurate?
7    A.  That is true and accurate.
8    Q.  Now, is it correct that during your time
9  at First DataBank the markups were generally 20
10  percent or 25 percent?
11    MR. KERN:  Objection; outside the scope. Go
12  ahead, Kay.
13    A.  I don't even have a foundation with which
14  to answer that question, because there were several
15  different numbers on the markup table.
16    Q.  Okay. Do you recall what those numbers
17  were?
18    A.  The markup could be 1 times S, which was
19  used as AWP suggested by the manufacturer. I don't
20  recall the higher end, but there were 33 percent
21  markups on there. There were 16 and two-thirds,
22  etcetera. There were different numbers.
23    MR. BARNHILL:  Could you read that answer

Page 44

1  back, please.
2    (The answer was read by the reporter.)
3  BY MR. EDWARDS:
4    Q.  Is it correct that this concept of the
5  wholesalers having markups was something that was
6  established well before you joined the industry?
7    A.  Before I joined First DataBank or before
8  I joined --
9    Q.  Before you joined the industry.
10    MR. KERN:  Object as vague and ambiguous.
11    Q.  Just so there's no secret about this, I'm
12  referring in particular to your testimony at Page
13  33 of the deposition we've been looking at. You'll
14  see that you were asked a series of questions about
15  Merck, and then at Line 20 you say, "This was all
16  done well before me and well before I joined the
17  industry." Correct?
18    MR. BARNHILL:  Objection to the question and
19  answer; speculative; no foundation.
20    MR. LAVINE:  Objection.
21    A.  I only hesitate because of the definition
22  of when I joined the industry; but the markups were
23  done well before I joined First DataBank or became

Page 45

1  aware of markups being applied.
2    Q.  Fair enough. Now, in some cases during
3  your tenure at First DataBank some manufacturers
4  would suggest AWPs; is that correct?
5    A.  That's correct.
6    Q.  And they were populated into a field
7  called suggested wholesale price or SWP; is that
8  correct?
9    A.  That's correct.
10    MR. KERN:  Pause a second before you answer.
11  I'll object as to outside the scope. Go ahead.
12    Q.  And the SWP was not defined as an actual
13  market price either; correct?
14    MR. KERN:  Objection; outside the scope.
15    A.  That's correct.
16    Q.  And if the wholesaler in your surveys
17  said, "Use the SWP as the AWP," then First DataBank
18  would do this --
19    MR. KERN:  Same objection.
20    Q.  -- correct?
21    MR. KERN:  Sorry, Steve. Same objection. Go
22  ahead.
23    A.  That's correct.

12  (Pages 42 to 45)

Morgan, Patricia Kay                                          August 27, 2007
                              Tampa, FL

Page 78

1  understanding as to how they would have obtained a
2  copy of this document?
3      MR. CARTER:  Object to the form.
4      A.  I don't know how they would have, but all
5  attendees received a copy of the presentations that
6  were made at the seminars.
7      Q.  Okay.  Let's go to Exhibit Morgan 010.
8  Is it fair to say that this is a fairly early
9  version of your presentation?
10     A.  No.
11     Q.  Okay.  It does not appear to be as
12 extensive, for example, as Exhibit Morgan 009.  Can
13 you explain why that's the case?
14     A.  This one was designed for a forum, which
15 is where we would -- customers of First DataBank
16 could come together at the seminar and discuss
17 topics.  So what this was was some questions that I
18 had assembled for a group discussion at that
19 seminar.
20     Q.  So this was kind of a break-out session
21 in addition to the official seminar?
22     A.  It would have been part of the seminar,
23 but they would have forums whereby the audience

Page 79

1  could interact more with the First DataBank
2  employees.
3      Q.  Well, let's go to the page with the Bates
4  No. 085642 in Exhibit Morgan 010.  It's a page
5  headed "AWP."  You'll see in Exhibit Morgan 009,
6  which is the April 2003 PowerPoint, there is a
7  similar page on Page 2.  It has the heading "Blue
8  Book Price (BB)," and then it says in bullets below
9  that "Average Wholesale Price, Published Price From
10 Wholesaler to Pharmacy."  I guess in Exhibit Morgan
11 010 it says "Published Price From Wholesaler to
12 Retail."  The third bullet is, quote, "Ain't What's
13 Paid."  The fourth bullet is "National/Standard for
14 AWP Does Not Exist."
15     Now, do you recall exactly -- strike that.  Do
16 you recall generally what you would have said as
17 you were going through this PowerPoint?
18     MR. BARNHILL:  Objection; no foundation,
19 speculative, form.
20     A.  To some extent, yes.
21     Q.  What do you recall?
22     A.  Regarding this specific slide in Exhibit
23 Morgan 009?

