# Exhibit C

**State of California ex rel. Ven-A-Care of the Florida Keys, Inc.
v. Abbott Laboratories, Inc., et al., Master Civil Action No. 01-12257-PBS,
Subcategory Case No. 06-11337**

Exhibit to the December 21, 2009 Declaration of Christopher C. Palermo in Support
of Defendants Mylan Inc. and Mylan Pharmaceuticals Inc's. Opposition to Plaintiffs' Motion for Partial Summary
Judgment

Case 1:01-cv-12257-PBS   Document 6798-5   Filed 12/21/09   Page 2 of 4

Gorospe, Pharm. D., J. Kevin - Vol. II                       September 22, 2008
                              Sacramento, CA

394

```
              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
    ------------------------------x
    IN RE PHARMACEUTICAL INDUSTRY  )
    AVERAGE WHOLESALE PRICE        )
    LITIGATION                     )
    _____    )
    THIS DOCUMENT RELATES TO       ) MDL No. 1456
    State of California, ex rel.   ) Civil Action:
    Ven-A-Care v. Abbott           ) 01-12258-PBS
    Laboratories, Inc., et al.     )
    ------------------------------x

                         VOL. II

                        --oOo--

              MONDAY, SEPTEMBER 22, 2008

                        --oOo--

                VIDEOTAPED DEPOSITION OF

                J. KEVIN GOROSPE, Pharm.D.

                        --oOo--



    Reported By:  CAROL NYGARD DROBNY, CSR No. 4018
                  Registered Merit Reporter
```

Case 1:01-cv-12257-PBS   Document 6798-5   Filed 12/21/09   Page 3 of 4

Gorospe, Pharm. D., J. Kevin - Vol. II                September 22, 2008
                    Sacramento, CA

75 (Pages 687 to 690)

687

1  Q.  Okay.  So this -- this type of a
2  statement about AWP you wouldn't have viewed as
3  being particularly important?
4      MR. PAUL:  Objection to form.
5      THE WITNESS:  Not at the time, no.
6  BY MR. ROBBEN:
7  Q.  Okay.  Now, the beginning part of that
8  paragraph, the part I didn't read, deals with WAC.
9      Now, WAC has no bearing on the -- on the
10 California Medicaid reimbursement; does it?
11 A.  No, it does not.
12 Q.  And it plays no part in your work with
13 Medicaid program?
14 A.  No, it does not.
15 Q.  And it didn't at the time of this
16 letter?
17 A.  No, it did not.
18 Q.  Okay.  So whatever Dey said about WAC
19 wouldn't have affected you -- you or your job in
20 Medi-Cal one way or the other; would it?
21 A.  No, it would not.
22     MR. ROBBEN:  I think we have to change

688

1  the tape.
2      VIDEOGRAPHER:  This is the end of tape
3  three, volume two, of the deposition of Kevin
4  Gorospe.
5      We are off the record at 4:36 p.m.
6      (Discussion off the record)
7      VIDEOGRAPHER:  This is the beginning of
8  tape four, volume two, of the deposition of Kevin
9  Gorospe.
10     We are on the record at 4:40 p.m.
11 BY MR. ROBBEN:
12 Q.  A few minutes ago you said that you had
13 received letters such as Exhibit 63 from other
14 manufacturers and that you passed those on to Mr.
15 Terra.
16     Did it ever occur that when you passed on
17 one of those letters to Mr. Terra he -- he asked
18 you to subsequently investigate anything about the
19 company that had sent it?
20 A.  No, not that I can recall.
21 Q.  Do you remember any -- any type of
22 letter like this exhibit touching off some type of

689

1  investigation, whether you did it or not?
2      MR. PAUL:  Objection to form.
3      THE WITNESS:  No.
4  BY MR. ROBBEN:
5  Q.  At the previous day of your deposition
6  you testified that you were familiar with something
7  called "usual and customary charge."
8      Do you remember that testimony?
9  A.  Yes.
10 Q.  And do I have it right that usual and
11 customary charge is an amount reported by a
12 pharmacy provider to Medi-Cal?
13 A.  Yes.
14 Q.  Okay.  And that that number is a
15 representation by the provider to Medi-Cal that
16 that's their usual and customary charge to the
17 public?
18     Is that correct?
19 A.  Yes.
20 Q.  Okay.  When a provider submits a claim
21 for a Medi-Cal -- for a drug submitted to a
22 Medi-Cal beneficiary, do they submit along with

