# Exhibit E

**State of California ex rel. Ven-A-Care of the Florida Keys, Inc.
v. Abbott Laboratories, Inc., et al., Master Civil Action No. 01-12257-PBS,
Subcategory Case No. 06-11337**

Exhibit to the December 21, 2009 Declaration of Christopher C. Palermo in Support
of Defendants Mylan Inc. and Mylan Pharmaceuticals Inc's. Opposition to Plaintiffs' Motion for Partial Summary
Judgment

**Page 1**

IN THE CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA

* * * * * * * * * * * * * *

STATE OF ALABAMA,

    Plaintiff,

CIVIL ACTION NO. 2005-219

vs.

ABBOTT LABORATORIES, INC.,
et al.,

    Defendants.

* * * * * * * * * * * * * *

CONFIDENTIAL DEPOSITION
BRIAN S. ROMAN

The video deposition of BRIAN S. ROMAN,
taken at the law offices of
Hand, Arendall, LLC,
107 St. Francis Street, Suite 3000,
Mobile, Alabama, on July 26, 2006,
commencing at approximately 9:10 a.m.

**Page 2**

APPEARANCES

FOR THE PLAINTIFF:

    A. CLAY RANKIN, III, ESQUIRE
    crankin@handarendall.com
    CAINE O'REAR, III, ESQUIRE
    SUSAN McALEER, PARALEGAL
    HAND, ARENDALL, LLC
    107 ST. FRANCIS STREET, 30TH FLOOR
    P. O. BOX 123
    MOBILE, AL 36601
    251-432-5511
        AND
    CLINTON C. CARTER, ESQUIRE
    BEASLEY, ALLEN, CROW,
      METHVIN, PORTIS & MILES, PC
    272 COMMERCE STREET (36104
    P. O. BOX 4160
    MONTGOMERY, AL 36103-4160
    334-269-2343

FOR THE DEFENDANTS MYLAN LABORATORIES, INC., MYLAN PHARMACEUTICALS, INC., AND UDL LABORATORIES, INC.:

    WILLIAM A. ESCOBAR, ESQUIRE
    wescobar@kelleydrye.com
    KELLEY, DRYE & WARREN, LLP
    101 PARK AVENUE
    NEW YORK, NY 10178

**Page 2 (cont.)**

    212-808-7771
        AND
    GARY M. LONDON, ESQUIRE
    BURR & FORMAN, LLP
    3100 SOUTHTRUST TOWER
    420 NORTH 20TH STREET
    BIRMINGHAM, AL 35203
    205-458-5203

VIDEOGRAPHER:
    JENNIE PHILLIPS, PRO LAW VIDEO
    251-751-9596

COURT REPORTER:

**Page 3**

INDEX

EXAMINATION
By Mr. Rankin - page 7

EXHIBITS

Mylan Exhibit 1 - page 12
    Second Amended Notice of Party Defendants
    Depositions

Mylan Exhibit 2 - pages 15 and 97
    Defendants Mylan Laboratories, Inc.'s, Mylan
    Pharmaceuticals, Inc.'s, and UDL
    Laboratories, Inc.'s Responses and Objections
    to Plaintiff's First Set of Interrogatories
    and Request for Production to Defendants

Mylan Exhibit 3 - page 17
    Targeted Drug List - Mylan

Mylan Exhibit 4 - page 88
    8/27/03 letter to Chairmen of Committee on
    Energy and Commerce from Joseph E. Killory,
    Jr., Counsel for Mylan Pharmaceuticals, Inc.,
    with attachments    ALMYLAN014153-14225

Mylan Exhibit 5 - page 218
    Listing of Propoxyphene/APAP
    ALMYLAN000211-217

**Page 4**

STIPULATION

It is stipulated and agreed by and between the parties hereto, through their respective counsel, that the video deposition of BRIAN S. ROMAN may be taken before Debra Amos Isbell, Notary Public for the State at Large, at the law offices of Hand, Arendall, LLC, 107 St. Francis Street, Suite 3000, Mobile, Alabama, on July 26, 2006.

It is further stipulated and agreed that this deposition is taken pursuant to the Alabama Rules of

Page 24

1    the drugs to the public, and now you changed it to
2    sold. I just want to be clear about that. Group
3    purchasing organizations take different forms. Group
4    purchasing organizations could consist of pharmacies
5    that dispense to the public. More often I've seen          09:
6    group purchasing organizations that are made up of
7    drug wholesalers or institutional purchasers.
8    MR. RANKIN:
9 Q. Okay. Now, of the various categories of
10   potential sellers of Mylan drugs to the public, do you     09:
11   agree that all of these categories may be in part
12   reimbursed by state Medicaid agencies?
13   MR. ESCOBAR: Objection to the form.
14 A. I guess I can't really speak to all of
15   them. But you did say may be reimbursed. And I             09:
16   suppose if they were dispensing product that was
17   eligible for reimbursement by a Medicaid agency to a
18   Medicaid beneficiary, then they could be eligible for
19   reimbursement.
20   MR. RANKIN:                                                09:
21 Q. Do you agree that sales by the types of
22   entities that we've just identified would constitute a
23   part of the retail class of trade?

Page 25

1    MR. ESCOBAR: Objection to the form.
2 A. What do you mean by retail class of trade?
3    MR. RANKIN:
4 Q. Let me ask you what's retail class of trade?
5 A. I'm not sure and that's why I'm asking you.               09:
6    How are you using it?
7 Q. I'm asking you whether Mylan or any of the
8    entities that you're here to represent can tell me
9    what retail class of trade means in the industry?
10   MR. ESCOBAR: Objection to the form.                        09:
11 A. I've heard the term "retail class of trade"
12   used in conjunction with AMP, or average manufacturer
13   price, calculations. I'm not sure exactly how it's
14   defined, but I believe that's something that's defined
15   by statute or regulations. It's defined by law. I          09:
16   don't hear people talking about, quote, unquote,
17   "retail class of trade." And we don't -- we do sell
18   to retail pharmacies, but for the most part Mylan's
19   customer base at the retail pharmacy level is more the
20   larger warehousing retail chains. We often talk about     09:
21   them as warehousing chains. And there's independent
22   pharmacies. They're not like a Walgreen's or a CVS.
23   But it's not a term that I'm familiar with in the

Page 26

1    day-to-day running of the business. And I think it
2    has some particular legal meaning that I'm not 100
3    percent conversant with.
4    MR. RANKIN:
5 Q. Am I correct that your answer is you're not              09:
6    real sure because that term may be defined by some
7    statute, regulation or other source that you're
8    personally unaware of?
9    MR. ESCOBAR: Objection to the form.
10 A. My answer is what I said, not necessarily               09:
11   what you said, because there was more in my answer
12   than what you said.
13   MR. RANKIN:
14 Q. Okay. What percentage of Mylan's sales are
15   reimbursed by Medicaid?                                    09:
16   MR. ESCOBAR: Objection to the form.
17 A. I don't know that.
18   MR. RANKIN:
19 Q. Do you have any idea?
20   MR. ESCOBAR: Objection to the form.                        09:
21 A. We as a company on a quarterly basis will
22   receive from each state Medicaid program a report or
23   an invoice that tells us what that state Medicaid

