# Exhibit G

**State of California ex rel. Ven-A-Care of the Florida Keys, Inc.
v. Abbott Laboratories, Inc., et al., Master Civil Action No. 01-12257-PBS,
Subcategory Case No. 06-11337**

Exhibit to the December 21, 2009 Declaration of Christopher C. Palermo in Support
of Defendants Mylan Inc. and Mylan Pharmaceuticals Inc's. Opposition to Plaintiffs' Motion for Partial Summary
Judgment

Page 1

```
 1         IN THE UNITED STATES DISTRICT COURT FOR THE

 2                  DISTRICT OF MASSACHUSETTS

 3           CIVIL ACTION NO. 03-CV-11865-PBS

 4     ------------------------------X

 5    THE COMMONWEALTH OF              )

 6    MASSACHUSETTS,                   )      VIDEOTAPED

 7              Plaintiff,             )    DEPOSITION UPON

 8                 v.                  )    ORAL EXAMINATION

 9    MYLAN LABORATORIES, INC.,        )          OF

10    et al.,                          )      BRIAN ROMAN

11              Defendants.            )       30(b)(6)

12    ------------------------------X

13                  C O N F I D E N T I A L

14                FOR ATTORNEYS' EYES ONLY

15         T R A N S C R I P T  of the stenographic

16    notes of G. DONAVICH, a Certified Shorthand

17    Reporter and Notary Public of the State of

18    Pennsylvania taken at the offices of AKF

19    Reporters, Inc., Court Reporting & VideoTech

20    Services, AKF Building, 436 Boulevard of the

21    Allies, Pittsburgh, Pennsylvania, on Thursday,

22    August 2, 2007, commencing at 9:14 a.m.
```

| Roman, Brian - 30(b)(6) | CONFIDENTIAL - ATTORNEYS' EYES ONLY<br>Pittsburgh, PA | August 2, 2007 |

Page 2

```
 1      APPEARANCES OF COUNSEL
 2
 3      FOR THE OFFICE OF THE ATTORNEY GENERAL:
 4
 5          Peter A. Mullin, Esq.
 6          Robert C. Molvar, Esq.
 7          One Ashburton Place
 8          Boston, MA 02108
 9          617-727-2200
10          Peter.Mullin@state.ma.us.
11
12
13      FOR THE DEFENDANT MYLAN:
14
15          William A. Escobar, ESQ.
16          KELLEY DRYE & WARREN, LLP
17          101 Park Avenue, New York 10178
18          212-808-7771
19          Wescobar@KelleyDrye.com
20
21
22
```

Page 4

```
 1                  PROCEEDINGS
 2                    - - - -
 3          THE VIDEOGRAPHER:  We're going on the
 4   record at 9:14 A.M.
 5          Today's date is August 2nd, 20007.  My
 6   name is Greg Allen.
 7          I'm a videographer for Henderson Legal
 8   Services.  The court reporter today is Glo
 9   Donavich, and here begins the videotaped
10   deposition of --
11          And I didn't actually get your name,
12   sir.
13          THE WITNESS:  It's Brian Roman.
14          THE VIDEOGRAPHER:  -- of Brian Roman
15   taken in the matter of the Commonwealth of
16   Massachusetts versus Mylan bearing case No. 03-
17   CV-11865-PBS.
18          Is that correct?
19          MR. MULLIN:  That is correct.
20          THE VIDEOGRAPHER:  Okay.  The
21   deposition is being held at 436 Boulevard of the
22   Allies, Pittsburgh, PA 15219.
```

Page 3

```
 1              I N D E X
 2
 3   WITNESS: BRIAN ROMAN, ESQ.              PAGE
 4      Direct Examination by Mr. Mullin............ 005
 5
 6              E X H I B I T S
 7   EXHIBIT       DESCRIPTION              PAGE
 8   Exhibit Roman 001-Deposition Notice............ 018
 9   Exhibit Roman 002-Drug List.................... 046
10   Exhibit Roman 003-MaMylan068835 to 069075...... 095
11   Exhibit Roman 004-MYLCA 000105 to 000106....... 162
12   Exhibit Roman 005-MYL000085 to 000087.......... 198
13   Exhibit Roman 006-MYL000095 to 000097.......... 200
14   Exhibit Roman 007-WIMYLAN011825................ 247
15   Exhibit Roman 008-MAMYLAN006286 to 006299...... 274
16
17
18
19
20
21
22
```

Page 5

```
 1          Will counsel please identify themselves
 2   for the record and state whom you represent
 3   starting with the noticing party.
 4          MR. MULLIN:  It's Peter Mullin and
 5   Robert Molvar from the attorney general's office
 6   for the Commonwealth of Massachusetts on behalf
 7   of the Commonwealth of Massachusetts.
 8          MR. ESCOBAR:  William Escobar, Kelley,
 9   Drye & Warren, on behalf of Mylan Laboratories,
10   Inc..
11          THE VIDEOGRAPHER:  Okay.  Would the
12   court reporter please swear in the witness.
13                    - - - -
14          B R I A N  R O M A N, E S Q.,
15   390 Avon Drive, Pittsburgh, Pennsylvania 15228,
16   having been first duly sworn testifies as
17   follows:
18                    - - - -
19              DIRECT EXAMINATION
20                    - - - -
21   BY MR. MULLIN:
22       Q.  Good morning, sir.
```

2 (Pages 2 to 5)

Roman, Brian - 30(b)(6)　　　　CONFIDENTIAL - ATTORNEYS' EYES ONLY　　　　August 2, 2007
Pittsburgh, PA

Page 66

1  was wondering if No. 18 was more along those
2  lines, and perhaps if the witness was addressing
3  that particular topic, he can explain some of the
4  subject areas in there that seem to relate to
5  what you're trying to get at, but I don't know.
6          MR. MULLIN:  I think that's actually a
7  different topic from our perspective.
8          MR. ESCOBAR:  Okay.
9          MR. MULLIN:  So let me just go back to
10 this for a second.
11         Are there documents or records at Mylan
12 that would list or show what various classes of
13 trade the company has used in its accounting
14 system to record sales by class or trade?
15         MR. ESCOBAR:  Objection to the form,
16 and I think that's beyond the scope.
17         THE WITNESS:  I know that our
18 accounting group follows defined methodologies
19 for classifying different sales transactions.
20         I also know for purposes of doing an
21 average manufacturer price calculation, which is
22 something we do every quarter in connection with

