# Exhibit H

**State of California ex rel. Ven-A-Care of the Florida Keys, Inc.
v. Abbott Laboratories, Inc., et al., Master Civil Action No. 01-12257-PBS,
Subcategory Case No. 06-11337**

Exhibit to the December 21, 2009 Declaration of Christopher C. Palermo in Support
of Defendants Mylan Inc. and Mylan Pharmaceuticals Inc's. Opposition  to Plaintiffs' Motion for Partial Summary
Judgment

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

THE COMMONWEALTH OF MASSACHUSETTS,   )
        Plaintiff,                   )   C.A. NO.
v.                                   )   03-11865-PBS
MYLAN LABORATORIES, INC., BARR       )
LABORATORIES, INC., DURAMED          )
PHARMACEUTICALS, INC., IVAX CORPORATION,)
WARRICK PHARMACEUTICALS CORPORATION, )
WATSON PRAMACEUTICALS, INC., SCHEIN  )
PHARMACEUTICAL, INC., TEVA           )
PHARMACEUTICALS USA, INC., PAR       )
PHARMACEUTICAL, INC.,                )
PUREPAC PHARMACEUTICAL CO.,          )
AND ROXANE LABORATORIES, INC.        )
        Defendants.                  )

---

VIDEOTAPED DEPOSITION OF

ROBERT G. CUNARD

October 26, 2007

9:21 a.m.

Page 2

```
 1          1180 West Peachtree Street
 2             Atlanta, Georgia
 3          Kendra B. James, B-2194
 4
 5
 6       APPEARANCES OF COUNSEL:
 7
 8  For Plaintiff:
 9  PETER A. MULLIN, ESQ.
10  ROBERT C. MOLVAR, ESQ.
11  The Commonwealth of Massachusetts
12  Office of the Attorney General
13  1 Ashburton Place
14  Boston, Massachusetts  02108
15  617-727-2200
16  617-727-2008
17  robert.molvar@ago.state.ma.us
18
19
20
21
22
```

Page 3

```
 1       APPEARANCES OF COUNSEL:
 2
 3  For Defendant:
 4  WILLIAM A. ESCOBAR, ESQ.
 5  Kelley Drye & Warren LLP
 6  101 Park Avenue
 7  New York, New York  10178
 8  212-808-7771
 9  212-808-7897
10  wescobar@kelleydrye.com
11
12  Also Present:
13    Mr. Brian Cuthbertson, Associate Litigation Counsel
14
15
16
17
18
19
20
21
22
```

Page 4

```
 1              C O N T E N T S
 2  EXAMINATION BY                         PAGE
 3  MR. MULLIN                          8, 300
 4  MR. ESCOBAR                         271, 323
 5
 6
 7           INDEX TO EXHIBITS
 8  NUMBER      DESCRIPTION               PAGE
 9  Exhibit Cunard 001 Section 4C Attachment    97
10  Exhibit Cunard 002 11/8/01 E-mail from Dan King
11       to Bob Potter Regarding Weekly
12       Update, Ending 11/2/01       103
13  Exhibit Cunard 003 New Product Plan Summary   112
14  Exhibit Cunard 004 6/28/00 E-mail from Jodi
15       Eichelberger to Robert Cunard
16       Regarding Drug 7 Spread       130
17  Exhibit Cunard 005 4/5/01 E-mail to Bob Potter
18       From Jack Walsh Regarding
19       Drug 2                       138
20  Exhibit Cunard 006 3/15/01 E-mail from Dan King
21       to Bob Potter and Robert
22       Cunard Regarding PCS          146
```

Page 5

```
 1           INDEX TO EXHIBITS
 2  NUMBER      DESCRIPTION              PAGE
 3  Exhibit Cunard 007 3/10/00 E-mail from Bob Potter
 4       Regarding Drug VII           153
 5  Exhibit Cunard 008 AWP Price Changes    173
 6  Exhibit Cunard 009 11/13/00 Letter to Generic
 7       Contract Vendor Regarding
 8       Market Competitive Prices     185
 9  Exhibit Cunard 010 4/15/03 E-mail from Tony
10       Mauro to Anthony Thomassey
11       Regarding Cyclobenzaprine     195
12  Exhibit Cunard 011 4/27/00 E-mail from Jason
13       Harper to Steve Krinke
14       Regarding Reimbursements      202
15  Exhibit Cunard 012 4/24/00 E-mail from Robert
16       Cunard to Mr. Moldin
17       Regarding Drug 7 Info         212
18  Exhibit Cunard 013 Medicaid Reimbursement
19       Comparison Worksheet          219
20  Exhibit Cunard 014 Product Planning Backup
21       Information 7/24/00 --
22       Enalapril                    231
```

2 (Pages 2 to 5)

Cunard, Robert G.                                                October 26, 2007
Atlanta, GA

Page 6

| | INDEX TO EXHIBITS | |
|---|---|---|
| NUMBER | DESCRIPTION | PAGE |
| Exhibit Cunard 015 | 8/28/01 E-mail from Dennis Bonnstetter to Robert Cunard Regarding Competitor's Catalogs | 236 |
| Exhibit Cunard 016 | 10/10/00 Letter to Laura Schneider from Bob Cunard | 237 |
| Exhibit Cunard 017 | 11/6/00 Letter to Steve LaFrance from Bob Cunard | 243 |
| Exhibit Cunard 018 | 7/31/00 E-mail from Dan King to bbsprad@wal-mart.com Regarding New AWPS | 246 |
| Exhibit Cunard 019 | 8/31/01 E-mail From Mike Hatch to Robert Cunard Regarding Anthem Pricing - Drug 2 30 mg | 253 |
| Exhibit Cunard 020 | 4/8/01 E-mail from Robert Cunard to Joe Duda Regarding Request for AWP/WAC Info | 259 |
| Exhibit Cunard 021 | Table of Contents | 266 |

Page 7

    THE VIDEOGRAPHER: Good morning, ladies and gentlemen. It's Friday, October 26th, 2007. It's 9:21 a.m. We're in Atlanta, Georgia. This will be the deposition of Robert G. Cunard.
    The case is the Commonwealth of Massachusetts plaintiffs versus Mylan Laboratories, Inc., Barr Laboratories, Inc., Duramed Pharmaceuticals, Inc., IVAX Corporation, Warrick Pharmaceuticals Corporation, Watson Pharmaceuticals, Inc., Schein Pharmaceuticals, Inc., TEVA Pharmaceuticals USA, Inc., Par Pharmaceutical, Inc., Purepac Pharmaceutical Company, and Roxane Laboratories, Inc. defendants, United States District Court, District of Massachusetts, Civil Action Number 03-11865-PBS.
    Would the attorneys please introduce themselves.
    MR. MULLIN: Good morning. Peter Mullin and Robert Molvar, assistant attorney generals (sic) for the Commonwealth of Massachusetts.
    MR. ESCOBAR: William Escobar, Kelley, Dry & Warren on behalf of Mylan and the witness.

