# Exhibit K

*State of California ex rel. Ven-A-Care of the Florida Keys, Inc.
v. Abbott Laboratories, Inc., et al.*, **Master Civil Action No. 01-12257-PBS,
Subcategory Case No. 06-11337**

Exhibit to the December 21, 2009 Declaration of Christopher C. Palermo in Support
of Defendants Mylan Inc. and Mylan Pharmaceuticals Inc's. Opposition to Plaintiffs' Motion for Partial Summary
Judgment

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. NO. 03-11865 PBS

------------------------------------x

| | |
|---|---|
| THE COMMONWEALTH OF MASSACHUSETTS, | : CONFIDENTIAL |
| Plaintiff, | : VIDEOTAPED |
| v | : 30(B)(6) |
| MYLAN LABORATORIES, INC., BARR | : DEPOSITION OF |
| LABORATORIES, INC., DURAMED | : DAVID L. |
| PHARMACEUTICALS, INC., IVAX | : WORKMAN, II |
| CORPORATION, WARRICK PHARMACEUTICALS | : |
| CORPORATION; WATSON PHARMACEUTICALS, | : SEPTEMBER 26, |
| INC., SCHEIN PHARMACEUTICALS, INC., | : 2007 |
| TEVA PHARMACEUTICALS USA, INC., PAR | : |
| PHARMACEUTICAL, INC.,DEY, INC., | : MORGANTOWN, |
| ETHEX CORPORATION, PUREPAC | : WEST VIRGINIA |
| PHARMACEUTICAL CO., and ROXANE | : |
| LABORATORIES, INC., | : |
| Defendants | : |

------------------------------------x

Workman, II, David L. - 30(b)(6)    CONFIDENTIAL                September 26, 2007
Morgantown, WV

2 (Pages 2 to 5)

**Page 2**

```
 1  APPEARANCES:
 2
 3  Attorneys for the Plaintiff
 4
 5      THE COMMONWEALTH OF MASSACHUSETTS
 6      Office of the Attorney General
 7      Medicaid Fraud Control Unit
 8      One Ashburton Place, RM 1813
 9      Boston, Massachusetts 02108-1598
10      BY: PETER A. MULLIN
11      Assistant Attorney General
12      peter.mullin@ago.state.ma.us
13
14          -and-
15
16      ROBERT C. MOLVAR
17      Assistant Attorney General
18      robert.molvar@ago.state.ma.us
19          (617) 727-2200
20
21
22  (CONTINUED)
```

**Page 3**

```
 1  APPEARANCES:  (CONTINUED)
 2
 3      Attorneys for the Defendant
 4      Mylan Laboratories, Inc.
 5      KELLEY DRYE & WARREN,
 6      101 Park Avenue,
 7      New York, New York 10178-0002
 8      BY: WILLIAM A. ESCOBAR
 9      wescobar@kelleydrye.com
10
11          -and-
12
13      BRIAN CUTHBERTSON, Esquire
14      brian.cuthbertson@mylanlabs.com
15
16
17  VIDEOGRAPHER: GREG DIEFENBAUGH
18
19
20
21
22
```

**Page 4**

```
 1              INDEX
 2  WITNESS            EXAMINATION BY          PAGE
 3  David Lee Workman, II   Mr. Mullin............. 005
 4
 5            EXHIBITS
 6  NUMBER            DESCRIPTION            PAGE
 7  Exhibit Workman 001, MaMylan011364 to 365...... 126
 8  Exhibit Workman 002, MYLCA 000105 to 106....... 134
 9  Exhibit Workman 003, MYLCA 000121 to 123....... 152
10  Exhibit Workman 004, MYLCA 000111 to 113....... 160
11  Exhibit Workman 005, MAMylan006253 to 256...... 172
12  Exhibit Workman 006, MAMylan005344............. 186
13  Exhibit Workman 007, MaMylan064027 to 41....... 194
14  Exhibit Workman 008, MAMylan001649 to 54....... 203
15  Exhibit Workman 009, MAMylan006272 to 74....... 206
16  Exhibit Workman 010, MAMylan006257 to 58....... 211
```

