# Exhibit V

**State of California ex rel. Ven-A-Care of the Florida Keys, Inc.
v. Abbott Laboratories, Inc., et al., Master Civil Action No. 01-12257-PBS,
Subcategory Case No. 06-11337**

Exhibit to the December 21, 2009 Declaration of Christopher C. Palermo in Support
of Defendants Mylan Inc. and Mylan Pharmaceuticals Inc's. Opposition to Plaintiffs' Motion for Partial Summary
Judgment

```
 1                  NO. D-1-GV-07-001259

 2   THE STATE OF TEXAS           ) IN THE DISTRICT COURT
                                  )
 3   ex rel.                      )
         VEN-A-CARE OF THE        )
 4         FLORIDA KEYS, INC.,    )
                                  )
 5            Plaintiffs,         )
                                  )
 6   VS.                          ) TRAVIS COUNTY, TEXAS
                                  )
 7   SANDOZ, INC. f/k/a GENEVA    )
     PHARMACEUTICALS, INC.,       )
 8   NOVARTIS PHARMACEUTICAL      )
     CORP., NOVARTIS AG, EON      )
 9   LABS, APOTHECON, INC.,       )
                                  )
10   MYLAN PHARMACEUTICALS, INC., )
     MYLAN LABORATORIES, INC.,    )
11   UDL LABORATORIES, INC.       )
                                  )
12   TEVA PHARMACEUTICALS USA,    )
     INC., f/k/a LEMMON           )
13   PHARMACEUTICALS, INC.,       )
     COPLEY PHARMACEUTICALS,      )
14   INC., IVAX PHARMACEUTICALS,  )
     INC., SICOR PHARMACEUTICALS, )
15   INC., TEVA NOVOPHARM, INC.,  )
     and TEVA PHARMACEUTICAL      )
16   INDUSTRIES, LTD.             )
             Defendants.          ) 201ST JUDICIAL DISTRICT
17

18

19   **********************************************************

20             ORAL AND VIDEOTAPED DEPOSITION OF

21                    ROBERT GEORGE CUNARD

22                     OCTOBER 30TH, 2008

23   **********************************************************

24

25
```

Electronically signed by debra mcgrew (201-239-323-8905)
Electronically signed by debra mcgrew (201-239-323-8905)

85b641cd-4309-40e5-968f-9d553eceb255

Page 2

```
 1        UNITED STATES DISTRICT COURT
          DISTRICT OF MASSACHUSETTS
 2
 3  IN RE: PHARMACEUTICAL    )
    INDUSTRY AVERAGE WHOLESALE  ) MDL No. 1456
 4  PRICE LITIGATION          ) Master File No.
                              ) 01-12257-PBS
 5                            )
    THIS DOCUMENT RELATES TO: )
 6                            ) Judge Patti B. Saris
    State of California, ex rel. )
 7  Ven-A-Care v. Abbott      ) Magistrate
    Laboratories, Inc., et al.  ) Judge Marianne Bowler
 8  Cause No. 03-cv-11226-PBS )
 9
10  *****************************************************
11
     IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA
12
                     Master Docket No.
13  In the Matter of:        CV-2005-219
14  ALABAMA MEDICAID PHARMACEUTICAL
    AVERAGE WHOLESALE PRICE LITIGATION
15  _____
16  This Document Relates To:
17  State of Alabama v. Mylan Laboratories, Inc.
    No. 2005-219.50
18
    State of Alabama v. Mylan Pharmaceuticals, Inc.
19  No. 2005-219.51
20  State of Alabama v. UDL Laboratories, Inc.
    No. 2005-219.72
21
    *****************************************************
22
23
24
25
```

