# Exhibit 57

*State of California ex rel. Ven-A-Care of the Florida Keys, Inc.*
*v. Abbott Laboratories, Inc., et al.*, **Master Civil Action No. 01-12257-PBS,**
**Subcategory Case No. 06-11337**

Exhibit to the December 21, 2009 Declaration of Philip D. Robben in Support
of Defendants' Motions for Partial Summary Judgment

# Pennsylvania Department of Public Welfare, DAB No. 1315 (1992)

Department of Health and Human Services

DEPARTMENTAL APPEALS BOARD

Appellate Division

SUBJECT: Pennsylvania Department of Public Welfare

DATE: March 18, 1992
Docket No. 91-113
Audit No. A-03-89-00233
Decision No. 1315

DECISION

The Pennsylvania Department of Public Welfare (Pennsylvania or State) appealed a determination of the Health Care Financing Administration (HCFA) disallowing $3,152,092 claimed by the State under title XIX of the Social Security Act. The disallowed amount represented the federal share of payments made by the State from October 29, 1987 through October 28, 1988 for multiple source drugs provided to Medicaid recipients. HCFA found that the State exceeded the upper payment limit for these drugs, which HCFA regulations provide may not exceed an aggregate amount equal to the sum of the specific limits established by HCFA for each listed drug plus a "reasonable dispensing fee" established by the state for each drug. During Board proceedings, the State conceded that $371,554 was properly disallowed. See page 6, note 6, infra. The issues with respect to the $2,780,538 remaining in dispute are whether the regulations require that, in calculating the aggregate upper payment limit, the State use the dispensing fee which it actually paid to pharmacies, and, if not, whether the dispensing fee used by the State in making its assurances that it would not exceed the upper payment limit was a "reasonable dispensing fee" within the meaning of the regulations.

For the reasons set forth below, we conclude that the regulations permit a state to calculate the aggregate upper payment limit using an amount other than the dispensing fee which it actually paid. However, unless the state provides documentation or analysis that the "reasonable dispensing fee" which it established is based on actual dispensing costs, HCFA reasonably may presume that the amount actually paid represents a reasonable dispensing fee. We further conclude that the State did not show that the dispensing fee used to make its assurances was a reasonable dispensing fee. Accordingly, we uphold the

disallowance, subject to reduction by HCFA if the State furnishes documentation to HCFA which establishes the reasonableness of this fee (or some lesser amount which exceeds the fee actually paid).

Statutory and Regulatory Background

Section 1902(a)(30)(A) of the Social Security Act requires state Medicaid plans to provide methods and procedures "to assure that payments are consistent with efficiency, economy, and quality of care." Pursuant to that authority, HCFA published rules which require states to provide assurances that they have complied with certain limits on payments for drugs provided under the Medicaid program. At issue here are limits on payments for "multiple source drugs," defined at 42 C.F.R. . 447.301 (1987) as drugs "marketed or sold by two or more manufacturers or labelers or . . . marketed or sold by the same manufacturer or labeler under two or more different proprietary names or both under a proprietary name and without such a name." A state must provide assurances "at least annually" that "[i]n the aggregate, its Medicaid expenditures for multiple source drugs . . . are in accordance with the upper limits specified in . 447.332(b) . . . ." 42 C.F.R. . 447.333(b) (1987). Section 447.332(b) states:

> Specific upper limits. The agency's payments for multiple source drugs identified and listed in accordance with paragraph (a) of this section must not exceed, in the aggregate, payment levels determined by applying for each drug entity a reasonable dispensing fee established by the agency plus an amount established by HCFA that is equal to 150 percent of the published price for the least costly therapeutic equivalent (using all available national compendia) that can be purchased by pharmacists in quantities of 100 tablets or capsules (or, if the drug is not commonly available in quantities of 100, the package size commonly listed) or, in the case of liquids, the commonly listed size. 1/

Prior to the period in question here, HCFA limited payments for multiple source drugs to the lowest of (1) the maximum allowable cost established by a Pharmaceutical Reimbursement Board plus a reasonable dispensing fee, (2) the estimated acquisition cost plus a reasonable dispensing fee, or (3) the provider's usual and customary charge to the public for the drug. 42 C.F.R. . 447.331 and . 447.332 (1986). 2/ The earlier regulations further stated that "[t]he dispensing fee must be set by the [state Medicaid] agency . . . ." 42 C.F.R. . 447.331(c). They required the agency to conduct periodic surveys of pharmacy operations to obtain certain data which the agency could take into account in setting the dispensing fee. 42 C.F.R. . 447.333(a). In addition, the regulations listed certain factors which it stated might justify variations in the dispensing fee. 42 C.F.R. . 447.333(b).

