UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| ASTRAZENECA CLASS 1 SETTLEMENT | Judge Patti B. Saris |

**CLASS PLAINTIFFS' OPPOSITION TO DON HAVILAND'S MOTION TO STAY
DISTRIBUTION OF ASTRAZENECA FEE AWARD AND FOR COURT REVIEW OF
LEAD COUNSEL'S ALLOCATION OF FEES AND REIMBURSEMENT OF COSTS**

## I.      INTRODUCTION

Having suffered an ignominious defeat in the First Circuit on his errant appeal of this

Court's approval of the AstraZeneca Class 1 settlement, Don Haviland now moves the Court for

an Order Staying Distribution of the AstraZeneca Fee Award and for Court Review of Lead

Counsel's Allocation of Fees and Reimbursement of Costs (Dkt. No. 6809).  Contrary to

Haviland's contentions, no firms, including Lead Class Counsel, have been paid any fees

approved by the Court in association with the AstraZeneca Class 1 Settlement.  The reason:

Haviland's frivolous appeal of that settlement effectively stayed the distribution of the fee award,

just as Haviland's frivolous appeal has precluded distribution of settlement monies to sick and

dying class members and to his own clients.  If, at the time the fee distribution is made, Haviland

is unhappy, he can object then.  But Haviland's unsupported motion is premature, the relief that

he seeks is unnecessary, and the Court should deny the motion.

## II.     FACTUAL BACKGROUND

In October 2008, Lead Class Counsel distributed the fees and expenses awarded by the

Court out of the GSK Settlement, using a well-reasoned tier approach reflecting the risks borne

and quality of work performed by various plaintiffs' counsel.  At that time, Class Counsel did not

distribute any fees and expenses associated with the GSK Settlement to Don Haviland, who was

an associate at the Kline & Specter law firm at the time the GSK Settlement was reached.  Kline

& Specter, a former Co-Lead counsel firm, received a distribution directly.  Haviland, who was

well aware that Class Counsel distributed the GSK Settlement fees directly to Kline & Specter,

did not object.

In an electronic Order issued on December 10, 2008, the Court directed "lead counsel to

consult with all firms regarding its plan for allocating fees in this MDL in the future and submit a

proposal to the Court within 30 days."  In that same Order, the Court held that any objections to

Lead Class Counsel's future fee allocations will "be reviewed on an abuse of discretion

standard."

On January 9, 2009, and pursuant to the Court's December 10, 2008 Order, Class

Counsel filed with the Court Class Counsel's Proposed Future Fee Allocation Guidelines (Dkt.

No. 5836) (the "Fee Allocation Guidelines," attached hereto as Exhibit 1).  Given that

(i) substantial claims remained to be litigated in the case, (ii) two proposed settlements still

awaited final approval, and (iii) Class Counsel could not predict with any certainty the

magnitude of expense reimbursements and fees that may be approved by the Court in the future,

the Fee Allocation Guidelines did not contain a detailed fee allocation plan.  The Fee Allocation

Guidelines did, however, present a summary of the factors that Class Counsel intend to apply to

all future fee allocations.  Those factors are well established and supported by decisions such as

*Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000), and *Gunter v. Ridgewood*

*Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000).  <u>Haviland did not object to these Fee</u>

<u>Allocation Guidelines filed a year ago</u>.

    The Court has approved a fee award in association with the AstraZeneca Class 1

Settlement.  Haviland's appeal of the Court's final approval of the AstraZeneca Class 1

Settlement, however, has prevented a distribution from that settlement, either to Class members

or the attorneys.  The First Circuit recently and emphatically rejected <u>all</u> of Haviland's

contentions on appeal, calling them "meritless."  *See In re Pharm. Indus. Average Wholesale*

*Price Litig.*, 2009 U.S. App. LEXIS 25536 (1st Cir. 2009) (attached as Ex. 2).  Nevertheless,

Class Counsel have not yet applied the Fee Allocation Guidelines and distributed the

AstraZeneca Class 1 fee award.[1]

## III.    ARGUMENT

    In his motion, Haviland brings a hodge-podge of arguments, all of which are

unsupported, and none of which justify the stay that he seeks.  We address each of them below.

**A.    Haviland Has Not Been Paid Because He Was Not Entitled to Participate in the GSK Fee Distribution.**

    Haviland complains that his firm has not been paid any fee or cost reimbursement for his

new firm's work on the case.  Br. at 2.  This is true, but for good reason.  First, the only fees and

expenses distributed to date have been associated with the GSK Settlement, and Haviland's firm

– HLF – did not even exist at the time of that Settlement.  Thus, HLF was <u>not</u> entitled to directly

receive a share of the GSK Settlement fees.  Haviland undoubtedly recognizes this, which is why

he <u>never</u> objected to the GSK Settlement fee distribution made by Class Counsel way back in

---

[1] In addition to the foregoing settlements, settlements are pending in favor of all Classes with respect to BMS and the Track 2 Defendants.  None of these additional settlements are final.  Consequently, there have not been any fee and expense distributions with respect to any of them.

October 2008 and has waived doing so.  For this reason, Haviland's present motion does not appear to seek any share of the fees from the GSK Settlement.[2]

Second, no fees and expenses associated with any other settlement have been distributed to any firm.  Distribution of the AstraZeneca Class 1 fee and expense award was held up by Haviland's frivolous appeal.

Thus, Haviland has not been directly paid any fees because he has not been entitled to receive any to date.  He has no reason to complain and his motion is thus frivolous.

**B.**    **Haviland Was Not Included in the Fee Allocation Guidelines Because He Was Not Entitled to Participate in the GSK Fee Distribution.**

Haviland next complains that his firm was excluded from the Tier groupings contained in the Fee Allocation Guidelines.  Br. at 2-3.  This is true.  However, Haviland failed to object at the time that those Guidelines were filed almost one year ago and has remained silent on this issue ever since.  In any event, Haviland was excluded from the Fee Allocation Guidelines for the simple reason that he was not eligible to participate in the GSK fee distribution.  He is not alone, as other firms that did not participate in work on behalf of plaintiffs prior to the GSK Settlement were excluded as well.[3]

**C.**    **Haviland Is Eligible to Participate in the AstraZeneca Class 1 Fee Distribution.**

Haviland claims that Class Counsel do not propose to pay HLF any fees or costs out of the proceeds of the AstraZeneca Settlement.  Br. at 3.  Class Counsel have not yet drawn up any plans to distribute the AstraZeneca Class 1 fee.  At the time that the AstraZeneca Class 1 fee is distributed, Haviland's efforts will be evaluated under the same criteria as other counsel.[4]  If he

---

[2] And even if it did, that would be a matter for Haviland to take up with his former employer, Kline & Specter, and not with Class Counsel.

[3] One example is the firm of Murdock Goldenberg Schneider & Groh, which worked on Track 2 defendants.

[4] We have not seen the time Haviland seeks compensation for, but class counsel do not intend to compensate Haviland for time spent raising issues the First Circuit deemed were "without merit."

has any objection to the amount that he is ultimately allocated, then he can object after the

allocation is made, as contemplated by the Court.  *See* December 12, 2008, Order (providing that

any objections to fee allocations "shall be reviewed on an abuse of discretion standard").

**D.      Haviland's Clients Have Not Been Paid Any Incentive Fees Because They Have Not
         Been Eligible to Receive Any Incentive Fees.**

Haviland next complains that his clients have not been paid the incentive fees that have

been awarded.  This is true, but it is Haviland's own fault that this has not been done.  As with all

other distributions pertaining to the AstraZeneca Class 1 Settlement, Class Counsel have not

distributed incentive fees to any class representatives because of Haviland's appeal.  Mrs. Howe

will be entitled to receive the compensation award that the Court approved for her at the time the

distribution is made, as will the other class representative, Mr. Townsend.  Of course, both

representatives would have long ago received their awards had Haviland not pursued his

frivolous appeal.

**E.      No Other Firms Have Been Paid Any Fees From the AstraZeneca Class 1
         Settlement.**

Haviland contends that other firms have been paid while he has not.  Br. at 4.  Again, no

firms have been paid any part of the fee award approved by the Court for the AstraZeneca

Class 1 Settlement.  The only *AWP*-related fee distribution made to date was in association with

the GSK Settlement, and Haviland's new firm, HLF, was not eligible to participate in that fee

distribution, which occurred in October 2008.

**F.      The Court Should Disregard Haviland's Continuing Crusade Against Kline &
         Specter.**

Lastly, Haviland contends that his former firm, Kline & Specter, "appears to be inflating

its lodestar. . . ."  Br. at 4-5.  Tellingly, Haviland offers no specific evidence, only speculation.

Class Counsel have no reason to believe that Kline & Specter, a former member of the Co-Lead

001534-16  345844 V2

Class Counsel team, has inflated its lodestar.  Indeed, it is difficult to view Haviland's

unsupported assertion as credible given the fact that Haviland has litigation pending against

Kline & Specter relating to fee splits in several cases.

The facts, ignored by Haviland, are as follows.  On June 22, 2007, Marc Edelson

submitted a declaration to the Court in support of class counsel's petition for attorneys' fees and

reimbursement of expenses in relation to the settlement with GSK.  Dkt. No. 4399.  In Exhibit 1

attached to his declaration, Mr. Edelson indicated that Kline & Specter had a total of 6,681.75

hours, $2,093,136.25 in lodestar, and $404,180.02 in expenses as of August 10, 2006.  These

numbers were inaccurate, as they failed to reflect all of the relevant work performed and

expenses paid by Kline & Specter that benefitted the certified class in this case.  More

specifically, Kline & Specter worked on several other, related cases, all of which were eventually

consolidated with MDL 1456, and all of which benefitted the class in this case.

On April 16, 2008, Mr. Edelson submitted a second declaration to the Court, this time in

relation to the settlement with AstraZeneca.  *See* Dkt. No. 5222.  In this declaration, Mr. Edelson

correctly indicated that Kline & Specter had $3,486,937.32 in lodestar and $602,739.90 in

expenses that benefitted the class.  These numbers accurately reflected all of the work performed

and expenses paid by Kline & Specter in all of the case that benefitted the class and were

consolidated in the MDL.  Shanin Specter, Esquire, a principal of Kline & Specter, reported the

specific breakdown of Kline & Specter's hours, lodestar and expenses in each of the cases

handled by Kline & Specter that benefitted the class to Mr. Edelson on December 19, 2006, and

again by affidavit on June 13, 2007.  *See* Ex. 3 attached hereto.

