# Exhibit 1

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
 2

 3
                                      - - -
 4   IN RE:  PHARMACEUTICAL         :   MDL DOCKET NO.
     INDUSTRY AVERAGE WHOLESALE     :   CIVIL ACTION NO.
 5   PRICE LITIGATION               :   01CV12257-PBS
                                      - - -
 6

 7

 8              Videotaped deposition of JULIE McHUGH
 9   was taken, pursuant to notice, at CENTOCOR, INC.,
10   850 Ridgeview Drive, Horsham, Pennsylvania on
11   Friday, April 29, 2005, beginning at 9:35 a.m.,
12   before M. Kathleen Muino, Professional Shorthand
13   Reporter, Notary Public, there being present:
14                         - - -
15   APPEARANCES:
16           SPECTOR, ROSEMAN & KODROFF, P.C.
             BY:  JOHN A. MACORETTA, ESQUIRE
17           BY:  JENNIFER L. ENCK, ESQUIRE
             1818 Market Street, 25th Floor
18           Philadelphia, Pennsylvania  19103
             Phone:  (215) 496-0300
19           Representing the Plaintiffs
20                    (CONTINUED)
21

22
```

Julie McHugh                    HIGHLY CONFIDENTIAL                    April 29, 2005
                                    Horsham, PA

Page 134

1  list price or an AWP.
2        It's not clear in my mind how the payers
3  were receiving that information; if they were
4  receiving it as an AWP base reimbursement price or
5  if they were receiving it as a WAC price. I don't
6  recall that that was specified in the research.
7  Q.      Okay. At -- at some point after your
8  research, you decide what the list price is,
9  right?
10 A.      That's correct.
11 Q.      Okay. My question is: And at some other
12 point, you also decided that the initial markup
13 from list price to AWP is going to be 30 percent,
14 right?
15        MR. HAAS: Objection to form.
16        THE WITNESS: We decided that a --
17 that it would be based on our assessment of other
18 products that were similar to us relative to the
19 -- the mode of administration and relative to
20 other biolog -- biologics, for example, that a --
21 a 30 percent markup to AWP -- or to WAC to
22 establish AWP would be appropriate and within the

Page 135

1  range of -- of other products established at that
2  time, and we didn't -- we -- we then recommended
3  to the various pricing compendium an AWP based on
4  that particular range that we examined.
5  BY MR. MACORETTA:
6  Q.      Okay. Did you decide on the 30 percent
7  markup before or after you decided what the list
8  price was going to be?
9  A.      We decided on the -- as I recall, it was
10 after we decided on the WAC price.
11 Q.      Okay. Let me show you what we're going
12 to mark as Exhibit McHugh-003. Well, actually -- yeah,
13 let's get a sticker.
14        - - -
15        (Whereupon, Exhibit McHugh-003 was
16 marked for Identification.)
17        - - -
18        THE WITNESS: Yes.
19 BY MR. MACORETTA:
20 Q.      Okay. Exhibit McHugh-003, is this part -- at
21 least part of the research you did in trying to
22 determine what the markup for AWP was going to be?

Page 136

1  A.      As I recall, this was the only piece of
2  research that we did in assessing what would be an
3  appropriate range for setting AWP or recommending
4  AWP.
5  Q.      Okay. How did you decide on these -- on
6  the drugs that you were going to analyze --
7  A.      These --
8  Q.      -- on the second page?
9  A.      -- were -- these are products that are
10 biologics and -- some of them are biologics, some
11 of them are -- are oncology products, others are
12 products that are IV-infused products that are
13 administered in a physician's outpatient setting,
14 so I -- I believe those were the criteria for
15 selection of the products.
16 Q.      Okay. I mean, we could sit here and
17 identify some other biologics or IV-administered
18 drugs that are not on this list. Do you have any
19 idea why these specific ones were chosen?
20        MR. HAAS: Objection to form.
21        THE WITNESS: I don't recall why
22 these specific products were -- were selected

Page 137

1  other than for the reasons I previously mentioned;
2  was that they were marketed biologic products,
3  they were marketed oncology products that were
4  incident to a physician's care, and for that
5  reason served the most relevant benchmark of -- of
6  -- of products to take a look at.
7  BY MR. MACORETTA:
8  Q.      Okay.
9  A.      Or a relevant. I don't know that it was
10 even the most relevant, but a relevant group of
11 reference products to take a look at.
12 Q.      And this was done by Brian Fitzpatrick,
13 right?
14 A.      It would appear so.
15 Q.      Okay. Who was he?
16 A.      Brian, at the time, was a marketing
17 research analyst that reported to Mark -- Matt
18 Carpenter.
19 Q.      Okay. And based on -- on this document
20 alone, you -- somebody decided that the markup for
21 AWP was going to be 30 percent; is that right?
22 A.      Based on this document, we recommended an

35 (Pages 134 to 137)

Julie McHugh                    HIGHLY CONFIDENTIAL                    April 29, 2005
                                    Horsham, PA

Page 250

1  service to their patients and payers.
2  Q.      And possibly make some income from that
3  service?
4  A.      Again --
5          MR. HAAS:  Objection to form.
6          THE WITNESS:  The -- the -- the --
7  whether or not a pay -- a physician would make an
8  income was a --a factor of that particular
9  physician's individual circumstances, but there
10 were some -- some -- some circumstances in which a
11 -- a physician who had the appropriate set of
12 payer circumstances and the appropriate set of
13 cost structure considerations, where a physician
14 could, in fact, cover his costs, although even
15 with covering that cost, the physician still was
16 carrying the risk of providing this -- this --
17 this particular service.
