# Exhibit 8

Page 1

1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
2

3

     In Re:                        )
4    PHARMACEUTICAL INDUSTRY       ) CA No. 01-12257-PBS
     AVERAGE WHOLESALE PRICE       ) MDL No. 1456
5    LITIGATION                    ) Pages 7-1 - 7-156

6

7

8                    BENCH TRIAL - DAY SEVEN
9            BEFORE THE HONORABLE PATTI B. SARIS
                 UNITED STATES DISTRICT JUDGE
10

11

12

13

                             United States District Court
14                           1 Courthouse Way, Courtroom 19
                             Boston, Massachusetts
15                           November 16, 2006, 9:15 a.m.
16

17

18

19

20

21

22

            LEE A. MARZILLI and TIMOTHY J. WILLETTE
23                  OFFICIAL COURT REPORTERS
                 United States District Court
24               1 Courthouse Way, Room 3205
                    Boston, MA  02210
25                    (617)345-6787

Page 14

1   A.   During what period of time?
2   Q.   Okay, well, let's take a look at Plaintiff's
3   Exhibit 976, please.  That's in the binder in front of you
4   toward the end.
5   A.   Okay.  Yes, I have that document.
6   Q.   And have you seen this before, Ms. Dooley?
7        THE COURT:  Don't forget, we lose your voice, so
8   you need to keep it right into the mike.
9        MR. BERMAN:  Okay, I'm sorry, your Honor.  I'm
10  losing my voice by the fourth day here.
11  Q.   Have you seen this before, Ms. Dooley?
12  A.   I have.
13  Q.   And the front page says "1999 Rebate Recommendations."
14  That's the retail segment of the business, correct?  That
15  would be pharmacists?
16  A.   It says "Retail, Physician, and Contracted Customers."
17  Q.   And the second page says "Rebate team members," and
18  you're listed on there, correct?
19  A.   That's correct.
20  Q.   And then if you turn to the page stamped 0835, please,
21  at the top it says "Physician Rebate Program 1993-1998
22  Projected," and then there's a series of figures for the
23  years '93 through '97.  And those were the actual rebates
24  offered for the various dosages off of Procrit for the years
25  '93 through '97, correct?

Page 15

1   A.   I would assume that from this document.  I joined in
2   1995.
3   Q.   But this was a document that you were involved with,
4   correct?
5   A.   I was on as -- as this document references, there were
6   rebate team members.  I was not a person who put it together,
7   but I would assume from this document that that is in
8   fact true.
9   Q.   Okay.  And so at that point in time, is it correct that
10  the most popular dosage of Procrit was the 10,000 1 ml?
11  A.   The most popular meaning --
12  Q.   Used most by physicians at that time.
13  A.   Well, at the dosing for oncology, that would have been
14  the dose that would have been used.
15  Q.   Okay.  And oncologists for the years '93 and '94
16  received 10 or 12 percent rebates if they administered
17  Procrit, correct?
18  A.   According to this document, yes.
19  Q.   Okay.  And then it went down to 6 and 7 percent and down
20  to 5 percent in later years, correct?
21  A.   According to what this document says, that's correct.
22       MR. BERMAN:  I move for admission of 976, please.
23       MR. SCHAU:  No objection
24       (Exhibit 976 received in evidence.)
25  Q.   And are you familiar with the drug called Aranesp?

Page 16

1   A.   I am.
2   Q.   And did the rebates increase after Aranesp entered the
3   market?
4   A.   I was not as involved in the actual process of that
5   because by that point I was in Washington, D.C., so I don't
6   have as much familiarity.  My understanding is, once there
7   was competition on the market, those rebates or discounts
8   would have increased.
9   Q.   Okay.  And is it correct to say then, looking at
10  Exhibit 976 and these rebates that were offered to doctors,
11  that physicians always were able to acquire Procrit at less
12  than WAC, in that they got rebates, so they bought at less
13  than the wholesale acquisition cost, correct?
14  A.   Could you repeat that?
15  Q.   Are you familiar with something called WAC, the
16  wholesale acquisition cost?
17  A.   As in -- you're defining WAC as list price?
18  Q.   Yes.
19  A.   Okay.
20  Q.   Okay, and so doctors who got rebates were always able to
21  buy at less than WAC?
22  A.   I would say that, yes, the vast majority of physicians
23  would have acquired the drug at less than list price.
24  Q.   And do you recall from time to time reporting to your
25  superiors that no doctors in the marketplace were purchasing

Page 17

1   Procrit based on average wholesale price?
2   A.   I can't recall a specific document, but I would have
3   said that the average wholesale price was what Medicare was
4   reimbursing off of.  That was different than what physicians
5   were purchasing the drug for.
6   Q.   Could you take a look, please, at Exhibit 339.
7   A.   Yes, I have that.
8   Q.   And is this a memo that you wrote to a Mr. Amick?
9   A.   That's correct.
10  Q.   And you wrote this in the ordinary course of business?
11  A.   I did.
12  Q.   And is this a he or she?
13  A.   Tom Amick.
14  Q.   And who is he?  Is he your boss or superior?
15  A.   He was a superior at the time, yes.
16  Q.   Okay.  And if you could turn to the Page 1805, please.
17       THE COURT:  Now, when we say Ortho, we're always
18  referring to Johnson & Johnson?  Is that a wholly owned
19  subsidiary?
20       THE WITNESS:  Ortho Biotech is, I believe, a wholly
21  owned subsidiary.  It's a Johnson & Johnson company.
22       THE COURT:  Is this technically a defendant in this
23  case?
24       MR. BERMAN:  Yes, it is.
25       THE COURT:  Separately or as a subsidiary of

Page 18

1  Johnson & Johnson?
2      MR. BERMAN:  We named it as a subsidiary.
3      THE COURT:  You named it as a subsidiary.
4      MR. BERMAN:  Yes.
5  Q.  Okay, we're at Page 1805, and I'd like to ask you some
6  questions about the paragraph that I've highlighted on the
7  screen, but you're welcome to look at it in hard copy.  You
8  write, "A drug survey is imminent, and it would show that no
9  physicians are paying AWP in the marketplace.  A survey would
10  look at average acquisition price and associated overhead
11  costs.  If there was a significant difference between AWP and
12  acquisition price (which there would be) the reimbursement
13  rate would be lowered.  Again, reimbursement rates can be
14  lowered by survey or an arbitrary pricing decision."
15      What was your understanding with respect to what
16  type of survey could be done and by who?
17  A.  My understanding was that because there had been a lot
18  of discussion on Capitol Hill with CMS, that CMS could decide
19  to authorize a survey to actually get what the drug pricing
20  was for physicians; and CMS could authorize that survey when
21  they wanted to or to instruct their local Medicare carriers to
22  do that.
23  Q.  Okay, when you write here, "If there was a significant
24  difference between AWP and acquisition price (which there
25  would be) the reimbursement rates would be lowered," is it

Page 19

1  correct to say, at that time you felt that if CMS found out
2  there was a difference, that they could lower the prices?
3  A.  Well, CMS knew that there was a difference.  And I know
4  personally, I had had a number of conversations with
5  different people at CMS --
6      THE COURT:  Who?
7      THE WITNESS:  I'm sorry, with -- it would have been
8  CMS, or the Centers for Medicare Services, which was the old
9  HCFA, the Health Care Finance Administration.
10      THE COURT:  Right, and who was the person you would
11  talk to?
12      THE WITNESS:  Oh, I spoke to a number of people
13  over the course of the time.  Nancy-Ann min DeParle.
14      THE COURT:  What did you tell her was happening?
15      THE WITNESS:  I can actually specifically remember
16  talking to her about this in the 1997 time frame because we
17  were talking about the difference of how the government
18  reimbursed EPO, or, you know, erythropoietin, two different
19  ways, one being in the end-stage renal disease population, or
20  people on dialysis, and the other being in oncology people
21  who had cancer.  And because they were separate government
22  programs, she was very interested in why the government was
23  reimbursing the same drug differently, and that led to a
24  discussion about the fact that in oncology, there had been a
25  lot of discussion on Capitol Hill about the need to reform

Page 20

1  average wholesale price.  And what we talked to Nancy about
2  was the fact that at that point, Procrit in the oncology
3  population was being reimbursed at, depending on the period
4  of time, either 100 percent or 95 percent of AWP, and that
5  suddenly physicians were buying at less than the list price.
6  So they knew that.  In our case, the discounts varied, you
7  know, 5 --
8      THE COURT:  When you say list price there, you mean
9  they knew people were purchasing less than AWP?
10      THE WITNESS:  They knew that people were,
11  absolutely, and they knew that --
12      THE COURT:  But you weren't referring them to the
13  WAC and then reductions below that, right?
14      THE WITNESS:  Actually we were, because when I
15  talked personally to Nancy-Ann min DeParle and Kathy King,
16  who was her special assistant, we talked about the fact that
17  actually physicians when they bought the drug, they were
18  buying the drug less than what the list price was, and then
19  they were reimbursing off of AWP.  And she was very
20  interested, for example, in, if Medicare was paying 80
21  percent, how often did the physicians collect the 20 percent
22  copay?  So she wanted to know what was that margin or what
23  was the dollar amount that they would get from what they
24  bought the drug for versus what Medicare would reimburse.
25      And she actually also asked, you know, were we a

Page 21

1  drug that had a high difference on that?  And we happened to
2  be a drug that didn't have a high difference.  It was, I
3  don't know, 5 to 10 or 4 to 8 or somewhere in that discount
4  range.  And she was well aware because she had attended
5  hearings on Capitol Hill where they had displays that talked
6  about different drugs that had different margins.
7      So it was important for us to explain to her two
8  things:  one, the difference of how our drug was reimbursed
9  in oncology, and, secondly, the fact that the discount that
10  we had was a small discount, and certainly at that time, you
11  know, oncologists needed some revenue to take care of
12  administering the cost of the drugs.
13      And that was, I would say, your Honor, one of
14  several conversations, not just with Nancy-Ann min DeParle,
15  but over the course of time, you know, Tom Scully, who was
16  another administrator --
17      THE COURT:  Did you talk personally to Tom Scully?
18      THE WITNESS:  Oh, numerous times, numerous times,
19  in both meetings, you know, on his cell phone.  You know,
20  you'd see him at meetings, so there were formal times that we
21  talked to him and laid things out, and there was informal
22  times.  Bob Neiman, who was a senior administrator up at CMS,
23  we had a lot of conversations about exactly what the
24  reimbursement for Procrit was because --
25      THE COURT:  And that would be, you said, in the

Page 22

1   1997-1998 time frame?
2          THE WITNESS:  Definitely with Bob Neiman.
3   Nancy-Ann min DeParle in that same time frame.
4          THE COURT:  The late '90s?
5          THE WITNESS:  It's like '96, '97, '98, that time
6   frame.  Tom Scully would have been later.
7   Q.   And so you say you had these discussions with CMS.
8   Isn't it true, ma'am, that you were writing your superiors at
9   the same time you now claim you had these discussions telling
10  your superiors that "It's fortunate for us that they do not
11  know what the cost is for different providers"?
12  A.   Are you looking at this memo?
13  Q.   No, I'm not, but do you recall informing your superiors
14  that it was fortunate for J & J, or Ortho, that CMS did not
15  know the cost for the providers of Procrit?
16  A.   If I recall correctly, what I --
17         THE COURT:  Where are you reading from, Mr. Berman?
18  Q.   Well, let's take a look at Exhibit 259.
19  A.   I'm sorry, 259?
20  Q.   Yes.
21         MR. BERMAN:  Before I do that, I move for admission
22  of the prior exhibit.
23         THE COURT:  What number?
24         MR. BERMAN:  What number was that?
25         THE COURT:  339?

Page 23

1          MR. BERMAN:  339.
2          (Exhibit 339 received in evidence.)
3   Q.   Now we're at 259, and is this a memo that you wrote or
4   an E-mail that you wrote?
5   A.   It is.
6   Q.   Okay, let's go through this.  At the very beginning you
7   say, "They initiated a pricing survey in 1994 that was
8   canceled midway, as there was a regulatory glitch that they
9   did not take into effect.  This was fortunate for us."  And
10  then in the second paragraph you talk about the pricing
11  survey is one of the ways the Secretary can set a price.
12  Then you go down to the paragraph second to the last to the
13  bottom:  "The only way that they could correct the current
14  system is to require an invoice be submitted with each
15  Medicare claim that is sent in.  This would be very
16  cumbersome, and the medical providers and the Medicare
17  carriers have rejected this (with 39 million recipients, the
18  number of claims is significant).  Right now they do not know
19  what the cost is for different providers."
20         Did you write that?
21  A.   I did write that.
22  Q.   And do you have -- I mean --
23  A.   But I guess without --
24  Q.   Excuse me, ma'am.
25  A.   I'm sorry.

Page 24

1   Q.   Do you have with respect to these meetings a meeting
2   with --
3          MR. CAVANAUGH:  Your Honor, the witness was
4   answering the question.
5          THE COURT:  No, no.  What's the next?  There was no
6   question.
7   Q.   Do you have with respect to these meetings -- I mean,
8   when you meet with Mr. Scully, he was head of the agency,
9   right?
10  A.   When I met with Mr. Scully, he was the CMS
11  administrator.
12  Q.   Okay, so he's the top dog?
13  A.   No.  That would be incorrect.
14  Q.   All right, but he's an important high-level official
15  there, correct?
16  A.   Yes.
17  Q.   And do you have any contemporaneous memo that you
18  created reporting to your superiors, as you are doing here,
19  reflecting your conversations with Mr. Scully in which
20  Mr. Scully said, "I know all about how much doctors are
21  acquiring Procrit at"?  Do you have any memo that you wrote?
22  A.   I don't have a memo that I wrote, but certainly in --
23  Q.   That's all I asked was what you wrote, ma'am.  Do you
24  have a memo that you wrote?
25  A.   I don't have a memo that I wrote, no.

