# Exhibit 31

| | |
|---|---|
| **From:** | Cohen, Cheryl [CNTUS] |
| **Sent:** | Wednesday, August 07, 2002 11:11 PM |
| **To:** | Weiss, Tom [CNTUS]; Anderson, Rick [CNTUS] |
| **Subject:** | FW: CIGNA & Aetna USHC Reimbursement Clarification |

Rick and Tom: Tom thank you for forwarding Rick message along and speaking with me today about this email. It is so critical that we are aligned with our communications and strategies. Rick AWP changes in reimbursement are not just a problem that we (corporate accounts) has, this is an organizational threat and problem that everyone owns because it crosses over so many customers that we don't impact. Unfortunately I don't have a solution for contracts that physicians signed with a health plan based on a contractual rate of reimbursement for the drug because that is between the health plan and the physician. What we can do as a TEAM is educate and strengthen the physicians knowledge and understanding to go into renegotiations with the plans concerning their reimbursement? But we cannot do this the physician has to do this himself with the plan. It is imperative that the directors understand what we can and cannot do legally. We can not find solves for a contracts they signed with a health plan. We can try and develop strategies such as infusion fees to help off set the dollars they can potentially loose on the AWP compenent(that we don't control). We are working with CIGNA on some create solves such as partnerships with GENTIVA and the health plan to ensure ACCESS which is one of our goals as well, not just protecting the revenue model. I am very much Rick a problem solver and I am constantly thinking of different ways we can develop strategies that protect the reimbursement,access, and prevent negative policies. If you would like to talk live phone I can go into specifics but each plan is so different and field wants answers today. I can go through several what if scenarios about what we are trying with CIGNA and AETNA but lessons learned with the field, you only communicate fact concerning health plans and fact today might be fiction tomorrow. Thanks for the direction and communication and I will definitely make changes in the future. Cheryl

-----Original Message-----
From: Weiss, Tom [CNTUS]
Sent: Wednesday, August 07, 2002 12:16 PM
To: Cohen, Cheryl [CNTUS]
Subject: Fw: CIGNA & Aetna USHC Reimbursement Clarification

Let's discuss

Tom

-----Original Message-----
From: Anderson, Rick [CNTUS] <RAnders2@CNTUS.JNJ.COM>
To: Weiss, Tom [CNTUS] <Tweiss@CNTUS.JNJ.COM>
Sent: Wed Aug 07 10:27:56 2002
Subject: FW: CIGNA & Aetna USHC Reimbursement Clarification

Tom,

Take a look at this. I would recommend that we work with the field directors to help them "solve" issues they have. I read this a couple of times and did not see a lot of solution oriented thinking. This could work against us in our alignment efforts we discussed last week.

Let's discuss.

Rick

-----Original Message-----
From: Fraser, Craig [CNTUS] <Cfraser@CNTUS.JNJ.COM>
To: Anderson, Rick [CNTUS] <RAnders2@CNTUS.JNJ.COM>
Sent: Thu Aug 01 09:01:28 2002
Subject: FW: CIGNA & Aetna USHC Reimbursement Clarification

1

**Plaintiffs' Exhibit**
**302**
01-12257-PBS

EXHIBIT
PENGAD 800-631-6889
Cohen 6
9/8/05   7

HighlyConfidential

FYI
-----Original Message-----
From:   Greenleaf, Peter [CNTUS]
Sent:   Wednesday, July 31, 2002 7:51 AM
To:     Fraser, Craig [CNTUS]; Kramer, Cheryl [CNTUS]
Subject:  FW: CIGNA & Aetna USHC Reimbursement Clarification

FYI - We discuss AWP reform .... it's here today ... with our largest providers on the commercial side.  We will put in place an action plan for Aetna.  It still sounds like we have a fighting chance to renegotiate at the physician level.  In areas where we are CIGNA "heavy" we will regroup and develop our battle plan.

