# Exhibit 36

*Haro Copy*
*( Fax WENT THRU THIS morning )*

*DP*

| Product PROCRIT® (Epoetin alfa) | Selling Unit or Package size | NDC Number | New Case Price | New Selling Unit Price | New AWP |
|---|---|---|---|---|---|
| 10,000 U | 6 pack | 59676-310-01 | $2359.20 | $589.80 | $707.76 |
| 10,000 U | 25 pack | 59676-310-02 | $9830.00 | $2457.50 | $2949.00 |
| 20,000 U/2ml multidose | 6 pack | 59676-312-01 | $4718.40 | $1179.60 | $1415.52 |
| ORTHOCLONE OKT®3 (muromonab CD3) | 5 ampule | 59676-101-01 | $2900.00 | $2900.00 | $3480.00 |
| LEUSTATIN® (cladribine) Injection | 7 pack vial | 59676-201-01 | $2898.00 | $2898.00 | $ 3477.60 |

*$414*

**Plaintiffs' Exhibit**
**237**
01-12257-PBS

**RECEIVED FEB 1 3 1997**

RECVD _____
ENTRY E _____  QC _KU_  02114197
CODE C _____  QC _____
FILE _KU_  02114197 # TO CODE _____

MFTR _ORTHO BIO-TECH_
EFF DT _2,13,97_
FMT _11_ LAB _59676_ DLAB _99962_
AWP _A_ WAC _D_ DP _Y_ DPPF _1.01,2_
WAPF1 _/_ WAPF2 _ _ WAPF3 _ _  Leustatin
PTY _/_ SCEN _I_ TYPE PART # : 25679.

WKH77797
CONFIDENTIAL



**ORTHO BIOTECH**

700 Rt. 202 South
Raritan, New Jersey 08869
(908) 704-5008 (Phone)

## URGENT - PRICE CHANGE INFORMATION

### February 12, 1997
### 5:00 P.M. EASTERN TIME

Medi-Span, Inc.
Jan Reed
8525 Woodfield Crossing Blvd.
Indianapolis, IN 46249-0930

Dear Jan:

Orders for selected Ortho Biotech Inc. products received or post marked after 5:00 PM Eastern Standard Time on Wednesday, February 12, 1997, will be billed at the new prices listed on the back of this notice.

Thank you for your cooperation.

Sincerely,

Rick Heine
Director, Trade Relations

WKH77798
CONFIDENTIAL

Feb-12-97 05:59P Ballantine Group Inc          201 209 0066          P.01

◆

## ORTHO BIOTECH

700 Rt. 202 South
Raritan, New Jersey 08869
(908) 704-5000 (Phone)

## URGENT:  PRICE CHANGE NOTIFICATION

**FAX TRANSMISSION**
**FAX NO. (201) 209-0066**

**DATE:**       February 12, 1997

**TO:**          Medi-Span, Inc.
                 8525 Woodfield Crossing Blvd.
                 Indianapolis, IN 46249-0930

**ATTN:**        Jan Reed
**FAX:**         (317) 469-5252

**FROM:**        ORTHO BIOTECH

                 We are transmitting __3__ pages including this cover sheet.

**RE:**          **URGENT PRICE CHANGE INFORMATION**
                 **Effective:**     5:00 (p.m.) Eastern Time        1 Feb 13, 1997
                                    **Wednesday, February 12, 1997**   is Feb 13, 1997

The following notification is also being sent by Federal Express to arrive **Thursday,
February 13, 1997.**

If there are any problems with this transmission, please contact Diane Staub at
(201) 209-1616.

RECEIVED FEB 1 3 1997

RECVD _____
ENTRY E _MD_ 2-13-97 QC _____
CODE C _____ QC _____
FILE _____ # TO CODE _____

MFTR _ORTHO BIOTECH_
EFF DT _2, 13, 97_
FMT _1 HR_ LAB _59676_ DLAB _99962_
AWP _A_ WAC _D_ DP _V_   DPP  #1 -1.00
                                  #2 -1.20 deudatu
WAPF1 _____ WAPF2 _____ WAPF3 _____
PTY _____ SCEN _7_ TYPE _Post_ #

WKH77799
CONFIDENTIAL



**ORTHO BIOTECH**

700 Rt. 202 South
Raritan, New Jersey 08869
(908) 704-5000 (Phone)

## URGENT - PRICE CHANGE INFORMATION

February 12, 1997
5:00 P.M. EASTERN TIME
( *translates to 2-13-97* )

Medi-Span, Inc.
Jan Reed
8525 Woodfield Crossing Blvd.
Indianapolis, IN 46249-0930

Dear Jan:

Orders for selected Ortho Biotech Inc. products received or post marked after 5:00 PM Eastern Standard Time on Wednesday, February 12, 1997, will be billed at the new prices listed on the back of this notice.

Thank you for your cooperation.

Sincerely,

Rick Heine
Director, Trade Relations

WKH77800
CONFIDENTIAL

Feb-12-97 05:59P Ballantine Group Inc        201 209 0066        P.03

| Product PROCRIT® (Epoetin alfa) | Selling Unit or Package size | NDC Number | New Case Price | New Selling Unit Price | New AWP |
|---|---|---|---|---|---|
| 10,000 U | 6 pack | 59676-310-01 | $2359.20 | $589.80 | $707.76 |
| 10,000 U | 25 pack | 59676-310-02 | $9830.00 | $2457.50 | $2949.00 |
| 20,000 U/2ml multidose | 6 pack | 59676-312-01 | $4718.40 | $1179.60 | $1415.52 |
| ORTHOCLONE OKT®3 (muromonab-CD3) | 5 ampule | 59676-101-01 | $2900.00 | $2900.00 | $3480.00 |
| LEUSTATIN® (cladribine) Injection | 7 pack vial | 59676-201-01 | $2898.00 | $2898.00 | $3477.60 |

WKH77801
CONFIDENTIAL

# Exhibit 37

*HARD COPY*

◆

# ORTHO BIOTECH

700 Rt. 202 South
Raritan, New Jersey 08869
(908) 704-5000 (Phone)

**URGENT -- PRICE CHANGE INFORMATION**

**January 6, 1998
5:00 P.M. EASTERN TIME**

MEDI-SPAN
8425 WOODFIELD CROSSING BLVD.
PO BOX 40930
INDIANAPOLIS, IN 46240

DEAR PHARMACEUTICAL BUYER:

Orders for selected Ortho Biotech Inc. products received or postmarked after 5:00 PM Eastern Standard Time on Tuesday, January 6, 1998, will be billed at the new prices listed on the back of this notice.

Thank you for your cooperation.

Sincerely,

*Rick J. Heine*

Rick Heine
Director, Trade Relations

**WKH 02434**

RECVD _____ JAN 7 1998 _____
ENTRY E __TM__ 1/8/98 QC __kw__ 01/07/98
CODE C _____ QC _____
FILE __kw__ 01/07/98 # TO CODE _____

MFTR Ortho Biotech
EFF DT 1/7/98 verified
FMT 11 12 LAB 59676 DLAB 09962
AMP A WAC D DP Y DPPF _____
                              (LESSMAN)
WAPF1 1.00 WAPF2 1.00 per WAPF3 _____
PTYP SCEN L TYPE PART # 28060

**Plaintiffs' Exhibit**
**238**
01-12257-PBS

_Δ FORMAT to 12_

_DP_

_USE PRICE DIVISOR OF 7_

| Product PROCRITE (DPX DPPF) (Epoetin alfa) | Selling Unit or Package Size | NDC Number | New Case Price | New Selling Unit Price | New AWP |
|---|---|---|---|---|---|
| 10,000 U | 6 pack | 59676-310-01 | $2,400.00 | $600.00 | $720.00 |
| 10,000 U | 25 pack | 59676-310-02 | $10,000.00 | $2,500.00 | $3,000.00 |
| 10,000 U/mL x 2mL (multidose) | 6 pack | 59676-312-01 | $4,800.00 | $1,200.00 | $1,440.00 |
| 20,000 U/mL x 1mL (multidose) | 6 pack | 59676-320-01 | $4,800.00 | $1,200.00 | $1,440.00 |
| ORTHOCLONE OKT®3 (DPX AWP) (muromonab-CD3) | 5 ampule | 59676-101-01 | $3,000.00 | $3,000.00 | $3,600.00 |
| LEUSTATIN® (cladribine) Injection (DPX DPPF) | 7 pack vial | 59676-201-01 | $3,010.00 | $3,010.00 | $3,612.00 |

WKH 02435

Jan-06-98 05:20P                                                    P.01

*FAX*
*COPY*

◆
**ORTHO BIOTECH**

700 RL 202 South
Raritan, New Jersey 08869
(908) 704-5000 [Phone]

## URGENT:  PRICE CHANGE NOTIFICATION

*FAX TRANSMISSION*
*FAX NO. (973) 209-0066*

DATE:       January 6, 1998

TO:         Medi-Span
            8425 Woodfield Crossing Blvd.
            PO Box 40930
            Indianapolis, IN  46240

ATTN:       Jan Reed

FAX:        317-469-5252

FROM:       ORTHO BIOTECH

            We are transmitting  _3_  pages including this cover sheet.

