# Exhibit 41

# PROCRIT Medicare Review
## February 8, 1999

John E. Corcoran
Robert M. Delise
David B. Fitzhenry

990 Washington Street
Suite 2145
Dedham, MA 02026
Phone:  (781) 326-9259
Fax:      (781) 326-9279

**Trinity Partners, Inc.**

ORTHO 01595588
Confidential – Attorneys Only

Highly Confidential

**Plaintiffs' Exhibit**
**346**
01-12257-PBS

MDL-OBI00060859

# Physician Medicare Reimbursement Scenarios

### • Per 40,000 Unit Vial •

**Assumptions:**

- AWP = list price + 20%
- AWP for 40,000 unit vial: $480.00 [list price $400.00 + 20%]
- Current Medicare reimbursement AWP less 5%

**Scenarios:**

| | AWP - 5% | AWP - 10% | AWP - 17% | FSS Pricing |
|---|---|---|---|---|
| **Physician cost:** | | | | |
| - Base price | $400.00 | $400.00 | $400.00 | $400.00 |
| - Rebate [5%] | $20.00 | $20.00 | $20.00 | $20.00 |
| **Net cost:** | **$380.00** | **$380.00** | **$380.00** | **$380.00** |
| **Physician Medicare reimbursement:** | | | | |
| - Carrier [80%] | $364.80 | $345.60 | $318.72 | $215.60 |
| - Co-pay [20%] | $91.20 | $86.40 | $79.68 | $54.00 |
| **Total Medicare reimbursement:** | **$456.00** | **$432.00** | **$398.40** | **$269.60** |
| **Physician profit scenarios:** | | | | |
| - Co-pay not collected: | ($15.20) | ($34.40) | ($61.28) | ($164.40) |
| - Co-pay collected from 50% patients: | $30.40 | $8.80 | ($21.44) | ($137.40) |
| - Co-pay collected from 100% patients: | $76.00 | $52.00 | $18.40 | ($110.40) |

Trinity Partners, Inc. ————

Page 2

ORTHO 01595589
Confidential - Attorneys Only

Highly Confidential

MDL-OBI00060860

# Physician Profit Per Course of EPO Therapy

**Assumptions:**

- Oncology patient
- 20 weeks EPO therapy
- 40,000 unit 1x weekly dosing

**Physician profit per course of EPO therapy:**

| | AWP - 5% | AWP - 10% | AWP - 17% | FSS Pricing |
|---|---|---|---|---|
| Co-pay not collected: | ($304) | ($668) | ($1,226) | ($3,288) |
| Co-pay collected from 50% patients: | $608 | $176 | ($429) | ($2,748) |
| Co-pay collected from 100% patients: | $1,520 | $1,040 | $368 | ($2,208) |

Trinity Partners, Inc.

Page 3

ORTHO 01595590
Confidential - Attorneys Only

Highly Confidential

MDL-OBI00060861

# PROCRIT Medicare Exposure

• Assumes 1999 Oncology Sales at 80% Total Forecast •

| Indication(s) | Expected 1999 Sales | % Medicare | 1999 Medicare Exposure |
|---|---|---|---|
| • Oncology [80% forecast]:<br>- Low case<br>- OBI Estimate [includes Part A] | $882.6 MM<br>$882.6 MM | 40%<br>51% | $353.1 MM<br>$452.4 MM |
| • Non-oncology [20% forecast]:<br>- Low case<br>- OBI Estimate | $220.7 MM<br>$220.7 MM | 15%<br>20% | $33.1 MM<br>$44.1 MM |
| • Total PROCRIT factory sales<br>- Low case<br>- OBI Estimate | $1.103 BB<br>$1.103 BB | 35%<br>45% | $386.2 MM<br>$496.5 MM |

Page 4

Trinity Partners, Inc.

ORTHO 01595591
Confidential - Attorneys Only

Highly Confidential

MDL-OBI00060862

# Impact of Medicare Pricing on PROCRIT Use
• Gross Revenue Implications - Medicare Exposure OBI Estimate •

| % Decrease in Medicare Use | % Decrease in Non-Medicare Use | | | | | |
|---|---|---|---|---|---|---|
| | 0.0% | 20.0% | 40.0% | 60.0% | 80.0% | 100.0% |
| 0.0% | $0.0 MM | $121.4 MM | $242.7 MM | $364.1 MM | $485.4 MM | $606.8 MM |
| 20.0% | $99.3 MM | $220.7 MM | $342.0 MM | $463.4 MM | $584.7 MM | $706.1 MM |
| 40.0% | $198.6 MM | $320.0 MM | $441.3 MM | $562.7 MM | $684.0 MM | $805.4 MM |
| 60.0% | $297.9 MM | $419.3 MM | $540.6 MM | $662.0 MM | $783.3 MM | $904.7 MM |
| 80.0% | $397.2 MM | $518.6 MM | $639.9 MM | $761.3 MM | $882.6 MM | $1.004 BB |
| 100.0% | $496.5 MM | $617.9 MM | $739.2 MM | $860.6 MM | $981.9 MM | $1.103 BB |

• Total 1999 forecast: $1.103 BB
  - % Medicare [OBI estimate] 45.0%
  - High Case Medicare sales: $496.5 MM
  - Non-Medicare sales $606.8 MM

Page 5

Trinity Partners, Inc.

ORTHO 01595592
Confidential - Attorneys Only

Highly Confidential

MDL-OBI00060863

# Physician Reimbursement Scenarios
• Per 40,000 Unit Vial •

List price: $400
Current Medicare reimbursement: AWP less 5%

| | AWP - 5% | AWP - 10% | AWP - 17% | FSS Pricing |
|---|---|---|---|---|
| • AWP [list price x 20%]: | $480.00 | $480.00 | $480.00 | $480.00 |
| • **Medicare reimbursement:** | **$456.00** | **$432.00** | **$398.40** | **$269.60** |
| - Carrier [80%] | $364.80 | $345.60 | $318.72 | $215.60 |
| - Co-pay [20%] | $91.20 | $86.40 | $79.68 | $54.00 |
| • **Physician economics:** | | | | |
| - Base price | $400.00 | $400.00 | $400.00 | $400.00 |
| - Rebate [5%] | $20.00 | $20.00 | $20.00 | $20.00 |
| - Net cost: | $380.00 | $380.00 | $380.00 | $380.00 |
| - Profit [at 100% of co-pay]: | $76.00 | $52.00 | $18.40 | ($110.40) |
| • **Physician profit scenarios:** | | | | |
| - If 50% of co-pay is collected: | $30.40 | $8.80 | ($21.44) | ($137.40) |
| - If 0% of co-pay is collected: | ($15.20) | ($34.40) | ($61.28) | ($164.40) |
| • **Profit per course of therapy:** [oncology patient; 40,000U/week; 20 weeks of therapy; 100% of co-pay] | $1,520 | $1,040 | $368 | ($2,208) |
| - If 0% of co-pay is collected: | ($304) | ($688) | ($1,226) | ($3,288) |

Trinity Partners, Inc.

Page 6

ORTHO 01595593
Confidential - Attorneys Only

Highly Confidential

MDL-OBI00060864

# Exhibit 42

Laura Glassco        HIGHLY CONFIDENTIAL   September 1, 2005
New York, New York

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

MDL DOCKET NO. CIVIL ACTION 01CV12257-PBS

---------------------------------x

In re: PHARMACEUTICAL INDUSTRY AVERAGE

WHOLESALE PRICE LITIGATION

---------------------------------x

THIS DOCUMENT RELATES TO:

ALL ACTIONS

---------------------------------x

September 1, 2005

9:00 a.m.


HIGHLY CONFIDENTIAL


Videotaped deposition of LAURA GLASSCO,

pursuant to Notice, held at the offices of Patterson,

Belknap, Webb & Tyler LLP, 1133 Avenue of the

Americas, New York, New York, before Jineen Pavesi, a

Registered Professional Reporter, Registered Merit

Reporter, Certified Realtime Reporter and Notary

Public of the State of New York.

Laura Glassco          HIGHLY CONFIDENTIAL   September 1, 2005
                       New York, New York

Page 14

1  directly to you there?
2       A.      Initially, no, and then, yes, in the
3  latter part of 2000 I had one direct report.
4       Q.      Who was that?
5       A.      Ken Wegner.
6       Q.      What did Mr. Wegner do?
7       A.      He called on regional offices of
8  national plans within the western area as well as
9  small regional payers.
10      Q.      When we say plans and payers, we're
11 talking about health insurers, is that right?
12      A.      Yes, we are.
13      Q.      Do you know where Mr. Wegner is now?
14      A.      No, I don't.
15      Q.      Do you know when he left Centocor?
16      A.      I want to say 2000; I think he started
17 in 2000 and he was with us about a year.
18              MR. MACORETTA: Let me show you what
19 we're going to mark as Exhibit Glassco 001.
20              (Exhibit Glassco 001, Bates Nos.
21 MDL-CEN 90283-302, was marked for identification, as
22 of this date.)

Page 15

1       Q.      Take as much time to look through that
2  and let me know when you are ready to chat about it.
3              (Witness perusing document.)
4       A.      Yes, thank you.
5       Q.      The cover memo here from Ken Wegner to
6  you references a Dr. Kassan.
7              Do you know Dr. Kassan at all?
8       A.      I have never met Dr. Kassan.
9       Q.      Have you ever spoken to him?
10      A.      No.
11      Q.      Do you know what his practice is?
12      A.      I have heard of him, yes.
13      Q.      Is he a Remicade user?
14      A.      I believe he is.
15      Q.      Provider, I should say.
16      A.      Yes.
17      Q.      In the memo Mr. Wegner is talking about
18 how he sat next to Dr. Kassan and discussed Remicade.
19              Is part of Mr. Wegner's job to discuss
20 Remicade with physicians?
21              MR. HAAS: Objection to form.
22      Q.      A minute ago you said he called on

Page 16

1  corporate accounts or plans.
2       A.      Payers.
3       Q.      Is part of his job to call on
4  physicians?
5       A.      Yes, call on physicians, as well, like
6  I said earlier, to discuss what the payers' policies
7  are and/or reimbursement issues.
8       Q.      The third paragraph of this memo he
9  says "We then began to discuss cost. I was able to
10 pull out my computer and walk him through each health
11 plan and what he might expect for reimbursement."
12              Did Centocor make available to
13 Mr. Wegner some type of computer software that would
14 provide different health plans' reimbursement amounts?
15              MR. HAAS: Objection to the form of the
16 question.
17      Q.      You can answer.
18      A.      No, we did not provide a computer that
19 had that information.
20      Q.      So that was something Mr. Wegner did on
21 his own or had on his own?
22              MR. HAAS: Objection to form,

Page 17

1  foundation.
2       A.      Can I confer with my attorney here for
3  a moment.
4       Q.      Absolutely.
5              (Witness and counsel conferring off the
6  record.)
7       A.      Can you repeat your question, I'm
8  sorry.
9              MR. HAAS: For the record, so it is
10 clear, my client had inquired with respect to what was
11 the meaning of the particular objections I was making
12 and I clarified what the intent of the objections were
13 and that when I make an objection to, for example,
14 foundation, she should nevertheless go ahead and
15 answer the question in any event.
16              (Record read.)
17      A.      It wasn't something Mr. Wegner did on
18 his own; it was something that we were instructed to
19 do as normal form, to go out to the payers and get
20 that information and provide that information to
21 providers, which was positions.
22              It was perfectly okay for Mr. Wegner to

5 (Pages 14 to 17)

Laura Glassco          HIGHLY CONFIDENTIAL   September 1, 2005
                        New York, New York

Page 18

1    do this, it is just that it wasn't a piece of a
2    Centocor computer software program that he was using
3    to do it?
4        A.       Correct.
5        Q.       Mr. Wegner says in the second sentence,
6    "We discussed Remicade and many issues that took place
7    at the ACR meeting."
8                What's the ACR meeting?
9        A.       Academy of -- American College of
10   Rheumatology.
11       Q.       First paragraph down Mr. Wegner says "I
12   said I would have someone deliver the Colorado grid
13   showing the reimbursement rates for each plan along
14   with provider relations phone numbers."
15               Did you have something called the
16   Colorado grid?
17       A.       We created a grid for each state that
18   provided information to the physician's office as well
19   as the physician as to how to contact different
20   payers, Medicare or private payers.
21               Dr. Kassan lived in Colorado, so
22   therefore Colorado was a value to Dr. Kassan.

Page 19

1        Q.       The other people Mr. Wegner is sending
2    his memo to, he is copying you because you were his
3    boss at the time, correct?
4        A.       Yes.
5        Q.       Who were the other people?
6        A.       I don't know who Trina Gillis is; John
7    Hogan was the representative's manager, area business
8    manager; Janet Nelson is an immunology specialist; and
9    Ann Ritter is an area business specialist in Centocor.
10       Q.       What was Mr. Wegner's title then?
11       A.       I believe regional account manager.
12       Q.       But his immediate boss was Mr. Hogan?
13       A.       That was me.
14       Q.       What was Mr. Hogan's role?
15       A.       He was an area business manager for the
16   representatives, sales representatives, so Janet
17   Nelson reported to him.
18       Q.       Because she was an immunology
19   specialist?
20       A.       Correct.
21       Q.       What does an area business specialist
22   like Ms. Ritter do?

