# Exhibit 51



# 1998 Reimbursement Update and Challenges

## February 12, 1998

Highly Confidential

Plaintiffs' Exhibit
**242**
01-12257-PBS

MDL-OBI00058888

# TABLE OF CONTENTS

1.      OVERHEADS

2.      ASCO LETTERS

3.      MS DELEGATION LETTER

4.      PRIORITIES / TIMELINE

5.      STARK II

Highly Confidential

MDL-OBI00058889



Highly Confidential

MDL-OBI00058890



## Notes

Highly Confidential

MDL-OBI00058891





### 1998 Reimbursement Update and Challenges

February 12, 1998



### AGENDA

+ Medicaid & Medicaid Managed Care
+ Medicare & Medicare Managed Care
+ OBI reimbursement plan
+ Changes in the reimbursement environment
+ Current threats



### Medicaid

+ Federal (57%) and State (43%) program
+ 36 million people covered
  • Focus on women, children, blind, disabled and elderly
+ Cost $156.3 billion
+ Drug coverage optional
  • All states cover drugs
  • Reimburse differently by state

*Indigent*



1

Highly Confidential

## Medicaid Managed Care

- Movement into managed care (35%)
  - Focus on AFDC population
  - Shift to HIV / AIDS and SKP population
- Carve outs can be handled in different ways
- Pharm Sector Medicaid managed care initiative
  - Goal
  - Progress

*Federal & State Program*
*More healthier people into*
*MCO (ii women & children)*

## Current Reimbursement Environment

- Focus on costs
  - Implications of HCFA re-organization - 7/97

- Radar Screen - new growth factors
  - Procrit, NEUPOGEN, LEUCINE

- Recent changes in ESRD
  - Changes in ceiling hematocrit
  - Potential decrease in reimbursement rate

*on state
renal
license
$10/ Munit*

## Medicare

- Medicare - Part A
  - Hospital Insurance
  - Outpatient Clinics associated with the Hospitals
- Medicare - Part B
  - Physician & Outpatient Hospital Care
- 1965 vs 1998

2

MDL-OBI00058893



## Medicare - Part A

+ Inpatient hospital
+ Nursing facility
+ Home health
+ Hospice services
+ Blood (after the first three units)
  • Cost of PROCRIT

## Medicare - Part A

+ Funded by payroll taxes (FICA - Medicare)

+ Beneficiaries responsible for a deductible

+ Eligible once age 65 is attained, disabled, ESRD

+ DRGs *Diagnosis Related Group* licenses

## Medicare - Part A



+ Managed by private insurance organizations
+ Contracted with HCFA - "Medicare Intermediaries"
+ Pharmaceuticals billed as a composite charge using a cost / charge
+ Known as "revenue codes"

3

Highly Confidential

MDL-CBI00058894

## Medicare - Part B

⊹ "Sign up"

- Supplementary medical insurance
- Outpatient hospital visits
- Physicians' services
- Durable medical equipment
- Diagnostic Tests

## Medicare - Part B

⊹ Funding - General Treasury
⊹ Premiums paid by insurer
⊹ Managed by local Medicare Carriers
⊹ Beneficiaries have a deductible
⊹ Physicians reimbursed at 80% of the "allowable amount"
⊹ Balance of charges billed to patients / supplemental insurance

*80% is AWP (Avg. Wholesaler Price)*
*List Price + 20%*

*20% Balance Pd for Patient*

## Medicare - Part B

⊹ Self-administration not covered

⊹ Administered "Incident to"

⊹ Charges- two of the three:
- Injection
- drug
- office visit

4

MDL-OBI00058895

## Medicare - Part B - The Future

+ APCs
+ Implications:
  • Cost containment
  • Better tracking
  • Limits on charges and services
  • ? Impact on business

## Medicare Managed Care

+ Medicare expenditures are expected to reach $263 billion by 1999 (CBO)

+ In this decade, the number of people over 65 will grow at 13% and over the age of 85 will grow at 48% (CBO)

## Medicare Managed Care

+ 60% of enrollment in 3 states (CA, FL, AZ)
  • account for 19% of all beneficiaries
+ 14% of population
+ Greater number of people in the US are uninsured
+ "Same benefits" - do not mirror benefits



5

Highly Confidential

## Model Policies

+ "Rumors"
  • 4 policies – PROCRIT, Neupogen, Chemotherapeutic agents, miscellaneous
  • Medical Director – market intelligence
  • Mississippi Local Medical Model Policies (LMMP)
+ Resemblance to the "rumored" policy
+ HCFA Cancer Work Group



*HCFA Cancer Groups - Policies*

## Future Reimbursement Environment - Model Policies

+ What are they and what are their implications?

+ ESRD vs non-dialysis
  • ESRD - national coverage
  • Non-dialysis - carrier specific

+ *Not just PROCRIT...*



*ERD treated w/ Epogen*

## Linking ESRD and non-dialysis

+ *EPO IS EPO*
+ Linkage of ESRD to non-dialysis
  • Differential treatment of one patient population
  • Guaranteed treatment of hematocrit levels
+ Players being "linked" – credibility
  • EPO and ESRD are on radar screen
  • Criticism of ESRD Congressional Mandate



6



### Erythropoetin in ESRD

+ Congressional mandate - "carve out"
+ Hematocrit 36-36
+ 36.5 rolling average over 90 days - no appeal
+ Can be self-administered
+ $10.00 / 1,000 units (? Reduction to $9.00 / 1,000 units in ESRD only at this time based on pricing survey)



### EPO in Non-dialysis

+ For Medicare - "Incident to"
+ Medicare influences other payers
+ Medicare FFS influences coverage for Medicare Managed Care
+ Currently no national guidelines
+ Local carrier discretion
+ Appeal process of three levels

### Ortho Biotech Inc. - Comprehensive Action Plan

+ Focus on National, State and Local

+ Focus on overall positioning for PROCRIT across indications - HIV, oncology, and surgery

+ Active involvement of OBI Senior Management in the process

7



### National

- HCFA Central office - Baltimore
- J&J Washington Office / multiple Congressional Visits
- Mississippi Delegation Letter
- HCFA Meeting 10/22/97; ongoing follow-up
- ASCO - letter to HCFA; visit 1/20/98
- ACCC
- Expert consultants



### National

- Trade Associations - Bio, PhRMA, MIHA
- AMA (J&J Community Affairs)
- Advocacy Groups
  - Existing / new (AAEP)
  - Generation of letter from the Cancer Leadership Coalition
- Calls from patient advocates and physicians to legislators

### State

- Mississippi State Oncology Society - 11/6/97
- Atlanta regional office 12/17/97
- Senator Lott 3/4/98
- J&J State Government Affairs (SGA)
  - Conference calls and updates
    - American Cancer Society, political connections, State Medical Societies

8

Highly Confidential

MDL-OBI00058899





## Local

+ Phase IV data - Medical Directors / Advisory Members
+ CAC Meetings

## Other Significant Issues

+ Self Administration
+ Change in Medicare reimbursement
  - Inherent reasonableness
+ National Coverage Regulation
+ Focus on BNWF / OIG Report
+ STARK II
+ FSS Pricing
+ Surgery - medical necessity



