# Exhibit 58

*State of California ex rel. Ven-A-Care of the Florida Keys, Inc.  v. Abbott Laboratories, Inc., et al.*, **Master Civil Action No. 01-12257-PBS, Subcategory Case No. 06-11337**

Exhibit to the January 15, 2010 Declaration of Philip D. Robben in Support of Defendants' Motion for Partial Summary Judgment
(202) 220-4158

Page 1

```
 1                UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF MASSACHUSETTS

 3     - - - - - - - - - - - - - - x

 4     IN RE:   PHARMACEUTICAL        )   MDL NO. 1456

 5     INDUSTRY AVERAGE WHOLESALE     )   Master File No. 01-12257-PBS

 6     PRICE LITIGATION               )   Subcategory Case No. 06-11337

 7     ---------------------------)

 8     THIS DOCUMENT RELATES TO:    )   Hon. Patti B. Saris

 9     State of California, ex rel.)

10     Ven-A-Care v. Abbott          )

11     Laboratories, Inc., et al.  )   VOLUME I

12     - - - - - - - - - - - - - - x

13                     Wednesday, September 23, 2009

14                         9:14 a.m. to 5:17 p.m.

15            Videotaped deposition of JEFFREY

16     LEITZINGER, Volume I, held at the law offices of

17     White & Case, 633 West Fifth Street, 19th Floor,

18     Los Angeles, California 90071-2007, the

19     proceedings being recorded stenographically by

20     Lisa O'Sullivan, California Certified Shorthand

21     Reporter No. 7822, RMR, CRR, and transcribed

22     under her direction.
```

Page 44

1    recall, I don't remember reading a report where

2    it was identical.

3         Q.   So it's entirely possible that if we

4    looked at pricing that one expert says should

5    have been reported as the AWP for Dey or for

6    Mylan, and what you say, that you could have

7    different numbers?

8              MR. GLASER:  Objection, form.

9              MR. ZLOTNICK:  Object to the form.

10        Q.   BY MR. ESCOBAR:  Is that right?

11        A.   Well, I think the question presumes

12   that there are other experts speaking as to what

13   should have been reported.  I'm not sure, at

14   least as I sit here and think about their

15   reports, that that's what they were saying.  At

16   least, it wasn't apparent on the face of the

17   reports.

18             And in speaking in my own case, I would

19   not characterize what I'm doing as offering an

20   opinion certainly about what should have been

21   reported.

22        Q.   So you have no opinion at all as to

 1   what either Dey or Mylan should have reported as
 2   their AWP; is that right?
 3        A.   That's not -- that is right.  That's
 4   not my role in this case.
 5             My role is to start with a legal
 6   position on that issue, or at least in the
 7   context of trying to -- in the context of the
 8   State's claims about overpayment, and to then
 9   determine the amount of overpayment based on that
10   legal position.
11        Q.   Now, when you say "start with a legal
12   position," what does that mean?
13        A.   You know, I think about generally, and
14   my work cases have a liability aspect to them,
15   where the parties adjudicate some grievance under
16   the law and determine whether or not there's been
17   some kind of a bad act or actions.
18             And then there is a damage phase, where
19   a damage expert starts with an assumption about
20   liability, typically based on the plaintiff's
21   theory of their case, and from that starting
22   point determines the damage.  And that's what I'm

Page 53

```
 1   that were published for any of the products that
 2   are at issue in this case, for any of the
 3   defendants?
 4        A.   Well, insofar as I was -- part of my
 5   work was to determine prices at which the
 6   defendants were selling pharmaceutical products
 7   to wholesalers, WAC at least in some part is part
 8   that picture.
 9             So in that sense, it was -- and to that
10   extent, it was embedded within the work that I
11   did.  But I have not separately done a study or
12   specifically a study as to WAC in connection with
13   my work in this case.
14        Q.   So in connection with your work, as I
15   read your reports, your focus was to come up with
16   a different number that you believe should have
17   been the number labeled AWP; is that right?
18             MR. ZLOTNICK:  Object to the form.
19             MR. GLASER:  Objection.
20        A.   No, it's not.  There isn't an element
21   of my belief about what should have happened, at
22   all in my work.
```

Page 54

```
 1        Q.   Let me put it a different way.  You saw
 2   in the work that you did that on the drugs at
 3   issue, that defendants would have an AWP for each
 4   one of those NDC numbers, correct?
 5        A.   Yes.
 6        Q.   Okay.  And then you did -- you and your
 7   staff did some analysis and came up with a
 8   different number for the AWP, correct?
 9             MR. GLASER:  Objection.
10        A.   Well, I think it's -- I would say more
11   generally it's a different number for
12   reimbursement.
13        Q.   A different number for reimbursement?
14        A.   For reimbursement.
15        Q.   Okay.  But all I'm asking you is, was
16   part of the analysis and part of what you did
17   looking at the AWP that existed for a particular
18   NDC at issue here, and then looking at the data
19   that you identified, and coming up with a
20   different number for that AWP?
21             Was that part of the exercise?
22        A.   Well, it's -- it's a different number
```

Page 55

1    as to the -- as to the average price which

2    wholesalers were selling the products in question

3    to pharmacies.

