# Exhibit 60

*State of California ex rel. Ven-A-Care of the Florida Keys, Inc.  v. Abbott Laboratories, Inc., et al.*, **Master Civil Action No. 01-12257-PBS, Subcategory Case No. 06-11337**

Exhibit to the January 15, 2010 Declaration of Philip D. Robben in Support of Defendants' Motion for Partial Summary Judgment
(202) 220-4158

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--oOo--

STATE OF CALIFORNIA, ex rel

VEN-A-CARE OF THE FLORIDA KEYS, INC.,

A Florida Corporation,

       Plaintiffs,

    vs.          MDL No. 1456

                Master File No.

                01-12257-PBS

ABBOTT LABORATORIES, INC.,   Civil Action No.

Et al.,              03-11226-PBS

       Defendants.

_____/

--oOo--

THURSDAY, NOVEMBER 6, 2008

--oOo--

VIDEOTAPE DEPOSITION OF THE CALIFORNIA DEPARTMENT

OF HEALTH CARE SERVICES BY STANLEY L. ROSENSTEIN

--oOo--

Reported By:  PATRICIA MCCARTHY, CSR No. 12888

Registered Professional Reporter

140

1   wholesaler, and the wholesaler in turn sells it
2   to the pharmacist.  And somebody, a Medicaid
3   beneficiary comes into the pharmacy to -- with a
4   prescription for the inhaler.
5           Are you with me?
6       A.  Yes.
7       Q.  And the pharmacist then turns around
8   and submits a claim to Medi-Cal, right, to be
9   reimbursed for dispensing the inhaler to the
10  Medicaid beneficiary, correct?
11      A.  That's correct.
12      Q.  And I think what you just said is, the
13  inhaler could be paid on the basis of a -- could
14  be reimbursed on the basis of AWP or could be
15  reimbursed on some other basis, right?
16      A.  Yeah, one of the other basis, if a
17  price was established for that inhaler.
18      Q.  Okay.  What is MAIC?
19      A.  MAIC is a state pricing mechanism
20  called maximum allowable ingredient cost.  So it
21  is typically established, or the concept is to be
22  established on generic drugs.  It is not an

1   effective program in Medi-Cal at this point.

2       Q.   And what is FUL?

3       A.   That is a federal upper payment limit.

4   That's established by CMS as the maximum price we

5   can pay for a drug, typically, a generic.

6       Q.   And so how is it determined -- on which

7   of those basis Medi-Cal's going to reimburse in

8   my hypothetical the pharmacist for dispensing?

9       A.   Well, if the prices -- if all of these

10  prices are established for a particular drug, we

11  would pay the lesser of -- the lowest price, not

12  to exceed what the pharmacist charged.

13      So our system would go through and look

14  and say, which of these indexes has the lowest

15  price. And we would pay that price, not to

16  exceed what the pharmacist charges.

17      Q.   And so the point of the second bullet

18  point Exhibit 11 was to communicate to the

19  Legislature that there were -- apart from AWP and

20  direct price, there were these other elements in

21  that pricing methodology, right?

22      A.   That's correct.

246

1   budget and this bill.  The trailer bill is to
2   adopt their budget which the governor can sign or
3   veto.
4        Q.   So the Legislature in section 72, and I
5   am now referring to page 10.
6             MR. PAUL:  Counsel, which page?
7             MR. BUEKER:  Ten.
8             THE WITNESS:  Yes.
9   BY MR. BUEKER:
10       Q.   In section 72, the Legislature proposed
11  -- the Legislature had adopted budget that called
12  for the implementation of MAIC or MAIC program,
13  right?
14       A.   With the language that changes the
15  index, we used for MAIC to what we thought was
16  going to be a more relevant effective MAIC than
17  the prior one in the statute.  We had an MAIC
18  before.  This changes how the MAIC is calculated.
19       Q.   And the MAIC before this change was
20  being calculated on the basis of AWP, right?
21       A.   AWP minus 5 percent.
22       Q.   Off of a reference AWP?

247

1    A.    I believe so, yes.
2    Q.    How -- in going forward, how was -- how
3    were MAIC's supposed to be set?
4    A.    We were going to survey wholesalers and
5    get actual prices from the wholesalers, and then
6    use that to build and update a MAIC for a drug
7    cost.
8    Q.    That is a proposal that DHS supported,
9    right?
10   A.    That was our proposal that the
11   Legislature adopted.
12   Q.    And so DHS supported that proposal?
13   A.    That's correct.
14   Q.    And why -- why did DHS support that
15   proposal?
16   A.    Again, as I said before, we think it
17   was important to set a MAC to compensate for the
18   fact that AWP, especially, at the -- even at the
19   17 percent was not reflective of the discounts
20   that we had found out about for the generic
21   drugs.
22         We wanted to have a more appropriate

248

1   pricing.  And what we were seeking was to get
2   accurate pricing, because we needed data, correct
3   data to be able to set an appropriate rate.
4        Q.   You were going to do that by surveying
5   wholesalers?
6        A.   That's correct.
7        Q.   And California hasn't done that -- has
8   not surveyed wholesalers?
9        A.   Wholesalers refused to participate
10  given changes that occurred at the same time at
11  the federal level, so we started the process, and
12  it failed because of federal changes.
13       Q.   But in making the decision to survey
14  wholesalers and set MAIC on that basis, DHS knew
15  that generic drugs were being purchased by
16  California pharmacies at below AWP minus 17
17  percent, correct?
18       A.   We were concerned about the -- whether
19  AWP was the proper reference.  And we were
20  concerned about the actual receiving data we were
21  getting through the AWP process.  We were seeking
22  to get accurate data to set rates.