# EXHIBIT E

Sacramento, CA

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-----------------------------X

IN RE PHARMACEUTICAL INDUSTRY  )

AVERAGE WHOLESALE PRICE        )  MDL No. 1456

LITIGATION                     )

-----------------------------X

THIS DOCUMENT RELATES TO       )  Civil Action:

State of California, ex rel.   )  01-12258-PBS

Ven-A-Care v. Abbott           )

Laboratories, Inc., et al.     )

-----------------------------X

--oOo--

WEDNESDAY, DECEMBER 3, 2008

--oOo--

VIDEOTAPED DEPOSITION OF

THE CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES

by J. KEVIN GOROSPE, Pharm.D.

--oOo--


Reported By:  CAROL NYGARD DROBNY, CSR No. 4018

Registered Merit Reporter

Page 70

BY MR. ROBBEN:
1
2      Q.   You know what the goals were in
3   launching the program?
4      A.   Prior to the change in the federal law
5   that created the Federal Rebate Program
6   California had already started its own
7   contracting program.
8      Q.   Okay.  So when you say "the federal,"
9   are you referring to the OBRA, O-B-R-A, 90
10  legislation?
11     A.   That's correct.
12     Q.   So prior to that federal legislation
13  California had determined that there was a need
14  for a rebate program?
15     A.   That is correct.
16     Q.   Do you know -- can you tell us what the
17  factors were that led to that decision, what --
18  what California -- what mode of -- what --
19       Strike that.
20       What was it that California did or what
21  -- analysis that they performed that gave rise to
22  the -- to their understanding that they needed a

Page 71

1   Supplemental Rebate Program?
2       MR. HENDERSON:  Objection, form,
3   foundation.
4       THE WITNESS:  I'm not privy to the
5   information related to why that occurred prior to
6   1990.
7   BY MR. ROBBEN:
8      Q.   My understanding is that if a drug was
9   subject to a supplemental rebate agreement, this
10  is the early supplemental rebate agreement in
11  California, that it was put on a preferred drug
12  list; is that correct?
13       MR. PAUL:  Objection to form.
14       THE WITNESS:  Are you describing post-
15  1990?
16  BY MR. ROBBEN:
17     Q.   The earliest version of the
18  Supplemental Rebate Program.
19     A.   Which would be post-1990.
20       Drugs were -- remain -- or either were
21  retained or added to the Medi-Cal list of
22  contract drugs as it's officially designated in

Page 72

1   the state statute.
2      Q.   So Medi-Cal list of contract drugs?
3      A.   That is correct.
4      Q.   Okay.  What was the effect of a drug
5   being on that -- on that list?
6      A.   Drugs not on the Medi-Cal list of
7   contract drugs, we refer to the list in this
8   case, --
9      Q.   Uh-huh.
10     A.   -- generally do not require prior
11  authorization.
12     Q.   Okay.  What's the "generally"?
13       What is the circumstance where they
14  might be?
15     A.   The Department in certain circumstances
16  for a specific drug may implement utilization
17  controls.
18       Though the product is on the contract
19  drug list, if there is a utilization control, for
20  example, age is a simple one -- if there's an age
21  restriction that says individuals between 5 and
22  16 can take the drug, then if the individual's

Page 73

1   outside that age range, prior authorization would
2   be required in order to -- for the pharmacy to
3   dispense it.
4      Q.   So the utilization control is something
5   that's specific to the certain facts about the
6   beneficiary; is that a fair statement?
7      A.   The utilization control on a specific
8   drug is related to the specific drug and
9   potential -- potentially, you know, related to
10  specific -- facts about the beneficiary, that is
11  correct.
12     Q.   Now, at some point or points in time
13  all drugs covered by Medi-Cal were covered by a
14  supplemental rebate agreement; is that correct?
15     A.   No.
16     Q.   What -- what -- what am I missing in
17  that?
18     A.   In the time frame from July 1st, 1994
19  through July -- June 30th, 1996 there was a
20  legislative mandate that manufacturers pay 10
21  percent supplemental rebate.
22       If a manufacturer refused to sign a

