# EXHIBIT J

Case 1:01-cv-12257-PBS    Document 6844-11    Filed 01/15/10    Page 2 of 4

Gorospe, Pharm. D., J. Kevin - Vol. II                                September 22, 2008
Sacramento, CA

Page 394

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

------------------------------x

IN RE PHARMACEUTICAL INDUSTRY)

AVERAGE WHOLESALE PRICE       )

LITIGATION                    )

_____)

THIS DOCUMENT RELATES TO      ) MDL No. 1456

State of California, ex rel. ) Civil Action:

Ven-A-Care v. Abbott          ) 01-12258-PBS

Laboratories, Inc., et al.    )

------------------------------x

VOL. II

--oOo--

MONDAY, SEPTEMBER 22, 2008

--oOo--

VIDEOTAPED DEPOSITION OF

J. KEVIN GOROSPE, Pharm.D.

--oOo--


Reported By:  CAROL NYGARD DROBNY, CSR No. 4018

              Registered Merit Reporter

Case 1:01-cv-12257-PBS   Document 6844-11   Filed 01/15/10   Page 3 of 4

Gorospe, Pharm. D., J. Kevin - Vol. II                          September 22, 2008
                              Sacramento, CA

Page 691

1    A.  Yes.
2    Q.  Okay.  So for a time it was AWP minus 5,
3  or FAC, or MAIC, and then the program would pay the
4  lower of each of those -- of those components;
5  correct?
6    A.  After comparing it to the usual and
7  customary.
8    Q.  Okay.  So if the usual and customary was
9  10 and the others were less than 10, one of those
10 other ones would be picked as the basis for the
11 reimbursement; right?
12   A.  That is correct.
13   Q.  Okay.  So now, is it fair to say based
14 on that that whenever some basis of payment was
15 selected other than the usual and customary charge
16 the Medi-Cal program obtained the prescription at a
17 discount?
18      MR. PAUL:  Objection to form.
19      THE WITNESS:  Yes.
20 BY MR. ROBBEN:
21   Q.  Okay.  Does it -- it obtained the
22 product for less than that pharmacy would have sold

Page 692

1  it to the general public; correct?
2    A.  Yes.
3    Q.  Okay.  So even if the basis of payment
4  was AWP, AWP minus 5 percent, let's say, if that
5  was less than usual and customary charge the
6  Medi-Cal program obtained that drug for less than
7  the pharmacy would have charged somebody else for
8  that product; correct?
9       MR. PAUL:  Objection to form.
10      THE WITNESS:  Yes.
11      MR. ROBBEN:  I have nothing else.
12      MR. PAUL:  You guys done with him for the
13 day?
14      MR. BUEKER:  (Nodding head)
15      MR. PAUL:  I had a couple of questions.
16      MR. ROBBEN:  Why don't you go ahead.
17      MR. PAUL:  Sure.
18 Mr. Gorospe --
19      MR. ROBBEN:  You want to trade places?
20      MR. BENNETT:  Yeah, why don't we.
21      MR. BUEKER:  I'll move out.
22         EXAMINATION

Page 693

1  BY MR. PAUL:
2    Q.  For the record I'm Nicholas Paul with
3  the California Department of Justice representing
4  the Medi-Cal program here in California in this
5  case and representing Mr. Gorospe in this
6  deposition.
7       Mr. Gorospe, counsel for Mylan and Dey,
8  Mr. Robben, asked you some questions at the
9  beginning of his time with you regarding a meeting
10 -- a discussion that you had with Mylan, his
11 client, in May 2007, I believe.
12      Do you recall the testimony?
13   A.  Yes.
14   Q.  And you provided responses to his
15 questions?
16   A.  Yes.
17   Q.  And if I recollect correctly, the
18 discussion with the Mylan representative included
19 discussion of AMPs; is that correct?
20   A.  Yes.
21   Q.  And the Mylan representative described
22 AMPs to you as a poor basis for reimbursement

Page 694

1  because they were unreliable; is that correct?
2       MR. ROBBEN:  Objection.
3  BY MR. PAUL:
4    Q.  Is that correct?
5    A.  Yes.
6    Q.  Do you recall -- did the Mylan
7  representative explain to you why he or she
8  believed that Mylan's AMP were unreliable?
9    A.  Yes, but I don't recall the content.
10   Q.  So you don't remember the reason for
11 their unreliability?
12   A.  Just -- I don't recall the specifics of
13 the conversation.
14   Q.  And I believe the representative also
15 expressed concern about using AMPs for
16 reimbursement because of the confidentiality of
17 AMP; is that correct?
18   A.  Yes.
19   Q.  Do you recall what the representative
20 stated to you regarding the confidentiality of
21 Mylan AMPs, any details?
22   A.  No, I don't recall the details.

