# EXHIBIT K

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

--o0o--

IN RE PHARMACEUTICAL INDUSTRY

AVERAGE WHOLESALE PRICE

LITIGATION

_____/MDL No. 1456

THIS DOCUMENT RELATES TO:     Civil Action: 01-12257-PBS

State of California, ex rel.

Ven-A-Care v. Abbott

Laboratories, Inc., et al.,

_____/


--o0o--

THURSDAY, APRIL 23, 2009

--o0o--

VIDEOTAPED DEPOSITION OF

MIKE NAMBA

--o0o--


Reported By:  CAROL NYGARD DROBNY, CSR No. 4018

              Registered Merit Reporter

Namba, Mike                                                               April 23, 2009
                                         Sacramento, CA

Page 150

1  regard to customary prompt pay discounts extended
2  to drug wholesalers.
3       Do you see that?
4       A.  Yes.
5       Q.  Now, have -- would you agree that
6  Average Manufacturer Price more closely
7  approximates Average Acquisition Cost as compared
8  to AWP?
9       MR. FISHER:  Objection as to form.
10      THE WITNESS:  I believe so.
11 BY MS. McDEVITT:
12      Q.  How -- you know, please describe the
13 context in which you have worked with AMPs, you
14 know, to the extent you have.
15      A.  AMPs were part of the requirements
16 that we had to drug manufacturers as part of the
17 business proposal.
18      Again, that was a key component in the
19 calculation of cost.  So we require AMPs.
20      Q.  All right.  And in -- in what way was
21 AMP a key component in the calculation of cost?
22      A.  When we did contracts, the discounts

Page 151

1  were -- the business proposals were based off a
2  percentage of AMP.
3       Q.  Could you just explain --
4       Just take a step back.
5       The contracts that you are referring to
6  are in connection with California's Supplemental
7  Rebate Program; is that correct?
8       A.  Yes, correct.
9       Q.  And was -- from what time frame during
10 the course of your employment with DHS were you
11 working on the Supplemental Rebate Program?
12      A.  That would have been from the time I
13 went to Sacramento as a Pharmaceutical Consultant
14 2, so 2000 to 2006.
15      Q.  Okay.  And during that time frame it
16 -- California's Supplemental Rebate Program was
17 -- was a voluntary one; is that correct?
18      A.  What do you mean by "voluntary."
19      Q.  In order for a manufacturer to have
20 its drug covered by Medi-Cal did it have to
21 participate in the California Supplemental Rebate
22 Program?

Page 152

1       A.  No, because certain drugs were
2  required by federal statute to be covered,
3  examples, AIDS and cancer.
4       Q.  So what would the benefit of
5  participating in California's Rebate Program be
6  to a manufacturer?
7       A.  Formulary placement.
8       Q.  And what would that involve?
9       Would that mean it would be approved --
10 like there would be no preapproval required for
11 the drug, or is there some other -- benefit to a
12 manufacturer?
13      A.  Generally speaking, it would mean that
14 there's no prior approval required.
15      Q.  Prior approval?
16      All right.
17      Did you work -- could you explain a bit
18 sort of how the mechanics of your work on the --
19 on the Supplemental Rebate Program were?
20      I mean did you -- did you -- did
21 manufacturers contact you, or --
22      A.  I'm sorry.

Page 153

1       Q.  -- did you contact them?
2       I'm just trying to figure out a little
3  bit of context about how it all worked as a
4  matter of process.
5       A.  As a Pharmaceutical Consultant 2 or as
6  a Program Manager?
7       Q.  Well, let's start -- I mean, let start
8  --
9       You worked on the program as a
10 Pharmaceutical Consultant 2?
11      A.  Yes.
12      Q.  And what -- what did you do when you
13 had that title?
14      A.  Primarily my job was to conduct the
15 drug reviews going through the five criteria and
16 establishing whether or not a drug was
17 appropriate for a placement on the formulary.
18      Q.  And we talked a bit about that
19 earlier.  That was the five factors.
20      Now, when you -- when you changed jobs,
21 how did your responsibilities in respect to the
22 rebate program, California's rebate program,

                                                       39 (Pages 150 to 153)

Page 154

1  change?
2      A.  At that time had the responsibility
3  for the staff that would be conducting the
4  reviews, so at that point I was also the person
5  who would receive the requests in addition to the
6  formulary from manufacturers.
7      Q.  All right.  And so then did you
8  respond to manufacturers' requests for addition
9  to the formulary?
10     A.  Yes.
11     Q.  And what was a manufacturer required
12 to do to be added to the formulary?
13     A.  We had a list of criteria, and I'm
14 sorry I don't remember all of them, but they had
15 to submit all of the information that we
16 required.
17         We would place the petition in what was
18 called a "queue," and we would hold the drug for
19 no more than three months.
20         I had two criteria which would trigger
21 the review.  One was time, three months, or if we
22 reached -- I believe it was eight or 10 drugs,

Page 155

1  whichever one came first, at that point in time
2  the batch was assigned to one of my staff members
3  to begin the review.
4      Q.  Okay.  And -- and you may have already
5  testified to this, but manufacturers as -- as a
6  condition to being on the formulary provided
7  California with AMPs, A-M-Ps?
8      A.  Yes.
9      Q.  And what did you do with the AMPs?
10     A.  Well, as part of the calculation,
11 because, again, the contract would be a discount
12 based off the AMP, so that would determine the
13 California supplemental rebate.
14     Q.  And what was the discount off AMP?
15     A.  Variable.
16     Q.  Variable manufacturer-to-manufacturer?
17     A.  Drug-to-drug.
18     Q.  Drug-to-drug?
19     A.  And manufacturer-to-manufacturer.
20     Q.  Okay.  Did you have anything to do
21 with -- monitoring or processing of payments
22 under the -- the Federal Rebate Program?

Page 156

1      A.  No.
2      Q.  Okay.  That's -- do you have any
3  familiarity with the Federal Rebate Program?
4      A.  Yes.
5      Q.  What do you understand is involved in
6  -- in the Federal Rebate Program that started
7  with OBRA 90?
8      A.  Well, it was actually a colleague of
9  mine, Craig Miller's, shop.
10         He basically ran the Rebate Department,
11 but the Federal Reserve Rebate was part of OBRA
12 90.
13         Basically manufacturers agreed to pay a
14 certain percentage of rebate as defined by
15 statute.
16     Q.  Right.
17         And in connection with the Federal
18 Rebate did California receive information from
19 manufacturers?
20     A.  In regards to contracting?
21     Q.  In regards to California's calculation
22 of payment under the Federal Rebate Program, did

Page 157

1  it receive -- did it receive certain information
2  by which California could calculate the amount of
3  reimbursement it was owed from --
4      A.  Yes, California is required to be
5  provided that information.
6      Q.  Right.
7          And do you know what type of
8  information was provided?
9      A.  The -- the AMP, as I recall.
10     Q.  The -- do you know whether DHS ever
11 considered, you know, taking a step back from --
12 for the -- the immediate moment from the
13 Supplemental Rebate Programs?
14         Did DHS ever consider using AMP as a
15 reimbursement benchmark?
16     A.  I don't think I was privy to that
17 information.
18     Q.  Okay.  So you don't know one way or
19 another?
20     A.  No.
21     Q.  Do you know whether anyone at --
22         Well, strike that.