# EXHIBIT O



**GPhA**

(GENERIC PHARMACEUTICAL ASSOCIATION)

February 20, 2007

VIA HAND DELIVERY
Centers for Medicare and Medicaid Services
Department of Health and Human Services          FEB 2 0 2007
Room 445-G
Hubert H. Humphrey Building
200 Independence Avenue, SW
Washington, DC  20201

RE:   **Comments to the Medicaid Program; Prescription Drugs Proposed
          Rule [CMS-2238-P]**

Dear Sir or Madam:

        The Generic Pharmaceutical Association ("GPhA") is pleased to submit these
comments on the *Medicaid Program; Prescription Drugs Proposed Rule* (the "Proposed
Rule").[1]   GPhA shares the commitment of the Centers for Medicare and Medicaid
Services ("CMS") to implement the Medicaid Drug Rebate Program reforms mandated
by the Deficit Reduction Act of 2005 ("DRA") in ways that save money for the Medicaid
program, that are practicable for manufacturers, and that do not adversely impact the care
furnished to Medicaid recipients.   Accordingly, GPhA appreciates this opportunity to
respond to CMS' requests for comments on the Proposed Rule and to address some of
GPhA's own concerns about such rule.

        GPhA is an association representing the manufacturers and distributors of finished
generic pharmaceutical products, manufacturers and distributors of bulk active
pharmaceutical chemicals, and suppliers of other goods and services to the generic
pharmaceutical industry.   Together, the members of GPhA manufacture more than 90
percent of all generic pharmaceuticals dispensed in the United States.

        As the primary source of generic pharmaceuticals in the country, GPhA members
are committed to ensuring patient access to affordable prescription drugs.   In order to
ensure that this effort is not compromised, CMS should provide clear guidance and
impose only operationally feasible requirements on manufacturers in connection with
their calculation and submission of average manufacturer price ("AMP") and best price
data. For purposes of CMS' guidance, we urge the agency to speak with sufficient clarity
and specificity to ensure that manufacturers understand what is required of them. At the
same time, CMS must take *care* to ensure that compliance with these requirements is

---
[1] *71 Fed. Reg.* 77174 (Dec. 22, 2006).

LEGAL02/30262599v1



GPHA-CA 00866
CONFIDENTIAL

feasible for manufacturers, which necessitates that manufacturers actually have access to the information that they are required to report.

In light of these concerns, GPhA supports CMS' efforts to clarify the definitions of significant terms as well as the treatment of various types of sales and prices in manufacturer calculations.  However, we do have a number of recommendations for further clarification and request guidance for treatment of certain transactions when compliance with the proposed requirements is not operationally feasible for manufacturers.  This operational infeasibility arises because the regulations, as proposed, require manufacturers to make calculations using data to which they do not have access. Because a chief purpose of the Proposed Rule is to obtain uniformity and accuracy in manufacturers' AMP calculations, it is critical that manufacturers understand the requirements and have the ability to implement them.  We highlight this point throughout our letter.

Not only are AMP calculations skewed by this lack of data, but they are also easily misinterpreted.  This misinterpretation occurs when payers, State agencies, and consumers rely on AMPs to indicate actual prices available in the marketplace.  On the contrary, AMP represents only a snapshot in time (as discussed more fully below) of a complex set of sales records.  In fact, given the spectrum of variables impacting AMP, there will be a different AMP for the same sale depending on the timing of the AMP calculation.

While we acknowledge that CMS has statutory obligations concerning AMP, many of our comments stem from our recognition of the flaws inherent in AMP data and the dangers of AMP publication.   Accordingly we open our comments below by discussing our concerns with public disclosure.  We organize our remaining comments based on the corresponding sections in the Proposed Rule.

## Requirements for Manufacturers – Section 447.510[2]

### *Adverse Effects of Public Disclosure of AMP on the Medicaid Program*

In the Proposed Rule, CMS indicates its intention to publish not only monthly AMP data, but also quarterly AMP, on the agency's website.  As CMS implements this new publication provision, we strongly recommend that multiple source AMPs be reported to States and posted on the CMS website in an aggregated, industry-wide weighted average format that combines individual manufacturer AMPs into one AMP for each drug.

The public disclosure of AMP envisioned by the DRA is a concept modeled after the disclosure of Part B average sales price ("ASP").  The DRA requires that, "the Secretary shall provide on a monthly basis to States . . . the most recently reported

---

[2] As mentioned above, we are only addressing public disclosure of AMP here and will address other aspects of "Requirements for Manufacturers – Section 447.510" later in this letter.

LEGAL02/30262599v1

GPHA-CA 00867
CONFIDENTIAL

average manufacturer prices for single source drugs and for multiple source drugs and shall, on at least a quarterly basis, update the information posted on the website . . .".[3] Also, the DRA allows the Secretary to disclose "through a website accessible to the public," AMPs. However, the DRA does not provide further guidance to CMS regarding how to implement these publication provisions. Instead, the DRA leaves CMS considerable discretion concerning implementation of the public disclosure provisions.

Thus, CMS should exercise its discretion and report only the aggregated, industry-wide weighted average AMPs for multiple source drugs. Though it is unwise to make these data public at all, if CMS feels it must do so, then we recommend that the agency take into account the following important considerations when determining how to implement this publication requirement.

