# EXHIBIT P

```
                    NO. D-1-GV-07-001259

THE STATE OF TEXAS            ) IN THE DISTRICT COURT
                              )
ex rel.                       )
    VEN-A-CARE OF THE         )
    FLORIDA KEYS, INC.,       )
                              )
        Plaintiffs,           )
                              )
VS.                           ) TRAVIS COUNTY, TEXAS
                              )
SANDOZ, INC. f/k/a GENEVA     )
PHARMACEUTICALS, INC.,        )
NOVARTIS PHARMACEUTICAL       )
CORP., NOVARTIS AG, EON       )
LABS, APOTHECON, INC.,        )
                              )
MYLAN PHARMACEUTICALS, INC.,  )
MYLAN LABORATORIES, INC.,     )
UDL LABORATORIES, INC.        )
                              )
TEVA PHARMACEUTICALS USA,     )
INC., f/k/a LEMMON            )
PHARMACEUTICALS, INC.,        )
COPLEY PHARMACEUTICALS,       )
INC., IVAX PHARMACEUTICALS,   )
INC., SICOR PHARMACEUTICALS,  )
INC., TEVA NOVOPHARM, INC.,   )
and TEVA PHARMACEUTICAL       )
INDUSTRIES, LTD.              )
        Defendants.           ) 201ST JUDICIAL DISTRICT
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

FRANK STIEFEL

November 13, 2008

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Cynthia Vohlken, CSR
(512) 364-8166

Page 38

1  Bristol-Myers Squibb --
2       MR. GALLAGHER: Objection, form.
3    Q. (BY MR. RIKLIN) -- in connection with that
4  transaction?
5    A. The marketing rights to the Apothecon product
6  portfolio.
7    Q. Okay.
8    A. And when I say that, I mean the generic
9  products, not non-promoted brand products that had
10 been in the Apothecon portfolio.
11   Q. Okay. So the generic products -- Apothecon's
12 generic product line was acquired by Geneva or the
13 rights to -- to sell and market those products were
14 acquired by Geneva in -- on or about the end of 2000?
15      MR. GALLAGHER: Objection, form.
16   A. Yes, I would say that's...
17   Q. (BY MR. RIKLIN) Now, before the acquisition
18 was finalized, did Geneva and Bristol-Myers Squibb
19 enter into any agreement or other business
20 relationship for the sale of any Apothecon products?
21      MR. GALLAGHER: Objection, form.
22   Q. (BY MR. RIKLIN) And I'm asking prior to the
23 end of 2000 had Geneva and Bristol-Myers Squibb
24 entered into any contract or other agreement for the
25 sale of Apothecon products?

Page 39

1       MR. GALLAGHER: Objection, form.
2    A. Not that I'm aware of.
3    Q. (BY MR. RIKLIN) Now, after -- let me have
4  another agreement with you. At some point Geneva
5  became Sandoz, correct?
6    A. Correct.
7    Q. Which -- which I pronounce Sandoz just out of
8  habit and I can't help myself.
9       But can we have another agreement that
10 when we refer to -- when we each refer to Geneva or
11 Sandoz we are talking about the same company?
12   A. That's fine.
13   Q. Okay. Now, when you joined Geneva, what was
14 your title?
15   A. I was senior vice president of sales.
16   Q. Okay. And did you hold that position
17 throughout your time at Geneva?
18   A. Yes, I did.
19   Q. Okay. And -- and that was from January, 2001
20 until when?
21   A. January of 2004.
22   Q. Okay. After you joined Geneva did you have
23 the same responsibilities as you had at Apothecon/
24 Bristol-Myers Squibb?
25      MR. GALLAGHER: Objection, form.

Page 40

1    A. Prior to the restructuring --
2    Q. (BY MR. RIKLIN) Yes.
3    A. -- that I mentioned at BMS, yes, I had
4  overall responsibility for the sales organization.
5    Q. Okay. What was Mr. Renner's position --
6  well, he was director of -- or vice president of
7  marketing, correct?
8       MR. GALLAGHER: Objection, form.
9    A. When?
10   Q. (BY MR. RIKLIN) Prior to the acquisition,
11 Joseph Renner. Did I get that right?
12   A. No, he was not a vice president.
13   Q. Director of marketing.
14   A. Correct.
15   Q. What was his position at Geneva at the time
16 of the acquisition?
17   A. He was -- he was -- his title was Chief
18 Operating Officer.
19   Q. Okay. And so he was the number two or number
20 three person at Geneva at the time?
21   A. He was the number --
22      MR. GALLAGHER: Objection, form.
23   A. -- two person.
24   Q. (BY MR. RIKLIN) Number two. He was the COO,
25 just under the CEO?

Page 41

1    A. Correct.
2    Q. What about Mr. Stevenson, what was his
3  position with Geneva at the time of the acquisition?
4    A. He was a director of product management.
5    Q. Same position he had at Bristol-Myers Squibb?
6    A. Similar responsibilities.
7    Q. Okay. And did the others that went -- that
8  joined Geneva upon or shortly after the acquisition
9  also have similar responsibilities at Geneva that they
10 had at -- at Apothecon? And I'm -- I'm referring to
11 Mr. Pefley, Ms. Coward, Ms. Cavanaugh, Mr. Picard and
12 Ms. Edwards.
13      MR. GALLAGHER: Objection, form.
14   A. They had similar responsibilities.
15   Q. (BY MR. RIKLIN) Okay. Similar titles?
16   A. Similar titles.
17   Q. Okay. As vice president of sales at Geneva
18 how many Geneva employees reported to you?
