# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| In re:  **PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION** | ) <br> ) <br> ) <br> ) |
| **THIS DOCUMENT RELATES TO:** | ) <br> ) <br> ) |
| *State of California ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Labs, Inc. et al.,* <br> Civil Action No. 03-11226-PBS | ) <br> ) <br> ) <br> ) |

**MDL No. 1456**
**Master File No. 01-12257-PBS**
**Subcategory Case No. 06-11337**

**Hon. Patti B. Saris**

**Magistrate Judge**
**Marianne B. Bowler**

## DEFENDANTS MYLAN INC., MYLAN PHARMACEUTICALS INC., DEY, INC., DEY, L.P. AND SANDOZ INC.'S JOINT REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANTS' JOINT LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN OPPOSITION TO SANDOZ INC.'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56.1 of the Local Rules of this Court, Defendants Mylan Inc. (formerly known as Mylan Laboratories Inc.) and Mylan Pharmaceuticals Inc. (collectively "Mylan"), Dey, Inc., and Dey, L.P., (collectively "Dey") and Sandoz Inc. ("Sandoz") (together, collectively, the "Defendants") hereby respectfully submit their Joint Reply to Plaintiffs' Response to Defendants' Joint Local Rule 56.1 Statement of Undisputed Material Facts in Support of their Motions for Partial Summary Judgment, as well as their Response to Plaintiffs' Statement of Additional Undisputed Facts in Opposition to Defendants' Motions for Partial Summary Judgment.

**DEFENDANTS' JOINT REPLY TO
PLAINTIFFS' RESPONSE TO DEFENDANTS' JOINT LOCAL RULE 56.1
STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR
MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

Defendants hereby submit their Joint Reply to Plaintiffs' Response to Defendants' Joint

Local Rule 56.1 Statement of Undisputed Material Facts in Support of their Motions for Partial

Summary Judgment.

**GENERAL REPLIES**

1.      Defendants generally object to Plaintiffs' responses to the extent that they raise

additional factual assertions that are irrelevant and argumentative, and thus do not conform with

Local Rule 56.1.  *See Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D. Mass.

2008) ("Rather than squarely addressing each of [Defendant's] assertions, Plaintiffs' Local Rule

56.1 filing provides a lengthy narrative of the events underlying this litigation and provides

citation for every allegation to attached affidavits.  Such an 'alternate statement of facts'

approach does not satisfy the requirements or fulfill the purpose of Local Rule 56.1.  Under such

circumstances, many courts have deemed the moving party's statement admitted.");  *see also*

C.D. Cal. L. R. 56-2, 56-3.

2.      Further, Defendants object to the extent Plaintiffs fail to make citations to

"affidavits, depositions and other documentation" as required by Local Rule 56.1, but rather

merely deny or object to the statement of undisputed fact.  All such statements of undisputed fact

should be deemed admitted.  *See* Local Rule 56.1; *Twomey v. Nstar Elec. and Gas Corp.*, No.

09-10481-GAO, 2009 WL 5110672, at * 1 (D. Mass. Dec. 18, 2009) (noting that plaintiff's

opposition motion failed to comply with Local Rule 56.1 because plaintiff failed to cite record

evidence in support of motion); *Okocha v. Brigham & Women's Hosp.*, 81 F.3d 147 (1st Cir.

1996) (holding that the lower court "properly struck plaintiff's statement of undisputed facts[]

because it contained no references to any supporting documents"); *see also* C.D. Cal. L. R. 56-2, 56-3.

3.    Defendants further object to the extent Plaintiffs fail to specifically controvert all portions of each statement of undisputed fact, and each such uncontroverted portion of a statement of undisputed fact should be deemed admitted.  *See* Local Rule 56.1; *Navarro*, F. Supp. 2d at 493 n. 1 ("[U]nless the non-moving party controverts the movant's statements of undisputed fact, the movant's assertions may be deemed admitted for the purposes of the motion."); *see also* C.D. Cal. L. R. 56-2, 56-3.

## SPECIFIC REPLIES

## I.    THE MEDICAID PROGRAM

1.    The Medicaid program was signed into law in 1965 as part of Title XIX of the Social Security Act and is a joint federal-state program that provides medical assistance to financially needy patients.  *See* 42 U.S.C.A. § 1396-1 (2009).

**Plaintiffs' Response:**  Plaintiffs do not dispute the statement, but clarify that Medicaid is a federal-state program to assist the poor, elderly, and disabled in obtaining medical care, and does not provide medical services itself. 42 C.F.R. § 430.0 (2009). Under the Medicaid Act, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 -1396v, the federal government provides financial support to states that establish and administer state Medicaid programs in accordance with federal law through a state plan approved by HHS. 42 U.S.C. § 1396; 42 C.F.R. §§ 430.0, 430.10 - 430.20 (2009).

**Defendants' Reply:**  Defendants' statement of fact in ¶ 1 should be deemed admitted for the following reasons.  Plaintiffs, in their own words, "do not dispute the statement," but only offer additional facts more appropriate for Plaintiffs' own Local Rule 56.1 statement.

2.    The Medicaid program is jointly funded by states and the federal government. The federal government pays for a share of each state's Medicaid program expenditures which ranges from 50% to 83%. *See* 42 U.S.C.A. § 1396d(b) (2009).

**Plaintiffs' Response:**  Undisputed.

**Defendants' Reply:**  None required.

3.      In 1987, CMS, then known as the Health Care Financing Administration ("HCFA"), after a Task Force report and recommendation, adopted regulations governing reimbursement payments for healthcare services provided by state Medicaid programs, including payments for drugs. *See* 42 C.F.R §§ 447.30 1 to 447.333. Those regulations remained in effect and did not substantially change from January 1, 1994 to December 31, 2004 (the "Relevant Time Period").

**Plaintiffs' Response:**  Plaintiffs do not dispute that HCFA enacted the regulations cited above in 1987, but note that the notice of final rulemaking only references concerns expressed to a task force and does not reference either a task force report or recommendation. 52 Fed. Reg. 28648 (July 31, 1987). Plaintiffs do not dispute the last sentence in the preceding SOF.

**Defendants' Reply:**  Defendants' statement of fact in ¶ 3 should be deemed admitted for the following reasons.  Plaintiffs concede that they do not dispute the statement, but only offer additional facts more appropriate for Plaintiffs' own Local Rule 56.1 statement.

4.      CMS provides individual states substantial discretion in designing their Medicaid programs. *See* 42 C.F.R § 447.502 (2009); 42 C.F.R § 447.302 (2009); 42 C.F.R § 447.304 (2009); 42 C.F.R § 447.512 (2009); 42 C.F.R § 447.514 (2009); 42 C.F.R § 447.5 18 (2009).

**Plaintiffs' Response:**  Plaintiffs object to Defendants' attempt to cast a purported statement of policy interpretation as a fact, and their attempt to use LR 56.1 as a vehicle to describe their view of the law or to obtain admissions by the Plaintiffs on matters of law.

**Defendants' Reply:**  Defendants' statement of fact in ¶ 4 should be deemed admitted for the following reasons.  Plaintiffs improperly dispute the statement without providing any citations to factual evidence.  *See* General Reply 2; *Okocha v. Brigham & Women's Hosp.*, 81 F.3d 147 (1st Cir. 1996).  Furthermore, Plaintiffs fail to explain why ¶ 4 inappropriately would "advance" Defendants' "view of the law."  The discretion given to the state is evident from the cited regulations.

5.      State Medicaid agencies must act in accordance with their State Plan, which CMS reviews and approves annually. *See* 42 C.F.R § 447.20 1 (2009); *see* 42 C.F.R § 447.5 18 (2009).

**Plaintiffs' Response:**  Plaintiffs object to Defendants' attempt to use LR 56.1 as a vehicle to describe their view of the law or to obtain admissions by Plaintiffs on matters

of law. Further, the regulations cited by Defendants do not reference annual review and approval of state plans.  Finally, to the extent Defendants suggest they have any standing to complain about a possible discrepancy between California's actual reimbursement practice and California's State Plan, Defendants are wrong. *Long Term Care Pharmacy Alliance v. Ferguson,* 362 F.3d 50 (1st Cir. 2004).

**Defendants' Reply:**  Defendants' statement of fact in ¶ 5 should be deemed admitted for the following reasons.  Plaintiffs' reference to "annual" review and approval of State Plans is irrelevant to, and does nothing to refute, the Defendants' statement that "State Medicaid agencies must act in accordance with their State Plan, which CMS reviews and approves . . . ."  At a minimum, this uncontroverted portion of Defendants' statement in ¶ 5 should be deemed admitted.  *See* General Reply 3; *Navarro v. U.S. Tsubaki, Inc.*, F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).  In addition, Plaintiffs' statement that "Defendants are wrong" to the extent they "suggest they have any standing to complain about a possible discrepancy between California's actual reimbursement practices and California's State Plan," should be disregarded because it is argument, not fact, and is irrelevant to Defendants' statement in ¶ 5.  *See* General Reply 1; *Navarro*, F. Supp. 2d at 493 n.1; *Mercier v. Boilermakers Apprenticeship and Training Fund*, No. 07-cv-11307-DPW, 2009 WL 458556, at *9 (D. Mass. Feb. 10, 2009).

6.    However, within the broad federal requirements set by CMS, states have considerable flexibility in designing their State Plans. (Robben Decl., Ex. 2 at 431:4-9; Robben Decl., Ex. 3 at HHC002-0565.)

**Plaintiffs' Response:**  Plaintiffs do not dispute that a CMS official testified that states had "flexibility" in "designing their systems." However, Plaintiffs dispute the materiality of this paragraph. Further, the excerpts quoted from the letter constitute inadmissible opinion evidence regarding the purpose or effect of a statute. *See, e.g., Thornburg v. Gingles,* 478 U.S. 30, 43 n. 7 (1986) ("We have repeatedly recognized that the authoritative source for legislative intent lies in the Committee Report..."). Plaintiffs additionally dispute this paragraph to the extent it asserts or implies that California had the "flexibility" to establish or implement payment amounts that were not permitted by federal law. California had no authority to implement payment amounts for the drugs at issue in this litigation exceeding the Estimated Acquisition Costs for those drugs, as that term is defined in federal and state statutes and regulations. Testimony by Medi-Cal and CMS officials establishes that although states had "flexibility" in administering their programs, that flexibility was constrained by federal regulations, including the estimated

acquisition cost requirement. Medi-Cal officials testified that the California program understood and implemented the federal estimated acquisition cost requirement. *(See, e.g.,* Paul Decl. Ex. 1 (12/3/08 Rule 30(b)(6) CA Dept. of Health Care Servs. (Gorospe) Dep.) at 20 1:4-202:9.)

Plaintiffs also refer the Court to the United States' Common Statement of Facts (docket no. 6316, ¶¶ 29-34).

**Defendants' Reply:**  Defendants' statement of fact in ¶ 6 should be deemed admitted for the following reasons.  Plaintiffs concede that states have "flexibility" in "designing their systems," and their remaining responses are irrelevant to, and do nothing to refute, Defendants' statement.  Plaintiffs do not explain why they dispute the "materiality" of Defendants' statement. In addition, Plaintiffs improperly cite to *Thornburg v. Gingles*, 478 U.S. 30, 43 n.7 (1986), as establishing that that the letter cited by Defendants is "inadmissible opinion evidence."  The footnote in *Thornburg* cited by Plaintiffs merely states the unremarkable proposition that Committee Reports on bills are authoritative for legislative intent, not that additional evidence of legislative intent is irrelevant or inadmissible.  Moreover, Plaintiffs' objection to ¶ 6 "to the extent it asserts or implies that California had the 'flexibility' to establish or implement payment amounts that were not permitted by federal law," and Plaintiffs' subsequent assertions, are arguments that are not relevant to disputing Defendants' statement in ¶ 6.  *See* General Reply 1; *Navarro*, F. Supp. 2d at 493 n.1; *Mercier v. Boilermakers Apprenticeship and Training Fund*, No. 07-cv-11307-DPW, 2009 WL 458556, at *9 (D. Mass. Feb. 10, 2009).  Finally, Plaintiffs' reference to "the United States' Common Statement of Facts" is not a proper citation to the factual record and should be disregarded.  *See* General Reply 2; *Okocha v. Brighman & Women's Hosp.*, 81 F.3d 147 (1st Cir. 1996).  As such, Defendants' statement should be deemed admitted in its entirety.

7.     Bruce Vladeck, Administrator of CMS from 1993 to 1997, testified that states had leeway to be able to determine the specific ingredient reimbursement basis that they wanted, as

long as it was acceptable to the federal government, and the federal government approved a variety of reimbursement methods that were consistent to federal law. (Robben Decl., Ex. 4 at 433:8-449:12.)

**Plaintiffs' Response:** Undisputed.

**Defendants' Reply:** None required.

8.      Mr. Vladeck testified as follows:

> A.  HCFA approved state plans that paid on some basis relative to AWP, because that's what the statute provided for.
> Q.  And in doing that you were approving plans that had the spread built into the reimbursement methodology. Right?
> MS. BROOKER:  Objection. Form.
> A.  Again, I would say that had a spread built into the reimbursement methodology.
> Q.  Fine. But you also had one state, at least, that had no spread. Right?
> MS. BROOKER:  Objection. Form.
> MR. BREEN:  Objection. Form.
> A.  Yes, that's correct.

(Robben Decl., Ex. 4 at 448:21-449:12.)

**Plaintiffs' Response:**  Plaintiffs do not dispute that Mr. Vladeck testified as set forth above, but note that Mr. Vladeck also testified that he was not competent to testify as to the size of the spread. (Robben Decl. Ex. 4 at 447:10-14.)

**Defendants' Reply:**  Defendants' statement of fact in ¶ 8 should be deemed admitted.

Plaintiffs concede that Mr. Vladeck testified as set forth by Defendants, and only offer additional

facts more appropriate for Plaintiffs' own Local Rule 56.1 statement.

9.      Thomas Scully, Administrator of CMS from 2001 to January 2004, testified that it was CMS's policy to let the states make their own determination of what levels to reimburse providers at, and that it was up to the states' discretion whether they decided to reimburse at, for example, AWP minus 10% when CMS and the state knew that average actual acquisition cost was more like AWP minus 40%. (Robben Decl., Ex. 5 at 209:11-210:15.)

**Plaintiffs' Response:**  Disputed. Plaintiffs do not dispute that Defendants accurately, but selectively, quote excerpts from Mr. Scully's testimony. The quoted testimony, however, is incomplete, misleading and does not support SOF 9. Deidre Duzor, Director of the Pharmacy Division for Medicaid, testified that CMS recognized states' difficulties in estimating acquisition costs, and that CMS approved state plans if it believed that the state was moving in the "right direction."

Q.  But based on your experience you did observe that it was difficult to get states to establish payment rates in adherence with the estimated acquisition cost, correct?

MR. BATES:  Objection to the form.
MS. MARTINEZ:  Objection to form.

A.  Well, in order to determine estimated acquisition cost my understanding of what had been done previously was to require states to do surveys and get invoices. And I think states were saying that that was too difficult, too time consuming, too out of date. By the time they did it prices were changing. So that states were telling us that they couldn't really do that anymore.
Q.  Is it your testimony that you didn't know that states were reimbursing drugs at levels higher than estimated acquisition cost?

MR. WINGET-HERNANDEZ:  Objection it form.
MR. BATES:  Objection to form.
MS. MARTINEZ:  Objection to form.

A.      I think based on the IG reports, yes, we expected that they were. But they were faced with difficult choices in terms of reducing their payments, which many states were doing, but they were doing it in a cautious manner. They didn't want to do it in a very precipitous manner because of course their pharmacy – their pharmacist and their pharmacy organizations were telling people that the sky would be falling in then. So I think they were in a difficult position to know how much they could reduce their rates.

Q.      Do you believe that their actions were reasonable?

MS. MARTINEZ:  Objection to form.
MR. BATES:  Objection to form.

A.  I think we thought the direction they were going was the proper direction. Whether they were being overly cautious or not I think is a hard judgment at the federal level to make. But, you know, I think we thought they were going in the right direction.

(Paul Decl. Ex. 2 (10/30/2007 Deidre Duzor Dep.) at 195:6-197:3.)

Q.      In order for you to approve this state plan would Minnesota need to provide you documentation that AWP minus 11 percent was their best estimate of the price that providers were currently and generally paying for drug products in Minnesota?

MS. MARTINEZ:  Objection, form.

A.  At the time our interest was encouraging states to reduce their payment. And so if they were going to be reducing their payment, as long as that would not result in an access problem we were generally accepting their documentation that this was a better payment than what would otherwise be paid, more appropriate payment.

Q.  So this would fall under the decision memo options that we saw earlier in Abbott Exhibits 328 and 487?

MS. MARTINEZ:  Objection, form.

A.  I don't know that it would -- I wouldn't say it would fall under those. That was guidance or an expansion of the kinds of factors that we would look at as we were evaluating state plan amendments. So it is consistent with it to the extent that the result of this amendment would be to lower reimbursement to a more appropriate level than would otherwise be the case.

Q.  What if the proposed amendment did not reduce the reimbursement amount to the prices at which pharmacies were generally and currently paying for drugs?

A.  We did not have independent evidence as to what the pharmacies were currently paying for drugs. So, you know, we didn't have that information in order to compare to it. The only thing we had was the Inspector General's report.

(Paul Decl. Ex. 3 (2/27/08 Deidre Duzor Dep.) at 347:12-349:4.)

**Defendants' Reply:**  Defendants' statement of fact in ¶ 9 should be deemed admitted for

the following reasons.  Plaintiffs do not dispute the statement, and in fact, concede that

Defendants "accurately" quote Mr. Scully's testimony.  Plaintiffs' further assertion that the

quoted testimony "is incomplete, misleading and does not support SOF 9" is unsupported

argument, not fact, and is irrelevant to Defendants' statement in ¶ 5.  In particular, Plaintiffs'

citation to the testimony of Deirdre Duzor is irrelevant to whether Thomas Scully testified as he

did.  Moreover, Ms. Duzor's testimony about states' purported difficulties in estimating

acquisition costs, and that CMS purportedly approved State Plans if it believed that a state was

moving in the "right direction," is irrelevant to Mr. Scully's undisputed testimony about CMS's

policy and states' discretion.  As such, Plaintiffs' response is an improper attempt to create an

alternate statement of facts that should be disregarded.  *See* General Reply 1; *Navarro*, F. Supp.

2d at 493 n.1; *Mercier v. Boilermakers Apprenticeship and Training Fund*, No. 07-cv-11307-

DPW, 2009 WL 458556, at *9 (D. Mass. Feb. 10, 2009).

**"In the Aggregate"**

10.      For multiple source drugs subject to an upper limit established by HCFA, the 1987
         regulations limited payment in the aggregate, across all drugs, to the amount that would
         result from the application of the specific limits established by HCFA plus a reasonable
         dispensing fee. (Robben Decl., Ex. 6.)

         <u>**Plaintiffs' Response:**</u>  Plaintiffs dispute Defendants' characterization of the 1987
         regulations. The language of the regulation (at 52 Fed. Reg. 28648, 28657 (July 31,
         1987)) controls, not Defendants' characterization. Further, it is inappropriate for
         Defendants to use LR 56.1 to advance their view of the law.

         <u>**Defendants' Reply:**</u>  Defendants' statement of fact in ¶ 10 should be deemed admitted

for the following reasons.  Plaintiffs improperly dispute the statement without explaining why

"the language of the regulation" differs or supersedes the statement, which it does not.  Plaintiffs

also fail to explain why ¶ 10 inappropriately would "advance" Defendants' "view of the law."

11.      For all "other drugs" not subject to a Federal Upper Limit ("FUL"), a state agency's
         payment "must not exceed, in the aggregate, payment levels that the agency has
         determined by applying the lower of the (1) EAC plus reasonable dispensing fees
         established by the agency; or (2) Providers' usual and customary charges to the general
         public." *See* 42 C.F.R. § 447.5 12(b) (2009).

         <u>**Plaintiffs' Response:**</u>  Plaintiffs dispute Defendants' characterization of the 1987
         regulations. The language of the regulation (at 52 Fed. Reg. 28648, 28657 (July 31,
         1987)) controls, not Defendants' characterization. Further, it is inappropriate for
         Defendants to use LR 56.1 to advance their view of the law.

         <u>**Defendants' Reply:**</u>  Defendants' statement of fact in ¶ 11 should be deemed admitted

for the following reasons.  Plaintiffs improperly dispute the statement without explaining why

"the language of the regulation" differs or supersedes the statement, which it does not.  Plaintiffs

also fail to explain why ¶ 11 inappropriately would "advance" Defendants' "view of the law."

12.     The regulations define "estimated acquisition cost" to be a state agency's "best estimate of the price generally and currently paid by providers for a drug marketed or sold by a particular manufacturer or labeler in the package size of drug most frequently purchased by providers." *See* 42 C.F.R. § 447.502 (2009).

   **Plaintiffs' Response:**  Plaintiffs do not dispute the accuracy of the quoted language.

   **Defendants' Reply:**  None required.

**Access to Care**

13.     A state agency's reimbursement methodologies are subject to an access constraint:  "The agency's payments must be sufficient to enlist enough providers so that services under the plan are available to recipients at least to the extent that those services are available to the general population." *See* 42 C.F.R. § 447.204 (2009).

   **Plaintiffs' Response:**  Plaintiffs dispute SOF 13 because the regulation references actual "payments" to providers, not reimbursement methodologies.

   **Defendants' Reply:**  Defendants' statement of fact in ¶ 13 should be deemed admitted for the following reasons.  Plaintiffs' citation to the regulation creates a distinction without a difference: the access requirement governing a Medicaid "agency's payments," 42 C.F.R. § 447.204, by necessity also governs that Medicaid agency's reimbursement methodology, as the methodology is what determines the payments.  As such, Plaintiffs' citation to the regulation is irrelevant to, and does nothing to refute, the stated fact in ¶ 13.  *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).

14.     Accordingly, state Medicaid agency personnel attempt to balance at least two competing goals when making policy decisions to set reimbursement rates:  1) achieve sufficient access to quality health care for the enrollees and 2) administer the program within the budget constraints imposed by the state legislature. (*See* Joint SOF *infra* at ¶¶ 52, 56, 57; *see also* Robben Decl., Ex. 7 at 108:3-109:13; Robben Decl., Ex. 8 at 307:13-308:5; Robben Decl., Ex. 9 at 464:2-465:7; Robben Decl., Ex. 10 at 49:10-51:18.)

   **Plaintiffs' Response:**  Plaintiffs dispute SOF 14 because the testimony from state Medicaid employees from the various states selected by Defendants does not support the characterization of these goals as necessarily "competing."

   **Defendants' Reply:**  Defendants' statement of fact in ¶ 14 should be deemed admitted for the following reasons.  Plaintiffs' reference to "the testimony from" unidentified "state

Medicaid employees from the various states" is without citation to factual evidence and, as such, should be disregarded.  *See* General Reply 2; *Okocha v. Brigham & Women's Hosp.*, 81 F. 3d 147 (1st Cir. 1996).  Moreover, Plaintiffs appear to take issue only with the word "competing." Plaintiff failed to specifically controvert all portions of ¶ 14, and at minimum, the remainder of ¶ 14 should be deemed admitted.  *See* General Reply 3; *Navarro v. U.S. Tsubaki, Inc.*, F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).

## II.   THE MEDI-CAL PROGRAM

15.   California's Medicaid program is known as Medi-Cal. (Robben Decl., Ex. 11 at 184:2-9.) It is administered by the California Department of Health Care Services, formerly known as the California Department of Health Services. *Id.* (Hereinafter, the California Department of Health Care Services, formerly known as the California Department of Health Services, shall be referred to as "DHS").

   **Plaintiffs' Response:**  Undisputed.

   **Defendants' Reply:**  None required.

16.   Throughout the relevant time period, the Medi-Cal program has provided coverage for prescription drugs. (Robben Decl., Ex. 1 at ¶ 26.)

   **Plaintiffs' Response:**  Undisputed.

   **Defendants' Reply:**  None required.

17.   Single-source, or brand name, drugs account for approximately 80% of the Medi-Cal program's expenditures for drugs. Multi-source, or generic, drugs account for only approximately 20% of the Medi-Cal program's total expenditures for drugs. (Robben Decl., Ex. 11 at 192:14-193:12.)

   **Plaintiffs' Response:**  Undisputed.

   **Defendants' Reply:**  None required.

18.   Throughout the relevant time period, Medi-Cal reimbursed pharmacists and other Medicaid providers who dispensed the Subject Drugs at the lower of Estimated Acquisition Cost ("EAC"), the Federal Upper Limit ("FUL"), the Maximum Allowable Ingredient Cost ("MAIC"), or the charge submitted by the provider. (Robben Decl., Ex. 13.)

**Plaintiffs' Response:**  Plaintiffs dispute SOF 18, as inaccurately stated. Throughout the relevant time period, Medi-Cal reimbursed pharmacists and other Medicaid providers who dispensed the Subject Drugs at the Estimated Acquisition Cost ("EAC"), which was the lowest of:  AWP minus a statutorily defined percentage (minus 5%, minus 10%, or minus 17%), the Federal Upper Limit ("FUL"), the Maximum Allowable Ingredient Cost ("MAIC"), Direct Price (until 2002), the Selling Price (after September 2004), or the charge submitted by the provider. (Robben Decl. Ex. 13 (Pl.'s Resp. to Defs. Interrog. 13).)

**Defendants' Reply:**  Defendants' statement of fact in ¶ 18 should be deemed admitted.

The cited document is self-evident, and the regulations it relies upon show that EAC is defined with reference to discounted AWP, and that payment is made at the lower of the measures referenced in the fact statement.

19.    From January 1, 1994 to November 30, 2002, EAC was defined in regulations as Average Wholesale Price ("AWP") minus five percent. From December 1, 2002 to August 31, 2004, EAC was defined in regulations as AWP minus ten percent. From September 1, 2004 to the present, EAC has been defined as AWP minus 17 percent. (Robben Decl., Ex. 13.)

**Plaintiffs' Response:**  Plaintiffs dispute this SOF, as inaccurately stated. EAC was not so defined. (*See* Pls. Resp. to SOF 18.) From January 1, 1994 to November 30, 2002, the statutorily defined discount off of AWP which was used to set AWP-based reimbursement within California's "lowest of" estimated acquisition cost methodology was defined in regulations as Average Wholesale Price ("AWP") minus five percent. From December 1, 2002 to August 31, 2004, it was defined as AWP minus ten percent. From September 1, 2004 to the present, it was defined as AWP minus 17 percent. (Robben Decl. Ex. 13 (Pl.'s Resp. to Defs. Interrog. 13).)

**Defendants' Reply:**  There is no dispute over the discounts off AWP used by California, or of the time periods in which each was used.

20.    Throughout the relevant time period, California has defined "AWP" as "the price for a drug product listed for a standard package in the Department's primary price reference source." See 22 CCR § 51513.

**Plaintiffs' Response:**  Disputed. California has not "defined" "AWP" as Defendants claim in SOF 20. Rather, the applicable statute explains that the term "Average wholesale price" refers to the price for a drug product listed in the department's primary price reference source, which is, specifically, a price reported by Defendants to the department's primary reference source (FDB) on each of their drugs. California's reimbursement statute states that reimbursement is conducted under an estimated acquisition cost (EAC) "lowest of" methodology, that "AWP" is a component of EAC,

and is therefore intended to be a price which represents "the department's best estimate of the price generally and currently paid by providers for a drug product sold by a particular manufacturer or principal labeler in a standard package." *See* CAL. WELF. & INST. CODE § 14105.45.

**Defendants' Reply:**  Defendants' statement of fact in ¶ 20 should be deemed admitted for the following reasons.  Plaintiffs do not dispute that California has published the definition of AWP set forth in ¶ 20.  As such, this statement is undisputed and deemed admitted.  Plaintiffs, however, improperly "dispute" ¶ 20 by contending that DHS intended AWP to be a price which represents "the department's best estimate of the price generally and currently paid by providers for a drug product sold by a particular manufacturer or principal labeler in a standard package" because AWP was utilized as one of several factors in the EAC "lowest of" methodology.  This statement does not squarely address the statement of facts in ¶ 20 and does not create a factual dispute as to whether 22 CCR § 51513 sets forth the definition of AWP contained in ¶ 20. Plaintiffs' response is nothing more than an attempt to create an alternate statement of facts by improperly couching legal argument as facts, and should be consequently rejected. *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).  Plaintiffs misread the relevant regulations and statutes, and ignore the fact that California discounts from AWP for purposes of reimbursement.

21. From January 1, 1994 to August 31, 2004, California paid a dispensing fee of $4.05. (Robben Decl., Ex. 13.) From September 1, 2004 to the present, California has paid a dispensing fee of $7.25 ($8.00 for drugs administered by long-term care facilities.) *Id.*

    **Plaintiffs' Response:**  Undisputed.

    **Defendants' Reply:**  None required.

## III. CALIFORNIA'S UNDERSTANDING OF AWP AND REIMBURSEMENT METHODOLOGIES DURING THE RELEVANT TIME PERIOD

22. Through both independent and government-sponsored studies, California has understood since well before the relevant time period that published AWPs, particularly those for

generic drugs, did not reflect providers' actual discounted acquisition costs for drugs.
(*See* Joint SOF *infra* at ¶¶ 23-40.)

