# EXHIBIT C

Hughes, James W. - Vol. I                    May 5, 2009
                        Chicago, IL

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


IN RE:  PHARMACEUTICAL          )

INDUSTRY AVERAGE WHOLESALE  ) MDL No. 1456

PRICE LITIGATION                )

_____) Master File

                                ) No. 01-CV-12257-PBS

THIS DOCUMENT RELATES TO:    )

_____) Subcategory

                                ) No. 06-CV-11337-PBS

United States of America,    )

ex rel. Ven-A-Care of the    )

Florida Keys, Inc., v.       )

Abbott Laboratories, Inc.,   )

CIVIL ACTION NO. 06-11337-PBS)    VOLUME I


        Videotaped Deposition of JAMES W.

HUGHES, Ph.D., at 77 West Wacker Drive, 35th

Floor, Chicago, Illinois, commencing at the hour

of 9:13 a.m. on Tuesday, May 5, 2009.

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                                    May 5, 2009
                              Chicago, IL

---

Page 2

1   APPEARANCES:
2
3   ON BEHALF OF THE UNITED STATES OF AMERICA:
4       R. ALEXANDER ACOSTA
5       UNITED STATES ATTORNEY
6       SOUTHERN DISTRICT OF FLORIDA
7       BY:  MR. MARK A. LAVINE
8           99 N.E. 4th Street
9           3rd Floor
10          Miami, Florida 33132
11          305.961.9303
12          mark.lavine@usdoj.gov
13
14  ON BEHALF OF THE RELATOR, VEN-A-CARE OF THE
15  FLORIDA KEYS, INC.:
16      THE BREEN LAW FIRM, P.A.
17      BY:  MR. JAMES J. BREEN
18          5755 Northpoint Parkway
19          Suite 260
20          Alpharetta, Georgia 30022
21          678.735.5040
22          jbreen@breenlaw.com

---

Page 3

1   APPEARANCES:  (CoNTINUED)
2
3   ON BEHALF OF ABBOTT LABORATORIES:
4       JONES DAY
5       BY:  MR. ERIC P. BERLIN
6           MS. CAROL P. GEISLER
7           77 West Wacker Drive
8           35th Floor
9           Chicago, Illinois 60601-1692
10          312.782.3939
11          epberlin@jonesday.com
12          cgeisler@jonesday.com
13
14  ON BEHALF OF THE STATE OF ALABAMA:
15      HAND ARENDALL, LLC
16      BY:  MS. WINDY COCKRELL BITZER
17          (via teleconference)
18          P.O. Box 123
19          Mobile, Alabama 36601
20          251.694.6263
21          wbitzer@handarendall.com
22

---

Page 4

1   APPEARANCES:  (CONTINUED)
2
3   VIDEOGRAPHER:
4       STEPHAN HOOG, Videographer
5       Legal Visual Services
6
7   REPORTED BY:
8       DONNA M. KAZAITIS, CSR, RPR, CLR, CRR
9       Illinois CSR No. 084-003145
10
11
12
13
14
15
16
17
18
19
20
21
22

---

Page 5

1              I N D E X
2   WITNESS:  JAMES W. HUGHES              PAGE
3       Examination by Mr. Lavine          7
4
5
6
7              E X H I B I T S
8   NUMBER          DESCRIPTION          PAGE
9   Exhibit Hughes 001  Subpoena             56
10  Exhibit Hughes 002  Curriculum Vitae     61
11  Exhibit Hughes 003  ABT-HUGHES-0001 - 0003     73
12  Exhibit Hughes 004  ABT-HUGHES-0157 - 0161     76
13  Exhibit Hughes 005  ABT-HUGHES-00383          77
14  Exhibit Hughes 006  Deposition Notice    96
15  Exhibit Hughes 007  Documents Considered by
16          James W. Hughes, Ph.D    100
17  Exhibit Hughes 008  Expert Report of
18          James Hughes          161
19
20
21
22

---

                                        2 (Pages 2 to 5)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

**Page 6**

1       THE VIDEOGRAPHER: This is Stephan Hoog
2   representing Henderson Legal Services. I am the
3   operator of this camera.
4       This is the videotaped deposition of
5   James Hughes as being taken pursuant to the
6   Federal Rules of Civil Procedure.
7       We are on the record on May 5, 2009.
8   The time is 9:13 a.m. as indicated on the video
9   screen. We are at 77 West Wacker, Chicago,
10  Illinois.
11      This case is captioned In Re:
12  Pharmaceutical Industry AWP, Case No.
13  01-12257-PBS.
14      Will the attorneys please identify
15  themselves for the video record.
16      MR. LAVINE: Mark Lavine representing
17  the United States.
18      MR. BREEN: Jim Breen. I represent the
19  relator Ven-a-Care of the Florida Keys.
20      MR. BERLIN: Eric Berlin, Jones Day,
21  representing Abbott Laboratories. With me today
22  is Carol Geisler.

**Page 7**

1       THE VIDEOGRAPHER: The Court Reporter
2   today is Donna Kazaitis, also with Henderson.
3       Can you swear in the witness.
4       (Witness sworn.)
5       MR. LAVINE: Is there anybody on the
6   phone?
7       MS. BITZER: Yes. This is Windy Bitzer
8   with Hand Arendall in Mobile, Alabama.
9       MR. BERLIN: Who do you represent?
10      MS. BITZER: We represent the State of
11  Alabama.
12      You just identified Mr. Hughes, Dr.
13  Hughes, as an expert in our case last Friday.
14      We're just listening in today. We will
15  not be asking any questions.
16          EXAMINATION
17  BY MR. LAVINE:
18      Q. Could you just state your name for the
19  record, please.
20      A. James Hughes.
21      Q. Do you normally prefer to be addressed
22  as Professor Hughes or Dr. Hughes? How do you

**Page 8**

1   like?
2       A. Dr. Hughes, Mr. Hughes, Jim. I'm not
3   very particular.
4       Q. Okay, thanks.
5       Before we get into the boring
6   background stuff, I wanted to start off with a
7   question about how, it seems that one of the
8   important or critical considerations in your
9   entire expert report is the idea that if the
10  reimbursement had been lowered to the level
11  suggested by Dr. Duggan in his report without
12  also raising the dispensing fees to an
13  appropriate amount, that that would then cause
14  people, doctors, pharmacies, to drop out of the
15  Medicare and Medicaid programs; is that right?
16      A. Is that one of my opinions?
17      Q. Right.
18      A. Yes.
19      Q. Is that a basis for your opinion?
20      A. Yes.
21      Q. Now, if they did drop out of the
22  program, that would mean they're not going to be

**Page 9**

1   treating the patients that they otherwise would
2   have treated; right?
3       A. It means that they will not be treating
4   the patients that they would otherwise be
5   treating, but it doesn't mean that the patients
6   would not be treated.
7       The patients would then for their
8   chemotherapy or other infusion treatment probably
9   wind up in hospitals, which is what I state in my
10  report. And that would cost the Medicaid system
11  substantially more than the home infusion, than
12  being treated through the home infusion
13  pharmacies.
14      Q. All right. But the particular
15  providers that were participating in Medicaid,
16  they would not be the ones providing any service
17  to those patients?
18      A. If they no longer accept Medicaid
19  because it's no longer remunerative for them,
20  then, yes, they would not be treating those
21  patients. But the patients would be treated.
22      Q. By other providers?

Hughes, James W. - Vol. I                                    May 5, 2009
                              Chicago, IL

Page 10

1     A.   By hospitals or other providers.  If
2  one infusion center drops out, they can perhaps
3  be treated by a different one.
4     Q.   So the providers that were in Medicaid
5  that now drop out, do you agree they would not
6  be, they would no longer need to buy those drugs.
7  They wouldn't be buying them anymore because they
8  wouldn't then be treating the Medicaid patients?
9     A.   They could well be treating other
10 patients.
11          They could be treating patients through
12 third-party payors and the like.  So I don't --
13    Q.   But they're not treating the Medicaid
14 or Medicare patients that they would then refuse
15 to treat?
16    A.   Yes.  But as I understood -- why don't
17 you restate your question.
18    Q.   You're saying that they're going to be,
19 these providers, if they're not paid enough, if
20 they're paid the amount suggested in Dr. Duggan's
21 report without also raising the dispensing fee,
22 that they wouldn't treat those Medicare and

Page 11

1  Medicaid patients; right?
2     A.   Yes.
3     Q.   So they wouldn't need to buy drugs to
4  treat those Medicare and Medicaid patients;
5  right?
6     A.   But they'd still need to buy the drugs
7  if they stay in business to treat the other
8  patients that they may be getting through Blue
9  Cross Blue Shield or other modes of payment.
10    Q.   Sure.  But they're not going to be
11 buying the drugs that they otherwise would have
12 needed to treat the Medicare and Medicaid
13 patients; will they?
14    A.   They will not, but those drugs will be
15 bought by somebody else who will be treating the
16 patients.
17    Q.   But totally independent providers not
18 related to the ones that we're talking about that
19 you're describing that are going to be dropping
20 out of the program?
21    A.   If they drop out of the program, they
22 will not be buying drugs for Medicare or

Page 12

1  Medicaid. But the patients will still be treated.
2          So I'm not sure what the object of your
3  question is.
4     Q.   Right.  But the patients, the providers
5  that were Medicare and Medicaid providers and now
6  are no longer Medicare or Medicaid providers,
7  they're not going to be buying the drugs.  You're
8  talking about a completely different set of
9  providers that might be buying those drugs?
10    A.   Why don't we switch from not buying the
11 drugs to being reimbursed by Medicaid.
12          If they drop out of the program, they
13 will no longer be reimbursed for treating such
14 patients by Medicare or Medicaid.
15          How much, what drugs they buy, is still
16 an open question.
17          MR. BREEN:  Objection, nonresponsive.
18
19
20 BY MR. LAVINE:
21    Q.   But they're dropping out under your
22 theory because -- let me start over.

Page 13

1          They're not going to be treating the
2  patients, under your theory, because they're not
3  going to be paid enough.  And that means they
4  won't be submitting claims for these drugs and
5  they're not going to be paid anything anymore;
6  right?
7          MR. BERLIN:  Objection, form.
8          THE WITNESS:  They're not going to be
9  billing Medicaid and they won't be receiving
10 payment from Medicaid if they're no longer
11 accepting Medicaid patients.
12 BY MR. LAVINE:
13    Q.   Because they're not treating those
14 patients, so of course they wouldn't need any
15 drugs to administer to those patients; right?
16    A.   Well, they won't need drugs to
17 administer to patients they're not treating.
18    Q.   Right.
19    A.   Okay.
20    Q.   Is that --
21    A.   That's fine.
22          But I mean, again, you're

Hughes, James W. - Vol. I                          May 5, 2009
                        Chicago, IL

Page 14

1  characterizing this as my theory.  And my opinion
2  is only based on the numerous state deposition
3  testimony from the officials and the reports that
4  were put together by various agencies that said
5  if you make dramatic drops, if you make
6  reductions in the ingredient costs, in fact much
7  less dramatic than those proposed by Dr. Duggan,
8  without an increase in dispensing fees, that
9  people are going to drop out of the system.
10     Q.  I understand that.
11     A.  It's not my theory.  It's that it's my
12  conclusion that's based on the testimony of state
13  officials and the numerous reports that I cite in
14  my report.
15     Q.  Well, do you agree then that if those
16  providers that were dropping out of
17  Medicare/Medicaid for that reason had been
18  customers of Abbott, that they would no longer
19  buy those drugs from Abbott?
20     A.  They would no longer buy those drugs
21  from Abbott to treat Medicare and Medicaid
22  patients.

Page 15

1       But they will still buy drugs from
2  Abbott or other manufacturers to treat other
3  patients.  And other hospitals will be buying
4  drugs from someplace to treat these patients
5  because the patients are not going to go
6  untreated.
7     Q.  But the former, the providers that are
8  dropping out of Medicare and Medicaid, they're
9  going to be buying fewer drugs from Abbott
10  because now they're not going to be treating that
11  part of their patient population?
12     A.  You know, I don't know where people are
13  going, I can't characterize what their sales, or
14  I'm sorry, what their purchases would be because
15  I don't know what else is happening.
16       But I'm agreeing with you that they
17  will no longer be buying drugs for the treatment
18  of Medicare and Medicaid patients.
19     Q.  But you don't agree that their overall
20  purchases from Abbott might be lower than it
21  would have been?
22     A.  I have no idea.

Page 16

1     Q.  Do you think that Abbott would have
2  anticipated that -- let me start over.
3       If Abbott published different prices
4  that would have resulted in reimbursement being
5  in amounts that were similar to the numbers that
6  were used by Dr. Duggan in his analysis, do you
7  think Abbott would have anticipated that the
8  reduction in providers, the providers not
9  treating patients in Medicare and Medicaid, would
10  have resulted in a reduction in sales to those
11  providers?
12     MR. BERLIN:  Objection, form.
13     THE WITNESS:  Sorry.  Could you read
14  that back to me.
15     (The record was read back as
16     requested.)
17     THE WITNESS:  I don't know what Abbott
18  would have anticipated.
19  BY MR. LAVINE:
20     Q.  So you don't have an opinion as to how
21  Abbott might have perceived how its sales may
22  have changed as a result of lower reimbursement

Page 17

1  on its products?
2     MR. BERLIN:  Objection, form.
3     THE WITNESS:  Well, I mean this was
4  Hospital Products Division.  So, like I say, the
5  patients are still going to be treated, and
6  they're going to be treated someplace else, most
7  likely in a hospital, at substantially greater
8  cost to the Medicaid program.
9       So Abbott sales may have gone down to
10  the home infusion centers, but Abbott sales may
11  have gone up to the hospital.
12       That makes economic sense.  But whether
13  Abbott thought of, anticipated, cared about that,
14  no, I don't have an opinion about what Abbott may
15  or may not have thought.
16  BY MR. LAVINE:
17     Q.  The statement you just made about sales
18  perhaps switching to hospitals, is that based on
19  any particular methodology?
20     A.  Based on common sense.  I think if you
21  were treating more patients in the hospital,
22  you'd need more materials.

5 (Pages 14 to 17)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                          May 5, 2009
                        Chicago, IL

Page 18

1     Q.  You haven't actually done a study on
2  that particular issue in support of your opinions
3  that are in this report?
4     A.  No.
5         But let me just add.  I don't think a
6  study is needed to make the conclusion that if
7  you're treating more patients in the hospital,
8  you're going to need more materials.
9         If I have ten more patients, I have to
10 buy more materials to treat them.  That's, I
11 don't even know that I want to call it simple
12 economics, it's just common sense.
13    Q.  You don't know, you didn't study though
14 the particular DRGs which might be applicable to
15 these patients?
16    A.  What's the relevance?
17        I mean you started this with if the
18 people drop out of Medicaid, there's going to be
19 less drugs bought by the home infusion centers.
20 And you asked me whether I agreed with that or
21 not, and I agreed with that.
22        Well, that wasn't based on a study

Page 19

1  either.  But you've got patients who need these
2  services.  They're going to get these services
3  through Medicaid one place or another.
4         And wherever they're being treated,
5  there's going to be the need for the materials
6  with which to treat them.
7     MR. BREEN:  Objection, nonresponsive,
8  move to strike.
9  BY MR. LAVINE:
10    Q.  We'll end up coming back to that, but
11 let's move on to some other subjects right now.
12        Who's your employer right now?
13    A.  Bates College.
14    Q.  And are you represented by counsel
15 today?
16    A.  Mr. Berlin is here.  I don't know that
17 that qualifies as representing, he's not retained
18 by me.
19    Q.  He's here as counsel for Abbott?
20    A.  Correct.
21    Q.  But not as your personal attorney?
22    A.  Correct.

Page 20

1     Q.  I assume you've testified in
2  depositions before?
3     A.  Yes, I have.
4     Q.  I'll just quickly go through the ground
5  rules.
6         One thing we've already run across is
7  you might have the answer to my question before I
8  finish getting it out.  So we need to be sure --
9     A.  Yes, I'm sorry.
10    Q.  -- to try not to speak at the same
11 time.  And we just did it again.
12        If you don't understand my question, I
13 need you to ask me to clarify that or else I'll
14 assume that you do understand it.
15    A.  Uh-huh.
16    Q.  All your responses need to be oral so
17 that it can be taken down for the record as
18 opposed to just nodding your head.
19    A.  Okay.
20    Q.  Thank you.
21        Any time you need a break, just let me
22 know and we can take a break.

Page 21

1     A.  Okay.  Thank you.
2     Q.  Am I right that you're not on any kind
3  of medication or suffering from any illness that
4  would affect your ability to answer any questions
5  today?
6     A.  Correct.  I am not.
7     Q.  And you're appearing today as an expert
8  on behalf of Abbott Laboratories; right?
9     A.  I am.
10    Q.  When was the first time you were
11 retained to be an expert in any of the AWP cases?
12    A.  That's hard to say.
13    Q.  Do you understand what I mean by "AWP
14 cases"?
15    A.  Yes, absolutely I do.
16        Can I look at my CV here?
17    Q.  Sure.
18    A.  Or not my CV, the list of testimony.
19 That would probably be easiest to answer your
20 question.
21        That's not going to tell me the year.
22 But the first time would have been when I was

6 (Pages 18 to 21)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. – Vol. I                    May 5, 2009
                   Chicago, IL

---

Page 22

1  retained by Aventis for the matter in the State
2  of Connecticut.
3        I want to say that's 2006, 2007. But
4  despite being under oath, I can't swear to the
5  accuracy of that year.
6     Q.  Approximately '06, '07.
7     A.  Yes.
8     Q.  How many times have you been retained
9  as an expert in AWP cases?
10    A.  I have issued reports in Connecticut,
11 another report in Montana, and Nevada, and I've
12 been retained in this case.
13    Q.  You've also been retained in the case
14 by the State of Alabama against Abbott Labs?
15    A.  Yes.  I've been retained by Abbott for
16 the case in the State of Alabama.  And I was also
17 briefly retained by Barr Laboratories, but the
18 case settled relatively quickly after I was
19 retained.
20    Q.  Does that include all the different
21 companies that would have retained you in the AWP
22 cases regardless of whether you were a consulting

---

Page 23

1  or a testifying expert?
2     A.  Yes.
3     Q.  And for Connecticut, Montana, and
4  Nevada, that was a single retention?  For
5  example, for Abbott you've been retained in two
6  different cases.  For Aventis only retained you
7  in connection with the Connecticut case?
8     A.  No.  Aventis also retained me in
9  Montana and Nevada.
10    Q.  Okay.  That was Aventis also?
11    A.  Yes.
12    Q.  So the only, three companies, Abbott,
13 Aventis, and Barr?
14    A.  Yes.
15    Q.  Not getting too far into the alphabet.
16    A.  No.  That's true.
17    Q.  So that's five cases.  All three
18 Aventis cases and both Abbott cases now you've
19 been designated as a testifying expert?
20    A.  Could you do that count again?  All
21 three --
22    Q.  There's three Aventis cases,

---

Page 24

1  Connecticut, Montana, and Nevada, and then
2  Abbott, the United States and Alabama.
3     A.  Yes.  Montana/Nevada I think of as one
4  case but I guess it is two cases, but there was
5  just one report.  That's what was confusing me.
6     Q.  Okay.
7     A.  So, yes, Aventis, Abbott, and Barr
8  would be it, would be all of them.
9     Q.  In Barr were you designated as a
10 testifying expert?
11    A.  I don't even think I got to the point
12 of being disclosed before it settled.
13    Q.  No report was prepared?
14    A.  There was no report.  There was no
15 testimony.
16    Q.  So have we now identified every time
17 you've been retained in an AWP case?
18    A.  To the best of my recollection, yes.
19    Q.  When were you retained in this
20 particular case?
21    A.  Last spring I believe.
22    Q.  Spring of 2008?

---

Page 25

1     A.  Correct.
2     Q.  When did you first start looking at
3  documents in connection with this case?
4     A.  In the summer of 2008.
5     Q.  In the Abbott case related to the State
6  of Alabama, is that also in connection with the
7  Jones Day law firm?
8     A.  Yes.
9     Q.  Have you been deposed in any of the
10 other AWP cases?
11    A.  No.
12    Q.  But you did prepare reports in, well,
13 one report in the Montana/Nevada, one combined
14 report for those two states; correct?
15    A.  Correct.
16    Q.  And you did a report for the
17 Connecticut case?
18    A.  It was a designation.  So it's the law
19 firm, the lawyers saying Professor Hughes will
20 testify that.  But I certainly helped in the
21 preparation of that but didn't have my signature
22 on it, which I guess is --

7 (Pages 22 to 25)

Henderson Legal Services, Inc.

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                    May 5, 2009
                    Chicago, IL

Page 26

1    Q.   The Connecticut version of a report?
2    A.   Yes, the Connecticut version of a
3  report.
4    Q.   Have you submitted a report in the
5  Alabama case at this point?
6    A.   No.
7    Q.   Have you testified in any manner in any
8  of the AWP cases before today?
9    A.   Oral testimony, no.
10   Q.   Written testimony?
11   A.   Reports, yes, which we've talked about,
12 but that's it.
13   Q.   Now, outside of the AWP arena, it looks
14 like you've been retained many times; is that
15 right?
16   A.   Many times, yes, sure.
17   Q.   I mean do you know approximately how
18 many times you've acted as an expert outside of
19 the AWP arena?
20   A.   No.  Probably between seven and ten,
21 something like that.
22   Q.   Are you referring to the retention as a

Page 27

1  consulting expert seven to ten times or as
2  testifying?
3    A.   No.  That's testifying.
4    Q.   Have you been retained additional times
5  as consulting expert?
6    A.   Yes.
7    Q.   Approximately how many times have you
8  been retained as a consultant where it did not
9  end up being a testifying expert?
10   A.   Four or five.
11   Q.   In any of those other nonAWP cases,
12 were any of those times, on any of those
13 occasions were you retained by a pharmaceutical
14 company?
15   A.   I'm never retained by the company. I'm
16 always retained by counsel for the company.
17      But, yes, in the other retentions I
18 have testified as an expert on behalf of other
19 pharmaceutical companies, yes.
20   Q.   Who would they have been?
21   A.   Aventis, Bayer, Pfizer.  I believe
22 that's it.

Page 28

1    Q.   How about Watson Pharmaceuticals?
2    A.   Indirectly because they were part of
3  Aventis at one point.  So they were kind of
4  lumped in with Aventis.  So I guess technically,
5  yes.
6    Q.   And the Rugby Group?
7    A.   Not to my knowledge.
8    Q.   Have you ever been retained in
9  connection with any Abbott litigation outside of
10 the AWP arena?
11   A.   No.
12   Q.   What was the nature of the case where
13 you were retained by Bayer?
14   A.   Bayer, that was two cases involving
15 Cipro, which was a patented antibiotic produced
16 by Bayer.
17   Q.   Something to do with the generic
18 version of Cipro hitting the market?
19   A.   Yes.
20      This was one of what had come to be
21 known as Paragraph 4 cases.  So there was issues
22 regarding the timing of the generic entry into

Page 29

1  the market.
2    Q.   Just generally, what were you retained
3  to do in that case?
4    A.   I was retained to comment on the
5  plaintiff's expert report about class
6  certification.
7    Q.   And what was your final conclusion on
8  that issue?
9    A.   That it was not, that the facts of the
10 case and the methods proposed by the plaintiff's
11 expert, were not suitable for class treatment.
12   Q.   Was that related to the issue of
13 liability or damages?
14   A.   It was related to the issue of class,
15 well, class certification.
16      So there was a damages methodology
17 proposed and could that damage methodology
18 adequately quantify common damage issues and
19 common proof.
20   Q.   And what was the ruling of the court in
21 the class certification issue?
22   A.   There were two state matters, one in

                              8 (Pages 26 to 29)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                          May 5, 2009
                        Chicago, IL

Page 30

1  New York, one in California.
2        Class certification was denied in New
3  York.  Class was certified in California.
4        And the California case is still
5  pending, to the best of my knowledge.
6     Q.  And you submitted a report with respect
7  to the California and the New York cases?
8     A.  Yes.
9     Q.  Essentially the same report?
10    A.  I don't remember, but, yes, I just
11  don't remember.
12    Q.  What was the nature of your engagement
13  in Pfizer?
14    A.  Most recently I was engaged by Pfizer
15  in a case involving a veterinary pharmaceutical
16  product.
17        There was a company that was, Pfizer
18  was producing a patent-protected antibiotic for
19  veterinary use.
20        Generics in the veterinary world are
21  different from generics in the human world,
22  sufficed to say for today.

Page 31

1        But a company entered the market
2  marketing a generic version of the drug.  It had
3  not received generic approval from the FDA for
4  veterinary use but the pills had received generic
5  approval from the FDA for human use.
6        The company was marketing these pills
7  as FDA approved, not clarifying whether it was
8  approved for human use or veterinary use.
9        Pfizer brought suit, asked them to, to
10  try to get them to stop doing that, to advertise
11  that it was FDA approved for human use only, not
12  for veterinary use.
13        The company countersued saying that
14  Pfizer had defamed them, damaged them, by calling
15  their drugs not FDA approved, claims that they
16  had interfered with wholesalers and the like.
17        My specific retention was they
18  produced, their expert produced, a damages report
19  on what he believed the damages that Pfizer had
20  allegedly caused to this company, Putney
21  Veterinary Products was the name of the company.
22  And I was asked to comment on that damages report

Page 32

1  was my primary assignment.
2     Q.  And what was the nature of your opinion
3  in that case?
4     A.  Quite frankly, the plaintiff's expert
5  report was rife with fairly obvious mistakes.
6        He was attributing damages for six
7  months when his client's product could not
8  possibly have been on the market.  Just there
9  were some really egregious errors, and I just
10  pointed those out.
11    Q.  Did you do any of your own calculation
12  of damages in that case?
13    A.  To the extent that I took the data that
14  their expert used and showed how the damage
15  estimates changed when you corrected his errors,
16  yes.  But I did not collect any independent data
17  or anything like that.
18    Q.  Did you end up with a figure that you
19  were of the opinion should have been the correct
20  damages figure?
21    A.  Again, you know, my assignment would
22  have been to take the allegations as being true.

Page 33

1        So that I don't think I couched it as
2  this was the correct damage, but I couched it, I
3  think if I remember correctly, I would have
4  phrased it something like under the plaintiff's
5  theory of the case doing the calculations
6  correctly this is what Dr., whatever his name
7  was, should have come up with.
8     Q.  Did any of those calculations depend in
9  any way upon reimbursement from insurance?
10    A.  No.  This was veterinary.  So it's not
11  an issue there.
12    Q.  Have you been retained by Bayer and
13  Pfizer in other cases?
14    A.  Bayer, no.  Pfizer, yes.
15        I was retained by Pfizer on a matter
16  involving Rezulin, and I was also retained by
17  Pfizer in a matter involving Procardia XL.
18    Q.  Did either of those cases involve
19  issues related to reimbursement under insurance
20  programs?
21    A.  These were both class certification.  So
22  to the best of my recollection, the answer would

Henderson Legal Services, Inc.

202-220-4158                        www.hendersonlegalservices.com

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                          May 5, 2009
                        Chicago, IL

Page 34

1   be yes.
2       Q.  In what way?
3       A.  Well, in particular if you have a
4   proposed class that involves individuals,
5   third-party payors, Medicare/Medicaid, you have
6   to to come up with a damage calculation, you've
7   got to figure out what were these companies
8   actually paying in reimbursements, what would
9   they pay in the but-for world, whatever
10  characterized the but-for world in those
11  particular cases.
12      So in many of these cases, even though
13  they might have been filed in a particular state,
14  these were attempts, to the best of my
15  recollection, these were usually attempts to
16  certify nationwide classes.
17      So we had to get into Medicaid
18  reimbursement, Medicaid copayments, Medicaid
19  issues in each of the states at issue.
20      So it was a fairly involved analysis in
21  some cases.
22      Q.  Was the Rezulin -- am I saying that

Page 35

1   right, R-E-Z-U-L-I-N?
2       A.  Your guess is as good as mine.  I think
3   that's about right.
4       Q.  The issues in the Rezulin and Procardia
5   cases were similar in that respect?
6       A.  Not really because the classes were
7   kind of different.
8       The Procardia case was another issue
9   about generic entry and the timing of generic
10  entry and Pfizer's alleged actions in
11  anticipation of generic entry.
12      The Rezulin case, Rezulin was a
13  diabetes drug that had been withdrawn from the
14  market at the request of the FDA.  There had been
15  product liability issues with it.
16      This was not such a case.  This was,
17  the proposed class was individuals who agreed
18  that they had not been harmed by Rezulin, they
19  agreed that they did not anticipate being harmed,
20  but their claim was that Rezulin was a dangerous
21  drug that had been put on the market without
22  adequate consumer knowledge.

Page 36

1       So they had somehow been defrauded,
2   misled, needlessly endangered.  So they sought to
3   get their money back for what they had paid for
4   Rezulin, even though the drug itself had not
5   harmed them.
6       Q.  And your final opinion in the Rezulin
7   case was that a class certification was
8   inappropriate?
9       A.  Yes, because the, I mean in a nutshell
10  their expert was saying that the but-for price of
11  Rezulin was zero, that the product was worthless.
12  So people deserved their entire money back.
13      My point was these are diabetes
14  patients.  If they're not being treated with
15  Rezulin, they're going to be treated with
16  something else.  And that's a matter of
17  individualized inquiry.
18      And their damages would be the
19  difference between what they paid for Rezulin and
20  what they paid for their alternative treatment,
21  some of which might actually be more expensive
22  than Rezulin.  But that there was no way to do

Page 37

1   this without individualized inquiry into people's
2   medical records.
3       Q.  And that never got past, your
4   participation in that never got past the class
5   certification stage?
6       A.  Correct.  The case settled at some
7   point.
8       Q.  So you never had to go follow through
9   and actually calculate a damage figure in that
10  case?
11      A.  Well, that wouldn't have been my job
12  anyway.  I mean if the class was certified, then
13  they would have calculated a damage figure.  And
14  I may have been invited to critique that, but
15  that was a discussion that never took place.
16      Q.  And in the Procardia case, again that
17  was a situation where your opinion was that a
18  class certification was inappropriate?
19      A.  Correct.
20      Q.  And that didn't progress through to the
21  point where you had to calculate any damages?
22      A.  No.

                              10  (Pages 34 to 37)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. – Vol. I                          May 5, 2009
                         Chicago, IL

Page 38

1    Q.  Have we now discussed every situation
2  in which you've been retained as an expert by any
3  pharmaceutical company?
4    A.  As a testifying expert?
5    Q.  In any respect.
6    A.  Okay.  In any respect, oh, no.
7      I was retained by Aventis in the
8  matters involving Cardizem and I was retained a
9  long time ago by Joint Defense Council in the,
10 gosh, now I don't remember what it was called,
11 Brand Name Pharmaceuticals Litigation.
12   Q.  You said that was by the Joint Defense
13 Council?
14   A.  Yes.
15   Q.  Representing the pharmaceutical
16 companies in that case?
17   A.  Yes.
18   Q.  So that was more than ten years ago?
19   A.  Yes.  I believe it started in '95, '94,
20 '95.
21   Q.  What about the Cardizem case, when was
22 that?

