# EXHIBIT E

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE:                            )
                                  )  CA No. 01-12257-PBS
PHARMACEUTICAL INDUSTRY AVERAGE   )  CA No. 06-11337-PBS
WHOLESALE PRICE LITIGATION        )  Pages 1 - 85
                                  )




DAUBERT HEARING - DAY TWO

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE






United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
December 11, 2009, 2:05 p.m.








LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

d6e0fc2a-f545-4522-a640-adcbb84498dc

Page 2

1  A P P E A R A N C E S :
2
3     GEORGE B. HENDERSON, ESQ. and JAMES J. FAUCI, ESQ.,
   Assistant United States Attorneys, Office of the United States
   Attorney, United States District Court, Suite 9200,
4  1 Courthouse Way, Boston, Massachusetts, 02210.
5     MARK A. LAVINE, ESQ. and ANN ST. PETER-GRIFFITH, ESQ.
   Assistant United States Attorneys, Office of the United States
6  Attorney, 99 NE 4th Street, Suite 300, Miami, Florida, 33132.
7     RENEE BROOKER, ESQ., United States Department of Justice,
   P.O. Box 14271, Washington, D.C., 20044.
8
      JAMES J. BREEN, ESQ., The Breen Law Firm,
9  3562 Old Milton Parkway, Alpharetta, Georgia, 30005.
10
   FOR THE DEFENDANTS:
11
      DAVID S. TORBORG, ESQ., Jones Day,
12  51 Louisiana Avenue, N.W., Washington, D.C., 20081-2113.
13     JAMES R. DALY, ESQ. and JASON G. WINCHESTER, ESQ.,
   Jones Day, 77 West Wacker, Chicago, Illinois, 60601-1692,
14  for Abbott Laboratories.
15
16
17
18
19
20
21
22
23
24
25

Page 3

1            I N D E X
2
   WITNESS        DIRECT  CROSS  REDIRECT  RECROSS
3
4  MARK G. DUGGAN
5  By Mr. Daly:           6
   By Mr. Lavine:              81
6
7  EXHIBITS          PAGE
8
   2-For ID          42
9
   3-For ID          44
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1            P R O C E E D I N G S
2            MARK G. DUGGAN
3  having been previously duly sworn, was examined and testified
4  further as follows:
5       (Discussion off the record.)
6       THE COURT:  You're still under oath.
7       THE WITNESS:  Do I just sit?
8       THE COURT:  Yes, you just sit, even though it's called
9  the "stand."
10       THE WITNESS:  Right.
11       MR. LAVINE:  Your Honor, one thing we didn't get to
12  present yesterday, we didn't have any additional questions
13  about it, but it's just a set of the peer-reviewed literature
14  that Dr. Duggan cited.  Can we have that marked and add that to
15  the materials?
16       THE COURT:  Yes.
17       MR. LAVINE:  And counsel has a copy.
18       THE COURT:  And can I say, from my vantage point, I
19  loved this binder.  You know, when you file crates full, you
20  can't expect me to read it.  So that when you give me the key
21  things you need me to focus on, it's just very helpful going
22  forward.  This will be my starting point, and there may be
23  additional ones from Abbott, but I won't be going through the
24  giant crate.  Okay?
25       MR. DALY:  Very well, your Honor.

Page 5

1       MR. LAVINE:  And can I just mention one more thing in
2  terms of scheduling, that Dr. Duggan is on a very tight
3  schedule, he has a very full plate.  I want to make sure he's
4  done today.
5       THE COURT:  He will be done today, but there may be no
6  opportunity for redirect.  I'm going to give them what you got
7  yesterday.
8       MR. LAVINE:  Okay.  That was my next request, but I
9  hear you.  Thank you.
10       MR. DALY:  Thank you, your Honor.  Your Honor, we've
11  prepared an exhibit book as well.
12       THE CLERK:  You're going to offer these as exhibits?
13       MR. DALY:  For identification right now.
14       THE COURT:  Do you have one for the record too?
15       MR. DALY:  Yes.
16       THE COURT:  Yes, so that any appellate court would
17  know, you know.
18       THE CLERK:  I need an official one for the record.
19       MR. DALY:  Yes, we will do that afterwards.
20       THE COURT:  Because this is what I'm going to use in
21  resolving it.  I'm not going back through the giant crate of
22  documents.
23       MR. DALY:  Your Honor, I think that's fair.  We might
24  have a couple more that we add based on yesterday's testimony,
25  but I think you're right, you'll have everything in these

Page 6

1  couple of notebooks that you're going to need.
2         THE COURT:  Okay, good.
3         MR. LAVINE:  Although one question on that, Judge.
4  Both of the opposing experts have been sent home is my
5  understanding, so neither one of them are available today.  And
6  one of the issues that came up yesterday is, there was a
7  discussion that they had actually done some additional analysis
8  for the states, and that's never been produced to us.  We've
9  never seen that.
10        THE COURT:  Let me deal with that later.  Let's just
11 get through him so he can go back and do all the stuff he's
12 doing down there, all right?  So let's just make sure we get
13 through him, and I'll worry about everybody else later, okay?
14 It's ten past 2:00.
15        MR. DALY:  I'm ready, your Honor.  Your Honor, my
16 exhibits are all marked, so with the Court's permission,
17 Mr. Torborg is going to man the Elmo machine.
18        THE COURT:  Great.
19        MR. TORBORG:  At least I'll try.
20        THE COURT:  It's true of all of us, right?
21 CROSS-EXAMINATION BY MR. DALY:
22 Q.  Good afternoon, Dr. Duggan.
23 A.  Good afternoon.
24 Q.  Can I direct you to Tab 2 in the book that I've handed
25 you, which is your supplemental report, and Page 2 of that,

Page 7

1  sir.  There is a table that sets forth your damages for
2  Medicare, correct?
3  A.  Did you say this was the rebuttal report or --
4  Q.  No, I believe I said it was your supplemental report.
5  A.  Yes, I see that.
6  Q.  And I'm just picking up where you left --
7         THE COURT:  Wait, where are we?  Tab 2.
8         MR. DALY:  Tab 2, Page 2, Judge.
9         THE COURT:  It refers to Medicaid, so why are you
10 saying Medicare?  Am I in the wrong place?  It says "Summary of
11 revisions to Medicaid analysis for the removal of Ohio."  I
12 just want to make sure I'm looking at the right thing here.
13 Q.  Is Tab 2 not your supplemental report, sir?
14 A.  No, it is.
15 Q.  And the table reflects the damages for Medicare as well as
16 Medicaid?
17        THE COURT:  You know, I don't have that, at least not
18 in Tab 2.
19        THE WITNESS:  I think if you go down to the subsequent
20 lines of that table, I think the first line is Medicaid, so
21 this is on the second page of Tab 2.
22        THE COURT:  All right, I have that, what you have up
23 on the screen, but not that prior --
24        THE WITNESS:  Right, and that has some Medicare
25 numbers on it, right.

Page 8

1         THE COURT:  Yes.
2  Q.  And I just wanted to confirm that your Medicare Part B-1,
3  the $15.6 million, that is the damages that you computed for
4  carriers for which you had arrays, correct?
5  A.  That is my best recollection.  Would you mind if I just
6  checked my report just to confirm that?
7  Q.  Sure.
8  A.  That's my best recollection, that is correct, yes.
9  Q.  And that number includes some extrapolation for carriers
10 for which you had arrays, correct?
11 A.  That's correct.
12 Q.  And the next line down, the Medicare Part B-2, the
13 $15.7 million, do you see that figure?
14 A.  I see that.
15 Q.  And that is the extrapolation that you did for the
16 carriers for which you had no arrays, correct?
17 A.  Correct.
18 Q.  And that is a hundred percent extrapolation, correct?
19 A.  Correct.
20 Q.  And yesterday you mentioned that you computed Medicare
21 damages for five of the J-Codes; is that right?
22 A.  Correct.
23 Q.  And that the other six, you basically made the difference
24 zero manually, correct?
25 A.  Correct.

Page 9

1  Q.  And so you're not coming forward with any damages for
2  those six J-Codes, right?
3  A.  In my report, that's correct.
4  Q.  Now, in terms of the numbers of carriers that are out
5  there, there's approximately 92 carriers during the relevant
6  time period here?
7  A.  Is that a question?
8  Q.  Yes.
9  A.  I'm not sure if it's 92 or 80 or -- it's in the 70, 80, 90
10 range.  And as mentioned yesterday, it depends a little bit on
11 how you count the carriers.  If you group together, for
12 example, Connecticut General, there's a number of carrier
13 numbers that are under the Connecticut General umbrella.  So if
14 one looks at Table 35, I think, from my report, it looks from a
15 quick scan to me like fewer than 92, but maybe.
16 Q.  Is it your recollection that there's approximately 90, 92
17 different carrier codes?
18 A.  Seventy is the number that --
19 Q.  Why don't you take a look at your affidavit that you filed
20 in this matter, which is Tab 6 in the book that I gave you.
21 A.  Okay.
22 Q.  And please look at Paragraph 21 of that affidavit, sir.
23 Do you see the last line of that paragraph?
24 A.  Yes.  Okay, so I just have -- there are a lot of numbers,
25 but, yes, 92 sounds plausible.

3 (Pages 6 to 9)

Page 10

1  Q.  And as you were mentioning, there are some carriers that
2  may have used multiple carrier codes?
3  A.  Correct.
4  Q.  Is it your recollection that there's approximately 40 or
5  50 unique carriers?
6  A.  I don't have that number at my fingertips, but it sounds
7  plausible, 40, approximately.  That would reflect an average of
8  about two codes per carrier.  Some carriers have more codes;
9  some have just one.  It sounds plausible.
10  Q.  And in terms of unique carriers, I mean, carriers for
11  which you had arrays, you only had arrays for four carriers,
12  right?
13  A.  Once again, I think that it's a -- there are a number of
14  carriers that for much of the period -- so I don't think four
15  is correct.  I don't think four is accurate, just to back-
16  pedal.  So there are a number of carriers, as I indicate in
17  Table 43, there are about seven different carriers for which I
18  had array information.  These other Region 5, for example,
19  piggybacked on Wisconsin Physician Services, so I just want
20  to -- I want to clarify the point.
21  Q.  And I want to help make that clear as well.  So WPS is one
22  of the carriers for which you had arrays right, and that's
23  Wisconsin Pension or something --
24       THE COURT:  You know, I can't even hear you, Mr. Daly.
25  So WPS, what was the point you were making?

Page 11

1  Q.  WPS is one of the carriers that you had arrays for in the
2  case, right?
3  A.  That's correct.
4  Q.  And several of the other carriers used those same arrays,
5  correct?
6  A.  Correct.
7  Q.  And several of the carriers that you have arrays for are
8  actually using WPS arrays, correct?
9  A.  That's correct.
10  Q.  All right.  And your individual carriers, your unique
11  carriers were Connecticut General, WPS, other Region 5, right?
12  Other Region 5 used the WPS arrays, correct?
13  A.  Yes, that's correct.
14  Q.  And you also had Kentucky Administar, correct?
15  A.  Correct.  And just one thing to clarify on that last one.
16  I try to be clear in the report that there are certain periods
17  during which the other Region 5 carriers used, just trying to
18  be precise, used Wisconsin Physician, not necessarily
19  throughout the period.  I don't have it memorized right now
20  what exact period that was, but for much of the period, that's
21  right, they utilized Wisconsin Physician's arrays.
22  Q.  And West Virginia Nationwide, another one of the carriers
23  that you calculated differences for, they also used the WPS
24  arrays, right?
25  A.  For part of the period.

Page 12

1  Q.  And another company that you had arrays for was other
2  Metra Health, right?
3  A.  Uh-huh.
4  Q.  And, finally, Florida Blue Cross-Blue Shield, right?
5  A.  Correct.  I -- yes.
6  Q.  And for the rest of the carriers that are out there, you
7  had no arrays for them, right?
8  A.  The carriers that are not listed in Table 43, I did not
9  have arrays for, that's correct.
10  Q.  And it's your understanding that those arrays are gone,
11  they're no longer available, right?
12  A.  To the best of my knowledge, I have the arrays that were
13  available.
14  Q.  And you don't have any information that any other arrays
15  exist other than the ones that were given to you, right?
16  A.  It is my understanding that the carriers -- can you
17  repeat?  I'm --
18  Q.  I was just trying to find out, do you have any information
19  that suggests that there are any more arrays available from any
20  source other than the ones that have been given to you to
21  perform your analysis here?
22  A.  No, I do not.
23  Q.  Why don't you take a look, if you would, sir, at Tab 26 in
24  the book that I gave you.
25  A.  Tab 26 is empty.