Page 80

1      Q.  Yes.  Or the exhibit -- the specific
2  slide in Exhibit Morgan 010.
3      MR. BARNHILL:  Objection; no foundation.
4      MR. EDWARDS:  Let me start that again. Let's
5  just focus on the specific slides in Exhibit Morgan
6  009.
7      MR. BARNHILL:  Can I have the question?  Is
8  the question what she said then or what she might
9  have said?
10 BY MR. EDWARDS:
11     Q.  The question is:  Give me your best
12 recollection of what you said when you went through
13 the slide on Page 2 of Exhibit Morgan 009 headed
14 "Blue Book Price (BB).
15     A.  Basically I would have indicated that an
16 available field on the First DataBank pricing file
17 would have been the Blue Book price known as BB,
18 also known as average wholesale price.  It's
19 considered to be the published price from the
20 wholesaler to the pharmacy or the retail sector of
21 the pharmacy market.  It's also known as "ain't
22 what's paid."  So it's a benchmark for
23 reimbursement, and it's best to bear in mind there

Page 81

1  is not a national definition or a standard
2  definition of what AWP is.
3      Q.  You said you referred to it as "ain't
4  what's paid."  What did you intend to convey by
5  that?
6      MR. LAVINE:  Objection to form.
7      A.  It's humor injected into acronyms and
8  that everyone should know that average wholesale
9  price, AWP, also stands for "ain't what's paid."
10     Q.  It's not a transaction price; correct?
11     MS. THOMAS:  Objection.
12     A.  Not in my understanding.
13     Q.  Okay.  In other words, I'm correct, what
14 you were trying to do here is convey to the people
15 in the seminar that AWP is not a transaction price?
16     MR. BARNHILL:  Objection, leading.
17     Q.  Is that correct?
18     A.  I don't think my intent was ever to
19 portray any of these prices as being a transaction
20 price; simply to define the editorial processes
21 used for populating those fields. There's much talk
22 about AWP and "ain't what's paid" gets a chuckle
23 out of the audience.

21 (Pages 78 to 81)

62b3fedf-4c61-45f1-a4f9-afec50e235f9

# EXHIBIT 19

Galownia, Kevin    HIGHLY CONFIDENTIAL       June 19, 2008
North Wales, PA

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL         ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     ) Master File No.

PRICE LITIGATION               ) 01-CV-12257-PBS

- - - - - - - - - - - - -

                               ) JUDGE PATTI B.

THIS DOCUMENT RELATES TO:      )      SARIS

State of California, ex rel.   )

Ven-A-Care v. Abbott           )

Laboratories Inc., et al.      )

All Cases In 03-CV-11226-PBS   )

- - - - - - - - - - - - -


        (cross captions appear on following pages)


        Videotaped deposition of KEVIN GALOWNIA


                   North Wales, Pennsylvania

                   Thursday, June 19, 2008

                   9:06 a.m.

Galownia, Kevin     HIGHLY CONFIDENTIAL        June 19, 2008
                    North Wales, PA

|  | Page 26 |
|---|---|

1    A.  That's correct.
2    Q.  Okay.  Was that purchasing done
3  pursuant to contracts between Cardinal and
4  various generic manufacturers that Cardinal
5  purchased from?
6    A.  That was my --
7       MR. GALLAGHER:  Objection to the form
8  of the question; no foundation.
9       THE WITNESS:  That was my
10  understanding.
11  BY MR. ROSS:
12    Q.  Okay.  Were you involved at all in
13  those contract negotiations?
14    A.  Not really.
15    Q.  You had some involvement, though?
16    A.  The limit of my involvement would have
17  been later in my tenure at Cardinal, in that I
18  would have -- I would provide folks at Cardinal
19  with guidance on if the pricing that was being
20  offered by a manufacturer was competitive in the
21  marketplace.  That was the only feedback I would
22  give as far as any offer from a manufacturer.

|  | Page 27 |
|---|---|

1    Q.  And what type of analysis did you do to
2  determine that?
3    A.  We would primarily -- they had an area
4  that gathered market information, competitive
5  prices from their various competitors -- Anda
6  McKesson, AmerisourceBergen, what they were
7  selling products out in the market.  We would
8  look at that data to determine if we would be
9  able to set a sell price that would be
10  competitive for Cardinal's customers.
11    Q.  Okay.  Is it true, under the autosub
12  program, that Cardinal purchased the drugs from
13  the various generic manufacturers at WAC?
14    A.  That is true.
15    Q.  And then is it true that, under the
16  autosub program, Cardinal then turned around and
17  sold those drugs to its customers at contract
18  prices which were below WAC?
19    A.  Cardinal did sell the product to
20  customers -- they could be Cardinal's customers,
21  they could be the manufacturer's customers -- at
22  a price that would be, in general, a contract

|  | Page 28 |
|---|---|

1  price that would be lower than WAC.
2    Q.  And if the contract price was lower
3  than WAC, Cardinal would then look to the
4  manufacturer to be compensated or made whole in
5  the form of a chargeback?
6       MR. GALLAGHER:  Objection to the form
7  of the question.
8       THE WITNESS:  There was a chargeback
9  process for any sale that was made on a contract
10  that was negotiated between either Cardinal and
11  the manufacturer or the manufacturer and the
12  ultimate customer.
13  BY MR. ROSS:
14    Q.  Okay.  So under the autosub program,
15  the price that Cardinal charged its customers
16  could be a price that was negotiated between the
17  customer and Cardinal, or it could be a price
18  that was negotiated between the customer and the
19  manufacturer; is that correct?
20       MR. GALLAGHER:  Objection to the form
21  of the question.
22       THE WITNESS:  That is not correct.  The