690

1  that any type of certification as to the accuracy
2  of the components in the claim?
3  A.  Not that I know of.
4  Q.  Okay.  Even if it doesn't come along
5  with the actual claim itself are pharmaceutical
6  providers like pharmacies expected to submit true
7  and accurate claims?
8  A.  Yes.
9  Q.  Okay.  So if a pharmacy says it
10 dispensed 30 antibiotic pills to Medicaid
11 beneficiary X, you expect that that's true and that
12 that actually happened; right?
13 A.  Yes.
14 Q.  Okay.  When they put the usual and
15 customary charge on their claim, you expect that
16 that usual and customary charge is a true number,
17 that's their usual and customary charge; correct?
18 A.  Yes.
19 Q.  Okay.  Now, as I understand how
20 reimbursement is worked under Medi-Cal, the program
21 is paid the lesser of a certain of number of -- of
22 factors; is that fair?

Case 1:01-cv-12257-PBS   Document 6798-5   Filed 12/21/09   Page 4 of 4

Gorospe, Pharm. D., J. Kevin - Vol. II                September 22, 2008
                        Sacramento, CA
                                                76 (Pages 691 to 694)

**691**

1   A. Yes.
2   Q. Okay. So for a time it was AWP minus 5,
3   or FAC, or MAIC, and then the program would pay the
4   lower of each of those -- of those components;
5   correct?
6   A. After comparing it to the usual and
7   customary.
8   Q. Okay. So if the usual and customary was
9   10 and the others were less than 10, one of those
10  other ones would be picked as the basis for the
11  reimbursement; right?
12  A. That is correct.
13  Q. Okay. So now, is it fair to say based
14  on that that whenever some basis of payment was
15  selected other than the usual and customary charge
16  the Medi-Cal program obtained the prescription at a
17  discount?
18      MR. PAUL: Objection to form.
19      THE WITNESS: Yes.
20  BY MR. ROBBEN:
21  Q. Okay. Does it -- it obtained the
22  product for less than that pharmacy would have sold

**692**

1   it to the general public; correct?
2   A. Yes.
3   Q. Okay. So even if the basis of payment
4   was AWP, AWP minus 5 percent, let's say, if that
5   was less than usual and customary charge the
6   Medi-Cal program obtained that drug for less than
7   the pharmacy would have charged somebody else for
8   that product; correct?
9       MR. PAUL: Objection to form.
10      THE WITNESS: Yes.
11      MR. ROBBEN: I have nothing else.
12      MR. PAUL: You guys done with him for the
13  day?
14      MR. BUEKER: (Nodding head)
15      MR. PAUL: I had a couple of questions.
16      MR. ROBBEN: Why don't you go ahead.
17      MR. PAUL: Sure.
18      Mr. Gorospe --
19      MR. ROBBEN: You want to trade places?
20      MR. BENNETT: Yeah, why don't we.
21      MR. BUEKER: I'll move out.
22              EXAMINATION

**693**

1   BY MR. PAUL:
2   Q. For the record I'm Nicholas Paul with
3   the California Department of Justice representing
4   the Medi-Cal program here in California in this
5   case and representing Mr. Gorospe in this
6   deposition.
7       Mr. Gorospe, counsel for Mylan and Dey,
8   Mr. Robben, asked you some questions at the
9   beginning of his time with you regarding a meeting
10  -- a discussion that you had with Mylan, his
11  client, in May 2007, I believe.
12      Do you recall the testimony?
13  A. Yes.
14  Q. And you provided responses to his
15  questions?
16  A. Yes.
17  Q. And if I recollect correctly, the
18  discussion with the Mylan representative included
19  discussion of AMPs; is that correct?
20  A. Yes.
21  Q. And the Mylan representative described
22  AMPs to you as a poor basis for reimbursement

**694**

1   because they were unreliable; is that correct?
2       MR. ROBBEN: Objection.
3   BY MR. PAUL:
4   Q. Is that correct?
5   A. Yes.
6   Q. Do you recall -- did the Mylan
7   representative explain to you why he or she
8   believed that Mylan's AMP were unreliable?
9   A. Yes, but I don't recall the content.
10  Q. So you don't remember the reason for
11  their unreliability?
12  A. Just -- I don't recall the specifics of
13  the conversation.
14  Q. And I believe the representative also
15  expressed concern about using AMPs for
16  reimbursement because of the confidentiality of
17  AMP; is that correct?
18  A. Yes.
19  Q. Do you recall what the representative
20  stated to you regarding the confidentiality of
21  Mylan AMPs, any details?
22  A. No, I don't recall the details.