Page 27

1    utilization was drug by drug. We get that from the
2    states so that we can pay rebates under the Medicaid
3    Drug Rebate Statute to the states. I think that would
4    be our only source of information about Medicaid
5    utilization. And I'm not aware of any effort to            09:
6    compare that number to our overall sales and reach any
7    conclusions or really factor that into the day-to-day
8    running. I've not seen reports that say, for example,
9    X percent of our sales ended up being dispensed to
10   Medicaid beneficiaries.                                    09:
11   MR. RANKIN:
12 Q. Are there any data collections or reports
13   distributed to Mylan management on a routine basis
14   that reflect information about Medicaid reimbursements
15   compared to other types of sales?                          09:
16 A. No.
17 Q. Is there anybody in the Mylan organization
18   who has any particular responsibility for tracking
19   Medicaid sales, Medicaid reimbursed sales?
20 A. Well, as I said, on a quarterly basis both              09:
21   Mylan Pharmaceuticals and UDL will receive reports in
22   from the state Medicaid agencies that show what those
23   states have reimbursed for, what Mylan products they

Page 28

1   have reimbursed for in a quarter. We have people who
2   need to process those invoices and make sure that the
3   states are getting paid the right rebates under the
4   Medicaid Drug Rebate Statute. So in a sense, those
5   people need to be understanding those reports and                09:
6   processing them to make sure that the rebates are paid
7   out. That would be the way that we track that
8   information. But I'm not sure it's the way you seem
9   to be meaning it, which sounds like tracking it over a
10  period of time and drawing conclusions about Medicaid            09:
11  reimbursement for drugs.
12 Q. What I'm really asking is: Does Mylan make
13  concerted efforts to market its drugs that are
14  reimbursed by Medicaid and take any particular steps
15  to promote or maintain that market?                              09:
16  MR. ESCOBAR: Objection to the form.
17 A. We don't think about a Medicaid market or
18  target a Medicaid market or anything like that. What
19  we do is try to sell our products to our customers at
20  Mylan Pharmaceuticals. Those are principally drug                09:
21  wholesalers and these warehousing retail chains. And
22  we sell based on the competitive environment that
23  we're in where we're trying to get business, and there

Page 29

1   are other generic companies, often many other generic
2   companies, competing to get that same business. So
3   we're competing on price, and that would be our
4   focus. We are looking for ways to make sure our
5   customers can get our product, that it's not on back             09:
6   order, that we're able to fill their orders, get it to
7   them quickly, get them a high quality product at a
8   price that is competitive. So that's the focus of our
9   sales and marketing, not the back end of
10  reimbursement.                                                   09:
11  MR. RANKIN:
12 Q. So you're telling me that Mylan doesn't have
13  any employee that has any duty to be aware of the
14  various states' reimbursement models or what figures
15  are being reimbursed to each state under Medicaid?               09:
16  MR. ESCOBAR: Objection to the form.
17  MR. RANKIN:
18 Q. Is that correct? Other than this testimony
19  that you gave about keeping up with the rebates and
20  making sure that that's handled?                                 09:
21  MR. ESCOBAR: Same objection.
22 A. My testimony is what my testimony was. In
23  terms of whether there are people who may get

Page 30

1   information about reimbursement structures and so on,
2   there probably are people who get that information.
3   But there's no person whose job is to be a person who
4   is focused on what Medicaid reimbursement is as their
5   sole or even primary duty. There are people in the              09:
6   organization who get information about those things
7   and have some level of awareness of reimbursement
8   issues. So I can't say that there's nobody in the
9   organization that knows anything about that, if that's
10  what you're asking me.                                           09:
11  MR. RANKIN:
12 Q. Why don't we do this. Let's look briefly at
13  Medicaid reimbursement and how it works. Do you have
14  an understanding about how Medicaid reimbursement
15  works?                                                           09:
16 A. Yeah. My understanding is that it differs
17  from state to state. And with any state, it probably
18  has changed over time. But what you will see is
19  various -- each state designing their own program the
20  way they want to design it to pay -- find a way to pay           09:
21  pharmacies to make sure that the people in their state
22  who are getting Medicaid benefits have access to the
23  medicines that they need. And like I said, every

Page 31

1   state has their own way of going about doing that, of
2   designing their program in a way that they feel is
3   efficient. And that's my general understanding of it.
4  Q. You do agree that Medicaid is a joint
5   program between the federal government and each of the          09:
6   50 states?
7  A. I know that the Medicaid program is under
8   the Social Security Act and there are some things that
9   the federal government does and some things that the
10  states do, but the day-to-day administration and                 09:
11  design of reimbursement programs for Medicaid drugs is
12  at the state level. That's my understanding.
13 Q. And do you understand that Medicaid's
14  purpose in part with respect to prescription drugs is
15  to provide prescription drugs to certain people who              09:
16  are poor, elderly, blind, disabled and can't afford
17  the drugs themselves?
18 A. Sure. It's people who are eligible for
19  Medicaid benefits.
20 Q. And you do understand that the plaintiff in                    09:
21  this case, Alabama Medicaid Agency, runs the Alabama
22  Medicaid program?
23  MR. ESCOBAR: Let me just note an objection

Page 44

1  Q. Is that your testimony or isn't it?
2     MR. ESCOBAR: Objection to the form and for
3     the reasons I stated.
4  A. I don't know how Alabama reimburses
5     pharmacies in Alabama for prescription drugs dispensed   10:
6     to Alabama's Medicaid beneficiaries. Sitting here
7     today I don't know that.
8     MR. RANKIN:
9  Q. Do you agree that federal regulations and
10    statutes require that the State of Alabama file         10:
11    documents with the federal government that describe
12    the process by which Alabama derives its best estimate
13    of the price generally and currently paid for
14    providers of a drug?
15    MR. ESCOBAR: Objection to the form.             10:
16 A. I don't know.
17    MR. RANKIN:
18 Q. You do not know the answer to that question;
19    is that right?
20 A. No, I don't know.                                 10:
21 Q. You agree, do you not, sir, that the State
22    of Alabama utilizes in the process of calculating
23    reimbursements reported prices known as the average

Page 45

1     wholesale price and the wholesale acquisition cost; do
2     you agree with that?
3     MR. ESCOBAR: Objection to the form.
4  A. Like I said, I don't know what formula
5     Alabama uses. But I do have a general understanding   10:
6     also -- and I think you left one out -- that there's
7     something called the federal upper limits for
8     reimbursement on generic drugs that would cap any
9     reimbursement that any state could pay. And I think
10    that's a very important part of the structure.       10:
11    MR. RANKIN:
12 Q. So you are aware that Alabama's
13    reimbursement methodology has something to do with
14    federal upper limit; is that right?
15 A. My understanding is that the federal upper   10:
16    limits are established by the federal centers for
17    Medicare services and are communicated across to all
18    states in some way, shape or form and that those are a
19    cap nationally on what Medicaid programs can pay for
20    generic drugs subject to an FUL.                      10:
21 Q. Do you agree with me or disagree that
22    Alabama has since 1991 used the average wholesale
23    price reported by pharmacy companies in calculating

Page 46

1     its Medicaid reimbursement?
2     MR. ESCOBAR: Objection to the form. And at
3     least with my knowledge of Alabama, I think that
4     statement is not accurate.
5  A. I don't know what formulas Alabama has used   10:
6     since 1991. But I would tell you that the federal
7     upper limits are certainly an important part of
8     looking at any Medicaid reimbursement structure for
9     generic drugs. And I would trust that Alabama has
10    respected and followed those federal upper limits when   10:
11    reimbursing for generic drugs. But I don't know the
12    details of Alabama's formula and certainly not over a
13    long period of time.
14    MR. RANKIN:
15 Q. Would you agree that across the 50 states   10:
16    the average wholesale price reported by the
17    manufacturers is also an important factor in the
18    calculation of reimbursements by state Medicaid
19    agencies?
20    MR. ESCOBAR: Objection to the form. And in   10:
21    fact, I think that is both incorrect and overstates
22    the point that I think you're trying to make. So I
23    think that's an improper question.