Page 67

1  our Medicaid drug rebate obligations, it's
2  important to be able to put the transactions into
3  particular classes of trade.
4          I know that that methodology is both
5  reflected in the functional tools that our
6  accountants use to do that work, and I believe
7  there's also a manual, if you will, that has --
8  that includes written instructions to them about
9  how to make some of those class of trade
10 determinations.
11         There may be additional documents that
12 the accountants have or have created that give
13 them further guidance or whatever, but those are
14 the ones that I know sitting here today our
15 accountants have at their disposal.
16 BY MR. MULLIN:
17     Q.  And who prepared this document?
18     A.  The Mylan Pharmaceuticals accounting
19 group.
20     Q.  And was there a particular person?
21     A.  I believe it was Beth Webber, but I
22 don't know if it was Beth who did that herself or

Page 68

1  whether she had other people working with her on
2  it.
3      Q.  What is Beth's position?
4      A.  I don't know her title, but she is a
5  fairly senior manager in the accounting group is
6  my understanding.
7      Q.  And does she have responsibility for
8  the AMP calculation?
9      A.  I think she has been involved with that
10 at different points in time.  The person who is
11 most directly responsible for AMP calculations
12 now is Jim Abrams.
13     Q.  How long has Jim been responsible for
14 AMP?
15     A.  I think Jim joined the company in 2005
16 or 2006, and he's had that responsibility since
17 he joined us.
18     Q.  Who had that prior to Jim?
19     A.  This is another one where I think you
20 had a topic about some of that, and we actually
21 have a chart that shows some of those people that
22 I would need to refer to.

Page 69

1      Q.  That would be fine.
2      A.  Thank you.
3          The AMP process included sort of three
4  different functional -- really two functional
5  processes, and then has a supervisor.
6          There were people who actually were
7  responsible for calculating the AMP, and that's
8  been a number of people throughout your relevant
9  time period starting with a woman named Michelle
10 Hintz back in 2000.
11     Q.  How do you spell the last name?
12     A.  H-I-N-T-Z.
13         That was then picked up by Jackie
14 Stempel followed by Steve Strupe, S-T-R-U-P-E;
15 and then it was Eric Sendaydiego, S-E-N-D-A-Y-D-
16 I-E-G-O; followed by Greg Demasi, D-E-M-A-S-I;
17 and I think that takes us --
18         There was one more person before Jim
19 Abrams took it over.  I believe this may be
20 outside your relevant time frame but the name is
21 Robert Laporte, L-A-P-O-R-T-E.
22         Those are the people who actually took

Page 70

1 care of filing the AMPs with the government and
2 were involved in the calculation.
3     Now, they were also supervised in that
4 process of doing the calculations, and the people
5 who have supervised that in the sort of same
6 chronological order are Gary Drenning, D-R-E-N-N-
7 I-N-G; Gary Sphar, that's S-P-H-A-R; Jim
8 Mastakas, M-A-S-T-A-K-A-S; and Beth Webber, who I
9 mentioned earlier.
10     I'm not --
11     Now that Jim Abrams is doing that, I'm
12 not sure who Jim Abrams reports directly to. I
13 think it may be to Gary Sphar who is the chief
14 financial officer at Mylan Pharmaceuticals.
15     Q. You mentioned that in addition to the
16 people who calculate, there was another function
17 or process.
18     A. Once the AMP, the A-M-P, numbers are
19 sent into the government, there's a process where
20 we have to write a rebate check to each state
21 based on the state's utilization, the number of
22 drugs, of our drugs, that they reimburse the

Page 71

1 pharmacies for; and the states give us --
2     Actually, it's sort of a three-way
3 process. The states provide that information,
4 and Mylan then gets an invoice showing the amount
5 that we need to pay to the states.
6     And that process of, you know, going
7 through utilization data and these invoices and
8 actually getting the rebates checks cut is the
9 other functional side.
10     Q. Okay. And there have been people that
11 have been responsible for that process?
12     A. Yes.
13     Q. Okay. And do you have some names
14 there?
15     A. I do.
16     Q. If you could, give us those.
17     A. For some period of time from the
18 beginning of 2000 to the beginning of 2002, the
19 same people doing the AMPs did the rebate side;
20 and that's Michelle Hintz, Jackie Stempel, and
21 Steve Strupe.
22     Starting the second quarter of 2002

Page 72

1 until the second quarter of 2003, Julie Booth was
2 handling the rebates.
3     Lisa Dublin did that for several months
4 in 2003.
5     I then have information that shows
6 there were four people involved in doing that
7 from the fourth quarter of 2003 to the second
8 quarter of 2004.
9     I don't know whether that's because two
10 people were doing it at the same time or whatnot,
11 but the four people doing it then were Lisa
12 Dublin, Erin Cage, Howard Martin, and Julie Booth
13 was again involved in that process.
14     Q. I think you said that you believed that
15 there would be a manual that would describe the
16 process that they used. Is that right?
17     A. Yes.
18     Q. And going back for a second to the
19 chart about classes of trade, the item in the
20 Notice of the Deposition asked for percentages.
21     I know we can calculate -- we could sum
22 these things and calculate them, but in general,

Page 73

1 is it generally true that little more than 50
2 percent of the company's sales are to wholesalers
3 and slightly less than 50 percent of the
4 company's sales are to -- directly to retailers?
5     MR. ESCOBAR: Objection to the form.
6     THE WITNESS: Anybody have a
7 calculator? That would make it easier.
8     In looking at these numbers, I see $551
9 million in gross sales to all classes throughout
10 this time frame of 2000 to 2004, and then $367
11 million to wholesalers.
12     That, for whatever reason in my
13 mathematically challenged brain, sounds more like
14 two-thirds to three quarters to wholesalers and
15 then most of the rest to retail, and that's $159
16 million there, and then the all other classes of
17 trade for that whole time frame adds up to $24
18 million.
19     Q. Do you have any information as to who
20 might be included in all others, what kind of
21 outlets or customers those are?
22     A. Those would be mostly hospitals and