Page 8

    MR. CUTHBERTSON: Brian Cuthbertson, Mylan.
    THE VIDEOGRAPHER: Would the court reporter please swear the witness.
        ROBERT G. CUNARD,
    having been first duly sworn,
    was examined and testified as follows:
        EXAMINATION
BY MR. MULLIN:
    Q.  Good morning, sir.
    A.  Good morning.
    Q.  Could you tell us your full name, please.
    A.  Robert George Cunard.
    Q.  And, Mr. Cunard, what's your residence address.
    A.  3560 Berkshire Eve Court, Duluth, Georgia.
    Q.  And the ZIP Code?
    A.  30097.
    Q.  Mr. Cunard, I think as you know, my name is Peter Mullin. This is Robert Molvar. We're assistant attorney generals with the Commonwealth of Massachusetts.
    Are you aware that the Commonwealth of

Page 9

Massachusetts has sued Mylan Laboratories and some other generic drug manufacturers in connection with price reporting?
    A.  Yes.
    Q.  And are you aware that this deposition is being taken in that case?
    A.  Yes.
    Q.  As you can see, we have a videographer and we're making a videotape of the testimony today and we have a court reporter and the reporter will prepare a transcript of the testimony that's given. And some or all of this deposition may be played to a jury in Boston in connection with the trial of the case.
    You've sworn an oath to tell the whole truth today. Do you understand that you're required to testify to the full extent of your recollection relating to any of the events that we ask you about today?
    MR. ESCOBAR: Objection to the form.
    You can answer.
    Q.  (By Mr. Mullin) Do you understand --

3 (Pages 6 to 9)

**Page 62**

1  the prices that Mylan reported to the price
2  reporting services was AWP?
3      A.  Yes.  As I recall, that was one of the
4  elements in the data file.
5      Q.  And did Mylan also report WAC prices,
6  W-A-C?
7      A.  Yes, I believe so.
8      Q.  And is that true for the period when you
9  joined the company at least through September of
10 2003?
11     A.  Yes.
12     Q.  Were there any other prices that Mylan
13 customarily or usually reported to price reporting
14 services during the period from when you joined the
15 company up through September of 2003?
16     MR. ESCOBAR:  Objection to the form.
17     THE WITNESS:  Would you please read that back?
18        (Whereupon, the record was read by the
19        reporter.)
20     THE WITNESS:  Not that I recall, no.
21     Q.  (By Mr. Mullin)  Would you describe your
22 role with regard to the establishment of Mylan's

**Page 63**

1  AWP prices during the time period from August '89
2  through September of 2003.
3      MR. ESCOBAR:  You mean August '99?
4      MR. MULLIN:  I'm sorry.  August of '99, yes.
5      Q.  (By Mr. Mullin)  When -- when you joined
6  the company up through September of 2003.
7      MR. ESCOBAR:  Objection to the form.
8      THE WITNESS:  Could you be more specific what
9  you're looking for.
10     Q.  (By Mr. Mullin)  What role, if any, you
11 played in deciding what the company's AWP was going
12 to be on its products.
13     A.  During the time period outlined, it -- my
14 role varied product to product, but I had oversight
15 and -- and -- and visibility into the price
16 setting.
17     Q.  Are you the primary person to recommend,
18 are you a decision-maker?  Describe your role for
19 us.
20     MR. ESCOBAR:  Objection to the form.
21     THE WITNESS:  As stated, it varied product to
22 product.  In some cases, I would be actively

**Page 64**

1  involved in the creation.  In other cases, I would
2  have just approved what others had put together.
3      Q.  (By Mr. Mullin)  And did you have at least
4  in some instances final approval authority during
5  that time period?
6      MR. ESCOBAR:  Objection to the form.
7      THE WITNESS:  Yes.
8      Q.  (By Mr. Mullin)  What was the practice at
9  Mylan with regard to the establishment of its AWP
10 during the time period from when you joined up
11 through September of 2003?
12     MR. ESCOBAR:  Objection to the form.
13     THE WITNESS:  As indicated around pricing, it
14 all varies product to product.  But at the time of
15 introduction, an -- a proposed AWP would be
16 established based on the reference listed drug AWP.
17     Q.  (By Mr. Mullin)  I'm sorry.  I didn't hear
18 the last part of your answer.
19     THE WITNESS:  Would you read it back, please.
20        (Whereupon, the record was read by the
21        reporter.)
22     Q.  (By Mr. Mullin)  When you say "the

**Page 65**

1  reference listed drug," what are you referring to?
2      A.  That is the brand drug for which the ANDA
3  or abbreviated drug application references to be
4  about the bioequivalent and the therapeutic
5  equivalent to.
6      Q.  And what was the -- the policy or the
7  guideline at Mylan in the period when you joined
8  the company up through September of 2003 with
9  regard to the relationship of the brand drug AWP
10 and the price that was established at Mylan for its
11 product?
12     MR. ESCOBAR:  Objection to the form; no
13 foundation.
14     THE WITNESS:  As indicated, it was a function
15 of the brand price of what our proposed AWP would
16 be.  Typical proposed pricing would be 89 percent of
17 the reference listed drug AWP.
18     Q.  (By Mr. Mullin)  When you say the
19 "proposed AWP," what are you referring to?
20     A.  The -- the proposed AWP that we would come
21 up with for submission to the third-party
22 databases.

Cunard, Robert G.  
October 26, 2007  
Atlanta, GA

Page 90

1   MR. ESCOBAR: Objection to the form and asked
2   and answered.
3   THE WITNESS: WAC as well as all the pricing
4   came through my area of pricing and contracts. So
5   as supervisor of that area, it was under my
6   responsibility.
7   Q. (By Mr. Mullin) Do you know a fellow by
8   the name of Dan King?
9   A. Yes.
10  Q. Who is Dan King?
11  A. Actually, I know two Dan Kings. I believe
12  the one you're referring to is a national account
13  manager for Mylan.
14  Q. And he was there when you were there?
15  A. Yes.
16  Q. All right. Did he predate you?
17  A. Yes.
18  Q. And was he there when you left?
19  A. Yes.
20  Q. And is he still there now?
21  A. I don't know.
22  Q. What were Mr. King's responsibilities

Page 91

1   while you were at Mylan?
2   A. As I knew it -- and once again, Mr. King
3   didn't report to me, he was on the sales side. But
4   he had national account responsibility as a
5   salesperson.
6   Q. Territory base, particular customer base;
7   what was the scope of his responsibilities?
8   A. It was my understanding that those were
9   all done customer based. They were not aligned
10  geographically.
11  Q. And who are his customers?
12  A. I -- I won't recall the exact list. I
13  know one of his customers was Albertson's. I
14  believe another one was the Opti-Source group,
15  which was a wholesale purchasing group, and HEB.
16  Q. I'm sorry?
17  A. HEB.
18  Q. What's that?
19  A. That is a grocery chain in Texas.
20  Q. And when you say Opti-Source is a
21  wholesale purchasing group, for what type of
22  entity?

Page 92

1   A. For independent wholesalers.
2   Q. Going back for a second to -- to WAC,
3   during the period August '89 through September of
4   2003, was there any rule of thumb or -- with regard
5   to setting what the WAC was at Mylan?
6   MR. CUTHBERTSON: He said it again.
7   MR. ESCOBAR: We're going to have a standing
8   agreement that when you say '89 you mean '99,
9   right?
10  MR. MULLIN: Let -- let me see if I can
11  correct it. Okay.
12  MR. ESCOBAR: Well, I'll give you the standing
13  --
14  Q. (By Mr. Mullin) Focusing --
15  MR. ESCOBAR: -- agreement.
16  Q. (By Mr. Mullin) -- focusing on the time
17  period August '99 through September 2003, was there
18  any practice or policy at Mylan with regard to the
19  establishment of the WAC price?
20  MR. ESCOBAR: Objection to the form and asked
21  and answered. I think you asked it, Mr. Mullin,
22  the exact question a little while ago.

Page 93

1   THE WITNESS: That -- there was not a policy.
2   The practice, as I believe I outlined earlier, was
3   product by product based on the competitive
4   situation in the marketplace.
5   Q. (By Mr. Mullin) And when you say "the
6   competitive situation in the marketplace," that
7   would be the -- the WAC prices of -- of other
8   competing generic pharmaceutical manufacturers?
9   MR. ESCOBAR: Objection to the form.
10  THE WITNESS: That would be any pricing
11  information that was available from competing
12  products, be it WAC or any other price point.
13  Q. (By Mr. Mullin) And would -- would --
14  contract prices for competing manufacturers, are
15  you saying that that would influence Mylan's
16  establishment of its WAC?
17  A. Yes.
18  Q. And -- and how would that work; how would
19  the contract price of a competing manufacturer
20  influence Mylan's WAC?
21  MR. ESCOBAR: Objection to the form.
22  THE WITNESS: The -- the WAC and contract

24 (Pages 90 to 93)

Cunard, Robert G.                                         October 26, 2007
                        Atlanta, GA

Page 94

1  prices are -- are all related, in that there are
2  specific customer discounts that apply to WAC. So
3  they all tie in as far as the understanding of
4  discounts that apply to what price points and the
5  economic or the financial impact of those different
6  prices as they -- as they interrelate on the sale
7  of a product.
8      Q. (By Mr. Mullin) In addition to -- well,
9  let -- let me back up.
10     You -- you -- I think you said WAC was the
11 invoice price of Mylan to wholesalers. Is that
12 right?
13     MR. ESCOBAR: Objection to the form; asked and
14 answered and mischaracterizes the testimony.
15     THE WITNESS: WAC is the invoice price and the
16 price that wholesalers and distributors pay for the
17 product.
18     Q. (By Mr. Mullin) Is it true that in many
19 instances, wholesalers and distributors would
20 receive discounts, rebates, or chargebacks with
21 regard to product that had been invoiced at WAC?
22     MR. ESCOBAR: Objection to the form.