**Page 5**

```
 1              PROCEEDINGS
 2
 3      VIDEOGRAPHER: The time is now 9:32 and
 4  we're now on the record.
 5      Would counsel please introduce
 6  themselves and who they represent.
 7      MR. MULLIN: Good morning. Peter Mullin
 8  and Robert Molvar, Assistant Attorney Generals,
 9  representing the Commonwealth of Massachusetts.
10      MR. ESCOBAR: William Escobar of Kelley
11  Drye on behalf of Mylan.
12      MR. CUTHBERTSON: Brian Cuthbertson,
13  Mylan Laboratories.
14      MR. MULLIN: Would the Court Reporter
15  please swear in the witness?
16
17      DAVID LEE WORKMAN, II
18  being first duly sworn, was examined and deposed
19  as follows:
20
21          EXAMINATION
22  BY MR. MULLIN:
```

Page 38

1  you for a period of time?
2     A. She did.
3     Q. And when she had the parallel position,
4  how did her responsibilities differ from your
5  responsibilities?
6     A. I -- I -- I don't remember if there was
7  a clear distinction.
8     Q. I think this is back when you were the
9  coordinator in pricing and contracts?
10    A. Yes.
11    Q. And I think that's the time period
12 when, among other things, you had responsibility
13 for processing chargebacks, right?
14    A. I don't remember the time when Hillary
15 and I had the same title or -- and how that
16 coincided with our responsibility for
17 chargebacks.
18    Q. Did -- at one time, did she have
19 responsibility for chargebacks?
20    A. I -- I don't remember.
21    Q. Did she have responsibility for bids --
22 making bids on behalf of the company to

Page 39

1  customers?
2     A. Yes.
3     Q. And did you have certain customers and
4  she had other customers?
5     A. I don't remember the distinction
6  between customers.
7     Q. Okay.
8        During the course of the testimony
9  today, I may refer to the "relevant time period"
10 in my questions, and that's the time period
11 that's alleged in the lawsuit, and essentially
12 that time period is the years 1998 to 2003.
13       So if a question -- if I include in the
14 question the words "relevant time period," that's
15 the time period that I'm referring to.
16       During that time period, what, if any,
17 responsibilities did you have with regard to
18 average wholesale price?
19       MR. ESCOBAR: Objection to the form.
20    A. I -- I -- I don't remember. When --
21 when I was coordinator of pricing and contracts
22 and associate manager of pricing and contracts,

Page 40

1  we were responsible for loading prices in our
2  operational databases. We provided price lists,
3  and we performed analysis. That's what I
4  remember, as it pertains to your question.
5     Q. Okay.
6        Do you have a recollection of being
7  asked to perform analysis relating to average
8  wholesale price?
9     A. I don't remember anything in
10 particular. We -- we did review average wholesale
11 price.
12    Q. Okay.
13       And describe the analysis that you do -
14 - is this finding out what other companies' AWPs
15 were?
16       MR. ESCOBAR: Objection to the form.
17    A. We reviewed our AWPs and other market
18 prices.
19    Q. And when you say "other market prices,"
20 you mean the AWPs of other competitors?
21    A. Yes.
22    Q. All right.

Page 41

1        And what would be your source of
2  information as to other customer -- other
3  competitors' AWPs?
4     A. Publications, such as Red Book and
5  Price Alert. There is a system known as
6  AnalySource.
7     Q. AnalySource?
8     A. AnalySource.
9     Q. Is that something that the company
10 subscribed to?
11    A. Yes.
12    Q. And that's something you used when you
13 were doing analysis relating to AWPs of
14 competitors?
15       MR. ESCOBAR: Objection to the form.
16    A. We -- we analyzed our prices and other
17 market prices.
18    Q. And is it -- who do you recall asking
19 you to perform analysis relating to AWP prices?
20       MR. ESCOBAR: Objection to the form.
21    A. I -- I -- I don't remember.
22    Q. Steve Krinke?