Page 3

```
 1       IN THE CIRCUIT COURT OF THE
         SECOND JUDICIAL CIRCUIT, IN AND
 2         FOR LEON COUNTY, FLORIDA
 3  STATE OF FLORIDA
 4  ex rel.
 5  VEN-A-CARE OF THE FLORIDA
    KEYS, INC. A Florida
 6  Corporation, by and through
    its principal officers and
 7  directors, ZACHARY T. BENTLEY
    and T. MARK JONES,
 8      Plaintiffs,
 9  VS.              CASE NO. 1998.CA.3032G
10  MYLAN LABORATORIES INC.;
    MYLAN PHARMACEUTICALS INC.;
11  NOVOPHARM, LTD.; SCHEIN
    PHARMACEUTICAL, INC.; TEVA
12  PHARMACEUTICAL INDUSTRIES,
    LTD.; TEVA PHARMACEUTICAL
13  USA; and WATSON
    PHARMACEUTICALS, INC.,
14      Defendants.
15
    *****************************************************
16
    IN THE CHANCERY COURT OF HINDS COUNTY MISSISSIPPI
17          FIRST JUDICIAL DISTRICT
18
    STATE OF MISSISSIPPI,   )
19      Plaintiff,   )
                     )
20  VS.              ) CAUSE NO. G2005-2021
                     )
21  ABBOTT LABORATORIES, INC., )
    et al.,          )
22      Defendants.  )
23
24
25
```

Page 4

```
 1      ORAL AND VIDEOTAPED DEPOSITION OF
 2  ROBERT GEORGE CUNARD, produced as a witness at the
 3  instance of the Plaintiffs, and duly sworn, was taken
 4  in the above-styled and numbered cause on the 30th day
 5  of October, 2008, from 9:05 a.m. to 6:11 p.m., before
 6  DEBRA L. McGREW, CSR in and for the State of Texas,
 7  reported by machine shorthand, at the Holiday Inn
 8  Express, 520 John B. Wilson Ct., Lawrenceville,
 9  Georgia, pursuant to the Texas Rules of Civil
10  Procedure and the provisions attached previously.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1             APPEARANCES
 2  FOR THE PLAINTIFF THE STATE OF TEXAS:
 3      Mr. Joseph V. Crawford
        Mr. Jason M. Idell
 4      Wright & Greenhill, P.C.
        221 West 6th Street, Suite 1800
 5      Austin, Texas 78701-3495
        Telephone: (512) 476-4600
 6
    FOR THE PLAINTIFF THE STATE OF ALABAMA:
 7
        Ms. Tracy R. Davis
 8      Hand Arendall, LLC
        1200 Park Place Tower
 9      2001 Park Place North
        Birmingham, Alabama 35203
10      Telephone: (205) 324-4400
11  FOR THE PLAINTIFF THE STATE OF CALIFORNIA:
12      Mr. Eliseo Sisneros
        Deputy Attorney General
13      Bureau of Medi-Cal Fraud & Elder Abuse
        State of California Department of Justice
14      110 West A Street #1100
        San Diego, California 92101
15      Telephone: (619) 688-6043
16  FOR THE PLAINTIFF THE STATE OF MISSISSIPPI:
17      Mr. H. Clay Barnett, III (by telephone)
        Beasley, Allen, Crow, Methvin, Portis &
18      Miles, P.C.
        P.O. Box 4160
19      Montgomery, Alabama 36103
        Telephone: (800) 898-2034
20
    FOR THE RELATOR, VEN-A-CARE OF THE FLORIDA KEYS FOR
21  THE TEXAS, CALIFORNIA AND FLORIDA CASES:
22      Mr. James Joseph Breen
        The Breen Law Firm, P.A.
23      5755 Northpoint Parkway #260
        Alpharetta, Georgia 30022
24      Telephone: (770) 740-0008
25
```

2 (Pages 2 to 5)

Fredericks Reporting & Litigation Services, LLC
AUSTIN (512) 241-3600   -   HOUSTON (713) 572-8897

Electronically signed by debra mcgrew (201-239-323-8905)
Electronically signed by debra mcgrew (201-239-323-8905)