In the preamble to the 1987 regulations, HCFA explained its adoption of a new method for limiting title XIX reimbursement of payments for

multiple source drugs. HCFA stated in pertinent part that "by setting an aggregate limit for multiple source drugs, we believe that we can provide more than adequate flexibility to States to use payment standards that reflect the price and availability of particular drugs." 52 Fed. Reg. 28648, at 28650 (July 31, 1987). HCFA also explained its decision to delete the requirement for periodic surveys of dispensing fees and related requirements as follows:

> In the interest of State flexibility and to avoid imposing unnecessary Federal procedural requirements as to how State agencies establish such fees, we are deleting the current requirement at . 447.333 regarding dispensing fees. State agencies will still be required to determine reasonable dispensing fees or, if dispensing fees are not paid separarely [sic], to impute an amount equivalent to a reasonable dispensing fee, in order to include those amounts in the calculations and comparisons they make to meet the upper limit standard for FFP. We expect that most States will continue their present activities to establish a reasonable dispensing fee level and will document these and any new activities in their State plan. Such activities could include: (1) Audits and surveys of pharmacy operational costs; (2) compilation of data regarding professional salaries and fees; and, (3) analysis of compiled data regarding pharmacy overhead costs, profits, etc.

Id. at 28651-28652.

Factual Background

Prior to the period covered by the disallowance, the State implemented its own program (State MAC program) 3/ which limited the amount it could pay pharmacies for certain multiple source drugs. However, most of the limits set by the State were higher than HCFA's specific limits and many multiple source drugs listed by HCFA were not even included in the State MAC program. The State paid the lower of (1) the State MAC program limit, if any, plus a dispensing fee of $2.75 per prescription; (2) the estimated acquisition cost plus a $2.75 per prescription dispensing fee; or (3) the pharmacy's usual charge. State ex. A at 2. 4/ The record does not indicate whether the $2.75 dispensing fee paid by the State was specified in the State's title XIX plan.

On October 13, 1987, the State wrote HCFA that "[t]here is a legitimate concern by the pharmacy community and the recipients that a straight application of the HCFA multisource upper limits in our program would create either a counterproductive financial situation for the pharmacies in Pennsylvania or an unavailability of certain medications for recipients . . . ." State ex. A at 1. However, the State told HCFA that it could pay the higher MAC prices and still assure that HCFA's aggregate upper payment limit was not exceeded. The State noted that its dispensing fee was the second lowest dispensing fee in the nation and that pharmacists in the State were able to provide adequate

pharmaceutical services only because the ingredient cost reimbursed by the State was higher than the cost to the pharmacies. The State stated that its dispensing fee could therefore not be considered a "reasonable dispensing fee" within the meaning of 42 C.F.R. . 447.332(b) and that the State was instead "defining a `reasonable dispensing fee' as the median dispensing fee of all Medicaid dispensing fees" for purposes of calculating the upper payment limit. According to the State, its payments would not exceed the aggregate of the median Medicaid dispensing fee plus the specific limits imposed by HCFA on drug costs. State ex. A at 2.

In response to the State's letter, HCFA advised the State on January 29, 1988 that the methodology the State had selected to assure that it met the upper payment limit requirements was not acceptable, and that the State should instead take into account the actual dispensing fee paid to pharmacies in the State. State ex. C at 1. In a letter dated March 17, 1988, the State maintained that its methodology was appropriate and asked HCFA to reconsider its position. However, the State indicated that it could assure that it would not exceed the upper payment limit even if it used the dispensing fee actually paid because it had expanded its MAC program to include additional drugs since the time it made its original assurances. State ex. E. There is no indication in the record that HCFA made any response to the State's request for reconsideration prior to taking the disallowance in this case.