Tellingly, Mr. Haviland was aware that Kline & Specter had a lodestar of around

$3,500,000.00, and was the individual at Kline & Specter who reported that number of

- 6 -

Mr. Specter and was responsible for preparing the time report prior to his discharge from Kline & Specter in September 2006. *See* email correspondence attached hereto as Ex. 4. Quite obviously, Mr. Haviland is attempting to discredit his former employer, with whom he continues to litigate, with no grounds for doing so. He should not be allowed to open a new litigation was with his old firm via the AWP MDL.

### IV.    CONCLUSION

Haviland closes his brief with the statement that "court intervention is required to avoid having the fee dispute become a separate, parallel litigation." Br. at 6. There simply is no fee dispute at this time, as Class Counsel have not allocated or distributed any portion of the AstraZeneca Class 1 fee award. Thus, court intervention is not necessary and frankly as demonstrated above each of his contentions in support of his motion are flat out frivolous.

Further, Haviland's statement is ironic: his motion, filed without any consultation or meet and confer with Class Counsel, seeks "separate, parallel litigation" relating to fees, which courts uniformly frown upon. Having been handed a crushing defeat of his appeal of the Court's final approval of the AstraZeneca Class 1 Settlement, it now appears that Haviland intends to perpetuate his misguided and disruptive objection efforts to the realm of fee awards. That is unfortunate, but Haviland so frequently chooses the unfortunate path of action, and one that unnecessarily taxes the Court's resources.

For the foregoing reasons, Haviland's motion should be denied.

DATED:  January 6, 2010

By    **s/ Steve W. Berman**
    Thomas M. Sobol (BBO#471770)
    Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Jeffrey Kodroff
John A. Macoretta
Spector, Roseman, Kodroff & Willis, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Wallace LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

**CO-LEAD COUNSEL FOR
PLAINTIFFS**

001534-16  345844 V2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **CLASS PLAINTIFFS' OPPOSITION TO DON HAVILAND'S MOTION TO STAY DISTRIBUTION OF ASTRAZENECA FEE AWARD AND FOR COURT REVIEW OF LEAD COUNSEL'S ALLOCATION OF FEES AND REIMBURSEMENT OF COSTS**, to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on January 6, 2010, a copy to LexisNexis File & Serve for posting and notification to all parties.

   **s/ Steve W. Berman**
Steve W. Berman

# Exhibit 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| ALL ACTIONS | Judge Patti B. Saris |

## <u>CLASS COUNSEL'S PROPOSED FUTURE FEE ALLOCATION GUIDELINES</u>

001534-16  279757 V1

## I.      INTRODUCTION

In an electronic Order issued on December 10, 2008, the Court directed "lead counsel to consult with all firms regarding its plan for allocating fees in this MDL in the future and submit a proposal to the Court within 30 days."  In that same Order, the Court held that any objections to Lead Class Counsel's future fee allocations will "be reviewed on an abuse of discretion standard."

Thus far, the Court has granted final approval to the GSK Settlement and the AstraZeneca Class 1 Settlement.  Lead Class Counsel have distributed the fees and expenses awarded in the GSK Settlement.  The AstraZeneca Class 1 Settlement is not yet final, as the appeal period has not expired.  Consequently, there has not yet been a fee and expense distribution from that settlement.  In addition to the foregoing settlements, settlements are pending in favor of all Classes with respect to the Track 2 Defendants, and Lead Class Counsel hope to present the BMS Class 1 Settlement to the Court for preliminary approval shortly.

Claims on behalf of multi-state Classes 2 and 3 are still pending against both AstraZeneca and BMS, and the Court has not yet entered a final order certifying those classes or set those claims for trial.  We may spend millions in costs and fees preparing for and prosecuting those claims at trial, and Plaintiffs may yet lose the trials.  In addition, the First Circuit Court of Appeals has yet to issue a decision on the appeals arising from the trial of the claims of Massachusetts Classes 2 and 3.  It is possible that a partial retrial of claims may follow the First Circuit decision.

Given that (i) substantial claims remain to be litigated in this case, (ii) two proposed settlements still await final approval, and (iii) the inability to predict with any certainty the magnitude of expense reimbursements and fees that may be approved by the Court in the future, Lead Class Counsel are unable to submit to the Court a detailed fee allocation plan at this time.

001534-16 279757 V1

However, we outline below the guidelines that we intend to apply to all future fee allocations. As was done in allocating the GSK award, Lead Class Counsel will be guided by factors that courts consider in awarding fees in class litigation. *See*, *e.g.*, *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000); *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000). Lead Class Counsel will apply a multi-factor analysis in an objective manner in allocating expenses and fees in a process similar to that used in allocating the GSK fee, which resulted in only a single objection from the 25 firms involved. As the Court requested, Lead Class Counsel have communicated the below guidelines to all Plaintiffs' counsel in this case.

## II.    THE GUIDELINES

### A.    Reimbursing Advanced Expenses.

As a first step in allocating any future fee awards, Lead Class Counsel will reimburse a specific portion of total expenses advanced. Expenses are paid first because they are substantial out-of-pocket outlays that magnify risk. In addition, it is important to partially recharge expense budgets on an ongoing basis as out-of-pocket costs, and particularly expert costs, continue to accrue in the case. The aggregate amount allocated to expenses will be reduced from the total fee award to determine the net amount remaining to be allocated as "fees."

### B.    The Primary Fee Allocation Factors.

Courts delegate substantial discretion to lead counsel to allocate a fee award across participating counsel and will not disturb that allocation provided that is fair and reasonable. The Court has recognized this by stating in its December 10 Order that any objections to Lead Class Counsel's future fee allocations will "be reviewed on an abuse of discretion standard."

Lead Class Counsel's fee allocation decisions will be guided by the factors that courts consider in awarding fees in class litigation, including the following three factors as the "primary" drivers of discerning each firm's contribution to the litigation: (i) the risks borne by

counsel in litigating a complex case on a contingency fee basis, (ii) the quality of the

representation provided, and (iii) the time and labor expended by counsel.  *See*, *e.g.*, *Goldberger*,

209 F.3d at 50; *Gunter*, 223 F.3d at 195 n.1.

We consider risk to be the most important factor.  *Goldberger*, 209 F.3d at 54 ("We have

historically labeled the risk of success as 'perhaps the foremost' factor to be considered in

determining whether to award an enhancement.").  This Court has already recognized the

magnitude of risk faced by class counsel in this case.  *See* May 1, 2008 Hearing Tr. at 24.  This

litigation has entailed, and continues to entail, an extraordinarily high level of risk.  It has

involved novel and complex legal and factual issues, and the limited resources of Lead Class

Counsel have been pitted against the seemingly infinite resources of defendants and their well-

heeled counsel, who pursue appeals at every opportunity.  In assessing risk profiles, Lead Class

Counsel will consider the magnitude of advanced expenses and each firm's commitment of full-

time firm personnel to the exclusion of other case opportunities.

With respect to the quality of representation factor, we will primarily consider each

firm's leadership position; its quality and volume of substantive work; whether the firm was an

integral component of the trial team; the number, experience and quality of the partners and

senior associates assigned to the case and whether and to what extent lower value contract

lawyers were utilized; and the consistency of the firm's commitment throughout the duration of

the litigation, including work on appellate issues.

With respect to the time and labor expended by counsel factor, we will consider each

firm's productive lodestar.  Lodestar will not be the sole or even determinative factor in Lead

Class Counsel's analysis.  Lead Class Counsel have collected and reviewed, and will continue to

collect and review, unaudited lodestar and expense information.  In determining reasonableness,

001534-16  279757 V1

we have reviewed, and will continue to review, hourly rates, the time asserted to have been

spent, and the work performed.

## C.     The Tiers.

Lead Class Counsel have employed the foregoing factors and will group the 25 Plaintiffs'

firms reporting time and expenses in the AWP litigation into three tiers based on their

contributions to the litigation as follows:[1]

| Tier | Firm |
|------|------|
| I | Hagens Berman Sobol Shapiro LLP<br>Wexler Toriseva Wallace LLP<br>Spector, Roseman, Kodroff & Willis, P.C.<br>Hoffman & Edelson, LLC |
| II | Heins, Mills & Olson, P.L.C.<br>Kline & Specter, P.C. |
| III | Audet & Partners, LLP<br>Bolognese & Associates, LLC<br>Carey & Danis, LLC<br>Cuneo Gilbert & Laduca, LLP<br>Freeman & Lorry, P.C.<br>Hanzman, Criden & Love, P.A.<br>Hulett Harper Stewart, LLP<br>Karmel Law Firm<br>Law Office of Adam S. Levy<br>Piper & Associates<br>RodaNast, P.C.<br>Rossbacher Firm<br>Sheller, P.C.<br>Shepherd, Finkleman, Miller & Shah, LLC<br>Squitieri & Fearon, LLP<br>Trujillo Rodriguez & Richards, LLC<br>Weller, Green, Toups & Terrell, L.L.P.<br>Williams Law Firm<br>Young, Pickett & Lee |

We will allocate a specific percentage of each fee award to each tier, similar to the

approach taken in the GSK fee allocation.  In light of the contributions highlighted below, the

Tier I firms will receive a higher percentage of future fee allocations than the other tiers.

---

[1] These are the same tiers that were utilized in allocating the GSK fee, except that the three sub-tiers previously employed for Tier III have been removed.

1.      **The Tier I contributions.**

The Tier I firms have led the case from inception to the present, done most of the work, advanced the most expenses (approximately 84% to date), shouldered most of the risk of nonpayment and were the primary drivers of the results achieved thus far.  Among other work, certain members of the Lead Class Counsel team have made the following contributions:  headed the litigation; comprised the trial team; spearheaded all substantive oral arguments and served as the primary "face" of the team in court; prepared most, if not all, of the substantive briefing; conducted the expert work; were liaison counsel to the Court; handled almost all of the case filings for the Plaintiffs; led on all case management order and pre-trial order negotiations and drafting; coordinated and conducted third-party TPP discovery; covered the so-called "government knowledge" depositions; coordinated with the DOJ on federal issues; conducted wholesaler discovery; conducted publisher discovery, with some help from a Tier III firm; and were responsible for discovery of all of the defendants.