18 BY MR. MACORETTA:
19 Q.      At there were at least some circumstances
20 where a physician could do more than just cover
21 his cost, right?
22         MR. HAAS:  Objection to form.

Page 251

1          THE WITNESS:  As I previously
2  explained, every physician's particular set of
3  circumstances would vary based on their
4  relationships and contracts with payers and based
5  on their cost structure.  In some cases there --
6  there were physicians who were in a position,
7  given their unique set of circumstances, where
8  they would be able to fully cover their cost of
9  providing this service.
10 BY MR. MACORETTA:
11 Q.      Although, when I look on this page -- you
12 just told me that your reps describe the
13 advantages of the various sites of care, but the
14 only advantages they're talking about describing
15 on this page are in-office care, right?
16         MR. HAAS:  Objection to form.
17         THE WITNESS:  Again, this -- this
18 particular document is a description of how a
19 conversation might flow for a sales
20 representative.  I think if you were to take a
21 look at the materials that we gave the reps, every
22 -- every site of care was explored as an option

Page 252

1  and considerations for those sites of care were --
2  were fully detailed or at least described in some
3  level of detail.
4  BY MR. MACORETTA:
5  Q.      But they're not mentioned here under the
6  sales message flow concept?
7          MR. HAAS:  Objection; asked and
8  answered; argumentative; and the document speaks
9  for itself.
10         THE WITNESS:  It -- they probably
11 would have been addressed at -- at another place
12 within the document.  It's not addressed on this
13 page.
14 BY MR. MACORETTA:
15 Q.      Then it says the rep would help physician
16 assess economic feasibility of in-office in-office
17 infusion services.  How would he do -- how would
18 the rep do that?
19 A.      Again, the reps had -- had some materials
20 that would allow them to provide a -- an
21 illustrative example of -- given, again, a certain
22 -- a certain defined scenario would provide an

Page 253

1  overview of how reimbursement might work for
2  providing this type of infusion in -- in their
3  office.
4          They would also have in the same set of
5  documents a qualitative list of cost
6  considerations so that a physician could look at
7  the full picture of what revenue they might
8  receive from payers for providing this service
9  against the cost that that particular physician
10 would incur for providing those services, and so
11 our -- our representatives provided this overview
12 of how to create and figure out whether or not
13 in-office infusion was a viable alternative for
14 any given physician.
15 BY MR. MACORETTA:
16 Q.      And when you mean -- when you use
17 qualitative, you mean no numbers, right?
18 A.      I mean related to the cost, there would
19 have been no numbers.
20 Q.      Was there ever a point where your reps
21 talked to the doctors about the specific numbers
22 estimate for the costs?

McHugh Julie      HIGHLY CONFIDENTIAL      June 27, 2005
Horsham, PA

Page 286

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
VOLUME II

- - -

IN RE:  PHARMACEUTICAL            :  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE         :  MASTER FILE NO.

PRICE LITIGATION                   :  01CV12257-PBS

- - -


         Continuation of the videotaped

deposition of JULIE McHUGH was taken, pursuant to

notice, at CENTOCOR, INC., 800 Ridgeview Drive,

Horsham, Pennsylvania on Monday, June 27, 2005,

beginning at 10:14 a.m., before M. Kathleen Muino,

Professional Shorthand Reporter, Notary Public,

and Robert Blum, Videographer, there being

present:

                  - - -

525271cc-4908-45f5-ac64-7b6484621ca2

McHugh Julie        HIGHLY CONFIDENTIAL        June 27, 2005
                    Horsham, PA

Page 355

1  assisting the physician to initiate in-office
2  infusions.  It was more about educating the
3  physicians on the environment for which they would
4  need to fully understand in order to make a -- a
5  good decision about whether or not to do in-office
6  infusions.
7  Q.      So you're making a distinction between
8  educating the physician and assisting them?
9  A.      Yes, I am.
10 Q.      Okay.  And -- and if you could look at
11 the last page -- the next-to-last page, Page 19,
12 it talks about an A to Z toolbox.  Are you
13 familiar with a -- are you familiar with that
14 term, the A to Z toolbox?
15 A.      The -- the concept of an A to Z toolbox
16 was just that; it was a concept.  The idea was to
17 provide all of the -- the tools and education that
18 we could provide that would assist a physician in
19 all of the -- the thinking and decision-making
20 that they would need to do leading up to a
21 decision to elect to -- to do in-office infusions
22 or not.

Page 356

1          So it -- again, it was more of a -- a
2  goal to create a series of resources that would be
3  comprehensive in assisting physicians if and when
4  they made a decision to -- to adopt in-office
5  infusion.
6  Q.      Were those resources ultimately created?
7  A.      The resources, many of which -- that --
8  that are -- that they're referring to, a number of
9  these were already in existence.  So, again,
10 looking at what's on this specific page, we could
11 go point by point, some of them were -- were to my
12 recollection implemented, and some of them to my
13 recollection were not.
14 Q.      Well, let's go point by point.  Let's
15 talk about the tools.
16 A.      Okay.
17 Q.      The practice management assessment
18 worksheet?