Page 25

1   Q.   Do you have any contemporaneous notes that you took of
2   these meetings?
3   A.   Not that I'm aware of.
4   Q.   And are you aware that your lawyers in this case
5   subpoenaed CMS, CMS produced millions of documents, and you
6   have not seen any notes from CMS of your meetings with them,
7   have you?
8   A.   I haven't had -- I have not.
9   Q.   Nothing has been brought to your attention in that
10  regard?
11  A.   Not that I'm aware of.
12  Q.   And looking at that memo, let's turn to Page 2 for a
13  second, and could you take a look at the two last bullet
14  points there.
15         THE COURT:  Well, let me ask you this:  Did you
16  ever get concerned about the copayments that people were
17  making based on AWP, that that was a fictitious price?
18         THE WITNESS:  Absolutely.  And, as a matter of
19  fact, we were very concerned about that and did several
20  things to try to address that.  We had a very extensive
21  patient assistance program that would try to find if people
22  had supplemental insurance; for example, if somebody had a
23  spouse that had insurance from, you know, a past government
24  job or a railroad job so that it would pick up some of the
25  copay.  We also instituted a foundation that would help

Page 26

1    people with their copay if they --
2          THE COURT:  What year was that?
3          THE WITNESS:  1999, I would say, in that time frame
4    thereabouts.
5          THE COURT:  So you told every person who took this
6    that you'd pick up the copay if they couldn't afford it?
7          THE WITNESS:  We didn't tell them that because we
8    were told by the Office of the Inspector General that they
9    would not allow us to do that.  So what we did do is have it
10   set up through a third party that was set up as a 501c3
11   organization; that if people called an 800 number and they
12   could qualify, you know, independent of us, that if they
13   qualified from an income standpoint, didn't have the means,
14   and they appropriately needed the medication, that they would
15   have access to it, and the copay would be picked up, that's
16   correct.  Because one of the things that really concerned us
17   and we heard from providers is that by law, they had to bill
18   the patients 20 percent.  And so, you know, some providers
19   would be very aggressive in how they would try to collect
20   that 20 percent.  Some providers would just do their, you
21   know, whatever the requirement was, sending out a letter to
22   try to collect that 20 percent copay.  And that varied,
23   frankly, by the provider in terms of, you know, what type of
24   patient population that they handled, because each provider
25   is very different, just like we --

Page 27

1          THE COURT:  I think you've answered.
2          THE WITNESS:  Sure.
3          THE COURT:  So basically you knew some consumers
4    were paying, and otherwise the supplemental would pick it up,
5    and you were hoping this foundation would deal with some of
6    the justice issues?
7          THE WITNESS:  We knew that the -- that's correct.
8    We knew the physicians, I mean, they were being paid off of
9    AWP, so that if the people qualified, at least this would
10   possibly give them some assistance.
11   Q.  Well, and then you were also worried that if it came
12   out, if it was publicly disclosed that patients were paying
13   off of a fictitious AWP, that it would be a public relations
14   issue, correct?
15   A.  That's not correct.  I mean, the government system was
16   to pay off of AWP at the time, and CMS had multiple authority
17   to change that if they had done things like surveys to try to
18   correct that system.
19   Q.  Well, let's look at what you wrote.  Let's look at the
20   last bullet point.
21   A.  Which document are you referring to?
22   Q.  The same document.  "This will be a sensitive issue
23   because the physician is able to bill Medicare and the
24   patient off of AWP.  The patient's 20 percent copay is higher
25   than it would be if it was billed off acquisition cost

Page 28

1    (public relations issue)."
2          Those were your words that you wrote in this
3    E-mail, correct?
4    A.  That's correct.
5          THE COURT:  So where are we now, what exhibit?
6          MR. BERMAN:  This is Exhibit 259, your Honor.
7          THE COURT:  Oh, 259.
8          MR. BERMAN:  And we're on Page 843.  It's the
9    second page.
10   Q.  And this is an E-mail that you sent to Richard -- who is
11   that?  Moran, is that the name?  I can't read it off the
12   copy?
13   A.  It says Moran, M-o-r-a-n.
14   Q.  And was he a superior at OBI?
15   A.  He was a head of finance at OBI.
16          MR. BERMAN:  I move for admission of that exhibit.
17          MR. CAVANAUGH:  No objection.
18          (Exhibit 259 received in evidence.)
19   Q.  Now, during the 1990s, is it correct that Procrit was
20   not always considered the standard of care by doctors?
21   A.  I'm sorry, in what year?
22   Q.  During the 1990s.
23   A.  I think it depended on when you were talking about.
24   When it was first introduced, I would agree that it was not a
25   standard of care.  Late in the '90s, I would say that, based

Page 29

1    on the published literature, and if you talked to
2    oncologists, they would say it was more of the standard of
3    care.
4    Q.  And you say by the late 1990s, it was more of the
5    standard of care?
6    A.  In approximately that area.
7    Q.  Let's take a look then at Exhibit 979 in your binder,
8    ma'am.  Again, is this a document you authored?
9    A.  That's correct.
10   Q.  And you were sending it to an S. Waldon, a superior of
11   yours?
12   A.  Not superior of mine, but I was sending it to an S.
13   Waldon.
14   Q.  And this is dated '97, correct?
15   A.  February 19, 1997.
16          MR. BERMAN:  I move for admission of this.
17          MR. CAVANAUGH:  No objection
18          (Exhibit 979 received in evidence.)
19   Q.  And could you turn to the second page of the document,
20   please, and let's take a look at the second bullet point.  It
21   says here, "Lastly, oncology practices derive a windfall from
22   the use of chemotherapy agents and related
23   drugs/biologics treating toxicities in the office setting.
24   With this said, the difference in actual acquisition cost and
25   what is reimbursed based on AWP may impact the use of a

Page 30

1  product like Procrit.  This is obviously a threat for the use
2  of a product that may not always be considered standard of
3  care."
4          Those are your words, correct?
5  A.  That's correct.
6  Q.  And so at that point in time, you felt that Procrit was
7  not always considered by doctors the standard of care,
8  correct?
9  A.  I state that it may not always be standard of care in
10  1997, that's correct.
11  Q.  Now, did there also come a point in time where part of
12  your job was to keep tabs on what was going on in Congress
13  with respect to changes to the Medicare reimbursement system?
14  A.  That's correct.
15  Q.  And you kept tabs on events that were happening that may
16  affect the Medicare reimbursement system?
17  A.  I worked with our Washington office that would have been
18  looking at those issues, and I did keep track of them.
19  Q.  And in part of your job, did you consider what the
20  revenue impact would be to Ortho Biotech by virtue of changes
21  in the Medicare law, the reimbursement system?
22  A.  Part of my job would have been to look at any changes in
23  the reimbursement for drugs that Ortho Biotech had, which
24  certainly was in terms of the revenue or any changes in the
25  methodology that was used.

Page 31

1  Q.  And could you take a look, please, now at Exhibit 365.
2  Is this a memo that you coauthored, ma'am?
3  A.  It is.
4  Q.  In April, 1997?
5  A.  That's correct.
6  Q.  And by this time, were you aware that Congress was
7  considering changes to the way reimbursement worked in
8  Medicare Part B?
9  A.  Congress had been considering that for five, six, seven
10  years before that, so it was an ongoing discussion, so I was
11  aware of that.
12  Q.  And at this point there was some language proposed that
13  you were focusing on in this regard, correct?
14  A.  There had been language proposed before, and there was
15  language proposed here, that's correct.
16  Q.  And you were asked to quantify the dollar impact that
17  the current proposal might have on Ortho Biotech, correct?
18  A.  That is correct.
19  Q.  All right.  And you write in the first bullet point,
20  "Implementation of the HCFA language impacts the windfall
21  that the physician receives for the drug."
22          The HCFA language, what was that you were referring
23  to?
24  A.  I don't have that in front of me, so I don't know
25  specifically what that language was.

Page 32

1  Q.  Okay.
2          THE COURT:  Well, do you have a rough memory as to
3  what it was doing?
4          THE WITNESS:  In that time frame, your Honor, they
5  were looking at changing from the current AWP system, and
6  they had proposed --
7          THE COURT:  "They" meaning Congress?
8          THE WITNESS:  "They" meaning CMS and Congress, both
9  of them.  So whether it was using AWP but paying a less
10  percentage of it, or using something off of another
11  government pricing, like average manufacturer price, that had
12  been discussed; or using widely available market price, they
13  had discussed that.  One of the pricings that the
14  government was already aware of, for example, Federal Supply
15  Schedule, they knew those prices were available.  So at
16  different points they looked at different types of
17  methodology and if that would work for the system, so I just
18  don't know specifically which this one was referring to.
19  Q.  The second bullet point, you say, "It would be safe to
20  assume that a decrease or a loss of the windfall would impact
21  some physician's redescribing pattern for a drug."  And you
22  go on to write, "A change in the prescribing pattern of a
23  physician would in turn impact sales of the product."
24          Do you recall writing those words?
25  A.  I do.

Page 33

1  Q.  And do you recall that at this time what was happening
2  in Congress was that Congress was suggesting that there be a
3  reduction from AWP to AWP minus 5?
4  A.  That is correct.
5          MR. BERMAN:  I move for admission of 365.
6          THE COURT:  Allowed.
7          (Exhibit 365 received in evidence.)
8  Q.  At some point in time, did you become aware that
9  Congress had agreed that it would be AWP minus 5 and that AWP
10  minus 5 would go into effect in 1998?
11  A.  Congress had looked at that, and at the same time they
12  were looking at if they decreased the cost of the drugs,
13  meaning if they changed how much physicians were getting
14  reimbursed for the drugs, how they would also take care of
15  the other side of the equation and make sure physicians could
16  get paid for administering the drugs.
17  Q.  But my question to you is, at some point you became
18  aware that in January of '98, the new payment would be AWP
19  minus 5?
20  A.  Absolutely.
21  Q.  Okay.  And prior to that time, before the new AWP minus
22  5 went into effect, were you part of the discussion at Ortho
23  Biotech about increasing the price of Procrit?
24  A.  I can't -- in a specific date, I don't recall, but, you
25  know, certainly in different periods of time in this

Page 38

1  Gary Ready to a Carol Webb?  Who was Carol Webb at that time?
2  A.   Carol Webb at that time I believe was the company
3  president.
4  Q.   President of Ortho Biotech?
5  A.   Ortho Biotech.
6  Q.   And in the fourth paragraph, it says, "By implementing
7  our recommended 1.7 price increase on Procrit's 10s and 20s,
8  we will reach parity with the established list price of
9  Epogen but not create a higher one.  We feel creating a
10 higher list price could raise undue attention and possibly
11 trigger a drug survey by HCFA because of the difference in
12 list price for the two identical drugs, Procrit and Epogen."
13 Do you see that?
14 A.   I do.
15 Q.   And does it refresh your recollection that ultimately it
16 was a 1.7 price increase that was adopted by the company?
17 A.   That appears to be correct.
18 Q.   Okay.  And now if we could take a look at Exhibit 348,
19 please.  And you remember I asked you whether you recalled
20 that the company had taken a price increase, a list price
21 increase of 3.5 percent in 1997?  Does this refresh your
22 recollection in that regard?
23 A.   It's listed as a price increase in 1997.
24 Q.   Okay, so I'm correct then that between the price
25 increases in '97, the 3.5, and 1.7 percent, by the time the

Page 39

1  AWP change went into effect in '98 of AWP minus 5, the
2  company had already increased its price by more than
3  5 percent?
4  A.   They had not taken a price increase, I believe, six
5  years before, and then they did take those two price
6  increases, that's correct.
7  Q.   One of the concerns that the company had and that you
8  had, while Congress was considering whether it should be AWP
9  minus 5, was that the company didn't want it to be a greater
10 discount than AWP minus 5, correct?
11 A.   I wouldn't agree exactly with that context.  We had a
12 concern, I had a concern, that if they changed reimbursement
13 to, whether it was a different system than AWP, 85 percent of
14 AWP or a different system, that they made sure that they also
15 changed the administration costs for drugs so that cancer
16 patients could still get them in their offices.  So that if
17 you change one side of the equation, you needed to make sure
18 you got both sides of the equation correct so that people who
19 needed drugs appropriately got them.  So that was definitely
20 a concern.
21       THE COURT:  Well, that's happened now, right?
22       THE WITNESS:  It has, your Honor.  When they
23 finally, finally got around to changing it to the average
24 sales price or ASP methodology in the MMA in 2003, what they
25 did, their goal -- and Tom Scully was behind this -- was to

Page 40

1  try to pay for the drugs closer to the cost, and at the same
2  time make sure that if you were a doc, you could give the
3  drugs in your office.
4        THE COURT:  And still it had savings to Medicare,
5  right?
6        THE WITNESS:  Well, I believe so.  I do believe so.
7        THE COURT:  Because before you described it as a
8  windfall, right?
9        THE WITNESS:  Well, when I say windfall, your
10 Honor, I think of windfall as anything above what you
11 actually paid for something, no different than I think of a
12 shortfall.
13       THE COURT:  Right, but what you were trying to
14 portray is that they were getting more than what would be the
15 administration fee subsidization?
16       THE WITNESS:  Actually what I think, your Honor,
17 with all due respect, what I meant was that they were getting
18 more than what they paid for the drug.  And just like there
19 would be a shortfall in the administration, I mean, for
20 example, a drug like Procrit, they were getting an
21 administration fee on an average of about $4.41 cents going
22 back to, say, you know, late 1998.  When they changed the
23 reimbursement for drugs, that went up: I think it was 400 and
24 something percent to about $24.
25       So when I think of windfall, I think of that in a

Page 41

1  drug case is anything in the margin from what you pay
2  versus -- what you bought the drug for versus what you got
3  paid, no difference in a shortfall of some of the things that
4  Medicare didn't pay for, like swabs or nursing time or
5  tubing.
6        THE COURT:  When all is said today what happens is,
7  they increase the administration cost, decrease the drug
8  cost, but it still comes out of the savings for the
9  government?
10       THE WITNESS:  I believe from the government data,
11 it does, yes.
12 Q.   Okay, could you take a look now at 318, please.  Is this
13 a memo that you wrote?
14 A.   Yes, it is, an E-mail.
15 Q.   An E-mail, I'm sorry.  And it's dated August 24, 1998?
16 A.   That's correct.
17 Q.   In the third paragraph you write --
18       THE COURT:  Where are we now?
19       MR. BERMAN:  318, your Honor.
20 Q.   You write, "There will be an intense focus on changing
21 the reimbursement for Medicare in 1998 to further cut AWP
22 minus 5 to AWP minus 10 or 15 or move to pricing
23 demonstration projects, FSS pricing or the like.  While the
24 worst-case scenario will probably not occur, you could be
25 looking at AWP minus 10 percent (we had a major struggle in

Page 42

1  1997 to hold at AWP minus 5 percent)."  Do you see that?
2  A.  I do.
3  Q.  Okay, and the "we" is Ortho Biotech?
4  A.  I think the "we" is just collectively that anybody who
5  was interested, ASCO, ACCC, any of the stakeholders who,
6  again, knew that AWP was going to be reformed but wanted to
7  insure you just didn't reform one side of the equation.
8  Q.  Well, your memo doesn't say anything about the other
9  side of the equation.  It just talks about holding at AWP
10  minus 5, correct?
11  A.  That's true, because I think most people who understood
12  the reimbursement -- you know, the issue was talked about so
13  much of the need for reform that I think most people knew
14  that, but it doesn't say that.
15  Q.  Now, from time to time did you engage consultants while
16  you were at Ortho Biotech to help you strategize how to
17  market and sell Procrit?
18  A.  Ortho Biotech did engage consultants to advise on
19  different business strategies.
20        MR. BERMAN:  And before we leave that exhibit, I
21  move for admission of 334.
22        THE COURT:  All right.
23        MR. BERMAN:  I'm sorry.  I have the wrong exhibit.
24        THE COURT:  You mean 318?
25        MR. BERMAN:  318.

Page 43

1        (Exhibit 318 received in evidence.)
2  Q.  And now let's take a look at 334, please.  Have you seen
3  this before, ma'am?
4  A.  You said Exhibit 334?
5  Q.  334.
6  A.  Yes, I have.
7  Q.  It's entitled "Strategies for Shaping the Reimbursement
8  Environment," and in the second page it indicates that you
9  were one of the people interviewed by this team?
10  A.  That's correct.
11  Q.  And do you recall seeing this before?
12  A.  I do.
13  Q.  All right, let's take a look at Page 6781.  And this was
14  a report prepared by McKinsey, right?
15  A.  Yes, that's correct.
16  Q.  And it's dated 1999, and remember I asked you whether
17  Procrit was considered to be the standard of care in the
18  '90s?
19  A.  Uh-huh.
20  Q.  And do you recall your consultant reporting to you in
21  1999, as indicated in the first bullet, that "Procrit has not
22  yet been broadly established as the standard of care"?  Do
23  you recall that?
24  A.  I see that bullet here, yes.
25  Q.  Okay.  And do you recall being advised that "Physician

Page 44

1  economics, while currently strong, are likely to deteriorate,
2  possibly creating a disincentive for physicians to administer
3  Procrit"?  Do you recall being advised of that?
4  A.  I see that in the McKinsey document, yes.
5  Q.  And you also see that one of the range of reimbursement
6  pressures that McKinsey was advising with respect to Procrit
7  sales growth was a possible AWP reduction?
8  A.  I see that.
9  Q.  Do you recall being advised of that?
10  A.  I do recall that.
11  Q.  Okay.  Now let's take a look at 6789, please.  In the
12  first heading there, it says, "Today, physicians have
13  significant economic incentives to prescribe supportive care
14  drugs such as Procrit, due to revenue and profits from
15  stocking and administering."
16        Do you recall receiving that advice?
17  A.  I recall that being in the McKinsey document, correct.
18  Q.  And in the next page there's a summary of interview
19  findings with oncologists.  Do you see that?
20  A.  I do.
21  Q.  Do you recall being advised, for example, that "For
22  private practitioners, stocking and administering Procrit
23  yield significant profit opportunities"?
24  A.  I recall McKinsey putting that in their report, yes.
25  Q.  And that, for example, there's a quote there about one