Peter

-----Original Message-----
From:   Cohen, Cheryl [CNTUS]
Sent:   Tuesday, July 30, 2002 10:36 PM
To:     Greenleaf, Peter [CNTUS]
Cc:     Murphy, Kymber [CNTUS]
Subject:  RE: CIGNA & Aetna USHC Reimbursement Clarification

Peter: Welcome to AWP reform on the commercial side of the business.  Cigna is currently reimbursing at AWP -17% ( and there is a question whether they have the right AWP for Remicade (they missed a few price increase) and they also reimbursement for the standard infusion codes 910780 910781.  To make matters worse Cigna is not working with us to keep it in the physicians office because they signed a capitalted agreement with GENTIVA (home infusion) upfront for the year based on all their members (PMPM).  So they feel that they have already paid for the infusion services with GENTIVA and they are not paying again.  Kym is meeting with every regional plan across the country.  She has been on a road show to see what we can do.  Currently we finally presented a level 1 contract to them this month and it is going through legal.  They don't even want to look at level 2 (infusion fee) because they don't want the preferred site of care to be office because they already paid infusion cost to GENTIVA.  Cigna is also extremely unhappy with our marketing practices (selling physicians on the revenue) and Kym has been trying to defend that as well.  Aetna rewrote all their physician contracts on July 1 and put in reimbursement of Remicade at AWP -17% or they can use their SPP and only collect money on the infusion codes.  Aetna is easier to work with and some physicians have been successful renegotiating a higher dollar amount.  I suggest that you have your Aetna providers contact Aetna directly to tell them they are not happy with the infusion dollars and they need to renegotiate or they will push it to the hospital.  Aetna is much more sophisticated and they do not want it moving to the hospital because they know what they are paying ( a lot).  Aetna is trying to move all of the regions to infusion fees and use a mandatory SPP but it will take time and the first step is to decrease AWP to -17%.  If you have any additional questions surrounding these accounts please feel free to contact myself or Kym directly. Cheryl

-----Original Message-----
From:   Greenleaf, Peter [CNTUS]
Sent:   Tuesday, July 30, 2002 2:16 PM
To:     Cohen, Cheryl [CNTUS]
Subject:   CIGNA & Aetna USHC Reimbursement Clarification

Hey Cheryl,

I hope all is well. I was having a discussion with one of our top accounts last week and subsequently had Lou do some follow up research with Barb about current reimbursement with these two payers.  Can you clarify whether these levels sound right to you.... they seem low to me -

CIGNA -

AWP less 17% - 573.50 per vial
+ nursing costs 40 or so
net on 3 vial patient - $170.50

USHC -

Similar picture

2

                                        MDL-CEN00032731

Let me know what you know

Thanks

Peter

3

HighlyConfidential

MDL-CEN00032732

# Exhibit 32

## JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC.
## AMENDMENT TO REBATE AGREEMENT

| | |
|---|---|
| **Customer Name:** | **Health Net Pharmaceutical Services** |
| **Customer Address:** | **10834 International Drive** |
| | **Suite 200** |
| | **Rancho Cordova, California  95670** |
| **Contract number:** | **IPS003916** |
| **Contract Effective Date:** | **April 1, 2000 – December 31, 2002** |
| **Amendment Effective Date:** | **January 1, 2002 – December 31, 2005** |

For the purposes of this Amendment the Definitions, Rebate Terms and General Provisions of the aforementioned Agreement shall survive the expiration of said Agreement.  The above-referenced Agreement is amended as follows:

For the purposes of this Amendment (Remicade only), for the first six (6) quarters of this Amendment, Customer shall have 90 days after the end of each calendar quarter to submit data listed on Exhibit A and reports listed in Rebate Terms section 6b.

### Participants: Health Net lives only

### Rebate Structures: (see below)

| Option | Requirement | Rebate Percent |
|---|---|---|
| Level 1 | No Infusion Fee | 6% |
| Level 2 | With Infusion Fee | 8% |

Notes:

### Level 1 – Without Infusion Fee

Supplier's obligation to pay Rebates with respect to the Products below shall be subject to these Product Specific Terms.

1.  Customer will earn a rebate of six percent (6%) off of the DLP in effect on the first day of the quarter provided Customer meets all of the following conditions:

    a)  Remicade is included on Formulary with at least Equal Status and/or is listed in relevant medical policies/guides or similar materials issued by the Plan as a covered Drug with Equal Status to other biologics within approved FDA indications.

    b)  Infusion in the office of Participating Providers shall be the preferred site of care and the site of care shall be determined by the Participating Provider.  Customer shall not disadvantage the physician office as the site of care.

    c)  Customer shall supply data for Remicade and the Drugs in the Defined Product Market on a quarterly basis in a format agreeable to both parties.

### Level 2 – With Infusion Fee

Supplier's obligation to pay Rebates with respect to the Products below shall be subject to these Product Specific Terms.