RE:         **URGENT PRICE CHANGE INFORMATION**
            **Effective:     5:00 p.m. Eastern Time**
            **Tuesday, January 6, 1998**

The following notification is also being sent by *Federal Express* to arrive
**Wednesday, January 7, 1998.**

If there are any problems with this transmission, please contact Lynn
Gustofson at (973) 209-1616.

**WKH 02436**



Jan-06-98  05:23P                                                      P.02

◆

**ORTHO BIOTECH**                                    700 Rt. 202 South
                                                     Raritan, New Jersey 08869
                                                     (908) 704-6000 (Phone)

### URGENT – PRICE CHANGE INFORMATION

**January 6, 1998**
**5:00 P.M. EASTERN TIME**

MEDI-SPAN
8425 WOODFIELD CROSSING BLVD.
PO BOX 40930
INDIANAPOLIS, IN 46240
ATTN: JAN REED

DEAR MS. REED:

Orders for selected Ortho Biotech Inc. products received or postmarked after
5:00 PM Eastern Standard Time on Tuesday, January 6, 1998, will be billed at
the new prices listed on the back of this notice.

Thank you for your cooperation.

Sincerely,

*Rick J. Heine*

Rick Heine
Director, Trade Relations

**WKH 02437**

Jan-06-98 05:21P                                                              P.03

| Product PROCRIT® (Epoetin alfa) | Selling Unit or Package Size | NDC Number | New Case Price | New Selling Unit Price | New AWP |
|---|---|---|---|---|---|
| 10,000 U | 6 pack | 59676-310-01 | $2,400.00 | $600.00 | $720.00 |
| 10,000 U | 25 pack | 59676-310-02 | $10,000.00 | $2,500.00 | $3,000.00 |
| 10,000 U/mL x 2mL (multidose) | 6 pack | 59676-312-01 | $4,800.00 | $1,200.00 | $1,440.00 |
| 20,000 U/mL x 1mL (multidose) | 6 pack | 59676-320-01 | $4,800.00 | $1,200.00 | $1,440.00 |
| ORTHOCLONE OKT®3 (muromonab-CD3) | 5 ampule | 59676-101-01 | $3,000.00 | $3,000.00 | $3,600.00 |
| LEUSTATIN® (cladribine) Injection | 7 pack vial | 59676-201-01 | $3,010.00 | $3,010.00 | $3,612.00 |

WKH 02438

# Exhibit 38

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


-------------------------------------x

IN RE PHARMACEUTICAL INDUSTRY

AVERAGE WHOLESALE PRICE LITIGATION,

-------------------------------------x


Civil Action:  01-CV-12257-PBS


July 28, 2004

9:40 a.m.


H I G H L Y   C O N F I D E N T I A L


30(b)(6) Deposition of THOMAS HIRIAK,

held at the offices of Patterson Belknap

Webb & Tyler, before David Henry, a

Certified Shorthand Reporter and Notary

Public of the State of New York.

1  some, and Johnson & Johnson Health Care
2  Systems might have as well.
3      Q.   Okay.  I understand the
4  distribution channels, just to sum up, that
5  the -- that OBI sells to -- directly to
6  physician distributors and wholesalers who
7  then sell to end-users or customers, is that
8  correct?
9      A.   That's correct.
10     Q.   And what is your understanding of
11 the markets in which the wholesalers or
12 physician distributors sell into?
13     A.   Physicians, hospitals, PBM's,
14 alternate sites, meaning long-term care,
15 home health.
16     Q.   And what is your understanding of
17 what the drivers for marketing to physician
18 market, to the physician market?  What were
19 the key selling points to the physician
20 market?
21     A.   From the physician distributor
22 standpoint or from our perspective?

1      Q.   Well, does OBI have sales
2  representatives who market or who detail or
3  market to physicians?
4      A.   Yes.
5      Q.   And to hospitals?
6      A.   Yes.
7      Q.   To PBM's?
8      A.   Yes.
9      Q.   To home health and long-term
10 care?
11     A.   Yes.
12     Q.   So my question is, what is your
13 understanding as to what the drivers for
14 each of those markets is, starting with
15 physicians?
16     MR. SCHAU:   You mean from OBI's
17 perspective?
18     Q.   From OBI's perspective.
19     A.   Clinical superiority or efficacy,
20 safety, long-term success, being in the
21 market for an extended period of time, and
22 lower cost to the health care system.

1      Q.   How about reimbursement to
2  physicians?
3      MR. SCHAU:   Object to form.
4      Q.   Is that a driver to the physician
5  market?
6      A.   It's a driver for the physicians.
7      Q.   And OBI recognizes that, is that
8  correct?
9      A.   Yes.
10     Q.   Okay, and has that always been
11 the case, that this has been a driver that
12 OBI is aware of in the physician market?
13     A.   Specifically in oncology, yes.
14     Q.   Okay.  How about the hospital
15 segment?  What are the drivers for the
16 hospital segment?
17     A.   I would say they were saying
18 clinical efficacy, safety profile, history
19 of success for the use of Procrit, patient
20 benefits and lower cost to the health care
21 system.
22     Q.   And was reimbursement of Procrit

1  a primary consideration for a hospital?
2      A.   Not as much as in physicians.
3      Q.   Why is that?
4      A.   Many hospital pharmacists still
5  just look at cost.  They look at in-patient
6  use of drugs, they look at DRG's, they look
7  at drugs as a cost center, and therefore the
8  cost message that Ortho Biotech talks about
9  I think resonates even better with hospital
10 pharmacists than it would with physicians.
11     Q.   Is another end user retailers?
12 Do you still have retailers as well?
13     A.   Retail is a market for Ortho
14 Biotech, yes.
15     Q.   Is it for Procrit?
16     A.   Yes.
17     MR. SCHAU:   His question is do
18 you sell to retailers.
19     Q.   No, my question was, is that a
20 market that is ultimately sold to by the
21 wholesale physicians or suppliers?
22     MR. SCHAU:   Okay, fair enough.

24  (Pages 90 to 93)

Thomas Hiriak          Highly Confidential          July 28, 2004
New York, NY

Page 94

1     A.  Yes.
2     Q.  And what are the drivers in the
3  retail market?  Are they the same as in the
4  physician market?
5     A.  Yes.
6     Q.  And was reimbursement a
7  consideration for the retail market?
8     A.  Reimbursement is driven by the
9  payers that they deal with.  I have to think
10  about that question for a minute.
11     Q.  Let me ask again.  Is
12  reimbursement a primary consideration for
13  the retail market?
14     A.  No.
15     Q.  Okay, was it a consideration?
16     A.  I think it is a consideration,
17  yes.
18     Q.  And why is that?
19     A.  Well, retail will know whether
20  that private payer is going to pay for
21  Procrit before they dispense the drug.  They
22  know what the patient copay is when that

Page 95

1  patient walks in the door.  So it is a
2  consideration because a managed care
3  organization for example, or PBN that is
4  representing an employer or a managed care
5  organization will make a decision whether
6  they will pay for it or not.  Retail will
7  know what's going on, so it is a
8  consideration, but I would say more of the
9  focus would be on what a Blue Cross and Blue
10  Shield plan or whoever employer group is
11  deciding to terms of the reimbursement for
12  Procrit.
13     Q.  Okay.  In 1991, was OBI the
14  entity that Ortho Biotech, was that the
15  entity that was marketing and selling
16  Procrit?
17     A.  I believe so, but I don't know.
18     Q.  Okay.  Do you know what the
19  marketing strategy was in 1991 for selling
20  Procrit?
21     A.  No.
22     Q.  Okay, the drivers that you

Page 96

1  identified earlier for the physician
2  hospital and retail market, are those the
3  same for all the franchises?
4     A.  They vary by franchise.
5     Q.  They vary in degree?
6     A.  Vary in degree.
7     Q.  Most focus on the reimbursement
8  franchises would be oncology?
9        MR. SCHAU:   Object to form.
10     Q.  Which franchise recognized that
11  reimbursement was the largest driver?
12        MR. SCHAU:   Object to form.
13     Q.  Let me ask it another way.  For
14  which franchise was reimbursement the
15  largest driver?
16        MR. SCHAU:   Object to form.
17     Q.  You can answer.
18     A.  In the oncology market, a
19  significant portion of an oncologist's
20  revenue is from drugs.  That is more in
21  oncology than it is for a nephrologist.  So
22  if you are talking specifically about

Page 97

1  revenue on the part of physicians, that
2  would be oncology.  But reimbursement
3  obviously is going to be a major component
4  in all markets.
5     Q.  And OBI was aware that the
6  oncology as well as -- okay, OBI was aware
7  from prelaunch until now that physicians or
8  hospitals in any of these franchise areas
9  were interested in the reimbursement level
10  for using Procrit?
11        MR. SCHAU:   Object to form.
12     A.  I don't know prelaunch, but
13  reimbursement is a major component of our
14  business.
15     Q.  And that's at least true back to
16  1991, will you agree with that?
17     A.  I don't know when the indication
18  for oncology, for chemotherapy was actually
19  introduced.  If you're asking me, was it as
20  big a driving force when chronic kidney
21  disease was the focus, I would say it
22  definitely has less of a focus at that time.