Page 20

1        A.       She works with the physicians as well
2    as other sites of care to help develop their
3    information regarding how to set up an infusion
4    opportunity, an infusion suite.
5        Q.       Ms. Nelson was an immunologist --
6        A.       Specialist.
7        Q.       Does an immunology specialist talk
8    about the issues about how to develop an infusion
9    suite with doctors, as well?
10               MR. HAAS:  Objection to form.
11       A.       I don't really know what they do, I am
12   not an immunology specialist nor do I have people
13   report to me.
14       Q.       Your response --  your forwarding
15   e-mail, I suppose -- second sentence says "This
16   particular MD would not go to PMP but sent an RM
17   only."
18               What's PMP?
19       A.       This was a program that we provided to
20   physicians in their offices called practice management
21   program to provide them information on payers and
22   other ways to understand the environment for

Page 21

1    infusions, so it was a program, and apparently he did
2    not want to attend but sent his nurse.
3        Q.       When you say in their offices, the PMP
4    program was given to physicians at their offices and
5    somewhere else, right?
6        A.       In a variety of locations, yes.
7        Q.       Were you involved at all in developing
8    the PMP materials or program?
9        A.       I had presented it, yes.
10       Q.       Presented at what exactly?
11       A.       At PMPs.
12       Q.       Is that a PMP in a physician's office
13   or somewhere else?
14       A.       Usually somewhere else, in a
15   restaurant.
16       Q.       At least some of these were weekend
17   seminars, right?
18       A.       Some of them, yes.
19       Q.       Were there others that were day-long,
20   or what were the other ones?
21       A.       Usually they were a day, a
22   day-and-a-half, yes.

                                6 (Pages 18 to 21)

Laura Glassco          HIGHLY CONFIDENTIAL    September 1, 2005
                       New York, New York

Page 26

1   manager, Bruce Henderson was John Hogan's manager or
2   regional business director, Mike Ziskin was the
3   director of healthcare and reimbursement I think was
4   his title, Brian Fitzpatrick was in marketing, I
5   believe, for Centocor, and Ken Wegner himself.
6       Q.      At the time is this pretty much all the
7   national account managers there were?
8       A.      I believe there were four, yes, plus
9   myself.
10      Q.      Attached to the cover memo or cover
11  e-mails of Exhibit Glassco 001, at the bottom it says
12  a file called California PMP.PPT, and there appears
13  to be some type of PowerPoint behind that.
14              Have you seen that before, the
15  PowerPoint that's attached to Exhibit Glassco 001?
16      A.      Yes.
17      Q.      Did you create it or help create it?
18      A.      Yes.
19      Q.      What is it?
20      A.      It is exactly what I gave you in
21  Exhibit Glassco 002.
22      Q.      The text would be the same?

Page 27

1       A.      Yes, I believe it is.
2               I haven't compared it page-for-page,
3   but it looks very similar.
4       Q.      Would Mr. Wegner also be giving PMP
5   presentations then?
6       A.      Yes.
7       Q.      Let me ask you about the PMPs.
8               You said -- first of all, were any of
9   them ever done in the physician's office to his staff?
10      A.      I don't recall.
11      Q.      That means you don't recall doing any,
12  right?
13              MR. HAAS:  Objection to form.
14      Q.      You don't recall doing any in a
15  physician's office?
16              MR. HAAS:  Objection to form.
17      A.      I never did one in a physician's
18  office; I don't know if there were others done in a
19  physician's office.
20      Q.      Typically you would do it with a group
21  of physicians that you brought together?
22      A.      Yes.

Page 28

1       Q.      How many in a typical group?
2               MR. HAAS:  Objection.
3       A.      I don't know.
4       Q.      More than ten, less than a hundred?
5               MR. HAAS:  Objection to form.
6       A.      Probably somewhere between five and
7   ten.
8       Q.      In addition to the -- it would be the
9   physician or it could be people from his office staff,
10  as well, right?
11              MR. HAAS:  Objection to form.
12      A.      Correct.
13      Q.      Where specifically would these PMP
14  presentations take place?
15      A.      I recall one that I went to was a
16  restaurant in the Seattle area.
17      Q.      How many PMP presentations did you do?
18      A.      I don't know.
19      Q.      More than a dozen?
20      A.      No.
21      Q.      By the way, you didn't give the entire
22  PMP presentation, right?

Page 29

1       A.      No, I did not.
2       Q.      The whole presentation was a
3   day-and-a-half typically, is that what you said?
4               MR. HAAS:  Objection, asked and
5   answered.
6       Q.      I can see you nod your head, the court
7   reporter can't take anything down, you have to say yes
8   or no.
9       A.      Yes.
10      Q.      How would it be decided what doctors
11  were invited to these PMP presentations?
12      A.      It would be decided based on the market
13  and what the field felt was important.
14      Q.      Does that mean that the reps could
15  invite whoever they felt it was important to invite?
16      A.      Yes.
17      Q.      If this was a day-and-a-half, would you
18  provide hotel rooms for the doctors or staff as part
19  of this?
20              MR. HAAS:  Objection to form.
21      A.      I don't know, I didn't get involved in
22  logistics.

8 (Pages 26 to 29)

Laura Glassco        HIGHLY CONFIDENTIAL   September 1, 2005
                     New York, New York

Page 102

1  described.
2       MR. HAAS: Take it under advisement and
3  I ask you to put it in writing.
4       MR. MACORETTA: I will show you what
5  we're going to mark as Exhibit Glassco 007.
6       (Exhibit Glassco 007, Bates Nos.
7  MDL-CEN 88912-32, was marked for identification, as of
8  this date.)
9       Q.    Let me know when you have had a chance
10 to look at that.
11      A.    All right.
12      (Witness perusing document.)
13      Q.    Have you ever seen this before?
14      A.    I don't recall seeing it, no.
15      Q.    The first page sets out the heading
16 "Practice Management Weekends."
17      At least some of these practice
18 management presentations that you went to were weekend
19 presentations?
20      A.    Yes, there were a few.
21      Q.    Was there a distinction between
22 practice management programs and practice management

Page 103

1  weekends?
2       A.    Not that I am aware of.
3       Q.    On the first page there is something
4  called strategic imperatives and objectives.
5       Did you ever have any discussions with
6  anybody at Centocor about what the strategic
7  imperatives and objectives were of the practice
8  management program?
9       A.    No.
10      Q.    Did you ever have any understanding
11 about what they were?
12      MR. HAAS: Objection to form.
13      A.    I can only speak to why I was called in
14 to do a presentation.
15      Q.    What was your understanding of why you
16 were called in?
17      A.    As I mentioned earlier, when I went to
18 do a practice management program, it was to discuss
19 what was going on with the payers in their community
20 and what were some of the payer landscape issues that
21 had come up, such as specialty pharmacy providers,
22 et cetera.

Page 104

1       Q.    Who would be the person calling you in
2  for that?
3       MR. HAAS: Objection to form, you can
4  answer.
5       A.    As I recall, again, memory has to go
6  back here in time, back to 2001, it might have been
7  somebody from the marketing department.
8       But also, as I mentioned earlier, it
9  might have been area business specialist or regional
10 business manager that felt it was important to have a
11 corporate accounts person attend.
12      Q.    Whoever called you in would say this is
13 what I want you to talk about?
14      A.    Yes, they would have asked me to talk
15 about the payers in the community.
16      Q.    Bates No. 920, "overview of the PMP
17 economic model," do you know what the PMP economic
18 model is?
19      MR. HAAS: Object to the form.
20      (Witness perusing document.)
21      MR. HAAS: Foundation.
22      A.    No.

Page 105

1       Q.    Have you ever heard of something called
2  the PMP economic model?
3       A.    No, I have not.
4       Q.    I want to go back to Exhibit Glassco 001
5  and talk about your presentations at PMPs for a second.
6       Typically this PMP would be in some
7  kind of conference room or ballroom type setting?
8       A.    Yes.
9       Q.    You would be up on a stage?
10      A.    Yes.
11      Q.    The PowerPoints similar to what we have
12 in Exhibit Glassco 001 would be projected?
13      A.    Yes.
14      Q.    I am not interested in the discussion
15 of the specific state payers.
16      Starting on page 298, when you talk
17 about average Medicare reimbursements, could you tell
18 me what exactly you would say to the physicians in
19 connection with these slides?
20      MR. HAAS: Objection to form.
21      Q.    You can answer.
22      A.    Basically I would share with the

27 (Pages 102 to 105)

Laura Glassco          HIGHLY CONFIDENTIAL   September 1, 2005
                        New York, New York

---

**Page 106**

1  physician that the Medicare reimbursement was based on
2  AWP, which is what the Medicare people told me, the
3  carriers throughout the U.S., that the code number for
4  the drug was J1745, that AWP was at that time the
5  price that's shown here, that Medicare reimbursement
6  was AWP less 5, however, the patient had a
7  responsibility for 20 percent of the remainder, so
8  that's shown here, as well.
9       So it shows what the physician can
10 expect; basically I would walk the physicians through
11 the slide so that they understood that Medicare
12 reimbursement was AWP less 5 percent and that the
13 patient's responsibility was for 20 percent after
14 that.
15      I also walked them through that there
16 were other things that would be billable within that
17 infusion event and I gave them the codes for that,
18 such as the first hour of infusion and subsequent
19 hours of infusion.
20      I also indicated that those amounts
21 could vary, unlike the drug reimbursement, based on
22 the region that we found ourself in, because each

---

**Page 107**

1  carrier might have covered the reimbursement of the
2  infusion differently.
3       I then walked through with them the
4  scenario which you see here of an example of a patient
5  that might be a three-vial infused patient.
6       Usually most rheumatoid arthritis
7  patients are given three vials based on their weight.
8       So the cost of the drug, if the cost of
9  the drug was a certain amount, I show the cost of the
10 drug to the physician and I compare that to what the
11 reimbursement was from Medicare as well as the
12 requirement the physician had to receive the
13 reimbursement from the patient in order for them to
14 get fully reimbursed not only from the Medicare
15 carrier but also from the patient.
16      The last slide shows then the
17 difference between what the physician paid for the
18 drug and what the physician -- if those assumptions
19 were correct, because I don't know what he pays for
20 the drug -- and what he gets reimbursed from the
21 provider -- I mean the Medicare carrier.
22      Q.     And that's what you called profit to

---

**Page 108**

1  drug on M.D. alone?
2       A.     Based on one fusion times seven
3  infusions; what the reimbursement would be for one
4  infusion and then I assumed based on the dosing
5  regimen of Remicade, the patients on average get about
6  seven infusions per year.
7       Q.     That was the best data you had at the
8  time as to what the average was?
9       A.     That's correct.
10      I was giving them a very simplistic
11 overview that they needed to take back to their own
12 practice and make their own determination.
13      Q.     And you said that you were basing the
14 physician's cost on the drug on the assumption that he
15 was paying list, right?
16      A.     Right.
17      MR. HAAS:  Objection.
18      A.     I didn't know what he was paying.
19      Q.     I understand you said you didn't know
20 what he was paying, but you were basing it on the
21 assumption he was paying list, at least for these
22 slides?

---

**Page 109**

1  A.     Right, I had no way to know what he was
2  going to pay, so I picked something out of the air.
3       Q.     Presumably you thought -- why did you
4  pick list out of the air?
5       A.     That's the only other price other than
6  AWP that I knew.
7       Q.     Did you have any understanding at all
8  as to what physicians were generally paying with
9  relation to the list price?
10      A.     No, I knew they were probably paying
11 more, but I didn't know how much.
12      So in the absence of not knowing each
13 provider and how well they can negotiate with their
14 wholesalers, I chose list.
15      Q.     And then the conclusion is, using your
16 assumptions, that the annual profit for drug, meaning
17 Remicade, alone per patient, I guess per year, is
18 $2,293.41, right?
19      A.     Yes, based on those assumptions.
20      Q.     It says "note CPT codes"; what are the
21 CPT codes?
22      A.     Are you familiar with what a CPT code

---

Laura Glassco          HIGHLY CONFIDENTIAL   September 1, 2005
                        New York, New York

Page 110

1  is?
2      Q.      Generally, but I am not the only
3  audience for this transcript, so I ask you to explain.
4      A.      A CPT code is a therapy versus a drug,
5  so CPT code stands for something that's being provided
6  by a healthcare professional.
7              In this case these are different codes
8  that a physician might be able to bill, might be able
9  to bill, I should repeat that, for office visits or
10  other types of reasons.
11             So 99211 through 99215 are different
12  what they call E&M codes, evaluation and management
13  services, that could be billed if they were considered
14  separate and identifiable from Remicade.
15     Q.      So if the patient just comes in and
16  gets an infusion and that's it, probably the physician
17  can't bill for any of the CPT codes?
18     A.      That's my understanding.
19     Q.      But if the doctor does something else,
20  some kind of evaluation or management, he may be able
21  to bill using one of these CPT codes?
22     A.      That's my understanding, yes.