## Quick Review

+ Erythropoetin:
  - ESRD
  - NON DIALYSIS

+ Different law
  - different guidelines
  - different payment rates
  - different administration



9

Highly Confidential

MDL-OBI00058900

## Self- Administration

+ HCFA pushing for drugs to be labeled for self-administration if possible

+ Impact for self-administration
  • Not currently covered for non-dialysis
  • Working closely with ACCC and ASCO
  • Access to benefit
  • Patient Advocates extremely important

*Presently's Package insert*

## Package Insert

+ GOAL: to keep any reference to self administration in the Chronic Renal Failure
+ Need to focus on overall positioning for PROCRIT
  • Easy to bridge from one patient group to another
+ Prescribed by physician

## Package Insert

+ Be aware of insurers / carriers with a limit on the number of units per does
+ Overall positioning

10

MDL-OBI00058901





### Medicare Reimbursement...
### Why the change?

- Focus on costs
- "Government recognizes that AWP is not a true discounted price" Medicare Manual 12/97?
- Recent focus on AWP
  - President Clinton's mention in a recent address
  - Focus on the fact that different prices are paid for drugs by the government



11

Highly Confidential





### Change in Medicare Reimbursement (cont.)

- Historically:
  - List price $100.00
  - AWP (list plus 20%) $120.00
  - Medicare reimbursed at 80% of AWP
  - Example: AWP of 10,000 units $120.00
    - X 80%
  - Medicare pays $ 96.00





### Change in Medicare Reimbursement (cont.)

- January 1, 1998:
  - List price $100.00
  - AWP (list plus 20%) $120.00
  - Medicare reimbursed 80% of AWP minus 5%
  - Example: AWP of 10,000 units $120.00
    - less 5% of AWP - $6.00
    - $114.00
    - X 80%
  - Medicare pays $ 91.20





### Implications for the Business

- Need to collect the 20% co-pay to remain whole
- HCFA practice costs show that certain chemotherapies are not reimbursed at a high enough amount
- Impact on utilization
- Treat to the lowest common denominator
- Minus 5 vs minus 10 vs minus 15

12

Highly Confidential



**STARK II**

+ Cuts out all margins on chemotherapy and supportive care drugs
+ Does not recognize the cost of administering chemotherapy drugs
+ Political fix to AWP - Republicans vs Democrats
+ Proposed rule vs legislation

**STARK II - Implications**

+ Shift from physician offices to clinics
  · Hospitals unable to accommodate
+ Shut down of oncology practices
+ Impact on oncology nurses
+ Impacts private and Medicare
+ Denied access for patients

13

Highly Confidential

MDL-OBI00058904

Highly Confidential

MDL-OBI00058905

# Notes

Highly Confidential

MDL-OBI00058906



# American Society of Clinical Oncology

225 Reinekers Lane, Suite 650, Alexandria, VA USA 22314
E-Mail: asco@asco.org • Web Site http://www.asco.org
Phone: 703-299-0150   Fax: 703-299-1044

October 15, 1997

President
Robert J. Mayer, MD

President-Elect
Allen S. Lichter, MD

Immediate Past President
James O. Armitage, MD

Secretary-Treasurer
Wilson P. Vaughan, MD

Board of Directors
Douglas W. Blayney, MD
George J. Bosl, MD
Paul A. Bunn, Jr., MD
Nancy E. Davidson, MD
Joy D. Harris, MD
Harry E. Hynes, MD
Larry Norton, MD
John D. Minna, MD
Philip A. Pizzo, MD
Jacob L. Wade, III, MD
Barbara L. Weber, MD
William C. Wood, MD

Executive Vice President
John R. Durant, MD

Grant Bagley, M.D.
Director, Coverage and Analysis Group
Office of Clinical Standards and Quality
Health Care Financing Administration
7500 Security Boulevard
Baltimore, Maryland 21244

Dear Grant:

I have recently received copies of new model local review policies for Neupogen and epoetin prepared by a carrier medical director workgroup. In addition, I have received a copy of a letter from a carrier referring to another model policy that will require a "meaningful survival advantage" before a cancer drug is covered for an off-label use. These model policies are apparently still in some stage of development and have not yet been issued to the carriers.

On behalf of the American Society of Clinical Oncology, I want to express our strong disagreement with the process by which these model policies are developed. They are written in secret by a small number of carrier medical directors and then, without any broad consultation, issued as "model" policies to be adopted nationwide. I recognize that each carrier must use the local consultation process before adopting the model policy, but HCFA's distribution of a policy labeled as a "model" implies a degree of thoroughness and consensus in development which may be totally absent.

In the case of the new epoetin policy, for example, the model policy includes a categorical requirement that the patient's hemoglobin must be less than 8. That inflexible requirement does not represent good medicine, and many Medicare cancer patients will not receive proper care as a result of this policy. It is highly disturbing that Medicare could issue such a dubious medical policy for nationwide implementation based on a secret process without consulting national medical groups. This is an inappropriate and unwise interference in the practice of medicine. As another example, the model policy on coverage off-label uses, by requiring a "meaningful survival advantage," is at odds with recognized guidelines for coverage of cancer drugs.

1997
Fall Education Conference
November 7-9
Orlando, FL

1998
Annual Meeting
May 16-19
Los Angeles, CA

CME ENROLLMENT
& CME CONTACT
MEETINGS DEPARTMENT
PHONE
(703) 299-1060
FAX
(703) 299-1044

Highly Confidential

MDL-OBI00058907

Grant Bagley, M.D.
October 15, 1997
Page 2



There may well be a good rationale for more uniform Medicare coverage policy.  Any such initiative should be undertaken by HCFA, however, only with an open process that relies on input from national organizations, the scientific literature, published clinical guidelines, and broad expert opinion.  National policy should not be developed by a very small number of carrier medical directors operating in secret.  HCFA cannot disassociate itself from the carriers' actions on the ground that these are somehow just local actions.  The medical directors are putting out model policies for universal adoption and are, as a practical matter, establishing national policy. It is completely unacceptable for Medicare to be establishing national policy on how physicians must treat patients using such procedures.

HCFA needs to immediately stop these actions by the carriers and adopt a more open process if it intends to continue issuing model policies.  This is a matter of great importance to ASCO and cancer patients, and I look forward to discussing with you how this process could be improved.

Sincerely yours,

Joseph S. Bailes, M.D.
Chairman, Clinical Practice
Committee



Office:       Two Lincoln Center
              Suite 900
              5420 LBJ Freeway
              Dallas, TX 75240
              Phone: (972) 392-8727
              Fax: (972) 387-0048

cc: Bill Gamel, M.D.
    Nancy Dickey, M.D.