4            Whether that -- I don't know as to

5    whether it would have been -- had attached to it

6    the label AWP or not, in the sense in which

7    that's been formally reported in the past.  I'm

8    not sure it was part of it.

9            I think the predicate assignment is

10   simply that -- to calculate what a reimbursement

11   number would have been.  And it's stated

12   specifically in my report, and I don't want to --

13   I'm going to paraphrase here a little bit.

14           But it's the -- what the reimbursement

15   would have been if the -- if the manufacturers

16   had reported a number which, based on the

17   information they had, approximated the price at

18   which the product was being sold from wholesalers

19   to pharmacies.

20        Q.   So are you coming up with a but-for

21   AWP?

22        A.   I think to call it AWP without caps --

Page 56

```
 1    that is, as a descriptive term -- it's an average
 2    price at which wholesalers were selling to --
 3    would have been selling to pharmacies, yes, I
 4    think in that sense that's what I would
 5    understand it to be.
 6              To the extent that you -- whether it
 7    would have been embedded in now all caps AWP, the
 8    reported price as that has been -- as that
 9    process has unfolded over years past, I don't
10    know that my work involves an assumption about
11    that one way or the other.
12         Q.   Well, you're aware that the defendants
13    here have an AWP that they transmit to publishers
14    that then publish the AWP, right?
15         A.   Yes.
16         Q.   Okay.  Is that -- is the number that
17    you come up with in your analysis, is that a
18    number that you believe can be labeled AWP in the
19    same way that the manufacturers label their AWP?
20         A.   Well, I'm not sure what you mean, "in
21    the same way."
22              I think in fact it is different,
```

Page 57

1   because it's a number that reflects the average
2   price that was actually -- that actually existed
3   between wholesalers and pharmacies and AWP, all
4   caps.  And the way that that has been reported,
5   at least based on the analysis that I have done,
6   did not.
7        Q.   So your AWP is different than what the
8   manufacturers or defendants here called their
9   AWP?
10            MR. ZLOTNICK:  Object to the form.
11            MR. GLASER:  Objection.
12       Q.   BY MR. ESCOBAR:  Is that right?
13       A.   The price that I've calculated, which
14  could be described as an average wholesale price,
15  yes, I think it is different than what was
16  reported as all caps AWP historically, at least
17  for these manufacturers and these NDCs.
18       Q.   Now, did you use, in coming up with --
19  in doing your analysis, did you look at or use
20  any specific definition of AWP, average wholesale
21  price, to guide you?
22       A.   Only insofar as it was contained within

Page 206

1   my calculated price -- actually, let me step back
2   a step.
3           In calculating the overpayments, as
4   we've described, I take the manufacturers' sale
5   price to wholesalers and add 25 percent.  I don't
6   do anything further by way of deducting some
7   percentage from that amount.
8       Q.  Right.  So in calculating the
9   overpayments, you're actually using a
10  reimbursement methodology that is different than
11  the one that California had in place?
12          MR. GLASER:  Objection.
13          MR. ZLOTNICK:  Object to the form.
14      A.  The elements of the reimbursement
15  calculation are certainly different.  Yes.
16      Q.  Right.  So --
17      A.  As is the result of it, obviously.
18      Q.  Right.  So you can only arrive at your
19  overpayment numbers by doing the reimbursement in
20  a way that's different than set out in the
21  California regulations and Medicaid procedures,
22  right?

Page 207

```
 1              MR. ZLOTNICK:  Object to the form.
 2              MR. GLASER:  Objection.
 3        A.    I'm not in a position to opine about
 4   what's set out generally in the regulations
 5   governing Medicaid and reimbursement.
 6              Having said that, yes, it is -- it is
 7   the case that the but-for reimbursement that I
 8   have used for purposes of calculating overpayment
 9   is -- is different than AWP, all caps, less 5
10   percent or 10 percent or 17 percent.  Yes.
11        Q.    And if you had applied -- if you had
12   taken your average prices that you calculate
13   using the methodology described in your report
14   and what we've discussed, and use the actual
15   California Medicaid reimbursement methodology,
16   and deduct in the appropriate quarters whatever
17   the governing deduction was from AWP, you would
18   come up with an entirely different conclusion as
19   to the overpayments, as to the overpayment
20   amounts, right?
21              MR. ZLOTNICK:  Object to the form.
22              MR. GLASER:  Objection.
```