19 (Pages 70 to 73)

da64dc31-37ca-4ff0-8b1b-f1748d285c39

CA Dept of Health Care Services (Gorospe, PharmD, J. Kevin)                    December 3, 2008

Sacramento, CA

Page 74

1  contract to do so, that manufacturer's products
2  were available only through prior authorization.
3        Not all manufacturers signed that
4  supplemental rebate agreement, and, therefore,
5  not all products were subject to the 10 percent.
6     Q.  Because it was 10 percent of AMP
7  rebate?
8     A.  That is correct.
9     Q.  So it wasn't mandatory, but the
10 consequence of not signing the agreement was that
11 then your products needed to be prior authorized?
12       MR. PAUL:  Objection to form.
13       THE WITNESS:  That is correct.
14 BY MR. ROBBEN:
15    Q.  Would it be -- did the prior
16 authorization requirement --
17       Strike that.
18       You said not all manufacturers entered
19 in to the rebate agreement?
20    A.  That is correct.
21    Q.  Were -- can you quantify it?
22       Was -- were the manufacturers that

Page 75

1  refused to enter in to the agreement or didn't
2  enter in to the agreement sort of a handful of
3  outliers or were there a substantial number --
4        MR. PAUL:  Objection to form.
5  BY MR. ROBBEN:
6     Q.  -- that didn't execute the agreement?
7     A.  I'm sorry?
8        MR. PAUL:  Objection to form.
9        THE WITNESS:  In the period from -- the
10 previously mentioned, the '94 through June 30th,
11 1996, there were several manufacturers -- I don't
12 know if you would call them "outliers" -- that
13 refused to sign.
14       In a subsequent extension of the 10
15 percent program from July 1st, '96 through the
16 end of '96, it would be December 31, those
17 manufacturers subsequently signed those
18 agreements.
19 BY MR. ROBBEN:
20    Q.  When they -- all of them did?
21    A.  I believe all the manufacturers that
22 had utilization in the program, that is correct.

Page 76

1     Q.  Did their agreement during that
2  extended period apply to the whole time starting
3  in July '94, or just for that six-month extension
4  of time?
5     A.  Just for the six-month extension time.
6     Q.  Do you know what their reasons were for
7  -- for --
8        Well, strike that.
9        Did they -- tell the Department why
10 they weren't executing the agreement?
11    A.  Not to my knowledge, no.
12    Q.  Do you -- can you recall the names of
13 the companies that didn't sign the agreement?
14    A.  I can only recall one.
15    Q.  Who?
16    A.  I believe it was Glaxo.
17    Q.  During this time period, this July '94
18 through December '96 time period, where were you
19 in the Department?
20    A.  In the time frame from July -- I
21 started with the Department of Health Services on
22 April 1st of 1995.

Page 77

1     Q.  So you kind of -- you started at -- in
2  the middle of this rebate period?
3     A.  That is correct.
4     Q.  Did you have any contact with Glaxo
5  during that time related to this particular
6  issue?
7     A.  No, I did not.
8     Q.  Why did the --
9        Strike that.
10       Why was the program initially -- the
11 supplemental rebate program -- initially only
12 running from July 1, '94 through June 30th, '96?
13       MR. HENDERSON:  Objection.
14       THE WITNESS:  The mandatory 10 percent
15 supplemental rebate?
16 BY MR. ROBBEN:
17    Q.  Yes.
18    A.  Was -- the Legislature put that in the
19 statute as a means to potentially increase rebate
20 income for the State of California.
21    Q.  So they imposed a sunset provision on
22 the rebate program?

Henderson Legal Services, Inc.

202-220-4158                              www.hendersonlegalservices.com

da64dc31-37ca-4ff0-8b1b-f1748d285c39