Case 1:01-cv-12257-PBS   Document 6844-11   Filed 01/15/10   Page 4 of 4

Gorospe, Pharm. D., J. Kevin - Vol. II                         September 22, 2008
                              Sacramento, CA

Page 703

1  called "10 percent supplemental rebate"?
2      A.  Yes.
3      Q.  Do you have an understanding of when --
4         Under --
5         Well, what is -- what is "supplemental
6  rebate"?
7      A.  A "supplemental rebate" is a rebate
8  that's paid to -- to Medi-Cal that's in addition to
9  the federally mandated rebate.
10     Q.  And under what circumstances does
11 California receive a supplemental rebate?
12     A.  Generally it's due to a contract
13 negotiated between the Medi-Cal program and the
14 individual manufacturer for individual products.
15        In the context of these documents there
16 was a statutorily mandated 10 percent supplemental
17 rebate that ran from -- it would have been third
18 quarter 2004 through the end of fourth quarter
19 2006.
20     Q.  You said 2004 through 2006?
21     A.  I mean -- I mean 1994 through 1996.
22        I'm sorry.  I'm a little punch drunk

Page 704

1  right now.
2      Q.  All right.  So you've stated that there
3  was a statute -- a statutorily mandated
4  supplemental rebate program.
5         Did that apply to all manufacturers whose
6  drugs were reimbursed by California's Medi-Cal
7  program?
8         MS. BERWANGER:  Objection to form.
9         THE WITNESS:  Yes.
10        The statute required that the
11 manufacturer pay the 10 percent supplemental rebate
12 or all of its products were subject to prior
13 authorization, however, the statute did allow the
14 Director to exempt specific products for health
15 medical needs.
16 BY MR. PAUL:
17     Q.  Were there many such exemptions?
18     A.  I can recall only one.
19     Q.  So is it your testimony that between
20 January 1994 and December 1996 all drug
21 manufacturers were required to enter in to
22 supplemental rebate agreements with California?

Page 705

1      A.  No, July 1994.
2      Q.  July 19 --
3         Through?
4      A.  December 31st, 2000 -- I mean 1996.
5      Q.  So approximately an 18-month --
6      A.  That's correct.
7      Q.  -- period?
8         Did the legislation that imposed that
9  requirement sunset after December of 1996?
10        In other words, did it -- the requirement
11 went away legislatively -- or statutorily?
12        MS. BERWANGER:  Objection to form.
13        THE WITNESS:  Excuse me.
14        There was original legislation that
15 sunsetted in June 30th, 1996.  The Legislature
16 extendedthat sunset to December 31st, 1996, after
17 which the mandatory 10 percent went away.
18 BY MR. PAUL:
19     Q.  And after December 1996 and the
20 statutory requirement that we've been discussing
21 ended did California continue to enter in to
22 supplemental rebate contracts with any

Page 706

1  manufacturers?
2         MS. BERWANGER:  Objection to form.
3         THE WITNESS:  Yes.
4  BY MR. PAUL:
5      Q.  All manufacturers?
6      A.  No.
7      Q.  Which manufacturers -- if you know?
8      A.  I can't specifically name all the
9  individual manufacturers, largely the manufacturers
10 of single source drugs though.
11     Q.  So California -- so since December 1996
12 California's supplemental rebates have only been
13 entered in to for branded drugs?
14     A.  No.  There were two or three contracts
15 with companies for generic products.
16     Q.  For specific MDCs or --
17     A.  For a specific drug product.
18     Q.  And how many multi-source -- just to
19 confirm, would you tell us how many supplemental
20 rebate contracts since January 1997 have been
21 entered in to for generic drugs?
22     A.  I believe four.