### 1.  *Limitations on the Usefulness of AMP*

AMP is mistakenly perceived as an indicator of market prices. However, it bears little relevance to market price. A variety of normal business activities cause periodic deflations or inflations of AMP from month-to-month. Some such activities include reduced sales of a product due to: backorders; temporary discontinuation of a product; or low demand from a manufacturer's current customer base. Fluctuations also occur in ordinary sales where there are timing differentials between the particular sales and the application of the associated customer credits, and swings in sales and credits that make AMPs particularly unreliable during the first few months of a product launch.

By way of example, one particular type of transaction producing such a timing differential is a sale with a market share rebate. Market share rebates are always processed on a lag because the manufacturer needs to obtain customer data reflecting the percent of prescriptions filled with product from a particular manufacturer compared with product filled from all manufacturers. The lag period can result in an additional 30 to 45 or more days until the transaction is fully closed, during which time the data are compiled by the customer and verified by the manufacturer for reasonableness.

Another source of timing differentials is the stocking adjustment, which is required when the manufacturer implements a price change. A stocking adjustment is processed on a lag because the manufacturer needs to obtain customer data reflecting the inventory levels for a product at a customer's distributor centers at the date the price was reduced by a manufacturer. The lag period, again, can result in 30 to 45 or more days after the applicable period after data are compiled by the customer and verified by the manufacturer for reasonableness. Stocking adjustment dollar values can be substantial depending on inventory levels at a customer and the amount of the price decrease. The impact on AMP is even greater because of the timing of the processed credit during the period when the manufacturer is billing a customer at the new price. For example, if the manufacturer had a price of $20 during January 2006 and lowered the price to $12 during February 2006, then an adjustment claim of $8 a bottle would be processed in March 2006 when the price is $12 and give the false impression via AMP of a net $4 price or

---

[3] DRA § 6001(b)(1)(B).

LEGAL02/30262599v1

GPHA-CA 00868
CONFIDENTIAL

less during March 2006 ($12 new price less the $8 adjustment for Jan 2006 inventory) depending on the customer inventory levels of the adjustment.

As these examples indicate, AMPs fluctuate regularly and sometimes significantly in the ordinary course of business. Moreover, even aside from any of these discount-related fluctuations, each product has at least three possible prices that may be included in AMP throughout its life cycle under ordinary conditions. These three prices are the following: (1) the price the wholesaler pays to the manufacturer, (2) the price the customer pays to the wholesaler, and (3) the price ultimately experienced by the manufacturer after chargebacks and other discounts in the ordinary course of business are taken into account. Because the erratic timing of transactions occurs within the ordinary course of business, AMPs published on the CMS website would not provide an accurate portrayal of the market. Using a "smoothing" mechanism to lag some of these transactions can help reduce some of the fluctuations in AMP (as discussed in more detail later in this letter) but cannot transform AMP into a reliable number.

## 2. *The Benefits of Generic Utilization*

Although the AMP changes are directed to Medicaid, the impact of those changes will be seen in other government health programs, such as Medicare. Analysts and policy makers routinely attribute the success of Medicare Part D to its emphasis on the use of generics, and they expect the importance of generic drugs in pharmaceutical cost management to grow over the next several years.

For example, on September 21, 2006, then-Administrator of CMS, Mark McClellan, MD, PhD, testified before the Senate that:

> The utilization of generic drugs has played an important role in the low costs and expected further cost reductions in the drug benefit. Due in part to increasing generic drug availability, strong competition in the prescription drug marketplace has led to slower rates of growth in overall prescription drug spending. Also, the availability of excellent coverage of generic drugs in the Part D drug benefit, as well as personalized information and support to help beneficiaries find out about how they can save using generics, have been important contributors to costs that are much lower than expected. Continuing to promote greater reliance on generics when available among Medicare beneficiaries is an important strategy to keep the new drug benefit affordable over the long term.[4]

As additional evidence, CMS itself just issued a press release acknowledging the role of generic drugs in reducing prescription drug costs for both consumers and payers nationwide.[5] In the course of implementing the switch from average wholesale price

---

[4] "Generic Drug Utilization in the Medicare Prescription Drug Benefit," Testimony before Senate Special Committee on Aging (Sept. 21, 2006), *available at* http://www.hhs.gov/asl/testify/t060921.html.
[5] "Generic Drug Utilization on the Rise: Consumers and Payers Benefit as More Americans Turn to Generics as One Way to Save Money and Improve their Health" (February 8, 2007), *available at* http://www.cms.hhs.gov/apps/media/press/release.asp?Counter=2081&intNumPerPage=10&checkDate=&

LEGAL02/30262599v1

GPHA-CA 00869
CONFIDENTIAL

("AWP") to AMP as a reimbursement benchmark, it is important that CMS not undercut the benefits that generic pharmaceuticals bring to health care cost containment by rushing to publicize generic manufacturers' most sensitive and proprietary pricing information.

### 3. *The Dangers of AMP Publication*

#### a. *Reduced Competition*

Unlike single source drugs where the manufacturer has wide latitude to establish and maintain the price, many generic drugs are viewed as commodities to be purchased at the lowest possible price. While competition is usually healthy, publishing manufacturer-specific AMPs for generic drugs has the potential to do more harm than good by creating a never-ending downward price spiral. Such a dynamic will result in less competition in the marketplace as generic manufacturers cease to offer products that are no longer profitable within these pricing dynamics. With less competition, the end result may be higher costs for CMS for some generic products due to fewer generic choices. Publication of only aggregated, industry-wide weighted average AMPs for multiple source drugs will mitigate against this outcome.