19   A. During what period of time?
20   Q. Initially.
21   A. Initially I had the three Apothecon national
22 account people, plus approximately seven people that
23 were with the Geneva organization.
24   Q. Okay. So the same people that reported to
25 you while you were at Apothecon just prior to the

11 (Pages 38 to 41)

Cynthia Vohlken, CSR
(512) 364-8166

c9208e87-5075-426c-9ed9-d8cbdab9d4f2

Page 66

1  Q. (BY MR. RIKLIN) Same for -- for adjusting
2  WACs?
3  A. Yes.
4  Q. During your time at Geneva, Mr. Stiefel, were
5  you aware that various third-party payers use AWP and
6  WAC to determine reimbursement?
7  A. I'm aware of that. I was aware of it.
8  Q. And among those third-party payers, Medicaid,
9  state Medicaid programs use AWP and WAC to determine
10 reimbursement, you were aware of that?
11 A. Yes.
12     MR. GALLAGHER: Objection, form.
13 Q. (BY MR. RIKLIN) And you understood during
14 your time at Geneva that reimbursement was important
15 to Geneva's customers.
16     MR. GALLAGHER: Objection, form.
17 A. Profitability was important to the customers.
18 Q. (BY MR. RIKLIN) Right. That's where --
19 that's where the profit comes from for the customers,
20 right?
21     MR. GALLAGHER: Objection.
22 A. On -- on which type of sale?
23 Q. (BY MR. RIKLIN) Well, I'm talking about for
24 your -- let's talk about retail pharmacies. That's
25 where they make their profit, right? The difference

Page 67

1  between the amount of the reimbursement and whatever
2  their acquisition cost is for a particular product,
3  right?
4  A. Yes.
5  Q. Okay. So during your time at Geneva you were
6  aware that Geneva's AWPs and WACs affected customer
7  reimbursement.
8      MR. GALLAGHER: Objection, form.
9  A. Yes, I was.
10 Q. (BY MR. RIKLIN) Mr. Stiefel, during your
11 time at Geneva were you aware that Medicaid is a joint
12 program between the federal government and any state
13 that chooses to participate to provide, among other
14 things, prescription drugs to citizens who are poor,
15 blind, elderly or disabled?
16 A. I was aware of that.
17 Q. Okay. And were you also aware that by law
18 state Medicaid programs attempt to estimate provider
19 acquisition cost as a basis for determining
20 reimbursement?
21     MR. GALLAGHER: Objection, form.
22     MR. SWEENEY: Objection, form.
23     MR. GALLAGHER: And objection,
24 misleading.
25 A. I was not aware of that.

Page 68

1      MR. SWEENEY: When you get to a good
2  breaking place, could we take a break?
3      MR. RIKLIN: Absolutely. I'm almost
4  there.
5  Q. (BY MR. RIKLIN) Mr. Stiefel, you -- during
6  your time at Geneva you were aware that there's no
7  legal requirement for a drug company to participate in
8  a -- in a state Medicaid program, you were aware of
9  that?
10     MR. GALLAGHER: Objection, form.
11 A. I wasn't aware of that.
12 Q. (BY MR. RIKLIN) You did not know that?
13 A. No.
14 Q. You did not know that drug companies can
15 choose to participate or not participate in a Medicaid
16 program.
17 A. I didn't know that was their choice.
18 Q. Well, during your time at Geneva did Geneva
19 seek to have its drugs listed on each state's Medicaid
20 formulary?
21     MR. GALLAGHER: Objection, form.
22 A. That wasn't -- that wasn't part of my role or
23 responsibility.
24 Q. (BY MR. RIKLIN) Yeah.
25 A. So what may or may not occur, you know, I

Page 69

1  don't know, you know, specifically.
2  Q. I understand it wasn't your responsibility,
3  Mr. Stiefel. That wasn't my question. My question
4  was: During your time at Geneva did you under -- did
5  you understand or were you aware that Geneva sought to
6  have its drugs listed on each state's Medicaid
7  formulary?
8      MR. GALLAGHER: Objection, form.
9  A. I know that they listed products on the
10 formularies, yes.
11 Q. (BY MR. RIKLIN) And that was something that
12 was important to Geneva's retail customers, correct?
13 A. That would be important, yes.
14 Q. Geneva's customers wanted Geneva's products
15 listed on state Medicaid formularies, correct?
16 A. If -- if they were using your product, they
17 would want it on the formulary, yes.
18 Q. And what's -- and the reason Geneva's
19 customers wanted Geneva products listed -- Geneva
20 products they purchased listed on state Medicaid
21 formularies is that's the only way they could be
22 reimbursed by state Medicaid programs, correct?
23     MR. GALLAGHER: Objection, form.
24 A. They don't want claims rejected, yes.
25 Q. (BY MR. RIKLIN) If you're not on -- if -- if

18 (Pages 66 to 69)

Cynthia Vohlken, CSR
(512) 364-8166

c9208e87-5075-426c-9ed9-d8cbdab9d4f2