**Plaintiffs' Response:**  Disputed. Plaintiffs object to Defendants' heading and statements of fact to the extent that Defendants have "cherry-picked" isolated items from a complex historical record. Plaintiffs further object to any and all statements of fact to the extent that they relate to California's understanding "well before the relevant time period" as irrelevant and immaterial to the issues before the Court. At all relevant times (i.e., 1994 through 2004), California's reimbursement methodology was governed by CAL. WELF. & INST. CODE §14105.45 and its implementing regulations, or predecessor regulation. *See* CAL. CODE REGS. tit. 22, § 51513. It is remarkable that while Defendants discuss at length facts purporting to show California's understanding "well before the relevant time period," they ignore the language and regulatory record of Section 51513, which governed during most of the relevant time period. *(See infra,* Plaintiffs' Statement of Additional Undisputed Facts ("CA SOAF Defs.") ¶¶ 18-19.) Any understanding that California officials may have had prior to 1989 is irrelevant and immaterial, given the fact that the Section 51513 and the subsequent statutes governing the reimbursement methodology and rate must be construed in accordance with their language and contemporaneous regulatory or statutory history. Plaintiffs further respond that California has understood at all relevant times that published AWPs did not reflect "actual discounted acquisition costs," but rather were intended to be an average of the wholesale prices for Defendants' pharmaceutical products that could reasonably be used in determining providers' estimated acquisition costs for those products. *(See* Pls.' Resp. to SOF 20.)

Finally, Defendants never came to California to explain the differences between their reported AWPs and actual provider acquisition costs for their drugs. *(See* CA SOAF Defs. ¶ 29.)

**Defendants' Reply:**  Defendants' statement of fact in ¶ 22 should be deemed admitted for the following reasons.  Plaintiffs do not dispute that California has understood since well before the relevant time period that published AWP did not reflect providers' actual discounted acquisition costs for drugs.  As such, this statement is undisputed and deemed admitted. Plaintiffs, however, improperly "dispute" ¶ 22 by contending that Defendants "ignore the language and regulatory record of Section 51513."  This statement does not squarely address the statement of facts in ¶ 22 and does not create a factual dispute as to California has understood that published AWPs did not reflect providers' actual discounted acquisition costs for dugs during the relevant time period.  *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F.

Supp. 2d 487, 493 n.1 (D. Mass. 2008).  Furthermore, Plaintiffs' assertion that "any

understanding that California officials may have had prior to 1989 is irrelevant and immaterial"

is a legal claim that is not appropriately set forth in a 56.1 Statement of Facts.  Finally, Plaintiffs'

assertion that California has understood at all relevant times that published AWPs "were

intended to be an average of wholesale prices for Defendants' pharmaceutical products that

could reasonably be used in determining providers' estimated acquisition costs for these

products" is contrary to the evidence in the record, discussed in Defendants' briefs, irrelevant to

Sandoz' asserted fact, and should be disregarded as an attempt to create an alternate statement of

facts and substitute argument for fact. *See id.*  Plaintiffs' final statement is improper here, as

noted above, and is not supported by the evidence as explained in Defendants' Response to

Plaintiffs' Statement of Additional Facts ¶ 29.

23.     In 1977, the California Department of Finance issued a report entitled "Medi-Cal Drug
        Price Controls, A Staff Reference Report" (the "1977 Report"). (Robben Decl., Ex. 14.)
        The 1977 Report examined various possible cost-control measures for Medi-Cal's
        prescription drug benefit. The 1977 Report documented that pharmacies could purchase
        drugs at significant discounts below AWP from manufacturers:

> Manufacturers' list prices to wholesalers and retailers, based upon
> inspection of the Red Book, appear to range from 14 percent below AWP
> from some manufacturers to 22 percent for others.
>
> Average Wholesale Price less these published discounts is the maximum
> price the pharmacist can expect to pay if he buys direct from the
> manufacturer. The range of discounts below AWP is in fact very wide and
> apt to change rapidly. Inspection of manufacturers' price lists for some
> items show discounts larger than those that appear in the Red Book by
> taking into account not only quantity per retail package, but number of
> packages per order. Other forms of discount include periodic rebates, extra
> goods given to the pharmacy by the manufacturer's representative,
> returned goods policy used to return slow-moving merchandise in addition
> to outdated goods, and extended dating of receivables. Special deals are
> offered intermittently and in certain areas but not others. Some such
> discounts reflect themselves in invoice prices; others do not.

*Id.* at 4. The report found that similar – though not as steep – discounts were available
through wholesalers:

> Wholesalers' discounts to most pharmacies in California appear to range
> from 8 to 12 percent below AWP. ... These discounts normally apply, not
> on an item-by-item basis, but to all purchases made during a month or
> other span of time. ... These discounts usually do not appear on invoices.
> The discount serves as both a volume and cash discount.

*Id.* at 4-6. On a whole, the report concluded that "[t]he range of discounts among
pharmacies is unknown but probably is from 8 to 25 percent or more..." *Id.* at 6. The
Report noted that, at the time, EAC for most drugs was an undiscounted AWP and that
"[t]he actual acquisition cost of individual pharmacies has no bearing upon the payment
Medi-Cal makes." *Id.* at 23. The 1977 Report also noted that "[s]ome manufacturers
maximize pharmacy earnings from Medi-Cal by maximizing the spread between the price
charged Medi-Cal (usually based on small quantities) and that paid by pharmacies (often
a lower price based on large quantities)." *Id.* at 29. However, the Report recognized that
the margins providers realized compensated for inadequate dispensing fees:  "Prior to the
new EAC controls of March 6, 1977 the margin between AWP and pharmacies' actual
acquisition cost served to offset a fee level which many pharmacists believed to be
inadequate." *Id.* at 23.

**Plaintiffs' Response:**  Plaintiffs do not dispute that Defendants have correctly quoted a
portion of the 1977 Report. Plaintiffs further incorporate their response to SOF 22.

**Defendants' Reply:**  Plaintiffs do not dispute this statement and it should be deemed

admitted.  Plaintiffs' incorporated response to Defendants' Joint SOF ¶ 22 raises irrelevant

material and should consequently be rejected.  *See* General Reply 1; *Navarro v. U.S. Tsubaki,*

*Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).

24.   In 1985, HCFA conducted a California-focused study comparing published AWPs to
      actual acquisition costs available to pharmacists throughout the state. (Robben Decl., Ex.
      15.) HCFA published its findings in a report entitled "EAC Survey Report, California
      Medi-Cal Program, EAC Patrol Initiative". *Id.* The report noted that "AWPs are not
      determined by surveying market transactions and thus do not accurately reflect prices
      pharmacists pay for drug products." *Id.* at 2. The report also noted that, at the time,
      California's EAC was calculated using an undiscounted AWP. *Id.* at 4. The report
      concluded that California pharmacists acquired drugs at an average of 16.63 percent
      below AWP. *Id.* at 6. The report also found that California pharmacists purchased generic
      drugs at an average of 22.14 percent below AWP. *Id.* at 7.

**Plaintiffs' Response:**  Plaintiffs incorporate their response to SOF 22. Plaintiffs further
respond as follows:  This statement is disputed in part. It is noteworthy that the 1985
HCFA study examined a very small sample of the many transactions covered by Medi-
Cal—only 480 transactions at 20 California pharmacies. (Robben Decl. Ex. 15 at 5, 8.)
Further, the report referenced by Defendants makes clear that:

> [E]stimated rather than actual acquisition cost reimbursement was adopted
> as a result of widespread opposition to the potential difficulties
> pharmacists would incur in recordkeeping and . . . the administrative
> problems of tracking deferred and cumulative discounts to pharmacists on
> their drug purchases. The purpose of the EAC requirement in the
> regulations was to bring reimbursement for drug ingredients more in line
> with what pharmacists were actually paying in the marketplace for those
> items.

(Robben Decl. Ex. 15 at 1.) As the report later reaffirmed, "the EAC should reflect the
prices pharmacists are actually paying in the marketplace for drugs." *(Id.* at 9; *see also id.*
at 3, noting that the very purpose of the instant study was to bring "EACs closer to what
pharmacists pay for drugs.") The report further noted that "the States have been allowed a
great deal of latitude in establishing their EAC programs" *(id.*) and that California "has
instituted several innovative cost containment measures," including the use of State
MAICs and payment for certain drugs at "direct price," as a result of which the State
actually "reimburse[d] providers at 9.08 percent below AWP." (*Id.* at 8.) Thus,
California's effective reimbursement rate was already "significantly less than AWP." (*Id.*
at 9.)

**Defendants' Reply:**  Defendants' statement of fact in ¶ 24 should be deemed admitted

for the following reasons.  Plaintiffs' assertion that "the 1985 HCFA study examined a very

small sample of the many transactions covered by Medi-Cal," that the "report further noted that

'the States have been allowed a great deal of latitude in establishing their EAC programs,'" and

that "'California has instituted several innovative cost containment measures'" is irrelevant to

Defendants' asserted fact and should be disregarded as an attempt to create an alternative

statement of facts.  *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d  487,

493 n.1 (D. Mass. 2008).  Defendants refer the Court to the 1985 report for a complete statement

of its content.  Finally, Defendants dispute any inference that California did not know and

understand the information shown in this report.

25.    In a February 4, 1986 letter, John Rodriguez, at the time the Deputy Director of Medical
       Care Services at DHS, acknowledged receipt of this report. (Robben Decl., Ex. 16.) In the
       letter, Mr. Rodriguez expressed concern about using the findings in the report to adjust
       California's EAC. In particular, Mr. Rodriguez noted:

> [W]e would like to remind HCFA that successfully "tightening up" our
> EAC program will concomitantly result in enormous pressure for

California's Medi-Cal program to upgrade the dispensing fee. This is exactly what occurred when we originally implemented our EAC program. Such a development may well result in no significant change in overall drug costs. If, in fact, costs are only shifted, is a change in federal regulations or more aggressive enforcement of existing EAC regulations really cost effective?

*Id.*

**Plaintiffs' Response:**  Plaintiffs incorporate their responses to SOFs 22 and 24, and further respond that this statement is disputed in part. Defendants have selectively quoted from Mr. Rodriguez's letter, which also stated that Medi-Cal had concerns regarding the study's accuracy in that it "did not weight the data, therefore rendering the conclusions of questionable value" and improperly excluded all drugs subject to a federal MAC (now a FUL). (Robben Decl. Ex. 16 at 1.) He also noted that a "significant number of drugs included in the survey are very low dollar volume drugs and their impact on the overall pharmaceutical program is negligible." (*Id.*) Mr. Rodriguez further commented that "California is one of the leading states in its aggressive implementation of the federal EAC regulations." (*Id.* at 2.) Notwithstanding Defendants' quotation, nothing in the letter indicated that California had a policy to cross-subsidize allegedly inadequate dispensing fees by over compensating pharmacists for the costs of the drug products for which Medi-Cal provided reimbursement. (*See* CA SOAF Defs. ¶ 15.)

**Defendants' Reply:**  Defendants' statement of fact in ¶ 25 should be deemed admitted for the following reasons.  Plaintiffs' "partial dispute" simply quotes other parts of the cited document and does nothing to dispute the asserted fact.  *See* General Reply 3; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d  487, 493 n.1 (D. Mass. 2008).  Plaintiffs' incorporation of other statements of fact and assertion of irrelevant arguments do not meet the substance of the asserted fact and should be rejected.  *See* General Reply 1; *Navarro*, F. Supp. 2d at 493 n. 1.  Defendants dispute as unsupported any inference that California did not know and understand this information shown in this report.

26.   When California adopted HCFA's 1987 FUL regulations, it issued a statement of reasons supporting its adoption of the regulations. (Robben Decl., Ex. 17.) In the addendum to the final statement of reasons, in response to complaints that FULs may adversely impact small business, California noted that the FUL regulations would actually benefit small businesses, while at the same time saving California money, by encouraging the use of low cost generics:

The regulation encourages pharmacists to select from among available alternatives, the drug product which meets the patient's needs and is

> available within the upper limit. Lower priced generic brands frequently
> carry a higher margin of profit in comparison to the more costly name
> brand drug products they compete with. This has the effect of increasing
> the actual net profit dollars on a smaller gross sale.

*Id.* at addendum 2. To illustrate the point, the addendum compared the reimbursement for
a brand drug, Mellaril, with an AWP of $28.32, and FUL of $17.48, and an actual
purchase price of $26.06 to the generic version of the drug, which had an AWP of
$10.90, and an actual purchase price of $5.23. *Id.* at addendum 3. Because of the FUL,
the addendum noted that dispensing the brand drug would result in a net loss to the
provider of $12.62, while dispensing the generic would result in a net profit of $5.67. *Id.*
The addendum concluded that the FUL, when combined with the "spread" between the
AWP and actual purchase price for the generic drug, benefited both California and the
provider:

> Not only did the pharmacist increase his margin by $3.40 when dispensing
> the generic drug product over the brand name product; but, by placing an
> upper limit of reimbursement, Medi-Cal saved $15.15, which is more than
> 50% of the reimbursement amount for the brand name product.

*Id.* at addendum 4. In preparing the final statement of reasons and the addendum,
California relied on several wholesaler catalogs, including a catalog of Geneva Inc.
drugs. *Id.* at 2.

**Plaintiffs' Response:**  Plaintiffs incorporate their response to SOF 22. Plaintiffs further
respond as follows. This statement is disputed in part. First, Defendants omit the express
statement in the Addendum that Medi-Cal will reimburse at AWP when that amount is
lower than the product's FUL. "If the selected brand has an AWP at or below the limit
[i.e., the FUL], it can be reimbursed by Medi-Cal at the AWP." (Robben Decl. Ex. 17 at
Addendum 2.)
   Further, nothing in the Final Statement of Reasons or the Addendum supports the
submission of inflated AWPs as a means to foster generic substitution or otherwise. The
example used by Defendants is taken out of context and used in a misleading fashion.
Defendants omit the crucial fact that the "actual purchase price of $5.23" in the example
is applicable to purchases in bulk (specifically in 1000s), although Medi-Cal reimburses
pharmacies, pursuant to applicable regulations, based on the AWP of the most commonly
dispensed package size, which is normally a package of 100 pills. Moreover, the $5.23
actual price relates to bulk purchases through a discount buying group, the California
Pharmaceutical Care Network. Thus, the Addendum uses this example to illustrate the
fact that, by using prudent business practices (such as buying in bulk and through a
discount buying group), pharmacies can still make a profit after implementation of the
FULs that were being adopted through this regulatory proceeding. *(Id.* at Addendum 3.)
Nothing in the Final Statement of Reasons or Addendum supports the idea that Medi-Cal
approved of or authorized the practice of reporting inflated AWPs for generic products in
order to encourage generic substitution.

**Defendants' Reply:**  Defendants' statement of fact in ¶ 26 should be deemed admitted for the following reasons.  Plaintiffs' assertion that Medi-Cal will reimburse at AWP when that amount is lower than the product's FUL is irrelevant to Defendants' asserted fact and should be disregarded as an attempt to create an alternative statement of facts. *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d  487, 493 n.1 (D. Mass. 2008).  Further, Plaintiffs' assertion that Defendants' example is "taken out of context" belies the fact that the Final Statement of Reasons cites multiple wholesaler catalogues detailing actual market prices of many of Defendants' products, and the use of an NDC package size of 1000s in the example does not change the point made by the example.  The pricing information contained in these documents is the same detailed transactional pricing information for Defendants' products that Plaintiffs allege California was unable to obtain.  California had these documents in their possession as far back as 1987.

Finally, Plaintiffs' assertion that "nothing in the Final Statement of Reasons or Addendum supports the idea that Medi-Cal approved of or authorized the practice of reporting inflated AWPs for generic products in order to encourage generic substitution" is irrelevant to Defendants' asserted fact and should be disregarded as an attempt to create an alternative statement of facts and improper argument disguised as asserted fact.  *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d  487, 493 n.1 (D. Mass. 2008).  California has understood since at least the late 1970s that compendia AWPs significantly exceed providers' actual costs to acquire prescription drugs.  (*See* Joint SOF at ¶¶ 22-41).  Despite this understanding, California has never defined AWP in a statute or regulation as anything other than a price listed in compendia, and has never offered any guidance as to how AWP should be determined.  (*See* Joint SOF at ¶ 20).  Therefore, there is no basis to contend that Defendants

reported "inflated" prices.  Moreover, California deliberately adopted a reimbursement

methodology, based in part on compendia AWPs, that it knew would pay providers more than

their actual acquisition costs for drugs to achieve its own policy goals, including compensating

providers for inadequate dispensing fees.  (*See* Joint SOF at ¶¶ 24-26, 33, 35-40, 52-53, 55, 67).

27.     In 1989, the Office of Inspector General for the United States Department of Health and
        Human Services ("HHS-OIG") issued a report entitled "Use of Average Wholesale Prices
        in Reimbursing Pharmacies Participating In Medicaid and the Medicare Prescription
        Drug Program" (the "1989 HHS-OIG Report"). (Robben Decl., Ex. 18.) The report
        detailed a survey conducted by the HHS-OIG comparing AWPs published in Blue Book
        and Medi-Span to prices available to pharmacies through national wholesalers. *Id.* at 2.
        The report found that the average discount off of AWP for all drugs was approximately
        15.5 percent, and for multi-source or generic drugs in particular was 18.2 percent. *Id.* at
        3. The report found that prices in one wholesaler's catalog were on average more than 30
        percent below AWP. *Id.* The report quoted a wholesaler representative stating "AWP is a
        meaningless figure" and a Pennsylvania Medicaid official saying that AWP "... just
        doesn't mean anything. It has no connection to what pharmacies really purchase the drugs
        for." *Id.* at 3-4.

        **Plaintiffs' Response:**  Plaintiffs incorporate their objections to SOF 22 and their
        response to SOF 24. Plaintiffs also object to the hearsay statements contained in the final
        two sentences. Plaintiffs further respond that this statement is disputed in part. Plaintiffs
        note that the 1989 HHS-OIG report appeared to show a decline in spreads between
        reported AWPs and actual acquisition costs as compared to the spreads found in the 1985
        HCFA study discussed in SOF 24 and that the 1989 report did not take into account the
        effect of California's other cost containment methods, including its use of MAICs and
        direct price reimbursement.
                More importantly, Defendants omit to state that the 1989 HHS-OIG report was a
        direct predicate for California's revisions to its reimbursement methodology and
        Regulation Section 51513 in September 1989 pursuant to an extended rulemaking
        proceeding. (*See* CA SOAF Defs. ¶ 18.)

        **Defendants' Reply:**  Defendants' statement of fact in ¶ 27 should be deemed admitted

for the following reasons.  Plaintiffs' assertion that "the 1989 HHS-OIG report was a direct

predicate for California's revisions to its reimbursement methodology and Regulation Section

51513 in September 1989," and its other assertions regarding the report, are irrelevant to

Defendants' asserted fact and should be disregarded as an attempt to create an alternative

statement of facts.  *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 493

n.1 (D. Mass. 2008).  Further, Defendants note that Regulation Section 51513 as revised in 1989

shows a policy decision to not reimburse at an average of market prices as shown by the 1989

HHS-OIG report and instead to pay Medi-Cal providers more than their actual acquisition costs

for drugs.

28.     In 1991, the Auditor General for the State of California issued a report entitled "How
        Medi-Cal and Other Health Care Providers Manage Their Pharmaceutical Expenditures."
        (Robben Decl., Ex. 19.) The Auditor's report cited to the 1989 HHS-OIG Report, noting
        that the report found that pharmacies were purchasing drugs, on average, at 15.5 percent
        below AWP and that the report "concluded that the AWP was not a meaningful payment
        level and that it should not be used for making reimbursements." *Id.* at 27. The report
        goes on to note that, in September of 1989, in response to guidance from HCFA that state
        Medicaid programs must discount off of AWP for EAC calculations, DHS adopted
        regulations setting reimbursement at AWP minus five percent for drugs not reimbursed
        on the basis of direct price. *Id.*

        **Plaintiffs' Response:**  Disputed in part. Defendants omit to disclose that the Auditor
        General's Report (the "Report") states in the sentence following the one quoted:  "The
        inspector general recommended that the HCFA continue to require state Medicaid
        agencies, such as Medi-Cal to discount the AWP when making program
        reimbursements." (Robben Decl. Ex. 19 at 27.) In fact, as noted in the quoted portion of
        the Report, in 1989, DHS, following a formal ratemaking proceeding, revised Section
        51513 to reduce its EAC reimbursement rate to AWP-5%. In taking that action, DHS
        expressly found that, on an overall basis, that rate was the Agency's best estimate of
        provider acquisition costs:  "In other words, the State must come as close as possible to
        the actual acquisition cost. The AWP-5% program is the State's best estimate of this
        cost." (*See* CA SOAF Defs. ¶ 19.) Further, Defendants omit to disclose that OBRA '90
        prohibited changes in State reimbursement rates for several years following the issuance
        of the Report.

                Plaintiffs further note that the Report in large measure compared the amounts that
        Medi-Cal paid to reimburse providers with amounts paid by "major pharmaceutical
        purchasers" (Robben Decl. Ex. 19 at 4-5), such as the California Department of General
        Services and the Department of Veterans' Affairs, a comparison which the Report notes
        is inherently inappropriate. As the Report concludes:

                As we discussed in Chapter 1 of our report, our survey of major
                pharmaceutical purchasers revealed they use many utilization and price
                strategies to control the cost of pharmaceuticals. Medi-Cal uses most of
                the same utilization and price strategies as the major pharmaceutical
                purchasers in its attempt to stem the increase in its drug expenditures, but
                not all of the controls the major pharmaceutical purchasers use would be
                suitable for use by Medi-Cal because of Medi-Cal's system for delivering
                services.

(Robben Decl. Ex. 19 at 38.)

**Defendants' Reply:**  Defendants' statement of fact in ¶ 28 should be deemed admitted

for the following reasons.  Plaintiffs' assertion that "Defendants omit to disclose that the Auditor

General's Report (the "Report") states in the sentence following the one quoted: 'The inspector

general recommended that the HCFA continue to require state Medicaid agencies, such as Medi-

Cal to discount the AWP when making program reimbursements,'" that AWP-5% was DHS'

"best estimate of provider acquisition costs," that "Defendants omit to disclose that OBRA '90

prohibited changes in State reimbursement rates for several years following the issuance of the

Report" and that the Report compared "the amounts that Medi-Cal paid to reimburse providers

with amounts paid by 'major pharmaceutical purchasers'" is irrelevant to Defendants' asserted

fact and should be disregarded as an attempt to create an alternative statement of facts.  *See*

General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).

Further, Defendants note that Regulation Section 51513 as revised in 1989 shows a policy

decision to not reimburse at an average of market prices as shown by the 1989 HHS-OIG report

and instead to pay Medi-Cal providers more than their actual acquisition costs for drugs.

29.     In 1994 and 1995, the HHS-OIG conducted a California-focused survey of pharmacy
        acquisition costs for Medi-Cal providers. (Robben Decl., Ex. 20; Ex. 21; Ex. 22.) DHS
        employees Douglas Hillblom, Allen Fung, and Roy Takeuchi assisted in the survey.
        (Robben Decl., Ex. 20 at App. 4.)

        **Plaintiffs' Response:**  Disputed in part. By way of clarification, Plaintiffs point out that
        the survey involved a number of states, including California.

        **Defendants' Reply:**  Defendants' statement of fact in ¶ 29 should be deemed admitted

for the following reasons.  Plaintiffs' assertion that "the survey involved a number of states,

including California" is irrelevant to Defendants' asserted fact and should be disregarded as an

attempt to create an alternative statement of facts. *See* General Reply 1; *Navarro v. U.S. Tsubaki,*

*Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).

30.    In August of 1994, HHS-OIG held a meeting in Richmond, Virginia to discuss the survey and enlist the assistance of various state Medicaid programs. (Robben Decl., Ex. 21.) Allen Fung attended the meeting on behalf of the Medi-Cal program. *Id.* State Medicaid officials at the meeting expressed concern that the review was limited to one aspect of pharmacy reimbursement and indicated that any effort to lower reimbursement for pharmacists' acquisition costs should also take into account dispensing fee payments. *Id.*

**Plaintiffs' Response:**  Disputed in part. It is undisputed that some state Medicaid officials expressed such views, but disputed to the extent the statement implies that all such persons expressed such concerns.

**Defendants' Reply:**  Defendants' statement of fact in ¶ 30 should be deemed admitted

for the following reasons.  Plaintiffs' limited dispute is not supported by citations to factual

evidence, and, as such, the statement should be deemed admitted in its entirety.  *See* General

Reply 2; *Okocha v. Brigham & Women's Hosp.*, 81 F.3d 147 (1st Cir. 1996).

31.    In September of 1995, HHS-OIG held a second meeting in Richmond, Virginia to report on the survey's findings. (Robben Decl., Ex. 23.) Douglas Hillblom attended this meeting on behalf of the Medi-Cal program. *Id.* The state Medicaid officials at the meeting indicated that the results of the survey were in line with what they anticipated. *Id.*

**Plaintiffs' Response:**  Undisputed.

**Defendants' Reply:**  None required.

32.    In May of 1996, HHS-OIG published the results of the California-focused survey in a report entitled "Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the California Department of Health Services" (A-06-95-00062) (the "1996 HHS-OIG Report"). (Robben Decl., Ex. 20.) The 1996 HHS-OIG Report examined over 2600 pharmacy invoices from across the state and found that pharmacists' invoice prices for brand-name or single source drugs were, on average, 17.5 percent below published AWPs and that invoice prices for generic or multi-source drugs were, on average, 41.4 percent below AWP. *Id.* at i. In his response to the report, John Rodriguez hoped that the report would "substantiate DHS' position that current drug ingredient cost reimbursement by the Medi-Cal program does not reflect actual purchasing activity of California pharmacies." *Id.* at App. 4.

**Plaintiffs' Response:**  Disputed in part. Plaintiffs do not dispute the existence of the 1996 OIG study. However, Plaintiffs dispute any characterization of the study as providing a factual basis to establish discovery, notice and/or government knowledge as to any specific manufacturer or drug product. Plaintiffs further note that the former Chief Deputy Director of Health Care Services, Stanley Rosenstein, testified that the 1996 OIG study was considered in California's efforts to figure out "honest prices" so that the appropriate discount off of AWP could be implemented:

Q. Okay. And I appreciate, there are a lot of, like dispensing fee, right, there are a lot of moving parts that have to be balanced. But I guess -- but what I am trying to get at is, did -- did DHS communicate in 1996 to the California Legislature an effort to reduce reimbursement rates that AWP minus 5 didn't reflect actual purchasing activity by California pharmacists?

MR. PAUL:  Objection to form.

THE WITNESS:  I am not sure in 1996 where we did. We proposed additional reimbursement reductions in pharmacies, coming off of an AWP minus greater amount.

BY MR. BUEKER:
Q. And as a part of-- as a part of justifying that reduction, one of the things that DHS would have communicated to the California Legislature was that the AWP minus 5 didn't reflect actual purchasing activity by California pharmacists, correct?

A.      Typically, my testimony when I did it was, that we were trying to get to honest pricing, that we accurately represented the cost of purchasing, and the cost of dispensing. The key was to have accurate pricing that had transparency, that everybody could see and agree to. So when I did the testimony on this, it really came from the perspective of we need to have a good honest price.

Q.      Okay. And I am trying to – I understand that. What I am trying to understand is, whether it was ever communicated to the California Legislature that AWP minus 5 didn't reflect the price at which pharmacists in California were actually purchasing pharmaceutical product?

MR. PAUL:  Objection. Form.

THE WITNESS:  I believe the communication was that that was an excessive reimbursement, so that we could pay at a higher -- or lower price, higher AWP.

BY MR. BUEKER:
Q.      Higher discount of AWP?

A.      Higher discount and maintain access to care.

(Paul Decl. Ex. 4 (11/6/08 Rule 30(b)(6) CA Dept. of Health Care Servs. (Rosenstein) Dep.) at 98:7-100:8.)

Plaintiffs further note that Mr. Rosenstein testified that *no manufacturer, following publication of the 1996 OIG report, ever came to Medi-Cal to clarify the discrepancies between its reported AWPs and actual provider acquisition costs:*

> Q.  I think you were showed earlier in the day an exhibit. I think it was Exhibit 5, a 1996 report by the OIG concerning its examination of the discrepancy between AWPs and acquisition costs for generic and branded drugs. Do you recall that?
>
> A.  Yes.
>
> Q.  To your knowledge, did any manufacturer come to the Medi-Cal program after the OIG issued that report to offer help in reforming its reporting of AWPs?
>
> A.  No.
>
> Q.  Did any manufacturer come to the program expressing any concern about the implications of that report to your knowledge?
>
> A.      Not to my knowledge, and never to me.

(*Id.* at 303:3-18.)

**Defendants' Reply**:  Defendants' statement of fact in ¶ 32 should be deemed admitted for the following reasons.  Plaintiffs' assertion that they "dispute any characterization of the study as providing a factual basis to establish discovery, notice and/or government knowledge as to any specific manufacturer or drug product" is irrelevant to Sandoz' asserted fact and should be disregarded as an improper and unsupported argument.  Defendants further state that the cited testimony of Stanley Rosenstein, which concerned what DHS communicated to the California Legislature and whether manufacturers communicated with Medi-Cal about the findings of the 1996 HHS-OIG report, does nothing to refute the stated fact, namely that the 1996 HHS-OIG report found that pharmacists' invoice prices for generic drugs were, on average, 41.4 percent below AWP, and that California received and understood that information.  Plaintiffs' statement should therefore be disregarded.  *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).