Page 39

1    A.  '98.
2    Q.  That never progressed to the point
3  where you prepared a report or testified?
4    A.  Well, I had two different roles there.
5      I served as a consulting expert.  And in
6  that regard initially there was class
7  certification matters, a class was certified,
8  there were opt-outs from the class.  And as a
9  consultant I was heavily involved in calculating
10 damages for one of the opt-out cases.
11     My other role was as a, I guess you
12 would call it testifying expert in the same
13 opt-out case, that plaintiffs had put forth an
14 expert and I issued a, wrote a, report in support
15 of a Daubert motion against that expert.
16   Q.  But your first role in that case --
17   A.  Was as a consultant.
18   Q.  As a consultant.
19     So there was no report prepared?
20   A.  Not by me, no.
21   Q.  You did the background work?
22   A.  Yes.

Page 40

1    Q.  Do you still have in your possession
2  any of the reports from the Bayer, Pfizer, or
3  Aventis cases beyond what's been produced in this
4  case?
5    A.  No.
6      MR. BERLIN:  Just let him finish his
7  questions.  Sometimes he trails off.
8      THE WITNESS:  Oh, okay.
9      MR. LAVINE:  A lot of it's my fault.  I
10 have a habit of getting my questions out slowly.
11 So be patient.
12     THE WITNESS:  Okay.
13 BY MR. LAVINE:
14   Q.  Did any of the other pharmacy related
15 cases, I'm sorry, pharmaceutical company related
16 cases, involve the Jones Day law firm?
17   A.  Pharmaceutical, no.
18   Q.  How about the nonpharmaceutical cases?
19   A.  Yes.
20     The reason I'm hesitating is that some,
21 when I was a consultant for the Brand Name
22 Pharmaceutical Litigation I highly expect that

Page 41

1  somebody from Jones Day was involved in that.
2  But it was not anybody that, I don't have
3  specific knowledge that Jones Day was involved in
4  that and I never interacted with anybody from
5  Jones Day, to my knowledge.  But I guess I don't
6  want you to come back and say well, see, Jones
7  Day was part of this joint defense group because
8  it just wasn't to my knowledge.
9      In the nonpharmaceutical cases, I
10 believe I dealt with, one of the attorneys that I
11 dealt with was from Jones Day Washington office,
12 and that was in the NBR litigation.  That's on my
13 list of testimony.
14   Q.  And in that case did you consider
15 yourself to have been retained by Jones Day?
16   A.  No.  I believe I was retained by Arnold
17 & Porter.
18     It was a joint defense.  There were
19 three or four companies involved.  But the
20 lawyers I dealt with on a regular basis were the
21 Arnold & Porter lawyers.
22   Q.  Were any of your fees paid for by Jones

                                    11 (Pages 38 to 41)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                                  May 5, 2009
                        Chicago, IL

Page 42

1  Day or its client?
2      A.  Yes.  By its client, yes.
3      Q.  How was that handled?  Was that they
4  paid a share of the total fees?
5      A.  These all run together, but I believe
6  they gave me a formula for dividing my fees
7  amongst the two or three or four firms,
8  companies, that were involved, yes, and it was
9  according to that formula.
10     Q.  Had you ever been retained as an expert
11 by any government entity?
12     A.  No.
13     Q.  Am I right that you have been retained
14 as an expert in the synthetic rubber industry?
15     A.  Yes.  That's the NBR case.
16     Q.  What about in the nutritional
17 supplement industry?
18     A.  I was a consulting expert, vitamins
19 litigation.
20     Q.  The auto insurance industry?
21     A.  Yes.
22     Q.  What was the nature of that?

Page 43

1      A.  That was a class certification matter.
2  The issue was what was known as, oh, gosh, what
3  was that called, inherent diminished value cases.
4      The idea, the plaintiff's idea being
5  that the insurance company paid for repairs to
6  their automobile.  And the repairs, even though
7  the repairs to the automobile were done to the
8  best of the body shop's ability, that the car
9  owner still, sorry, the automobile still had a
10 lower value by virtue of having been in an
11 accident.  And it was the plaintiff's contention
12 that that loss in value was also covered by their
13 auto insurance policy.
14     So this was a matter based in
15 Louisiana, if memory serves, that was attempting
16 a nationwide class.  And I was asked to discuss
17 whether this was appropriate for class treatment.
18 And I believe I issued a report and was deposed
19 in the matter.
20     Q.  The sum and substance of your opinion
21 there, was it a class certification was not
22 appropriate?

Page 44

1      A.  The methods that were proposed by the
2  plaintiff's expert were completely unrealistic.
3      He somehow felt that he was going to
4  get market values for cars that had specific
5  sorts of damage over thousands of different
6  models and thousands of different types of
7  damage, that he was somehow going to get what
8  that sales price might have been fifteen years
9  before by virtue of a survey of auto dealers.
10     And I found this to be wholly
11 unrealistic as a data gathering technique.  So I
12 found, I believe my conclusion was that his
13 method was not going to prove common damages
14 using common proof and wasn't going to prove much
15 of anything.
16     I mean I simply thought that his data
17 collection proposal was completely infeasible and
18 unrealistic.
19     Q.  But the end result of the opinion was
20 then that a class certification would be
21 inappropriate for the reasons?
22     A.  With that methodology, yes.

Page 45

1      Q.  And you've also been hired as an expert
2  in cases involving the sardines market; is that
3  right?
4      A.  Yes, I have.
5      Q.  And in a case involving retail
6  automobile sales?
7      A.  Oh, yes.
8      Q.  The retail gasoline market?
9      A.  Yes.
10     Q.  School photography?
11     A.  Yes.
12     Q.  Musical instruments?
13     A.  Yes.
14     Q.  Airline transportation?
15     A.  Yes.
16     Q.  Sex discrimination?
17     A.  Yes.
18     Q.  Plastic, the sale of plastic resin?
19     A.  Yes.
20     Q.  In Canada.
21     A.  Uh-huh.
22     Q.  The prescription benefit manager

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                    May 5, 2009
                   Chicago, IL

Page 46

1  industry?
2     A.  Yes.
3     Q.  The environmental control industry?
4     A.  Oh, yes.
5     Q.  The hospital industry?
6     A.  Yes.
7     Q.  And of course the pharmaceutical
8  industry?
9     A.  Yes.
10    Q.  Anything else?
11    A.  No.  I believe that covers it.
12    Q.  The prescription benefit manager case
13 that you were retained in, is that the case of
14 Brady Enterprises vs. Medco?
15    A.  Correct.
16    Q.  Do you have a copy of the report that
17 you filed in that case?
18    A.  I do, but it was filed under seal.
19    Q.  Do you have a copy of the document or
20 seal order that governs the seal in that case?
21    A.  I doubt it.  It's just that every page
22 of my report is stamped "Filed Under Sealed

Page 47

1  Confidential."
2     Q.  And it's your understanding that that
3  keeps it under seal permanently?
4     A.  That's my recollection of the
5  Protective Order.
6     Q.  Do you know if that was designed to
7  protect any particular party in the case?
8     A.  I have no idea.
9     Q.  Did you make any inquiries as to
10 whether you could provide that report to the
11 United States in connection in this case?
12    A.  No.  I did not.
13    Q.  Who retained you in that case?
14    A.  Counsel for Medco, which I believe was
15 Sherman & Sterling in New York.  I think that's
16 the name of the law firm.
17    Q.  Is that another case where your opinion
18 was that class certification was inappropriate?
19    A.  That's correct.
20    Q.  And that involved an allegation by
21 retail pharmacies that Medco was reimbursing them
22 at artificially low prices?

Page 48

1     A.  Yes.
2     Q.  And part of that was that they were
3  being reimbursed too little for their dispensing
4  fees; right?
5     A.  Dispensing fees and ingredient cost, it
6  was all, one of the specific things were MAC
7  prices that Medco was putting in place and how
8  they were determined.
9        But it was, you know, it was an
10 interaction between the networks that Medco was
11 forming and the reimbursements that resulted, the
12 different reimbursements that were allowed under
13 the different networks that Medco was marketing
14 to third-party payors.
15    Q.  Are you relying upon any of your
16 experience from that case to inform your opinions
17 in this case?
18    A.  Yes, probably.
19    Q.  Did your opinion in that case address
20 the dispensing fee issues?
21    A.  You know, I'm thinking more about how
22 what I learned about how MAC prices are

Page 49

1  determined with respect to pharmacy benefit
2  managers.
3     Q.  So tell me how it is that the report or
4  opinions you expressed in the Brady case inform
5  your opinions in this case.
6     A.  Well, one of the things that I mention
7  in my report is that I disagree with Dr. Duggan's
8  characterization of MAC prices as being
9  fraudulent because these are prices that are
10 negotiated in Medicaid, either with the state
11 agency or some Medicaid agency simply adopts
12 third-party payor MACs.
13       And because these are often negotiated
14 with full knowledge of what the acquisition costs
15 actually are, that the MAC prices rather than
16 being fraudulent it's my opinion should be
17 considered the result of a considered state
18 policy that this is what the state and the
19 providers agree is the minimum amount that they
20 can accept and still provide that service.
21    Q.  In the Medco case though it didn't
22 involve any MAC implemented by a state or other

13 (Pages 46 to 49)

Henderson Legal Services, Inc.
202-220-4158              www.hendersonlegalservices.com

Hughes, James W. - Vol. I                          May 5, 2009
                        Chicago, IL

Page 50

1  government entity; did it?
2      A.  There was interaction between Medco
3  MACs, state MACs.  I think that Medco was
4  actually the PBM for some state Medicaid
5  agencies.  I'm not positive I'm remembering that
6  correctly.  But I believe that some, it's my
7  recollection that some Medicaid agencies farmed
8  out their prescription benefit to Medco or other
9  PBMs.
10      So there were times, as I understood
11  it, that Medco followed the state implemented
12  MACs for certain drugs and there were other times
13  that I understood that the state Medicaid
14  agencies would follow Medco's MAC for a
15  particular drug.
16      Q.  So to the extent that Medco was
17  establishing MACs in its role acting on behalf of
18  any state, that was a direct part of the case
19  that you worked on?
20      A.  Well, it got to the adequacy of
21  reimbursements that Medco was providing in
22  different situations, so yes.

Page 51

1      Q.  So is that a situation again where you
2  reached an opinion that class certification was
3  inappropriate?
4      A.  Yes, I did.
5      Q.  Did you actually calculate any damages
6  in that case?
7      A.  No.
8          It was the plaintiff's expert said we
9  can do all this through a regression.  And,
10  again, he proposed a regression for which the
11  data, the independent variables that he said had
12  to go into the regression, they didn't exist.  So
13  it just wasn't a feasible method.
14      Q.  Would it be fair to say that in the
15  large majority of prior cases in which you've
16  been retained as an expert that your opinion has
17  generally been that the damages methodology was
18  inappropriate and/or that class certification was
19  inappropriate?
20      A.  In every class certification matter
21  that I have accepted, yes.
22          The point is is that there's been quite

Page 52

1  a few cases that I've been approached as an
2  expert and I've refused to participate.
3      Q.  But on those cases you wouldn't have
4  progressed to the point of expressing any formal
5  opinions?
6      A.  No.  But I mean I looked at the facts
7  of the case or listened to the facts of the case
8  as it was explained to me and said I, as an
9  economist, I don't have anything that will be of
10  use to you, and so I don't want to get involved
11  in this case.
12      Q.  So if it was a situation where you
13  might have opined that a class certification was
14  appropriate, you would turn down the engagement?
15      A.  No.  It's where I don't have, these
16  were not, I'm trying to think of the ones I
17  turned down.
18          These were sometimes merits cases, and
19  it was just, you know, as an economist, I don't
20  have anything to help you, I don't have any way
21  to help you explain that your price fixing was
22  actually pro-competitive for example.

Page 53

1      Q.  Have you been deposed in any of the
2  other nonAWP cases?
3      A.  Yes.
4      Q.  Approximately how many times?
5      A.  NonAWP cases, ten.
6      Q.  When was the first time you were
7  deposed as an expert in any case?
8      A.  I believe that would have been the
9  school photography case that you mentioned
10  before. It's a long time ago.
11      Q.  Approximately when?
12      A.  1996, 1997.
13      Q.  Have you actually testified in any of
14  those other cases in a court hearing?
15      A.  No.  I have been in the courtroom
16  several times, but the judge has always said
17  we're not hearing from economists today.
18      Q.  Was that because of a ruling that your
19  testimony was inadmissible?
20      A.  No.  It was that the judge had to go to
21  lunch.
22          I'm sorry.  I'm not really being

14  (Pages 50 to 53)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                         May 5, 2009
                        Chicago, IL

Page 54

1  facetious.  That's exactly what the judge said in
2  a couple of cases.
3      Q.  Why was it that it never reconvened and
4  required your testimony?
5      A.  I have no idea.
6          I mean these were evidentiary hearings,
7  and the judge was deciding who he was going to
8  listen to and who he wasn't.  And in both of the
9  cases that I'm thinking of, the judge wanted to
10  hear only the oral arguments from the lawyers.
11      Q.  Do you recall the names of those cases?
12      A.  The Cipro New York and the Rezulin case
13  are the two that spring to mind.
14      Q.  So have we now discussed, at least
15  generally, every time you've been retained --
16      A.  Yes, I think so.
17      Q.  -- retained as an expert in any other
18  litigation matter?
19      A.  That list that you went through was
20  quite comprehensive, yes.
21      Q.  In any of those cases, were you
22  retained to represent the plaintiff in the case?

Page 55

1      A.  Yes.  Airline ticketing and musical
2  instruments.
3      Q.  Who did you represent in the airline
4  ticketing case?
5      A.  That was, this retention was very
6  short.  That was the, what was that called.  I
7  believe that was called the travel agency
8  litigation.  So travel agents were trying to put
9  together a class claiming that the airlines were
10  in some way underpaying them.
11          I was retained, I reviewed some
12  documents, talked to the attorneys a few times,
13  and then the attorneys decided to use a different
14  expert.  But I mean I was paid for the time that
15  I put in on the case.
16      Q.  But that's a case where you did not
17  actually issue a report?
18      A.  Right.
19      Q.  Who retained you in the musical
20  instrument case?
21      A.  I believe it was something called
22  Meridian Music in southwest Michigan.  I'm not

Page 56

1  going to remember the name of the town.
2      Q.  Did you prepare a report in that case?
3      A.  No.
4          That was a case that flared up.  There
5  was some discussion, I believe I looked at some
6  data, and then the plaintiff ended up dropping
7  the case.
8          To my recollection, it was gearing up
9  to be a predatory pricing case against another
10  music store.
11      Q.  When was that case?
12      A.  You know, to be perfectly honest, I
13  just don't remember.  Early to mid '90s.
14          MR. LAVINE:  Mark that as an exhibit.
15          (Exhibit Hughes 001 was marked for
16  identification.)
17  BY MR. LAVINE:
18      Q.  We just marked as Exhibit 1 a five-page
19  document.  And on the front page it reflects a
20  signature date of March 11, 2009. (Document
21  tendered to the witness.)
22          Dr. Hughes, have you ever seen this

Page 57

1  document before?
2      A.  Yes, I have.
3      Q.  Do you know what it is?
4      A.  It's the Subpoena for me to appear here
5  today.
6      Q.  Well, let me just ask you to focus on
7  the middle of the page.  There's a date and time
8  on the first page, center right.  (Indicating.)
9      A.  Yes.
10      Q.  Do you see where it says March 23,
11  2009?
12      A.  I do.
13      Q.  That's not today's date; right?
14      A.  That is not today's date, correct.
15      Q.  So I just wanted to see if that will
16  help refresh your recollection as to what this
17  document is.
18      A.  Oh, I'm sorry.  So I guess this is the
19  Subpoena for my document production.
20      Q.  Can you turn to the fourth page of that
21  document, please.
22          Before we get into that, who gave you

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                          May 5, 2009
                        Chicago, IL

---

Page 58

1  this document?
2      A.  I received it by Federal Express from a
3  Jones Day attorney whose name is escaping me.
4      Q.  Well, if it comes back to you, let me
5  know.
6          Did you have any discussions regarding
7  the manner in which to respond to this document?
8      A.  Yes.  I talked to the same attorney on
9  the phone for some time, and we went through the
10 request and what I had or what I had produced.
11         So, yes, we did have a discussion on
12 responding to this.
13     Q.  Did you have separate counsel beyond
14 Jones Day help you with this?
15     A.  No.
16         My regular contact with Jones Day is
17 Ms. Geisler, and she was on vacation that week.
18 They know the name of the attorney, but I can't
19 remember.
20     Q.  So you relied on Jones Day to help you
21 respond to this?
22     A.  Well, the Subpoena came through them to

---

Page 59

1  me.
2          So they wanted to make sure I
3  understood it, they wanted to make sure that I
4  issued a complete production because this is
5  probably the first time I've seen one quite like
6  this.
7          So the conversation was basically
8  understanding what was being asked and making
9  sure that I looked in all of the places I needed
10 to look to see if I had these things.
11     Q.  So you went through each of these Items
12 1 through 12 one by one?
13     A.  That is my recollection, yes.
14     Q.  And everything that is described in 1
15 through 12 has been produced to the United
16 States?
17     A.  Well, let me look.
18     MR. BERLIN:  Objection, form.
19 BY MR. LAVINE:
20     Q.  Maybe it's easier to go one by one.
21         The first paragraph talks about
22 documents with regard to be disclosed under

---

Page 60

1  Federal Rule of Civil Procedure 26(a)(2).
2          Did you have a discussion as to what
3  documents are within that rule?
4      A.  I'm assuming so.  I don't have specific
5  recollection of the conversation.
6      Q.  Are you able to say then that those
7  documents were produced to the United States?
8      A.  To the best of my knowledge, yes.
9      Q.  But relying on Jones Day to do that?
10     A.  Yes.
11     Q.  No. 2 asks for any written report and
12 drafts of such report.
13     A.  Yes.  And those have been provided.
14     Q.  There was just one draft report?
15     A.  Correct.
16     Q.  No. 3, all documents, information,
17 material, or data that you have considered, had
18 access to, or were provided regardless of whether
19 you relied upon it, rejected it, or cited it.
20         Have those materials been turned over
21 to the United States, to your knowledge?
22     A.  To the best of my knowledge, yes.

---

Page 61

1      Q.  Item 4, all exhibits that summarize or
2  support your opinions in this case.
3      A.  Yes.
4      Q.  Do we have a copy of your most current
5  resume or CV as called for in Paragraph 5?
6      A.  Yes.  I believe that's Exhibit 1 to my
7  report.
8      Q.  Is that the most current version?
9      A.  Let me look.
10         I believe there's a publication that
11 was accepted for publication two weeks ago that
12 does not appear on here.
13         But other than that, I believe it is
14 the most recent version.
15     MR. LAVINE:  Let's just mark the CV as
16 a separate exhibit.
17     (Exhibit Hughes 002 was marked for
18 identification.)
19 BY MR. LAVINE:
20     Q.  We just marked as Exhibit 2 a document
21 of several pages, and on the front top it
22 reflects the name James W. Hughes.  (Document

---

16 (Pages 58 to 61)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                                    May 5, 2009
                          Chicago, IL

Page 62

1    tendered to the witness.)
2         Is this your CV?
3         A.  This is the CV that was produced to the
4    government, yes.
5         Q.  And the only thing you would add to
6    update this would be that one publication you
7    were talking about?
8         A.  That's correct.
9         Q.  And what publication was that?
10        A.  It has to do with Chinese labor force
11   participation, and it's, I'm not going to come up
12   with the journal title.
13        Q.  Were you the primary author of that?
14        A.  I was a co-equal author with Professor
15   Morfazzio and Ms. Zhang.
16        Q.  Next on Exhibit 1, Item 6, is a list of
17   all other cases in which you have testified as an
18   expert at trial or by deposition or affidavit.
19        Has that been turned over to the United
20   States?
21        A.  I'm sorry.  Where are we?  I'm lost.
22        Q.  Back to Exhibit 1, Item 6.

Page 63

1         A.  My fault.
2         The listing is for the past five years
3    only as I recall was what I was required to
4    produce.
5         Q.  Was that what was attached as Exhibit 3
6    to your report?
7         A.  Yes.
8         Q.  I'm sorry.  Maybe not Exhibit 3.
9         A.  It's Exhibit 2 to my report.
10        Q.  Exhibit 2.
11        Who prepared Exhibit 2 to your report?
12        A.  I did.
13        Q.  How was it that the State of Alabama
14   case ended up being on there?
15        A.  Because I misunderstood.
16        I took, it says testifying expert.  I
17   took that to mean retained as a testifying expert
18   as opposed to actually having testified. So that
19   case appears on there in error because I hadn't
20   actually been disclosed at that point.  So that
21   was my mistake.
22        Q.  But that's the approach you took on

Page 64

1    everything that's listed here; right?
2         A.  Yes.
3         So, for example, the Commonwealth of
4    Massachusetts vs. Mylan Labs, that's the Barr
5    retention I was telling you about, there was no
6    report or testimony in there.
7         But I was retained with the
8    understanding that I was going to be the
9    testifying expert, which is why I placed it on
10   here.  But I now understand that that's not how I
11   should have done it.
12        Q.  The Axiom Plastics case, that was the
13   plastic resin case?
14        A.  Yes, plastic resin in Canada case.
15        Q.  What was the subject of the NBR
16   antitrust litigation?
17        A.  That was a proposed class certification
18   of consumers of NBR rubber, indirect purchasers
19   of NBR rubber.  I lost my train of thought, but
20   pursuant to a price fixing allegation.
21        Q.  And what was the Ward Construction case
22   regarding?

Page 65

1         A.  That's another one that shouldn't be on
2    there because I haven't actually provided
3    anything.
4         That is the so-called plastic additives
5    litigation.
6         Q.  Is that a case where you're not going
7    to be doing a report or it hasn't progressed to
8    that point yet?
9         A.  That case was stayed for about three
10   years until January.  They were waiting for a
11   Third Circuit Court decision which came down in
12   January.
13        So I have been told that the case is
14   now alive, but I haven't been asked to do any
15   additional work.
16        As far as I understand, as the case
17   progresses I will at some point produce a report,
18   but it just hasn't moved in a long time.
19        Q.  What about the very first case, the
20   Griffiths vs. Eastern Maine?
21        A.  Oh, I'm sorry.  I didn't mention that
22   one.

17 (Pages 62 to 65)

Hughes, James W. - Vol. I                    May 5, 2009
                        Chicago, IL

Page 66

1         Yes, that was, Dr. Griffiths was a
2    doctor who's an orthopedic surgeon whose
3    credentials were revoked by Eastern Maine Medical
4    Center.  She had brought suit against Eastern
5    Maine Medical for wrongful termination but also
6    for antitrust, with an antitrust complaint.
7         I was asked to, she produced, she had
8    an expert produce a damage report, and I
9    commented on the damage calculation.
10    Q.  And your opinion was that the damages
11   methodology utilized by the plaintiff's expert
12   was flawed?
13    A.  Once again, it was a pretty ridiculous
14   report in my opinion as an economist.
15         Just to give you one indication, his
16   calculation counted inflation three different
17   times.  So it was pretty obvious error.  And that
18   was just one of many.
19    Q.  But the primary thrust of your opinion
20   in that case was that plaintiff's methodology of
21   calculating damages was flawed?
22    A.  Yes.

Page 67

1         And that case has since been dropped by
2    Dr. Griffiths.  So it's no longer active.
3    Q.  Next, Item 7 of Exhibit 1, do we have
4    all the materials relating to your compensation
5    that you've received from Jones Day or Abbott in
6    connection with this retention?
7    A.  I don't believe that you have the March
8    invoice.  And I believe we brought it with us
9    today.
10    Q.  But what was previously produced
11   reflects everything --
12    A.  Yes.
13    Q.  -- up through the end of February?
14    A.  Yes.
15    Q.  And then this updates it.
16    A.  Right.
17    Q.  You haven't done any work in April or
18   May?
19    A.  Well, I'm doing work today in May
20   obviously.
21         I did do some work in April.  I have
22   been busy and so I have not produced a bill yet.

Page 68

1    Q.  How many hours do you think you worked
2    on this matter in April?
3    A.  Fifteen to twenty perhaps.
4    Q.  Next, Item 8 -- I'm sorry.  Let me
5    follow up on Item 7.
6         Do we have everything, do these
7    invoices reflect work done by others on your
8    behalf in support of this?
9    A.  No.  That's just work done by me.
10    Q.  So who was doing work on your behalf in
11   this case?
12    A.  I was supported by Huron Consulting.
13    Q.  Anybody in particular at Huron?
14    A.  Christopher Rohn and a young fellow by
15   the first name of Casey.  I don't know his last
16   name.
17    Q.  Anybody else?
18    A.  No.
19    Q.  What's your understanding as to how
20   they were reimbursed for their time and effort in
21   connection with supporting you?
22    A.  I assume they kept their hours and

Page 69

1    other expenses and submitted them to Jones Day
2    for forwarding to Abbott like I do.  But I have
3    no specific knowledge of how it happened.
4    Q.  And you aren't familiar with
5    approximately how much time they spent supporting
6    you?
7    A.  No.
8    Q.  Item No. 8 on Exhibit 1 relating to
9    communications, have you turned over to the
10   United States all the communications relating to
11   your retention by Abbott as an expert in this
12   case?
13         MR. BERLIN:  Objection, form.
14         THE WITNESS:  Yes.  All the written
15   communication, yes.
16   BY MR. LAVINE:
17    Q.  So we have all the correspondence, any
18   e-mails?
19    A.  Yes.
20    Q.  Including anything that went back and
21   forth between you and Huron Consulting?
22    A.  Yes.

                              18 (Pages 66 to 69)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                    May 5, 2009
                        Chicago, IL

---

Page 70

1      Q.  And Analysis Group provided no support
2  for you in this case?
3      A.  No.
4      Q.  Do we have all of the notes that you
5  took in connection with preparing your report in
6  this case?
7      A.  Yes, you do.
8      Q.  Do you have in your possession any
9  transcripts of any prior testimony you've given?
10     A.  No.
11     Q.  We discussed earlier several different
12  reports.
13         But what about affidavits,
14  declarations, or any other statement under oath
15  in connection with your previous testimony as an
16  expert?  Do you have anything like that?
17     A.  Nothing aside from what I've already
18  provided to you.
19     Q.  Item 11 talks about documents
20  reflecting contracts, employment or consulting
21  relationships between you and any other
22  pharmaceutical company.

---

Page 71

1         You have not turned those materials
2  over; right?
3      A.  I don't think I have anything.
4         For example, I don't, it has been in
5  the past relatively rare for me to have a
6  retention letter.  It's just yes, you're
7  retained, this is your fee, send us the bill,
8  here are your charges.
9         So the ones that I have you have.
10     Q.  Do you consider your engagement with
11  Aventis to still be active at this point in
12  connection with the AWP cases?
13     A.  Yes.
14     Q.  Are you actively working on that at the
15  current time?
16     A.  No.
17     Q.  In Item 12 we asked for other materials
18  --
19         MR. LAVINE:  I'm sorry.  We have to
20  take a break.  We're running out of tape.
21         THE WITNESS:  Okay.
22         THE VIDEOGRAPHER:  Going off the record

---

Page 72

1  at 10:30 a.m.
2         (A recess was taken.)
3         THE VIDEOGRAPHER:  Beginning of
4  Videotape No. 2.  We're back on the record at
5  10:48 a.m.
6  BY MR. LAVINE:
7      Q.  We were still working through Exhibit
8  1, the final Paragraph 12 --
9      A.  Yes.
10     Q.  -- asked for materials related to
11  Abbott or other related entities.
12         Have you done any work for Hospira?
13     A.  No.  I have not.
14     Q.  How about for Tap Pharmaceuticals?
15     A.  I have not.
16     Q.  Have we discussed everything that
17  you've been retained to do for Abbott?
18     A.  Everything that I've been disclosed,
19  yes.
20     Q.  There might be other things on which
21  you've been retained as a consultant?
22     A.  Yes.

---

Page 73

1      Q.  Have we discussed everything related to
2  other defendants in any other AWP related case,
3  federal or state?
4      A.  Yes, we have.
5         (Exhibit Hughes 003 was marked for
6  identification.)
7  BY MR. LAVINE:
8      Q.  Let me hand you what we've marked as
9  Exhibit 3.  (Document tendered to the witness.)
10         I just ask you if you recognize that
11  document, which is a letter on the letterhead of
12  Jones Day, dated April 29, 2008.
13     A.  Yes, I do.
14     Q.  What is it?
15     A.  This is a copy of my retention letter.
16     Q.  And you signed it on the third page?
17     A.  Yes, I did.
18     Q.  Was there any other kind of retention
19  letter with either Abbott or Jones Day?
20     A.  No.
21     Q.  So this contains the entire statement
22  of work for the case?

---

19 (Pages 70 to 73)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                    May 5, 2009
                        Chicago, IL

Page 74

1    A.  Yes.
2    Q.  Do you know of any separate agreement
3  between either Abbott or Jones Day with Huron
4  Consulting or Analysis Group?
5    A.  No.
6    Q.  You weren't party to anything else that
7  there might be?
8    A.  No.  If they exist, I did not see them.
9    Q.  What was your understanding with -- I'm
10  sorry.
11       Let me ask you, earlier you had said
12  you're normally retained by the law firm. But let
13  me ask you just to look at the third paragraph
14  here, Abbott will be responsible for paying your
15  invoices.
16    A.  Yes, correct.
17    Q.  So is that right, that you're retained
18  by Abbott Laboratories in this case?
19    A.  According to this letter, yes.
20    Q.  And Abbott Laboratories is the one
21  paying your invoices; right?
22    A.  Yes, they are.

Page 75

1    Q.  And the terms in the first paragraph
2  are correct, at $575 per hour?
3    A.  That is correct, yes.
4    Q.  Is there anything addressed in Exhibit
5  3 regarding any understanding you have with
6  Abbott or Jones Day regarding assistance you
7  might get from other people?
8    A.  I believe there's something in here
9  that I can't hire such people without their
10  permission is my recollection.  Yes, at the top
11  of Page 2.
12    Q.  Did you seek any consent from Abbott or
13  Jones Day in that regard?
14    A.  Huron was, to the best of my
15  understanding, Huron was already retained in this
16  matter by the time I came on.
17       So if I, when I needed data analysis
18  work done, I directed that to Huron.  So I didn't
19  have any communication with Abbott about it or
20  anything like that.
21    Q.  But at some point somebody from Jones
22  Day would have made it known to you that Huron

Page 76

1  Consulting was doing work and they were available
2  to you to assist you?
3    A.  That sounds about right, yes.
4    Q.  When did that happen?  Do you know?
5    A.  Sometime after this, sometime in the
6  summer.
7       (Exhibit Hughes 004 was marked for
8  identification.)
9  BY MR. LAVINE:
10    Q.  We just marked as Exhibit 4 a five-page
11  composite document, and the first page is
12  Document No. ABT-Hughes-0157.  (Document tendered
13  to the witness.)
14    A.  Yes.
15    Q.  Do you recognize these documents?
16    A.  Yes, I do.
17    Q.  What are they?
18    A.  These are my bills submitted through
19  Jones Day to Abbott for my services in this
20  matter.
21    Q.  With the exception of the bill for
22  March of 2009, are any missing?