Page 13

1  Q.  Oh, sorry.  It should be a very interesting chart then.
2  A.  Okay, great.
3       (Discussion off the record.)
4  Q.  Now, Doctor, with respect to Tab 25 --
5  A.  Tab 26.
6  Q.  Tab 26, I'm sorry.  Tab 26 is a graphic image of the
7  various arrays in this case that you did and did not have, and
8  let me just kind of walk you through it.
9       MR. LAVINE:  Your Honor, can I just note an objection.
10  We've never seen this chart before.  It's the first time it's
11  ever been disclosed to us.
12       THE COURT:  Well, it's actually very useful to me to
13  understand it.  I'll do the same that I did for him.  If you
14  think it's wrong after you review it afterwards, let me know,
15  but it's actually helpful because it's what we were talking
16  about yesterday, which is how much did he extrapolate it from.
17  It's just a graphic depiction of it.  It may be wrong, and you
18  can tell me about it later.
19       Are there any more of these because no one should be
20  popping anything?  Why wasn't this given to him before?
21       MR. DALY:  Your Honor, to be honest, we were working
22  on it as late as this morning.
23       MR. LAVINE:  Yesterday we heard an objection because
24  we only gave them two weeks lead time.
25       THE COURT:  And I overruled it.

Page 14

1    MR. LAVINE:  I know, but now here we are the minute
2  before it's being put to use.
3    THE COURT:  You know what, let's not waste time on it.
4  I'll let you refute it if it turns out not to be true, okay?
5  So we're at a Daubert hearing.  If it were a trial, it would be
6  out the window.
7  Q.  Let's take a look at this chart, and also you might want
8  to turn to Table 25 of your initial report.
9  A.  Okay, not of this.  My report.
10  Q.  Right.
11    THE COURT:  What tab are we now?
12    MR. DALY:  Table 25 of the initial report, which is
13  Exhibit 1 in the book that I've handed out, Judge.
14    THE COURT:  Hold on, which tab, 25?
15    THE WITNESS:  No.  Table 25 in Tab 1.
16    MR. DALY:  Tab 1, your Honor.
17    THE COURT:  Tab 1, yes.
18    MR. DALY:  And Table 43.
19    THE COURT:  Table 43, okay.
20    MR. DALY:  Which is the very last page, the second of
21  two last pages.
22    THE COURT:  All right, got it.
23  Q.  And, Doctor, just if you look at your Table 25, you list
24  down in the left-hand column the various carriers that you had
25  arrays for; is that correct?

Page 15

1    MR. HENDERSON:  Table 43?
2    MR. DALY:  I believe that's correct, yes.
3    MR. HENDERSON:  You said Table 25, I think.
4    MR. DALY:  I'm sorry.
5  Q.  Do you see that, sir?
6  A.  I see that.
7  Q.  And does that correspond to the carriers that we've listed
8  above the line in Chart 26?
9  A.  It does, yes.
10  Q.  And then as you continue with Table 43, which is the next
11  page after -- Table 44 right after 43, these are some of the
12  other carriers that you do not have arrays for, right?
13  A.  It looks correct.
14  Q.  And those companies that you do not have arrays for, those
15  are the ones that appear in the gray boxes below the line on
16  Chart 26, right?
17  A.  Correct.
18  Q.  Now, for some of the years, you had situations where you
19  didn't have an actual array for a given quarter for a given
20  carrier, but you had evidence that the carrier may have been
21  using arrays from adjacent quarters; is that correct?
22  A.  I had the -- rephrase that.
23  Q.  Within the carriers that you had some arrays for, you did
24  not have individual quarter-by-quarter arrays for all time
25  periods, right?

Page 16

1  A.  That is correct.
2  Q.  And for some of the periods, you used adjacent arrays from
3  other quarters on the ground that the company probably used
4  those for the quarters that they did not have arrays for,
5  correct?
6  A.  I think there's a bit more to it than that.
7  Q.  Okay, do you want to explain that?
8  A.  In terms of the analysis of the data, being able to see
9  the allowed amounts in the data and whether the allowed amounts
10  moved substantially between those periods.  So that's something
11  that -- it wasn't -- that was conducted as with, you know,
12  other analyses that I talked about yesterday, with an eye to
13  the data itself, so looking at the underlying paid claims data.
14  Q.  And in terms of just comparing Tab 26, the chart, to your
15  Table 43, if you look at the first column after the name of the
16  carrier on the left, you have these periods, and you have --
17  for example, Connecticut General is the first -- and this is on
18  Table 43 -- and you show Q-1 1997 through 2001 Q-4, right?
19  A.  Can you point me again?
20  Q.  Table 43, the second column.
21  A.  Okay.
22  Q.  Under the heading "Period," do you see that?
23  A.  Sure.
24  Q.  And so for Connecticut General, this first line of '97 Q-1
25  to 2001 Q-4, that is the period for which you had arrays,

Page 17

1  right?
2  A.  That's correct.
3  Q.  The period underneath that, '95 Q-2 to '96 Q-4, that's the
4  period that you extrapolated for this carrier, correct?
5  A.  Right, back in time, that's correct.
6  Q.  Right.  And I just want to compare, for example,
7  Connecticut General, Q-1 '97 to Q-4 2001, that's what Chart 26
8  reflects in terms of the colored bar where you say you had
9  arrays?
10  A.  That's correct.
11  Q.  And does that seem to be generally true for the other
12  carriers for which you had arrays?  In other words, when you
13  say in your chart, in your Table 43, that you had arrays for
14  certain time periods, those time periods are reflected in
15  Chart 26?  You can take a look if you'd like.
16  A.  Yes, from a quick -- I mean, there's obviously a lot here,
17  but it looks reasonable.
18    THE COURT:  Well, I don't understand something.
19  What's the difference between gray and blue?  So if you go
20  back, the first line in your Tab 26, the gray says "Calculated
21  whether any difference through extrapolation."  But then blue
22  is called "Use of array from adjacent period."
23    THE WITNESS:  Is it okay if I take a stab and explain
24  that?
25    THE COURT:  Yes.

1    THE WITNESS: So, basically, suppose that I had an
2  array for Wisconsin Physician Services in '97 quarter one and
3  then again in '98 quarter one. Typically my examination of the
4  data reveals that these carriers are not changing the arrays
5  every quarter, so the allowed amounts are very stable, often
6  remaining the same for quite a long time. And so in that
7  period in between, I can see whether something seems to have
8  changed, whether the allowed amounts persist, remain stable
9  during that period.
10    And, moreover, just suppose, for example, that in '97
11  quarter one the allowed amount was $9, and in '98 quarter one
12  the allowed amount was $10, okay, so something happened in
13  between those two periods. And what the claims data allows me
14  to do is look on a sort of literally day-by-day basis and see,
15  when does the $9 transition to something else? And when it
16  transitions to that something else, is it transitioning to, you
17  know, something different than $9 or $10? No, it's typically
18  changing from $9 to $10. And in some cases it might happen in
19  April, in other cases it might happen in December in that
20  example, and so I account for that in the analysis by -- in
21  those two arrays, suppose the first, in the first case the
22  median would have moved from $9 to $8 and in the second case
23  the median would have moved from $10 to $7. Analogous to what
24  I did for the Medicaid analysis, I would replace all those
25  claims, each individual claim where a paid amount was $9 with

1  $8, and continue that until the period when it transitioned to
2  $10, at which point I would replace the $10s with a $7, okay.
3  And so the identifying assumption, if there was some allowed
4  amount in there that I couldn't explain with the arrays --
5  suppose I saw an $11 in there or a $4 or what have you -- I
6  would drop that claim from the analysis. So that part of what
7  I try to do --
8    THE COURT: That's blue?
9    THE WITNESS: That's the blue, though. That's what's
10  going on in the blue.
11    THE COURT: And how does that differ from the gray?
12  You just took -- what's the difference between the
13  extrapolation, or did you just take -- how did you do that? I
14  sort of assumed you did the similar kind of process with the --
15    THE WITNESS: Right, so going back, it is -- so there
16  I can -- basically I am assuming that if all I see in the data
17  are $9s and $10s, then those two adjacent arrays are capturing
18  them. And to the extent that there's anything else that
19  happens in the data, be it a paid amount of $7 or $11 or what
20  have you, those get knocked out because I wouldn't have arrays
21  for those things under this analysis.
22    Going back in time, so for the period before, so I can
23  see basically for '97 quarter one, that might be the first
24  period in which I have an array. Well, let's think about
25  December, 1996. Suppose the allowed amount in '97 quarter one

1  is $9. Suppose I go to December of '96 and I see it's paying
2  $9. So I sort of assume going back somewhat that the array is
3  stable in that period. And then --
4    THE COURT: So it sounds like the same process?
5    THE WITNESS: It's not identical because then in some
6  cases I'll go back beyond that $9. And this brings in this
7  point about what fraction of the claims are Abbott AWPs. I'll
8  sort of look in the data to see, can I get any evidence that --
9  so suppose there's a different paid amount, $8.50, let's say,
10  before the $9, but that isn't based on that specific array.
11  But suppose, for example, that's an Abbott AWP. That gives me
12  comfort that they're using -- basically it shows they're using
13  an Abbott AWP in that previous array, but I'll stop basically
14  at a point where it's less obvious to me they're using Abbott
15  AWPs very intensively.
16    So it's a bit different, the going back, let's say,
17  for the Connecticut General, let's say. In some cases it will
18  be the same. In some cases I just might go back from that
19  allowed amount of $9 and see, you know, and then see paid
20  amounts that don't suggest to me that they were using an Abbott
21  AWP prior to that. But I basically use the average for the --
22  similar to what I do for the Medicaid analysis where I
23  basically look at what was the difference-to-spending ratio for
24  that product in that quarter, that very first quarter where I
25  have data, I'll sort of move that back until it is clear it's

1  less obvious that they're using an Abbott AWP. So I'll kind of
2  use that ratio. So in the same way that I'm kind of -- as with
3  the Medicaid thing that I was accounting for the fact that the
4  spread was growing over time, here, this just chopping off
5  those first four and a quarter years of claims is analogous to
6  this, just I'm going to just drop them out to be conservative.
7    THE COURT: Well, is it fair to say that if you didn't
8  have an array on either end, you called it extrapolation, and
9  it's gray? But if you had an array on both ends, you would put
10  it blue?
11    THE WITNESS: I didn't make this.
12    THE COURT: No, I'm trying to understand it, what the
13  difference -- that's what took me what I didn't understand, the
14  difference --
15    THE WITNESS: I think, I guess, in terms of explaining
16  this --
17    THE COURT: Well, maybe you can help me.
18    MR. TORBORG: Your Honor, if I may, just to try to
19  speed it up a little bit --
20    THE COURT: Maybe it's not important.
21    MR. TORBORG: Well, that's what I'm trying to get to.
22  Our motion challenges the gray extrapolation. It doesn't seek
23  to exclude the blue periods.
24    THE COURT: Yes, but they sound very similar as how
25  he's doing it, and everyone's saying it should be ahead. So

Page 22

1  they all agree that it's not, so I'll just wait and listen.
2  Q.  But in terms of the periods that you had, let's look at
3  the Connecticut General line in the chart.  What you did is,
4  when you extrapolated within that carrier -- there's
5  within-carrier extrapolation for all these carriers above the
6  line, right?
7  A.  That's right.
8  Q.  And so then in order to decide whether you felt
9  comfortable extrapolating backwards for Connecticut General,
10  for example, you made some kind of determination of whether
11  that was an appropriate maneuver or not, right?
12  A.  That's exactly right.
13  Q.  Right.  And then once you made the decision how far back
14  you wanted to go, what you did was, you took the ratio of
15  difference that you computed for this entire period that's
16  colored green and blue and came up with a ratio of difference
17  on a J-Code-by-J-Code basis, and then took that ratio of
18  difference and applied it backwards in time against the
19  aggregate data that you had for claims within that period,
20  right?
21  A.  That is correct.  I guess I would give it a little more --
22  give a little more detail to it than that.
23       THE COURT:  All right, so that is substantially
24  different.
25       THE WITNESS:  That is somewhat different than the

Page 23

1  adjacent arrays, but I guess just the clarification that I
2  wanted to make is that some of those gray areas that are before
3  these periods may -- I just haven't, like, looked at this.  I
4  haven't had a chance to look at it until right now, but if I
5  recall, in many cases when I looked back, it was the identical
6  allowed amount.  Like, in that example that I just told you,
7  the $9 was the allowed amount in '97 quarter one in the array,
8  but I look in -- and that's still the allowed amount quite a
9  ways back, and then it's something different, let's say, prior
10  to that.  So some of those grays may --
11       THE COURT:  May be appropriately blue?
12       THE WITNESS:  I don't know that I can do it right
13  here, but they may be blue, given the methodology they're --
14       THE COURT:  Okay, that's useful.  But for the ones
15  where you felt uncomfortable by using the adjacent arrays, then
16  you would do this extrapolation through the percentage?
17       THE WITNESS:  Right, but there were many claims, many,
18  many claims -- and you can see this from Table 43 -- that I
19  exclude altogether because I don't have much -- it doesn't
20  appear that they're -- I don't have good evidence that they're
21  using the Abbott AWP in determining their allowed amounts.
22  Q.  So if we look, for example, to Connecticut
23  General, Judge, the first line, in your Table 43, Doctor, you
24  say, "I only used arrays '97 Q-1 to 2001 Q-4," right?
25  A.  (The witness nodded affirmatively.)