|  | Page 29 |
|---|---|

1  autosub contract was specifically between
2  Cardinal and their customer.
3  BY MR. ROSS:
4    Q.  Okay.  What factors did you look at in
5  determining what price Cardinal would sell its
6  products to its customers under the autosub
7  program?
8    A.  The primary factors to consider, there
9  were different tiers of pricing, different
10  programs essentially.  Certain programs would
11  sell -- the customer would pay whatever the
12  manufacturer's cost was to Cardinal, so the other
13  programs would have to be higher than that.  So
14  that would be one factor.  I couldn't price a
15  retail independence price lower than this generic
16  alliance contract that would be for Cardinal's
17  largest customers on the autosubstitution
18  program.  So that would be one consideration in
19  setting the price.
20       Clearly, we would look at what
21  Cardinal's price was and what rebates they were
22  receiving in determining what sell price we could

Henderson Legal Services, Inc.

365f8314-3660-4720-b380-3927b0c38b81

Galownia, Kevin     HIGHLY CONFIDENTIAL     June 19, 2008
North Wales, PA

Page 30

1  set, because we couldn't set a sell price that
2  was going to be lower than what Cardinal was
3  ultimately paying for the product.
4      Main determinant of price point would
5  be what is the widely available price in the
6  marketplace? what are Cardinal's competitors
7  charging to similar customers for those products?
8  what are Cardinal's customers receiving
9  from Cardinal's competitors for the same product,
10  and how did that price compared to Cardinal's
11  price?
12     Q.  Were there any instances that you can
13  recall where the price charged by Cardinal to its
14  customers under the autosub program was at WAC?
15     A.  I don't recall the specific situation.
16     Q.  Okay.  But your general recollection is
17  that the price that Cardinal charged -- or the
18  prices that Cardinal charged its customers under
19  the autosub program was generally below WAC?
20     A.  In general, yes.  There may have been
21  situations where they charged WAC.  I honestly
22  don't recall.

Page 31

1      Q.  Okay.  Do you recall any situation
2  where the price Cardinal charged its customers
3  under the autosub program was above WAC?
4      A.  I don't recall a price on a Cardinal-
5  specific autosub program that would be higher
6  than WAC.
7      Q.  Okay.  So certainly Cardinal never
8  charged its customers under the autosub program
9  price that was anywhere near AWP; is that
10  correct?
11     A.  I don't know with absolute certainty.
12  I set the sell prices for the programs.
13  Cardinal's agreement with their customers on what
14  they ultimately paid -- if it were some cost-plus
15  calculation, some cost-minus -- I don't know how
16  that ultimately factored into the ultimate price
17  they set.  I just know that I set a price that
18  would be for a customer that paid that actual
19  sale price without any cost adjustment negotiated
20  between Cardinal and that customer.
21     Q.  Are you aware, though, that there were
22  cost adjustments that were negotiated between

Page 32

1  Cardinal and its customers under the autosub
2  program?
3      A.  I don't know that for sure.  I was
4  never aware that that was the case or that wasn't
5  the case.
6      Q.  Okay.  So you don't know one way or the
7  other; is that what you're saying?
8      A.  That is correct:  I don't know.
9      Q.  So in approximately March of 2002, you
10  moved over to Sandoz; correct?
11     A.  That is correct.
12     Q.  Was it Geneva at the time?
13     A.  It was called Geneva Pharmaceuticals at
14  the time.
15     Q.  So whether I say "Geneva" or "Sandoz,"
16  can we have an understanding that at least I'm
17  referring to the same company?
18     A.  Sure.
19     Q.  If there's a question in your mind or
20  you draw some distinction, please let me know.
21  Okay?
22     A.  Absolutely.  In general, I will call it

Page 33

1  Sandoz.
2      Q.  And so will I.
3      All right.  So again, in about March of
4  2002, you moved from Cardinal to Sandoz; correct?
5      A.  That is correct.
6      Q.  And what is the first position you held
7  at Sandoz?
8      A.  The first and only position I held at
9  Sandoz was senior manager of pricing and
10  financial analysis.
11     Q.  What position or positions did the
12  senior manager of pricing and financial analysis
13  report to?
14     A.  When I first started at Sandoz, I
15  reported to the vice president of sales and
16  marketing.  Approximately one year after I was at
17  Sandoz, my reporting changed from the vice
18  president of sales and marketing to the director
19  of customer marketing; and that was the reporting
20  structure up until I left Sandoz.
21     Q.  When you started at Sandoz, who was the
22  VP of sales and marketing?