Page 47

1  A. That's not my understanding.
2     MR. RANKIN:
3  Q. So you don't think that the reported average
4     wholesale price of the various drugs manufactured by
5     companies in the United States and reported by those   10:
6     companies has any bearing on the reimbursement
7     process?
8  A. Are we talking about generic drugs?
9     MR. ESCOBAR: Excuse me. Objection to the
10    form. And again -- first of all, now you're asking   10:
11    him about all 50 states for a 15-year period. And I
12    think the way you're describing it, it also
13    incorrectly describes the reimbursement programs not
14    only in Alabama but in other states. So I would
15    object to the question on that and other grounds.   10:
16    MR. RANKIN:
17 Q. Do you know sitting here today, sir, whether
18    or not the average wholesale price published by Mylan
19    for its drugs has anything to do at all with Alabama's
20    reimbursement calculations?                          10:
21    MR. ESCOBAR: Objection to the form.
22 A. Mylan doesn't publish AWPs. There are
23    pricing publications that report AWPs. So I have an

Page 48
1   issue with that part of your question. But it's also
2   my understanding, as I've said, that reimbursement by
3   the Medicaid program for generic drugs, which is far
4   and away what we sell, would be subject to federal
5   upper limits in many, if not all, situations where            10:
6   there are multiple generic suppliers out there. And
7   that FUL would operate as a cap and I believe take the
8   AWP completely out of the picture if it were even in
9   the picture in the first place. I don't know how
10  Alabama has designed its program to reimburse for             10:
11  generic drugs, if it's based on AWPs or WACs or
12  something else entirely. I just don't know.
13  MR. RANKIN:
14 Q. You mentioned that Mylan doesn't report any
15  average wholesale price information?                          10:
16  MR. ESCOBAR: Objection to the form.
17 A. Publish. Publish I said.
18  MR. RANKIN:
19 Q. Publish. Do you agree that Mylan has since
20  1991 reported average wholesale price information?            10:
21 A. Mylan communicates an AWP number for its
22  products to a company like First Data Bank. There's a
23  process, sort of a back and forth sometimes, for the

Page 49
1   Mylan product. But it's First Data Bank that
2   ultimately publishes an AWP for that drug.
3 Q. Let me ask you the same question about
4   wholesale acquisition cost. Has Mylan since 1991 also
5   reported to First Data Bank pricing information              10:
6   described as wholesale acquisition cost of the drugs
7   manufactured or sold by Mylan?
8   MR. ESCOBAR: Objection to the form.
9 A. I can't answer it categorically that for
10  every drug that we've ever sold we have definitely           10:
11  reported a W-A-C, or a WAC, to First Data Bank. But
12  generally speaking, that is a number that we would
13  report to First Data Bank.
14  MR. RANKIN:
15 Q. And do you understand, sir, that First Data   10:
16  Bank in turn reports Mylan's prices for average
17  wholesale price and wholesale acquisition cost to the
18  State of Alabama?
19  MR. ESCOBAR: Objection to the form.
20 A. I don't know whether Alabama subscribes to    10:
21  First Data Bank or not. If First Data Bank -- in
22  addition, you called them prices, and that isn't
23  necessarily accurate. WAC, for example, wholesale

Page 50
1   acquisition cost, that is an invoice price for the
2   drugs. AWP is not a price at which Mylan sells its
3   drugs to its customers. So I've got an issue with the
4   way you worded your question.
5   MR. RANKIN:                                                  10:
6 Q. Okay. Well, let's establish one thing based
7   on your last answer. You do agree with me, sir, that
8   the term "average wholesale price" is not the price at
9   which Mylan has ever sold any drugs to its customers?
10  MR. ESCOBAR: Objection to the form.                          10:
11 A. I can't be categorical about it. We've been
12  in business 45 years and we sell about 150 different
13  drugs today. So I don't know whether Mylan has sold
14  products at AWP to its customers. It's possible we
15  have at some point. But as a general matter, AWP is          10:
16  not a price at which Mylan sells Mylan's products to
17  Mylan's customers. It doesn't mean it's not a price
18  at which our products are sold downstream. The
19  pharmacy may charge AWP to its customer, for example.
20  MR. RANKIN:                                                  10:
21 Q. Okay. In addition to First Data Bank, is it
22  also true that since 1991 Mylan has published prices
23  described as average wholesale price and wholesale

Page 51
1   acquisition costs to other third-party reporting
2   services?
3   MR. ESCOBAR: Objection to the form. Again,
4   I think you used the word "published," which the
5   witness has previously noted that they don't do.             10:
6   MR. RANKIN: I'll withdraw the question.
7 Q. Do you agree, sir, that since 1991 Mylan has
8   reported prices described as average wholesale price
9   and wholesale acquisition costs to other reporting
10  services besides First Data Bank?                            10:
11 A. I've heard of a service called Red Book. I
12  believe we do send AWP and WAC information to Red
13  Book, for example. I think that's different from
14  First Data Bank.
15 Q. Yes, sir. Any other companies that you're    10:
16  aware of that Mylan reports those numbers to?
17 A. You're talking about companies that publish
18  these list prices?
19 Q. Yes, sir.
20 A. I've heard of Medi-Span. I don't know       10:
21  whether -- or for what period of time we may have sent
22  numbers to Medi-Span.
23 Q. Is there a group of people in your company

Page 52

1    that are responsible for reporting these prices?
2 A. At Mylan Pharmaceuticals there's a man named
3    Steve Krinke who is the person who interacts with
4    First Data Bank. He'll send them an AWP or a WAC
5    number for a product and then interact with them about
6    that.
7 Q. But is he the person, to your knowledge,
8    that takes care of this reporting of these numbers?
9 A. Mr. Krinke would be the person who sends the
10   AWP and WAC information to First Data Bank, for
11   example, and then interact with them about that
12   number.
13 Q. Is he still an employee of Mylan?
14 A. Yes, he is.
15 Q. What's his job title?
16 A. I'm sorry, I'm not sure exactly what his
17   title is. I think he's in the sales marketing area.
18 Q. Isn't it a fact, sir, that the reimbursement
19   paid by Alabama Medicaid since 1991 for Mylan drugs
20   has been calculated on the basis of reported average
21   wholesale price and wholesale acquisition costs as
22   well as some other considerations, including FUL and
23   MAC?