Page 122

1  trade is aware that we have a generic product
2  available at a discount to the brand.
3      Q.  During this time period, '98 to 2003,
4  was Mylan aware that many third-party payors and
5  government programs were using First Databank
6  information for reimbursement purposes?
7      A.  I don't know whether that's true or
8  not, that many were using the First Databank
9  information for reimbursement purposes.
10         I have heard and I think there is some
11 general understanding that the information in
12 those books can be used as a benchmark in a
13 number of different commercial transactions,
14 including reimbursement transactions.
15     Q.  And Mylan was aware of that during the
16 time period 1998 to 2003?
17     A.  Aware of what I described?  Yes.
18     Q.  And was that the reason, at least one
19 of the reasons, why Mylan reported information to
20 First Databank during that time period?
21         MR. ESCOBAR:  Objection to the form.
22         THE WITNESS:  I really don't have

Page 123

1  anything to add to my earlier answers about why
2  we reported it.  We reported it to First Databank
3  so that the trades and the industry would know
4  that we had a generic version available, and it
5  was being sold at a discount to brand.
6      MR. MULLIN:  I'm asking you a different
7  question.  I'm asking you whether one of the
8  purposes for reporting price information to First
9  Databank was so that it could be used for
10 reimbursement purposes.
11     MR. ESCOBAR:  Objection to the form.
12     THE WITNESS:  What I'm saying is we're
13 communicating the information to show the trade
14 that we're available, and we're available at a
15 discount.
16         Now, there is, there was, an awareness
17 that information in those services could be used
18 as a benchmark in a lot of different types of
19 transactions, including reimbursement.
20         For example, if an insurance company
21 had agreed to reimburse a pharmacy at AWP less 30
22 percent, then it's very possible and we would

Page 124

1  know that it is possible that the insurance
2  company --
3  BY MR. MULLIN:
4      Q.  That --
5      A.  Let me finish please.
6         -- would refer to that information in
7  order to, you know, as a benchmark in that
8  transaction between them.
9      Q.  I'm not focused on how people can use
10 the information.
11         I'm focused on Mylan's purpose, why
12 Mylan was sending price information to First
13 Databank, and I'm asking whether or not one of
14 Mylan's purposes during the years '98 to 2003 for
15 sending price information to First Databank was
16 so that that information could be used by others
17 for reimbursement purposes.
18         MR. ESCOBAR:  Objection to the form,
19 and asked and answered.
20         THE WITNESS:  I don't have anything to
21 add to what I've already told you.
22         MR. MULLIN:  I don't believe you've

Page 125

1  answered that question as to whether that was one
2  of Mylan's purposes, and I would ask you to
3  answer it now.
4      MR. ESCOBAR:  Objection, and asked and
5  answered.  He told you what Mylan's purpose was,
6  and he answered the question.
7      THE WITNESS:  I did answer the
8  question, and I don't have anything to add.
9  BY MR. MULLIN:
10     Q.  You mentioned Medispan.
11     A.  Yes.
12     Q.  That's one of the reporting services
13 that Mylan reported prices to?
14     A.  I believe so.
15     Q.  And is Medispan used by any particular
16 part of the pharmaceutical industry?
17         MR. ESCOBAR:  Objection to the form.
18         THE WITNESS:  I don't know.
19 BY MR. MULLIN:
20     Q.  Was there any particular reason to
21 report prices to Medispan in addition to First
22 Databank?

Page 138

1 to apply to those three drugs?
2    A. I've been testifying generally about
3 levels of authority in the organization, and, no,
4 those levels of authority, it's not as if they
5 have a footnote to them that says this doesn't
6 apply to this particular drug or anything like
7 that.
8    Q. If you would, would you turn in Exhibit
9 Roman 001, the Notice of the Deposition, to Item
10 No. 9.
11      This item asks for policies, practices,
12 and procedures at Mylan during the relevant time
13 period for establishing the prices that it
14 reported to price reporting services,
15 particularly with regard to AWP and WAC.
16      Was there any policy that the company
17 followed during that time period with regard to
18 setting its AWP price?
19      MR. ESCOBAR: Objection to the form.
20      THE WITNESS: I'm not aware of any
21 written policy about that.
22      MR. MULLIN: Whether written or not,

Page 139

1 did the company have a policy?
2      MR. ESCOBAR: Objection to the form.
3      THE WITNESS: I think there was a way
4 that the company did it, and that was fairly
5 consistent, and I can talk about that.
6      I don't know whether that means you
7 would call it a policy or not. When you say
8 "policy," I tend to think of a written document
9 that says our policy is you do this, you don't do
10 that, so let me talk about how the company
11 established the prices that it reported out.
12      AWP is set as -- or in relation to the
13 existing AWP for the branded product; and if we
14 are expecting to introduce a first generic, then
15 that branded AWP is going to be the source of
16 information we'll be looking to as the existing
17 market benchmark for that product.
18      We know that as a generic drug, we're
19 offering a product at lower cost, that is,
20 substitutable.
21      And we know that in order to be
22 classified or characterized as a generic drug by

Page 140

1 the price reporting services, in the judgment of
2 those price reporting services, our AWP needs to
3 be sufficiently lower than the branded AWP for
4 them to decide we're a generic drug.
5      If we are entering a market where there
6 are already some other companies selling a
7 generic drug, then you would know that there are
8 some other generic AWPs reported, and then that
9 could give you an additional guidepost to look at
10 in saying, well, to be characterized as a
11 generic, I need to be sort of in that pack to be
12 characterized as a generic by the price reporting
13 services, which is our goal in communicating
14 those prices out is to have the services consider
15 us a generic.
16      So it's always set in relation to the
17 other AWPs that are reported for the same drug.
18      If there's only a brand AWP, it will be
19 set in relation to that. If there's a brand AWP
20 and several generic AWPs, it will be set in
21 relation to that entire mix of numbers.
22 BY MR. MULLIN:

Page 141

1    Q. Let me back up and go over a couple of
2 things you mentioned. Let's take the situation
3 where Mylan at launch expects to be the sole
4 generic available, at least for a relatively
5 brief period of time.
6      Typically as part of launch, Mylan
7 would have to set an AWP for its product?
8    A. Mylan typically would set an AWP for
9 its product when it is launching it and then
10 communicate that to the price services who either
11 may accept it, change it, or whatever; but, yeah,
12 we do have an AWP we suggest and report to the
13 price service.
14    Q. All right. I think what you said is if
15 you expect to be the sole generic, what you look
16 at is the AWP for the branded product for which
17 your product is going to be the therapeutic
18 equivalent.
19    A. Yes.
20    Q. And that the price reporting services
21 generally require that the generic AWP be a
22 certain level below the branded product in order