Page 95

1      THE WITNESS: Could you please read that back?
2         (Whereupon, the record was read by the
3         reporter.)
4      THE WITNESS: Again, it varies product by
5  product and customer by customer. There may be
6  discounts associated with that WAC invoice price.
7      Q. (By Mr. Mullin) And I understand that
8  there may be.
9      I'm asking you whether or not it would
10 generally be true that the majority of sales made
11 at WAC would be subject to some type of a -- a
12 discount, a rebate, or a chargeback?
13     MR. ESCOBAR: Objection to the form.
14     THE WITNESS: I believe that's a different
15 question. But to answer, yes, the majority of
16 sales to the wholesaler and distributor range would
17 have discounts applied to the WAC price.
18     Q. (By Mr. Mullin) And did you have price
19 authority with regard to establishing contract
20 prices with customers?
21     A. Yes, that was in the area of my
22 responsibility.

Page 96

1      Q. And at any given time, would your
2  authority with regard to contract prices be in
3  written form?
4      A. I don't understand the question.
5      Q. Would -- would there be some kind of a
6  document that would say that you had authority to
7  discount prices to a certain level, but if it was
8  going to be greater than that level, it required
9  higher level of approval or?
10     A. In the pricing and contracts department,
11 there were preestablished bid levels that different
12 individuals in the department could utilize. And
13 yes, any pricing that was recommended outside of
14 those bid levels would go through a series of
15 escalating approvals.
16     Q. And -- and what were the -- the various
17 levels of escalating approval?
18     A. It varied product by product and customer
19 by customer based on the -- the deviation from the
20 bid list as well as the annual financial impact of
21 the transaction.
22     MR. MULLIN: Let me mark this document as

Page 97

1  Exhibit Cunard 001.
2         (Whereupon, Exhibit Cunard 001 was marked
3  for identification.)
4      Q. (By Mr. Mullin) I'm showing you what's
5  been marked as Exhibit Cunard 001.
6      I'd represent to you that this was produced to
7  the Commonwealth by Mylan and it has a Bates number
8  that ends in 73007.
9      Do you recognize this document?
10     A. No, I don't.
11     Q. Do you -- you see up in the top right-hand
12 corner it says, "Section 4-C, Attachment 11 -- 11,
13 bid processing"?
14     And it appears to be a form and it appears
15 that you could plug in a customer name and it
16 appears to have signature lines for various people
17 with dollar amounts next to their names.
18     Is this -- does this document relate to the
19 various escalating levels of approval that you
20 referenced?
21     MR. ESCOBAR: Objection to the form; no
22 foundation.

25 (Pages 94 to 97)

Cunard, Robert G.  
Atlanta, GA  
October 26, 2007

Page 118

1  that back.
2      (Whereupon, the record was read by the
3      reporter.)
4      THE WITNESS: Yes, the pricing was my
5  responsibility.
6      Q. (By Mr. Mullin) Okay. Including the
7  strategy, right?
8      MR. ESCOBAR: Objection to the form.
9      THE WITNESS: I don't know what pricing
10 strategy would be.
11     Q. (By Mr. Mullin) You're familiar with the
12 word "strategy", aren't you?
13     A. Yes.
14     Q. Okay. And you're familiar with the word
15 "pricing", aren't you?
16     A. Yes.
17     Q. All right. And don't companies develop
18 strategies when they're deciding how to price their
19 product?
20     MR. ESCOBAR: Objection to the form.
21     THE WITNESS: As my understanding would be,
22 pricing would be a tactic to lead to a broader

Page 119

1  strategy, but I don't see it (sic) pricing strategy
2  per se.
3      Q. (By Mr. Mullin) In any event, whatever
4  the -- the -- the pricing for the product that
5  launched in November '99 was one of your
6  responsibilities, correct?
7      A. Yes.
8      Q. This document indicates that with regard
9  to this drug, the first point under pricing
10 strategy was "maximize reimbursement profitability
11 for the pharmacy."
12     Do you -- having looked at this document, was
13 it ever the policy of the company while you were
14 there with regard to establishing its prices to
15 maximize reimbursement profitability for the
16 pharmacy?
17     MR. ESCOBAR: Objection to the form.
18     THE WITNESS: No, it was not.
19     Q. (By Mr. Mullin) All right. Can you think
20 of any reason why this would -- that would be
21 recorded in this document?
22     A. I don't know. As I look at that

Page 120

1  statement, I think it's fundamentally flawed in
2  that as -- a generic pharmaceutical manufacturer
3  cannot control pharmacy profitability.
4      Q. You can certainly influence their
5  revenues, right?
6      MR. ESCOBAR: Objection to the form; no
7  foundation.
8      THE WITNESS: No.
9      Q. (By Mr. Mullin) You can't influence their
10 revenues at all?
11     MR. ESCOBAR: Objection to the form.
12     THE WITNESS: No.
13     Q. (By Mr. Mullin) You essentially sell
14 pharmaceuticals ultimately for use by pharmacies in
15 filling prescriptions, right?
16     MR. ESCOBAR: Objection to the form.
17     THE WITNESS: Yes.
18     Q. (By Mr. Mullin) And that's the essence of
19 Mylan's business, isn't it, manufacture and
20 distribute pharmaceuticals so prescriptions can be
21 filled and people can use them to deal with medical
22 conditions, right?

Page 121

1      A. Yes.
2      Q. And you're aware that pharmacies
3  frequently are paid by third-party payers for the
4  prescriptions that they fill, right?
5      A. Yes.
6      Q. And you're aware that many third-party
7  payers base their reimbursement to the pharmacy for
8  a prescription on reported prices?
9      MR. ESCOBAR: Objection to the form; no
10 foundation.
11     THE WITNESS: Please repeat that for me.
12        (Whereupon, the record was read by the
13        reporter.)
14     THE WITNESS: I'm aware that there's different
15 methodologies for third-party reimbursement.
16     Q. (By Mr. Mullin) And -- and some of them
17 are AWP-based, right?
18     A. Yes.
19     Q. Some of them are WAC-based?
20     A. Yes.
21     Q. Okay. And essentially, Mylan sets both of
22 those, right?