**Page 78**

1  Q. When you say "Steve," do you mean Steve
2  Krinke?
3  A. That's correct.
4  Q. And "Jason," you mean Jason Harper?
5  A. That's correct.
6  Q. Is there any person there in sales or
7  in marketing that is kind of generally
8  responsible for the -- for the files, the records
9  relating to the sales and marketing department?
10     MR. ESCOBAR: Objection to the form.
11 A. Today?
12 Q. Yeah.
13 A. I -- I don't know.
14 Q. Okay.
15     Back when your department was part of
16 sales and marketing, was there some person who
17 was kind of the go-to person with regard to
18 finding documents and records from prior periods?
19     MR. ESCOBAR: Objection to the form.
20 A. When pricing and contracts were a part
21 of sales and marketing, pricing and contracts
22 were responsible for our files. However, there

**Page 79**

1  were many people that had their individual files,
2  and various individuals had administrative
3  assistants. Customer service had their own group
4  of files.
5      So if you're asking me if there's one
6  person that we would seek out for files for the
7  sales and marketing department, the question
8  would be -- or the answer would be no, there's
9  not a single person that I would search out.
10 Q. Okay.
11     Going back to my question with regard
12 to AWP, during the relevant time period, 1998 to
13 2003, what was the policy at Mylan with regard to
14 setting AWP at launch?
15     MR. ESCOBAR: Objection to the form.
16 A. I -- I -- I don't know.
17 Q. To the best of your information, was
18 the policy to set AWP at launch at the brand AWP
19 minus 10 percent?
20     MR. ESCOBAR: Objection to the form.
21 A. I -- I don't know, and I don't know if
22 -- if there was a policy.

**Page 80**

1  Q. Even if it's not a written policy that
2  people can refer to, was that -- is that your
3  understanding as to what, in general, was done in
4  establishing AWPs at launch?
5      MR. ESCOBAR: Objection to the form.
6  A. I -- I -- I don't remember, but again,
7  every product and every different situation could
8  be different. I would not limit a price being
9  set in a consistent manner time over time.
10 Q. While you're in pricing and contracts
11 before you go down to Bertek, would you be
12 involved in decisions to change the AWP on a
13 product?
14     MR. ESCOBAR: Objection to the form.
15 A. What do you mean by "decisions"?
16 Q. The company has an existing AWP and it
17 decides to report a different AWP.
18     MR. ESCOBAR: Objection to the form.
19 A. Would I decide that?
20     Is that your question?
21 Q. No.
22     Are you involved in the decision as to

**Page 81**

1  what the amount is going to be?
2      MR. ESCOBAR: Excuse me. Objection to
3  the form.
4  A. I -- I -- I would prepare prices, but I
5  wouldn't necessarily say that I was involved in
6  the decision.
7  Q. When you say you would "prepare
8  prices," what do you mean?
9  A. That I would assign a price to a
10 product for others to review.
11 Q. Who would do the review?
12 A. Other people within our department, Joe
13 Duda, Bob Kinard, and others that I may not know
14 about.
15 Q. So you'd prepare prices -- and
16 essentially you were recommending, "Here's what I
17 think"?
18     MR. ESCOBAR: Objection to the form.
19 A. Yes.
20 Q. I take it -- is it both Joe and Bob
21 might review the same recommendation, or is it --
22 I guess Bob was Joe's supervisor for a period of

Page 82

1  time; is that right?
2     A. That's correct.
3     Q. And is it your understanding that when
4  Joe was there, things went not only to Joe but
5  also up to Bob Kinard?
6     A. That's correct.
7     Q. And you don't know if Bob consulted
8  with someone above him?
9     A. I -- I know that Bob did consult with
10 people above him. I don't know if he did so on
11 every occasion, or who those people necessarily
12 were.
13    Q. Then you'd get word back whether the
14 company was going with the price you'd
15 recommended or some different price?
16    A. That's correct.
17    Q. What would be the occasions -- what
18 would be the circumstance that would cause the
19 company to adjust or change a reported AWP price?
20       MR. ESCOBAR: Objection to the form.
21    A. Changes in market conditions.
22    Q. What kind of changes?