85b641cd-4309-40e5-968f-9d553cceb255

Page 6

```
 1   FOR THE RELATOR, VEN-A-CARE OF THE FLORIDA KEYS FOR
     THE CALIFORNIA CASE:
 2
         Mr. Adam D. Miller
 3       Engstrom, Lipscomb & Lack, P.C.
         10100 Santa Monica Boulevard, 12th Floor
 4       Los Angeles, California  90067-4107
         Telephone:  (310) 552-3800
 5
     FOR THE DEFENDANT MYLAN:
 6
         Mr. William A. Escobar
 7       Kelley Drye & Warren LLP
         101 Park Avenue
 8       New York, New York  10178
         Telephone:  (212) 808-7771
 9
     ALSO PRESENT:
10
         Mr. Erik C. Naft,
11          Associate Litigation Counsel, Mylan Inc.
         Mr. Brian Bobbitt, Videographer
12
13
                   *-*-*-*-*
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1                     INDEX
 2   Appearances...................................  5
 3   ROBERT GEORGE CUNARD
         Examination by Mr. Crawford..............  11
 4       Examination by Mr. Breen.................  168
         Examination by Ms. Davis.................  272
 5
     Signature and Changes.........................  304
 6   Reporter's Certificate........................  306
 7                    EXHIBITS
 8   NO.   DESCRIPTION                         PAGE
 9   1    ..........................  13
         Deposition of Robert Cunard in Commonwealth
10       of Massachusetts V. Mylan, et al, 10-26-07
     2    ..........................  37
11       Email Chain, Subject "Drug Pricing Data
         Under Scrutiny"
12   3    ..........................  49
         "OIG Compliance Program Guidance for
13       Pharmaceutical Manufacturers"
     4    ..........................  101
14       Memo from Krinke, 7-8-99, Subject
         "Additional AWP Revisions"
15   5    ..........................  104
         Redacted Email, Eichelberger to Cunard,
16       6-28-2000, Subject "Drug 7"
     6    ..........................  109
17       Redacted Documents Regarding Drug 7
     7    ..........................  120
18       Documents Regarding Application and Approval
         of Clobetasol Propionate by State of Texas
19   8    ..........................  134
         Memo, Cunard to Krinke, 1-8-01,
20       Subject "Reimbursement Outline"
     9    ..........................  150
21       Memo, Workman to Cunard, 12-19-05,
         Subject "Price Floors - Price Committee"
22   10   ..........................  157
         "FY 2000 Marketing Plan"
23   11   ..........................  159
         Documents Listing Mylan Employees and
24       Company Titles
25
```

Page 8

```
 1   12   ..........................  159
         Memo, Eichelberger to Cunard, 6-28-2000,
 2       Subject "Nifedipine ER Spread"
     13   ..........................  160
 3       Letter, Cunard to Emnett, 5-8-01, with
         Proposal for Buspirone Tablets
 4   14   ..........................  164
         Email Chain, Subject "Mylan WAC"
 5   15   ..........................  213
         Email, Cunard to Spradlin, 3-16-01,
 6       Subject "Mylan 4/15 Price Changes"
     16   ..........................  225
 7       Email Chain, Subject "WAC Reductions"
     17   ..........................  230
 8       "Clozapine and the Retail Pharmacy,"
         Areas to Discuss
 9   18   ..........................  233
         "Clozapine and the Retail Pharmacy
10       Presented By: Cliff Holmes and Ron Wilcox"
     19   ..........................  241
11       Memo, Cunard to Johnson and Workman,
         2-27-2000, Subject "Staff Meeting 3/3/2000"
12   20   ..........................  250
         Email, Cunard to Moldin, 4-24-2000,
13       Subject "Nifedipine ER Information"
     21   ..........................  255
14       Email, Cunard to Belldina, 4-11-03,
         Subject "Medicaid Status Chart.xls"
15   22   ..........................  256
         Email Chain, Subject "Product Launches"
16   23   ..........................  268
         Email Chain, Subject "Information Request"
17   24   ..........................  268
         Memo, Martin to Cunard and Duda, 8-7-01,
18       Subject "PHS Pricing"
     25   ..........................  268
19       Memo, Krinke and Workman to Cunard, Subject
         "Fifth Annual 340B Coalition Conference"
20   26   ..........................  282
         Memo, Floyd to Third Party Contacts, Subject
21       "AWP Changes Effective September 23, 1999"
     27   ..........................  285
22       Fax Regarding AWP Changes Effective 10-20-99
     28   ..........................  286
23       Memo, Krajewska to Distribution, Subject,
         "AWP Changes Effective February 7, 2000"
24   29   ..........................  287
         Memo, Johnson to Distribution, Subject
25       "AWP Changes Effective April 5, 2001"
```