In calculating the aggregate upper payment limit (and thus the disallowance here), HCFA used $2.75 as a "reasonable dispensing fee." According to the State, HCFA should have used the median dispensing fee for the period in question ($3.50). HCFA did not dispute that, if $3.50 rather than $2.75 is used to calculate the upper payment limit, the resulting amount (after making an allowance for brand medically necessary drugs) would be greater than the State's total drug payments so there would be no disallowance. 5/

In October 1990, the Office of the Inspector (OIG), Office of Audit Services, issued a report on its review of the State's compliance with upper payment limit requirements for the period October 29, 1987 through October 28, 1988. The report identified $3,152,092 (federal share) in unallowable costs, consisting of:

 o  $2,780,538 paid in excess of HCFA's upper payment limit for
 claims not coded "brand medically necessary" and claims for
 generic drugs which were erroneously coded "brand medically
 necessary";

 o  $362,455 paid in excess of HCFA's upper payment limit for
 claims coded "brand medically necessary" which were not exempt
 from HCFA's upper payment limit because the physician did not
 certify that brand name drugs were medically necessary; and

 o  $9,099 paid in excess of State MAC program limits, but not

the HCFA upper payment limit, for claims for generic drugs which were erroneously coded "brand medically necessary."

State ex. P.

On June 21, 1991, HCFA notified the State that it was disallowing the amounts identified in the OIG report. State ex. V. The State initially appealed the entire disallowance. The State later withdrew its appeal with respect to the $362,455 and $9,099 identified above. State's letter to Board dated 2/19/92. 6/

Parties' Arguments

HCFA took the position that "the natural, reasonable reading of the plain language of the regulation is that the `reasonable dispensing fee established by the agency' . . . is the dispensing fee which the Medicaid agency actually uses to reimburse pharmacists." HCFA's brief dated 12/4/91, p. 13. HCFA argued, moreover, that even if the State's interpretation of the regulations is also a reasonable one, HCFA's interpretation should be upheld since HCFA advised the State of its interpretation when it first received the State's assurances.

HCFA also argued that, while the major purpose of the 1987 regulations was to give states flexibility to choose their own payment methodologies, that does not "imply that a state may use . . . imaginary dispensing fees" in calculating the upper payment limit. Id. at 14. Moreover, HCFA noted that another purpose of the regulations was to allow "responsible but not burdensome Federal oversight," (Id. at 16, quoting preamble at 52 Fed. Reg. 28648, 28653), and argued that the State's approach would undercut the possibility of such oversight since states could avoid the effect of HCFA's specific limits "by merely redefining what constitutes a `reasonable dispensing fee,' exclusively for the purposes of the upper payment limit calculation." Id.

HCFA also took the position that the fact that HCFA deleted the requirement for annual surveys of pharmacy operations when it adopted the 1987 regulations did not mean that HCFA had changed the regulations to no longer require that states use the dispensing fees actually paid in calculating the upper payment limit. HCFA noted that the preamble to the 1987 regulations stated that "State agencies will still be required to determine reasonable dispensing fees," and that the preamble described the provisions which were deleted merely as "unnecessary Federal procedural requirements." Id. at 14-15, quoting preamble at 52 Fed. Reg. 28648, 28651 (with added emphasis).

Finally, HCFA argued that the Board's decision in Oklahoma Dept. of Human Services, DAB No. 1271 (1991) was erroneous to the extent that it found a connection between the ingredient cost and the dispensing fee. HCFA asserted, in any event, that the lack of connection between the two components was even clearer in the case of multiple source drugs than in

the case of the other drugs at issue in Oklahoma since a state determines only the dispensing fee for multiple source drugs while the state determines both the ingredient cost and the dispensing fee for other drugs.

The State took the position that it properly used the median Medicaid dispensing fee rather than the dispensing fee it actually paid to determine whether it had complied with the upper payment limit in 42 C.F.R. . 447.332(b). The State asserted that the regulations could easily have stated that the dispensing fee be the fee actually used to reimburse pharmacists if that was what was intended. The State argued that the absence of a definition of the term "reasonable dispensing fee" therefore signified that HCFA did not intend to require the use of the actual dispensing fee paid by a state. The State also argued that the preamble to the final regulations "clearly allows a state `to impute an amount equivalent to a reasonable dispensing fee'," and that it had merely followed this directive. State's brief dated 8/28/91, at 9.

The State also argued that, in directing that payments for multiple source drugs be examined "in the aggregate," the regulations make federal funding available as long as a state "does not exceed the aggregate of a `reasonable dispensing fee' plus a drug ingredient price set by HCFA." State's brief dated 8/28/91, at 9. Thus, according to the State, the regulations "implicitly" recognize that a state may need to impute an amount equivalent to a reasonable dispensing fee to offset HCFA limits on ingredient prices. Id.