2.      **The Tier II contributions.**

The Tier II firms once participated in leadership roles and, for a time, shared some of the Tier I responsibilities.  The Tier II firms' former participation in leadership roles differentiates them from the Tier III firms, although the Tier II firms dropped out of the case and thereby minimized their risks.

3.      **The Tier III contributions.**

The roles of the Tier III firms were primarily but not exclusively limited to participating in document review projects early in the litigation.  This work was important and necessary to filter the literally millions of documents produced by the defendants in this case.  And the fact that many Plaintiffs' counsel participated in document review projects does not mean that time spent reviewing documents was duplicative.  To the contrary, all of the documents produced

needed to be read, coded, and analyzed whether the case was litigated by few firms or many. Lead Class Counsel instituted procedures designed to avoid duplication and inefficiency and divided document review responsibilities in a cogent manner. The Tier III firms did not play a leadership role and generally have either no or minimal additional time and expenses in the case after 2006.

## D. Lead Class Counsel's Aspirational Goals.

As we have explained to the Court in prior submissions, the total lodestar of Plaintiffs' counsel in this case dwarf the fees awarded thus far and will likely do so for some time. In addition, expenses and lodestar continue to grow as the case progresses. Both the timing and magnitude of any future fee awards are difficult if not impossible to predict, especially since a significant part of the case is still being litigated. Under these circumstances, it should come as no surprise that we cannot guarantee that any firm – including each firm on the Lead Class Counsel team – will recover its total lodestar.

We have, however, set certain fee allocation goals that pertain to the ultimate resolution of the case, that is, after all litigation is over. In the event that all awarded fees from all AWP MDL cases at the conclusion of all matters total less than the collective lodestar and expenses of all Plaintiffs' counsel (the "Total Lodestar Over Total Fees Percentage"), Lead Class Counsel will endeavor in good faith to provide each firm up to a total of 80 percent of its lodestar and expense reimbursement. If the Court awards the percentage fees requested in all settlements and/or judgments, and if the Total Lodestar Over Fees Percentage exceeds 100 percent, then Lead Class Counsel will endeavor in good faith to provide each firm 100 percent of its lodestar and expense reimbursement. Given the uncertainty associated with future fee recoveries, the foregoing are aspirational goals and not guarantees. There are several scenarios under which we

001534-16 279757 V1

would be unable to meet these goals, including an aggregate result where the Total Lodestar

Over Fees Percentage is close to or less than 80 percent.

### III.    CONCLUSION

Lead Class Counsel intend to objectively deploy the three primary *Goldberger* factors

outlined above in allocating future fee awards across the proposed tiers.  The process has been

and will remain fair and transparent, as the Court has directed.


DATED:  January 9, 2009.                    By     **/s/ Steve W. Berman**
                                                  Thomas M. Sobol (BBO#471770)
                                                  Edward Notargiacomo (BBO#567636)
                                            Hagens Berman Sobol Shapiro LLP
                                            One Main Street, 4th Floor
                                            Cambridge, MA  02142
                                            Telephone: (617) 482-3700
                                            Facsimile: (617) 482-3003

                                            **LIAISON COUNSEL**

                                            Steve W. Berman
                                            Sean R. Matt
                                            Hagens Berman Sobol Shapiro LLP
                                            1301 Fifth Avenue, Suite 2900
                                            Seattle, WA  98101
                                            Telephone: (206) 623-7292
                                            Facsimile: (206) 623-0594

                                            Jeffrey Kodroff
                                            John Macoretta
                                            Spector, Roseman Kodroff & Willis, P.C.
                                            1818 Market Street, Suite 2500
                                            Philadelphia, PA  19103
                                            Telephone: (215) 496-0300
                                            Facsimile: (215) 496-6611

001534-16 279757 V1

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Wallace LLP
55 W. Monroe, Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Hoffman & Edelson LLC
45 West Court Street
Doylestown, PA 18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

**CLASS COUNSEL**

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing submission to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on January 9, 2009, a copy to LexisNexis File & Serve for posting and notification to all parties.

 /s/ Steve W. Berman
Steve W. Berman

001534-16 279757 V1

# Exhibit 2



LEXSEE 2009 U.S. APP. LEXIS 25536

**IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION; M. JOYCE HOWE, Plaintiff, Appellant, v. LEROY TOWNSEND, Plaintiff, Appellee.**

**No. 09-1196**

**UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT**

*2009 U.S. App. LEXIS 25536*

**November 19, 2009, Decided**

**SUBSEQUENT HISTORY:**    As Amended December 21, 2009.

**PRIOR HISTORY:**  [*1]
    APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS. Hon. Patti B. Saris, U.S. District Judge.
*Shepley v. Johnson & Johnson (In re Pharm. Indus. Average Wholesale Price Litig.), 582 F.3d 231, 2009 U.S. App. LEXIS 21214 (1st Cir. Mass., 2009)*

**COUNSEL:** Donald E. Haviland with whom Michael J. Lorusso and The Haviland Law Firm, LLC were on brief for the appellant.

Steve Berman with whom Sean R. Matt, Thomas M. Sobol, Edward Notargiacomo, Hagens Berman Sobol Shapiro LLP, Kenneth R. Wexler, Jennifer Fountain Connolly, Wexler Wallace LLP, Jeffrey Kodroff, John A. Marcoretta, Spector, Roseman, Kodroff & Willis P.C., Marc H. Edelson, and Hoffman & Edelson were on brief for the appellee.

**JUDGES:** Before Lynch, Chief Judge, Torruella and Howard, Circuit Judges.

**OPINION BY:** LYNCH

**OPINION**

LYNCH, *Chief Judge*. One unhappy named plaintiff appeals from an order approving a $ 24 million class action settlement in one multidistrict litigation, in which class members allege that AstraZeneca Pharmaceuticals LP (AstraZeneca) published artificially inflated prescription drug prices. *In re Pharm. Indus. Average Wholesale Price Litig., MDL No. 1456, Civ. A. No. 01-12257, 2008 U.S. Dist. LEXIS 111818 (D. Mass. Dec. 15, 2008)* (order approving final settlement) (*In re Pharm. Final Settlement Approval*). The settlement is between AstraZeneca and a class of consumer plaintiffs who claimed they overpaid  [*2] Medicare co-payments because AstraZeneca inflated the price of Zoladex.

M. Joyce Howe, one of the class representatives for the AstraZeneca consumer subclass, appeals. The other AstraZeneca subclass representative, Leroy Townsend, asks us to uphold the settlement. Howe argues that the settlement must be rejected on the grounds that it creates a cy pres fund of up to $ 10 million rather than distributing all recovery to class members; that the settlement is not fair, reasonable, and adequate because its method for calculating and distributing class members' damages is flawed; and that the parties allegedly improperly negotiated fees simultaneously with the settlement. Howe failed to raise the last argument before final approval of the settlement.

    Howe also argues to us two procedural objections she did not make in the district court. Howe contends the

district court's order approving the settlement, which expanded the settlement class, did not sufficiently define the new class and its claims as required by *Rule 23(c)(1)(B)*. Howe also argues that the district court did not properly reappoint class counsel under *Rule 23(g)*, *see Fed. R. Civ. P. 23(g)*, when approving the expanded settlement [*3] class.

The cy pres and *Rule 23(c)(1)(B)* issues are ones of first impression for this court. We find Howe's challenges meritless and affirm the district court, which handled this matter with great sensitivity and care.

I.

This appeal is in one case of a series of class actions alleging pharmaceutical companies fraudulently inflated a figure known as the "average wholesale price" (AWP) between 1991 and 2003 to boost sales. [1] This court has already decided other appeals from these multidistrict litigations and related cases. *See In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 231 (1st Cir. 2009); In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 156 (1st Cir. 2009); Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Benefits Fund, 582 F.3d 30 (1st Cir. 2009); U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P., 579 F.3d 13 (1st Cir. 2009).*

> 1   The AWP was supposed to reflect the average amount wholesalers charged providers for pharmaceutical drugs. Wholesalers bought drugs from manufacturers, marked up the price about 20 to 25 percent to make a profit, and resold them to physicians. Patients obtaining drugs from physicians either paid out of pocket or had their [*4] insurers reimburse physicians, while usually making a co-payment. Insurers and Medicare reimbursed physicians based on published AWPs, which in turn determined patients' co-payments.
>
> Over time, the acquisition costs for physicians plummeted. Wholesalers added much smaller markups, around 2.5 percent, due to increasing competition. And pharmaceutical companies began using rebates and similar devices to further drive down the cost of drugs. Yet pharmaceutical companies did not adjust published AWPs to reflect this market change. Instead, companies continued to push costs down but reported AWPs based on the 20 to 25 percent markup.

Because Medicare and insurers continued to rely on published AWPs, the "spread" between physicians' acquisition costs and their reimbursements grew dramatically, generating increasing profits for doctors. Pharmaceutical companies marketed this spread to physicians to encourage doctors to prescribe the companies' drugs.

The healthcare industry treated the AWP, which pharmaceutical companies self-reported, as the sticker price for drugs. Insurers used AWPs to decide how much to reimburse providers when patients obtained drugs, which in turn affected patients' co-payments. [*5] Most of the drugs involved in these litigations are expensive drugs for serious illnesses, including cancer. The drug involved in this appeal, Zoladex, is commonly used to treat prostate cancer. Consequently, Medicare, insurers, and patients allegedly overpaid by many millions of dollars for critical treatments based on manipulated AWPs.

A coalition of citizen, healthcare, senior citizen, and consumer advocacy groups sued dozens of drug manufacturers and healthcare-product companies [2] in the District Court for the District of Massachusetts on December 19, 2001. Similar lawsuits were filed across the country, and on April 30, 2002, the Judicial Panel on Multidistrict Litigation consolidated the lawsuits and assigned the case to the District Court for the District of Massachusetts. *In re Immunex Corp. Average Wholesale Price Litig., 201 F. Supp. 2d 1378, 1379-81 (J.P.M.L. 2002).*

> 2   The complaint also named numerous co-conspirators and Doe defendants, possibly including other companies and doctors who participated in fraudulent billing.

The district court ultimately divided the multidistrict litigation into two tracks, a fast track (Track One) and a normal track (Track Two). Track One included [*6] three classes. One of the three--Class 1, called the Medicare Part B Co-Payment Class--consisted of patients covered by Medicare Part B who made co-payments for these drugs. A subclass of Class 1, which sued AstraZeneca for inflating the price of Zoladex, is involved in this appeal.