19 A.      I don't know if we ultimately developed a
20 piece that we called that.  I know that we had
21 materials that we provided to our sales reps, some
22 of them we looked at the last time we were

Page 357

1  together, and they were materials that were, in
2  essence, intended to help physicians think through
3  all of the factors pertaining to their particular
4  practice and whether or not it made sense for them
5  to offer this service in their office.
6  Q.      And did you give the sales reps training
7  on those tools?
8  A.      Yes, we would have trained them on the
9  tools.
10 Q.      And the next box, the economic worksheet,
11 do you know if that tool was ever developed?
12 A.      Again, I don't recall if that's what we
13 ultimately called the tool when we completed it,
14 but, again, that was a -- a piece which I believe
15 we -- we reviewed the last time we were together,
16 and that was essentially a -- a list of the
17 considerations of -- of the various different
18 costs that would be associated with deciding to do
19 in-office infusions.
20 Q.      How about the space/equipment algorithm?
21 A.      Again, I don't recall a specific piece,
22 but I know, again, that was an element of the

Page 358

1  conversation, so whether or not there was a tool,
2  I don't recall specifically.
3          MR. HAAS:  Excuse me.
4  BY MR. MACORETTA:
5  Q.      Did you ever develop an algorithm
6  relating to --
7          MR. HAAS:  Objection to form.
8  BY MR. MACORETTA:
9  Q.      -- cost of space and equipment for
10 Remicade?
11         MR. HAAS:  Objection to form.
12         THE WITNESS:  I know that we had at
13 least an internal document.  Again, whether or not
14 we used it in the field, I don't recall.
15 BY MR. MACORETTA:
16 Q.      When you -- when you say "an internal
17 document," what are you -- what are you think --
18 what are you referring to there?
19 A.      When I'm talking about an internal
20 document, I'm talking about something that the
21 internal marketing and/or sales management team
22 might have looked at to -- to -- to think about

19 (Pages 355 to 358)

525271cc-4908-45f5-ac64-7b6484621ca2

# Exhibit 2

---

**Lopez, Ibis [OBI]**

| | |
|---|---|
| From: | Klein, Maren [OBI] |
| Sent: | Wednesday, January 07, 1998 4:38 PM |
| To: | Keele, Bruce [OBI]; Lopez, Ibis [OBI] |
| Subject: | FW: MEDICARE REIMBURSEMENT |

---

From: Dooley, Cathleen [OBI]
Sent: Wednesday, January 07, 1998 2:33 PM
To: Klein, Maren [OBI]; Pearson, Bill [OBI]
Subject: FW: MEDICARE REIMBURSEMENT

EXHIBIT 4/A
Dooley
Jan. 13. 2006

FYI- I meant to copy you both on this . .
Cathy

---

| | |
|---|---|
| From: | Dooley, Cathleen [OBI] |
| Sent: | Wednesday, January 07, 1998 2:31 PM |
| To: | Gatens, Richard [JJCUS] |
| Cc: | Moran, Richard [OBI] |
| Subject: | RE: MEDICARE REIMBURSEMENT |

Rich-

They initiated a pricing survey in 1994 that was cancelled mid-way as there was a regulatory glitch that they did not take into effect. This was fortunate for us.

A pricing survey is one of the two ways the Secretary of Health can set a price. If they had done a survey and come up with an average price, this would have changed the reimbursement. This is what is happening with Epogen used in ESRD – they did a survey last year and they are now considering lowering the reimbursement rate to $9.00/1,000 units from the current $10.00/1,000 units.

The reason that this is not an easy fix for them is that drugs in the Medicare program are billed based on a HCPCS (HCFA Common Procedure Coding System). Each drug is assigned a code which indicates that dosage amount, not a brand. In the Medicaid system the use of the NDC number makes the information easy to track - in the Medicare system it makes it impossible.

The only way they could correct the current system is to require an invoice be submitted with each Medicare claim that is sent in. This would be very cumbersome and the medical providers and Medicare carriers have rejected this.(With 39 million recipients, the number of claims is significant.) Right now they do not know what the cost is for different providers.

If they were smart, they would expand the current demonstration project they have to expand the depots and only allow drugs to be purchased through identified depots where pricing could be controlled.

Please let me know if you need any additional information.

Regards,
Cathy

---

| | |
|---|---|
| From: | Gatens, Richard [JJCUS] |
| Sent: | Wednesday, January 07, 1998 11:33 AM |
| To: | Dooley, Cathleen [OBI] |

Highly Confidential

MDL-OBI00058842

**Plaintiffs' Exhibit**
**259**
01-12257-PBS

Subject:      FW: MEDICARE REIMBURSEMENT

Cathleen, I sent this to Dick but probably should have sent my question directly to you. It seems like they can solve their own problem by using this EAC. Why don't they use EAC to calculate their reimbursement? RG



From:       Gatens, Richard [JJCUS]
Sent:       Wednesday, January 07, 1998 10:30 AM
To:         Moran, Richard [OBI]
Subject:    RE: MEDICARE REIMBURSEMENT

Dick, as I read the Inspector General report it would seem to me the easy thing for them to do is not use AWP, but use the EAC( which is a survey of ACTUAL prices paid for the drug) to calculate the reimbursement. Do we know why they don't use this EAC approach? RG

From:       Moran, Richard [OBI]
Sent:       Wednesday, January 07, 1998 9:48 AM
To:         Gatens, Richard [JJCUS]
Subject:    FW: MEDICARE REIMBURSEMENT

From:       Dooley, Cathleen [OBI]
Sent:       Tuesday, January 06, 1998 6:07 PM
To:         Moran, Richard [OBI]
Cc:         Klein, Myron [OBI]; Pearson, Bill [OBI]
Subject:    RE: MEDICARE REIMBURSEMENT

Dick –

In response to Ed's question, the following information might help clarify this issue:



- The Office of Investigator General (OIG) report refers to the price the physician pays AAC (Average Acquisition Cost) and what Medicare reimburses off of which is AWP (Average Wholesale Price). AWP, as you know, is defined by the Red Book, the official pricing source for Medicare, as list plus 20%. (Some manufacturers request it be list plus 25%.)