Page 45

1  practice making $6,000 to $8,000 per month on Procrit?
2  A.  Yes, I see that.
3  Q.  And at the very last one, it says, "My Medicare
4  reimbursement is excellent because I automatically get
5  80 percent from Medicare, and I typically get most of my
6  20 percent in copays."  Do you see that?
7  A.  I do see that.
8  Q.  And do you recall receiving that advice?
9  A.  I wouldn't call it "advice."  I recall seeing that from
10  McKinsey in their report, yes.
11        MR. BERMAN:  I move for admission of that, your
12  Honor.
13        THE COURT:  Yes.
14        (Exhibit 334 received in evidence.)
15  Q.  Now let's take a look at my last exhibit, which I'm sure
16  you'll be pleased to hear, Exhibit 346.
17  A.  Okay.
18  Q.  And this is entitled "Procrit Medicare Review,
19  February 8, 1999."  Have you seen this before?
20  A.  I have.
21  Q.  Okay.  And if you could turn to the Page 0861, please.
22  A.  I have that.
23  Q.  And it says "Physician Profit Per Course of EPO
24  Therapy," and it lists at the top "Oncology patient, 20 weeks
25  EPO therapy, 40,000 unit weekly dosing."  So was the typical

1  course for a patient receiving this drug 18 to 20 weeks?
2  A.  It varied from that to nine -- I've heard that amount.
3  I've heard nine to twelve, so --
4  Q.  Okay.  And then there's kind of an economic profile here
5  of AWP minus 5, that if the copay was not collected, the
6  doctor would lose $304 on the drug?
7  A.  I see that.
8  Q.  Right?  And if he collects 50 percent, he gets $608 from
9  that patient?
10  A.  Uh-huh.
11  Q.  And if he collects all the copay, he makes $1,520,
12  correct?
13  A.  That's what it lists, yes.
14        THE COURT:  From each patient?
15  Q.  It says "oncology patient" in the singular at the top.
16  Do you see that?
17  A.  Yes, I'm just looking at that.
18        (Witness examining document.)
19  A.  It says "per course," so it would be per patient.
20  Q.  And that was generally consistent with your
21  understanding of the economics to an oncologist administering
22  Procrit, correct?
23  A.  Meaning that if they collected their copay?
24  Q.  Yes.
25  A.  For the drug costs, absolutely, although this would just

1  be for the drug part and doesn't include administration.
2  Q.  I understand that.
3        MR. BERMAN:  That's all I have.  Thank you, ma'am.
4        THE COURT:  And your theory as to why this wasn't
5  troubling to you is that mostly the third-party payors would
6  pick it up?
7        THE WITNESS:  Oh, no.  Obviously, your Honor, it
8  was troubling.  My understanding of it was that it had been
9  debated so long by CMS and HCFA, that even though they knew
10  it was a problem, that they knew it was a problem that they
11  should correct, that because of lots of different reasons,
12  politics probably being one of them, that they didn't move to
13  change that AWP reform system before they did.
14        THE COURT:  Well, you were lobbying to have them
15  not change it, right?
16        THE WITNESS:  No.  Actually, we were one of the --
17  our CEO was one of the first people reported in the
18  Pink Sheet to say that they should change it.  Our only
19  concern was that when they changed the AWP, we didn't want
20  them to just reduce, say, the drug cost to Federal Supply
21  Schedule and not be able to also give the right amount of
22  administration fees, because if that happened, people would
23  have to go to hospitals.
24        THE COURT:  Do you have any document that shows
25  that you were worried that it would change?

1        THE WITNESS:  We were worried that they would
2  change just the drug reimbursement and not look at the
3  administration, absolutely.
4        THE COURT:  Is this thick binder all different
5  documents or the same document?  We're running out of office
6  space.
7        (Laughter.)
8        MR. SCHAU:  There are about six or seven
9  defendants' exhibits in this.  One of them is a large
10  document, and we could probably negotiate on the pages, your
11  Honor.
12        THE COURT:  I promise you I will not read anything
13  except what -- I'm sitting here doing yellow stickies and
14  underlines.  I'm just not going to sit and read through it.
15        MR. SCHAU:  Okay.  I plan to call your attention to
16  it.
17        THE COURT:  Okay.
18  CROSS-EXAMINATION BY MR. SCHAU:
19  Q.  Good morning, Ms. Dooley.
20  A.  Good morning.
21  Q.  We established, I think, earlier that you're an employee
22  of Johnson & Johnson?
23  A.  That's correct.
24  Q.  Can you tell us a little bit about your employment
25  history.

1  A.  Sure.  I've been an employee of J & J for about
2  seventeen years in clinical research, regulatory, various
3  positions, and then have been down in the Washington office
4  for the past six years.
5  Q.  And prior to Johnson & Johnson, who did you work for?
6  A.  Prior to Johnson & Johnson, I was a pediatric oncology
7  nurse, and I worked at the University of Virginia Medical
8  Center, and then went back to grad school down there.
9  Q.  Now, Mr. Berman asked you what Procrit is, and you said
10  it's a drug for anemia, but can you tell the Judge just a
11  little bit about the kinds of anemia that Procrit is used to
12  treat.
13  A.  Sure.  Procrit is used to treat anemia, your Honor, in
14  several different areas:  oncology patients that have cancer
15  chemotherapy, HIV patients.  People who are going to have
16  surgery, they could be treated ahead of time so that they
17  wouldn't have to get transfusions and have the risks
18  associated with that; and also in predialysis patients, so
19  people who have chronic kidney disease who are not on
20  dialysis yet.
21  Q.  And is this the kind of anemia we used to see on
22  television commercials for Geritol?
23        THE COURT:  For what?
24        MR. SCHAU:  Geritol.  I'm dating myself.
25        (Laughter.)

1  A.  I was aware of that.
2      MR. SCHAU:  Your Honor, I just have some
3  housekeeping.  I think we've reached agreement.  I had
4  proposed to admit 1046, which you indicated was a rather
5  large document.  What I would propose to do subject to your
6  approval would be that we admit that document but put in your
7  notebook only the pages referenced in that document.
8      THE COURT:  Which one is this now?
9      MR. SCHAU:  Office of Technology Assessment report.
10     THE COURT:  At this point it's not worth the
11  effort.  We'll just admit them.  I'm just going to read the
12  pages you gave me.
13     MR. SCHAU:  Understood.  And then there were a
14  handful -- I've cut my examination short.  There were a
15  handful of exhibits that were referenced in the direct
16  testimony that we provided to you in writing that we did not
17  review today on the stand, and I would propose --
18     THE COURT:  Were they referenced in the direct?
19     MR. SCHAU:  In the written direct, yes.  They were
20  attached to the written direct, and therefore.
21     THE COURT:  No objection?
22     MR. BERMAN:  No objection.
23     MR. SCHAU:  And just so your Honor knows, that
24  would be Defense Exhibits 1059, 1060, 2774, 2775, 2776 and
25  2777.  And I believe Mr. Berman wishes to propose some that I

1  have no objection to.
2      MR. BERMAN:  These were exhibits that were referred
3  to when I was examining her:  263, 348 and 346.
4              REDIRECT EXAMINATION
5  BY MR. BERMAN:
6  Q.  Good afternoon.
7  A.  Hi.
8      MR. BERMAN:  Could you put up Defense Exhibit 1098,
9  page 14, please?
10     THE COURT:  Well, actually, what are you doing now,
11  redirect?
12     MR. BERMAN:  Yes.
13     THE COURT:  Nobody else has any questions?
14     (No response)
15     MR. BERMAN:  I'll be very brief.
16  BY MR. BERMAN:
17  Q.  Let's blow up the section that you were asked about.
18     You testified that from this report, Congress was
19  aware of the discounts off of AWP for the drug your company
20  manufactures, correct?
21  A.  Yes.  Which report was this from?
22  Q.  This is the 2001 GAO report.
23  A.  Okay.
24  Q.  And it says here:  "The average widely available
25  discount from AWP for epoeitin alpha is 15.2 percent,"

1  correct?
2  A.  That's correct.
3  Q.  That wasn't the real discount available to doctors, was
4  it?
5  A.  I can only tell you what's on this report.
6  Q.  Okay.  Well, let's break it down.
7      You testified earlier in response to my direct exam
8  that you understood that doctors always purchased Procrit
9  below WAC, correct?
10  A.  I testified off of -- below list is what I think I said.
11  Q.  Okay.  And you also testified in response to either a
12  question from me or her Honor that you understood there was a
13  spread between average wholesale price and list price of 20
14  percent?
15  A.  I said that it was list plus 20 percent, that's correct.
16  Q.  Okay.  So the real average available discount to doctors
17  was AWP minus the 20 percent, then minus the actual rebates
18  being offered by your company, which would put it at anywhere
19  between 25 and 33 percent, correct?
20  A.  The discount that I referred to was the discount off of
21  the list price.
22  Q.  Right, and those were five to ten percent.
23  A.  Correct.
24  Q.  Correct.  So if you take the five to ten percent off of
25  list price and you add the additional spread off of AWP

1  versus list price of 20 percent, you're at 30 to 35 percent,
2  correct?
3      MR. SCHAU:  Objection, your Honor.  He's confusing
4  the math.
5  A.  Yeah.
6      THE COURT:  Overruled.  So tell me, what was the
7  real discount in the marketplace off of AWP?
8      THE WITNESS:  I'm aware of the discount off of list
9  price that we offered would have been five to ten percent.
10     THE COURT:  That's off of --
11     THE WITNESS:  List.
12     THE COURT:  Right.  The difference between list and
13  AWP is what?
14     THE WITNESS:  For us, for Procrit, it was list plus
15  20 percent.
16     THE COURT:  So why isn't that what he just said?
17     THE WITNESS:  I don't -- I don't think that's
18  correct, or maybe I'm confused on it.
19  BY MR. BERMAN:
20  Q.  I think it is and I'll leave it there.
21     And you also -- last question -- said that nothing
22  that you ever heard from any meeting that you've attended
23  with any officials from CMS led you to believe that your AWP
24  was supposed to be a real average price, correct?
25  A.  That's correct.

# Exhibit 9



**Memorandum**

## ORTHO BIOTECH

To:     T. Amick                                                Date:   August 6, 1996

From:   C. Dooley                                              cc:     J. Slurzberg

Subject:   Reimbursement Considerations for Spillover Planning

Jo Ellen and I outlined some relevant reimbursement issues which will serve in providing background for spillover planning.

### REIMBURSEMENT ISSUES FOR EPO - HISTORICAL PERSPECTIVE

- In the fall of 1993, HCFA changed the reimbursement rate for Eppetin alfa <u>from $11.00/1,000u to $10.00/1,000u</u> across all indications . Several things contributed to this change in price including an informal survey and politics around the ESRD program in California.  Prior to this time, the reimbursement was set by the government at $11.00/1,000u strictly based on the ESRD.  Other than EPO, the government has not historically set any prices for a pharmaceutical or biologic; rather, the reimbursement rate has been based on AWP.  However, the government does have the right to change the reimbursement for any product  by an arbitrary pricing decision or by a survey  ( eg. IOLAB, LifeScan and ESRD).  Medicare does not pay for self administered drugs, except by exception (oral chemotherapies) as the initial intent of Medicare was that it would not provide drug coverage, but focus on acute illness.   Drugs make up approximately 4% of the Medicare budget with growth factors making up 1% of this segment.  NEUPOGEN does not hit the radar screen for pricing impact.  EPO on the other hand, hits the radar screen because of high usage in the ESRD program and the fact that it is reimbursed at 100% in this government program .

### REIMBURSEMENT ISSUES FOR NEUPOGEN

- NEUPOGEN is not reimbursed through a government carve out, but rather reimbursed based on standard AWP.  There is no mandated program under HCFA for NEUPOGEN.  It is reimbursed as a "traditional injectable".



- NEUPOGEN is sold to physicians by supply houses through the same mechanisms that Ortho Biotech provides PROCRIT.  Amgen has the flexibility to raise the price of Neupogen as it is not government controlled.  A year ago, they raised their price approximately 1.0%. With a price increase, they have the flexibility to change the discounts offered to their physicians.  A factor in the significant discount offered with NEUPOGEN may be an element of compensation for the hassle of a 7 day daily administration.

- NEUPOGEN is reimbursed per total vial as opposed to per <u>unit</u> based reimbursement.   With the recent price increase from $148.00 to $152.30 for a 300mcg, physicians would be reimbursed at 80% of AWP ($152.30) or approximately $121.84. Therefore, they are making at least $26.30/vial or more if they are at a lower contracted price.

EXHIBIT _1 A_
Dooley
Jan. 13, 2006

ORTHO 00989112
Confidential - Attorneys Only

**Plaintiffs' Exhibit**
**339**
**01-12257-PBS**

- Some oncology products and chemotherapies are reimbursed per vial, others per unit. For example, Zofran is billed on a per unit basis vs Leustatin which is reimbursed per vial. Determination of whether a drug is billed per unit or per vial is based on what is usual and customary and the indication for the drug.

## REIMBURSEMENT OF EPO
- To a payer, EPO equals EPO. This has significant implications for PROCRIT.
  - The Federal Government mandates the reimbursement rate for EPO under the ESRD Program - CONGRESS MANDATES EPO PAYMENT RATES
  - The cost per thousand units of EPO was lowered from $11.00 to $10.00 under OBRA '93 for ESRD. This was the result of:
    - A need to cost shift to cover the increased payment of immunosuppressive agents for transplant patients;
    - Survey of dialysis centers which reflected a lower acquisition; and
    - Politics
  - Amgen is essentially handcuffed by the government regarding changing the price of EPOGEN. This has implications for PROCRIT when it comes to raising price.
  - It is important to note that EPO IS CURRENTLY BEING REIMBURSED AT A PREMIUM RATE for non dialysis use at AWP, compared to the average acquisition cost.

## HOW IS EPOGEN REIMBURSED?

- EPOGEN is reimbursed under the ESRD Program:
  - In 1989, Amgen successfully lobbied for EPO to be self-administered and reimbursed at 100% rather than be included in the composite rate for dialysis treatment. It is reimbursed at $10.00 /1,000u by law through the ESRD program. A separate reimbursement carve out program for erythropoietin for patients with a specified level of anemia was created. OBRA'90 extended coverage of self-administered erythropoietin for home dialysis patients. It is estimated that about 90% of Medicare ESRD patients use erythropoietin. As previously noted, THE PAYMENT FOR ERYTHROPOIETIN IS MADE ON A PER UNIT BASIS, SET BY LAW AT $10.00/1,000u. It should be noted that the estimates for expenditures for erythropoietin under Medicare in 1994 were $736 million which is approximately $5600 per patient based on average use.
  - Attempts to bundle erythropoietin into the composite rate have been unsuccessful.

## HOW IS PROCRIT REIMBURSED?

- PROCRIT Reimbursement
  - Once again, from the government perspective, EPO is EPO is EPO. For our purpose, the government sees OBI as responsible for Epoetin alfa indicated for non-ESRD uses.

    To obtain the current reimbursement rate based on AWP of $11.40/10,000u for non-dialysis patients, we lobbied HCFA to differentiate the ESRD patient from the non-dialysis patient. The majority of pre-dialysis is wrapped into the ESRD (any state that currently uses the Q99 HCPCS are reimbursed at $10.00/1,000u)



ORTHO 00989133
Confidential - Attorneys Only

- Both ESRD and non-dialysis are paid for under Part B funds (treasury vs. Part A which comes out of the CBO)



- If a patient has an insurance plan that allows for supply and outpatient administration, either through home health care agency or a retail plan, the physician office will send the patient through these vehicles to access PROCRIT.

- There is no concern of driving the patient currently in the physician office to the retail setting as these are the Medicare patient or a private patient plan that fashions after Medicare, requiring that the drug be administered incident to a physician's service.

- Since we are not labeled for self administration, some insurers are hesitant to allow for self-administration due to liability.  We are seeing this in some of the managed care plans and in Medicare Managed Care.

- Non-ESRD use of Epoetin alfa is reimbursed at 80% of the AWP allowable amount with beneficiaries being responsible for the remaining 20%.
  - A drug survey is imminent and would show that no physicians are paying AWP in the market place.  A survey would look at average acquisition price and associated overhead costs.  If there was a significant difference between AWP and acquisition price (which there would be), the reimbursement rate would be lowered.  Again reimbursement rates can be lowered by survey or an arbitrary pricing decision.

- Elimination of some of our commercial rebates, has resulted in physicians paying more for our drug with an increase in business being driven through contract prices.