1.  Customer will earn a rebate of eight percent (8%) off of the DLP in effect on the first day of the quarter provided Customer meets **all** of the following conditions:

DEFENDANT'S EXHIBIT
2804
PENGAD 800-631-6989

HIGHLY CONFIDENTIAL

MDL-CEN00000738

a)   Remicade is included on Formulary with at least Equal Status and/or is listed in relevant medical policies/guides or similar materials issued by the Plan as a covered Drug with Equal Status to other biologics within approved FDA indications.

b)   Infusion in the office of Participating Providers shall be the preferred site of care and the site of care shall be determined by the Participating Provider.  Customer shall not disadvantage the physician office as the site of care.

c)   Customer agrees to develop and implement a reasonable Infusion Fee for the administration of Remicade.  For purposes of this Agreement, "Infusion Fee" shall be defined as a single payment rate to be paid to a Participating Provider which covers the professional services, direct and indirect drug administration costs (including overhead) associated with each infusion of Remicade.   Customer agrees to establish a process for adoption of an Infusion Fee which shall include the following elements:

   i)    Consultation with Participating Providers who are familiar with the clinical administration of Remicade in physicians' offices/clinic settings and its associated costs;

   ii)   Consideration of data concerning the professional service costs and direct and indirect drug administration costs (including overhead) associated with an infusion of a full course of therapy with Remicade in physician offices/clinic settings as components of an Infusion Fee;

   iii)  Consideration of appropriate external data regarding   the professional services and direct and indirect drug administration costs (including overhead) of a single infusion of other infusible drugs such as cancer chemotherapeutics (including without limitation consideration of appropriate data and guidelines issued by the American Society of Clinical Oncology);

   iv)   Development of a proposed Infusion Fee, specifying the amounts of payment and differentiating, where appropriate, among uses of Remicade for differing clinical indications;

   v)    The adoption and implementation of a reasonable Infusion Fee will be required within eight (8) weeks following the execution of a Letter of Commitment which will be required for any Plan to access the Level II Rebate Schedule, subsequent to the execution of the base Amendment.

Notwithstanding any other provision of this Agreement, Customer shall have sole and exclusive discretion with, Participating Providers, the decision to adopt a reasonable Infusion Fee, and the amount of any such Infusion Fee. In the event that Customer does not adopt and implement an Infusion Fee as described herein, the Parties shall meet to discuss an appropriate prospective adjustment to the applicable rebate percentage and/or termination of the Agreement.

d)   Customer shall supply data for Remicade and the Drugs in the Defined Product Market on a quarterly basis in a format agreeable to both parties

HIGHLY CONFIDENTIAL

This Amendment does not supersede, eliminate or change any part of the above-referenced Agreement except as specifically stated herein.  All other Terms and Conditions of the above-referenced Agreement shall remain intact.

**IN WITNESS WHEREOF,** the parties hereto have caused this Amendment to the Agreement to be executed by their respective officers or representatives duly authorized to do so.

| CUSTOMER | SUPPLIER |
|---|---|
| John Sivori<br>President | Robert C. Nelson<br>Corporate Account Director<br><br>Patrick Adams<br>Manager, Account Development |

HIGHLY CONFIDENTIAL

MDL-CEN00000740

**Exhibit A**

**Data Requirements**

**Remicade® Data Elements:**

1. **HealthNet Plan (Region) (ie-HealthNet of NE, HN of CA, HN of AZ, HN of OR).**
2. **Site of Infusion (Providers Office, Hospital Outpatient Department, Home Health, Free Standing Clinic etc)**
3. **Number of Units (translated into vials)  ( ie- J-Code or NDC).**
4. **Date of service/infusion.**
5. **Number of patients (identity masked) or treatments.**

**Competitive Data Elements:**

1. **HealthNet Plan (Region) (ie-HealthNet of NE, HN of CA, HN of AZ, HN of OR)**
2. **ZIP Code**
3. **Number of Units (By all NDC numbers).**
4. **Date of Dispensing.**

HIGHLY CONFIDENTIAL

MDL-CEN00000741

# Exhibit 33

William C. Pearson, Vol. II HIGHLY CONFIDENTIAL          March 28, 2006
New York, NY

Page 319

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------

In Re:  Pharmaceutical Industry: MDL Docket No.

Average Wholesale Price          : Civil Action

Litigation                       : 01CV12257-PBS

--------------------------------

This Document relates to:        :

All Actions                      :

--------------------------------

HIGHLY CONFIDENTIAL

Tuesday, March 28, 2006

New York, New York

Time:  1:25 p.m.