25 (Pages 94 to 97)

Thomas Hiriak          Highly Confidential          July 28, 2004
                        New York, NY

Page 154

```
 1   McKinsey's position on that is that
 2   physicians have a strong reimbursement
 3   environment for Procrit.
 4      Q.   And this is prior to the
 5   introduction of Aranesp, isn't that correct?
 6      A.   I believe so, yes.
 7      Q.   Okay.  And the fact that it was
 8   going to deteriorate was going to create a
 9   disincentive for physicians to use Procrit.
10   Do you agree with that statement?
11      MR. SCHAU:   Object to form.
12   You can answer the question if you
13   understand it, but I need to object to form
14   to preserve the record.
15      A.   If you read it saying possibly
16   creating a disincentive for physicians to
17   administer Procrit, I think it is a
18   possibility, yes.
19      Q.   Okay.  Now, so at the time of
20   this document, was OBI aware that if its
21   physician economics deteriorated, physicians
22   may choose to use another drug?
```

Page 155

```
 1      MR. SCHAU:   Object to form.
 2      A.   This obviously is McKinsey's
 3   position, so they'd have to answer exactly
 4   what they meant.  I'm not sure it had to do
 5   with competition, maybe it did, I'd have to
 6   review the whole document, but there were
 7   discussions I believe at that time with the
 8   government saying that reimbursement for the
 9   product was going to go down from AWP minus
10   5 to AWP minus 15.  That's how I would read
11   what McKinsey is saying.  Now, maybe they
12   were talking about competition.  The way
13   that I read it though, that's what I would
14   take out of what McKinsey was trying to get
15   across at that time.
16      Q.   Do you see any reference to the
17   change of AWP based reimbursement by
18   government in this section?  That would make
19   you think that's what you're talking about?
20      MR. SCHAU:   I object to form.
21   This section meaning this page?
22      MR. HOFFMAN:   The executive
```

Page 156

```
 1   summary.
 2      THE WITNESS:   Oh, just on this
 3   one page, I'm sorry.
 4      Q.   I'm just wondering what the basis
 5   is of your assumption that it's government
 6   based AWP.
 7      A.   Well, if I read just that next
 8   bullet point, range of reimbursement
 9   threatened, Procrit sales growth, and then
10   it keeps going on, and then you can see down
11   there it says AWP reduction, and also APC's
12   is a reimbursement change as well.  So on
13   that executive summary, yes, I do see
14   something about AWP reduction.
15      Q.   Okay, but you agree that
16   physician economics prior to the
17   introduction of Aranesp was -- you agree
18   that Procrit was well positioned prior to
19   the introduction of Aranesp?
20      MR. SCHAU:   Objection.
21      Q.   If you can turn to page 651 on
22   this document, again that's Bates number
```

Page 157

```
 1   651.  Mr. Hiriak, if you can take a look at
 2   that page, Bates number 651, at the top of
 3   the page, it says today, physicians have
 4   significant economic incentives to prescribe
 5   supportive care drugs such as Procrit, due
 6   to revenue and profits from stocking and
 7   administering.
 8      Now, my question is at the time
 9   of this document, did OBI understand this
10   statement to be true?
11      MR. SCHAU:   Object to form.
12      A.   I don't know how you define
13   significant, but did Ortho Biotech
14   understand that reimbursement and drug
15   revenue was important to physicians, yes.
16      Q.   Right.  Did OBI dispute this
17   statement in any way at the time this
18   document was created?
19      MR. SCHAU:   Objection.
20      A.   I don't know.
21      Q.   If you could take a look at page
22   659.
```

40 (Pages 154 to 157)

Page 158

1    A.   Yes.
2    Q.   And at the top there it says
3  strategic evolution for Procrit, and there
4  is a category of from and to, do you see
5  that?
6    A.   Yes.
7    Q.   And would you agree with me that
8  the from category previously was being
9  marketed, and two, their recommendation as
10  to where it should be marketed or how it
11  should be marketed?
12    MR. SCHAU:   Their being
13  McKinsey?
14    MR. HOFFMAN:   Yes.
15    A.   Could you ask the question again?
16    Q.   Okay, let me just ask this
17  question. You see at the first bullet point
18  under from, it says used by physicians
19  because it's economically attractive, while
20  providing clinical benefits. Do you see
21  that?
22    A.   Yes.

Page 159

1    Q.   What period is that referring to
2  for McKinsey? What period is McKinsey
3  referring to under that category?
4    A.   Period of time?
5    Q.   Yes.
6    A.   I would assume as of June 21,
7  1999.
8    Q.   And was that your understanding
9  at the time you read this document in 1999?
10    A.   My understanding that that's
11  where McKinsey was coming from?
12    Q.   That that was McKinsey's
13  conclusion as to how Procrit, or why
14  physicians were using Procrit prior to 1999.
15    A.   That was McKinsey's position, I
16  would assume so, again, because it's in
17  their documents, yes.
18    Q.   At that time, did you understand
19  this statement to be true?
20    MR. SCHAU:   The statement being
21  the first bullet point on that page?
22    MR. HOFFMAN:   Yes, the

Page 160

1  statement that is in the text of the page we
2  just read.
3    A.   I would question which would come
4  first, clinical benefits or economically
5  attractive, but again, did Ortho Biotech
6  understand that reimbursement and margins
7  were important to oncologists, the answer is
8  yes.
9    Q.   Is it also true that Ortho
10  Biotech understood that physicians were
11  using the drug because it was economically
12  attractive?
13    A.   That's why I said I would
14  question which would come first, whether
15  clinical benefits comes first or whether
16  economics come first. But again, do we know
17  that profit and margins were important to
18  oncologists, the answer is yes.
19    Q.   Okay. I'd like to mark this
20  document as Exhibit Hiriak 007.
21    (Exhibit Hiriak 007, Document
22  entitled Procrit Contracting Modelling

Page 161

1  Provider Economics, marked for
2  identification.)
3    Do you recognize this document
4  entitled Procrit Contracting Modelling
5  Provider Economics?
6    A.   Yes.
7    Q.   Did you receive this document on
8  or about August of 2002?
9    A.   I would assume so, yes.
10    Q.   Do you recall the reason why
11  Charles River Associates was asked to
12  prepare this document?
13    A.   I believe so, yes.
14    Q.   Okay, can you tell me what that
15  reason was?
16    A.   Charles River worked with us on
17  our contracting strategy. One of the issues
18  we ran into with physicians is that we as a
19  company would not market on the spread.
20  Product specialists couldn't talk about it,
21  district managers couldn't talk about it,
22  they couldn't talk about it as part of our

41 (Pages 158 to 161)

Thomas Hiriak          Highly Confidential          July 28, 2004
                         New York, NY

Page 226

1      A.   The one that has done most of the
2  work, or almost all of the work is IBM, used
3  to be PWC and now it's IBM.
4      Q.   And of the six pricing changes, I
5  believe you said six, that have taken place,
6  have all those involved third party
7  consultant analyses?
8      A.   That I don't know.
9      Q.   In other words does it require a
10 third party analysis to ultimately implement
11 a pricing change?
12     A.   Third party, are you counting our
13 own internal finance department?
14     Q.   Not in this instance.
15     A.   Then I would say no, it would not
16 always have to include an outside source.
17     Q.   Okay, in the internal finance
18 department, who would conduct that analysis?
19     A.   Right now Doris Chern, John
20 Peterkins and ultimately Pete Patesco..
21     Q.   And you said that 1997 was the
22 first price change.  Can you tell me who

Page 227

1  would have worked on the internal analyses
2  from that time until now, or is it too many
3  people?
4      A.   It would be difficult.  I don't
5  necessarily know for 97, and the one in
6  98 --
7      Q.   Let me ask you this.  I'm going
8  to switch subjects.  Has the price change
9  been recommended and not implemented during
10 the period 1997 to the present?
11     MR. SCHAU:   Object to form.
12     Q.   And I don't want to confuse you
13 with recommended.
14     MR. SCHAU:   That's why I
15 objected.
16     Q.   Has there been someone asked to
17 look into a price increase which didn't
18 result in price increase ultimately?
19     A.   Yes.
20     Q.   How many times has that happened?
21     A.   Since I've been involved, I am
22 aware of one circumstance.

Page 228

1      Q.   And what year was that
2  approximately?
3      A.   That would have been 2002.
4      Q.   And would a written analysis have
5  occurred in connection with that request?
6      A.   I don't know.
7      Q.   You don't know if there was any
8  kind of analysis done as to whether or not a
9  pricing change would be appropriate in that
10 instance?
11     A.   I'm sorry, there was an analysis
12 done.  Whether -- because of market
13 conditions, there was a decision made that
14 it would be bad timing, because the pricing
15 people, or the members of the pricing team
16 thought it would be bad timing.  Their
17 recommendation was not to do anything.  I
18 don't know if there was anything that was
19 written that was taken to senior management
20 at that time.
21     Q.   Okay.  What is contained in these
22 analyses?  What factors are considered?