Page 111

1      Q.      And the point of that is you can bill,
2  meaning get more money from Medicare for whatever the
3  services are, right?
4      A.      Correct.
5              I wasn't advising him, I was just
6  giving him as much information as possible.
7      Q.      Telling him those codes are out there,
8  right?
9      A.      Yes.
10     Q.      The next slide after your Medicare
11  example is summary and that's what, a summary of
12  everything that went before?
13             (Witness perusing document.)
14     Q.      Is it a summary of just the Medicare
15  example?
16     A.      I think I just am summarizing the whole
17  presentation of the large health plans in their area;
18  if you look through the slide, it is basically
19  summarizing the previous.
20     Q.      Then the slide after that titled
21  "Reimbursement for Remicade," can you tell me how you
22  would talk about that slide?

Page 112

1      A.      Sure.
2              Basically this is a grid that shows if
3  AWP is at that amount shown here and if the
4  reimbursement from any given payer, public or
5  otherwise, private, is a reduction off of AWP, what
6  the physician would be reimbursed per vial and what
7  the difference between AWP and that reimbursement
8  would be based on an assumed purchase of $500.
9              For the next line, it discusses, as we
10  spoke earlier, about the average of three vials per
11  patient, so it basically multiplies what one vial is
12  times three vials.
13             And the last line then takes a patient
14  to a year, first it talks about per vial, then it
15  talks per infusion, and then it talks about per year,
16  based on the different reimbursements that we knew
17  available out there with the public payers and private
18  payers.
19     Q.      Let me ask you a little differently
20  then.
21             Could you give me an example, you just
22  told me what the slides say --

Page 113

1      A.      That's what I would have said.
2      Q.      Just like what you told me?
3
4      A.      Very similar, yes, spelling out for
5  them exactly what I just said.
6              It is what it is.
7      Q.      What you are calling here on the last
8  slide profit per patient or profit on three-vial
9  infusion, is that concept of profit something that you
10  would discuss with the health plans?
11             MR. HAAS:  Objection.
12     A.      I wouldn't think the health plan would
13  be concerned about that, no, I would not.
14     Q.      It is not something?
15     A.      No, it is not something I would discuss
16  with them.
17     Q.      Was there a time at Centocor when
18  instructions were given that you couldn't talk about
19  profit anymore, are you aware of any policy at
20  Centocor that said don't talk about profit anymore?
21             MR. HAAS:  Objection to form.
22     A.      To physicians about profit?

Henderson Legal Services
(202) 220-4158

Laura Glassco        HIGHLY CONFIDENTIAL   September 1, 2005
                     New York, New York

Page 114

1    Q.      Yes.
2    A.      I think it was pretty much understood
3 that we shouldn't discuss profits probably a couple of
4 years ago, yes, I think it was a policy, but I don't
5 have it written down.
6    Q.      How would you have learned of that
7 policy, would someone have sent you a writing saying
8 this is the new policy?
9           MR. HAAS: Objection, form.
10   A.      I am not sure if it was in writing or
11 not.
12          I think it was well understood through
13 verbal communication, as well.
14   Q.      At that time somebody said don't talk
15 about profit?
16   A.      Right.
17   Q.      Who would that have been, do you know?
18   A.      I don't recall, I don't specifically
19 recall.
20   Q.      Do you remember when that was?
21   A.      No, I don't.
22   Q.      Do you remember why that policy came

Page 115

1 into being?
2    A.      No, I don't.
3    Q.      If you wanted to review whatever the
4 policy is to figure out exactly what it said, is there
5 a place you could go look for that at Centocor?
6           MR. HAAS: Objection, form.
7    A.      No.
8    Q.      Is there some central library of all
9 the policies out there?
10   A.      No.
11          MR. HAAS: Objection to form.
12   Q.      Were you ever involved in training
13 anybody else regarding the practice management
14 program?
15   A.      I am not sure of the question.
16   Q.      I think I asked you some of this
17 earlier.
18          You were never involved in creating any
19 training materials for anybody?
20   A.      No, I was not.
21   Q.      And you may have occasionally given a
22 talk or a presentation in some training, right?

Page 116

1    A.      And some training?
2    Q.      At some training for representatives or
3 somebody else, is that true?
4    A.      Yes, yes.
5    Q.      And that was the extent of your
6 involvement in training anybody regarding practice
7 management or reimbursement?
8    A.      Correct.
9           MR. MACORETTA: Why don't you give me a
10 minute here.
11          THE VIDEO TECHNICIAN: Time is 11:29
12 a.m., going off the record.
13          (Recess taken.).
14          THE VIDEO TECHNICIAN: Time is 11:34
15 a.m. and we're back on the record.
16 BY MR. MACORETTA:
17   Q.      I wanted to talk to you for a minute
18 about the documents you produced to us today.
19          Let me show you first what we can mark
20 as Exhibit Glassco 008, which is a two-page document
21 that says "Practice Management Worksheet For Assessing
22 New Services," Bates No. CEN 00107382-383.

Page 117

1           (Exhibit Glassco 008, Bates No. CEN
2 00107382-383, was marked for identification, as of
3 this date.)
4    Q.      Do you have a copy of that?
5           (Witness perusing document.)
6    Q.      What is this, Ms. Glassco?
7    A.      When I was asked to appear, I was asked
8 to look at my computer on certain subjects and I found
9 this in my computer.
10          It is not a document that I used per
11 se, but I think it was a document that was used during
12 the practice management programs.
13   Q.      So it is --
14   A.      It is a worksheet.
15   Q.      It is a Centocor-created document?
16   A.      Correct.
17   Q.      Is this a computer worksheet, meaning
18 does it work that when you fill in certain columns,
19 the numbers in other columns change?
20   A.      I don't know.
21          What you see is what I had.
22   Q.      That number at the bottom right of the

30 (Pages 114 to 117)

# Exhibit 43



# REMICADE™
### INFLIXIMAB

# Office-Based Infusion Guide

Plaintiffs' Exhibit
**252**
01-12257-PBS

EXHIBIT
Zislind 8
12/2/04

HIGHLY CONFIDENTIAL



# REMICADE™ (infliximab) Office-Based Infusion Guide

**Table of Contents**

### Introduction — 4
REMICADE™ Appropriateness Worksheet — 5

### Financial Analysis — 6
Billing for REMICADE™ — 6
REMICADE™ Financial Impact Worksheet — 8
Malpractice/Liability Insurance — 9

### Resource Evaluation — 10
Space Requirements — 10
Infusion Suite Equipment — 11
Administration Supplies — 13
Staff Training & Certification — 14
Resource Optimization — 14
Patient Comfort — 15

### Practical Examples — 16
Single Site Practice — 16
Multiple Site Practice — 18
Multispecialty Practice — 19

HIGHLY CONFIDENTIAL



**Introduction**

The purpose of this REMICADE™ (infliximab) Office-Based Infusion
Guide is to provide physicians, office managers and clinical staff
members a better understanding of the key practical issues
surrounding the administration of REMICADE™ in the office setting.
If you are considering providing REMICADE™ infusions in your office,
then this guide will provide you with a comprehensive list of
important considerations, including an analysis of financial
implications and an evaluation of practice resources. This guide,
in conjunction with other materials from Centocor, is designed to
assist you in determining whether providing REMICADE™ infusion
services is appropriate in your own practice. Benefits of providing
REMICADE™ infusion in the office setting include:

■ *Provision of high-quality, appropriate care*
REMICADE™ infusion performed in the office setting is consistent
with government and private payer goals of providing quality
health care in the most cost-appropriate setting.

■ *Patient convenience*
Providing REMICADE™ infusion in the physician office setting is
convenient for patients.

■ *Direct supervision of infusion*
Providing REMICADE™ infusion in the physician office setting
allows providers to maintain close contact with patients.

■ *Improved autonomy*
Providing REMICADE™ infusion in the office setting decreases
reliance on outside medical providers and their external
processes.

■ *Expand billable services*
Depending on reimbursement, office-based infusion may provide a
financial benefit to a physician's practice. Please refer to the
Financial Impact Worksheet on page 8 of this guide to estimate
the potential value of REMICADE™ infusion to your practice.

If you have any questions or issues regarding REMICADE™ infusion,
please contact your local Centocor representative. Call Centocor's
Customer Service line at 877-438-2686 or access Centocor's Web site
at www.centocor.com.

4

MDL-CEN00003481

# REMICADE™ (infliximab) Appropriateness Worksheet

Is your practice a good candidate for REMICADE™ therapy?  Please complete the following worksheet to help determine whether or not you should consider offering REMICADE™ therapy in your office.

| Question | Key | Score |
|---|---|---|
| 1. Which number best describes your average caseload of patents? | 0 = 0 – 5 patients/year<br>1 = 5 – 10 patients/year<br>2 = 10 – 15 patients/year<br>3 = 15+ patients/year | |
| 2. Is the portion of your patient population who are covered under a specialty capitation agreement (prospective per member per month) less than 20%? | 0 = no<br>1 = yes | |
| 3. Given your current workload, please indicate how much nursing staff time would be available for REMICADE™ infusions. | 0 = <1 hour/week<br>1 = 1 – 4 hours/week<br>2 = >4 hours/week | |
| 4. Is there at least 1 member of your nursing staff who has or can easily obtain IV certification? | 0 = no<br>1 = yes | |
| 5. Does your practice have adequate space for REMICADE™ infusions (a spare exam room or a minimum 36-sq-ft space) available for approximately 2.5 hours per infusion? | 0 = no<br>1 = yes | |
| | Total score = | |

| Score | Indicates |
|---|---|
| 0 – 4 | Your practice may not be a good candidate for office-based infusion. You may want to consider referring your patients elsewhere for REMICADE™ infusion. |
| 5 – 8 | Your practice may be a good candidate for office-based infusion. Please review the REMICADE™ Practice Management Kit and consult with your local Centocor representative to learn more about providing REMICADE™ infusions in the office-based setting. |

5

HIGHLY CONFIDENTIAL



## Billing for REMICADE™ (infliximab)

To bill for professional fees for REMICADE™ infusion, a physician must
be present at the location the infusion is administered. If the
physician provides separately identifiable and medically appropriate
services, you may also bill for evaluation and management (E/M)
services on the same day as the infusion. Thus, you could bill for the
following:

- REMICADE™ (unclassified drug)          J3490 (HCPCS or local code issued
                                         by the payer)
- Infusion, normal saline                J7050
- IV infusion, up to 1 hour              90780 (CPT-4)
- IV infusion, each additional hour      90781
- Office visit                           99211-99215 (as appropriate)
- Supplies and materials                 99070

As with any new procedure or therapy, REMICADE™ infusions will require
additional time and effort on the part of billing staff members. With
experience, the administrative and billing tasks associated with
REMICADE™ infusion should be accomplished easily. Office management
staff will need to address the following administrative issues:

- *Prior authorization*
  The appropriate staff person should contact health plans/insurers
  to receive prior authorization for REMICADE™ infusion and to verify
  coverage so that claims will be paid in a timely manner. If you
  would like assistance verifying coverage, please contact REMICADE™
  Reimbursement Services at 1-800-964-8345.

- *Claims Submission*
  Submitted claims should include appropriate diagnosis code(s),
  procedure codes for supervised infusion and an office visit code,
  if there is an office visit in addition to the infusion procedure.
  If REMICADE™ is purchased by the practice, code J3490 should be used
  until REMICADE™ is issued its own unique J code. It is very important
  to provide the drug name, NDC number and number of vials of drug
  used on the physician claim form. For assistance in obtaining and
  completing reimbursement forms and answering coding questions,
  please contact REMICADE™ Reimbursement Services at 1-800-964-8345.

6

MDL-CEN00003483

■ *Patient Financial Responsibility*
The patient's responsibility for receiving REMICADE™ (infliximab)
infusion in your office will depend on his/her health plan. It is
important to appropriately bill patients covered by HMO plans who
may be responsible for a copayment, as well as those covered by
PPO/Indemnity plans, who may be responsible for a deductible and/or
coinsurance.

■ *Payer Mix*
The reimbursement your practice receives for performing REMICADE™
infusions will depend greatly on your mix of payers. Please ask your
local Centocor representative to demonstrate the REMICADE™ Practice
Management Assistant, which provides a detailed assessment and shows
how payer mix may impact your financial results.

■ *Documentation*
Because REMICADE™ is a relatively expensive therapy, it is
recommended that administrative/billing staffs develop and
maintain a log to track REMICADE™ purchases, infusions
and reimbursements. Your practice may already have such a tracking
system in place. Maintaining a central source of REMICADE™
information will be a valuable method to organize and evaluate the
administration of this infusion therapy. Please see Appendix IX of
the REMICADE™ Practice Management Kit for a sample REMICADE™
Tracking Log.

For additional information regarding the reimbursement of REMICADE™,
please refer to the REMICADE™ Billing Guide or contact REMICADE™
Reimbursement Services at 1-800-964-8345.