Highly Confidential

MDL-OBI00058908

# ASCO NEWS
# POLICY WATCH

AMERICAN SOCIETY OF CLINICAL ONCOLOGY

NOVEMBER 1997

## Medicare Publishes 1998 Fee Schedule

It seems that oncologists will see a Medicare payment increase for their services under the physician fee schedule for 1998 issued by the Health Care Financing Administration. Most of the increase results from changes enacted earlier this year by Congress as part of the Balanced Budget Act. A single conversion factor (of $36.69) will be used instead of the three conversion factors currently used. The practice expense components for some procedures will be reduced, and the savings will fund a 13% increase in the practice expense components for office visits.

As a result of these changes and changes for new and revised codes, HCFA estimates that hematologists-oncologists will experience a net increase of 8% in Medicare payments in 1998. Radiation oncologists will see an estimated 8.4% increase.

HCFA has also revised the rules for physician supervision of diagnostic tests. Each test (by CPT code) has been assigned a level of required supervision—general supervision (physician presence not required), direct supervision (physician must be present in the office suite), or personal supervision (physician must be in the room during the procedure). Most x-rays and CT and MRI scans require only general supervision unless contrast agents are used, in which case direct supervision is required. Bone marrow aspirations and biopsies are not subject to this rule. The 1998 fee schedule does not include any change to the "incident to" requirements for chemotherapy administration services.

HCFA has also implemented new cancer screening benefits recently enacted by Congress. As part of this implementation, HCFA has decided to cover screening barium enemas for colorectal cancer (in addition to other methods). Congress had left the issue of covering barium enemas to HCFA to decide, and HCFA stated that, while there was not a consensus regarding barium enemas as a screening test, there was a sufficient

basis for coverage.

HCFA has decided not to require physicians to reduce their charges for a particular Medicare patient if the physician has agreed to accept a lower charge from the patient's secondary insurer. ASCO and other physician organizations had strongly opposed this proposal. HCFA announced that the proposal needed further study and would not be implemented at this time.

Copies of the October 31, 1997, *Federal Register* containing the 1998 fee schedule can be obtained for $8 by calling the Superintendent of Documents at 202-512-1800 (specify stock number 069-001-00101). It is also available on the Internet at www.access.gpo.gov/su_docs. □

## E&M Documentation Guidelines Revised

The American Medical Association in collaboration with the Health Care Financing Administration has revised guidelines for documenting evaluation and management services. Major changes in the guidelines include: 1) more clinical specificity in defining the content of general multi-system examinations; 2) changes in the documentation requirements for general multi-system exams; 3) definitions for content and documentation requirements for ten organ systems; and 4) an expanded definition for history of present illness. The new guidelines went into effect October 1, 1997, but HCFA is providing an "education" period for physicians to become familiar with the changes. Mandatory compliance begins January 1, 1998.

The previous guidelines stated that physicians were required to examine organ systems and make a general note in the patient's record about their observations. In contrast, the new guidelines call for specific elements that must be *performed and documented* within each organ system. For example, in a general multi-system exam, an examination of the cardiovascular system requires performance and documentation of an examination of the carotid arteries,

abdominal aorta, femoral arteries, pedal pulses, and the extremities for edema and/or varicosities. The level of the exam is determined by the number of elements (identified in the guidelines as bullets) performed.

Another change is the expanded definition of the history of present illness (HPI). The HPI is a chronologic description of the development of the patient's present illness from the first sign or symptom or from the previous encounter to the present, and includes the following elements: location, quality, severity, duration, timing, context, modifying factors, and associated signs and symptoms. A brief or an extended HPI is distinguished by the amount of detail needed to accurately characterize the clinical problem. An extended HPI now consists of at least four elements or the status of at least three chronic or inactive conditions. HCFA and AMA give as examples of chronic or inactive conditions hypertension, diabetes or multiple sclerosis. An extended HPI is required to bill a Level 4 or 5 visit for new or established outpatients.

To assist in the use of the guideline revisions, ASCO is producing a laminated card that summarizes the changes and lists the elements of the general multi-system exam. The card along with explanatory information will be mailed to ASCO members in December. The full text of the E & M documentation guidelines is available on the HCFA website at www.hcfa.gov. □

## Carriers Developing "Model" Policies

Recently, a number of Medicare carrier medical directors have formed workgroups for the purpose of developing "model" review policies. The workgroups, which consist of a small number of medical directors, have been formulating policies without broad consultation or input from appropriate medical organizations. These policies which may be inconsistent with the scientific literature, published clinical guidelines, or expert opinion, are in some instances being issued by the Health Care Financing Administration as

Highly Confidential

MDL-CBI00058909

models for adoption by carriers nationwide. ASCO is particularly concerned about the workgroup on cancer drugs and its process for setting new coverage policies. For example, a new policy on coverage for epoetin includes a categorical requirement that the patient's hemoglobin must be less than 8. It is ASCO's opinion that such a requirement may lead to improper care for Medicare cancer patients. As another example, the model policy on coverage for off-label uses requires a "meaningful survival advantage" which is at odds with recognized guidelines for coverage of cancer drugs.

ASCO has written to HCFA strongly expressing its concerns about the actions of the workgroups and urging a more open and thoughtful process for developing model policies. ASCO calls upon HCFA to stop the activities of these workgroups until a process is adopted that includes publication of proposed policies with an opportunity for public comment.

ASCO has also submitted a resolution to the American Medical Association House of Delegates for consideration at its December meeting. The resolution proposes that AMA convey to HCFA and other appropriate parties its opposition to the practice of developing "model" Medicare policies without appropriate consultation. ◨

## Congress Finalizes NIH Appropriations Bill

On November 8, Congress completed action on the appropriations bill for the Departments of Labor, Health and Human Services, and Education (H.R. 2264). The legislation includes $13.648 billion for the National Institutes of Health for fiscal 1998, an increase of 7.1 percent over last year and $569.6 million more than the President's request. The bill also includes $2.547 billion for the National Cancer Institute, an increase of 6.6 percent over 1997.

While agreement over most provisions of the bill had been reached on October 30, the legislation was being held up over the scope and administration of proposed national education testing programs for math and reading, which has been a priority issue for the Administration. The House and Senate have approved compromise language on national testing, but it is still uncertain whether President Clinton will sign the bill. ◨

## End-of-Life Survey to Be Mailed in December

ASCO's survey on cancer care at the end-of-life will be mailed to members in the United States and Canada on December 1. The survey is an essential component of the multi-faceted program being developed by the Task Force on Cancer Care at the End of Life. Members are urged to complete the survey as the results will allow an assessment of current attitudes and practices. Information from the survey will also help the Task Force in the development of educational initiatives. ◨

## AMA Seeks Participation in Allocation Ballot

The American Medical Association is urging specialty societies represented in the AMA's House of Delegates to participate in this year's balloting for allocating the specialty society's number of delegates. Beginning this year, specialty societies receive additional delegates based on the number of AMA members who choose that society to speak on their behalf. ASCO currently has one delegate. For every 2,000 physicians who choose ASCO to represent them, the Society will receive an additional delegate.