#### b. *Anticompetitive Concerns*

Publishing manufacturer-specific AMPs, moreover, raises significant anticompetitive concerns. As GPhA observed in its June 9, 2006 letter to Dr. McClellan, publication of aggregate data such as an industry-wide average is supported by long-standing interpretations of the Sherman Act, which condemn conduct that could facilitate anticompetitive collusion among competitors. In the health care industry in particular, the federal antitrust enforcement agencies have consistently recognized the potential anticompetitive impact of the sharing of specific companies' internal price-related information.[6]  GPhA is concerned that, as a simple matter of economics, publication of prices in such manner will lead to less competition and greater uniformity in prices. It is not that companies will act improperly, but that with greater public information, prices will just naturally tend to stabilize as manufacturers react rationally to the information available.

---

checkKey=&srchType=&numDays=3500&srchOpt=0&srchData=&keywordType=All&chkNewsType=1
%2C+2%2C+3%2C+4%2C+5&intPage=&showAll=&pYear=&year=&desc=&cboOrder=date.
[6] *See, e.g., In re Mich. State Med. Soc'y,* 101 F.T.C. 191, 270 (1983) ("There is ... some inherent danger in allowing any collective dialogue with third party payers on questions directly related to reimbursement amounts or policies."); *see also* Federal Trade Commission, Staff Advisory Opinion from Arthur N. Lerner, Assistant Director, to Dennis L. Dedecker, D.D.S., Secretary, Utah Society of Oral & Maxillofacial Surgeons (February 8, 1985) ("Depending upon the purpose or effect of the conduct, dissemination of price information by an organization of competitors can be found to constitute or facilitate an unlawful price agreement."); *see also* Department of Justice/ Federal Trade Commission, *Statements of Antitrust Enforcement Policy in Health Care* (August 1996).

LEGAL02/30262599v1

GPHA-CA 00870
CONFIDENTIAL

### c. *Confusion Among Purchasers and Payers*

Yet another concern regarding publication of AMPs is the confusion that published prices would cause purchasers and payers. For a variety of reasons, as discussed above, many of the published prices would not be accurate indicators of the market. In addition, many of these prices would not be widely available. For instance, a manufacturer that chooses to sell a product to a single entity, regardless of volume, at a discounted price would have an atypically low AMP. A manufacturer with a large proportion of sales to large volume purchasers at discounted prices (based on the purchase of bulk package sizes) could also have a very low AMP. In both these cases, manufacturers may not be able to make these prices available to all purchasers.

Because purchasers and payers viewing these published prices would not know the reasons for the low AMPs, they might mistakenly think the prices are widely available and that the prices they have paid are unreasonable in comparison. Moreover, all the published prices – even those that are not unusually low or temporarily deflated – would represent wholesale prices and not prices to the ultimate consumers, which would include dispensing fees and wholesaler/distributor markup fees. Thus, even published prices that were widely available as wholesaler prices would seem low to certain purchasers, who would likely be unaware of the nature of the published prices. Month-to-month fluctuations in manufacturers' AMPs (for reasons discussed above) would also be likely to confuse customers who were unfamiliar with the many complicated transactions in pharmaceutical manufacturing and sales.

### 4. *Proposed Partial Solution*

In light of these concerns, we recommend that CMS do the following:

- *Publish only aggregated, industry-wide weighted average AMPs.* CMS should publish only the aggregated, industry-wide weighted AMPs for multiple source drugs.

- *Delay disclosure of AMPs until after adequate compliance period.* CMS should not disclose AMPs until the rule is finalized and manufacturers have had sufficient time to come into compliance with its requirements. This compliance period should last at least 180 days from the time the Final Rule is issued. Given manufacturers' need for additional clarity on many key issues in the Proposed Rule (discussed herein), manufacturers will not be able to publish consistent AMP data until CMS makes the required clarifications and manufacturers have time to absorb the information and implement the required changes. Before these things happen, different manufacturers may be employing disparate assumptions to calculate their respective AMPs, which will result in variability across AMPs and prevent meaningful comparison of pricing data across manufacturers. If, however, CMS waits a sufficient amount of time after the issuance of the Final Rule to publish AMPs, then there will be at least some assurance that all

LEGAL02/30262599v1

GPHA-CA 00871
CONFIDENTIAL

stakeholders are calculating AMP in the same way. This will, in turn, ensure that the comparison of manufacturer AMPs is a fair one.

- *Allow a testing period for AMP data.* As discussed later in this letter, CMS should provide for a 90-day testing period, after the 180 day compliance period, during which AMP information may be used for research and verification purposes only. CMS should indicate that AMP data may not be used for reimbursement purposes during this testing period, since manufacturers will need time to gain experience with the new system.

- *Allow refiling of monthly AMPs.* As highlighted later in this letter, we urge CMS to allow manufacturers to refile monthly AMPs for up to three years after initially submitted, as is currently allowed with respect to quarterly AMP data. This allowance is needed in recognition of the complexity of AMP calculations and of the timing issues surrounding the availability of the data needed in these calculations.

- *Provide a disclaimer with any public disclosure AMP.* On the CMS website, CMS should indicate the limitations on AMP data and advise purchasers and payers that these data may not necessarily reflect the price that is available to all consumers. Such a disclaimer could help reduce purchaser and payer confusion.