33.     In 1996, the California legislature considered revising Medi-Cal's EAC calculation from AWP minus five percent to AWP minus ten percent or Wholesale Acquisition Cost ("WAC") plus seven percent. (Robben Decl., Ex. 24; Ex. 25 at 143:15-147:18.) In response, DHS prepared a document assessing the fiscal impact of the change and weighing its pros and cons. (Robben Decl., Ex. 24.) The document listed the following as the "Pros" to the proposed change:

- Reduces drug expenditures by reducing ingredient cost reimbursement to make it more consistent with the actual acquisition cost of drugs, and other third party payers.
- Would result in General Fund savings.

*Id.* The document also listed the following as the "Cons" to the proposed change:

- Will be opposed by pharmacy providers just as they opposed a previous legislative proposal on this issue.
- Will undermine working relationship between Department of Health Services and the California Pharmacists Association (CPhA) in efforts to develop a regulatory solution that reduces ingredient costs while recognizing other inequities in the reimbursement policies.
- Some pharmacy providers will stop providing services to Medi-Cal beneficiaries because of the reduced payment.

*Id.* Douglas Hillblom, a Pharmacy Consultant with DHS from 1995 to 2000, testified that the "other inequities" referenced in the second bullet point under "Cons" included an inadequate dispensing fee. (Robben Decl., Ex. 25 at 39:12-40:2; 157:4-158:12.) Although it was considered, this methodology was never adopted. *See supra* at ¶ 19-21.

**Plaintiffs' Response:**  Disputed in part. Plaintiffs dispute that the Legislature considered this in 1996. Rather, the referenced document is a Budget Change Proposal for Fiscal Year 1997-98, which has a proposed implementation date of November 1, 1997. It was likely considered, if at all, in 1997. In addition, the cited evidence does not demonstrate the extent to which, if at all, this proposal was ever considered by the Legislature. Rather, the cited testimony reflects that the Legislature asked DHS to suggest potential changes that would result in budgetary savings and that this proposal was developed in response, listing the potential pros and cons of reducing the budget in this manner. But there is no evidence that it was actually proposed to, much less considered by the Legislature or was anything more than an internal Agency "think piece." Plaintiffs further note that the proposal would have eliminated California's use of "direct price" as an element of its reimbursement formula.

        By way of further response, Plaintiffs note that Defendants have omitted those portions of Exhibit 24 that demonstrate that the program intended to reimburse providers for estimated drug acquisition costs, but that, due to the lack of transparency in Defendants' pricing practices as well as the lack of adequate resources, Medi-Cal could not estimate providers' acquisition costs with any precision. In that regard, Exhibit 24 states as follows:

DHS does not have an ongoing program which monitors the most
appropriate formula for reimbursing pharmacy providers for their actual
acquisition drug [sic] costs. . . . The proposal to change the pharmacy
dispensed drug reimbursement methodology . . . reflects DHS' estimate as
to actual pharmacy drug ingredient acquisition costs. However, this may
not be entirely accurate as this methodology was established without
validating actual acquisition costs of drugs within each of the wide variety
of pharmacy provider types . . . . Historically, Medi-Cal drug ingredient
cost reimbursement rates have been based on a combination of estimating
actual drug ingredient acquisition costs versus what most other third party
payers offer in terms of drug ingredient cost reimbursement. This was
appropriate ten or even five years ago, but is no longer a valid approach
due to increased competition in the provider marketplace. Much of this
change in marketplace pressure is due to managed care programs, both
public and private. In recent years, continuous changes in the marketplace
have resulted in a myriad of prescription drug buying schemes (e.g.,
various deals made through wholesale vendors, direct purchases from
manufacturers, special deals made based on projected sales, prices based
on volume purchases, prompt payment discounts, cooperative buying
groups, etc.) This has made it very difficult to determine, on average, what
drug ingredient acquisition costs are for pharmacy providers in Medi-
Cal.... DHS has never developed an ongoing investigative approach to the
problem addressed in this proposal. Current level of staffing has not been
sufficient to accomplish this level of program monitoring.

(Robben Decl. Ex. 24 at 1-3.)

**Defendants' Reply:**  Defendants' statement of fact in ¶ 33 should be deemed admitted

for the following reasons.  Plaintiffs improperly dispute that the Legislature considered this

change in 1996 without providing any citations to factual evidence, and, as such, this statement

should be deemed admitted.  *See* General Reply 2; *Okocha v. Brigham & Women's Hosp.*, 81

F.3d 147 (1st Cir. 1996).  Any dispute as to the date is immaterial and does not refute the

essential elements of the stated fact.  Furthermore, Plaintiffs' citation to Exhibit 24 does not

support the proposition that the alleged lack of transparency in Defendants' pricing prevented

Medi-Cal from estimating providers' acquisition costs with any precision, and Plaintiffs have

offered no other evidence to support its contention, which is improper argument.  *See* General

Reply 2; *Okocha v. Brigham & Women's Hosp.*, 81 F.3d 147 (1st Cir. 1996).  Indeed, that

proposition is contrary to other facts in the record.

34.     Vic Walker, a Pharmacy Consultant with DHS since 1988, indicated that DHS had access
        to WACs from First DataBank at the time this proposal was under consideration.
        (Robben Decl., Ex. 26 at 76:  1-77:22.)

   **Plaintiffs' Response:**  Disputed as stated. Plaintiffs do not dispute that DHS could have
   obtained reported WACs from First DataBank, but deny the statement to the extent
   Defendants imply that DHS routinely examined WACs or compared the WACs for
   Defendants' products to the AWPs of those products. Furthermore, the Rule 30(b)(6)
   deponent designated to testify on behalf of Medi-Cal testified as follows regarding the
   fact that California did not have WAC pricing:

   Q.  Is the WAC for any given NDC available through the RAIS system?

   A.  No, it is not.

   Q.  Okay. So it's not for any NDC?

   A.  No

   * * *

   BY MR. PAUL:
   Ms. Tooker, why does DHS at the time, DHCS now, not get WAC
   information from First DataBank?

   A.      I can't answer that question.

   (Paul Decl. Ex. 5 (10/21/08 Rule 30(b)(6) CA Dept. of Health Care Servs. (Tooker) Dep.)
   at 98:22-99:4, 114:17-21.)

   **Defendants' Reply:**  Defendants' statement of fact in ¶ 34 should be deemed admitted

for the following reasons.  Plaintiffs' citation to the transcript of the Rule 30(b)(6) deposition,

which concerns whether WAC was currently stored in the RAIS system, is irrelevant to, and

does nothing to refute, the stated fact in ¶ 34, namely that Vic Walker had personal knowledge of

the fact that DHS had access to WACs from First DataBank at the time this proposal was under

consideration.  *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d  487, 493 n.1

(D. Mass 2008).

35. In 1999, Vic Walker prepared an analysis of a similar proposal. (Robben Decl., Ex. 27.) His analysis described the proposal as follows:

> This proposal changes the method by which pharmacy drug acquisition costs are reimbursed by replacing Average Wholesale Price minus 5% (AWP-5%) and the Direct Price reimbursement elements in the formula with AWP minus X% or Wholesale Acquisition Cost (WAC) plus Y percent, which is lower, on a drug-by-drug basis. This would more closely approximate actual acquisition costs of drugs by pharmacies.

*Id.* Mr. Walker's analysis noted the California-focused 1996 HHS-OIG Report. *Id.* It also noted that it would be advisable to implement the change through legislation, rather than administrative rule making:

> This change *can* be implemented through regulation, but the Department does not believe it can sustain the legal challenges to the regulations that will be brought to bear by its opponents. The most certain way to implement a new reimbursement schedule is through legislation.

*Id.* The analysis also noted that political pressure from lobbying groups had blocked implementation of similar measures in the past:

> This identical proposal has been made almost every year since the early 1990s, but has been fought to a standstill in every instance by the effective lobbying efforts of the pharmacy provider organizations and beneficiary advocacy organizations. The pharmacy provider organizations oppose these changes because it would result in reduced reimbursement. The beneficiary advocacy organizations oppose them because they might result in reduced pharmacy provider participation.

*Id.* This proposal, like the previous one, was never adopted. *See supra* at ¶ 19-22.

**Plaintiffs' Response:**  Disputed in part. The cited evidence does not demonstrate the extent to which, if at all, this proposal was ever considered by the Legislature. Rather, the cited testimony reflects that the Legislature asked DHS to suggest potential changes that would result in budgetary savings and that this proposal was developed in response, listing the potential pros and cons of reducing the budget in this manner. But there is no evidence that it was actually proposed to, much less considered by the Legislature or was anything more than an internal Agency "think piece." Plaintiffs further note that the proposal would have eliminated California's use of "direct price" as an element of its reimbursement formula. By way of further response, Plaintiffs incorporate their response to SOF 33, and state that in 1999 the Legislature directed DHS to perform a study of pharmaceutical acquisition costs and dispensing costs, so that it could make appropriate adjustments to the reimbursement rate(s). (*See* SOF 41 below and Plaintiffs' response thereto.)

**Defendants' Reply:**  Defendants' statement of fact in ¶ 35 should be deemed admitted for the following reasons.  Plaintiffs' assertion that "there is no evidence that it was actually proposed to . . . the Legislature" is irrelevant to Defendants' asserted fact and should be disregarded as an attempt to create an alternative statement of facts. *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d  487, 493 n.1 (D. Mass. 2008).  Plaintiffs assert that the proposal would have "eliminated California's use of 'direct price' as an element of its reimbursement formula" without providing any citations to factual evidence.  Further, this assertion is irrelevant to Defendants' asserted fact and should be disregarded as an attempt to create an alternative statement of facts.  *See id.*

36.  In 2000, the California legislature was considering a bill, AB 1915, that would lower Medi-Cal's pharmacy reimbursement rate from AWP minus five percent to AWP minus 15 percent. (Robben Decl., Ex. 28 at 113:1-19; Ex. 29.) In response to the bill, DHS prepared a bill analysis recommending that AB 1915 be opposed. (Robben Decl., Ex. 29.) In the analysis, DHS raised the concern that a decrease in the reimbursement rate could drive providers out of the program, creating serious access issues:

> Reducing the Medi-Cal EAC for drugs with AWP minus 5 percent to AWP minus 15 percent would not be merited without first taking steps to determine an appropriate rate of reimbursement. Federal law requires that the state assure that "...payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers..." [Social Security Act Section 1902(a)(30)(A)] which can best be demonstrated through performance of a proper rate study.

> If the proposed AWP minus 15 percent were to be implemented, together with the current direct price component, California would be last in drug ingredient cost pharmacy reimbursement when compared to other "AWP minus" states. At this point, Medi-Cal may suffer a serious patient access problem as providers disenroll from Medi-Cal rather than accept the reduced payment.

*Id.* at 2. AB 1915 was never enacted. *See supra* at ¶ 19.

**Plaintiffs' Response:**  Disputed in part. As Exhibits 28 and 29 make clear, DHS's opposition to Assembly Bill 1915 was based on a number of reasons, including, but not limited to those Defendants mention. By way of further response, Plaintiffs' incorporate their responses to SOFs 33 and 25, above, and state that DHS was already in the process

of performing a reimbursement rate and dispensing cost study so that it could recommend appropriate changes to the State's reimbursement formula.

**Defendants' Reply:**  Defendants' statement of fact in ¶ 36 should be deemed admitted for the following reasons.  Plaintiffs' assertion that "Assembly Bill 1915 was based on a number of reasons, including, but not limited to those Defendants mention" is irrelevant to Defendants' asserted fact and should be disregarded as an attempt to create an alternative statement of facts. *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d  487, 493 n.1 (D. Mass. 2008).  The existence of additional reasons that form the basis of Assembly Bill 1915 does not create a dispute of fact as to the reasons Defendants presented in ¶ 36.

37.     At their depositions, several Medi-Cal officials testified that they have understood for a long time that AWP was not representative of actual prices paid.

**Plaintiffs' Response:**  Disputed. In addition, Plaintiffs object to this statement as improperly vague and incapable of response, in particular since Defendants cite no supporting evidence. Plaintiffs further respond that certain Medi-Cal officials testified that, although they believed reported AWPs were "not representative of actual prices paid" by pharmacies, they also testified that various features of California's reimbursement methodology, including the reimbursement of certain manufacturers' drugs at the "direct price" as well as the fact that EAC was discounted from AWP, compensated for the variance between AWP and actual acquisition costs.

**Defendants' Reply:**  Defendants' statement of fact in ¶ 37 should be deemed admitted for the following reasons.  Plaintiffs' assertion that some Medi-Cal officials testified that "various features of California's reimbursement methodology . . . compensated for the variance between AWP and actual acquisition costs" is irrelevant to Defendants' asserted fact and should be disregarded as an attempt to create an alternative statement of facts. *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d  487, 493 n.1 (D. Mass. 2008).  The existence of such testimony does not create a dispute of fact as to the testimony cited in ¶ 37.  Defendants further note that the supporting evidence is found in the succeeding three paragraphs, which quote the referenced testimony.

38.     Kevin Gorospe, Chief of the Medi-Cal Pharmacy Policy Unit at DHS since 2000, testified as follows:

> Q.  . . .You understood that variation -- Sometime in the late nineties you understood that variations existed between how Medicaid was reimbursing for drugs and the actual pharmacy acquisition costs for drugs?
> A. Yes.

(Robben Decl., Ex. 30 at 503:13-18.) Mr. Gorospe also acknowledged that prices for generic drugs were generally significantly more than 20 percent below AWP:

> Q.  Did you have that understanding also going back to the late nineties, that AWP minus 20 percent is significantly higher than pharmacy acquisition costs for generic drugs?
> A.     Yes.
> …
> Q.  So was it your understanding to the extent you recall this proposal that the reimbursement rate of AWP minus 20 percent was made knowing that reimbursement on that basis would be significantly higher than acquisition costs for generic drugs?
> A.     Yes.

(Robben Decl., Ex. 30 at 594:7-11; 594:21-595:5.)

**Plaintiffs' Response:**  Plaintiffs do not dispute that Defendants accurately, but selectively, quote excerpts of Dr. Gorospe's testimony. By way of further response, Plaintiffs state that Medi-Cal relied on the accuracy of the price information that Defendants reported and did not have the resources to conduct ongoing audits of pharmaceutical pricing patterns. Plaintiffs further note that Douglas Hillblom, who worked for DHS from 1993 to 2005 and was the Senior Pharmaceutical Consultant from 1995 to 2001, testified as follows:

> Q.  To your knowledge did the -- during your time at the Department of Health Services did the Department of Health Services have an expectation that drug manufacturers would report the AWPs to First DataBank honestly and truthfully?

> MR. BUEKER:  Objection to form.

> MS. BERWANGER:  Objection to form.

> MR. ROBBEN:  I thought he wasn't a 30(b)(6) witness.

> THE WITNESS:  My understanding is that the expectation of the Department was that the -- the data supplied was the appropriate data, that it was accurate.

(Paul Decl. Ex. 6 (9/23/08 Hillblom Dep.) at 348:1-13.) Plaintiffs further note that Dr. Gorospe testified as follows:

> BY MR. PAUL:
> Q.  At any time in your career at DHCS have you ever received any communication of any sort from Mylan explaining the differences between the AWPs it reports and providers' actual acquisition costs?
>
> A.  /Not that I can recall.
>
> Q.  At any time in your career at DHCS have you ever received any communication of any sort from Sandoz explaining the differences between the actual acquisition costs for its drugs and Sandoz's reported AWPs?
>
> A.  Not that I can recall.
>
> Q.  I won't restate the question each time, but the same question regarding Dey Pharmaceuticals?
>
> A.  Not that I recall -- not that I can recall, no.
>
> Q.  And Warrick?
>
> A.  Again, the answer is no.
>
> Q.  Schering?
>
> A.  No.

(Paul Decl. Ex. 7 (9/22/08 Gorospe Dep.) at 698:7-699:6.)

> Q.  In Your opinion, Dr. Gorospe, if manufacturers had reported AWPs truthfully as -- as accurate measures of actual wholesale prices, would this legislation and the efforts made to implement it have -- have been necessary?
>
> MR. BUEKER:  Objection as to form.
>
> THE WITNESS:  If you mean by "truthful" the description as stated here, what wholesale selling price represents?
>
> MR. HENDERSON:  Yes.
>
> THE WITNESS:  Yes, this legislation would not have been necessary.

(Paul Decl. Ex. 1(12/3/08 Rule 30(b)(6) Dept. of Health Care Servs. (Gorospe) Dep.) at 253:10-21; *see also* Pls.' Resp. to SOFs 33 and 35 above.)

**Defendants' Reply:**  Defendants' statement of fact in ¶ 38 should be deemed admitted for the following reasons.  Plaintiff does not dispute the cited statement but instead attempts to raise factual assertions that are irrelevant to the asserted fact.  *See* General Objection 1.  Plaintiffs' assertion, moreover, are not supported.  Defendants object to the use of the testimony cited in ¶ 38 as violative of Rule 611(c) of the Federal Rules of Evidence, on the grounds that it was elicited from a witness produced by California through leading questions asked by California's counsel during direct examination.  The admissible facts show California has understood since at least the late 1970s that compendia AWPs significantly exceed providers' actual costs to acquire prescription drugs.  (*See* Joint SOF at ¶¶ 22-41).  Despite this understanding, California has never defined AWP in a statute or regulation as anything other than a price listed in compendia, and has never offered any guidance as to how AWP should be determined.  (*See* Joint SOF at ¶ 20).  Defendants did not report "inflated" or "incorrect" AWPs, because the reported AWPs were precisely what they were expected to be (*see* Sandoz' Response to Plaintiffs' Sandoz-specific SOF in support of Plaintiffs' Motion at ¶¶ 8, 11).

39.   Len Terra, Mr. Gorospe's predecessor, agreed that AWP did not reflect prices actually paid:

> Q.  Would you have agreed in 1985 that AWP was not a reliable predictor of the price pharmacists actually pay for drugs?
> A.  I probably would have agreed to that, but I would not have necessarily been privy to this type of information. I am not aware of, you know, being aware of this specific information, but it was generally known in the pharmacist industry that AWP did not reflect actual acquisition costs by pharmacists.

(Robben Decl., Ex. 31 at 107:1-11.)

**Plaintiffs' Response:**  Plaintiffs object to the relevance of this SOF in that this statement relates to Mr. Terra's understanding some nine years prior to the beginning of the relevant period and four years before California extensively studied its reimbursement rates and revised its reimbursement methodology in 1989. Plaintiffs incorporate their responses to SOFs 22, 24, 25 and 38 above. (See also CA SOAF Defs. ¶¶ 18-19.)

**Defendants' Reply:**  Defendants' statement of fact in ¶ 39 should be deemed admitted for the following reasons.  Plaintiffs do not dispute the statement but instead object to its relevance.  Defendants' motion explains the relevance of this and other facts regarding California's knowledge and understanding of AWP and related information.  Plaintiffs' attempts to raise factual assertions that are irrelevant to the asserted fact, by referring generally to other fact statement paragraphs, must be rejected.  *See* General Objection 1.  And Plaintiffs' assertion is not supported by the cited fact statement paragraphs, as Defendants' responses thereto explain.

40.    Vic Walker indicated that he understood since 1996 that Medi-Cal's EAC calculation was higher than pharmacists' acquisition costs:

> Q.  And was there a time after California implemented the AWP-5 percent reimbursement that you reached an understanding that reimbursement based on AWP-5 percent was in excess of pharmacies' actual acquisition cost?
> A.  I -- at some point I arrived at that conclusion. I don't know when.
> Q.  It was before this report was issued though; correct?
> A.  Yes.
> Q.  Was it well before this report was issued?
> A.  Well, we have evidence in 1996 I was thinking that way.

(Robben Decl., Ex. 26 at 146:12-147:3.)

**Plaintiffs' Response:**  Disputed in part. Plaintiffs do not dispute that Defendants have correctly, if selectively, quoted Mr. Walker's testimony. Plaintiffs object to this statement on the grounds that Mr. Walker was a Pharmacy Consultant who did not at any time have authority to either speak for DHS or set Agency policy. His personal opinions are therefore irrelevant. By way of further response, Plaintiffs incorporate their responses to SOFs 33, 34, 35, 38 and 39 above and note that the Agency did not have adequate resources to accurately determine pharmaceutical ingredient costs, but instead were forced to rely in large measure on the honesty and integrity of the prices that Defendants reported.

**Defendants' Reply:**  Defendants' statement of fact in ¶ 40 should be deemed admitted for the following reasons.  Plaintiffs do not dispute the statement but instead object to it.  The objection is not well-taken, as the cited testimony supports Defendants' asserted fact, and does not represent personal opinions.  Plaintiffs attempts to raise factual assertions that are irrelevant

to the asserted fact, by referring generally to other fact statement paragraphs, must be rejected.

*See* General Reply 1.  And Plaintiffs' assertion is not supported by the cited fact statement

paragraphs, as Defendants' responses thereto explain.  Defendants did not report "inflated" or

"incorrect" AWPs, because the reported AWPs were precisely what they were expected to be

(*see* Sandoz' Response to Plaintiffs' Sandoz-specific SOF in support of Plaintiffs' Motion at ¶¶

8, 11).

## IV.    THE MYERS & STAUFFER REPORTS

41.    In 1999, the California legislature required DHS to perform a study of Medi-Cal provider
acquisition costs and dispensing costs for pharmaceutical products. (Robben Decl., Ex.
32 at 227:13-18.) DHS commissioned Myers and Stauffer LC to conduct the study. *Id.* at
227: 19-228:3.

**Plaintiffs' Response:**  Plaintiffs do not dispute the facts contained in SOF 41, but clarify
that California Senate Bill 393 expressly required as follows:

> "The State Department of Health Services shall conduct a study of the
> adequacy of Medi-Cal pharmacy reimbursement rates including the cost of
> providing prescription drugs and services."

(Robben Decl. Ex. 33, at 3.)

Plaintiffs further clarify that DHS did not have the manpower to conduct such a study
itself and was required to issue a request for proposals, part of the government bid
process, before eventually selecting Myers & Stauffer to undertake the study and issue its
report. In his deposition, Dr. Kevin Gorospe, the Chief of the Medi-Cal Pharmacy Policy
Unit, testified that the report took about 18 months to obtain after Myers & Stauffer was
engaged to prepare it.

> Q. Okay. In 1999 did the California Legislature instruct the Department to
> prepare a study on the -- the adequacy of reimbursements to pharmacies?

> MR. BUEKER:  Objection as to form.

> THE WITNESS:  Pursuant to Senate Bill 393 the Legislature directed the
> Department to do a study.

> BY MR. HENDERSON:

> Q.  Okay. And was that in 1999?

> A.  That was in 1999.

Q.  Okay. Did -- did the Department take any action within the next year on that?

A.  No.

Q.  Did the Legislature subsequently establish a deadline for a study -- such a study -- if you recall?

A.  Not that I can recall --

Q.  Okay.

A.  -- specifically.

Q.  In any event, did the Department then take some action to have such a study prepared?

A.  Yes. In 2001 the Department issued an RFP, Request for Proposal, to find a -- company to do such a study.

Q.  All right.  And that -- that request for proposal ultimately resulted in an arrangement with Myers and Stauffer, and they produced two reports that have been discussed in your testimony previously; is that right?

A.  That's correct. They -- they produced essentially two reports. They were -- one on dispensing costs and one on acquisition costs.

Q.  So about how long did it take between when the Department first started the process of preparing a request for proposal and when the Myers and Stauffer studies were actually issued?

A.  Roughly 18 months.

(Paul Decl. Ex. 1(12/3/08 Gorospe Dep.) at 237:21-239:16.)

**Defendants' Reply**:  Defendants' statement of fact in ¶ 41 should be deemed admitted

for the following reasons.  Plaintiffs do not dispute that in 1999, the California legislature

required DHS to perform a study of Medi-Cal provider acquisition costs and dispensing costs for

pharmaceutical products.  As such, this statement is undisputed and deemed admitted.  Plaintiffs,

however, improperly seek to "clarify" this fact by contending that DHS did not have the

manpower to conduct such a study itself and was required to issue a request for proposals, part of

the government bid process, before eventually selecting Myers & Stauffer to undertake the study

and issue its report.  This statement, which is irrelevant, does not squarely address the statement of fact in ¶ 41 and should consequently be rejected.  *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).  Furthermore, Plaintiffs' citation to California Senate Bill 393 does nothing to refute the stated fact in ¶ 41, namely that the California legislature required DHS to perform a study of Medi-Cal provider acquisition costs and dispensing costs for pharmaceutical products.  Defendants also object to the testimony cited in ¶ 41 as violative of Rule 611(c) of the Federal Rules of Evidence, on the grounds that it was elicited from a witness produced by California through leading questions asked during direct examination by an attorney for the United States, a party with a unity of interest with California and Relator.

42.     In June of 2002, Myers and Stauffer issued two reports detailing the results of its study. (Robben Decl., Ex. 32 at 227:19-228:22; Ex. 33; Ex. 34.)

   **Plaintiffs' Response:**  Plaintiffs dispute that the reports were issued in June 2002, but rather agree that, as stated in SOF 52, the Myers & Stauffer reports, although due on July 1, 2002, were in fact released on August 23, 2002.

   **Defendants' Reply:**  It is undisputed that Myers and Stauffer issued two reports detailing the results of its study.  The reports were due on July 1, 2002 and were released on August 23, 2002.

43.     One report, entitled "A Survey of Acquisition Costs of Pharmaceuticals in the State of California," examined pharmacists' actual acquisition costs for the top 2,000 drugs as measured by Medi-Cal expenditures. (Robben Decl., Ex. 34 at 3.) The report examined invoices from over 2,000 Medi-Cal providers. *Id.*

   **Plaintiffs' Response:**  Plaintiffs do not dispute the facts in the first sentence, but dispute the second sentence. On page 10 of the report, the survey methodology indicates a random sample of 2010 pharmacies was asked to participate in the study but usable invoices came from only 491 pharmacies. (Robben Decl. Ex. 34 at 10.)

   **Defendants' Reply:**  Defendants' statement of fact in ¶ 43 should be deemed admitted for the following reasons.  Defendants object to the extent Plaintiffs fail to specifically controvert

all portions of each statement of undisputed fact, and each such uncontroverted portion of a

statement of undisputed fact should be deemed admitted.  *See* General Reply 3; *Navarro v. U.S.*

*Tsubaki, Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).  Furthermore, Plaintiffs do not

dispute that the Myers and Stauffer report, entitled "A Survey of Acquisition Costs of

Pharmaceuticals in the State of California," examined pharmacists' actual acquisition costs for

the top 2,000 drugs as measured by Medi-Cal expenditures.  As such, this statement is

undisputed and deemed admitted.  *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F.

Supp. 2d 487, 493 n.1 (D. Mass. 2008).  Plaintiffs limit their dispute to the report having

examined invoices from over 2,000 Medi-Cal providers, which is not relevant to ¶ 43.

44.   According to the report, pharmacists could acquire single source drugs at an average of
      82.8 percent of AWP. (Robben Decl., Ex. 34 at 4) The report also found that pharmacists
      could acquire multi-source drugs without a FUL for an average of 56.6 percent of AWP.
      Id. Finally, the report concluded that pharmacists could acquire multi-source drugs with a
      FUL for an average of 12.7 percent of AWP and 38.7 percent of the FUL. *Id.*

      **Plaintiffs' Response:**  Plaintiffs dispute Defendants' characterization of the report,
      which states:  "The acquisition costs for multi-source drugs exhibited *much greater*
      *variation* but averaged 56.6% of the AWP (mean weighted by Medi-Cal volume) for
      drugs without FUL prices." (Robben Decl. Ex. 34 (italics added).)

             To clarify by adding context, Dr. Gorospe explained that there would be
      significant problems if 56.6% of AWP was used for reimbursement of such drugs, as
      some providers would be undercompensated and some would be overcompensated. The
      chart indicates the weighted mean with underpayment and overpayment occurring on
      either side of the mean. Using AWP minus 56.6% would not accomplish California's
      goals to be fair and consistent in reimbursing for drugs.

             Q.  All right. I believe the chart indicates that the weighted mean shown in
             terms of average acquisition cost as a percentage of AWP is 56.6 percent;
             is that right? That's what this says anyway?

             A.  That's what the chart says, yes.

             Q.  And if reimbursement were set at AWP minus 56.6 percent, what
             would that mean for those drugs that are at the right side of the mean?

             MS. DANNA:  Object to form.

THE WITNESS:  For products whose average acquisition cost is above 56.6 percent that would mean the pharmacy would — would essentially lose money on the ingredient cost.

BY MR. HENDERSON:

Q. Okay. And for drugs to the left of the mean what would it mean for pharmacies who are reimbursed for those drugs?

A. That they would make money based on the percentages.

Q. All right. So if -- would it be fair to say that if -- if reimbursement were based on AWP minus 56.6 percent of AWP, there would be very significant inaccuracies in the amounts of reimbursements because of this wide variation in the relationship between AWP and actual acquisition costs?

MR. BUEKER:  Objection as to form.

BY MR. HENDERSON:

Q.  Is that fair to conclude?

MR. BUEKER:  Same objection.

THE WITNESS:  Based on the -- the chart presented, that's correct.

BY MR. HENDERSON:
Q. Are you aware of any rational policy reason for paying inflated reimbursements for those drugs that just happened to fall on the left side of the mean?

MR. BUEKER:  Objection as to form.

THE WITNESS:  No, I don't.

BY MR. HENDERSON:
Q. And are you aware of any rational policy reason for paying an inadequate ingredient cost for those drugs that happen to be on the right side of that midpoint?

MR. BUEKER:  Same objection.