Page 77

1    A.  No.  None are missing.
2    Q.  So these invoices do represent all the
3  work that you've done on this case?
4    A.  With the exception of what was done in
5  April and May, yes.
6    Q.  And the March one that we got.
7    A.  I'm sorry, yes.  And the one March one
8  that you just received.
9    Q.  So in total do you estimate that you
10  spent about two hundred fifty hours working on
11  this case?
12    A.  I have not added it up, but let's see,
13  well, with the addition of that bill it will be
14  more than a hundred seventy.  It'll be more like
15  two hundred, two twenty-five.  Just doing the
16  addition in my head.
17       MR. LAVINE:  It's my only copy, but why
18  don't we mark this as Exhibit 5.
19       (Exhibit Hughes 005 was marked for
20  identification.)
21  BY MR. LAVINE:
22    Q.  Am I correct, Exhibit 5 is your bill

20  (Pages 74 to 77)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                              May 5, 2009
                              Chicago, IL

Page 78

1  for your services performed in March of 2009 in
2  connection with this case? (Document tendered to
3  the witness.)
4      A.  That's correct.
5      Q.  So the first set of bills, Exhibit 4,
6  adds up to about a hundred ninety hours and then
7  another sixty hours or so in March?
8      A.  That sounds about right, yes.
9      Q.  And you said approximately twenty more
10 in April?
11     A.  Yes, something like that.
12     Q.  Do you know approximately how many
13 deposition transcripts were sent to you in this
14 case for you to review?
15     A.  Many, many.  I wouldn't even want to
16 hazard a guess.
17         It is contained in my Exhibit 3.
18     Q.  Do you think it would be approximately
19 a hundred twenty-five?
20     A.  Honestly, I just don't know.  I did not
21 count them.
22     Q.  In addition to the deposition

Page 79

1  transcripts, you were forwarded numerous other
2  documents as well; right?
3      A.  Yes.
4      Q.  And the deposition transcripts
5  generally included all of the exhibits that were
6  associated with those depositions?
7      A.  Yes.
8      Q.  And you are being paid for your time
9  here today?
10     A.  Yes, I am.
11     Q.  What did you do to prepare for the
12 deposition today?
13     A.  I reviewed my report; I reviewed the
14 exhibits to my report; I reviewed the supporting
15 documents to my report; I reviewed Dr. Duggan's
16 report; I reviewed Dr. Duggan's rebuttal report;
17 I looked over some deposition transcripts,
18 although that's quite a while ago; sat with my
19 feet up and thought about some things.
20     Q.  Did you have any meetings?
21     A.  Yes.  I met with counsel yesterday.
22     Q.  Here in Chicago?

Page 80

1      A.  Yes.
2      Q.  Who did you meet with?
3      A.  I met with Ms. Geisler and Mr. Berlin.
4      Q.  When did the meeting begin?
5      A.  10:00 a.m.
6      Q.  And when did it end?
7      A.  The meeting with counsel probably ended
8  about 3:00.
9      Q.  Was there a follow-up meeting with
10 others?
11     A.  I had asked for Chris Rohn from Huron
12 to come in because I had a couple of
13 clarifications I wanted to ask him.
14     Q.  How long did you meet with Mr. Rohn?
15     A.  On business, about a half an hour.
16 Socially probably another half an hour.
17     Q.  Did you have any telephone
18 conversations in preparation for your deposition
19 today?
20     A.  No.  I did not.
21     Q.  So you reviewed your report and the
22 associated exhibits and underlying support

Page 81

1  materials; right?
2      A.  That's correct.
3      Q.  And then Professor Duggan's report and
4  rebuttal report?
5      A.  That's correct.
6      Q.  Did you also review his supplemental
7  report?
8      A.  I've read that report.  But
9  specifically in preparation for this deposition,
10 I did not.
11     Q.  And you mentioned that you had reviewed
12 transcripts some time ago.  What did you mean by
13 that?
14     A.  The month of April was very busy for me
15 because my school is ending.  So knowing that my
16 deposition was in the beginning of May, I just
17 wanted to refresh my memory about what some of
18 the state witnesses and Abbott witnesses, Abbott
19 witness, and the like, I just wanted to, because
20 a lot of those, not so much the state witnesses,
21 but some of the federal witnesses I maybe had
22 read their deposition for the first time last

21 (Pages 78 to 81)

Hughes, James W. - Vol. I                          May 5, 2009
                        Chicago, IL

Page 82

1  summer.
2        So I just wanted to look at the context
3  of the things that I was relying upon to refresh
4  my memory about what they had said.  So that was
5  mostly done in March.  That's why I say some time
6  ago.
7        Q.  So you reviewed some of the transcript
8  of testimony of state and federal witnesses?
9        A.  In March, yes.
10       Q.  And of the Abbott employee?
11       A.  Yes.
12       Q.  What was the follow-up work that you
13  asked Mr. Rohn to do?
14       A.  I don't believe it was follow-up work.
15       There was a printing problem with one
16  of my exhibits, and I wanted to make sure, well,
17  we determined it was a printing problem.  The
18  exhibit looked funny in my production, and I
19  wanted to make sure that I understood that this
20  was a printing problem and not something in the
21  data that I had missed.
22       Q.  Which exhibit?

Page 83

1        A.  It's in, give me a second.  It's in
2  Exhibit 4 and --
3        Q.  Those are the charts comparing prices
4  to the Consumer Price Index for medical products?
5        A.  That's correct.
6        So, for example, I don't know how you
7  want to handle this, but this is for one of the
8  sodium chloride.  And I know the Court Reporter
9  can't get this, but here's the CPI, here's the
10  direct price, and then there's this other
11  horizontal line.  And I --
12       Q.  Can you just identify the particular --
13       A.  Yes.
14       Q.  -- NDC number here?
15       A.  It is NDC 00074613822.
16       So it appeared to me that there was an
17  extraneous horizontal line the way this printed,
18  and I wanted to verify with Mr. Rohn that my
19  understanding was that this was a printing
20  problem and not some other bit of information in
21  the exhibit that I was not recollecting.
22       I had proofread all these exhibits when

Page 84

1  the report was finalized, and I don't remember
2  those lines being there, which was why I was, is
3  it a printing error or did I miss something in
4  the proofreading process.
5        Q.  So, I'm sorry, which was it?  What was
6  the answer?
7        A.  It's a printing error.  There's a
8  horizontal line that shouldn't be there.
9        It's not in the electronic version, but
10  every time you print it it comes out.  So I don't
11  know.
12       Q.  So the correct line would be the one
13  that drops down?
14       A.  That's correct.  The correct direct
15  price line, yes.
16       Q.  And the line that's horizontal and just
17  sloping downward a little bit is the extraneous
18  line?
19       A.  That's correct.
20       Q.  Why did you need to meet with him in
21  person for that?
22       A.  He was in Chicago, I was in Chicago.

Page 85

1        It's kind of hard over the telephone to
2  say look at this, what's going on. It's better to
3  just do it in the same room.
4        I suppose while we're at it, I should
5  probably point out to you that there are two that
6  have that problem.  00074613922 and --
7        MR. BREEN:  Is the other one 13822?
8        THE WITNESS:  The other one is
9  00074613822, that's correct.
10
11
12  BY MR. LAVINE:
13       Q.  So on both of those the secondary
14  straight slightly downward sloping line --
15       A.  Right.
16       Q.  -- would be extraneous?
17       A.  The almost horizontal line is
18  extraneous, yes.
19       Q.  Were you ever able to figure out why
20  that was printing?
21       A.  You know, that was Mr. Rohn's
22  department.  So I left it to him.

22  (Pages 82 to 85)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Page 86

It's still a mystery because if you look at it on the screen in the electronic production, it doesn't appear.
It's my understanding that back at Huron they tried printing it a couple different ways and the line still came out.
So the answer is no, we did not figure out where it's coming from.
Q. Now, during your meeting with counsel yesterday, were you asked to focus on any particular issues?
A. No.
We just, we generally talked through my opinions in my report and discussed some things about Dr. Duggan's report and rebuttal report.
Q. What was it that you discussed about the rebuttal report?
A. Just generally what issues that Dr. Duggan was covering and some of my preliminary thoughts about what I thought about some of his rebuttal points.
Q. So what were some of your preliminary

Page 87

points that you made during the meeting yesterday?
A. Well, I don't remember exactly what I said. I assume we'll get into that in the form of questions.
The big one for me is that in his rebuttal he does not contradict at all my opinion that his characterization of the but-for world is not realistic.
Q. So that was one of the reactions you shared with counsel yesterday?
A. That was one of the reactions I shared, yes.
Q. What other reactions did you share with counsel about the rebuttal report yesterday?
MR. BERLIN: Objection, form, calls for a narrative answer.
You're welcome to ask this, but I'll tell you we walked through the report. So you can ask him to narrate what was his, I mean you can conduct your deposition as you want, but there's an objection to that.

Page 88

MR. BREEN: And I'll object to the --
MR. LAVINE: Narrative objection?
MR. BREEN: -- speaking objection.
MR. BERLIN: And I'll object to your objection to my objection.
MR. BREEN: It's not proper, and I'd like to hear an answer to that question.
THE WITNESS: I just don't, again, it's the end of a long day, I don't remember with great specificity and exactly what was discussed.
And for me to do so here I think would be speculative. I just don't want to speculate on what I may or may not have said.
BY MR. LAVINE:
Q. So to describe the other reactions that you might have expressed to counsel yesterday regarding the rebuttal report would require speculation?
MR. BERLIN: As to what he, that's not what he said.
MR. LAVINE: He can answer the question, and you can object to form, Eric. You

Page 89

don't need to answer his questions for him. You know that's not appropriate.
THE WITNESS: Could you read back the original question that's on the table?
(The record was read back as requested.)
THE WITNESS: To respond to that question, which was what did you discuss with counsel, yes, would require speculation because I don't have specific recollection of the conversation or my monologue or anything like that.
So I would be speculating as to reconstruct that conversation.
BY MR. LAVINE:
Q. Can you describe generally the nature of other issues that may have been raised regarding Professor Duggan's rebuttal report yesterday?
THE WITNESS: Could I have that again? I'm sorry.
(The record was read back as

Page 90

1      requested.)
2      THE WITNESS:  Yes.  I discussed what my
3  reaction to the various points in rebuttal that
4  Dr. Duggan was making, what I may have thought
5  about them at the time.
6  BY MR. LAVINE:
7      Q.  Did counsel ask you particular
8  questions about any of the issues raised in the
9  rebuttal report?
10     A.  No.
11     Q.  Did they ask you any questions about
12  the rebuttal report?
13     A.  No.
14     It was my paging through the report,
15  talking about what he was saying, talking about
16  my preliminary thoughts about what I thought
17  about the points that he was making.
18     So it was more in the form of monologue
19  on my part than a question-and-answer session.
20     Q.  And there was only one particular point
21  that you can remember having mentioned to counsel
22  yesterday?

Page 91

1      A.  I just remember that as kind of being
2  an overriding he did not engage this kind of
3  major point of my report.
4      Q.  Did you discuss any particular issues
5  raised in Professor Duggan's original report with
6  counsel during your preparation meeting
7  yesterday?
8      MR. BERLIN:  Objection, form.
9      THE WITNESS:  Yes.  I'm sure I did.
10  BY MR. LAVINE:
11     Q.  Do you remember any of them?
12     MR. BERLIN:  Objection, form --
13  actually, I withdraw that objection to the
14  specific question.
15     THE WITNESS:  I don't remember
16  specifically the points that we, from Dr.
17  Duggan's original report, that we discussed.
18  BY MR. LAVINE:
19     Q.  Well, did you talk about how you might
20  answer questions regarding any of the issues
21  raised in the report?
22     MR. BERLIN:  Objection, form.

Page 92

1      THE WITNESS:  I talked about how I,
2  well, I mean my report speaks for itself about
3  how I respond to his report.
4      So, no, it was just a matter of
5  matching up, just I've been through his report,
6  I've been through mine.  So there was nothing new
7  that I discussed or that I recall counsel
8  discussing about things that were in Dr. Duggan's
9  report that are not currently in my report.
10  BY MR. LAVINE:
11     Q.  Did counsel provide any example
12  questions that you might be faced with today?
13     A.  No, they didn't.
14     Q.  Did they suggest any issues that they
15  expect to be raised today?
16     A.  Not that I recall.
17     Q.  I'm talking about the meeting
18  yesterday; right?
19     A.  Yes, the meeting yesterday.
20     Q.  About how much time do you think you
21  spent reviewing transcripts in order to prepare
22  for your deposition today?

Page 93

1      A.  Specifically in preparing for
2  deposition today, probably, I can just refer to
3  one bill, specifically in preparation for
4  deposition, twenty-two, twenty-three.
5      Q.  And you were refreshing your
6  recollection on that by looking at Exhibit 5,
7  which is the invoice from March?
8      A.  Right.
9      Well, my report, actually I guess I've
10  stated that wrong.
11     My report was filed on March 6th, to my
12  recollection.  So the remaining time in March,
13  which I do have to correct that now, it's
14  actually more like sixteen hours.
15     The remaining time on Exhibit 5 that's
16  from March 12th through March 26th, that would
17  have been reviewing transcripts, documents, just
18  refreshing my memory about certain things that I
19  relied upon for my report that were in
20  preparation for deposition.
21     Q.  When did you get a copy of the rebuttal
22  report from Dr. Duggan -- or let me rephrase

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                          May 5, 2009
                        Chicago, IL

Page 94

1    that.
2         When were you provided with a copy of
3    Dr. Duggan's rebuttal report?
4         A.   Recently.
5         I mean my guess is it was forwarded to
6    me the day that counsel received it, but I don't
7    remember a specific date.
8         Q.   Did you perform any additional analysis
9    after reading the rebuttal report?
10        A.   No.  I did not.
11        Q.   Did you get a copy of Dr.
12   Schondelmeyer's rebuttal report?
13        A.   I did not.
14        Q.   I'm sorry.  You said you did not?
15        A.   I don't think so.
16        Q.   Did you ask anyone else to perform any
17   analysis in connection with the rebuttal report
18   of Professor Duggan?
19        A.   No.
20        I mean if memory serves, Dr. Duggan's
21   rebuttal report came in late March or early
22   April.  And April was just not a month that I had

Page 95

1    much time to devote to, actually I don't remember
2    when Dr. Duggan's report came in.  But to the
3    extent it was in the month of April, I just
4    didn't have a lot of time to devote to it.
5         Q.   Do you know if anybody at Huron
6    Consulting was doing additional analysis as a
7    result of having reviewed the rebuttal report of
8    Professor Duggan?
9         MR. BERLIN:  Objection, form.
10        THE WITNESS:  I don't know.  I don't
11   think so.  I don't think so -- well, let me try
12   that again.
13        They were not doing any additional work
14   in response to Dr. Duggan's rebuttal report in
15   support of me.
16
17
18   BY MR. LAVINE:
19        Q.   You didn't ask them.
20        A.   I didn't ask them to do that.
21        Q.   And the only specific point you can
22   remember having made yesterday in your meeting

Page 96

1    with counsel regarding the rebuttal report was
2    that it didn't directly contradict your opinion
3    that his but-for world was unrealistic?
4         A.   That's correct.  That's the specific
5    thing that I remember.
6         (Exhibit Hughes 006 was marked for
7    identification.)
8    BY MR. LAVINE:
9         Q.   We just marked as Exhibit 6 a document
10   titled Notice of Deposition of James Hughes,
11   Ph.D. (Document tendered to the witness.)
12        Have you seen that document before, Dr.
13   Hughes?
14        A.   Yes, I have.
15        Q.   And you're appearing here today in
16   response to this document?
17        A.   That's my understanding, yes.
18        Q.   Besides the single invoice page that
19   has been provided by counsel, have you brought
20   any other documents or materials with you today
21   to this deposition?
22        A.   No.  I have not.

Page 97

1         Q.   Were you provided a copy of the
2    Subpoena that's attached to Exhibit 6 before
3    today?
4         A.   Yes, yes.
5         Q.   And other than the single bill that was
6    provided, there's no other materials that were to
7    be provided?
8         A.   No.
9         Q.   And the documents that you reviewed in
10   preparation for the deposition today were already
11   disclosed, nothing additional to what you had
12   already identified?
13        A.   That's correct.
14        Q.   I just wanted to review with you the
15   process of your review of the materials that you
16   considered in connection with your report that
17   you prepared in this case.
18        Can you take me through the process of
19   how that worked, please, when you first got the
20   materials and how you went about reviewing them?
21        A.   Yes.  After I was retained, I began to
22   receive several boxes of documents.  These were,

Henderson Legal Services, Inc.

202-220-4158                      www.hendersonlegalservices.com

Hughes, James W. - Vol. I                    May 5, 2009
                    Chicago, IL

Page 98

1  to the best of my recollection, mostly
2  depositions.  There were some catalogs and
3  pricelists that I had specifically requested.
4  Probably some other documents.  To the best of my
5  recollection, I was invited to begin reading the
6  deposition transcripts.
7        Oh, I'm sorry.  And I was provided with
8  what up to that date had been all of the court
9  filings.  So there was the complaint and the
10 reply and Interrogatories and things like that.
11       So I would have started with that to
12 understand what the allegations were.  And then
13 from there I would have moved to other documents
14 and to some of the deposition testimony.
15       I would have been doing mostly that
16 kind of document review up until the time that
17 Dr. Duggan submitted his report.  And then I
18 would have then started reviewing his report and
19 going to other documents, doing other research on
20 my own to begin to form my opinions of what I
21 thought of the material in Dr. Duggan's report.
22       That would pretty much proceed like

Page 99

1  that.  That happened through the summer.  And
2  then in September I was instructed to stop
3  working on the case.
4        Q.  I'm sorry.  What?
5        A.  In September I was instructed to stop
6  working on the case.
7        Q.  Any explanation given?
8        A.  There was scheduling issues.  So until
9  the scheduling issues were resolved, I wasn't to
10 do any more work.
11       Q.  And I guess eventually that order had
12 been countermanded?
13       A.  Sometime in mid-January.  But then work
14 didn't really begin completely in earnest until
15 early February.
16       Q.  In the course of your work, if you had
17 a meeting with any of the attorneys at Jones Day,
18 it would be reflected on your bills?
19       A.  Yes, yes, it would.
20       Q.  Then if you could look at Exhibit 4, on
21 the second page, which is your bill for June?
22       A.  Yes.

Page 100

1        Q.  It's dated July 31st of '08.
2        A.  Correct.
3        Q.  On June 20th the activity is
4  drafting/editing.
5        Does that represent when you started
6  drafting your expert report in this matter?
7        A.  That would be my best estimate, yes.
8        Q.  And all of the documents that you
9  relied upon in connection with preparing your
10 expert report have been produced to the United
11 States; right?
12       A.  Yes.
13       (Exhibit Hughes 007 was marked for
14 identification.)
15 BY MR. LAVINE:
16       Q.  We just marked as Exhibit 7 an
17 eight-page document entitled Documents Considered
18 by James W. Hughes, Ph.D.  (Document tendered to
19 the witness.)
20       Did you prepare this document?
21       A.  I did not.
22       Q.  Did you participate in the preparation

Page 101

1  of this document?
2        A.  Yes, certainly.
3        Q.  Did you review it and/or add/modify it?
4        A.  Review it and/or add/modify it?
5        There would have been documents that I
6  found and/or relied upon that I would have
7  provided copies to Jones Day as something that I
8  had considered, and then they would have added it
9  to the list.
10       So I think that's a long roundabout way
11 of saying "Yes."
12       Q.  Now, the first two items listed would
13 have been materials that you previously had in
14 your possession; right?
15       A.  Yes.
16       Q.  And then the next is a retention
17 letter?
18       A.  Yes.
19       Q.  And then following that though, those
20 are all materials that were provided to you by
21 Jones Day in connection with this case?
22       A.  Well, no.  When you get on --

                              26 (Pages 98 to 101)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                                    May 5, 2009
                          Chicago, IL

---

Page 102

1    Q.  Well, at some point you get to --
2    A.  You get to some of the things that I
3  would have.
4        But everything else on Page 1, yes,
5  would have been provided to me by Jones Day.
6    Q.  Can you just work your way through
7  until you see any materials that were not
8  provided to you by Jones Day?
9    A.  Certainly.
10       On Page 6, the sixth item down, program
11  memorandum, those two program memoranda, I
12  believe that I provided those.
13       Farther down, Economics of Strategy,
14  Dynamics of Pricing Rivalry, Chapter 9, I
15  provided that.
16       Washington Law Review article, I
17  provided that.  Electronic Orange Book, I
18  provided that.
19       The Besanko, Dranove, and Shanley,
20  Economics of Strategy, that's the full book from
21  which the previously-mentioned chapter came from,
22  I provided that.

---

Page 103

1        The two papers by Fiona Scott-Morton, I
2  would have provided those.  Roger Blair and
3  William Page, I would have provided those.
4        The next document which is
5  reimbursement information by state, to my
6  recollection I provided those.
7    Q.  I'm sorry.  Which one is that?
8    A.  The one right after the Roger Blair and
9  William Page.  It's a web --
10   Q.  The website?
11   A.  The website citation.
12       The next one, I have a feeling I
13  provided that, but I can't tell from the web
14  citation exactly what it is.  So I have to say I
15  don't know on that one.
16       And then several of the next things
17  from HHS, HEW, HCFA action transmittal -- well,
18  here's the thing with those:  I found those, I
19  provided those, and then I learned that they had
20  been provided to me.  They were on a CD and I
21  just had not, so I guess I'll call that one a
22  tie.  I think it was provided to me, and I

---

Page 104

1  provided it back because my filing system at home
2  is not perhaps what it should be.
3        United States Senate, Special Committee
4  On Aging, same thing.  Some of the, the OIG
5  reports, the Barron's article.
6        Barron's article, again, I believe I
7  provided a copy, but I believe what was actually
8  in the production is a copy of an exhibit that
9  has appeared someplace else.  So what you have is
10  actually what Jones Day had and not what I
11  provided to Jones Day.
12       President William Clinton Radio
13  Address, I provided.  House Committee on Ways &
14  Means, I provided.
15       Some of those next, the Idaho
16  Administrative Code, Independent Living of
17  Southern California, Arkansas, my recollection is
18  that I had come across some of these cases in my
19  research and I provided the citation to Jones
20  Day, and they found and produced the actual
21  complaint or document.
22       Farther down, United States DHHS,

---

Page 105

1  implementation of the Deficit Reduction Act of
2  2005, I provided that.
3        The last one, U.S. HCFA, that was
4  another one that I found and provided to Jones
5  Day only to learn that it was in my possession,
6  that it had been on a CD that had been provided
7  to me in the past year.
8    Q.  Out of the materials on the I guess the
9  last three pages you described, were some of
10  those also provided to you by counsel in
11  connection with other matters on which you had
12  been retained, such as the Aventis case?
13   A.  Not, well, not to my recollection,
14  although I think I saw in here, I think I saw in
15  here a copy of the, okay, yes -- I'm sorry.
16       I'm on Page 6.  About two thirds of the
17  way down the page there's the State of
18  Connecticut vs. Aventis and In Re: Pharmaceutical
19  Industry Average Wholesale Price Litigation in
20  the matters of State of Nevada and State of
21  Montana vs. Abbott Labs, et al.
22       I would have had that from those

---

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                                    May 5, 2009
                              Chicago, IL

| Page 106 | Page 108 |
|---|---|

Page 106

1  previous, that would have been given to me by
2  counsel for Aventis at some point in the past.
3      Q.   What is that referring to then?
4      A.   Okay.  Those are the two complaints
5  that generated the reports that appear as the
6  first two documents, the one, the Connecticut
7  disclosure and the Montana report, those are the
8  complaints.
9      Q.   The complaints?
10     A.   Yes, the complaints.
11     Q.   It doesn't actually identify what that
12  is.  It just gives a cite to the case.
13     A.   Yes, I'm sorry.  But those are, to my
14  understanding, the complaint.
15         Now, I would have had those in my
16  possession from Aventis, from counsel for Aventis
17  previously.  Whether I physically gave those to
18  Jones Day or they got the citations and they
19  called them up and provided them to the
20  government, I just don't remember which way it
21  went.
22     Q.   But, for example, on the Barron's

Page 107

1  citation, is that something you discovered in
2  independent research, or was that pointed out to
3  you by an attorney in connection with one of the
4  AWP cases?
5      A.   That citation comes up a lot.
6         My recollection was is that I first
7  came across that in reading one of the
8  transmittal letters in an OIG report that said
9  there's this article from Barron's.  So then I
10  went off to find it on my own.
11     Q.   So after working through Exhibit 7,
12  does that refresh your recollection as to whether
13  there might be some other documents that were
14  left off of this list that you relied upon in
15  connection with your report?
16     A.   Not that I can recall, no.
17     Q.   So this is complete?  This is the
18  universe of all documents that you reviewed or
19  relied upon in connection with preparing your
20  report in this case?
21     A.   Certainly to the best of my
22  recollection, yes.

Page 108

1      Q.   Did you review the CD-ROMs that were
2  provided to the United States which conveyed the
3  materials --
4      A.   No.  I did not.
5         MR. BERLIN:  Hold on.  Let him finish
6  his questions.
7         MR. LAVINE:  Sorry.  My fault.  I
8  paused.
9         THE WITNESS:  No.  I did not review the
10  CDs that were provided to the government in
11  connection with my report.
12  BY MR. LAVINE:
13     Q.   I had asked this, but am I right, you
14  took no handwritten notes whatsoever during your
15  work in this case?
16     A.   No, I didn't.
17     Q.   And you only produced a single draft
18  report?
19     A.   That's correct.
20     Q.   You worked on this case for a year.  Can
21  you explain to me how it is there's only one
22  draft report?

Page 109

1         MR. BERLIN:  Objection, form.
2         THE WITNESS:  Well, it was less than a
3  year because there was a three- or four-month
4  hiatus between September and January.  But I did
5  work on the report.
6         The actual drafting of course didn't
7  start until the summer after quite a bit of
8  documents had been reviewed.  And, of course, I
9  didn't start until after Dr. Duggan's report had
10  been received.
11         But it's my practice that when I'm
12  beginning to put together a report that I will
13  create on my computer a fairly detailed six-,
14  seven-, eight-, ten-page outline that becomes the
15  master document.
16         So I will as I review things find
17  citations that support a particular point I'm
18  trying to make or a particular point I'm trying
19  to refute, I will type the citation right into
20  the appropriate part of the outline.
21         Then as my work progresses, the bare
22  bones of the outline begins to become paragraphs

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                    May 5, 2009
                        Chicago, IL

Page 110

1  of a report.  And, as I say, the citations are
2  sort of added live as I come across them in my
3  research.
4      So I never print out, and I have no
5  need to print out any drafts.  Nobody asked me to
6  print out or provide any drafts.  The one that
7  was produced was for purposes of proofreading by
8  myself and people here at Jones Day before it was
9  submitted.
10     Q.  So is it fair to characterize the one
11 draft report that you prepared in this case as
12 being very close to the final form?
13     A.  Yes.  I think that's accurate.
14     Q.  And the process you just described as
15 to the way you created this report, is that your
16 normal practice in all of your cases where you've
17 been retained as an expert witness?
18     A.  Yes, it is.
19     Q.  That's different though than the way,
20 is that different from the way you would do it
21 outside of your retention as an expert?
22     A.  Not necessarily.

Page 111

1      I mean if you're speaking of my
2  academic research, that has a much different
3  characteristic to it just because, to the extent
4  that I'm working with coauthors, I might create
5  an outline but then a coauthor is in China so
6  then it'll be transmitted electronically to that
7  coauthor.
8      She'll add some parts that she had
9  worked on, maybe, you know, just to give you a
10 particular example, my Chinese colleague was the
11 only one with access to the 2000 Chinese Census.
12 So she would have done some analysis with that.
13 So she would have put in the tables the narrative
14 that goes along with that.
15     But it still proceeds, you know, in
16 that case we're very, in all of my collaborations
17 with the exception of the collaborations with my
18 wife, which I'm happy to describe to you if you'd
19 like, but in all my collaborations we take
20 special care to make sure that there is but one
21 master document and we know who is in control of
22 it because if you have three coauthors all

Page 112

1  editing at once, then it becomes unclear what the
2  paper is.
3      So the general idea that there is a
4  single master document, then that's the one where
5  the edits are done, that's pretty consistent with
6  what I do in my consulting work as well.
7      Q.  But in this case what started as a
8  detailed outline of about six to eight pages
9  slowly over the course of your engagement turned
10 into the forty-five, forty-six page report?
11     A.  That's correct, yes.
12     Q.  And to the extent there are any changes
13 or modifications or deletions, it's impossible to
14 figure out what those might have been at this
15 point?
16     MR. BERLIN:  Objection, form.
17     THE WITNESS:  I mean they were done on
18 the master document.  So I mean I don't know
19 anything about forensic computing, but I
20 certainly don't know how to do it.
21 BY MR. LAVINE:
22     Q.  But you don't have any --

Page 113

1      A.  No.
2      Q.  -- actual backups?
3      A.  No, I don't.
4      Q.  No other versions of the report as it
5  might have existed at earlier points in time?
6      A.  No.
7      Q.  Did anybody else have direct access to
8  the draft of your report so that they could
9  review it?
10     A.  No.
11     I mean like if you're referring to like
12 did they have access to my computer so that they
13 could review it and comment on it, no.
14     Q.  It wasn't posted or available in some
15 way where other people could review it as a work
16 in progress and/or suggest changes to it?
17     A.  Well, we did have on two occasions when
18 I was in Maine, I posted the document to what's
19 called Web-X.  So attorneys here in Chicago could
20 see the document that was on my computer.
21     Q.  What is Web-X?
22     A.  Good question.  It's a computer program

29 (Pages 110 to 113)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                    May 5, 2009
Chicago, IL

---

Page 114

1    that basically you connect into some website, and
2    then people sign in to a meeting, and then
3    everybody who signed into the meeting can see the
4    document that's on my computer screen, wherever
5    they may be, on their own computer screen or on a
6    monitor in a meeting room or however they choose
7    to do it.
8        Q.   And you made your draft report
9    available to other people using Web-X on two
10   occasions during the course of your engagement in
11   this case?
12       MR. BERLIN:  Objection, form.
13       THE WITNESS:  "Available" is probably
14   not quite the right word.
15       I was in control of the document. So if
16   we paged, you know, if it were being paged
17   through, it was me doing the paging through.
18       They had no ability to edit or change
19   the document.  They could see what was on my
20   computer screen, but they could not make any
21   changes to it.
22

---

Page 115

1
2    BY MR. LAVINE:
3        Q.   But they could read it as you were
4    scrolling through it?
5        A.   Yes, they could.
6        Q.   And the purpose behind that was to let
7    them read it, the version of the report as it
8    existed at that time, and give you comments;
9    right?
10       A.   Yes.  I think that's accurate.
11       Q.   And who was it that you gave Web-X
12   access of your document to?
13       A.   Ms. Geisler and I believe Ms. Tabacchi
14   also of Jones Day.
15       Q.   Would you be able to identify any entry
16   on the invoices that would be associated with
17   that process?
18       A.   Doubt it.
19       Q.   That wouldn't count as a meeting?
20       A.   No.  That wouldn't count as a meeting.
21       Q.   Would it be identified as
22   drafting/editing?