Page 24

1  Q.  And so that being your exhibit from your report, if we
2  look at the period before 1997, you were not in fact using
3  adjacent -- you weren't using any arrays?  You were
4  extrapolating, right?
5  A.  Is it okay if I take a minute just to --
6  Q.  Sure.
7       THE COURT:  Yes.
8  A.  Because if we're going to drill down on a specific, I just
9  want to make sure that --
10       (Discussion off the record.)
11  A.  Okay, that's correct, in the instance for Connecticut
12  General, right.  That's correct, in this instance for
13  Connecticut General, that is --
14       THE COURT:  What's the question again?
15       MR. DALY:  The question was, Judge, we were trying to
16  clarify this point that we were working on, which is these gray
17  boxes in Line 1 of Connecticut General.
18  Q.  Just to confirm, Doctor, comparing that to your Table 43,
19  your testimony is that prior to 1997, you did not use any
20  arrays, so that those gray boxes are extrapolation, not the use
21  of adjacent arrays, correct?
22  A.  That is correct.  I'm using the array, the information
23  contained in the subsequent arrays to estimate what the
24  difference was in the preceding year and a half.
25       THE COURT:  But did you use just a flat percentage, or

Page 25

1  did you use your subjective judgment by looking at the adjacent
2  arrays?
3       THE WITNESS:  So basically what I did, let's just take
4  a particular J-Code, J 70-50.  Suppose that for that J-Code the
5  ratio of difference to spending during that five-year period
6  when I had arrays was 20 percent, okay.  And it bounces around
7  somewhat, more in the case of Medicare than in Medicaid.  So I
8  average across the arrays, partly because of this bouncing
9  around, which is less --
10       THE COURT:  That's fine, I just want to understand.
11  So you applied a percentage?
12       THE WITNESS:  Right, I applied a percentage to that
13  preceding year and a half, and then knocked out and applied
14  zero to the preceding four and a half years.
15       THE COURT:  All right, so you did use a percentage.
16       THE WITNESS:  Yes, that's exactly what I did, yes.
17  Q.  So it was a simple average of the years that you had
18  arrays for.  Like, your example, let's say it was 20 percent,
19  you would take that 20 percent and apply it to the period that
20  you were extrapolating for for that J-Code, right?
21  A.  Correct.
22  Q.  And I believe yesterday you talked about in Medicaid, that
23  when you went backwards in time, you applied some sort of
24  scaling factor to it to take recognition of the fact that the
25  spreads were lower in the earlier years.  Do you recall that

d6e0fc2a-f545-4522-a640-adcbb84498dc

Page 26

1 testimony?
2 A.   Yes, I do.
3 Q.   And you did not do that with this Medicare extrapolation
4 backwards, did you?
5 A.   I didn't do that same thing, but I did something that is
6 arguably more -- you know, I did something similar in spirit in
7 the sense that I knocked out the first -- I zeroed out the
8 190,000 claims in the first five and a quarter years, so in a
9 similar -- I mean, it -- in the same way that sort of going
10 back in time in Medicaid, I could have used that percentage and
11 applied it back to 1991 quarter one.  I specifically didn't do
12 that because my examination of the data suggested that was not
13 an appropriate thing to do.  So if we look in this case, I
14 examine 130,000 claims for the extrapolation but drop 190,000
15 claims, so I'm effectively scaling it down by 60 percent.
16 Q.   So in effect you're scaling down just by lopping off a
17 couple of years, right?  Is that your testimony?
18 A.   I would say that it is scaling down the percentage for
19 that five years, applying that to seven quarters and dropping
20 seventeen quarters.
21 Q.   Just dropping the quarters?
22 A.   In the same way that I dropped the claims for the six
23 J-Codes that we discussed yesterday, that I guess I discussed
24 yesterday, a similar dropping here; difference equals zero for
25 those 190,000 claims.

Page 27

1 Q.   So when it comes to Medicare, dropping a couple of years
2 is a stand-in for your scaling factor, right?
3 A.   I guess I wouldn't -- so, first, I wouldn't call four and
4 a quarter a couple, and it's -- I mean, the applications differ
5 somewhat, and it is similar in spirit.  The determination -- I
6 mean, I think the very first thing that I said yesterday was
7 that Medicaid and Medicare difference in one very significant
8 respect, and this is an adjustment methodology that is tailored
9 to the details of this application.
10 Q.   And isn't it true that when you looked at some of the data
11 for the early years for Connecticut General, for example, you
12 found that the Abbott price only appeared in the arrays, like,
13 1.2 percent of the time, and so you felt uncomfortable
14 extrapolating backwards to too early a time period, the early
15 '90s?  Isn't that your testimony, sir?
16 A.   Yes, 1.2 rings a bell.  I think that -- let me just see
17 here if -- but there was a low percentage in those first
18 seventeen quarters, and I think the corresponding -- I don't
19 know, I can't remember the other corresponding percentage here,
20 but that there was -- you know, this fraction of claims with an
21 Abbott AWP bounces around somewhat, but I think it was, yes,
22 only about 1 or 2 percent in those first four and a quarter
23 years for this specific carrier, and thus it could --
24 Q.   And that's why you dropped the first four and a half
25 years, right?

Page 28

1 A.   The first four and a quarter, the first seventeen
2 quarters, that's right.
3       THE COURT:  Did you extrapolate backwards for those
4 quarters for the other carriers?
5       THE WITNESS:  So I tried to scrutinize the paid
6 amount, so I essentially did programs carrier by carrier.  So I
7 did a Connecticut General program in which I sort of looked at
8 year by year so I can see the allowed amounts that are being
9 paid in '97, '98, '99, and so forth, and so for Connecticut
10 General in this application, I went back to '95 quarter two.
11 In other instances, I didn't go back by that same amount
12 because perhaps I saw the Abbott -- the details vary a little
13 bit, and I explain it in a lot of detail in the report, but the
14 idea, the big-picture idea is that if I look back, so I take
15 this use of the Abbott AWP, this presence of the Abbott AWP as
16 an allowed amount as a demonstration that they're using the
17 Abbott products in these arrays in this preceding period.  As
18 we discussed yesterday, more often than not, when Abbott is in
19 the array and affects the median, they're not the median, but I
20 take that as an indicator of whether -- you know, it's not a
21 perfect indicator, I'll concede, but it's a way to sort of
22 gauge, is this carrier using Abbott products?  And it's worth
23 noting that these five J-Codes, four of them are for sodium
24 chloride, and so to the extent that they're using an Abbott AWP
25 for the J 70-50, there's a pretty strong correlation, if you

Page 29

1 look across carriers within the same quarter, if they're using
2 Abbott and Baxter and Braun -- I can't remember all the
3 companies -- but if they're using them in the J 70-50, the
4 firms' products, they tend to be using them in the 70-40, the
5 70-30, and the 70-60 as well.  So I did -- Wisconsin Physician,
6 I went back an extra quarter, partly because of what the data
7 showed.
8 Q.   And so if we keep on Chart 26, Tab 26, the carriers above
9 the line that you had some arrays for, those were the sample
10 that you used to extrapolate to all the carriers that you had
11 no arrays for below the line, right?
12 A.   That's correct.
13 Q.   And that sample above is what was available to you,
14 correct?
15 A.   The arrays for the sample above are, yes, what was
16 available to me, correct.
17 Q.   Let's take a look at some of these years that we're
18 talking about.  The damage period here is '91 to 2001, to your
19 understanding, right?
20 A.   That's my understanding.
21 Q.   So for all of these carriers when you look -- you know,
22 '91 isn't even on the chart.  In '91 you calculated no damages,
23 right?
24 A.   Right.
25 Q.   '92 you calculated no damages for any carrier, correct?

Page 30

1   A.   Correct.
2   Q.   Now, '93 you also have no arrays for any carrier, correct?
3   A.   Yeah, I haven't scrutinized this, but that looks from what
4   appears on this --
5   Q.   On the chart?
6   A.   Yes, on the chart.
7   Q.   If you want to check, look at your Table 43, and I think
8   you'll find that there's no indication of any arrays for the
9   year 1993.
10   A.   Correct, okay.
11   Q.   Is that correct?
12   A.   Correct.
13   Q.   And without any arrays, you were still able to extrapolate
14   damages.  Both above the line for other Metra Health and
15   Florida Blue Cross-Blue Shield, you see yourself calculating
16   damages for that time period for the year 1993 for those two
17   carriers that you had some arrays for but not for this year?
18   A.   Can you repeat?
19   Q.   Sure.  If you look at the chart or look at your
20   Exhibit 43, if you look at the year 1993, you had no arrays
21   from any carrier, correct?
22   A.   That's correct.
23   Q.   And yet you calculated damages for some of the
24   above-the-line carriers that you had other arrays for and all
25   of the carriers below the line for which you had no arrays

Page 31

1   whatsoever, right?
2   A.   That's correct.  I guess I would want to explain what
3   underlies this, but --
4   Q.   Now, for some of the carriers above the line that you had
5   arrays for, if you look at other Metra Health, other Region 5,
6   and even Connecticut General, those are three carriers that you
7   did have arrays for, right, from other periods?  Right?
8   A.   Yes.
9   Q.   And yet you did not extrapolate backwards for them, even
10   though you had some arrays for them, right, for this time
11   period of 1993?
12   A.   Correct.
13   Q.   Because, as you discussed earlier, they only appeared very
14   infrequently in the data, and you didn't feel comfortable
15   extrapolating backwards for those carriers, right?  Is that
16   right?
17   A.   I think the -- yes, the explanation was -- the idea was
18   that the Abbott AWP was not appearing as an allowed amount.  I
19   discuss it.  It's -- you know, I don't remember the details of
20   each of the seven analyses that I go into detail on in the
21   report, but the idea is --
22   Q.   So you didn't do it for those carriers above the line that
23   you had arrays for for 1993, but you did do it for all of the
24   carriers below the line that you had no arrays for at all,
25   right?

Page 32

1   A.   That's correct, and there's an explanation for that that
2   I'm happy to talk about.
3   Q.   Well, the sample for the extrapolation that you did below
4   the line is the arrays above the line, right?  Is that correct?
5   A.   The information that I use -- I mean, it is the data, so
6   it's a combination of the arrays applied to the data across,
7   you know, millions of claims, and then using that to estimate
8   for the other group.  Now, as I outline in the report, the
9   reason that I went back to early '93 in the case of these other
10   carriers was that a careful examination of the data for them
11   reveals that those carriers, these, you know, twelve or so
12   carriers, are much more likely, significantly more likely
13   during that early period to be using Abbott AWPs.  So I don't
14   remember the percentages offhand, but in contrast to some of
15   the ones above, the ones that are below, I think it may have
16   been 24 percent of the allowed amounts for these other carriers
17   in the early, let's say, '93-'94 period were Abbott AWPs.  So
18   if anything, for these carriers, we talked yesterday about how
19   the intensity with which these other carriers were using the
20   Abbott AWPs in this later period was lower than for the sample
21   carriers, but that wasn't correct for the early period.
22   Q.   Right.  But when you do extrapolate for them, you
23   extrapolate from not a single array in 1993, right?
24   A.   That's correct.
25   Q.   And you said that above the line you knocked off these

Page 33

1   extra quarters where you didn't see a lot of use of an Abbott
2   price in the array or the purchase price, right?
3   A.   As the allowed amount, if the Abbott AWP -- right.
4   Q.   And that was your scaling, that was a way to scale the
5   results, correct?
6   A.   Correct, to adjust.  I guess I would -- yes, to adjust the
7   data to account for the fact that the claims administered by
8   those first seven carriers are not perfectly representative of
9   the remaining ones.  It's an adjustment methodology.
10   Q.   But when you extrapolate from all the other arrays that
11   you have for later time periods above the line, and you're
12   taking those ratios of differences and applying them to these
13   early years for the carriers where you have no arrays, that
14   scaling is not being transferred to the carriers below the
15   line, is it?
16   A.   I guess I would disagree in the sense that -- can I take a
17   minute to refresh my memory on some stuff?
18   Q.   Sure.
19          THE COURT:  Actually, if we have everyone here, this
20   might be a good moment to do the switch-over.  How much longer
21   How much do you have left, do you figure, Mr. Daly?
22          MR. DALY:  As much time as we have left today, Judge,
23   I'm afraid, although it's going to move along pretty quickly.
24          THE COURT:  Well, we're going to finish him today,
25   so --

9 (Pages 30 to 33)

d6e0fc2a-f545-4522-a640-adcbb84498dc

Page 34

1    MR. DALY:  Yes.
2  A.  So I guess I would --
3    THE COURT:  Why don't we finish up this one thing, and
4  then we'll do the switch.
5  A.  So I guess I would not agree that I'm not scaling in that
6  earlier period.  You'll see that it's -- I know there's a lot
7  of numbers floating around, so please interrupt me if I'm not
8  explaining it well.  So yesterday I had mentioned that from '95
9  quarter four to 2001 quarter four -- I'm just going to throw
10  you some round numbers just to keep it fairly simple.  Suppose
11  that 24 percent of the claims in my sample had an Abbott AWP as
12  the allowed amount, and suppose 16 percent of the other
13  carriers --
14    MR. DALY:  Can I interrupt at this point, Judge,
15  because that's another thing that we're going to talk about.
16  I'm talking about --
17    THE WITNESS:  But I'm trying to explain the
18  specific -- I just disagree with one thing that you said
19  earlier, so I'm just trying to clarify what I mean.  I'm just
20  trying to help the Judge.
21  Q.  Well, but I want to focus on the two years or the four and
22  a half quarters that you knocked off which you said was --
23  that's one of your scaling factors, right?
24  A.  But --
25  Q.  Is that right?