9  (Pages 30 to 33)

365f8314-3660-4720-b380-3927b0c38b81

Galownia, Kevin      HIGHLY CONFIDENTIAL         June 19, 2008
North Wales, PA

Page 34

1    A.  Christopher Worrell.
2    Q.  So for approximately a year, you
3  reported directly to Mr. Worrell?
4    A.  That is correct.
5    Q.  And who was the director of customer
6  marketing that you began to report to?
7    A.  The director of customer marketing that
8  I reported to was John Denman.
9    Q.  Was Mr. Worrell a VP of sales and
10  marketing during your entire tenure at Sandoz?
11    A.  He was the vice president of sales and
12  marketing up until, as I recall, August 2005.  I
13  left Sandoz in September of 2005.
14    Q.  So was -- did somebody replace Mr.
15  Worrell for the last month that you were at
16  Sandoz?
17    A.  Yes.
18    Q.  Who did you report to?
19    A.  I reported to -- actually -- as I was
20  reporting to the director of customer marketing,
21  John Denman left Sandoz in July of 2005, at which
22  time, I reported to Frank Della-Fera, who was the

Page 35

1  vice president of sales and marketing that was
2  coming in to replace Chris.
3    Q.  Was there somebody in your position
4  prior to you starting with Sandoz?
5    A.  There was some in a pricing manager
6  position that was similar to my position.
7    Q.  Who was that?
8    A.  His name was Rick Rogerson.  He was in
9  Broomfield, Colorado, prior to the move to
10  Princeton, New Jersey.
11    Q.  So generally speaking, what were your
12  duties and responsibilities at Sandoz?
13    A.  My general responsibilities would have
14  been broken out between the pricing area and the
15  financial analysis area.
16        In the pricing area, I was generally
17  responsible for determining price points,
18  contract price points that would be offered to
19  our customers.  I was responsible for making sure
20  that those price points that were offered and
21  accepted were appropriately implemented into
22  Sandoz's contracting system.

Page 36

1        I was responsible for working with the
2  marketing department and the sales force on new
3  product launches, which would entail
4  establishment of recommend pricing for AWPs, WAC
5  and contract pricing to customers.
6        For the financial analysis portion,
7  that was primarily dealing with interactions with
8  marketing and the finance department, making them
9  aware of different marketing activities that may
10  result in a financial impact:  A bill from a
11  customer, a payment to a customer, a rebate to a
12  customer.  And that would also entail just
13  general analysis for the marketing department.
14    Q.  Okay.  In connection with the new
15  products, you were responsible for determining
16  and setting the AWP and WAC; correct?
17        MR. GALLAGHER:  Objection to the form
18  of the question; misstates prior testimony.
19        THE WITNESS:  Not entirely.  I was
20  responsible for making a recommendation on what
21  the AWP and WAC would be, based on the net
22  contract pricing and based on the market.

Page 37

1  BY MR. ROSS:
2    Q.  Okay.  In terms of the market, how did
3  the market factor into your recommendations for
4  AWP and WAC?
5        MR. GALLAGHER:  Objection to the form
6  of the question.
7        THE WITNESS:  There would be -- two
8  price points, from my perspective of a pricing
9  manager, served two different purposes.
10        AWP was intended to allow Sandoz to be
11  designated as a generic product.  So in setting
12  our AWP, we were focusing on making sure that we
13  were receiving a generic designation.  So that
14  was my consideration in setting an AWP price.
15        For WAC, since WAC is a price that we
16  used to invoice wholesalers and there are
17  different charges that we pay to wholesalers
18  based off of that price, it's more of a financial
19  consideration on what should our WAC be relevant
20  to the actual contract prices that we're charging
21  to customers.
22  BY MR. ROSS:

10  (Pages 34 to 37)

365f8314-3660-4720-b380-3927b0c38b81

Galownia, Kevin      HIGHLY CONFIDENTIAL        June 19, 2008
North Wales, PA

Page 58

1    A.  Yes, there were.
2    Q.  And what were the reasons -- or what
3  was the reason or what were the reasons for
4  raising AWPs while you were at Sandoz?
5         MR. GALLAGHER:  Objection to the form
6  of the question.
7         THE WITNESS:  The main reason would
8  have been a change in the market condition that
9  resulted in contract pricing that would
10  essentially make it necessary to raise AWP to
11  have the AWP be higher than the contract price.
12  BY MR. ROSS:
13    Q.  So I understand what you're saying is
14  you didn't want a situation where a contract
15  price was above AWP; is that correct?
16    A.  That is correct.
17    Q.  Is that what you meant by the testimony
18  you just gave as to why AWP was raised?
19         MR. GALLAGHER:  Objection to the form
20  of the question.
21         THE WITNESS:  That is one of the
22  considerations that would lead to an AWP

Page 59

1  increase.
2  BY MR. ROSS:
3    Q.  What were other considerations?
4    A.  I don't recall any.
5    Q.  As we sit here today, the one
6  consideration that you can recall is you did not
7  want the AWP to be below contract -- the contract
8  prices for any particular product; correct?
9    A.  As a general industry dynamic, that
10  doesn't make sense.
11    Q.  So it's -- the answer is yes; is that
12  right?
13    A.  The answer is, AWP, as a general
14  industry dynamic, is higher than contract price.
15  So if contract price were raised to be higher
16  than existing AWP, AWP would be increased.
17    Q.  Okay.  Did you need authorization or
18  approval to raise contract prices?
19         MR. GALLAGHER:  Objection to the form
20  of the question.
21         THE WITNESS:  As a general strategy to
22  increase contract price, yes.