Page 53

1    MR. ESCOBAR: Objection to the form of the
2    question.
3 A. Like I said, I don't know the formula that
4    Alabama Medicaid has chosen to use to reimburse for
5    drugs. But I do know that in terms of generic drugs,
6    in most if not all cases there would likely be a
7    federal upper limit that would actually determine the
8    maximum amount that the Medicaid program could legally
9    reimburse for those products. And there may be some
10   lower number that Alabama has decided even below the
11   federal upper limits.
12   MR. RANKIN:
13 Q. Do you know whether or not at any time since
14   1991 Alabama has considered reported average wholesale
15   price or wholesale acquisition costs in calculating
16   any single reimbursement the State of Alabama has ever
17   made --
18   MR. ESCOBAR: Objection to form.
19   MR. RANKIN:
20 Q. -- for Medicaid?
21   MR. ESCOBAR: Objection to the form. And I
22   restate my objection that I think this is not within
23   the topics that you outlined. So I think again we're

Page 54

1    veering away from what the deposition is about.
2 A. Sir, I never worked for Alabama Medicaid. I
3    can't possibly answer a question about what Alabama
4    Medicaid has ever considered doing with respect to
5    anybody's product over a 15-year period of time. I
6    just can't answer a question like that. I'm sorry,
7    sir.
8    MR. RANKIN:
9 Q. That wasn't the question I asked.
10 A. That's the way I understood it.
11 Q. Okay. I'll withdraw the question. Here's
12   my question: Are you telling me here on behalf of the
13   three Mylan entities that are here for 30(b)(6)
14   deposition that you have no information whatsoever
15   that would point to the conclusion that the State of
16   Alabama has ever used either average wholesale price
17   or wholesale acquisition costs reported by Mylan in
18   connection with any reimbursement transaction?
19   MR. ESCOBAR: Objection to the form of the
20   question. I think now you're ignoring his prior
21   answers. You're veering from the topics. And I think
22   you're asking the question in a way that's intended to
23   create some issue that is not even part of the

Page 55

1    deposition notice, Mr. Rankin. So I think, again,
2    particularly given that this is a 30(b)(6) deposition,
3    the witness is here to address specific topics. So
4    I'd urge you to stick to the topics. But I think the
5    question is objectionable beyond that.
6    MR. RANKIN:
7 Q. Can you answer the question?
8 A. I don't think I can. It's very confusing to
9    me the way you've put it.
10 Q. Okay. I don't want you to be confused. I
11   want you to be totally unconfused and clear. Is it
12   your testimony, sir, based on your knowledge as the
13   30(b)(6) witness in this case for Mylan that the
14   reported numbers that Mylan has reported since 1991
15   for average wholesale price and wholesale acquisition
16   cost have not played any part in the amount that
17   Alabama has reimbursed from Medicaid?
18   MR. ESCOBAR: Objection to the form of the
19   question for the reasons I've stayed.
20 A. My testimony is that I don't know how
21   Alabama has chosen to design its program to reimburse
22   for generic drugs in its Medicaid program. And I
23   certainly don't know what that formula has been over a

Page 56

1   long period of time. But I do have a general
2   understanding that there would be other factors that
3   you didn't list in your question, importantly the
4   federal upper limits that would provide a cap on what
5   Alabama Medicaid could lawfully reimburse pharmacies        10:
6   for generic drugs.
7   So my testimony, I think, is what it's been
8   and it's not necessarily what you said in your
9   question. So no, I don't agree with you that my
10  testimony is what you said it is.                           10:
11  MR. ESCOBAR: Mr. Rankin, let me just also
12  note I think the questions you're asking relate to how
13  Alabama has paid claims over a 15-year period for many
14  drugs, including many Mylan drugs. And that is
15  information that would be more on your end of the           10:
16  table than it would be on ours. It's a subject of
17  discovery that we've undertaken. I know we have not
18  received the claim information to even be able to even
19  look at that. So I just note that because I think
20  again we're veering to topics that are not part of the      10:
21  deposition.
22  MR. RANKIN: I'm not interested for the
23  purpose of this deposition in what Alabama knows or

Page 57

1   doesn't know. I'm interested for the purpose of this
2   deposition in what Mylan knows or doesn't know about
3   the reimbursement process in the state of Alabama.
4   MR. ESCOBAR: On that score I would say
5   there is not -- and it certainly would have been easy       10:
6   enough, I suppose, to put in a request that said one
7   of the topics was Mylan's knowledge of the
8   reimbursement process in Alabama. And there is no
9   such topic here. So again, we're going to a topic
10  that's not in the notice.                                   10:
11  MR. RANKIN:
12 Q. Do you agree, sir, that in order to be
13  eligible for the drugs that it sells to be reimbursed
14  by any state Medicaid agency, including Alabama, a
15  drug manufacturer like Mylan has to enter a contract        10:
16  with the federal government?
17  MR. ESCOBAR: Objection to the form.
18 A. I believe for our products to be eligible
19  for reimbursement under Medicaid, we are required to
20  enter into a Medicaid Drug Rebate Agreement with --         10:
21  it's actually with HCFA and it's now CMS. And both
22  Mylan Pharmaceuticals and UDL have entered into
23  agreements like that with the government.

Page 58

1   MR. RANKIN:
2 Q. And do you also agree that a manufacturer
3   such as Mylan has the option to either enter that
4   agreement or not enter that agreement?
5   MR. ESCOBAR: Objection to the form.          10:
6 A. I think it's a requirement to enter into the
7   agreement in order to have our drugs be eligible for
8   reimbursement by Medicaid or eligible for purchase by
9   the federal government and its various programs such
10  as the Veterans Administration Health Care Program and     10:
11  so on. So in a sense, I suppose that's true that in
12  1991 any company could have said we don't want to sign
13  an agreement like that.
14  We did sign the agreement. And the
15  agreement -- the agreement really deals with Medicaid      10:
16  rebates that we're paying to the states, and that's
17  the principal object in that agreement.
18  MR. RANKIN:
19 Q. But you have just testified, I just want to
20  confirm, that every year since 1991 the Mylan entities     10:
21  that you're here to testify on behalf of have entered
22  into that contract with CNS?
23  MR. ESCOBAR: Objection to the form.

Page 59

1 A. No. I'm not sure when we signed the
2   contract, but it would have been near the beginning of
3   the Medicaid rebate program, which I think was passed
4   into law in 1990. I don't think there's an annual
5   process of signing that contract every year. I think       10:
6   there's one contract that continues in effect. I'd
7   have to look back at the agreement to know for sure.
8   MR. RANKIN:
9 Q. But either it's an annual process or the
10  contract covers the whole period, but Mylan has been       10:
11  covered by this contract ever since 1991; do you agree
12  with that?
13  MR. ESCOBAR: Objection to the form.
14 A. Again, I don't remember when -- I'm not sure
15  precisely what year we signed it.                           10:
16  MR. RANKIN:
17 Q. It might have been '92, but some early year
18  in the '90s; do you agree with that?
19 A. I know that Mylan Pharmaceuticals and UDL
20  are parties to Medicaid Drug Rebate Agreements with        10:
21  the federal government, and I believe those agreements
22  have been in place since the early 1990s.
23 Q. And Mylan entered into that contract because

Page 64

1  these drugs over the period of time that you've been
2  asking me about that there probably would have been
3  federal upper limits in place for most of them. I
4  can't say there's always been a FUL at all times for
5  every one of these drugs. There could have been. I'm
6  just not sure.
7  MR. RANKIN:
8  Q. And who calculated this FUL, federal upper
9  limit?
10 A. I believe CMS, the federal government does
11 that.
12 Q. And are you aware of the factors that go
13 into the calculation of federal upper limit by CMS?
14 MR. ESCOBAR: Objection to the form. Again,
15 it's not a topic that's in the notice. But Mr. Roman
16 can answer that individually.
17 A. Yeah. There may be others at Mylan who know
18 more specifics about how FULs are calculated. There
19 may not be. I can give you my personal understanding
20 of it, is that an FUL will come into place when
21 they're -- I think it's when there's three
22 manufacturers of a generic drug. And CMS will
23 calculate or just determine what the federal upper

Page 65

1  limit is.
2  MR. RANKIN:
3  Q. And is it a fact that in making that
4  calculation CMS would include among other factors the
5  reported average wholesale price and the reported
6  wholesale acquisition cost?
7  MR. ESCOBAR: Objection to the form. I
8  don't think that's accurate based on what the statutes
9  provide.
10 MR. RANKIN: Excuse me, sir. I don't mean
11 to interrupt you. But we're under the Alabama Rules
12 of Civil Procedure. If you would kindly stick to
13 object to the form of the question. And if you have
14 an issue that needs to be taken up with the special
15 masters, they're kind of standing by and can help us
16 out. Will that be all right with you?
17 MR. ESCOBAR: That's fine with me. I just
18 noticed at some points you're summarizing federal
19 statutes and I don't think you're summarizing them
20 correctly. So I can't let a line of questioning
21 continue if I think the summary that you provided of a
22 statutory provision is incorrect. But I'll try to
23 limit myself as much as possible. And hopefully I