Roman, Brian - 30(b)(6)      CONFIDENTIAL - ATTORNEYS' EYES ONLY     August 2, 2007
Pittsburgh, PA

Page 142

1  to be reported and designated as a generic.  Is
2  that right?
3      A.  Yes.
4      Q.  And is that typically ten percent, that
5  if you're not at least ten percent below the
6  branded product, they won't report you or
7  characterize you as a generic alternative?
8      A.  My understanding is the minimum
9  difference between a brand AWP and a generic AWP
10 to be considered a generic is in that range, like
11 ten to eleven percent, that if it's less than
12 that, then the price reporting service definitely
13 would not consider you a generic.
14     Now, it's also the case, though, that
15 if there are other generics launching, you may
16 need --
17     You know, ten percent off the brand AWP
18 may not be sufficient to be called a generic.
19 You may need to be lower.
20     Q.  And to your knowledge or to Mylan's
21 knowledge, are these policies and practices of
22 any of the reporting services written down or

Page 143

1  published anywhere?
2      A.  No.
3      Q.  Mylan's not aware of this practice
4  being written down?
5      A.  The practice being what is the number
6  that you need to show in terms of how much below
7  the brand you are to be considered a generic?
8  No.
9      It's our understanding that that is
10 determined on a case-by-case basis, and we're not
11 really sure of all of the factors that go into
12 the price reporting services' decision about how
13 they're going to classify you.
14     The way we have found out about the
15 fact that that's the way they do it over the
16 years is really through communicating it.
17     Mr. Krinke has called the price
18 reporting services and said here's our
19 information for a new drug we're launching.
20     They would sometimes communicate back,
21 well, based upon that information, we're going to
22 call you another brand, and then there would be

Page 144

1  sort of that back-and-forth that I've described.
2      Q.  Now, Mylan's experience over the years
3  has been that the difference between the brand
4  reported AWP and a generic AWP, that normally
5  usually in the vast majority of instances a
6  difference of ten or eleven percent would be
7  sufficient to get a generic designation.
8      MR. ESCOBAR:  Objection to the form.
9      THE WITNESS:  No.  What my
10 understanding is, that it would have to always be
11 at least that, but frequently it will be more
12 than that.  You frequently will see --
13     MR. MULLIN:  What's the range that
14 Mylan believes has been necessary to get the
15 designation?
16     MR. ESCOBAR:  Objection to the form.
17     THE WITNESS:  I can't answer that.
18     MR. MULLIN:  Are there instances where
19 you have to be 75 below the brand in order to get
20 the designation?
21     MR. ESCOBAR:  Objection to the form.
22     THE WITNESS:  I don't know.  I have

Page 145

1  heard that you have to be at least ten to eleven
2  percent off, but I also know there are a lot of
3  drugs when sell where the AWP is a lot more than
4  ten or eleven percent below the brand, so the way
5  you had asked the original question is, you know,
6  in the vast majority of situations and all that -
7  -
8      No, I can't really agree with that, nor
9  do I know or really Mylan know the total range
10 is.  I think that would require some fairly deep
11 analysis across a lot of products over a lot of
12 years to say what specifically have they accepted
13 here and there, and we've not done an analysis
14 like that.
15     MR. MULLIN:  Is it fair --
16     Is it accurate to say that during the
17 period '98 to 2003 it's been the practice at
18 Mylan to attempt to set AWPs at a level at
19 whatever the minimum was between brand and the
20 generic in order to get generic designation?
21     MR. ESCOBAR:  Objection to the form.
22     THE WITNESS:  I've never heard that.

37 (Pages 142 to 145)

Henderson Legal Services
(202) 220-4158

Roman, Brian - 30(b)(6)　　　CONFIDENTIAL - ATTORNEYS' EYES ONLY　　　August 2, 2007
Pittsburgh, PA

Page 158

1  I don't see a benefit to Mylan of reporting a
2  higher or lower AWP than other manufacturers
3  have.
4          MR. MULLIN:  Is the answer then that
5  Mylan is not aware of any benefit to having a
6  lower AWP?
7          MR. ESCOBAR:  Objection.  Asked and
8  answered.
9          THE WITNESS:  I answered your question.
10 I don't have anything to add.
11         MR. MULLIN:  Is there ever a benefit to
12 Mylan to having a higher AWP than its
13 competitors?
14         MR. ESCOBAR:  Objection.  Asked and
15 answered.
16         MR. MULLIN:  I don't believe the higher
17 has ever been answered.
18         MR. ESCOBAR:  He said either way, so
19 objection, asked and answered.
20         THE WITNESS:  I can't think of a
21 benefit to Mylan either way, higher or lower.
22         MR. MULLIN:  Is it true, speaking on

Page 159

1  behalf of Mylan and recognizing the obligation to
2  provide the whole truth, is Mylan aware, or was
3  Mylan aware during the time period '98 to 2003,
4  that there were benefits to reporting a higher
5  AWP than competing generic manufacturers?
6          MR. ESCOBAR:  Objection to the form of
7  the question.
8          THE WITNESS:  I don't think that's any
9  different than the questions I've already
10 answered.
11         MR. MULLIN:  Was Mylan aware that there
12 were benefits to a higher AWP during that time
13 period?
14         MR. ESCOBAR:  Objection to the form of
15 the form of the question.
16         THE WITNESS:  Benefits to Mylan from
17 having a higher AWP than its competitors?  That's
18 what you're asking me.
19         MR. MULLIN:  Yes.
20         THE WITNESS:  No.  I don't see that
21 there's a benefit to Mylan from that.
22         MR. MULLIN:  Well, if it increased the

Page 160

1  reimbursement that Mylan's customers could get
2  from buying your product, wouldn't that be a
3  benefit to the company?
4          MR. ESCOBAR:  Objection to the form of
5  the question, and it assumes facts not in
6  evidence and mischaracterizes certainly
7  Massachusetts' reimbursement.
8          THE WITNESS:  Yeah.  That's so
9  hypothetical, I don't know to answer it.
10         MR. MULLIN:  It's not hypothetical at
11 all.
12         MR. ESCOBAR:  It is in Massachusetts,
13 isn't it?
14         THE WITNESS:  And I think it is.
15         MR. MULLIN:  Was one of the strategies
16 at Mylan during the period '98 to 2003 to
17 maximize reimbursement to pharmacies?
18         MR. ESCOBAR:  Objection to the form of
19 the question.
20         MR. MULLIN:  Let me correct the
21 question.
22         Was one of the pricing strategies at