31 (Pages 118 to 121)

Cunard, Robert G.                                                    October 26, 2007
                         Atlanta, GA

Page 122

1    MR. ESCOBAR: Objection to the form and
2    misrepresents the evidence.
3    THE WITNESS: As indicated previously, we
4    develop a proposed AWP that is submitted. And --
5    and, yes, we establish a WAC based on a competitive
6    scene -- scenario of the market.
7    Q. (By Mr. Mullin) And to the extent that
8    the AWPs are higher and WACs are higher, the
9    reimbursement to the pharmacy is going to be
10   higher, isn't it?
11   MR. ESCOBAR: Objection to the form.
12   THE WITNESS: I don't know.
13   Q. (By Mr. Mullin) Can you think of any way
14   that having a higher AWP would not result in a
15   higher reimbursement to a pharmacy for every
16   third-party payer who's AWP-based?
17   MR. ESCOBAR: Objection to the form.
18   THE WITNESS: Well, there's many other points
19   that are used in reimbursements, such as MAC and
20   other elements as well. So yes, I could see cases
21   where an AWP is not relevant in the reimbursement.
22   Q. (By Mr. Mullin) All right. Sometimes

Page 123

1    even with a higher AWP, it won't result in a higher
2    price because of MACs or FULs or other caps on
3    reimbursement, right?
4    A. Yes.
5    Q. But to the extent that a drug wasn't
6    subject to a MAC or a FUL, it would -- if -- if
7    it's pure AWP-based reimbursement, the higher the
8    reimbursement, it always results in a -- the higher
9    the AWP, it always results in a higher
10   reimbursement to the pharmacy?
11   MR. ESCOBAR: Objection to the form; calls for
12   speculation.
13   THE WITNESS: I believe the mathematics would
14   be true. If the reimbursement methodology didn't
15   change, a higher AWP would reflect a higher
16   reimbursement.
17   Q. (By Mr. Mullin) And with regard to --
18   FULs are federal upper limits, right?
19   A. Yes.
20   Q. And sometimes there's a state upper limit
21   as well?
22   A. I'm not aware of that -- that specific

Page 124

1    terminology. But yes, states can set their own MAC
2    or -- or some kind of maximum cost.
3    Q. And with regard to federal upper limits
4    and for the period of time that you were at Mylan
5    or at least up through September of 2003, the
6    federal upper limit was set at 150 percent of the
7    lowest reported price as long as there were at
8    least three reported prices for a generic product?
9    MR. ESCOBAR: Objection to the form.
10   THE WITNESS: I'm not aware of the exact
11   methodology per se on those.
12   Q. (By Mr. Mullin) Are -- are you aware that
13   the upper limit prices were -- were based on
14   looking at what the reported prices were and then
15   applying a percentage mark-up to whatever the
16   lowest reported price was for the therapeutic
17   equivalents?
18   MR. ESCOBAR: Objection to the form and no
19   foundation.
20   THE WITNESS: No, I was not.
21   Q. (By Mr. Mullin) You -- I think you said
22   you were aware that some third-party payers based

Page 125

1    their reimbursement on the WAC price; is that
2    right?
3    A. Yes.
4    Q. And -- and Mylan would set the WAC?
5    MR. ESCOBAR: Objection to the form.
6    THE WITNESS: There was a WAC established for
7    every product launch and -- and maintained moving
8    forward.
9    Q. (By Mr. Mullin) In connection with that
10   launch, Mylan would report that price to First
11   DataBank and Medi-Span, right?
12   A. Yes, as part of requirements for having
13   the product listed.
14   Q. And the higher you set the -- the WAC, the
15   higher the reimbursement, right?
16   MR. ESCOBAR: Objection to the form.
17   Q. (By Mr. Mullin) For those third-party
18   payers that used WAC as the basis for their
19   reimbursement?
20   MR. ESCOBAR: Same objection.
21   THE WITNESS: As discussed with AWP,
22   mathematically the same methodology applied to a

                              32 (Pages 122 to 125)

Page 126

1  higher price would yield a higher reimbursement.
2       Q.  (By Mr. Mullin)  So that a pharmacy can --
3  I mean a manufacturer can influence the revenue
4  that the pharmacy receives in connection with the
5  -- filling a prescription with Mylan's products --
6       MR. ESCOBAR:  Objection --
7       Q.  (By Mr. Mullin)  -- correct?
8       MR. ESCOBAR:  -- objection to the form; no
9  foundation.
10      THE WITNESS:  No, because the other variables
11 don't control.  There's many variables that would
12 go into a reimbursement methodology.  You don't
13 control them.
14      Q.  (By Mr. Mullin)  Like what?
15      A.  Like the percentage discount.  Like a MAC.
16 Like an FUL.  Or the implementation or application
17 of any of those.
18      Q.  Well -- okay.  That -- whatever the
19 percentage discount is, if you increase the WAC, as
20 long as you're applying the same percentage as a
21 matter of mathematics, the -- the resulting
22 number's always going to be higher if you start

Page 127

1  with a higher WAC, right?
2       MR. ESCOBAR:  Objection to the form.  And
3  you're calling now for speculation about what are a
4  myriad of different programs.
5       THE WITNESS:  As answered previously,
6  mathematically, yes, it -- it's very simple.
7       Q.  (By Mr. Mullin)  Do you recall
8  discussions, conversations at Mylan with regard to
9  establishing reported prices, AWPs and WACs, about
10 being concerned at maximizing revenue for
11 pharmacies?
12      MR. ESCOBAR:  Objection to the form.
13      THE WITNESS:  No.
14      Q.  (By Mr. Mullin)  Do you recall any
15 discussion of that at any time while you were at
16 Mylan?
17      MR. ESCOBAR:  Objection to the form.
18      THE WITNESS:  Could you rephrase that, please.
19      MR. MULLIN:  Could you read it back.
20          (Whereupon, the record was read by the
21          reporter.)
22      THE WITNESS:  Would you repeat the previous

Page 128

1  question, please.
2          (Whereupon, the record was read by the
3          reporter.)
4       THE WITNESS:  No.
5       Q.  (By Mr. Mullin)  No recollection
6  whatsoever on that topic?
7       MR. ESCOBAR:  Objection to the form; asked and
8  answered.
9       Q.  (By Mr. Mullin)  Is that right?
10      A.  Yes, that is correct.
11      Q.  Okay.  Any recollection of discussion of
12 spreads?
13      MR. ESCOBAR:  Objection to the form.  What do
14 you mean by spreads?
15      MR. MULLIN:  Spreads between the contract
16 price and the AWP price.
17      MR. ESCOBAR:  Objection to the form.
18      Q.  (By Mr. Mullin)  Do you recall any
19 discussion, conversation, that ever coming up at
20 Mylan while you were working there?
21      MR. ESCOBAR:  Objection to the form.
22      THE WITNESS:  No.

Page 129

1       Q.  (By Mr. Mullin)  Did people ever send you
2  e-mails saying that customers were reporting that
3  someone else had a better spread and, therefore,
4  they were less willing or maybe even unwilling to
5  buy Mylan's product?
6       MR. ESCOBAR:  Objection to the form.
7       THE WITNESS:  Not that I recall.
8       Q.  (By Mr. Mullin)  Do you know Jodi
9  Eichelberger?
10      A.  Yes.
11      Q.  Who's Jodi Eichelberger?
12      A.  Jodi Eichelberger was an employee of UDL,
13 which is an institutional -- or was an
14 institutional division of Mylan.
15      Q.  When you say "an institutional division,"
16 what do you mean?
17      A.  The company focused on hospital and
18 long-term care customer -- pharmacy customers.
19      Q.  Selling pharmaceuticals in blister packs
20 for individual doses?
21      A.  Yes.
22      Q.  And was that Jodi's position in or about

Cunard, Robert G.                                                                October 26, 2007
Atlanta, GA

Page 210

1    THE WITNESS: They complement each other but
2 are distinct.
3    Q. (By Mr. Mullin) And at Mylan, didn't you
4 work closely with the sales people?
5    MR. ESCOBAR: Objection to the form.
6    THE WITNESS: No, not on a regular basis.
7    Q. (By Mr. Mullin) And do you have any
8 opinion as to whether or not a -- a template that
9 calculated the reimbursement of Mylan's product as
10 compared to a brand product and other generics
11 would be a valuable or not a valuable selling tool?
12    MR. ESCOBAR: Objection to the form. Calls
13 for speculation and no foundation.
14    THE WITNESS: No, I don't have an opinion.
15    Q. (By Mr. Mullin) And you don't have any
16 memory of people at Mylan having this; is that
17 right?
18    MR. ESCOBAR: Objection to the form.
19    THE WITNESS: That's correct. I don't recall
20 this.
21    Q. (By Mr. Mullin) Let me -- did you ever --
22 do you know someone at Mylan by the name of R.