Page 83

1     A. Price fluctuation, on our product or a
2  competing product.
3     Q. So if you got reports that a competing
4  product had changed or adjusted their AWP, that
5  might prompt Mylan to adjust or change its AWP?
6        MR. ESCOBAR: Objection to the form.
7     A. Perhaps. Every situation is different.
8     Q. AWP -- is that a price that Mylan
9  charges its customers?
10    A. During what time period?
11    Q. Well, let's focus on '98 to 2003.
12       MR. ESCOBAR: Objection to the form.
13    A. I -- I don't know.
14    Q. What's your understanding of what AWP
15 is?
16    A. It's an acronym for Average Wholesale
17 Price. It is at times used as a method or a
18 reference point for reimbursement.
19    Q. Mylan's not a wholesaler, right?
20    A. No.
21    Q. So that -- and AWP isn't the price that
22 Mylan charges wholesalers, correct?

Page 84

1        MR. ESCOBAR: Objection to the form.
2     A. I don't know. During that time period
3  -- and you may have a price listed as your AWP,
4  there could be perhaps a time when a customer has
5  the same price as AWP. I -- I don't know.
6     Q. You're familiar with something called
7  Wholesale Acquisition Cost?
8     A. I am.
9     Q. And that's frequently known as the WAC
10 price, W-A-C?
11    A. Yes.
12    Q. Is that typically usually the price
13 charged to wholesalers?
14       MR. ESCOBAR: Objection to the form.
15    A. Mylan invoices our wholesalers at WAC.
16    Q. So I think you said that -- going back
17 to AWP -- if -- one occasion, one thing that
18 might prompt the company to adjust or change its
19 AWP would be reports that competitors had
20 adjusted or changed their AWP; is that right?
21       MR. ESCOBAR: Objection to the form.
22 Asked and answered.

Page 85

1     A. I -- I believe I've said it would be
2  market conditions and fluctuations in price.
3     Q. Okay, is there anything else that you
4  can think of that would prompt Mylan to change
5  its AWP?
6        MR. ESCOBAR: Objection to the form.
7     A. If we were notified that we were
8  categorized as a branded product. However, that
9  would be dictated by market conditions and
10 fluctuations in price.
11    Q. At any time prior to you going to
12 Bertek, can you recall any circumstance where
13 Mylan was ever notified by a price reporting
14 service that they were going to label the Mylan
15 product as a branded product rather than a
16 generic product because of what its AWP was?
17    A. I don't recall the circumstance, but
18 I'm aware that that has occurred.
19    Q. One or more than one occasion?
20    A. I don't know.
21    Q. You don't recall the product or when it
22 was or any of the circumstances?

**Page 98**

1  understanding of who did that.
2      Q.  When you were making your
3  recommendations, did you have any rule of thumb
4  in establishing WAC prices or recommending WAC
5  prices as to what the relationship was going to
6  be between AWP prices and WAC prices?
7          MR. ESCOBAR:  Objection to the form.
8      A.  I -- I did not necessarily have a rule
9  of thumb, with the --
10     Q.  And in formulating --
11     A.  With the exception that WAC is lower
12 than AWP.
13     Q.  Okay, anything else?
14     A.  Not that I remember.
15     Q.  What would you consider in coming up
16 with your recommendations?
17     A.  Market conditions and the competitive
18 environment. Additionally, where we have
19 negotiated contract prices, if they existed.
20 That's all I can remember.
21     Q.  How would negotiated contract prices
22 influence your recommendations as to WAC?