Page 9

```
 1   30   ..........................  289
         Memo, Morgan to Isaacs, 9-11-03
 2       Subject "Mylan Nefazodone - FDB Launch Info"
     31   ..........................  289
 3       Memo, Cunard to Spradlin, 4-4-2000,
         Regarding Revised Proposal for Wal-Mart
 4   32   ..........................  291
         Letter, Cunard to Groth, 6-25-02,
 5       Regarding Walgreens Business Relationship
     33   ..........................  291
 6       Letter, Duda to Schmitto, 7-12-02,
         Regarding Price Adjustments for McKesson
 7   34   ..........................  293
         Letter, Cunard to Plessinger, 6-23-03,
 8       Regarding Offer for Tizanidine to Cardinal
     35   ..........................  297
 9       Letter, Cunard to Plessinger, 6-23-03,
         Regarding Offer for Mirtazapine to Cardinal
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Electronically signed by debra mcgrew (201-239-323-8905)
Electronically signed by debra mcgrew (201-239-323-8905)

85b641cd-4309-40e5-968f-9d553ecbb255

Page 214

1  call that person "Bill."
2       Do you see that?
3  A.  Yes.
4  Q.  Now, Wal-Mart was a big customer, wasn't it?
5  A.  Wal-Mart was a customer.
6  Q.  So Wal-Mart's not a big customer?
7  A.  I can't speak now.  At the time they were an
8  average-sized customer.
9  Q.  Okay.  So -- but you refer to somebody there
10 as "Bill," bbsprad@wal-mart.com.
11      Do you see that?
12 A.  Yes.
13 Q.  Who was Dan King and Bob Potter?
14 A.  Dan King was a national account manager for
15 Mylan, and Bob Potter at this time was the
16 vice-president of sales for Mylan.
17 Q.  Now, it's pretty short.  Why don't you go
18 ahead and read what you said to Bill for the ladies
19 and gentlemen of the jury.
20 A.  "Bill, as a follow-up to our conversation
21 yesterday, please find the attached spread sheet
22 outlining pricing changes recently implemented.  I
23 have outlined our previous and new WAC prices where
24 applicable as well as competitive WAC prices and the
25 latest HCFA FULs.  As you can see, we should not be

Page 215

1  the supplier holding down reimbursement in any
2  scenario.  Please review this at your convenience.
3  Feel free to contact me with any questions.
4  800-848-0461, extension 4098.  Thanks, Bob."
5  Q.  Okay.  And you're vice-president of marketing
6  at this point in time, correct?
7  A.  Yes.
8  Q.  So why would the vice-president of marketing
9  of -- well, let me ask this question.  What was Bob's
10 job at Wal-Mart?
11      MR. ESCOBAR:  "Bill," you mean?
12      MR. BREEN:  Bill's job.  Sorry.
13      THE WITNESS:  As I recall, Bill was a
14 buyer for Wal-Mart.
15 Q.  (BY MR. BREEN)  Why would the vice-president
16 of marketing of Mylan be writing to a buyer of
17 Wal-Mart, showing him your previous and new WAC prices
18 and your previous and new AWPs and the HCFA FULs and
19 then say, quote, "As you can see, we should not be the
20 supplier holding down reimbursement in any scenario"?
21      Do you see that?
22 A.  Yes.
23 Q.  If you really weren't involved in
24 reimbursement and you never analyzed any FULs or WAC
25 effects on FULs while you were at Mylan, why in the

Page 216

1  world would you be telling the buyer for Wal-Mart what
2  you're telling him here?
3       MR. ESCOBAR:  Objection for the form.
4       THE WITNESS:  Well, as I read and have
5  read this, where it states, "As a follow-up to our
6  conversation yesterday," I would interpret this that
7  this was a request made by Mr. Spradlin, a customer in
8  this case, that I was responding to.
9  Q.  (BY MR. BREEN)  And -- and -- but -- but why