The State further argued that the Board "acknowledged the connection between ingredient cost and dispensing fee" in its decision in Oklahoma. State brief dated 8/28/91, at 10. The State contended that, under Oklahoma, it would be inconsistent and arbitrary for HCFA to require the use of the $2.75 dispensing fee because that fee "was linked to the higher State MAC prices" rather than the prices established by HCFA. Id. at 11.

The State argued, moreover, that its interpretation of the regulations did not deprive HCFA of the ability to control drug prices since, even if the State did not exceed the upper payment limit, HCFA could still review the dispensing fee set by the State to see if it was reasonable. The State asserted that HCFA had failed to demonstrate that a $3.50 dispensing fee was unreasonable here, however. According to the State, the $3.50 dispensing fee was actually incurred because part of the cost of dispensing a drug "was being covered by higher ingredient cost." State's reply brief dated 12/24/91, at 3. The State also contended that a $3.50 dispensing fee was reasonable because the State did not pay more in the aggregate for multiple source drugs than other states. 7/

Discussion

As discussed below, we conclude that the regulations permit states the flexibility to establish as a "reasonable dispensing fee" an amount

other than the amount actually paid. This does not mean, however, that a state may simply disregard the amount actually paid and designate an arbitrary amount as a "reasonable dispensing fee," without any supporting analysis based on actual costs. The regulations contemplate a determination by a state of an amount reasonably sufficient to reimburse actual dispensing costs in the particular state. HCFA is entitled to presume that the amount actually paid represents such a determination by the state, absent affirmative evidence that a higher amount established by the state as a "reasonable dispensing fee" reasonably reflects actual dispensing costs.

Here, the mere fact that the $3.50 dispensing fee on which the State's original assurances were based was the median dispensing fee for all the states is not sufficient to establish its reasonableness for Pennsylvania. Furthermore, the State has provided no other evidence of its actual dispensing costs. Given the flexibility which the regulations give states to establish a "reasonable dispensing fee," and the particular circumstances here (where the State specifically and consistently took the position that the $2.75 actually paid was too low to reimburse actual dispensing costs, and where HCFA never contended that the $3.50 was unreasonable), however, HCFA should afford the State an opportunity to provide documentation of actual dispensing costs in Pennsylvania to support its contention that $3.50 was a "reasonable dispensing fee" for the disallowance period. Accordingly, we uphold the disallowance in principle, subject to reduction in whole or in part if the State establishes that use of an amount higher than the $2.75 actually paid (but not exceeding the $3.50 established by the State as a "reasonable dispensing fee") is justified.

1. Whether the regulations require the use of the dispensing fee actually paid by a state

We conclude that the regulations permit a state to use an amount other than the dispensing fee which it actually paid in calculating the upper payment limit. As the State pointed out, the regulations do not define the term "reasonable dispensing fee." The only express limitation on what constitutes a reasonable dispensing fee is that the dispensing fee be "established by the [state] agency." This implies that there has been some formal determination of an appropriate dispensing fee. However, this language does not obviously imply that the dispensing fee must be the amount paid. The submission of assurances which adopt another dispensing fee for purposes of calculating the upper payment limit can also be viewed as establishing a dispensing fee. 8/ (Nevertheless, as we discuss in section 2. below, in the absence of a specific and supportable state determination of a different dispensing fee amount as reasonable, HCFA is entitled to presume that the dispensing fee actually paid by a state was the fee established by the state agency.)

The structure of the regulations also supports the State's reading of the regulations as not requiring use of the dispensing fee actually paid

for purposes of calculating the upper payment limit. Section 447.333(b) of 42 C.F.R. provides in pertinent part that a state's drug payments may not exceed "in the aggregate" the specific limits established by HCFA for each drug plus a reasonable dispensing fee for each drug. Since the focus of the regulations is on a state's overall payment level, the State could reasonably have concluded that it could offset a lower than reasonable dispensing fee with ingredient costs which were higher than HCFA's specific limits as well as higher than the costs to the pharmacies themselves.

The preamble to the 1987 regulations provides further support for the State's position. The preamble indicates that HCFA set an aggregate limit to give the states flexibility to adopt alternative methods of reimbursement. Contrary to HCFA's position, it is likely that HCFA intended a state to have flexibility in how it determined its overall payments and not merely with respect to the pricing of ingredient costs since HCFA recognized that some states paid pharmacies without separately identifying a dispensing fee. HCFA's approach of holding the State to the dispensing fee actually paid regardless of the circumstances under which it was set is thus inimical to the intent to give the states greater flexibility expressed in the preamble.