The Medicare Part B Co-Payment Class alleged that the defendants violated state consumer protection statutes

2009 U.S. App. LEXIS 25536, *6

by artificially inflating AWPs. Between 1992 and 2005, Medicare Part B reimbursements were based on published AWPs under federal law. [3] Medicare covered 80 percent of this cost, requiring patients to make a 20 percent co-payment.

> [3] Medicare reimbursed physicians 100 percent of the AWP from 1992 to 1998, up to 95 percent of the AWP until 2003, and 85 percent of the AWP until 2005, when the federal government finally stopped relying on AWPs altogether.

Most patients had supplemental insurance that covered some but not all of this co-payment. Those who had supplemental coverage for the full co-payment were excluded from the class. Most class members had Medigap insurance that covered 80 percent of the 20 percent co-payment (leaving patients to pay 20 percent of the 20 percent Medicare co-payment). Thus [*7] patients in the class were differently affected depending on whether they had supplemental insurance and how much of the co-payment that insurance covered.

On August 16, 2005, the district court denied some proposed classes and deferred certifying the Medicare Part B Co-Payment class until the plaintiffs located individuals to act as class representatives. *In re Pharm. Indus. Average Wholesale Price Litig., 230 F.R.D. 61, 96 (D. Mass. 2005)* (order partially denying and partially deferring class certification) (*In re Pharm. Preliminary Class Certification*). [4] The court issued the order after carefully analyzing whether the Medicare Part B Co-Payment Class, as well as all proposed Track One classes, met the requirements for class certification under *Rule 23 of the Federal Rules of Civil Procedure*. *Id. at 76-96.* The plaintiffs filed an amended complaint in October 2005 that reflected the court's instructions.

> [4] The district court issued many orders in this case, only a handful of which are relevant to this appeal. We refer to orders based on their content for the purposes of this appeal only.

The district court certified the Medicare Part B Co-Payment Class under *Rule 23(b)(3) of the Federal Rules of Civil Procedure* [*8] on January 30, 2006. *In re Pharm. Indus. Average Wholesale Price Litig., 233 F.R.D. 229, 230-31 (D. Mass. 2006)* (order granting and denying class certification) (*In re Pharm. Class Certification*). It defined the class as "[a]ll natural persons nationwide who made, or who incurred an obligation

enforceable at the time of judgment to make, a co-payment based on AWP for a Medicare Part B covered Subject Drug that was manufactured by" the defendants, including AstraZeneca, between January 1, 1991, and January 1, 2005. *Id. at 229-32* (footnote omitted). The court excluded residents in nine states whose consumer-protection statutes did not create a cause of action, unlike the law in states whose residents were certified as class members. *Id. at 230.* It certified class counsel under *Rule 23(g)*. *Id. at 232.*

The court divided the plaintiffs into four subclasses according to which pharmaceutical-company defendant had distributed the subject drugs to them. *Id. at 230.* The court certified Howe [5] and Townsend as subclass representatives for the class members suing AstraZeneca. *Id.*

> [5] The court certified Howe individually and on behalf of her husband's estate.

After months of intense litigation and negotiation, [*9] AstraZeneca and the Zoladex subclass reached a final settlement in May 2007, on the eve of trial. [6] That settlement is at issue in this appeal. The plaintiffs' expert had calculated the class's damages were $ 31,128,851. In the settlement, AstraZeneca agreed to pay $ 24 million in total compensation to all class members or, for deceased class members, to their spouses or the legal representatives of their estates. In an effort to achieve a comprehensive settlement, the parties also agreed AstraZeneca would pay the consumers from nine states who had previously been excluded from the class. If the amount of submitted claims exceeded $ 24 million, class members' recovery would be reduced proportionally.

> [6] In June 2007 some members of Classes 2 and 3 of the Track One plaintiffs proceeded to a bench trial against four defendants, including AstraZeneca, and the district court ruled in favor of the plaintiffs. *In re Pharm. Indus. Average Wholesale Price Litig., 491 F. Supp. 2d 20, 29-32 (D. Mass. 2007)* (*In re Pharm. Trial*).

AstraZeneca also promised to pay all costs of distributing this money as well as $ 8.7 million in attorneys' fees and costs, representing about one-third of the settlement [*10] amount. The parties agreed AstraZeneca would pay fees and costs separately and not deduct that from the class members' $ 24 million recovery.

2009 U.S. App. LEXIS 25536, *10

The parties expected a large portion of the total sum AstraZeneca was willing to pay would go unclaimed. Because Zoladex is used to treat prostate cancer, many class members were elderly, had died, or could die soon, and not all of them could be found. The parties addressed this issue through two mechanisms.

First, rather than paying the money up front into a fund that would distribute money to class members, AstraZeneca agreed to pay class members only on a comparatively easy claims-made basis. Class members only had to submit relatively minimal proof of when they took Zoladex. Then, based on a formula created by the plaintiffs' expert, class members would receive compensation for *double* their actual losses. Because the formula tried to calculate actual losses, it calculated the damages of class members who had supplemental insurance were 20 percent of their 20 percent Medicare co-payment, based on the average Medigap coverage that class members had.

Second, the parties agreed to create a fund, called a cy pres fund, that would pay any amount remaining [*11] (after payout to the claimants) of the $ 24 million to "mutually acceptable charitable organizations funding cancer research or patient care" that the court would approve in the future. The parties capped the cy pres amount at $ 10 million if not all of the $ 24 million was paid out.

The parties submitted this agreement to the district court for preliminary approval on May 21, 2007. Howe quickly objected to the proposed settlement. She then raised six concerns but did not repeat all of them later in the settlement process. Those concerns were (1) the settlement changed the composition of the class, (2) the settlement compensated members on a claims-made basis rather than sending class members a check for their share of the class's damages, (3) the cy pres fund unfairly deprived class members of recovery, (4) the loss formula should not have reduced payments to those with supplemental insurance and also failed to calculate different coverage levels among those with supplemental insurance, (5) the settlement exposed class members to having other classes subrogate their claims, and (6) the settlement was tainted because the parties negotiated it and attorneys' fees simultaneously.

The district [*12] court granted preliminary approval of the settlement. *In re Pharm. Indus. Average Wholesale Price Litig.*, 520 F. Supp. 2d 267 (D. Mass.

2007) (order preliminarily approving settlement) (*In re Pharm. Preliminary Settlement Approval*). In the preliminary approval the court certified an expanded class that included the residents in nine states who were previously excluded, finding the class satisfied all requirements in *Rules 23(a)* and *(b)(3)*. *[slip op.] at 2-4*. The court again certified class counsel under *Rule 23(g)*. *[slip op.] at 4*.

In 2008 the parties sought final approval of the proposed settlement. The morning of the fairness hearing, May 1, 2008, Howe filed a reply brief objecting to the settlement. She again argued that class members, not a cy pres fund, should receive the entire settlement amount; the claims-made process and loss formula were flawed; and the settlement risked subrogation of the plaintiffs' claims. Howe proposed adopting the settlement distribution method used in one Track Two settlement. She argued AstraZeneca should use a Center for Medicare and Medicaid Services (CMS) database containing information about Medicare reimbursements to mail all class members [*13] a check for their equal share of the total amount class members overpaid, regardless of whether they had supplemental insurance. She also contended the attorneys' fees were excessive.

Although Howe's reply brief was tardy and its arguments were arguably waived, the district court considered each objection at the fairness hearing. [7] The court found $ 24 million was a reasonable settlement. Class counsel reported that they expected $ 14 million of the $ 24 million settlement to go unclaimed. Under the proposed settlement, up to $ 10 million of those leftover funds would be distributed through cy pres. The district judge agreed with Howe that more money should go to the plaintiffs rather than to the cy pres fund. She instructed the parties that the settlement should pay *treble* damages to those plaintiffs who had the strongest claims because they obtained Zoladex in the "heartland period" [8] and should correspondingly reduce the cy pres fund.

7   Howe had earlier filed an objection to the settlement that essentially cited, for three pages, Howe's earlier pleadings before the court without stating any specific grounds for the objection. During the fairness hearing, the district court properly [*14] held that anything raised in this pleading that Howe did not explain in the reply brief was waived. *See TAG/ICIB Servs. Inc. v. Sedeco Servicio de Descuento en Compras, 570*

*F.3d 60, 66 n.6 (1st Cir. 2009)* (holding an argument waived in part because the party failed to develop it in the district court).

8  The "heartland period," which the district court set as between December 1997 and 2003, was the time when plaintiffs who have the strongest claim took the subject drugs. *See In re Pharm. Trial, 491 F. Supp. 2d at 31-32.* The court found statutes of limitations barred claims before 1997 and the AWP scheme after 2003 was not as egregious because Congress changed the Medicare reimbursement policy. *Id.*

The court reserved deciding the attorneys' fees issue and rejected Howe's other arguments. The district judge agreed with class counsel that no subrogation issue existed. The court additionally accepted class counsel's justification for calculating damages for class members with supplemental insurance based on the average Medigap coverage, even if some members' insurance covered less than 80 percent of the Medicare co-payment. Class counsel reported that Howe's attorney had identified no plaintiff [*15] other than Howe who had different supplemental coverage, the plaintiffs' expert had reaffirmed that 80 percent coverage fairly approximated the class's supplemental insurance, and those few with different coverage would still be compensated beyond their losses.

Class counsel also explained, and the district court accepted, why Howe's proposal to mail equal checks to all class members was inappropriate. First, the CMS database did not reveal whether individuals had supplemental insurance. Because those with full supplemental insurance were excluded from the class, Howe's method would have the detriments of compensating non-class members, overcompensating those with supplemental insurance, and undercompensating those without it. By failing to consider individual damages, Howe's approach actually would dramatically reduce individual payouts. [9] Second, unlike in this Track One case, it was prohibitively difficult for the parties in the Track Two settlement to calculate plaintiffs' individual damages. Those cases involved many drugs that people took at a variety of dosages over varying periods. Zoladex, by contrast, is taken at regular dosages at regular intervals. With information about [*16] when a plaintiff started Zoladex and whether the plaintiff had supplemental insurance, it was easy to calculate a Zoladex plaintiff's actual damages.