- Medicare has historically paid 80% of AWP; effective 1/1/98, they will pay off of AWP minus 5%.

- By law, the physician must bill the patient the remaining 20% co-pay.

- The reason there is no reference to the co-pay in the OIG report is that the government knows that by law, the remaining co-pay of 20% must be billed.  They know that a certain percentage of the co-pays will be collected and therefore the physician will "make money" on the administration of certain drugs.

- This will be a sensitive issue because the physician is able to bill Medicare and the patient off of AWP. the patient's 20% co-pay is higher than it would be if it was billed off of acquisition cost (public relations' issue).

As a follow-up to your voice mail, you are correct that this report focuses on the fact that IF the 22 drugs identified in the report had cost under the Medicare program what they cost under Medicaid program, the savings would have been the estimated $447 million plus.   As we discussed yesterday, there is no exposure for Medicaid because Medicaid

Highly Confidential

MDL-OBI00058843

gets the calculated "best price" which involves us paying rebates on the lowest possible
unit cost on a quarterly basis.

Please let me know if you have any questions.

Thanks
Cathy


> From:      Moran, Richard (OBI)
> Sent:      Tuesday, January 06, 1998 8:16 AM
> To:        Dooley, Cathleen (OBI); Klein, Moran (OBI)
> Subject:   FW: MEDICARE REIMBURSEMENT

How should we respond to ed?
Dick

> From:      Strobino, E. D. (Corp.) (JJCUS)
> Sent:      Monday, January 05, 1998 9:00 PM
> To:        Galeno, Richard (JJCUS); Leahy, Kenneth (PRI); Nystrom, Thomas (OMP); Strobo, John A.
>            *; Moran, Richard (OBI)
> Cc:        Forte, Marilyn (JJCUS)
> Subject:   MEDICARE REIMBURSEMENT

BASED ON THE OFFICE OF INSPECTOR GENERAL REPORT I AM CONFUSED
ESPECIALLY IF I USE BIOTECH'S NUMBERS. THE REPORT KEEPS
REFERRING TO THE DIFFERENCE BETWEEN THE AWP PRICE THAT
MEDICARE PAYS AND WHAT THE PHYSICIAN PAYS. THERE IS NO
REFERENCE TO ANY CO-PAY AMOUNT RECEIVED BY THE PHYSICIAN. IF
THIS IS THE DIFFERENCE IN THE TWO AMOUNTS, THEN WE DO NOT HAVE A
PROBLEM AS IT RELATES TO BIOTECH??? HELP. ED

Highly Confidential

# Exhibit 3

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| | CIVIL ACTION: 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO: | Judge Patti B. Saris |
| ALL CLASS ACTIONS | |

### <u>TRIAL AFFIDAVIT OF ANNA CHOICE</u>

I, Anna Choice, pursuant to 28 U.S.C. § 1746, on oath, depose and state as follows:

1.       My name is Anna Choice and I live in Chicago, Illinois.  I was born on March 25, 1952.  I am single and live alone.

2.       Although it is now in remission, I was diagnosed with breast cancer in the fall of 2000.   After that diagnosis, my cancer was treated for several years.   I had to undergo chemotherapy, which begin in late October 2000, and radiation, which began in December 2000.

3.       I had to go get chemotherapy every three weeks for six or seven months.  I also had surgery to remove the breast cancer.

4.       To this day, I go back to see Dr. Thomas every three months for a check-up.

5.       I have been employed at Cub Foods, a grocery store locate in Chicago, for almost 16 years.  I am currently a customer service representative, and am in charge of the cashiers and baggers, and work at the customer service desk at Cub.

6.       I am a member of the United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund ("UFCW"), Local 881, and have been for almost sixteen years.

7.      I get medical benefits through my UFCW membership, which offers Cubs Foods employees a Preferred Physician Organization ("PPO") plan through Blue Cross Blue Shield of Illinois ("BCBS IL").  To my knowledge Cub Foods employees have had BCBS IL insurance for at least the last 14 or 15 years.  It is my understanding that BCBS IL pays 80% of my medical expenses, and I am responsible for the remaining 20%.

8.      I have no other private health insurance other than this BCBS IL policy.  I am not eligible enrollment in Medicare, Medicaid, Veteran's benefits, or Social Security.

9.      From approximately September of 2000-March of 2001 I received disability benefits when I was first diagnosed with breast cancer, but I am not currently receiving any such benefits.  I used the money I received through my disability benefits to pay for my household expenses, food, and bills because I was unable to work at that time.