- Any change in our current discount rates, resulting in a higher acquisition prices, actually protects OBI in a survey.  HOWEVER, IT IS KEY TO NOTE THAT HCFA WOULD NOT RAISE THE REIMBURSEMENT RATE. This would result in our customers paying more for their drug.

## WHAT WOULD HAPPEN IF WE RAISED THE PRICE OF PROCRIT?

- An increase in price of PROCRIT would drive the payer to EPOGEN, who cannot increase their price.

- The increase would be passed onto the payers

- There would be a high probability of triggering a survey because there would then be two prices in the marketplace for the same product.  The two products are currently priced the same BUT reimbursed differently BECAUSE a survey was done of dialysis centers which determined they purchased EPOGEN at lower than AWP resulting in a decrease reimbursement rate from $12 to $10/1,000u.

## IMPLICATIONS FOR THE SURGERY INDICATION:

- 70% of the market is Medicare

ORTHO 00989136
Confidential - Attorneys Only

MDL-OBI00061805

- We need to ensure appropriate reimbursement for our product if physicians are purchasing at a higher rate



- Orthopedic surgeons may send their patients to the hospital for injections; if we do not take ownership of this market in the hospital setting and grow the non-dialysis market , Amgen wins our indication.

There will need to be assurance that physicians supply and administer PROCRIT and bill out of their office will be reimbursed for the cost of the drug.

## RISK ASSESSMENT

- Based on the fact that physicians are reimbursed at an average of $11.40/1,000 under Medicare and EPO is likely to be a target in a drug survey which will demonstrate lower AAC, it is unlikely that this reimbursement rate WILL EVER INCREASE.

- Medicare does not pay for drugs; PROCRIT as an injectable is not labeled for self administered.

- Once patients have moved into Medicare managed care, the cost of care is expected to be reduced. Currently, Medicare Managed Care Organizations are reimbursed at 95% of the AAPCC (i.e. the amount the government pays per month). With time, this rate will be decreased; AAPCC rates will be adjusted and therefore there will be no room to increase price as the majority of care will be at a contracted price.



- Amgen hospital customers who offer a 12% discount.
    i.e. 12% of $100.00 AWP= 12.00 OFF A VIAL
    VIAL 88.00
    EQUALS 8.80 PER 1,000/u
    THEY ARE REIMBURSED AT 10.00/1,000u
    EQUALS +$1.20 per 1000/u

BUT, the hospitals are actually receiving 100% payment and there is no bad debt associated with the EPO use in the dialysis indication.

## RECOMMENDATIONS:

- Growth in the non-dialysis market is dependent on increasing the untapped potential in the non-dialysis market. We need to grow our TOTAL PORTION WITHIN THE TOTAL MARKET WHILE SIMULTANEOUSLY GROWING THE MARKET.

- The long term non-dialysis potential for EPO is larger than dialysis portion of the business based on new indications in growing patients population, i.e. the elderly as opposed to dialysis, where the government is looking at ways to better control the patient population as evidenced by the ESRD demonstration project.   ESRD is growing in lower socioeconomic areas.

- With the movement of Medicaid patients into managed care, there is a movement to implement preventive medicine which will keep these patients off of dialysis longer . Dialysis is a limited

ORTHO 00989135
Confidential - Attorneys Only

market with no room for new indications; therefore, it can only grow proportionate to its existing markets.

· The potential implementation of Medicare rebates may introduce a Medicare best price consideration.

· Eliminating the current discount from our 10,000u and 20,000u vials would obviously increase the cost to our payers and has the potential to trigger a survey for a price comparison between AWP and AAC.

## IMPACT OF REDUCING DISCOUNT

The goal is to keep the physician "whole" i.e. whole on the 80% as there is a fear that they will not be reimbursed on the remaining 20%.

Therefore discount cannot be reduced more than a percentage that would allow the physician to break even with the reimbursement rate of 80% of $11.40/10,000u

For physician's offices:
$95 for 10,000u
8% discount = $7.60 or $87.40/10,000u or $8.74/1,000u
reimbursed at 80% of AWP ($114) or $91.20 (or $9.12/1,000u)

If we gave no discount to physician offices,  and they purchased at list price of $95/vial , they would still be reimbursed by the government at 80% of AWP which is equal to $91.20.  Physicians would be at risk for bad debt for patients without supplemental insurance to cover the remaining 20%. 76% of patients  have supplemental coverage; 15% of Medicare  recipients have no supplemental insurance, but have a large impact on physician use due to failure to pay and complaints about out-of-pocket expenses. Participating Medicare physicians, cannot bill more than the Medicare allowable charge.

i.e.
    $95.00 for 10,000/u
    5% discount = $4.75
    AAC $90.25
    (reimbursed at 80% of AWP ($114) or $91.20

The nominal for the physicians to capture their full acquisition costs discount to equal $95.00, would need to be about 5.0% which is $4.75 or $91.20/10,000/u .

ORTHO 00989136
Confidential - Attorneys Only

# Exhibit 10

*files - newburrment*

**ORTHO BIOTECH**

*CONFIDENTIAL*

**Memorandum**

To:     G. Reedy

From:   C. Dooley

Date:   December 2, 1997

cc:     B. Pearson

Subject: <u>Implications and Ramifications of Price Increase over Parity with Amgen's 10s and 20s</u>
<u>PROCRIT – Attorney Client Privilege</u>

This memo addresses 2 issues:
1. Implications of exceeding 1.8% price increase resulting in OBI not being on parity with Amgen's 10s and 20s and the potential implications this would have for HCFA and other payers
2. Implications of the Congressional mandate in ESRD stipulating payment of $10.00/ 1,000 units for ESRD patients and the ramifications in the oncology arena of a change in AWP

<u>Issue:</u>
- High use of EPO in ESRD makes EPO a visible expenditure for HCFA
- EPO is currently reimbursed at different rates by the federal government for different indications – same drug different reimbursement rate
- Epoetin alfa EQUAL Epoetin alfa to the government
- Currently OBI is reimbursed at a premium rate – Amgen is essentially "handcuffed" by the government regarding increasing EPO price.
- Non-dialysis is reimbursed at $12.00 / 1,000 units; ESRD is reimbursed at $10.00 / 1,000 units

<u>Implications for Increase over Parity</u>
- **The mandated price set by the Congressional mandate for ESRD results in market sensitive to price change. (HCFA is the major payer for ESRD.)**
- Change in list price could trigger a drug survey by HCFA.
  [HCFA reserves the right to pay the average acquisition cost established by surveying the market. (Federal government can lower the price by one of two means: 1) Congressional mandate to decrease price; or 2) application of Inherent Reasonable Clause – e.g. LifeScan.]
- **You may have a pricing survey anyway, but raising red flags could trigger it earlier.**
  (There is already sensitivity on Medicare drug pricing based on OIG report in the spring of 1997 which outlined the money the federal government spends on the same drug under the Medicare program vs the Medicaid program and articles that have appeared in Baron's (6/97 and 11/97) and the *Pink Sheets.*
- **Consequence of pricing survey could be acquisition, FSS or ESRD reimbursement rate in non-dialysis.**



EXHIBIT 3A
Dooley
Jan. 13, 2006

**Plaintiffs' Exhibit**
**262**
01-12257-PBS

HIGHLY CONFIDENTIAL

<u>Private Payers</u>

- Private fee-for-service and discounted fee-for-service often mimic the Medicare payment strategy. Pharmaceuticals are generally reimbursed based on AWP.
- Some private plans and managed care plans allow or prefer that PROCRIT be accessed through a retail pharmacy channel of distribution. Prescription co-pays may apply.

<u>Background on ESRD Payment</u>

- Federal Government mandates the reimbursement rate for EPO under the ESRD program – Congressional mandate sets EPO payment rates in the dialysis market.
- The Congressional mandate is a carve out that stipulates guidelines for coverage, payment, and intervention points for use of EPO in ESRD.
- The reimbursement rate per thousand units of EPO in ESRD was lowered from $11.00 to $10.00 under OBRA '93 for ESRD.
  - This was a cost shift to cover the increased payment of immunosuppressive agents for transplant patients.
  - It was determined that providers could sustain lower reimbursement rate for Epoetin alfa because it more accurately reflected their purchase price. Survey of dialysis center reflected the lower acquisition cost.

HIGHLY CONFIDENTIAL

# Exhibit 11

CAROL WEBB      Fax:908-526-4365      Dec. 8.'97   15:46   P.01/02

# ORTHO BIOTECH

**Fax Cover Sheet**

700 U.S. Highway 202
P.O. Box 670
Raritan, NJ 08869-0670

DEC 8 1997

| | | | |
|---|---|---|---|
| **Date:** | December 8, 1997 | **Pages:** | 2 Total |
| **To:** | Peter T. Tattle | **From:** | Carol Webb |
| **Company:** | J&J Corporate | **Company:** | Ortho Biotech Inc. |
| **Fax #:** | 732-524-2178 | **Fax #:** | 908-526-4365 |
| **Telephone #:** | | **Telephone #:** | 908-704-5232 |

**Comments:**   Peter,

I agree with this recommendation.

Carol

cc:  E. Strobino (732) 828-3063
R. Gatens (732) 846-8667



HIGHLY CONFIDENTIAL

**Plaintiffs' Exhibit**
**263**
**01-12257-PBS**

MDL-OMP0049638

CAROL WEBB          Fax:908-526-4365          Dec  8 '97  15:46   P.02/02

CC: Strobino
Carlos

**Memorandum**

# ORTHO BIOTECH

| | | | |
|---|---|---|---|
| **To:** | Carol Webb | **Date:** | December 3, 1997 |
| **From:** | Gary Reedy | **cc:** | T. Amick |
| | | | C. Dooley |
| | | | J. Hopwood |
| | | | M. Klein |
| | | | L. Lonczak |
| | | | W. Pearson |

*Peter, I agree with this recommendation. Carol 12/8/97*

**Subject:**   PROCRIT Pricing Recommendation - Revised

**CONFIDENTIAL**

We have discussed the possibility of pushing PROCRIT pricing above the current established list price and recommend we do not take this action for the following reasons.

There is high uncertainty in the marketplace regarding reimbursement for epoetin alfa. The government limits the reimbursement for ESRD at $10.00/1,000 unit regardless of the list price. The government pays for approximately 95% of all ESRD patients. HCFA conducted a pricing survey last year in ESRD and is considering lowering the reimbursement to $9.00 per 1,000 units. The usage and payment of epoetin alfa is high on the government's radar screen.

The government presently pays for approximately 50-60% of all PROCRIT usage. PROCRIT is presently reimbursed at a premium ($12.00/1,000 units) predicated on the list price established in the market. Legislation was passed this year, which effective 1/1/98 will lower the reimbursement rate to AWP less five percent. The government is very aware of the AWP pricing on epoetin alfa and there is great sensitivity around this issue (i.e., companies elevating AWP prices to incent physicians to use more product due to greater reimbursement potential).

By implementing our recommended 1.7% price increase on PROCRIT's 10's and 20's, we will reach parity with the established list price of Epogen but not create a higher one. We feel creating a higher list price could raise undue attention and possibly trigger a drug survey by HCFA because of the difference in list price for the two identical drugs, PROCRIT and Epogen.

Our strategy is to create a stable pricing/reimbursement environment for PROCRIT and focus on increasing top line revenues and net profit by accelerating market penetration and continuing to reduce/eliminate our rebate/discount structure.

Please let me know if you need additional information.

97gmr95.doc

HIGHLY CONFIDENTIAL

MDL-OMP0049639

# Exhibit 12

Page 1

HIGHLY CONFIDENTIAL

SUBJECT TO PROTECTIVE ORDER

* * *

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - x

IN RE PHARMACEUTICAL INDUSTRY    :

AVERAGE WHOLESALE PRICE          : CIVIL ACTION:

LITIGATION                       :  01-CV-12257-PBS

- - - - - - - - - - - - - - x

                    Mt. Crested Butte, Colorado

                    Friday, August 12, 2005


        Videotaped Deposition of CAROL WEBB, a

witness herein, called for examination by counsel

for Plaintiffs in the above-entitled matter, pursuant

to notice and the Federal Rules of Civil Procedure,

the witness being duly sworn by CRAIG KNOWLES,

a Notary Public in and for the State of Colorado,

at 9:30 a.m.,  and the proceedings being taken down

in Stenotype by CRAIG KNOWLES and transcribed under

his direction.

ced9d3be-854d-4b5b-b0eb-a7c780ba1c2f

Carol Webb       HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER August 12, 2005
Mt. Crested Butte, CO

Page 102

1  increase so that you could increase revenue up
2  through the level of Epogen's price?
3      A.  That's correct.
4      Q.  And that was true in 1997?
5      A.  I would believe that would be the reason.
6      Q.  Are you aware at any time between 1991 and
7  2003 when the list price of Procrit was higher than
8  that of Epogen's?
9      A.  No.
10     Q.  And was that done on purpose by OBI?
11         MR. MANGI:  Object to the form.
12     A.  I don't remember.
13         BY MR. HOFFMAN:
14     Q.  Is it possible that was a deliberate
15  strategy of OBI throughout that period?
16         MR. MANGI:  Is it possible that was a
17  deliberate strategy?  Object to the form.
18     A.  It's hard to answer your question.  Could
19  you restate it?
20         BY MR. HOFFMAN:
21     Q.  Sure.  Was it OBI's strategy at any time
22  during 1991 to 2003 that it remain at or near

Page 103

1  parity of Epogen pricing?
2      A.  It was one consideration.
3      Q.  And that was always a consideration that
4  was discussed at the time of any price change?
5      A.  One consideration.
6      Q.  For every price change that you were aware
7  of?
8      A.  That, I couldn't tell you.
9      Q.  And is it fair to say that another
10  consideration in connection with keeping their
11  price at parity or below that of Epogen was not to
12  trigger a survey or investigation by the government
13  into epoetin alfa pricing for Procrit?
14         MR. MANGI:  Object to the form.
15     A.  A consideration, yes.
16         BY MR. HOFFMAN:
17     Q.  For all price changes?
18     A.  That, I couldn't tell you.
19     Q.  For which price changes was that a
20  consideration?
21     A.  I have no idea.
22     Q.  Okay.  And the same thing with regard to

Page 104

1  keeping the price of Epogen at parity, for which
2  price changes was that a strategy?
3      A.  I have no idea.
4      Q.  Let's go back to -- actually, let me just
5  finish with Exhibit Webb 005.
6         In the last paragraph it says:  Our
7  strategy is to create a stable
8  pricing/reimbursement environment for Procrit and
9  focus on increasing top line revenues and net
10  profit by accelerating market penetration and
11  continuing to reduce, eliminate our rebate/discount
12  structure.
13         Do you see that?
14     A.  Yes, I do.
15     Q.  By stable -- what is your understanding of
16  what he meant by a stable pricing reimbursement
17  environment for Procrit?
18     A.  What we were trying to do was to ensure
19  that our drug was reimbursed.
20     Q.  By whom?
21     A.  By all parties.
22     Q.  Okay.  And by raising your price at parity

Page 105

1  with that of Epogen, how were you going to ensure
2  that there was going to be a stable pricing
3  reimbursing environment for Procrit?
4         MR. MANGI:  Objection.  Mischaracterizes
5  the document.
6      A.  I don't believe that they have anything in
7  common.  I think the last paragraph is just a
8  recap.
9      Q.  A recap of strategies?
10     A.  Of strategy.
11     Q.  Strategies that were identified earlier in
12  this document?
13     A.  No, I think just a recap of strategy in
14  general.
15     Q.  Is it your belief that these strategies
16  that are identified in this document are
17  inconsistent with the overall strategies that are
18  being recapped here?
19         MR. MANGI:  Object to the form.
20     A.  I don't quite understand your question.
21         BY MR. HOFFMAN:
22     Q.  You are telling me that the last paragraph

27 (Pages 102 to 105)

ced9d3be-854d-4b5b-b0eb-a7c780ba1c2f

# Exhibit 13

## ◆ ORTHO BIOTECH

**Memorandum**

**To:**   S. Salmon

**From:**   M. Klein / C. Dooley

**Date:**   April 3, 1997

**cc:**   T. Amick
C. McConnell
D. Moran

**Subject:**

The impact of the language submitted to HCFA by OMB for the Medicare AWP drug reimbursement proposal is significant to Ortho Biotech. This memo is in response to your request to quantify the dollar impact on the enactment of this proposal. Assumptions need to be considered in this scenario and are as follows:

• Implementation of the HCFA language impacts the windfall that the physician receives for the drug.
• It would be safe to assume that a decrease or loss of the windfall would impact some physician's prescribing pattern for a drug.
• A change in the prescribing pattern of a physician would in turn impact the sales of the product.
• Medicare payment for covered drugs furnished in a physician's office would be impacted by this language. However, there would be no change for the hospital outpatient department or other entities paid for either on a cost or PPS basis by this provision (i.e. Part A clinics).
• There is currently a movement of Medicare drug administration from the physicians' office into the hospital clinic.
Adoption of this language could be expected to expedite this movement of Medicare drug administration from the physician's office into the clinic.
• The majority of Procrit usage is billed under Medicare Part B. These units are quantifiable; however, Part A units of Procrit are billed under a bundled charge and are not quantifiable.
• If the language was enacted, the immediate pricing impact would be on Part B. However, Part A would be impacted by either application of this pricing to a drug billed under Part A or the application of APGs (Ambulatory Patient Groups).