Continued Deposition of WILLIAM C.

PEARSON, taken by Plaintiffs, at the offices of

Patterson Belknap Webb & Tyler, LLP, 1133 Avenue

of the Americas, New York, New York, on Tuesday,

March 28, 2006, pursuant to Agreement, as taken

by and before Anita Shemin, a Shorthand Reporter

and Notary Public of the State of New York.

William C. Pearson, Vol. II HIGHLY CONFIDENTIAL          March 28, 2006
New York, NY

Page 400

1       A.   What was your question?
2       Q.   I just wanted to make it clear to you that
3  62954 is a continuation of the hospital training
4  objectives?
5           MR. PAREKH:  The document speaks for
6  itself.
7  BY MR. HOFFMAN:
8       Q.   Do you see that?
9       A.   Yes.
10      Q.   Under J, it talks about use of grants.
11           Did OBI use grants or offering of grants
12  to hospitals in order to promote the use of Procrit
13  by that hospital?
14      A.   Ortho Biotech used grants to customers. It
15  -- it depended on the reason the grants were given.
16  Primarily educational grants, as I recall.
17      Q.   Did OBI use grants to just improve the
18  business relationship between the hospital and OBI
19  by giving unrestricted educational grants?
20           MR. PAREKH:  Objection to form.
21      A.   I don't recall.  I would have to look at
22  the specific grant.

Page 401

1       Q.   Did OBI offer grants in order to lower the
2  overall acquisition cost of the hospital for their
3  Procrit that they purchased?
4           MR. PAREKH:  Objection to form.
5       A.   Not that I recall.
6       Q.   Turning back to the prior page just for a
7  moment, you testified earlier that sales reps were
8  attempting to convert Epogen business in the
9  nondialysis sector to Procrit; correct?
10           MR. PAREKH:  Objection to the extent that
11  it mischaracterizes his testimony.
12      A.   I didn't answer exactly like that, but I
13  did say that they were attempting to convert
14  nondialysis business to Procrit.
15      Q.   Okay.  Would you agree that at least in
16  the nondialysis sector, that OBI viewed Epogen as a
17  competitor?
18           MR. PAREKH:  Objection to form.
19      A.   We viewed Epogen as a product being sold
20  into the nondialysis market, which is a market that
21  we had the rights to.
22      Q.   You are battling for market share with

Page 402

1  Epogen within the nondialysis sector; is that
2  correct?
3           MR. PAREKH:  Objection to form.
4       A.   Yes, we were battling to get those
5  accounts to purchase Procrit for nondialysis.
6       Q.   Right.
7       A.   It may or may not have been Epogen. Maybe
8  they weren't treating nondialysis patients at the
9  time, so, again, we were battling to get Procrit
10  used in nondialysis.
11      Q.   If they weren't treating with Epogen even
12  at that time, they would be transfusions, that would
13  be that you were trying to move physicians away to
14  use toward Procrit?
15      A.   It could be or no treatment at all.
16      Q.   Okay.
17           MR. PAREKH:  I would like to make this
18  deposition highly confidential, as was the original.
19           MR. HOFFMAN:  Sure.
20  BY MR. HOFFMAN:
21      Q.   If you turn to 62599, look at the top, you
22  will see these are now retail training objectives.

Page 403

1  Do you see that?
2       A.   Yes.
3       Q.   Would you agree that that is --
4       A.   Yes.
5       Q.   Would you agree with me that that refers
6  to how sales reps are supposed to go about selling
7  Procrit to pharmacy chains?
8       A.   It says retail training objectives, but it
9  gives --
10      Q.   What type of customer is retail training
11  objectives referring to?
12           MR. PAREKH:  Objection.  It assumes it is
13  talking about a customer.
14      A.   Retail to me is a retail pharmacist.
15      Q.   If you look down at H, the document says,
16  "Know how to explain Procrit profit to the
17  pharmacist."  Do you see that?
18      A.   I do.
19      Q.   Do you know what that is referring to?
20      A.   No, I don't.
21      Q.   Does it surprise you that a document is
22  being -- is being provided to the sales force as

22 (Pages 400 to 403)

ab1571e5-3371-4ecb-a546-47ae3fa1aa81

# Exhibit 34

John Dempsey        HIGHLY CONFIDENTIAL        August 5, 2005
                Bridgewater, New Jersey

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE

        DISTRICT OF MASSACHUSETTS


In Re:  PHARMACEUTICAL INDUSTRY     MDL DOCKET NO.