Page 229

1      A.   I think competitive environment,
2  what's going on with the competition, their
3  price, the reimbursement environment, what's
4  going on in the reimbursement environment.
5  Obviously margins and what could potentially
6  happen to physicians' margins.  Timing since
7  the last price increase, future marketplace
8  changes, what potential reaction would be of
9  our competitors or scenarios based on that,
10 if there is anything in our potential
11 contract that could mitigate the price
12 increase.  Those are the things that come to
13 mind.
14     Q.   Okay, and to whom is that
15 analysis presented?
16     A.   Initially the pricing team.
17     Q.   And what does the pricing team do
18 with those analyses?
19     A.   There is a discussion that ensues
20 that shows what the belief is in terms of
21 what's going on in the environment and then
22 a decision would be made to further continue

# Exhibit 39

**Memorandum**

# ORTHO BIOTECH

| | | | | |
|---|---|---|---|---|
| **To:** | S. Walden | | **Date:** | February 19, 1997 |
| **From:** | C. Dooley | | **cc:** | M. Naismith |
| | | | | S. Salmon |

**Subject:**   Medicare AWP Drug Reimbursement Proposal

Sue-

Thanks for the opportunity of reviewing the draft language proposal submitted to HCFA by OMB for the Medicare AWP drug reimbursement proposal.  While the fact that Medicare rebates are not proposed is certainly positive, the proposed language is of big concern as the impact on OBI would potentially be very significant.

As I was in the J&J Washington office today, Shannon and I had the opportunity to discuss this and we spoke about the potential for this being a vehicle for price fixing / regulation with the obvious immediate impact on Medicare drugs, and the threat of the potential expansion to government regulation of drug prices in the future.

   A few initial comments:

- The fact that the drug or biologic would not be paid on cost or prospective payment basis would imply that this is only applicable to the physicians' offices and not to clinics billed based on a cost report. (marked as line 18). We are currently seeing a shift in business for PROCRIT from the physicians' office to the clinic with one factor being the expense.
- Average Wholesale Price as specified by the Secretary seems to imply the government setting price (line 23-24).
- It appears that it would be cumbersome to submit the actual acquisition cost for each purchaser to obtain the average or actual cost.
- When the possibility of pricing surveys has occurred in the past, we have worked closely with ASCO to make sure that the actual acquisition cost is reflective of the costs incurred (i.e. syringes, storage, refrigeration, etc.). These costs are significant to the physicians' offices.  I assume from the language that there is no consideration given to these indirect costs.  The cost of medical and infusion supplies are considered incidental to treatment and theoretically payment is out of the windfall of the pharmaceuticals.
- Due to the fact the drugs are administered "incident to a physicians' services" under Medicare, the physician's office incurs significant up front outlay of cash - some of which may not be recovered due to wastage, spillage or indigent care.

EXHIBIT // A

Dooley
Jan. 13, 2006

Plaintiffs' Exhibit
979
01-12257-PBS

- It is interesting that they provide a  roadmap of dates for calculation as this seems to open a way to skew the system.
- Lastly, oncology practices derive a windfall from the use of chemotherapeutic agents and related drugs / biologics treating toxicities in the office setting. With this said, the difference in actual acquisition cost and what is reimbursed based on AWP may impact the use of a product like PROCRIT. This is obviously a threat for the use of a product that is may not always be considered standard of care.
- We are currently lowering our rebates to physicians and this is a step in the right direction to ensure that the acquisition price is maximized.

I would welcome your thoughts and insights on this issue and look forward to working with you on it in the future.

# Exhibit 40



CONFIDENTIAL

# Strategies for Shaping the Reimbursement Environment

ORTHO-BIOTECH, INC.

Highlights of Phase 1 findings
December 1999

This report is solely for the use of client personnel. No part of it may be circulated, quoted, or reproduced for distribution outside the client organization without prior written approval from McKinsey & Company. This material was used by McKinsey & Company during an oral presentation; it is not a complete record of the discussion.

**Plaintiffs' Exhibit**
**334**
01-12257-PBS

**HIGHLY CONFIDENTIAL**

MDL-OBI00006777

## INTERVIEWS CONDUCTED

### Johnson & Johnson Internal

| Strategic customer group | Other OBI groups | Johnson & Johnson |
|---|---|---|
| • Barbara Ballard | • Tom Amick | • Sandy Babey |
| • Chris Benecchi | • Don Cope | • Syd Frank |
| • Joan Bost | • Steve Heller | • Gerald Holleman |
| • Arisa Cunningham | • Bob Honigberg | • Darryl Jodray |
| • Hilton Hopwood | • Jennifer Hopwood | • Doug Michaels |
| • John Dempsey | • Loretta Itri | • Shannon Salmon |
| • Annette DeVine | • Phil Ligouri | • Jack Vaughn |
| • Cathy Dooley | • Greg Marlo | • Yolanda Wallace |
| • Dan Dupre | • Dave Pierson | |
| • Cheryl Gay | • Charlia Raffin | |
| • Tom Hiriak | • Gary Reedy | |
| • Ellen Ivey | • Dick Robbins | |
| • Elaine Kling | • Liz Scull | |
| • Mary McGovern | • Mitch Slavin | |
| • Jim Millrany | • Carol Webb | |
| • Stu Mohr | | |
| • Rich O'Leary | | |
| • Bill Pearson | | |
| • Mark Reese | | |
| • Jeff Stewart | | |
| • Cheryl Wallace | | |
| • Scott Willet | | |

### External consultants/specialists

• Tom Ault, Health Policy Alternatives
• Nancy Bradish Myers, BIO
• Bobbi Buell, CEO Documedics
• Maureen Coleman, Practice Management Specialist
• Jacob Drapkin, Drapkin Associates
• Mark Erwin, VP Business Development at Comprehensive Reimbursement Consultants
• Jo Ellen Slurzberg, Cyprus Bioscience
• Debbie Steelman, Steelman Health Strategies
• Ann Vickory, Hogan & Hartson

**Representatives of other Pharma companies**
• AstraZeneca
• Immunex
• Pfizer
• Sanofi

**McKinsey payor/provider practice**
• Rick Edmunds
• David Levine, MD
• Rick Schlesinger

N-1010.326/99100BNmicSO1

HIGHLY CONFIDENTIAL

MDL-OBI00006778

## INTERVIEWS CONDUCTED (CONTINUED)

| Payors | Providers | Government agencies and other organizations |
|---|---|---|
| **Leading private payors** | **Academic medical centers** | **HCFA** |
| • Former Pharmacy Head | • Dr. Pablo Cagnoni, University of | • Dr. Robert Berenson, Director Reimbursement group |
| • Pharmacy Head | Colorado | • Dr. Grant Bagley, JD, Director Coverage and Analysis Group |
| • President Specialty Healthcare | • Oncology Fellow, Memorial Sloan | • Dr. John J. Whyte, MPH, Medical Officer Coverage and Analysis |
| • VP Pharmacy Management | Kettering | Group |
| • Director of Formulary | • Dr. Leonard, Cornell Medical Center | • Medical Director, Medicare Carrier, BCBS Virginia/Trigon (Part A) |
| Management | • Dr. Rob Glassman, NYU | • John Sirmon, Special Assistant, Health Plan Purchasing and |
| • Head of Pharmacy |  | Administration |
| Management | **Community Practices** | **Medicare Commission** |
| • VP Medical Management | • Dr. Caruso, Stoneybrook, NY | • Bobby Jindal, Staff Director (also former head of Medicaid in Los |
| • SVP Medical Management | • Wendy Conners, Director Case | Angeles) |
| • Case Manager | Management | • Debbie Steelman, Member (also consultant) |
|  | • Dr. Rob Gelfand, NY |  |
|  | • Nancy Kinney, Director Disease | **MedPac** |
|  | Management | • Gail Wilensky, Chairman |
|  | • Wendy McNap, Practice Administrator |  |
|  | • Dr. Peter Yi, Princeton, NJ | **Medicaid** |
|  |  | • Ed Vaccaro, Pharmacy, New Jersey |
|  |  | • Margaret Murray, Director of Medical Assistance, New Jersey |
|  |  | • Marva Lubker, former Deputy Director Medicaid, Missouri |
|  |  | **Executive Branch** |
|  |  | • Bill White, White House Staff Member Intergovernmental Affairs |
|  |  | (focus on social security, health care) |
|  |  | **American Cancer Community Center (ACCC)** |
|  |  | • Lee Mortenson |
|  |  | **American Society of Clinical Oncologists (ASCO)** |
|  |  | • Laurie Lamar, Reimbursement Specialist |
|  |  | **American Oncology Resources (AOR)** |
|  |  | • Russ Carson, Welsh Carson – Investor/Board Member |
|  |  | **Other** |
|  |  | • Debbie Cohen, Oncology book author |
|  |  | • David Cassak, *In Vivo* magazine |

2

NJ-I010.32698910USNmicSO1

MDL-OBI00006779

## PROJECT OVERVIEW

**Phase 1**

**Developing strategies to shape reimbursement environment**

- Analyzing flow of Procrit by payor today and likely future flow
- Identifying issues and scenarios
- Understanding stakeholders' perspectives
- Prioritizing issues facing OBI
- Developing strategies and example tactics

**Phase 2**

**Enhancing organizational effectiveness**

- Developing high-level organization design
- Describing key skills and capabilities
- Outlining key processes and activities including critical lines of communication to support strategic objectives

HIGHLY CONFIDENTIAL

NJ-1010.326|99100|9|NmicSO1

MDL-OBI00006780

## EXECUTIVE SUMMARY – PHASE 1

As Procrit's market position continues to grow, pressure and attention to coverage and reimbursement will increase significantly, particularly for the oncology franchise. The challenge these pressures represent to the Strategic Customer Group specifically, and the OBI organization more broadly, have less to do with assisting physicians with claims coding than with developing a strategy to ensure continued top-line growth.