7

HIGHLY CONFIDENTIAL



## REMICADE™ (infliximab) Financial Impact Worksheet

In determining whether or not to perform REMICADE™ infusions in the office setting, the following worksheet will help you estimate projected monthly revenues from this procedure.*

### Sample Worksheet

| | |
|---|---|
| a) Assumed Acquisition Cost (AAC) per vial | $457.00 |
| b) Average Wholesale Price (AWP) per vial | $611.33 |
| c) Estimated payment (estimated % of AWP) | (.90) x $611.33 = $550.20 |
| d) Estimated margin per vial (c − a) | $93.20 |
| e) Number of vials needed per patient | 4 |
| f) Estimated revenue per patient (d x e) | $372.80 |
| g) Estimated copayment/coinsurance per visit | $15.00 |
| h) Estimated infusion payment (CPT-4: 90780 & 90781) | $80.00 |
| i) Estimated office visit payment (CPT-4: 99213) | $65.00 |
| j) Total revenue per patient (f + g + h + i) | $532.80 |
| k) Assumed patient caseload per month | 5 |
| l) Estimated monthly revenue from REMICADE™ (j x k) | $2,664.00 |

### Your Practice

| | |
|---|---|
| a) Assumed Acquisition Cost (AAC) per vial | $ |
| b) Average Wholesale Price (AWP) per vial | $611.33 |
| c) Estimated payment (estimated % of AWP) | (.   ) x $611.33 = $ |
| d) Estimated margin per vial (c − a) | $ |
| e) Number of vials needed per patient | |
| f) Estimated revenue per patient (d x e) | $ |
| g) Estimated copayment/coinsurance per visit | $ |
| h) Estimated infusion payment (CPT-4: 90780 & 90781) | $ |
| i) Estimated office visit payment (CPT-4: 99213) | $ |
| j) Total revenue per patient (f + g + h + i) | $ |
| k) Assumed patient caseload per month | |
| l) Estimated monthly revenue from REMICADE™ (j x k) | $ |

*Notice: Please note that this analysis is for illustrative purposes only. Actual income or loss is a function of many factors, including payer mix, payer policies, office costs and more. This worksheet is not a substitute for a full financial analysis of REMICADE™ infusions.*

8

HIGHLY CONFIDENTIAL

MDL-CEN00003485

## Malpractice/Liability Insurance

You should consult with your professional insurance representative
to review the details of your malpractice and liability policies
regarding REMICADE™ (infliximab) infusion. Providing REMICADE™ therapy
in the office setting may or may not have any effect on the rates you
pay for malpractice and liability coverage.

9

HIGHLY CONFIDENTIAL

MDL-CEN00003486



## Space Requirements

REMICADE™ (infliximab) infusion is readily performed in the ambulatory care setting. REMICADE™ typically will be administered as a scheduled, nonemergency infusion for patients.

The space requirements for REMICADE™ infusions are modest. Infusions may be performed in a typical exam room that can accommodate the following equipment:

### Essential

■ IV pole
■ Standard examination room table or chair
■ Countertop workstation
■ Refrigerated storage space

### Optional

■ Reclining chair
■ Additional seating for companion/family member
■ Magazines/reading material
■ TV/VCR

Most of the equipment required already may be present in many office settings.

10

HIGHLY CONFIDENTIAL

# Infusion Suite Equipment

## Essential Equipment

■ *IV pole*
A standard IV pole is necessary for REMICADE™ (infliximab) infusion. This IV pole should be equipped with wheels to allow for patient mobility, as patients may require the use of the bathroom during the 2-hour infusion. For information on infusion poles, please contact your local medical supply provider.

■ *Exam table*
Most examination rooms are already equipped with an exam table. Although REMICADE™ infusion can be administered in a chair designed specifically for infusion therapy or a standard reclining chair for optimal patient comfort, the entire procedure can be accomplished on a basic or reclining exam table. In addition, the exam table can provide space for a patient to lie down.

■ *Countertop workstation*
A countertop workstation within close proximity of the infusion suite is recommended to reconstitute the REMICADE™ solution and prepare the infusion.

■ *Refrigerator*
Because REMICADE™ must be stored at 2°C to 8°C (36°F to 46°F), refrigerated storage space will be needed.

■ *Infusion reaction kit*
In order to treat a patient who experiences an adverse reaction, a kit containing appropriate administration supplies and the following medications should be readily available in the infusion suite:

- − acetaminophen
- − antihistamines
- − corticosteroids
- − epinephrine

For additional information regarding the treatment of adverse reactions, please refer to Section IV of the REMICADE™ Use & Administration Guide.

11



TM

## Optional Equipment

■ *Reclining chair*
For optimal patient comfort, REMICADE™ (infliximab) infusion can be
administered in a chair designed specifically for infusion therapy or
a standard reclining chair. If necessary, the chair should be modified
to ensure that any blood/fluid spill could be easily removed and
cleaned. For information on infusion chairs, please contact your
local medical supply provider.

■ *Table or cart*
If there is not an adequate aseptic countertop workstation within
close proximity of the infusion suite, then an appropriate table or
cart will be required.

■ *Infusion pump*
A simple infusion pump may be used for REMICADE™ infusion; however,
a pump is not required.

■ *Patient assistance signal device*
If the infusion suite is located away from routine workspace, patients
should be provided with a means to signal clinical staff members for
assistance, such as an electronic signal device or a bell.

12

HIGHLY CONFIDENTIAL

# Administration Supplies

Infusion supplies are listed below. These items may be ordered separately. Some specialty distributors may have a convenience kit available. Please refer to Appendix IX of the REMICADE™ (infliximab) Practice Management Kit for a listing of specialty distributors and their toll-free phone numbers.

Supplies for administering REMICADE™

- 250-mL non-PVC IV bag or glass bottle of 0.9% sodium chloride
- Non-PVC IV administration tubing
- 0.9% sodium chloride injection for priming and flushing line
- 1.2-micron in-line nonprotein-binding filter
- 10 mL Sterile Water for Injection USP for each vial of REMICADE™ to be reconstituted
- IV catheter
- IV bag label
- Alcohol wipes
- 10-mL syringes and 21-gauge needles
- Antiseptic swab
- 2" x 2" gauze
- Adhesive strip

Reconstituted REMICADE™ solutions must be stored in bottles (glass, polypropylene) or plastic bags (polypropylene, polyolefin) and administered through polyethylene-lined administration sets to minimize patient exposure to the plasticizer DEHP (di[2-ethylhexyl]phthalate), which may be leached from PVC infusion bags or sets.

*Note: REMICADE™ must be administered in non-PVC bags and infused through non-PVC tubing. These supplies are easily obtained from specialty distributors.*

An infusion pump is not required. You may elect to use one, or you may simply hang the IV bag from a standard IV pole. The infusion rate should be controlled to ensure that the 250-mL infusion of REMICADE™ is administered over a 2-hour period.

13

HIGHLY CONFIDENTIAL

MDL-CEN00003490



## Staff Training & Certification

Clinical staff members who will be administering REMICADE™ (infliximab) will require certification for inserting intravenous catheters and administering IV therapies.

Intravenous certification usually requires a single-day course and may be available through the following:

- Education department of community hospital
- Local schools of nursing
- Local chapter of the American Nurses Association (HQ: 800-274-4262)
- Local chapter of the Oncology Nurses Society (HQ: 412-921-7373)

All clinical staff members who plan to be involved with REMICADE™ administration should review the REMICADE™ Use & Administration Guide to gain a working knowledge about the therapy, administration and side effects. This guide will also assist in answering questions that patients may have.

## Resource Optimization

From start to finish, the entire REMICADE™ infusion process takes approximately 3 hours.

- Designated "REMICADE™ Clinic" days may be scheduled by offices that are interested in conducting its REMICADE™ infusions on a dedicated day in order to maximize efficiency.
- A practice may choose to schedule evening sessions when the office is otherwise unused. This arrangement could also be convenient for patients who would then be able to schedule their infusions outside of normal working hours.
- Offices with appropriate staffing and infusion suite resources are able to conduct multiple concurrent infusions.
- A practice may choose to designate 1 or more clinical staff member(s) to administer all REMICADE™ infusions in order to build proficiency in this procedure.

The initial step in REMICADE™ infusion is to record the patient's baseline vital signs. During the infusion, the clinician should check the patient's pulse and blood pressure every 30 minutes. Developing a flow sheet to track patient vital signs during REMICADE™ infusion may be helpful. Please refer to Appendix IX of the REMICADE™ Practice Management Kit for sample flow sheets. Although a physician should always be available in the office during the infusion, he/she is able to perform other clinical and administrative tasks. Likewise, a nurse may be able to perform other tasks while supervising the infusion, provided that he/she is readily available.

14

HIGHLY CONFIDENTIAL

# Patient Comfort

In addition to providing patients with a comfortable setting and a chair designed specifically for infusion therapy or a standard reclining chair, your practice might consider the following:

- *Companion/family member seating*
  A companion or family member may choose to accompany a patient for REMICADE™ (infliximab) infusion. Your practice may wish to accommodate this family member, friend or caregiver in the infusion suite.

- *Bathroom usage*
  The patient should have a bathroom readily accessible. The IV pole should be mobile to allow the patient to travel to the bathroom, if necessary.

- *Drinking & eating*
  There are no medical restrictions on the consumption of food or beverage during REMICADE™ infusion. Practices may choose to establish their own guidelines regarding drinking or eating during infusion.

- *Entertainment*
  To keep patients comfortable and occupied during the infusion, current magazines or other reading materials are suggested. Additionally, a television, television with VCR or radio might be made available in the infusion room. If the infusion suite is equipped with a television with VCR, patient education videos on procedures, nutrition or other topics might be shown to certain patients. Patients should also be encouraged to bring their own reading materials (or VCR tapes).

15

HIGHLY CONFIDENTIAL

MDL-CEN00003492



TM

## Single Site Practice

Group #1 is a 3-person single specialty group practice with 1 office location in a suburban community in the Southeast. This group has been providing REMICADE™ (infliximab) infusions to its patients since shortly after the product became commercially available. A staff RN, who works 3 days a week, conducts all Remicade™ infusions. The practice administers a maximum of 2 REMICADE™ infusions on each of these 3 days. This nurse attended a 1-day training course on infusion therapy techniques through the education department of a local community hospital.

REMICADE™ infusions are initiated in a standard examination room. This exam room has adequate storage space for administration supplies and a countertop workstation for reconstituting the medication and preparing the infusion. REMICADE™ vials are kept in a medicine-storage refrigerator located in another room. REMICADE™ and the ancillary supplies are purchased through a specialty distributor.

Once the RN has successfully initiated the REMICADE™ infusion, the patient is moved with the portable IV pole to a second exam room, which has been outfitted for patient education purposes. This is done to make the patient more comfortable. This exam room contains a standard reclining chair (from the home of one of the physicians), 2 additional chairs for companion/family member seating, and a television with VCR. Patients are encouraged to bring in their own videotape to watch while receiving REMICADE™ infusion. Group #1 maintains an Infusion Reaction Kit, containing appropriate medications and supplies, in a plastic carrying box. This kit follows the patient between the exam room and the infusion suite. At the conclusion of the infusion, the RN moves the patient back to the first examination room, removes the IV, then conducts post-infusion observation.

16

HIGHLY CONFIDENTIAL

MDL-CEN00003493

Group #1 conducts a follow-up survey in order to assess the patient's perception of the care received at their practice. This feedback mechanism provides the group with a better understanding of how well they are preparing their patients for receiving REMICADE™ infusion. In addition, it serves to collect patients' opinions and suggestions about the infusion process. Finally, this survey allows the practice to ask about response to therapy, side effects or possible delayed infusion reactions.

The Group #1 Office Manager uses REMICADE™ Reimbursement Services (1-800-964-8345) for assistance with prior authorization and coding questions.

17



## Multiple Site Practice

Group #2 has 11 specialists practicing in 4 office locations in an urban community in the Northwest. The primary office includes a GI endoscopy suite. The group has been providing REMICADE™ (infliximab) infusions to its patients since the product became commercially available. A staff RN has primary responsibility for REMICADE™ infusions with assistance from 2 LPNs. All 3 received training in infusion therapy techniques earlier in their careers.

REMICADE™ infusions are performed in a standard examination room. Administration supplies, purchased from a specialty distributor, are stored in a cabinet near the nurse's station. This station also has a countertop workstation for reconstituting the medication. REMICADE™ vials are kept in a medicine-storage refrigerator located nearby.

The infusion room contains a standard reclining chair, an additional chair for companion/family member seating and a television with VCR. Patients are shown educational videos, as appropriate. Because Group #2 has an endoscopy suite in its primary office, they maintain a full resuscitation cart including defibrillator, appropriate medications and supplies.

Group #2 has elected to monitor patients' heart rate and rhythm during infusions with an electrical monitoring device, which they maintain in their endoscopy suite.

Billing staff in this practice received an in-service training from a Centocor Reimbursement Specialist to establish customized billing procedures that facilitate reimbursement and maximize efficiency.

18

HIGHLY CONFIDENTIAL

## Multispecialty Practice

Group #3 is a multispecialty group of 15 physicians. 2 of whom provide REMICADE™ infusions. The practice is located in a suburban location in the Southwest. A staff RN, trained in infusion therapy techniques, conducts the infusions.