To cast your vote, call 1-888-200-5309, or vote via e-mail at www.ama-assn.org/memdata/ballot897 or ballot@ama-assn.org. When voting, you will be asked for ASCO's ballot code which is 590. Ballots are due by December 31, 1997. ◨





American Society of Clinical Oncology
225 Reinekers Lane; Suite 650
Alexandria, VA 22314

PRE-SORT
FIRST CLASS
U.S. Postage
PAID
Permit No. 7
Ashland, MA

Highly Confidential

MDL-OBI00058911

# Notes

Highly Confidential

MDL-OBI00058912

COMMITTEE ON
AGRICULTURE, NUTRITION,
AND FORESTRY

COMMITTEE ON
APPROPRIATIONS

COMMITTEE ON
GOVERNMENTAL AFFAIRS

COMMITTEE ON
RULES AND
ADMINISTRATION

### United States Senate
WASHINGTON, DC 20510-2402

November 6, 1997

Ms. Nancy-Ann Min DeParle
Acting Administrator
Health Care Financing Administration
200 Independence Avenue, S.W.
Washington, D.C. 20201

Dear Ms. DeParle:

We are writing to you to express our concern about HCFA's actions to deny Medicare coverage of needed drug therapy for chemotherapy and surgery patients in Mississippi and perhaps across the country. The drug, PROCRIT (Epoetin alfa), is approved by the FDA for the treatment of anemia in cancer patients undergoing chemotherapy, for certain anemic patients prior to surgery and for other nondialysis uses. PROCRIT is a recombinant drug identical to erythropoietin, the naturally occurring hormone in the body that stimulates the production of red blood cells. Use of the drug for treatment of anemia in patients receiving chemotherapy and for anemic surgery patients dramatically improves their quality of life and often avoids the need for blood transfusions.

Notwithstanding the clear beneficial effects of PROCRIT, the Medicare carrier in Mississippi has adopted an extremely restrictive policy that denies coverage of the drug for many Medicare patients. The policies adopted by this carrier are at odds with accepted medical practice in Mississippi and elsewhere, as well as with FDA labeling for use of the drug and the guidelines of professional associations such as the Association of Community Cancer Centers. The carrier's policies, which appear to have been adopted without appropriate consideration of public comment, block Medicare beneficiaries in our state from receiving the benefits of this effective treatment.

We are also concerned that the restrictive policies of the Mississippi carrier may be under consideration for use by other, perhaps all, Medicare carriers. Ortho Biotech Inc., the company which distributes the drug, has sought clarification on the implementation plans from HCFA's central office. Despite several phone conversations and a recent meeting, the company has not been able to determine whether there is a draft "model" policy under consideration for implementation by all Medicare carriers,

MDL-OBI00058913

November 6, 1997
Page 2

or whether HCFA central office staff are encouraging local carriers to adopt such a policy.  The company also has been unable to learn whether central office agrees with the policy of the Mississippi carrier and the manner in which the policy was implemented.  While, we are pleased to hear that HCFA staff has begun to work with the company, we are concerned that this issue must be resolved so that Mississippi beneficiaries will not continue to receive substandard care.

We urge you to investigate this issue and take appropriate action so that those Medicare beneficiaries in Mississippi and throughout the country who are anemic as a result of undergoing chemotherapy or who are scheduled to undergo elective surgery are able to receive the substantial benefits of PROCRIT therapy.

We would appreciate your response to the attached questions by December 1, 1997.

Sincerely,

THAD COCHRAN
United States Senator

Trent Lott
United States Senator

Roger Wicker
Member of Congress

Mike Parker
Member of Congress

Gene Taylor
Member of Congress

Bennie Thompson
Member of Congress

Chip Pickering
Member of Congress

Highly Confidential

## QUESTIONS RAISED BY HCFA AND LOCAL CARRIER ACTIONS ON
## MEDICARE COVERAGE OF PROCRIT ® (Epoetin alfa)



- o   What is the basis for the Mississippi policies on coverage of PROCRIT® (Epoetin alfa) to differ from the FDA labeling, accepted medical practice and the guidelines of national associations like the Association of Community Cancer Centers?

- o   Is there a draft "model" policy (or policies) to guide Medicare coverage decisions involving erythropoeitin therapy for the treatment of anemia related to chemotherapy or elective surgery in nondialysis patients?

- o   If there are draft model policies, will they be reviewed by central office to assure that are they consistent with Medicare law and regulation and with FDA labeling, accepted medical practice and the guidelines of national associations?

- o   What will be the role of central office in the implementation of model policies?  Are you considering - or would you consider - establishing a national policy or policies for use of erythropoetin in nondialysis patients?  What is the plan for receiving public comment on the policies?

- o   Are HCFA staff encouraging Medicare carriers to adopt erythropoeitin coverage policies for non dialysis patients that are similar to either Mississippi policies or to any model policies which may exist?



- o   What role do you envision for HCFA central or regional offices in addressing local carrier policies, such as the one in Mississippi, that deviate from FDA labeling, guidelines of national associations, accepted medical practice or the policies of other carriers?



Highly Confidential

MDL-OBI00058915

4

Highly Confidential

MDL-OBI00058916

# Notes

Highly Confidential

MDL-OBI00058917

*B. Buell*

# HCFA BEGINS THE NEW YEAR WITH A FRESH "STARK"

## 1. STARK II—PROPOSED REGULATIONS ARE FINALLY HERE

The long-awaited proposed rule-making implementing Stark II was published in Friday's *Federal Register*. The Stark II legislation, which became effective January 1, 1995, expanded the physician self-referral prohibition under Stark I to include other "designated health services" and broadened the scope of the prohibition to include Medicaid services. The following report is based on a preliminary review of the proposed rules which went on public display early last week.
Reporter, Larry Oday, Washington 202-639-6792

    **a. "Direct Supervision" is Redefined**—This change is big news because it affects the "in-office ancillary" exception which requires that a non-physician employee be under the "direct supervision" of a physician. HCFA has spent a lot of time on this issue. First, it was the most important new aspect to the latest RBRVS rule-making. Now it shows up here:

> "Supervision by a physician who is present in the office suite in which the services are being furnished, throughout the time they are furnished, and immediately available to provide assistance and direction. 'Present in the office suite' means that the physician is actually physically present."

HCFA is quite explicit that a "service will not qualify as an in-office ancillary service during any time period in which the physician is scheduled to be in the office, but in reality is specifically or routinely expected to be somewhere else or is scheduled to be somewhere else." However, HCFA is willing to allow for "brief unexpected absences" as well as "routine absences of short duration (such as a lunch break) . . ." leaving it up to the local carrier to decide.

    **b. Only HHAs Can Provide Home Health Services**—Home health services, in the view of HCFA, *can only be provided* by a home health agency ("HHA"). They cannot be provided by another entity *even if the HHA is owned by such other entity.* HCFA is very explicit about this in the preamble text:

> ". . . even if a hospital owns an HHA, the exception for hospital ownership in section 1877(d)(3), which applies to designated health services 'provided by a hospital', would not apply to home health services provided by a hospital-based HHA."