## Definitions – Section 447.502

### 1.  *"Dispensing Fee"*

Currently, individual States determine the dispensing fees paid to pharmacies. Under the Proposed Rule, the term "dispensing fee" would be defined similarly to how it is defined under the Medicare Part D program. CMS states that, "[w]e are defining this term in order to assist States in their evaluation of factors in establishing a reasonable dispensing fee to pharmacy providers. We note that while we propose to define this term, we do not intend to mandate a specific formula or methodology which the States must use to determine the dispensing fee."[7] Thus, there is no requirement in the Proposed Rule that States must pay a fair dispensing fee that accurately reflects the actual costs associated with providing the full range of pharmacy services.

However, with the potential reduction in generic drug reimbursement that will be triggered by the switch to AMP, dispensing fees become increasingly important in ensuring that pharmacies are paid fairly for filling generic prescriptions. This will influence the extent to which pharmacies can promote generic utilization. As discussed in the previous section, generic utilization has been a key force behind the reduction in prescription drug costs for consumers and for the government. To preserve these cost-saving opportunities, CMS must keep in mind the need to incentivize generic usage over

---

[7] 71 *Fed Reg.* 77176.

LEGAL02/30262599v1

GPHA-CA 00872
CONFIDENTIAL

brand usage when making changes to the Medicaid Drug Rebate Program.  To ensure continued and aggressive dispensing of generic products by Medicaid, CMS should encourage States to incentivize generics through State program releases that advocate fair dispensing fees.

### 2. *"Manufacturer"*

GPhA is concerned that the proposed definition of the term "manufacturer" may unintentionally affect the rebate reporting and payment obligations of some entities that do not own a particular National Drug Code ("NDC") but only produce a drug under license from another company.  The proposed definition states that "manufacturer" will include any "entity that does not possess legal title to the NDC," in the case of "private labeling arrangements."[8]  Under current Medicaid rebate rules, only manufacturers who legally possess the NDC report and pay rebates on those drugs.[9]  Whereas the definition of "manufacturer" in the rebate statute is broad enough to cover both parties in a private labeling relationship,[10] the sample rebate agreement clarifies that the term "manufacturer" refers to "the entity holding legal title to or possession of the NDC number for the Covered Outpatient Drug."[11]

The NDC refinement in the rebate agreement is an important added directive for determining who has the rebate reporting and payment obligation for a private labeled product.  We are concerned that the Proposed Rule's definition of "manufacturer" could be interpreted as an intention by CMS to change the rebate agreement's definition and to require that the party without legal title to the NDC also report and pay rebates.  In that case, a manufacturer could potentially be required to report on and pay a rebate for Medicaid sales of someone else's product – an outcome that would be unjust and irrational.[12]  The rebate reporting and payment obligation should be on the NDC owner/manufacturer, as it is under the current system.

We believe that CMS' purpose in the Proposed Rule was to ensure that these private label sales be included in the AMP computation – not to require that both parties report and pay rebates.  Thus, to ensure the proper placement of this obligation on the NDC owner, we recommend that CMS revise the definition of "manufacturer" in the Proposed Rule to clarify that any manufacturer that has the NDC would have to report and pay rebates on the drug, while a manufacturer that does not have an NDC, but rather

---

[8] 71 *Fed. Reg.* 77196.

[9] In other words, if Manufacturer A produces a drug for Manufacturer B, and B owns the NDC, then B has the rebate obligation.

[10] For purposes of the rebate statute, the relevant language is the following: "(5) MANUFACTURER.— The term "manufacturer" means any entity which is engaged in— . . . (B) in the packaging, repackaging, labeling, relabeling, or distribution of prescription drug products."  Social Security Act § 1927(k)(5). By using the term "engaged in," this definition could encompass both the entity that owns the NDC and the entity that is under contract to produce the drug.

[11] "Rebate Agreement between the Secretary of Health and Human Services and the Manufacturer Identified in Section XI of this Agreement," *available at*
http://www.cms.hhs.gov/MedicaidDrugRebateProgram/downloads/rebateagreement.pdf.

[12] Using the example from footnote 9, it would be unfair to require Manufacturer A to pay rebates on Manufacturer B's product.

LEGAL02/30262599v1

GPHA-CA 00873
CONFIDENTIAL

produces a drug directly on behalf of an NDC-holder for retail sales, will not be obligated to report and pay rebates on the drug (as the NDC-holder is already reporting on and paying these rebates).

## Determination of Average Manufacturer Price – Section 447.504

In response to the Proposed Rule's discussion of AMP calculation, we have several requests for clarification and recommendations to ensure that manufacturers can actually implement the requirements CMS imposes. Many of these requests and recommendations are general concerns, applicable to every aspect of the proposed calculation of AMP. For this reason, we have organized the comments below such that we present our overarching concerns first. We make other suggestions item-by-item in this section after we present the broad areas of concern.

### A. *Broad Concerns*

#### 1. *Calculation of AMP*

##### a. *Need for Operational Feasibility*

Our first broad concern is that the requirements for calculating AMP be operationally feasible for manufacturers. An understanding of what is operationally feasible requires familiarity with the typical distribution chain for generic drugs. This pathway works as follows: generic pharmaceutical manufacturers distribute their products directly to warehousing chain pharmacies, mail order pharmacies, various managed care entities, wholesalers and distributors (who themselves resell to non-warehousing chain pharmacies, independent pharmacies, hospitals, clinics, etc.). While manufacturers are aware of the location of their drug product after the first sale, they frequently have no way of knowing where their products end up after that first purchaser resells or redistributes the product.