THE WITNESS:  No, I don't.

BY MR. HENDERSON:
Q. Is it the Department's policy to be fair and consistent in its methodology for reimbursing drugs?

A. Yes.

(Paul Decl. Ex. 1 (12/3/08 Rule 30(b)(6) CA Dept. of Health Care Servs. (Gorospe) Dep.) at 243:8-245:16.)

**Defendants' Reply:**  Defendants' statement of fact in ¶ 44 should be deemed admitted for the following reasons.  Defendants object to the extent Plaintiffs fail to specifically controvert all portions of each statement of undisputed fact, and each such uncontroverted portion of a statement of undisputed fact should be deemed admitted.  *See* General Reply 3; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).

Plaintiffs do not dispute that the report concluded that pharmacists could acquire single source drugs at an average of 82.8 percent of AWP, or multi-source drugs without a FUL for an average of 56.6 percent of AWP, or multi-source drugs with a FUL for an average of 12.7 percent of AWP and 38.7 percent of the FUL.  As such, this statement is undisputed and deemed admitted.  Plaintiffs, however, improperly dispute ¶ 44 by pointing to the report's statement of "variation" among acquisition costs for multi-source drugs without an FUL.  This statement does not squarely address the statements of fact in ¶ 44 and should consequently be rejected.  *See* General Reply 1; *Navarro*, 577 F. Supp. 2d at 493 n.1 (D. Mass. 2008).

Furthermore, Plaintiffs' citation to transcript testimony from Dr. Gorospe, which concerns his interpretation of the implications of the report and his views as to California, is irrelevant to, and does nothing to refute, the report conclusions stated in ¶ 44.  *See* General Reply 1; *Navarro*, 577 F. Supp. 2d at 493 n.1 (D. Mass. 2008).  Defendants also object to the testimony cited in ¶ 41 as violative of Rule 611(c) of the Federal Rules of Evidence, on the grounds that it was elicited from a witness produced by California through leading questions asked during direct examination by an attorney for the United States, a party with a unity of interest with California and Relator.  Plaintiffs' "context" also must be rejected as improper and unsupported argument.

45.     The report also contained lists comparing average actual acquisition costs to published AWPs for the top 200 multi-source products without a FUL and the top 200 multisource products with a FUL. (Robben Decl., Ex. 34 at Exs. 5 & 6.) Included on these lists are 3 of the Dey subject NDCs, 31 of the Mylan NDCs and 44 Sandoz NDCs. *Id.* The chart below sets forth examples comparing the average actual acquisition costs and published AWPs for certain of the Subject Drugs, as well as the "spreads" between them:

| Drug/NDC | Average actual acquisition cost per unit | Published AWP per unit | Spread |
|---|---|---|---|
| Mylan's cimetidine 00378037205 | $0.05 | $1.61 | 3055% |
| Mylan's diphenoxylate/atropine 00378041510 | $0.09 | $0.48 | 419% |
| Dey's ipratropium 49502068503 | $0.21 | $0.71 | 238% |
| Dey's albuterol sulfate 49502069703 | $0.07 | $0.40 | 471% |
| Sandoz' Amiodarone HCL 781120360 | $0.57 | $3.13 | 447% |
| Sandoz' Atenolol 781150701 | $0.03 | $1.04 | 3836% |

**Plaintiffs' Response:**  Plaintiffs dispute Defendants' implied representation that a column labeled "spread" exists in the multi-paged chart contained in the Myers & Stauffer report. No such column was included in the lists to which Defendants point in SOF 45.

        Nevertheless, Plaintiffs do not dispute Defendants' accurate calculations of their own, and acknowledged, megaspreads based on the Myers & Stauffer snapshot of pricing data.

**Defendants' Reply:**  Defendants' statement of fact in ¶ 45 should be deemed admitted for the following reasons.  Plaintiffs do not dispute the contention that the report contained the data listed in ¶ 45 other than the spread calculations, and do not dispute the accuracy of the spread calculations.  Defendants acknowledge that the spread calculations are their own and do not appear in the report.  Thus the statement of fact in ¶ 45 is undisputed and should be deemed admitted.

46.     Not surprisingly, the report concluded that California's EAC calculation at the time, AWP minus five percent, paid providers considerably more than their actual acquisition cost for drugs:

> Findings from this study indicate that the current pharmacy ingredient reimbursement rate of AWP less 5% provides payments in excess of the costs actually incurred by California pharmacies in acquiring pharmaceutical products for Medi-Cal recipients. In fact, the acquisition cost study findings indicate that for a "typical" prescription, a pharmacy's margin on ingredient reimbursement is approximately $10.

(Robben Decl., Ex. 34 at 4-5.) However, the report warned that the ingredient cost could be assessed without also considering the dispensing fee:

> These margins on ingredient cost must be considered in tandem with an analysis of pharmacy dispensing cost and dispensing fee reimbursement.

*Id.* at 5.

**Plaintiffs' Response:**  Plaintiffs dispute Defendants' characterization that the report concluded that providers were paid "considerably more" than actual acquisition costs for all drugs, or that the report "warned" anyone.

Plaintiffs further note that the report did not purport to analyze the legality of considering ingredient costs "in tandem" with dispensing costs, but only the economic reality that together the two items resulted in the "total" reimbursement paid to pharmacies. The 1989 regulatory history made clear that California did not have a policy of cross-subsidizing purportedly inadequate dispensing fees by overcompensating providers for ingredient costs. In addition, Dr. Gorospe testified that California did not permit or approve of inflated reimbursement on ingredient cost to subsidize for supposedly inadequate dispensing fees. (Paul Decl. Ex. 1 (12/3/08 Rule 30(b)(6) CA Dept. of Health Care Servs. (Gorospe Dep.) at 294:6-296:14, 299:3-10.)

California also disputes the implication that the State of California had a policy of paying inflated ingredient costs in order to cross-subsidize dispensing fees. Dr. Gorospe testified on the subject as follows:

> BY MR. HENDERSON:
> Q. Did the – did the Department ever delegate to drug manufacturers the authority to determine how much dispensing fees should be paid to providers?
>
> A. No.
>
> Q. Did the Department ever take a position that drug manufacturers should be permitted to report false AWP pricing information so that — in order to compensate for inadequate dispensing fees?
>
> MR. BUEKER:  Objection as to form.

A. THE WITNESS:  No.

BY MR. HENDERSON:
Q. In your opinion, Dr. Gorospe, would it be a reasonable government policy to give drug manufacturers the – the power to increase reimbursements in order to make up for what they perceive to be inadequate dispensing fees?

MR. BUEKER:  Objection as to form.

A. HE WITNESS:  No.

BY MR. HENDERSON:
Q. Why not?

MR. BUEKER:  Same objection.

A. THE WITNESS:  Why not what?

BY MR. HENDERSON:
Q. Well, why wouldn't that be a reasonable policy to pursue?

MR. BUEKER:  Same objection.

A. THE WITNESS:  The management of the – the program is – with the State of California and with – and the federal government, and to allow a – what is considered in California a provider type, which a manufacturer is, to set rates for providers would – would not make sense.

BY MR. HENDERSON:
Q. It would give the manufacturer control over how much money is – of the State's money is spent; is that fair to say?

A. Potentially.

Q. To your knowledge has – Let me withdraw that and ask a different question. If Abbott Laboratories reported grossly inflated Average Wholesale Prices to First DataBank knowing and intending that those prices would be used by state Medicaid agencies, including Medi-Cal, to pay inflated reimbursements to customers, people who bought Abbott drugs, would you consider that to be deceptive?

MR. COLE:  Objection. Form.

A.  THE WITNESS:  Yes.

* * *

Q.  Has the Department ever had a — any policy or practice of paying inflated acquisition costs in order to compensate for perceived inadequate dispensing fees?

MR. BUEKER:  Objection as to form.

A.  THE WITNESS:  Was it a policy?

Q.  MR. HENDERSON:  Yes.

A.  THE WITNESS:  No.

(Paul Decl. at Ex. 1 (12/3/08 Rule 30(b)(6) CA Dept. of Health Care Servs. (Gorospe) Dep.) at 294:6-296:14, 299:3-10.) In addition, Douglas Hillblom, who worked for DHS from 1993 to 2005 and was the Senior Pharmaceutical Consultant from 1995 to 2001, testified as follows:

A.  THE WITNESS:  Pharmacy reimbursement is a multi-component item. Cost of the drug product is only one component.

BY MR. BUEKER:
Q.  The other component is dispensing fee; correct?

A.  Correct.

Q.  And that's a rate that was set independently of the ingredient cost reimbursement rate; is that fair?

A. Yes.

Q.  And together the two had to total something that the Department considered reasonable; right?

A. Yes.

Q.  But in terms of the actual calculation of the two components, the calculation of the two components, that portion of it was done separately?

A.  Yes.

Paul Decl. Ex. 6 (9/23/08 Hillblom Dep.) at 93:16 - 94:13.)

**Defendants' Reply**:  Defendants' statement of fact in ¶ 46 should be deemed admitted

for the following reasons.  Plaintiffs improperly dispute the Defendants' alleged

"characterization" of the report without providing any citations to factual evidence, and as such,

this statement should be deemed admitted.  *See* General Reply 2; *Okocha v. Brigham &*

*Women's Hosp.*, 81 F.3d 147 (1st Cir. 1996).

Furthermore, Plaintiffs' citation to Dr. Gorospe's testimony, which concerns California's

policy as to the cross-reimbursement of dispensing fees, is irrelevant to, and does nothing to

refute, the stated fact in ¶ 46, namely that the report concluded that California's EAC calculation

at the time, AWP minus five percent, paid providers considerably more than their acquisition

cost for drugs, and that the report warned that the ingredient cost could be assessed without also

considering the dispensing fee.  *See* General Reply 1; *Navarro*, 577 F. Supp. 2d at 493 n.1 (D.

Mass. 2008).  Whatever California's policy – which is addressed elsewhere at length -- was has

no bearing on what the report actually stated.

Defendants also object to the testimony cited in ¶ 41 as violative of Rule 611(c) of the

Federal Rules of Evidence, on the grounds that it was elicited from a witness produced by

California through leading questions asked during direct examination by an attorney for the

United States, a party with a unity of interest with California and Relator.

47.   The second report, entitled "Study of Medi-Cal Pharmacy Reimbursement," examined
      Medi-Cal pharmacy providers' costs to dispense drugs. (Robben Decl., Ex. 33.) The
      report found that the average cost of dispensing drugs weighted by Medi-Cal volume was
      $8.69. *Id.* at 26. Excluding intravenous and compounded drugs, the report found that
      average cost of dispensing weighted by Medi-Cal volume was $7.21. *Id.* at 28. Even
      excluding intravenous drugs, the average cost of dispensing was more than $3.00 higher
      than the $4.05 dispensing fee then paid by California.

      **Plaintiffs' Response:**  Plaintiffs dispute Defendants' characterization of the Myers &
      Stauffer findings. In particular, Myers & Stauffer expressly concluded that it was
      inappropriate to include the generally greater costs associated with intravenous and
      compounded drugs and that the $8.69 amount, which included such products, was not
      appropriate to use as the basis for reimbursement. (Robben Decl. Ex. 33 at 28.) Further,
      although the Report found that the average cost of dispensing weighted by Medi-Cal
      volume was $7.21 per prescription, the Report expressly concluded that "[t]he
      measurement that is the most ideally suited for determining the typical cost of dispensing
      prescriptions to Medicaid recipients is the **median weighted by Medi-Cal volume."** (*Id.*
      at 25.) That amount was $6.95 per prescription. (*Id.* at 28.)

**Defendants' Reply:**  Defendants' statement of fact in ¶ 47 should be deemed admitted for the following reasons.  Plaintiffs do not dispute that the report plainly states that the average cost of dispensing drugs weighted by Medi-Cal volume was $8.69, or, excluding intravenous and compounded drugs, $7.21.  Nor do they dispute that this average cost of dispensing was more than $3.00 higher than the $4.05 dispensing fee paid by California.  Plaintiffs' editorializing about the report's methodology and reasoning does not dispute the actual content of the report. *See* General Reply 1; *Navarro v. U.s. Tsubaki, Inc.* 577 F.Supp. 2d at 193 n.1.

48.   As part of the report, Myers & Stauffer calculated the total average cost to the pharmacist to dispense the drug (including the pharmacist's cost to acquire the drug and the pharmacist's cost to dispense the drug), the average reimbursement payment by Medi-Cal (including the ingredient cost reimbursement and the dispensing fee), and the average margin for various categories of drugs:

|  | Average Cost | Average Payment | Average Margin | Percent Margin |
|---|---|---|---|---|
| Brand drugs | $120.36 | $133.14 | $12.78 | 9.60% |
| Generic drugs without FULs | $28.87 | $38.34 | $9.47 | 24.70% |
| Generic drugs with FULs | $10.46 | $11.73 | $1.27 | 10.90% |

(Robben Decl. Ex. 33 at 50.)

**Plaintiffs' Response:**  Plaintiffs dispute this statement, which is incomplete. In particular, Plaintiffs note that Defendants' chart is incomplete and omits relevant information relating to the facts that certain drugs were reimbursed at direct price and others based on a MAIC, which resulted in an overall margin on reimbursement of only 11%. The actual report provides as follows:

### Table 5.2 Average Margins on Medi-Cal Prescriptions

| Drug Category | Average Cost[1] | Average Payment[2] | Average Margin | Percent Margin |
|---|---|---|---|---|
| Single Source – Not Paid with Direct Price | $120.36 | $133.14 | $12.78 | 9.6% |
| Single Source – Paid with Direct Price | $90.92 | $92.66 | $1.74 | 1.9% |
| Multi-Source Drugs – Not Paid with Direct Price (no FUL or MAIC) | $28.87 | $38.34 | $9.47 | 24.7% |

| | | | | |
|---|---|---|---|---|
| Multi-Source Drugs – Paid with Direct Price (no FUL or MAIC) | $51.59 | $51.44 | ($0.15) | (0.3%) |
| Multi-Source Drugs with a Federal Upper Limit (FUL) | $10.46 | $11.73 | $1.27 | 10.9% |
| Multi-Source Drugs with a MAIC | $9.79 | $11.07 | $1.28 | 11.6% |
| **All Drug Product Categories** | **$53.88** | **$60.55** | **$6.67** | **11.0%** |

(*See* Robben Decl. Ex. 33 at 50.)

**Defendants' Reply:**  Defendants' statement of fact in ¶ 48 should be deemed admitted

for the following reasons.  Plaintiffs do not dispute the accuracy of the contents of the chart as

presented by Defendants, only that the chart omits certain other data contained in the report.  The

presence of other data in the report is irrelevant to, and does nothing to refute, the data as stated

in ¶ 48.  Thus the statement in ¶ 48 remains undisputed.  *See* General Reply 1; *Navarro v. U.S.

Tsubaki, Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).

49.   Both reports were provided to the California legislature and would have been considered
      by them in making any determinations regarding pharmacy reimbursement. (Robben
      Decl., Ex. 32 at 229:1-230:7.)

   **Plaintiffs' Response:**  Plaintiffs dispute this statement. The cited testimony states, and
   Plaintiffs do not dispute. that the Myers & Stauffer reports were provided to legislative
   staff Plaintiffs do not dispute that the reports were likely used at some point by the
   Legislature, but the extent and manner of such use is not clear from the cited testimony.
   Furthermore, as discussed in response to SOF 50, below, the Myers & Stauffer reports
   were not available to the Legislature at the time it adopted the 2002 changes in
   California's reimbursement methodology, but were used in connection with the 2004
   changes.

   **Defendants' Reply:**  Defendants' statement of fact in ¶ 49 should be deemed admitted

for the following reasons.  Plaintiffs do not dispute the accuracy of the statement itself, but

dispute the extent to which the legislature "considers" these reports.  This is irrelevant to and

does nothing to refute the stated fact in ¶ 49, namely that the legislature did consider the reports,

no matter what form their consideration took.  *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).

## V.    CALIFORNIA'S CHANGES TO ITS REIMBURSEMENT METHODOLOGY AFTER THE MYERS & STAUFFER REPORT

50.    As set forth above, California adjusted the manner in which it calculated EAC twice after the Myers & Stauffer report was issued.

> **Plaintiffs' Response:**  This statement is disputed and misleading to the extent it implies that the 2002 legislative changes to California's reimbursement methodology were based on the Myers & Stauffer reports. To the contrary, the 2002 changes in California's reimbursement rate were contained in a budget trailer bill (Assembly Bill 442), which included 106 sections, one of which pertained to this issue. Further, the legislative history demonstrates that the Legislature acted before the issuance of the Myers & Stauffer reports on August 23, 2002, although the bill was not signed into law until shortly thereafter. Specifically, Assembly Bill 442 was approved by the budget committee in May 2002, was voted upon by the Senate in June 2002, and was passed by the Assembly on August 26, 2002, only three days after the Myers & Stauffer study was issued. Substantively, the Myers & Stauffer reports provided part of the basis for the 2004 change in California's reimbursement formula, but were not the basis not for the 2002 change.

> **Defendants' Reply**:  The relevant portions of this fact statement should be deemed

admitted.  California does not dispute that the Myers & Stauffer reported provided a basis for the

adjustments passed in 2004.  And by the time California adopted AWP minus ten percent in

2002, it was well aware that providers could acquire generic drugs at prices significantly below

AWP, regardless of whether it had an opportunity to review the Myers and Stauffer report.  In

the enrolled bill report recommending that the Governor sign AB 442 into law, DHS

acknowledged that providers could acquire generic drugs at 40 to 50 percent below compendia

AWP, but noted that it dropped a proposal to reimburse for generic drugs at AWP minus 40

percent out of concerns that the reductions would create access problems for Medi-Cal

beneficiaries.  (*See* Joint SOF at ¶52.)

51.    In response to the legislation enacting the change from AWP minus five percent to AWP minus ten percent, DHS prepared an enrolled bill report that was signed on September 17, 2002. (Robben Decl., Ex. 35.) Enrolled bill reports are used by DHS to make recommendations to the Governor as to whether to sign or veto legislation passed by the California legislature. (Robben Decl., Ex. 32 at 67:1-12.)

   **Plaintiffs' Response**:  Undisputed, but Plaintiffs clarify that Assembly Bill 442 (2002) did much more than simply change the Medi-Cal reimbursement rate. (*See* Pls.' Resp. to SOF 50, above.)

   **Defendants' Reply**:  Defendants' statement of fact in ¶ 50 should be deemed admitted

for the following reasons.  Plaintiffs' assertion that "Assembly Bill 442 (2002) did much more

than simply change the Medi-Cal reimbursement rate" is irrelevant to Sandoz' asserted fact and

should be disregarded as an attempt to create an alternate statement of facts.   *See* General Reply

1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).

52.    In discussing the change from AWP minus five percent to AWP minus ten percent, the report notes:

       It is often noted that Medi-Cal's rate of AWP-5% is higher than other third-party payers, both in the private and public sectors. Various reviews of pharmacy purchasing indicate that brand name drugs are purchased at approximately AWP-15% to 17% and generic drugs can be purchased at AWP-40% to 50%. With this in mind, the original May Revision proposed deep cuts in the ingredient cost rate to AWP-10% for brand drugs and AWP-40% for generic drugs. This type of change, however, does not take into account the overall reimbursement (professional fee) rate. The pharmacy industry has indicated that the average cost of dispensing a prescription, in California, ranges from $6 to $10. Arkansas Medicaid's rate study concluded that the cost of dispensing a prescription in Arkansas is $5.08. Considering the significantly higher cost of doing business in California, a $6 to $10 per prescription estimate is very realistic. These costs are significantly higher than Medi-Cal's current professional fee of $4.05.

       Pharmacy providers have relied on the margin between acquisition cost and the Medi-Cal ingredient cost reimbursement rate to account for the difference in the actual cost of dispensing a prescription and the Medi-Cal rate of $4.05.

       The California Pharmacists Association (CPhA) contends that pharmacy providers will be unable to provide prescription services [for] Medi-Cal beneficiaries of the rate proposed in the original May Revision; in some

> cases, forcing independent pharmacies (non-chain) in areas of high Medi-Cal enrollment out of business. This reduction in pharmacy providers would create access problems for the Medi-Cal beneficiary. CPhA believes that this proposal coupled with the implementation of a broader MAIC program and a reinstatement of the 50-cent claim reduction are cuts that the pharmacy provider community will be unable to bear. In recognition of CPhA's contentions, the DHS modified the original May revision proposal to AWP-10% for all drugs.

(Robben Decl., Ex. 35 at 92-93.) The report also noted that the Myers & Stauffer study, which was due on July 1, 2002, was released on August 23, 2002. *Id.* at 93. In the report DHS stated its support for the change. *Id.* at 10-11.

**Plaintiffs' Response:**  It is undisputed that Defendants have correctly quoted a portion of the Enrolled Bill Report. Plaintiffs object, however, to the extent that much of the material quoted by Defendants summarizes positions expressed by the pharmacy industry and/or the California Pharmacists Association and therefore does not reflect the position of DHS (or the Legislature). Plaintiffs further note that the Report was prepared after the release of the Myers & Stauffer study, but that the legislative discussions and actions referenced in the Report occurred before the release of that study. (*See* Pls.'s Resp. to SOF 50, above.)

**Defendants' Reply:**  Defendants' statement of fact in ¶ 52 should be deemed admitted for the following reasons.  Plaintiffs' assertion that "much of the material quoted by Defendants summarizes positions expressed by the pharmacy industry and/or the California Pharmacists Association" is irrelevant to Sandoz' asserted fact and should be disregarded as an attempt to create an alternate statement of facts.  *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).  Further, Plaintiffs' assertion that "the legislative discussions and actions referenced in the Report occurred before the release of that study" is irrelevant to Sandoz' asserted fact and should be disregarded as an attempt to create an alternate statement of facts.

By the time California adopted the reimbursement formula of AWP minus ten percent, it was well aware that providers could acquire generic drugs at prices significantly below AWP, regardless of whether it had an opportunity to review the Myers and Stauffer report, as noted in the cited material, which acknowledged that providers could acquire generic drugs at 40 to 50

percent below compendia AWP, but noted that it dropped a proposal to reimburse for generic drugs at AWP minus 40 percent out of concerns that the reductions would create access problems for Medi-Cal beneficiaries.

53.   The legislation became law on December 1, 2002.

      **Plaintiffs' Response:**  Undisputed.

      **Defendants' Reply**:  None required.

54.   In 2004, the California legislature lowered the EAC calculation to AWP minus 17 percent and raised the dispensing fee to $7.25.

      **Plaintiffs' Response:**  Disputed in part. As stated in SOF 21, the dispensing fee paid for prescriptions for persons in long term care facilities was $8.00.

      **Defendants' Reply:**  Defendants' statement of fact in ¶ 54 should be deemed admitted for the following reasons.  Plaintiffs' assertion that "the dispensing fee paid for prescriptions for persons in long term care facilities was $8.00" is irrelevant to Defendants' asserted fact and should be disregarded as an attempt to create an alternate statement of facts.  *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).

55.   Originally, DHS had proposed moving EAC to AWP minus 20 percent. (Robben Decl., Ex. 28 at 192:17-193:10; Ex. 36.) In May of 2004, in response to an inquiry from a California Senate Budget Committee staffer, Kevin Gorospe prepared a paper to support the change to AWP minus 20 percent. (Robben Decl., Ex. 28 at 215:20-222:21; Ex. 37.) That document began by noting that, based on confidential discussions with providers and other individuals knowledgeable of provider costs, "it appears that the average pharmacy obtains drugs at Wholesaler Acquisition Cost (WAC) less some percentage that is based on how quickly they pay their invoices . . . The acquisition cost of generic drugs is often lower than this, however, the specific discount was not readily available." (Robben Decl., Ex. 37.) The document indicates that DHS then obtained WAC prices from First DataBank. *Id.* The document then states as follows:

> Based on this information, the Department has determined that the AWP is, on average, 26% higher than WAC for brand name drugs and 350% higher than WAC for generic drugs. Based on this information, if the pharmacies are purchasing brand name drugs between WAC and WAC minus 2% and the Department reimburses the pharmacies at AWP minus 20%, on average, the pharmacies have approximately a 1-3% margin (profit) on brand name drugs and 180-182% margin on generic drugs.

> Using current AWP and WAC prices and utilization volume from 2003, the weighted average margin on drugs would be 3-5%. The overall margin is probably higher because the acquisition cost of generic drugs is likely lower than what is presented in these calculations.

*Id.* The document also proposes an increase in the dispensing fee to $8.30.

**Plaintiffs' Response:**  Plaintiffs object to the relevance of such internal agency memoranda, particularly given the facts that the e-mail did not purport to state Agency policy and that the reimbursement rate was a legislative issue and was not determined by DHS. Plaintiffs do not dispute that Defendants have accurately quoted a portion of the document, and do not dispute the statement that the discounts available on generic drugs prices are not readily available.

**Defendants' Reply:**  Defendants' statement of fact in ¶ 55 should be deemed admitted for the following reasons.  Plaintiffs' assertion that "the reimbursement rate was a legislative issue and was not determined by DHS" is irrelevant to Defendants' asserted fact and should be disregarded as an attempt to create an alternate statement of facts.  *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).

56.     In an e-mail dated June 15, 2004, Kevin Gorospe stated that, based on information he had received from pharmacy providers, he believed "that the current proposal of AWP-20% plus $8.30 will be too deep of a cut to maintain access, especially in the area of Long Term Care (LTC)." (Robben Decl., Ex. 38.) At the end of the e-mail, Mr. Gorospe laid out three alternative pricing strategies:

> 1 – Change the rate to AWP-17% + $7.50 – This rate is close to the M&S, though it doesn't allow for inflation of costs in the dispensing fee. It provides a level of savings equal to that proposed by the providers of $42.7 million GF.
> 2 – Leave proposal at AWP-20% + $8.30 and give LTC a fee of $10.30 – This would provide a cushion for the higher cost associated with LTC pharmacy and result in a $74.2 million GF savings in the BY.
> 3 – Change to AWP-18% + $8.30 ($9.30 for LTC) – This provides for a compromise rate between the original proposal and the level at which providers indicate that they stop taking Medi-Cal patients. This is a $41.5 million GF savings in the BY.

> DHS staff believe that option 3 is the best. It allows for continued margin and is likely at level to maintain access in the program. It does however result in a decrease in savings of $37.6 million GF in the BY.

*Id.*

**Plaintiffs' Response:**  Plaintiffs object to the relevance of such internal agency e-mails, particularly given the facts that the e-mail did not purport to state Agency policy and that the reimbursement rate was a legislative issue and was not determined by DHS. Plaintiffs do not dispute that Defendants have accurately quoted a portion of the e-mail.

**Defendants' Reply:**  Defendants' statement of fact in ¶ 56 should be deemed admitted for the following reasons.  Plaintiffs' assertion that "the reimbursement rate was a legislative issue and was not determined by DHS" is irrelevant to Defendants' asserted fact and should be disregarded as an attempt to create an alternate statement of facts.  *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).

57.     A June 16, 2004 e-mail sent from the e-mail account of Bud Lee stated that, based on feedback from pharmacies, the proposed change to AWP minus 20 percent "may unduly disaffect access, particularly for LTC facility patients and pharmacies providing high volumes of innovator drugs." (Robben Decl., Ex. 39.) The e-mail proposed adopting AWP minus 17 percent and an increase in the dispensing fee to $7.50, with an additional 50 cents for long term care pharmacies. *Id.* Under the heading "RATIONALE", the email stated as follows:

> AWP-20% is an arbitrary number, notwithstanding the current proposal from CPhA. AWP-17% is grounded in the Myers and Stauffer study, a rigorous and reliable $400,000 analysis that found the acquisition cost of brand-named drugs on average was AWP-17.2%. This will be the most defensible position in the event of litigation.

*Id*.

**Plaintiffs' Response:**  Plaintiffs object to the relevance of such internal agency e-mails, particularly given the facts that the e-mail did not purport to state Agency policy and that the reimbursement rate was a legislative issue and was not determined by DHS. Plaintiffs do not dispute that Defendants have accurately quoted a portion of the e-mail.

**Defendants' Reply**:  Defendants' statement of fact in ¶ 57 should be deemed admitted for the following reasons.  Plaintiffs' assertion that "the reimbursement rate was a legislative issue and was not determined by DHS" is irrelevant to Defendants' asserted fact and should be disregarded as an attempt to create an alternate statement of facts.  *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).

58.     The fact sheet that DHS prepared for the legislature concerning the proposal noted that
AWP minus 17 percent was still considerably higher than providers' costs for generic
drugs. "At AWP-17% Medi-Cal will still be overpaying the cost of generic drugs, which
pharmacies can purchase at AWP-40% or less." (Robben Decl., Ex. 36.)

**Plaintiffs' Response:**  Plaintiffs object to the relevance of such internal agency
memoranda, particularly given the facts that the memoranda did not purport to formally
state Agency policy and that the reimbursement rate was a legislative issue and was not
determined by DHS. Plaintiffs do not dispute that Defendants have accurately quoted a
portion of the document.

**Defendants' Reply:**  Defendants' statement of fact in ¶ 58 should be deemed admitted

for the following reasons.  Plaintiffs' assertion that "the reimbursement rate was a legislative

issue and was not determined by DHS" is irrelevant to Defendants' asserted fact and should be

disregarded as an attempt to create an alternate statement of facts.  *See* General Reply 1; *Navarro*

*v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).

59.     The reimbursement methodology proposed in this fact sheet was the one the legislature
ultimately adopted. *See supra* at ¶19. It is still in effect today.