---

Page 116

1        A.   Highly likely.
2        Q.   When did those two Web-X events occur?
3        A.   I believe they were both in February,
4    maybe two weeks apart.
5        Q.   Did you give counsel a chance to read
6    through the entire document?
7        A.   I don't remember.  I would assume so. I
8    don't remember specifically.
9        Q.   How long were you, or how long did the
10   Web-X event occur or last, I'm sorry?
11       A.   They were between an hour, hour and a
12   half.
13       Q.   Did counsel give you comments on the
14   report during the course of the Web-X review?
15       A.   There were comments along the lines of,
16   you know, I'm an economist writing as an
17   economist.  So there was a lot of I'm sorry, what
18   are you saying here, kinds of things.
19       So then I would discuss with them this
20   is what I'm trying to say, and then they'd say
21   oh, okay, well that's not clear.
22       So then I would go back and edit that

---

Page 117

1    usually at a later time.  I would not, not in
2    their presence, if you will.
3        Q.   Was it ever suggested that you needed
4    to add any additional sections to your report?
5        A.   No.
6        I mean there was a suggestion once of
7    reorganizing.
8        Early on I was, in a futile attempt to
9    be creative, I think I was trying to deal with
10   Medicare and Medicaid at the same time, and it
11   was like that's not working.  And I was like
12   okay, so I will reorganize it and separate it.
13       So, again, it was pretty much a matter
14   of clarity.  So there were certainly
15   organizational comments that were made, but
16   nobody had suggested that I needed to add things.
17       You also have to remember at the time
18   that these were being looked at, there would be
19   substantial parts of the quote unquote report
20   that were still in outline form.
21       So to give a complete answer to your
22   question, we'd get to the part that was still

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Hughes, James W. - Vol. I                    May 5, 2009
                    Chicago, IL

Page 118

1   outlined and they would say, an attorney might
2   say well, you're going to fill that in, right,
3   yes. Because the deadline was coming up, and so
4   they were concerned that I was going to be done
5   on time.  So it was comments like that.
6       Q.   As far as you understand, the way Web-X
7   works you don't actually upload a copy of that to
8   a website?
9       A.   As I understand it, it transmits the
10  contents of my screen to those who are signed on
11  to the meeting.  But I certainly don't have any
12  idea of the mechanics.
13      Q.   Are they able to download a copy of
14  what they're reviewing?
15      A.   I have no idea quite honestly.
16      I doubt it.  It was the, I mean the
17  mechanics when you sign on to it, somebody is
18  given control of the meeting, and in this case it
19  would be me since I had the document to present.
20  You push a couple of buttons which, to the best
21  of my recollection, are labeled something like
22  Share, Share Your Desktop, meaning the desktop of

Page 119

1   the computer.
2       You do that and it appears on the Web-X
3   screen of my computer, and then it appears, as I
4   understand it, on the Web-X screen of the others
5   who are signed in to this meeting.
6       Q.   Let's switch gears a little bit.
7       You are here as an expert today; right?
8       A.   That's correct.
9       Q.   How is it that you are an expert?
10      MR. BERLIN:  Objection, form.
11      THE WITNESS:  Well, I have, as you can
12  see from my testimony list, I have substantial
13  experience in the pharmaceutical industry from my
14  consulting work, both as a testifying expert and
15  as a consultant going back about fifteen or
16  sixteen years.
17      I am trained as a health economist.  I
18  have taught health economics in the past.  My
19  Ph.D. dissertation was in the legal end of the
20  healthcare field.  It was on medical malpractice.
21      I have been very involved at my
22  employer, Bates College, in serving on their

Page 120

1   committee for health insurance, choosing health
2   insurers and the like.
3       So I have over the years accumulated
4   substantial knowledge and substantial familiarity
5   with the workings of pharmaceutical
6   reimbursement, both third-party payors as well as
7   Medicare and Medicaid.
8       Q.   The first thing you described was, and
9   correct me if I get it wrong, but fifteen to
10  sixteen years working on healthcare-related
11  issues?  Is that what you said?
12      A.   Yes.  I mean not exclusively
13  healthcare-related issues, but I started in
14  consulting in healthcare issues 1994, 1995, in
15  that area.
16      Q.   Okay.  For that experience you're
17  talking about the work you've done as a
18  consultant?
19      A.   Well, that sentence was the work I had
20  done as a consultant.
21      But as an academic, again, I'm trained
22  in health economics, I taught health economics, I

Page 121

1   had a post-doctoral fellowship at Brandies
2   University in their healthcare section, things
3   like that.
4       Q.   But the first category would be
5   expertise gained as a consultant; is that right?
6       A.   The first category I mentioned, yes, is
7   expertise gained as a consultant.
8       Q.   How would you categorize the second
9   category, how would you describe that?
10      A.   Academic training and experience.
11      Q.   Is the Ph.D. dissertation an example of
12  the academic training and experience?
13      A.   That's one example, yes.
14      Q.   The work that you've done at Bates
15  College in the healthcare field, would you put
16  that in the same category as academic experience?
17      A.   Well, the teaching certainly was
18  academic experience.
19      I taught health economics at Bates and
20  also at my previous employer, Amherst College.
21      Then there was just, there was the
22  institutional involvement, if you will, with the

31 (Pages 118 to 121)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                           May 5, 2009
                    Chicago, IL

Page 122

1  health insurance system as it was applied to
2  Bates College and employees and staff.
3      Q.  I'm not sure what you mean by that.
4      In connection with providing health
5  benefits to employees of the college?
6      A.  Yes.
7      I served on the committee that read the
8  proposals, met with the consultants, decided what
9  we could afford to cover and what we couldn't
10 afford to cover, talked about where we would get
11 our prescription drug benefit, were we going to
12 use Medco, were we going to use another, what was
13 the form of reimbursement, what kind of contracts
14 could we have, could we have a fixed price
15 contract.
16     And I was involved in all of those
17 discussions and all of those decisions.
18     Q.  Sounds like one of those volunteer
19 duties you get assigned to?
20     MR. BERLIN:  Objection, form.
21     THE WITNESS:  Quite honestly, compared
22 to normal college committee work it was actually

Page 123

1  quite interesting.
2      Normal college committee work is seeing
3  if the streetlights are working.
4      So I liked this much better. Thanks.
5  BY MR. LAVINE:
6      Q.  So far you've referenced health
7  economics.
8      Is that something you consider a
9  subdiscipline of economics?
10     A.  I think it's referred to as a field of
11 economics, yes.
12     Q.  And in your report you say that you're
13 offering your opinion as an economist.
14     A.  Yes, sir.
15     Q.  But does that include any additional
16 subdisciplines or fields of economics?
17     A.  Well, I'm an applied micro-economist.
18     So everything to do with the workings
19 of product and factor markets would be covered
20 under that.
21     Q.  But you're not here, for example, in
22 your capacity as an environmental economics

Page 124

1  expert, for example?
2      A.  I'm offering no environmental economics
3  opinions, no.
4      Q.  How about labor economics, any opinions
5  related to any expertise in labor economics?
6      A.  Well, you know, in labor economics you
7  do touch on issues like are at issue here.
8      So, for example, how does Medicaid
9  income limitations, how does that affect labor
10 force supply, excuse me, how does that affect
11 labor supply, how does that affect people's
12 decision to participate in the labor force.
13     So one thing that one does in labor
14 economics is examine what we'll for lack of a
15 better term just call welfare systems generally.
16     So my experience as a labor economist
17 and the materials that I come across as a
18 practicing labor economist would certainly inform
19 parts of what went into my opinion today, what
20 went into the opinion in my report I mean.
21     Q.  Do any of your opinions in this case
22 rely upon any expertise you have in industrial

Page 125

1  organization?
2      A.  Well, industrial organization is market
3  workings, competition policy, and the like. So,
4  yes, I think it would.
5      Prices, markets, how people respond to
6  incentives, monopolization, monopsinization, how
7  are prices determined in different market
8  structures. I think, yes, I think it does inform
9  my opinion as it appears in my report.
10     Q.  And do your opinions in this matter
11 rely or depend upon your expertise in any kind of
12 antitrust policy?
13     A.  Well, as I state in a footnote in my
14 report, that antitrust authorities have been
15 fairly diligent in trying to prevent firms from
16 collecting pricing data which they then share
17 amongst each other as a competition policy, I'm
18 sorry, as a matter of competition policy, that
19 antitrust authorities and the courts have
20 considered that the collection and dissemination
21 of pricing information among competitors is
22 generally a bad thing for competition.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. – Vol. I                                    May 5, 2009
                         Chicago, IL

Page 126

1    Q.   And do your opinions in this case also
2  draw upon any expertise you have in law and
3  economics?
4    A.   Well, to the extent if you define law
5  and economics as being restricted to the idea of
6  the common law moving away from inefficient rules
7  towards efficient rules, probably not.
8         But to the extent that law and
9  economics is a discipline with a certain outlook
10  on how markets and actors within those markets
11  work, I can't say it doesn't influence my
12  thinking at all.  But I don't think I can point
13  to something in my report that says yes, this is
14  a law and economics point.
15         I mean all of these are just applied
16  micro-fields, and my point is I'm a broadly
17  practicing applied micro-economist.
18    Q.   So your area of expertise or areas of
19  expertise you're drawing upon in connection with
20  this case include applied micro-economics, health
21  economics, labor economics, industrial
22  organization, antitrust, and law and economics?

Page 127

1    A.   You know, I think that's kind of overly
2  broad.  I mean they're all subfields of, they're
3  all fields of applied micro-economics.
4         So I only hold myself out here as being
5  an applied micro-economist.  That's the main
6  thing one needs to understand to understand
7  what's going on in this case in my opinion.
8    Q.   Now, the consulting work that you've
9  done over the years in the health arena, what
10  experience do you have as a result of your
11  consulting work that qualifies you as an expert
12  to testify in this case?
13    A.   Well, I believe, as I said before, in
14  my role as a consulting and testifying expert,
15  I've had to familiarize myself several times over
16  the years with drug reimbursement policies of
17  state Medicaid agencies, Medicare, third-party
18  payors, pharmacy benefit managers, and the like.
19         The assignments have called on me to
20  familiarize, I would say to deepen my
21  familiarization with medical markets of all
22  kinds, but, you know, particularly in the

Page 128

1  pharmaceutical areas since that was the area
2  where I was doing most of the work.
3    Q.   When have you worked on drug
4  reimbursement policies as related to Medicare and
5  Medicaid in the past?
6    A.   I would say fairly confidently in every
7  one of the class certification matters in
8  pharmaceuticals.
9    Q.   Were there any other of your consulting
10  engagements that provided or support any of your
11  expertise in drug reimbursement policies for
12  Medicare and Medicaid?
13    A.   Well, certainly my previous work in
14  Connecticut and Montana, Nevada.
15         It came up in, well, that was a class
16  certification matter.
17         Certainly in my role as a consultant in
18  Cardizem.  That was the, I spoke about serving as
19  a consultant when there was an opt-out plaintiff,
20  which was a third-party payor. So I had to, in
21  order to construct the damage estimates that we
22  made, I had to become familiar with the ins and

Page 129

1  outs and the practices of that particular
2  third-party payor, what their policies were
3  towards reimbursement, what their policies were
4  towards putting brand drugs versus generic drugs
5  on the formulary, where on the formulary they
6  would put them, under what circumstances, what
7  would change when they would carve out their
8  pharmacy benefit and have it run by a pharmacy
9  benefit manager, what sorts of rebates and under
10  what circumstances that they could get, did get
11  or could get, from brand name pharmaceutical
12  manufacturers, what sorts of incentives they were
13  given by state, federal, or simply profit motives
14  for moving from brands to generics on the
15  formularies, things like that.
16         Very detailed, it required getting very
17  detailed knowledge about how a number of
18  different reimbursement systems were working.
19    Q.   Did any of your prior cases involve
20  analysis of the individual claims paid by a
21  portion of the Medicaid programs?
22    A.   There was time that we, in many of the

                                33 (Pages 126 to 129)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                          May 5, 2009
                        Chicago, IL

Page 130

1  class certification cases I would make use of
2  these, what's the acronym, the state utilization,
3  state Medicaid utilization data that appears on
4  the web, or at least used to appear on the web.
5  So that's aggregate rather than individual claims
6  data.
7         But there was analysis and manipulation
8  of those data in the course of that work.  And
9  that was two or three or four of those cases that
10  we've talked about before.
11     Q.  Are you talking about what is referred
12  to as the STUD data, S-T-U-D?
13     A.  I think so.
14     Q.  Have you ever worked with the SMRF/MAX
15  data before?
16     A.  I have not, no.
17     Q.  Your work with the STUD data -- I'm
18  sorry.  Did you base any of your work on that
19  data?
20     A.  I'm sorry.  I need to correct something
21  previously.
22         There was individual Medicaid claims

Page 131

1  data that we analyzed in the Connecticut matter.
2  I'm sorry.  I left that out.
3         Was that SMRF data, was that MAX data,
4  I don't recall, but it was individual claims data
5  that was provided by the state.
6         It just seems to me there was, HUGR,
7  H-U-G-R, was the acronym that I remember that as
8  I recall was data that was provided to us by
9  Connecticut Medicaid.
10     Q.  Was that claims level data?
11     A.  Yes.
12     Q.  So it would show on a particular date a
13  particular person got "X" units of a particular
14  drug?
15     A.  Yes.
16     Q.  Did that data cover, well, describe the
17  scope of that data.
18     A.  Well, it was specific to the drugs at
19  issue which were primarily Taxotere and Anzemet,
20  which were Aventis drugs.
21         So it was, you know, relative to other
22  Medicaid data I think it was relatively small

Page 132

1  because these were, they're not chemo drugs but
2  they are anti-hematics, to relieve nausea in
3  chemo patients.  So it was a relatively small
4  market because it was restricted to the State of
5  Connecticut.  But, as I recall, there were still
6  several thousand of those claims.
7         So what we were doing was that the
8  plaintiff's expert had said, and I'll always
9  remember this number, that Medicaid reimbursed
10  for these drugs at 90.25 percent of AWP.
11         So we went into the claims data to
12  review exactly what was the reimbursement because
13  regardless of what plaintiff's expert was saying,
14  the state regulations for part of the period said
15  that these drugs would be reimbursed on an
16  as-billed basis up to $499.  And then if the
17  doctor billed more than $499, the claim would be
18  reviewed, rejected, reduced.  But up to $499 it
19  would simply be accepted.
20         So we got into looking at the
21  individual claims data to see what was actually
22  reimbursed and in effect what was the

Page 133

1  relationship between these reimbursements to the
2  reimbursement formulas that the plaintiff's
3  expert was claiming, what was the relationship of
4  the individual reimbursements to the amounts that
5  the state was saying it was reimbursing.
6     Q.  Just one quick clarification and then
7  we're done with the tape.
8         The Connecticut data related to several
9  thousand claims?  Is that what you said?
10     A.  To the best of my recollection.
11     Q.  So it was smaller than the data we're
12  dealing with this case?
13     A.  Well, it was one state.  It was two
14  relatively restrictive drugs.  And it was over,
15  yes, several thousand would be about right, yes.
16         MR. LAVINE:  We better take a break.
17         THE VIDEOGRAPHER:  Going off the record
18  at 12:06 p.m.
19         (A recess was taken.)
20         THE VIDEOGRAPHER:  Beginning of
21  Videotape No. 3.  Back on the record at 12:15
22  a.m.

34 (Pages 130 to 133)

Hughes, James W. - Vol. I                    May 5, 2009
                        Chicago, IL

---

Page 134

1  BY MR. LAVINE:
2      Q.  With respect to your prior experience,
3  in any of the other cases that you worked on as
4  an expert or a consultant, did you get the actual
5  underlying claims data and perform any analysis
6  on it?
7      A.  It's my understanding that's what we
8  did in Connecticut, yes, to the best of my
9  recollection.
10     Q.  But does that mean you didn't do it but
11 somebody else did it?
12     A.  Yes.  Somebody else did it at my
13 direction, yes.
14     Q.  Were there any other cases where you
15 actually got Medicare and Medicaid data and did
16 an analysis of the paid claims?
17     A.  Well, the paid claims, like I said,
18 I've used the utilization data that's online, but
19 that's not, what I used was not individual claims
20 data.
21         Again, in the Cardizem case it was
22 individual claims data from a third-party payor

---

Page 135

1  but not from Medicaid.
2      Q.  Just to clarify.  In Connecticut who
3  did the actual hands-on analysis of the claims
4  data?
5      A.  A company called The Brattle Group was
6  retained to keep custody of the data and to do
7  what I asked them to do.
8      Q.  Can you spell that?
9      A.  Brattle Group?
10     Q.  Yes.
11     A.  Sure, B-R-A-T-T-L-E.
12     Q.  Is there any other reason that the
13 consulting work that you've done helped to
14 qualify you as an expert for the issues you're
15 addressing in this case?
16     A.  Well, again, in virtually every one of
17 the class certification cases, in fact I think in
18 all of the class certification cases --
19     Q.  Pharmacy-related.
20     A.  Pharmacy-related class certification
21 cases, there is the issue of how, I mean these
22 are proposed damage methodologies.

---

Page 136

1          So in order to assess the adequacy or
2  inadequacy of any particular damage methodology,
3  you've got to go into the nitty-gritty details of
4  everybody who is or wants to be a member of the
5  putative class.
6          So that means going into the payment
7  methods and the practices of all sorts of
8  third-party payors, not just private insurance
9  companies, but also to the extent, also Medicaid,
10 to a lesser extent Medicare, because the drugs
11 that it, for example, Cipro wasn't a drug that
12 would be covered under Medicare Part B.  And
13 prior to Part D Cipro wouldn't be covered under
14 Medicare, but certainly Medicaid was a big user.
15         On the other hand, Taxotere and
16 Anzemet, they're drugs more like the drugs in
17 this case.  So Medicare and Medicaid are both at
18 issue there.
19         But in order to form an opinion about
20 any particular damage methodology, you've got to
21 have a pretty intimate knowledge of what data are
22 going to be available, what are the practices and

---

Page 137

1  procedures of all of the actors who want to be
2  members of this proposed class.
3          So at least to, and that research,
4  regardless of who was doing data analysis at my
5  direction, that research was all done by me.
6  This was not anything that lawyers gave to me.
7  This was not anything that I told a consulting
8  firm to go find out what you can find out about
9  this.
10         The standard practice was rather for me
11 to do the research and then tell the consultants
12 okay, here's what we know about Medicaid for the
13 Medicaid say CHIP program, Child Healthcare Plan
14 in the state of Illinois, all right, so go look
15 at the data and tell me, you know, are the
16 reimbursements that are supposed to be in this
17 and the copayments that are supposed to be in
18 this and this was actually showing up in the
19 data.
20         So, yes, I considered that through all
21 of this I have a fairly detailed knowledge of
22 Medicaid and Medicare pharmacy reimbursement

---

35 (Pages 134 to 137)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                    May 5, 2009
Chicago, IL

Page 138

1  practices as well as regular third-party payors
2  and as well as cash payors for that matter.
3      Q.  Does that cover everything regarding
4  your consulting background --
5      A.  No.  That covers the answer to your
6  question.
7      MR. BERLIN:  Wait.  I don't think he
8  finished his question.
9      Had you finished your question?
10     MR. LAVINE:  No.
11     THE WITNESS:  Okay.  I'm sorry.  You
12 start over and I'll sit here until you're done.
13 BY MR. LAVINE:
14     Q.  Well, have we exhausted your testimony
15 concerning each and every reason why your
16 consulting experience qualifies you to be an
17 expert in this case?
18     MR. BERLIN:  Objection, form.
19     THE WITNESS:  I don't know.  Each and
20 every reason?  The ones I can think, we covered
21 the ones I can think of sitting here.
22 BY MR. LAVINE:

Page 139

1      Q.  Am I right, that in none of your
2  consulting work have you ever taken the data onto
3  your own computers and personally analyzed it?
4      A.  No.  That's not correct.
5      In the Cardizem case, well, in a lot of
6  these cases I had the data in my own computer.
7      In Cipro, in Cardizem, in Procardia, in
8  Rezulin, I would direct the client that we needed
9  to get access to IMS claims data.
10     A case that, I'm sorry, I did not
11 mention that I was involved in for Coumadin,
12 which was a consulting expert case a long time
13 ago.
14     But particularly when I was working as
15 a consulting expert, that's what I did.  The data
16 was on my computer and I was the one doing the
17 analysis and I was the one who was handing it off
18 then to the testifying expert doing the analyses
19 that he directed.
20     Q.  Did any of those circumstances involve
21 situations where the data you had on your
22 computer that you worked with came from the

Page 140

1  Medicare or Medicaid programs?
2      A.  The utilization data that I talked
3  about before, yes, that was mine.
4      Q.  The aggregate STUD data?
5      A.  Yes.  That was definitely on my
6  computer.
7      Q.  But that was useful to your analysis?
8      A.  In those cases, yes.
9      Q.  You found it reliable enough to work
10 with; right?
11     A.  For the purposes that we were trying to
12 use it for, which was, you know, we knew what
13 total sales were in a state -- let me take that
14 back.
15     We knew what total sales were.  We
16 needed to know what sales were of these drugs in
17 particular states at particular times for the
18 Medicaid program.  And for that purpose it was
19 fine.
20     Q.  Did you take any steps to verify the
21 accuracy of the STUD data?
22     A.  In Coumadin I believe that I went back

Page 141

1  to the client to, I believe I did some
2  verification with the client.
3      I mean they didn't have, since most of
4  their sales were through wholesalers, they didn't
5  know exactly but they had some information from
6  somewhere about what Medicaid sales were.
7      So it was to the extent of verifying
8  with the client that they thought that the
9  numbers were reliable.
10     Sometimes the numbers of course were
11 completely unreliable.  There would be a month in
12 the state of New York where they would say there
13 was two pills of Coumadin sold.  And you knew
14 that had to be wrong because there had been
15 35,000 sold the month before and another 35,000
16 sold the month after.  So you knew that wasn't
17 right.  But it didn't end up mattering that much
18 for what use I was using it for in these class
19 certification matters.
20     Q.  Let's just talk about your academic
21 training and experience --
22     A.  Okay.

36  (Pages 138 to 141)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                              May 5, 2009
                          Chicago, IL

Page 142

1      Q.  -- as that supports your expertise in
2  this case.
3         You said you were trained in health
4  economics.  What training in health economics are
5  you referring to?
6      A.  Classwork.  I was planning, before I
7  turned to medical malpractice, I was planning on
8  doing my Ph.D. thesis on a healthcare topic.
9         So there was a lot of background
10  reading of journal articles and books that I did
11  in preparation for that.  And I just never, I
12  just chose to go a different direction once I got
13  exposed to law and economics.  The topic was more
14  interesting, the data were more readily
15  available, so I went that route.
16         So that's why I consider myself to be
17  trained in health economics.
18         Then also when you teach a course,
19  maybe some people do it this way, but the lay
20  person, if I may, may think you pick up a
21  textbook and you teach from that.  But that's not
22  really the way teaching works.

Page 143

1         I was certainly qualified, felt
2  qualified, to teach health economics.  So then
3  you go through, in my experience when I'm doing a
4  new course I spend six to eight hours preparing
5  for every hour in the classroom.
6         So that's going to be not just dealing,
7  and, in fact, probably not dealing much at all
8  with the textbook, but rather familiarizing one's
9  self with journal articles and other materials
10  that you need to teach the course that you're
11  going to teach.
12      Q.  When you talk about classwork, you're
13  referring to when you were a student?
14      A.  Well, in that answer I was referring to
15  both.
16      Q.  Well, first as a student and then as a
17  teacher.
18      A.  Right.
19         But as a student, again, the training
20  was, I simply don't remember.  I don't know that
21  I ever had a course entitled "Health Economics,"
22  although I took courses in health law at the

Page 144

1  Michigan Law School.
2         When I was an undergraduate, I was a
3  research assistant for health economist when I
4  was at Boston University.  So there was a lot of
5  training in there.
6         But maybe as an undergrad, I can't
7  remember if I ever took a course that was
8  entitled "Health Economics."
9      Q.  In terms of your experience in labor
10  economics, industrial organization, and
11  antitrust, and law and economics, is the basis
12  for those similar as to what you just described
13  for health economics?
14      A.  No.
15         I have certainly studied law and
16  economics and of course taught it several times.
17         Labor economics I did not take a course
18  in.
19         Industrial organization I had several
20  courses in, three that come to mind off the top
21  of my head.
22         So there is much more academic training

Page 145

1  there.
2      Q.  In any of your work, have you actually
3  calculated a damage figure in a false claims
4  case?
5      A.  In a false claims case, no.
6      Q.  Have you ever done any data analysis
7  where you would extrapolate from experiences in
8  one Medicaid program to the reimbursement
9  experience you would see in another Medicaid
10  program?
11      A.  Not to my recollection, no.
12      Q.  Have you had any prior experience in
13  connection with analyzing damages in connection
14  with the Medicare program J-Code reimbursement?
15      A.  Calculating damages, no.
16      Q.  Any type of reimbursement experience
17  related to Medicare J-Codes?
18      A.  Certainly in the AWP litigation, I
19  certainly had to know something about it for the
20  reports that I wrote.
21      Q.  Did you look at the way any state
22  Medicaid programs may have reimbursed based upon

37 (Pages 142 to 145)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                          May 5, 2009
                        Chicago, IL

Page 146

1  J-Codes?
2      A.  It certainly came up in Connecticut.
3      I will say it must have come up in
4  Montana and Nevada, but I don't have a specific
5  recollection.
6      Q.  You didn't offer any particular opinion
7  related to that?
8      A.  I don't remember.
9      Q.  Okay.  So we talked about consulting
10 experience and academic experience with classroom
11 and teaching.  And then you had the additional
12 duties related to Bates College where you
13 actually served on a committee to try to identify
14 or select the best benefit program for the
15 college.
16     Anything else that we haven't talked
17 about?
18     A.  Not that I can think of sitting here.
19     Q.  You have a Bachelor's degree from
20 Boston University in international comparative
21 studies; is that right?
22     A.  That's right.

Page 147

1      Q.  That was in 1977?
2      A.  Yes, that's correct.
3      Q.  And then a year later you get your
4  Master's in economics from Boston University?
5      A.  That's correct.
6      Q.  How was it so fast that you were able
7  to get your Master's degree one year later?
8      A.  That's a good question.
9      The Master's program I believe was
10 typically two years.  Some of the coursework that
11 I did as an undergraduate.  My Bachelor's degree
12 was in international comparative studies, but I
13 had started taking economics in my junior and
14 senior years.
15     What had happened is I took a course my
16 senior year in environmental economics with Dr.
17 Ray Hartman, as irony would have it.
18     In any event, I wrote a paper in the
19 course of that environmental economics course,
20 and he said this, you know, this is pretty much
21 Master's work, why don't you stick around and do
22 a Master's degree.  And I hadn't really thought

Page 148

1  of it.  And in 1977 with a major in international
2  comparative studies, there weren't exactly people
3  beating the door down to give me a job.  So the
4  Master's degree sounded pretty good.
5      Q.  When did you start pursuing your Ph.D.?
6      A.  When did I start?  Fall of 1980.
7      Q.  And that was at the University of
8  Michigan?
9      A.  That's correct.
10     Q.  And then you eventually got your Ph.D.
11 from the University of Michigan?
12     A.  That's right.
13     Q.  In 1987?
14     A.  That's when, yes, when the dissertation
15 was signed off on, yes.
16     Q.  I'm sorry.  What was the title of that
17 dissertation?
18     A.  Something like the economics of medical
19 malpractice reform, something like that.
20     Q.  Was that a study relating to how the
21 laws pertaining to medical malpractice impacted
22 the length of time the litigation of medical

Page 149

1  malpractice issues lasted?
2      A.  I later did work on that question.
3      But the dissertation itself was looking
4  at the effects of various medical malpractice
5  reforms on, well, there were two parts of the
6  dissertation.
7      The empirical part of the dissertation
8  was looking at how the different medical
9  malpractice reforms affected the probability that
10 a claim would be dropped, settled, or litigated
11 to verdict.
12     And the innovation there was that
13 previous research had looked at econometrically,
14 statistically, had looked at the question of
15 dropped versus not dropped and settled versus
16 litigated as separate questions without taking
17 into account the fact that if there's a change in
18 the percentage of claims dropped, then that
19 changes the characteristics of the claims that
20 proceed through to settlement versus litigation.
21     So I used a statistical technique that
22 treated these as a single estimation so that any

                                    38 (Pages 146 to 149)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                          May 5, 2009
                        Chicago, IL

Page 150

1  changes at the earlier stages would be reflected.
2       So to use a technical term, the
3  estimates would not be biased.  When you dealt
4  with them separately, the estimates of settled
5  versus litigated were only what people tried to
6  say conditionally unbiased, which meant that they
7  were biased because the condition was always met.
8       The theoretical part of my doctoral
9  dissertation was on the question of do contingent
10 fees increase the quantity of litigation because
11 at that time I think probably as today there's a
12 popular belief that contingent fees lead
13 attorneys in that line of work to speculate and
14 to bring a lot of baseless or quote unquote
15 meritless claims.
16      As an economist I found the question
17 interesting because one wouldn't really expect
18 attorneys who are only going to get paid if the
19 claim is successful, you wouldn't expect them to
20 go ahead and file a lot of baseless claims
21 because they wouldn't really expect to win that
22 often.

Page 151

1       So the bottom line is the results of my
2  dissertation, and, again, this was theoretical
3  work, was that yes, that the presence of
4  contingent fees did increase the quantity of
5  litigation but for good economic reasons rather
6  than for bad reasons rather than for, it wasn't
7  the idea that there was a lot of baseless
8  speculative claims going forward but rather the
9  contingent fees cured an information problem
10 between the attorney and the client.
11      Thought you were going to have to come
12 at me for that one?  No.  It was an interesting
13 study.
14      Q.  So how does your educational background
15 inform your opinions that you're articulating in
16 this case?
17      A.  Well, again, as an applied
18 micro-economist, which deals at the highest level
19 with how do actors in a market respond to
20 incentives, pretty much all of my experience as
21 an applied micro-economist comes to bear in this
22 report in this litigation.