Page 35

1  A.  I guess I'm -- I'm -- I'm --
2    THE COURT:  At this point we're breaking.  So let me
3  just ask.  We don't even need this -- well, actually we should
4  have this on the record.  So am I right that if you had an
5  array, it was either red, yellow, purple, or green?
6    MR. DALY:  Yes, your Honor.
7    THE WITNESS:  Or blue.  Oh, yeah, yeah, the blue.  If
8  with that assumption, the blue.
9    THE COURT:  So I don't know why there are all
10  different colors, but at least I can assume that red, yellow,
11  purple, and green are where you actually had an array?
12    MR. DALY:  Right, Judge.
13    THE COURT:  Is that how you did this?  And then if
14  it's half red and half gray, it's because you only had for some
15  J-Codes and not others?
16    MR. DALY:  That's right, Judge.
17    THE WITNESS:  Right.
18    THE COURT:  Okay.  All right, and then I know blue and
19  gray.  Fine, thank you, all right.
20    (A recess was taken, 2:59 p.m.)
21    (Resumed, 3:25 p.m.)
22    THE COURT:  Now, isn't that inspirational to you all
23  to try and get together and --
24    (Laughter.)
25    THE COURT:  No?

Page 36

1    MR. HENDERSON:  Did I dodge the bullet, your Honor?
2    THE COURT:  Huh?
3    MR. HENDERSON:  Did I dodge the bullet okay?
4    THE COURT:  You went to grad school up here, right?
5    THE WITNESS:  I did.  I grew up around here.
6    THE COURT:  Where did you grow up?
7    THE WITNESS:  A half hour north, Lynnfield.
8    THE COURT:  So it isn't too much of a big deal coming
9  back here, huh?
10    THE WITNESS:  No.  My family doesn't know I'm here,
11  though, so don't tell them.
12    (Laughter.)
13    THE WITNESS:  Is it okay if I just finish up?  I was
14  trying to explain a point before.
15    THE COURT:  Yes, yes, go ahead.
16    THE WITNESS:  So there's the arrays, the carriers for
17  which I have arrays, and if I look at the claims -- remember,
18  the array is one set of data, but the claims are a very
19  powerful set of data as well because I can scrutinize what's
20  going on in the claims data.  So I take the information for
21  those carriers where I have the arrays, and 24 percent of the
22  time Abbott's allowed amount -- the allowed amount is an Abbott
23  AWP.  Then we look at these other carriers during that same
24  period, '95 quarter three forward, the same, and for them the
25  corresponding percentage is, like, 16 percent.  So --

Page 37

1    THE COURT:  16 percent is what?
2    THE WITNESS:  16 percent of the claims have an Abbott
3  AWP as the allowed amount.
4    THE COURT:  But can I just say this?  So one way, if I
5  don't totally go with that, you would say that at the very
6  least, the 24 percent is on the mark because it's AWPs?
7    THE WITNESS:  Those are Abbott AWPs.
8    THE COURT:  So that's how in the earlier quarters you
9  know for sure that you're a hundred percent certain for
10  24 percent of them?
11    THE WITNESS:  So I'm a hundred percent sure for a
12  hundred percent of them where that 24 number comes.
13    THE COURT:  Right, yes, you're sure of a hundred
14  percent of the ones where the Abbott AWP is actually what the
15  claims are being paid out at?
16    THE WITNESS:  Right.
17    THE COURT:  All right.  And the ones that you're
18  extrapolating from are the ones where that is not the AWP?
19    THE WITNESS:  No.  I think I want to step back just a
20  little bit.
21    THE COURT:  All right, so I don't get that because I'm
22  looking at the gray.  I think this is a confederacy, okay, so
23  I've got the gray.  So in the gray --
24    THE WITNESS:  So let's think of three different
25  carrier array -- three different examples.

d6e0fc2a-f545-4522-a640-adcbb84498dc

Page 38

1    THE COURT:  All right.
2    THE WITNESS:  So Wisconsin Physician in '98, let's
3  imagine them where I have some arrays, okay?  And then I look
4  across.  So that's an example of what I'm going to be talking
5  about now when I go to this 24 percent number.
6    THE COURT:  All right.
7    THE WITNESS:  So look at all of those claims for which
8  I have right in front of me the underlying array, and what I
9  observe is that in 24 percent of cases, the median in those
10  arrays and in the data is an Abbott AWP.  But I have those
11  arrays.  There's nothing about extrapolation there.
12    THE COURT:  Right.
13    THE WITNESS:  Okay.  Now these other carriers where I
14  don't have array information, for them, that corresponding
15  number is like 16 percent, so it's lower, less often these
16  other carriers.  So forget -- this is just going across.  This
17  is like Wisconsin Physician --
18    THE COURT:  When you say "across," you mean down?
19    THE WITNESS:  Yes, down, exactly.
20    THE COURT:  You know, do you see the screen?
21    THE WITNESS:  Yes, I do.
22    THE COURT:  You can touch it, and it moves down.  All
23  right, see, beautiful.
24    THE WITNESS:  So right down here, this is 16 percent
25  in here.

Page 39

1    THE COURT: 16 percent of the --
2    THE WITNESS:  The claims.
3    THE COURT:  -- claims are being paid at AWP?
4    THE WITNESS:  Abbott's AWP.
5    THE COURT:  All right.
6    THE WITNESS:  Okay?  So it's lower than in the up
7  above it, okay?  And I just down to account for that.
8    THE COURT:  So of those 16 percent, you're a hundred
9  percent sure it's certain?
10    THE WITNESS:  I think there are going to be -- there
11  is inevitably going to be an example or two where there's both
12  an Abbott and a Baxter with a 10.03.
13    THE COURT:  So for 16 percent of the gray below the
14  line, you've got a pretty high degree of certainty?
15    THE WITNESS:  That's right, that's right, in the '95
16  quarter three forward period, okay?  And so if you think about
17  halfway through the time period essentially.
18    Now, a little bit before, if you go to '93 and '94 and
19  the first half of '95, it turns out that those other carriers
20  are having Abbott AWPs as their allowed amounts even more
21  often.  So it appears that --
22    THE COURT:  The other carriers, by which you mean
23  below the line?
24    THE WITNESS:  North Dakota, below the line.
25    THE COURT:  Below the line.

Page 40

1    THE WITNESS:  Yes, exactly.  And so what I'm doing
2  there is, I am basically applying that -- it is true that I'm
3  calculating some difference in '93 and '94 for those other
4  carriers, but it is also true that I'm scaling it down by this
5  16 to 24 ratio.  It turns out there's 22 percent of claims in
6  that -- for those below the line are being paid at an Abbott
7  AWP.  So it appears, if anything, this later period is -- so
8  I'm in a sense scaling down those earlier claims more
9  aggressively to, you know, account for -- to penalize it for
10  the fact that I don't have array information, for example, in
11  '93.  But the data --
12    THE COURT:  All right, you know what, he's got to
13  actually ask his questions.
14    THE WITNESS:  Yes, I know, but I just wanted -- I
15  guess it's somewhat complicated.
16    THE COURT:  It's very complicated.
17  BY MR. DALY:
18  Q.  And I think it's not clear yet because when you say you're
19  a hundred percent sure of the 25 percent, a hundred percent
20  sure of what?
21  A.  So for each array that I observe, I can see the AW -- so I
22  think it needs a little bit of background?
23  Q.  Well, I'm just trying to -- a hundred percent of your
24  damage calculation or a hundred percent sure that an Abbott
25  price was in the array?

Page 41

1  A.  So with the caveat that I mentioned a second ago,
2  reasonably certain, close to a hundred percent certain that it
3  is an Abbott AWP that is in that array, in the sense that that
4  is the -- and, you know, inevitably I just caveated it for the
5  reason that I mentioned, but the --
6  Q.  But knowing that an Abbott AWP is in the array doesn't
7  tell you anything about damages, does it?
8  A.  I guess I would disagree with that.
9  Q.  Well, you're coming in as an expert on damages, right, in
10  this case?
11  A.  That's right, that's my understanding, yes.
12  Q.  And that an Abbott price is in an array by itself tells
13  you nothing about damages; isn't that correct?
14  A.  But --
15  Q.  Is that correct or not?
16  A.  That's correct, but it's not synonymous with what we were
17  just talking about because if the Abbott AWP is the median --
18  so you can take an example, and you can inevitably --
19  Q.  Just to be clear, if you see an Abbott price in the data,
20  then you're saying that that's telling you that the Abbott
21  price was the median, right?
22  A.  Correct, with that caveat.
23  Q.  But knowing that Abbott's price was the median doesn't
24  tell you anything about how much the median moved when you
25  substituted the new ASP for the Abbott price, does it?

Page 42

1  A.  I would argue that it sheds a considerable amount of
2  information on that, so I guess I would disagree.  I think
3  that's wrong.
4      And just to clarify one thing that you said about using
5  the average sales price, that's not -- I mean, we went through
6  a lot of info yesterday where that's not the price, that's not
7  the Abbott price that I'm using.  I'm using a very scaled
8  version of the average price.
9      MR. DALY:  Your Honor, I have a couple of, if I may
10  approach --
11      THE COURT:  Yes.
12      MR. DALY:  A couple of additional exhibits.
13      THE COURT:  Good.  Thank you.
14      (Exhibit 2 marked for identification.)
15  Q.  Dr. Duggan, I've handed you an array prepared by Myers &
16  Stauffer.  Those are your consultants on this project, right?
17  Is that correct?
18  A.  At my direction, they prepared array information.
19  Q.  Right.  And this is an array for Travelers, also known as
20  Metra Health, right?  It says it at the bottom of the footer,
21  correct?
22  A.  I'm trying to find where it says Metra Health.  Oh, in the
23  footer, okay, yes.
24  Q.  And that is one of the carriers that you had arrays for,
25  right?