Page 60

1  BY MR. ROSS:
2    Q.  Okay.  And who did you receive that
3  authorization or approval from?
4    A.  Ultimately, from the vice president of
5  sales and marketing.
6    Q.  That would have been Mr. Worrell?
7    A.  Yes.
8    Q.  Okay.  Were there ever any occasions
9  where you needed to seek the approval or
10  authorization of anybody above Mr. Worrell?
11    A.  Mr. Worrell very well may have needed
12  to seek authorization.  I don't know of any
13  specific requirement for him to do so.
14    Q.  Okay.  Well, I'm talking about you.
15  Was there any occasion where you needed to seek
16  approval or authorization above Mr. Worrell?
17    A.  No.  I seeked all of my authorization
18  from Chris.
19    Q.  Okay.  What about WAC?  Did you need to
20  seek approval or authorization from anybody --
21  from anybody -- to raise WAC for a particular
22  product?

Page 61

1         MR. GALLAGHER:  Objection to the form
2  of the question.
3         THE WITNESS:  Again, I sought my
4  authorization from Chris Worrell.
5  BY MR. ROSS:
6    Q.  Okay.  Was there ever an occasion where
7  you had to go above Mr. Worrell to get that
8  authorization or approval?
9    A.  Not that I know of.
10    Q.  Okay.  What about for AWP?  Did you
11  need to receive anybody's authorization or
12  approval to raise AWPs?
13         MR. GALLAGHER:  Same objection.
14         THE WITNESS:  Same as contract price
15  and WAC:  I needed to get authorization from
16  Chris Worrell.
17  BY MR. ROSS:
18    Q.  Okay.  Were there ever any occasions
19  where you need to go above Mr. Worrell for
20  authorization or approval?
21    A.  Not that I recall.
22    Q.  Okay.  Are you aware of whether Mr.

16 (Pages 58 to 61)

365f8314-3660-4720-b380-3927b0c38b81

Galownia, Kevin   HIGHLY CONFIDENTIAL   June 19, 2008
North Wales, PA

Page 66

1 customer's reimbursement ever taken into
2 consideration by you?
3       MR. GALLAGHER:  Objection to the form
4 of the question.
5       THE WITNESS:  In my role as a pricing
6 manager, contract price was established based on
7 where the market determined we needed to set a
8 contract price.
9 BY MR. ROSS:
10   Q.  Okay.  Well, was the reimbursement
11 amount obtained by that customer part of the
12 market analysis that you performed?
13       MR. GALLAGHER:  Objection to the form
14 of the question.
15       THE WITNESS:  I wouldn't have.
16 BY MR. ROSS:
17   Q.  So the answer is no, it was not part of
18 any analysis that you performed?
19   A.  The answer is that I did not, as a
20 general matter, take reimbursement into
21 consideration in my role of setting a price for a
22 customer.

Page 67

1   Q.  Okay.  Were there some instances where,
2 in fact, you did that?
3   A.  Not that I recall.
4   Q.  Were there any instances that you can
5 recall where the issue of a customer
6 reimbursement was taken into account in your
7 decision to either set or recommend a WAC price
8 for a particular product?
9       MR. GALLAGHER:  Objection to the form
10 of the question.
11       THE WITNESS:  Not that I recall.
12 BY MR. ROSS:
13   Q.  And was there any circumstance or
14 instance that you can recall while you were at
15 Sandoz where the issue of customer reimbursement
16 was taken into account by you in determining or
17 recommending an AWP price for a particular Sandoz
18 product?
19   A.  Not that I recall.
20   Q.  And you don't recall ever discussing
21 reimbursement issues with any of Sandoz's
22 customers, do you?

Page 68

1       MR. GALLAGHER:  Objection to the form
2 of the question.
3       THE WITNESS:  I would not have had that
4 kind of conversation with a customer.
5 BY MR. ROSS:
6   Q.  Okay.  Regarding the reporting of AWPs,
7 it was your responsibility, while you were at
8 Sandoz, to report AWPs and WACs to the pricing
9 services; correct?
10   A.  That is correct.
11   Q.  Were you the only one at Sandoz that
12 did that, while you were employed there?
13   A.  Yes, I was.
14   Q.  And as you understood it, what was the
15 reason that you report AWPs to the pricing
16 services?
17   A.  Because AWPs were used to determine
18 whether we were going to be classified as a
19 generic or a brand.
20   Q.  Okay.  And that's because, to get a
21 generic classification from First Databank, you
22 had to be approximately 10 percent -- your AWP

Page 69

1 had to be approximately 10 percent below the
2 brand AWP for the corresponding product; is that
3 correct?
4   A.  To be classified as a generic, my
5 understanding was our AWP needed to be lower than
6 the brand AWP and within range of other generic
7 AWPs.
8   Q.  What does "within range of other
9 generic AWPs" mean?
10   A.  If we were entering a market with --
11 that was already genericized and generics had
12 been on the market for years and years and years
13 and generic AWPs were 30 percent below brand AWP,
14 my using a 10 percent off of brand AWP may not
15 classify me as a generic.
16   Q.  Where did you get that understanding?
17   A.  From Kay Morgan at First Databank.
18   Q.  Was that something that Ms. Morgan told
19 you?
20   A.  It was something that Kay Morgan
21 discussed with me and me making a comment that I
22 would be a generic if I were 10 percent below AWP