Page 66

1  won't have to speak at all.
2  MR. RANKIN: Good. Thank you.
3  Q. Do you know whether or not CMS in
4  calculating the federal upper limit has ever paid any
5  attention to the reported prices that we have
6  described as wholesale acquisition cost or average
7  wholesale price?
8  MR. ESCOBAR: Objection to the form.
9  A. I don't know the formula that CMS applies in
10 calculating the federal upper limits. But I do
11 believe that it's some process -- it would involve
12 multiple manufacturers and that they may well take
13 into account something like a WAC price. But I'm not
14 sure.
15 MR. RANKIN:
16 Q. Is there anybody at Mylan that because of
17 their job description and duties would know more about
18 how Alabama calculates its reimbursements than you do?
19 A. I don't know.
20 Q. Now, you mentioned that in the reporting of
21 prices to First Data Bank that there has been from
22 time to time -- I believe you used the phrase a back
23 and forth process.

Page 67

1  A. Yes.
2  Q. Would you tell me what you mean?
3  A. Sure. When Mylan launches a generic drug,
4  by definition there's already been a branded drug
5  that's been out there in the marketplace for some
6  amount of time. Maybe the patent expired and we're
7  going to start selling a generic version. We will
8  report to the publishing company, we'll send them a
9  number that's an AWP number that is lower than the
10 branded AWP, which is a pre-existing number out there
11 in the marketplace that is intended to get our drug
12 classified by First Data Bank as a generic drug
13 eligible for substitution. And there are times when
14 we will report an AWP to First Data Bank and they'll
15 tell us: Well, okay, if that's your AWP, you're not a
16 generic drug. And if this is a generic drug and we
17 intend for it to be sold and used as a generic drug,
18 there could be a back and forth where then we would
19 send a different AWP number. And then First Data Bank
20 would tell us: Okay, now you are classified as a
21 generic drug. So that's the sort of back and forth
22 that sometimes occurs.
23 Q. To your knowledge, would that back and forth

Page 68

1   kind of process relate to any other subject matter
2   than seeing to it that your generic drug is properly
3   categorized as generic?
4 A. The process that I just described relates to
5   getting the drug classified as a generic.
6 Q. And are you aware of any other instances or
7   types of back and forth process on these reported
8   numbers between Mylan and First Data Bank?
9 A. Not in terms of the specific back and forth
10  about that AWP. But I should note that the number
11  that we send to First Data Bank isn't necessarily the
12  number that they will ultimately publish as the AWP.
13  Sometimes they do their own whatever they do, and I'm
14  not sure what it is in terms of whether it's a market
15  survey or something like that. And they may end up
16  publishing an AWP that is a different number than what
17  we sent in. But in terms of a specific back and forth
18  with them, it's along the lines of getting a drug
19  classified as a generic.
20 Q. I'll ask you some more about that later.
21  Let me ask you this: Is the wholesale acquisition
22  cost reported number by Mylan a price at which Mylan
23  has ever sold drugs to any of its wholesale customers?

Page 69

1 A. Yes.
2 Q. Has Mylan at any time in its history sold to
3   wholesalers at a price lower than the wholesale
4   acquisition cost as reported?
5   MR. ESCOBAR: Objection to the form.
6 A. Let me tell you how it works. When we sell
7   drugs to a wholesaler, we will invoice them at WAC,
8   which is the wholesale acquisition cost for the drug.
9   Wholesalers don't dispense drugs to the public. They
10  resell the drugs to pharmacies or hospitals or other
11  -- sometimes to other wholesalers. So when they do
12  that, there are sometimes -- in fact, pretty often
13  they will sell the drug to a company that we have a
14  contract with where in our contract with that other
15  company we have said: Hey, our drug is available at
16  this wholesaler. We won't ship it to you, go get it
17  from the wholesaler. And when you do, here's what
18  your price will be.
19  And if the price to that customer is lower
20  than WAC, then the customer getting the drug pays that
21  agreed-upon price to the wholesaler. Well, if the
22  wholesaler has paid us WAC and got less than WAC, the
23  wholesaler will then send what's called a chargeback

Page 70

1   to Mylan to credit them the difference to make sure
2   that the wholesaler has been kept whole in that
3   process. So once you net out a chargeback, for
4   example, you could say that the wholesaler didn't end
5   up paying WAC ultimately for the drug.
6   Now, there's also other forms -- or other
7   features of these agreements with the wholesalers like
8   prompt pay discounts. If they pay us within 60 days,
9   for example, they can get a 2 percent prompt pay
10  discount that gets put in the mix. There are other
11  forms of incentive rebates and things of that nature
12  that get built into these agreements with the
13  wholesalers that ultimately in a net kind of a way
14  bring the price the wholesaler paid down below WAC.
15  But we do actually charge WAC and invoice at WAC as
16  part of those transactions.
17  MR. RANKIN:
18 Q. You mentioned that there are other types of
19  incentives other than the ones that you've already
20  testified to. What are they?
21 A. The ones I'm aware of would be an incentive
22  rebate. I should say these differ from wholesaler to
23  wholesaler and they have also differed over time. And

Page 71

1   they'd also be different from Mylan to UDL. So just
2   take this as a general sort of statement of what I
3   would understand the different types of incentives to
4   be.
5 Q. Okay.
6 A. We may have in an agreement that if the
7   wholesaler sells a certain amount of our product, that
8   they can earn an incentive rebate based on the volume
9   that they've sold. If they sell 1,000 bottles of a
10  particular product, then they can earn a certain
11  percent rebate on those sales in an aggregate kind of
12  a way.
13  Wholesalers have the ability to and do
14  promote products to their customers. And you can see
15  arrangements in these agreements for promotional
16  allowances, for example, where if a wholesaler agrees
17  to run a special promotion on our product, on a
18  particular product or group of products, we would pay
19  them an incentive to do that, pick up the cost of that
20  promotion or something, and that ends up increasing
21  the sales. Those are the ones that come to mind.
22 Q. Is there such a thing as a market share
23  rebate?

Page 80

1  Medicaid agencies don't have access to price
2  information.
3  MR. RANKIN:
4  Q. Isn't it a fact that your company goes to a
5  great deal of effort to conceal its prices from the
6  public?
7  MR. ESCOBAR: Objection to the form.
8  A. No, sir. We operate in a very competitive
9  environment where for generic drugs you'll have
10 multiple companies, multiple generic companies
11 competing against each other pretty vigorously for the
12 same business at these wholesalers and retail chains.
13 And to some extent certainly it wouldn't be good for
14 -- it wouldn't be a good idea to have our competitors
15 know exactly what we're selling our drug to our
16 customers at because then that could give our
17 competitors an unfair competitive advantage. So to
18 the extent we have confidentiality provisions in our
19 agreements and so on, that's what we're aiming to
20 protect.
21 But no, I wouldn't say there's any effort to
22 conceal our prices from the public. In fact, when
23 we've received requests from the government for fully

Page 81

1  discounted price information -- for example, we got a
2  request a couple of years ago from a Congressional
3  committee, it was a completely voluntary request,
4  didn't get a subpoena, and they asked us for this very
5  proprietary pricing information and we provided it
6  voluntarily.
7  In addition, every three months we report to
8  the federal government our fully discounted average
9  manufacturer prices for the drugs that we sell and now
10 we're reporting average sales prices, ASP, under
11 current law. So those are things that we report to
12 the government agency, which is the public, on a very
13 regular and consistent basis.
14 MR. RANKIN:
15 Q. Isn't it a fact that AMP by statute is
16 confidential?
17 MR. ESCOBAR: Objection to the form.
18 A. Well, I believe that the AMP numbers that go
19 into CMS -- yeah, when Congress passed that law, I'm
20 sure Congress recognized that it's not a great idea to
21 have pricing information publicly available between
22 competitors. You could have all kinds of competitive
23 problems that come out of doing something like that.