Page 161

1  Mylan during the time period '98 to 2003 to
2  maximize pharmacy reimbursement?
3          MR. ESCOBAR:  Objection to the form of
4  the question.
5          THE WITNESS:  Mylan has no control over
6  pharmacy reimbursement and does not participate
7  in --
8          MR. MULLIN:  That's not my question.
9          THE WITNESS:  -- any discussions or
10 negotiations around pricing reimbursement.
11         Our pricing policy and aim is to try to
12 get the business of our customers by negotiating
13 with them a price at which the customers will
14 give us their business.
15         MR. ESCOBAR:  Can you also indicate to
16 me what topic those particular questions relate
17 to?
18         MR. MULLIN:  I'm looking for a
19 document.
20         MR. ESCOBAR:  Okay.
21         MR. MULLIN:  I'm looking for the launch
22 one, the one about the launch.

| Roman, Brian - 30(b)(6) | CONFIDENTIAL - ATTORNEYS' EYES ONLY<br>Pittsburgh, PA | August 2, 2007 |

Page 162

1  MR. MULLIN: Let mark this as the next
2  exhibit.
3       - - - -
4       - - - -
5       (Exhibit Roman 004 marked for
6  identification.)
7       - - - -
8  BY MR. MULLIN:
9     Q.  I'm showing you what has just been
10 marked as Exhibit Roman 004 in this deposition.
11 This is a document that has a Bates number Mylan
12 California in the lower right-hand corner,
13 000105, and at the top, it indicates New Product
14 Plan Summary.  Do you see that?
15    A.  I'm reviewing the document.
16    Q.  I'm not asking you to read the
17 document. I'm asking you if you see at the top it
18 says New Product Plan Summary?
19       MR. ESCOBAR:  I think the witness is
20 entitled to look at the exhibit and then start
21 answering questions.
22       MR. MULLIN:  No.  I think I'm entitled

Page 163

1  to ask him questions whether he sees certain
2  things first.
3       MR. ESCOBAR:  I disagree with you.  I
4  instruct the witness to read the document you
5  gave him.  Otherwise, how is he going to answer
6  your question?
7       MR. MULLIN:  It depends on what my
8  question is.
9       MR. ESCOBAR:  I don't think it's fair
10 to the witness to not let them read this document
11 that you gave them.
12       MR. MULLIN:  Well, it depends on what
13 the question is.
14       MR. ESCOBAR:  Well, I disagree.
15      MR. MULLIN:  Would the videographer
16 note the time, please.
17      THE VIDEOGRAPHER:  The time it is now?
18      MR. MULLIN:  Yes.
19      THE VIDEOGRAPHER:  The time noted on
20 the screen is 12:36.
21      THE WITNESS:  Okay.  What's your
22 question, sir?

Page 164

1     MR. MULLIN:  Can I have the time,
2  please?
3     THE VIDEOGRAPHER:  It's 12:37:49.
4  BY MR. MULLIN:
5     Q.  Do you recognize this document?
6     A.  No.
7     Q.  Are you familiar with product plan
8  summaries in connection with the launch of
9  pharmaceuticals?
10    A.  No.
11    Q.  If you --
12       You have no familiarity with the fact
13 that a plan is typically prepared by the company
14 in connection with the launch of a product?
15      MR. ESCOBAR:  Objection to the form of
16 the question.
17      THE WITNESS:  I actually don't think a
18 plan is typically prepared in connection with the
19 launch of a product; so, no, I don't have any
20 familiarity with that.
21    Q.  Do you recognize this document at all?
22    A.  No.

Page 165

1     Q.  If you turn in Exhibit Roman 001 to
2  Item 16, it asks for the policies, practices, and
3  procedures at Mylan during the relevant time
4  period relating to the launch of new
5  pharmaceutical products.
6        What, if anything, did you do to
7  familiarize yourself for that -- to testify about
8  that item?
9       MR. ESCOBAR:  Which topic are you
10 talking about?
11      MR. MULLIN:  16.
12      THE WITNESS:  I've worked at Mylan for
13 a number of years, and my job has required me to
14 be very involved in decisions around the launch
15 of new pharmaceutical products.
16       In the course of doing that job, I've
17 come to have some understanding of historical
18 practices about that, and I'm very prepared to
19 talk to you about that topic.
20    Q.  All right.  In Exhibit Roman 004, do
21 you recognize the format of the document, the
22 logo that's on it?

42 (Pages 162 to 165)

Roman, Brian - 30(b)(6)　　　　CONFIDENTIAL - ATTORNEYS' EYES ONLY　　　　August 2, 2007
Pittsburgh, PA

Page 174

1  And the WAC, though, is really a
2  different price point, a very different price
3  point than AWP, and it's not set based on a brand
4  reference point, for example.
5      MR. MULLIN: How is it set?
6      THE WITNESS: That is the price that we
7  are offering to sell to wholesalers and actually
8  invoicing wholesalers at.
9      It's the price --
10     If you're going to sell any product,
11 you need to have a price you're going to ask for
12 it, and that is the price for wholesalers for the
13 product.
14     MR. MULLIN: And what was the practice
15 at Mylan during the relevant time period in
16 deciding what price it would set as its WAC
17 price?
18     I understand that the price -- it's the
19 price you're going to sell to a wholesaler. If
20 there's any range of numbers it could be, I'm
21 asking what the practice was in setting that
22 price.

Page 175

1      MR. ESCOBAR: Objection to the form.
2      THE WITNESS: The practice is that the
3  pricing in contracts in conjunction with the
4  sales leadership would determine a price based on
5  the existing competitive conditions and the
6  forecast of how the market would shape up to come
7  up with a price that they felt would be a price
8  that would be attractive to customers and would
9  enable us to get business.
10     MR. MULLIN: What percentage of Mylan's
11 sales during the relevant time period for
12 pharmaceuticals, solid dose pharmaceuticals, do
13 you expect occurred at WAC?
14     MR. ESCOBAR: Objection to the form.
15     THE WITNESS: That's not anything I've
16 ever analyzed, but I would say that all of our
17 transactions with wholesalers -- and as we've
18 talked about earlier, that is a large part of
19 Mylan Pharmaceuticals' business -- but our
20 transactions with wholesalers, the WAC is the
21 invoice price for the wholesaler.
22     MR. MULLIN: All or virtually all of