Page 211

1 Moldin, M-o-l-d-i-n?
2    A. Yes.
3    Q. Who is that?
4    A. For a period of time, Richard Moldin was
5 the president of Mylan Laboratories.
6    Q. So that would be the president of the
7 parent company of Mylan Pharmaceuticals?
8    A. That is correct.
9    Q. So that would be your boss's boss when you
10 were there?
11    MR. ESCOBAR: Objection to the form.
12    THE WITNESS: I believe the time Mr. Moldin
13 was there, I reported to Mr. DeBone who reported to
14 Mr. Moldin.
15    Q. (By Mr. Mullin) Okay. Do you have any
16 recollection of ever sending any templates to Mr.
17 Moldin that he could use to compare drugs?
18    MR. ESCOBAR: Objection to the form.
19    Q. (By Mr. Mullin) The reimbursement of
20 drugs?
21    A. Not that I recall, no.
22    Q. Did you deal with Richard Moldin on a

Page 212

1 day-to-day basis?
2    A. Not on a day-to-day basis, no.
3    Q. Would you think -- would you say it would
4 be unusual or an exception to be dealing directly
5 with Mr. Moldin when you were at Mylan?
6    A. He was there a limited amount of time. I
7 couldn't say it would be unusual or exceptional,
8 but I did not have daily communication with Mr.
9 Moldin.
10    Q. Do you have a recollection of sending him
11 any templates or spreadsheets that would allow him
12 to compare reimbursement on Mylan's drugs versus
13 various other drugs?
14    A. Not that I recall, no.
15    Q. Any new tools that the company had that it
16 was distributing to its sales force and you wanted
17 to let him know what was going on; anything like
18 that ring any bells with you?
19    A. No, not that I recall.
20    MR. MULLIN: Let's -- I'll have our next
21 number. Let's mark this as Exhibit Cunard 012.
22    (Whereupon, Exhibit Cunard 012 was marked

Page 213

1 for identification.)
2    Q. (By Mr. Mullin) I'd ask you to look at
3 what's been marked Exhibit Cunard 012.
4    I'd represent to you that this is a document
5 that was produced to the Commonwealth by the
6 California Attorney General's Office who
7 represented to us that it was provided to them by
8 Mylan and to a House committee and that the
9 redactions that are shown on here were done by
10 Mylan.
11    And if you look at the very top, it appears to
12 be an e-mail from you to R. Moldin, right?
13    A. The copy is a little run together, but
14 yeah, I believe that's the case.
15    Q. And it's dated April 24, 2000, right?
16    A. Yes, sir.
17    Q. And at that time, you were the director of
18 pricing and contracts, right?
19    A. That is correct.
20    Q. So there was a VP between you and Mr.
21 Moldin, right?
22    MR. ESCOBAR: Objection to the form.

54 (Pages 210 to 213)

Henderson Legal Services
202-220-4158

**Page 214**

1  THE WITNESS: Yes, that is correct.
2  Q. (By Mr. Mullin) So he would have been
3  three levels above you?
4  MR. ESCOBAR: Objection to the form.
5  THE WITNESS: I don't know the exact levels.
6  But -- but yes, there would have been an additional
7  person from what I had outlined earlier.
8  Q. (By Mr. Mullin) So it would be fair to
9  say he was your boss's boss's boss?
10  MR. ESCOBAR: Objection for the form.
11  THE WITNESS: Yes, I think that would be
12  accurate.
13  Q. (By Mr. Mullin) You say, "Dear Mr.
14  Moldin, please find attached Drug 7 information per
15  your request. The spreadsheets are a little
16  complex, but hopefully they will make sense."
17  Then you had attached three spreadsheets,
18  right; is that what the document shows?
19  A. Yes, that's what it appears.
20  Q. All right. And one is called price
21  comparison and you -- underneath that you say,
22  "Outlines current Drug 7 generic and proposed Mylan

**Page 215**

1  prices par -- prior to cash discount and Medicaid."
2  Right?
3  A. Yes, that's what it says.
4  Q. Then the next attachment that you have is
5  Mylan versus TEVA versus Drug Roman numeral VII and
6  you say, "Outlines the reimbursement model
7  comparing Mylan's Drug 7 to TEVA generic and Drug
8  Roman numeral VII. Quoted prices are at wholesaling
9  chains."
10  And then the third attachment is Drug 7
11  projections; is that right; that's the title that's
12  listed there?
13  A. Yes.
14  Q. And then you say, "Represents the
15  projected Drug 7 conversion rate."
16  What's the conversion rate with regard to the
17  launch of a pharmaceutical?
18  A. The conversion rate is the rate that the
19  generic captures the brand market share.
20  Q. Okay. And do you have a recollection of
21  sending price comparison documents to Mr. Moldin,
22  including comparisons that would permit the

**Page 216**

1  comparison of one generic to another generic and
2  reimbursement -- what the reimbursement was going
3  to be on the various products?
4  MR. ESCOBAR: Objection to the form.
5  THE WITNESS: I don't recall the specific
6  reimbursement piece, but I do recall in this
7  instant (sic), there was confusion in the
8  marketplace as there were two products that were
9  both the same molecule extended release but they
10  were not interchangeable with one another. And
11  there was confusion in the marketplace around the
12  pricing dynamics that we were trying to remedy.
13  Q. (By Mr. Mullin) And this was with regard
14  to the generic versions of Procardia?
15  A. Our product was the -- the Mylan product
16  was the generic name and equivalent version of
17  Procardia XL. There was another product named that
18  was nifedipine extended release as well. However,
19  it was bioequivalent and interchangeable with the
20  brand product Adalat CC. And the fact that the two
21  products shared the same molecule name and extended
22  release, there was confusion in the marketplace.

**Page 217**

1  But they were not interchangeable with one another.
2  Q. And who was the manufacturer of Adalat?
3  A. Oh. I believe at the time it was Bayer.
4  I'm -- I'm not sure who purchased them or where
5  that company would be today.
6  Q. And do you have a recollection of sending
7  Mr. Moldin documents relating to what the
8  comparison was on the reimbursement for various
9  drugs?
10  MR. ESCOBAR: Objection to the form. Are you
11  asking if he has a recollection of sending the
12  document that you're looking at now?
13  MR. MULLIN: Ever, with regard to anything.
14  MR. ESCOBAR: Can you just try to rephrase it
15  so we -- we have, like, a complete question.
16  Q. (By Mr. Mullin) Mr. Cunard, do you have a
17  recollection of sending attachments, forms,
18  spreadsheets that permitted the comparison of the
19  reimbursement on one of Mylan's product versus the
20  reimbursement on some competing manufacturers'
21  products to Mr. Moldin?
22  A. I do not recall that, no. I don't believe

Page 222

1    A.  Yes, that appears to be the case.
2    Q.  And you're aware -- you were aware back
3  when you were with Mylan that each state has its
4  own Medicaid program?
5    A.  Yes.
6    Q.  And that each state set its own criteria
7  as to the basis on which it was going to reimburse
8  under -- for prescription drugs under its Medicaid
9  program?
10   MR. ESCOBAR:  Objection to the form.
11   Q.  (By Mr. Mullin) Is that right?
12   A.  I wasn't aware of the -- exactly the --
13 the methodology or how that was obtained, but
14 through various publications, it was clear that
15 there were differences among the programs.
16   Q.  Okay.  If you would, sir, would you turn
17 to page 2 of Exhibit Cunard 013 and look at the
18 column for the Commonwealth of Massachusetts.  I
19 think it's the fourth column if you go across
20 horizontally.
21   Do you see that?
22   A.  I do.

Page 223

1    Q.  And under the brand reimbursement
2  criteria, do you see in line 3 reimbursement is WAC
3  plus and the entry is 10 percent?
4    A.  Yes.
5    Q.  And a dispensing fee of $3?
6    A.  Yes.
7    Q.  And a copay of 50 cents?
8    A.  Yes.
9    Q.  And then an AWP is plugged in, a WAC price
10 is plugged in, and a reimbursement is calculated.
11   Do you see that, the 126.83?
12   A.  Yes.
13   Q.  Then there's a dispensing fee and a -- a
14 copay and it comes up with a total reimbursement of
15 130.33.
16   Do you see that?
17   A.  Yes.
18   Q.  And the cost to the pharmacy, the invoice
19 price is 115.30?
20   A.  Yes.
21   Q.  And it calculates that the profit to the
22 pharmacy at invoice is 15.03.