**Page 99**

1      A.  During that time period, we looked at
2  where our chargeback obligations were, and what
3  our prompt pay value were, as it pertained to not
4  only contract prices but the cost of the product.
5      Q.  When you say "prompt pay value," that's
6  a discount that Mylan offered its customers if
7  they paid within a certain period of time?
8      A.  Correct.
9      Q.  What was the company's standard prompt
10 pay terms?
11         MR. ESCOBAR:  Objection to the form.
12     A.  There is not a standard.
13     Q.  During '98 to 2003 there was no
14 standard prompt pay term?
15     A.  That is a condition that is
16 individually negotiated.
17     Q.  Is there one term that would be more
18 commonly agreed-upon than others?
19         MR. ESCOBAR:  Objection to the form.
20     A.  I -- I don't know.
21     Q.  During the period '98 to 2003, do you
22 think it's fair and accurate to say that the vast

**Page 100**

1  majority of the customers had prompt payment
2  terms of two percent net 30 days?
3          MR. ESCOBAR:  Objection to the form.
4      A.  I -- I don't know.
5      Q.  I mean, you were there and you dealt
6  with this stuff, right?
7      A.  I did and I do today.
8      Q.  Is that kind of an industry standard?
9      A.  Prompt payment terms vary from customer
10 to customer, in percentages and length.
11     Q.  But is it fair -- is it accurate to say
12 that most customers are on two percent net 30
13 days?
14         MR. ESCOBAR:  Objection to the form.
15 Asked and answered, and I think he'd disagree
16 with that notion.
17     A.  I don't know.
18     Q.  So you're saying you don't know whether
19 most of them are on that; is that right?
20         MR. ESCOBAR:  Objection to the form.
21     A.  That's correct.  I -- I don't know.
22     Q.  One of the other things that you said,

**Page 101**

1  that you'd consider -- you'd take into account
2  when you were making WAC recommendations was
3  market conditions and the competitive
4  environment.
5          What market conditions would influence
6  WAC recommendations?
7      A.  Market conditions and competitive
8  environment affects your negotiated price, up or
9  down, and the difference between WAC and that
10 contract price is your chargeback obligation. For
11 wholesalers, your prompt payment obligation is
12 off of that WAC price, and you review those
13 components of those prices as you're negotiating.
14     Q.  Okay, would what the competitors were
15 reporting as WACs -- as their WAC -- is that
16 something that you'd take into account?
17         MR. ESCOBAR:  Objection to the form.
18     A.  We -- we would review other
19 manufacturers' WAC prices.
20     Q.  In general, did you have an objective
21 with regard to your reported WAC and competitors'
22 reported WACs?

**102**

1  MR. ESCOBAR: Objection to the form.
2  A.  I -- I don't know. From a financial
3  perspective, we were concerned of our WAC prices
4  and our prompt payment obligation and our
5  chargeback obligation, compared to our contract
6  prices. So we analyzed all of those components
7  of price when making a recommendation.
8  Q.  Is it fair -- is it accurate to say
9  that one of your objectives was to keep your WAC
10 price above your highest contract price?
11     MR. ESCOBAR: Objection to the form.
12 Calls for speculation.
13 A.  A WAC should be higher than a contract
14 price in which chargebacks are received, however,
15 there could be contract prices higher than WAC.
16 Q.  What circumstance would there be a
17 contract price higher than WAC?
18 A.  Every product and every customer is
19 individually negotiated. There is a customer
20 that we have shipped to that is WAC plus 20
21 percent. Every circumstance is different.
22 Q.  Who have you shipped to at WAC plus 20?

**103**

1  A.  The name of the company I do not --
2  it's not a -- I don't remember their exact name.
3  Q.  What were the circumstances?
4  A.  I believe their name is Martijn, M-A-R-
5  T-I-J-N, Trading.
6  Q.  What were the circumstances relating to
7  the sale?
8  A.  I -- I don't know what you mean by
9  "circumstances" to the sale?
10 Q.  Is it a continuing relationship?
11     Is it a one-time transaction?
12     Was there some shortage in the industry
13 at the time and, you know, they particularly
14 wanted this product?
15     What was going on?
16     MR. ESCOBAR: Objection to the form.
17 A.  No. They buy some products. They
18 don't buy others. It's an at-will relationship.
19 Q.  Are you saying that on an ongoing basis
20 that they regularly pay WAC plus 20?
21 A.  What do you mean by "regularly"? I --
22 I'm -- I don't know the frequency. The company