10 are you talking about FULs and saying that "We should
11 not be the supplier holding down reimbursement in any
12 scenario"?  What do you mean by that?
13      Let me ask you this question:  I thought
14 it was your belief at Mylan that you had no control
15 over reimbursement, no -- you had no influence on
16 reimbursement.
17      MR. ESCOBAR:  What's -- what's the
18 question?
19 Q.  (BY MR. BREEN)  So why would you be telling
20 the buyer at Wal-Mart that Mylan would not be the
21 supplier holding down reimbursement in any scenario?
22      MR. ESCOBAR:  Objection to the predicate
23 to the question.
24      THE WITNESS:  I -- I'm sorry.  What is
25 the question?

Page 217

1  Q.  (BY MR. BREEN)  Why were you telling
2  Mr. Sprad (sic) at Wal-Mart that Mylan would not be
3  the supplier holding down reimbursement in any
4  scenario?
5  A.  I don't recall, but -- but, once again, I
6  believe this was responding to some request that he
7  had made.  And, once again, it's a -- it's a reporting
8  of -- of just published pricing.
9  Q.  All right.  Were you -- but your -- according
10 to your email, you're trying to show him that Mylan
11 will not be holding down reimbursement in any
12 scenario.
13      Do you see that?
14      MR. ESCOBAR:  Objection for the form.
15 Q.  (BY MR. BREEN)  Well, let me ask this
16 question:  Is one of the purposes of this email to
17 demonstrate to Mr. Sprad (sic) at Wal-Mart that Mylan
18 would not be the supplier holding down reimbursement
19 in any scenario?
20 A.  I don't know and -- and, once again, it's a
21 reporting of -- of data.  And at the time then and I
22 can't think now that -- that I could do anything that
23 would have said that, you know, we won't hold it down
24 or -- or had an ability to -- to impact that.
25 Q.  So you -- you -- as a matter of fact, you

Page 218

1  didn't believe you could impact reimbursement on
2  March 16th, 2001, did you?
3      A.  No.
4      Q.  So you just happened to tell Mr. Sprad (sic)
5  that you would not be the supplier holding down
6  reimbursement in any scenario even though you didn't
7  think you could impact reimbursement.
8          Is that your testimony?
9      A.  Yes.
10     Q.  Okay.  So -- but back in March of '01, were
11 you aware that the Health Care Financing
12 Administration or Centers for Medicaid & Medicare
13 Services, later known as CMS, would set FULs based
14 upon the published prices for -- for drugs?
15     A.  I didn't know and -- and don't know today
16 what the -- what the methodology is for setting FULs.
17     Q.  Well, did somebody else typically write your
18 emails to the buyers at Wal-Mart?
19     A.  No, not that I recall.
20     Q.  So if -- if you wrote this email, then --
21 then -- then you supposedly knew what you were talking
22 about at the time, right?
23     A.  Yes.
24     Q.  Okay.  So at the time -- and you knew what
25 you were talking about at the time -- you told the

Page 219

1  buyer at Wal-Mart that, "As you can see, we should not
2  be the supplier holding down reimbursement in any
3  scenario," right?
4      A.  Yes.  That's what it says.
5      Q.  And you're -- you -- you make that reference
6  right after you -- you show him the latest HCFA FULs.
7      A.  Well, the HCFA FULs are in the spread sheet,
8  yes.
9      Q.  But it's right after the reference to FULs in
10 your -- in your email, right?
11     A.  Yes.
12     Q.  And you knew FULs to be the federal upper
13 limit on reimbursement for Medicaid reimbursement,
14 correct?
15     A.  Yes.
16     Q.  Okay.  Now, I'll ask the question again.
17         While you were at Mylan, did you ever,