We are not persuaded, moreover, that the State's interpretation of the regulations deprives HCFA of the ability to perform the oversight function referred to in the preamble. As discussed in section 2. below, HCFA must still determine whether the dispensing fee established by a state is reasonable. Accordingly, contrary to HCFA's argument, the State's interpretation does not give a state complete freedom to determine whether it meets the upper payment limit.

The fact that the requirements for surveys of pharmacy operations were deleted when the 1987 regulations were adopted can also be viewed as evidence that HCFA did not intend to require states to use the dispensing fee actually paid for purposes of assuring that they would not exceed the upper payment limit. While the regulations still require a state to maintain "records to support its findings and assurances" (42 C.F.R. . 447.333(c)), the omission of the requirement for the collection of specific data relating to pharmacies indicates that HCFA did not wish to dictate the manner in which a state agency established a dispensing fee. This is not inconsistent with HCFA's description of the requirements which were deleted as "procedural" requirements. Moreover, while the preamble clearly indicates that the deletion of these requirements did not change the requirement that a "reasonable dispensing fee" be established by the state agency, this does not address the question of what constituted a reasonable dispensing fee.

Finally, we find that the State did not have adequate notice that its interpretation of the regulations was not the interpretation adopted by HCFA. The State was first advised that its assurances were not acceptable in a letter from the Regional Administrator of HCFA for Region III dated January 29, 1988. The letter merely stated that

"[y]our computations in determining whether Pennsylvania meets with upper limit requirements should take into account the actual dispensing fee paid to pharmacies in the state." State's ex. C at 1 (emphasis in the original). The letter did not identify any specific wording in the regulations or in any official policy issuance which supported this conclusion nor specify how the actual dispensing fee should be taken "into account." In light of all of the factors discussed above which support the State's interpretation of the regulations, the conclusory statement in the Regional Administrator's letter is not a sufficient basis for holding the State to the interpretation which HCFA advanced here.

2. Whether the median Medicaid dispensing fee was a reasonable dispensing fee for the State

Our conclusion that the State was not required to use the dispensing fee it actually paid to calculate the upper payment limit does not necessarily mean that a state may simply disregard the amount actually paid and designate an arbitrary amount as a "reasonable dispensing fee." The regulations identify the specific limits on ingredient costs and the dispensing fee as separate components in determining the upper payment limit on drug costs. Thus, HCFA clearly did not intend to preclude an examination of the separate components in determining the upper payment limit. Instead, as the Board has noted elsewhere, the regulations require one to "separately examine these components to determine what is the appropriate amount of . . . [ingredient costs] for which payments may be made and what is a reasonable dispensing fee for any period." Ruling on Request for Reconsideration of Oklahoma Dept. of Human Services, DAB No. 1271 (1991), dated February 6, 1992, at 4. 9/ Moreover, the general requirement in 42 C.F.R. . 447.333(c) that states maintain records to support their assurances clearly requires some documentation and analysis to show that a state's dispensing fee is in fact reasonable. See also State Medicaid Manual, section 6305.2 D. Furthermore, the State itself acknowledged that the regulations require that the dispensing fee be reasonable.

However, the State failed to provide sufficient evidence to show that the dispensing fee of $3.50 which it used to calculate the upper payment limit was reasonable. A dispensing fee is reasonable only if it reflects the actual costs of dispensing drugs in the state. The fact that $3.50 was the median for all states does not mean that it necessarily reflects a fair estimate of actual dispensing costs in Pennsylvania. In order to establish that $3.50 was a reasonable dispensing fee in Pennsylvania, the State must show that the costs covered by the dispensing fee in Pennsylvania were similar to the median costs for all states. Here, however, the State did not even allege that this was the case.

Furthermore, the fact that the State did not pay more in the aggregate for multiple source drugs than other states does not show that a $3.50 dispensing fee was reasonable. It is possible that the State's overall

payments did not exceed that of other states for other reasons (such as that its ingredient costs were relatively low) and not because $3.50 reflected actual dispensing costs in the State. Accordingly, the reasonableness of the dispensing fee must be separately examined.