9  The plaintiffs estimated that, under Howe's proposed method, class members would get just under $ 54 each, well short of the hundreds or thousands of dollars some are entitled to under the settlement the district court ultimately approved.

The parties amended the proposed settlement agreement to address the court's instruction to increase the payout to class members. The amended agreement continued to provide that all class members would receive double their damages. But the new agreement no longer simply gave leftover money to charity. After all claimants were paid double damages, all heartland plaintiffs would receive *treble* damages pro rata. Then leftover money would be paid to charity through cy pres. Like the original cy pres payout, the parties capped the additional treble damages and cy pres distribution at $ 10 million.

On October 2, 2008, the district court approved the amended settlement, subject to two further qualifications. *In re Pharm. Indus. Average Wholesale Price Litig., MDL No. 1456, Civ. A. No. 01-12257, 2008 U.S. Dist. LEXIS 111835 (D. Mass. Oct. 2, 2008)* [*17] (order partially approving settlement) (*In re Pharm. Partial Settlement Approval*). First, the court instructed the parties to adjust the settlement to pay heartland plaintiffs treble damages, then, if money remained, to pay treble damages to all class members pro rata. If money was still left over, the parties agreed the remaining money would be distributed to charity through cy pres. *2008 U.S. Dist. LEXIS 111835 at *76.* Second, it reduced the attorneys' fees to 30 percent of the recovery. *2008 U.S. Dist. LEXIS 111835 at *76-*77.* The district court discussed and rejected Howe's other concerns. *2008 U.S. Dist. LEXIS 111835 at *78-*79.*

The parties once more amended the settlement agreement to reflect the court's instructions. They again limited the total payout of treble damages to all class members and remaining money to charity through cy pres to $ 10 million. The plaintiffs' expert predicted in February 2009 that, even with class-wide treble damages, class members would claim only about $ 17.2 million, leaving about $ 6.8 million of the $ 24 million settlement left over for charity.

It is this amended settlement that the district court approved on December 15, 2008, as a fair, adequate, and

reasonable product of "extensive arm's-length negotiations." *In re Pharm. Final Settlement Approval, 2008 U.S. Dist. LEXIS 111818 at *78* [*18] . Incorporating its prior orders dated August 16, 2005, and January 30, 2006, the district court found the settlement class satisfied the requirements of *Rules 23(a)* and *(b)(3)*. *2008 U.S. Dist. LEXIS 111818 at *75-*76*.

The court again addressed Howe's objections and rejected them. It found Howe's proposal that class members should all receive a check rather than submit a claim was unreasonable because that approach would ultimately reduce the amount all class members received. *2008 U.S. Dist. LEXIS 111818 at *80*. The court also rejected Howe's contention that the damages formula unfairly reduced recovery for class members with supplemental insurance. The reduction in the settlement better reflected class members' real damages, and all members would receive more than their losses regardless. *2008 U.S. Dist. LEXIS 111818 at *80-*81*. The court similarly held Howe's argument that the formula unfairly calculated all supplemental-insurance reductions based on the 80 percent average supplemental coverage rather than based on individuals' insurance policies was meritless because the number of affected class members was small and because those with less coverage would receive more than their damages. *2008 U.S. Dist. LEXIS 111818 at *81*. [*19] The district court rejected Howe's other objections. *Id.*

Howe now appeals the court order approving the settlement agreement.

II.

We review the district court's approval of a settlement for abuse of discretion. *City P'ship Co. v. Atl. Acquisition Ltd. P'ship, 100 F.3d 1041, 1043 (1st Cir. 1996)*. We review any legal conclusions de novo. *McKenna, 475 F.3d 418, 422 (1st Cir. 2007)*.

In turn, "[a] district court can approve a class action settlement only if it is fair, adequate and reasonable," *City P'ship, 100 F.3d at 1043*, "or (in shorthand) 'reasonable,'" *Nat'l Ass'n of Chain Drug Stores, 582 F.3d at 44*. If the parties negotiated at arm's length and conducted sufficient discovery, the district court must presume the settlement is reasonable. *City P'ship, 100 F.3d at 1043*. "[T]he district court enjoys considerable range in approving or disapproving a class settlement, given the generality of the standard and the need to balance [a

settlement's] benefits and costs." *Nat'l Ass'n of Chain Drug Stores, 582 F.3d at 45*.

On appeal Howe argues the settlement is unreasonable because it creates a cy pres fund, the agreement's claims process and formula for calculating loss are inappropriate, and the [*20] parties allegedly discussed settlement and attorneys' fees together. Howe also claims that the court's final approval order did not satisfy the requirements of *Rule 23(c)(1)(B)* to define the expanded class and its claims and that the court did not properly certify class counsel under *Rule 23(g)* when approving the settlement. The district court did not abuse its discretion by rejecting these arguments.

A. *The District Court Did Not Abuse Its Discretion by Finding the Settlement Provision Creating a Cy Pres Fund Was Fair, Adequate, and Reasonable*

Appellate courts review a district court's conclusion that a settlement agreeing to a cy pres distribution is reasonable for abuse of discretion. *E.g., In re Airline Ticket Comm'n Antitrust Litig., 307 F.3d 679, 682 (8th Cir. 2002)*; *Wilson v. Sw. Airlines, 880 F.2d 807, 811 (5th Cir. 1989)*. Howe raises two challenges to the cy pres distribution in this settlement: that the class members are entitled to any surplus settlement money and that class counsel had a conflict of interest when negotiating the cy pres distribution. We find no abuse of discretion.

1. *The Cy Pres Distribution*

This circuit has not had occasion to consider whether settlement [*21] agreements in class actions may establish cy pres funds. Other circuits have approved agreements that provide for cy pres funds, particularly those negotiated at arm's-length by the parties. *See* A. Conte & H.B. Newberg, 4 *Newberg on Class Action* § 11:20, at 28-31 (4th ed. 2002).

A cy pres [10] distribution results from application of a legal doctrine that courts have imported into class actions from trusts and estates law. In trusts and estates law, cy pres, taken from the Norman French expression *cy pres comme possible* ("as near as possible"), "save[s] testamentary gifts that otherwise would fail" because their intended use is no longer possible. *In re Airline Ticket Comm'n, 307 F.3d at 682*. Courts permit the gift to be used for another purpose as close as possible to the gift's intended purpose. *Id.*

10  Some courts and commentators have used the terms "cy pres" and "fluid recovery" interchangeably. *E.g., Mirfasihi v. Fleet Mortgage Corp., 356 F.3d 781, 784 (7th Cir. 2004); Molski v. Gleich, 318 F.3d 937, 954 (9th Cir. 2003); Democratic Cent. Comm. of D.C. v. Washington Metro. Area Transit Comm'n, 84 F.3d 451, 455, 318 U.S. App. D.C. 11 (D.C. Cir. 1996);* 4 Conte & Newberg, *supra*, § 11:20, at 28. These terms may [*22] be different. *See* 3 Conte & Newberg, *supra*, § 10:17, at 517 & n.7. Here we simply use "cy pres."

In class actions, courts have approved creating cy pres funds, to be used for a charitable purpose related to the class plaintiffs' injury, when it is difficult for all class members to receive individual shares of the recovery and, as a result, some or all of the recovery remains. *Id.*; 4 Conte & Newberg, *supra*, § 11:20. The use of a cy pres fund sometimes "prevent[s] the defendant from walking away from the litigation" without paying a full recovery because of practical obstacles to individual distribution. *Mirfasihi v. Fleet Mortgage Corp., 356 F.3d 781, 784 (7th Cir. 2004); see also* 3 Conte & Newberg, *supra*, § 10:15, at 513 ("[T]he cy pres . . . distributions serve the objectives of compensation for the class (albeit in an indirect manner), access to judicial relief for small claims, and deterrence of illegal behavior.").

Court-mandated cy pres distributions, as opposed to court-approved settlements using cy pres, are controversial. *See Democratic Cent. Comm. of D.C. v. Washington Metro. Area Transit Comm'n, 84 F.3d 451, 455 n.2, 318 U.S. App. D.C. 11 (D.C. Cir. 1996);* 3 Conte & Newberg, *supra*, §§ 10:20-24, [*23] at 529-39; 4 *id.* § 11:20, at 28. But "courts are not in disagreement that cy pres distributions are proper in connection with a class settlement, subject to court approval of the particular application of the funds." 4 Conte & Newberg, *supra*, § 11:20, at 28. Because this case involves a settlement, we need not reach the questions raised by court-created cy pres funds.

Courts have approved cy pres funds in settlements in at least two circumstances. *Id.* First, cy pres settlement funds have been approved when it is economically infeasible to distribute money to class members. *Id.; see, e.g., Mirfasihi, 356 F.3d at 784* (rejecting a settlement because it was feasible to compensate class members individually); *Molski v. Gleich, 318 F.3d 937, 954-55*

*(9th Cir. 2003)* (same). Distribution of all funds to the class can be infeasible, for example, when class members cannot be identified, when the class changes constantly, or when class members' individual damages--although substantial in the aggregate--are too small to justify the expense of sending recovery to individuals. *Mirfasihi, 356 F.3d at 784; Powell v. Ga.-Pac. Corp., 119 F.3d 703, 706 (8th Cir. 1997);* 3 Conte & Newberg, *supra*, § 10:16, [*24] at 513 n.1. In these cases, some courts have permitted the parties to create a cy pres fund *in lieu of* a class payout. *See Mirfasihi, 356 F.3d at 784.* That is not our situation.

Second, courts have allowed parties to establish cy pres funds when money remained from the defendant's payout after money for damages had been distributed to class members. *In re Airline Ticket, 307 F.3d at 684.* This situation often arises because some class members never claimed their share. *Six (6) Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301, 1307 (9th Cir. 1990).* Among other solutions, courts have approved giving money unclaimed after payout to class members to charities related to the plaintiffs' injuries. *Id.; e.g., In re Simon II Litig., 407 F.3d 125, 131 (3d Cir. 2005); In re Mexico Money Transfer Litig., 267 F.3d 743, 746 (7th Cir. 2001); Powell, 119 F.3d at 706-07 (8th Cir. 1997); Six (6) Mexican Workers, 904 F.2d at 1307.* This kind of cy pres fund is at issue in this case.