10.     Other than receiving the disability benefits during this limited time, I have had no other entity or person to help me pay my medical bills over the last fifteen years.

11.     Each time I visit the doctor, I am responsible for a certain portion of the expenses.  My doctor sends me a bill showing the amount BCBS IL paid, and the amount I am responsible for paying.  These bills are itemized to show the cost for each service and drug.

12.     While I have made several payments on certain medical bills and have paid others in full, I still have some outstanding medical bills that I continue to make payments on.  Some of my medical bills were sent to a collection agency, and I am on a payment plan to pay $125/month with one doctor's office to pay an outstanding bill that was approximately $4,000 back in November of 2005.  It is my understanding that BCBS IL did not pay for my last round of chemotherapy.

13.    I was given many different drugs as part of my cancer treatment.  These include Rubex, Zofran, Cytoxan, Heparin Sod, Dexamethasone Sodium and Taxotere.    I was administered, billed for, and made out-of-pocket payments for these drugs during the time period alleged in the Complaint.

14.    I do not specifically recall being prescribed or taking these particular medicines, mostly because I was given so many drugs during chemotherapy and radiation that it's all a bit of a blur.  However, I know that I took and made payments for them based upon my bills and statements from BCBS IL.

15.    I understand this case to be about drug manufacturers overcharging for their medicine and making more money than they need.  I think they would make money either way because people will always need the medicine to get better.

16.    I do not know how medical providers determine the amount they charge for their services and prescription drugs, nor do I know how BCBS IL determines how much it is willing to pay for those services or drugs.

17.    I first heard of AWP, or Average Wholesale Price, from my involvement in this lawsuit.  I am still not quite sure what AWP is or how it factors into the payments I am required to make for my cancer drugs.

18.    It is my personal opinion that whatever system is used as a basis for calculating my co-payment should be fair and accurate and not be subject to manipulation.

19.    I took Rubex, Zofran and Cytoxan.  I understand that the manufacturers of those drugs are alleged to have published prices and then secretly offered their drugs at a lower price, providing a profit for the doctor.  I understand that my payments were based on the higher published prices.  If these facts are true, I feel it is unfair for drug companies to publish prices

3

that have no real meaning, the effect of which is to cause me and others like me to pay more for those drugs.

20.    I understand that defendants say that their published prices are like a sticker price on a car.   However, to me a drug company that creates a false price knowing that my life depends on the drugs and that I must pay for them stands in different shoes than a car manufacturer.   In addition, I am not aware of any situation where a car manufacturer offers discounts of 30%, 60% or even over 300% off sticker price.

21.    The bills and statements I received from my doctors and BCBS IL do not show what the AWP is for the drugs I was given.   There was no way for me to have known, as a patient, whether certain charges for a given medication were based on AWP or where the prices came from or were calculated.

22.    While I think the drugs I took helped me survive my cancer, I believe that they are far too expensive and, years later, even though my cancer is in remission I am still paying off medical bills for services and the drugs that I received during my chemotherapy and radiation.

23.    I believe the drug manufacturers are overcharging both insured and uninsured individuals, unions, and insurance companies, and these are the types of people I am hoping to represent in this case.   I know that there are others out there like me who can't afford to pay a lot of money for medicine, including those people who have no insurance at all.

24.    I just learned that my Cubs Food location will be closing in December of 2006 and I will be out of a job and without health insurance.   This will make it even more difficult for me to pay off my remaining medical bills.

I declare under penalty of perjury that the foregoing is true and correct.

Date: October 27 2006

_Anna Choice_
Anna Choice

# Exhibit 4

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE
LITIGATION

MDL No. 1456

THIS DOCUMENT RELATES TO:

CIVIL ACTION: 01-CV-12257-PBS

ALL CLASS ACTIONS

Judge Patti B. Saris

## DECLARATION OF REBECCA ANNE HOPKINS FOR PURPOSES OF TRIAL

I, Rebecca Anne Hopkins, under oath declare as follows:

1.       I currently reside at 10262 East Lake Road, North East, Pennsylvania, 16428, and
have lived there for approximately 12 years. I am 50 years of age, married and have one child.
My highest level of education is a graduate degree in public relations from Syracuse University.
I am not currently eligible for, and have never received, Medicare Part B benefits.

2.       In June of 1991, I was diagnosed with a type of ovarian cancer known as
granulosa cell tumor ("GCT") of the ovary. Since then, my cancer has progressed and
metastasized elsewhere in my body. Additionally, my cancer and the many drug therapies and
treatments for my cancer have caused me to suffer from numerous serious complications and
have resulted in other illnesses and medical conditions, some of which were life-threatening and
required emergency life-saving medical treatments and surgeries. All told, my GCT, directly or
indirectly, has resulted in my receiving scores of medications.

- 1 -

3.    Treatments, surgeries and other medical procedures relating to or caused by my

GCT or otherwise, and some of the medications administered or prescribed to me as a result,

include, but are not limited to, the following:

A.    After diagnosis of GCT in June, 1991, I had surgery to remove my right

fallopian tube and right ovary and a sample from my omentum;

B.    After re-occurrence of my GCT in February, 1995, I had a complete

hysterectomy and underwent surgical removal of five small GCT nodules/polyps from my

abdominal cavity and bladder area and a six-month regimen of chemotherapy every 28 days.