• Due to this effect on both parts of Medicare, we need to look at the impact of our overall Medicare Dollars (see attached schedule).

**Plaintiffs' Exhibit
365
01-12257-PBS**

HIGHLY CONFIDENTIAL

ORTHO 00985586
Confidential - Attorneys Only

MDL-OBI00061785

# Exhibit 14

# Attachment G.3.c: Johnson & Johnson Annual Spreads

| NDC | Drug | Description | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 00062740003 | Procrit | PROCRIT 4000U/ML AMG | 22.6% | 23.7% | 21.8% | | | | | | | | | | |
| 00062740103 | Procrit | PROCRIT 10000U/ML AMG | 22.8% | 23.0% | 22.8% | | | | | | | | | | |
| 00062740201 | Procrit | PROCRIT 2000U/ML AMG | 24.4% | 24.8% | 22.3% | | | | | | | | | | |
| 00062740501 | Procrit | PROCRIT 3000U/ML AMG | 21.0% | 25.2% | 21.4% | | | | | | | | | | |
| 59676030201 | Procrit | PROCRIT 2000 U/ML 6'S | | | | 22.4% | 21.6% | 21.9% | 21.5% | 21.4% | 22.8% | 20.1% | 21.0% | 19.8% | 17.6% |
| 59676030202 | Procrit | PROCRIT 2000 U/ML , INSTITUTIO | | | 20.5% | 21.4% | 22.0% | 25.2% | | 24.7% | 22.7% | 19.0% | 24.1% | 27.6% | 21.8% |
| 59676030301 | Procrit | PROCRIT 3000 U/ML 6'S | | | | | 22.1% | 22.1% | 21.7% | 21.5% | 22.5% | 20.9% | 21.4% | 20.5% | 18.6% |
| 59676030302 | Procrit | PROCRIT 3000 U/ML 25'S | | | 21.5% | 22.7% | 23.4% | 22.1% | | 23.6% | 22.1% | 20.9% | 22.9% | 24.6% | 20.8% |
| 59676030401 | Procrit | PROCRIT 4000 U/ML 6'S | | | | 22.5% | 23.4% | 24.4% | | 21.0% | 22.2% | 20.8% | 21.5% | 20.9% | 19.1% |
| 59676030402 | Procrit | PROCRIT 4000 U/ML 25'S | | | | 22.7% | 21.6% | 21.7% | 21.2% | 23.0% | 22.6% | 19.4% | 22.9% | 21.1% | 21.1% |
| 59676031001 | Procrit | PROCRIT 10000 U/ML 6'S | | | 23.8% | 23.4% | 24.2% | 25.3% | | 21.5% | 23.2% | 21.5% | 22.0% | 21.4% | 20.7% |
| 59676031002 | Procrit | PROCRIT 10000 U/ML 25'S | | | 22.8% | 22.5% | 21.8% | 22.1% | 22.5% | 21.5% | 25.5% | 22.7% | 25.4% | 23.5% | 24.4% |
| 59676031201 | Procrit | PROCRIT 10,000 U/ML , MULTIDOS | | | 24.4% | 22.4% | 22.3% | 24.2% | 26.8% | 24.9% | 25.0% | 22.3% | 24.6% | 23.7% | 24.3% |
| 59676032001 | Procrit | PROCRIT 20,000 U/ML - 1ML | | | | | 20.5% | 23.4% | 23.4% | 25.0% | 25.6% | 25.2% | 26.3% | 25.6% | 26.0% |
| 59676034001 | Procrit | PROCRIT 40000 U/ML 4'S | | | | | | | | | 24.4% | 24.7% | 26.0% | 25.5% | 26.0% |
| 57894003001 | Remicade | C16IJ REMICADE 1PCK US PD | | | | | | | | 29.8% | 32.1% | 28.5% | 31.9% | 29.9% | 30.0% |

Direct Testimony of Raymond S. Hartman

# Exhibit 15

Page 1

```
 1    UNITED STATES DISTRICT COURT

 2    FOR THE DISTRICT OF MASSACHUSETTS

 3    ----------------------------------x

 4    In re:  PHARMACEUTICAL

 5    INDUSTRY AVERAGE WHOLESALE          MDL DOCKET NO.

 6    PRICE LITIGATION                    CIVIL ACTION

 7    ----------------------------------x  01CV12257-PBS

 8    THIS DOCUMENT RELATES TO:

 9    ALL ACTIONS

10    ----------------------------------x

11                         May 5, 2006

12                         9:36 a.m.

13

14           Deposition of JAYSON S. DUKES  taken

15        by the Plaintiffs, at the offices of

16        Patterson, Belknap, Webb & Tyler, LLP, 1133

17        Avenue of the Americas, New York, New York,

18        before David Levy, CSR, a Notary Public of

19        the State of New York.

20

21

22
```

Jayson S. Dukes                                                          May 5, 2006
New York, NY

Page 38

1          MR. SCHAU:  Object to form.
2      Q.    You can answer.
3      A.    Well, considering there was billions
4  of dollars of Remicade sold and it was a keypunch
5  error off of an invoice, I don't consider that
6  material.
7      Q.    By the way, some of these sales do
8  equal the list price, don't they?
9          MR. MACORETTA:  Tell you what, let me
10      show you what we're going to mark as
11      Exhibit Dukes 003.
12          (Deposition Exhibit Dukes 003,
13          MDL-CEN0044503, marked for identification,
14          as of this date.)
15      Q.    Before we talk about that, it's your
16  understanding that, at least for Remicade, it was
17  never sold above list price; right?
18      A.    I don't recall that happening.
19      Q.    Okay.  Same question for Procrit while
20  we're on this subject.
21      A.    I don't specifically recall that
22  happening.

Page 39

1      Q.    Okay.  And in fact, if we look at
2  Exhibit Dukes 003, the second box says, "WAC price
3  after increase, 493.29."
4          WAC price equals list price for
5  Remicade; right?  Is that your understanding?
6      A.    List -- I'm sorry --
7      Q.    WAC price and list price are the same
8  thing for Remicade, right?
9      A.    WAC is defined as Wholesale
10  Acquisition Cost.
11      Q.    Well, this is Remicade's document -- I
12  can tell you yes.  Certain core employees have
13  testified that WAC is Wholesale Acquisition Cost.
14      A.    Yes.
15      Q.    And you understand that WAC equals
16  list, correct?
17      A.    Yes.
18      Q.    And when we see a WAC price there of
19  493.29, and then we see on the bottom of the first
20  page of -- on the first page, we see the last two
21  sales are ten vials each at 493.2, right?
22      A.    It appears so, yes.

Page 40

1      Q.    So why are they out?
2      A.    You know, I would have to inquire to
3  my staff -- hold on.
4          (A pause in the proceedings.)
5      A.    I don't know the answer.
6      Q.    Okay.  Your assumption number 2 says,
7  "We also excluded the effects of service fees and
8  prompt-pay discounts earned by specialty
9  distributors and to wholesalers from our Remicade
10  ASP calculations."
11          That's what you intended to do, right?
12      A.    Correct.
13      Q.    A prompt-pay discount means the
14  customer pays their bill within a certain amount
15  of time and they get a percentage discount off the
16  price; right?
17      A.    Correct.
18      Q.    Why did you exclude them?
19      A.    That's what we were told to do.
20      Q.    Told by whom?
21      A.    By counsel.
22      Q.    Okay.  That's different than what

Page 41

1  Dr. Hartman did, right?  He didn't exclude those
2  discounts.
3          MR. SCHAU:  Object to form.
4      A.    I thought he had.
5      Q.    Okay.  Do you have an understanding as
6  to whether or not prompt pay discounts are
7  included or excluded when calculating ASP for the
8  Medicare Modernization Act?
9      A.    I don't.
10      Q.    Same question -- first of all, service
11  fees, what are service fees, as you use it in
12  paragraph 2?
13      A.    Fees for service.  Fees for services
14  provided by the specialty distributor.
15      Q.    Do you know what services specifically
16  were provided?
17      A.    No.
18      Q.    Do you know if the fee paid was equal
19  to the service that was actually received?
20          MR. SCHAU:  Object to form.
21      A.    I was not asked to look at that.
22      Q.    Why did you decide to exclude service

11 (Pages 38 to 41)

Jayson S. Dukes                                                    May 5, 2006
New York, NY

Page 42

1   fees?
2        A.   Because it was a fee for service, I
3   was told to excluded from the --
4        Q.   Told by whom?
5        A.   Told by counsel.
6        Q.   Did you look at any of the contracts
7   or documents that detail what those services are?
8        A.   I was not asked to.
9        Q.   Okay.  So you simply looked for
10  service fees and took them out.
11       A.   Correct.
12       Q.   Okay.  And you don't have any
13  rationale for why you did that other than counsel
14  told you to do it.
15            MR. SCHAU:  Object to form.
16       A.   Yeah.
17       Q.   Do you understand that Dr. Hartman
18  kept those service fees in?
19       A.   I don't know that specifically.
20       Q.   Okay.  Well, wouldn't you have to know
21  whether or not he kept them in to determine
22  whether or not you were following his methodology?

Page 43

1        A.   On the service fees, I was instructed
2   by counsel to exclude them.
3        Q.   I understand.  But earlier you said
4   your job was to follow Dr. Hartman's methodology,
5   right?
6        A.   Um-hum.
7        Q.   If you took out prompt pay discounts
8   and service fees, and you don't know what
9   Dr. Hartman did, how could you know if you were
10  following his methodology?
11            MR. SCHAU:  Object to form.
12       Q.   You can answer.
13       A.   I don't know.
14       Q.   Okay.  And it says the service fees
15  you took out, and prompt pay discounts, are on
16  Exhibit 20, right?
17       A.   Correct.
18            MR. MACORETTA:  Let me show you what
19  we're going to mark as Exhibit Dukes 004.
20            (Deposition Exhibit Dukes 004,
21  multipage listing of invoices, printout of
22  Exhibit 20 to declaration of Jayson Dukes,

Page 44

1   marked for identification, as of this date.)
2            MR. SCHAU:  Is Exhibit Dukes 004 --
3            MR. MACORETTA:  Exhibit Dukes 004 is
4   the printout of Exhibit 20.
5            MR. SCHAU:  Thank you.
6            (Witness perusing document.)
7        Q.   First of all, do you understand that
8   what I showed you as Exhibit Dukes 004 is Exhibit
9   20 to your report?
10       A.   It appears to be.
11       Q.   Okay.  And maybe I'm not understanding
12  this.  But how do I figure out from Exhibit 20
13  which transactions you took out because of service
14  fees and prompt payment discounts?
15            MR. SCHAU:  Object to form.
16       Q.   All of them or...
17       A.   All of these would have been taken out
18  because of the service fee and prompt pay
19  discount -- or actually, they wouldn't have been
20  taken out.  What would have happened is, we would
21  have grossed all these transactions up to list.
22       Q.   Okay.  Is there some way to look at

Page 45

1   Exhibit 20 and figure out which ones are service
2   fees and which ones are prompt pay discounts?
3        A.   It was my understanding that the
4   service fee and the prompt pay discount were
5   both -- there's -- there would be no way to
6   differentiate.  They were both incorporated into
7   the transaction.
8        Q.   So everybody who got a prompt payment
9   discount also got a service fee or...
10            MR. SCHAU:  Objection to form.
11       A.   I don't know that that's a correct
12  statement.
13       Q.   Let me try it this way:
14            Can you quantify for me in dollar
15  terms how much you took out for service fees?
16       A.   No.
17       Q.   Okay.  Can you quantify for me in
18  dollar terms how much you took out for prompt
19  payment discounts?
20       A.   No.
21       Q.   Okay.  I guess we could add up -- can
22  you quantify the effect of both of them together?

12 (Pages 42 to 45)

Jayson S. Dukes                                                    May 5, 2006
New York, NY

Page 54

1    A.   That's correct.  Or with the company.
2    Q.   And was it that you didn't ask for any
3  more backup, any more information about these
4  service fees or that you asked for it and nobody
5  gave you any more information?
6    A.   I wasn't asked to look into it any
7  further.
8    Q.   Okay.  You got all the information you
9  asked for concerning service fees?
10   A.   Yes.
11   Q.   Okay.
12       MR. SCHAU:  When it's convenient,
13  John, let's take a short break.
14       MR. MACORETTA:  You know, give me one
15  second, I want to see if I can finish with
16  these exhibits.
17       MR. SCHAU:  Absolutely.  When it's
18  convenient.
19       (A pause in the proceedings.)
20       MR. MACORETTA:  You know what?  This
21  is a fine time, this is fine.  We'll take a
22  quick break.

Page 55

1       (Recess taken.)
2  EXAMINATION (Cont'd.)
3  BY MR. MACORETTA:
4    Q.   Mr. Dukes, we're back on the record.
5       Can you tell me which attorneys gave
6  you the instructions we talked about as to whether
7  or not to include discount fees or service fees?
8       MR. SCHAU:  Object to form.
9    Q.   The names of the lawyers.
10   A.   Andrew Schau.
11   Q.   Anybody else?
12   A.   No.
13   Q.   So your conversations about the
14  specifics of your declaration and what should or
15  shouldn't be included were with Mr. Schau and no
16  other lawyers from his firm.
17   A.   Correct.
18       MR. MACORETTA:  Let me mark as Exhibit
19  Dukes 005 another copy of your declaration
20  which is nicely bound.
21       (Deposition Exhibit Dukes 005, bound
22  copy of declaration of Jayson Dukes, marked

Page 56

1  for identification, as of this date.)
2       (Witness perusing document.)
3    Q.   And I'm going to direct you to page 8,
4  paragraph 47.  In the middle of paragraph 47, you
5  say, "My staff and I posed numerous data-related
6  questions to Johnson & Johnson's counsel and to
7  knowledgeable individuals at various Johnson &
8  Johnson operating companies," right?
9    A.   Um-hum.
10   Q.   Okay.  And the questions posed to
11  counsel were posed only to Mr. Schau, right?
12   A.   I'm sorry, clarify that?
13   Q.   You say, "We posed numerous questions
14  to Johnson & Johnson's counsel."
15       And who was the lawyer at Johnson &
16  Johnson's counsel you posed those questions to?
17   A.   Well, it would either be to Andy or to
18  Adeel, as far as the data-related questions go.
19   Q.   "And to knowledgeable individuals at
20  various Johnson & Johnson operating companies"?
21   A.   Yes.
22   Q.   And as we sit here today, you can't

Page 57

1  tell me the names of any of those individuals.
2    A.   No.
3    Q.   Okay.  And you say, "Their responses
4  enabled us to resolve numerous issues that were
5  otherwise indeterminate."
6    A.   Okay.
7    Q.   So presumably, from those responses,
8  you had some more information that Dr. Hartman
9  didn't have; right?
10       MR. SCHAU:  Object to form.
11   A.   Those responses were in the form of
12  data sets that are identified in either my
13  statement of assumptions or in attachment C.
14   Q.   Well --
15   A.   Attachment 3.
16   Q.   -- okay.  But Dr. Hartman on his own
17  couldn't have generated those data sets without
18  knowing what you knew from talking to J&J people;
19  right?
20       MR. SCHAU:  Object to form.
21   A.   Could you restate the question?
22   Q.   Sure.  You say, "Their responses