AVERAGE WHOLESALE PRICE             CIVIL ACTION

LITIGATION                          01CV12257-PBS

-------------------------------X

ALL ACTIONS

-------------------------------X


                Friday, August 5, 2005
                9:45 a.m.




        HIGHLY CONFIDENTIAL DEPOSITION of JOHN

DEMPSEY, held at the offices of Ortho Biotech,

Bridgewater, New Jersey, a Certified Shorthand

(Stenotype) Reporter and Notary Public within and

for the State of New York.

e39e387d-4c69-414c-9765-58b1994d3312

John Dempsey          HIGHLY CONFIDENTIAL          August 5, 2005
                   Bridgewater, New Jersey

Page 110

1  the rebates when you were back at Ortho?
2       A   Yes.
3       Q   Can you tell me generally what the
4  terms of the rebate agreements were with
5  pharmacies?
6       A   It was for market share
7  achievement.
8       Q   Meaning the same thing, if the
9  pharmacy had X percentage of its sales in that
10  group of Procrit, it would get a certain rebate;
11  right?
12      A   That's correct.
13      Q   Did you understand, then, that
14  pharmacies could influence which drug ultimately
15  was given to the patient, Procrit or Epogen?
16      A   Yes.
17      Q   I mean, how would pharmacies do
18  that?
19      A   Procrit and Epogen are what is
20  referred to as AB rated.  The products are
21  identical.  The difference is the name that's on
22  the label, and that's because of the marketing

Page 111

1  and the licensing agreement that Amgen and Ortho
2  Biotech have agreed to where Procrit can be
3  utilized in the nondialysis marketplace, and
4  Epogen has sole rights to the dialysis market.
5          In retail stores, I believe the
6  percentage agreement between the two companies
7  was that 90 percent of the sales that went
8  through retail would rightfully be Ortho
9  Biotech's.  And for us, our goal was to brand
10  the product such that when Procrit was used --
11  or when epoetin alpha was prescribed in the
12  retail setting, the brand would be utilized.
13          And as I understand it, that
14  retail rebate program was initiated to
15  encourage the utilization of Procit when an
16  epoetin alpha prescription was written by a
17  physician.  So a retail pharmacy would be
18  rewarded for their market share of Procrit
19  versus Epogen.
20      Q   So if a prescription [sic] writes
21  a prescription for Epogen, can the pharmacist
22  then give them Procrit?

Page 112

1       A   They could.
2       Q   You said there was some
3  understanding that 90 percent of the retail
4  business belonged to Ortho?
5       A   I believe that's correct.  I could
6  be off by 5 percent.
7       Q   What does that mean?  Is that just
8  a general understanding between the companies, or
9  did the contract figure out some financial
10  arrangement based on that 90 percent?
11      A   Not sure I understand your
12  question.  The two companies arrived at an
13  agreement in all segments of the marketplace,
14  whether it be retail, hospital, physician
15  distributor, that X amount of the utilization of
16  the product in this segment would be nondialysis
17  based on surveys that were conducted.  I don't
18  know who conducted the surveys, but based on
19  surveys that were conducted.
20          And the two companies would say,
21  "Okay, that date is correct.  85, 95 percent of
22  the business that's going through a retail

Page 113

1  pharmacy should be Ortho Biotech's, and it
2  should be Procrit if Epogen is sold in that
3  marketplace, those prescriptions should be
4  Procrit prescriptions.  Just like if Procrit is
5  sold in dialysis, that should be Epogen, and
6  Epogen should be sold in those settings.  If
7  either product was sold in a setting where it
8  shouldn't be sold, one company would have to
9  pay the other a penalty."
10      Q   Are you saying it didn't really
11  matter how much Epogen versus Procrit the
12  pharmacist prescribed?  I guess Amgen would have
13  been on the hook if less than 90 percent of those
14  prescriptions were for Procrit?
15      A   Just to clarify, pharmacists don't
16  prescribe --
17      Q   Fair enough.
18      A   -- pharmacists dispense.  You are
19  correct in your assumption.
20      Q   If it turned out that for some
21  time period, 50 percent of the prescriptions
22  dispensed in retail pharmacies were for Procrit,

29 (Pages 110 to 113)

e39e387d-4c69-414c-9765-58b1994d3312