¶ Currently, Procrit's market position is vulnerable along two key dimensions:

• Procrit has not yet been broadly established as the standard of care

• Physician economics, while currently strong, are likely to deteriorate, possibly creating a disincentive for physicians to administer Procrit.

¶ A range of reimbursement pressures threaten Procrit sales growth. While each individually has a low likelihood of posing a major risk, the cumulative business risk is large, particularly for self administration, AWP reduction, Medicare national guidelines, and APCs.

¶ To successfully shape the outcome of these issues, OBI must move from a largely targeted, reactive strategy to one that proactively addresses a broader range of issues and constituents.

NJ-1010.326/9810/5Nmfd5O1

HIGHLY CONFIDENTIAL

MDL-OBI00006781

5

- Procrit position today

- Reimbursement pressures

- Strategies to shape reimbursement

NJ-1010.326/691008Nml/oSO1

HIGHLY CONFIDENTIAL

MDL-OBI00006782

**OBI REVENUE BREAKDOWN – 1998 GROSS SALES**

$ Millions, percent



**Indication**

100% = $880 million

- Other
- Surgery
- Pre-renal
- HIV
- Oncology 65%
- 2
- 6
- 13
- 14

**Payor**

100% = $880 million

ESTIMATE
☐ Private payors

- Medicaid
- Medicare 34%
- VA/military, other government, self, other/unknown
- Medicare managed care
- HMO
- PPO
- Fee for service (largely managed indemnity)
- 10
- 11
- 4
- 16
- 8
- 17

Source: Trinity Partners; Accelerated Growth Plans; Franchise Business Plans

NJ-1010.326/991006/Nm/sSO1

6



**GROWTH OF PROCRIT SALES**
$ Millions, percent of net total

Implied payor mix in 2001*

Medicare — 34
Fee for service (largely managed indemnity) — 18
PPO — 7
HMO — 15
Medicare managed care — 4
Medicaid — 9
VA/military, other government, self, other/unknown — 10

ESTIMATE
☐ Private payors

100% = $752 million

| | 1998 | 1999 | 2000E | 2001E |
|---|---|---|---|---|
| | | 1,250 | 1,855 | 2,321 |
| Other | 6 | 7 | 8 | 9 |
| Surgery/ICU | 13 | 10 | 8 | 7 |
| Pre-renal | 14 | 14 | 12 | 10 |
| HIV | 2 | 1 | 1 | 1 |
| Oncology | 65% | 67% | 71% | 73% |

\* Based on payor mix by indication for 1998 and estimated indication mix for 2001
Note: Growth rates for 2000 to 2001 were taken at half the previous year's rate (i.e., oncology, estimated to grow 57% from 1999 to 2000; our estimate for 2000 to 2001 is 28%)
Source: Trinity Partners; Accelerated Growth Plan (April 22, 1999 version); McKinsey analysis

NJ-I-010,526/9910BNmfcS01

7

HIGHLY CONFIDENTIAL

MDL-OBI00006784

8

## STANDARD OF CARE SUMMARY

As yet, Procrit has not been broadly established as the standard of care in oncology among providers or payors. As a result, Procrit is not currently in a strong enough market position to withstand the reimbursement pressures that currently face it.

¶  **Physicians:**  Questions about Procrit's clinical benefit and reimbursement concerns have led some physicians to determine use on a case by case basis, rather than as standard procedure for all patients.

¶  **Payors:**  Procrit is not generally perceived by payors as having a sufficiently robust clinical case.

¶  **Hospitals:**  Procrit is not universally recognized as the standard of care for chemotherapy patients by leading hospitals, nor is it cited as such by external sources.

N.J-1010.328/9810061Nm0501

**HIGHLY CONFIDENTIAL**

MDL-OBI00006785

STANDARD OF CARE – PHYSICIAN PERSPECTIVES

**There is a wide range of opinion within the physician community around the clinical benefit of Procrit**

"Growth factors never saved a life... I'm not convinced they make a difference."
– Oncologist, Academic Medical Center

"I transfuse 40 to 50% of my oncology patients so I don't use much Procrit"
– Community Oncologist

"Academic physicians don't believe supportive care drugs are standard of care."
– Community Oncologist

**Procrit use is often determined case by case**

"Quality of life issues are addressed on a case-by-case basis, rather than broadly applied... All interventions must have a cost/benefit rationale."
– Case Manager

"For supportive care drugs, the economics come more into play... When patients have managed care plans I'm particularly stingy about prescribing."
– Community Oncologist

"Prescribing of growth factor is at the physician's discretion... No real guidelines are in place... The only real trigger is if blood counts are low."
– Oncology Fellow, Academic Medical Center

"Most community physicians rely on their own experience (to determine standard of care)."
– Community Oncologist Center

Source: Physician Interviews

NJ-1010326/991006Nmcs01

HIGHLY CONFIDENTIAL

MDL-OBI00006786

9

# EXTERNAL PERSPECTIVES ON PROCRIT AS STANDARD OF CARE

EXAMPLES
- ● High
- ◑ Medium
- ○ Low

| Sources | Strength of Procrit position | Comments |
|---|---|---|
| • National Cancer Institute PDQ (comprehensive cancer database) | ○ | No mention of Erythropoietin |
| – Patient brief on supportive care: fatigue | | |
| – Health professional brief on supportive care: Fatigue | | "Although fatigue is one of the most prevalent symptoms in cancer, there are few pharmacologic interventions with proven efficacy in clinical trials" |
| • Clinical pathways | ◑ | Start treatment at Hb < 11 |
| – Georgetown University Medical Center, M.D. Anderson, Allegheny University Hospital | | |
| – Memorial Sloan Kettering | | "I don't know of any established clinical pathway for Procrit." – Oncology Fellow |
| • ASCO | ? | Clinical guideline under development to be released Spring 2000 |
| • ACCC | ◑ | Per Georgetown University Medical Center |
| • Compendia (USP, AHFS) | ◑ | Largely as per label with minimal off-label uses |
| • Medical texts | ◑ | "Erythropoietin also can ameliorate the anemia associated with cancer chemotherapy." |
| – Goodman and Gillman's *The Pharmacologic Basis of Therapeutics* | | |
| – *Cancer Principles and Practice of Oncology*, Devita | | "Clinician needs to look for treatable causes of anemia, such as iron deficiency or blood loss, consider the underlying illness and other factors to determine if a course of EPO treatment is warranted." |
| • Peer-reviewed clinical literature | ◑ | Transfusion triggers (and related role of Procrit) under debate |
| • Cancer Care Ontario practice guidelines (Literature review based) | ● | "For cancer patients … in whom symptoms of anemia sufficient to require red cell transfusion are anticipated, and where transfusion is not considered an acceptable treatment option, EPO can be recommended as a safe, effective treatment alternative" |

Source: Literature search; interviews

NJ-1010.326/691006NmlsBO1

HIGHLY CONFIDENTIAL

MDL-OBI00006787

11

## STANDARD OF CARE – PAYOR PERSPECTIVES

**Payors are looking for compelling clinical evidence before making a drug standard of care**

"Clinical evidence is the foundation. Evidence-based medicine is our number one criteria."
– VP Pharmacy Management, Leading Health Insurer

"There will never be a reimbursement issue for drugs that are clearly needed for clinical reasons."
– President of Specialty Healthcare, Leading Health Insurer

"Internal committees review the weight of the evidence and then make a coverage decision."
– Head of Pharmacy, Leading Health Insurer

"Try to insure that the right patient gets the right drug at the right time."
– Director of Formulary Management, Leading Health Insurer

**Procrit is often mentioned (unprompted) as a drug without a sufficiently robust clinical case**

"Off-label uses of Epogen are unsupported by clinical data."
– Head of Pharmacy, Leading Health Insurer

"I would really worry about the medical necessity issue. Payors will be asking: 'Do you really need Neupogen, Procrit, Zofran, etc.?'"
– Reimbursement Consultant

Compounded by Procrit's status as a supportive care drug

8 of top 10 Medicare states require Hb<10.5 for oncology use

Source: Payor/consultant interviews

NJ-1010,326/99 1005/knt/c501

MDL-OBI00006788

12

## ONCOLOGIST ECONOMICS SUMMARY

¶ Today, physicians have significant economic incentives to prescribe supportive care drugs such as Procrit, due to revenue and profits from stocking and administering.

¶ For supportive care drugs, patient insurance status often influences prescribing. Physicians tend to determine the source of Procrit (e.g., own stock versus pharmacy) and site of care depending on expected reimbursement outcomes.

¶ The large number of Procrit accounts below $250,000 suggests that some oncologists either do not want to hold the financial risk, or do not fully understand the profit potential of using Procrit, this implies a significant opportunity for OBI to increase penetration.

¶ Despite this opportunity, a number of external pressures such as medical to pharma switch, could significantly erode physician profitability.

NJ-I010.325/991008NmcSO1

HIGHLY CONFIDENTIAL

MDL-OBI00006789

13

## ONCOLOGIST ECONOMICS – INTERVIEW FINDINGS

**For private practitioners, stocking and administering Procrit yield significant profit opportunities**

"Epogen is a great profit maker."