REMICADE™ infusions are conducted in a standard examination room, which functions as the infusion room. Administration supplies, purchased from a specialty distributor, are stored in the infusion suite. This room also has a countertop workstation for reconstituting the medication. REMICADE™ vials are kept in a medicine-storage refrigerator located nearby.

The infusion room contains a reclining examination table, upon which patients remain for the duration of the REMICADE™ infusion. This room also has an additional chair for companion/family member seating, as well as current patient education materials and magazines.

19

MDL-CEN00003496



**REMICADE™**
**INFLIXIMAB**
recombinant

**DESCRIPTION:**

REMICADE™ (infliximab) is a chimeric IgG1κ monoclonal antibody with an approximate molecular weight of 149,100 daltons. It is composed of human constant and mouse variable regions. Infliximab binds specifically to human tumor necrosis factor alpha (TNFα) with an association constant of $10^{10}$ M$^{-1}$. Infliximab is produced by a recombinant cell line cultured by continuous perfusion and is purified by a series of steps that includes measures to inactivate and remove viruses.

REMICADE is supplied as a sterile, white, lyophilized powder for intravenous infusion. Following reconstitution with 10 mL of Sterile Water for Injection, USP, the resulting pH is approximately 7.2. Each single-use vial contains 100 mg infliximab, 500 mg sucrose, 0.5 mg polysorbate 80, 2.2 mg monobasic sodium phosphate and 6.1 mg dibasic sodium phosphate. No preservatives are present.

**CLINICAL PHARMACOLOGY:**

**General**

Infliximab neutralizes the biological activity of TNFα by binding with high affinity to the soluble and transmembrane forms of TNFα and inhibits binding of TNFα with its receptors. Infliximab does not neutralize TNFβ (lymphotoxin-α), a related cytokine that utilizes the same receptors as TNFα. Biological activities attributed to TNFα include: induction of pro-inflammatory cytokines such as IL-1 and IL-6, enhancement of leukocyte migration by increasing endothelial layer permeability and expression of adhesion molecules by endothelial cells and leukocytes, activation of neutrophil and eosinophil functional activity, induction of acute phase reactants and other liver protease, as well as tissue degrading enzymes produced by synoviocytes and/or chondrocytes. Cells expressing transmembrane TNFα bound by infliximab can be lysed in vitro by complement or effector cells. Infliximab inhibits the functional activity of TNFα in a wide variety of in vitro bioassays utilizing human fibroblasts, endothelial cells, neutrophils, B and T lymphocytes and epithelial cells. Anti-TNFα antibodies reduce disease activity in the cotton-top tamarin colitis model, and decrease synovitis and joint erosions in a murine model of collagen-induced arthritis. Infliximab prevents disease in transgenic mice that develop polyarthritis as a result of constitutive expression of human TNFα, and, when administered after disease onset, allowed eroded joints to heal.

**Pharmacokinetics**

Single intravenous infusions of 1 to 20 mg/kg showed a predictable and linear relationship between the dose administered and the maximum serum concentration and area under the concentration-time curve. The volume of distribution at steady state was independent of dose and indicated that infliximab was distributed primarily within the vascular compartment. Infliximab pharmacokinetic results for the recommended doses of 3 mg/kg in rheumatoid arthritis and 5 mg/kg in Crohn's disease indicate that the terminal half-life of infliximab is 8.0 to 9.5 days.

Following an initial dose of REMICADE, repeated infusions at 2 and 6 weeks in fistulizing Crohn's disease and rheumatoid arthritis patients resulted in predictable concentration-time profiles following each treatment. No systemic accumulation of infliximab occurred upon continued repeated treatment with 3 mg/kg or 10 mg/kg at 4- or 8-week intervals in rheumatoid arthritis patients or patients with moderate to severe Crohn's disease treated with 5 mg/kg or 10 mg/kg at 8-week intervals. No major differences in clearance or volume of distribution were observed in patient subgroups defined by age or weight. It is not known if there are differences in clearance or volume of distribution in patients with marked impairment of hepatic or renal function.

**CLINICAL STUDIES:**

**Rheumatoid Arthritis**

The safety and efficacy of REMICADE when given in conjunction with methotrexate (MTX) were assessed in a multicenter, randomized, double-blind, placebo-controlled study of 428 patients with active rheumatoid arthritis despite treatment with MTX (the Anti-TNF Trial in Rheumatoid Arthritis with Concomitant Therapy or ATTRACT). The median age of patients enrolled was 54 years, with a median duration of disease of 8.4 years and a median number of swollen and tender joints of 20 and 31 respectively. All patients were to have received MTX for ≥ 3 months and be on a stable dose ≥ 12.5 mg/week for 4 weeks prior to study. All REMICADE and placebo groups continued their stable dose of MTX and folic acid.

In addition to MTX, patients received placebo, 3 mg/kg or 10 mg/kg of REMICADE by intravenous infusion at weeks 0, 2 and 6 followed by additional infusions every four or eight weeks thereafter. Concurrent use of stable doses of oral corticosteroids (10 mg/day) and/or nonsteroidal anti-inflammatory drugs was also permitted. The primary endpoint was the proportion of patients at week 30 who attained an improvement in their signs and symptoms as measured by the American College of Rheumatology criteria. (ACR 20). An ACR 20 response is defined as at least a 20% improvement in both tender and swollen joint counts and in 3 of the following 5 criteria: physician global assessment, patient global assessment, functional/disability measure, visual analog pain scale and erythrocyte sedimentation rate (ESR) or CRP.

At week 30, 42/86 (50%) of patients treated every 8 weeks with 3 mg/kg of REMICADE plus MTX attained and ACR 20 compared with 16/86 (22%) of patients treated with placebo plus MTX (p<0.001). Higher doses and/or more frequent administrations did not result in higher response rates. Results are shown in Figure 1.



--- Placebo    --- 3 mg/kg q 4 wks    --- 10 mg/kg q 8 wks
3 mg/kg q 8 wks    10 mg/kg q 4 wks

All groups received concomitant methotrexate

Figure 1. Percentage of Patients who Achieved an ACR 20.

At week 30, the ACR 50 response was 27% for patients treated with 3 mg/kg REMICADE (infliximab) every 8 weeks plus MTX, compared to 5% for patients treated with placebo plus MTX (p<0.001). The ACR 70 response was 8% for patients treated with 3 mg/kg REMICADE every 8 weeks plus MTX and 0% for patients treated with placebo plus MTX. Patients receiving 3 mg/kg REMICADE every 8 weeks demonstrated greater improvement in all ACR response components including HAQ compared to patients treated with placebo plus MTX (Table 1). Data on use of REMICADE without concurrent MTX are limited (see PRECAUTIONS, Immunogenicity).

**Table 1**

MEDIAN VALUES AT BASELINE & WEEK 30 FOR ACR COMPONENTS

| Parameter | Placebo + MTX | | 3 mg/kg q 8 wks REMICADE + MTX | |
|---|---|---|---|---|
| | Baseline | 30 weeks | Baseline | 30 weeks |
| No. of Tender Joints | 24 | 16 | 22 | 12 |
| No. of Swollen Joints | 19 | 13 | 19 | 9 |
| Pain[a] | 6.7 | 5.8 | 7.0 | 3.8 |
| Physician's Global Assessment[a] | 6.5 | 5.0 | 6.1 | 2.6 |
| Patient's Global Assessment[a] | 6.2 | 6.5 | 6.6 | 2.6 |
| Disability Index (HAQ)[b] | 1.8 | 1.5 | 1.8 | 1.5 |
| CRP (mg/dL) | 3.0 | 2.3 | 3.1 | 0.6 |
| ESR (mm/hr) | 39 | 35 | 40 | 24 |

[a] Visual Analog Scale (0=best, 10=worst)
[b] Health Assessment Questionnaire, measurement of 8 categories: dressing and grooming, arising, eating, walking, hygiene, reach, grip, and activities

**Active Crohn's Disease**

The safety and efficacy of REMICADE were assessed in a randomized, double-blind, placebo-controlled dose ranging study of 108 patients with moderate to severe active Crohn's disease (Crohn's Disease Activity Index [CDAI] ≥220≤400). All patients had experienced an inadequate response to prior conventional therapies. Including corticosteroids (59% of patients), 5-aminosalicylates (S-ASA) (86%) and/or 6-mercaptopurine/azathioprine (6-MP/AZA) (37%). Concurrent use of stable dose regimens of corticosteroids, 5-ASA, 6-MP and/or AZA and AZA was permitted and 92% of patients continued to receive at least one of these medications.

The study was divided into three phases. In the first phase, patients were randomized to receive a single intravenous (IV) dose of placebo, 5, 10 or 20 mg/kg of REMICADE. The primary endpoint was the proportion of patients who experienced a clinical response, defined as a decrease in CDAI by 270 points from baseline at the 4-week evaluation and without an increase in Crohn's disease medications or surgery for Crohn's disease. Patients who responded at week 4 were followed to week 12. Secondary endpoints included the proportion of patients who were in clinical remission at week 4 (CDAI <150), and clinical response over time.

At week 4, four of twenty-five (16%) of the placebo patients achieved a clinical response vs. twenty-two of twenty-seven (81%) of the patients receiving 5 mg/kg REMICADE [p < 0.001, two-sided, Fisher's Exact test]. One of twenty (5%) placebo patients and fifteen of twenty-seven (56%) patients receiving 10 mg/kg REMICADE achieved a CDAI <150 at week 4. The maximum response to any dose of REMICADE was observed within 2-4 weeks. The proportion of patients responding gradually diminished over the 12 weeks of the evaluation period. There was no evidence of a dose response; doses higher than 5 mg/kg did not result in a greater proportion of responders. Results are shown in Figure 2.



--○-- Placebo (n = 25)    --□-- 10 mg/kg (n = 28)
--△-- 5 mg/kg (n = 27)    --●-- 20 mg/kg (n = 28)

Figure 2. Response (≥70 point decrease in CDAI) to a Single IV REMICADE or Placebo Dose.

During the 12-week period following infusion, patients treated with REMICADE compared to placebo demonstrated improvement in outcomes measured by the Inflammatory Bowel Disease Questionnaire.

In the second phase, 29 patients who did not respond to the single dose of 5, 10 or 20 mg of REMICADE entered the open-label phase and received a single 10 mg/kg dose of REMICADE 4 weeks after the initial dose. Ten of twenty-nine (34%) patients experienced a response 4 weeks after receiving the second dose.

Patients who remained in clinical response at week 8 during the first or second phase were eligible for the retreatment phase. Seventy-three patients were re-randomized at week 12 to receive 4 infusions of placebo or 10 mg/kg REMICADE at 8-week intervals (weeks 12, 20, 28, 36) and were followed to week 48. In the limited data set available, no significant differences were observed between the REMICADE and placebo re-treated patients.

**Fistulizing Crohn's Disease**

The safety and efficacy of REMICADE were assessed in a randomized, double-blind, placebo controlled study of 94 patients with fistulizing Crohn's disease who had fistula(s) that were of at least 3 months duration. Concurrent use of stable doses of corticosteroids, 5-ASA, antibiotics, MTX, 6-MP and/or AZA was permitted, and 83% of patients continued to receive at least one of these medications. Fifty-two (55%) had multiple cutaneously draining fistulas. Ninety percent of patients had fistula(s) to the perianal area and 10% had abdominal fistula(s).

Patients received 3 doses of placebo, 5 or 10 mg/kg REMICADE at weeks 0, 2 and 6 and were followed up to 26 weeks. The primary endpoint was the proportion of patients who experienced a clinical response, defined as a ≥50% reduction from baseline in the number of fistula(s) draining upon gentle compression, on at least two consecutive visits, without an increase in medication or surgery for Crohn's disease.

Eight of thirty-one (26%) patients in the placebo arm achieved a clinical response vs. twenty-one of thirty-one (68%) patients in the 5 mg/kg REMICADE arm (p = 0.002, two-sided, Fisher's Exact test). Eighteen of thirty-two (56%) patients in the 10 mg/kg arm achieved a clinical response.

The median time to onset of response in the REMICADE-treated group was 2 weeks. The median duration of response was 12 weeks, after 22 weeks there was no difference between either dose of REMICADE and placebo in the proportion of patients in response (Figure 3). New fistula(s) developed in approximately 15% of both REMICADE and placebo-treated patients.

HIGHLY CONFIDENTIAL



**Figure 3. Response (fistula/s) observed with Three Doses of REMICADE (infliximab) or Placebo.**

Seven of sixty (12%) evaluable REMICADE-treated patients, compared to one of thirty-one (3.5%) placebo-treated patients, developed an abscess in the area of fistulae between 8 and 16 weeks after the last infusion of REMICADE. Six of the REMICADE abscess who developed an abscess had experienced a clinical response [see ADVERSE REACTIONS, Infections].

Dose regimens other than dosing at weeks 0, 2 and 6 have not been studied. Studies have not been done to assess the effects of REMICADE on healing of the internal fistulae canal, on closure of non-cutaneously draining fistulas (e.g., entero-entero), or on cutaneously draining fistulas in locations other than perineal and parabdominal.