    **c. New Exception for Discounts**—HCFA intends to create a new exception for discounts received by a physician, *but only if the discount is passed on* in full to their patients or their insurers (including Medicare), and does not inure to the benefit of the physician in any way. The agency offers the following illustration of a discount which *would NOT meet the standard:*

> "For example, physicians will sometimes purchase oncology drugs from manufacturers at a discount, yet mark the drugs up to eliminate the discount when billing Medicare. Such arrangements would not meet the standard."

Highly Confidential

MDL-OBI00058918

## HCFA BEGINS NEW YEAR, CONT.

d.  "Radiology" Defined—HCFA's proposed definition is as follows:

> "Radiology services and radiation therapy and supplies means any diagnostic test or therapeutic procedure using x-rays, ultrasound or other imaging services, computerized axial tomography, magnetic resonance imaging, radiation or nuclear medicine, and diagnostic mammography services, as covered under § 1861(s)(3) and (4) of the Act and §§ 410.32(a), 410.34 and 410.35, including the professional component of these services, but excluding any invasive radiology procedure in which the imaging modality is used to guide a needle, probe, or catheter accurately."

Note the reference to professional component. This is something of a surprise. HCFA states that it is appropriate to do so because radiology "always consists of a technical service combined with a physician's professional service."

The good news is the exclusion of "invasive" procedures. HCFA also provides the following list of "invasive" procedures which we presume to be illustrative examples:

——Percutaneous transluminal angioplasty    ——Placement of drainage catheters
——Balloon dilation of strictures              ——Removal of stones
——Placement of catheters for therapeutic     ——Biopsies    ——Orthrograms
    embolization of tumors                     ——Mylograms

## 2. HCFA ISSUES FINAL RULE IMPLEMENTING STARK LAW ADVISORY OPINIONS

HCFA has also published a final rule with comment period implementing the Stark Law advisory opinion procedure as required under the Balanced Budget Act. Such opinions will address whether a physician referral for "designated health services" is prohibited under Stark Law. According to the rules, Stark opinions will not cover (i) issues relating to the fair market value of any goods, services or property, or (ii) whether an individual is an employee as defined in Section 3121(d)(2) of the Internal Revenue Code. The rules require HCFA to render an advisory opinion within 90 days of the date of request, however, this standard may be relaxed to "a reasonable time frame" in instances where complex legal issues and complicated facts are involved. Similar to the OIG's advisory opinion process, requestors are required to submit a $250 fee deposit and are given the option to withdraw the request if additional fees exceed a pre-specified dollar amount. HCFA is also soliciting public comment regarding the kind of information that the agency will need to receive in order to process advisory opinion requests. In the interim, HCFA is advising that formal requests for opinions be initiated by telephone contact until a final revised rulemaking is published. While Stark Law advisory opinions will be made available to the public via HCFA's website on the Internet [www.hcfa.gov/regs/aop/]; they are binding only on the Secretary of HHS and the requesting party. Reporter, Larry Oday, Washington, 202-639-6792

f:/kr4872/Healthhea/01-09-98.wpd

Highly Confidential

MDL-OBI00058919



MDL-OBI00058920

# Notes

**5**

Highly Confidential



less $ for Medicare patients of FFS or MC

**1996**     **1998**     **2000**     **2002**     **2005**

**Medicare**
- Medicare in trouble "$"   HCFA Drug Survey
- +HCFA's incentives to drive   APG's Introduced
  pts. to MC
- -HCFA reviewing payment process
  for pharm. /rebates

Reduce incentives/profits for
HMO's; AAPCC payment revisions
APG's Implemented partially
Part A broke

APG's: outpatient hospital
and physician offices

**FFS** — **Part A**
Shift outpatient back to hospital outpatient
90% (45% of sales)
- -MD incentive to provide services
- -decrease in carriers as they
  assume MC contracts

**Part B**

Demand for strong clinical/
outcomes data
Fewer Part B Carriers

*Cancer-Carveouts/PMO's as payers

**Med./MC**
10% enrollment
Choices Demonstration
w/AAPCC Risk Adjusters

22% enrollment
MC dictates care & products
—AAPCC Risk Adjusters—
level playing field
Elective surgeries scrutinized/limited

POS options;    25% enrollment
└ Quality drivers services &
Incentives aligned to pt. demands**
and market dynamics
curative/limited

**PROCRIT**
Market driven by MD
profit incentives

Clinical drivers imperative to
manage/grow market
-Sales incentives aligned to 0
long term objectives

Self admin option PCT for CA?
Impact on surgery?

**ONC/Surg Markets**
ONC:  OBRA '93

Cancer care moving toward
curative vs. palliative
Surgery: No benefit from OBRA '93

→ Aggressive Cancer Care for Cure →

OBRA '93 could have negative
Impact on cancer -self-adminis
tration; could be saddled under
limited Rx benefit away from
medical benefit

**Physician/Provider**
-Tx
-Profit based clinical drivers

-MD controls technology selection
-Onc's joining PMO's

—HCFA payment process revised—
- profits limited

PMO's becoming payers*

No FFS/No MC profit on drugs

**Patient**
-Limited Role
-76% pts. have supplemental
Insurance = 100% coverage

Increased role: active demand
for better functional capacity in
disease free survival/oncology
choice of tx for surgery