One example of the many situations in which manufacturers lack access to information arises with manufacturer sales to hospitals. The Proposed Rule requires manufacturers to include sales to hospitals when the drugs are used in the outpatient setting but to exclude these sales when the drugs are used in the inpatient setting.[13] However, when a manufacturer sells to a hospital, the manufacturer will not know whether the hospital ultimately uses the drugs in the outpatient context or in the inpatient context, since purchases for all hospital needs are consolidated to obtain the best possible discount. Manufacturers, therefore, are unable to ensure that their AMP calculations include only those sales in which the drugs are ultimately used in the hospital's outpatient department.

Manufacturers also experience a lack of information on downstream sales when selling to entities including, but not limited to, wholesalers, mail order pharmacies, and

---

[13] 71 *Fed. Reg.* 77197.

- 9 -

GPHA-CA 00874
CONFIDENTIAL

pharmacy benefit managers ("PBMs"). The AMP data reported will be much more complete and consistent if CMS imposes requirements that are clear and operationally feasible. The agency must be careful to formulate these requirements in consideration of which information is in fact available to manufacturers. If manufacturers are required to discriminate among particular types of sales but do not have access to the information that would enable them to do so, then manufacturers will be unable to comply with the requirements through no fault of their own.

### b. Need for Clarity

In addition to operational feasibility, we are also concerned about the problems related to ambiguous definitions of key concepts related to the AMP calculation. Imprecise definitions could lead to inconsistent treatment of various transactions, so we recommend that CMS clearly indicate what is meant by certain terms. In particular, we request that CMS unambiguously define the following:

- "Repackagers/relabelers";

- "Nursing home pharmacies";

- "PBMs"/"Managed care organizations" ("MCOs").

Manufacturer compliance with the new mandates for AMP calculation necessitates clear and meaningful guidance from CMS.

### 2. Need for Consistency with Medicaid and 340B Programs

Another issue of particular importance to GPhA is the need for consistency between the Medicaid and 340B Drug Pricing Programs. In order to have drugs be Medicaid-covered, manufacturers must also participate in the Section 340B Drug Pricing Program. Under the 340B program, manufacturers must offer drugs to certain nonfederal entities at prices that do not exceed AMP decreased by the Medicaid rebate percentage (the "340B ceiling price") as specified in the statute.[14] Participation in Medicaid, thus, requires that manufacturers submit AMPs for the Medicaid Drug Rebate Program and for the 340B Drug Pricing Program.

While AMP is used in both programs, the Proposed Rule's definition of AMP will cause AMP for Medicaid purposes to differ from AMP for 340B purposes. In its January 30, 2007 letter to pharmaceutical manufacturers, the Office of Pharmacy Affairs ("OPA") clarified the definition of AMP in 340B ceiling price calculations ("OPA letter"):

Although the Deficit Reduction Act amended the statutory definition of Average Manufacturers Price for purposes of Medicaid by removing the deduction for customary prompt payment discounts, Section 340B(c) of the Public Health

---

[14] SSA § 1927(k).

LEGAL02/30262599v1

GPHA-CA 00875
CONFIDENTIAL

Service Act states, "Any reference in this section to a provision of the Social Security Act shall be deemed to be a reference to the provision as in effect on the date of the enactment of this section." Accordingly, manufacturers that have signed pharmaceutical pricing agreements (PPAs) must continue to calculate 340B ceiling prices so that the calculated price continues to reflect a reduction for any prompt payment discounts.[15]

Thus, while AMP is used in both the 340B and the Medicaid program, the calculation for each program will differ at least in relation to the treatment of customary prompt pay discounts.

While this difference is required by statute, other differences between the two calculations that are not statutorily mandated could be eliminated, thereby reducing manufacturers' administrative burdens. In recognition of the magnitude of these burdens, OPA stated in the letter: "We welcome comments from all parties about how to best implement the 340B Program requirements in the wake of changes in related areas impacted by the DRA. Our goal would be to minimize the burden on pharmaceutical manufacturers in submitting the required data."[16]

Operationally, the differences between the 340B and Medicaid programs will require manufacturers to move from 16 to 20 calculations annually. This move does not simply add four basic calculations to manufacturers' annual compliance requirement but, rather, requires a near-complete reprogramming of the data maintenance system for each reporting period. Because the same server cannot support hundreds of calculations per month or per quarter – as would be required to comply with both programs – manufacturers' submissions to at least one program could necessarily be delayed. Thus, the issue is not simply one of an onerous burden on manufacturers but is instead one of operational impracticability.

In accordance with the sentiment of the OPA letter, we recommend that the methodology for calculating AMP be as consistent as is statutorily possible across the Medicaid and PHS/340B programs. Calculation, maintenance, and reporting of differing AMPs for the two programs would create an undue burden for manufacturers as well as unnecessary confusion for organizations involved in the delivery of health care services. Moreover, duplicative reporting would waste time and energy within the federal programs. We ask that CMS coordinate its approach with OPA to prevent these problems.

The subsections above in this comment on AMP calculation address broad concerns that underlie all our AMP comments. Thus, while the remainder of this section addresses several specific elements of the AMP calculation, our general concerns still apply.