**Plaintiffs' Response:**  Plaintiffs object to the relevance of this statement insofar as it
pertains to the current reimbursement rate, some five years after the relevant period. In
addition, Plaintiffs object in that Defendants have not fully and accurately stated the
reimbursement changes that were adopted, in particular, California Welfare and
Institution Code section 14105.45 also provided for the use of "selling price" as part of
the reimbursement formula, which was to be based on an "average sales price" to be
reported by manufacturers. (See CA SOAF Defs. ¶¶ 23-24.) In addition, the Legislation
made changes to the MAIC program that were intended to separately address the problem
of reported generic drug prices that were grossly inflated over actual prices.

**Defendants' Reply:**  Defendants' statement of fact in ¶ 59 should be deemed admitted

for the following reasons.  Plaintiffs' assertion that "Defendants have not fully and accurately

stated the reimbursement changes that were adopted" is irrelevant to Defendants' asserted fact

and should be disregarded as an attempt to create an alternate statement of facts.  *See* General

Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).

## VI.   THE COMMENCEMENT OF THIS ACTION

60.    This action was originally commenced in July of 1998 by a *qui tam* relator, Ven-A-Care of the Florida Keys, Inc ("Ven-A-Care"). (Robben Decl., Ex. 40; Ex. 41 at 2.) The original *qui tam* complaint was filed under seal and named as defendants 23 drug manufacturers, including Dey, Inc. (Robben Decl., Ex. 41 at 2.)

**Plaintiffs' Response:**  Undisputed. Plaintiffs further note that the 1998 *qui tam* Ven-A-Care complaint did not name Mylan and/or Sandoz as Defendants.

**Defendants' Reply:**  None required.

61.    The original *qui tam* complaint sets forth a chart containing the published price, Ven-A-Care's acquisition cost, and the so-called "spread," both in percentage and dollar terms, for 11 of Dey's Subject NDCs. (Robben Decl., Ex. 40 at 105-107.) The alleged "spreads" range from 55 percent to over 500 percent. *Id.* Set forth in the chart below are examples of the [sic] for 2 of the Dey NDCs:

| Drug | Ven-A-Care's Cost (per package) | California's Payment (per package) | "Spread" |
|---|---|---|---|
| Dey's cromolyn 49502068902 | $24.50 | $39.90 | 62% |
| Dey's albuterol sulfate 49502069703 | $8.50 | $28.74 | 238% |

**Plaintiffs' Response:**  Plaintiffs do not dispute the statement that "The alleged spreads range from 55 to over 500 percent." Note that the "spread" is the "provider's gross profit %", which represents the difference between Medi-Cal payment and Plaintiff's acquisition cost. Medi-Cal was reimbursing at the rate of AWP minus 5% in 1995.

Plaintiffs dispute the statement, "The original *qui tam* complaint sets forth a chart containing the published price, Ven-A-Care's acquisition cost, and the so-called "spread," both in percentage and dollar terms, for 11 of Dey's Subject NDCs." The chart depicts 14 Dey NDCs and shows the Medi-cal payment, Plaintiff's acquisition cost, Provider's Gross Profit **$** and Provider's Gross Profit %—not the published price.

Plaintiffs dispute the statement, "Set forth in the chart below are examples of 2 NDCs of Dey drugs," as incomplete, because Defendants' chart fails to show the "provider's gross        profit dollars" below.

Cromolyn - Provider's Gross Profit - $15.40

Albuterol - Provider's Gross Profit - $20.25

**Defendants' Reply:**  Plaintiffs do not dispute the statement in ¶ 61 that "[t]he alleged spreads range from 55 to over 500 percent," and, as uncontroverted, that portion of Defendants'

statement should be deemed admitted.  *See* General Reply 3; *Navarro v. U.S. Tsubaki, Inc.*, F.

Supp. 2d 487, 493 n.1 (D. Mass. 2008).  Moreover, the portion in Defendants' statement in ¶ 61

that "[s]et forth in the chart below are examples of 2 NDCs of Dey drugs" should be deemed

admitted, as Plaintiffs' assertion that the chart fails to show the "providers' gross profit dollars"

is an improper attempt to create an alternate statement of facts.  *See* General Reply 1; *Navarro v.*

*U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).  Finally, the chart itself should

be admitted as Plaintiffs do not dispute it.  *See* General Reply 3; *Navarro*, F. Supp. 2d at 493 n.1.

62.   Ven-A-Care filed an amended *qui tam* complaint in August of 2002, also under seal,
      which named a total of 46 drug manufacturers, including Dey, Mylan, and Sandoz.
      (Robben Decl., Ex. 42; Ex. 41 at 4.)

      **Plaintiffs' Response:**  Undisputed.

      **Defendants' Reply:**  None required.

63.   Like the original *qui tam* complaint, the amended *qui tam* complaint contained charts
      setting the published price, Ven-A-Care' s acquisition cost, and the so-called "spread,"
      both in percentage and dollar terms for 283 of Mylan's NDCs (*id.* at 93-117) and for 17
      of Sandoz's Subject NDCs (*id.* at 164). Set forth in the chart below are examples for 2 of
      the Mylan NDCs and 2 of the Sandoz NDCs:

| Drug | Ven-A-Care's Cost (per package) | California's Payment (per package) | "Spread" |
|---|---|---|---|
| **Mylan's cimetidine** 00378037205 | $32.74 | $765.68 | 2239% |
| **Mylan's diphenoxylate/atropine** 00378041510 | $165.34 | $422.75 | 156% |
| **Sandoz' alprazolam** 00781107905 | $7.04 | $453.74 | 6345% |
| **Sandoz' fluphenazine HCL** 00781143901 | $12.71 | $109.01 | 378% |

**Plaintiffs' Response:**  Plaintiffs dispute the statement, "Like the original *qui tam*
complaint, the amended *qui tam* complaint contained charts setting the published price,
Ven-A-Care's acquisition cost, and the so-called "spread," both in percentage and dollar
terms for 283 of Mylan's NDCs (*id.* at 93-117) and for 17 of Sandoz's Subject NDCs (*id.*

at 164).” Instead, the chart sets forth 279 of Mylan’s NDCs and shows Medi-Cal payment, Ven-A-Care’s cost, Gross Profit **$** spread and Spread as % of actual cost. It did not show the “published price.”

Plaintiffs dispute the completeness of Defendants’ representations concerning the charts, as follows:

Mylan Cimetidine – Provider’s Gross Profit $732.94 Spread is omitted.

Mylan Diphenoxylate – Provider’s Gross Profit $257.41 Spread is omitted.

Sandoz Alprazolam – Provider’s Gross Profit $446.70 Spread is omitted.

Sandoz Fluphenazine – Provider’s Gross Profit $96.30 Spread is omitted and also the Spread as % of Actual Cost is wrong. The spread contained on Plaintiff's chart is 758%.

(Robben Decl. Ex. 41 at 77.)

For clarity, Plaintiffs further note that the “spread” percentage is different from the alleged “spread” in the Dey charts in the original July 28, 1998 complaint. The spreads in the Dey charts were spreads between Medi-Cal prices (AWP minus 5%) and Ven-A-Care’s acquisition costs. The Mylan and Sandoz spreads represent the spread percentage between the provider’s gross profit and actual cost—NOT Medi-Cal’s payment and actual cost, which would have been greater.

**Defendants’ Reply:**  Defendants’ statement in ¶ 63 that “[s]et forth in the chart below are examples for 2 of the Mylan NDCs and 2 of the Sandoz NDCs” – and the chart itself – should be deemed admitted for the following reasons.  Plaintiffs’ assertion that the chart fails to show providers’ gross profit dollars is an improper attempt to create an alternate statement of facts.  *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).  Moreover, the chart itself should be admitted as Plaintiffs do not dispute it.  *See* General Reply 3; *Navarro*, F. Supp. 2d at 493 n.1.

64.    The action remained under seal as to Dey, Mylan, and Sandoz, until August of 2005, when California filed its complaint in intervention. (Robben Decl., Ex. 1.)

**Plaintiffs’ Response:**  Undisputed.

**Defendants’ Reply:**  None required.

## VII.   CHALLENGES TO CALIFORNIA'S REIMBURSEMENT METHODOLOGY

65.   On January 16, 2009, a group of pharmacists and other Medicaid providers commenced an action in the United States District Court for the Central District of California entitled *Managed Pharmacy Care v. David Maxwell-Jolly*, No. 09-00382-CAS-MAN. In the action, the providers seek to enjoin the current director of the California Department of Health and Human Services from implementing sections of the legislation AB 1183 that would implement a five percent reduction in pharmacy reimbursement payments to Medi-Cal providers. (Robben Decl., Ex. 43 at 1-2.) The providers contend that the five percent reduction, the legislature's conduct in enacting it, and the director's conduct in implementing it, are inconsistent with and in violation of federal law governing Medicaid reimbursement payments. (Robben Decl., Ex. 44, at 3-4.) In particular, the providers contend that the five percent reduction violates 42 U.S.C. 1396a(a)(30)(A), which requires that state Medicaid programs make sure that their reimbursement payments are "consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." *Id.*

**Plaintiffs' Response:**  Plaintiffs dispute SOF 65 to the extent it improperly identifies the Department of Health and Human Services and its director as a party to Managed Pharmacy Care v. David Maxwell-Jolly, No. 09-00382-CAS-MAN. The suit was directed toward David Maxwell-Jolly, Director of Department of Health Care Services. (Robben Decl. Ex. 43 at 1-2.) Plaintiffs do not dispute the balance of SOF 65.

**Defendants' Reply:**  Defendants' statement of fact in ¶ 65 should be deemed admitted.

Plaintiffs improperly dispute this statement with the irrelevant fact of David Maxwell-Jolly's title

that does nothing to contradict the stated fact in ¶ 65, namely that the suit was filed with the

stated purpose of enjoining the implementations of the legislation.  As Plaintiffs themselves

state, the balance of the statement remains undisputed and should be deemed admitted.  *See*

General Reply 3; *Navarro v. U.S. Tsubaki, Inc.*, F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).

66.   On February 2, 2009, the providers moved for a preliminary injunction to enjoin the five percent rate cut. (Robben Decl., Ex. 44.)

**Plaintiffs' Response:**  Undisputed.

**Defendants' Reply:**  None required.

67.   On February 11, 2009, Maxwell-Jolly filed an opposition to the providers' preliminary injunction motion. (Robben Decl., Ex. 43.) The opposition papers filed by Maxwell-Jolly

include a declaration of Kevin Gorospe. (Robben Decl., Ex. 43; Ex. 45.) The declaration contains the following paragraph in response to contentions in the providers' motion that the current dispensing fee of $7.25 does not accurately reflect the cost of dispensing the drugs:

> Mr. Wilson next alleges that there is a difference between the Medi-Cal dispensing fee and the average Medi-Cal dispensing cost of $4.61 per prescription. Actually the difference between the inflated average dispensing cost per prescription of $11.59 and the 5% reduced Medi-Cal dispensing fee is $4.71. But as explained in at [*sic*] pages 9-10 of the DHCS Analysis, the median dispensing fee cost is $11.01. That means half the pharmacies have a dispensing fee cost [*sic*] below that amount. Obviously then more efficient pharmacies will not have as great a spread between their dispensing cost per prescription and Medi-Cal dispensing fee. More importantly, for each drug dispensed, Medi-Cal pays not only the dispensing fee but also an amount for the drug itself. And it is because the Medi-Cal reimbursement for the drug itself frequently is well above pharmacy acquisition cost, that any loss on the dispensing fee portion of reimbursement is made up for by a significant profit on Medi-Cal reimbursement for the drug itself.

*Id.* at ¶ 21.

**Plaintiffs' Response:**  Defendants have accurately quoted a portion of Dr. Gorospe's cited declaration. Plaintiffs dispute, however, Defendants' implication that California had a policy of cross-subsidizing drug dispensing fees through inflated reimbursement for drug ingredient costs. Dr. Gorospe testified that California did not approve of or permit inflated reimbursement on ingredient cost to subsidize for supposedly inadequate dispensing fees. (Paul Decl. Ex. 8 (3/19/08 Gorospe Dep.) at 357:16-358:5; Paul Decl. Ex. 1(12/3/08 Rule 30(b)(6) CA Dept. of Health Care Servs. (Gorospe) Dep.) at 294:6-296:1, 299:3-10; Paul Decl. Ex. 4(11/6/08 Rule 30(b)(6) CA Dept. of Health Care Servs. (Rosenstein) Dep.) at 313:10-314:3.) Specifically, with regard to the issue of cross-subsidization, Dr. Gorospe testified:

> By Mr. Gobena:
> Q:  Was it ever, based on your knowledge, was it ever Medi-Cal's policy to overpay for drug ingredient costs?
>
> A.  No.
>
> Q.  Now, you mentioned -- hold on a second. And was it ever, to your knowledge -- again, was it ever Medi-Cal's policy to knowingly or intentionally overpay providers for drug purchases in order to subsidize what were perceived to be inadequate dispensing fees?
>
> MR. COLE:  Object to the form.

THE WITNESS:  Not to my knowledge.

(Paul Decl. Ex. 8(3/19/08 Gorospe Dep.) at 357: 16-358:5.)

BY MR. HENDERSON:
Q.  Did the—did the Department ever delegate to drug manufacturers the authority to determine how much dispensing fees should be paid to providers?

A.      No.

Q. Did the Department ever take a position that drug manufacturers should be permitted to report false AWP pricing information so that—in order to compensate for inadequate dispensing fees?

MR. BUEKER:  Objection as to form.

A. THE WITNESS:  No.

BY MR. HENDERSON:
Q. In your opinion, Dr. Gorospe, would it be a reasonable government policy to give drug manufacturers the—the power to increase reimbursements in order to make up for what they perceive to be inadequate dispensing fees?

MR. BUEKER:  Objection as to form.

A. THE WITNESS:  No.

BY MR. HENDERSON:
Q. Why not?

MR. BUEKER:  Same objection.

A. THE WITNESS:  Why not what?

BY MR. HENDERSON:
Q. Well, why wouldn't that be a reasonable policy to pursue?

MR. BUEKER:  Same objection.

A. THE WITNESS:  The management of the—the program is—with the State of California and with—and the federal government, and to allow a—what is considered in California a provider type, which a manufacturer is, to set rates for providers would—would not make sense.

BY MR. HENDERSON:

Q. It would give the manufacturer control over how much money is — of the State's money is spent; is that fair to say?

A. Potentially

* * *

BY MR. HENDERSON:
Q. Has the Department ever had a -- any policy or practice of paying inflated acquisition costs in order to compensate for perceived inadequate dispensing fees?

MR. BUEKER:  Objection as to form.

THE WITNESS:  Was it a policy?

MR. HENDERSON:  Yes.

THE WITNESS:  No.

(Paul Decl. Ex. 1(12/3/08 Rule 30(b)(6) CA Dept. of Health Care Servs. (Gorospe) Dep.) at 294:6-296: 1, 299:3-10.)

By Mr. Paul:
Q. Just to be clear, I want to confirm with you whether or not, has it ever been the policy of the Medi-Cal program to deliberately accept inflated and inaccurate AWPs simply because the program knew it would offset them by shorting or minimizing the amount of the filling fee for pharmacists?

Mr. Bucker:  Objection as to form.

Mr. Cyr:  Objection.

A:      No. It has always been our policy to have accurate information and to use that information to establish what the accurate price should be, should be on both ends of the equation. We do believe they need to be both looked at, but they have got to come from accurate data sources.

(Paul Decl. Ex. 4 (11/6/08 Rule 30(b)(6) CA Dept. of Health Care Servs. (Rosenstein) Dep.) at 3 13:10-314:3.)

**Defendants' Reply:**  Defendants' statement of fact in ¶ 67 should be deemed admitted

for the following reasons.  Plaintiffs improperly dispute the statement's "implication that

California had a policy of cross-subsidizing drug dispensing fees," because Plaintiffs' statement is

argument, not fact, and is irrelevant to Defendants' statement in ¶ 67.  Plaintiffs' citation of Dr.

Gorospe's and Mr. Rosenstein's testimony is also irrelevant and should be disregarded as such.

*See* General Reply 1; *Navarro*, F. Supp. 2d at 493 n.1; *Mercier v. Boilermakers Apprenticeship*

*and Training Fund*, No. 07-cv-11307-DPW, 2009 WL 458556, at *9 (D. Mass. Feb. 10, 2009).

Defendants additionally object to the testimony cited in ¶ 67 as violative of Rule 611(c) of the

Federal Rules of Evidence, on the grounds that it was elicited from a witness produced by

California through leading questions asked during direct examination by California's counsel and

counsel for the United States, who has a unity of interest with California and Relator.

68.     The court presiding over the case granted the providers' motion for a preliminary
        injunction on February 27, 2009. (Robben Decl., Ex. 46.)

        **Plaintiffs' Response:**  Undisputed.

        **Defendants' Reply:**  None required.

## VIII.   FULS ESTABLISHED BY CMS

### A.     The FULs CMS Set Did Not Comport With the Formula Set Forth in the Regulations

69.     As a general rule, CMS did not adhere to the formula prescribed in 42 C.F.R. 447.332
        (2006) when establishing FULs.

        **Plaintiffs' Response:**  Disputed.  Defendants fail to provide any factual support or
        citation to support this statement. Sue Gaston, a CMS employee responsible for setting
        FULs, declared that, "[A]mong my responsibilities as lead analyst for the FUL program
        was the setting of FULs. My general practice in establishing FULs was that, once I
        established that there were three suppliers for the drug, I set the FUL at 150 percent of the
        lowest published price.. .To the extent I exercised this discretion when setting a FUL, I
        did so in order to ensure access while also achieving cost savings for the Medicaid
        program as required by 42 C.F.R. § 447.332." (Paul Decl. Ex. 9 (Declaration of Susan E.
        Gaston dated June 15, 2009) at 3.)

        **Defendants' Reply:**  Defendants' statement of fact in ¶ 69 should be deemed admitted

for the following reasons.  Plaintiffs do not dispute that CMS did not adhere to the formula

prescribed 42 C.F.R. 447.332 (2006) when establishing FULs.  As such, this statement is

undisputed and deemed admitted.  Plaintiffs, however, improperly "dispute" ¶ 69 by contending that Defendants have failed to provide factual support from the record to support the statement and by selectively quoting from Ms. Gaston's declaration.  However, ¶ 69 is supported by the subsequent paragraphs.  Furthermore, the quoted portion of Ms. Gaston's declaration confirms, rather than contradicts, the statement of fact in ¶ 69, as Ms. Gaston affirmatively states that she would exercise her discretion when setting a FUL.  In subsequent paragraphs of her declaration, Ms. Gaston describes how she would depart from the formula set forth in 42 C.F.R. 447.332 (2006) if she determined that the resulting FUL was too low.  (*See* Paul Decl. Ex. 9, at ¶ 4, 5.)

70.   Sue Gaston was the CMS employee responsible for setting FULs from April 1991 through February of 2003. (Robben Decl., Ex. 47 at 40:7-10, 45:2-12.)

   **Plaintiffs' Response:**  Undisputed.

   **Defendants' Reply:**  None required.

71.   Gail Sexton was the CMS employee responsible for setting FULs beginning in November, 2004. (Robben Decl., Ex. 48 at 49:13-50:21.)

   **Plaintiffs' Response:**  Undisputed.

   **Defendants' Reply:**  None required.

72.   Although Ms. Gaston and Ms. Sexton were only examined on nine drugs that were selected for targeted FUL discovery, Ms. Sexton testified those nine drugs are not unique, and that the process used to set the FULs for these drugs is representative of the process for establishing FULs more generally. (Robben Decl., Ex. 48 at 31:4-22, 33:1-9.)

   **Plaintiffs' Response:**  Undisputed.

   **Defendants' Reply:**  None required.

73.   Ms. Gaston and Ms. Sexton testified that CMS used a computer program ("the FULs System") to gather both Orange Book data and pricing data from the three national compendia and to initially calculate FULs for those drugs that met the specified criteria. Then, CMS officials would engage in a "manual review" process because "we want to make sure that that lowest price is a true price." (Robben Decl., Ex. 47 at 232:22-241:7; Robben Decl., Ex. 12 at 410:14-411:18, 416:10-15, 429:18-22, 432:14-21, 533:5-10; Robben Decl., Ex. 48 at 89:2-5, 93:12-94:13 (stating that Ms. Sexton conducted "further manual interventions" into the FUL for albuterol – one of the Subject Drugs – because

she had "learned of other suppliers that were marketing this drug"); *id.* at 95:15-95:20 (stating that she would conduct a manual review "in cases where I saw that manual intervention could have changed the price, changed the federal upper limit, or where it appeared that perhaps the criteria was not met and that further intervention should have been taken"); *id.* at 138:6-7 ("When possible we would manually verify that drugs were available."); *id.* at 147:8-15 (stating that upon finding "an outlier situation" she would "do some manual verifications on whether that NDC was available and available at that price")).

**Plaintiffs' Response:**  Disputed. First, CMS officials testified that they did not engage in a manual review process every time a FUL was established, and that a manual review would be performed only if it was necessary. (Robben Decl. Ex. 12 at 533:5-10; Robben Decl. Ex. 48 at 95:10-20.)

Second, Plaintiffs emphasize that their theory of recovery and damages model are *not* based upon a showing that Defendants' false price statements caused inflated FULs per se; rather, Plaintiffs contend that Defendants' false price representations caused California's computation of the estimate acquisition cost to be inflated (under California's "lowest of" reimbursement methodology), and thereby caused damages whenever a pharmacy claim's original reimbursement amount—whether based on AWP, FUL, or U&C—was higher than it would have been but for the Defendants' false and inflated AWPs. When the Defendants published false and inflated AWPs, they ensured that any claims for reimbursement for their drugs would be false, including all instances in which the but-for "real" AWPs were *less* than the FUL or U&C on which such claims were paid. In other words, had Defendants reported AWPs that reasonably reflected providers' acquisition costs, those AWPs would have controlled the payment level in all instances in which they were less than the FUL or U&C. Defendants' false AWPs were therefore material to all instances in which California reimbursed a claim based on the reported AWPs; and were also material to all claims paid by Medi-Cal when the underlying NDC's actual but-for price, if it had been truthfully reported as the AWP, was lower than the FUL or U&C on which the claim was paid.

Third, while Plaintiffs do not dispute that Ms. Gaston and Ms. Sexton testified as described, the quoted snippets of testimony present an incomplete description of the mechanics of the FUL-setting process. CMS utilized a computerized application with processing logic that automatically excludes certain NDCs from consideration in establishing a FUL. For example, drug products of labelers who do not have an active Rebate Agreement with the Secretary are excluded from the FULs System output made available to the FULs analyst for consideration in setting an FUL. This processing step reflects the determination of CMS that a FUL should not be calculated based on a price for a product that is not eligible for reimbursement under the Medicaid program. *See* 52 Fed. Reg. at 28653 ("The upper limits for drugs contained in this rule pertain only to the Medicaid program."). Further, if an NDC is designated by Medi-Span as "inactive" or "deleted," or designated by First DataBank as "obsolete," then the FULs System places the record on an "Inactive List" and excludes it from the data output considered by the system user in setting FULs. (Paul Decl. Ex. 10 (Declaration of Dona M. Coffinan dated November 25, 2009) ¶ 14.) Moreover, the FUL regulation requires that FULs be based on cost information "for drugs available for sale nationally," 42 C.F.R. § 447.332(a)(1)(ii) (2006), and thus it would not be proper to set FULs on the basis of prices of drugs that

are, or soon will be no longer sold nationally. Finally, if two out of the three Compendia specify that the NDC is a unit dose form of the drug, the FULs System processing logic excludes the NDC from consideration in setting FULs. Plaintiffs do not dispute that CMS employees then manually reviewed the FULs System output to ensure that the final FUL was consistent with CMS's program objectives. For prices that were important to the determination of a FUL, the FULs analyst typically contacted the manufacturers to verify that the prices are valid and that the products were widely available in the market. Handwritten notes on the printouts illustrate this practice. As explained in the Declaration of Susan E. Gaston dated June 15, 2009 (Paul Decl. Ex. 9), for at least some FULs, CMS has exercised discretion to ensure that the FUL was higher than published WACs of 3 available products of at least three manufacturers. This discretion was exercised to ensure beneficiary access to the drugs while still also achieving cost savings for the Medicaid program. Thus, if the FUL calculated from the lowest published price was not higher than the WACs of at least three manufacturers (including the WAC used to calculate the FUL), then CMS might reject the lowest price (treating it, in effect, as an outlier) and instead calculate the FUL based on the next higher price that would yield a FUL that was higher than at least three WACs for available products. (Paul Decl. Ex. 9 (Gaston Decl.) ¶ 5.)

If a price published in the compendia was significantly lower than other prices, a FULs analyst might call the supplier to verify that the price was actually available, and if so, use that price to set the FUL. (Robben Decl. Ex. 48 at 158:1-:15.)
A system upgrade deployed in 1999 gives the FULs analyst limited ability to affect the output of the FULs System. First, the upgrade allows the FULs analyst to annotate the FULs System data by assigning a "T" or "P" exclusion code to an NDC indicate that the product is temporarily or permanently unavailable (typically based on the analyst's communications with the manufacturer as previously noted). Products with these designations still appear on the FULs on-line System and printouts but will not be considered when the FUL is set. Second, the FULs analyst has the ability to redesignate an NDC to a Product Group in the event the analyst learns of an error in the FULs System matching process. With these two limited exceptions, the FULs analyst does not exercise discretion to include or exclude products from the list that appears in the FULs System printout. (Paul Decl. Ex. 10 (Coffinan Decl.) ¶ 17.)

**Defendants' Reply:**  Defendants' statement of fact in ¶ 73 should be deemed admitted

for the following reasons.  Plaintiffs do not dispute that CMS used a computer program ("the

FULs System") to gather both Orange Book data and pricing data from the three national

compendia and to initially calculate FULs for those drugs that met the specified criteria and

would then engage in a manual review process because to ensure that the lowest price is a true

price.  As such, this statement is undisputed and deemed admitted.  Plaintiffs, however,

improperly "dispute" ¶ 73 by contending that CMS would not engage in a manual review for

every FUL it established.  This statement does not squarely address the statement of fact in ¶ 73

and should consequently be rejected.  *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577

F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).  Furthermore, that CMS would not engage in a manual

review for every FUL it established does not change the fact CMS engaged in manual reviews

after the FUL System initially calculated a FUL.

Defendants object to the second paragraph in Plaintiffs' response to paragraph ¶ 73 as

irrelevant, immaterial, and improper for a Local Rule 56.1 Statement on the grounds that it

does set forth factual matter supported by evidence in the record but rather characterizes

Plaintiffs' legal theories of its case.  Defendants object to the third, fourth, and fifth paragraph in

Plaintiffs' response to paragraph ¶ 73 as irrelevant, immaterial, and improper for a Local Rule

56.1 Statement on the grounds that they are not offered to dispute the statement of fact in

paragraph ¶ 73.

74.     Ms. Gaston further testified that the manual review was used to determine whether a drug
        was "truly available or not" and whether or not "you should follow up and see if it's
        available." (Robben Decl., Ex. 47 at 229:8-230:14.)

        **Plaintiffs' Response:**  Disputed. Plaintiffs incorporate by reference their response to
        SOF 73. Additionally, Ms. Gaston testified that she engaged in a manual review when the
        drug with the lowest published price was not available and when there was a question as
        to whether the published price information was correct. (*See* Robben Decl. Ex. 47 at
        255:18-257:12.) Such action was necessary given the objectives of the FUL program.
        (*See id.* at 216:14-19, 245:12-246:16; Robben Decl. Ex. 12 at 329:10-331:3.)

        **Defendants' Reply:**  Defendants' statement of fact in ¶ 74 should be deemed admitted

for the following reasons.  Plaintiffs do not dispute that Ms. Gaston testified that she conducted a

manual review.  As such, this statement is undisputed and deemed admitted.  Plaintiffs, however,

improperly "dispute" ¶74 by setting forth other reasons why Ms. Gaston would engage in a

manual review.  This statement does not squarely address the statement of fact in ¶ 74 and should

consequently be rejected.  *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d

487, 493 n.1 (D. Mass. 2008).  Furthermore, Plaintiffs' characterization of Ms. Gaston's testimony in her response is not inconsistent with the statement of fact in ¶74.  Defendants further incorporate herein by reference their reply to Plaintiffs' response to statement of fact in ¶ 73.

75.     During her deposition, Ms. Gaston was presented with the 2001 FULs System printout for clonazepam, one of the Subject Drugs, on which someone had crossed out the FUL generated by the FULs System, $0.1 199, and written in a different, higher FUL, $0.2455. (Robben Decl., Ex. 12 at 441:22-443:4 **&** Ex. 5.)

**Plaintiffs' Response:**  Plaintiffs dispute Defendants' incomplete characterization of the testimony. At her deposition, Ms. Gaston testified that the difference between lowest published WAC ($0.0799) and the next lowest WAC ($0.16370) caused CMS to believe that setting the FUL on the lowest published WAC would have created an unreasonably low FUL. *(See* Robben Decl. Ex. 12 at 444:16-445:13 & Ex. 5.) ("Q:  Do you know why CMS chose not to set a FUL on the basis of that lower published price? A:  I could give you my opinion. Q:  Sure. A:  That here again what I think they were trying to do was since there's such a difference between the .07 and then the next price of .16370, that we wanted to make sure that the FUL price that's set is a reasonable price and that we'll be assured the availability of the drug. So we went up to the next lowest price."). Plaintiffs further incorporate by reference their response to SOF 73.