Page 152

1       Q.  You began teaching at Bates College in
2  1992?
3       A.  Yes, I did.
4       Q.  What type of college is Bates College?
5       A.  Bates College is an American invention,
6  it's what's called a liberal arts college.
7       So it teaches undergraduates only and
8  gives students grounding in, as the name implies,
9  the liberal arts.  So they study broadly in
10 humanities, social sciences, and natural
11 sciences.
12      Q.  How many full-time students does it
13 have?
14      A.  1,710.  I'm on that committee too.
15      Q.  But it doesn't offer any kind of
16 Master's or Doctoral programs?
17      A.  It does not.
18      Q.  I guess it would be considered a
19 college as opposed to a university?
20      A.  Yes.
21      Q.  Is there anything additional from your
22 experience as a professor at Bates College that

Page 153

1  lends additional support for your expertise in
2  this case?
3       A.  Not that I can think of sitting here.
4       Q.  Same thing as we discussed before about
5  your teaching background?
6       A.  Well, again, in applied micro-economics
7  you change reimbursement, you change people's
8  incentives, and how do they react, and what does
9  that mean for the market outcomes.  That's what's
10 at issue here.
11      Q.  I guess at the college there's no
12 courses offered about reimbursement of drugs?
13      A.  We actually have a health economics
14 course that does have, I don't teach it now, we
15 have a new fellow who teaches it, but yes, it has
16 a section that deals with pharmaceutical markets
17 and drug reimbursements, third-party payors,
18 Medicare, Medicaid systems, how healthcare is
19 provided to the aging and the poor.
20      Q.  Are there any courses related to
21 calculating damages in a false claims case?
22      A.  No.

39 (Pages 150 to 153)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                        May 5, 2009
                        Chicago, IL

Page 154

1      Q.   Your CV has several publications
2  listed.
3          Are there any of those publications or
4  other items listed in your CV that support your
5  expertise as an expert in this case?
6      A.   Well, certainly to the extent that
7  almost all of these publications use statistical
8  and econometric analysis in some form and some
9  use rather advanced techniques and some use less
10 advanced techniques, I believe that that work
11 qualifies me to comment on the calculations that
12 Dr. Duggan did in this case.  I think that is
13 certainly the biggest thing.
14         But I mean specifically to the Medicaid
15 system, part of the work that I did at Brandies
16 University was on substance abuse benefits under
17 Medicaid.
18         So, again, we became extremely familiar
19 with the Medicaid system for substance abuse in
20 all fifty states and as a result also became
21 familiar with a lot of other things about
22 Medicaid in those fifty states.

Page 155

1      Q.   I'm sorry.  Where is that on your CV?
2      A.   That is at the bottom of Page 3.
3          And then under Working Papers there is
4  our paper that we can't quite ever get done is
5  "Napsterizing Pharmaceuticals" that I've written
6  with Drs. Moore and Snyder, which speaks to
7  issues of patents and innovation, but, again,
8  reflects the expertise that I believe that I have
9  in the pharmaceutical industry.
10     Q.   Anything else in your CV that you'd
11 point to?
12     A.   Well, I have mentioned it before, and
13 that's on the last page, the post-Doctoral
14 fellowship that I did at Brandies University.
15 But that's some time ago.  But certainly that was
16 perhaps where I cut my teeth on the Medicaid
17 program, if you will.
18         I mean there are other presentations
19 that pertain to various things about health and
20 health insurance, but I don't know that anything
21 particularly jumps out as something that I
22 thought back on as I was performing the analysis

Page 156

1  for this case.
2          MR. LAVINE:  Why don't we take a break
3  right here.
4          MR. BERLIN:  Sure.
5          THE VIDEOGRAPHER:  Going off the record
6  at 12:43 p.m.
7          (A lunch recess was taken, and said
8  deposition continued as follows:)
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 157

1          THE VIDEOGRAPHER:  We are back on the
2  record at 1:53 p.m.
3          JAMES W. HUGHES, having been previously
4  duly sworn, was examined and testified further as
5  follows:
6              EXAMINATION
7              (Continuing)
8  BY MR. LAVINE:
9      Q.   So what have you been hired to do in
10 this case?
11     A.   As it says in my report, I have been
12 hired to review and evaluate the expert report of
13 Dr. Duggan.
14     Q.   So none of your opinions relate to any
15 of the other reports prepared by any other expert
16 of the United States?
17     A.   No.
18     Q.   And you haven't seen or read the
19 reports of Dr. Marmar or Dr. Perri?
20     A.   No.
21     Q.   You did get a copy of the report from
22 Dr. Schondelmeyer; right?

                        40 (Pages 154 to 157)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                          May 5, 2009
                        Chicago, IL

Page 158

1    A.   One report from Dr. Schondelmeyer, yes.
2    Q.   But you're not directly expressing any
3  opinion with respect to his report?
4    A.   Correct.  I am not.
5    Q.   Did you get copies of any of the
6  reports of any of the other experts retained by
7  Abbott in this case?
8    A.   I have not.
9    Q.   So nothing from Dr. Helms, Rossiter,
10 Montinez, Young, or Reisetter?
11   A.   No.  I haven't seen any of those
12 reports.
13   Q.   And for Mr. Young you haven't even seen
14 any kind of a draft of his report either?
15   A.   No.  I have not seen a draft.
16   Q.   You've been asked to evaluate Dr.
17 Duggan's report, both with respect to liability
18 and damage?
19   A.   It's my understanding that as a damages
20 report that both Dr. Duggan and I, I'll just
21 speak for myself, but that we're supposed to take
22 the allegations as stated in the complaint as

Page 159

1  true.
2       So I would assume that would exclude
3  liability.
4    Q.   It would exclude liability?
5    A.   Well, if I'm assuming that the fraud
6  and misrepresentation that the government alleges
7  in fact took place for purposes of my report,
8  then as I understand the way you're using the
9  term "liability," that there would be nothing for
10 me to opine upon because I'm assuming that those
11 allegations are true.
12   Q.   So you're not extending any opinions
13 into the arena of the manner in which Abbott
14 conducted itself in connection with this case;
15 right?
16   A.   Correct.
17   Q.   So what else have you been retained to
18 do in connection with this case?
19   A.   In connection with this case, nothing.
20   Q.   What opinions have you been retained to
21 offer?
22       MR. BERLIN:  Objection, form.

Page 160

1       THE WITNESS:  I haven't been retained
2  to offer opinions specifically.
3       I've been retained to evaluate Dr.
4  Duggan's report and offer my opinions about his
5  report, which are contained in my report.
6  BY MR. LAVINE:
7    Q.   So what are the opinions that you've
8  reached in this case then?
9    A.   Do you want me to go through my report
10 or what is it that, how would you like me to
11 answer that question?
12   Q.   Well, I'd like to just get you to
13 describe them generally to start.
14   A.   Well, if it's all the same to you, I'd
15 just as soon use my report as a guide, unless you
16 object.
17   Q.   Well, let me get a particular copy of
18 the report for you --
19   A.   Okay.
20   Q.   -- just to confirm we're working with
21 the right one.
22       MR. LAVINE:  Unfortunately every page

Page 161

1  but the last is stapled together.
2       Can we mark this as the next exhibit?
3       (Exhibit Hughes 008 was marked for
4  identification.)
5  BY MR. LAVINE:
6    Q.   We have just marked as Exhibit 8 a
7  document entitled "Expert Report of James
8  Hughes."  Pages 1 through 46 are numbered, and
9  then the signature page is not numbered.
10 (Document tendered to the witness.)
11       My first question would just be is this
12 a copy of your report and is it correct that the
13 signature page was, you know, that is the
14 appropriate signature page?
15   A.   Yes.  This does appear to be a copy of
16 my report, and, yes, this is the appropriate
17 signature page.
18   Q.   So even though it's not numbered, that
19 is the appropriate -- and this is the final
20 version of your report, forty-six pages and
21 ninety-nine paragraphs?
22       MR. BERLIN:  Objection, form.

                              41 (Pages 158 to 161)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                        May 5, 2009
                        Chicago, IL

Page 162

1        THE WITNESS:  To the best of my
2    knowledge, sitting here without going through it,
3    this certainly looks like -- well, let me take
4    that back.
5        This looks like the final version of
6    the text of my report.  The exhibits are not
7    accompanying this, but it does look like the
8    final version of the text of the report.
9    BY MR. LAVINE:
10       Q.  And the reason I ask is the first
11   version we got was missing some pages, and I just
12   wanted to make sure that we're working with the
13   proper --
14       A.  Okay.
15       Q.  -- version.
16       MR. BERLIN:  Objection, move to strike.
17       MR. BREEN:  What's the matter?
18       MR. BERLIN:  It was the commentary as
19   to the draft.
20   BY MR. LAVINE:
21       Q.  Do you need the question repeated?
22       A.  Oh, I'm sorry.  Is there a question

Page 163

1    pending?
2        Q.  Well, you had wanted to look at the
3    report because I had asked you what your opinions
4    were.
5        A.  I'm terribly sorry.  I was waiting for
6    the question to be restated.  That's fine.
7        One of the overriding opinions that I
8    offer and that I think goes to the heart of my
9    opinion and touches on all of my other objections
10   to Dr. Duggan's calculations is that his exercise
11   is in my opinion not a damage calculation.
12       In his report he doesn't characterize
13   what he's done as a damage calculation, but
14   rather only as a difference in government
15   expenditures.
16       While one can calculate a difference,
17   that is not the same as a damage calculation
18   because in my opinion in order to do a valid
19   calculation of damages, you need to state clearly
20   a realistic and defensible version of what we
21   call the but-for world, the world that would
22   exist without the alleged wrongdoing, which in

Page 164

1    this case is the allegedly wrongful pricing
2    practices that Abbott undertook.
3        Insofar as what leads this to not be a
4    damage calculation is that there's enormous
5    amounts of evidence in the record that speak to
6    what would have happened in a but-for world
7    absent the alleged wrongdoing by Abbott which he
8    leaves out completely.
9        I mean one of the things that we talked
10   about early on was the relationship between
11   ingredient costs, reductions in ingredient cost
12   reimbursement, and the opinion of numerous state
13   officials and federal officials that such
14   reductions could not be undertaken without the
15   concomitant increase in dispensing fees.
16       Along those lines there's in my opinion
17   alternatives.  Dr. Duggan claims, well, you know,
18   this would be speculative to say what would
19   happen in such a but-for world, but yet I offer
20   that for both the Medicare and the Medicaid
21   systems we have but-for worlds.
22       We have a situation where the Congress

Page 165

1    of the United States in both cases has examined
2    Medicaid reimbursements and has examined Medicare
3    reimbursements and has examined these in the
4    light of the divergence from AWP and the
5    selling prices that pharmaceutical companies use
6    and has examined this in light of the adequacy or
7    inadequacy of dispensing fees and has through
8    legislation enacted replacement reimbursement
9    systems for both Medicare and Medicaid that take
10   into account all of the factors, necessary
11   factors, of access and cost containment that had
12   been alleged to have plagued the current system.
13       The alternate reimbursement method
14   that, the alternate reimbursement amounts that
15   Dr. Duggan proposes bears absolutely no
16   resemblance to anything that was actually
17   undertaken by the U.S. Congress in the Medicare
18   and Medicaid programs.
19       So for that reason alone, I consider
20   his characterization of the but-for world where
21   you just lower reimbursements to a hundred
22   twenty-five percent of the average contract

42 (Pages 162 to 165)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                              May 5, 2009
                          Chicago, IL

---

Page 166

1  selling price with no adjustment in dispensing
2  fees and no consideration as to whether providers
3  will continue to participate in the program, I
4  consider that to be completely at odds with the
5  record.
6        Not just with the new systems for
7  Medicare and Medicaid but the state and federal,
8  as I believe I've said already, but the state and
9  federal deposition transcripts are replete with
10 examples of individuals who were actually working
11 in the state Medicaid systems who were of the
12 opinion that ingredient costs and dispensing fees
13 would be dealt with, needed to be dealt with
14 together.  That what mattered to the viability of
15 the providers and what mattered to the access to
16 the system was the total reimbursement, and what
17 fraction was divided into ingredient cost and
18 what was divided into dispensing fee was less
19 important than the adequacy of the overall
20 reimbursement.
21       Dr. Duggan also ignores similar
22 evidence contained in reports by the accounting

Page 167

1  firm Myers and, I believe it's an accounting
2  firm, Myers & Stauffer, that he relies upon their
3  expertise in his own report, but he disregards
4  the reports that they've done for Medicaid state
5  agencies that have repeatedly emphasized the need
6  to deal with ingredient costs and dispensing fees
7  together rather than as two quantities that are
8  independent of one another.
9        His fellow government expert, Dr.
10 Schondelmeyer, in a report on California took the
11 same opinion that if even the modest reduction in
12 ingredient costs that at the time were being
13 proposed in California, if those were undertaken
14 without an increase in dispensing fees, that
15 providers would begin to leave the California
16 Medicaid system.
17       The evidence is throughout the record
18 in my opinion and that any reasonable attempt to
19 characterize the world that would have existed in
20 the absence of Abbott's alleged wrongful actions
21 would have to take these into account, and he in
22 my opinion utterly fails to do so.

Page 168

1        In Medicare, as I state in my report,
2  his extrapolations are based on incomplete,
3  inaccurate data.
4        He's making assumptions about Medicaid,
5  excuse me, Medicare reimbursement arrays that
6  have no basis, he has no basis for making such
7  assumptions.
8        When he sees a price that happens to
9  match an AWP price of Abbott's, he assumes that
10 that's an Abbott price, even though given the
11 wild variation in Medicare arrays in terms of the
12 products that are included, the errors that are
13 there in terms of the products that are included
14 or the dosage sizes that are included, it seems
15 to me quite impossible to be certain that if
16 you're looking at a price of $10.16, that that's
17 definitely an Abbott price.  But he assumes that,
18 he assumes such to be the case in making his
19 extrapolation.
20       Then when he changes the Medicare
21 arrays to coincide with his vision of the but-for
22 world, he only changes the Abbott reported price

Page 169

1  from the Abbott AWP as contained in First
2  Databank to his calculation of an alternative
3  AWP, which is, again, if I recall correctly, a
4  hundred twenty-five percent of the contract price
5  to the retail sector.
6        He doesn't explain in his report why he
7  assumes that only the Abbott price would change.
8  He doesn't state what his assumption is about the
9  validity of those other prices.
10       If the Abbott AWPs are inflated and
11 wrongful and need to be changed, he doesn't state
12 what his assumption is about these other
13 companies' AWPs.  Are they wrongful?  Are they
14 inflated?  Should they be changed?  If not, why
15 not?  Does he accept them as being the true
16 average selling prices for those manufacturers?
17 He's completely silent on that.
18       But the most egregious thing in my
19 opinion the results that he concludes for
20 Medicare is that then he lowers the Abbott AWP,
21 that ends up lowering the median, which is the
22 basis for reimbursement in Medicare.

43 (Pages 166 to 169)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                    May 5, 2009
                        Chicago, IL

Page 170

1      Because he only moves the Abbott price,
2  he then attributes one hundred percent of the
3  damages that he calculates in that way, he
4  attributes to Abbott, which is in my mind
5  completely incorrect because he presents no
6  evidence that in any of these, for any of these
7  Medicare carriers, for any of these periods, did
8  Abbott in fact sell one hundred percent of the
9  products to the Medicare system at any particular
10 time.
11     So somehow Abbott is responsible for a
12 hundred percent of the damages, but there's no
13 evidence that they were in all of these, for all
14 of these carriers in all of these periods, that
15 they actually accounted for one hundred percent
16 of the sales.
17     He further ignores the fact that under
18 the Medicare system the alleged manipulation of
19 AWP, which the government in its complaint claims
20 Abbott manipulated its AWP in order to increase
21 its sales, Dr. Duggan ignores the fact that under
22 the Medicare system it would be impossible for

Page 171

1  Abbott or anybody else to manipulate their AWP in
2  such a way as to move market share to themselves
3  because, number one, the concept of, since
4  there's no standard for how the arrays are
5  constructed, there's no rules that the government
6  put forward as to what drugs have to be in the
7  arrays, from which manufacturers, and how many
8  have to be in the arrays.  So the arrays are
9  constructed by the Medicare carriers in an ad hoc
10 and somewhat arbitrary fashion.
11     So, number one, there's no way for
12 Abbott or anybody else to know that if they were
13 to raise their AWP, that this would have any
14 particular effect one way or the other on any
15 particular array for any particular carrier for
16 the simple reason is that they have no way of
17 knowing whether their products are even in the
18 array, nor do they have any idea of what other
19 products are in the array.
20     So even if they have, and, again,
21 assuming that the accusations of the government
22 are true for purposes of my report, so even if

Page 172

1  Abbott wanted to manipulate the arrays, it's not
2  clear, well, not only is it not clear, it strikes
3  me as just simply being incorrect that they could
4  do that with such a degree of accuracy that it
5  would actually inure to their benefit.
6      Secondly, that even if they could
7  manipulate the arrays and wanted to manipulate
8  the arrays, they're not going to be able to --
9  let me back up.
10     Suppose that Abbott raises its AWP and
11 suppose that Abbott raising its AWP actually does
12 increase the median such that the government
13 payment under Medicare is in fact increased as a
14 result of that Abbott action, abbott can't gain
15 market share that way because the increased
16 reimbursement is not just paid to purchasers of
17 the Abbott product but it's paid to purchasers of
18 every other manufacturer's product within that
19 J-Code as well.
20     So that manipulation of AWP would give
21 purchasers no reason at all to buy the Abbott
22 product rather than anybody else's product

Page 173

1  because the median, ninety-five percent of the
2  median AWP, which is the reimbursement, would be
3  paid, the dollar amount they would receive in
4  reimbursement from the government would be
5  exactly the same no matter which manufacturer's
6  product was purchased. So there's no reason for
7  them to switch to the Abbott product.
8      So the idea that Abbott's manipulation,
9  A, led to damages, B, led to a hundred percent of
10 damages, just ignores the underlying mechanic of
11 how the Medicare reimbursement system operates.
12     And Dr. Duggan ignores all of that in
13 his characterization of the but-for world.  He
14 ignores all of that in his calculations.
15     In the Medicaid system, he bases his
16 damage estimates on claims data that is
17 incomplete.  He says that he calculates his
18 extrapolations based on ten states, but that's
19 not actually true.  It's really only nine states
20 because one of his ten, shall we say exemplar
21 states, is Indiana and he did not calculate
22 damages for the state of Indiana directly, but

                          44 (Pages 170 to 173)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                           May 5, 2009
                        Chicago, IL

Page 174

1  rather he said Illinois is just like Indiana.
2  And so he extrapolated damages from Illinois to
3  Indiana, and then included Indiana, a state which
4  had extrapolated damages itself, included that in
5  the set of states that he then uses to
6  extrapolate damages to the other thirty-eight
7  states.
8        This is needless because for many of
9  these other thirty-eight states it's my
10  understanding that data was available or should
11  have been available.
12       In his rebuttal report, he talks about
13  using claims data from other thirty-eight states
14  to respond to this criticism.  To which I say if
15  he's using it now to respond to the criticism,
16  why didn't he use it in the original report?
17  That was my criticism to begin with.
18       The other major criticism of his
19  Medicaid calculations are that, again, his
20  characterization of the but-for world in my view
21  is completely in error and ignores copious
22  amounts of evidence that the things that he says

Page 175

1  he is holding constant in fact would not stay
2  constant, that the dramatic reductions in
3  reimbursements that he proposes while holding
4  dispensing fees constant would, according to the
5  testimony and the reports that I read and that I
6  have relied upon, suggest that carriers would in
7  fact leave the Medicaid system.
8        And that would violate the legal
9  mandate in the Medicaid statutes that access for
10  Medicaid patients be available, access to
11  services, be available on the same, roughly the
12  same basis, as the access that's available to
13  nonMedicaid clients.
14       And if substantial numbers of the
15  pharmacies, the home infusion pharmacies, that
16  are at issue in this case, were to withdraw from
17  the market, that Medicaid access would be
18  compromised.
19       He doesn't take this factor into
20  account.  He ignores evidence in the record that
21  says that the states and the federal government
22  took the access mandate extremely seriously and

Page 176

1  in several states proposals to reduce ingredient
2  costs, and these are proposals that were much
3  more modest than those proposed by Dr. Duggan,
4  that these proposals were either modified or
5  abandoned because of fears that had been raised
6  by the providers that the access to services by
7  Medicaid providers would in fact be compromised
8  by reductions in ingredient costs that are much
9  less Draconian than those proposed by Dr. Duggan.
10       I'll say I'm done there.
11  Q.  All right.  So one key opinion that I
12  think addresses or applies to the Medicare and
13  Medicaid program is that Dr. Duggan's report did
14  not apply an accurate or realistic but-for world?
15  A.  That is my opinion that his but-for
16  world is at odds with events as they have
17  transpired and also at odds with the evidence in
18  the record in the case.
19  Q.  Explain to me why it is that is a
20  necessary prerequisite to his damages model.
21  A.  Well, if you don't have an accurate
22  but-for world, you're not going to have accurate

Page 177

1  damages.
2        So if, well, let's see, another
3  possible but-for world is that if -- let me
4  strike that and start over.  That wasn't going to
5  be a good analogy, so I'm going to try again.
6        The idea is that in calculating
7  damages, one has to put forth a vision of the
8  but-for world that is as close as possible to
9  what actually would happen had the events not
10  taken place.
11       So that in spite of what he says in his
12  rebuttal report about indirect effects,
13  unfortunately prices change.  For economists,
14  prices are incentive systems.  So when prices
15  change, incentives change.  And when incentives
16  change, people's actions change.
17       And so these actions can lead to
18  calculations that are higher or lower than
19  calculations that don't take into account these
20  changes and incentives.
21       But just to assume rather than to test
22  against the evidence the idea that nobody will

45 (Pages 174 to 177)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                          May 5, 2009
                          Chicago, IL

Page 178

1   raise dispensing fees, to assume rather than to
2   test against the available evidence in the case
3   that no providers would exit the program, seem to
4   me to fall short of that standard.
5          The standard that you need to take into
6   account the effects, not just the first order
7   effects but you also need to take into account
8   reasonably expected, you need to take into
9   account reasonably expected consequential effects
10  because those can have significant effects on the
11  expenditures and on the damages that is the
12  object of your study.
13     Q.   Now, you mentioned several different
14  issues related to the need for a realistic
15  but-for world.
16         One of them was the evidence from the
17  state and federal officials.  I guess you're
18  referring both to testimony and to government
19  reports; is that right?
20     A.   Yes.
21     Q.   Now, am I right though that that's a
22  factual support for your opinion about the

Page 179

1   realistic but-for world but that that part of it
2   is not actually an opinion in and of itself;
3   right?
4          MR. BERLIN:  Objection, form.
5          THE WITNESS:  I have to admit I don't
6   understand your question.
7   BY MR. LAVINE:
8      Q.   Is part of your expert opinion that
9   there's lots of evidence that state and federal
10  officials were aware of the discounts from AWP?
11         MR. BERLIN:  Objection, form.
12         THE WITNESS:  As I say in my report,
13  the reports and the testimony are there that the
14  government, there was lots of information
15  available to the government officials.
16         I cite deposition testimony in my
17  report where certain government officials do say
18  that yes, they were aware of differences between
19  AWP and average, or actual selling prices,
20  average selling price, whatever you want to call
21  it.  But I don't render any opinion about a
22  general state of government knowledge because I

Page 180

1   don't have any basis for that.
2   BY MR. LAVINE:
3      Q.   That's what I'm trying to clarify.
4          The opinion is that you need a
5   realistic but-for world and that Professor Duggan
6   did not utilize a realistic but-for world
7   because, one of the reasons is, if you look at
8   the facts related to the knowledge by the state
9   and federal officials, that would support your
10  opinion in that regard?
11     A.   The evidence from the state and federal
12  officials and the evidence from the federal
13  reports all speaks to the fact that when you go
14  to, the reports from Myers & Stauffer, the
15  reports from OIG, the testimony of state and
16  federal officials, speak to the notion that if
17  you lower ingredient cost, other things will
18  happen. And Dr. Duggan lowers ingredient cost but
19  he does not, he expressly assumes away the
20  possibility that anything else will happen.
21         And in my opinion that flies in the
22  face of the evidence in this case from state and

Page 181

1   federal officials who know what's likely to
2   happen in the Medicaid system better than I do
3   and better than Dr. Duggan does.
4      Q.   Then the next item of support for the
5   concept that Dr. Duggan's not based his report on
6   a realistic but-for world was that we have
7   existing but-for worlds in the sense that you're
8   able to look at the existing statutes in both the
9   state and federal systems, and what we see there
10  is not like what Dr. Duggan did.
11     A.   Well, that's correct.
12         I mean going back to the first one, the
13  basic idea is that state and federal officials
14  stated the opinion or this was contained in
15  reports that if you change ingredient cost, other
16  things will happen.
17         So that a, if you will, holistic
18  approach was going to be needed to curing
19  whatever problems were seen in the existing
20  reimbursement system.
21         Congress in 2003 and 2005 undertook
22  that balancing, the balancing of the desire for

46  (Pages 178 to 181)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                          May 5, 2009
                        Chicago, IL

---

Page 182

1  cost containment, balanced against the desire for
2  access, balanced against providers having to be
3  able to have a remunerative reimbursement in
4  order to stay in business.
5       And after Congress met and after
6  Congress deliberated and had its hearings and
7  heard from state officials and heard from
8  industry officials and heard from anybody I
9  presume who wanted to come and talk to the
10 Congress, they came to, they deliberated and came
11 to a new system that was, as far as I understand,
12 designed to address shortcomings and problems
13 that had existed in the existing systems.
14      And that in my mind was, what
15 Congress did, was responsive to what the state
16 and federal officials had been fearing.  That you
17 have to take these other consequences into
18 account when you're changing ingredient cost.
19      So in both cases, in the Medicare
20 reform and in Medicaid reform, I mean first of
21 all in Medicaid the reimbursements were not
22 lowered to anything, I'm sorry, the ingredient

---

Page 183

1  cost reimbursements were not lowered to anything
2  remotely resembling the levels that Dr. Duggan
3  proposed.
4       But even with those higher than Dr.
5  Duggan's ingredient cost reimbursements, Congress
6  still mandated that dispensing fees be looked at
7  and dispensing fees be adjusted based on surveys
8  of what the dispensing costs of pharmacies
9  actually was and in the interim had proposed
10 increase, until such studies were done, in the
11 interim had proposed increases in the current
12 dispensing fees.
13      Similarly, for Medicare they lowered
14 the, sorry, I guess I should say changed the
15 ingredient cost reimbursement to a hundred six
16 percent of average selling price I believe.
17 That's what's defined in the statute.  And then,
18 again, raised dispensing fees or directed changes
19 to dispensing fees to be made.  And interestingly
20 for the durable medical equipment category, one
21 of which at least at some point in this
22 litigation was involved, actually retained the

---

Page 184

1  old allegedly problem-laded scaled AWP system.
2       So I would have had a lot, I would have
3  given Dr. Duggan's report a lot more credibility
4  if he had said well, okay, if we change the
5  system which has caused such problems because of
6  the alleged wrongful behavior of the drug
7  companies, suppose that the Medicare
8  Modernization Act had been invoked in 1991 or
9  1994 or suppose that the Deficit Reduction Act
10 had been enacted earlier with those changes, so
11 then what would have the change in government
12 expenditures have been, that to me would have
13 been an adequate answer to my criticism that he
14 does not provide a realistic assessment of the
15 but-for world because he was using a but-for
16 world that was constructed by duly elected
17 government officials in light of the criticisms
18 and alleged problems with the current system.
19      Q.  All right.  So the reasons that Dr.
20 Duggan's but-for world was unrealistic are that
21 he ignores the evidence relating to the knowledge
22 of the state and federal officials and if we look

---

Page 185

1  to the systems of reimbursement that were
2  actually implemented at the current time, both of
3  those would provide factual support for the
4  initial proposition that Dr. Duggan's but-for
5  world was unrealistic?
6       MR. BERLIN:  Objection, form.
7       THE WITNESS:  I think you
8  mischaracterized what I said a little bit in the
9  beginning because I think you spoke to the
10 evidence about the knowledge of government
11 officials.  And that's not really what I was
12 getting at.
13      I had the testimony of what government
14 officials believed would happen, the
15 consequences, the other consequences that would
16 happen if you tried to reduce ingredient cost.
17      I spoke only to the information that
18 was available to government officials.  But I
19 have not and am not now trying to characterize
20 their state of knowledge.
21 BY MR. LAVINE:
22      Q.  I'm not sure I understand the

---

47 (Pages 182 to 185)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                              May 5, 2009
                        Chicago, IL

---

Page 186

1  difference here.
2      A.  I don't know that --
3      MR. BERLIN:  Wait, wait.  He hasn't
4  asked a question yet.
5  BY MR. LAVINE:
6      Q.  You're not trying to characterize their
7  knowledge, but you are saying that their
8  knowledge demonstrates that Dr. Duggan's but-for
9  world is unrealistic?
10     A.  Let's break it down.
11         Ultimately why I'm saying Dr. Duggan's
12  but-for world is unrealistic is because the
13  government officials at the state and federal
14  levels testified to attempts that they had made
15  to lower ingredient cost, which later proved to
16  be unsuccessful because the providers would not
17  accept it and the whole political process that
18  surrounds it.  So those are, that's an
19  unrealistic but-for world because of the direct
20  statements of the government officials.
21         He doesn't take into account the
22  opinions and the information that was available

Page 187

1  to government officials from reports and other,
2  well, reports primarily, that talked about the
3  divergence between AWP and average selling price
4  and the like.
5         What I am not, the difference that
6  you're looking for with your question is that
7  there's a difference between characterizing, as I
8  do, there was a lot of information available to
9  government officials because, as I say in my
10  report, there were government reports from
11  government agencies and from government
12  contractors going back forty years that spoke to
13  differences in AWP and average selling price and
14  spoke to the reliability or the lack of
15  reliability of AWP as a basis for reimbursement.
16         But what of that, any particular
17  government official or the government in general
18  actually knew, I cannot characterize.  I don't
19  know what they actually knew.
20         I do know what reports were produced
21  and what information was available to them, and
22  that's what's underlying my opinion.