Page 43

1  A.  That's correct.
2  Q.  And in this array, if you look at the top, April, 1997,
3  we're talking about J-Code 70-50, which is the biggest damage
4  J-Code in the case, right?  Do you see that?
5  A.  70-50 I think is the biggest spending.  I don't know if
6  it's the biggest damage, the biggest difference.
7  Q.  The biggest spending?
8  A.  But it's the biggest spending.
9  Q.  Okay, and that's what this is an array for, right?
10  A.  That's what it looks like.
11  Q.  Okay.  Now, if you look at the three prices in the array,
12  there's an Abbott, a Baxter, and a McGaw.  Do you see that?
13  A.  That's correct.
14  Q.  And Abbott's price is the median, right?
15  A.  Correct.
16  Q.  And so you see the median being calculated at 10.03.  You
17  substitute in a new price for the 10.03, and Abbott's price is
18  then 118, and we have a new median, right?  And the new median
19  is --
20      THE COURT:  You just lost me if you're going so fast,
21  so --
22      MR. DALY:  I'm sorry.  The way these work, Judge, is,
23  on the top we have three prices, 10.03, 9.67, 12.30.  Do you
24  see that on the '97 one?
25      THE COURT:  All right, '97.  I'm looking at '96.  All

Page 44

1  right, that's fine, okay.
2      MR. DALY:  And the Abbott price, the $10.03, that's
3  the median in this calculation.  That's the array that the
4  carrier was using.  And then below, what happens is that Myers
5  & Stauffer and Dr. Duggan substitute in a new price for Abbott.
6  That's the 118 that you see there?
7      THE COURT:  I see it, yes.
8      MR. DALY:  And then that makes the 9.67 the median
9  because now Abbott's, instead of being the median, it's the low
10  price.
11      THE COURT:  Okay.
12  Q.  And so what happened here, Dr. Duggan, is that in this
13  example the price moved from -- the median moved from $10.03 to
14  $9.67, which is 36 cents, right?
15  A.  Correct.
16  Q.  And, now, did I hand you the other exhibit?  Did I hand
17  you July of 1996?
18  A.  I don't think you did.
19  Q.  Here we go.
20      MR. DALY:  We'll mark that as Exhibit 3 for today.
21      (Exhibit 3 marked for identification.)
22      MR. DALY:  And, Judge, that's the other one.  That's
23  the 1997 one.
24      THE COURT:  But what's the point of what you just did?
25      MR. DALY:  The point is going to be made right now --

Page 45

1      THE COURT:  All right.
2  Q.  -- which is that this is the same carrier, the same
3  J-Code, just a different time period, right?  Is that right,
4  Doctor?
5  A.  I'm just trying to -- there's a lot of information here.
6  I'm just trying to --
7  Q.  Sure.  Well, these are the documents you worked with.
8  Right?
9      THE COURT:  Yes, but there are thousands of them,
10  so let's just --
11  A.  Just give me a second.  I'm just trying to. . .
12      (Witness examining documents.)
13  A.  Okay, got it.
14  Q.  So on this document, this is the same carrier,
15  Metra Health, as you can see on the footer, the same J-Code,
16  70-50.  And in this case a year later, what you have is a
17  situation where Abbott is once again the median, right?
18  A.  Correct.
19  Q.  The median is 955.  And when you substitute in a new price
20  for the median, the median is now 496 instead of 995, right?
21  A.  Correct, 955.
22  Q.  Pardon?
23  A.  955, but, yes, that's right.
24  Q.  And that's like a 48 percent difference?  That's like $5
25  difference, right?

Page 46

1  A.  Yes.
2  Q.  And it's because the damage calculation depends on what's
3  in the array, right?
4  A.  Correct.
5  Q.  And so knowing simply that an Abbott NDC is part of the
6  array doesn't tell you anything about how much damage there is
7  from you substituting in a new ASP into the array, correct?
8  A.  On a specific array, that is correct.  I guess I would
9  just add --
10  Q.  Well, on any array.  In other words, just take any array
11  in the world.  There could be five NDCs in it, and some of
12  these J-Codes would have four, five, six, seven, eight NDCs in
13  them, right?
14  A.  I guess --
15  Q.  Right?  Is that true?
16      MR. LAVINE:  Your Honor, could we let the witness
17  answer the questions?  He keeps getting cut off over and over
18  again.
19      THE COURT:  Although, you know, we've got to finish.
20  We've got to finish.
21  Q.  J-Codes can have three, four, five, six, seven, eight NDCs
22  in them, right?
23  A.  Correct.
24  Q.  Pick any one that you've ever seen, and I'll tell you that
25  Abbott's median price was $5.83, okay?  Will you accept that

Page 47

1  for purposes of illustration?
2  A.  Abbott's AWP was $5.83?
3  Q.  The Abbott price used in the array was $5.83.
4  A.  Okay.
5  Q.  Okay.  Tell me what the damages are when you substitute in
6  a new price.
7  A.  That's why I sort of qualified it.  In a specific array
8  for a specific claim, it's going to depend on which other
9  products are included in the array.
10  Q.  Exactly.  So as in the two examples that we just looked
11  at, it might be 33 cents in one case, it might be $5 in the
12  other case.  It depends on what's in the array, as you just
13  said, right?
14  A.  Right.  And that's exactly why I tried to leverage
15  information from many arrays, from many carriers, and take
16  account of the fact that there is heterogeneity across
17  products.  So, for example, the 33-70 product, the vanco
18  product, tends to have much bigger differences, so I'm
19  averaging across many arrays for 33-70.  Some will be low, only
20  a minor difference; others will be high.  But, you know, in the
21  same way as with Medicaid, in some cases an estimation will be
22  high, in some cases it will be low; but that's why I leverage
23  information from dozens and dozens of arrays and from millions
24  and millions of Medicare claims to estimate what the difference
25  is in these other periods.

Page 48

1  Q.  But the mere fact that it's in there -- and now we're back
2  to your 25 percent/16 percent thing that you were talking to
3  the Judge about -- the mere fact that it's in there doesn't
4  tell you whether it moved $5 or 33 cents, correct?
5  A.  Correct.
6  Q.  Or one cent or $10, right?
7  A.  Correct.
8  Q.  Thank you.  Take a look, if you would, at Exhibit 35,
9  which is in the big book that I gave you earlier when we
10  started today, in here.
11  A.  And so --
12  Q.  Tab 35.
13  A.  Tab 35?
14  Q.  Yes.
15      MR. DALY:  This is in the book we started with, your
16  Honor.
17  Q.  Do you have that, sir?  Now, these are two arrays for
18  J 70-50, which I believe you discussed in your report.  And the
19  point of this, again, is that here's a couple of examples where
20  in the one situation you have J 70-50 again, the largest
21  expenditure drug.  The Cigna array has three participants in
22  it, right?
23  A.  Correct.
24  Q.  And the WPS array for the same J-Code, same quarter, has
25  six in it, right?

Page 49

1  A.  Correct.  Is that the same period?  I just don't see any
2  indication of the timing on the Wisconsin Physician one, but --
3  Q.  Well, if you want to, we can look back.  It's 97 to 105 of
4  your report.
5  A.  No, that's fine.
6  Q.  But when you substitute in here, what you end up with,
7  again, is an example where in the one situation it drops from
8  1069 to 911, which is a 14, 15 percent increase; and in the
9  other situation, the WPS, it changes from $11 to $5.82, which
10  is a 47.8 percent difference.  Do you see that?
11  A.  Yes.
12  Q.  And that again is a fact that's dependent on which NDCs,
13  which other companies' drugs are in the array and at what
14  prices those drugs are at, right?
15  A.  Correct.
16  Q.  Okay.  And if you would turn for a moment to Tab 27 in the
17  book that we gave you this morning, these, Doctor, are what you
18  call your DIFF-FRACs, your ratios of difference for each of the
19  carriers for J-Code 70-50.  Do you see that?  And these, I've
20  included all the backup in there.  This comes from, as you see
21  from the bottom of the page --
22      MR. DALY:  And this is not an analysis, Judge.  This
23  is simply a demonstrative based on his data, but the source of
24  this is from your reliance materials.
25      MR. LAVINE:  And just to preserve the objection,

Page 50

1  Judge, we haven't seen this till just now, but --
2       THE COURT:  Why does this keep happening?
3       MR. DALY:  Judge, this is just a demonstrative on his
4  data.
5       THE COURT:  Yes, but, excuse me.  These numbers are
6  hard.  I don't know why this wasn't handed to the other side.
7       MR. DALY:  Well, we were working on it, Judge.
8       THE COURT:  When?
9       MR. DALY:  Over the last week.
10      THE COURT:  Yes, but you should have given it to them.
11  You were screaming foul when you got something two weeks ago.
12      MR. DALY:  That was a new analysis, Judge.  This is
13  simply --
14      THE COURT:  No, but you've got to give it to them.
15  Are there any other new things?
16      MR. DALY:  Very well, Judge.
17      MR. LAVINE:  There are several in the book.
18      THE COURT:  Well --
19  Q.  Well, Doctor, you didn't create -- in your reports, in
20  none of your reports is there a table of the DIFF-FRACs, the
21  ratios of difference that you created for each carrier for each
22  J-Code, is there?
23  A.  Not that I recall.  There are a lot of tables, but this
24  one isn't one that I recall.
25      THE COURT:  You can't pop this on people.  I can't

Page 51

1  even read it as fast as you're asking questions on it.  What is
2  it?  I don't understand what it is.
3       MR. DALY:  Your Honor, this is simply -- these are
4  the -- remember when the witness testified earlier that he
5  calculated these ratios of difference for each J-Code for each
6  quarter, and then extrapolated them backwards, and then
7  extrapolated them to the carriers below the lines.  These are
8  those actual fractions plucked out of his data.  This is from
9  his data.
10      THE COURT:  Do you recognize these?
11      THE WITNESS:  I worked with this -- I worked hard to
12  do -- there's a lot of numbers in this analysis.  I've never
13  seen the data presented in this way, so it is -- I mean, I
14  deploy this kind of data in my analysis.
15      THE COURT:  The objection then is sustained.  You've
16  got to give people advance notice on this stuff.
17      MR. DALY:  Very well, Judge.
18      THE COURT:  The other one was pretty self-explanatory
19  pretty quickly.  If he can't verify it as true, I can't let you
20  ask questions about it.
21  Q.  Doctor, we did include the backup material from your --
22      THE COURT:  I know, but he doesn't have time to go
23  through it.
24      MR. DALY:  Oh, I see.  Very well, Judge.
25      THE COURT:  Your expert will have to do it.

Page 52

1  Q.  Doctor, I'd like to shift gears and talk a little bit
2  about Medicaid.
3  A.  Okay.
4  Q.  Now, yesterday you were talking a little bit about some of
5  the MAC data that you had or MAC information that you saw in
6  some of the data relating to some of the states that were used,
7  both in your calculation of claims data and your extrapolations.
8  do you recall that testimony generally?
9  A.  Right, discussion of -- yes, the discussion of MACs.  I
10  don't know what specific part of it you're talking about.
11  Q.  My question is, you included difference calculations and
12  difference damages for claims that were based on MACs in your
13  difference calculations and your damage calculations, correct?
14  A.  In certain instances, yes.
15  Q.  Well, are there any instances in which you took them out?
16  A.  Well, as I had described in my report, there are many
17  instances in which I dropped claims because -- so I'm sure some
18  of -- it seems plausible that some of them include MAC claims;
19  but the analysis would account for, to the extent the MAC was
20  lower than, let's say, the AWP, the analysis would account for
21  that.
22  Q.  But you made no specific adjustment to your analysis to
23  account for claims that were based on MACs, right?
24  A.  I don't agree with that.
25  Q.  All right.  Well, what specific adjustments did you make

Page 53

1  to account for the fact that many payments made by the states
2  were based on MACs?
3  A.  So yesterday I gave you, you know, in talking about, let's
4  say, vanco, a product that had an AWP of, depending on the
5  product, let's say 60, when the 125 percent of the average
6  pharmacy price was, I don't know, 6, let's say, a 10-to-1
7  ratio.  But in some cases a state might have a MAC in effect.
8  Instead of paying AWP minus 10, it would pay 20.  So instead of
9  paying 60 or 54, which would be AWP minus 10, it might pay 20.
10  So in carrying out my analysis, when calculating the
11  difference, it would not -- every claim would take account of
12  that because it would basically, the difference would be the
13  difference between the MAC and the amount that would result if
14  the Abbott price were used rather than -- so every -- the
15  analysis absolutely accounted for that.
16  Q.  Well, and by that, you mean that when you did your
17  analysis you would subtract your recalculated ASP from the
18  amount that the state paid, right?  And the amount that the
19  state paid might have been based on a MAC, right?  Is that what
20  you're saying?
21  A.  Right.  I mean, it was somewhat more complicated than
22  that, but if we ignore all the dispensing fees and so forth,
23  that basically in that example, if the state was paying 20
24  instead of the AWP of 60, I would only do 20 -- calculate 20
25  minus 6 for that specific claim.  So that's accounted for

d6e0fc2a-f545-4522-a640-adcbb84498dc

Page 54

1  in numbers.
2  Q.  So in your difference calculations and your damage
3  calculations, there are dollars in there that relate to claims
4  paid by states based on MACs?
5       THE COURT:  Just the differential, right?  Or is that
6  wrong?
7       MR. DALY:  Right.
8       THE WITNESS:  Just the differential, that's right,
9  just the differential.
10  Q.  And you did no analysis to determine what effect, if any,
11  any Abbott price had on a state MAC, correct?
12  A.  That is correct.  That's something we could have -- I
13  mean, it is something that -- it's part of the reason that we
14  dropped the Ohio from the analysis had to do with the MAC
15  issue.
16       THE COURT:  Which is what?
17       THE WITNESS:  So Ohio was a state that used MACs
18  during this period, and it turns out that the MAC, even if --
19  so to go back to that earlier example, if the Abbott price was
20  6 and the AWP was 60 and they had a MAC of 20, even if Abbott
21  had reported 6, you know, to First Databank and that had gone
22  to Ohio, they would have deployed 20, they would have used 20.
23       THE COURT:  But in all the other states, is it a lower
24  than?
25       THE WITNESS:  It's a lower than.  So that's exactly