18 (Pages 66 to 69)

365f8314-3660-4720-b380-3927b0c38b81

Galownia, Kevin     HIGHLY CONFIDENTIAL     June 19, 2008
North Wales, PA

Page 70

1  -- brand AWP.
2    Q.  Okay.  Is that one particular occasion
3  that you're thinking of, or was it something
4  general, if the market, as you put it, was
5  genericized?
6    A.  I don't recall how many discussions
7  revolved around the question.  I do know that I
8  would have probably asked her if we were coded as
9  a brand for a product where our AWP was 10
10  percent below a brand AWP.  I would have asked
11  why, and she would have explained to me the
12  mechanism that they used to give that price
13  indicator.
14    Q.  When you were going to launch a
15  product, did you contact Kay Morgan or anybody
16  else at First Databank to find out where your AWP
17  should be to receive the generic classification?
18    A.  As a general matter, I did not.
19    Q.  Okay.  So when you were going to launch
20  a product, where did you place your AWP to
21  receive that generic classification?
22      MR. GALLAGHER:  Objection to the form

Page 71

1  of the question.
2      THE WITNESS:  For a new product launch,
3  in general, we would use 10 percent below the
4  brand AWP.
5  BY MR. ROSS:
6    Q.  Okay.  And if, as you say, the market
7  was genericized, what would you do?
8    A.  We would receive the AWP pricing for
9  existing generic products and determine where we
10  wanted to establish our AWP to receive a generic
11  designation.
12    Q.  You were aware, weren't you, while you
13  were at Sandoz, that AWP was used by third-party
14  payers as at least a starting point for
15  reimbursement; correct?
16    A.  Yes, I was.
17      MR. GALLAGHER:  Objection to the form
18  of the question.
19  BY MR. ROSS:
20    Q.  Were you also aware of that while you
21  were at Cardinal?
22      MR. GALLAGHER:  Objection to the form

Page 72

1  of the question.
2      THE WITNESS:  No, I was not.
3  BY MR. ROSS:
4    Q.  So that's something that you first
5  became aware of when you came to work at Sandoz?
6    A.  It was something I would have learned
7  while I was at Sandoz.
8    Q.  And is it also true that at least part
9  of the reason that Sandoz reported AWPs to First
10  Databank and the other pricing services is that -
11  - is for the purpose of third-party payers
12  reimbursing customers who purchase the Sandoz
13  products?
14      MR. GALLAGHER:  Objection to the form
15  of the question.
16      THE WITNESS:  My understanding, in
17  communicating AWPs to First Databank or any
18  pricing service, was that it was a requirement to
19  get a generic designation; and by not providing
20  that information, our customers may not be able
21  to get reimbursed for that product.
22  BY MR. ROSS:

Page 73

1    Q.  Okay.  Did your customers -- by "yours"
2  I mean Sandoz's -- customers require that Sandoz
3  report AWPs to the pricing services?
4      MR. GALLAGHER:  Objection to the form
5  of the question.
6      THE WITNESS:  Customers didn't
7  specifically require it.  We were required to be
8  listed at the pricing services; and to be listed
9  at the pricing services, we provided an AWP
10  price.
11  BY MR. ROSS:
12    Q.  Now, when you adjusted AWPs, for
13  whatever reason, you reported the new AWP price
14  to the pricing services; correct?
15    A.  In the event that we would have
16  adjusted AWPs, we would have reported it to the
17  pricing services.
18    Q.  Okay.  Why did you do that?
19    A.  Because products -- our products were
20  listed at the pricing service with an AWP and a
21  WAC price; and if those would change, we would
22  update the pricing services so that they had the

19 (Pages 70 to 73)

365f8314-3660-4720-b380-3927b0c38b81

Galownia, Kevin     HIGHLY CONFIDENTIAL     June 19, 2008
North Wales, PA

Page 78

1       MR. GALLAGHER:  Just note for the
2   record an objection that there appears to be,
3   from the document, an attachment to it that's not
4   included in the exhibit.
5       THE WITNESS:  Okay.
6   BY MR. ROSS:
7       Q.   Do you recognize Exhibit 42?
8       A.   Not specifically.
9       Q.   It purports to be an email dated May
10  13, 2002, from you to -- looks like Roni Lane at
11  Medec.com.
12      A.   Yes.
13      Q.   Do you know who Roni Lane is?
14      A.   Roni Lane worked for Redbook.
15      Q.   Okay.  Would this be an example of
16  communication from you to Redbook correcting or
17  changing AWP and WAC information that was
18  published by Redbook?
19      MR. GALLAGHER:  Objection to the form
20  of the question.
21      THE WITNESS:  This appears to me to be
22  a follow-up email to a separate communication.