Page 82

1  But when we pay the rebates, it's a matter
2  of fairly simple arithmetic to determine what that AMP
3  was per unit based on the amount of rebate that's paid
4  because the formula is pretty straightforward. On a
5  generic drug it's 11 percent of AMP.
6  MR. RANKIN:
7  Q. You're in a competitive business with other
8  companies that are trying to outsell you on all these
9  drugs; right?
10 A. Right.
11 Q. And you don't want those other companies to
12 know your price if you can help it; isn't that right?
13 MR. ESCOBAR: Object to the form.
14 A. Well, I don't think in any business you'd
15 want your competitor to know exactly what you were
16 selling your product for to your customer. And I
17 think for a lot it reasons across a lot of industries
18 that's very common. That's not something that you
19 would want your competitors to have.
20 I'd also add, though, that there are pricing
21 services. There's one called IMS Health that you can
22 subscribe to and many people subscribe to that -- and
23 again, I'm not exactly sure how IMS Health does what

Page 83

1  they do. But they go out and they survey drug
2  wholesalers and people who are buying drugs at the
3  wholesale level, and they will report market price
4  information for drugs, on a drug-by-drug basis. And
5  that's something that's available by subscription.
6  So there are a number of ways out there that
7  if somebody is interested in knowing what -- getting
8  some market information about what a price is, they
9  could get it. I also believe there are some states
10 that require pharmacies to tell them what they paid
11 for a drug.
12 So I think there's a lot of ways out there
13 that fully discounted prices could be and are
14 reported.
15 MR. RANKIN:
16 Q. I'll get back to my question. Isn't it a
17 fact that Mylan as part of its sales strategy does
18 what it can to keep these prices confidential?
19 MR. ESCOBAR: Objection to the form. Asked
20 and answered.
21 A. No, sir. I just gave you an explanation
22 about that that I can certainly go through again.
23 What we do is the prices that we negotiate with our

Page 104

1  MR. RANKIN:
2  Q. Yeah. Who wouldn't?
3  A. -- then they may decide that they want to
4  design their formula in a way that they're building in
5  there an incentive to the pharmacist to dispense
6  generic drugs instead of the brand name equivalents.
7  And so to do that they may consciously design a
8  program in a way that drives generic utilization, that
9  gives the pharmacist a financial incentive to say I'm
10 better off as a pharmacist dispensing the generic
11 drug. And that that could be a conscious decision
12 made by a Medicaid administrator that would make
13 sense.
14 Q. Okay. Do you agree that First Data Bank
15 does not create the price numbers that it publishes
16 for average wholesale price and wholesale acquisition
17 cost?
18 MR. ESCOBAR: Objection to the form.
19 A. I don't know how First Data Bank does what
20 they do. I know that we send numbers in to First Data
21 Bank, but I believe that the numbers we send in are
22 not invariably or necessarily the numbers that they
23 publish.

Page 105

1  MR. RANKIN:
2  Q. Who in your company is the person most
3  knowledgeable about that? Would that be Mr. Krinke?
4  A. I think Mr. Krinke would be knowledgeable
5  about the process of sending the numbers in to First
6  Data Bank. I don't know whether Mr. Krinke then looks
7  at what First Data Bank publishes and compares it to
8  what we sent. I don't know whether he does that. So
9  I don't know whether there's anybody in our company
10 more knowledgeable about how often that's occurred or
11 why.
12 Q. Do you know whether there's ever been any
13 instance since 1991 when First Data Bank published an
14 average wholesale price or a wholesale acquisition
15 cost different than that reported to them by Mylan for
16 one of Mylan's drugs?
17 MR. ESCOBAR: Objection to the form.
18 A. That's not anything I've looked into.
19 MR. RANKIN:
20 Q. But you do agree that that's covered by the
21 categories in our notice?
22 MR. ESCOBAR: I'm sorry. What is covered?
23 MR. RANKIN: The question I just asked.

Page 106

1  MR. ESCOBAR: I don't understand.
2  THE WITNESS: I don't either.
3  MR. RANKIN:
4  Q. I asked whether or not you were aware of any
5  instance in which the price published by First Data
6  Bank was different than the price reported by Mylan to
7  First Data Bank for either AWP or WAC.
8  MR. ESCOBAR: Objection to the form. I
9  don't think that specific question is something that's
10 in the notice.
11 MR. RANKIN:
12 Q. I'm looking at item number 9: Regarding
13 your drugs, the calculation of and reporting to First
14 Data Bank and/or Red Book of AWP, WAC, direct price
15 and all other pricing information bearing different
16 nomenclature.
17 MR. ESCOBAR: And he's testified about
18 that. You asked him questions about that and he's
19 testified about that.
20 A. And I am prepared to testify about that.
21 But in order to answer a question about whether
22 something is in or out of the scope of the notice, I
23 think you're really now asking for a position about

Page 107

1  the interpretation of the rules of civil procedure as
2  they apply to the questions you're asking. And I'm
3  going to have to refer that to my lawyer.
4  MR. RANKIN:
5  Q. I'm not really asking that at all. I'm just
6  asking whether you know whether there's ever been a
7  penny difference between any price reported by Mylan
8  to First Data Bank and the price that First Data Bank
9  published. That's what I'm asking.
10 A. That's a different question. You're asking
11 now what was --
12 Q. Okay. Forget about all the other ones.
13 Just answer that one, please.
14 A. Ready?
15 Q. Yes, sir.
16 A. Okay. To prepare for this deposition, I
17 didn't go back through and compare -- and I don't know
18 that anybody has ever done this or really could do
19 this in any reasonable sense. We sell about 150
20 products. We've been in business for 45 years. There
21 undoubtedly have been a lot of instances where we've
22 sent information along to First Data Bank. You could
23 go back, then, and look at whether a number that was

Page 108

1  reported at a particular point in time by First Data
2  Bank for a particular Mylan drug matched up with the
3  most recent notice sent to First Data Bank. That's
4  not anything that I've ever undertaken to do or would
5  have any reason to do that in the ordinary course of          11:
6  our business and don't really think that's a
7  reasonable thing to have asked anybody to do for this
8  exercise. And so my answer is no, sitting here today,
9  I can't tell you that I've gone back through, matched
10 them up and determined whether they're all the same,          11:
11 all different, some the same, some different over a
12 very long period of time. But it is my general
13 understanding, and I have heard during the course of
14 working at Mylan, that there are times when the number
15 that gets published by these publishers isn't the same        11:
16 as the number that we sent them.
17 Q. Well, let's concentrate on that for a
18    moment, if we could.
19    MR. ESCOBAR: I have to note here that we
20    have objected to the way these things are framed. So       11:
21    I'd just reference those objections.
22    MR. RANKIN:
23 Q. Let's concentrate on that for a minute.