Page 176

1  Mylan's sales to wholesalers are at WAC.
2  Correct?
3      MR. ESCOBAR: Objection to the form.
4      THE WITNESS: That's the price that the
5  wholesalers are invoiced. That's the invoice
6  price to the wholesalers.
7      MR. MULLIN: But that's not the price
8  the wholesaler will end up paying for a certain
9  percentage of the sales that are invoiced at WAC.
10 Correct?
11     MR. ESCOBAR: Objection to the form.
12     THE WITNESS: There are frequently
13 discounts or rebates that a wholesaler can earn
14 based on the occurrence of additional things that
15 would, as an accounting matter, result in the
16 transaction netting out at something lower than
17 the WAC, but those depend on, for example, a
18 wholesaler may earn a two percent prompt pay
19 discount if they actually pay the bill within 60
20 days.
21     If they don't pay the bill within 60
22 days, they're not going to earn that. They may

Page 177

1  earn an incentive rebate if they buy a determined
2  amount, an agreed-upon amount, of the product
3  over a period of time.
4      If they attain that level, they would
5  earn the rebate. If they don't attain that
6  level, they're not going to earn the rebate,
7  things like that.
8  BY MR. MULLIN:
9      Q. And there are also charge-backs?
10     A. There are charge-backs, true. That's a
11 different sort of a transaction.
12     The charge-back is, as I've described
13 earlier, something that occurs when a Mylan
14 indirect customer buys from a wholesaler at less
15 than the price the wholesaler bought from us, and
16 then we would --
17     That generates a charge-back, and then
18 we would pay the wholesaler that amount.
19     I'm not going to --
20     I'm not really from an accounting
21 standpoint able to tell you is that charge-back
22 an adjustment to the sale, is it something else.

Roman, Brian - 30(b)(6)     CONFIDENTIAL - ATTORNEYS' EYES ONLY     August 2, 2007
Pittsburgh, PA

Page 178

There are also other transactions with wholesalers. Like, they charge us fees, administrative fees, for example. That has become more frequent.

I'm not really able to tell you in '98 to '03 how much of that there was, but wholesalers provide a service, a valuable service, to Mylan by having this customer and distribution network.

They have very sophisticated warehouses around the country, and they can get products on the shelves of thousands and thousands of pharmacies, you know, in a matter of hours or days, which is, as you can imagine, a pretty substantial --

It requires a lot of effort and a lot of machinery and people and all that stuff, so there are transactions that are at times renegotiated with the wholesalers, and we actually pay them a fee, an administrative fee, in connection with these sales.

Q. Looking at the time period '98 to 2003,

Page 179

of the sales that Mylan made to wholesalers, what percentage were subject to charge-backs?

A. I don't know.

Q. More or less than half?

A. I've never done the analysis, and I don't know. I would expect there would be a substantial number of charge-backs, but I can't tell you is it more or less than 50 percent.

Q. What's Mylan's best information?

MR. ESCOBAR: Objection to the form, and I don't believe that's a category that is included in your Notice.

A. Somebody would need to query the accounting records.

MR. MULLIN: Does Mylan have --

Do you have any information? Can you give us any rough idea whether you think it's 10 percent, 90 percent, it's around 50? Do you have any information in that regard?

MR. ESCOBAR: Objection to the form and beyond the scope of the 30(b)(6) deposition.

THE WITNESS: All I can tell you is it

Page 180

would be my understanding that in the wholesaler sales there are frequently charge-backs that are yielded, but without going through and querying the accounting system and so on, I'm not sure I could you give you any even reasonably accurate estimate of what the percentage is.

MR. MULLIN: As Mylan's representative, you can't give us any idea other than frequently?

MR. ESCOBAR: Objection to the form and beyond the scope.

THE WITNESS: If, for example, it would have been something you had asked us for in your Deposition Notice we may have been able to query the accounting system to do that.

But we got this Notice about a week and a half ago. It was not something that we have undertaken to do for the deposition today.

Could it be done? It could probably be done. I can't really tell you how involved or burdensome or expensive that would be, but, you know, someone would need to query the accounting system and do further investigation to answer a

Page 181

question like that. I'm not able to answer it for you sitting here today.

MR. MULLIN: In your prior answers with regard to the policies, practices, and procedures at Mylan during the relevant time period for setting the WAC price, you mentioned that the people doing that looked at the competitive situation.

Were there any factors other than the competitive situation in setting WAC prices?

MR. ESCOBAR: Objection to the form.

THE WITNESS: Not that I can think of.

MR. MULLIN: And when you include the competitive situation, does Mylan include what the reimbursement for the product will be vis-a-vis the competing manufacturers?

MR. ESCOBAR: Objection to the form.

THE WITNESS: I'm not aware of any widespread or systematic effort or policy at Mylan in that time frame to establish WAC prices in a way that would -- or establish WAC prices in relation to reimbursement dollars.

46 (Pages 178 to 181)

Page 182

1   The WAC is the price that we're
2   invoicing our wholesalers at. Wholesalers aren't
3   even getting reimbursements, I would think, most
4   of the time, and there are also other economic
5   reasons why, you know, we actually --
6       Our business is served by having a
7   fairly low WAC where the size of the charge-backs
8   and the accounting and the reserves we have to
9   hold. I mean, when that WAC is --
10      The higher that WAC is, the larger that
11  charge-back could be, so that causes issues.
12      MR. MULLIN: During this time period,
13  '98 to 2003, was Mylan aware that many
14  pharmacists made the choice as to which generic
15  drug they would purchase on the basis of what the
16  reimbursement that they would receive for
17  prescribing that drug to be?
18      MR. ESCOBAR: Objection to the form of
19  the question. Beyond the scope.
20      THE WITNESS: I have never heard
21  anything like that.
22      MR. MULLIN: And do you not believe

Page 183

1   that to be true?
2       MR. ESCOBAR: Objection to the form of
3   the question.
4       THE WITNESS: I know that Mylan through
5   that time frame and today competes for business
6   with its competitors based on the price at which
7   we're selling to our customer.
8       MR. MULLIN: Do you also compete on the
9   basis of the reimbursement that your product will
10  get?
11      MR. ESCOBAR: Object to the form of the
12  question.
13      THE WITNESS: I don't think so, no.
14      MR. MULLIN: Can you think of any
15  reason why a pharmacist would buy your product if
16  the product -- the reimbursement the pharmacist
17  was going to get was $50 and if he bought another
18  generic of the same product and his reimbursement
19  would be $55 why he wouldn't take the $55 product
20  and not yours?
21      MR. ESCOBAR: Objection to the form of
22  the question.