Page 224

1    Do you see that?
2    A.  Yes.
3    Q.  And the -- the net profit or the profit at
4  net to the pharmacy is 15.03?
5    A.  Yes.
6    Q.  Then it does the same thing for generic
7  reimbursement; is that right?
8    A.  Yes, that appears to be the case.
9    Q.  And they plug in the generic AWP, the
10 124.50?
11   A.  Yes.
12   Q.  And for a -- a pharmacy cost, they plug in
13 81.30?
14   A.  Yes, I see that.
15   Q.  And the profit at net to the pharmacy
16 using the generic product is 19.76?
17   A.  Yes.
18   Q.  And interpreting this chart or comparison
19 worksheet, does it appear to you that the
20 conclusion here is that the pharmacy makes more
21 money using the generic than the brand product?
22   MR. ESCOBAR:  Objection to the form.

Page 225

1    THE WITNESS:  Well, as the model outlines,
2  19.76 is greater than 15.03, yes.
3    Q.  (By Mr. Mullin) Do you have a
4  recollection of having a document like this at
5  Mylan that people used?
6    A.  I do not, no.
7    Q.  Is this the document that you sent to Mr.
8  Moldin?
9    A.  No.
10   Q.  Do you think this would be valuable to a
11 salesman?
12   A.  I don't --
13   MR. ESCOBAR:  Objection to the form; calls for
14 speculation.
15   THE WITNESS:  I don't know.
16   Q.  (By Mr. Mullin) You have no idea
17 whatsoever whether it would be valuable or not to a
18 salesman?
19   MR. ESCOBAR:  Objection to the form; calls for
20 speculation.
21   THE WITNESS:  No.
22   Q.  (By Mr. Mullin) Can you think of any

Cunard, Robert G.  October 26, 2007
Atlanta, GA

Page 254

1  019.
2      Q. (By Mr. Mullin) Mr. Cunard, I'm going to
3  show you what's been marked as Exhibit Cunard 019.
4      It's a series of e-mails. At least the -- the
5  one at the very top of the very page is from Mike
6  Hatch to you. It appears to attach some
7  information relating to Anthem.
8      Are you familiar with a customer by the name
9  of Anthem?
10     A. Yes, I am.
11     Q. This document was produced to the
12 Commonwealth by California AG's office. They
13 represented to us they got it from Mylan, that it
14 was also produced to a committee of the Congress.
15 It has redactions and we've been told the
16 redactions were done by Mylan.
17     In going through the document, it all appears
18 to relate to the same topic or at least the first
19 six or seven pages, although some of the e-mails
20 are repeated.
21     Why don't I let you look at this just so you
22 can become familiar with it. Then I'm going to

Page 255

1  direct your attention to page 2 to an e-mail from
2  you to Bob Potter dated 8/8/01 at 2:33 p.m.
3      MR. MULLIN: You can disregard the last four
4  pages of Exhibit Cunard 019. I think they're
5  documents that we previously looked at.
6      Mr. Escobar, if you prefer, I'm going to pull
7  the last four pages off of this.
8      MR. ESCOBAR: I think that would be the -- a
9  better way to go.
10     MR. MULLIN: All right. Let's remove the last
11 four pages.
12     MR. ESCOBAR: Why don't you do this.
13     MR. MULLIN: Right now, Exhibit Cunard 019,
14 the first page has a Bates number MYLCA-000114 and
15 the numbers run continuously to MYLCA-000120.
16 There's also a set of Bates numbers on here, MYL
17 that end in 88 and run through 94. So there's two
18 numbers on each page.
19     Q. (By Mr. Mullin) All right. Mr. Cunard,
20 have you had a chance to look at this at least a
21 little bit and become familiar with what this is
22 about?

Page 256

1      A. Yes, I have.
2      Q. And the -- the customer seems to be
3  Anthem?
4      A. Yes.
5      Q. And what's Anthem?
6      A. Anthem is a (sic) insurance program that
7  has a mail order pharmacy associated with it.
8      Q. And it appears that somebody at Anthem was
9  raising a -- a question or an issue about Medicaid
10 reimbursement in Ohio for some -- for a drug?
11     MR. ESCOBAR: Objection to the form;
12 mischaracterizes the document.
13     THE WITNESS: I don't see it as raising an
14 issue, but just presenting a scenario.
15     Q. (By Mr. Mullin) Okay. And turning to
16 page 2 of Exhibit Cunard 019, which has a Bates
17 number in the lower right-hand corner ending in
18 115, there's an e-mail from you to Bob Potter with
19 copies to Joe Duda and Bob Claeys.
20     And you say, "Bob, Bob, and Joe, something
21 doesn't jibe with his reimbursement rates.
22 Everything I have on Ohio puts them at AWP minus 11

Page 257

1  percent for Medicaid or MAC, which this should not
2  have being (sic) an exclusive. The 152 price being
3  offered is the same spread in comparison to AWP as
4  the 15-milligram, which they have purchased 565
5  bottles through 7/31. So must be okay. Need more
6  info what the issues are. Thanks, Bob." And then I
7  guess it has the name Bob Potter under there.
8      Did you in the course of performing your
9  duties at Mylan make efforts to keep up on what the
10 reimbursement rates were for various Medicaid
11 programs around the country?
12     MR. ESCOBAR: Objection for the form and asked
13 and answered.
14     THE WITNESS: I did not make an effort to keep
15 up on it, but as I indicated earlier, the
16 information was published in at least one trade
17 journal on somewhat of a regular basis that would
18 show Medicaid reimbursements by state.
19     Q. (By Mr. Mullin) And what journal was
20 that?
21     A. I believe it was Drug Topics. I'm not
22 sure of the exact.

65 (Pages 254 to 257)

Page 258

1   Q. And is that, like, an annual issue or a
2   quarterly issue or something like that or was it
3   every month or?
4   A. Drug Topics was at least monthly and
5   perhaps more frequent. They didn't publish that
6   information monthly, but it was numerous times
7   during the year, I believe.
8   Q. And that's something that you had; you
9   maintained Drug Topics and -- and the issues that
10  had the -- the Medicaid information?
11      MR. ESCOBAR: Objection to the form.
12      THE WITNESS: I didn't really maintain it, but
13  I -- I typically kept the issues of Drug Topics,
14  all the issues.
15  Q. (By Mr. Mullin) All right. And was one
16  of your reasons or part of your reasons for doing
17  the fact that from time to time, you would consult
18  with it when issues would arise or questions would
19  arise about Medicaid reimbursements?
20      MR. ESCOBAR: Objection to the form.
21      THE WITNESS: It was a -- it was a source of
22  reference as issues may arise.

Page 259

1   Q. (By Mr. Mullin) And were you aware of
2   others at Mylan who also kept copies of Drug
3   Topics?
4   A. I'm not aware. They may or may not have.
5   Q. Was there some kind of a library within
6   sales and marketing?
7   A. No.
8   Q. How about the -- the marketing people; did
9   they maintain some kind of a bookcase or collection
10  of industry publications?
11  A. There were some publications. They were
12  mainly to maintain copies of our advertisement that
13  ran in those journals.
14      MR. MULLIN: Let me mark this document as --
15  Exhibit Cunard 020 is our next one.
16      (Whereupon, Exhibit Cunard 020 was marked
17  for identification.)
18  Q. (By Mr. Mullin) I'm showing you what's
19  been marked Exhibit Cunard 020.
20  I'd represent to you that it's a document that
21  was produced to the Commonwealth by Mylan in
22  response to a document request. The Bates number

Page 260

1   ends -- on the first page ends in 2318263 and the
2   next page ends in 64.
3       And if you look down at the bottom of the
4   first page, it seems to be an e-mail from Karen
5   Konkus, K-o-n-k-u-s, the manager of pharmaceutical
6   pricing at Omnicare in Covington, Kentucky, and
7   that it was forwarded by Christine McArdle --
8   McArdle at Mylan.
9       Who's Christine McArdle?
10  A. Christine McArdle was a clerical person
11  within the pricing and contracts group.
12  Q. And are you familiar with Karen Konkus?
13  A. I am not, no.
14  Q. Are you familiar with Omnicare?
15  A. Yes.
16  Q. What's Omnicare?
17  A. Omnicare is an operator of long-term care
18  pharmacies for nursing homes.
19  Q. And was Omnicare a customer?
20  A. Yes.
21  Q. Significant one?
22      MR. ESCOBAR: Objection for the form.