**104**

1  still exists and that is still the price
2  structure.
3  Q.  Where are they located?
4  A.  I don't know.
5  Q.  Outside the United States?
6  A.  Yes.
7  Q.  Do you know what continent?
8  A.  I don't know.
9  Q.  Is part of the price the shipping
10 expense?
11 A.  I don't know.
12 Q.  Are they a direct customer?
13 A.  They purchase directly, yes.
14 Q.  So Mylan necessarily -- all your
15 product is shipped F.O.B., right?
16     MR. ESCOBAR: Objection to the form.
17 A.  I don't know.
18 Q.  Well, at least this company's product,
19 Mylan's paying the shipping?
20     MR. ESCOBAR: Objection to the form.
21 A.  I don't know.
22 Q.  Other than this one company, can you --

**105**

1  based on your years at Mylan, can you think of
2  anyone else that was paying more than WAC?
3  A.  Customers that we're shipping to? What
4  customers are you referring to?
5  Q.  Any customer who is paying Mylan.
6  A.  I -- I don't know.
7  Q.  Okay. You've got AWP prices, you've
8  got WAC prices, and you've got contract prices;
9  is that right?
10     MR. ESCOBAR: Objection to the form.
11 A.  Mylan's price structure to its
12 customers that we establish, yes.
13 Q.  And I think you've told me -- and you
14 correct me if I'm wrong -- that contract prices
15 are individually negotiated with customers; is
16 that right?
17 A.  Yes.
18 Q.  And during the relevant time period,
19 '98 to 2003, who had authority to approve
20 contract prices?
21 A.  Myself, Joe Duda, Bob Kinard, Mike
22 Doan, Dan Dorsey, Tom Darby, Hal Korman, Bob

**166**

1  Q. And you reduce or take out a copay of
2  1.75?
3     You then get a total reimbursement to
4  the pharmacy of 133.06?
5  A. Okay.
6     MR. ESCOBAR: Hang on a second. Did
7  you say --
8     MR. _____: Dispensing fee 5.40,
9  copay $1.75?
10    MR. ESCOBAR: Yeah, and I think you
11 said you take -- you reduce it by the copay, Mr.
12 Mullin?
13    MR. MULLIN: Copays don't go to the
14 pharmacy, do they?
15    MR. ESCOBAR: Well, I think you're
16 incorrect on the way your reading that column.
17 It seems to be --
18 BY MR. MULLIN:
19 Q. What's your understanding, Mr. Workman?
20    Does Medicaid pay the copay or does the
21 patient pay the copay?
22 A. The patient pays the copay?

**167**

1     MR. ESCOBAR: To the pharmacy?
2  A. To the pharmacy, yes.
3  Q. And if you look at the numbers here, I
4  guess the total reimbursement column would be the
5  sum of the three numbers immediately above?
6  A. Yes.
7  Q. For "Cost to Pharmacy" it has "Invoice"
8  and it has the WAC price; is that right?
9  A. Yes.
10 Q. If you reduce the -- if you subtract
11 total -- the cost to the pharmacy from total
12 reimbursement, you get 17.76?
13 A. Yes.
14 Q. And that's the profit at net to the
15 pharmacy?
16    MR. ESCOBAR: Objection to the form.
17 A. Where does it show what it was sold out
18 at?
19 Q. I believe that -- it's doing "Profit at
20 Invoice" and "Profit at Net." As far as any
21 rebates, it has "Rebates" at zero, so the only
22 cost to the pharmacy is 115.30?

**168**

1  A. And what was the claim submitted at?
2     MR. ESCOBAR: I'm not understanding
3  your question.
4  A. Did the pharmacy submit the claim at
5  AWP?
6     Is that AWP minus those fees, or is it
7  WAC minus those fees? What --
8  Q. I believe that this form indicates that
9  the State of Alabama reimburses on the basis of
10 WAC plus 9.2 percent.
11    I'm just asking you to look at the
12 columns here and whether or not you understand
13 this form to be saying that the net profit to the
14 pharmacy for using the brand product would be
15 $17.76?
16    MR. ESCOBAR: Objection to the form.
17 A. This is the first time I've went
18 through this form.
19 Q. Okay.
20 A. So I would have to go through this form
21 and try to understand it first, before I could
22 make any educated comments.