18 or anybody else, to your knowledge, at Mylan, discuss
19 how Mylan's price reporting would affect a customer's
20 reimbursement with a customer?
21     A.  Not that I recall, no.
22     Q.  So is it your testimony to the Court and the
23 jury today that Exhibit -- in Exhibit 15 you were not
24 talking to your customer, Wal-Mart, about the topic of
25 whether or not Mylan's reported prices will affect

Page 220

1  reimbursement?
2          MR. ESCOBAR:  Objection for the form.
3          THE WITNESS:  That was a statement made.
4  That was my perspective but, as indicated, at this
5  time nor now do I know how an FUL is created or what
6  goes into it.  Mr. Spradlin may very well have
7  responded back saying, "Well, it's different and
8  here's why."  I couldn't say.
9          It was -- it was my opinion, and it's --
10 I don't believe anywhere here I'm saying that "We're
11 authorities on this, and we know better than you," as
12 a pharmacy customer.
13         MR. BREEN:  Objection, nonresponsive.
14 Let me ask the question again another way.
15     Q.  (BY MR. BREEN)  While you were at Mylan, did
16 you ever discuss with a customer the topic of their --
17 of reimbursement by Medicaid programs and Abbott's
18 reported prices in -- I'm sorry -- Mylan's reported
19 prices in the same communication?
20         MR. ESCOBAR:  Objection for the form.
21         THE WITNESS:  Not that I can recall, no.
22     Q.  (BY MR. BREEN)  So is it your testimony,
23 then, that in Exhibit 15 you're not talking to the
24 buyer at Wal-Mart about the topic of Medicaid
25 reimbursement and you're not talking to the buyer at

Page 221

1  Wal-Mart about the topic of Abbott's -- or, rather,
2  Mylan's reported WACs?
3          MR. ESCOBAR:  Objection for the form.
4          THE WITNESS:  That's correct.  I see
5  nothing in this document that talks about Medicaid
6  reimbursement.
7      Q.  (BY MR. BREEN)  And so it's your testimony to
8  the Court and the jury that HCFA FULs have nothing to
9  do with Medicaid reimbursement; is that correct?
10         MR. ESCOBAR:  Objection for the form.
11         THE WITNESS:  No.  I don't believe I
12 said that.
13     Q.  (BY MR. BREEN)  All right.  I'll ask the
14 question, then.  Does -- is this a communication where
15 you discuss as a topic, you mention, Medicaid
16 reimbursement in any way, shape or form?
17         MR. ESCOBAR:  Objection for the form.
18         THE WITNESS:  I see no reference on any
19 of these documents to Medicaid reimbursement.
20     Q.  (BY MR. BREEN)  Okay.  So is it your
21 testimony to the Court and the jury that, when you
22 talk about HCFA FULs, that has nothing to do with
23 Medicaid reimbursement?
24         MR. ESCOBAR:  Objection for the form.
25         THE WITNESS:  It -- it -- it could, but

56 (Pages 218 to 221)

Page 262

1  "Mylan Reimbursement Model."
2          Do you see that?
3      A.  Yes, sir.
4      Q.  The numbers you have in there, are those
5  numbers from an actual transaction, or are those like
6  projected pro forma examples to try to get a handle on
7  the quantitative factors here?
8      A.  As I review all this information, I would say
9  there's no actuals.  This is all just -- just
10 projected and -- and just analytical models, trying to
11 figure it out.
12     Q.  Okay.  Under "Mylan Reimbursement" where you
13 got "From reimbursement, $694.58" -- do you see that?
14     A.  Yes.
15     Q.  And then under that "Minus $60.76, 1.5 times
16 brand reimbursement."  Do you see that?
17     A.  Yes.
18     Q.  Then you get to $82.18.  Do you see that?
19     A.  Yes.
20     Q.  That's the likely margin for who, the