The State also attempted to bring itself within the scope of the Board's holding in Oklahoma, alleging that the $2.75 dispensing fee was "linked to the higher State MAC prices" and that part of the cost of dispensing a drug was covered by the ingredient cost paid by the State. However, the State did not provide any evidence that the ingredient costs included any costs of dispensing drugs. Thus, on the record before us, we cannot find that the $3.50 dispensing fee was reasonable. 10/

Accordingly, we uphold the disallowance in principle, subject to reduction by HCFA in whole or in part if the State furnishes documentation to HCFA which establishes that $3.50 (or some lesser amount which exceeds the $2.75 paid) reasonably reflects actual dispensing costs in the State. Any such documentation should be submitted to HCFA within 30 days of the State's receipt of this decision or within such longer period as HCFA may allow. If the State submits documentation which HCFA rejects in whole or in part, the State may return to the Board.

Conclusion

For the reasons discussed above, we conclude that the State was not required to use the $2.75 dispensing fee actually paid in calculating the upper payment limit on multiple source drugs. We further conclude, however, that the State did not show that the $3.50 dispensing fee which it established in making its assurances that the upper payment limit would not be exceeded was a reasonable one. Accordingly, we uphold the disallowance subject to reduction on the basis specified above.

_____ Donald F. Garrett

_____ Norval D. (John) Settle

_____ Judith A. Ballard Presiding Board Member

1. Section 447.331(c) provides that multiple source drugs which a physician certifies are "brand medically necessary" are not subject to the upper payment limit in . 447.332(b). This exception is not at issue

in this case, however.

2.  These regulations tracked Department-wide regulations at 45 C.F.R. Part 19.

3.  "MAC" is an acronym for "maximum allowable cost".

4.  The State also deducted any copayment from the amount which it paid the pharmacy.

5.  On January 26, 1989, the State submitted assurances which gave the same rationale as the prior year's assurances for not using the actual dispensing fee and stated that for the purpose of calculating the upper payment limit, the State was "defining a `reasonable dispensing fee' as the dispensing fee established by HCFA in the recently enacted Medicare Catastrophic Coverage Act.  This Act clearly defines the initial dispensing fee as $4.50."  State ex. F at 2.

6.  The State originally objected to the statistical sampling methodology used to determine the amount of overpayments on "brand medically necessary" transactions, but later withdrew its objection.  Since this was the only basis on which the State objected to the last two components of the disallowance identified above, totalling $371,554, this amount is no longer in dispute.

7.  Although the State referred generally to "prescription drugs," we assume that it meant multiple source drugs since the upper payment limits for multiple source drugs and other drugs are calculated separately.

8.  A different situation would be presented if the State had not suggested a $3.50 dispensing fee until it became apparent that the State had exceeded the upper payment limit using the $2.75 actually paid.  We agree with HCFA that it would be inappropriate under those circumstances, where the $3.50 was arrived at solely for the purpose of avoiding an overpayment, to view the $3.50 as the dispensing fee "established" by the State.

9.  In Oklahoma, the Board considered the question of the appropriate dispensing fee for purposes of calculating the upper payment limit for drugs other than multiple source drugs (the aggregate of the estimated acquisition costs plus reasonable dispensing fees).  Oklahoma had improperly used the undiscounted average wholesale price (AWP) of the drugs as their EAC.  However, the Board found that HCFA should have applied the dispensing fee which Oklahoma established when it later adopted an EAC of 90% of AWP rather than the lower dispensing fee adopted with the undiscounted AWP.  The Board stated that the State had consistently linked the two pricing components and that there was "evidence that the undiscounted AWP had effectively accounted for certain overhead costs that could appropriately be included in the

dispensing fee component of the reimbursement rate." Oklahoma at 11. In its ruling on HCFA's request for reconsideration of Oklahoma, the Board further stated:

> The regulation can reasonably be read to permit states to pay more than an appropriately determined EAC for drug ingredient cost, but less than a reasonable dispensing fee, so long as the payments did not, in the aggregate, exceed the upper limit.

Ruling on Request for Reconsideration at 5.

HCFA's argument that Oklahoma was wrongly decided has already been fully addressed in our reconsideration ruling.

10. We do not agree with HCFA that this case is distinguishable from Oklahoma on the basis that HCFA and not the state sets the ingredient costs for multiple source drugs. HCFA sets the ingredient costs for purposes of the upper payment limit calculation, but does not require a state to actually pay those amounts. Since the State used its own specific limits to determine payments for such drugs, it could reasonably have linked the dispensing fee which it paid to pharmacies to these