The settlement provision creating a cy pres fund here is somewhat unusual in its timing. Under the final settlement, all class members will receive treble damages before any money goes to cy pres. The parties already know [*25] that some original class members will not file claims because they are elderly or have died and their heirs will not stand in their shoes. They expect a significant amount of the $ 24 million will go unclaimed, and that expectation is supported by expert evidence predicting that class members will claim only about $ 17.2 million, leaving approximately $ 6.8 million left over. The parties have agreed that any remainder will go, after distribution of treble damages to class members, to cancer or patient-related charities.

Although unusually timed, the cy pres fund in this case, contrary to Howe's argument, is not taking damages away from the class members. The settlement permits all plaintiffs to claim and be paid their damages--indeed *treble* their damages--before any money is paid to charity through cy pres. This process is like other, routinely

approved cy pres distributions. *See, e.g., Powell,* 119 F.3d at 705-06 (refusing, after money in a settlement fund remained, to distribute the rest to class members because "neither party ha[d] a legal right" to the unclaimed funds); *In re Folding Carton Antitrust Litig.,* 744 F.2d 1252, 1253-54 (7th Cir. 1984) (holding a cy pres distribution was [*26] appropriate when $ 6 million remained in a fund created to pay costs and extra claims in a settlement because "neither the plaintiff class nor the settling defendants ha[d] any right" to the money). It would elevate form over substance to require the parties to wait until after all claims are paid before reaching an agreement as to how to distribute any remaining money to charity.

Howe nevertheless insists that the class members are entitled to receive any remaining money. She argues that, when deciding how to allocate remaining money, the primary consideration is whether it is economically infeasible to distribute the remaining proceeds to all claimants. Howe relies on and, in our view, Howe misunderstands the American Law Institute's ("ALI") recent draft of the Principles of the Law of Aggregate Litigation discussing the appropriateness of cy pres distributions in settlements. *See* American Law Institute, Principles of the Law of Aggregate Litigation § 3.07 (Apr. 1, 2009) (proposed final draft) [hereinafter "ALI Aggregate Litigation Draft"]. [11] The question before us is not whether the settlement complies with the ALI draft, but whether the district court abused its discretion in approving [*27] the cy pres part of the settlement. *Cf. Bobby v. Van Hook,* 130 S. Ct. 13, 175 L. Ed. 2d 255, 2009 WL 3712013, at *3 (2009) (noting, in a criminal appeal arguing that the defendant's counsel was ineffective, that "'American Bar Association standards and the like' are 'only guides' to what reasonableness means" (quoting *Strickland v. Washington,* 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984))) (per curiam).

> [11]   Howe cites one district court case relying on the ALI proposed draft. But that court used the draft's reasoning to approve a settlement, not reject a settlement. *In re Tyco Int'l Multidistrict Litig.,* 535 F. Supp. 2d 249, 262 (D.N.H. 2007).

The district court's actions in this case were entirely congruent with the proposed draft's purposes. The ALI's proposed draft expresses a policy preference, when settlement money remains, for redistributing that money

to class members to ensure they recover their losses. The ALI was concerned that cy pres funds are often inappropriate because "few settlements award 100 percent of a class member's losses, and thus it is unlikely in most cases that further distributions to class members would result in more than 100 percent recovery." ALI Aggregate Litigation Draft § 3.07 cmt. [*28] b. The ALI also believed "that in most circumstances distributions to class members better approximate the goals of the substantive laws than distributions to third parties that were not directly injured by the defendant's conduct." *Id.*

The district court shared these concerns. The court ultimately insisted that the settlement pay class members treble damages before any money is distributed through cy pres. This set the benchmark well above the ALI's hope that class members might receive 100 percent recovery.

And the court recognized that the cy pres fund serves the goals of civil damages by ensuring AstraZeneca fairly pays for the class's alleged losses. We asked at oral argument why AstraZeneca would be willing to pay a total sum more than the treble damages for each class member. Counsel for Plaintiff Townsend replied that the plaintiffs had insisted on AstraZeneca paying a larger sum to better represent the losses of the entire class, including those class members who would never claim their recovery.

The district court's approval reflected another important concern: facilitating a settlement in a hard-fought, complex class action. *See Durrett v. Housing Auth.,* 896 F.2d 600, 604 (1st Cir. 1990) [*29] (recognizing a policy encouraging class action settlements). Achieving settlement in such cases is not easy. District judges must realistically evaluate settlements based on the circumstances of the case. "[T]he ultimate decision by the judge involves balancing the advantages and disadvantages of the proposed settlement as against the consequences of going to trial or other possible but perhaps unattainable variations on the proffered settlement." *Nat'l Ass'n of Chain Drug Stores,* 582 F.3d at 44. The court's judgment here was not an abuse of discretion.

### 2. *Conflict of Interest*

As we read her argument, Howe also objects that the district court abused its discretion by finding the settlement was reasonable even though class counsel

allegedly had a conflict of interest. We have not before considered what effect potential conflicts of interest by attorneys have on class settlements. Although they have substantial discretion to approve settlements, district judges do have responsibility to monitor class counsel's performance. [12] "Because class actions are rife with potential conflicts of interests between class counsel and class members, district judges are expected to give careful scrutiny [*30] to the terms of the proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *Mirfasihi, 356 F.3d at 785* (citations omitted) (collecting cases).

> 12   When reviewing settlements, district courts also must ensure class counsel have met their ongoing duty, imposed by *Rule 23(g)(4)*, to fairly and adequately represent the class. *See Key v. Gillette Co., 782 F.2d 5, 7 (1st Cir. 1986)*. The duty of adequate representation requires counsel to represent the class competently and vigorously and without conflicts of interest with the class. *See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 626 n.20, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997); Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998); Rutherford v. City of Cleveland, 137 F.3d 905, 909 (6th Cir. 1998); Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985); see also* 1 Conte & Newberg, *supra*, § 3:22. The duty to avoid conflicts is serious. Class counsel are fiduciaries to the class. *Rodriguez v. W. Publishing Corp., 563 F.3d 948, 968 (9th Cir. 2009); see also Sondel v. Nw. Airlines, Inc., 56 F.3d 934, 938 (8th Cir. 1995)*; 1 Conte & Newberg, *supra*, § 3:40, at 520 & n.5.

Howe alleges class counsel [*31] had a conflict of interest with the class because some attorneys had previously represented Prescription Action Litigation (PAL), an organization dedicated to reducing costs of pharmaceuticals in part by bringing class actions challenging industry practices. Howe argues that loyalty to the class obligated class counsel to demand the highest possible payout to class members. Counsel's affiliation with PAL, she contends, instead caused the attorneys to push for a cy pres fund because PAL's express purpose is to create cy pres funds and because counsel intended to distribute the fund's proceeds to PAL.

We reject Howe's description of counsel's

obligations, PAL's purposes, and the settlement's terms. As we have explained, there was nothing inherently wrong with class counsel advocating for a cy pres fund to benefit those class members whose recovery would go unclaimed after counsel ensured all claimants would receive more than their damages. Howe presents no evidence that PAL's purpose is to promote cy pres distributions, and the record is otherwise. PAL cannot receive any cy pres funds from this settlement. The settlement provides the cy pres money will go to "mutually acceptable charitable [*32] organizations funding cancer research or patient care," a description PAL does not meet.

B. *The District Court Did Not Abuse Its Discretion by Approving the Settlement's Method for Calculating Class Members' Damages and Distributing the Settlement Amount*

Howe raises three objections on appeal to the district court's approval of the method for calculating and distributing class members' individual recovery. First, Howe argues in one sentence that the district court should not have approved the settlement because it reduced class members' payments if they had supplemental insurance. This argument is waived because Howe has failed to develop it on appeal. *See United States v. DeCologero, 530 F.3d 36, 60 (1st Cir. 2008)*.

Even were it not waived, the argument has no merit. The settlement formula tailors class members' recovery to their actual losses, since those who had supplemental insurance paid less out of pocket than those who did not. [13] As the district court found, this agreement therefore avoids undercompensating class members who lacked supplemental insurance. See *In re Pharm. Final Settlement Approval, 2008 U.S. Dist. LEXIS 111818 at *79; In re Pharm. Partial Settlement Approval, 2008 U.S. Dist. LEXIS 111835 at *79*. [*33]  And by limiting those with supplemental insurance to their actual co-payment, the settlement makes more money available to more class members. *See In re Pharm. Final Settlement Approval, 2008 U.S. Dist. LEXIS 111818 at *79*.

> 13   As the plaintiffs explained to the district court, these insurers are members of another class against these defendants.

Second, Howe asserts that the settlement should pay class members with supplemental insurance according to their individual coverage. Howe's insurance covered 50

percent of her Medicare co-pay, not 80 percent as the loss formula assumes, and she wants her share adjusted. The district court rejected this argument because Howe and any similar class members, at double or treble damages, would still receive well above their damages. *2008 U.S. Dist. LEXIS 111818 at *81.*

That conclusion was not an abuse of discretion. Howe was the only plaintiff known to counsel (and the court) who had different coverage. The plaintiffs' expert had reaffirmed his formula was appropriate despite Howe's objection. And all class members, even if others existed who, like Howe, had less supplemental coverage, would [*34] receive more than their actual damages. [14]

    14    The plaintiffs estimate Howe will receive about $ 200 more than her actual losses.

Third, Howe again advocates a distribution system like the one in a Track Two settlement. She argues all class members should simply receive a check representing their share of the total losses reported in the CMS database.

The district court could determine this plan was not more equitable than the distribution method in the settlement. Because the CMS database does not show who had supplemental insurance, this system would ultimately reduce class members' payouts. It would compensate nonmembers and overcompensate class members who had supplemental insurance. The district court understood that, unlike in Track Two, it was possible to avoid this problem in this case because the parties could calculate Zoladex patients' losses.

C. *Howe's Objection to Class Counsel Allegedly Negotiating Attorneys' Fees with the Settlement Is Waived*

Howe contends the settlement agreement is "tainted" because the parties negotiated the settlement and attorneys' fees together. Class counsel argue they did not. Howe raised this objection when the district court was considering granting [*35] preliminary but not final approval to the settlement. She therefore waived it. *See Iverson v. City of Boston, 452 F.3d 94, 102 (1st Cir. 2006).*

D. *The District Court Satisfied the Requirements of Rule 23(c)(1)(B)*

The meaning of *Rule 23(c)* is a legal question we interpret de novo. *See NEPSK, Inc. v. Town of Houlton, 283 F.3d 1, 5 (1st Cir. 2002)* (interpreting a federal rule of procedure de novo).