This regimen of chemotherapy included administration of bleomycin, cisplatin and etoposide

(VP-16);

C.    In May, 1997, I had another recurrence of my GCT and underwent an

eight-month regimen of chemotherapy every 28 days. The chemotherapy was administered

through a Mediport implant and consisted of cisplatin and etoposide (VP-16), but not bleomycin

because my lungs were too damaged;

D.    In October, 1998, I had out-patient surgery to reduce a GCT fluid-filled

sack around my bladder;

E.    In 1999, I received monthly Lupron® injections (over 10 months) in a

failed attempt to control GCT activity. The tumor, which had metastasized in my right pleural

cavity wall, did not reduce in size, and the right lung became affected;

F.    In December, 2000, I began thorentisis every 90 days to drain my fluid-

filled pleural cavity due to GCT irritation of my pleural cavity wall, which affected my right lung

breathing capacity;

- 2 -

G.     In April, 2001, I received an injection of doxycycline into my right pleural
cavity to coat the GCT;

H.     Beginning in November, 2001 and continuing into at least January of
2002, I received weekly Taxol® intravenous chemotherapy through an Optiport/Mediport to
reduce the size of the GCT in my right pleural cavity wall. Taxol® treatment was discontinued
due to the onset of sepsis (infection) of the Mediport;

I.     In January, 2002, I spent three weeks in the Intensive Care Unit ("ICU")
due to sepsis of the Mediport. I nearly died after my kidneys failed and I went into cardiac
arrest. Among other intravenous medications, I received vancomycin, and I also received
dialysis and an external pacemaker. My three-week stay in the ICU was followed by intensive
physical rehabilitation, including re-learning how to walk;

J.     In March, 2002, I began daily oral doses of tamoxifen and monthly local
Lupron® injections to control my various GCTs. At that point, chemotherapy was no longer
considered an option;

K.     In April, 2002, I developed a staph bone infection in my left ankle and
received a six-month daily regimen of minocycline. By October of 2002, this infection still had
not been eliminated. I underwent an operation in the following month to remove dead bone and
tissue, and was placed in a cast and received antibiotic medical beads for release into my ankle.
Between November, 2002 and March, 2003, I received an eight-week daily infusion of
vancomycin for the infections, had a stainless steel pin inserted into my ankle and tibia, and had
various ankle casts applied;

L.     In April, 2003, I continued to take oral doses of tamoxifen (with monthly
Lupron® injections pending);

- 3 -

M.      In July, 2003, I underwent a week of tests relating to coughing and sputum
production. I was released and prescribed Zithromax® (azithromycin) and cefuroxime for any
general bacterial infections. However, an ultra-sound revealed a mass in addition to a well
defined tumor in my lung. In early August, 2003, I underwent surgery to remove my lower right
lung lobe and 80% of my diaphragm. My tumors were confined between my pleural cavity wall
and right lung, and were resected;

N.      From August, 2003 to March, 2005, I continued to take oral daily doses of
tamoxifen and to receive monthly injections of Lupron®. In March, 2005, I discontinued this
treatment because it was no longer considered to be therapeutic for me;

O.      Starting in April, 2005, I received Gleevic® treatment based on treatment
of a female patient in Germany. This treatment ended in May, 2005. From May to June, 2005, I
received a new chemotherapy combination of gembetacine and carboplatin;

P.      In July, 2005, I underwent radiation treatment for a tumor located beside
the vena cava (a primary vein that returns blood to the heart), which presented the danger of
pressure on the vein.

I have undergone various other treatments and procedures, and received numerous other
medications, which are not detailed above.

4.      Since 1991, there have been times when I have had no health care insurance at all
to pay for my medical treatment and medications. Other times, I had health care insurance. In
fact, over the years, I have had many different kinds of health care insurance provided by many
different health care insurers. Sometimes, my insurance required me to pay a deductible;
sometimes, it required that I pay flat co-pays; sometimes, I believe, I had percentage-based co-
insurance obligations; and sometimes there may have been a combination of a deductible and

- 4 -

either a flat co-pay or percentage-based co-insurance. I have had so many different types of insurance over the years -- due in part to changes in the status of my husband's employment -- that it is difficult for me to recall all of the specifics of my various insurers and types of insurance. However, I do know that there have been times that I have had to pay for my medications either entirely out of my own pocket (for example, at times when I had no insurance) or partially out of my own pocket (when I did have insurance) in a manner that was not simply a flat co-pay.

5.      In more recent years, I have become uninsurable and have received welfare assistance through a Commonwealth of Pennsylvania program (known as Pennsylvania Access), which has helped pay for my medical treatment and medications. Over time, my finances were destroyed by the costly medical treatment and excessively priced medications that have been, and continue to be, necessary to keep me alive, and I have become unable to pay for my treatment and medications without welfare assistance. For years, I had great difficulty paying all of my medical providers' bills. Over the years, my providers have sent various collection agencies after me, and I have on-going obligations to pay my providers for past amounts owed. I have always done my best to pay my medical bills, but the burden simply became too great for me to keep up.

6.      At times, I have had to pay out-of-pocket, either entirely or in part, for the medications administered or prescribed to me. These payments, at times, were not flat co-pays. Such payments that I made were for medications manufactured by various pharmaceutical companies, one of which is Defendant Bristol Myers Squibb ("BMS"), which I understand to be the company that manufactured the Taxol® that I received in the 2001 to 2002 time frame and against which I am pursuing a law suit and seeking to be a class representative in this action.