15 (Pages 54 to 57)

Jayson S. Dukes                                                                May 5, 2006
New York, NY

Page 70

1    details of the apparent PBM rebate?
2         A.    I do not remember her name.
3         Q.    If we wanted to figure that out, how
4    would you do that?
5         A.    Talk with Adeel.
6         Q.    Okay.  You don't have any piece of
7    paper at FTI that would tell us?
8         A.    No.
9         Q.    Okay.  And also in paragraph 47, your
10   first sentence, "It is understandable and not
11   surprising that Dr. Hartman's staff were unable to
12   identify and exclude all the transactions that
13   Dr. Hartman intended for them to exclude."
14         Now, is it your position that the
15   prompt payment discounts and service fees were
16   things Dr. Hartman intended to exclude?
17         A.    It was my understanding that he did
18   not include prompt pay discounts.
19         Q.    Okay.  And you're basing that on what?
20         A.    I'm thinking back to my read of his
21   declaration.
22         Q.    Okay.  How about service fees, did he

Page 71

1    include or exclude them?
2         A.    I do not recall him discussing service
3    fees.
4         Q.    So how did you know whether or not he
5    intended to exclude or include them?
6         A.    Can you repeat the question?
7         Q.    If you don't remember Dr. Hartman
8    discussing service fees, how did you know whether
9    or not he intended to include or exclude them?
10         A.    I spoke with counsel.
11         Q.    Okay.  The only reason you took them
12   out is because counsel told you to take them out.
13         A.    Correct.
14         Q.    Okay.  Let me go back to your
15   statement of assumptions.  Number three, "Patient
16   assistance program fees."
17         You took them out for Remicade, too;
18   right?
19         A.    Correct.
20         Q.    And why did you take them out?
21         A.    I was told that they were fees for
22   services and they were to be excluded from the

Page 72

1    calculation, and the fees -- the transactions were
2    included but the transactions were grossed up to
3    list.
4         Q.    Okay.  I'm sorry, I didn't mean to cut
5    you off.
6         A.    I'm done.
7         Q.    Okay.  So you took them out because
8    counsel told you to take them out.
9         A.    Correct.
10         Q.    Did you do any investigation at all as
11   to figure out whether or not they were in fact
12   fees for services?
13         A.    I was not asked to look into that.
14         Q.    Do you have any understanding as to
15   whether or not the Medicare ASP calculations
16   require the inclusion or exclusion of these kinds
17   of fees?
18         A.    No.
19         Q.    That would be Exhibit 21.
20         MR. MACORETTA:  That we'll mark as
21   Exhibit Dukes 006.
22         (Deposition Exhibit Dukes 006,

Page 73

1    printout of Exhibit 21 to declaration of
2    Jayson Dukes, marked for identification, as
3    of this date.)
4         (Document placed before the witness.)
5         Q.    What you told me, you just grossed
6    these up to list price, right?  That's how you
7    took them out?
8         A.    The effect of the program fees was
9    removed from these transactions by grossing them
10   up to list.
11         Q.    And how did you figure out which
12   transactions to gross up to list for program fees?
13         A.    We provided a list to -- a list of the
14   transactions to counsel that forwarded those on to
15   the company.
16         Q.    First of all, by the way, what we
17   marked as Exhibit Dukes 006, do you understand that
18   to be the printout of your Exhibit 21?
19         A.    I assume it to be about having my
20   exhibit to verify it against.
21         Q.    Fair enough.  And I see a bunch of
22   Priority Health on here but I don't see any Nova

19 (Pages 70 to 73)

Jayson S. Dukes                                                May 5, 2006
New York, NY

Page 78

1    Q.   Okay.  Do you know what analysis the
2 company did to come up with this list?
3    A.   I do not.
4    Q.   Because there's no way to tell from
5 here that this was in fact a situation where the
6 invoice came after the price change but the order
7 was before; right?  And there's nothing on Exhibit
8 Dukes 007 that tells us that; is there?
9    A.   Correct.
10    Q.   Do you know what the company did to
11 figure out that these are the ones with the
12 invoices postdating the order?
13    A.   I do not.
14    Q.   Do you know who at J&J did this
15 calculation?
16    A.   I do not.
17    Q.   By the way, I see some of these are
18 invoices to McKesson, "McK," and the customer
19 number is McKesson, right?
20    A.   Um-hum.
21    Q.   Right?
22    A.   Without -- that's a valid assumption.

Page 79

1    Q.   And is it a common practice to give
2 customers price protection, meaning a separate
3 customer can buy the product at the old price for
4 a certain amount of time after a price increase is
5 announced?
6        MR. SCHAU:  Object to form.  Are you
7     asking --
8    Q.   Are you aware of that practice in the
9 pharmaceutical industry?
10    A.   Yes.
11    Q.   Okay.  Do you have any knowledge as to
12 whether or not Centocor engaged in that practice?
13    A.   No.
14    Q.   Okay.  If Centocor did engage in that
15 practice, that would explain why the invoice price
16 after a price increase shows the old price;
17 wouldn't it?
18        MR. SCHAU:  Object to form.
19    Q.   Because that was part of an agreement
20 with the customer that they would do that.
21        MR. SCHAU:  Object to form.  It's
22     hypothetical.

Page 80

1    Q.   You can answer.
2    A.   Can you repeat the question?
3    Q.   Sure.  If Centocor did have an
4 agreement with certain customers that it would
5 provide price protection, that would be a reason
6 why the invoice would show the lower price, even
7 though it was dated after the price increase,
8 wouldn't it?
9        MR. SCHAU:  Object to form.
10    A.   That would be a valid assumption.
11    Q.   Okay.  Did you do anything to figure
12 out whether or not Centocor had such an
13 arrangement?
14    A.   I was not asked to do so.
15    Q.   And in fact, was it your understanding
16 that that was a way wholesalers make some money,
17 by profiting from this price protection
18 arrangement, buying low and selling a little bit
19 higher?
20        MR. SCHAU:  Object to form.
21    A.   Yes.
22    Q.   Do you know whether or not Dr. Hartman

Page 81

1 intended to exclude transactions such as this
2 where the invoices postdate the order around the
3 price increase?
4    A.   I don't think he specifically
5 discusses that in his declaration.
6    Q.   So you didn't take it out to be
7 consistent with what Dr. Hartman did.
8    A.   I took it out at the direction of
9 counsel.
10    Q.   Do you have an opinion on whether or
11 not taking it out is consistent with what
12 Dr. Hartman did or is not consistent with what
13 Dr. Hartman did?
14    A.   No.
15    Q.   And the effect of taking these
16 transactions out of your calculation would be to
17 cause the ASP to go up, right?
18    A.   Correct.
19    Q.   Did you discuss with anybody at the
20 company or counsel that that would be the effect,
21 meaning, taking these out would cause the ASP to
22 go up?

21 (Pages 78 to 81)

Jayson S. Dukes                                                      May 5, 2006
New York, NY

Page 82

1     A.    I don't recall that specific
2  conversation.
3     Q.    Your next assumption, you took out, it
4  says you took out sales where the sale price was
5  zero for both Procrit and Remicade.  I'm looking
6  at assumption 5 on your attachment.  That's what
7  you did; right?
8     A.    Yes.
9     Q.    Why did you decide to do that?
10    A.    At the direction of counsel, we were
11 told that these were charity-type donations.
12 Therefore, they should be removed.
13    Q.    Did you do anything to confirm that?
14    A.    No.
15    Q.    I mean, if this was an audit and
16 somebody told you that, you would go ask for some
17 proof that it really was a charity donation;
18 right?
19    A.    It would depend.
20    Q.    Well, you wouldn't just take the
21 company's word that you should take these out,
22 would you?

Page 83

1     A.    It would depend upon the materiality.
2     Q.    Let's say it was material.
3     A.    Yes.
4     Q.    Yes, you would want some prior
5  verification beyond the company's say-so.
6     A.    Correct.
7     Q.    Okay.  Do you know if Dr. Hartman took
8  out the zero price units?
9     A.    He may have.
10    Q.    Well, so you weren't doing this to be
11 consistent with what Dr. Hartman did, then; were
12 you?
13    A.    I was doing this under the direction
14 of counsel.
15          MR. MACORETTA:  Let me hand you what's
16 marked as Exhibit Dukes 008.
17          (Deposition Exhibit Dukes 008,
18 printout of Exhibit 23 to declaration of
19 Jayson Dukes, marked for identification, as
20 of this date.)
21          (Document placed before the witness.)
22          MR. MACORETTA:  And let me show you

Page 84

1  Exhibit Dukes 009.
2          (Deposition Exhibit Dukes 009,
3  printout of Exhibit 24 to declaration of
4  Jayson Dukes, marked for identification, as
5  of this date.)
6          (Document placed before the witness.)
7     Q.    And Exhibit Dukes 008 and Exhibit Dukes
8  009 I will tell you are the printouts of your
9  Exhibits 23 and 24.  Do you have any reason to
10 disagree with that as we sit here right now?
11    A.    Not without verifying each of the ten
12 thousand pages.
13    Q.    I understand.  And so these represent
14 all the zeroed unit sales you took out.
15    A.    Correct.
16    Q.    Okay.  Some of these Remicades, as I
17 look through the Remicade units, Exhibit Dukes 008,
18 there are some pretty big units, a thousand units,
19 three hundred units, another three hundred units.
20 Do you have an idea who was getting three hundred
21 free units of Remicade?
22          MR. SCHAU:  Object to form.

Page 85

1          MR. MACORETTA:  I'm on page 1,
2  Exhibit Dukes 008.
3     A.    I do not.
4     Q.    And how about for Procrit, how did you
5  decide which Procrit units to come out at zero?
6  That was the discretion of counsel?
7     A.    Correct.
8     Q.    Did you talk to anybody at the
9  company, at OBI, about why these would be coming
10 out?
11    A.    I did not specifically.
12    Q.    I mean, a lot of these Procrit sales
13 seem to be going to physicians, right?
14    A.    Correct.
15    Q.    Do you have any idea why physicians
16 are getting zero dollar units of Procrit?
17    A.    Not specifically.
18    Q.    Do you have any understanding of OBI's
19 or Centocor's free sample policies?
20    A.    I do not.
21    Q.    And by taking out these zero price
22 units, that would have the effect of raising the

22 (Pages 82 to 85)

Jayson S. Dukes                                                    May 5, 2006
New York, NY

Page 86

1    ASP as well; right?
2         A.    Correct.
3         Q.    And you took these units out at the
4    direction of counsel; right?
5         A.    Correct.
6         Q.    And again, you don't know if
7    Dr. Hartman took these units out or not?
8         A.    I don't, although he does say in his
9    report that he took out all non-de minimis
10   transactions.  Well, that he would not have
11   included non-de minimis transactions.
12        Q.    Not have included non -- there's a lot
13   of negatives in that.  Could we try that again?
14        MR. SCHAU:  That's how Dr. Hartman
15   wrote it.
16        MR. MACORETTA:  Well, that could be.
17        A.    It's my interpretation that he did not
18   include within his calculation de minimis
19   transactions.  So non-de minimis would be not
20   small, is the way I interpreted that.
21        Q.    In terms of number of units?
22        A.    He doesn't -- he doesn't -- he doesn't

Page 87

1    quantify or clarify that.
2         Q.    Okay.  So are you telling me that you
3    interpreted Dr. Hartman's report to be that he
4    took out all the zero unit sales?
5         A.    That's one interpretation.
6         Q.    Is that the interpretation you used?
7    Let me try it this way:
8              You didn't take out the zero unit
9    sales because you were trying to match what
10   Dr. Hartman did, did you?
11        A.    No.
12        Q.    You did it because the lawyers told
13   you to do it.
14        A.    Correct.
15        Q.    Okay.  Your assumption number 7,
16   "Calculating Procrit ASP across all NDCs by year."
17             And what this means, I take it, is
18   that there are about -- there are how many Procrit
19   NDCs, 7 or 8?
20        A.    Fifteen.
21        Q.    Fifteen, I'm sorry.  So you tried to
22   make one ASP for all those NDCs.

Page 88

1         A.    Per year.
2         Q.    Per year, correct.  Okay.  And why did
3    you do that?
4         A.    I was directed by counsel to do that.
5         Q.    Did you understand that that's
6    something Dr. Hartman did?
7         A.    No.
8         Q.    Okay.  So this isn't really changing
9    his methodology.  This is just making a
10   calculation he didn't make; right?
11        A.    Correct.
12        Q.    Dr. Hartman.  And that's something
13   counsel told you to do.
14        A.    Correct.
15        Q.    Okay.  Do you have any understanding
16   of why you did that, other than counsel, what the
17   reason for doing this was?
18        A.    I didn't ask.
19        Q.    I skipped an assumption.  I'll come
20   back to that.
21             And did you understand that, I mean,
22   did you understand that different NDCs of Procrit

Page 89

1    were sold or marketed at different times in
2    different ways?  I mean, not every NDC of Procrit
3    was marketed to the same doctor with the same
4    discount all the time; right?
5         MR. SCHAU:  Object to form.
6         A.    I was not aware of of that.
7         Q.    I'm trying to understand, what would
8    be the value of creating one ASP across all NDCs?
9         A.    I don't have an opinion on that.
10        Q.    You don't know what that reveals to
11   anybody?
12        MR. SCHAU:  Object to form.
13        A.    Haven't thought about it.
14        Q.    Okay.  Do you know if anybody at OBI
15   ever looked at Procrit that way, meaning they had
16   internally some, one ASP across all the NDCs?
17        MR. SCHAU:  Object to form.
18        A.    Don't know.
19        Q.    You did it because lawyers told you to
20   do it.
21        A.    Yes.
22        Q.    Okay.  Now I'm going to go back to

23 (Pages 86 to 89)

Jayson S. Dukes                                                           May 5, 2006
New York, NY

Page 90

1  your assumption number 6.  "AWPs employed and
2  spread comparison."
3      A.   Hold on just a second.
4      Q.   Sure.
5          (A pause in the proceedings.)
6      A.   Okay.
7      Q.   AWP's employed in a spread comparison.
8  For years when the AWP price changed during the
9  year, you did a weighted average to come up with
10  one AWP, right?
11     A.   Correct.
12     Q.   Did you do that for both Procrit and
13  Remicade?
14     A.   Only for Procrit.
15     Q.   Why did you only do it for Procrit?
16     A.   Because Remicade only has one NDC.
17     Q.   No, no, now we're talking about AWP
18  changes during the year.  I'm on number 6.
19     A.   Um-hum.  I'm sorry.
20     Q.   Am I not understanding?  Number 6
21  says, when the AWP price changes during the year,
22  you calculate one weighted average AWP for that

Page 91

1  year, right?  That's correct?
2      A.   I can't remember whether or not we
3  needed to do this for Remicade.  I'd have to go
4  back and look.
5      Q.   Okay.  Well, there's no question that
6  Remicade's AWP price changed during the year at
7  least a couple of times, right?
8      A.   Correct.
9      Q.   Okay.  Why did you do this?  Why did
10  you undertake this approach?
11     A.   It was necessary on, by looking at
12  when you're trying to do a ASP across all NDCs for
13  one year, it would be necessary to do that --
14  well, actually two reasons:
15         One, even for the individual NDCs, if
16  you're doing a spread comparison, you're going to
17  want to look at, and there was a change during the
18  year, you're going to want to look at the weighted
19  average AWP within that year.
20         So actually, I'll take that back.  We
21  would have done this for Remicade as well.  So
22  you're going to need that to do your spread

Page 92

1  comparison.  Else-wise, your spread will be off.
2      Q.   Because you'll be using an AWP that
3  didn't apply to the whole year.
4      A.   Correct.
5      Q.   Of course, you could have also just
6  done one spread comparison up to the time of the
7  price change and one spread comparison after the
8  price change, right?
9      A.   That's one way of doing it as well.
10     Q.   Do you know what approach Dr. Hartman
11  used to deal with this issue?
12     A.   I believe he took an AWP at a specific
13  point in time during the year.
14     Q.   Okay.  By the way, this is a change
15  from Dr. Hartman's methodology, right?  Using the
16  weighted average as opposed to an AWP?
17     A.   Yes.
18     Q.   Why did you decide to make this
19  change?
20     A.   Discussed it with counsel and that's
21  what -- how we decided to do it.
22     Q.   Was this something counsel told you to