"I stock both Neupogen and Epogen and do high volumes of both. They're profit makers -- Medicare covers both and it's relatively easy to get paid for it."

"My practice makes $6-8,000 per month on Procrit."

"The money is in ancillary services such as injectable drugs."

**For supportive care drugs, patients insurance status influences prescribing... physicians tend to steer their patients depending on their insurance coverage**

"I look at the patient's insurance and think about the risk I'm taking...I worry about whether I'll get paid by the insurer, so it really depends on who's covering the patient."

"My concern is less for making money and more for losing money on big investments...so I try to insulate myself by sending the more restricted patients to the pharmacy or outpatient hospital clinic."

"My Medicare reimbursement is excellent because I automatically get 80% from Medicare, and I typically get most of my other 20% in copays."

Source: Oncologist interviews

NJ-1010.326/991006Xmfc5O1

HIGHLY CONFIDENTIAL

MDL-OBI00006790

# ONCOLOGIST ECONOMICS

*ESTIMATE*



**Average total revenues = $1,700,000**

| | |
|---|---|
| Other** | ~7 |
| Lab and pathology | ~14 |
| Services and procedures* / Evaluation and management | 28% |
| Drugs | 50% |

Example revenue drivers

Aredia −5 · Leucavorin −5 · Taxol −10–20 · Camptosar −5 · Cisplatin −5 · Epogen −10 · Neupogen −8 · Antiemetics (Zofran, Kytril, Anzemet) −10 · Other −30 · Gemzar −5

| Drug | Profit*** | | Billing | |
|---|---|---|---|---|
| | Average margin | Range | Average charge | Range |
| Epogen (1,000 units) | 29% | 5 to 55% | $15.40 | $11 to 26 |
| Neupogen (300 mcg) | 18 | 5 to 35% | $171.60 | $152 to 208 |
| Zofran (1 mg) | 35 | 14 to 50% | $7.70 | $6 to 11 |
| Kytril (100 mcg) | 14 | −7 to 32% | $22.60 | $19 to 35 |
| Taxol (30 mg) | 12 | −1 to 28% | $203.30 | $173 to 291 |

* Includes injections, immunizations, and chemotherapy administration
** Includes procedures/diagnostic tests
*** Analyzed from 8 oncology practices
Note: Actual drug cost to practices is typically AWP – 20%
Source: Community Oncology Practice; Health Care Inc. data from 10 oncology practices; McKinsey analysis

NJ-1010.32E/991006NnfeSO1

14

HIGHLY CONFIDENTIAL

MDL-OBI00006791



PHYSICIAN ECONOMICS FOR MEDICARE PATIENT PER WEEK

For 3 X 10,000 unit dose
Dollars

CASE EXAMPLE

15

Procrit from own stock

Procrit from pharmacy/PBM

Physician profit**

| Drug | Office visits/ injections | Total |

Physician cash outlay
Secondary insurer copayment (20% of Medicare allowance) AWP – 5%
Medicare reimbursement (80% of AWP – 5%)

-277.20   -68.40   273.6   64.00   45.00   109.00

Physician profit**

| | Office visits/ injections |

Pharmacy cash outlay
Patient copay* ($5-10 per Rx)
Pharmacy benefit reimbursement (AWP – 5%)
Pharmacy profit on drug
Office visits/ injections

-285.00   -22.50   342.0   79.50   45.00

* Roughly 90% of patients have copays of $5-10; rest have 80/20% deals
** Assuming payor pays for all 3 visits a week (often depends on payor), and typical practice overhead is 50% of revenues for office visits and injection fees
Note: Medicare allowance is $120.00
Sources: Community Oncology Practice
NJ-1010.32E/991008NmicSO1

HIGHLY CONFIDENTIAL

MDL-OBI00006792





ONCOLOGY PATIENT TREATMENT PATHWAYS

Procrit treatment pathway

**Risk bearer for Procrit cost**

Physician

Patient

Patient

Hospital

Injects Rx in office

Treats from own stock

Sends patient to pharmacy to get Rx

Orders Rx from PBM, Medco, etc.

Sends patient to outpatient clinic

Oncologist

Patient

Not restrictive insurance
• Medicare
• FFS

Highly restrictive insurance
• HMO

Source: Physician interviews

NJ-1010.326/891006Nmlc5O1

MDL-OBI00006793

16

17

- Procrit position today
- Reimbursement pressures
- Strategies to shape reimbursement

NJ-1010.325/9910080NinSO1

HIGHLY CONFIDENTIAL

MDL-OBI00006794

## SUMMARY OF REIMBURSEMENT PRESSURES

¶ OBI faces a myriad of reimbursement pressures which could affect different indications and patient payor groups. These pressures can be prioritized based on size of potential sales impact and likelihood of occurrence over the next three years.

¶ The pressures with the highest potential sales impact and greatest likelihood of being on the agenda or occurring are:

- Increase in AWP discount up to an additional 10%
- *Ambulatory Payment Classification (APCs)*
- Medicare national coverage guidelines
- *Self administration*
- Competitor impact on payor and hospital formularies.

¶ In addition, there are additional pressures with a lower likelihood of occurrence but high potential sales impact which should be monitored on an ongoing basis:

- Federal Supply Schedule (FSS)
- Actual Acquisition Cost (AAC)
- Medical to pharmaceutical switch.

¶ While the probability of any one of these pressures occurring may be low, the magnitude of the probability adjusted impact strongly suggests that investment today *is vital to protect OBI's strategic and financial position.*

18

NJ-1013.326991006NMbSO1

HIGHLY CONFIDENTIAL

MDL-OBI00006795

OVERVIEW OF REIMBURSEMENT PRESSURES



**Private payor/provider**
- Medical to pharma switch
- Tougher guidelines, concurrent review and case management
- More physician risk-sharing
- Dosing

**State/local government**
- Medicare local carrier guidelines
- ADAP
- Medicaid managed care
- State legislation and regulation

**Competition**
- Amgen entry
- HMR entry

**Medicare price realization**
- FSS
- AWP
- AAC

**Federal government**
- Medicare national coverage guidelines
- Expanded drug coverage
- APCs
- Medicare managed care
- Self administration
- Stark II/Stark "III"
- Fraud and abuse

19

NJ-I-010.326/99100gNmIcSO1

HIGHLY CONFIDENTIAL

MDL-OBI00006796

# PRIORITIZATION OF REIMBURSEMENT PRESSURES

20



* Have not conducted valuation analysis

Source: Interviews; Accelerated Growth Plan; Trinity Partners; McKinsey analysis

NJ-1010.325/991/006NmicSO1

HIGHLY CONFIDENTIAL

MDL-OBI00006797

21

## UNIT PRICE REALIZATION – MAY 1999 PERSPECTIVES

### Key Findings

• AWP-10% is the most likely scenario to occur

– "I'd bet on some form of AWP modification.  It's so much easier.
AWP-10% is most likely"
– Leading health care lobbyist

– "AWP-17% probably can be beat; but AWP-10% ... It's easier than
defining AAC or going to FSS"
– Former HCFA official

• FSS is unlikely to be implemented in the near term, but will not disappear

– "This may just not be our most important battle right now ... Rather than
take on the industry en masse, I think we may see one-off actions
against select drugs"
– HCFA official

– "Votes are not there this time around"
–Former HCFA official

• AAC is a dead issue

–"I don't think we have the votes"
– White House Staff in Interdepartmental Affairs

–"We've got Y2K and much bigger issues"
– HCFA official

–"Defining AAC is not easy and not worth the effort when you can just do
an AWP change."
– Former HCFA official

• Of all the pricing scenarios,
AWP minus 10% appears to
be the most likely outcome in
the next 1-3 years; it certainly
will receive attention and
discussion and must be
influenced

• FSS has huge dollar impact
and must continue to be
monitored

HIGHLY CONFIDENTIAL

NJ-1010.320/9910098/micSO2

MDL-OBI00006798

## APCs – MAY 1999 PERSPECTIVES

### Key Findings

• Once implemented APCs could decrease hospital out patient clinic sales by $30 to $50 million (1999 sales)

• Currently delayed due to a systems development hold at HCFA, pending resolution of Y2K issues

• Once finalized, Medicare will likely implement immediately; private payors are likely to follow quickly

• Significant opposition around bundling and assignments within system suggest there will be further revisions

  – "MedPac and others have serious concerns about the various bundlings in APC. There is still more to be done before this should be implemented."
      – Former HCFA Official

• Broad consensus within the cancer community to encourage cancer carve-out as per Center for Patient Advocacy legislation

• Six payors currently use the APC system, e.g., Blue Shield of California and Iowa Medicaid

• Based on Blue Shield of California experience, APCs could cause shifting of patients from oncology clinics to inpatient hospital settings

• Despite the slower pace and anticipated revisions, APCs appear likely to happen

• Implementation expected to occur within 2 to 3 years

• Private sector likely to follow once HCFA starts implementing; many already looking at ways (including APCs) to do this

22

NJ-1010.328/99/1C05/Kn/cSO2

HIGHLY CONFIDENTIAL

MDL-OBI00006799

## MEDICARE NATIONAL COVERAGE – MAY 1999

### Key Findings

- Medical advisory committee (MCAC) will likely replace local decision making on roughly 10-20 decisions per year

- Drugs examined will likely be new or existing products with:
  - Scientific or medical controversy
  - Major impact on Medicare
  - Broad public controversy

- **Any individual** can initiate a request for review through formal request

- Once implemented local carriers must adhere to guideline; meanwhile, local carriers have full autonomy

- Congress may also play a role through targeted legislation

- HCFA continuing to encourage interaction among local carriers through carrier working groups, etc.