## INDICATIONS AND USAGE:

### Rheumatoid Arthritis
REMICADE, in combination with methotrexate, is indicated for the reduction in signs and symptoms of rheumatoid arthritis in patients who have had an inadequate response to methotrexate.

### Crohn's Disease
REMICADE is indicated for the reduction in signs and symptoms of Crohn's disease in patients with moderately to severely active Crohn's disease who have had an inadequate response to conventional therapy.

The safety and efficacy of therapy continued beyond a single dose have not been established [see DOSAGE AND ADMINISTRATION].

REMICADE is indicated for the reduction in the number of draining enterocutaneous fistulae in patients with fistulizing Crohn's disease.

The safety and efficacy of therapy continued beyond these doses have not been studied [see DOSAGE AND ADMINISTRATION].

## CONTRAINDICATIONS:

REMICADE should not be administered to patients with known hypersensitivity to any murine proteins or other component of the product.

## WARNINGS:

### RISK OF INFECTIONS
SERIOUS INFECTIONS, INCLUDING SEPSIS AND FATAL INFECTIONS, HAVE BEEN REPORTED IN PATIENTS RECEIVING TNF-BLOCKING AGENTS. MANY OF THE SERIOUS INFECTIONS IN PATIENTS TREATED WITH REMICADE HAVE OCCURRED IN PATIENTS ON CONCOMITANT IMMUNOSUPPRESSIVE THERAPY THAT, IN ADDITION TO THEIR CROHN'S DISEASE OR RHEUMATOID ARTHRITIS, COULD PREDISPOSE THEM TO INFECTIONS. CAUTION SHOULD BE EXERCISED WHEN CONSIDERING THE USE OF REMICADE IN PATIENTS WITH A CHRONIC INFECTION OR A HISTORY OF RECURRENT INFECTION. REMICADE SHOULD NOT BE GIVEN TO PATIENTS WITH A CLINICALLY IMPORTANT, ACTIVE INFECTION. PATIENTS WHO DEVELOP A NEW INFECTION WHILE UNDERGOING TREATMENT WITH REMICADE SHOULD BE MONITORED CLOSELY. IF A PATIENT DEVELOPS A SERIOUS INFECTION OR SEPSIS, REMICADE THERAPY SHOULD BE DISCONTINUED [see ADVERSE REACTIONS, Infections].

### Hypersensitivity
REMICADE has been associated with hypersensitivity reactions that vary in their time of onset. Most hypersensitivity reactions, which include urticaria, dyspnea, and/or hypotension, have occurred during or within 2 hours of infliximab infusion. However, in some cases, serum sickness-like reactions have been observed in Crohn's disease patients 3 to 12 days after REMICADE therapy was reinstituted following an extended period without REMICADE treatment. Symptoms associated with these reactions include fever, rash, headache, sore throat, myalgias, polyarthralgias, hand and facial edema and/or dysphagia. These reactions were associated with marked increase in antibodies to infliximab, loss of infliximab serum concentrations of REMICADE, and possible loss of drug efficacy. REMICADE should be discontinued for severe reactions. Medications for the treatment of hypersensitivity reactions [e.g., acetaminophen, antihistamines, corticosteroids and/or epinephrine] should be available for immediate use in the event of a reaction [see ADVERSE REACTIONS, Infusion-related Reactions].

## PRECAUTIONS:

### Autoimmunity
Treatment with REMICADE may result in the formation of autoantibodies and, rarely, in the development of a lupus-like syndrome. If a patient develops symptoms suggestive of a lupus-like syndrome following treatment with REMICADE, treatment should be discontinued [see ADVERSE REACTIONS, Autoantibodies/Lupus-like Syndrome].

### Malignancy
Patients with long duration of Crohn's disease or rheumatoid arthritis and chronic exposure to immunosuppressant therapies are more prone to develop lymphomas [see ADVERSE REACTIONS, Malignancies/Lymphoproliferative Disease]. The impact of treatment with REMICADE on these phenomena is unknown.

### Immunogenicity
Treatment with REMICADE can be associated with the development of antibodies to infliximab (also referred to as human antichimeric antibodies, HACA). One hundred thirty-four of the 199 Crohn's disease patients treated with REMICADE were evaluated for the development of infliximab-specific antibodies; 18 (13%) were antibody-positive (the majority at low titer, ≤1:20). Patients who were antibody-positive were more likely to experience an infusion reaction [see ADVERSE REACTIONS, Infusion-related Reactions]. Antibody development was lower among rheumatoid arthritis and Crohn's disease patients receiving immunosuppressant therapies such as 6-MP/AZA or MTX. With repeated dosing of REMICADE, serum concentrations of infliximab were higher in rheumatoid arthritis patients who received concomitant MTX. There are limited data available on the development of antibodies to infliximab in patients receiving long-term treatment with REMICADE. Because immunogenicity analyses are product-specific, comparison of antibody rates to those from other products is not appropriate.

### Vaccinations
No data are available on the response to vaccination or on the secondary transmission of infection by live vaccines in patients receiving anti-TNF therapy. It is recommended that live vaccines not be given concurrently.

### Drug Interactions
Specific drug interaction studies, including interactions with MTX, have not been conducted. The majority of patients in rheumatoid arthritis or Crohn's disease clinical trials received one or more concomitant medications. In rheumatoid arthritis, concomitant medications besides MTX were methotrexate anti-inflammatory agents, folic acid, corticosteroids and/or narcotics. Concomitant Crohn's disease medications were antibiotics, antivirals, corticosteroids, 6-MP/AZA and aminosalicylates. Patients with Crohn's disease who received immunosuppressants tended to experience fewer infusion reactions compared to patients on no immunosuppressants [see PRECAUTIONS, Immunogenicity and ADVERSE REACTIONS, Infusion-related Reactions].

### Carcinogenesis, Mutagenesis and Impairment of Fertility
Long-term studies in animals have not been performed to evaluate the carcinogenic potential. No clastogenic or mutagenic effects of infliximab were observed in the in vivo mouse micronucleus test or the Salmonella-Escherichia coli (Ames) assay, respectively. Chromosomal aberrations were not observed in an assay performed using human lymphocytes. It is not known whether infliximab can impair fertility in humans. No impairment of fertility was observed in a fertility and general reproduction toxicity study conducted in mice using an analogous antibody that selectively inhibits the functional activity of mouse TNFα.

### Pregnancy Category C
Since infliximab does not cross-react with TNFα in species other than humans and chimpanzees, animal reproduction studies have not been conducted with REMICADE (infliximab). It is not known whether REMICADE can cause fetal harm when administered to a pregnant woman or can affect reproduction capacity while infliximab is present in the serum [see CLINICAL PHARMACOLOGY, Pharmacokinetics]. REMICADE should be given to a pregnant woman only if clearly needed. No evidence of maternal toxicity, embryotoxicity or teratogenicity was observed in a developmental toxicity study conducted in mice using an analogous antibody that selectively inhibits the functional activity of mouse TNFα.

### Nursing Mothers
It is not known whether infliximab is excreted in human milk or absorbed systemically after ingestion. Because many drugs and immunoglobulins are excreted in human milk, and because of the potential for adverse reactions in nursing infants from REMICADE, a decision should be made whether to discontinue nursing or to discontinue the drug, taking into account the importance of the drug to the mother.

### Pediatric Use
Safety and effectiveness of REMICADE in patients with juvenile rheumatoid arthritis and in pediatric patients with Crohn's disease have not been established.

### Geriatric Use
In the ATTRACT study, no overall differences were observed in effectiveness or safety in the 72 patients aged 65 or older compared to younger patients. In Crohn's disease studies, there were insufficient numbers of patients aged 65 or older to determine whether they respond differently from patients aged 18 to 65. Because there is a higher incidence of infections in the elderly population in general, caution should be used in treating the elderly [see ADVERSE REACTIONS, Infections].

## ADVERSE REACTIONS:

A total of 771 patients were treated with REMICADE in clinical trials, in both rheumatoid arthritis and Crohn's disease trials. Approximately 5% of patients discontinued REMICADE because of adverse experiences. The most common reasons for discontinuation of treatment were dyspnea, urticaria and headache.

### Infusion-related Reactions

#### Acute infusion reactions
An infusion reaction was defined as any adverse event occurring during the infusion or within 1 to 2 hours after the infusion. Seventeen percent of REMICADE-treated patients in all clinical trials experienced an infusion reaction compared to 7% of placebo-treated patients. Among the 3234 REMICADE infusions, 4% were accompanied by nonspecific symptoms such as fever or chills, 1% were accompanied by pruritus or urticaria, 1% were accompanied by cardiopulmonary reactions (primarily chest pain, hypotension, hypertension or dyspnea), and 0.1% were accompanied by combined symptoms of pruritus/urticaria and cardiopulmonary reactions. Less than 2% of patients discontinued REMICADE because of infusion reactions, and all patients recovered with treatment and/or discontinuation of infusion. REMICADE infusions beyond the initial infusion in rheumatoid arthritis patients were not associated with a higher incidence of reactions.

Patients with Crohn's disease who became positive for antibodies to infliximab were more likely to develop infusion reactions than were those who were negative (35% vs. 11% respectively). Use of concomitant immunosuppressant agents appeared to reduce the frequency of antibodies to infliximab and infusion reactions [see PRECAUTIONS, Immunogenicity and Drug Interactions].

#### Reactions following readministration
In a clinical trial of forty patients with Crohn's disease retreated with infliximab following a 2 to 4 year period without infliximab treatment, 10 patients experienced adverse events manifesting 3 to 12 days following infusion of which 6 were considered serious. Signs and symptoms included myalgia and/or arthralgia with fever and/or rash, with some patients also experiencing pruritus, facial, hand or lip edema, dysphagia, urticaria, sore throat, and headache. Patients experiencing these adverse events had not experienced infusion-related adverse events associated with their initial infusion(s) therapy. Of the 40 patients retreated, these adverse events occurred in 9 of 23 (39%) who had received fluid formulations which is no longer in use and 1 of 17 (6%) who received lyophilized formulation. The clinical data are not adequate to determine if occurrence of these reactions is due to differences in formulation. Patients' signs and symptoms improved substantially or resolved with treatment in all cases. There are insufficient data on the incidence of these events after drug-free intervals of less than 2 years. However these events have been observed infrequently in clinical trials and post-marketing surveillance at intervals of less than 1 year.

#### Infections
In REMICADE clinical trials, infections were reported by 26% of REMICADE-treated patients (average of 27 weeks of follow-up) and by 16% of placebo-treated patients (average of 28 weeks of follow-up). The infections most frequently reported were upper respiratory tract infections (including, sinusitis, pharyngitis, and bronchitis) and urinary tract infections. No increased risk of serious infections or sepsis has been observed with Remicade compared to placebo. Among REMICADE-treated patients, three serious infections including pneumonia, cellulitis, pyelonephritis and sepsis. In the ATTRACT study, one patient died with disseminated tuberculosis and one died with disseminated coccidioidomycosis. The relationship to REMICADE is unknown [see WARNINGS, Risk of Infections]. Twelve percent of patients with fistulizing Crohn's disease developed a new abscess within 8 to 16 weeks after the last infusion of REMICADE [see CLINICAL STUDIES, Fistulizing Crohn's Disease].

#### Autoantibodies/Lupus-like Syndrome
Patients were tested for autoantibodies at multiple time points. In the rheumatoid arthritis (ATTRACT) study, 22% of REMICADE-treated patients developed antinuclear antibodies (ANA) between screening and last evaluation, compared to 5% of placebo-treated patients. Anti-dsDNA antibodies developed in approximately 4% of REMICADE-treated patients, compared to none of the placebo-treated patients. No association was seen between REMICADE concentration and development of ANA or anti-dsDNA.

Of Crohn's disease patients treated with REMICADE who were evaluated for antinuclear antibodies (ANA), 34% developed ANA between screening and last evaluation. Anti-dsDNA antibodies developed in approximately 9% of Crohn's disease patients treated with REMICADE. The development of anti-dsDNA antibodies was not related to either the dose or duration of REMICADE treatment. However, baseline therapy with an immunosuppressant in Crohn's disease patients was associated with reduced development of anti-dsDNA antibodies. At approximately 21% in patients not receiving any immunosuppressants, Crohn's disease patients were approximately 2 times more likely to develop anti-dsDNA antibodies if they were ANA-positive at study entry.

Three patients developed clinical symptoms consistent with a lupus-like syndrome, two with rheumatoid arthritis and one with Crohn's disease. All three patients improved following discontinuation of therapy and appropriate medical treatment [see PRECAUTIONS, Autoimmunity].

#### Malignancies/Lymphoproliferative Disease
Five new and 2 recurrent malignancies were observed in 6 of 771 patients treated with REMICADE for up to 38 weeks in clinical trials. These were non-Hodgkin's B-cell lymphoma, breast cancer, melanoma, squamous cell cancer of the skin, and basal cell cancer. There are insufficient data to determine whether Remicade contributed to the development of these malignancies. The observed rates and incidences were similar to those expected for the populations studied[1] [see PRECAUTIONS, Malignancy].