Higher co-pays
for greater choice

Patient Advocates
demand quality medical care**

**Payers (Private)**
-Influenced by Medicare FFS
-Private MC beginning to
manage pharmaceutical dispensing

Cancer Carve-outs become payers*

Highly Confidential

Ortho Biotech Inc.    DRAFT

| Issue | Goal | Priority/Resource |
|---|---|---|
| **PROCRIT® (Epoetin alfa) - Oncology**<br>Threat of implementation of restrictive guidelines based on local model policy in Mississippi which would limit patient access and product growth (Hgb 8-10) | ○ Preservation of guidelines<br>○ Clinical data input into HCFA process<br>○ Monitoring of development of model policy for EPO non-dialysis<br>○ National coverage policy based on clinical data and SOC<br>○ HCFA and Mississippi delegation letter follow-up<br>○ Advocacy & professional society support | ○ Very high<br>○ OBI resource availability in J&J Washington Office<br>○ J&J Washington Office support |
| **PROCRIT – Surgery**<br>Threat of no coverage for FDA approved indication | ○ TAC input<br>○ Challenge of HCFA Cancer Work Group decision<br>○ National coverage regulation based on FDA approved indication | ○ Very high<br>○ OBI resource availability in J&J Washington Office<br>○ J&J Washington Office support |
| **Self-Administration**<br>There is focus by the FDA and HCFA to include the fact that a drug can be self-administered in the labeling if the drug has the potential to be self-administered. This has severe implications for PROCRIT in the non-dialysis population, as there would be no coverage under current law. | ○ Preservation of coverage | ○ Very high<br>○ Team to develop ongoing strategy |
| **AWP**<br>Decrease in Medicare reimbursement from AWP minus 5% to a lower reimbursement (i.e. AWP minus 10% or acquisition cost) has the potential to negatively impact prescribing patterns of physicians. There is currently a high profile around Medicare reimbursement for profit of oncology drugs based on publications in the WSJ and Baron's. | ○ Partner with professional societies, ACCC, ASCO to maximize reimbursement for providers<br>○ Assess implication of shift of administration of PROCRIT from physicians office to clinical setting<br>○ Raise awareness of patient access issue. | ○ Very high<br>○ OBI resource availability in J&J Washington Office<br>○ J&J Washington Office support |
| **Proposed Stark legislation**<br>Proposed language would consider providers to have a financial arrangement with manufacturers if the discount received from the manufacturer is not passed on to the patient and the insurer. The implication is for the provider who is considered to have a financial arrangement with a manufacturer is that they can not prescribe the drug to Medicaid or Medicare patients. (Based on the language definition of a drug or biologic, this impact would only be on drugs or biologics which could be purchased in a retail store and therefore would not impact many chemotherapeutic agents administered in a physician's office.) | ○ Deletion of language | ○ Very high<br>○ OBI resource availability in J&J Washington Office<br>○ J&J Washington Office support |
| **FSS**<br>Expansion of FSS pricing to city, county & state has significant monetary exposure for OBI business and implications for spillover. | ○ Continued repeal of expansion | ○ Very high |

MDL-OBI00058923

# Exhibit 52



**ORTHO BIOTECH**

**Memorandum**

To:      Minneapolis District                    Date: July 10, 1996

From:    John Hess                               cc:   George Mooney

Subject: Oncology Clinic Success

At the recent Western Region Marketing Strategy meeting that I attended, Margaret Gardner provided information on key factors that have been identified that have contributed to the success of Procrit use in high user oncology clinics. The following key points are worth reviewing:

1.   A solid pre-call plan.

2.   Ability to gain access and ability to understand and to discuss the clinical issues.

3.   Business Issues- The ability to tactfully discuss how an office can profit from providing Procrit in the office. This discussion can be brought up whenever an office raises the objection about the expense of Procrit therapy and how they are at risk of losing money when they purchase expensive medications such as Procrit. The office needs to understand that there is profit associated with Procrit and that they are also protected from loss under our Reimbursement Assurance Program. This information is most beneficial to the Office Manager or Cancer Center Administrator. **It is important to keep in mind that you should only promote the appropriate use of Procrit in cancer patients on chemotherapy.**

The following provides you with an explanation of return on equity for Procrit.

I.   Non-Medicare Reimbursement Schedule:

| Billing Charge | Injection Fee | Acquisition Cost | Profit/Injection |
|----------------|---------------|------------------|------------------|
| $159.60        | $16.50        | $90.00           | $86.10           |

These numbers are examples. When reviewing with a physician or office manager you should ask for their real numbers.

Billing Charge - their charge to the patient for the drug.
Injection Fee - may vary from account
Acquisition Cost - depends on physician supply house

Plaintiffs' Exhibit
**268**
01-12257-PBS

Non-Medicare per patient profit:

| | |
|---|---|
| Weekly | $258.30 |
| Monthly | $1033.20 |
| 6 Months | $6,199.20 |
| 12 Months | $12,398.40 |

II.  Medicare Reimbursement Schedule:

| Billing Charge | Injection Fee | Acquisition Fee | Profit/Injection |
|---|---|---|---|
| $114.00 | $3.42 | $90.00 | $27.42 |

Medicare per patient profit:

| | |
|---|---|
| Weekly | $82.26 |
| Monthly | $329.04 |
| 6 Months | $1974.24 |
| 12 Months | $3948.48 |

When reviewing this information simply draw out the scenario on a piece of scratch paper asking for the office billing fee, injection fee, and acquisition fee based on medicare or non-medicare.  Give this a try in those offices raising the objection of cost and risk to the office.

If you have any questions about this memo, please give me a call.

**Please do not distribute this memo to your offices.  This if for your information only!**

MDL-OBI00063657

# Exhibit 53

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MASSACHUSETTS

3       --------------------------------

4    In Re:  Pharmaceutical Industry: MDL Docket No.

5    Average Wholesale Price         : Civil Action

6    Litigation                      : 01CV12257-PBS

7       --------------------------------

8    This Document relates to:       :

9    All Actions                     :

10      --------------------------------

11                  HIGHLY CONFIDENTIAL

12                 ORAL DEPOSITION OF

13                   JOHN R. HESS

14             FRIDAY, MARCH 24, 2006

15              MINNEAPOLIS, MINNESOTA

16

17        Oral Deposition of JOHN R. HESS taken at

18    the law offices of Heins, Mills & Olson, 3550

19    IDS Center, 80 South Eighth Street, Minneapolis,

20    Minnesota on Friday, March 24, 2006, commencing

21    at 9:30 a.m. before Rebecca L. Klanderud, a

22    Certified Shorthand Reporter.

John R. Hess

HIGHLY CONFIDENTIAL
Minneapolis, MN

March 24, 2006

Page 94

1  that is raising an objection to the expense of
2  Procrit.
3         So recapping again what was discussed at
4  this strategy meeting is the way I look at this memo
5  today. It was not a directive, but a possible
6  answer for a representative that had been faced this
7  particular objection by an office. That's all I can
8  -- that's really all I can say to that.
9  BY MR. WILLIAMS:
10     Q.  And this -- and these factors or points
11 were to be used to convince customers, in fact, that
12 there is considerable profit to be made by Procrit
13 use?
14        MR. MANGI: Object to the form.
15        THE WITNESS: Again, I can't really answer
16 to say that -- I mean if I look at the memo today
17 and as I read it, as I stated earlier, you know, we
18 wouldn't be directing the reps to sell or promote on
19 profit. But looking at that scenario, if they had
20 an objection to cost -- once you move away -- if you
21 can remove a customer's objection regarding costs,
22 you can then move beyond that objection and move

Page 95

1  back to what is the clinical benefit of this drug,
2  why should this drug be available to your patients,
3  what can it do to your patients to avoid blood
4  transfusions, and actually for them to feel better
5  in their quality of life as they go through their
6  chemotherapy. So that's how I respond to that.
7  BY MR. WILLIAMS:
8      Q.  In your role as a district manager, were
9  you aware of customers or oncologists being
10 interested in making a profit on the use of Procrit?
11        MR. MANGI: Object to the form.
12        THE WITNESS: I'm not aware of it, nor
13 have I actually had a discussion with the customer
14 or anybody bring that up at any time during visits
15 with any customers in the field with
16 representatives.
17 BY MR. WILLIAMS:
18     Q.  Any sales reps ever report to you that
19 customers were interested in what type of profit
20 could be made from Procrit?
21     A.  Not that I recall or remember, no.
22     Q.  Are you -- were you generally aware that

Page 96

1  oncologists or other customers were hoping to make a
2  profit by the use of Procrit?
3        MR. MANGI: Object to the form, asked and
4  answered.
5        THE WITNESS: No.
6  BY MR. WILLIAMS:
7      Q.  Would you -- let me ask you this: Was this
8  memo approved by Mr. -- maybe I already asked this -
9  - approved by Mr. Mooney?
10     A.  Again, I couldn't answer that because I
11 don't know.
12     Q.  Do you ever recall receiving any type of
13 discipline relating to this memo being sent?
14        MR. MANGI: Object to the form, lacks
15 foundation.
16        THE WITNESS: No.
17 BY MR. WILLIAMS:
18     Q.  In your mind, would this have been an
19 improper memorandum to have issued to the
20 Minneapolis district based on what you refer to as
21 an unwritten policy at the company relating to
22 discussions of profit?