---

[15] Jimmy Mitchell, Director of OPA, "Dear Pharmaceutical Manufacturer Letter Clarifying the Definition of Average Manufacturer Price" (January 30, 2007), *available at* http://www.hrsa.gov/opa/pharm-mfg-ltr013007.htm.
[16] *Id.*

LEGAL02/30262599v1

GPHA-CA 00876
CONFIDENTIAL

**B.** *Specific Concerns on Particular Sections*

### 1. *Customary Prompt Pay Discounts*

The Proposed Rule states that a "customary prompt pay discount" will be defined as "any discount off the purchase price of a drug routinely offered by the manufacturer to a wholesaler for prompt payment of purchased drugs within a specified time."[17]  There are significant uncertainties, however, in this definition.  Therefore, GPhA respectfully suggests that CMS clarify what is meant by "routinely offered" and specify the criteria that manufacturers should use to determine what is "routine."

In addition, we request that CMS address whether a customary prompt pay discount could be considered a manufacturer's "routinely offered" prompt pay discount if:

- It differs across customers?

- It changes over the life cycle of a product? (e.g., the prompt pay discount offered at the introduction of the product differs from the prompt pay discount offered for the remainder of the product's life cycle.)

- It is different across products?

We ask that CMS provide guidance that would address these scenarios.

### 2. *State Pharmaceutical Assistance Program ("SPAP") Sales and Rebates*

CMS proposes to include all SPAP sales and rebates in AMP to the extent that these sales are made to the retail pharmacy class of trade.  This proposal conflicts with the treatment required under previous CMS Manufacturer Release #68, which instructs manufacturers to distinguish between "qualified" and "unqualified" SPAPs, based on criteria listed in such release.[18]  Pursuant to the release, only sales to qualified SPAPs are excluded from AMP, whereas sales to unqualified SPAPs are included in AMP.  We request that CMS revisit this program release to address this inconsistency.

As an additional matter, if CMS ultimately decides to include all SPAP sales and rebates, then the agency should provide guidance regarding the method of inclusion.  Specifically, CMS should specify over what ratio of sales manufacturers are to apply SPAP rebates, since the data available to manufacturers do not indicate the particular sales to which the rebates apply.

---

[17] 71 *Fed. Reg.* 77196.
[18] Medicaid Drug Rebate Program Release No. 68 (April 1, 2005).

- 12 -

LEGAL02/30262599v1

GPHA-CA 00877
CONFIDENTIAL

**Determination of Best Price – Section 447.505**

Manufacturers bear substantial administrative burdens in complying with Medicaid Drug Rebate Program requirements for data submission and retention. As mentioned above, these burdens are increased in light of the DRA's change to the definition of AMP for Medicaid purposes, since this definition now differs from the definition of AMP used in the 340B program. These burdens are also increased by new reporting and retention requirements imposed on manufacturers by the Proposed Rule. In order to reduce manufacturers' already significant administrative burdens, we recommend that CMS maintain as much consistency as possible between the treatment of underlying transactions in best price and in AMP calculations.

**Authorized Generic Drugs – Section 447.506**

In the Proposed Rule, CMS proposes to "require the NDA holder to include sales of the authorized generic product marketed by the secondary manufacturer or the brand manufacturer's subsidiary in its calculation of AMP and best price."[19] CMS has thus indicated that brand manufacturers' rebates must be calculated based on the sales of both the branded product and the authorized generic product. We understand that this requirement entails that generic manufacturers must provide their authorized generic drug information to the branded company holding the NDA. To avoid any potential antitrust implications that this exchange of information could raise, we request that CMS make the Federal Trade Commission ("FTC") aware of this requirement before implementing it.

**Requirements for Manufacturers – Section 447.510**

As noted at the beginning of these comments, the most important issue raised by the Proposed Rule for manufacturers is the public disclosure of AMP, and so we discussed this requirement at the outset rather than here with our other comments relating to this section of the Proposed Rule. Below we present the rest of our comments concerning the proposed requirements for manufacturers.

### 1. *Time to Implement Operational Changes*

Complex administrative system changes and additions will be needed to implement the new definitions and reporting requirements in the Final Rule. However, the proposed effective dates do not create adequate time to design and operationalize these changes. The certification required by the Proposed Rule, and the consequences of inaccurate certification, necessitate the utmost accuracy and reliability in the reporting of manufacturers' data. The revised definition of AMP requires new data fields to be created and substantial reprogramming of sales reporting systems that must be tested and validated. Manufacturers must also ensure that their government-pricing calculation is

---

[19] 71 *Fed. Reg.* 77184.

LEGAL02/30262599v1

GPHA-CA 00878
CONFIDENTIAL

established accurately and that the system is compliant with Sarbanes-Oxley requirements. In light of these major changes, we request that CMS allow at least 180 days after issuance of the Final Rule for manufacturers to implement all reporting changes created by the Proposed Rule.

### 2. Use of 12-Month Rolling Average Smoothing Mechanism

In the Proposed Rule, CMS discussed two possible methodologies for "smoothing" monthly data: (1) 12-month rolling average estimates of all lagged discounts and (2) three-month rolling average estimates of all lagged discounts. CMS has invited comments on the appropriate methodology for calculating monthly AMP.[20] In response to the invitation for comments, we recommend that CMS allow manufacturers the choice of whether or not to use a smoothing mechanism but specify that smoothing must be done, if at all, using an annual period.