**Defendants' Reply:**  Defendants' statement of fact in ¶ 75 should be deemed admitted for the following reasons.  Plaintiffs do not dispute that Ms. Gaston was presented with the described document at her deposition.  As such, this statement is undisputed and deemed admitted.  Plaintiffs, however, improperly "dispute" ¶ 75 by contending that it is an "incomplete characterization of her testimony."  This statement does not squarely address the statement of fact in ¶ 75 and should consequently be rejected.  *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).  Furthermore, the statement of fact in ¶ 75 simply described a document that Ms. Gaston was shown at her deposition.  The matters Plaintiffs offer in their response are irrelevant and immaterial to this statement.  Defendants further incorporate herein by reference their reply to Plaintiffs' response to statement of fact in ¶ 73.

76.   Ms. Gaston testified that the lowest published price was not used when setting the FUL for clonazepam because CMS "wanted to make sure that the FUL price that's set is a reasonable price and that we'll be assured the availability of the drug" and that therefore "we went up to the next lowest price." (Robben Decl., Ex. 12 at 442:21-445:4.)

**Plaintiffs' Response**:  Plaintiffs do not dispute this statement, but incorporate by reference their response to SOF 73.

**Defendants' Reply**:  Undisputed.  Defendants incorporate herein by reference their reply

to Plaintiffs' response to the statement of fact in ¶ 73.

77.   During her deposition, Ms. Gaston was presented with the 2001 FULs System printout for lorazepam, another Subject Drug, on which someone had crossed out the FUL generated by the FULs System, $0.2999, and written in a different, higher FUL, $0.5718. (Robben Decl., Ex. 12 at 445:14-450:20 & Ex. 6.)

**Plaintiffs' Response**:  Plaintiffs do not dispute this statement, but incorporate by reference their response to SOF 73.

**Defendants' Reply**:  Undisputed.  Defendants incorporate herein by reference their reply

to Plaintiffs' response to the statement of fact in ¶ 73.

78.   Ms. Gaston testified that CMS used a price other than the lowest published price for lorazepam as the basis for the FUL to ensure that the FUL was set at a "reasonable" level. (Robben Decl., Ex. 12 at 450:6-453:1.)

**Plaintiffs' Response**:  Plaintiffs do not dispute this statement, but incorporate by reference the response to SOF 73.

**Defendants' Reply**:  Undisputed.  Defendants incorporate herein by reference their reply

to Plaintiffs' response to the statement of fact in ¶ 73.

79.   During her deposition, Ms. Gaston was presented with the 2001 FULs System printout for cefadroxil, on which someone had crossed out the FUL generated by the FULs System, $1.2749, and written in a different, higher FUL, $2.9000. (Robben Decl., Ex. 12 at 453:12-454:20 & Ex. 7.)

**Plaintiffs' Response**:  Plaintiffs do not dispute this statement, but incorporate by reference the response to SOF 73.

**Defendants' Reply**:  Undisputed.  Defendants incorporate herein by reference their reply

to Plaintiffs' response to the statement of fact in ¶ 73.

80.     Ms. Gaston testified that the FUL for cefadroxil that had been calculated by the FULs System required "some manual review" because the price on which it had been based "seemed much lower than all the other published prices." (Robben Decl., Ex. 12 at 45 5:6-12.)

**Plaintiffs' Response:**  Plaintiffs do not dispute this statement, but incorporate by reference the response to SOF 73.

**Defendants' Reply:**  Undisputed.  Defendants incorporate herein by reference their reply

to Plaintiffs' response to the statement of fact in ¶ 73.

81.     During her deposition, Ms. Gaston was presented with the 2001 FULs System printout for metoprolol tartrate, another Subject Drug, which showed a FUL generated by the FULs System of $0.0816 and a handwritten notation that the "new FUL" was $0.0914. (Robben Decl., Ex. 12 at 419:18-22 & Ex. 2.)

**Plaintiffs' Response:**  Plaintiffs do not dispute this statement, but incorporate by reference the response to SOF 73.

**Defendants' Reply:**  Undisputed.  Defendants incorporate herein by reference their reply

to Plaintiffs' response to the statement of fact in ¶ 73.

82.     Ms. Gaston testified that CMS did not use a lower published price to calculate the FUL for metoprolol tartrate because it had discovered that the manufacturer that had reported that lower price was "temporarily out of stock" and that a FUL resulting from that price "might not be a realistic price." (Robben Decl., Ex. 12 at 425:15-427:20.)

**Plaintiffs' Response:**  Plaintiffs do not dispute this statement, but incorporate by reference their response to SOF 73.

**Defendants' Reply:**  Undisputed.  Defendants incorporate herein by reference their reply

to Plaintiffs' response to the statement of fact in ¶ 73.

83.     Ms. Sexton testified that, in February of 2005, the FULs System calculated a FUL for lorazepam, another Subject Drug, based on a published price of $0.077, but that Ms. Sexton chose not to change the previous FUL, which had been based on a published price of$0.3812. (Robben Decl., Ex. 48 at 126:14-128:11.)

**Plaintiffs' Response:**  Plaintiffs do not dispute this statement, but incorporate by reference their response to SOF 73.

**Defendants' Reply:**  Undisputed.  Defendants incorporate herein by reference their reply

to Plaintiffs' response to the statement of fact in ¶ 73.

84.   Ms. Gaston testified that when she was setting FULs, she could base FULs on B-rated drugs, rather than A-rated drugs, as long as three A-rated drugs were listed in the Orange Book. (Robben Decl., Ex. 12 at 523:15-524:11, 525:8-13.)

**Plaintiffs' Response:**  Plaintiffs dispute that this constitutes a material fact. Plaintiffs do not otherwise dispute this statement, but incorporate by reference their response to SOF 73.

**Defendants' Reply:**  Defendants' statement of fact in ¶ 84 should be deemed admitted for the following reasons.  Plaintiffs do not dispute the statements of fact; as such, this statement is undisputed and deemed admitted.  Plaintiffs, however, improperly "dispute" ¶ 84 by contending that it is not "material."  Plaintiffs' contention regarding the "materiality" of the statement of fact in ¶ 84 does not squarely address the truth of the matter in statement of fact in ¶ 84 and should consequently be rejected.  *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).  Defendants further incorporate herein by reference their reply to Plaintiffs' response to statement of fact in ¶ 73.

85.   Ms. Sexton testified that, when she set a FUL for a particular drug, she would consider drugs that were not listed as A-rated in the Orange Book, and set the FUL according to that price. (Robben Decl., Ex. 48 at 104:4-18) (regarding the FUL for the 90 mcg. albuterol inhaler, a Subject Drug).

**Plaintiffs' Response:**  Plaintiffs dispute that this constitutes a material fact. Plaintiffs do not otherwise dispute this statement, but incorporate by reference the response to SOF 73.

**Defendants' Reply:**  Defendants' statement of fact in ¶ 85 should be deemed admitted for the following reasons.  Plaintiffs do not dispute the statements of fact; as such, this statement is undisputed and deemed admitted.  Plaintiffs, however, improperly "dispute" ¶ 85 by contending that it is not "material."  Plaintiffs' contention regarding the "materiality" of the statement of fact in ¶ 85 does not squarely address the truth of the matter in statement of fact in ¶ 85 and should consequently be rejected.  *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).  Defendants further incorporate herein by reference their reply to Plaintiffs' response to statement of fact in ¶ 73.

86.     Ms. Gaston testified that when CMS set the FUL for cefadroxil, the FUL was not based on the most common package size. (Robben Decl., Ex. 12 at 466:19- 469:14)(recognizing that while the most common package size was found to be the 100-count of cefadroxil, the FUL had been set on the 50-count package size).

**Plaintiffs' Response:**  Plaintiffs dispute that this constitutes a material fact. Plaintiffs do not otherwise dispute this statement, but incorporate by reference their response to SOF 73.

**Defendants' Reply:**  Defendants' statement of fact in ¶ 86 should be deemed admitted for the following reasons.  Plaintiffs do not dispute the statements of fact; as such, this statement is undisputed and deemed admitted.  Plaintiffs, however, improperly "dispute" ¶ 86 by contending that it is not "material."  Plaintiffs' contention regarding the "materiality" of the statement of fact in ¶ 86 does not squarely address the truth of the matter in statement of fact in ¶ 86 and should consequently be rejected.  *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).  Defendants further incorporate herein by reference their reply to Plaintiffs' response to statement of fact in ¶ 73.

87.     Ms. Sexton testified that, when she set the FUL for isosorbide mononitrate, a Subject Drug, she called the manufacturer to determine their unpublished WAC price and set the FUL according to that information. (Robben Decl., Ex. 48 at 113:20-113:21, 117:12-118:3.)

**Plaintiffs' Response:**  Plaintiffs do not dispute this statement, but incorporate by reference their response to SOF 73.

**Defendants' Reply:**  Undisputed.  Defendants incorporate herein by reference their reply to Plaintiffs' response to the statement of fact in ¶ 73.

88.     Ms. Gaston testified that CMS removed the FUL for the 90 MCG albuterol inhaler upon learning of a shortage of the drug's raw material because "if the product is not available then it wouldn't make sense to put a FUL price on it." (Robben Decl., Ex. 12 at 470:7-472 :21.)

**Plaintiffs' Response:**  Plaintiffs do not dispute that Ms. Gaston testified that CMS temporarily removed the FUL for the 90 MCG albuterol inhaler upon being told by persons outside CMS that there was a raw material shortage for the drug. Furthermore, the FUL regulation requires that FULs be based on cost information "for drugs available for sale nationally," 42 C.F.R. § 447.332(a)(1)(ii) (2006), and thus it would not be proper

to set FULs on the basis of prices of drugs that are, or soon will be no longer sold nationally.

**Defendants' Reply:** Defendants' statement of fact in ¶ 88 should be deemed admitted for the following reasons. Plaintiffs' assertions concerning FULs for the 90 MCG albuterol inhaler are irrelevant to Defendants' asserted fact and should be disregarded as an attempt to create an alternate statement of facts. *See* General Reply 1; *Navarro v. U.S. Tsubaki*, Inc., 577 F. Supp. 2d 487, 493 n.1 (D. Mass. 2008). Defendants further object to the second sentence in Plaintiffs' response to the statement of fact in ¶ 88 as improper for a Local Rule 56.1 Statement because it does not consist of a factual assertion supported by evidence in the record, but is rather a legal conclusion.

89.  Ms. Gaston testified that CMS officials would not use a particular published price if that manufacturer "only distribute[d] to maybe [a] limited amount of states and not all states." (Robben Decl., Ex. 12 at 429:9-17.)

**Plaintiffs' Response:** Plaintiffs incorporate by reference their response to SOF 88 above.

**Defendants' Reply:** Undisputed. Defendants incorporate herein by reference their reply to Plaintiffs' response to the statement of fact in ¶ 73.

90.  CMS officials would decline to set a FUL when the FUL was equal to an AWP because States' "regular reimbursement methodology would be a percentage off of AWP," such that setting a FUL that was equal to AWP "would kind of counter what the states were doing with their other reimbursement methodology." (Robben Decl., Ex. 12 at 456:10-20 (discussing the FUL for cefadroxil); *see also* Robben Decl., Ex. 48 at 76:20-77:13 (stating that she could not recall ever having set a FUL based on an AWP). Ms. Gaston testified that CMS "wouldn't have used AWP" when establishing FULs because "[s]etting a FUL using the AWP wouldn't achieve the cost savings." (Robben Decl., Ex. 12 at 458:15-459:7; *see also* Robben Decl., Ex. 48 at 58:15-59:8 ("[I]f the federal upper limit, once it was calculated, was higher than the AWP price or the majority of the AWP prices, then we would generally not set a FUL on those drug ingredients, because the AWP – well, a couple years ago the average AWP on a national basis was I think AWP minus 12 percent for drug reimbursement, estimated acquisition costs for drug reimbursement for a drug that did not have a federal upper limit.")).

**Plaintiffs' Response:** Plaintiffs do not dispute this statement, but incorporate by reference their response to SOF 73.

**Defendants' Reply:**  Undisputed.  Defendants incorporate herein by reference their reply to Plaintiffs' response to the statement of fact in ¶ 73.

91.   CMS did not have any written policy in place for employees to follow in setting FULs, and CMS officials individually made decisions about whether and at what rate to set a FUL on a case-by-case basis. (Robben Decl., Ex. 47 at 250:2-6, 252:3-20; Robben Decl., Ex. 12 at 464:7-465:16; Robben Decl., Ex. 48 at 60:22-61:7.)

**Plaintiffs' Response:**  Disputed. The testimony cited by Defendants does not state that CMS did not have any written policy for setting FULs. (Robben Decl. Ex. 47 at 250:2-6, 252:3-20; Robben Decl. Ex. 12 at 464:7-465:16; Robben Decl. Ex 48 at 60:22-61:7.)
Plaintiffs further dispute that CMS did not have a written policy in place for employees to follow in setting FULs, and that CMS officials individually made decisions about whether and at what rate to set a FUL. Section 447.332 provides:

Upper limits for multiple source drugs.(b) *Specific upper limits.* The agency's payments for multiple source drugs identified and listed in accordance with paragraph (a) of this section must not exceed, in the aggregate, payment levels determined by applying for each drug entity a reasonable dispensing fee established by the agency plus an amount established by CMS that is equal to 150 percent of the published price for the least costly therapeutic equivalent (using all available national compendia) that can be purchased by pharmacists in quantities of 100 tablets or capsules (or, if the drug is not commonly available in quantities of 100, the package size commonly listed) or, in the case of liquids, the commonly listed size.

(*See also* Pls.' Resp. to SOF 73.)

**Defendants' Reply:**  Defendants' statement of fact in ¶ 91 should be deemed admitted for the following reasons.  Plaintiffs' contention that the cited testimony in ¶ 91 does not support the statement of fact is false.  The cited testimony describes instances in which CMS employees followed procedures and rules in setting FULs that were not contained in any written policy and made determinations about whether and how to set FULs on a case by case basis.  Moreover, Plaintiffs' citation to 42 C.F.R. 447.332 (2006) does not contradict the statement of fact contained in ¶ 91.  The cited testimony describes instances in which CMS employees followed procedures and rules in setting FULs that were not consistent with the provisions of section

447.332 and made determinations about whether and how to set FULs on a case by case basis

that were not consistent with the provisions in section 447.332.  Accordingly, Plaintiffs have

failed to raise a material question of fact as to the statements of fact in ¶ 91. Defendants further

incorporate herein by reference their reply to Plaintiffs' response to the statement of fact in ¶ 73.

92.     Based on FDA data, ipratropium bromide inhalation solution was qualified to be
        considered for inclusion on the FUL list in 2000, but was not added to the FUL list until
        August 24, 2003. (Robben Decl., Ex. 12 at 539:19-545:7; Robben Decl., Ex. 49 at ii.)

        **Plaintiffs' Response:**  Plaintiffs do not dispute that ipratropium bromide inhalation
        solution was qualified to be considered for inclusion on the FUL list in 2000 based on
        FDA data. Based on the FUL setting process, ipratropium bromide inhalation solution
        was not qualified to be considered for inclusion on the FUL list in 2000. However,
        Plaintiffs notes that the FULs System does not simply download and reproduce all
        pricing data published by the compendia. Rather, the System downloads, processes, and
        groups that data in accordance with criteria designed by CMS to comport with the
        governing regulation and to further the objectives of the FUL program. (Paul Decl. Ex.
        10 (Coffinan Decl.) ¶¶ 8-10, 14-15.) The output of this data processing made available to
        the FULs analyst, who then manually reviews the printouts and determines final FULs.
        (Id. ¶¶ 16-17.) Plaintiffs further incorporate by reference their response to SOF 73.

        **Defendants' Reply:**  Defendants' statement of fact in ¶ 92 should be deemed admitted

for the following reasons.  Plaintiffs' assertions concerning the FUL setting process and the FUL

System are irrelevant to Defendants' asserted fact and should be disregarded as an attempt to

create an alternate statement of facts.  *See* General Reply 1; *Navarro v. U.S. Tsubaki*, Inc., 577 F.

Supp. 2d 487, 493 n.1 (D. Mass. 2008).  Defendants incorporate herein by reference their reply

to Plaintiffs' response to the statement of fact in ¶ 73.

## B.     CMS Set FULs To Strike a Balance Between Cost-Savings and Access

93.     CMS officials were informally taught by other CMS officials how to exercise their
        discretion to set FULs manually so as to meet the dual objectives of cost savings and
        access. (Robben Decl., Ex. 47 at 225:16-226:7; Robben Decl., Ex. 48 at 73:14-74:22.)

        **Plaintiffs' Response:**  Disputed insofar as the cited authority does not support this
        paragraph. The testimony cited by Defendants does not state that CMS officials were
        "informally taught" by other CMS officials. (Robben Decl. Ex. 47 at 225:16-226:7;
        Robben Decl. Ex. 48 at 73:14-74:22.) Plaintiffs further incorporate by reference the
        response to SOF 73.

**Defendants' Reply:**  Defendants' statement of fact in ¶ 93 should be deemed admitted for the following reasons.  Plaintiffs' contention that the testimony cited in ¶ 93 does not support the statement of fact in ¶ 93 is false.  The testimony cited in ¶ 93 describes instances in which CMS officials were taught by other CMS officials to set FULs manually to meet the dual objectives of cost savings and access and does not indicate that this training occurred in a formal setting or as part of a written policy.

94.     When asked about CMS's objectives when establishing FULs, Sue Gaston testified as follows:

> Q. So what we see in Exhibit 6 is another situation in which, exercising its discretion, CMS chose to set a FUL not based on the lowest published price but based on the next lowest published price because that's what was reasonable to do in terms of ensuring access, correct?
> A. Correct.

(Robben Decl., Ex. 12 at 45 1:12-19.)

**Plaintiffs' Response:**  Plaintiffs do not dispute that Ms. Gaston testified as noted, but in the interests of completeness, incorporate their response to SOF 73.

**Defendants' Reply:**  Undisputed.  Defendants incorporate herein by reference their reply to Plaintiffs' response to the statement of fact in ¶ 73.

95.     Ms. Gaston further testified as follows:

> Q. So as we've kind of seen throughout, CMS is trying to establish a FUL that's not too low and not too high to achieve a cost savings, but also not set it too low to create an access issue; that's the balance CMS is trying to strike?
> A. Correct.
> Q. And you did that – the balance was struck, sometimes the computer program worked as it was supposed to and that balance was struck by the computer program, but other times it was the result of manual intervention?
> A. Correct.
> Q. And the manual intervention resulted in CMS making a choice in its discretion, correct?
> A. Correct.

(Robben Decl., Ex. 23 at 498:16-499:9.)

**Plaintiffs' Response:**  Plaintiffs do not dispute this statement, but incorporate by reference their response to SOF 73.

**Defendants' Reply:**  Undisputed.  Defendants incorporate herein by reference their reply to Plaintiffs' response to the statement of fact in ¶ 73.

C.    **CMS Reviewed Market Information When It Set FULs**

96.    Pursuant to federal law, all drug manufacturers whose drugs are reimbursed under state Medicaid programs must enter into a rebate agreement (the "Rebate Agreement") with the United States Secretary of Health and Human Services, and report Average Manufacturer Prices ("AMPs") to CMS on a quarterly basis. *See* 42 U.S.C. § 1396r-8(a)(1), (b)(3)(A). The Rebate Agreement sets forth a comprehensive definition of AMP as an average of the discounted unit price of a drug:

> (a) "Average Manufacturer Price (AMP)" means, with respect to a Covered Outpatient Drug of the Manufacturer for a calendar quarter, the average unit price paid to the Manufacturer for the drug in the States by wholesalers for drugs distributed to the retail pharmacy class of trade (excluding direct sales to hospitals, health maintenance organizations and to wholesalers where the drug is relabeled under that distributor's national drug code number). Federal Supply Schedule prices are not included in the calculation of AMP. AMP includes cash discounts allowed and all other price reductions (other than rebates under section 1927 of the Act), which reduce the actual price paid. It is calculated as a weighted average of prices for all the Manufacturer's package sizes for each Covered Outpatient Drug sold by the Manufacturer during that quarter. Specifically, it is calculated as Net Sales divided by numbers of units sold, excluding free goods (i.e. drugs or any other items given away, but not contingent on any purchase requirements). For Bundled Sales, the allocation of the discount is made proportionately to the dollar value of the units of each drug sold under the bundled arrangement. The Average Manufacturer Price for a quarter must be adjusted by the Manufacturer if cumulative discounts or other arrangements subsequently adjust the prices actually realized.

(Robben Decl., Ex. 50, at § 1(a) (Enclosure A).) Each of the capitalized terms incorporated in the AMP definition set forth above is further defined by the Rebate Agreement. (Robben Decl., Ex. 50, at § I.)

**Plaintiffs' Response:**  Plaintiffs do not dispute that the Medicaid Drug Rebate Agreement defines the Average Manufacturer Price as reflected in SOF 96, but dispute the relevance of AMP as California did not sue Defendants based on the accuracy of their reported AMPs.

**Defendants' Reply:**  Defendants' statement of fact in ¶ 96 should be deemed admitted

for the following reasons.  Plaintiffs do not dispute the statements of fact in ¶ 96.  As such, this

statement is undisputed and deemed admitted.  Plaintiffs, however, improperly "dispute" this fact

by contending that it is not relevant.  Plaintiffs' contention regarding the relevancy of the

statement of fact in ¶ 96 does not squarely address the truth of the matter in statement of fact in

¶ 96 and should consequently be rejected.  *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*,

577 F. Supp. 2d 487, 493 n.1 (D. Mass. 2008).  Defendants further incorporate herein by

reference their reply to Plaintiffs' response to statement of fact in ¶ 73.

97.     Ms. Gaston testified that she had access to the AMP information that manufacturers
        reported to CMS. (Robben Decl., Ex. 12 at 528:1-3 ("Q. Would you have had access to
        that AMP information? A. Yes.").)

       **Plaintiffs' Response:**  Disputed to the extent the statement seeks to establish as fact that
        CMS could use AMPs for reimbursement purposes, ignores that AMPs were confidential,
        and ignores that AMPs are not published prices or WACs. Ms. Gaston also testified that
        CMS did not use AMPs in setting FULs. (Robben Decl. Ex. 12 at 528:1-6.) Moreover,
        pursuant to the Rebate Agreement, the AMPs provided to CMS are confidential and not
        to be disclosed by CMS except for the purpose of carrying out the Rebate Program. 42
        U.S.C. § 1396r-8(b)(3)(D). This Court has already addressed this issue at length and
        found AMPs to have been confidential and "not to be revealed to third parties."
        *Massachusetts v. Mylan Labs.,* 608 F. Supp. 2d 127, 152 (D. Mass. 2008). In this
        instance, the third parties would be the state Medicaid programs because only the drug
        companies and CMS normally are privy to AMP information.

       **Defendants' Reply:**  Defendants' statement of fact in ¶ 97 should be deemed admitted

for the following reasons.  Plaintiffs' assertions concerning whether CMS used AMPs in setting

FULs and the confidentiality of AMPs are irrelevant to Defendants' asserted fact and should be

disregarded as an attempt to create an alternate statement of facts.  *See* General Reply 1; *Navarro*

*v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D. Mass 2008).  Defendants further object to

statements in Plaintiffs' response to ¶ 97 as improper for a Local Rule 56.1 Statement on the

grounds that they are not factual assertions supported by evidence in the record, but are rather a

legal conclusions.

98.     CMS officials received feedback from members of the pharmacy community and from
        State Medicaid agencies about "whether they felt that the FUL prices or the drugs were
        correctly on the FUL list or needed [to be] adjust[ed]"; whether the product was
        "available"; and whether "the pricing appears to be either too low or too high." (Robben
        Decl., Ex. 12 at 433:14-434:8, 435:8-11; *see also* Robben Decl., Ex. 48 at 110:14-21
        (stating that in addition to feedback from industry groups, she received feedback "from
        pharmacy providers or states").

        **Plaintiffs' Response:**  Disputed because statement is unclear as to time period and the
        cited references do not support the statement. CMS witnesses testified that during the
        2000 time period, CMS solicited comments from states and pharmacy associations
        regarding a draft FUL list CMS created without engaging in any manual review process.
        *(See* Robben Decl. Ex. 12 at 432:14-433:6.) At other times outside of the above-described
        2000 time period, when CMS received feedback from pharmacies, the feedback usually
        concerned availability of the drug. *(See id.* at 434:19-435:11.) Pharmacies may have also
        notified CMS that the FUL price was either "too low or too high." (*Id.* at 435:6-11.)
        When CMS received feedback that a drug was not available, CMS would call the
        manufacturer to verify if it was true. (*Id.* at 435:12-21.)

        **Defendants' Reply:**  Defendants' statement of fact in ¶ 98 should be deemed admitted

for the following reasons.  Plaintiffs do not dispute that CMS received feedback from the

pharmacy community and state Medicaid programs concerning whether drugs should be FULed,

whether a drug was available, and whether FULs were too low or too high.  Plaintiffs, however,

improperly "dispute" this fact by contending that the "time period" at issue is "unclear."  This

statement does not squarely address the statement of fact in ¶ 98 and should consequently be

rejected.  *See* General Reply 1; *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 493 n.1 (D.

Mass. 2008).

99.     In response to feedback that a drug was not available, CMS officials would "call the
        manufacturer or wholesaler and verify if that was a fact." (Robben Decl., Ex. 12 at
        435:12-21; *see also* Robben Decl., Ex. 48 at 111:12-17 (stating that in response to
        feedback, Ms. Sexton "would look at the availability in the compendia" or "call
        suppliers")).

        **Plaintiffs' Response:**  Undisputed.

**Defendants' Reply:**  None required.

100.   CMS officials telephoned drug manufacturers, wholesalers, or a compendia publisher
when the databases did not provide the WAC for a particular NDC or to determine
whether a drug was available. (Robben Decl., Ex. 48 at 60:22-61:7 ("There were times
when we would call or I would call the manufacturers or the suppliers to determine if a
drug was available. . . . [S]ome of these drugs were looked at, most of them, on a case-
by-case basis because there were times when we would have three or more suppliers but
perhaps we were missing a wholesale acquisition cost, for instance."); *id.* at 60:12-16
("[I]f you just looked at the prices that were on the pricing sheet and there was a
wholesale acquisition cost that was missing, that could have had a lower wholesale
acquisition cost than the prices that were shown . . . "); *id.* at 116:1-116:14 ("So to
determine whether there was a lower WAC out there, that looks like that was the impetus
for the calls.").

**Plaintiffs' Response**:  Undisputed.

**Defendants' Reply:**  None required.

101.   Ms. Gaston testified that she would sometimes review state MAC prices to "verify that
the FUL price that we establish is in the ballpark" and "looks realistic for states."
(Robben Decl., Ex. 12 at 478:17-479:9.)

**Plaintiffs' Response:**  Plaintiffs do not dispute Ms. Gaston's testimony about Federal
Upper Limit ("FUL") and Maximum Allowed Cost ("MAC") prices, which simply
operate as a maximum or ceiling price which caps reimbursement. Accordingly, FUL or
MAC prices do not exclusively form the basis for Medicaid reimbursement, even when
FUL or MAC prices are effective, since the California reimbursement methodology is a
lesser of formula.

**Defendants' Reply:**  Defendants' statement of fact in ¶ 101 should be deemed admitted
for the following reasons.  Plaintiffs' assertions concerning FUL and MAC prices are irrelevant
to Defendants' asserted fact and should be disregarded as an attempt to create an alternate
statement of facts.  *See* General Reply 1; *Navarro v. U.S. Tsubaki*, Inc., 577 F. Supp. 2d 487, 493
n.1 (D. Mass. 2008).

**DEFENDANTS' JOINT RESPONSE TO PLAINTIFFS' STATEMENT
OF ADDITIONAL UNDISPUTED FACTS IN OPPOSITION TO
DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

Defendants hereby submit their Joint Response to Plaintiffs' Statement of Additional

Undisputed in Opposition to Defendants' Motions for Partial Summary Judgment.

**GENERAL RESPONSES AND OBJECTIONS**

Defendants generally object to the Additional Statements insofar as they inappropriately

conjoin completely unrelated or marginally related statements together as one purported factual

statement.  Defendants generally object to the Additional Statements insofar as they are

immaterial to the issues before the Court on the present motion.  Defendants generally object to

the citation of evidence which does not support a particular fact or is not the best evidence of a

particular fact.  Defendants' agreement that a fact is undisputed is not an agreement that

Plaintiffs' citations support such fact and is limited to this motion only.  Defendants object to the

Additional Statements to the extent that the purported "undisputed facts" contained therein are

supported by testimony elicited from a witness produced by California through leading questions

asked by California's counsel during direct examination.