Page 188

1      Q.  So am I describing it properly with
2  respect to the information, the information
3  available to the state and federal officials is
4  the support you're looking to justify the
5  conclusion that Dr. Duggan's report has an
6  unrealistic but-for world?
7      A.  There is tons of evidence in these
8  reports that talk about what happens if you try
9  to reduce ingredient costs.  There's tons of
10  testimony about consequences resulting from
11  attempts to try to reduce ingredient costs and
12  make other changes to the program.
13         And that speaks to when you try to
14  reduce ingredient costs what's going to happen.
15  And it's the government officials who are doing
16  the speaking, not me.  I'm just relying on their
17  statements because they know more about this than
18  I do.
19         But it is my opinion that Dr. Duggan
20  intentionally and specifically ignores all of
21  this because he says I'm going to lower
22  ingredient costs by ninety percent in some states

Page 189

1  and yet I'm going to say that nothing else in the
2  Medicaid system is going to change.  I find that
3  an unrealistic characterization of the but-for
4  world.
5      Q.  So the information you're looking to
6  with respect to the state and federal officials
7  is the idea that they recognize a or discuss a
8  potential access problem, if ingredient cost is
9  lowered without a corresponding increase in the
10  dispensing fee?
11     A.  In various and sundry ways, yes.  Some
12  of the state and federal officials do discuss
13  potential problems with access if ingredient
14  costs are lowered and dispensing fees are not
15  changed.
16     Q.  But is there something additional with
17  respect to the information that you've relied
18  upon in connection with the state and federal
19  officials that also supports the proposition that
20  Dr. Duggan's but-for world is unrealistic?
21     A.  Well, the idea -- no.  I'll just leave
22  it at that.

48 (Pages 186 to 189)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                    May 5, 2009
                        Chicago, IL

Page 190

1    Q.  The information available or the
2  information you've read regarding the state and
3  federal officials supports the idea that there
4  would be access problems if the ingredient costs
5  went down without the dispensing fee going up,
6  and the failure to account for that in Dr.
7  Duggan's methodology makes for his but-for world
8  unrealistic?
9    A.  There's all sorts of reports and all
10  sorts of testimony out there that says we tried
11  to do this, we tried to lower ingredient cost, we
12  would like to lower ingredient cost, we are aware
13  that ingredient cost can be lowered from their
14  current levels because we are currently
15  reimbursing above the average acquisition cost,
16  and for any number of reasons at the federal
17  level and for any number of reasons at the state
18  level the changes either didn't take place or
19  were relatively minor because of political and
20  other considerations.
21       And Dr. Duggan takes none of this into
22  account, and therefore, his proposal that you can

Page 191

1  reduce reimbursements by ninety percent and have
2  nothing change is at odds with the testimony of
3  state and federal officials.
4    Q.  One of the examples supporting this
5  then are the Myers & Stauffer reports that you
6  mentioned?
7    A.  Yes, that's one.
8    Q.  And the idea that the total
9  reimbursement between the dispensing fee and the
10  ingredient cost together needs to be considered.
11  That's a piece of the same analysis?
12    A.  Well, the reimbursement has to be
13  remunerative to the provider so that the provider
14  can afford to stay in business, the provider can
15  afford to continue to treat Medicaid patients.
16       How much of that reimbursement is
17  ingredient cost and how much, the thrust of the
18  Myers & Stauffer and other reports is how much of
19  that is ingredient cost and how much of that is
20  dispensing fee is irrelevant.
21       What really matters is that the total
22  reimbursement be such that these companies can

Page 192

1  not just stay in business but remain willing to
2  provide services to Medicaid patients.
3    Q.  All right.  So in connection with the
4  criticism of Dr. Duggan's report regarding his
5  unrealistic but-for world, you've talked about
6  the information in the hands of state and federal
7  officials, the reimbursement methodologies
8  currently in place, the idea that the total
9  compensation between both ingredient cost and
10  dispensing fee is the proper consideration, not
11  one in isolation, the M&S reports are further
12  support for the information in the hands of state
13  and federal officials.
14       Is there anything else that provides
15  further support for the unrealistic but-for world
16  relied upon by Dr. Duggan?
17    A.  I don't remember at this point.  I just
18  went through it all.  That sounds complete.
19       I mean look at it this way: Without
20  taking into account any of the testimony, without
21  taking into account any of the reports that the
22  government provided, without taking into account

Page 193

1  anything else, you just say I'm going to
2  calculate a hundred twenty-five percent of
3  average contract selling price and then I'm going
4  to take the difference between that hundred
5  twenty-five percent of average contract selling
6  price and the reimbursement that was actually
7  paid, and I'm going to call that damages, all
8  right.
9       What you've done is not a damages
10  report.  What you've done is subtraction.  And
11  that's my big objection to Dr. Duggan's ignoring
12  any attempt at a characterization of the but-for
13  world.
14       He's not got a damages report.  He has
15  a large scale addition and subtraction exercise.
16    Q.  The process of review that you engaged
17  in in looking at Dr. Duggan's report and then
18  reaching this opinion, what methodology is that
19  that you used to perform that analysis?
20       MR. BERLIN:  Objection, form.
21       THE WITNESS:  I'm not trying to be
22  smart here, but I read his report.

49 (Pages 190 to 193)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                        May 5, 2009
                        Chicago, IL

Page 194

1      I'm not sure what else you're looking
2  for.
3  BY MR. LAVINE:
4      Q.  Just whatever the methodology was that
5  you employed to analyze, to take and reach your
6  opinions regarding the unrealistic nature of Dr.
7  Duggan's but-for world.
8      A.  When you're engaged in this kind of
9  work, whether you are the person who is forming
10 the damage report or whether you're the person
11 who is commenting on the damage report, I think
12 what one, well, I don't know what one does, but
13 what certainly I would do is after reading Dr.
14 Duggan's report I would say to myself okay, now,
15 if I were doing this how would I do it.
16     And I think that's, when you talk
17 methodology, that's the methodology at issue
18 here, that I've engaged in damage calculations
19 similar to this in other matters, I have a lot of
20 experience and a lot of knowledge about the
21 Medicaid system, I gained a lot more information
22 and knowledge about what Medicaid state and

Page 195

1  federal officials thought about these matters
2  from the testimony and reports that were offered
3  here.
4      And when I was done, the conclusion was
5  I would not just assume that I'm going to take
6  reimbursements down to a hundred twenty-five
7  percent of the average contract selling price,
8  make that the substitute AWP, then subtract ten,
9  fifteen, seventeen percent from that, assume that
10 the providers can still remain in business,
11 assume that providers are still willing to
12 service Medicaid patients, that that certainly
13 wouldn't be the way that I would do it.
14     One would have to take into account,
15 and if I were doing this I would certainly take
16 into account, well, what is going to be, do some
17 sensitivity analysis.  What's going to happen if
18 access is compromised?
19     Well, one thing that might happen we
20 know from testimony if access might be
21 compromised is that maybe you can't lower
22 ingredient cost that far.

Page 196

1      I mean, as I say, to this date no state
2  or federal program has adopted reimbursements
3  anywhere near as low as Dr. Duggan's, even though
4  again we have forty years of information
5  available to government officials that AWP was
6  not average selling price. But yet nobody has
7  adopted --
8      MR. LAVINE:  Sorry.  I don't mean to
9  cut you off, but we are running low on the tape.
10     MR. BERLIN:  We need to take a break?
11     MR. LAVINE:  Yes.  We only had a piece
12 of the tape left.
13     THE WITNESS:  Oh, that's right.
14     THE VIDEOGRAPHER:  Going off the record
15 at 2:43 p.m.
16     (A recess was taken.)
17     THE VIDEOGRAPHER:  Beginning of
18 Videotape No. 4.  We're back on the record at
19 2:56 p.m.
20 BY MR. LAVINE:
21     Q.  The first opinion you mentioned with
22 respect to Dr. Duggan's report is that you said

Page 197

1  it was not a damage calculation.
2      Why does that matter to your opinion?
3      A.  Because there's, no pun intended, a
4  difference between a damage calculation and a
5  difference calculation.
6      A damage calculation, I believe I, one
7  of the items that I produced that was contained
8  in a footnote to my report was a paper by
9  Professor Blair on speculative, in his case
10 antitrust damages.
11     But it speaks to the standards that I
12 understand exist when one's doing a damage
13 report, and that is that a but-for world has got
14 to not just take into account a difference in the
15 price that may have occurred because any alleged
16 wrongful action but also the changes in the
17 behavior of the actors and any other reasonably
18 ascertainable consequences of changing the price
19 from the, if you will, illegal price to the legal
20 price.
21     And that is what I see as, again,
22 sorry, the difference between what Dr. Duggan has

                    50 (Pages 194 to 197)

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Page 198

1 done in a difference calculation and actually a
2 damage calculation.
3    Q.  But do you see that the name, the word
4 he used as meaningful, as opposed to the
5 underlying flaws you've identified in his
6 methodology?
7       MR. BERLIN:  Objection, form.
8       THE WITNESS:  Certainly he seemed to
9 view it as being important because in my
10 recollection of his deposition testimony on his
11 report, he resisted for some time having his
12 calculation characterized as a damage report, and
13 as I recall in that exchange discussed his
14 deposition in I believe it was the Texas matter
15 where on a couple of occasions he corrected the
16 questioner, asked the questioner, to change the
17 characterization from "damage" to "difference"
18 because it seemed to matter to him.
19       But I understand that, and I guess I
20 concur with that, to the extent that if you
21 simply change the price and nothing else, then
22 you've subtracted one price from the other, and

Page 199

1 it is indeed an, it's a difference because the
2 result of any subtraction is of course a
3 difference, that that's all that you've done.
4 That that doesn't rise to the level of a damage
5 report unless you can provide affirmative
6 evidence that indeed nothing else would likely
7 happen as a result of this change in price.
8       And that gives rise to the criticism
9 that we went through in the previous session in
10 some detail, that we have a voluminous record of
11 state and federal officials in government reports
12 and government-commissioned reports that speak to
13 the consequences that are likely to occur for
14 states that try to lower Medicaid ingredient cost
15 reimbursements.
16 BY MR. LAVINE:
17    Q.  But if he had created a damages
18 methodology that accounted for all of the issues
19 and criticisms that you level at it but still
20 called it a difference, that wouldn't invalidate
21 it in and of itself; would it?
22    A.  I don't know.  I'd have to see exactly

Page 200

1 what, you know, what he had done.
2       For example, if his methodology had
3 been here's what Medicaid paid historically
4 versus here's what Medicaid would have paid had
5 the DRA been implemented in 1992, because that
6 would take into account, by adopting the DRA
7 procedure, if you will, by adopting the DRA
8 procedure he would be taking into account
9 the fact that Congress considered and formed a
10 new mechanic that was better able to assure cost
11 containment and access than the one in existence,
12 then I probably wouldn't, if you wanted to call
13 it a difference calculation, I don't know that I
14 would object to it to the same extent.
15       But it would depend on how he
16 characterizes it too.  If he says it's a damage
17 calculation, then we can talk about that, you
18 know.
19       But absent such another report, I am
20 kind of hesitant to say yeah, that would be fine
21 or that wouldn't.
22    Q.  So even if he had calculated a figure

Page 201

1 that would be identical to a damages figure you
2 would come up with, because he might call it a
3 difference you would say that invalidates his
4 methodology?
5       MR. BERLIN:  Objection, form.
6       THE WITNESS:  I'm not taking issue
7 really with his word "difference."  He's free to
8 call his calculations anything that he would
9 like.
10       But what he has done, changing the
11 price, subtracting actual reimbursement from his
12 but-for reimbursement, assuming nothing else
13 changes, does not in my mind constitute a valid
14 damages methodology.
15       If he wants to call it -- put it this
16 way:  I would have exactly the, if he had not
17 used the word "difference" but had he used the
18 word "damage" in his original report that we're
19 discussing today, I would have the same
20 objections to his methodology that we've just
21 been discussing over the past hour or so.
22 BY MR. LAVINE:

51 (Pages 198 to 201)

Hughes, James W. - Vol. I                          May 5, 2009
                        Chicago, IL

1     Q.   So are we agreeing it's the flaws in
2  the underlying methodology that you take issue
3  with and not the use of the word "difference" to
4  describe the result of that methodology?
5     A.   Well, I take significance from the
6  notion that Dr. Duggan himself seems to be very
7  purposeful about the word "difference," that he's
8  not, from his testimony, he does not seem to me
9  to be indifferent between the use of the word
10  "difference" and the word "damages."  So I do
11  take meaning from that.
12       But at the same time, as I just said,
13  he's free to call it a cocker spaniel if that's
14  the word that he chooses to use.
15       So I don't have the objection to the
16  word as much as I do have, I don't have the
17  objection to the word, I do have the objection to
18  the methodology that he has in fact implemented.
19       But I do find it remarkable this
20  seems to carefully in each of his reports, this
21  report and the rebuttal report, he seems to be
22  very careful to use the word "difference" and to

1  resist using the word "damage."
2     Q.   Now, with respect to the Medicare
3  program, the opinions you described earlier
4  regarding Dr. Duggan's reports, the first one is
5  that the extrapolations are based upon incomplete
6  data.
7     A.   Yes.
8     Q.   And in that respect are you talking
9  about incomplete array data?
10     A.   There is incomplete array data.  And,
11  if memory serves, there's incomplete claims data
12  as well.
13     Q.   And the question regarding the
14  incomplete array data relates to the premise that
15  the arrays upon which he based his calculations
16  only related to certain carriers for certain time
17  periods?
18     A.   He takes those as being a
19  representative sample from which one can safely
20  extrapolate.  And it's my opinion he has no basis
21  for making that assumption, yes.
22     Q.   And the extrapolation is the result of

1  the fact that the arrays are from limited
2  carriers during limited time periods?
3     A.   Correct.
4       I mean we know from the arrays that he
5  produces that at any particular point in time
6  arrays used by two different carriers are going
7  to be different.
8       But, nevertheless, he'll take those
9  arrays at that period of time and he'll
10  extrapolate to other carriers in that time period
11  where he doesn't have arrays.
12       So we know that there's not a standard
13  methodology, and it's clear from the arrays that
14  he did produce, that there can be great
15  differences in how these arrays are constructed.
16       But he simply goes ahead and
17  extrapolates to these other carriers in that time
18  period for which he doesn't have arrays.  And, to
19  me, that is quite baseless because we have no
20  idea for some of these carriers how they
21  constructed any of their arrays.
22       But he's assuming, in the face of the

1  evidence that's contained in the arrays that he
2  has, he's assuming that all the other carriers
3  construct their arrays in exactly the same way.
4  And I don't think there's any foundation for
5  that.
6     Q.   And your opinion though is that if he
7  can't show that the other carriers constructed
8  their arrays in exactly the same way, that he
9  doesn't have a proper basis upon which to
10  extrapolate?
11     A.   Well, I mean if he had all of the
12  arrays and took a statistically justifiable
13  random sample from that and extrapolated to it,
14  well, I'd still have a criticism why are you
15  sampling when you've got the dataset.
16       But, still, if there was any reason to
17  believe that the arrays that he has in his
18  possession are in any way representative in a
19  statistical sense, then I wouldn't have as much
20  of an issue.
21       But because we know that the carriers
22  construct arrays different ways, then to assume

Henderson Legal Services, Inc.
202-220-4158              www.hendersonlegalservices.com

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                    May 5, 2009
                    Chicago, IL

Page 206

1   that the ones I don't have are just like the ones
2   I do have, it's an assumption without a basis.
3       Q.   But are you saying that he needs to
4   show, what he should have shown was that the
5   arrays for the carriers that he does not have had
6   to have been exactly the same as the arrays that
7   he does have?
8       A.   Well, he doesn't even know for the
9   arrays that he doesn't have that Abbott drugs
10  were even in them.
11      Q.   But are you saying that he needs to
12  show that the arrays he doesn't have would be
13  exactly the same as the arrays that he does have?
14          MR. BERLIN:  Objection, form.
15          THE WITNESS:  I'm not saying anything
16  about exactness.
17          I'm saying he's extrapolating on a
18  nonrandom sample.  And by so doing, he's making
19  yet another unstated assumption, because he never
20  lays out his assumptions in his report, he's
21  making another unstated assumption that since I'm
22  extrapolating from Group X to Group Y, I'm

Page 207

1   assuming that Group Y must be like Group X.
2           What I'm saying is he has no basis for
3   that assumption.
4   BY MR. LAVINE:
5       Q.   So he doesn't need to show that the
6   arrays, the missing arrays, are exactly the same
7   as the arrays that he has?
8       A.   Well, you keep coming back to the word
9   "exact," and that's not what my criticism is.
10          What my criticism is is he has an
11  assumption that has no basis in the record.
12      Q.   So I think you're saying that you're
13  not, you're not saying they have to be exactly
14  the same?
15      A.   Whether they're exactly the same, kind
16  of the same, a little bit the same, a lot the
17  same, he's assuming that they are exactly the
18  same and he provides absolutely no basis at all.
19          Let me give you an example.  If CMS or
20  its predecessor had ever promulgated regulations
21  for the carriers that said here's how you do your
22  arrays, everybody has to do arrays this way, you

Page 208

1   need "X" number of products, this many NDCs, you
2   have to do it this way, the median if you've got
3   an even number, it's calculated this way, all of
4   those different things, and that the arrays that
5   he had in his possession demonstrate pretty
6   clearly that at least most of the time, if not
7   all of the time, that the people constructing
8   those arrays had conformed with those Medicare
9   regulations.
10          Then if he had extrapolated to that,
11  then the assumption would be well, these guys,
12  I'm sorry, these carriers, conformed with the
13  Medicare regulations and constructed their arrays
14  in a certain way; therefore, I'm going to assume
15  that the other carriers for whom I don't have the
16  arrays would also have constructed arrays that
17  conformed with the Medicare regulations, then I
18  wouldn't have this kind of objection because then
19  he had a basis, then he would have had a basis
20  that there are regulations that are being
21  followed by one group and I have no reason to
22  believe that the other people that I don't have

Page 209

1   are also following those regulations.
2           But in the absence of any regulation,
3   in the absence of any custom that I'm aware of,
4   certainly Dr. Duggan does nothing to make me
5   aware of any, in the absence of arrays for any
6   particular period of time across any particular
7   number of carriers, in the absence of any arrays
8   that are terribly similar in terms of what they
9   include, what they exclude, what sizes of
10  packages they include or anything, given the
11  great variation in the arrays that he does have,
12  I need more than well, I'm just going to assume
13  they're all the same before I'm going to give
14  credence to those extrapolations because it's
15  clear he doesn't know because he's not providing
16  any basis for the assumption that he's making.
17      Q.   Earlier you said that Professor Duggan
18  can't be certain that it was definitely the
19  Abbott price that was used in any situation where
20  he does not have an array.
21          Is it your opinion that he has to be
22  certain that an Abbott price definitely was used

Henderson Legal Services, Inc.

Hughes, James W. - Vol. I                          May 5, 2009
                        Chicago, IL

Page 210

1  in the situations where he doesn't have an array?
2        MR. BERLIN: Objection, form.
3        THE WITNESS: My goodness, if he's
4  going to attribute a hundred percent of the
5  damages to Abbott, then I would say yes, I think
6  you do have to have some evidence that there is
7  indeed an Abbott product in the array that you're
8  about to done him for a hundred percent of
9  damages for.
10  BY MR. LAVINE:
11    Q. But that's the appropriate standard,
12  certainty that the Abbott price was definitely in
13  the array.
14        MR. BERLIN: Objection, form.
15        THE WITNESS: Just clarify for me,
16  standard for what?
17  BY MR. LAVINE:
18    Q. Before he could satisfy your objection
19  to the methodology he employed.
20    A. Well, you know, I don't know what he
21  did, if anything, to check, okay.
22        So there's an Abbott price, $10.16

Page 211

1  sticks in my head from an example in his report.
2  So he goes through the other payment data, and if
3  he sees a carrier paying $10.16, then he assumes
4  that this was an Abbott price.
5        In his report, to my recollection, he
6  says well, this is just what I'm doing. And in
7  his rebuttal report in a footnote he says well, I
8  checked to see that there weren't others. But
9  what did he check?
10        So if it's a bag of point, whatever the
11  strength is, .045 percent saline bag, one liter,
12  twenty-four packages, twenty-four bags in a case,
13  did he check that against just those others or
14  taking into account the fact that these arrays
15  contain mistakes and that there's sometimes
16  products in them that shouldn't be in that
17  J-Code, products in there that are the wrong
18  dosage size, packages in there that are the wrong
19  package size?
20        What did he check it against? Did he
21  check it against all the other things that might
22  have mistakenly gotten into the arrays so that to

Page 212

1  guarantee that there's nothing else that could
2  make it into one of these arrays that had a price
3  of $10.16.
4        Again, it's a matter of providing
5  basis. And in his report he just says I looked
6  for an Abbott price and if I found one I took it.
7  That's what he says, and that's the extent of it.
8        That's no basis. Now, in his rebuttal
9  report he's saying that he's checked. Okay, fine,
10  but what did you check? Because we know that
11  there's variation and mistakes in these arrays.
12  So did you check it, do you know that this is the
13  price that Abbott gave for that product in that
14  J-Code, or is this something that got in there
15  extraneously?
16        He doesn't know. And, again, it's just
17  a matter of when you're making an assumption,
18  give me a basis for it. But when you're just
19  making an assumption that has significant
20  consequences because he's attributing a hundred
21  percent of the damages to a company that didn't
22  sell a hundred percent of the product, then give

Page 213

1  me a basis.
2    Q. So you are saying that before he could
3  extrapolate to carriers where he doesn't have an
4  array, he would need to be certain that an Abbott
5  price was definitely in the array?
6        MR. BERLIN: Objection, form.
7        THE WITNESS: Well, again, you like to
8  use certainty and exact and all of those specific
9  words.
10        I'm saying he has to provide, if he's
11  making an assumption, and assumptions can
12  sometimes hold and assumptions can not sometimes
13  hold, but when you're making an assumption I want
14  a basis from the record, from the evidence, from
15  his experience, from something, that says the
16  assumption that I'm making is reasonable.
17        Does he have to be absolutely certain?
18  No, not if he's providing a basis for me some
19  other way. But he's not.
20        So, again, I'm disagreeing with you.
21  I'm not saying he has to be certain, but give me
22  the basis for the assumption that you're making.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                         May 5, 2009
                    Chicago, IL

---

Page 214

1  And if you give me no basis for the assumption
2  that you're making, then I have no particular
3  reason to accept it.
4      Q.  So as long as Professor Duggan was
5  being reasonable in the basis for his conclusion
6  that the Abbott prices were used in the array,
7  that would be acceptable to you?
8      A.  Well, number one, if he provided any
9  basis and if I agreed with him that that basis
10 were reasonable, then I could perhaps, then in
11 that case I could probably live with his
12 extrapolations.
13      But I'd have to see the basis and we'd
14 have to have a discussion about whether it was in
15 fact reasonable.
16     Q.  Do you have any competing opinion as to
17 how the allowed price in these other carriers
18 would end up being equal to the price of the
19 Abbott product if an Abbott product were not
20 actually in the array?
21     A.  To go back to my example, somebody else
22 has a product that made it into the array that

Page 215

1  had a price of $10.16.
2      Q.  Did you look to see if any other
3  competing product had such a price at any time?
4      A.  I'm sorry.  It doesn't seem to me to be
5  my, I don't believe it's my burden to correct his
6  mistakes.
7      You know, it's not my burden to prove
8  that he is right or that he is, you know, it's
9  not my burden to prove it's right.
10      It's his burden to provide a basis for
11 the assumptions that he's making.  And, again, my
12 objection is he provided no basis for this
13 assumption.
14     Q.  Your understanding is he hasn't
15 explained anything whatsoever as to the basis for
16 his conclusion in that regard?
17     A.  In the original report, no.
18     Q.  And in the rebuttal report?
19     A.  Well, in the rebuttal report he says
20 that he checked to see if there were other
21 products that had an AWP, and, again, to use that
22 example $10.16.

Page 216

1      But, again, given the erroneous
2  products that find their ways into this array, it
3  would be necessary to -- I'm sorry.  I just lost
4  my train of thought.
5      THE WITNESS:  I'm sorry.  Could you
6  read back my answer to me.
7      (The record was read back as
8      requested.)
9      THE WITNESS:  When he says he checks,
10 he still doesn't say he checked what.
11      So was he just checking the specific
12 AWPs or whatever price he's actually using there,
13 was he checking the specific prices of the other
14 manufacturers' products that are identical to the
15 Abbott product with a $10.16 price, or was he
16 checking other products that may have otherwise
17 found their way erroneously into these arrays,
18 which we know they often do, to see if any of
19 them had prices of $10.16.
20      And I don't know what it was that he
21 was checking or how extensive the checking was.
22 But he does, in his rebuttal report, does say

Page 217

1  that he checked, which was more than he said in
2  the original report, to my recollection.
3  BY MR. LAVINE:
4      Q.  But you never actually went to check
5  either.  So you're not really saying that
6  Professor Duggan is wrong.  You're saying that he
7  hasn't demonstrated to your satisfaction that
8  he's right?
9      A.  Which I understand to be his burden.
10      But at the same time, I say he's made
11 an assumption for which he's provided no economic
12 basis, he's provided no evidentiary basis, he's
13 provided no basis in the testimony, he's provided
14 no basis in the reports.
15      You know, if he gave me a report, you
16 know, if he pointed me to an OIG report that said
17 well, OIG has investigated this and all carriers
18 construct their arrays in exactly the same way or
19 these guys construct it this way, these guys
20 construct it that way, these guys construct it
21 that way, and he uses that to reconstruct his
22 arrays, well, that's what I mean by a basis.

Henderson Legal Services, Inc.
202-220-4158                  www.hendersonlegalservices.com

Hughes, James W. - Vol. I                          May 5, 2009
                          Chicago, IL

---

Page 218

1        Rather than just saying I'm looking for
2    an Abbott price and if I find something that
3    happens to match an Abbott price, I'm going to
4    take it.  To me, that is an assumption without
5    basis, and there's no reason to accept it.
6        Q.   In preparing your report, you never
7    actually looked at any of the actual arrays
8    prepared by any carrier; did you?
9        A.   Yes.  I looked at the spreadsheet
10   arrays that Dr. Duggan provided in his
11   production.
12       Q.   Is it your understanding that that was
13   something prepared by the carrier or by Dr.
14   Duggan?
15       A.   Both.
16            There were two panels to it.  The top
17   panel was what I understood to be the original
18   array which had been constructed on Dr. Duggan's
19   behalf by Myers & Stauffer, to the best of my
20   understanding, using documentation that came from
21   the carrier.
22            The lower panel was what we could call

---

Page 219

1    Dr. Duggan's but-for array, that if the prices of
2    the Abbott product were reduced from the original
3    AWP to his but-for AWP, which is the average
4    contract selling price to the retail trade, that
5    it's my understanding that that lower panel was
6    constructed by Myers & Stauffer on his behalf.
7            For all I know, Dr. Duggan, I mean I
8    don't know who actually did it, but from what I
9    understand from the report, that those
10   spreadsheets were constructed by Myers &
11   Stauffer.
12       Q.   One clarification.  Professor Duggan's
13   report and analysis wasn't based upon the average
14   contract price, it was a hundred twenty-five
15   percent of that price; right?
16       A.   Thank you.  Yes.
17       Q.   And I think what you were saying is
18   you've relied upon the recreations of the
19   original arrays that were put together by either
20   Myers & Stauffer or Dr. Duggan but you never
21   actually looked at any of the original arrays
22   themselves?

---

Page 220

1        A.   Those were, to the best of my
2    knowledge, those were not made available to me.
3        Q.   And you didn't ask for them either.
4        A.   I would assume that Myers & Stauffer is
5    going to do an accurate job of recreating them.
6    They were produced by Dr. Duggan.
7            I was interested, quite honestly I'm
8    interested more in what he used as opposed to, if
9    Myers & Stauffer wasn't accurate, it's more Dr.
10   Duggan's problem than it is mine.
11       Q.   But you're not expressing any opinion
12   about the accuracy of the underlying array
13   information that was collected and utilized by
14   Myers & Stauffer in Dr. Duggan's report?
15       A.   No.  I mean I have no reason to think
16   that there was anything that was not truthfully
17   transcribed or whatever the process was that they
18   used.
19       Q.   All right.  So we talked about the
20   extrapolations being based upon incomplete data,
21   that there was no basis for his assumptions
22   regarding the use of the Abbott prices in

---

Page 221

1    circumstances where he doesn't have the arrays.
2        A.   Yes.
3        Q.   Earlier you also said one of the
4    problems for the Medicare damages was an
5    extrapolation of the claims data as well.
6            What is that issue?
7        A.   You know, I focused on the arrays.  I
8    would have to look in the report.  I'm not
9    remembering anything to do with the claims data.
10           It's my recollection that he didn't
11   always have the claims data, but I don't
12   remember.
13           But there were certainly numerous
14   claims that he threw out from the Medicare, from
15   his Medicare calculations, because of incomplete
16   data.  And I assume that must have been
17   incomplete claims data.
18       Q.   Are you saying he extrapolated --
19       A.   No.
20       Q.   -- the data that he threw out?
21       A.   No, no.  I'm correcting myself.
22           That when he had, as I recall, when he

---

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                    May 5, 2009
                        Chicago, IL

Page 222

1  had incomplete claims data -- if you don't have
2  claims data, what are you going to extrapolate
3  to? You don't even know how many claims there
4  are; right?
5       So it's my recollection that there was
6  substantial number of claims that he threw out
7  because of incomplete data.
8       Q.  But there was no extrapolations to any
9  circumstances to where the data was missing?
10      A.  Well, he did no extrapolation to where
11 he had thrown things out.  That's for sure, yes.
12      Q.  So the only issue relates to
13 extrapolating to circumstances where there was no
14 array directly supporting the data?
15      A.  That's my main objection, yes.
16      Q.  Was there an additional objection?
17      A.  Well, that is the main objection
18 regarding the extrapolations I guess is what I
19 mean.
20      Q.  Okay.  The next thing you mentioned was
21 that regarding changes to the Abbott price and
22 how that would change the array.

Page 223

1       A.  Yes.
2       Q.  So you're saying there that Dr. Duggan
3  hasn't demonstrated that Abbott's price affected
4  the median?
5       A.  No.
6            Clearly, the way that he constructed
7  his new arrays, the Abbott price in all of those
8  cases where he had the arrays, the Abbott price,
9  changing the Abbott price, certainly did affect
10 the median.
11           But the objection there is that of
12 course the reason that the Abbott price affected
13 the median was because, excuse me, the reason the
14 change in the Abbott price affected the median
15 was because the Abbott price was the only one
16 that Dr. Duggan changed.
17           So if the Abbott price had started out
18 above the median and then when he reduces it to
19 his a hundred twenty-five percent of average
20 contract selling price, it falls below the
21 median, then that change in the price will cause
22 the median to move.