Page 55

1  why we removed Ohio.
2  Q.  And when you did your 10-state sample, the states that you
3  had some data for, you originally included Ohio in the states.
4  There were 11 to begin with, right?
5  A.  Ohio was originally one of the states, right.
6  Q.  So when you did your calculus of the 10 states that you
7  then applied to the other 38, Ohio was in that calculation,
8  right?
9  A.  Correct.
10  Q.  And including Ohio in that calculation because it was a
11  MAC state served to lower the differences and the damages in
12  the 11 states, right?
13  A.  That's true, yes, to some extent.
14  Q.  And so when you took Ohio out, your damages actually went
15  up?
16  A.  Not in the aggregate, no.
17  Q.  -- per state on an average basis?
18  A.  No.  I don't remember the exact numbers, but I think
19  the numbers were along the lines of, Ohio coming out lowered
20  the federal difference by 3, but then it raised the federal
21  difference by I think about 1 million for the remaining states,
22  so it offset a little bit of it, so -- but having dropped Ohio
23  from the analysis, as I would do, and, you know -- yes, so, in
24  any case, that's right, but it did rise somewhat.
25  Q.  Okay.  And just to clarify, you haven't done any analysis

Page 56

1  to see what Abbott pricing, what effect any Abbott pricing had
2  on any state MACs, right?
3  A.  That was not a focus of my analysis, no.
4  Q.  Now, California had a MAC program, didn't it?
5  A.  In certain periods.
6  Q.  And were you in communication with California about
7  whether MACs should be included in your analysis?
8  A.  I was not in conversation with California, no.
9  Q.  Were other folks working under your direction and control
10  in contact with them?
11  A.  At my direction, Myers & Stauffer did an incredible amount
12  of research on the adjudication methodologies that were
13  employed by the various states.  And you may note from my
14  Table 25, which is sort of a big-picture summary of the first
15  10 states, that in California I only went back to the second
16  quarter of 1994 because of other things going on in California
17  in the first thirteen quarters of the analysis period.
18  Q.  And that was because there was MAC data in those early
19  years that you couldn't separate?
20  A.  No.  I'm not sure -- it is -- I was --
21  Q.  Let's take a --
22  A.  Can I just finish?  I was just instructed to ignore that
23  period of the analysis from the sample, given the intricacies,
24  so I'm not sure.
25  Q.  Okay.  And who instructed you?

Page 57

1  A.  DOJ.
2  Q.  And did they tell you why?
3  A.  Not that I can recall here, but it's possible, but I
4  just -- there's a lot of states, a lot of -- nothing leaps to
5  mind right here.
6  Q.  Let's take a look, if we would, very briefly at Tab 7 of
7  the book in front of you, sir.  And this is a document produced
8  from your reliance materials.  It's an e-mail dated August 3,
9  2007, from Ms. Lamhorn to Mr. Ormond, and he is someone who
10  assisted you with this project, right?
11  A.  Yes.  He worked at my direction.
12  Q.  Okay.  And if you go down to the narrative, in point
13  three, the numbered Paragraph 3, the senior staff counsel from
14  California writes to your assistant:  "Claims using MAIC
15  (Maximum Allowable Ingredient Cost).  In the state case, the
16  judge ruled in her decision granting in part and denying in
17  part defendants' motion to dismiss the MAIC claims are not
18  included."  Do you see that language?
19       THE COURT:  I don't.  Where are we?
20       MR. DALY:  Numbered Paragraph 3 of the letter, Judge,
21  right in the middle of the page.
22       THE COURT:  Numbered paragraph?  Could you point to it
23  on the screen.
24       MR. DALY:  Do you have it, Judge?
25       THE COURT:  I found it.

Page 58

1      (Discussion off the record.)
2  Q.  So continuing, in the next paragraph that begins "In the
3  state case," do you see that, sir?
4  A.  I do.
5  Q.  There's a question asked of your assistant, "The Bureau of
6  Medi-Cal Fraud and Elder Abuse has asked us to exclude the
7  claims listed above from the data that we pull."  That includes
8  the MAC claims.  And your assistant is asked, "Should the data
9  for your use in the federal case --" this case -- "also exclude
10  these claims and be limited to NDC codes?"  Do you see that?
11  A.  I see that, yes.
12  Q.  And do you recall that subject being discussed and a
13  determination made to either include or exclude MAC-based
14  claims, in light of the court's ruling in the California case?
15  A.  I mean, we've had so many discussions about data, and --
16      THE COURT:  Well, instead of playing this, did some
17  California court rule that MAC was not based on the lower-than
18  methodology, that California is not based on that?
19      MR. DALY:  This is your ruling, Judge.  This is your
20  ruling in the California case.
21      THE COURT:  Doesn't it say the state court?
22      MR. DALY:  They're calling it the state case.  This is
23  the California case where on summary judgment --
24      THE COURT:  I see, I see.
25  Q.  And it's okay if you don't remember.  I'm just asking

Page 59

1  you --
2      THE COURT:  Well, quite candidly, I don't remember
3  because I've done so many state cases.  What did I rule about
4  MAC in California?  Did I say that there wasn't a lower-than
5  methodology?
6      MR. DALY:  You ruled that they were not appropriately
7  in the case because you couldn't --
8      THE COURT:  Because I couldn't tell.
9      MR. DALY:  Yes.
10      THE COURT:  Well, that was consistent with, but
11  that's -- all right, so what's the story?  Do we now know?
12      MR. TORBORG:  I think what your Honor ruled was
13  that -- there was a section in your opinion called non-AWP,
14  non-direct price reimbursement --
15      THE COURT:  Right.
16      MR. TORBORG:  -- where Abbott and others had argued,
17  claims that were not based on AWP and not based on a direct
18  price but were based in fact on a MAC should be taken out of
19  the case because after 2002, the MACs were not based on
20  reported prices; they were based on wholesale and catalogs.
21      THE COURT:  All right, so --
22      MR. TORBORG:  And your Honor threw those out, and he's
23  making the point, did he do it here?
24      THE COURT:  All right, did you do it here, do we know,
25  if they weren't based on reported prices?

Page 60

1      THE WITNESS:  In the analysis we do -- for each state
2  I did quite a lot to purge, to start with a big sample of data,
3  drop claims, drop claims, drop claims that had this or that
4  feature.  I just can't remember here on the fly the details
5  of -- it sounds like, "Can you confirm you don't want the
6  claims I listed above, and we should proceed back to 1994?"  So
7  is this referring to 1993 and earlier?  I'm guess I'm just not
8  sure what --
9      THE COURT:  So you're not an expert witness.  Say "I
10  don't recall."
11      THE WITNESS:  Right, I don't recall.
12      THE COURT:  "I don't recall," thank you, or he doesn't
13  remember.
14      So now the issue is, what do we do about this?
15  Because at the time I'm not sure I understood the whole -- I
16  don't remember when I ruled at what point.  It always depended
17  on how people teed this up to me.  Did we understand whether
18  there was a lesser-than methodology in California?
19      MR. TORBORG:  Ven-A-Care argued that to you, the same
20  argument that they made here, and you rejected it.
21      THE COURT:  I just don't remember, so we'll brief that
22  point.
23      MR. TORBORG:  Yes, it's in our briefing, actually, for
24  summary judgment, this issue came up.
25      THE COURT:  I haven't even read the summary judgment

Page 61

1  papers.  It was all I could do to get ready for today, and I've
2  read the spoliation, so don't assume I've read it.  So the
3  issue is, you think that the lesser-than methodology doesn't
4  work for California?
5      MR. TORBORG:  Well, for all states where the actual
6  transaction was based on a MAC, consistent with your opinion in
7  California, if there's been no showing that the MAC was
8  impacted by a reported price throughout the case --
9      THE COURT:  I don't think we did the lesser-than
10  methodologies in those cases.  I think it was because the
11  complaint said it was AWP-based, but I'd have to go back and
12  look at it.
13      MR. DALY:  Well, that's why my question to the witness
14  is, and he already answered it, he hasn't analyzed this, so he
15  doesn't know what --
16      THE COURT:  No, he said he didn't remember exactly.
17      MR. DALY:  Well, no, he --
18  Q.  Well, I'll ask you again.  You have not analyzed the
19  effect of any Abbott price on any state MAC, correct?
20  A.  I have not -- that statement is correct.  I've analyzed
21  the data very closely.
22      And I just think, your Honor, I think one piece of
23  information that might be useful in assessing is this a big
24  issue --
25      THE COURT:  Yes.

Page 62

1   THE WITNESS: So we talked about Ohio where the MACs
2   were systematic throughout much of the period, where the ratio
3   of difference to spending in that state was less than
4   50 percent, okay. And that reflects the fact that they had
5   this very aggressive MAC program. In California, on the other
6   hand, the ratio of difference to spending is actually higher
7   than in the typical, a bit higher. It's right in the ballpark
8   of all of the other states, suggesting it's not the case. And,
9   you know, with 281,000 claims from California, you
10  know, I would, I guess, have to go back and check. But I can
11  tell you that if you look big picture at the data, how big of
12  an issue is this MAC thing likely to be if they were employing
13  these MACs very often, I would expect to see this, you know,
14  Ohio-ish difference rather than it just looking like all the
15  other states. So I guess I just throw that out.
16  Q. But you don't know? I mean, not having looked at it, you
17  can't know, right?
18  A. I didn't -- so the issue -- I think there are a couple of
19  issues here. There's the issue of, did the Abbott AWP affect
20  the state MAC? That's one issue, and I didn't look at that
21  issue. The second issue of, did you account for the fact that
22  there was a MAC being paid and lower your difference, lower the
23  difference accordingly? And I assume, the assumption that I
24  employ is that a lesser-of methodology is being employed. Now,
25  when I found that assumption was wrong in Ohio, knocked that

Page 63

1   entire state out.
2   THE COURT: And did Myers & Stauffer, did they say it
3   was a lesser-than methodology in California?
4   THE WITNESS: That's what, based on their analysis, it
5   was a lesser-than methodology. And, once again, I'm not even
6   sure of these 281,000 claims -- I don't have them memorized --
7   how many of them used a MAC. It could be none of them. You
8   know, for these 44 products, saying a state had a MAC program
9   in effect, this is just 44 products, there are 25,000 NDCs at
10  any point in time, it's just hard to --
11  Q. Take a look at Tab 5 in the book that we've given you,
12  Dr. Duggan.
13  MR. DALY: And, your Honor, this is a tab that comes
14  from Mr. Young, one of our expert reports, filed several
15  months --
16  THE COURT: So this has been around?
17  MR. DALY: This has been around.
18  THE COURT: Fine.
19  MR. DALY: And it's fair to say it's relatively
20  uncontroversial.
21  Q. You've seen this before, right, Doctor? This was in your
22  opposing expert's report?
23  A. I've seen it.
24  Q. And you have no reason to or you haven't yet to indicate
25  any disagreement with the information, which I'll take a moment

Page 64

1   to explain, correct?
2   A. This, right, it looks, from a quick glance, it looks like
3   an accurate description of the periods during which I utilized
4   state-produced claims data.
5   Q. And this comes from your Table 25 in your report, if you
6   need to look at it, but the point being that on the top are all
7   the quarters, right, that are in the damage period, right?
8   A. Right.
9   Q. Along the left-hand margin, all the states?
10  A. Correct.
11  Q. And only one color -- actually two colors, Judge -- green,
12  those are the time periods in which you had state-produced
13  claim data, correct?
14  A. Those are the state quarter combinations, right, when I
15  had the data, that's right, the state-produced claims data,
16  when I utilized the state-produced claims data in the analyses.
17  I had a lot of data for those other periods, just not this, did
18  not use this.
19  Q. Well, I'll say it again. The green shaded areas represent
20  the quarters in which you had state-produced claim data?
21  A. Correct. Used, used, because we talked about there were
22  some states --
23  Q. That's right, you had some other ones.
24  A. Yes.
25  Q. Now, I just want to very briefly look at this because it