Page 79

1   What it sounds like is they had verified an AWP
2   and WAC price for an item that I found to be
3   incorrect, so I re-communicated everything to
4   them that changed on that day to make sure they
5   had received the information.
6   BY MR. ROSS:
7       Q.   Okay.  And was it your intent, when you
8   reported AWP and WAC prices to the various
9   pricing services, that those numbers would be the
10  ones published by various pricing services?
11      MR. GALLAGHER:  Objection to the form
12  of the question.
13      THE WITNESS:  My understanding was that
14  they would publish the information that I
15  provided to them.
16  BY MR. ROSS:
17      Q.   Okay.  And if information that they
18  published was incorrect and you pointed that out
19  to the publishing services, your understanding --
20  or your expectation was that the publishing
21  services would make the corrections or changes
22  you requested; correct?

Page 80

1       MR. GALLAGHER:  Objection to the form.
2       THE WITNESS:  My understanding, from
3   all of the pricing services that I worked with
4   while I was at Sandoz, was that they wanted their
5   information to match the information that I
6   communicated to them.
7       MR. ROSS:  Okay.
8       (Exhibit Galownia 043 was marked
9   for identification.)
10  BY MR. ROSS:
11      Q.   You've been handed what we've marked as
12  Exhibit 43.  It's a two-page email stream Bates-
13  stamped SANDOZ WISC 0547054 and 55.  Mr.
14  Galownia, please take a look at the exhibit and
15  let me know when you're ready.
16      A.   Okay.
17      Q.   Do you recognize Exhibit 43?
18      A.   I have seen this document before.
19      Q.   Okay.  I want to direct your attention
20  to the top email, the one from Mr. Worrell to you
21  dated June 11, 2002, with the subject, Re:
22  Albertson's' lisinopril.  Do you see that?

Page 81

1       A.   Yes.
2       Q.   Mr. Worrell states, "It is time we land
3   on our WAC and AWP for our lisinopril."
4       Do you have a recollection of what Mr.
5   Worrell meant by that?
6       MR. GALLAGHER:  Objection to the form
7   of the question.
8       THE WITNESS:  This email was sent in
9   June of 2002.  We launched the product in July of
10  2002.  So my understanding would be that we were
11  in the process of determining our AWP and WAC
12  pricing for launch.
13  BY MR. ROSS:
14      Q.   Okay.  And do you have an understanding
15  as to why Mr. Worrell was advising you to call
16  First Databank regarding guidance on where the
17  AWP and WAC should be?
18      A.   This -- this email was --
19      MR. GALLAGHER:  Object to the form of
20  the question.  Sorry.
21      THE WITNESS:  This email was provided
22  to me prior to us subscribing to a service that

21 (Pages 78 to 81)

Galownia, Kevin    HIGHLY CONFIDENTIAL    June 19, 2008
North Wales, PA

Page 82

1  provided AWP and WAC information for the market.
2  So all I can gather is that he wanted me to try
3  to provide some competitive intelligence on where
4  any AWP and WAC pricing might be for this
5  product.
6  BY MR. ROSS:
7      Q.  Okay.  And what service are you
8  referring to?
9      A.  AnalySource.
10     Q.  And AnalySource provided what?
11     A.  AnalySource provide us access to the
12  information that's listed in First Databank.
13     Q.  Okay.  Would that be AWPs and WACs?
14     A.  The AnalySource information includes,
15  among other things, AWP and WAC.
16     Q.  That would be AWPs and WACs for
17  Sandoz's competitors; correct?
18     A.  That would be AWP and WAC for any
19  pharmaceutical product listed in First Databank's
20  system.
21     Q.  Okay.  Mr. Worrell goes on by saying,
22  "We will likely go low but do not want to hurt

Page 83

1  reimbursement."
2          Do you have an understanding of what he
3  meant by that?
4          MR. GALLAGHER:  Objection to the form
5  of the question.
6          THE WITNESS:  I don't know specifically
7  what he meant by that.
8          I do realize that he -- we were dealing
9  within a certain group of customers in launching
10  our product.  Essentially, what I would gather
11  Chris was trying to do was to make sure that we
12  were not unnecessarily bringing overall marketing
13  pricing down by listing an unnecessarily low WAC.
14  BY MR. ROSS:
15     Q.  Well, what about the part that says,
16  "We do not" -- or "do not want to hurt
17  reimbursement"?  Do you have an understanding of
18  what Mr. Worrell meant by that?
19     A.  I don't know.
20         MR. GALLAGHER:  Objection to the form
21  of the question.
22         THE WITNESS:  I don't know

Page 84

1  specifically.
2  BY MR. ROSS:
3      Q.  Well, do you remember speaking to Mr.
4  Worrell about that?
5      A.  No, I don't.
6      Q.  When you received this email in June of
7  2002 and you did not understand what he meant by
8  that, would it have been something you would have
9  done to go and talk to him about that?
10         MR. GALLAGHER:  Objection to the form;
11  misstates prior testimony.
12         THE WITNESS:  In reading this email, I
13  had a specific request to seek out information
14  from First Databank.  I would have sought out
15  that information and provided that information --
16  any information that I may find to Chris.
17  BY MR. ROSS:
18     Q.  Okay.  And your testimony is, though,
19  that you do not -- as we sit here today, you do
20  not understand what he meant by "do not want to
21  hurt reimbursement"; is that correct?
22     A.  I don't specifically recall what he was