Page 109

1  Does Mylan have a contract with First Data Bank?
2 A. I don't know.
3 Q. Does Mylan have any understanding with First
4    Data Bank about the extent to which First Data Bank is
5    going to modify in any way the numbers reported by         11:
6    Mylan?
7    MR. ESCOBAR: Objection to the form.
8 A. Not to my knowledge.
9    MR. RANKIN:
10 Q. Are you aware of any particular instance in            11:
11    which any of these numbers have been modified other
12    than just being published in the form that they were
13    originally communicated by Mylan to First Data Bank?
14 A. Like I said, I've never gone back through to
15    look at all of the notifications that would have been    11:
16    sent over a long period of time for all of the 150 or
17    so products that we sell and match them up with the
18    number that was published by First Data Bank. But I
19    have heard in a general sense that the numbers that we
20    send are not necessarily the numbers that are           11:
21    published by First Data Bank. That's not anything
22    that I've followed up on to say, okay, well what drug,
23    in what year and when did that occur. So I don't

Page 110

1  know.
2 Q. Well, it does have to do, does it not, sir,
3    with the role played by First Data Bank in this whole
4    process? Is it your understanding that First Data
5    Bank exercises any sort of obligation to review the      11:
6    numbers that Mylan is reporting and change them for
7    any particular reason?
8    MR. ESCOBAR: Objection to the form.
9 A. I have heard that First Data Bank doesn't
10   always publish the same number that we send them. I     11:
11   don't know how First Data Bank does what they do or
12   why they do what they do or what they feel their
13   obligations may be to do what it is they do. And
14   that's not something, truthfully, how First Data Bank
15   goes about publishing numbers, that Mylan has           11:
16   knowledge about or that I'm here and able to testify
17   about as a representative of Mylan. But again, I have
18   heard in different contexts that First Data Bank
19   doesn't always publish the same number that we send
20   in.                                                     11:
21   MR. RANKIN:
22 Q. Well, if First Data Bank made a routine
23   practice of taking Mylan's reported, say, wholesale

Page 111

1   acquisition cost number and publishing 10 percent of
2   that as your wholesale acquisition cost, that would
3   make a difference to your business, wouldn't it?
4   MR. ESCOBAR: Objection to the form.
5 A. I never thought about that.                             11:
6   MR. RANKIN:
7 Q. How about thinking about it now.
8   MR. ESCOBAR: I don't think that's an
9   appropriate question to pose to the witness at this
10  deposition. You're asking a hypothetical.                11:
11  MR. RANKIN: I withdraw the question.
12 Q. You, Mylan, do not expect First Data Bank to
13  be changing your reported numbers as a part of their
14  normal business processes, do you?
15  MR. ESCOBAR: Objection to the form. He     11:
16  explained to you at some length the interaction with
17  First Data Bank. So I think it's a little bit unfair
18  when you're going back to those questions.
19  MR. RANKIN: Sir, do you remember my
20  commentary about the objections? If you've got a        11:
21  problem, please just object to the form of the
22  question. And if we need to call the special master,
23  they're sitting there waiting.

Page 132

1    Pharmaceuticals, and that pricing committee gets input
2    from sales.
3    MR. RANKIN:
4 Q. Okay. Who's on the pricing committee?
5    MR. ESCOBAR: Mr. Rankin, are we talking        01:
6    about a specific period of time?
7    MR. RANKIN: Since he started in 2003, let's
8    talk about 2003 until now.
9    MR. ESCOBAR: I don't know that he started
10   in 2003. I just want to make sure that we're talking   01:
11   about -- that we all understand what periods of time
12   since you're covering many years.
13 A. The pricing committee, I think, was formed
14   in 2005. Go ahead.
15   MR. RANKIN:                                    01:
16 Q. I didn't mean to interrupt you. Sorry.
17 A. The pricing committee at Mylan
18   Pharmaceuticals has representation on it from pricing
19   and contracts, from legal, from corporate compliance,
20   from sales, from corporate finance, and also more   01:
21   recently the manager of government pricing is involved
22   in that. I don't know if that's exactly his title,
23   but he is the guy who manages the process of the AMP

Page 133

1    calculations and submissions and so on. Those
2    different groups have representation on the
3    committee.
4    Right now at Mylan Pharmaceuticals -- I
5    didn't memorize the list of who's on that, but I know   01:
6    Hal Korman, who's the president of Mylan
7    Pharmaceuticals, is on the pricing committee. I
8    believe Joe Duda, D-U-D-A, who is the manager or
9    director of pricing and contracts, is on that
10   committee. Vince Suneja is an attorney on the   01:
11   committee. Jim Abrams is the government pricing
12   person. From the sales and marketing side, I believe
13   Bob Potter is on the committee. I'm not positive
14   about that. And I believe corporate compliance has
15   representation from time to time. Corporate    01:
16   compliance is -- we have a chief compliance officer
17   named Roger Foster. I'm not sure whether Roger
18   attends all those meetings or is formally a part of
19   that committee, but from time to time he can get
20   involved in those.                             01:
21 Q. Corporate compliance with what?
22 A. You're asking what does corporate compliance
23   mean?

Page 134

1 Q. What does corporate compliance see to it
2    that the corporation complies to?
3 A. Laws, regulations, ethics, things of that
4    nature, our own code of ethics, standards for
5    interactions with health care providers. They exist   01:
6    to ensure that our people are following the policies
7    and procedures that have been set out to make sure
8    that we do business in accordance with the law.
9 Q. All right. Did you say who was on this
10   committee from sales?                          01:
11 A. I think Bob Potter has both the sales and
12   marketing side. There may be additional marketing
13   representatives. I'm sorry, I don't know exactly
14   where these guys are slotted in the organizational
15   chart today. But I think there's a couple of fellows   01:
16   like Mike Hatch and Dave Workman who participate and
17   may be members of that committee.
18 Q. So Mylan has a sales and a marketing
19   department that are separate?
20 A. Yes. Although right now they're both   01:
21   reporting to the same vice president, Bob Potter.
22 Q. What's the purpose of the pricing committee?
23 A. I know there's a formal charter for the

Page 135

1    pricing committee that states what its purpose is. I
2    don't think I've ever read that charter, so I wouldn't
3    want to try to paraphrase something I haven't read.
4    But I can tell you what it does.
5 Q. It has something to do with pricing; right?   01:
6 A. Yeah. Some of the things that committee
7    does include if we're going to launch a new product,
8    the salespeople and the pricing and contracts group
9    need to have some authority, some ranges of authority
10   about the prices at which we are prepared to sell   01:
11   products. And the pricing committee will set a price
12   floor, for example, where if the price in the
13   marketplace hits that price floor, then the
14   salespeople in pricing and contracts would need to
15   come back and get additional authority so that a   01:
16   decision could be made whether we would want to sell
17   the product at a lower price and try to get the
18   business or walk away from the business, for example.
19   It also exists to ensure communication among the
20   various functional groups like corporate finance, for   01:
21   example. Corporate finance has an interest in knowing
22   if we entered into -- or if we're contemplating
23   entering into an arrangement with a customer for a

Page 136

1   large volume of product at a particular price. That
2   can impact their forecasting and their assumptions
3   about financial performance.
4 Q. Who is the corporate finance guy that's
5   involved in this?                              01:
6   MR. ESCOBAR: Objection to the form. You
7   mean the corporate finance person on the pricing
8   committee?
9   MR. RANKIN: Sorry. Withdraw the question.
10 Q. Who's the corporate finance person who sits    01:
11  on the pricing committee?
12 A. I think that's changed recently. I know
13  that there is a guy, Jim Mastakas, who's no longer
14  with us who participated in that. And right now I'm
15  not sure if it's Gary Sphar or Bob Tighe or Katrina  01:
16  Adams or all three. But it's usually one of those
17  people who would be there.
18 Q. How do you spell Mr. Mastakas last name?
19 A. M-A-S-T-A-K-A-S.
20 Q. Where does he work now?                      01:
21 A. He works for Sandoz Pharmaceuticals.
22 Q. How did the pricing committee come to be
23  formed in 2005 when Mylan has been in business for 40