Page 184

1   I must note that you're now
2   mischaracterizing both Massachusetts
3   reimbursement, federal reimbursement, and the
4   reimbursement that exists throughout the country
5   with respect to generics; and your question is
6   not including information that relates to that,
7   so it's a misleading and inappropriate question.
8       MR. MULLIN: Your objection's noted.
9       THE WITNESS: I would need to
10  understand what sort of reimbursement system
11  you're talking about that would pay more for one
12  generic version versus than another. I
13  personally have never heard of a reimbursement
14  structure like that.
15      Your question said --
16      Your question assumed that there was a
17  situation where if they bought our generic, they
18  would get reimbursed a certain amount; but if
19  they bought a competitor's generic they would get
20  reimbursed a different amount.
21      I'm telling you that I've never heard
22  of a reimbursement structure that works that way.

Page 185

1   BY MR. MULLIN:
2       Q. Are you familiar with the Massachusetts
3   reimbursement structure?
4       A. Generally yes.
5       Q. And are you during the time period, for
6   most of the time period that's we're -- that's
7   the relevant time period in this deposition that
8   Massachusetts reimbursement, one of the levels
9   was WAC plus ten percent?
10      A. One of the levels?
11      Q. One of the levels.
12      A. That was a level, and there's a
13  dispensing fee component, and then you would have
14  to look at what the federal upper limits were, et
15  cetera. Yes. I'm aware of that.
16      Q. Assuming that the lowest price among
17  the four prices that Massachusetts was going to
18  consider was WAC plus ten, if one company's WAC
19  for the product is $50 and another company's WAC
20  for the therapeutic equivalent is $60, can you
21  think of any reason why a pharmacist would buy
22  your product at $50 and not a competitor's

Roman, Brian - 30(b)(6)   CONFIDENTIAL - ATTORNEYS' EYES ONLY   August 2, 2007
Pittsburgh, PA

Page 190

1    At this point, I think we ought to take
2    a luncheon recess.  It's 1:05.  Okay?
3         THE WITNESS:  That's fine.
4         THE VIDEOGRAPHER:  We're going off the
5    record.  The time indicated is 1:04.
6              - - - -
7         (There was a recess in the
8    proceedings.)
9              - - - -
10        THE VIDEOGRAPHER:  This marks the
11   beginning of Tape III.  The time indicated on the
12   screen is 2:07.
13   BY MR. MULLIN:
14        Q.  Good afternoon, sir.
15        A.  Hello.
16        Q.  If you would, would you look at
17   Deposition Exhibit Roman 001, the Notice of
18   Deposition, and Item 11 on the schedule.
19        This relates to reporting services.
20   One of the things it asks about is what services
21   did Mylan subscribe to during the relevant time
22   period; what industry reporting services did

Page 191

1    Mylan subscribe to?
2         MR. ESCOBAR:  Objection to the form.
3         THE WITNESS:  None until, I believe,
4    2003 when we started subscribing to a service
5    called Analysource.
6         Q.  Can you spell that for me.
7         A.  I think it's A-N-A-L-Y-S-O-U-R-C-E.
8         Q.  All one word?
9         A.  Yes.
10        Q.  And the company started sometime in
11   2003 subscribing to that?
12        A.  Yes.
13        Q.  Is that a service that the company sent
14   price information to?
15        A.  No.
16        Q.  Were there any price reporting services
17   that the company sent price information to that
18   it also subscribed to and received what they
19   published?
20        A.  No.
21        Q.  And speaking as a representative of
22   Mylan, is it correct that Mylan did not subscribe

Page 192

1    to First Databank during the period '98 to 2003?
2         A.  Yes.
3         Q.  And what about Medispan?
4         A.  No.  I believe there was a --
5         There was a book that we got called
6    Price Alert that, to the best of our recollection
7    and knowledge, was free.  We didn't really
8    subscribe to it.  We just got it.  It would come
9    to us.
10        Q.  And it included the prices that the
11   company had sent to Price Alert?
12        MR. ESCOBAR:  Objection to the form.
13        THE WITNESS:  No.  We didn't send
14   prices to Price Alert.
15   BY MR. MULLIN:
16        Q.  Okay.  So you --
17        A.  I think we're not really sure how Price
18   Alert got the information that was in Price
19   Alert, whether they were getting it from one of
20   the other services or what.
21        Similarly, Analysource is not a service
22   that we send data to, but they report data.

Page 193

1         Q.  If you would, sir, would you look at
2    Item 14 on the Notice schedule.  This asks what
3    Mylan's belief was during the relevant time
4    period regarding the percentage of its sales of
5    pharmaceuticals that were reimbursed by the
6    Medicaid program.
7         What was Mylan's belief during the
8    relevant time period?
9         A.  I don't think Mylan had any specific
10   belief about that.  We did receive utilization
11   information in connection with the Medicaid drug
12   rebate program that we would use in conjunction
13   with paying rebates to the states each quarter
14   over those years.
15        But to the best of our knowledge, there
16   isn't anybody at the company who has ever --
17   certainly not on any regular or systematic basis
18   -- taken information like that, compared it to
19   overall sales, and tracked or reported what
20   percentage of our sales ended up being dispensed
21   to Medicaid beneficiaries, so that's not a metric
22   that we have followed or tracked to the best we

Roman, Brian - 30(b)(6)    CONFIDENTIAL - ATTORNEYS' EYES ONLY    August 2, 2007
Pittsburgh, PA

Page 194

1 can tell.
2    Q.  Is it fair, is it accurate to say, that
3 during the relevant time period, Mylan was aware
4 that the Medicaid, the federal -- the Medicaid
5 program was a major source of reimbursement for
6 pharmaceuticals?
7        MR. ESCOBAR:  Objection to the form.
8        THE WITNESS:  You used the word
9 "major," which might imply it's a majority or
10 something like that.  I don't think it was
11 anything like that.
12        I know when I asked Steve Krinke that
13 question, what he related to me was he recalls
14 perhaps reading in trade press some figures like
15 ten or eleven percent on an industrywide basis.
16    Q.  Was that a recent conversation?
17    A.  Yes.
18    Q.  If you'd look at Item 15, this asks
19 about Mylan's efforts prior to and during the
20 relevant time period to learn about and to
21 monitor Medicaid reimbursement methodologies.
22        What, if any, efforts did Mylan make in