Page 261

1       THE WITNESS: I don't recall.
2   Q. (By Mr. Mullin) Well, Ms. Konkus writes,
3   "As Omnicare continues to monitor closely the
4   Medicaid changes with HCFA and FULs within our
5   states of operation, we need your help. Dave
6   Kramer -- Kramer director of Medicaid relations
7   will be contacting you shortly to set up a
8   procedure to receive ongoing electronic updates for
9   WACs and AWPs. Dave's phone number here at the
10  corporate office is" -- and then there's a phone
11  number -- "and his e-mail address is" -- and
12  there's an e-mail address. "Thanks in advance for
13  your help on this matter."
14      Christine forwarded this e-mail to you; is
15  that right?
16  A. Yes, it appears to be the case.
17  Q. And Christine said to you, "I got this
18  message from Karen Konkus at Omnicare Heartland.
19  Should I forward this -- who should I forward this
20  to?"
21  Right?
22  A. Yes.

Page 262

1   Q.  And you forward it to Joe Duda, right?
2   A.  Yes.
3   Q.  And you told him basically, "Please
4   contact Mr. Kramer.  We can do this.  However, need
5   to discuss what format and how they would like to
6   receive it.  We can send via e-mail or perhaps via
7   conventional EDI depending upon their capabilities.
8   Let's discuss."
9       Medicaid reimbursement is a huge issue for
10  nursing homes and long-term pharmacies -- long-term
11  care pharmacies?
12      MR. ESCOBAR:  Objection to the form.  Calls
13  for speculation; no foundation; and also seems to
14  be completely unrelated to this document.  I'm not
15  sure what you -- before you ask the question.
16      THE WITNESS:  I don't know what the relative
17  importance of Medicaid is to those facilities.
18  Q.  (By Mr. Mullin)  Okay.  At least this
19  company Omnicare claimed Ms. Konkus has a director
20  of Medicaid relations, Mr. Kramer.
21      In -- in agreeing to have Mr. Duda contact
22  them and work this out, was part of your reasoning

Page 263

1   that the customer wanted this information because
2   of the impact that your WACs and your AWPs can have
3   in their reimbursement from the Medicaid programs?
4       MR. ESCOBAR:  Objection to the form.  Calls
5   for speculation as to the third party, the
6   customer, and mischaracterizes the document on
7   which your question was apparently based.
8       THE WITNESS:  I asked Mr. Duda to contact the
9   customer to facilitate making this happen just
10  because it was a customer and they had requested
11  information that we could relatively easily
12  provide.  As to what their use for that information
13  was, it was insignificant to me.
14  Q.  (By Mr. Mullin)  It's always good to know
15  why customers want things?
16      MR. ESCOBAR:  Objection to the form.
17      THE WITNESS:  Not necessarily, no.
18  Q.  (By Mr. Mullin)  It's usually good to know
19  why customers wants things?
20      MR. ESCOBAR:  Objection to the form.
21      THE WITNESS:  Not necessarily, no.
22  Q.  (By Mr. Mullin)  You got any idea why they

Page 264

1   wanted that information?
2       MR. ESCOBAR:  Objection for the form.  And
3   you're asking him to speculate about a third
4   party's actions.
5       THE WITNESS:  No.  And as I indicated, I had
6   no issue on providing that as that -- it was not in
7   conflict with any of our business interests.
8   Q.  (By Mr. Mullin)  David Workman, did he
9   report to you for a period of time?
10  A.  Yes.
11  Q.  And what was Mr. Workman's position at the
12  company when he reported to you?
13  A.  As I recall, when I joined the company,
14  Mr. Workman was also a coordinator within the
15  pricing area responsible for direct customer
16  pricing.  He was later brought back to the pricing
17  area again and as a -- and I believe the title was
18  director.
19  Q.  For contracts --
20  A.  He was --
21  Q.  -- contract pricing?
22  A.  In the pricing and contracts area, yes.

Page 265

1   Q.  And over the course of time that you
2   worked at Mylan, you got to know Mr. Workman?
3   A.  Yes.  And I knew Mr. Workman before
4   joining Mylan.
5   Q.  And how did you know him?
6   A.  As a customer of Mylan, I had met him on
7   several occasions.
8   Q.  You -- that's when you were with Rite Aid?
9   A.  Rite Aid and Value Drug.
10  Q.  And he'd come out on sales calls?
11  A.  No.  No.
12  Q.  You just talked to him over the phone
13  about your account?
14  A.  No.  I was invited on several occasions
15  for plant visits and to tour the Mylan facilities
16  in Morgantown.  During those visits, I met Mr.
17  Workman.
18  Q.  And are you aware of Mr. Workman doing a
19  study while you were at Mylan maybe in connection
20  with a college course he was taking about
21  establishing a training program at Mylan for a --
22  internal training within sales and marketing

**Page 270**

1  delivers inadequate service to Mylan's customers.
2  Examples of the problems were as follows." And the
3  first bullet point is, "Lack of knowledge of
4  pharmacy reimbursement scenarios from Mylan
5  products."
6     Did you find that to be the case?
7     MR. ESCOBAR: Objection to the form. And
8  you're asking him to -- I'm not sure what you're
9  asking him.
10    MR. MULLIN: I'm asking whether or not he
11 found that to be the case.
12    MR. ESCOBAR: Did -- did he find what to be
13 the case?
14    MR. MULLIN: That individuals within the sales
15 and marketing department at Mylan lacked knowledge
16 of pharmacy reimbursement scenarios for Mylan
17 products.
18    MR. ESCOBAR: Objection to the form.
19    THE WITNESS: I don't recall ever doing any
20 kind of evaluation to determine their understanding
21 of pharmacy reimbursement, so I -- I -- I can't say
22 I had any opinion on the topic.

**Page 271**

1     MR. MULLIN: Well, I think that completes our
2  examination of this witness.
3     MR. ESCOBAR: Okay. We'll take a few minutes.
4  I'll have some questions for the witness and then
5  we can dismiss.
6     MR. MULLIN: Okay.
7     THE VIDEOGRAPHER: 4:32. We're off the
8  record.
9        (Whereupon, a recess was taken.)
10    THE VIDEOGRAPHER: 4:40. We're back on the
11 record.
12           EXAMINATION
13 BY MR. ESCOBAR:
14    Q. Good afternoon, Mr. Cunard.
15    I'm ask you -- I'm going to ask you a few
16 questions following up on -- on Mr. Mullin's
17 examination.
18    Just to put it in context, I think you
19 described generally that during the time you were
20 at Mylan from 1999 to 2006, your principal function
21 was in the area of pricing and contracts. Is that
22 right?

**Page 272**

1     A. Yes, that's where the majority of my time
2  was spent.
3     Q. And as a general proposition, was a lot of
4  your activity revolving around negotiating with
5  customers or coming up with pricing that customers
6  -- that you would have with customers on a contract
7  basis?
8     A. Yes.
9     Q. Now, Mr. Mullin asked you questions
10 throughout the day talking about reimbursement,
11 sometimes about Medicaid reimbursement.
12    Did -- to your knowledge, did Mylan receive
13 any money or any reimbursement from Medicaid in
14 connection with Mylan's sales of drugs?
15    A. No.
16    Q. Was it your understanding that the
17 reimbursement that Mr. Mullin mentioned or Medicaid
18 reimbursement was something that was paid by
19 federal and state governments to providers that
20 dispensed the products?
21    A. Yes, that's correct.
22    Q. And Mylan is -- I think you described that

**Page 273**

1  Mylan is a company that is engaged in the sale of
2  generic pharmaceutical products, right?
3     A. Yes, that's correct.
4     Q. And did Mylan participate in a market that
5  you would view as a competitive one?
6     A. Yes.
7     Q. And what were the general basis (sic) on
8  which you perceived that you competed with other
9  companies with respect to the sale of
10 pharmaceutical products?
11    A. As indicated earlier, price, supply,
12 value-added services, CE programs --
13    MR. MULLIN: I'm sorry. I couldn't hear you.
14    THE WITNESS: Price, supply, value-added
15 services such as continuing education programs,
16 quality of product, reliability, reputation.
17    Q. (By Mr. Escobar) And generally within --
18 and in your experience during the time that you
19 were at Mylan, was -- were Mylan's products viewed
20 favorably in the market and had the requisite
21 approvals by government agencies?
22    A. Yes.