**169**

1  Q. Okay, let me step back then. I think
2  you said that this was the document -- when you
3  looked at it at the meeting with the Mylan
4  attorneys that refreshed some recollections in
5  your mind?
6  A. Yes.
7  Q. What was it about the document that
8  refreshed those recollections?
9     MR. ESCOBAR: Objection to the form.
10 A. That I remembered a spreadsheet that
11 contained a list of states, and if -- what their
12 reimbursement methodology, meaning was it based
13 on WAC or AWP, and if generics were mandatory or
14 not mandatory.
15 Q. Was that something you'd seem back
16 years ago?
17    MR. ESCOBAR: Objection to the form.
18 A. I don't recall. I remember being aware
19 of it. Seeing it or having possession, I don't
20 believe I did, and it did not have the matrix
21 that is represented by this document.
22 Q. Do you have any memory of having seen

**170**

1  Exhibit Workman 004 prior to your meeting with
2  Mylan counsel preparing for this deposition?
3      A.  I -- I don't recall.
4      Q.  All right, do you have any information
5  that indicates that this document, Exhibit
6  Workman 004, was distributed to the field sales
7  force?
8          MR. ESCOBAR:  Objection to the form.
9      A.  Could you repeat the question, please?
10     Q.  Do you have any information that
11 Exhibit Workman 004, this comparison worksheet,
12 was distributed by Mylan to its field sales
13 force.
14         MR. ESCOBAR:  Objection to the form.
15     A.  I don't recall.
16     Q.  Okay, let's put that document aside.
17         At any time in connection with your --
18 well, let me ask you this -- is there any way
19 that anyone at Mylan could use AWP as a selling
20 tool?
21         MR. ESCOBAR:  Objection to the form.
22 Calls for speculation.

**171**

1      A.  Yes, possibly.
2      Q.  Okay, how?
3          MR. ESCOBAR:  Objection to the form.
4  Calls for speculation.
5      A.  If our AWPs are high, one could
6  demonstrate that our customers could charge more
7  for the product.  If our AWPs are low, it could
8  also demonstrate that we are less expensive than
9  our competitors.
10         However, in both situations, you could
11 possibly put yourself at a disadvantage, and you
12 would want to find more of a balance between all
13 customer types, rather than one entity.
14     Q.  Do you know Steve Krinke?
15     A.  Yes.
16     Q.  You worked with him for a number of
17 years?
18     A.  Yes.
19     Q.  Do you consider him competent?
20     A.  Yes.
21     Q.  He seems to know what he's doing?
22     A.  Yes.

**172**

1      Q.  Do you know anything about his
2  employment history prior to joining Mylan?
3      A.  Yes.
4      Q.  What do you know about his employment
5  history prior to joining Mylan?
6      A.  I know he is a pharmacist.  He has
7  worked in pharmacy, and I believe at one time he
8  was a buyer for pharmaceuticals.
9      Q.  Have you ever heard Steve Krinke say
10 that it would be an advantage to Mylan to have
11 maximum AWPs?
12         MR. ESCOBAR:  Objection to the form.
13     A.  I don't recall.
14         MR. MULLIN:  Okay, let me mark a
15 document as our next exhibit, which I guess is
16 Five.
17
18         (Whereupon, Exhibit Workman 005
19 was marked for identification purposes.)
20
21 BY MR. MULLIN:
22     Q.  I'm showing you what's been marked as

**173**

1  Exhibit Workman 005.
2          This is a memo from Steve Krinke to a
3  bunch of people in July 8 of 1999, right?
4          MR. ESCOBAR:  Objection to the form.
5      A.  Yes.
6      Q.  And I think you're listed as a "cc" on
7  there, right?
8      A.  Yes.
9      Q.  And the subject line is "Additional AWP
10 Revisions," right?
11     A.  Yes.
12     Q.  And it says, "The attached AWP
13 modifications were approved by First Databank
14 today and are effective immediately.  We will
15 continue to monitor all Mylan products and make
16 adjustments to ensure competitive/maximal AWPs."
17         I think you told us that when you
18 transferred from Customer Service over to pricing
19 and contracts you did an analysis or a research
20 project when you first got there, right?
21         MR. ESCOBAR:  Objection to the form.
22 It mischaracterizes his testimony.