21 pharmacy or Mylan?  Or I should say is that the likely
22 margin for the customer or for Mylan?
23         MR. ESCOBAR:  Objection for the form.
24         THE WITNESS:  I believe that's an
25 estimate of pharmacy --

Page 263

1          MR. BREEN:  Okay.
2          THE WITNESS:  -- at that point in time.
3      Q.  (BY MR. BREEN)  And when you do this
4  1.5 times brand reimbursement, you see it there
5  above -- right there above that $82.18 number?
6      A.  Yes.
7      Q.  And then you go to the first page and it says
8  at the -- "Etoposide -- If $60.76 is 1.5 times brand
9  margin."  Do you see that?
10     A.  Yes.
11     Q.  I'm assuming there's some significance of
12 1.5 times brand margin.
13         MR. ESCOBAR:  Objection for the form.
14     Q.  (BY MR. BREEN)  Would I be correct in that
15 assumption, that there's something significant about
16 1.5 times brand margin if you put it in the
17 document --
18         MR. ESCOBAR:  Objection for the form.
19     Q.  (BY MR. BREEN)  -- and you based your
20 computations on it somehow?
21         MR. ESCOBAR:  Same objection.
22         THE WITNESS:  Yes.
23     Q.  (BY MR. BREEN)  Okay.  So is 1.5 times brand
24 margin -- does that mean you're trying to -- to work
25 the numbers so that the pharmacy makes 50 percent more

Page 264

1  profit on the Mylan generic etoposide than it is on
2  the VePesid sold by -- I think Bristol sold VePesid,
3  BMS?
4      A.  Yes.  That was a high-level assumption that
5  we would need to deliver incremental value to the
6  pharmacy for -- for them to utilize the product.
7      Q.  Okay.  So VePesid was the brand sold by BMS,
8  which is Bristol-Myers Squibb, right?
9      A.  I believe that's correct, yes.
10     Q.  And -- and you're trying to do some
11 quantification or some -- some -- set price so that
12 the pharmacy or the -- whoever's buying the product,
13 be it a pharmacy or a physician, makes 50 percent
14 again more profit or margin than it would on the brand
15 product, correct?
16         MR. ESCOBAR:  Objection for the form.
17         THE WITNESS:  Well, as -- as I stated,
18 that's a baseline assumption.  But when you look at my
19 email and looking at my -- my suggested D level
20 pricing, it would be less than that amount.
21     Q.  (BY MR. BREEN)  Okay.  How -- okay.  What --
22 would the margin, then, be -- the comparative brand
23 margin be based upon your recommended price?
24         MR. ESCOBAR:  Objection for the form.
25         THE WITNESS:  I don't know exactly what

Page 265

1  it would be.
2      Q.  (BY MR. BREEN)  Where was your recommended
3  price at?
4      A.  As I read this, I recommended D of $633.80.
5      Q.  So you actually recommended a higher price
6  for etoposide, right?
7      A.  Yes.
8          MR. ESCOBAR:  Higher than what?
9      Q.  (BY MR. BREEN)  Higher than the $60.76 that
10 would have resulted in 1.5 times brand margin, right?
11     A.  To be accurate, I believe higher than the D
12 price of $612.40 that is laid out in the exhibit.
13     Q.  Okay.  So $612.40, is that a price that
14 you're actually going to charge the customer?
15     A.  That's a proposed price, yes.
16     Q.  Okay.  So would the customer make more or
17 less margin with your proposed price than with the
18 $60.76?
19     A.  I believe less.
20     Q.  All right.  And the reason there's such a --
21 the $60.76 is -- is -- should really be considered
22 $607.60 to compare with the 633.80, correct?
23         MR. ESCOBAR:  Objection for the form.
24         THE WITNESS:  No.  That's not accurate.
25     Q.  (BY MR. BREEN)  All right.  Well, then --

67 (Pages 262 to 265)