Howe objects to the court's certification order under *Rule 23(c)(1)(B).* She presents this argument for the first time on appeal, and it is therefore waived. *See In re New Motor Vehicles Canadian Exp. Antitrust Litig., 533 F.3d 1, 6 (1st Cir. 2008).* Nevertheless, we address this issue in order to provide guidance to courts interpreting and applying this rule.

*Rule 23(c)(1)(B),* which was added in 2003, requires orders certifying classes to "define the class and the class claims, issues, or defenses." [15] *Fed. R. Civ. P. 23(c)(1)(B).* The advisory notes do not clarify the rule further. This court has not before addressed the meaning of *23(c)(1)(B).* Only the Third Circuit has interpreted it. *Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am., 453 F.3d 179, 184-88 (3d Cir. 2006).*

    15    Orders also must [*36] "appoint class counsel under *Rule 23(g)."* *Fed. R. Civ. P. 23(c)(1)(B).* We address Howe's objections to class counsel appointment below.

Howe's arguments assume that *Rule 23(c)(1)(B)* applies to amended certification orders. As we read her brief, Howe solely objects that the district court's December 15, 2008, order did not meet her reading of *Rule 23(c)(1)(B).* That order certified the final settlement class, which was expanded to include the residents from nine states who were previously excluded, and finally approved the settlement agreement. *In re Pharm. Final Settlement Approval,* MDL No. 1456, Civ. A. No. 01-12257. Howe contends the district court could not satisfy *Rule 23(c)(1)(B)* by incorporating by reference, as it did, its prior orders issued on August 16, 2005, and January 30, 2006, certifying the original class. *2008 U.S. Dist. LEXIS 111818 at *75.* She says the court's December 2008 certification order had to exhaustively explain and justify the certification decision for the expanded class.

Howe's brief presents three arguments why the December 2008 order erred under *Rule 23(c)(1)(B).* First, by incorporating its prior orders and not giving a full restatement of those orders, Howe argues, the district [*37] court did not define the class or its claims in sufficient detail. Second, even if the district court could

incorporate prior orders, Howe contends that the August 2005 order, which discussed whether to certify the original class, did not define the class claims, issues, or defenses with sufficient clarity. Third, Howe argues, neither the December 2008 order nor the prior orders explained why the court approved the expanded settlement class.

We begin with the rule's plain text as well as its structure and purpose. *See Pavelic & LeFlore v. Marvel Entm't Group, 493 U.S. 120, 123, 110 S. Ct. 456, 107 L. Ed. 2d 438 (1989)* (giving "the Federal Rules of Civil Procedure their plain meaning"); *cf. Simmons v. Galvin, 575 F.3d 24, 35 (1st Cir. 2009)* (explaining that we interpret statutes according to "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole" (quoting *Nken v. Holder, 129 S. Ct. 1749, 1756, 173 L. Ed. 2d 550 (2009)*) (internal quotation marks omitted)). To resolve any ambiguities, we may also consider the rule's drafting history. *Cf. Bercovitch v. Baldwin Sch., Inc., 133 F.3d 141, 149 (1st Cir. 1998)* ("[C]ourts look first to the text of a statute, and then to the legislative [*38] history if the meaning of the text is ambiguous.").

*Rule 23(c)(1)(B)* explains the contents of a certification order: the order must clarify and detail the identity of a class and the class claims, issues, or defenses in a class action. *See Merriam-Webster's Collegiate Dictionary* 303 (10th ed. 1993) (defining to "define" as "to make distinct, clear, or detailed"); *see also Wachtel, 453 F.3d at 185. Rule 23(c)(1)* contains two other provisions governing class certification orders. First, "[a]t an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." *Fed. R. Civ. P. 23(c)(1)(A).* And "[a]n order that grants or denies class certification may be altered or amended before final judgment." *Fed. R. Civ. P. 23(c)(1)(C).* The federal rules contemplate district courts issuing an order certifying a class and detailing the class composition and the case's issues and claims, an order the court can amend before final judgment.

*Rule 23(c)(1)* does not explain whether 23(c)(1)(B)'s substantive requirements apply to amended orders issued under *23(c)(1)(C).* But *Rule 23(c)(1)(B)*'s text appears to apply [*39] to any order certifying a class, including orders certifying an amended class. The rule governs "[a]n order that certifies a class action." *Fed. R. Civ. P.*

*23(c)(1)(B).* The text uses "an" rather than "the," which suggests the drafters did not mean to restrict *23(c)(1)(B)* to a single certification order in a case. Courts have interpreted similar language in *Rule 23(f)*, which applies to "an order granting or denying class-action certification," to permit interlocutory review of amended orders. *See Gutierrez v. Johnson & Johnson, 523 F.3d 187, 199 n.12 (3d Cir. 2008); Carpenter v. Boeing Co., 456 F.3d 1183, 1191 (10th Cir. 2006).*

The text of *Rule 23(c)(1)* does not specify how courts can accomplish the rule's aims, but the rule is meant to serve certain functions. The depth of explanation courts should provide in amended certification orders depends on the circumstances. Courts can amend certification orders to reflect major changes or minor adjustments to the class. *See Fed. R. Civ. P. 23(c)(1)(C).* District courts should ensure that, after the new order, the class's composition and claims remain well defined.

This interpretation makes sense in light of *Rule 23(c)(1)(B)*'s history and purpose. [*40] *Rule 23* was substantially revised in 2003 to "provide the district courts with the tools, authority, and discretion to closely supervise class-action litigation." *See* Comm. on Rules of Practice and Procedure, Judicial Conference, *Report of the Judicial Conference* 8 (Sept. 2002). As part of this project, the rules committee made several amendments to *Rule 23(c)* in 2003 that put greater emphasis on understanding and articulating the "contours" of the class action throughout the litigation. *Wachtel, 453 F.3d at 186; see also* L. J. Hines, "Challenging the Issue Class Action End-Run," *52 Emory L.J. 709, 763 (2003)* (noting the 2003 amendments' emphasis on defining a class's issues).

An amendment to 23(c)(1)(A) adjusted the timing of class certification to give courts flexibility to wait to certify the class until the court feels it understands the case and the issues it raises. [16] *Wachtel, 453 F.3d at 186; see also Fed. R. Civ. P. 23(c)(1)(A)* advisory comm. notes on 2003 amendments. *Rule 23(c)(2)(B)* was amended to make notice to class members more informative. It now requires notice to state "the definition of the class certified" and "the claims, issues, or defenses." *Fed. R. Civ. P. 23(c)(2)(B)(ii)-(iii).* [*41] [17] *Rule 23(c)(1)(B)* was added, at least in part, to help appellate courts reviewing an order better understand the district court's decision. *See* Comm. on Rules of Practice and Procedure, *supra,* at 11. [18]

16    The amendment was intended in part to address the "critical need" to "determine how the case will be tried." *Wachtel, 453 F.3d at 186* (quoting *Fed. R. Civ. P. 23(c)(1)(A)* advisory comm. notes on 2003 amendments). The drafters observed that "[a]n increasing number of courts require a party requesting class certification to present a 'trial plan' that describes the issues likely to be presented at trial and tests whether they are susceptible to class-wide proof." *Id.* (internal quotation marks omitted).

17    The drafters intentionally made this language parallel with *Rule 23(c)(1)(B)*. *Fed. R. Civ. P. 23(c)(1)(C)* advisory comm. notes on 2003 amendments.

18    The drafting history says *Rule 23(c)(1)(B)* was added to assist interlocutory review of certification orders under *Rule 23(f)*. Comm. on Rules of Practice and Procedure, *supra*, at 11. Because appellate courts have discretion whether to permit interlocutory review under *23(f)*, however, appellate courts often do not review certification orders [*42] until after final judgment. *See Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 293-94 (1st Cir. 2000)*. *Rule 23(c)(1)(B)* does not limit itself to orders that will be reviewed on interlocutory appeal. One of its purposes seems to be to facilitate appellate review at any stage.

We see many possible benefits to the 2003 amendments to *Rule 23(c)*. Overall, better comprehension and explanation of the class and the class claims helps district courts, appellate courts, attorneys, and parties all proceed with more information and mutual understanding. *See* Fed. R. Civ. P. 23 advisory comm. notes on 2003 amendments; *see also Wachtel, 453 F.3d at 186-87* (discussing the effect of the 2003 amendments); Comm. on Rules of Practice and Procedure, *supra*, at 9-12 (explaining the purpose of the 2003 amendments to *Rule 23(c)*).

In this case the district court satisfied *Rule 23(c)(1)(B)*'s text and purpose. The court could incorporate its prior orders by reference when certifying the expanded class. Looking at the incorporated orders, the August 2005 order plainly defined the class and the class claims, issues, and defenses in sufficient detail. The district court devoted many pages to the class's factual [*43] allegations against the defendant. *See In re Pharm.*

*Preliminary Class Certification, 230 F.R.D. at 65-76*. It then carefully analyzed the proposed class's suitability for certification, again explaining the issues common to the class. *See id. at 77-85, 96*. The court also discussed the state consumer protection statutes underlying the class's claim, noting differences among them. *Id. at 83-85*.

It is also perfectly clear why the district court expanded the settlement class in the December 2008 order. [19] The court originally excluded residents in these nine states because the defendants had objected that including residents from these states defeated the predominance requirement, *see Fed. R. Civ. P. 23(b)(3)*, since their consumer-protection statutes differed. *In re Pharm. Preliminary Class Certification, 230 F.R.D. at 83-85*; *In re Pharm. Class Certification, 233 F.R.D. at 230*. In the settlement, however, AstraZeneca bargained for "total peace" to resolve all remaining claims against it. When expanding the class, the December 2008 order references these prior orders and "the record before the Court." *In re Pharm. Final Settlement Approval, 2008 U.S. Dist. LEXIS 111818 at *75*. That is [*44] enough.

19    The rule says only that a court must define, not necessarily justify, a class and its claims. *See Fed. R. Civ. P. 23(c)(1)(B)*.

E. *Howe's Argument That the District Court Did Not Properly Certify Class Counsel under Rule 23(g) Is Waived*

*Rule 23(g)* requires district courts to appoint class counsel and governs how courts should choose counsel. *Fed. R. Civ. P. 23(g)(1)-(2)*. Howe argues the district court did not appoint class counsel under *Rule 23(g)* when approving the settlement in this case and that the district court did not satisfy *Rule 23(g)*'s requirements.