- 5 -

7.     One instance in which I paid for certain companies' medications entirely out of
my own pocket (without any assistance from any insurance carrier) came in 1995 when I paid
over $3,800.00 to Roswell Park Cancer Center for my chemotherapy consisting of bleomycin,
cisplatin and etoposide. My attorneys and I have produced in this case my cancelled checks and
billing statements from Roswell Park Cancer Center that show my payments for these
chemotherapy medications.

8.     As for BMS drugs, I received chemotherapy with Taxol® over at least the period
from in or about November 2001 until at least January 15, 2002. Treatment records, among
other documents, produced in this case verify this treatment.

9.     I paid a portion of the charges for this Taxol® treatment out of my own pocket,
and my payments were not in the form of a flat co-pay. This came during a time when I was
insured by Highmark Blue Cross Blue Shield ("Highmark") and I was responsible for a
deductible that was applied to medications provided and billed for by Regional Cancer Center,
which included this Taxol® treatment. A three-page Supplemental Bill from Regional Cancer
Center, dated 11/6/03, that my attorneys and I produced in this case shows multiple treatments
with Taxol® and certain other drugs. (*See* Hopkins 0140-42.) The major charge was for the
Taxol® at $1,472.00 for each 30 mg dose that I received. This Supplemental Bill identifies my
"Personal Check" payment of $144.00 on 2/19/02 (Hopkins 0141) and my "Personal Check"
payment of $26.00 on 5/7/03 (Hopkins 0142), and shows a "Current Balance" of $80.00
remaining (Hopkins 0142).

10.    Additional documents demonstrate the payments I made for Taxol®, among other
drugs. Several Regional Cancer Center billing statements that my attorneys and I produced in
this case show that I was responsible for a "balance forward" of $106.00 for "Dec 2001 6mo

- 6 -

chemo 12/18 - 6/17/02." (*See, e.g.*, Hopkins 0421, dated 1/3/03; identical billing statements

were sent to me in the months that followed, and still other billing statements show that my

balance had later dropped from $106.00 to $80.00 following the additional payment of $26.00

that I had made.)

11.     The records that my attorneys and I produced in this case also show that these

payments were necessary due to my deductible obligation under my insurance with Highmark.

For example, in a letter dated 5/5/03, Highmark advised me that "[t]he billing from Regional

Cancer Center for chemotherapy from 12/18 – 5/17/02 and dated 12/31/01, is your out of pocket

deductible and your responsibility to pay. You owe the Regional Cancer Center $106.00 and this

should be paid ASAP." (Hopkins 0424.)

12.     I understand that this case is about the use of "AWP" or Average Wholesale

Price. My understanding is that I have paid for my medications based on AWPs, but that AWP

is a price largely set by the manufacturer.

13.     At the time I was paying for Taxol, I had no idea that my payments were higher

than they would have been if the published AWP for Taxol had been a true average of prices

paid by providers. I now understand that it was not such an average and that the average price

paid by providers was substantially below what I was charged.

14.     I do not know why BMS or other manufacturers would try to impose higher costs

on me, but I think it is very unfair. Average folks like me have to rely on the honesty of those

setting prices.

15.     I have brought this case because I believe the defendants have acted illegally in

using AWPs to inflate the prices of their medications to consumers and other payers, including

medications I have taken and for which I have paid. I believe that I and others like me who pay

- 7 -

for medications have all been overcharged for the medications we have purchased, and that we have been defrauded by the defendants, particularly by their inflating prices to create a spread for medical providers who charge me and other payers for our medications. I and others who pay for medications have been harmed by being made to pay these inflated AWPs.

16.     Before this case was initiated, I had not heard of AWP. Of course I knew that my medications were very expensive, but I did not know of AWP or that the defendants were inflating their prices in this manner. I did not know of AWP or of a possible pricing spread on any of my medications until after I learned about this lawsuit some time after it was initiated.

17.     I understand that this is a class action, involving many consumers, insurance companies and others that have been paying based on defendants' inflated AWPs, I am serving as a class representative in this case. I understand that this is a way for me to represent the many patients who have paid for these high-priced medications. I want to represent those people who, like me, have had their finances impacted by the inflated prices of medications and anyone else who has had to pay too much for their medications.

18.     I understand that people like me, who were not receiving Medicare Part B benefits when they paid for their medications, are not currently included in this class action, because for non-Medicare people the case is limited to people and companies who reside in Massachusetts. I understand that there is class action across the nation for people and companies who paid for medications in the Medicare Part B setting. I hope that by testifying as a witness in this case, I can tell my story and perhaps help expand the case to include people like me.

- 8 -

I certify under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief.

Executed this $\underline{25}$ day of October, 2006.

REBECCA ANNE HOPKINS

# Exhibit 5

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 C.A. No. 01-12257-PBS |
| THIS DOCUMENT PERTAINS TO: ALL CLASS ACTIONS | Judge Patti B. Saris |

**DECLARATION OF LARRY YOUNG**

I, Larry Young, hereby declare as follows:

1.     This Declaration is submitted in opposition to Defendants' Motions for Summary Judgment.

2.     I am a resident of the State of Oklahoma and am representing the Estate of my wife, Patricia K. Young, in this litigation.