Page 93

1  do?
2      A.   We were directed by counsel.
3      Q.   In your opinion as an expert, was this
4  the most appropriate way to look at the AWP?
5      A.   Yes.
6      Q.   So you think this is a better way to
7  do it than Dr. Hartman did it.
8      A.   Correct.
9      Q.   Why is that?
10     A.   It's more representative -- AWP is
11  more -- the weighted average represents the
12  transactions or the comparison across the entire
13  year as opposed to just using an AWP at one point
14  in time during the year because for the all those
15  transactions would have been related to that
16  particular AWP.
17         And in calculating the spread, you
18  wouldn't want to be calculating a spread off of --
19  that has information contained within that spread
20  or that was based upon that, that wasn't related
21  to the AWP that was in effect during that time.
22     Q.   Okay.  Did you do any analysis of the

24 (Pages 90 to 93)

Jayson S. Dukes                                                                May 5, 2006
New York, NY

Page 98

1    on your own, it's something the attorneys told you
2    to do?
3        A.   Yes.
4        Q.   And this is not something Dr. Hartman
5    did, right?
6        A.   I don't believe he did.
7        Q.   Essentially what you're doing here is,
8    you're taking the managed care rebates and
9    subtracting them from AWP in your spread
10   calculation, right?
11       A.   From the amount reimbursed,
12   theoretically reimbursed based upon AWP.
13       Q.   Well, Dr. Hartman assumes that the
14   amount reimbursed is AWP, right?
15       A.   Yes.
16       Q.   And that's what you do with this
17   exception, right?
18       A.   Correct.
19       Q.   Okay.  And nowhere does Dr. Hartman
20   have any subtractions from AWP, right?
21       A.   I don't believe so.
22       Q.   Other than counsel telling you to do

Page 99

1    this, do you have any basis for doing it, or any
2    other reasons for doing it?
3        A.   It was a direction of counsel.
4        Q.   And again, you've differed here from
5    Dr. Hartman's methodology for doing this, right?
6             MR. SCHAU:  Object to form.
7        A.   I believe so.
8        Q.   Okay.  You say, "First I identified
9    that Centocor paid managed care rebates for
10   Remicade in the amounts of" -- certain dollar
11   amounts -- "for '01, '02, and '03 respectively."
12   How did you do that?
13       A.   Based upon the managed care rebates
14   that were produced in the litigation for Remicade.
15       Q.   Meaning what, you looked at some
16   rebate database or -- I mean, how did you identify
17   all those rebates?
18       A.   They would have been rebates
19   associated with Remicade, either one of the two
20   managed care rebate files.
21       Q.   What are you looking at, attachment
22   three?

Page 100

1        A.   Three.
2        Q.   Manage care rebate files, meaning --
3        A.   It's on the second page.
4        Q.   "CARS_REBATES_FINAL, or
5    "CARSIS_MANAGEDCARE_NEW"?
6        A.   Correct.
7        Q.   How did you determine that those were
8    all the managed care rebates?
9        A.   We summed them up.
10       Q.   I mean, who told you that these were
11   the managed care rebates, that's something you
12   learned from the company?
13       A.   Yes.
14       Q.   Am I correct that Dr. Hartman's --
15   well, let me try it this way:
16            You read Dr. Hartman's declaration,
17   right?
18       A.   Yes.
19       Q.   Why is Dr. Hartman performing the
20   spread calculation at all?  I mean, what is he
21   trying to show by doing that spread calculation?
22            MR. SCHAU:  Object to form.

Page 101

1        A.   He's trying to calculate the
2    difference between AWP and ASP.
3        Q.   And the reason he's doing that is to
4    compare it to a benchmark he's created as to what
5    the market understood; is that right?  Is that
6    your understanding of what he's doing?
7             MR. SCHAU:  Object to form.
8        A.   That's my understanding.
9        Q.   Okay.  And that benchmark is designed
10   to somehow indicate what the marketplace
11   understood the actual acquisition cost of
12   pharmaceuticals was, right?
13            MR. SCHAU:  Object to form.  What
14   Dr. Hartman thinks --
15       Q.   I can ask you to explain to me in
16   detail what you understood Dr. Hartman to be
17   doing, or I can ask it this way, so it's --
18       A.   It's my assumption, yes.
19       Q.   Okay.  And Dr. Hartman's basic premise
20   is that the market had an understanding that AWP
21   was within a certain percentage relationship to
22   actual prices.

26 (Pages 98 to 101)

Jayson S. Dukes                                                                May 5, 2006

New York, NY

Page 166

1  are in, which customers are out.
2          Can you quantify for me what the
3  impact was of that, of just the reclassification
4  of classes of trade?
5          MR. SCHAU:  Object to form.
6      A.    How do you define reclassification?
7      Q.    Well, you have a bunch of assumptions
8  here as to which things are in or out and then you
9  also say that, "For Remicade, we excluded certain
10 customers because they weren't in the proper
11 classes, Dr. Hartman shouldn't have included
12 them."
13         Putting aside the assumptions, let's
14 just talk about the customers that you took out
15 that Dr. Hartman included.
16         Can you tell me what the impact of
17 that was?
18     A.    Not off the top of my head, nor do I
19 think we did those -- I don't believe we did those
20 calculations.
21     Q.    Okay.  Same question for Procrit.
22     A.    Yes, same answer.

Page 167

1      Q.    Okay.  Let's talk about your, I'm
2  going to go down attachment 2, your statement of
3  assumptions.
4          Number 2, your exclusion of service
5  fees and prompt pay discounts, can you tell me
6  what the impact of excluding that was?
7      A.    We didn't calculate an impact.
8      Q.    Pardon?
9      A.    We did not calculate an impact.
10     Q.    So you don't know what it is.
11     A.    No.
12     Q.    But presumably, the effect was to
13 raise the ASP.
14     A.    Could you repeat the question?
15     Q.    By excluding service fees and prompt
16 pay discounts, you effectively raised the ASP,
17 isn't that right?
18     A.    Yes.
19     Q.    Okay.  Same question for number 3, the
20 patient assistance program fees.  Do you know what
21 the impact of excluding them was?
22     A.    No, I do not.

Page 168

1      Q.    And excluding them also had the effect
2  of raising the ASP, right?
3      A.    Yes.
4      Q.    Okay.  Same question for transactions
5  with invoices postdating the order.  Excluding
6  them had the effect of raising the ASP, right?
7      A.    Correct.
8      Q.    Can you tell me what the impact of
9  that exclusion was?
10     A.    No.
11     Q.    Same questions for units with the
12 sales price of zero.  Can you tell me what the
13 impact of excluding them was?
14     A.    No.
15     Q.    But it would have had the effect of
16 raising the ASP.
17     A.    Yes.
18     Q.    Again, for -- well, number 6, do you
19 know what the impact of your weighted average AWP
20 was?
21     A.    No.
22     Q.    So you don't know what effect that

Page 169

1  would have had.  Would that have had the effect of
2  raising or lowering the spreads?
3      A.    Would depend.  Could have been in
4  either direction.
5      Q.    And the same for number 8, the managed
6  care analysis, did you ever figure out what the
7  impact of that was?
8      A.    The impact of what?
9      Q.    Of adding in rebates, of using the
10 managed care rebates for Centocor as a reduction
11 of AWP.
12     A.    The impact of what?
13     Q.    The impact to spread calculations.
14     A.    It would decrease the spread.
15     Q.    It would decrease the sped.  But did
16 you ever try to figure out by what percentage
17 or --
18     A.    No.
19     Q.    -- it would?
20     A.    No.
21     Q.    And all the assumptions we're looking
22 at here, assumptions 1 through 8, they were all

43 (Pages 166 to 169)

Jayson S. Dukes                                                    May 5, 2006
New York, NY

Page 170

1   made because counsel told you to make them, right?
2       A.   Under the direction of counsel, yes.
3           MR. HOFFMAN:  You want to step out for
4   a second?  Why don't you give us thirty
5   seconds to step out.
6           (Recess taken.)
7           MR. MACORETTA:  All right, Mr. Dukes,
8   let me show you what we're going to mark as
9   Exhibit Dukes 012.
10          (Deposition Exhibit Dukes 012,
11  MDL-OB100015367, marked for identification,
12  as of this date.)
13          (Document placed before the witness.)
14  EXAMINATION (Cont'd.)
15  BY MR. MACORETTA:
16      Q.   Mr. Dukes, have you ever seen this
17  before?
18      A.   I do not recall ever seeing this
19  schedule.
20      Q.   Do you know what the reference to
21  "gross" and "net" ASP is in this document?
22      A.   I do not.

Page 171

1       Q.   Not familiar at all with those terms
2   as they relate to OBI?
3       A.   I'm familiar with the terms "gross"
4   and "net" individually, yes.
5       Q.   Well, in connection with ASP?
6       A.   No.
7       Q.   Have you ever seen documents similar
8   to this before, have you seen these terms used
9   before?  Gross and net ASP?
10      A.   I have not.
11      Q.   Okay.
12          MR. MACORETTA:  That's all the
13  questions I have right now, Mr. Dukes.
14  Thank you.
15          (Continued on following page.)
16
17
18
19
20
21
22

Page 172

1           Andy, before we go off the record,
2   there were a couple of questions Mr. Dukes
3   couldn't answer today, like what he did with
4   the other category of Procrit.  I don't
5   know -- I'd kind of like an answer to that.
6   How do you want to handle that?
7           MR. SCHAU:  We'll resolve that off
8   line.
9           MR. MACORETTA:  Okay.
10          MR. SCHAU:  I don't disagree with your
11  need to get an answer to those kinds of
12  questions.  I just don't know as I sit here
13  now what the best vehicle for that is, but
14  we can work that out.
15          MR. MACORETTA:  Okay, great.  Thank
16  you very much, Mr. Dukes.
17          (Time noted:  2:29 p.m.)
18
19
20
21
22

Page 173

1           C E R T I F I C A T E
2   STATE OF NEW YORK     )
3                 :  ss.
4   COUNTY OF NEW YORK    )
5
6       I, DAVID LEVY, CSR, a Shorthand Reporter
7   and Notary Public within and for the State of New
8   York, do hereby certify:
9       That JAYSON S. DUKES, the witness whose
10  deposition is hereinbefore set forth, was duly
11  sworn by me and that such deposition is a true
12  record of the testimony given by the witness.
13      I further certify that I am not related to
14  any of the parties to this action by blood or
15  marriage, and that I am in no way interested in
16  the outcome of this matter.
17      IN WITNESS WHEREOF, I have hereunto set my
18  hand this 8th day of May, 2006.
19      _____
20          DAVID LEVY, CSR
21
22

44 (Pages 170 to 173)

# Exhibit 16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


In re:                        )
PHARMACEUTICAL INDUSTRY        ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE        ) MDL No. 1456
LITIGATION                     )




MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
May 23, 2006, 3:05 p.m.







LEE A. MARZILLI
CERTIFIED REALTIME REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

Page 64

1          MR. BERMAN:  They were, your Honor.

2          THE COURT:  So why wouldn't that --

3          MR. BERMAN:  Because in this class that's going to

4 trial, they had no choice but to pay based off a statutory

5 scheme.  What they knew in Class 1 and 2 is not relevant.

6          THE COURT:  Well, yes, it is as to when they

7 brought the suit.  It wouldn't bar them from recovery, but it

8 would affect how far back they could recover.

9          MR. BERMAN:  Correct.

10          THE COURT:  So, I mean, that seems fair.  That's

11 why I was going to take it drug by drug.  And so with respect

12 to Zolodex, if in fact any company was purchasing, I'm going

13 to have to deal with the effects of that in a class because

14 that would put you on inquiry notice.  If you're paying one

15 price and you see that the statutory AWP price is a different

16 one, that would be inquiry notice.  What's it, the -- you

17 should have engaged in inquiry at that point, right?  So --

18          MR. HAVILAND:  That's the statute of limitations

19 defense, your Honor.

20          THE COURT:  Right.

21          MR. HAVILAND:  And obviously that issue would go to

22 the Class 2 plaintiffs.  There's been no contest, no evidence

23 that the plaintiffs in Class 1 knew or should have known at

24 any point in time.

25          THE COURT:  Right, Class 1 is different.

# Exhibit 17

```
 1              UNITED STATES DISTRICT COURT
 2               DISTRICT OF MASSACHUSETTS
 3    -------------------------------
      IN RE:                       :    Civil Action
 4                                 :    No. 01-12257-PBS
      PHARMACEUTICAL INDUSTRY      :    Courtroom No. 19
 5    AVERAGE WHOLESALE PRICE      :    1 Courthouse Way
      LITIGATION                   :    Boston, MA 02210
 6                                 :    10:00 a.m., Tuesday
      _____:    July 3, 2007
 7
 8                        HEARING
 9
10    Before:       THE HONORABLE PATTI B. SARIS,
                    UNITED STATES DISTRICT JUDGE
11
12
13    APPEARANCES:
14    Hagens Berman Sobol Shapiro LLP, (by Steve W. Berman, Esq.)
         1301 5th Avenue, Seattle, WA 98101-1090,
15       on behalf of the Plaintiffs.
16    Hagens Berman Sobol Shapiro LLP,
         (by Edward Notargiacomo, Esq.),
17       One Main Street, Cambridge, MA 02142,
         on behalf of the Plaintiffs.
18
      The Haviland Law Firm, LLC, (by Donald E. Haviland, Esq.)
19       740 S. Third Street, Philadelphia, PA 91912,
         on behalf of the Plaintiffs.
20
      Hogan & Hartson, (by Steven J. Edwards, Esq. and Lyndon M.
21       Tretter, Esq.), 875 Third Ave., New York, NY 10022,
         on behalf of the Defendant Bristol-Myers Squibb.
22
23                    Marie L. Cloonan
                    Federal Court Reporter
24             1 Courthouse Way - Room 7200
                Boston, MA  02210- 617-439-7086
25         Mechanical Steno - Transcript by Computer
```

Page 6

1  sides to make simultaneous filings on August 1st.  And,
2  I wonder if it wouldn't be more helpful to the Court, if
3  we can't reach agreement, if we did the filings
4  seriatim.  Let the plaintiffs --
5         THE COURT:  Then, I lose my law clerk.  See,
6  that's the big issue.  I'm hoping you'll confer in
7  advance and, then, you'll both file something.  And,
8  then, if you need to respond, you'll do so within the
9  two weeks.  But, at least I'll have both sides' position
10  and we can start getting going.  Maybe you could
11  exchange drafts a week beforehand so I'll know exactly
12  where there's an agreement or disagreement.
13         We timed it that way.  Otherwise, what ends up
14  happening is it takes me -- a full brief, two-week
15  response.  People are on vacation.  I mean, it is
16  August.  And, then, the reply and, then, the sur-reply
17  and, then, the hearing.  I'll lose what I need.  Okay?
18         So, if I can't do it, I can't.  But, no way --
19  I can't back it up much more.  Right?
20         MR. EDWARDS:  Well, we would be prepared to
21  respond very, very quickly.  But, if the Court prefers
22  to get the initial filings simultaneously, we can do
23  that as well.
24         The only thing that occurs to us is that we
25  think we should be able to reach an agreement, unless

Page 7

1  there is a surprise lurking there.  And, if there is a
2  surprise, then, we may not be able to anticipate it in
3  our simultaneous filing.  But --
4         MR. BERMAN:  Steve, let me interrupt.
5         By the time we get to August 1, we'll know.
6  There won't be any surprises.  We're going to tell you
7  what our issues are.
8         THE COURT:  Okay.
9         MR. EDWARDS:  Sure.
10         THE COURT:  So, should I schedule a hearing
11  now?  Or, should I just ...
12         You all know how to find us.
13         MR. BERMAN:  I think you scheduled a hearing on
14  August 9th.
15         MR. EDWARDS:  You have scheduled one for
16  August 9th.
17         MR. NOTARGIACOMO:  For everybody.
18         MR. EDWARDS:  For --
19         THE COURT:  Everybody, right.  All right.
20         So, we'll treat that as the time to spin out
21  any issues, if we need them, on the damages as well.
22         Now, am I right, that this basically wraps up
23  Track 1?  Because, I dismissed Johnson & Johnson.
24  Schering had no class representative -- I had forgotten
25  that, actually, when I was trying to schedule it.  It