- Number of local carriers likely to decrease as HCFA encourages consolidation and local carriers exit business due to growing concerns about fraud and abuse (e.g., fines paid by Blue Cross of Illinois)

- Given Procrit's increasing impact on Medicare budgets, reasonable chance that a Procrit guideline is considered in next 3 years

- OBI should coordinate approaches across franchises to ensure, at minimum, oncology outcome is "favorable"

- State and local oncology guidelines should be managed in the interim as they could be used later to affect national guidelines

- Private payor guidelines also need to be actively managed as they could be used later to affect national guidelines

23

NJ-1910.325/991005Nmks002

HIGHLY CONFIDENTIAL

MDL-OBI00006800

## STATE LEGISLATIVE AND REGULATORY ACTIVITY – MAY 1999 PERSPECTIVES

24

- "The Virginia bill illustrates the potential for the pharmaceutical industry to benefit from 'patients' rights' bill on the state and federal level."
  – "The Pink Sheet"

- "If I were a product company, there is going to be a lot of legislation on both the federal and state level that I would be involved in."
  – HCFA official

- "There are 48 proposals in 23 states about pharmacy benefit for the elderly and typically for outpatient drugs.  This is one of the few areas with upside coverage mandates"
  – J&J State Relations

- "We are putting in a variety of hard edits and prioritization guidelines to slow down the rising cost of pharmaceuticals.  We are also looking at guideline opportunities in the clinical and hospital setting."
  – Medicaid official

- "Even if Breaux doesn't pass on the federal level, numerous states are adding additional coverage for senior pharmaceutical assistance programs."
  – Reimbursement consultant

- "I believe that there will be substantial activity at the state level, particularly given that there will be lots of talk but little action at the federal level."
  – Former HCFA administrator

- "Most drug companies do not realize that I do worry about what the insurance commissioner thinks about my plans and the benefits included since he regulates my industry."
  – President of Specialty Business/Head Medical Management, Major private payor

- Increase in State legislative activity affecting coverage

- Substantial changes are occurring and likely to continue affecting both Medicaid and private health plans

- State legislature appears more active than regulatory agencies (e.g., Department of Insurance) but these agencies are still influential

- One of few areas with true upside potential

- State and federal legislation interlinked necessitating shaping activity at both levels

NJ-1010.32899100th\nic502

HIGHLY CONFIDENTIAL

MDL-OBI00006801

## CASE EXAMPLE – VIRGINIA

### 1999 Legislative and Regulatory activity

**New mandates**

Several mandated benefits now required, examples include:
- Hospice care
- Annual pap smears
- Equipment supplies and outpatient self-management training and education including medical nutrition therapy, for the treatment of diabetes
- Coverage for cancer pain management medications
- Coverage of clinical trials for certain cancer treatment

**Access**

Several new laws were designed to increase direct access including:
- Standing referral for cancer pain management
- 24 hour telephone access to patients who must gain pre-authorization treatment approvals

**Formularies**

Also enacted were new measures that broadly regulate drug formularies in health plans. Among the new measures is the requirement that health plans:
- Not deny coverage for any drug prescribed to treat a covered indication so long as the drug has been approved by the USFDA for at least one indication and the drug is recognized for treatment of the covered indication in one of the standard reference compendia or in substantially accepted peer-reviewed medical literature

**Expansion of Medicaid managed care**

- Medallion II, Virginia's HMO program for Medicaid recipients expanded to Central and Eastern shore region

**Vetoed bills**

- Right to sue HMO directly for denial of treatment

Source: Literature search; interview with Virginia payor

NJ-1010-02898103MnIc902

25

HIGHLY CONFIDENTIAL

MDL-OBI00006802

## LOCAL LEGISLATION/REGULATION – MAY 1999 PERSPECTIVES

- "Medicare carrier local decision authority is not disappearing with the Medicare Coverage Advisory Commission because they will only deal with a limited number of issues.  Still, we are trying to encourage carriers and medical directors to work together where appropriate and share information; decisions by one local carrier will very likely impact other local carriers."
  – HCFA official

- "In the absence of a specific national coverage decision, coverage decisions are made at the discretion of the local contractors."
  – HCFA, 4/22/99 General Notice re: Procedures for Making National Coverage Decisions

- "We're just getting started, but we're going after expensive drugs that are used in both the hospital and physician setting."
  – Director Formulary Management, private payor

- "Local health plans involved with managed Medicare and managed Medicaid have freedom to put in guidelines, particularly prior authorization."
  – Medicare Office of Health Plan Purchasing and Administration

- On a market by market basis, Procrit could get scrutinized, particularly as expenditures increase

- There are a range of influencers from case managers to medical directors that OBI will need to call on

- Local legislation and regulations are linked to federal activities

26

NJ-I-010.325/99100ENmioSO2

HIGHLY CONFIDENTIAL

MDL-OBI00006803

## MEDICAL TO PHARMACEUTICAL SWITCH – MAY 1999

### Key findings

- Leading private payors do not generally differentiate management of pharmacy benefit (as opposed to payment) between medical and pharmaceutical benefit

- Only a subset of products are likely to switch. Those will tend to be generally expensive, biotech, injectable and/or have high potential for abuse

- Switch to pharma benefit unlikely without more prevalent self-administration (with or without label change)

- Likely minimal impact on patient out-of-pocket costs for most indications since most plans have annual caps and use of other drugs hits caps rapidly

- If implemented, patient compliance likely to decrease somewhat due to inconvenience and reluctance to self-administer

- Switch to pharma benefit difficult without concurrent self-administration due to systems complexities of tying dispensing, billing, and auto adjudication into physician offices or hospital clinics

- For switch to be meaningful, payors must act in a coordinated manner

- While revenue impact is large, approximately $250 million primarily from Medicare sales, most stakeholders lack either the incentive or the ability to drive the switch on their own

- A few "triggers" could increase likelihood such as:
  - Significant improvement in payor systems
  - Private payors reducing Procrit fee schedules and physicians choosing to hold less risk
  - Addition of self-administration to label

27

NJ-1010.326/99 1Cd5NnIc5?02

HIGHLY CONFIDENTIAL

MDL-OBI00006804

28

- Procrit situation today

- Reimbursement pressures

- Strategies to shape reimbursement

HIGHLY CONFIDENTIAL

MDL-OBI00006805

29

## SUMMARY OF STRATEGIES TO SHAPE REIMBURSEMENT

To date, OBI has largely taken a reactive posture with regard to reimbursement issues. Given the diverse nature of the pressures the company is likely to face over the next three years, OBI must adopt a much more aggressive stance. Achieving this will require continuous reprioritizing of the pressures and allocating resources based on where they are likely to have the greatest impact. This will allow the organization to:

¶ Establish Procrit as the standard of care in oncology to all parties

¶ Address the interlinked private/state and federal payor systems

¶ In addition to Medicare, focus more on private payors and oncology

¶ Push more aggressively to position Procrit in a preferred position with payors.

HIGHLY CONFIDENTIAL

NJ-1010.326/931005NmleSO2

MDL-OBI00006806

30

## STRATEGIC EVOLUTION FOR PROCRIT

☐ Not focus of this effort

**From**

- Used by physicians because it is economically attractive, while providing clinical benefits
- Covered by payors but with restrictions and concerns

⇨

- Primarily focus on expanding the marketplace

⇨

- Primarily Medicare – federal focus

⇨

- Reactive response with little differentiation of resources by magnitude of opportunity/threat

⇨

- Little proactive planning and coordination across the business system or J&J on reimbursement issues

⇨

**To**

- Considered by physicians, patients, and payors to be absolutely vital in the treatment and recovery of patients

- Focus on marketplace and competitor entry
  - Strong formulary position based on safety and efficacy
  - Pricing strategy
  - Other late lifecycle strategies

- Focus on both public (federal, state, and local) and private constituents

- Frequent reprioritization of issues and resource allocation based on sales impact and likelihood of occurrence

- Reimbursement group playing central role in dosing, formulation, trial design and new indication decisions
- Explicit proactive planning and communication across J&J

N-J-1010.226/991006X/mlcSC2

HIGHLY CONFIDENTIAL

MDL-OBI00006807

STANDARD OF CARE – TWO LINKED ARENAS



**Physician/hospital usage**

- Training (both initial and CME)
- Prevailing local clinical practice
- Belief in clinical benefit/clinical experience
- Economics
  – Vital if direct/OOP for the MD
  – Indirect through reimbursement
- Clinical care pathway by practice, local hospitals
- Literature – peer reviewed
- Medical society perspectives
- Patient demand
- Payor demand/guidelines

**Payor coverage**

- FDA label/approval
- Other recognized guidelines
  – Compendia (e.g., USP)
  – M&R
  – Interqual
- Peer reviewed literature
- Claims history (e.g., are providers using the drug)
- Employer demand
- PBM recommendation, if applicable
- Competitors' actions
- Mandates by legislature/insurance commissioner
- Requirements by NCCA
- Patient demand (especially as organized advocacy groups)
- Drug type:
  – Lifestyle
  – Life enhancing; supportive/palliative
  – Life saving