#### Other Adverse Reactions
Adverse events occurring at a frequency of at least 5% in trials in patients with rheumatoid arthritis or Crohn's disease are shown in Table 2. Patients with Crohn's disease who were treated with REMICADE were more likely than patients with rheumatoid arthritis to experience adverse events associated with gastrointestinal symptoms.

HIGHLY CONFIDENTIAL

Table 2

## ADVERSE EVENTS IN RHEUMATOID ARTHRITIS AND CROHN'S DISEASE TRIALS

| | RHEUMATOID ARTHRITIS | | CROHN'S DISEASE | |
|---|---|---|---|---|
| | Placebo (n=133) | REMICADE (infliximab) (n=555) | Placebo (n=56) | REMICADE (n=199) |
| ~ Avg. weeks of follow-up | 22.3 | 26.9 | 14.7 | 27.0 |
| **Respiratory** | | | | |
| Upper respiratory infection | 13% | 29% | 5% | 18% |
| Coughing | 5% | 10% | 6% | 5% |
| Sinusitis | 3% | 8% | 2% | 5% |
| Rhinitis | 4% | 8% | 4% | 8% |
| Pharyngitis | 5% | 6% | 5% | 3% |
| Bronchitis | 2% | 4% | 2% | 7% |
| **Gastrointestinal** | | | | |
| Nausea | 17% | 14% | 4% | 17% |
| Abdominal Pain | 7% | 8% | 4% | 12% |
| Vomiting | 10% | 6% | 0% | 9% |
| **Other** | | | | |
| Headache | 10% | 20% | 21% | 23% |
| Rash | 4% | 5% | 5% | 6% |
| Fatigue | 5% | 6% | 5% | 11% |
| Fever | 4% | 6% | 7% | 10% |
| Back pain | 2% | 6% | 4% | 6% |
| Pain | 4% | 6% | 5% | 9% |
| Urinary tract infection | 3% | 6% | 4% | 3% |
| Pruritus | 0% | 5% | 2% | 5% |
| Moniliasis | 2% | 3% | 0% | 5% |

Serious adverse events by body system that occurred in all patients treated with REMICADE at frequencies <2% are as follows:

*Body as a whole:* abdominal hernia, chest pain, sepsis
*Blood:* splenic infarction, splenomegaly, syncope
*Cardiovascular:* hypertension, hypotension, syncope
*Central & Peripheral Nervous:* dizziness, headache, upper motor neuron lesion
*Collagen:* lupus erythematosus syndrome, rheumatoid nodule
*Ear and Hearing:* osteitismedia
*Gastrointestinal:* abdominal pain, Crohn's disease, diarrhea, gastric ulcer, intestinal obstruction, intestinal perforation, intestinal stenosis, nausea, pancreatitis, proctalgia, vomiting
*Heart Rate and Rhythm:* palpitation, tachycardia
*Liver and Biliary:* cholecystitis
*Metabolic and Nutritional:* dehydration, pancreatic insufficiency, weight decrease
*Musculoskeletal:* arthropathy, back pain, bone fracture, myalgia, tendon disorder, tendon injury
*Myo-, Endo-, Pericardial and Coronary Valve:* cardiac failure, myocardial ischemia
*Neoplasms:* lymphoma
*Platelet, Bleeding and Clotting:* thrombocytopenia
*Psychiatric:* anxiety, confusion, delirium, depression, somnolence, suicide attempt
*Red Blood Cell:* anemia
*Resistance Mechanism:* abscess, cellulitis, fever, infection bacterial, sepsis
*Respiratory:* adult respiratory distress syndrome, bronchitis, coughing, dyspnea, pleurisy, pneumonia, pulmonary edema/insufficiency, respiratory insufficiency
*Skin and Appendages:* furunculosis, rash, increased sweating
*Urinary:* nephrolithiasis, kidney infection, renal failure, ureteral obstruction
*Vascular (Extracardiac):* brain infarction, pulmonary embolism, thrombophlebitis deep
*White cell and Reticuloendothelial:* leukopenia, lymphadenopathy

A greater proportion of patients enrolled into the ATTRACT trial who received REMICADE plus MTX experienced mild, transient elevations (<2 times the upper limit of normal) in AST or ALT (37% each) compared to patients treated with placebo plus MTX (AST: 24%; ALT: 29%). Five (1.3%) patients treated with REMICADE and MTX experienced more prolonged elevations in this ALT.

## OVERDOSAGE

Single doses up to 20 mg/kg have been administered without any adverse toxic effect. In case of overdosage, it is recommended that the patient be monitored for any signs or symptoms of adverse reactions or effects and appropriate symptomatic treatment instituted immediately.

## DOSAGE AND ADMINISTRATION

### Rheumatoid Arthritis

The recommended dose of REMICADE is 3 mg/kg given as an intravenous infusion followed with additional 3 mg/kg doses at 2 and 6 weeks after the first infusion then every 8 weeks thereafter. Remicade should be given in combination with methotrexate.

### Crohn's Disease

The recommended dose of REMICADE is 5 mg/kg given as a single intravenous infusion for treatment of moderately to severely active Crohn's disease. In patients with fistulizing disease, an initial 5 mg/kg dose should be followed with additional 5 mg/kg doses at 2 and 6 weeks after the first infusion.

There are no well-controlled safety and efficacy data for the use of REMICADE in Crohn's disease beyond the recommended duration (see WARNINGS, Hypersensitivity and ADVERSE REACTIONS, Infusion-related Reactions, and INDICATIONS AND USAGE).

**Preparation and administration instructions: Use aseptic technique.**
REMICADE vials do not contain antibacterial preservatives. Therefore, the vials after reconstitution should be used immediately, not re-stored or stored. The diluent to be used for reconstitution is 10 mL of Sterile Water for Injection, USP. The total dose of the reconstituted product must be further diluted to 250 mL with 0.9% Sodium Chloride Injection, USP. The infusion concentration should range between 0.4 mg/mL and 4 mg/mL. The REMICADE infusion should begin within 3 hours of preparation.

1. Calculate the dose and the number of REMICADE vials needed. Each REMICADE vial contains 100 mg of infliximab. Calculate the total volume of reconstituted REMICADE solution required.

2. Reconstitute each REMICADE vial with 10 mL of Sterile Water for Injection, USP, using a syringe equipped with a 21-gauge or smaller needle. Remove the flip-top from the vial and wipe the top with an alcohol swab. Insert the syringe needle into the vial through the center of the rubber stopper and direct the stream of Sterile Water for injection, USP, to the glass wall of the vial. Do not use the vial if the vacuum is not present. Gently swirl the solution by rotating the vial to dissolve the lyophilized powder. Avoid prolonged or vigorous agitation. DO NOT SHAKE. Foaming of the solution on reconstitution is not unusual. Allow the reconstituted solution to stand for 5 minutes. The solution should be colorless to light yellow and opalescent, and the solution may develop a few translucent particles as infliximab is a protein. Do not use if opaque particles, discoloration, or other foreign particles are present.

3. Dilute the total volume of the reconstituted REMICADE solution dose to 250 mL with 0.9% Sodium Chloride Injection, USP, by withdrawing a volume of 0.9% Sodium Chloride Injection, USP, equal to the volume of reconstituted REMICADE from the 0.9% Sodium Chloride Injection, USP, 250 mL bottle or bag. Slowly add the total volume of reconstituted REMICADE solution to the 250 mL infusion bottle or bag. Gently mix.

4. The infusion solution must be administered over a period of not less than 2 hours and must use an infusion set with an in-line, sterile, non-pyrogenic, low-protein-binding filter (pore size of 1.2 μm or less). Any amount of the infusion solution should not be stored for reuse.

5. No physical biochemical compatibility studies have been conducted to evaluate the co-administration of REMICADE with other agents. REMICADE should not be infused concomitantly in the same intravenous line with other agents.

6. Parenteral drug products should be inspected visually for particulate matter and discoloration prior to administration, whenever solution and container permit. If visibly opaque particles, discoloration or other foreign particulates are observed, the solution should not be used.

---

**Storage**
Store the lyophilized product under refrigeration at 2°C to 8°C (36°F to 46°F). Do not freeze. Do not use beyond the expiration date. This product contains no preservative.

**HOW SUPPLIED:**
REMICADE (infliximab) lyophilized concentrate for IV injection is supplied in individually-boxed single-use vials in the following strength:
NDC 57894-030-01        100 mg infliximab in a 20-mL vial

REFERENCES:

1. Knight DM, Trinh H, Le J, Siegel S, Shealy D, McCloskey M, Scallon B, Moore MA, Vilcek J, Daddona P, Ghrayeb J. Construction and initial characterization of a mouse-human chimeric anti-TNF antibody. Molec Immunol 1993;30:1443-1453.

2. Scallon BJ, Moore MA, Trinh H, Knight DM, Ghrayeb J. Chimeric anti-TNFα monoclonal antibody cA2 binds recombinant transmembrane TNFα and activates immune effector functions. Cytokine 1995;7:251-259.

3. Siegel SA, Shealy DJ, Nakada MT, Le J, Woulfe DS, Probert L, Kollias G, Ghrayeb J, Vilcek J, Daddona PE. The mouse/human chimeric monoclonal antibody cA2 neutralizes TNF in vitro and protects transgenic mice from cachexia and TNF lethality in vivo. Cytokine 1995;7:15-25.

4. Data on file.

5. Chu CQ, Field M, Feldmann M and Maini RN. Localization of tumor necrosis factor alpha in synovial tissues and at the cartilage-pannus junction in patients with rheumatoid arthritis. Arthritis and Rheum 1991;34:1125-1132.

6. Brennan CP, Nichols S, March SH, Stephens S, Macdonald TT. Tumour necrosis factor alpha in stool as a marker of intestinal inflammation. Lancet 1992;339:89-91.

7. Maini RN, Breedveld FC, Kalden JR, Smolen JS, Davis D, Macfarlane JD, Antoni C, Leeb B, Elliott MJ, Woody JN, Schaible TF, Feldmann M. Therapeutic efficacy of multiple intravenous infusions of anti-tumor necrosis factor α monoclonal antibody combined with low-dose weekly methotrexate in rheumatoid arthritis. Arthritis Rheum 1998;41(9):1552-1563.

8. Elliott MJ, Maini RN, Feldmann M, et al. Randomised double-blind comparison of chimeric monoclonal antibody to tumour necrosis factor alpha (cA2) versus placebo in rheumatoid arthritis. Lancet 1994 Oct 22;344(8930):1105-1110.

9. Targan SR, Hanauer SB, van Deventer SJH, Mayer L, Present D, Braakman T, DeWoody K, Schaible TF, Rutgeerts PJ. A short-term study of chimeric monoclonal antibody cA2 to tumor necrosis factor α for Crohn's disease. N Engl J Med 1997;337(15):1029-1035.

10. Present OH, Rutgeerts P, Targan S, Hanauer SB, Mayer L, van Hogezand RA, Podolsky DK, Sands B, Braakman T, DeWoody KL, Schaible TF, van Deventer SJH. Infliximab for the treatment of fistulas in patients with Crohn's disease. N Engl J Med 1999;340:1398-1405.

11. Greenstein AJ, Mullin GE, Strauchen JA, Heimann T, et al. Lymphoma in inflammatory bowel disease. Cancer 1992;69:1119-23.

12. Jones M, Symmons D, Finn J, Wolfe F. Does exposure to immunosuppressive therapy increase the 10 year malignancy and mortality risks in rheumatoid arthritis? A matched cohort study. Br J Rheum 1996;35:738-45.

Centocor, Inc., Malvern, PA 19355, USA          License #1242
1-800-457-6399                                  9 November 1999

MDL-CEN00003499



Manufactured by:
Centocor B.V.
Einsteinweg 101
2333 CB Leiden
The Netherlands

Distributed by:
Centocor, Inc.
200 Great Valley Parkway
Malvern, PA 19355
USA

Centocor   IN99058   7/99



HIGHLY CONFIDENTIAL

MDL-CEN00003500

# Exhibit 44

# Remicade™ Practice Management Assistant



Exclusively For:

Douglas Adler,
Dr. Adler
325
Skoie, IL  20005

Prepared 2/15/200!



*Confidential*



EXHIBIT

Zishiud 18

PENICAD-DOC-031-0868

Plaintiffs' Exhibit
**289**
01-12257-PBS

# Overview

Exclusively For Douglas Adler,                                        Prepared 2/15/2005

### What It Does
This interactive model is designed to help you assess the economic impact of providing in-office infusions of REMICADE™ in your practice and make the best practice management decision regarding site of care. This model estimates both the costs and income associated with an investment in the overhead and staff needed to administer REMICADE™ in an office setting.

### How It Does It
This model provides worksheets that assist you in accounting the cost of setting up your office to perform infusions. This also provides spreadsheets to help you calculate potential income from performing in-office infusions of REMICADE™ based on insurer payment policies and your patient mix of various payers. This tool allows you to evaluate the total costs and potential income of providing in-office infusions and calculate an investment time to payback.

### How You Use It
Examine costs, charges, payment, copayment, payer mix, and plan details. If yours are different, change them to see the potential effect on your practice.