Page 97

1      A.  No.
2        MR. MANGI: Objection to the form.
3        THE WITNESS: No.
4  BY MR. WILLIAMS:
5      Q.  The last line of the memo on the second
6  page is: Please do not distribute this memo to your
7  offices. This is for your information only.
8        Why would this be improper to leave with a
9  customer?
10     A.  Again, not remembering when I wrote this
11 or, you know, what I was meaning at the time, in
12 looking at it today, I can tell you for sure that in
13 any pharmaceutical company, any homemade pieces that
14 aren't approved by internal legal PRC committee
15 groups, that that's a direct violation of any
16 company operating guideline; that you cannot make
17 homemade promotional pieces or anything like that
18 that you can leave with customers.
19        So clearly someone would not -- this is
20 really for their information. It's not -- it
21 wouldn't have been meant to photocopy and go give to
22 somebody.

25 (Pages 94 to 97)

# Exhibit 54

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

IN RE:  PHARMACEUTICAL        )

INDUSTRY AVERAGE             )    MDL No. 1456

WHOLESALE PRICE             )

LITIGATION                  )    Civil Action No.

--------------------------  )    01-CV-12257-PBS

This Document Relates to    )

All Actions                 )

--------------------------  )

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY


                    August 18, 2005
                    9:37 a.m.


        Deposition of JAMES N. "DICK" ROBBINS,

held at the offices of Patterson, Belknap, Webb &

Tyler, 1133 Avenue of the Americas, New York, New

York, before Laurie A. Collins, a Registered

Professional Reporter and Notary Public of the

State of New York.

James N. "Dick" Robbins   HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY        August 18, 2005

## New York, NY

---

Page 138

1      MR. MANGI:  Thirteen?
2      MR. HOFFMAN:  Yes.
3      Q.   At the top of the document it says, In
4  the near term OBP can expect Amgen to increase its
5  rebates or discounts regardless of OBP's move.
6      Do you see that?
7      A.   I see that.
8      Q.   Was it your understanding that OBI or
9  Ortho Biotech was increasing its rebates and
10  discounts that it was making available to
11  physicians or hospital clinics or outpatients in
12  order to neutralize Amgen's margin advantage?
13      MR. MANGI:  Object to the form, lack of
14  foundation.
15      A.   My understanding is that to be
16  competitive with Amgen's discounts and rebates we
17  had to increase discounts and rebates.
18      Q.   And the reason you had to increase your
19  discounts and rebates was to overcome Amgen's
20  margin advantage?
21      MR. MANGI:  Object to the form, lack of
22  foundation.

---

Page 139

1      Q.   Is that correct?
2      A.   To lower the cost of the drug to
3  physicians in order to be competitive with Amgen
4  and Aranesp.
5      Q.   Because that would neutralize at least
6  to some extent the margin advantage Aranesp had
7  over Procrit?
8      MR. MANGI:  Object to the form.
9      A.   It would lower the cost basis for the
10  drug relative to Aranesp.
11      Q.   Right.  And by lowering the cost basis,
12  that would increase the amount of spread between
13  reimbursement and acquisition cost; correct?
14      MR. MANGI:  Object to the form.
15      A.   I don't know.
16      Q.   Well, if you have a fixed reimbursement
17  amount and you lower the acquisition cost, wouldn't
18  that increase the spread between reimbursement and
19  acquisition cost?
20      A.   Applying that logic, yes.
21      Q.   Isn't that in fact the consequence of
22  offering discounts and rebates to physicians, it

---

Page 140

1  lowers their acquisition cost?
2      A.   It lowers their acquisition cost.
3      Q.   So by lowering their acquisition cost,
4  you're increasing their spread; correct?
5      MR. MANGI:  Objection to form.
6      A.   Yes, theoretically you would be.
7      Q.   It's not just theoretically; it's
8  actually realistically -- or actually that's what
9  happens; is that correct?
10      MR. MANGI:  Object to the form.
11      A.   I don't know.
12      MR. MANGI:  I ask the reporter to mark
13  this entire transcript as highly confidential
14  pursuant to the protective order.
15      (Exhibit Robbins 005, document, Bates
16  stamped MDL-OBI00045123 through 227, marked for
17  identification, as of this date.)
18  (Discussion off the record.)
19      MR. HOFFMAN:  I'll state for the record
20  that this document is Bates stamped MDL-OBI00045123
21  through 227.  Due to technical reasons when the
22  document prints out, it does not have that stamp

---

Page 141

1  indicated on it.  It's an issue that's been ongoing
2  in this case.
3      MR. MANGI:  The document should also be
4  considered highly confidential, as we established
5  with other documents.
6      MR. HOFFMAN:  That's fine.
7      Q.   The cover of this document says
8  contracting strategy, executive summary.  Do you
9  see that, Mr. Robbins?
10      A.   I do.
11      Q.   You testified earlier you're not
12  involved in contracting strategy whatsoever; is
13  that correct?
14      MR. MANGI:  Object to the form,
15  mischaracterizes the testimony.
16      A.   I didn't say whatsoever; I just said --
17      Q.   That's true.
18      A.   -- I wasn't.
19      Q.   I apologize.  I added the "whatsoever."
20  The impression I got was you were not involved at
21  all.
22      A.   Generally I wasn't, until toward the end

36  (Pages 138 to 141)

James N. "Dick" Robbins   HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY   August 18, 2005

New York, NY

Page 294

1  next page talks about Medicare model, and it refers
2  to a patient mix and a dose or vial size that can
3  be filled in by the sales rep.
4       MR. MANGI:  Object to the form.
5       Q.  Is that correct?
6       MR. MANGI:  Lack of foundation.
7       A.  Yes.  But I might also point out that on
8  this and the previous page there are a lot of
9  columns that can't be impacted by the sales rep
10  that have zeros in them.  For example, your AWP I
11  believe on the previous page showed zeros across
12  there.
13       Q.  Right.  And I understand and agree with
14  that.
15       A.  Okay.
16       Q.  But what I've found is once you fill in
17  those numbers in the boxes, the other numbers
18  change.
19       A.  Okay.
20       Q.  I'll represent that.  It's your disk.
21  But isn't that your understanding of how it works?
22       A.  That it does the calculations?  Yes.