We support smoothing with an annual period rather than with a three-month period because the longer time period allows the AMPs to be less volatile. Smoothing has produced positive results in ASP pricing for Medicare Part B drugs, particularly in Healthcare Common Procedure Coding System ("HCPCS") codes that apply to multiple source products. Generic products are particularly well-suited for smoothing, due to the need to account for, in AMP, discontinued products, backordered products, and the large dollar value of chargebacks customarily processed for wholesaler sales for generic products. As a result, generic manufacturers should be encouraged (but not required) to use annual smoothing in the AMP calculation, in order to accommodate transaction timing and minimize fluctuations.

### 3. Timeline for Use of Monthly AMPs

When CMS implemented ASP pricing for Medicare Part B drugs, the agency provided manufacturers with a six- to nine- month "test" period. During this period, manufacturers could gain an understanding of the new requirements and make the necessary system-level adjustments to implement these requirements to ensure accurate reporting. Moreover, CMS guaranteed that it would not use ASP for reimbursement during this "test" period.

Similarly, when CMS began the implementation of the new Medicaid drug pricing requirements of the DRA, the agency recognized the need to allow extra time for manufacturers to come into compliance with the new requirements. While the DRA required publication of AMPs as of July 2006, CMS used its discretion to make these data available at that date only to the States and not to the public. According to then-Administrator Mark McClellan, the agency delayed public disclosure for the following reasons:

> We know that an imprecise definition of AMP, especially if publicly posted, will be misleading to state Medicaid directors and others who will use this as a

---

[20] 71 *Fed. Reg.* 77186.

- 14 -

LEGAL02/30262599v1

GPHA-CA 00879
CONFIDENTIAL

reference point for setting pharmacy reimbursement. . . Consequently, I am announcing today that CMS will not publicly release the current AMP figures. They just aren't the right numbers to use.[21]

In the press release accompanying the publication of the Proposed Rule, CMS indicated its intention to begin making AMP data available to States and to the public in late spring.[22] However, the same concerns expressed by Dr. McClellan in May 2006 still apply, since manufacturers have not been afforded sufficiently clear guidance and sufficient time to operationalize the new requirements to guarantee that AMP submissions will be accurate and consistent by late spring.

For these reasons, we recommend that CMS follow the ASP model when implementing AMP pricing for Medicaid drugs. To this end, as mentioned above, CMS should provide a 180 day period after the Final Rule is published for manufacturers to come into compliance with the new requirements. Further, CMS should indicate that the first reporting period will commence 90 days after the end of this implementation period. Only at the end of this reporting period could State Medicaid agencies rely on AMPs for reimbursement purposes. Finally, in addition, we request that manufacturers be permitted to refile monthly AMPs for up to three years after initially submitted, as is currently allowed with respect to quarterly AMP data.

Such allowances by the agency would not only treat manufacturers fairly in light of the burdensome changes required by the rule, but would also help ensure that data were not used for reimbursement until they were likely to be accurate and consistent across manufacturers. We suggest that CMS make these timing issues clear by publishing a timeline indicating how new monthly AMPs will be used over time.

### 4. *Net Unit Reporting*

The government needs a program in place to determine products per manufacturer that are not widely available to the retail class of trade. For ASPs, manufacturers are currently required to submit net units shipped (excluding returns) for each product so CMS will have some assistance in determining if a product is widely available. We recommend that the same method be adopted for AMPs. However, because the net unit number alone does not indicate whether a product is widely available, the government will also need to consider additional factors, such as whether the product is available from several wholesalers. Nonetheless, net unit reporting is a good tool to be used as part of this process of determining widely available products, and it should be required of manufacturers in their AMP submissions. Moreover, the net unit information could also be used for weighting, as required for the rebate calculation process. Importantly, CMS

---

[21] Remarks of Mark B. McClellan, MD, PhD, as delivered to the NCPA 38th Legislation and Governance Conference (May 22, 2006).

[22] CMS, "Medicaid Drug Pricing Regulation Proposed" (December 15, 2006), *available at* http://www.cms.hhs.gov/apps/media/press/factsheet.asp?Counter=2062&intNumPerPage=10&checkDate= &checkKey=&srchType=&numDays=3500&srchOpt=0&srchData=&keywordType=All&chkNewsType= 6&intPage=&showAll=&pYear=&year=&desc=&cboOrder=date.

LEGAL02/30262599v1

GPHA-CA 00880
CONFIDENTIAL

must keep in mind that this information is confidential and, therefore, cannot be posted on the agency's website or otherwise released to the public.

### 5. *Record-Keeping Requirements*

In the Proposed Rule, CMS proposes the requirement that manufacturers retain "records used in calculating the customary prompt pay discounts and nominal price discounts reported to CMS."[23] To provide adequate guidance to manufacturers concerning implementation of the new record retention requirements, CMS should specify what prompt pay information is needed for retention.

### 6. *Reporting Requirements*

In the Proposed Rule, CMS stipulates that customary prompt pay discounts are to be reported as an aggregate dollar amount for each reported NDC-9, so as to include discounts extended to all purchasers in the rebate period.[24] However, the new file formats that have been provided to manufacturers from CMS for quarterly reporting do not include specifications for reporting customary prompt pay aggregate dollars. We ask that CMS include a field for aggregate prompt pay dollar amount in the file used for quarterly price submissions, or that CMS expressly allow manufacturers to submit aggregate prompt pay dollar amounts for each NDC-9 in a separate file with format determined by each manufacturer.