**SPECIFIC RESPONSES**

1.      Based upon a methodology more fully set forth in his report, Plaintiffs' expert, Dr.
        Leitzinger, concludes that total overpayments by the State of California on Medi-Cal
        reimbursements for Dey identified pharmaceutical products during the period from
        January 1, 1994 through December 31, 2004 equal $30.1 million. (Paul Ex. 11 (12/18/09
        Leitzinger Decl.), at Ex. A, ¶ 7.) In calculating the overpayments made by the State for
        the 28 relevant Dey NDCs, Dr. Leitzinger excluded claims for which the actual
        reimbursement did not exceed the average net price paid by wholesalers to Dey by at
        least 25 percent. For each remaining claim, he calculated the overpayment as the
        difference between the actual ingredient cost reimbursed by the State and an amount that
        is 25 percent above the average net price paid by wholesalers to Dey. (Paul Ex. 12
        (11/19/09 Leitzinger Dey Decl.) ¶ 7.)
        Based upon a methodology more fully set forth in his report, Plaintiffs' expert, Dr.
        Leitzinger, concludes that total overpayments by the State of California on Medi-Cal
        reimbursements for Mylan identified pharmaceutical products during the period from

January 1, 1994 through December 31, 2004 equal $104.4 million.  (Paul Ex. 11 (12/18/09 Leitzinger Decl.), at Ex. B, ¶ 7.) In calculating the overpayments made by the State for the 217 relevant Mylan NDCs, Dr. Leitzinger excluded claims for which the actual reimbursement did not exceed the average net price paid by wholesalers to Mylan by at least 25 percent. For each remaining claim, he calculated the overpayment as the difference between the actual ingredient cost reimbursed by the State and an amount that is 25 percent above the average net price paid by wholesalers to Mylan. (Paul Ex. 13 (11/19/09 Leitzinger Mylan Decl.) ¶ 7.

Based upon a methodology more fully set forth in his report, Plaintiffs' expert, Dr. Leitzinger, concludes that total overpayments by the State of California on Medi-Cal reimbursements for Sandoz identified pharmaceutical products during the period from January 1, 1994 through December 31, 2004 equal $142.6 million. (Paul Ex. 11 (12/18/09 Leitzinger Decl.), at Ex. C ¶ 7.) In calculating the overpayments made by the State for the 149 relevant Sandoz NDCs, Dr. Leitzinger excluded claims for which the actual reimbursement did not exceed the average net price paid by wholesalers to Sandoz by at least 25 percent. For each remaining claim, he calculated the overpayment as the difference between the actual ingredient cost reimbursed by the State and an amount that is 25 percent above the average net price paid by wholesalers to Sandoz. (Paul Ex. 14 (11/19/09 Leitzinger Sandoz Decl.) ¶ 7.)

**Defendants' Response:**  For the purposes of this motion, Defendants do not dispute that the Prof. Leitzinger's declaration referenced in paragraph 1 contains what Prof. Leitzinger purports to be the difference between AWP and "average net prices" as calculated by Prof. Leitzinger, plus an arbitrary 25 percent mark-up for the Subject Drugs, but the purported statement is irrelevant to this Motion, as Dr. Leitzinger's opinions are not facts and are inadmissible under *Daubert*.  Defendants dispute that there is any basis to conclude that Defendants had an obligation to report as their AWPs the "average net prices" as calculated by Prof. Leitzinger, that California only ever intended to reimburse providers at 25 percent above what wholesalers paid Defendants to acquire drugs, or that Prof. Leitzinger's calculations are otherwise probative evidence of any of the elements of California's claims against Defendants, or are probative evidence of the measure of the purported injury, if any, suffered by California. Defendants further dispute that the existence of a difference between Medi-Cal's reimbursement payment for a drug and a provider's actual cost for a drug constitutes an "overpayment" because

California deliberately adopted a reimbursement methodology that it knew would pay providers more than their actual acquisition costs for drugs to achieve its own policy goals.  (*See* Joint SOF at ¶¶ 24-26, 33, 35-40, 52-53, 55, 67.[1])

2.      Former Chief Deputy Director of Health Services, Stanley Rosenstein, testified that the reporting of inflated AWPs by drug manufacturers directly caused Medi-Cal to reimburse pharmacists in excessive amounts, which cost the Program hundreds of millions of taxpayer dollars. (Paul Ex. 4 (11/6/08 Rule 30(b)(6) CA Dept. of Health Care Servs. (Rosenstein) Dep.) at 303:19-304:11; 310:11-311:2.) Mr. Rosenstein testified:

> Q.      If manufacturers AWPs had been reported by the manufacturers owning those AWPs as actual and accurate measures of their -- of the average wholesale prices of those drugs, would that have affected Medi-Cal's efforts to contain its drug reimbursement costs?
> MR. BUEKER:  Objection as to form.
> THE WITNESS: Yes. We have been spending -- we spent all day talking about the effort we've had to get accurate pricing. Had we started with accurate pricing, we wouldn't have had to go through all of these changes, and we would have had an accurate reimbursement system in the Medi-Cal program. That would have saved the taxpayers hundreds of millions of dollars.
> (*Id*. at 303:19-304:11.) Mr. Rosenstein further testified:

> Q.      Do you believe that the Medi-Cal program has been defrauded by manufacturers who have reported inflated AWPs knowingly to the program?
> MR. BUEKER: Objection as to form. Calls for a legal conclusion.
> BY MR. PAUL:
> Q.      Do you believe the program has been cheated?
> MR. BUEKER: Objection as to form.
> THE WITNESS: Yeah, I believe we have been. I believe the taxpayers have had to pay excessive amounts of money because of incorrectly reported and incorrectly reported AWPs.
> (*Id*. at 310:11-311:2.)

**Defendants' Response:**  Defendants object to the testimony cited in paragraph 2 as violative of Rule 611(c) of the Federal Rules of Evidence, on the grounds that it was elicited from a witness produced by California through leading questions asked by California's counsel

---

[1]      "Joint SOF at ¶ __" refers to the Defendants' Joint Statement of Undisputed Material Facts in Support of Their Motions for Partial Summary Judgment, Dkt. No. 6703.

during direct examination.  To the extent a response is required, Defendants dispute paragraph 2.

The reimbursement payments that are at issue in this action are not "overpayments" and were not

caused by Defendants.  Rather, they were the direct result of deliberate and informed decisions

by California to pay providers more than their actual acquisition costs for drugs to achieve its

own policy goals.  (*See* Joint SOF at ¶¶ 24-26, 33, 35-40, 52-53, 55, 67.)  Moreover, considering

that California has never defined AWP as anything other than a price listed in compendia, (*see*

Joint SOF at ¶ 20), Defendants did not report "inflated" or "incorrect" AWPs, because the

reported AWPs were precisely what they were expected to be.  (*See* Sandoz' Response to

Plaintiffs' Sandoz-specific SOF in support of Plaintiffs' Motion at ¶¶ 8, 11).

3.      Demonstrative charts, based on Dr. Leitzinger's calculations, graphically portray the
        extent of the spreads for four of each Defendant's Subject Drug NDCs. These charts
        show the gulf between Defendants' reported AWPs versus Dr. Leitzinger's calculated
        "but-for" average net quarterly prices. (Paul Ex. 15 (Demonstrative Charts).)

        **<u>Defendants' Response</u>:**  For the purposes of this motion, Defendants do not dispute that

the charts referenced in paragraph 3 contain what Prof. Leitzinger purports to be the difference

between AWPs and "'but-for' average net quarterly prices" as calculated by Prof. Leitzinger for

certain of the Subject Drugs, but the purported statement is irrelevant to this Motion, as Dr.

Leitzinger's opinions are not facts and are inadmissible under *Daubert*.  Defendants dispute that

they were under any obligation at any time to report as their AWPs the "'but-for' average net

quarterly prices" as calculated by Prof. Leitzinger or that Prof. Leitzinger's calculations of the

differences between published AWPs and his "'but-for' average net quarterly prices" are

probative evidence of any of the elements of California's claims against Defendants, or are

probative evidence of the measure of the purported injury, if any, suffered by California.

Professor Leitzinger offers no opinion that his calculated "average net quarterly prices" would

have been or should have been reported by Defendant.  (*See* Robben Decl., Ex. 58 at 44:22-45:10; Robben Decl., Ex. 59 at 506:5-10.)[2]

4.      Plaintiffs' expert Dr. Schondelmeyer concludes that Defendants Dey, Mylan, and Sandoz reported inflated prices to the commercial price databases used by Medi-Cal that were not reasonably or fairly indicative of the "prices generally and currently paid by providers" in the marketplace during the period beginning January 1, 1994 through December 31, 2004. (Paul Ex. 16 (Schondelmeyer Expert Report) ¶ 184.)

**Defendants' Response:**  For the purposes of this motion, Defendants do not dispute that paragraph 4 accurately characterizes the cited statements contained in Prof. Schondelmeyer's report, but the purported statement is irrelevant to this Motion, as Dr. Schondelmeyer's opinions are not facts and are inadmissible under *Daubert.*Defendants dispute that they were ever obligated to report to compendia as their AWPs "prices generally and currently paid by providers" or that Prof. Schondelmeyer's unsupported opinions are probative evidence of any of the elements of California's claims against Defendants, or are probative evidence of the measure of the purported injury, if any, suffered by California.

5.      California Senate Bill 393 was chaptered into law on October 10, 1999. Among other things, Senate Bill 393 required DHCS to "conduct a study of the adequacy of Medi-Cal pharmacy reimbursement rates including the cost of providing prescription drugs and services."  The bill was ultimately chaptered as Cal. Bus. & Prof. Code § 4426. (Pls.' Request for Judicial Notice ("RFJN") Ex. 1.)

**Defendants' Response:**  Undisputed.

6.      The Myers & Stauffer report compares Mylan's Piroxicam 20mg capsule's AWP of $2.6391 against its average cost of acquisition of .0339 cents for a spread on ingredient costs of $2.61—i.e., a spread percentage of 7685%. (Declaration of Suzanne Graydon ("Graydon Decl.) ¶¶ 1-7 & Ex. 1 at line 13.)

---

[2]      "Robben Decl., Ex. __" refers to the Declaration of Philip D. Robben in Support of Defendants' Motions for Partial Summary Judgment and the exhibits annexed thereto, Dkt. Nos. 6702 to 6702-69, the Corrected Declaration of Philip D. Robben in Opposition to Plaintiff's Motion for Partial Summary Judgment and the exhibits annexed thereto, Dkt. Nos. 6799 to 6799-8, and the Declaration of Philip D. Robben in Further Support of Defendants' Motions for Partial Summary Judgment and the exhibits annexed thereto.

**Defendants' Response**:  Undisputed.

7.     California Budget Trailer Bill Assembly Bill 442 was voted upon by the California
Senate on June 29, 2002, was voted upon by the California Assembly on September 1,
2002, and was approved by the Governor on September 30, 2002. (Pls. RFJN Ex. 2.)

**Defendants' Response**:  Undisputed.

8.     The California Legislature did not rely upon the Myers & Stauffer report when
considering the proposed change in the Medi-Cal prescription drug reimbursement rate
from AWP-5% to AWP-10% pursuant to California Budget Trailer Bill AB 442. This
fact is verified by the testimony of the Chief of the Medi-Cal Pharmacy Policy Unit, Dr.
Kevin Gorospe. (Paul Ex. 1 (12/3/08 Rule 30(b)(6) CA Dept. of Health Care Servs.
(Gorospe) Dep.) at 246:3-16.) Dr. Gorospe testified:

> BY MR. HENDERSON:
> Q.     … After this report was -- was issued by Myers and Stauffer did
> the California Legislature enact changes to the reimbursement
> methodologies by California?
> A.     There were changes in the methodology in 2002, but the report --
> this report was issued too late in the budget cycle process for it to be used
> in those decisions by the Legislature. They had already moved forward a
> proposal.

*Id.*

**Defendants' Response**:  Defendants do not dispute that California has accurately cited

the testimony of Dr. Gorospe, but objects to the cited testimony as irrelevant and immaterial.  By

the time California adopted AWP minus ten percent, it was well aware that providers could

acquire generic drugs at prices significantly below AWP, regardless of whether it had an

opportunity to review the Myers and Stauffer report.  In the enrolled bill report recommending

that the Governor sign AB 442 into law, DHS acknowledged that providers could acquire

generic drugs at 40 to 50 percent below compendia AWP, but noted that it dropped a proposal to

reimburse for generic drugs at AWP minus 40 percent out of concerns that the reductions would

create access problems for Medi-Cal beneficiaries.  (*See* Joint SOF at ¶52.)

9.      The Governor did not have line-item veto authority for California Budget Trailer Bill AB
442. (Paul Ex. 17 (5/19/09 Rosenstein Dep.) at 171:6-171:13, 178:22-179:12.) In this
regard, Mr. Rosenstein testified:

>   Q.      Okay. If you could turn to page 10 of the document. Actually, my
>   apologies. Before we go to page 10, just to stay on the first page for a
>   moment, AB 442 was designed to implement portions of the 2002/2003
>   State budget; correct?
>   A.      That is correct.
>   ***
>   Q.      And in this document the Department is recommending that the
>   Governor not veto Section 73; correct?
>   A.      Well, recommending he not veto the entire bill. With the trailer bill
>   he does not have line item veto, so he either signs the entire bill or vetoes
>   the entire bill.
>   Q.      And that would include Section 73?
>   A.      That's right.
>   Q.      As a result Section 73 became law in California; is that right?
>   A.      That's correct.
>
> *Id.*

**Defendants' Response:**  Defendants do not dispute that California has accurately cited

the testimony of Mr. Rosenstein, but objects to the cited testimony as irrelevant and immaterial.

The decision to set reimbursement at AWP minus ten percent originated with a recommendation

from DHS, as did the decision not to reimburse for generic drugs at AWP minus 40 percent.

(*See* Joint SOF at ¶52.)


10.     Section 73 of California Budget Trailer Bill AB 442 provided for the reduction in
reimbursement from AWP-5% to AWP-10% in 2002. The trailer bill consists of 106
sections and extends over 150 pages in the California Legislative Digest. (Pls.' RFJN Ex.
3.)

**Defendants' Response:**  Undisputed.


11.     As more fully set out in his report, Plaintiffs' expert, Professor Marmor, reports that
throughout the relevant time period from 1994 through 2004, California faced significant
fiscal challenges and, with respect to Medi-Cal prescription drug reimbursement issues,
took extensive steps to comply with its obligation to provide access to Medi-Cal
beneficiaries and reduce public expenditures, despite ongoing political and legal attacks
against Medi-Cal from other stakeholders. (Paul Ex. 18 (Marmor Report) ¶¶ 88-92.)
Specifically, Professor Marmor observes:

In 1994-95, California was in the throes of a state fiscal crisis. Without study, the legislature reduced the reimbursement for each drug claim by 50 cents, a figure later reduced to 25 cents, and then 10 cents. The legislature tried to take other steps at this time, but none other than the claim reimbursement reductions and the supplemental rebate contracts described in the previous paragraph were enacted. The historical record shows that these were efforts to reduce public expenditures, not efforts to reform the drug reimbursement system nor deal with possible fraud.

…

The legislature was in stalemate for much of the period 1996-2002. In 2002, the legislature decided that drug reimbursement would be decreased to AWP-10%, eliminated direct price payments (DP) as a standard, and kept the same dispensing fee. It is my understanding that the defendants claim that this modest decrease in some way supports their claims of approval or acquiescence. I disagree. There were continuing battles, both political and legal, during this period. See, e.g., *Orthopaedic Hospital v. Belshe*, 103 F.3d 1491 (9th Cir. 1997) (describes lengthy litigation over reimbursement rates in California). Efforts to make change that were thwarted by lobbying and litigation—or slowed by independent study--hardly qualify as evidence of approval or acquiescence in the pharmaceutical companies' conduct.

By 2002, the indicators of increasing spreads between reported and acquisition costs prompted the legislature to enact an increased discount from AWP-5% to AWP-10%. Shortly after the 2002 changes were implemented, Myers & Stauffer issued its report. The report distinguished between acquisition costs and dispensing fees. In response, in 2004, the legislature made a more substantial change to AWP -17%. That change was part of an overall adjustment of policy. There was an increase in dispensing fees: from $4.05 to $7.25 (for pharmacies) and $8 (for long term care facilities).

During the relevant time period and at the federal level, the pharmaceutical companies resisted any changes to the AWP method--or alternative measures--through vigorous and costly lobbying. In California, there were other forms of resistance to increases in AWP discounting or alternative methods of reimbursement. In Dey's case, a lawsuit was filed, which sought to enjoin First Data Bank from reporting much lower and apparently more accurate prices. See Complaint in *Dey v. First Data Bank, Inc.*, Superior Court of the State of California (Napa County), Case No. 26-21019 (April 15, 2003)….

*Id*.

**Defendants' Response:**  Defendants object to paragraph 11 on the grounds that it is based on inadmissible hearsay.  Professor Marmor was retained by California as an expert witness and has no personal knowledge of the facts of this case, yet California cites to

cumulative narrative contained in his report for the truth of its content.  To the extent a response

is required, Defendants do not dispute that paragraph 11 accurately quotes Prof. Marmor's report

for the purposes of this motion.  Defendants dispute that Prof. Marmor's characterizations and

conclusions are admissible under *Daubert*, are probative evidence of any of the elements of

California's claims against Defendants, or are probative evidence of the measure of the purported

injury, if any, suffered by California.

12. Medi-Cal relies upon the accuracy of all stakeholders. (Paul Ex. 4 (11/06/08 CA Dept. of
Health Care Servs. (Rosenstein) Dep.) at 301:15-302:6.) In this regard, Mr. Rosenstein
testified as follows:

> Q.   And to your knowledge, is it the intent of the Medi-Cal program
> that manufacturers report AWPs as an accurate measure of average
> wholesale prices?
> MR. BUEKER: Objection. Form.
> THE WITNESS: Absolutely. We depend upon the accuracy and the
> integrity of everybody who participates in the program. It is a humongous
> revised program with a relatively small staff. In all aspects of it, it depends
> upon the people who provide the government, the state, the federal
> government with data they do accurately.

*Id*.

**Defendants' Response**:  Defendants object to the use of the testimony cited in paragraph

12 as violative of Rule 611(c) of the Federal Rules of Evidence, on the grounds that it was

elicited from a witness produced by California through leading questions asked by California's

counsel during direct examination.  To the extent a response is required, Defendants dispute

paragraph 12.  California has understood since at least the late 1970s that compendia AWPs

significantly exceed providers' actual costs to acquire prescription drugs.  (*See* Joint SOF at ¶¶

22-41.)  Despite this understanding, California has never defined AWP in a statute or regulation

as anything other than a price listed in compendia, and has never offered any guidance as to how

AWP should be determined.  (*See* Joint SOF at ¶ 20.)

13.     The failure of manufacturers to report accurate pricing resulted in Medi-Cal having to
        make changes to its reimbursement policies and has resulted in an inaccurate
        reimbursement system. (Paul Ex. 4 (11/06/08 CA Dept. of Health Care Servs.
        (Rosenstein) Dep.) at 303:19-304:11.) In this regard, Mr. Rosenstein testified as follows:

>       Q.      If manufacturers AWPs had been reported by the manufacturers
>       owning those AWPs as actual and accurate measures of their -- of the
>       average wholesale prices of those drugs, would that have affected Medi-
>       Cal's efforts to contain its drug reimbursement costs?
>       MR. BUEKER: Objection as to form.
>       THE WITNESS: Yes. We have been spending -- we spent all day talking
>       about the effort we've had to get accurate pricing. Had we started with
>       accurate pricing, we wouldn't have had to go through all of these changes,
>       and we would have had an accurate reimbursement system in the Medi-
>       Cal program. That would have saved the taxpayers hundreds of millions of
>       dollars.

*Id.*

**Defendants' Response:**  Defendants object to the use of the testimony cited in paragraph

13 as violative of Rule 611(c) of the Federal Rules of Evidence, on the grounds that it was

elicited from a witness produced by California through leading questions asked by California's

counsel during direct examination.  To the extent a response is required, Defendants dispute

paragraph 13.  California, not Defendants, controls the amount Medi-Cal reimburses providers

who dispense the Subject Drugs.  California has understood since at least the late 1970s that

compendia AWPs significantly exceed providers' actual costs to acquire prescription drugs.  (*See*

Joint SOF at ¶¶ 22-41.)  Despite this understanding, California has never defined AWP in a

statute or regulation as anything other than a price listed in compendia, and has never offered any

guidance as to how AWP should be determined.  (*See* Joint SOF at ¶ 20.)  Instead, California

deliberately adopted a reimbursement methodology, based in part on compendia AWPs, that it

knew would pay providers more than their actual acquisition costs for drugs to achieve its own

policy goals.  (*See* Joint SOF at ¶¶ 24-26, 33, 35-40, 52-53, 55, 67.)

14.     But-for the failure of drug manufacturers to report accurate prices, Medi-Cal could have
        saved hundreds of hours in Program resources, which could have been better used to

improve the Program. (Paul Ex. 4 (11/06/08 CA Dept. of Health Care Servs. (Rosenstein) Dep.) at 311:4-312:4.) In this regard, Mr. Rosenstein testified as follows:

> Q.      Earlier in your testimony in response to questions from counsel for Warrick, I think you mentioned at one point that Dr. [Gorospe] conducted some interviews or participated in interviews with the participating pharmacies sometimes around 2004. And I think you used the phrase, "This was a resource intensive effort on the part of Dr. [Gorospe] and his pharmacists"; is that correct?
> A.      That's correct.
> Q.      And would you agree that had the generic drug manufacturers accurately reported their AWPs as actual average wholesale prices that that resource intensive effort would not have had to take place?
> MR. BUEKER: Objection as to form.
> THE WITNESS: We would have saved hundreds of hours of our pharmacist's time that both that effort which took weeks and throughout this whole process, time that he could have better been spent on other ways to improve the Medi-Cal program.

*Id.*

**Defendants' Response**:  Defendants object to the use of the testimony cited in paragraph 14 as violative of Rule 611(c) of the Federal Rules of Evidence, on the grounds that it was elicited from a witness produced by California through leading questions asked by California's counsel during direct examination.  Defendants further object to the use of the testimony cited in paragraph 14 as irrelevant and immaterial.  To the extent a response is required, Defendants dispute Paragraph 14.  California has understood since at least the late 1970s that compendia AWPs significantly exceed providers' actual costs to acquire prescription drugs.  (*See* Joint SOF at ¶¶ 22-41.)  Despite this understanding, California has never defined AWP in a statute or regulation as anything other than a price listed in compendia, and has never offered any guidance as to how AWP should be determined.  (*See* Joint SOF at ¶ 20.)  Therefore, there is no basis to contend that Defendants failed to report "accurate" prices, or that the effort by Dr. Gorospe alluded to by Mr. Rosenstein was a result of Defendants' conduct.

15.      It has never been the policy of the Medi-Cal program to deliberately accept inflated and inaccurate AWPs simply because the program knew it would offset them by shorting or

minimizing the amount of the filling fee for pharmacists, or because it might be able to offset the effect of inflated AWPs with rebates. (Paul Ex., Paul Ex. 4 (11/06/08 CA Dept. of Health Care Servs. (Rosenstein) Dep.) at 313:10-314:3].) In this regard, Mr. Rosenstein testified as follows:

> Q.     Just to be clear, I want to confirm with you whether or not, has it ever been the policy of the Medi-Cal program to deliberately accept inflated and inaccurate AWPs simply because the program knew it would offset them by shorting or minimizing the amount of the filling fee for pharmacists?
> MR. BUEKER: Objection as to form.
> MR. CYR: Objection.
> THE WITNESS: No. It has always been our policy to have accurate information and to use that information to establish what the accurate price should be, should be on both ends of the equation. We do believe they need to be both looked at, but they have got to come from accurate data sources.

*Id.*

    **Defendants' Response**: Defendants object to the use of the testimony cited in paragraph 15 as violative of Rule 611(c) of the Federal Rules of Evidence, on the grounds that it was elicited from a witness produced by California through leading questions asked by California's counsel during direct examination. To the extent a response is required, Defendants dispute paragraph 15. California has understood since at least the late 1970s that compendia AWPs significantly exceed providers' actual costs to acquire prescription drugs. (*See* Joint SOF at ¶¶ 22-41.) Despite this understanding, California has never defined AWP in a statute or regulation as anything other than a price listed in compendia, and has never offered any guidance as to how AWP should be determined. (*See* Joint SOF at ¶ 20.) Therefore, there is no basis to contend that Defendants reported "inaccurate" or "inflated" prices. Moreover, California deliberately adopted a reimbursement methodology, based in part on compendia AWPs, that it knew would pay providers more than their actual acquisition costs for drugs to achieve its own policy goals, including compensating providers for inadequate dispensing fees. (*See* Joint SOF at ¶¶ 24-26, 33, 35-40, 52-53, 55, 67.)

16.     There is no evidence that the California Legislature ratified Defendants' reporting of grossly inflated AWPs. (Paul Ex. 4 (11/06/08 CA Dept. of Health Care Servs. (Rosenstein) Dep.) at 308:12-309:1.) In this regard, Mr. Rosenstein testified that he never heard any legislator or staffer indicate an acceptance of inflated or untruthful AWPs, but rather that he had heard strong objections to the government receiving false information.

> Q.      Did you ever hear of any staffer or legislator in either the Senate or the Assembly state an acceptance of inflated AWPs or acceptance of reimbursement from the Medi-Cal program of pharmacy drugs based on inflated or untruthful AWPs?
> MR. BUEKER: Objection as to form.
> MR. CYR: Objection.
> THE WITNESS: No, I do not. In fact, I have heard it quite the opposite of strong objection to the government getting false information.

*Id.*

**Defendants' Response:**  Defendants object to the use of the testimony cited in paragraph 16 as violative of Rule 611(c) of the Federal Rules of Evidence, on the grounds that it was elicited from a witness produced by California through leading questions asked by California's counsel during direct examination.  Defendants further object to the testimony cited in paragraph 16 as immaterial and irrelevant.  To the extent a response is required, Defendants dispute paragraph 16.  California has understood since at least the late 1970s that compendia AWPs significantly exceed providers' actual costs to acquire prescription drugs.  (*See* Joint SOF at ¶¶ 22-41.)  Despite this understanding, California has never defined AWP in a statute or regulation as anything other than a price listed in compendia, and has never offered any guidance as to how AWP should be determined.  (*See* Joint SOF at ¶ 20.)  Therefore, there is no basis to contend that Defendants reported "grossly inflated AWPs."  Moreover, the California legislature has twice deliberately enacted statutes calling for reimbursement based in part on compendia AWP, knowing full well that the resulting payments would exceed providers' acquisition costs, especially for generic drugs.  (*See* Joint SOF at ¶¶ 52-53, 55, 67.)

17.     Defendant Sandoz' expert David Rubinfeld admits that Sandoz AWPs could not be used to estimate acquisition cost without independent information about prices actually paid

by providers. (Paul Ex. 19 (9/29/09 Rubinfeld Dep.) at 135:2-135:14.) In this regard, Dr. Rubinfeld testified as follows:

> Q.      Would it be accurate to say that you would need some actual or average price information about selling prices of Sandoz's drugs in order to come up with an appropriate discount off of AWPs to end up with an estimate of the price generally and currently paid?
> A.      I would say it slightly differently. I would say that you would need independent information as to Sandoz invoice prices. You couldn't—you wouldn't know what discount, if any, to have off AWP as a benchmark unless you actually had information about prices actually paid.

*Id.*

**Defendants' Response:**  Defendants do not dispute that Dr. Rubinfeld provided the testimony cited in paragraph 17.

18.    In 1989, California revised Section 51513 of Title 22 of the California Code of Regulations ("CCR") to establish the basic formula that governed Medi-Cal's pharmaceutical reimbursement methodology through November 30, 2002. (Robben Decl. Ex. 13, Pl.'s Resp. to Defs. Interrog # 13.)

**Defendants' Response:**  Undisputed that California made the referenced regulatory change.  Disputed is any inference that the change altered Medi-Cal's other reimbursement formulas, or that the discounted AWP formula is the "basic formula" as that concept is nowhere in the regulation, and Medi-Cal used other reimbursement benchmarks, notably the FUL, to reimburse generic drugs more frequently than it used the discounted AWP formula.  (*See* Sandoz' Response to Plaintiffs'  Additional Statement of Facts in Opp. to Sandoz Motion at ¶ 26 (showing that basis of payment was FUL or usual and customary charge for over 80% of claims at issue as to Sandoz)).

19.    The Regulation was revised through a formal rulemaking proceeding. The Final Statement of Reasons for the revision states that "the State must come as close as possible to the actual acquisition cost. The AWP-5% program is the State's best estimate of this cost." (Paul Decl. Ex. 20 at 2.)

The Addendum to the Final Statement of Reasons issued by DHS in connection with the revisions to the Regulation made clear that California's policy was to *not* cross-subsidize

allegedly inadequate dispensing fees by allowing excess ingredient cost payments, stating as follows: "[C]urrent federal regulations at 42 C.F.R. 447.332, require the Department to make drug reimbursements based on the estimated acquisition cost of the drug without including any loss on dispensing fee requirements." (Paul Decl. Ex. 20 at 1.) That document also made clear that California's reimbursement formula was calculated to estimate providers' acquisition costs as accurately as possible, stating: "An analysis of existing elements of Medi-Cal reimbursement, such as the FAC, MAIC and direct price, determined that when combined with AWP-5%, they resulted in an overall discount which was equal to the Department's best estimate of the price generally and currently paid by pharmacy providers." (*Id.* at 2-3.)

**Defendants' Response:**  Defendants do not dispute that California has quoted selectively from what it purports to be a "Final Statement of Reasons" concerning California's revisions to Section 51513 of Title 22 of the California Code of Regulations, but dispute that the statements accurately reflect California's policies during the time period relevant to this action, namely January 1, 1994 to December 31, 2004.  During the relevant time period, California deliberately adopted a reimbursement methodology, based in part on compendia AWP, that it knew would pay providers more than their actual acquisition costs for drugs to achieve its own policy goals, including compensating providers for inadequate dispensing fees.  (*See* Joint SOF at ¶¶ 24-26, 33, 35-40, 52-53, 55, 67.)