Page 224

1            And, again, within the confines of what
2  he did, I don't have any objection that he
3  recalculated his but-for medians correctly.
4            But, conceptually, Dr. Duggan never
5  states what he's assuming about the other prices
6  in the array.  If the Abbott price is being
7  changed from the AWP to his but-for AWP, a
8  hundred twenty-five percent of the average
9  selling price, because of the government
10 allegation that the original AWP was fraudulent,
11 well, the other manufacturers' AWPs are, well,
12 put it this way, closer to the Abbott AWP than
13 they are to Dr. Duggan's but-for AWP.
14           So he doesn't change any of those
15 prices.  So what is he assuming about those
16 prices?  Is he assuming that those prices are a
17 hundred twenty-five percent of those
18 manufacturers average selling prices?  Is he
19 assuming that a change in the way that AWP is
20 reported would somehow apply only to Abbott?
21           So it didn't make any sense to me,
22 again, as a valid representation of the but-for

Page 225

1  world, that he would have this one price change
2  and nobody else's price would change.
3            If companies have to all report a
4  hundred twenty-five percent of average selling
5  price, well, then these other companies have to
6  report a hundred twenty-five percent of average
7  selling price.
8            And the median would still change, to
9  be sure.  But then the issue becomes it may not
10 be the change in the Abbott price that actually
11 causes the median to change.
12           For example, if Abbott was the highest
13 price in the array before, you change all the
14 prices to a hundred twenty-five percent of the
15 average contract selling price of all
16 manufacturers, you change the price of all
17 manufacturers, and when that's done the Abbott
18 price is still the highest, well, the median
19 moved but it wasn't the Abbott change in price
20 that moved the median.
21           So then who caused the alleged
22 overpayment?  Whose price was it?  And how do you

57 (Pages 222 to 225)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                                    May 5, 2009
                         Chicago, IL

---

Page 226

1  then go to attribute a hundred percent of the
2  damages to Abbott?
3        He never states his assumption about
4  whether these other prices are valid prices,
5  whether a change in regulation only applies to
6  Abbott or anything else.  He just moves this one
7  price and no others.
8        And I, again, I cannot imagine a
9  but-for world where that's going to happen.
10   Q.  So your position on this issue is that
11  Professor Duggan needed to have obtained the
12  underlying transaction prices on all of the
13  competitive products that went into the arrays
14  and performed a similar average price plus a
15  hundred twenty-five percent analysis and factored
16  all of those into the revised arrays?
17       MR. BERLIN:  Objection to form.
18       THE WITNESS:  Well, it certainly seems
19  that would be a more realistic way for the arrays
20  to have changed than to just say that one company
21  is required to change its reported price and
22  nobody else is required to do so.

---

Page 227

1        But you're right.  I would not have
2  this objection if he had done this, if he had
3  gotten all of the other selling data and had
4  calculated that.
5        But it would raise then issues of
6  causality that he has managed to avoid with the
7  methodology that he's chosen because if only the
8  Abbott price moves, only the Abbott price moves
9  the array, ergo the artificially inflated Abbott
10  price was the cause of the alleged government
11  overpayment; therefore, I'm going to attribute a
12  hundred percent of the damages to Abbott, even
13  though Abbott doesn't make a hundred percent of
14  the sales.
15       But if you move all of them, then the
16  question, it's not always, I would imagine, it's
17  not always going to be the Abbott change in price
18  that's actually going to be the one that causes
19  the median to move because Abbott started out
20  above the median or below the median and ended up
21  above the median or below the median.
22       So then the damages have to be

---

Page 228

1  attributed some other way to some other company.
2  And his ability to just sort of obligingly say
3  that it's all attributable to Abbott would no
4  longer be possible.
5        But to reform the array in that way
6  would seem to be a much more realistic
7  representation of a true but-for world.
8  BY MR. LAVINE:
9    Q.  The next point that I wrote down was
10  that you said Professor Duggan doesn't state his
11  assumptions about the other AWPs.  And I think
12  that's what you were just describing.
13     A.  Yes.  That's what I was just --
14     Q.  That he's silent about that.
15     A.  Yes.
16     Q.  Although you can tell from reading his
17  report that the other AWPs were not changed;
18  right?
19     A.  Well, you can certainly tell from his
20  report that they were not changed, but he doesn't
21  explain why they weren't changed.
22       If I may add.  In his rebuttal report,

---

Page 229

1  he does allude to the, he now allows the
2  possibility that the other companies' AWPs might
3  also have been artificially inflated and needed
4  to be changed.  And he talks about the
5  consequences for his difference calculation if
6  one were to change all of those prices.
7        Well, okay, finally he's saying that
8  okay, these may not be valid prices either, which
9  then brings me back to my criticism of his
10  original report is that well, if those other
11  prices weren't valid prices either why in your
12  original analysis did you not change those.
13     Q.  So is it your opinion that that's the
14  only way to have properly gone about assessing
15  damages caused by the arrays?
16     A.  The only way?  No.  I don't think I
17  would say that.
18       What I would say is that would be a way
19  of doing it that would strike me as a more
20  realistic but-for world.
21       For example, a but-for world where the
22  government says AWP shall be one hundred

---

58 (Pages 226 to 229)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                          May 5, 2009
                        Chicago, IL

Page 230

1  twenty-five percent of average contract selling
2  price, for example, that that would be a more
3  realistic but-for world than saying Abbott, you
4  alone have to report a hundred twenty-five
5  percent of average contract selling price, and
6  you other companies can continue to report
7  whatever it is that you traditionally report.
8         That doesn't strike me as a
9  particularly realistic but-for world.
10    Q.  In your next point, which you described
11  as the most egregious, was the idea that one
12  hundred percent of the damages attributed to
13  Abbott, even though there's been no showing that
14  Abbott represented one hundred percent of sales.
15    A.  Correct.
16         And as I think I've explained over the
17  last half hour or so, that this attribution of a
18  hundred percent of damages to Abbott is an
19  artifact of this other what I consider
20  unjustified assumption that only the Abbott price
21  would change because then it's the Abbott price
22  that causes a hundred percent of the damages.

Page 231

1         He would not be able to do that if he
2  had adjusted all of the prices and had to then
3  evaluate which company or companies' change in
4  prices had actually caused the change in the
5  median.
6         And whether he would attribute a
7  hundred percent of the damages to those companies
8  or whether he would do something else would with
9  it, I don't know.  That's certainly up to him.
10         But this objection would I think go
11  away if he had adjusted the arrays in a different
12  manner, along the lines of what I've been talking
13  about for the past half hour.
14    Q.  So he would have needed to have
15  performed a similar analysis regarding average
16  prices of the competitors, added the twenty-five
17  percent to it, and additionally factored in
18  perhaps the timing of when those prices came into
19  effect to account for which one caused the median
20  to move?
21         MR. BERLIN:  Objection, form.
22         THE WITNESS:  You know, I don't know if

Page 232

1  there's something in there about the timing
2  because the timing of the companies' price change
3  and the timing of the what is supposed to be
4  quarterly adjustments of the arrays, those don't
5  necessarily influence one another.
6         So, as I understand it, they used the
7  AWP in effect on the day they make the array. So
8  I don't know that the timing of changes of when,
9  if I'm taking, if I'm understanding you
10  correctly, so I probably should have asked you to
11  clarify the question, what you mean by the timing
12  is that as AWPs change over time as companies
13  raise prices, that kind of timing?  Or the timing
14  of a government regulation requiring different
15  reporting of AWP?
16  BY MR. LAVINE:
17    Q.  Let me just ask it this way.
18    A.  Okay.
19    Q.  You introduced the concept of once all
20  of the prices are adjusted, then you need to
21  identify which of the price is the one that
22  changed the median.

Page 233

1         How would you go about doing that?
2    A.  Well, I think you would have just the
3  same sort of matrices that Dr. Duggan used but
4  you'd have more columns to it.
5         So there would be, you'd look at the
6  median before and you'd look at the median after
7  and you would see which of the companies'
8  different reporting prices would result in a
9  different median price.
10         And if that's not Abbott, then the
11  conclusion would be that whatever Abbott was
12  allegedly doing with its AWP was not what caused
13  the alleged overpayment by the government.
14    Q.  But if there are three prices in the
15  original array, let's say $10.00, $10.50, and
16  $11.00, and the new array now has a price of
17  $1.00, $1.10, and $1.20, previously the median
18  would have been $10.50, now the median is going
19  to be $1.10, how do you decide who to attribute
20  that to?
21    A.  Well, that's his problem, not mine.
22         But you have a, I mean you're

59 (Pages 230 to 233)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                    May 5, 2009
                      Chicago, IL

Page 234

1  constructing the array in the same way in the
2  actual world and the but-for world, but rather
3  than saying who do you attribute to I could give
4  you an example of who you wouldn't attribute it
5  to.
6         So if Company X is the highest price in
7  the original array and they're the highest price
8  in the revised array, then their alleged
9  overstating of their AWP did not cause the array
10 to move because their price was not
11 determinative, did not determine the median,
12 right, they were above before and they were above
13 after.
14        But it could get complicated obviously
15 if somebody goes from being the highest price in
16 the original array to the lowest price.
17        But you've got to come up with a
18 method, you know, you might also apportion the
19 damages amongst the three.  I mean I don't know
20 because I haven't been asked to perform that
21 analysis, and I haven't performed that analysis.
22        But the fact remains that the example

Page 235

1  that you just gave is a much more realistic
2  but-for array than an array where Abbott's AWP
3  goes from $10.50 let's say to $1.10 and everybody
4  else's stays at $7, $8, $12, $14.
5      Q.  But you just said, I believe, that if a
6  company started with the highest price and then
7  after the new array was created they still had
8  the highest price, that in your opinion that
9  would have no impact on the median.
10     A.  With enough firms in the array, yes.
11     Q.  The example we were discussing related
12 to three different companies in the array.
13     A.  Right.
14        You know, I haven't done the analysis,
15 and I'm just thinking of this on the top of my
16 head, so I'm going to reserve the right not to be
17 held to this.  But if you have only three
18 companies, then the middle one's going to be the
19 median, the high one is going to be high, and the
20 low one is going to be low.
21        So if you were to take away the high
22 one, well then you're left with two, and so

Page 236

1  that's going to move the median if the high one
2  disappears.
3         But if you have let's say five or seven
4  companies in the array, you're the highest
5  before, you're the highest after, take that away,
6  not take it away, but you're the highest before,
7  you're the highest after, it's not moving that
8  median.  Your price was not determinative of the
9  median before and it's not determinative of the
10 median afterwards.
11     Q.  Can you give me a concrete example of
12 how it's possible for a price to be in an array
13 and not affect the median, other than a situation
14 where there's two prices that are identical?
15     A.  Well, I mean I think I talk about this
16 in the report, or if I don't I'll give you a
17 concrete example.
18        If Abbott had an AWP of $12 and was the
19 highest in the array and Abbott changes its AWP
20 to $15 and everybody else kept their price the
21 same, then Abbott's price change had no affect on
22 the array, excuse me, had no affect on the

Page 237

1  median.
2      Q.  The price change to go from highest to
3  remaining the highest --
4      A.  Yes.
5      Q.  -- would have no impact on the median?
6      A.  Correct.
7      Q.  What about the impact on the original
8  array where it was the highest to begin with?
9  Doesn't that not dictate what the median is?
10     A.  Say that again.
11     Q.  The starting point is an array where
12 the Abbott product is $12.
13     A.  Okay.
14     Q.  So that price will be arrayed, and
15 whatever ends up in the middle will be the median
16 price; right?
17     A.  Okay.
18     Q.  If Abbott's product was eliminated from
19 that array, the median would move to a different
20 point; wouldn't it?
21     A.  Yes.
22        MR. BERLIN:  Objection, form.

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                    May 5, 2009
Chicago, IL

---

Page 238

1    THE WITNESS: Right. But that's not
2  the, that is an example that we were discussing,
3  but that's not the example that is relevant here.
4    The example that's relevant here is
5  that if Abbott had the highest price with its
6  original AWPs and Dr. Duggan calculates but-for
7  AWPs for all three companies and Abbott remains
8  the highest of the three, the point being that,
9  okay, so let's say the new median goes from $10
10 to $2, whether Abbott's AWP is $12 or $4 doesn't
11 change the fact that the median went from $10 to
12 $2.
13    So if Abbott had kept its AWP at $12
14 and everybody else moved, that median still would
15 have dropped to $2, if I'm remembering my example
16 correctly.
17    That's what I'm getting at. It's that
18 the alleged over, the alleged unlawful or
19 whatever you want to call it reporting of AWP by
20 Abbott did not affect the median because it was
21 the highest before and it was the highest after.
22 And if it had stayed at $12, the median still

---

Page 239

1  would have fallen to $2 in my example, if you're
2  still with me.
3    Q. So can you give me an example of a
4  situation in which a price change would cause a
5  change in the median?
6    A. I'm sorry. A price change? What kind
7  of price change are we talking about?
8    Are we talking about Abbott changing
9  the price, or are we talking about Dr. Duggan
10 replacing one AWP with his but-for AWP? Which one
11 are we talking about?
12    Q. Just in a hypothetical situation.
13 Before you talked about the price going from $12
14 to $15, highest to highest would still not cause
15 a change in the median.
16    A. Oh, okay.
17    Q. What type of situation would cause a
18 change in the median?
19    A. Sure.
20    So if companies started out with an AWP
21 that was below the existing median and then they
22 raise their AWP to a price that was above the

---

Page 240

1  original median, then that would cause the median
2  to change.
3    Q. So in your example with the $12 as the
4  highest price and let's say the median was $10
5  and the lowest price was $8, if that person, the
6  $8 product, moved to anything over $10, that
7  would change the median?
8    A. Yes, I believe so, yes.
9    Q. Next you talked about how the
10 manipulation of AWP in the Medicare arena can't
11 be of benefit to a manufacturer.
12    A. Specifically that the manipulation of
13 AWP cannot move market share, cannot increase the
14 sales for a particular manufacturer, correct.
15    Q. Because the reimbursement would be the
16 same for all three manufacturers?
17    A. However many manufacturers there are,
18 yes.
19    Q. For as many manufacturers as exist,
20 they would all get the same reimbursement;
21 therefore, there would be no --
22    A. Right.

---

Page 241

1    So even if I manipulate my AWPs so as
2  to raise the reimbursement, that's not going to
3  give customers any incentive to buy my product
4  because even though the reimbursement went up,
5  the reimbursement went up for all manufacturers'
6  products. So there's no reason for them to
7  switch from some other company to my product.
8    Q. Right.
9    If there was a differential in the
10 reimbursement, one company was higher, that would
11 give an incentive. But that doesn't exist in the
12 Medicare J-Code reimbursement system?
13    A. Specifically not regarding the AWP, no.
14    Q. Next you mentioned that there's no
15 standards or rules regarding the creation of the
16 arrays.
17    A. Right.
18    As I understand it, there's no Medicare
19 regulation on, an array has got to be this many
20 NDCs, chosen this way in this reason.
21    It's ad hoc, at least in practice, and
22 that there's, while I understand Medicare may

---

61 (Pages 238 to 241)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                               May 5, 2009
                            Chicago, IL

| Page 242 | Page 244 |
|---|---|

**Page 242**

1  have like language about the intent of the
2  arrays, but there's not in the same way, for
3  example, the MMA, Medicare Modernization Act,
4  actually has a formula in the legislation that
5  says how AMP is going to be calculated.
6        There's nothing like that, to my
7  understanding, for how arrays are to be
8  constructed.
9     Q.   And that particular issue isn't a
10  direct criticism of the methodology employed by
11  Dr. Duggan.  That's a failing of the underlying
12  data itself?
13    A.   Well, it's a failing of the underlying
14  data itself, but it's a failing of the underlying
15  data that Dr. Duggan ignores, which he just kind
16  of blows by, and, again, assumes the entities
17  that I don't have arrays for are just like the
18  entities that I do have arrays for.
19        And, again, absent such standards,
20  absent such regulations on how these things are
21  to be constructed, I maintain that that
22  assumption has no basis.

**Page 243**

1     Q.   And it only would have been appropriate
2  to rely on the differing arrays if they were all
3  identical; right?
4     A.   No.
5        It would make sense to, again, rely on
6  the existing arrays if the arrays he had in his
7  possession were constructed, again, pursuant to
8  some regulation promulgated by CMS and you looked
9  at the existing arrays and said yeah, everybody
10  pretty much did this the way that they were
11  supposed to.
12        So, therefore, since the carriers I do
13  have constructed their arrays according to these
14  regulations more or less, I'm going to assume
15  that the companies I don't have also constructed
16  their arrays according to these regulations more
17  or less.  So that will allow me, by making that
18  assumption I can extrapolate from the arrays that
19  I do have to the arrays that I don't have.
20        But that's not the same, as I believe
21  you were saying, is that they all have to be
22  exactly the same.

**Page 244**

1        Again, it's just you need to have a
2  basis, and that basis, for the assumption, and
3  the basis needs to make sense.  And, as I
4  understand, he has no basis for the assumption,
5  sensible or otherwise.
6     Q.   So the arrays from the different
7  carriers in order to perform this analysis don't
8  need to be identical?
9     A.   There needs to be a basis for the
10  assumption that the arrays that I do have, excuse
11  me, the arrays that I don't have are like the
12  arrays that I do have, okay.
13        That basis could come in many forms
14  like evidence of how, you know, or, for example,
15  a custom, here's the arrays I do have, for
16  reasons completely unknown to me all of the
17  arrays for J-Code 5240 look basically exactly the
18  same.  They have the same number of drugs, they
19  have the same companies, they have the same AWPs,
20  there's no mistakes, everybody is kind of doing
21  this the same way, I don't really know why.  But
22  if I look across these, there's very little

**Page 245**

1  variation across the carriers in this period of
2  time for the arrays that they create for this
3  J-Code.
4        So given that these were all the same,
5  I'm going to make the assumption that these
6  others are all the same, all right.  So I'm going
7  to extrapolate from the average of the ones I do
8  have to the ones that I don't have.  That would
9  be a basis that we could kick around and decide
10  whether that was reasonable or not.
11        What I'm saying is we know they're not
12  all the same.  We don't know why they're not all
13  the same.  They're very ad hoc.  They're supposed
14  to be revised every quarter.  They're not revised
15  every quarter.  There's all sorts of reasons that
16  these things vary across time and across
17  carriers.
18        And Dr. Duggan makes absolutely no
19  attempt in my opinion to say here's why this
20  assumption is reasonable, here's the basis for
21  this assumption, and then Dr. Hughes and I can
22  kick around whether this basis is reasonable or

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                                May 5, 2009
                            Chicago, IL

Page 246

1  not.
2          But right now he has every reason to
3  believe exactly the opposite because the arrays I
4  have differ across time and they differ across
5  carriers.
6          So I have every reason to believe the
7  carriers that I don't have, their arrays will
8  differ across time and differ across carriers.
9          But speaking as Dr. Duggan, I'm going
10  to ignore that and just extrapolate from the ones
11  that I have to the ones that I don't have, and
12  I'm just going to ignore the fact that the ones
13  that I don't have may be wildly different from
14  the ones that I do have, much like the ones that
15  I do have being wildly different from one
16  another.
17          And, to me, that is an assumption
18  without a basis.  So his extrapolations are
19  therefore baseless.
20          He's just making an assumption and
21  extrapolating out, and we have no idea whether
22  these things are accurate, kind of accurate,

Page 247

1  wildly inaccurate.  We don't know one way or the
2  other.
3      Q.  But I want to understand what the
4  standard is that you applied.
5          You're not saying that before Professor
6  Duggan could utilize the arrays for an
7  extrapolation that they all need to be identical;
8  right?
9      A.  No.
10          I am saying, again, that he needs to
11  provide for me a basis in economics, in the data,
12  in his exhibits, in testimony, in documents from
13  somebody or another that there is a valid reason
14  for believing the arrays that I don't have are
15  basically like the ones that I do have.
16          That could, as I've explained over the
17  past half hour a couple of different ways, that
18  could come from, I mean I've given examples of
19  ways that that could happen, a basis that could
20  be provided that then we could debate whether Dr.
21  Duggan and I agree that that basis was
22  reasonable.

Page 248

1          But my objection is the arrays he has
2  aren't identical, they're not constructed in the
3  same way, they're not revised in the same way,
4  they differ across time, they differ across
5  space.
6          He has rather than any reason to
7  believe that the arrays that he doesn't have are
8  similar, in fact he has every reason to believe
9  from the evidence that he does have that the
10  arrays that he doesn't have are dissimilar, are
11  not the same.  And yet he just plows right ahead,
12  says I'm going to extrapolate based on the
13  average of the arrays that I do have, and I'm
14  just going to assume that these things are
15  basically the same.
16          That leaves us in the situation that
17  his extrapolations could be highly accurate.  It
18  leaves us with the situation that his
19  extrapolations could be wildly inaccurate.  And
20  the reason for that is he has provided us with no
21  reason to believe that the assumption that he is
22  making has any validity whatsoever.

Page 249

1          MR. BERLIN:  Mark, will this be a good
2  time to take a break, and then we'll work through
3  until 5:00 after that?
4          MR. LAVINE:  No.  Let's go for a little
5  bit longer.
6          How much time do we have left on the
7  tape?
8          THE VIDEOGRAPHER:  Twenty minutes.
9          MR. LAVINE:  Let's get a little bit
10  further and see if we can get through at least
11  the Medicare issues before we turn to the
12  Medicaid.
13          THE WITNESS:  I'm sorry.  Didn't we
14  already do Medicaid?
15          It's your deposition.  You ask me
16  whatever you want.  I'm sorry.
17          MR. LAVINE:  I think we covered some of
18  it, but there's some additional matters.
19          THE WITNESS:  Okay.  Go right ahead.
20  It's your deposition.  I should have shut up.
21          MR. LAVINE:  Can you read back the last
22  sentence or two of his previous answer.

                                    63 (Pages 246 to 249)

Hughes, James W. - Vol. I                    May 5, 2009
                        Chicago, IL

Page 250

1    (The record was read back as
2    requested.)
3  BY MR. LAVINE:
4    Q.  So am I right though that you have no
5  opinion regarding the level of precision that
6  would be necessary in order to extrapolate from
7  the existing arrays?
8        MR. BERLIN:  Objection, form.
9        THE WITNESS:  I don't think that's
10 accurate.
11       What I have said now several times is
12 that when one makes an assumption, the assumption
13 needs to be reasonable.
14       The standard for the reasonableness of
15 the assumption is can you point to some evidence,
16 any kind of evidence, that says that this
17 assumption is reasonable, has a basis in the
18 facts of the case, has a basis in the practices
19 in this case of the Medicare carriers, does it
20 have any basis whatsoever.
21       I am certainly not, I'm an economist,
22 I'm not saying that you can do analyses all the

Page 251

1  time, that you can always do analyses without
2  making assumptions.
3        I mean economists, and I'm included in
4  this, we make assumptions in our analyses all the
5  time.
6        But one of the criticisms of Dr. Duggan
7  is he makes assumptions, he doesn't always spell
8  out the assumptions that he's going to be making.
9  And when he doesn't spell out the assumptions
10 that he's going to be making, or when he does or
11 doesn't spell out the assumptions he's going to
12 be making, he rarely if ever provides the basis
13 for the assumption that he's making.
14       So that's where I'm at on the Medicare
15 arrays, is I might believe him if he can give me
16 documents, if he can give me testimony, if you
17 all can provide an affidavit that says that
18 there's standard practice for this, these arrays
19 followed the standard practice, everybody else
20 follows the standard practice, I'm not going to
21 have much of a problem with that.
22       But that's not going to be, and that's

Page 252

1  not going to be a situation where everybody is
2  going to be exactly the same.  But, more or less,
3  there's a procedure that's followed, and, more or
4  less, you can look at the arrays that we have and
5  come to the conclusion that for the most part,
6  not a hundred percent of the time, but for the
7  most part people are following those procedures.
8  And you give me that and say well, I'm going to
9  then assume everybody else also follows those
10 procedures, I don't have that much of an
11 objection to that.
12       Again, it's going to depend on what the
13 evidence is that you give me that there are these
14 procedures and everybody's following.  You know,
15 give me a basis and then let's kick around
16 whether it's reasonable or not.
17       But at this point Dr. Duggan hasn't
18 given me any basis for that assumption.  And the
19 evidence that we do have suggests it's a very bad
20 assumption.  And that's what my objection is.
21 BY MR. LAVINE:
22    Q.  What is the standard that you're going

Page 253

1  to hold professor Duggan to beyond just saying
2  that what he does needs to be reasonable?
3        MR. BERLIN:  Objection, form.
4        THE WITNESS:  I did not say what he
5  does needs to be reasonable.
6        I said that his, the assumptions that
7  he makes need to have a reasonable basis in fact,
8  that you're just not making some assumption
9  because it's convenient but you have every reason
10 to believe as I believe we have here to think
11 that this assumption is not valid.
12 BY MR. LAVINE:
13    Q.  So if Professor Duggan had a reasonable
14 basis in fact regarding his assumption that the
15 Abbott products were used in the other arrays,
16 then that would be an acceptable methodology, and
17 your problem is he did not articulate that for
18 you?
19       MR. BERLIN:  Objection, form.
20       THE WITNESS:  We're on to a different
21 subject now.  I mean what we were talking about
22 before was the arrays he does have versus the

Hughes, James W. - Vol. I                    May 5, 2009
                        Chicago, IL

Page 254

1  arrays that he doesn't have, right.
2       But I am in basic agreement with you
3  that if he says here's the assumption I'm going
4  to make about the similarity or lack of
5  similarity of the arrays I do have to the arrays
6  I don't have, and he's made that assumption, he
7  hasn't stated it but he's made the assumption
8  that the arrays I don't have look like the arrays
9  that I do have.  He hasn't stated it but you can
10 figure that out that he is assuming that, and he
11 says in his report here's why I think making that
12 assumption makes sense.
13      To me, an unacceptable reason why this
14 assumption makes sense would be something like I
15 don't have anything else to do, this is all I
16 got, and I got to use the arrays I have, and I'm
17 just stuck with it, and so whether it's right or
18 wrong I just got to use these arrays.
19      That's not a reasonable basis for
20 making the assumption.  An assumption is a
21 rebuttable presumption.
22      So if he then were to say in his report

Page 255

1  well, everybody knows that arrays are all
2  constructed in the same way, everybody knows that
3  Medicare has been on the phone with these folks,
4  and everybody knows that there's some standards
5  that are applied to these arrays, so the ones
6  that I don't have are going to be just like the
7  ones that I do have, okay, that's a basis.
8       Then we get to kick around whether it's
9  reasonable or not.  And one measure whether it
10 will be reasonable, okay, let's look at the
11 arrays that you do have, are they constructed the
12 same way, do they have the same number,
13 constructed the same way, are they constructed
14 according to the standard that you say has been
15 communicated to the carriers by CMS or HCFA or
16 whoever is in charge at the time.
17      If it does, fine.  Then we may well
18 agree that this was a reasonable assumption with
19 a reasonable basis.
20      An example of a more reasonable basis,
21 as I've said before, is that if there were
22 Medicare regulations that said here's how you do

Page 256

1  arrays, and that the arrays that Dr. Duggan had
2  in his possession, again, not a hundred percent
3  of the time but the vast majority of the time
4  it's clear that these carriers followed those
5  regulations in constructing those arrays.
6       And so then he says in his report well,
7  everybody that I do have is following these
8  regulations fairly closely, so I think it's a
9  reasonable assumption to make that the people
10 that I don't have also followed these regulations
11 reasonably closely.  So I'm going to assume that
12 the arrays that I have are the same as the arrays
13 that I don't have.
14      He and I could kick that one around and
15 I may well come to agree with him yeah, under the
16 circumstances that's reasonable because the
17 evidence that we have both of the regulations and
18 how those regulations are or are not reflected in
19 the arrays that we have matches up well enough
20 such that yeah, okay, I can see that being
21 reasonable.
22      But we're in a situation now where he's

Page 257

1  just simply making an assumption, and he's
2  provided me, not provided to me, he provides the
3  reader with no basis for why that should be
4  reasonable.
5       And, the evidence that he does have in
6  his possession, the arrays that he does have,
7  suggests that that assumption is not reasonable
8  because these arrays vary greatly in the way that
9  they're constructed and the way that they're put
10 together across carriers and across time.
11 BY MR. LAVINE:
12    Q.  And another consequence of that issue
13 is that there would have been no way for Abbott
14 to have known whether it would have gotten a
15 benefit from any alleged AWP manipulation?
16      MR. BERLIN:  Objection, form.
17      THE WITNESS:  No.  That's not quite
18 what I said.
19 BY MR. LAVINE:
20    Q.  I apologize.  Correct me.
21    A.  No, that's okay.
22      What I was saying was because of the

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. – Vol. I                           May 5, 2009
                        Chicago, IL

Page 258

1  variability and the kind of ad hoc nature with
2  which the arrays are constructed, that if, as the
3  government proposes, Abbott set out to manipulate
4  the AWP to its own advantage, given that nobody,
5  including the carriers, including CMS or HCFA,
6  nobody seems to know with any regularity how
7  these arrays are constructed, and Abbott, as far
8  as I know, has no better information from the
9  carriers than CMS would have or some other
10 government agency would have, then it just
11 strikes me that there's no particular way that
12 Abbott would know enough about the arrays in
13 order to manipulate their AWP such that they
14 could gain.
15        But then follow that with the point
16 that even if they could, they still couldn't gain
17 from manipulating the AWP because even if they
18 raised the reimbursement to their customers, the
19 higher reimbursement is paid on Abbott products
20 and is paid on everybody else's products.
21        So it would be, even if they had the
22 intent to do it and even if they could do it, it

Page 259

1  would be futile to try to increase your market
2  share by manipulating the AWP in order to
3  increase the Medicare reimbursement in hopes of
4  getting more sales for Abbott because the higher
5  reimbursement would go to the customers of the
6  manufacturers of all the products in the array.
7     Q.  Unless the higher reimbursement favored
8  one particular manufacturer, it wouldn't be of
9  any benefit to the manufacturer at all?
10    A.  Could you clarify what you mean by the
11 higher reimbursement benefiting one manufacturer?
12    Q.  Well, you said that since the increase
13 of any AWP manipulation under the J-Code system
14 in the Medicare program would be to the benefit
15 of every manufacturer's product reimbursed under
16 that J-Code, that there could be no way to favor
17 one particular manufacturer; right?
18    A.  Not quite.  Let me see if I can unpack
19 that.
20        The AWP manipulation, if it happens,
21 would not, the higher reimbursement would not
22 inure to the benefit of the manufacturer because

Page 260

1  the reimbursement goes to the customer, the
2  reimbursement does not go to Abbott or Baxter or
3  whoever the other manufacturers might be.
4        So I think you said the higher
5  reimbursement benefit to manufacturers, and I
6  guess I want to take issue with that, that the
7  higher reimbursement would be to the benefit of
8  the customers.
9        The hope in the hypothetical then is
10 that if I'm manipulating my AWP and getting my
11 customers higher reimbursement, well, then
12 they'll buy more of my products.  But the problem
13 is if they're buying my competitors' products,
14 they're also getting the higher reimbursement.
15        So that higher reimbursement in and of
16 itself from my AWP manipulation gives my
17 competitors' customers no reason to switch from
18 them to me.  And so I can't benefit from that
19 manipulation.
20    Q.  So unless the higher reimbursement
21 benefited the customers of a particular
22 manufacturer, it wouldn't provide any incentives

Page 261

1  to do any AWP manipulation?
2     A.  Unless the AWP manipulation favored the
3  customers of one manufacturer, which in reality
4  they do not, then it would go to the benefit of
5  the manufacturer.
6        But, again, to be clear, the change in
7  reimbursement does not favor any one
8  manufacturer.
9     Q.  In the Medicare program?
10    A.  In the Medicare program.  Thank you.
11    Q.  Now, a few minutes ago you mentioned
12 that no one knows how the arrays are constructed.
13 Am I quoting you right on that?
14    A.  Maybe.  Unfortunately, if so.  I mean
15 certainly the people who construct the arrays
16 know what they did.  But, again, I'm not aware of
17 any standards.
18        Like I say, as I understand, I believe
19 there are, you know, things about you're supposed
20 to update them, you have to conclude that, you
21 know, but there's no, again, shall we say formula
22 in the same way that AMP is reported to Medicaid

66 (Pages 258 to 261)

Hughes, James W. - Vol. I                    May 5, 2009
                    Chicago, IL

Page 262

1  or AMP is calculated under the MMA or anything
2  like that.
3        So that's the sense in which I mean
4  there's not a consistent method for constructing
5  the arrays. So, therefore, looking at it, hand
6  me an array or hand the head of CMS an array from
7  a particular carrier at a particular point in
8  time.
9        It's not like there's some formula that
10 that person could look to and say oh, here's how
11 it was constructed.
12     Q.  Is there some or what is the evidence
13 that you're relying upon for that point?
14     A.  Well, if you look at the arrays that we
15 do have, and if I recall I believe Dr. Duggan
16 himself says that the arrays vary greatly in his
17 report.
18     Q.  So by looking at the arrays, you can
19 tell they're different between one carrier and
20 another?
21     A.  If there's a formula, we don't know.
22 You can't figure out what the formula is by

Page 263

1  looking at the arrays, if one does exist.
2        Q.  Is there any other basis for that?
3        A.  I do not have depositions memorized,
4  but I seem to remember a deposition from a
5  Medicare official, but I'm not going to promise
6  that that's correct.
7        I have vague recollections of a lot of
8  things. There may be such testimony, but I just
9  can't call it up at the moment.
10     Q.  The last point I remember you saying,
11 and I think it's fair to characterize it as a
12 summary statement but correct me if I'm wrong --
13     A.  Okay.
14     Q.  -- is that you said that Dr. Duggan's
15 approach ignores the way that the system works.
16        MR. BERLIN:  Objection.
17 BY MR. LAVINE:
18     Q.  Is that a summary of all the other
19 issues wrapped up together?
20        MR. BERLIN:  Objection, form.
21        THE WITNESS:  Yes and no.
22     I mean I think it's a bit overstated

Page 264

1  because I was I think at the end of a rather long
2  monologue.
3        But, again -- I'll be as quickly as
4  possible -- certainly what I meant by that
5  statement is that changes have consequences,
6  people have testified to what those consequences
7  are.
8        The system works a certain way. Prices
9  give incentives. Regulations give incentives.
10        The idea that you can change one thing
11 without having other things change or without
12 having people's incentives and people's actions
13 change is belied by just about every report and
14 tons and tons of testimony.
15        So in that sense I was saying yes, he's
16 ignoring the consequences of what he says would
17 happen.  So, yes, he's ignoring the way the
18 system works.  That's what it was summing up.
19        MR. LAVINE:  Let's take a break.
20        THE VIDEOGRAPHER:  Going off the record
21 at 4:12 p.m.
22        (A recess was taken.)