Page 65

1   helps to make our point concerning the extrapolation. For
2   1991, the year 1991, you had one state with claims data, right?
3   A. Correct.
4   Q. And you extrapolated to every other state in the country
5   from that one -- from that three-quarters of data from Illinois
6   to every other state except Arkansas, California, and Ohio,
7   right?
8   A. Right, I used the Illinois data in that 1991 period. That
9   was the state-produced claims data that I used to estimate the
10  difference in the other states in conjunction with the CMS
11  data. And I think, you know, in assessing this issue, it's
12  worth noting that 1991 is one out of the eleven years; but in
13  terms of the fraction of the amount paid, it's two percent of
14  the spending. So, you know, in the same way I think it's
15  helpful to bear in mind when looking at this figure -- you
16  know, one can present figures and data in a number of different
17  ways -- 1991 is sort of equal in this figure to 1999 when there
18  was, you know, about ten times more spending in California and
19  Vermont and so on, so it's just worth noting this 1991.
20  Q. So whatever the percentage of the overall damages are
21  represented in 1991, you extrapolated them all from
22  three-quarters of Illinois data?
23  A. Correct, that's correct.
24  Q. And then for 1992, we have two states have joined the
25  party. We have Illinois and we have New Jersey. And from

17 (Pages 62 to 65)

d6e0fc2a-f545-4522-a640-adcbb84498dc

Page 66

1  those two states' claims data, you extrapolated to the other
2  47 states, or whatever it is?
3  A.  Correct.
4  Q.  Right?  And it's not until 1995, 1996 that you get
5  anything more than seven or eight states involved, right?
6  A.  I have eight states in the first quarter of '95.
7  Q.  And then looking at your backwards extrapolation, we see
8  Illinois is your most productive state in terms of claims data
9  that you got from them, right?
10  A.  They have data for the most quarters.
11  Q.  Michigan is relatively small by comparison, correct?
12  A.  In terms of the share of quarters, that's correct.
13  Q.  And so what you did in Michigan is, you took these last
14  five quarters and extrapolated all the way back to Q-2 1991 for
15  Michigan, right?
16  A.  That's correct.
17  Q.  And then that Michigan reverse extrapolation then also
18  went into the difference ratios that you applied to the states
19  that you didn't have any claims data for; isn't that correct?
20  A.  No.  The Illinois -- so let's take 1993 quarter four.
21  Florida, Illinois, New Jersey, New York, and Wisconsin are
22  being used in the calculation of DIFF-FRAC.  So those five
23  states are forming -- I'm using those five states, taking the
24  average of those states' DIFF-FRAC for each of the 44 products
25  in each of the four quarters, and basically taking that average

Page 67

1  and then applying it to the states like, for example, Nebraska
2  or South Dakota or what have you.  So it's not -- I guess I
3  interpreted what you said to mean that when extrapolating back
4  in Michigan, the DIFF-FRAC I calculate in Michigan in '93
5  is being used to estimate South Dakota, and that's not true.  I
6  was just trying to clarify that.
7  Q.  Okay, I appreciate that.  And so when we look at '91 and
8  '92, the only states' data that's being used to extrapolate the
9  other 48 are New Jersey and Illinois, right?
10  A.  They're being used to extrapolate to 38 states.
11  Q.  Thirty-eight states.
12  A.  Right, because they're not extrapolating to the other --
13  I'm using Michigan to extrapolate back in Michigan and, you
14  know, New York to extrapolate back in New York; but it's true
15  that I'm in '92 using New Jersey and Illinois to extrapolate
16  to, you know, Idaho and so forth.
17  Q.  Now, I think, based on your testimony yesterday as well,
18  but these 11 states -- I'm sorry -- 10 states because Ohio came
19  out -- the 10 states, those are states that you selected on a
20  combination of two things:  One, it was data that was
21  available, and, two, you were concentrating on the largest
22  states, right?
23  A.  That's correct.  It was a combination of factors, but
24  that's a high-level summary of it.
25  Q.  And that's because you felt that it was -- in your

Page 68

1  affidavit, Paragraph 74, that's when you said that because it
2  was more important to you to be more accurate with respect to a
3  place like Florida versus a place like Vermont?
4  A.  In terms of arriving at the most accurate possible number
5  for this difference, it is true that Florida looms larger than
6  Vermont.
7  Q.  Doctor, at the end of your testimony yesterday, one of the
8  things that you said was, you were talking about the new
9  analysis that you did for the 9 states.  Do you recall your
10  testimony on that generally yesterday?
11  A.  I do.
12  Q.  And at the end of your testimony, you said you kind of
13  wished that you had done a little bit better than 6 percent?
14  Do you remember that?  Do you remember saying that?
15       MR. LAVINE:  Your Honor, just to clarify, this is the
16  attachment to one of the exhibits that we used yesterday, but
17  it's been stripped away from the letter that came with it.
18  That's all.
19       THE COURT:  I don't know what you're talking about.
20       MR. LAVINE:  I'm sorry, the new document that --
21       MR. DALY:  I have not given it to anybody yet.
22       MR. LAVINE:  Oh, I'm sorry.
23  A.  In terms of an out-of-sample prediction, there was a
24  difference of about 6 percent between --
25  Q.  Right.  My question was, you lamented that you hadn't done

Page 69

1  a little bit better than that on an overall basis yesterday,
2  right?
3  A.  I think anyone would prefer an estimate that differed by
4  zero to one that differed by more than zero, any trained
5  empirical economist if they're trying to do a out-of-sample
6  prediction.
7  Q.  Did you wish you had done better than 42 percent?
8  A.  I'm not sure what you mean.
9  Q.  Well, you told the Court that the overall situation was,
10  you were very happy to see that it was within 6 percent.  That
11  was your testimony yesterday, right?
12       THE COURT:  Well, what is this?  What am I looking at?
13       MR. DALY:  I'm just --
14  Q.  The document I've handed you, sir, that's your table that
15  goes with the new analysis that you gave us last Monday, right?
16  A.  That's correct.
17  Q.  And this table is the new 9 states, right --
18  A.  Correct.
19  Q.  -- that you've done a claims analysis for based on claims
20  data that you've had for a long time but decided to do for this
21  hearing, right?
22       THE COURT:  That's a week ago Monday?  Is that it?
23       MR. DALY:  Yes.
24  A.  Eleven days ago.  Uhm --
25  Q.  This is your table, right?

d6e0fc2a-f545-4522-a640-adcbb84498dc

Page 70

1  A.  Right, this is.
2  Q.  And these are your 9 states on the left-hand column,
3  right?
4  A.  Correct.
5  Q.  And what it shows is that two of the states went up, and
6  that's Texas and Massachusetts, right?
7  A.  Correct.
8  Q.  And 7 of the 9 states, your damages analysis actually went
9  down from where you had extrapolated it, correct?
10 A.  Correct.
11 Q.  And that's not something you mentioned yesterday, is it?
12 A.  I did not, but I do think yesterday --
13 Q.  And in fact if you look at Utah, for example, it went from
14 486,000 in damages that you originally extrapolated to 342,000,
15 right?
16 A.  That's Iowa, but --
17 Q.  Iowa, I'm sorry.
18      THE COURT:  All right, no wonder I'm looking at the
19 wrong --
20      MR. DALY:  Thank you, Judge.
21 Q.  Iowa goes from 486,000 to 342,000, right?
22 A.  That's correct.
23 Q.  That's a decrease.  That's 42 percent, right?
24 A.  No, it's not a decrease of that amount.
25 Q.  What's the percentage between 342,000 and 486,000?

Page 71

1      THE COURT:  Well, you've probably done it.  Have you
2  done the math?
3      THE WITNESS:  So, I mean, I can, if you want, 144,000
4  is the difference.  Divided by 486,000, that's in the
5  neighborhood of about 30 percent.
6  Q.  Okay, so that's 30 percent off?
7  A.  29, 30, 31, I don't know exactly, but it's in that
8  ballpark.
9  Q.  All right.  And how far off is Minnesota?
10 A.  Minnesota is off by about 10 percent.
11 Q.  Right.  And Utah is off by what, about 26 percent?
12 A.  No.  About 21.
13 Q.  About 21?  Okay.
14 A.  I guess one thing worth bearing in mind when interpreting
15 the numbers in this table is that, as I indicated yesterday,
16 these 9 look less like the first 10 than the remaining 29 in
17 terms of this usual and customary thing.  So part of the
18 explanation for this difference is that usual and customary is
19 paid in these states more often than in the other 10, but it's
20 also paid more often than in the other 29.  So just, you know,
21 the extrapolation is -- so it's worth bearing that in mind.
22 Q.  So 7 of the 9 states went up when you did your actual
23 claims analysis on these states that you gave us eleven days
24 ago, right?
25 A.  Seven of the 9 went down.

Page 72

1  Q.  Seven of the 9 went down, right?
2  A.  Correct.
3  Q.  And there are still 30 states out there that you haven't
4  done any claims analysis for, correct?
5  A.  I disagree with that.
6  Q.  Well, state-produced claims analysis, correct?
7  A.  That's correct, 29 states.
8  Q.  And some of those 29, some of them have data available,
9  and some of them don't, right?
10 A.  That is correct.
11 Q.  Okay.  And let's take --
12 A.  Have state-produced data available in some of them.
13 Q.  Okay, let's take Oklahoma.  Oklahoma is one of those
14 states that you haven't done anything with on the claims data,
15 right?
16 A.  I have not used Oklahoma state-produced claims data, but I
17 have used CMS claims data that is the result of Oklahoma
18 state --
19 Q.  So you extrapolated some value for Oklahoma, though,
20 didn't you, in the damages?
21 A.  I did.
22 Q.  Okay, so if you redid it, is Oklahoma going to look more
23 like Iowa at the 29 percent, or is it going to look more like
24 one of these other states that's within 2 or 3 percent of your
25 original extrapolation?

Page 73

1  A.  I don't have Oklahoma's data or methodology memorized, so
2  I'm not sure.
3  Q.  So you don't know?
4  A.  Do I know --
5  Q.  You don't know, do you?
6  A.  -- whether Oklahoma will be high or low?
7  Q.  Right.
8  A.  I don't know.
9  Q.  Nor do you know by how much?
10 A.  I think that --
11      THE COURT:  He doesn't know.  You know, we're trying
12 to wrap this up.
13      MR. DALY:  I'm sorry.  I'm just trying to get an
14 answer, Judge.
15      THE COURT:  How much longer do you have?  Because
16 you're now at about the period of time the other side had
17 yesterday, because, don't forget, yesterday we had the opening
18 statements and we had a break, and I haven't had that, and I'm
19 fading, so --
20      MR. LAVINE:  And I'd still like to beg for a little
21 bit of redirect.
22      THE COURT:  You know what?  I have been going
23 straight.  You had the break, I didn't, and I have been on
24 trial since quarter of 9:00 this morning, and so I am fading.
25      MR. LAVINE:  Maybe one or two questions?

Page 74

1    MR. DALY: Judge, I am quickly wrapping up.
2  Q.  You mentioned yesterday that -- you said something about,
3  "When I reviewed the claims, I've now reviewed 2.4 million, and
4  there's only a few hundred thousand that I haven't looked at in
5  terms of claims data."  Was that your testimony?
6  A.  That's not what I said.
7  Q.  What did you say about having reviewed 2.4 million claims?
8  A.  I recall that I caveated it with the point that in that
9  2.4 million claims, there were some claims to which I was doing
10  the backwards extrapolation, so the 2.4 million number might be
11  closer to, and if one pulls out Indiana, it may be closer to
12  about 2.0 million.  And, moreover, I think that I tried to do
13  some sort of head math.  There were 890,000 claims for the
14  other 38 states, and I thought that I had about 350,000 in
15  these new 9 states.  So I think what I said was that there were
16  about 550,000 claims in those remaining 29, and that in the
17  first 19 there were about 2.4 million, the vast majority of
18  which I did use the state-produced data for.
19  Q.  But that 2.4 million includes Indiana and includes all of
20  the claims that are not based on claims data, right?  So in
21  other words, you're throwing in the SMRF and the SDUD data into
22  that 2.4 million, right?
23  A.  And precisely why I --
24  Q.  Is that true?  That's all I want.
25  A.  That's why I caveated it yesterday.  So that's why

Page 75

1  yesterday I said the 2.4 million includes some backwards
2  extrapolation.  For example, in Michigan, one would have to
3  subtract off -- I'm pretty sure that yesterday I went through a
4  bit of that, but given the time limitation, I didn't dwell on
5  it.
6  Q.  A couple of small points.  You talked a little bit
7  yesterday about this per-claim spending, this Footnote 45 from
8  your report where you said you had done some sort of check on
9  the situation and found that what, 24 of the 44, what, had
10  actually spent more?  Or what was that again?
11  A.  So that was trying to gauge -- essentially I was trying to
12  gauge the comparability of the sample of 10 with the remaining
13  38, and the notion was that if the remaining 38 were all
14  Ohio-type claims, then it would be the case that paid amounts
15  per claim would tend to be lower in those remaining 38 states
16  for the 44 products.  So that comparison was in an effort to
17  assess, do we have a bunch of Ohios in these remaining 38, or
18  are they pretty reflective?  And what I found, that, if
19  anything, on average, those 38 states had average reimbursement
20  that was a bit higher on -- you know, for 24 out of 44, it was
21  higher.  For the other 20, it was lower, but more often than
22  not -- and those 24, mind you, also accounted for about
23  75 percent of the Medicaid spending.  So, if anything, you
24  know, they looked very comparable, and, if anything, it looked
25  like they were a bit less Ohio-intensive, if you get what I'm

Page 76

1  trying to say there.  So, in any case, they looked very
2  comparable.
3  Q.  So this analysis, could you tell the Court what time
4  period it covered.
5  A.  It covered 1999 to 2001, and I think yesterday --
6  Q.  So only three years of the damage period?
7  A.  Right, so the goal was to --
8  Q.  No, no, that's my only point.
9  A.  -- apples and apples.
10  Q.  So the analysis that you talked about yesterday only
11  covered three years, '98 to 2001.  It didn't go all the way
12  back to 2001, right?
13  A.  You mean to '91, you mean.
14  Q.  To '91.
15  A.  Right.
16    THE COURT:  We're talking about the new 10 states?
17    THE WITNESS:  No.  We're talking about the comparison
18  of the average prices and the sample of 10 states versus the
19  other 38.  So you line up 44 prices for the 10, 44 prices for
20  the 38 to see, do they look similar?  And the period -- what
21  he's saying is that the period over which I calculated those
22  prices was just the last three years, '99 to 2001, because
23  those are the only three years for which I have identical data
24  for all 49 states.  It's CMS claims-level data for all 49
25  states.  So that's the explanation for that.