Page 85

1  talking about with that line.
2      Q.  Okay.  Are you saying that you may have
3  known at one time and you just don't recall now,
4  or you don't know one way or the other?
5      A.  I don't know.
6          MR. ROSS:  We have a few minutes left
7  on the tape.  Why don't we take a break right
8  now.
9          MR. GALLAGHER:  Sure.  Sounds good.
10         THE VIDEOGRAPHER:  It is 10:22.  This
11  concludes Tape 1 of the video deposition of Kevin
12  Galownia.
13         (Brief recess.)
14         THE VIDEOGRAPHER:  It is 10:33.  This
15  begins Tape No. 2 the video deposition of Kevin
16  Galownia.
17         (Exhibit Galownia 044 was marked
18  for identification.)
19  BY MR. ROSS:
20     Q.  Mr. Galownia, you've just been handed
21  what we've marked as Exhibit 44.  It's Bates-
22  stamped SANDOZ WISC 0320555 and 56.  Would you

22  (Pages 82 to 85)

365f8314-3660-4720-b380-3927b0c38b81

Galownia, Kevin     HIGHLY CONFIDENTIAL     June 19, 2008
North Wales, PA

Page 234

1   discount" refer to?
2       A.   That is the generic's AWP as a
3   percentage of the brand's AWP.  So that's a
4   discount off.
5           So, for example, for the first item,
6   it's a Geneva item.  The brand AWP is 106.95.  If
7   you take 35 percent off of that, you will come to
8   the generic AWP of 69.52.
9       Q.   Okay.  And if you continue over to the
10  right, you have "generic WAC."  Do you see that
11  column?
12      A.   Yes, I do.
13      Q.   "New WAC" and then "spread."  And what
14  does that "spread" refer to?
15      A.   The spread is the difference between
16  the generic AWP and the generic WAC, as a
17  percentage.
18      Q.   Okay.  What did -- for what purpose did
19  you use that number, the difference between the
20  generic AWP and the generic WAC, expressed as a
21  percentage?
22      A.   In this case, it would be used for two

Page 235

1   purposes.  One would be to look and see if we
2   have a competitor with significant share that has
3   a larger spread than we do.  In other words, a
4   smaller spread than we do.
5           In other words, their WAC pricing is
6   closer to AWP than ours, which would potentially
7   indicate a price-increase opportunity if we
8   choose to do the same thing.
9           The spread calculation -- "spread" is
10  not really the best word to use, because it's not
11  really that.  What it is is it's an AWP/WAC
12  variance.
13          When we set up our pricing, whenever we
14  do a new product launch or a price increase, in
15  general, when setting up an AWP and WAC, AWP is a
16  certain percentage off brand, and WAC is set up
17  as a certain percentage difference from generic
18  AWP.
19          So that's just -- for purposes of
20  percentage, it automatically calculates what that
21  new price would be.
22      Q.   Okay.  In situations where Geneva or

Page 236

1   Sandoz is going to launch a new product and there
2   were no other generic equivalents in the market,
3   competitors in the market, it was just a brand,
4   the AWP that you would set for this product that
5   Sandoz was going to launch would have been
6   approximately 10 percent below the brand AWP; is
7   that correct?
8       A.   Correct.
9       Q.   Okay.  And your understanding was that
10  was a sufficiently low number below the brand AWP
11  to ensure a generic classification for the Sandoz
12  product; correct?
13      A.   In the event that we were a generic
14  exclusive, yes.
15      Q.   Right.  Why is it, if you know, that
16  the Sandoz AWP was set at that level as opposed
17  to a level far below -- or far more distant than
18  10 percent of the generic brand -- I'm sorry, the
19  generic brand -- than the brand AWP?
20          MR. GALLAGHER:  Objection to the form
21  of the question.
22          THE WITNESS:  Would you ask the

Page 237

1   question again.
2   BY MR. ROSS:
3       Q.   Yes.  I'm not sure what I asked.
4       A.   I think I know, but --
5       Q.   Sure.  I think I know too.
6           Why was that -- why was 10 percent off
7   the brand AWP picked as the generic AWP number,
8   as opposed to 50 percent off or 75 percent below?
9   Why was it 10 percent below?
10          MR. GALLAGHER:  Objection to the form
11  of the question.
12          THE WITNESS:  It was just something --
13  I don't know specifically where that percent came
14  from.  It was just a percent that, in the end,
15  gave the generic product their generic
16  designation and, as such, it just became general
17  industry practice for a -- especially an
18  exclusive new product launch.
19  BY MR. ROSS:
20      Q.   Okay.  But in terms of receiving that
21  generic classification, you understood that you
22  could have set that generic AWP at, say, 20

Henderson Legal Services, Inc.
202-220-4158                                    www.hendersonlegalservices.com

365f8314-3660-4720-b380-3927b0c38b81