Page 137

1   years without a pricing committee?
2   MR. ESCOBAR: Objection to the form.
3   MR. RANKIN: Withdraw the question.
4 Q. Why did Mylan start a pricing committee in
5   2005?                                          01:
6 A. I don't know the answer to that. My
7   understanding is the pricing committee exists to
8   ensure there is clear guidance given to the sales and
9   pricing contracts groups about the authority that they
10  have and to ensure that there is clear communication  01:
11  among the different operational arms of the company
12  about pricing decisions that are being made on a
13  day-to-day basis and that it ties in with our overall
14  efforts to have solid financial controls about the
15  operations of the company, that there is a compliance  01:
16  aspect to it as well. And all of that is in the mix.
17  But I should add, too, that the charter may state a
18  purpose as well, and I haven't read that charter, so I
19  can't --
20 Q. Is the pricing committee concerned with      01:
21  Mylan's competition for the various drugs it's
22  considering?
23  MR. ESCOBAR: Objection to the form.

Page 138

1 A. Well, competition -- all of the products
2   that we sell face competition. And competition
3   ultimately determines the prices at which we sell.
4   And so, yeah, the committee will take into account
5   facts about what's going on in the marketplace and who  01:
6   the competitors are or where the pricing seems to be
7   headed for the product as appropriate.
8   MR. RANKIN:
9 Q. As a part of Mylan's normal business
10  processes, does Mylan attempt to keep up with the  01:
11  prices being charged by its competition for the drugs
12  competing with Mylan's drugs?
13  MR. ESCOBAR: Object to the form.
14 A. What do you mean by keep up with?
15  MR. RANKIN:                                   01:
16 Q. Keep track of, learn, know.
17 A. Well, we're trying to get the business of
18  our customers, and our customers more often than not
19  buy on price. So we will find out from our customers
20  from time to time that another company -- they may not  01:
21  always tell us who -- has offered the drug to them at
22  a lower price than what we're charging today, and
23  they'll ask us if we want to meet that or beat it. So

Page 139

1   it can come up that way, sure.
2 Q. Is there anybody in the Mylan organization
3   whose job it is to monitor the prices being charged
4   for competitive drugs that are in the marketplace?
5   MR. ESCOBAR: Objection to the form.        01:
6 A. I don't believe so. But market intelligence
7   that we can get will factor into decisions that we're
8   making or forecasts we're making about future products
9   and within the bounds of what you can legally do in
10  terms of finding out pricing information. For  01:
11  example, if a customer wants to tell us that they're
12  buying a drug for a particular price, that could be a
13  good source of information. We can look at the IMS
14  data that I mentioned earlier and find out what the
15  price is in the marketplace for a drug.        01:
16  So there are things that we can do to
17  determine what price levels are out there in the
18  marketplace and then we will factor that into our
19  decision. But there's nobody whose primary or sole
20  job within the company it is to do that kind of thing.  01:
21  MR. RANKIN:
22 Q. Does Mylan routinely subscribe to IMS
23  Health?

Page 172

1  reported wholesale acquisition cost number is? Do you
2  know the answer to that question?
3  MR. ESCOBAR: Objection to the form of the
4  question.
5 A. Does Mylan know what Alabama cares about?         01:
6  MR. RANKIN:
7 Q. Whether Alabama cares about its wholesale
8  acquisition cost number.
9  MR. ESCOBAR: Objection to the form of the
10 question.                                           01:
11 A. As I've said before, your notice didn't lay
12 out anything in there about what Alabama's
13 reimbursement formulas are. So I'm not here
14 testifying about what Mylan knows or doesn't know
15 about Alabama's reimbursement formula. But let me   01:
16 finish, please. What I do understand is that the
17 state Medicaid programs have a lot of latitude to
18 design programs in a way that they want to design
19 them. They come up with different factors. There's
20 the federal upper limits. It's possible that they   01:
21 could have a WAC-based reimbursement, some formula off
22 of WAC. They may also use usual and customary prices
23 paid to the pharmacy. They're always going to be

Page 173

1  subject to the FUL if it's there. And what I've told
2  you repeatedly is, sitting here today, I don't know
3  what Alabama's current formula is or what it's been
4  over a period of time. And if it is that easy to pull
5  it off and show it to me, I'd appreciate seeing it.  02:
6  MR. RANKIN:
7 Q. Okay. Let's start with this. You say that
8  the notice hasn't given you any information that we
9  might be interested in this; is that your testimony?
10 MR. ESCOBAR: Objection to the form.           02:
11 MR. RANKIN:
12 Q. That the deposition notice doesn't mention
13 any of this subject matter.
14 MR. ESCOBAR: Why don't you point me to --
15 MR. RANKIN: Okay. Let's do that.             02:
16 MR. ESCOBAR: -- the request that talks
17 about asking the witness to come in and testify about
18 Alabama's reimbursement methodology. Where does it
19 say that?
20 MR. RANKIN:                                  02:
21 Q. Okay. Let's look at number 9: Regarding
22 your drugs, the calculation of and reporting to First
23 Data Bank and/or Red Book of AWP, WAC, direct price

Page 174

1  and all other pricing information bearing different
2  nomenclature.
3 A. Yes, sir.
4  MR. ESCOBAR: All right. He's answered the
5  questions on that. It doesn't say anything about    02:
6  Alabama's reimbursement methodology.
7  MR. RANKIN: Evidence that the prices for
8  your drugs which you reported to First Data Bank and
9  Red Book reflected actual prices based on your actual
10 sales transactions.                                 02:
11 MR. ESCOBAR: And again, there's nothing in
12 there about Alabama's reimbursement methodology.
13 MR. RANKIN:
14 Q. Okay. There was a time before you became
15 general counsel when you were the litigation lawyer 02:
16 within Mylan that was responsible for this case; isn't
17 that right?
18 A. Yes.
19 Q. And part of that, I'm sure, included reading
20 the allegations in the complaint, didn't it?        02:
21 A. I'm not going to get into what I did in
22 connection with my duties as an attorney defending
23 this litigation, sir. I think that's clearly

Page 175

1  protected by the attorney work product doctrine,
2  attorney/client privilege, and I'm not going to answer
3  that.
4 Q. Okay. So in response to having had this
5  lawsuit in some file folder at Mylan for the last 18  02:
6  months, as I understand it, you have not undertaken to
7  determine what Alabama's reimbursement formula is; is
8  that right?
9  MR. ESCOBAR: Mr. Rankin, I think we're now
10 in some kind of spinning wheels here.                02:
11 MR. RANKIN: No. I'm just totally
12 flabbergasted by an allegation that he doesn't know
13 what Alabama's reimbursement formula is.
14 MR. ESCOBAR: Look, I am flabbergasted that
15 you insist on spending a lot of time on things that  02:
16 you didn't have in the notice. This is a 30(b)(6) of
17 the institution with specific topics. There is no
18 topic in your list that says be prepared to discuss
19 the Alabama reimbursement methodology. On top of
20 that, that's a scenario that you know more about than 02:
21 probably anybody else since that's your side of the
22 case.
23 If you want the witness to talk to you right