Page 195

1 that regard?
2    A.  Mylan really did not make a concerted
3 or regular effort to keep track of the changing
4 methodologies for Medicaid reimbursement.
5        We do know that from time to time some
6 industry publications would include maybe on an
7 annual basis a chart that showed, you know, one
8 of the metrics that was used by a state.
9        I remember seeing a document that was a
10 photocopy of a page out of a book like that, and
11 it showed things like the fact that Delaware was
12 paying something they called actual acquisition
13 costs, and I think it did have for Massachusetts
14 like the WAC plus ten, things like that on the
15 page.
16    Q.  Was that from some publication that
17 Mylan subscribed to?
18    A.  It was from a publication that Mylan
19 received.  I didn't inquire whether it was a
20 publication that we paid a subscription fee to or
21 if it was just sent to us.
22    Q.  And can you describe that.  Was this

Page 196

1 something that you looked at recently?
2    A.  Yes.
3    Q.  Can you describe the document that you
4 were looking at.
5    A.  I think it was a page out of something
6 called Drug Facts.
7        MR. ESCOBAR:  Drug Topics.
8        THE WITNESS:  Drug Topics.  Okay.
9        MR. ESCOBAR:  I just tossed that in.  I
10 think that's what it is, but --
11        THE WITNESS:  I'm sorry.  Mr. Krinke
12 had suggested to me that that is, at that time,
13 the only place he could think of where you would
14 find information like that if you were looking
15 for it, and I have seen at least one document
16 like that out of our production view.
17        MR. MULLIN:  And is this page something
18 that you believe was produced to the Commonwealth
19 in connection with this litigation?
20        MR. ESCOBAR:  Objection to the form.
21        THE WITNESS:  I think so.
22 BY MR. MULLIN:

Page 197

1    Q.  Do you have the Bates number?
2    A.  No.
3    Q.  What leads you to believe it was
4 produced to us?
5    A.  Because I believe that the materials I
6 was reviewing in preparation for the deposition
7 were discovery materials, documents that had been
8 produced to you.
9        I think we produced hundreds of
10 thousands of pages of documents to you.  I
11 certainly don't know the Bates numbers, et
12 cetera, to pinpoint it.
13        MR. ESCOBAR:  Mr. Mullin, we'll look at
14 that, because I'm not sure that it isn't --
15        I think it's a document that comes from
16 some other source, but I'll verify it.
17        MR. MULLIN:  Did Mylan maintain a
18 Medicaid reimbursement comparison worksheet?
19        MR. ESCOBAR:  Objection to the form.
20        THE WITNESS:  I have no awareness of
21 anything like that.  I've not heard of a document
22 like that.  I can't rule it out, but I've not

Henderson Legal Services
(202) 220-4158

Roman, Brian - 30(b)(6)    CONFIDENTIAL - ATTORNEYS' EYES ONLY    August 2, 2007
Pittsburgh, PA

Page 298

1  recently?
2      A.  Yes.  And this project had started some
3  time ago, and it was revisited in connection with
4  this deposition.
5      Q.  When do you think the project started?
6      A.  I don't know.
7          I don't know, I said.
8      Q.  A year, two years, five years ago?
9          MR. ESCOBAR:  Don't guess if you don't
10 know.
11         THE WITNESS:  I don't know.
12 BY MR. MULLIN:
13     Q.  But it was when Mr. Debski was with the
14 company?
15     A.  Yes.
16     Q.  Okay.  I think you told me, and you
17 correct me if I'm wrong, that the practice at
18 Mylan with regard to WAC pricing was to set a WAC
19 and not change it.  Is that correct?
20         MR. ESCOBAR:  Objection to the form.
21 Misstates his testimony.
22         THE WITNESS:  No.  I don't remember

Page 299

1  testifying to that.
2          MR. MULLIN:  What was the policy with
3  respect to WACs?
4          MR. ESCOBAR:  Objection to the form and
5  asked and answered.  We went over this at some
6  length.
7          THE WITNESS:  I don't know of a policy
8  about WACs.  I think I did describe to you what
9  the WAC is and how we communicated and what we
10 use it for.
11         MR. MULLIN:  I wanted to focus on the
12 practice at the company with regard to setting
13 WACs when you -- with regard to solid-dose
14 pharmaceuticals.
15         What was the practice?  I believe you
16 told us that at least with regard to initially
17 setting it, that you considered if you were going
18 to be the sole entrant, you considered who the --
19 what the brand product was at.  Correct?
20         MR. ESCOBAR:  Objection, Mr. Mullin,
21 and I do think we're circling back to things you
22 went over at some length.

Page 300

1          MR. MULLIN:  I don't believe that
2  question I'm trying to get to has been asked, and
3  I want to make sure I understand what the witness
4  has told me.
5          THE WITNESS:  I think you're blending
6  together some testimony I gave you about AWP with
7  what I said about WAC.
8          MR. MULLIN:  Fine.
9          Tell me with regard to WAC what the
10 practice was with regard to setting WAC at
11 launch.
12         MR. ESCOBAR:  Objection to the form.
13 Asked and answered, and we've gone through this.
14         THE WITNESS:  My understanding is the
15 WAC is set at a price.  It's a price that we are
16 offering our product to wholesalers at, and it's
17 a price that's set with regard to the competitive
18 conditions of the marketplace.
19 BY MR. MULLIN:
20     Q.  And when you say the competitive
21 conditions, what do you mean?
22     A.  The factors of supply and demand,

Page 301

1  looking at who else is selling it, what prices
2  exist in the marketplace; we're never -- even
3  though we may be the first generic, that there is
4  an existing marketplace for this drug that has
5  been created by the brand company that exists
6  when we come into it; so, you know, a significant
7  part of the philosophy, as I said, would be that
8  we're offering all of our products as a discount
9  to the brand as an alternative, as a lower price
10 alternative for the same medicine; so the prices
11 would be lower than the corresponding brand
12 prices.
13     Q.  And is there --
14         What has been the practice with regard
15 to the magnitude of the discount from the branded
16 WAC?
17         MR. ESCOBAR:  Objection to the form.
18         THE WITNESS:  I'm not aware of any
19 consistent practice saying that it would be some
20 particular percentage difference between a
21 branded WAC and a Mylan WAC.
22 BY MR. MULLIN:

76 (Pages 298 to 301)