Page 274

1  Q. Now, Mr. Mullin mentioned at the outset
2  that the reason the deposition was being taken is
3  because Massachusetts had sued Mylan and other
4  generic companies in a case that's now pending up
5  in Massachusetts. And one of the allegations
6  that's being made by Massachusetts is that
7  Massachusetts was deceived into thinking that the
8  WAC price of Mylan's product was a price that was
9  net of rebates, chargebacks, discounts, and other
10 deductions.
11     Did -- to your knowledge, did anyone at Mylan
12 ever represent to the State of Massachusetts that
13 Mylan's WAC on its products was net of discounts,
14 chargebacks, rebates, and other -- other
15 deductions?
16     MR. MULLIN: Objection; foundation and
17 misstates the allegations in the complaint.
18     MR. ESCOBAR: You can answer.
19     THE WITNESS: No. I'm not aware any of such
20 representation.
21  Q. (By Mr. Escobar) And the -- Mylan's WAC
22 price, was that an actual invoice price that Mylan

Page 275

1  charged to its wholesale customers?
2  A. Yes.
3  Q. Did -- the suggestion in the allegations
4  in the complaint that Massachusetts has filed is
5  that Mylan would raise its WACs for the purpose of
6  increasing reimbursement.
7      In your experience dealing with the pricing
8  area and with WACs in particular, are there
9  negative consequences to Mylan if it just raises
10 its WACs for purposes of reimbursement?
11  A. Yes. As typically in the generic market,
12 over time you see price erosion as competition
13 continues and customers go through bid cycles, so
14 the -- the net price continues to erode. An
15 increase of WAC where there's specific discounts
16 tied to it around the wholesale programs would
17 actually be counter-productive to the profitability
18 of Mylan.
19  Q. And can you explain to the jury how it
20 would be that if you increase WACs while the prices
21 erode, as you put it, due to competition, how that
22 could have a negative consequence?

Page 276

1  A. If a WAC price is increased for wholesale
2  and distributor com- -- customers, they pay their
3  cash discount or their prompt pay discount off of
4  invoice price, which is WAC. They have
5  distribution service fees which are paid off the
6  invoice price, which is WAC. There's often volume
7  incentives which are paid off WAC. So inflating the
8  WAC price would increase the cost of all those
9  programs. Absent a change on the net or the
10 contract price side, those increased costs would be
11 reflected directly in the profitability of Mylan's
12 products.
13     Q. And in the -- in the time that you were at
14 Mylan working in the pricing area, would -- as a
15 general -- as a general proposition, would -- would
16 the company look at WACs to see if they had to be
17 reduced in order to avoid issues along the
18 chargeback issue that you mentioned?
19     MR. ESCOBAR: Objection; leading.
20     MR. ESCOBAR: You can answer.
21     THE WITNESS: Adjustments to WAC that were
22 done proactively would be more around a decrease

Page 277

1  because that would decrease our costs to the
2  customer base and increase our profitability if we
3  were able to achieve that.
4  Q. (By Mr. Escobar) Now, Massachusetts has
5  provided in the course of this litigation some
6  damage calculations where they argue that they
7  should have been paying -- reimbursed. And -- and
8  their allegation is that they were reimbursing on
9  the basis of WAC for three specific drugs,
10 clozapine, lorazepam, and phenytoin, and that they
11 were reimbursing on the basis of WAC which they
12 allege was false, and that they really should have
13 been paying on something much lower and are using
14 an AMP calculation to indicate what they believe
15 they should have been paying.
16     Are you familiar with the term "AMP"?
17  A. Yes, I am.
18     MR. MULLIN: Objection to the question in that
19 it misstates the allegations in the complaint and
20 the damage calculation.
21     MR. ESCOBAR: Are you not calculating some
22 damages on the basis of some AMP number?

Page 278

1    MR. MULLIN: We're calculating on the basis of
2  that. We're not saying that reimbursement should
3  have been based on that.
4    MR. ESCOBAR: But your -- your -- you are --
5  your calculations that you've given us are based
6  AMP, correct?
7    MR. MULLIN: That they're -- they're -- that's
8  the closest number we can find to the real WAC.
9    Q. (By Mr. Escobar) Okay. So at the moment,
10 Massachusetts is suggesting that this real WAC
11 should have been AMP.
12    So let me ask you, are you familiar with the
13 term "AMP"?
14    A. I am.
15    Q. And what do those letters stand for as you
16 understand it?
17    A. Average manufacturer price.
18    Q. And is that a -- tell us what average
19 manufacturer price is and what Mylan does with
20 that.
21    A. As I understand it, that is the -- a
22 calculation done for a given period of time

Page 279

1  representing net sales and corresponding units for
2  non-government business. It's a straight division
3  that comes up with an average price per dose as is
4  typically done, either tablet or capsule.
5  Currently, that's reported on a quarterly basis to
6  CMS.
7    Q. And CMS is a federal agency that oversees
8  the Medicaid program?
9    A. Yes.
10    Q. And is it your understanding that Mylan
11 reports AMPs in accordance with instructions for
12 calculating those AMPs that are provided by the
13 federal government?
14    A. Yes.
15    Q. Now, is it your understanding that the
16 reporting of AMP happens on a quarterly basis every
17 year?
18    A. Yes, that is correct.
19    Q. So based on -- during the time that you
20 were at Mylan, was it your understanding that the
21 CMS agency which oversees the Medicaid program was
22 receiving AMP information on Mylan's drugs?

Page 280

1    A. Yes.
2    Q. Mr. Mullin showed you some spreadsheets
3  and talked to you about spread and used that word
4  on -- several times during the course of your
5  testimony and pointed you to some documents.
6    Based on the reporting of AMP, is it your
7  understanding that people that run the Medicaid
8  program had information from Mylan from which they
9  could compare the AMP for a drug and the WAC or the
10 AWP number?
11    MR. MULLIN: Objection; foundation.
12    THE WITNESS: Yes. It's my understanding that
13 that information is available from CMS if
14 requested.
15    Q. (By Mr. Escobar) So as far as you know,
16 during the time that you were working at Mylan, the
17 -- the government agency that ran Medicaid could
18 look at both Mylan's AWP and WAC and compare it to
19 an AMP number; is that right?
20    MR. MULLIN: Objection; foundation.
21    Q. (By Mr. Escobar) Is that right?
22    A. Yes, that is correct.

Page 281

1    Q. Okay. Now, Mr. Mullin asked you and
2  showed you documents about various customers,
3  wholesalers, and other types of Mylan customers.
4    Was the federal government a customer of
5  Mylan's?
6    A. Yes.
7    Q. And what -- what kind of a customer were
8  they in terms of the terminology that you use to
9  describe customers?
10    A. They were a contract customer in that they
11 did not buy product directly from us, but sourced
12 it under a contract through the wholesale
13 distribution network.
14    Q. And the contract that the federal
15 government -- that was used in selling to the
16 federal government, did that have a name?
17    A. Yes. There's actually -- actually two
18 that I was aware of. One was the Veterans
19 Administration contract and the second one is the
20 Federal Supply Schedule more commonly known as FSS.
21    Q. And what was your familiarity with FSS?
22    A. FSS is just a -- a contract that pricing