**210**

1    A. I'm -- I don't recall what "CM"
2    represents. "CO" represents 15 percent -- a
3    price point of 15 percent off WAC -- and I'm not
4    clear or I don't recall what "SWS" represents.
5        Q. Can you think of any way that we might
6    be able to search for at Mylan and find the
7    attachments to this document?
8        MR. ESCOBAR: Objection to the form.
9        A. I -- I would assume you have these
10   documents.
11       Q. Why would you assume that?
12       A. Since this e-mail was produced.
13       Q. Why would you think that the
14   attachments were produced also?
15       A. Why would I assume otherwise?
16       Q. Let me tell you that the company's
17   produced various documents to us. Many times we
18   see an e-mail with an indication that there was
19   an attachment, but it doesn't necessarily mean
20   that the attachment at least came with it or that
21   it's grouped near it or that we can figure out
22   whether we have the attachment or we don't.

**211**

1        MR. ESCOBAR: Nor does it mean the
2    opposite.
3        Q. That's correct. So can you think of
4    any way that we could look or research in the
5    files of Mylan to see if we could find these
6    attachments?
7        MR. ESCOBAR: Objection to the form.
8        A. I -- I don't know.
9        MR. MULLIN: Let's just put that
10   document aside. I have one more document I want
11   to show you. I'm going to mark this -- I guess
12   Ten is our next number.
13
14       (Whereupon, Exhibit Workman 010
15   was marked for identification purposes.)
16
17   BY MR. MULLIN:
18       Q. I'm showing you what has just been
19   marked as Exhibit Workman 010 in this deposition.
20   I'd ask you to look at it. I'd represent to you
21   that this document was also produced to the
22   Commonwealth by Mylan in response to a document

**212**

1    request, and the first page has the Bates number
2    that ends in 6257. Page Two is the next number,
3    6258.
4        Do you recognize this document at all?
5        A. No.
6        Q. Looking at Page Two, do you recognize
7    that handwriting?
8        A. No.
9        Q. Do you think you'd know Steve Krinke's
10   handwriting if you saw it?
11       MR. ESCOBAR: I think Mr. Krinke
12   testified yesterday that it was his handwriting
13   and read it to you. So I don't see the point of
14   having the witness try to speculate if it's not
15   his. Didn't he tell you that?
16       MR. MULLIN: He -- I believe he did.
17       MR. ESCOBAR: Okay, so what is --
18       MR. MULLIN: But I felt I couldn't pass
19   that information on to Mr. Workman.
20       MR. ESCOBAR: No, but I'm asking why
21   spend time on it when you already know from
22   yesterday who the author was and what it says?

**213**

1    BY MR. MULLIN:
2        Q. Does that appear to be Mr. Krinke's
3    handwriting to you, Mr. Workman?
4        A. I -- I don't know.
5        Q. Looking at this document, can you think
6    of any reason why this table -- this spreadsheet
7    would have been created?
8        MR. ESCOBAR: Objection to the form.
9    Calls for speculation, and no foundation.
10       A. Again, there's a constant review of
11   prices and market conditions. I believe that is
12   on a by-product basis comparing a set of our
13   prices versus a competitor. There's other
14   information in -- I -- I don't know the specific
15   purpose for this review.
16       Q. In the reviews that are done, would you
17   typically also review the Federal Upper Limits
18   for your products?
19       MR. ESCOBAR: Objection to the form.
20       A. I -- I don't recall.
21       Q. Looking off on the far right-hand side,
22   the last column on the spreadsheet says "Range of