Howe is mistaken. The district court did find, while approving the settlement, that class counsel met *Rule 23(g)*'s requirements. *In re Pharm. Preliminary Settlement Approval, 520 F. Supp. 2d 267, [slip op.] at 3-4*; *In re Pharm. Final Settlement Approval, 2008 U.S. Dist. LEXIS 111818 at *76*.

Any argument the district court did not satisfy *Rule 23(g)* is waived because Howe raises this claim for the first time on appeal. *See Rocafort v. IBM Corp., 334 F.3d 115, 121 (1st Cir. 2003)*.

III.

2009 U.S. App. LEXIS 25536, *44

The approval of the settlement is *affirmed*.

# Exhibit 3

**KLINE & SPECTER**

A PROFESSIONAL CORPORATION

ATTORNEYS AT LAW

THE NINETEENTH FLOOR
1525 LOCUST STREET
PHILADELPHIA, PENNSYLVANIA 19102

———

215-772-1000

FAX: 215-772-1359

Direct Fax: 215-735-0957                                    shanin.specter@klinespecter.com

December 19, 2006

<u>VIA EMAIL & U.S. FIRST CLASS MAIL</u>

Marc H. Edelson, Esquire
**HOFFMAN & EDELSON, LLC.**
45 W. Court Street
Doylestown, PA 18901

     Re:    *In re: Pharmaceutical Industry Average Wholesale Price Litigation*; MDL No. 1456

Dear Marc:

     Enclosed please find our firms's time and expense submission from inception through November 30, 2006.  Below is a breakdown by case:

| CASE | LODESTAR | EXPENSES |
|------|----------|----------|
| AWP MDL | $2,129,496.25 | $437,857.67 |
| AWP NJ | $449,198.75 | $47,564.00 |
| AZ AWP | $21,678.75 | $3,366.94 |
| AZ Lupron[1] | $886,563.57 | $113,951.29 |
| **TOTALS:** | $3,486,937.32 | $602,739.90 |

Very truly yours,

Shanin Specter

SS:ks
Enclosure

---

[1]    Note these figures do not include the amount apportioned to *Swanston in* the Lupron litigation.

P_08769

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| | C.A. No. 01-12257-PBS |
| THIS DOCUMENT RELATED TO: ALL ACTIONS | Judge Patti B. Saris |

## DECLARATION OF KATHLEEN M. SPURKA

I, Kathleen Spurka, have personally compiled and summarized the attached time and expense records based on my entries and the entries of others at Kline & Specter. This compilation and summarization is correct to the best of my knowledge. In certain instances, I have deleted entries that I felt to be inadequately substantiated.

Date: <u>December 18, 2006</u>

<u>Kathleen M. Spurka</u>
Kathleen M. Spurka

P_08770

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | CIVIL ACTION: 01-CV-12257-PBS<br><br>Judge Patti B. Saris |

**AFFIDAVIT OF SHANIN SPECTER IN SUPPORT OF
CLASS PLAINTIFFS' JOINT PETITION FOR ATTORNEYS' FEES
AND REIMBURSEMENT OF EXPENSES IN RELATION TO
SETTLEMENT WITH GSK FILED ON BEHALF OF KLINE & SPECTER, P.C.**

I, Shanin Specter, being duly sworn, depose and say:

1.      I am a partner of the law firm of Kline & Specter, P.C., one of the counsel for

plaintiffs in this matter.  I am submitting this Affidavit in support of all plaintiffs' counsel's

(including my firm's) application for an award of attorneys' fees and reimbursement of

expenses provided in connection with the services rendered to plaintiffs and the class by my

firm in the course of this litigation.

2.      I am an attorney in good standing and duly licensed and admitted to the Bars of

Commonwealth of Pennsylvania; United States District Court for the Eastern, Middle and

Western Districts of Pennsylvania; and the United States Courts of Appeals for the Third and

Ninth Circuit.  The statements set in this Declaration are based on first-hand knowledge, about

which I could and would testify competently in open Court if called upon to do so as well as

information gathered within my firm by others.

3.      This firm was counsel of record for various individual plaintiffs and the class in

this litigation and the companion state court litigation.  As one of the counsel for the plaintiffs

P_08084

1

and class, my firm performed services on this matter as follows: correspondence, telephone conferences and meetings with the class representatives and many individual consumer class members regarding the status of their claims;  preparation for and defense of all depositions of the class representatives;   factual discovery including extensive collection of all relevant medical and billing records for the class representatives and hundreds of individual consumer class members; factual and legal research regarding claims of the consumer class; drafting of pleadings relating to the consumer class; and email, telephone and live conferences with co-counsel regarding the claims of the consumer class.  Additionally, my firm was involved in document reviews related to claims of the TPP class, and drafted pleadings and attended strategy discussions with co-counsel regarding the same.

4.     Attached, as Exhibit 1, is a detailed summary indicating the amount of time spent by each attorney and paralegal of my firm who worked on this litigation and the lodestar calculation based on my firm's historical billing rates (the rates for each timekeeper that were in effect during this litigation, and when the work was performed).  The schedule was prepared from computerized records that were contemporaneously generated and kept by my firm in the ordinary course of its business.  Time expended in preparing this application for fees and reimbursement of expenses has not been included in this lodestar.

5.     From the inception of the case through August 10, 2006, my firm expended a total of 11,404 hours on behalf of the various plaintiffs and the class.  The total lodestar amount for these hours based on my firm's historical hourly billing rates is $3,449,772.32.  The hourly rates set out in Exhibit 1 are the same or similar rates that my firm charged, and collected based upon, and which have been the basis for our fee requests from other courts.

P_08085

6.     In addition, as detailed in Exhibit 2, my firm expended a total of $568,977.50 in expenses in connection with the prosecution of this litigation.  None of these expenses have been reimbursed to date.

7.     My firm recorded these expenses as they were incurred, and they are reflected in its computerized bookkeeping records which were created from invoices, receipts and other proofs of the charges and payments.

8.     Thus, for this litigation, the total historical lodestar of my firm is $3,449,772.32 and we incurred expenses of $568,977.50.

| CASE | HOURS | LODESTAR | EXPENSES |
|---|---|---|---|
| AWP MDL | 6,681.75 | $2,093,136.25 | $404,180.02 |
| AWP NJ | 1,284.00 | $448,393.75 | $47,491.77 |
| AZ AWP | 77.00 | $21,678.75 | $3,354.42 |
| AZ Lupron[1] | 3,361.25 | $886,563.57 | $113,951.29 |
| TOTALS: | 11,404.00 | $3,449,772.32 | $568,977.50 |

I declare under penalty of perjury under the laws of the Commonwealth of Massachusetts that the foregoing is true and correct.

Executed this 13th day of June, 2007.

Shanin Specter, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street
The Nineteenth Floor
Philadelphia, PA  19102
215-772-1000 telephone
215-735-0957 facsimile

---

[1]   Note these figures do not include the amount apportioned to *Swanston in* the Lupron litigation.

3

P_08086

**KLINE & SPECTER, P.C.**
1525 Locust Street
The Nineteenth Floor
Philadelphia, PA 19102
215-772-1000 telephone
215-735-0957 facsimile

---

### HOURS/LODESTAR

| CASE | HOURS | LODESTAR |
|---|---|---|
| AWP MDL | 6,681.75 | $2,093,136.25 |
| AWP NJ | 1,284.00 | $448,393.75 |
| AZ AWP | 77.00 | $21,678.75 |
| AZ Lupron* | 3,361.25 | $886,563.57 |
| TOTALS: | 11,404.00 | $3,449,772.32 |

\*    Note these figures do not include the amount apportioned to *Swanston in* the Lupron litigation.

# EXHIBIT 1
(Hours/Lodestar)

P_08087

# Exhibit 4

**Brophy, Steve B.**

| | |
|---|---|
| **From:** | Specter, Shanin |
| **Sent:** | Saturday, August 26, 2006 8:40 AM |
| **To:** | Haviland, Donald E. |
| **Cc:** | Kline, Thomas R. |
| **Subject:** | Re: File Moves |

Don -- Your reply of last night that you'll do what you'd said you'd do is vague. Before you leave, Tom and I expect you to (1) fully complete the time report to Edelson in the MDL accounting for what you told me on August 14 to be 3.7mm in time, which you said you would do both in that meeting and again this week in our meeting with Kathy and Roberta (and, Don, literally no one but you can do this as only you know the fair attribution of work to the MDL case before our formal involvement -- if you don't do this our firm will likely lose this money), (2) do a memo setting forth what we've contributed to the MDL case, (this need not be an opus, but need simply set forth that which we would provide to an adjudicator in the event of a fee dispute in the MDL), (3) finish your time sheets up to the date of departure and (4) pledge that you will respond to reasonable requests after you leave (which you told me you'd do on August 14). The clean up/accounting/transition work in #1, #2 and #3 above is integral to the smooth transition any law firm has the right to expect from a departing attorney and is specifically contemplated by the 60 day transition period and accompanying language in your employment agreement. #4 is also a reasonable request particularly in light of your request to leave early.

It makes no sense for our relationship to become adversarial now, or for that matter, ever, or for you to burn the bridge you have with our firm and Tom and me. We have lots of work together, particularly the ongoing work in Bridgeport, and a breach between us won't be good for anyone, particularly our shared clients.

Our firm's employees are working to pack our boxes with our files for you. I've agreed to arrange and pay for their move to your new firm, which is a cost that is plainly not our responsibility but which I'm undertaking to literally go the extra mile due east for you.

I've given you the biggest boost I can with everyone from the Pennsylvania AG's office to Steve Berman to RodaNast to Paul Bartle and his colleagues to Kim West to potential sources of business for you like Mike DeBenedictus and intend to continue to do so. I have a lot of respect for your talents. And I have defended you from criticism from many quarters, some of which you are aware of. By the way, I appreciate your doing the briefing and agreeing to take K-Dur to your new firm if it isn't resolved here (the transfer to your new firm is subject to Henderson's and the AG's ok which I will work on). These are examples of how we are and should continue to work together on this transition.

I know this is a stressful time for you and your family and I recall you telling me that you are moving this weekend, so I suggest we not communicate by email on this any more this weekend but rather speak in person about this Monday morning.