3.     My wife was diagnosed with rheumatoid arthritis, Hepatitis C, and lymphoma. She was prescribed the following physician administered drugs as part of her treatment for these illnesses: anzemet; aristocort; cytoxan; dexamethasone acetate; dexamethasone sodium phosphate; dolasetron mesylate; dopamine hydrochloride; epirubicin; epoetin alfa; fentanyl citrate; filgrastim; heparin sodium; hydrocortisone sodium succinate; infliximab; ketorolac tromethamine; levofloxacin; lidocaine hydrochloride injectable; lorazepam injectable; methotrexate sodium injectable; midazolam; moxifoxacin injectable; oprelvekin; promethazine; protonix injectable; solucortef; triamcincolone acetonide; vancomycin sulfate; vincristine sulfate; and warfarin sodium injectable.

4.     My wife and I paid for a portion of the cost of these physician-administered prescription medications which she received.

5.   My wife treated for her illnesses with the following healthcare providers: Dexeus Oncology; Integris Bass Baptist Health Center; Craig Carson, M.D., Oklahoma Arthritis Center; and St. Mary's Regional Medical Center.

6.   My wife and I relied on the advice of my wife's health care providers regarding her medical treatment, use of the above listed prescription drugs, and whether or not she should continue to use them.

7.   My wife and I relied on the advice of my wife's doctors and their facilities to be fair in their pricing of prescription medications and to comport with all ethical, moral, medical, regulatory and legal standards with respect to their medical care and treatment and their bills.

8.   My wife and I did not know if she ever received free samples of any of the prescription drugs she was administered and our medical bills and records do not indicate whether or not she received free samples of any of these drugs.  Also, my wife's healthcare providers never told us whether or not she received free samples of these prescription medications.

9.   My wife and I did not know if (or to what extent) her doctors or their facilities received free samples of prescription medications and then billed for the free samples, as we were never told.

10.   My wife and I did not know what her doctors or their facilities paid for the prescription medications my wife was administered, as we were never told.

11.   My wife and I did not know if (or to what extent) her doctors or their facilities profited from the sale of prescription medications, as we were never told.

12.   My wife and I did not know if (or to what extent) her doctors or their facilities received other things of value from any of the defendant drug companies, as we were never told.

2

13.  Prior to the filing of this action, we did not ever have occasion to read any government report, article or presentation in the media, or other document or presentation which caused us to learn about the unlawful marketing and sales practices alleged in this case to have been committed by the drug company defendants.

14.  As set forth in the Complaint I filed in this action, I believe that my wife and I, and the people I represent in the certified class in this case, suffered direct injury and damages as a result of the defendants' conduct.

15.  I hereby declare under penalty of perjury that all of the foregoing statements made by me are true and correct to the best of my knowledge, information and belief.

This the 7th day of April, 2006.

/s/
**LARRY YOUNG**

3

# Exhibit 6

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br>C.A. No. 01-12257-PBS |
| THIS DOCUMENT PERTAINS TO:<br>ALL CLASS ACTIONS | Judge Patti B. Saris |

## DECLARATION OF JAMES SHEPLEY

I, James Shepley, hereby declare as follows:

1.  This Declaration is submitted in opposition to Defendants' Motions for Summary Judgment.

2.  I am a resident of the State of Nevada and reside in Reno, Nevada.

3.  I have been diagnosed with prostate cancer and have been prescribed the following physician-administered drugs as part of my healthcare treatment for this illness: epoetin alfa ("Procrit") and goserelin acetate ("Zoladex").

4.  I have paid for a portion of the cost of these physician-administered prescription medications which I received.

5.  I have treated for this illness with the following healthcare providers: Dr. Angelo Kanellos; Dr. Kirsten Lorenzen; Dr. Steven Moss; and Dr. Steven Schiff.

6.  I relied on the advice of my healthcare providers regarding my medical treatment, use of the above listed prescription drugs, and whether or not I should continue to use them.

7.  I relied on the advice of my doctors and their facilities to be fair in their pricing of prescription medications and to comport with all ethical, moral, medical, regulatory and legal standards with respect to their medical care and treatment and their bills.

8.      I do not know if I ever received free samples of any of the prescription drugs I was administered and my medical bills and records do not indicate whether or not I received free samples of any of these drugs.   Also, my healthcare providers never told me whether or not I received free samples of these prescription medications.

9.      I do not know if (or to what extent) my doctors or their facilities received free samples of prescription medications and then billed for the free samples, as I was never told.

10.     I do not know what my doctors or their facilities paid for the prescription medications I was administered, as I was never told.

11.     I do not know if (or to what extent) my doctors or their facilities profited from the sale of prescription medications, as I was never told.

12.     I do not know if (or to what extent) my doctors or their facilities received other things of value from any of the defendant drug companies, as I was never told.

13.     Prior to the filing of this action, I did not ever have occasion to read any government report, article or presentation in the media, or other document or presentation which caused us to learn about the unlawful marketing and sales practices alleged in this case to have been committed by the drug company defendants.

14.     As set forth in the Complaint I filed in this action, I believe that I, and the people I represent in the certified class in this case, have suffered direct injury and damages as a result of the defendants' conduct.

15.     I hereby declare under penalty of perjury that all of the foregoing statements made by me are true and correct to the best of my knowledge, information and belief.

This the 7th day of April, 2006.

/s/ _____

JAMES SHEPLEY