Page 8

1  just had totally gone from my mind.  Although, Schering
2  quite quickly reminded me of it.
3         So, there will be no more trials with respect
4  to the first five defendants in Track 1 with respect to,
5  as I understand it, Class 1.  And, then, we've got the
6  two -- what I'll call -- bellwether trials on Classes 2
7  and 3.  And, I know you're eager to schedule a national
8  class, but I'm just as eager to start going into
9  Class -- Track 2.
10         So, I might schedule them for a hearing.  And,
11  I know -- I see Mr. DeMarco here.  We've got to move
12  that because it interferes with some people's vacation
13  plans to --
14         What date was it?
15         MR. DE MARCO:  July 17th, your Honor.
16         THE COURT:  July 17th.
17         THE CLERK:  2:30 p.m.
18         THE COURT:  But, as far as Track 1 goes --
19         MR. BERMAN:  There's one issue on Track 1,
20  your Honor.
21         THE COURT:  Yeah?
22         MR. BERMAN:  And, that is Johnson & Johnson.
23  I know that you said that their drugs didn't exceed the
24  30 percent rule for the purposes of Class 2 and 3.  But,
25  it's our position -- and we would like the opportunity

Page 9

1  to present this or maybe you've already decided -- that
2  that 30 percent would not apply to Track 1.
3         THE COURT:  I thought I ruled that.  The 30
4  percent did apply to Track -- to Class 1.
5         MR. BERMAN:  Well, you have a footnote that
6  talks about -- implies that, but you did not rule in
7  that way.  That's your ruling, that we have no J & J
8  Class 1 trial.
9         THE COURT:  I thought it was not a footnote.
10  I thought I went on and on about it.  I think I went on
11  and on about everything.  So, maybe I ought to look at
12  it again.
13         MR. BERMAN:  I don't think you did --
14         THE COURT:  I think I said that I rejected
15  plaintiffs' position that the per se liability for Class
16  1 and that I thought that the 30 percent speed limit
17  should apply to Class 1 as well.  And, that would be, I
18  thought applicable to all of the defendants.
19         So, why is that not clear?
20         MR. BERMAN:  Well, I didn't see that in the
21  order, your Honor.
22         THE COURT:  They've got it.
23         MR. BERMAN:  At the time we negotiated the --
24  via that settlement, both sides thought that was a risk
25  that could go either way.  And, we discussed that with

3 (Pages 6 to 9)

Page 10

```
 1   the mediator.  The mediator didn't think it was clear
 2   either.
 3              THE COURT:  Well --
 4              MR. BERMAN:  It's clear now.
 5              THE COURT:  It's clear now.  And, I will look
 6   at it again.  If it wasn't clear, it is clear.  The 30
 7   percent speed limit applies to Class 1.
 8              I rejected a per se position.  And, I have to
 9   go look through it again, because I thought it was
10   clear.  That's why I essentially had the expert go back
11   and calculate the damages again.  Because, the way he
12   did it was he aggregated all the years when he did it
13   with the 30 percent speed limit.  He didn't back out
14   the -- it might have been statute of limitations and on
15   the specific NDCs.  That's why I needed a root
16   calculation.
17              Otherwise, I could have done it.  Right?  On
18   the per se.  Because, he did it year by year.
19              MR. BERMAN:  Correct, you could have, yeah.
20              THE COURT:  I could have done that.  I mean
21   ...
22              MR. BERMAN:  But, we felt it was a different
23   issue with the consumers, because there's no evidence
24   that they had any knowledge of the so-called industry
25   norm of 20, 25 percent.
```

Page 11

```
 1              THE COURT:  Well, I ruled to the contrary and
 2   I don't accept that position.  And, I thought it was
 3   clear.  If not, I'm making it clear now.
 4              Now, I want to know what -- I'm ready, at this
 5   point, to deal with Montana and Nevada and move them
 6   back to their home states.  I've waited because I
 7   thought I would give someone the template so that
 8   someone else wouldn't have to relive this entire piece
 9   of it.  And, the question only is, from my point of
10   view, whether or not you all want to talk to them about
11   -- before I ship it off -- whether it's worth using
12   Eric Green's expertise to try and settle it before I do
13   that or whether I should just send it.
14              MR. BERMAN:  From our perspective, your Honor,
15   we are already in discussion with some of the
16   defendants.  So, if you want to get Mr. Green involved,
17   the plaintiffs would not -- we think that's a good
18   idea.
19              THE COURT:  I know I've only got one of you
20   here and not everybody.  But, what do you think?
21              I mean, once I've got a template, does this
22   make sense?  I know I've got this Medicaid and it's not
23   -- the TPPs and the Medicare statute.  But, Mr. Green
24   knows so much about it right now that I'd hate to ship
25   it back to the MDL and have them ship it up to the
```

Page 12

```
 1   courts in Montana and Nevada.
 2              Do you want to consult with everyone and see
 3   what you want to do?
 4              MR. EDWARDS:  We could certainly do that, your
 5   Honor.  But, let me just make two observations.
 6              The issues on the Medicaid cases are a little
 7   bit different because you have the state actually
 8   determining the reimbursement formula, paying the
 9   reimbursement formula, and there's a real issue as to
10   state knowledge and state policy.
11              All of that being said, we're always happy to
12   talk to Mr. Green.  Mr. Green has been very helpful.
13   And, I would anticipate that, you know, to the extent
14   that our adversaries in any case want to mediate, if
15   they would agree to use Mr. Green to mediate, we would,
16   too.
17              THE COURT:  I think he's on vacation, or, at
18   least he said he was going on vacation when he called me
19   a week ago.
20              So, when do you anticipate -- I've got the
21   opinion, basically drafted, sending the case back.  So,
22   the question really is:  How long do you think before
23   you could talk to your colleagues?
24              MR. EDWARDS:  Well, we can certainly talk to
25   our colleagues this week.  Getting an answer is
```

Page 13

```
 1   sometimes a little bit like the proverbial herding
 2   cats.  But, perhaps we could get back to you in a week
 3   to 10 days.
 4              THE COURT:  Deadlines help.  By July?  What do
 5   you want to say, the 15th?
 6              MR. EDWARDS:  Sure.
 7              THE COURT:  Does that make sense?  Is that
 8   reasonable, given people's schedules?  And, if it
 9   doesn't work, let me know?
10              MR. EDWARDS:  Yes.
11              THE COURT:  All right.
12              So, by July 15th, you will let me know whether
13   you want me to keep it here so you can try and settle
14   that case.
15              And, Mr. Berman, you represent Nevada and
16   Montana.  Right?
17              MR. BERMAN:  Yes, I do, your Honor.
18              THE COURT:  So, I mean, I don't know whether
19   that falls -- I'm just now starting to plow through the
20   Medicaid statutes, partly through the Vena Care cases
21   and also partly because I've got some of the state
22   cases.  So, I understand there are very different legal
23   issues, very different.
24              But, still, there's a certain body of
25   expertise that has been built up with Mr. Green and with
```

Electronically signed by Marie Cloonan (201-033-226-9106)                                    7b934d04-2a2e-44a6-acd5-995b081517b8

# Exhibit 18

# United States Court of Appeals
## For the First Circuit

No. 08-1002

IN RE:   PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE LITIGATION.

FEB 2 1 2008

ORDER OF COURT

Entered: February 15, 2008

This appeal is brought by two named plaintiffs, Larry Young and Therese Shepley, in their capacity as class representatives, from a judgment in favor of certain defendants ("the Johnson & Johnson defendants") in this massive antitrust class action.   The Johnson & Johnson defendants have moved to dismiss the appeal because it is being prosecuted by The Haviland Law Firm ("Haviland"), which was recently disqualified as class counsel by the district court.

Plaintiffs, represented by Haviland, opposed the motion to dismiss, arguing that the appeal was filed prior to the disqualification order and that dismissing the appeal would deprive them of their right to appeal the allegedly erroneous judgment against them.   Alternatively, plaintiffs asked that this appeal be consolidated with their appeal from the disqualification order.

Class counsel responded to the motion to dismiss by agreeing that Haviland can no longer prosecute this appeal but moving that the court permit class counsel to be substituted for Haviland rather than dismiss the appeal.   In response to class counsel's motion, the Johnson & Johnson defendants acknowledged that class counsel are authorized to prosecute this appeal and that allowing class counsel's motion to substitute themselves for Haviland would make dismissal of the appeal unnecessary.

Although the disqualification order predated the notice of appeal, now that Haviland has been disqualified from serving as class counsel, it can no longer represent the class in this appeal.   Further, although the disqualification order itself has been appealed,[1] that order

_____

[1]Neither our jurisdiction to review that order nor the merits of that order are presently before us.   Accordingly, we intimate no view on

presently remains in effect.   Finally, although class counsel did not initially file an appeal on plaintiffs' behalf from the judgment in favor of the Johnson & Johnson defendants, now that class counsel have offered to take over prosecution of the appeal filed by Haviland, plaintiffs' right to pursue their appeal is no longer at stake.   We therefore allow class counsel's motion to substitute themselves for Haviland in this appeal, thereby mooting the Johnson & Johnson defendants' motion to dismiss.   Since allowing the motion to substitute makes the merits of the disqualification order irrelevant to this appeal, we deny plaintiffs' motion to consolidate this appeal with their appeal from the disqualification order.

Class counsel's motion to substitute is <u>granted</u>.   Johnson & Johnson's motion to dismiss and plaintiffs' motion to consolidate are <u>denied</u>.

By the Court:

Richard Cushing Donovan, Clerk.

By: ____MARGARET CARTER____
Chief Deputy Clerk.

[cc: Steve Berman Esq., Rita Hanscom esq., Donald Haviland Esq., Steven Edwards Esq., Andrew Schau Esq., D. Scott Wise Esq., Jill Brenner Meixel Esq., Scott Kinsel Esq.]

either issue.

# Exhibit 19

Page 1

1              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
2
3   IN RE:                        )
                                  )  CA No. 01-12257-PBS
4   PHARMACEUTICAL INDUSTRY AVERAGE    )
    WHOLESALE PRICE LITIGATION        )  Pages 1 - 25
5                                 )
6
7
8
                       STATUS HEARING
9
            BEFORE THE HONORABLE PATTI B. SARIS
10             UNITED STATES DISTRICT JUDGE
11
12
13
14
                        United States District Court
15                      1 Courthouse Way, Courtroom 19
                        Boston, Massachusetts
16                      October 8, 2009, 4:10 p.m.
17
18
19
20
21
22                 LEE A. MARZILLI
              OFFICIAL COURT REPORTER
23          United States District Court
            1 Courthouse Way, Room 7200
24              Boston, MA  02210
                (617)345-6787
25

1  question --
2  THE COURT:  Let me put it this way:  I have not,
3  intentionally anyway, ruled on the rest of the states.  Now,
4  I've actually, unfortunately, plowed through the laws in all
5  these different states.  So the question really is, on
6  Johnson & Johnson, I found there was no liability with
7  respect to the third-party payors and the consumer
8  plaintiffs.  So now the question is, should I simply have a
9  bench trial, which is all you get, based on the old
10  evidence, and make a finding with respect to Class 1?
11  Should I do it based on summary judgment?  How do you want
12  me to proceed on Class 1 with 93A?  And then we can address
13  what we should do with respect to the nation because as the
14  First Circuit points out, and I actually found, many of
15  these states require jury trials.  So --
16  MR. SCHAU:  Well, I think, under 93A, if I read
17  the First Circuit's decision correctly, we should probably
18  move for summary judgment and have you decide.
19  THE COURT:  I'm not sure, or whether you just want
20  to go based on the evidence of the bench trial and make
21  findings on fact and law.  I think that's almost a better
22  way to go.
23  MR. SCHAU:  Okay.
24  MR. BERMAN:  I'm okay with that.
25  THE COURT:  Because I have heard it.  There's no

1  new evidence, exact same lawyer, exact same plaintiffs.
2  MR. SOBOL:  The exact same lawyer?
3  THE COURT:  What?  I mean plaintiffs' lawyers, the
4  plaintiffs' lawyers, right?  It's the exact same thing.  So
5  the only issue is whether I should apply it a little
6  differently or a lot differently because it involves
7  Medicare beneficiaries as opposed to third-party payor
8  consumers, right?
9  MR. BERMAN:  Correct.
10  THE COURT:  Why should I go through the whole
11  rain dance of summary judgment when I've actually got a
12  record?
13  MR. SCHAU:  Sure.
14  THE COURT:  But then there's another issue with
15  respect to the rest of the class.
16  MR. SCHAU:  Right.  I guess I'm a little confused
17  now.
18  THE COURT:  I was confused.  I wasn't sure what
19  was argued up there.  I don't know what was said.  They
20  definitely left it open for me to do summary judgment, for
21  me to do basically what I felt was appropriate.  And the
22  issue is whether or not on Massachusetts only I should do it
23  based on the evidence that I have, and I think answer is
24  "yes" because then I'm making fact findings rather than
25  drawing all reasonable inferences.  Then we get to the rest

1  of the country, right?
2  MR. BERMAN:  Correct.
3  THE COURT:  And then we have to decide that, I
4  think.
5  Now I'm going to ask you all this:  If there were
6  a separate trial for the rest of the country -- let's talk
7  about the rest of the country right now -- do we want to do
8  that on summary judgment?  Or is there new evidence that you
9  would deal with for the rest of the country?  Or do you want
10  me to just rely on the same evidence for the rest of the
11  country?
12  MR. BERMAN:  Well, I think that given the fact
13  that you called it a close call, right, and that there's
14  deferential scale on summary judgment, evidence is construed
15  in the light most favorable to the plaintiff, I don't see
16  how we could ever find summary judgment is appropriate.
17  You're just going to wind up with a bunch of boxes.  It's a
18  triable issue.
19  THE COURT:  Not on -- well, 93A I think we can
20  easily do on the evidence.
21  MR. BERMAN:  I understand that, but in a jury
22  trial states, if you read this very carefully, I think that
23  the First Circuit is saying --
24  THE COURT:  Well, I think what we should do is
25  leave you the chance to file a motion for summary judgment,

1  see what happens with AstraZeneca, because I'm not going
2  to -- and I need to make findings under 93A, which I already
3  thought I had done, but I understand why there's confusion.
4  So now I need to deal with what to do with the rest of the
5  country.  What do you want to do with the rest of the
6  country?  Do you want to file a motion for summary judgment
7  for the rest of the country?
8  MR. SCHAU:  I do.  I think that there's no
9  particular urgency to that, and therefore I'd be interested
10  in what you would expect from us.
11  THE COURT:  I've already been doing this for eight
12  years.
13  MR. SCHAU:  Right.
14  THE COURT:  My sense of urgency is just to finish
15  it, at least the class end, okay?  I've got all these
16  federal government cases.  Talk about rooms of documents,
17  wait till you see what's happening in the relator cases.
18  It's unbelievable.  And I have all the state cases.  It's
19  overwhelming at this point.  It's more, not less.  So you
20  don't want to get bogged down in all of that.
21  I am going to make fact-findings as a trial judge
22  on Class 1.  That's what I thought I was doing last time,
23  and I didn't do it well enough.  On the rest of it, I didn't
24  think I was doing the whole thing.  Now, maybe I was tired
25  at the end and didn't notice what the language said, and no

# Exhibit 20



# United States Court of Appeals
## For the First Circuit

No. 08-1046

IN RE: PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE LITIGATION

### JUDGMENT

Entered: **June 19, 2008**
Pursuant to 1st Cir. R. 27.0(d)

The Defendants-Appellees/Cross-Appellants' unopposed motion to voluntarily dismiss this cross-appeal pursuant to Fed. R. App. P. 42(b) is granted. This dismissal will not affect Plaintiffs-Appellants/Cross-Appellees' appeal No. 08-1002.

Mandate to issue forthwith.

By the Court:
/s/Richard Cushing Donovan, Clerk.

cc:
Steve Berman
Rita Hanscom
Donald Haviland
Steven Edwards
Andrew Schau
D. Scott Wise
Jill Brenner Meixel
Scott Kinsel
Jennifer F. Connolly