**Procrit status:**    Not a standard of care for many physicians or institutions

Most payors reimburse since Procrit is an FDA-approved drug used in treatment of covered service; but there is more and more management of its use

NJ-1010.0256/9P1008h/ncSO3

HIGHLY CONFIDENTIAL

MDL-OBI00006808

31

## INFLUENCING PAYOR COVERAGE

| Influencer | Comments |
|---|---|
| **Clinical data**<br>• Label<br>• Peer-reviewed literature<br>• Third-party clinical review | • Evidence-based clinical results are the foundation of every coverage discussion |
| **Internal data**<br>• Claims experience<br>• Input of payor's physician community through P&T | • Actual experience carries significant weight |
| **Guidelines**<br>• Compendia – especially for off-label use<br>• M&R and other guidelines | • Publicly-accepted practice guidelines are a common standard that shelters payors from liability |
| **State government**<br>• Legislature<br>• Regulatory | • State government can impact coverage requirements through specific legislation or through the office of the State Insurance Commissioner |
| **Federal government**<br>• Lobbyist/advisors (MedPac)<br>• HCFA<br>• FDA<br>• Congress | • Federal government decisions generally cascade down |
| **General public**<br>• Educated large employers<br>• Large consumer demand | • Payors will respond to demands of their customers |

While OBI must influence a broad set of constituents to influence payor coverage, the foundation of everything must be compelling clinical evidence

**Implied strategy**
• Design and carry out clear, unambiguous clinical trials supporting positioning

• Build support for coverage among multiple influencers

32

NJ-1010.326/891006Nnc5O2

HIGHLY CONFIDENTIAL

MDL-OBI00006809

33

## INFLUENCING PHYSICIAN USAGE

| Influencer | Comments |
|---|---|
| **Personal experience**<br>• Initial training<br>• Ongoing experience<br>• Formulary status of drug | • Practice patterns are largely habitual unless given new compelling reason to change |
| **Economics**<br>• Drug<br>• Administration<br>• Office visit | • In today's world of medicine, dollars drive behavior, even in oncology |
| **Clinical evidence**<br>• Literature<br>• Thought leaders<br>• CME | • Physicians are trained to think analytically and to monitor clinical developments |
| **Physician peer groups**<br>• Practices<br>• Associations | • Practice patterns differ by locale and region |
| **Pharma industry**<br>• Sales reps<br>• CME<br>• Advertising | • Ability to educate physicians about Procrit's benefits<br><br>• Opportunity to assist in practice management to improve economics |
| **Patients** | • Patient push may be stronger in oncology than other therapeutic areas<br>– Urgency of disease<br>– Payor/physician desired image for compassion |

**Implied strategy**
• OBI must preserve positive economics for physicians

• If economics deteriorate
– Standard of care and "habitual" prescribing increases in importance
– Advocacy and patient push will be vital

Source: Interviews

NJ-1010.226/991005N/nlc5C2

MDL-OBI00006810

34

## UNIT PRICE REALIZATION – STRATEGIC IMPLICATIONS

| Strategic opportunity | Example tactics |
|---|---|
| • Monitoring and lobbying of Federal government at two levels: <br><br> – Key Executive Branch agencies (particularly HCFA, NCI and FDA) <br><br> – Politics of Capitol Hill | • Develop a wide net of contacts and foster ongoing conversations at multiple levels <br><br> • Develop relationships with key thought leaders in Congress, e.g., Allen, Stark, Kennedy, Rockefeller and Waxman |
| • Build more comprehensive relationships with oncology disease and patient advocacy groups to ensure strong reimbursement | • Use existing relationships to leverage unique J&J position across oncology spectrum: <br><br> – Prevention <br> – Diagnosis <br> – Treatment <br> – Supportive care <br><br> to be seen as a thought leader in disease rather than products |
| • Recognize the interplay among AWP, discounts/ rebates and FSS and how they impact each other | • Re-examine discretionary level of discounts strategic account managers may award |
| • Standard of care | • Identify key decision makers to establish Procrit as standard of care to physicians, payors, patients, societies, and all other influential parties |

NJ-1010,326/991006NmicSG2

HIGHLY CONFIDENTIAL

MDL-OBI00006811

35

## APCs – STRATEGIC IMPLICATIONS

| Strategic opportunity | Example tactics |
|---|---|
| • Promote cancer carve-out | • Work with key cancer community members to promote carve-out such as support of Medicare Full Access to Cancer Treatment Act; ensure carve-out will include payment for supportive care |
| | • Consider aligning with other key oncology players such as BMS, particularly if there is a risk that they might choose to "go it alone" and "give up" supportive care coverage to ensure chemotherapy coverage |
| • Increase value of chemotherapy APC to include cost of Procrit | • Work with Medpac and others to lobby for specific changes in the way APCs are bundled and priced |
| • Standard of care | • Establish Procrit as standard of care so that out-patient clinics will have a harder time eliminating Procrit despite potential lack of room in capitated system |

NJ-1010.326/991006Knic5C2

HIGHLY CONFIDENTIAL

MDL-OBI00006812

36

## MEDICARE NATIONAL COVERAGE – STRATEGIC IMPLICATIONS

| Strategic opportunity | Tactics |
|---|---|
| • Standard of care | • Understand and influence the process to establish Procrit as standard of care for all MCAC members<br>  – Develop strategies to ensure **each** member understands the clinical value of Procrit<br>  – Understand and communicate with full set of external advisors who could be brought in for technical assessment |
| • Shape discussion around clinical use and standards on state, local, and private payor levels | • Proactively provide relevant and persuasive fact base to key influencers and decision makers<br>• Consider focusing guideline discussion on oncology if push for all indications is perceived as "greedy" |

NJ-1010.326/991006ENmicSO2

HIGHLY CONFIDENTIAL

MDL-OBI00006813

37

## MEDICAL TO PHARMACEUTICAL SWITCH – STRATEGIC IMPLICATIONS

| Strategic opportunity | Example tactics |
| --- | --- |
| • Establish Procrit as standard of care to all relevant parties | ✓ • Ensure compendia listings are as strong as possible<br>✓ • Lobby state legislatures to adopt compendia<br>• Work more closely with individual and institutional thought leaders |
| • Encourage full disease management for total care of oncology, HIV, and surgery patients | • Work with disease management companies and leading oncology companies (e.g., AOR) to develop disease management programs which include Procrit |
| • Discourage risk sharing programs by payors which encourage physicians to decrease prescribing | • Align with advocacy groups to pass legislation to discourage risk sharing for oncology which might encourage reduced pharmaceutical usage |

NJ-1010.326/891006NmidSO2

HIGHLY CONFIDENTIAL

MDL-OBI00006814

38

## STATE LEGISLATIVE AND REGULATORY ACTIVITY – STRATEGIC IMPLICATIONS

| Strategic opportunity | Example tactics |
|---|---|
| • With "patients' rights" bills, promote cancer "quality of life" care coverage mandate<br>– Pain management<br>– Nausea management<br>– Fatigue management | • Work with key cancer community members (both other product companies and patient advocacy groups) to promote mandate<br>• Educate key state legislators and staff on the "cancer care case" |
| • Explore opportunities to work with state insurance commissioners and Department of Corporations to ensure most attractive regulatory guidelines | • Work with key cancer community members to educate key regulators and their staff about "the cancer care case" |

NJ-I010.326/99100BNfdc5O2

HIGHLY CONFIDENTIAL

MDL-OBI00006815

39

## LOCAL LEGISLATION/REGULATION – STRATEGIC IMPLICATIONS

| Strategic opportunity | Example tactics |
|---|---|
| ✓ • Develop relationships with key decision makers at leading private plans (including special focus on Medicare Risk leading plans e.g., Humana, Pacificare, Kaiser, United) | ✓ • Call on local medical directors in addition to case managers |
| ✓ • Develop relationships with key decision makers at local Medicare Carriers in critical states | ✓ • Call on local medical directors in addition to case managers |
| • Develop Procrit as standard of care | • Establish Procrit as standard of care so that it is "unacceptable" not to cover or to have restrictive guidelines |
| • Better integrate payor contracting approach | • Coordinate contracting across entire product line (HMO, PPO, Medicare Risk) for key payors<br>• Rethink pricing decisions based on impact on AWP (e.g., discounts, rebates) |

NJ-1010.325/981006NmicSO2

HIGHLY CONFIDENTIAL

MDL-OBI00006816

40

## ORGANIZATIONAL IMPLICATIONS OF PHASE 1

- Increase in over-all resource levels particularly on private and state level

- Realigned structure and reporting relationships

- Change in roles/activities to enhance focus on:
  - Tiered decision makers
  - Long term relationships
  - External networking/alliance building

- Expanded Strategic Customer Group interactions within OBI and J&J particularly:
  - Clinical and regulatory
  - Field sales force
  - J&J federal and state groups

- Increased group skill set:
  - Clinical/medical knowledge and credibility
  - Prioritization and focus
  - Customer relationships beyond traditional sales and contracting

HIGHLY CONFIDENTIAL

NJ-1010.32699?006N/nleSC2

MDL-OBI00006817