### Disclaimer
Warning - Reimbursement policies vary widely from insurer to insurer and reimbursement policies of the same insurer may vary in different sections of the U.S. As reimbursment policies are subject to change, the information contained herein may not be accurate at the time of use. Prior to submission of a claim for reimbursement, the user should contact the insurer - (i.e., Medicare, Medicaid or private payer) to verify applicable codes and reimbursement levels. Centocor, Inc., does not guarantee that the purchase of Remicade™, related infusion supplies, or infusion services is reimbursable in whole or part, by any public or private health care insurer. This model represents a good-faith effort by Centocor, Inc., to provide financial information to our customers. Centocor is not responsible for inaccuracies in the model data or calculations or for differences between model projections and actual financial outcomes.



*Confidential*

# Executive Summary

Exclusively For Douglas Adler,                                    Prepared 2/15/2005

### Average Estimated Income (Loss) Per Remicade™ Infusion Across Payers And Plans

| | |
|---|---|
| Estimated Revenue Per Remicade™ Infusion: | 3,389.94 |
| Average Drug Cost Per Remicade™ Infusion: | 1,980.00 |
| Average Supplies, Labor, and Overhead Cost Per Remicade™ Infusion: | 73.39 |
| Average Estimated Income (Loss) Per Remicade™ Infusion: | 1,336.55 |

### Total Estimated Income (Loss) Per Year For All Remicade™ Eligibles

| | |
|---|---|
| Average Annual Infusions per Remicade™ Eligible Patient: | 1.29 |
| Total Annual Remicade™ Eligible Patients: | 420 |
| Total Annual Remicade™ Infusions: | 542 |
| Total Estimated Income (Loss) Per Year: | 24,410.10 |



*Confidential*

# Assumptions Of Analysis

Exclusively For Douglas Adler,                                         Prepared 2/15/2005

## Caseload

|  | Fistula | No Fistula | Remicade™ Eligible |
|---|---|---|---|
| Estimated Annual # Remicade™ Patients*: | 60 | 360 | 420 |
| Average Annual # IV Sessions per Patient: | 3 | 1 | 1.29 |
| Remicade™ Infusions per Year: | 180 | 360 | 540 |
| Average Hours Per IV Session: | 3.00 | | |

\* Excludes capitated patients. Model does not compute capitated portion of caseload.

## Staff & Overhead

| | |
|---|---|
| Office Administrative Assistant Per Hour: | 17.00 |
| Billing administrator: | 10.00 |
| I.V. Nurse cost per hour: | 30.00 |
| Physician cost per hour: | 250.00 |
| Medical transcription per line: | 0.13 |
| Annual cost per square foot infusion space: | 15.00 |
| Office space required per infusion hour: | 36 |

## Clinical

| | |
|---|---|
| Average weight of Remicade™ patient - kg: | 70 |
| Dosing - mg/kg: | 5 |
| Full 100 mg vials needed per infusion: | 4 |
| Remicade™ (100 mg vial) - cost to practice: | 495.00 |
| Remicade™ (100 mg vial) - AWP: | 611.33 |

## Other

| | |
|---|---|
| Markup on charges – services: | 250 |
| Markup on charges – supplies: | 250 |
| Markup on charges – drugs: | 125 |
| Overall copayment recovery rate: | 75 |



*Confidential*

# Estimated Per Infusion Income/Loss

Exclusively For Douglas Adler,                                           Prepared 2/15/2005

| Plan | Cost | Revenue | Income/Loss |
|------|------|---------|-------------|
| Medicare | 2,053.39 | 2,311.52 | 258.13 |
| Medicaid | 2,053.39 | 2,934.38 | 880.99 |
| CCN/Illinois | 2,053.39 | 2,495.32 | 441.93 |
| Aetna Life Insurance Company | 2,053.39 | 2,373.05 | 319.66 |





*Confidential*

# Estimated Annual Income/Loss By Plan

Exclusively For Douglas Adler,                                          Prepared 2/15/2005

| Plan | Costs* Per Patient | Revenue Per Patient | Income Per Patient | Percent Of Patients | Weighted Income** | Estimated Income |
|------|-----|-----|-----|-----|-----|-----|
| Medicare | 2,648.87 | 2,981.86 | 332.99 | 35 | 116.55 | 48,949.19 |
| Medicaid | 2,648.87 | 3,785.35 | 1,136.48 | 5 | 56.82 | 23,866.02 |
| CCN/Illinois | 2,648.87 | 3,218.96 | 570.09 | 50 | 285.04 | 19,718.84 |
| Aetna Life Insurance Company | 2,648.87 | 3,061.23 | 412.36 | 50 | 206.18 | 86,595.89 |







*Centocor*

*Confidential*

# Estimated Time To Payback

Exclusively For Douglas Adler,                                          Prepared 2/15/2005

| | |
|---|---|
| Estimated Annual Income From Remicade™ Infusion Therapy: | $724,410.10 |
| Initial Investment For Infusion Therapy: | $650.00 |
| Months To Payback: | 1 |





*Confidential*

# Exhibit 45

Keith Patterson        HIGHLY CONFIDENTIAL        June 29, 2005
Philadelphia, PA

Page 217

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
VOLUME II

IN RE:  PHARMACEUTICAL        :  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    :  MASTER FILE NO.

PRICE LITIGATION              :  01CV12257-PBS

        - - -

        Continuation of the videotaped

deposition of KEITH PATTERSON was taken, pursuant

to notice, at SPECTOR, ROSEMAN & KODROFF, P.C.,

1818 Market Street, 25th Floor, Philadelphia,

Pennsylvania on Wednesday June 29, 2005, beginning

at 9:06 a.m., before M. Kathleen Muino,

Professional Shorthand Reporter, Notary Public,

and Robert Blum, Videographer, there being

present:

        - - -

98357da5-ca46-4b3b-a26a-9aca53fb2492

Keith Patterson      HIGHLY CONFIDENTIAL      June 29, 2005
Philadelphia, PA

---

**Page 310**

1             ---
2          (Whereupon, Exhibit Patterson 026 was
3    marked for Identification.)
4             ---
5          THE VIDEOGRAPHER: This is the
6    beginning of Tape No. 2 in the second volume of
7    Keith Patterson's deposition. We are now back on
8    the record. The time is 11:28.
9    BY MR. WEXLER:
10   Q.   Mr. Patterson, you've been handed
11   Patterson Deposition Exhibit Patterson 026, which I'd
12   like you to take a minute to review. It is
13   Document MDL-CEN000086707 through CEN000086777.
14         MS. HARRIS: I'd just like to state
15   for the record that this is not an AstraZeneca
16   document and that counsel for Centocor's not
17   present.
18         MR. WEXLER: However, counsel for
19   Centocor was given notice of the deposition, and
20   so I don't -- I -- I just want -- so that the
21   record reflects that, that's all.
22         MS. HARRIS: (Indicating.)

---

**Page 311**

1          MR. SCHEFF: Fine.
2          THE WITNESS: Okay.
3    BY MR. WEXLER:
4    Q.   Do you recognize this document, sir?
5    A.   I do not.
6    Q.   For the record, the document is entitled
7    The Power Within. It's a Centocor document and
8    refers to Remicade.
9          If you turn to the -- and I believe it's
10   the fourth or fifth page, where --
11         MR. SCHEFF: Do you have a Bates
12   number?
13         MR. WEXLER: Yes. 86713.
14   BY MR. WEXLER:
15   Q.   It appears to list the immunology
16   marketing team, and you are listed as director of
17   US marketing?
18   A.   Correct.
19   Q.   And was that your position?
20   A.   Yes, it was.
21   Q.   Now, with respect to Remicade, what was
22   the overall marketing strategy?

---

**Page 312**

1          MR. SCHEFF: Object to the form.
2          You can answer the question.
3          THE WITNESS: In a single sentence,
4    geez. For -- Remicade had two separate claims:
5    for Crohn's disease and for rheumatoid arthritis.
6    In each case, it was our objective to acquire as
7    many patients as possible on -- based upon a
8    platform of clinical superiority to our
9    competitors.
10         In the instance of rheumatoid
11   arthritis, which was an elderly population, there
12   was a component of return to practice that was
13   included in our promotional emphasis.
14   BY MR. WEXLER:
15   Q.   And who was the direct purchaser of
16   Remicade for the rheumatoid -- rheumatoid
17   arthritis?
18   A.   Centocor sold the vast majority of their
19   product, and perhaps all, I don't recall
20   specifically, through six specialty wholesalers.
21   I don't recall that we shipped anything directly
22   to physicians.

---

**Page 313**

1    Q.   How is return to practice realized with
2    respect to the rheumatoid arthritis indication?
3    A.   In a very similar manner to that which we
4    have discussed for -- for Zoladex.
5    Q.   All right. Could you just describe it
6    for --
7    A.   Sure.
8    Q.   -- Remicade?
9    A.   There was a -- it's slight -- slightly
10   different in -- in that the wholesalers themselves
11   would determine the actual acquisition price, but
12   there was a margin. The acquisition price was
13   lower than the reimbursed price, so that there was
14   a spread, and that was illustrated to the
15   physicians.
16   Q.   Who illustrated that to the physicians?
17   A.   The sales representatives.
18   Q.   Did they have detailed materials to show
19
20   A.   I don't re --
21   Q.   -- to those physicians?
22   A.   -- recall if they had durable copies.

25 (Pages 310 to 313)

98357da5-ca46-4b3b-a26a-9aca53fb2492

Keith Patterson      HIGHLY CONFIDENTIAL      June 29, 2005
Philadelphia, PA

---

Page 314

1    They did have spreadsheets on their laptops.
2    Q.    What was reflected on the spreadsheets?
3    A.    It -- it was a -- an Excel spreadsheet
4    whereby the representatives could input the
5    estimated numbers of patients that might be
6    treated, input an assumed acquisition cost, and it
7    would calculate the -- the margin that -- that
8    could be realized by the -- by the physician.
9    Q.    Was the product sold to wholesalers at
10   the lower -- at a lower acquisition cost?
11         MR. SCHEFF: Lower than what?
12         THE WITNESS: Lower -- lower than --
13   than what?
14   BY MR. WEXLER:
15   Q.    Than typical.
16         MR. SCHEFF: Object to the form.
17         THE WITNESS: What's typical?
18   BY MR. WEXLER:
19   Q.    Well, at what price did wholesalers
20   purchase Remicade?
21   A.    I -- I don't recall the price.
22   Q.    What was the formula?

---

Page 315

1    A.    I don't recall.
2    Q.    Was it a percentage off of AWC?
3    A.    I don't recall.  I don't believe -- more
4    likely a percentage off of AWP, the average
5    wholesale cost, which is a percentage off of the
6    AWP.
7    Q.    Well, the question is: Since physicians
8    were able to acquire the drug from wholesalers --
9    A.    Uh-huh.
10   Q.    -- at a lower acquisition cost --
11   A.    Lower than the AWP.
12   Q.    -- lower than AWP, were whole -- were
13   wholesalers achieving the same --
14   A.    I -- I don't recall --
15   Q.    -- reduction?
16   A.    -- if -- if there were incentives to the
17   wholesalers.  I -- I do not recall that there was
18   any kind of quant -- quantity based discount
19   schedule.
20   Q.    How were wholesalers compensated for
21   selling it at a lower acquisition cost to the
22   physician?

---

Page 316

1          MR. SCHEFF: Object to the form.
2          THE WITNESS: The -- the price they
3    sold to the physicians would be higher than the
4    price that they paid for the product.  I don't
5    recall if there were administrative fees offered.
6    BY MR. WEXLER:
7    Q.    Administration fees offered by Centocor
8    to the wholesalers?
9    A.    Correct, but I don't recall if that is a
10   -- a contractual -- arrangement that is
11   employed.  I don't know.  I don't recall in this
12   case if that -- if our wholesalers did get that
13   kind of incentive.
14   Q.    What was the Practice Management Program?
15   A.    The Practice Management Program, I don't
16   recall.
17   Q.    Do you recall a strategy employed to
18   encourage doctors to perform in-office infusions
19   of Remicade?
20   A.    I -- I recall, generally, yes, that we
21   did attempt to educate them, but my recollection
22   was that there was a program called the Practice

---

Page 317

1    Enhancement Program.  I remember the name.  I
2    don't remember the specific components, but it did
3    include the financial incentives that could be
4    realized through the reimbursement.
5    Q.    What do you mean that it -- it did
6    include the financial incentives?
7    A.    A part -- part of the incentive for --
8    for physicians to begin using Remicade and
9    infusing it in their office was the fact that they
10   could make money by doing so.
11         And rheumatologists, in general, were not
12   equipped to administer in-office infusions.  It
13   requires an infusion suite, a trained nurse, so we
14   did assist them, educate them as to what was
15   necessary to do so.
16   Q.    And was it a successful program, in your
17   opinion?
18   A.    I -- I would -- my -- my tenure there was
19   short, so I -- I -- I'd rather not say yes or no.
20   Q.    Do you recall what reimbursement support
21   tools were provided to the sales force?
22         MR. SCHEFF: Object to the form.

---

26 (Pages 314 to 317)

98357da5-ca46-4b3b-a26a-9aca53fb2492