Page 295

1       Q.  Let's see what else -- okay.  And the
2  next page is a dosing conversion.  Do you see that?
3       A.  Yes.
4       Q.  The next page says, Procrit offers
5  flexible dosing titration in a wide variety of
6  patients.  Any reason to believe that this disk is
7  not provided to or used in the presentation to
8  physicians?
9       MR. MANGI:  Object to the form, lack of
10  foundation.
11       A.  No.
12       Q.  And again, just so it's clear, you would
13  have reviewed these CD-ROMs before they were
14  provided to the sales representatives sold to
15  physicians; correct?
16       MR. MANGI:  Object to the form, lack of
17  foundation.
18       A.  Either myself or one of the investees
19  would have seen these prior to usage.
20       Q.  But you reviewed these since the time it
21  was initially handed out; correct?
22       MR. MANGI:  Objection, asked and

Page 296

1  answered.
2       A.  You mean after the fact have I gone back
3  and reviewed these?
4       Q.  No, I mean as field sales director and
5  national sales director, there would have been a
6  time when you would have reviewed the CD-ROMs used
7  out in the field by sales representatives; is that
8  correct?
9       A.  Yes.
10       Q.  The next page talks about Procrit is
11  indicated for.  Do you see that?
12       A.  Yes.
13       Q.  And that appears to be the end of the
14  CD-ROM with regard to at least the comparison flag
15  on the left-hand side.  Is that fair?
16       A.  Yes.
17       Q.  Let's just check it.  If I click on
18  "comparison," it takes us back to that chart we saw
19  earlier which is the side-by-side cost-of-dosing
20  comparison.
21       A.  Uh-huh.
22       Q.  Now, can you help me go about filling in

Page 297

1  the information as it would have been provided in a
2  presentation to a physician in the boxes?
3       MR. MANGI:  Object to the form.  You
4  laid no foundation as to whether he has ever used
5  this with a physician, or anybody.
6       Q.  Do you understand how this CD-ROM is to
7  be used with a physician?
8       A.  I stated earlier I had never used it
9  with a physician, and I have never sat and
10  practiced with it myself so...
11       Q.  Did you ever give any guidance to sales
12  representatives as to how to use this?
13       A.  No, I wouldn't have.  Training would
14  have done that.
15       Q.  Okay.  But you are familiar with sales
16  presentations to physicians and clinics; isn't that
17  correct?
18       MR. MANGI:  Object to the form.  He has
19  just said --
20       MR. HOFFMAN:  He said away from the
21  CD-ROM.
22       MR. MANGI:  Nothing so far as it

75 (Pages 294 to 297)

Page 379

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

IN RE:  PHARMACEUTICAL           )

INDUSTRY AVERAGE                 ) MDL No. 1456

WHOLESALE PRICE                  )

LITIGATION                       ) Civil Action No.

- - - - - - - -  - - -  ) 01-CV-12257-PBS

This Document Relates to         )

All Actions                      ) Volume II

- - - - - - - - - - - -  )

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

March 22, 2006

1:23 p.m.


Continuation of the deposition of

JAMES N. "DICK" ROBBINS, held at the Courtyard

Atlanta Marietta, 2455 Delk Road, Marietta,

Georgia, before Suzanne Beasley, a Registered

Professional Reporter and Notary Public of the

State of Georgia.

James N. "Dick" Robbins, Vol. II HIGHLY CONFIDENTIAL–OUTSIDE ATTORNEYS' EYES ONLY        March 22, 2006
Marietta, GA

Page 464

1    So how John got from here to here, I had
2  no input on that as well. I did make the comment
3  previously that he was not a very successful
4  district manager, and I stand by that. This is a
5  lateral move from here to here. I will say that.
6  That was not a promotion.
7    As to whether there were any repercussions
8  from this or anybody ever really saw this and caught
9  that, I don't know, so I can't really address it.
10    Q. If you turn to the second page of Exhibit
11  Robbins 021, and if you read the last paragraph on
12  that --
13    A. I'm sorry. Turn to page what?
14    Q. Second page. And just read through the
15  last paragraph for me.
16    Was that a sales tactic of OBI to draw the
17  reimbursement information out on a scratch piece of
18  paper, and, you know, discuss billing fee, injection
19  fee, acquisition fee with the doctor?
20    A. It was not OBI direction. It was not --
21  and I can't speak for, you know, for John Hess or
22  for anyone else. I can only speak for myself. The

Page 465

1  direction I gave as a district manager, or as an
2  RBD, regional manager, regional business director,
3  and for the company itself, that was not our
4  direction, and obviously it must have taken place
5  with some individuals, so --
6    Q. It wasn't a sales tactic that OBI
7  installed to talk tactfully about profit; is that
8  what you're telling me?
9    A. No.
10    Q. Now, do you see on page two where it's in
11  the Roman numeral two, and he's talking about
12  Medicare per-patient profit?
13    A. Uh-huh.
14    Q. So he's identifying for the doctors the
15  cash stream in terms of profit that can be derived
16  by each patient they put on Procrit?
17    MR. SCHAU: Object to form.
18  BY MR. VERDERAME:
19    Q. Isn't that similar to the sales plan we
20  were discussing previously in Exhibit Robbins 019,
21  where they're talking about how many shots, how many
22  infusions? Isn't that similar type language?

Page 466

1    MR. SCHAU: Object to form.
2    THE WITNESS: I don't draw that
3  correlation at all.
4  BY MR. VERDERAME:
5    Q. And isn't that an incentive -- we're
6  referring again to the Exhibit Robbins 021. Isn't
7  that an incentive for the doctor to put as many
8  patients as he can on Procrit and to keep them on it
9  for as long as possible?
10    MR. SCHAU: Object to form.
11    THE WITNESS: There's two parts to your
12  question, and the answer's not the same for both.
13    On the first part, assuming that John's
14  numbers are correct there, the first part would be
15  yes.
16    The second part, keeping them on for as
17  long as possible, the answer would be no, because
18  reimbursement would not continue if you kept them on
19  for as long as possible.
20    The other part of that would be clinically
21  it would be malfeasance to keep them on until their
22  hemoglobin became too high. It would be

Page 467

1  malpractice. It would be very dangerous to the
2  patient, so they wouldn't just keep them on.
3    (Off-the-record discussion.)
4  BY MR. VERDERAME:
5    Q. Do you know who would have attended the
6  western regional managers' meeting that apparently
7  took place in approximately June or July of '96?
8    A. I don't.
9    Q. In terms of OBI senior management down to
10  George Mooney and John Hess?
11    MR. SCHAU: Object to form.
12    THE WITNESS: What managers' meeting are
13  you referring to?
14  BY MR. VERDERAME:
15    Q. He was referring in his memorandum to --
16    A. Oh, to the --
17    Q. Yeah. Do you understand that, western
18  region marketing strategy meeting?
19    A. Okay. You said managers' meeting.
20    Q. Right.
21    A. Marketing strategy meeting. I have no
22  idea who attended that meeting. I have no way of

23  (Pages 464 to 467)