CMS also proposes to require manufacturers to report revisions to customary prompt pay discounts and nominal prices reported to CMS.[25] From this statement alone, it is unclear whether manufacturers need to do this reporting on an accrued basis or on a cash basis (i.e. whether manufacturers must report what they offered to customers or what their customers actually paid). CMS should specify that manufacturers report what they offered to customers, as this is the only information manufacturers are able to report.

### 7. *Certification Requirement*

In the Proposed Rule, CMS proposes to add a requirement that manufacturers must certify the pricing reports they submit to CMS. CMS proposes that this certification must be made by "the manufacturer's Chief Executive Officer (CEO), Chief Financial Officer (CFO), or an individual who has delegated authority to sign for, and who reports directly to, the manufacturer's CEO or CFO."[26] We recommend that this requirement be altered slightly to allow an individual who reports directly or *indirectly* to the CEO or CFO to provide the certification. This flexibility is needed because a company's CEO or CFO (or their direct report) is not always available to review and certify data reports on a monthly basis.

---

[23] 71 *Fed. Reg.* 77185.
[24] 71 *Fed. Reg.* 77198.
[25] 71 *Fed. Reg.* 77185.
[26] 71 *Fed. Reg.* 77186.

- 16 -

LEGAL02/30262599v1

GPHA-CA 00881
CONFIDENTIAL

### 8. *Negative AMPs*

The Proposed Rule requires manufacturers to report AMPs on a monthly basis, whereas these data were formerly submitted only quarterly. One consequence of the new monthly AMP reporting requirements is a potential increase in the number of negative AMPs. CMS should clarify that negative AMPs should be reported.

## Upper Limits for Multiple Source Drugs – Section 447.514

### 1. *Definition of "Formulation"*

Pursuant to the DRA, the Proposed Rule stipulates that upper limits are to be placed on multiple source drugs when there are two or more therapeutically and pharmaceutically equivalent formulations, regardless of whether all additional formulations are rated as such.[27] For purposes of determining which multiple source drugs require upper limits, the term "formulation" should be clarified to mean products of the same form and route of administration (i.e., tablet to tablet, controlled release tablet to controlled release tablet, liquid to liquid, etc.). It would not be appropriate for a liquid or controlled release tablet to be set at the same level of reimbursement as a standard tablet formulation. Such a comparison is unreasonable as the products will have different prices and be sold separately. We believe this is the intent of the Proposed Rule.

### 2. *Availability of Generics at the FUL Price*

CMS proposes "additional criteria to ensure that a drug is nationally available at the FUL price and that a very low AMP is not used by us to set a FUL that is lower than the AMP for other therapeutically and pharmaceutically equivalent multiple source drugs."[28] Specifically, CMS proposes to set the FUL based on the lowest AMP that is not less than 30 percent of the next highest AMP for that drug. CMS solicited comments regarding whether 30 percent is an appropriate measure to use.

While we support the intent of the proposed methodology, the 30 percent rule alone does not accomplish the stated objective of preventing outliers from determining the FUL. We are unaware of any evidence or experience, and CMS has offered no data, supporting the theory that products with AMPs that are 29 percent of the next highest AMP should qualify as outliers, but that those with AMPs that are 30 percent of the next highest AMP are routinely and nationally available. However, we believe the 30 percent rule, when used in conjunction with an aggregate, industry-wide weighted average AMP (as discussed below), is a good place to start. Over time, we request that CMS revisit the 30 percent rule to assess whether the accumulated AMP data support setting the threshold at a different percentage. Nonetheless, because there is nothing special about 30 percent, the use of this number alone as a threshold would not guarantee that outliers were removed from the FUL calculation.

---

[27] *Id.*
[28] 71 *Fed. Reg.* 77188.

- 17 -

GPHA-CA 00882
CONFIDENTIAL

To accomplish this intent of "ensur[ing] that the FUL will be set at an adequate price to ensure that a drug is available for sale nationally," we would recommend using the 30 percent rule in conjunction with an aggregate, industry-wide weighted average AMP.[29]  When calculating FULs, CMS should first remove any AMPs less than 30 percent (or whatever threshold is later adopted) of the next highest AMP, and then from this set of AMPs, calculate the aggregate, industry-wide weighted average AMP. This two-step process would ensure that the resulting FUL represents a nationally available price, not an arbitrary number.

### 3. *Reporting of AMPs at the NDC Nine-Digit Level*

The currently reported AMP is based on the nine-digit NDC, combining all package sizes of the drug into the same computation.  CMS proposed to continue this policy and solicited comments on the alternative approach of using 11-digit NDC to calculate AMP as well as comments on the merits of using both approaches in calculating AMP for the FUL calculation.[30]  We do not find a compelling reason to move away from the nine-digit NDC calculation, and we are concerned that significant system changes would be required to support 11-digit reporting.  Therefore, we favor the proposed AMP reporting at the nine-digit level for FUL computation as well as rebate purposes.

* * *

Thank you for the opportunity to submit these comments.  GPhA looks forward to working with CMS while these provisions of the Proposed Rule are being finalized. Please do not hesitate to contact us if you have any questions or concerns.

Sincerely,

Kathleen D. Jaeger

---

[29] 71 *Fed. Reg.* 77187.
[30] *Id.*

LEGAL02/30262599v1

GPHA-CA 00883
CONFIDENTIAL