Defendants further dispute that the document accurately characterizes the federal regulations governing Medicaid reimbursements at the time.  Those regulations  limited aggregate reimbursement payments for certain multi-source drugs with FULs to the FULs plus a reasonable dispensing fee, and limited payments for all other drugs "in the aggregate" at the lower of (i) the EAC plus a reasonable dispensing fee and (ii) the usual and customary charge submitted by providers.  *See* 42 C.F.R. §§ 447.331, 447.332.  The Health Care Financing Agency's ("HCFA") description of the rules noted that, "[u]nder this rule, the EAC criteria are applied as an upper limit on an aggregate basis rather than on a prescription by prescription basis."  (*See* Fed. Reg. Vol. 52, No. 147, July 31, 1987, at p. 28652.)  As a result, states are

permitted by the federal government to make higher payments for some drugs as long as those

higher payments are offset by lower payments for other drugs:

> 1.  Increased State Flexibility
> \*       \*       \*
> Under these final regulations, State agencies will be able to make higher
> payments for some listed drugs as long as they pay at rates lower than
> those listed for other drugs on the list. … Similarly, State agencies may
> employ essentially the same approach in meeting the limits for all other
> drugs.  That is, the same principal [*sic*] of balancing payment increases for
> some drugs with decreases for other drugs also applies in determining
> whether aggregate payments exceed the limit.

(Fed. Reg. Vol. 52, No. 147, July 31, 1987, at p. 28655.)

Moreover, when determining whether a state's pharmacy reimbursement payments

comply with the federal aggregate upper limits, the regulations require that ingredient payments

be considered together with a *reasonable* dispensing fee, not necessarily the dispensing fee

actually paid by the state.  (*See* Robben Decl., Ex. 57, at 7 ("We conclude that the regulations

permit a state to use an amount other than the dispensing fee it actually paid in calculating the

upper payment limit.").)  Thus, states – including California – could offset inadequate dispensing

fee payments with ingredient portion payments that exceeded the limits set by the regulations, so

long as, in the aggregate, the resulting payments did not exceed the ingredient limits plus a

reasonable dispensing fee.  (*See id*., at 8.)

Furthermore, as the federal government stated in its comments to the 1987 regulations,

this change in the law explicitly acknowledges that states are allowed to build a profit margin

into reimbursement to encourage pharmacists to use lower priced generic drugs and

acknowledges the use of extensive discounting from benchmark prices:

> In the previous section, we discussed the possible effects of building into
> our rates for ingredients a profit margin for pharmacists.  We expressed
> the hope that States would recognize the advantage of providing
> pharmacies with an incentive to participate in the Medicaid program and

to stimulate pharmacies to engage in prudent purchasing practices and the substitution of lower cost therapeutically equivalent products.

\*        \*        \*

[W]e suspect that price competition would be carried on in the form of discounts, promotional campaigns and other incentives aimed at the retail pharmacists. … [O]ur policy of using published prices as a basis for determining payment levels may cause wholesalers to invent new ways of offering discounts to smaller independent retail outlets, thereby expanding the practice of discounting to those outlets and enabling them to have access to less expensive sources of pharmaceuticals. . . .

(Fed. Reg. Vol. 52, No. 147, July 31, 1987, at p. 28656.)  HCFA acknowledged, moreover, that

the reported prices "overstated" actual costs.  (Fed. Reg. Vol. 52, No. 147, July 31, 1987, at p.

28650.)

20.     The 2002 Myers & Stauffer study found, *inter alia*, as follows:

For some multi-source drug products without federal upper limits, the acquisition cost as a percentage of the AWP is similar to those of single source drugs. However, there are a significant number of products purchased with acquisition costs much lower than the 80% to 85% range observed for single source drugs.

(Robben Decl. Ex. 34 at 22.) There was significant variation in the discount from AWP at which such products could be purchased. (*Id.*) The report also found that "[f]or calendar year 2000, approximately $182 million in savings was obtained by reimbursing the FUL price instead of the EAC price." (*Id.* at 23.)

**Defendants' Response:**  Defendants do not dispute that California has selectively quoted

from and cited to the 2002 Myers and Stauffer study in Paragraph 20.  Defendants refer the Court

to the Myers and Stauffer study for a complete statement of its content.

21.     The 2002 Myers & Stauffer study recommended, inter alia, as follows:

In light of these findings, we recommend that the Department should consider increasing the discount from the Average Wholesale Price (AWP) for both single source and multi-source drugs. The acquisition cost study indicates that the Department could justify setting ingredient reimbursement for brand name drugs at a level between AWP minus 12% and AWP minus 15%. The study would also support a differential reimbursement rate for generic drugs such as one between AWP minus 20% and AWP minus 25%.

* * *

FUL and MAC systems are appropriate for certain multi-source drugs where the relationship of acquisition cost to the AWP can be highly skewed (e.g., acquisition cost of AWP minus 90% or greater is not uncommon) and incentives to promote generic utilization are appropriate…. An expansion of MAIC pricing to cover a more comprehensive set of multi-source drugs might be desirable.

(Robben Decl. Ex. 33 at 5-6.)

**Defendants' Response:**  Defendants do not dispute that California has selectively quoted from the 2002 Myers and Stauffer study in Paragraph 21.  Defendants refer the Court to the Myers and Stauffer study for a complete statement of its content.

22.  A March 11, 2003 report issued by the California Assembly Committee on Health, titled "Prescription Drugs: Why Are They So Expensive? What Can We Do to Control Costs?" states, in part, as follows:

. . . the "true" cost of prescription drugs has grown increasingly elusive. According to a National Health Policy Forum Issue Brief published in 2002, drug prices are subject to various types of discounts and rebates, seen and unseen on both the public and private side. Each drug sold by a manufacturer is subject to multiple prices, and little is known publicly about this pricing information.

Table 1 lists ten commonly used pricing methodologies and the relative cost of an "average" prescription drug under each methodology. For any individual drug, only three of the ten prices are published, and only the Average Wholesale Price (AWP) is widely available and includes all drugs.

(Paul Decl. Ex. 21 (11/6/08 Rule 30(b)(6) CA Dept. of Health Care Servs. (Rosenstein) Dep.), Ex. 37 at 3.)

**Defendants' Response:**  Defendants do not dispute that California has selectively quoted from the report "Prescription Drugs: Why Are They So Expensive? What Can We Do to Control Costs?" in Paragraph 22.  Defendants refer the Court to that report for a complete statement of its content.

23.  The DHS Fact Sheet relating to the 2004 statute states, in pertinent part, as follows:

The 2000 *Study of Med-Cal Pharmacy Reimbursement* [the Myers and Stauffer Report], an independent study mandated by the Legislature, found the average ingredient cost for brand name drugs was Average Wholesale Price (AWP) – 17.2%, and the average ingredient cost for generic drugs was AWP – 43.4%.

The only products for which Medi-Cal knows the actual prices pharmacies pay are blood factors, . . ..

* * *

The May [budget] Revision proposed to reimburse pharmacies for both brand name and generic drugs at AWP-20% based on information available at the time.

Review of new data indicates that many of the critical drugs for AIDS and mental health are purchased by pharmacies at about AWP-17%. To continue with average AWP-20% reduction, could affect access to these drugs and would disproportionately affect pharmacies who specialize in these drugs. Further, they would have a major negative impact on long term care pharmacies.

Based on this new information, the proposal now is to reimburse pharmacies for both brand and generic drugs at AWP-17%.

*At AWP -17% Medi-Cal will still be overpaying the cost of generic drugs, which pharmacies can purchase at AWP-40% or less. Medi-Cal will be implementing maximum allowable ingredient costs to reduce the costs of these drugs.*

(Robben Decl. Ex. 36 (emphasis added).)

**Defendants' Response:**  Defendants do not dispute that California has selectively quoted from the referenced DHS Fact Sheet in Paragraph 22.  Defendants refer the Court to that Fact Sheet for a complete statement of its content.

24.      In 2004, in addition to other changes to the reimbursement rates, the Legislature revised Medi-Cal's MAIC system, providing that "the department shall base the MAIC on the mean of the wholesale selling prices of drugs generically equivalent to the particular innovator drug that are available in California from wholesale drug distributors selected by the department." CAL. WELF. & INST. CODE § 14105.45(b)(3)(A).

**Defendants' Response:**  Undisputed.

25.      Due to a lack of cooperation from the industry, DHS was not able to effectuate the above change in the MAIC program. (Paul Decl. Ex. 4 (11/6/08 Rule 30(b)(6) CA Dept. of Health Care Servs. (Rosenstein) Dep.) at 296:14-299:14.)

**Defendants' Response**:  Defendants dispute paragraph 25 on the grounds that it is not supported by the evidence cited therein.  Defendants do not dispute that California did not implement the changes to its MAIC program referenced in paragraph 24 and that California does not have a functioning MAIC program today.  (*See* Robben Decl. Ex. 60 at 140:18-141:1; 246:10-248:12.)  However, the testimony cited by California in paragraph 25 does not support the statement that DHS was not able to effectuate MAIC changes due to a lack of cooperation from the "industry."  Indeed, the cited testimony does not discuss DHS's inability to implement changes to the MAIC program at all.  Rather, as Mr. Rosenstein testified elsewhere, California has not been able to implement its MAIC program because wholesalers are not willing to report "wholesale selling prices" as required by California Welfare & Institutions Code 14105.45(b)(3)(C).  (*See* Robben Decl. Ex. 60 at 246:10-248:12.)

26.     CMS received AMP information from drug manufacturers for the sole purpose of use in the Medicaid Drug Rebate Program. AMPs were not used by CMS to set FULs because AMPs were confidential and were not published in the national compendia. (Paul Decl. Ex. 9 (Declaration of Susan E. Gaston, June 15, 2009), at ¶ 6.)

**Defendants' Response**:  Defendants dispute paragraph 26 on the grounds that it is not supported by the evidence cited therein.  In her declaration, Ms. Gaston merely describes her individual understanding of CMS's purposes for collecting AMP and their confidentiality.  The federal law governing CMS's use of AMP does not contain an unconditional requirement that CMS keep AMPs confidential.  Nor does it unconditionally limit the use of AMPs to the Medicaid rebate program.  During the relevant time period, 42 U.S.C. § 1396r-8(b)(3)(D) provided in relevant part:

> Notwithstanding any other provision of law, information disclosed by manufacturers or wholesalers under this paragraph … is confidential and shall not be disclosed by the Secretary … or a State agency (or contractor therewith) in a form which discloses the identity of a specific manufacturer or wholesaler, prices charged for drugs by such

> manufacturer or wholesaler, except –
> (i)  as the Secretary determines to be necessary to carry out this section;
> (ii)  to permit the Comptroller General to review the information provided, and
> (iii)  to permit the Director of the Congressional Budget Office to review the information provided.

42 U.S.C. § 1396r-8(b)(3)(D) (2003).  There is nothing contained in the text of this subsection that would prohibit CMS from using AMPs internally for purposes other than the Medicaid rebate program (including examining how closely FULs tracked actual costs), or from publicly disclosing AMPs, or information derived from AMPs, in a manner that does not identify a particular manufacturer or wholesaler, or prices paid by a particular manufacturer or wholesaler.

Defendants further state that, in a 2001 report, the OIG discussed the confidentiality provisions of 42 U.S.C. § 1396r-8(b)(3)(D) and CMS's interpretation of them:

> Currently, CMS interprets the confidentiality clause very narrowly. This interpretation prevents CMS from sharing average manufacturer price data with State Medicaid agencies. The CMS reports only the unit rebate amounts to States, from which States cannot deduce AMP because of the complex unit rebate methodology. It would seem plausible, however, to interpret the confidentiality provision more broadly as a safeguard to prevent manufacturers from gaining access to the pricing information of their competitors. The legislation specifically prohibits the State Medicaid agencies from disclosing average manufacturer price and Best Price, which implies a legislative assumption that State Medicaid agencies would have access to that information. In September 1995, CMS addressed this issue in response to comments received on the proposed rule regarding Medicaid payment for outpatient drugs. The CMS asserted that they would not to disclose AMP to the States but maintained that the statute contemplates the disclosure of manufacturer pricing data to the States and that they believed Congress intended that States have access to sufficient pricing information to implement the Medicaid drug rebate program.

(*See* Robben Decl., Ex. 61 at 22.)


27.    Ms. Gaston testified that her general practice was to use WACs that were published in one or more of the national compendia to set the FULs. (Paul Decl. Ex. 9 (Declaration of Susan E. Gaston, June 15, 2009), at ¶ 3.)

**Defendants' Response**:  Defendants do not dispute that, in her declaration, Ms. Gaston states that it was her general practice to use published WACs to determine FULs, but dispute any implication that she relied exclusively on published WACs to determine FULs.  At her deposition, Ms. Gaston testified she would consider a number of other factors when setting FULs, including pricing information received directly from manufacturers, the availability of a product or a particular generic version of a product, and input from pharmacists, state Medicaid agencies, and wholesalers.  (Joint SOF at ¶¶ 87-89.)

28.     Ms. Gaston testified that had drug manufacturers supplied lower WACs to the publishing compendia, she would have considered those WACs in the context of setting FULs provided those lower WACs were not outliers. (Paul Decl. Ex. 9 (Declaration of Susan E. Gaston, June 15, 2009), at ¶ 7.)

**Defendants' Response**:  Defendants do not dispute that, in her declaration, Ms. Gaston states that, if a manufacturer reported a lower WAC for its drug, she would have considered the lower WAC when establishing a FUL provided that it was reasonably within a range of other WACs for the drug at issue, but dispute any implication that she would have necessarily used the lower WAC to establish the FUL.  As Ms. Gaston testified, she would use her discretion when setting FULs to make sure that the appropriate balance was struck between cost savings and ensuring adequate access to quality care.  (Joint SOF at ¶¶ 94-95.)

29.     The former Chief Deputy Director of Health Care Services, Stanley Rosenstein, testified as follows:

> BY MR. PAUL:
> Q.      With regard to generic manufacturers, has any generic manufacturer, to your knowledge, ever come to the Medi-Cal program and provided information to explain to the program the difference between actual provider costs and its reported AWPs for any of its drugs?
> A.      Not in the 13 years that I have been a part of running the Medi-Cal program.
> Q.      So that statement would apply to the four defendants who are represented by counsel at this table?

A.      That's right. No one has come to my office and told us that. And we have other providers who have come to us and disclosed, you know, inaccurate claiming over the past. It does happen, but none of the drug manufacturers have come to me and made that disclosure.

Mr. Rosenstein further testified as follows:

Q.      I think you were showed earlier in the day an exhibit. I think it was Exhibit 5, a 1996 report by the OIG concerning its examination of the discrepancy between AWPs and acquisition costs for generic and branded drugs. Do you recall that?

A.      Yes.

Q.      To your knowledge, did any manufacturer come to the Medi-Cal program after the OIG issued that report to offer help in reforming its reporting of AWPs?

A.      No.

Q.      Did any manufacturer come to the program expressing any concern about the implications of that report to your knowledge?

A.      Not to my knowledge, and never to me.

(Paul Decl. Ex. 4 (11/6/08 Rule 30(b)(6) CA Dept. of Health Care Servs. (Rosenstein) Dep.) at

302:8-303:18.)

**Defendants' Response:**  Defendants object to the use of the testimony cited in Paragraph

29 as violative of Rule 611(c) of the Federal Rules of Evidence, on the grounds that it was

elicited from a witness produced by California through leading questions asked by California's

counsel during direct examination.  To the extent a response is required, Defendants dispute

Paragraph 29.  Each of the Defendants has had direct communications with California during the

relevant time period regarding the differences between compendia AWP and providers' actual

costs.

For instance, since 1999, Dey sent letters to state Medicaid administrators, including

Medi-Cal administrators, in which Dey explicitly described the nature of its published AWPs

when new products were introduced or when prices were changed.  (Reid Decl., Ex. 28; Reid

Decl., Ex. 29; Reid Decl., Ex. 30; Reid Decl., Ex. 31; Reid Decl., Ex. 32; Reid Decl., Ex. 33;

Reid Decl., Ex. 34; Reid Decl., Ex. 35; Reid Decl., Ex. 36; Reid Decl., Ex. 37; Reid Decl., Ex.

38; Reid Decl., Ex. 39.)[3]  For example, in one such letter dated August 10, 1999, Robert Mozak,

Dey's Executive Vice President for Sales and Marketing, wrote to state Medicaid administrators

as well as regional Medicare benefits administrators, apprising them of a new NDC number for

Dey's Albuterol Sulfate Inhalation Solution 0.5%.  (Reid Decl., Ex. 30.)

The letter describes AWP as follows:

> Further, as you also know, the Average Wholesale Price (or "AWP") per
> unit listed above does not represent actual wholesale prices which will be
> charged or paid for this product.  It is Dey's practice to set an AWP before
> a product is first sold and not subsequently to change that figure.  We
> understand that this is consistent with industry practice and is understood
> by state and federal Medicaid regulators.

(Reid Decl., Ex. 30 (emphasis in original).)  The letter closes with the following sentence:  "If

you need additional information, please feel free to contact Todd Galles, Senior Product

Manager, at 800-755-5560, ext. 7450."  (Reid Decl., Ex. 30.)

Len Terra, Chief of the Medi-Cal Drug Program, was one of the recipients of this letter.

(Reid Decl., Ex. 30, at DEY-LABS-0415394.)  Todd Galles, the Dey contact person listed on the

August 1999 letter discussed above, testified that he had never been contacted by anyone

regarding the letter.  (Reid Decl., Ex. 40, at 410:1-411:15.)  In addition to the general letters,

many letters were specifically addressed to Medi-Cal officials, including: (i) a March 16, 1999

letter to Kevin Gorospe, Senior Pharmacy Consultant for Medi-Cal Benefits Branch, introducing

the EasiVent Mask; (ii) July 18, 2000 letter to Len Terra, Chief of the Medi-Cal Drug Program,

introducing a new Albuterol Inhalation Aerosol, 17g Metered Dose Inhaler Kit and Refill; (iii)

August 2, 2000 letter to Len Terra, Chief of the Medi-Cal Drug Program, introducing the private

label Astech Peak Flow Meter; and (iv) January 2, 2001 letter to Len Terra, Chief of the Medi-

Cal Drug Program, regarding price changes for certain Dey drugs.  (Reid Decl., Ex. 29, at DEY-

---

[3]        "Reid Decl., Ex. __" refers to the Declaration of Sarah L. Reid in Support of Dey, L.P. and Dey, Inc.'s
Motion for Partial Summary Judgment and the exhibits annexed thereto, Dkt. Nos. 6699 to 6699-46.

MDL-0105075; Reid Decl., Ex. 32, at DEY-MDL-0105085, 090; Reid Decl., Ex. 34, DEY-

LABS-0415539; Reid Decl., Ex. 35, at DEY-BO0018910, 912.)

Kevin Gorospe testified that he recalled receiving letters with disclosures like the ones in

Dey's price notification letters from manufacturers.  Mr. Gorospe could not recall any attempt to

contact any manufacturer, and certainly not Dey, in response to such disclosures.  Mr. Gorospe

further did not recall such disclosures prompting any investigation:

> Q.      Did it ever occur that when you passed on one of those letters to
> Mr. Terra he -- he asked you to subsequently investigate anything about
> the company that had sent it?
> A.      No, not that I can recall.
> Q.      Do you remember any -- any type of letter like this exhibit
> touching off some type of investigation, whether you did it or not?
> MR. PAUL:  Objection to form.
> THE WITNESS:  No.

(Reid Decl., Ex. 27, at 688:16-689:3).

On July 17, 2002, Mike Namba from Medi-Cal emailed Eric Belldina at Mylan to

illustrate how Medi-Cal calculated its net cost per unit for various types of drugs.  (Palermo

Decl., Ex. S; Palermo Decl., Ex. T.[4])  One of the examples is the "Medi-Cal Net Price Cost

Calculation" for "AWP-5% Generic drug."  (Palermo Decl., Ex. S at CAAG/DHS-E0039868;

Palermo Decl., Ex. T at CAAG/DHS-0068438.)  The calculations show that, for a drug with

AWP at $3.00 not subject to a FUL or MAIC, Medi-Cal's lowest price per capsule is $2.85

(AWP-5%).  (Palermo Decl., Ex. S at CAAG/DHS-E0039868; Palermo Decl., Ex. T at

CAAG/DHS-0068438.)  The AMP, "as reported to HCFA," is $0.50.  (Palermo Decl., Ex. S at

CAAG/DHS-E0039868; Palermo Decl., Ex. T at CAAG/DHS-0068438.)  The illustration

proceeds to determine Medi-Cal's Net Price, stating that "[i]n this example, Medi-Cal agrees to

add a drug to the List if the manufacturer will guarantee that Medi-Cal's price will be $2.00 per

---

[4]        "Palermo Decl., Ex. __" refers to the Declaration of Christopher C. Palermo in Support of Defendants
Mylan Inc. and Mylan Pharmaceuticals Inc.'s Opposition to Plaintiffs' Motion for Partial Summary Judgment, and
the exhibits annexed thereto, Dkt. Nos. 6798 to 6798-27.

capsule.  Since the AWP is inflated, the manufacturer must rebate a very large amount to reach

the net price."  (Palermo Decl., Ex. S at CAAG/DHS-E0039868; Palermo Decl., Ex. T at

CAAG/DHS-0068438.)  The difference between Medi-Cal's lowest price of $2.85 and Medi-

Cal's net price of $2.00 is $0.85, which represents the "total amount that must be rebated from

[the] manufacturer to Medi-Cal."  (Palermo Decl., Ex. S at CAAG/DHS-E0039868; Palermo

Decl., Ex. T at CAAG/DHS-0068438.)

      From 1991 until 1996, the State of California received directly from Sandoz for each

drug its AMP, which represents a federally-mandated measure of the net prices received by

Sandoz for drugs sold directly or indirectly to the retail class of trade.  (Sandoz Statement of

Facts in Support of Motion for Summary Judgment ¶¶ 5-6, 12-13.)

30.    Under Medi-Cal's system of reimbursement, drug manufacturers reported AWPs are used
as one of the reference prices within California's Estimated Acquisition Cost
reimbursement methodology, which pays the "lowest of" (for the purposes of California's
lawsuit), AWP, FUL, or Usual and Customary ("U&C") as the ingredient cost. In some
cases, the reported AWPs for some Subject Drugs, once discounted by the statutorily
required minus-5%, 10% or 17% (depending on the year), would result in an ingredient
cost that was lower than the FUL limit for the generic drug product. (Paul Decl. Ex. 16
(Schondelmeyer Expert Report) ¶¶ 19, 139; Paul Decl. Ex. 22 (9/15/09 Schondelmeyer
Dep.) at 206:10-22; Paul Decl. Ex. 23 (9/16/09 Schondelmeyer Dep.), 474:5-15, 613:1-
614:11, 659:18-660:6.)

**Defendants' Response:**  Defendants object to paragraph 30 as irrelevant and immaterial.

Defendants do not dispute that, as a result of Medi-Cal's "lower of" reimbursement

methodology, Medi-Cal will occasionally reimburse a provider at an amount that is less than the

FUL as set by CMS.  However, Defendants dispute that cited portions of Prof. Schondelmeyer's

report and testimony are probative evidence of any of the elements of California's claims against

Defendants, or are probative evidence of the measure of the purported injury, if any, suffered by

California.  Defendants further dispute any implication that there is any causal link between

Defendants' price reporting practices and reimbursement payments made on the basis of an FUL.

There is no evidence in the record that, had Defendants reported as their AWPs final net prices to providers, Medi-Cal would have (or could have, under applicable law) reimbursed providers at prices at these lower prices, or would otherwise have reimbursed providers at prices below FULs, in light of Medi-Cal's obligation to ensure access to quality medical care.

31.     Plaintiffs retained Dr. Jeffrey Leitzinger to perform analyses and calculations from the Medi-Cal data associated with provider claims which were paid by Medi-Cal during the relevant time period, and concern Defendants' drugs at issue in California's case. Dr. Leitzinger's report identifies approximately 28.7 million such claims (approximately 1.0 million for Dey, 14.9 million for Mylan and 12.8 million for Sandoz). Within that universe of claims, Dr. Leitzinger has verified (following the same claim payment identification method employed by Defendant Sandoz's data analysis expert), approximately 312,000 reimbursed claim payments for which the reimbursement price per unit (i.e., the price which defined the reimbursement amount for each such Medi-Cal claim) was *less* than the published FUL, *and* based on AWP-based reimbursement (i.e., AWP minus the California statutory discount of minus 5, 10 or 17% [the amount of the discount depends on the year in which the claim was paid].). As reflected in the same claims data, there are approximately 62,000 additional claims that were reimbursed at an amount that was *less* than the published FUL, *and* was based on the pharmacy's reported Usual and Customary ("U&C") charge. *In other words, the claims data in the record contains approximately 374,000 claims which were paid (a) at a figure which was less than the FUL, and (b) was based on either "AWP-minus the statutory discount", or U&C.* (Paul Ex. 11 (12/18/09 Leitzinger Decl.) ¶¶ 1-6.)

  **Defendants' Response:**  Defendants object to paragraph 31 as irrelevant and immaterial.

Defendants do not dispute that, as a result of Medi-Cal's reimbursement methodology, Medi-Cal will occasionally reimburse a provider at an amount that is less than the FUL as set by CMS. However, Defendants dispute that cited portions of Prof. Leitzinger's report and testimony are probative evidence of any of the elements of California's claims against Defendants, or are probative evidence of the measure of the purported injury, if any, suffered by California. Defendants further dispute any implication that there is any causal link between Defendants' price reporting practices and reimbursement payments made on the basis of an FUL.  There is no evidence in the record that, had Defendants reported as their AWPs final net prices to providers, that Medi-Cal would have (or could have, under applicable law) reimbursed providers at prices

at these lower prices, or would otherwise have reimbursed providers at prices below FULs, in

light of Medi-Cal's obligation to ensure access to quality medical care.

32.    The Myers & Stauffer reports cost between $400,000 and $500,000 dollars, paid for by
       California and federal government monies. (Paul Decl. Ex. 4 (11/6/08 Rule 30(b)(6) CA
       Dept. of Health Care Servs. (Rosenstein) Dep.) at 312:20-313:9.)

       **Defendants' Response:**  Defendants object to paragraph 32 as irrelevant and immaterial.

33.    The CMS FULs analyst has limited ability to affect the output of the FULs system. A
       system upgrade in 1999 provides the only such limited ability. The 1999 upgrade allows
       the FULs analyst to annotate the FULs System data by assigning a "T" or "P" exclusion
       code to an NDC to indicate that the product is temporarily or permanently unavailable
       (typically based on the analyst's communications with the manufacturer). Products with
       such designations still appear in the FULs data systems, but are not considered when the
       FUL is set. Second, the FULs analyst has the ability to re-designate an NDC to a Product
       Group in the event the analyst learns of an error in the FULs system matching process.
       With these two limited exceptions, the FULs analyst does not exercise discretion to
       include or exclude products from the list that appears in the FULs data system array of
       prices from which the FUL is determined. (Paul Decl. Ex. 10 (Coffman Decl.) ¶ 17.)

       **Defendants' Response:**  Defendants do not dispute that CMS employees have some

ability to affect the output of the FULs System.  Defendants dispute that the limitations on

CMS's ability to affect the output of the FULs System had any impact on CMS's subsequent

ability to manually review and revise FULs.  Both Ms. Gaston and Ms. Sexton testified that they

would conduct manual reviews of the FULs produced by the FULs System in order to ensure that

the drug was available at the price the FULs System generated.  (*See* Joint SOF at ¶¶ 73-74.)  As

a result of these manual reviews, Ms. Gaston and Ms. Sexton would routinely revise the FUL

price generated by the FULs System to ensure that the FUL was a "reasonable" price.  (*See* Joint

SOF at ¶¶ 75-82.)

Dated: January 15, 2010

Respectfully Submitted:

KELLEY DRYE & WARREN LLP

/s/Christopher C. Palermo
   William A. Escobar (*pro hac vice*)
   Neil Merkl (*pro hac vice*)
   Christopher C. Palermo (*pro hac vice*)
   Philip D. Robben (*pro hac vice*)
101 Park Avenue
New York, NY 10178
Telephone:  (212) 808-7800
Facsimile:  (212) 808-7897

*Counsel for Mylan Inc., and Mylan
Pharmaceuticals Inc.*

KELLEY DRYE & WARREN LLP

/s/Sarah L. Reid
   Paul F. Doyle (BBO # 133460)
   William A. Escobar (*pro hac vice*)
   Sarah L. Reid (*pro hac vice*)
   Neil Merkl (*pro hac vice*)
   Christopher C. Palermo (*pro hac vice*)
   Philip D. Robben (*pro hac vice*)
101 Park Avenue
New York, NY 10178
Telephone:  (212) 808-7800
Facsimile:  (212) 808-7897

*Counsel for Defendants Dey, Inc. and Dey, L.P.*

WHITE & CASE

/s/Wayne A. Cross
   Wayne A. Cross (*pro hac vice*)
   Michael J. Gallagher (*pro hac vice*)
1155 Avenue of the Americas
New York, NY  10036
Telephone: (212) 819-8200
Facsimile: (212) 354-8113

*Counsel for Sandoz Inc.*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was delivered to all counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order No. 2, by causing to be sent, on January 15, 2010, a copy to LexisNexis File & Serve for posting and notification to all parties.


＿＿＿/s/ Sarah L. Reid＿＿＿＿＿＿＿
Sarah L. Reid