Page 265

1        THE VIDEOGRAPHER:  Beginning of
2  Videotape No. 5.  We're back on the record at
3  4:32 p.m.
4  BY MR. LAVINE:
5        Q.  Have we now discussed all of the
6  reasons that in your opinion Professor Duggan's
7  model regarding Medicare damages was flawed?
8        MR. BERLIN:  Objection, form.
9        THE WITNESS:  I want to say I think so,
10 but I suppose I should be sure.
11        MR. BERLIN:  I just want to state an
12 objection so there's no claim of waiver that our
13 disclosure -- you can keep looking -- I mean I'm
14 not suggesting one way or another whether there
15 is something left or not, but the disclosure is
16 the full disclosure, and anything disclosed in
17 the deposition or in the report is his
18 disclosure.
19        So to the extent there's something in
20 the report that he hasn't now discussed, we're
21 not waiving his opinion as to it.  And I don't
22 think you're permitted to chop out something that

67 (Pages 262 to 265)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                              May 5, 2009
                          Chicago, IL

Page 266

1  might be in the report because he doesn't
2  remember to bring it up.
3        I think it's your obligation to look at
4  the report and see if there's something else that
5  hasn't been discussed.
6        MR. LAVINE: I disagree.
7        MR. BERLIN: I mean I don't think it's
8  open to disagreement. Quite frankly, you're
9  wrong.
10       MR. BREEN: I disagree too.
11       MR. BERLIN: Well, of course you do.
12       MR. BREEN: So it must be open to
13 disagreement.
14       MR. BERLIN: I'm sure you wouldn't even
15 have listened to what he said and you would agree
16 with him and disagree with me.
17       MR. BREEN: No. That's not true.
18       THE WITNESS: Okay. Are we done?
19       MR. BERLIN: Yes. The attorneys are
20 done. You may answer the question with my
21 caveat.
22       THE WITNESS: Okay. To the best of my

Page 267

1  knowledge sitting here, yes, I believe we have
2  discussed all of my objections to Dr. Duggan's
3  analysis of the Medicare program.
4        MR. BERLIN: And so I don't have to
5  disturb your deposition again, that objection
6  will hold to any extent you ask him is there
7  anything else.
8        MR. LAVINE: You know, I don't think we
9  need your objection on that.
10       Some day if we file a motion on this
11 basis, you can make your legal argument.
12       MR. BERLIN: The reason --
13       MR. LAVINE: But we don't need to have
14 the deposition interrupted for you to state that.
15       MR. BERLIN: That's what I just said.
16       And the reason I said it now is so that
17 you would not be arguing waiver because I didn't
18 state it at some point. And I specifically said
19 that I was only going to state it once so that I
20 would not disturb your deposition.
21 BY MR. LAVINE:
22    Q.  All right. I wanted to move on to

Page 268

1  Medicaid related issues.
2     A.  Okay.
3     Q.  The first thing that you mentioned
4  regarding your opinions as to the Medicaid
5  program was that Professor Duggan based his
6  analysis on incomplete data; is that correct?
7     A.  Correct.
8     Q.  And your position on that is that
9  Professor Duggan's analysis was only based on
10 nine states, and that you don't count Indiana
11 because that was an extrapolation based upon
12 Illinois data.
13    A.  Correct.
14    Q.  And that because more data was
15 available to Professor Duggan, the extrapolation
16 itself was needless. And that's another reason
17 the damage methodology is flawed.
18    A.  Yes. I would agree with that.
19       And that in my opinion as an economist
20 if you, in this day and age with computing power
21 being cheap and reasonably accessible, that it's
22 clear as Dr. Duggan points out in his rebuttal

Page 269

1  report that extrapolations are likely to end up
2  being higher or lower than the actual difference
3  that one would calculate because after all you're
4  not using the actual data, you're extrapolating
5  from one set of estimates that you've made to
6  another population or another sample.
7        So that's the basis for my saying that
8  he's needlessly introducing error into his
9  estimates because he's extrapolating where he
10 could have used the actual data for some or all
11 of those thirty-eight states.
12       I understand that the computer
13 programming is extensive, that was undertaken,
14 but once the basic programs are written, exposing
15 those programs to additional data, modifying an
16 existing program is a lot less work than writing
17 a program from scratch.
18       And since claims data has some degree
19 of consistency across states, that you have
20 roughly the same information from one state to
21 the next.
22       So Dr. Duggan and I may disagree, but

68 (Pages 266 to 269)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                         May 5, 2009
                        Chicago, IL

Page 270

1  it seems to me when you have, you know, why
2  estimate when you can calculate.
3        THE WITNESS:  I should go into
4  advertising.
5        MR. BREEN:  Let me write that down.
6  BY MR. LAVINE:
7     Q.  The next point you mentioned was that
8  in the rebuttal report he goes on to use some
9  data to counter some of your points that in your
10  opinion he could have just used to begin with?
11    A.  Well, I must admit, it's not crystal
12  clear to me exactly what he did in the rebuttal
13  report, but it sounds like from what I read in
14  the rebuttal report, it sounds like he's saying
15  something along the lines of well, okay, I'm
16  going to use some of the data that Dr. Hughes
17  says I should have used, recalculate my
18  difference, and guess what, I find out that the
19  difference is actually higher than what I
20  estimated through my extrapolation.  That's my
21  recollection of what he's saying in the rebuttal.
22        And if it was that easy to do the

Page 271

1  calculations with the available data such that he
2  does it on relatively short notice in a rebuttal
3  report, again, why not do it, you're his
4  employer, if he's getting a higher difference by
5  using the actual data, why are you putting up
6  with an estimate that underestimates the true
7  damages?  I mean, again, if you have the data,
8  why not use it.
9        So I thought the argument might be
10  well, it's way too complicated to do, but it
11  seems that he's doing it in the rebuttal report.
12  So that just strengthens my argument.
13        By the way, his conclusion in the
14  rebuttal report that well, if I do it using the
15  actual data the difference comes out to be
16  higher, that's consonant with my conclusion in my
17  report that because he's using these
18  extrapolations, that his results are inaccurate
19  and unreliable.
20        And he's in effect, to me, demonstrated
21  that because when he's used the actual data, he's
22  gotten a difference that is in fact different

Page 272

1  from what he calculated using the estimates.
2  Ergo, his initial estimates were in fact
3  inaccurate.
4     Q.  So what is the methodology that
5  requires that Professor Duggan have used
6  additional data that was available?
7     A.  My understanding and opinion about best
8  practices in economics is that if you have a
9  dataset sitting there, why sample from it, why
10  use a subset of the data if you actually have the
11  data.
12        Especially when he demonstrates in his
13  rebuttal report that to use this additional data
14  was not an insurmountable obstacle.
15        But, again, it's my understanding that
16  the best practice is that you use the data that's
17  available to you, especially if the alternative
18  is to ignore the dataset that's sitting in your
19  hand and make guesstimates about what is going on
20  in those areas through extrapolation.
21        You can calculate the actual number.
22  So why don't you go ahead and do so.

Page 273

1     Q.  But are you saying that if the data is
2  in the possession of an economist, in every
3  circumstance he absolutely has to use it?
4        MR. BERLIN:  Objection, form.
5        THE WITNESS:  Well, again, give me a
6  basis why not.
7        Speaking to another economist, I'm
8  going to extrapolate, thereby again assuming that
9  the states I'm extrapolating to are the same as
10  the states that I'm extrapolating from.
11        When you have the data, that's a
12  testable hypothesis, right.  You can actually say
13  okay, well, how accurate are these
14  extrapolations.
15        And Dr. Duggan speaks to that in his
16  rebuttal report, and, in fact, concludes that his
17  extrapolations are somewhat inaccurate because he
18  comes up with a higher calculation for difference
19  when he uses the actual claims data.
20        But if you, you know, again, if you
21  have a basis whereby a researcher were to say
22  every single state has a different format for the

                              69 (Pages 270 to 273)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. – Vol. I                                    May 5, 2009
                              Chicago, IL

Page 274

1  data, they're collecting the same information but
2  they have a different format for the data.
3      So every single time I want to do
4  analysis on one of these states, I've got to
5  write from scratch an entire new STATA or a SAS
6  or whatever programming language you're going to
7  use, I have to write an entire new program.
8      That strikes me as a basis that, again,
9  we can discuss whether that's a reasonable basis
10  for ignoring data in your possession and using
11  extrapolation instead.
12      Again, I am unaware of any basis that
13  Dr. Duggan has provided that says these ten
14  states, sorry, these nine states are at all
15  representative of the, that I have reason to
16  believe that these nine states are representative
17  of the other thirty-nine states that he works
18  with, and absent such basis calls the validity of
19  the assumption into question.
20  BY MR. LAVINE:
21      Q.  So it would be acceptable to not use
22  data in the possession of an economist as long as

Page 275

1  there's a reasonable basis therefore and that
2  reasonable basis is articulated?
3      A.  Again, once you propose a basis and
4  state that it's reasonable, then that becomes a
5  rebuttable presumption that reasonable economists
6  can debate and may agree or may disagree.
7      But at least then you're telling the
8  reader of your report, you're telling the reader
9  of your research, here's why I made the choices
10  that I made, and here's why I think that they're
11  reasonable, and then reasonable people can
12  discuss this and decide whether it is in fact
13  reasonable.
14      But if as it appears in this case there
15  was no particular barrier to using the other data
16  that was in his possession and when he did use it
17  in rebuttal it shows that in fact his original
18  estimates were inaccurate, then it seems to me
19  that it behooves him to use the data, use all of
20  the data, that's available to him.
21      Q.  So if you have data and you don't use
22  it, there needs to be a reasonable basis for not

Page 276

1  using it?
2      A.  When you have data and you don't use it
3  and you extrapolate into those areas where you
4  have data, you are by definition introducing
5  error into your estimates because they're
6  estimates, they're not calculations from the
7  actual data.  So you're assuming that Illinois is
8  like New Hampshire, all right.
9      When you have data on New Hampshire,
10  I'm trying to think of the word I want to use,
11  all I can come up with at this hour of the day is
12  a phrase I always use with my students is that's
13  something you should be testing rather than
14  assuming.
15      So if it's testable whether New
16  Hampshire is like Illinois, then a researcher
17  should be testing that.
18      If it's not testable, well, then you
19  state the assumption clearly that I don't have
20  any information on New Hampshire, I don't have
21  any choice but to extrapolate, and here are the
22  reasons that I think that New Hampshire looks

Page 277

1  like these other nine states.  And then that's
2  something that the readers and the author can
3  discuss as to whether that's a reasonable basis
4  or not.
5      Q.  So if there's a reasonable basis for
6  not using the data, that's acceptable?
7      MR. BERLIN:  Objection, form.
8      THE WITNESS:  Well, you know, I will
9  agree with you on that.
10      But, again, one has to state such a
11  basis, and it's my opinion that Dr. Duggan
12  doesn't do much to state what the basis for
13  making this assumption was.
14      And I would also argue that whatever
15  basis he does apply, whatever basis he does put
16  forth for omitting the data, seems to be given
17  lie to by his then turning around and using those
18  data in his rebuttal report.
19      If it was too hard, if it was too
20  complicated, then it shouldn't have shown up in
21  his rebuttal either.
22  BY MR. LAVINE:

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                              May 5, 2009
                        Chicago, IL

Page 278

1    Q.  But the concept of extrapolation
2  though, you're not suggesting that that's not an
3  acceptable methodology in the field of economics?
4    A.  As a broad general term, no.
5       But like any mathematical tool,
6  extrapolation can be done well or extrapolation
7  can be done poorly.
8    Q.  And if the extrapolation gives you a
9  result that's not materially different than some
10  other analysis, that would be acceptable; right?
11    A.  Well, I'm not sure exactly what you
12  mean by "some other analysis."
13       I guess I'm just going to ask you to
14  take another crack at that.  I'm not sure exactly
15  what your question is.
16    Q.  Well, do you characterize the
17  difference between the result that Professor
18  Duggan got by extrapolation and the result that
19  he later got after doing a claims level analysis
20  as part of his rebuttal as a material difference
21  between the two numbers?
22    A.  He certainly seemed to think so, that

Page 279

1  look at this, the difference is going to rise by
2  this much percent.
3    Q.  Material to the issue in this case --
4       MR. BERLIN:  Objection.
5  BY MR. LAVINE:
6    Q.  -- of calculating damages caused by
7  Abbott to the Medicare and Medicaid programs?
8       MR. BERLIN:  Objection, form.
9       THE WITNESS:  Again, I have to say I'm
10  not positive exactly what you're asking.
11       One thing that would have helped us is
12  if Dr. Duggan had said I did it this way, I did
13  it that way, the difference in the two difference
14  calculations is or is not statistically
15  significantly different.  But he provides no test
16  for that.
17       It would be possible to do an
18  extrapolation and then do a calculation with the
19  data, run a statistical test to say are these two
20  results statistically significantly different
21  from one another.
22       If they are, then economists would say

Page 280

1  these two methodologies are not the same in a
2  statistical sense, or I'm sorry, do not give the
3  same result in a statistical sense.
4       And if it's not statistically
5  significantly different, then economists would
6  generally conclude that either method, the
7  methods give, statistically speaking, the same
8  result. And so there's no reason to choose one
9  over the other.
10       But just to say well, this is .2
11  percent higher done with claims data than done
12  through extrapolation, is that a lot or is that a
13  little, I don't have a, I cannot articulate a
14  standard for saying that that's a lot or that's a
15  little.
16    Q.  So you don't have an opinion as to
17  whether the differential between the two methods
18  that he employed are material to this case?
19    A.  Well, again, he seemed to think they
20  were material because after he did the
21  calculation, he says to me through his rebuttal
22  report, see, if I did it differently, this would

Page 281

1  have come out, the difference calculation would
2  have come out higher.
3       And then he doesn't say but, by a
4  statistically insignificant amount or by an
5  amount that really doesn't matter.  He says look,
6  it's different.
7       So I will follow him, and it seemed it
8  was material enough for him to point it out.
9    Q.  But you haven't done any such analysis;
10  correct?
11       MR. BERLIN:  Objection, form.
12       THE WITNESS:  I don't have access to
13  the data, no.  I haven't been asked to conduct
14  any such analysis.
15  BY MR. LAVINE:
16    Q.  Also with the Medicaid program, you
17  said that your other major criticism of Professor
18  Duggan was the manner in which his but-for world
19  was created.
20       Are there any differences between your
21  criticisms of the but-for world in the Medicaid
22  arena as compared to the Medicare arena?

71 (Pages 278 to 281)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                    May 5, 2009
                        Chicago, IL

Page 282

1    A.  Well, generally no.  But specifically
2  yes.
3        Again, there are numerous bits, not
4  numerous bits, numerous pieces of evidence from
5  testimony, from reports, from government
6  publications, speaking to the consequences for
7  access and speaking to the consequences for the
8  viability of providers if ingredient costs are
9  reduced.  And, again, as I've said earlier, Dr.
10  Duggan does nothing to take this into, does
11  nothing to take this into account.
12       So he is, again, ignoring specifically
13  lots of evidence in this matter that suggests
14  that the way he has characterized the but-for
15  world is not an accurate representation of the
16  world that would have existed absent the alleged
17  wrongful behavior of Abbott in this matter.
18    Q.  Because, again, you are of the opinion
19  that if he lowered the ingredient cost the way he
20  did in his method, there needed to have been some
21  way of accounting for increased dispensing fees
22  that would have been necessary as a result of

Page 283

1  that?
2    A.  Well, I mean that's one part of it.
3        But the other part is of course that to
4  reduce, according to the testimony that I read,
5  to reduce ingredient costs by that amount while
6  assuming everything else, particularly dispensing
7  fees, stays constant, remain constant, that that
8  would threaten patient access to the Medicaid
9  system.  And that would violate the mandate in
10  the Medicaid law that requires that Medicaid
11  recipients have the same access to medical care
12  as nonMedicaid recipients, a mandate that is
13  co-equal in my understanding with the mandate to
14  keep the costs of the program low.
15    Q.  I'm not sure I understand how this
16  criticism is different than the similar criticism
17  you've leveled in connection with the Medicare
18  program.
19        You're saying that dispensing fees and
20  the ingredient cost need to be considered
21  together.  If you don't consider it together,
22  it's an unrealistic but-for world.  And one of

Page 284

1  the reasons for that is because of the access
2  issues that may result from not doing that.
3        Is there anything else in that?
4    A.  Well, but I mean the other thing is
5  that of course this is a state-by-state program
6  and that these plans are approved on a
7  state-by-state basis.
8        So that how states are going to or how
9  the evidence shows that states balance access
10  versus cost issues, how states approach cost
11  containment.  I mean when state budgets get bad,
12  they often just go after Medicaid.  So it may
13  have very little to do with the issues that may
14  be active in this matter.
15        So there's the added part here is that
16  because these things are determined on a
17  state-by-state basis, that there's going to be
18  some variance in these consequences when
19  ingredient costs are attempted to be lower.
20        I mean if you look at the evidence,
21  some states, over the period of this lawsuit,
22  some states were able to reduce their ingredient

Page 285

1  cost by a little bit.  Some of them raised
2  dispensing fees, some of them didn't.
3        But it remains the case that nobody had
4  the kind of wholesale Draconian cut in ingredient
5  cost that Dr. Duggan proposes in his report.
6    Q.  So is this criticism at least in part
7  that Professor Duggan doesn't account for the
8  individual differences between the state Medicaid
9  programs?
10    A.  Well, in some of his, in some of his
11  data analysis he certainly, you know, he
12  certainly does.
13        I mean he takes into account if a state
14  has a MAC for a drug for example.  So I mean
15  there are differences he certainly does
16  attempt to take into account.
17        But on the bigger picture, on the
18  consequential issues that what happens when you
19  lower ingredient costs by so much, how are states
20  going to react, how are providers in states going
21  to react, the evidence seems to suggest that some
22  states worry more about access than others.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                           May 5, 2009
                          Chicago, IL

Page 286

1       So how much you would actually be able
2  to lower ingredient costs and still keep the
3  viable network of providers would vary from state
4  to state.
5       But, again, my criticism is he
6  absolutely ignores all of that because he assumes
7  that the provider networks stay the same,
8  dispensing fees stay the same, everything stays
9  the same, but in some states he can cut the
10  reimbursements by ninety percent and have nothing
11  happen.  And that just seems unrealistic to me.
12     Q.  So are you also of the opinion that the
13  manner in which the extrapolation was performed
14  had some mathematical flaw?
15     A.  Well, it was, again, unnecessary in
16  many cases.
17       It requires the making of assumptions
18  that Dr. Duggan does not state for us what those
19  assumptions are.
20       I did not in my review of his report,
21  and I did not review the data, but in my review
22  of his report I did not detect that his

Page 287

1  subtraction was in any way flawed, no.
2     Q.  Is that a review you understood to be
3  handled by Huron Consulting?
4     A.  Not specifically, but I suppose that it
5  was.  I mean nobody ever said to me yes, that's
6  what's Huron is doing.  But I assume that's what
7  Mr. Young did.
8     Q.  That never came up in any conversation
9  with counsel as to shouldn't there be somebody
10  looking at the actual data in this case?
11     A.  Oh, there's all sorts of experts Abbott
12  has.  I couldn't tell you what any of them are
13  doing specifically.
14       It wasn't anything that was discussed
15  with me.  And I never asked.  I mean outside of
16  Mr. Young, I actually couldn't name any of the
17  other Abbott experts.
18     Q.  And you didn't make any recommendations
19  as to type of data analysis that might be done in
20  connection with this case?
21     A.  Only to the extent that things appeared
22  in the exhibits to my report.

Page 288

1     Q.  Have we covered all of the issues
2  related to the Medicaid program?
3     A.  I doubt that.
4     Q.  We talked about the need for incomplete
5  -- additional data could have been obtained and
6  was not, that the but-for world was unrealistic
7  for the various different reasons, failure to
8  state assumptions in how Professor Duggan
9  addressed the differences between the states.
10     A.  Well, if I could add that we have not
11  covered, in this section of the deposition, we
12  haven't covered my opinion that he focuses
13  wrongly on ingredient costs in isolation and he
14  does not pay any attention to the total
15  reimbursement to providers.
16       So he doesn't pay any attention to
17  whether or not providers would be receiving a
18  remunerative reimbursement that would allow them
19  to remain in the program, or not allow them to
20  remain in the program but give them the incentive
21  to remain in the program because they were able
22  to cover their costs by so doing.  So that gets

Page 289

1  at dispensing fees and other things.
2       The other item that we have not covered
3  is that the but-for ingredient cost that Dr.
4  Duggan proposes, I note that in the almost
5  fifteen years, fourteen years, since this action
6  has been filed, if his characterization of the
7  but-for world were accurate, one would expect
8  that there would be a state out there that would
9  have seen the problems with the way that
10  companies were reporting or seen the problems
11  with the way that the reimbursement system was
12  constructed.
13       And if his vision of the but-for world
14  is correct, then we should have seen somewhere
15  along the line a state that would have modified
16  its reimbursement scheme in such a way as to
17  mimic that which Dr. Duggan proposes for the
18  but-for world.
19       So if we were to negate the allegedly
20  wrongful reporting of Abbott and other companies,
21  that all that was required to keep a viable
22  network in Medicare, excuse me, Medicaid going,

                        73 (Pages 286 to 289)

Hughes, James W. - Vol. I                              May 5, 2009
                          Chicago, IL

Page 290

1  that we could reduce our, that states could
2  reduce their ingredient cost reimbursements by
3  seventy, eighty, ninety percent for these drugs
4  and other drugs, that we should have seen a state
5  program adopt a reimbursement system similar to
6  that proposed by Dr. Duggan.
7      And he provides no evidence and I'm not
8  aware of any state that has implemented a method
9  for calculating ingredient cost that comes
10  anywhere near the low unremunerative ingredient
11  cost that Dr. Duggan has in his report.
12      The other facet to that is that, again,
13  when the federal government took up the issue of
14  the alleged problems with the companies reporting
15  and the way that this reporting found its way
16  into reimbursement systems, when the federal
17  government and Congress took this up and weighed
18  all of the considerations of cost and access and
19  everything else that goes into the complex system
20  that is Medicaid, that if Dr. Duggan were right
21  the resulting revised system passed by the
22  Congress should have resembled the system that is

Page 291

1  proposed by Dr. Duggan in his report.
2      But not only did the new system that
3  was enacted through the Deficit Reduction Act not
4  resemble Dr. Duggan's reimbursement method, but
5  it was a reimbursement system that actually wound
6  up with substantially higher reimbursements for
7  the drugs at issue in this matter than were
8  present under the current, under the original
9  system, the system that's at issue here.
10      So, again, at every turn everywhere you
11  might look for a valid vision of the but-for
12  world, and by "valid vision" I mean one supported
13  by the world outside these walls or one supported
14  by the testimony and evidence in this case, you
15  don't see anything that vaguely resembles Dr.
16  Duggan's proposed but-for reimbursement system.
17      And for that reason I think that his
18  vision of the but-for world is inadequate to the
19  task that he puts it.
20   Q.  And the method though that you used to
21  reach that determination was an examination of
22  the laws in place currently?

Page 292

1   A.  Well, the laws that have been passed,
2  the laws that have been passed by Congress, yes.
3      MR. BERLIN:  Mark, I notice it's after
4  5:00 o'clock.  Should we break for the evening?
5      MR. LAVINE:  Yes.  Can we do just a
6  couple more minutes?
7      MR. BERLIN:  You have a couple more
8  minutes?
9      MR. LAVINE:  I didn't say one question.
10  I didn't go that far.
11      MR. BERLIN:  I didn't say that.
12      MR. LAVINE:  No.  I just said when a
13  lawyer says one question --
14      MR. BERLIN:  Go ahead.
15      MR. LAVINE:  Yes.  It won't take long.
16  BY MR. LAVINE:
17   Q.  You did a review of the laws that had
18  been passed, but you didn't go in and do any data
19  analysis to show the degree to which there might
20  be a difference between Professor Duggan's
21  approach and the current method utilized by any
22  other state Medicaid program; right?

Page 293

1   A.  I did in my report.  And it appears in
2  two of the exhibits.  I did show the differences
3  between the reimbursements under DRA versus the
4  reimbursements proposed by Dr. Duggan to
5  illustrate that they were indeed substantially
6  different.
7   Q.  You're referring to the example
8  regarding the Federal Upper Limit?
9   A.  Do we have a copy of my exhibits?  That
10  would probably be the quickest way to do it.
11      Oh, the exhibits are here.  I'm sorry.
12  I have them.  They're not marked.
13   Q.  Well, if it'll just refresh your
14  recollection, go ahead and take a look, and we'll
15  bring them out tomorrow to follow up.
16   A.  Okay.
17   Q.  We only have a couple minutes left.
18      MR. BERLIN:  We had a couple minutes
19  left a couple minutes ago.
20      THE WITNESS:  Okay.  I'm sorry.  Oh,
21  no, here it is.  Exhibit 9 in my report compares
22  --

74 (Pages 290 to 293)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f

Hughes, James W. - Vol. I                              May 5, 2009
                          Chicago, IL

Page 294

1  BY MR. LAVINE:
2      Q.   That is the FUL based upon two hundred
3  fifty percent of the AMP; right?
4      A.   Yes, correct.
5      Q.   Any other analysis that you did,
6  data-based analysis?
7      A.   It seems to me I might have asked Huron
8  to do this for a few more NDCs, but, you know,
9  since it's all the same four products, it wasn't,
10 you know, I got one of each of the four products.
11     Q.   And to the extent there was some
12 additional work done, it would show up in the
13 backup supporting materials that were produced?
14     A.   I would assume so.
15         I mean at this point I remember
16 discussing how many of these to do, but I
17 absolutely can't swear how many of them they
18 actually did.  I guess I'll leave it at that.
19         But if they did it, I would expect it
20 to be in that backup documentation, yes.
21         MR. LAVINE:  All right.  I mean I don't
22 mind going later, but I guess you're saying we're

Page 295

1  near the end.
2          MR. BERLIN:  We're here tomorrow;
3  right?
4          MR. LAVINE:  Yes, sure.  Well, I was
5  hoping to try to close out the summary opinion
6  stuff.  We'll pick up in the morning.
7          THE VIDEOGRAPHER:  Going off the record
8  at 5:09 p.m.
9          (Said deposition was so adjourned at
10 5:09 p.m.)
11
12
13         _____
14             JAMES W. HUGHES
15
16 Subscribed and sworn to and before me
17 this _____ day of _____, 20____.
18
19
20 _____
21     Notary Public
22

Page 296

1  STATE OF ILLINOIS )
2              ) SS:
3  COUNTY OF C O O K )
4      I, Donna M. Kazaitis, CRR, CLR, RPR, CSR
5  No. 084-003145, do hereby certify:
6      That the foregoing deposition of JAMES W.
7  HUGHES was taken before me at the time and place
8  therein set forth, at which time the witness was
9  put under oath by me;
10     That the testimony of the witness and all
11 objections made at the time of the examination
12 were recorded stenographically by me, were
13 thereafter transcribed under my direction and
14 supervision and that the foregoing is a true
15 record of same.
16     I further certify that I am neither counsel
17 for nor related to any party to said action, nor
18 in any way interested in the outcome thereof.
19     IN WITNESS WHEREOF, I have subscribed my name
20 this 11th day of May, 2009.
21 _____
22     DONNA M. KAZAITIS, CSR No. 084-003145\

                              75 (Pages 294 to 296)

92efdca1-5c3b-4f63-b2de-1b847bfafa3f