Page 77

1  Q.  So that those are the only years that you had the data
2  for.  Are there reasons why the results would be different
3  between the two samples?
4  A.  I think -- and so one thing that is apparent from an
5  inspection, from a careful inspection of the adjudication
6  methodologies used by the states is, there's a great deal of
7  similarity.  You know, 8 out of 10 use AWP, 30 out of 38 use
8  AWP, similar dispensing fees and so forth, but inevitably there
9  are going to be differences.  One state, as we discussed
10  yesterday, may have a bit -- their pharmacies for whatever
11  reason may tend to submit lower usual and customaries.  In
12  another state there may be -- like, there are nuances, so
13  there's variation.  Part of why I'm leveraging all this data is
14  to sort of come up with a reliable, valid estimate of --
15  Q.  Right, but I'm just trying to focus on this test that you
16  did, and I think you started on this line, but there's a lot of
17  reasons why it might be higher in the 38 than it is in the 10,
18  and you started to list those.  It could be that they had
19  different formulas involved, right, different adjudication
20  formulas by the state, right?
21  A.  Sure, right.
22  Q.  It could be because there were MACs involved in one state
23  and not another, right?
24  A.  Yes.
25  Q.  It could be different U and C charges that were

Page 78

1  administered by the states?  In other words, some states have
2  one definition of U and C, other states have other definitions
3  of U and C, right?
4  A.  I don't know about the definition of U and C, but there
5  just may be a different tendency, a different culture of
6  reporting it.
7  Q.  And how they treat co-pays within the state, that can
8  impact this kind of an analysis too, right?
9  A.  A bit.
10 Q.  Yes?  I'm sorry.
11 A.  A bit, yes, co-pays do.
12 Q.  When you do this comparison, you want to do an apples to
13 apples, right?
14 A.  Correct.
15 Q.  And so you'd want to compare, you know, five units in one
16 state to five units in another state in an ideal world, right?
17 A.  It is --
18 Q.  Is that true?
19 A.  I think the goal is to compare the 10 with the 38.
20 Q.  No, no, I'm sorry.  I'm talking about five units of drug.
21 I mean, if you had five bags of saline in Arkansas, you'd want
22 to compare that to five bags of saline in Oklahoma, right?
23 A.  That would be an even more -- that would be an apples to
24 apples.
25 Q.  And that's what you'd want in an ideal world, right?

Page 79

1  A.  I, uhm. . .I think that the analysis -- so the analysis
2  that I did is looking at the amount paid per claim, and so it
3  is true, there could be differences in terms of the number of
4  units.  So the assumption is that across the 10 states, 44
5  products, so the 440 NDC quarter combinations, there's
6  inevitably going to be differences between -- that's even true
7  in random samples.  If you take huge random samples, there's
8  differences between the two groups.  You take the 440 and you
9  compare them with the remaining NDC state combinations, and in
10 some cases the average units will be higher in the 10 for
11 vanco, and in others it will be lower, but there is some --
12 that's another factor, sure.
13 Q.  Right.  So one state on a claim might have paid for ten
14 units of drug X, and another state might have paid for one
15 unit, and there would be a very large disparity between the
16 prices, right?
17 A.  For those two specific claims, that's true.
18 Q.  Right, right.  And you didn't control for in this analysis
19 that you did in Footnote 45 for one state paying $600 for ten
20 doses and a state paying $6 for one, right?
21 A.  So, remember, it's an aggregate of hundreds of thousands
22 of claims.
23 Q.  Is what I said right?
24 A.  So it is true that units -- it was not a price per unit.
25 It was a price per claim.  It was a reimbursement amount per

Page 80

1  claim.
2  Q.  Right.  And so when you did the per claim thing, one claim
3  might be for ten.  So you might have a $600 claim put in for
4  ten units, and that $600 was part of the average, right?  And
5  it would be one claim, right?
6  A.  That's correct, in that one example.
7  Q.  Right.  And then in another state, they submitted one
8  claim for one bag of saline for ten bucks, and that would also
9  get a rate of one and go into the average that you're talking
10 about, right?
11 A.  Right, so identifying -- you know, at some level, to the
12 extent that there are systematic differences in units between
13 the 38 for the 44 products versus the ten, you know, what one
14 would -- you know, that could influence this price per claim.
15 But, you know, it is to the extent that some claims will have
16 many units, some claims will have fewer units, so it's going to
17 vary.
18 Q.  And your Footnote 45 analysis didn't control for differing
19 units across states, correct?
20 A.  Differences in the number of units per claim, it's an
21 average amount paid per claim, so to the extent that -- you
22 know, if it were true -- you know, to the extent that the
23 number of units are similar in the 10 to the number of units in
24 the 38, that's going to balance out.  But it's an amount paid
25 per claim, I'll concede, you know.

Page 81

1       THE COURT:  Why don't you finish up here.
2       MR. DALY:  I am.  Just one moment, Judge.  I think I
3  am finished.
4       No further questions, Judge.
5       THE COURT:  That's beautiful.  So what do you --
6       MR. LAVINE:  One very important point to clarify, and
7  it will only take a moment.
8       THE COURT:  Yes.
9  REDIRECT EXAMINATION BY MR. LAVINE:
10 Q.  On Table 43 discussing --
11      THE COURT:  What tab are we talking about?
12      MR. LAVINE:  I'm sorry.  It's Table 43 --
13      MR. DALY:  It would be Tab 1 in our book, Judge.
14      MR. LAVINE:  And it's also Tab 1 in ours.  It's the
15 next-to-last table in his original report.
16      THE COURT:  All right, yes, we've been there before.
17      MR. LAVINE:  Right.
18 Q.  And we talked about the Abbott prices showing up in almost
19 every array that you looked at, but then you said that the
20 Abbott NDC appeared as the allowed amount about 24 percent of
21 the time?
22 A.  Right.
23 Q.  So in the chart, on the fifth column in, "Percentage of
24 Claims," and Connecticut General, the first number is
25 86.1 percent, what does that percentage indicate?

d6e0fc2a-f545-4522-a640-adcbb84498dc

Page 82

1  A.  What that indicates is that for 86 percent of the claims,
2  an Abbott AWP was at or above the median; and thus revising it
3  with the Abbott-based price brought it down, basically resulted
4  in a difference greater than zero.  And I should note, I think
5  it's important to note, that actually understates substantially
6  the number of claims where Abbott was at or above the median
7  because -- I don't have this number right here off the top of
8  my head, but if I recall, I think a very large share -- and it
9  may be the majority, and it may be the vast majority, I just
10  can't remember here off the top of my head -- a very large
11  share of those claims where the difference is equal to zero,
12  it's not because Abbott is not affecting the median; it's
13  because the usual and customary was paid.
14       So in that example that Abbott counsel gave earlier,
15  that Mr. Daly gave earlier, about 10.03 moving to 9.67, okay,
16  so in that array, the median moved from 10.03 to 9.67, there
17  are going to be some claims in the data where they paid usual
18  and customary of like $8 or $9 or $7.  So there's no difference
19  on that claim.  So this 86 percent doesn't mean that in
20  86 percent of the claims -- it turns out that -- once again, I
21  don't have it here at my fingerprints, but the vast, vast
22  majority of the claims have an Abbott AWP at or above the
23  median.  This is largely being driven by usual and customary,
24  and that's something that I should have made clear, and it's
25  hard to keep this all straight.

Page 83

1  Q.  But this means that replacing the Abbott price as
2  published with your alternative prices changed the median
3  amount at least 89 percent of the time?
4  A.  86 percent of the time for Connecticut General, that's
5  right.  And were it not for that usual and customary, that
6  number would be considerably higher.
7  Q.  And the 24 percent was different in the sense that it was
8  the percentage of times at which Abbott's AWP was the actual
9  median?
10  A.  Correct, that's right.
11  Q.  As opposed to Abbott's AWP changing the median when it was
12  corrected?
13  A.  Exactly, exactly.  So much more often than not Abbott is
14  above the median.  So for every time Abbott is at the median,
15  there are about 2.6 times where it's above the median in terms
16  of claims.  So there are many more claims where it's above the
17  median and affects it than where it's at the median.
18       THE COURT:  Anything based on that line of
19  questioning?
20       MR. DALY:  No, your Honor.
21       THE COURT:  Thank you.
22       THE WITNESS:  I'm done?
23       THE COURT:  You're done.
24       (Witness excused.)
25       THE COURT:  So let's think about this.  One thing that

Page 84

1  can't happen is new data coming up at the last minute, new
2  charts, new data.  So you now have everything -- do you have
3  any new studies or anything that your experts have done?  Is
4  that what I'm hearing they're concerned about?
5       MR. DALY:  No, we have no studies.  We just had some
6  demonstratives.
7       THE COURT:  All right, so have your experts done new
8  data analyses that they're going to be testifying --
9       MR. DALY:  Your Honor, I will tell you that we have
10  been working a little bit on this very new stuff that we just
11  got last week, and we may have some stuff, and what your Honor
12  is going to say is that when we have it, we should give it to
13  the other side.
14       THE COURT:  Immediately, because I won't allow it in.
15  And this new chart is a problem because for both sides, you
16  can't do that.  I won't even allow examination next time.  I
17  happened to find the gray-red chart very helpful, but this one
18  you can't go through that fast.  You'd have to correlate the
19  data.
20       MR. DALY:  Our experts will be able to do that, Judge.
21       THE COURT:  But no new ones.  Don't do it again, okay?
22       All right, so now the next question is when.  We have
23  so much more to do in this case.  What do you estimate, since
24  you were so wildly, both of you, off on what we could get
25  accomplished before?  I'm assuming, will one afternoon -- how

Page 85

1  many experts do you have left?  Let's go off the record because
2  Lee has been at this all day too.
3       (Discussion off the record.)
4       (Adjourned, 4:45 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 86

```
 1              C E R T I F I C A T E
 2
 3
      UNITED STATES DISTRICT COURT )
 4    DISTRICT OF MASSACHUSETTS    ) ss.
      CITY OF BOSTON               )
 5
 6
 7        I, Lee A. Marzilli, Official Federal Court Reporter,
 8    do hereby certify that the foregoing transcript, Pages 1
 9    through 85 inclusive, was recorded by me stenographically at
10    the time and place aforesaid in Civil Action No. 01-12257-PBS,
11    In Re:  Pharmaceutical Industry Average Wholesale Price
12    Litigation, and thereafter by me reduced to typewriting and is
13    a true and accurate record of the proceedings.
14        In witness whereof I have hereunto set my hand this 8th
15    day of January, 2010.
16
17
18
19
20           /s/ Lee A. Marzilli
             _____
21           LEE A. MARZILLI, CRR
             OFFICIAL FEDERAL COURT REPORTER
22
23
24
25
```

d6e0fc2a-f545-4522-a640-adcbb84498dc